MDL 875

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

OCT 3 0 2001

FILED
CLERK'S OFFICE

| | | |
|---|---|---|
| CHARLES E. WARD, | ) | |
| | ) | |
| Plaintiff, | ) | No. 3-01-CV-433 |
| v. | ) | |
| | ) | Knox County Circuit Court No. |
| A-BEST PRODUCTS COMPANY, INC., et al., | ) | 2-496-01 |
| | ) | |
| Defendants. | ) | MDL# 875 |

**MOTION AND BRIEF IN SUPPORT TO VACATE
CONDITIONAL TRANSFER ORDER**

Comes now the Plaintiff, by and through counsel, and moves the Court to vacate the conditional transfer order and remand the above-styled and numbered action to the Circuit Court for Knox County, Tennessee, and for grounds would respectfully show unto the Court the following:

1.    Removal statutes are strictly construed and doubts should be resolved against removal.  See, Butler v. Polk, 592 F.2d 1293, 1296 (5th Cir. 1979).

2.    The above-styled and numbered action was removed to this Court on or about September 10, 2001, by the defendant, Union Carbide Corporation f/k/a Union Carbide Chemicals and Plastics, on the basis of federal enclave jurisdiction, or in the alternative, as a claim with respect to persons acting under an officer or agency or the United States, pursuant to 28 U.S.C. §1442.

3.    That pursuant to 28 U.S.C. § 1446 (a) the defendant has not filed copies with this Court of all pleadings in this action.  A copy of the Master Complaint in this action is attached hereto as Exhibit "1".

4.    The defendant has failed to obtain the consent of all the other defendants in this action and has otherwise failed to explain why consent was not

**OFFICIAL FILE COPY**
IMAGED OCT 3 1 '01

obtained.

     5.    The Plaintiff's claims against the defendants herein are based on and originate in statutes of the State of Tennessee, including, but not limited to, the Tennessee Products Liability Act, T.C.A. §29-28-101 et seq. as construed by the courts of the State of Tennessee.  Therefore, 28 U.S.C. §1331 is inapplicable to the cause of action.

     6.    The defendant has failed to establish sufficient facts to support their allegation that the Department of Energy Facilities in Oak Ridge, Tennessee, are a federal enclave under the United States Constitution, Article 1 § 8, Clause 17, and thus subject to Federal Court jurisdiction and governed by federal law.  Department of Energy nuclear production facilities are not federal enclaves.  See, Goodyear Atomic Corporation v. Miller, 486 U.S. 174, 183 n.4 (1988).

     7.    The defendant has failed to establish sufficient facts to support their allegation that Union Carbide was acting under an officer or agency of the United States within the meaning of 28 U.S.C. § 1442 (a)(1) during the period of time when Plaintiff was exposed to asbestos-containing products.  In Morgan v. Brush Wellman, et al., ___ F. Supp. ____ (E.D. Tenn. 2000); 2000 U.S. Dist. Lexis 9898 (Feb. 16, 2000) the Court stated that there must be substantial supervision over the day-to-day operations of the contractor in order to find that the individual is acting as a government employee.  It is evident that there was not substantial supervision over the day-to-day operation of Union Carbide by the Department of Energy or its predecessor federal agencies.  See, p. 15 of attached opinion, Exhibit "2".

**WHEREFORE,** premises considered, the Plaintiff asks this Honorable

Court to vacate the conditional transfer order and remand this case to the

Circuit Court for Knox County, Tennessee.

Respectfully submitted this ___26___ day of October, 2001.


THE LAW OFFICES OF PETER G. ANGELOS, P.C.


by:_____

MIKE G. NASSIOS (PID No. 359581)
RANDALL E. REAGAN (PID No. 150)
TIMOTHY M. McLAUGHLIN (PID No. 402338)
ROBERT S. PATTERSON (PID No. 127776)
JAMES PATRICK HAWKINS (PID No. 304248)

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

<u>CERTIFICATE OF SERVICE</u>

OCT 3 0 2001

FILED
CLERK'S OFFICE

I hereby certify that I have served a true and exact copy of the foregoingng Motion to
Remand Action to State Court by United States Mail, first-class postage pre-paid to the following:

Michael J. King, Esq.
Woolf, McClane, Bright, Allen & Carpenter
900 Gay Street, 9th Floor
Post Office Box 900
Knoxville, Tennessee  37901

Thomas A. Bickers, Esq.
800 S. Gay Street
Suite 1100
Knoxville, Tennessee 37929

Stephen Daves, Esq.
David L. Hill, Esq.
O'Neil, Parker & Williamson
416 Cumberland Avenue
Post Office Box 217
Knoxville, Tennessee  37901

James Gandy, Esquire
Pierce, Herns, Sloan & McLeod, LLC
P.O. Box 22437
Charleston, SC  29413

Steven L. Hurdle, Esq.
Arnett, Draper & Hagood
P.O. Box 300
Knoxville, Tennessee 37901

Martin L. Ellis, Esq.
Butler, Vines & Babb
507 South Gay Street
Post Office Box 2649
Knoxville, Tennessee  37901

John Rose, Esq.
Wyatt, Tarrant & Combs, LLP
2525 West End Avenue
Suite 1500
Nashville, Tennessee 37203

RECEIVED
CLERK'S OFFICE
2001 OCT 30 A II: 10
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

John W. Baker, Esq.
Baker, McReynolds, Byrne, O'Kane, Shea & Townsend
Post Office Box 1708
Knoxville, Tennessee 37901-1708

Russell B. Morgan, Esq.
Boult, Cummings, Conners & Berry, PLC
P.O. Box 198062
Nashville, Tennessee 37219

Harold T. Pinkley, Jr.
Miller & Martin
1200 First Union Tower
150 Fourth Avenue, North
Nashville, Tennessee 37219

Debra L. Fulton
Frantz, McConnell & Seymour
550 West Main Street, Suite 500
Knoxville, Tennessee 37902


This _26_ day of _October_, 2001.

_____
ATTORNEY

# PANEL SERVICE LIST (Excerpted from CTO-206)
## DOCKET NO. 875
## IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)

Thomas A. Bickers
Paine, Tarwater, Bickers & Tillman
First Tennessee Plaza, Suite 1100
800 South Gay Street
Knoxville, TN 37929

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114

Edward J. Cass
Gallagher, Sharp, Fulton & Norman
Bulkley Building, 7th Floor
1501 Euclid Avenue
Cleveland, OH 44115

Adam M. Chud
Shea & Gardner
1800 Massachusetts Avenue, N.W.
Washington, DC 20036

David A. Damico
Burns, White & Hickton
2400 Fifth Avenue Place
120 Fifth Avenue
Pittsburgh, PA 15222

Raymond P. Forceno
Forceno & Hannon
Philadelphia Bourse Building
Suite 1000
Independence Mall East
Philadelphia, PA 19106

Ellen B. Furman
Goldfein & Joseph
1600 Market Street
33rd Floor
Philadelphia, PA 19103

Susan M. Hanson
Stich, Angell, Kreidler & Muth, P.A.
The Crossings, Suite 120
250 2nd Avenue South
Minneapolis, MN 55401

Reginald S. Kramer
Oldham & Dowling
195 South Main Street
Suite 300
Akron, OH 44308

David C. Landin
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Gene Locks
Greitzer & Locks
1500 Walnut Street
Philadelphia, PA 19102

Timothy M. McLaughlin
Law Offices pf Peter G. Angelos
2643 Kingston Pike
First Floor
Knoxville, TN 37919

Ronald L. Motley
Ness, Motley, Loadholt, Richardson
& Poole
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC 29465

John J. Repcheck
Marks, O'Neill
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219

John D. Roven
John Roven & Associates
2190 North Loop West
Suite 410
Houston, TX 77018

Richard D. Schuster
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216

Neil Selman
Selman, Breitman & Burgess
11766 Wilshire Boulevard
Sixth Floor
Los Angeles, CA 90025

Robert N. Spinelli
Kelley, Jasons, McGuire & Spinelli
Centre Square West
15th Floor
Philadelphia, PA 19102

Robert E. Swickle
Jaques Admiralty Law Firm, P.C.
1370 Penobscot Building
Detroit, MI 48226

Andrew J. Trevelise
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

William D. Vines, III
Butler, Vines & Babb, P.L.L.C.
507 South Gay Street, Suite 810
P.O. Box 2649
Knoxville, TN 37901

James K. Weston, II
Tom Riley Law Firm
4040 First Avenue, N.E.
P.O. Box 998
Cedar Rapids, IA 52406

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT 3 0 2001

FILED
CLERK'S OFFICE

IN THE CIRCUIT COURT FOR KNOX COUNTY, TENNESSEE
DIVISION III

IN RE: ALL ASBESTOS PERSONAL )
INJURY CASES FILED BY )
THE LAW OFFICES OF )
PETER G. ANGELOS )

## MASTER COMPLAINT

### INTRODUCTION

Pursuant to the provisions of an Order of Court on March 11, 1991, regarding personal injury asbestos cases, Plaintiffs by their attorneys Peter G. Angelos, George A. Weber, Gary J. Ignatowski and the Law Offices of Peter G. Angelos hereby file this Master Complaint for all personal injury asbestos cases filed on or after March 11, 1991.

Each Plaintiff who files a personal injury asbestos case on or after March 11, 1991 shall file a Short-form Complaint which adopts and incorporates by reference the relevant paragraphs of this Master Complaint.

In this Master Complaint, where appropriate, the following applies:

1.   The singular shall include the plural and the plural shall include the singular.

2.   The present tense shall include the past tense and the past tense shall include the present tense.

3.   References to the male gender shall include the female gender.

4.   References to Defendants shall include their predecessors and successors in interest, if any.

5.   In Survival Actions, use of the term "Plaintiff" shall include "Plaintiff's decedent" his Personal Representative or his Surviving Spouse.

6.   Plaintiffs would also sue the Johns-Manville Corporation, the Johns-Manville Sales Corporation, Unarco Industries, Inc., Armatex Corporation, Forty Eight Insulations, Inc., Raymark Industries, Inc., Nicolet, Inc., The Celotex

MSTCOMP.GAW
04/19/91 (crb)                    1

PLAINTIFF'S
EXHIBIT
1

Corporation, Eagle Picher Industries, Inc., H.K. Porter Company, Inc. Carey Canada, Inc. and Standard Insulation, Inc.; however, each of these potential defendants has filed a Petition for Relief under Chapter 11 of the Bankruptcy Code, and pursuant to 11 U.S.C. Section 362 (a), the institution of actions against these companies is stayed, but for which Plaintiffs would have named them as Defendant Asbestos Suppliers.  With respect to Johns-Manville Corporation and the Johns-Manville Sales Corporation, the Bankruptcy Court has issued certain Orders and the Manville Corporation Second Amended and Restated Plan of Reorganization which may control the action against these companies has been issued.  Further, an integration Order has been signed by this Court and to the extent applicable allegations contained in this Master Complaint are made against Johns-Manville Corporation and/or the Manville Corporation Asbestos Disease Compensation Fund.

<u>COUNT ONE - STRICT LIABILITY</u>

Plaintiffs sue the Defendants who are or have been manufacturers, suppliers and/or users of asbestos-containing products (hereinafter sometimes referred to collectively as "Asbestos Suppliers"), and in support thereof allege:

1.  Defendants, and each of them, at all times relevant hereto, were miners, manufacturers, processors, importers, converters, compounders, merchants, removers, suppliers and/or users of asbestos, asbestos insulation materials and/or asbestos-containing products (hereinafter referred to as "asbestos products") who acting by and through their servants, agents and employees caused such asbestos products to be sold, used and placed in the stream of commerce in the State of Tennessee.

2.  **Survival Actions only** - Plaintiff, as Personal Representative of the estate of the decedent or Surviving Spouse or Next of Kin, is empowered to commence and prosecute this action as one which the decedent could have commenced and prosecuted and to recover all damages recoverable by Plaintiff's decedent, had he survived, and, in addition thereto, funeral and other incidental expenses as allowable by law.

MSTCOMP.GAW
04/19/91 (crb)                          2

3.    Over the course of years, Plaintiff was employed in the building and construction industry as a skilled building tradesman and was required to work with and around asbestos products which were manufactured and/or supplied by each of the Defendants.

(3-A)  **Non-Trades Cases only** - Over the course of years, Plaintiff was employed as a [SEE SHORT-FORM COMPLAINT - ADDITIONAL INFORMATION] and was required to work with and around asbestos products which were manufactured and/or supplied by each of the Defendants.

(3-B)  **Spouse's Actions only** - Over the course of years, Plaintiff's husband was employed in the building and construction industry as a skilled building tradesman and was required to work with and around asbestos products which were manufactured and/or supplied by each of the Defendant Asbestos Suppliers.

(3-C)  **Spouse's Actions only** - Over the course of years, Plaintiff's husband was employed as a [SEE SHORT-FORM COMPLAINT - ADDITIONAL INFORMATION] and was required to work with and around asbestos products which were manufactured and/or supplied by each of the Defendant Asbestos Suppliers.

(3-D)  **Spouse's Actions only** - During the period of time when Plaintiff's husband was required to work with and around asbestos products which were manufactured and/or supplied by each of the Defendant Asbestos Suppliers, he was married to Plaintiff, who, in the course of her marital duties, laundered, cleaned and otherwise came into contact with the asbestos fibers and dust brought into the home on the clothing and person of her husband.

4.    The Defendants' asbestos products were defective in design and/or construction in that they contained harmful, deleterious, carcinogenic, and otherwise inherently and latently dangerous asbestos which unreasonably endangered the life and health of the ultimate users thereof and of persons in the position of Plaintiff.  Defendants placed their asbestos products in the market knowing that they would be used without inspection for such defects.

MSTCOMP.GAW
04/19/91 (crb)                              3

5.   The Defendants' asbestos products were defective in design and/or construction as alleged in Paragraph 4 and Defendants failed to provide warnings, adequate warnings, or instructions about the dangers, risks and harm inherent in their asbestos products.

6.   The Defendants' asbestos products were incapable of being made safe for their ordinary and intended use and purpose and Defendants failed to provide warnings, adequate warnings or instructions about the dangers, risks and harm inherent in their asbestos products.

7.   At the time each of the Defendants manufactured, sold, delivered and were otherwise in possession of the aforesaid asbestos products, such products were expected to, and did, reach Plaintiff in a condition without substantial change from that in which such products were when within the possession of Defendants.

8.   Plaintiff, unaware of the defective and unreasonably dangerous condition of the Defendants' asbestos products, and at a time when such products were being used for the purposes for which they were intended, was exposed, in the course of his employment as a skilled building tradesman, to Defendants' asbestos products.

(8-A)   Plaintiff, unaware of the defective and unreasonably dangerous condition of the Defendants' asbestos products, and at a time when such products were being used for the purposes for which they were intended, was exposed, in the course of his employment as a [SEE SHORT-FORM COMPLAINT - ADDITIONAL INFORMATION] to Defendants' asbestos products.

(8-B)   **Spouse's Actions only** - Plaintiff, unaware of the defective and unreasonably dangerous condition of the Defendants' asbestos products, and at a time when such products were being used for the purposes for which they were intended, was exposed to said products through the washing, handling, shaking and other exposure to the clothing and person of her husband.

9.   As a direct and proximate result of the above-described exposure to Defendants' asbestos products, Plaintiff suffers from an asbestos-related disease, has a diminished life

MSTCOMP.GAW
04/19/91 (crb)                    4

expectancy and has a greatly enhanced probability of and susceptibility to various other disease, including but not limited to oncological, respiratory, pulmonary, cardiological and cardiovascular disease. Plaintiff has suffered and will suffer physical, emotional and mental pain, anxiety, anguish, embarrassment and humiliation, and has lost the ability to enjoy life as he otherwise would were he not suffering from an asbestos-related disease.

(9-A)  **Survival Actions only** - As a direct and proximate result of the above-described exposure to Defendants' asbestos products, Plaintiff's decedent developed and suffered from an asbestos-related disease and died as a result thereof.

10. As a further direct and proximate result of the exposure and injuries described above, Plaintiff has been and in the future will be in need of medical treatment, and has incurred and will incur expenses for such medical and hospital care and treatment. Moreover, as a proximate result of the injuries sustained, Plaintiff's ability to engage in his usual occupation has been injured and diminished and, as a consequence thereof, Plaintiff has sustained and will sustain lost wages and earning capacity.

(10-A)  **Survival Actions only** - As further direct and proximate results of the exposure and injuries described above, Plaintiff's decedent suffered great physical, emotional and mental pain, anxiety, anguish, embarrassment and humiliation and lost the ability to enjoy life as he otherwise would if he had not suffered from an asbestos-related disease. Plaintiff's decedent required medical treatment and incurred great expenses for medical and hospital care and treatment.

11. **WHEREFORE**, Plaintiff request judgment against each and every one of the Defendant Asbestos Suppliers, in the amount of **TWO MILLION DOLLARS ($2,000,000.00)** compensatory damages and **FOUR MILLION DOLLARS ($4,000,000.00)** punitive damages.

## COUNT TWO - BREACH OF WARRANTY

12.   Plaintiff adopts and incorporates by reference paragraphs 1, 2 when appropriate, 3, 3-A when appropriate, 3-B when appropriate, 3-C when appropriate, 3-D when appropriate, 8-A when appropriate, 9, 9-A when appropriate, 10 and 10-A when appropriate of this Master Complaint as if fully set forth herein.

13.   Defendants, and each of them, impliedly warranted that their asbestos products were of good and merchantable quality and fit and suitable for the particular use for which said products were intended.  The implied warranty was breached in that harmful, poisonous, deleterious and inherently dangerous asbestos dust and fibers were released into the air and atmosphere wherein Plaintiff carried out his duties using said products.  As a direct and proximate result of the breach of such warranty, Plaintiff developed an asbestos-related disease, without negligence or want of due care on the part of Plaintiff contributing thereto.

(13-A)   **Spouse's Actions only** - Defendants, and each of them, impliedly warranted that their asbestos products were of good and merchantable quality and fit and suitable for the ordinary use for which said products were intended.  The implied warranty was breached in that harmful, poisonous, deleterious and inherently dangerous asbestos dust and fibers were given off into the air and atmosphere to which Plaintiff was exposed through contact with the clothing and person of her husband.  As a direct and proximate result of the breach of such warranty, Plaintiff developed an asbestos-related disease without negligence or want of due care on the part of the Plaintiff contributing thereto.

14.   **WHEREFORE**, Plaintiff requests judgment against each and every one of the Defendant Asbestos Suppliers in the amount of **TWO MILLION DOLLARS ($2,000,000.00)** compensatory damages and **FOUR MILLION DOLLARS ($4,000,000.00)** punitive damages.

## COUNT THREE - NEGLIGENCE

15. Plaintiff adopts **and** incorporates by reference paragraphs 1, 2 when appropriate, 3, 3-A when appropriate, 8-A when appropriate, 8-B when appropriate, 9, 9-A when appropriate, 10, 10-A when appropriate, and 13-A when appropriate of this Master Complaint as if fully set forth herein.

16. Defendant Asbestos Suppliers, and each of them, knew, or in the exercise of reasonable care should have known, that persons employed as skilled building tradesmen, as Plaintiff was, would be required to and would, in fact, come into contact with and work in close proximity to their asbestos products, which the Defendants knew, or in the exercise of ordinary care should have known, were health and life-threatening.

(16-A) Defendant Asbestos Suppliers, and each of them, knew, or in the exercise of reasonable care should have known, that persons employed as [SEE SHORT-FORM COMPLAINT - ADDITIONAL INFORMATION], as Plaintiff was, would be required to and would, in fact, come into contact with and work in close proximity to their asbestos products, which the Defendants knew, or in the exercise of ordinary care should have known, were health and life-threatening.

(16-B) **Spouse's Actions only** - Defendant Asbestos Suppliers, and each of them, knew, or in the exercise of reasonable care should have known, that persons living with persons employed as was Plaintiff's husband, would be required to and would, in fact, come into contact with and work in close proximity to their asbestos products, which the Defendants knew, or in the exercise of ordinary care should have known, were health and life-threatening.

17. Defendants, and each of them, negligently, willfully, wantonly, recklessly and with gross indifference for the rights of persons in Plaintiff's position, omitted and failed, among other things:

(a) To properly design and/or construct their asbestos products in that they contained harmful, deleterious, carcinogenic, and otherwise inherently and latently dangerous asbestos which unreasonably endangered life and health;

MSTCOMP.GAW
04/19/91 (crb)                    7

(b)   To advise Plaintiff of the dangerous characteristics of their asbestos products;

(c)   To provide Plaintiff with the knowledge as to what would be reasonably safe and sufficient safeguards, including wearing apparel and protective and monitoring equipment, which could have been employed to protect Plaintiff from the harmful exposure to their asbestos products;

(d)   To place any warnings or, alternatively, adequate warnings, on their asbestos products or containers thereof to advise the users of the products and those exposed thereto of the dangers of exposure to and breathing of asbestos fibers and dust;

(e)   To package and contain their asbestos products in a manner to lessen or eliminate the inhalation of asbestos fibers during the installation and removal thereof;

(f)   To take reasonable precautions or to exercise reasonable care to publish, adopt and communicate safety plans and safe methods of handling, installing and removing their asbestos products and otherwise to recommend methods to improve the work environment; and

(g)   To develop and distribute asbestos-free products.

(17-A)   **Spouse's Actions only** - Defendants, and each of them, negligently, willfully, wantonly, recklessly and with gross indifference for the rights of persons in Plaintiff's position, omitted and failed, among other things:

(a)   To advise Plaintiff, her husband and family of the dangerous characteristics of their asbestos products;

(b)   To provide Plaintiff, her husband or family with the knowledge as to what would be reasonably safe and sufficient safeguards, including wearing apparel and protective and monitoring equipment, which could have been employed to protect Plaintiffs from harmful exposure to their asbestos products;

(c)   To place any warnings or, alternatively, adequate warnings, on their asbestos products or containers thereof to advise the users of the products and those exposed thereto of the dangers of exposure to and breathing of asbestos fibers and dust;

MSTCOMP.GAW
04/19/91 (crb)                    8

(d)   To package and contain their asbestos products in a manner to lessen or eliminate the inhalation of asbestos fibers during the installation and removal thereof;

(e)   To take reasonable precautions or to exercise reasonable care to publish, adopt and communicate safety plans and safe methods of handling, installing and removing their asbestos products and otherwise to recommend methods to improve the work environment; and

(f)   To develop and distribute asbestos-free insulation products.

18.   As a proximate result of the negligence, recklessness and gross indifference of Defendant Asbestos Suppliers, Plaintiff developed an asbestos-related disease as the result of his exposure to the Defendants' asbestos products, without negligence or want of due care on the part of Plaintiff contributing thereto.

