# MDL 875

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

NOV - 5 2001

FILED
CLERK'S OFFICE

BEFORE THE JUDICIAL PANEL

ON MULTI DISTRICT LITIGATION

IN RE ASBESTOS PRODUCTS    *       MDL DOCKET NO. 875

                                *

LIABILITY LITIGATION (NO. IV) *

                                *

                                *

*******************************

TURNER, et al. v. ANCHOR PACKING CO., et al.
E.D. Louisiana, C.A. No. 2:01-2767

## MOTION TO VACATE CONDITIONAL TRANSFER ORDER

1.      Pursuant to Rule 7.4(d) of the <u>Rules of Procedure of the Judicial Panel on Multidistrict Litigation</u>, the Plaintiffs hereby move to vacate the Conditional Transfer Order entered by the Clerk on October 4, 2001, transferring the above-captioned action to the U.S. District Court for the Eastern District of Pennsylvania (MDL Docket No. 875) previously designated as the transferee district court for actions alleging asbestos related personal injury. Plaintiffs aver as follows in support of this motion.

2.      Mr. and Mrs. Turner, Plaintiffs, bring claims for asbestos-related lung cancer against a number of defendants.

3.      Mr. Turner has been advised by his treating physician that he has fewer than six months remaining in his life. (See, Affidavit of Dr. Gould, attached hereto as Exhibit "A").

4.      Defendant Westinghouse Electric Corporation ("WEC")(f/k/a CBS and n/k/a Viacom) (hereinafter "WEC") contends that the U.S. District Court has jurisdiction over the instant matter pursuant to a federal contractor defense.

5.      The Plaintiffs have filed a Motion with the U.S. District Court for the Eastern District of Louisiana to remand the action to State Court based on the ...

OFFICIAL FILE COPY

IMAGED NOV 9 '01

PLEADING NO. 3323

RECEIVED CLERK'S OFFICE

Petition filed by WEC is defective under 28 U.S.C 1446 in that (a) Plaintiffs were not served with the Removal Petition and attachments thereto "promptly" as required by statute and in violation of counsel for WEC's signed and filed Certificate of Service, and (b) WEC filed the Removal Petition more than 30 days following their notice by "other paper" of the grounds they assert for attempting to invoke Federal jurisdiction over the instant matter; and (2) that there is no federal contractor defense available to WEC in the instant matter.  Hearing is set for November 7, 2001 and it has been fully briefed.

6.     The Plaintiffs contend that the U.S. District Court for the Eastern District of Louisiana is best suited to decide the Motion to Remand and that, therefore, this matter should remain in Louisiana until such time as the Motion has been resolved.  The principle of allowing the transferring Court to decide dispositive motions of this nature before transferring to an MDL transferee Court has been upheld in prior decisions of this Court.  In Re L.E. Lay & Co. Antitrust Litigation, 391 F. Supp. 1054, 1056 (Jud. Pan. Multi Lit. 1975) ("on principles of comity, we are reluctant to transfer any action that has an important motion under submission with a court"); In Re Resource Exploration, Inc. Securities Litigation, 483 F. Supp. 817, 822 (Jud. Pan. Multi Lit. 1980), and cases cited therein ("we are persuaded, on principles of comity, to defer our decision concerning transfer of the Pennsylvania action because of the pendency of the defendants' motion for summary judgement, which is fully submitted to the potential transferor judge.").

6.     The Plaintiffs further submit the accompanying memorandum, with supporting attachments, in support of this Motion.

THEREFORE, for the foregoing reasons, the Plaintiffs respectfully move the Panel to vacate the Conditional Transfer Order previously entered by the Clerk of the Panel on October 4, 2001.

DATED: New Orleans, Louisiana, November 2, 2001.

Respectfully Submitted,

NESS, MOTLEY, LOADHOLT,
RICHARDSON & POOLE, PA

_____

DONNIE E. YOUNG
SCOTT M. GALANTE
1555 Poydras Street, Suite 1700
New Orleans, LA  70112
Telephone:  (504) 636-3480
Facsimile:  (504) 636-3499
Attorneys for Plaintiffs

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

BEFORE THE JUDICIAL PANEL

NOV - 5 2001

ON MULTIDISTRICT LITIGATION

FILED
CLERK'S OFFICE

IN RE ASBESTOS PRODUCTS     *       MDL DOCKET NO. 875
LIABILITY LITIGATION (VI)       *       CTO - 205
                            *       E.D. Louisiana, C.A. No. 2:01-2767
*******************************
            TURNER, et al. v. ANCHOR PACKING CO., et al.

**BRIEF IN SUPPORT OF**
**MOTION TO VACATE CONDITIONAL TRANSFER ORDER**

Plaintiffs, Mr. and Mrs. James C. Turner,  respectfully file this Brief in Support of their

Motion to Vacate the Conditional Transfer Order and, for reasons set forth below, show the Court

that these matters should be remanded to the 17th Judicial District Court for the Parish of LaFourche,

State of Louisiana.

**FACTS**

James Turner, a 65 year old father of four grown daughters and one son, was born on July

17, 1940. Mr. Turner lost his father at an early age leaving his mother to rear him and his two

brothers.  He dropped out of school in the eighth grade to work in a sawmill to help his family

financially. Upon his 17th birthday, Mr. Turner enlisted with the United States Navy and served his

country for 20 years as a patriot during times of peace and war.

Mr. Turner was occupationally exposed to asbestos during his term in the United State Navy

where his work included repairs on steam lines, steam joints, and removing and restoring asbestos

insulation. Mr. Turner specifically recalls working on approximately 20 WEC turbines during his

twenty-year Navy career, including tearing off asbestos insulation on WEC as well as other turbines.

On at least three occasions, Mr. Turner recalls that WEC sent Tech Reps (WEC employees) aboard

the ships during which time he worked under the supervision and direction of the Tech Reps. (See

1

Ex. "A" ; Copy of Mr. Turner's deposition).  After the Navy, Mr. Turner was an offshore cargo boat engineer where he also recalled working on marine turbines.

On July 30, 2001, Mr. and Mrs. James C. Turner filed suit in state court seeking damages for his asbestos related lung cancer. Mr. Turner's treating physician has opined that Mr. Turner has approximately six months left in his life. (Ex. "B", Affidavit of Dr. Gould). Westinghouse Electric Corp. ("WEC")(f/k/a CBS and n/k/a Viacom) was among the defendants named in the action which was formally served on WEC on **August 8, 2001**.  With service, Plaintiffs propounded discovery upon WEC *and* included with the petition was Plaintiffs' Master Discovery Responses, which identified the specific U.S. Navy ships upon which Mr. Turner was exposed to asbestos.

Apparently, on September 10, 2001(the 30th day following WEC's <u>alleged</u> 'other paper' noticing them of the instant matter's removability, but 31 days after formal service of the petition and Plaintiffs' Master Discovery Responses, and 42 days after plaintiffs forwarded courtesy copies of the petition and Master Discovery Responses), WEC filed a Notice of Removal in the U.S. Eastern District of Louisiana alleging federal jurisdiction.  On September 17, 2001, WEC filed a Notice of Removal in the state court proceeding.  On September 18, 2001, undersigned counsel received a facsimile copy of a letter to the state district court, dated the previous day, which indicated that WEC had filed a Notice of Removal. (Ex. "C"; Letter to state district court carbon copied to counsel); the filed Notice of Removal and attachments were not included in the facsimile.[1]  On October 10, 2001, Plaintiffs filed a Motion to Remand.  On October 12, 2001, in response to

---

[1]   On September 18, 2001 (the date on which Plaintiffs received the afformentioned facsimile), undersigned counsel contacted the Clerk of the Judicial Panel on Multidistrict Litigation, MDL No. 875 - In Re Asbestos Products Liability Litigation (No. VI) and was advised that the panel had previously received notice of the above-styled matter in the form of a stamped, signed, and certified copy of the notice of removal with attachments.

receiving Plaintiffs' Motion to Remand, WEC finally forwarded a copy of its Notice of Removal and related exhibits to plaintiffs. (Ex. "D"; letter from counsel for WEC forwarding Notice of Removal). Counsel for WEC fails to explain the 32 delay in forwarding a copy of the signed and filed Notice of Removal and related exhibits to plaintiffs.

The faxed letter which was carbon copied to undersigned by counsel for WEC indicates that there were original copies of the stamped pleadings attached for filing into state court. None of the attachments referenced in the Notice of Removal or other documents were attached to WEC's pleadings which were faxed as a carbon copy to undersigned counsel. A cursory review indicates that the attachments to the facsimile are without time/date stamps, without signatures, and with blank certificates of service. Furthermore, no verification is attached to the purported 'pleadings.'

Plaintiffs now respectfully move this Honorable Court to VACATE the Conditional Transfer Order based on: (1) WEC's improper procedure in removing the action, (2) WEC's untimely removal of the instant matter, and (3) the lack of merit in WEC's request for removal.

## LAW AND ARGUMENT

On Plaintiffs' Motion for Remand under 28 U.S.C §1447, the burden is on WEC to show by a preponderance of the evidence adduced in the petition itself and/or the pleadings in the state court case that federal jurisdiction is proper. Gaus v. Miles, 980 F. 2d 564, 566-67 (9th Cir. 1992);Anderson v. Avondale Industries, Inc., 1994 WL 679827, at *1 (E.D. La. 12/5/94) (*citing* Willey v. Coastal Corp., 855 F.2d 1160, 1164 (5th Cir. 1988). Federal courts are courts of limited jurisdiction and there is a presumption against the exercise of federal jurisdiction such that all uncertainties as to removal jurisdiction are to be resolved in favor of remand. Russell Corp. v. American Home Assur. Co., 2001 WL 1019114 (11th Cir. 2001); Anderson, ("If the right to remove is doubtful, the case should be remanded...[It is] axiomatic that ambiguities are generally construed

3

against removal." (citations omitted)).

## I.    THE PROCEDURAL DEFECTS

Plaintiffs contend that the removal filed by WEC is defective on two separate and distinct

procedural grounds and that each ground is independently sufficient to support a remand;

specifically: (A) WEC's notice of removal is procedurally defective as neither the state court nor

opposing counsel were given prompt notice of the removal; and (B) WEC's removal was untimely.

### A.    **WEC UNTIMELY SERVED COUNSEL, FILED A FALSE CERTIFICATE OF SERVICE AND FAILED TO GIVE PROMPT NOTICE**

WEC's Removal in the instant matter is procedurally governed by 28 U.S.C. §1446.  Section

1446(d) reads as follows:

> Promptly after the filing of such notice of removal of a civil action the defendant or
> defendants shall give written notice thereof to all adverse parties and shall file a copy
> of the notice with the clerk of such State court, which shall effect the removal and the
> State court shall proceed no further unless and until the case is remanded.

(*emphasis added*).  The procedure requires 'prompt' notice to all adverse parties  "[b]ecause under

28 U.S.C. §1446 a notice of removal is effective without judicial order unless a remand is ordered,

it is critical that removing parties honor procedural safeguards set forth in that statute such as notice

to opposing counsel." Adler v. Adler, 862 F. Supp. 70, 72 (S.D.N.Y. 1994) (*citing* Ullah v. FDIC,

852 F. Supp. 218 (S.D.N.Y. 1994)).  "[W]ithout service, a removal is not properly effected." Id.,

(*citing* La Maina v. Brannon, 804 F. Supp. 607, 612-13 (D.N.J. 1992); Donlan v. F.H. McGraw &

Co., 81 F. Supp. 599 (S.D.N.Y. 1948)).  The requirements of filing the Petition for Removal with

the clerk of the state court and of giving notice to adverse parties are not merely modal or formal,

but, rather, constitute mandatory conditions precedent to terminate state court jurisdiction and for

the assumption of jurisdiction by the federal court. Beleos v. Life & Cas. Ins. Co. of Tenn., E.D.S.C.

4

956, 161 F.Supp. 627; State v. Butler, La.1981, 405 So.2d 836.

Courts have grappled with the issue of 'promptness' for some time when discussing the removal of cases under §1446.  In Coletti v. Ovaltine Food Products, 274 F. Supp. 719 (D.C. Puerto Rico 1967)[2], the Court granted a Motion to Remand where there was a mere five day delay between the filing of the removal and the notice to opposing counsel.  The court reasoned that " . . . the plaintiff did not receive promptly the written notification of said filing as required by law.  Therefore, this Court finds that the unnecessary delay of five (5) days in notifying the plaintiff of the filing of the petition for removal is amply sufficient to order that this case be remanded to the Commonwealth Court." Pennsylvania Co. v. Leeman, 160 Ind. 16, 66 N.E. 48; Quilhot v. Hamer, 2 Cir., 158 F. 188; Aetna Indemnity Co. v. L. Rock, 115 S.W. 960." Id., at 723.

Here, WEC certified that it forwarded a copy of the Notice of Removal to all known counsel on the date it was filed, September 10, 2001 (Ex. "E";Certificate of Service attached to Notice of Removal).  The certificate was **false**.  WEC failed to provide Plaintiffs with a copy of the pleading and attachments filed in the U.S. Eastern District of Louisiana for over one month.  (See Ex. "D").  The certificate violation alone should warrant remand of the instant matter.

Section 1446 provides for the "prompt" notice of both opposing counsel and the Court below.  WEC failed to promptly notice both the State Court below and undersigned counsel of their Notice of Removal.  Plaintiffs urge this Court to take note of the wide variations (indicating a factually-sensitive issue) in decisions on this issue and find that the time delays by WEC in their requisite

---

[2] But see, Alpena Power Co. v. Utility Workers Union of America, Local 286, 674 F.Supp. 1286, 1287 (E.D.Mich. 1987) (The sole federal case found by undersigned rejecting the Coletti decision.  However, the Alpena court "borrowed Rule 6(a)'s ten day distinction and accompanying exclusionary provisions . . . simply based on reason and analogy," Alpena, at 1287, an analysis inappropriate in the context of the procedural posture of the present case.)

notices required under §1446 were both unreasonable and in violation of the statute. Finally, Plaintiffs continue to aver that although they have received by facsimile the unsigned, unstamped copy of the Notice of Removal (a document that was never filed), which might meet some definition of 'constructive notice," *Plaintiffs were not served with the Notice of Removal and attachments until after the Motion for Remand was served on WEC*, a delay of over one month.

**B.    WEC UNTIMELY REMOVED THE CASE AFTER THEIR NOTICE OF REMOVABILITY BY 'OTHER PAPER'**

"If the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant ... of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable... ." 28 U.S.C § 1446(b). "Failure to file timely a notice of removal requires the district court to remand the matter to state court." See Royal v. State Farm Fire & Cas. Co., 685 F.2d 124, 127 (1982) (per curiam); Evett v. Consolidated Freightways Corp., 110 F.Supp.2d 510, 512 (E.D.Tex.2000)." Here, WEC's remand is not timely because WEC: (1) was served with an action that was originally "removable", or (2) received an "other paper" demonstrating the action's removability prior to August 9, 2001.

WEC has asserted that the removal in the instant matter was timely as it was within 30 days of their receipt of an 'other paper' which notified them that the action was removable. This is simply inaccurate. In fact, a copy of Plaintiffs' Petition and Master Discovery Responses were mailed to counsel for WEC on July 30, 2001. (Ex. "F" Petition and Discovery Responses forwarded to Counsel on July 30, 2001). Plaintiffs Master Discovery Responses informed WEC that Mr. Turner's employment exposure to which Plaintiffs allege liability against WEC was, in part, during his U.S.

Navy service upon the five identified vessels for the enumerated years.[3] Thus, when WEC received service of the petition on August 8, 2001 it already had in its possession information that Mr. Turner was exposed to asbestos on its marine turbines on naval vessels.[4] There is little question that WEC was given such 'other paper' prior to the deposition that began on August 9, 2001.

The Eastern District recently dealt with just such a question: whether or not discovery responses were considered 'other paper' sufficient for the application of the thirty day rule under §1446(b). Alonzo v. Shoney's, Inc., 2001 WL 15641 (E.D.La., 2001) The Court found that ". . . Alonzo's suit was not removable until Shoney's was apprised by some "other paper" that her claim satisfied the jurisdictional amount. When Shoney's received Alonzo's answer to an interrogatory on September 25, 2000 that she had a herniated cervical disk, it was able to quantify her claim, and the thirty-day clock started. Chapman, 969 F.2d at 164 ("Clearly the answer to interrogatory which triggered the filing of the notice of removal in this case is such an "other paper.")." Alonzo, at *2.

In the instant matter, WEC has attempted to argue that they were not aware the case was removable at the time the case was filed. However, as their entire argument supporting removal reveals, they rely on the fact that Mr. Turner was exposed through his military service. All ambiguities to that effect were cleared, and they were fully apprised of his military service and exposure when they received Plaintiffs' Master Discovery Responses mailed on July 30, 1002 (42

---

[3]   WEC has significant information in its possession from which it was able to readily confirm that the Navy ships identified in Plaintiffs' Master Discovery were equipped with its turbines. Additionally, it is common knowledge that asbestos litigants frequently reference Jane's Fighting Ships to confirm such information. Jane's Fighting Ships is "[a] renowned reference guide for naval military vessels of all nations together with their specifications." Abney v. Westinghouse, 93-CV-150WR (S.D.Ms. 4/8/93) (remand order finding removal by WEC untimely, in part, after review of discovery) attached.

[4]   WEC received a second copy of Plaintiffs' Master Discovery Responses which was served on WEC on August 8, 2001 with the service of the Petition for Damages.

7

days before WEC filed the Notice of Removal)[5] or, at the latest, on the very same day WEC was served with Plaintiffs' original petition, as it was accompanied by Plaintiffs' Master Discovery Responses (31 days before WEC filed the Notice of Removal).  Those discovery responses carefully detail what WEC contends they learned the very next day in Mr. Turner's deposition: that he was exposed on military ships.  Therefore, Plaintiffs aver that WEC has untimely removed the instant action and it should be remanded back to state court.

## II.   MERITS DEFECTS

WEC was required to plead, prove and support through competent evidence the federal claim in question.  It was incumbent upon WEC to come forth with facts showing that this defense was available to it, rather than forcing Plaintiffs to set forth facts and evidence, negating WEC's claim. Celotex v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2553 (1986) (applying analogous FRCP 56). WEC's failure to attach documents supporting its self-serving claims dooms its removal.  WEC should be confined to the evidence it has adduced thus far and should be prohibited from proffering

---

[5]   WEC was forwarded the first "other paper," Plaintiffs' Master Discovery Responses and a copy of the Petition for Damages, approximately 42 days before it filed the Notice of Removal. In Bodden v. Union Oil Co. of Calif., 82 F.Supp. 584 (E.D.La. 2/20/98), the court held that the thirty day period begins when the defendant receives a copy of the initial pleading through any means, not just service of process.  Bodden was based on the Fifth Circuit's decision in Reece v. Wal-Mart Stores, Inc., 98 F.3d 839 (5th Cir. 1996)(adopting the receipt rule) which was subsequently abrogated by Murphy Bros. Inc. v. Michetti Pipe Stringing, Inc., 526 U.S. 344, 355-56 (1999) thereby possibly calling into question the holding in Bodden.  See Hibernia Community Development Corp., Inc. V. U.S.E. Community Services Groupp, Inc., 2001 WL 378832, at *2 (E.D.La. 4/13/01) While Reece and Bodden may not support a finding that the delay for filing the Notice of Removal began on July 30, 2001 (a question this court must resolve), the court's principles enunciated in Bodden based on Reece were not called into question; namely, the requirement of expediency in seeking removal. Expediency in removal includes prompt notice.  This principle clearly supports a finding that prompt notice requirements were not met by WEC's 42 day delay (between the July 30, 2001 forwarding of the pleadings and the September 10, 2001 filing of the Notice of the Removal) coupled with the additional 8 day delay in notifying the state court (September 18, 2001) with the delay in giving plaintiffs notice of the removal, much less waiting over one month to serve plaintiffs.

more. WEC has completely failed to show that there is a jurisdictional basis for removal.  Instead of providing evidence in its Notice of Removal, WEC disingenuously and improperly asserts that it need not do so now and that it will await Plaintiffs' Motion for Remand before doing so.  This maneuvering, typical of WEC's strategy in other asbestos cases dealing with this exact issue[6], is a transparent attempt to transfer the burden of proof to the party seeking a remand who must argue somewhat blindly as to the alleged basis of the federal claim and the existence of proof, if any, supporting the claim.  Plaintiffs request that this court preclude WEC's continued  manipulation of procedure aimed at forum shopping.  That is, plaintiffs respectfully request that this court find that WEC failed to carry its burden of proving federal jurisdiction and remand the matter to state court where it belongs.

In Mesa v. California, 489 U.S. 121, 109 S. Ct 959 (1989), the Supreme Court set forth the three criteria that a "person," must prove to support removal under §1442(a)(1).  Specifically, a person, or commercial entity like WEC, must  (1) demonstrate that it acted under the direction of a federal officer; (2) raise a colorable defense to plaintiffs' claims; and (3) demonstrate a causal nexus between plaintiffs' claims and acts it performed under color of federal office.

## A. NAVY OFFICERS AND AGENTS NEVER DIRECTED OR CONTROLLED THE DESIGN, DEVELOPMENT OR MANUFACTURE OF ASBESTOS

Under the first Mesa element, "removal by a 'person acting under' the direction of a federal officer must be predicated upon a showing that the acts that form the basis of the state ... suit were performed pursuant to an officer's direct order or to comprehensive and detailed regulations. Anderson v. Avondale Industries, Inc., 1994 WL 679827 (E.D.La.)(quoting Ryan v. Dow Chemical Co., 781 F.Supp. 934 ,947 (E.D.N.Y. 1992)(removing party did not meet its burden of proof of

---

[6] Farley v. WEC Elec. Corp., Civil Action No. 94-629 (E.D.Pa.).

9

"acting under" where defendants were sued for formulating and producing Agent Orange, defendants previously developed components of formula and later produced and delivered Agent Orange under the control of federal officers)).  The focus of this inquiry must be on the government's actions with regard to the particular design feature in question and actual government discretion over that feature. Trevino v. General Dynamics Corp., 865 F.2d 1474 (5th Cir.), cert. denied, 493 U.S. 935 (1989).

In Anderson, plaintiff, an Avondale employee diagnosed with cancer, filed suit against manufacturers of asbestos containing products, including Borden Inc., the manufacturer of "M-6-B." A 1952 government specification encompassed the product.  In support of its allegation of "acting under" Navy control, Borden submitted the affidavit of its chemist who attested that (a) M-6-B was produced to meet government specifications, (b) the government specification required that the product contain asbestos, (c) the product was not produced prior to the government specification regarding the required components was issued, and (d) limited quantities of M-6-B were manufactured for the Navy to meet this government specification.  Nonetheless, the court found that there was "no evidence presented of intimate government oversight or involvement in the design or production of M-6-B."  The court noted that Plaintiffs produced evidence that the asbestos containing substance at issue was manufactured before the 1952 specification issued.  Since Borden failed to prove the first Mesa requirement, the court found that failure defeated removal thereby mooting any inquiry with respect to the remaining Mesa requirements.

Here, the only product that caused James Turner's terminal cancer is asbestos.  WEC has not suggested, much less produced any evidence, that the government, or its agencies or officers were involved with the design or production of asbestos insulation.  Moreover, like the product at issue in Anderson, asbestos insulation, including that used on turbines, was produced and manufactured long before it could have been used on the vessels upon which Mr. Turner served.

10

## B.  NO COLORABLE DEFENSE

Under the second <u>Mesa</u> criteria, WEC must raise a colorable federal defense to plaintiffs' claims. WEC claims that, under <u>Boyle v. United Technologies Corp.</u>, 108 S.Ct. 2510 (1980) it has a federal defense to plaintiffs' state tort suit; specifically, "immunity from liability for injuries arising from any exposure to asbestos related to turbine generators on board U.S. government vessels, insofar as constructed or repaired by WEC." (See Notice of Removal paragraph 8).

In <u>Boyle</u>, the Supreme Court held that under very limited circumstances federal law will preempt state law for military contractors supplying military equipment.  In so adopting this limited federal common law defense to state tort law actions, the Court viewed the various theories of the military contractor defense as established by the different federal circuits and, essentially, adopted the three elements first established by the Ninth Circuit in <u>McCay v. Rockwell Corp.</u>, 704 F.2d 444 (9th Cir. 1983).   Thus, Ninth Circuit opinions on the military contractor defense are highly instructive.

<u>Boyle</u> explicitly held that a manufacturer of military equipment must meet three conditions to be immunized from suit.  The Court explained that the first two conditions insure that the suit is within the scope of the discretionary function of a governmental official.  As the Court stated:

> In sum, we are of the view that state law which holds Government contractors liable for **design defects** in **military equipment** does in some circumstances present "significant conflict" with federal policy and must be displaced.  We agree with the scope of the displacement... adopted by the Ninth Circuit, <u>see</u> MCKay v. Rockwell Int'l Corp., <u>supra</u>, at 451.  Liability for **design defects** in **military equipment** cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specification; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.  The first two of these conditions assure that the suit is within the area where the policy of the 'discretionary function' would be frustrated -- i.e. they assure that the design feature in question was considered by the Government officer, and not merely by the contractor itself. <u>Boyle</u>, 108 S.Ct. at 2518 (emphasis added).

11

The Court first determined that a state's laws of negligence and strict liability were not to be discarded when the product in question came from the manufacturer's "stock" or product line sold to the general public. Id. at 2516. The Court noted that if the government orders a product from a manufacturer's general stock without making special requests relating to the product's design, the government in essence would have signified its ambivalence as to the design of the product. By not making changes to a manufacturer's stock product, the Court held that the government was rendering tacit acceptance of whatever design state law might mandate. Id.

Substantively, Plaintiffs show that: (1) the asbestos products at issue here are not military equipment and, for this reason alone, the Boyle military contract defense does not apply; (2) there is no proof that the government approved reasonably precise specifications; and (3)  WEC's failure to warn of the health hazards associated with asbestos precludes existence of a colorable federal defense under Boyle.

### 1.      ASBESTOS IS NOT MILITARY EQUIPMENT

A necessary condition to assert a colorable defense under Boyle is that the product at issue be "military equipment," not commercial products. Boyle, 108 S.Ct. At 2518; Nielsen v. George Diamond Vogel Paint, 892 F.2d 1450, 1454-55 (9th Cir. 1990); McKay v. Rockwell Int'l. Corp., 704 F. 444, 451 (9th Cir. 1983).

It must be emphasized that just because a product conforms to military specifications that alone does not transform the product into "military equipment." The military wrote specifications for virtually every product it purchased. There are even specifications for such ordinary products like pencils. This does not mean that pencils used by Navy secretaries are military equipment.

The Ninth Circuit, in In re Hawaii Federal Asbestos Cases, 960 F.2d 806 (9th Cir. 1992), addressed the issue of application of the Boyle defense to injuries caused by asbestos used on Navy

ships. "Where the goods ordered by the military are those readily available, in substantially similar form, to commercial users, the military contractor defense does not apply." Id. at 811. The court found that the Boyle defense was unavailable to manufacturers of asbestos containing products because Boyle limited its protection to products "manufactured with the special needs of the military in mind." Id. at 812. The court concluded that in this context, asbestos insulation provided by the defendant manufacturer did not constitute military equipment. The court observed that Boyle "repeatedly described the military contractor defense in terms limiting it to those who supply military equipment to the Government." Id. at 810. As the Ninth Circuit made clear, the Court, in Boyle, made a guarded effort to fit the government's military equipment selection process into the discretionary function exception of the FTCA. Noting the Supreme Court's concern in Boyle that, without immunity, contractors would raise prices or refuse to manufacture critical military equipment, the Ninth Circuit reasoned that these concerns did not apply to products that "have not been developed on the basis of involved judgment by the military." Id. at 811. Certainly, as found by the Court, the concerns of raised prices or refusal to manufacture military equipment are not implicated with respect to products, like asbestos insulation, which are already available on the commercial market. Id. This is so because the cost of ordinary tort liability has already been factored into the price of commercially available goods, like asbestos insulation. Id.[7] See also, In

---

[7] Similarly, in Santos v. Owens-Corning Fiberglas Corp., 1994 WL 564720 (N.D.Cal. 10/6/94), the district court found that defendants failed to raise a colorable government contract defense under Boyle against a suit for damages arising from exposure to asbestos insulation present on a military base. In line with Boyle's requirement that the injury result from a design defect specified by the government on military equipment, the Court noted that there was no evidence proving that the asbestos at issue was a specially designed product for the government or that it was designed under federal orders. According to the court, the most glaring omission was that "no defendant produce[d] any evidence whatsoever that the products it designed pursuant to government orders were different from those designed for civilian use **in any manner pertinent to state law liability**." Id. at 3 (emphasis added). The court elaborated on the connection between government

re New York City Asbestos Litigation, 542 N.Y.S.2d 118, 119 (N.Y. Sup. Ct. 1989)(finding asbestos

not military equipment); Lopez v. Raymark Industries, Inc. 858 F.2d 712 (Fed. Cir. 1988)(asbestos

specifications were of the performance type, not design type; further, the court took judicial notice

that all insulating material containing asbestos is hazardous whether supplied to the government or

private consumers). Dorse v. Armstrong World Industries, Inc., 513 So.2d 1265, 1269 (Fl.

1987)(refusing the find an asbestos manufacturer immune from tort liability concluding that "the

defense is inappropriate where the contract in question is to supply services or goods of a

commercial, nonmilitary nature.").

## 2. THE GOVERNMENT RELIED ON MEMBERS OF THE ASBESTOS INDUSTRY TO CREATE SPECIFICATIONS

WEC was not only a member of the asbestos industry; it was a leader of the industry.

WEC admits it manufactured and sold over 100 asbestos containing products. (Ex. "G", WEC

supplemental discovery responses in Abrams). WEC admits manufacturing marine turbines which

were placed in service as early as 1911. (Ex. "H", WEC discovery responses in Abrams). WEC,

at times, manufactured asbestos blankets for use on its turbines which were the same for military and

non-military turbines. (See Ex. "I" June 11, 1946 WEC spec. 7303-4-5) "Only insulation materials

approved by Westinghouse [were] permitted on Westinghouse turbines and piping." (Ex. "J" Steam

Supervisor's Letter No. 50-8) The WEC "approved" asbestos insulation materials were the same

---

specifications and the use of asbestos products by the military. The court opined that the defense
applies where the asbestos products used by the military were, pursuant to government orders and
specifications, made more dangerous than those sold on the open market. Id. (Citing Boyle,
"defendant entitled to defense where it altered its design and manufactured outward opening hatches
pursuant to government orders and where it was subsequently sued directly on the basis of its
outward-opening hatches). In Santos, the court found that asbestos products were not uniquely
designed for government use and, thus, there was no colorable claim for the government contractor
defense.

materials whether the turbines were sold for military or non-military use.  (Ex. "K", WEC SSDL #62-23).

WEC was a founding member of the Industrial Hygiene Foundation (IHF), promoted by Johns-Manville's Vandiver Brown as a "creature of industry and the one institution upon which employers can rely completely for a sympathetic appreciation of their viewpoint." Castleman, Barry L., Asbestos: Medical and Legal Aspects, p. 726 (4th Ed. 1996)(attached are pp. 725-28 discussing the Industrial Hygiene Association, including a photograph of the Board of Trustees, Joseph Dilworth, President of WEC, was a trustee and is pictured standing.) WEC was a member of the IHF or its predecessor, the Konicide Club, at least from 1935 through 1984. Through the IHF, the asbestos industry, including WEC, suppressed information regarding the health hazards associated with asbestos in an effort to impact government decisions regarding the then existing TLV's for the sole purpose of financial gain through increased sales and profits.  (See Petition for Damages; Allegations of Misconduct of WEC sections 68-128).

Allowing WEC to argue that it should not be responsible for its actions because government specifications somehow included the asbestos products that were used on WEC turbines would be contrary to the facts as they occurred.  Rather, it was the government that relied upon and accepted the representations of the asbestos industry in creating specifications for asbestos products. (Ex. "L", Declaration of Joseph Chilcote, July 9, 1981, and attached correspondence) Mr. Chilcote served as project engineer for the Materials Standards Branch for the Department of the Navy from 1942 to 1964. In this capacity, he consulted with the asbestos industry to draft specifications for materials, which included asbestos insulation. Mr. Chilcote declared that the asbestos industry would work with the government and supply the actual specifications of their asbestos products to be used.

When specifications were drafted for asbestos insulation products, the intent was to have the

15

specifications conform to the products in the marketplace. The government did not design specifications so that the asbestos industry would have to invent new products. Evidence supporting this contention is provided by the November 5, 1980 deposition of John Haas, chairman of the Ships Specifications Control Board of the United States Navy, where he testified:

> Question:    Since 1950, is it your understanding that in part the D.O.D. [Department of Defense] intended that the military, the Navy specifically, find out what products existed for a particular need in the process of drafting a specification?
> Answer:    That's correct.
> Question:    And this was done so that specifications could be drafted to conform to those products; is that also correct?
> Answer:    That's correct.
> Question:    This would be true for thermal insulation products as well as other products requested by the Navy?
> Answer:    Right.
> Question:    And this has always been the case as far as you know?
> Answer:    To the best of my knowledge...
> Question:    In general, sir, the Navy relied upon the suppliers to determine what products were actually available to fit their particular need; is that also a fair statement?
> Answer:    In general, yes...
> Question:    Mr. Haas, do you know of any prohibition among Navy regulation rule which would prohibit a supplier of thermal insulation product from drafting the specification pertaining to that product?
> Answer:    I don't know of any.
> Question:    It is your understanding, is it not, that suppliers could request revisions of military specifications dealing with thermal insulation products?
> Answer:    Yes. Done all the time.

(Ex. "M", Deposition of John Haas at pages 191, 198-99 and 205)

The testimony of individuals from the government aligns perfectly with the testimony and internal documents of those within the asbestos industry. The recognition that specifications were developed and written by manufacturers of the asbestos products was recognized by workers in the technical field and the boardroom. The former president of Eagle-Picher, Herman Huelster, fully understood how the process took place and admitted the same when he testified that government specifications were "creatures of the industry." (Ex. "N" Excerpt of trial testimony of Mr. Huelster).

When the military used asbestos containing products it was acting as a mere consumer, albeit a large consumer.  It exercised no more control over the content of those products than does the average grocery shopper of the contents of a can of beans.  In the instant case, the same asbestos insulation was used on private vessels as well as military vessels; it was clearly not military and clearly available on the commercial market.  WEC failed to warn about the hazards associated with asbestos contained in its asbestos blankets and the thermal insulation on its turbines.  This is critical.  It is not the turbines themselves that are claimed to be at issue in this matter.  That is, plaintiffs have made no claims that the turbines themselves were defective.  Rather,  it is the failure to warn of the hazards associated with the asbestos insulation on the turbines.  This asbestos was not military equipment.  The insulation was simply commercially available asbestos insulation sold by Owens-Illinois, Fibreboard, Owens-Corning, Johns-Manville, Pittsburgh-Corning, that was available on the commercial market and is unprotected by the immunity outlined in Boyle.

### 3.  WEC FAILED TO WARN OF HEALTH HAZARDS ASSOCIATED WITH ASBESTOS

Boyle requires that the government contractor warn the government of the dangers associated with the use of the equipment when the contractor has information which the government lacks.  This requirement insures that the government will make informed design decisions.  "[T]he primary purpose of the warning element is 'to enable the government to make determinations as to the design and use of military equipment based on all readily available information.'"  Trevino v. General Dynamics Corp., 865 F.2d 1474 (5th Cir. 1989).  Further, "the warning requirement prevents the defense from creating an incentive to withhold information."  Id. at 1481.

In Vanouwerker v. Owens-Corning Fiberglass Corp., 1999 WL 335960 (E.D.Tx 5/26/99), defendants, premise owners, claimed a colorable federal defense in support of removal of asbestos

related personal injury cases. The court found, in part, that there was no evidence that the defendant

provided the government with any warnings regarding asbestos and there was no evidence that the

government independently knew of the hazards associated with asbestos. The court held that the

defendants failed to color their federal defense with any supporting evidence. In light of these and

other significant doubts about the correctness of removal, the court concluded that those doubts must

be resolved against removal thereby granting plaintiffs' motion for remand. See In re New York

Asbestos Litigation, 847 F.Supp. 1086 (S.D.N.Y. 1994)(military contractor defense inapplicable to

asbestos manufacturer's liability where asbestos manufacturer did not meet its burden of proof since

asbestos manufacturer presented no evidence that it attempted to find out what the United States

Government knew about the dangers in the use of asbestos or that it attempted in any way to warn

the Government about these dangers).[8]

---

[8] Interestingly, in Crocker v. Borden, Inc. 852 F. Supp. 1322 (E.D.La. 1994), the court noted that "the military contractor defense has been routinely rejected in almost every post-Boyle asbestos case. This is so because unless the government is warned about the dangers in the use of defective equipment and the contractor knows of the dangers, the military contractor defense does not apply." (Citing Mitchell v. Lone Star Ammunition, Inc., 913 F.2d. 242 (5th Cir. 1990)). Given this observation, it is not surprising that Crocker has been severely criticized. Good v. Armstrong World Industries, Inc., 914 F. Supp.1125 (E.D.Pa. 1/18/96)(case noted but citation glaringly omitted from WEC's Notice of Removal)(similar affidavit used to support WEC's removal in Crocker found insufficient to support WEC's removal in Good). Crocker can be distinguished from the present case in that in Crocker, WEC's evidentiary submission went unrebutted. See also, Feidt v. Owens Corning Fiberglas Corp., 153 F.3d 124, 127 (3d Cir. 1998)(noting district court's decision to remand asbestos case against WEC arising out of exposure on navy ships; also noting district court's approval of Good) Based on undersigned counsel's research, it appears that the court's statement in Crocker still holds true - practically every post-Boyle asbestos case has rejected the military contractor defense. But see, Fung v.Abex Corp., 816 F. Supp. 569 (N.D.Cal. 10/26/92)(a pre-Crocker and pre-Good case cited for support by WEC; however, it appears that WEC's references relate to an unpublished order, not to the cited case); Pack v. AcandS, Inc., 838 F.Supp. 1099 (D.Md. 1993)(cited by WEC for support wherein it appears that the court may have improperly placed the burden of proof on the plaintiffs seeking remand noting only that the court did not insist on a detailed analysis by WEC of its defense and that the remand was unsupported; there was no discussion of WEC's support for removal).

Here, like elsewhere, WEC's failure to prove that it warned the government of the health

hazards associated with asbestos dooms its removal.  There is no evidence that WEC provided the

government with warnings.  There is no evidence that WEC attempted to find out what the Navy

knew about the dangers of asbestos to determine what information it should share with the Navy.

There is no evidence of the government's independent knowledge of the hazards associated with

asbestos.  WEC's failure to meet this Boyle criteria is another fatal flaw to its assertion of the

government contractor defense.

### C.      THE GOVERNMENT DID NOT MAKE WEC DO IT

Under the third Mesa criteria, as stated in Gauthe v. Asbestos Corp., 1997 WL 3255

(E.D.La.)(quoting Overly v. Raybestos-Manhattan, 1996 WL 532150 (N.D.Cal.)) there must be

> a causal nexus between the rules imposed by the United States on the defendant
> contractor by the federal government and the liability asserted by plaintiff.  There
> must be a causal connection between what the officer has done under asserted official
> authority and the state prosecution..  It must appear that the [state] prosecution has
> arisen out of the acts done by the officer under color of federal authority and in
> enforcement of federal law.

A causal nexus requires more than merely showing that the defendant followed government

specifications for design and  materials, inspection procedures, and compliance with specifications.

Rather, Mesa requires that the tortious act complained of must be federally authorized or mandated.

Mouton v. Flexitallic, Inc., 1999 WL 225438 (E.D.La.)[9].  In other words, the tortfeasor must be able

---

[9]       In Mouton, plaintiff filed suit under various theories of liability against numerous
defendants for damages arising from asbestos exposure. Defendants, Avondale Interests, were added
to the suit under a failure to warn theory and failure to provide a safe place to work. Avondale
asserted that it met the Mesa causal nexus requirement because the act complained of occurred
within the course of Avondale's duties to the Navy.  Avondale offered as evidence contract
specifications, material specifications, and inspection procedures.  Avondale also pointed out that
the Navy required the use of asbestos.  Further, Avondale employees attested that regulations
regarding the handling of asbestos were enforced by safety inspections from the Navy.  The court
found this insufficient to meet the Mesa nexus requirement noting that "other cases have rejected

to say, in response to plaintiffs' claims, that "the Government made me do it."

WEC has done little more than claim that it followed government specifications for the design and materials on its marine turbines sold to the Navy. Westinghouse did not and can not say that the government made it do the acts complained of in Plaintiffs' Petition the majority of which relate heavily to WEC's failure to warn of the health hazards associated with asbestos. Certainly, WEC does not and will not suggest that the government participated in acts of fraud and conspiracy with WEC and other members of the asbestos industry as outlined in Plaintiffs' Petition. Since the government did not make WEC do it, there is no causal nexus and, accordingly, removal was improper under §1442 as interpreted by Mesa.

## IV.   CONCLUSION

Based on the foregoing, Plaintiffs respectfully request this Court Vacate the Conditional Transfer Order and Remand this Matter to State Court where it belongs.

_____

Scott M. Galante
1555 Poydras Street, Suite 1700
New Orleans, LA 70112
504-636-3480

---

the theory that the federal government's contractual design specifications satisfy the causal link required absent express contractual government specifications regarding warnings." Mouton, at 3 (citing Gauthe 1997 WL 3255 at 2, and Overly, 1996 WL 532150, at 4). Since the federal government provided no direction on warnings when using asbestos and did not prevent Avondale from taking its own safety precautions, the court concluded that Avondale failed to establish a causal connection. The court found support for its analysis in recent Fifth Circuit precedent. Mouton, 1999 WL 225438 at 3 (citing Winters v. Diamond Shamrock Chemical Co., 149 F.3d 387, 397 (5th Cir. 1998)("finding removal proper in a failure to warn case when government's contract specifications for the manufacture of Agent Orange included provisions for packaging and transport, and specific prohibitions against warnings on the barrels.").

BEFORE THE JUDICIAL PANEL

ON MULTI DISTRICT LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

NOV - 5 2001

FILED
CLERK'S OFFICE .

IN RE ASBESTOS PRODUCTS     *          MDL DOCKET NO. 875

                              *

LIABILITY LITIGATION (NO. IV) *

                              *

                              *

*******************************

TURNER, et al. v. ANCHOR PACKING CO., et al.
E.D. Louisiana, C.A. No. 2:01-2767

**SCHEDULE**

Pursuant to Rule 7.2(a)(ii) of the <u>Rules of Procedure of the Judicial Panel on Multidistrict</u>

<u>Litigation</u>, Plaintiffs attach the following schedule which provides The Panel with the complete

docket information of the instant matter:

(A)     **Full Caption**: JAMES C. TURNER and MARLENE F. TURNER VERSUS

ANCHOR PACKING COMPANY; CARBORUNDUM; CBS (Formerly known as Westinghouse

Electric Corporation); A.W. CHESTERTON COMPANY; COMBUSTION ENGINEERING, INC.;

JOHN CRANE, INC.; DANA CORPORATION; EAGLE, INC.; THE FLINTKOTE COMPANY;

FLINTKOTE MINES, LTD.; FOSTER WHEELER CORPORATION; GARLOCK, INC; GASKET

HOLDINGS COMPANY, INC. (successor to Flexitallic, Inc.); GENERAL ELECTRIC COMPANY;

GEORGIA-PACIFIC CORPORATION; INGERSOLL-RAND; KELLY MOORE PAINT

COMPANY; THE McCARTY CORPORATION; REILLY-BENTON CO., INC.;

TAYLOR-SEIDENBACH, INC.; J.T. THORPE, INC.; 3M (a.k.a. MINNESOTA MINING &

MANUFACTURING COMPANY); WORTHINGTON PUMP, INC.; KIM SUSAN, INC.

(Formerly known as Fagan Boat Service, Inc.)

(B)   **District Court and Division**:      The action is pending in the United States

District Court for the Eastern District of Louisiana, Section "S".

(C)   **The Civil Action Number**:      2:01-2767

(D)   **Assigned Judge**:      The Honorable Mary Ann Vial Lemmon

I declare under penalty of perjury under the laws of the State of Louisiana that the foregoing

is true and correct.

DATED at New Orleans, Louisiana, this 2nd day of November, 2001.

_____
SCOTT M. GALANTE
1555 Poydras Street, Suite 1700
New Orleans, LA  70112
Telephone:  (504) 636-3480
Facsimile:  (504) 636-3499
Attorneys for Plaintiffs

2

NOV - 5 2001

FILED
CLERK'S OFFICE.

BEFORE THE JUDICIAL PANEL

ON MULTI DISTRICT LITIGATION

IN RE ASBESTOS PRODUCTS     *        MDL DOCKET NO. 875
                                    *
LIABILITY LITIGATION (NO. IV) *
                                    *
                                    *
*******************************

TURNER, et al. v. ANCHOR PACKING CO., et al.
E.D. Louisiana, C.A. No. 2:01-2767

RECEIVED
CLERK'S OFFICE
2001 NOV -5 A 10:47
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

## **DECLARATION OF SERVICE**

Scott M. Galante hereby declares as follows:

That on November 2, 2001, I had copies of Plaintiffs' Motion to Vacate Conditional Transfer

Order served upon attorneys of record for defendants and the clerk of the transferee District Court

by having said copies mailed, postage prepaid, to them at the addresses on the attached list.

I declare under penalty of perjury under the laws of the State of Louisiana that the foregoing

is true and correct.

DATED at New Orleans, Louisiana, this 2nd day of November, 2001.

                              _____
                              SCOTT M. GALANTE
                              1355 Poydras Street, Suite 1700
                              New Orleans, LA  70112
                              Telephone:  (504) 636-3480
                              Facsimile:  (504) 636-3499
                              Attorneys for Plaintiffs

**PANEL SERVICE LIST (Excerpted from CTO-205)**
**DOCKET NO. 875**
**IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)**

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH  44114

Edward J. Cass
Gallagher, Sharp, Fulton & Norman
Bulkley Building, 7th Floor
1501 Euclid Avenue
Cleveland, OH  44115

Adam M. Chud
Shea & Gardner
1800 Massachusetts Avenue, N.W.
Washington, DC  20036

David A. Damico
Burns, White & Hickton
2400 Fifth Avenue Place
120 Fifth Avenue
Pittsburgh, PA  15222

Raymond P. Forceno
Forceno & Hannon
Philadelphia Bourse Building
Suite 1000
Independence Mall East
Philadelphia, PA  19106

Ellen B. Furman
Goldfein & Joseph
1600 Market Street
33rd Floor
Philadelphia, PA  19103

Scott M. Galante
Ness, Motley, Loadholt, Richardson
& Poole
1555 Poydras Street
Suite 1700
New Orleans, LA  70112

Leon Gary, Jr.
Jones, Walker, Waechter, et al.
8555 United Plaza Boulevard
5th Floor
Baton Rouge, LA  70809

Susan M. Hanson
Stich, Angell, Kreidler & Muth, P.A.
The Crossings, Suite 120
250 2nd Avenue South
Minneapolis, MN  55401

Reginald S. Kramer
Oldham & Dowling
195 South Main Street
Suite 300
Akron, OH  44308

David C. Landin
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA  23219

Gene Locks
Greitzer & Locks
1500 Walnut Street
Philadelphia, PA  19102

Ronald L. Motley
Ness, Motley, Loadholt, Richardson
& Poole
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC  29465

John J. Repcheck
Marks, O'Neill
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA  15219

John D. Roven
John Roven & Associates
2190 North Loop West
Suite 410
Houston, TX  77018

Richard D. Schuster
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH  43216

Neil Selman
Selman, Breitman & Burgess
11766 Wilshire Boulevard
Sixth Floor
Los Angeles, CA  90025

Robert N. Spinelli
Kelley, Jasons, McGuire & Spinelli
Centre Square West
15th Floor
Philadelphia, PA  19102

Robert E. Swickle
Jaques Admiralty Law Firm, P.C.
1370 Penobscot Building
Detroit, MI  48226

Andrew J. Trevelise
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA  19103

James K. Weston, II
Tom Riley Law Firm
4040 First Avenue, N.E.
P.O. Box 998
Cedar Rapids, IA  52406



# CANCER CENTER
## OF THIBODAUX REGIONAL

R. Clay Gould, MD
Radiation Oncologist

August 20, 2001

Ness, Motley, Loadhold, Richardson & Poole
ATTN:  Susan Zeutschel
1555 Poydras St.
Suite 1700
New Orleans, LA  70112

Re:    James C. Turner
       DOB:  7/14/40; SSN: 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

To Whom It May Concern:

Please note Mr. James Turner has recurrent lung cancer.  His prognosis is poor and his life expectancy is around 6 - 9 months.

If you need additional information, please call.

Sincerely,

R. Clay Gould, M.D.

608 North Acadia Road
Thibodaux, LA 70301
985 493 4338
985 449 2524 Fax

EXHIBIT

A

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

NOV - 5 2001

FILED
CLERK'S OFFICE

# In The Matter Of: The transcript of

*JAMES C. TURNER AND MARLENE TURNER*   *v.*

*ANCHOR PACKING, ET AL.*

---

*JAMES C. TURNER*

*August 9, 2001*

*Vol. I*

---

*PROFESSIONAL SHORTHAND REPORTERS, INC.*

*NEW ORLEANS, LA  PH. (504)529-5255   FAX (504)529-5257*

*BATON ROUGE, LA  PH. (225)924-3488   FAX (225)924-2582*

*SHREVEPORT, LA   PH. (318)213-1055   FAX (318)213-1056*

*OR TOLL FREE, 1-800-536-5255*

Original File TURNER.TXT, 132 Pages
Min-U-Script® File ID: 0424267750

# Word Index included with this Min-U-Script®

EXHIBIT

A

JAMES C. TURNER AND MARLENE TURNER, v.
ANCHOR PACKING, ET AL.

Case MDL No. 875   Document 3323   Filed 11/05/01   Page 30 of 247

JAMES C. TURNER
August 9, 2001

Page 1

[1]    17TH JUDICIAL DISTRICT COURT

[2]        PARISH OF LAFOURCHE

[3]        STATE OF LOUISIANA

[4]

[5] JAMES C. TURNER AND        CIVIL ACTION

    MARLENE F. TURNER

[6]

    VERSUS            NO.

[7]

    ANCHOR PACKING COMPANY;     DIV.

[8] CARBORUNDUM; CBS (FORMERLY KNOWN

    AS WESTINGHOUSE ELECTRIC CORPORATION);

[9] ET AL.

[10]

[11]    VIDEOTAPED DEPOSITION OF JAMES C.

    TURNER, 219 CYPRESS VILLAGE, GHEENS,

[12] LOUISIANA 70355, TAKEN IN THE OFFICES OF

    NESS, MOTLEY, LOADHOLT, RICHARDSON & POOLE,

[13] SUITE 1700, 1555 POYDRAS STREET, NEW

    ORLEANS, LOUISIANA, ON THE 9TH DAY OF

[14] AUGUST, 2001.

[15]

[16] APPEARANCES:

[17]

    NESS, MOTLEY, LOADHOLT, RICHARDSON

[18]    & POOLE

    BY:  SHERMAN AMES, ESQ.

[19] SUITE 1700, 1555 POYDRAS STREET

    NEW ORLEANS, LOUISIANA  70112

[20]

        REPRESENTING THE PLAINTIFFS

[21]

    HAILEY, MCNAMARA, HALL, LARMANN &

[22]    PAPALE

    BY: CLAUDE GRECO, ESQ.

[23] ONE GALLERIA BOULEVARD

    METAIRIE, LOUISIANA  70001

[24]

        REPRESENTING TAYLOR-SEIDENBACH

[25]

Page 2

[1] APPEARANCES CONTINUED:

[2]

    BERNARD, CASSISA, ELLIOTT & DAVIS

[3]  BY: EUGENE MCEACHIN, ESQ.

    1615 METAIRIE ROAD

[4] METAIRIE, LOUISIANA  70055

[5]    REPRESENTING THE REILLY-BENTON

        COMPANY, INC.

[6]

[7]   DEUTSCH, KERRIGAN & STILES

    BY: ANDRE BROUSSARD, ESQ.

[8]  755 MAGAZINE STREET

    NEW ORLEANS, LOUISIANA  70130

[9]

        REPRESENTING FLEXITALLIC, INC.

[10]    AND THE DANA CORPORATION

[11]

    JONES, WALKER, WAECHTER, POITEVENT

[12]    CARRERE & DENEGRE

    BY: LEON GARY, JR., ESQ.

[13] 8555 UNITED PLAZA BOULEVARD

    BATON ROUGE, LOUISIANA  70809

[14]

        REPRESENTING VIACOM, INC.,

[15]    F/K/A WESTINGHOUSE

[16]

    JONES, WALKER, WAECHTER, POITEVENT

[17]    CARRERE & DENEGRE

    BY: H. LEE STRAYHAN III, ESQ.

[18] 201 ST. CHARLES AVENUE

    NEW ORLEANS, LOUISIANA  70170

[19]

        REPRESENTING CARBORUNDUM

[20]

[21] LUKER, SIBAL & MCMURTRAY

    BY:  PATRICK MCMURTRAY, ESQ.

[22] 616 GIROD STREET

    NEW ORLEANS, LOUISIANA  70130

[23]

        REPRESENTING FOSTER-WHEELER

[24]

[25]

JAMES C. TURNER
August 9, 2001

Case MDL No. 875   Document 3323   Filed 11/05/01   Page 31 of 247

JAMES C. TURNER AND MARLENE TURNER   v.
ANCHOR PACKING, ET AL.

Page 3

[1] APPEARANCES CONTINUED:
[2]

SULZER & WILLIAMS
[3] BY: RICHARD E. WILLIAMS IV, ESQ.
210 HOLIDAY BOULEVARD, SUITE 335
[4] COVINGTON, LOUISIANA 70433
[5]   REPRESENTING KELLY MOORE PAINT
COMPANY
[6]
[7] AULTMAN, TYNER, RUFFIN & YARBOROUGH,
LTD., A PLC
[8] BY: GLEN L.M. SWETMAN, ESQ.
400 POYDRAS STREET, SUITE 1900
[9] NEW ORLEANS, LOUISIANA 70130
[10]   REPRESENTING GARLOCK, INC.
[11]

LABORDE & NEUNER
[12] BY: BEN L. MAYEAUX, EQ.
JENNIE P. PELLEGRIN, ESQ.
[13] ONE PETROLEUM CENTER, SUITE 200
1001 W. PINHOOK ROAD
[14] LAFAYETTE, LOUISIANA 70503
[15]   REPRESENTING INGERSOLL-RAND
[16]

GALLOWAY, JOHNSON, TOMPKINS,
[17]   BURR & SMITH
BY: JAMES R. GUIDRY, ESQ.
[18] 701 POYDRAS STREET, SUITE 4040
ONE SHELL SQUARE
[19] NEW ORLEANS, LOUISIANA 70139
[20]   REPRESENTING COMBUSTION ENGINEERING
[21]

FORMAN PERRY WATKINS KRUTZ & TARDY
[22] BY: W. SCOTT BROWN, ESQ.
1515 POYDRAS STREET, SUITE 1420
[23] NEW ORLEANS, LOUISIANA 70112
[24]   REPRESENTING GEORGIA-PACIFIC CORP.
[25]

Page 4

[1] APPEARANCES CONTINUED:
[2]

BLANCHARD, WALKER, O'QUIN & ROBERTS
[3] BY: PAMELA G. NATHAN, ESQ.
BANK ONE TOWER
[4] SHREVEPORT, LOUISIANA 71163
[5]   REPRESENTING J.T. THORPE, INC.
[6]

MONTGOMERY, BARNETT, BROWN, READ,
[7]   HAMMOND & MINTZ
BY: HOLLY E. RAMSEY, ESQ.
[8] 3200 ENERGY CENTRE
1100 POYDRAS STREET
[9] NEW ORLEANS, LOUISIANA 70163
[10]   REPRESENTING EAGLE, INC.
[11]

PLAUCHE', MASELLI, LANDRY &
[12]   PARKERSON
BY: WENDY LAPPENGA, ESQ.
[13] SUITE 4240 - PLACE ST. CHARLES
201 ST. CHARLES AVENUE
[14] NEW ORLEANS, LOUISIANA 70170
[15]   REPRESENTING JOHN CRANE
[16]

SLATER, VAN HORN & TOMENY
[17] BY: CORY R. CAHN, ESQ.
SUITE 2600, 650 POYDRAS STREET
[18] NEW ORLEANS, LOUISIANA 70130
[19]   REPRESENTING GENERAL ELECTRIC
[20]

HAILEY, MCNAMARA, HALL, LARMANN &
[21]   PAPALE
BY: MICHAEL ABRAHAM, ESQ.
[22] ONE GALLERIA BOULEVARD
METAIRIE, LOUISIANA 70001
[23]

REPRESENTING FLINTKOTE MINES, LTD.
[24]   AND THE FLINTKOTE COMPANY
[25]

JAMES C. TURNER AND MARLENE TURNER, v.
ANCHOR PACKING, ET AL.

Case MDL No. 875   Document 3323   Filed 11/05/01   Page 32 of 247   JAMES C. TURNER

August 9, 2001

**Page 5**

[1] APPEARANCES CONTINUED:

[2]

SIMON, PERAGINE, SMITH & REDFEARN
[3] BY: MICHAEL HAROLD, ESQ.
ENERGY CENTRE
[4] NEW ORLEANS, LOUISIANA 70163
[5] REPRESENTING THE MCCARTY CORPORATION
[6]

CRULL, CASTAING, LILLY & HERMAN
[7] BY: EDWARD J. LILLY, ESQ.
SUITE 2323, 601 POYDRAS STREET
[8] PAN-AMERICAN LIFE CENTER
NEW ORLEANS, LOUISIANA 70130
[9]

REPRESENTING A.W. CHESTERTON
[10]

[11] DUPLASS, ZWAIN, BOURGEOIS & MORTON
BY: CLAIRE E. BREAUX, ESQ.
[12] SUITE 2900, 3838 N. CAUSEWAY BOULEVARD
METAIRIE, LOUISIANA 70002
[13]

REPRESENTING MINNESOTA MINING &
[14] MANUFACTURING COMPANY
[15] REPORTED BY:
[16] CATHY RENEE' POWELL
CERTIFIED COURT REPORTER
[17]

VIDEOGRAPHER:
[18]

PATRICK GREEN
[19] PROFESSIONAL SHORTHAND REPORTERS
[20]
[21]
[22]
[23]
[24]
[25]

**Page 6**

[1] EXAMINATION INDEX
[2] Page
[3] BY MR. AMES............................14
[4] BY MR. GARY............................61
[5] BY MS. NATHAN.........................94
[6] BY MR. CAHN.............................95
[7] BY MR. BROUSSARD...................100
[8] BY MR. MCEACHIN....................115
[9] BY MS. BREAUX........................116
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

**Page 7**

[1] **STIPULATION**
[2] It is stipulated and agreed by and
[3] between counsel for the parties hereto that
[4] the deposition of the aforementioned witness
[5] is hereby being taken for all purposes
[6] allowed under Article 1421, et. seq., of the
[7] Louisiana Code of Civil Procedure, in
[8] accordance with law, pursuant to notice;
[9] That the formalities of reading
[10] and signing are specifically not waived;
[11] That the formalities of sealing,
[12] certification and filing are specifically
[13] waived;
[14] That all objections, save those as
[15] to the form of the question and the
[16] responsiveness of the answer, are hereby
[17] reserved until such time as this deposition,
[18] or any part thereof, may be used or sought
[19] to be used in evidence.
[20]
[21] Cathy Renee' Powell, Certified
[22] Court Reporter in and for the State of
[23] Louisiana, officiated in administering the
[24] oath to the witness.
[25]

**Page 8**

[1] **THE VIDEOGRAPHER:**
[2] Today is the 9th day of August,
[3] 2001. The time is approximately 12:17 p.m.
[4] My name is Patrick Green, Video
[5] Specialist with the firm of PSR, Inc. The
[6] Court Reporter is Cathy Renee' Powell, also
[7] with PSR.
[8] This is the videotaped deposition
[9] of James C. Turner, taken at Ness, Motley,
[10] Loadholt, Richardson and Poole, located at
[11] 1555 Poydras Street, Suite 1700, New
[12] Orleans, Louisiana, for the case entitled
[13] James C. Turner and Marlene F. Turner versus
[14] Anchor Packing Company, et al., in the 17th
[15] Judicial District Court of LaFourche Parish,
[16] State of Louisiana.
[17] Will Counsel please identify
[18] themselves and which parties they represent?
[19] **MS. RAMSEY:**
[20] Holly Ramsey, for Eagle, Inc.
[21] **MR. GUIDRY:**
[22] James Guidry, for Combustion
[23] Engineering.
[24] **MR. ABRAHAM:**
[25] Mike Abraham, for The Flintkote

JAMES C. TURNER
August 9, 2001

Case MDL No. 875  Document 3323  Filed 11/05/01  Page 33 of 247

JAMES C. TURNER AND MARLENE TURNER  v.
ANCHOR PACKING, ET AL.

Page 9

[1] Company, and Flintkote Mines.
[2] **MS. PELLEGRIN:**
[3] Jennie Pellegrin on behalf of
[4] Ingersoll-Rand.
[5] **MS. BREAUX:**
[6] Claire Breaux on behalf of 3-M.
[7] **MR. HAROLD:**
[8] Michael Harold on behalf of the
[9] McCarty Corporation.
[10] **MR. MAYEAUX:**
[11] Ben Mayeaux for Ingersoll-Rand.
[12] And our appearance today is for the limited
[13] purpose of attending a perpetuation
[14] deposition. We are reserving all rights and
[15] objections, particularly objections to
[16] sufficiency of service of process.
[17] **MS. BREAUX:**
[18] And actually, if I could, Claire
[19] Breaux again, we are going to join in that
[20] objection; and we have not yet been served
[21] and we are not waiving any exceptions we may
[22] have or any exceptions.
[23] **MS. LAPPENGA:**
[24] Wendy Lappenga on behalf of John
[25] Crane, Inc.

Page 10

[1] **MR. LILLY:**
[2] Ed Lilly on behalf of A.W.
[3] Chesterton, and we also join in the
[4] objections and reservations.
[5] **MR. STRAYHAN:**
[6] Lee Strayhan on behalf of
[7] Carborundum. We also join the objections
[8] and reservations.
[9] **MR. BROUSSARD:**
[10] Andre Broussard on behalf of Dana
[11] Corporation and Flexitallic; we also join
[12] the objections and reservations.
[13] **MR. CAHN:**
[14] Cory Cahn, representing General
[15] Electric; we also join in the objections and
[16] reservations.
[17] **MS. NATHAN:**
[18] Pam Nathan on behalf of J.T.
[19] Thorpe, Inc. I also join in the objections
[20] and reservations.
[21] **MR. GARY:**
[22] Leon Gary, for Viacom; we adopt
[23] the objections and reservations.
[24] **MR. GRECO:**
[25] Claude Greco, representing

Page 11

[1] Taylor-Seidenbach; we join in the objections
[2] and reservations.
[3] **MR. BROWN:**
[4] Scott Brown, for Georgia Pacific
[5] Corporation, and we also adopt the
[6] objections and reservations.
[7] **MR. MCMURTRAY:**
[8] Patrick McMurtray, for Foster
[9] Wheeler, and I adopt the reservations and
[10] objections of Mr. Mayeaux.
[11] **MR. WILLIAMS:**
[12] Robert Williams, representing
[13] Kelly Moore Paint Company, and we also adopt
[14] Mr. Mayeaux's objections.
[15] **MR. SWETMAN:**
[16] Max Swetman for Garlock. And I
[17] join in the objections and reservations.
[18] **MR. GUIDRY:**
[19] For the record, James Guidry, for
[20] Combustion Engineering; we also join in
[21] objections and reservations.
[22] **MS. RAMSEY:**
[23] Holly Ramsey, joining.
[24] **MS. LAPPENGA:**
[25] Wendy Lappenga, for John Crane,

Page 12

[1] joining.
[2] **MR. HAROLD:**
[3] McCarty joins.
[4] **MR. ABRAHAM:**
[5] Mike Abraham, Flintkote Company,
[6] and Flintkote Mining Company, also joins.
[7] **MR. MCEACHIN:**
[8] I am Eugene M. McEachin Jr., for
[9] the Reilly-Benton Company.
[10]
[11] **JAMES C. TURNER**
[12] having been duly sworn by the above
[13] mentioned court reporter, did testify as
[14] follows:
[15] **MR. GARY:**
[16] Good morning, Mr. Turner. I am
[17] Leon Gary and I represent Viacom, which is
[18] the former Westinghouse.
[19] I just want to take a second to
[20] put on the record, the agreement we reached
[21] this morning with your counsel, about the
[22] scope of your deposition today.
[23] We understand that you are on
[24] chemotherapy, and physically, you may not be
[25] able to testify as long as may be required

JAMES C. TURNER AND MARLENE TURNER v.
ANCHOR PACKING, ET AL.

Case MDL No. 875   Document 3323   Filed 11/05/01   Page 34 of 247

JAMES C. TURNER
August 9, 2001

Page 13

[1] to do a thorough discovery deposition about
[2] your knowledge concerning the facts involved
[3] in the lawsuit.
[4]     So, your lawyer has asked us to
[5] curtail the questions, but has agreed
[6] whenever your health permits, to make you
[7] available again for a continuation. On that
[8] basis, we have agreed to do our best to
[9] limit the questions, so as not to overburden
[10] you this morning.
[11]     And I take it that is acceptable
[12] with you?
[13]                 THE WITNESS:
[14]     That's correct.
[15]                 MR. GARY:
[16]     On that basis, then we, for
[17] Viacom, reserve our rights if we are unable
[18] to complete a discovery deposition, such as
[19] they may be, to limit or exclude the
[20] admissibility or availability of the
[21] perpetuation deposition.
[22]                 THE VIDEOGRAPHER:
[23]     Go off the record; it is
[24] 12:23 p.m.
[25]     (Discussion off the record.)

Page 14

[1]                 THE VIDEOGRAPHER:
[2]     Back on record; it is 12:25 p.m.
[3]                 MR. AMES:
[4]     Hi. I am Sherman Ames from
[5] Charleston, South Carolina. I am here on
[6] behalf of Mr. Turner.
[7]     Before we proceed with his
[8] examination, we have agreed that an
[9] objection by one Defendant constitutes an
[10] objection by all. And other than that, we
[11] will abide by any of the usual stipulations.
[12]     But we are also understanding that
[13] this deposition is to be used at trial, and
[14] for whatever purposes are available under
[15] the laws of the State of Louisiana. And we
[16] will abide accordingly.
[17]                 EXAMINATION BY MR. AMES:
[18]     **Q:** Would you state your full name,
[19] please, sir?
[20]     **A:** James Carl Turner.
[21]     **Q:** Where do you live?
[22]     **A:** Gheens, Louisiana.
[23]     **Q:** Where is that, relative to New
[24] Orleans?
[25]     **A:** Forty miles west, southwest.

Page 15

[1]     **Q:** What is your home address?
[2]     **A:** 219 Cypress Village Lane, Gheens,
[3] Louisiana 70355.
[4]     **Q:** Are you married, Mr. Turner?
[5]     **A:** Yes.
[6]     **Q:** What is your wife's name?
[7]     **A:** Marlene.
[8]     **Q:** How long have you been married to
[9] Marlene?
[10]     **A:** Twenty-one years.
[11]     **Q:** Do you have any children?
[12]     **A:** One girl.
[13]     **Q:** And what is your girl's name?
[14]     **A:** Billie Jean.
[15]     **Q:** Do you have any children by any
[16] previous marriages?
[17]     **A:** I have four daughters and she has
[18] one son.
[19]     **Q:** Just for the benefit of the Court
[20] and jury, what are the names of the
[21] daughters and the son?
[22]     **A:** My son is Richard; my daughters
[23] are Michelle, Anita, Terry, and Jackie.
[24]     **Q:** Do they live around here, or are
[25] they scattered all about?

Page 16

[1]     **A:** Scattered.
[2]     **Q:** Whereabouts are they?
[3]     **A:** Two in Houston; one in Georgia;
[4] one in South Carolina; and one in jail.
[5]     **Q:** What is your date of birth,
[6] Mr. Turner?
[7]     **A:** 7/17/1940.
[8]     **Q:** For the benefit of those that are
[9] math impaired, how old are you, as we sit
[10] here today?
[11]     **A:** Sixty-one.
[12]     **Q:** How far did you get in school?
[13]     **A:** I have the equivalent of a
[14] first-year college, including eighth grade,
[15] through the eighth grade in school, plus
[16] Navy training, and some courses at Nicholls
[17] State University.
[18]     **Q:** Insofar as your formal schooling,
[19] how far did you get?
[20]     **A:** Well, I had took courses at
[21] Nicholls State University. Math, English.
[22]     **Q:** And where did you go to elementary
[23] school?
[24]     **A:** Cleveland, South Carolina.
[25]     **Q:** What is the last grade you

August 9, 2001

JAMES C. TURNER
Case MDL No. 875   Document 3323   Filed 11/05/01   Page 35 of 247

JAMES C. TURNER AND MARLENE TURNER   v.
ANCHOR PACKING, ET AL.

Page 17

[1] completed in school?

[2] **A:** Completed the eighth grade.

[3] **Q:** After you completed the eighth
[4] grade, what did you do?

[5] **A:** I was working at a sawmill to try
[6] to help my family out. And then, as soon as
[7] I turned 17 years old, I went and joined the
[8] Navy.

[9] **Q:** When you joined the Navy, where is
[10] the first place you went?

[11] **A:** I was sworn in, in Macon, Georgia.

[12] **Q:** And after Macon, what did the Navy
[13] do to you?

[14] **A:** Shipped me off to Great Lakes,
[15] Illinois.

[16] **Q:** What did you do at Great Lakes?

[17] **A:** Went through basic training.

[18] **Q:** After you got out of basic, where
[19] did you go?

[20] **A:** Aboard the USS HAYNSWORTH, DD-700.

[21] **Q:** You say the USS HAYNSWORTH,
[22] DD-700. What does the DD stand for?

[23] **A:** Destroyer.

[24] **Q:** About when was it you went aboard
[25] the HAYNSWORTH?

Page 18

[1] **A:** October of 1957.

[2] **Q:** What was your capacity there, what
[3] did you first do when you went on the
[4] HAYNSWORTH?

[5] **A:** An engineer. Entry level
[6] engineer, fireman.

[7] **Q:** What kind of work does a —

[8] **A:** Wiping bilges.

[9] **Q:** How long —

[10] **A:** Standing watches.

[11] **Q:** How long did you stay on the
[12] HAYNSWORTH?

[13] **A:** A little over three years.

[14] **Q:** What were your general duties when
[15] you were aboard that ship, in addition to
[16] those that you have already told us about.

[17] **A:** Well, I made machinist second
[18] class on the HAYNSWORTH, and my duties
[19] increased from watch-standing to senior
[20] watch in the aft engine room, operating the
[21] entire engine room.

[22] **Q:** Could you describe, for the
[23] benefit of the Court and jury, the size of
[24] these engine rooms, and just kind of give us
[25] a picture of what they looked like?

Page 19

[1] **A:** Typical engine room on a destroyer
[2] is about 40 feet by 40 feet. Engines, from
[3] the keel to the upper level, two levels, the
[4] engine is about 35,000 horsepower. All
[5] various pumps. Piping, steam piping.

[6] **Q:** And as a machinist mate second
[7] class working in that engine room,
[8] specifically, what kind of work did you do?

[9] **A:** All types of repairs on steam
[10] lines, steam joints. Insulation, removing
[11] and restoring insulation, removing
[12] insulation. Cleaning pumps and turbines,
[13] and all types of marine equipment.

[14] **Q:** Do you know how those engines got
[15] their power on the HAYNSWORTH?

[16] **A:** Steam.

[17] **Q:** Where did the steam come from?

[18] **A:** From a boiler, 600 psi boilers.

[19] **Q:** Do you remember how many of those
[20] boilers were on the HAYNSWORTH?

[21] **A:** Four boilers, two per fire room.

[22] **Q:** How long did you stay on the
[23] HAYNSWORTH?

[24] **A:** Just over three years.

[25] **Q:** After the HAYNSWORTH, what

Page 20

[1] happened?

[2] **A:** I was transferred to the USS LUCE.

[3] **Q:** What kind of ship was the LUCE?

[4] **A:** DLG. Destroyer leader guided
[5] missile.

[6] **Q:** For the benefit of all of us who
[7] don't know what that is, could you refine
[8] that, or tell us a little bit more
[9] specifically, about what that ship does?

[10] **A:** A destroyer leader was, at that
[11] time, one of the newest 1200 steam powered,
[12] superheated to 980 degrees, 8500 horsepower
[13] missiles. The primary armory was missiles
[14] on both ends of the ship. Carrier missiles.

[15] **Q:** What were your duties on the LUCE?

[16] **A:** I progressed from watch-standing,
[17] senior enlisted watch-stander in the aft
[18] engine room, to the senior watch officer in
[19] the main engine room.

[20] **Q:** What does a senior watch officer
[21] do?

[22] **A:** He is in charge of the — the
[23] whole engineering department. As when he is
[24] on watch, every — for four hours, he is in
[25] charge of the entire engine department. All

Page 21

[1] the four boilers, engines, both engine
[2] rooms.
[3]    Q: And to be a little bit more
[4] specific, what did your duties entail as
[5] being the watch officer there?
[6]    A: To make sure that engines were
[7] ready to answer all bells required by the
[8] captain, commensurate with our operating
[9] procedures at that time, whether we had two
[10] boilers or four boilers on the line.
[11]    Q: How long did you stay aboard the
[12] USS LUCE?
[13]    A: Over three years, a little over
[14] three years.
[15]    Q: What did you do after you got off
[16] the LUCE?
[17]    A: I went to a Naval Air Training
[18] Command in Jacksonville, Florida, for two
[19] years shore duty.
[20]    Q: And what kind of shore duty did
[21] you have?
[22]    A: I was a master at arms in the
[23] barracks.
[24]    Q: What does a master at arms do?
[25]    A: Maintains good order and

Page 22

[1] discipline among the troops.
[2]    Q: How long did you last at that job?
[3]    A: Two years.
[4]    Q: That takes us through
[5] approximately what year?
[6]    A: 1965, about.
[7]    Q: After being a master at arms, and
[8] trying to keep order among the troops, what
[9] did you do?
[10]    A: I was transferred to the USS
[11] SHENANDOAH in Norfolk, Virginia.
[12]    Q: What kind of ship?
[13]    A: A D-26. That is a destroyer
[14] repair ship.
[15]    Q: For the benefit of those that
[16] don't know what a destroyer repair ship
[17] does, could you kind of enlighten us in that
[18] regard?
[19]    A: Normally, it stays beside the
[20] pier, wherever she is tied up, and brings
[21] destroyers alongside. They have a certain
[22] period of time, usually two weeks, to tear
[23] down what machinery they need repaired, and
[24] let the repair department know.
[25]    And we send the necessary

Page 23

[1] personnel aboard the ship. Or the equipment
[2] is brought aboard the repair ship and
[3] repaired, and returned to the destroyers.
[4]    Q: What specifically was your duty
[5] when you were aboard the SHENANDOAH?
[6]    A: I started out operating the
[7] distilling plants aboard the SHENANDOAH.
[8] And then I was transferred to the repair
[9] department, where I was in charge of the
[10] outside repair. That included bringing
[11] aboard the equipment for repairs, and going
[12] aboard other ships to effect repairs.
[13]    Q: You said that you did some work
[14] with the distilling plant?
[15]    A: Yes.
[16]    Q: What kind of distilling were you
[17] doing?
[18]    A: Making freshwater out of
[19] saltwater.
[20]    Q: Okay. Could you describe the
[21] machinery, the process involved in that?
[22]    A: The particular ones I was
[23] operating on the SHENANDOAH were flash-type,
[24] tube-type distilling plants. And they
[25] flashed the saltwater into steam, and the

Page 24

[1] steam is then caught and collected, and
[2] condensed. And it is pure water.
[3]    Q: You also, I think, indicated that
[4] you were part of the outside repair work
[5] that was being done. Could you be just a
[6] little more specific in what your duties
[7] entailed there?
[8]    A: In outside repair work, would
[9] usually include work on the main shafts. If
[10] they had a bad bearing, we would pull the
[11] bearing, bring it to the SHENANDOAH, repack
[12] it, the bearing, and return it to the ship
[13] and install it, among other types of
[14] materials, such as control equipment for
[15] pumps, and equipment like Leslie regulators,
[16] steam regulators, such as for feed pumps and
[17] boilers.
[18]    Q: Is this something with which you
[19] had hands-on experience?
[20]    A: Absolutely.
[21]    Q: Is there anything else you did
[22] aboard the SHENANDOAH that you haven't
[23] talked about, in the general sense? I am
[24] not talking about swabbing the decks, or
[25] something like that.

JAMES C. TURNER
August 9, 2001

Case MDL No. 875   Document 3323   Filed 11/05/01   Page 37 of 247

JAMES C. TURNER AND MARLENE TURNER   v.
ANCHOR PACKING, ET AL.

Page 25

[1] **A:** That was mostly my duties. Just
[2] the evaporators and the repair department.
[3] **Q:** Okay. After the — how long did
[4] you —
[5] **A:** I did spend a small amount of time
[6] in the engine room, watch-standing aboard
[7] the SHENANDOAH.
[8] **Q:** Is this watch-standing that you
[9] were doing, like the watch-standing that you
[10] previously described to us?
[11] **A:** Yes. Operating the engines.
[12] **Q:** Okay. About how long were you on
[13] the SHENANDOAH?
[14] **A:** Four and a half years.
[15] **Q:** After you left the SHENANDOAH,
[16] what did you do?
[17] **A:** I was transferred to the USS
[18] JOSEPHUS DANIELS.
[19] **Q:** What kind of ship was that?
[20] **A:** Destroyer leader guided missile.
[21] **Q:** Is that like the USS LUCE or is
[22] that different?
[23] **A:** A lot bigger.
[24] **Q:** What difference is there between
[25] the JOSEPHUS DANIELS and the LUCE?

Page 26

[1] **A:** It was approximately 100, maybe a
[2] little shorter than 100 foot longer than the
[3] LUCE, and 10, 12 feet wider. It was bigger
[4] in every respect: Heavier armament,
[5] different missiles, five-inch guns, the
[6] modern antisubmarine warfare, ASROC.
[7] **Q:** What was your job description on
[8] the JOSEPHUS DANIELS?
[9] **A:** I was in charge of the A Division.
[10] I operated all the air conditioning. I
[11] operated and repaired hydraulic systems,
[12] steam heating, and that's about it.
[13] **Q:** Was this the same kind of hands-on
[14] type repair that you previously described as
[15] a result of your working on the SHENANDOAH
[16] and other ships, or was it different?
[17] **A:** It might have been slightly
[18] different, but mostly the same. Because by
[19] that time, I had made chief petty officer,
[20] and my duties usually just included
[21] supervisory. But I did get my hands dirty.
[22] **Q:** About how many people, by that
[23] time, were you supervising in your capacity
[24] as a chief petty officer?
[25] **A:** Aboard the JOSEPHUS DANIELS, I

Page 27

[1] think I was in charge of 20 to 30 people —
[2] **Q:** How long —
[3] **A:** — directly. Indirectly, when I
[4] was watch-standing, 50 to 75.
[5] **Q:** When you were watch-standing,
[6] about how long would that, what we may think
[7] of as a shift, last?
[8] **A:** We was usually on, at that time,
[9] after I made chief petty officer, four hours
[10] on, eight hours off.
[11] **Q:** Okay. After you left the JOSEPHUS
[12] DANIELS, where did you go?
[13] **A:** Ashore for two years at the Fleet
[14] Maintenance Assistance Group in Norfolk,
[15] Virginia.
[16] **Q:** What did you do in that capacity?
[17] **A:** Essentially, the same duties as I
[18] had on the USS SHENANDOAH. Repair ships.
[19] **Q:** You told us the SHENANDOAH was the
[20] destroyer repair ship?
[21] **A:** Yes.
[22] **Q:** And were your duties, in fact,
[23] substantially similar to what you have
[24] described in terms of your work that you
[25] were doing on the SHENANDOAH?

Page 28

[1] **A:** Yes.
[2] **Q:** Other than being onshore in
[3] Norfolk, Virginia, was there much difference
[4] at all between the SHENANDOAH work and what
[5] you were doing in Norfolk?
[6] **A:** Not much. The traveling is the
[7] only thing. I traveled to the shipyard in
[8] Philadelphia and did a lot of work.
[9] **Q:** Was that the same kind of work up
[10] there in Philadelphia?
[11] **A:** Repair work.
[12] **Q:** I think you testified that you
[13] spent about two years in Norfolk?
[14] **A:** Yes.
[15] **Q:** After that, what did you do?
[16] **A:** I was transferred to the USS
[17] LEAHY, DG-16.
[18] **Q:** What is a DG?
[19] **A:** Heavy cruiser.
[20] **Q:** For the benefit of those that
[21] don't know, what kind of ship is a heavy
[22] cruiser?
[23] **A:** It is approximately the same as
[24] the USS JOSEPHUS DANIELS. A little heavier,
[25] missiles on both ends. More updated

JAMES C. TURNER AND MARLENE TURNER v.
ANCHOR PACKING, ET AL.

Case MDL No. 875   Document 3323   Filed 11/05/01   Page 38 of 247   JAMES C. TURNER
August 9, 2001

Page 29

[1] submarine warfare equipment, such as the
[2] torpedoes.
[3]    Q: What did you do aboard the LEAHY?
[4]    A: I was in charge of both engine
[5] rooms. I was the senior machinist mate
[6] aboard the LEAHY. And I had a chief petty
[7] officer working underneath me, and
[8] approximately 80 to 100 people, enlisted
[9] men.
[10]    Q: What kind of work were the people
[11] under you doing?
[12]    A: Repair and operation of all the
[13] shipboard machinery and equipment.
[14]    Q: What kind of — to be a little
[15] more specific, what kind of machinery and
[16] equipment would they be working with, and
[17] repairing and overhauling?
[18]    A: Steam turbines; steam-driven
[19] pumps; electric-driven pumps; oil storage
[20] and recovery equipment; hydraulic oil;
[21] hydraulic systems; heating and air
[22] conditioning systems.
[23]    Q: And I think you said that you were
[24] supervising the people who were doing that
[25] work. Were you actually around them as they

Page 30

[1] were doing it?
[2]    A: All the time.
[3]    Q: After you left the LEAHY, what
[4] happened?
[5]    A: I retired. Fleet reserve.
[6]    Q: What year was it that you retired,
[7] Mr. Turner?
[8]    A: June 16th, 1977.
[9]    Q: What was your rank when you
[10] retired?
[11]    A: E-8, machinist mate.
[12]    Q: What kind of discharge did you
[13] get?
[14]    A: Honorable.
[15]    Q: Subsequent to your honorable
[16] discharge as a senior chief machinist mate
[17] E-8 on June 16th of 1977, what did you do?
[18] I don't want to talk about that night or the
[19] next couple of days, just generically.
[20]    A: I decided to come to Louisiana,
[21] because of the work advantages in the
[22] oilfield. And I came to Louisiana, and went
[23] to work at a plastic manufacturing place.
[24]    Q: Whereabouts in Louisiana was this?
[25]    A: Physically in Valentine,

Page 31

[1] Louisiana. Lockport. I think the address
[2] is Lockport.
[3]    Q: Do you remember the name of the
[4] people for whom you came to work? The
[5] company, actually; I don't mean the people.
[6]    A: It was a division of Valentine
[7] Sugars.
[8]    Q: In a general sense, what kind of
[9] work did you do for those folks?
[10]    A: I started cooking the resin that
[11] is the base for manufacturing plastics.
[12]    Q: For those of us that don't know
[13] what cooking resin and plastics is, could
[14] you give us a little bit of a description of
[15] what kind of work that was?
[16]    A: That is a mixture of phenol,
[17] formaldehyde, and an agent to kick it over
[18] to make it have an exothermic reaction. You
[19] mix it together in a kettle, let it have its
[20] exothermic reaction, pump it under a vacuum,
[21] draw the water off, and you are left with a
[22] base resin that is used in the manufacture
[23] of plastics.
[24]    Q: Were the plastics actually
[25] manufactured there, or did —

Page 32

[1]    A: The pellets, the — it was
[2] manufactured in pellets and then shipped to
[3] places like Proctor Silex, and different
[4] manufacturers that used the phenolic-based
[5] plastics to make coffee pots, the hard
[6] plastics and such like that.
[7]    Q: How long did you work in the
[8] plastics industry?
[9]    A: Very short time. I got allergic
[10] to the formaldehyde, and I started working
[11] in the repair of forklifts and equipment.
[12]    Q: Did you go to work for somebody
[13] else, or is this —
[14]    A: The same division, same place.
[15]    Q: How long did you work as a
[16] forklift repairman?
[17]    A: Probably a little over three
[18] years.
[19]    Q: And what happened at the end of
[20] that three years?
[21]    A: That is when the bottom fell out
[22] of everything in Louisiana, and I was laid
[23] off.
[24]    Q: Subsequent to being laid off, what
[25] did you do next?

August 9, 2001

Case MDL No. 875   Document 3323   Filed 11/05/01   Page 39 of 247

JAMES C. TURNER AND MARLENE TURNER   v.
ANCHOR PACKING, ET AL.

Page 33

[1]    **A:** I went to — out in the oilfield,
[2] on board a cargo boat.
[3]    **Q:** Do you remember about what year
[4] that was?
[5]    **A:** 1982.
[6]    **Q:** For whom did you go to work in —
[7]    **A:** Fagan Boat Service.
[8]    **Q:** What kind of work did you do for
[9] Fagan?
[10]    **A:** Engineer on a cargo boat.
[11]    **Q:** What kind of work is that?
[12]    **A:** Close to the same duties as Navy,
[13] except this was diesel, and the navy is
[14] mostly steam. Same equipment: Pumps,
[15] diesel engines, heating and air
[16] conditioning; removing and replacing gaskets
[17] on exhaust lines, and stuff like that.
[18]    **Q:** And you have said the work was
[19] similar to that, that you performed in the
[20] Navy?
[21]    **A:** Yes.
[22]    **Q:** Is this hands-on work, is it
[23] supervising other people, or is it both?
[24]    **A:** This is mostly hands-on work.
[25]    **Q:** Did you have occasion, when you

Page 34

[1] worked for Fagan, to supervise people as
[2] well —
[3]    **A:** Yes.
[4]    **Q:** — or was this primarily your
[5] work?
[6]    **A:** I had occasion to supervise other
[7] people.
[8]    **Q:** Any other duties aboard, while you
[9] were working for Fagan?
[10]    **A:** I became a port engineer. And my
[11] duties included helping get the ships into
[12] the shipyard, and get them overhauled and
[13] get them out.
[14]    **Q:** About how long did your job last
[15] with Fagan?
[16]    **A:** Five years.
[17]    **Q:** That would take us through about
[18] what year, through about what year, if you
[19] recall?
[20]    **A:** 1987.
[21]    **Q:** Is there anything else about your
[22] work at Fagan that comes to mind, that is
[23] any different from what you have already
[24] described for us?
[25]    **A:** Just the shipyard work. It is

Page 35

[1] mostly getting the boats in and out of the
[2] shipyard, rather than mostly hands-on work.
[3]    **Q:** In 1987, after you left Fagan Boat
[4] Company, what did you do?
[5]    **A:** I went to work with Petrol Marine.
[6]    **Q:** What kind of work was the Petrol
[7] Marine work?
[8]    **A:** Exactly the same. Engineer on a
[9] cargo boat.
[10]    **Q:** Where were they based?
[11]    **A:** Houma, Louisiana.
[12]    **Q:** I take it, as you have testified,
[13] your job duties and descriptions were pretty
[14] much the same as they were with Fagan? Is
[15] that fair to say?
[16]    **A:** Yes.
[17]    **Q:** How long did you last with Petrol
[18] Marine?
[19]    **A:** I think I was injured in 1993, and
[20] I continued to work until '95. And I had a
[21] back operation. And since then, I have been
[22] disabled.
[23]    **Q:** What happened in 1993? You said
[24] you were injured. Can you describe for us
[25] what happened, please?

Page 36

[1]    **A:** We was in rough weather, and I was
[2] trying to tie up to a rig. Actually, trying
[3] to get untied from it. And the line we was
[4] trying to get untied — they finally got it
[5] cut. Had to work on it a long time.
[6]      Finally got it cut, and I was
[7] hanging onto it to try to get them some
[8] slack, so they could maneuver around and get
[9] it cut. And when it came loose, it jerked
[10] me down on some piping and wrenched my back.
[11]    **Q:** And that, I think you have said
[12] happened in '93?
[13]    **A:** Yes.
[14]    **Q:** And then in 1993 and '95, what did
[15] you do?
[16]    **A:** I continued to try to work with,
[17] you know, rehabilitation and pain
[18] medication. And then, it got so bad I had
[19] to have an operation.
[20]    **Q:** When was that operation?
[21]    **A:** '95.
[22]    **Q:** And what did they do when they
[23] operated on you?
[24]    **A:** Laminectomy at L5 and S1,
[25] something or another like that.

JAMES C. TURNER AND MARLENE TURNER, v.
ANCHOR PACKING, ET AL.

Case MDL No: 875   Document 3323   Filed 11/05/01   Page 40 of 247

JAMES C. TURNER
August 9, 2001

**Page 37**

[1]    **Q:** I think you have just testified
[2] that you have been disabled ever since?
[3]    **A:** Yes.
[4]    **Q:** Have you worked at all since that
[5] laminectomy in 1995?
[6]    **A:** None. I cut the grass.
[7]              **MR. AMES:**
[8]    Let's take a short break.
[9]              **THE VIDEOGRAPHER:**
[10]    Going off the record; it is
[11] 12:51 p.m.
[12]    (Recess.)
[13]              **THE VIDEOGRAPHER:**
[14]    Back on record; it is 12:58 p.m.
[15]         **EXAMINATION BY MR. AMES:**
[16]    **Q:** Mr. Turner, you have described for
[17] us your work history, from the time that you
[18] went to work out of eighth grade and went
[19] into a sawmill, until you retired, as of
[20] 1995, as a result of your back injury.
[21]    Starting with kind of your newest,
[22] or the job first, that is to say, your job
[23] with Petrol Marine, do you recall the names
[24] of any of the folks that you spent time
[25] with, that is to say, your co-workers?

**Page 38**

[1]    **A:** Captains: Bobby Daigle; Dale
[2] Lane.
[3]    **Q:** Now, if you can remember if they
[4] were at Petrol Marine, or Fagan Boat, or
[5] anything like — just tell us if you can —
[6]    **A:** Both of those were Petrol Marine.
[7]    **Q:** Okay.
[8]    **A:** Kenny Dawson, Petrol Marine;
[9] personnel manager of Petrol Marine was
[10] Alfred — I can't remember his last name.
[11]    **Q:** Working our way back, anybody at
[12] Fagan that you remember you spent more time
[13] with than anybody else?
[14]    **A:** I can't remember his name.
[15]    **Q:** Fair enough. Backing up a little
[16] bit further, at Valentine, are there any
[17] co-workers there that you remember working
[18] with or around more than anybody else?
[19]    **A:** Mr. Tom Woodruff, deceased. L.E.
[20] Gautreaux, deceased; Hubert Gautreaux, I am
[21] sure he is still alive. Mrs. Ruth Woodruff.
[22]    **Q:** Anybody else?
[23]    **A:** Johnny Frosch.
[24]    **Q:** And I know you have testified that
[25] in the Navy, you served aboard a lot of

**Page 39**

[1] different ships, as well as having had some
[2] shore duty. Are there any shipmates or guys
[3] that you spent time with, while you were in
[4] the Navy, that come to mind as folks that
[5] you spent more time with than anybody else?
[6]    **A:** One of my officers was
[7] Mr. Henningson. He was a good friend.
[8]    **Q:** Was he on board any one
[9] specific —
[10]    **A:** The SHENANDOAH.
[11] Randall Brazzi, the USS LUCE; Alva
[12] Lee Reed, USS LUCE; Eugene Breale, USS
[13] HAYNSWORTH; Mr. P.O. Peters, USS JOSEPHUS
[14] DANIELS.
[15]    That's all I can think of right
[16] off.
[17]    **Q:** You have previously articulated
[18] for us, or told us about the kind of work
[19] you did, and what you did, as you say, to
[20] get your hands dirty.
[21]    During the course of this work
[22] history that you have described for us, have
[23] you ever had occasion to work with or around
[24] asbestos insulation products?
[25]    **A:** A lot of it.

**Page 40**

[1]    **Q:** Without getting real specific,
[2] could you tell us just kind of generically,
[3] what kinds of products you are talking
[4] about?
[5]    **A:** Pipe insulation; gasket material;
[6] pump packing; valve packing; joint gaskets;
[7] Carborundum grinding wheels; compressed
[8] asbestos.
[9]    **Q:** You mentioned pipe insulation, I
[10] believe, first. What did the pipe
[11] insulation look like, and what was it used
[12] for?
[13]    **A:** Well, I remember it in two
[14] different forms. Some of it come molded and
[15] all you had to do was put it around the
[16] pipe, and then fill in the cracks with
[17] mortar-type stuff that you made up. And
[18] then wrap it with sheets of asbestos cloth,
[19] and put a liquid coating over it that turned
[20] semi-hard.
[21]    **Q:** You said that there was the
[22] premolded kind; what was the other kind?
[23]    **A:** There was a type that we always
[24] mixed up in a bucket and molded it to
[25] whatever we needed to insulate, and then put

August 9, 2001    Case MDL No. 875   Document 3323   Filed 11/05/01   Page 41 of 247

JAMES C. TURNER AND MARLENE TURNER v. ANCHOR PACKING, ET AL.

**Page 41**

[1] the asbestos cloth over that.

[2]    **Q: And did you do this kind of work**

[3] **yourself?**

[4]    **A: Oh, yes.**

[5]    **Q: I think you mentioned gasket**

[6] **materials. Gasket materials. Would you**

[7] **describe for the Court and jury, just —**

[8] **what were they used for?**

[9]    **A: We used a lot of sheet compressed**

[10] asbestos. And mostly pumps, pump joints.

[11] Some steam joints, low-pressure steam

[12] joints. Water, there was a lot of water

[13] piping on the tank-covered gaskets.

[14]    **Q: Were these gaskets premolded, or**

[15] did you have to work with them, or did both

[16] kinds of jobs involve your use of gaskets?

[17]    **A: Both kinds. But mostly we had to**

[18] hammer them out ourselves.

[19]    **Q: How did you do that?**

[20]    **A: Used the piece of material that we**

[21] needed to make the gasket for, use it as a

[22] template. And hammer around the edges of

[23] it, and then hammer the bolt holes out, and

[24] then hammer the inside hole out.

[25]    **Q: And the premolded ones, how were**

**Page 42**

[1] they —

[2]    **A: Usually, they were already stamped**

[3] out, the inside hole stamped out. The bolt

[4] holes were stamped out, just put them in

[5] place and bolt it up.

[6]    **Q: Have you personally used both the**

[7] premolded, as well as make your own gaskets,

[8] as you have described?

[9]    **A: Lots of both.**

[10]    **Q: I think you talked about pumps**

[11] just a second ago, in terms of your use of

[12] the gaskets, as well as some of the work

[13] that you described when you were aboard

[14] ships. Other than the obvious of pumping

[15] stuff, how were they used?

[16]    **A: The pumps themselves?**

[17]    **Q: Yes.**

[18]    **A: They pumped all types of liquid,**

[19] like lube oil, feed water, freshwater,

[20] diesel fuel.

[21]    **Q: Were you involved personally in**

[22] the maintenance of these pumps?

[23]    **A: Yes.**

[24]    **Q: How so?**

[25]    **A: I had to tear them down, replace**

**Page 43**

[1] bearing rings, bearings, seals, reassemble

[2] them with new gaskets, packing or seals.

[3]    **Q: I think you also mentioned that**

[4] you have done some work packing valves and

[5] working with valves?

[6]    **A: Yes.**

[7]    **Q: Would you describe, please, for**

[8] us, and the Court and the jury, what that

[9] work is like?

[10]    **A: Well, it consisted of steam**

[11] pressure from 150 pounds to 1200 pounds.

[12] And it required disassembling a valve,

[13] extracting the old packing, and inspecting

[14] it to make sure it wasn't steam cut. And

[15] then installing — cutting and installing

[16] new packing. And reinstalling the hold-down

[17] device. It is called a — I don't

[18] recollect.

[19]    **Q: You used the word a second ago,**

[20] steam cut. What does that mean?

[21]    **A: That is when you have a steam**

[22] leak, a small — it starts off as a small

[23] steam leak. And if it is leaking, it

[24] actually cuts into the metal. Cuts a path

[25] into the metal. Then it has to be taken

**Page 44**

[1] out. Taken to a repair facility and cut.

[2]    **Q: And I think you mentioned joint**

[3] gaskets; are they any different than you

[4] have been talking about with us, with

[5] respect to the valves and the pumps and the

[6] like?

[7]    **A: Nothing, except the Spiral Wound**

[8] Flexitallic asbestos gaskets. And that is

[9] the compressed asbestos. And then you have

[10] got the steam gaskets, that is all spiral

[11] wound for the high-pressure steam. The Flex

[12] gaskets.

[13]    **Q: I think you also talked about**

[14] grinding wheels?

[15]    **A: We used a lot of grinding,**

[16] Carborundum grinding wheels in the repair

[17] department for sharpening tools, like

[18] cutting tools for the lathes, tools for

[19] scraping and cleaning joints.

[20]    **Q: Did you personally do this kind of**

[21] work?

[22]    **A: Yes.**

[23]    **Q: Did you supervise others doing**

[24] this kind of work?

[25]    **A: Yes.**

JAMES C. TURNER AND MARLENE TURNER v.
ANCHOR PACKING, ET AL.

Case MDL No. 875   Document 3323   Filed 11/05/01   Page 42 of 247

JAMES C. TURNER
August 9, 2001

Page 45

[1]    Q: We talked about compressed
[2] asbestos, when you were describing these
[3] things to us a little bit ago.
[4]    Other than the compressed asbestos
[5] that you talked about, with respect to the
[6] gaskets that you had pounded and hammered
[7] out, did you use it for any other purpose?
[8]    A: No. Not that I can think of.
[9]    Q: If I can read my notes, you talked
[10] about —
[11]    A: We used to use it in the place of
[12] welding. If somebody was welding, we tried
[13] to put a sheet of it in place to keep the
[14] slag from seeping in the oil in the bilges,
[15] and starting a fire. Things like that.
[16]    Q: Is that any different than the
[17] asbestos cloth that you talked about a
[18] little bit ago?
[19]    A: It is different, but it is
[20] similar.
[21]    Q: How is the cloth different than
[22] the compressed asbestos?
[23]    A: The cloth is a weave, a woven
[24] cloth. And this compressed asbestos is just
[25] a sheet of paper-like product.

Page 46

[1]    Q: You also described a liquid
[2] coating that was used, with respect to the
[3] premolded and bucket-type pipe insulation.
[4] Could you describe a little more
[5] specifically what you were talking about
[6] with that liquid coating?
[7]    A: I don't know exactly what the
[8] liquid coating was. I don't remember a
[9] name, or anything like that. I remember
[10] there was just open buckets of it, usually
[11] just like a paint can.
[12]    And when we got the asbestos cloth
[13] molded the way we wanted it, just spread
[14] this white paste on it, and it semi-hardened
[15] and it held it in place.
[16]    Q: Did you ever have to finish this
[17] liquid coating, or did you just paint it on
[18] and that was it?
[19]    A: No. After a certain amount of
[20] time, it turned yellow and you painted it
[21] with white paint.
[22]    Q: Are there any kinds — and again,
[23] I am just talking generically right now —
[24] any other kinds of asbestos-related
[25] insulation materials with which you either

Page 47

[1] worked with or worked around, over the
[2] course of your career?
[3]    A: Not that I can think of, except
[4] the large turbines and stuff that was
[5] insulated with that material, with asbestos,
[6] and large, six to — six-inch steam lines.
[7]    Q: Now, you have said "the large
[8] turbines." How big were these turbines,
[9] just in —
[10]    A: Well, in a typical warship, like
[11] the USS LEAHY, that develops
[12] 85,000-horsepower, it sounds awful big,
[13] 85,000 horses. But it is just a small
[14] turbine. A turbine combination 20 feet long
[15] by eight, 10 feet wide. Well, not even that
[16] big. That big after it is insulated.
[17]    Q: I think you also mentioned during
[18] the course of our discussion, sir, that you
[19] worked around boilers?
[20]    A: Yes.
[21]    Q: Could you describe, again, for
[22] those of us that don't have the experience
[23] you do, the size and scope of what these
[24] boilers might have looked like?
[25]    A: They are just big, square, almost

Page 48

[1] square enclosures, enclosed with firebrick
[2] inside, with tube coming up and down, and
[3] metal casings.
[4]    And you got the D-type boilers and
[5] the M-type boilers. The old 600-pound I
[6] believe was the D-type boilers, and the
[7] modern 1200-pound is the M-type boilers.
[8]    No, just the opposite. The old
[9] 600 was the M-type, and the new modern kind
[10] is the D-type. And it is just a big room,
[11] where you build a fire, exposed to water
[12] tubes and generate steam.
[13]    Q: Were these boilers insulated?
[14]    A: Insulated inside with firebrick.
[15]    Q: Were they insulated on the
[16] outside?
[17]    A: Mostly, what you seen on the
[18] outside was just aluminum looking, or
[19] stainless steel-looking material.
[20]    But some insulation, the asbestos
[21] where the steam piping come out of the
[22] boilers we started, went to the engine room.
[23]    Q: You have described some generic,
[24] we might say, types of asbestos insulation
[25] products, and named for us some of the names

JAMES C. TURNER
August 9, 2001

Case MDL No. 875  Document 3323  Filed 11/05/01  Page 43 of 247

JAMES C. TURNER AND MARLENE TURNER   v.
ANCHOR PACKING, ET AL.

Page 49

[1] that came to mind that go along with the
[2] generic products.
[3]     What names of manufacturers of
[4] these products, or any of the turbines or
[5] boilers, or any of the other materials that
[6] you have just been describing for us, what
[7] specific names come to your mind, as you sit
[8] here today, Mr. Turner?
[9]     A: Packing, John Crane;
[10] Johns-Manville; Kelly Moore; GAF; Victor;
[11] Babcock & Wilcox; General Electric;
[12] Westinghouse; Ingersoll-Rand; Aurora;
[13] Consolidated Gasket Material Company.
[14]     Did I get John Crane? A lot of
[15] that. Victor, Spiral Wound Flexitallic
[16] Gaskets.
[17]     That is all I can think of.
[18]     Q: If any other names come through
[19] your mind as we are discussing the rest of
[20] your work today, just like anything else, if
[21] you think of another co-workers' names, feel
[22] free to interject that at any time. Is that
[23] fair enough, Mr. Turner?
[24]     A: Uh-huh (affirmative response).
[25]     Q: Okay.

Page 50

[1] When, if at all, did you become
[2] aware that asbestos might be harmful to
[3] people?
[4]     A: I am not sure. I am not sure I
[5] understand — I don't believe I really
[6] understood that until the '70s, for sure.
[7]     Q: How, again, just generally, did
[8] that awareness come to you?
[9]     A: I really wasn't fully aware of it
[10] until I was diagnosed with cancer, with
[11] asbestos.
[12]     Q: Did you ever see a warning label
[13] on any of the asbestos materials that you
[14] have been describing for us?
[15]     A: No, sir. Not to my knowledge.
[16]     Q: Did you ever see a skull and
[17] crossbones, or anything of that nature on
[18] any of these materials?
[19]     A: No, sir.
[20]     Q: Did anybody tell you, to your
[21] knowledge today, to avoid contact with any
[22] of these asbestos materials you have been
[23] talking about?
[24]     A: No, sir.
[25]     Q: What is the state of your health,

Page 51

[1] as you sit here today?
[2]     A: Very bad. I have been diagnosed
[3] with lung cancer, and asbestosis, due to
[4] asbestos.
[5]     Q: Describe for us how that came
[6] about, please.
[7]     A: I had a bad cold in December of
[8] '99, I believe it was. And a lot of pain in
[9] my back. Well, it kept bouncing me back
[10] from acupuncture to therapy, to pain
[11] medication.
[12]     Finally, I asked the doctor if
[13] this could be, this type of pain could be
[14] associated with lung cancer. And he said, I
[15] don't think so, but we will send you for an
[16] X-ray and find out.
[17]     Q: Not to interrupt, but I am going
[18] to anyway. What doctor was that, that you
[19] had that discussion with?
[20]     A: Dr. Juracovich.
[21]     Q: Where is Dr. Juracovich?
[22]     A: St. Ann Hospital in Raceland.
[23]     Q: Sorry to have interrupted, but
[24] after your discussion with the doctor, what
[25] happened?

Page 52

[1]     A: He sent me for an x-ray, and then
[2] the next day he called me and told me that I
[3] did have something on my lung.
[4]     And he sent me to Ochsner, over
[5] here in New Orleans. And I had a needle
[6] biopsy, and that was the diagnosis: Lung
[7] cancer.
[8]     Q: About when it was that you were
[9] diagnosed with the lung cancer?
[10]     A: I believe it was August 8th.
[11]     Q: Since your diagnosis of the lung
[12] cancer, how has the state of your health
[13] been?
[14]     A: Up and down. I was given therapy
[15] for — chemotherapy and radiation. And I
[16] was okay for a while, then the cancer came
[17] back. I am on radiation and chemotherapy
[18] now.
[19]     Q: How often are you taking these
[20] treatments now?
[21]     A: Radiation everyday, and — five
[22] days a week; chemotherapy, once a week.
[23]     Q: Where do you go for your
[24] therapies?
[25]     A: Thibodaux General. Thibodaux

JAMES C. TURNER AND MARLENE TURNER v.
ANCHOR PACKING, ET AL.

Case MDL No. 875    Document 3323    Filed 11/05/01    Page 44 of 247

JAMES C. TURNER
August 9, 2001

Page 53

[1] General Hospital.

[2] **Q:** How far is that from your home?

[3] **A:** Twenty, 20 miles.

[4] **Q:** Do you drive yourself?

[5] **A:** No.

[6] **Q:** How do you get there?

[7] **A:** My wife takes me.

[8] **Q:** How long have you been undergoing

[9] these treatments?

[10] **A:** Since — I had surgery

[11] November 30th of 2000, and treatments have

[12] been on and off ever since.

[13] **Q:** What surgery did you have in

[14] November of 2000?

[15] **A:** They removed the top third of my

[16] right lung.

[17] **Q:** Where did that surgery take place?

[18] **A:** Thibodaux Regional Hospital.

[19] **Q:** Do you remember who the surgeon

[20] was that did that, took away the top third

[21] of your lung?

[22] **A:** Phil — Phillip Robichaux.

[23] **Q:** You said that you are undergoing

[24] chemotherapy and radiation therapy. What,

[25] if anything, does that do to you physically?

Page 54

[1] **A:** It drains me. I don't have no

[2] energy. I got sick from the chemotherapy,

[3] and a lot of throwing up at night, after the

[4] chemotherapy. And the — tired, from the

[5] radiation.

[6] **Q:** Are you presently taking any kind

[7] of medication?

[8] **A:** (Witness nods head affirmatively.)

[9] **Q:** What are you taking?

[10] **A:** Morphine.

[11] **Q:** How often do you take it?

[12] **A:** Three times a day.

[13] **Q:** Why do you take morphine?

[14] **A:** For pain.

[15] **Q:** As you sit here right now, in

[16] front of this camera, would you tell us how

[17] you feel?

[18] **A:** Not good.

[19] **Q:** Mr. Turner, prior to your

[20] diagnosis of lung cancer back in August of

[21] last year, how was your health?

[22] **A:** Always good. I always had good

[23] health.

[24] **Q:** I know you have testified that you

[25] had a disabling back injury, back in '95,

Page 55

[1] and had a laminectomy. Other than that, had

[2] you had any other kinds of hospitalizations?

[3] **A:** Just a hernia repair.

[4] **Q:** About when was that?

[5] **A:** And the mumps.

[6] **Q:** Do you remember when the hernia

[7] repair was?

[8] **A:** That was in March of '76.

[9] **Q:** I think we can safely skip the

[10] mumps.

[11] Did you have any other kinds of

[12] health problems, besides those that we have

[13] talked about?

[14] **A:** Not to my knowledge.

[15] **Q:** Let me ask you something else.

[16] Have you ever been a smoker?

[17] **A:** Yes.

[18] **Q:** When did you start?

[19] **A:** When I was about 16 years old.

[20] **Q:** How long did you smoke?

[21] **A:** About 40 years.

[22] **Q:** Well, first of all, what did you

[23] smoke?

[24] **A:** Just cigarettes, mostly.

[25] **Q:** Do you remember what kind?

Page 56

[1] **A:** Usually, Winston.

[2] **Q:** Were they filtered or unfiltered?

[3] **A:** Filtered.

[4] **Q:** When did you stop?

[5] **A:** When I was diagnosed with lung

[6] cancer.

[7] **Q:** Is there any specific reason that

[8] you stopped?

[9] **A:** Scared.

[10]                **MR. AMES:**

[11]    Let's take another short break,

[12] please.

[13]              **THE VIDEOGRAPHER:**

[14]    Going off the record; it is

[15] 1:23 p.m.

[16]    (Recess.)

[17]              **THE VIDEOGRAPHER:**

[18]    Everyone ready? We are back on

[19] record. It is 1:28 p.m.

[20]         **EXAMINATION BY MR. AMES:**

[21] **Q:** Mr. Turner, you had described for

[22] us all a lot of your work history, and you

[23] have talked about your exposures to

[24] asbestos-containing, insulation-type

[25] materials.

August 9, 2001    Case MDL No. 875   Document 3323   Filed 11/05/01   Page 45 of 247

JAMES C. TURNER AND MARLENE TURNER   v.
ANCHOR PACKING, ET AL.

---

Page 57

[1] Q: Did you ever, when you were doing
[2] this kind of work, did you ever see any dust
[3] attendant to the work that you were doing?
[4] A: All the time. In the shipyard,
[5] the dust was constantly in the air.
[6] Q: Could you describe a little bit
[7] more specifically, what this kind of dust
[8] looked like?
[9] A: Just white, mote-like dust from
[10] the shipyard workers, usually tearing out
[11] stuff and putting it back in. And you could
[12] see it. The holes they cut in the ship, you
[13] could just look up in the sunlight and see
[14] it floating through there.
[15] Q: Were you exposed to this dust,
[16] this kind of dust that you have described,
[17] when you were working in the plastics
[18] industry?
[19] A: No.
[20] Q: How about when you were working
[21] after you left the job at the plastic
[22] manufacturing and went back to work for
[23] Fagan and for Petrol Marine?
[24] A: Sure. In the engine rooms and in
[25] the shipyards.

Page 58

[1] Q: Did you ever do anything to avoid
[2] breathing that kind of dust?
[3] A: We used to get some little face
[4] mask-type things.
[5] Q: Can you describe those things a
[6] little bit more specifically?
[7] A: It just covered the nose and
[8] mouth, and usually just used it to paint
[9] with. To use it when we were painting.
[10] Q: Do you remember the name brands of
[11] any of those masks?
[12] A: Three-M, we used 3-M a lot.
[13] Q: I am going to ask you a couple of
[14] names and see if they ring a bell with you.
[15] Does the name Garlock mean
[16] anything to you?
[17] A: Yes.
[18] Q: In what sense do you remember that
[19] name?
[20] A: Lots of packing.
[21] Q: How about the name Anchor?
[22] A: Yes. Packing.
[23] Q: How about the name A.W.
[24] Chesterton?
[25] A: Packing and seals.

Page 59

[1] Q: Does the name Worthington ring any
[2] kind of bell with you?
[3] A: Pumps, turbines.
[4] Q: How about, does the name Flintkote
[5] mean anything at all?
[6] A: Flooring coating. Floor covering.
[7] Q: How about Georgia Pacific?
[8] MR. BROWN:
[9] Object to the form.
[10] THE WITNESS:
[11] Not specifically. I know — I am
[12] familiar with Georgia Pacific, but in
[13] what — not in any specific relation that I
[14] can think of.
[15] EXAMINATION BY MR. AMES:
[16] Q: Do you remember — I didn't ask
[17] you about this, and as a matter of trying to
[18] tie everything up — do you remember the
[19] names of any of the boiler manufacturers,
[20] other than I believe Babcock & Wilcox, you
[21] have already mentioned; do you remember the
[22] names of any of the other manufacturers of
[23] the boilers that you worked around?
[24] A: Com — something engineering.
[25] Combustion Engineering. There was Babcock &

Page 60

[1] Wilcox, and one — Foster-Wheeler.
[2] Q: Mr. Turner, before you took sick
[3] with the cancer that you have described, did
[4] you have any hobbies?
[5] A: Oh yeah. Fishing, woodworking,
[6] teaching my grandchildren to play ball and
[7] fish.
[8] Q: What kind of woodworking did you
[9] do?
[10] A: I made shelves, and little corner
[11] knickknacks for my wife. And hand-towel
[12] racks. Just small stuff.
[13] Q: What kind of fishing did you do?
[14] A: Redfish, and speckled trout.
[15] Q: Do you do any of those kinds of
[16] things today?
[17] A: No.
[18] Q: Why is that?
[19] A: I am in too much pain.
[20] Q: What is your understanding,
[21] Mr. Turner, of what the future holds for
[22] you?
[23] A: Not much.
[24] Q: What makes you say that?
[25] A: My doctor said so.

---

Page 61

[1]  **Q:** What, if anything, have you done
[2] to prepare for the future?
[3]  **A:** I don't understand the question.
[4]  **Q:** Is there anything else that you
[5] would like to say, to us or the jury that
[6] may be looking at this some time in the
[7] future, that I haven't asked you, or that
[8] you haven't already said?
[9]  **A:** I am a blank.
[10]  **Q:** Do you have an understanding of
[11] what the cause of your lung cancer is,
[12] Mr. Turner?
[13]  **A:** I was told it was asbestos.
[14]  **MR. AMES:**
[15]  That is all I have. Thank you
[16] very much.
[17]  Let's go off the record.
[18]  **THE VIDEOGRAPHER:**
[19]  Going off the record; it is 1:34
[20] p.m.
[21]  (Off the record discussion.)
[22]  **THE VIDEOGRAPHER:**
[23]  We're back on record; it is 1:35
[24] p.m.
[25]  **EXAMINATION BY MR. GARY:**

Page 62

[1]  **Q:** Mr. Turner, my name is Leon Gary.
[2] And as I have said earlier this morning, my
[3] client is Viacom, Inc., which bought the old
[4] Westinghouse that you have already talked
[5] about.
[6]  I am going to try my best to be
[7] brief with the questions that I have, and
[8] limit them only to the things that I think I
[9] need to know about right now; and to give
[10] the lawyers for the other 23 people that you
[11] have sued a chance, as well.
[12]  So these are just a couple of
[13] ground rules. I will do my best to ask
[14] questions that will be clear to you, that
[15] you can understand. But if I fail to do
[16] that, you need to stop me and say: I don't
[17] understand your question.
[18]  And the reason for that is, that
[19] if you answer a question, I will assume you
[20] understood it, as will everyone else in the
[21] room.
[22]  If I also interrupt an answer by
[23] starting a question before you have
[24] finished, I apologize in advance for doing
[25] that, but you should stop me and say: I

Page 63

[1] haven't finished my answer. And I will be
[2] happy to allow you to do so, because I do
[3] not want to cut you off.
[4]  And I also hope that you will be
[5] able to give us answers that are as full and
[6] as complete as you are able to remember.
[7]  You have been here a while
[8] answering your lawyer's questions. If you
[9] start feeling bad, if you feel weak, if you
[10] believe you are no longer able to remember
[11] as well as you would like to remember, tell
[12] us that, and we will stop and recess, or
[13] adjourn, or whatever is appropriate.
[14]  But I do not want to put you
[15] through anything that makes you any more
[16] uncomfortable than you want to put up with;
[17] is that fair?
[18]  **A:** (Witness nods head affirmatively.)
[19]  **Q:** When this deposition is over, the
[20] reporter who is transcribing it, is going to
[21] send a copy of the deposition to your lawyer
[22] and to you, for you to read and sign, to
[23] enable you to correct anything that she got
[24] wrong when you said it, or someone else said
[25] it, or to straighten out any answer that you

Page 64

[1] need to straighten out.
[2]  So when you have done that, or if
[3] you remember something after we ask
[4] questions, that changes something that you
[5] have told us that you think we should know
[6] about in order to understand completely all
[7] of the facts, please tell your lawyer that,
[8] so he can get in touch with us and let us
[9] know; is that fair?
[10]  **A:** (Witness nods head affirmatively.)
[11]  **Q:** I want to go back to something
[12] that you recently testified about, because
[13] it is fresh on my mind. But, I think your
[14] lawyer asked if you were told what caused
[15] your lung cancer, and you said you were told
[16] it was the exposure to asbestos. Were you
[17] also told that it was caused by smoking
[18] cigarettes?
[19]  **A:** No.
[20]  **Q:** No doctor has ever told you that?
[21]  **A:** No.
[22]  **Q:** Do you have an understanding that
[23] smoking cigarettes can cause lung cancer?
[24]  **A:** Yes.
[25]  **Q:** And how did you gain that

August 9, 2001

JAMES C. TURNER
Case MDL No. 875   Document 3323   Filed 11/05/01   Page 47 of 247

JAMES C. TURNER AND MARLENE TURNER   v.
ANCHOR PACKING, ET AL.

Page 65

[1] understanding?

[2] **A:** By exposure to the television, and

[3] the cigarette packs.

[4] **Q:** You saw warning labels on packages

[5] of cigarettes, I take it; probably on

[6] billboards, outdoor advertising, that

[7] mentioned lung cancer could be caused by

[8] cigarettes?

[9] **A:** Yes.

[10] **Q:** When was the first time in your

[11] life, that you actually understood that

[12] there was a potential association between

[13] smoking tobacco products and the causation

[14] of lung cancer?

[15] **A:** I have no idea.

[16] **Q:** In any years?

[17] **A:** A few years.

[18] **Q:** Just a few?

[19] **A:** Yes.

[20] **Q:** Would it be less than five?

[21] **A:** Probably more than five. Maybe

[22] ten years.

[23] **Q:** And in connection with your use of

[24] tobacco products, in addition to cigarettes,

[25] what other tobacco products have you used?

Page 66

[1] **A:** None.

[2] **Q:** Never used pipe tobacco, cigars,

[3] snuff?

[4] **A:** Occasionally. Not, you know,

[5] nothing daily. Like occasionally, somebody

[6] will give me a cigar for a baby was born or

[7] something, but that's all.

[8] **Q:** So your product of choice was —

[9] **A:** Cigarettes.

[10] **Q:** And your brand of choice was

[11] generally, filtered Winston cigarettes?

[12] **A:** Yes.

[13] **Q:** When you started smoking, you were

[14] about age 16?

[15] **A:** (Witness nods head affirmatively.)

[16] **Q:** And you smoked continuously from

[17] that point in time, until you quit when you

[18] were diagnosed with lung cancer?

[19] **A:** That was two or three years in

[20] between there that I did quit smoking for a

[21] year at a time.

[22] **Q:** Do you remember when that was?

[23] **A:** In the '70s. Just when I retired,

[24] a little before I retired, I quit smoking

[25] for over a year.

Page 67

[1] **Q:** Okay.

[2] **A:** And then one other time, I quit

[3] smoking for over a year.

[4] **Q:** When you started smoking, did you

[5] start smoking Winston filtered cigarettes?

[6] **A:** No. The best I remember is

[7] stealing my step-father's Camels.

[8] **Q:** Unfiltered Camels?

[9] **A:** Yes.

[10] **Q:** And at what point in time, I

[11] guess, did you, I guess, become committed to

[12] Winston as your brand of choice? How long

[13] had you been smoking by that time?

[14] **A:** That was in my 20s, right after I

[15] joined the Navy.

[16] **Q:** Prior to that time, did you smoke

[17] unfiltered Camels?

[18] **A:** No, not regularly. I always tried

[19] to smoke filtered cigarettes.

[20] **Q:** What other brands, besides

[21] Winston?

[22] **A:** Pall Mall; some Fatima, some old

[23] cigarettes.

[24] **Q:** Chesterfields; Lucky Strikes?

[25] **A:** I remember — I have smoked Lucky

Page 68

[1] Strikes a little bit, and Chesterfield.

[2] **Q:** Marlboro?

[3] **A:** Marlboro.

[4] **Q:** Other than cigarettes that you may

[5] have obtained from someone else when you

[6] didn't have one, did you yourself purchase

[7] any brand of tobacco product, other than

[8] Winston, once you started and switched to

[9] Winston?

[10] **A:** Once I switched to Winston, that

[11] was it.

[12] **Q:** You were committed to Winstons?

[13] **A:** (Witness nods head affirmatively.)

[14] **Q:** Did you smoke any type of Kent

[15] cigarettes?

[16] **A:** I have.

[17] **Q:** Do you remember when and how

[18] frequently?

[19] **A:** I remember in the Navy, they was

[20] trying to get rid of a case of Kent

[21] cigarettes. Me and my buddy went together

[22] and bought them for $75. Seventy-five

[23] cartons of cigarettes for 75 cents a carton.

[24] **Q:** Can you remember approximately

[25] when, or what ship you were on?

Page 69

[1] **A:** That was early '70s. I don't
[2] remember what ship.
[3] **Q:** Do you remember who your buddy
[4] was?
[5] **A:** No.
[6] **Q:** During the time that you have
[7] smoked, can you give us an idea of the
[8] quantity of cigarettes that you would use on
[9] a regular, daily basis?
[10] **A:** Very seldom over a pack a day.
[11] **Q:** Were there occasions when you
[12] smoked more than a pack?
[13] **A:** Only if I stayed up hours at a
[14] time.
[15] **Q:** Some people have, in their smoking
[16] history, peaks and valleys, where they get
[17] up to more than a pack and then they try to
[18] cut back and reduce it. Was there ever a
[19] period of time when you would have fairly
[20] described yourself as a two-pack-a-day
[21] smoker?
[22] **A:** No, never.
[23] **Q:** And then, other than the brief
[24] periods when you quit after retirement, you
[25] were consistently a pack-a-day cigarette

Page 70

[1] smoker?
[2] **A:** Yes.
[3] **Q:** And I take it, it would be true,
[4] since you don't think that smoking has got
[5] anything to do with your lung cancer, you
[6] are not a plaintiff in a lawsuit against any
[7] tobacco company?
[8] **A:** No.
[9] **Q:** With respect to your back injury,
[10] did you file any kind of lawsuit against
[11] anybody relating to that incident?
[12] **A:** Yes.
[13] **Q:** Can you tell us who you sued and
[14] where the suit was filed?
[15] **A:** I am not sure there was a suit
[16] filed. I guess there had to be if there was
[17] a settlement, weren't there?
[18] **Q:** Yes.
[19] Well, not necessarily. But I take
[20] it, I guess, what you are telling us is that
[21] you did settle claims against third parties
[22] relating to that?
[23] **A:** Yes.
[24] **Q:** Can you remember who the lawyer
[25] was that represented you at that time?

Page 71

[1] **A:** David Shea.
[2] **Q:** Shea?
[3] **A:** Yes.
[4] **Q:** Spelled S-H-E-A?
[5] **A:** Yes.
[6] **Q:** And where does Mr. Shea work or
[7] practice?
[8] **A:** In Houma.
[9] **Q:** In Houma? And do you remember who
[10] it was that you brought, or you made the
[11] claim against relating to your back injury?
[12] **A:** All I can remember, it was a
[13] drilling rig.
[14] **Q:** A rig company?
[15] **A:** Yes.
[16] **Q:** I want to just briefly ask you
[17] some questions about your knowledge
[18] concerning what I would call generic
[19] carcinogens, or things that you understood
[20] could cause cancer, that you may have worked
[21] with.
[22] Am I correct in concluding from
[23] the description of the work that you have
[24] given us today, that you would have worked
[25] personally with solvents, for example, to

Page 72

[1] remove paint, clean up grease, or anything
[2] like that?
[3] **A:** I have used that type of material,
[4] yes.
[5] **Q:** Can you tell us a little bit about
[6] what materials you used that you would
[7] describe as a solvent, and when you used
[8] them and where you used them?
[9] **A:** I remember using some paint
[10] stripper, I don't remember if that is a
[11] solvent or not, to strip some paint off of
[12] wood.
[13] **Q:** What about to clean parts? Remove
[14] grease, stuff like that?
[15] **A:** I have used that.
[16] **Q:** Would you have used solvents in
[17] the Navy, for example?
[18] **A:** Very little in the Navy. No. I
[19] don't remember any of that.
[20] **Q:** What about at the plastics company
[21] where you worked, would you have used
[22] solvents to clean parts there?
[23] **A:** If it would have been something
[24] like gasoline or diesel fuel, or something
[25] like that.

JAMES C. TURNER
August 9, 2001

Case MDL No. 875   Document 3323   Filed 11/05/01   Page 49 of 247

JAMES C. TURNER AND MARLENE TURNER   v.
ANCHOR PACKING, ET AL.

Page 73

[1] **Q:** Did you work frequently with
[2] gasoline and diesel fuel as a cleaning
[3] agent?
[4] **A:** I wouldn't say frequently, no.
[5] **Q:** What about kerosene?
[6] **A:** No. I never used that.
[7] I have used that, but — that was
[8] years and years and years ago.
[9] **Q:** Have you ever used benzene?
[10] **A:** Benzene, I don't remember ever
[11] using that.
[12] **Q:** What about toluene?
[13] **A:** That is not familiar with me.
[14] **Q:** Lacquer thinner, or lacquer
[15] remover?
[16] **A:** I am familiar with it. And I
[17] think I have used it in small quantities,
[18] some limited amount.
[19] **Q:** Were you ever working in any place
[20] where you had an understanding that you were
[21] either handling or working in proximity to
[22] any kind of a hazardous chemical?
[23] **A:** Would you repeat that?
[24] **Q:** Yes.
[25] Do you remember whether you worked

Page 74

[1] at any time, in any place, either directly
[2] with or in close proximity to someone else
[3] working with something that you understood
[4] to be a hazardous chemical?
[5] **A:** As far as I understand your
[6] question, no.
[7] **Q:** During the time that you were in
[8] the Navy, you saw no warnings on any type of
[9] container, box, jug, jar, or anything else,
[10] that said that this is a hazardous
[11] substance, and you should take some kinds of
[12] precautions in using it?
[13] **A:** I don't remember anything like
[14] that.
[15] **Q:** Would the same be true for the
[16] plastics company, Fagan Boat Company and
[17] Petrol Marine?
[18] **A:** Yes.
[19] **Q:** With respect to the
[20] asbestos-containing products that you have
[21] described, that you worked with or around in
[22] the U.S. Navy, did you have any role in the
[23] procurement of those products? Did you
[24] place orders for them, or requisition them?
[25] **A:** Yes.

Page 75

[1] **Q:** Were you ever provided by the Navy
[2] with anything like a Material Data Safety
[3] Sheet that described any of these products,
[4] and that gave you instructions for safe
[5] handling of the products?
[6] **A:** I don't remember any of that.
[7] **Q:** When, for example, the molded pipe
[8] insulation that you have described was
[9] brought onship, did it come loose, did it
[10] come packed in boxes or cartons, or did it
[11] come in some other manner?
[12] **A:** As far as I can recollect, it came
[13] in plastic, inside a box. A cardboard box.
[14] **Q:** And did you have any role in the
[15] actual handling of those boxes, either
[16] inspecting them to make sure that they were
[17] what you specified, or making sure that they
[18] were put in the right place for use?
[19] **A:** The only thing I remember is
[20] opening them and using them.
[21] **Q:** So when you opened boxes that you
[22] knew contained, for example, molded
[23] half-round insulation, pipe insulation. You
[24] would actually, personally open the boxes
[25] that it came in?

Page 76

[1] **A:** Yes.
[2] **Q:** Some of that product, I think you
[3] said, was manufactured by Johns-Manville?
[4] **A:** As far as I remember, yes.
[5] **Q:** And was any of it manufactured by
[6] either Owens-Illinois, or Owens-Corning?
[7] **MR. BROWN:**
[8] Object to the form.
[9] **EXAMINATION BY MR. GARY:**
[10] **Q:** You can answer.
[11] **A:** Those names are familiar, but —
[12] **Q:** Is the name Kaylo, K-A-Y-L-O?
[13] **MR. BROWN:**
[14] Object to the form.
[15] **THE WITNESS:**
[16] No.
[17] **EXAMINATION BY MR. GARY:**
[18] **Q:** What about half-round pipe
[19] insulation manufactured by Pittsburgh
[20] Corning Corporation?
[21] **A:** No.
[22] **Q:** Do you recognize the name
[23] Unibestos?
[24] **A:** Yes.
[25] **Q:** Do you know who made Unibestos?

Min-U-Script®

JAMES C. TURNER AND MARLENE TURNER v.
ANCHOR PACKING, ET AL.

Case MDL No. 875  Document: 3323  Filed 11/05/01  Page 50 of 247

JAMES C. TURNER
August 9, 2001

Page 77

[1] **A:** No.

[2] **Q:** Did you use or work around
[3] Unibestos?

[4] **A:** As far as I know, yes.

[5] **Q:** In comparison to Johns-Manville,
[6] what percentage of the molded pipe
[7] insulation did you work with or around,
[8] would have been Johns-Manville, versus
[9] Pittsburgh Corning?

[10] **A:** I couldn't pick out a number. To
[11] me, it is both — probably the same.

[12] **Q:** Roughly the same?

[13] **A:** (Witness nods head affirmatively.)

[14] **Q:** Do you recognize the name
[15] Thermobestos?

[16] **A:** No, not really.

[17] **Q:** What about Pabco?

[18] **A:** Pabco?

[19] **Q:** Pabco?

[20] **A:** I seem to remember that.

[21] **Q:** As a half-round pipe insulation?

[22] **A:** No. It is hard to pin these

[23] things down. I mean, it is years ago.

[24]     These names are familiar, they are

[25] all familiar, but exactly what context, and

Page 78

[1] exactly what specific application, I can't
[2] say for sure.

[3] **Q:** All right.

[4] In connection with — let me back
[5] up. Am I correct that you do not believe
[6] that you worked either with or around
[7] asbestos until you enlisted in the Navy?

[8] **A:** As far as I know, never.

[9] **Q:** There would not have been any at
[10] the sawmill where you worked?

[11] **A:** No.

[12] **Q:** And you had no other job in any
[13] kind of a plant or building, or shipyard or
[14] facility?

[15] **A:** No.

[16] **Q:** All right. Beginning with your
[17] term in the Navy, what information was
[18] provided to you by the Navy concerning the
[19] safe handling of asbestos-containing
[20] products?

[21] **A:** To my knowledge, I have never been
[22] instructed in any way in the handling of
[23] asbestos.

[24] **Q:** By anybody?

[25] **A:** By anybody.

Page 79

[1] **Q:** So that would be true at the
[2] plastics plant, the Fagan Boat Company, and
[3] Petrol Marine?

[4] **A:** Yes.

[5] **Q:** And in connection with your work
[6] at the Navy, did you participate in safety
[7] meetings, where the safe handling of any
[8] kind of hazardous substance would have been
[9] discussed?

[10] **A:** Very limited, if at all.

[11] **Q:** And what was generally discussed
[12] at those meetings? What kinds of products
[13] were you usually dealing with?

[14] **A:** Usually not products. Usually
[15] shipboard safety in respect to ladders, and
[16] gangways, and handling of lines, and
[17] seamanship.

[18] **Q:** Is it true that during the time
[19] that you served in the Navy, both
[20] onboardship, and when you had shore duty,
[21] that you do not recall seeing any kind of
[22] sign or signage, that would have contained
[23] any kind of warning about asbestos hazards?

[24] **A:** That is correct.

[25] **Q:** Okay. Do you remember who at the

Page 80

[1] plastics company, according to your
[2] understanding, was responsible for the
[3] safety of yourself and other workers?

[4] **A:** All I can say, my immediate
[5] supervisor, which would have been Mr. Tom
[6] Woodruff.

[7] **Q:** And who was Mr. Woodruff's
[8] supervisor?

[9] **A:** Somebody here in New Orleans. I
[10] have no idea who.

[11] **Q:** Was Woodruff the top man at the
[12] plastics plant?

[13] **A:** Well, there was two: Johnny
[14] Frosch and Mr. Woodruff. Frosch was in
[15] charge of the operations, and Mr. Woodruff
[16] was the chemical engineer.

[17] **Q:** Who at Fagan Boat Company did you
[18] understand had responsibility for safety for
[19] yourself and other workers?

[20] **A:** Overall?

[21] **Q:** Well, let's make it a little more
[22] detailed. If you had a question about
[23] safety, who would you have gone to at Fagan
[24] Boat Company, for an answer?

[25] **A:** In my particular situation, I

August 9, 2001 — Case MDL No. 875 — Document 3323 — Filed 11/05/01 — Page 51 of 247

JAMES C. TURNER AND MARLENE TURNER v.
ANCHOR PACKING, ET AL.

Page 81

[1] would have went to the captain.
[2] **Q:** Of the vessel?
[3] **A:** Yes.
[4] **Q:** Is there anybody else that you
[5] thought at Fagan Boat Company, had overall
[6] safety responsibility?
[7] **A:** The operations manager.
[8] **Q:** And that would have been whom; do
[9] you remember?
[10] **A:** At that time, they didn't have a
[11] personnel manager. I mean, an operations
[12] manager. The personnel manager was all of
[13] it. I can't remember his name.
[14] **Q:** He was Alfred somebody?
[15] **A:** No. This was at Fagan, you said?
[16] I understood your question to be Fagan.
[17] **Q:** It was Fagan. What about at
[18] Petrol Marine, who would you regard as being
[19] responsible for safety for yourself and
[20] other workers?
[21] **A:** They had safety officers there.
[22] They had safety — they called them port
[23] engineers — port captains. And they were
[24] responsible for the safety program, running
[25] the safety program, having various meetings.

Page 82

[1] **Q:** Do you remember any of their
[2] names?
[3] **A:** Maybe next week.
[4] **Q:** I want to ask you about something
[5] in your lawsuit that was also curious to me,
[6] that I am not sure whether it was just a
[7] mistake or not.
[8] But there is an allegation that
[9] you were exposed to asbestos-containing
[10] materials at Westinghouse Electric Company,
[11] in connection with your work on land-based
[12] turbines for General Electric Company.
[13] Did you ever work for General
[14] Electric Company?
[15] **A:** No.
[16] **Q:** Did you ever work on any
[17] Westinghouse land-based turbines?
[18] **A:** Not to my knowledge.
[19] **Q:** In specific, in the Navy or
[20] anywhere else, did you work on what I would
[21] call marine turbines, that you understood to
[22] have been manufactured by Westinghouse?
[23] **A:** Repeat that.
[24] **Q:** When you were in the Navy, or when
[25] you worked for Fagan or Petrol Marine, or

Page 83

[1] any other place, did you work on marine
[2] turbines, that you understood were
[3] manufactured by Westinghouse?
[4] **A:** Yes.
[5] **Q:** Let's start with the earliest
[6] recollection that you have of working in any
[7] manner on a Westinghouse turbine. Tell us
[8] where it was, and what you did.
[9] **A:** I was aboard all these ships. I
[10] remember tearing insulation off — oh, this
[11] is a Westinghouse turbine. But I can't put
[12] that Westinghouse turbine on any ship.
[13] **Q:** On any one particular ship?
[14] **A:** No.
[15] **Q:** Were there Westinghouse turbines
[16] on every ship that you worked on in the
[17] Navy?
[18] **A:** I have no idea.
[19] **Q:** Don't know?
[20] **A:** Could have been.
[21] **Q:** Do you know who supplied the
[22] insulation that was on the turbines that you
[23] thought was a Westinghouse turbine?
[24] **A:** I have no idea.
[25] **Q:** Do you know whether it was more

Page 84

[1] than five Westinghouse turbines? I am just
[2] trying to quantify your experience working
[3] on Westinghouse turbines.
[4] **A:** Well, it must have been more than
[5] five for sure.
[6] **Q:** Okay. More than ten?
[7] **A:** Probably.
[8] **Q:** More than 20?
[9] **A:** Probably less than 20, maybe.
[10] **Q:** When you worked on turbines,
[11] explain to me what it was that you yourself
[12] did.
[13] **A:** Well, the smaller turbines, we
[14] tore them down, inspected the turbine
[15] blades, took them to a repair facility and
[16] had them repaired, if necessary. And
[17] reassembled them, put them all back
[18] together, and re- —
[19] **Q:** I'm sorry.
[20] **A:** Reinsulated them.
[21] **Q:** When you say smaller turbines, do
[22] you mean just generally?
[23] **A:** Generally.
[24] **Q:** Or the small Westinghouse turbine?
[25] **A:** Generally.

JAMES C. TURNER AND MARLENE TURNER v.
ANCHOR PACKING, ET AL.

Case MDL No. 875   Document 3323   Filed 11/05/01   Page 52 of 247

JAMES C. TURNER
August 9, 2001

Page 85

[1] **Q:** Were there Westinghouse turbines
[2] that fit what you are calling a smaller
[3] turbine?
[4] **A:** As best as I can remember, yes.
[5] **Q:** What was the function of that
[6] turbine?
[7] **A:** To operate pumps.
[8] **Q:** Pumps? Okay.
[9] Did you work on turbines that you
[10] understood — for Westinghouse — that were
[11] part of propulsion systems on vessels in the
[12] Navy, or at Fagan or Petrol Marine?
[13] **A:** To the best of my knowledge, yes.
[14] Main propulsion turbines, yes.
[15] **Q:** And these would be part of what
[16] you would call a turbine generator set?
[17] **A:** Well, not — a generator set, yes.
[18] But a combination of the turbine
[19] installation itself. The high-pressure,
[20] low-pressure, cruising, and the entire set.
[21] **Q:** And with respect —
[22] **A:** It is not just one turbine. It is
[23] all three.
[24] **Q:** I understand. With respect to the
[25] turbine generator set, what would you do

Page 86

[1] when you worked on it?
[2] **A:** The turbine itself, usually major
[3] repairs were done by the shipyard, but we
[4] also rolled the bearings out, inspected
[5] them, took readings; if the bearings needed
[6] to be replaced, we took them to a repair
[7] facility.
[8] They melted the old babbitt out.
[9] Rebabbitted them, recut them. Brought them
[10] back to us, we rerolled them in, scraped
[11] them, fitted them, put them back together.
[12] **Q:** Did you have to remove insulation
[13] in order to do that?
[14] **A:** Yes.
[15] **Q:** What kind of insulation would you
[16] remove?
[17] **A:** Usually, it would be molded
[18] insulation, like I described earlier.
[19] **Q:** Okay.
[20] **A:** And it would be the material that
[21] you mix up, mold it to this turbine, put the
[22] cloth on it, and put the sealer on it.
[23] **Q:** Do you know who supplied the
[24] molded insulation that you are describing?
[25] **A:** No.

Page 87

[1] **Q:** With respect to supervising your
[2] activities when you worked on what you
[3] understood were Westinghouse turbines, who,
[4] if you recall, gave you instructions about
[5] what to do and how to do it?
[6] **A:** My division officer.
[7] **Q:** In the Navy?
[8] **A:** Uh-huh (affirmative response).
[9] **Q:** Would there have been personnel
[10] that you understood to have been employed by
[11] Westinghouse, present, directing your work?
[12] **A:** Yes, in one situation. We called
[13] them tech reps.
[14] Are you familiar with a tech rep?
[15] They would be sent to places like the
[16] Mediterranean, and foreign areas, when we
[17] were doing major repairs on a ship that has
[18] really had a catastrophe, and they would
[19] help with the repairs.
[20] **Q:** Can you help us by telling us when
[21] those kinds of instances occurred? Do you
[22] remember the vessel where you had a
[23] catastrophe, or an event?
[24] **A:** At this time, I was aboard the USS
[25] SHENANDOAH in the Mediterranean, and this

Page 88

[1] particular incident had happened.
[2] **Q:** Was the turbine part of the
[3] equipment of the SHENANDOAH?
[4] **A:** No.
[5] **Q:** Or another vessel you were working
[6] on?
[7] **A:** Yes.
[8] **Q:** Do you recall the name of that
[9] other vessel?
[10] **A:** I can't.
[11] **Q:** Okay.
[12] **A:** I know the chief engineer was
[13] relieved, and maybe two or three other
[14] people.
[15] **Q:** Was there any other occasion,
[16] besides the one you just described in the
[17] Mediterranean, where you recall a
[18] Westinghouse tech rep being present?
[19] **A:** I think there was one other — one
[20] or two other times, but I can't remember —
[21] **Q:** Specifics?
[22] **A:** Specifics. Which ship, which —
[23] **Q:** On those occasions that you recall
[24] a Westinghouse tech rep being present, who
[25] was giving you your instructions about what

August 9, 2001

Case MDL No. 875   Document 3323   Filed 11/05/01   Page 53 of 247

JAMES C. TURNER AND MARLENE TURNER   v.
ANCHOR PACKING, ET AL.

Page 89

[1] to do and how to do it?

[2] **A:** There was two of them, and I took

[3] instruction from both of them.

[4] **Q:** The tech reps?

[5] **A:** Yes.

[6] **Q:** I think the last question that I

[7] wanted to really cover with you today, was

[8] something about your diagnosis for your lung

[9] cancer.

[10] You had stated — and if I am

[11] paraphrasing you incorrectly, straighten me

[12] out — but at some point in time, you became

[13] concerned that the back pain that you were

[14] experiencing, might in some manner be

[15] related to lung cancer, and you asked one of

[16] your doctors about that.

[17] **A:** (Witness nods head affirmatively.)

[18] **Q:** Can you help us with the time

[19] frame of when that happened?

[20] **A:** This happened in December of 1999,

[21] I think. As far as I am thinking.

[22] I had a terrible, terrible case of

[23] strep throat, and whatever they call it, you

[24] know.

[25] **Q:** Bronchitis?

Page 90

[1] **A:** Yeah. Bronchitis. Terrible case.

[2] Never had that before in my life. And it

[3] concerned me; and then coughing, coughing,

[4] coughing.

[5] **Q:** And you thought it might be

[6] related to lung cancer?

[7] **A:** Yes. And then the pain. After

[8] that, after that December, into January and

[9] continuing from then on, the pain, the back

[10] pain.

[11] **Q:** And at that time, where were you

[12] being treated?

[13] **A:** Dr. Joseph Juracovich was my

[14] family physician. My primary care

[15] physician.

[16] **Q:** At St. Ann's in Raceland?

[17] **A:** Raceland.

[18] **Q:** And Dr. Juracovich had been taking

[19] care of your normal, routine family medicine

[20] issues for some period of time?

[21] **A:** Yes.

[22] **Q:** He would be the person most

[23] familiar with your physical condition?

[24] **A:** Yes.

[25] **Q:** Were you informed by some person

Page 91

[1] that you had asbestos at the same time you

[2] were informed you had lung cancer, or was

[3] this on a different occasion, either earlier

[4] or later?

[5] **A:** I have no idea. It was

[6] approximately the same time frame. Before

[7] or after, I don't know.

[8] **Q:** Is it fair to say that prior to

[9] the incident when you had the strep throat

[10] and the bronchitis, you had not been

[11] diagnosed by any person, as having any

[12] asbestos or other asbestos-related disease?

[13] **A:** No.

[14] **Q:** Had you participated in any kind

[15] of screening program to detect asbestos

[16] disease?

[17] **A:** My doctor gave me regular x-rays.

[18] **Q:** Regular x-rays?

[19] **A:** Yes.

[20] **Q:** And this was Dr. Juracovich?

[21] **A:** Yes.

[22] **Q:** What about when you were working

[23] for the plastics company, Fagan Boat Company

[24] and Petrol Marine, did you get regular

[25] physical examinations for those companies?

Page 92

[1] **A:** Well, I held a Coast Guard

[2] license, and I had to get a physical every

[3] time I renewed the license, every four

[4] years. And then as far as I know, the Coast

[5] Guard required a back x-ray and all that,

[6] before you went to work for them. And

[7] that's about it.

[8] **Q:** So you had pre-employment

[9] physicals before you went to work?

[10] **A:** Yes.

[11] **Q:** There was not an ongoing program

[12] of physical evaluation at these companies;

[13] and you had periodic physical exams to renew

[14] your Coast Guard license?

[15] **A:** Yes.

[16] **Q:** Where did you go to take the Coast

[17] Guard license physicals? Was that also

[18] Dr. Juracovich, or was there —

[19] **A:** No, it was not — I don't remember

[20] the doctor's name. In Houma.

[21] **Q:** The hospital in Houma?

[22] **A:** Haydel, I believe. Dr. Haydel,

[23] maybe. That name seems familiar.

[24] **Q:** That narrows it down to about six

[25] doctors in Houma named Haydel.

JAMES C. TURNER AND MARLENE TURNER v. ANCHOR PACKING, ET AL.

CASE MDL No: 875 Document 3323 Filed 11/05/01 Page 54 of 247

JAMES C. TURNER
August 9, 2001

Page 93

[1] And I take it that no one, in
[2] connection with your Coast Guard physicals,
[3] or with your pre-employment physicals,
[4] informed you that you had any kind of health
[5] condition related to exposure to asbestos?
[6] A: No.
[7] Q: That you did not know about that,
[8] until you raised that issue with
[9] Dr. Juracovich?
[10] A: That's correct.
[11] Q: Since that time — let me word
[12] this better than that.
[13] Dr. Phillip Robichaux did your
[14] lung surgery, that you have already
[15] described. Have you been involved with any
[16] other physician or health care professional,
[17] relating to your lung cancer condition,
[18] besides Dr. Juracovich and Dr. Robichaux?
[19] A: Dr. Manish Dhawan, and Dr. Gould.
[20] Dr. Dhawan is the oncologist and Dr. Gould
[21] is the radiologist.
[22] Q: At Thibodaux General, as well?
[23] A: Yes.
[24] Q: Has all of your treatment for lung
[25] cancer been at Thibodaux General?

Page 94

[1] A: Yes. Except for tests here in New
[2] Orleans.
[3] Q: At Ochsner?
[4] A: The PET scan, and the original
[5] diagnosis.
[6] Q: After your original diagnosis, or
[7] your trip to Ochsner, that is the only
[8] involvement you have had with them?
[9] A: Yes.
[10] MR. GARY:
[11] I think I am going to pass the
[12] witness. Thank you very much.
[13] THE WITNESS:
[14] Thank you.
[15] MR. AMES:
[16] Let's go off the record for just a
[17] second.
[18] THE VIDEOGRAPHER:
[19] Going off the record; it is
[20] 2:07 p.m.
[21] (Recess.)
[22] THE VIDEOGRAPHER:
[23] Back on record; it is 2:09 p.m.
[24] EXAMINATION BY MS. NATHAN:
[25] Q: Good afternoon, Mr. Turner. My

Page 95

[1] name is Pamela Nathan, and I am here just to
[2] ask a few questions.
[3] Do you recognize the name J.T.
[4] Thorpe, Inc.?
[5] A: No.
[6] MS. NATHAN:
[7] I have no more questions.
[8] EXAMINATION BY MR. CAHN:
[9] Q: Good afternoon, Mr. Turner. My
[10] name is Corey Cahn.
[11] Do you ever recall working on or
[12] around land-based turbines manufactured by
[13] General Electric Company?
[14] A: No.
[15] Q: Do you ever recall working on or
[16] around marine turbines that you believe to
[17] be manufactured by General Electric Company?
[18] A: Yes.
[19] Q: Where do you recall working around
[20] those turbines?
[21] A: Aboard all the ships that I served
[22] on.
[23] Q: Do you recall marine turbines
[24] manufactured by General Electric on each of
[25] the ships that you served on?

Page 96

[1] A: As far as I can remember, yes.
[2] Q: How many turbines do you recall
[3] being present on the USS HAYNSWORTH?
[4] A: Eight, ten. Whether they were all
[5] General Electric, I have no idea.
[6] Q: Was there a particular designation
[7] that went with the turbine that you believe
[8] was manufactured by General Electric?
[9] A: I can't be specific, no.
[10] Q: Do you have a specific
[11] recollection of working around a General
[12] Electric turbine on the USS HAYNSWORTH?
[13] A: I cannot say definitely, but I
[14] remember taking the insulation off of
[15] turbines, and there it was: General
[16] Electric.
[17] That's all I can remember. I
[18] can't remember if it was every ship, or I
[19] can't specifically say it was the
[20] HAYNSWORTH.
[21] Q: Do you recall how many times you
[22] took insulation off of a turbine that you
[23] believe was manufactured by General Electric
[24] on the HAYNSWORTH?
[25] A: I don't know how many times.

JAMES C. TURNER

August 9, 2001

Case MDL No. 875   Document 3323   Filed 11/05/01   Page 55 of 247

JAMES C. TURNER AND MARLENE TURNER   v.
ANCHOR PACKING, ET AL.

Page 97

[1] Q: What other manufacturers of
[2] turbines were present on the HAYNSWORTH?
[3] A: As far as I know, Westinghouse,
[4] Worthington. That's all I remember.
[5] Q: And you don't remember how many of
[6] those were manufactured by each
[7] manufacturer?
[8] A: No.
[9] Q: How about the USS LUCE?
[10] A: Same.
[11] Q: Do you specifically recall
[12] turbines being manufactured by General
[13] Electric?
[14] A: As far as I can remember, yes.
[15] Q: How many turbines were present on
[16] the LUCE?
[17] A: Ten, 12.
[18] Q: Do you recall how many of those
[19] were manufactured by General Electric?
[20] A: No.
[21] Q: Do you recall whether or not there
[22] was a specific designation that went with
[23] General Electric turbines?
[24] A: No. I know there was, but I can't
[25] remember what it was.

Page 98

[1] Q: How about the USS SHENANDOAH? Do
[2] you recall how many turbines were present?
[3] A: No. There might not have been any
[4] aboard the SHENANDOAH.
[5] Q: So you —
[6] A: It had very limited propulsion
[7] capability.
[8] Q: So were the turbines in connection
[9] with the propulsion systems?
[10] A: Yes. Well, the auxiliaries, to —
[11] for pumps and stuff like that.
[12] Q: How about the JOSEPHUS DANIELS, do
[13] you specifically recall the presence of GE
[14] turbines?
[15] A: The same.
[16] Q: Do you remember how many turbines
[17] were present on the JOSEPHUS DANIELS?
[18] A: I know there was a bunch of
[19] turbines.
[20] Q: Do you recall how many of them
[21] were manufactured by GE?
[22] A: No, sir.
[23] Q: What work did you do on the GE
[24] turbines, on the JOSEPHUS DANIELS?
[25] A: It depends on whether it was a

Page 99

[1] propulsion turbine or auxiliary. If it was
[2] an auxiliary, I did a lot of it. If it was
[3] a propulsion turbine, very little.
[4] Q: Do you recall specifically working
[5] on propulsion turbines manufactured by GE?
[6] A: Working around them, and operating
[7] them, and maintaining them. But no major
[8] repairs to them, or anything like that.
[9] When it come to that, the propulsion
[10] turbines would use the shipyard.
[11] Q: How about the auxiliary turbines?
[12] A: Yes. I did a lot of that. Took
[13] them out, disassembled them, reassembled
[14] them. Had them repaired and reassembled
[15] them.
[16] Q: Do you recall the presence of GE
[17] turbines on the USS LEAHY?
[18] A: It seems like all the others. All
[19] the other ships was the same. I remember
[20] the GE turbines. That's all I remember. I
[21] can't put them on one specific ship.
[22] Q: When you say you recall them, do
[23] you recall because you knew at one time you
[24] worked on GE turbines, or can you place them
[25] on a ship?

Page 100

[1] A: I worked around GE turbines on all
[2] the ships that I was on, as far as I can
[3] remember.
[4] Q: And you have a specific
[5] recollection of working around GE turbines
[6] on each of these vessels?
[7] A: As far as I can remember. Unless
[8] my memory has gone completely bad, which it
[9] could have.
[10] **MR. CAHN:**
[11] That is all the questions I have.
[12] **EXAMINATION BY MR. BROUSSARD:**
[13] Q: Good afternoon, Mr. Turner. My
[14] name is Andre Broussard, and I have a couple
[15] of questions for you.
[16] One of the names that you
[17] mentioned earlier when your attorney was
[18] asking you generically about products that
[19] you can recall seeing over the course of
[20] your career, was the name Victor.
[21] A: (Witness nods head affirmatively.)
[22] Q: What type of product or material
[23] do you associate with the name Victor?
[24] A: As far as I know, a lot of Spiral
[25] Wound Flexitallic asbestos gaskets, and

Page 101

[1] packing of all types. And as far as I can
[2] remember, wire-inserted asbestos,
[3] carbon-inserted asbestos, braided asbestos.
[4]     I am not positive, but that's my
[5] recollection.
[6]     **Q:** You mentioned gaskets and packing.
[7] Is that what you associate with the name
[8] Victor?
[9]     **A:** One of the things, yeah.
[10]     **Q:** I believe one of the distinctions
[11] that was made earlier was the difference
[12] between a preformed gasket, as opposed to
[13] sheeting gasket; is that a fair distinction
[14] to make?
[15]     **A:** Yes.
[16]     **Q:** Did you personally use both types
[17] of gaskets during the course of your career?
[18]     **A:** Yes.
[19]     **Q:** Of those two types of gaskets,
[20] which type did you use the most?
[21]     **A:** I made my own.
[22]     **Q:** Would that be the sheeting?
[23]     **A:** Sheeting.
[24]     **Q:** What type of gasket material do
[25] you associate with the name Victor?

Page 102

[1]     **A:** As far as I can remember,
[2] compressed asbestos. And I am almost sure
[3] of the Flexitallic gaskets. I remember the
[4] name Victor stamped right on them.
[5]     **Q:** How did this material that you
[6] associate with the name Victor come
[7] packaged; if you can recall?
[8]     **A:** The compressed asbestos? It
[9] comes — we used to order it by two- or
[10] three-yard rolls. It would just be rolled
[11] up, and a piece of tape taped around it.
[12]     **Q:** What color were those rolls?
[13]     **A:** Depends on what it was; if it was
[14] carbon-coated, or it had a black carbon-like
[15] coating; and some of it was just plain
[16] white. Not white, an off-white.
[17]     **Q:** Other than white and off-white,
[18] are there any other colors that you can
[19] recall —
[20]     **A:** Well, the other stuff was black.
[21]     **Q:** Okay.
[22]     **A:** I guess it was carbon — no. What
[23] is the stuff you can order — it is coated
[24] with — I can't remember the name of it. It
[25] is a real common product, though. It is —

Page 103

[1] kind of lubricates it.
[2]     **Q:** Okay, sir.
[3] Can you specifically recall seeing
[4] the name Victor stenciled on a sheet gasket
[5] product?
[6]     **A:** Yes.
[7]     **Q:** Are there other names, other than
[8] Victor, that you can recall seeing on sheet
[9] gasket material over your career?
[10]     **A:** Oh, yes.
[11]     **Q:** What other names can you recall?
[12]     **A:** Consolidated Gasket Company;
[13] Garlock; and I am sure there is two or three
[14] others. They just won't come to mind.
[15]     **Q:** Okay, sir. Of the names you
[16] associate with sheet gasket tools, is it
[17] possible for you to tell me whether Victor
[18] was one you would have used more often, less
[19] often, or can you tell me?
[20]     **A:** I just ordered it and it came.
[21] Sometimes it was Victor, sometimes it was
[22] Garlock, sometimes it was something else. I
[23] didn't specify — I had no way to specify
[24] what I needed, whether it was Victor or any
[25] other name.

Page 104

[1]     **Q:** The Victor product that we are
[2] talking about, that is a material that you
[3] used during your service in the Navy?
[4]     **A:** Yes.
[5]     **Q:** Did you use any of the material
[6] that you associated with the name Victor
[7] after your retirement from the Navy in 1977?
[8]     **A:** Yes.
[9]     **Q:** Where else did you use a product
[10] that you associate with the name Victor
[11] after your discharge from the Navy?
[12]     **A:** Aboard the cargo boats out here in
[13] the Gulf.
[14]     **Q:** Was that during your employment
[15] for Fagan?
[16]     **A:** Fagan, Petrol, Hornbeck.
[17]     **Q:** Was that the same type of material
[18] that you described for me earlier?
[19]     **A:** Yes. It looked and felt and
[20] tasted exactly the same to me.
[21]     **Q:** All right, sir.
[22]     **A:** Smelled.
[23]     **Q:** Now, specifically, how would you
[24] use the gasket product that you associate
[25] with the name Victor? What type of

August 9, 2001

JAMES C. TURNER v.
Case MDL No. 875   Document 3323   Filed 11/05/01   Page 57 of 247
JAMES C. TURNER AND MARLENE TURNER   v.
ANCHOR PACKING, ET AL.

Page 105

[1] equipment or machinery would you use that
[2] product on?
[3]     A: Making gaskets for pumps, water
[4] lines, oil lines, steam lines.
[5]     Q: Anything else?
[6] Do you know for a fact, sir, that
[7] the material that you handled, that you
[8] associate with the name Victor, contained
[9] asbestos?
[10]    A: No, sir. When I ordered it, when
[11] I looked in the book, I said, Here, this is
[12] what I need, asbestos, compressed asbestos.
[13] That is what I ordered.
[14]    Q: Would you specifically order a
[15] product that went by the name Victor, or
[16] would you order compressed asbestos?
[17]    A: No. Compressed asbestos.
[18]    Q: And whatever you got was what you
[19] got?
[20]    A: Yes.
[21]    Q: You mentioned ordering these
[22] materials. I take it that it was part of
[23] your job in the Navy, to order certain
[24] materials; is that fair?
[25]    A: That's correct. And out in the

Page 106

[1] Gulf.
[2]     Q: Did any of your duties for Fagan
[3] Boat Service involve ordering materials?
[4]     A: Yes.
[5]     Q: And the same for Petrol?
[6]     A: Yes.
[7]     Q: At any time during your career, do
[8] you have any recollection of ordering a
[9] material, and specifically requesting a
[10] Victor product?
[11]    A: No, no.
[12]    Q: You mentioned the name
[13] Flexitallic. What type of product or
[14] material specifically do you associate with
[15] the name Flexitallic?
[16]    A: Flexitallic, usually a metal ring,
[17] inserted with a flexible spiral wound piece
[18] of metal, inserted with asbestos.
[19] Sandwiched around asbestos.
[20]    Q: Was this a gasket product?
[21]    A: Yes.
[22]    Q: Going back to the distinction we
[23] made earlier, was Flexitallic a pre-formed
[24] gasket?
[25]    A: Yes.

Page 107

[1]     Q: It was a pre-formed gasket?
[2]     A: It was — it was what it was.
[3]     Q: You tell me.
[4]     A: I ordered a gasket, and that is
[5] what I got. A Flexitallic gasket, all ready
[6] to put in the steam line and bolt it up.
[7]     Q: All right, sir.
[8] And did you say that it had a
[9] metal ring?
[10]    A: Mostly, yes. Not every situation,
[11] no. Sometimes they didn't have that outside
[12] metal ring.
[13]    Q: Did Flexitallic gaskets have any
[14] type of name or words stenciled on the
[15] gasket itself?
[16]    A: I remember the word Victor and
[17] Flexitallic. As far as my recollection
[18] right now is, Flexitallic is a name of a
[19] manufacturer. But I am not positive.
[20]    Q: Can you specifically recall seeing
[21] the name Flexitallic stenciled on any type
[22] of gasket?
[23]    A: Yes.
[24]    Q: Was that a pre-formed gasket?
[25]    A: Yes.

Page 108

[1]     Q: And you mentioned again, the name
[2] Victor. I want to make sure we are clear.
[3]       Can you recall the name Victor
[4] stenciled on anything other than the sheet
[5] gasket that we talked about earlier?
[6]     A: As far as I can remember, it was
[7] stenciled on the Flexitallic gasket. On
[8] what I call the Flexitallic gaskets. The
[9] spiral wound asbestos-inserted gasket with
[10] the name Victor stenciled right on it.
[11]    Q: Were all of the gaskets — sorry.
[12]    A: Unless I am mistaken. I don't
[13] think I am.
[14]    Q: Were all the gaskets that you can
[15] recall seeing the name Victor on, were they
[16] all round?
[17]    A: Yes.
[18]    Q: When can you recall personally
[19] working with Flexitallic gaskets?
[20]    A: From the time I went in the
[21] Navy — from the time I went aboardship in
[22] October of 1957, until I retired in 1977.
[23]    Q: Did you ever have occasion to work
[24] with a Flexitallic gasket after you retired
[25] from the Navy in 1977?

JAMES C. TURNER AND MARLENE TURNER, v. ANCHOR PACKING, ET AL.

CASE MDL No. 875 Document 3323 Filed 11/05/01 Page 58 of 247

JAMES C. TURNER
August 9, 2001

Page 109

[1] **A:** Yes.

[2] **Q:** Where?

[3] **A:** Out here in the Gulf, on these
[4] cargo boats.

[5] **Q:** And specifically, what type of
[6] equipment or machinery were you working on,
[7] that were requiring you to work with a
[8] Flexitallic gasket?

[9] **A:** Usually the diesel exhaust. The
[10] exhaust from the — specifically, D399
[11] Caterpillars.

[12] **Q:** Is there any other type of
[13] specific machinery that you can recall
[14] working with a Flexitallic gasket?

[15] **A:** Not out here in civilian life, no.

[16] **Q:** What about in the Navy?

[17] **A:** Yes.

[18] Wait. Repeat your question.

[19] **Q:** Sure.

[20] Other than the exhaust lines on a
[21] Caterpillar, and I assume you are talking
[22] about a diesel Caterpillar, while working on
[23] the workboats out in the Gulf, can you
[24] recall working with a Flexitallic gasket on
[25] any other type of specific application?

Page 110

[1] **A:** Not military. Is that what you
[2] are asking?

[3] **Q:** I am asking both, either civilian
[4] or the military?

[5] **A:** The steam lines in the United
[6] States Navy ships. I mean, every three or
[7] four feet has got a Flexitallic gasket in
[8] it, especially if it is 600-pound steam and
[9] above.

[10] **Q:** When you would handle Flexitallic
[11] gaskets, were these gaskets new, like right
[12] out of the package?

[13] **A:** Not all the time. I mean, we had
[14] to keep a stock of them on hand.

[15] **Q:** And I am not sure I understand
[16] your answer. When did you have occasion to
[17] use a Flexitallic gasket, when the gasket
[18] was not new?

[19] **A:** Well, when you say not new, as
[20] opposed to unused? I never used a used
[21] gasket in a steam line. It was always
[22] unused, in other words, new. Is that what
[23] you mean?

[24] **Q:** Yes, sir. And let me — maybe it
[25] was a poorly worded question.

Page 111

[1] My question to you, sir, is when
[2] you used Flexitallic gaskets over the course
[3] of your career, were these gaskets, you were
[4] always installing a new gasket when you used
[5] them; is that fair?

[6] **A:** Yes, yes.

[7] **Q:** Did the gasket itself create any
[8] dust when you handled it?

[9] **A:** Always.

[10] **Q:** And how would the gasket itself
[11] create dust when you handled it?

[12] **A:** Just by picking it up and looking
[13] at it, and making sure it is the right size.
[14] And you have got to rub it a little bit with
[15] your hand. Your fingers is going to get on
[16] it. And I have always seen just a minute
[17] amount of dust flying from it all the time.
[18] Just about every time you pick one up.

[19] **Q:** Was that true of all gaskets that
[20] you handled during your career?

[21] **A:** All Flexitallic gaskets that I can
[22] remember, yes.

[23] **Q:** Now, Flexitallic wasn't the only
[24] type of preformed gasket that you handled;
[25] correct?

Page 112

[1] **A:** Right.

[2] **Q:** You handled other types of
[3] gaskets, other than the Flexitallic?

[4] **A:** Compressed asbestos.

[5] **Q:** Yes, sir.

[6] I'm sorry?

[7] **A:** I didn't see any dust flying from
[8] them.

[9] **Q:** You didn't see any dust flying
[10] from the compressed asbestos material?

[11] **A:** Not usually.

[12] **THE VIDEOGRAPHER:**

[13] We're going off the record; it is
[14] 2:27 p.m.

[15] (Recess.)

[16] **THE VIDEOGRAPHER:**

[17] Back on record; it is 2:31 p.m.,
[18] and the beginning of tape two.

[19] **EXAMINATION BY MR. BROUSSARD:**

[20] **Q:** Mr. Turner, I appreciate your time
[21] this afternoon, and I have just a few more
[22] questions for you, sir.

[23] Other than the name Flexitallic,
[24] do you associate any other specific names
[25] with preformed gaskets?

Page 113

[1] **A:** Other than Flexitallic?

[2] **Q:** Yes, sir.

[3] **A:** Wait. Repeat that.

[4] **Q:** We talked about Flexitallic.

[5] **A:** Uh-huh (affirmative response).

[6] **Q:** And you indicated that that was a

[7] preformed type of gasket; correct?

[8] **A:** Yes.

[9] **Q:** Do you associate any other

[10] specific names with preformed gaskets, that

[11] you may have ever worked around?

[12] **A:** As far as I can remember, all of

[13] them, all of the major companies that

[14] manufacture compressed asbestos,

[15] manufactures the preformed gaskets, already

[16] punched out. Standard size.

[17] Garlock, John Crane. I am almost

[18] sure whoever manufactures them, usually

[19] makes some preformed gaskets.

[20] **Q:** Okay, sir. Right before we took

[21] that last break, we were talking about dust.

[22] And I believe you said that you don't recall

[23] the compressed asbestos creating any visible

[24] dust; is that correct?

[25] **A:** Very little.

Page 114

[1] **Q:** Okay, sir.

[2] **A:** As opposed to the Flexitallic,

[3] where you can just handle it, and almost

[4] invariably, you're going to see some dust.

[5] But there is some dust. You can see —

[6] well, not necessarily flying in the air, but

[7] you get it on your fingers, and you can feel

[8] it.

[9] **Q:** And just to make sure that I am

[10] clear, when you say compressed asbestos, is

[11] that the same thing as the gasket sheeting

[12] material?

[13] **A:** Yes.

[14] **Q:** And I have one more very important

[15] question for you, sir: Did you go by any

[16] nicknames over the course of your work

[17] career?

[18] **A:** They used to call me Greaser.

[19] **Q:** Glad I asked.

[20] **MR. BROUSSARD:**

[21] Thank you, sir.

[22] **MR. AMES:**

[23] All right. Let's go off the

[24] record a minute.

[25] **THE VIDEOGRAPHER:**

Page 115

[1] Going off the record; it is

[2] 2:34 p.m.

[3] (Recess.)

[4] **THE VIDEOGRAPHER:**

[5] Back on record; it is 2:37 p.m.

[6] **EXAMINATION BY MR. MCEACHIN:**

[7] **Q:** Mr. Turner, my name is Eugene

[8] McEachin. Good afternoon, sir. I wanted to

[9] ask you a couple of questions.

[10] You said that after you moved to

[11] Louisiana, and began working in Louisiana on

[12] these, I call them crewboats, you call them

[13] cargo boats —

[14] **A:** There is a distinction.

[15] **Q:** Okay. Well, all these cargo

[16] boats. Now, you said you went to some

[17] shipyards with these cargo boats. What

[18] shipyards did you go to?

[19] **A:** Allied Shipyard in Larose;

[20] Bollinger Shipyard in Larose; Bollinger

[21] Shipyard in Lockport; Bollinger Shipyard in

[22] Texas City. There is more.

[23] **Q:** Well —

[24] **A:** I can't remember.

[25] **Q:** You can't remember?

Page 116

[1] **A:** CRS. Right. I can translate

[2] that.

[3] **Q:** Do you know the names, sir, of any

[4] companies that sold, supplied or distributed

[5] any asbestos-containing products to the

[6] boats that you worked on here in Louisiana,

[7] or to any of these shipyards?

[8] **A:** The way that happens is, the

[9] request goes from the boat to the

[10] headquarters, the office. It is ordered

[11] through the office, and sent out to the

[12] boat. I have no idea where it comes from.

[13] I just use it.

[14] **MR. MCEACHIN:**

[15] That is all the questions I have.

[16] Thank you very much.

[17] **EXAMINATION BY MS. BREAUX:**

[18] **Q:** Mr. Turner, my name is Claire

[19] Breaux.

[20] You had testified earlier that you

[21] wore dust masks, that you believe were

[22] manufactured by 3-M, when painting. When

[23] did you wear those dust masks?

[24] **A:** In the Navy and after the Navy.

[25] **Q:** Did you only wear those dust masks

Page 117

[1] when you were painting?

[2] **A:** Usually, yes. If I was in a

[3] situation where I knew there was going to be

[4] dust, like cement dust, barite dust, I would

[5] put one on.

[6] **Q:** What was that?

[7] **A:** Barite. It is a product they used

[8] in the wells to keep the fluid, to keep

[9] the — to keep it lubricated.

[10] **Q:** Did you ever wear a dust mask

[11] while working with asbestos-containing

[12] products?

[13] **A:** Not to my knowledge.

[14] **Q:** Can you describe the dust masks

[15] you wore?

[16] **A:** Well, it was white, and had a

[17] little rubber thing to put behind your ears.

[18] It molded over your nose and molded around

[19] your mouth.

[20] **Q:** Was the face mask portion of the

[21] mask, what color was it?

[22] **A:** White.

[23] **Q:** And was it smooth or was it

[24] ridged?

[25] **A:** Ridged.

Page 118

[1] **Q:** And how many straps were there?

[2] **A:** Just one, as far as I know.

[3] **Q:** And what color was it?

[4] **A:** Neutral, like a tan rubber.

[5] **Q:** Was it adjustable, can you

[6] adjust —

[7] **A:** I believe it was. Not sure.

[8] **Q:** Was there any writing on the mask?

[9] **A:** Usually, no.

[10] **Q:** You say usually, no —

[11] **A:** I don't remember. I think there

[12] was sometimes, but a lot of times, there was

[13] nothing on it.

[14] **Q:** Was there some sort of clip to

[15] fasten to your nose?

[16] **A:** Not to fasten. I think it was a

[17] little bright and shiny thing, like a metal

[18] object. I think you could clamp it on

[19] your — kind of — not really adjustable,

[20] but you could make it fit your nose better.

[21] **Q:** Was that on the outside or inside

[22] of the mask?

[23] **A:** I think the metal was on the

[24] inside. I don't remember exactly.

[25] **Q:** And do you recall what year you

Page 119

[1] first wore a dust mask, or what ship, if

[2] that would help?

[3] **A:** I don't believe I used them until

[4] I was aboard the LUCE, in the '60s.

[5] **Q:** And then, you recall wearing them

[6] on the LUCE; did you wear them on every

[7] ship you worked on?

[8] **A:** I think I used them on every ship

[9] from then on.

[10] **Q:** What about after the Navy, did you

[11] wear any respiratory protection at any of

[12] the other places, Petrol, Fagan or the

[13] plastic plant?

[14] **A:** Yes.

[15] **Q:** All three?

[16] **A:** Yes.

[17] **Q:** Plastics?

[18] **A:** Plastic plant? No. Don't

[19] remember using them there.

[20] **Q:** So you do recall using them both

[21] at Petrol and Fagan?

[22] **A:** Yes.

[23] **Q:** Now, you have described a dust

[24] mask. Is that the only type of dust mask

[25] you wore over the years?

Page 120

[1] **A:** No.

[2] **Q:** You have worn different kinds?

[3] **A:** Yes.

[4] **Q:** The dust mask that you have

[5] described, who was the manufacturer of that

[6] dust mask?

[7] **A:** I don't know. Don't know.

[8] **Q:** Did you ever see the packaging?

[9] **A:** I have seen them, yes.

[10] **Q:** Do you associate 3-M with that

[11] particular dust mask that you just

[12] described?

[13] **A:** Not necessarily. Not necessarily.

[14] **Q:** When do you recall seeing 3-M

[15] packaging?

[16] **A:** I don't remember if it was every

[17] ship I was on, or just one or two.

[18] **Q:** But you do recall seeing the

[19] packaging on a Navy ship?

[20] **A:** Yes. And out here in the Gulf, on

[21] at least — at least one of the companies.

[22] **Q:** What did the packaging look like?

[23] **A:** It was red, with white lettering,

[24] as far as I can remember.

[25] **Q:** Did you ever read any pamphlets

JAMES C. TURNER
August 9, 2001

Case MDL No. 875   Document 3323   Filed 11/05/01   Page 61 of 247

JAMES C. TURNER AND MARLENE TURNER   v.
ANCHOR PACKING, ET AL.

Page 121

[1] about the dust masks?

[2] **A:** I glanced at it. I didn't read as

[3] much as I should, I am sure.

[4] **Q:** Did you ever read any of the

[5] instructions or directions about any of the

[6] dust masks you wore?

[7] **A:** I read them, but I don't remember.

[8] **Q:** Were there any warnings on the

[9] packaging that the dust masks came in?

[10] **A:** Not that I remember.

[11] **Q:** And you said you recalled some

[12] dust masks had writing on them?

[13] **A:** I seem to remember that, yes.

[14] **Q:** Do you recall what the writing

[15] said?

[16] **A:** No.

[17] **Q:** Other than the dust masks you have

[18] described, what other dust masks have you

[19] worn?

[20] **A:** They furnished dust masks to use

[21] in the cement, in the barite, as goggles

[22] that covers your whole head, face, under

[23] your chin. And it has the canisters to

[24] filter out the material.

[25] **Q:** And you are sort of indicating it

Page 122

[1] was a double-cartridge respirator?

[2] **A:** Yes.

[3] **Q:** And you wore those around cement

[4] dust and barite dust?

[5] **A:** Yes.

[6] **Q:** These double-cartridge

[7] respirators, do you know who manufactured

[8] them?

[9] **A:** No.

[10] **Q:** And you didn't wear those types of

[11] respirators around any asbestos-containing

[12] products, did you?

[13] **A:** No.

[14] **Q:** Other than the double-cartridge

[15] respirator, and the single-strap dust mask

[16] you just described, did you ever wear any

[17] other types of respiratory protection,

[18] either while in the Navy or out on the Gulf?

[19] **A:** I am sure I have, but I can't

[20] remember enough to describe it in any detail

[21] at all.

[22] **Q:** Have you ever worn any other type

[23] of dust mask, other than a single-strap dust

[24] mask?

[25] **A:** Not that I recall.

Page 123

[1] **Q:** So you don't recall ever wearing a

[2] double-strap dust mask?

[3] **A:** No.

[4] **Q:** Did you ever receive any

[5] instructions from anyone at the Navy, or

[6] anyone at Petrol or Fagan, about the use of

[7] the dust mask or the respiratory protection

[8] you wore?

[9] **A:** No.

[10] **Q:** Was respiratory protection ever a

[11] subject at any safety meetings, either in

[12] the Navy or at Petrol or Fagan?

[13] **A:** In the later years, yes. At

[14] Petrol. Not necessarily Petrol, but after

[15] Hornbeck bought Petrol out, they had started

[16] monthly safety meetings, and that subject

[17] always came up, yes.

[18] **Q:** What year was that?

[19] **A:** In late '80s, early '90s.

[20] **Q:** So the first time you recall

[21] respiratory protection being discussed at a

[22] safety meeting, would have been in the late

[23] 1980s or the early 1990s?

[24] **A:** Yes.

[25] **Q:** And was respiratory protection at

Page 124

[1] those safety meetings discussed in relation

[2] to any asbestos?

[3] **A:** No.

[4] **Q:** Were you ever told to wear

[5] respiratory protection while working around

[6] asbestos?

[7] **A:** No. No.

[8] **Q:** And you said you wore a dust mask

[9] when painting. What type of painting?

[10] **A:** Just painting the inside of the

[11] engine room.

[12] **Q:** Were you spray painting or was it

[13] brush painting?

[14] **A:** Brush.

[15] **Q:** And while you were doing this

[16] brush painting while wearing a dust mask,

[17] were there any other workers around you,

[18] doing any other type of work?

[19] **A:** Wait. I did use the dust mask

[20] when I was spray painting.

[21] **Q:** Okay. And let me ask that

[22] question again.

[23]     At any time while you wore the

[24] dust mask while painting, were there any

[25] other trades working near you? Any other

JAMES C. TURNER AND MARLENE TURNER, v.
ANCHOR PACKING, ET AL.

Case MDL No: 875   Document 3323   Filed 11/05/01   Page 62 of 247

JAMES C. TURNER
August 9, 2001

Page 125

[1] workers working around you, doing anything
[2] other than painting?
[3]   **A:** Yes, I am sure.
[4]   **Q:** Do you have a specific
[5] recollection?
[6]   **A:** (Witness shakes head negatively.)
[7]   **Q:** No? You have to answer out loud.
[8]   **A:** Just working on machinery.
[9] Specifically what, I don't remember.
[10]   **Q:** Did you ever work with any
[11] asbestos-containing products that you
[12] believed to be manufactured by 3-M?
[13]   **A:** Not that I remember.
[14] Subsequent to — well, I have been
[15] told that the 3-M dust masks used to contain
[16] asbestos. That's all I know.
[17]   **Q:** Who told you that?
[18]   **A:** I don't remember.
[19]   **Q:** When were you told that?
[20]   **A:** I don't remember.
[21]   **Q:** Your petition specifically alleges
[22] that you worked around asbestos-containing
[23] products manufactured by 3-M. And it
[24] specifically mentions sandpaper. Do you
[25] have any knowledge of ever working with any

Page 126

[1] sandpaper manufactured by 3-M, which would
[2] have contained asbestos?
[3]   **A:** I can't fathom where that came
[4] from.
[5]   **Q:** So you have no knowledge of ever
[6] working with any sandpaper manufactured by
[7] 3-M?
[8]   **A:** Sandpaper, yeah; whether it
[9] contained asbestos or not, I don't know.
[10]   **Q:** And you have no knowledge, as you
[11] sit here today, that any sandpaper you ever
[12] used contained asbestos, do you?
[13]   **A:** Not to my knowledge.
[14]   **Q:** Do you have a recollection of
[15] using 3-M sandpaper?
[16]   **A:** I am almost positive, yes.
[17]   **Q:** When did you use it, and for what?
[18]   **A:** Seems like I have used it all my
[19] life. I don't know. I just looked at the
[20] back of them, and seems like I seen 3-M.
[21]   **Q:** And I know your hobby used to be
[22] woodworking.
[23]   **A:** Yes.
[24]   **Q:** Did you use it in connection with
[25] your woodworking?

Page 127

[1]   **A:** Yes, yes.
[2]   **Q:** Did you ever use it while working
[3] with asbestos-containing products?
[4]   **A:** Not that I know of.
[5]       **MS. BREAUX:**
[6]   I believe that is all I have.
[7] Thank you.
[8]       **MR. AMES:**
[9]   Are there any other counsel that
[10] have either one or two questions, to their
[11] knowledge, or brief cross-examination of
[12] Mr. Turner?
[13]   Mr. Turner has told me that he has
[14] just about reached the end of his ability to
[15] function today.
[16]   If anybody has anything that they
[17] would anticipate being very, very short, we
[18] may be able to accommodate them. But in the
[19] event anybody has anything that is going to
[20] take any time whatsoever, we will be more
[21] than happy to abide by our discussions at
[22] the beginning of the afternoon, and reach an
[23] accommodation in terms of allowing
[24] additional cross-examination, once
[25] Mr. Turner has had the chance to recuperate

Page 128

[1] from today.
[2]       **THE VIDEOGRAPHER:**
[3]   One other thing.
[4] Before we go off the record, for
[5] the videotape, could I have Counsel identify
[6] themselves one more time, please?
[7]       **MR. MCEACHIN:**
[8]   My name is Eugene M. McEachin; I
[9] represent The Reilly-Benton Company.
[10]       **MS. RAMSEY:**
[11]   Holly Ramsey for Eagle Inc.
[12]       **MR. GUIDRY:**
[13]   James Guidry for Combustion
[14] Engineering.
[15]       **MR. ABRAHAM:**
[16]   Michael Abraham for Flintkote
[17] Company and Flintkote Mines.
[18]       **MS. BREAUX:**
[19]   Claire Breaux for Minnesota Mining
[20] and Manufacturing.
[21]       **MS. LAPPENGA:**
[22]   Wendy Lappenga for John Crane,
[23] Inc.
[24]       **MS. PELLEGRIN:**
[25]   Jennie Pellegrin on behalf of

JAMES C. TURNER
August 9, 2001

Case MDL No. 875   Document 3323   Filed 11/05/01   Page 63 of 247

JAMES C. TURNER AND MARLENE TURNER   v.
ANCHOR PACKING, ET AL.

Page 129

[1] Ingersoll-Rand.
[2]                    **MR. HAROLD:**
[3]    Mike Harold for the McCarty
[4] Corporation.
[5]                    **MR. MAYEAUX:**
[6]    Ben Mayeaux; Ingersoll-Rand.
[7]                    **MR. LILLY:**
[8]    Ed Lilly; A.W. Chesterton.
[9]                    **MR. STRAYHAN:**
[10]   Lee Strayhan for Carborundum.
[11]                    **MR. GARY:**
[12]   Leon Gary for Viacom, Inc.
[13]                    **MR. CAHN:**
[14]   Cory Cahn for General Electric.
[15]                    **MS. NATHAN:**
[16]   Pamela Nathan; J.T. Thorpe.
[17]                    **MR. BROUSSARD:**
[18]   Andre Broussard; Flexitallic and
[19] Dana Corporation.
[20]                    **MR. GRECO:**
[21]   Claude Greco; Taylor Seidenbach,
[22] Inc.
[23]                    **MR. BROWN:**
[24]   Scott Brown; Georgia-Pacific
[25] Corporation.

Page 130

[1]                    **MR. MCMURTRAY:**
[2]    Patrick McMurtray; Foster Wheeler.
[3]                    **MR. WILLIAMS:**
[4]    Robert Williams; Kelly Moore.
[5]                    **MR. SWETMAN:**
[6]    Max Swetman; Garlock.
[7]                    **MR. AMES:**
[8]    I am Sherman Ames on behalf of the
[9] Plaintiff.
[10]                    **THE VIDEOGRAPHER:**
[11]   This conclude this evening's
[12] deposition; it is 2:55 p.m.
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 131

[1]
[2]
[3]        CERTIFICATE OF DEPONENT
[4]
[5]
[6]    I hereby certify that I have read
[7] and examined the foregoing transcript, and
[8] the same is a true and accurate record of
[9] the testimony given by me.
[10]    Any additions or corrections that I
[11] feel are necessary, I will attach on a
[12] separate sheet of paper to the original
[13] transcript.
[14]
[15]
[16]
[17]
[18]
[19]    (Witness' signature)
[20]
[21]
[22]
[23]
[24]
[25]

Page 132

[1]
[2]    REPORTER'S CERTIFICATE
[3]
[4]    I, Cathy Renee' Powell, CCR,
[5] Certified Court Reporter, State of
[6] Louisiana, do hereby certify that
[7] within-named witness personally appeared
[8] before me at the time and place herein set
[9] out, and after having been duly sworn by me,
[10] according to law, was examined by counsel.
[11]    I further certify that the
[12] examination was recorded stenographically by
[13] me and this transcript is a true record of
[14] the proceedings.
[15]    I further certify that I am not of
[16] counsel to any of the parties hereto, nor in
[17] any way interested in the outcome of this
[18] action.
[19]
[20]
[21]
[22]    CATHY RENEE' POWELL
       Certified Court Reporter
[23]
[24]
[25]
[1]

**Lawyer's Notes**

# In The Matter Of: The transcript of

## *TURNER   v.*
## *ANCHOR PACKING, ET AL.*

---

### *JAMES C. TURNER*
### *Vol. 2, October 3, 2001*

---

*PROFESSIONAL SHORTHAND REPORTERS, INC.*
*NEW ORLEANS, LA  PH. (504)529-5255   FAX (504)529-5257*
*BATON ROUGE, LA  PH. (225)924-3488   FAX (225)924-2582*
*SHREVEPORT, LA   PH. (318)213-1055   FAX (318)213-1056*
*OR TOLL FREE, 1-800-536-5255*

*Original File 100301JT.TXT, 137 Pages*
*Min-U-Script® File ID: 2614929672*

**Word Index included with this Min-U-Script®**

ANCHOR PACKING, et al.

VOL. 2, October 3, 2001

Page 1

[1]          17TH JUDICIAL DISTRICT COURT
[2]            PARISH OF LAFOURCHE
[3]             STATE OF LOUISIANA
[4]
[5]  JAMES C. TURNER AND
     MARLENE F. TURNER
[6]                   NO. 91-847
     VERSUS
[7]                   DIVISION "C"
     ANCHOR PACKING COMPANY;
[8]  ET AL.
[9]
[10]          VOLUME II
[11]
     VIDEOTAPED DEPOSITION OF JAMES C. TURNER,
[12] 219 CYPRESS VILLA, GHEENS, LOUISIANA, TAKEN
     IN THE OFFICES OF NESS, MOTLEY, LOADHOLT,
[13] RICHARDSON & POOLE, 1555 POYDRAS STREET,
     SUITE 1750 NEW ORLEANS, LOUISIANA  70112, ON
[14] WEDNESDAY, THE 3RD DAY OF OCTOBER, 2001.
[15]
     APPEARANCES:
[16]
[17] NESS, MOTLEY, LOADHOLT, RICHARDSON & POOLE
     BY:  SHERMAN AMES, ESQ.
[18] 1555 POYDRAS STREET, SUITE 1750
     NEW ORLEANS, LOUISIANA  70112
[19]
     ATTORNEYS FOR JAMES C. TURNER  AND
[20]   MARLENE  F. TURNER
[21]
[22]
[23]
[24]
[25]

Page 2

[1]  APPEARANCES CONTINUED:
[2]  HAILEY, McNAMARA, HALL, LARMANN & PAPALE
     BY:  CLAUDE A. GRECO, ESQ.
[3]  ONE GALLERIA BOULEVARD, SUITE 1400
     METAIRIE, LOUISIANA 70001
[4]
         ATTORNEYS FOR TAYLOR-SEIDENBACH
[5]
[6]
     BERNARD, CASSISA, ELLIOTT & DAVIS
[7]  BY:  FRANCINE GUIGNO, ESQ.
     1615 METAIRIE ROAD
[8]  METAIRIE, LOUISIANA  70055
[9]    ATTORNEYS FOR THE REILLY-BENTON COMPANY
[10]
     DEUTSCH, KERRIGAN & STILES
[11] BY:  KEVIN WEBB, ESQ.
     755 MAGAZINE STREET
[12] NEW ORLEANS, LOUISIANA 70130
[13]    ATTORNEYS FOR THE DANA CORPORATION
[14]
     JONES, WALKER, WAECHTER, POITEVENT,
[15]   CARRERE & DENEGRE, LLP
     BY:  WILLIAM SCHUETTE, ESQ.
[16] 8555 UNITED PLAZA BOULEVARD
     BATON ROUGE, LOUISIANA 70809
[17]
         ATTORNEYS FOR VIACOM, INC., F/K/A
[18]     WESTINGHOUSE
[19]
     JONES, WALKER, WAECHTER, POITEVENT,
[20]   CARRERE & DENEGRE, LLP
     BY:  H. LEE STRAYHAN, III, ESQ.
[21] 50TH FLOOR, FNBC CENTER
     201 ST. CHARLES AVENUE
[22] NEW ORLEANS, LOUISIANA 70170
[23]    ATTORNEYS FOR CARBORUNDUM
[24]
[25]

Page 3

[1] APPEARANCES CONTINUED:

[2]

[3] LUKER, SIBAL & McMURTRAY, LLC
BY: PATRICK D. MCMURTRAY, ESQ.
[4] 616 GIROD STREET
NEW ORLEANS, LOUISIANA 70130
[5] .
ATTORNEYS FOR FOSTER-WHEELER

[6]
[7]
MCGLINCHEY STAFFORD
[8] BY: ERIC SHUMAN, ESQ.
643 MAGAZINE STREET
[9] NEW ORLEANS, LOUISIANA 70130
[10] ATTORNEYS FOR DRESSER INDUSTRIES
[11]
AULTMAN, TYNER, RUFFIN & YARBOROUGH, LTD.,
[12] A PLC
BY: ROBERT P. VINING, ESQ.
[13] SUITE 1900, TEXACO CENTER
400 POYDRAS STREET
[14] NEW ORLEANS, LOUISIANA 70130
[15] ATTORNEYS FOR GARLOCK, INC.
[16]
LABORDE & NEUNER
[17] BY: GREG KOURY, ESQ.
ONE PETROLEUM CENTER, SUITE 200
[18] 1001 WEST PINHOOK ROAD
LAFAYETTE, LOUISIANA 70503
[19]
ATTORNEYS FOR INGERSOLL-RAND
[20]
[21] GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH
BY: DORRIS T. BOBADILLA, ESQ.
[22] SUITE 4040, ONE SHELL SQUARE
701 POYDRAS STREET
[23] NEW ORLEANS, LOUISIANA 70139
[24] ATTORNEYS FOR COMBUSTION ENGINEERING
[25]

Page 4

[1] APPEARANCES CONTINUED:

[2] FORMAN, PERRY, WATKINS, KRUTZ & TARDY,
PLLC
[3] BY: W. SCOTT BROWN, ESQ.
[4] 1515 POYDRAS STREET, SUITE 1420
[5] NEW ORLEANS, LOUISIANA 70112
[5] ATTORNEYS FOR GEORGIA-PACIFIC
CORPORATION

[6]
[7]
MONTGOMERY, BARNETT, BROWN, READ, HAMMOND
[8] & MINTZ
BY: TONYA SHORT, ESQ.
[9] SUITE 3200, ENERGY CENTRE
1100 POYDRAS STREET
[10] NEW ORLEANS, LOUISIANA 70163
[11] ATTORNEYS FOR EAGLE, INC.
[12]
PLAUCHE', MASELLI, LANDRY & PARKERSON, LLP
[13] BY: WENDY LAPPENGA, ESQ.
SUITE 4240, BANK ONE CENTER
[14] 201 ST. CHARLES AVENUE
NEW ORLEANS, LOUISIANA 70170
[15]
ATTORNEYS FOR JOHN CRANE
[16]
[17] HAILEY, McNAMARA, HALL, LARMANN & PAPALE
BY: MICHAEL ABRAHAM, ESQ.
[18] ONE GALLERIA BOULEVARD
SUITE 1400
[19] METAIRIE, LOUISIANA 70001
[20] ATTORNEYS FOR FLINTKOTE MINES, LTD. AND
THE FLINTKOTE COMPANY
[21]
[22] SIMON, PERAGINE, SMITH & REDFEARN
BY: MICHAEL HAROLD, ESQ.
[23] 30TH FLOOR, ENERGY CENTRE
1100 POYDRAS STREET
[24] NEW ORLEANS, LOUISIANA 70163
[25] ATTORNEYS FOR THE MCCARTY CORPORATION

Page 5

[1] APPEARANCES CONTINUED:

[2]

[3] CRULL, CASTAING, LILLY & HERMAN
BY:  EDWARD J. LILLY, ESQ.

[4] SUITE 2323, PAN AMERICAN LIFE CENTER
601 POYDRAS STREET

[5] NEW ORLEANS, LOUISIANA 70130

[6]   ATTORNEYS FOR A. W. CHESTERTON

[7]

DUPLASS, ZWAIN, BOURGEOIS & MORTON

[8] BY:  CLAIRE E. BREAUX, ESQ.
SUITE 2900, THREE LAKEWAY CENTER

[9] 3838 NORTH CAUSEWAY BOULEVARD
METAIRIE, LOUISIANA 70002

[10]

ATTORNEYS FOR MINNESOTA MINING &

[11]   MANUFACTURING COMPANY

[12]

[13]

[14] REPORTED BY:

[15] CATHY RENEE' POWELL
CERTIFIED COURT REPORTER

[16]

[17]

[18] VIDEOGRAPHER:

[19] PATRICK GREEN
PROFESSIONAL SHORTHAND REPORTERS

[20]

[21]

[22]

[23]

[24]

[25]

Page 6

[1]

[2]   EXAMINATION INDEX

[3]   Page

[4] EXAMINATION BY MR. SCHUETTE: ........  12

[5] EXAMINATION BY MR. MCMURTRAY: .......  17

[6] EXAMINATION BY MS. LAPPENGA: .........  22

[7] EXAMINATION BY MR. HAROLD: ..........  46

[8] EXAMINATION BY MR. ABRAHAM: .........  52

[9] EXAMINATION BY MR. STRAYHAN: ........  64

[10] EXAMINATION BY MR. SHUMAN: .........  84

[11] EXAMINATION BY MR. VINING: .........  103

[12] EXAMINATION BY MR. LILLY: .........  107

[13] EXAMINATION BY MR. WEBB: ...........  114

[14] EXAMINATION BY MS. BREAUX: .........  115

[15] EXAMINATION BY MR. STRAYHAN: ........  123

[16] EXAMINATION BY MR. ABRAHAM: ........  124

[17] EXAMINATION BY MR. AMES: ...........  127

[18] EXAMINATION BY MR. SCHUETTE: .......  133

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 7

[1]   STIPULATION

[2]   It is stipulated and agreed by and

[3] between counsel for the parties hereto that

[4] the deposition of the aforementioned witness

[5] is hereby being taken for all purposes

[6] allowed under Article 1421, et seq, of the

[7] Louisiana Code of Civil Procedure, in

[8] accordance with law, pursuant to notice;

[9]   That the formalities of reading

[10] and signing are specifically not waived;

[11]   That the formalities of filing,

[12] sealing, and certification are specifically

[13] waived;

[14]   That all objections, save those as

[15] to the form of the question and the

[16] responsiveness of the answer, are hereby

[17] reserved until such time as this deposition,

[18] or any part thereof, may be used or sought

[19] to be used in evidence.

[20]

[21]   CATHY RENEE' POWELL, Certified

[22] Shorthand Reporter, in and for the State of

[23] Louisiana, officiated in administering the

[24] oath to the witness.

[25]

Page 8

[1]   THE VIDEOGRAPHER:

[2]   Today is the 3rd day of October,

[3] 2001. The time is approximately 9:48 a.m.

[4]   This is the videotaped deposition

[5] of James C. Turner, taken at the law offices

[6] of Ness, Motley, Loadholt, Richardson &

[7] Poole, located at 1555 Poydras Street, Suite

[8] 1700, New Orleans, Louisiana, for the case

[9] entitled James C. Turner and Marlene P.

[10] Turner versus Anchor Packing Company, et

[11] al., in the 17th Judicial District Court,

[12] LaFourche Parish, State of Louisiana, Case

[13] No. 91-847, Division C.

[14]   Will counsel please identify

[15] themselves and which parties they represent?

[16]   MR. WEBB:

[17]   Kevin Webb representing the Dana

[18] Corporation.

[19]   MR. ABRAHAM:

[20]   Mike Abraham representing

[21] Flintkote Company and Flintkote Mines,

[22] Limited.

[23]   MR. HAROLD:

[24]   Mike Harold with McCarty.

[25]   MS. BREAUX:

Page 9

[1]    Claire Breaux, Minnesota Mining
[2] and Manufacturing Company.
[3]                MS. LAPPENGA:
[4]    Wendy Lappenga for John Crane.
[5]                MS. GUIGNO:
[6]    Francine Guigno for Reilly-Benton.
[7]                MR. STRAYHAN:
[8]    Lee Strayhan on behalf of the
[9] Carborundum.
[10]                MR. SHUMAN:
[11]    Eric Shuman for Dresser
[12] Industries.
[13]                MR. VINING:
[14]    Robert P. Vining for Garlock.
[15]                MR. SCHUETTE:
[16]    Bill Schuette, for Viacom,
[17] formerly known as CBS Corporation.
[18]                MR. LILLY:
[19]    Ed Lilly for A.W. Chesterton.
[20]                MS. SHORT:
[21]    Tonya Short for Eagle, Inc.
[22]                MR. GRECO:
[23]    Claude Greco for
[24] Taylor-Seidenbach.
[25]                MR. MCMURTRAY:

Page 10

[1]    Patrick McMurtray for
[2] Foster-Wheeler.
[3]                MR. BROWN:
[4]    Scott Brown for the
[5] Georgia-Pacific Corporation.
[6]                MS. BOBADILLO:
[7]    Dorris Bobadillo on behalf of
[8] Crown Cork and Seal.
[9]                MR. AMES:
[10]    Sherman Ames on behalf of the
[11] plaintiffs, Mr. and Mrs. James Turner.
[12]    (Plaintiff previously sworn in Volume I
[13] of his deposition, taken August 9, 2001.)
[14]                MR. SCHUETTE:
[15]    Prior to getting started — this
[16] is William Schuette, on behalf of Viacom,
[17] formerly known as Westinghouse.
[18]    We have noted that this deposition
[19] was noticed in the State Court proceedings.
[20] A petition for removal has been filed in
[21] this case. It has not been ruled upon. It
[22] is our position that the jurisdiction
[23] currently vests in the Federal Court, and
[24] that the deposition should have been noticed
[25] in the Federal Court proceedings.

Page 11

[1]    We hereby reserve any rights we
[2] may have as a result of this anomaly. But
[3] we want to let the deposition go forward.
[4]                MR. AMES:
[5]    Fair enough.
[6]                MR. SHUMAN:
[7]    Note an additional objection.
[8] Eric Shuman on behalf of Dresser Industries.
[9] We were not provided with notice of the
[10] initial phase of this deposition, therefore,
[11] we reserve our objections to the use of
[12] that.
[13]                MR. STRAYHAN:
[14]    Lee Strayhan on behalf of
[15] Carborundum, reserving rights and
[16] objections.
[17]                MS. BOBADILLO:
[18]    Dorris Bobadillo on behalf of
[19] Crown Cork and Seal, same objection.
[20]                MR. AMES:
[21]    Fair enough. Ready to proceed
[22] then?
[23]    As I understand, and as I
[24] recollect, we were engaged in cross
[25] examination of Mr. Turner, and pretty much

Page 12

[1] going around the room, and I would assume
[2] that whomever has planned to be next, is
[3] free to do so, and we would just as soon get
[4] started with that aspect.
[5]                MR. SCHUETTE:
[6]    Well, I will go ahead and get
[7] started.
[8]        EXAMINATION BY MR. SCHUETTE:
[9]    Q: Mr. Turner, my name is William
[10] Schuette. I represent Viacom, which used to
[11] be known as Westinghouse. You talked with
[12] my partner last time, Mr. Leon Gary. I am
[13] not intending to go back over the things you
[14] discussed with Mr. Gary, but we did have
[15] just a couple more questions.
[16]    I note from your first deposition,
[17] that when you worked on the SHENANDOAH, when
[18] you were in the Navy, that you were at that
[19] time, servicing other vessels from the
[20] SHENANDOAH facility. Is that correct?
[21]    A: That's correct.
[22]    Q: Okay. You weren't actually
[23] working on the SHENANDOAH itself?
[24]    A: Both.
[25]    Q: Oh, both?

Page 13

[1]   **A:** My first, when I first went aboard
[2] the SHENANDOAH, for the first couple of
[3] years, I was ship's company. And that
[4] included, my duties was evaporators, and
[5] engine room, and watch standing. Then I was
[6] transferred to the repair department. And
[7] that is where servicing other ships started.
[8]   **Q:** Okay. And how long did you spend
[9] in the repair department when you were on
[10] the SHENANDOAH?
[11]   **A:** Probably about three years, three
[12] and a half years.
[13]   **Q:** Do you recall specifically any of
[14] the ships that you serviced from the
[15] SHENANDOAH during those three years?
[16]   **A:** I should. DESRON 22, I think.
[17] DESRON, DESTROYER SQUADRON 22, DD-700, 698,
[18] 697 — 697, 98; WALDRON; ALT; HAYNSWORTH.
[19]   **Q:** Do you recall on any of those
[20] ships that you just mentioned, whether you
[21] worked specifically on a Westinghouse
[22] turbine on any of those ships for the
[23] repairs that were being made?
[24]   **A:** Might have been. Unlikely. Might
[25] have. Might not have. Maybe an auxiliary

Page 14

[1] turbine, like a pump turbine or a turbine
[2] used to drive a pump. But not anything
[3] major.
[4]   **Q:** Okay. Was the SHENANDOAH, did it
[5] not have the facilities to be able to
[6] service the main propulsion turbines?
[7]   **A:** Not too much of the turbine
[8] itself, but the turbine insulation,
[9] including the bearings, gears, all the
[10] bearings, gears, and the bearings in the
[11] gears, the gears in the turbines, anything
[12] that didn't have to do with the turbine
[13] buckets themselves, the turbine blades
[14] themselves. If they were damaged too much,
[15] then the SHENANDOAH didn't have that
[16] capacity.
[17]   **Q:** Okay. When you say you maybe
[18] worked on an auxiliary turbine, you are
[19] talking about a smaller turbine that serves
[20] as like basically a motor for a pump?
[21]   **A:** (Witness nods head affirmatively.)
[22]   **Q:** And as I appreciate it, based upon
[23] your response, you can't really tell me
[24] specifically on which ship you may have
[25] worked on a Westinghouse turbine, as opposed

Page 15

[1] to a G.E. turbine, or a Worthington turbine
[2] or somebody else's turbine?
[3]   **A:** No.
[4]   **Q:** What about when you worked — at
[5] some point in time you worked for Fleet
[6] Services?
[7]   **A:** Fleet Maintenance Assistance
[8] Group.
[9]   **Q:** Fleet Maintenance Assistance
[10] Group? And what years was that, do you
[11] recall?
[12]   **A:** I believe around '73 and '74.
[13] Something like that.
[14]   **Q:** Okay. And were you working on,
[15] were you performing ship repairs at that
[16] time?
[17]   **A:** Yes.
[18]   **Q:** But you were stationed onshore at
[19] that time?
[20]   **A:** Yes.
[21]   **Q:** Do you recall whether you worked
[22] on any Westinghouse turbines during your
[23] stint with the Fleet Maintenance Assistance
[24] Group?
[25]   **A:** In this case, most likely, yes.

Page 16

[1]   **Q:** Most likely? Do you specifically
[2] recall any ships on which you worked on a
[3] Westinghouse turbine?
[4]   **A:** No.
[5]   **Q:** Do you recall the ships you worked
[6] on, while you were with the Fleet
[7] Maintenance Assistance Group?
[8]   **A:** If I sat here and thought about it
[9] for a week, I could come up with two or
[10] three at least, but there was so many.
[11]   **Q:** Okay. I noticed also from your
[12] deposition, that you were involved at some
[13] points in your career at least, in procuring
[14] materials for the repair operations.
[15]   **A:** Just peripherally. Not — that
[16] was not specifically my duties.
[17]   **Q:** Okay. What was your involvement
[18] then in the procurement of materials for the
[19] repairs efforts?
[20]   **A:** I was in charge of the outside
[21] repair department, and my duties sometimes
[22] included ordering a few materials, but
[23] mostly, I had a petty officer underneath me
[24] that did all that. I told him what I
[25] wanted, he looked up stock numbers, ordered

Case MDL No. 875 - Document 3323 - Filed 11/05/01 - Page 71 of 247

[1] it.

[2] **Q:** And is it the case that,

[3] particularly dealing with Navy ships, that

[4] the Navy exercised a great deal of control

[5] over what you could order, as far as repair

[6] parts? I mean, they had to be approved by

[7] higher-ups in the Navy before you could

[8] actually order a part?

[9] **A:** Never had that problem.

[10] **Q:** Never experienced that?

[11] **A:** No, sir.

[12]             **MR. SCHUETTE:**

[13]     Mr. Turner, I think that is all

[14] the questions I have. Thank you.

[15]             **MR. MCMURTRAY:**

[16]     I guess I will go next.

[17]         **EXAMINATION BY MR. MCMURTRAY:**

[18]     **Q:** Mr. Turner, my name is Patrick

[19] McMurtray. Good morning.

[20]     I was here for the first part of

[21] your deposition, so I don't need to go back

[22] over any of that. I do have a few

[23] questions, though.

[24]     On the HAYNSWORTH, do you remember

[25] who made the boilers that were on that ship?

[1]     **A:** I am sure that would be the old

[2] M-type boilers, and I can't narrow it down

[3] to one manufacturer.

[4]     **Q:** Your next ship was the LUCE? Is

[5] that right? The LUCE?

[6]     **A:** Yes.

[7]     **Q:** Do you remember who made the

[8] boilers on that ship?

[9]     **A:** I don't remember who made the

[10] boilers on any of the ships I was on. I

[11] remember Babcock & Wilcox; Combustion

[12] Control Engineering. One other major boiler

[13] manufacturer, one or two others. I don't

[14] remember their names.

[15]     **Q:** But as you sit here today, you

[16] can't put a specific boiler on a specific

[17] ship. Is that right?

[18]     **A:** No.

[19]     **Q:** And the way you answered that

[20] question a minute ago, dealt only with the

[21] ships that you served on. Is the same true

[22] for the ships that you worked on, in

[23] addition?

[24]     **A:** That's correct.

[25]     **Q:** When you were talking about the

[1] SHENANDOAH last time, I understood you to

[2] say that the SHENANDOAH was basically tied

[3] to the dock and never left; ships would come

[4] to it. Is that right?

[5]     **A:** During my four and a half years,

[6] we made two Mediterranean cruises. In other

[7] words, we pulled into places like Naples,

[8] Italy, tied up to the dock and repaired

[9] ships. Ships came alongside that were

[10] deployed to the Mediterranean. Italy,

[11] Malta. And they came alongside and we

[12] repaired them.

[13]     **Q:** Do you remember how long those two

[14] cruises lasted?

[15]     **A:** Six months each.

[16]     **Q:** And for the remainder of time,

[17] where was the SHENANDOAH tied up?

[18]     **A:** Norfolk, Virginia.

[19]     **Q:** Do you remember any ship that you

[20] ever served on, and we will talk about the

[21] ships you served on first, where there were

[22] major boiler repairs that needed to be made?

[23]     **A:** Absolutely.

[24]     **Q:** What ships? And then we will talk

[25] about what was done on the boilers.

[1]     **A:** To my knowledge, every one —

[2] every ship I served on, except the

[3] SHENANDOAH, did — had to have major work

[4] done on the boilers.

[5]     **Q:** And just so that we understand

[6] each other, when you say major work done on

[7] the boilers, what do you mean?

[8]     **A:** Tear them up, tear them down to

[9] where you can walk through them, cut all the

[10] firebrick out, rebrick them. Cut out tubes,

[11] weld in new tubes.

[12]     **Q:** And this wouldn't be done while

[13] the vessel was at sea. Is that right?

[14]     **A:** No. Shipyard.

[15]     **Q:** Do you remember the specific

[16] shipyards that any of these ships went into,

[17] to have that work done?

[18]     **A:** Norfolk Naval Shipyard in

[19] Portsmouth, Virginia; Charleston Naval

[20] Shipyard; Boston Naval Shipyard.

[21]     **Q:** Was this work done as part of a

[22] routine overhaul or maintenance schedule, or

[23] was it done because of some catastrophic

[24] loss of a boiler?

[25]     **A:** Routine overhaul.

[1] **Q:** Do you remember, as you sit here
[2] today, what kind of overhaul schedule those
[3] boilers had?
[4] **A:** No. That really wasn't my
[5] department. I was a machinist's mate,
[6] boiler tender. Boiler technicians took care
[7] of that.
[8] **Q:** They would take care of noting
[9] when it was time for that overhaul?
[10] **A:** Yes.
[11] **Q:** And would it be the shipyard crews
[12] that would come in and actually do the work?
[13] **A:** Yes. Well, ship's company
[14] assisted a lot. In other words, if a boiler
[15] didn't have to have too much major work
[16] done, maybe the shipyard would do one or two
[17] of the boilers on the ship, and ship's
[18] company would do the other, if they had the
[19] expertise.
[20] **Q:** And that is my next question. As
[21] a member of the ship, as ship's company,
[22] what kind of boiler repair or construction
[23] expertise would the ship's company have?
[24] **A:** They would have the capacity to
[25] rebrick, do the complete rebricking of the

[1] boiler, some minor welding on the tubes,
[2] downcomers, the minor tubes. Not anything
[3] major.
[4] **Q:** I understand. And when you talk
[5] about brick, you are talking about
[6] firebrick?
[7] **A:** Yes.
[8] **Q:** Do you have any reason to believe
[9] that any firebrick that the Navy used, ever
[10] contained asbestos?
[11] **A:** I have no idea.
[12]                 **MR. MCMURTRAY:**
[13]     I believe that is all I have.
[14] Thank you, sir.
[15]         **EXAMINATION BY MS. LAPPENGA:**
[16] **Q:** Good morning, sir. My name is
[17] Wendy Lappenga. I represent John Crane in
[18] this case.
[19]     I think when we were here back in
[20] August, you mentioned that you associated
[21] the name John Crane with two different
[22] products: Packing, or preformed gaskets; or
[23] what you called compressed asbestos. Do I
[24] remember that correctly?
[25] **A:** Yes.

[1] **Q:** I wanted to ask you some questions
[2] first about the preformed gaskets, or
[3] compressed asbestos.
[4]     How are you able to identify John
[5] Crane as a supplier of that type of
[6] material, while you were working with the
[7] Navy?
[8] **A:** If my memory is correct, John
[9] Crane would be written right on it. But I
[10] remember some graphite coated that seems
[11] like John Crane was — their name was
[12] stenciled all over it. And the non-graphite
[13] type also, seemed like. But I am not
[14] positive.
[15]     More packing, John Crane was more
[16] packing than compressed asbestos.
[17] **Q:** Would you say that the amount of
[18] John Crane compressed asbestos that you
[19] used, was minor in the scope of your career?
[20] **A:** If I am thinking right, I can't
[21] say whether we used more of one compressed
[22] asbestos than the other.
[23] **Q:** Okay.
[24] **A:** In other words, I ordered
[25] compressed asbestos three, four, five yards

[1] at a time. And had no way to specify John
[2] Crane or whatever. I ordered it through the
[3] supply department, the material came, and if
[4] it were John Crane, that's fine with me.
[5] **Q:** Okay.
[6] **A:** If it was something else, I had no
[7] control over that.
[8] **Q:** I understand. And just so I make
[9] sure that we are on the same page, we are
[10] talking about the preformed ones that you
[11] didn't have to hammer out. Right?
[12] **A:** Usually, I had no way to order a
[13] preformed gasket. I had to make all of my
[14] own, mostly.
[15] **Q:** Okay. Do you associate —
[16] **A:** Very few preformed gaskets we used
[17] in the Navy.
[18] **Q:** Do you associate the name John
[19] Crane with the non-preformed gaskets?
[20] **A:** I think so. I am not sure.
[21] **Q:** You're not sure?
[22] **A:** I am not positive.
[23] **Q:** Okay. Did you see the packaging
[24] that John Crane gaskets came in?
[25] **A:** The preformed gaskets?

**Page 25**

[1] **Q:** Correct.

[2] **A:** I don't think I remember packaging

[3] for the preformed gaskets. Just packing.

[4] **Q:** All right. I will ask you about

[5] the packing in a few minutes. The gaskets

[6] themselves, I know you already mentioned

[7] that there were some that were graphite

[8] coated and some that weren't. Do you

[9] remember what color the gaskets that said

[10] John Crane on them were?

[11] **A:** It was black for graphite, and

[12] off-white for the non-graphite.

[13] **Q:** Was there anything else on the

[14] gaskets themselves, other than the stenciled

[15] name John Crane, any logos, style numbers?

[16] **A:** I can't remember anything, but

[17] John Crane.

[18] **Q:** Do you recall the dimensions of

[19] the John Crane preformed gaskets?

[20] **A:** Usually, what I remember is

[21] tank-top gaskets, the preformed type of

[22] tank-top gaskets, about, something like

[23] 20 inches, and I don't know how you say that

[24] in —

[25] **Q:** Diameter?

**Page 26**

[1] **A:** In diameter.

[2] **Q:** Was that true of both the graphite

[3] and the non-graphite?

[4] **A:** Mostly that was water tanks and I

[5] believe we used non-graphite.

[6] **Q:** What did you use the graphite John

[7] Crane gaskets for?

[8] **A:** I don't remember why we used it.

[9] Sometimes, that is just what they send us,

[10] is the reason we used it. But other

[11] times — and some types of water lines and

[12] stuff like that, we needed some kind of

[13] coating for lubrication, and I think that is

[14] reason, the lubrication properties of the

[15] graphite.

[16] **Q:** Did you use the John Crane

[17] preformed gaskets, graphite or non-graphite

[18] on anything other than water lines and water

[19] tanks?

[20] **A:** I am sure.

[21] **Q:** Okay. Do you remember —

[22] **A:** But I can't remember specifically.

[23] **Q:** Okay.

[24] **A:** When it was convenient to order a

[25] preformed gasket, we would. I remember some

**Page 27**

[1] pumps, we used preformed gaskets on some

[2] pumps, but normally, we didn't have access

[3] to the preformed gaskets for those pumps.

[4] We would order them through supply and nine

[5] times out of ten, supply wouldn't have them.

[6] We would have to make our own.

[7] **Q:** Okay. And again, you don't

[8] specifically remember whether any of the

[9] kinds of gaskets you had to make on your

[10] own, were John Crane gaskets?

[11] **A:** No.

[12] **Q:** So to your recollection, the John

[13] Crane gaskets that you used, you used mostly

[14] on water lines and water tanks, and

[15] occasionally, on pumps?

[16] **A:** Yes.

[17] **Q:** Okay. The water lines, were these

[18] hot or cold water lines?

[19] **A:** Usually cold.

[20] **Q:** What were those water lines going

[21] to?

[22] **A:** Water tanks. We used the

[23] freshwater for the crew and feedwater for

[24] the boilers.

[25] **Q:** What were the water tanks for?

**Page 28**

[1] **A:** Usually, freshwater for the

[2] boilers, and the crew.

[3] **Q:** Do you remember any specific

[4] vessels that you used the John Crane gaskets

[5] on, on this equipment?

[6] **A:** Specific —

[7] **Q:** Vessels, ships?

[8] **A:** All that I served on.

[9] **Q:** Okay. The pumps that you believe

[10] you may have sometimes used the John Crane

[11] gaskets on, what types of pumps were those,

[12] if you recall?

[13] **A:** Different types of water pumps.

[14] **Q:** And those would have been cold

[15] water?

[16] **A:** No. Condensate pumps would be

[17] warm water. That would be feedwater for the

[18] boilers, and in the case where the

[19] condensate pump pumped it, at that point, it

[20] would be warm water.

[21] **Q:** Okay. Any idea of the temperature

[22] of that water?

[23] **A:** Maybe a hundred, 120 degrees.

[24] **Q:** Okay. Do you have any reason to

[25] believe that the John Crane gaskets you used

Page 29

[1] on this equipment we have talked about,

[2] contained asbestos?

[3] **A:** To my knowledge, all that I used,

[4] did.

[5] **Q:** Okay.

[6] **A:** That was my understanding.

[7] **Q:** All right. What do you base that

[8] understanding on?

[9] **A:** Compressed asbestos. When I

[10] ordered gasket material for the — to repair

[11] the pump, I go to the book, the supply book,

[12] and it says compressed asbestos. That tells

[13] me it is asbestos.

[14] **Q:** Okay. That makes sense.

[15] So when you went to the supply

[16] book and ordered compressed asbestos,

[17] sometimes you got John Crane gaskets, ones

[18] that said John Crane on them?

[19] **A:** To my knowledge, to the best of my

[20] remembrance.

[21] **Q:** Okay. And the only specific thing

[22] you remember using the John Crane gaskets on

[23] is the equipment you have talked about

[24] already: The water lines, water tanks, and

[25] water pumps?

Page 30

[1] **A:** Yes.

[2] **Q:** How did you install the John Crane

[3] gaskets on this equipment?

[4] **A:** There would be bolts. You would

[5] unbolt, if you needed to repair something,

[6] you unbolted it, and then made your repairs

[7] and got your gasket, either made it, or got

[8] it preformed and put it back in place and

[9] bolted it. Used bolts to bolt it up.

[10] **Q:** When you were handling the John

[11] Crane gaskets, the new John Crane gaskets,

[12] did they create any dust, that you recall?

[13] **A:** Usually not.

[14] **Q:** On occasion, you would have to

[15] remove an old gasket from this equipment?

[16] **A:** Yes.

[17] **Q:** Were you able to tell whether or

[18] not it was a John Crane gasket, when you

[19] were removing an old gasket?

[20] **A:** Very seldom.

[21] **Q:** Okay. How did you go about

[22] removing old gaskets from this equipment you

[23] and I have talked about?

[24] **A:** Usually, you had to unbolt. And

[25] sometimes, the gasket would be — you could

Page 31

[1] just peel it right off. But mostly, you had

[2] to take a scraper and scrape it off,

[3] depending on the temperature of whatever you

[4] was using it for. Usually, the temperature

[5] would bake it right onto the metal surface,

[6] and you would have to scrape it off in tiny

[7] pieces.

[8] **Q:** What did you use to scrape it off?

[9] **A:** Steel scrapers, mostly. Sometimes

[10] we would have a carbide, tungsten carbide

[11] scraper, if we got real lucky. It worked

[12] real good.

[13] **Q:** When you had to scrape the gasket

[14] off, did that create any dust?

[15] **A:** Not really. Not that much dust,

[16] just small shavings.

[17] **Q:** Can you tell me about how often

[18] you had to scrape the gasket off, versus

[19] being able to peel it off?

[20] **A:** Ninety percent of the time.

[21] **Q:** Which one was 90?

[22] **A:** You would have to scrape it.

[23] **Q:** Okay. If any of the John Crane

[24] gasket material that you used was not

[25] preformed, how did you go about cutting out

Page 32

[1] or creating a gasket out of the

[2] non-preformed material?

[3] **A:** Usually it was piping, and it

[4] would be using a flange to, to bolt up a

[5] flange. You would use one side of the

[6] flange, place the piece of gasket material

[7] on it, and use a small ball peen hammer and

[8] beat it out.

[9] **Q:** And again, did that process create

[10] any dust?

[11] **A:** Usually not.

[12] **Q:** But as far as you recall, you are

[13] not positive that you used John Crane

[14] non-preformed gaskets?

[15] **A:** I am not positive.

[16] **Q:** Okay. Let me move on to the —

[17] oh, one other question about the gaskets.

[18] You said that you used John Crane

[19] gaskets possibly on every ship you served on

[20] in the Navy. Right?

[21] **A:** Yes.

[22] **Q:** Okay. Did you use John Crane

[23] gaskets after you left the Navy at all, in

[24] your work career?

[25] **A:** Yes.

Page 33

[1] **Q:** Where else did you use John Crane
[2] gaskets?
[3] **A:** Aboard boats, cargo boats out in
[4] the Gulf of Mexico.
[5] **Q:** Did you use them on generally the
[6] same type of equipment?
[7] **A:** Yes.
[8] **Q:** Did they appear the same as they
[9] did when you used them in the Navy?
[10] **A:** Yes.
[11] **Q:** Is there anything that was
[12] different about their appearance, or the way
[13] you used them on the cargo boats, versus in
[14] the Navy?
[15] **A:** Appearance?
[16] **Q:** Their appearance, or the way you
[17] used them?
[18] **A:** No.
[19] **Q:** So you used them when you were
[20] with the Fagan Boat Company?
[21] **A:** Yes.
[22] **Q:** And did you also use them when you
[23] were with Petrol Marine?
[24] **A:** Yes.
[25] **Q:** Did you use them at all while you

Page 34

[1] were with the Valite plastics plant?
[2] **A:** I can't remember any that I used
[3] there.
[4] **Q:** When you were at the Naval
[5] Training Center in Jacksonville, as a, I
[6] believe you told us, master at arms, you
[7] didn't use any John Crane products there,
[8] did you?
[9] **A:** No.
[10] **Q:** And that was about from 1965 to
[11] 1967?
[12] **A:** (Witness nods head affirmatively.)
[13] **Q:** She is asking you to answer out
[14] loud. You were shaking your head.
[15] I forgot the question myself.
[16] When you were on the USS LEAHY —
[17] **A:** Yes.
[18] **Q:** — I believe you told us you were
[19] a senior machinist mate, and you supervised
[20] about 80 to 100 people?
[21] **A:** Yes.
[22] **Q:** Were you doing any hands-on work
[23] when you were on that vessel?
[24] **A:** Some, yes.
[25] **Q:** Was it pretty limited?

Page 35

[1] **A:** Yes. Mostly supervisory.
[2] **Q:** Could you give me any percentage
[3] of how much time you spent doing hands-on
[4] work on that ship?
[5] **A:** Five percent of the time.
[6] **Q:** All right. Now I want to ask you
[7] some questions about the John Crane packing
[8] you mentioned.
[9] I think you said that you did see
[10] the packaging that the packing came in?
[11] **A:** Yes.
[12] **Q:** Okay. Could you describe that to
[13] me?
[14] **A:** Usually, what I remember, we got
[15] it in rolls, compressed or braided asbestos,
[16] wire-inserted, just plain braided asbestos.
[17] Braided asbestos, graphite-inserted. And if
[18] I remember — I remember the black and
[19] yellow boxes.
[20] Was that your question?
[21] **Q:** That helps, yes.
[22] Did it come on a roll in a box, or
[23] did it come two different ways?
[24] **A:** In boxes, rolls; two different
[25] ways. Flat, in a big box, if it was big

Page 36

[1] packing; flat rolls, and circular rolls.
[2] Actual — I don't know. A roll like this
[3] (indicating).
[4] **Q:** The size of a Styrofoam coffee
[5] cup?
[6] **A:** Bigger.
[7] **Q:** Okay.
[8] **A:** Some smaller, some bigger.
[9] **Q:** Was all of the John Crane packing
[10] that you used, braided with the
[11] wire-inserted and graphite-coated?
[12] **A:** No.
[13] **Q:** That was all different kinds that
[14] you used?
[15] **A:** Yes.
[16] **Q:** Okay.
[17] **A:** A lot of it was just graphite, I
[18] think. We used pump packing. It came in
[19] metal, round metal containers, half-edge. I
[20] think it was just graphite.
[21] **Q:** Okay. So the pump packing you
[22] used was half-inch, and graphite-coated?
[23] **A:** (Witness nods head affirmatively.)
[24] **Q:** Okay. Did the packing itself have
[25] any printing on it, or logos, or anything of

[1] that sort?

[2]   A: I don't remember anything on the

[3] packing itself.

[4]   Q: Okay. The box that you described,

[5] did that have any lettering on it, logos?

[6]   A: Yes.

[7]   Q: Okay. What was on the box?

[8]   A: I just remember John Crane.

[9]   Q: Did it have any style numbers, or

[10] anything like that on it?

[11]   A: Numbers, yes.

[12]   Q: Do you recall what any of those

[13] are?

[14]   A: Size would always be on it. Some

[15] kind of style number usually.

[16]   Q: But you don't recall any of those

[17] numbers?

[18]   A: No. Just sizes.

[19]   Q: Do you remember all the different

[20] sizes that you used?

[21]   A: Something like one-quarter to

[22] about three-quarters, maybe.

[23]   Q: Okay.

[24]   A: One-half-inch or three-quarters.

[25] Maybe — we might not have used any

[1] three-quarter. It might be just one-quarter

[2] to half-inch.

[3]   Q: All right. The pump packing that

[4] you used, what types of pumps did you use

[5] that on?

[6]   A: What they call booster pumps and

[7] condensate pumps. Saltwater pumps. Fire

[8] pumps. Pumps for evaporators.

[9]   Q: And in each of those instances,

[10] did you use the graphite-coated?

[11]   A: Yes.

[12]   Q: When we were here before, you

[13] mentioned quite a few names of manufacturers

[14] of packing that you used. Do you have any

[15] recollection of using one manufacturer's

[16] packing more than another?

[17]   A: No.

[18]   Q: Okay. Just used whatever was

[19] available?

[20]   A: Whatever they sent me.

[21]   Q: Okay. And you don't remember them

[22] sending one manufacturer's packing more

[23] often than another?

[24]   A: No.

[25]   Q: Okay. Other than pump packing,

[1] talking about just John Crane packing, do

[2] you remember any other types of John Crane

[3] packing that you used?

[4]   A: Steam packing, for steam valves.

[5] Well, we used the packing for all

[6] kinds of valves: Steam, water, condensate,

[7] lube oil.

[8]   Q: Could you describe to me the John

[9] Crane packing that you used on steam valves?

[10]   A: Usually it was either braided

[11] asbestos, or braided asbestos wire-inserted.

[12] Depending on the steam pressure we was

[13] working with.

[14]   Q: Were either of those

[15] graphite-coated?

[16]   A: Yes.

[17]   Q: Both?

[18]   A: (Witness nods head affirmatively.)

[19]   Q: Do you recall what the steam

[20] pressure was, when you were using just the

[21] braided without the wire-inserted?

[22]   A: That would have been 150 to

[23] 600 pounds.

[24]   Q: And when you used the

[25] wire-inserted?

[1]   A: 1,200 pounds.

[2]   Q: Was the packing that you used on

[3] some of the other valves, water valves,

[4] condensate valves, was that the same kind

[5] you used on the steam valves?

[6]   A: No, not necessarily. It would

[7] have been the — either the graphite —

[8] sometimes it would have been the braided

[9] asbestos, graphite-coated, or just the

[10] graphite packing, just graphite itself. I

[11] think. I am not sure. It was either some

[12] kind of molded graphite — in other words,

[13] it wasn't —

[14]   Q: It wasn't braided?

[15]   A: Yeah. It wasn't braided.

[16]   Q: Okay.

[17]   A: In other words, you could take a

[18] piece of it and just pull it apart with your

[19] fingers.

[20]   Q: Okay. Was all of the John Crane

[21] packing that you used, graphite coated?

[22]   A: Most of it.

[23]   Q: When you say most of it, can you

[24] give me any kind of percentage?

[25]   A: I would say 90, 95 percent.

Case MDL No. 875   Document 3323   Filed 11/05/01   Page 77 of 247

Page 41

[1] **Q:** When you handled new John Crane
[2] packing, did that create any dust when you
[3] were handling it?
[4] **A:** No.
[5] **Q:** Did you use John Crane packing on
[6] anything other than pumps and valves?
[7] **A:** I can't remember anything else.
[8] **Q:** Okay. When you were working on
[9] packing with pumps, would you normally —
[10] let me start over.
[11]     It has always been my
[12] understanding, that when you have a pump,
[13] and you need to replace the packing, it is
[14] normally because there is some kind of leak
[15] there. Is that right?
[16] **A:** Yes.
[17] **Q:** So when you would take out old
[18] packing, it would be somewhat moist.
[19] Correct?
[20] **A:** Yes. Worn, or pieces, or
[21] sometimes, no pieces at all. It would all
[22] be gone.
[23] **Q:** Okay. What did you use to remove
[24] old packing from pumps?
[25] **A:** Usually, an extractor, packing

Page 42

[1] extractor, a little metal pig-tail-looking
[2] device.
[3] **Q:** How long would it normally take
[4] you to remove old packing?
[5] **A:** Maybe ten minutes.
[6] **Q:** Could you tell which
[7] manufacturer's packing it was, when you
[8] removed old packing?
[9] **A:** No.
[10] **Q:** Did it create any dust when you
[11] were removing the packing?
[12] **A:** Usually no.
[13] **Q:** When you were installing new
[14] packing on a pump, how did you go about
[15] doing that?
[16] **A:** We cut it off of the roll in
[17] pieces, measured the shaft, and put the
[18] piece of packing around the shaft, so that
[19] it met. And put it into the packing gland.
[20] Bolt the packing flange down.
[21] **Q:** How did you normally cut the
[22] packing?
[23] **A:** Usually with a knife, unless it
[24] was wire-inserted, then you had to have a
[25] cutter.

Page 43

[1] **Q:** And that didn't create any dust,
[2] did it?
[3] **A:** No.
[4] **Q:** The steam valves that you used
[5] John Crane packing on, how did you get to
[6] the valves? Did you have to remove any
[7] insulation or anything to get to them?
[8] **A:** Usually, we didn't have to use —
[9] usually, it was right out in the open. You
[10] could just unbolt the bolts.
[11] **Q:** Okay. How did you remove old
[12] packing from the valves?
[13] **A:** Same way: With a packing
[14] extractor.
[15] **Q:** Okay. Was any dust created when
[16] you removed it from the valves?
[17] **A:** Depends on, you know, you usually
[18] couldn't see it, but, you know, on steam
[19] valves, it would be cooked, or baked,
[20] glazed, and you would have to use the
[21] packing extractor, and do a lot of wiggling
[22] around, and you would create some dust,
[23] especially with the wire-inserted.
[24] **Q:** Wasn't much though, was it?
[25] **A:** No, not much.

Page 44

[1] **Q:** How did you go about installing
[2] new packing on valves?
[3] **A:** Same thing. You would just
[4] measure the stem, the valve stem itself,
[5] wind the packing around the valve stem, cut
[6] it into correct length, pack it into the
[7] packing flange, and buckle it down with the
[8] packing flange bolts.
[9] **Q:** Going back to removing it, for
[10] just a second, you couldn't tell which
[11] manufacturer's packing it was then either,
[12] right?
[13] **A:** No.
[14] **Q:** Did you spend more time on,
[15] working on pumps versus valves, or vice
[16] versa, or can you tell me at all?
[17] **A:** More than likely, I would spend a
[18] lot more time on the valves, the steam lines
[19] and valves.
[20] **Q:** How much of your overall time,
[21] while you were in the Navy, would you spend
[22] working on steam lines and valves? It
[23] wasn't something you did every day, was it?
[24] Or was it?
[25] **A:** When we were onboard ship, yeah.

Page 45

[1] Every day we had something to do with the
[2] steam lines, and the valves.
[3] **Q:** Okay. Would that involve
[4] replacing the packing?
[5] **A:** Not necessarily. Sometimes just
[6] cleaning up.
[7] **Q:** Can you give me any rough estimate
[8] of how much time you would spend replacing
[9] the packing on steam valves?
[10] **A:** Maybe 10 percent of the time.
[11] **Q:** How about how much time you spent
[12] placing packing in pumps?
[13] **A:** Roughly, maybe 15 percent. That
[14] was a little more than steam, I believe,
[15] steam lines.
[16] **Q:** But certainly, your job didn't
[17] involve nothing but working on pumps and
[18] steam lines. Right?
[19] **A:** Repeat that.
[20] **Q:** Okay. Your job overall involved a
[21] lot more than working on just pumps and
[22] steam lines?
[23] **A:** Yes.
[24] **Q:** Okay. Overall, if you take your
[25] duties as a whole, how much of your time was

Page 46

[1] spent working on pumps and steam lines?
[2] **A:** Probably 50 percent maybe.
[3] **Q:** That would be true for the Navy?
[4] **A:** Yes.
[5] **Q:** Okay. What about when you were
[6] with these cargo boat lines, the Fagan Boat
[7] Company and Petrol Marine?
[8] **A:** That would have been more time in
[9] that, because training wasn't involved.
[10] Probably 70, 80 percent of the time, I would
[11] be working on stuff like that.
[12] **Q:** When you were with the Fagan Boat
[13] Company and Petrol Marine, did you use any
[14] particular manufacturer's gaskets or packing
[15] more, one more than the other?
[16] **A:** No.
[17] **Q:** Did you use John Crane packing
[18] when you were with those two companies? We
[19] talked about gaskets.
[20] **A:** Yes.
[21]       **MS. LAPPENGA:**
[22]    I am going to go sit back and look
[23] at my notes, and I will let someone else ask
[24] questions. Thank you, sir.
[25]       **EXAMINATION BY MR. HAROLD:**

Page 47

[1]     **Q:** Good morning, Mr. Turner. Michael
[2] Harold. Nice to see you again. I just have
[3] a few questions for you.
[4]     **A:** All right.
[5]     **Q:** Mr. Turner, in your last
[6] deposition when you were here, you were
[7] asked about names of manufacturers of
[8] asbestos-containing products. One of the
[9] names you mentioned was Johns-Manville. And
[10] I believe you mentioned while — that you
[11] remembered Johns-Manville while you were in
[12] the Navy. Is that correct?
[13]     **A:** I think so.
[14]     **Q:** Do you remember any specific type
[15] of Johns-Manville products that you may have
[16] handled, or been exposed to?
[17]     **A:** It would have to be something like
[18] packing, or compressed asbestos, some kind
[19] of deck coating or something like that
[20] maybe.
[21]     **Q:** Did you personally, or do you
[22] remember actually handling Johns-Manville
[23] products while you were with the Navy?
[24]     **A:** My recollection is yes.
[25]     **Q:** Do you ever recall handling

Page 48

[1] Johns-Manville pipecovering while you were
[2] with the Navy?
[3]     **A:** That should have been included in
[4] my answer awhile ago. I can't remember
[5] specifically — I just remember the name
[6] Johns-Manville. I can't put any type of
[7] material — I can't remember the type of
[8] material I associate with Johns-Manville.
[9]     **Q:** Okay. Do you remember seeing any
[10] Johns-Manville products, or handling any
[11] Johns-Manville products, when you were in
[12] Louisiana, at Fagan or at Petrol Marine?
[13]     **A:** I don't remember where I used
[14] Johns-Manville materials, whether it was in
[15] the Navy or with — out in the Gulf of
[16] Mexico.
[17]     **Q:** Okay.
[18]     **A:** One or the other, or both.
[19]     **Q:** All right. Did you ever have any
[20] reason to handle steam pipecovering while
[21] you were with Fagan or Petrol Marine?
[22]     **A:** Yes.
[23]     **Q:** And where — in what sense would
[24] that be? Why would you handle pipecovering
[25] at Fagan Boat Service?

Page 49

[1] **A:** Exhaust lines from the diesel
[2] engines. We had the molded pipe insulation,
[3] just like we used in steam for the Navy.
[4] **Q:** Do you know in particular the
[5] names of the manufacturers of that
[6] insulation?
[7] **A:** No, I don't.
[8] **Q:** What about while you were at
[9] Valentine Sugars, were you exposed to any
[10] asbestos products there?
[11] **A:** Had to be, yes.
[12] **Q:** What types of products do you
[13] think you were exposed to there?
[14] **A:** Packing, compressed asbestos,
[15] steam line coverings, insulation.
[16] **Q:** What is compressed asbestos? I am
[17] not sure what you're talking about.
[18] **A:** Sheets of gasket material. That's
[19] what we used it for, gasket material. It is
[20] some graphite-coated and some not. It is
[21] used in water lines, steam lines, tank
[22] covers.
[23] **Q:** Okay. The steam line covering at
[24] Valentine Sugar that you may have been
[25] exposed to, do you know who manufactured

Page 50

[1] that material?
[2] **A:** No.
[3] **Q:** By any chance, do you know who may
[4] have supplied or sold any
[5] asbestos-containing products to Valentine
[6] Sugars?
[7] **A:** No.
[8] **Q:** And what about insulation products
[9] in general, whether they had asbestos or
[10] not, at Valentine Sugars, do you know who
[11] might have sold or supplied those materials?
[12] **A:** No.
[13] **Q:** And do you know who may have sold
[14] or supplied any insulation materials to
[15] Fagan or to Petrol Marine?
[16] **A:** I remember all the spectrum of the
[17] manufacturers of compressed asbestos, gasket
[18] material, the pipe insulation. But I can't
[19] name one specific manufacturer, and put it
[20] with one boat.
[21] **Q:** Okay. And also, other than a
[22] manufacturer, at Fagan or Petrol, do you
[23] remember any company, like a middleman, who
[24] may have actually supplied materials
[25] manufactured by somebody else, but supplied

Page 51

[1] insulation materials? Do you know any names
[2] of those companies?
[3] **A:** I am sure that is where we got all
[4] of our material, the middleman.
[5] **Q:** But do you know the names of the
[6] middlemen?
[7] **A:** I remember Grandeur.
[8] **Q:** Grandeur? Is that a local
[9] Louisiana company?
[10] **A:** I am not sure.
[11] **Q:** And they used —
[12] **A:** I know they have an outlet in New
[13] Orleans here.
[14] **Q:** And you think Grandeur actually
[15] supplied insulation materials?
[16] **A:** I don't know.
[17] **Q:** All right.
[18] **A:** I know they supplied a lot of our
[19] materials.
[20] **Q:** Oh, okay. But you don't know who
[21] actually supplied the insulation materials
[22] to Fagan or Petrol, do you?
[23] **A:** No.
[24] **Q:** I am here today representing a
[25] local company called The McCarty

Page 52

[1] Corporation. Can you tell me anything about
[2] McCarty?
[3] **A:** Don't remember ever hearing that.
[4]     **MR. HAROLD:**
[5]     Okay. I believe that is all I
[6] have. Thank you very much.
[7]     **MR. AMES:**
[8]     Could we take about a five-minute
[9] break, to replenish water —
[10]     **THE VIDEOGRAPHER:**
[11]     Going off the record. It is
[12] 10:43 a.m.
[13]     (Recess.)
[14]     **THE VIDEOGRAPHER:**
[15]     Back on record. It is 10:57 a.m.
[16]     **EXAMINATION BY MR. ABRAHAM:**
[17] **Q:** Hi, Mr. Turner. My name is Mike
[18] Abraham. I was present at your August 9
[19] deposition.
[20]     I am here representing the
[21] Flintkote Company and Flintkote Mines,
[22] Limited.
[23]     At your prior deposition, I
[24] believe you stated you associated the name
[25] Flintkote with flooring coating and/or floor

Page 53

[1] coating. Is that correct?

[2] **A:** Yes. To the best of my knowledge.

[3] **Q:** What do you mean by flooring

[4] coating?

[5] **A:** We used a lot of it in the Navy,

[6] for passageways, and on the mess decks, to

[7] cover the steel decks.

[8] **Q:** And what was the purpose of that?

[9] **A:** Just to keep from having to walk

[10] on the steel decks, I assume.

[11] **Q:** What color —

[12] **A:** And maybe for some insulation. I

[13] am not sure.

[14] **Q:** Were these decks on the inside or

[15] the outside of the ship?

[16] **A:** Inside.

[17] **Q:** Inside? Do you recall the color

[18] of this coating?

[19] **A:** Best I remember, all different

[20] colors. I remember green for sure, and tan,

[21] and I remember tile and sheets, both.

[22] **Q:** I am going to ask you some

[23] questions about the tile in a second. I am

[24] just trying to get the coating straight.

[25] **A:** And I am not sure they're

Page 54

[1] Flintkote. I seen a lot of it, and it is —

[2] to my knowledge, Flintkote is — comes

[3] written on it somewhere.

[4] **Q:** How did this coating come

[5] packaged?

[6] **A:** In the case of tiles, I remember

[7] just packages of 400, 450 in a pack or

[8] something like that.

[9] **Q:** But this coating that you

[10] described, was it painted on, or —

[11] **A:** No. Sheets.

[12] **Q:** Sheets? So these were sheets

[13] of — the coating was tile?

[14] **A:** Yeah. The professionals would

[15] come aboard and put it down. They would

[16] make all the measurements and put some —

[17] looked like concrete, to level everything

[18] out. And then they would put the sheets

[19] of — looked like linoleum.

[20] **Q:** So it was more or less rolled out?

[21] **A:** Uh-huh (affirmative response).

[22] **Q:** Cut to fit size?

[23] **A:** Used the big heavy rollers and

[24] rolled it out. They fit it and then put the

[25] glue down, and then put the material down,

Page 55

[1] and then rolled it out with the big rollers.

[2] **Q:** Did you have any participation in

[3] the installation of this?

[4] **A:** Just had to get out of their way.

[5] We had to work around each other.

[6] **Q:** Now, do you recall ever seeing any

[7] types of logos or names, on this product

[8] itself?

[9] **A:** On either the squares or that, I

[10] am not sure, or both.

[11] **Q:** What name do you recall was

[12] labeled on this product?

[13] **A:** Seemed to me like it was written

[14] in one word: Flintkote.

[15] **Q:** Now, this linoleum, was there ever

[16] any dust created in the installation of this

[17] product?

[18] **A:** Not really, that you could see.

[19] **Q:** Do you recall specifically where

[20] you may have been when this linoleum was

[21] being installed?

[22] **A:** Usually in a shipyard.

[23] **Q:** Do you recall which shipyard?

[24] **A:** In the case of the Navy, it would

[25] be Norfolk Naval Shipyard in Portsmouth,

Page 56

[1] Virginia; Boston Naval Shipyard;

[2] Philadelphia Naval Shipyard; Charleston

[3] Naval Shipyard.

[4] **Q:** Now, was this on any of the ships

[5] you worked on? Do you recall seeing this

[6] product being installed?

[7] **A:** Usually, the earlier ships, it

[8] seems to me like. But it was installed in

[9] all the ships, and I don't remember seeing

[10] it installed in every ship. I mean, being

[11] present when it was being installed on every

[12] ship. But it was, to the best of my

[13] knowledge, it was on every ship, either the

[14] squares or the sheet.

[15] **Q:** Now, the sheet coating, do you

[16] recall for sure whether every time you would

[17] have seen it, this would have been

[18] Flintkote?

[19] **A:** No.

[20] **Q:** Do you know if this sheeting

[21] contained asbestos?

[22] **A:** No.

[23] **Q:** And this mainly, if I understand

[24] you correctly, would have been installed at

[25] the shipyards that you had named?

[1]   **A:** Yes.

[2]   **Q:** Do you recall when you

[3] specifically were there?

[4]   **A:** No. Between '77 and '57. And

[5] some in the Gulf of Mexico, on the cargo

[6] ships.

[7]   **Q:** Are you talking about the

[8] sheeting?

[9]   **A:** (Witness nods head affirmatively.)

[10]   **Q:** And that was when — Fagan or

[11] Petrol Marine?

[12]   **A:** Yes. Same thing. Installed by

[13] professionals at the shipyard.

[14]   **Q:** Do you know if those at Fagan and

[15] Petrol Marine were made by Flintkote?

[16]   **A:** No, I don't. I can't remember

[17] where I seen Flintkote all the time. I seen

[18] it in a lot of different places.

[19]   **Q:** Could you put a time, percentage

[20] of your time, as far as being present when

[21] this sheeting would have been installed?

[22]   **A:** It would have been miniscule.

[23] Five percent maybe.

[24]   **Q:** Once it was installed, was there

[25] ever any dust associated with the sheeting?

[1]   **A:** Not that you could see.

[2]   **Q:** Were you ever present during any

[3] removal of the sheeting?

[4]   **A:** Yes.

[5]   **Q:** Would that have also been at the

[6] shipyards?

[7]   **A:** Usually.

[8]   **Q:** Okay.

[9]   **A:** Sometimes the ship's crew would

[10] remove it before we got to the shipyard. If

[11] we had time.

[12]   **Q:** If I went through each of these

[13] ships you worked on: The HAYNSWORTH, the

[14] LUCE, SHENANDOAH, JOSEPHUS DANIELS, LEAHY,

[15] could you tell me whether or not the

[16] sheeting was on any of those ships?

[17]   **A:** No. It was either the sheeting or

[18] the squares, I am not sure which.

[19]   **Q:** When you say the sheeting was

[20] installed on the decks, which types of

[21] decks, if you can recall?

[22]   **A:** The steel decks.

[23]   **Q:** And where would those be located

[24] on the ship?

[25]   **A:** Inside the passageways, and the

[1] mess decks.

[2]   **Q:** Like the walkways?

[3]   **A:** And the crew's berthing quarters.

[4]   **Q:** But as far as your duties on the

[5] ship, you had nothing to do with the

[6] installation or anything involving that?

[7]   **A:** No.

[8]   **Q:** That was outside contractors maybe

[9] that would have come in to perform?

[10]   **A:** Yes.

[11]   **Q:** Would you recall any names of

[12] anybody who may have installed that?

[13]   **A:** No.

[14]   **Q:** Now, talking about tiles you

[15] mentioned, do you recall what size they

[16] were?

[17]   **A:** Nine by 12, I think.

[18]   **Q:** Do you recall how they came

[19] packaged?

[20]   **A:** The only thing I remember is

[21] stacks of 50 or something like that, and

[22] wrapped in some type of paper.

[23]   **Q:** Now, how do you associate those

[24] tiles with Flintkote?

[25]   **A:** Just by remembering the name

[1] Flintkote, and knowing it had something to

[2] do with deck coatings.

[3]   **Q:** So you specifically don't recall

[4] maybe seeing the name Flintkote on these

[5] tiles?

[6]   **A:** Either these tiles, or the

[7] sheeting. I am not sure which.

[8]   **Q:** So is it possible you saw the name

[9] on one of these, say, the sheeting, and

[10] whenever you saw any of that type of

[11] product, whether you saw the name or not,

[12] you just are assuming it might have been

[13] Flintkote?

[14]   **A:** That's possible.

[15]   **Q:** Now, do you know if these tiles

[16] contained asbestos?

[17]   **A:** No.

[18]   **Q:** Can you describe any of the colors

[19] of these tiles?

[20]   **A:** I remember green and a mixture of

[21] green and something else. And tan, for

[22] sure.

[23]   **Q:** Were you ever present when the

[24] tiles were being installed?

[25]   **A:** Yes.

Page 61

[1] **Q:** And do you recall the procedure on
[2] how the tiles were installed?
[3]   **A:** The best I remember, the deck was
[4] ground real clean, and then a coating put
[5] down, and then the tiles put down on top of
[6] the glue.
[7]   **Q:** Do you recall the color of the
[8] glue that was used?
[9]   **A:** Seems like it was a whitish or
[10] brownish color.
[11]   **Q:** Do you know how the glue was
[12] packaged, what kind of container it was in?
[13]   **A:** Buckets I remember, some kind of
[14] buckets.
[15]   **Q:** Do you recall any logos or names
[16] on any of the buckets?
[17]   **A:** Un-unh (negative response).
[18]   **Q:** Do you recall the size of the
[19] buckets?
[20]   **A:** No.
[21]   **Q:** So the glue was put down first on
[22] the flooring and the tiles were then placed
[23] on top of it?
[24]   **A:** (Witness nods head affirmatively.)
[25]   **Q:** Do you recall on any of the ships

Page 62

[1] you have worked on, whether or not they had
[2] these types of tiles you were describing?
[3]   **A:** Seems to me like they could have
[4] very well been using all of them.
[5] Especially in the berthing compartments.
[6]   **Q:** In the what compartments?
[7]   **A:** The berthing compartments, where
[8] the men went to sleep.
[9]   **Q:** But could you tell me, sitting
[10] here today, if you recall where you would
[11] have specifically seen maybe Flintkote tile
[12] or sheeting on a specific ship?
[13]   **A:** No.
[14]   **Q:** Is it fair to say that the only
[15] products that you associate with the
[16] Flintkote name, is this floor coating or
[17] this floor tile?
[18]   **A:** As far as I can remember, yes.
[19]   **Q:** And this would have been sometime
[20] between '57 and '77, but you can't give me a
[21] specific —
[22]   **A:** Well, out in the Gulf also, some
[23] of it was used while I was present, from '82
[24] until '95.
[25]   **Q:** Where would you have seen this

Page 63

[1] sheeting or floor tile?
[2]   **A:** On what boat?
[3]   **Q:** Right.
[4]   **A:** On Fagan boats, all the boats.
[5] Petrol Marine, Hornbeck. Lot of it used on
[6] the mess decks.
[7]   **Q:** Did you ever see the floor coating
[8] or tiles being installed while at Fagan or
[9] Petrol?
[10]   **A:** Yes.
[11]   **Q:** Did you see the Flintkote name
[12] while you were there?
[13]   **A:** I don't remember.
[14]   **Q:** Do you know if the sheeting and
[15] tile at Fagan or Petrol contained asbestos?
[16]   **A:** No.
[17]   **Q:** Would it have been the same colors
[18] as you described earlier on the Navy ships,
[19] as well as at Fagan and Petrol?
[20]   **A:** Yes, except I don't remember any
[21] green at Fagan and Petrol. Mostly just
[22] brown, tan, cream, light color.
[23]   **Q:** Were the tiles the same shape,
[24] same size as you described earlier?
[25]   **A:** Yes.

Page 64

[1]   **Q:** Were those installed the same way?
[2]   **A:** The tiles themselves?
[3]   **Q:** The tiles themselves?
[4]   **A:** Yes. I remember whoever was
[5] installing them, used a heater.
[6]   **Q:** And what was that for?
[7]   **A:** I don't know. I assume to make
[8] the tiles pliable, or maybe it was just
[9] because it was wintertime. I don't know.
[10]   I seen them use a portable
[11] electric heater. Probably irrelevant.
[12]   **MR. ABRAHAM:**
[13]   I think that is all I have for
[14] now. I am going to review my notes. I may
[15] have a few more later.
[16]   **EXAMINATION BY MR. STRAYHAN:**
[17]   **Q:** Good morning, Mr. Turner, Lee
[18] Strayhan on behalf of The Carborundum.
[19]   In your last deposition, you
[20] identified The Carborundum with grinding
[21] wheels?
[22]   **A:** Uh-huh (affirmative response).
[23]   **Q:** And I believe you said you used
[24] them in the repair department. Is that
[25] correct?

**Page 65**

[1] **A:** Yes.

[2] **Q:** What repair department are you

[3] speaking of?

[4] **A:** The repair department on the USS

[5] SHENANDOAH.

[6] **Q:** Okay. So is there any other

[7] product that you associated The Carborundum

[8] with, besides grinding wheels?

[9] **A:** That's all I can think of at this

[10] time.

[11] **Q:** Okay. And is the use of the

[12] grinding wheels limited to the USS

[13] SHENANDOAH?

[14] **A:** No. Some at Valentine Sugars.

[15] **Q:** Anywhere else that you can think

[16] of?

[17] **A:** The shipyards all had them, but I

[18] don't remember using them in the shipyards.

[19] **Q:** Would you be around the area where

[20] the grinding would be conducted though?

[21] **A:** Yes.

[22] **Q:** What about at Fagan and Petrol?

[23] **A:** I don't remember them having The

[24] Carborundum wheels.

[25] **Q:** You say you actually conducted

**Page 66**

[1] grinding wheel operations on the USS

[2] SHENANDOAH yourself. Correct?

[3] **A:** Yes.

[4] **Q:** And at Valentine Sugars. Correct?

[5] **A:** Yes. Very limited amount, but

[6] some.

[7] **Q:** Okay. So in a typical week, you

[8] said — let me go back.

[9] You said you were assigned to the

[10] repair department of the USS SHENANDOAH for

[11] about three years. Is that correct?

[12] **A:** Yes.

[13] **Q:** And during that time, on any

[14] particular day, you would spend about how

[15] much time conducting grinding activities?

[16] **A:** It wouldn't be one percent, but

[17] the machinery repairmen, the people that

[18] used all the tiles, to sharpen tools for the

[19] lathes, they used them everyday.

[20] **Q:** Would you be —

[21] **A:** And I was around it all day long,

[22] every day. Seven — five days a week

[23] usually.

[24] **Q:** So five days a week, you would be

[25] around it for a greater percentage of your

**Page 67**

[1] day?

[2] **A:** Yes.

[3] **Q:** Can you recall any workers that

[4] were operating the machines at the USS

[5] SHENANDOAH?

[6] **A:** The names of workers?

[7] **Q:** Yes.

[8] **A:** No.

[9] **Q:** When you say y'all sharpened

[10] tools, is that basically what you were

[11] grinding, was the wheels? Is that it,

[12] tools?

[13] **A:** Tools, metal cutting tools for the

[14] lathes, and the scrapers, the tungsten

[15] carbide scrapers, drill bits. That's all I

[16] can remember.

[17] **Q:** Okay. So you were cutting tools,

[18] as well as sharpening tungsten carbide tools

[19] as well. Correct?

[20] **A:** Yes.

[21] **Q:** And you said before that was

[22] somewhat of a treat, to have a tungsten

[23] carbide scraper, in that it was rare.

[24] Correct?

[25] **A:** Yes.

**Page 68**

[1] **Q:** So generally, the tools that you

[2] were cutting, or sharpening, were made out

[3] of metal?

[4] **A:** Yes.

[5] **Q:** And how often would you get a

[6] tungsten carbide tool to work with?

[7] **A:** Usually, the only time we would

[8] get it is when we steal it from the

[9] shipyard.

[10] **Q:** Okay. And how often would that

[11] be, that y'all stole the —

[12] **A:** Once every year, when we would go

[13] into the shipyard.

[14] **Q:** And how often would you sharpen a

[15] tungsten carbide?

[16] **A:** Very sparingly. We didn't want to

[17] wear them out.

[18] **Q:** What was the general life of a

[19] tungsten carbide tool?

[20] **A:** I have got one in my toolbox right

[21] now that I got up in Boston in 1961.

[22] **Q:** Now, could the same grinding wheel

[23] be used to grind a tungsten carbide tool as

[24] well as the steel tools?

[25] **A:** Yes. That's what I associate with

[1] a Carborundum grinding wheel: Hard, hard
[2] metals. The stellite-type of metal that we
[3] used on steam valves, 1,200 pound steam
[4] valves. And hard, hard metals, for the
[5] green Carborundum grinding wheels.
[6]    **Q:** So any hard-type of metal, meaning
[7] metal and tungsten carbide, could be used
[8] with the grinding wheels you worked with.
[9] Correct?
[10]    **A:** Yes.
[11]    **Q:** What was the general diameter of
[12] the tools that you worked with, that you
[13] would cut?
[14]    **A:** Real small. From half-inch, up to
[15] no more than about an inch, I guess.
[16]    **Q:** Did you mount the tools on a
[17] machine while you sharpened them or cut
[18] them, or did you —
[19]    **A:** Usually, they had a mounting
[20] thing, especially for drill bits and small
[21] tools like that, mounted in the thing, and
[22] adjusted exactly right. And just do it —
[23] rub it over the wheel.
[24]    **Q:** Did you ever use the term "cutting
[25] wheel"?

[1]    **A:** I know what a cutting wheel is,
[2] but I am not — that's not what I am talking
[3] about.
[4]    **Q:** So you distinguish that from a
[5] grinding wheel?
[6]    **A:** Machinery repairmen used the
[7] cutting wheels like that, to cut off pieces
[8] of stock. That's what I associate with a
[9] cutting wheel.
[10]    **Q:** And you don't associate The
[11] Carborundum with a cutting wheel?
[12]    **A:** Carborundum, I think so. A
[13] cutting tool? There is a cutting tool that
[14] they used to cut off work pieces, and a
[15] cutting wheel that they used. And I am not
[16] saying it is Carborundum.
[17]    **Q:** Okay. You don't recall
[18] specifically whether or not Carborundum —
[19]    **A:** No.
[20]    **Q:** — had a cutting wheel. Correct?
[21]    **A:** I am saying it probably was,
[22] because of the type of work being done,
[23] cutting off steel, hard-metal, metal work
[24] pieces, pieces that's been manufactured. I
[25] am not sure.

[1]    **Q:** Okay then, Valentine Sugars, about
[2] how much of your day were you around
[3] grinding activities?
[4]    **A:** Not very much. Maybe five
[5] percent, maybe less.
[6]    **Q:** And during that time that you were
[7] around it, were you actually conducting the
[8] activities yourself?
[9]    **A:** Mostly somebody else. But I did a
[10] little bit, light grinding, if I needed my
[11] scraper ground, or a drill bit. But that
[12] would have been miniscule, timewise.
[13]    **Q:** While you were around the grinding
[14] activities, did you ever wear a safety
[15] device?
[16]    **A:** No.
[17]    **Q:** Did you ever wear safety devices
[18] while actually conducting the grinding
[19] activities?
[20]    **A:** Yes.
[21]    **Q:** Were there various grinding wheels
[22] that you used in different shapes and sizes,
[23] or just one primarily that you can recall?
[24]    **A:** I remember several different
[25] sizes, mostly one or two different sizes,

[1] from small to up to about six inches.
[2]    **Q:** So there is one or two different
[3] sizes that you can recall?
[4]    **A:** Yes.
[5]    **Q:** What would be the smaller size,
[6] about what was the diameter of the smaller
[7] size?
[8]    **A:** Maybe four inches.
[9]    **Q:** What was the grit of that smaller
[10] wheel?
[11]    **A:** Seemed like about a 200-grit.
[12]    **Q:** Was it coarse or fine to the
[13] touch?
[14]    **A:** Between, in between. Kind of on
[15] the coarse side.
[16]    **Q:** Was the material on the same — on
[17] the smaller wheel, I am speaking of, was the
[18] material the same on the outside edge as it
[19] is on the center?
[20]    **A:** No, no, no. Wait a minute.
[21] It had to be a lot smoother than
[22] that, to sharpen the drill bits and stuff
[23] like that. About 400 to 600 grit, I think.
[24] In other words, fine.
[25]    **Q:** Okay. And was the material the

Page 73

[1] same from the outside edge to the center of
[2] the wheel, the smaller wheel?
[3]     **A:** The best I can remember, yes.
[4] Looked the same.
[5]     In other words, same color all the
[6] way across? Is that what your question is?
[7]     **Q:** Correct. Basically, yes.
[8] Did you see any variance in color,
[9] or material variance from the center to the
[10] edge?
[11]     **A:** Usually, what I remember is the
[12] same color.
[13]     **Q:** Pretty uniform throughout the
[14] whole wheel?
[15]     **A:** Yes.
[16]     **Q:** And what would be like the
[17] thickness of the wheel that you used, do you
[18] recall?
[19]     **A:** Small one is from about a half
[20] inch, to the large ones, about three
[21] quarters to one inch, or one inch, or a
[22] little bigger than one inch. A little
[23] thicker than one inch maybe.
[24]     **Q:** Were any of the small wheels made
[25] out of a rock-type substance? Or they were

Page 74

[1] just fine? Were there — were any of them
[2] rock-type substances?
[3]     **A:** That is what I associated with
[4] them, rock-type.
[5]     **Q:** You don't specifically recall —
[6]     **A:** Hard, hard.
[7]     **Q:** Sorry.
[8] You don't specifically recall the
[9] material that the smaller wheel would be
[10] made out of, do you?
[11]     **A:** I just remember something like
[12] rock.
[13]     **Q:** Okay. And you said you remember
[14] the color. What about the small wheel, do
[15] you remember the color exactly of the
[16] smaller wheels?
[17]     **A:** Some of it is tinted green. Gray
[18] to green. I associate The Carborundum with
[19] a green wheel.
[20]     **Q:** Whether it be big or small?
[21]     **A:** Yes.
[22]     **Q:** So the big wheels were green as
[23] well?
[24]     **A:** Yes.
[25]     **Q:** And you said there is a grayness

Page 75

[1] to them as well?
[2]     **A:** Yeah, gray to green. Yes.
[3]     **Q:** But the color would — it wouldn't
[4] vary within the wheel, it was just uniform
[5] throughout?
[6]     **A:** Yes, usually.
[7]     **Q:** You say usually, what do you mean?
[8]     **A:** Well, predominantly gray-greenish.
[9] I can't get it any closer than that.
[10]     **Q:** Okay. Was there any steel
[11] component to the wheels?
[12]     **A:** No.
[13]     **Q:** Was the grit the same on the
[14] bigger wheels?
[15]     **A:** It was usually coarser.
[16]     **Q:** What were those wheels used for?
[17]     **A:** The bigger, heavier tools, for
[18] lathe operations, cutting tools, sharpening
[19] cutting tools.
[20]     **Q:** And the width of those would be
[21] thicker than the smaller ones?
[22]     **A:** Uh-huh (affirmative response).
[23]     **Q:** How big would the width be?
[24]     **A:** Up to one inch, something like
[25] that.

Page 76

[1]     **Q:** How do you associate Carborundum
[2] with these wheels? Did it have a
[3] description on the wheel itself?
[4]         **MR. AMES:**
[5]     Hang on for a second.
[6]         **THE WITNESS:**
[7]     I didn't give an answer.
[8] The best I remember, I read the
[9] name Carborundum on the wheel itself, or on
[10] the packaging or something.
[11]         **EXAMINATION BY MR. STRAYHAN:**
[12]     **Q:** So you can't recall specifically
[13] whether or not it was on the package or the
[14] wheel, but you just recall seeing the name?
[15]     **A:** I think it was on the wheel.
[16]     **Q:** What was the shape of the wheel?
[17] Was it just typically round?
[18]     **A:** Yes.
[19]     **Q:** Any variance in the shape or size,
[20] just a round wheel?
[21]     **A:** No.
[22]     **Q:** And the wheels, like you said, you
[23] think that they contained the logo of The
[24] Carborundum Company on the wheel itself?
[25]     **A:** The best I remember, yes.

Page 77

[1] Q: And were these wheels used with a
[2] portable grinder, or a machine?

[3] A: Bench grinder.

[4] Q: Bench grinder?

[5] A: (Witness nods head affirmatively.)

[6] Q: Did you ever personally mount the
[7] wheel to the bench grinder?

[8] A: It seems like I have changed
[9] wheels on the bench grinder. Not mounted
[10] the bench grinder itself.

[11] Q: And how would you change the
[12] wheel?

[13] A: Take a nut off the end, usually.
[14] Just take a nut off of one end of it and
[15] take the old wheel off and put a new one on.

[16] Q: And the small wheels and the
[17] larger wheels would fit on this bench
[18] grinder?

[19] A: Usually the big wheel on one end
[20] and the small wheel on the other.

[21] Q: Did the wheels have a hole in them
[22] where they would slide onto the grinder?

[23] A: Yes.

[24] Q: And then the grinder itself would
[25] fasten it?

Page 78

[1] A: Yes.

[2] Q: That would be as opposed to like
[3] the wheel actually containing a bolt that
[4] would screw itself into the grinder, the
[5] machine, the grinding machine?

[6] A: The best I remember, it had no
[7] threads. You used the fasteners on the
[8] bench grinder itself to fasten it.

[9] Q: And that would be both at the USS
[10] SHENANDOAH and Valentine Sugars?

[11] A: Yes.

[12] Q: Did you ever see the packaging the
[13] grinding wheels came in?

[14] A: Yes.

[15] Q: Do you recall what they looked
[16] like?

[17] A: No. Cardboard boxes, I think.

[18] Q: Cardboard boxes?

[19] A: Small cardboard boxes.

[20] Q: Any in plastic, covered in
[21] plastic?

[22] A: I don't remember plastic.

[23] Q: Meaning, just single wheels, in a
[24] cardboard box?

[25] A: Yes.

Page 79

[1] Q: And how long did these wheels
[2] usually last?

[3] A: The best I remember, a long time.
[4] Depends on how much they were used. Like on
[5] the SHENANDOAH, they were used daily. They
[6] wouldn't last all that long. Like in
[7] Valentine Sugars, they would last for
[8] months.

[9] Q: Because they were used sparingly
[10] at Valentine?

[11] A: Yes.

[12] Q: What years were you at Valentine?

[13] A: '78 – no. '77 to '82.

[14] Q: So the wheels would be changed off
[15] pretty often at the USS SHENANDOAH —

[16] A: Yes.

[17] Q: — because they were ground down?
[18] And in grinding there, how far
[19] down would you grind the wheels before
[20] replacing them?

[21] A: I don't remember. Seems like they
[22] have got a mark, or I had some instruction
[23] on when to change the wheel. I think the
[24] wheel had a mark on it.

[25] Q: Do you recall that mark being like

Page 80

[1] one inch, two inches, or all the way down to
[2] the core?

[3] A: It was not down to the core, no.
[4] I don't remember if it was one inch —

[5] Q: But it was never down to the core?

[6] A: No.

[7] Q: So you would — you think it would
[8] probably be within inches?

[9] A: Yes.

[10] Q: Did you ever grind on the side of
[11] the wheel, maybe like side grinding, I think
[12] workers may have called it?

[13] A: Only when I sneaked it. We was
[14] instructed not to.

[15] Q: And why is that?

[16] A: Safety, I assume. To keep the
[17] shape of the wheel square, for grinding
[18] precise tools.

[19] Q: So y'all were instructed to only
[20] grind —

[21] A: On the face of the wheel.

[22] Q: And was the grinding conducted dry
[23] or did you use any fluid?

[24] A: Dry.

[25] Q: Did you have any reason to believe

Page 81

[1] that these wheels contained asbestos?

[2]   **A:** Not to my knowledge.

[3]   **Q:** There was no labels, or warnings

[4] on the products themselves?

[5]   **A:** No.

[6]   **Q:** Never heard any of the other

[7] workers, supervisors speaking of asbestos?

[8]   **A:** No.

[9]   **Q:** Did you use any other wheels from

[10] any other manufacturers, besides the

[11] Carborundum?

[12]   **A:** We used different wheels for

[13] different things, but Carborundum wheels is

[14] all I remember for grinding tools,

[15] sharpening tools, and for the hard,

[16] case-hardened metals, the hard stuff, the

[17] Carborundum is what we used.

[18]   **Q:** So there were other wheels for

[19] different purposes?

[20]   **A:** Lots of other wheels, yes.

[21]   **Q:** Do you recall the manufacturers of

[22] any of those other grinding wheels?

[23]   **A:** Not really.

[24]   **Q:** Could you describe the bench

[25] grinder that you talked about earlier?

Page 82

[1] Could you just describe it generally?

[2]   **A:** Usually, the ones I remember is

[3] about two horsepower, one to two horsepower,

[4] with wheels on each end. One small, one

[5] big. Or sometimes, they would have a wheel

[6] on one end and a brush on the other.

[7]   **Q:** You don't recall the manufacturer

[8] of any of those machines, do you?

[9]   **A:** No.

[10]   **Q:** And after you attached the wheel,

[11] did it move back and forth or did it stay

[12] stationary?

[13]   **A:** Stationary.

[14]   **Q:** And like you said, the larger

[15] wheels could be mounted on those, but it was

[16] relatively smaller wheels?

[17]   **A:** Yes.

[18]   **Q:** Was there ventilation in the area

[19] during grinding activities?

[20]   **A:** Some type of ventilation, yes.

[21] Just normal ship's ventilation.

[22]   **Q:** Did the grinding machine itself

[23] have an exhaust fan on it?

[24]   **A:** No.

[25]   **Q:** So there was no dust collector on

Page 83

[1] the grinding machine itself?

[2]   **A:** No. Just a bucket, a little

[3] bucket underneath the wheel where the stuff

[4] would be collected. Slag.

[5]   **Q:** Was there a lot of dust produced

[6] from the grinding activities?

[7]   **A:** Not an awful lot, but some.

[8]   **Q:** Was there any guard on the —

[9]   **A:** Yes, guards.

[10]   **Q:** There was guards on the machines?

[11]   **A:** Yes.

[12]   **Q:** Have you ever heard of the Black

[13] Magic wheel?

[14]   **A:** I have heard of Black Magic. Not

[15] in that context though. Not in a wheel.

[16]   **Q:** How about the Diamond wheel?

[17]   **A:** I have heard of the Diamond wheel,

[18] sure.

[19]   **Q:** And do you associate that with

[20] Carborundum?

[21]   **A:** No.

[22]   **Q:** Do you have any particular company

[23] that you would associate the Diamond wheel

[24] with?

[25]   **A:** No.

Page 84

[1]   **Q:** Do you associate the Diamond wheel

[2] with grinding activities?

[3]   **A:** Yes.

[4]   **Q:** And what types of grinding

[5] activities?

[6]   **A:** Again, the hard, hard metals, you

[7] had to have something really tough.

[8]   **Q:** So you recall seeing the label

[9] Diamond — the Diamond wheel?

[10]   **A:** That's too expensive for the Navy.

[11] They don't buy that stuff.

[12]   **Q:** How about Valentine Sugars?

[13]   **A:** No.

[14]   **Q:** No? So at the USS SHENANDOAH, you

[15] didn't work with any Diamond wheels?

[16]   **A:** Not to my knowledge, no.

[17]   **Q:** Not to your knowledge? How about

[18] a Black Magic Diamond wheel?

[19]   **A:** Not that I know of.

[20]       **MR. STRAYHAN:**

[21]     Well, that is all the questions I

[22] have right now. Thank you.

[23]       **EXAMINATION BY MR. SHUMAN:**

[24]   **Q:** Mr. Turner, good morning. My name

[25] is Eric Shuman. I was not at your last

[1] deposition, so you will excuse me if I ask a
[2] few questions that may have been covered
[3] before.
[4]     My interest is in equipment made
[5] by the Worthington Company. I understand
[6] that the name did come up earlier.
[7]     Can you tell me what kind of
[8] equipment, Worthington equipment you may
[9] have worked with or around?
[10]    **A:** Pumps and turbines, it seems like.
[11] Worthington turbines, auxiliary turbines. A
[12] lot of Worthington pumps.
[13]    **Q:** Okay. Let's break those down into
[14] different companies. First the pumps. What
[15] locations, either what ships or what
[16] land-based locations, did you work with
[17] Worthington pumps?
[18]    **A:** Nothing land-based.
[19] Oh, yes. There was — well, I
[20] didn't actually work with it at Valentine
[21] Sugars, but they were there.
[22]     All the cargo boats out here in
[23] the Gulf, plus all the Navy boats, all the
[24] Navy ships.
[25]    **Q:** Okay. Are you saying that there

[1] was Worthington pumps on every ship you
[2] worked on?
[3]    **A:** Yes. As far as I know, yes.
[4]    **Q:** Okay. Do you recall any specifics
[5] regarding, and you may have covered this
[6] before, the time periods where you would
[7] have not merely been on a ship, but worked
[8] with Worthington pumps on a ship?
[9]     Since I don't know your whole job
[10] history, the question may have been unclear.
[11]     I need to know the years or range
[12] of years when you would have been working
[13] with Worthington pumps.
[14]    **A:** '57 to '77.
[15]    **Q:** Okay. And that would include all
[16] of your Navy years?
[17]    **A:** Yes.
[18]    **Q:** And that would also include some
[19] of your years after the Navy?
[20]    **A:** Yes.
[21]    **Q:** On cargo vessels?
[22]    **A:** Yes.
[23]    **Q:** What type of pumps were these?
[24]    **A:** Water pumps usually.
[25]    **Q:** Do you recall, you know, in hot,

[1] cold, chemical solutions? What are we
[2] talking about?
[3]    **A:** Just warm to hot.
[4]    **Q:** Okay.
[5]    **A:** One hundred twenty degrees to
[6] maybe 300 degrees.
[7]    **Q:** What were these pumps used with,
[8] that is, were they for boilers or fire
[9] suppression?
[10]    **A:** Usually pumping water for the
[11] boilers.
[12]    **Q:** So as far as you can recall, most
[13] of the Worthingtons you worked with, were
[14] hooked up to boilers in some fashion?
[15]    **A:** Yes.
[16]    **Q:** Do you recall any details about
[17] the type of pump, that is, reciprocating,
[18] centrifugal, anything about its mechanism?
[19]    **A:** Some reciprocating, but usually,
[20] centrifugal.
[21]    **Q:** The type of pump, was there one
[22] type of pump, such as reciprocating or
[23] centrifugal, used on any type of vessel, or
[24] was it just random?
[25]    **A:** To my knowledge, all the newer

[1] vessels were. The reciprocating pumps, we
[2] used on the old 600-pound steam. After
[3] that, all reciprocating mostly.
[4]    **Q:** I'm sorry. I think your answer
[5] may have been unclear. Was it the
[6] reciprocating were older?
[7]    **A:** Yes.
[8]    **Q:** So if a pump was of anything
[9] regarding a newer vintage, it would have
[10] been a centrifugal?
[11]    **A:** Right.
[12]    **Q:** Got you. Do you recall a certain
[13] time period which would tend to indicate use
[14] of a reciprocator, like a vessel built
[15] before a certain year or a certain class of
[16] vessel?
[17]    **A:** The vessels built during the war
[18] years and shortly thereafter, had some
[19] reciprocating pumps on them. After about
[20] 1950 or so, there would have been very few,
[21] if any, reciprocating pumps.
[22]    **Q:** Do you recall the size of these
[23] pumps, either by their pump-type dimensions,
[24] such as suction and discharge, or their
[25] simple dimensions and weights?

Page 89

[1] **A:** From small to — I would say like
[2] three- or four-inch suction, to six- or
[3] eight-inch suction for a big reciprocating
[4] pump for a boiler.
[5] **Q:** Okay. Is that —
[6] **A:** Like bilge pumps, small.
[7] **Q:** When you say small, like a bilge
[8] pump, again, fit on the table top? How big
[9] would this thing be?
[10] **A:** The cylinder itself would be about
[11] four inches, I think, the steam cylinder.
[12] The suction pipe would be about four to six
[13] inches.
[14] **Q:** And when you talk about the larger
[15] pumps with the six-inch or eight-inch lines,
[16] again, how big would that unit be?
[17] **A:** Well, from taller than a man's
[18] head, including the pump end of it, and the
[19] steam cylinder end of it, seven or eight
[20] feet tall maybe.
[21] **Q:** And what would the bigger pumps be
[22] used for?
[23] **A:** Feed pumps.
[24] **Q:** Do you have any idea as to how
[25] many total Worthington pumps you have worked

Page 90

[1] with, throughout your career?
[2] **A:** Maybe as many as 20, or slightly
[3] less than 20. Something like that.
[4] **Q:** What kind of work would you do
[5] with a Worthington pump? And if it varied
[6] according to different vessels or different
[7] types of pumps, please tell me.
[8] **A:** With the reciprocating?
[9] **Q:** Well, we can start there. What
[10] kind of work would you do on a
[11] reciprocating?
[12] **A:** Usually, it was the steam end of
[13] it we had a lot of trouble with. Tearing it
[14] down — temperamental. Your reciprocating
[15] pumps, especially if they are small, are
[16] real temperamental. You had to keep
[17] adjusting, making adjustments on the — I
[18] can't think of the name of the parts any
[19] more. But it had a lot of adjustment to
[20] them and a lot of steam. Tearing it down,
[21] cleaning, and putting steam — replacing the
[22] rings on the steam piston. Packing.
[23] **Q:** Do you know one way or another,
[24] whether any materials you worked with on the
[25] reciprocating pumps contained asbestos?

Page 91

[1] **A:** All of them did, to my knowledge.
[2] **Q:** What parts would those be?
[3] **A:** The packing, the insulation, the
[4] steam cylinder would be insulated, piping.
[5] **Q:** Where would insulation be on this
[6] reciprocating pump itself? That is, in
[7] terms of the pump body?
[8] **A:** The steam cylinder itself.
[9] **Q:** What kinds of insulation —
[10] **A:** Steam piston.
[11] **Q:** What kind of insulation would this
[12] be? That is, molded, pre—
[13] **A:** Molded. Usually molded.
[14] **Q:** Was this a permanent part of the
[15] pump or something that would be taken off or
[16] reapplied from time to time?
[17] **A:** Taken off.
[18] **Q:** When you started working on
[19] reciprocating pumps, were any of those new
[20] pumps or were they already somewhat older by
[21] the time you had gotten to them?
[22] **A:** They were all older by the time I
[23] worked on them.
[24] **Q:** Do you know one way or another,
[25] whether they had previously had their

Page 92

[1] insulation removed or replaced by the time
[2] you got to them?
[3] **A:** I would assume probably every one
[4] of them did.
[5] **Q:** That is, it had been replaced by
[6] someone else before you?
[7] **A:** Yes.
[8] **Q:** Okay. When you went to replace
[9] the insulation, where would you get the
[10] replacement insulation from on the
[11] reciprocating pumps?
[12] **A:** We would try to use whatever we
[13] could of the old, and sometimes, we had
[14] spare material to reinsulate it. Usually,
[15] it had to wait until we went to the
[16] shipyard.
[17] **Q:** What type of material would you
[18] use to reinsulate a reciprocating pump steam
[19] cylinder?
[20] **A:** The type of material that you have
[21] to mix up in a bucket and mold it to the
[22] cylinder. And then, use a cloth, asbestos
[23] cloth and wrap it. And then, use a material
[24] to make it, to kind of — a type of glue.
[25] **Q:** The various materials, the

[1] molding, the cloth and the glue, would you
[2] get those from ship's stores or the
[3] shipyard?
[4]    **A:** Usually it would be left over from
[5] the shipyard. Ships did not normally carry
[6] material like that.
[7]    **Q:** Do you recall the names of any
[8] particular vessels on which the
[9] reciprocating pumps were used?
[10]   **A:** USS HAYNSWORTH; USS LUCE;
[11] SHENANDOAH.
[12]   **Q:** If I were to ask you questions
[13] about work on the gaskets and packings of
[14] pumps in general, would your answers tend to
[15] be the same as the answers you gave to the
[16] John Crane attorney?
[17]   **A:** Yes.
[18]   **Q:** I mean, as far as you are
[19] concerned, working with gasket material is
[20] pretty much the same, whether it is on one
[21] pump or a different pump?
[22]   **A:** Yes.
[23]   **Q:** Lets talk about the centrifugal
[24] pumps. What kind of work would you have
[25] done on a centrifugal pump?

[1]    **A:** Everything from repacking them to
[2] taking them apart and completely overhauling
[3] them, or putting them back together.
[4]    **Q:** What were the uses of these
[5] centrifugal pumps? What were their
[6] applications onboard?
[7]    **A:** Pumping water, freshwater.
[8] Pumping water for the crew. Pumping water
[9] for the boilers.
[10]   **Q:** What kind of material do you think
[11] was used on the cylinder pumps that might
[12] have contained asbestos?
[13]   **A:** The insulation.
[14]   **Q:** What portion of a centrifugal
[15] pump, in your experience, might have been
[16] insulated?
[17]   **A:** Not very much, except the hot
[18] water pumps, like booster pumps, feed pumps.
[19] And almost all of those were completely
[20] insulated.
[21]   **Q:** What kind of insulation was used
[22] on that kind of pump?
[23]   **A:** A lot of the molded-type and some
[24] pads manufactured by the shipyard.
[25]   **Q:** When you say molded-type, is this

[1] like a pre-made, pre-molded thing that fits
[2] the form, or is this something you apply to
[3] the object?
[4]    **A:** Something you mix up and apply to
[5] the object. Usually done by the shipyard.
[6] But patching, we did a lot of patching up.
[7]    **Q:** Do you recall the names of any
[8] vessels on which you would have used the
[9] centrifugal-type pump?
[10]   **A:** All the vessels I ever served on.
[11]   **Q:** Would it likely be the case that
[12] on some of the older vessels, you would have
[13] some centrifugals and then a few
[14] reciprocating also?
[15]   **A:** Yes.
[16]   **Q:** But on a newer vessel, you would
[17] have all centrifugals?
[18]   **A:** Yes. Centrifugal, screw and
[19] lobe-type.
[20]   **Q:** On a centrifugal pump, how often
[21] would you have to perform work that would
[22] require you to get into the inside
[23] mechanisms of the pump?
[24]   **A:** How often?
[25]   **Q:** Yes. Tear the casing down, that

[1] sort of work?
[2]    **A:** Like every three, four months.
[3]    **Q:** And on the centrifugal-type of
[4] pump, how often would you have to do any
[5] repacking?
[6]    **A:** Once every couple of weeks.
[7]    **Q:** At the time you first began
[8] working on any of these Worthington
[9] centrifugal pumps, do you recall how old
[10] they may have been? That is, were they new
[11] installations or had they been there a
[12] while?
[13]   **A:** The whole range, from new to old.
[14]   **Q:** Okay.
[15]   **A:** From old to new.
[16]   **Q:** Is there any way you can tell me
[17] by your job category or by vessel, which
[18] were the newer pumps, which were the older?
[19] Any distinctions there?
[20]   **A:** The HAYNSWORTH was all old pumps.
[21] SHENANDOAH, old. LUCE would have been new.
[22]      And I am not sure — I don't
[23] remember seeing Worthington pumps on every
[24] vessel. It seems like the newer ships, I
[25] didn't see any, maybe I didn't see any

Page 97

[1] Worthington pumps on those, like the LEAHY,
[2] JOSEPHUS DANIELS, I don't remember
[3] Worthington on those.
[4]   **Q:** Okay. What years were you in
[5] service on the LUCE?
[6]   **A:** '61 to '65.
[7]   **Q:** And you do recall Worthingtons on
[8] that vessel?
[9]   **A:** As far as I can remember, yes.
[10]   **Q:** What other brands of pumps do you
[11] recall working with or around?
[12]   **A:** Aurora. Several different names.
[13] But I can't remember.
[14]   **Q:** They just don't come to you?
[15]   **A:** Yes.
[16]   **Q:** Let's talk about turbines. You
[17] mentioned working around Worthington
[18] turbines. Can you tell me on what locations
[19] or vessels you would have worked with a
[20] Worthington turbine?
[21]   **A:** It seems like the older vessels,
[22] more Worthington than new ones, but the
[23] auxiliary turbines, like oil pumps, and
[24] maybe a condensate pump. We would have an
[25] electric one, steam. The auxiliary turbine

Page 98

[1] would be a Worthington.
[2]   **Q:** Can you pick out any particular
[3] vessels on which you would have worked on a
[4] Worthington, pure Worthington turbine?
[5]   **A:** I am almost sure the HAYNSWORTH
[6] had them.
[7]   **Q:** What about the others?
[8]   **A:** I am not sure.
[9]   **Q:** When you were working on the
[10] HAYNSWORTH and there were Worthington
[11] turbines, were these new turbines or older
[12] installations?
[13]   **A:** Older. Older.
[14]   **Q:** Do you recall about how much older
[15] they would have been by the time you got to
[16] them?
[17]   **A:** Probably 12, 15 years old.
[18]   **Q:** What type of work might you have
[19] had to do on a turbine, that could possibly
[20] expose you to any sort of asbestos product?
[21]   **A:** Anything to do with maintenance
[22] and operation, to if we had to tear it down
[23] and do any kind of — like if something went
[24] wrong with the turbine and it had to be
[25] removed and sent to a repair facility. We

Page 99

[1] had — any of the range, from any minor
[2] repair, until we had to overhaul it, or
[3] something like that.
[4]   **Q:** And how would that kind of repair
[5] put you in some kind of contact with a
[6] potential asbestos-containing product?
[7]   **A:** If we had to tear it down and
[8] remove it, we had to remove the insulation
[9] to get to the bolts and pipes.
[10]   **Q:** Can you describe the insulation on
[11] these turbines for me?
[12]   **A:** The turbines themselves usually
[13] had some type of molded insulation on them.
[14] Like you had to mix up and mold it, and put
[15] the cloth on and all that stuff. But some
[16] had just blankets.
[17]   **Q:** The molded insulation you just
[18] told me about, on the turbines, that is
[19] similar to what you described as the molding
[20] insulation for pumps?
[21]   **A:** Yes.
[22]   **Q:** You would have to apply that
[23] yourself at the end of the job?
[24]   **A:** We didn't get into much of that,
[25] but sometimes we had to. But usually, when

Page 100

[1] we had to, it was patching.
[2]   **Q:** Okay. But if their insulation was
[3] to be reapplied, somebody had to do it in
[4] the field?
[5]   **A:** Yes.
[6]   **Q:** Got you. And these blankets you
[7] have described, what did they look like and
[8] how were they located on the turbine?
[9]   **A:** Usually they were on the steam
[10] lines to the turbines. Just a type of
[11] insulation inside with the asbestos cloth
[12] folded over, and some type of fasteners,
[13] sewn either with a machine or a stapler, or
[14] something like that.
[15]   **Q:** Were any of these —
[16]   **A:** Usually made by the shipyard.
[17]   **Q:** Okay. Were any of these kinds of
[18] blankets that you have described located
[19] inside of the turbine proper?
[20]   **A:** No.
[21]   **Q:** And again, whatever parts were
[22] used in turbine repairs would tend to be
[23] obtained from what, the shipyard or onboard
[24] the vessel itself?
[25]   **A:** The parts?

[1]  **Q:** Well, gaskets, packing, any kind
[2]  of insulation products?
[3]  **A:** All the minor stuff we had aboard
[4]  the ship.
[5]  **Q:** Do you ever recall speaking with
[6]  anybody whom you understood to be from the
[7]  Worthington Company?
[8]  **A:** I don't remember that. No.
[9]  **Q:** I think you have mentioned a few
[10]  other brands of turbines. Do you recall
[11]  what those are, other turbines you may have
[12]  worked with?
[13]  **A:** Westinghouse, GE.
[14]  **Q:** What was the — you mentioned the
[15]  function auxiliary turbines. But what
[16]  generally was the size of the Worthington
[17]  turbines?
[18]  **A:** Usually, the small turbines. The
[19]  auxiliary, for the pumps.
[20]  **Q:** And how big is a small turbine?
[21]  **A:** That big around (indicating).
[22]  **Q:** You are showing us about what, a
[23]  foot and a half or two?
[24]  **A:** Yes.
[25]  **Q:** And about how long or high would

[1]  that be?
[2]  **A:** The bucket wheels, they would be
[3]  one to two feet in diameter, and just maybe
[4]  two inches thick.
[5]  **Q:** How often would a turbine, a
[6]  Worthington turbine require the type of work
[7]  that would require you to get into the
[8]  insides of it?
[9]  **A:** They was real good. They didn't
[10]  require very much maintenance.
[11]  **Q:** In the world of turbines, I am not
[12]  sure what that means. How many weeks,
[13]  months or years might go by before you would
[14]  have to get into it?
[15]  **A:** Months. Minor repairs, like
[16]  re-packing and replacing some kind of bolts
[17]  or something, just maybe a month or two
[18]  months. Any type of repair that required a
[19]  shipyard or anything like that, six months.
[20]  **Q:** Did you ever work on Worthington
[21]  turbines outside of the Navy?
[22]  **A:** Never worked on them, no.
[23]  **MR. SHUMAN:**
[24]  I think that is all the questions
[25]  I have. Thank you.

[1]  **THE VIDEOGRAPHER:**
[2]  This might be a good time to
[3]  change the tape.
[4]  Going off the record. It is
[5]  11:53 a.m.
[6]  (Recess.)
[7]  **THE VIDEOGRAPHER:**
[8]  We are back on record. It is
[9]  11:57 a.m., and the beginning of Tape 2.
[10]  **EXAMINATION BY MR. VINING:**
[11]  **Q:** Mr. Turner, good afternoon. Or
[12]  good morning, still. My name is Robert
[13]  Vining.
[14]  The Valentine Sugars facility, you
[15]  were involved in making plastics, if I
[16]  understand?
[17]  **A:** Yes.
[18]  **Q:** With the name Valentine Sugars,
[19]  did you work in a sugar mill or refinery of
[20]  any type?
[21]  **A:** Very seldom I ever had to go in
[22]  the sugar mill.
[23]  **Q:** Okay. Was it a sugar mill or just
[24]  a sugar refinery?
[25]  **A:** Sugar mill.

[1]  **Q:** Okay. What parts of the mill did
[2]  you go into?
[3]  **A:** All over.
[4]  **Q:** All over? Did they have bagasse
[5]  in one particular area, and another area
[6]  where they were cooking the raw sugar?
[7]  **A:** Yes.
[8]  **Q:** All right. How often would you go
[9]  into this mill?
[10]  **A:** Maybe once a day if I was working,
[11]  like once a day, on an eight-hour shift.
[12]  **Q:** And you were at Valentine Sugars
[13]  for two years?
[14]  **A:** Five years.
[15]  **Q:** Five years? Did you help any of
[16]  the employees in the sugar mill portion with
[17]  any of their job duties?
[18]  **A:** No.
[19]  **Q:** You were just walking through,
[20]  basically?
[21]  **A:** Yes. And sometimes they would
[22]  have parts over there that I needed. Just
[23]  drop in to get a part and leave. Or a tool.
[24]  **Q:** Would they have any parts that you
[25]  believe contained asbestos, that you would

[1] have to go borrow, or get from them?

[2] **A:** My understanding is, there was a

[3] lot of asbestos in the sugar mill itself,

[4] not anything to do with what I went after,

[5] parts or anything like that.

[6] **Q:** Were you ever there when

[7] individuals were insulating pipes, or

[8] removing insulation?

[9] **A:** Yes.

[10] **Q:** Which? Both, or one or the other?

[11] **A:** Both.

[12] **Q:** Okay.

[13] **A:** Grinding period is a very short

[14] time. And the rest of it is maintenance, in

[15] a sugar mill.

[16] **Q:** I was just about to ask you that.

[17] Seasonally, there is a part of

[18] time when the mill is basically shut down

[19] and it is just maintenance. And I assume at

[20] that point is when the insulation would be

[21] removed, installed, parts worked on. Is

[22] that correct?

[23] **A:** Yes.

[24] **Q:** Have you smoked at all since your

[25] last deposition? I remember your last one,

[1] you said you had quit?

[2] **A:** No, I haven't.

[3] **Q:** Okay. And you talked extensively

[4] about gaskets. One of the gaskets you named

[5] last time was Garlock?

[6] **A:** Yes.

[7] **Q:** Did it differ in appearance or

[8] texture than any of the other gaskets you

[9] have talked about?

[10] **A:** Not that I could see.

[11] **Q:** Was there any particular

[12] application that you would use a Garlock

[13] gasket, versus any other type of gasket?

[14] **A:** No.

[15] **Q:** Last time, I think you said you

[16] used the spiral wound gaskets a lot?

[17] **A:** The spiral wound Flexitallic.

[18] **Q:** Did you use the spiral wound more

[19] than the compressed sheet gaskets, or can

[20] you distinguish how often you used one

[21] versus the other type?

[22] **A:** No. We used an awful lot of both.

[23] **Q:** Okay. Did the spiral wound

[24] gaskets have a tendency to stick, like the

[25] sheet asbestos would stick?

[1] **A:** No.

[2] **Q:** Would you try to use a spiral

[3] wound one when you could, so it —

[4] **A:** If I could, that's what I used.

[5] **Q:** Okay.

[6] **MR. VINING:**

[7] That is all the questions for

[8] you — oh, I'm sorry.

[9] **EXAMINATION BY MR. VINING:**

[10] **Q:** With regards to packing, you also

[11] named Garlock made some packing, and I

[12] believe Anchor as well.

[13] **A:** Yes.

[14] **Q:** Was there any particular

[15] application that you used Garlock or Anchor

[16] Packing, versus another brand of packing?

[17] **A:** Not that I can think of.

[18] **Q:** And like with gaskets, they looked

[19] similar to other packing?

[20] **A:** Yes.

[21] **Q:** Okay.

[22] **MR. VINING:**

[23] That is all I have for you, sir.

[24] Thank you very much.

[25] **THE WITNESS:**

[1] We need more like him.

[2] **EXAMINATION BY MR. LILLY:**

[3] **Q:** Mr. Turner, my name is Ed Lilly.

[4] I represent A.W. Chesterton Company.

[5] In your previous deposition, you

[6] identified A.W. Chesterton Company with

[7] mechanical seals and packing. Is that

[8] correct?

[9] **A:** Yes.

[10] **Q:** What is a mechanical seal?

[11] **A:** A type of — they're manufactured

[12] with springs, some type of — I want to say

[13] carbon — carbon-based seals, or Teflon.

[14] **Q:** To your knowledge, did they have

[15] any asbestos products in them?

[16] **A:** Not that I know of.

[17] **Q:** Did you ever work personally with

[18] Chesterton-manufactured packing?

[19] **A:** Like, you mean like the pump

[20] packing?

[21] **Q:** Well, whatever kind of packing?

[22] **A:** As far as I know, yes. As far as

[23] I can remember, all of the different types

[24] of packing, the wire-inserted, braided

[25] asbestos, asbestos.

Page 109

[1] **Q:** How did you specifically identify
[2] it as a Chesterton product?
[3] **A:** I just remember the name.
[4] **Q:** Did you ever see a box?
[5] **A:** That's what I — I associate the
[6] Chesterton name with.
[7] **Q:** All right. Can you describe the
[8] box that you may have associated the name
[9] with?
[10] **A:** I remember all different types of
[11] boxes, but I can't put a Chesterton name on
[12] any of them.
[13] **Q:** Okay. Did you ever specifically
[14] order or request a Chesterton product?
[15] **A:** Not that I can remember it.
[16] Whatever came, that is what I used.
[17] **Q:** Do you recall seeing the
[18] Chesterton name stamped on any particular
[19] packing product?
[20] **A:** No, not that I remember it, except
[21] seals.
[22] **Q:** Except for the mechanical seals?
[23] **A:** Yeah.
[24] **Q:** Do you know any specific
[25] application that a Chesterton product would

Page 110

[1] have been used for? Let's talk about pumps
[2] first.
[3] **A:** Seals or packing?
[4] **Q:** No, I am talking about the packing
[5] being used in pumps.
[6] **A:** All different types of packing, in
[7] the pumps. Usually like the cold water
[8] pumps, some type of carbon. It wasn't
[9] anything braided or anything like that. I
[10] can't name the product.
[11] **Q:** Was it —
[12] **A:** But it was in cold water and low
[13] pressure.
[14] **Q:** They used it in cold water and low
[15] pressure systems?
[16] **A:** Yes.
[17] **Q:** Did you need to use asbestos
[18] packing in those types of systems?
[19] **A:** No.
[20] **Q:** Can you describe the packing? You
[21] said it was not braided.
[22] **A:** The type I am talking about with
[23] the pumps, it is smooth on the outside, and
[24] usually from one-quarter inch — maybe it
[25] don't go down to a quarter inch.

Page 111

[1] Three-eighths inch for sure, to half-inch.
[2] And it is black, I want to say graphite. It
[3] must be manufactured out of some kind of
[4] graphite.
[5] **Q:** Would it flake off in your
[6] fingers?
[7] **A:** It could, yeah.
[8] **Q:** What about Chesterton packing
[9] being used on steam lines, did you ever use
[10] that?
[11] **A:** Not that I remember specifically.
[12] **Q:** So the other packing that, for
[13] instance, John Crane asked you questions
[14] before about packing being used on
[15] high-pressure steam lines. Chesterton
[16] products were not used on those lines?
[17] **A:** If they manufactured the asbestos,
[18] the braided asbestos, wire-inserted stuff
[19] like that, yes, they were.
[20] **Q:** Okay. But do you recall
[21] specifically using a Chesterton-manufactured
[22] product on a high-pressure steam line?
[23] **A:** No.
[24] **Q:** Without having to go through all
[25] the various vessels that you worked on in

Page 112

[1] the Navy, the questions I just asked you,
[2] would they apply to your entire Navy career,
[3] or were there changes between vessel and
[4] vessel?
[5] **A:** All of them, as far as I know, the
[6] question, the same question would apply,
[7] except seals. The older ships, like the USS
[8] HAYNSWORTH, I don't remember any Chesterton
[9] seals, any seals, mechanical seals on that
[10] ship.
[11] **Q:** Okay. And do you recall using any
[12] Chesterton products while you worked for
[13] Fagan Boat Service?
[14] **A:** Almost positive. I am not quite
[15] positive. Some seals.
[16] **Q:** The seals, but what about packing?
[17] **A:** Just like everything else: I
[18] remember all of the names of the packing,
[19] like Garlock, the manufacturers of all the
[20] packing, and I most certainly used that.
[21] But Chesterton, I don't know. I don't
[22] remember. If they manufactured the packing,
[23] we probably used it.
[24] **Q:** But you don't have any specific
[25] recollection of that?

Page 113

[1] **A:** No.

[2] **Q:** And same question for Petrol

[3] Marine?

[4] **A:** Yeah. Same.

[5] **Q:** Same answer?

[6] **A:** Yes.

[7] **Q:** And you had earlier said that when

[8] you worked for Valentine Sugars that you may

[9] have been exposed to packing. If I recall

[10] your testimony from the last deposition, you

[11] didn't — you weren't working with pumps and

[12] valves at that time, were you?

[13] **A:** No.

[14] **Q:** So you weren't installing and

[15] removing packing?

[16] **A:** No. Just walking through. That's

[17] all.

[18] **Q:** And the attorney for John Crane

[19] asked you certain questions about removal of

[20] packing, installation of packing, for

[21] instance, when you cut packing, was dust

[22] created.

[23] If I asked you the same questions

[24] about Chesterton packing, would your answers

[25] be the same?

Page 114

[1] **A:** You couldn't see it. The answer

[2] would be the same: You couldn't see it,

[3] but, you know.

[4] **Q:** Okay. And when you would remove

[5] packing, there was no way that you could

[6] identify the manufacturer of that packing?

[7] **A:** Not that I had ever seen.

[8] **MR. LILLY:**

[9] I have no other questions. Thank

[10] you very much.

[11] **EXAMINATION BY MR. WEBB:**

[12] **Q:** Mr. Turner, my name is Kevin Webb,

[13] and I have a few more questions about

[14] packing material. But hopefully not too

[15] many.

[16] Can you describe the packaging

[17] that contained the Victor packing material?

[18] **A:** No. I remember a lot of different

[19] packaging and a lot of different names, and

[20] it is hard to put them together.

[21] **Q:** How do you know that you used

[22] packing manufactured by Victor?

[23] **A:** I am not sure where the Victor

[24] name came from, as far as the braided

[25] asbestos, pump packing, steam packing and

Page 115

[1] stuff like that. But the compressed

[2] asbestos, I remember the name Victor on the

[3] compressed, sheets of compressed asbestos,

[4] and Flexitallic gaskets.

[5] **Q:** Okay. So you remember Victor for

[6] the compressed asbestos. Do you recall

[7] Victor associated with any packing material?

[8] **A:** I can't say that I do. No.

[9] **Q:** Okay.

[10] **MR. WEBB:**

[11] That is all I have. Thank you.

[12] **EXAMINATION BY MS. BREAUX:**

[13] **Q:** Hi, Mr. Turner. My name is Claire

[14] Breaux. I asked you some questions the last

[15] time and I just have a couple of follow-up

[16] questions for you.

[17] I was asking you about your use of

[18] dust masks at your last deposition. And my

[19] question for you is, you had testified that

[20] you wore dust masks when you were painting,

[21] beginning in the Navy, and then going

[22] through your employment at Petrol and Fagan.

[23] How often did you wear a dust

[24] mask?

[25] **A:** Not every time I painted.

Page 116

[1] **Q:** Okay.

[2] **A:** But I did a lot of painting, like

[3] especially out in the Gulf, with the cargo

[4] boats. Just about every day, or at least

[5] every week, I was wearing a dust mask out

[6] there.

[7] **Q:** Okay.

[8] **A:** In the Navy, those things didn't

[9] come along until the later years, so we

[10] didn't use them that much.

[11] **Q:** Okay. I believe you had testified

[12] previously that you recalled first wearing a

[13] dust mask, I believe, on the USS LUCE, if I

[14] am not mistaken?

[15] **A:** That is my memory.

[16] **Q:** Okay. Let me break the question

[17] down this way: While you were in the Navy,

[18] how often did you wear a dust mask?

[19] **A:** I would say from 1960 to '70,

[20] maybe once a week. None before or after

[21] that, that I remember.

[22] **Q:** Okay. And when you wore a dust

[23] mask once a week in the Navy, was that while

[24] painting?

[25] **A:** Usually.

Page 117

[1]   Q: What other activities did you
[2] perform while wearing a dust mask in the
[3] Navy?
[4]   A: Some type of cleaning, like using
[5] an air hose to blow things here and there,
[6] to blow — to clean different things.
[7]   Q: What types of things?
[8]   A: Steam lines, bulkheads, pumps,
[9] turbines.
[10]   Q: What were you blowing down?
[11]   A: Just general dirt from outside.
[12]   Q: When you would do the blow-down
[13] activities, was that outside on the ships?
[14]   A: No. Always inside.
[15]   Q: Inside? To your knowledge, were
[16] you blowing down any asbestos, or asbestos
[17] dust?
[18]   A: That was not my intention.
[19]   Q: Okay. So it was primarily dirt?
[20]   A: It was a product of the
[21] blowing-down, yes. Because the steam lines
[22] all were insulated with asbestos.
[23]   Q: How often did you clean down the
[24] steam lines and the other machines that you
[25] have described, in the Navy?

Page 118

[1]   A: When I was — before I made chief
[2] petty officer, that was an ongoing thing,
[3] every day.
[4]   Q: Let me ask it this way: How often
[5] did you do the cleaning when dust masks —
[6] when you wore a dust mask?
[7]   A: We tried to use a dust mask every
[8] time we used the blowing down by hose, or
[9] either painting or using the blow-down hose.
[10]   Q: But you said when you were a petty
[11] officer, you did it a lot. But you didn't
[12] start wearing a dust mask until the later
[13] years?
[14]   A: Yeah.
[15]   Q: So what I am trying to get from
[16] you is in those later years, when you began
[17] wearing a dust mask, you said you wore it
[18] about once a week. Out of that period of
[19] time, how many times would you say you
[20] cleaned down the machines and the steam
[21] lines?
[22]   A: My question was — my answer was
[23] once a week?
[24]   Q: Right.
[25]   A: That's when we used the dust

Page 119

[1] masks.
[2]   Q: And that — what percentage of
[3] time would that have been divided between
[4] the painting and the blowing-down with an
[5] air hose?
[6]   A: Maybe ten percent.
[7]   Q: Ten percent for which?
[8]   A: For each.
[9]   Q: Okay. I am not understanding.
[10] Ten percent of your entire time?
[11]   A: Well, it wouldn't take that much
[12] time to blow down the entire engine room.
[13]   Q: Oh, okay.
[14]   A: So if it took an hour to blow down
[15] the engine room, we was using the masks an
[16] hour. If it took five hours to paint, we
[17] was using the masks for five hours.
[18]   Q: Okay. I understand what you're
[19] saying now.
[20]   A: I don't know if that makes sense
[21] or not.
[22]   Q: Did it typically take about an
[23] hour for you to clean with the air hose,
[24] when you did that type of activity?
[25]   A: Yes.

Page 120

[1]   Q: When you were at Petrol and Fagan,
[2] how often did you wear a dust mask?
[3]   A: Some, at least once a week.
[4]   Q: While you were in the Navy, or
[5] while you were employed with Petrol or
[6] Fagan, was it ever your responsibility to
[7] order respiratory equipment?
[8]   A: Yes.
[9]   Q: In the Navy, was it ever your
[10] responsibility to order respiratory
[11] equipment?
[12]   A: No, I don't think so.
[13]   Q: Okay. At Petrol, did you ever
[14] order —
[15]   A: Yes.
[16]   Q: Where did you order respiratory
[17] equipment from?
[18]   A: We filled out the requisitions on
[19] the boat, and it went to the office, and
[20] they went from — from a middleman here in
[21] New Orleans, and different places.
[22]   Q: Do you have any knowledge of who
[23] those middlemen were?
[24]   A: I know two or three different
[25] companies, but I can't recall —

Page 121

[1] **Q:** Okay. Same question for Fagan?

[2] **A:** Same.

[3] **Q:** So no recollection of who the

[4] suppliers were?

[5] **A:** No.

[6] **Q:** Okay. When you would fill out the

[7] requisition form, would you ever specify

[8] what type of respiratory equipment you

[9] needed by manufacturer?

[10] **A:** No.

[11] **Q:** So if you needed dust masks, you

[12] would just write down "dust masks," or if

[13] you needed double cartridge respirators, you

[14] would just put "down double cartridge

[15] respirators"?

[16] **A:** Yes.

[17] **Q:** Okay. Are you aware of whether or

[18] not any air monitoring or air sampling was

[19] done while you were working in the Navy?

[20] **A:** Not to my knowledge.

[21] **Q:** Are you aware of whether or not

[22] any air monitoring or sampling was done at

[23] Fagan?

[24] **A:** None.

[25] **Q:** Same question for Petrol?

Page 122

[1] **A:** None.

[2] **Q:** Do you know whether or not OSHA

[3] ever visited Petrol or Fagan while you were

[4] there?

[5] **A:** I don't believe.

[6] **Q:** And do you know if OSHA ever

[7] visited any of the ships or shipyards while

[8] you were in the Navy?

[9] **A:** I am sure they most certainly did,

[10] but I don't — I never — that never had

[11] anything to do with me.

[12] **Q:** So you have no knowledge?

[13] **A:** No.

[14] **Q:** You had testified in your last

[15] deposition, that you had seen some red and

[16] white 3-M packaging. Do you recall whether

[17] or not you ever obtained any dust masks

[18] directly from those packages? Did you ever

[19] go to the red and white boxes and take out a

[20] dust mask?

[21] **A:** I have, yes.

[22] **Q:** Okay. And where did you do that?

[23] **A:** Onboard the cargo boats, out in

[24] the Gulf.

[25] **Q:** For both Petrol and Fagan?

Page 123

[1] **A:** All three. Hornbeck.

[2] **Q:** Was there ever a time when you

[3] stopped working with asbestos-containing

[4] products?

[5] **A:** No. Not that I know of.

       **MS. BREAUX:**

[7]    That's all I have. Thanks.

[8]        **THE VIDEOGRAPHER:**

[9]    Anyone else?

[10]        **MR. STRAYHAN:**

[11]    I have like two just quick

[12] questions. Very brief.

[13]        **EXAMINATION BY MR. STRAYHAN:**

[14] **Q:** Lee Strayhan again. The

[15] Carborundum. Just real quick questions.

[16]    On the other Navy ships you worked

[17] on, you said you were around grinding

[18] activities. Correct?

[19] **A:** Yes.

[20] **Q:** Besides the USS SHENANDOAH.

[21] Correct?

[22] **A:** Yes.

[23] **Q:** Would your answers be any

[24] different concerning Carborundum products?

[25] **A:** No.

Page 124

[1] **Q:** No? And the Diamond wheel that

[2] you said you heard of, but you had never

[3] used before. Correct?

[4] **A:** Yes.

[5] **Q:** Where did you hear of the Diamond

[6] wheel, do you recall?

[7] **A:** On the SHENANDOAH, I am sure.

[8] **Q:** Just, you knew that it was an

[9] expensive wheel; however, y'all didn't use

[10] it?

[11] **A:** Yes.

[12] **Q:** And the green wheels you spoke of,

[13] the small green wheels and the larger green

[14] wheels, they were used to cut tools for the

[15] lathes. Correct?

[16] **A:** Yes.

[17] **Q:** And those are also the same tools

[18] you used for sharpening tools as well?

[19] **A:** Yes.

[20]        **MR. STRAYHAN:**

[21]    Okay. Thank you.

[22]        **THE VIDEOGRAPHER:**

[23]    Anyone else?

[24]        **MR. ABRAHAM:**

[25]    Let me just do a couple real

Page 125

[1] quick. Since I had a little time to think.

[2]          **EXAMINATION BY MR. ABRAHAM:**

[3]    **Q:** Mr. Turner, real quick. Do you

[4] recall what was used more, the sheeting or

[5] the tiles?

[6]    **A:** I would have to say the tile.

[7]    **Q:** Now, if you can remember, can you

[8] give me about how many times you were

[9] present when this tile sheeting was being

[10] installed?

[11]    **A:** At least ten times.

[12]    **Q:** And I believe you stated you

[13] recalled seeing the Flintkote name. Now, do

[14] you recall, was it on the product itself or

[15] was it on the packaging?

[16]    **A:** I seem to remember the product

[17] itself, each individual piece of the

[18] product.

[19]    **Q:** And do you recall how many times

[20] you saw the name, meaning like if you were

[21] present, you said at least ten times, when

[22] you saw it being installed, do you recall

[23] seeing the Flintkote name each and every

[24] time of those ten times?

[25]    **A:** As far as I know, yes.

Page 126

[1]    **Q:** And you described the — in the

[2] installation process of the sheeting, and as

[3] well as the tiles, some sort of a glue

[4] substance being used?

[5]    **A:** Yes.

[6]    **Q:** Do you know who the manufacturer

[7] was of the glue substance?

[8]    **A:** No.

[9]    **Q:** Do you know if that glue substance

[10] contained asbestos?

[11]    **A:** No.

[12]    **Q:** Now, would it be fair to say that

[13] once the sheeting or the tile was installed,

[14] and if you were on one ship and were then

[15] assigned to another ship, and you saw

[16] similar tile, would it be fair to say that

[17] you would have no idea who the manufacturer

[18] of the product was, once it was installed?

[19]    **A:** That's correct.

[20]          **MR. ABRAHAM:**

[21]    That is all I have. Thank you.

[22]          **MR. AMES:**

[23]    I may have only some redirect, but

[24] I would like to take a few-minutes break, or

[25] a lunch break, whatever counsel would

Page 127

[1] prefer, and collect my thoughts and wits,

[2] and go from there.

[3]          **THE VIDEOGRAPHER:**

[4]    Going off the record. It is

[5] 12:23 p.m.

[6]    (Recess.)

[7]          **THE VIDEOGRAPHER:**

[8]    Back on record. It is 12:32 p.m.

[9]          **EXAMINATION BY MR. AMES:**

[10]    **Q:** Mr. Turner, I have just a couple

[11] of follow-up questions, since our last

[12] deposition of August 9, I believe it was.

[13]    Do you remember giving that

[14] deposition, back then?

[15]    **A:** Yes.

[16]    **Q:** Since that period of time, have

[17] you sought any additional medical attention?

[18]    **A:** Yes.

[19]    **Q:** What is the nature of that?

[20]    **A:** I had more chemotherapy, and

[21] radiation.

[22]    **Q:** Where did you have that done?

[23]    **A:** Thibodaux General Medical Center.

[24]    **Q:** If you recall, when is the last

[25] that you had any therapy done?

Page 128

[1]    **A:** Last month.

[2]    **Q:** How are you feeling, as we sit

[3] here today?

[4]    **A:** Not too bad, considering that I

[5] have lung cancer.

[6]    **Q:** Are you taking any medication?

[7]    **A:** A little less of the morphine and

[8] somewhat less of the Lortab, since the last

[9] deposition.

[10]    **Q:** Do you feel that the medication

[11] that you are taking has in any way affected

[12] your testimony here today?

[13]    **A:** It is possible it has. It is very

[14] possible. It has affected my memory for

[15] sure.

[16]    **Q:** Since your last deposition, have

[17] any of your habits, any of your free-time

[18] activities changed at all?

[19]    **A:** No. I still can't go fishing. I

[20] still can't cut the grass. I have a lot of

[21] fatigue from radiation. I sleep a lot.

[22]    **Q:** Anything else?

[23]    **A:** Not that I remember.

[24]    **Q:** As we sit here today, are you in

[25] any pain?

[1]    **A:** Yes.

[2]    **Q:** Where is that, if you can tell us?

[3]    **A:** On my right side, between my

[4]  shoulder blade, front and back, and my neck.

[5]    **Q:** Do you personally have any idea of

[6]  what is causing that pain?

[7]    **A:** From the lung cancer.

[8]    **Q:** Mr. Turner, as hard as it is for

[9]  me to not ask a question about you being, to

[10]  make a small joke, a service man on the

[11]  LUCE, I just have a couple of questions

[12]  regarding some of your previous testimony,

[13]  where you were asked about technical

[14]  representatives while you were with the

[15]  Navy, but some technical representatives

[16]  that were not with the Navy, that came and

[17]  worked either with you, or directed you, or

[18]  your fellow service people in the repair of

[19]  some of the ships and/or the portions

[20]  thereof. Do you remember that, questions in

[21]  that regard, that were asked of you?

[22]    **A:** Yes.

[23]    **Q:** Could you elaborate, please, about

[24]  the circumstances under which such occasions

[25]  happened?

[1]    **A:** Well, I remember the first tech

[2]  reps, when we put the LUCE in commission in

[3]  1961, there was — it was relatively new,

[4]  the 1,200-pound steam system. And there was

[5]  a lot of bugs to be worked out in the engine

[6]  room and the boiler room. And there was

[7]  tech reps all over the place for both the

[8]  engine room and fire room, and we was in

[9]  contact with them a lot, receiving

[10]  instruction and — for the officers and

[11]  enlisted.

[12]    **Q:** What specific portions of the

[13]  equipment, if you remember, were these tech

[14]  reps directing their attention toward?

[15]    **A:** A lot on the boilers and turbines,

[16]  and operation.

[17]    **Q:** Do you remember who the tech reps

[18]  were working for?

[19]    **A:** The Defense Department. I

[20]  understood they came out of Philadelphia. I

[21]  am not sure if they were working for

[22]  Westinghouse or General Electric.

[23]    **Q:** One of those?

[24]    **A:** One of those.

[25]    **Q:** Do you have a recollection as to

[1]  whether these technical representatives were

[2]  giving the orders to the naval personnel or

[3]  taking orders from them, or in what fashion

[4]  would you characterize the relationship

[5]  between the two?

[6]    **A:** They were giving orders to the

[7]  Navy. It was their equipment.

[8]    Boiler tech reps also, I didn't —

[9]  there was the G.E. and Westinghouse, one or

[10]  the other, or both; and the representatives

[11]  from Babcock & Wilcox, whoever manufactures

[12]  those D-type boilers. I can't remember

[13]  which manufacturer. One of those major

[14]  boiler manufacturers. They were aboard a

[15]  lot.

[16]    **Q:** In addition to the period of time

[17]  when you were on the LUCE, so to speak, when

[18]  you had talked about the tech reps, were

[19]  there any other occasions where tech reps

[20]  would come and interact with naval

[21]  personnel, that you recall?

[22]    **A:** Oh, yeah. Any time there was a

[23]  major catastrophe, like burning up bearings,

[24]  or damaging the turbines or anything like

[25]  that, they would be aboard. They would be

[1]  called.

[2]    **Q:** The incident with the LUCE, do you

[3]  recall where it was that the LUCE was

[4]  stationed when that happened?

[5]    **A:** That is when we were putting it in

[6]  commission, up in Boston, in 1961.

[7]    **Q:** Were there any occasions ever

[8]  where you would be stationed overseas when

[9]  technical reps would come over and help?

[10]    **A:** I was stationed on the SHENANDOAH,

[11]  and we had a — one of the ships had a

[12]  casualty, and burnt up the bearings, and

[13]  forward engine room turbines and gears. We

[14]  had to have the tech reps come out and help

[15]  us get it back together.

[16]    **Q:** Where, if you recall, did that

[17]  take place?

[18]    **A:** As far as I can remember, we was

[19]  anchored out in Malta. In the

[20]  Mediterranean.

[21]    **Q:** What, if you recall, was the

[22]  specific nature of the function that the

[23]  tech rep performed in coming out there to

[24]  Malta?

[25]    **A:** They made all the recommendations

[1] on what had to be done to the turbines and
[2] the gears, in regard to rolling the bearings
[3] out, and inspecting the turbines themselves,
[4] the bucket wheels themselves, the shrouding,
[5] to make sure there was no damage that had
[6] been done to the turbines themselves. Which
[7] turned out to be the case. So the technical
[8] expertise was in the bearings on the
[9] turbines and gears.
[10]     **Q:** Just so that we can understand,
[11] about what size are these bearings that
[12] we're talking about?
[13]     **A:** Anywhere from four-inch, small
[14] four-inch bearings to large eight-inch
[15] bearings, for the reduction gears.
[16] Babbitted bearings for the pans and gears,
[17] double reduction.
[18]     **Q:** Do you have a recollection as to
[19] whom or for whom the tech reps were working
[20] on that incident?
[21]     **A:** The turbine installation, I can't
[22] remember if it was G.E. or Westinghouse.
[23]                **MR. AMES:**
[24]     Okay. Thanks, Mr. Turner. That
[25] is all I have.

[1]          **EXAMINATION BY MR. SCHUETTE:**
[2]     **Q:** Mr. Turner, I just have a couple
[3] of follow-up questions about what you were
[4] just asked about.
[5]     Again, this is Bill Schuette,
[6] representing Westinghouse.
[7]     With regard to the system on the
[8] LUCE, the issue was the fact that this was a
[9] brand new steam system that was being put
[10] into operation, a new design of a steam
[11] system?
[12]     **A:** Yes.
[13]     **Q:** Do you know who designed the steam
[14] system?
[15]     **A:** I don't think it was a specific
[16] designer of the steam system itself. It was
[17] just the manufacturer's, when they went from
[18] 600 PSI steam superheated, to, I don't know,
[19] maybe 700, 750 degrees to 1,200 PSI
[20] superheated, to 950 degrees. Just a higher
[21] steam pressure, more maneuverability.
[22]     **Q:** I guess my question is
[23] specifically with regard to the technical
[24] reps for the turbines. You don't recall
[25] whether it was a G.E. rep or a Westinghouse

[1] rep?
[2]     **A:** No, I don't.
[3]     **Q:** You would agree with me that if it
[4] was a G.E. turbine, it was a G.E. rep that
[5] showed up there?
[6]     **A:** You can bet on it.
[7]     **Q:** Okay. And would you know whether
[8] or not the Navy actually provided the
[9] designs and specifications for the turbine
[10] on the LUCE, on the USS LUCE?
[11]     **A:** I am sure they did.
[12]                **MR. SCHUETTE:**
[13]     That is all the questions I have.
[14] Thank you.
[15]              **MR. AMES:**
[16]     Nothing further from me.
[17]         **THE VIDEOGRAPHER:**
[18]     This concludes this evening's
[19] deposition. It is 12:42 p.m.
[20]     (Which concluded the deposition.)
[21]
[22]
[23]
[24]
[25]

[1]
[2]          WITNESS' CERTIFICATE
[3]
[4]     I have read or have had the foregoing
[5] testimony read to me and hereby certify that
[6] it is a true and correct transcription of my
[7] testimony with the exception of any attached
[8] corrections or changes.
[9]
[10]
[11]
[12]
[13]
[14]          JAMES C. TURNER
[15] PLEASE INDICATE
[16] ( ) NO CORRECTIONS
[17] ( ) CORRECTIONS; ERRATA SHEET(S) ENCLOSED
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 137

[1]       REPORTER'S CERTIFICATE

[2]

[3]       I, Cathy Renee' Powell, Certified Court

[4] Reporter, State of Louisiana, do hereby

[5] certify that above-named witness, after

[6] having been duly sworn by me to testify to

[7] the truth, did testify as hereinabove set

[8] forth;

[9]       That this testimony was reported by me

[10] in the stenotype reporting method and

[11] transcribed thereafter by me on computer,

[12] and that same is a true and correct

[13] transcript to the best of my ability and

[14] understanding;

[15]       That I am not of counsel, nor related

[16] to counsel or the parties hereto, and in no

[17] way interested in the outcome of this

[18] matter.

[19]

[20]

[21]

[22]

[23]       Cathy Renee' Powell

[24]       Certified Court Reporter

[25]



# CANCER CENTER
## OF THIBODAUX REGIONAL

R. Clay Gould, MD
Radiation Oncologist

August 20, 2001

Ness, Motley, Loadhold, Richardson & Poole
ATTN:  Susan Zeutschel
1555 Poydras St.
Suite 1700
New Orleans, LA  70112

Re:   James C. Turner
DOB:  7/14/40; SSN: 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

To Whom It May Concern:

Please note Mr. James Turner has recurrent lung cancer.  His prognosis is poor and his life expectancy is around 6 - 9 months.

If you need additional information, please call.

Sincerely,

R. Clay Gould, M.D.

608 North Acadia Road
Thibodaux, LA 70301
985 493 4338
985 449 2524 Fax

EXHIBIT
B

JONES
WALKER

Four United Plaza, 8555 United Plaza Boulevard
Baton Rouge, Louisiana 70809-7000
Telephone: 225-248-2000
Fax: (225) 248-3031

# FAX COVER SHEET

This facsimile communication contains information that is intended only for the recipient named and may be confidential and subject to the attorney-client privilege. If you are not the intended recipient or an agent responsible for delivering this communication to the intended recipient, you are hereby notified that you have received this facsimile in error and that any review, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone (call collect at 225-248-2000) and return the original facsimile to us by mail, without retaining any copies. Thank you.

**TO:**   Donni E. Young

**FROM:** Anne Strahan

**DATE:** Tuesday, September 18, 2001 3:53:06 PM

**PAGE 1 OF** 14

**FAX NO.:** 15046363499

If you do not receive the entire copy, please call Anne Strahan at (225) 248-3431 as soon as possible.

201 St. Charles Avenue • New Orleans, Louisiana 70170-5100 • Telephone: 504-582-8000 • Fax: 504-582-8583
Washington, D.C. Office: Suite 600, 499 South Capitol Street SW • Washington, D.C. 20003 • 202-828-8363 • FAX 202-8
Lafayette Office: The Dover Building • 500 Dover Blvd., Suite 120 • Lafayette, Louisiana 70503 • 337-406-5610 • FAX 337-

EXHIBIT
C



# JONES WALKER

William L. Schuette
Avery Lea Griffin
Olivia S. Tomlinson
 Direct Dial 225-248-2000
Fax 225-248-3051

September 17, 2001

Clerk of Court
Lafourche Parish
Courthouse Annex
P. O. Box 818
Thibodaux, LA  70302-0818

Re:   James C. Turner, et al v. Anchor Packing Company, et al
      Number 91847 "C"
      Our File:   20364/94123-00

Dear Sir:

Please find enclosed the following documents:

1)   An original and one copy of a Notice of Removal in the 17th Judicial District
     Court being submitted for filing into the record on behalf of Viacom, Inc.,
     successor in  interest  to CBS Corporation formerly known as
     Westinghouse Electric Corporation.

2)   A file-stamped copy of a Notice of Removal *with attachments* filed with
     the United States District Court, Eastern District of Louisiana on
     September 10, 2001

3)   A file-stamped copy of a Notice of Removal ***without attachments*** filed
     with the United States District Court, Eastern District of Louisiana on
     September 10, 2001.

Please file the Notice of Removal for the 17th Judicial District and include with it,
the copy of the Eastern District Notice of Removal with attachments.

Please date stamp **both** the copy of the 17th JDC Notice of Removal as well as
the copy of the Eastern District Notice of Removal (without attachments) and return
these two documents to me in the enclosed self-addressed and stamped envelope.

JONES, WALKER, WAECHTER, POITEVENT, CARRÈRE & DENÈGRE L.L.P.

8555 UNITED PLAZA BOULEVARD • BATON ROUGE, LOUISIANA 70809-7000 • 225-248-2000 • FAX 225-248-2010 • E-MAIL info@joneswalker.com • www.joneswalker.com

B0165691.1            BATON ROUGE    LAFAYETTE    NEW ORLEANS    WASHINGTON, D.C.

September 17, 2001
Page 2

Finally, I have been advised that $50.00 will cover the costs associated with filing these documents and I have enclosed our firm check to cover this cost.

Thank you for your time and cooperation in this matter. If you have any questions, please feel free to call my office.

Very truly yours,

Avery Lea Griffin

ALG/as
Enclosures
c: All Counsel of Record (w/enc. via facsimile)

B0165691.1

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

**JAMES C. TURNER AND MARLENE F. TURNER**

**CIVIL ACTION**

**versus**

**NUMBER**

**SECTION**

**ANCHOR PACKING COMPANY, CARBORUNDUM; CBS, (Formerly known as Westinghouse Electric Corporation); A. W. CHESTERTON COMPANY; COMBUSTION ENGINEERING, INC.; JOHN CRANE, INC; DANA CORPORATION; EAGLE, INC.; THE FLINTKOTE COMPANY; FLINTKOTE MINES, LTD.; FOSTER WHEELER CORPORATION; GARLOCK, INC.; GASKET-HOLDINGS COMPANY, INC. (Successor to Flexitallic, Inc.); GENERAL ELECTRIC COMPANY; GEORGIA-PACIFIC CORPORATION; INGERSOLL-RAND; KELLY MOORE PAINT COMPANY; THE McCARTY CORPORATION; REILLY-BENTON CO., INC.; TAYLOR-SEIDENBACH, INC.; J.T. THORPE, INC.; 3-M (a.k.a. MINNESOTA MINING & MANUFACTURING COMPANY); WORTHINGTON PUMP, INC.; KIM SUSAN, INC. (Formerly known as Fagan Boat Service, Inc.)**

**MAGISTRATE**

B0164657.1

3

## NOTICE OF REMOVAL

TO:  THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF LOUISIANA.

The Notice of Removal of Viacom, Inc., successor in interest to CBS Corporation

f/k/a Westinghouse Electric Corporation ("Westinghouse"), removing this action from the

17th Judicial District Court for the Parish of Lafourche, respectfully represents that:

### BACKGROUND

1.

This Notice of Removal has been filed within thirty (30) days of receipt by

Westinghouse of information from which it could first ascertain that the case is or has

become removable. 28 U.S.C. §§ 1446(b).

2.

On July 30, 2001, Plaintiff commenced a civil action against Westinghouse and other

defendants by filing a petition in the 17th Judicial District Court for the Parish of Lafourche,

State of Louisiana, No. 91847, Div. "C." A copy of the petition is attached hereto as Exhibit

"A".

B0164657.1

4

3.

Westinghouse was served with the petition in the state court action on August 8, 2001.

4.

In his petition, Plaintiff, James Turner, alleges that he has contracted lung cancer as a result of exposure to and inhalation of asbestos from products he either used or worked around while enlisted in the U.S. Navy as a machinist mate from 1957 to 1977 and while employed by Fagan Boat Service as a cargo boat engineer from 1982 to 1987 and by Petrol Marine as a cargo boat engineer from 1987 to 1995. (See Exhibit "A", ¶4). The petition identifies the defendants, including Westinghouse, as a sellers, suppliers, distributors, manufacturers and installers of the asbestos containing materials. (See Exhibit "A").  More specifically, in his petition, Plaintiff premises Westinghouse's liability on his claim (subsequently repudiated) that he was exposed to "asbestos containing materials in connection with his work on land-based turbines for General Electric Company, including, but not limited to, asbestos, asbestos paper, asbestos millboard, asbestos fiber, asbestos cement sheets and panels, and other asbestos-containing materials to which plaintiff was exposed."

5.

Plaintiff gave deposition testimony under oath on August 9, 2001 during which he contradicted the allegations of the petition concerning his alleged exposure to asbestos from Westinghouse products.  The plaintiff testified that he never worked for General Electric and did not ever work on any Westinghouse land-based turbines. (See Plaintiff's

B0164657.1

deposition, page 82, lines 8-18 attached as Exhibit "B")    For the first time, however, Plaintiff contended that he worked on marine turbines on board U.S. Navy vessels that he believed to have been manufactured by Westinghouse. (See Plaintiff's deposition page 82, lines 24 & 25 to page 83, line 4).

6.

To the extent that Plaintiff's deposition testimony can be deemed to be a "paper" within the meaning of  28 U.S.C. §§ 1446, it was the first "paper," from which Westinghouse could determine that the case is removable. S.W.S. Erectors , Inc. v. INFAX, Inc., 72 F.3d. 489 (5th Cir. 1996); Poole v. Western Gas Resources, Inc., 1997 WL 722958 (E.D. La. 1997).  The Plaintiff's August 9, 2001 deposition testimony was the first assertion of exposure or injury related to asbestos contained on or in Westinghouse marine turbines on specific ships manufactured and/or installed in accordance with the specifications and control of the United States government and its agencies.

**JURISDICTION**

7.

The basis for removal is that this action involves a person, i.e., Westinghouse, that acted under the authority of an officer or agency of the United States, within the meaning of 28 U.S.C. §§ 1442(a)(1). Mesa v. California, 489 U.S. 121 (1989).  Westinghouse marine turbines installed on a U. S. Navy vessel were constructed and installed under the supervision and control of the United States or its agencies and in strict accordance with

plans and specifications prepared and approved by the United States or its agencies. (See Plaintiff's deposition page 85, lines 9 - 14)  As required by the supply contracts governing these turbines, the material aspects of the design and production of the tubines at issue were specified, reviewed, approved, and accepted by the United States Navy and officers within its command, the United States Maritime Commission and other governmental agencies.  If Westinghouse performed any work on the United States Navy vessels identified by Plaintiff, such work was performed under the ultimate authority and control of the United States and under immediate and direct supervision and control of its agents, and in compliance with specifications and requirements developed by the U.S. Naval Sea Systems Command, formerly the Bureau of Ships, or the United States Maritime Commission.  Thus, under the terms of the turbine production contracts and their amendments, Westinghouse was at all times acting under the authority and control of an officer or agent of the United States.

8.

As recognized in Boyle v. United Technologies Corp., 487 U.S. 500 (1988), Westinghouse has, inter alia, a federal defense to these actions: i.e., immunity from liability for injuries arising from any exposure to asbestos related to turbine generators on board U.S. government vessels, insofar as constructed or repaired by Westinghouse. Accord Carley v. Wheeled Coach, 991 F.2d 1117 (3d Cir. 1993); Kleemann v. McDonnell Douglas Corp., 890 F.2d 698 (4th Cir. 1989); Garner v. Santoro, 865 F.2d 629 (5th Cir. 1991). Because Westinghouse has raised more than a colorable claim of having acted under color of a federal officer or agency, removal of this civil action pursuant to 28 U.S.C. § 1442(a)(1)

is proper. <u>Fung v. Abex Corp., et al.</u>, 816 F. Supp. 569 (N.D. Cal., 1992); <u>Williams v. Brooks</u>, 945 F.2d 1322 (5th Cir. 1991).

9.

Should Plaintiff file a Motion to Remand this case, Westinghouse respectfully requests an opportunity to respond more fully in writing, but offers the following authorities at this time.

10.

The District Court for the Northern District of California addressed the issue of removal in this exact situation in <u>Fung v. Abex Corp., et al.</u>, 816 F. Supp. 569 (N.D. Cal., 1992). The plaintiffs in <u>Fung</u> alleged asbestos exposure from, <u>inter alia</u>, Westinghouse marine turbines supplied to the United States Navy, and defendant General Dynamics filed a Notice of Removal based upon 28 U.S.C. §§ 1442(a)(1). After the District Court denied plaintiffs' motion to remand, General Dynamics was dismissed from the case. Plaintiffs moved for reconsideration of their motion for remand. Westinghouse opposed the remand. In denying plaintiffs' motion, the District Court found removal by Westinghouse proper under 28 U.S.C. §§ 1442(a)(1) because, Like General Dynamics, Westinghouse (1) acted under the direction of federal officers, (2) raised a federal defense to plaintiffs' claims, and (3) demonstrated a causal nexus between plaintiffs' claims and the acts it performed under color of federal office. <u>See</u> <u>Crocker v. Borden, Inc.</u>, 852 F. Supp. 1322 (E.D. La. 1994); <u>Pack v. ACandS</u>, 838 F. Supp. 1099 (D.Md. 1993); <u>but see</u>, <u>Good v. Armstrong World Industries, Inc., et al.</u>

11.

More recently, in Pack v. ACandS, Inc., et al., 838 F. Supp. 1099 (D. Md. 1993), Senior U.S. District Court Judge Joseph H. Young upheld the removal by Westinghouse of a consolidated group of cases on the basis of the extensive involvement by United States Government officials in the design, installation and testing of marine turbines. Judge Young held that the government officials "had extensive control over the construction, design, and testing of the turbines," sufficient to state a colorable federal defense under Section 1442. 838 F. Supp. at 1103. On October 13, 1995, the Third Circuit Court of Appeals denied the Pack plaintiffs' attempt to obtain remand of those cases through a Writ of Mandamus which sought an order directing Judge Charles R. Weiner, Jr., United States District Judge for the Eastern District of Pennsylvania, to remand the cases back to state court. Pack, et al. v. ACandS Insulation Co., et al., No. 95-1766A, slip op. at 1 (3d Cir. Oct. 13, 1995)(per curiam).

12.

In determining the removability of this case, the complaint in the state court action, the Notice of Removal and any affidavits accompanying the Notice must be evaluated. O'Bryan v. Chandler, 496 F.2d 403 (10th Cir. 1974) cert. den., 419 U.S. 986, 42 L.Ed.2d, 95 S. Ct. 245; rehearing den., 420 U.S. 913, 42 L.Ed.2d 845, 95 S. Ct. 838.

13.

A properly removed case cannot be remanded for discretionary or policy reasons such as allegedly related state court cases or a contention that judicial economy compels remand. 28 U.S.C. §§ 1447(c); Thermitron Products, Inc. v. Hermansdorfer, 423 U.S. 336, 96 S. Ct. 584, 46 L.Ed. 542 (1976); Elrad v. United Life 7 Accident Insurance Company, 624

80164657.1

9

F. Supp. 742 (N.D. Ill. 1985).

14.

The federal officer removal statute is not narrow or limited, and it should not be frustrated by a narrow or grudging interpretation of §§ 1442(a)(1). Willingham v. Morgan, 395 U.S. 402, 405; 89 S. Ct. 1813, 23 L.Ed.2d 396 (1960).

15.

Westinghouse is not required to notify and obtain the consent of any other defendant in this action in order to remove Plaintiff's action as a whole under § 1442(a)(1). Ely Valley Mines, Inc. v. Hartford Accident Indemnity Co., 644 F.2d 1310, 1315 (9th Cir. 1981); National Audubon Society v. Department of Water & Power of the City of Los Angeles, 496 F. Supp. 499, 509 (E.D. Cal. 1980).

16.

The United States District Court for the Eastern District of Louisiana is the federal judicial district embracing the 17th Judicial District Court for the Parish of LaFourche, where the suit was originally filed. 28 U.S.C. §98 (a).

17.

As required by 29 U.S.C. §§ 1446(b), copies of all process, pleadings, and orders served upon Westinghouse are being filed with this Notice of Removal, and attached as Exhibit "C".

B0164657.1

10

WHEREFORE, Westinghouse requests that this action be removed to this Court.

Respectfully submitted,
**JONES, WALKER, WAECHTER, POITEVENT CARRÈRE & DENÈGRE, L.L.P.**
LEON GARY, JR. (Bar Roll No. 5959)
WILLIAM L. SCHUETTE, JR. (Bar Roll No. 2098)
AVERY LEA GRIFFIN (Bar Roll No. 22914)
OLIVIA S. TOMLINSON (Bar Roll No. 27114)
8555 United Plaza Boulevard
Four United Plaza, Fifth Floor
Baton Rouge, Louisiana 70809-7000
Telephone: (225) 248-2000
Facsimile: (225) 248-3051

_____

Olivia S. Tomlinson

## CERTIFICATE

I hereby certify that copies of the foregoing pleading have been served upon counsel of record for all parties and have been filed with the Clerk of Court for the 17th Judicial District Court for the Parish of Lafourche, State of Louisiana by depositing copies with the United States Postal Service properly addressed and postage prepaid.

This _____ day of _____, 2001.

_____

Olivia S. Tomlinson

B0164657.1

11

# 17th JUDICIAL DISTRICT COURT

# FOR THE PARISH OF LaFOURCHE

# STATE OF LOUISIANA

**NUMBER 91847**

**DIVISION "C"**

## JAMES C. TURNER AND MARLENE F. TURNER

### versus

**ANCHOR PACKING COMPANY, CARBORUNDUM; CBS, (Formerly known as Westinghouse Electric Corporation); A. W. CHESTERTON COMPANY; COMBUSTION ENGINEERING, INC.; JOHN CRANE, INC; DANA CORPORATION; EAGLE, INC.; THE FLINTKOTE COMPANY; FLINTKOTE MINES, LTD.; FOSTER WHEELER CORPORATION; GARLOCK, INC.; GASKET-HOLDINGS COMPANY, INC. (Successor to Flexitallic, Inc.); GENERAL ELECTRIC COMPANY; GEORGIA-PACIFIC CORPORATION; INGERSOLL-RAND; KELLY MOORE PAINT COMPANY; THE McCARTY CORPORATION; REILLY-BENTON CO., INC.; TAYLOR-SEIDENBACH, INC.; J.T. THORPE, INC.; 3-M (a.k.a. MINNESOTA MINING & MANUFACTURING COMPANY); WORTHINGTON PUMP, INC.; KIM SUSAN, INC. (Formerly known as Fagan Boat Service, Inc.)**

---

## NOTICE OF REMOVAL

---

Please take notice that defendant, Viacom, successor in interest to CBS Corporation, f/k/a Westinghouse Electric Corporation ("Westinghouse") has on the 10th day of September, 2001, filed its Notice of Removal in the office of the Clerk of the United States District Court for the Eastern District of Louisiana. A copy of the Notice of Removal as filed in federal court is attached.

Respectfully submitted,

---

**JONES, WALKER, WAECHTER, POITEVENT, CARRÈRE & DENÈGRE, L.L.P.**
LEON GARY, JR. (Bar Roll No. 5959)
WILLIAM L. SCHUETTE, JR. (Bar Roll No. 2098)
AVERY L. GRIFFIN (Bar Roll No. 22914)

OLIVIA S. TOMLINSON (Bar Roll No. 27114)
8555 United Plaza Boulevard
Four United Plaza, Fifth Floor
Baton Rouge, Louisiana 70809-7000
Telephone:   (225) 248-2000
Facsimile:   (225) 248-3051

B0160235.1

12

## CERTIFICATE

I hereby certify that copies of the foregoing pleading have been served upon counsel of record for all parties and have been filed with the Clerk of Court for the Civil District Court for the Parish of Orleans, State of Louisiana by depositing copies with the United States Postal Service properly addressed and postage prepaid.

This ____ day of September, 2001.

_____
AVERY LEA GRIFFIN

B0160235.1

13



# JONES WALKER

Olivia S. Tomlinson
Direct Dial 225-248-2082
Direct Fax 225-248-3082
otomlinson@joneswalker.com

October 12, 2001

Donni E. Young
Suite 1700
1555 Poydras Street
New Orleans, LA 70112

Re:   James C. Turner, et al v. Anchor Packing Company, et al
      Number 91847 "C"
      Our File:   20364/94123-00

Dear Ms. Young:

Yesterday, I received a copy of plaintiffs' Motion to Remand and Motion for Sanctions filed with the U.S. Eastern District Court on October 10, 2001. Please be advised that the Motion for Sanctions does not comply with the requirements of Rule 11. Accordingly, I ask that you dismiss the motion immediately.

Additionally, I have also enclosed a copy of Viacom, Inc.'s Notice of Removal and related exhibits for your records.

If you have any further questions, please contact my office.

Very truly yours,

Olivia S. Tomlinson

OST/as
Enclosures



JONES, WALKER, WAECHTER, POITEVENT, CARRÈRE & DENÈGRE L.L.P.

8555 UNITED PLAZA BOULEVARD ∘ BATON ROUGE, LOUISIANA  70809-7000 ∘ 225-248-2000 ∘ FAX 225-248-2010 ∘ E-MAIL info@joneswalker.com ∘ www.joneswalker.com
BATON ROUGE   LAFAYETTE   NEW ORLEANS   WASHINGTON, D.C.

WHEREFORE, Westinghouse requests that this action be removed to this Court.

Respectfully submitted,

**JONES, WALKER, WAECHTER, POITEVENT CARRÈRE & DENÈGRE, L.L.P.**
LEON GARY, JR. (Bar Roll No. 5959)
WILLIAM L. SCHUETTE, JR. (Bar Roll No. 2098)
AVERY LEA GRIFFIN (Bar Roll No. 22914)
OLIVIA S. TOMLINSON (Bar Roll No. 27114)
8555 United Plaza Boulevard
Four United Plaza, Fifth Floor
Baton Rouge, Louisiana 70809-7000
Telephone:   (225) 248-2000
Facsimile:   (225) 248-3051

Olivia S. Tomlinson

## CERTIFICATE

I hereby certify that copies of the foregoing pleading have been served upon counsel of record for all parties and have been filed with the Clerk of Court for the 17th Judicial District Court for the Parish of Lafourche, State of Louisiana by depositing copies with the United States Postal Service properly addressed and postage prepaid. This 10th day of September_____, 2001.

Olivia S. Tomlinson

B0164657.1                                    9



```
                        ******************************
                        ***   MULTI TX/RX REPORT   ***
                        ******************************

TX/RX NO          0848
PGS.                4
TX/RX INCOMPLETE    -----
TRANSACTION OK      (1)   95252456
                    (2)   95281080

ERROR INFORMATION   -----
```

# Ness, Motley, Loadholt, Richarson & Poole

*1555 Poydras Street, Suite 1700*
*New Orleans, LA 70112*
*504.636.3480*
*Fax: 504.636.3499*

## FAX TRANSMISSION COVER SHEET

**To:**     Glenn L.M. Swetman/Troy N. Bell/David E. Redmann, Jr.  (504) 528-9640

Larry G. Canada (504) 525-2456

Thomas W. Tyner (601) 583-2677

Benjamin R. Slater, III/Mark E. VanHorn  (504) 528-1080

William L. Schuette, Jr./Leon Gary, Jr./Jennifer Anderson (225)231-2010

Stan Denegre  (504) 582-8015

**Re:**     James C. Turner          **Date:**   July 30, 2001

**Sender:**   Susan Zeutschel, Paralegal to Donni E. Young

**Client No.:**   152303

The original   _x_ will ___ will not be mailed to you, along with Petition and Discovery.
YOU SHOULD RECEIVE 4 PAGE(S), INCLUDING THIS COVER SHEET.  IF YOU DO
NOT RECEIVE ALL THE PAGES, PLEASE CALL 504.636-3499



EXHIBIT

F

```
                    ********************************
                    ***    MULTI TX/RX REPORT    ***
                    ********************************

TX/RX NO              0847
PGS.                  4
TX/RX INCOMPLETE     (2)   95252456
                     (4)   95281080
TRANSACTION OK       (1)   95289640
                     (3)   916015832677
                     (5)   912252312010
                     (6)   ◆95828015

ERROR INFORMATION    _____
```

# Ness, Motley, Loadholt, Richarson & Poole

*1555 Poydras Street, Suite 1700*
*New Orleans, LA 70112*
*504.636.3480*
*Fax: 504.636.3499*

## FAX TRANSMISSION COVER SHEET

**To:**    Glenn L.M. Swetman/Troy N. Bell/David E. Redmann, Jr. (504) 528-9640

Larry G. Canada (504) 525-2456

Thomas W. Tyner (601) 583-2677

Benjamin R. Slater, III/Mark E. Van Horn (504) 528-1080

William L. Schuette, Jr./Leon Gary, Jr./Jennifer Anderson (225)231-2010

Stan Denegre (504) 582-8015

**Re:**    James C. Turner                      **Date:**    July 30, 2001

**Sender:**    Susan Zeutschel, Paralegal to Donni E. Young

**Client No.:**    152303

**The original __x__ will ___ will not be mailed to you, along with Petition and Discovery.**
**YOU SHOULD RECEIVE 4 PAGE(S), INCLUDING THIS COVER SHEET. IF YOU DO**
**NOT RECEIVE ALL THE PAGES, PLEASE CALL 504.636-3499**

# Ness, Motley, Loadholt, Richarson & Poole

*1555 Poydras Street, Suite 1700*
*New Orleans, LA 70112*
*504.636.3480*
*Fax: 504.636.3499*

## FAX TRANSMISSION COVER SHEET

**To:**    Glenn L.M. Swetman/Troy N. Bell/David E. Redmann, Jr.  (504) 528-9640

Larry G. Canada (504) 525-2456

Thomas W. Tyner (601) 583-2677

Benjamin R. Slater, III/Mark E. VanHorn  (504) 528-1080

William L. Schuette, Jr./Leon Gary, Jr./Jennifer Anderson (225)231-2010

Stan Denegre  (504) 582-8015

**Re:**    James C. Turner              **Date:**    July 30, 2001

**Sender:**    Susan Zeutschel, Paralegal to Donni E. Young

**Client No.:**    152303

**The original   _x_  will ___  will not be mailed to you, along with Petition and Discovery.**
**YOU SHOULD RECEIVE 4 PAGE(S), INCLUDING THIS COVER SHEET.  IF YOU DO**
**NOT RECEIVE ALL THE PAGES, PLEASE CALL 504.636.3499**

**CONFIDENTIALITY NOTE**
This facsimile transmission contains legally privileged and confidential
information intended only for the use of the individual or entity named
above. If the reader of this message is not the intended recipient, you
are hereby notified that any dissemination, disclosure, distribution or
copying of this transmission is strictly prohibited. If you have received
this communication in error, please immediately notify us by telephone and
return the original message to us at the above address via the U.S. Postal
Service.

LAW OFFICES

# NESS, MOTLEY, LOADHOLT, RICHARDSON & POOLE

PROFESSIONAL ASSOCIATION

1555 POYDRAS STREET
SUITE 1700
NEW ORLEANS, LOUISIANA 70112

DONNI E. YOUNG
DIRECT DIAL: 985-636-3480
FAX: 985-636-3499

OTHER OFFICES:
MOUNT PLEASANT, SOUTH CAROLINA
CHARLESTON, SOUTH CAROLINA
BARNWELL, SOUTH CAROLINA
PROVIDENCE, RHODE ISLAND
RALEIGH, NORTH CAROLINA

July 30, 2001

VIA FACSIMILE

Glen L.M. Swetman/Troy N. Bell, Esq.
David E. Redmann, Jr.
AULTMAN, TYNER, McNEESE & RUFFIN, LTD.
400 Poydras Street, Suite 2250
New Orleans, Louisiana 70130

Thomas W. Tyner, Esq.
AULTMAN, TYPNER, McNEESE & RUFFIN, LTD.
315 Hemphill Street/P.O. Drawer 750
Hattiesburg, MS 39403-0750

William L. Schuette, Jr./Leon Gary, Jr., Esq.
Jennifer L. Anderson, Esq.
JONES, WALKER, WAECHTER, POITEVENT,
  CARRERE & DENEGRE, L.L.P.
8555 United Plaza Boulevard, Fifth Floor
Baton Rouge, LA 70 70809-7000

Larry G. Canada, Esq.
GALLOWAY, JOHNSON, TOMPKINS
  & BURR
701 Poydras Street, Suite 4040
New Orleans, Louisiana 70139-4003

Benjamin R. Slater, III/Mark E. VanHorn, Jr.
SLATER LAW FIRM
650 Poydras Street, Suite 2600
New Orleans, LA 70130-6101

Stan Denegre, Esq.
JONES, WALKER, WAECHTER, POITEVENT,
  CARRERE & DENEGRE, L.L.P.
201 St. Charles Avenue
48th Floor
New Orleans, Louisiana 70170-5100

RE:   James C. Turner, et al v. Anchor Packing Co., et al
      17th J.D.C. Case Number: 91847

Dear Counselors:

Please find attached a Notice of Video Deposition relative to the above-captioned matter. Please note that Mr. Turner's deposition is set for August 8, 2001, commencing at 2:00 p.m.

Our client has opted not to be part of the settlement agreement in place. Therefore, a tort action has been filed. Via U.S. Mail, you will be receiving a copy of this letter, the Original Petition for Damages, Request for Notice, Notice of Video Deposition, Interrogatories, Request for Production, Request for Admissions and Plaintiffs' Answers to Defendants' Master Set of Interrogatories and Request for Production of Documents, which is being filed with the court.

Sincerely yours,

Susan Zeutschel
Paralegal to Donni E. Young

/sz
Enclosures

17TH JUDICIAL DISTRICT COURT FOR THE PARISH LaFOURCHE

STATE OF LOUISIANA

NO. 91847

DIVISION:

JAMES C. TURNER and MARLENE F. TURNER

VERSUS

DIVISION C

ANCHOR PACKING COMPANY; CARBORUNDUM; CBS (Formerly known as Westinghouse Electric Corporation); A.W. CHESTERTON COMPANY; COMBUSTION ENGINEERING, INC.; JOHN CRANE, INC.; DANA CORPORATION; EAGLE, INC.; THE FLINTKOTE COMPANY; FLINTKOTE MINES, LTD.; FOSTER WHEELER CORPORATION; GARLOCK, INC; GASKET HOLDINGS COMPANY, INC. (successor to Flexitallic, Inc.); GENERAL ELECTRIC COMPANY; GEORGIA-PACIFIC CORPORATION; INGERSOLL-RAND; KELLY MOORE PAINT COMPANY; THE McCARTY CORPORATION; REILLY-BENTON CO., INC.; TAYLOR-SEIDENBACH, INC.; J.T. THORPE, INC.; 3M (a.k.a. MINNESOTA MINING & MANUFACTURING COMPANY); WORTHINGTON PUMP, INC.; KIM SUSAN, INC. (Formerly known as Fagan Boat Service, Inc.)

FILED: _____

_____
DEPUTY CLERK

## ORIGINAL PETITION FOR DAMAGES

NOW INTO COURT, through undersigned counsel, come Plaintiffs, James C. Turner and Marlene F. Turner, who respectfully represents that:

### DEFENDANTS

1.

Made Defendants herein are:

**A.  ANCHOR PACKING COMPANY**
A New Jersey Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: CT Corporation System, 400 Poydras Street, New Orleans, Louisiana, 70130.

**B.  CBS (formerly known as WESTINGHOUSE ELECTRIC COMPANY)**
A Delaware Corporation, who may be served through the its registered agent, CT Corporation System, 8550 United Plaza Boulevard, Baton Rouge, Louisiana, 70809.

**C.  THE CARBORUNDUM COMPANY**
A Delaware Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: CT Corporation System, 400 Poydras Street, New Orleans, Louisiana, 70130.

**D.  A.W. CHESTERTON**
A Massachusetts Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: C.T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana  70809.

1

E.  **COMBUSTION ENGINEERING, INC.**
A Delaware Corporation who may be served through the its registered agent, CT Corporation System, 8550 United Plaza Boulevard, Baton Rouge, Louisiana, 70809.

F.  **JOHN CRANE, INC.**
A Delaware Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: C.T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809.

G.  **DANA CORPORATION**
A Virginia Corporation who may be served via the Louisiana Long Arm Statute, c/o Allen Goolsby, III, 951 East Bird Street, Richmond, VA, 23219.

H.  **EAGLE, INC.**
(Formerly Eagle Asbestos & Packing Co., Inc.) A corporation duly organized, created and existing under and by the virtue of the laws of the State of Louisiana, with its principal place of business in New Orleans, Louisiana, with the agent for service in the State of Louisiana, to wit:  Lawrence G. Pugh, III, Montgomery, Barnett , Brown, Read, Hammond & Mintz, LLP, 3200 Energy Center, 1100 Poydras Street, New Orleans, Louisiana, 70163-3200.

I.  **THE FLINTKOTE CORPORATION**
A Delaware Corporation who may be served through the Louisiana Long Arm Statute, through their agent for service of process: The Flintkote Company, 3 Embarcadero Center, Suite 1190, San Francisco, California 94111.

J.  **FLINTKOTE MINES, LTD.**
Which may be served via the Louisiana Long Arm Statute through it Agent, Belanger Suave (Richard Nadeaux, Esq.), Barrister *Solicitors, 1, Place Ville Marit, Suite 1700, Montreal, Quebec, H3B2C1

K.  **FOSTER WHEELER CORPORATION**
A Delaware corporation authorized to do and doing business in the State of Louisiana with its principle place of business in New Jersey, and may be served pursuant to the Louisiana Long Arm Statute, to wit: Perryville Corporation Park, Clinton, NJ 08809

L.  **GARLOCK, INC.**
An Ohio Corporation, authorized to do and doing business in the State of Louisiana, with its principal place of business in New York and with an agent for service of process in the State of Louisiana: CT Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809.

M.  **GASKET HOLDINGS COMPANY, INC. (Successor to Flexitallic, Inc.)**
A Delaware Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: C.T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809.

N.  **GENERAL ELECTRIC COMPANY**
A New York Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: C.T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809.

2

O.   **GEORGIA-PACIFIC CORPORATION,** A Georgia Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: C.T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana, 70809.

P.   **INGERSOLL-RAND COMPANY**
A New Jersey Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: C.T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809.

Q.   **KELLY MOORE PAINT COMPANY, INC.**
A California Corporation who may be served through the Louisiana Long Arm Statute, through their agent for service of process:  Kelly Moore Paint Company, Inc., 987 Commercial Street, San Carlos, California 94070.

R.   **THE McCARTY CORPORATION**
A domestic corporation, may be served through its agent for service of process:  Paul H. Spaht, 445 N. Boulevard, Suite 300, Baton Rouge, Louisiana, 70802.

S.   **REILLY-BENTON COMPANY, INC.**
A corporation duly organized, created and existing under and by virtue of the laws of the State of Louisiana, with its principal place of business in New Orleans, Louisiana, with agent for service of process in the State of Louisiana, to wit:  Deutsch, Kerrigan & Stiles, 755 Magazine Street, New Orleans, Louisiana, 70130.

T.   **TAYLOR SEIDENBACH, INC.**
A corporation duly organized, created and existing under and by virtue of the laws of the State of Louisiana, with its principle place of business in New Orleans, Louisiana, with agent for service in the State of Louisiana, to wit: Ralph I. Sheperd, 731 S. Scott Street, New Orleans, Louisiana 70150

U.   **J.T. THORPE, INC.**
A California Corporation, who may be served through the Louisiana Long Arm Statute, through their agent for service of process: Ken Prindle, Prindle, Decker & Amaro, 369 Pine Street, Suite 800, San Francisco, CA, 94104.

V.   **3M COMPANY**
(a.k.a. Minnesota Mining & Manufacturing Company)
A Delaware Corporation, who can be served through the Louisiana Long Arm Statute, through their agent for service of process:  Roger P. Smith, Secretary, Minnesota Mining & Manufacturing Company, 3M Center, Building 220-14W-06, St. Paul, Minnesota, 55144-1000.

W.   **WORTHINGTON PUMP, INC.**
A Delaware Corporation, who may be served through the Louisiana Long Arm Statute, through its registered agent for service of process:  C.T. Corporation System, 350 North St. Paul Street, Suite 2900, Dallas, Texas, 75201.

X.   **KIM SUSAN, INC.**
(Formerly known as Fagan Boat Service, Inc.)
A corporation duly organized, created and existing under and by virtue of the laws of the State of Louisiana, with its principle place of business in LaRose, Louisiana, with agent for service in the State of Louisiana, to wit: Kent J. Fagan, West 21st Street, Larose, Louisiana, 70373.

Hereinafter referred to as "Defendants named in Paragraph 1."

2.

All of the Defendants named herein are solidary obligors.

## VENUE

3.

This Court has jurisdiction over this cause of action, which occurred principally in the State of Louisiana. This action is filed pursuant to the Jones Act and the General Maritime Law, and Plaintiffs bring this action in state court pursuant to the Savings to Suitors Clause, 28 U.S.C. 1333, et seq., and the Jones Act.

4.

As an adult, Plaintiff, JAMES C. TURNER, was enlisted in the U.S. Navy as a Machinist Mate from 1957 to 1977 working on various ships and after retiring from the Navy, worked for Valite Plastic Plant as a fork lift mechanic from 1977 to 1982, Kim Susan, Inc. (formerly known as Fagan Boat Company) as an offshore cargo boat engineer from 1982 to 1987 and Petrol Marine as a cargo boat engineer from 1987 to 1995. Plaintiff's job duties included but are not limited to the following: fork lift mechanic, machinist and offshore cargo boat engineer.

5.

During this period of time, and while enlisted with the U.S. Navy, working at the plastic plant and on board of a vessel and as a maritime worker, as stated above, plaintiff was exposed to heavy amounts of asbestos in connection with repair and asbestos tear-out activities including asbestos brake lining, asbestos pipe covering, asbestos block, asbestos cement, asbestos mud, asbestos plaster, asbestos rope, asbestos gaskets, asbestos cloth, asbestos tape, boilers, asbestos panels and other types of asbestos-containing materials. Additionally, Plaintiff was exposed to the following products designed, mined, manufactured, sold, supplied, used and distributed by Defendants:

## DEFENDANTS' PRODUCTS

6.

(a)    At all times relevant hereto, **Defendant Anchor Packing Company,** manufactured, distributed and/or installed asbestos-containing products, including but not limited to, packings, gaskets, brake linings, asbestos sheets, asbestos rope and many

4

other asbestos-containing materials, to which Plaintiff was exposed while such products were present at the Plaintiff's job sites described above.

(b)     At all times relevant hereto, **Defendant The Carborundum Company**, manufactured, distributed, sold and/or distributed asbestos-containing materials, including but not limited to, grinding wheels and other asbestos containing materials to which Plaintiff was exposed while present at the job sites described above.

(c)     At all times relevant hereto, **Defendant CBS Corporation (formerly known as Westinghouse Electric Company)**, sold, supplied, distributed, manufactured, installed, and otherwise used asbestos-containing materials.  Plaintiff was exposed to asbestos-containing materials of Westinghouse Electric Company, in connection with his work on land-based turbines for General Electric Company, including, but not limited to, asbestos, asbestos paper, asbestos millboard, asbestos fiber, asbestos cement sheets and panels, and other asbestos-containing materials to which Plaintiff was exposed.

(d)     At all times relevant hereto, **Defendant A.W. Chesterton**, manufactured, marketed, distributed and sold through various suppliers, asbestos packing, gaskets, asbestos sheet and cloth for gasket fabrication to which Plaintiff was exposed.

(e)     At all times relevant hereto, **Defendant Combustion Engineering, Inc.,** sold, supplied, distributed, manufactured, installed, and otherwise used asbestos-containing materials, including, but not limited to, asbestos, asbestos pipe covering, block, cement, mortar, refractory, cloth, brick, packing, gaskets and other asbestos-containing materials to which Plaintiff was exposed while at the job sites described above.

(f)     At all times relevant hereto, **Defendant John Crane, Inc.,** was a manufacturer of asbestos containing gaskets and packing materials, to which Plaintiff was exposed.

(g)     At all times relevant hereto, **Defendant Dana Corporation** manufactured, distributed, sold and/or distributed asbestos-containing materials, including but not limited to, Victor Sheet Gaskets, Asbestos steam gaskets, to which Plaintiff was exposed.

(h)     At all times relevant hereto, **Defendant Eagle, Inc.,** distributed, fabricated and/or installed asbestos-containing products, including but not limited to, asbestos fittings

5

made at Eagle Asbestos facilities and sold as its own products, pipe covering, block, sprays, tile packing, cloth, tape, gaskets, refractories, and cements to which Plaintiff was exposed. Eagle, Inc. regularly engaged in the practice of manufacturing "Ts" and "Ls" and other specialty materials for sale to customers, other asbestos products vendors and for use in its own business. These materials were shipped and sold in Eagle Asbestos & Packing Company containers as Eagle products.

(I)    At all times relevant hereto, **Defendant  The Flintkote Corporation** mined, manufactured, distributed and/or installed asbestos-containing products, including but not limited to, asbestos coatings, mastics, asbestos floor tile, asbestos underlay, asbestos pipe and  cements.

(j)    At all times relevant hereto, **Defendant Flintkote Mines, Ltd.,**  mined, milled, manufactured, distributed, sold and/or distributed asbestos-containing materials, including but not limited to, pure asbestos fiber, milled asbestos fiber, pulverized asbestos, asbestos cement, to which Plaintiff was exposed.

(k)    At all times relevant hereto, **Defendant Foster Wheeler Corporation** sold, supplied, distributed, manufactured, installed, and otherwise used asbestos-containing materials, including but not limited to, boilers, kilns and other high-heat production devices composed and specified by Foster Wheeler Corporation, asbestos, asbestos pipe covering, insulating block, cement, cloth, packing and gaskets and many other  asbestos containing materials to which Plaintiff was exposed.

(l)    At all times  relevant  hereto,  **Defendant Garlock,  Inc.,**  manufactured, distributed, sold, and/or installed asbestos-containing products, including, but not limited to, gaskets, packing, asbestos rope, asbestos sheets, asbestos cloth, and asbestos tape, to which Plaintiff was exposed.

(m)    At all times relevant hereto, **Defendant  Gasket Holdings Company, Inc. (Successor to Flexitallic, Inc.),** designed, manufactured, fabricated, supplied, sold, marketed, warranted, and/or advertised asbestos-containing products including but not limited to, "Flexitallic Gaskets" and gasket material to which Plaintiff was exposed.

6

(n)   At all times relevant hereto, **Defendant General Electric Company**, made various electrical rotor and apparatus which contained asbestos, turbines, which required asbestos pipe covering, asbestos blankets, asbestos block, asbestos cement and spray-on asbestos to which Plaintiff was exposed.

(o)   At all times relevant hereto, **Defendant Georgia Pacific Corporation**, manufactured, distributed, sold and/or distributed asbestos-containing materials, including but not limited to, joint compound, drywall adhesive, plaster, texture, and many other asbestos containing materials to which Plaintiff was exposed while present at the job sites described above.

(p)   At all times relevant hereto, **Defendant Ingersoll-Rand Company**, manufactured, distributed, sold and/or distributed asbestos-containing materials, including but not limited to, air compressors and gaskets, asbestos containing materials to which Plaintiff was exposed while present at the job sites described above.

(q)   At all time relevant hereto, **Defendant Kelly Moore Paint Company**, manufactured, distributed, sold and/or distributed asbestos-containing materials, including but not limited to, bedding cement, compounds, texture, finishes, paints and other asbestos containing materials to which Plaintiff was exposed.

(r)   At all times relevant hereto, **Defendant The McCarty Corporation**, re-labeled, distributed, sold, fabricated, and/or installed asbestos-containing products, including but not limited to pipe covering, block, sprays, cloth, tape, tile packing, gaskets, refractories and cements to which Plaintiff was exposed.

(s)   At all time relevant hereto, **Defendant Reilly-Benton Company, Inc.**, distributed and/or installed asbestos-containing products, including but not limited to, pipe covering, block, sprays, tile, packing, gaskets, refractories, cloth, tape and cements, to which Plaintiff was exposed.

(t)   At all time relevant hereto, **Defendant, Taylor-Seidenbach, Inc.**, distributed and/or installed asbestos-containing products, including but not limited to, pipe covering, block, sprays, cloth, tape, tile packing, gaskets, refractories and cements to which the Plaintiff was exposed.

7

(u)    At all time relevant hereto, **Defendant, J.T. Thorpe Company**, sold, supplied, distributed, manufactured, installed, and otherwise used asbestos-containing materials, including but not limited to, boilers, kilns and other high-heat production devices composed and specified by J.T. Thorpe, Inc., asbestos, asbestos pipe covering, insulating block, cement, cloth, packing and gaskets and many other asbestos-containing materials to which Plaintiff was exposed.

(v)    At all times relevant hereto, **Defendant 3M (a.k.a. Minnesota Mining & Manufacturing Company)**, manufactured, distributed, sold and/or fabricated asbestos-containing products, including but not limited to, sandpaper, masks and other materials to which Plaintiff used.

(w)    At all times relevant hereto, **Defendant Worthington Pump, Inc.**, manufactured, distributed, sold and/or distributed asbestos-containing products, including but not limited to, air compressors and pumps, asbestos containing materials to which Plaintiff was exposed while present at the job sites described above.

(x)    At all times relevant hereto, **Defendant Kim Susan, Inc.** (formerly Fagan Boat Company), in the 1980's, was a Jones Act employer who was responsible for the safety of James C. Turner, a crew member on board vessels owned and operated by Kim Susan, Inc.  Plaintiff worked in the engine rooms and machinery spaces where he was exposed to asbestos containing materials.

7.

As a direct result of the plaintiff's exposure to the Defendants' asbestos-containing products, plaintiff was diagnosed with asbestos-related lung cancer, and other asbestos related diseases, including asbestos related pleural diseases, irreversible and progressive lung damage, as well as other asbestos related diseases, including pleural thickening, pleural plaques, pleural calcification, pleural effusion, with resulting symptoms, including but not limited to, shortness of breath and inability to breathe, as well as decreased exercise tolerance. This asbestos related disease is progressive and can be fatal.

## LIABILITY ALLEGATIONS--FAILURE TO WARN

8.

8

Each of the Defendants knew or should have known through industry and medical studies, the existence of which were unknown to the Plaintiff, of the health hazards inherent in the asbestos-containing products which they were selling, manufacturing or otherwise using.  Instead of warning the Plaintiff and the general public of these dangers, certain Defendants ignored, concealed or misrepresented such information, or condoned such concealment, in order to sell asbestos or asbestos-containing products and avoid litigation by those who were injured from asbestos inhalation.  Those Defendants who have engaged in this misconduct are specifically set forth in this Petition, and their conduct specifically described hereinafter in the Section which, in additional to general negligence or strict liability allegations, identifies or forms of specified misconduct, and similarly identifies by name, the particular Defendant and the specific counts of misconduct.

9.

Plaintiff suffered excessive exposure to asbestos.  Plaintiff's cause of action against this Jones Act employer is brought pursuant to 45 U.S.C. § 1 et seq., which grants this Court jurisdiction.  While Plaintiff was employed at the above-noted locations, he was exposed to asbestos without warnings, without adequate safety training, and as a result of other acts of negligence, and strict liability as vessel owner or operator, and which will be demonstrated through discovery and at trial.  The employer and its safety officials delegated specific duties to protect this Plaintiff, knew or should have known of these dangers and are liable to Plaintiff for all acts of negligence resulting in Plaintiff's harm.

10.

As a direct and proximate contributing result of having inhaled, ingested or otherwise been exposed to asbestos while working at, including but not limited to the vessel listed above, during the exposure period, the Plaintiff received injuries, both physically and mentally, including, without limitation, the following conditions: (I) asbestosis; (ii) impaired pulmonary capacity; (iii) reduced lung volume; (iv) pleural plaques; (v) interstitial lung fibrosis; (vi) cardiac and circulatory disease; (vii) mental anguish associated with the preceding conditions; (viii) reduced life span from asbestos-related malignancy; (ix) loss of enjoyment of life; (x) medical expenses;  and other damages.

9

11.

Because of the latency period of the above asbestos-related injuries, and because of the active concealment by some Defendants of the causes and effects of exposure to asbestos, the Plaintiff has only recently discovered this injury.

12.

Plaintiff was exposed to asbestos and asbestos-containing products in the course and scope of this employment at the various work locations referred to above, while working for the enumerated employers, and without fault on Plaintiff's part, Plaintiff was exposed to asbestos-containing products and dust. Plaintiff alleges that the presence of asbestos dust and fibers in sufficient quantities to cause disease renders each Defendant listed as an employer liable for vessel negligence and strictly liable for their vessel defect.

13.

Plaintiff inhaled and otherwise ingested these fibers from products and has, as a direct cause, suffered the injuries complained of in the foregoing allegations of this Petition.

14.

The Defendants identified as employers and/or their insurors, at all times relevant hereto were the employers of Plaintiff, with specific responsibilities for the health and safety of the Plaintiff.

15.

These Defendants negligently, recklessly, willfully and/or because of gross and wanton negligence failed to properly discharge their duties to the Plaintiff in the following:

(a)     failed to provide Plaintiff with a safe place to work;

(b)     failed to provide Plaintiff with safety equipment;

(c)     failed to provide Plaintiff with correct, adequate or proper safety equipment;

(d)     failed to disclosure, warn or reveal critical medical or safety information to Plaintiff regarding the special hazards in connection with asbestos and asbestos dust;

(e)     failed to properly train Plaintiff with respect to the safety equipment that was issued;

10

(f)     failed to properly provide Plaintiff with the correct types of safety equipment;

(g)     failed to timely remove asbestos hazards from the workplace;

(h)     inadequately provided for ventilation for Plaintiff in connection with exposure to asbestos dust at work site;

(I)     failed to properly monitor asbestos dust levels at the work site as required by good and proper industrial hygiene practices, as well as federal law;

(j)     failed to provide Plaintiff medical monitoring or counseling regarding these hazards in the workplace, so that Plaintiff could protect himself;

(k)     any other negligent act or omission as may be revealed in discovery or at trial.

The above-described negligence and fault of these defendants was a legal cause of Plaintiff's injuries complained of in this Petition, and a matter of negligence, gross negligence, reckless conduct, and fault within the meaning of the law.

## GENERAL ALLEGATIONS -- STRICT LIABILITY

16.

The allegations above are incorporated by reference herein.

17.

The asbestos or asbestos-containing products mined, manufactured, produced, marketed, sold, or distributed by each and every Defendant were defective and unreasonably dangerous to human health because (a) they were sold without any warnings or adequate warnings as to their dangers and without adequate instructions on how to use the products so as to reduce those dangers, or (b) because Defendants failed to develop alternative products with safer designs even though such products were feasible.  Those defects were the proximate cause of the injuries to plaintiff.

18.

The manufacture, production, marketing, sale, or distribution by each and every Defendant of defective asbestos or asbestos-containing products was reckless, wanton, and willful and in conscious disregard of the safety and health of plaintiff and those similarly situated to him.

11

## BREACH OF EXPRESS AND IMPLIED WARRANTY

19.

The allegations above are incorporated by reference herein.

20.

Each and every Defendant has breached express, as well as implied, warranties of good and merchantable quality and fitness for intended use with respect to its asbestos-containing products.

21.

The breach of those warranties has proximately caused injury to plaintiff.

22.

During all times relevant hereto, each and every Defendant failed to take reasonable steps to provide to plaintiff  (a) adequate warnings of the danger from exposure to its asbestos or asbestos-containing products and (b) adequate instructions on how to use its asbestos or asbestos-containing products so as to reduce the danger. The failure by each and every Defendant to provide such warnings and instructions constituted negligence and proximately caused the injuries to plaintiff.

## STRICT LIABILITY OF ASBESTOS MANUFACTURERS, MINERS, SELLERS, SUPPLIERS, DISTRIBUTORS AND VESSEL OWNERS

23.

Plaintiffs incorporate by reference all general liability allegations made above as though made herein, and make additional allegations that follow.

24.

The Defendants identified in the caption to this Petition and in the foregoing paragraphs, are manufacturers, miners, sellers, suppliers, distributors, vessel owners or users or were otherwise engaged in conduct which constitutes under Louisiana law, the act of "manufacturing of asbestos" or "asbestos-containing products," and are guilty of negligence and strict liability to Plaintiffs, for the enumerated, but not exclusively limited to, the conduct that follows:

12

a. For the mining, manufacturer, sale, supply, wholesale, and use of these products that are unreasonably dangerous and unreasonably dangerous per se;

b. The mining, manufacture, sale, supply, wholesale, and use of products that possess inherent and known properties that make them unreasonably dangerous by presenting a high potential for causing serious injury such as respiratory disease, cancer, and other health problems to those who would be foreseeable exposed to them, including those employed in Plaintiff's respective trade;

c. Lack of warning, failure to warn, and/or lack of sufficient warning of the hazards that these products would present in the course of their normal or foreseeable use;

d. Lack of safety instructions, or of sufficient safety instructions, for eliminating or reducing the health risk associated with the intended use of these products;

e. Failure of Defendants to inspect these products to insure the sufficiency and adequacy of warnings and safety cautions, including the types of diseases that these products would present, the appropriate levels at which these products could be safely used, and the nature and necessity of the type of ventilation that would be required in order for workers to be adequately protected;

f. Failure to test or adequately test these products for defects or hazards that they would present to the intended or foreseeable users;

g. Failure to truthfully report or adequately report the known hazards the products presented, including the results of the product testing, the medical studies associated with foreseeable hazards that these products would present, and the dust studies which indicated that these products were not performing within any existing recommended safety guidelines;

13

h.   Improper design of these products where the nature of the product did not require use of asbestos, or where alternate, equally suitable substances were readily available;

I.   Defects in the composition and construction of these products;

j.   Failure to recall these products after they were mined, manufactured, sold, supplied, at and to plaintiff's work sites;

k.   Failure to properly package these products so that they could be safely transported, handled, stored or disposed of;

l.   Over warranting the safety of these products that they mined, manufactured, sold, wholesaled, supplied or used by these Defendants;

m.   Failure to notify or advise the end purchasers and users of these products, including bystanders, of simple, inexpensive, remedial measure which could be taken to protect plaintiff and others from exposure to these hazards;

n.   Other defects or faults as may be revealed in discovery or at trial.

The defective conditions of Defendants' products and their conduct, in question with the mining, manufacturer, sale, supply, use and failure to recall these hazardous products as noted above, are the proximate cause of plaintiff's injuries.  Plaintiffs also allege that each and every one of the foregoing Defendants, and the enumerated acts above, were and constitute negligence, which is also a proximate cause of plaintiff's injuries.

## THEORY OF RECOVERY AGAINST DEFENDANTS BASED UPON DEFENDANTS' FAILURE TO USE ALTERNATIVE PRODUCTS OR DESIGNS

25.

Defendants' products were unreasonably dangerous because of their design for the following reasons:

A.   As the manufacturers of potentially dangerous products, Defendants were held to the knowledge of experts.  They were required by the law to keep abreast of scientific knowledge, discoveries and advances and are presumed to know what is imparted thereby.  Defendants also had the duty to test and inspect their products and the extent of the research and any experiments must have commensurate with the dangers involved, all of which they failed to do.

B.   Even if a reasonable person would conclude that the danger-in-fact of Defendants products did not outweigh the utility of those products,

14

there were feasible ways to design Defendants' products with less harmful consequences of which Defendants held to the standard and skill of experts, should have been aware and feasibly could have utilized, yet failed to do so.

C.     Even if a reasonable person would not conclude that the danger-in-fact of Defendants' products did not outweigh the utility of those products, Defendants, held to the standard and skill of experts, should have reasonably known of the dangers inherent to the use of asbestos containing products and could have feasibly utilized alternative products with less harmful consequence, which they failed to do.

## THEORY OF RECOVERY AGAINST DEFENDANTS BASED UPON THEIR FAILURE TO WARN

### 26.

Defendants failed to adequately warn Plaintiff, James C. Turner, concerning all dangers related to the way their products were designed.  Specifically, Defendants failed to provide Plaintiff or others with adequate warnings of all dangers inherent in the normal use of their products which were not within the knowledge of or obvious to the ordinary user of those products.  These dangers include the fact that the Defendants' products were highly dangerous to the health of the person exposed to them in that they caused or contributed to the pulmonary diseases of asbestos and a wide variety of cancers.

Additionally, Defendants failed to provide the Plaintiff  with knowledge as to what would be reasonably safe and sufficient wearing apparel and proper protective equipment and appliances, if in truth, there were any, to protect them from being poisoned and disabled as a result of their exposure to or use of Defendants' products.

Further, Defendants failed to instruct the Plaintiff as to the proper and safe use of their products, if such products could ever safely be used.

### 27.

Subsequent to the time that Defendants caused their asbestos products to be sold and placed on job sites where the Plaintiff was employed, Defendants continued to acquire additional knowledge of the dangers caused by their products.  This increased knowledge included the knowledge that exposure to even small amounts of asbestos and/or asbestos containing dust can cause serious and permanent injury.

15

Nevertheless, Defendants have negligently and recklessly failed and refused to warn and advise the Plaintiff or others similarly situated of the dangers caused by their past exposure to Defendants' defective products, which they had reason to know were in place on Plaintiff's job site, and have refused to warn and advise of the dangers caused by their products even years after they had been exposed to them.

Despite Defendants' knowledge that their asbestos and/or asbestos containing products had contaminated ships, buildings and job sites where the Plaintiff was required to work, even to the present time, possessed with the information uniquely available to them relating to the dangerous effects of continued asbestos exposure, Defendants have refused or neglected to provide such information to the Plaintiff or the public at large. Defendants have deliberately, intentionally, and purposefully withheld such information from Plaintiff, thus denying Plaintiff the knowledge with which to take necessary safety precautions, good and proper decontamination procedures, periodic x-rays, and medical examinations or avoiding further dust exposure or cigarette smoking, the carcinogenic effect of which Defendants have long since learned is multiplied by exposure to their asbestos or asbestos containing products.

Specifically, even as of the present time, Defendants have absolutely failed to warn persons such as the Plaintiff, who Defendants knew were likely exposed to their asbestos containing products of the need for continued and regular health monitoring due to prior asbestos exposure; Defendants have never issued recall type letters or notices to prior users of their products; Defendants have intentionally delayed the use of warnings on asbestos products and failed to advise Plaintiff and others exposed to their products in the past of medical findings known to Defendants concerning the dangers of asbestos exposure; Defendants have suppressed the decimation of information to Plaintiff and the public at large and falsely represented facts to Plaintiff and the public at large concerning the dangers of present and past asbestos exposure.

Defendants' failure to warn and intentional misrepresentation took place before, during and after Plaintiff was exposed to the asbestos-containing products they manufactured. The Defendants' breach of their post-sale duty to warn Plaintiff of the

16

dangers posed by his exposure to Defendants' asbestos containing products was a substantial contributing cause of Plaintiff's damages.

## THEORY OF RECOVERY AGAINST DEFENDANTS BASED UPON THE MANUFACTURING AND SUPPLYING OF PRODUCTS WHICH WERE UNREASONABLY DANGEROUS PER SE

28.

Although Defendants' products were unreasonably dangerous because of their defective design and because of Defendants' failure to warn, even if the risk of the hazard related to the use of the Defendants' products was not discoverable under existing technology at the time they were designed and marketed, Defendants' products were unreasonably dangerous per se because of the intrinsically dangerous characteristics of those products, including their intrinsically dangerous construction, composition and design. Whether or not Defendants actually perceived or could have perceived the dangers of their products at the time they were designed and marketed, a reasonable person would conclude that the danger-in-fact of those products, whether foreseeable or not, actually outweighed the benefit which flowed from their use.

## THEORY OF RECOVERY AGAINST DEFENDANTS FOR INTENTIONAL AND WILLFUL MISCONDUCT

29.

With conscience disregard and indifference for the safety of the Plaintiff and other users of the products which Defendants manufactured, advertised, marketed, and sold, Defendants, acting through their servants, employees, representatives, and agents, placed their products in the market to be purchased and used by the public when Defendants knew that exposure to and use of their products could and would cause severe personal injuries and lung damage to the Plaintiff and other persons exposed to the products.

30.

Defendants, at all times herein mentioned, knew that their products and the component parts and accessories thereof, were defective, and that Defendants, each of them, intentionally, wrongfully and knowingly placed them on the market when they knew that their products would be handled by or used in the vicinity of persons such as the Plaintiff, James C. Turner, who had absolutely no knowledge of the dangers involved.

17

31.

Defendants implicitly represented, by placing their products on the market, that their products could safely be used for the purposes for which they were manufactured and could safely be used and handled by employees in various industries and at various job sites, such as on naval ships and various other naval shipyards and/or job sites located throughout the United States, where Plaintiff, James C. Turner, was, in the main part, employed.

32.

In researching, testing, manufacturing, distributing, labeling and marketing their products, Defendants did so with conscience disregard for the safety of the user of those products, in that the Defendants had specific prior knowledge that there was a high risk of injury or death resulting from exposure to or use of their products, including, but not limited to asbestosis, lung cancer, mesothelioma, and other asbestos related diseases and other forms of cancer. This knowledge was obtained, in part, from scientific studies and medical data to which Defendants had and have access and knowledge. Despite their knowledge of the dangers involved, Defendants continued to manufacture and distribute their products without attempting to protect users from or warn users of the high risk of injury and death resulting from exposure to their products.

33.

Defendants' intentional misconduct was motivated by their financial interest and the continuing uninterrupted distribution and marketing of their products. In pursuit of this financial motivation, Defendants consciously disregarded the safety of the user of their products and were, in fact, consciously willing to permit their products to cause injuries to persons, such as Plaintiff, James C. Turner, who they knew was exposed to their products without having any idea of the risk involved.

34.

Prior to placing their defective products on the market, Defendants knew and possessed medical and scientific data and other knowledge that clearly indicated that

18

asbestos and asbestos containing materials and products were hazardous to the health and safety of individuals such as the plaintiff, working in close proximity to such materials, and that Defendants had specific knowledge that there was a high risk of injury or death resulting from exposure to asbestos and asbestos-containing products, including but not limited to asbestosis, asbestos related pleural disease, lung cancer, mesothelioma, and other forms of cancer and asbestos related diseases. This knowledge was obtained, in part, from scientific studies and medical data to which the Defendants had access, as well as scientific studies performed by, at the request of, or at the insistence of said Defendants. With the intent to deceive the Plaintiff and with the intent that they should be, and remain, ignorant of such medical and scientific data and with the further intent to induce the Plaintiff to alter his position to his injuries and/or risk, and in order to gain an advantage, said Defendants committed the following acts of deceptive concealment:

A.   Defendants did deliberately cause to be suggested as a fact to Plaintiff, by not placing warning labels on their products, that it was safe for the Plaintiff to work in close proximity with such materials;

B.   Defendants deliberately concealed the hazardous nature of their products from Plaintiff by concealing the facts that asbestos fibers released into the air as a result of the use of the Defendants' products can, if inhaled, bring about pathological effects without noticeable trauma, when Defendants were possessed with knowledge that such material was dangerous and a threat to the health of persons coming into contact therewith and had a duty to disclose such facts to Plaintiff;

C.   Defendants deliberately failed to provide Plaintiff with adequate respirator protective devices when they were required to work in areas where they would be exposed to Defendants' products, even though Defendants knew that such protective measures were necessary, and had a duty to advise Plaintiff that, if such protective devices were not used, it would result in injury to the Plaintiff;

D.   Defendants deliberately concealed from Plaintiff the true nature of their industrial exposure to their products, in that Defendants knew that the Plaintiff, upon inhalation of asbestos fibers would in time develop irreversible lung damage, and would immediately be in danger of ill health, and concealed the fact that Plaintiff had in fact been exposed to harmful materials contained in their products and concealed that fact that the materials which Plaintiff was exposed to would cause pathological effects without noticeable trauma;

E.   Defendants deliberately failed to provide medical and scientific information to the public at large as to the true nature of the hazards of asbestos and actively concealed such known medical and scientific facts from the public and the Plaintiff; and

19

F.   The aforementioned deceptive concealment by Defendants of the true nature of the hazards resulting from inhalation of asbestos contributed in cause to Plaintiff's injuries.

## THEORY OF RECOVERY BASED UPON
## FRAUD, CONSPIRACY AND CONCERT OF ACTION

### 35.

Plaintiffs repeat and allege all allegations contained in all paragraphs above and below as if fully set forth herein and further allege with regard to The Flintkote Company (a member of IHF and QAMA), Garlock, Inc. (a member of the ATI), and Westinghouse Electric Corporation (a member of QAMA).

### 36.

These Defendants, individually and as agents of one another and as co-conspirators, aided, abetted, encouraged, counseled, assisted, agreed, and conspired among themselves and with other asbestos manufacturers and distributors a course of conduct that resulted in and is a legal cause of Plaintiffs' injuries and others similarly situated.

### 37.

These Defendants knew that the others conduct constituted a breach of duty and gave substantial assistance or encouragement to the other so to conduct itself.

### 38.

These Defendants acted in the following fashion:

A.   During the 1920's, information was published in the United Kingdom identifying asbestosis as a disease and anecdotally relating it to lung cancer. Metropolitan Life Insurance Company (Met Life) at the same time was studying asbestos related health hazards in the USA and Canada. Met Life was a major insurer of various risks within the asbestos industry and was vitally interested in this issue. Met Life determined to do a study of Canadian asbestos interests through McGill University in Canada. In exchange for funding to McGill, Met Life required a tangible quid pro quo from McGill University in the 1920's in exchange for them providing funding for a study of asbestos disease in Canadian miners. That was the result of the study would be solely within the control of Met Life. The study revealed a high percentage of asbestos miners suffered from asbestosis. The study was never published. Subsequently, Met Life through Dr. Anthony Lanza in the published medical literature, indicated that their studies showed that there was no evidence that asbestos exposure was a cause of disease in North America.

20

B.    In 1932, Dr. Anthony Lanza, Dr. Fellows, and others, assisted the Johns-Manville Corporation with medical examinations of over 1,000 employees of Johns-Manville's factory in Manville, New Jersey. The report of this study demonstrated that a large percentage of the employees suffered from asbestosis including employees not directly involved in the asbestos handling or manufacturing process. This 1932 medical survey (early evidence of bystander exposure and disease) was not published in the medical literature and therefor was unavailable to scientists studying the issue of asbestos disease. Met Life, Johns-Manville officials and the Defendants named in this suit were advised of the results of these studies, and continued to represent to the public that there was no significant health hazard presented by asbestos.

C.    Beginning in 1934, Johns-Manville Corporation, through Vandiver Brown, its attorney, J.C. Hobart, and Raybestos-Manhattan, through its agents, Sumner Simpson and J. Rohrgach; suggested to Dr. Lanza, Associate Medical Director of Met Life (insurers of Manville, Raybestos, and others) that Dr. Lanza publish a study on asbestosis in which they could affirmatively represent that asbestos exposure did not present any significant health risks. This was accomplished through Dr. Lanza's description of asbestosis as relatively benign despite clear evidence of its potentially "fatal nature," despite knowledge that it was or could result in death. While these facts were known by Dr. Lanza and the Defendants herein, this information was held in confidence from the general public. Dr. Lanza's study was published in the medical literature in 1935. The defendants were motivated, in part, by the desire to influence proposed legislation to regulate asbestos exposures and to provide a defense in lawsuits involving Manville, Raybestos, and others. By this time, the Air Hygiene Foundation (later to be called "IHF") was formed by Johns-Manville, Met Life, the Mellon Institute, KACC, Keasbey & Mattison Company, and others. The IHF was ordained to be a creature to represent the interests of industry, in connection with research work that would be used to combat claims for industrial or occupationally related dust diseases.

D.    In 1936, Dr. Lanza, Medical Director of the Air Hygiene Foundation (IHF), American Brake Block Corporation, Asbestos Manufacturing Company, Gatke Corporation, Johns-Manville Corporation, Keasbey & Mattison Company (through funding and direction by T&N, Raybestos-Manhattan, Russell Manufacturing(whose liabilities have been assumed by H.K. Porter Company), Union Asbestos and Rubber Company, and United States Gypsum Company, entered into an agreement with the Saranac Laboratories and Dr. Leroy Gardner, its medical director. Under this agreement, these companies would pay for asbestos related animal research by the lab, but retained the power to decide what information the researcher, Dr. Leroy Gardner, of the Saranac Laboratories could publish about the asbestos disease study and control in what form such publications were to occur. As the details of this study emerged unexpected study of an asbestos cancer connection were found. Defendants, after meeting and discussing these findings decided the cancer issue should be deleted and

21

discussion confined to a select group of industries. The results of the work at Saranac were published without the reference to cancer. The companies rewrote the study to suit their own ends, in several respects.

E.    The agreement to delete the references to cancer was unanimously reached on November 11, 1948, when representatives of the following met at the headquarters of Johns-Manville Corporation: American Brake Block Division of American Brake and Shoe Foundry, Gatke Corporation, Keasbey & Mattison Company (with the support of Turner & Newall)    Raybestos-Manhattan,    Inc.,    Thermoid Company(whose assets and liabilities were later purchased by H.K. Porter Company), Union Asbestos and Rubber Company, and U.S. Gypsum Company. U.S. Gypsum did not send a representative to the meeting, but instead authorized Vandiver Brown of Johns-Manville to represent its interest at the meeting and to take action on its behalf.

F.    At this November 11, 1948 meeting, these defendants and their representatives agreed to certain deletions contained within the substance of research started by Dr. Leroy Gardner at the Saranac Laboratories beginning in 1936. Dr. Gardner's research involved asbestos as it related to asbestosis. The carcinogenicity of asbestos in mice was an unexpected finding which was discovered in connection with an evaluation of the health effects of asbestos on humans with a critical review of the then existing standards of dust exposure for asbestos and asbestos-containing products.

G.    At this meeting, it was determined that Dr. Gardner's work should be edited to specifically delete material facts about the cancer-causing propensity of asbestos and the health effects of asbestos on humans; to soften the critique of the dust standards and then published it in the medical literature as edited by Dr. Arthur Vorwald. These acts were carried out by, Dr. Lanza, the medical director of the IHF. While discussions regarding these findings were conducted by members of the asbestos industry within the IHF, ATI and QAMA, this information was carefully omitted from the public.

H.    As a result of these conducts, Dr. Vorwald published Dr. Gardner's edited work in January, 1951, in the Archives of Industrial Hygiene and Occupational Medicine, (Vol. 3, No. 1), a journal of the American Medical Association. The published version stressed those portions of Gardner's work that the companies wished stressed, but omitted references to cancer, to human asbestosis, and to the inadequacy of the then-established threshold limit values (TLVs). Furthermore, that article made the claim that the published report was the "complete survey" of Dr. Gardner's work without any hint of what had been deleted. This altered version of the work was disseminated to university libraries, government officials, medical doctors, agencies, the public, and others.

I.    Dr. Gardner, believing that the cancer connection required immediate follow up work, was denied funding by his industry sponsors. When he attempted to obtain a grant through the

22

National Cancer Institute his request was killed after Dr. Lanza approached all members of the committee and implied that Dr. Gardner and the Saranac Labs were ill suited for such work. The request was killed. Dr. Gardner never understood or was given an explanation regarding this denial, but continued to press for industry cooperation to study employee records.

J.  The following companies and others were members of the trade association known as Quebec Asbestos Mining Association (Q.A.M.A.); Johns-Manville Corporation, Carey-Canada (individually and as successor to Quebec Asbestos Corporation), the Celotex Corporation (successor to Quebec Asbestos Corporation) National Gypsum Company (n/k/a Asbestos Claims Management Corporation), and Turner & Newall (individually and successor to Bell Asbestos). The members of Q.A.M.A. participated in the above-described misrepresentation of the work of Dr. Gardner published by Dr. Vorwald in the <u>AMA Archives of Industrial Health</u> in 1951. Evidence of the Q.A.M.A.'s involvement in this misrepresentation arises from co-conspirator Johns-Manville's membership in the Q.A.M.A. and its representative, Ivan Sabourin, acting on behalf of all Q.A.M.A.'s members. QAMA received a copy of the study.

K.  Defendants who were members of the Q.A.M.A. began on or about 1950 to formulate a plan to influence public opinion about the relationship between asbestos and cancer by influencing the medical literature on this subject by disseminating the aforementioned edited Saranac study literature to the public and to organizations and legislative bodies responsible for regulatory controls of asbestos with the specific intent of supporting the notion that the existing scientific information and data in their possession and control, showed little, if any risk of injury or disease from asbestos. Despite detailed knowledge that the methods and manner in which asbestos dust was counted and measured to determine safety levels was defective, despite knowledge that the IHF's own research was questioning the efface of the 5mppcf Air TLV, and the deletion of all references to cancer.

L.  The named members of QAMA and IHF again discreetly sponsored animal research at the Saranac Laboratories to do an evaluation of whether cancer was related to asbestos exposure. After a preliminary report authored by Dr. Vorwald in 1952 indicated that a cancer-asbestos relationship might exist in experimental animals due to the rising incidence of malignancy, the funding of the study was terminated and it was never publicly discussed.

M.  Subsequent to the termination of this study, the defendants, certain members of the IHF & QAMA, after the 7th Saranac Symposium decided it would be safer to do an epidemiological study. Oddly, the 7th Saranac Symposium minutes were never published. The new study was funded by QAMA under a contract with the IHF and conducted by scientists approved and hired by IHF. The work was done through the clinics of the asbestos mines, based on records kept by asbestos company doctors, that admittedly undercounted the incidence

23

of asbestos disease and had no tracking method for former employees that died of lung cancer.

N.   The results of this study predictably concluded that asbestosis did not increase a worker's chances of incurring lung cancer. At least this was the published result.

O.   The Q.A.M.A. defendants thereafter caused, in 1958, a publication of the work known as the Braun and Truan Study in which the findings regarding increased incidence of cancer in persons with asbestosis were watered down by the scientist. The published version of this study contained a conclusion that asbestos exposure did not display any increase in the incidence of lung cancer over the general population. This conclusion was known by the defendant conspirators to be patently false. The statistical cohort was manipulated to minimize the incident of cancers in a way that suggested that the rate of cancer was no greater among asbestos miners than the public as a whole. This was untrue, and in fact the raw data not made available until much later in the 1980's supported a contrary conclusion.

P.   The publication of this study concluding that asbestos exposure did not cause an increase in the incidence of lung cancer, the IHF, the Q.A.M.A. and the defendants affirmatively misrepresented to the public and concealed from the public the extent of risks associated with inhalation of asbestos fibers. Sales of asbestos fiber continue to rise.

Q.   In 1958, the Q.A.M.A. publicized the edited works of Drs. Braun and Truan at a symposium in an effort to spread the industries' news to the public that the inhalation of asbestos dust would <u>not</u> cause cancer.

R.   Beginning in 1946, as elaborated above and continuing with the publication of the 1958 Braun/Truan study, the traditional TLVs combined with these studies were used by the IHF, ATI and QAMA to support the argument to keep the standards for safe exposure at an excessively high level. These efforts inhibited the lowering of the threshold limit value due to the cancer risk associated with asbestos inhalation until 1968.

S.   In the mid-1960's, the Q.A.M.A. and defendants determined that they would create a separate scientific body and associate it with an independent sounding name, yet it would be funded and controlled solely by the QAMA. In this manner it could issue findings and statements favorable to the asbestos industry and would have the appearance of scientific neutrality. In this way they could effectively question the integrity of publicity that was contrary to Industries' interests, with the appearance of unbiased views and opinions.

T.   The following companies were members of the Magnesia Insulation Manufacturers Association (MIMA): Philip-Carey Corporation (predecessors to Celotex), Johns-Manville; and others.

24

U.  In 1955, these companies caused to be published the MIMA 85% Magnesia Insulation Manual. This manual stated that asbestos-containing products offered no hazard to workers who used these products, despite its members' knowledge to the contrary. These manuals were sent to contractors and suppliers of asbestos products.

V.  The following companies were members of the trade organization known as the Asbestos Textile Institute (ATI): Raybestos-Manhattan, Johns-Manville, H.K. Porter, Keasbey & Mattison (Individually and through Turner & Newall), Garlock, Inc., National Gypsum (n/k/a Asbestos Claims Management Corporation), and others.

W.  In 1947, the members of the ATI and IHF, received a report from W.C.L. Hemeon, an industrial hygienist, regarding asbestosis that suggested reevaluation of the then-existing TLVs for asbestos exposure. Thereafter, these defendants continued to press the view that the 5mppcf standard was adequate.   They also represented to The American Conference of Governmental Industrial Hygienists (ACGIH), that all information they had supported the 5 mppcf standard.

X.  In 1953, National Gypsum (n/k/a Asbestos Claims Management Corporation), through its agents, in response to an inquiry from the Indiana Division of Industrial Hygiene regarding health hazards of asbestos spray products, refused to mail a proposed response to that division indicating that a respirator should be worn by applicators of the products. National Gypsum's response distorted and fraudulently misrepresented the need for applicators of asbestos spray products to wear respirators and fraudulently concealed from such applicators the need for respirators.

Y.  In 1955, Johns-Manville, through its employee, Dr. Kenneth W. Smith, M.D., published in the <u>AMA Archives of Industrial Health</u>, an article entitled "Pulmonary Disability in Asbestos Workers." This published study materially altered the result of an earlier study in 1948 concerning the same set of workers.

Z.  In 1955, the National Cancer Institute held a meeting at which Johns-Manville (individually and as the representative of the Defendants and the IHF, and Dr. Vorwald (as agent of co-conspirators) represented that there were no existing animal studies concerning the relationship between asbestos exposure and cancer.

AA.  In 1957, the members of the ATI, jointly rejected a proposed research study on cancer and asbestos out of fear that the results would demonstrate the same asbestos cancer connection as in the U.K. and would smear the North America asbestos industry.

BB.  In 1964 the members of the ATI met to formulate a plan for rebutting the association between lung cancer and asbestos exposure that had been recently discussed by Dr. Irving J. Selikoff. Thereafter, these members of the ATI embarked upon a public relation's campaign to minimize the association

25

between asbestos exposure and lung cancer. Representatives of ATI, IHF and QAMA continued to state publicly they were aware of no cases of asbestos related diseases in North America.

CC.    In 1970, through their agents, defendants, The Celotex Corporation and Carey-Canada, represented to OSHA at public hearings that it had been in the asbestos business since 1918 and found no reported conditions of asbestosis or lung disease. This statement was also issued to people inquiring of the dangers of asbestos and was issued to the public in general.

DD.    All of the foregoing actions were known by the Defendants and expressly or tacitly agreed to by them.

39.

These Defendants:

A.    Did a tortious act in concert with one another or pursuant to a common design with each other;

B.    Knew that each other's conduct constituted a breach of duty and they each gave substantial assistance or encouragement to the other so to conduct himself; and/or

C.    Gave substantial assistance to the other in accomplishing a tortious result and its own conduct, separately considered, constitutes a breach of duty to the Plaintiffs.

40.

The acts of the Defendants as described above, constitute a fraudulent concealment and/or a fraudulent misrepresentation that proximately caused injury to the Plaintiffs in the following manner:

A.    The material published or caused to be published by the defendants was false and incomplete in that the defendants knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-containing products.

B.    Defendants individually, as members of a conspiracy, as agents of other co-conspirators, and as aiders and abettors of each other intended that the publication of false and misleading reports and/or the nondisclosure of documented reports of the health hazards of asbestos;

    1.    maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-related products;

    2.    assist in the continued pecuniary gain of the defendants through the sale of their products;

26

3.  influence in the Defendants' favor proposed legislation to regulate asbestos exposure and;

4.  to provide a defense in lawsuits brought from injury resulting from asbestos disease.

C.  Plaintiffs reasonably relied upon the published medical and scientific reports on the extent, nature, and existence of hazards of asbestos and asbestos-containing products to continue exposure to asbestos because of a belief that it was safe.

D.  Defendants individually, as members of a conspiracy, and as agents of each other intended that the Plaintiffs rely upon the published report regarding the safety of asbestos and asbestos-containing products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products.

E.  Defendants individually, as members of a conspiracy, as agents of each other, as aiders and abettors of each other are and were in a position of superior knowledge regarding the health hazards of asbestos commissioned by the defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-containing products.

## THE FLINTKOTE FRAUD ALLEGATIONS

### 41.

The Flintkote Company, both on its own for its financial benefit, and by and through its wholly-owned subsidiary, Flintkote Mines, Ltd., were members of the Quebec Asbestos Mining Association ("QAMA"), the Industrial Hygiene Foundation ("IHF"), the Gypsum Association, the Asbestos Cement Products Association ("ACPA"), and the Asbestos Textile Institute ("ATI"). Employees of both the Flintkote Company and Flintkote Mines, Ltd., served in various capacities in each of these organizations, as representatives, office holders and special committee workers, and assisted in implementing and formulating certain policies which these associations pursued with and on behalf of their representative asbestos manufacturing associations. The purpose of certain of these policies was to mislead the public regarding the hazards asbestos presented, to publish medical and safety literature which misrepresented the hazards that asbestos dust presented, to promote epidemiological studies which did not accurately

portray the potential hazards of asbestos, to issue and promulgate public announcements and press releases regarding the hazards of asbestos, which they knew to be untrue, and other acts of conspiracy and fraud, as set out herein.

42.

The Flintkote fraud and conspiracy story is complex. Perhaps it can best be typified by the following: The Flintkote Company, through various of its managerial personnel, and Flintkote Mines, Ltd., were members of QAMA, referenced in the Petition above. They were privy to a policy that QAMA would not publish or disseminate any unfavorable information about asbestos dangers to the public. In 1972, the Quebec Asbestos Mining Association issued the following statement to the public, through various public relations agencies: "There is no evidence that exposure to minute amounts of asbestos present in community air constitutes any hazard . . . there is no evidence of harm to the general public, we have not found a single case." Flintkote and its QAMA officers were fully aware of this statement, and concurred in its release. Flintkote knew that this information was untrue, as the following allegations demonstrate.

43.

Flintkote is a long-time member of the Asbestos Cement Products Association ("ACPA"), and has key employees serving on its Association Health and Safety Council. In a letter of the Asbestos Cement Products Association Health and Safety Council, dated November, 1959, the letter confirms a meeting which was held. In attendance at this meeting were: W.J. Burke and W.H. Knorr, of the Flintkote Company and Mr. J.A. Main, of the Flintkote Company, who was Chairman of the meeting. The letter indicates at the meeting, the following discussion was held: "It is acknowledged that neighborhood exposure cases appear to be a very real situation. It is popularly thought that there is no genuine health risk, though

28

it is acknowledged that when fibers are inhaled, they are retained in the lungs and it is possible that even one fiber could cause mesothelioma." It was discussed as to whether the Association and its constituent membership should warn the public. It is noted by Dr. Pelnar that mesothelioma is being found in the United Kingdom and in the United States, and elsewhere. He appears to be implicating fibers other than crocidolite. Mesothelioma, in 80% of the cases investigated, showed an occupational exposure which might be mainly, though not exclusively, due to crocidolite. The letter notes that the ACPA has become an associate member of the IHF. It goes on to state, "From what we have learned, we can assume asbestos cement Products may pose health problems where there is long term exposure . . . it is demonstrated that there is a dose relationship between exposures and disease. Malignancies related to asbestos are clear. Smoking appears to compound the risk." None of this information was given to the public.

44.

Flintkote was also a long-time member of the Gypsum Association. In September of 1967, the Gypsum Association's Safety Committee discussed the issues and concerns of neighborhood malignancies and asbestosis in connection with asbestos mining operations and asbestos product manufacturing operations respecting asbestos dust emissions. Mr. R.W. Henley and J. Tuffy, of the Flintkote Company are on this committee and were in attendance at this discussion. At that time the Gypsum Association members are expressing uncertainty as to the existence of any measurable threshold of dust and the potential of dust to cause harm to the neighborhood bystanders to these operations. This fact is important in that it demonstrates detailed knowledge of the dangers and risks of injury on the part of Flintkote and that, in fact, Flintkote has knowledge in 1967 that there is virtually no safe exposure level connected with asbestos.

45.

Mr. J.A. Main, a corporate official of the Flintkote Company and Flintkote Mines, Ltd., was in attendance at the summer meeting of QAMA in August of 1966. At this meeting, Mr. Main, along with other industry representatives discussed methods by which the asbestos industry could counter recent bad publicity about asbestos. It was the stated policy of QAMA to promote the idea that the presence of asbestos-related pleural plaques and the diagnosis of mesothelioma had no causal relationship to each other, despite having knowledge that the contrary was true. These industry officials agreed that making this statement could give the industry ammunition with which to fight off attacks. It was agreed by Mr. Main, of the Flintkote operations, as well as others in attendance, that they will use public relation devices to funnel information around the world to promote the idea that the use of asbestos has improved industry; that there has not been a single objective complaint about its dangers; and that asbestos communities are good places to live. It is agreed by all present that the asbestos industry is still viewed by the media as being authoritative on the dangers. QAMA will, therefore, use this to its advantage to counteract dangerous medical statements made in the United States. It is agreed at that time that QAMA will use a new research counsel . . . "we will announce our research counsel and make it __appear__ that we are launching an important international health project of truly humanitarian significance." Moreover, "we will express criticism of Selikoff's style and we will have to be dramatic in doing so." Dr. Selikoff was a medical expert publishing studies at that time strongly indicting that asbestos is carcinogenic. It is further agreed by those present that "rather than make these announcements from industry-sponsored QAMA we will do so from the health council itself." That way, the statements will be more believable.

46.

In October of 1966, QAMA publishes a newsletter regarding a make up of the members of what appears to be the new "Institute of Occupational and Environmental Health" ("IOEH").   The industry association touts: "Members of our Scientific Committee of QAMA are also members of the Institute of Occupational and Environmental Health."  The fact is concealed from the public.  The Executive Committee of this institute is composed entirely of industry (QAMA) members.  The Board of Directors of IOEH are all QAMA members, including Mr. J.A. Main, of the Flintkote Company.  It is agreed and understood that the establishment of this organization, under a new name and incorporation, will still be funded by QAMA, and will posture itself as free as possible of bias in the eyes of the scientific community.  This is important to facilitate our acceptance of our activities by the scientific world . . . the location of the institute in the same quarters of QAMA is not "too unfortunate" and is not viewed as a serious impediment.  The Committee (QAMA) is going to set the agenda for the foundation.  Five goals are announced by QAMA with respect to the institute.  QAMA will direct what will be done in connection with supporting research; we will contact scientists and medical schools around the United States to locate scientists who are interested in generating interest in our aimed studies; we will not publicize our activities; we will be mindful of the strategies by the tobacco industry; and we will retain the right of veto power over published statements.  Mr. J.A. Main, of the Flintkote Company and Flintkote Mines, Ltd., was present and agreed to these tenets.  At this very same meeting, information was disseminated from European studies which indicated that second-hand exposure of wives doing laundry can cause mesothelioma.  Additionally, it was acknowledged that many of the papers presented in the overseas study were pessimistic and tended to suggest that even short exposures can cause malignancy.

31

47.

In February of 1967, J.A. Main is promoted to Director of QAMA. It is acknowledged that the Association is experiencing trouble regarding longshoremen concerns about asbestos health in the United Kingdom in connection with the method of packaging of asbestos Products from Canada. It is also discussed and agreed those reports of mesothelioma in Pennsylvania from asbestos exposure would not be published in Minutes of the Tokyo QAMA conference. It was agreed at this conference that the QAMA would set up a slush fund with ATI and ACPA, most of the money coming from Canadian sources in order to promote the scientific committee's "quiet revolution." At this meeting, the Association discusses the increasing use of asbestos world wide, and at the same time, again endorses continuing to downplay asbestos hazards.

48.

On May 25, 1967, a special technical committee meeting of QAMA is held. Mr. J.C. Blais and Mr. D. Poirier are in attendance. Both are designated employees of Flintkote Mines, Ltd., however, Mr. Blais and Mr. D. Poirier are stockholders and corporate officials of the Flintkote Company. With reference to longshoremen concerns respecting asbestos bags, it was agreed that they would study the loading process and look for ways to pin the blame of exposure to the stevedores themselves. At this time, discussions are held regarding coordinating certain "aimed medical studies" between QAMA and ATI, for IOEH.

49.

At the August 1967 QAMA meetings, Mr. J.A. Main, QAMA Director, is present. It was discussed that despite the British change in the United Kingdom's laws regarding the packaging of asbestos, no changes would be made until they could get further clarification of what would be required. Additionally, it was agreed that the industry will make no admission with

respect to Dr. Selikoff's challenge to the industry to do something to make asbestos less potentially hazardous to human health. At the same time, this Association acknowledged that the industry is looking at modifying handling methods to reduce the risk of exposure from the dust. The QAMA Public Relations Committee discussed meeting with the Scientific Committee to discuss the possibility of producing counter propaganda regarding medical issues.

50.

In August, 1967, Mr. J.A. Main, of Flintkote Corporation, meets with Dr. Wright, of the Occupational and Environment Health and Safety Committee of QAMA. Dr. Wright notes that there is a threat of clear-cut evidence of lung cancer associated with asbestos fiber. They are also advised by Dr. Enterline that there are excessive deaths among asbestos textile workers. The Committee agrees that they will have the Public Relations Committee of QAMA produce some rebuttal material -- even though there is no scientific data available to support the Public Relations Committee's position. During this time period, both QAMA and ATI, with the full knowledge of members, were issuing public statements that they are not aware of a single case of injury from asbestos.

51.

On November 13, 1967, Mr. Poirier of the Flintkote Company, is in attendance at the QAMA meeting, where the over wrapping problems of longshoremen in the United Kingdom is admittedly unresolved. It is determined that the Committee will blame bag damage on workers.

52.

In March, 1968, the QAMA holds its meeting in the Bahamas. Mr. J.A. Main of the Flintkote Company is in attendance, along with other Flintkote employees. It is announced that the QAMA Institute of Occupational Environmental Health now has a budget of $250,000.00. It is determined

33

that for public relations purposes, QAMA will announce that there is no scientific evidence that anyone has ever contracted any disease from exposure to Products containing asbestos. QAMA pronounces that "[we] will state that we are studying this in Canada, and that previous research shows that everything is okay." It is noted that the prior year, Flintkote Mines produced 36,618 tons of asbestos. At the same meeting, it is suggested that a new study will be done at several locations in the New Orleans area, sponsored by QAMA, and Metropolitan Life Insurance Company. One of the sites for this study is the Flintkote Company manufacturing facility on Galvez Street, New Orleans, Louisiana. The Minutes of this special meeting support the idea that the industry knows that the threshold limit values established by industry and accepted by industrial hygiene practices as safe are, in fact, not safe. At this meeting, and in the Minutes, it is acknowledged that the cancer hazard potential for asbestos has been known since 1935. After talking to tobacco lawyers, QAMA members suggest not getting carried away by the medical profession. At this conference, it is also acknowledged that Flintkote and the industry know of mesothelioma and its relationship to asbestos exposure.

53.

At a QAMA meeting in May of 1968, Mr. D. Poirier, of Flintkote was in attendance. At this meeting, it is pointed out that the number of lung sickness claims is increasing with QAMA members stating that "[we] need to place industry representatives on the workers' compensation boards." It is also discussed that the dust studies done by the Institute of Occupational and Environmental Health ("QAMA") at Johns Manville Sales Corporation are disappointing. It is agreed that each Company will look in to obtaining a legal opinion as to the advisability of placing a warning on fiber bags.

34

54.

In September of 1968, at the special QAMA meeting, attended by Flintkote Mines, Ltd., Mr. J.A. Main, Director of QAMA, as well as a Flintkote Corporation corporate official, and Mr. D. Poirier, the Institute of Occupational and Environmental Health Committee adopts a resolution to place warnings on bags: "Caution. Bag contains chrysotile fiber -- use protective devices. Inhalation over long periods may be harmful." At this meeting, the tabulation of Quebec Mining tonnage was also made, showing an all time high in the export of Canadian asbestos.

55.

In November of 1968, a letter is sent from Paul A. Filteau to Mr. J.A. Main, of the Flintkote Company, and to other asbestos companies, transmitting minutes of the September, 1968 meeting. It is acknowledged that the following aspects were covered at the meeting: an increase was reported in industrial diseases related to asbestos; that the asbestos business in Canada was still on the upswing; Dr. Newhouse's report on mesothelioma was based on levels of exposure that were alarming to the industry; there were reports of cases of neighborhood exposures and disease; the shipyard studies by Dr. Selikoff indicated that there was very heavy exposure reported; and that the United States Association of Governmental and Industrial Hygienists was contemplating a 2 fiber per cc standard, but the Antigua QAMA Conference has had an impact, moving it from 5 million particles per cubic foot to 2 million particles per cubic foot (maintaining exposure guidelines at levels both the industry and Flintkote knew to be unsafe). It is noted that the United Kingdom has now established a 2 fiber per cc of air. It is acknowledged by the industry that the clouds are about to burst; the claims are mounting and that procedures should be systematically placed to have all claims canceled. The Institute (IOEH) doctors are well respected and are coordinated with our Institute. It is the

35

intention of QAMA members to use its doctors to influence workers' compensation boards. Flintkote is fully involved in this decision.

56.

In December of 1968, in a transmittal letter to Mr. J.A. Main, of Flintkote regarding a QAMA meeting, it was agreed that the employers would arrange to place their representatives on workers' compensation boards. That way, there could be a collaboration between the asbestos clinic and miners, and the workers' compensation boards. It was noted that the purported Johns-Manville bag warning was not yet in effect. It was further agreed that the asbestos companies would stop giving asbestos to the schools for modeling or molding purposes. Additionally, the Committee agreed to contact the government about direct participation in any new legislation regarding air pollution by the government.

57.

In the March, 1969, meeting of the Health Council of QAMA, listed in attendance are Mr. James Moran, Mr. J.A. Main, and Mr. W. N. Knorr, all of Flintkote. It was noted in this meeting that the QAMA studies demonstrated that the respirators in use were not satisfactory for protection from asbestos dust. It was agreed that QAMA would implement a safe practices code, which would be prepared for the purposes of limiting the liability of the manufacturers. Dr. Wright advised the Committee on the current assessment of asbestos as an environmental health problem, noting that 80% of asbestos workers in the United Kingdom have asbestos-related problems. Dr. Wright noted that cancer -- the risk of cancer -- for asbestos workers could be as high as 90 times the general public population. It was further noted that the mechanism for the QAMA funding for scientific work that the Directors of QAMA, not the scientists, have the final say so on what gets funded and published.

58.

March 10, 1969, the QAMA transmits a letter of the Minutes of the January 1969 meeting. Mr. J.A. Main, and Mr. Poirier for Flintkote were in attendance. Dr. Wright indicated he thought he may not be able to hold his scientific committee together, noting that the asbestos industry had a serious problem and could not leave the matter to others (referring to the Scientific Committee) and that the industry must fight its own battles before someone else determines the issue of the hazards. It is noted that Threshold Limit Values ("TLVs") are being reduced in both the United Kingdom and the United States.

59.

April of 1969, at the QAMA special meeting, where Mr. J.A. Main and Mr. D. Poirier of Flintkote are in attendance, it was announced that shrink wrap of asbestos pallets would begin at the request of only certain customers. It was also acknowledged that industrial disease and accident claims were increasing. QAMA members agreed to use a tactic of using industrial doctors with sympathy to industries, and industrial standards to attempt to defeat mesothelioma claims.

60.

June, 1969, Mr. J.A. Main and Mr. Poirier of Flintkote, attend an IOEH meeting wherein the research of the New Orleans, Louisiana, plants was discussed as follows: "We are still waiting on National Gypsum's results. Both Drs. Thompson and Rodner report that mesothelioma will become an epidemic in the future. It is agreed that the Association will publish a book entitled 'Toward the Safe Use of Asbestos Fibers.' No release of this book will be made until the Executive Committee approves of it." Regarding cautionary labels, the legal counsel of various companies are not yet in agreement; therefore, no meeting has been called. A transmittal letter follows this meeting from Mr. J.A. Main, of Flintkote, wherein he admonishes

all members to destroy Pages 8 and 9 of the Minutes, and to substitute them. This removes references in the Minutes to a "mesothelioma epidemic" and the "industry's view."  It is also announced that Mr. Main is retiring.

61.

In July of 1969, Mr. J.A. Main indicates that he had not received any response from the users of asbestos with regard to Johns-Manville Corporation's ("JM") cautionary label.  Additionally, it was noted that Mr. Main was retiring from all duties with the Flintkote Company.

62.

In October of 1969, it is acknowledged in a QAMA meeting that, based on discussions from the International Congress on Occupational Health, it would seem that all asbestos fibers are carcinogenic.  Mr. Poirier, of Flintkote, was in attendance.  Additionally, Dr. Wright, regarding the New Orleans, Louisiana, study of asbestos cement workers produces his report. It is important to note that the plant workers in connection with this study were studied, and not advised that they were working in hazardous conditions or in conditions wherein improper safety methodologies were being followed.  Quite simply, x-rays were being taken without explanation as to their purpose.  The advisability of the use of warning labels was still being discussed by QAMA and its members.  Industry survey notes that the demand for asbestos was still strong.

63.

On November 29, 1969 the Quebec Asbestos Mining Association agreed by all present, including the representatives of Flintkote Mines, Ltd., and Flintkote Corporation, not to let epidemiology work rest in the hands of the University or the government.  It is agreed that all work by any QAMA funded research would be kept in "industry's hands."

64.

In a January, 1970 letter from Asbestos Corporation, Limited, to QAMA companies, including Flintkote Mines, Ltd., outlined an agreement that warnings would be placed on bags of asbestos; however, it would be some time before the current backlog of inventory of bags without warnings would be used up.

65.

In March, 1970, the QAMA special meeting is held wherein in attendance Mr. M. C. Carpenter and Mr. A. Hooker, both of Flintkote were present. Those in attendance discussed the following: The sales outlook shows an increase over last year. The Association Minutes acknowledged and noted historically that there were questions about asbestos and cancer, dating back to the 1940s. It was known that the major reason that the asbestos exposure standards in the U.S. are not as low as in the United Kingdom, is due to the Institute of Occupational and Environmental Health (QAMA). It is agreed by the Association that publicly, the asbestos industry would take the position that it wants to do what is necessary. However, it was agreed by all, though not publicly disclosed, that haste is not desirable.

66.

In October of 1971, the QAMA meeting is attended by Mr. M.C. Carpenter, Director of QAMA, with Mr. A.R. Hooker, of Flintkote Mines, Ltd. It is noted that Flintkote has closed its asbestos mines, and that Flintkote Mines, Ltd., is being phased out by the Flintkote Company.

67.

In March of 1972, the annual QAMA meeting is held in Jamaica. It is noted that Dr. Cartier, a physician expert who has served QAMA for many years, will now be a consultant to the Canadian Workers' Compensation Board. The object was to have a top industry specialist render decisions on pneumonology and pathology. It was agreed that QAMA would maintain a

39

close contact with the Asbestos Information Committee of North America, and that they will make available, their own internal activities and research. The Environmental Control Committee advised McGill University Environmental Studies about QAMA's studies regarding respirators and the best kind for protection.  McGill University had agreed not to publish the performance figures about respirators, and to let QAMA see all papers prior to publication.  At this meeting, it is indicated that asbestos will no longer be used for or in connection with road aggregate due to pollution concerns. Further, it is noted that lung disease claims increased in 1971.  It is further agreed that QAMA members would make the following misleading and false informational statement to the public:  "That the asbestos industry has recognized for years that there are health concerns with asbestos.  That the asbestos industry began consulting with the Saranac Laboratories in the 1920s.  That we continue to support work at McGill University Drs. Wiell and Jones of New Orleans, Louisiana.  QAMA will continue to state publicly that only cigarette smokers get lung cancer; that there is no risk of harm to the general public; that mesothelioma is associated only with blue asbestos (crocidolite asbestos); that there is no evidence to support the notion that there is an epidemic occurring with asbestos-related injuries; that no case of mesothelioma has ever been reported in Canada; [and] that lower general environmental asbestos levels do not constitute a significant risk to the population in terms of the development of lung cancers."  This information is given to the United States government by the asbestos industry, despite having information in their possession that the bulk of this is untrue.  At this very same meeting, Dr. Wright issued a report detailing the following facts: Lung cancer is, in fact, seen in those asbestos workers who are heavily exposed; it has been demonstrated that asbestosis can develop in individuals with less exposures than previously thought; that it is demonstrated that incidents of asbestos-related diseases appear to be even

greater in manufacturing and insulation workers. It is agreed at this meeting that the "Asbestos and Your Health" leaflet will be produced to the public, which states the following misleading and knowingly false facts: "Chrysotile asbestos does not present a risk to the general public; that asbestos presents no health hazards to the general public; that asbestos is not a major air pollutant; that asbestos does not stay in the lungs; that Chrysotile asbestos can be safety used in the work place; that the health risk and concerns of and concerning asbestos are unwarranted and erroneous; that there is no evidence that minute exposure of asbestos presents any health hazard to the public." The Minutes of this meeting conclude with the following statements: "That there has been a small decline in the use of Canadian asbestos for the year 1971, but the forecast for 1972 is ahead of 1971; that the Flintkote Mines ceased operations because they exhausted the ore body," and it is agreed that it would be highly imprudent to permit additional contamination of the public environment with asbestos. This last fact was not given to the public.

## ADDITIONAL ALLEGATIONS OF MISCONDUCT AGAINST WESTINGHOUSE (NOW KNOWN AS CBS)

### 68.

Plaintiffs reallege all prior allegations made against all defendants, including Westinghouse, in extenso, and further aver:

### 69.

Westinghouse has been involved with asbestos since at least 1908.

### 70.

Westinghouse has manufactured or distributed over 101 asbestos-containing products, including turbines.

### 71.

Westinghouse manufactured asbestos-containing turbine insulating blankets that at one time contained amosite asbestos.

41

72.

Westinghouse specified asbestos-containing insulation products for use on and around its turbines.

73.

Westinghouse regularly provided asbestos insulation to its customers for installation on its turbines.  Additionally, Westinghouse often installed the insulation through its service department.

Westinghouse incorporated the following asbestos or asbestos-containing material in its products including:

| | |
|---|---|
| Asbestos Cloth | Paper, Millboard, Sheet |
| Block | Pipe covering |
| Sound Deadened | Asbestos Fiber |
| Pulverized Asbestos | Asbestos Fiber Spray |
| Blankets | Gaskets |
| Packing | Yarn |
| Micarta | Moldarta sheets |
| Wire-Inserted Asbestos Cloth | Micarta Tubing |
| Tape | Micarta Bars |
| Ebony Finish Asbestos Lumber | Asbestos Cement Sheet |
| Asbestos Cement | |

74.

C. Wayne Bickerstaff, Westinghouse Corporate Industrial Hygiene Manager, has admitted that Westinghouse knew about the connection between asbestos and cancer in the 1940's.

75.

Also, Westinghouse's Edgar C. Barnes, industrial hygienist, and headquarters industrial hygienist,  Wilbur Speicher expressed concern in internal documents about the hazards posed by the use of asbestos-containing materials in a number of Westinghouse departments, including those in which Westinghouse blankets were manufactured and where asbestos was being used in the manufacture of lagging for heat insulation of steam turbines.

76.

In 1946, Westinghouse industrial hygienist, Edgar C. Barnes, warned Westinghouse management that worker protection against asbestos, used in heat insulation for steam turbines, was hardly suitable or adequate.  Mr. Barnes noted that, in several cases, workers had lung conditions that might be associated with exposure to asbestos dust.

77.

Elsewhere, in 1948, Mr. Barnes called attention to the hazards of asbestos dust from a saw and from cutting asbestos materials.  He warned that considerable care be taken to minimize the asbestos hazard.

78.

In 1946, Westinghouse issued a process specification which contained the following caution:

> CAUTION CLAUSE: DO NOT BREATHE DUST FROM FIBERGLAS OR ASBESTOS.  AVOID CONTACT OF FIBERGLAS OR ASBESTOS WITH THE SKIN. WORKERS HANDLING FIBERGLAS OR ASBESTOS MUST BE PROVIDED WITH AND USE A WELL VENTILATED ROOM, AND BLANKET FILLING OPERATIONS MUST BE CONDUCTED UNDER A HOOD PROVIDED WITH SUFFICIENT DRAFT TO CARRY THE DUST PARTICLES AWAY FROM THE WORKMEN.  IN ADDITION, THE WORKMEN MUST BE PROVIDED WITH AND USE GOGGLES AND SHOULDER LENGTH GLOVES OF AN IMPERVIOUS MATERIAL.  USE RESPIRATORS ON ANY JOB WHERE THE DUST IS NOT PROPERLY CARRIED AWAY BY THE HOOD.

79.

As early as 1948,  Westinghouse was aware of the need for good ventilation and dust collection systems in all areas where asbestos dust was present.  The industrial hygiene department recommended the installation of the ventilation and dust collection system so that Westinghouse could "effectively defend" workers' compensation claims that might arise in the future.

80.

Westinghouse recognized the hazards of bystander exposure as early as 1948. Westinghouse knew early on that dust from asbestos cloth and lagging was a hazard.

81.

In 1952 Wilbur Speicher of Westinghouse's industrial hygiene department stated that asbestosis could be far advanced before an x-ray could detect it.

82.

In 1953, Westinghouse drafted a document called an Asbestos Safe Practice Sheet. In this Safe Practice data sheet, Westinghouse admits that exposure to asbestos could cause a chronic lung disease known as asbestosis. Westinghouse further admits that persons working in asbestos dust should wear airline respirators to protect them from the asbestos fibers. In 1953, Westinghouse knew that the asbestos fibers which caused disease were those which could not be seen. In 1953, Westinghouse also knew these fine, invisible particles caused asbestosis.

83.

In spite of Westinghouse's overwhelming knowledge of the dangers of asbestos, Westinghouse intentionally did nothing to protect workers, like the plaintiffs, who would be exposed to those hazards when they worked with or near Westinghouse asbestos-containing products.

84.

The action Westinghouse should have taken in view of its knowledge of the hazards of asbestos, i.e. warning the workers, was well-known to Westinghouse.

85.

Westinghouse was familiar with the proper industrial hygiene procedures to follow when developing a new product for the market and when faced with a product that posed hazards. The articles of Dr. T. Lyle

Hazlette, the medical director for Westinghouse, discussed the need for hazard testing and workers' education. In the Hazlette articles, Dr. Hazlette advised that it was good industrial hygiene to do the following:

 (a) investigate the hazards of a new product before selling it;

 (b) warn the workers and educate them about the hazards to which they may be exposed.

These two Hazlette recommendations were good practice if followed. Unfortunately, Westinghouse failed to follow Dr. Hazlette's advice. None of the information regarding the hazards of asbestos nor advice of how to protect against those hazards was communicated by Westinghouse to the workers, like the plaintiffs, customers, and industry users of Westinghouse's products.

86.

In 1976, Westinghouse's Large Rotating Apparatus Division issued a report on the department's attempt to eliminate the use of asbestos. The report admitted that the hazards of breathing large quantities of asbestos dust had been recognized since ancient Rome and that the dangers of asbestos had become widely recognized as an industrial hazard in 1936. This document also contained a long list of Westinghouse products in which asbestos was still being used in 1976.

87.

Westinghouse's membership in industry organizations, such as the Industrial Health Foundation(IHF) and the National Safety Council, show that it had access to the information regarding the hazards of asbestos since the 1930's.

88.

The Industrial Hygiene Foundation began as the "Konicide Club". Formed in 1932, the Konicide Club, (the "Club") was initially organized to deal with the increasing problem of occupationally related silicosis cases.

The Club eventually expanded its focus to include asbestos related claims. Dr. T. Lyle Hazlette, medical director of Westinghouse Electric, was a charter member.  At a Konicide Club meeting in 1933, Dr. Leroy Gardner of the Saranac Labs in Saranac, New York, gave an address on "What We Know About Asbestos."

89.

Shortly thereafter, the Club and its members played an start up role in the organization and conduct of a meeting held at the Mellon Institute and the 1936 Silicosis Conference.  From these two meetings, the IHF evolved.

90.

Westinghouse was a charter member and controlling force of the IHF in 1936 and continued its membership until 1984.   Joseph Dilworth, Westinghouse's president, served as a member of the Board of Directors for many years.  Dr. T. Lyle Hazlette, medical director for Westinghouse, represented Westinghouse in the IHF medical committee.  Westinghouse held controlling, decision making positions with the IHF.

91.

Westinghouse received the Industrial Hygiene Digest from 1937-1967. The Industrial Hygiene Digest was published by the IHF monthly beginning in 1937.  Through the Digest, Westinghouse received current abstracts of worldwide literate on workplace illnesses, including asbestos related diseases.

92.

As interest in occupationally related pneumoconiosis, silicosis, and asbestosis grew, industry lawyers concerned with workers' compensation claims, and company representatives and consultants, such as Anthony J. Lanza of Metropolitan Life Insurance Company, sought greater participation in the Club meetings. By 1939 its purpose fulfilled, the Konicide Club ceased its meetings.  The IHF by this time was well on its way to becoming a force in the industrial hygiene community.

46

93.

The IHF was created by the asbestos industry, including Westinghouse.

94.

A purpose of the IHF was to help the asbestos industry with its industrial hygiene and health problems. Far from being an independent industrial hygiene organization, the IHF was a creature of the asbestos industry, financed and founded to do the industry's bidding. The IHF provided a means for performing confidential asbestos studies and compiling medical, legal, and industrial hygiene knowledge for the member companies to use, suppress, or manipulate to maintain profits.

95.

The principal research contractors used by the asbestos industry were the Saranac Laboratory and the IHF.

96.

In 1947, an industrial hygienist who worked for the IHF, W.C. L. Hemeon drafted a report that emphasized the inadequacies of the then current Threshold Limit Values (TLV) of 5 mpcf and recommended that the TLV be re-evaluated. This report was suppressed by the IHF and the Quebec Asbestos Mining Association (QAMA) for whom it was done.

97.

In 1957, the QAMA arranged with the IHF to have Dr. Daniel Braun study the relationship between asbestos exposure, asbestosis and lung cancer. In 1957, Dr. Braun and his co-author Truan reported to the QAMA that asbestosis did increase a worker's chance of developing lung cancer. The IHF and QAMA and its members, including Westinghouse, kept this report confidential.

98.

In December of 1957, Dr. Kenneth Smith of Johns-Manville wrote to Ivan Sabourin, an attorney for QAMA, suggesting changes in the Braun-

Truan report which would make the suggested exclusion of the cancer data more believable. In 1958, QAMA requested that the report of Drs. Braun and Truan be edited to exclude the finding that persons with asbestosis had an increased risk of lung cancer. The IHF agreed and published a version of the study which contained a conclusion that asbestos exposure alone did not increase the incidence of lung cancer. This conclusion was know by the IHF to be false. If these two studies and its true findings had been made available to the American Conference of Industrial Hygienist, the 5 mpcf TLV would have been changed. The result was a published study that actively misled academia, government bodies, unions and other entities, concerning the true nature of the hazards connected with asbestos and asbestos products. A further result was the perpetuation of erroneous beliefs concerning TLV standards as well as potential carcinogenic effects of asbestos. This silence has resulted in ignorance on the part of the lay public generally, and workers like plaintiffs specifically, to the dangers of asbestos thereby needlessly resulting in thousands of exposures.

99.

Westinghouse also belonged to an organization called the National Electrical Manufacturers Association.

100.

Westinghouse has been a member of the NEMA since the organization's beginning in 1926.

101.

Westinghouse knew that asbestos caused injuries, sometimes resulting in death. Nonetheless, in 1976, NEMA's members joined with the Asbestos Information Association to fight OSHA's attempt to lower the TLV.

102.

Large volumes of technical literature received by Westinghouse regarding industrial hygiene matters, including IHF documents which, based upon information and belief, demonstrated that Westinghouse participated

through the IHF in falsifying medical studies and suppressing of knowledge about asbestos hazards. Westinghouse determined that these documents, which if produced or found to be in Westinghouse files, would prove Westinghouse's early knowledge of the dangers of asbestos.

103.

Westinghouse has been involved in the design and manufacture of turbines (the term turbine refers not only to the turbine itself but also all the related piping and equipment) since the late 1800's.

104.

The Westinghouse turbines at issue in this case include, but are not limited to, power generated turbines, i.e. powerhouse turbines and/or industrial turbines.

105.

Westinghouse turbines were asbestos insulated in areas where high heat was generated or collected. This was necessary to protect the turbines from damage and increased efficiency by conserving heat. This includes, without limitation, the cylinders, steam chest, and crossover piping.

106.

The types of asbestos insulation used on Westinghouse turbines included block, cement, cloth, gaskets, paste, and blankets.

107.

Westinghouse made its own asbestos-containing turbine blankets.

108.

Up until the early to mid-1970's, the insulation used on Westinghouse turbines contained asbestos.

109.

Westinghouse designed its turbines to be insulated with asbestos. Westinghouse engineers prepared detailed drawings of each turbine manufactured and sold by Westinghouse. These drawings went into great detail about the application of insulation. The drawings identified the specific

49

placement of the insulation as well as the thickness of the insulation, the type and brand name.  The type and brand name of the insulation and method of application was specified on the drawing by reference to process specifications and material cards.  In order to interpret the insulation instructions contained in the drawing, one referred to the following Westinghouse documents:

(a) The Westinghouse Standards Book which contained specific instruction about insulation;

(b) The process specification identified by the SP number on the drawing; and,

(c) The material card, also specified by Westinghouse material number, either on the drawing or in the process specification.

110.

The process specifications were mandatory not permissive.  All district offices were issued a Standards Book containing the Lester Works Standard PH 920.1-920.5 on insulation which provided:  "Only insulation materials approved by Westinghouse will be permitted on Westinghouse turbines and piping."

111.

When Westinghouse sold turbines to its customers it routinely provided insulation materials.

112.

Even when Westinghouse did not install or supply the insulation, it kept strict control over its application.

113.

Westinghouse knew about the hazards associated with the asbestos insulation being specified for use on its turbines at least as early as 1946, probably, earlier.  Yet, Westinghouse issued no warnings to any of its turbine customers or their employees regarding those hazards.

114.

Westinghouse provided instruction books for each turbine which contained detailed information regarding start up of the turbine and maintenance therefor. However, the Westinghouse instruction books to date reveal that no warnings were contained in these instruction booklets regarding precautions to be taken regarding the asbestos insulation.

115.

Westinghouse also affixed name plates on its turbines stating that the turbines were Westinghouse turbines and the size of the turbines. No cautions regarding the hazards of asbestos were on these name plates.

116.

Additionally, Westinghouse knew that asbestos was dangerous in the 1940's and began a program to clean up the manufacturing process in their plants in the 1950's while continuing to manufacture asbestos-containing products without warning to downstream customers.

117.

Westinghouse began manufacturing asbestos-containing wallboard systems in 1956 and continued to do so until the mid 1970's. Prior to 1972, Westinghouse failed to provide any warning regarding the asbestos hazard with its products. In 1972, in response to Occupational Safety and Health Administration ("OSHA") regulations, Westinghouse applied warning labels that would necessarily be obscured by the substrate of the wallboard system, thereby appearing to comply with OSHA regulations without actually warning the end users of the inherent dangers of Westinghouse's asbestos-containing products.

118.

Subsequent to this activity, Westinghouse learned through in-house counsel that there existed numerous documents that would implicate Westinghouse for its actions. These documents reflected early knowledge on the part of Westinghouse and contained documents related to

51

Westinghouse's activities within the IHF, product manufacturing information, air sample studies, architectural reports, work papers, old work files, and other similar materials.

119.

With the advent of the claims of earlier plaintiffs, Westinghouse adopted so called "document retention policies" in which documents, indicating Westinghouse's knowledge, were purged from their corporate records.

120.

Westinghouse was, therefore, determined to destroy certain records, including correspondence files, which date from the 1930's up to and through 1974, which contained documentation which criticized Westinghouse operations. All records of the historical files of the industrial hygiene department, with the exception of those records which were to be maintained pursuant to law, were discarded.

121.

Many of these documents sought to be destroyed were referred to by Westinghouse as "smoking guns," and the considerations for their destruction appeared to be motivated with an eye towards their effect on future asbestos litigation, like the present case, and other toxic litigation involving the company. In January of 1978, it was determined that C.W. Bickerstaff, Manager of Corporate Industrial Hygiene, with and based upon the information by Westinghouse attorney, Jeffrey Blair, that these items would be destroyed.

122.

According to the testimony of Zella Heasley, a Westinghouse witness, Mr. Wilbur Speicher was in charge of asbestos matters until he retired from Westinghouse in 1975. Wilbur Speicher was the head of industrial hygiene for over 20 years. Very few industrial hygiene documents authored by Mr.

Speicher have ever been found in the corporate records or documents produced by Westinghouse.

123.

Other documents that were viewed as potential "smoking guns" were industrial hygiene audit and trip reports.  Industrial hygiene in each plant audited, critiqued and criticized its facility from an industrial hygiene perspective. Industrial hygiene also makes recommendations to improve the hygiene of the plant.  These documents were likewise destroyed.

124.

Other documents that were destroyed included material cards, material safety data sheets, purchasing, department specification cards, safe practice data sheets and historical safe practices data sheet files.  The safe practices detailed in the safe practice data sheets were not made a part of sites and industrial hygiene programs;  nor were they communicated to customers.

125.

The stated internal policy of Westinghouse was to delay as long as possible the use of warning labels in order to protect Westinghouse's business. Even as late as 1973, Westinghouse was pursuing a stated policy of delaying the implementation of OSHA warning regulations.  This policy was described in a memorandum authored by J.C. Botts, Manager of the Insulation and Design Engineering Group, to G.M. Shelby, of Manufacturing in April of 1973.

126.

While Westinghouse concedes knowledge that the carcinogenic effects of asbestos exposure are nearly irrefutable (J.J. Austin, Division Manager of Engineering, to the Marine Division in a memorandum),  and Mr. R.J. Polk, of the Manufacturing Division, advised Mr. Seago, of the Marketing Group, that they may be in violation of OSHA, when selling asbestos laminate panels without warnings, Westinghouse's resolution of this problem

was to ink-stamp a warning on the back of a panel before it was glued to the core material. The result that the panel had a warning within the product itself, but no one would ever see it.

127.

The purpose of a warning is to allow the workers such as plaintiff, to make an informed choice about continuing to be exposed to a hazard. Wilbur Speicher, Westinghouse's Administrator of Industrial Hygiene, wrote in 1965 that: "Any person working with a hazardous material has a right to know about the associated hazards and the necessary precaution for safe usage." Westinghouse's failure to provide such warnings to the workers exposed to its asbestos-containing products made it impossible for the workers to make such choices.

128.

This conduct amounts to more than a failure to warn -- it is intentional misconduct and constitutes fraud and conspiracy, making Westinghouse solidarily liable with other defendants for Plaintiffs harm in this matter.

## DAMAGES SUSTAINED BY PLAINTIFFS

129.

All of the allegations of the above paragraphs are incorporated by reference herein.

130.

By reason of the Defendants' fault, as described above, and because of the injuries to the plaintiff, James C. Turner's health, resulting in his disability, physical harm and subsequent medical problems, Plaintiffs, James C. Turner and Marlene F. Turner are entitled to recover the following damages for the following:

(a)    Past, present and future medical expenses and rehabilitation;

(b)    Past, present and future physical pain and suffering of James C. Turner;

(c)    Past, present and future mental anguish of James C. Turner;

54

(d)     Past loss of earnings and/or earning capacity of James C. Turner;

(e)     Past, present and future disability of James C. Turner;

(f)     Loss of enjoyment of life of James C. Turner;

(g)     Loss of help, love and support of James C. Turner;

(h)     Any other losses established at the trial of this matter, including exemplary damages and attorneys' fees for fraud and all costs of these proceedings;

### 131.

By reason of the Defendants' fault, as described above, and because of the injuries and ill health effects suffered by Plaintiff, James C. Turner, as a result of his occupationally induced asbestos related diseases, Plaintiff's spouse ("Loss of Consortium Plaintiff") has suffered loss of consortium and is entitled to damages as are reasonable in the premises.

### 132.

The acts and omissions of Defendants that were the direct and proximate cause of plaintiffs' injuries were willful, malicious, wanton, undertaken with reckless disregard of the rights of plaintiffs and were grossly negligent.

### 133.

As a direct and proximate result of the acts of the Defendants, plaintiff, James C. Turner,  suffered serious bodily injury, endured great pain and suffering, incurred medical expenses, and has been otherwise damaged.

**WHEREFORE**, Plaintiffs pray that Defendants, and each of them, be cited to appear and answer herein as the law directs, and that, after due proceedings are had, Plaintiffs recover of and from Defendants, and each of them, individually, jointly and in solido, for their damages as alleged in an amount which the evidence may show proper at time of trial, together with costs, and legal interest from  the date of judicial demand until paid, any other losses established at the trial of this matter, including exemplary damages, attorneys' fees for fraud and all costs of these proceedings and for

such other and further relief, special and general, as law and equity may permit.

**PLAINTIFFS REQUEST THAT THIS MATTER BE TRIED BY JURY.**

Respectfully submitted:

_____

**Donni E. Young (LSBN 19843)**
**Scott M. Galante (LSBN 26890)**
**Ness, Motley, Loadholt,**
  **Richardson & Poole**
1555 Poydras Street, Suite 1700
New Orleans, Louisiana 70112
Tel: (504) 636-3480
Fax: (504) 636-3499

**John F. Dillon, P.L.C.**
**John F. Dillon (LSBN 18586)**
1555 Poydras Street, Suite 1700
New Orleans, Louisiana 70112
Tel: (504) 636-3480
Fax: (504) 636-3499

**Counsel for Plaintiffs**

**PLEASE SERVE ORIGINAL PETITION FOR DAMAGES and ATTACHED INTERROGATORIES, REQUEST FOR PRODUCTION AND REQUEST FOR ADMISSIONS, PLAINTIFFS' RESPONSES TO DEFENDANTS' MASTER SET OF INTERROGATORIES, REQUEST FOR PRODUCTION, REQUEST FOR NOTICE AND NOTICE FOR VIDEO DEPOSITION TO THE FOLLOWING:**

A.  **ANCHOR PACKING COMPANY**
    A New Jersey Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: CT Corporation System, 400 Poydras Street, New Orleans, Louisiana, 70130.

B.  **CBS (formerly known as WESTINGHOUSE ELECTRIC COMPANY)**
    A Delaware Corporation, who may be served through the its registered agent, CT Corporation System, 8550 United Plaza Boulevard, Baton Rouge, Louisiana, 70809.

C.  **THE CARBORUNDUM COMPANY**
    A Delaware Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: CT Corporation System, 400 Poydras Street, New Orleans, Louisiana, 70130.

D.  **A.W. CHESTERTON**
    A Massachusetts Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: C.T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809.

**Continued on next page**

E.    **COMBUSTION ENGINEERING, INC.**
A Delaware Corporation who may be served through the its registered agent, CT Corporation System, 8550 United Plaza Boulevard, Baton Rouge, Louisiana, 70809.

F.    **JOHN CRANE, INC.**
A Delaware Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: C.T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809.

G.    **DANA CORPORATION**
A Virginia Corporation who may be served via the Louisiana Long Arm Statute c/o Allen Goolsby, III, 951 East Bird Street, Richmond, Virginia, 23219.

H.    **EAGLE, INC.**
(Formerly Eagle Asbestos & Packing Co., Inc.) A corporation duly organized, created and existing under and by the virtue of the laws of the State of Louisiana, with its principal place of business in New Orleans, Louisiana, with the agent for service in the State of Louisiana, to wit:  Lawrence G. Pugh, III, Montgomery, Barnett , Brown, Read, Hammond & Mintz, LLP, 3200 Energy Center, 1100 Poydras Street, New Orleans, Louisiana, 70163-3200.

I.    **THE FLINTKOTE CORPORATION**
A Delaware Corporation who may be served through the Louisiana Long Arm Statute, through their agent for service of process: The Flintkote Company, 3 Embarcadero Center, Suite 1190, San Francisco, California 94111.

J.    **FLINTKOTE MINES, LTD.**
Which may be served via the Louisiana Long Arm Statute through it Agent, Belanger Suave (Richard Nadeaux, Esq.), Barrister *Solicitors, 1, Place Ville Marit, Suite 1700, Montreal, Quebec, H3B2C1

K.    **FOSTER WHEELER CORPORATION**
A Delaware corporation authorized to do and doing business in the State of Louisiana with its principle place of business in New Jersey, and may be served pursuant to the Louisiana Long Arm Statute, to wit: Perryville Corporation Park, Clinton, NJ 08809

L.    **GARLOCK, INC.**
An Ohio Corporation, authorized to do and doing business in the State of Louisiana, with its principal place of business in New York and with an agent for service of process in the State of Louisiana: CT Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809.

M.    **GASKET HOLDINGS COMPANY, INC. (Successor to Flexitallic, Inc.)**
A Delaware Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: C.T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809.

Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809.

N.   **GENERAL ELECTRIC COMPANY**
A New York Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: C.T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809.

O.   **GEORGIA-PACIFIC CORPORATION,** A Georgia Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: C.T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana, 70809.

P.   **INGERSOLL-RAND COMPANY**
A New Jersey Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: C.T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809.

Q.   **KELLY MOORE PAINT COMPANY, INC.**
A California Corporation who may be served through the Louisiana Long Arm Statute, through their agent for service of process: Kelly Moore Paint Company, Inc., 987 Commercial Street, San Carlos, California 94070.

R.   **THE McCARTY CORPORATION**
A domestic corporation, may be served through its agent for service of process:  Paul H. Spaht, 445 N. Boulevard, Suite 300, Baton Rouge, Louisiana, 70802.

S.   **REILLY-BENTON COMPANY, INC.**
A corporation duly organized, created and existing under and by virtue of the laws of the State of Louisiana, with its principal place of business in New Orleans, Louisiana, with agent for service of process in the State of Louisiana, to wit: Deutsch, Kerrigan & Stiles, 755 Magazine Street, New Orleans, Louisiana, 70130.

T.   **TAYLOR SEIDENBACH, INC.**
A corporation duly organized, created and existing under and by virtue of the laws of the State of Louisiana, with its principle place of business in New Orleans, Louisiana, with agent for service in the State of Louisiana, to wit: Ralph I. Sheperd, 731 S. Scott Street, New Orleans, Louisiana 70150

U.   **J.T. THORPE, INC.**
A California Corporation, who may be served through the Louisiana Long Arm Statute, through their agent for service of process: Ken Prindle, Prindle, Decker & Amaro, 369 Pine Street, Suite 800, San Francisco, CA, 94104.

**Continued on next page**

V.    **3M COMPANY**
      (a.k.a. Minnesota Mining & Manufacturing Company)
      A Delaware Corporation, who can be served through the
      Louisiana Long Arm Statute, through their agent for service of
      process:   Roger P. Smith, Secretary, Minnesota Mining &
      Manufacturing Company, 3M Center, Building 220-14W-06, St.
      Paul, Minnesota, 55144-1000.

W.    **WORTHINGTON PUMP, INC.**
      A Delaware Corporation, who may be served through the
      Louisiana Long Arm Statute, through its registered agent for
      service of process:  C.T. Corporation System, 350 North St.
      Paul Street, Suite 2900, Dallas, Texas, 75201.

X.    **KIM SUSAN, INC.**
      (Formerly known as Fagan Boat Service, Inc.)
      A corporation duly organized, created and existing under and
      by virtue of the laws of the State of Louisiana, with its principle
      place of business in LaRose, Louisiana, with agent for service
      in the State of Louisiana, to wit: Kent J. Fagan, West 21st
      Street, Larose, Louisiana, 70373.

59

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NUMBER: _____   DIVISION " "   SECTION " "

JAMES C. TURNER and MARLENE F. TURNER

VERSUS

ANCHOR PACKING COMPANY; CARBORUNDUM; CBS (Formerly known as Westinghouse Electric Corporation); A.W. CHESTERTON COMPANY; COMBUSTION ENGINEERING, INC.; JOHN CRANE, INC.; DANA CORPORATION; EAGLE, INC.; THE FLINTKOTE COMPANY; FLINTKOTE MINES, LTD.; FOSTER WHEELER CORPORATION; GARLOCK, INC; GASKET HOLDINGS COMPANY, INC. (successor to Flexitallic, Inc.); GENERAL ELECTRIC COMPANY; GEORGIA-PACIFIC CORPORATION; INGERSOLL-RAND; KELLY MOORE PAINT COMPANY; THE McCARTY CORPORATION; REILLY-BENTON CO., INC.; TAYLOR-SEIDENBACH, INC.; J.T. THORPE, INC.; 3M (a.k.a. MINNESOTA MINING & MANUFACTURING COMPANY); WORTHINGTON PUMP, INC.; KIM SUSAN, INC. (Formerly known as Fagan Boat Service, Inc.)

FILED: _____          _____
                                          DEPUTY CLERK

**PLAINTIFFS' ANSWERS TO
DEFENDANTS' MASTER SET OF INTERROGATORIES
AND REQUESTS FOR PRODUCTION OF DOCUMENTS**

NOW COME Plaintiffs, through undersigned counsel, and responds to Interrogatories and

Requests for Production of Documents propounded by the Defendants, as follows:

## INTERROGATORIES

**INTERROGATORY NUMBER 1:**

Please state your name, current address, date of birth, Social Security number, and residence

address(es) for the last 10 years.

**ANSWER TO INTERROGATORY NUMBER 1:**

James C. Turner; 219 Cypress Villa Lane; Gheens, Louisiana, 70355; DOB: 07-17-40;

Soc. Sec. #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.

**INTERROGATORY NUMBER 2:**

Identify your employment history from age 16 to present, including periods of part-time

and self-employment. With respect to each employment, provide the following information:

    a.  Identify the employer;

    b.  Identify the location of the employment including city, county, state, country;

    c.  Describe your title or craft (e.g., mechanic), duties and responsibilities, and the place (e.g., particular building, room ship or vessel) where you performed your job duties for each employment;

   d. If you were exposed to asbestos, state how you were exposed to asbestos in each job title or position;

   e. If you were exposed to asbestos, please state the brand, product name and manufacturer of each and every asbestos-containing product you allege that you were exposed to;

## ANSWER TO INTERROGATORY NUMBER 2:

   a. U. S. Navy - 2 months - 1957
   b. Great Lakes Naval Base, Illinois
   c. Basic Training
   d. No exposure at this time.
   e. Not applicable.

   a. U.S. Navy - 1957-1961
   b. USS Haynsworth DD-700  (In 1959-6 mos. at Portsmouth Naval Shipyard)
   c. Machinist Mate-overhauled boilers, pumps, valves and insulation
   d. Plaintiff will supplement accordingly
   e. Plaintiff will supplement accordingly

   a. U.S. Navy - 1961-1965
   b. USS Luce DLG-7 (In 1964, 6 mos. at Charleston Naval Shipyard)
   c. Machinist Mate - overhauling of major systems
   d. Plaintiff will supplement accordingly
   e. Plaintiff will supplement accordingly

   a. U.S. Navy - 1965-1967
   b. Jacksonville, Florida, USA - Naval Training Center
   c. Master of Arms
   d. No exposure at this time.
   e. Not applicable.

   a. U.S. Navy - 1967-1971
   b. USS Shennandoah AD-26
   c. Machinist Mate - engine room and repairs to other ships while at sea.
   d. Plaintiff will supplement accordingly
   e. Plaintiff will supplement accordingly

   a. U.S. Navy - 1971-1972
   b. USS Josephus Daniels
   c. Machinist Mate - daily maintenance and repair of hydraulic systems as well as a/c and heating systems.
   d. Plaintiff will supplement accordingly
   e. Plaintiff will supplement accordingly

   a. U.S. Navy - 1972-1974
   b. Norfolk Naval Repair Facility
   c. Machinist Mate - routine repairs to docked ships as well as worked at Philadelphia Naval Shipyard overhauling ships.
   d. Plaintiff will supplement accordingly
   e. Plaintiff will supplement accordingly

   a. U.S. Navy - 1974-1977
   b. USS Leahy
   c. Machinist Mate - Long Beach Naval Shipyard and overhaul of USS Leahy-1977
   d. Plaintiff will supplement accordingly
   e. Plaintiff will supplement accordingly

## INTERROGATORY NUMBER 3:

   With regard to the plaintiff, please state:

   a.  The full name of your current spouse;

   b.  The date of your marriage;

   c.  Whether or not you are currently living together;

   d.  If (c) is negative, the spouse's current address;

   e.  Place of the marriage;

   f.  The full name and address of any previous spouse or spouses and date(s) and place(s) of marriage(s);

   g.  The date, manner of, and reason for termination of each previous marriage;

   h.  If you are now married, state your spouse's present employment.

## ANSWER TO INTERROGATORY NUMBER 3:

   a.  Marlene F. Holt Burkowitz Turner

   b.  September 2, 1978

   c.  Yes

   d.  n/a

   e.  Lockport, Louisiana

   f.  First:   Barbara Denny Lafern
       Second: Patricia A. Morando Turner married 3/68 in Elizabeth City, North Carolina

   g.  First:   wife died in auto accident in November of 1966
       Second:  divorced in 1975

   h.  Spouse, Marlene Turner, is not employed.

## INTERROGATORY NUMBER 4:

With regard to the Plaintiff, state the full name, age, current address and telephone number of each child. If any child has died, please state the date and cause of death.

## ANSWER TO INTERROGATORY NUMBER 4:

Michelle Thomason; 161 Short Street, Fairplay, South Carolina; DOB: 7/25/64; Phone: Unknown.

Anita F. Jordan; P.O. Box 147, Alto, Georgia; DOB: 7/3/66; (706) 776-7736

Theresa L. Turner; Highlands, Texas; DOB: 7/23/68; (281) 426-2098

Jacquelyn A. Turner; 7123 Sharpsburg Drive, Richmond, Texas; DOB: 8/21/70; (281) 343-9405

Billie J. Turner; resides with plaintiff; (504) 532-5772;  DOB: 3/17/81; and

James R. Turner (grandson) resides with plaintiff.

## INTERROGATORY NUMBER 5:

With regard to each person listed in the two previous Interrogatories, please state who is dependent upon you for financial support, their ages, marital status, present employer and

relationship to you.

### ANSWER TO INTERROGATORY NUMBER 5:

Spouse, Marlene F. Turner who is not employed; Billie J. Turner, 20 year old son; and grandson James R. Turner currently resides with plaintiff.

### INTERROGATORY NUMBER 6:

Identify fully any trade association or labor union of which you are a member or have ever been a member, and please give the following:

    a. Identify your occupation and/or job titles for each trade or labor union to which you have belonged;

    b. The name of the union(s) to which you have belonged;

    c. Inclusive dates of your membership in each;

    d. Numbers and complete addresses of the local unions to which you have belonged;

    e. All offices or other positions which you have held in each union, identifying the office, position, and union in which held and inclusive dates the position or office was held.

### ANSWER TO INTERROGATORY NUMBER 6:

Plaintiff, James C. Turner was never a member of any Union.

### INTERROGATORY NUMBER 7:

Please provide your military history including each branch of the service in which you served, each location where you served and the dates of such service, your highest rank, your military identification number, a description of all jobs or occupational specialities you held, the date, place and type of any discharge(s) you received, and the reason for and amount of any disability payments you received subsequent to your discharge.

### ANSWER TO INTERROGATORY NUMBER 7:

Please refer to Answer to Interrogatory Number 1.   Mr. Turner reached Senior Chief Machinist Mate - Engineering (E-8) prior to his retirement from the U.S. Navy.  Any further information may be obtained through the attached executed authorization.

### INTERROGATORY NUMBER 8:

Have you ever been denied health or life insurance or have you ever been canceled on any health or life insurance policy?  If so, please identify the insurance company, the date insurance was denied or canceled and the reason given by the insurance company for denying or canceling insurance coverage.

**ANSWER TO INTERROGATORY NUMBER 8:**

No.

**INTERROGATORY NUMBER 9:**

Do you contend that the plaintiff is suffering from any medical condition related to asbestos exposure, including but not limited to any pleural or pulmonary problems?  If so, please state:

a.  The name of the disease process for which plaintiff claims injury;

b.  Date and time of such diagnosis;

c.  Identity of the diagnosing physician and any physician who either concurred in the diagnosis or reviewed the radiographs or radiographic reports concerning the diagnosis;

d.  The method and information upon which such diagnosis was based;

e.  The identity of each and every hospital, medical institution, laboratory, physician, nurse or laboratory technician involved in any part of such diagnosis;

f.  Description in detail of the specific course(s) of treatment or therapy, including any medication prescribed as a result of such diagnosis, and the name, address, and telephone number of each prescribing physician;

g.  The identity of the plaintiff's employer at the time of the diagnosis; and

**ANSWER TO INTERROGATORY NUMBER 9:**

a.  Plaintiff has been diagnosed with asbestos related lung cancer as well as other conditions as reflected in plaintiff's medical records.

b-e.  Plaintiff will supplement accordingly;

f.  Plaintiff will supplement accordingly.

g.  None, retired.

**INTERROGATORY NUMBER 10:**

Upon what date did the plaintiff first see a physician regarding treatment of those symptoms described in preceding interrogatory?  Give the name and address of the first physician the plaintiff saw and all subsequent physicians that he has seen or consulted in connection with his diagnosis.

**ANSWER TO INTERROGATORY NUMBER 10:**

Approximately August, 2000.  Plaintiff will supplement accordingly.

**INTERROGATORY NUMBER 11:**

Upon what date was the plaintiff advised by a physician that the symptoms, described in answer to Interrogatory No. 12 resulted from the plaintiff's alleged exposure to asbestos and/or asbestos-containing products.  Please provide the name and address of the physician making the diagnosis described above.

### ANSWER TO INTERROGATORY NUMBER 11:

Plaintiff will supplement as medical records become available.

### INTERROGATORY NUMBER 12:

Itemize the medical expenses you have incurred as a result of each medical problem you allege was caused by exposure to asbestos and state:

    a.  Who provided the care;

    b.  When the care was provided; and

    c.  The amount of the expense.

### ANSWER TO INTERROGATORY NUMBER 12:

Plaintiff will supplement accordingly.

### INTERROGATORY NUMBER 13:

Has the plaintiff ever smoked/used any kind of cigarette, cigar, pipe or other tobacco product? If so, please state:

    a.  The type and brand of product smoked/used; if cigarettes were smoked, state whether the particular brand was filtered or unfiltered;

    b.  The approximate date or age begun;

    c.  The number of cigars, cigarettes or pipe bowls per day;

    d.  The date of cessation, if applicable;

    e.  The reasons for stopping; and

    f.  Whether any physician or medical personnel ever advised you to stop smoking. If so, when?

### ANSWER TO INTERROGATORY NUMBER 13:

Yes. James C. Turner smoked Winstons cigarettes (approx. 1 pack a day) for about forty years; Mr. Turner quit smoking approximately August of 2000, because he was feeling ill.

### INTERROGATORY NUMBER 14:

Has any person who ever lived with plaintiff ever smoked any kind of cigarette, cigar, pipe or other type of tobacco product? If so, then please state:

    a.  Name of person and relationship to plaintiff;

    b.  The type and brand of product smoked/used; if cigarettes were smoked, state whether the particular brand was filtered or unfiltered;

    c.  Dates when plaintiff lived with said person; and

    d.  Number of cigarettes, cigars or pipes full of tobacco per day.

## ANSWER TO INTERROGATORY NUMBER 14:

Yes.  James C. Turner's spouse, Marlene F. Turner, smoked Perfect Blend (generic) cigarettes (approx. 1 pack a day).

## INTERROGATORY NUMBER 15:

For every chest x-ray that plaintiff has undergone, please give the following:

    a.  The place of the exam;

    b.  The date;

    c.  The reasons why the x-ray was taken;

    d.  The interpretive or diagnostic results, conclusions or possibilities derived form each such examination; and

    e.  The name and address of the physician who recommended or ordered the chest x-ray.

## ANSWER TO INTERROGATORY NUMBER 15:

Plaintiff will supplement as medical records become available.

## INTERROGATORY NUMBER 16:

For every pulmonary function test that plaintiff has undergone, please give the following:

    a.  The place of the exam;

    b.  The date;

    c.  The reasons why the test was taken;

    d.  The technician's impression who performed the test;

    e.  The interpretive or diagnostic results, conclusions or possibilities derived form each such examination; and

    f.  The name and address of the physician who recommended or ordered the test.

## ANSWER TO INTERROGATORY NUMBER 16:

Plaintiff will supplement as medical records become available.

## INTERROGATORY NUMBER 17:

Has plaintiff been diagnosed as being disabled?  If so, please state the date, nature and cause of disability; date of determination of disability; nature of benefits which you are receiving or have received; the source of those benefits; the name of the physician who has rendered this diagnosis and the date upon which it was made.

## ANSWER TO INTERROGATORY NUMBER 17:

Plaintiff objects to "diagnosed as disabled" as undefined.  However, without waiver of this objection, Plaintiff notes that under the AMA Guides for the Evaluation of Permanent

Impairment, Mr. Turner received a back injury from a work related accident in 1995 for which he is receiving disability benefits.

### INTERROGATORY NUMBER 18:

Have you ever been diagnosed with any cancer, sarcoma or other malignancy?

### ANSWER TO INTERROGATORY NUMBER 18:

Yes.  Plaintiff, James C. Turner, has been diagnosed with lung cancer secondary to asbestosis.

### INTERROGATORY NUMBER 19:

Please identify fully any carcinoma, sarcoma, mesothelioma or any other cancers, or any pulmonary disease which any brother, sister or either of your parents or grandparents or your spouse has ever contracted.

### ANSWER TO INTERROGATORY NUMBER 19:

Plaintiff's father contracted pneumonia which caused his death.  Any pulmonary disease of other older relatives is unknown.  Mr. Turner's brothers are still alive.

### INTERROGATORY NUMBER 20:

If you ever had a biopsy performed or tissue sample taken, please identify the following information for each procedure performed:

a. The name and address of the office or hospital where such procedures were performed;

b. Reasons as to why such procedures were performed;

c. The date(s) on which such procedures were performed;

d. The information reported to you from medical practitioners as a result of such procedures;

e. The person(s) who performed such procedure and the person(s) who made such findings;

f. The location of any tissue sample or any other physical evidence obtained in the performance of such procedures; and

g. The location and custodian of any reports or written findings of any such procedures.

### ANSWER TO INTERROGATORY NUMBER 20:

James C. Turner had lung surgery at Thibodaux Regional Hospital.  Plaintiff will supplement this answer when more information becomes available.

### INTERROGATORY NUMBER 21:

If you are claiming in this action lost wages, future lost wages or future loss of earnings by

impairment of earning capacity, please state the amount of such loss of earnings and the detailed basis upon which you computed that amount.

**ANSWER TO INTERROGATORY NUMBER 21:**

Plaintiffs are claiming all damages to which they are entitled under Louisiana law.

**INTERROGATORY NUMBER 22:**

If you or any of your immediate family members have ever been employed by any of the defendants in this action, please identify and describe the date, location, all supervisors and the duties for each person's employment.

**ANSWER TO INTERROGATORY NUMBER 22:**

Not known at this time. Plaintiff will supplement this answer.

**INTERROGATORY NUMBER 23:**

Was the plaintiff ever employed where his duties involved tearing out of insulation or other materials which allegedly contained asbestos? If so, please state for each such employment:

    a. Name, address, telephone number of employer;

    b. Name and location of job site(s);

    c. Dates of such employment period(s); and

    d. Detailed job description and description of work methods and techniques.

**ANSWER TO INTERROGATORY NUMBER 23:**

Please refer to Answer to Interrogatory Number 2, above. Plaintiff will supplement this answer.

**INTERROGATORY NUMBER 24:**

Have you worked as a sandblaster, sandblaster's helper, welder or welder's helper? If so, please state where and when said activity took place.

**ANSWER TO INTERROGATORY NUMBER 24:**

No.

**INTERROGATORY NUMBER 25:**

State whether any respiratory protective equipment and/or masks were made available to you for your use during any job that you ever performed. If such equipment was made available, state:

    a. The name of each ship on which or facility at which such equipment was available;

    b. The type of equipment (including model number and manufacturer) available and where such equipment was located and/or stored;

c. Whether you were given instructions for the use of such equipment, and, if so, the name and rank of the person giving such instruction;

d. The date the repair work was performed when such equipment was available;

e. The nature and extent of the repair work performed when such equipment was available;

f. Your duties in connection with each such repair; and

g. Whether you used and/or wore the available protective equipment, and, if not, why.

**ANSWER TO INTERROGATORY NUMBER 25:**

3M masks were used.

**INTERROGATORY NUMBER 26:**

Please state whether you have ever performed any work (new construction, installation, maintenance or repair) on any equipment, at any of the places of your employment, which required you to use, apply, install, rip off, or remove any products, which you claim contained asbestos. If so, for each piece of equipment, where you performed such work please state:

a. Your employer, and location of the equipment;

b. The type of equipment;

c. The manufacturer, supplier, or distributor of the equipment;

d. The type, manufacturer, distributor, and/or supplier of each of the products, which allegedly contained asbestos, which you used, applied, installed, ripped off, or removed from the equipment, and the manner in which you used and how the products were used on the equipment; and

e. Your job title and the period of time when each activity was performed.

**ANSWER TO INTERROGATORY NUMBER 26:**

Please refer to Answer to Interrogatory Number 2, above, for information.  Plaintiff will supplement this answer.

**INTERROGATORY NUMBER 27:**

State whether you, either directly or through counsel, have at any time made an agreement or reached an understanding (either tentative of final) with any defendant o defendants regarding either the ultimate outcome of your claims against such defendant o defendants or the manner in which these cases, or some of them, will be tried.  Your answer should include but not be limited to:  settlement agreements, contingent settlement agreements, partial settlement agreements, releases, covenants not to sue, covenants not to execute, "Mary Carter" agreements, "high/low" agreements, loan receipt agreements, sliding scale agreements, guaranteed verdict agreements or understandings in which you agree to waive claims against any participating defendant or defendants

(for example a claim for punitive damages) or in which any participating defendant agrees not to raise one or more defenses or not to contest certain elements of alleged liability, or in which the participating parties agree to minimum and maximum amounts of compensatory liability, or in which the participating parties agree not to disclose the terms of such agreements or understandings.

## ANSWER TO INTERROGATORY NUMBER 27:

Objection.  Overly broad.  Production of documents and monetary amounts are irrelevant at this stage and subject to confidentiality agreements.  Prior to trial, Plaintiff will identify all defendants that have entered into settlement agreement(s) and release(s) pursuant to the court's scheduling order.

## INTERROGATORY NUMBER 28:

Have any of your medical expenses, which you are claiming as damages in this suit, been paid by anyone other than you, or have reimbursements been made to you or your decedent or on your or your decedent's behalf by anyone for your medical expenses, including without limitation by insurance companies, health maintenance organizations, employers, friends, family or governmental agencies, entities or programs (like Medicare, Medicaid or Social Security Disability)?  If so, identify:

    a.  The insurer, company, person, agency, entity or program;

    b.  The insurance policy number or the designation, if any, pursuant to which or under which payment or reimbursement was made and recorded;

    c.  The recipient of each payment or reimbursement;

    d.  The purpose of each payment or reimbursement; and

    e.  The amount and date of each payment or reimbursement.

## ANSWER TO INTERROGATORY NUMBER 28:

Plaintiff to supplement this answer.

## REQUEST FOR PRODUCTION OF DOCUMENTS

## REQUEST NUMBER 1:

Please produce any and all medical reports, records, notes, charts, written documentation, chest or pulmonary X-rays, film, CT scans, or test results concerning any examination and/or treatment for any injury, illness or disease you claim you sustained as a result of exposure to asbestos.  If you are not currently in possession of such documents, pursuant to Code of Civil Procedure article 1465.1, please duplicate the attached form, complete and execute an original medical authorization for each hospital, physician, physical therapist, chiropractor and any other

medical practitioner and institution identified in your answers to Interrogatories, which are being propounded contemporaneously with this Request for Production.

**RESPONSE TO REQUEST NUMBER 1:**

Plaintiff will forward a signed release authorization.

**REQUEST NUMBER 2:**

Please produce any and all medical reports, records, notes, charts or other written documentation concerning any examination and/or treatment for any injury, illness, disease or condition that is unrelated to alleged asbestos exposure and for which you have undergone treatment. If you are not currently in possession of such documents, pursuant to Code of Civil Procedure Article 1465.1, please duplicate the attached form, complete and execute an original medical authorization for each hospital, physician, physical therapist, chiropractor and any other medical practitioner and institution identified in your answers to Interrogatories, which are being propounded contemporaneously with this Request for Production.

**RESPONSE TO REQUEST NUMBER 2:**

Plaintiff will forward a signed release authorization.

**REQUEST NUMBER 4:**

Please produce copies of all records regarding your service in the military, or other branch of the armed forces. If you are not currently in possession of such documents, please complete the attached authorization to obtain such documents.

**RESPONSE TO REQUEST NUMBER 4:**

Plaintiff will forward a signed release authorization.

**REQUEST NUMBER 5:**

Please produce copies of your Social Security records or itemized earnings. If you are not currently in possession of such documents, please complete the attached authorization to obtain such information.

**RESPONSE TO REQUEST NUMBER 5:**

None available at this time. Plaintiff will supplement this request upon receipt of same.

**REQUEST NUMBER 6:**

Please produce copies of all cards or documents reflecting membership in unions or other trade, skill or professional organization. If you are not currently in possession of such documents, please complete the attached authorization to obtain such information.

**RESPONSE TO REQUEST NUMBER 6:**

Plaintiff will supplement this request accordingly.

**REQUEST NUMBER 7:**

Please produce a copy of your birth certificate and any marriage license(s).

**RESPONSE TO REQUEST NUMBER 7:**

Plaintiff will supplement this request accordingly.

**REQUEST NUMBER 8:**

In the case of deceased plaintiffs, please produce a copy of the decedent's death certificate and, if applicable, autopsy report.

**RESPONSE TO REQUEST NUMBER 8:**

Not applicable.

**REQUEST NUMBER 9:**

Please produce a completed work history exposure sheet.

**RESPONSE TO REQUEST NUMBER 9:**

Please see Plaintiff's response to the Interrogatories.

**REQUEST NUMBER 10:**

Please produce any photographs, motion picture, video, slides and/or still pictures taken as a result or in connection with the occurrence alleged in your petition.

**RESPONSE TO REQUEST NUMBER 10:**

None at this time.  Plaintiff will supplement accordingly.

Respectfully submitted,

_____
**DONNI E. YOUNG (LSBN 19843)**
**SCOTT GALANTE (LSBN 26890)**
**Ness, Motley, Loadholt, Richardson & Poole**
1555 Poydras Street -- Suite 1700
New Orleans, Louisiana  70112
(504) 636-3480

## CERTIFICATE OF SERVICE

Undersigned counsel hereby certifies that a copy of the above and foregoing pleading has been forwarded to all counsel of record to this proceeding by placing a copy of same in the United States mail, postage prepaid and properly addressed on this _____ day of _____, 2001.

_____

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NUMBER: 91847                    DIVISION " "                    SECTION " "

JAMES C. TURNER and MARLENE F. TURNER

VERSUS

ANCHOR PACKING COMPANY;    CARBORUNDUM; CBS (Formerly known as
Westinghouse Electric Corporation); A.W. CHESTERTON COMPANY; COMBUSTION
ENGINEERING, INC.; JOHN CRANE, INC.; DANA CORPORATION; EAGLE, INC.; THE
FLINTKOTE COMPANY; FLINTKOTE MINES, LTD.; FOSTER WHEELER
CORPORATION; GARLOCK, INC; GASKET HOLDINGS COMPANY, INC. (successor to
Flexitallic, Inc.); GENERAL ELECTRIC COMPANY; GEORGIA-PACIFIC CORPORATION;
INGERSOLL-RAND;    KELLY    MOORE    PAINT    COMPANY;    THE    McCARTY
CORPORATION; REILLY-BENTON CO., INC.; TAYLOR-SEIDENBACH, INC.; J.T.
THORPE, INC.; 3M (a.k.a. MINNESOTA MINING & MANUFACTURING COMPANY);
WORTHINGTON PUMP, INC.; KIM SUSAN, INC. (Formerly known as Fagan Boat Service,
Inc.)

FILED:_____        _____

DEPUTY CLERK

**PLAINTIFFS' SUPPLEMENTAL ANSWER TO
DEFENDANTS' MASTER SET OF INTERROGATORIES
AND REQUESTS FOR PRODUCTION OF DOCUMENTS**

NOW COME Plaintiffs, through undersigned counsel, and who supplements Interrogatory

Number 2, as follows:

**INTERROGATORIES**

**INTERROGATORY NUMBER 2:**

Identify your employment history from age 16 to present, including periods of part-time

and self-employment.  With respect to each employment, provide the following information:

   a.  Identify the employer;

   b.  Identify the location of the employment including city, county, state, country;

   c.  Describe your title or craft (e.g., mechanic), duties and responsibilities, and the
       place (e.g., particular building, room ship or vessel) where you performed your job
       duties for each employment;

   d.  If you were exposed to asbestos, state how you were exposed to asbestos in each job
       title or position;

   e.  If you were exposed to asbestos, please state the brand, product name and
       manufacturer of each and every asbestos-containing product you allege that you
       were exposed to;

**SUPPLEMENTAL ANSWER TO INTERROGATORY NUMBER 2:**

   a.  Valite Plastic Plant - 1977-1982
   b.  Valentine, Louisiana
   c.  Plastics cook and fork lift mechanic
   d.  Plaintiff will supplement accordingly.
   e.  Plaintiff will supplement accordingly.

a. Fagan Boat Company (now known as Kim Susan, Inc.) 1982-1987
b. Arose, Louisiana
c. Offshore cargo boat engineer
d. Plaintiff was responsible for the operation and maintenance of the engine room.  At times, Mr. Turner was also responsible for the removal and installation of insulation.
e. Plaintiff will supplement accordingly

a. Petrol Marine (a.k.a Hornbeck Offshore; a.k.a. Tidewater) 1987-1995
b. Morgan City, Louisiana
c. Cargo boat engineer
d. Plaintiff was responsible for the operation and maintenance of the engine room.  At times, Mr. Turner was also responsible for the removal and installation of insulation.
e. Plaintiff will supplement accordingly

Respectfully submitted,

DONNI E. YOUNG (LSBN 19843)
SCOTT GALANTE (LSBN 26890)
Ness, Motley, Loadholt, Richardson & Poole
1555 Poydras Street -- Suite 1700
New Orleans, Louisiana   70112
(504) 636-3480

<u>CERTIFICATE OF SERVICE</u>

Undersigned counsel hereby certifies that a copy of the above and foregoing pleading has been forwarded to all counsel of record to this proceeding by placing a copy of same in the United States mail, postage prepaid and properly addressed on this 2nd day of August, 2001.

IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSISSIPPI

IN RE:   ASBESTOS PERSONAL INJURY CASES ABRAMS LEAD NOS.
88-5422(2), 89-5088(2), 89-5121(2), 90-5247(2),
88-5420(2), 89-5252(2), 90-5069(2), 90-5322(2),
89-5153(2), 90-5353(2), 89-5268(2), 90-5045(2),
90-5274(2), 88-5181(2), 91-5000(2), 91-5119(2),
90-5178(2), 90-5369(2), 90-5387(2), 91-5098(2),
91-5135(2) AND 91-5187(2)

**DEFENDANT WESTINGHOUSE ELECTRIC CORPORATION'S
SUPPLEMENTAL RESPONSE TO PLAINTIFFS'
SECOND SUPPLEMENT TO MASTER SET OF INTERROGATORIES**

The defendant, Westinghouse Electric Corporation (Westinghouse), supplements its earlier answer to the plaintiffs' second supplement to master set of interrogatories. By doing so, Westinghouse does not waive and expressly preserves all of its prior objections to this overbroad discovery and to the relevance or admissibility of this information.

**INTERROGATORY**

Please state:

The trade names and a short description of all products and that contained asbestos.

**SUPPLEMENTAL ANSWER**

Because of the unlimited scope of this interrogatory, the number of years Westinghouse has been in business, the size of its operations, and the fact that it does not keep records according to asbestos content, this interrogatory is extremely difficult to answer with certainty. Historically, Westinghouse has manufactured and sold equipment and components for the generation, transmission, use and control of electricity. Since its founding in the 1800's, Westinghouse has sold many thousands of different products, with hundreds of thousands of variations of those products. Upon information and belief, the following is a list of the products sold to the public by Westinghouse which at some point in time may have contained some amount of asbestos, without regard to the type or amount of the asbestos ingredient or the potential or lack of potential for the release of loose, respirable asbestos fibers into the air. Further, only certain variations of these products contained asbestos; many other variations contained no asbestos.

> air conditioners and compressors
> armatures
> brakes for motors, bridge hoists, cranes and other
>   industrial equipment and linings
> bus ways
> circuit breakers
> condensers
> control rod drive mechanisms
> control items such as relays, contactors, arc chutes
>   overhead controls, and switches
> CPL arrester
> CRC test press


EXHIBIT
G

DC contactor
electronic tubes
elevators
escalators
fans
flexible laminate
floodlights, aviation lights and light fixtures
fluorescent lights
gaskets in equipment
generators
governors
heat transfer products
heating coils
high voltage incandescent lamp, 230V
induction heating equipment and systems
JF autostarter
lighting arresters
liquid slip regulator
mercury lamp
mercury vapor rectifier
micarta
molded line traps
molded parts for electrical equipment, including:
    spacer barrier
    mounting or terminal blocks
    electrical insulator sleeve
    plug board
    barrier support
    coil shield
motors (split phase, traction, D.C., fractional horse,
    capacitor, single phase) and internal insulating
    materials
moveable wall panels
network protectors
oxygen analyzer probe assembly
oxygen shield
power enclosures
pumps
range timer
reductor gears
sleaving
SVS arrester
steam & gas turbines and ancillary insulation
switchgears
tape
thermal demand meter
toasters
transducers
transformers
valves
varnish treated paper
welding electrodes
welding machines
wire wound resistor assembly

Upon information and belief, Westinghouse distributed,
through Westinghouse Electric Supply Company (WESCO), a
Westinghouse division, asbestos-containing products manufactured
by Westinghouse and other companies.  The following is a list of
asbestos-containing products of other companies that were
available for sale through WESCO.  There may have been other such
products, which Westinghouse is unable to identify based upon the
generic product information available to it.

American Beauty Heater Cord
Armored Thermostat Cable
Asbestos Insulated Heat-resisting Fixture Cord, type AF
Asbestos Insulated Wire and Cable
Asbestos Ranger and Rheostat Wire "Rockbestos"
Collyer Asbestos Heater Cord
General Cable Asbestos Insulated Fixture Wire
General Cable Asbestos Insulated Flexible Cord
Heater Cord Type HPD
Rockbestos Asbestos Varnished Cambric Wire,
    Types ABC and AVP
Rockbestos Asbestos-covered Nickel Cord
Rockbestos AVC Boiler Room Wire and Cable
Rockbestos AVC Switchboard Wire
Rockbestos Heat Resisting Fixture Wire
Rockbestos Power Cable
Rockbestos Stove Wire
Rockbestos Table LH Hotbed or Industrial Heating Cable
Thermostat Cable

Westinghouse reserves the right to supplement this answer, based in particular upon a review of purchase orders, invoices, or other documents within the possession of plaintiffs' counsel and/or Ingalls but which Westinghouse has not yet been provided or had an opportunity to review.

WESTINGHOUSE ELECTRIC CORPORATION

3

COMMONWEALTH OF PENNSYLVANIA    )
                                                    ) SS:
COUNTY OF ALLEGHENY             )

Before me, the undersigned authority, a Notary Public in and for said Commonwealth and County, personally appeared DANIEL D. VICKOVIC, who, being duly sworn, deposes and says that he is ASSISTANT SECRETARY OF WESTINGHOUSE ELECTRIC CORPORATION, and that he signs the foregoing WESTINGHOUSE ELECTRIC CORPORATION'S SUPPLEMENTAL RESPONSE TO PLAINTIFFS' SECOND SUPPLEMENT TO INTERROGATORIES on behalf of that defendant and is duly authorized so to do; that the matters stated in the foregoing document are not necessarily within the personal knowledge of deponent and that deponent is informed that there is no officer of WESTINGHOUSE ELECTRIC CORPORATION who has personal knowledge of all such matters; and that the facts stated in the foregoing document have been assembled by authorized employees and counsel of defendant and deponent is informed that the facts stated in the foregoing document are true.

_____
DANIEL D. VICKOVIC
Assistant Secretary

SWORN TO and subscribed
before me this 21st day
of May , 1992.

_____
Notary Public

Notary Seal
Teresa M. DeSousa, Notary Public
Pittsburgh, Allegheny County
My Commission Expires Feb. 21, 1994
Member, Pennsylvania Association of Notaries

COLINGO, WILLIAMS, HEIDELBERG,
     STEINBERGER & McELHANEY
718 Delmas Avenue
Post Office Drawer H
Pascagoula, Mississippi  39568-0240
(601) 762-8021

By: _____
     Roy C. Williams

David C. Landin
Waller T. Dudley
McGUIRE WOODS BATTLE & BOOTHE
One James Center
801 East Cary Street
Richmond, Virginia  23219-4030
(804) 775-1000

4

V:\WESTMSE1\SUPRESP.IR

## CERTIFICATE OF SERVICE

I, ROY C. WILLIAMS, do hereby certify that I have this day mailed, by United States Mail, postage prepaid, a true and correct copy of the above and foregoing document to all counsel of record.

This the _____ day of May, A.D., 1992.

ROY C. WILLIAMS

MISS. - IN RE. ABRAMIA et al
1992

5

IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSISSIPPI

IN RE:    ASBESTOS PERSONAL INJURY ACTIONS

NOS.:     88-5422(2), 89-5088(2), 89-5121(2), 90-5247(2),
          88-5420(2), 89-5252(2), 90-5069(2), 90-5322(2),
          89-5153(2), 90-5352(2), 89-5268(2), 90-5045(2),
          90-5274(2), 88-5181(2)


DEFENDANT WESTINGHOUSE ELECTRIC
CORPORATION'S RESPONSE TO PLAINTIFFS' SECOND
SUPPLEMENT TO MASTER SET OF INTERROGATORIES

The Defendant, Westinghouse Electric Corporation ("Westinghouse"), by and through its attorneys, responds to Plaintiffs' Second Supplement to Master Set of Interrogatories, as follows:

BACKGROUND

This docket arises from the Court's consolidation of the cases of 14 so-called "lead plaintiffs" asbestos personal injury cases. A total of 4,670 individual plaintiffs are included.

During the past several months, liaison counsel for the plaintiffs and the defendant, approved by this Court, negotiated in an attempt to agree on a case management order and a case administration order. Meanwhile, all discovery previously filed had been stayed, per the April 17, 1991 Order of Judge Maples, in part so that jurisdictional discovery could proceed in order to determine which parties are properly before the Court. This Court continued the non-jurisdictional discovery stay by Order dated October 16, 1991.

On January 31, 1992, this Court entered an Order reopening non-plaintiff specific discovery, and directing that all outstanding non-plaintiff specific discovery heretofore served shall be answered by Monday, March 2, 1992. The Court also authorized the filing of so-called "product identification" discovery by both sides. The plaintiffs served a second supplement to their interrogatories and requests for production on Westinghouse on February 6, 1992. Westinghouse is responding to this second supplemental interrogatory.



EXHIBIT
H

On March 3, 1992, the plaintiffs served their Response to the Defendants' Supplement to Master Set of Interrogatories, including a "Product ID Chart - Preliminary Statement."  This document is represented to be the plaintiffs' initial identification of each asbestos-containing product to which the plaintiffs were allegedly exposed.  Although the plaintiffs have listed 19 "products" attributable to Westinghouse, many of the terms used are so broad and generic that they do not place Westinghouse on reasonable notice of the specific products the plaintiffs attribute to Westinghouse.  This problem is discussed in greater detail below.

## GENERAL OBJECTION

The plaintiffs have made no attempt to tailor their supplemental interrogatory to the facts or issues in this case. It is not limited to whatever product(s) the plaintiffs believe to be at issue or otherwise.  Apparently, the plaintiffs take the position that they are entitled to "go fishing" to see if they can discover something, completely without regard to the burden imposed on Westinghouse or the relevance of the information sought.  Fairly construed, the plaintiffs want the keys to every Westinghouse facility.

It would very likely be impossible to draft one interrogatory more onerous and overreaching than the one filed by the plaintiffs.  The plaintiffs do not seek information about asbestos-containing products which were used by the plaintiffs at the Ingalls shipyard; they want all information about any asbestos-containing product regardless of when, where or how it was manufactured, sold or used.  It would be unduly burdensome and fabulously expensive for Westinghouse to even attempt to respond this request, which is completely unlimited in time, scope or subject matter.

Unlike some of the other defendants, Westinghouse is not a business with one or two locations and a limited product line.  To the contrary, Westinghouse has hundreds of separate

2

business operations throughout the world.  This fact does not obviate normal discovery rules concerning fairness, relevance and relative burden.

The basic premise of every lawsuit is for the plaintiff to state a claim and to pursue discovery on that claim.  There is no authority for the approach taken by the plaintiffs: to seek discovery completely without regard to whatever Westinghouse products they have any basis to believe were responsible for their injuries.  The plaintiffs have had years to discuss the claims with thousands of plaintiffs, to interview co-worker witnesses, and to review countless documents produced by Ingalls and various subcontractors.  It would be patently unfair to allow the plaintiffs to conduct a massive fishing expedition without any focus on the products at issue.  Westinghouse objects to any discovery which goes beyond the products which the plaintiffs have a basis to believe form a basis for their claims as to Westinghouse.

Westinghouse is a relative newcomer to this litigation having been joined in the Jackson County cases in 1990.  This is because Westinghouse is not now, nor has it ever been, a miner of asbestos fiber or a manufacturer of the kinds of thermal insulation products which have been the focus of asbestos personal injury litigation.  Thus, it has never been a member of the "asbestos industry" as that term is commonly used in this litigation.  The interrogatory is overbroad and irrelevant because it fails to take into account this key fact.

Westinghouse is a broadly diversified corporation that currently employs over 100,000 people and manufactures in various countries several thousand basic products and several hundred thousand variations of those products.  Although Westinghouse is engaged principally in the manufacture, sale and service of equipment and components for the generation, transmission, utilization and control of electricity, its businesses also include a wide range of products and services that are unrelated to electrical manufacturing.

3

Many of the products that Westinghouse manufactures and sells are very complex and consist of hundreds or thousands of components. Many of the components, as well as materials, are supplied to Westinghouse by other companies. Westinghouse does not have records to identify the composition of each product from each of its suppliers. Similarly, Westinghouse does not know the ultimate destination of each product sold because Westinghouse's sales frequently are not to the end user.

Westinghouse's portfolio of businesses and products changes almost continually. Changes occur when Westinghouse develops new products, discontinues old products, acquires other companies or their product lines, or divests itself of subsidiaries or product lines. Changes also occur when Westinghouse adds suppliers to and deletes suppliers from its product lines. Westinghouse has not and does not maintain its business records according to product content. Therefore, it is not reasonably possible for Westinghouse to answer the interrogatory because of the broad, categorical manner in which it is framed.

The plaintiff's interrogatory is not limited to products alleged by plaintiff to have been sold by Westinghouse and to have given off respirable asbestos fibers that were a factor in producing any asbestos-related illnesses which are the subject of this lawsuit. So far, some of these products have been identified only in broad, non-descriptive fashion such as "electrical equipment" or "motors." It would therefore be unduly burdensome for Westinghouse to attempt to respond to the plaintiff's interrogatories regarding products that bear no relation to the limited product descriptions the plaintiff has provided.

The plaintiff also seeks discovery which, if complied with fully, would require Westinghouse to provide responses that are speculative, and to incur unreasonable time and expense searching for documents related to products that the plaintiff is unable or unwilling to identify specifically, or which, if identified, cannot have been a substantial proximate cause of his alleged asbestos-related disorders.

4

Westinghouse also objects to these interrogatories to the extent that they seek to elicit information that is protected by the attorney client privilege, the attorney work-product doctrine or as trial preparation material and to the extent that they seek to elicit an expert witness opinion beyond the scope of permissible discovery. By responding below, Westinghouse does not waive any of its objections as stated above. In particular, it reserves objections as to the relevance or admissibility of the following information.

Without waiving these objections, and subject thereto, Westinghouse further responds to the interrogatories as follows:

SUPPLEMENTAL INTERROGATORY NO. 1: State the following information: (i) The trade names and short description of all products sold that contained asbestos; (ii) the percentages of asbestos contained in each such product; (iii) the first and last dates of sale respecting each such product; (iv) the names and addresses of all distributors of such products; (v) the names and addresses of all providers of asbestos fiber; (vi) the names of all insurance carriers who are or may be liable for amounts claimed by the plaintiffs; (vii) the amounts and years of coverage respecting each such insurer.

(i)     Based upon reasonable information and belief, Westinghouse made several hundred thousand types of products during the relevant time period. Of those products, fewer than 100 ever contained some amount of asbestos in some form. These were not "asbestos products" as that term is commonly used in asbestos litigation. That is to say, asbestos was not a primary or only ingredient of these products. Rather, asbestos was used as one component or ingredient of a particular part of the product, or the finished product itself, as illustrated by the answers below.

Westinghouse objects to providing a list of each product it has ever manufactured which

5

*Rog*

*4-22-92*

contained any type or amount of asbestos, completely without regard to whether or not those products have anything to do with the claims asserted by the plaintiffs in this case.  Without waiving these objections, Westinghouse responds further as follows:

Westinghouse sold fire resistant micarta through its exclusive distributor, U.S. Plywood Corporation.  As indicated by Hopeman Brothers invoices which have been made available to all parties, this micarta was shipped by Westinghouse from its micarta plant in Hampton, South Carolina to Hopeman Brothers in Waynesboro, Virginia.  The composition of fire resistant micarta, including asbestos-containing tissue sheets, is explained in documents which will be produced.  Westinghouse fire resistant micarta was developed in approximately 1956 and was last sold in approximately 1973.

Westinghouse also supplied marine turbines pursuant to contracts with owners or the Maritime Administration, the U.S. Navy for certain ships constructed at Ingalls between 1943 and 1974. Upon information and belief, certain parts of these turbines and the piping connected to them were insulated at Ingalls with various asbestos-containing products manufactured and sold by others, in accordance with specifications promulgated by the ship owners, marine architects such as George Sharp, regulations of the United States Maritime Administration, and/or the United States Navy.  Westinghouse did not normally sell or supply the thermal insulation products used on the exterior of the turbines.  Plaintiff Leo Fortner has confirmed that these products were

6

manufactured by others and installed by the various insulation subcontractors at Ingalls.

Some of the turbines contained internal components such as asbestos-containing gaskets or packing material manufactured by others. Most of the gaskets used on Westinghouse marine turbine generators are standard size gaskets, or gaskets cut from sheet on the ship. The original equipment may have contained one set of gaskets that was manufactured by others, not by Westinghouse. Westinghouse did not normally supply standard size gaskets or sheet material as replacement parts.

A very small percentage of gaskets on turbine generator sets was required to be pre-cut and pre-formed by a gasket manufacturer to fit special or unusually shaped openings in the equipment. Westinghouse did not manufacture any of these special, pre-cut gaskets. Westinghouse turbines containing special, pre-cut gaskets may have been accompanied by one set of replacement gaskets, in accordance with American Bureau of Shipping regulations. Any subsequent replacement gaskets normally were supplied by the gasket manufacturer, not by Westinghouse.

Likewise, the equipment may have contained original and one set of replacement packing material that was manufactured by others, not by Westinghouse. Any subsequent replacement packing normally was supplied by the packing manufacturer, and not by Westinghouse. Packing material used in valves and glands are completely encapsulated and are installed in the interior of operating equipment.

Westinghouse is attempting to verify the ships constructed at Ingalls between 1943 and 1973

7

to which Westinghouse supplied steam turbines.
Except as protected by the attorney work product
privilege, that information will be provided in a
supplemental answer.

Electrode is a general term used for a
conductor which establishes electrical contact as
part of a circuit.  Westinghouse cannot be sure
what the plaintiffs intend by the word
"electrodes" in the context of this litigation.
Arc welders use a covered metal electrode,
sometimes called a welding rod, to carry an
electrical current from the power source to the
metal being welded.  Consumable electrodes have a
coating called flux which surrounds the core wire
of the electrode.  Westinghouse began manufactur-
ing welding electrodes in the mid-1930s.  A small
percentage of asbestos was used in the flux
material for a small percentage of electrodes
manufactured prior to 1970.

Westinghouse has manufactured hundreds of
types of transformers since the 1880s, including
power transformers and distribution transformers.
The Westinghouse transformers are or both general
application and for specific customers.  Certain
transformers contained internal components with
asbestos at some point in time.  Any asbestos-
containing components located within the trans-
former fluid reservoir were fully encapsulated.
The windings for dry type transformers are covered
with varnish and baked at extremely high tempera-
tures to avoid moisture infiltration.

Westinghouse is unaware that it ever
manufactured or sold asbestos cloth as a product.
If the plaintiffs will provide some explanation of
the kind of cloth they believe to be at issue,

Westinghouse will endeavor reasonably to supplement this response to the best of its ability.

Melamine is a generic term which is used to describe a large family of plastic laminate products. For example, Westinghouse micarta is correctly termed a melamine laminate. Westinghouse will provide complete information about micarta in its answers to plaintiffs' master discovery requests and the documents it will produce. If the plaintiffs believe some other kind of melamine product is at issue, Westinghouse will endeavor reasonably to supplement this answer to the best of its ability.

Westinghouse is unaware that it ever manufactured or sold a product called "O-Rings". An O-Ring is a synthetic rubber material which Westinghouse used in hydraulic lines in rotating machinery, or where a seal is required for hydraulic fluid such as oil.

Upon information and belief, flame resistant kraft is a generic term for a kind of paper known as kraft paper, which is fire retardant due to its having been treated in the manufacturing process. Regular kraft paper has been used in the manufacture of Westinghouse micarta for many years. At the time Westinghouse was asked to develop a new, more fire-resistant type of micarta in 1956, its employees experimented with kraft paper, which had traditionally been used to manufacture micarta, and numerous other ingredients, in an attempt to satisfy the inflammability requirements imposed by the United States Coast Guard and its customer U.S. Plywood. Subject to this information, if the plaintiffs will provide further explanation of

9

what is meant by the phrase "flame resistant kraft", Westinghouse will endeavor to supplement this answer.

Westinghouse has manufactured many types and sizes of "electric machinery" since the company was founded in the 1800's. The broad, categorical use of this term makes it impossible for Westinghouse to provide a meaningful response. If the plaintiffs will provide a further explanation of what kind of "electric machinery" they believe to be involved in this case, Westinghouse will endeavor to supplement its answer to the best of its ability.

The same is true for "engines", and "motors". Westinghouse makes many, many, varieties of engines and motors and cannot respond concerning those products in a meaningful way absent further information from the plaintiffs. Since the 1880s, Westinghouse has manufactured a full range of alternating and direct current motors. These motors are used to drive a variety of equipment including, for example, pumps, compressors, fans, blowers and countless other applications. Because of the variety of motors and the period of time in which Westinghouse has manufactured motors, it is impossible to list with any degree of certainty the specific motor components that may have contained an asbestos ingredient at any point in time. The rotors and stators of certain motors contained thin strips of asbestos-containing micarta, which were dipped and baked in varnish and thereafter covered with a paint.

Circuit breakers are circuit interrupting devices held closed by a mechanical latch, which are opened by electronically tripping the

10

mechanical latch so that gravity or a spring will open a switch. Certain circuit breakers manufactured by Westinghouse have contained encapsulated asbestos-containing components at various points in time. These components have included micarta, neoprene gaskets, laminated core washers, epoxy resin coating and wire.

Westinghouse has manufactured generators since the late 1880s. Some generators have contained components with an asbestos ingredient, including windings, slot wedges and bearing rings. As stated above, based upon reasonable investigation, information and belief, any such asbestos-containing internal components were fully encapsulated within the body of the generator and did not release respirable fibers.

Marinite was manufactured and sold by Johns-Manville, which has held a patent on marinite since the early 1930s.

A division of Westinghouse Electric Corporation, Westinghouse Electric Supply Company (WESCO), has had an office in Jackson, Mississippi since approximately 1947. Upon information and belief, WESCO may have sold asbestos-containing wire and cable products manufactured by other companies. Westinghouse did not manufacture asbestos-containing wire or cable.

(ii)     As explained above, Westinghouse does not have records reasonably available from which it can determine the percentages of asbestos contained in the products discussed above. Westinghouse has not maintained its records according to the content, asbestos or otherwise, of the particular product. The asbestos content of fire resistant micarta is described in the

11

documents which will be produced concerning that product.

(iii)    As stated above, Westinghouse has manufactured and sold electrical motors, switches, transformers, generators and electric machinery since the 1800s.  The fire resistant micarta at issue in this case was developed in 1956 and discontinued in approximately 1973.

The first Westinghouse marine geared-turbine was placed in service in 1911.  Westinghouse welding rods were first sold in the 1930s and were sold up until 1983.  No asbestos flux was used after 1970.

(iv)    As stated above, U.S. Plywood Corporation of New York and/or Stamford, Connecticut was the exclusive distributor for Westinghouse fire resistant micarta.  Westinghouse Electric Supply Company has had an office in Jackson, Mississippi since approximately 1947.

(v)    See General Objection.  Westinghouse's records have not been maintained so that Westinghouse can reasonably determine the source of all suppliers of any asbestos ingredient for the components of the products discussed above.

(vi)    Westinghouse has and has had numerous policies of insurance, both primary and excess, covering claims for allegedly bodily injury. Coverage under these many policies depends on the plaintiff's alleged dates of direct exposure, manifestation, injury, or other pertinent data.

Since there are several thousand plaintiffs in this consolidated action, it would be unduly burdensome and very likely impossible for Westinghouse to provide information relating to the numerous insurance policies which might apply

12

cc:  Transmittal and attachments are being faxed to Roy Williams,
counsel for Westinghouse.

to any individual plaintiff.  At such time as the
Court selects one or more plaintiffs for trial,
Westinghouse will endeavor to identify the policy
or policies applicable to those plaintiffs and
provide all information required under applicable
court rules and Mississippi law.

(vii)        <u>See</u> Answer vi above.

Respectfully Submitted,

WESTINGHOUSE ELECTRIC CORPORATION

By: _____
        ROY C. WILLIAMS, Attorney

OF COUNSEL:

BRYANT, COLINGO, WILLIAMS & CLARK
718 Delmas Avenue
P.O. Drawer H
Pascagoula, Mississippi  39568-0240
(601) 762-8021

David C. Landin
Waller T. Dudley
McGUIRE, WOODS, BATTLE & BOOTHE
One James Center
901 East Cary Street
Richmond, Virginia  23219-4030
(804) 775-1000

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing was
served, postage prepaid, this 22 day of April, 1992 to all
counsel of record.

_____

13

South Philadelphia Works
Steam Engineering Dept.

June 11, 1946

P.D.Specs. 7303-4-5
Blanket Insulation

EAST PITTSBURGH WORKS
Eng. Labs. and Standards 111
Materials and Standards
Mr. R. A. Frye

1.      Please be advised that the above three
specifications may now be canceled.  We are making
all of our blankets within the plant, and material
cards have been prepared for the basic materials;
and a process specification for the operations.

W. L. Mochel, Manager
Metallurgical Engineering

DOCUMENTS PRODUCED DALLAS COUNTY CASES 3/18/92

DOCUMENTS PRODUCED DALLAS COUNTY CASES 3/18/92



PLAINTIFF'S
EXHIBIT
6743.0

7303
04
05

## BLANKETS
### Practice Before & Early in the War

| Deg. Fahr. | No. of Blanket-Layers | Blanket Position | Cloth Position | Cloth Grade | Cloth Weight |
|---|---|---|---|---|---|
| To 500 F. | Single | x | Inner | AA | 2.5 |
| | | | Outer | AA | 2.5 |
| .85o 500-25 F. | Double | Inner | Inner | AAA | 3.0 |
| | | | Outer | AA | 2.5 |
| | | Outer | Inner | AA | 2.5 |
| | | | Outer | AA | 2.5 |
| 85o Over 85 F. | Double | Inner | Inner | AAAA | 3.0 |
| | | | Outer | AAA | 2.5 |
| | | Outer | Inner | AAA | 2.5 |
| | | | Outer | AAA | 2.5 |

Stores.-

| | | |
|---|---|---|
| AA | 90-95% | 2.5 |
| AAA | 95-99% | 2.5 |
| AAA | 95-99% | 3.0 |
| AAAA | 99-100% | 3.0 |

DOCUMENTS PRODUCED DALLAS COUNTY CASES

DOCUMENTS PRODUCED DALLAS COUNTY CASES 3/18/92.

June 14, 1950

**STEAM SUPERVISORS' LETTER NO. 50.- 8**
**MAILING LIST 6 A**

Boston Engrg. & Service, Mr. R. H. Bessom, Steam Supt.
New York Engrg. & Service, Mr. H. T. Brohl, Steam Supt.
Philadelphia Engrg. & Service, Mr. J. Taylor, Steam Supt.
Atlanta Engrg. & Service, Mr. P. Genntison, Steam Supt.
Pittsburgh Engrg. & Service, Mr. H. H. Bucker, Steam Supt.
Cincinnati Engrg. & Service, Mr. H. S. Malany, Steam Supv.
Detroit Engrg. & Service, Mr. J. B. Chapman, Steam Supv.
Chicago Engrg. & Service, Mr. R. M. Beville, Steam Supv.
Chicago Engrg. & Service, Mr. B. C. McDonnell, Staff Asst.
Minneapolis Engrg. & Service, Mr. I. L. Boyum, E. & S. Supv.
St. Louis Engrg. & Service, Mr. G. M. Nilsson, Steam Supt.
Houston Engrg. & Service, Mr. T. W. Rubottom, Steam Supv.
~~New Orleans Engrg. & Service, Mr. J. W. Crane~~
East Pittsburgh Works, 8-L-23, Mr. L. C. Moore, Asst. to Mgr., E.E&S.

SUBJECT:                    INSULATION

       We are trying to obtain some cost data on the application of Block Type Insulation on 166, 246 and 286 Frame Turbines.

       We have the possibility of having more than one condition facing you in the field. In the past these frames have not had the block-type insulation put on here at South Philadelphia. We are considering doing this now and therefore we are interested in field experience as far as cost is concerned.

       As you know, on Supervision jobs we are supposed to ship material from here for installation by the customer. Several of these frames got out where we did not supply the block insulation from here and we asked you to buy it in the field. In these cases you should be able to give us cost of material.

       In some cases on delivery and erect jobs you have contracted for material and labor to install insulation in the field. If you can break down the labor and material we would appreciate it.

       There may also be some cases where we did furnish the insulation from here and you had to install it. If so, can you give us the labor cost?

       This only applies to block type insulation.

       Will any one of you having such data please let us hear from you promptly.

                            *J. C. Tiefel*
                           Assistant to Manager
J. C. Tiefel                  Steam Service Department

28002876

EXHIBIT

**Westinghouse**

**Date**  12/27/62

**From**  Lester Works – G Bldg

**Subject**  STEAM SERVICE DATA LE
#62-23

**INDEX:**  Field Application of
Turbine Insulation

**ROUTE:**  M.L. #S-15

There still seems to be some misunderstanding concerning the application of turbine insulation in the field. This letter supersedes Steam Supervisors' Letter #58-10.

Process specification 600729 covers the application of block and plastic insulation on unit cylinders above the 286 frame. This is our standard insulation spec for turbines to be insulated in the field. Blanket insulation is applied only when required by the contract, since a price addition is involved. It specifies that the inner layer of insulation, next to the hot surface to be insulated, must be of water resistant thermal insulating block, material 46601AB(Previous 7309-2) made of bonded mineral wool. The outer layer is to be of material 46110BJ(Previous 8407-1) which is a loose, fibrous plastic insulating cement.

Process specification 600433 shows the application of block insulation to piping of all sizes, and to single cylinder turbine units shipped assembled, and therefore insulated in the shop.

In general, 600433 Part I specifies block insulation for large piping (over 10") to be a single layer of 46102BB(Previous 7308) calcium silicate blocks for temperatures up to 600°F. A double layer of 46102BB material is used for temperature range of 601° to 1050°F. Over 1050°F a double layer consisting of material 46601AA (inner) and 46102BB (outer) shall be used.

Part II specifies molded insulation for 10" piping and smaller consisting of material 54251AH (Previous 5779) up to 1050°F. For 1051°F to 1200°F a double layer of material 46601BA (Previous 7310) shall be used.

Insulation cement material 46110BA is to be used for all pipe insulation patching, filling and finishing.

28002877

EXHIBIT
K

All District Offices have on file a standards book containing Lester Works Standard 920.1 through 920.5 on Insulation. They also have a Material card file and a Process Specification Book.

Quite often insulating contractors, who wish to make bids for supplying and/or installing the necessary insulation material, visit the job sites for estimating purposes. The attached information listing the current approved materials should aid our Field Service Engineers. Only insulation materials approved by Westinghouse will be permitted on Westinghouse turbines and piping.

*T. W. Bonham*

Headquarters Steam Service - T. W. Bonham

Attachment

2B002878

SSDL #62-23

## Process Specification 600729

### Turbine Cylinder Insulation

__46601AB (Previous 7309-2) (inner).__ Heat insulating block made of bonded mineral wood for steam turbine and steam piping for temperatures up to 1700°F where resistance to moisture is required. Characterized by the dirty brown color.

    Suppliers:

    Baldwin-Ehret-Hill   - Baldwin Hill Mono Block.

    Eagle-Picher       - FV Supertemp Block.

    Johns-Manville    - Banroc HT Block.

__46110BJ (Previous 8407-1) (outer).__ Loose fibrous heat insulating cement, composed of black mineral wool derived from slag, asbestos fiber and clay binder.

    Suppliers:

    Baldwin-Ehret-Hill - Baldwin-Hill #1 Insulating Cement

    Philip Carey       - MW 50 Insulating Cement

    Eagle-Picher       - Super 66 Plastic Insulation

    Johns-Manville     - J-M 450 Insulating Cement

    Owens-Corning Fiberglas - O-C 660 Insulating Cement

## Process Specification 600433

__46601AA (Previous 7309-1).__ On pipe over 10".

    Suppliers:

    Johns-Manville     - Superex M Block

    Keasbey & Mattison - K&M Hy-Temp Block

    Owens-Corning Fiberglas - Kaylo 20 Block

    Philip Carey       - Carey Hi-Temp 19 Block

SD62-23-3        29002879

- 2 -

Baldwin-Ehret-Hill - Enduro Hi-Temp Block

Fibreboard Paper Products Corp. - Prasco 15C Hi-Temp Block
Pabco Precision Molded (
Block.

<u>46102BB (Previous 7308)</u>.  On piping over 10".  High temperature
calcium silicate heat insulating block for steam turbines and
steam piping for temperatures up to 1200°F.

Suppliers:

Baldwin-Ehret-Hill - Thermasil Block

Johns-Manville      - Thermobestos Block

Owens-Corning Fiberglas - Kaylo Block

Ruberoid            - Calsilite Block

Fibreboard Paper Products Corp. - Pabco Precision Molded Ca
Block.

<u>Part II</u>

<u>54251AH (Previous 5779)</u>.  Pipe size 1" through 10" using calcium
silicate heat insulation.

Suppliers:

Baldwin-Ehret-Hill - Thermasil Pipe

Johns-Manville      - Thermobestos Pipe

Owens-Corning Fiberglas - Kaylo Pipe

Ruberoid            - Calcilite

<u>46601BA (Previous 7310)</u>.  High temperature calcium silicate heat
insulation (over 1050°F) for pipe under 10".

Suppliers:

Baldwin-Ehret-Hill - Enduro Hi-Temp & Thermasil Pipe Insulat

Johns-Manville      - Superex - M & Thermobestos Pipe Insula

Owens-Corning Fiberglas - Kaylo 20 & Kaylo Pipe Insulation

Fibreboard Paper Products Corp. - Prasco 15C Hi-Temp.
Pipe Insulation or Pabco
Precision Molded Caltemp
Pipe Insulation

SSD 62-23-4.                                    28002890

- 3 -

<u>46110BA (Previous 7311)</u> Insulating Cement.

     Suppliers:

     Baldwin-Ehret-Hill - Long Fiber Cement 150

     Johns-Manville     - Asbestos Cement 302

     Philip Carey Mfg. Co. - Plastic Cement 707

SSD 69-23-5

28002881



## DECLARATION OF JOSEPH H. CHILCOTE

I, JOSEPH H. CHILCOTE, declare:

1. I am presently retired and reside at 3710 Lee Highway, Arlington, Virginia 22207.

2. From 1942 until my retirement in 1964, I was employed by the Department of the Navy, Bureau of Ships (later Naval Sea Systems Command), Materials Standards Branch as a project engineer. In that capacity I was responsible for consulting with industry and drafting procurement specifications for a wide variety of materials, including thermal insulation materials.

3. Because time, resource and cost constraints made it impracticable for the Navy to develop the detailed expertise necessary to independently undertake its own product development, when my office was required by other Navy activities to procure a product or material, we invariably consulted with industry to determine product availability from preexisting commercial sources. We regularly met with technical or sales representatives from various companies, including those from insulation manufacturers such as Raybestos-Manhattan, Inc., Johns-Manville and Keasby-Mattison Corporation, who often initiated such contacts. Such companies sent representatives to Washington, D.C. to meet with us to discuss their products and product capabilities and to provide samples for suitability testing at our Engineering Experiment Station at Annapolis, Maryland. I relied on the



specific and comprehensive knowledge so provided rega.
their particular product lines because my responsibiliti
for broad ranging and diverse materials precluded me from
acquiring such information quickly in any other manner.
Moreover, we wanted to adapt our needs and our specifica-
tions wherever possible to products and materials already
commercially available in order to facilitate acquisition
and to save time and money otherwise required for develop-
ment.  This was invariably true with respect to thermal
insulation materials where consultation with industry experts
was regularly accomplished with a view towards fully utilizing
available industry expertise and materials in fulfilling the
needs of the Navy.

4.    In consulting with industry and in receiving
industry comments on proposed military specifications, I
frequently received correspondence from both individual
manufacturers and trade associations.  Hereto attached as
Exhibits A-D are true copies of some such correspondence
received from Raybestos-Manhattan, Inc. and from the Asbestos
Textile Institute.  Exhibit A consists of a letter to me from
Raybestos-Manhattan, Inc. transmitting a copy of a letter
dated May 14, 1978, from Raybestos-Manhattan reciting arrange-
ments made with a private shipyard to furnish a sample of
asbestos cloth manufactured by Raybestos-Manhattan and "under
evaluation" by the Navy for inclusion in Federal Specification
SS-C-466 (Cloth, Thread and Tape - Asbestos).  Exhibit B is

a December 24, 1958 letter to me from Raybestos-Manhatta.
reciting arrangements to submit a sample of the same cloth.
The letter also furnishes manufacturing specifications for
the cloth and recommends amendment of the relevant govern-
ment specifications (including SS-C-466) to include their
product.   Exhibit C is a copy of a letter I received from
Raybestos-Manhattan, dated March 29, 1969, acknowledging
receipt of an interim revision of SS-C-466 submitted to it
for comment, suggesting minor changes and advising that
Raybestos-Manhattan would furnish further comment to the
Asbestos Textile Institute which would reply on behalf of
the industry.   Exhibit D is the composite industry comment
submitted by the Asbestos Textile Institute by letter
dated April 30, 1963.

    5.   Following this process of consulting with industry
and obtaining its comments and product samples for testing
and comparison, we described the best commercially available
products for desired applications and uses in terms of their
performance characteristics.   They were drafted to require
specific material compositions only in those few instances
where the product described in such specification was the
only product available on the market which met the perform-
ance requirements.   Specifications were drafted in this
manner to permit the widest possible number of companies
to qualify their products for a given performance and
thus enhance cost competition.

6.   The above-described working relationship maintained with industry continued throughout my tenure with the Department of the Navy.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 9, 1981.

JOSEPH H. CHILCOTE

# RAYBESTOS-MANHATTAN, INC.

### ASBESTOS TEXTILE DIVISION
#### Manheim, Pennsylvania



14 May 1958

Navy Department
Bureau of Ships
Washington 25, D.C.

Attention:  Mr. Joseph Chilcote - Code 344

Gentlemen:

The New York Shipbuilding Corporation are interested in our
style 20P070 wet brushed cloth for use as a lagging cloth.
They have asked us whether this cloth has Navy approval and
we have answered them per copy attached. We trust that our
explanation meets with your approval.

Sincerely yours,

J. A. PETTES, JR. - MANAGER

nh

ENCLOSURE RETURNED IN 22

5190293-59

EXHIBIT A

[illegible fine print at bottom of page]



# COPY

**RAYBESTOS-MANHATTAN, INC.**

Asbestos Textile Division

MANHEIM, PA.

14 May 1958

New York Shipbuilding Corporation
Camden, New Jersey

Attention:  Mr. Earl Wilmoth - Buyer

Dear Mr. Wilmoth:

We wish to thank you for the courtesies extended our Mr. H. M. Gibson when he called at your office last week. At his request we are pleased to enclose a copy of our price page 4N dated 21 March 1958 covering the various styles of asbestos cloth described by Federal Spec. SS-C-466. We hope you will find this schedule a useful addition to your records.

At Mr. Gibson's suggestion we are arranging to send to your personal attention under separate cover a 5-yd. sample of our style 20P070 cloth on which we are pleased to quote as follows:-

### ASBESTOS CLOTH IN ROLLS 40" X 100 YDS.

| | |
|---|---|
| R/M Style | 20P070 |
| ASTM Grade | Underwriters |
| Finish | Wet Brushed |
| Weight Sq. Yd. | .70 lbs. ($\pm$ 5%) |
| Price  Sq. Yd. | $ 1.38 |
| Price  Sq. Ft. | 15-1/3¢ |

Terms, 1% 10th prox., net 30th prox. for acceptance in 15 days and shipments prior to 30 June 1958.
Freight prepaid and allowed from N. Charleston, S.C. on shipments of 200 lbs. and over.

The U. S. Navy has had a fabric of this construction under evaluation for sometime. They have not as yet added a .70 lb. cloth to Spec. SS-C-466A. We understand, however, that they have about decided to make such an addition to this specification. It would therefore seem quite possible that if you would apply to the Bureau of Ships for authorization to use a fabric to the above description the Bureau would approve the usage for certain applications.

-Continued-

Page two

We look forward with interest to receipt of your comments on samples submitted.

Very truly yours,


J. A. BETTES, JR. - MANAGER
nh


cc-
Mr. J. F. Chilcote - Buships
J. A. Brown, Jr.
M. M. Gibson
J. W. Frampton, Jr.


S190293-58

# RAYBESTOS-MANHATTAN, INC.

### Asbestos Textile Division
#### Manheim, Pennsylvania



24 December 1958

Navy Department
Bureau of Ships
Washington 25, D.C.

Attention:  Mr. Joseph Chilcote - Code 345C

Gentlemen:

Our Mr. M. M. Gibson will personally deliver to Mr. J. Chilcote a sample of asbestos cloth identified as Laboratory Sample #L7025.  The purpose of this letter is to recommend the inclusion of this style cloth under Spec. MIL-C-1207 12/14/49 and Federal Spec. SS-C-466A 4/30/56.  We believe this cloth will serve very satisfactorily as an extra light weight lagging cloth over pipe covering aboard ship.

The manufacturing specification of the cloth, and an actual laboratory analysis are compared as follows:-

| | RECOMMENDED SPECIFICATION | LABORATORY ANALYSIS |
|---|---|---|
| R/M STYLE | 20P070 | |
| R/M LAB. SPEC. | | L-7025 |
| WEAVE | $\frac{1}{1}$ | $\frac{1}{1}$ |
| FINISH | Napped & Calendered | Napped & Calendered |
| A.S.T.M. GRADE | Underwriters | 82.6% |
| WEIGHT SQ. YD. | .70 lbs. ± 7% | .69 lbs. |
| ENDS PER 1" | 21 ± 1 | 22.0 |
| PICKS PER 1" | 17 ± 1 | 17.6 |
| TENSILES BEFORE HEATING | | |
| WARP   (MIN. AV.) | 45 | 48.5 |
| FILLING   "   " | 48 | |
| TREATING AFTER HEATING TO 200° F. | | |
| WARP   (MIN. AV.) | 40 | 46.6 |
| FILLING   "   " | 35 | 43.0 |

2271224-59

CONTROLLED CONFIDENCE

DUE DATE ------------

-Continued-

EXHIBIT B

Page two

We invite your particular attention to the proposed warp and
filling tensiles, both before and after the heating test.
These tensiles may be somewhat higher than some usages demand.
However, an Underwriters grade asbestos fabric weighing .70
pounds per square yard, if properly manufactured, should achieve
at least the above suggested minimum average tensiles.  To put
the matter another way, if the cloth does not meet these minimums
it is deficient in some manner.  We, therefore, recommend the
inclusion of at least these minimum tensiles in order to insure
delivery of quality material under G.S.S.O. contracts.

We believe the above described cloth will do a wholly satisfactory
job for many applications where grade A cloth is now used.  The
weight reduction from 1.40 lbs. sq. yd. to .70 lbs. sq. yd. would
represent a very appreciable tonage saving on a large carrier.
However, we also believe that some measure of control should be
established so that grade A class 2, grade A class 5 and the
proposed fabric are NOT used indiscriminately.  If there is a
need for all three fabrics in the specification, there is also
a need for proper selection of the fabric in accordance with
the service requirement.

We look forward with keen interest to receipt of your comments
on sample submitted.  If you would like us to send a trial yardage
to the Engineering Experiment Station at Annapolis for evaluation,
we will be pleased to do so.

Sincerely yours,

J. A. COTTES, JR. - MANAGER
mh

2271224-59

# R. BESTOS-MANHATTAN INC.

### ASBESTOS TEXTILE DIVISION

#### Manheim, Pennsylvania



29 March 1963

Department of the Navy
Bureau of Ships
Washington 25, D. C.

Attn:   Mr. F. M. Gantt, Head
        Specifications & Standardization Branch
        Technical Materials Division

Subj:   Your File 4121/SS-C-466
        (FSC 5640)
        Ser 621-70

Gentlemen:

This will acknowledge and thank you for your letter dated 8 l
enclosing two copies of Interim Federal Specification SS-C-0(
(NAVY-Ships) dated 19 June 1962. As you probably know, Raybe
Manhattan will send its official comments to Dr. M. C. Shaw a
Asbestos Textile Institute on this Interim Revision. Dr. Sha
will reply to the Bureau on behalf of the industry.

In addition to any technical revisions which may be recommen
the writer would like to suggest a minor addition to Table I
in paragraph 3.3.6.1. You will note in all your other table
the several weights of cloth are differentiated by style num
I think it would be well to add style numbers to Table IX as
gested by the red pencil changes to the enclosed price page
dated 16 August 1962.

My own personal opinion is that there is no real need for ni
separate tables in this specification. In my opinion the sp
cification would be a lot easier to use and to read if all c
the fabrics were listed in one table, again similar to our p
page 4X.

We thank you for the opportunity to review this specificatic
and hope the above suggestions will be found helpful.

Sincerely yours,

J. A. METTES, JR. - MANAGER

cc:
Encl.

EXHIBIT C

RAYBESTOS-MANHATTAN, INC.
Asbestos Textile Division
Manheim, Pa.        No. Charleston, S.C.

ASBESTOS CLOTH & THREAD
TO FEDERAL SPEC. NO. SS-C-00466d 6/10/62

Standard Rolls 40" x 50 Yds. (approx.)
Cloth 36", 60" or 72" also available

| Navy Style | Table No. | Const. No. | R/M Style | A.T.I. Style | Wt Lbs Sq Yd | Texture | Min Av Lbs Tensile Warp | Fill | List Price Sq Yd | Per |
|---|---|---|---|---|---|---|---|---|---|---|
| **UNDERWRITER'S GRADE PLAIN CLOTHS** | | | | | | | | | | |
| 1 | I | 1 | 10P225 | 36P10 | 2.25 | 18 x 9 | 90 | 40 | $5.63 | $2 |
| 2 | II | 1 | 16P140 | 22P16 | 1.40 | 19 x 10 | 80 | 40 | 6.93 | 4 |
| 3 | III | 1 | *18P075 | 11P18 | .75 | 21 x 17 | 40 | 30 | 3.23 | 4 |
| 4 | IV | 2 | 10P105 | 18P10 | 1.05 | 20 x 15 | 65 | 40 | 3.43 | 3 |
| **UNDERWRITER'S GRADE GLASSBESTOS(R) CLOTHS** | | | | | | | | | | |
| 5 | V | 3 | 10P111 | 18P10G | 1.10 | 13 x 9 | 90 | 70 | 3.74 | 3 |
| 6 | VI | 4 | 10P140 | 22P10G | 1.40 | 18 x 9 | 125 | 70 | 4.76 | 3 |
| **GRADE AA PLAIN CLOTH** | | | | | | | | | | |
| 1 | VII | 1 | 10P225 | 36P10 | 2.25 | 18 x 9 | 100 | 40 | 6.98 | 3 |
| **GRADE AAA PLAIN CLOTHS** | | | | | | | | | | |
| 1 | VIII | 1 | 10P225 | 36P10 | 2.25 | 18 x 9 | 125 | 50 | 8.93 | 3 |
| 2 | VIII | 2 | 16P140 | 22P16 | 1.40 | 19 x 10 | 80 | 40 | 8.99 | 6. |
| **GRADE AAA METALLIC CLOTHS** | | | | | | | | | | |
| 1 | IX | 1 | #12M260 | 42M12 | 2.60 | 18 x 9 | NS | NS | 12.69 | 4 |
| 1 | IX | 2 | +10M275 | 44M10 | 2.75 | 18 x 9 | NS | NS | 13.75 | 5 |
| 1 | IX | 3 | +10M350 | 56M10 | 3.50 | 18 x 9 | NS | NS | 18.45 | 5 |
| **SEWING THREAD** | | | | | | | | | | |
| | II | | 1011/3 Grade AAA Monel | | | | | | | 5 |
| | III | | 1020 Commercial Grade Plain Treated & Endless | | | | | | | 2 |

* Napped & Calendared    # Nickel Wire Inserted   (R) Registered Trademark
+ Monel Wire Inserted    NS Not Specified        Raybestos-Manhattan

TERMS    1% 10th prox., net 30th prox., on approved credit.
SHIPMENT from North Charleston, South Carolina.
FREIGHT  prepaid and allowed on shipments of 200 lbs. and
         over to any destination in the U.S.A. east of Den-
         ver, Colo. and also to any destination in Ontario
         or Quebec, Canada.



# ASBESTOS TEXTILE INSTITUTE

## ℅ PHILADELPHIA TEXTILE INSTITUTE
### SCHOOLHOUSE LANE
### PHILADELPHIA 44, PA.

Phone: VIc

April 30, 1963

Mr. F. M. Gantt, Head,
Specifications and Standardization Branch
Technical Materials Div.
Department of the Navy
Bureau of Ships
Washington 25, D. C.

Dear Mr. Gantt:

Enclosed herewith please find a composite of the comments of those members of the Asbestos Textile Institute who were qualified to consider the proposed revisions for Specification MIL-C-00166d; Cloth, Thread and Tape - Asbestos.

We trust that these remarks will prove helpful and if we can assist you further in this regard, please feel free to call upon us.

Very truly yours,
ASBESTOS TEXTILE INSTITUTE

Myril C. Shaw,
Executive Director

MCS:s

EXHIBIT D

April 30, 1963

Proposed Revision
Interim Federal Specification
Cloth, Thread, and Tape — Asbestos
SS-C-00466d (Navy-Ships)

Page 1.   Paragraph 1.2.1 Forms, Grades and Styles - It is suggested that under Form 1 - Cloth, Grade U.G., Styles 5 and 6, some clarification be made to indicate that the glass is a filament yarn.  The clause might read "asbestos yarn and glass filament yarn plied together".

Page 2.   Paragraph 3.3.3. Grade U.G., 80 percent asbestos, blue stripe.- The cloth shall contain not less than 80 percent asbestos and a blue marker thread shall be woven in each selvage.

Page 4.   Paragraph 3.3.3.6. Table VI - Grade U.G., style 6 cloth, No. 4

| Weight per square yard ± 7% Pounds | Construction Ends per inch ± 1 | Picks per inch ± 1 | Minimum Average Breaking Strength, Warp | Fill |
|---|---|---|---|---|
| 1.40 | 18 | 9 | 90 | 40 |

Page 4.   Paragraph 3.3.4.1. Style 1, plain weave.- The cloth shall contain not less than 90 percent asbestos and shall conform to the construction shown in Table VII.  A red marker thread shall be woven in each selvage edge.

Page 4.   Paragraph 3.3.5. Grade AAA, 95 percent asbestos, green stripe.- The cloth shall contain not less than 95 percent asbestos and a green marker thread shall be woven in each selvage edge.

Page 5.   Paragraph 3.3.6.1 Table IX - Grade AAA-H, styles 7,8,9.

| Style | Weight per Square Yard ± 7% | End per inch ± 1 | Picks per inch ± 1 | Composition | Diameter ± .001 | Number of Strands |
|---|---|---|---|---|---|---|
| 7 | 2.60 | 18 | 9 | Soft annealed nickel | .006 | 1 |
| 8 | 2.75 | 18 | 9 | Nickel-Copper alloy 58% Ni. | .008 | 1 |
| 9 | 3.50 | 18 | 9 | Nickel-Copper alloy 58% Ni. | .008 | 2 |

Page 6    Paragraph 4.2.2 <u>Examination</u>.— The following sentence shall be to this paragraph.— "Rejected lots may be offered again for in-provided the contractor has repaired or removed all non-conformi-material. The inspector shall again examine samples from resubmitted lots to verify compliance with this specification."

Page 6    Paragraph 4.3 <u>Tests</u>.— The following sentence shall be added to this paragraph — "Rejected lots may be offered again for inspection provided the contractor has repaired or removed all non-conforming material. The inspector shall again examine samples from resubmitted lots to verify compliance with this specification."

Page 10    Paragraph 6.2. <u>Ordering data</u>.— Add a fifth subject to be covered as follows:    (e) Allowable variations in Quantity.

Page 10    Paragraph 6.3.1. <u>Cloth</u>.— Asbestos cloth is normally available in widths of 36", 40" and 60" and in rolls of 50 or 100 yards, providing the weight of the rolls does not exceed 225 pounds each. The tolerance shall be plus or minus 5 yards. Ten percent of the total number of rolls per style in a shipment may contain two pieces.

Page 10    Add a paragraph 6.3.1.1. <u>Quantity Variations</u>.— Variations in quantity to be ± 2% minimum. Such variations shall also apply to quantities supplied to individual destinations.

Page 10    Add a paragraph 6.3.2.1. <u>Quantity Variations</u>.— Variations in quantity to be ± 2% minimum. Such variations shall also apply to quantities supplied to individual destinations.

Page 10    Paragraph 6.3.3. <u>Tape</u>.— Add the following sentence to this paragraph — "Ten percent of the total number of rolls may contain two pieces".

Page 10    Add paragraph 6.3.3.1 <u>Quantity Variations</u>.— Variations in quantity to be ± 2% minimum. Such variations shall also apply to quantities supplied to individual destinations.



ORIGINAL



SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

DOROTHY ST. JACQUE, ET AL.,           )
                                      )
              PLAINTIFFS,             )
                                      )
      VS.                             )
                                      )    NO.   C 137 465
JOHNS-MANVILLE PRODUCTS CORP.,        )
ETC., ET AL.,                         )
                                      )
              DEFENDANTS.             )
- - - - - - - - - - - - - - - - - - - )
                                      )
AND ALL RELATED ASBESTOS CASES.       )
                                      )
────────────────────────────

PAGE 190 TO 344

DEPOSITION OF JOHN HAAS, TAKEN ON BEHALF

OF PLAINTIFF, AT 312 NORTH SPRING STREET,

LOS ANGELES, CALIFORNIA 90012, ON

WEDNESDAY, NOVEMBER 5, 1980, AT 9:30 A.M.,

PURSUANT TO NOTICE.

REPORTED BY:

H.F. WATSON, CSR 1687

Watson C.S.R., Inc.

CERTIFIED SHORTHAND RE
• 1523 SIXTH STREET • S
SANTA MONICA, CALIFORN
TELEPHONE: 451-47


EXHIBIT
M


PLAINTIFF'S EXHIBIT

IS A CONCLUSION OF THAT DEPOSITION.

Q     AND THAT IS YOUR UNDERSTANDING AS WELL, MR. HAAS?

A     YES.

Q     DO YOU RECALL, SIR, THE DEPOSITION PROCEDURE THAT WERE EXPLAINED TO YOU PRIOR TO THE LAST TAKING OF YOUR DEPOSITION?

A     I DO.

Q     SO THERE WOULD BE NO NEED TO REVIEW THOSE AGAIN TODAY, AND YOU UNDERSTAND, SIR, THAT YOU ARE UNDER OATH AND TESTIFYING UNDER PENALTY OF PERJURY JUST AS YOU DID LAST TIME?

A     I DO.

Q     ARE YOU STILL CHAIRMAN OF THE SHIPS SPECIFICATIONS CONTROL BOARD OF THE UNITED STATES  NAVY?

A     YES.

Q     AND, AS SUCH, YOUR DUTIES ARE THE SAME AS THEY WERE WHEN YOU DESCRIBED THEM AT THE LAST SESSION OF YOUR DEPOSITION?

A     THAT'S CORRECT.

Q     ARE YOU STILL DIRECTOR OF THE ENGINEERING STANDARDS DIVISION OF THE NAVAL SEA SYSTEMS COMMAND?

A     YES.

Q     AND IN THAT CAPACITY ARE YOUR DUTIES THE SAME AS THEY WERE AS YOU DESCRIBED DURING THE LAST TAKING OF YOUR DEPOSITION, AT THE LAST SESSION?

A     YES.

THAT FORMULATED THAT PROCEDURE OR POLICY, AND I THINK THAT CALLS FOR SPECULATION.  I'LL JOIN IN MR. TEUBER'S OBJECTION AND ADD THE OBJECTION I JUST VOICED.

MR. SIMON:  FOR THE RECORD, I DON'T CONSIDER THE LAST TWO OBJECTIONS WOULD BE VALID.  WHAT WE ARE TALKING ABOUT IS A DEPARTMENT OF DEFENSE POLICY WHICH WAS ISSUED TO THE NAVY.  MR. HAAS IS AN EMPLOYEE OF THE NAVY AND I WOULD ASSUME HE WOULD HAVE UNDERSTANDING OF THAT POLICY, AND THE PURPOSE OF IT, AND I AM ASKING HIS UNDERSTANDING OF THE PURPOSE.

ANYBODY ELSE CAN ASK HIM WHERE HE OBTAINED THAT UNDERSTANDING.

MR. TEUBER:  IF YOU WILL QUALIFY IT WITH HIS UNDERSTANDING OF IT --

MR. NORBY:  I THINK WHAT YOU ARE SAYING IS, YOU ARE ASKING HIM GENERAL QUESTIONS PERTAINING TO D.O.D. POLICY.

MR. SIMON:  ABSOLUTELY, AND THESE GENERAL QUESTIONS WHICH PERTAIN TO D.O.D. POLICY WOULD ALSO APPLY TO THERMAL INSULATION PRODUCTS AS WELL AS OTHER PRODUCTS.

Q      IS THAT CORRECT?

A      THAT'S CORRECT.

MR. SIMON:  I FURTHER DON'T THINK THE OBJECTION THAT THE QUESTION IS OVERBROAD IS VALID EITHER.

Q      ~~GETTING BACK TO THAT PURPOSE OF THE D.O.D. POLICY AND YOUR UNDERSTANDING OF IT~~ SINCE 1950, IS IT YOUR UNDERSTANDING THAT IN PART THE D.O.D. INTENDED THAT THE MILITARY, THE NAVY SPECIFICALLY, FIND OUT WHAT PRODUCTS

EXISTED FOR A PARTICULAR NEED IN THE PROCESS OF DRAFTING

A SPECIFICATION.

A     THAT'S CORRECT.

Q     AND THIS WAS DONE SO THAT SPECIFICATIONS

COULD BE DRAFTED TO CONFORM TO THOSE PRODUCTS; IS THAT

ALSO CORRECT?

A     THAT'S CORRECT.

Q     THIS WOULD BE TRUE FOR THERMAL INSULATION

PRODUCTS AS WELL AS OTHER PRODUCTS REQUESTED BY THE NAVY?

A     RIGHT:

Q     AND THIS HAS ALWAYS BEEN THE CASE AS FAR AS

YOU KNOW?

A     TO THE BEST OF MY KNOWLEDGE.

Q     I ASSUME THAT THIS ATTEMPT TO OBTAIN COMMENTS

FROM SUPPLIERS OF PRODUCTS WAS DONE BY WRITTEN MATERIAL,

BY VIRTUE OF WRITTEN MATERIAL, WRITTEN REQUEST?

MR. KEMALYAN: WHAT WAS THAT?

MR. SIMON: WRITTEN REQUESTS.

A     ARE YOU REFERRING NOW TO BEFORE THE SPECI-

FICATION WAS DRAFTED?

Q     BY MR. SIMON: YES, SIR.

A     IT PROBABLY WOULD NOT BE DONE IN WRITING

AT THAT POINT. IT WOULD BE AFTER A DRAFT WAS AVAILABLE,

THEN IT WOULD BE IN WRITING. PRIOR TO THAT IT WOULD BE

A WORKING RELATIONSHIP BETWEEN OUR ENGINEERS AND ENGINEERS

IN INDUSTRY.

Q     SO THAT IF ONE OF YOUR ENGINEERS DETERMINED

THAT THERE WAS A PARTICULAR NEED FOR A PRODUCT HE WOULD

MR. SIMON:   APPARENTLY THERE IS NO AGREEMENT TO STIPULATE, SO THERE CAN'T BE A STIPULATION.

MR. KAUFMAN:   MY UNDERSTANDING IS, WE COULD ENTER INTO A STIPULATION WHERE, IF ONE DEFENDANT OBJECTED, UNLESS A SPECIFIC DEFENDANT WITHDREW FROM THE STIPULATION FOR THAT OBJECTION, THAT THE OBJECTION WOULD APPLY TO EVERYBODY.

MS. CANO:   I'LL AGREE WITH THAT.

MR. SIMON:   THAT'S GETTING RIDICULOUS.

MR. SCHULTE:   HOW ABOUT A STIPULATION WHEN AN OBJECTION IS MADE, RATHER THAN CLOUDING UP THIS RECORD WITH A LOT OF JOINERS, A STIPULATION BE MADE THAT WE ALL JOINED EXCEPT FOR EAGLE-PICHER, UNLESS KRIS CANO CHOOSES TO ENTER AND JOIN ON HER OWN BEHALF; RIGHT?

MS. CANO:   THANK YOU.

Q        BY MR. SIMON:   MR. HAAS, DO YOU KNOW OF ANY PROHIBITION AMONG NAVY REGULATIONS OR RULES WHICH WOULD PROHIBIT A SUPPLIER OF A THERMAL INSULATION PRODUCT FROM DRAFTING THE SPECIFICATION PERTAINING TO THAT PRODUCT?

A        I DON'T KNOW OF ANY.

Q        IT IS YOUR UNDERSTANDING, IS IT NOT, THAT SUPPLIERS COULD REQUEST REVISIONS OF MILITARY SPECIFICATIONS DEALING WITH THERMAL INSULATION PRODUCTS?

A        YES.   DONE ALL THE TIME.

Q        AND SUCH REVISIONS COULD BE REQUESTED TO INCLUDE CERTAIN MATERIALS OR SUBSTANCES.

MR. TEUBER:   I WANT TO OBJECT TO THIS ONE.   WHAT DO YOU MEAN BY "A REVISION"?   HE HAS DESCRIBED SEVERAL PRO-CESSES BY WHICH WAIVERS CAN BE MADE, FOR INSTANCE; IS THAT WHAT

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

| | |
|---|---|
| PHILOMENA NOBRIGA,<br>Individually and as<br>Special Administratrix<br>of the Estate of TRISTAN<br>NOBRIGA, Deceased, et al.,<br><br>　　　　　Plaintiffs,<br><br>　vs.<br><br>JOHNS-MANVILLE SALES<br>CORPORATION, et al.,<br><br>　　　　　Defendants. | CIVIL NO. 55624 |

## TRANSCRIPT OF PROCEEDINGS

heard before the HONORABLE ROBERT WON BAE CHANG, Judge
Presiding, Fifth Division, First Circuit, State of
Hawaii, on Thursday, June 17, 1982.　JURY TRIAL.


APPEARANCES:

GARY O. GALIHER　　　　　　　For PLAINTIFFS
GERARD A. JERVIS
RONALD L. MOTLEY

MICHAEL F. O'CONNOR　　　　For Defendant EAGLE-
BRIAN K. YOMONO　　　　　　PICHER INDUSTRIES,
　　　　　　　　　　　　　　INC.

PAUL DEVENS　　　　　　　　For Defendant
PAULA DEVENS　　　　　　　　RAYBESTOS-MANHATTAN,
　　　　　　　　　　　　　　INC.

JAMES T. ESTES, JR.　　　　For Defendant ALOHA
　　　　　　　　　　　　　　STATE SALES CO.


OFFICIAL COURT REPORTERS
First Circuit Court
Honolulu, Hawaii



EXHIBIT
N

96

1   naval vessels; is that correct?

2       A    That is correct, sir.

3       Q    You didn't give your cement away to these

4   contractors, did you?

5       A    We sold it.

6       Q    For a profit

7      .A    We were in business for that purpose, sir.

8       Q    And so you sold it to the contractors for a

9   profit, knowing it would end up in the shipyards;

10  isn't that correct?

11      A    That is right.

12      Q    You could have chosen not to sell any

13  products to the contractors who were selling to the

14  Navy.  You had that choice, did you not?

15      A    We had the choice of going out of business,

16  too, sir.

17      Q    I understand that.  But you chose to sell it

18  to the contractor who's selling it to the Navy so that

19  you would make a profit.  There's nothing wrong with

20  that, but that's the truth, isn't it?

21      A    Of course that's true.  That's the reason

22  you're in business, too, sir.

23      Q    Well, I'm not selling anything.

24           Mr. Huelster, let me ask you this.  Do you

25  agree with me that military specifications were a

97

1    creature of industry?

2         A    I beg your pardon?

3         Q    The military specifications were a—creature

4    of industry.

5         A    It was created by industry, that is true.

6         Q    Yes.  All right.

7         A    With the assistance of those people in the

8    Navy or armed services.

9         Q    And you, Eagle Picher, also lobbied with the

10   Navy on occasions, did they not?

11        A    We attempted to.  When I say "we," I mean

12   the research people.

13        Q    Are you familiar with the Aloha Distributing

14   Company?

15        A    No, sir.

16        Q    Do you know whether or not they're one of

17   your contractors?

18        A    No, sir.

19        Q    Do you know whether or not your company ever

20   wrote directly to Aloha Distributors, or any other

21   distributor in Hawaii who might have been selling to

22   Pearl Harbor, and advise them of the health hazards of

23   asbestos?

24        A    You would have to contact the sales

25   department.  I have no input into that.

DEBRA KEKUNA CHUN
Official Court Reporter
State of Hawaii