**MDL 875**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

NOV 19 2001

FILED
CLERKS OFFICE

# BEFORE THE JUDICIAL PANEL
# ON MULTI DISTRICT LITIGATION

IN RE ASBESTOS PRODUCTS

LIABILITY LITIGATION (NO. IV)

MDL DOCKET NO. 875

### *Turner, et al. v. Anchor Packing Co., et al.*
### E.D. Louisiana, C.A. No. 2001-2767

---

## OPPOSITION TO MOTION TO VACATE CONDITIONAL TRANSFER ORDER

---

**MAY IT PLEASE THE COURT:**

Defendant Viacom, Inc., successor in interest to CBS Corporation, formerly known as Westinghouse Electric Corporation ("Westinghouse"), submits this opposition to the Motion to Vacate Conditional Transfer Order filed by plaintiffs.

### I.    Summary Argument

Westinghouse properly and timely removed this case under the federal officer statute, 28 U.S.C. §1442, i.e., within 30 days of receipt of the first paper putting it on notice that a removable claim had been asserted against it --- when the plaintiff, James Turner, testified in a deposition that he was allegedly exposed to asbestos from insulation on Westinghouse *marine turbines* while serving and working on U.S. Navy vessels and repudiated his prior claims in his pleadings that his claims against Westinghouse were based solely on his exposure to asbestos insulation on land-based, industrial turbines.   In designing marine turbines for U.S. Navy vessels, Westinghouse acted under the auspices of a federal officer.  Plaintiffs received prompt notice of the removal and were not prejudiced in any brief delay that may have occurred.

B0171779.1

1

**OFFICIAL FILE COPY**

IMAGED NOV 21 '01

Consequently, plaintiffs' Motion to Vacate the Conditional Transfer Order should be denied.

## II.    Introduction

On July 30, 2001, plaintiffs commenced a civil action against Westinghouse and other defendants by filing a petition in the 17th Judicial District Court for the Parish of Lafourche.

In his original petition (complaint), the plaintiff, James Turner, alleges that he contracted lung cancer as a result of exposure to and inhalation of asbestos from products he either used or worked around while enlisted in the U.S. Navy as a machinist mate from 1957 to 1977; while employed by Fagan Boat Service as a cargo boat engineer from 1982 to 1987 and by Petrol Marine as a cargo boat engineer from 1987 to 1995. (Exhibit "A", Plaintiffs' Petition for Damages, ¶4). The petition identifies the defendants, including Westinghouse, as sellers, suppliers, distributors, manufacturers and installers of the asbestos containing materials. More specifically, in the petition, plaintiffs premise Westinghouse's liability on the claim (subsequently repudiated) that Mr. Turner was exposed to "asbestos containing materials in connection with his work on land-based turbines for General Electric Company, including, but not limited to, asbestos, asbestos paper, asbestos millboard, asbestos fiber, asbestos cement sheets and panels, and other asbestos-containing materials to which plaintiff was exposed."

Plaintiff, James Turner, gave deposition testimony under oath on August 9, 2001, during which he contradicted and repudiated the allegations of the petition concerning his alleged exposure to asbestos from Westinghouse products. The plaintiff testified

that he never worked for General Electric and did not ever work on any Westinghouse land-based turbines. (See Exhibit "B", Deposition of James Turner, 8/9/01, page 82, lines 8-18)   For the first time, however, Plaintiff contended that while on board U.S. Navy vessels, he worked on Westinghouse *marine turbines*.  (See Exhibit "B", Deposition of James Turner, page 82, line 24 to page 83, line 4).

## III.   **Removal Was Timely**

Westinghouse removed the case on federal officer immunity grounds[1] within 30 days after it first ascertained that the case was removable in accordance with 28 U.S.C. § 1446(b).  On the facts alleged in the original petition, Plaintiffs' claim was not removable by Westinghouse.  Westinghouse removed this case on federal officer grounds pursuant to 28 U.S.C. §1442(a)(1), in that this action involves a person, i.e., Westinghouse, that acted under the authority of an officer or agency of the United States.  In general, removal by Westinghouse under the federal officer statute is available only when plaintiffs allege exposure to Westinghouse *marine turbines*  used on U.S. Navy vessels.  Plaintiffs' initial allegations limited their claims against Westinghouse to alleged asbestos exposure from insulation on *land-based, industrial* turbines which did not initially present any grounds for removal.  Once Mr. Turner repudiated his pleadings and testified that his claim against Westinghouse was based on work around *marine turbines*, removal under 28 U.S.C. §1442(a)(1) became available.

Plaintiffs' petition for damages specifically limits plaintiffs' claim against

---

[1]        28 U.S.C. §1442(a)(1)

Westinghouse to *land-based* turbines. Paragraph 4(c) clearly states that James Turner

was exposed to "asbestos containing materials of Westinghouse Electric Company, in

connection with his work on *land-based* turbines for General Electric Company . . ."

Additionally, in paragraph 104, the petition reiterates that the "Westinghouse turbines

at issue in this case, include, but are not limited to, power generated (sic) turbines, i.e.,

powerhouse turbines and/or industrial turbines," thus, specifically excluding any claim

for exposure to Westinghouse *marine turbines*.   (See Exhibit "A", ¶ 3 and ¶ 104)

Plaintiffs assert that their self-generated responses to what they describe as

"defendants' master set of discovery"[2], provided to counsel for Westinghouse prior to

formal service on August 8, 2001,  constitutes an "other paper" that notified

Westinghouse that the action was removable.  However, because plaintiffs' own

petition, subsequently served, clearly limits the claim against Westinghouse to land-

based turbines, Mr. Turner's potential exposure to asbestos from unspecified sources

while on U.S. Navy vessels was irrelevant to the claim asserted against Westinghouse.

It was not until Mr. Turner's deposition on August 9, 2001, that Westinghouse

learned of Mr. Turner's potential *marine turbine* claim.   During his deposition, Mr.

Turner repudiated and contradicted the allegations of his petition concerning his alleged

exposure to asbestos from Westinghouse products.  Mr. Turner testified that he never

worked for General Electric and did not ever work on any Westinghouse land-based

---

[2]     Defendants served no such discovery on plaintiffs.  Plaintiffs' counsel simply generated
responses to non-existant discovery requests styling them responses to defendants'
discovery.

turbines. (See Exhibit "B", Deposition of James Turner, page 82, lines 8-18).  For the first time, notwithstanding plaintiff counsel's attempt to mischaracterize Mr. Turner's exposure and possibly mislead Westinghouse, Mr. Turner revealed that his claim against Westinghouse arose out of work he performed on Westinghouse *marine turbines* on board U.S. Navy vessels. (See Exhibit "B", Deposition of James Turner, page 82, line 24 to page 83, line 4). Consequently, it was not until Mr. Turner's deposition that the plaintiffs' real basis for claims against Westinghouse was revealed.

Plaintiffs' counsel are well aware of Westinghouse's practice of removing cases under the federal officer statute when *marine turbines* are at issue. It is the practice of some plaintiff attorneys to limit a plaintiff's claim to exposure to marine turbines only, intentionally precluding Westinghouse from removing the case under the federal officer statute. Initially, plaintiffs presented Mr. Turner's claim as one dealing *only with land turbines*. Whether this was an attempt to mischaracterize Mr. Turner's exposure or mislead Westinghouse in an attempt to prevent removal, Westinghouse will never know. What is clear is that on August 9, 2001, while under oath, Mr. Turner repudiated and contradicted the allegations of his petition concerning his alleged exposure to asbestos from Westinghouse products, and asserted that his claim against Westinghouse was based on his exposure to *marine turbines*. At this moment, Westinghouse had sufficient grounds on which to remove the case.

Plaintiffs' attempt to hide the issue by focusing on when Westinghouse was provided a copy of the petition and plaintiffs' self-generated responses to what they describe as "defendants' master set of discovery". The date Westinghouse received a

copy of these documents, whether by formal service or via courtesy copy, is irrelevant because the case was not removable at that time due to plaintiffs' attempt to exclude a claim for exposure to marine turbines. Had Westinghouse attempted to remove the case on the face of the petition, it is likely that plaintiffs would have opposed the removal asserting that the plaintiffs' claims, as asserted in the petition, were for land-based turbines only.

Saturday, September 8, 2001, was the thirtieth day from the date Westinghouse first ascertained that the action was removable, therefore, Westinghouse timely removed the action on Monday, September 10, 2001 pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Accordingly, this action was properly remanded to the U. S. District Court for the Eastern District of Louisiana and plaintiff's Motion to Vacate the Conditional  Transfer Order should be denied.

## IV.    Plaintiffs Were Promptly Notified of the Removal

Parties removing an action to federal court must comply with the requirements of 28 U.S.C. §1446. Plaintiffs allege that Westinghouse failed to comply with the notice requirements of Section 1446(d) asserting that Westinghouse did not promptly notify the plaintiffs that it removed the case to federal court. Plaintiffs' position is without merit and does not support remand.

Westinghouse filed a notice of removal with this Court on September 10, 2001. Plaintiffs' assert that Westinghouse failed to provide notice of the removal to them until September 18, 2001, eight days after the notice of removal was filed. Westinghouse has no documentary evidence to show that plaintiffs were served with notice of the

B0171779.1                                          6

removal prior to September 18, 2001. Plaintiffs, however, received notice the case was removed on September 18, 2001. Even if plaintiffs were not given notice until September 18, 2001, notice was still timely and in compliance with Section 1446(d).

Section 1446 does not specify a particular time period to clarify the meaning of "promptly." Case law applying Section 1446(d) provides insight as to what may be considered prompt notice under the statute. In *Jackson v. City of New Orleans,* 1995 U.S. Dist. LEXIS 15022 (E.D. La. 1995), the United States District Court for the Eastern District of Louisiana relied on *Alpena Power Co. v. Utility Workers Union of America, Local 286,* 674 F.Supp. 1286, 1287 (E.D. Mich. 1987) to determine whether notice under section 1446(d) was prompt. In *Alpena Power Co.* the court found providing oral notice that a case had been removed 10 calendar days after the filing of the removal petition and subsequent written notice 13 days after the petition for removal was filed to be "prompt". *Id* at 1287. Relying on the distinction between time periods of "less than 11 days" and those greater than 11 days in Rule 6(a) of the Federal Rules of Civil Procedure, the court held that notice filed within a period of less than 11 days was prompt for purposes of Section 1446(d). *Id* at 1287.

A similar interpretation of "prompt" has been reached by other courts. See *Pittman v. Monumental Life Ins. Co.,* 1998 WL 378359 (N.D. Miss.1998)(denying plaintiffs' motion to remand where plaintiffs did not receive written notice of the removal within nine days of removal); and *Sullivan v. Leaf River Forest Products, Inc.,* 791 F.Supp. 627 (S.D. Miss 1991)(holding that plaintiffs were timely notified of the removal when notice was provided six days after the notice of removal was filed). One

court has even stated that "constructive notice may be sufficient notice for purposes of the statute." *McCall v. Greyhound Lines, Inc.,* 1998 WL 865626 (S.D. N.Y. 1998). Additionally, a United States district court dealing with this same issue stated "[w]here defendants make a good faith effort to give notice, and where plaintiffs suffer no prejudice as a result of the failure of that attempt, we think the requirements of section 1446(d) are sufficiently fulfilled to effect removal." *L&O Partnership v. Aetna Casualty & Surety Co.,* 761 F.Supp. 549, 552 (N.D. Ill. 1991).

Plaintiffs again attempt to cloud the issue with other matters unrelated to the removal action. The only matter at issue is whether plaintiffs were timely notified that Westinghouse removed the action. Westinghouse provided plaintiffs notice of the removal on September 18, 2001. Notice at this time period is timely and in compliance with §1446(d) and case law interpreting §1446(d). Accordingly, this action was properly removed to federal court and plaintiff's Motion to Vacate the Conditional Transfer Order must be denied.

## V.    Removal Under the Federal Officer Statute is Proper

James Turner's claims against Westinghouse arise out of his alleged exposure to asbestos containing products associated with *marine turbines* while working on U.S. Navy vessels. When plaintiffs assert such a claim, removal under the federal officer statute is available. The Supreme Court has encouraged a liberal interpretation of the federal officer removal statute for over two decades. See *Winters v. Diamond Shamrock Chemical Co.,* 149 F.3d 397, 398 (5th Cir. 1998); citing *Willingham v. Morgan,* 395 U.S. 402, 407 89 S.Ct. 1813, (1960); *Arizona v. Manypenny,* (451 U.S. at 242) 101 S. Ct.

1657, 68 L.Ed. 2d 58 (1981); *State of Louisiana v. Sparks,* 978 F.2d 226, 232 (5th Cir. 1998). Accordingly, the purposes of this statute should not be frustrated by narrow or grudging interpretation. *Willingham,* 395 U.S. at 405.

The basis for removal is that this action involves a person, i.e., Westinghouse, that acted under the authority of an officer or agency of the United States, within the meaning of 28 U.S.C. § 1442(a)(1). *Mesa v. California,* 489 U.S. 121 (1989). In order to qualify as a federal officer or one acting under a federal officer for purposes of 28 U.S.C. §1442(a)(1), the removing party must satisfy the requirements of *Mesa,* namely (1) demonstrate that it acted under the direction of a federal officer; (2) raise a federal defense to the plaintiff's claim; and (3) demonstrate a causal nexus between plaintiff's claims and acts it performed under color of federal office. *Id* at 131-132.

Many of the ships on which Mr. Turner worked were built pursuant to contracts with the United States or its agencies. Westinghouse contracted with the United States to supply the marine turbines on only one of these vessels, the U.S.S. Shenandoah. See Exhibit "C", Affidavit of James M. Gate ("Gate Affidavit I"). As required by the supply contracts governing these turbines, the material aspects of the design and production of the turbines at issue were specified, reviewed, approved, and accepted by the United States Navy and officers within its command, the United States Maritime Commission, and other governmental agencies.

If Westinghouse performed any work on the United States Navy vessels identified by Plaintiff, such work was performed under the ultimate authority and control of the United States government and under immediate and direct supervision

and control of its agents, and in compliance with specifications and requirements developed by the U.S. Naval Sea Systems Command, formerly the Bureau of Ships, or the United States Maritime Commission. See Exhibit "D", Affidavit of James M. Gate (Gate Affidavit II).

The Gate Affidavit II describes, from Westinghouse's perspective, how Westinghouse's work for the Navy was controlled by Navy officers and Navy-employed civilians, with closest and most frequent interaction by a Navy Inspector of Naval Machinery.

The officer with highest authority was the Secretary of the Navy, but several other Naval officers and Navy-employed civilians acting under his command, specifically the Commander of Naval Sea Systems and Commander of Naval Supply and their subordinate officers, exercised closest scrutiny over Westinghouse's work. See Exhibit "D".

In *Crocker v. Borden*, 852 F.Supp. 1322 (E.D. La. 1994) Westinghouse removed a third-party demand against it filed by Owens Corning Fiberglass and the main demand brought by Avondale shipyard workers. This Court determined that federal jurisdiction exists over the third-party demand under the federal officer statute and found that Westinghouse's submission of the Gate Affidavit to be a clear showing that Westinghouse acted under the direction of the Navy in the construction of its marine turbines. *Id* at 1326. Thus, under the terms of the turbine production contracts and their amendments, Westinghouse was at all times acting under the authority and control of an officer or agent of the United States.

B0171779.1                                        10

To satisfy the second *Mesa* requirement, Westinghouse asserts the military contractor defense resulting from its manufacture of marine turbines for Naval vessels. As recognized in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), Westinghouse does have, inter alia, such a defense to these actions: i.e., immunity from liability for injuries arising from any exposure to asbestos related to turbine generators on board U.S. government vessels, insofar as constructed or repaired by Westinghouse. *Accord Carley v. Wheeled Coach*, 991 F.2d 1117 (3d Cir. 1993); *Kleemann v. McDonnell Douglas Corp.*, 890 F.2d 698 (4th Cir. 1989); *Garner v. Santoro*, 865 F.2d 629 (5th Cir. 1991). Under *Willingham v. Morgan*, 395 U.S. 402, 80 S.Ct. 1813 (1969), any party qualifying as a federal officer need only present a colorable defense, and not prove his case prior to removal, to be entitled to remove. *Id* at 1816. Because Westinghouse has raised more than a colorable claim of having acted under color of a federal officer or agency, removal of this civil action pursuant to 28 U.S.C.§ 1442(a)(1) is proper. *Fung v. Abex Corp., et al.*, 816 F. Supp. 569 (N.D. Cal., 1992); *Williams v. Brooks*, 945 F.2d 1322 (5th Cir. 1991).

Finally, the third *Mesa* requirement, demonstration that a causal nexus exists between the claims against Westinghouse and the acts it performed under color of federal office, has been satisfied. The Plaintiffs' claims of exposure to asbestos containing products against Westinghouse arise out of the construction of marine turbines, which were constructed pursuant to government specifications. In *Crocker,* this Court found that the causal nexus was established and the third *Mesa* requirement satisfied in a similar situation where a third party demand against Westinghouse arose

out of the construction of marine turbines. *Id* at 1327.

The District Court for the Northern District of California addressed the issue of removal in this exact situation in *Fung v. Abex Corp., et al.*, 816 F. Supp. 569 (N.D. Cal., 1992). The plaintiffs in *Fung* alleged asbestos exposure from, inter alia, Westinghouse marine turbines supplied to the United States Navy, and defendant General Dynamics filed a Notice of Removal based upon 28 U.S.C. §§ 1442(a)(1). After the District Court denied plaintiffs' motion to remand, General Dynamics was dismissed from the case. Plaintiffs moved for reconsideration of their motion for remand. Westinghouse opposed the remand. In denying plaintiffs' motion, the District Court found removal by Westinghouse proper under 28 U.S.C. § 1442(a)(1) because, Like General Dynamics, Westinghouse (1) acted under the direction of federal officers, (2) raised a federal defense to plaintiffs' claims, and (3) demonstrated a causal nexus between plaintiffs' claims and the acts it performed under color of federal office. See *Crocker v. Borden, Inc.*, 852 F. Supp. 1322 (E.D. La. 1994); *Pack v. ACandS*, 838 F. Supp. 1099 (D.Md. 1993).

In *Pack v. ACandS, Inc., et al.*, 838 F. Supp. 1099 (D. Md. 1993), Senior U.S. District Court Judge Joseph H. Young upheld the removal by Westinghouse of a consolidated group of cases on the basis of the extensive involvement by United States Government officials in the design, installation, and testing of marine turbines. Judge Young held that the government officials "had extensive control over the construction, design, and testing of the turbines," sufficient to state a colorable federal defense under Section 1442. 838 F. Supp. at 1103; See also Gate Affidavit II attached as Exhibit "D".

On October 13, 1995, the Third Circuit Court of Appeals denied the *Pack* plaintiffs' attempt to obtain remand of those cases through a Writ of Mandamus which sought an order directing Judge Charles R. Weiner, Jr., United States District Judge for the Eastern District of Pennsylvania, to remand the cases back to state court. *Pack, et al. v. ACandS Insulation Co., et al.*, No. 95-1766A, slip op. at 1 (3d Cir. Oct. 13, 1995)(per curiam).

In determining the removability of this case, the complaint in the state court action, the Notice of Removal and any affidavits accompanying the Notice must be evaluated. *O'Bryan v. Chandler*, 496 F.2d 403 (10th Cir. 1974) *cert. den.*, 419 U.S. 986, 42 L.Ed.2d, 95 S. Ct. 245; *rehearing den.* , 420 U.S. 913, 42 L.Ed.2d 845, 95 S. Ct. 838. Indeed, a defendant's affidavits have been found to be conclusive where they state that the conduct complained of occurred in the performance of duties acting under color of federal office. *New York v. Keim*, 308 F.Supp. 421 (S.D.N.Y. 1969).  Here, Gate Affidavit  II demonstrates that whatever Westinghouse did with regard to turbines built for Navy ships was controlled by the United States Navy and its officers.  See Exhibit "D".  In particular, Gate Affidavit II identifies, from Westinghouse's perspective, the naval officers who most closely supervised its work.

Moreover, this affidavit discusses the regulations and specifications which governed the design, materials and performance requirements which applied to all equipment supplied by Westinghouse for use aboard Navy vessels, some of which require the use of asbestos-containing materials.

As shown in the Gate Affidavit, the material aspects of design and production of the marine turbines were specified, reviewed, approved, and accepted by the U.S. Navy

and officers within its command, the United States Maritime Commission, and other

governmental agencies.  James Gate's deposition testimony in *May 2001 Extremis*

*Cases- All Trial Groups v. Viacom, Inc.*[3] further reveals that the U.S. Navy had direct

supervision and control over the design and production of Westinghouse marine

turbines.  (See Exhibit "E", Deposition of James Gate, 7/25/01)  James Gate describes

the intensive approval process to which Westinghouse was subjected as follows:

> Q.    The drawings that you were talking about earlier, at the time that these
> ships on the list were – before they were being built, obviously, but when the
> equipment was designed and planned, did the drawings go from Westinghouse
> to the Navy for approval?
>
> A.    Yes.[4]
>
>                         * * *
>
> Q.    You were asked a couple of questions or  series of questions, I should
> say, regarding Navy approval of drawings.
>
> Can you just explain to us that process?
>
> A.    Well, Navy approval of drawings must happen.  In other words, once a
> drawing is done and it  is signed off officially, then in accordance with the
> contract that we have, we then send it off to the first level of approval.
>
> Sometimes it is to the inspector of machinery that is right in our own
> shop.  Other times it is sent to the supervisory of shipbuilding.  And many times
> it has to go both those levels.  And then from there, it goes to the Bureau of
> Ships.  And they have a final approval.
>
> Then they write the approval letter receiving all of the comments back
> from the inspector of Naval machinery, the supervisor of the shipbuilding, and it
> all goes into that one there and back to Westinghouse and says approve or did
> approve for the following reasons.

---

[3]    Supreme Court of New York, No. 40,000.

[4]    Exhibit "E", Deposition of James Mark Gate, July 26, 2001, Page 47, Line 9-14.

And many times they will mark up the drawing saying that this must be changes, that must be changed.  And so you just make a note of it and just find out, well, is this really within the contract or not.

And then if it is, or someone says yes, we will make all of those changes and we will resubmit and sometimes it is resubmit for approval again, start the cycle all over again, if there are certain things they are looking for or it is just remit the changed copy.

Q.    Who has the ultimate and final authority on whether a turbine generator or propulsion turbine is acceptable to the U.S. Government and the U. S. Navy?

A.    The Bureau of Ships.

In other words, after tests, we have test results.  And those test results go to the inspector of Naval machinery again by contract.  Sometimes we have to send them off to the supervisor of shipbuilding at the same time and then in turn send it back to the Bureau of Ships.  And then it comes back through the chain this time to let everyone know it is approved or disapproved, the rest results.

Q.    Does Westinghouse, as a contractor to the government, have any discretion whatsoever to change a specification without the approval of the governmental agency such as the U. S. Navy?

A.    No, we cannot change.

Every change that we think of, we then have to submit a proposal to the government saying we would like to see this thing changed, and they would have to approve it.

Q.    In your approximately 41 years of history with Westinghouse, did you ever at any time see an occasion where Westinghouse had the discretion to change any specification without that government approval?

A.    No, I have never seen it.[5]

---

[5]     Exhibit "E", Deposition of James Mark Gate, July 26, 2001, Page 182, Line 8 through Page 184, Line 13.

Furthermore, Mr. Gate's testimony reveals that the United States Navy, not

Westinghouse, dictated the parts, insulation, and warnings to be used on the marine

turbine sets, including all repair parts.

> Q.    Any of the materials that are listed on this repair parts list, does
> Westinghouse have any discretion to change one of these parts without prior
> approval from the Navy?
>
> A.    No.  The numbers and the items that are listed as repair parts are all set
> up by standard format that are dictated by the Navy.[6]
>
> * * *
>
> Q.    Based on your experience and review of the documents, did
> Westinghouse specify any insulation materials for the turbine on any of these
> ships?
>
> MR. KRISTAL:        Object.   Foundation.
>
> THE WITNESS:  Any information that was placeed on the drawings was in
> line with our contractual requirements.
>
> BY MR. BRADLEY:
>
> Q.    And those contractual requirements were with  whom?
>
> A.    With the government.
>
> Q.    I know we have talked about this earlier.
>
> Did you have any authority or discretion to deviate from what the
> government told you were on their specifications?
>
> A.    No.  I did not have any means of changing anything with respect to the
> government contracts.[7]

---

[6]    Exhibit "E", Deposition of James Mark Gate, July 26, 2001, Page 196, Lines 3-9.

[7]    Exhibit "E", Deposition of James Mark Gate, July 26, 2001, Page 200, Line 14 through
Page 201,Line 5.

* * *

Q.      So wherever there is a flange inside the  generator turbine generator set, in between the two flanges would be a gasket?

A.      That is correct.

Q.      Do you know one way or the other whether those gaskets contained asbestos?

A.      Yes, I do.

Q.      Okay.

A.      It was spiral-wound gaskets.  There is a  metal outer piece and an asbestos inner piece.

Q.      How do you know that?

A.      Because the Navy specifies spiral-wound gaskets on all steam lines.[8]

* * *

Q.      And what was the source of your knowledge regarding the asbestos component of the gaskets that you knew about?

A.      The Navy had a document on piping systems that dictated for various temperatures what type of gasket material you would you.

Q.      Did the Navy ever tell you with respect to the cautions and the warnings and the advice that were in the technical manuals regarding preventing injury to the equipment not to put those things in the technical manual?

A.      Yes.

Q.      They told you not to do that?

A.      Certain warning devices we did not have control over, the Navy did.

Q.      I think maybe you misunderstood my question.

---

[8]      Exhibit "E", Deposition of James Mark Gate, July 26, 2001, Page 110, Lines 10 - 22.

There is written words their in the technical manuals that say "caution" or "warning" or give advice in the manual with that language.

A.    Yes.

Q.    I am not talking about a warning device.

A.    No, I understand you.

Q.    I am talking about words.

A.    These are plates, name plates that have written – that say "caution" and "beware of this" or that.

Q.    And sometimes Westinghouse would put those on their equipment?

A.    Only with the permission of the Navy.[9]

It is evident that the United States Navy, not Westinghouse, controlled the materials, design, production, and repair of marine turbines used on Navy vessels. This supervision and control supports removal of this action and provides Westinghouse with a colorable defense to the plaintiffs' claims. While being questioned regarding the use of asbestos on the turbine generator sets used on Navy vessels, Mr. Gate revealed the extent to which the government controlled the design and production of Westinghouse marine turbines:

Q.    Westinghouse was aware, based on this drawing, that each one of the turbine generator sets on each of the battleships that are listed on this drawing would have amosite asbestos felt put on the outside of them as insulation –

A.    Yes.

---

[9]    Exhibit "E", Deposition of James Mark Gate, July 26, 2001, Page 138, Line 1 through Page 139, Line 4.

Q.    – in order to meet the requirements of the battleship specifications that were in the contract that we had with the Navy?

A.    Right.

Q.    The government made you do it?

A.    That is correct.[10]

Westinghouse properly removed this case under the auspices of the federal officer statute, and thus, this case should not be remanded to stated court.  As Westinghouse has met the pleading requirements established by *Mesa*, and has demonstrated with supporting evidence that it acted under the authority and direction of a federal officer, and that it has a colorable federal defense, remand is inappropriate and the transfer of this action to the U.S. District Court for the Eastern District of Pennsylvania (MDL Docket No. 875) is proper.

## VI.        Conclusion

Westinghouse properly and timely removed this case under the federal officer statute, 28 U.S.C. §1442, i.e., within 30 days of receipt of the first paper putting it on notice that a removable claim had been asserted against it --- when the plaintiff, James Turner, testified in a deposition that he was allegedly exposed to asbestos from insulation on Westinghouse *marine turbines* while serving and working on U.S. Navy Vessels and repudiated his prior claims in his pleadings that his claims against Westinghouse were based solely on his exposure to asbestos insulation on land-based,

---

[10]        Exhibit "E", Deposition of James Mark Gate, July 26, 2001, Page 151, Lines 10-21.

industrial turbines.   In designing marine turbines for U.S. Navy vessels, Westinghouse

acted under the auspices of a federal officer.   Plaintiffs received prompt notice of the

removal and were not prejudiced in any brief delay that may have occurred.  This action

was properly removed to the U.S. District Court for the Eastern District of Louisiana and

properly transferred to the U.S. District Court for the Eastern District of Pennsylvania

(MDL Docket No. 875).   Plaintiffs Motion to Vacate the Conditional Transfer Order

should be denied.

Respectfully submitted,

**JONES, WALKER, WAECHTER, POITEVENT
CARRÈRE & DENÈGRE, L.L.P.**
LEON GARY, JR. (Bar Roll No. 5959)
WILLIAM L. SCHUETTE, JR. (Bar Roll No. 2098)
AVERY LEA GRIFFIN (Bar Roll No. 22914)
OLIVIA S. TOMLINSON (Bar Roll No. 27114)
8555 United Plaza Boulevard
Four United Plaza, Fifth Floor
Baton Rouge, Louisiana 70809-7000
Telephone:   (225) 248-2000
Facsimile:   (225) 248-3051

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

NOV 19 2001

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL
## ON MULTI DISTRICT LITIGATION

IN RE ASBESTOS PRODUCTS                           MDL DOCKET NO. 875

LIABILITY LITIGATION (NO. IV)

### *Turner, et al. v. Anchor Packing Co., et al.*
### E.D. Louisiana, C.A. No. 2001-2767

---

## DECLARATION OF SERVICE

---

Olivia S. Tomlinson hereby declares as follows:

I hereby certify that copies of Westinghouse's Opposition to Plaintiffs' Motion to Vacate the Conditional Transfer Order have been served upon counsel of record for all parties by depositing copies with the United Parcel Service and/or United States Postal Service properly addressed and postage prepaid to the addresses on the attached list.

Baton Rouge, Louisiana, the 16th day of November, 2001.

*Olivia Tomlinson*

Olivia S. Tomlinson

RECEIVED
CLERK'S OFFICE
2001 NOV 19 A 10: 32
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

**PANEL SERVICE LIST (Excerpted from CTO-205)**
**DOCKET NO. 875**
**IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)**

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH  44114

Edward J. Cass
Gallagher, Sharp, Fulton & Norman
Bulkley Building, 7th Floor
1501 Euclid Avenue
Cleveland, OH  44115

Adam M. Chud
Shea & Gardner
1800 Massachusetts Avenue, N.W.
Washington, DC  20036

David A. Damico
Burns, White & Hickton
2400 Fifth Avenue Place
120 Fifth Avenue
Pittsburgh, PA  15222

Raymond P. Forceno
Forceno & Hannon
Philadelphia Bourse Building
Suite 1000
Independence Mall East
Philadelphia, PA  19106

Ellen B. Furman
Goldfein & Joseph
1600 Market Street
33rd Floor
Philadelphia, PA  19103

Scott M. Galante
Ness, Motley, Loadholt, Richardson
& Poole
1555 Poydras Street
Suite 1700
New Orleans, LA  70112

Leon Gary, Jr.
Jones, Walker, Waechter, et al.
8555 United Plaza Boulevard
5th Floor
Baton Rouge, LA  70809

Susan M. Hanson
Stich, Angell, Kreidler & Muth, P.A.
The Crossings, Suite 120
250 2nd Avenue South
Minneapolis, MN  55401

Reginald S. Kramer
Oldham & Dowling
195 South Main Street
Suite 300
Akron, OH  44308

David C. Landin
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA  23219

Gene Locks
Greitzer & Locks
1500 Walnut Street
Philadelphia, PA  19102

Ronald L. Motley
Ness, Motley, Loadholt, Richardson
& Poole
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC  29465

John J. Repcheck
Marks, O'Neill
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA  15219

John D. Roven
John Roven & Associates
2190 North Loop West
Suite 410
Houston, TX  77018

Richard D. Schuster
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH  43216

Neil Selman
Selman, Breitman & Burgess
11766 Wilshire Boulevard
Sixth Floor
Los Angeles, CA  90025

Robert N. Spinelli
Kelley, Jasons, McGuire & Spinelli
Centre Square West
15th Floor
Philadelphia, PA  19102

Robert E. Swickle
Jaques Admiralty Law Firm, P.C.
1370 Penobscot Building
Detroit, MI  48226

Andrew J. Trevelise
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA  19103

James K. Weston, II
Tom Riley Law Firm
4040 First Avenue, N.E.
P.O. Box 998
Cedar Rapids, IA  52406

Donni E. Young
Suite 1700
1555 Poydras Street
New Orleans, LA 70112

Glen L. Swetman
David E. Redman, Jr.
Aultman, Tyner
Texaco Center, Suite 2250
400 Poydras Street
New Orleans, LA 70130

Patrick J. Veters
Jones Walker
201 Place St. Charles
50th Floor
New Orleans, LA 70170

Edward J. Castaing, Jr.
2323 Pan American Life Center
601 Poydras Street
New Orleans, LA 70130

Andrew Plauche
201 St. Charles Avenue
New Orleans, LA 70170

Lawrence G. Pugh
3200 Energy Centre
1100 Poydras Street
New Orleans, LA 70163

Dominic Ovella
Valerie Scvhexnayder
Kelly Lightfoot
One Galleria Blvd
Suite 1400
Metairie, LA 70011

Lynn Luker
616 Girod Street
Suite 200
New Orleans, LA 70130

David E. Redman, Jr.
The Texaco Center
400 Poydras Street
Suite 1900
New Orleans, LA 70130

Benjamin R. Slater, III
Don Miester
650 Poydras Street
Suite 2600
New Orleans, LA 70130

John Cosmich
188 East Capital Street
P. O. Box 22608
Jackson, MS  39225

Jennie P. Pellegrin
1001 West Pinhook Road
Suite 200, P. O. Drawer 52828
Lafayette, LA 70503

Richard P. Sulzer
201 Holiday Blvd.
Suite 335
Covington, LA 70433

Susan B. Kohn
The Energy Centre
30th Floor
1100 Poydras Street
New Orleans, LA 70163-3000

Ann Sico
Bernard, Cassisa
1615 Metairie Road
Metairie, LA 70005

2

Andrew Weinstock
Lawrence J. Duplass
Three Lakeway Center
3838 N. Causeway
Suite 2900
Metairie, LA 7002

Eric Shuman
643 Magazine Street
New Orleans, LA 70130

A. Wendell Stout, III
Deutsch Kerrigan & Stiles
755 Magazine Street
New Orleans, LA 70130

Scott Brown
1515 Poydras Street
Suite 1420
New Orleans, LA 70112

Larry Canada
GALLOWAY JOHNSON
One Shell Square
701 Poydras Street
Suite 626
New Orleans, LA 70139-4003

Thomas W. Tyner
315 Hemphill Street
P. O. Box 750
Hattiesburg, MS 39403-0750

A. M. Stroud, III
P. O. Drawer 1126
Shreveport, LA 71163-1126

Claude F. Bosworth
601 Poydras Street
27th Floor
New Orleans, LA 70130-6027

Rebecca Bush
ADAMS & REESE
4500 One Shell Square
New Orleans, LA 70139

3

17TH JUDICIAL DISTRICT COURT FOR THE PARISH LaFOURCHE

STATE OF LOUISIANA

NO. *9184⁷*

DIVISION: *C*

JAMES C. TURNER and MARLENE F. TURNER

VERSUS

ANCHOR PACKING COMPANY; CARBORUNDUM; CBS (Formerly known as Westinghouse Electric Corporation); A.W. CHESTERTON COMPANY; COMBUSTION ENGINEERING, INC.; JOHN CRANE, INC.; DANA CORPORATION; EAGLE, INC.; THE FLINTKOTE COMPANY; FLINTKOTE MINES, LTD.; FOSTER WHEELER CORPORATION; GARLOCK, INC; GASKET HOLDINGS COMPANY, INC. (successor to Flexitallic, Inc.); GENERAL ELECTRIC COMPANY; GEORGIA-PACIFIC CORPORATION; INGERSOLL-RAND; KELLY MOORE PAINT COMPANY; THE McCARTY CORPORATION; REILLY-BENTON CO., INC.; TAYLOR-SEIDENBACH, INC.; J.T. THORPE, INC.; 3M (a.k.a. MINNESOTA MINING & MANUFACTURING COMPANY); WORTHINGTON PUMP, INC.; KIM SUSAN, INC. (Formerly known as Fagan Boat Service, Inc.)

FILED: _____          _____
                                                  DEPUTY CLERK

## ORIGINAL PETITION FOR DAMAGES

**NOW INTO COURT**, through undersigned counsel, come Plaintiffs, James C. Turner and Marlene F. Turner, who respectfully represents that:

### DEFENDANTS

1.

Made Defendants herein are:

**A.     ANCHOR PACKING COMPANY**
A New Jersey Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: CT Corporation System, 400 Poydras Street, New Orleans, Louisiana, 70130.

**B.     CBS (formerly known as WESTINGHOUSE ELECTRIC COMPANY)**
A Delaware Corporation, who may be served through the its registered agent, CT Corporation System, 8550 United Plaza Boulevard, Baton Rouge, Louisiana, 70809.

**C.     THE CARBORUNDUM COMPANY**
A Delaware Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: CT Corporation System, 400 Poydras Street, New Orleans, Louisiana, 70130.

**D.     A.W. CHESTERTON**
A Massachusetts Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: C.T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809.

I



E. **COMBUSTION ENGINEERING, INC.**
A Delaware Corporation who may be served through the its registered agent, CT Corporation System, 8550 United Plaza Boulevard, Baton Rouge, Louisiana, 70809.

F. **JOHN CRANE, INC.**
A Delaware Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: C.T. Corporation Systems, 8550 United Plaza  Boulevard, Baton Rouge, Louisiana  70809.

G. **DANA CORPORATION**
A Virginia Corporation who may be served via the Louisiana Long Arm Statute, c/o Allen Goolsby, III, 951 East Bird Street, Richmond, VA, 23219.

H. **EAGLE, INC.**
(Formerly Eagle Asbestos & Packing Co., Inc.) A corporation duly organized, created and existing under and by the virtue of the laws of the State of Louisiana, with its principal place of business in New Orleans, Louisiana, with the agent for service in the State of Louisiana, to wit:  Lawrence G. Pugh, III, Montgomery, Barnett , Brown, Read, Hammond & Mintz, LLP, 3200 Energy Center, 1100 Poydras Street, New Orleans, Louisiana, 70163-3200.

I. **THE FLINTKOTE CORPORATION**
A Delaware Corporation who may be served through the Louisiana Long Arm Statute, through their agent for service of process: The Flintkote Company, 3 Embarcadero Center, Suite 1190, San Francisco, California 94111.

J. **FLINTKOTE MINES, LTD.**
Which may be served via the Louisiana Long Arm Statute through it Agent, Belanger Suave (Richard Nadeaux, Esq.), Barrister *Solicitors, 1, Place Ville Marit, Suite 1700, Montreal, Quebec, H3B2C1

K. **FOSTER WHEELER CORPORATION**
A Delaware corporation authorized to do and doing business in the State of Louisiana with its principle place of business in New Jersey, and may be served pursuant to the Louisiana Long Arm Statute, to wit: Perryville Corporation Park, Clinton, NJ 08809

L. **GARLOCK, INC.**
An Ohio Corporation, authorized to do and doing business in the State of Louisiana, with its principal place of business in New York and with an agent for service of process in the State of Louisiana: CT Corporation Systems, 8550 United Plaza  Boulevard, Baton Rouge, Louisiana  70809.

M. **GASKET HOLDINGS COMPANY, INC. (Successor to Flexitallic, Inc.)**
A Delaware Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: C.T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809.

N. **GENERAL ELECTRIC COMPANY**
A New York Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: C.T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809.

**O.**   **GEORGIA-PACIFIC CORPORATION,** A Georgia Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: C.T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana, 70809.

**P.**   **INGERSOLL-RAND COMPANY**
A New Jersey Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: C.T. Corporation Systems, 8550 United Plaza  Boulevard, Baton Rouge, Louisiana  70809.

**Q.**   **KELLY MOORE PAINT COMPANY, INC.**
A California Corporation who may be served through the Louisiana Long Arm Statute, through their agent for service of process:  Kelly Moore Paint Company, Inc., 987 Commercial Street, San Carlos, California 94070.

**R.**   **THE McCARTY CORPORATION**
A domestic corporation, may be served through its agent for service of process:  Paul H. Spaht, 445 N. Boulevard, Suite 300, Baton Rouge, Louisiana, 70802.

**S.**   **REILLY-BENTON COMPANY, INC.**
A corporation duly organized, created and existing under and by virtue of the laws of the State of Louisiana, with its principal place of business in New Orleans, Louisiana, with agent for service of process in the State of Louisiana, to wit:  Deutsch, Kerrigan & Stiles, 755 Magazine Street, New Orleans, Louisiana, 70130.

**T.**   **TAYLOR SEIDENBACH, INC.**
A corporation duly organized, created and existing under and by virtue of the laws of the State of Louisiana, with its principle place of business in New Orleans, Louisiana, with agent for service in the State of Louisiana, to wit: Ralph I. Sheperd, 731 S. Scott Street, New Orleans, Louisiana 70150

**U.**   **J.T. THORPE, INC.**
A California Corporation, who may be served through the Louisiana Long Arm Statute, through their agent for service of process: Ken Prindle, Prindle, Decker & Amaro, 369 Pine Street, Suite 800, San Francisco, CA, 94104.

**V.**   **3M COMPANY**
(a.k.a. Minnesota Mining & Manufacturing Company)
A Delaware Corporation, who can be served through the Louisiana Long Arm Statute, through their agent for service of process:  Roger P. Smith, Secretary, Minnesota Mining & Manufacturing Company, 3M Center, Building 220-14W-06, St. Paul, Minnesota, 55144-1000.

**W.**   **WORTHINGTON PUMP, INC.**
A Delaware Corporation, who may be served through the Louisiana Long Arm Statute, through its registered agent for service of process:  C.T. Corporation System, 350 North St. Paul Street, Suite 2900, Dallas, Texas, 75201.

**X.**   **KIM SUSAN, INC.**
(Formerly known as Fagan Boat Service, Inc.)
A  corporation duly organized, created and existing under and by virtue of the laws of the State of Louisiana, with its principle place of business in LaRose, Louisiana, with agent for service in the State of Louisiana, to wit: Kent J. Fagan, West 21st Street, Larose, Louisiana, 70373.

Hereinafter referred to as "Defendants named in Paragraph 1."

2.

All of the Defendants named herein are solidary obligors.

## VENUE

3.

This Court has jurisdiction over this cause of action, which occurred principally in the State of Louisiana. This action is filed pursuant to the Jones Act and the General Maritime Law, and Plaintiffs bring this action in state court pursuant to the Savings to Suitors Clause, 28 U.S.C. 1333, et seq., and the Jones Act.

4.

As an adult, Plaintiff, JAMES C. TURNER, was enlisted in the U.S. Navy as a Machinist Mate from 1957 to 1977 working on various ships and after retiring from the Navy, worked for Valite Plastic Plant as a fork lift mechanic from 1977 to 1982, Kim Susan, Inc. (formerly known as Fagan Boat Company) as an offshore cargo boat engineer from 1982 to 1987 and Petrol Marine as a cargo boat engineer from 1987 to 1995. Plaintiff's job duties included but are not limited to the following: fork lift mechanic, machinist and offshore cargo boat engineer.

5.

During this period of time, and while enlisted with the U.S. Navy, working at the plastic plant and on board of a vessel and as a maritime worker, as stated above, plaintiff was exposed to heavy amounts of asbestos in connection with repair and asbestos tear-out activities including asbestos brake lining, asbestos pipe covering, asbestos block, asbestos cement, asbestos mud, asbestos plaster, asbestos rope, asbestos gaskets, asbestos cloth, asbestos tape, boilers, asbestos panels and other types of asbestos-containing materials. Additionally, Plaintiff was exposed to the following products designed, mined, manufactured, sold, supplied, used and distributed by Defendants:

## DEFENDANTS' PRODUCTS

6.

(a) At all times relevant hereto, **Defendant Anchor Packing Company**, manufactured, distributed and/or installed asbestos-containing products, including but not limited to, packings, gaskets, brake linings, asbestos sheets, asbestos rope and many

other asbestos-containing materials, to which Plaintiff was exposed while such products were present at the Plaintiff's job sites described above.

(b)     At all times relevant hereto, **Defendant The Carborundum Company**, manufactured, distributed, sold and/or distributed asbestos-containing materials, including but not limited to, grinding wheels and other asbestos containing materials to which Plaintiff was exposed while present at the job sites described above.

(c)     At all times relevant hereto, **Defendant CBS Corporation (formerly known as Westinghouse Electric Company)**, sold, supplied, distributed, manufactured, installed, and otherwise used asbestos-containing materials.  Plaintiff was exposed to asbestos-containing materials of Westinghouse Electric Company, in connection with his work on land-based turbines for General Electric Company, including, but not limited to, asbestos, asbestos paper, asbestos millboard, asbestos fiber, asbestos cement sheets and panels, and other asbestos-containing materials to which Plaintiff was exposed.

(d)     At all times relevant hereto, **Defendant A.W. Chesterton**,  manufactured, marketed, distributed and sold through various suppliers, asbestos packing, gaskets, asbestos sheet and cloth for gasket fabrication to which Plaintiff was exposed.

(e)     At all times relevant hereto, **Defendant Combustion Engineering, Inc.,** sold, supplied, distributed, manufactured, installed, and otherwise used asbestos-containing materials, including, but not limited to, asbestos, asbestos pipe covering, block, cement, mortar, refractory, cloth, brick, packing, gaskets and other asbestos-containing materials to which Plaintiff was exposed while at the job sites described above.

(f)     At all times relevant hereto, **Defendant John Crane, Inc.,** was a manufacturer of asbestos containing gaskets and packing materials, to which Plaintiff was exposed.

(g)     At all times relevant hereto, **Defendant Dana Corporation** manufactured, distributed, sold and/or distributed asbestos-containing materials, including but not limited to, Victor Sheet Gaskets, Asbestos steam gaskets, to which Plaintiff was exposed.

(h)     At all times relevant hereto, **Defendant Eagle, Inc.,** distributed, fabricated and/or installed asbestos-containing products, including but not limited to, asbestos fittings

made at Eagle Asbestos facilities and sold as its own products, pipe covering, block, sprays, tile packing, cloth, tape, gaskets, refractories, and cements to which Plaintiff was exposed. Eagle, Inc. regularly engaged in the practice of manufacturing "Ts" and "Ls" and other specialty materials for sale to customers, other asbestos products vendors and for use in its own business.  These materials were shipped and sold in Eagle Asbestos & Packing Company containers as Eagle products.

(i)     At all times relevant hereto, **Defendant  The Flintkote Corporation** mined, manufactured, distributed and/or installed asbestos-containing products, including but not limited to, asbestos coatings, mastics, asbestos floor tile, asbestos underlay, asbestos pipe and  cements.

(j)     At all times relevant hereto, **Defendant Flintkote Mines, Ltd.**, mined, milled, manufactured, distributed, sold and/or distributed asbestos-containing materials, including but not limited to, pure asbestos fiber, milled asbestos fiber, pulverized asbestos, asbestos cement, to which Plaintiff was exposed.

(k)     At all times relevant hereto, **Defendant Foster Wheeler Corporation** sold, supplied, distributed, manufactured, installed, and otherwise used asbestos-containing materials, including but not limited to, boilers, kilns and other high-heat production devices composed and specified by Foster Wheeler Corporation, asbestos, asbestos pipe covering, insulating block, cement, cloth, packing and gaskets and many other  asbestos containing materials to which Plaintiff was exposed.

(l)     At all times relevant hereto, **Defendant Garlock, Inc.,** manufactured, distributed, sold, and/or installed asbestos-containing products, including, but not limited to, gaskets, packing, asbestos rope, asbestos sheets, asbestos cloth, and asbestos tape, to which Plaintiff was exposed.

(m)     At all times relevant hereto, **Defendant  Gasket Holdings Company, Inc. (Successor to Flexitallic, Inc.),** designed, manufactured, fabricated, supplied, sold, marketed, warranted, and/or advertised asbestos-containing products including but not limited to, "Flexitallic Gaskets" and gasket material to which Plaintiff was exposed.

(n)     At all times relevant hereto, **Defendant General Electric Company**, made various electrical rotor and apparatus which contained asbestos, turbines, which required asbestos pipe covering, asbestos blankets, asbestos block, asbestos cement and spray-on asbestos to which Plaintiff was exposed.

(o)     At all times relevant hereto, **Defendant Georgia Pacific Corporation**, manufactured, distributed, sold and/or distributed asbestos-containing materials, including but not limited to, joint compound, drywall adhesive, plaster, texture, and many other asbestos containing materials to which Plaintiff was exposed while present at the job sites described above.

(p)     At all times relevant hereto, **Defendant Ingersoll-Rand Company**, manufactured, distributed, sold and/or distributed asbestos-containing materials, including but not limited to, air compressors and gaskets, asbestos containing materials to which Plaintiff was exposed while present at the job sites described above.

(q)     At all time relevant hereto, **Defendant Kelly Moore Paint Company**, manufactured, distributed, sold and/or distributed asbestos-containing materials, including but not limited to, bedding cement, compounds, texture, finishes, paints and other asbestos containing materials to which Plaintiff was exposed.

(r)     At all times relevant hereto, **Defendant The McCarty Corporation**, re-labeled, distributed, sold, fabricated, and/or installed asbestos-containing products, including but not limited to pipe covering, block, sprays, cloth, tape, tile packing, gaskets, refractories and cements to which Plaintiff was exposed.

(s)     At all time relevant hereto, **Defendant Reilly-Benton Company, Inc.**, distributed and/or installed asbestos-containing products, including but not limited to, pipe covering, block, sprays, tile, packing, gaskets, refractories, cloth, tape and cements, to which Plaintiff was exposed.

(t)     At all time relevant hereto, **Defendant, Taylor-Seidenbach, Inc.**, distributed and/or installed asbestos-containing products, including but not limited to, pipe covering, block, sprays, cloth, tape, tile packing, gaskets, refractories and cements to which the Plaintiff was exposed.

(u)     At all time relevant hereto, **Defendant, J.T. Thorpe Company**, sold, supplied, distributed, manufactured, installed, and otherwise used asbestos-containing materials, including but not limited to, boilers, kilns and other high-heat production devices composed and specified by J.T. Thorpe, Inc., asbestos, asbestos pipe covering, insulating block, cement, cloth, packing and gaskets and many other asbestos-containing materials to which Plaintiff was exposed.

(v)     At all times relevant hereto, **Defendant 3M (a.k.a. Minnesota Mining & Manufacturing Company)**, manufactured, distributed, sold and/or fabricated asbestos-containing products, including but not limited to, sandpaper, masks and other materials to which Plaintiff used.

(w)     At all times relevant hereto, **Defendant Worthington Pump, Inc.,** manufactured, distributed, sold and/or distributed asbestos-containing products, including but not limited to, air compressors and pumps, asbestos containing materials to which Plaintiff was exposed while present at the job sites described above.

(x)     At all times relevant hereto,  **Defendant Kim Susan, Inc.** (formerly Fagan Boat Company), in the 1980's, was a Jones Act employer who was responsible for the safety of James C. Turner, a crew member on board vessels owned and operated by Kim Susan, Inc.  Plaintiff worked in the engine rooms and machinery spaces where he was exposed to asbestos containing materials.

7.

As a direct result of the plaintiff's exposure to the Defendants' asbestos-containing products, plaintiff was diagnosed with asbestos-related lung cancer, and other asbestos related diseases, including asbestos related pleural diseases, irreversible and progressive lung damage, as well as other asbestos related diseases, including pleural thickening, pleural plaques, pleural calcification, pleural effusion, with resulting symptoms, including but not limited to, shortness of breath and inability to breathe, as well as decreased exercise tolerance. This asbestos related disease is progressive and can be fatal.

## LIABILITY ALLEGATIONS--FAILURE TO WARN

8.

Each of the Defendants knew or should have known through industry and medical studies, the existence of which were unknown to the Plaintiff, of the health hazards inherent in the asbestos-containing products which they were selling, manufacturing or otherwise using. Instead of warning the Plaintiff and the general public of these dangers, certain Defendants ignored, concealed or misrepresented such information, or condoned such concealment, in order to sell asbestos or asbestos-containing products and avoid litigation by those who were injured from asbestos inhalation. Those Defendants who have engaged in this misconduct are specifically set forth in this Petition, and their conduct specifically described hereinafter in the Section which, in additional to general negligence or strict liability allegations, identifies or forms of specified misconduct, and similarly identifies by name, the particular Defendant and the specific counts of misconduct.

9.

Plaintiff suffered excessive exposure to asbestos. Plaintiff's cause of action against this Jones Act employer is brought pursuant to 45 U.S.C. § 1 et seq., which grants this Court jurisdiction. While Plaintiff was employed at the above-noted locations, he was exposed to asbestos without warnings, without adequate safety training, and as a result of other acts of negligence, and strict liability as vessel owner or operator, and which will be demonstrated through discovery and at trial. The employer and its safety officials delegated specific duties to protect this Plaintiff, knew or should have known of these dangers and are liable to Plaintiff for all acts of negligence resulting in Plaintiff's harm.

10.

As a direct and proximate contributing result of having inhaled, ingested or otherwise been exposed to asbestos while working at, including but not limited to the vessel listed above, during the exposure period, the Plaintiff received injuries, both physically and mentally, including, without limitation, the following conditions: (I) asbestosis; (ii) impaired pulmonary capacity; (iii) reduced lung volume; (iv) pleural plaques; (v) interstitial lung fibrosis; (vi) cardiac and circulatory disease; (vii) mental anguish associated with the preceding conditions; (viii) reduced life span from asbestos-related malignancy; (ix) loss of enjoyment of life; (x) medical expenses; and other damages.

11.

Because of the latency period of the above asbestos-related injuries, and because of the active concealment by some Defendants of the causes and effects of exposure to asbestos, the Plaintiff has only recently discovered this injury.

12.

Plaintiff was exposed to asbestos and asbestos-containing products in the course and scope of this employment at the various work locations referred to above, while working for the enumerated employers, and without fault on Plaintiff's part, Plaintiff was exposed to asbestos-containing products and dust. Plaintiff alleges that the presence of asbestos dust and fibers in sufficient quantities to cause disease renders each Defendant listed as an employer liable for vessel negligence and strictly liable for their vessel defect.

13.

Plaintiff inhaled and otherwise ingested these fibers from products and has, as a direct cause, suffered the injuries complained of in the foregoing allegations of this Petition.

14.

The Defendants identified as employers and/or their insurors, at all times relevant hereto were the employers of Plaintiff, with specific responsibilities for the health and safety of the Plaintiff.

15.

These Defendants negligently, recklessly, willfully and/or because of gross and wanton negligence failed to properly discharge their duties to the Plaintiff in the following:

(a)    failed to provide Plaintiff with a safe place to work;

(b)    failed to provide Plaintiff with safety equipment;

(c)    failed to provide Plaintiff with correct, adequate or proper safety equipment;

(d)    failed to disclosure, warn or reveal critical medical or safety information to Plaintiff regarding the special hazards in connection with asbestos and asbestos dust;

(e)    failed to properly train Plaintiff with respect to the safety equipment that was issued;

(f)     failed to properly provide Plaintiff with the correct types of safety equipment;

(g)    failed to timely remove asbestos hazards from the workplace;

(h)    inadequately provided for ventilation for Plaintiff in connection with exposure to asbestos dust at work site;

(I)     failed to properly monitor asbestos dust levels at the work site as required by good and proper industrial hygiene practices, as well as federal law;

(j)     failed to provide Plaintiff medical monitoring or counseling regarding these hazards in the workplace, so that Plaintiff could protect himself;

(k)    any other negligent act or omission as may be revealed in discovery or at trial.

The above-described negligence and fault of these defendants was a legal cause of Plaintiff's injuries complained of in this Petition, and a matter of negligence, gross negligence, reckless conduct, and fault within the meaning of the law.

## GENERAL ALLEGATIONS -- STRICT LIABILITY

16.

The allegations above are incorporated by reference herein.

17.

The asbestos or asbestos-containing products mined, manufactured, produced, marketed, sold, or distributed by each and every Defendant were defective and unreasonably dangerous to human health because (a) they were sold without any warnings or adequate warnings as to their dangers and without adequate instructions on how to use the products so as to reduce those dangers, or (b) because Defendants failed to develop alternative products with safer designs even though such products were feasible. Those defects were the proximate cause of the injuries to plaintiff.

18.

The manufacture, production, marketing, sale, or distribution by each and every Defendant of defective asbestos or asbestos-containing products was reckless, wanton, and willful and in conscious disregard of the safety and health of plaintiff and those similarly situated to him.

11

## BREACH OF EXPRESS AND IMPLIED WARRANTY

19.

The allegations above are incorporated by reference herein.

20.

Each and every Defendant has breached express, as well as implied, warranties of good and merchantable quality and fitness for intended use with respect to its asbestos-containing products.

21.

The breach of those warranties has proximately caused injury to plaintiff.

22.

During all times relevant hereto, each and every Defendant failed to take reasonable steps to provide to plaintiff  (a) adequate warnings of the danger from exposure to its asbestos or asbestos-containing products and (b) adequate instructions on how to use its asbestos or asbestos-containing products so as to reduce the danger. The failure by each and every Defendant to provide such warnings and instructions constituted negligence and proximately caused the injuries to plaintiff.

## STRICT LIABILITY OF ASBESTOS MANUFACTURERS, MINERS, SELLERS, SUPPLIERS, DISTRIBUTORS AND VESSEL OWNERS

23.

Plaintiffs incorporate by reference all general liability allegations made above as though made herein, and make additional allegations that follow.

24.

The Defendants identified in the caption to this Petition and in the foregoing paragraphs, are manufacturers, miners, sellers, suppliers, distributors, vessel owners or users or were otherwise engaged in conduct which constitutes under Louisiana law, the act of "manufacturing of asbestos" or "asbestos-containing products," and are guilty of negligence and strict liability to Plaintiffs, for the enumerated, but not exclusively limited to, the conduct that follows:

12

a. For the mining, manufacturer, sale, supply, wholesale, and use of these products that are unreasonably dangerous and unreasonably dangerous per se;

b. The mining, manufacture, sale, supply, wholesale, and use of products that possess inherent and known properties that make them unreasonably dangerous by presenting a high potential for causing serious injury such as respiratory disease, cancer, and other health problems to those who would be foreseeable exposed to them, including those employed in Plaintiff's respective trade;

c. Lack of warning, failure to warn, and/or lack of sufficient warning of the hazards that these products would present in the course of their normal or foreseeable use;

d. Lack of safety instructions, or of sufficient safety instructions, for eliminating or reducing the health risk associated with the intended use of these products;

e. Failure of Defendants to inspect these products to insure the sufficiency and adequacy of warnings and safety cautions, including the types of diseases that these products would present, the appropriate levels at which these products could be safely used, and the nature and necessity of the type of ventilation that would be required in order for workers to be adequately protected;

f. Failure to test or adequately test these products for defects or hazards that they would present to the intended or foreseeable users;

g. Failure to truthfully report or adequately report the known hazards the products presented, including the results of the product testing, the medical studies associated with foreseeable hazards that these products would present, and the dust studies which indicated that these products were not performing within any existing recommended safety guidelines;

h.   Improper design of these products where the nature of the product did not require use of asbestos, or where alternate, equally suitable substances were readily available;

I.   Defects in the composition and construction of these products;

j.   Failure to recall these products after they were mined, manufactured, sold, supplied, at and to plaintiff's work sites;

k.   Failure to properly package these products so that they could be safely transported, handled, stored or disposed of;

I.   Over warranting the safety of these products that they mined, manufactured, sold, wholesaled, supplied or used by these Defendants;

m.   Failure to notify or advise the end purchasers and users of these products, including bystanders, of simple, inexpensive, remedial measure which could be taken to protect plaintiff and others from exposure to these hazards;

n.   Other defects or faults as may be revealed in discovery or at trial.

The defective conditions of Defendants' products and their conduct, in question with the mining, manufacturer, sale, supply, use and failure to recall these hazardous products as noted above, are the proximate cause of plaintiff's injuries. Plaintiffs also allege that each and every one of the foregoing Defendants, and the enumerated acts above, were and constitute negligence, which is also a proximate cause of plaintiff's injuries.

**THEORY OF RECOVERY AGAINST DEFENDANTS
BASED UPON DEFENDANTS' FAILURE TO USE
ALTERNATIVE PRODUCTS OR DESIGNS**

25.

Defendants' products were unreasonably dangerous because of their design for the following reasons:

A.   As the manufacturers of potentially dangerous products, Defendants were held to the knowledge of experts. They were required by the law to keep abreast of scientific knowledge, discoveries and advances and are presumed to know what is imparted thereby. Defendants also had the duty to test and inspect their products and the extent of the research and any experiments must have commensurate with the dangers involved, all of which they failed to do.

B.   Even if a reasonable person would conclude that the danger-in-fact of Defendants products did not outweigh the utility of those products,

14

there were feasible ways to design Defendants' products with less harmful consequences of which Defendants held to the standard and skill of experts, should have been aware and feasibly could have utilized, yet failed to do so.

C.     Even if a reasonable person would not conclude that the danger-in-fact of Defendants' products did not outweigh the utility of those products, Defendants, held to the standard and skill of experts, should have reasonably known of the dangers inherent to the use of asbestos containing products and could have feasibly utilized alternative products with less harmful consequence, which they failed to do.

### THEORY OF RECOVERY AGAINST DEFENDANTS
### BASED UPON THEIR FAILURE TO WARN

26.

Defendants failed to adequately warn Plaintiff, James C. Turner, concerning all dangers related to the way their products were designed.  Specifically, Defendants failed to provide Plaintiff or others with adequate warnings of all dangers inherent in the normal use of their products which were not within the knowledge of or obvious to the ordinary user of those products.  These dangers include the fact that the Defendants' products were highly dangerous to the health of the person exposed to them in that they caused or contributed to the pulmonary diseases of asbestos and a wide variety of cancers.

Additionally, Defendants failed to provide the Plaintiff with knowledge as to what would be reasonably safe and sufficient wearing apparel and proper protective equipment and appliances, if in truth, there were any, to protect them from being poisoned and disabled as a result of their exposure to or use of Defendants' products.

Further, Defendants failed to instruct the Plaintiff as to the proper and safe use of their products, if such products could ever safely be used.

27.

Subsequent to the time that Defendants caused their asbestos products to be sold and placed on job sites where the Plaintiff was employed, Defendants continued to acquire additional knowledge of the dangers caused by their products.  This increased knowledge included the knowledge that exposure to even small amounts of asbestos and/or asbestos containing dust can cause serious and permanent injury.

Nevertheless, Defendants have negligently and recklessly failed and refused to warn and advise the Plaintiff or others similarly situated of the dangers caused by their past exposure to Defendants' defective products, which they had reason to know were in place on Plaintiff's job site, and have refused to warn and advise of the dangers caused by their products even years after they had been exposed to them.

Despite Defendants' knowledge that their asbestos and/or asbestos containing products had contaminated ships, buildings and job sites where the Plaintiff was required to work, even to the present time, possessed with the information uniquely available to them relating to the dangerous effects of continued asbestos exposure, Defendants have refused or neglected to provide such information to the Plaintiff or the public at large. Defendants have deliberately, intentionally, and purposefully withheld such information from Plaintiff, thus denying Plaintiff the knowledge with which to take necessary safety precautions, good and proper decontamination procedures, periodic x-rays, and medical examinations or avoiding further dust exposure or cigarette smoking, the carcinogenic effect of which Defendants have long since learned is multiplied by exposure to their asbestos or asbestos containing products.

Specifically, even as of the present time, Defendants have absolutely failed to warn persons such as the Plaintiff, who Defendants knew were likely exposed to their asbestos containing products of the need for continued and regular health monitoring due to prior asbestos exposure; Defendants have never issued recall type letters or notices to prior users of their products; Defendants have intentionally delayed the use of warnings on asbestos products and failed to advise Plaintiff and others exposed to their products in the past of medical findings known to Defendants concerning the dangers of asbestos exposure; Defendants have suppressed the decimation of information to Plaintiff and the public at large and falsely represented facts to Plaintiff and the public at large concerning the dangers of present and past asbestos exposure.

Defendants' failure to warn and intentional misrepresentation took place before, during and after Plaintiff was exposed to the asbestos-containing products they manufactured.  The Defendants' breach of their post-sale duty to warn Plaintiff of the

dangers posed by his exposure to Defendants' asbestos containing products was a substantial contributing cause of Plaintiff's damages.

## THEORY OF RECOVERY AGAINST DEFENDANTS BASED UPON THE MANUFACTURING AND SUPPLYING OF PRODUCTS WHICH WERE UNREASONABLY DANGEROUS PER SE

28.

Although Defendants' products were unreasonably dangerous because of their defective design and because of Defendants' failure to warn, even if the risk of the hazard related to the use of the Defendants' products was not discoverable under existing technology at the time they were designed and marketed, Defendants' products were unreasonably dangerous per se because of the intrinsically dangerous characteristics of those products, including their intrinsically dangerous construction, composition and design. Whether or not Defendants actually perceived or could have perceived the dangers of their products at the time they were designed and marketed, a reasonable person would conclude that the danger-in-fact of those products, whether foreseeable or not, actually outweighed the benefit which flowed from their use.

## THEORY OF RECOVERY AGAINST DEFENDANTS FOR INTENTIONAL AND WILLFUL MISCONDUCT

29.

With conscience disregard and indifference for the safety of the Plaintiff and other users of the products which Defendants manufactured, advertised, marketed, and sold, Defendants, acting through their servants, employees, representatives, and agents, placed their products in the market to be purchased and used by the public when Defendants knew that exposure to and use of their products could and would cause severe personal injuries and lung damage to the Plaintiff and other persons exposed to the products.

30.

Defendants, at all times herein mentioned, knew that their products and the component parts and accessories thereof, were defective, and that Defendants, each of them, intentionally, wrongfully and knowingly placed them on the market when they knew that their products would be handled by or used in the vicinity of persons such as the Plaintiff, James C. Turner, who had absolutely no knowledge of the dangers involved.

17

31.

Defendants implicitly represented, by placing their products on the market, that their products could safely be used for the purposes for which they were manufactured and could safely be used and handled by employees in various industries and at various job sites, such as on naval ships and various other naval shipyards and/or job sites located throughout the United States, where Plaintiff, James C. Turner, was, in the main part, employed.

32.

In researching, testing, manufacturing, distributing, labeling and marketing their products, Defendants did so with conscience disregard for the safety of the user of those products, in that the Defendants had specific prior knowledge that there was a high risk of injury or death resulting from exposure to or use of their products, including, but not limited to asbestosis, lung cancer, mesothelioma, and other asbestos related diseases and other forms of cancer. This knowledge was obtained, in part, from scientific studies and medical data to which Defendants had and have access and knowledge. Despite their knowledge of the dangers involved, Defendants continued to manufacture and distribute their products without attempting to protect users from or warn users of the high risk of injury and death resulting from exposure to their products.

33.

Defendants' intentional misconduct was motivated by their financial interest and the continuing uninterrupted distribution and marketing of their products. In pursuit of this financial motivation, Defendants consciously disregarded the safety of the user of their products and were, in fact, consciously willing to permit their products to cause injuries to persons, such as Plaintiff, James C. Turner, who they knew was exposed to their products without having any idea of the risk involved.

34.

Prior to placing their defective products on the market, Defendants knew and possessed medical and scientific data and other knowledge that clearly indicated that

18

asbestos and asbestos containing materials and products were hazardous to the health

and safety of individuals such as the plaintiff, working in close proximity to such materials,

and that Defendants had specific knowledge that there was a high risk of injury or death

resulting from exposure to asbestos and asbestos-containing products, including but not

limited to asbestosis, asbestos related pleural disease, lung cancer, mesothelioma, and

other forms of cancer and asbestos related diseases.  This knowledge was obtained, in

part, from scientific studies and medical data to which the Defendants had access, as well

as scientific studies performed by, at the request of, or at the insistence of said

Defendants.  With the intent to deceive the Plaintiff and with the intent that they should be,

and remain, ignorant of such medical and scientific data and with the further intent to

induce the Plaintiff to alter his position to his injuries and/or risk, and in order to gain an

advantage, said Defendants committed the following acts of deceptive concealment:

A. Defendants did deliberately cause to be suggested as a fact to Plaintiff, by not placing warning labels on their products, that it was safe for the Plaintiff to work in close proximity with such materials;

B. Defendants deliberately concealed the hazardous nature of their products from Plaintiff by concealing the facts that asbestos fibers released into the air as a result of the use of the Defendants' products can, if inhaled, bring about pathological effects without noticeable trauma, when Defendants were possessed with knowledge that such material was dangerous and a threat to the health of persons coming into contact therewith and had a duty to disclose such facts to Plaintiff;

C. Defendants deliberately failed to provide Plaintiff with adequate respirator protective devices when they were required to work in areas where they would be exposed to Defendants' products, even though Defendants knew that such protective measures were necessary, and had a duty to advise Plaintiff that, if such protective devices were not used, it would result in injury to the Plaintiff;

D. Defendants deliberately concealed from Plaintiff the true nature of their industrial exposure to their products, in that Defendants knew that the Plaintiff, upon inhalation of asbestos fibers would in time develop irreversible lung damage, and would immediately be in danger of ill health, and concealed the fact that Plaintiff had in fact been exposed to harmful materials contained in their products and concealed that fact that the materials which Plaintiff was exposed to would cause pathological effects without noticeable trauma;

E. Defendants deliberately failed to provide medical and scientific information to the public at large as to the true nature of the hazards of asbestos and actively concealed such known medical and scientific facts from the public and the Plaintiff; and

F.  The aforementioned deceptive concealment by Defendants of the true nature of the hazards resulting from inhalation of asbestos contributed in cause to Plaintiff's injuries.

## THEORY OF RECOVERY BASED UPON
## FRAUD, CONSPIRACY AND CONCERT OF ACTION

35.

Plaintiffs repeat and allege all allegations contained in all paragraphs above and below as if fully set forth herein and further allege with regard to The Flintkote Company (a member of IHF and QAMA), Garlock, Inc. (a member of the ATI),  and Westinghouse Electric Corporation (a member of QAMA).

36.

These Defendants, individually and as agents of one another and as co-conspirators, aided, abetted, encouraged, counseled, assisted, agreed, and conspired among themselves and with other  asbestos manufacturers and distributors a course of conduct that resulted in and is a legal cause of Plaintiffs' injuries and others similarly situated.

37.

These Defendants knew that the others conduct constituted a breach of duty and gave substantial assistance or encouragement to the other so to conduct itself.

38.

These Defendants acted in the following fashion:

A.  During the 1920's, information was published in the United Kingdom identifying asbestos as a disease and anecdotally relating it to lung cancer. Metropolitan Life Insurance Company (Met Life) at the same time was studying asbestos related health hazards in the USA and Canada. Met Life was a major insurer of various risks within the asbestos industry and was vitally interested in this issue.  Met Life determined to do a study of Canadian asbestos interests through McGill University in Canada.  In exchange for funding to McGill, Met Life required a tangible quid pro quo from McGill University in the 1920's in exchange for them providing funding for a study of asbestos disease in Canadian miners.  That was the result of the study would be solely within the control of Met Life.  The study revealed a high percentage of asbestos miners suffered from asbestosis.   The study was never published.  Subsequently, Met Life through Dr. Anthony Lanza in the published medical literature, indicated that their studies showed that there was no evidence that asbestos exposure was a cause of disease in North America.

20

B.    In 1932, Dr. Anthony Lanza, Dr. Fellows, and others, assisted the Johns-Manville Corporation with medical examinations of over 1,000 employees of Johns-Manville's factory in Manville, New Jersey. The report of this study demonstrated that a large percentage of the employees suffered from asbestosis including employees not directly involved in the asbestos handling or manufacturing process. This 1932 medical survey (early evidence of bystander exposure and disease) was not published in the medical literature and therefor was unavailable to scientists studying the issue of asbestos disease. Met Life, Johns-Manville officials and the Defendants named in this suit were advised of the results of these studies, and continued to represent to the public that there was no significant health hazard presented by asbestos.

C.    Beginning in 1934, Johns-Manville Corporation, through Vandiver Brown, its attorney, J.C. Hobart, and Raybestos-Manhattan, through its agents, Sumner Simpson and J. Rohrgach; suggested to Dr. Lanza, Associate Medical Director of Met Life (insurers of Manville, Raybestos, and others) that Dr. Lanza publish a study on asbestosis in which they could affirmatively represent that asbestos exposure did not present any significant health risks. This was accomplished through Dr. Lanza's description of asbestosis as relatively benign despite clear evidence of its potentially "fatal nature," despite knowledge that it was or could result in death. While these facts were known by Dr. Lanza and the Defendants named herein, this information was held in confidence from the general public. Dr. Lanza's study was published in the medical literature in 1935. The defendants were motivated, in part, by the desire to influence proposed legislation to regulate asbestos exposures and to provide a defense in lawsuits involving Manville, Raybestos, and others. By this time, the Air Hygiene Foundation (later to be called "IHF") was formed by Johns-Manville, Met Life, the Mellon Institute, KACC, Keasbey & Mattison Company, and others. The IHF was ordained to be a creature to represent the interests of industry, in connection with research work that would be used to combat claims for industrial or occupationally related dust diseases.

D.    In 1936, Dr. Lanza, Medical Director of the Air Hygiene Foundation (IHF), American Brake Block Corporation, Asbestos Manufacturing Company, Gatke Corporation, Johns-Manville Corporation, Keasbey & Mattison Company (through funding and direction by T&N, Raybestos-Manhattan, Russell Manufacturing(whose liabilities have been assumed by H.K. Porter Company), Union Asbestos and Rubber Company, and United States Gypsum Company, entered into an agreement with the Saranac Laboratories and Dr. Leroy Gardner, its medical director. Under this agreement, these companies would pay for asbestos related animal research by the lab, but retained the power to decide what information the researcher, Dr. Leroy Gardner, of the Saranac Laboratories could publish about the asbestos disease study and control in what form such publications were to occur. As the details of this study emerged unexpected study of an asbestos cancer connection were found. Defendants, after meeting and discussing these findings decided the cancer issue should be deleted and

21

discussion confined to a select group of industries. The results of the work at Saranac were published without the reference to cancer. The companies rewrote the study to suit their own ends, in several respects.

E.    The agreement to delete the references to cancer was unanimously reached on November 11, 1948, when representatives of the following met at the headquarters of Johns-Manville Corporation: American Brake Block Division of American Brake and Shoe Foundry, Gatke Corporation, Keasbey & Mattison Company (with the support of Turner & Newall) Raybestos-Manhattan, Inc., Thermoid Company(whose assets and liabilities were later purchased by H.K. Porter Company), Union Asbestos and Rubber Company, and U.S. Gypsum Company. U.S. Gypsum did not send a representative to the meeting, but instead authorized Vandiver Brown of Johns-Manville to represent its interest at the meeting and to take action on its behalf.

F.    At this November 11, 1948 meeting, these defendants and their representatives agreed to certain deletions contained within the substance of research started by Dr. Leroy Gardner at the Saranac Laboratories beginning in 1936. Dr. Gardner's research involved asbestos as it related to asbestosis. The carcinogenicity of asbestos in mice was an unexpected finding which was discovered in connection with an evaluation of the health effects of asbestos on humans with a critical review of the then existing standards of dust exposure for asbestos and asbestos-containing products.

G.    At this meeting, it was determined that Dr. Gardner's work should be edited to specifically delete material facts about the cancer-causing propensity of asbestos and the health effects of asbestos on humans; to soften the critique of the dust standards and then published it in the medical literature as edited by Dr. Arthur Vorwald. These acts were carried out by, Dr. Lanza, the medical director of the IHF. While discussions regarding these findings were conducted by members of the asbestos industry within the IHF, ATI and QAMA, this information was carefully omitted from the public.

H.    As a result of these conducts, Dr. Vorwald published Dr. Gardner's edited work in January, 1951, in the <u>Archives of Industrial Hygiene and Occupational Medicine,</u> (Vol. 3, No. 1), a journal of the American Medical Association. The published version stressed those portions of Gardner's work that the companies wished stressed, but omitted references to cancer, to human asbestosis, and to the inadequacy of the then-established threshold limit values (TLVs). Furthermore, that article made the claim that the published report was the "complete survey" of Dr. Gardner's work without any hint of what had been deleted. This altered version of the work was disseminated to university libraries, government officials, medical doctors, agencies, the public, and others.

I.    Dr. Gardner, believing that the cancer connection required immediate follow up work, was denied funding by his industry sponsors. When he attempted to obtain a grant through the

22

National Cancer Institute his request was killed after Dr. Lanza approached all members of the committee and implied that Dr. Gardner and the Saranac Labs were ill suited for such work. The request was killed. Dr. Gardner never understood or was given an explanation regarding this denial, but continued to press for industry cooperation to study employee records.

J.    The following companies and others were members of the trade association known as Quebec Asbestos Mining Association (Q.A.M.A.); Johns-Manville Corporation, Carey-Canada (individually and as successor to Quebec Asbestos Corporation), the Celotex Corporation (successor to Quebec Asbestos Corporation) National Gypsum Company (n/k/a Asbestos Claims Management Corporation), and Turner & Newall (individually and successor to Bell Asbestos). The members of Q.A.M.A. participated in the above-described misrepresentation of the work of Dr. Gardner published by Dr. Vorwald in the AMA Archives of Industrial Health in 1951. Evidence of the Q.A.M.A.'s involvement in this misrepresentation arises from co-conspirator Johns-Manville's membership in the Q.A.M.A. and its representative, Ivan Sabourin, acting on behalf of all Q.A.M.A.'s members. QAMA received a copy of the study.

K.    Defendants who were members of the Q.A.M.A. began on or about 1950 to formulate a plan to influence public opinion about the relationship between asbestos and cancer by influencing the medical literature on this subject by disseminating the aforementioned edited Saranac study literature to the public and to organizations and legislative bodies responsible for regulatory controls of asbestos with the specific intent of supporting the notion that the existing scientific information and data in their possession and control, showed little, if any risk of injury or disease from asbestos. Despite detailed knowledge that the methods and manner in which asbestos dust was counted and measured to determine safety levels was defective, despite knowledge that the IHF's own research was questioning the efface of the 5mppcf Air TLV, and the deletion of all references to cancer.

L.    The named members of QAMA and IHF again discreetly sponsored animal research at the Saranac Laboratories to do an evaluation of whether cancer was related to asbestos exposure. After a preliminary report authored by Dr. Vorwald in 1952 indicated that a cancer-asbestos relationship might exist in experimental animals due to the rising incidence of malignancy, the funding of the study was terminated and it was never publicly discussed.

M.    Subsequent to the termination of this study, the defendants, certain members of the IHF & QAMA, after the 7th Saranac Symposium decided it would be safer to do an epidemiological study. Oddly, the 7th Saranac Symposium minutes were never published. The new study was funded by QAMA under a contract with the IHF and conducted by scientists approved and hired by IHF. The work was done through the clinics of the asbestos mines, based on records kept by asbestos company doctors, that admittedly undercounted the incidence

23

of asbestos disease and had no tracking method for former employees that died of lung cancer.

N.      The results of this study predictably concluded that asbestosis did not increase a worker's chances of incurring lung cancer. At least this was the published result.

O.      The Q.A.M.A. defendants thereafter caused, in 1958, a publication of the work known as the Braun and Truan Study in which the findings regarding increased incidence of cancer in persons with asbestosis were watered down by the scientist. The published version of this study contained a conclusion that asbestos exposure did not display any increase in the incidence of lung cancer over the general population. This conclusion was known by the defendant conspirators to be patently false. The statistical cohort was manipulated to minimize the incident of cancers in a way that suggested that the rate of cancer was no greater among asbestos miners than the public as a whole. This was untrue, and in fact the raw data not made available until much later in the 1980's supported a contrary conclusion.

P.      The publication of this study concluding that asbestos exposure did not cause an increase in the incidence of lung cancer, the IHF, the Q.A.M.A. and the defendants affirmatively misrepresented to the public and concealed from the public the extent of risks associated with inhalation of asbestos fibers. Sales of asbestos fiber continue to rise.

Q.      In 1958, the Q.A.M.A. publicized the edited works of Drs. Braun and Truan at a symposium in an effort to spread the industries' news to the public that the inhalation of asbestos dust would not cause cancer.

R.      Beginning in 1946, as elaborated above and continuing with the publication of the 1958 Braun/Truan study, the traditional TLVs combined with these studies were used by the IHF, ATI and QAMA to support the argument to keep the standards for safe exposure at an excessively high level. These efforts inhibited the lowering of the threshold limit value due to the cancer risk associated with asbestos inhalation until 1968.

S.      In the mid-1960's, the Q.A.M.A. and defendants determined that they would create a separate scientific body and associate it with an independent sounding name, yet it would be funded and controlled solely by the QAMA. In this manner it could issue findings and statements favorable to the asbestos industry and would have the appearance of scientific neutrality. In this way they could effectively question the integrity of publicity that was contrary to Industries' interests, with the appearance of unbiased views and opinions.

T.      The following companies were members of the Magnesia Insulation Manufacturers Association (MIMA): Philip-Carey Corporation (predecessors to Celotex), Johns-Manville; and others.

U.  In 1955, these companies caused to be published the MIMA 85% Magnesia Insulation Manual.  This manual stated that asbestos-containing products offered no hazard to workers who used these products, despite its members' knowledge to the contrary.  These manuals were sent to contractors and suppliers of asbestos products.

V.  The following companies were members of the trade organization known as the Asbestos Textile Institute (ATI): Raybestos-Manhattan, Johns-Manville, H.K. Porter, Keasbey & Mattison (Individually and through Turner & Newall), Garlock, Inc., National Gypsum (n/k/a Asbestos Claims Management Corporation), and others.

W.  In 1947, the members of the ATI and IHF, received a report from W.C.L. Hemeon, an industrial hygienist, regarding asbestosis that suggested reevaluation of the then-existing TLVs for asbestos exposure. Thereafter, these defendants continued to press the view that the 5mppcf standard was adequate.   They also represented to The American Conference of Governmental Industrial Hygienists (ACGIH), that all information they had supported the 5 mppcf standard.

X.  In 1953, National Gypsum (n/k/a Asbestos Claims Management Corporation), through its agents, in response to an inquiry from the Indiana Division of Industrial Hygiene regarding health hazards of asbestos spray products, refused to mail a proposed response to that division indicating that a respirator should be worn by applicators of the products. National Gypsum's response distorted and fraudulently misrepresented the need for applicators of asbestos spray products to wear respirators and fraudulently concealed from such applicators the need for respirators.

Y.  In 1955, Johns-Manville, through its employee, Dr. Kenneth W. Smith, M.D., published in the AMA Archives of Industrial Health, an article entitled "Pulmonary Disability in Asbestos Workers." This published study materially altered the result of an earlier study in 1948 concerning the same set of workers.

Z.  In 1955, the National Cancer Institute held a meeting at which Johns-Manville (individually and as the representative of the Defendants and the IHF, and Dr. Vorwald (as agent of co-conspirators) represented that there were no existing animal studies concerning the relationship between asbestos exposure and cancer.

AA.  In 1957, the members of the ATI, jointly rejected a proposed research study on cancer and asbestos out of fear that the results would demonstrate the same asbestos cancer connection as in the U.K. and would smear the North America asbestos industry.

BB.  In 1964 the members of the ATI met to formulate a plan for rebutting the association between lung cancer and asbestos exposure that had been recently discussed by Dr. Irving J. Selikoff.  Thereafter, these members of the ATI embarked upon a public relation's campaign to minimize the association

25

between asbestos exposure and lung cancer. Representatives of ATI, IHF and QAMA continued to state publicly they were aware of no cases of asbestos related diseases in North America.

CC.     In 1970, through their agents, defendants, The Celotex Corporation and Carey-Canada, represented to OSHA at public hearings that it had been in the asbestos business since 1918 and found no reported conditions of asbestosis or lung disease. This statement was also issued to people inquiring of the dangers of asbestos and was issued to the public in general.

DD.     All of the foregoing actions were known by the Defendants and expressly or tacitly agreed to by them.

39.

These Defendants:

A.      Did a tortious act in concert with one another or pursuant to a common design with each other;

B.      Knew that each other's conduct constituted a breach of duty and they each gave substantial assistance or encouragement to the other so to conduct himself; and/or

C.      Gave substantial assistance to the other in accomplishing a tortious result and its own conduct, separately considered, constitutes a breach of duty to the Plaintiffs.

40.

The acts of the Defendants as described above, constitute a fraudulent concealment and/or a fraudulent misrepresentation that proximately caused injury to the Plaintiffs in the following manner:

A.      The material published or caused to be published by the defendants was false and incomplete in that the defendants knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-containing products.

B.      Defendants individually, as members of a conspiracy, as agents of other co-conspirators, and as aiders and abettors of each other intended that the publication of false and misleading reports and/or the nondisclosure of documented reports of the health hazards of asbestos;

1.      maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-related products;

2.      assist in the continued pecuniary gain of the defendants through the sale of their products;

26

3.    influence in the Defendants' favor proposed legislation to regulate asbestos exposure and;

4.    to provide a defense in lawsuits brought from injury resulting from asbestos disease.

C.    Plaintiffs reasonably relied upon the published medical and scientific reports on the extent, nature, and existence of hazards of asbestos and asbestos-containing products to continue exposure to asbestos because of a belief that it was safe.

D.    Defendants individually, as members of a conspiracy, and as agents of each other intended that the Plaintiffs rely upon the published report regarding the safety of asbestos and asbestos-containing products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products.

E.    Defendants individually, as members of a conspiracy, as agents of each other, as aiders and abettors of each other are and were in a position of superior knowledge regarding the health hazards of asbestos commissioned by the defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-containing products.

## THE FLINTKOTE FRAUD ALLEGATIONS

### 41.

The Flintkote Company, both on its own for its financial benefit, and by and through its wholly-owned subsidiary, Flintkote Mines, Ltd., were members of the Quebec Asbestos Mining Association ("QAMA"), the Industrial Hygiene Foundation ("IHF"), the Gypsum Association, the Asbestos Cement Products Association ("ACPA"), and the Asbestos Textile Institute ("ATI"). Employees of both the Flintkote Company and Flintkote Mines, Ltd., served in various capacities in each of these organizations, as representatives, office holders and special committee workers, and assisted in implementing and formulating certain policies which these associations pursued with and on behalf of their representative asbestos manufacturing associations. The purpose of certain of these policies was to mislead the public regarding the hazards asbestos presented, to publish medical and safety literature which misrepresented the hazards that asbestos dust presented, to promote epidemiological studies which did not accurately

27

portray the potential hazards of asbestos, to issue and promulgate public announcements and press releases regarding the hazards of asbestos, which they knew to be untrue, and other acts of conspiracy and fraud, as set out herein.

42.

The Flintkote fraud and conspiracy story is complex. Perhaps it can best be typified by the following: The Flintkote Company, through various of its managerial personnel, and Flintkote Mines, Ltd., were members of QAMA, referenced in the Petition above. They were privy to a policy that QAMA would not publish or disseminate any unfavorable information about asbestos dangers to the public. In 1972, the Quebec Asbestos Mining Association issued the following statement to the public, through various public relations agencies: "There is no evidence that exposure to minute amounts of asbestos present in community air constitutes any hazard . . . there is no evidence of harm to the general public, we have not found a single case." Flintkote and its QAMA officers were fully aware of this statement, and concurred in its release. Flintkote knew that this information was untrue, as the following allegations demonstrate.

43.

Flintkote is a long-time member of the Asbestos Cement Products Association ("ACPA"), and has key employees serving on its Association Health and Safety Council. In a letter of the Asbestos Cement Products Association Health and Safety Council, dated November, 1959, the letter confirms a meeting which was held. In attendance at this meeting were: W.J. Burke and W.H. Knorr, of the Flintkote Company and Mr. J.A. Main, of the Flintkote Company, who was Chairman of the meeting. The letter indicates at the meeting, the following discussion was held: "It is acknowledged that neighborhood exposure cases appear to be a very real situation. It is popularly thought that there is no genuine health risk, though

28

it is acknowledged that when fibers are inhaled, they are retained in the lungs and it is possible that even one fiber could cause mesothelioma." It was discussed as to whether the Association and its constituent membership should warn the public. It is noted by Dr. Pelnar that mesothelioma is being found in the United Kingdom and in the United States, and elsewhere. He appears to be implicating fibers other than crocidolite. Mesothelioma, in 80% of the cases investigated, showed an occupational exposure which might be mainly, though not exclusively, due to crocidolite. The letter notes that the ACPA has become an associate member of the IHF. It goes on to state, "From what we have learned, we can assume asbestos cement Products may pose health problems where there is long term exposure . . . it is demonstrated that there is a dose relationship between exposures and disease. Malignancies related to asbestos are clear. Smoking appears to compound the risk." None of this information was given to the public.

44.

Flintkote was also a long-time member of the Gypsum Association. In September of 1967, the Gypsum Association's Safety Committee discussed the issues and concerns of neighborhood malignancies and asbestosis in connection with asbestos mining operations and asbestos product manufacturing operations respecting asbestos dust emissions. Mr. R.W. Henley and J. Tuffy, of the Flintkote Company are on this committee and were in attendance at this discussion. At that time the Gypsum Association members are expressing uncertainty as to the existence of any measurable threshold of dust and the potential of dust to cause harm to the neighborhood bystanders to these operations. This fact is important in that it demonstrates detailed knowledge of the dangers and risks of injury on the part of Flintkote and that, in fact, Flintkote has knowledge in 1967 that there is virtually no safe exposure level connected with asbestos.

29

45.

Mr. J.A. Main, a corporate official of the Flintkote Company and Flintkote Mines, Ltd., was in attendance at the summer meeting of QAMA in August of 1966.  At this meeting, Mr. Main, along with other industry representatives discussed methods by which the asbestos industry could counter recent bad publicity about asbestos.  It was the stated policy of QAMA to promote the idea that the presence of asbestos-related pleural plaques and the diagnosis of mesothelioma had no causal relationship to each other, despite having knowledge that the contrary was true.  These industry officials agreed that making this statement could give the industry ammunition with which to fight off attacks.  It was agreed by Mr. Main, of the Flintkote operations, as well as others in attendance, that they will use public relation devices to funnel information around the world to promote the idea that the use of asbestos has improved industry; that there has not been a single objective complaint about its dangers; and that asbestos communities are good places to live.  It is agreed by all present that the asbestos industry is still viewed by the media as being authoritative on the dangers.  QAMA will, therefore, use this to its advantage to counteract dangerous medical statements made in the United States.  It is agreed at that time that QAMA will use a new research counsel . . . "we will announce our research counsel and make it appear that we are launching an important international health project of truly humanitarian significance."  Moreover, "we will express criticism of Selikoff's style and we will have to be dramatic in doing so."  Dr. Selikoff was a medical expert publishing studies at that time strongly indicting that  asbestos is carcinogenic.  It is further agreed by those present that "rather than make these announcements from industry-sponsored QAMA we will do so from the health council itself."  That way, the statements will be more believable.

46.

In October of 1966, QAMA publishes a newsletter regarding a make up of the members of what appears to be the new "Institute of Occupational and Environmental Health" ("IOEH"). The industry association touts: "Members of our Scientific Committee of QAMA are also members of the Institute of Occupational and Environmental Health." The fact is concealed from the public. The Executive Committee of this institute is composed entirely of industry (QAMA) members. The Board of Directors of IOEH are all QAMA members, including Mr. J.A. Main, of the Flintkote Company. It is agreed and understood that the establishment of this organization, under a new name and incorporation, will still be funded by QAMA, and will posture itself as free as possible of bias in the eyes of the scientific community. This is important to facilitate our acceptance of our activities by the scientific world . . . the location of the institute in the same quarters of QAMA is not "too unfortunate" and is not viewed as a serious impediment. The Committee (QAMA) is going to set the agenda for the foundation. Five goals are announced by QAMA with respect to the institute. QAMA will direct what will be done in connection with supporting research; we will contact scientists and medical schools around the United States to locate scientists who are interested in generating interest in our aimed studies; we will not publicize our activities; we will be mindful of the strategies by the tobacco industry; and we will retain the right of veto power over published statements. Mr. J.A. Main, of the Flintkote Company and Flintkote Mines, Ltd., was present and agreed to these tenets. At this very same meeting, information was disseminated from European studies which indicated that second-hand exposure of wives doing laundry can cause mesothelioma. Additionally, it was acknowledged that many of the papers presented in the overseas study were pessimistic and tended to suggest that even short exposures can cause malignancy.

31

47.

In February of 1967, J.A. Main is promoted to Director of QAMA. It is acknowledged that the Association is experiencing trouble regarding longshoremen concerns about asbestos health in the United Kingdom in connection with the method of packaging of asbestos Products from Canada. It is also discussed and agreed those reports of mesothelioma in Pennsylvania from asbestos exposure would not be published in Minutes of the Tokyo QAMA conference. It was agreed at this conference that the QAMA would set up a slush fund with ATI and ACPA, most of the money coming from Canadian sources in order to promote the scientific committee's "quiet revolution." At this meeting, the Association discusses the increasing use of asbestos world wide, and at the same time, again endorses continuing to downplay asbestos hazards.

48.

On May 25, 1967, a special technical committee meeting of QAMA is held. Mr. J.C. Blais and Mr. D. Poirier are in attendance. Both are designated employees of Flintkote Mines, Ltd., however, Mr. Blais and Mr. D. Poirier are stockholders and corporate officials of the Flintkote Company. With reference to longshoremen concerns respecting asbestos bags, it was agreed that they would study the loading process and look for ways to pin the blame of exposure to the stevedores themselves. At this time, discussions are held regarding coordinating certain "aimed medical studies" between QAMA and ATI, for IOEH.

49.

At the August 1967 QAMA meetings, Mr. J.A. Main, QAMA Director, is present. It was discussed that despite the British change in the United Kingdom's laws regarding the packaging of asbestos, no changes would be made until they could get further clarification of what would be required. Additionally, it was agreed that the industry will make no admission with

respect to Dr. Selikoff's challenge to the industry to do something to make asbestos less potentially hazardous to human health.  At the same time, this Association acknowledged that the industry is looking at modifying handling methods to reduce the risk of exposure from the dust.  The QAMA Public Relations Committee discussed meeting with the Scientific Committee to discuss the possibility of producing counter propaganda regarding medical issues.

50.

In August, 1967, Mr. J.A. Main, of Flintkote Corporation, meets with Dr. Wright, of the Occupational and Environment Health and Safety Committee of QAMA.  Dr. Wright notes that there is a threat of clear-cut evidence of lung cancer associated with asbestos fiber.  They are also advised by Dr. Enterline that there are excessive deaths among asbestos textile workers.  The Committee agrees that they will have the Public Relations Committee of QAMA produce some rebuttal material – even though there is no scientific data available to support the Public Relations Committee's position.  During this time period, both QAMA and ATI, with the full knowledge of members, were issuing public statements that they are not aware of a single case of injury from asbestos.

51.

On November 13, 1967, Mr. Poirier of the Flintkote Company, is in attendance at the QAMA meeting, where the over wrapping problems of longshoremen in the United Kingdom is admittedly unresolved.  It is determined that the Committee will blame bag damage on workers.

52.

In March, 1968, the QAMA holds its meeting in the Bahamas.  Mr. J.A. Main of the Flintkote Company is in attendance, along with other Flintkote employees.  It is announced that the QAMA Institute of Occupational Environmental Health now has a budget of $250,000.00.  It is determined

33

that for public relations purposes, QAMA will announce that there is no scientific evidence that anyone has ever contracted any disease from exposure to Products containing asbestos. QAMA pronounces that "[we] will state that we are studying this in Canada, and that previous research shows that everything is okay." It is noted that the prior year, Flintkote Mines produced 36,618 tons of asbestos. At the same meeting, it is suggested that a new study will be done at several locations in the New Orleans area, sponsored by QAMA, and Metropolitan Life Insurance Company. One of the sites for this study is the Flintkote Company manufacturing facility on Galvez Street, New Orleans, Louisiana. The Minutes of this special meeting support the idea that the industry knows that the threshold limit values established by industry and accepted by industrial hygiene practices as safe are, in fact, not safe. At this meeting, and in the Minutes, it is acknowledged that the cancer hazard potential for asbestos has been known since 1935. After talking to tobacco lawyers, QAMA members suggest not getting carried away by the medical profession. At this conference, it is also acknowledged that Flintkote and the industry know of mesothelioma and its relationship to asbestos exposure.

53.

At a QAMA meeting in May of 1968, Mr. D. Poirier, of Flintkote was in attendance. At this meeting, it is pointed out that the number of lung sickness claims is increasing with QAMA members stating that "[we] need to place industry representatives on the workers' compensation boards." It is also discussed that the dust studies done by the Institute of Occupational and Environmental Health ("QAMA") at Johns Manville Sales Corporation are disappointing. It is agreed that each Company will look in to obtaining a legal opinion as to the advisability of placing a warning on fiber bags.

34

54.

In September of 1968, at the special QAMA meeting, attended by Flintkote Mines, Ltd., Mr. J.A. Main, Director of QAMA, as well as a Flintkote Corporation corporate official, and Mr. D. Poirier, the Institute of Occupational and Environmental Health Committee adopts a resolution to place warnings on bags: "Caution. Bag contains chrysotile fiber -- use protective devices. Inhalation over long periods may be harmful." At this meeting, the tabulation of Quebec Mining tonnage was also made, showing an all time high in the export of Canadian asbestos.

55.

In November of 1968, a letter is sent from Paul A. Filteau to Mr. J.A. Main, of the Flintkote Company, and to other asbestos companies, transmitting minutes of the September, 1968 meeting. It is acknowledged that the following aspects were covered at the meeting: an increase was reported in industrial diseases related to asbestos; that the asbestos business in Canada was still on the upswing; Dr. Newhouse's report on mesothelioma was based on levels of exposure that were alarming to the industry; there were reports of cases of neighborhood exposures and disease; the shipyard studies by Dr. Selikoff indicated that there was very heavy exposure reported; and that the United States Association of Governmental and Industrial Hygienists was contemplating a 2 fiber per cc standard, but the Antigua QAMA Conference has had an impact, moving it from 5 million particles per cubic foot to 2 million particles per cubic foot (maintaining exposure guidelines at levels both the industry and Flintkote knew to be unsafe). It is noted that the United Kingdom has now established a 2 fiber per cc of air. It is acknowledged by the industry that the clouds are about to burst; the claims are mounting and that procedures should be systematically placed to have all claims canceled. The Institute (IOEH) doctors are well respected and are coordinated with our Institute. It is the

intention of QAMA members to use its doctors to influence workers' compensation boards. Flintkote is fully involved in this decision.

56.

In December of 1968, in a transmittal letter to Mr. J.A. Main, of Flintkote regarding a QAMA meeting, it was agreed that the employers would arrange to place their representatives on workers' compensation boards. That way, there could be a collaboration between the asbestos clinic and miners, and the workers' compensation boards. It was noted that the purported Johns-Manville bag warning was not yet in effect. It was further agreed that the asbestos companies would stop giving asbestos to the schools for modeling or molding purposes. Additionally, the Committee agreed to contact the government about direct participation in any new legislation regarding air pollution by the government.

57.

In the March, 1969, meeting of the Health Council of QAMA, listed in attendance are Mr. James Moran, Mr. J.A. Main, and Mr. W. N. Knorr, all of Flintkote. It was noted in this meeting that the QAMA studies demonstrated that the respirators in use were not satisfactory for protection from asbestos dust. It was agreed that QAMA would implement a safe practices code, which would be prepared for the purposes of limiting the liability of the manufacturers. Dr. Wright advised the Committee on the current assessment of asbestos as an environmental health problem, noting that 80% of asbestos workers in the United Kingdom have asbestos-related problems. Dr. Wright noted that cancer -- the risk of cancer -- for asbestos workers could be as high as 90 times the general public population. It was further noted that the mechanism for the QAMA funding for scientific work that the Directors of QAMA, not the scientists, have the final say so on what gets funded and published.

36

58.

March 10, 1969, the QAMA transmits a letter of the Minutes of the January 1969 meeting. Mr. J.A. Main, and Mr. Poirier for Flintkote were in attendance. Dr. Wright indicated he thought he may not be able to hold his scientific committee together, noting that the asbestos industry had a serious problem and could not leave the matter to others (referring to the Scientific Committee) and that the industry must fight its own battles before someone else determines the issue of the hazards. It is noted that Threshold Limit Values ("TLVs") are being reduced in both the United Kingdom and the United States.

59.

April of 1969, at the QAMA special meeting, where Mr. J.A. Main and Mr. D. Poirier of Flintkote are in attendance, it was announced that shrink wrap of asbestos pallets would begin at the request of only certain customers. It was also acknowledged that industrial disease and accident claims were increasing. QAMA members agreed to use a tactic of using industrial doctors with sympathy to industries, and industrial standards to attempt to defeat mesothelioma claims.

60.

June, 1969, Mr. J.A. Main and Mr. Poirier of Flintkote, attend an IOEH meeting wherein the research of the New Orleans, Louisiana, plants was discussed as follows: "We are still waiting on National Gypsum's results. Both Drs. Thompson and Rodner report that mesothelioma will become an epidemic in the future. It is agreed that the Association will publish a book entitled 'Toward the Safe Use of Asbestos Fibers.' No release of this book will be made until the Executive Committee approves of it." Regarding cautionary labels, the legal counsel of various companies are not yet in agreement; therefore, no meeting has been called. A transmittal letter follows this meeting from Mr. J.A. Main, of Flintkote, wherein he admonishes

all members to destroy Pages 8 and 9 of the Minutes, and to substitute them. This removes references in the Minutes to a "mesothelioma epidemic" and the "industry's view." It is also announced that Mr. Main is retiring.

61.

In July of 1969, Mr. J.A. Main indicates that he had not received any response from the users of asbestos with regard to Johns-Manville Corporation's ("JM") cautionary label. Additionally, it was noted that Mr. Main was retiring from all duties with the Flintkote Company.

62.

In October of 1969, it is acknowledged in a QAMA meeting that, based on discussions from the International Congress on Occupational Health, it would seem that all asbestos fibers are carcinogenic. Mr. Poirier, of Flintkote, was in attendance. Additionally, Dr. Wright, regarding the New Orleans, Louisiana, study of asbestos cement workers produces his report. It is important to note that the plant workers in connection with this study were studied, and not advised that they were working in hazardous conditions or in conditions wherein improper safety methodologies were being followed. Quite simply, x-rays were being taken without explanation as to their purpose. The advisability of the use of warning labels was still being discussed by QAMA and its members. Industry survey notes that the demand for asbestos was still strong.

63.

On November 29, 1969 the Quebec Asbestos Mining Association agreed by all present, including the representatives of Flintkote Mines, Ltd., and Flintkote Corporation, not to let epidemiology work rest in the hands of the University or the government. It is agreed that all work by any QAMA funded research would be kept in "industry's hands."

64.

In a January, 1970 letter from Asbestos Corporation, Limited, to QAMA companies, including Flintkote Mines, Ltd., outlined an agreement that warnings would be placed on bags of asbestos; however, it would be some time before the current backlog of inventory of bags without warnings would be used up.

65.

In March, 1970, the QAMA special meeting is held wherein in attendance Mr. M. C. Carpenter and Mr. A. Hooker, both of Flintkote were present. Those in attendance discussed the following: The sales outlook shows an increase over last year. The Association Minutes acknowledged and noted historically that there were questions about asbestos and cancer, dating back to the 1940s. It was known that the major reason that the asbestos exposure standards in the U.S. are not as low as in the United Kingdom, is due to the Institute of Occupational and Environmental Health (QAMA). It is agreed by the Association that publicly, the asbestos industry would take the position that it wants to do what is necessary. However, it was agreed by all, though not publicly disclosed, that haste is not desirable.

66.

In October of 1971, the QAMA meeting is attended by Mr. M.C. Carpenter, Director of QAMA, with Mr. A.R. Hooker, of Flintkote Mines, Ltd. It is noted that Flintkote has closed its asbestos mines, and that Flintkote Mines, Ltd., is being phased out by the Flintkote Company.

67.

In March of 1972, the annual QAMA meeting is held in Jamaica. It is noted that Dr. Cartier, a physician expert who has served QAMA for many years, will now be a consultant to the Canadian Workers' Compensation Board. The object was to have a top industry specialist render decisions on pneumonology and pathology. It was agreed that QAMA would maintain a

39

close contact with the Asbestos Information Committee of North America, and that they will make available, their own internal activities and research. The Environmental Control Committee advised McGill University Environmental Studies about QAMA's studies regarding respirators and the best kind for protection.  McGill University had agreed not to publish the performance figures about respirators, and to let QAMA see all papers prior to publication.  At this meeting, it is indicated that asbestos will no longer be used for or in connection with road aggregate due to pollution concerns. Further, it is noted that lung disease claims increased in 1971.  It is further agreed that QAMA members would make the following misleading and false informational statement to the public:  "That the asbestos industry has recognized for years that there are health concerns with asbestos.  That the asbestos industry began consulting with the Saranac Laboratories in the 1920s.  That we continue to support work at McGill University Drs. Wiell and Jones of New Orleans, Louisiana.  QAMA will continue to state publicly that only cigarette smokers get lung cancer; that there is no risk of harm to the general public; that mesothelioma is associated only with blue asbestos (crocidolite asbestos); that there is no evidence to support the notion that there is an epidemic occurring with asbestos-related injuries; that no case of mesothelioma has ever been reported in Canada; [and] that lower general environmental asbestos levels do not constitute a significant risk to the population in terms of the development of lung cancers."  This information is given to the United States government by the asbestos industry, despite having information in their possession that the bulk of  this is untrue.  At this very same meeting, Dr. Wright issued a report detailing the following facts: Lung cancer is, in fact, seen in those asbestos workers who are heavily exposed; it has been demonstrated that asbestosis can develop in individuals with less exposures than previously thought; that it is demonstrated that incidents of asbestos-related diseases appear to be even

greater in manufacturing and insulation workers. It is agreed at this meeting that the "Asbestos and Your Health" leaflet will be produced to the public, which states the following misleading and knowingly false facts: "Chrysotile asbestos does not present a risk to the general public; that asbestos presents no health hazards to the general public; that asbestos is not a major air pollutant; that asbestos does not stay in the lungs; that Chrysotile asbestos can be safety used in the work place; that the health risk and concerns of and concerning asbestos are unwarranted and erroneous; that there is no evidence that minute exposure of asbestos presents any health hazard to the public." The Minutes of this meeting conclude with the following statements: "That there has been a small decline in the use of Canadian asbestos for the year 1971, but the forecast for 1972 is ahead of 1971; that the Flintkote Mines ceased operations because they exhausted the ore body," and it is agreed that it would be highly imprudent to permit additional contamination of the public environment with asbestos. This last fact was not given to the public.

## ADDITIONAL ALLEGATIONS OF MISCONDUCT
## AGAINST WESTINGHOUSE (NOW KNOWN AS CBS)

68.

Plaintiffs reallege all prior allegations made against all defendants, including Westinghouse, in extenso, and further aver:

69.

Westinghouse has been involved with asbestos since at least 1908.

70.

Westinghouse has manufactured or distributed over 101 asbestos-containing products, including turbines.

71.

Westinghouse manufactured asbestos-containing turbine insulating blankets that at one time contained amosite asbestos.

41

72.

Westinghouse specified asbestos-containing insulation products for use on and around its turbines.

73.

Westinghouse regularly provided asbestos insulation to its customers for installation on its turbines. Additionally, Westinghouse often installed the insulation through its service department.

Westinghouse incorporated the following asbestos or asbestos-containing material in its products including:

| | |
|---|---|
| Asbestos Cloth | Paper, Millboard, Sheet |
| Block | Pipe covering |
| Sound Deadened | Asbestos Fiber |
| Pulverized Asbestos | Asbestos Fiber Spray |
| Blankets | Gaskets |
| Packing | Yarn |
| Micarta | Moldarta sheets |
| Wire-Inserted Asbestos Cloth | Micarta Tubing |
| Tape | Micarta Bars |
| Ebony Finish Asbestos Lumber | Asbestos Cement Sheet |
| Asbestos Cement | |

74.

C. Wayne Bickerstaff, Westinghouse Corporate Industrial Hygiene Manager, has admitted that Westinghouse knew about the connection between asbestos and cancer in the 1940's.

75.

Also, Westinghouse's Edgar C. Barnes, industrial hygienist, and headquarters industrial hygienist, Wilbur Speicher expressed concern in internal documents about the hazards posed by the use of asbestos-containing materials in a number of Westinghouse departments, including those in which Westinghouse blankets were manufactured and where asbestos was being used in the manufacture of lagging for heat insulation of steam turbines.

76.

In 1946, Westinghouse industrial hygienist, Edgar C. Barnes, warned Westinghouse management that worker protection against asbestos, used in heat insulation for steam turbines, was hardly suitable or adequate. Mr. Barnes noted that, in several cases, workers had lung conditions that might be associated with exposure to asbestos dust.

77.

Elsewhere, in 1948, Mr. Barnes called attention to the hazards of asbestos dust from a saw and from cutting asbestos materials. He warned that considerable care be taken to minimize the asbestos hazard.

78.

In 1946, Westinghouse issued a process specification which contained the following caution:

> CAUTION CLAUSE: DO NOT BREATHE DUST FROM FIBERGLAS OR ASBESTOS. AVOID CONTACT OF FIBERGLAS OR ASBESTOS WITH THE SKIN. WORKERS HANDLING FIBERGLAS OR ASBESTOS MUST BE PROVIDED WITH AND USE A WELL VENTILATED ROOM, AND BLANKET FILLING OPERATIONS MUST BE CONDUCTED UNDER A HOOD PROVIDED WITH SUFFICIENT DRAFT TO CARRY THE DUST PARTICLES AWAY FROM THE WORKMEN. IN ADDITION, THE WORKMEN MUST BE PROVIDED WITH AND USE GOGGLES AND SHOULDER LENGTH GLOVES OF AN IMPERVIOUS MATERIAL. USE RESPIRATORS ON ANY JOB WHERE THE DUST IS NOT PROPERLY CARRIED AWAY BY THE HOOD.

79.

As early as 1948, Westinghouse was aware of the need for good ventilation and dust collection systems in all areas where asbestos dust was present. The industrial hygiene department recommended the installation of the ventilation and dust collection system so that Westinghouse could "effectively defend" workers' compensation claims that might arise in the future.

80.

Westinghouse recognized the hazards of bystander exposure as early as 1948.  Westinghouse knew early on that dust from asbestos cloth and lagging was a hazard.

81.

In 1952 Wilbur Speicher of Westinghouse's industrial hygiene department stated that asbestosis could be far advanced before an x-ray could detect it.

82.

In 1953, Westinghouse drafted a document called an Asbestos Safe Practice Sheet.  In this Safe Practice data sheet, Westinghouse admits that exposure to asbestos could cause a chronic lung disease known as asbestosis.  Westinghouse further admits that persons working in asbestos dust should wear airline respirators to protect them from the asbestos fibers. In 1953, Westinghouse knew that the asbestos fibers which caused disease were those which could not be seen.  In 1953, Westinghouse also knew these fine, invisible particles caused asbestosis.

83.

In spite of Westinghouse's overwhelming knowledge of the dangers of asbestos, Westinghouse intentionally did nothing to protect workers, like the plaintiffs, who would be exposed to those hazards when they worked with or near Westinghouse asbestos-containing products.

84.

The action Westinghouse should have taken in view of its knowledge of the hazards of asbestos, i.e. warning the workers, was well-known to Westinghouse.

85.

Westinghouse was familiar with the proper industrial hygiene procedures to follow when developing a new product for the market and when faced with a product that posed hazards.  The articles of Dr. T. Lyle

44

Hazlette, the medical director for Westinghouse, discussed the need for hazard testing and workers' education. In the Hazlette articles, Dr. Hazlette advised that it was good industrial hygiene to do the following:

    (a)    investigate the hazards of a new product before selling it;

    (b)    warn the workers and educate them about the hazards to which they may be exposed.

These two Hazlette recommendations were good practice if followed. Unfortunately, Westinghouse failed to follow Dr. Hazlette's advice. None of the information regarding the hazards of asbestos nor advice of how to protect against those hazards was communicated by Westinghouse to the workers, like the plaintiffs, customers, and industry users of Westinghouse's products.

86.

In 1976, Westinghouse's Large Rotating Apparatus Division issued a report on the department's attempt to eliminate the use of asbestos. The report admitted that the hazards of breathing large quantities of asbestos dust had been recognized since ancient Rome and that the dangers of asbestos had become widely recognized as an industrial hazard in 1936. This document also contained a long list of Westinghouse products in which asbestos was still being used in 1976.

87.

Westinghouse's membership in industry organizations, such as the Industrial Health Foundation(IHF) and the National Safety Council, show that it had access to the information regarding the hazards of asbestos since the 1930's.

88.

The Industrial Hygiene Foundation began as the "Konicide Club". Formed in 1932, the Konicide Club, (the "Club") was initially organized to deal with the increasing problem of occupationally related silicosis cases.

45

The Club eventually expanded its focus to include asbestos related claims. Dr. T. Lyle Hazlette, medical director of Westinghouse Electric, was a charter member. At a Konicide Club meeting in 1933, Dr. Leroy Gardner of the Saranac Labs in Saranac, New York, gave an address on "What We Know About Asbestos."

89.

Shortly thereafter, the Club and its members played an start up role in the organization and conduct of a meeting held at the Mellon Institute and the 1936 Silicosis Conference. From these two meetings, the IHF evolved.

90.

Westinghouse was a charter member and controlling force of the IHF in 1936 and continued its membership until 1984. Joseph Dilworth, Westinghouse's president, served as a member of the Board of Directors for many years. Dr. T. Lyle Hazlette, medical director for Westinghouse, represented Westinghouse in the IHF medical committee. Westinghouse held controlling, decision making positions with the IHF.

91.

Westinghouse received the Industrial Hygiene Digest from 1937-1967. The Industrial Hygiene Digest was published by the IHF monthly beginning in 1937. Through the Digest, Westinghouse received current abstracts of worldwide literate on workplace illnesses, including asbestos related diseases.

92.

As interest in occupationally related pneumoconiosis, silicosis, and asbestosis grew, industry lawyers concerned with workers' compensation claims, and company representatives and consultants, such as Anthony J. Lanza of Metropolitan Life Insurance Company, sought greater participation in the Club meetings. By 1939 its purpose fulfilled, the Konicide Club ceased its meetings. The IHF by this time was well on its way to becoming a force in the industrial hygiene community.

46

93.

The IHF was created by the asbestos industry, including Westinghouse.

94.

A purpose of the IHF was to help the asbestos industry with its industrial hygiene and health problems. Far from being an independent industrial hygiene organization, the IHF was a creature of the asbestos industry, financed and founded to do the industry's bidding. The IHF provided a means for performing confidential asbestos studies and compiling medical, legal, and industrial hygiene knowledge for the member companies to use, suppress, or manipulate to maintain profits.

95.

The principal research contractors used by the asbestos industry were the Saranac Laboratory and the IHF.

96.

In 1947, an industrial hygienist who worked for the IHF, W.C. L. Hemeon drafted a report that emphasized the inadequacies of the then current Threshold Limit Values (TLV) of 5 mpcf and recommended that the TLV be re-evaluated. This report was suppressed by the IHF and the Quebec Asbestos Mining Association (QAMA) for whom it was done.

97.

In 1957, the QAMA arranged with the IHF to have Dr. Daniel Braun study the relationship between asbestos exposure, asbestosis and lung cancer. In 1957, Dr. Braun and his co-author Truan reported to the QAMA that asbestosis did increase a worker's chance of developing lung cancer. The IHF and QAMA and its members, including Westinghouse, kept this report confidential.

98.

In December of 1957, Dr. Kenneth Smith of Johns-Manville wrote to Ivan Sabourin, an attorney for QAMA, suggesting changes in the Braun-

Truan report which would make the suggested exclusion of the cancer data more believable. In 1958, QAMA requested that the report of Drs. Braun and Truan be edited to exclude the finding that persons with asbestosis had an increased risk of lung cancer. The IHF agreed and published a version of the study which contained a conclusion that asbestos exposure alone did not increase the incidence of lung cancer. This conclusion was know by the IHF to be false. If these two studies and its true findings had been made available to the American Conference of Industrial Hygienist, the 5 mpcf TLV would have been changed. The result was a published study that actively misled academia, government bodies, unions and other entities, concerning the true nature of the hazards connected with asbestos and asbestos products. A further result was the perpetuation of erroneous beliefs concerning TLV standards as well as potential carcinogenic effects of asbestos. This silence has resulted in ignorance on the part of the lay public generally, and workers like plaintiffs specifically, to the dangers of asbestos thereby needlessly resulting in thousands of exposures.

99.

Westinghouse also belonged to an organization called the National Electrical Manufacturers Association.

100.

Westinghouse has been a member of the NEMA since the organization's beginning in 1926.

101.

Westinghouse knew that asbestos caused injuries, sometimes resulting in death. Nonetheless, in 1976, NEMA's members joined with the Asbestos Information Association to fight OSHA's attempt to lower the TLV.

102.

Large volumes of technical literature received by Westinghouse regarding industrial hygiene matters, including IHF documents which, based upon information and belief, demonstrated that Westinghouse participated

48

through the IHF in falsifying medical studies and suppressing of knowledge about asbestos hazards. Westinghouse determined that these documents, which if produced or found to be in Westinghouse files, would prove Westinghouse's early knowledge of the dangers of asbestos.

103.

Westinghouse has been involved in the design and manufacture of turbines (the term turbine refers not only to the turbine itself but also all the related piping and equipment) since the late 1800's.

104.

The Westinghouse turbines at issue in this case include, but are not limited to, power generated turbines, i.e. powerhouse turbines and/or industrial turbines.

105.

Westinghouse turbines were asbestos insulated in areas where high heat was generated or collected. This was necessary to protect the turbines from damage and increased efficiency by conserving heat. This includes, without limitation, the cylinders, steam chest, and crossover piping.

106.

The types of asbestos insulation used on Westinghouse turbines included block, cement, cloth, gaskets, paste, and blankets.

107.

Westinghouse made its own asbestos-containing turbine blankets.

108.

Up until the early to mid-1970's, the insulation used on Westinghouse turbines contained asbestos.

109.

Westinghouse designed its turbines to be insulated with asbestos. Westinghouse engineers prepared detailed drawings of each turbine manufactured and sold by Westinghouse. These drawings went into great detail about the application of insulation. The drawings identified the specific

placement of the insulation as well as the thickness of the insulation, the type and brand name. The type and brand name of the insulation and method of application was specified on the drawing by reference to process specifications and material cards. In order to interpret the insulation instructions contained in the drawing, one referred to the following Westinghouse documents:

    (a)    The Westinghouse Standards Book which contained specific instruction about insulation;

    (b)    The process specification identified by the SP number on the drawing; and,

    (c)    The material card, also specified by Westinghouse material number, either on the drawing or in the process specification.

110.

The process specifications were mandatory not permissive. All district offices were issued a Standards Book containing the Lester Works Standard PH 920.1-920.5 on insulation which provided: "Only insulation materials approved by Westinghouse will be permitted on Westinghouse turbines and piping."

111.

When Westinghouse sold turbines to its customers it routinely provided insulation materials.

112.

Even when Westinghouse did not install or supply the insulation, it kept strict control over its application.

113.

Westinghouse knew about the hazards associated with the asbestos insulation being specified for use on its turbines at least as early as 1946, probably, earlier. Yet, Westinghouse issued no warnings to any of its turbine customers or their employees regarding those hazards.

114.

Westinghouse provided instruction books for each turbine which contained detailed information regarding start up of the turbine and maintenance therefor. However, the Westinghouse instruction books to date reveal that no warnings were contained in these instruction booklets regarding precautions to be taken regarding the asbestos insulation.

115.

Westinghouse also affixed name plates on its turbines stating that the turbines were Westinghouse turbines and the size of the turbines. No cautions regarding the hazards of asbestos were on these name plates.

116.

Additionally, Westinghouse knew that asbestos was dangerous in the 1940's and began a program to clean up the manufacturing process in their plants in the 1950's while continuing to manufacture asbestos-containing products without warning to downstream customers.

117.

Westinghouse began manufacturing asbestos-containing wallboard systems in 1956 and continued to do so until the mid 1970's. Prior to 1972, Westinghouse failed to provide any warning regarding the asbestos hazard with its products. In 1972, in response to Occupational Safety and Health Administration ("OSHA") regulations, Westinghouse applied warning labels that would necessarily be obscured by the substrate of the wallboard system, thereby appearing to comply with OSHA regulations without actually warning the end users of the inherent dangers of Westinghouse's asbestos-containing products.

118.

Subsequent to this activity, Westinghouse learned through in-house counsel that there existed numerous documents that would implicate Westinghouse for its actions. These documents reflected early knowledge on the part of Westinghouse and contained documents related to

51

Westinghouse's activities within the IHF, product manufacturing information, air sample studies, architectural reports, work papers, old work files, and other similar materials.

119.

With the advent of the claims of earlier plaintiffs, Westinghouse adopted so called "document retention policies" in which documents, indicating Westinghouse's knowledge, were purged from their corporate records.

120.

Westinghouse was, therefore, determined to destroy certain records, including correspondence files, which date from the 1930's up to and through 1974, which contained documentation which criticized Westinghouse operations.   All records of the historical files of the industrial hygiene department, with the exception of those records which were to be maintained pursuant to law, were discarded.

121.

Many of these documents sought to be destroyed were referred to by Westinghouse as "smoking guns," and the considerations for their destruction appeared to be motivated with an eye towards their effect on future asbestos litigation, like the present case, and other toxic litigation involving the company.  In January of 1978, it was determined that C.W. Bickerstaff, Manager of Corporate Industrial Hygiene, with and based upon the information by Westinghouse attorney, Jeffrey Blair, that these items would be destroyed.

122.

According to the testimony of Zella Heasley, a Westinghouse witness, Mr. Wilbur Speicher was in charge of asbestos matters until he retired from Westinghouse in 1975. Wilbur Speicher was the head of industrial hygiene for over 20 years. Very few industrial hygiene documents authored by Mr.

Speicher have ever been found in the corporate records or documents produced by Westinghouse.

### 123.

Other documents that were viewed as potential "smoking guns" were industrial hygiene audit and trip reports.  Industrial hygiene in each plant audited, critiqued and criticized its facility from an industrial hygiene perspective.  Industrial hygiene also makes recommendations to improve the hygiene of the plant.  These documents were likewise destroyed.

### 124.

Other documents that were destroyed included material cards, material safety data sheets, purchasing, department specification cards, safe practice data sheets and historical safe practices data sheet files.  The safe practices detailed in the safe practice data sheets were not made a part of sites and industrial hygiene programs;  nor were they communicated to customers.

### 125.

The stated internal policy of Westinghouse was to delay as long as possible the use of warning labels in order to protect Westinghouse's business. Even as late as 1973, Westinghouse was pursuing a stated policy of delaying the implementation of OSHA warning regulations.  This policy was described in a memorandum authored by J.C. Botts, Manager of the Insulation and Design Engineering Group, to G.M. Shelby, of Manufacturing in April of 1973.

### 126.

While Westinghouse concedes knowledge that the carcinogenic effects of asbestos exposure are nearly irrefutable (J.J. Austin, Division Manager of Engineering, to the Marine Division in a memorandum),  and Mr. R.J. Polk, of the Manufacturing Division, advised Mr. Seago, of the Marketing Group, that they may be in violation of OSHA, when selling asbestos laminate panels without warnings, Westinghouse's resolution of this problem

was to ink-stamp a warning on the back of a panel before it was glued to the core material. The result that the panel had a warning within the product itself, but no one would ever see it.

127.

The purpose of a warning is to allow the workers such as plaintiff, to make an informed choice about continuing to be exposed to a hazard. Wilbur Speicher, Westinghouse's Administrator of Industrial Hygiene, wrote in 1965 that: "Any person working with a hazardous material has a right to know about the associated hazards and the necessary precaution for safe usage." Westinghouse's failure to provide such warnings to the workers exposed to its asbestos-containing products made it impossible for the workers to make such choices.

128.

This conduct amounts to more than a failure to warn -- it is intentional misconduct and constitutes fraud and conspiracy, making Westinghouse solidarily liable with other defendants for Plaintiffs harm in this matter.

**DAMAGES SUSTAINED BY PLAINTIFFS**

129.

All of the allegations of the above paragraphs are incorporated by reference herein.

130.

By reason of the Defendants' fault, as described above, and because of the injuries to the plaintiff, James C. Turner's health, resulting in his disability, physical harm and subsequent medical problems, Plaintiffs, James C. Turner and Marlene F. Turner are entitled to recover the following damages for the following:

(a)     Past, present and future medical expenses and rehabilitation;

(b)     Past, present and future physical pain and suffering of James C. Turner;

(c)     Past, present and future mental anguish of James C. Turner;

54

(d)    Past loss of earnings and/or earning capacity of James C. Turner;

(e)    Past, present and future disability of James C. Turner;

(f)    Loss of enjoyment of life of James C. Turner;

(g)    Loss of help, love and support of James C. Turner;

(h)    Any other losses established at the trial of this matter, including exemplary damages and attorneys' fees for fraud and all costs of these proceedings;

131.

By reason of the Defendants' fault, as described above, and because of the injuries and ill health effects suffered by Plaintiff, James C. Turner, as a result of his occupationally induced asbestos related diseases, Plaintiff's spouse ("Loss of Consortium Plaintiff") has suffered loss of consortium and is entitled to damages as are reasonable in the premises.

132.

The acts and omissions of Defendants that were the direct and proximate cause of plaintiffs' injuries were willful, malicious, wanton, undertaken with reckless disregard of the rights of plaintiffs and were grossly negligent.

133.

As a direct and proximate result of the acts of the Defendants, plaintiff, James C. Turner,  suffered serious bodily injury, endured great pain and suffering, incurred medical expenses, and has been otherwise damaged.

**WHEREFORE,** Plaintiffs pray that Defendants, and each of them, be cited to appear and answer herein as the law directs, and that, after due proceedings are had, Plaintiffs recover of and from Defendants, and each of them, individually, jointly and in solido, for their damages as alleged in an amount which the evidence may show proper at time of trial, together with costs, and legal interest from  the date of judicial demand until paid, any other losses established at the trial of this matter, including exemplary damages, attorneys' fees for fraud and all costs of these proceedings and for

55

such other and further relief, special and general, as law and equity may

permit. .

**PLAINTIFFS REQUEST THAT THIS MATTER BE TRIED BY JURY.**

Respectfully submitted:

**Donni E. Young (LSBN 19843)**
**Scott M. Galante (LSBN 26890)**
**Ness, Motley, Loadholt,**
   **Richardson & Poole**
1555 Poydras Street, Suite 1700
New Orleans, Louisiana 70112
Tel: (504) 636-3480
Fax: (504) 636-3499

**John F. Dillon, P.L.C.**
**John F. Dillon (LSBN 18586)**
1555 Poydras Street, Suite 1700
New Orleans, Louisiana 70112
Tel: (504) 636-3480
Fax: (504) 636-3499

**Counsel for Plaintiffs**

**PLEASE SERVE ORIGINAL PETITION FOR DAMAGES and ATTACHED INTERROGATORIES, REQUEST FOR PRODUCTION AND REQUEST FOR ADMISSIONS, PLAINTIFFS' RESPONSES TO DEFENDSTS' MASTER SET OF INTERROGATORIES, REQUEST FOR PRODUCTION, REQUEST FOR NOTICE AND NOTICE FOR VIDEO DEPOSITION TO THE FOLLOWING:**

A.   **ANCHOR PACKING COMPANY**
    A New Jersey Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: CT Corporation System, 400 Poydras Street, New Orleans, Louisiana, 70130.

B.   **CBS (formerly known as WESTINGHOUSE ELECTRIC COMPANY)**
    A Delaware Corporation, who may be served through the its registered agent, CT Corporation System, 8550 United Plaza Boulevard, Baton Rouge, Louisiana, 70809.

C.   **THE CARBORUNDUM COMPANY**
    A Delaware Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: CT Corporation System, 400 Poydras Street, New Orleans, Louisiana, 70130.

D.   **A.W. CHESTERTON**
    A Massachusetts Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: C.T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809.

**Continued on next page**

E.    **COMBUSTION ENGINEERING, INC.**
A Delaware Corporation who may be served through the its registered agent, CT Corporation System, 8550 United Plaza Boulevard, Baton Rouge, Louisiana, 70809.

F.    **JOHN CRANE, INC.**
A Delaware Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: C.T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809.

G.    **DANA CORPORATION**
A Virginia Corporation who may be served via the Louisiana Long Arm Statute c/o Allen Goolsby, III, 951 East Bird Street, Richmond, Virginia, 23219.

H.    **EAGLE, INC.**
(Formerly Eagle Asbestos & Packing Co., Inc.) A corporation duly organized, created and existing under and by the virtue of the laws of the State of Louisiana, with its principal place of business in New Orleans, Louisiana, with the agent for service in the State of Louisiana, to wit:  Lawrence G. Pugh, III, Montgomery, Barnett , Brown, Read, Hammond & Mintz, LLP, 3200 Energy Center, 1100 Poydras Street, New Orleans, Louisiana, 70163-3200.

I.    **THE FLINTKOTE CORPORATION**
A Delaware Corporation who may be served through the Louisiana Long Arm Statute, through their agent for service of process: The Flintkote Company, 3 Embarcadero Center, Suite 1190, San Francisco, California 94111.

J.    **FLINTKOTE MINES, LTD.**
Which may be served via the Louisiana Long Arm Statute through it Agent, Belanger Suave (Richard Nadeaux, Esq.), Barrister *Solicitors, 1, Place Ville Marit, Suite 1700, Montreal, Quebec, H3B2C1

K.    **FOSTER WHEELER CORPORATION**
A Delaware corporation authorized to do and doing business in the State of Louisiana with its principle place of business in New Jersey, and may be served pursuant to the Louisiana Long Arm Statute, to wit: Perryville Corporation Park, Clinton, NJ 08809

L.    **GARLOCK, INC.**
An Ohio Corporation, authorized to do and doing business in the State of Louisiana, with its principal place of business in New York and with an agent for service of process in the State of Louisiana: CT Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809.

M.    **GASKET HOLDINGS COMPANY, INC. (Successor to Flexitallic, Inc.)**
A Delaware Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: C.T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809.

Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809.

N.   **GENERAL ELECTRIC COMPANY**
A New York Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: C.T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809.

O.   **GEORGIA-PACIFIC CORPORATION,** A Georgia Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: C.T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana, 70809.

P.   **INGERSOLL-RAND COMPANY**
A New Jersey Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: C.T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809.

Q.   **KELLY MOORE PAINT COMPANY, INC.**
A California Corporation who may be served through the Louisiana Long Arm Statute, through their agent for service of process: Kelly Moore Paint Company, Inc., 987 Commercial Street, San Carlos, California 94070.

R.   **THE McCARTY CORPORATION**
A domestic corporation, may be served through its agent for service of process:  Paul H. Spaht, 445 N. Boulevard, Suite 300, Baton Rouge, Louisiana, 70802.

S.   **REILLY-BENTON COMPANY, INC.**
A corporation duly organized, created and existing under and by virtue of the laws of the State of Louisiana, with its principal place of business in New Orleans, Louisiana, with agent for service of process in the State of Louisiana, to wit: Deutsch, Kerrigan & Stiles, 755 Magazine Street, New Orleans, Louisiana, 70130.

T.   **TAYLOR SEIDENBACH, INC.**
A corporation duly organized, created and existing under and by virtue of the laws of the State of Louisiana, with its principle place of business in New Orleans, Louisiana, with agent for service in the State of Louisiana, to wit: Ralph I. Sheperd, 731 S. Scott Street, New Orleans, Louisiana 70150

U.   **J.T. THORPE, INC.**
A California Corporation, who may be served through the Louisiana Long Arm Statute, through their agent for service of process: Ken Prindle, Prindle, Decker & Amaro, 369 Pine Street, Suite 800, San Francisco, CA, 94104.

**Continued on next page**

**V.  3M COMPANY**

(a.k.a. Minnesota Mining & Manufacturing Company)
A Delaware Corporation, who can be served through the Louisiana Long Arm Statute, through their agent for service of process:  Roger P. Smith, Secretary, Minnesota Mining & Manufacturing Company, 3M Center, Building 220-14W-06, St. Paul, Minnesota, 55144-1000.

**W.  WORTHINGTON PUMP, INC.**

A Delaware Corporation, who may be served through the Louisiana Long Arm Statute, through its registered agent for service of process:  C.T. Corporation System, 350 North St. Paul Street, Suite 2900, Dallas, Texas, 75201.

**X.  KIM SUSAN, INC.**

(Formerly known as Fagan Boat Service, Inc.)
A corporation duly organized, created and existing under and by virtue of the laws of the State of Louisiana, with its principle place of business in LaRose, Louisiana, with agent for service in the State of Louisiana, to wit: Kent J. Fagan, West 21st Street, Larose, Louisiana, 70373.

FILED

JUL 3 0 2001

CLERK OF COURT

A TRUE COPY
Clerk of Court's Office
Thibodaux, August 3, 2001

Clerk of Court

59

# In The Matter Of:  The transcript of

## *JAMES C. TURNER AND MARLENE TURNER   v.*
## *ANCHOR PACKING, ET AL.*

---

## *JAMES C. TURNER*
## *August 9, 2001*

---

## *PROFESSIONAL SHORTHAND REPORTERS, INC.*
*NEW ORLEANS, LA  PH. (504)529-5255   FAX (504)529-5257*
*BATON ROUGE, LA  PH. (225)924-3488   FAX (225)924-2582*
*SHREVEPORT, LA   PH. (318)213-1055   FAX (318)213-1056*
*OR TOLL FREE, 1-800-536-5255*

*Original File TURNER.TXT, 132 Pages*
*Min-U-Script® File ID: 0424267750*

# Word Index included with this Min-U-Script®



Page 1

[1]     17TH JUDICIAL DISTRICT COURT

[2]         PARISH OF LAFOURCHE

[3]         STATE OF LOUISIANA

[4]

[5] JAMES C. TURNER AND        CIVIL ACTION

    MARLENE F. TURNER

[6]

    VERSUS            NO.

[7]

    ANCHOR PACKING COMPANY;      DIV.

[8] CARBORUNDUM; CBS (FORMERLY KNOWN

    AS WESTINGHOUSE ELECTRIC CORPORATION);

[9] ET AL.

[10]

[11]    VIDEOTAPED DEPOSITION OF JAMES C.

    TURNER, 219 CYPRESS VILLAGE, GHEENS,

[12] LOUISIANA 70355, TAKEN IN THE OFFICES OF

    NESS, MOTLEY, LOADHOLT, RICHARDSON & POOLE,

[13] SUITE 1700, 1555 POYDRAS STREET, NEW

    ORLEANS, LOUISIANA, ON THE 9TH DAY OF

[14] AUGUST, 2001.

[15]

[16] APPEARANCES:

[17]

    NESS, MOTLEY, LOADHOLT, RICHARDSON

[18]    & POOLE

    BY:  SHERMAN AMES, ESQ.

[19] SUITE 1700, 1555 POYDRAS STREET

    NEW ORLEANS, LOUISIANA 70112

[20]

    REPRESENTING THE PLAINTIFFS

[21]

    HAILEY, MCNAMARA, HALL, LARMANN &

[22]    PAPALE

    BY: CLAUDE GRECO, ESQ.

[23] ONE GALLERIA BOULEVARD

    METAIRIE, LOUISIANA  70001

[24]

    REPRESENTING TAYLOR-SEIDENBACH

[25]

Page 2

[1] APPEARANCES CONTINUED:

[2]

    BERNARD, CASSISA, ELLIOTT & DAVIS

[3] BY: EUGENE MCEACHIN, ESQ.

    1615 METAIRIE ROAD

[4] METAIRIE, LOUISIANA 70055

[5]    REPRESENTING THE REILLY-BENTON

        COMPANY, INC.

[6]

[7]  DEUTSCH, KERRIGAN & STILES

    BY:  ANDRE BROUSSARD, ESQ.

[8]  755 MAGAZINE STREET

    NEW ORLEANS, LOUISIANA  70130

[9]

    REPRESENTING FLEXITALLIC, INC.

[10]    AND THE DANA CORPORATION

[11]

    JONES, WALKER, WAECHTER, POITEVENT

[12]    CARRERE & DENEGRE

    BY:  LEON GARY, JR., ESQ.

[13] 8555 UNITED PLAZA BOULEVARD

    BATON ROUGE, LOUISIANA  70809

[14]

    REPRESENTING VIACOM, INC.,

[15]    F/K/A WESTINGHOUSE

[16]

    JONES, WALKER, WAECHTER, POITEVENT

[17]    CARRERE & DENEGRE

    BY: H. LEE STRAYHAN III, ESQ.

[18] 201 ST. CHARLES AVENUE

    NEW ORLEANS, LOUISIANA  70170

[19]

    REPRESENTING CARBORUNDUM

[20]

[21] LUKER, SIBAL & MCMURTRAY

    BY:  PATRICK MCMURTRAY, ESQ.

[22] 616 GIROD STREET

    NEW ORLEANS, LOUISIANA  70130

[23]

    REPRESENTING FOSTER-WHEELER

[24]

[25]

Page 3

[1] APPEARANCES CONTINUED:
[2]

SULZER & WILLIAMS
[3] BY:  RICHARD E. WILLIAMS IV, ESQ.
210 HOLIDAY BOULEVARD, SUITE 335
[4] COVINGTON, LOUISIANA  70433
[5]   REPRESENTING KELLY MOORE PAINT
COMPANY
[6]
[7] AULTMAN, TYNER, RUFFIN & YARBOROUGH,
LTD., A PLC
[8] BY:  GLEN L.M. SWETMAN, ESQ.
400 POYDRAS STREET, SUITE 1900
[9] NEW ORLEANS, LOUISIANA 70130
[10]   REPRESENTING GARLOCK, INC.
[11]

LABORDE & NEUNER
[12] BY:  BEN L. MAYEAUX, EQ.
JENNIE P. PELLEGRIN, ESQ.
[13] ONE PETROLEUM CENTER, SUITE 200
1001 W. PINHOOK ROAD
[14] LAFAYETTE, LOUISIANA  70503
[15]   REPRESENTING INGERSOLL-RAND
[16]

GALLOWAY, JOHNSON, TOMPKINS,
[17]   BURR & SMITH
BY:  JAMES R. GUIDRY, ESQ.
[18] 701 POYDRAS STREET, SUITE 4040
ONE SHELL SQUARE
[19] NEW ORLEANS, LOUISIANA  70139
[20]   REPRESENTING COMBUSTION ENGINEERING
[21]

FORMAN PERRY WATKINS KRUTZ & TARDY
[22] BY:  W. SCOTT BROWN, ESQ.
1515 POYDRAS STREET, SUITE 1420
[23] NEW ORLEANS, LOUISIANA  70112
[24]   REPRESENTING GEORGIA-PACIFIC CORP.
[25]

Page 4

[1] APPEARANCES CONTINUED:
[2]

BLANCHARD, WALKER, O'QUIN & ROBERTS
[3] BY:  PAMELA G. NATHAN, ESQ.
BANK ONE TOWER
[4] SHREVEPORT, LOUISIANA  71163
[5]   REPRESENTING J.T. THORPE, INC.
[6]

MONTGOMERY, BARNETT, BROWN, READ,
[7]   HAMMOND & MINTZ
BY:  HOLLY E. RAMSEY, ESQ.
[8] 3200 ENERGY CENTRE
1100 POYDRAS STREET
[9] NEW ORLEANS, LOUISIANA 70163
[10]   REPRESENTING EAGLE, INC.
[11]

PLAUCHE', MASELLI, LANDRY &
[12]   PARKERSON
BY:  WENDY LAPPENGA, ESQ.
[13] SUITE 4240 - PLACE ST. CHARLES
201 ST. CHARLES AVENUE
[14] NEW ORLEANS, LOUISIANA  70170
[15]   REPRESENTING JOHN CRANE
[16]

SLATER, VAN HORN & TOMENY
[17] BY:  CORY R. CAHN, ESQ.
SUITE 2600, 650 POYDRAS STREET
[18] NEW ORLEANS, LOUISIANA  70130
[19]   REPRESENTING GENERAL ELECTRIC
[20]

HAILEY, MCNAMARA, HALL, LARMANN &
[21]   PAPALE
BY:  MICHAEL ABRAHAM, ESQ.
[22] ONE GALLERIA BOULEVARD
METAIRIE, LOUISIANA  70001
[23]

REPRESENTING FLINTKOTE MINES, LTD.
[24]   AND THE FLINTKOTE COMPANY
[25]

Page 5

[1] APPEARANCES CONTINUED:
[2]

SIMON, PERAGINE, SMITH & REDFEARN
[3] BY: MICHAEL HAROLD, ESQ.
ENERGY CENTRE
[4] NEW ORLEANS, LOUISIANA 70163
[5] REPRESENTING THE MCCARTY CORPORATION
[6]

CRULL, CASTAING, LILLY & HERMAN
[7] BY: EDWARD J. LILLY, ESQ.
SUITE 2323, 601 POYDRAS STREET
[8] PAN-AMERICAN LIFE CENTER
NEW ORLEANS, LOUISIANA 70130
[9]

REPRESENTING A.W. CHESTERTON
[10]
[11] DUPLASS, ZWAIN, BOURGEOIS & MORTON
BY: CLAIRE E. BREAUX, ESQ.
[12] SUITE 2900, 3838 N. CAUSEWAY BOULEVARD
METAIRIE, LOUISIANA 70002
[13]

REPRESENTING MINNESOTA MINING &
[14] MANUFACTURING COMPANY
[15] REPORTED BY:
[16] CATHY RENEE' POWELL
CERTIFIED COURT REPORTER
[17]
VIDEOGRAPHER:
[18]

PATRICK GREEN
[19] PROFESSIONAL SHORTHAND REPORTERS
[20]
[21]
[22]
[23]
[24]
[25]

Page 6

[1]    EXAMINATION INDEX
[2]    Page
[3] BY MR. AMES...........................14
[4] BY MR. GARY...........................61
[5] BY MS. NATHAN.........................94
[6] BY MR. CAHN...........................95
[7] BY MR. BROUSSARD.....................100
[8] BY MR. MCEACHIN......................115
[9] BY MS. BREAUX........................116
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 7

[1]                STIPULATION
[2] It is stipulated and agreed by and
[3] between counsel for the parties hereto that
[4] the deposition of the aforementioned witness
[5] is hereby being taken for all purposes
[6] allowed under Article 1421, et. seq., of the
[7] Louisiana Code of Civil Procedure, in
[8] accordance with law, pursuant to notice;
[9] That the formalities of reading
[10] and signing are specifically not waived;
[11] That the formalities of sealing,
[12] certification and filing are specifically
[13] waived;
[14] That all objections, save those as
[15] to the form of the question and the
[16] responsiveness of the answer, are hereby
[17] reserved until such time as this deposition,
[18] or any part thereof, may be used or sought
[19] to be used in evidence.
[20]
[21]     Cathy Renee' Powell, Certified
[22] Court Reporter in and for the State of
[23] Louisiana, officiated in administering the
[24] oath to the witness.
[25]

Page 8

[1]              THE VIDEOGRAPHER:
[2]     Today is the 9th day of August,
[3] 2001. The time is approximately 12:17 p.m.
[4]     My name is Patrick Green, Video
[5] Specialist with the firm of PSR, Inc. The
[6] Court Reporter is Cathy Renee' Powell, also
[7] with PSR.
[8]     This is the videotaped deposition
[9] of James C. Turner, taken at Ness, Motley,
[10] Loadholt, Richardson and Poole, located at
[11] 1555 Poydras Street, Suite 1700, New
[12] Orleans, Louisiana, for the case entitled
[13] James C. Turner and Marlene F. Turner versus
[14] Anchor Packing Company, et al., in the 17th
[15] Judicial District Court of LaFourche Parish,
[16] State of Louisiana.
[17]     Will Counsel please identify
[18] themselves and which parties they represent?
[19]              MS. RAMSEY:
[20]     Holly Ramsey, for Eagle, Inc.
[21]              MR. GUIDRY:
[22]     James Guidry, for Combustion
[23] Engineering.
[24]              MR. ABRAHAM:
[25]     Mike Abraham, for The Flintkote

Page 9

[1] Company, and Flintkote Mines.

[2] **MS. PELLEGRIN:**

[3]     Jennie Pellegrin on behalf of

[4] Ingersoll-Rand.

[5] **MS. BREAUX:**

[6]     Claire Breaux on behalf of 3-M.

[7] **MR. HAROLD:**

[8]     Michael Harold on behalf of the

[9] McCarty Corporation.

[10] **MR. MAYEAUX:**

[11]     Ben Mayeaux for Ingersoll-Rand.

[12] And our appearance today is for the limited

[13] purpose of attending a perpetuation

[14] deposition. We are reserving all rights and

[15] objections, particularly objections to

[16] sufficiency of service of process.

[17] **MS. BREAUX:**

[18]     And actually, if I could, Claire

[19] Breaux again, we are going to join in that

[20] objection; and we have not yet been served

[21] and we are not waiving any exceptions we may

[22] have or any exceptions.

[23] **MS. LAPPENGA:**

[24]     Wendy Lappenga on behalf of John

[25] Crane, Inc.

Page 10

[1] **MR. LILLY:**

[2]     Ed Lilly on behalf of A.W.

[3] Chesterton, and we also join in the

[4] objections and reservations.

[5] **MR. STRAYHAN:**

[6]     Lee Strayhan on behalf of

[7] Carborundum. We also join the objections

[8] and reservations.

[9] **MR. BROUSSARD:**

[10]     Andre Broussard on behalf of Dana

[11] Corporation and Flexitallic; we also join

[12] the objections and reservations.

[13] **MR. CAHN:**

[14]     Cory Cahn, representing General

[15] Electric; we also join in the objections and

[16] reservations.

[17] **MS. NATHAN:**

[18]     Pam Nathan on behalf of J.T.

[19] Thorpe, Inc. I also join in the objections

[20] and reservations.

[21] **MR. GARY:**

[22]     Leon Gary, for Viacom; we adopt

[23] the objections and reservations.

[24] **MR. GRECO:**

[25]     Claude Greco, representing

Page 11

[1] Taylor-Seidenbach; we join in the objections

[2] and reservations.

[3] **MR. BROWN:**

[4]     Scott Brown, for Georgia Pacific

[5] Corporation, and we also adopt the

[6] objections and reservations.

[7] **MR. MCMURTRAY:**

[8]     Patrick McMurtray, for Foster

[9] Wheeler, and I adopt the reservations and

[10] objections of Mr. Mayeaux.

[11] **MR. WILLIAMS:**

[12]     Robert Williams, representing

[13] Kelly Moore Paint Company, and we also adopt

[14] Mr. Mayeaux's objections.

[15] **MR. SWETMAN:**

[16]     Max Swetman for Garlock. And I

[17] join in the objections and reservations.

[18] **MR. GUIDRY:**

[19]     For the record, James Guidry, for

[20] Combustion Engineering; we also join in

[21] objections and reservations.

[22] **MS. RAMSEY:**

[23]     Holly Ramsey, joining.

[24] **MS. LAPPENGA:**

[25]     Wendy Lappenga, for John Crane,

Page 12

[1] joining.

[2] **MR. HAROLD:**

[3]     McCarty joins.

[4] **MR. ABRAHAM:**

[5]     Mike Abraham, Flintkote Company,

[6] and Flintkote Mining Company, also joins.

[7] **MR. MCEACHIN:**

[8]     I am Eugene M. McEachin Jr., for

[9] the Reilly-Benton Company.

[10]

[11]     **JAMES C. TURNER**

[12] having been duly sworn by the above

[13] mentioned court reporter, did testify as

[14] follows:

[15] **MR. GARY:**

[16]     Good morning, Mr. Turner. I am

[17] Leon Gary and I represent Viacom, which is

[18] the former Westinghouse.

[19]     I just want to take a second to

[20] put on the record, the agreement we reached

[21] this morning with your counsel, about the

[22] scope of your deposition today.

[23]     We understand that you are on

[24] chemotherapy, and physically, you may not be

[25] able to testify as long as may be required

JAMES C. TURNER AND MARLENE TURNER V.
ANCHOR PACKING, ET AL.

Case MDL No. 875 Document 3337 Filed 11/19/01 Page 89 of 233

JAMES C. TURNER
August 9, 2001

Page 13

[1] to do a thorough discovery deposition about
[2] your knowledge concerning the facts involved
[3] in the lawsuit.
[4]     So, your lawyer has asked us to
[5] curtail the questions, but has agreed
[6] whenever your health permits, to make you
[7] available again for a continuation. On that
[8] basis, we have agreed to do our best to
[9] limit the questions, so as not to overburden
[10] you this morning.
[11]     And I take it that is acceptable
[12] with you?
[13]                    THE WITNESS:
[14]     That's correct.
[15]                    MR. GARY:
[16]     On that basis, then we, for
[17] Viacom, reserve our rights if we are unable
[18] to complete a discovery deposition, such as
[19] they may be, to limit or exclude the
[20] admissibility or availability of the
[21] perpetuation deposition.
[22]                    THE VIDEOGRAPHER:
[23]     Go off the record; it is
[24] 12:23 p.m.
[25]     (Discussion off the record.)

Page 14

[1]                    THE VIDEOGRAPHER:
[2]     Back on record; it is 12:25 p.m.
[3]                    MR. AMES:
[4]     Hi. I am Sherman Ames from
[5] Charleston, South Carolina. I am here on
[6] behalf of Mr. Turner.
[7]     Before we proceed with his
[8] examination, we have agreed that an
[9] objection by one Defendant constitutes an
[10] objection by all. And other than that, we
[11] will abide by any of the usual stipulations.
[12]     But we are also understanding that
[13] this deposition is to be used at trial, and
[14] for whatever purposes are available under
[15] the laws of the State of Louisiana. And we
[16] will abide accordingly.
[17]                    EXAMINATION BY MR. AMES:
[18]     Q: Would you state your full name,
[19] please, sir?
[20]     A: James Carl Turner.
[21]     Q: Where do you live?
[22]     A: Gheens, Louisiana.
[23]     Q: Where is that, relative to New
[24] Orleans?
[25]     A: Forty miles west, southwest.

Page 15

[1]     Q: What is your home address?
[2]     A: 219 Cypress Village Lane, Gheens,
[3] Louisiana 70355.
[4]     Q: Are you married, Mr. Turner?
[5]     A: Yes.
[6]     Q: What is your wife's name?
[7]     A: Marlene.
[8]     Q: How long have you been married to
[9] Marlene?
[10]     A: Twenty-one years.
[11]     Q: Do you have any children?
[12]     A: One girl.
[13]     Q: And what is your girl's name?
[14]     A: Billie Jean.
[15]     Q: Do you have any children by any
[16] previous marriages?
[17]     A: I have four daughters and she has
[18] one son.
[19]     Q: Just for the benefit of the Court
[20] and jury, what are the names of the
[21] daughters and the son?
[22]     A: My son is Richard; my daughters
[23] are Michelle, Anita, Terry, and Jackie.
[24]     Q: Do they live around here, or are
[25] they scattered all about?

Page 16

[1]     A: Scattered.
[2]     Q: Whereabouts are they?
[3]     A: Two in Houston; one in Georgia;
[4] one in South Carolina; and one in jail.
[5]     Q: What is your date of birth,
[6] Mr. Turner?
[7]     A: 7/17/1940.
[8]     Q: For the benefit of those that are
[9] math impaired, how old are you, as we sit
[10] here today?
[11]     A: Sixty-one.
[12]     Q: How far did you get in school?
[13]     A: I have the equivalent of a
[14] first-year college, including eighth grade,
[15] through the eighth grade in school, plus
[16] Navy training, and some courses at Nicholls
[17] State University.
[18]     Q: Insofar as your formal schooling,
[19] how far did you get?
[20]     A: Well, I had took courses at
[21] Nicholls State University. Math, English.
[22]     Q: And where did you go to elementary
[23] school?
[24]     A: Cleveland, South Carolina.
[25]     Q: What is the last grade you

JAMES C. TURNER
August 9, 2001

Case MDL No. 875   Document 3337   Filed 11/19/01   Page 90 of 233

JAMES C. TURNER AND MARLENE TURNER   v.
ANCHOR PACKING, ET AL.

---

Page 17

[1] completed in school?

[2] **A:** Completed the eighth grade.

[3] **Q:** After you completed the eighth

[4] grade, what did you do?

[5] **A:** I was working at a sawmill to try

[6] to help my family out. And then, as soon as

[7] I turned 17 years old, I went and joined the

[8] Navy.

[9] **Q:** When you joined the Navy, where is

[10] the first place you went?

[11] **A:** I was sworn in, in Macon, Georgia.

[12] **Q:** And after Macon, what did the Navy

[13] do to you?

[14] **A:** Shipped me off to Great Lakes,

[15] Illinois.

[16] **Q:** What did you do at Great Lakes?

[17] **A:** Went through basic training.

[18] **Q:** After you got out of basic, where

[19] did you go?

[20] **A:** Aboard the USS HAYNSWORTH, DD-700.

[21] **Q:** You say the USS HAYNSWORTH,

[22] DD-700. What does the DD stand for?

[23] **A:** Destroyer.

[24] **Q:** About when was it you went aboard

[25] the HAYNSWORTH?

---

Page 18

[1] **A:** October of 1957.

[2] **Q:** What was your capacity there, what

[3] did you first do when you went on the

[4] HAYNSWORTH?

[5] **A:** An engineer. Entry level

[6] engineer, fireman.

[7] **Q:** What kind of work does a —

[8] **A:** Wiping bilges.

[9] **Q:** How long —

[10] **A:** Standing watches.

[11] **Q:** How long did you stay on the

[12] HAYNSWORTH?

[13] **A:** A little over three years.

[14] **Q:** What were your general duties when

[15] you were aboard that ship, in addition to

[16] those that you have already told us about.

[17] **A:** Well, I made machinist second

[18] class on the HAYNSWORTH, and my duties

[19] increased from watch-standing to senior

[20] watch in the aft engine room, operating the

[21] entire engine room.

[22] **Q:** Could you describe, for the

[23] benefit of the Court and jury, the size of

[24] these engine rooms, and just kind of give us

[25] a picture of what they looked like?

---

Page 19

[1] **A:** Typical engine room on a destroyer

[2] is about 40 feet by 40 feet. Engines, from

[3] the keel to the upper level, two levels, the

[4] engine is about 35,000 horsepower. All

[5] various pumps. Piping, steam piping.

[6] **Q:** And as a machinist mate second

[7] class working in that engine room,

[8] specifically, what kind of work did you do?

[9] **A:** All types of repairs on steam

[10] lines, steam joints. Insulation, removing

[11] and restoring insulation, removing

[12] insulation. Cleaning pumps and turbines,

[13] and all types of marine equipment.

[14] **Q:** Do you know how those engines got

[15] their power on the HAYNSWORTH?

[16] **A:** Steam.

[17] **Q:** Where did the steam come from?

[18] **A:** From a boiler, 600 psi boilers.

[19] **Q:** Do you remember how many of those

[20] boilers were on the HAYNSWORTH?

[21] **A:** Four boilers, two per fire room.

[22] **Q:** How long did you stay on the

[23] HAYNSWORTH?

[24] **A:** Just over three years.

[25] **Q:** After the HAYNSWORTH, what

---

Page 20

[1] happened?

[2] **A:** I was transferred to the USS LUCE.

[3] **Q:** What kind of ship was the LUCE?

[4] **A:** DLG. Destroyer leader guided

[5] missile.

[6] **Q:** For the benefit of all of us who

[7] don't know what that is, could you refine

[8] that, or tell us a little bit more

[9] specifically, about what that ship does?

[10] **A:** A destroyer leader was, at that

[11] time, one of the newest 1200 steam powered,

[12] superheated to 980 degrees, 8500 horsepower

[13] missiles. The primary armory was missiles

[14] on both ends of the ship. Carrier missiles.

[15] **Q:** What were your duties on the LUCE?

[16] **A:** I progressed from watch-standing,

[17] senior enlisted watch-stander in the aft

[18] engine room, to the senior watch officer in

[19] the main engine room.

[20] **Q:** What does a senior watch officer

[21] do?

[22] **A:** He is in charge of the — the

[23] whole engineering department. As when he is

[24] on watch, every — for four hours, he is in

[25] charge of the entire engine department. All

---

JAMES C. TURNER AND MARLENE TURNER v.
ANCHOR PACKING, ET AL.

Case MDL No. 875   Document 3337   Filed 11/19/01   Page 91 of 233

JAMES C. TURNER
August 9, 2001

Page 21

[1] the four boilers, engines, both engine
[2] rooms.
[3]   Q: And to be a little bit more
[4] specific, what did your duties entail as
[5] being the watch officer there?
[6]   A: To make sure that engines were
[7] ready to answer all bells required by the
[8] captain, commensurate with our operating
[9] procedures at that time, whether we had two
[10] boilers or four boilers on the line.
[11]   Q: How long did you stay aboard the
[12] USS LUCE?
[13]   A: Over three years, a little over
[14] three years.
[15]   Q: What did you do after you got off
[16] the LUCE?
[17]   A: I went to a Naval Air Training
[18] Command in Jacksonville, Florida, for two
[19] years shore duty.
[20]   Q: And what kind of shore duty did
[21] you have?
[22]   A: I was a master at arms in the
[23] barracks.
[24]   Q: What does a master at arms do?
[25]   A: Maintains good order and

Page 22

[1] discipline among the troops.
[2]   Q: How long did you last at that job?
[3]   A: Two years.
[4]   Q: That takes us through
[5] approximately what year?
[6]   A: 1965, about.
[7]   Q: After being a master at arms, and
[8] trying to keep order among the troops, what
[9] did you do?
[10]   A: I was transferred to the USS
[11] SHENANDOAH in Norfolk, Virginia.
[12]   Q: What kind of ship?
[13]   A: A D-26. That is a destroyer
[14] repair ship.
[15]   Q: For the benefit of those that
[16] don't know what a destroyer repair ship
[17] does, could you kind of enlighten us in that
[18] regard?
[19]   A: Normally, it stays beside the
[20] pier, wherever she is tied up, and brings
[21] destroyers alongside. They have a certain
[22] period of time, usually two weeks, to tear
[23] down what machinery they need repaired, and
[24] let the repair department know.
[25]   And we send the necessary

Page 23

[1] personnel aboard the ship. Or the equipment
[2] is brought aboard the repair ship and
[3] repaired, and returned to the destroyers.
[4]   Q: What specifically was your duty
[5] when you were aboard the SHENANDOAH?
[6]   A: I started out operating the
[7] distilling plants aboard the SHENANDOAH.
[8] And then I was transferred to the repair
[9] department, where I was in charge of the
[10] outside repair. That included bringing
[11] aboard the equipment for repairs, and going
[12] aboard other ships to effect repairs.
[13]   Q: You said that you did some work
[14] with the distilling plant?
[15]   A: Yes.
[16]   Q: What kind of distilling were you
[17] doing?
[18]   A: Making freshwater out of
[19] saltwater.
[20]   Q: Okay. Could you describe the
[21] machinery, the process involved in that?
[22]   A: The particular ones I was
[23] operating on the SHENANDOAH were flash-type,
[24] tube-type distilling plants. And they
[25] flashed the saltwater into steam, and the

Page 24

[1] steam is then caught and collected, and
[2] condensed. And it is pure water.
[3]   Q: You also, I think, indicated that
[4] you were part of the outside repair work
[5] that was being done. Could you be just a
[6] little more specific in what your duties
[7] entailed there?
[8]   A: In outside repair work, would
[9] usually include work on the main shafts. If
[10] they had a bad bearing, we would pull the
[11] bearing, bring it to the SHENANDOAH, repack
[12] it, the bearing, and return it to the ship
[13] and install it, among other types of
[14] materials, such as control equipment for
[15] pumps, and equipment like Leslie regulators,
[16] steam regulators, such as for feed pumps and
[17] boilers.
[18]   Q: Is this something with which you
[19] had hands-on experience?
[20]   A: Absolutely.
[21]   Q: Is there anything else you did
[22] aboard the SHENANDOAH that you haven't
[23] talked about, in the general sense? I am
[24] not talking about swabbing the decks, or
[25] something like that.

MES C. TURNER
August 9, 2001

Case MDL No. 875   Document 3337   Filed 11/19/01   Page 92 of 233

JAMES C. TURNER AND MARLENE TURNER   v.
ANCHOR PACKING, ET AL.

**Page 25**

[1] **A:** That was mostly my duties. Just
[2] the evaporators and the repair department.
[3] **Q:** Okay. After the — how long did
[4] you —
[5] **A:** I did spend a small amount of time
[6] in the engine room, watch-standing aboard
[7] the SHENANDOAH.
[8] **Q:** Is this watch-standing that you
[9] were doing, like the watch-standing that you
[10] previously described to us?
[11] **A:** Yes. Operating the engines.
[12] **Q:** Okay. About how long were you on
[13] the SHENANDOAH?
[14] **A:** Four and a half years.
[15] **Q:** After you left the SHENANDOAH,
[16] what did you do?
[17] **A:** I was transferred to the USS
[18] JOSEPHUS DANIELS.
[19] **Q:** What kind of ship was that?
[20] **A:** Destroyer leader guided missile.
[21] **Q:** Is that like the USS LUCE or is
[22] that different?
[23] **A:** A lot bigger.
[24] **Q:** What difference is there between
[25] the JOSEPHUS DANIELS and the LUCE?

**Page 26**

[1] **A:** It was approximately 100, maybe a
[2] little shorter than 100 foot longer than the
[3] LUCE, and 10, 12 feet wider. It was bigger
[4] in every respect: Heavier armament,
[5] different missiles, five-inch guns, the
[6] modern antisubmarine warfare, ASROC.
[7] **Q:** What was your job description on
[8] the JOSEPHUS DANIELS?
[9] **A:** I was in charge of the A Division.
[10] I operated all the air conditioning. I
[11] operated and repaired hydraulic systems,
[12] steam heating, and that's about it.
[13] **Q:** Was this the same kind of hands-on
[14] type repair that you previously described as
[15] a result of your working on the SHENANDOAH
[16] and other ships, or was it different?
[17] **A:** It might have been slightly
[18] different, but mostly the same. Because by
[19] that time, I had made chief petty officer,
[20] and my duties usually just included
[21] supervisory. But I did get my hands dirty.
[22] **Q:** About how many people, by that
[23] time, were you supervising in your capacity
[24] as a chief petty officer?
[25] **A:** Aboard the JOSEPHUS DANIELS, I

**Page 27**

[1] think I was in charge of 20 to 30 people —
[2] **Q:** How long —
[3] **A:** — directly. Indirectly, when I
[4] was watch-standing, 50 to 75.
[5] **Q:** When you were watch-standing,
[6] about how long would that, what we may think
[7] of as a shift, last?
[8] **A:** We was usually on, at that time,
[9] after I made chief petty officer, four hours
[10] on, eight hours off.
[11] **Q:** Okay. After you left the JOSEPHUS
[12] DANIELS, where did you go?
[13] **A:** Ashore for two years at the Fleet
[14] Maintenance Assistance Group in Norfolk,
[15] Virginia.
[16] **Q:** What did you do in that capacity?
[17] **A:** Essentially, the same duties as I
[18] had on the USS SHENANDOAH. Repair ships.
[19] **Q:** You told us the SHENANDOAH was the
[20] destroyer repair ship?
[21] **A:** Yes.
[22] **Q:** And were your duties, in fact,
[23] substantially similar to what you have
[24] described in terms of your work that you
[25] were doing on the SHENANDOAH?

**Page 28**

[1] **A:** Yes.
[2] **Q:** Other than being onshore in
[3] Norfolk, Virginia, was there much difference
[4] at all between the SHENANDOAH work and what
[5] you were doing in Norfolk?
[6] **A:** Not much. The traveling is the
[7] only thing. I traveled to the shipyard in
[8] Philadelphia and did a lot of work.
[9] **Q:** Was that the same kind of work up
[10] there in Philadelphia?
[11] **A:** Repair work.
[12] **Q:** I think you testified that you
[13] spent about two years in Norfolk?
[14] **A:** Yes.
[15] **Q:** After that, what did you do?
[16] **A:** I was transferred to the USS
[17] LEAHY, DG-16.
[18] **Q:** What is a DG?
[19] **A:** Heavy cruiser.
[20] **Q:** For the benefit of those that
[21] don't know, what kind of ship is a heavy
[22] cruiser?
[23] **A:** It is approximately the same as
[24] the USS JOSEPHUS DANIELS. A little heavier,
[25] missiles on both ends. More updated

JAMES C. TURNER AND MARLENE TURNER v. ANCHOR PACKING, ET AL.

Case MDL No. 875   Document 3337   Filed 11/19/01   Page 93 of 233

JAMES C. TURNER
August 9, 2001

Page 29

[1] submarine warfare equipment, such as the
[2] torpedoes.
[3]    Q: What did you do aboard the LEAHY?
[4]    A: I was in charge of both engine
[5] rooms. I was the senior machinist mate
[6] aboard the LEAHY. And I had a chief petty
[7] officer working underneath me, and
[8] approximately 80 to 100 people, enlisted
[9] men.
[10]    Q: What kind of work were the people
[11] under you doing?
[12]    A: Repair and operation of all the
[13] shipboard machinery and equipment.
[14]    Q: What kind of — to be a little
[15] more specific, what kind of machinery and
[16] equipment would they be working with, and
[17] repairing and overhauling?
[18]    A: Steam turbines; steam-driven
[19] pumps; electric-driven pumps; oil storage
[20] and recovery equipment; hydraulic oil;
[21] hydraulic systems; heating and air
[22] conditioning systems.
[23]    Q: And I think you said that you were
[24] supervising the people who were doing that
[25] work. Were you actually around them as they

Page 30

[1] were doing it?
[2]    A: All the time.
[3]    Q: After you left the LEAHY, what
[4] happened?
[5]    A: I retired. Fleet reserve.
[6]    Q: What year was it that you retired,
[7] Mr. Turner?
[8]    A: June 16th, 1977.
[9]    Q: What was your rank when you
[10] retired?
[11]    A: E-8, machinist mate.
[12]    Q: What kind of discharge did you
[13] get?
[14]    A: Honorable.
[15]    Q: Subsequent to your honorable
[16] discharge as a senior chief machinist mate
[17] E-8 on June 16th of 1977, what did you do?
[18] I don't want to talk about that night or the
[19] next couple of days, just generically.
[20]    A: I decided to come to Louisiana,
[21] because of the work advantages in the
[22] oilfield. And I came to Louisiana, and went
[23] to work at a plastic manufacturing place.
[24]    Q: Whereabouts in Louisiana was this?
[25]    A: Physically in Valentine,

Page 31

[1] Louisiana. Lockport. I think the address
[2] is Lockport.
[3]    Q: Do you remember the name of the
[4] people for whom you came to work? The
[5] company, actually; I don't mean the people.
[6]    A: It was a division of Valentine
[7] Sugars.
[8]    Q: In a general sense, what kind of
[9] work did you do for those folks?
[10]    A: I started cooking the resin that
[11] is the base for manufacturing plastics.
[12]    Q: For those of us that don't know
[13] what cooking resin and plastics is, could
[14] you give us a little bit of a description of
[15] what kind of work that was?
[16]    A: That is a mixture of phenol,
[17] formaldehyde, and an agent to kick it over
[18] to make it have an exothermic reaction. You
[19] mix it together in a kettle, let it have its
[20] exothermic reaction, pump it under a vacuum,
[21] draw the water off, and you are left with a
[22] base resin that is used in the manufacture
[23] of plastics.
[24]    Q: Were the plastics actually
[25] manufactured there, or did —

Page 32

[1]    A: The pellets, the — it was
[2] manufactured in pellets and then shipped to
[3] places like Proctor Silex, and different
[4] manufacturers that used the phenolic-based
[5] plastics to make coffee pots, the hard
[6] plastics and such like that.
[7]    Q: How long did you work in the
[8] plastics industry?
[9]    A: Very short time. I got allergic
[10] to the formaldehyde, and I started working
[11] in the repair of forklifts and equipment.
[12]    Q: Did you go to work for somebody
[13] else, or is this —
[14]    A: The same division, same place.
[15]    Q: How long did you work as a
[16] forklift repairman?
[17]    A: Probably a little over three
[18] years.
[19]    Q: And what happened at the end of
[20] that three years?
[21]    A: That is when the bottom fell out
[22] of everything in Louisiana, and I was laid
[23] off.
[24]    Q: Subsequent to being laid off, what
[25] did you do next?

JAMES C. TURNER
August 9, 2001

Case MDL No. 875    Document 3337    Filed 11/19/01    Page 94 of 233

JAMES C. TURNER AND MARLENE TURNER  v.
ANCHOR PACKING, ET AL.

---

Page 33

[1]  A: I went to — out in the oilfield,
[2] on board a cargo boat.
[3]  Q: Do you remember about what year
[4] that was?
[5]  A: 1982.
[6]  Q: For whom did you go to work in —
[7]  A: Fagan Boat Service.
[8]  Q: What kind of work did you do for
[9] Fagan?
[10]  A: Engineer on a cargo boat.
[11]  Q: What kind of work is that?
[12]  A: Close to the same duties as Navy,
[13] except this was diesel, and the navy is
[14] mostly steam. Same equipment: Pumps,
[15] diesel engines, heating and air
[16] conditioning; removing and replacing gaskets
[17] on exhaust lines, and stuff like that.
[18]  Q: And you have said the work was
[19] similar to that, that performed in the
[20] Navy?
[21]  A: Yes.
[22]  Q: Is this hands-on work, is it
[23] supervising other people, or is it both?
[24]  A: This is mostly hands-on work.
[25]  Q: Did you have occasion, when you

---

Page 34

[1] worked for Fagan, to supervise people as
[2] well —
[3]  A: Yes.
[4]  Q: — or was this primarily your
[5] work?
[6]  A: I had occasion to supervise other
[7] people.
[8]  Q: Any other duties aboard, while you
[9] were working for Fagan?
[10]  A: I became a port engineer. And my
[11] duties included helping get the ships into
[12] the shipyard, and get them overhauled and
[13] get them out.
[14]  Q: About how long did your job last
[15] with Fagan?
[16]  A: Five years.
[17]  Q: That would take us through about
[18] what year, through about what year, if you
[19] recall?
[20]  A: 1987.
[21]  Q: Is there anything else about your
[22] work at Fagan that comes to mind, that is
[23] any different from what you have already
[24] described for us?
[25]  A: Just the shipyard work. It is

---

Page 35

[1] mostly getting the boats in and out of the
[2] shipyard, rather than mostly hands-on work.
[3]  Q: In 1987, after you left Fagan Boat
[4] Company, what did you do?
[5]  A: I went to work with Petrol Marine.
[6]  Q: What kind of work was the Petrol
[7] Marine work?
[8]  A: Exactly the same. Engineer on a
[9] cargo boat.
[10]  Q: Where were they based?
[11]  A: Houma, Louisiana.
[12]  Q: I take it, as you have testified,
[13] your job duties and descriptions were pretty
[14] much the same as they were with Fagan? Is
[15] that fair to say?
[16]  A: Yes.
[17]  Q: How long did you last with Petrol
[18] Marine?
[19]  A: I think I was injured in 1993, and
[20] I continued to work until '95. And I had a
[21] back operation. And since then, I have been
[22] disabled.
[23]  Q: What happened in 1993? You said
[24] you were injured. Can you describe for us
[25] what happened, please?

---

Page 36

[1]  A: We was in rough weather, and I was
[2] trying to tie up to a rig. Actually, trying
[3] to get untied from it. And the line we was
[4] trying to get untied — they finally got it
[5] cut. Had to work on it a long time.
[6]  Finally got it cut, and I was
[7] hanging onto to it to try to get them some
[8] slack, so they could maneuver around and get
[9] it cut. And when it came loose, it jerked
[10] me down on some piping and wrenched my back.
[11]  Q: And that, I think you have said
[12] happened in '93?
[13]  A: Yes.
[14]  Q: And then in 1993 and '95, what did
[15] you do?
[16]  A: I continued to try to work with,
[17] you know, rehabilitation and pain
[18] medication. And then, it got so bad I had
[19] to have an operation.
[20]  Q: When was that operation?
[21]  A: '95.
[22]  Q: And what did they do when they
[23] operated on you?
[24]  A: Laminectomy at L5 and S1,
[25] something or another like that.

---

JAMES C. TURNER AND MARLENE TURNER v.
ANCHOR PACKING, ET AL.    Case MDL No. 875    Document 3337    Filed 11/19/01    Page 95 of 233

JAMES C. TURNER
August 9, 2001

Page 37

[1] **Q:** I think you have just testified
[2] that you have been disabled ever since?
[3] **A:** Yes.
[4] **Q:** Have you worked at all since that
[5] laminectomy in 1995?
[6] **A:** None. I cut the grass.
[7] **MR. AMES:**
[8] Let's take a short break.
[9] **THE VIDEOGRAPHER:**
[10] Going off the record; it is
[11] 12:51 p.m.
[12] (Recess.)
[13] **THE VIDEOGRAPHER:**
[14] Back on record; it is 12:58 p.m.
[15] **EXAMINATION BY MR. AMES:**
[16] **Q:** Mr. Turner, you have described for
[17] us your work history, from the time that you
[18] went to work out of eighth grade and went
[19] into a sawmill, until you retired, as of
[20] 1995, as a result of your back injury.
[21] Starting with kind of your newest,
[22] or the job first, that is to say, your job
[23] with Petrol Marine, do you recall the names
[24] of any of the folks that you spent time
[25] with, that is to say, your co-workers?

Page 38

[1] **A:** Captains: Bobby Daigle; Dale
[2] Lane.
[3] **Q:** Now, if you can remember if they
[4] were at Petrol Marine, or Fagan Boat, or
[5] anything like — just tell us if you can —
[6] **A:** Both of those were Petrol Marine.
[7] **Q:** Okay.
[8] **A:** Kenny Dawson, Petrol Marine;
[9] personnel manager of Petrol Marine was
[10] Alfred — I can't remember his last name.
[11] **Q:** Working our way back, anybody at
[12] Fagan that you remember you spent more time
[13] with than anybody else?
[14] **A:** I can't remember his name.
[15] **Q:** Fair enough. Backing up a little
[16] bit further, at Valentine, are there any
[17] co-workers there that you remember working
[18] with or around more than anybody else?
[19] **A:** Mr. Tom Woodruff, deceased. L.E.
[20] Gautreaux, deceased; Hubert Gautreaux, I am
[21] sure he is still alive. Mrs. Ruth Woodruff.
[22] **Q:** Anybody else?
[23] **A:** Johnny Frosch.
[24] **Q:** And I know you have testified that
[25] in the Navy, you served aboard a lot of

Page 39

[1] different ships, as well as having had some
[2] shore duty. Are there any shipmates or guys
[3] that you spent time with, while you were in
[4] the Navy, that come to mind as folks that
[5] you spent more time with than anybody else?
[6] **A:** One of my officers was
[7] Mr. Henningson. He was a good friend.
[8] **Q:** Was he on board any one
[9] specific —
[10] **A:** The SHENANDOAH.
[11] Randall Brazzi, the USS LUCE; Alva
[12] Lee Reed, USS LUCE; Eugene Breale, USS
[13] HAYNSWORTH; Mr. P.O. Peters, USS JOSEPHUS
[14] DANIELS.
[15] That's all I can think of right
[16] off.
[17] **Q:** You have previously articulated
[18] for us, or told us about the kind of work
[19] you did, and what you did, as you say, to
[20] get your hands dirty.
[21] During the course of this work
[22] history that you have described for us, have
[23] you ever had occasion to work with or around
[24] asbestos insulation products?
[25] **A:** A lot of it.

Page 40

[1] **Q:** Without getting real specific,
[2] could you tell us just kind of generically,
[3] what kinds of products you are talking
[4] about?
[5] **A:** Pipe insulation; gasket material;
[6] pump packing; valve packing; joint gaskets;
[7] Carborundum grinding wheels; compressed
[8] asbestos.
[9] **Q:** You mentioned pipe insulation, I
[10] believe, first. What did the pipe
[11] insulation look like, and what was it used
[12] for?
[13] **A:** Well, I remember it in two
[14] different forms. Some of it come molded and
[15] all you had to do was put it around the
[16] pipe, and then fill in the cracks with
[17] mortar-type stuff that you made up. And
[18] then wrap it with sheets of asbestos cloth,
[19] and put a liquid coating over it that turned
[20] semi-hard.
[21] **Q:** You said that there was the
[22] premolded kind; what was the other kind?
[23] **A:** There was a type that we always
[24] mixed up in a bucket and molded it to
[25] whatever we needed to insulate, and then put

Page 41

[1] the asbestos cloth over that.

[2] **Q:** And did you do this kind of work

[3] yourself?

[4] **A:** Oh, yes.

[5] **Q:** I think you mentioned gasket

[6] materials. Gasket materials. Would you

[7] describe for the Court and jury, just —

[8] what were they used for?

[9] **A:** We used a lot of sheet compressed

[10] asbestos. And mostly pumps, pump joints.

[11] Some steam joints, low-pressure steam

[12] joints. Water, there was a lot of water

[13] piping on the tank-covered gaskets.

[14] **Q:** Were these gaskets premolded, or

[15] did you have to work with them, or did both

[16] kinds of jobs involve your use of gaskets?

[17] **A:** Both kinds. But mostly we had to

[18] hammer them out ourselves.

[19] **Q:** How did you do that?

[20] **A:** Used the piece of material that we

[21] needed to make the gasket for, use it as a

[22] template. And hammer around the edges of

[23] it, and then hammer the bolt holes out, and

[24] then hammer the inside hole out.

[25] **Q:** And the premolded ones, how were

Page 42

[1] they —

[2] **A:** Usually, they were already stamped

[3] out, the inside hole stamped out. The bolt

[4] holes were stamped out, just put them in

[5] place and bolt it up.

[6] **Q:** Have you personally used both the

[7] premolded, as well as make your own gaskets,

[8] as you have described?

[9] **A:** Lots of both.

[10] **Q:** I think you talked about pumps

[11] just a second ago, in terms of your use of

[12] the gaskets, as well as some of the work

[13] that you described when you were aboard

[14] ships. Other than the obvious of pumping

[15] stuff, how were they used?

[16] **A:** The pumps themselves?

[17] **Q:** Yes.

[18] **A:** They pumped all types of liquid,

[19] like lube oil, feed water, freshwater,

[20] diesel fuel.

[21] **Q:** Were you involved personally in

[22] the maintenance of these pumps?

[23] **A:** Yes.

[24] **Q:** How so?

[25] **A:** I had to tear them down, replace

Page 43

[1] bearing rings, bearings, seals, reassemble

[2] them with new gaskets, packing or seals.

[3] **Q:** I think you also mentioned that

[4] you have done some work packing valves and

[5] working with valves?

[6] **A:** Yes.

[7] **Q:** Would you describe, please, for

[8] us, and the Court and the jury, what that

[9] work is like?

[10] **A:** Well, it consisted of steam

[11] pressure from 150 pounds to 1200 pounds.

[12] And it required disassembling a valve,

[13] extracting the old packing, and inspecting

[14] it to make sure it wasn't steam cut. And

[15] then installing — cutting and installing

[16] new packing. And reinstalling the hold-down

[17] device. It is called a — I don't

[18] recollect.

[19] **Q:** You used the word a second ago,

[20] steam cut. What does that mean?

[21] **A:** That is when you have a steam

[22] leak, a small — it starts off as a small

[23] steam leak. And if it is leaking, it

[24] actually cuts into the metal. Cuts a path

[25] into the metal. Then it has to be taken

Page 44

[1] out. Taken to a repair facility and cut.

[2] **Q:** And I think you mentioned joint

[3] gaskets; are they any different than you

[4] have been talking about with us, with

[5] respect to the valves and the pumps and the

[6] like?

[7] **A:** Nothing, except the Spiral Wound

[8] Flexitallic asbestos gaskets. And that is

[9] the compressed asbestos. And then you have

[10] got the steam gaskets, that is all spiral

[11] wound for the high-pressure steam. The Flex

[12] gaskets.

[13] **Q:** I think you also talked about

[14] grinding wheels?

[15] **A:** We used a lot of grinding,

[16] Carborundum grinding wheels in the repair

[17] department for sharpening tools, like

[18] cutting tools for the lathes, tools for

[19] scraping and cleaning joints.

[20] **Q:** Did you personally do this kind of

[21] work?

[22] **A:** Yes.

[23] **Q:** Did you supervise others doing

[24] this kind of work?

[25] **A:** Yes.

JAMES C. TURNER AND MARLENE TURNER v.
ANCHOR PACKING, ET AL.

Case MDL No. 875   Document 3337   Filed 11/19/01   Page 97 of 233

JAMES C. TURNER
August 9, 2001

Page 45

[1] **Q:** We talked about compressed
[2] asbestos, when you were describing these
[3] things to us a little bit ago.
[4]     Other than the compressed asbestos
[5] that you talked about, with respect to the
[6] gaskets that you had pounded and hammered
[7] out, did you use it for any other purpose?
[8]     **A:** No. Not that I can think of.
[9]     **Q:** If I can read my notes, you talked
[10] about —
[11]     **A:** We used to use it in the place of
[12] welding. If somebody was welding, we tried
[13] to put a sheet of it in place to keep the
[14] slag from seeping in the oil in the bilges,
[15] and starting a fire. Things like that.
[16]     **Q:** Is that any different than the
[17] asbestos cloth that you talked about a
[18] little bit ago?
[19]     **A:** It is different, but it is
[20] similar.
[21]     **Q:** How is the cloth different than
[22] the compressed asbestos?
[23]     **A:** The cloth is a weave, a woven
[24] cloth. And this compressed asbestos is just
[25] a sheet of paper-like product.

Page 46

[1]     **Q:** You also described a liquid
[2] coating that was used, with respect to the
[3] premolded and bucket-type pipe insulation.
[4] Could you describe a little more
[5] specifically what you were talking about
[6] with that liquid coating?
[7]     **A:** I don't know exactly what the
[8] liquid coating was. I don't remember a
[9] name, or anything like that. I remember
[10] there was just open buckets of it, usually
[11] just like a paint can.
[12]     And when we got the asbestos cloth
[13] molded the way we wanted it, just spread
[14] this white paste on it, and it semi-hardened
[15] and it held it in place.
[16]     **Q:** Did you ever have to finish this
[17] liquid coating, or did you just paint it on
[18] and that was it?
[19]     **A:** No. After a certain amount of
[20] time, it turned yellow and you painted it
[21] with white paint.
[22]     **Q:** Are there any kinds — and again,
[23] I am just talking generically right now —
[24] any other kinds of asbestos-related
[25] insulation materials with which you either

Page 47

[1] worked with or worked around, over the
[2] course of your career?
[3]     **A:** Not that I can think of, except
[4] the large turbines and stuff that was
[5] insulated with that material, with asbestos,
[6] and large, six to — six-inch steam lines.
[7]     **Q:** Now, you have said "the large
[8] turbines." How big were these turbines,
[9] just in —
[10]     **A:** Well, in a typical warship, like
[11] the USS LEAHY, that develops
[12] 85,000-horsepower, it sounds awful big,
[13] 85,000 horses. But it is just a small
[14] turbine. A turbine combination 20 feet long
[15] by eight, 10 feet wide. Well, not even that
[16] big. That big after it is insulated.
[17]     **Q:** I think you also mentioned during
[18] the course of our discussion, sir, that you
[19] worked around boilers?
[20]     **A:** Yes.
[21]     **Q:** Could you describe, again, for
[22] those of us that don't have the experience
[23] you do, the size and scope of what these
[24] boilers might have looked like?
[25]     **A:** They are just big, square, almost

Page 48

[1] square enclosures, enclosed with firebrick
[2] inside, with tube coming up and down, and
[3] metal casings.
[4]     And you got the D-type boilers and
[5] the M-type boilers. The old 600-pound I
[6] believe was the D-type boilers, and the
[7] modern 1200-pound is the M-type boilers.
[8]     No, just the opposite. The old
[9] 600 was the M-type, and the new modern kind
[10] is the D-type. And it is just a big room,
[11] where you build a fire, exposed to water
[12] tubes and generate steam.
[13]     **Q:** Were these boilers insulated?
[14]     **A:** Insulated inside with firebrick.
[15]     **Q:** Were they insulated on the
[16] outside?
[17]     **A:** Mostly, what you seen on the
[18] outside was just aluminum looking, or
[19] stainless steel-looking material.
[20]     But some insulation, the asbestos
[21] where the steam piping come out of the
[22] boilers we started, went to the engine room.
[23]     **Q:** You have described some generic,
[24] we might say, types of asbestos insulation
[25] products, and named for us some of the names

Page 49

[1] that came to mind that go along with the
[2] generic products.
[3]     What names of manufacturers of
[4] these products, or any of the turbines or
[5] boilers, or any of the other materials that
[6] you have just been describing for us, what
[7] specific names come to your mind, as you sit
[8] here today, Mr. Turner?
[9]     A: Packing, John Crane;
[10] Johns-Manville; Kelly Moore; GAF; Victor;
[11] Babcock & Wilcox; General Electric;
[12] Westinghouse; Ingersoll-Rand; Aurora;
[13] Consolidated Gasket Material Company.
[14]     Did I get John Crane? A lot of
[15] that. Victor, Spiral Wound Flexitallic
[16] Gaskets.
[17]     That is all I can think of.
[18]     Q: If any other names come through
[19] your mind as we are discussing the rest of
[20] your work today, just like anything else, if
[21] you think of another co-workers' names, feel
[22] free to interject that at any time. Is that
[23] fair enough, Mr. Turner?
[24]     A: Uh-huh (affirmative response).
[25]     Q: Okay.

Page 50

[1] When, if at all, did you become
[2] aware that asbestos might be harmful to
[3] people?
[4]     A: I am not sure. I am not sure I
[5] understand — I don't believe I really
[6] understood that until the '70s, for sure.
[7]     Q: How, again, just generally, did
[8] that awareness come to you?
[9]     A: I really wasn't fully aware of it
[10] until I was diagnosed with cancer, with
[11] asbestos.
[12]     Q: Did you ever see a warning label
[13] on any of the asbestos materials that you
[14] have been describing for us?
[15]     A: No, sir. Not to my knowledge.
[16]     Q: Did you ever see a skull and
[17] crossbones, or anything of that nature on
[18] any of these materials?
[19]     A: No, sir.
[20]     Q: Did anybody tell you, to your
[21] knowledge today, to avoid contact with any
[22] of these asbestos materials you have been
[23] talking about?
[24]     A: No, sir.
[25]     Q: What is the state of your health,

Page 51

[1] as you sit here today?
[2]     A: Very bad. I have been diagnosed
[3] with lung cancer, and asbestosis, due to
[4] asbestos.
[5]     Q: Describe for us how that came
[6] about, please.
[7]     A: I had a bad cold in December of
[8] '99, I believe it was. And a lot of pain in
[9] my back. Well, it kept bouncing me back
[10] from acupuncture to therapy, to pain
[11] medication.
[12]     Finally, I asked the doctor if
[13] this could be, this type of pain could be
[14] associated with lung cancer. And he said, I
[15] don't think so, but we will send you for an
[16] X-ray and find out.
[17]     Q: Not to interrupt, but I am going
[18] to anyway. What doctor was that, that you
[19] had that discussion with?
[20]     A: Dr. Juracovich.
[21]     Q: Where is Dr. Juracovich?
[22]     A: St. Ann Hospital in Raceland.
[23]     Q: Sorry to have interrupted, but
[24] after your discussion with the doctor, what
[25] happened?

Page 52

[1]     A: He sent me for an x-ray, and then
[2] the next day he called me and told me that I
[3] did have something on my lung.
[4]     And he sent me to Ochsner, over
[5] here in New Orleans. And I had a needle
[6] biopsy, and that was the diagnosis: Lung
[7] cancer.
[8]     Q: About when it was that you were
[9] diagnosed with the lung cancer?
[10]     A: I believe it was August 8th.
[11]     Q: Since your diagnosis of the lung
[12] cancer, how has the state of your health
[13] been?
[14]     A: Up and down. I was given therapy
[15] for — chemotherapy and radiation. And I
[16] was okay for a while, then the cancer came
[17] back. I am on radiation and chemotherapy
[18] now.
[19]     Q: How often are you taking these
[20] treatments now?
[21]     A: Radiation everyday, and — five
[22] days a week; chemotherapy, once a week.
[23]     Q: Where do you go for your
[24] therapies?
[25]     A: Thibodaux General. Thibodaux

JAMES C. TURNER AND MARLENE TURNER, v.
ANCHOR PACKING, ET AL.

Case MDL No. 875   Document 3337   Filed 11/19/01   Page 99 of 233

JAMES C. TURNER
August 9, 2001

**Page 53**

[1] General Hospital.

[2] **Q:** How far is that from your home?

[3] **A:** Twenty, 20 miles.

[4] **Q:** Do you drive yourself?

[5] **A:** No.

[6] **Q:** How do you get there?

[7] **A:** My wife takes me.

[8] **Q:** How long have you been undergoing

[9] these treatments?

[10] **A:** Since — I had surgery

[11] November 30th of 2000, and treatments have

[12] been on and off ever since.

[13] **Q:** What surgery did you have in

[14] November of 2000?

[15] **A:** They removed the top third of my

[16] right lung.

[17] **Q:** Where did that surgery take place?

[18] **A:** Thibodaux Regional Hospital.

[19] **Q:** Do you remember who the surgeon

[20] was that did that, took away the top third

[21] of your lung?

[22] **A:** Phil — Phillip Robichaux.

[23] **Q:** You said that you are undergoing

[24] chemotherapy and radiation therapy. What,

[25] if anything, does that do to you physically?

**Page 54**

[1] **A:** It drains me. I don't have no

[2] energy. I got sick from the chemotherapy,

[3] and a lot of throwing up at night, after the

[4] chemotherapy. And the — tired, from the

[5] radiation.

[6] **Q:** Are you presently taking any kind

[7] of medication?

[8] **A:** (Witness nods head affirmatively.)

[9] **Q:** What are you taking?

[10] **A:** Morphine.

[11] **Q:** How often do you take it?

[12] **A:** Three times a day.

[13] **Q:** Why do you take morphine?

[14] **A:** For pain.

[15] **Q:** As you sit here right now, in

[16] front of this camera, would you tell us how

[17] you feel?

[18] **A:** Not good.

[19] **Q:** Mr. Turner, prior to your

[20] diagnosis of lung cancer back in August of

[21] last year, how was your health?

[22] **A:** Always good. I always had good

[23] health.

[24] **Q:** I know you have testified that you

[25] had a disabling back injury, back in '95,

**Page 55**

[1] and had a laminectomy. Other than that, had

[2] you had any other kinds of hospitalizations?

[3] **A:** Just a hernia repair.

[4] **Q:** About when was that?

[5] **A:** And the mumps.

[6] **Q:** Do you remember when the hernia

[7] repair was?

[8] **A:** That was in March of '76.

[9] **Q:** I think we can safely skip the

[10] mumps.

[11] Did you have any other kinds of

[12] health problems, besides those that we have

[13] talked about?

[14] **A:** Not to my knowledge.

[15] **Q:** Let me ask you something else.

[16] Have you ever been a smoker?

[17] **A:** Yes.

[18] **Q:** When did you start?

[19] **A:** When I was about 16 years old.

[20] **Q:** How long did you smoke?

[21] **A:** About 40 years.

[22] **Q:** Well, first of all, what did you

[23] smoke?

[24] **A:** Just cigarettes, mostly.

[25] **Q:** Do you remember what kind?

**Page 56**

[1] **A:** Usually, Winston.

[2] **Q:** Were they filtered or unfiltered?

[3] **A:** Filtered.

[4] **Q:** When did you stop?

[5] **A:** When I was diagnosed with lung

[6] cancer.

[7] **Q:** Is there any specific reason that

[8] you stopped?

[9] **A:** Scared.

[10] **MR. AMES:**

[11] Let's take another short break,

[12] please.

[13] **THE VIDEOGRAPHER:**

[14] Going off the record; it is

[15] 1:23 p.m.

[16] (Recess.)

[17] **THE VIDEOGRAPHER:**

[18] Everyone ready? We are back on

[19] record. It is 1:28 p.m.

[20] **EXAMINATION BY MR. AMES:**

[21] **Q:** Mr. Turner, you had described for

[22] us all a lot of your work history, and you

[23] have talked about your exposures to

[24] asbestos-containing, insulation-type

[25] materials.

Page 57

[1] Did you ever, when you were doing
[2] this kind of work, did you ever see any dust
[3] attendant to the work that you were doing?
[4] **A:** All the time. In the shipyard,
[5] the dust was constantly in the air.
[6] **Q:** Could you describe a little bit
[7] more specifically, what this kind of dust
[8] looked like?
[9] **A:** Just white, mote-like dust from
[10] the shipyard workers, usually tearing out
[11] stuff and putting it back in. And you could
[12] see it. The holes they cut in the ship, you
[13] could just look up in the sunlight and see
[14] it floating through there.
[15] **Q:** Were you exposed to this dust,
[16] this kind of dust that you have described,
[17] when you were working in the plastics
[18] industry?
[19] **A:** No.
[20] **Q:** How about when you were working
[21] after you left the job at the plastic
[22] manufacturing and went back to work for
[23] Fagan and for Petrol Marine?
[24] **A:** Sure. In the engine rooms and in
[25] the shipyards.

Page 58

[1] **Q:** Did you ever do anything to avoid
[2] breathing that kind of dust?
[3] **A:** We used to get some little face
[4] mask-type things.
[5] **Q:** Can you describe those things a
[6] little bit more specifically?
[7] **A:** It just covered the nose and
[8] mouth, and usually just used it to paint
[9] with. To use it when we were painting.
[10] **Q:** Do you remember the name brands of
[11] any of those masks?
[12] **A:** Three-M, we used 3-M a lot.
[13] **Q:** I am going to ask you a couple of
[14] names and see if they ring a bell with you.
[15] Does the name Garlock mean
[16] anything to you?
[17] **A:** Yes.
[18] **Q:** In what sense do you remember that
[19] name?
[20] **A:** Lots of packing.
[21] **Q:** How about the name Anchor?
[22] **A:** Yes. Packing.
[23] **Q:** How about the name A.W.
[24] Chesterton?
[25] **A:** Packing and seals.

Page 59

[1] **Q:** Does the name Worthington ring any
[2] kind of bell with you?
[3] **A:** Pumps, turbines.
[4] **Q:** How about, does the name Flintkote
[5] mean anything at all?
[6] **A:** Flooring coating. Floor covering.
[7] **Q:** How about Georgia Pacific?
[8] **MR. BROWN:**
[9] Object to the form.
[10] **THE WITNESS:**
[11] Not specifically. I know — I am
[12] familiar with Georgia Pacific, but in
[13] what — not in any specific relation that I
[14] can think of.
[15] **EXAMINATION BY MR. AMES:**
[16] **Q:** Do you remember — I didn't ask
[17] you about this, and as a matter of trying to
[18] tie everything up — do you remember the
[19] names of any of the boiler manufacturers,
[20] other than I believe Babcock & Wilcox, you
[21] have already mentioned; do you remember the
[22] names of any of the other manufacturers of
[23] the boilers that you worked around?
[24] **A:** Com — something engineering.
[25] Combustion Engineering. There was Babcock &

Page 60

[1] Wilcox, and one — Foster-Wheeler.
[2] **Q:** Mr. Turner, before you took sick
[3] with the cancer that you have described, did
[4] you have any hobbies?
[5] **A:** Oh yeah. Fishing, woodworking,
[6] teaching my grandchildren to play ball and
[7] fish.
[8] **Q:** What kind of woodworking did you
[9] do?
[10] **A:** I made shelves, and little corner
[11] knickknacks for my wife. And hand-towel
[12] racks. Just small stuff.
[13] **Q:** What kind of fishing did you do?
[14] **A:** Redfish, and speckled trout.
[15] **Q:** Do you do any of those kinds of
[16] things today?
[17] **A:** No.
[18] **Q:** Why is that?
[19] **A:** I am in too much pain.
[20] **Q:** What is your understanding,
[21] Mr. Turner, of what the future holds for
[22] you?
[23] **A:** Not much.
[24] **Q:** What makes you say that?
[25] **A:** My doctor said so.

JAMES C. TURNER AND MARLENE TURNER v.
ANCHOR PACKING, ET AL.

Case MDL No. 875   Document 3337   Filed 11/19/01   Page 101 of 233

JAMES C. TURNER
August 9, 2001

Page 61

[1] **Q:** What, if anything, have you done
[2] to prepare for the future?
[3]     **A:** I don't understand the question.
[4]     **Q:** Is there anything else that you
[5] would like to say, to us or the jury that
[6] may be looking at this some time in the
[7] future, that I haven't asked you, or that
[8] you haven't already said?
[9]     **A:** I am a blank.
[10]     **Q:** Do you have an understanding of
[11] what the cause of your lung cancer is,
[12] Mr. Turner?
[13]     **A:** I was told it was asbestos.
[14]                 **MR. AMES:**
[15]     That is all I have. Thank you
[16] very much.
[17]     Let's go off the record.
[18]             **THE VIDEOGRAPHER:**
[19]     Going off the record; it is 1:34
[20] p.m.
[21]     (Off the record discussion.)
[22]             **THE VIDEOGRAPHER:**
[23]     We're back on record; it is 1:35
[24] p.m.
[25]         **EXAMINATION BY MR. GARY:**

Page 62

[1]     **Q:** Mr. Turner, my name is Leon Gary.
[2] And as I have said earlier this morning, my
[3] client is Viacom, Inc., which bought the old
[4] Westinghouse that you have already talked
[5] about.
[6]     I am going to try my best to be
[7] brief with the questions that I have, and
[8] limit them only to the things that I think I
[9] need to know about right now; and to give
[10] the lawyers for the other 23 people that you
[11] have sued a chance, as well.
[12]     So these are just a couple of
[13] ground rules. I will do my best to ask
[14] questions that will be clear to you, that
[15] you can understand. But if I fail to do
[16] that, you need to stop me and say: I don't
[17] understand your question.
[18]     And the reason for that is, that
[19] if you answer a question, I will assume you
[20] understood it, as will everyone else in the
[21] room.
[22]     If I also interrupt an answer by
[23] starting a question before you have
[24] finished, I apologize in advance for doing
[25] that, but you should stop me and say: I

Page 63

[1] haven't finished my answer. And I will be
[2] happy to allow you to do so, because I do
[3] not want to cut you off.
[4]     · And I also hope that you will be
[5] able to give us answers that are as full and
[6] as complete as you are able to remember.
[7]     You have been here a while
[8] answering your lawyer's questions. If you
[9] start feeling bad, if you feel weak, if you
[10] believe you are no longer able to remember
[11] as well as you would like to remember, tell
[12] us that, and we will stop and recess, or
[13] adjourn, or whatever is appropriate.
[14]     But I do not want to put you
[15] through anything that makes you any more
[16] uncomfortable than you want to put up with;
[17] is that fair?
[18]     **A:** (Witness nods head affirmatively.)
[19]     **Q:** When this deposition is over, the
[20] reporter who is transcribing it, is going to
[21] send a copy of the deposition to your lawyer
[22] and to you, for you to read and sign, to
[23] enable you to correct anything that she got
[24] wrong when you said it, or someone else said
[25] it, or to straighten out any answer that you

Page 64

[1] need to straighten out.
[2]     So when you have done that, or if
[3] you remember something after we ask
[4] questions, that changes something that you
[5] have told us that you think we should know
[6] about in order to understand completely all
[7] of the facts, please tell your lawyer that,
[8] so he can get in touch with us and let us
[9] know; is that fair?
[10]     **A:** (Witness nods head affirmatively.)
[11]     **Q:** I want to go back to something
[12] that you recently testified about, because
[13] it is fresh on my mind. But, I think your
[14] lawyer asked if you were told what caused
[15] your lung cancer, and you said you were told
[16] it was the exposure to asbestos. Were you
[17] also told that it was caused by smoking
[18] cigarettes?
[19]     **A:** No.
[20]     **Q:** No doctor has ever told you that?
[21]     **A:** No.
[22]     **Q:** Do you have an understanding that
[23] smoking cigarettes can cause lung cancer?
[24]     **A:** Yes.
[25]     **Q:** And how did you gain that

Page 65

[1] understanding?

[2]   **A:** By exposure to the television, and

[3] the cigarette packs.

[4]   **Q:** You saw warning labels on packages

[5] of cigarettes, I take it; probably on

[6] billboards, outdoor advertising, that

[7] mentioned lung cancer could be caused by

[8] cigarettes?

[9]   **A:** Yes.

[10]   **Q:** When was the first time in your

[11] life, that you actually understood that

[12] there was a potential association between

[13] smoking tobacco products and the causation

[14] of lung cancer?

[15]   **A:** I have no idea.

[16]   **Q:** In any years?

[17]   **A:** A few years.

[18]   **Q:** Just a few?

[19]   **A:** Yes.

[20]   **Q:** Would it be less than five?

[21]   **A:** Probably more than five. Maybe

[22] ten years.

[23]   **Q:** And in connection with your use of

[24] tobacco products, in addition to cigarettes,

[25] what other tobacco products have you used?

Page 66

[1]   **A:** None.

[2]   **Q:** Never used pipe tobacco, cigars,

[3] snuff?

[4]   **A:** Occasionally. Not, you know,

[5] nothing daily. Like occasionally, somebody

[6] will give me a cigar for a baby was born or

[7] something, but that's all.

[8]   **Q:** So your product of choice was —

[9]   **A:** Cigarettes.

[10]   **Q:** And your brand of choice was

[11] generally, filtered Winston cigarettes?

[12]   **A:** Yes.

[13]   **Q:** When you started smoking, you were

[14] about age 16?

[15]   **A:** (Witness nods head affirmatively.)

[16]   **Q:** And you smoked continuously from

[17] that point in time, until you quit when you

[18] were diagnosed with lung cancer?

[19]   **A:** That was two or three years in

[20] between there that I did quit smoking for a

[21] year at a time.

[22]   **Q:** Do you remember when that was?

[23]   **A:** In the '70s. Just when I retired,

[24] a little before I retired, I quit smoking

[25] for over a year.

Page 67

[1]   **Q:** Okay.

[2]   **A:** And then one other time, I quit

[3] smoking for over a year.

[4]   **Q:** When you started smoking, did you

[5] start smoking Winston filtered cigarettes?

[6]   **A:** No. The best I remember is

[7] stealing my step-father's Camels.

[8]   **Q:** Unfiltered Camels?

[9]   **A:** Yes.

[10]   **Q:** And at what point in time, I

[11] guess, did you, I guess, become committed to

[12] Winston as your brand of choice? How long

[13] had you been smoking by that time?

[14]   **A:** That was in my 20s, right after I

[15] joined the Navy.

[16]   **Q:** Prior to that time, did you smoke

[17] unfiltered Camels?

[18]   **A:** No, not regularly. I always tried

[19] to smoke filtered cigarettes.

[20]   **Q:** What other brands, besides

[21] Winston?

[22]   **A:** Pall Mall; some Fatima, some old

[23] cigarettes.

[24]   **Q:** Chesterfields; Lucky Strikes?

[25]   **A:** I remember — I have smoked Lucky

Page 68

[1] Strikes a little bit, and Chesterfield.

[2]   **Q:** Marlboro?

[3]   **A:** Marlboro.

[4]   **Q:** Other than cigarettes that you may

[5] have obtained from someone else when you

[6] didn't have one, did you yourself purchase

[7] any brand of tobacco product, other than

[8] Winston, once you started and switched to

[9] Winston?

[10]   **A:** Once I switched to Winston, that

[11] was it.

[12]   **Q:** You were committed to Winstons?

[13]   **A:** (Witness nods head affirmatively.)

[14]   **Q:** Did you smoke any type of Kent

[15] cigarettes?

[16]   **A:** I have.

[17]   **Q:** Do you remember when and how

[18] frequently?

[19]   **A:** I remember in the Navy, they was

[20] trying to get rid of a case of Kent

[21] cigarettes. Me and my buddy went together

[22] and bought them for $75. Seventy-five

[23] cartons of cigarettes for 75 cents a carton.

[24]   **Q:** Can you remember approximately

[25] when, or what ship you were on?

Page 69

[1] **A:** That was early '70s. I don't
[2] remember what ship.
[3] **Q:** Do you remember who your buddy
[4] was?
[5] **A:** No.
[6] **Q:** During the time that you have
[7] smoked, can you give us an idea of the
[8] quantity of cigarettes that you would use on
[9] a regular, daily basis?
[10] **A:** Very seldom over a pack a day.
[11] **Q:** Were there occasions when you
[12] smoked more than a pack?
[13] **A:** Only if I stayed up hours at a
[14] time.
[15] **Q:** Some people have, in their smoking
[16] history, peaks and valleys, where they get
[17] up to more than a pack and then they try to
[18] cut back and reduce it. Was there ever a
[19] period of time when you would have fairly
[20] described yourself as a two-pack-a-day
[21] smoker?
[22] **A:** No, never.
[23] **Q:** And then, other than the brief
[24] periods when you quit after retirement, you
[25] were consistently a pack-a-day cigarette

Page 70

[1] smoker?
[2] **A:** Yes.
[3] **Q:** And I take it, it would be true,
[4] since you don't think that smoking has got
[5] anything to do with your lung cancer, you
[6] are not a plaintiff in a lawsuit against any
[7] tobacco company?
[8] **A:** No.
[9] **Q:** With respect to your back injury,
[10] did you file any kind of lawsuit against
[11] anybody relating to that incident?
[12] **A:** Yes.
[13] **Q:** Can you tell us who you sued and
[14] where the suit was filed?
[15] **A:** I am not sure there was a suit
[16] filed. I guess there had to be if there was
[17] a settlement, weren't there?
[18] **Q:** Yes.
[19] Well, not necessarily. But I take
[20] it, I guess, what you are telling us is that
[21] you did settle claims against third parties
[22] relating to that?
[23] **A:** Yes.
[24] **Q:** Can you remember who the lawyer
[25] was that represented you at that time?

Page 71

[1] **A:** David Shea.
[2] **Q:** Shea?
[3] **A:** Yes.
[4] **Q:** Spelled S-H-E-A?
[5] **A:** Yes.
[6] **Q:** And where does Mr. Shea work or
[7] practice?
[8] **A:** In Houma.
[9] **Q:** In Houma? And do you remember who
[10] it was that you brought, or you made the
[11] claim against relating to your back injury?
[12] **A:** All I can remember, it was a
[13] drilling rig.
[14] **Q:** A rig company?
[15] **A:** Yes.
[16] **Q:** I want to just briefly ask you
[17] some questions about your knowledge
[18] concerning what I would call generic
[19] carcinogens, or things that you understood
[20] could cause cancer, that you may have worked
[21] with.
[22] Am I correct in concluding from
[23] the description of the work that you have
[24] given us today, that you would have worked
[25] personally with solvents, for example, to

Page 72

[1] remove paint, clean up grease, or anything
[2] like that?
[3] **A:** I have used that type of material,
[4] yes.
[5] **Q:** Can you tell us a little bit about
[6] what materials you used that you would
[7] describe as a solvent, and when you used
[8] them and where you used them?
[9] **A:** I remember using some paint
[10] stripper, I don't remember if that is a
[11] solvent or not, to strip some paint off of
[12] wood.
[13] **Q:** What about to clean parts? Remove
[14] grease, stuff like that?
[15] **A:** I have used that.
[16] **Q:** Would you have used solvents in
[17] the Navy, for example?
[18] **A:** Very little in the Navy. No. I
[19] don't remember any of that.
[20] **Q:** What about at the plastics company
[21] where you worked, would you have used
[22] solvents to clean parts there?
[23] **A:** If it would have been something
[24] like gasoline or diesel fuel, or something
[25] like that.

JAMES C. TURNER
August 9, 2001

Case MDL No. 875    Document 3337    Filed 11/19/01    Page 104 of 233    JAMES AND MARLENE TURNER    v.
ANCHOR PACKING, ET AL.

Page 73

[1] **Q:** Did you work frequently with
[2] gasoline and diesel fuel as a cleaning
[3] agent?

[4] **A:** I wouldn't say frequently, no.

[5] **Q:** What about kerosene?

[6] **A:** No. I never used that.

[7] I have used that, but — that was
[8] years and years and years ago.

[9] **Q:** Have you ever used benzene?

[10] **A:** Benzene, I don't remember ever
[11] using that.

[12] **Q:** What about toluene?

[13] **A:** That is not familiar with me.

[14] **Q:** Lacquer thinner, or lacquer
[15] remover?

[16] **A:** I am familiar with it. And I
[17] think I have used it in small quantities,
[18] some limited amount.

[19] **Q:** Were you ever working in any place
[20] where you had an understanding that you were
[21] either handling or working in proximity to
[22] any kind of a hazardous chemical?

[23] **A:** Would you repeat that?

[24] **Q:** Yes.

[25] Do you remember whether you worked

Page 74

[1] at any time, in any place, either directly
[2] with or in close proximity to someone else
[3] working with something that you understood
[4] to be a hazardous chemical?

[5] **A:** As far as I understand your
[6] question, no.

[7] **Q:** During the time that you were in
[8] the Navy, you saw no warnings on any type of
[9] container, box, jug, jar, or anything else,
[10] that said that this is a hazardous
[11] substance, and you should take some kinds of
[12] precautions in using it?

[13] **A:** I don't remember anything like
[14] that.

[15] **Q:** Would the same be true for the
[16] plastics company, Fagan Boat Company and
[17] Petrol Marine?

[18] **A:** Yes.

[19] **Q:** With respect to the
[20] asbestos-containing products that you have
[21] described, that you worked with or around in
[22] the U.S. Navy, did you have any role in the
[23] procurement of those products? Did you
[24] place orders for them, or requisition them?

[25] **A:** Yes.

Page 75

[1] **Q:** Were you ever provided by the Navy
[2] with anything like a Material Data Safety
[3] Sheet that described any of these products,
[4] and that gave you instructions for safe
[5] handling of the products?

[6] **A:** I don't remember any of that.

[7] **Q:** When, for example, the molded pipe
[8] insulation that you have described was
[9] brought onship, did it come loose, did it
[10] come packed in boxes or cartons, or did it
[11] come in some other manner?

[12] **A:** As far as I can recollect, it came
[13] in plastic, inside a box. A cardboard box.

[14] **Q:** And did you have any role in the
[15] actual handling of those boxes, either
[16] inspecting them to make sure that they were
[17] what you specified, or making sure that they
[18] were put in the right place for use?

[19] **A:** The only thing I remember is
[20] opening them and using them.

[21] **Q:** So when you opened boxes that you
[22] knew contained, for example, molded
[23] half-round insulation, pipe insulation. You
[24] would actually, personally open the boxes
[25] that it came in?

Page 76

[1] **A:** Yes.

[2] **Q:** Some of that product, I think you
[3] said, was manufactured by Johns-Manville?

[4] **A:** As far as I remember, yes.

[5] **Q:** And was any of it manufactured by
[6] either Owens-Illinois, or Owens-Corning?

[7]           **MR. BROWN:**
[8]    Object to the form.

[9]           **EXAMINATION BY MR. GARY:**

[10] **Q:** You can answer.

[11] **A:** Those names are familiar, but —

[12] **Q:** Is the name Kaylo, K-A-Y-L-O?

[13]           **MR. BROWN:**
[14]    Object to the form.

[15]           **THE WITNESS:**
[16]    No.

[17]           **EXAMINATION BY MR. GARY:**

[18] **Q:** What about half-round pipe
[19] insulation manufactured by Pittsburgh
[20] Corning Corporation?

[21] **A:** No.

[22] **Q:** Do you recognize the name
[23] Unibestos?

[24] **A:** Yes.

[25] **Q:** Do you know who made Unibestos?

JAMES C. TURNER AND MARLENE TURNER v.
ANCHOR PACKING, ET AL.

JAMES C. TURNER
August 9, 2001

Case MDL No. 875   Document 3337   Filed 11/19/01   Page 105 of 233

Page 77

[1] **A:** No.

[2] **Q:** Did you use or work around

[3] Unibestos?

[4] **A:** As far as I know, yes.

[5] **Q:** In comparison to Johns-Manville,

[6] what percentage of the molded pipe

[7] insulation did you work with or around,

[8] would have been Johns-Manville, versus

[9] Pittsburgh Corning?

[10] **A:** I couldn't pick out a number. To

[11] me, it is both — probably the same.

[12] **Q:** Roughly the same?

[13] **A:** (Witness nods head affirmatively.)

[14] **Q:** Do you recognize the name

[15] Thermobestos?

[16] **A:** No, not really.

[17] **Q:** What about Pabco?

[18] **A:** Pabco?

[19] **Q:** Pabco?

[20] **A:** I seem to remember that.

[21] **Q:** As a half-round pipe insulation?

[22] **A:** No. It is hard to pin these

[23] things down. I mean, it is years ago.

[24]     These names are familiar, they are

[25] all familiar, but exactly what context, and

Page 78

[1] exactly what specific application, I can't

[2] say for sure.

[3] **Q:** All right.

[4] In connection with — let me back

[5] up. Am I correct that you do not believe

[6] that you worked either with or around

[7] asbestos until you enlisted in the Navy?

[8] **A:** As far as I know, never.

[9] **Q:** There would not have been any at

[10] the sawmill where you worked?

[11] **A:** No.

[12] **Q:** And you had no other job in any

[13] kind of a plant or building, or shipyard or

[14] facility?

[15] **A:** No.

[16] **Q:** All right. Beginning with your

[17] term in the Navy, what information was

[18] provided to you by the Navy concerning the

[19] safe handling of asbestos-containing

[20] products?

[21] **A:** To my knowledge, I have never been

[22] instructed in any way in the handling of

[23] asbestos.

[24] **Q:** By anybody?

[25] **A:** By anybody.

Page 79

[1] **Q:** So that would be true at the

[2] plastics plant, the Fagan Boat Company, and

[3] Petrol Marine?

[4] **A:** Yes.

[5] **Q:** And in connection with your work

[6] at the Navy, did you participate in safety

[7] meetings, where the safe handling of any

[8] kind of hazardous substance would have been

[9] discussed?

[10] **A:** Very limited, if at all.

[11] **Q:** And what was generally discussed

[12] at those meetings? What kinds of products

[13] were you usually dealing with?

[14] **A:** Usually not products. Usually

[15] shipboard safety in respect to ladders, and

[16] gangways, and handling of lines, and

[17] seamanship.

[18] **Q:** Is it true that during the time

[19] that you served in the Navy, both

[20] onboardship, and when you had shore duty,

[21] that you do not recall seeing any kind of

[22] sign or signage, that would have contained

[23] any kind of warning about asbestos hazards?

[24] **A:** That is correct.

[25] **Q:** Okay. Do you remember who at the

Page 80

[1] plastics company, according to your

[2] understanding, was responsible for the

[3] safety of yourself and other workers?

[4] **A:** All I can say, my immediate

[5] supervisor, which would have been Mr. Tom

[6] Woodruff.

[7] **Q:** And who was Mr. Woodruff's

[8] supervisor?

[9] **A:** Somebody here in New Orleans. I

[10] have no idea who.

[11] **Q:** Was Woodruff the top man at the

[12] plastics plant?

[13] **A:** Well, there was two: Johnny

[14] Frosch and Mr. Woodruff. Frosch was in

[15] charge of the operations, and Mr. Woodruff

[16] was the chemical engineer.

[17] **Q:** Who at Fagan Boat Company did you

[18] understand had responsibility for safety for

[19] yourself and other workers?

[20] **A:** Overall?

[21] **Q:** Well, let's make it a little more

[22] detailed. If you had a question about

[23] safety, who would you have gone to at Fagan

[24] Boat Company, for an answer?

[25] **A:** In my particular situation, I

Page 81

[1] would have went to the captain.

[2] **Q:** Of the vessel?

[3] **A:** Yes.

[4] **Q:** Is there anybody else that you

[5] thought at Fagan Boat Company, had overall

[6] safety responsibility?

[7] **A:** The operations manager.

[8] **Q:** And that would have been whom; do

[9] you remember?

[10] **A:** At that time, they didn't have a

[11] personnel manager. I mean, an operations

[12] manager. The personnel manager was all of

[13] it. I can't remember his name.

[14] **Q:** He was Alfred somebody?

[15] **A:** No. This was at Fagan, you said?

[16] I understood your question to be Fagan.

[17] **Q:** It was Fagan. What about at

[18] Petrol Marine, who would you regard as being

[19] responsible for safety for yourself and

[20] other workers?

[21] **A:** They had safety officers there.

[22] They had safety — they called them port

[23] engineers — port captains. And they were

[24] responsible for the safety program, running

[25] the safety program, having various meetings.

Page 82

[1] **Q:** Do you remember any of their

[2] names?

[3] **A:** Maybe next week.

[4] **Q:** I want to ask you about something

[5] in your lawsuit that was also curious to me,

[6] that I am not sure whether it was just a

[7] mistake or not.

[8]      But there is an allegation that

[9] you were exposed to asbestos-containing

[10] materials at Westinghouse Electric Company,

[11] in connection with your work on land-based

[12] turbines for General Electric Company.

[13]      Did you ever work for General

[14] Electric Company?

[15] **A:** No.

[16] **Q:** Did you ever work on any

[17] Westinghouse land-based turbines?

[18] **A:** Not to my knowledge.

[19] **Q:** In specific, in the Navy or

[20] anywhere else, did you work on what I would

[21] call marine turbines, that you understood to

[22] have been manufactured by Westinghouse?

[23] **A:** Repeat that.

[24] **Q:** When you were in the Navy, or when

[25] you worked for Fagan or Petrol Marine, or

Page 83

[1] any other place, did you work on marine

[2] turbines, that you understood were

[3] manufactured by Westinghouse?

[4] **A:** Yes.

[5] **Q:** Let's start with the earliest

[6] recollection that you have of working in any

[7] manner on a Westinghouse turbine. Tell us

[8] where it was, and what you did.

[9] **A:** I was aboard all these ships. I

[10] remember tearing insulation off — oh, this

[11] is a Westinghouse turbine. But I can't put

[12] that Westinghouse turbine on any ship.

[13] **Q:** On any one particular ship?

[14] **A:** No.

[15] **Q:** Were there Westinghouse turbines

[16] on every ship that you worked in the

[17] Navy?

[18] **A:** I have no idea.

[19] **Q:** Don't know?

[20] **A:** Could have been.

[21] **Q:** Do you know who supplied the

[22] insulation that was on the turbines that you

[23] thought was a Westinghouse turbine?

[24] **A:** I have no idea.

[25] **Q:** Do you know whether it was more

Page 84

[1] than five Westinghouse turbines? I am just

[2] trying to quantify your experience working

[3] on Westinghouse turbines.

[4] **A:** Well, it must have been more than

[5] five for sure.

[6] **Q:** Okay. More than ten?

[7] **A:** Probably.

[8] **Q:** More than 20?

[9] **A:** Probably less than 20, maybe.

[10] **Q:** When you worked on turbines,

[11] explain to me what it was that you yourself

[12] did.

[13] **A:** Well, the smaller turbines, we

[14] tore them down, inspected the turbine

[15] blades, took them to a repair facility and

[16] had them repaired, if necessary. And

[17] reassembled them, put them all back

[18] together, and re- —

[19] **Q:** I'm sorry.

[20] **A:** Reinsulated them.

[21] **Q:** When you say smaller turbines, do

[22] you mean just generally?

[23] **A:** Generally.

[24] **Q:** Or the small Westinghouse turbine?

[25] **A:** Generally.

Page 85

[1] Q: Were there Westinghouse turbines
[2] that fit what you are calling a smaller
[3] turbine?
[4] A: As best as I can remember, yes.
[5] Q: What was the function of that
[6] turbine?
[7] A: To operate pumps.
[8] Q: Pumps? Okay.
[9] Did you work on turbines that you
[10] understood — for Westinghouse — that were
[11] part of propulsion systems on vessels in the
[12] Navy, or at Fagan or Petrol Marine?
[13] A: To the best of my knowledge, yes.
[14] Main propulsion turbines, yes.
[15] Q: And these would be part of what
[16] you would call a turbine generator set?
[17] A: Well, not — a generator set, yes.
[18] But a combination of the turbine
[19] installation itself. The high-pressure,
[20] low-pressure, cruising, and the entire set.
[21] Q: And with respect —
[22] A: It is not just one turbine. It is
[23] all three.
[24] Q: I understand. With respect to the
[25] turbine generator set, what would you do

Page 86

[1] when you worked on it?
[2] A: The turbine itself, usually major
[3] repairs were done by the shipyard, but we
[4] also rolled the bearings out, inspected
[5] them, took readings; if the bearings needed
[6] to be replaced, we took them to a repair
[7] facility.
[8] They melted the old babbitt out.
[9] Rebabbitted them, recut them. Brought them
[10] back to us, we rerolled them in, scraped
[11] them, fitted them, put them back together.
[12] Q: Did you have to remove insulation
[13] in order to do that?
[14] A: Yes.
[15] Q: What kind of insulation would you
[16] remove?
[17] A: Usually, it would be molded
[18] insulation, like I described earlier.
[19] Q: Okay.
[20] A: And it would be the material that
[21] you mix up, mold it to this turbine, put the
[22] cloth on it, and put the sealer on it.
[23] Q: Do you know who supplied the
[24] molded insulation that you are describing?
[25] A: No.

Page 87

[1] Q: With respect to supervising your
[2] activities when you worked on what you
[3] understood were Westinghouse turbines, who,
[4] if you recall, gave you instructions about
[5] what to do and how to do it?
[6] A: My division officer.
[7] Q: In the Navy?
[8] A: Uh-huh (affirmative response).
[9] Q: Would there have been personnel
[10] that you understood to have been employed by
[11] Westinghouse, present, directing your work?
[12] A: Yes, in one situation. We called
[13] them tech reps.
[14] Are you familiar with a tech rep?
[15] They would be sent to places like the
[16] Mediterranean, and foreign areas, when we
[17] were doing major repairs on a ship that has
[18] really had a catastrophe, and they would
[19] help with the repairs.
[20] Q: Can you help us by telling us when
[21] those kinds of instances occurred? Do you
[22] remember the vessel where you had a
[23] catastrophe, or an event?
[24] A: At this time, I was aboard the USS
[25] SHENANDOAH in the Mediterranean, and this

Page 88

[1] particular incident had happened.
[2] Q: Was the turbine part of the
[3] equipment of the SHENANDOAH?
[4] A: No.
[5] Q: Or another vessel you were working
[6] on?
[7] A: Yes.
[8] Q: Do you recall the name of that
[9] other vessel?
[10] A: I can't.
[11] Q: Okay.
[12] A: I know the chief engineer was
[13] relieved, and maybe two or three other
[14] people.
[15] Q: Was there any other occasion,
[16] besides the one you just described in the
[17] Mediterranean, where you recall a
[18] Westinghouse tech rep being present?
[19] A: I think there was one other — one
[20] or two other times, but I can't remember —
[21] Q: Specifics?
[22] A: Specifics. Which ship, which —
[23] Q: On those occasions that you recall
[24] a Westinghouse tech rep being present, who
[25] was giving you your instructions about what

JAMES C. TURNER
August 9, 2001

Case MDL No. 875   Document 3337   Filed 11/19/01   Page 108 of 233

JAMES C. TURNER AND MARLENE TURNER   v.
ANCHOR PACKING, ET AL.

Page 89

[1] to do and how to do it?

[2] A: There was two of them, and I took

[3] instruction from both of them.

[4] Q: The tech reps?

[5] A: Yes.

[6] Q: I think the last question that I

[7] wanted to really cover with you today, was

[8] something about your diagnosis for your lung

[9] cancer.

[10] You had stated — and if I am

[11] paraphrasing you incorrectly, straighten me

[12] out — but at some point in time, you became

[13] concerned that the back pain that you were

[14] experiencing, might in some manner be

[15] related to lung cancer, and you asked one of

[16] your doctors about that.

[17] A: (Witness nods head affirmatively.)

[18] Q: Can you help us with the time

[19] frame of when that happened?

[20] A: This happened in December of 1999,

[21] I think. As far as I am thinking.

[22] I had a terrible, terrible case of

[23] strep throat, and whatever they call it, you

[24] know.

[25] Q: Bronchitis?

Page 90

[1] A: Yeah. Bronchitis. Terrible case.

[2] Never had that before in my life. And it

[3] concerned me; and then coughing, coughing,

[4] coughing.

[5] Q: And you thought it might be

[6] related to lung cancer?

[7] A: Yes. And then the pain. After

[8] that, after that December, into January and

[9] continuing from then on, the pain, the back

[10] pain.

[11] Q: And at that time, where were you

[12] being treated?

[13] A: Dr. Joseph Juracovich was my

[14] family physician. My primary care

[15] physician.

[16] Q: At St. Ann's in Raceland?

[17] A: Raceland.

[18] Q: And Dr. Juracovich had been taking

[19] care of your normal, routine family medicine

[20] issues for some period of time?

[21] A: Yes.

[22] Q: He would be the person most

[23] familiar with your physical condition?

[24] A: Yes.

[25] Q: Were you informed by some person

Page 91

[1] that you had asbestos at the same time you

[2] were informed you had lung cancer, or was

[3] this on a different occasion, either earlier

[4] or later?

[5] A: I have no idea. It was

[6] approximately the same time frame. Before

[7] or after, I don't know.

[8] Q: Is it fair to say that prior to

[9] the incident when you had the strep throat

[10] and the bronchitis, you had not been

[11] diagnosed by any person, as having any

[12] asbestos or other asbestos-related disease?

[13] A: No.

[14] Q: Had you participated in any kind

[15] of screening program to detect asbestos

[16] disease?

[17] A: My doctor gave me regular x-rays.

[18] Q: Regular x-rays?

[19] A: Yes.

[20] Q: And this was Dr. Juracovich?

[21] A: Yes.

[22] Q: What about when you were working

[23] for the plastics company, Fagan Boat Company

[24] and Petrol Marine, did you get regular

[25] physical examinations for those companies?

Page 92

[1] A: Well, I held a Coast Guard

[2] license, and I had to get a physical every

[3] time I renewed the license, every four

[4] years. And then as far as I know, the Coast

[5] Guard required a back x-ray and all that,

[6] before you went to work for them. And

[7] that's about it.

[8] Q: So you had pre-employment

[9] physicals before you went to work?

[10] A: Yes.

[11] Q: There was not an ongoing program

[12] of physical evaluation at these companies;

[13] and you had periodic physical exams to renew

[14] your Coast Guard license?

[15] A: Yes.

[16] Q: Where did you go to take the Coast

[17] Guard license physicals? Was that also

[18] Dr. Juracovich, or was there —

[19] A: No, it was not — I don't remember

[20] the doctor's name. In Houma.

[21] Q: The hospital in Houma?

[22] A: Haydel, I believe. Dr. Haydel,

[23] maybe. That name seems familiar.

[24] Q: That narrows it down to about six

[25] doctors in Houma named Haydel.

JAMES C. TURNER AND MARLENE TURNER v.
ANCHOR PACKING, ET AL.

Case MDL No. 875 · Document 3337    Filed 11/19/01    Page 109 of 233

JAMES C. TURNER
August 9, 2001

**Page 93**

[1] And I take it that no one, in
[2] connection with your Coast Guard physicals,
[3] or with your pre-employment physicals,
[4] informed you that you had any kind of health
[5] condition related to exposure to asbestos?
[6] A: No.
[7] Q: That you did not know about that,
[8] until you raised that issue with
[9] Dr. Juracovich?
[10] A: That's correct.
[11] Q: Since that time — let me word
[12] this better than that.
[13] Dr. Phillip Robichaux did your
[14] lung surgery, that you have already
[15] described. Have you been involved with any
[16] other physician or health care professional,
[17] relating to your lung cancer condition,
[18] besides Dr. Juracovich and Dr. Robichaux?
[19] A: Dr. Manish Dhawan, and Dr. Gould.
[20] Dr. Dhawan is the oncologist and Dr. Gould
[21] is the radiologist.
[22] Q: At Thibodaux General, as well?
[23] A: Yes.
[24] Q: Has all of your treatment for lung
[25] cancer been at Thibodaux General?

**Page 94**

[1] A: Yes. Except for tests here in New
[2] Orleans.
[3] Q: At Ochsner?
[4] A: The PET scan, and the original
[5] diagnosis.
[6] Q: After your original diagnosis, or
[7] your trip to Ochsner, that is the only
[8] involvement you have had with them?
[9] A: Yes.
[10]              MR. GARY:
[11] I think I am going to pass the
[12] witness. Thank you very much.
[13]              THE WITNESS:
[14] Thank you.
[15]              MR. AMES:
[16] Let's go off the record for just a
[17] second.
[18]              THE VIDEOGRAPHER:
[19] Going off the record; it is
[20] 2:07 p.m.
[21] (Recess.)
[22]              THE VIDEOGRAPHER:
[23] Back on record; it is 2:09 p.m.
[24]          EXAMINATION BY MS. NATHAN:
[25] Q: Good afternoon, Mr. Turner. My

**Page 95**

[1] name is Pamela Nathan, and I am here just to
[2] ask a few questions.
[3] Do you recognize the name J.T.
[4] Thorpe, Inc.?
[5] A: No.
[6]              MS. NATHAN:
[7] I have no more questions.
[8]          EXAMINATION BY MR. CAHN:
[9] Q: Good afternoon, Mr. Turner. My
[10] name is Corey Cahn.
[11] Do you ever recall working on or
[12] around land-based turbines manufactured by
[13] General Electric Company?
[14] A: No.
[15] Q: Do you ever recall working on or
[16] around marine turbines that you believe to
[17] be manufactured by General Electric Company?
[18] A: Yes.
[19] Q: Where do you recall working around
[20] those turbines?
[21] A: Aboard all the ships that I served
[22] on.
[23] Q: Do you recall marine turbines
[24] manufactured by General Electric on each of
[25] the ships that you served on?

**Page 96**

[1] A: As far as I can remember, yes.
[2] Q: How many turbines do you recall
[3] being present on the USS HAYNSWORTH?
[4] A: Eight, ten. Whether they were all
[5] General Electric, I have no idea.
[6] Q: Was there a particular designation
[7] that went with the turbine that you believe
[8] was manufactured by General Electric?
[9] A: I can't be specific, no.
[10] Q: Do you have a specific
[11] recollection of working around a General
[12] Electric turbine on the USS HAYNSWORTH?
[13] A: I cannot say definitely, but I
[14] remember taking the insulation off of
[15] turbines, and there it was: General
[16] Electric.
[17] That's all I can remember. I
[18] can't remember if it was every ship, or I
[19] can't specifically say it was the
[20] HAYNSWORTH?
[21] Q: Do you recall how many times you
[22] took insulation off of a turbine that you
[23] believe was manufactured by General Electric
[24] on the HAYNSWORTH?
[25] A: I don't know how many times.

Page 97

[1] Q: What other manufacturers of
[2] turbines were present on the HAYNSWORTH?
[3] A: As far as I know, Westinghouse,
[4] Worthington. That's all I remember.
[5] Q: And you don't remember how many of
[6] those were manufactured by each
[7] manufacturer?
[8] A: No.
[9] Q: How about the USS LUCE?
[10] A: Same.
[11] Q: Do you specifically recall
[12] turbines being manufactured by General
[13] Electric?
[14] A: As far as I can remember, yes.
[15] Q: How many turbines were present on
[16] the LUCE?
[17] A: Ten, 12.
[18] Q: Do you recall how many of those
[19] were manufactured by General Electric?
[20] A: No.
[21] Q: Do you recall whether or not there
[22] was a specific designation that went with
[23] General Electric turbines?
[24] A: No. I know there was, but I can't
[25] remember what it was.

Page 98

[1] Q: How about the USS SHENANDOAH? Do
[2] you recall how many turbines were present?
[3] A: No. There might not have been any
[4] aboard the SHENANDOAH.
[5] Q: So you —
[6] A: It had very limited propulsion
[7] capability.
[8] Q: So were the turbines in connection
[9] with the propulsion systems?
[10] A: Yes. Well, the auxiliaries, to —
[11] for pumps and stuff like that.
[12] Q: How about the JOSEPHUS DANIELS, do
[13] you specifically recall the presence of GE
[14] turbines?
[15] A: The same.
[16] Q: Do you remember how many turbines
[17] were present on the JOSEPHUS DANIELS?
[18] A: I know there was a bunch of
[19] turbines.
[20] Q: Do you recall how many of them
[21] were manufactured by GE?
[22] A: No, sir.
[23] Q: What work did you do on the GE
[24] turbines, on the JOSEPHUS DANIELS?
[25] A: It depends on whether it was a

Page 99

[1] propulsion turbine or auxiliary. If it was
[2] an auxiliary, I did a lot of it. If it was
[3] a propulsion turbine, very little.
[4] Q: Do you recall specifically working
[5] on propulsion turbines manufactured by GE?
[6] A: Working around them, and operating
[7] them, and maintaining them. But no major
[8] repairs to them, or anything like that.
[9] When it come to that, the propulsion
[10] turbines would use the shipyard.
[11] Q: How about the auxiliary turbines?
[12] A: Yes. I did a lot of that. Took
[13] them out, disassembled them, reassembled
[14] them. Had them repaired and reassembled
[15] them.
[16] Q: Do you recall the presence of GE
[17] turbines on the USS LEAHY?
[18] A: It seems like all the others. All
[19] the other ships was the same. I remember
[20] the GE turbines. That's all I remember. I
[21] can't put them on one specific ship.
[22] Q: When you say you recall them, do
[23] you recall because you knew at one time you
[24] worked on GE turbines, or can you place them
[25] on a ship?

Page 100

[1] A: I worked around GE turbines on all
[2] the ships that I was on, as far as I can
[3] remember.
[4] Q: And you have a specific
[5] recollection of working around GE turbines
[6] on each of these vessels?
[7] A: As far as I can remember. Unless
[8] my memory has gone completely bad, which it
[9] could have.
[10] **MR. CAHN:**
[11] That is all the questions I have.
[12] **EXAMINATION BY MR. BROUSSARD:**
[13] Q: Good afternoon, Mr. Turner. My
[14] name is Andre Broussard, and I have a couple
[15] of questions for you.
[16] One of the names that you
[17] mentioned earlier when your attorney was
[18] asking you generically about products that
[19] you can recall seeing over the course of
[20] your career, was the name Victor.
[21] A: (Witness nods head affirmatively.)
[22] Q: What type of product or material
[23] do you associate with the name Victor?
[24] A: As far as I know, a lot of Spiral
[25] Wound Flexitallic asbestos gaskets, and

JAMES C. TURNER AND MARLENE TURNER v. ANCHOR PACKING, ET AL.

Case MDL No. 875  Document 3337  Filed 11/19/01  Page 111 of 233

JAMES C. TURNER
August 9, 2001

Page 101

[1] packing of all types. And as far as I can
[2] remember, wire-inserted asbestos,
[3] carbon-inserted asbestos, braided asbestos.
[4]     I am not positive, but that's my
[5] recollection.
[6]     Q: You mentioned gaskets and packing.
[7] Is that what you associate with the name
[8] Victor?
[9]     A: One of the things, yeah.
[10]     Q: I believe one of the distinctions
[11] that was made earlier was the difference
[12] between a preformed gasket, as opposed to
[13] sheeting gasket; is that a fair distinction
[14] to make?
[15]     A: Yes.
[16]     Q: Did you personally use both types
[17] of gaskets during the course of your career?
[18]     A: Yes.
[19]     Q: Of those two types of gaskets,
[20] which type did you use the most?
[21]     A: I made my own.
[22]     Q: Would that be the sheeting?
[23]     A: Sheeting.
[24]     Q: What type of gasket material do
[25] you associate with the name Victor?

Page 102

[1]     A: As far as I can remember,
[2] compressed asbestos. And I am almost sure
[3] of the Flexitallic gaskets. I remember the
[4] name Victor stamped right on them.
[5]     Q: How did this material that you
[6] associate with the name Victor come
[7] packaged; if you can recall?
[8]     A: The compressed asbestos? It
[9] comes — we used to order it by two- or
[10] three-yard rolls. It would just be rolled
[11] up, and a piece of tape taped around it.
[12]     Q: What color were those rolls?
[13]     A: Depends on what it was; if it was
[14] carbon-coated, or it had a black carbon-like
[15] coating; and some of it was just plain
[16] white. Not white, an off-white.
[17]     Q: Other than white and off-white,
[18] are there any other colors that you can
[19] recall —
[20]     A: Well, the other stuff was black.
[21]     Q: Okay.
[22]     A: I guess it was carbon — no. What
[23] is the stuff you can order — it is coated
[24] with — I can't remember the name of it. It
[25] is a real common product, though. It is —

Page 103

[1] kind of lubricates it.
[2]     Q: Okay, sir.
[3] Can you specifically recall seeing
[4] the name Victor stenciled on a sheet gasket
[5] product?
[6]     A: Yes.
[7]     Q: Are there other names, other than
[8] Victor, that you can recall seeing on sheet
[9] gasket material over your career?
[10]     A: Oh, yes.
[11]     Q: What other names can you recall?
[12]     A: Consolidated Gasket Company;
[13] Garlock; and I am sure there is two or three
[14] others. They just won't come to mind.
[15]     Q: Okay, sir. Of the names you
[16] associate with sheet gasket tools, is it
[17] possible for you to tell me whether Victor
[18] was one you would have used more often, less
[19] often, or can you tell me?
[20]     A: I just ordered it and it came.
[21] Sometimes it was Victor, sometimes it was
[22] Garlock, sometimes it was something else. I
[23] didn't specify — I had no way to specify
[24] what I needed, whether it was Victor or any
[25] other name.

Page 104

[1]     Q: The Victor product that we are
[2] talking about, that is a material that you
[3] used during your service in the Navy?
[4]     A: Yes.
[5]     Q: Did you use any of the material
[6] that you associated with the name Victor
[7] after your retirement from the Navy in 1977?
[8]     A: Yes.
[9]     Q: Where else did you use a product
[10] that you associate with the name Victor
[11] after your discharge from the Navy?
[12]     A: Aboard the cargo boats out here in
[13] the Gulf.
[14]     Q: Was that during your employment
[15] for Fagan?
[16]     A: Fagan, Petrol, Hornbeck.
[17]     Q: Was that the same type of material
[18] that you described for me earlier?
[19]     A: Yes. It looked and felt and
[20] tasted exactly the same to me.
[21]     Q: All right, sir.
[22]     A: Smelled.
[23]     Q: Now, specifically, how would you
[24] use the gasket product that you associate
[25] with the name Victor? What type of

**JAMES C. TURNER** Case MDL No. 875 Document 3337 Filed 19/09/01 Page 2 of 233 JAMES C. TURNER and MARLEENE TURNER v.

**August 9, 2001**

**ANCHOR PACKING, ET AL.**

Page 105

[1] equipment or machinery would you use that
[2] product on?
[3]     **A:** Making gaskets for pumps, water
[4] lines, oil lines, steam lines.
[5]     **Q:** Anything else?
[6] Do you know for a fact, sir, that
[7] the material that you handled, that you
[8] associate with the name Victor, contained
[9] asbestos?
[10]    **A:** No, sir. When I ordered it, when
[11] I looked in the book, I said, Here, this is
[12] what I need, asbestos, compressed asbestos.
[13] That is what I ordered.
[14]    **Q:** Would you specifically order a
[15] product that went by the name Victor, or
[16] would you order compressed asbestos?
[17]    **A:** No. Compressed asbestos.
[18]    **Q:** And whatever you got was what you
[19] got?
[20]    **A:** Yes.
[21]    **Q:** You mentioned ordering these
[22] materials. I take it that it was part of
[23] your job in the Navy, to order certain
[24] materials; is that fair?
[25]    **A:** That's correct. And out in the

Page 106

[1] Gulf.
[2]     **Q:** Did any of your duties for Fagan
[3] Boat Service involve ordering materials?
[4]     **A:** Yes.
[5]     **Q:** And the same for Petrol?
[6]     **A:** Yes.
[7]     **Q:** At any time during your career, do
[8] you have any recollection of ordering a
[9] material, and specifically requesting a
[10] Victor product?
[11]    **A:** No, no.
[12]    **Q:** You mentioned the name
[13] Flexitallic. What type of product or
[14] material specifically do you associate with
[15] the name Flexitallic?
[16]    **A:** Flexitallic, usually a metal ring,
[17] inserted with a flexible spiral wound piece
[18] of metal, inserted with asbestos.
[19] Sandwiched around asbestos.
[20]    **Q:** Was this a gasket product?
[21]    **A:** Yes.
[22]    **Q:** Going back to the distinction we
[23] made earlier, was Flexitallic a pre-formed
[24] gasket?
[25]    **A:** Yes.

Page 107

[1]     **Q:** It was a pre-formed gasket?
[2]     **A:** It was — it was what it was.
[3]     **Q:** You tell me.
[4]     **A:** I ordered a gasket, and that is
[5] what I got. A Flexitallic gasket, all ready
[6] to put in the steam line and bolt it up.
[7]     **Q:** All right, sir.
[8] And did you say that it had a
[9] metal ring?
[10]    **A:** Mostly, yes. Not every situation,
[11] no. Sometimes they didn't have that outside
[12] metal ring.
[13]    **Q:** Did Flexitallic gaskets have any
[14] type of name or words stenciled on the
[15] gasket itself?
[16]    **A:** I remember the word Victor and
[17] Flexitallic. As far as my recollection
[18] right now is, Flexitallic is a name of a
[19] manufacturer. But I am not positive.
[20]    **Q:** Can you specifically recall seeing
[21] the name Flexitallic stenciled on any type
[22] of gasket?
[23]    **A:** Yes.
[24]    **Q:** Was that a pre-formed gasket?
[25]    **A:** Yes.

Page 108

[1]     **Q:** And you mentioned again, the name
[2] Victor. I want to make sure we are clear.
[3] Can you recall the name Victor
[4] stenciled on anything other than the sheet
[5] gasket that we talked about earlier?
[6]     **A:** As far as I can remember, it was
[7] stenciled on the Flexitallic gasket. On
[8] what I call the Flexitallic gaskets. The
[9] spiral wound asbestos-inserted gasket with
[10] the name Victor stenciled right on it.
[11]    **Q:** Were all of the gaskets — sorry.
[12]    **A:** Unless I am mistaken. I don't
[13] think I am.
[14]    **Q:** Were all the gaskets that you can
[15] recall seeing the name Victor on, were they
[16] all round?
[17]    **A:** Yes.
[18]    **Q:** When can you recall personally
[19] working with Flexitallic gaskets?
[20]    **A:** From the time I went in the
[21] Navy — from the time I went aboardship in
[22] October of 1957, until I retired in 1977.
[23]    **Q:** Did you ever have occasion to work
[24] with a Flexitallic gasket after you retired
[25] from the Navy in 1977?

JAMES C. TURNER AND MARLENE TURNER v.
ANCHOR PACKING, ET AL.

Case MDL No. 875   Document 3337   Filed 11/19/01   Page 113 of 233

JAMES C. TURNER
August 9, 2001

Page 109

[1]  **A:** Yes.

[2]  **Q:** Where?

[3]  **A:** Out here in the Gulf, on these
[4] cargo boats.

[5]  **Q:** And specifically, what type of
[6] equipment or machinery were you working on,
[7] that were requiring you to work with a
[8] Flexitallic gasket?

[9]  **A:** Usually the diesel exhaust. The
[10] exhaust from the — specifically, D399
[11] Caterpillars.

[12]  **Q:** Is there any other type of
[13] specific machinery that you can recall
[14] working with a Flexitallic gasket?

[15]  **A:** Not out here in civilian life, no.

[16]  **Q:** What about in the Navy?

[17]  **A:** Yes.

[18] Wait. Repeat your question.

[19]  **Q:** Sure.
[20] Other than the exhaust lines on a
[21] Caterpillar, and I assume you are talking
[22] about a diesel Caterpillar, while working on
[23] the workboats out in the Gulf, can you
[24] recall working with a Flexitallic gasket on
[25] any other type of specific application?

Page 110

[1]  **A:** Not military. Is that what you
[2] are asking?

[3]  **Q:** I am asking both, either civilian
[4] or the military?

[5]  **A:** The steam lines in the United
[6] States Navy ships. I mean, every three or
[7] four feet has got a Flexitallic gasket in
[8] it, especially if it is 600-pound steam and
[9] above.

[10]  **Q:** When you would handle Flexitallic
[11] gaskets, were these gaskets new, like right
[12] out of the package?

[13]  **A:** Not all the time. I mean, we had
[14] to keep a stock of them on hand.

[15]  **Q:** And I am not sure I understand
[16] your answer. When did you have occasion to
[17] use a Flexitallic gasket, when the gasket
[18] was not new?

[19]  **A:** Well, when you say not new, as
[20] opposed to unused? I never used a used
[21] gasket in a steam line. It was always
[22] unused, in other words, new. Is that what
[23] you mean?

[24]  **Q:** Yes, sir. And let me — maybe it
[25] was a poorly worded question.

Page 111

[1]  My question to you, sir, is when
[2] you used Flexitallic gaskets over the course
[3] of your career, were these gaskets, you were
[4] always installing a new gasket when you used
[5] them; is that fair?

[6]  **A:** Yes, yes.

[7]  **Q:** Did the gasket itself create any
[8] dust when you handled it?

[9]  **A:** Always.

[10]  **Q:** And how would the gasket itself
[11] create dust when you handled it?

[12]  **A:** Just by picking it up and looking
[13] at it, and making sure it is the right size.
[14] And you have got to rub it a little bit with
[15] your hand. Your fingers is going to get on
[16] it. And I have always seen just a minute
[17] amount of dust flying from it all the time.
[18] Just about every time you pick one up.

[19]  **Q:** Was that true of all gaskets that
[20] you handled during your career?

[21]  **A:** All Flexitallic gaskets that I can
[22] remember, yes.

[23]  **Q:** Now, Flexitallic wasn't the only
[24] type of preformed gasket that you handled;
[25] correct?

Page 112

[1]  **A:** Right.

[2]  **Q:** You handled other types of
[3] gaskets, other than the Flexitallic?

[4]  **A:** Compressed asbestos.

[5]  **Q:** Yes, sir.
[6] I'm sorry?

[7]  **A:** I didn't see any dust flying from
[8] them.

[9]  **Q:** You didn't see any dust flying
[10] from the compressed asbestos material?

[11]  **A:** Not usually.

[12]  **THE VIDEOGRAPHER:**
[13]  We're going off the record; it is
[14] 2:27 p.m.

[15]  (Recess.)

[16]  **THE VIDEOGRAPHER:**
[17]  Back on record; it is 2:31 p.m.,
[18] and the beginning of tape two.

[19]  **EXAMINATION BY MR. BROUSSARD:**

[20]  **Q:** Mr. Turner, I appreciate your time
[21] this afternoon, and I have just a few more
[22] questions for you, sir.

[23]  Other than the name Flexitallic,
[24] do you associate any other specific names
[25] with preformed gaskets?

Page 113

[1] **A:** Other than Flexitallic?

[2] **Q:** Yes, sir.

[3] **A:** Wait. Repeat that.

[4] **Q:** We talked about Flexitallic.

[5] **A:** Uh-huh (affirmative response).

[6] **Q:** And you indicated that that was a

[7] preformed type of gasket; correct?

[8] **A:** Yes.

[9] **Q:** Do you associate any other

[10] specific names with preformed gaskets, that

[11] you may have ever worked around?

[12] **A:** As far as I can remember, all of

[13] them, all of the major companies that

[14] manufacture compressed asbestos,

[15] manufactures the preformed gaskets, already

[16] punched out. Standard size.

[17] Garlock, John Crane. I am almost

[18] sure whoever manufactures them, usually

[19] makes some preformed gaskets.

[20] **Q:** Okay, sir. Right before we took

[21] that last break, we were talking about dust.

[22] And I believe you said that you don't recall

[23] the compressed asbestos creating any visible

[24] dust; is that correct?

[25] **A:** Very little.

Page 114

[1] **Q:** Okay, sir.

[2] **A:** As opposed to the Flexitallic,

[3] where you can just handle it, and almost

[4] invariably, you're going to see some dust.

[5] But there is some dust. You can see —

[6] well, not necessarily flying in the air, but

[7] you get it on your fingers, and you can feel

[8] it.

[9] **Q:** And just to make sure that I am

[10] clear, when you say compressed asbestos, is

[11] that the same thing as the gasket sheeting

[12] material?

[13] **A:** Yes.

[14] **Q:** And I have one more very important

[15] question for you, sir. Did you go by any

[16] nicknames over the course of your work

[17] career?

[18] **A:** They used to call me Greaser.

[19] **Q:** Glad I asked.

[20] **MR. BROUSSARD:**

[21] Thank you, sir.

[22] **MR. AMES:**

[23] All right. Let's go off the

[24] record a minute.

[25] **THE VIDEOGRAPHER:**

Page 115

[1] Going off the record; it is

[2] 2:34 p.m.

[3] (Recess.)

[4] **THE VIDEOGRAPHER:**

[5] Back on record; it is 2:37 p.m.

[6] **EXAMINATION BY MR. MCEACHIN:**

[7] **Q:** Mr. Turner, my name is Eugene

[8] McEachin. Good afternoon, sir. I wanted to

[9] ask you a couple of questions.

[10] You said that after you moved to

[11] Louisiana, and began working in Louisiana on

[12] these, I call them crewboats, you call them

[13] cargo boats —

[14] **A:** There is a distinction.

[15] **Q:** Okay. Well, all these cargo

[16] boats. Now, you said you went to some

[17] shipyards with these cargo boats. What

[18] shipyards did you go to?

[19] **A:** Allied Shipyard in Larose;

[20] Bollinger Shipyard in Larose; Bollinger

[21] Shipyard in Lockport; Bollinger Shipyard in

[22] Texas City. There is more.

[23] **Q:** Well —

[24] **A:** I can't remember.

[25] **Q:** You can't remember?

Page 116

[1] **A:** CRS. Right. I can translate

[2] that.

[3] **Q:** Do you know the names, sir, of any

[4] companies that sold, supplied or distributed

[5] any asbestos-containing products to the

[6] boats that you worked on here in Louisiana,

[7] or to any of these shipyards?

[8] **A:** The way that happens is, the

[9] request goes from the boat to the

[10] headquarters, the office. It is ordered

[11] through the office, and sent out to the

[12] boat. I have no idea where it comes from.

[13] I just use it.

[14] **MR. MCEACHIN:**

[15] That is all the questions I have.

[16] Thank you very much.

[17] **EXAMINATION BY MS. BREAUX:**

[18] **Q:** Mr. Turner, my name is Claire

[19] Breaux.

[20] You had testified earlier that you

[21] wore dust masks, that you believe were

[22] manufactured by 3-M, when painting. When

[23] did you wear those dust masks?

[24] **A:** In the Navy and after the Navy.

[25] **Q:** Did you only wear those dust masks

JAMES C. TURNER AND MARLENE TURNER v.
ANCHOR PACKING, ET AL.

Case MDL No. 875 · Document 3337 · Filed 11/19/01 · Page 115 of 233

JAMES C. TURNER
August 9, 2001

Page 117

[1] when you were painting?

[2] A: Usually, yes. If I was in a

[3] situation where I knew there was going to be

[4] dust, like cement dust, barite dust, I would

[5] put one on.

[6] Q: What was that?

[7] A: Barite. It is a product they used

[8] in the wells to keep the fluid, to keep

[9] the — to keep it lubricated.

[10] Q: Did you ever wear a dust mask

[11] while working with asbestos-containing

[12] products?

[13] A: Not to my knowledge.

[14] Q: Can you describe the dust masks

[15] you wore?

[16] A: Well, it was white, and had a

[17] little rubber thing to put behind your ears.

[18] It molded over your nose and molded around

[19] your mouth.

[20] Q: Was the face mask portion of the

[21] mask, what color was it?

[22] A: White.

[23] Q: And was it smooth or was it

[24] ridged?

[25] A: Ridged.

Page 118

[1] Q: And how many straps were there?

[2] A: Just one, as far as I know.

[3] Q: And what color was it?

[4] A: Neutral, like a tan rubber.

[5] Q: Was it adjustable, can you

[6] adjust —

[7] A: I believe it was. Not sure.

[8] Q: Was there any writing on the mask?

[9] A: Usually, no.

[10] Q: You say usually, no —

[11] A: I don't remember. I think there

[12] was sometimes, but a lot of times, there was

[13] nothing on it.

[14] Q: Was there some sort of clip to

[15] fasten to your nose?

[16] A: Not to fasten. I think it was a

[17] little bright and shiny thing, like a metal

[18] object. I think you could clamp it on

[19] your — kind of — not really adjustable,

[20] but you could make it fit your nose better.

[21] Q: Was that on the outside or inside

[22] of the mask?

[23] A: I think the metal was on the

[24] inside. I don't remember exactly.

[25] Q: And do you recall what year you

Page 119

[1] first wore a dust mask, or what ship, if

[2] that would help?

[3] A: I don't believe I used them until

[4] I was aboard the LUCE, in the '60s.

[5] Q: And then, you recall wearing them

[6] on the LUCE; did you wear them on every

[7] ship you worked on?

[8] A: I think I used them on every ship

[9] from then on.

[10] Q: What about after the Navy, did you

[11] wear any respiratory protection at any of

[12] the other places, Petrol, Fagan or the

[13] plastic plant?

[14] A: Yes.

[15] Q: All three?

[16] A: Yes.

[17] Q: Plastics?

[18] A: Plastic plant? No. Don't

[19] remember using them there.

[20] Q: So you do recall using them both

[21] at Petrol and Fagan?

[22] A: Yes.

[23] Q: Now, you have described a dust

[24] mask. Is that the only type of dust mask

[25] you wore over the years?

Page 120

[1] A: No.

[2] Q: You have worn different kinds?

[3] A: Yes.

[4] Q: The dust mask that you have

[5] described, who was the manufacturer of that

[6] dust mask?

[7] A: I don't know. Don't know.

[8] Q: Did you ever see the packaging?

[9] A: I have seen them, yes.

[10] Q: Do you associate 3-M with that

[11] particular dust mask that you just

[12] described?

[13] A: Not necessarily. Not necessarily.

[14] Q: When do you recall seeing 3-M

[15] packaging?

[16] A: I don't remember if it was every

[17] ship I was on, or just one or two.

[18] Q: But you do recall seeing the

[19] packaging on a Navy ship?

[20] A: Yes. And out here in the Gulf, on

[21] at least — at least one of the companies.

[22] Q: What did the packaging look like?

[23] A: It was red, with white lettering,

[24] as far as I can remember.

[25] Q: Did you ever read any pamphlets

Page 121

[1] about the dust masks?

[2]   **A:** I glanced at it. I didn't read as

[3] much as I should, I am sure.

[4]   **Q:** Did you ever read any of the

[5] instructions or directions about any of the

[6] dust masks you wore?

[7]   **A:** I read them, but I don't remember.

[8]   **Q:** Were there any warnings on the

[9] packaging that the dust masks came in?

[10]   **A:** Not that I remember.

[11]   **Q:** And you said you recalled some

[12] dust masks had writing on them?

[13]   **A:** I seem to remember that, yes.

[14]   **Q:** Do you recall what the writing

[15] said?

[16]   **A:** No.

[17]   **Q:** Other than the dust masks you have

[18] described, what other dust masks have you

[19] worn?

[20]   **A:** They furnished dust masks to use

[21] in the cement, in the barite, as goggles

[22] that covers your whole head, face, under

[23] your chin. And it has the canisters to

[24] filter out the material.

[25]   **Q:** And you are sort of indicating it

Page 122

[1] was a double-cartridge respirator?

[2]   **A:** Yes.

[3]   **Q:** And you wore those around cement

[4] dust and barite dust?

[5]   **A:** Yes.

[6]   **Q:** These double-cartridge

[7] respirators, do you know who manufactured

[8] them?

[9]   **A:** No.

[10]   **Q:** And you didn't wear those types of

[11] respirators around any asbestos-containing

[12] products, did you?

[13]   **A:** No.

[14]   **Q:** Other than the double-cartridge

[15] respirator, and the single-strap dust mask

[16] you just described, did you ever wear any

[17] other types of respiratory protection,

[18] either while in the Navy or out on the Gulf?

[19]   **A:** I am sure I have, but I can't

[20] remember enough to describe it in any detail

[21] at all.

[22]   **Q:** Have you ever worn any other type

[23] of dust mask, other than a single-strap dust

[24] mask?

[25]   **A:** Not that I recall.

Page 123

[1]   **Q:** So you don't recall ever wearing a

[2] double-strap dust mask?

[3]   **A:** No.

[4]   **Q:** Did you ever receive any

[5] instructions from anyone at the Navy, or

[6] anyone at Petrol or Fagan, about the use of

[7] the dust mask or the respiratory protection

[8] you wore?

[9]   **A:** No.

[10]   **Q:** Was respiratory protection ever a

[11] subject at any safety meetings, either in

[12] the Navy or at Petrol or Fagan?

[13]   **A:** In the later years, yes. At

[14] Petrol. Not necessarily Petrol, but after

[15] Hornbeck bought Petrol out, they had started

[16] monthly safety meetings, and that subject

[17] always came up, yes.

[18]   **Q:** What year was that?

[19]   **A:** In late '80s, early '90s.

[20]   **Q:** So the first time you recall

[21] respiratory protection being discussed at a

[22] safety meeting, would have been in the late

[23] 1980s or the early 1990s?

[24]   **A:** Yes.

[25]   **Q:** And was respiratory protection at

Page 124

[1] those safety meetings discussed in relation

[2] to any asbestos?

[3]   **A:** No.

[4]   **Q:** Were you ever told to wear

[5] respiratory protection while working around

[6] asbestos?

[7]   **A:** No. No.

[8]   **Q:** And you said you wore a dust mask

[9] when painting. What type of painting?

[10]   **A:** Just painting the inside of the

[11] engine room.

[12]   **Q:** Were you spray painting or was it

[13] brush painting?

[14]   **A:** Brush.

[15]   **Q:** And while you were doing this

[16] brush painting while wearing a dust mask,

[17] were there any other workers around you,

[18] doing any other type of work?

[19]   **A:** Wait. I did use the dust mask

[20] when I was spray painting.

[21]   **Q:** Okay. And let me ask that

[22] question again.

[23]     At any time while you wore the

[24] dust mask while painting, were there any

[25] other trades working near you? Any other

JAMES C. TURNER AND MARLENE TURNER v.
ANCHOR PACKING, ET AL.

Case MDL No. 875   Document 3337   Filed 11/19/01   Page 117 of 233

JAMES C. TURNER
August 9, 2001

Page 125

[1] workers working around you, doing anything
[2] other than painting?
[3]   **A:** Yes, I am sure.
[4]   **Q:** Do you have a specific
[5] recollection?
[6]   **A:** (Witness shakes head negatively.)
[7]   **Q:** No? You have to answer out loud.
[8]   **A:** Just working on machinery.
[9] Specifically what, I don't remember.
[10]   **Q:** Did you ever work with any
[11] asbestos-containing products that you
[12] believed to be manufactured by 3-M?
[13]   **A:** Not that I remember.
[14]   Subsequent to — well, I have been
[15] told that the 3-M dust masks used to contain
[16] asbestos. That's all I know.
[17]   **Q:** Who told you that?
[18]   **A:** I don't remember.
[19]   **Q:** When were you told that?
[20]   **A:** I don't remember.
[21]   **Q:** Your petition specifically alleges
[22] that you worked around asbestos-containing
[23] products manufactured by 3-M. And it
[24] specifically mentions sandpaper. Do you
[25] have any knowledge of ever working with any

Page 126

[1] sandpaper manufactured by 3-M, which would
[2] have contained asbestos?
[3]   **A:** I can't fathom where that came
[4] from.
[5]   **Q:** So you have no knowledge of ever
[6] working with any sandpaper manufactured by
[7] 3-M?
[8]   **A:** Sandpaper, yeah; whether it
[9] contained asbestos or not, I don't know.
[10]   **Q:** And you have no knowledge, as you
[11] sit here today, that any sandpaper you ever
[12] used contained asbestos, do you?
[13]   **A:** Not to my knowledge.
[14]   **Q:** Do you have a recollection of
[15] using 3-M sandpaper?
[16]   **A:** I am almost positive, yes.
[17]   **Q:** When did you use it, and for what?
[18]   **A:** Seems like I have used it all my
[19] life. I don't know. I just looked at the
[20] back of them, and seems like I seen 3-M.
[21]   **Q:** And I know your hobby used to be
[22] woodworking.
[23]   **A:** Yes.
[24]   **Q:** Did you use it in connection with
[25] your woodworking?

Page 127

[1]   **A:** Yes, yes.
[2]   **Q:** Did you ever use it while working
[3] with asbestos-containing products?
[4]   **A:** Not that I know of.
[5]         **MS. BREAUX:**
[6]   I believe that is all I have.
[7] Thank you.
[8]         **MR. AMES:**
[9]   Are there any other counsel that
[10] have either one or two questions, to their
[11] knowledge, or brief cross-examination of
[12] Mr. Turner?
[13]   Mr. Turner has told me that he has
[14] just about reached the end of his ability to
[15] function today.
[16]   If anybody has anything that they
[17] would anticipate being very, very short, we
[18] may be able to accommodate them. But in the
[19] event anybody has anything that is going to
[20] take any time whatsoever, we will be more
[21] than happy to abide by our discussions at
[22] the beginning of the afternoon, and reach an
[23] accommodation in terms of allowing
[24] additional cross-examination, once
[25] Mr. Turner has had the chance to recuperate

Page 128

[1] from today.
[2]         **THE VIDEOGRAPHER:**
[3]   One other thing.
[4] Before we go off the record, for
[5] the videotape, could I have Counsel identify
[6] themselves one more time, please?
[7]         **MR. MCEACHIN:**
[8]   My name is Eugene M. McEachin; I
[9] represent The Reilly-Benton Company.
[10]         **MS. RAMSEY:**
[11]   Holly Ramsey for Eagle Inc.
[12]         **MR. GUIDRY:**
[13]   James Guidry for Combustion
[14] Engineering.
[15]         **MR. ABRAHAM:**
[16]   Michael Abraham for Flintkote
[17] Company and Flintkote Mines.
[18]         **MS. BREAUX:**
[19]   Claire Breaux for Minnesota Mining
[20] and Manufacturing.
[21]         **MS. LAPPENGA:**
[22]   Wendy Lappenga for John Crane,
[23] Inc.
[24]         **MS. PELLEGRIN:**
[25]   Jennie Pellegrin on behalf of

**JAMES C. TURNER**
**August 9, 2001**

Case MDL No. 875   Document 3337   Filed 11/19/04   Page 129 of 133

JAMES C. TURNER AND MARLENE TURNER   v.
ANCHOR PACKING, ET AL.

---

Page 129

[1] Ingersoll-Rand.

[2] **MR. HAROLD:**

[3] Mike Harold for the McCarty

[4] Corporation.

[5] **MR. MAYEAUX:**

[6] Ben Mayeaux; Ingersoll-Rand.

[7] **MR. LILLY:**

[8] Ed Lilly; A.W. Chesterton.

[9] **MR. STRAYHAN:**

[10] Lee Strayhan for Carborundum.

[11] **MR. GARY:**

[12] Leon Gary for Viacom, Inc.

[13] **MR. CAHN:**

[14] Cory Cahn for General Electric.

[15] **MS. NATHAN:**

[16] Pamela Nathan; J.T. Thorpe.

[17] **MR. BROUSSARD:**

[18] Andre Broussard; Flexitallic and

[19] Dana Corporation.

[20] **MR. GRECO:**

[21] Claude Greco; Taylor Seidenbach,

[22] Inc.

[23] **MR. BROWN:**

[24] Scott Brown; Georgia-Pacific

[25] Corporation.

Page 130

[1] **MR. MCMURTRAY:**

[2] Patrick McMurtray; Foster Wheeler.

[3] **MR. WILLIAMS:**

[4] Robert Williams; Kelly Moore.

[5] **MR. SWETMAN:**

[6] Max Swetman; Garlock.

[7] **MR. AMES:**

[8] I am Sherman Ames on behalf of the

[9] Plaintiff.

[10] **THE VIDEOGRAPHER:**

[11] This conclude this evening's

[12] deposition; it is 2:55 p.m.

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 131

[1]

[2]

[3] CERTIFICATE OF DEPONENT

[4]

[5]

[6] I hereby certify that I have read

[7] and examined the foregoing transcript, and

[8] the same is a true and accurate record of

[9] the testimony given by me.

[10] Any additions or corrections that I

[11] feel are necessary, I will attach on a

[12] separate sheet of paper to the original

[13] transcript.

[14]

[15]

[16]

[17]

[18]

[19] (Witness' signature)

[20]

[21]

[22]

[23]

[24]

[25]

Page 132

[1]

[2] REPORTER'S CERTIFICATE

[3]

[4] I, Cathy Renee Powell, CCR,

[5] Certified Court Reporter, State of

[6] Louisiana, do hereby certify that

[7] within-named witness personally appeared

[8] before me at the time and place herein set

[9] out, and after having been duly sworn by me,

[10] according to law, was examined by counsel.

[11] I further certify that the

[12] examination was recorded stenographically by

[13] me and this transcript is a true record of

[14] the proceedings.

[15] I further certify that I am not of

[16] counsel to any of the parties hereto, nor in

[17] any way interested in the outcome of this

[18] action.

[19]

[20]

[21]

CATHY RENEE' POWELL

[22] Certified Court Reporter

[23]

[24]

[25]

[1]

STATE OF LOUISIANA

PARISH OF LAFOURCHE

    I, REBECCA L TROSCLAIR, Deputy Clerk of Court, do hereby certify that the following 263 pages is a true and correct copy of the record entitled JAMES C. TURNER, ET AL VS. NO. 91847 ANCHOR PACKING COMPANY, ET AL filed on July 30, 2001 in the 17th Judicial District Court, Parish of Lafourche.

    In testimony whereof, witness my hand and official seal, September 7, 2001, at Thibodaux, Louisiana.


                           *Rebecca L. Trosclair*
                           Rebecca L. Trosclair
                           Deputy Clerk of Court

it is acknowledged that when fibers are inhaled, they are retained in the lungs and it is possible that even one fiber could cause mesothelioma." It was discussed as to whether the Association and its constituent membership should warn the public. It is noted by Dr. Pelnar that mesothelioma is being found in the United Kingdom and in the United States, and elsewhere. He appears to be implicating fibers other than crocidolite. Mesothelioma, in 80% of the cases investigated, showed an occupational exposure which might be mainly, though not exclusively, due to crocidolite. The letter notes that the ACPA has become an associate member of the IHF. It goes on to state, "From what we have learned, we can assume asbestos cement Products may pose health problems where there is long term exposure . . . it is demonstrated that there is a dose relationship between exposures and disease. Malignancies related to asbestos are clear. Smoking appears to compound the risk." None of this information was given to the public.

44.

Flintkote was also a long-time member of the Gypsum Association. In September of 1967, the Gypsum Association's Safety Committee discussed the issues and concerns of neighborhood malignancies and asbestosis in connection with asbestos mining operations and asbestos product manufacturing operations respecting asbestos dust emissions. Mr. R.W. Henley and J. Tuffy, of the Flintkote Company are on this committee and were in attendance at this discussion. At that time the Gypsum Association members are expressing uncertainty as to the existence of any measurable threshold of dust and the potential of dust to cause harm to the neighborhood bystanders to these operations. This fact is important in that it demonstrates detailed knowledge of the dangers and risks of injury on the part of Flintkote and that, in fact, Flintkote has knowledge in 1967 that there is virtually no safe exposure level connected with asbestos.

29

45.

Mr. J.A. Main, a corporate official of the Flintkote Company and Flintkote Mines, Ltd., was in attendance at the summer meeting of QAMA in August of 1966. At this meeting, Mr. Main, along with other industry representatives discussed methods by which the asbestos industry could counter recent bad publicity about asbestos. It was the stated policy of QAMA to promote the idea that the presence of asbestos-related pleural plaques and the diagnosis of mesothelioma had no causal relationship to each other, despite having knowledge that the contrary was true. These industry officials agreed that making this statement could give the industry ammunition with which to fight off attacks. It was agreed by Mr. Main, of the Flintkote operations, as well as others in attendance, that they will use public relation devices to funnel information around the world to promote the idea that the use of asbestos has improved industry; that there has not been a single objective complaint about its dangers; and that asbestos communities are good places to live. It is agreed by all present that the asbestos industry is still viewed by the media as being authoritative on the dangers. QAMA will, therefore, use this to its advantage to counteract dangerous medical statements made in the United States. It is agreed at that time that QAMA will use a new research counsel . . . "we will announce our research counsel and make it appear that we are launching an important international health project of truly humanitarian significance." Moreover, "we will express criticism of Selikoff's style and we will have to be dramatic in doing so." Dr. Selikoff was a medical expert publishing studies at that time strongly indicting that asbestos is carcinogenic. It is further agreed by those present that "rather than make these announcements from industry-sponsored QAMA we will do so from the health council itself." That way, the statements will be more believable.

46.

In October of 1966, QAMA publishes a newsletter regarding a make up of the members of what appears to be the new "Institute of Occupational and Environmental Health" ("IOEH").   The industry association touts: "Members of our Scientific Committee of QAMA are also members of the Institute of Occupational and Environmental Health."   The fact is concealed from the public.   The Executive Committee of this institute is composed entirely of industry (QAMA) members.   The Board of Directors of IOEH are all QAMA members, including Mr. J.A. Main, of the Flintkote Company.   It is agreed and understood that the establishment of this organization, under a new name and incorporation, will still be funded by QAMA, and will posture itself as free as possible of bias in the eyes of the scientific community.   This is important to facilitate our acceptance of our activities by the scientific world . . .  the location of the institute in the same quarters of QAMA is not "too unfortunate" and is not viewed as a serious impediment.   The Committee (QAMA) is going to set the agenda for the foundation.   Five goals are announced by QAMA with respect to the institute.   QAMA will direct what will be done in connection with supporting research; we will contact scientists and medical schools around the United States to locate scientists who are interested in generating interest in our aimed studies; we will not publicize our activities; we will be mindful of the strategies by the tobacco industry; and we will retain the right of veto power over published statements.   Mr. J.A. Main, of the Flintkote Company and Flintkote Mines, Ltd., was present and agreed to these tenets.   At this very same meeting, information was disseminated from European studies which indicated that second-hand exposure of wives doing laundry can cause mesothelioma.   Additionally, it was acknowledged that many of the papers presented in the overseas study were pessimistic and tended to suggest that even short exposures can cause malignancy.

31

47.

In February of 1967, J.A. Main is promoted to Director of QAMA. It is acknowledged that the Association is experiencing trouble regarding longshoremen concerns about asbestos health in the United Kingdom in connection with the method of packaging of asbestos Products from Canada. It is also discussed and agreed those reports of mesothelioma in Pennsylvania from asbestos exposure would not be published in Minutes of the Tokyo QAMA conference. It was agreed at this conference that the QAMA would set up a slush fund with ATI and ACPA, most of the money coming from Canadian sources in order to promote the scientific committee's "quiet revolution." At this meeting, the Association discusses the increasing use of asbestos world wide, and at the same time, again endorses continuing to downplay asbestos hazards.

48.

On May 25, 1967, a special technical committee meeting of QAMA is held. Mr. J.C. Blais and Mr. D. Poirier are in attendance. Both are designated employees of Flintkote Mines, Ltd., however, Mr. Blais and Mr. D. Poirier are stockholders and corporate officials of the Flintkote Company. With reference to longshoremen concerns respecting asbestos bags, it was agreed that they would study the loading process and look for ways to pin the blame of exposure to the stevedores themselves. At this time, discussions are held regarding coordinating certain "aimed medical studies" between QAMA and ATI, for IOEH.

49.

At the August 1967 QAMA meetings, Mr. J.A. Main, QAMA Director, is present. It was discussed that despite the British change in the United Kingdom's laws regarding the packaging of asbestos, no changes would be made until they could get further clarification of what would be required. Additionally, it was agreed that the industry will make no admission with

respect to Dr. Selikoff's challenge to the industry to do something to make asbestos less potentially hazardous to human health. At the same time, this Association acknowledged that the industry is looking at modifying handling methods to reduce the risk of exposure from the dust. The QAMA Public Relations Committee discussed meeting with the Scientific Committee to discuss the possibility of producing counter propaganda regarding medical issues.

50.

In August, 1967, Mr. J.A. Main, of Flintkote Corporation, meets with Dr. Wright, of the Occupational and Environment Health and Safety Committee of QAMA. Dr. Wright notes that there is a threat of clear-cut evidence of lung cancer associated with asbestos fiber. They are also advised by Dr. Enterline that there are excessive deaths among asbestos textile workers. The Committee agrees that they will have the Public Relations Committee of QAMA produce some rebuttal material -- even though there is no scientific data available to support the Public Relations Committee's position. During this time period, both QAMA and ATI, with the full knowledge of members, were issuing public statements that they are not aware of a single case of injury from asbestos.

51.

On November 13, 1967, Mr. Poirier of the Flintkote Company, is in attendance at the QAMA meeting, where the over wrapping problems of longshoremen in the United Kingdom is admittedly unresolved. It is determined that the Committee will blame bag damage on workers.

52.

In March, 1968, the QAMA holds its meeting in the Bahamas. Mr. J.A. Main of the Flintkote Company is in attendance, along with other Flintkote employees. It is announced that the QAMA Institute of Occupational Environmental Health now has a budget of $250,000.00. It is determined

33

that for public relations purposes, QAMA will announce that there is no scientific evidence that anyone has ever contracted any disease from exposure to Products containing asbestos. QAMA pronounces that "[we] will state that we are studying this in Canada, and that previous research shows that everything is okay." It is noted that the prior year, Flintkote Mines produced 36,618 tons of asbestos. At the same meeting, it is suggested that a new study will be done at several locations in the New Orleans area, sponsored by QAMA, and Metropolitan Life Insurance Company. One of the sites for this study is the Flintkote Company manufacturing facility on Galvez Street, New Orleans, Louisiana. The Minutes of this special meeting support the idea that the industry knows that the threshold limit values established by industry and accepted by industrial hygiene practices as safe are, in fact, not safe. At this meeting, and in the Minutes, it is acknowledged that the cancer hazard potential for asbestos has been known since 1935. After talking to tobacco lawyers, QAMA members suggest not getting carried away by the medical profession. At this conference, it is also acknowledged that Flintkote and the industry know of mesothelioma and its relationship to asbestos exposure.

53.

At a QAMA meeting in May of 1968, Mr. D. Poirier, of Flintkote was in attendance. At this meeting, it is pointed out that the number of lung sickness claims is increasing with QAMA members stating that  "[we] need to place industry representatives on the workers' compensation boards." It is also discussed that the dust studies done by the Institute of Occupational and Environmental Health ("QAMA") at Johns Manville Sales Corporation are disappointing. It is agreed that each Company will look in to obtaining a legal opinion as to the advisability of placing a warning on fiber bags.

34

54.

In September of 1968, at the special QAMA meeting, attended by Flintkote Mines, Ltd., Mr. J.A. Main, Director of QAMA, as well as a Flintkote Corporation corporate official, and Mr. D. Poirier, the Institute of Occupational and Environmental Health Committee adopts a resolution to place warnings on bags: "Caution. Bag contains chrysotile fiber -- use protective devices. Inhalation over long periods may be harmful." At this meeting, the tabulation of Quebec Mining tonnage was also made, showing an all time high in the export of Canadian asbestos.

55.

In November of 1968, a letter is sent from Paul A. Filteau to Mr. J.A. Main, of the Flintkote Company, and to other asbestos companies, transmitting minutes of the September, 1968 meeting. It is acknowledged that the following aspects were covered at the meeting: an increase was reported in industrial diseases related to asbestos; that the asbestos business in Canada was still on the upswing; Dr. Newhouse's report on mesothelioma was based on levels of exposure that were alarming to the industry; there were reports of cases of neighborhood exposures and disease; the shipyard studies by Dr. Selikoff indicated that there was very heavy exposure reported; and that the United States Association of Governmental and Industrial Hygienists was contemplating a 2 fiber per cc standard, but the Antigua QAMA Conference has had an impact, moving it from 5 million particles per cubic foot to 2 million particles per cubic foot (maintaining exposure guidelines at levels both the industry and Flintkote knew to be unsafe). It is noted that the United Kingdom has now established a 2 fiber per cc of air. It is acknowledged by the industry that the clouds are about to burst; the claims are mounting and that procedures should be systematically placed to have all claims canceled. The Institute (IOEH) doctors are well respected and are coordinated with our Institute. It is the

35

intention of QAMA members to use its doctors to influence workers' compensation boards. Flintkote is fully involved in this decision.

56.

In December of 1968, in a transmittal letter to Mr. J.A. Main, of Flintkote regarding a QAMA meeting, it was agreed that the employers would arrange to place their representatives on workers' compensation boards. That way, there could be a collaboration between the asbestos clinic and miners, and the workers' compensation boards. It was noted that the purported Johns-Manville bag warning was not yet in effect. It was further agreed that the asbestos companies would stop giving asbestos to the schools for modeling or molding purposes. Additionally, the Committee agreed to contact the government about direct participation in any new legislation regarding air pollution by the government.

57.

In the March, 1969, meeting of the Health Council of QAMA, listed in attendance are Mr. James Moran, Mr. J.A. Main, and Mr. W. N. Knorr, all of Flintkote. It was noted in this meeting that the QAMA studies demonstrated that the respirators in use were not satisfactory for protection from asbestos dust. It was agreed that QAMA would implement a safe practices code, which would be prepared for the purposes of limiting the liability of the manufacturers. Dr. Wright advised the Committee on the current assessment of asbestos as an environmental health problem, noting that 80% of asbestos workers in the United Kingdom have asbestos-related problems. Dr. Wright noted that cancer -- the risk of cancer -- for asbestos workers could be as high as 90 times the general public population. It was further noted that the mechanism for the QAMA funding for scientific work that the Directors of QAMA, not the scientists, have the final say so on what gets funded and published.

58.

March 10, 1969, the QAMA transmits a letter of the Minutes of the January 1969 meeting. Mr. J.A. Main, and Mr. Poirier for Flintkote were in attendance. Dr. Wright indicated he thought he may not be able to hold his scientific committee together, noting that the asbestos industry had a serious problem and could not leave the matter to others (referring to the Scientific Committee) and that the industry must fight its own battles before someone else determines the issue of the hazards. It is noted that Threshold Limit Values ("TLVs") are being reduced in both the United Kingdom and the United States.

59.

April of 1969, at the QAMA special meeting, where Mr. J.A. Main and Mr. D. Poirier of Flintkote are in attendance, it was announced that shrink wrap of asbestos pallets would begin at the request of only certain customers. It was also acknowledged that industrial disease and accident claims were increasing. QAMA members agreed to use a tactic of using industrial doctors with sympathy to industries, and industrial standards to attempt to defeat mesothelioma claims.

60.

June, 1969, Mr. J.A. Main and Mr. Poirier of Flintkote, attend an IOEH meeting wherein the research of the New Orleans, Louisiana, plants was discussed as follows: "We are still waiting on National Gypsum's results. Both Drs. Thompson and Rodner report that mesothelioma will become an epidemic in the future. It is agreed that the Association will publish a book entitled 'Toward the Safe Use of Asbestos Fibers.' No release of this book will be made until the Executive Committee approves of it." Regarding cautionary labels, the legal counsel of various companies are not yet in agreement; therefore, no meeting has been called. A transmittal letter follows this meeting from Mr. J.A. Main, of Flintkote, wherein he admonishes

all members to destroy Pages 8 and 9 of the Minutes, and to substitute them. This removes references in the Minutes to a "mesothelioma epidemic" and the "industry's view." It is also announced that Mr. Main is retiring.

61.

In July of 1969, Mr. J.A. Main indicates that he had not received any response from the users of asbestos with regard to Johns-Manville Corporation's ("JM") cautionary label. Additionally, it was noted that Mr. Main was retiring from all duties with the Flintkote Company.

62.

In October of 1969, it is acknowledged in a QAMA meeting that, based on discussions from the International Congress on Occupational Health, it would seem that all asbestos fibers are carcinogenic. Mr. Poirier, of Flintkote, was in attendance. Additionally, Dr. Wright, regarding the New Orleans, Louisiana, study of asbestos cement workers produces his report. It is important to note that the plant workers in connection with this study were studied, and not advised that they were working in hazardous conditions or in conditions wherein improper safety methodologies were being followed. Quite simply, x-rays were being taken without explanation as to their purpose. The advisability of the use of warning labels was still being discussed by QAMA and its members. Industry survey notes that the demand for asbestos was still strong.

63.

On November 29, 1969 the Quebec Asbestos Mining Association agreed by all present, including the representatives of Flintkote Mines, Ltd., and Flintkote Corporation, not to let epidemiology work rest in the hands of the University or the government. It is agreed that all work by any QAMA funded research would be kept in "industry's hands."

64.

In a January, 1970 letter from Asbestos Corporation, Limited, to QAMA companies, including Flintkote Mines, Ltd., outlined an agreement that warnings would be placed on bags of asbestos; however, it would be some time before the current backlog of inventory of bags without warnings would be used up.

65.

In March, 1970, the QAMA special meeting is held wherein in attendance Mr. M. C. Carpenter and Mr. A. Hooker, both of Flintkote were present. Those in attendance discussed the following: The sales outlook shows an increase over last year. The Association Minutes acknowledged and noted historically that there were questions about asbestos and cancer, dating back to the 1940s. It was known that the major reason that the asbestos exposure standards in the U.S. are not as low as in the United Kingdom, is due to the Institute of Occupational and Environmental Health (QAMA). It is agreed by the Association that publicly, the asbestos industry would take the position that it wants to do what is necessary. However, it was agreed by all, though not publicly disclosed, that haste is not desirable.

66.

In October of 1971, the QAMA meeting is attended by Mr. M.C. Carpenter, Director of QAMA, with Mr. A.R. Hooker, of Flintkote Mines, Ltd. It is noted that Flintkote has closed its asbestos mines, and that Flintkote Mines, Ltd., is being phased out by the Flintkote Company.

67.

In March of 1972, the annual QAMA meeting is held in Jamaica. It is noted that Dr. Cartier, a physician expert who has served QAMA for many years, will now be a consultant to the Canadian Workers' Compensation Board. The object was to have a top industry specialist render decisions on pneumonology and pathology. It was agreed that QAMA would maintain a

39

close contact with the Asbestos Information Committee of North America, and that they will make available, their own internal activities and research. The Environmental Control Committee advised McGill University Environmental Studies about QAMA's studies regarding respirators and the best kind for protection. McGill University had agreed not to publish the performance figures about respirators, and to let QAMA see all papers prior to publication. At this meeting, it is indicated that asbestos will no longer be used for or in connection with road aggregate due to pollution concerns. Further, it is noted that lung disease claims increased in 1971. It is further agreed that QAMA members would make the following misleading and false informational statement to the public: "That the asbestos industry has recognized for years that there are health concerns with asbestos. That the asbestos industry began consulting with the Saranac Laboratories in the 1920s. That we continue to support work at McGill University Drs. Wiell and Jones of New Orleans, Louisiana. QAMA will continue to state publicly that only cigarette smokers get lung cancer; that there is no risk of harm to the general public; that mesothelioma is associated only with blue asbestos (crocidolite asbestos); that there is no evidence to support the notion that there is an epidemic occurring with asbestos-related injuries; that no case of mesothelioma has ever been reported in Canada; [and] that lower general environmental asbestos levels do not constitute a significant risk to the population in terms of the development of lung cancers." This information is given to the United States government by the asbestos industry, despite having information in their possession that the bulk of this is untrue. At this very same meeting, Dr. Wright issued a report detailing the following facts: Lung cancer is, in fact, seen in those asbestos workers who are heavily exposed; it has been demonstrated that asbestosis can develop in individuals with less exposures than previously thought; that it is demonstrated that incidents of asbestos-related diseases appear to be even

greater in manufacturing and insulation workers. It is agreed at this meeting that the "Asbestos and Your Health" leaflet will be produced to the public, which states the following misleading and knowingly false facts: "Chrysotile asbestos does not present a risk to the general public; that asbestos presents no health hazards to the general public; that asbestos is not a major air pollutant; that asbestos does not stay in the lungs; that Chrysotile asbestos can be safety used in the work place; that the health risk and concerns of and concerning asbestos are unwarranted and erroneous; that there is no evidence that minute exposure of asbestos presents any health hazard to the public." The Minutes of this meeting conclude with the following statements: "That there has been a small decline in the use of Canadian asbestos for the year 1971, but the forecast for 1972 is ahead of 1971; that the Flintkote Mines ceased operations because they exhausted the ore body," and it is agreed that it would be highly imprudent to permit additional contamination of the public environment with asbestos. This last fact was not given to the public.

### ADDITIONAL ALLEGATIONS OF MISCONDUCT
### AGAINST WESTINGHOUSE (NOW KNOWN AS CBS)

68.

Plaintiffs reallege all prior allegations made against all defendants, including Westinghouse, in extenso, and further aver:

69.

Westinghouse has been involved with asbestos since at least 1908.

70.

Westinghouse has manufactured or distributed over 101 asbestos-containing products, including turbines.

71.

Westinghouse manufactured asbestos-containing turbine insulating blankets that at one time contained amosite asbestos.

41

72.

Westinghouse specified asbestos-containing insulation products for use on and around its turbines.

73.

Westinghouse regularly provided asbestos insulation to its customers for installation on its turbines. Additionally, Westinghouse often installed the insulation through its service department.

Westinghouse incorporated the following asbestos or asbestos-containing material in its products including:

| | |
|---|---|
| Asbestos Cloth | Paper, Millboard, Sheet |
| Block | Pipe covering |
| Sound Deadened | Asbestos Fiber |
| Pulverized Asbestos | Asbestos Fiber Spray |
| Blankets | Gaskets |
| Packing | Yarn |
| Micarta | Moldarta sheets |
| Wire-Inserted Asbestos Cloth | Micarta Tubing |
| Tape | Micarta Bars |
| Ebony Finish Asbestos Lumber | Asbestos Cement Sheet |
| Asbestos Cement | |

74.

C. Wayne Bickerstaff, Westinghouse Corporate Industrial Hygiene Manager, has admitted that Westinghouse knew about the connection between asbestos and cancer in the 1940's.

75.

Also, Westinghouse's Edgar C. Barnes, industrial hygienist, and headquarters industrial hygienist, Wilbur Speicher expressed concern in internal documents about the hazards posed by the use of asbestos-containing materials in a number of Westinghouse departments, including those in which Westinghouse blankets were manufactured and where asbestos was being used in the manufacture of lagging for heat insulation of steam turbines.

76.

In 1946, Westinghouse industrial hygienist, Edgar C. Barnes, warned Westinghouse management that worker protection against asbestos, used in heat insulation for steam turbines, was hardly suitable or adequate. Mr. Barnes noted that, in several cases, workers had lung conditions that might be associated with exposure to asbestos dust.

77.

Elsewhere, in 1948, Mr. Barnes called attention to the hazards of asbestos dust from a saw and from cutting asbestos materials. He warned that considerable care be taken to minimize the asbestos hazard.

78.

In 1946, Westinghouse issued a process specification which contained the following caution:

> CAUTION CLAUSE: DO NOT BREATHE DUST FROM FIBERGLAS OR ASBESTOS. AVOID CONTACT OF FIBERGLAS OR ASBESTOS WITH THE SKIN. WORKERS HANDLING FIBERGLAS OR ASBESTOS MUST BE PROVIDED WITH AND USE A WELL VENTILATED ROOM, AND BLANKET FILLING OPERATIONS MUST BE CONDUCTED UNDER A HOOD PROVIDED WITH SUFFICIENT DRAFT TO CARRY THE DUST PARTICLES AWAY FROM THE WORKMEN. IN ADDITION, THE WORKMEN MUST BE PROVIDED WITH AND USE GOGGLES AND SHOULDER LENGTH GLOVES OF AN IMPERVIOUS MATERIAL. USE RESPIRATORS ON ANY JOB WHERE THE DUST IS NOT PROPERLY CARRIED AWAY BY THE HOOD.

79.

As early as 1948, Westinghouse was aware of the need for good ventilation and dust collection systems in all areas where asbestos dust was present. The industrial hygiene department recommended the installation of the ventilation and dust collection system so that Westinghouse could "effectively defend" workers' compensation claims that might arise in the future.

80.

Westinghouse recognized the hazards of bystander exposure as early as 1948. Westinghouse knew early on that dust from asbestos cloth and lagging was a hazard.

81.

In 1952 Wilbur Speicher of Westinghouse's industrial hygiene department stated that asbestosis could be far advanced before an x-ray could detect it.

82.

In 1953, Westinghouse drafted a document called an Asbestos Safe Practice Sheet. In this Safe Practice data sheet, Westinghouse admits that exposure to asbestos could cause a chronic lung disease known as asbestosis. Westinghouse further admits that persons working in asbestos dust should wear airline respirators to protect them from the asbestos fibers. In 1953, Westinghouse knew that the asbestos fibers which caused disease were those which could not be seen. In 1953, Westinghouse also knew these fine, invisible particles caused asbestosis.

83.

In spite of Westinghouse's overwhelming knowledge of the dangers of asbestos, Westinghouse intentionally did nothing to protect workers, like the plaintiffs, who would be exposed to those hazards when they worked with or near Westinghouse asbestos-containing products.

84.

The action Westinghouse should have taken in view of its knowledge of the hazards of asbestos, i.e. warning the workers, was well-known to Westinghouse.

85.

Westinghouse was familiar with the proper industrial hygiene procedures to follow when developing a new product for the market and when faced with a product that posed hazards. The articles of Dr. T. Lyle

44

Hazlette, the medical director for Westinghouse, discussed the need for hazard testing and workers' education. In the Hazlette articles, Dr. Hazlette advised that it was good industrial hygiene to do the following:

(a)   investigate the hazards of a new product before selling it;

(b)   warn the workers and educate them about the hazards to which they may be exposed.

These two Hazlette recommendations were good practice if followed. Unfortunately, Westinghouse failed to follow Dr. Hazlette's advice. None of the information regarding the hazards of asbestos nor advice of how to protect against those hazards was communicated by Westinghouse to the workers, like the plaintiffs, customers, and industry users of Westinghouse's products.

86.

In 1976, Westinghouse's Large Rotating Apparatus Division issued a report on the department's attempt to eliminate the use of asbestos. The report admitted that the hazards of breathing large quantities of asbestos dust had been recognized since ancient Rome and that the dangers of asbestos had become widely recognized as an industrial hazard in 1936. This document also contained a long list of Westinghouse products in which asbestos was still being used in 1976.

87.

Westinghouse's membership in industry organizations, such as the Industrial Health Foundation(IHF) and the National Safety Council, show that it had access to the information regarding the hazards of asbestos since the 1930's.

88.

The Industrial Hygiene Foundation began as the "Konicide Club". Formed in 1932, the Konicide Club, (the "Club") was initially organized to deal with the increasing problem of occupationally related silicosis cases.

45

The Club eventually expanded its focus to include asbestos related claims. Dr. T. Lyle Hazlette, medical director of Westinghouse Electric, was a charter member. At a Konicide Club meeting in 1933, Dr. Leroy Gardner of the Saranac Labs in Saranac, New York, gave an address on "What We Know About Asbestos."

89.

Shortly thereafter, the Club and its members played an start up role in the organization and conduct of a meeting held at the Mellon Institute and the 1936 Silicosis Conference. From these two meetings, the IHF evolved.

90.

Westinghouse was a charter member and controlling force of the IHF in 1936 and continued its membership until 1984. Joseph Dilworth, Westinghouse's president, served as a member of the Board of Directors for many years. Dr. T. Lyle Hazlette, medical director for Westinghouse, represented Westinghouse in the IHF medical committee. Westinghouse held controlling, decision making positions with the IHF.

91.

Westinghouse received the Industrial Hygiene Digest from 1937-1967. The Industrial Hygiene Digest was published by the IHF monthly beginning in 1937. Through the Digest, Westinghouse received current abstracts of worldwide literate on workplace illnesses, including asbestos related diseases.

92.

As interest in occupationally related pneumoconiosis, silicosis, and asbestosis grew, industry lawyers concerned with workers' compensation claims, and company representatives and consultants, such as Anthony J. Lanza of Metropolitan Life Insurance Company, sought greater participation in the Club meetings. By 1939 its purpose fulfilled, the Konicide Club ceased its meetings. The IHF by this time was well on its way to becoming a force in the industrial hygiene community.

46

93.

The IHF was created by the asbestos industry, including Westinghouse.

94.

A purpose of the IHF was to help the asbestos industry with its industrial hygiene and health problems. Far from being an independent industrial hygiene organization, the IHF was a creature of the asbestos industry, financed and founded to do the industry's bidding. The IHF provided a means for performing confidential asbestos studies and compiling medical, legal, and industrial hygiene knowledge for the member companies to use, suppress, or manipulate to maintain profits.

95.

The principal research contractors used by the asbestos industry were the Saranac Laboratory and the IHF.

96.

In 1947, an industrial hygienist who worked for the IHF, W.C. L. Hemeon drafted a report that emphasized the inadequacies of the then current Threshold Limit Values (TLV) of 5 mpcf and recommended that the TLV be re-evaluated. This report was suppressed by the IHF and the Quebec Asbestos Mining Association (QAMA) for whom it was done.

97.

In 1957, the QAMA arranged with the IHF to have Dr. Daniel Braun study the relationship between asbestos exposure, asbestosis and lung cancer. In 1957, Dr. Braun and his co-author Truan reported to the QAMA that asbestosis did increase a worker's chance of developing lung cancer. The IHF and QAMA and its members, including Westinghouse, kept this report confidential.

98.

In December of 1957, Dr. Kenneth Smith of Johns-Manville wrote to Ivan Sabourin, an attorney for QAMA, suggesting changes in the Braun-

Truan report which would make the suggested exclusion of the cancer data more believable. In 1958, QAMA requested that the report of Drs. Braun and Truan be edited to exclude the finding that persons with asbestosis had an increased risk of lung cancer. The IHF agreed and published a version of the study which contained a conclusion that asbestos exposure alone did not increase the incidence of lung cancer. This conclusion was know by the IHF to be false. If these two studies and its true findings had been made available to the American Conference of Industrial Hygienist, the 5 mpcf TLV would have been changed. The result was a published study that actively misled academia, government bodies, unions and other entities, concerning the true nature of the hazards connected with asbestos and asbestos products. A further result was the perpetuation of erroneous beliefs concerning TLV standards as well as potential carcinogenic effects of asbestos. This silence has resulted in ignorance on the part of the lay public generally, and workers like plaintiffs specifically, to the dangers of asbestos thereby needlessly resulting in thousands of exposures.

99.

Westinghouse also belonged to an organization called the National Electrical Manufacturers Association.

100.

Westinghouse has been a member of the NEMA since the organization's beginning in 1926.

101.

Westinghouse knew that asbestos caused injuries, sometimes resulting in death. Nonetheless, in 1976, NEMA's members joined with the Asbestos Information Association to fight OSHA's attempt to lower the TLV.

102.

Large volumes of technical literature received by Westinghouse regarding industrial hygiene matters, including IHF documents which, based upon information and belief, demonstrated that Westinghouse participated

48

through the IHF in falsifying medical studies and suppressing of knowledge about asbestos hazards. Westinghouse determined that these documents, which if produced or found to be in Westinghouse files, would prove Westinghouse's early knowledge of the dangers of asbestos.

103.

Westinghouse has been involved in the design and manufacture of turbines (the term turbine refers not only to the turbine itself but also all the related piping and equipment) since the late 1800's.

104.

The Westinghouse turbines at issue in this case include, but are not limited to, power generated turbines, i.e. powerhouse turbines and/or industrial turbines.

105.

Westinghouse turbines were asbestos insulated in areas where high heat was generated or collected. This was necessary to protect the turbines from damage and increased efficiency by conserving heat. This includes, without limitation, the cylinders, steam chest, and crossover piping.

106.

The types of asbestos insulation used on Westinghouse turbines included block, cement, cloth, gaskets, paste, and blankets.

107.

Westinghouse made its own asbestos-containing turbine blankets.

108.

Up until the early to mid-1970's, the insulation used on Westinghouse turbines contained asbestos.

109.

Westinghouse designed its turbines to be insulated with asbestos. Westinghouse engineers prepared detailed drawings of each turbine manufactured and sold by Westinghouse. These drawings went into great detail about the application of insulation. The drawings identified the specific

49

placement of the insulation as well as the thickness of the insulation, the type and brand name. The type and brand name of the insulation and method of application was specified on the drawing by reference to process specifications and material cards. In order to interpret the insulation instructions contained in the drawing, one referred to the following Westinghouse documents:

    (a)    The Westinghouse Standards Book which contained specific instruction about insulation;

    (b)    The process specification identified by the SP number on the drawing; and,

    (c)    The material card, also specified by Westinghouse material number, either on the drawing or in the process specification.

110.

The process specifications were mandatory not permissive. All district offices were issued a Standards Book containing the Lester Works Standard PH 920.1-920.5 on insulation which provided: "Only insulation materials approved by Westinghouse will be permitted on Westinghouse turbines and piping."

111.

When Westinghouse sold turbines to its customers it routinely provided insulation materials.

112.

Even when Westinghouse did not install or supply the insulation, it kept strict control over its application.

113.

Westinghouse knew about the hazards associated with the asbestos insulation being specified for use on its turbines at least as early as 1946, probably, earlier. Yet, Westinghouse issued no warnings to any of its turbine customers or their employees regarding those hazards.

114.

Westinghouse provided instruction books for each turbine which contained detailed information regarding start up of the turbine and maintenance therefor. However, the Westinghouse instruction books to date reveal that no warnings were contained in these instruction booklets regarding precautions to be taken regarding the asbestos insulation.

115.

Westinghouse also affixed name plates on its turbines stating that the turbines were Westinghouse turbines and the size of the turbines. No cautions regarding the hazards of asbestos were on these name plates.

116.

Additionally, Westinghouse knew that asbestos was dangerous in the 1940's and began a program to clean up the manufacturing process in their plants in the 1950's while continuing to manufacture asbestos-containing products without warning to downstream customers.

117.

Westinghouse began manufacturing asbestos-containing wallboard systems in 1956 and continued to do so until the mid 1970's. Prior to 1972, Westinghouse failed to provide any warning regarding the asbestos hazard with its products. In 1972, in response to Occupational Safety and Health Administration ("OSHA") regulations, Westinghouse applied warning labels that would necessarily be obscured by the substrate of the wallboard system, thereby appearing to comply with OSHA regulations without actually warning the end users of the inherent dangers of Westinghouse's asbestos-containing products.

118.

Subsequent to this activity, Westinghouse learned through in-house counsel that there existed numerous documents that would implicate Westinghouse for its actions. These documents reflected early knowledge on the part of Westinghouse and contained documents related to

Westinghouse's activities within the IHF, product manufacturing information, air sample studies, architectural reports, work papers, old work files, and other similar materials.

119.

With the advent of the claims of earlier plaintiffs, Westinghouse adopted so called "document retention policies" in which documents, indicating Westinghouse's knowledge, were purged from their corporate records.

120.

Westinghouse was, therefore, determined to destroy certain records, including correspondence files, which date from the 1930's up to and through 1974, which contained documentation which criticized Westinghouse operations.   All records of the historical files of the industrial hygiene department, with the exception of those records which were to be maintained pursuant to law, were discarded.

121.

Many of these documents sought to be destroyed were referred to by Westinghouse as "smoking guns," and the considerations for their destruction appeared to be motivated with an eye towards their effect on future asbestos litigation, like the present case, and other toxic litigation involving the company.  In January of 1978, it was determined that C.W. Bickerstaff, Manager of Corporate Industrial Hygiene, with and based upon the information by Westinghouse attorney, Jeffrey Blair, that these items would be destroyed.

122.

According to the testimony of Zella Heasley, a Westinghouse witness, Mr. Wilbur Speicher was in charge of asbestos matters until he retired from Westinghouse in 1975.  Wilbur Speicher was the head of industrial hygiene for over 20 years.  Very few industrial hygiene documents authored by Mr.

Speicher have ever been found in the corporate records or documents produced by Westinghouse.

123.

Other documents that were viewed as potential "smoking guns" were industrial hygiene audit and trip reports. Industrial hygiene in each plant audited, critiqued and criticized its facility from an industrial hygiene perspective. Industrial hygiene also makes recommendations to improve the hygiene of the plant. These documents were likewise destroyed.

124.

Other documents that were destroyed included material cards, material safety data sheets, purchasing, department specification cards, safe practice data sheets and historical safe practices data sheet files. The safe practices detailed in the safe practice data sheets were not made a part of sites and industrial hygiene programs; nor were they communicated to customers.

125.

The stated internal policy of Westinghouse was to delay as long as possible the use of warning labels in order to protect Westinghouse's business. Even as late as 1973, Westinghouse was pursuing a stated policy of delaying the implementation of OSHA warning regulations. This policy was described in a memorandum authored by J.C. Botts, Manager of the Insulation and Design Engineering Group, to G.M. Shelby, of Manufacturing in April of 1973.

126.

While Westinghouse concedes knowledge that the carcinogenic effects of asbestos exposure are nearly irrefutable (J.J. Austin, Division Manager of Engineering, to the Marine Division in a memorandum), and Mr. R.J. Polk, of the Manufacturing Division, advised Mr. Seago, of the Marketing Group, that they may be in violation of OSHA, when selling asbestos laminate panels without warnings, Westinghouse's resolution of this problem

was to ink-stamp a warning on the back of a panel before it was glued to the core material.  The result that the panel had a warning within the product itself, but no one would ever see it.

127.

The purpose of a warning is to allow the workers such as plaintiff,  to make an informed choice about continuing to be exposed to a hazard. Wilbur Speicher, Westinghouse's Administrator of Industrial Hygiene, wrote in 1965 that: "Any person working with a hazardous material has a right to know about the associated hazards and the necessary precaution for safe usage." Westinghouse's failure to provide such warnings to the workers exposed to its asbestos-containing products made it impossible for the workers to make such choices.

128.

This conduct amounts to more than a failure to warn -- it is intentional misconduct and constitutes fraud and conspiracy, making Westinghouse solidarily liable with other defendants for Plaintiffs harm in this matter.

**DAMAGES SUSTAINED BY PLAINTIFFS**

129.

All of the allegations of the above paragraphs are incorporated by reference herein.

130.

By reason of the Defendants' fault, as described above, and because of the injuries to the plaintiff, James C. Turner's  health, resulting in his disability, physical harm and subsequent medical problems, Plaintiffs, James C. Turner and Marlene F. Turner are entitled to recover the following damages for the following:

    (a)    Past, present and future medical expenses and rehabilitation;

    (b)    Past, present and future physical pain and suffering of James C. Turner;

    (c)    Past, present and future mental anguish of James C. Turner;

54

(d)   Past loss of earnings and/or earning capacity of James C. Turner;

(e)   Past, present and future disability of James C. Turner;

(f)   Loss of enjoyment of life of James C. Turner;

(g)   Loss of help, love and support of James C. Turner;

(h)   Any other losses established at the trial of this matter, including exemplary damages and attorneys' fees for fraud and all costs of these proceedings;

131.

By reason of the Defendants' fault, as described above, and because of the injuries and ill health effects suffered by Plaintiff, James C. Turner, as a result of his occupationally induced asbestos related diseases, Plaintiff's spouse ("Loss of Consortium Plaintiff") has suffered loss of consortium and is entitled to damages as are reasonable in the premises.

132.

The acts and omissions of Defendants that were the direct and proximate cause of plaintiffs' injuries were willful, malicious, wanton, undertaken with reckless disregard of the rights of plaintiffs and were grossly negligent.

133.

As a direct and proximate result of the acts of the Defendants, plaintiff, James C. Turner, suffered serious bodily injury, endured great pain and suffering, incurred medical expenses, and has been otherwise damaged.

WHEREFORE, Plaintiffs pray that Defendants, and each of them, be cited to appear and answer herein as the law directs, and that, after due proceedings are had, Plaintiffs recover of and from Defendants, and each of them, individually, jointly and in solido, for their damages as alleged in an amount which the evidence may show proper at time of trial, together with costs, and legal interest from the date of judicial demand until paid, any other losses established at the trial of this matter, including exemplary damages, attorneys' fees for fraud and all costs of these proceedings and for

such other and further relief, special and general, as law and equity may permit.

**PLAINTIFFS REQUEST THAT THIS MATTER BE TRIED BY JURY.**

Respectfully submitted:

_____

**Donni E. Young (LSBN 19843)**
**Scott M. Galante (LSBN 26890)**
**Ness, Motley, Loadholt,**
**Richardson & Poole**
1555 Poydras Street, Suite 1700
New Orleans, Louisiana 70112
Tel: (504) 636-3480
Fax: (504) 636-3499

**John F. Dillon, P.L.C.**
**John F. Dillon (LSBN 18586)**
1555 Poydras Street, Suite 1700
New Orleans, Louisiana 70112
Tel: (504) 636-3480
Fax: (504) 636-3499

**Counsel for Plaintiffs**

**PLEASE SERVE ORIGINAL PETITION FOR DAMAGES and ATTACHED INTERROGATORIES, REQUEST FOR PRODUCTION AND REQUEST FOR ADMISSIONS, PLAINTIFFS' RESPONSES TO DEFENDANTS' MASTER SET OF INTERROGATORIES, REQUEST FOR PRODUCTION, REQUEST FOR NOTICE AND NOTICE FOR VIDEO DEPOSITION TO THE FOLLOWING:**

A.   **ANCHOR PACKING COMPANY**
A New Jersey Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process:  CT Corporation System, 400 Poydras Street, New Orleans, Louisiana, 70130.

B.   **CBS (formerly known as WESTINGHOUSE ELECTRIC COMPANY)**
A Delaware Corporation, who may be served through the its registered agent, CT Corporation System, 8550 United Plaza Boulevard, Baton Rouge, Louisiana, 70809.

C.   **THE CARBORUNDUM COMPANY**
A Delaware Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: CT Corporation System, 400 Poydras Street, New Orleans, Louisiana, 70130.

D.   **A.W. CHESTERTON**
A Massachusetts Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: C.T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809.

**Continued on next page**

E.   **COMBUSTION ENGINEERING, INC.**
A Delaware Corporation who may be served through the its registered agent, CT Corporation System, 8550 United Plaza Boulevard, Baton Rouge, Louisiana, 70809.

F.   **JOHN CRANE, INC.**
A Delaware Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: C.T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809.

G.   **DANA CORPORATION**
A Virginia Corporation who may be served via the Louisiana Long Arm Statute c/o Allen Goolsby, III, 951 East Bird Street, Richmond, Virginia, 23219.

H.   **EAGLE, INC.**
(Formerly Eagle Asbestos & Packing Co., Inc.) A corporation duly organized, created and existing under and by the virtue of the laws of the State of Louisiana, with its principal place of business in New Orleans, Louisiana, with the agent for service in the State of Louisiana, to wit:  Lawrence G. Pugh, III, Montgomery, Barnett , Brown, Read, Hammond & Mintz, LLP, 3200 Energy Center, 1100 Poydras Street, New Orleans, Louisiana, 70163-3200.

I.   **THE FLINTKOTE CORPORATION**
A Delaware Corporation who may be served through the Louisiana Long Arm Statute, through their agent for service of process: The Flintkote Company, 3 Embarcadero Center, Suite 1190, San Francisco, California 94111.

J.   **FLINTKOTE MINES, LTD.**
Which may be served via the Louisiana Long Arm Statute through it Agent, Belanger Suave (Richard Nadeaux, Esq.), Barrister *Solicitors, 1, Place Ville Marit, Suite 1700, Montreal, Quebec, H3B2C1

K.   **FOSTER WHEELER CORPORATION**
A Delaware corporation authorized to do and doing business in the State of Louisiana with its principle place of business in New Jersey, and may be served pursuant to the Louisiana Long Arm Statute, to wit: Perryville Corporation Park, Clinton, NJ 08809

L.   **GARLOCK, INC.**
An Ohio Corporation, authorized to do and doing business in the State of Louisiana, with its principal place of business in New York and with an agent for service of process in the State of Louisiana: CT Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809.

M.   **GASKET HOLDINGS COMPANY, INC. (Successor to Flexitallic, Inc.)**
A Delaware Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: C.T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809.

Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809.

N.    **GENERAL ELECTRIC COMPANY**
A New York Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: C.T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809.

O.    **GEORGIA-PACIFIC CORPORATION,** A Georgia Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: C.T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana, 70809.

P.    **INGERSOLL-RAND COMPANY**
A New Jersey Corporation, authorized to do and doing business in the State of Louisiana, with an agent for service of process: C.T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, Louisiana 70809.

Q.    **KELLY MOORE PAINT COMPANY, INC.**
A California Corporation who may be served through the Louisiana Long Arm Statute, through their agent for service of process: Kelly Moore Paint Company, Inc., 987 Commercial Street, San Carlos, California 94070.

R.    **THE McCARTY CORPORATION**
A domestic corporation, may be served through its agent for service of process:  Paul H. Spaht, 445 N. Boulevard, Suite 300, Baton Rouge, Louisiana, 70802.

S.    **REILLY-BENTON COMPANY, INC.**
A corporation duly organized, created and existing under and by virtue of the laws of the State of Louisiana, with its principal place of business in New Orleans, Louisiana, with agent for service of process in the State of Louisiana, to wit:  Deutsch, Kerrigan & Stiles, 755 Magazine Street, New Orleans, Louisiana, 70130.

T.    **TAYLOR SEIDENBACH, INC.**
A corporation duly organized, created and existing under and by virtue of the laws of the State of Louisiana, with its principle place of business in New Orleans, Louisiana, with agent for service in the State of Louisiana, to wit: Ralph I. Sheperd, 731 S. Scott Street, New Orleans, Louisiana 70150

U.    **J.T. THORPE, INC.**
A California Corporation, who may be served through the Louisiana Long Arm Statute, through their agent for service of process: Ken Prindle, Prindle, Decker & Amaro, 369 Pine Street, Suite 800, San Francisco, CA, 94104.

**Continued on next page**

**V.   3M COMPANY**
(a.k.a. Minnesota Mining & Manufacturing Company)
A Delaware Corporation, who can be served through the Louisiana Long Arm Statute, through their agent for service of process:  Roger P. Smith, Secretary, Minnesota Mining & Manufacturing Company, 3M Center, Building 220-14W-06, St. Paul, Minnesota, 55144-1000.

**W.   WORTHINGTON PUMP, INC.**
A Delaware Corporation, who may be served through the Louisiana Long Arm Statute, through its registered agent for service of process:  C.T. Corporation System, 350 North St. Paul Street, Suite 2900, Dallas, Texas, 75201.

**X.   KIM SUSAN, INC.**
(Formerly known as Fagan Boat Service, Inc.)
A corporation duly organized, created and existing under and by virtue of the laws of the State of Louisiana, with its principle place of business in LaRose, Louisiana, with agent for service in the State of Louisiana, to wit: Kent J. Fagan, West 21st Street, Larose, Louisiana, 70373.

FILED

JUL 3 0 2001

CLERK OF COURT

A TRUE COPY
Clerk of Court's Office
Thibodaux, *August 3, 2001*

Clerk of Court

59

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

JAMES C. TURNER AND MARLENE F. TURNER

versus

ANCHOR PACKING COMPANY, CARBORUNDUM; CBS, (Formerly known as Westinghouse Electric Corporation); A. W. CHESTERTON COMPANY; COMBUSTION ENGINEERING, INC.; JOHN CRANE, INC; DANA CORPORATION; EAGLE, INC.; THE FLINTKOTE COMPANY; FLINTKOTE MINES, LTD.; FOSTER WHEELER CORPORATION; GARLOCK, INC.; GASKET-HOLDINGS COMPANY, INC. (Successor to Flexitallic, Inc.); GENERAL ELECTRIC COMPANY; GEORGIA-PACIFIC CORPORATION; INGERSOLL-RAND; KELLY MOORE PAINT COMPANY; THE McCARTY CORPORATION; REILLY-BENTON CO., INC.; TAYLOR-SEIDENBACH, INC.; J.T. THORPE, INC.; 3-M (a.k.a. MINNESOTA MINING & MANUFACTURING COMPANY); WORTHINGTON PUMP, INC.; KIM SUSAN, INC. (Formerly known as Fagan Boat Service, Inc.)

CIVIL ACTION

NUMBER C-01-2767

SECTION "S"

## AFFIDAVIT OF JAMES M. GATE

I, James M. Gate, being under penalty of perjury, declare and say:

1.      My name is James M. Gate.  I am over the age of twenty-one (21), and am fully competent to testify to the matters contained herein.  I have personal knowledge of the matter set forth in this Affidavit and they are true and correct.

2.      I am the former Manager of Design Verification of the Marine Division of Westinghouse Electric Corporation, located in Sunnyvale, California.

B0166523.1                                   1



3.     I joined Westinghouse in 1953, immediately after receiving a Bachelor of Science degree in Marine Engineering from the United States Merchant Marine Academy at King's Point, New York.   Except for the period of 1971 to 1976, I was involved in marine engineering during my entire career at Westinghouse, and during that time was stationed principally at Westinghouse's Marine Division, initially in Lester, Pennsylvania, until operations were moved to Sunnyvale, California.   My work involved both United States Navy and Merchant Marine vessels.   I retried from Westinghouse in December, 1994.

4.     This Affidavit is made following a thorough and diligent search of the available Westinghouse records, and public records, and is based on my personal knowledge of such records and of Westinghouse marine equipment generally.

5.     Based upon my review of these reocrds, Westinghouse did not supply any turbine equipment aboard the USS Haynesworth  DD-700, USS Josephus Daniels CG-27, USS Luce DL-7, and USS Leahy CG-16

6.     I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that if called as a witness, I could competently testify to the foregoing facts, all of which are within my own personal knowledge.

Executed this _15_ day of ___October___, 2001 at Sunnyvale, California.

_James M. Gate_
JAMES M. GATE

**STATE OF CALIFORNIA**

**COUNTY OF SANTA CLARA**

Personally appeared before me this __15th__ day of __Oct__ 2001, James M. Gate, who made oath that the statements contained in the affidavit above are true and correct to the best of his knowledge.

Subscribed and sworn to before me this __15th__ day of __Oct__ 2001.

My Commission expires: __Aug 20th 2005__

__Pavneet Singh.__
Notary Public

> PAVNEET SINGH
> Commission # 1318493
> Notary Public - California
> Santa Clara County
> My Comm. Expires Aug 20, 2005

B0166523.1                                    3

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JAMES C. TURNER AND MARLENE F. TURNER | CIVIL ACTION |
| versus | NUMBER C-01-2767 |
| | SECTION "S" |
| ANCHOR PACKING COMPANY, CARBORUNDUM; CBS, (Formerly known as Westinghouse Electric Corporation); A. W. CHESTERTON COMPANY; COMBUSTION ENGINEERING, INC.; JOHN CRANE, INC; DANA CORPORATION; EAGLE, INC.; THE FLINTKOTE COMPANY; FLINTKOTE MINES, LTD.; FOSTER WHEELER CORPORATION; GARLOCK, INC.; GASKET-HOLDINGS COMPANY, INC. (Successor to Flexitallic, Inc.); GENERAL ELECTRIC COMPANY; GEORGIA-PACIFIC CORPORATION; INGERSOLL-RAND; KELLY MOORE PAINT COMPANY; THE McCARTY CORPORATION; REILLY-BENTON CO., INC.; TAYLOR-SEIDENBACH, INC.; J.T. THORPE, INC.; 3-M (a.k.a. MINNESOTA MINING & MANUFACTURING COMPANY); WORTHINGTON PUMP, INC.; KIM SUSAN, INC. (Formerly known as Fagan Boat Service, Inc.) | |

## AFFIDAVIT OF JAMES M. GATE
## IN SUPPORT OF WESTINGHOUSE ELECTRIC
## CORPORATION'S NOTICE OF REMOVAL OF CIVIL ACTION

I, James M. Gate, being under penalty of perjury, declare and say:

I am the former Manager of Design Verification of the Marine Division of Westinghouse Electric Corporation ("Westinghouse"), located in Sunnyvale, California.

I joined Westinghouse in 1953, immediately after receiving a Bachelor of Science degree in Marine Engineering from the United States Merchant Marine Academy at King's Point, New York.  Except for the period of 1971 to 1976, I was involved in marine

B0166523.1                                    1



engineering during my entire career at Westinghouse, and during that time was stationed principally at Westinghouse's Marine Division, initially in Lester, Pennsylvania, until operations were moved to Sunnyvale, California. My work involved both United States Navy and Merchant Marine vessels. I retired from Westinghouse in December, 1994.

I submit this Affidavit to attest to the level of supervision and control by the United States Navy ("U.S. Navy" or "Navy") and its officers, such as the Inspector of Naval Machinery ("INM"), over the design and manufacture by Westinghouse of equipment intended for installation on U. S. Navy vessels, particularly propulsion turbines and turbine-generator sets and related equipment (hereinafter "turbines"), and specifically concerning the USS Shenandoah AD-26.

I am personally familiar with the extent of U. S. Navy control over the production of turbines built for the U. S. Navy vessels built by Westinghouse because I participated in the design, manufacturing, testing and sea trials of these turbines, and personally interacted with the Navy's machinery inspectors, officers such as Capt. A. L. Rosenstein and Capt. O. Earle, Chief INMs formerly stationed at Westinghouse's Lester, Pennsylvania plant. As test engineer at Westinghouse's Lester plant, I also interfaced with Navy Inspector James Moodie. At the Navy Bureau of Ships (BuShips") and its successor Naval Sea Systems Command ("NAVSEA"), I would meet with the Head of the Navy's Steam Turbine Branch, Turbine & Gear Desk, Howard Ball, to discuss the Navy's requirements for turbines to be built by Westinghouse. Under the authority of the Turbine & Gear Desk were the Navy's Main Turbine Section and Auxiliary Turbine Section. I and other Westinghouse personnel worked under the direction of Walter Sharp in the Main Turbine Section. We also worked under the direction of Robert Trout in the Navy's Auxiliary Turbine Section, a division of the Turbine & Gear Desk until 1982, when it was folded into the Main Turbine Section. Mr. Trout wrote the Navy's turbine generator and auxiliary steam turbine specifications for several Navy vessels.

Westinghouse made and supplied turbines for U. S. Navy ships under contracts between Westinghouse and the shipyards and/or the United States of America, specifically

the Navy Department, which administered the contract through NAVSEA, which acted under authority of the Secretary of the Navy. NAVSEA personnel exclusively developed ship designs and plans, as well as comprehensive and detailed regulations and specifications for all shipboard equipment, and its officers supervised, enforced, and approved the vendor's compliance with the plans, regulations and specifications. Changes to the plans and specifications could only be authorized by the Navy through one of its officers. Westinghouse's production of turbines for Navy vessels was immediately supervised by the INM, a naval officer subordinate to various levels of command within NAVSEA or its predecessor, BuShips. The INM, who worked on-site at Westinghouse's Marine Division plants in Lester, Pennsylvania and Sunnyvale, California, exercised immediate, direct and detailed control over all aspects of the Westinghouse's production of turbines for Navy vessels. The INM observed the manufacturing process, and enforced compliance with design specifications.

I have reviewed the records for the turbines manufactured and supplied by Westinghouse in connection with one Navy vessel at issue in this action, namely the USS Shenandoah AD-26, and based upon my review of these records, I have verified that the turbines were manufactured and suppled by Westinghouse for this vessel under the strict direction and control of officers of the U. S. Navy.

Westinghouse's records concerning the USS Shenandoah AD-26 which I have reviewed include BuShips contract specifications for the ships classifications and drawings. Of these, I attach as exhibits to the Affidavit the following:

Todd Pacific Shipyards Purchase Order No. AD 26 201 dated July 7, 1944 with Appendix B purchase specification no. MAD 26-1001 dated May 29, 1944.

Westinghouse sold 1 main propulsion turbine and 6 auxiliary turbines to the Navy for installation aboard the USS Shenandoah during its construction.

Having reviewed the contract documents relative to this ship, I can attest that Westinghouse did not supply the thermal insulation. On the contrary, the Navy provided the thermal insulation to be used with these Westinghouse turbines.

In the case of the USS Shenandoah, the contract incorporates BuShip contract specifications which, in turn incorporate military specifications, and these documents require use of asbestos-containing thermal insulation for the turbines.

With respect to the turbines supplied by Westinghouse to the Navy for use aboard the USS Shenandoah all aspects of the design, performance requirements, and materials used for construction, including thermal insulation, were specified by BuShips, which acted under authority of the Secretary of the Navy.  Compliance with the specifications which could not be changed without direct approval of Main Turbines Section personnel, Walter Sharp, and Auxiliary Turbine Section personnel, Robert Trout, and was directly enforced at Westinghouse's plant by the INM, although the Turbine & Gear Desk official, Howard Ball, ultimately controlled these details.

Westinghouse, during all aspects of its turbine work (i.e., design, manufacture, testing, and sea trials) for U.S. Navy vessels, including the USS Shenandoah, performed its work under immediate supervision by the Navy through NAVSEA officers.  This supervision and control was exercised through contract documents, design and construction drawings, written specifications, and personal oversight of Westinghouse's work by ship design engineers and machinery specialists employed by the U. S. Navy. The chain of U. S. Navy authority between Westinghouse and the Secretary of the Navy was multi-tiered and staffed by officers of varying levels of responsibility, and virtually no aspect of the development, manufacture, and testing of naval turbines escaped this close control.

Before the construction of a U. S. Navy vessel, including the USS Shenandoah, there was an extensive set of General Specifications for ships of the United States Navy as well as U. S. Navy specifications, or military specifications known as MilSpecs, already in place which governed all aspects of ship construction.  The MilSpecs totaled tens of thousands of pages and governed all aspects of a vessel's design and construction and specified the materials to be used, including asbestos-containing thermal insulation.

The U. S. Navy specifications for the Westinghouse turbines manufactured for the USS Shenandoah incorporated several lower-level specifications, including those governing

the components or materials used for or with the turbines, such items as metals, bearings, packings, gaskets, insulation, etc. Some of these specifications required the use of asbestos-containing materials, such as thermal insulation for turbines.

The turbines manufactured and supplied by Westinghouse for any U.S. Navy vessel, including the referenced ships, had to meet detailed and precise U.S. Navy specifications. Additionally, each turbine was specifically designed for the vessel or class of vessels in question. In other words, the turbines for a vessel or class were not interchangeable, but instead, were custom built, i.e., the instruments were not "off the shelf" product.

NAVSEA developed the initial conceptual design for all classes of naval vessels. By the time an outside design consultant began to participate in the design phase of a new turbine, such as the turbines and related equipment for the USS Shenandoah, the U. S. Navy had specified at least the weight, size, power output, speed, and other design parameters of the turbine.

In the design phase of the turbine project, as in all other phases, the U.S. Navy retained ultimate decision authority over the design of the turbines. If an engineering disagreement arose between the Navy and the outside design consultant, the Navy controlled the design adopted. All final design drawings and specifications required express U.S. Navy approval and adoption.

Following the Navy's acceptance of a quotation for manufacture of the prototype turbine, the prototype vendor would begin tooling and construction under continuing U.S. Navy supervision and oversight. During manufacture of a turbine at sites such as Westinghouse's former Lester, Pennsylvania facility, the Navy had an on-site INM. In the 1950s and 1960s, the INM was typically a Naval Captain (the rank immediately below Admiral). Captains Rosenstein and Earle noted above, are examples. In later years, the INM was typically a Commander (the rank immediately below Captain). The INM was on site full time in a separate set of offices called the Defense Contract Management Office. Later, after Westinghouse transferred its turbine manufacturing operations to its plant in Sunnyvale, California, the INM worked on-site in Sunnyvale. Frequently, Westinghouse

engineers such as myself dealt directly with the Navy's Main Turbine and Auxiliary Turbine sections in Washington, D.C. A number of U.S. Navy civilian employees, including inspectors and engineers, supported the INM on site. At the Lester facility, for example, the INM's staff would typically include more than ten full-time civilian U.S. Navy inspectors and several mechanical engineers. One of the individuals who supervised Westinghouse's work was James Moodie, noted above. All members of the INM staff were Navy employees and had access to all areas of the production facility at all times.

During the construction of the prototype turbine, all drawing approvals and any report of out-of-tolerance machining were submitted to, and approved by, the INM or by the mechanical engineers working under him.

Many steps of the production process required in-process testing. For example, all welds were tested. All weld testing reports were reviewed and approved by the INM on site. The INM also approved the procedures used to test welds. Similarly, other test results (e.g., balance testing, vibration testing, tolerance measurements, machine variations and the like) were reviewed and approved by the INM. Any reports which resulted in the replacement of a component part were also sent to NAVSEA BuShips, the Department of the Navy in Washington, D.C., for its review and approval.

Before shipment, the turbine typically was tested at the site of manufacture. A detailed test agenda for on-site testing was approved by the U.S. Navy. The agenda included tests for power output at various levels of steam pressure, vibration and noise tests, bearing temperature tests and the like. The test agenda was then conducted on the turbine. The performance of the test agenda was closely monitored by the INM and all test results were submitted to him. The manufacturer then prepared a final report on the prototype turbine, including all test reports. This final report then was submitted for approval by the on-site INM. Following INM approval, the final report was forwarded to NAVSEA or Buships in Washington, D.C., where further approval was required before the manufacturer could ship the turbine.

Following the completion of the test agenda, the turbine was typically fully

disassembled and inspected.  This disassembly and inspection was carried on in the personal presence of the on-site INM.  One or more of the INM's mechanical engineers would also attend the disassembly inspection.  Any abnormalities discovered at this point would lead to rejection of the turbine or to modifications and re-testing.  A report of each tear down was prepared and was then approved and signed by the INM.

Paralleling the manufacture of the prototype, the U.S. Navy would prepare a Request for Quotation on the production models of the turbine, subject to any changes developed during the production and testing of the prototype turbine unit.  The resulting quotations would then be subject to a similar review as that described above with respect to the prototype unit, including quotation review meeting(s).  Approval of the quotation would eventually be given to one or more vendors.  Often two vendors were selected to supply production units.  In many instances, the manufacturer of the prototype unit would secure part or all of the contract work for the production units, but in some instances the manufacturer of the prototype would not be selected for the production contract.

The manufacturing process for the production units then proceeded under the same level and intensity of U.S. Navy supervision as described above for the prototype unit.  The INM, assisted by Navy civilian inspectors and mechanical engineers as described above, would oversee and approve virtually every aspect of the manufacturer and testing of the turbine.  As before, a test agenda for the production units was approved by the U.S. Navy and all reports from the tests were approved by the on-site INM.  Following the completion of the test series, each individual turbine was fully torn down in the presence of mechanical engineers working for the INM.  Any abnormalities were noted and resolved.  A final report was prepared for each individual turbine, incorporating these test reports, and was approved both by the on-site INM and by the  Department of the Navy in Washington, D.C.  Re-assembly of each turbine was then approved by the U.S. Navy civilian inspections headed up by James Moodie prior to shipment.

The first production unit was then shipped to the shipyard with construction responsibilities for the first vessel.   The turbine was typically installed by shipyard

personnel acting under supervision of engineers from the Supervisor of Shipbuilding, who was subordinate to the Commander of Naval Sea Systems. Typically, the involvement of the turbine vendor at this stage of the process (i.e., from delivery of the turbine to completion of the sea trials) was the presence on-site of an engineer acting in a liaison and troubleshooting capacity.

Once the turbine was installed, it was typically tested in place by the shipyard using an artificial load and under less than full power. This testing was reviewed and approved by U.S. Navy personnel at the shipyard. Any deficiencies discovered at this stage were required to be remedied by Westinghouse.

Once the ship was launched and outfitted, sea trials followed. The first sea trial was called the "builder's trial" and was conducted by the shipyard using its personnel with senior U.S. Navy personnel on board for observation and approval. Representatives from the major component vendors would also attend such trials. (I have participated personally on two occasions as the Westinghouse turbine representative on the builder's trial on the initial vessels of a new class.)

Following successful completion of the builder's trials, the U.S. Navy would conduct its own sea trial, called an "acceptance trial." Acceptance trials were fully conducted and staffed by U.S. Navy officers, civilian employees and crew, with shipyard and manufacturers' representatives along to observe. As before, any deficiencies discovered in the turbine during acceptance trials would be the responsibility of Westinghouse to correct.

Following the acceptance trials, the vessel was commissioned and would typically embark on a "shakedown cruise." During this cruise, the operation of all components of the vessel were further evaluated and tested under the widest possible range of operating conditions.

During the launching, outfitting, and sea trials of the first vessel in the new class, other vessels in the class may be under construction on a trailing schedule. Each and every vessel would go through essentially the same construction, inspection, testing, sea

trials, and shakedown procedure as described above for the first vessel for the class.

All equipment, including the turbines supplied by Westinghouse for the USS Shenandoah, was built in accordance with the U.S. Navy specifications in existence at the time and were approved by the U.S. Navy.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that if called as a witness, I could competently testify to the foregoing facts, all of which are within my own personal knowledge.

Executed this *5* day of *October*, 2001 at Sunnyvale, California.

_James M. Gate_
JAMES M. GATE

**STATE OF CALIFORNIA**
**COUNTY OF SANTA CLARA**

Personally appeared before me this 15th day of Oct 2001, James M. Gate, who made oath that the statements contained in the affidavit above are true and correct to the best of his knowledge.

Subscribed and sworn to before me this 15th day of Oct 2001.
My Commission expires: Aug 20th 2005

_Pavneet Singh._
Notary Public



B0166523.1                                             9

TC D PACIFIC SHIPYARDS, INC. FC ERLY
SEATTLE-TACOMA SHIPBUILDING CORPORATION
TACOMA DIVISION
TACOMA, WASHINGTON
BY
GIBBS & COX, INC.
21 WEST STREET
NEW YORK 6, N. Y.

*SHEET 1 OF 5*

**PURCHASE ORDER NO**
**AD26-201**
MUST APPEAR ON ALL CORS
SPONDENCE, INVOICES, PAC
AGES AND DOCUMENTS.

TO. Westinghouse Elec. & Mfg. Co.
40 Wall St.
New York 5, N. Y.

INSPECTION:  By U.S.Navy Dept. prior to shipment.

DATE  July 7, 1944

F. O. B. Works, South Phi
delphia,

PLACE OF MANUFACTURE: Westinghouse Elec. & Mfg. Co.,
South Philadelphia, Pa.

Please furnish the following articles, consigned to
SUPERVISOR OF SHIPBUILDING, U.S.N.
c/o Tampa Shipbuilding Co., Inc.,
Tampa, Florida

ROUTING: USE GOV'T. B/L

TERMS: NET 30 DAYS

subject to all conditions written herein and the General Instructions and Appendix "A" and APPENDIX "B"
Purchase Order. Forms Nos. 812-663-813-665-666        hereto attached and forming part o
Invoices are to be rendered in accordance with the applicable portions of the General Instructions hereto attached.

| INQUIRY NUMBER | | CMP CLASSIFICATION |
|---|---|---|
| AB7-23 | MAIN PROPULSION TURBINES | BUSHIPS SPECIAL ITE |

MATERIAL UNDER COGNIZANCE OF BUREAU OF SHIPS FOR  AD26-29

CONTRACT  NObs 1538

Production Requisition No. MAD26-1001

The material covered by this order is to be as specified
herein and in strict accordance with the Appendix "B" of
this Purchase Order entitled "Purchase Specification
No. MAD26-1001"

Correspondence relating to this negotiation is listed hereunder
as a matter of reference:

Westinghouse Elec. & Mfg. Co. letter to Seattle-Tacoma (G&C)
dated May 15, 1944 (5/17/44-#903), with attached proposal,
dated May 15, 1944;

(continued)

CMP CERTIFICATION—Allotment Number N-6—The undersigned certify, subject to the criminal penalties for misrepresentation contain
in Section 35 (A) of the United States Criminal Code, that they are authorized under CMP Regulation No. 3 to apply or exte
the above allotment number or symbol and the preference rating shown in this order to the delivery of the items covered by the ord
END USE CERTIFICATION—The undersigned certify to the Producer and to the War Production Board that the material ordered herein
to fill orders in Group Classification "NAVY" whose END USE Symbol is "USN" and whose Classification Number is 2.70

APPROVED

TODD PACIFIC SHIPYARDS, INC. FORMERLY
SEATTLE-TACOMA SHIPBUILDING CORPORATION
TACOMA DIVISION
BY GIBBS & COX, INC

HCGreene   7/10/44

Supervisor of Shipbuilding, U. S. N., N.Y

Case MDL No. 875, Document 3337, Filed 11/19/01, Page 164 of 233

| Item | Quantity | DESCRIPTION | Price |
|------|----------|-------------|-------|
| | | (continued) | |
| | | Westinghouse E. & M. Co. supplementary proposal to Seattle-Tacoma (G&C) dated May 18, 1944 (5/20/44-NC-#32); | |
| | | Such conditions of the Vendor's proposal listed above, as are incorporated herein, are operable. | |
| | | Westinghouse E. & M. Co. letter to Seattle-Tacoma (G&C) dated May 23, 1944 (5/24/44-#675); | |
| | | Westinghouse E. & M. Co. letter to Seattle-Tacoma (G&C) dated June 2, 1944 (6/3/44-NC-#29); | |
| | | Todd-Pacific Shipyards, Inc., Tacoma Div. (G&C) commitment letter 11871/S41-1/S42(AB7-7042-JLC) to Westinghouse E. & M. Co. dated June 7, 1944 (6/7/44-#1511). | |
| | | Quantities listed are for one (1) Ship. Material is required for four (4) Ships. | |
| | | The following applies against Production Requisition No. MAD26-1001: | |
| 1 | 1 | Westinghouse Main Propulsion Turbine, consisting of a high pressure and a combined low pressure and astern turbine, maneuvering valve, fittings, accessories, etc., all as described and/or specified herein and including services of an engineer to supervise installation of the equipment and to attend dock and sea trials. | $97,182.00 E |
| 2 | 1 Set | Shipboard Spare Parts for Item #1, consisting of the following for each set: | $2,375.00 per se |

|  |  |
|---|---|
| 2 – High Pressure Turbine Bearings | $230.00 |
| 2 – Low Pressure Turbine Bearings | 30.00 |
| 1 – Set Coupling Bolts | 5.00 |
| 2 – Sets Oil Deflectors | 300.00 |
| 2 – Sets Carbon Gland Packing With Springs | 440.00 |
| 1 – Set Springs | 20.00 |
| 1 – Set Thrust Bearing Shoes, complete | 140.00 |
| 2 – Sentinel Valves | 30.00 |
| 5% – Bolts, studs and nuts of each size | 100.00 |

(continued)

P. O. NO. **AD26-201**

SHEET NO. **3** OR **5**

DATE **July 7, 1944**

| Item | Quantity | DESCRIPTION | Price |
|---|---|---|---|
| 2 | (cont'd) 1 Set | Shipboard Spare Parts for Item #1, consisting of the following for each set - | |
| | | 6 - Sight Flow Glasses with Gaskets $10.00 | |
| | | 1 - Set Maneuvering Valve Seats, stems and discs and steam strainer basket 800.00 | |
| | | $2,375.00 | |
| 3 | 1 Set | Special Tools for Item #1, consisting of the following for each set: | $280.00 per set |
| | | 1 - Lifting Beams for Turbine Rotors $15.00 | |
| | | 1 - Set Wire Rope Slings for Lifting Turbine Rotors & Turbine Covers 15.00 | |
| | | 1 - Set Guide Posts for Lifting Turbine Rotors & Turbine Covers 110.00 | |
| | | 1 - Set Eyebolts for all parts to be lifted 15.00 | |
| | | 1 - Set Jack Bolts for breaking Turbine Joint 5.00 | |
| | | 1 - Set Jacking Devices for taking rotor weight off of the bearings 50.00 | |
| | | 1 - Set Mandrels for fitting and checking carbon rings 70.00 | |
| | | 1 - Micrometer depth gage Included | |
| | | Total- $280.00 | |
| 4 | 2 Sets | Special Wrenches and Tools required for Turbines and Fittings, Item #1 | $27.50 per set |
| 5 | As Req'd. | Navy Standard Metal Spare Parts Boxing for Items #2, 3 & 4 | Included in Items 2,3&4 |
| | | TURBINE SHORE BASED SPARE PARTS Turbine Shore based spare parts are included in the requirements of Purchase Order AR13-201. | |

Case MDL No. 875, Document 3337, Filed 11/19/01, Page 166 of 233

P. O. NO. **AD26-201**

SHEET NO. **4** OR **5**

DATE **July 7, 1944**

| Item | Quantity | DESCRIPTION | Price |
|------|----------|-------------|-------|
| | | PLANS AND INSTRUCTION BOOKS | |

PLANS AND INSTRUCTION BOOKS
Plan and Instruction Book requirements for the equipment
covered by this Purchase Order are ordered on
Purchase Order AR13-201.

WEIGHTS:
The weights of the equipment covered by this Purchase
Order shall be as follows:

| Item # | Per Ship Weight |
|--------|-----------------|
| 1 | 51,500 lbs.(Guaranteed) |
| 2 | 450 lbs. |
| 3 & 4 | 500 lbs. |
| 5 | 250 lbs. |
| Total- | 52,700 |

DELIVERY:
Delivery of equipment is to be made in accordance with
Bureau of Ships shipping requirements, as follows:

Pkge. No. 14 - 210 Days BEC
AD26 - Jan. 31, 1945
AD27 - Mar. 15, 1945
AD28 - Apr. 30, 1945
AD29 - June 15, 1945

## PREFERENCE RATING

P.O. NO. __AD26-201__

SHEET NO. _5_ OF _5_

DATE __July 7, 1944__

THE PREFERENCE RATINGS APPLICABLE TO THIS ORDER ARE AA-1 FOR MATERIAL FOR 1 VESSEL AND AA-2X FOR MATERIAL FOR 3 VESSELS.

## CERTIFICATION

The undersigned purchaser hereby represents to the seller and to the War Production Board that he is entitled to apply or extend the Preference Ratings indicated opposite the items shown on this purchase order, and that such application or extension is in accordance with Priorities Regulation No. 3, as amended, with the terms of which the undersigned is familiar.

TODD PACIFIC SHIPYARDS, INC.

BY GIBBS & COX, INC.
_____
(Name of Purchaser)

21 West Street
New York 6, N. Y.
_____
(Address)

_____
Procurement & Production Division
(Signature and Title of Duly Authorized Officer)

July 7, 1944
_____
(Date)

The Vendor may extend the Preference Rating(s) assigned to this purchase order to suppliers of materials which will be physically incorporated into the subject equipment in accordance with the provisions set forth in Priorities Regulation No. 3, as amended.

AD27  will bear priority rating AA-1, August 1, 1944.

NOTE: - The progressive reratings indicated herein are to become effective for the specified ships on the dates shown, unless notice to the contrary is received prior to such dates.  Prompt application of these reratings to our Purchase Orders, and extension to your sub-contractors thereunder, is mandatory upon the dates shown.

G&C 746 6/22/44-UM

T⦵⦵⦵ PACIFIC SHIPYARDS, INC. FO⦵⦵⦵RLY
SEATTLE-TACOMA SHIPBUILDING CORPORATION
TACOMA DIVISION
TACOMA, WASHINGTON
BY
GIBBS & COX, INC.
21 WEST STREET
NEW YORK 6, N. Y.

n/60 8009

SHEET 1 OF 5

PURCHASE ORDER NO
AD26-201
MUST APPEAR ON ALL COR
SPONDENCE, INVOICES, PAC
AGES AND DOCUMENTS.

TO: Westinghouse Elec. & Mfg. Co.
40 Wall St.
New York 5, N. Y.

INSPECTION: By U.S.Navy Dept. prior to shipment.

DATE   July 7, 1944

F. O. B. Works, South Phi
delphia,

PLACE OF MANUFACTURE: Westinghouse Elec. & Mfg. Co.,
South Philadelphia, Pa.

Please furnish the following articles, consigned to
SUPERVISOR OF SHIPBUILDING, U. S. N.
c/o Tampa Shipbuilding Co., Inc.,
Tampa, Florida

ROUTING: USE GOVT. B/L

TERMS: NET 30 DAYS

subject to all conditions written herein and the General Instructions and Appendix "A" hereto attached and forming part of
Purchase Order. Forms Nos. 812-663-813-666-666      and APPENDIX "B"
Invoices are to be rendered in accordance with the applicable portions of the General Instructions hereto attached.

| INQUIRY NUMBER | | CMP CLASSIFICATION |
|---|---|---|
| AB7-23 | MAIN PROPULSION TURBINES | BUSHIPS SPECIAL ITI |

MATERIAL UNDER COGNIZANCE OF BUREAU OF SHIPS FOR  AD26-29

CONTRACT   NObs 1538

Production Requisition No. MAD26-1001

The material covered by this order is to be as specified
herein and in strict accordance with the Appendix "B" of
this Purchase Order entitled "Purchase Specification
No. MAD26-1001"

Correspondence relating to this negotiation is listed hereunder
as a matter of reference:

Westinghouse Elec. & Mfg. Co. letter to Seattle-Tacoma (G&C)
dated May 15, 1944 (5/17/44-#903), with attached proposal,
dated May 15, 1944;

(continued)

CMP CERTIFICATION—Allotment Number N-4—The undersigned certify, subject to the criminal penalties for misrepresentation containe
in Section 35 (A) of the United States Criminal Code, that they are authorized under CMP Regulation No. 3 to apply or each
the above allotment number or symbol and the preference rating shown in this order to the delivery of the items covered by the ord
END USE CERTIFICATION—The undersigned certify to the Producer and to the War Production Board that the material ordered herein
to fill orders in Group Classification "NAVY" whose END USE Symbol is "USN" and whose Classification Number is 2.70

APPROVED

TODD PACIFIC SHIPYARDS, INC. FORMERLY
SEATTLE-TACOMA SHIPBUILDING CORPORATION
TACOMA DIVISION
BY GIBBS & COX, INC

_McGreene_   7/10/44

Supervisor of Shipbuilders, U. S. N., N. Y.

| Item | Quantity | DESCRIPTION | Price |
|------|----------|-------------|-------|
| | | (continued) | |
| | | Westinghouse E. & M. Co. supplementary proposal to Seattle-Tacoma (G&C) dated May 18, 1944 (5/20/44-NC-#32); | |
| | | Such conditions of the Vendor's proposal listed above, as are incorporated herein, are operable. | |
| | | Westinghouse E. & M. Co. letter to Seattle-Tacoma (G&C) dated May 23, 1944 (5/24/44-#675); | |
| | | Westinghouse E. & M. Co. letter to Seattle-Tacoma (G&C) dated June 2, 1944 (6/3/44-NC-#29); | |
| | | Todd-Pacific Shipyards, Inc., Tacoma Div. (G&C) commitment letter 11871/S41-1/S42(AB7-7042-JLC) to Westinghouse E. & M. Co. dated June 7, 1944 (6/7/44-#1511). | |
| | | Quantities listed are for one (1) Ship. Material is required for four (4) Ships. | |
| | | The following applies against Production Requisition No. MAD26-1001: | |
| 1 | 1 | Westinghouse Main Propulsion Turbine, consisting of a high pressure and a combined low pressure and astern turbine, maneuvering valve, fittings, accessories, etc., all as described and/or specified herein and including services of an engineer to supervise installation of the equipment and to attend dock and sea trials. | $97,132.00 E |
| 2 | 1 Set | Shipboard Spare Parts for Item #1, consisting of the following for each set: | $2,375.00 per se |

| | | |
|---|---|---|
| 2 - High Pressure Turbine Bearings | $230.00 | |
| 2 - Low Pressure Turbine Bearings | 30.00 | |
| 1 - Set Coupling Bolts | 5.00 | |
| 2 - Sets Oil Deflectors | 300.00 | |
| 2 - Sets Carbon Gland Packing With Springs | 440.00 | |
| 1 - Set Springs | 20.00 | |
| 1 - Set Thrust Bearing Shoes, complete | 140.00 | |
| 2 - Sentinel Valves | 30.00 | |
| 5% - Bolts, studs and nuts of each size | 100.00 | |

(continued)

P. O. NO. __AD26-201__

SHEET NO. __3__ OF __5__

DATE __July 7, 1944__

| Item | Quantity | DESCRIPTION | Price |
|---|---|---|---|
| 2 | (cont'd) 1 Set | Shipboard Spare Parts for Item #1, consisting of the following for each set – | |
| | | 6 – Sight Flow Glasses with Gaskets $10.00 | |
| | | 1 – Set Maneuvering Valve Seats, stems and discs and steam strainer basket 800.00 | |
| | | $2,375.00 | |
| 3 | 1 Set | Special Tools for Item #1, consisting of the following for each set: | $280.00 per set |
| | | 1 – Lifting Beams for Turbine Rotors $15.00 | |
| | | 1 – Set Wire Rope Slings for Lifting Turbine Rotors & Turbine Covers 15.00 | |
| | | 1 – Set Guide Posts for Lifting Turbine Rotors & Turbine Covers 110.00 | |
| | | 1 – Set Eyebolts for all parts to be lifted 15.00 | |
| | | 1 – Set Jack Bolts for breaking Turbine Joint 5.00 | |
| | | 1 – Set Jacking Devices for taking rotor weight off of the bearings 50.00 | |
| | | 1 – Set Mandrels for fitting and checking carbon rings 70.00 | |
| | | 1 – Micrometer depth gage Included | |
| | | Total – $280.00 | |
| 4 | 2 Sets | Special Wrenches and Tools required for Turbines and Fittings, Item #1 | $27.50 per set |
| 5 | As Req'd. | Navy Standard Metal Spare Parts Boxing for Items #2, 3 & 4 | Included in Items 2,3&4 |
| | | TURBINE SHORE BASED SPARE PARTS Turbine Shore based spare parts are included in the requirements of Purchase Order AR13-201. | |

*(Handwritten annotations in left margin: 41-5-517, 41-5-271, 41-5-282, 41-5-573, 41-5-257, 41-5-272)*

Case MDL No. 875, Document 3337, Filed 11/19/01, Page 171 of 233

ORDER

| Item | Quantity | DESCRIPTION | Price |
|------|----------|-------------|-------|
|      |          | **PLANS AND INSTRUCTION BOOKS**<br>Plan and Instruction Book requirements for the equipment covered by this Purchase Order are ordered on Purchase Order AR13-201. |      |

PLANS AND INSTRUCTION BOOKS
Plan and Instruction Book requirements for the equipment
covered by this Purchase Order are ordered on
Purchase Order AR13-201.

WEIGHTS:
The weights of the equipment covered by this Purchase
Order shall be as follows:

| Item # | Per Ship Weight |
|--------|-----------------|
| 1 | 51,500 lbs.(Guaranteed) |
| 2 | 450 lbs. |
| 3 & 4 | 500 lbs. |
| 5 | 250 lbs. |
| Total- | 52,700 |

DELIVERY:
Delivery of equipment is to be made in accordance with
Bureau of Ships shipping requirements, as follows:

Pkge. No. 14 - 210 Days BEC

AD26 - Jan. 31, 1945
AD27 - Mar. 15, 1945
AD28 - Apr. 30, 1945
AD29 - June 15, 1945

Case MDL No. 875   Document 3337   Filed 11/19/01   Page 172 of 233

# PREFERENCE RATING

THE PREFERENCE RATINGS APPLICABLE TO THIS ORDER ARE AA-1 FOR MATERIAL FOR 1 VESSEL AND AA-2X FOR MATERIAL FOR 3 VESSELS.

## CERTIFICATION

The undersigned purchaser hereby represents to the seller and to the War Production Board that he is entitled to apply or extend the Preference Ratings indicated opposite the items shown on this purchase order, and that such application or extension is in accordance with Priorities Regulation No. 3, as amended, with the terms of which the undersigned is familiar.

TODD PACIFIC SHIPYARDS, INC.                    21 West Street
BY GIBBS & COX, INC.                            New York 6, N. Y.

_____                       _____
(Name of Purchaser)                             (Address)


_____                       July 7, 1944
Procurement & Production Division               _____
(Signature and Title of Duly Authorized Officer)  (Date)


The Vendor may extend the Preference Rating(s) assigned to this purchase order to suppliers of materials which will be physically incorporated into the subject equipment in accordance with the provisions set forth in Priorities Regulation No. 3, as amended.

AD27  will bear priority rating AA-1, August 1, 1944.

NOTE: - The progressive reratings indicated herein are to become effectiv for the specified ships on the dates shown, unless notice to the contrary is received prior to such dates.  Prompt application of these reratings to our Purchase Orders, and extension to your sub-contractors thereunder, is mandatory upon the dates shown.

G&C 746 4/22/44-1M

# T⟨ ⟩ PACIFIC SHIPYARDS, INC. FO⟨ ⟩ERLY
## SEATTLE-TACOMA SHIPBUILDING CORPORATION
### TACOMA DIVISION
### TACOMA, WASHINGTON
#### BY
## GIBBS & COX, INC.
### 21 WEST STREET
### NEW YORK 6, N. Y.

*N/60 8009*

SHEET 1 OF 5

PURCHASE ORDER NO
AD26-201
MUST APPEAR ON ALL COR-
SPONDENCE, INVOICES, PAC-
AGES AND DOCUMENTS.

TO:  Westinghouse Elec. & Mfg. Co.
40 Wall St.
New York 5, N. Y.

INSPECTION:  By U.S.Navy Dept. prior to shipment.

DATE   July 7, 1944

F. O. B. Works, South Phi
delphia,

PLACE OF MANUFACTURE:  Westinghouse Elec. & Mfg. Co.,
South Philadelphia, Pa.

Please furnish the following articles, consigned to

SUPERVISOR OF SHIPBUILDING, U. S. N.
c/o Tampa  Shipbuilding Co., Inc.,
Tampa, Florida

ROUTING: USE GOVT. B/L

TERMS: NET 30 DAYS

and APPENDIX "B"
subject to all conditions written herein and the General Instructions and Appendix "A"/hereto attached and forming part of
Purchase Order. Forms Nos.  812-663-813-665-666
Invoices are to be rendered in accordance with the applicable portions of the General Instructions hereto attached.

| INQUIRY NUMBER | | | |
|---|---|---|---|
| AB7-23 | | MAIN PROPULSION TURBINES | CMP CLASSIFICATION |
| | | | BUSHIPS SPECIAL ITE |

MATERIAL UNDER COGNIZANCE OF BUREAU OF SHIPS FOR  AD26-29

CONTRACT   NObs 1538

Production Requisition No. MAD26-1001

The material covered by this order is to be as specified
herein and in strict accordance with the Appendix "B" of
this Purchase Order entitled "Purchase Specification
No. MAD26-1001"

Correspondence relating to this negotiation is listed hereunder
as a matter of reference:

Westinghouse Elec. & Mfg. Co. letter to Seattle-Tacoma (G&C)
dated May 15, 1944 (5/17/44-#903), with attached proposal,
dated May 15, 1944;

(continued)

CMP CERTIFICATION—Allotment Number N-6—The undersigned certify, subject to the criminal penalties for misrepresentation contain
in Section 35 (A) of the United States Criminal Code, that they are authorized under CMP Regulation No. 3 to apply or each
the above allotment number or symbol and the preference rating shown in this order to the delivery of the items covered by the ord
END USE CERTIFICATION—The undersigned certify to the Producer and to the War Production Board that the material ordered herein
to fill orders in Group Classification "NAVY" whose END USE Symbol is "USN" and whose Classification Number is 2.70

APPROVED

*M. Greene*   7/10/44

Supervisor of Shipbuilding, U. S. N. N. Y.

TODD PACIFIC SHIPYARDS, INC. FORMERLY
SEATTLE-TACOMA SHIPBUILDING CORPORATION
TACOMA DIVISION
BY GIBBS & COX, INC

Case MDL No. 875   Document 3337   Filed 11/19/01   Page 174 of 233

| Item | Quantity | DESCRIPTION | Price |
|------|----------|-------------|-------|
| | | (continued) | |
| | | Westinghouse E. & M. Co. supplementary proposal to Seattle-Tacoma (G&C) dated May 18, 1944 (5/20/44-NC-#32); | |
| | | Such conditions of the Vendor's proposal listed above, as are incorporated herein, are operable. | |
| | | Westinghouse E. & M. Co. letter to Seattle-Tacoma (G&C) dated May 23, 1944 (5/24/44-#675); | |
| | | Westinghouse E. & M. Co. letter to Seattle-Tacoma (G&C) dated June 2, 1944 (6/3/44-NC-#29); | |
| | | Todd-Pacific Shipyards, Inc., Tacoma Div. (G&C) commitment letter 11871/S41-1/S42(AB7-7042-JLC) to Westinghouse E. & M. Co. dated June 7, 1944 (6/7/44-#1511). | |
| | | Quantities listed are for one (1) Ship. Material is required for four (4) Ships. | |
| | | The following applies against Production Requisition No. MAD26-1001: | |
| 1 | 1 | Westinghouse Main Propulsion Turbine, consisting of a high pressure and a combined low pressure and astern turbine, maneuvering valve, fittings, accessories, etc., all as described and/or specified herein and including services of an engineer to supervise installation of the equipment and to attend dock and sea trials. | $97,182.00 E |
| 2 | 1 Set | Shipboard Spares Parts for Item #1, consisting of the following for each set: | $2,375.00 per se |

|  | |
|---|---|
| 2 - High Pressure Turbine Bearings | $230.00 |
| 2 - Low Pressure Turbine Bearings | 30.00 |
| 1 - Set Coupling Bolts | 5.00 |
| 2 - Sets Oil Deflectors | 300.00 |
| 2 - Sets Carbon Gland Packing With Springs | 440.00 |
| 1 - Set Springs | 20.00 |
| 1 - Set Thrust Bearing Shoes, complete | 140.00 |
| 2 - Sentinel Valves | 30.00 |
| 5% - Bolts, studs and nuts of each size | 100.00 |

(continued)

P. O. NO. __AD26-201__

SHEET NO. __3__ OR __5__

DATE __July 7, 1944__

| Item | Quantity | DESCRIPTION | Price |
|------|----------|-------------|-------|
| 2 | (cont'd). 1 Set | Shipboard Spare Parts for Item #1, consisting of the following for each set –<br><br>6 – Sight Flow Glasses with Gaskets $10.00<br>1 – Set Maneuvering Valve Seats, stems and discs and steam strainer basket 800.00<br>$2,375.00 | |
| 3 | 1 Set | Special Tools for Item #1, consisting of the following for each set:<br><br>1 – Lifting Beams for Turbine Rotors $15.00<br>1 – Set Wire Rope Slings for Lifting Turbine Rotors & Turbine Covers 15.00<br>1 – Set Guide Posts for Lifting Turbine Rotors & Turbine Covers 110.00<br>1 – Set Eyebolts for all parts to be lifted 15.00<br>1 – Set Jack Bolts for breaking Turbine Joint 5.00<br>1 – Set Jacking Devices for taking rotor weight off of the bearings 50.00<br>1 – Set Mandrels for fitting and checking carbon rings 70.00<br>1 – Micrometer depth gage Included<br>Total – $280.00 | $280.00 per set |
| 4 | 2 Sets | Special Wrenches and Tools required for Turbines and Fittings, Item #1 | $27.50 per set |
| 5 | As Req'd. | Navy Standard Metal Spare Parts Boxing for Items #2, 3 & 4<br><br>TURBINE SHORE BASED SPARE PARTS<br>Turbine Shore based spare parts are included in the requirements of Purchase Order AR13-201. | Included in Items 2, 3&4. |

(handwritten annotations in left margin:) 41-8517  41-8-271  41-8-282  41-8-573  41-8-257  41-8-272

PURCHASE ORDER

| Item | Quantity | DESCRIPTION | Price |
|------|----------|-------------|-------|
|  |  | **PLANS AND INSTRUCTION BOOKS** | |

PLANS AND INSTRUCTION BOOKS
Plan and Instruction Book requirements for the equipment
covered by this Purchase Order are ordered on
Purchase Order AR13-201.

WEIGHTS:
The weights of the equipment covered by this Purchase
Order shall be as follows:

|  Item # | Per Ship Weight |
|--------|-----------------|
| 1 | 51,500 lbs.(Guaranteed) |
| 2 | 450 lbs. |
| 3 & 4 | 500 lbs. |
| 5 | 250 lbs. |
| Total- | 52,700 |

DELIVERY:
Delivery of equipment is to be made in accordance with
Bureau of Ships shipping requirements, as follows:

Pkge. No. 14 - 210 Days BEC
AD26 - Jan. 31, 1945
AD27 - Mar. 15, 1945
AD28 - Apr. 30, 1945
AD29 - June 15, 1945

# PREFERENCE RATING

P.O. NO. AD26-201
SHEET NO. 5 OF 5
DATE July 7, 1944

THE PREFERENCE RATINGS APPLICABLE TO THIS ORDER ARE AA-1 FOR MATERIAL FOR 1 VESSEL AND AA-2X FOR MATERIAL FOR 3 VESSELS.

## CERTIFICATION

The undersigned purchaser hereby represents to the seller and to the War Production Board that he is entitled to apply or extend the Preference Ratings indicated opposite the items shown on this purchase order, and that such application or extension is in accordance with Priorities Regulation No. 3, as amended, with the terms of which the undersigned is familiar.

TODD PACIFIC SHIPYARDS, INC.
BY GIBBS & COX, INC.

(Name of Purchaser)

21 West Street
New York 6, N. Y.

(Address)

Procurement & Production Division

(Signature and Title of Duly Authorized Officer)

July 7, 1944

(Date)

The Vendor may extend the Preference Rating(s) assigned to this purchase order to suppliers of materials which will be physically incorporated into the subject equipment in accordance with the provisions set forth in Priorities Regulation No. 3, as amended.

AD27  will bear priority rating AA-1, August 1, 1944.

NOTE: - The progressive reratings indicated herein are to become effective for the specified ships on the dates shown, unless notice to the contrary is received prior to such dates. Prompt application of these reratings to our Purchase Orders, and extension to your sub-contractors thereunder, is mandatory upon the dates shown.

G&C 746 6/22/44-1M

APPENDIX B

**GIBBS & COX, INC.**

SHEET No. 1 OF 14

PURCHASE SPECIFICATIONS

FOR

MAIN PROPULSION TURBINES

DESIGN No. 11872        PURCHASE SPEC'N. No. MAD26-1001

This purchase specification applies to Destroyer Tenders

**(a) General:**

1. The equipment covered by these purchase specifications shall, except as noted hereinafter, conform to the applicable rules and regulations of the following authorit[ies]

    (a) American Bureau of Shipping
    (b) United States Coast Guard
    (c) Senate Report No. 184

2. Reference herein to Navy or Federal Leaflet Specifications is for the purpose of establishing the quality of items desired. Materials shall conform to the issue current at time of request for bids. When approved by the Government, sworn certifica[te] stating that items have been tested and found to meet the specifications requirements will be accepted in lieu of tests witnessed by the authorized inspector, except for material requiring testing by the Rules and Regulations of the United States Coast Guard and the American Bureau of Shipping. However, acceptance of such certificates will not waive the right of the government to reject any items subsequently found to be not in accordance with specification requirements.

3. **Cast iron shall not be used except where special permission is requested in writing and special written approval received.**

4. All galvanizing shall be done by the hot process and the zinc shall be 98% pure.

5. Wherever the words "as approved", "as required", etc. are used the decision of the Supervisor of Shipbuilding, U.S.N. (via Gibbs & Cox, Inc.) is intended.

APPROVED FOR INQUIRY: DATE _____

APPROVED FOR PURCHASE: DATE MAY 29, 1944

(b)   Special Specifications:

Applicable portions of the Machinery Specifications for Destroyer Tenders AD26-27 are quoted below for compliance.

## "Section 50 - Main Propelling Machinery"

### "Intent of Specifications"

"The intent also is to cover substantial machinery of first class design and workmanship but without unnecessary finish, however, attention is to be paid in selecting particular items so that those units will be selected that will give the best service with the least amount of operating maintenance and upkeep."

### "Definitions:"

"Wherever the terms "Shaft Horsepower", "Designed Sea Speed", "Normal Shaft Horsepower", "Maximum Designed Shaft Horsepower", "Maximum Shaft Horsepower" or "Full Power" are used, the following definitions shall apply:

#### "Shaft Horsepower"

"The shaft horsepower is the horsepower obtained from a torsion meter applied to a calibrated section of the line shafting."

#### "Designed Sea Speed"

"The designed sea speed shall be that speed obtained on trial when using 80% of the normal shaft horsepower at deep load draft."

#### "Normal Shaft Horsepower"

"Normal shaft horsepower shall be 8500 at about 85 R.P.M."

#### "Maximum Design Shaft Horsepower"

"The maximum design shaft horsepower shall be 9350.  The propulsion machinery shall be capable of continuous operation at this power.  This shaft horsepower shall also be used in determining the various safety factors for the component parts of machinery unless otherwise specified."

#### "Maximum Shaft Horsepower or Full Power"

"The term maximum shaft horsepower or full power shall be that power obtainable from the power plant with all turbine nozzles open and with the steam characteristics developed in accordance with the specifications."

### "General Description"

"The main propelling unit shall consist of a high speed cross-compound double reduction geared turbine of the latest marine design driving a single propeller through a line of shafting at about 85 R.P.M. when developing 8500 normal S.H.P. at the

GAC 177 9/2/43-2M

## (b)  Special Specifications: (Continued)

propeller and capable of continuous operation with the turbine developing 10% in excess of normal power."

"The turbine at normal S.H.P. of 8500 when furnished with steam at the throttles at 410 lbs. pressure and 725°F. total temperature and exhausting at 28-1/2" of vacuum with sea water at 75°F. shall have a water rate at straight condensing not exceeding 7.08# per S.H.P. per hour."

"The equipment proposed for installation must be of a type and manufacture that is being used successfully in practice and has demonstrated its adaptability to the service intended."

"All machinery and equipment shall be designed to operate satisfactorily with a momentary roll of 30° or a permanent list of 15°, to either side, and a permanent inclination of 5° fore and aft."

## "Torsional Vibration"

"The design of the entire rotating system including the turbines, gears, shafting and propeller shall be such that the operation will be free from all serious torsional, critical and other forms of vibration at all speeds within the operating range."

## "Critical Materials"

"The uses of critical materials shall be limited to those applications where the substitution of another material is impracticable or will seriously affect the continued satisfactory operation of the equipment covered by these specifications."

"Among the critical materials, the following should be especially concerned."

| | | | |
|---|---|---|---|
| "Aluminum" | "Cobalt" | | |
| "Antimony" | "Copper" | "Molybdenum" | "Tungsten" |
| "Cadmium" | "Magnesium" | "Nickel" | "Vanadium" |
| "Chromium" | "Mercury" | "Rubber" | |
| | | "Tin" | |

"Regardless of any provisions in these specifications for the use of definite materials, such materials shall not be used contrary to any rules or regulations issued by the War Production Board or other similar governmental body.  In lieu thereof the contractor shall submit proposals for the use of substitutes for the consideration of the Supervisor of Shipbuilding."

"Likewise, where the procurement of specified materials is not contrary to such rules or regulations but would clearly involve delay in delivery of the vessels proposals for the use of substitutes shall be submitted to the Supervisor of Shipbuilding."

C-1C 177 9/2/43-2M

Case MDL No. 875   Document 3337   Filed 11/19/01   Page 181 of 233

(b) Special Specifications: (Continued)

"Section 51 Main Turbines"

"Ahead Turbine"

"The main turbine and gear unit shall be of the cross compound double reduction type, consisting of one high pressure turbine and one low pressure turbine and one double reduction gear connected to turbines with flexible mechanical couplings."

"The ahead turbine and gear shall be designed to deliver normal rated power of 8500 S.H.P. at about 85 R.P.M. with a steam pressure of 410# gage and 725°F. total temperature at the throttle and shall also be designed and nozzled to operate continue at 10% in excess of normal power."

"The ahead turbine shall consist of the impulse or impulse-reaction type and the astern turbine will consist of suitable impulse wheels located in the exhaust and of the low pressure turbine."

"There shall be an efficient deflector installed in the exhaust end of the low pressure casings, which will prevent the impingement of steam from the astern turbine, on the last row of ahead blades and vice versa; the design to be such, that dangerous temperatures will not be reached, under any conditions of operations."

"Astern Turbine"

"An astern turbine shall be located in the low pressure turbine cylinder and shall be designed to develop not less than 40% of the ahead power and to deliver at least 90% of the normal ahead torque at 50% R.P.M. based on a steam flow equal to normal rated ahead steam flow."

"Economy"

"The ahead turbine shall be provided with sufficient nozzle valves, controls an by-pass if necessary to obtain a relatively flat water rate curve from one-half normal S.H.P. to maximum designed S.H.P."

"Emergency Operation"

"The turbine should be equipped with suitable cross-connecting steam piping and connections which when installed will permit the operation of either the high or low pressure elements singly as a provision for emergency ahead operation. Provision is be made for the proper stowage of this piping in convenient locations when not in use

APPENDIX B

DESIGN NO. __11872__    PURCHASE SPEC'N. NO. __MAD26-1001__    SHEET NO.__5__ OF __14__

(b)  Special Specifications (Continued)

"Rotors"

"Rotors shall be made of forged steel, finished machined all over and accurately balanced in a dynamic balancing machine and to conform to the requirements of the United States Coast Guard.  All rotating parts shall have a factor of safety of not less than 2.5 based on yield point and at the speed corresponding to 110% S.H.P. The critical speed of the rotors shall be at least 20% above the speed corresponding to 110% S.H.P."

"Blading"

"All blading shall be of corrosion-resisting material suitable for the temperature to which the blading may be subjected and properly heat-treated and shall be positively secured to the rotor and casing in accordance with the practice of the manufacturer, and as approved by the Navy Department."

"Casings"

"The turbine casings, nozzle boxes, and other parts coming in contact with high temperature steam shall be of steel suitable to the steam temperature and shall be designed with three bleed connections and necessary bleeder valves to permit extraction of steam for feed heating.  Casings shall be divided along horizontal center lines, and shall be suitably supported to allow for expansion without distortion.  All pockets shall be drained to condenser to prevent accumulation of water.  Relief valve to be fitted to L.P. casing at exhaust and exhausting to atmosphere to prevent excessive pressure in turbine due to failure of circulating pump.  This valve to have a light spring and arranged for being sealed with water and to have a pipe led from its outlet to some convenient point in the engine room casing, well above the engine room. In lieu of this relief valve, an excess pressure device that will act on a valve which will shut off the main steam when pressure exceeds 5 lbs. gage, may be installed."

"Casings shall be properly heat-treated in accordance with the characteristics of the material of which they are made.  Casings to be heat-treated after rough boring and hydrostatically tested to American Bureau of Shipping classification requirements and all valves and fittings subject to high pressure steam will be hydrostatically tested in accordance with the requirements of the United States Coast Guard."

"Dummies"

"Where reaction blading is used, the end thrust shall be partly balanced by a dummy.  The dummy cylinder shall be made in halves and bolted to the turbine casing or may be cast integral with turbine casing.  The spindle dummies shall have rings machined integral with the spindle."

"Glands"

"Glands for preventing leakage around spindle at casing shall be of the steam sealed labyrinth or carbon type."

GAC J77 9/2/43-1M

APPENDIX B

DESIGN NO. 11873 _____ PURCHASE SPEC'N NO. MAD26-1001 _____ SHEET NO. 6 OF 14

(b) Special Specifications: (Continued)

**"Journal Bearings"**

"The bearings shall be split and lined with genuine babbitt. The bearing shall be removable without the necessity of removing the rotor."

**"Thrust Bearing"**

"A suitable Kingsbury or equally effective thrust bearing shall be provided on the forward end of each turbine to take the unbalanced thrust and to maintain axial position of the rotor."

**"Diaphragms and Nozzles"**

"All diaphragms shall be of materials suitable to the temperature to which they are exposed and shall be split on the horizontal center line. The diaphragms in upper half of casing shall be secured so as to lift out with the casing. The design of diaphragms to be such as to reduce steam leakage to a minimum."

"The nozzles shall be of corrosion-resisting material suitable for the temperature of steam with which they come in contact. The high pressure nozzles shall be fitted in cast steel nozzle chambers. Suitable hand operated nozzle control valves shall be provided for economical operation.

**"Steam Strainer"**

"A cast steel strainer shall be fitted in the main steam line at the throttle valve. The basket shall be of suitable corrosion-resisting material, fitted with perforated sheets welded to the frame work of the baskets."

**"Throttle and Control Valves"**

"Suitable manually operated ahead and astern balanced maneuvering valves of the interlocking type shall be supplied. Additional piping shall be arranged so that live steam can be led to L.P. ahead turbine in an emergency."

"Hand control valves shall be fitted to the H.P. ahead steam chest so that nozzles may be cut in for overload conditions and maintain high efficiency when running at reduced power."

**"Relief and Sentinel Valves"**

"Relief and sentinel valves shall be provided where necessary. These valves shall be suitably piped to prevent injury to personnel by the escaping steam."

**"Axial Clearance Indicators and Dummy Micrometers"**

"All turbines shall be provided with axial position indicators and alarms to show the position of the rotor relative to the casing and to give warning if excessive axial movement of the rotors does occur. Dummy micrometers shall also be provided for impulse-reaction or reaction turbines where the end thrust is balanced by a contact type dummy."

GEC 477 9(7)42-2M

(8)   Special Specifications: (Continued)

## "Rotor Adjustment"

"Rotors should not require adjustment during any condition of operation including manuevering and astern.  The trials, including economy and astern runs, shall be conducted with one predetermined clearance which shall not be changed during the duration of the trials.  Rotor adjusting devices permitting adjustment during operation will not be approved."

## "Pipes"

"Crossover, equalizing and other necessary turbine piping shall be seamless drawn steel and shall provide for expansion in a manner approved by the Navy Department

## "Couplings"

"The flexible couplings connecting the turbine rotors and pinions shall be of the jaw or tooth type designed to permit whatever end movement is expected and also to allow a reasonable amount of misalignment.  The couplings shall be of forged steel with provision for an adequate and positive means of lubrication."

## "Support"

"Turbines should be suitably supported to provide for expansion."

## "Lifting"

"Turbine units are to be fitted with proper lifting guides so that casing and rotors may be lifted while in the ship.  Suitable forcing or jacking bolts and eye-bolts should be provided for lifting all parts where necessary for maintenance of units.

## "Spares" "(For Each Vessel)"

## "Carried on Board"

"Set consists of 100% for one unit unless otherwise noted."

" 1 - Set bearings, turbine shaft complete"
" 1 - Set couplingwearing parts, of each size and type"
" 2 - Sets oil deflectors, bearing, complete"
" 2 - Sets packing, gland, carbon, complete sets, with springs"
" 2 - Sets packing, gland, complete (when not caulked)"
" 1 - Set Springs"
" 1 - Set thrust bearing shaft collar (Segmental type thrust bearing) one of each size and type"
" 2 - Set thrust bearing shoes, complete (Segmental type thrust bearing)"
" 1 - Set valves, relief"
" 1 - Set Valves, sentinel"
" 1 - Set equipment including special or unusual fittings.  Knuckle joints, bevel gears, etc. necessary for proper maintenance.  Special attention should be given to throttle valves, revolution indicators, control gear, glands, special bolts and nuts and pins"
" - Spare Steam Strainer Basket

Sparing Specifications: (Continued)

**"Not Carried on Board (Sets Required)"**

"Set consists of 100% for one unit"

" 1 - Set 110% of blading, impulse and reaction, both stationary and rotating, for all stages, with wedges, space blocks and undrilled or unpunched. shrouding complete."
" 1 - Set Nozzles, first stage complete"
" 1 - Set packing, diaphragm, complete"
" 1 - Set 110% of packing, gland, complete (when caulked)"
" 1 - Set segments, intermediate, with holding bolts complete" —

**"Tools"**

**"Carried on Board"**

" 1 - Set Gages, bridge, for all turbine bearings (in cases). To be supplied with suitable pin gages for checking the accuracy of the bridge gages"
" 1 - Set Gages, packing piece"
" 1 - Set Gages, reaction blade section"
" 1 - Set Tools, special for removal and replacement of turbine shaft thrust bearing collars."
" 1 - Set Tools, special, all required."
" 2 - Sets wrenches, special for turbines and fittings"

**"Section 84 Painting, Machinery"**

"The painting of all machinery, tanks, piping, etc. shall be in accordance with Appendix 6 of the General Specifications for Machinery unless otherwise approved by the Supervisor of Shipbuilding."

"The finished, working and internal surfaces of all equipment shall be slushed with a suitable rust preventative compound as approved for protection during shipment and storage prior to installation and operation aboard ship."

**(c) Detail Requirements:**

**General**

The design and materials of the turbines and equipment shall be submitted for approval of the Supervisor of Shipbuilding, U.S.N., (via Gibbs & Cox, Inc.)

The main propulsion turbines shall be suitable for the maximum pressure to which they may be subjected when supplied with steam at a steam drum pressure of 435 p.s.i. gage at the first stage nozzles, or with a maximum boiler steam drum pressure of 475 p.s.i. gage.

The design of the complete units shall preclude any critical torsional or other vibration of any rotating part during trials or in service at any possible operating speed of the propeller shaft in service and operating condition. The turbine manufacturer the gear manufacturer and the contractor are to be mutually responsible for correction thereof.

GAC .77 9/2;43-2M

(C) Detail Requirements: (Continued)

The pressure and quantities of extracted steam at normal full load shall be approximately as follows:

| | |
|---|---|
| H.P. Bleed: | None |
| M.P. Bleed: | 7000 lbs./hr. at 41 p.s.i. abs., maximum |
| L.P. Bleed: | 6000 lbs./hr. at 9 p.s.i. abs., maximum |

The H.P. Bleed point shall be capable of supplying a maximum of 9500 lbs/hr. at approximately 100 p.s.i. absolute.

Ahead rotation for the H.P. and L.P. turbines shall be clockwise when viewed from the after end of the turbines.

Micrometer depth gages shall be furnished for measuring the wear of all turbine bearings. They shall be properly marked with initial clearance. These gages shall not be permanently installed.

Provisions shall be made for the axial adjustment of all thrust bearing, for use only during overhaul or at anchor periods.

Drains shall be provided as necessary in the various stages. High pressure drain connections, sizes 1" and below shall be accomplished by screwing flanged nipples into the casing and seal welding same at casing. The flanged nipple, for all drains, shall be of the same material as the casing to which it is attached. The nipple shall be screwed into a counterbored hole so that the seal weld will go beyond the last thread. Annealing will not be required after seal-welding inasmuch as some connections may have to be completed at the shipyard or on board ship. Drain connections above 1" size will be flanged and cast integral. Exceptions to this requirement will require specific approval.

The turbines shall be connected to the reduction gear through an approved type flexible coupling. Couplings will be furnished by the reduction gear manufacturer

All flanges for pipe connections on casing shall terminate outside the lagging line.

High Pressure Turbine

The high pressure turbine willbe of the impulse reaction type.

The turbine casing shall consist of the high pressure cylinder casing and the high pressure exhaust casing - both horizontally split. The casing shall be of a high grade cast steel in accordance with Navy Dept. leaflet Specification 49S1(INT) Class "B" or equal, thoroughly sound, heat treated and smoothly bored with integral valve chests in the upper half. The steam chest shall be designed to withstand full boiler pressure and temperature. The casing shall be stress relieved after all welding has been completed. The steam inlet shall be made to the top half while the exhaust connection shall be in the bottom half at the side adjacent to the low pressure turbine.

(o)  Detail Requirements:  (Continued)

## Low Pressure Turbine

The low pressure turbine will be of reaction type and the astern turbine, which shall be contained in the low pressure turbine casing, will be of the impulse type.

The turbine casing shall consist of the astern turbine casing and the combined low pressure cylinder and exhaust and casing - both horizontally split.  The astern turbine cylinder casing shall be of special high grade cast steel in accordance with Navy Dept. leaflet Specification 49S1 (INT) or equal and the combined low pressure cylinder and exhaust end casing shall be of cast steel, each thoroughly seasoned, heat tweated and smoothly bored.  The astern turbine steam chest shall be designed to withstand full boiler pressure and temperature.

The steam inlet for the astern turbine shall be in the top half of the casing while inlet for the low pressure turbine shall be made in the bottom half at the side adjacent to the high pressure turbine.  The condenser shall be located athwartship directly underneath the low pressure turbine.  It is to be bolted to the exhaust flange of the turbine cylinder.

A diaphragm shall be located between the first and second stage of the astern turbine.  This diaphragm shall be of satisfactory material to withstand the temperature to which it is subjected and shall be horizontally split and so arranged that the top half is removable with the cover.  The design of the diaphragm is to be such as to reduce steam leakage to a minimum.

## Joints:

Horizontal joint flanges shall be so designed that all bolts may be, insofar as is practicable, of the same dimensions.  Sufficient clearance shall be provided in all cases around the bolt heads and nuts to permit ready manipulation with ordinary tools.  All casing and steam chest joints to be made metal to metal without the use of sheet packing materials; flange faces may be lightly painted with a thin layer of boiler linseed oil, boiled linseed oil and graphite or other suitable material, which will withstand the temperature conditions and will permit reasonable ease in breaking the joints in service.  A simple system of flange grooving shall be provided on both horizontal and vertical joints for pressure pumping with a suitable form of sealing compound.  Similar grooving shall be provided on condenser flanges for the joints between turbine exhaust and condenser where the condenser forms the support for the turbine.  These grooves are required for making up tight joints in service and except for flange between turbine and condenser shall not be filled or used in making up joints on original installation, unless specifically approved.

Jacking bolts shall be provided in location and spacing, sufficient to permit readily breaking joints for inspection and repair.

G&C 477 9/12/43-2M

DESIGN NO. 11872 _____ PURCHASE SPEC'N. NO. MAD26-1001 _____ SHEET NO. 11 __ OF 14

**(c) Detail Requirements: (Continued)**

### Inspection Holes

Inspection holes in turbine casings shall be provided as approved for size and location.

### Glands:

Suitable glands and packing, as approved, shall be provided around the shafts of the turbines to prevent leakage of steam from, or ingress of air into the turbines under all conditions of operation, warming up and standing by. The turbine glands whe: subjected to a surface temperature in excess of 650°F., shall be separated from the adjacent bearings in a manner satisfactory to the Navy Department and as approved. The design shall also permit the renewal of all stationary and rotating gland parts, including packing strips when the turbine casing is lifted, but without necessitating removing the rotor.

### Blading:

The impulse blading in the high pressure turbine and in the astern turbine shall be stainless steel milled from bar stocks and fitted with appropriate shrouding. Spacer pieces shall be eliminated by using blading having suitable root thickness.

The reaction blading shall be made of stainless steel rolled, milled or forged to exact cross section and with brazed packing pieces. Blades of proper lengths shall be assemblied with shrouding secured in place by riveting over blade tenons.

### Foundation:

The turbines are to be supported by the same foundation which supports the condenser, the low pressure turbine being supported by and directly connected to the main condenser. The design of the foundation should permit longitudinal movement due to expansion.

### Bearings:

There shall be a thrust bearing on the forward end and journal bearings on both ends of each turbine.

### Lubricating System:

Lubricating oil piping, valves and fittings, etc., shall comply with the requirement of the Bureau of Ships drawing No. S4800-3000 for material and tests. The turbine bearings will be supplied with oil from a common supply header at approximately 8 to 10 p.s.i. gage pressure. Pressure gages shall be provided as required and approved. Combined sight flow and thermometer fittings will be installed in the drain line from each bearing, located to assure easy access and clear visibility. Thermometers shall be provided for all bearings. Oil piping which is within 3 feet of any hot surface (above 650°F.) shall be steel tubing with heavy steel male and female flanges and as approved. All other lubricating oil piping shall be steel tubing with 300 pound pressure flanges.

GAC 477 9/5;143-211

DESIGN NO. ___11872___ PURCHASE SPEC'N. NO. ___MAD26-100___ SHEET NO. 12 OF 14

(c) Detail Requirements: (Continued)

## Sealing System

The vendor shall furnish diagrams showing the total losses or gains in power due to sealing steam for each of the following head conditions:

Standby

100% Full power

No overspeed trip or low lubricating oil pressure trip is required.

## Tests:

All completed turbine rotors shall be accurately balanced dynamically and all pressure parts given a hydrostatic test suitable for the conditions to which they will be subjected.

Turbines shall be completely assembled in the shop prior to shipment and tested over the entire speed range and checked for balance. Overspeed test of all turbines and at least one complete turbine and gear unit shall be made at 15% over the maximum operating speed for a period of at least 15 minutes.

## Engineering Services

The services of a competent erecting engineer shall be provided to supervise the installation of the entire equipment.

The services of a guaranteed engineer shall be furnished for dock and sea trials, and for such duties as may be required in connection with the equipment during the guarantee period.

## (d) Connections:

The type and location of all connections shall be indicated upon approved type "B" plans and shall include the sizes as follows:

High Pressure Turbine
Steam Inlet - 6"
Exhaust - as shown on type "B" plans

Low Pressure Turbine
Steam Inlet - as shown on type "B" plans
Exhaust - as shown on type "B" plans

Astern Turbine
Steam Inlet - 5"

## Templates:

The turbine manufacturer shall furnish a template for use by the condenser manufacturer in drilling the L.P. Turbine exhaust inlet flange on the condenser.

GSC 477 9(2)(63-2A

APPENDIX B

DESIGN NO. 11872 _____ PURCHASE SPEC'N. NO. _____ MAD26-1001 _____ SHEET NO. 13 OF 14

(d) Connections: (Continued)

Units shall be provided with all necessary connections for lubricating oil supply, drains, bleeder steam, pressure gages, thermometers thermal alarms, etc., as required and approved.

Flanged nipples shall be supplied with stiffening brackets where necessary.

Lubricating oil connections shall terminate with a female flange. (6" - 300# flange if more than 3 ft. from a hot surface (above 650°F)

Flange dimensions shall be in accordance with the applicable commercial standards for the pressure and service involved.

(e) Fittings:

The following fittings shall be furnished by the vendor with each unit.

One (1) maneuvering valve assembly consisting of an ahead valve, an astern valve and a steam strainer. Valves are to be single seated type, balanced by means of an internal pilot valve.

Integral piping complete for each unit, including lubricating oil, equalizing, gland sealing, leak-off and drains, etc.

One (1) set of bearing thermometers pressure gauges and sight flow indicators.

Two (2) sentinel valves for high pressure - low pressure crossover and low pressure casing.

One (1) horizontal joint insulation shield for high pressure turbine and one (1) horizontal joint insulation shield low pressure turbine (H.P. end only).

Cross-over connections shall be furnished complete with piping, expansion joints, fittings and drains etc., as follows:

High pressure turbine to low pressure turbine.

One (1) set of crossover parts consisting of:
Expansion joints with bolts, nuts and gaskets
Piping between H.P. and L.P. turbine exhaust for emergency operation of H.P. turbine alone with blank and ring flanges complete.

Flanged connections for emergency operation of L.P. turbine alone, including orifice plate and blank flanges, complete.

C&C 177 9/2/43-2M

DESIGN NO. 1187    PURCHASE SPEC'N. NO. NAD26-1001    SHEET NO. 14 OF 14

(f)  Lagging and Insulation:

Steam turbine insulation and lagging shall be furnished by the purchaser.

(g)  Spare Parts:

Spare parts shall be furnished in accordance with the Special Specifications quoted herein and as approved.  The spare parts shall be listed on type "B" plans.

Shipboard spares shall be placed in metal boxes unless parts are to be stored in bins aboard ship.  For parts stored in bins, metal boxes need not be furnished, but the parts shall be suitably packed to prevent damage or deterioration during shipment. Spare parts boxing shall be generally in accordance with Bureau of Ships Specification 42B9(INT).

Shore spares shall be boxed for export in wooden boxes and shipped as complete sets.  Each box shall be legibly marked for identification.

(h)  Tools:

Tools and special wrenches for each vessel shall be furnished in accordance with the Special Specification as quoted herein, and as approved.  The tools and special wrenches shall be listed on type "B" plans.  Special tools shall be detailed, showing application where necessary.

(i)  Plans and Instruction Books:

Unless otherwise approved, plans and instruction books shall be furnished in accordance with the requirements as outlined in subsection S1-1 of the General Specifications for Machinery.

(j)  Guaranteed Performance:

The guaranteed performance of the unit shall be as agreed upon by the contractor and vendor.

(k)  Protection of Material:

All material shall be adequately protected to prevent deterioration or corrosion from exposure to weather during shipment and storage prior to installation on board ship.

APPENDIX B

GIBBS & COX, INC.

SHEET No. 1 OF 14

## PURCHASE SPECIFICATIONS

### FOR

## MAIN PROPULSION TURBINES

DESIGN No. 11872                    PURCHASE SPEC'N. No. MAD26-1001

This purchase specification applies to Destroyer Tenders

(a)  General:

1.    The equipment  covered by these purchase specifications shall, except as noted hereinafter, conform to the applicable rules and regulations of the following authorit:

    (a)  American Bureau of Shipping
    (b)  United States Coast Guard
    (c)  Senate Report No. 184

2.    Reference herein to Navy or Federal Leaflet Specifications is for the purpose of establishing the quality of items desired.  Materials shall conform to the issue current at time of request for bids.  When approved by the Government, sworn certifica: stating that items have been tested and found to meet the specifications requirements will be accepted in lieu of tests witnessed by the authorized inspector, except for material requiring testing by the Rules and Regulations of the United States Coast Guard and the American Bureau of Shipping.  However, acceptance of such certificates will not waive the right of the government to reject any items subsequently found to be not in accordance with specification requirements.

3.    Cast iron shall not be used except where special permission is requested in writing and special written approval received.

4.    All galvanizing shall be done by the hot process and the zinc shall be 98% pure.

5.    Wherever the words "as approved", "as required", etc. are used the decision of the Supervisor of Shipbuilding, U.S.N. (via Gibbs & Cox, Inc.) is intended.

APPROVED FOR INQUIRY: DATE

APPROVED FOR PURCHASE: DATE MAY 29, 1944

(b)   Special Specifications:

Applicable portions of the Machinery Specifications for Destroyer Tenders AD26-27 are quoted below for compliance.

## "Section 50 - Main Propelling Machinery"

### "Intent of Specifications"

"The intent also is to cover substantial machinery of first class design and workmanship but without unnecessary finish, however, attention is to be paid in selecting particular items so that those units will be selected that will give the best service with the least amount of operating maintenance and upkeep."

### "Definitions:"

"Wherever the terms "Shaft Horsepower", "Designed Sea Speed", "Normal Shaft Horsepower", "Maximum Designed Shaft Horsepower", "Maximum Shaft Horsepower" or "Full Power" are used, the following definitions shall apply:

#### "Shaft Horsepower"

"The shaft horsepower is the horsepower obtained from a torsion meter applied to a calibrated section of the line shafting."

#### "Designed Sea Speed"

"The designed sea speed shall be that speed obtained on trial when using 80% of the normal shaft horsepower at deep load draft."

#### "Normal Shaft Horsepower"

"Normal shaft horsepower shall be 8500 at about 85 R.P.M."

#### "Maximum Design Shaft Horsepower"

"The maximum design shaft horsepower shall be 9350. The propulsion machinery shall be capable of continuous operation at this power. This shaft horsepower shall also be used in determining the various safety factors for the component parts of machinery unless otherwise specified."

#### "Maximum Shaft Horsepower or Full Power"

"The term maximum shaft horsepower or full power shall be that power obtainable from the power plant with all turbine nozzles open and with the steam characteristics developed in accordance with the specifications."

### "General Description"

"The main propelling unit shall consist of a high speed cross-compound double reduction geared turbine of the latest marine design driving a single propeller through a line of shafting at about 85 R.P.M. when developing 8500 normal S.H.P. at the

CAC 177 9/2243-244

Case MDL No. 875   Document 3337   Filed 11/19/01   Page 194 of 233

## (b)  Special Specifications: (Continued)

propeller and capable of continuous operation with the turbine developing 10% in excess of normal power."

"The turbine at normal S.H.P. of 8500 when furnished with steam at the throttles at 410 lbs. pressure and 725°F. total temperature and exhausting at 28-1/2" of vacuum with sea water at 75°F. shall have a water rate at straight condensing not exceeding 7.08# per S.H.P. per hour."

"The equipment proposed for installation must be of a type and manufacture that is being used successfully in practice and has demonstrated its adaptability to the service intended."

"All machinery and equipment shall be designed to operate satisfactorily with a momentary roll of 30° or a permanent list of 15°, to either side, and a permanent inclination of 5° fore and aft."

"Torsional Vibration"

"The design of the entire rotating system including the turbines, gears, shafting and propeller shall be such that the operation will be free from all serious torsional, critical and other forms of vibration at all speeds within the operating range."

"Critical Materials"

"The uses of critical materials shall be limited to those applications where the substitution of another material is impracticable or will seriously affect the continued satisfactory operation of the equipment covered by these specifications."

"Among the critical materials, the following should be especially concerned."

| | | | |
|---|---|---|---|
| "Aluminum" | "Cobalt" | | |
| "Antimony" | "Copper" | "Molybdenum" | "Tungsten" |
| "Cadmium" | "Magnesium" | "Nickel" | "Vanadium" |
| "Chromium" | "Mercury" | "Rubber" | |
| | | "Tin" | |

"Regardless of any provisions in these specifications for the use of definite materials, such materials shall not be used contrary to any rules or regulations issued by the War Production Board or other similar governmental body.  In lieu thereof the contractor shall submit proposals for the use of substitutes for the consideration of the Supervisor of Shipbuilding."

"Likewise, where the procurement of specified materials is not contrary to such rules or regulations but would clearly involve delay in delivery of the vessels proposals for the use of substitutes shall be submitted to the Supervisor of Shipbuilding."

Case MDL No. 875   Document 3337   Filed 11/19/01   Page 195 of 233

(b)  Special Specifications: (Continued)

"Section 51 Main Turbines"

"Ahead Turbine"

"The main turbine and gear unit shall be of the cross compound double reduction type, consisting of one high pressure turbine and one low pressure turbine and one double reduction gear connected to turbines with flexible mechanical couplings."

"The ahead turbine and gear shall be designed to deliver normal rated power of 8500 S.H.P. at about 85 R.P.M. with a steam pressure of 410# gage and 725°F. total temperature at the throttle and shall also be designed and nozzled to operate continuous at 10% in excess of normal power."

"The ahead turbine shall consist of the impulse or impulse-reaction type and the astern turbine will consist of suitable impulse wheels located in the exhaust and of the low pressure turbine."

"There shall be an efficient deflector installed in the exhaust end of the low pressure casings, which will prevent the impingement of steam from the astern turbine, on the last row of ahead blades and vice versa; the design to be such, that dangerous temperatures will not be reached, under any conditions of operations."

"Astern Turbine"

"An astern turbine shall be located in the low pressure turbine cylinder and shall be designed to develop not less than 40% of the ahead power and to deliver at least 80% of the normal ahead torque at 50% R.P.M. based on a steam flow equal to normal rated ahead steam flow."

"Economy"

"The ahead turbine shall be provided with sufficient nozzle valves, controls and by-pass if necessary to obtain a relatively flat water rate curve from one-half normal S.H.P. to maximum designed S.H.P."

"Emergency Operation"

"The turbine should be equipped with suitable cross-connecting steam piping and connections which when installed will permit the operation of either the high or low pressure elements singly as a provision for emergency ahead operation.  Provision is to be made for the proper stowage of this piping in convenient locations when not in use."

APPENDIX B

DESIGN NO. __11872__ PURCHASE SPEC'N NO. __MAD26-1001__ SHEET NO. __5__ OF __14__

**(b) Special Specifications (Continued)**

## "Rotors"

"Rotors shall be made of forged steel, finished machined all over and accurately balanced in a dynamic balancing machine and to conform to the requirements of the United States Coast Guard. All rotating parts shall have a factor of safety of not less than 2.5 based on yield point and at the speed corresponding to 110% S.H.P. The critical speed of the rotors shall be at least 20% above the speed corresponding to 110% S.H.P."

## "Blading"

"All blading shall be of corrosion-resisting material suitable for the temperature to which the blading may be subjected and properly heat-treated and shall be positively secured to the rotor and casing in accordance with the practice of the manufacturer, and as approved by the Navy Department."

## "Casings"

"The turbine casings, nozzle boxes, and other parts coming in contact with high temperature steam shall be of steel suitable to the steam temperature and shall be designed with three bleed connections and necessary bleeder valves to permit extraction of steam for feed heating. Casings shall be divided along horizontal center line, and shall be suitably supported to allow for expansion without distortion. All pockets shall be drained to condenser to prevent accumulation of water. Relief valve to be fitted to L.P. casing at exhaust and exhausting to atmosphere to prevent excessive pressure in turbine due to failure of circulating pump. This valve to have a light spring and arranged for being sealed with water and to have a pipe led from its outlet to some convenient point in the engine room casing, well above the engine room. In lieu of this relief valve, an excess pressure device that will act on a valve which will shut off the main steam when pressure exceeds 5 lbs. gage, may be installed.

"Casings shall be properly heat-treated in accordance with the characteristics of the material of which they are made. Casings to be heat-treated after rough boring and hydrostatically tested to American Bureau of Shipping classification requirements and all valves and fittings subject to high pressure steam will be hydrostatically tested in accordance with the requirements of the United States Coast Guard."

## "Dummies"

"Where reaction blading is used, the end thrust shall be partly balanced by a dummy. The dummy cylinder shall be made in halves and bolted to the turbine casing or may be cast integral with turbine casing. The spindle dummies shall have rings machined integral with the spindle."

## "Glands"

"Glands for preventing leakage around spindle at casing shall be of the steam sealed labyrinth or carbon type."

G&C J77 9/2/43-2M

APPENDIX B

DESIGN· NO. 11972 _____ PURCHASE SPEC'N NO. MAD26-1001 _____ SHEET NO. 6 OF 14

(b) Special Specifications: (Continued)

### "Journal Bearings"

"The bearings shall be split and lined with genuine babbitt. The bearing shall be removable without the necessity of removing the rotor."

### "Thrust Bearing"

"A suitable Kingsbury or equally effective thrust bearing shall be provided on the forward end of each turbine to take the unbalanced thrust and to maintain axial position of the rotor."

### "Diaphragms and Nozzles"

"All diaphragms shall be of materials suitable to the temperature to which they are exposed and shall be split on the horizontal center line. The diaphragms in upper half of casing shall be secured so as to lift out with the casing. The design of diaphragms to be such as to reduce steam leakage to a minimum."

"The nozzles shall be of corrosion-resisting material suitable for the temperature of steam with which they come in contact. The high pressure nozzles shall be fitted in cast steel nozzle chambers. Suitable hand operated nozzle control valves shall be provided for economical operation."

### "Steam Strainer"

"A cast steel strainer shall be fitted in the main steam line at the throttle valve. The basket shall be of suitable corrosion-resisting material, fitted with perforated sheets welded to the frame work of the baskets."

### "Throttle and Control Valves"

"Suitable manually operated ahead and astern balanced maneuvering valves of the interlocking type shall be supplied. Additional piping shall be arranged so that live steam can be led to L.P. ahead turbine in an emergency."

"Hand control valves shall be fitted to the H.P. ahead steam chest so that nozzles may be cut in for overload conditions and maintain high efficiency when running at reduced power."

### "Relief and Sentinel Valves"

"Relief and sentinel valves shall be provided where necessary. These valves shall be suitably piped to prevent injury to personnel by the escaping steam."

### "Axial Clearance Indicators and Dummy Micrometers"

"All turbines shall be provided with axial position indicators and alarms to show the position of the rotor relative to the casing and to give warning if excessive axial movement of the rotors does occur. Dummy micrometers shall also be provided for impulse-reaction or reaction turbines where the end thrust is balanced by a contact type dummy."

GEC 477 9/7/42-3M

(8) Special Specifications: (Continued)

## "Rotor Adjustment"

"Rotors should not require adjustment during any condition of operation including manuevering and astern. The trials, including economy and astern runs, shall be conducted with one predetermined clearance which shall not be changed during the duration of the trials. Rotor adjusting devices permitting adjustment during operation will not be approved."

## "Pipes"

"Crossover, equalizing and other necessary turbine piping shall be seamless drawn steel and shall provide for expansion in a manner approved by the Navy Department"

## "Couplings"

"The flexible couplings connecting the turbine rotors and pinions shall be of the jaw or tooth type designed to permit whatever end movement is expected and also to allow a reasonable amount of misalignment. The couplings shall be of forged steel with provision for an adequate and positive means of lubrication."

## "Support"

"Turbines should be suitably supported to provide for expansion."

## "Lifting"

"Turbine units are to be fitted with proper lifting guides so that casing and rotors may be lifted while in the ship. Suitable forcing or jacking bolts and eye-bolts should be provided for lifting all parts where necessary for maintenance of units."

## "Spares" "(For Each Vessel)"

## "Carried on Board"

"Set consists of 100% for one unit unless otherwise noted."

"  1 - Set bearings, turbine shaft complete"
"  1 - Set couplingwearing parts, of each size and type"
"  2 - Sets oil deflectors, bearing, complete"
"  2 - Sets packing, gland, carbon, complete sets, with springs"
"  2 - Sets packing, gland, complete (when not caulked)"
"  1 - Set Springs"
"  1 - Set thrust bearing shaft collar (Segmental type thrust bearing) one of each size and type"
"  1 - Set thrust bearing shoes, complete (Segmental type thrust bearing)"
"  1 - Set valves, relief"
"  1 - Set Valves, sentinel"
"  1 - Set equipment including special or unusual fittings. Knuckle joints, bevel gears, etc. necessary for proper maintenance. Special attention should be given to throttle valves, revolution indicators, control gear, glands, special bolts and nuts and pins"
"  1 - Spare Steam Strainer Basket"

Case MDL No. 875   Document 3337   Filed 11/19/01   Page 199 of 233

13. Special Specifications: (Continued)

"Not Carried on Board (Sets Required)"

"Set consists of 100% for one unit"
" 1 - Set 110% of blading, impulse and reaction, both stationary and rotating, for
all stages, with wedges, space blocks and undrilled or unpunched.
shrouding complete."
" 1 - Set Nozzles, first stage complete"
" 1 - Set packing, diaphragm, complete"
" 1 - Set 110% of packing, gland, complete (when caulked)"
" 1 - Set segments, intermediate, with holding bolts complete" —

"Tools"

"Carried on Board"

" 1 - Set Gages, bridge, for all turbine bearings (in cases).  To be supplied with
suitable pin gages for checking the accuracy of the bridge gages"
" 1 - Set Gages, packing piece"
" 1 - Set Gages, reaction blade section"
" 1 - Set Tools, special for removal and replacement of turbine shaft thrust bearing
collars."
" 1 - Set Tools, special, all required."
" 2 - Sets wrenches, special for turbines and fittings"

"Section 84 Painting, Machinery"

"The painting of all machinery, tanks, piping, etc. shall be in accordance
with Appendix 6 of the General Specifications for Machinery unless otherwise approved
by the Supervisor of Shipbuilding."

"The finished, working and internal surfaces of all equipment shall be slushed
with a suitable rust preventative compound as approved for protection during shipment
and storage prior to installation and operation aboard ship."

(c)  Detail Requirements:

General

The design and materials of the turbines and equipment shall be submitted for
approval of the Supervisor of Shipbuilding, U.S.N., (via Gibbs & Cox, Inc.)

The main propulsion turbines shall be suitable for the maximum pressure to
which they may be subjected when supplied with steam at a steam drum pressure of 435
p.s.i. gage at the first stage nozzles, or with a maximum boiler steam drum pressure
of 475 p.s.i. gage.

The design of the complete units shall preclude any critical torsional or other
vibration of any rotating part during trials or in service at any possible operating
speed of the propeller shaft in service and operating condition.  The turbine manufactur
the gear manufacturer and the contractor are to be mutually responsible for correction
thereof.

GAC .77 9/2/43-2M

Case MDL No. 875   Document 3337   Filed 11/19/01   Page 200 of 233

(d)  Detail Requirements: (Continued)

The pressure and quantities of extracted steam at normal full load shall be approximately as follows:

| | |
|---|---|
| H.P. Bleed: | None |
| M.P. Bleed: | 7000 lbs./hr. at 41 p.s.i. abs., maximum |
| L.P. Bleed: | 6000 lbs./hr. at 9 p.s.i. abs., maximum |

The H.P. Bleed point shall be capable of supplying a maximum of 9500 lbs/hr. at approximately 100 p.s.i. absolute.

Ahead rotation for the H.P. and L.P. turbines shall be clockwise when viewed from the after end of the turbines.

Micrometer depth gages shall be furnished for measuring the wear of all turbine bearings. They shall be properly marked with initial clearance. These gages shall not be permanently installed.

Provisions shall be made for the axial adjustment of all thrust bearing, for use only during overhaul or at anchor periods.

Drains shall be provided as necessary in the various stages. High pressure drain connections, sizes 1" and below shall be accomplished by screwing flanged nipples into the casing and seal welding same at casing. The flanged nipple, for all drains, shall be of the same material as the casing to which it is attached. The nipple shall be screwed into a counterbored hole so that the seal weld will go beyond the last thread. Annealing will not be required after seal-welding inasmuch as some connections may have to be completed at the shipyard or on board ship. Drain connections above 1" size will be flanged and cast integral. Exceptions to this requirement will require specific approval.

The turbines shall be connected to the reduction gear through an approved type flexible coupling. Couplings will be furnished by the reduction gear manufacturer

All flanges for pipe connections on casing shall terminate outside the lagging line.

High Pressure Turbine

The high pressure turbine will be of the impulse reaction type.

The turbine casing shall consist of the high pressure cylinder casing and the high pressure exhaust casing - both horizontally split. The casing shall be of a high grade cast steel in accordance with Navy Dept. leaflet Specification 49S1(INT) Class "B" or equal, thoroughly sound, heat treated and smoothly bored with integral valve chests in the upper half. The steam chest shall be designed to withstand full boiler pressure and temperature. The casing shall be stress relieved after all welding has been completed. The steam inlet shall be made to the top half while the exhaust connection shall be in the bottom half at the side adjacent to the low pressure turbine.

(o)  Detail Requirements:   (Continued)

## Low Pressure Turbine

The low pressure turbine will be of reaction type and the astern turbine, which shall be contained in the low pressure turbine casing, will be of the impulse type.

The turbine casing shall consist of the astern turbine casing and the combined low pressure cylinder and exhaust and casing - both horizontally split.  The astern turbine cylinder casing shall be of special high grade cast steel in accordance with Navy Dept. leaflet Specification 49S1 (INT) or equal and the combined low pressure cylinder and exhaust end casing shall be of cast steel, each thoroughly seasoned, heat tweated and smoothly bored.  The astern turbine steam chest shall be designed to withstand full boiler pressure and temperature.

The steam inlet for the astern turbine shall be in the top half of the casing while inlet for the low pressure turbine shall be made in the bottom half at the side adjacent to the high pressure turbine.  The condenser shall be located athwartship directly underneath the low pressure turbine.  It is to be bolted to the exhaust flange of the turbine cylinder.

A diaphragm shall be located between the first and second stage of the astern turbine.  This diaphragm shall be of satisfactory material to withstand the temperature to which it is subjected and shall be horizontally split and so arranged that the top half is removable with the cover.  The design of the diaphragm is to be such as to reduce steam leakage to a minimum.

## Joints:

Horizontal joint flanges shall be so designed that all bolts may be, insofar as is practicable, of the same dimensions.  Sufficient clearance shall be provided in all cases around the bolt heads and nuts to permit ready manipulation with ordinary tools.  All casing and steam chest joints to be made metal to metal without the use of sheet packing materials; flange faces may be lightly painted with a thin layer of boiled linseed oil, boiled linseed oil and graphite or other suitable material, which will withstand the temperature conditions and will permit reasonable ease in breaking the joints in service.  A simple system of flange grooving shall be provided on both horizontal and vertical joints for pressure pumping with a suitable form of sealing compound.  Similar grooving shall be provided on condenser flanges for the joints between turbine exhaust and condenser where the condenser forms the support for the turbine.  These grooves are required for making up tight joints in service and except f flange between turbine and condenser shall not be filled or used in making up joints on original installation, unless specifically approved.

Jacking bolts shall be provided in location and spacing, sufficient to permit readily breaking joints for inspection and repair.

DESIGN NO. 11872            PURCHASE SPEC'N. NO. MAD26-1001            SHEET NO 11 OF 14

## (c) Detail Requirements: (Continued)

### Inspection Holes

Inspection holes in turbine casings shall be provided as approved for size and location.

### Glands:

Suitable glands and packing, as approved, shall be provided around the shafts of the turbines to prevent leakage of steam from, or ingress of air into the turbines under all conditions of operation, warming-up and standing by. The turbine glands when subjected to a surface temperature in excess of 650°F., shall be separated from adjacent bearings in a manner satisfactory to the Navy Department and as approved. The design shall also permit the renewal of all stationary and rotating gland parts, including packing strips when the turbine casing is lifted, but without necessitating removing the rotor.

### Blading:

The impulse blading in the high pressure turbine and in the astern turbine shall be stainless steel milled from bar stocks and fitted with appropriate shrouding. Spacer pieces shall be eliminated by using blading having suitable root thickness.

The reaction blading shall be made of stainless steel rolled, milled or forged to exact cross section and with brazed packing pieces. Blades of proper lengths shall be assemblied with shrouding secured in place by riveting over blade tenons.

### Foundation:

The turbines are to be supported by the same foundation which supports the condenser, the low pressure turbine being supported by and directly connected to the main condenser. The design of the foundation should permit longitudinal movement due to expansion.

### Bearings:

There shall be a thrust bearing on the forward end and journal bearings on both ends of each turbine.

### Lubricating System:

Lubricating oil piping, valves and fittings, etc., shall comply with the requirement of the Bureau of Ships drawing No. S4800-3000 for material and tests. The turbine bearings will be supplied with oil from a common supply header at approximately 8 to 10 p.s.i. gage pressure. Pressure gages shall be provided as required and approved. Combined sight flow and thermometer fittings will be installed in the drain line from each bearing, located to assure easy access and clear visibility. Thermometers shall be provided for all bearings. Oil piping which is within 3 feet of any hot surface (above 650°F.) shall be steel tubing with heavy steel male and female flanges and as approved. All other lubricating oil piping shall be steel tubing with 300 pound pressure flanges.

GAC 477 9E:143-244

(c)  Detail Requirements:  (Continued)

## Sealing System

The vendor shall furnish diagrams showing the total losses or gains in power due to sealing steam for each of the following head conditions:

> Standby
> 100% Full power

No overspeed trip or low lubricating oil pressure trip is required.

## Tests:

All completed turbine rotors shall be accurately balanced dynamically and all pressure parts given a hydrostatic test suitable for the conditions to which they will be subjected.

Turbines shall be completely assembled in the shop prior to shipment and tested over the entire speed range and checked for balance.  Overspeed test of all turbines and at least one complete turbine and gear unit shall be made at 15% over the maximum operating speed for a period of at least 15 minutes.

## Engineering Services

The services of a competent erecting engineer shall be provided to supervise the installation of the entire equipment.

The services of a guaranteed engineer shall be furnished for dock and sea trials, and for such duties as may be required in connection with the equipment during the guarantee period.

## (d)  Connections:

The type and location of all connections shall be indicated upon approved type "B" plans and shall include the sizes as follows:

> High Pressure Turbine
>     Steam Inlet - 6"
>     Exhaust - as shown on type "B" plans
>
> Low Pressure Turbine
>     Steam Inlet - as shown on type "B" plans
>     Exhaust - as shown on type "B" plans
>
> Astern Turbine
>     Steam Inlet - 5"

## Templates:

The turbine manufacturer shall furnish a template for use by the condenser manufacturer in drilling the L.P. Turbine exhaust inlet flanges on the condenser.

GEC 477 9(2)(A-3-22A

APPENDIX B

DESIGN NO. 11872 _____ PURCHASE SPEC'N. NO. _____ MAD26-1001 _____ SHEET NO. 13 OF 14

(d) Connections: (Continued)

Units shall be provided with all necessary connections for lubricating oil supply, drains, bleeder steam, pressure gages, thermometers thermal alarms, etc., as required and approved.

Flanged nipples shall be supplied with stiffening brackets where necessary.

Lubricating oil connections shall terminate with a female flange. (6" - 300# flange if more than 3 ft. from a hot surface (above 650°F)

Flange dimensions shall be in accordance with the applicable commercial standards for the pressure and service involved.

(e) Fittings:

The following fittings shall be furnished by the vendor with each unit.

One (1) maneuvering valve assembly consisting of an ahead valve, an astern valve and a steam strainer. Valves are to be single seated type, balanced by means of an internal pilot valve.

Integral piping complete for each unit, including lubricating oil, equalizing, gland sealing, leak-off and drains, etc.

One (1) set of bearing thermometers pressure gauges and sight flow indicators.

Two (2) sentinel valves for high pressure - low pressure crossover and low pressure casing.

One (1) horizontal joint insulation shield for high pressure turbine and one (1) horizontal joint insulation shield low pressure turbine (H.P. end only).

Cross-over connections shall be furnished complete with piping, expansion joints, fittings and drains etc., as follows:

High pressure turbine to low pressure turbine.

One (1) set of crossover parts consisting of:
    Expansion joints with bolts, nuts and gaskets
    Piping between H.P. and L.P. turbine exhaust for emergency operation of H.P. turbine alone with blank and ring flanges complete.

Flanged connections for emergency operation of L.P. turbine alone, including orifice plate and blank flanges, complete.

C&C 577 7/2/43-2M

(f)  Lagging and Insulation:

Steam turbine insulation and lagging shall be furnished by the purchaser.

(g)  Spare Parts:

Spare parts shall be furnished in accordance with the Special Specifications quoted herein and as approved.  The spare parts shall be listed on type "B" plans.

Shipboard spares shall be placed in metal boxes unless parts are to be stored in bins aboard ship.  For parts stored in bins, metal boxes need not be furnished, but the parts shall be suitably packed to prevent damage or deterioration during shipment. Spare parts boxing shall be generally in accordance with Bureau of Ships Specification 42B9(INT).

Shore spares shall be boxed for export in wooden boxes and shipped as complete sets.  Each box shall be legibly marked for identification.

(h)  Tools:

Tools and special wrenches for each vessel shall be furnished in accordance with the Special Specification as quoted herein, and as approved.  The tools and special wrenches shall be listed on type "B" plans.  Special tools shall be detailed, showing application where necessary.

(i)  Plans and Instruction Books:

Unless otherwise approved, plans and instruction books shall be furnished in accordance with the requirements as outlined in subsection S1-1 of the General Specifications for Machinery.

(j)  Guaranteed Performance:

The guaranteed performance of the unit shall be as agreed upon by the contractor and vendor.

(k)  Protection of Material:

All material shall be adequately protected to prevent deterioration or corrosion from exposure to weather during shipment and storage prior to installation on board ship.

APPENDIX B

GIBBS & COX, INC.

SHEET No. 1 OF 14

PURCHASE SPECIFICATIONS

FOR

MAIN PROPULSION TURBINES

DESIGN No. 11872                    PURCHASE SPEC'N. No. MAD26-1001

This purchase specification applies to Destroyer Tenders

(a) General:

1. The equipment covered by these purchase specifications shall, except as noted hereinafter, conform to the applicable rules and regulations of the following authorit

    (a) American Bureau of Shipping
    (b) United States Coast Guard
    (c) Senate Report No. 184

2. Reference herein to Navy or Federal Leaflet Specifications is for the purpose of establishing the quality of items desired. Materials shall conform to the issue current at time of request for bids. When approved by the Government, sworn certifica stating that items have been tested and found to meet the specifications requirements will be accepted in lieu of tests witnessed by the authorized inspector, except for material requiring testing by the Rules and Regulations of the United States Coast Guard and the American Bureau of Shipping. However, acceptance of such certificates will not waive the right of the government to reject any items subsequently found to be not in accordance with specification requirements.

3. Cast iron shall not be used except where special permission is requested in writing and special written approval received.

4. All galvanizing shall be done by the hot process and the zinc shall be 98% pure

5. Wherever the words "as approved", "as required", etc. are used the decision of the Supervisor of Shipbuilding, U.S.N. (via Gibbs & Cox, Inc.) is intended.

APPROVED FOR INQUIRY: DATE

APPROVED FOR PURCHASE: DATE MAY 29, 1944

### (b)  Special Specifications:

Applicable portions of the Machinery Specifications for Destroyer Tenders AD26-27 are quoted below for compliance.

## "Section  50 - Main Propelling Machinery"

### "Intent of Specifications"

"The intent also is to cover substantial machinery of first class design and workmanship but without unnecessary finish, however, attention is to be paid in selecting particular items so that those units will be selected that will give the best service with the least amount of operating maintenance and upkeep."

### "Definitions:"

"Wherever the terms "Shaft Horsepower", "Designed Sea Speed", "Normal Shaft Horsepower", "Maximum Designed Shaft Horsepower", "Maximum Shaft Horsepower" or "Full Power" are used, the following definitions shall apply:

#### "Shaft Horsepower"

"The shaft horsepower is the horsepower obtained from a torsion meter applied to a calibrated section of the line shafting."

#### "Designed Sea Speed"

"The designed sea speed shall be that speed obtained on trial when using 80% of the normal shaft horsepower at deep load draft."

#### "Normal Shaft Horsepower"

"Normal shaft horsepower shall be 8500 at about 85 R.P.M."

#### "Maximum Design Shaft Horsepower"

"The maximum design shaft horsepower shall be 9350.  The propulsion machinery shall be capable of continuous operation at this power.  This shaft horsepower shall also be used in determining the various safety factors for the component parts of machinery unless otherwise specified."

#### "Maximum Shaft Horsepower or Full Power"

"The term maximum shaft horsepower or full power shall be that power obtainable from the power plant with all turbine nozzles open and with the steam characteristics developed in accordance with the specifications."

### "General Description"

"The main propelling unit shall consist of a high speed cross-compound double reduction geared turbine of the latest marine design driving a single propeller through a line of shafting at about 85 R.P.M. when developing 8500 normal S.H.P. at the

GAO 177 9/3443-288

## (b)  Special Specifications: (Continued)

propeller and capable of continuous operation with the turbine developing 10% in excess of normal power."

"The turbine at normal S.H.P. of 8500 when furnished with steam at the throttles at 410 lbs. pressure and 725°F. total temperature and exhausting at 28-1/2" of vacuum with sea water at 75°F. shall have a water rate at straight condensing not exceeding 7.08# per S.H.P. per hour."

"The equipment proposed for installation must be of a type and manufacture that is being used successfully in practice and has demonstrated its adaptability to the service intended."

"All machinery and equipment shall be designed to operate satisfactorily with a momentary roll of 30° or a permanent list of 15°, to either side, and a permanent inclination of 5° fore and aft."

## "Torsional Vibration"

"The design of the entire rotating system including the turbines, gears, shafting and propeller shall be such that the operation will be free from all serious torsional, critical and other forms of vibration at all speeds within the operating range."

## "Critical Materials"

"The uses of critical materials shall be limited to those applications where the substitution of another material is impracticable or will seriously affect the continued satisfactory operation of the equipment covered by these specifications."

"Among the critical materials, the following should be especially concerned."

| | | | |
|---|---|---|---|
| "Aluminum" | "Cobalt" | | |
| "Antimony" | "Copper" | "Molybdenum" | "Tungsten" |
| "Cadmium" | "Magnesium" | "Nickel" | "Vanadium" |
| "Chromium" | "Mercury" | "Rubber" | |
| | | "Tin" | |

"Regardless of any provisions in these specifications for the use of definite materials, such materials shall not be used contrary to any rules or regulations issued by the War Production Board or other similar governmental body.  In lieu thereof the contractor shall submit proposals for the use of substitutes for the consideration of the Supervisor of Shipbuilding."

"Likewise, where the procurement of specified materials is not contrary to such rules or regulations but would clearly involve delay in delivery of the vessels proposals for the use of substitutes shall be submitted to the Supervisor of Shipbuilding."

(b) Special Specifications: (Continued)

"Section 51 Main Turbines"

"Ahead Turbine"

"The main turbine and gear unit shall be of the cross compound double reduction type, consisting of one high pressure turbine and one low pressure turbine and one double reduction gear connected to turbines with flexible mechanical couplings."

"The ahead turbine and gear shall be designed to deliver normal rated power of 8500 S.H.P. at about 85 R.P.M. with a steam pressure of 410# gage and 725°F. total temperature at the throttle and shall also be designed and nozzled to operate continuou at 10% in excess of normal power."

"The ahead turbine shall consist of the impulse or impulse-reaction type and the astern turbine will consist of suitable impulse wheels located in the exhaust and of the low pressure turbine."

"There shall be an efficient deflector installed in the exhaust end of the low pressure casings, which will prevent the impingement of steam from the astern turbine, on the last row of ahead blades and vice versa; the design to be such, that dangerous temperatures will not be reached, under any conditions of operations."

"Astern Turbine"

"An astern turbine shall be located in the low pressure turbine cylinder and shall be designed to develop not less than 40% of the ahead power and to deliver at least 90% of the normal ahead torque at 50% R.P.M. based on a steam flow equal to normal rated ahead steam flow."

"Economy"

"The ahead turbine shall be provided with sufficient nozzle valves, controls and by-pass if necessary to obtain a relatively flat water rate curve from one-half normal S.H.P. to maximum designed S.H.P."

"Emergency Operation"

"The turbine should be equipped with suitable cross-connecting steam piping and connections which when installed will permit the operation of either the high or low pressure elements singly as a provision for emergency ahead operation.  Provision is to be made for the proper stowage of this piping in convenient locations when not in use."

BC-77 VB/43-14

(b)  Special Specifications (Continued)

## "Rotors"

"Rotors shall be made of forged steel, finished machined all over and accurately balanced in a dynamic balancing machine and to conform to the requirements of the United States Coast Guard.  All rotating parts shall have a factor of safety of not less than 2.5 based on yield point and at the speed corresponding to 110% S.H.P. The critical speed of the rotors shall be at least 20% above the speed corresponding to 110% S.H.P."

## "Blading"

"All blading shall be of corrosion-resisting material suitable for the temperature to which the blading may be subjected and properly heat-treated and shall be positively secured to the rotor and casing in accordance with the practice of the manufacturer, and as approved by the Navy Department."

## "Casings"

"The turbine casings, nozzle boxes, and other parts coming in contact with high temperature steam shall be of steel suitable to the steam temperature and shall be designed with three bleed connections and necessary bleeder valves to permit extraction of steam for feed heating.  Casings shall be divided along horizontal center line, and shall be suitably supported to allow for expansion without distortion.  All pockets shall be drained to condenser to prevent accumulation of water.  Relief valve to be fitted to L.P. casing at exhaust and exhausting to atmosphere to prevent excessive pressure in turbine due to failure of circulating pump.  This valve to have a light spring and arranged for being sealed with water and to have a pipe led from its outlet to some convenient point in the engine room casing, well above the engine room. In lieu of this relief valve, an excess pressure device that will act on a valve which will shut off the main steam when pressure exceeds 5 lbs. gage, may be installed.

"Casings shall be properly heat-treated in accordance with the characteristics of the material of which they are made.  Casings to be heat-treated after rough boring and hydrostatically tested to American Bureau of Shipping classification requirements and all valves and fittings subject to high pressure steam will be hydrostatically tested in accordance with the requirements of the United States Coast Guard."

## "Dummies"

"Where reaction blading is used, the end thrust shall be partly balanced by a dummy.  The dummy cylinder shall be made in halves and bolted to the turbine casing or may be cast integral with turbine casing.  The spindle dummies shall have rings machined integral with the spindle."

## "Glands"

"Glands for preventing leakage around spindle at casing shall be of the steam sealed labyrinth or carbon type."

APPENDIX B

DESIGN NO. 11872 _____ PURCHASE SPEC'N NO. MAD26-1001

SHEET NO. 6 OF 14

(b) Special Specifications: (Continued)

### "Journal Bearings"

"The bearings shall be split and lined with genuine babbitt.  The bearing shall be removable without the necessity of removing the rotor."

### "Thrust Bearing"

"A suitable Kingsbury or equally effective thrust bearing shall be provided on the forward end of each turbine to take the unbalanced thrust and to maintain axial position of the rotor."

### "Diaphragms and Nozzles"

"All diaphragms shall be of materials suitable to the temperature to which they are exposed and shall be split on the horizontal center line.  The diaphragms in upper half of casing shall be secured so as to lift out with the casing.  The design of diaphragms to be such as to reduce steam leakage to a minimum."

"The nozzles shall be of corrosion-resisting material suitable for the temperature of steam with which they come in contact.  The high pressure nozzles shall be fitted in cast steel nozzle chambers.  Suitable hand operated nozzle control valves shall be provided for economical operation.

### "Steam Strainer"

"A cast steel strainer shall be fitted in the main steam line at the throttle valve.  The basket shall be of suitable corrosion-resisting material, fitted with perforated sheets welded to the frame work of the baskets."

### "Throttle and Control Valves"

"Suitable manually operated ahead and astern balanced maneuvering valves of the interlocking type shall be supplied.  Additional piping shall be arranged so that live steam can be led to L.P. ahead turbine in an emergency."

"Hand control valves shall be fitted to the H.P. ahead steam chest so that nozzles may be cut in for overload conditions and maintain high efficiency when running at reduced power."

### "Relief and Sentinel Valves"

"Relief and sentinel valves shall be provided where necessary.  These valves shall be suitably piped to prevent injury to personnel by the escaping steam."

### "Axial Clearance Indicators and Dummy Micrometers"

"All turbines shall be provided with axial position indicators and alarms to show the position of the rotor relative to the casing and to give warning if excessive axial movement of the rotors does occur.  Dummy micrometers shall also be provided for impulse-reaction or reaction turbines where the end thrust is balanced by a contact type dummy."

GBC 477 917/42-2M

(8)  Special Specifications: (Continued)

## "Rotor Adjustment"

"Rotors should not require adjustment during any condition of operation includin manuevering and astern.  The trials, including economy and astern runs, shall be conducted with one predetermined clearance which shall not be changed during the duration of the trials.  Rotor adjusting devices permitting adjustment during operation will not be approved."

## "Pipes"

"Crossover, equalizing and other necessary turbine piping shall be seamless drawn steel and shall provide for expansion in a manner approved by the Navy Department

## "Couplings"

"The flexible couplings connecting the turbine rotors and pinions shall be of the jaw or tooth type designed to permit whatever end movement is expected and also to allow a reasonable amount of misalignment.  The couplings shall be of forged steel with provision for an adequate and positive means of lubrication."

## "Support"

"Turbines should be suitably supported to provide for expansion."

## "Lifting"

"Turbine units are to be fitted with proper lifting guides so that casing and rotors may be lifted while in the ship.  Suitable forcing or jacking bolts and eye-bolts should be provided for lifting all parts where necessary for maintenance of units.

## "Spares" "(For Each Vessel)"

## "Carried on Board"

"Set consists of 100% for one unit unless otherwise noted."

" 1 - Set bearings, turbine shaft complete"
" 1 - Set couplingwearing parts, of each size and type"
" 2 - Sets oil deflectors, bearing, complete"
" 2 - Sets packing, gland, carbon, complete sets, with springs"
" 2 - Sets packing, gland, complete (when not caulked)"
" 1 - Set Springs"
" 1 - Set thrust bearing shaft collar (Segmental type thrust bearing) one of each size and type"
" 1 - Set thrust bearing shoes, complete (Segmental type thrust bearing)"
" 1 - Set valves, relief"
" 1 - Set Valves, sentinel"
" 1 - Set equipment including special or unusual fittings.  Knuckle joints, bevel gears, etc. necessary for proper maintenance.  Special attention should be given to throttle valves, revolution indicators, control gear, glands, special bolts and nuts and pins"
" 1 - Spare Steam Strainer Basket

Spare Specifications: (Continued)

**"Not Carried on Board (Sets Required)"**

"Set consists of 100% for one unit"

" 1 - Set 110% of blading, impulse and reaction, both stationary and rotating, for all stages, with wedges, space blocks and undrilled or unpunched. shrouding complete."
" 1 - Set Nozzles, first stage complete"
" 1 - Set packing, diaphragm, complete"
" 1 - Set 110% of packing, gland, complete (when caulked)"
" 1 - Set segments, intermediate, with holding bolts complete" —

**"Tools"**

**"Carried on Board"**

" 1 - Set Gages, bridge, for all turbine bearings (in cases).  To be supplied with suitable pin gages for checking the accuracy of the bridge gages"
" 1 - Set Gages, packing piece"
" 1 - Set Gages, reaction blade section"
" 1 - Set Tools, special for removal and replacement of turbine shaft thrust bearing collars."
" 1 - Set Tools, special, all required."
" 2 - Sets wrenches, special for turbines and fittings"

**"Section 84 Painting, Machinery"**

"The painting of all machinery, tanks, piping, etc. shall be in accordance with Appendix 6 of the General Specifications for Machinery unless otherwise approved by the Supervisor of Shipbuilding."

"The finished, working and internal surfaces of all equipment shall be slushed with a suitable rust preventative compound as approved for protection during shipment and storage prior to installation and operation aboard ship."

**(c)  Detail Requirements:**

**General**

The design and materials of the turbines and equipment shall be submitted for approval of the Supervisor of Shipbuilding, U.S.N., (via Gibbs & Cox, Inc.)

The main propulsion turbines shall be suitable for the maximum pressure to which they may be subjected when supplied with steam at a steam drum pressure of 435 p.s.i. gage at the first stage nozzles, or with a maximum boiler steam drum pressure of 475 p.s.i. gage.

The design of the complete units shall preclude any critical torsional or other vibration of any rotating part during trials or in service at any possible operating speed of the propeller shaft in service and operating condition.  The turbine manufacturer the gear manufacturer and the contractor are to be mutually responsible for correction thereof.

GAC .77 9/2;43-2M

APPENDIX B                                                      AD26-201

DESIGN NO. __11872__ _____ PURCHASE SPEC'N. NO. __MAD26-1001__ SHEET NO. __9__ OF __14__

(e) Detail Requirements: (Continued)

The pressure and quantities of extracted steam at normal full load shall be approximately as follows:

| | |
|---|---|
| H.P. Bleed: | None |
| M.P. Bleed: | 7000 lbs./hr. at 41 p.s.i. abs., maximum |
| L.P. Bleed: | 6000 lbs./hr. at 9 p.s.i. abs., maximum |

The H.P. Bleed point shall be capable of supplying a maximum of 9500 lbs/hr. at approximately 100 p.s.i. absolute.

Ahead rotation for the H.P. and L.P. turbines shall be clockwise when viewed from the after end of the turbines.

Micrometer depth gages shall be furnished for measuring the wear of all turbine bearings. They shall be properly marked with initial clearance. These gages shall not be permanently installed.

Provisions shall be made for the axial adjustment of all thrust bearing, for use only during overhaul or at anchor periods.

Drains shall be provided as necessary in the various stages. High pressure drain connections, sizes 1" and below shall be accomplished by screwing flanged nipples into the casing and seal welding same at casing. The flanged nipple, for all drains, shall be of the same material as the casing to which it is attached. The nipple shall be screwed into a counterbored hole so that the seal weld will go beyond the last thread. Annealing will not be required after seal-welding inasmuch as some connections may have to be completed at the shipyard or on board ship. Drain connections above 1" size will be flanged and cast integral. Exceptions to this requirement will require specific approval.

The turbines shall be connected to the reduction gear through an approved type flexible coupling. Couplings will be furnished by the reduction gear manufacturer

All flanges for pipe connections on casing shall terminate outside the lagging line.

High Pressure Turbine

The high pressure turbine will be of the impulse reaction type.

The turbine casing shall consist of the high pressure cylinder casing and the high pressure exhaust casing - both horizontally split. The casing shall be of a high grade cast steel in accordance with Navy Dept. leaflet Specification 49S1(INT) Class "B" or equal, thoroughly sound, heat treated and smoothly bored with integral valve chests in the upper half. The steam chest shall be designed to withstand full boiler pressure and temperature. The casing shall be stress relieved after all welding has been completed. The steam inlet shall be made to the top half while the exhaust connection shall be in the bottom half at the side adjacent to the low pressure turbine.

C&C 477 9(2;43-23A

Case MDL No. 875   Document 3337   Filed 11/19/01   Page 215 of 233

(c)  Detail Requirements:  (Continued)

## Low Pressure Turbine

The low pressure turbine will be of reaction type and the astern turbine, which shall be contained in the low pressure turbine casing, will be of the impulse type.

The turbine casing shall consist of the astern turbine casing and the combined low pressure cylinder and exhaust and casing - both horizontally split.  The astern turbine cylinder casing shall be of special high grade cast steel in accordance with Navy Dept. leaflet Specification 49S1 (INT) or equal and the combined low pressure cylinder and exhaust end casing shall be of cast steel, each thoroughly seasoned, heat tweated and smoothly bored.  The astern turbine steam chest shall be designed to withstand full boiler pressure and temperature.

The steam inlet for the astern turbine shall be in the top half of the casing while inlet for the low pressure turbine shall be made in the bottom half at the side adjacent to the high pressure turbine.  The condenser shall be located athwartship directly underneath the low pressure turbine.  It is to be bolted to the exhaust flange of the turbine cylinder.

A diaphragm shall be located between the first and second stage of the astern turbine.  This diaphragm shall be of satisfactory material to withstand the temperature to which it is subjected and shall be horizontally split and so arranged that the top half is removable with the cover.  The design of the diaphragm is to be such as to reduce steam leakage to a minimum.

## Joints:

Horizontal joint flanges shall be so designed that all bolts may be, insofar as is practicable, of the same dimensions.  Sufficient clearance shall be provided in all cases around the bolt heads and nuts to permit ready manipulation with ordinary tools.  All casing and steam chest joints to be made metal to metal without the use of sheet packing materials; flange faces may be lightly painted with a thin layer of boiled linseed oil, boiled linseed oil and graphite or other suitable material, which will withstand the temperature conditions and will permit reasonable ease in breaking the joints in service.  A simple system of flange grooving shall be provided on both horizontal and vertical joints for pressure pumping with a suitable form of sealing compound.  Similar grooving shall be provided on condenser flanges for the joints between turbine exhaust and condenser where the condenser forms the support for the turbine.  These grooves are required for making up tight joints in service and except for flange between turbine and condenser shall not be filled or used in making up joints on original installation, unless specifically approved.

Jacking bolts shall be provided in location and spacing, sufficient to permit readily breaking joints for inspection and repair.

Case MDL No. 875   Document 3337   Filed 11/19/01   Page 216 of 233

(c) Detail Requirements: (Continued)

## Inspection Holes

Inspection holes in turbine casings shall be provided as approved for size and location.

## Glands:

Suitable glands and packing, as approved, shall be provided around the shafts of the turbines to prevent leakage of steam from, or ingress of air into the turbines under all conditions of operation, warming-up and standing by. The turbine glands when subjected to a surface temperature in excess of 650°F., shall be separated from adjacent bearings in a manner satisfactory to the Navy Department and as approved. The design shall also permit the renewal of all stationary and rotating gland parts, including packing strips when the turbine casing is lifted, but without necessitating removing the rotor.

## Blading:

The impulse blading in the high pressure turbine and in the astern turbine shall be stainless steel milled from bar stocks and fitted with appropriate shrouding. Spacer pieces shall be eliminated by using blading having suitable root thickness.

The reaction blading shall be made of stainless steel rolled, milled or forged to exact cross section and with brazed packing pieces. Blades of proper lengths shall be assembled with shrouding secured in place by riveting over blade tenons.

## Foundation:

The turbines are to be supported by the same foundation which supports the condenser, the low pressure turbine being supported by and directly connected to the main condenser. The design of the foundation should permit longitudinal movement due to expansion.

## Bearings:

There shall be a thrust bearing on the forward end and journal bearings on both ends of each turbine.

## Lubricating System:

Lubricating oil piping, valves and fittings, etc., shall comply with the requirement of the Bureau of Ships drawing No. S4800-3000 for material and tests. The turbine bearings will be supplied with oil from a common supply header at approximately 8 to 10 p.s.i. gage pressure. Pressure gages shall be provided as required and approved. Combined sight flow and thermometer fittings will be installed in the drain line from each bearing, located to assure easy access and clear visibility. Thermometers shall be provided for all bearings. Oil piping which is within 3 feet of any hot surface (above 650°F.) shall be steel tubing with heavy steel male and female flanges and as approved. All other lubricating oil piping shall be steel tubing with 300 pound pressure flanges.

GAC 477 9/5:143-243

**(c) Detail Requirements: (Continued)**

## Sealing System

The vendor shall furnish diagrams showing the total losses or gains in power due to sealing steam for each of the following head conditions:

Standby
100% Full power

No overspeed trip or low lubricating oil pressure trip is required.

## Tests:

All completed turbine rotors shall be accurately balanced dynamically and all pressure parts given a hydrostatic test suitable for the conditions to which they will be subjected.

Turbines shall be completely assembled in the shop prior to shipment and tested over the entire speed range and checked for balance. Overspeed test of all turbines and at least one complete turbine and gear unit shall be made at 15% over the maximum operating speed for a period of at least 15 minutes.

## Engineering Services

The services of a competent erecting engineer shall be provided to supervise the installation of the entire equipment.

The services of a guaranteed engineer shall be furnished for dock and sea trials, and for such duties as may be required in connection with the equipment during the guarantee period.

## (d) Connections:

The type and location of all connections shall be indicated upon approved type "B" plans and shall include the sizes as follows:

High Pressure Turbine
Steam Inlet - 6"
Exhaust - as shown on type "B" plans

Low Pressure Turbine
Steam Inlet - as shown on type "B" plans
Exhaust - as shown on type "B" plans

Astern Turbine
Steam Inlet - 5"

## Templates:

The turbine manufacturer shall furnish a template for use by the condenser manufacturer in drilling the L.P. Turbine exhaust inlet flanges on the condenser.

APPENDIX 8

DESIGN NO. 11872 _____ PURCHASE SPEC'N. NO. MAD26-1001 _____ SHEET NO. 13 OF 14

(d) Connections:   (Continued)

Units shall be provided with all necessary connections for lubricating oil supply, drains, bleeder steam, pressure gages, thermometers thermal alarms, etc., as required and approved.

Flanged nipples shall be supplied with stiffening brackets where necessary.

Lubricating oil connections shall terminate with a female flange.   (6" - 300# flange if more than 3 ft. from a hot surface (above 650°F)

Flange dimensions shall be in accordance with the applicable commercial stand-ards for the pressure and service involved.

(e)  Fittings:

The following fittings shall be furnished by the vendor with each unit.

One (1) maneuvering valve assembly consisting of an ahead valve, an astern valve and a steam strainer.   Valves are to be single seated type, balanced by means of an internal pilot valve.

Integral piping complete for each unit, including lubricating oil, equalizing, gland sealing, leak-off and drains, etc.

One (1) set of bearing thermometers pressure gauges and sight flow indicators.

Two (2) sentinel valves for high pressure - low pressure crossover and low pressure casing.

One (1) horizontal joint insulation shield for high pressure turbine and one (1) horizontal joint insulation shield low pressure turbine (H.P. end only).

Cross-over connections shall be furnished complete with piping, expansion joints, fittings and drains etc., as follows:

High pressure turbine to low pressure turbine.

One (1) set of crossover parts consisting of:
Expansion joints with bolts, nuts and gaskets
Piping between H.P. and L.P. turbine exhaust for emergency operation of H.P. turbine alone with blank and ring flanges complete.

Flanged connections for emergency operation of L.P. turbine alone, including orifice plate and blank flanges, complete.

C&C 477 3/5/43-2M

### (f)  Lagging and Insulation:

Steam turbine insulation and lagging shall be furnished by the purchaser.

### (g)  Spare Parts:

Spare parts shall be furnished in accordance with the Special Specifications quoted herein and as approved.  The spare parts shall be listed on type "B" plans.

Shipboard spares shall be placed in metal boxes unless parts are to be store in bins aboard ship.  For parts stored in bins, metal boxes need not be furnished, bu the parts shall be suitably packed to prevent damage or deterioration during shipment Spare parts boxing shall be generally in accordance with Bureau of Ships Specificatio 42B9(INT).

Shore spares shall be boxed for export in wooden boxes and shipped as comple sets.  Each box shall be legibly marked for identification.

### (h)  Tools:

Tools and special wrenches for each vessel shall be furnished in accordance with the Special Specification as quoted herein, and as approved.  The tools and special wrenches shall be listed on type "B" plans.  Special tools shall be detailed, showing application where necessary.

### (i)  Plans and Instruction Books:

Unless otherwise approved, plans and instruction books shall be furnished in accordance with the requirements as outlined in subsection S1-1 of the General Specifications for Machinery.

### (j)  Guaranteed Performance:

The guaranteed performance of the unit shall be as agreed upon by the contractor and vendor.

### (k)  Protection of Material:

All material shall be adequately protected to prevent deterioration or corrosion from exposure to weather during shipment and storage prior to installation on board ship.

1          SUPREME COURT OF THE STATE OF NEW YORK

2                 COUNTY OF NEW YORK

3                      --o0o--

4    MAY 2001 EXTREMIS CASES -

5    ALL TRIAL GROUPS,

6          Plaintiffs,

7    -vs-                          NYCAL INDEX NO. 40,000

8    VIACOM, INC., SUCCESSOR BY

9    MERGER TO CBS CORPORATION

10   f/k/a/ WESTINGHOUSE ELECTRIC

11   CORPORATION, et al.,

12          Defendants.

13   _____/

14

15

16                 VOLUME 1

17        DEPOSITION OF JAMES MARK GATE

18          Thursday, July 26, 2001

19          San Francisco, California

20

21   ATKINSON-BAKER, INC.COURT REPORTERS

22   5 Third Street, Suite 625San Francisco, California 94103

23   800/288-3376

24   REPORTED BY:  Heidi J. Ryder, CSR NO. 10053

25   FILE NO.: 9B057C8



1

```
 1              SUPREME COURT OF THE STATE OF NEW YORK

 2                     COUNTY OF NEW YORK

 3                          --oOo--

 4    MAY 2001 EXTREMIS CASES -

 5    ALL TRIAL GROUPS,

 6              Plaintiffs,

 7    -vs-                          NYCAL INDEX NO. 40,000

 8    VIACOM, INC., SUCCESSOR BY

 9    MERGER TO CBS CORPORATION

10    f/k/a/ WESTINGHOUSE ELECTRIC

11    CORPORATION, et al.,

12              Defendants.

13    _____/

14

15         Deposition of JAMES MARK GATE, Volume 1,

16    taken on behalf of Plaintiffs, at the law offices of

17    Morganstein & Jubelirer, One Market, Spear Tower, 32nd

18    Floor, San Francisco, California, commencing at

19    10:01 a.m., Thursday, July 26, 2001, before Deposition

20    Officer Heidi J. Ryder, CSR No. 10053.

21

22

23

24

25
```

```
 1                  A P P E A R A N C E S

 2

 3

 4      FOR THE PLAINTIFFS:

 5      WEITZ & LUXENBERGBY: JERRY KRISTAL, ESQ.

 6      BY: STEPHEN RIEGEL, ESQ.180 Maiden Lane

 7      New York, New York 10038800/438-9786

 8

 9      FOR THE WESTINGHOUSE ELECTRIC, VIACOM INC.:

10      AKIN, GUMP, STRAUSS, HAUER & FELDBY: WILLIAM J. BRADLEY III, ESQ.

11      590 Madison AvenueNew York, New York 10022

12      212/872-1027

13      FOR THE DEFENDANTS WESTINGHOUSE:

14      EVERY & WEATHERSBY, L.L.C.

15      BY: WILLIAM D. HARVARD, ESQ.3405 Piedmont Road

16      Suite 225Atlanta, Georgia 30305

17      404/233-8718

18

19

20

21

22

23

24

25
```

3

7/26/2001  Gate, James M. 7/26/01

1    if you did.

2              MR. BRADLEY:  Not to interrupt.

3              We have been going a little over an hour.

4    Would you like to take a break, or are you good to go?

5              THE WITNESS:  No.  Let's take a break.  Good

6    idea.

7                   (Break 11:00 a.m. to 11:08 a.m.)

8    BY MR. KRISTAL:

9         Q.    The drawings that you were talking about

10   earlier, at the time that these ships on the list

11   were -- before they were being built, obviously, but

12   when the equipment was designed and planned, did the

13   drawings go from Westinghouse to the Navy for approval?

14        A.    Yes.

15        Q.    Did they go to anybody else?  Was there a

16   ship builder or contractor who may have been doing

17   different --

18        (Multiple colloquy.)

19   BY MR. KRISTAL:

20              Let me finish the --

21        A.    I'm sorry.

22        Q.    That's okay.

23              -- or did it go to somebody else who had some

24   function in terms of the ability of the ship?

25        A.    It varied with the contract.

1    And the flange itself is an external component.  It is

2    not a internal component.

3         Q.    So where the flanges are in this diagram, are

4    they inside or outside the equipment?

5         A.    They are outside of the component that it is

6    representing.

7         Q.    But it is within the turbine generator set?

8         A.    That is right.  It is located within the

9    turbine generator set.

10        Q.    So wherever there is a flange inside the

11   generator turbine generator set, in between the two

12   flanges would be a gasket?

13        A.    That is correct.

14        Q.    Do you know one way or the other whether

15   those gaskets contained asbestos?

16        A.    Yes, I do.

17        Q.    Okay.

18        A.    It was spiral-wound gaskets.  There is a

19   metal outer piece and an asbestos inner piece.

20        Q.    And how do you know that?

21        A.    Because the Navy specifies spiral-wound

22   gaskets on all steam lines.

23        Q.    And the other gaskets that were not spiral

24   wound, do you understand whether or not they had

25   asbestos?

1          And what was the source of your knowledge

2     regarding the asbestos component of the gaskets that you

3     knew about?

4          A.     The Navy had a document on piping systems

5     that dictated for various temperatures what type of

6     gasket material you would use.

7          Q.     Did the Navy ever tell you with respect to

8     the cautions and the warnings and the advice that were

9     in the technical manuals regarding preventing injury to

10    the equipment not to put those things in the technical

11    manual?

12         A.     Yes.

13         Q.     They told you not to do that?

14         A.     Certain warning devices we did not have

15    control over, the Navy did.

16         Q.     I think maybe you misunderstood my question.

17              There is written words their in the technical

18    manuals that say "caution" or "warning" or give advice

19    in the manual with language.

20         A.     Yes.

21         Q.     I am not talking about a warning device.

22         A.     No, I understand you.

23         Q.     I am talking about words.

24         A.     These are plates, name plates that have

25    written -- that say "caution" and "beware of this" or

138

1    that.

2         Q.    And sometimes Westinghouse would put those on

3    their equipment?

4         A.    Only with the permission of the Navy.

5         Q.    Okay.

6              With respect to the words in the manual --

7    I'm not talking about the caution plates -- are you with

8    me?

9         A.    Okay.  You are now talking about the caution

10   plates.

11        Q.    The Navy never said don't put the cautions,

12   don't put Navy -- don't put the advice regarding the --

13        (Reporter interruption.)

14              MR. BRADLEY:  Object to the form.

15              Could you just --

16              MR. KRISTAL:  I will break it down.

17              MR. BRADLEY:  And maybe can you show an

18   example?

19              MR. KRISTAL:  Sure.

20              Turn to page 121 of Exhibit 4.

21              MR. BRADLEY:  Page 121, Jerry?

22              MR. KRISTAL:  Yes.

23              THE WITNESS:  Is it 124?

24              MR. KRISTAL:  Yes, sir, 121.

25              THE WITNESS:  121?

7/26/2001  Gate, James M. 7/26/01

1          A.    That is correct.

2          Q.    And Westinghouse was aware that those

3    materials were going to be used on each one of these

4    asbestos generator sets for each of the battleships

5    listed --

6               I'm sorry.  Let me start again.

7               MR. BRADLEY:  Even your own partner.

8               MR. KRISTAL:  I realized after it came out.

9    Time out.

10         Q.    Westinghouse was aware, based on this

11   drawing, that each one of the turbine generator sets on

12   each of the battleships that are listed on this drawing

13   would have amosite asbestos felt put on the outside of

14   them as insulation --

15         A.    Yes.

16         Q.    -- in order to meet the requirements of the

17   battleship specifications that were in the contract that

18   we had with the Navy?

19         A.    Right.

20         Q.    The government made you do it?

21         A.    That is correct.

22         Q.    And listed under the amosite asbestos felt

23   are other asbestos-containing materials.  For example,

24   number 4 is asbestos cloth type?

25         A.    That is correct.

1     Q.    Why don't you want dirt or major debris to

2    get inside that turbine?

3     A.    It is the worst thing that can happen to a

4    turbine.  That can go through your steam strainer, get

5    by the steam strainer and cause breakage of the parts

6    inside the turbine.  So you really want to keep it as

7    clean as you can.

8     Q.    You were asked a couple of questions or

9    series of questions, I should say, regarding Navy

10    approval of drawings.

11         Can you just explain to us that process?

12     A.    Well, Navy approval of drawings must happen.

13         In other words, once a drawing is done and it

14    is signed off officially, then in accordance with the

15    contract that we have, we then send it off to the first

16    level of approval.

17         Sometimes it is to the inspector of machinery

18    that is right in our own shop.  Other times it is sent

19    to the supervisor of shipbuilding.  And many times it

20    has to go both those levels.  And then from there, it

21    goes to the Bureau of Ships.  And they have a final

22    approval.

23         They then write the approval letter receiving

24    all of the comments back from the inspector of Naval

25    machinery, the supervisor of the shipbuilding, and it

7/26/2001   Gate, James M. 7/26/01

1    all goes into that one there and back to Westinghouse

2    and says approve or did approve for the following

3    reasons.

4           And many times they will mark up the drawing

5    saying that this must be changed, that must be changed.

6    And so you just make a note of it and just find out,

7    well, is this really within the contract or not.

8           And then if it is, or someone says yes, we

9    will make all of those changes and we will resubmit and

10   sometimes it is resubmit for approval again, start the

11   cycle all over again, if there are certain things they

12   are looking for or it is just remit the changed copy.

13        Q.   Who has ultimate and final authority on

14   whether a turbine generator or propulsion turbine is

15   acceptable to the U.S. Government and the U.S. Navy?

16        A.   The Bureau of Ships.

17           In other words, after tests, we have test

18   results.  And those test results go to the inspector of

19   Naval machinery again by contract.  Sometimes we have to

20   send them off to the supervisor of shipbuilding at the

21   same time and then in turn send it back to the Bureau of

22   Ships.  And then it comes back through the chain this

23   time to let everyone know it is approved or disapproved,

24   the test results.

25        Q.   Does Westinghouse, as a contractor to the

1    government, have any discretion whatsoever to change a

2    specification without the approval of the governmental

3    agency such as the U.S. Navy?

4        A.    No, we cannot change.

5            Every change that we think of, we then have

6    to submit a proposal to the government saying we would

7    like to see this thing changed, and they would have to

8    approve it.

9        Q.    In your approximately 41 years of history

10   with Westinghouse, did you ever at any time see an

11   occasion where Westinghouse had the discretion to change

12   any specification without that governmental approval?

13       A.    No, I have never seen it.

14       Q.    We mentioned specification S-39 earlier,

15   Jerry had asked you about.

16           Would that be true for that specification as

17   well?

18       A.    Yes.

19       Q.    Jerry also asked you earlier about a

20   Westinghouse internal document called a "Safe Practice

21   Data Sheet."

22           Do you recall that?

23       A.    Yes.

24       Q.    Okay.  Given your job duties, your job

25   description, would you have any reason to have received

1    name stock number and they could then give them more

2    gaskets.

3         Q.    Any of the materials that are listed on this

4    repair parts list, does Westinghouse have any discretion

5    to change one of these parts without prior approval from

6    the Navy?

7         A.    No.  The numbers and the items that are

8    listed as repair parts are all set up by standard format

9    that are dictated by the Navy.

10        Q.    And we discussed that earlier?

11        A.    Right.

12        Q.    You also had mentioned and had been asked by

13   Jerry about maintenance of a turbine.

14             Do you recall that?

15        A.    Yes.

16        Q.    And in the technical manuals, or at least the

17   two that we were referred to, it said to maintain and

18   dismantel or open the turbine about once a year, quote,

19   "depending on the nature of service"; is that right?

20        A.    That is correct.

21        Q.    In your experience, Mr. Gate, how often would

22   you dismantel or maintain a marine turbine?

23        A.    A marine turbine generally, I feel, should

24   not be dismantled if there are no indicating signs that

25   there is some stress condition.

1    Westinghouse supplied any thermal insulation for any of

2    these turbines on any of these ships?

3             MR. KRISTAL:  Object.  Foundation.

4             THE WITNESS:  No.  Westinghouse did not

5    supply heat insulation for the turbines on these ships.

6    BY MR. BRADLEY:

7        Q.   Based upon your experience and reviews, did

8    Westinghouse install any insulation on the turbine on

9    board any of these ships?

10            MR. KRISTAL:  Objection.  Foundation.

11            THE WITNESS:  No, they did not insulate any

12   thermal insulation turbines on board these ships.

13   BY MR. BRADLEY:

14       Q.   Based on your experience and review of the

15   documents, did Westinghouse specify any insulation

16   materials for the turbine on any of these ships?

17            MR. KRISTAL:  Object.  Foundation.

18            THE WITNESS:  Any information that was placed

19   on the drawings was in line with our contractual

20   requirements.

21   BY MR. BRADLEY:

22       Q.   And those contractual requirements were with

23   whom?

24       A.   With the government.

25       Q.   I know we have talked about this earlier.

200

7/26/2001  Gate, James M. 7/26/01

1          Did you have any authority or discretion to

2    deviate from what the government told you were on their

3    specifications?

4          A.    No.   I did not have any means of changing

5    anything with respect to the government contracts.

6               MR. BRADLEY:   Thank you, I appreciate your

7    time.

8               THE WITNESS:   Thanks.

9               MR. KRISTAL:   I have got some questions as I

10   predicted I would.

11              THE WITNESS:   Okay, sure.

12

13                           EXAMINATION

14

15   BY MR. KRISTAL:

16         Q.    First of all, you didn't read all of the

17   documents that you brought here today, correct?

18         A.    I did not read the complete document; that is

19   correct.

20         Q.    And secondly, as we discussed, with some of

21   the exhibits, I think it was 9, 10, and 11, you don't

22   know if those documents are complete or not complete.

23   Right?

24         A.    That's right.

25         Q.    And with respect to the contract,