19.   **WHEREFORE**, Plaintiff requests judgment against each and every one of the Defendant Asbestos Suppliers in the amount of **TWO MILLION DOLLARS ($2,000,000.00)** compensatory damages and **FOUR MILLION DOLLARS ($4,000,000.00)** punitive damages.

<u>COUNT FOUR - FRAUD</u>

20.   Plaintiff adopts and incorporates by reference paragraphs 1, 2 when appropriate, 3, 3-A when appropriate, 3-B when appropriate, 3-C when appropriate, 3-D when appropriate, 8-A when appropriate, 8-B when appropriate, 9, 9-A when appropriate, 10, 10-A when appropriate, 13-A when appropriate, 16-A when appropriate, 16-B when appropriate, 24-A when appropriate, 26, 27, 28a through 28ggg and 29 of this Master Complaint as if fully set forth herein.

21.   At all times relevant hereto, each and every Defendant Asbestos Supplier aided, assisted and encouraged the distribution and sale of their products, including those complained of herein, without adequate warnings, other safety precautions or change in design, by the participation in, support of and the use of industry-wide and/or parallel product research and development,

MSTCOMP.GAW
04/19/91 (crb)                                    9

exchanges of information, marketing, advertising, promotion and/or other similar endeavors, all of which such effort inured to the joint and mutual benefit of all such suppliers in the wide and continued distribution, sale and use of Defendants' products.

22.   Since a time prior to exposure of the Plaintiff to the Defendants' asbestos products, Defendants, and each of them, have been possessed with substantial medical and scientific data by which these Defendants knew that their asbestos products were, or were likely to become, hazardous to the life, health and safety of persons in the position of Plaintiff who were exposed to their products.

23.   Nevertheless, prompted by pecuniary motives, each of the Defendant Asbestos Suppliers, individually and collectively, failed and refused to act upon such medical and scientific data, to warn users of their products and those who worked in close proximity thereto of the life and health-threatening dangers of exposure to and the breathing of asbestos fibers and dust, and to take such other reasonable precautions necessary to lessen the dangers and potentially lethal and dangerous characteristics of their asbestos products.   Defendants, in wanton and reckless disregard for human life and health, deliberately, intentionally and purposely withheld and concealed such information from users of and those exposed to their products.

24.   Plaintiff, unaware of the dangers to life and health resulting from exposure to Defendants' asbestos products and not possessing the degree of technical knowledge and expertise of the Defendants concerning asbestos and its use, continued to work with and around their products and was deprived by the above-described acts and omissions of Defendants of the free and informed opportunity to remove himself from exposure to Defendants' asbestos products and otherwise to protect himself from exposure thereto. The Defendants' fraudulent conduct of concealment was a direct and proximate cause of Plaintiff's asbestos-related disease.

(24-A)   8pouse's Actions only - Plaintiff, unaware of the dangers to life and health resulting from exposure to Defendants'

MSTCOMP.GAW
04/19/91 (crb)                    10

asbestos products and not possessing the degree of technical knowledge and expertise of the Defendants concerning asbestos and its use, continued to come into contact with and around their products and was deprived by the above-described acts and omissions of Defendants of the free and informed opportunity to remove and protect herself, her husband and her family from exposure thereto. Defendants' fraudulent conduct of concealment was a direct and proximate cause of Plaintiff's asbestos-related disease.

25. **WHEREFORE**, Plaintiff requests judgment against Defendant Metropolitan Life Insurance and each and every one of the Defendant Asbestos Suppliers, in the amount of **TWO MILLION DOLLARS** ($2,000,000.00) compensatory damages and **FOUR MILLION DOLLARS** ($4,000,000.00) punitive damages.

<u>COUNT FIVE - CONSPIRACY</u>

26. Plaintiff adopts and incorporates by reference paragraphs 1, 2 when appropriate, 3, 4, 5, 6, 8-A when appropriate, 8-B when appropriate, 9, 9-A when appropriate, 10, 10-A when appropriate, 13-A when appropriate, 16, 16-A when appropriate, 16-B when appropriate, 17, 21, 22, 23 and 24-A when appropriate of this Master Complaint as if fully set forth herein.

27. Defendants formed confederacies as hereinafter described and entered into agreements or tacit understandings to individually, jointly and in conspiracy with each other market asbestos products by unlawful means, including <u>inter alia</u>, their tortious conduct of suppressing their knowledge of the dangers of asbestos and of placing into the stream of commerce, without adequate testing or warnings, their asbestos products, which were unreasonably dangerous, ultrahazardous, deleterious, carcinogenic and potentially deadly.

28. Defendants, individually, jointly and in conspiracy with each other knowingly committed the tortious and contractual acts described in this Master Complaint, as well as other similar wrongs, in furtherance of their agreement or understanding to market asbestos products in an unlawful manner.

MSTCOMP.GAW
04/19/91 (crb)                    11

28a.  Deleted.

28b.  As for Defendants A C and S, Inc., Armstrong World Industries, Inc., Asbestospray Corporation, Carey Canada, Inc., The Celotex Corporation, Eagle Picher Industries, Inc., Fibreboard Corporation, GAF Corporation, Georgia Pacific Corporation, H.K. Porter Company, Inc., Johns-Manville Corporation, (whose liabilities have been assumed by the Manville Corporation Asbestos Disease Compensation Fund), Keene Corporation, Metropolitan Life Insurance Company, National Gypsum Company, Owens-Corning Fiberglas Corp., Owens-Illinois Glass Co., Pittsburgh Corning Corporation, The Ruberoid Company, Smith & Kanzler Corporation, Southern Textile Corporation, Turner & Newall, plc., United States Gypsum Co., and U.S. Minerals Products Company, Plaintiffs allege that the Defendants knew beginning in the early 1930's of the extreme dangers to those who were exposed to asbestos dust and fibers and that this knowledge continued into the 1940's, 1950's and 1960's and later.  Instead of warning representatives and other similar workers about the dangerous nature of their asbestos and asbestos products, the Defendants conspired with each other to hide the dangers, hide all information about the dangers, and indeed to keep workers and others ignorant or at least unknowing about the dangers of asbestos.

28c.  Plaintiffs allege and will prove that the Defendants, hereinafter sometimes referred to as "conspirators" or "conspiring Defendants" conspired amongst themselves and with other manufacturers, some of whom may presently be in bankruptcy, and distributors to injure the Plaintiffs in the following fashion:

28d.  In 1928, the Eagle Picher Lead Co. through its General Manager, George Potter, became associated with the Tri-State Operators Clinic at Picher, Oklahoma.  This clinic was run jointly by co-conspirator Metropolitan Life Insurance Company and others.  Dr. Sayers of the U.S. Bureau of Mines and Dr. Anthony J. Lanza, employee and/or agent of the Metropolitan Life Insurance Company were physicians associated with the clinic.  Throughout 1930 and thereafter, the Eagle Picher Lead Co. remained associated

MSTCOMP.GAW
04/19/91 (crb)                    12

with the clinic.  On May 23, 1930, Dr. F.V. Meriwether another physician associated with the clinic informed Dr. Anthony J. Lanza, Assistant Medical Director of the Metropolitan Life Insurance Company that Mr. O.N. Wampler, Safety Director of the Eagle Picher Lead Company expressed concern over Eagle Picher Lead Co.'s lack of supervision of manpower which ultimately permitted industrial diseases to become part of the compensation laws.  Mr. Wampler expressed particular concern over asbestos legislation.  Eagle Picher, by and through its agents, servants and/or employees with its co-conspirators intentionally failed to warn workers and others of the dangers of exposure to asbestos which it and others possessed at that time.

28e. In 1930, Metropolitan Life Insurance Company, through its agent Dr. Anthony J. Lanza along with Dr. Frank Pedley conducted a study of 195 Quebec asbestos miners.  Forty-two cases of asbestosis were identified among the 195 men examined, but the results were never published in medical literature.  In 1939, Dr. Anthony J. Lanza published an article in the American Review of Tuberculosis, <u>Industrial Dusts and the Mortality From Pulmonary Disease</u>, in which he stated that the asbestos cases described therein originated in textile and other asbestos fabricating plants and not in connection with asbestos mining.

28f. In 1933, Metropolitan Life Insurance Company, insurer of co-conspirator Johns-Manville Company, through its agent Dr. Anthony J. Lanza, advised physicians at the Johns-Manville, Waukegan, Illinois plant that it was doubtful whether the asbestos hazard was sufficient to justify warning posters that asbestos was hazardous to health.  According to Dr. Lanza this was especially true in light of the extraordinary legal situation.

28g. In the early 1930's several asbestos manufacturers were subjected to compensation suits by individuals employed in their factories and mills.  These suits provoked Defendant Johns-Manville and now bankrupt co-conspirator Raymark Industries, Inc. (Raybestos-Manhattan, Inc.) to conduct research into the effects of asbestos on human beings and animals.  Numerous studies of

MSTCOMP.GAW
04/19/91 (crb)                    13

experimental and statistical nature were conducted by various co-conspirators and were either never published in the medical literature, as previously alleged or which when published, were subjected to substantive editing by members of the conspiracy.

28h. Beginning in approximately 1934, Johns-Manville Corporation, through its agents, Vandiver Brown and attorney J.C. Hobart, and co-conspirator Raybestos-Manhattan, through its agents, Sumner Simpson and J.D. Rohrbach, suggested to Dr. Anthony Lanza, Associate Director of co-conspirator, Metropolitan Life Insurance Company (insurers of Manville and Raybestos) that Dr. Lanza edit a previously completed study on asbestos and publish a study which would affirmatively misrepresent a material fact about asbestos exposure; that is, the seriousness of the disease process, asbestosis. This was accomplished through intentional deletion of Lanza's description of asbestosis as "fatal"; and through other selective editing that affirmatively misrepresented asbestosis as a disease process less serious than it actually is and was known to be. As a result, Dr. Lanza's study was published in the medical literature in this misleading fashion in 1935 in the United States Public Health Service Reports. The conspirators were motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent nondisclosure by the desire to influence proposed legislation to regulate asbestos exposure and to provide a defense in lawsuits involving Manville and Raybestos.

28i. In 1934, F.W. Sherwood, Vice President of Owens-Illinois and Roger Hitchins presented a request to the Mellon Institute of Industrial Research from various manufacturers that the Mellon Institute sponsor a symposium on industrial disease problems. In December of 1934, Dr. E.R. Werdlein, Director of the Mellon Institute of Industrial Research, wrote a letter to, among others, Metropolitan Life Insurance Company and Johns-Manville outlining various types of dust diseases known generally as pneumoconiosis and including asbestosis. Following this letter a symposium of dust problems was held on January 15, 1935 in Pittsburgh, Pennsylvania. Among those present were Vandiver Brown

MSTCOMP.GAW
04/19/91 (crb)                    14

of Johns-Manville, A.J. Lanza, Metropolitan Life Insurance Company and A.C. Hirth, an attorney for Owens-Illinois Glass Company.  In January of 1935, Vandiver Brown wrote "An impressive list of experts" specializing in various aspects of the dust problem attended the meeting and delivered addresses which "together with open discussion following them" revealed:

> ...The very menacing character of the problem, its complex nature, the uncertainties attending most of its aspects and the necessity of some form of united action by the afflicted industries.

Participants in the symposium discussed the problems related to (1) obtaining expert testimony; (2) jury verdicts; (3) "[p]roblems of ventilation, dust collecting and elimination, and respiratory devices" and (4) "establishing of standards (a) for dust counting and particle size determination, (b) for the taking of x-rays and diagnostic use, and (c) for the interpretation of the markings on the films so produced."

28j. At the conclusion of the symposium a committee was elected for the purpose of "formulation of ways and means to bring about effective cooperation of some character between the various industries for meeting and combating those phases of the dust problem common to all."  A.W. Sherwood from Owens-Illinois and Vandiver Brown from Johns-Manville were elected to various committees.  Dr. Lanza of Metropolitan Life Insurance was a central figure in the formation of what became known as the Industrial Hygiene Foundation and also became Chairman of the Medical Committee of the Foundation.  The Industrial Hygiene Foundation performed confidential industrial and medical surveys for the Asbestos Textile Institute, as hereinafter alleged, and also performed an epidemiological study of lung cancer in asbestos mines for the Quebec Asbestos Mining Association and ultimately altered the final report to delete substantive data on the prevalence of lung cancer in asbestos miners, all as hereinafter alleged.

28k. In 1936, conspirators American Brake Block Corporation, Asbestos Manufacturing Company, Gatke Corporation, Johns-Manville Corporation, Keasbey & Mattison Company (then an alter-ego to conspirator Turner & Newall), Raybestos-Manhattan, Russell Manufacturing (whose liabilities have been assumed by H.K. Porter Company), Union Asbestos and Rubber Company, United States Gypsum Company, the Thermoid Company and Southern Asbestos Company (whose liabilities have been assumed by H.K. Porter Company) entered into an agreement with the Saranac Laboratories. Under this agreement, these conspirators acquired the power to decide what information Saranac Laboratories could publish about asbestos disease and control in what form such publications were to occur. This agreement gave these conspirators power to affirmatively misrepresent the results of the work at Saranac, and also gave these conspirators power to suppress material facts included in any study. On numerous occasions thereafter, the conspirators exercised their power to prevent Saranac scientists from disclosing material scientific data, resulting in numerous misstatements of fact being made at scientific meetings.

28l. As a result of the aforegoing Saranac Studies Dr. Leroy Gardner, in 1943, prepared a monograph on human asbestosis which suggested evidence that asbestosis may precipitate the development of lung cancer. On October 24, 1946, Dr. Leroy Gardner, the primary scientist and researcher in charge of the Saranac Laboratory studies unexpectedly died.

28m. In 1946, Dr. Anthony Lanza was elected to the Board of Trustees of the Saranac Laboratory, Trudeau Foundation but maintained his position as Medical Director for Metropolitan Life Insurance Company. Thereafter, on numerous occasions signatories of the 1936 agreement began to enlist the services of Dr. Lanza to have an edited report of Dr. Gardner's studies published.

28n. On January 21, 1947, Dr. Lanza met with executives of one of the co-conspirators Johns-Manville to devise a plan to have Dr. Gardner's Saranac studies published. During the meeting Vandiver Brown called attention to the editorial control of the

asbestos company sponsors over any publication and of the importance of not including any objectionable material from the conspirators point of view such as the relationship between asbestos dust and cancer which Dr. Gardner had made in his monograph or outline on humans asbestosis.

28o. On November 11, 1948, representatives of the following conspirators met at the headquarters of Johns-Manville Corporation: American Brake Block Division of American Brake and Shoe Foundry, Gatke Corporation, Keasbey & Mattison Company (then an alter-ego to conspirator Turner & Newall), Raybestos Manhattan, Inc., Thermoid Company (whose assets and liabilities were later purchased by H.K. Porter Company), Union Asbestos and Rubber Company and United States Gypsum. U.S. Gypsum did not send a representative to the meeting, but instead authorized Vandiver Brown of Johns-Manville to represent its interest at the meeting and to take action on its behalf.

28p. At this November 11, 1948 meeting, these co-conspirators and their representatives decided to exert their influence to materially alter and misrepresent material facts about the substance of research started by Dr. Leroy Gardner at the Saranac Laboratories beginning in 1936. Dr. Gardner's research involved the carcinogenicity of asbestos in mice and also included an evaluation of the health effects of asbestos on humans with a critical view of the then-existing standards of dust exposure for asbestos and asbestos products.

28q. At this meeting, these co-conspirators intentionally and affirmatively determined that Dr. Gardner's work should be edited to specifically delete material facts about the cancer-causing propensity of asbestos and the health effects of asbestos on humans and the critique of the dust standards and then published same in the medical literature as edited by Dr. Arthur Vorwald. These Defendants thereby fraudulently misrepresented the risks of asbestos exposure to the public in general and the class of persons exposed to asbestos, including the Plaintiffs.

28r. As a result of influence exerted by the above-described conspirators, Dr. Vorwald published Dr. Gardner's edited work in the <u>Journal of Industrial Hygiene, AMA Archives of Industrial Hygiene Occupational Health</u> in 1951 in a form that stressed those portions of Dr. Gardner's work that the conspirators wished stressed, but which omitted references to human asbestosis and cancer, thereby fraudulently and affirmatively misrepresenting the extent of risks. The conspirators affirmatively and deliberately disseminated this misleading Vorwald publication the university libraries, government officials, agencies and others.

28s. Such action constituted a material affirmative misrepresentation of the total content of material facts involved in Dr. Gardner's work and resulted in creating an appearance that inhalation of asbestos was less of a health problem then Dr. Gardner's unedited work indicated.

28t. The following conspirators were members of the trade association known as Quebec Asbestos Mining Association (Q.A.M.A.): Johns-Manville Corporation, Carey Canada, Inc., Philip Carey Company (whose liabilities have been assumed by Celotex), National Gypsum Company, Turner & Newall, and H.K. Porter Company. These conspirators, members of the Q.A.M.A., participated in the above-described misrepresentation of the work of Dr. Leroy Gardner published by Arthur Vorwald in the AMA Archives of Industrial Health in 1951. Evidence of the Q.A.M.A.'s involvement in this misrepresentation arises from co-conspirator Johns-Manville's membership of the Q.A.M.A., as well as correspondence from co-conspirators dated:

10/29/47 from A.R. Fisher to J.P. Woodard

11/26/47 from J.P. Woodard to Vandiver Brown

3/6/48 from George K. Foster to J.P. Woodard

10/15/48 from J.P. Woodard to Vandiver Brown

3/8/49 from Vandiver Brown to Ivan Sabourin

3/21/51 from Vandiver Brown to Ivan Sabourin

9/6/50 from J.P. Woodard to G.K. Foster,

and all indicating close monitoring of the editing process by

Q.A.M.A.'s representative, Ivan Sabourin, acting on behalf of all Q.A.M.A.'s members.

28u. Defendants who were members of the Q.A.M.A. as described above, began on or about 1950 to formulate a plan to influence public opinion about the relationship between asbestos and cancer by influencing the medical literature on this subject and then touting and disseminating this literature to the public and to organizations and legislative bodies responsible for regulatory control of asbestos with the specific intent of misrepresenting the existing scientific information and suppressing contrary scientific data in their possession and control.

28v. This plan of misrepresentation and influence over the medical literature began in or about 1950 when the aforementioned Q.A.M.A. members selected Saranac Laboratories to do an evaluation of whether cancer was related to asbestos. After a preliminary report authored by Arthur Vorwald in 1952 indicated that a cancer/asbestos relationship might exist in experimental animals, these Q.A.M.A. members refused to further fund the study and it was terminated and never publicly discussed.

28w. As a result of the termination of this study, these Defendants fraudulently withheld information from the public and affirmatively misrepresented to the public and responsible legislative and regulatory bodies that asbestos did not cause cancer, including affirmative misrepresentations by conspirators' agents K.W. Smith, M.D., Paul Cartier, M.D., A.J. Vorwald, M.D., A.J. Lanza, M.D., Vandiver Brown and Ivan Sabourin, said misrepresentations being directed to inter alia, U.S. Government officials, Canadian government officials, U.S. National Cancer Institute, other medical organizations and the general public, including Plaintiffs.

28x. Subsequently, the Q.A.M.A. defendant conspirators contracted with the Industrial Hygiene Foundation and Dr. Daniel Braun to further study the relationship between asbestos exposure, asbestosis and lung cancer. In 1957, Drs. Braun and Truan reported to the Q.A.M.A. that asbestosis did increase a workers' chances of

MSTCOMP.GAW
04/19/91 (crb)                    19

incurring lung cancer.

28y. The Q.A.M.A. defendant conspirators/members thereafter caused, in 1958, a publication of the work by Braun and Truan in which the findings regarding increased incidence of cancer in persons with asbestosis was edited out by agents of the Q.A.M.A. The published version of this study contained a conclusion that asbestos exposure, alone, did not increase the incidence of lung cancer, a conclusion known by the defendant conspirators to be patently false.

28z. By falsifying and causing publication of studies concluding that asbestos exposure did not cause lung cancer and simultaneously omitting a documented finding that asbestosis did increase the risk of lung cancer, these Q.A.M.A. defendant conspirators affirmatively misrepresented to the public and concealed from the public the extent of risks associated with inhalation of asbestos fibers.

28aa. In approximately 1958, the Q.A.M.A. defendant conspirators publicized the edited works of Drs. Braun and Truan at a symposium in an effort to fraudulently misrepresent to the public and persons exposed to asbestos that the inhalation of asbestos dust would not cause cancer.

28bb. The fraudulent misrepresentations beginning in 1946 as elaborated above and continuing with the publication of the 1958 Braun/Truan study influenced the standards set for threshold limit values and prevented the lowering of the threshold limit value because of cancer risk associated with asbestos inhalation.

28cc. In 1967, Q.A.M.A. conspirators determined at their trade association meeting that they would intentionally mislead consumers about the extent of risks involved in inhalation of asbestos products.

28dd. The following conspirators were members of the Magnesia Insulation Manufacturers Association which later changed its name to the National Insulation Manufacturers Association (NIMA): Philip-Carey Corporation (whose assets and liabilities have been assumed by Celotex), Johns-Manville, GAF Corporation, The

Ruberoid Company, Owens-Corning Fiberglas, Eagle Picher Industries, Inc., Pittsburgh Corning Corporation, Fibreboard Corporation and Keene Corporation.

28ee.  In 1955, these conspirators caused to be published the MIMA 85% Magnesia Insulation Manual.  This manual falsely and fraudulently misrepresented that asbestos-containing products were easily cut and fit and offered no hazard to workers who used these products.

28ff.  In May, 1968 John Vyverberg of Owens-Corning Fiberglas, along with Cliff Sheckler of Johns-Manville addressed a Southwestern Insulation Contractors Association (SWICA) meeting concerning asbestos related health hazards.  Pittsburgh Corning's R.E. Fuhs reported on that meeting in a 5/28/68 memorandum to R.E. Buckley and stated:

> During the recent SWICA meeting in Biloxi, Mississippi, a great deal of time was spent discussing the health hazards imposed on workers through the use of asbestos in high temperature insulation.
>
> A program was presented by NIMA with Cliff Sheckler of Johns-Manville and John Vyverberg of Owens-Corning bringing the group in attendance up-to-date on the problem and what NIMA is doing to counteract some very adverse activity at the present time.
>
> It appears, Bob that the problem of health hazards amongst asbestos workers is rapidly becoming critical (30% of current asbestos workers have pulmonary problems) and that a strong united front is necessary to preserve this industry.  In my opinion, NIMA is doing an excellent job of spotlighting this problem and through research and discreet publicity are probably our best hope of combating this very serious situation.

In 1968, NIMA published a brochure entitled, "Recommended Health Safety Practices for Handling and Applying Thermal Insulation Products Containing Asbestos," which fails to mention asbestosis, lung cancer or mesothelioma.  It states, by way of introduction,

> The modern mass production of hundreds of natural and synthetic materials such as asbestos, has brought the need to protect workers from certain health risks, known or suspected.

MSTCOMP.GAW
04/19/91 (crb)                    21

This vague reference to "certain health risks" clearly misleads the public including the Plaintiffs by not calling attention to the well established link between asbestos exposure and asbestosis, lung cancer and mesothelioma.  The co-conspirators through their active participation in NIMA, acted in concert with the other NIMA members to distort, suppress and misrepresent information relating to health hazards associated with asbestos.

The following conspirators, among others, were members of the trade organization known as the Asbestos Textile Institute (ATI): Raybestos-Manhattan, Johns-Manville, Southern Asbestos Company/H.K. Porter, Keasbey & Mattison, individually and through its alter-ego Turner & Newall and National Gypsum Company.

28gg.  In 1947, these conspirators, members of the ATI, received a report from W.C.L. Hemeon regarding asbestosis, which suggested re-evaluation of the then-existing threshold limit values for asbestos exposure.  These defendants caused this report not to be published and thereby fraudulently concealed material facts about asbestos exposure from the public and affirmatively misrepresented to the public and class of persons exposed to asbestos that the existing threshold limit value was acceptable. Thereafter, these defendant conspirators withheld additional material information on the dust standards from the American Conference of Governmental Industrial Hygienists (ACGIH), thereby further influencing evaluations of threshold limit values for asbestos exposure.

28hh.  In 1953, conspirator National Gypsum, through its agents, in response to an inquiry from the Indiana Division of Industrial Hygiene regarding health hazards of asbestos spray products, refused to mail a proposed response to that division indicating that respirators should be worn by applicators of the product.  National Gypsum's response distorted and fraudulently misrepresented the need for applicators of asbestos spray products to wear respirators and fraudulently concealed from such applicators the need for respirators.

28nn.  All conspirators identified above approved and ratified and furthered the previous conspiratorial acts of conspirators Johns-Manville, Raybestos Manhattan, and A.J. Lanza, acting on behalf of Metropolitan Life Insurance Company, and all alleged co-conspirators during the dates and circumstances alleged above, acted as agents and conspirators for the other conspirators.

28oo.  The acts of the Defendant conspirators, as described above, constitute a fraudulent misrepresentation which proximately caused injury to the Plaintiffs in the following manner:

(a)  The material published or caused to be published by the Defendants was false and incomplete in that the Defendants knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-related products.

(b)  Defendants individually, as member of a conspiracy, and as agents of other co-conspirators, intended that the publication of false and misleading reports and/or the nondisclosure of documented reports of the health hazards of asbestos:

(1)  maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-related products;

(2)  assist in the continued pecuniary gain of the Defendants through the sale of their products;

(3)  influence in the Defendants' favor proposed legislation to regulate asbestos exposure; and,

(4)  to provide a defense in lawsuits brought for injury resulting from asbestos disease.

(c)  Plaintiffs reasonably relied upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-related products, and the absence of published medical and scientific reports on the hazards of asbestos and asbestos-related products, and continued their exposure to asbestos because they believed it to be safe.

MSTCOMP.GAW
04/19/91 (crb)                    24

28ii.   In 1955, conspirator Johns-Manville, through its agent Kenneth Smith, caused to be published in the <u>AMA Archives of Industrial Health</u>, an article entitled "Pulmonary Disability in Asbestos Workers".   This published study materially altered the results of an earlier study in 1949 concerning the same set of workers.   This alteration of Dr. Smith's study constituted a fraudulent and material misrepresentation about the extent of the risk associated with asbestos inhalation.

28jj.   In 1955, the National Cancer Institute held a meeting at which conspirator Johns-Manville, individually and as an agent for other alleged co-conspirators, affirmatively misrepresented that there were no existing animal studies concerning the relationship between asbestos exposure and cancer, when, in fact, the conspirators were in secret possession of several studies which demonstrated that positive evidence did exist.

28kk.   In 1957, the aforementioned conspirators, members of the ATI, jointly rejected a proposed research study on cancer and asbestos and this resulted in fraudulently concealing from the public material facts regarding asbestos exposure and also constituted an affirmative misrepresentation of the then-existing knowledge about asbestos exposure and lung cancer.

28ll.   In 1964, conspirators who were members of the ATI met to formulate a plan for rebutting the association between lung cancer and asbestos exposure that had been recently discussed by Dr. Irvin J. Selikoff.   Thereafter, these members of the ATI embarked upon a campaign to further misrepresent the association between asbestos exposure and lung cancer.

28mm.   In 1970, through their agents, Defendants, the Celotex Corporation and Carey-Canada, affirmatively misrepresented that it had been in the asbestos business since 1918 and found no reported conditions of asbestosis or lung disease.   This constituted a fraudulent misrepresentation about the material facts known to these Defendants.

(d)  Defendants individually, as members of a conspiracy, and as agents of other co-conspirators intended Plaintiffs to rely upon the published reports regarding the safety of asbestos and asbestos-related products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products, and to continue their exposure to those products.

(e)  Defendants individually, as members of a conspiracy, and as agents of other co-conspirators are in a position of superior knowledge regarding the health hazards of asbestos and therefore Plaintiffs had a right to rely on the published reports commissioned by the Defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products.

(f)  Plaintiffs suffered injury as a direct and proximate result of the acts alleged herein.

28pp.  Deleted.

28qq.  On October 28, 1938, Owens-Illinois and Corning Glass Works entered into an agreement for the formation of Owens-Corning Fiberglas Corporation.  When Owens-Corning Fiberglas was incorporated in 1938 it had an interlocking Board of Directors consisting of seven members, three of whom were designated by Owens-Illinois and three of whom were designated by Corning Glass Works.  The seventh member was Harold Boeschenstein who was President of Owens-Corning Fiberglas Corporation since its inception in 1938 and was also on the Board of Directors of Owens-Illinois.

28rr.  As early as March 9, 1937, W.C. Templer, M.D., medical director of Corning Glass Works, one of the parent companies of Owens-Corning Fiberglas Corporation, was aware that asbestos was capable of producing fibrosis of the lung.

28ss.  Additionally, as early as 1941, representatives of Owens-Corning Fiberglas Corporation and Owens-Illinois, Inc. shared information concerning the hazards of asbestos exposure.

28tt.   Despite this knowledge, Owens-Illinois entered into an agreement with Owens-Corning Fiberglas whereby Owens-Corning Fiberglas Corporation became the national distributor of Kaylo products from 1953 to 1958, at which time Owens-Illinois sold the Kaylo product line to Owens-Corning.  At least in 1956, Owens-Illinois placed the Owens-Corning Fiberglas logo on some boxes of Kaylo, all of which were sold, then and thereafter without any warnings concerning the dangers of exposure to asbestos-containing products.

28uu.   A C and S, Inc. began operating in 1958 under the name Armstrong Contracting and Supply Corporation.  It was a wholly owned subsidiary of the Armstrong Cork Company, now known as Armstrong World Industries.  A C and S, Inc. conspired with the makers of the products it distributed by failing to recommend non-asbestos products and by failing to warn handlers and users of the hazards of asbestos.  A C and S, Inc. and these manufacturers used their respective positions in the market place to suppress knowledge of the hazards of asbestos and prevent it from reaching users of these products such as the Plaintiffs.  A C and S, Inc. not only failed to warn of the dangers despite its knowledge, but also failed to transmit any warnings its suppliers may have provided.

28vv.   A C and S, Inc. particularly conspired with Turner & Newall which exercised great control over the sales and application of Limpet, an asbestos-containing spray product. Turner & Newall shared its longstanding knowledge of the hazards of asbestos with A C and S, Inc.   A C and S, Inc. joined Turner & Newall in failing to warn users of Limpet of the dangers and in suppressing Turner & Newall's substantial and specific knowledge of the hazards of asbestos.

28ww.   A C and S, Inc., furthermore, cooperated with its insurance companies and other insurance companies by settling claims by workmen for injury due to asbestos exposure, thereby preventing public knowledge of the claims and hazards.

28xx.   Armstrong World Industries conspired with the makers of the products it relabeled and distributed by failing to recommend non-asbestos products and by failing to warn ultimate building users of the hazards of asbestos.   Armstrong World Industries and these manufacturers, which included Baldwin-Ehret-Hill (Keene), Eagle Picher, Keasbey & Mattison (Turner & Newall and/or Nicolet) used their respective positions in the market place to suppress knowledge of the hazards of asbestos and prevent it from reaching users of these products, including the Plaintiffs. Armstrong not only failed to warn of the dangers despite its knowledge, it also failed to transmit any warnings these other manufacturers provided to Armstrong.

28yy.  Armstrong Cork (now Armstrong World Industries), in concert with Armstrong Contracting and Supply Corp., joined forces to suppress information about the asbestos hazards that had overcome their mutual workforce.   Armstrong Cork, Armstrong Contracting and Supply Co., (now A C and S, Inc.) and their insurance carriers suppressed information by making cash settlements to workers who submitted compensation claims.

28zz.   In November, 1961, Smith and Kanzler and Asbestospray joined forces with Columbia Acoustics and Fireproofing Company, (now U.S. Minerals Products Corp.) and others to organize a trade association to promote the use of asbestos-containing sprayed fiber products.

28aaa.  In October, 1965, Baldwin-Ehret-Hill (now Keene) joined the aforementioned group of asbestos spray fireproofing manufacturers comprised of Defendant U.S. Mineral Products Company, Asbestospray Corporation and Smith & Kanzler Company.  The group was called the Spray Mineral Fibers Manufacturers' Association (SMFMA).  The purpose of this organization was to promote the use of the members' asbestos spray products by representing those products to be safe and suitable for use as fireproofing and thermal insulation (contrary to the specific knowledge of the members that asbestos was dangerous).  The group sponsored secret asbestos dust tests of the members' products which proved Keene's

products to be unreasonably and uncontrollably dusty. The result of the secret asbestos dust studies were shared among the group but were suppressed from the general public as well as from the users, installers and consumers of those products.

28bbb. From its creation, SMFMA was represented actively by counsel who was present at all meetings and wrote or reviewed all minutes for the express purpose of defending against subsequent allegations of conspiratorial activity by the members. Subsequent correspondence revealed:

> Having had some said experience with antitrust investigation and some with trade associations, I think if you are serious about the organization of such an association, it might be highly advisable to have an attorney on hand even at this first meeting, lest everybody get accused later of conspiracy, "phases of the moon," etc.

28ccc. As the popular press began to regularly publish medical findings in 1965 which established the unquestionable link between asbestos and cancer, Baldwin-Ehret-Hill (Keene) worked with the other members of SMFMA to try to suppress and minimize public recognition of the hazards posed by spray asbestos products in buildings.

28ddd. Moreover, the group acted in express unanimity to discredit and undermine manufacturers who made spray mineral fiber products which did not contain asbestos. The group further acted in concert to suppress information published by non-asbestos spray mineral fiber manufacturers that would alert the public to the inherent dangers of asbestos spray products due to foreseeable dusting, flaking and cracking.

28eee. Along with the Celotex Corporation, Georgia Pacific Corporation, National Gypsum Company and others, U.S. Gypsum was a member of a trade association called the Gypsum Association.

28fff. As recently as 1970, Defendant U.S. Gypsum demonstrated its tacit agreement with other Defendant and non-defendant members of the asbestos industry to keep silent on the

MSTCOMP.GAW
04/19/91 (crb)                    28

health hazards of asbestos. U.S. Gypsum understood that its decision to put an asbestos warning on any of its products was a decision that had to be made by the entire industry or be subject to competitive disadvantages because each company, including U.S. Gypsum, knew that consumers would not purchase their products if they were made aware of the hazards of their asbestos content.

28ggg. The acts of the Defendant conspirators, as described above, constitute a fraudulent misrepresentation which proximately caused injury to the Plaintiffs in the following manner:

(a) The material published or caused to be published by the Defendants was false and incomplete in that the Defendants knowingly failed to advise the general public including the Plaintiffs of the known health hazards of asbestos and asbestos-related products.

(b) Defendants individually, as members of a conspiracy, and as agents of other co-conspirators, intended that the publication of false and misleading reports and/or the nondisclosure of documented reports of the health hazards of asbestos:

(1) maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-related products;

(2) assist in the continued pecuniary gain of the Defendants through the sale of their products;

(3) influence in the Defendants' favor proposed legislation to regulate asbestos exposure; and,

(4) to provide a defense in lawsuits brought for injury resulting from asbestos disease.

(c) Plaintiffs reasonably relied upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-related products, and the absence of published medical and scientific reports on the hazards of asbestos and asbestos-related products to continue their exposure to asbestos because they believed it to be safe.

MSTCOMP.GAW
04/19/91 (crb)                    29

(d)  Defendants individually, as members of a conspiracy, and as agents of other co-conspirators intended that Plaintiffs rely upon the published reports regarding the safety of asbestos and asbestos-related products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products, to continue his exposure to those products.

(e)  Defendants individually, as members of a conspiracy, and as agents of other co-conspirators are in a position of superior knowledge regarding the health hazards of asbestos and therefore Plaintiffs had a right to rely on the published reports commissioned by the Defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products.

(f)  Plaintiffs suffered injury as a direct and proximate result of the acts alleged herein.

29.  Defendants' conspiracy and conduct in furtherance thereof were a direct and proximate cause of Plaintiff's asbestos-related disease.

30.  **WHEREFORE**, Plaintiff requests judgment against Defendant Metropolitan Life Insurance and each and every one of the Defendant Asbestos Suppliers, in the amount of **TWO MILLION DOLLARS** **($2,000,000.00)** compensatory damages and **FOUR MILLION DOLLARS** **($4,000,000.00)** punitive damages.

<u>COUNT SIX - MARKET SHARE LIABILITY</u>

31.  Plaintiff adopts and incorporates by reference paragraphs 1, 2 when appropriate, 3, 3-A when appropriate, 3-B when appropriate, 3-C when appropriate, 3-D when appropriate, 4 - 8, 8-A when appropriate, 8-B when appropriate, 9, 9-A when appropriate, 10, 10-A when appropriate, 13, 13-A when appropriate, 16, 16-A when appropriate, 16-B when appropriate, 17, 17-A when appropriate, 18, 21 - 24, and 24-A when appropriate to this Master Complaint as if fully set forth herein.

32. At all times relevant hereto, the named Defendants represent substantially all those involved in the mining and/or manufacturing and/or fabricating and/or supplying and/or distributing and/or selling of asbestos products to which Plaintiff was exposed during the relevant time periods. To the extent that Plaintiff may be unable to identify the actual manufacturers, suppliers, or distributors of the specific asbestos products to which he was exposed, all named Defendant Suppliers are liable to Plaintiff in proportion to their market share position in the industry with reference to asbestos products. All named Defendant Asbestos Suppliers are therefore liable to Plaintiff in such proportion under the theory of "enterprise liability" set forth, among other places, in <u>Sindell v. Abbott Laboratories</u>, 26 Cal. 3d 588, 163 Cal. Rptr. 132, 607 P.2d 924 (1980), <u>cert. denied</u> 449 U.S. 921 (1980).

33. **WHEREFORE**, Plaintiff requests judgment against each and every one of the Defendant Asbestos Suppliers, in the amount of **TWO MILLION DOLLARS ($2,000,000.00)** compensatory damages and **FOUR MILLION DOLLARS ($4,000,000.00)** punitive damages.

<u>COUNT SEVEN - LOSS OF CONSORTIUM</u>

34. Plaintiff adopts and incorporates by reference paragraphs 1, 2 when appropriate, 3, 3-A when appropriate, 3-B when appropriate, 3-C when appropriate, 3-D when appropriate, 4 - 8, 8-A when appropriate, 8-B when appropriate, 9, 9-A when appropriate, 10, 10-A when appropriate, 13, 13-A when appropriate, 16, 16-A when appropriate, 16-B when appropriate, 17, 17-A when appropriate, 18, 21 - 24, 24-A when appropriate, 27 - 29, and 32 of this Master Complaint as if fully set forth herein.

35. Plaintiffs have been married to each other at all relevant points in time.

36. Plaintiffs have suffered and will continue to suffer a loss of consortium to the detriment of their marital relationship, which loss and detriment are a proximate consequence of the aforementioned acts, omissions, failures and breaches of

MSTCOMP.GAW
04/19/91 (crb)                    31

warranty, duty, and law by Defendants.

37.   **WHEREFORE**, Plaintiffs request judgment against each and every one of the Defendants in the amount of **ONE MILLION DOLLARS** ($1,000,000.00) compensatory damages and **TWO MILLION DOLLARS** ($2,000,000.00) punitive damages.

## COUNT EIGHT - WRONGFUL DEATH

38.   Plaintiff adopts and incorporates by reference paragraphs 1, 3, 3-A when appropriate, 3-B when appropriate, 3-C when appropriate, 3-D when appropriate, 4 - 8, 8-A when appropriate, 8-B when appropriate, 9, 9-A when appropriate, 10, 10-A when appropriate, 13, 13-A when appropriate, 16, 16-A when appropriate, 16-B when appropriate, 17, 17-A when appropriate, 18, 21 - 24, 24-A when appropriate, 27 - 29, and 32 of the Master Complaint as if fully set forth herein.

39.   Plaintiff and Plaintiff's decedent were married at the time of his death and had been for many years; and, as a direct and proximate result of Defendants' acts, omissions, failures, breaches of warranty, duty and law as alleged above, Plaintiff's decedent developed an asbestos-related disease, which caused his death.

40.   As a direct and proximate result of the wrongful death of Plaintiff's decedent, Plaintiff has lost and has been deprived of the services, care, attention, society, companionship, comfort, protection, marital care, advice, counsel and guidance which Plaintiff's decedent rendered to her while alive and which he would have continued to afford and render to her had he continued to live.  As a further and direct proximate result of the tortious conduct and products complained of herein, Plaintiff has suffered and will suffer extreme mental anguish and emotional pain and suffering and, further, has been, is and will be unable to live her normal life.

41.   By reason of the aforementioned acts, omissions, failures, breaches of warranty, duty and law by the Defendant Asbestos Suppliers, a cause of action has accrued for the use of and on behalf of Plaintiff for compensation to her for all

MSTCOMP.GAW
04/19/91 (crb)

pecuniary losses and damages, past, present and future which she has sustained, is sustaining and will sustain.

42. As a result of their marriage, Plaintiff and Plaintiff's decedent had children, including a minor, who, by his Next Friend, joins in this action as a Plaintiff.

(42-A) As a result of their marriage, Plaintiff and Plaintiff's decedent had children, who join in this action as Plaintiffs.

43. As a direct and proximate result of the wrongful death of their father, the children have lost and have been deprived of the services, care, attention, society, companionship, comfort, protection, guidance and education which their father rendered to them while alive and which he would have continued to afford and render to them had he continued to live. As a further and direct proximate result of the tortious conduct and products complained of herein, Plaintiffs have suffered and will suffer extreme mental anguish and emotional pain and suffering and further, have been, are and will be unable to live their normal lives.

44. By reason of the aforementioned acts, omissions, failures, breaches of warranty, duty and law by the Defendant Asbestos Suppliers, a cause of action has accrued for the use of and on behalf of Plaintiffs for compensation to them for all pecuniary losses and damages, past, present and future which they have sustained, are sustaining and will sustain.

45. **WHEREFORE**, Plaintiff requests judgment against each and every one of the Defendant Asbestos Suppliers in the amount of **TWO MILLION DOLLARS ($2,000,000.00)** compensatory damages and **FOUR MILLION DOLLARS ($4,000,000.00)** punitive damages.

PETER G. ANGELOS (PID No. 14179)

GEORGE A. WEBER, III (PID No. 13674)

GARY J. IGNATOWSKI (PID No. pending
assignment)

LAW OFFICES OF
PETER G. ANGELOS
2643 KINGSTON PIKE, SUITE 101
KNOXVILLE, TENNESSEE  37919
(615) 673-9900

MSTCOMP.GAW
04/19/91 (crb)                    34

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and exact copy of the foregoing has been furnished to counsel of record in this cause by placing the same in the U.S. Mail, postage prepaid and addressed as follows:

Hugh B. Bright, Esq.
M. Denise Moretz, Attorney
Baker, Worthington, Crossley,
   Stansberry & Woolf
900 Gay Street
Post Office Box 1792
Knoxville, Tennessee  37901

Stephen C. Daves, Esq.
O'Neil, Parker & Williamson
416 Cumberland Avenue
Post Office Box 214
Knoxville, Tennessee  37901

William D. Vines, III, Esq.
Butler, Vines, Babb & Threadgill
507 South Gay Street
Post Office Box 2649
Knoxville, Tennessee  37901

Patti Jane Lay, Attorney
Kennerly, Montgomery & Finley
Post Office Box 442
Knoxville, Tennessee  37901

John W. Baker, Jr., Esq.
Poore, Cox, Baker, Ray & Byrne
11th Floor, Valley Fidelity Bank Building
Post Office Box 1708
Knoxville, Tennessee  37901

John Curtis, Esq.
Leitner, Warner, Moffit,
   Williams & Dooley
801 Broad Street
Chattanooga, Tennessee  37402

G. Mark Phillips, Esq.
The Hood Law Firm
Post Office Box 1508
Charleston, South Carolina  29401

Kent Krause, Esq.
Brewer, Krause & Brooks
Suite 2600, The Tower
611 Commerce Street
Nashville, Tennessee  37203

Earl Layman, Esq.
Layman, O'Connor, Petty & Child
603 Main Avenue
Post Office Box 219
Knoxville, Tennessee  37901

Debra Fulton, Attorney
Frantz, McConnell & Seymour
Post Office Box 39
Knoxville, Tennessee  37901

Harry P. Ogden, Esq.
Lewis, King, Kreig & Waldrop
620 Market Street
Post Office Box 2425
Knoxville, Tennessee  37901

Darryl G. Lowe, Esq.
Lowe, Hogan, Shirley & Yeager
913 Charter Federal Building
531 South Gay Street
Knoxville, Tennessee  37902

Steven L. Hurdle, Esq.
Arnett, Draper & Hagood
Suite 2300, Plaza Tower
800 South Gay Street
Knoxville, Tennessee  37902

Eric L. Zalud
Benesch, Friedlander, Coplan
    and Arnoff
1100 Citizens Building
850 Euclid Avenue
Cleveland, Ohio  44114-3399

J. Thomas Jones
Bernstein, Stair, McAdams
First Tennessee Bank Building, #600
530 South Gay Street
Knoxville, Tennessee  37902

R. Franklin Norton
Norton & Luhn
Suite 900, Sovran Center
550 Main Avenue
Knoxville, Tennessee  37902

James M. Doran, Jr.
Manier, Herod, Hollabaugh & Smith
2200 One Nashville Place
150 Fourth Avenue
Nashville, Tennessee  37219

This 25th day of _April_, 1991.

_George A. Weber III_
ATTORNEY

8-27

# IN THE CIRCUIT COURT FOR KNOX COUNTY, TENNESSEE
## DIVISIONS I, II & III

IN RE:      ALL ASBESTOS PERSONAL )
              INJURY CASES FILED    )
              BY THE LAW OFFICES    )
              OF PETER G. ANGELOS   )

## FIRST AMENDED MASTER COMPLAINT

### INTRODUCTION

Pursuant to the provisions of an Order of Court on March 11, 1991, regarding personal injury asbestos cases, Plaintiffs by their attorneys Peter G. Angelos, George A. Weber, Gary J. Ignatowski and the Law Offices of Peter G. Angelos hereby file this Master Complaint for all personal injury asbestos cases filed on or after March 11, 1991.

Each Plaintiff who files a personal injury asbestos case on or after March 11, 1991 shall file a Short-form Complaint which adopts and incorporates by reference the relevant paragraphs of this Master Complaint.

In this Master Complaint, where appropriate, the following applies:

1.      The singular shall include the plural and the plural shall include the singular.

2.      The present tense shall include the past tense and the past tense shall include the present tense.

3.      References to the male gender shall include the female gender.

4.      References to Defendants shall include their predecessors and successors in interest, if any.

5.      In Survival Actions, use of the term "Plaintiff" shall include "Plaintiff's decedent" his Personal Representative or his Surviving Spouse.

6.      Plaintiffs would also sue the Johns-Manville Corporation, the Johns-Manville Sales Corporation, Unarco Industries, Inc., Armatex Corporation, Forty Eight Insulations, Inc., Raymark Industries, Inc., Nicolet, Inc., The Celotex Corporation, Eagle Picher Industries, Inc., H.K. Porter Company, Inc. Carey Canada, Inc. and Standard Insulation, Inc.; however, each of these potential defendants has filed a Petition for Relief

PLAINTIFF'S
EXHIBIT
1

under Chapter 11 of the Bankruptcy Code, and pursuant to 11 U.S.C. Section 362 (a), the institution of actions against these companies is stayed, but for which Plaintiffs would have named them as Defendant Asbestos Suppliers. With respect to Johns-Manville Corporation and the Johns-Manville Sales Corporation, the Bankruptcy Court has issued certain Orders and the Manville Corporation Second Amended and Restated Plan of Reorganization which may control the action against these companies has been issued. Further, an integration Order has been signed by this Court and to the extent applicable allegations contained in this Master Complaint are made against Johns-Manville Corporation and/or the Manville Corporation Asbestos Disease Compensation Fund.

<u>COUNT ONE - STRICT LIABILITY</u>

Plaintiffs sue the Defendants who are or have been manufacturers, suppliers and/or users of asbestos-containing products (hereinafter sometimes referred to collectively as "Asbestos Suppliers"), and in support thereof allege:

1.      Defendants, and each of them, at all times relevant hereto, were miners, manufacturers, processors, importers, converters, compounders, merchants, removers, suppliers and/or users of asbestos, asbestos insulation materials and/or asbestos-containing products (hereinafter referred to as "asbestos products") who acting by and through their servants, agents and employees caused such asbestos products to be sold, used and placed in the stream of commerce in the State of Tennessee.

2.      **Survival Actions only** - Plaintiff, as Personal Representative of the estate of the decedent or Surviving Spouse or Next of Kin, is empowered to commence and prosecute this action as one which the decedent could have commenced and prosecuted and to recover all damages recoverable by Plaintiff's decedent, had he survived, and, in addition thereto, funeral and other incidental expenses as allowable by law.

3.      Over the course of years, Plaintiff was employed in the building and construction industry as a skilled building tradesman and was required to work with and around asbestos products which were manufactured and/or supplied by each of the Defendants.

(3-A)   **Non-Trades Cases only** - Over the course of years, Plaintiff was employed as a [SEE SHORT-FORM COMPLAINT - ADDITIONAL INFORMATION]

G:\FILES\COLLEEN\MASTERS\COMPLAIN.GAW
09/11/93(JQW:cre)                    2

and was required to work with and around asbestos products which were manufactured and/or supplied by each of the Defendants.

(3-B) **Spouse's Actions only** - Over the course of years, Plaintiff's husband was employed in the building and construction industry as a skilled building tradesman and was required to work with and around asbestos products which were manufactured and/or supplied by each of the Defendant Asbestos Suppliers.

(3-C) **Spouse's Actions only** - Over the course of years, Plaintiff's husband was employed as a [SEE SHORT-FORM COMPLAINT - ADDITIONAL INFORMATION] and was required to work with and around asbestos products which were manufactured and/or supplied by each of the Defendant Asbestos Suppliers.

(3-D) **Spouse's Actions only** - During the period of time when Plaintiff's husband was required to work with and around asbestos products which were manufactured and/or supplied by each of the Defendant Asbestos Suppliers, he was married to Plaintiff, who, in the course of her marital duties, laundered, cleaned and otherwise came into contact with the asbestos fibers and dust brought into the home on the clothing and person of her husband.

4.     The Defendants' asbestos products were defective in design and/or construction in that they contained harmful, deleterious, carcinogenic, and otherwise inherently and latently dangerous asbestos which unreasonably endangered the life and health of the ultimate users thereof and of persons in the position of Plaintiff.  Defendants placed their asbestos products in the market knowing that they would be used without inspection for such defects.

5.     The Defendants' asbestos products were defective in design and/or construction as alleged in Paragraph 4 and Defendants failed to provide warnings, adequate warnings, or instructions about the dangers, risks and harm inherent in their asbestos products.

6.     The Defendants' asbestos products were incapable of being made safe for their ordinary and intended use and purpose and Defendants failed to provide warnings, adequate warnings or instructions about the dangers, risks and harm inherent in their

asbestos products.

      7.    At the time each of the Defendants manufactured, sold, delivered and were otherwise in possession of the aforesaid asbestos products, such products were expected to, and did, reach Plaintiff in a condition without substantial change from that in which such products were when within the possession of Defendants.

      8.    Plaintiff, unaware of the defective and unreasonably dangerous condition of the Defendants' asbestos products, and at a time when such products were being used for the purposes for which they were intended, was exposed, in the course of his employment as a skilled building tradesman, to Defendants' asbestos products.

      (8-A)    Plaintiff, unaware of the defective and unreasonably dangerous condition of the Defendants' asbestos products, and at a time when such products were being used for the purposes for which they were intended, was exposed, in the course of his employment as a [SEE SHORT-FORM COMPLAINT - ADDITIONAL INFORMATION] to Defendants' asbestos products.

      (8-B)    **Spouse's Actions only** - Plaintiff, unaware of the defective and unreasonably dangerous condition of the Defendants' asbestos products, and at a time when such products were being used for the purposes for which they were intended, was exposed to said products through the washing, handling, shaking and other exposure to the clothing and person of her husband.

      9.    As a direct and proximate result of the above-described exposure to Defendants' asbestos products, Plaintiff suffers from an asbestos-related disease, has a diminished life expectancy and has a greatly enhanced probability of and susceptibility to various other disease, including but not limited to oncological, respiratory, pulmonary, cardiological and cardiovascular disease. Plaintiff has suffered and will suffer physical, emotional and mental pain, anxiety, anguish, embarrassment and humiliation, and has lost the ability to enjoy life as he otherwise would were he not suffering from an asbestos-related disease.

      (9-A)    **Survival Actions only** - As a direct and proximate result of the above-described exposure to Defendants' asbestos products, Plaintiff's decedent developed and suffered from an asbestos-related disease and died as a result thereof.

10.    As a further direct and proximate result of the exposure and injuries described above, Plaintiff has been and in the future will be in need of medical treatment, and has incurred and will incur expenses for such medical and hospital care and treatment. Moreover, as a proximate result of the injuries sustained, Plaintiff's ability to engage in his usual occupation has been injured and diminished and, as a consequence thereof, Plaintiff has sustained and will sustain lost wages and earning capacity.

(10-A)  **Survival Actions only** - As further direct and proximate results of the exposure and injuries described above, Plaintiff's decedent suffered great physical, emotional and mental pain, anxiety, anguish, embarrassment and humiliation and lost the ability to enjoy life as he otherwise would if he had not suffered from an asbestos-related disease. Plaintiff's decedent required medical treatment and incurred great expenses for medical and hospital care and treatment.

(10-B)   Additionally, as to Defendants Armstrong World Industries (hereinafter AWI) and ACandS, Plaintiffs allege the following:

(a)    In 1957, Armstrong Cork (n/k/a AWI) created a subsidiary, Armstrong Contracting and Supply Corp. (hereinafter Armstrong Contracting). Armstrong Contracting commenced operations on January 1, 1958, to carry out Armstrong's contract insulation business and the product sales that previously had been conducted by its contract unit, the Armstrong Cork Insulation Division. In 1969, Armstrong Cork sold its subsidiary Armstrong Contracting to the former management of Armstrong Contracting. The resulting company became known as ACandS, Inc. (hereinafter ACandS).

(b)    Beginning on January 1, 1958, and thereafter, Armstrong Cork, as the parent corporation for Armstrong Contracting, exercised substantial control over the management functions and operations of Armstrong Contracting such that, although the two corporations were separate entities, the Defendants engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities. As such, in addition to its individual liability for its own torts, Defendant Armstrong World Industries (f/k/a Armstrong Cork Co.) (hereinafter AWI) is liable with Defendant ACandS for the tortious conduct of Defendant ACandS and its predecessor Armstrong Contracting under an "alter ego" and "agency" theory.

(c)     In 1958, Armstrong Cork (n/k/a AWI) transferred all existing contracts, inventory and accounts receivable to its newly-created subsidiary Armstrong Contracting.  The subsidiary continued to use the same office space and facilities for its district and branch offices as was previously utilized by Armstrong Cork.  Armstrong Cork provided the initial capitalization and additional infusion of capital, as needed, to conduct the business of Armstrong Contracting.

(d)     After 1957, Armstrong Cork continued to market, distribute and sell asbestos-containing thermal insulation products through its subsidiary Armstrong Contracting.  Armstrong Cork restricted Armstrong Contracting's use of non-Armstrong Cork materials.  During the period January 1, 1958 until August 1, 1969, Armstrong Contracting utilized Armstrong Cork's primary trademarks in connection with the sale, distribution, supply and installation of asbestos-containing thermal insulation products.  Armstrong Cork granted Armstrong Contracting a license to use the trademark "Armstrong" with "A" encircled and also the "Armatemp" and "Armabestos" trademarks.  Furthermore, during the same time period, Armstrong Contracting manufactured, distributed and installed products relabeled for it under tradenames owned by Armstrong Cork pursuant to an exclusive licensing agreement with Armstrong Cork.  In August, 1969, Armstrong Cork (n/k/a AWI) transferred its ownership of trademarks for relabeled products to ACandS (f/k/a Armstrong Contracting).

(e)     During the time that Armstrong Contracting was a wholly-owned subsidiary of Armstrong Cork (n/k/a AWI) all members of its Board of Directors, with one exception, were also officers or directors of Armstrong Cork.  Substantially, all of the Armstrong Contracting Board of Directors' meetings were held at the offices of Armstrong Cork.  James W. Liddell, President of Armstrong Contracting, reported to officers and directors of Armstrong Cork and considered those persons his supervisors.  Thus, Armstrong Cork and Armstrong Contracting had an interlocking directorate and the two corporate entitles were operated and controlled by the same individuals.

(f)     Armstrong Contracting had no independent legal, accounting, tax, insurance, employee benefits or date processing departments.  All of such services and functions were provided and performed by Armstrong Cork. The Armstrong Cork Company

Insurance Department procured all insurance for Armstrong Contracting and processed and handled all claims, including worker's compensation claims.  Armstrong Contracting and Armstrong Cork interchanged employees and Armstrong Contracting employees considered themselves employees of Armstrong Cork.  Armstrong Cork conducted selling skill seminars for Armstrong Cork employees, including employees of Armstrong Contracting.

(10-C) Defendants' who manufactured, supplied, distributed and/or otherwise placed these defective or unreasonably dangerous asbestos-containing products into the stream of commerce or Defendants who aided those who manufactured, supplied, distributed and/or otherwise placed these defective or unreasonably dangerous asbestos-containing products into the stream of commerce acted intentionally, fraudulently, maliciously and/or recklessly.

11. **WHEREFORE**, Plaintiff request judgment against each and every one of the Defendant Asbestos Suppliers, in the amount of **TWO MILLION DOLLARS ($2,000,000.00)** compensatory damages and **FOUR MILLION DOLLARS ($4,000,000.00)** punitive damages.

## COUNT TWO - BREACH OF WARRANTY

12. Plaintiff adopts and incorporates by reference paragraphs 1, 2 when appropriate, 3, 3-A when appropriate, 3-B when appropriate, 3-C when appropriate, 3-D when appropriate, 8-A when appropriate, 9, 9-A when appropriate, 10, 10-A when appropriate, 10-B and 10-C of this Master Complaint as if fully set forth herein.

13. Defendants, and each of them, impliedly warranted that their asbestos products were of good and merchantable quality and fit and suitable for the particular use for which said products were intended.  The implied warranty was breached in that harmful, poisonous, deleterious and inherently dangerous asbestos dust and fibers were released into the air and atmosphere wherein Plaintiff carried out his duties using said products.  As a direct and proximate result of the breach of such warranty, Plaintiff developed an asbestos-related disease, without negligence or want of due care on the part of Plaintiff contributing thereto.

(13-A) **Spouse's Actions only** - Defendants, and each of them, impliedly warranted that their asbestos products were of good and merchantable quality and fit and suitable for the ordinary use for which said products were intended.  The implied warranty

was breached in that harmful, poisonous, deleterious and inherently dangerous asbestos dust and fibers were given off into the air and atmosphere to which Plaintiff was exposed through contact with the clothing and person of her husband.  As a direct and proximate result of the breach of such warranty, Plaintiff developed an asbestos-related disease without negligence or want of due care on the part of the Plaintiff contributing thereto.

      14.    **WHEREFORE,** Plaintiff requests judgment against each and every one of the Defendant Asbestos Suppliers in the amount of **TWO MILLION DOLLARS ($2,000,000.00)** compensatory damages and **FOUR MILLION DOLLARS ($4,000,000.00)** punitive damages.

<u>COUNT THREE - NEGLIGENCE</u>

      15.    Plaintiff adopts and incorporates by reference paragraphs 1, 2 when appropriate, 3, 3-A when appropriate, 8-A when appropriate, 8-B when appropriate, 9, 9-A when appropriate, 10, 10-A when appropriate, 10-B, and 10-C, and 13-A when appropriate of this Master Complaint as if fully set forth herein.

      16.    Defendant Asbestos Suppliers, and each of them, knew, or in the exercise of reasonable care should have known, that persons employed as skilled building tradesmen, as Plaintiff was, would be required to and would, in fact, come into contact with and work in close proximity to their asbestos products, which the Defendants knew, or in the exercise of ordinary care should have known, were health and life-threatening.

      (16-A)  Defendant Asbestos Suppliers, and each of them, knew, or in the exercise of reasonable care should have known, that persons employed as [SEE SHORT-FORM COMPLAINT - ADDITIONAL INFORMATION], as Plaintiff was, would be required to and would, in fact, come into contact with and work in close proximity to their asbestos products, which the Defendants knew, or in the exercise of ordinary care should have known, were health and life-threatening.

      (16-B)  **Spouse's Actions only** - Defendant Asbestos Suppliers, and each of them, knew, or in the exercise of reasonable care should have known, that persons living with persons employed as was Plaintiff's husband, would be required to and would, in fact, come into contact with and work in close proximity to their asbestos products, which the Defendants knew, or in the exercise of ordinary care should have known, were health and life-threatening.

17.   Defendants, and each of them, negligently, willfully, wantonly, recklessly and with gross indifference for the rights of persons in Plaintiff's position, omitted and failed, among other things:

(a)   To properly design and/or construct their asbestos products in that they contained harmful, deleterious, carcinogenic, and otherwise inherently and latently dangerous asbestos which unreasonably endangered life and health;

(b)   To advise Plaintiff of the dangerous characteristics of their asbestos products;

(c)   To provide Plaintiff with the knowledge as to what would be reasonably safe and sufficient safeguards, including wearing apparel and protective and monitoring equipment, which could have been employed to protect Plaintiff from the harmful exposure to their asbestos products;

(d)   To place any warnings or, alternatively, adequate warnings, on their asbestos products or containers thereof to advise the users of the products and those exposed thereto of the dangers of exposure to and breathing of asbestos fibers and dust;

(e)   To package and contain their asbestos products in a manner to lessen or eliminate the inhalation of asbestos fibers during the installation and removal thereof;

(f)   To take reasonable precautions or to exercise reasonable care to publish, adopt and communicate safety plans and safe methods of handling, installing and removing their asbestos products and otherwise to recommend methods to improve the work environment; and

(g)   To develop and distribute asbestos-free products.

(17-A)   **Spouse's Actions only** - Defendants, and each of them, negligently, willfully, wantonly, recklessly and with gross indifference for the rights of persons in Plaintiff's position, omitted and failed, among other things:

(a)   To advise Plaintiff, her husband and family of the dangerous characteristics of their asbestos products;

(b)   To provide Plaintiff, her husband or family with the knowledge as to what would be reasonably safe and sufficient safeguards, including wearing apparel and protective and monitoring equipment, which could have been employed to protect Plaintiffs from harmful exposure to their asbestos products;

(c) To place any warnings or, alternatively, adequate warnings, on their asbestos products or containers thereof to advise the users of the products and those exposed thereto of the dangers of exposure to and breathing of asbestos fibers and dust;

(d) To package and contain their asbestos products in a manner to lessen or eliminate the inhalation of asbestos fibers during the installation and removal thereof;

(e) To take reasonable precautions or to exercise reasonable care to publish, adopt and communicate safety plans and safe methods of handling, installing and removing their asbestos products and otherwise to recommend methods to improve the work environment; and

(f) To develop and distribute asbestos-free insulation products.

18. As a proximate result of the negligence, recklessness and gross indifference of Defendant Asbestos Suppliers, Plaintiff developed an asbestos-related disease as the result of his exposure to the Defendants' asbestos products, without negligence or want of due care on the part of Plaintiff contributing thereto.

19. **WHEREFORE**, Plaintiff requests judgment against each and every one of the Defendant Asbestos Suppliers in the amount of **TWO MILLION DOLLARS** **($2,000,000.00)** compensatory damages and **FOUR MILLION DOLLARS ($4,000,000.00)** punitive damages.

<u>COUNT FOUR - FRAUD</u>

20. Plaintiff adopts and incorporates by reference paragraphs 1, 2 when appropriate, 3, 3-A when appropriate, 3-B when appropriate, 3-C when appropriate, 3-D when appropriate, 8-A when appropriate, 8-B when appropriate, 9, 9-A when appropriate, 10, 10-A when appropriate, 10-B, and 10-C, 13-A when appropriate, 16-A when appropriate, 16-B when appropriate, 24-A when appropriate, 26, 27, 28a through 28ggg and 29 of this Master Complaint as if fully set forth herein.

21. At all times relevant hereto, each and every Defendant Asbestos Supplier aided, assisted and encouraged the distribution and sale of their products, including those complained of herein, without adequate warnings, other safety precautions or change in design, by the participation in, support of and the use of industry-wide and/or parallel product research and development, exchanges of information, marketing, advertising, promotion and/or other similar endeavors, all of which such effort inured to the joint and

mutual benefit of all such suppliers in the wide and continued distribution, sale and use of Defendants' products.

22.    Since a time prior to exposure of the Plaintiff to the Defendants' asbestos products, Defendants, and each of them, have been possessed with substantial medical and scientific data by which these Defendants knew that their asbestos products were, or were likely to become, hazardous to the life, health and safety of persons in the position of Plaintiff who were exposed to their products.

23.    Nevertheless, prompted by pecuniary motives, each of the Defendant Asbestos Suppliers, individually and collectively, failed and refused to act upon such medical and scientific data, to warn users of their products and those who worked in close proximity thereto of the life and health-threatening dangers of exposure to and the breathing of asbestos fibers and dust, and to take such other reasonable precautions necessary to lessen the dangers and potentially lethal and dangerous characteristics of their asbestos products. Defendants, in wanton and reckless disregard for human life and health, deliberately, intentionally and purposely withheld and concealed such information from users of and those exposed to their products.

24.    Plaintiff, unaware of the dangers to life and health resulting from exposure to Defendants' asbestos products and not possessing the degree of technical knowledge and expertise of the Defendants concerning asbestos and its use, continued to work with and around their products and was deprived by the above-described acts and omissions of Defendants of the free and informed opportunity to remove himself from exposure to Defendants' asbestos products and otherwise to protect himself from exposure thereto. The Defendants' fraudulent conduct of concealment was a direct and proximate cause of Plaintiff's asbestos-related disease.

(24-A)  **Spouse's Actions only** - Plaintiff, unaware of the dangers to life and health resulting from exposure to Defendants' asbestos products and not possessing the degree of technical knowledge and expertise of the Defendants concerning asbestos and its use, continued to come into contact with and around their products and was deprived by the above-described acts and omissions of Defendants of the free and informed opportunity to remove and protect herself, her husband and her family from exposure thereto. Defendants' fraudulent conduct of concealment was a direct and proximate cause of Plaintiff's asbestos-

related disease.

25.     **WHEREFORE,** Plaintiff requests judgment against Defendant Metropolitan Life Insurance and each and every one of the Defendant Asbestos Suppliers, in the amount of **TWO MILLION DOLLARS ($2,000,000.00)** compensatory damages and **FOUR MILLION DOLLARS ($4,000,000.00)** punitive damages.

## COUNT FIVE - CONSPIRACY

26.     Plaintiff adopts and incorporates by reference paragraphs 1, 2 when appropriate, 3, 4, 5, 6, 8-A when appropriate, 8-B when appropriate, 9, 9-A when appropriate, 10, 10-A, 10-B and 10-C when appropriate, 13-A when appropriate, 16, 16-A when appropriate, 16-B when appropriate, 17, 21, 22, 23 and 24-A when appropriate of this Master Complaint as if fully set forth herein.

27.     Defendants formed confederacies as hereinafter described and entered into agreements or tacit understandings to individually, jointly and in conspiracy with each other market asbestos products by unlawful means, including inter alia, their tortious conduct of suppressing their knowledge of the dangers of asbestos and of placing into the stream of commerce, without adequate testing or warnings, their asbestos products, which were unreasonably dangerous, ultrahazardous, deleterious, carcinogenic and potentially deadly.

28.     Defendants, individually, jointly and in conspiracy with each other knowingly committed the tortious and contractual acts described in this Master Complaint, as well as other similar wrongs, in furtherance of their agreement or understanding to market asbestos products in an unlawful manner.

28a.   Deleted.

28b.   As for Defendants ACandS, Inc., Armstrong World Industries, Inc., Asbestospray Corporation, Carey Canada, Inc., The Celotex Corporation, Eagle Picher Industries, Inc., Fibreboard Corporation, GAF Corporation, Georgia Pacific Corporation, H.K. Porter Company, Inc., Johns-Manville Corporation, (whose liabilities have been assumed by the Manville Corporation Asbestos Disease Compensation Fund), Keene Corporation, Metropolitan Life Insurance Company, National Gypsum Company, Owens-Corning Fiberglas Corp., Owens-Illinois Glass Co., Pittsburgh Corning Corporation, The Ruberoid Company, Smith & Kanzler Corporation, Southern Textile Corporation, Turner

& Newall, plc., United States Gypsum Co., and U.S. Minerals Products Company, Plaintiffs allege that the Defendants knew beginning in the early 1930's of the extreme dangers to those who were exposed to asbestos dust and fibers and that this knowledge continued into the 1940's, 1950's and 1960's and later. Instead of warning representatives and other similar workers about the dangerous nature of their asbestos and asbestos products, the Defendants conspired with each other to hide the dangers, hide all information about the dangers, and indeed to keep workers and others ignorant or at least unknowing about the dangers of asbestos.

28c.    Plaintiffs allege and will prove that the Defendants, hereinafter sometimes referred to as "conspirators" or "conspiring Defendants" conspired amongst themselves and with other manufacturers, some of whom may presently be in bankruptcy, and distributors to injure the Plaintiffs in the following fashion:

28d.    In 1928, the Eagle Picher Lead Co. through its General Manager, George Potter, became associated with the Tri-State Operators Clinic at Picher, Oklahoma. This clinic was run jointly by co-conspirator Metropolitan Life Insurance Company and others. Dr. Sayers of the U.S. Bureau of Mines and Dr. Anthony J. Lanza, employee and/or agent of the Metropolitan Life Insurance Company were physicians associated with the clinic. Throughout 1930 and thereafter, the Eagle Picher Lead Co. remained associated with the clinic. On May 23, 1930, Dr. F.V. Meriwether, another physician associated with the clinic, informed Dr. Anthony J. Lanza, Assistant Medical Director of the Metropolitan Life Insurance Company, that Mr. O.N. Wampler, Safety Director of the Eagle Picher Lead Company, expressed concern over Eagle Picher Lead Co.'s lack of supervision of manpower which ultimately permitted industrial diseases to become part of the compensation laws. Mr. Wampler expressed particular concern over asbestos legislation. Eagle Picher, by and through its agents, servants and/or employees with its co-conspirators intentionally failed to warn workers and others of the dangers of exposure to asbestos which it and others possessed at that time.

28e.    In 1930, Metropolitan Life Insurance Company, through its agent Dr. Anthony J. Lanza along with Dr. Frank Pedley conducted a study of 195 Quebec asbestos miners. Forty-two cases of asbestosis were identified among the 195 men examined, but the results were never published in medical literature. In 1939, Dr. Anthony J. Lanza published

an article in the American Review of Tuberculosis, <u>Industrial Dusts and the Mortality From Pulmonary Disease</u>, in which he stated that the asbestos cases described therein originated in textile and other asbestos fabricating plants and not in connection with asbestos mining.

28f.   In 1933, Metropolitan Life Insurance Company, insurer of co-conspirator Johns-Manville Company, through its agent Dr. Anthony J. Lanza, advised physicians at the Johns-Manville, Waukegan, Illinois plant that it was doubtful whether the asbestos hazard was sufficient to justify warning posters that asbestos was hazardous to health. According to Dr. Lanza this was especially true in light of the extraordinary legal situation.

28g.   In the early 1930's several asbestos manufacturers were subjected to compensation suits by individuals employed in their factories and mills. These suits provoked Defendant Johns-Manville and now bankrupt co-conspirator Raymark Industries, Inc. (Raybestos-Manhattan, Inc.) to conduct research into the effects of asbestos on human beings and animals. Numerous studies of experimental and statistical nature were conducted by various co-conspirators and were either never published in the medical literature, as previously alleged or which when published, were subjected to substantive editing by members of the conspiracy.

28h.   Beginning in approximately 1934, Johns-Manville Corporation, through its agents, Vandiver Brown and attorney J.C. Hobart, and co-conspirator Raybestos-Manhattan, through its agents, Sumner Simpson and J.D. Rohrbach, suggested to Dr. Anthony Lanza, Associate Director of co-conspirator, Metropolitan Life Insurance Company (insurers of Manville and Raybestos) that Dr. Lanza edit a previously completed study on asbestos and publish a study which would affirmatively misrepresent a material fact about asbestos exposure; that is, the seriousness of the disease process, asbestosis. This was accomplished through intentional deletion of Lanza's description of asbestosis as "fatal"; and through other selective editing that affirmatively misrepresented asbestosis as a disease process less serious than it actually is and was known to be. As a result, Dr. Lanza's study was published in the medical literature in this misleading fashion in 1935 in the United States Public Health Service Reports. The conspirators were motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent nondisclosure by the desire to influence proposed legislation to regulate asbestos exposure and to provide a defense in

lawsuits involving Manville and Raybestos.

28i.    In 1934, F.W. Sherwood, Vice President of Owens-Illinois, and Roger Hitchins presented a request to the Mellon Institute of Industrial Research from various manufacturers that the Mellon Institute sponsor a symposium on industrial disease problems. In December of 1934, Dr. E.R. Werdlein, Director of the Mellon Institute of Industrial Research, wrote a letter to, among others, Metropolitan Life Insurance Company and Johns-Manville outlining various types of dust diseases known generally as pneumoconiosis and including asbestosis.  Following this letter a symposium of dust problems was held on January 15, 1935 in Pittsburgh, Pennsylvania.  Among those present were Vandiver Brown of Johns-Manville, A.J. Lanza, Metropolitan Life Insurance Company and A.C. Hirth, an attorney for Owens-Illinois Glass Company.  In January of 1935, Vandiver Brown wrote "An impressive list of experts" specializing in various aspects of the dust problem attended the meeting and delivered addresses which "together with open discussion following them" revealed:

> ...The very menacing character of the problem, its complex nature, the uncertainties attending most of its aspects and the necessity of some form of united action by the afflicted industries.

Participants in the symposium discussed the problems related to (1) obtaining expert testimony; (2) jury verdicts; (3) "[p]roblems of ventilation, dust collecting and elimination, and respiratory devices" and (4) "establishing of standards (a) for dust counting and particle size determination, (b) for the taking of x-rays for diagnostic use, and (c) for the interpretation of the markings on the films so produced."

28j.    At the conclusion of the symposium a committee was elected for the purpose of "formulation of ways and means to bring about effective cooperation of some character between the various industries for meeting and combating those phases of the dust problem common to all." A.W. Sherwood from Owens-Illinois and Vandiver Brown from Johns-Manville were elected to various committees.  Dr. Lanza of Metropolitan Life Insurance was a central figure in the formation of what became known as the Industrial Hygiene Foundation and also became Chairman of the Medical Committee of the Foundation.  The Industrial Hygiene Foundation performed confidential industrial and medical surveys for the Asbestos Textile Institute, as hereinafter alleged, and also performed

an epidemiological study of lung cancer in asbestos mines for the Quebec Asbestos Mining Association and ultimately altered the final report to delete substantive data on the prevalence of lung cancer in asbestos miners, all as hereinafter alleged.

    28k.  In 1936, conspirators American Brake Block Corporation, Asbestos Manufacturing Company, Gatke Corporation, Johns-Manville Corporation, Keasbey & Mattison Company (then an alter-ego to conspirator Turner & Newall), Raybestos-Manhattan, Russell Manufacturing (whose liabilities have been assumed by H.K. Porter Company), Union Asbestos and Rubber Company, United States Gypsum Company, the Thermoid Company and Southern Asbestos Company (whose liabilities have been assumed by H.K. Porter Company) entered into an agreement with the Saranac Laboratories. Under this agreement, these conspirators acquired the power to decide what information Saranac Laboratories could publish about asbestos disease and control in what form such publications were to occur. This agreement gave these conspirators power to affirmatively misrepresent the results of the work at Saranac, and also gave these conspirators power to suppress material facts included in any study. On numerous occasions thereafter, the conspirators exercised their power to prevent Saranac scientists from disclosing material scientific data, resulting in numerous misstatements of fact being made at scientific meetings.

    28l.  As a result of the aforegoing Saranac Studies Dr. Leroy Gardner, in 1943, prepared a monograph on human asbestosis which suggested evidence that asbestosis may precipitate the development of lung cancer. On October 24, 1946, Dr. Leroy Gardner, the primary scientist and researcher in charge of the Saranac Laboratory studies unexpectedly died.

    28m.  In 1946, Dr. Anthony Lanza was elected to the Board of Trustees of the Saranac Laboratory, Trudeau Foundation but maintained his position as Medical Director for Metropolitan Life Insurance Company. Thereafter, on numerous occasions signatories of the 1936 agreement began to enlist the services of Dr. Lanza to have an edited report of Dr. Gardner's studies published.

    28n.  On January 21, 1947, Dr. Lanza met with executives of Johns-Manville to devise a plan to have Dr. Gardner's Saranac studies published. During the meeting Vandiver Brown called attention to the editorial control of the asbestos company sponsors over any publication and of the importance of not including any objectionable material from

the conspirators point of view such as the relationship between asbestos dust and cancer which Dr. Gardner had made in his monograph or outline on human asbestosis.

      28o.   On November 11, 1948, representatives of the following conspirators met at the headquarters of Johns-Manville Corporation:  American Brake Block Division of American Brake and Shoe Foundry, Gatke Corporation, Keasbey & Mattison Company (then an alter-ego to conspirator Turner & Newall), Raybestos Manhattan, Inc., Thermoid Company (whose assets and liabilities were later purchased by H.K. Porter Company), Union Asbestos and Rubber Company and United States Gypsum.  U.S. Gypsum did not send a representative to the meeting, but instead authorized Vandiver Brown of Johns-Manville to represent its interest at the meeting and to take action on its behalf.

      28p.   At this November 11, 1948 meeting, these co-conspirators and their representatives decided to exert their influence to materially alter and misrepresent material facts about the substance of research started by Dr. Leroy Gardner at the Saranac Laboratories beginning in 1936.  Dr. Gardner's research involved the carcinogenicity of asbestos in mice and also included an evaluation of the health effects of asbestos on humans with a critical view of the then-existing standards of dust exposure for asbestos and asbestos products.

      28q.   At this meeting, these co-conspirators intentionally and affirmatively determined that Dr. Gardner's work should be edited to specifically delete material facts about the cancer-causing propensity of asbestos and the health effects of asbestos on humans and the critique of the dust standards and then published same in the medical literature as edited by Dr. Arthur Vorwald.  These Defendants thereby fraudulently misrepresented the risks of asbestos exposure to the public in general and the class of persons exposed to asbestos, including the Plaintiffs.

      28r.   As a result of influence exerted by the above-described conspirators, Dr. Vorwald published Dr. Gardner's edited work in the <u>Journal of Industrial Hygiene,</u> <u>AMA Archives of Industrial Hygiene Occupational Health</u> in 1951 in a form that stressed those portions of Dr. Gardner's work that the conspirators wished stressed, but which omitted references to human asbestosis and cancer, thereby fraudulently and affirmatively misrepresenting the extent of risks.  The conspirators affirmatively and deliberately disseminated this misleading Vorwald publication to university libraries, government

officials, agencies and others.

28s.    Such action constituted a material affirmative misrepresentation of the total content of material facts involved in Dr. Gardner's work and resulted in creating an appearance that inhalation of asbestos was less of a health problem than Dr. Gardner's unedited work indicated.

28t.    The following conspirators were members of the trade association known as Quebec Asbestos Mining Association (Q.A.M.A.): Johns-Manville Corporation, Carey Canada, Inc., Philip Carey Company (whose liabilities have been assumed by Celotex), National Gypsum Company, Turner & Newall, and H.K. Porter Company. These conspirators, members of the Q.A.M.A., participated in the above-described misrepresentation of the work of Dr. Leroy Gardner published by Arthur Vorwald in the AMA Archives of Industrial Health in 1951. Evidence of the Q.A.M.A.'s involvement in this misrepresentation arises from co-conspirator Johns-Manville's membership of the Q.A.M.A., as well as correspondence from co-conspirators dated:

> 10/29/47 from A.R. Fisher to J.P. Woodard
>
> 11/26/47 from J.P. Woodard to Vandiver Brown
>
> 3/6/48 from George K. Foster to J.P. Woodard
>
> 10/15/48 from J.P. Woodard to Vandiver Brown
>
> 3/8/49 from Vandiver Brown to Ivan Sabourin
>
> 3/21/51 from Vandiver Brown to Ivan Sabourin
>
> 9/6/50 from J.P. Woodard to G.K. Foster,

and all indicating close monitoring of the editing process by Q.A.M.A.'s representative, Ivan Sabourin, acting on behalf of all Q.A.M.A.'s members.

28u.    Defendants who were members of the Q.A.M.A. as described above, began in or about 1950 to formulate a plan to influence public opinion about the relationship between asbestos and cancer by influencing the medical literature on this subject and then touting and disseminating this literature to the public and to organizations and legislative bodies responsible for regulatory control of asbestos with the specific intent of misrepresenting the existing scientific information and suppressing contrary scientific data in their possession and control.

28v.   This plan of misrepresentation and influence over the medical literature began in or about 1950 when the aforementioned Q.A.M.A. members selected Saranac Laboratories to do an evaluation of whether cancer was related to asbestos. After a preliminary report authored by Arthur Vorwald in 1952 indicated that a cancer/asbestos relationship might exist in experimental animals, these Q.A.M.A. members refused to further fund the study and it was terminated and never publicly discussed.

28w.   As a result of the termination of this study, these Defendants fraudulently withheld information from the public and affirmatively misrepresented to the public and responsible legislative and regulatory bodies that asbestos did not cause cancer, including affirmative misrepresentations by conspirators' agents K.W. Smith, M.D., Paul Cartier, M.D., A.J. Vorwald, M.D., A.J. Lanza, M.D., Vandiver Brown and Ivan Sabourin, said misrepresentations being directed to inter alia, U.S. Government officials, Canadian government officials, U.S. National Cancer Institute, other medical organizations and the general public, including Plaintiffs.

28x.   Subsequently, the Q.A.M.A. defendant conspirators contracted with the Industrial Hygiene Foundation and Dr. Daniel Braun to further study the relationship between asbestos exposure, asbestosis and lung cancer. In 1957, Drs. Braun and Truan reported to the Q.A.M.A. that asbestosis did increase a workers' chances of incurring lung cancer.

28y.   The Q.A.M.A. defendant conspirators/members thereafter caused, in 1958, a publication of the work by Braun and Truan in which the findings regarding increased incidence of cancer in persons with asbestosis was edited out by agents of the Q.A.M.A. The published version of this study contained a conclusion that asbestos exposure, alone, did not increase the incidence of lung cancer, a conclusion known by the defendant conspirators to be patently false.

28z.   By falsifying and causing publication of studies concluding that asbestos exposure did not cause lung cancer and simultaneously omitting a documented finding that asbestosis did increase the risk of lung cancer, these Q.A.M.A. defendant conspirators affirmatively misrepresented to the public and concealed from the public the extent of risks associated with inhalation of asbestos fibers.

28aa.  In approximately 1958, the Q.A.M.A. defendant conspirators publicized the edited works of Drs. Braun and Truan at a symposium in an effort to fraudulently misrepresent to the public and persons exposed to asbestos that the inhalation of asbestos dust would not cause cancer.

28bb.  The fraudulent misrepresentations beginning in 1946 as elaborated above and continuing with the publication of the 1958 Braun/Truan study influenced the standards set for threshold limit values and prevented the lowering of the threshold limit value because of cancer risk associated with asbestos inhalation.

28cc.  In 1967, Q.A.M.A. conspirators determined at their trade association meeting that they would intentionally mislead consumers about the extent of risks involved in inhalation of asbestos products.

28dd.  The following conspirators were members of the Magnesia Insulation Manufacturers Association which later changed its name to the National Insulation Manufacturers Association (NIMA): Philip-Carey Corporation (whose assets and liabilities have been assumed by Celotex), Johns-Manville, GAF Corporation, The Ruberoid Company, Owens-Corning Fiberglas, Eagle Picher Industries, Inc., Pittsburgh Corning Corporation, Fibreboard Corporation and Keene Corporation.

28ee.  In 1955, these conspirators caused to be published the MIMA 85% Magnesia Insulation Manual.  This manual falsely and fraudulently misrepresented that asbestos-containing products were easily cut and fit and offered no hazard to workers who used these products.

28ff.  In May, 1968 John Vyverberg of Owens-Corning Fiberglas, along with Cliff Sheckler of Johns-Manville, addressed a Southwestern Insulation Contractors Association (SWICA) meeting concerning asbestos related health hazards.  Pittsburgh Corning's R.E. Fuhs reported on that meeting in a 5/28/68 memorandum to R.E. Buckley and stated:

> During the recent SWICA meeting in Biloxi, Mississippi, a great deal of time was spent discussing the health hazards imposed on workers through the use of asbestos in high temperature insulation.
>
> A program was presented by NIMA with Cliff Sheckler of Johns-Manville and John Vyverberg of Owens-Corning bringing the group in attendance up-to-date on the problem and what NIMA is doing to counteract some very adverse activity at the

present time.

> It appears, Bob that the problem of health hazards amongst asbestos workers is rapidly becoming critical (30% of current asbestos workers have pulmonary problems) and that a strong united front is necessary to preserve this industry.  In my opinion, NIMA is doing an excellent job of spotlighting this problem and through research and discreet publicity are probably our best hope of combating this very serious situation.

In 1968, NIMA published a brochure entitled, "Recommended Health Safety Practices for Handling and Applying Thermal Insulation Products Containing Asbestos," which fails to mention asbestosis, lung cancer or mesothelioma.  It states, by way of introduction,

> The modern mass production of hundreds of natural and synthetic materials such as asbestos, has brought the need to protect workers from certain health risks, known or suspected.

This vague reference to "certain health risks" clearly misleads the public including the Plaintiffs by not calling attention to the well established link between asbestos exposure and asbestosis, lung cancer and mesothelioma.  The co-conspirators through their active participation in NIMA, acted in concert with the other NIMA members to distort, suppress and misrepresent information relating to health hazards associated with asbestos.

The following conspirators, among others, were members of the trade organization known as the Asbestos Textile Institute (ATI): Raybestos-Manhattan, Johns-Manville, Southern Asbestos Company/H.K. Porter, Keasbey & Mattison, individually and through its alter-ego Turner & Newall, and National Gypsum Company.

28gg.  In 1947, these conspirators, members of the ATI, received a report from W.C.L. Hemeon regarding asbestosis, which suggested re-evaluation of the then-existing threshold limit values for asbestos exposure.  These defendants caused this report not to be published and thereby fraudulently concealed material facts about asbestos exposure from the public and affirmatively misrepresented to the public and the class of persons exposed to asbestos that the existing threshold limit value was acceptable.  Thereafter, these defendant conspirators withheld additional material information on the dust standards from the American Conference of Governmental Industrial Hygienists (ACGIH), thereby further influencing evaluations of threshold limit values for asbestos exposure.

28hh.  In 1953, conspirator National Gypsum, through its agents, in response to an inquiry from the Indiana Division of Industrial Hygiene regarding health hazards of

asbestos spray products, refused to mail a proposed response to that division indicating that respirators should be worn by applicators of the product. National Gypsum's response distorted and fraudulently misrepresented the need for applicators of asbestos spray products to wear respirators and fraudulently concealed from such applicators the need for respirators.

28ii.   In 1955, conspirator Johns-Manville, through its agent Kenneth Smith, caused to be published in the AMA Archives of Industrial Health an article entitled "Pulmonary Disability in Asbestos Workers". This published study materially altered the results of an earlier study in 1949 concerning the same set of workers. This alteration of Dr. Smith's study constituted a fraudulent and material misrepresentation about the extent of the risk associated with asbestos inhalation.

28jj.   In 1955, the National Cancer Institute held a meeting at which conspirator Johns-Manville, individually and as an agent for other alleged co-conspirators, affirmatively misrepresented that there were no existing animal studies concerning the relationship between asbestos exposure and cancer, when, in fact, the conspirators were in secret possession of several studies which demonstrated that positive evidence did exist.

28kk.   In 1957, the aforementioned conspirators, members of the ATI, jointly rejected a proposed research study on cancer and asbestos and this resulted in fraudulently concealing from the public material facts regarding asbestos exposure and also constituted an affirmative misrepresentation of the then-existing knowledge about asbestos exposure and lung cancer.

28ll.   In 1964, conspirators who were members of the ATI met to formulate a plan for rebutting the association between lung cancer and asbestos exposure that had been recently discussed by Dr. Irvin J. Selikoff. Thereafter, these members of the ATI embarked upon a campaign to further misrepresent the association between asbestos exposure and lung cancer.

28mm.   In 1970, Defendants The Celotex Corporation and Carey-Canada, through their agents, affirmatively misrepresented that they had been in the asbestos business since 1918 and found no reported conditions of asbestosis or lung disease. This constituted a fraudulent misrepresentation about the material facts known to these Defendants.

28nn.  All conspirators identified above approved and ratified and furthered the previous conspiratorial acts of conspirators Johns-Manville, Raybestos Manhattan, and A.J. Lanza, acting on behalf of Metropolitan Life Insurance Company, and all alleged co-conspirators during the dates and circumstances alleged above, acted as agents and co-conspirators for the other conspirators.

28oo.  The acts of the Defendant conspirators, as described above, constitute a fraudulent misrepresentation which proximately caused injury to the Plaintiffs in the following manner:

(a)  The material published or caused to be published by the Defendants was false and incomplete in that the Defendants knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-related products.

(b)  Defendants individually, as members of a conspiracy, and as agents of other co-conspirators, intended that the publication of false and misleading reports and/or the nondisclosure of documented reports of the health hazards of asbestos:

(1)  maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-related products;

(2)  assist in the continued pecuniary gain of the Defendants through the sale of their products;

(3)  influence in the Defendants' favor proposed legislation to regulate asbestos exposure; and,

(4)  provide a defense in lawsuits brought for injury resulting from asbestos disease.

(c)  Plaintiffs reasonably relied upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-related products, and the absence of published medical and scientific reports on the hazards of asbestos and asbestos-related products, and continued their exposure to asbestos because they believed it to be safe.

(d)  Defendants individually, as members of a conspiracy, and as agents of other co-conspirators intended Plaintiffs to rely upon the published reports regarding the safety of asbestos and asbestos-related products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products, and to continue their exposure to those products.

(e)  Defendants individually, as members of a conspiracy, and as agents of other co-conspirators are in a position of superior knowledge regarding the health hazards of asbestos and therefore Plaintiffs had a right to rely on the published reports commissioned by the Defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products.

(f)  Plaintiffs suffered injury as a direct and proximate result of the acts alleged herein.

28pp.  Deleted.

28qq.  On October 28, 1938, Owens-Illinois, Inc., and Corning Glass Works entered into an agreement for the formation of Owens-Corning Fiberglas Corporation. When Owens-Corning Fiberglas was incorporated in 1938 it had an interlocking Board of Directors consisting of seven members, three of whom were designated by Owens-Illinois and three of whom were designated by Corning Glass Works.  The seventh member was Harold Boeschenstein who was President of Owens-Corning Fiberglas Corporation since its inception in 1938 and was also on the Board of Directors of Owens-Illinois.

28rr.  As early as March 9, 1937, W.C. Templer, M.D., medical director of Corning Glass Works, one of the parent companies of Owens-Corning Fiberglas Corporation, was aware that asbestos was capable of producing fibrosis of the lung.

28ss.  Additionally, as early as 1941, representatives of Owens-Corning Fiberglas Corporation and Owens-Illinois, Inc. shared information concerning the hazards of asbestos exposure.

28tt.  Despite this knowledge, Owens-Illinois entered into an agreement with Owens-Corning Fiberglas whereby Owens-Corning Fiberglas Corporation became the national distributor of Kaylo products from 1953 to 1958, at which time Owens-Illinois sold the Kaylo product line to Owens-Corning.  At least in 1956, Owens-Illinois placed the Owens-Corning Fiberglas logo on some boxes of Kaylo, all of which were sold, then and thereafter without any warnings concerning the dangers of exposure to asbestos-containing products.

28uu.  ACandS, Inc. began operating in 1958 under the name Armstrong Contracting and Supply Corporation.  It was a wholly owned subsidiary of the Armstrong

Cork Company, now known as Armstrong World Industries. ACandS, Inc. conspired with the makers of the products it distributed by failing to recommend non-asbestos products and by failing to warn handlers and users of the hazards of asbestos. ACandS, Inc. and these manufacturers used their respective positions in the market place to suppress knowledge of the hazards of asbestos and prevent it from reaching users of these products such as the Plaintiffs. ACandS, Inc. not only failed to warn of the dangers despite its knowledge, but also failed to transmit any warnings its suppliers may have provided.

28vv.   ACandS, Inc. particularly conspired with Turner & Newall which exercised great control over the sales and application of Limpet, an asbestos-containing spray product. Turner & Newall shared its longstanding knowledge of the hazards of asbestos with ACandS, Inc. ACandS, Inc. joined Turner & Newall in failing to warn users of Limpet of the dangers and in suppressing Turner & Newall's substantial and specific knowledge of the hazards of asbestos.

28ww.   ACandS, Inc., furthermore, cooperated with its insurance companies and other insurance companies by settling claims by workmen for injury due to asbestos exposure, thereby preventing public knowledge of the claims and hazards.

28xx.   Armstrong World Industries conspired with the makers of the products it relabeled and distributed by failing to recommend non-asbestos products and by failing to warn ultimate building users of the hazards of asbestos. Armstrong World Industries and these manufacturers, which included Baldwin-Ehret-Hill (Keene), Eagle Picher, Keasbey & Mattison (Turner & Newall and/or Nicolet) used their respective positions in the market place to suppress knowledge of the hazards of asbestos and prevent it from reaching users of these products, including the Plaintiffs. Armstrong not only failed to warn of the dangers despite its knowledge, it also failed to transmit any warnings these other manufacturers provided to Armstrong.

28yy.   Armstrong Cork (now Armstrong World Industries), in concert with Armstrong Contracting and Supply Corp., joined forces to suppress information about the asbestos hazards that had overcome their mutual workforce. Armstrong Cork, Armstrong Contracting and Supply Co., (now ACandS, Inc.) and their insurance carriers suppressed information by making cash settlements to workers who submitted compensation claims.

28zz.  In November, 1961, Smith and Kanzler and Asbestospray joined forces with Columbia Acoustics and Fireproofing Company, (now U.S. Minerals Products Corp.) and others to organize a trade association to promote the use of asbestos-containing sprayed fiber products.

28aaa.   In October, 1965, Baldwin-Ehret-Hill (now Keene) joined the aforementioned group of asbestos spray fireproofing manufacturers comprised of Defendant U.S. Mineral Products Company, Asbestospray Corporation and Smith & Kanzler Company. The group was called the Spray Mineral Fibers Manufacturers' Association (SMFMA). The purpose of this organization was to promote the use of the members' asbestos spray products by representing those products to be safe and suitable for use as fireproofing and thermal insulation (contrary to the specific knowledge of the members that asbestos was dangerous). The group sponsored secret asbestos dust tests of the members' products which proved Keene's products to be unreasonably and uncontrollably dusty.  The result of the secret asbestos dust studies were shared among the group but were suppressed from the general public as well as from the users, installers and consumers of those products.

28bbb.  From its creation, SMFMA was represented actively by counsel who was present at all meetings and wrote or reviewed all minutes for the express purpose of defending against subsequent allegations of conspiratorial activity by the members. Subsequent correspondence revealed:

> Having had some said experience with antitrust investigation and some with trade associations, I think if you are serious about the organization of such an association, it might be highly advisable to have an attorney on hand even at this first meeting, lest everybody get accused later of conspiracy, "phases of the moon," etc.

28ccc.  As the popular press began to regularly publish medical findings in 1965 which established the unquestionable link between asbestos and cancer, Baldwin-Ehret-Hill (Keene) worked with the other members of SMFMA to try to suppress and minimize public recognition of the hazards posed by spray asbestos products in buildings.

28ddd.  Moreover, the group acted in express unanimity to discredit and undermine manufacturers who made spray mineral fiber products which did not contain asbestos.  The group further acted in concert to suppress information published by non-asbestos spray mineral fiber manufacturers that would alert the public to the inherent

dangers of asbestos spray products due to foreseeable dusting, flaking and cracking.

28eee.  Along with the Celotex Corporation, Georgia Pacific Corporation, National Gypsum Company and others, U.S. Gypsum was a member of a trade association called the Gypsum Association.

28fff.  As recently as 1970, Defendant U.S. Gypsum demonstrated its tacit agreement with other Defendant and non-defendant members of the asbestos industry to keep silent on the health hazards of asbestos.  U.S. Gypsum understood that its decision to put an asbestos warning on any of its products was a decision that had to be made by the entire industry or be subject to competitive disadvantages because each company, including U.S. Gypsum, knew that consumers would not purchase their products if they were made aware of the hazards of their asbestos content.

28ggg.  The acts of the Defendant conspirators, as described above, constitute a fraudulent misrepresentation which proximately caused injury to the Plaintiffs in the following manner:

(a)  The material published or caused to be published by the Defendants was false and incomplete in that the Defendants knowingly failed to advise the general public including the Plaintiffs of the known health hazards of asbestos and asbestos-related products.

(b)  Defendants individually, as members of a conspiracy, and as agents of other co-conspirators, intended that the publication of false and misleading reports and/or the nondisclosure of documented reports of the health hazards of asbestos:

(1)  maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-related products;

(2)  assist in the continued pecuniary gain of the Defendants through the sale of their products;

(3)  influence in the Defendants' favor proposed legislation to regulate asbestos exposure; and,

(4)  provide a defense in lawsuits brought for injury resulting from asbestos disease.

(c)  Plaintiffs reasonably relied upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-related products, and the absence

of published medical and scientific reports on the hazards of asbestos and asbestos-related products to continue their exposure to asbestos because they believed it to be safe.

(d)   Defendants individually, as members of a conspiracy, and as agents of other co-conspirators intended that Plaintiffs rely upon the published reports regarding the safety of asbestos and asbestos-related products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products, to continue his exposure to those products.

(e)   Defendants individually, as members of a conspiracy, and as agents of other co-conspirators are in a position of superior knowledge regarding the health hazards of asbestos and therefore Plaintiffs had a right to rely on the published reports commissioned by the Defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products.

(f)   Plaintiffs suffered injury as a direct and proximate result of the acts alleged herein.

29.   Defendants' conspiracy and conduct in furtherance thereof were a direct and proximate cause of Plaintiff's asbestos-related disease.

30.   **WHEREFORE**, Plaintiff requests judgment against Defendant Metropolitan Life Insurance and each and every one of the Defendant Asbestos Suppliers, in the amount of **TWO MILLION DOLLARS ($2,000,000.00)** compensatory damages and **FOUR MILLION DOLLARS ($4,000,000.00)** punitive damages.

## COUNT SIX - MARKET SHARE LIABILITY

31.   Plaintiff adopts and incorporates by reference paragraphs 1, 2 when appropriate, 3, 3-A when appropriate, 3-B when appropriate, 3-C when appropriate, 3-D when appropriate, 4 - 8, 8-A when appropriate, 8-B when appropriate, 9, 9-A when appropriate, 10, 10-A when appropriate, 10-B, 10-C, 13, 13-A when appropriate, 16, 16-A when appropriate, 16-B when appropriate, 17, 17-A when appropriate, 18, 21 - 24, and 24-A when appropriate to this Master Complaint as if fully set forth herein.

32.   At all times relevant hereto, the named Defendants represent substantially all those involved in the mining and/or manufacturing and/or fabricating and/or supplying and/or distributing and/or selling of asbestos products to which Plaintiff

was exposed during the relevant time periods.  To the extent that Plaintiff may be unable to identify the actual manufacturers, suppliers, or distributors of the specific asbestos products to which he was exposed, all named Defendant Suppliers are liable to Plaintiff in proportion to their market share position in the industry with reference to asbestos products. All named Defendant Asbestos Suppliers are therefore liable to Plaintiff in such proportion under the theory of "enterprise liability" set forth, among other places, in <u>Sindell v. Abbott Laboratories</u>, 26 Cal. 3d 588, 163 Cal. Rptr. 132, 607 P.2d 924 (1980), <u>cert. denied</u> 449 U.S. 921 (1980).

33.     **WHEREFORE**, Plaintiff requests judgment against each and every one of the Defendant Asbestos Suppliers, in the amount of **TWO MILLION DOLLARS ($2,000,000.00)** compensatory damages and **FOUR MILLION DOLLARS ($4,000,000.00)** punitive damages.

## COUNT SEVEN - LOSS OF CONSORTIUM

34.     Plaintiff adopts and incorporates by reference paragraphs 1, 2 when appropriate, 3, 3-A when appropriate, 3-B when appropriate, 3-C when appropriate, 3-D when appropriate, 4 - 8, 8-A when appropriate, 8-B when appropriate, 9, 9-A when appropriate, 10, 10-A when appropriate, 10-B, 10-C, 13, 13-A when appropriate, 16, 16-A when appropriate, 16-B when appropriate, 17, 17-A when appropriate, 18, 21 - 24, 24-A when appropriate, 27 - 29, and 32 of this Master Complaint as if fully set forth herein.

35.     Plaintiffs have been married to each other at all relevant points in time.

36.     Plaintiffs have suffered and will continue to suffer a loss of consortium to the detriment of their marital relationship, which loss and detriment are a proximate consequence of the aforementioned acts, omissions, failures and breaches of warranty, duty, and law by Defendants.

37.     **WHEREFORE**, Plaintiffs request judgment against each and every one of the Defendants in the amount of **ONE MILLION DOLLARS ($1,000,000.00)** compensatory damages and **TWO MILLION DOLLARS ($2,000,000.00)** punitive damages.

## COUNT EIGHT - WRONGFUL DEATH

38.     Plaintiff adopts and incorporates by reference paragraphs 1, 3, 3-A when appropriate, 3-B when appropriate, 3-C when appropriate, 3-D when appropriate, 4 - 8, 8-A when appropriate, 8-B when appropriate, 9, 9-A when appropriate, 10, 10-A, 10-B

and 10-C when appropriate, 13, 13-A when appropriate, 16, 16-A when appropriate, 16-B when appropriate, 17, 17-A when appropriate, 18, 21 - 24, 24-A when appropriate, 27 - 29, and 32 of the Master Complaint as if fully set forth herein.

39.     Plaintiff and Plaintiff's decedent were married at the time of his death and had been for many years; and, as a direct and proximate result of Defendants' acts, omissions, failures, breaches of warranty, duty and law as alleged above, Plaintiff's decedent developed an asbestos-related disease, which caused his death.

40.     As a direct and proximate result of the wrongful death of Plaintiff's decedent, Plaintiff has lost and has been deprived of the services, care, attention, society, companionship, comfort, protection, marital care, advice, counsel and guidance which Plaintiff's decedent rendered to her while alive and which he would have continued to afford and render to her had he continued to live.  As a further and direct proximate result of the tortious conduct and products complained of herein, Plaintiff has suffered and will suffer extreme mental anguish and emotional pain and suffering and, further, has been, is and will be unable to live her normal life.

41.     By reason of the aforementioned acts, omissions, failures, breaches of warranty, duty and law by the Defendant Asbestos Suppliers, a cause of action has accrued for the use of and on behalf of Plaintiff for compensation to her for all pecuniary losses and damages, past, present and future which she has sustained, is sustaining and will sustain.

42.     As a result of their marriage, Plaintiff and Plaintiff's decedent had children, including a minor, who, by his Next Friend, joins in this action as a Plaintiff.

(42-A)  As a result of their marriage, Plaintiff and Plaintiff's decedent had children, who join in this action as Plaintiffs.

43.     As a direct and proximate result of the wrongful death of their father, the children have lost and have been deprived of the services, care, attention, society, companionship, comfort, protection, guidance and education which their father rendered to them while alive and which he would have continued to afford and render to them had he continued to live.  As a further and direct proximate result of the tortious conduct and products complained of herein, Plaintiffs have suffered and will suffer extreme mental anguish and emotional pain and suffering and further, have been, are and will be unable to live their normal lives.

44.     By reason of the aforementioned acts, omissions, failures, breaches of warranty, duty and law by the Defendant Asbestos Suppliers, a cause of action has accrued for the use of and on behalf of Plaintiffs for compensation to them for all pecuniary losses and damages, past, present and future which they have sustained, are sustaining and will sustain.

45.     **WHEREFORE,** Plaintiff requests judgment against each and every one of the Defendant Asbestos Suppliers in the amount of **TWO MILLION DOLLARS ($2,000,000.00)** compensatory damages and **FOUR MILLION DOLLARS ($4,000,000.00)** punitive damages.

<u>COUNT NINE - PREMISES LIABILITY</u>

46.     Plaintiffs adopt and incorporate by reference paragraphs 1, 2 when appropriate, 3, 3-A when appropriate, 3-B when appropriate, 3-C when appropriate, 3-D when appropriate, 8, 8-A when appropriate, 8-B when appropriate, 9, 9-A when appropriate, 10, 10-A when appropriate, 10-B, 10-C, 34 - 36, 38 - 44 when appropriate, as if fully set forth herein.

47.     Plaintiff, on numerous occasions and for substantial periods of time, was invited onto and lawfully entered upon property owned and/or controlled by certain corporations (hereinafter the Premises Liability Defendants) to perform work for the benefit of said Premises Liability Defendants.  At all such times, or a substantial majority of such time, Plaintiff was employed by individuals or entities other than the Premises Liability Defendants.

(47-A) **Spouse's Actions only** - Plaintiff's spouse, on numerous occasions, and for substantial periods of time, was invited onto and lawfully entered upon property owned and/or controlled by the Premises Liability Defendants to perform work for the benefit of said Premises Lability Defendants.  At all such time, or a substantial majority of such time, neither Plaintiff nor Plaintiff's spouse was employed by the Premises Liability Defendants.

48.     The Premises Liability Defendants each owed a duty of care to Plaintiff, as invitee, to use due care to maintain their premises free of unreasonably dangerous and/or defective conditions and to provide a reasonably safe place in which to work.

(48-A)  **Spouse's Actions only** - The Premises Liability Defendants each owed a duty of care to Plaintiff, as the spouse of an invitee, to use due care to maintain their premises in such a fashion that workers would not unknowingly carry asbestos dust and fibers outside the work environment in such a manner that others such as Plaintiff could be subjected to injurious inhalation of asbestos dust and fibers.

49.     Before and during the times when Plaintiff was injuriously exposed to asbestos while upon the property of the Premises Liability Defendants as invitee, said Defendants knew or should have known that:

(a)     Large quantities of asbestos-containing products were present on their premises;

(b)     The asbestos-containing products on their premises released dangerous levels of airborne asbestos fibers during application, deterioration, and removal;

(c)     Persons such as Plaintiff would work with, around, or in close proximity to those working with the asbestos-containing products on their premises and would thus inhale injurious quantities of asbestos fibers;

(d)     The inhalation of asbestos fibers could cause asbestos lung disease and other asbestos-related diseases;

(e)     Plaintiff was unaware of the dangers of asbestos exposure, or the full magnitude of that danger, and thus could not reasonably be assumed to take, or to be equipped to take, adequate measures to protect himself.

(49-A)  **Spouse's Actions only** - Before and during the times when Plaintiff was injuriously exposed to asbestos while Plaintiff's spouse was upon the property of the Premises Liability Defendants as invitee, said Defendants knew or should have known that:

(a)     Large quantities of asbestos-containing products were present on their premises;

(b)     The asbestos-containing products on their premises released dangerous levels of airborne asbestos fibers during application, deterioration, and removal;

(c)     Persons such as Plaintiff's spouse would work with, around or in close proximity to those working with asbestos-containing products on their premises and would thus carry asbestos dust and fibers away from the premises and injuriously expose others such as Plaintiff to asbestos dust and fibers;

(d)   The inhalation of asbestos fibers could cause asbestos lung disease and other asbestos-related diseases;

(e)   Plaintiff was unaware of the dangers of asbestos exposure, or the full magnitude of that danger, and thus could not reasonably be assumed to take, or equipped to take, adequate measure to protect herself.

50.   Nonetheless, the Premises Liability Defendants negligently failed, inter alia, to:

(a)   Warn Plaintiff and others similarly situated of the unreasonably dangerous and/or defective condition of the premises;

(b)   Remove or contain the asbestos-containing material so as to render the premises safe;

(c)   Cease and discontinue further use of asbestos-containing products about their premises;

(d)   Require that safe work practices be adhered to about their premises;

(e)   To otherwise exercise their control of the property in a manner reasonably calculated to maintain their premises free of unreasonably dangerous and/or defective conditions.

(50-A) **Spouse's Actions only** - Nonetheless, the Premises Liability Defendants negligently failed, inter alia, to:

(a)   Warn Plaintiff or Plaintiff's spouse and others similarly situated of the unreasonably dangerous situation created by its invitees unknowingly creating injurious asbestos exposure to persons outside the premises;

(b)   Cease and contain the asbestos-containing materials so as to render the premises safe;

(c)   Cease and discontinue further use of asbestos-containing products about their premises;

(d)   Require that invitees leave the premises free of asbestos dust and fibers so as not to subject others, such as Plaintiff, to inhalation of asbestos dust and fibers outside the premises;

and fibers so as not to subject others, such as Plaintiff, to inhalation of asbestos dust and fibers outside the premises;

(e)    To otherwise insure that dangerous substances used within the Defendants premises did not escape to cause harm to those, such as Plaintiff, outside the premises.

51.    **WHEREFORE**, Plaintiff requests Judgment against each and every one of the Premises Liability Defendants in the amount of **TWO MILLION DOLLARS ($2,000,000.00)** compensatory damages and **FOUR MILLION DOLLARS ($4,000,000.00)** punitive damages.

GEORGE A. WEBER, III (PID No. 13674)
ROBERT S. PATTERSON (PID No. 12205)
JERE FRANKLIN OWNBY III (PID No.14979)
J. QUINN WINDHAM (PID No. 15716)
DAVID K. OVERSTREET (PID No. 15590)
JOHN A. ANEN (PID No. 319010)
ATTORNEYS FOR PLAINTIFFS

LAW OFFICES OF PETER G. ANGELOS
2643 KINGSTON PIKE, FIRST FLOOR
KNOXVILLE, TENNESSEE 37919
(615) 673-9900

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been furnished to counsel of record in this cause by hand-delivery or by placing the same in the U.S. Mail, postage prepaid and addressed as follows:

Hugh B. Bright, Esq.
M. Denise Moretz, Attorney
Baker, Worthington, Crossley,
Stansberry & Woolf
900 Gay Street
Post Office Box 1792
Knoxville, Tennessee  37901

Andrew Craig Troutman, Esq.
O'Neil, Parker & Williamson
416 Cumberland Avenue
Post Office Box 214
Knoxville, Tennessee  37901

G. Mark Phillips, Esq.
The Hood Law Firm
Post Office Box 1508
Charleston, South Carolina  29401

Steven L. Hurdle, Esq.
Arnett, Draper & Hagood
Suite 2300, Plaza Tower
800 South Gay Street
Knoxville, Tennessee  37902

Eric L. Zalud
Benesch, Friedlander, Coplan
and Arnoff
1100 Citizens Building
850 Euclid Avenue
Cleveland, Ohio  44114-3399

Bernard Bernstein
Bernstein, Stair & McAdams
First Tennessee Bank Building, #600
530 South Gay Street
Knoxville, Tennessee  37902

Thomas A. Bickers
Paine, Sweeney & Tarwater
800 South Gay Street, 1100 Plaza Tower
Post Office Box 198
Knoxville, Tennessee  37901

William D. Vines, III, Esq.
Butler, Vines, Babb & Threadgill
507 South Gay Street
Post Office Box 2649
Knoxville, Tennessee  37901

John W. Baker, Jr., Esq.
Poore, Cox, Baker, Ray & Byrne
11th Floor, Valley Fidelity Bank Building
Post Office Box 1708
Knoxville, Tennessee  37901

John W. Curtis, Esq.
Leitner, Warner, Moffit,
  Williams & Dooley
801 Broad Street
Chattanooga, Tennessee  37402

Kent Krause, Esq.
Brewer, Krause & Brooks
Suite 2600, The Tower
611 Commerce Street
Nashville, Tennessee  37203

James E. Wagner, Esq.
Frantz, McConnell & Seymour
Post Office Box 39
Knoxville, Tennessee  37901

Debra Fulton, Attorney
Frantz, McConnell & Seymour
Post Office Box 39
Knoxville, Tennessee  37901

Darryl G. Lowe
Lowe, Shirley & Yeager
Riverview Tower
Suite 1950
900 South Gay Street
Knoxville, Tennessee  37902

John Vistas
Kathy Condo
Reed, Smith, Shaw & McClay
Post Office Box 2009
435 Sixth Avenue
Pittsburgh, Pennsylvania  15230

This _27th_ day of _August_ , 1993.

_____
**ATTORNEY**

Source: All Sources > Federal Legal - U.S. > District Court Cases - By State > **TN Federal District Courts** 🛈
Terms: **morgan w/sent brush w/sent wellman** (Edit Search)

⌐ Select for FOCUS™ or Delivery

*2000 U.S. Dist. LEXIS 9898, ***

TROY MURPHY **MORGAN**, et ux., Plaintiffs v. **BRUSH WELLMAN,** INC., et al., Defendants; GARY FOSTER, et ux., Plaintiffs v. **BRUSH WELLMAN,** INC., et al., Defendants; JAMES L. GRANT, et ux., Plaintiffs v. **BRUSH WELLMAN,** INC., et al., Defendants; JERRY HALL, et ux., Plaintiffs v. **BRUSH WELLMAN,** INC., et al., Defendants; MACK A. ORICK, et ux., Plaintiffs v. **BRUSH WELLMAN,** INC., et al., Defendants; ALFRED G. BELL, et ux., Plaintiffs v. UNITED STATES OF AMERICA, Defendant; ALBERT GLADSON, et ux., Plaintiffs v. UNITED STATES OF AMERICA, Defendant; ESTHER SHULAR, et vir., Plaintiffs v. UNITED STATES OF AMERICA, Defendant; JOYCE J. CABE, et vir., Plaintiffs v. UNITED STATES OF AMERICA, Defendant; ALFRED L. HAYNES, et ux., Plaintiffs v. UNITED STATES OF AMERICA, Defendant; BURLIN McKINNEY, et ux., Plaintiffs v. UNITED STATES OF AMERICA, Defendant; JOHN R. BURNUM, et al., Plaintiffs v. UNITED STATES OF AMERICA, Defendant; ROBERT G. FREELS, Plaintiff v. UNITED STATES OF AMERICA, Defendant

No. 3:94-cv-369, No. 3:97-cv-105, No. 3:97-cv-593, No. 3:99-cv-110, No. 3:98-cv-652, No. 3:95-cv-505, No. 3:96-cv-459, No. 3:96-cv-254, No. 3:96-cv-253, No. 3:96-cv-252, No. 3:96-cv-251, No. 3:97-cv-141, No. 3:97-cv-605

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE

2000 U.S. Dist. LEXIS 9898

February 16, 2000, Filed

**DISPOSITION:** **[*1]** Motions to dismiss for lack of subject matter jurisdiction granted. Actions dismissed.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant United States moved to dismiss for lack of subject matter jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1), plaintiffs' tort claims against it under the Federal Torts Claims Act, 28 U.S.C.S. § 1346(b), et seq., for injuries allegedly suffered following their employment at nuclear plants.

**OVERVIEW:** Plaintiffs were employees or former employees of a government contractor who alleged they were injured by exposure to beryllium at federal nuclear power plants. Plaintiffs sued defendant federal government under the Federal Torts Claims Act (FTCA), 28 U.S.C.S. § 1346(b), et seq. Defendant moved to dismiss for lack of subject matter jurisdiction contending that all claims against it were barred either by the discretionary function exception to the FTCA or were claims against plaintiffs' employer, an independent contractor of the government, for whose negligence the United States was not liable. The court found none of the conduct plaintiffs alleged occurred demonstrated that the government violated any mandatory statutory or regulatory provisions with respect to which it had no discretion. Consequently, the discretionary function exception applied. Moreover, there was no substantial supervision over the day-to-day operations of the independent contractors by a federal agency, so defendant was not liable for the negligence of any of the employees of its independent contractors. Dismissal of the claims against defendant was ordered.

**PLAINTIFF'S EXHIBIT**
2

**OUTCOME:** The court granted the motion to dismiss, finding the claims were protected by the discretionary function exception, thus the court lacked subject matter jurisdiction; moreover, defendant could not be liable for the negligence of any of the employees of its independent contractors.

**CORE TERMS:** contractor, beryllium, exposure, workplace, hazard, regulation, discretionary function, mandatory, plant, exposed, monitoring, respirable, inspection, discretionary, imminent danger, subject matter jurisdiction, environmental protection, day-to-day, directive, monitor, safe, government employees, disease, prescribed, effective, independent contractor, supervision, chronic, duty, industrial

### CORE CONCEPTS - ◆ Hide Concepts

Civil Procedure : Pleading & Practice : Defenses, Objections & Demurrers : Motions to Dismiss

When considering a factual Fed. R. Civ. P. 12(b)(1) motion, the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case, and no presumptive truthfulness attaches to the plaintiffs' allegations. Furthermore, plaintiffs will have the burden of proof that jurisdiction does in fact exist.

Torts : Public Entity Liability : Federal Causes of Action

The Federal Torts Claims Act (FTCA), 28 U.S.C.S. § 1346(b), et seq., authorizes suits against the United States for damages caused by the tortious conduct of federal employees when such conduct would render a private actor liable under the law of the place where the conduct occurred. 28 U.S.C.S. § 1346(b). However, the FTCA does not permit claims based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved is abused. 28 U.S.C. S. § 2680(a).

Torts : Public Entity Liability : Federal Causes of Action

The United States Supreme Court has provided a two-step analysis used to determine whether the discretionary function exception in the Federal Torts Claims Act (FTCA), 28 U.S.C.S. § 1346(b), et seq., applies in a particular case. First, the court must determine whether the challenged conduct involves an element of judgment or choice. It is crucial to first identify the actual conduct which is in question. In addition, the exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of conduct for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive. Second, if the challenged conduct involves discretion, the court must determine whether that discretion is of the kind the discretionary function exception was designed to shield. The purpose of the exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.

Energy & Utilities Law : Nuclear Power Industry

The Atomic Energy Act of 1954 explicitly authorizes the Atomic Energy Commission and its successor agencies to regulate health and safety as deemed necessary. 42 U.S.C.S. § 2201(I)(3). Statutes and regulations authorizing a government agency to establish such health and safety standards do not impose mandatory or specific duties and the decisions to establish such standards are clearly susceptible to policy considerations.

Torts : Public Entity Liability : Federal Causes of Action

The first part of the test for whether the immunity exception under the Federal Torts

Claims Act (FTCA), 28 U.S.C.S. § 1346(b), et seq., applies requires a determination of whether the challenged act or omission violated a mandatory regulation or policy that allowed no judgment or choice. The requirement of judgment or choice is not satisfied if a federal statute, regulation or policy specifically prescribes a course of action for an employee to follow, because the employee had no rightful option but no adhere to the directive.

Torts : Public Entity Liability : Federal Causes of Action
The United States Court of Appeals for the Sixth Circuit has explicitly held that the discretionary function exception to tort liability under the Federal Torts Claims Act (FTCA), 28 U.S.C.S. § 1346(b), et seq., is applicable to alleged negligence in the delegation of safety responsibilities to a government contractor.

Torts : Public Entity Liability : Federal Causes of Action
The discretionary function exception to tort liability under the Federal Torts Claims Act (FTCA), 28 U.S.C.S. § 1346(b), et seq., encompasses government decisions on how and how much to supervise the safety procedures of independent contractors. Moreover, the retention of open-ended supervisory authority that allows the government employees to exercise choice and discretion does not render the exception inapplicable.

Torts : Public Entity Liability : Federal Causes of Action
Under the Federal Torts Claims Act (FTCA), 28 U.S.C.S. § 1346(b), et seq., the United States is subject to liability for the negligence of an independent contractor only if it can be shown that the government had authority to control the detailed physical performance of the contractor and exercised substantial supervision over its day-to-day activities. This exception is based on the language of the statute which provides that the United States is subject to liability for damages caused by the negligent or wrongful act or omission of any employee of the federal government. 28 U.S.C.S. § 1346(b).

Torts : Public Entity Liability : Federal Causes of Action
The Federal Torts Claims Act (FTCA), 28 U.S.C.S. § 1346(b), et seq., defines employee of the Government as any employees of any federal agency. 28 U.S.C.S. § 2671. "Federal agency" is defined as executive departments, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, that does not include any contractor with the United States.

Torts : Public Entity Liability : Federal Causes of Action
Under the Federal Torts Claims Act (FTCA), 28 U.S.C.S. § 1346(b), et seq., the United States cannot be found liable for the negligence of its independent contractors. There must be substantial supervision over the day-to-day operations of the contractor in order to find that the individual is acting as a government employee.

Torts : Public Entity Liability : Federal Causes of Action
The United States Supreme Court has indicated that detailed regulation and inspections are no longer evidence of an employee relationship. The ability to compel compliance with federal regulations does not change a contractor's personnel into federal employees.

**COUNSEL:** For TROY M **MORGAN**, CORKY D MCCARTER, RICHARD E MYERS, SR, WILMA D MYERS, KATHLENE BEATTY, plaintiffs (94-CV-369): Elizabeth A Rowland, Michael Y Rowland,

Janet Edwards, Rowland & Rowland, Knoxville, TN.

For TROY M **MORGAN**, CORKY D MCCARTER, KAREN S MCCARTER, RICHARD E MYERS, SR, WILMA D MYERS, KATHLENE BEATTY, plaintiffs (94-CV-369): Alicia D Butler, Fredrick M Baron, Steve B Jensen, Baron & Budd, P.C., Dallas, TX.

For KAREN S MCCARTER, plaintiff (94-CV-369): W Andrew Fox, Stewart, Curry & Fox, Knoxville, TN.

For **BRUSH WELLMAN**, INCORPORATED, defendant (94-CV-369): W Kyle Carpenter, Woolf, McClane, Bright, Allen & Carpenter, Knoxville, TN.

**JUDGES:** James H. Jarvis, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** James H. Jarvis

**OPINION: MEMORANDUM OPINION**

The above-styled actions are all brought by employees or former employees of a government contractor against the United States under the Federal Torts Claims Act (FTCA), 28 U.S.C. § 1346(b), et seq. Plaintiffs in each case allege that they suffer from chronic beryllium disease (CBD) as a result of exposure to beryllium **[*2]** or beryllium-containing products while they were engaged in the manufacture of nuclear weapons at the Department of Energy's (formerly the Atomic Energy Commission's) K-25 and Y-12 Plants in Oak Ridge, Tennessee. In some cases, plaintiffs have also sued the manufacturers or sellers of the beryllium and/or beryllium-containing products. However, in each case the United States is a defendant and has moved to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), Federal Rules of Civil Procedure, contending that all claims against it are barred either by the discretionary function exception to the FTCA or are claims against plaintiffs' employer, an independent contractor of the government, for whose negligence the United States is not liable. With respect to these motions, all of these cases raise identical issues and will be consolidated for purposes of these motions only. For the reasons that follow, the government's motions to dismiss each of the claims against it for lack of subject matter jurisdiction will be granted.

Plaintiffs claim that this court has subject matter jurisdiction over their FTCA claims pursuant to 28 U.S.C. § 1346(b). **[*3]** The United States has made a factual attack on the court's subject matter jurisdiction. See RMI Titanium Company v. Westinghouse Electric Corporation, 78 F.3d 1125, 1134 (6th Cir. 1996). ✦When considering a factual Rule 12(b)(1) motion, "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case," and "no presumptive truthfulness attaches to the plaintiffs' allegations." Id. Furthermore, "plaintiffs will have the burden of proof that jurisdiction does in fact exist." Id.

I.

Factual Background

The United States Department of Energy (DOE) owns a number of facilities throughout the United States, including the Y-12 and K-25 Plants in Oak Ridge, where work related to atomic energy, including nuclear weapons, is performed. DOE, as the owner of these facilities, is the successor of the Energy Research and Development Administration (ERDA) and the Atomic Energy Commission (AEC), and like its predecessors, DOE uses management and operating (M&O) contractors to operate these facilities, continuing the arrangements among federal, industrial and academic organizations that were initiated as part of the War **[*4]** Department's Manhattan Engineer District Project (Manhattan Project) to develop the atomic bomb during World War II. The initial M&O contractor hired to operate the K-25 and Y-12

Plants was Union Carbide and Carbon Corporation, which later became the Union Carbide Corporation (Union Carbide). In 1984, Union Carbide did not bid on the renewal contract and Martin Marietta Energy Systems (Martin Marietta) replaced Union Carbide as the M&O contractor. The current contractor at those facilities is Lockheed Martin Energy Systems (Lockheed Martin), the successor to Martin Marietta as a result of the merger of Lockheed Aircraft and Martin Marietta.

DOE's M&O contracts are characterized by their unique purpose and by the special relationship that exists between the government and the M&O contractor. 48 C.F.R. § 17.604 (1993). In essence, these are unique contracts, designed to facilitate long-term private management of government-owned facilities. *See United States v. New Mexico*, 455 U.S. 720, 723, 71 L. Ed. 2d 580, 102 S. Ct. 1373 (1982) (discussion of the nature and operation of M&O contracts).

The Atomic Energy Act of 1946 permits "management contracts for the operation **[*5]** of government-owned plants so as to gain full advantage of the skill and experience of American industry." S. Rep. No. 1211, 79th Cong., 2d Sess. 15 (1946). Although DOE is not compelled to use M&O contractors, they were first statutorily authorized to do so by the Atomic Energy Act of 1946.

Since the passage of the Atomic Energy Act of 1946, AEC, ERDA and DOE have established a comprehensive scheme governing the procedures used by the M&O contractors to perform a wide range of activities, including various forms of subcontracting. This scheme manifests itself through DOE's Acquisition Regulations (DEAR) and through DOE's contracts with its M&O contractors. The DEAR, 48 C.F.R. Chapter 9, implement and supplement the Federal Acquisition Regulation (FAR) as authorized by FAR Subparts 1.3 and 17.6. 48 C.F.R. Subparts 1.3, 17.6 (1993). DEAR Part 970, 48 C.F.R. Part 970 (1993), governs M&O contracting activities.

In 1946, the various arrangements with M&O contractors, as well as the Manhattan Project facilities operated by them, were transferred to the AEC by Executive Order 98.16. The Energy Reorganization Act of 1974 abolished AEC and established ERDA. In 1977, Congress passed the Department **[*6]** of Energy Organization Act, which established DOE and abolished ERDA.

AEC, ERDA and DOE were each given authority to enter into contractual arrangements "for the conduct of research and development activities," 42 U.S.C. § 2051(a); "for the production of special nuclear material in facilities owned by the Commission," 42 U.S.C. § 2061(b); "for the processing, fabricating, separating, or refining in facilities owned by the Commission of source, by-product, or other material, or special nuclear material," 42 U.S.C. § 2201(t); "for the purchase or acquisition of reactor services or services related to or acquired by the operation of reactors," 42 U.S.C. § 2201(u); "for the conduct of research and development activities with private or public institutions or persons," 42 U.S.C. § 5817(a); or "to carry out functions now or hereinafter vested in the [DOE] Secretary," 42 U.S.C. § 7256. In addition, DOE imposes on its M&O contractors requirements for public and employee safety and health at its nuclear facilities. 42 U.S.C. §§ 2051 **[*7]** (d), 2061(b)(2)(B) and (C), 2201(1)(3), and 7274(m).

AEC, ERDA and DOE all exercised the statutory authority to regulate employee safety and health at their contractor-operated facilities by a directives system composed of orders and contractual requirements issued by DOE. Contractors at the various sites have been responsible for day-to-day operations and safety decisions under the general oversight of DOE officials. Orders and directives related to the regulation of employee safety and health have been issued by AEC, ERDA and DOE. On September 30, 1995, DOE Order No. 440.1 was approved. That order replaced the then-existing employee safety and health orders, with the exception of DOE Order No. 5482.1B, which remained in full force and effect. Together

those two orders now form the basis of DOE's program for the protection of federal and contractor employees at DOE-owned, contractor-operated sites. DOE Order 440.1 establishes the framework for the worker protection program, and DOE Order 5482.1B establishes the program for appraisal of employee safety and health.

DOE Order 440.1 states an objective, "to establish the framework for an effective worker protection program that will  [*8]  reduce or prevent accidental losses, injuries, and illnesses and providing DOE Federal and contractor workers with a safe and healthful workplace." Under DOE Order 440.1 and an attachment to that order, both DOE and the contractor are required to participate in the maintenance of a safe workplace for the workers. The order requires that all elements of DOE are required to take enumerated steps to implement a worker protection program for all DOE employees. The order also requires DOE to implement procedures to allow workers, through their supervisors, to stop work when they discover employee exposures to imminent danger, to inform workers of their rights and responsibilities by appropriate means, to identify existing and potential workplace hazards and evaluate the risk of associated worker injury, to provide workers, supervisors, managers, visitors and worker protection professionals with worker protection training to insure that contractors implement effective worker protection programs, to review contractor worker protection program budgets and provide recommendations to the funding official of the appropriateness of the budget request, to provide contractors with technical direction,  [*9]  to insure that unannounced worker protection inspections of contractor workplaces are conducted at least annually to insure immediate and effective remedial actions are taken for imminent danger situations discovered during worker protection inspections, and to conduct an inspection as soon as possible after an imminent danger situation has been corrected to insure that appropriate actions have been taken to preclude recurrence.

DOE Order 440.1 also contains an Attachment 2 which sets out the "contractor requirements document" and describes "worker protection management for DOE contractor employees". This section requires the contractor to, among other things, implement a worker protection program that provides a place of employment free from recognized hazards, to establish written policies, goals and objectives for the worker protection program, to use qualified worker protection staff to direct and manage the worker protection program, to allow contractor workers the right, without reprisal, to accompany DOE protection personnel during workplace inspections, to express concerns related to worker protection, to provide contractor employees the right to be notified when monitoring  [*10]  results indicate that they were exposed to hazardous materials, to implement procedures to allow contractor workers, through their supervisors, to stop work when they discover employee exposures to imminent danger conditions or other serious hazards, and to assess worker exposure to chemical, physical, biological, or ergonomic hazards through appropriate workplace monitoring.

In essence, under DOE Order 440.1, the United States is required to take numerous steps to implement a safety program for its employees and to exercise supervisory or oversight control over the safety steps which the contractor is required to implement for the protection of the contractor's employees. Among other safety requirements, contractors are required to comply with Title 29 of the Code of Federal Regulations (C.F.R.), Part 1910, which are the Occupational Safety and Health Administration (OSHA) Rules and Standards adopted by OSHA after it was created by Congress in 1970. Included in the OSHA standards are the eight-hour time-weighted average exposure limit, the acceptable ceiling concentration, and the acceptable maximum peak exposure limit for beryllium and beryllium compounds. 29 C.F.R. § 1910.1000,  [*11]  Rules 7.1 and 7.2.

DOE Order 5482.1B applies to both DOE elements and contractors performing work for DOE. Under that order, government officials are responsible for most of the safety and health appraisal activities required. However, the contractors are required to perform internal appraisals of their safety and health programs.

Pursuant to congressional authority, the United States entered into an agreement with Union Carbide and Carbon Corporation in 1950, which predates the earliest hire date of any of the plaintiffs. Article XVII of that agreement required the contractor to "conform to all health and safety requirements as may be prescribed by the Commission." In addition, the contractor was directed to "take all reasonable steps and precautions to protect health and minimize danger from all hazards to life and property." Further, Article XVII required the contractor to permit the Commission to inspect the facilities with regard to health and safety. Between 1950 and 1984, the contract provision related to the contractor's responsibilities for health and safety did not change substantially.

The first agreement between DOE and Martin Marietta was dated March 30, 1984. Paragraph [*12] 14 of that contract addressed safety and health requirements and added provisions requiring the DOE contracting officer to notify the contractor not only of non-compliance with the safety and health provisions, but also corrective actions which must be taken by the contractor. In the event of contractor non-compliance with DOE's requirements, the contracting officer was authorized to issue a stop work order, and the contractor was prohibited from seeking compensation or damages for any work stoppage.

The DOE/Lockheed Martin contract was modified in 1995. That modification included the latest environment, safety and health provisions. Paragraph H.16(c)(1), dealing with DOE directives, was materially amended as it related to environment, safety and health requirements. It provided that those areas would be governed by an alternate set of requirements "identified in (1) the standards/requirements identification document(S/RID) approved on November 1, 1994, February 2, 1995, and April 18, 1995, by DOE, or (2) necessary and sufficient standards as approved by DOE." Lockheed Martin developed extensive standards/requirements identification document(S/RID) applicable to the Y-12 Plant and [*13] K-25 site. This is a four volume set of standards and requirements which comprehensively link the DOE directives with specific job functions and addresses the issues of environment, safety and health. This set of standards now forms the framework for worker protection at the DOE Oak Ridge facilities.

At both the Y-12 and K-25 locations, there are several hundred DOE employees who are engaged in a supervisory role with respect to the several thousand Martin Marietta employees who perform the day-to-day operations of the plants. The Martin Marietta workers are clearly employed by Martin Marietta and not by the Department of Energy.

II.

*Plaintiffs' Allegations Against the United States*

The plaintiffs allege that the United States and DOE employees negligently omitted and failed to do the following:

> (1) to warn the plaintiffs and other employees of the health hazards and danger from exposure to respirable particles of beryllium dust,

> (2) to warn the plaintiffs and other employees that some workers who became sensitive to beryllium would develop the disease of berylliosis or chronic disease (CBD) even if their exposures are below the two micrograms per cubic centimeter [*14] of air OSHA eight-hour workplace standard,

> (3) to scientifically research and establish a threshold limit value standard to protect plaintiffs and other employees from the hazards of beryllium in their workplace environment,

(4) to warn the plaintiffs and other employees of the risk of developing berylliosis and progressive respiratory impairment even when exposed to levels below the OSHA workplace standard,

(5) to establish workplace preventative and protective procedures for their contractors' employees,

(6) to monitor respirable levels of beryllium particles in the area of the plant in which the plaintiffs were exposed,

(7) to establish and require the contractor to use adequate safety devices to prevent plaintiffs' exposure to beryllium particles,

(8) to require the contractor to monitor the medical conditions of workers known to be exposed to respirable beryllium,

(9) to establish, prescribe, require and enforce appropriate safety methods, standards and procedures for their contractors regarding exposure to respirable particles or dust from beryllium-containing products, and

(10) to perform and evaluate epidemiological studies of workers exposed to respirable levels of  [*15]  beryllium to determine whether a safe level of beryllium exposure existed.

III.

*Governmental Immunity and the Discretionary Function Exception*

The FTCA is a limited waiver of the United States' sovereign immunity. ☂The FTCA authorizes suits against the United States for damages caused by the tortious conduct of federal employees when such conduct would render a private actor liable under the law of the place where the conduct occurred. 28 U.S.C. § 1346(b). However, the FTCA does not permit claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved is abused." 28 U.S.C. § 2680(a). ☂The United States Supreme Court has provided a two-step analysis used to determine whether the discretionary function exception applies in a particular case. First, the court must determine whether the challenged conduct involves an element of judgment or choice. *Berkovitz v. United States*, 486 U.S. 531, 536, 100 L. Ed. 2d 531, 108 S. Ct. 1954 (1988). Prior to this first step  [*16]  of the analysis, it is crucial to first identify the actual conduct which is in question. In addition, the exception "will not apply when a federal statute, regulation, or policy specifically prescribes a course of conduct for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive." *Id.* Second, if the challenged conduct involves discretion, the court must determine whether that discretion is "of the kind that the discretionary function exception was designed to shield." *United States v. Gaubert*, 499 U.S. 315, 322-23, 113 L. Ed. 2d 335, 111 S. Ct. 1267 (1991). The purpose of the exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814, 81 L. 2d 660, 104 S. Ct. 2755 (1984). Thus, the court must determine whether the discretionary conduct was a policy decision. If so, the exception applies and shields the government from liability from the consequences of that conduct.  [*17]

In *Gaubert*, the Court described the wide range of governmental decisions which are based on social, economic and political policy as follows:

When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion. ... The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis.

*Gaubert*, 499 U.S. at 324-25. The Court rejected the argument that only high level planning or policy decisions were exempt from liability under the discretionary function exception, holding that day-to-day activities at the operational level may be immune from liability if the activities involved are grounded in policy considerations. *Id.* at 325. The Court further noted that the government need not demonstrate that each challenged action was rooted in a social, economic or political policy consideration. Rather, the **[*18]** Court held that, when statutes, regulations or guidelines allow a government agent to exercise discretion, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Id.* at 324.

IV.

*Analysis*

Initially, the plaintiffs who sued only the United States have alleged that DOE violated certain mandatory federal regulations which purportedly required DOE to warn the plaintiffs of the dangers of beryllium exposure. Plaintiffs argue that because these duties were mandatory, DOE employees had no discretion but were required to follow these mandatory requirements, and therefore the discretionary function exception is inapplicable. Plaintiffs describe these mandatory requirements as follows:

> "Occupational safety and health professionals of field organizations shall conduct unannounced compliance inspections of GOCO facilities using the DOE prescribed OSHA standards as requirements. These inspections are in addition to occupational safety and health appraisals or audits required by any other DOE Order, and shall be conducted on a priority basis with respect to the safety and health hazards involved and the number of employees **[*19]** affected. ... Where violations of the DOE prescribed OSHA standards are noted, appropriate follow-up actions shall be taken to assure the effectiveness of corrective actions taken on deficiencies noted during initial compliance inspections."

Chapter II, § 6(a) of DOE Order 5483.1A. In addition, § 6(c) of that same Order states, in pertinent part:

> "In the event the inspector discovers a situation which presents an imminent danger to contractor employees' safety and health, he or she shall take immediate and effective remedial action to assure that employees are removed from the danger area and/or that the danger is eliminated. ... The field organization and the contractor shall assure that the matter is investigated and that prompt actions are taken to preclude recurrence of a similar imminent danger situation."

The plaintiffs further note that under DOE Order 5483.1A, a DOE inspector is required to take specific actions and institute specific procedures when a violation of the OSHA standards set forth in 29 C.F.R. § 1910 by the contractor is discovered. Plaintiffs contend that among the various OSHA standards set forth in 29 C.F.R. § 1910 is a requirement **[*20]** that an employer communicate to employees hazards posed by toxic materials to which employees are actually or potentially may be exposed. Plaintiffs contend that both the contractor and DOE knew of the dangers of exposure to even small amounts of beryllium dust and DOE inspectors failed to take action to "assure the effectiveness of corrective actions" taken by the contractor when the contractor was found to be in violation of the DOE-prescribed OSHA standard by failing to warn its employees of the health hazards of beryllium exposure.

Essentially the plaintiffs argue that they should have been warned of the dangers of exposure to even "trace" amounts of beryllium. However, ✦the Atomic Energy Act of 1954 explicitly authorized the AEC and its successor agencies to regulate health and safety as deemed necessary. 42 U.S.C. § 2201(I)(3). Statutes and regulations authorizing a government agency to establish such health and safety standards do not imposed mandatory or specific duties and the decisions to establish such standards are clearly susceptible to policy considerations. When the AEC prescribed the beryllium standard, which was later adopted by OSHA, the AEC **[*21]** balanced the nation's need for beryllium to manufacture nuclear weapons against the shortcomings of scientific knowledge regarding the potentially dangerous levels of beryllium. When plaintiffs make reference to DOE's failure to notify plaintiffs of the dangers of "trace" amounts of beryllium, they are essentially requesting the court to secondguess the beryllium standards set by OSHA. Deciding whether a lower standard should have been adopted or whether employees of independent contractors should be warned that any level of exposure was an unacceptable risk involves the type of fundamental discretion which the discretionary function exception is intended to protect. I cannot find that there is any mandatory standard set forth in DOE Order 5483.1A which DOE employees failed to comply with.

Other plaintiffs have identified other mandatory DOE orders which they claim DOE workers failed to follow. As noted, ✦the first part of the *Gaubert* test requires a determination of whether the challenged act or omission violated a mandatory regulation or policy that allowed no judgment or choice. "The requirement of judgment or choice is not satisfied if a federal statute, regulation or policy **[*22]** specifically prescribes a course of action for an employee to follow, because the employee had no rightful option but no adhere to the directive." *Berkowitz*, 486 U.S. at 536. The plaintiffs have identified multiple DOE orders which they claim had mandatory regulations or policies which did not allow for discretion on the part of DOE employees and were violated by those employees. These regulations are as follows:

(1) DOE Order 5480.1 (1980) [canceled by DOE Order 5480.1A in 1981]. This order states that it is the policy of DOE to "provide safe and healthful workplaces and conditions of employment for all employees of DOE and DOE contractors." This order also provides that "line organizations are assigned basic responsibility for implementing the DOE environmental protection, safety, and health protection program." This order does not provide a mandatory regulation or policy that allowed no judgment or choice. Rather, it leaves discretion to employees of DOE with respect to how to provide a safe and healthful workplace for its employees and the employees of the contractors. It gives basic responsibility for implementing worker protection programs to DOE line organizations, **[*23]** but it also clearly affords them discretion in how to implement those programs.

(2) DOE Order 5480.1A (1981). This order establishes the "Environmental Protection, Safety and Health Protection Program for Department of Energy (DOE) Operations." The order provides that DOE has authority to establish and enforce environmental protection, safety, and health protection program requirements. It again describes the policy of DOE to provide safe and healthful workplaces and conditions of employment for all employees of DOE and its

contractors. It also gives DOE "line management" responsibility for assuring that "DOE and Federal environmental protection, safety quality assurance, and health protection policies, directives and orders are adhered to continuously and vigorously in all DOE operations." DOE Program Secretarial Officers are also responsible for implementation of the Federal Employee Occupational Safety and Health Program. They are also required to "take such action as may be appropriate to assure safety, including directing the field office manager to curtail and suspend their operations when, in their opinion, such operation would result in undue environmental protection, safety, **[*24]** or health protection risks." Further, the order directs that heads of field organizations shall take such action as may be appropriate to assure safety, including curtailment and suspension of operations when, in their opinion, operation would result in undue environmental protection, safety, or health protection risks. They are further required to execute programs and assure that contractors and their subcontractors execute programs and policies in a manner that shall include compliance with prescribed environmental protection, safety, and health regulations.

This order also requires DOE employees to establish an industrial hygiene program to preserve employee health and well-being. It requires a DOE industrial hygienist to identify and document potential occupational health hazards, carry out periodic walk through surveys, document information provided by inter-organizational communication and coordination, and review proposed projects and facilities. Finally, the order provides that the affected employee "shall be notified promptly of any exposures or potential exposures exceeding the standards of Chapter 1 of this Order."

Again, with respect to this order, there are no mandatory **[*25]** regulations which allegedly have not been followed by DOE employees. They established the programs and set the standards which were required to be established. Plaintiffs simply disagree that these standards and programs as established sufficiently protected their health concerns. For example, plaintiffs do not allege that employees were exposed to levels of beryllium exceeding the standards of Chapter 1 of DOE Order 5480.1A, but DOE employees failed in their mandatory requirement to notify the employees of this exposure. Rather, it is apparently their position that the exposure standards in Chapter 1 were not sufficient to protect their health. Setting those exposure standards was a discretionary function based on policy considerations such as economics and the needs of national security.

(3) DOE Order 5480.10 (Chapter X of Order 5480.1A) (1985). This order states that it is the policy of the Department of Energy to provide places and conditions of employment that are free from or protected against recognized hazards that cause or are likely to cause sickness, impaired health and well-being, or significant discomfort and inefficiency among workers or those with whom they come into **[*26]** contact. The order requires an industrial hygiene program which has features such as requirements to identify and document existing and potential occupational health hazards through knowledge and assessment of the operations, periodic walk-through surveys, information provided by inter-organizational communication, review of proposed projects, facilities, engineering plans and specifications, and maintenance of a hazards inventory or tracking system. The order provides that control measures shall be implemented when it is determined that potential health hazards exist and the industrial hygiene staff shall formally recommend control measures to the first level supervisor who must respond promptly. The order also requires that the program shall include written notification of employees of environmental monitoring results when the results indicate that the employees are exposed above permissible limits. The order also provides for training to include information on operations that may lead to exposure, the potential health effects of the hazard, the content of applicable standards, and the purpose and results of environmental monitoring. That training is to be updated and repeated periodically. **[*27]**

Again, the identification of health hazards, the control measures to be taken, and the type of employee education to be provided are not mandatory requirements. It is within the discretion of DOE employees to implement appropriate control measures, appropriately

educate the employees, and appropriately monitor exposures.

(4) DOE Order 5480.1B (1986) [canceled by DOE Order 440.1 (1995)]. This order requires DOE line management to be responsible for effective Environment Safety and Health performance in their programs. It provides that the Assistant Secretary for Environment, Safety and Health shall curtail or suspend operations at DOE facilities when a clear and present danger exists to workers or members of the public. Again, this order gives to a DOE employee discretion regarding when to curtail or suspend operations at the DOE facilities. That employee must make a decision regarding when a clear and present danger exists and this decision is guided by economic and defense related policy considerations.

(5) DOE Order 440.1 (1995). This order requires that DOE elements shall implement a written worker protection program, provide workers the right, without reprisal, to have access [*28] to DOE worker protection publications, DOE-prescribed standards, and the organization's own worker protection standards or procedures applicable to the workplace, and to be notified when monitoring results indicate they were over-exposed to hazardous materials. It also provides that DOE is to identify existing and potential workplace hazards, assess worker exposure to such hazards through workplace monitoring, and for hazards identified in the workplace take abatement actions. There is no evidence in the record that the DOE employees failed to take any of these actions. Rather, plaintiffs are dissatisfied with the actions which were taken, contending that they were not sufficient to protect them.

(6) DOE Order 5483.1 (1979). This order requires DOE to establish a program to instruct all employees initially and periodically on matters pertaining to employee protections, establish a system that provides for meaningful employee participation in a safety and health program, establish a program to monitor the workplace for known toxic substances and harmful physical agents, advise employees or their authorized representatives that they are to be provided an opportunity to observe monitoring [*29] or measuring for toxic materials and have access to the results thereof, and notify the employee promptly of any information indicating that an exposure to toxic materials or harmful physical agents may have exceeded DOE standards. Plaintiffs do not contend that any employees were ever exposed to beryllium in levels that exceeded DOE standards, yet they were not advised of that exposure. Rather, their complaint is that the DOE standards were improperly high, and that any exposure to respirable beryllium poses an unacceptable risk. However, the decision on the appropriate DOE standard is a discretionary one based on policy considerations. Again, this order provides that employees would be notified promptly of any information indicating that an exposure to toxic materials or harmful physical agents may have exceeded DOE standards. However, there is no claim made that they were subjected to exposures in excess of DOE standards and not notified.

(7) DOE Order 5483.1A (1983). This order provides initially that the provisions of OSHA do not apply to the working conditions of DOE contractor employees since DOE exercises statutory authority to prescribe and enforce safety and health standards [*30] at these facilities. This order also requires contractors to fully inform their employees of rights, protections, obligations and responsibilities as required by Chapter 1 and to inform the employees of any information indicating their radiation dose or exposure to toxic materials or harmful physical agents may have exceeded the limits specified by DOE prescribed OSHA standards. Finally, in the event a DOE inspector discovers a situation which presents an imminent danger to contractor employee's safety or health, he or she shall take immediate and effective remedial action to assure that employees are removed from the danger area and/or that the danger is eliminated. This order also contains an element of discretion in that the DOE inspector must make a determination of when a situation which presents an imminent danger to a contractor employee's safety and health exists, and this determination could be based on policy considerations.

Some of the plaintiffs have set out ten areas in which the government failed in a particular

duty to the plaintiffs. Several of the ten identified areas are repetitive, and for purposes of analysis the court has identified five basic claims against the **[*31]** United States as follows:

> (1) Failure to warn the plaintiffs of dangers of beryllium, particularly that the applicable OSHA standard was not at a level that would protect all workers exposed to those levels from chronic beryllium disease;

> (2) Failure to adequately research the level at which beryllium exposure would be without danger;

> (3) Failure to establish workplace procedures to protect the plaintiffs from exposures to beryllium;

> (4) Failure to monitor respirable levels of beryllium in the K-12 or Y-12 Plants or to evaluate epidemiological studies of the workers; and

> (5) Failure to require the contractor to take steps such as to monitor the medical condition of its employees and use adequate safety devices and procedures to protect them.

First, with respect to plaintiffs' claim that DOE employees failed to warn them of the dangers of beryllium, particularly that the applicable OSHA standard was not at a level that would protect all workers from chronic beryllium disease, it is clear that failing to provide the contractor's employees with such warnings did not violate any mandatory regulatory or statutory requirements. Further, any decision with respect to warning the **[*32]** contractor's employees of the dangers of beryllium was a discretionary one. With respect to the alleged failure to warn, the government's decision with regard to the dangers that might result from the exposure to low levels of beryllium is a policy decision and, therefore, protected by the discretionary function exception.

Second, the plaintiffs contend that the government failed to adequately research the level at which beryllium exposure could occur without danger to the plaintiffs. The decision by government officials with regard to how much research or the type of research to do regarding acceptable levels of beryllium exposure are clearly discretionary decisions which are subject to policy considerations.

In addition, the alleged failure of the United States to establish workplace procedures that would protect the plaintiffs from any danger are discretionary decisions based on policy considerations such as economics and the needs of national defense to keep a strong nuclear weapons arsenal. Accordingly, the government's alleged failure to establish workplace procedures to protect the plaintiffs from harm are protected by the discretionary function exception.

Again, the government's **[*33]** alleged failure to monitor respirable levels of beryllium in the plants or to evaluate epidemiological studies of workers are discretionary decisions based on policy considerations such as economics and the needs of national defense.

Finally, plaintiffs' claim that the government failed to require its contractor to take such steps as monitoring the medical condition of the contractor's employees and using adequate safety devices and procedures to protect them. ☂The United States Court of Appeals for the Sixth Circuit has explicitly held that the discretionary function exception is applicable to alleged negligence in the delegation of safety responsibilities to a government contractor. _Totten v. United States_, 806 F.2d 698, 701 (6th Cir. 1986). Cases such as _Totten_ recognize that the government may delegate such duties to government contractors and no exception is created

if the dangers are the result of "dangerous instrumentalities." In addition, the United States may not be liable for negligent failure to supervise its contractors. ✦The discretionary function exception encompasses government decisions on how and how much to supervise the safety procedures of independent [*34] contractors. *Varig Airlines*, 467 U.S. 797, 104 S. Ct. 2755, 81 L. Ed. 2d 660 (FAA's decision to delegate responsibility for inspection for inspecting aircraft to manufacturing manager and to conduct "spot check" monitoring of manufacturer are discretionary acts). Moreover, the retention of open-ended supervisory authority that "allow[s] the government employee to exercise choice and discretion" does not render the exception inapplicable. *Domme v. United States*, 61 F.3d 787, 791 (10th Cir. 1995).

In summary, the court finds that none of the conduct alleged by the plaintiffs with respect to the government employees demonstrates that the government violated any mandatory statutory or regulatory provisions with respect to which it had no discretion. Rather, all of the plaintiffs' claims of negligence by government employees challenge actions or omissions on the part of the government employees which involve elements of discretion. The court further finds that that discretion was of the kind that the discretionary function exception was designed to shield; that is, policy decisions. The decision of the United States regarding warnings to the plaintiffs of the dangers of beryllium and [*35] the levels to which they were exposed, the decision of government employees regarding the amount of research to do regarding safe levels of beryllium, the United States' decision to utilize an independent contractor to insure safety at the Y-12 and K-25 Plants, the decisions on what workplace procedures were necessary to protect the plaintiffs from harm, the decisions on monitoring respirable levels of beryllium in the plants, and evaluating epidemiological studies of workers, and the decisions on what safety steps to require its contractors to take were all decisions in which policy considerations played a factor. Whether or not the discretion involved was abused is irrelevant. *See* 28 U.S.C. § 2680(a). n1

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n1 The court is aware that many of the plaintiffs may have suffered very severe injuries as a result of performing dangerous and even heroic work essential to our national defense. President William Jefferson Clinton, in a memorandum dated July 15, 1999, observed that contractor personnel working for the Department of Energy and its predecessor agencies who helped our nation win the Cold War often faced dangerous working conditions and a small number of them were exposed to beryllium and subsequently contracted chronic beryllium disease. The President's memorandum announced that his administration would submit draft legislation to Congress which would create a new program to give DOE contractor employees with CBD and beryllium sensitivity the same benefits now available to federal employees under the Federal Employee Compensation Act (FECA), which currently provides federal workers a proportion of lost wages, medical costs, rehabilitation, and training. On November 16, 1999, the Clinton administration forwarded to Congress legislation which would, if enacted, provide benefits to employees of contractors with CBD, including an option for covered employees to elect a lump sum payment of $ 100,000. The decision with respect to whether the United States should compensate these contractor workers is one that must be made by Congress, as are all decisions with regard to the extent to which the federal government will waive its sovereign immunity. The only questions appropriate for this court's consideration are whether the United States has already waived its sovereign immunity, given the discretionary function exception and the independent contractor exceptions to liability under the FTCA.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - **[*36]**

V.

*The Government Contractor Exception*

The United States contends that many of the claims of negligence brought against its employees are actually allegations of negligent acts or omissions by its independent contractors, Union Carbide or Lockheed Martin, for which the United States has no liability. The court agrees.

Under the FTCA, the United States is subject to liability for the negligence of an independent contractor only if it can be shown that the government had authority to control the detailed physical performance of the contractor and exercised substantial supervision over its day-to-day activities. See *United States v. Orleans*, 425 U.S. 807, 814-15, 48 L. Ed. 2d 390, 96 S. Ct. 1971 (1976). This exception is based on the language of the statute which provides that the United States is subject to liability for damages "caused by the negligent or wrongful act or omission of any employee of the Government. ..." 28 U.S.C. § 1346(b). The FTCA defines "employee of the Government" as any "employees of any federal agency. ..." 28 U.S.C. § 2671. "Federal agency" is defined as

> (e) Executive departments, the **[*37]** military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, that does not include any contractor with the United States.

*Id.* Thus, under the FTCA, the United States cannot be found liable for the negligence of its independent contractors. "There must be substantial supervision over the day-to-day operations of the contractor in order to find that the individual is acting as a government employee." *Laurence v. United States*, 59 F.3d 112, 114 (9th Cir. 1995). Upon a review of the evidence, it is evident that there was not substantial supervision over the day-to-day operations of Union Carbide, Martin Marietta or Lockheed Martin by the Department of Energy or its predecessor federal agencies. There were only several hundred DOE employees at the Y-12 and K-25 Plants who had oversight responsibility over several thousand employees of the contractors. This was in accordance with DOE Order 5480.19, which states that DOE's supervision of contract performance consists of "establishing written standards and operations, periodically monitoring and assessing performance, **[*38]** and holding personnel accountable for their performance."

The United States Supreme Court has indicated that detailed regulation and inspections are no longer evidence of an employee relationship. See *Orleans*, 425 U.S. at 815. The ability to compel compliance with federal regulations does not change a contractor's personnel into federal employees. *Letnes v. United States*, 820 F.2d 1517, 1519 (9th Cir. 1997). The court concludes that the United States did not engage in substantial supervision over the day-to-day operations of its contractors with regard to the K-25 and Y-12 Plants such that those contractors were acting as government employees. Accordingly, the United States cannot be liable under any *respondeat superior* theory for any negligence on the part of its contractors.

VI.

*Conclusion*

Because all claims brought by the plaintiffs in these cases against the United States are protected by the discretionary function exception, this court lacks subject matter jurisdiction over the FTCA claims, and these claims will be dismissed pursuant to Rule 12(b)(1), Federal Rules of Civil Procedure. Further, under the independent contractor exception, **[*39]** the United States cannot be liable for the negligence of any of the employees of its independent contractors. Accordingly, the following motions to dismiss for lack of subject matter jurisdiction will be granted: Court File # 149 in Civil Action No. 3:94-cv-369; Court File # 38

in Civil Action No. 3:97-cv-105; Court File # 62 in Civil Action No. 3:97-cv-593; Court File # 10 in Civil Action No. 3:98-cv-652; Court File # 16 in Civil Action No. 3:95-cv-505; Court File # 3 in Civil Action No. 3:97-cv-141; and Court File # 3 in Civil Action No. 3:97-cv-605.

As the United States is the only party, the following actions will be dismissed: Civil Action No. 3:95-cv-505; Civil Action No. 3:96-cv-459; Civil Action No. 3:96-cv-254; Civil Action No. 3:96-cv-253; Civil Action No. 3:96-cv-252; Civil Action No. 3:96-cv-251; Civil Action No. 3:97-cv-141; and Civil Action No. 3:97-cv-605.

Order accordingly.

James H. Jarvis,

UNITED STATES DISTRICT JUDGE

**ORDER**

For the reasons set forth in the Memorandum Opinion this day passed to the Clerk for filing, it is hereby ORDERED that the following motions to dismiss for lack of subject matter jurisdiction will be granted: Court File # 149 in **[*40]** Civil Action No. 3:94-cv-369; Court File # 38 in Civil Action No. 3:97-cv-105; Court File # 62 in Civil Action No. 3:97-cv-593; Court File # 10 in Civil Action No. 3:98-cv-652; Court File # 16 in Civil Action No. 3:95-cv-505; Court File # 3 in Civil Action No. 3:97-cv-141; and Court File # 3 in Civil Action No. 3:97-cv-605.

It is further ORDERED that, as the United States is the only party, the following actions will be dismissed: Civil Action No. 3:95-cv-505; Civil Action No. 3:96-cv-459; Civil Action No. 3:96-cv-254; Civil Action No. 3:96-cv-253; Civil Action No. 3:96-cv-252; Civil Action No. 3:96-cv-251; Civil Action No. 3:97-cv-141; and Civil Action No. 3:97-cv-605.

James H. Jarvis,

UNITED STATES DISTRICT JUDGE

Source: All Sources > Federal Legal - U.S. > District Court Cases - By State > **TN Federal District Courts** ●
Terms: **morgan w/sent brush w/sent wellman**  (Edit Search)
View: Full
Date/Time: Thursday, October 4, 2001 - 5:10 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2001 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.