**MDL 875**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

DEC - 3 2001

FILED
CLERK'S OFFICE

### BEFORE THE JUDICIAL PANEL
### ON MULTI DISTRICT LITIGATION

**IN RE ASBESTOS PRODUCTS**

**MDL DOCKET NO. 875**

**LIABILITY LITIGATION (NO. IV)**

*Turner, et al v. Anchor Packing Company, et al*
*E.D. Louisiana, C.A. No. 2001-2767*

---

### REPLY TO WEC'S OPPOSITION TO MOTION TO VACATE
### CONDITIONAL TRANSFER ORDER

---

**MAY IT PLEASE THE COURT:**

Mr. and Mrs. James Turner, plaintiffs, respectfully submit this reply memorandum to Westinghouse Electric Corp.'s ("WEC) Opposition to Plaintiffs' Motion to Vacate Conditional Transfer Order.  Vacating the Conditional Transfer Order and remanding this matter to the State Court is appropriate for three reasons:  (1) the Remand was untimely; (2) WEC failed to promptly notice plaintiffs or other parties of the Removal, including filing a false certificate of service and (3) WEC failed to submit evidence supporting its claim of federal officer immunity.[1]

## I.    REMAND WAS UNTIMELY

WEC was served with plaintiff's Petition on **August 8, 2001.**[2]  (Ex. "A").  The 30th day from that date was Friday, September 7, 2001. WEC filed its Notice of Removal on September 10, 2001, 32 days following formal service.  The Notice of Removal was untimely.

In an effort to recover from the untimely removal, WEC attempts to gain the additional

---

[1]    Although WEC's improper removal and conduct relating to the removal warrant the imposition of sanctions, the focus in this matter remains on having this case remanded to state court where it belongs.  Accordingly, plaintiffs reserve the right to file a separate motion at a later date noting that this court retains authority to award costs and attorney's fees associated with the improper removal even absent such a motion.

[2]    On page 4 of WEC's Opposition to Plaintiffs' Motion to Vacate Conditional Transfer Order, WEC admits that it was formally served on August 8, 2001.



IMAGED DEC 5 '01   OFFICIAL FILE COPY

necessary day by using the date Mr. Turner was deposed as supporting WEC's "other paper" argument. However, that argument is transparent. The information provided in discovery which was simultaneously served with a courtesy copy of the petition on July 30, 2001, clearly identified the vessels where Mr. Turner was exposed to asbestos. WEC was aware of its potential liability even before it was formally served on August 8, 2001.

WEC asserts that plaintiff "repudiated" his claims in his petition on August 9, 2001 by declaring that he had not worked on land-based turbines. However, the discovery propounded upon defendants clearly demonstrates that exposure allegations against WEC are limited to NAVY SHIPS. WEC, through unsubstantiated claims of plaintiffs' counsels' misdeeds, attempt to belittle the "other paper" implications of 1446. Clearly, the discovery propounded by plaintiffs is an "other paper" (as argued in Plaintiffs' original brief) sufficient to put WEC on notice that claims against it were limited to Naval exposure. The inadvertent error by plaintiffs in referring to land-based exposure does not negate the fact that plaintiffs had alleged exposure not limited to land-based turbines and had provided discovery responses detailing exclusively Naval exposure.

## II.   WEC FAILED TO PROMPTLY NOTIFY COUNSEL OF REMOVAL
WEC FILED A FALSE CERTIFICATE OF SERVICE

WEC argues that plaintiffs were given "notice" of the removal on September 18, 2001 and that WEC "has no documentary evidence to show that plaintiffs were served with notice of the removal prior to September 18, 2001." The reason WEC lacks evidence proving service on plaintiffs prior to September 18, 2001 is because no such service occurred. However, there is evidence that WEC served plaintiffs with the Notice of Removal long after September 18, 2001. In fact, WEC waited until October 12, 2001, over one month after filing the Notice of Removal, to serve plaintiffs with the Notice and related exhibits. (Ex. "B").

WEC filed its Notice of Removal on September 10, 2001 and certified in the attached

2

certificate of service, filed in the District court, that on September 10, 2001, it forwarded a copy of the Notice to all known counsel of record. (Ex. "C") That certificate was **false.** WEC continues to ignore this fact. Without explanation, WEC waited 8 days to file a Notice of Removal in the state court proceeding and WEC waited 8 days to forward apparently a draft Notice of Removal to counsel for plaintiffs. (Ex. "D") The draft Notice was unsigned, undated, unstamped, and unaccompanied by any attachments. This draft Notice was not the document filed in the District court. Not until October 12, 2001, in response to receiving plaintiffs' Motion to Remand, did counsel for WEC finally forward to plaintiffs WEC's Notice of Removal with related attachments. (Ex. "B")

WEC's failure to "promptly" notify "all adverse parties" as required by Section 1446 is further evidenced by the continued filing of documents by other parties in the state court proceeding. Specifically, subsequent to WEC filing of the Notice of Removal in this Court at least three defendants filed answers in the state court proceeding and at least seven defendants responded to discovery in the state court proceeding. (Ex. "E"). WEC failed to give the required prompt notice to any party.

WEC argues that its lengthy, unexplained delays did not prejudice plaintiffs and, further, the lack of prejudice is somehow evidenced by plaintiffs' timely filed Motion to Remand. This logic escapes undersigned counsel. The reality is that plaintiffs, due to the lack of evidentiary support by WEC, were forced to blindly respond to the Removal with a Motion to Remand and were deprived of a significant portion of time in which to do so. The delay for filing plaintiffs' Motion to Remand was not extended by WEC's delay in notifying plaintiffs and WEC's delay did not delay the deadlines that were simultaneously being set by this Panel.

In an effort to reduce the prejudice already occasioned by WEC's delay in notifying

plaintiffs, plaintiffs requested that WEC respond to plaintiffs' discovery.[3] WEC refused to comply within a time that would be meaningful in light of the pending issues. In response, plaintiffs agreed to limit WEC's responses to information relating to the removal. Again, WEC refused to respond within a meaningful time frame. (Ex. "F") Rather, WEC waited until after its Opposition was filed in the district court to provide plaintiffs with any of its purported removal related information.[4] WEC's Opposition to Remand, received by counsel on November 2, 2001, for the first time, attempted to factually support WEC removal. In light of the November 7, 2001 hearing date, before the district court, and the relatively meager time afforded plaintiffs to respond to the removal information provided by WEC, the prejudice to plaintiffs caused by WEC's continuing strategy of delay should be overwhelmingly clear. Contrary to the law, WEC's delays placed the burden of proof relating to the removal issue on plaintiffs. Further, WEC's delays deprived plaintiffs of the opportunity to fully investigate the new information which WEC now seeks to use to support its Removal and Opposition to Plaintiffs' Motion to Vacate Conditional Transfer Order .

Plaintiffs respectfully suggest that this court not reward WEC for its conduct. Rather, as argued more fully in Plaintiffs' Motion to Vacate Conditional Transfer Order, WEC has the burden of proving that the remand was proper.[5] WEC's failure to produce any evidence in support of its Notice of Removal alone should doom the removal. Moreover, WEC should be confined to the evidence adduced in support of its Notice of Removal, none.

---

[3]To date, WEC has completely failed to respond to discovery and continues to delay in providing plaintiffs timely copies of pleadings, including failing to attach exhibits to pleadings once they are provided.

[4] For example, Mr. Gate's affidavit was executed October 15, 2001. Nonetheless, WEC withheld the affidavit from undersigned counsel until after it was filed in the district court. The affidavit was received with the Opposition to Remand on November 2, 2001, leaving undersigned counsel little time to review, research, and respond to the contents of the affidavit.

[5] Vanouwerker v. Owens-Corning Fiberglass Corp., 1999 WL 335960 (E.D.Tx. 5/26/99).

## III.   WEC'S SELF-SERVING AFFIDAVIT FAILS TO SUPPORT REMOVAL

WEC's support for seeking removal under the federal officer defense is an affidavit prepared by a former employee, James M. Gate.  In addition to suggesting that the affidavit should be stricken because it was not filed with WEC's Notice of Removal, plaintiffs request that the affidavit be stricken because it contains false and misleading statements and it is not based on personal knowledge.  At the very least, WEC's affidavit and attachments fail to establish the three Mesa[6] criteria:  (1) WEC's affidavit does not demonstrate that it acted under the direction of a federal officer, (2) WEC's affidavit fails to carry its burden of proving that it has raised a colorable defense to plaintiffs' claims, and (3) WEC's affidavit fails to demonstrate a causal nexus between plaintiffs' claims and acts WEC performed under color of federal office.  Id.

According to WEC's Opposition, it contracted with the United States to supply marine turbines for only one vessel upon which Mr. Turner served, the U.S.S. Shenandoah.  However, documents attached to Mr. Gate's affidavit reveal that the contract to provide marine turbines was between WEC and  Todd Pacific Shipyards, Inc., identified as the turbine purchaser, not between WEC and the U.S. Navy.  Mr. Gate's affidavit does not dispute this fact.  (Ex. "G")  The U.S.S. Shenandoah was awarded in 1944 and delivered in 1945.  (Ex. "H").  Mr. Gate did not begin working for Westinghouse until 1953.  (Ex. "G")  Mr. Gate has no personal knowledge to attest to facts prior to 1953; the time period relevant to the construction of the U.S.S. Shenandoah, including the placement of asbestos containing insulation aboard the vessel at issue.  In fact, on numerous prior occasions, Mr. Gate has admitted that he is not qualified to address what occurred prior to 1953, including the supervision exercised by the U.S. Navy. (again, the U.S.S. Shenandoah was built in

---

[6] Mesa v. California, 489 U.S. 121, 109 S.Ct. 959 (1989).

1944-45, Mr. Gate became a WEC employee in 1953). For example, in a deposition of Mr. Gate[7]

dated June 30, 1992, (p.30:2-19) (Ex. "I ") he testified:

Q.   Just to clarify, is your response that you did not know, or is it your response
     that no, Westinghouse never recommended any materials?
A.   No, Westinghouse never recommended any such materials.
Q.   And what is your knowledge based on in that regard?
A.   The naval architect[8] is responsible to cover the turbines and the other piping
     insulation in the engine room so that personnel will not be burned.
Q.   And is that the case today, that responsibility of the naval architect?
A.   Yes.
Q.   And was that the case in 1953?
A.   Yes.
Q.   Do you have any knowledge as to what was the situation from 1910 to 1953?
A.   No.

                                    ***

Further, in the same deposition, Mr. Gate testified as follows:  (page 35:4-8)

Q.   But with regard to vessels constructed prior to 1953, you wouldn't have any
     knowledge as to whether or not Westinghouse would have specified or
     recommended use of certain   insulating materials?
A.   No.

Similarly, in a deposition[9] dated February 16, 1994 (p.53:23- 54:2) (Ex. "J "), he testified as follows:

Q.   It's a fair statement then that prior to 1953 you don't have any personal
     knowledge about the contracting procedures between Westinghouse and the
     U.S. Navy?
A.   That is correct.

Mr. Gate's affidavit is not based on personal knowledge. His affidavit is based on a review of

limited documents dated long before he was employed by WEC. In fact, a careful reading of the

affidavit reveals that Mr. Gate admits to his limited years of personal knowledge by narrowing the

---

[7]  In re all Asbestos Cases by Baron & Budd, P.C and set for Trial on July 13, 1992, In the
134th District court, Dallas, Texas, June 30, 1992 .

[8]  Naval architects are not military personnel (i.e. Navy architects); they are generally
employees of shipyards or contractors who design ships.

[9]  Gordon v. Fibreboard Corp., 53rd Judicial District, Travis County, Texas (February 16,
1994).

6

time period to the 1950's and 1960's (WEC Ex. "G" p. 5)  Like Mr. Gate's, the court can review

documents. Mr. Gate's affidavit is an attempt by WEC to interpret those documents which results

in favorable legal conclusions using buzzwords like "supervision and control."  Since Mr. Gate

lacked first hand knowledge of what transpired before 1953, those relevant documents should have

been produced allowing the court to interpret them.[10] Absent production of such documents, WEC

has failed to produce any admissible evidence proving that it acted under the direction of a federal

officer.  Accordingly, WEC has failed to meet the first <u>Mesa</u> requirement.

To assert a "colorable defense," the second <u>Mesa</u> requirement, WEC must establish that: (1)

the United States approved reasonably precise specifications, (2) the equipment conformed to those

specifications, and (3) the supplier warned the United States about the dangers.[11]

Again, Mr. Gate's affidavit falls woefully short of establishing even a colorable defense.  Mr.

Gate admits he has no knowledge regarding what occurred prior to 1953 and has specifically

admitted this regarding insulation, the true product at issue in this case.  Mr. Gate testified in a

deposition dated February 16, 1994 (p. 110:6-10) (Ex. "J"):

> Q.    Mr. Gate, have you ever seen any document that discussed the shipment of
>        turbines with or without insulation in place in the 1940's?
> A.    No.

Similarly, in a 30(b)(6) deposition of WEC with Mr. Gate[12] as the designee dated June 3, 1992, Mr.

Gate testified (p. 31:10-23) (Ex. "K "):

> Q.    Do you have any knowledge as we sit here today whether or not any of the

---

[10] This same strategy was attempted during Mr. Gate's trial testimony in the proceeding in Jackson County, Mississippi. (p. 9788:1-19).  An objection to this tactic was sustained by the Hon. Kathy King.

[11] <u>Boyle v. United Technologies Corp.</u>, 108 S. Ct. 2510 (1980).

[12] <u>In re: Asbestos Personal Injury Cases</u>: Circuit Court of Jackson County, Mississippi (June 3, 1992).

          material that were used in the construction of the turbines by Westinghouse
          did or did not contain asbestos?

A.     Objection * * *

Q.     Generally.

A.     No.

There is simply no viable proof that the government approved reasonably precise specifications for the use of asbestos insulation aboard the U.S.S. Shenandoah. Mr. Gate's affidavit and prior testimony overwhelmingly reveal that he has no knowledge regarding the time period when such insulation would have been placed upon this vessel. Moreover, to the extent that Mr. Gate's has previously testified about asbestos insulation, his prior testimony evidences that the government did not have precise specifications; rather, it appears that the government was rather ambivalent about the type of insulation used (asbestos or non-asbestos): (Ex. "K"; deposition dated June 3, 1992; p.69:12- 70:25 ):

Q.     You talked earlier about the blankets, and I believe you called them sleeves, that were removed from the turbines in the process of taking them down. What other types of insulation would be found on a marine turbine?

A.     Objection to form * * *

A.     The many forms of insulation is right in the specifications for ships. In other words, U.S. Maritime Commission allows for at least two or three types of insulation. And the Coast Guard regulations also state two or three types of insulation. And the general specifications for ships by the United States navy also delineates those types.

Q.     Are you familiar with those types?

A.     I would have to have the specifications in front of me.

Q.     Okay, Without the specifications in front of you, do you generally know what types of insulations you are referring to?

A.     No. I don't know what types of insulation that are in each one of those specifications.

                                        * * *

A.     You could have fiberglass. You could have felt wool. You could have asbestos. You could have many types. You could have paper.

In fact, Mr. Gate's prior testimony further reveals that although he has little knowledge regarding asbestos insulation, the product at issue in the case, WEC's turbines, which WEC erroneously but repeatedly focuses on, are very much like off-the-shelf consumer products, not military equipment.

A necessary condition to assert a colorable defense under Boyle is that the product at issue be

"military equipment," not commercial products.   After reviewing a photograph of a marine turbine

with counsel for Westinghouse, the following exchange occurred on direct examination during trial

testimony of Mr. Gate[13] dated June 29 and 30, 1993 (p.9760:12-25) (Ex. "L"):

> Q.   Mr. Gate, is that a picture of a Westinghouse turbine that you've just shown
>       us there?
> A.   That could be a picture of any turbine.
> Q.   Are most turbines basically the same in design --
> A.   Yes.
> Q.   --and appearance?
> A.   Most turbines have the same appearance, the same type of design; yes.
> Q.   Do you know if others designed and sold turbines to Ingalls, as well as
>       Westinghouse?
> A.   Yes. There are -- We have our competitors, and they're like GE and De
>       Laval.  They are our competitors and they make turbines just like this.

WEC did not build to precise specifications.  As explained by Mr. Gate in his trial testimony, WEC

first determined whether it already had products in its inventory that met a customer's needs whether

the customer was the U.S. government[14] or a commercial entity (p. 9763:3 -12) (Ex. "L"):

> Q.   All right, sir. And when you received this particular document [ship
>       specification], what, if anything would you as the engineer of Westinghouse
>       --what duties would you perform in order to prepare a quotation?
> A.   Okay.  We would review it and insure ourselves what regulatory bodies, again, are
>       called for in the document, and we also would check the parameters, and then we
>       would see if we had machinery that could fit those qualifications.  And if so, there
>       could be very little we would have to do, or we would design it new.
> ***
> (p.9768:9-25 through 9769:1-4) (Ex. "L")
> Q.   Now as I understand what you said earlier, sir, these would be the parameters
>       that they would provide to you in order for you to supply to them a turbine
>       that would do what they want it to do?
> A.   That's right.
> Q.   And that is propel a particular ship in a certain fashion?

---

[13]  In re: Asbestos Personal Injury Cases - Abrams Lead Group I Plaintiffs, Circuit Court of
Jackson County, Mississippi.

[14]  According to Mr. Gate's deposition testimony dated June 30, 1992, (p. 24:10-16) (Ex.
"I"), Mr. Gate even recalls Westinghouse selling to the **Iranian Navy**.

A.   That's right. And in other words, the pressure and the temperature, as I mentioned earlier, the vacuum, and the propeller speed. They're the important parameters that we have to cover in our design.

Q.   Now, as I understood also, you said when you received this particular request for quote, and you had these parameters, you would just go to your files to see if you had something that would fit these requirements?

A.   That's correct. In other words, we just don't start off with a fresh sheet of paper. What we try to do is see what we had in our horsepower requirement, the last one that we put out, and then we would go back and check the regulatory bodies which were called for in the specifications a few pages earlier.

\*\*\*

(p.9791:16- 9792:5)

Q.   Now, Mr. Gate, we've been talking primarily about commercial ships. Did Westinghouse ever sell any turbines to naval vessels, for -- to the navy?

A.   Yes, they did.

Q.   Were there any difference in the manner or method of designing or specifying or planning drawings for turbines used aboard naval vessels?

A.   No, not really. They had specifications and they had specifications which were adhered to. I would say the only thing that would be different between the navy and the Maritime Administration [governing commercial vessels] is the amount of inspection required by the navy. In fact, the navy did have their own inspection force at our plant and, therefore, whenever there was an inspection we made sure the naval inspector was there.

Finally, <u>Boyle</u> **requires** the government contractor to warn the government of the dangers associated with the use of the equipment. Here, WEC has absolutely failed to color their defense with any evidence of a warning. Interestingly, WEC does not even address this requirement of <u>Boyle</u> in its Opposition. In <u>Crocker v. Borden, Inc.</u>, 852 F. Supp. 1322 (E.D.La. 1994), the district court noted that "the military contractor defense has been routinely rejected in almost every post-Boyle asbestos case. This is so because unless the government is warned about the dangers in the use of defective equipment and the contractor knows of the dangers, the military contractor defense does not apply." Perhaps this explains WEC's omission.

In his prior trial testimony, Mr. Gate testified regarding WEC's lack of warnings to the government (p. 9869:3- 6) (Ex. "L"):

Q.   And, Mr. Gate, you have never seen a warning on a turbine manufactured by Westinghouse Electric Corporation warning anybody about the hazards of

10

asbestos, have you?

A.    I have not.

Further, Mr. Gate was unable to identify any specification from any regulatory body that would have precluded Westinghouse from placing warning labels on their turbines to warn of the hazards associated with asbestos. (p.9869:7-13) (p. 9869-9872) (Ex. "L").

WEC has provided, to the Panel, excerpts from a recent deposition of Mr. Gate. That testimony does nothing to further WEC's compliance with the Mesa criteria. In fact, the inherent inconsistencies between Mr. Gate's prior testimony and that of his July 25, 2001 deposition, demonstrate that his testimony and affidavits cannot be relied upon for accuracy in this instance. This is especially true in light of his prior testimony (cited supra.) that he knew nothing about asbestos and had no personal knowledge of Pre-1953 conduct. The turbine at issue in this matter was constructed in the 1940's for Todd Shipyards.

WEC has done little more than claim, not prove, that it was acting under the direct supervision and control of the United States government. WEC has failed to allege, much less establish, that the government made it do the acts complained of in plaintiffs' petition the majority of which are closely related to WEC's failure to warn of the health hazards associated with asbestos. Those allegations further outline WEC's fraudulent conduct and participation in a conspiracy with other asbestos industry members in concealing the health hazards associated with asbestos in their efforts to continue to make profits. There is no causal connection between this conduct and the rules imposed by the United States government. Accordingly, WEC has failed to meet the third Mesa requirement.

In sum, plaintiffs submit that WEC's removal was procedurally and substantively improper. Accordingly, plaintiffs respectfully request that this personal injury matter be remanded to state court where it belongs to allow the Turners a timely day in court under the exigent circumstances

that exist in this case.  (See Exhibit "M"; affidavit from Dr. R. Clay Gould stating Mr. Turner has

6-9 months to live.)

Respectfully submitted,

BY: _____

**JOHN F. DILLON, PLC**
John F. Dillon, LSB #18586
1555 Poydras Street, Suite 1700
New Orleans, LA 70112
(504) 636-3480

**NESS, MOTLEY, PA**
Donni E. Young, LSB #19843
Scott M. Galante, LSB #26890
1555 Poydras Street, Suite #1700
New Orleans, La.  70112
(504) 636-3480

RECEIVED
CLERK'S OFFICE
2001 DEC - 3  A 10: 38
...DISTRICT...
...GATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**BEFORE THE JUDICIAL PANEL**
**ON MULTI DISTRICT LITIGATION**

DEC - 3 2001

FILED
CLERK'S OFFICE

IN RE ASBESTOS PRODUCTS

**MDL DOCKET NO. 875**

LIABILITY LITIGATION (NO. IV)

*Turner, et al v. Anchor Packing Company, et al*
**E.D. Louisiana, C.A. No. 2001-2767**

---

### DECLARATION OF SERVICE

---

Donni E. Young hereby declares as follows:

That on November 30, 2001, I had copies of Plaintiffs' Reply to WEC's Opposition to

Motion to Vacate Conditional Transfer Order served upon attorneys of record for defendants and

the Clerk of the transferee District Court by having said copies mailed, postage prepaid, to them at

the addresses on the attached list.

I declare under the penalty of perjury under the laws of the State of Louisiana that the

foregoing is true and correct.

DATED at New Orleans, Louisiana, this 30th day of November, 2001.

NESS, MOTLEY, PA

Donni E. Young, LSB #19842
1555 Poydras Street, Suite #1700
New Orleans, LA 70112
New Orleans, La. 70112
(504) 636-3480

RECEIVED
CLERK'S OFFICE
2001 DEC - 3  A 10: 38
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**PANEL SERVICE LIST (Excerpted from CTO-205)**
**DOCKET NO. 875**
**IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)**

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH  44114

Edward J. Cass
Gallagher, Sharp, Fulton & Norman
Bulkley Building, 7th Floor
1501 Euclid Avenue
Cleveland, OH  44115

Adam M. Chud
Shea & Gardner
1800 Massachusetts Avenue, N.W.
Washington, DC  20036

David A. Damico
Burns, White & Hickton
2400 Fifth Avenue Place
120 Fifth Avenue
Pittsburgh, PA  15222

Raymond P. Forceno
Forceno & Hannon
Philadelphia Bourse Building
Suite 1000
Independence Mall East
Philadelphia, PA  19106

Ellen B. Furman
Goldfein & Joseph
1600 Market Street
33rd Floor
Philadelphia, PA  19103

Scott M. Galante
Ness, Motley, Loadholt, Richardson
& Poole
1555 Poydras Street
Suite 1700
New Orleans, LA  70112

Leon Gary, Jr.
Jones, Walker, Waechter, et al.
8555 United Plaza Boulevard
5th Floor
Baton Rouge, LA  70809

Susan M. Hanson
Stich, Angell, Kreidler & Muth, P.A.
The Crossings, Suite 120
250 2nd Avenue South
Minneapolis, MN  55401

Reginald S. Kramer
Oldham & Dowling
195 South Main Street
Suite 300
Akron, OH  44308

David C. Landin
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA  23219

Gene Locks
Greitzer & Locks
1500 Walnut Street
Philadelphia, PA  19102

Ronald L. Motley
Ness, Motley, Loadholt, Richardson
& Poole
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC  29465

John J. Repcheck
Marks, O'Neill
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA  15219

John D. Roven
John Roven & Associates
2190 North Loop West
Suite 410
Houston, TX  77018

Richard D. Schuster
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH  43216

Neil Selman
Selman, Breitman & Burgess
11766 Wilshire Boulevard
Sixth Floor
Los Angeles, CA  90025

Robert N. Spinelli
Kelley, Jasons, McGuire & Spinelli
Centre Square West
15th Floor
Philadelphia, PA  19102

Robert E. Swickle
Jaques Admiralty Law Firm, P.C.
1370 Penobscot Building
Detroit, MI  48226

Andrew J. Trevelise
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA  19103

James K. Weston, II
Tom Riley Law Firm
4040 First Avenue, N.E.
P.O. Box 998
Cedar Rapids, IA  52406

BLM

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

# CITATION

DEC - 3 2001

FILED
CLERK'S OFFICE

JAMES C. TURNER, ET AL

VERSUS NO.   91847

ANCHOR PACKING CO., ET AL

17TH JUDICIAL DISTRICT COURT

PARISH OF LAFOURCHE

STATE OF LOUISIANA

STATE OF LOUISIANA:

TO:  CBS FORMERLY KNOWN AS WESTINGHOUSE
     ELECTRIC CO A DELEWARE CORP THROUGH
     ITS AGENT FOR SERVICE CT CORP
     SYSTEM 8550 UNITED PLAZA BLVD BATON
     ROUGE, LA 70809

residing in the Parish of East Baton Rouge, State of Louisiana.

You are hereby cited to comply with the demand contained in the
petition a certified copy of which accompanies this citation.
Alternatively, you should file an answer or other pleading to said
petition in the office of the Clerk of the Seventeenth Judicial
District Court, in Thibodaux, Louisiana, within
fifteen (15) days after the service hereof.  Your failure to comply
herewith will subject you to the penalty of entry of default
judgment against you.

Witness the Honorable Judges of the said Court, and my official

Granted under the impress of my office and
signature,  August 2, 2001.

VERNON H. RODRIGUE
CLERK OF COURT.

Deputy Clerk of Court
Lafourche Parish

ATTORNEY:

NESS, MOTLEY, LOADHOLT, RICHARDSON POOLE
ATTORNEYS AT LAW
1515 POYDRAS STREET, STE. 2080
NEW ORLEANS, LA. 70112

| PERSONAL SERVICE | DOMICILLARY SERVICE |
|---|---|
| on _____ on the _____ day of _____, 20 ___ Service: _____ Mileage: _____ | on _____ leaving same with _____ by _____ on the _____ day of _____, 20 _____ Service: _____ Mileage: _____ |

Dty Sheriff-East Baton Rouge
Parish

Dty. Sheriff-East Baton Rouge
Parish

FILED

AUG 1 7 2001

Linda Rober
CLERK OF COURT

EXHIBIT
A



# JONES WALKER

Olivia S. Tomlinson
Direct Dial 225-248-2082
Direct Fax 225-248-3082
otomlinson@joneswalker.com

October 12, 2001

Donni E. Young
Suite 1700
1555 Poydras Street
New Orleans, LA 70112

Re:   James C. Turner, et al v. Anchor Packing Company, et al
Number 91847 "C"
Our File:   20364/94123-00

Dear Ms. Young:

Yesterday, I received a copy of plaintiffs' Motion to Remand and Motion for Sanctions filed with the U.S. Eastern District Court on October 10, 2001. Please be advised that the Motion for Sanctions does not comply with the requirements of Rule 11. Accordingly, I ask that you dismiss the motion immediately.

Additionally, I have also enclosed a copy of Viacom, Inc.'s Notice of Removal and related exhibits for your records.

If you have any further questions, please contact my office.

Very truly yours,

Olivia S. Tomlinson

OST/as
Enclosures



EXHIBIT
B

JONES, WALKER, WAECHTER, POITEVENT, CARRÈRE & DENÈGRE L.L.P.

8555 UNITED PLAZA BOULEVARD   BATON ROUGE, LOUISIANA  70809-7000   225-248-2000   FAX 225-248-2010   E-MAIL info@joneswalker.com   www.joneswalker.com
BATON ROUGE   LAFAYETTE   NEW ORLEANS   WASHINGTON, D.C.

## CERTIFICATE

I hereby certify that copies of the foregoing pleading have been served upon counsel of record for all parties and have been filed with the Clerk of Court for the Civil District Court for the Parish of Orleans, State of Louisiana by depositing copies with the United States Postal Service properly addressed and postage prepaid.

This 19th day of September, 2001.

AVERY LEA GRIFFIN



EXHIBIT
C

B0160235.1

# JONES
# WALKER

Four United Plaza, 8555 United Plaza Boulevard
Baton Rouge, Louisiana 70809-7000
Telephone: 225-248-2000
Fax: (225) 248-3087

## FAX COVER SHEET

This facsimile communication contains information that is intended only for the recipient named and may be confidential and subject to the attorney-client privilege. If you are not the intended recipient or an agent responsible for delivering this communication to the intended recipient, you are hereby notified that you have received this facsimile in error and that any review, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone (call collect at 225-248-2000) and return the original facsimile to us by mail, without retaining any copies. Thank you.

**TO:**   Scott Galente

**FROM:**  Rhonda Cifreo

**DATE:**  Friday, November 02, 2001 10:24:08 AM

**PAGE 1 OF** 03

**FAX NO.:**  1-504-636-3499

If you do not receive the entire copy, please call Rhonda Cifreo at
(225) 248-3487 as soon as possible.



EXHIBIT
D

New Orleans Office: 201 St. Charles Avenue • New Orleans, Louisiana 70170-5100 • 504-582-8000 • FAX 504-589-8803
Washington, D.C. Office: Suite 600, 499 South Capitol Street SW • Washington, D.C. 20003 • 202-203-1000 • FAX 202-201-0000
Lafayette Office: The Dover Building • 600 Dover Blvd., Suite 120 • Lafayette, Louisiana 70503 • 337-406-5610 • FAX 337-406-5620
Miami Office: 601 Brickell Key Drive • Suite 500 • Miami, Florida 33131 • 305-679-5700 • FAX 305-679-5710
Houston Office: Waterway Plaza Two • 10001 Woodloch Forest Drive • Suite 350 • The Woodlands, Texas 77380 • 281-296-5900 • FAX 281-296-5910

# JONES WALKER 

William L. Schuette
Avery Lea Griffin
Olivia S. Tomlinson
Direct Dial 225-248-2000
Fax 225-248-3051

**November 2, 2001**

**via facsimile no. 1-504-636-3499**

Scott M. Galante, Esq.
Attorney at Law
Suite 1700
1555 Poydras Street
New Orleans, LA 70112

Re:  **James C. Turner, et al v. Anchor Packing Company, et al
Number 91847 "C"
Our File:  20364/94123-00**

Dear Scott:

I received your letter dated October 26, 2001, this morning via facsimile.  I am not sure why you think we filed an opposition on October 20, 2001, to your motion to remand.  However, we did file an opposition on October 30, 2001, which has already been mailed to you.

As I have already told you, we are preparing the discovery responses as quickly as possible.  The discovery responses were not due on October 26 at the close of business.  Mr. Ames granted an extension until we heard from him that he wanted the discovery responses; however, we did not hear from you until last week.  When you indicated that you wanted the responses, I requested that my client get the documents together as quickly as possible.

If your client has been prejudiced in this matter by Mr. Ames granting us an extension on the discovery, you need to take that matter up with him.  Upon the receipt from my client of all the documents you requested, I will forward them to you.  I think you dramatization of "procedural games" is a little much.

JONES, WALKER, WAECHTER, POITEVENT, CARRÈRE & DENÈGRE L.L.P.

8555 UNITED PLAZA BOULEVARD ▪ BATON ROUGE, LOUISIANA 70809-7000 ▪ 225-248-2000 ▪ FAX 225-248-2010 ▪ E-MAIL info@joneswalker.com ▪ www.joneswalker.com

BATON ROUGE    LAFAYETTE    NEW ORLEANS    WASHINGTON, D.C.

BR:110820.1

November 2, 2001
Page 2

Sincerely,

/s/ Avery Lea Griffin
Avery Lea Griffin

ALG/rc

B0169670.1

# McGLINCHEY STAFFORD
### LAW OFFICES
#### A PROFESSIONAL LIMITED LIABILITY COMPANY

DERMOT S. McGLINCHEY (1933-1993)
GRAHAM STAFFORD (1940-1987)
SAMUEL LA 'O (1909-1989)

COLVIN G. NORWOOD, JR. (1)
DAVID S. WILLENZIK (1)
FRANK VOELKER, JR. (1)
B. FRANKLIN MARTIN, III (1)
E. FREDRICK PREIS, JR.
MICHAEL H. RUBIN
HENRI WOLBRETTE, III (1)
SAMUEL E. SCOTT (10)
WILLIAM V. DALFERES, JR (1)
BENNET S. KOREN
JAMES M. FANTACI
KATHLEEN A. MANNING
KENNETH A. WEISS (1)(15)(16)
DONNA GUINN KLEIN (1)
JAMES C. CRIGLER, JR.
MICHAEL M. NOONAN
RICHARD A. CURRY
R. KEITH COLVIN
MARY TERRELL JOSEPH
J. PATRICK BEAUCHAMP
RUDY J. CERONE (1)(7)
JOEL W. MOHRMAN (2)(9)
DAN E. WEST
ANTHONY ROLLO
CRAIG L. CAESAR
RODOLFO J. AGUILAR, JR.
STEPHEN P. STROHSCHEIN (7)
PAUL SLOCOMB WEST
EVE B. MASINTER
JOHN H. CLEGG
STEPHEN W. RIDER

ERIC SHUMAN
KATHLEEN K. CHARVET
LAURA HOBSON BROWN
STEPHEN C. EDDS (10)
WILTON J. H. JOHNSTON, III (10)
MARK S. EDELMAN (17)(15)
MARK D. HERBERT (10)
CHARLES R. PENOT, JR.
ERROL J. KING
LAUREN A. WELCH
JENNIFER L. DAVIS (2)
THOMAS A. ROBERTS
STEPHEN P. BEISER
MICHAEL J. deBLANC, JR
MARK M. BODIN
RICHARD A. AGUILAR
MARK M. MALLERY
KEVIN L. O'DEA (4)
S. JESS SPERRY
J. SCOTT SHEEHAN (2)
SAMUEL A. BACOT
ARTHUR M. LEITH
SUSAN M. TYLER (13)
MONICA A. FROIS
MICHAEL D. FERACHI
WILLIAM S. MENDENHALL (10)
WILLIAM HOLLIS LEECH, SR. (10)
DAPHNE McNUTT
LISA E. MAURER
KATHERINE CONKLIN (5)(8)
SUE HICKS FAIRBANK (10)
ANITA LECHNER BOSCH
DEBORAH J. BULLION (2)
R. MARSHALL GRODNER
ELIZABETH PALERMO BLITCH
DEBORAH A. VAN METER

JOYCE L. SCHENEWERK (11)
PATRICK J. O'CAIN
DANIEL T. PLUNKETT
ERIN FURY PARKINSON
D. JEFFREY WAGNER (17)
GARY G. HEBERT
ERIC J. SIMONSON (4)
J. MICHAEL CUTSHAW (3)
CLARENCE E. ERIKSEN (7)
JULIANN H. PANAGOS (2)
ANN De GROFF LEVINE
A. KELTON LONGWELL (5)
TIMOTHY W. LINDSAY (10)
LAUREN Z. GARVEY
JON ANN H. GIBLIN
ELISKA M. PLUNKETT
CYNTHIA L. KNIGHT
F. SHERMAN BOUGHTON, JR.
DEIRDRE C. McGLINCHEY
DWAYNE C. JEFFERSON
RENEE C. GLUTH
S. SUZANNE MAHONEY
EDWARD L. FENASCI (4)
JOLIE S. LENZ (2)
JULIA H. TERRY (14)
STEPHANIE G. JOHN
JEAN-PAUL PERRAULT
SHANNON M. RICHARDS (2)
LISA CHRISTINA BINGHAM (2)
MINDY BRICKMAN PATRON
DENISE LANGLOIS BROWN
LANCE A. BOWLING
MARK H. TYSON (10)
AMY KEBERT ELDER (10)
ASHLEY BYRD LOWE
CLAUDE B. ANELLO (2)

CAROL M. LAFARGUE
JOHN A. MARZULLO
JAMES E. SWINNEN
BETTY A. MALLETT (10)
CHRISTOPHER E. MOORE (8)
B AVEN BRUSER
JAYE ANDRAS CAFFREY (4)
VICTORIA A. STRINGFELLOW (10)
LISA D. MUNYON
MICHAEL G. HORNER
ANDREW W. MARTIN, JR.
MICHAEL LOUIS FANTACI
LANEY M. VAZQUEZ (2)
M. BRENT HICKS
ANNE D. LE JEUNE
DANIEL LIM (2)
P. WAYNE PICKERING (2)
CHRISTOPHER M. WAPPEL
LOU ANNE MILLIMAN
ELLEN STEMAN FANTACI
MICHAEL D. HERRIN (10)
DEBORAH A. HOWELL
LEO D. CONGENI
LISA F. ANDERSON (10)
GAYLE M. McCONNELL (2)
HEATHER REE SLAY (2)
JAMES LEE BREAUX
ADAM C. McNEIL
EMILY BLACK GREY
JUSTON M. O'BRIEN
M. LUCILLE ANDERSON (2)
NATHALIE G. SIMON
DAVID W. THOMPSON (18)(16)
JILL D. PRUSSACK (10)
SAMER AL-AZEM(7)
SARAH NEY

CLINTON D. HOWIE

OF COUNSEL
JOE GIARRUSSO, JR.
MARGARET G. DIAMOND
MARY LYNNE FRIEDMAN
RODNEY O. ELLIS (7)
ALAN L. MOORE (10)
LARRY L. MURRAY
DEBORAH DUPLECHIN HARKINS
BETH L. ORLANSKY (10)
ARTHUR J. ROTATORI (15)

(1)LAW CORPORATION
(2)MEMBER OF TEXAS BAR
(3)MEMBER OF LOUISIANA AND
   DISTRICT OF COLUMBIA BARS
(4)MEMBER OF LOUISIANA AND TEXAS BARS
(5)BOARD CERTIFIED TAX ATTORNEY
   LOUISIANA BOARD OF LEGAL SPECIALIZATION
(6)BOARD CERTIFIED ESTATE PLANNING
   AND ADMINISTRATION SPECIALIST
   LOUISIANA BOARD OF LEGAL SPECIALIZATION
(7)BOARD CERTIFIED BUSINESS BANKRUPTCY LAW
   LOUISIANA BOARD OF LEGAL SPECIALIZATION
(8)MEMBER OF LOUISIANA AND TENNESSEE BARS
(9)BOARD CERTIFIED CIVIL TRIAL LAW
   TEXAS BOARD OF LEGAL SPECIALIZATION
(10)MEMBER OF MISSISSIPPI BAR
(11)MEMBER OF LOUISIANA AND CALIFORNIA BARS
(12)MEMBER OF ILLINOIS BARS
(13)MEMBER OF LOUISIANA AND FLORIDA BARS
(14)MEMBER OF LOUISIANA AND MISSISSIPPI BARS
(15)MEMBER OF OHIO BAR
(16)MEMBER OF KENTUCKY BAR
ALL OTHERS LOUISIANA BAR

HOUSTON
BATON ROUGE
JACKSON
CLEVELAND
LAKE PROVIDENCE
MONROE

643 MAGAZINE STREET   NEW ORLEANS, LA 70130-3477
MAILING ADDRESS: P. O. BOX 60643   NEW ORLEANS, LA 70160-0643
http://www.mcglinchey.com

(504) 586-1200
FAX (504) 596-2800
TDD (504) 596-2728
CABLE MACSTAC
DIRECT DIAL:

October 2, 2001

Vernon H. Rodrigue
Clerk of Court
17th Judicial District Court
Parish of Lafourche
P. O. Box 818
Thibodaux, Louisiana  70302-0818

RE:   James C. Turner, et al v.
      Anchor Packing Company, et al
      17th JDC No. 91847, "C"
      Our Ref. No.: 01450.1017

Dear Sir:

Enclosed please find an original and one copy of Answer and Request for Notice. On behalf of Dresser Industries, Inc., we request that you file the originals and return a conformed copy of each to the undersigned in the enclosed, self-addressed envelope.

Also enclosed is our check in the amount of $15.40 to cover the costs associated with this request.

Thank you.

Very truly yours,

Eric Shuman

ES/lkh
Enclosures



EXHIBIT
E

# HAILEY, McNAMARA, HALL, LARMANN & PAPALE, L.L.P.

### ATTORNEYS AT LAW

W. MARVIN HALL •
LAURENCE E. LARMANN •
ANTONIO E. PAPALE, JR •
RICHARD T. SIMMONS, JR •
DOMINIC J. OVELLA
MICHAEL P. MENTZ
DAVID K. PERSONS
JOHN T. CULOTTA • 11
MICHAEL J. VONDENSTEIN
C. KELLY LIGHTFOOT
JOHN E. UNSWORTH, JR
JULIE DiFULCO ROBLES
CLAUDE A. GRECO
VALERIE T. SCHEXNAYDER
W. EVAN PLAUCHE
KURT D. ENGELHARDT
CAROLINE D. IBOS
ROBERT D. FORD
W. GLENN BURNS
F. THEODORE LE CLERCQ †◊◊
BARBARA B. O'DONNELL
JOSEPH L. SPILMAN, III ▽△V

**SUITE 1400**
**ONE GALLERIA BLVD.**
**METAIRIE, LA 70001**
**TELEPHONE: (504) 836-6500**
**TELECOPIER: (504) 836-6565**
**www.haileymcnamara.com**

MAILING ADDRESS:
P.O. BOX 8288
METAIRIE, LA 70011-8288

September 12, 2001

OF COUNSEL
JAMES W. HAILEY, JR •
HENRY D. McNAMARA, JR

WILLIAM R. SEAY, JR
JAMES W. HAILEY, III
ALAYNE R. CORCORAN
KEVIN O. LARMANN
DAVID K. GROOME, JR
GABRIEL J. VENINATA
ROGER A. JAVIER
KELLY E. O'HARA
ERIN F. LORIO
KELLY L. COVINGTON
LORIE G. DEMARCAY
DARREN A. PATIN
MARC J. BITNER
MELISSA L. ADERHOLD
MICHAEL H. ABRAHAM
NICOLE A. BOYER
JAMIE N. HEBERT
PHILIP C. BRICKMAN
JAMES L. CANNELLA, JR
AMIE D. STASSI
ANNE E. MEDO
SERENA C. VAUGHAN
SHANNON H. HUBER

• PROFESSIONAL CORP.
ALSO ADMITTED IN
† SOUTH CAROLINA
11 TEXAS
◊ TENNESSEE
△ WASHINGTON, D.C.
▽ MARYLAND
V ALABAMA
◊ MISSISSIPPI

Clerk of Court
**PARISH OF LAFOURCHE**
P.O. Box 818
Thibodaux, LA  70302

> Re:   James C. Turner, et al. v.
>        Anchor Packing Company, et al
>        17th JDC No: 91847, Div. "C"
>        Our File: 1274-54067-VTS

Dear Clerk:

   Enclosed please find the original and one copy of our Exceptions, Answer and Defenses by Flintkote Mines, Ltd. to Plaintiff's Petition for Damages, as well as a Request for Notice, the originals of which I would appreciate your filing into the record of the above captioned matter.  Please return to me the copy bearing the date and time of filing in the self-addressed envelope, enclosed for your convenience.  Also please find enclosed our firm check in the amount of $100.00 to cover the court costs in this matter.

   Thanking you for your assistance and cooperation in this matter.

   With kind regards, I remain

Sincerely,

*Valerie Schexnayder*

**VALERIE T. SCHEXNAYDER**

/mkd
Enclosures
cc:   All Known Counsel of Record

LAW OFFICES

MONTGOMERY, BARNETT, BROWN, READ, HAMMOND & MINTZ, L.L.P.
A REGISTERED LIMITED LIABILITY PARTNERSHIP

3200 ENERGY CENTRE

1100 POYDRAS STREET

NEW ORLEANS, LOUISIANA 70163-3200

TELEPHONE (504) 585-3200
FAX (504) 585-7688

WRITER'S DIRECT DIAL NUMBER

September 11, 2001

Clerk of Court
17th JDC, Parish of Lafourche
P.O. Box 818
Thibodaux, La. 70302

Re:    James C. Turner, et al v. Anchor Packing Co., et al
       17th JDC, Parish of Lafourche #91847, Div. C
       Our file: 7506.1759

Dear Clerk,

Enclosed is an original and one copy of Eagle's Answer to Plaintiffs' Petition for Damages in the above captioned matter. Please file the original into the record and return a stamped copy to us in the enclosed self-addressed, stamped envelope. Our firm check in the amount of $7.07 is enclosed to cover the cost of filing.

Sincerely,

MONTGOMERY, BARNETT, BROWN, READ,
    HAMMOND & MINTZ

Alison S. Borison

ASB/lmr
Enclosure
cc: All counsel w/enclosure

# SULZER & WILLIAMS, L.L.C.

### ATTORNEYS AND COUNSELORS AT LAW
201 Holiday Boulevard, Ste. 335
Covington, Louisiana 70433

Richard P. Sulzer
Robert E. Williams, IV

Telephone: 985-898-0608
Telefax:    985-898-0871

October 12, 2001

**<u>VIA FAX:  504-636-3499</u>**
Donni E. Young
Ness, Motley, Loadholt, Richardson & Poole
1555 Poydras Street, Suite 1700
New Orleans, LA 70112

John F. Dillon
1555 Poydras Street, Suite 1700
New Orleans, LA 70112

Re:   *James C. Turner, et al v. Anchor Packing Company, et al*
USDC, Easter District, No. 01-2767, Section "S"
Our File No. 137-01-022

Dear Donni and John:

We have attempted several times today, October 12, 2001, to transmit the enclosed discovery responses via fax. However, each attempt was terminated by BellSouth advising that the fax number (636-3499) had been disconnected. Therefore, enclosed please find Kelly-Moore's responses to plaintiff's Interrogatories, Requests for Production of Documents and Request for Admissions.

With kindest regards, we remain

Sincerely,

RICHARD P. SULZER
ROBERT E. WILLIAMS, IV

RPS/REW/mc
Enclosure

DEUTSCH, KERRIGAN & STILES, L.L.P.

(A PARTNERSHIP INCLUDING PROFESSIONAL LAW CORPORATIONS)

755 MAGAZINE STREET

NEW ORLEANS, LA 70130-3672

TELEPHONE (504) 581-5141

FAX (504) 566-1201

ANDRE C. BROUSSARD, JR.
(504) 593-0704
abroussard@dkslaw.com

2510 14TH STREET, SUITE 1001
GULFPORT, MISSISSIPPI 39501
TELEPHONE (228) 864-0161
FAX (228) 863-5278

2130 KALISTE SALOOM ROAD
SUITE 308
LAFAYETTE, LOUISIANA 70508
TELEPHONE (318) 993-0084
FAX (318) 993-8352

October 9, 2001

Sherman Ames, Esq.
Ness, Motley, Loadholt, Richardson
& Poole
1555 Poydras Street
Suite 1700
New Orleans, LA 70112

**Certified Mail**

Re:   *James C. Turner, et ux v. Anchor Packing Company, et al*
C. A. No. 91847, Division "C", 17th JDC
Parish of Lafourche, State of Louisiana
Our Ref: 00757-14960

Dear Mr. Ames:

Enclosed please find Responses to Interrogatories, Requests for Production of Documents and Requests for Admission propounded to Dana Corporation by plaintiffs in connection with the above-referenced matter.

Sincerely,

Andre C. Broussard

Enclosure(s)

G:\Taylor\ACB\ach\14960\corres\Ames-ltr01.wpd

# PLAUCHÉ MASELLI
# LANDRY & PARKERSON L.L.P.
### ATTORNEYS AT LAW

ANDREW L. PLAUCHÉ, JR.
JOSEPH MASELLI, JR.
ARTHUR W. LANDRY
G. BRUCE PARKERSON
ROBERT E. CARAWAY III
MARK E. YOUNG
CHERIE T. BURLETT

201 ST. CHARLES AVENUE, SUITE 4240
NEW ORLEANS, LOUISIANA 70170-4240

TELEPHONE 504-582-1142
FAX 504-582-1172
www.pmlpnola.com

MATTHEW A. EHRLICHER
KENAN S. RAND, JR.
S. MICHAEL COOPER
WENDY K. LAPPENGA
DIANE S. MITNIK
REBECCA M. GOFORTH
LEZLY L. PETROVICH
STEPHANIE E. RENNELL

September 26, 2001

Via United States Mail and Facsimile: 636-3499

Donni E. Young, Esquire
Ness, Motley, Loadholt, Richardson & Poole
1555 Poydras Street, Suite 1700
New Orleans, Louisiana 70112

Re:   James C. Turner, et al. v. Anchor Packing, et al.
      17nd JDC, Parish of Lafourche, No. 91,847
      Our File No. 1150.05931

Dear Donni:

Attached please find John Crane Inc.'s Supplemental Responses to Plaintiffs' Discovery.

Should you have any questions, please do not hesitate to contact me.

Sincerely,

Wendy K. Lappenga

WKL/jrp

Enclosure

cc:   All known counsel of record (via facsimile)

T:\Crane\Turner J\cors\young6.wpd

LAW OFFICES
## LABORDE & NEUNER
ONE PETROLEUM CENTER

SUITE 200

1001 W. PINHOOK ROAD

P. O. BOX 52828 (70505-2828)

LAFAYETTE, LOUISIANA 70503

TELEPHONE: (337) 237-7000

FACSIMILE: (337) 233-9450

CLIFFE E. LABORDE III
FRANK X. NEUNER, JR. *
JAMES L. PATE
LOUIS SIMON II
DEAN ANDERSON COLE
BEN L. MAYEAUX
SUSAN STAGG ROBINSON
ROBERT E. TORIAN
JAMES D. HOLLIER
MELISSA L. THERIOT *

PROFESSIONAL LAW CORPORATIONS
* ALSO ADMITTED IN TEXAS

C. E. LABORDE, JR.
(1913-1983)
CADE A. EVANS
KEVIN P. MERCHANT
JENNIE P. PELLEGRIN
JEAN-LOUIS LEMOINE
GREGORY A. KOURY
CATHERINE SABA GIERING
BRAD O. PRICE
MICHELLE L. HOYCHICK

September 25, 2001
**CERTIFIED MAIL/RETURN RECEIPT REQUESTED**
**#7001 0360 0001 0674 9244**


Ms. Donni E. Young
Ness, Motley, Loadholt, Richardson
   & Poole
1555 Poydras Street, Suite 1700
New Orleans, LA 70112

   RE:   James C. Turner, et al v. Anchor Packing Co., et al
         Lafourche Parish 17th JDC Docket No.; 91847
         Our File No.; 14295

Dear Donni:

   Enclosed please find Ingersoll-Rand's answers to
interrogatories, responses to requests for production of
documents and responses to requests for admissions.  However, I
am retaining the original of same should any future hearing be
necessitated with regard to this discovery.

   Please call if you have any questions.

                              Very truly yours,

                              Jennie P. Pellegrin

JPP/lab
Enclosures

# PLAUCHÉ MASELLI
# LANDRY & PARKERSON L.L.P.

ATTORNEYS AT LAW

201 ST. CHARLES AVENUE, SUITE 4240

## NEW ORLEANS, LOUISIANA 70170-4240

TELEPHONE 504-582-1142

FAX 504-582-1172

www.pmlpnola.com

ANDREW L. PLAUCHÉ, JR.
JOSEPH MASELLI, JR.
ARTHUR W. LANDRY
G. BRUCE PARKERSON
ROBERT E. CARAWAY III
MARK E. YOUNG
CHERIE T. BURLETT

MATTHEW A. EHRLICHER
KENAN S. RAND, JR.
S. MICHAEL COOPER
WENDY K. LAPPENGA
DIANE S. MITNIK
REBECCA M. GOFORTH
LEZLY L. PETROVICH
STEPHANIE E. RENNELL

September 24, 2001

Via United States Mail and Facsimile: 636-3499

Donni E. Young, Esquire
Ness, Motley, Loadholt, Richardson & Poole
1555 Poydras Street, Suite 1700
New Orleans, Louisiana 70112

Re:   James C. Turner, et al. v. Anchor Packing, et al.
17nd JDC, Parish of Lafourche, No. 91,847
Our File No. 1150.05931

Dear Donni:

Enclosed please find John Crane's Answers and Objections to Plaintiffs' Interrogatories and Request for Production of Documents and Request for Admissions.   Please be advised that supplemental discovery will be forthcoming along with our verification sheet, which is not included in this response.

Should you have any questions, please do not hesitate to contact me.

Sincerely,

Stephanie E. Rennell

Enclosure

cc:   All known counsel of record (via facsimile)

T:\Crane\Turner J\cors\young5.wpd

## DUPLASS, ZWAIN, BOURGEOIS & MORTON

A PROFESSIONAL LAW CORPORATION
SUITE 2900
THREE LAKEWAY CENTER
3838 N. CAUSEWAY BLVD.
METAIRIE, LOUISIANA 70002
TELEPHONE (504) 832-3700
FAX (504) 837-3119

LAWRENCE J. DUPLASS
GARY M. ZWAIN (1)
DAVID J. BOURGEOIS
JOSEPH B. MORTON, III
C. MICHAEL PFISTER
GREGORY O. CURRIER (2)
ANDREW D. WEINSTOCK (1)
GEOFFREY P. CLEMENT
GUYTON H. VALDIN, JR.
KELLY CAMBRE BOGART
CLAIRE E. BREAUX
CHRISTIAN B. BOGART

KATHLEEN C. MARKSBURY
JOSEPH G. GLASS (2)
DANA ANDERSON-CARSON
LOUIS O. OUBRE
DARRELL R. SIMS
MIRIAM K. McMICHAEL (3)
KEVIN R. DERHAM
MAGALI PUENTE MARTIN

(1) ALSO ADMITTED IN STATE OF TEXAS
(2) ALSO ADMITTED IN STATE OF MISSISSIPPI
(3) ALSO ADMITTED IN STATE OF GEORGIA

OF COUNSEL
KENNETH J. BERKE
LESLI S. BOLNER
JAMES F. GASQUET, III

September 21, 2001

**VIA HAND DELIVERY**

Donni E. Young, Esq.
Ness, Motley, Loadhold, Richardson & Poole
1555 Poydras Street, Suite 1700
New Orleans, Louisiana 70112

Re:   **James C. Turner and Marlene F. Turner v.**
      **Anchor Packing Company, et al**
      **17th JDC, No. 91847, Div. "C"**
      **Our File No. 01-MMM-141**

Dear Ms. Young:

Enclosed please find 3M's responses to Discovery and Requests for Admissions in the above referenced matter.  Thank you for your co-operation in this matter.

Should you have any questions, please do not hesitate to contact me.

With kindest regards, I am

Sincerely,

**DUPLASS, ZWAIN, BOURGEOIS & MORTON**

KELLY C. BOGART

KCB/pm
Enclosure

# FORMAN
# PERRY
# WATKINS
# KRUTZ &
# TARDY, PLLC

ATTORNEYS AT LAW

1200 ONE JACKSON PLACE
188 EAST CAPITOL STREET
JACKSON, MISSISSIPPI 39201-2131
POST OFFICE BOX 22608
JACKSON, MISSISSIPPI 39225-2608
TELEPHONE: 601-960-8600
MAIN FACSIMILE: 601-960-8613
ASBESTOS FACSIMILE: 601-960-3241

September 21, 2001

**Via Facsimile & Federal Express**
Donni E. Young, Esquire
NESS MOTLEY LOADHOLT
RICHARDSON & POOLE
1555 Poydras Street, Suite 1700
New Orleans, LA 70112

Re:   *James C. Turner and Marlene F. Turner vs. Anchor Packing Company,, et al;*
      *Docket Number 91847; Division "C";*
      *17th JDC; Parish of LaFourche, State of Louisiana*

Dear Counselors:

Enclosed please find Defendant, **Georgia-Pacific Corporation's Objections and Responses to Plaintiff's Interrogatories, Request for Production of Documents and Request for Admission** in the above-referenced matter.  A copy of this letter is being mailed to all defense counsel of record and they may obtain a copy of the document  by request.

The Verification will be forwarded to you under separate cover.

Should you have any questions, please do not hesitate to contact me direct at (601) 960-8620.

Sincerely,

**FORMAN PERRY WATKINS,**
**KRUTZ & TARDY, PLLC**

Tiffany Dockins
**Paralegal to Laura Sanders Brown**

/th
cc:   All Defense Counsel of Record w/o enclosures

LAW OFFICES

# NESS, MOTLEY, LOADHOLT, RICHARDSON & POOLE

PROFESSIONAL ASSOCIATION

1555 POYDRAS STREET
SUITE 1700
NEW ORLEANS, LOUISIANA 70112
985-636-3480

SCOTT M. GALANTE
DIRECT DIAL: 985-636-3487
FAX: 985-636-3499

OTHER OFFICES:
MOUNT PLEASANT, SOUTH CAROLINA
CHARLESTON, SOUTH CAROLINA
BARNWELL, SOUTH CAROLINA
PROVIDENCE, RHODE ISLAND
RALEIGH, NORTH CAROLINA

October 24, 2001

Avery Griffin
Jones, Walker
8555 United Plaza Blvd.
Baton Rouge, La. 70809-7000

RE:   James C. Turner, et al  vs. Anchor Packing Company, et al
No. 91847 "C"

Avery,

During our conversation on yesterday and, again, in your letter today, you stated that Plaintiffs' counsel, Sherman Ames, gave your client and indefinite extension of time in which to respond to discovery propounded to your client in the above-captioned matter has ceased.  I spoke with Sherman Ames and he indicated that the extension of time was solely to encompass the period during which Plaintiffs were making a decision as to whether they intended to proceed in the matter against your client.  As that time passed some time ago, evidence by his understanding was that the discovery would be due in a reasonable amount of time following that event.

I understand that the extension was not a clear and unambiguous period of time and I therefore would certainly not assert that the responses were due to us immediately.  Nonetheless, you have had 82 days to review and gather the requested information.  Therefore, I request that your client make every effort to deliver those responses as soon as possible as some underlying material may be relevant to Plaintiffs' Motion to Remand filed into the Federal Court for the Eastern District of Louisiana.  I believe an additional 15 days, as provided in your letter, is extensive and not warranted by the law or circumstances.

Therefore, Plaintiffs would urge that your client provide responses to all outstanding discovery in the above-captioned matter by the close of business on Friday, October 26, 2001.  Please contact my office at your earliest convenience to discuss this arrangement if you would like to discuss this matter more thoroughly.  Thank you for your time and cooperation in this matter.

Sincerely,

Scott M. Galante

SMG:wvs
cc:   Donni E. Young
      Sherman Ames







# JONES WALKER

William L. Schuette
Avery Lea Griffin
Olivia S. Tomlinson
Direct Dial 225-248-2000
Fax 225-248-3051

October 25, 2001

**via facsimile no. 1-504-636-3499**

Scott M. Galante, Esq.
Attorney at Law
Suite 1700
1555 Poydras Street
New Orleans, LA 70112

> **Re:  James C. Turner, et al v. Anchor Packing Company, et al**
> **Number 91847 "C"**
> **Our File:  20364/94123-00**

Dear Scott:

Mr. Sherman agreed that we did not have to answer discovery until we heard back from you all that you wanted the discovery. Therefore, we have not been working on responses. The <u>first</u> time I heard from you all that you wanted the discovery responded to was Tuesday. I have instructed my client to gather the necessary information for us to respond. Responding to discovery in three days is unreasonable. We will get the discovery responses to you as soon as possible and no later than 15 days.

Sincerely,

/s/ Avery Lea Griffin

Avery Lea Griffin

ALG/rc

---

JONES, WALKER, WAECHTER, POITEVENT, CARRÈRE & DENÈGRE L.L.P.

8555 UNITED PLAZA BOULEVARD • BATON ROUGE, LOUISIANA 70809-7000 • 225-248-2000 • FAX 225-248-2010 • E-MAIL info@joneswalker.com • www.joneswalker.com

BATON ROUGE    LAFAYETTE    NEW ORLEANS    WASHINGTON, D.C.

B0169670.1

LAW OFFICES

# NESS, MOTLEY, LOADHOLT, RICHARDSON & POOLE

PROFESSIONAL ASSOCIATION

1555 POYDRAS STREET
SUITE 1700
NEW ORLEANS, LOUISIANA 70112
985-636-3480

SCOTT M. GALANTE
DIRECT DIAL: 985-636-3487
FAX: 985-636-3499

OTHER OFFICES:
MOUNT PLEASANT, SOUTH CAROLINA
CHARLESTON, SOUTH CAROLINA
BARNWELL, SOUTH CAROLINA
PROVIDENCE, RHODE ISLAND
RALEIGH, NORTH CAROLINA

October 25, 2001

**VIA FACSIMILE - 225-248-2010**

Avery Griffin
Jones, Walker
8555 United Plaza Blvd.
Baton Rouge, La.  70809-7000

RE:    James C. Turner, et al  vs. Anchor Packing Company, et al
         No. 91847 "C"

Avery,

First, please be advised that you were mistaken regarding your assertion that Sherman Ames was not qualified to conduct Mr. Turner's depositions.  A review of the documents served on counsel for Westinghouse will reveal that Mr. Ames was admitted pro hac vice in this matter.  In light of your misstatement, however, it is very suspect that you requested an extension from an attorney that you believed was precluded from even conducting the deposition.

Next, upon your assertion during our conversation today that you have not even begun reviewing the documents in this matter to respond to discovery, it appears clear that your focus was on removal with the intent of avoiding litigation or, at the very least, continuing the strategy of delay.  The documents requested by our discovery include any documents that you intend to use to support your assertion that removal was proper.  Certainly, your assertions in your removal filed 46 days ago, were based upon information that you gathered relevant to this case. That information is discoverable and, since it is already available to you, it must be made available to us immediately.

As you are aware, we have moved to exclude your last minute attempts to introduce into evidence anything that was not submitted in support of your removal.  I have and continue to give you every opportunity to conduct this litigation in a professional manner by producing information that provides me with time to properly respond, as opposed to being forced to blindly respond to what you might argue or seek to have admitted into evidence. Nonetheless, you continue your strategy of withholding information in your possession relating to the removal which you believe may be admitted or support your position.  You are capable of producing that information now and supplementing your responses with other requested information at a later date.  Again, I request that you provide this information by Friday, October, 26, 2001.

As I believe it to be the prudent course of action, I look forward to an amicable resolution of this discovery issue.  If you require clarification of what information I am seeking you to produce by Friday, please do not hesitate to contact me.

Sincerely

Scott M. Galante

SMG:wvs
cc:    Donni E. Young
        Sherman Ames



# JONES
# WALKER

William L. Schuette
Avery Lea Griffin
Olivia S. Tomlinson
 Direct Dial 225-248-2000
Fax 225-248-3051

October 25, 2001

**via facsimile no. 1-504-636-3499**

Scott M. Galante, Esq.
Attorney at Law
Suite 1700
1555 Poydras Street
New Orleans, LA 70112

> **Re:**  **James C. Turner, et al v. Anchor Packing Company, et al**
> **Number 91847 "C"**
> **Our File:  20364/94123-00**

Dear Scott:

I requested an extension from the attorney <u>you</u> had defend the plaintiff's deposition. If Mr. Ames did not have authority to grant an extension, he should have informed me of that when I requested the extension.

Additionally, as I informed you today, the turbine documents are not owned by Westinghouse; however, in the spirit of cooperation we have requested a copy of them from the current owner.  If you would like to review the documents in our clients's possession, please let me know and I will arrange to have the document repository available for you in Pittsburg.

Lastly, my correct fax number is 225-248-3051.  Please update your record to reflect the correct number.

Sincerely,

/s/ Avery Lea Griffin
Avery Lea Griffin

ALG/rc

JONES, WALKER, WAECHTER, POITEVENT, CARRÈRE & DENÈGRE L.L.P.

8555 UNITED PLAZA BOULEVARD • BATON ROUGE, LOUISIANA 70809-7000 • 225-248-2000 • FAX 225-248-2010 • E-MAIL info@joneswalker.com • www.joneswalker.com

BATON ROUGE    LAFAYETTE    NEW ORLEANS    WASHINGTON, D.C.

B0169749.1

LAW OFFICES

# NESS, MOTLEY, LOADHOLT, RICHARDSON & POOLE

PROFESSIONAL ASSOCIATION

1555 POYDRAS STREET
SUITE 1700
NEW ORLEANS, LOUISIANA 70112

SCOTT M. GALANTE
DIRECT DIAL: 504-636-3480
FAX: 504-636-3499

OTHER OFFICES:
MOUNT PLEASANT, SOUTH CAROLINA
CHARLESTON, SOUTH CAROLINA
BARNWELL, SOUTH CAROLINA
PROVIDENCE, RHODE ISLAND
RALEIGH, NORTH CAROLINA

October 26, 2001

**VIA FACSIMILE**
**(225) 248-3051**

Avery Lea Griffin, Esq.
JONES, WALKER, WAECHTER, POITEVENT,
  CARRERE & DENEGRE, L.L.P.
8555 United Plaza Boulevard, Fifth Floor
Baton Rouge, LA  70 70809-7000

RE:   James C. Turner, et al v. Anchor Packing Co., et al
        17th J.D.C. Case Number:  91847

Dear Avery:

I hope this letter finds you well.  I am writing requesting a copy of your Opposition to Plaintiffs' Motion for Remand and Sanctions filed in the Eastern District of Louisiana.  I understand that you filed the pleading on Tuesday, October 20, 2001 around noontime.  Our office has received its last mail delivery for the day and we have yet to get a courtesy copy or a service copy.  I would be happy to send a runner over to your firm's local office to pick up such a copy if you would make it available today.

Secondly, I have yet to receive any discovery responses from your client in the above-captioned matter.  As my correspondence indicated last week, the discovery responses became due at the close of business on Friday, October 26, 2001.  If any of the attachments to your opposition are documents that were requested through discovery, I will have no option other than to continue to object to the use of any such evidence as Plaintiffs have been unnecessarily precluded from access thereto.

I am merely reiterating my request to you that I am afforded the same professional courtesies myself and my office have afforded you throughout this matter.  The procedural game that continues in this matter furthers the prejudicial effect on my clients.  If my office can be of any assistance in my receipt of the pleadings and evidence that I am both requesting and entitled to receive, please do not hesitate to contact me at your earliest convenience.

Sincerely yours,

Scott M. Galante

SMG/sz

LAW OFFICES
# NESS, MOTLEY, LOADHOLT, RICHARDSON & POOLE
PROFESSIONAL ASSOCIATION

1555 POYDRAS STREET
SUITE 1700
NEW ORLEANS, LOUISIANA 70112
985-636-3480

SCOTT M. GALANTE
DIRECT DIAL: 985-636-3487
FAX: 985-636-3499

OTHER OFFICES:
MOUNT PLEASANT, SOUTH CAROLINA
CHARLESTON, SOUTH CAROLINA
BARNWELL, SOUTH CAROLINA
PROVIDENCE, RHODE ISLAND
RALEIGH, NORTH CAROLINA

October 26, 2001

**VIA FACSIMILE**
**(225) 248-3051**

Avery Lea Griffin, Esq.
JONES, WALKER, WAECHTER, POITEVENT,
  CARRERE & DENEGRE, L.L.P.
8555 United Plaza Boulevard, Fifth Floor
Baton Rouge, LA 70 70809-7000

RE:   James C. Turner, et al v. Anchor Packing Co., et al
       17th J.D.C. Case Number: 91847

Dear Avery:

First, a review of my prior correspondence reflects that I have not stated that Mr. Ames did not have authority to grant an extension. Rather, as I previously stated, given your stated belief that Mr. Ames did not have authority to even conduct the deposition, it is highly suspect that you called him to seek an extension relating to discovery. This is particularly true in light of your attempts to represent the extension as indefinite. As Mr. Ames clarified, the extension was only during the time period pending a determination of whether this case was going to be submitted under the Westinghouse settlement agreement. Further, I find suspect the fact that you contacted Mr. Ames when, aside from the deposition, this case has been exclusively litigated by myself and Donni Young. In any event, the time discussed with Mr. Ames expired long ago as evidenced by the conduct of both parties, including but not limited to, the removal filed by you, the settlement demands by plaintiffs (demands made outside of the agreement), and the remand filed by plaintiffs.

While I am very interested in reviewing the turbine documents requested in discovery, my correspondence dated October 25, 2001, made clear that I am seeking immediate production of documents used to support your contention that removal was proper. You made unsupported factual allegations in your removal. You should immediately respond with information in your possession used to make those factual allegations. Your obligation to do so is clear. If you truly are interested in furthering the spirit of cooperation, you will provide the removal information without further delay. As I previously stated, I am interested in amicably resolving this issue; however, your continued failure to do so will require the court to address this issue.

As you state in your letter dated October 25, 2001, you have requested a copy of the turbine documents. As Westinghouse is not the owner of those documents, it appears illogical to go to Pittsburgh to review them. Therefore, please make arrangements for the review of these copied documents in your office or my office. I am confident that this will be the most cost efficient and time efficient manner to proceed with this discovery which should benefit all involved. Also, since you have requested the documents, please advise me regarding the volume of documents at issue and the date upon which they will be made available for inspection and copying.



Page 2
Avery Lea Griffin
October 26, 2001


Finally, since you indicated that documents are no longer owned by Westinghouse, I request that you identify the document owner and clarify the circumstances surrounding the new ownership of the documents. If my recollection is correct, you indicated that it was a company located in Florida whose name contained the word "Branton." Also, please advise me regarding whether you are counsel for this entity.

As usual, if you require further clarification of the information that I am seeking to have immediately produced, please feel free to contact me.

Sincerely yours,

Scott M. Galante

SMG/sz

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

JAMES C. TURNER AND MARLENE F. TURNER

versus

ANCHOR PACKING COMPANY, CARBORUNDUM; CBS, (Formerly known as Westinghouse Electric Corporation); A. W. CHESTERTON COMPANY; COMBUSTION ENGINEERING, INC.; JOHN CRANE, INC; DANA CORPORATION; EAGLE, INC.; THE FLINTKOTE COMPANY; FLINTKOTE MINES, LTD.; FOSTER WHEELER CORPORATION; GARLOCK, INC.; GASKET-HOLDINGS COMPANY, INC. (Successor to Flexitallic, Inc.); GENERAL ELECTRIC COMPANY; GEORGIA-PACIFIC CORPORATION; INGERSOLL-RAND; KELLY MOORE PAINT COMPANY; THE McCARTY CORPORATION; REILLY-BENTON CO., INC.; TAYLOR-SEIDENBACH, INC.; J.T. THORPE, INC.; 3-M (a.k.a. MINNESOTA MINING & MANUFACTURING COMPANY); WORTHINGTON PUMP, INC.; KIM SUSAN, INC. (Formerly known as Fagan Boat Service, Inc.)

CIVIL ACTION

NUMBER C-01-2767

SECTION "S"

## AFFIDAVIT OF JAMES M. GATE
## IN SUPPORT OF WESTINGHOUSE ELECTRIC
### CORPORATION'S NOTICE OF REMOVAL OF CIVIL ACTION

I, James M. Gate, being under penalty of perjury, declare and say:

I am the former Manager of Design Verification of the Marine Division of Westinghouse Electric Corporation ("Westinghouse"), located in Sunnyvale, California.

I joined Westinghouse in 1953, immediately after receiving a Bachelor of Science degree in Marine Engineering from the United States Merchant Marine Academy at King's Point, New York.  Except for the period of 1971 to 1976, I was involved in marine

B0166523.1

1


EXHIBIT
G

engineering during my entire career at Westinghouse, and during that time was stationed principally at Westinghouse's Marine Division, initially in Lester, Pennsylvania, until operations were moved to Sunnyvale, California.  My work involved both United States Navy and Merchant Marine vessels.  I retired from Westinghouse in December, 1994.

I submit this Affidavit to attest to the level of supervision and control by the United States Navy ("U.S. Navy" or "Navy") and its officers, such as the Inspector of Naval Machinery ("INM"), over the design and manufacture by Westinghouse of equipment intended for installation on U. S. Navy vessels, particularly propulsion turbines and turbine-generator sets and related equipment (hereinafter "turbines"), and specifically concerning the USS Shenandoah AD-26.

I am personally familiar with the extent of U. S. Navy control over the production of turbines built for the U. S. Navy vessels built by Westinghouse because I participated in the design, manufacturing, testing and sea trials of these turbines, and personally interacted with the Navy's machinery inspectors, officers such as Capt. A. L. Rosenstein and Capt. O. Earle, Chief INMs formerly stationed at Westinghouse's Lester, Pennsylvania plant. As test engineer at Westinghouse's Lester plant, I also interfaced with Navy Inspector James Moodie.  At the Navy Bureau of Ships (BuShips") and its successor Naval Sea Systems Command ("NAVSEA"), I would meet with the Head of the Navy's Steam Turbine Branch, Turbine & Gear Desk, Howard Ball, to discuss the Navy's requirements for turbines to be built by Westinghouse.  Under the authority of the Turbine & Gear Desk were the Navy's Main Turbine Section and Auxiliary Turbine Section.  I and other Westinghouse personnel worked under the direction of Walter Sharp in the Main Turbine Section.  We also worked under the direction of Robert Trout in the Navy's Auxiliary Turbine Section, a division of the Turbine & Gear Desk until 1982, when it was folded into the Main Turbine Section.  Mr. Trout wrote the Navy's turbine generator and auxiliary steam turbine specifications for several Navy vessels.

Westinghouse made and supplied turbines for U. S. Navy ships under contracts between Westinghouse and the shipyards and/or the United States of America, specifically

the Navy Department, which administered the contract through NAVSEA, which acted under authority of the Secretary of the Navy.  NAVSEA personnel exclusively developed ship designs and plans, as well as comprehensive and detailed regulations and specifications for all shipboard equipment, and its officers supervised, enforced, and approved the vendor's compliance with the plans, regulations and specifications. Changes to the plans and specifications could only be authorized by the Navy through one of its officers.   Westinghouse's production of turbines for Navy vessels was immediately supervised by the INM, a naval officer subordinate to various levels of command within NAVSEA or its predecessor, BuShips.  The INM, who worked on-site at Westinghouse's Marine Division plants in Lester, Pennsylvania and Sunnyvale, California, exercised immediate, direct and detailed control over all aspects of the Westinghouse's production of turbines for Navy vessels. The INM observed the manufacturing process, and enforced compliance with design specifications.

I have reviewed the records for the turbines manufactured and supplied by Westinghouse in connection with one Navy vessel at issue in this action, namely the USS Shenandoah AD-26, and based upon my review of these records, I have verified that the turbines were manufactured and suppled by Westinghouse for this vessel under the strict direction and control of officers of the U. S. Navy.

Westinghouse's records concerning the USS Shenandoah AD-26 which I have reviewed include BuShips contract specifications for the ships classifications and drawings. Of these, I attach as exhibits to the Affidavit the following:

Todd Pacific Shipyards Purchase Order No. AD 26 201 dated July 7, 1944 with Appendix B purchase specification no. MAD 26-1001 dated May 29, 1944.

Westinghouse sold 1 main propulsion turbine and 6 auxiliary turbines to the Navy for installation aboard the USS Shenandoah during its construction.

Having reviewed the contract documents relative to this ship, I can attest that Westinghouse did not supply the thermal insulation. On the contrary, the Navy provided the thermal insulation to be used with these Westinghouse turbines.

In the case of the USS Shenandoah, the contract incorporates BuShip contract specifications which, in turn incorporate military specifications, and these documents require use of asbestos-containing thermal insulation for the turbines.

With respect to the turbines supplied by Westinghouse to the Navy for use aboard the USS Shenandoah all aspects of the design, performance requirements, and materials used for construction, including thermal insulation, were specified by BuShips, which acted under authority of the Secretary of the Navy. Compliance with the specifications which could not be changed without direct approval of Main Turbines Section personnel, Walter Sharp, and Auxiliary Turbine Section personnel, Robert Trout, and was directly enforced at Westinghouse's plant by the INM, although the Turbine & Gear Desk official, Howard Ball, ultimately controlled these details.

Westinghouse, during all aspects of its turbine work (i.e., design, manufacture, testing, and sea trials) for U.S. Navy vessels, including the USS Shenandoah, performed its work under immediate supervision by the Navy through NAVSEA officers. This supervision and control was exercised through contract documents, design and construction drawings, written specifications, and personal oversight of Westinghouse's work by ship design engineers and machinery specialists employed by the U. S. Navy. The chain of U. S. Navy authority between Westinghouse and the Secretary of the Navy was multi-tiered and staffed by officers of varying levels of responsibility, and virtually no aspect of the development, manufacture, and testing of naval turbines escaped this close control.

Before the construction of a U. S. Navy vessel, including the USS Shenandoah, there was an extensive set of General Specifications for ships of the United States Navy as well as U. S. Navy specifications, or military specifications known as MilSpecs, already in place which governed all aspects of ship construction. The MilSpecs totaled tens of thousands of pages and governed all aspects of a vessel's design and construction and specified the materials to be used, including asbestos-containing thermal insulation.

The U. S. Navy specifications for the Westinghouse turbines manufactured for the USS Shenandoah incorporated several lower-level specifications, including those governing

the components or materials used for or with the turbines, such items as metals, bearings, packings, gaskets, insulation, etc.  Some of these specifications required the use of asbestos-containing materials, such as thermal insulation for turbines.

The turbines manufactured and supplied by Westinghouse for any U.S. Navy vessel, including the referenced ships, had to meet detailed and precise U.S. Navy specifications. Additionally, each turbine was specifically designed for the vessel or class of vessels in question.  In other words, the turbines for a vessel or class were not interchangeable, but instead, were custom built, i.e., the instruments were not "off the shelf" product.

NAVSEA developed the initial conceptual design for all classes of naval vessels.  By the time an outside design consultant began to participate in the design phase of a new turbine, such as the turbines and related equipment for the USS Shenandoah, the U. S. Navy had specified at least the weight, size, power output, speed, and other design parameters of the turbine.

In the design phase of the turbine project, as in all other phases, the U.S. Navy retained ultimate decision authority over the design of the turbines.  If an engineering disagreement arose between the Navy and the outside design consultant, the Navy controlled the design adopted. All final design drawings and specifications required express U.S. Navy approval and adoption.

Following the Navy's acceptance of a quotation for manufacture of the prototype turbine, the prototype vendor would begin tooling and construction under continuing U.S. Navy supervision and oversight.  During manufacture of a turbine at sites such as Westinghouse's former Lester, Pennsylvania facility, the Navy had an on-site INM.  In the 1950s and 1960s, the INM was typically a Naval Captain (the rank immediately below Admiral).  Captains Rosenstein and Earle noted above, are examples.  In later years, the INM was typically a Commander (the rank immediately below Captain).  The INM was on site full time in a separate set of offices called the Defense Contract Management Office. Later, after Westinghouse transferred its turbine manufacturing operations to its plant in Sunnyvale, California, the INM worked on-site in Sunnyvale.  Frequently, Westinghouse

engineers such as myself dealt directly with the Navy's Main Turbine and Auxiliary Turbine sections in Washington, D.C.  A number of U.S. Navy civilian employees, including inspectors and engineers, supported the INM on site.  At the Lester facility, for example, the INM's staff would typically include more than ten full-time civilian U.S. Navy inspectors and several mechanical engineers.  One of the individuals who supervised Westinghouse's work was James Moodie, noted above.  All members of the INM staff were Navy employees and had access to all areas of the production facility at all times.

During the construction of the prototype turbine, all drawing approvals and any report of out-of-tolerance machining were submitted to, and approved by, the INM or by the mechanical engineers working under him.

Many steps of the production process required in-process testing.  For example, all welds were tested.  All weld testing reports were reviewed and approved by the INM on site.  The INM also approved the procedures used to test welds.  Similarly, other test results (e.g., balance testing, vibration testing, tolerance measurements, machine variations and the like) were reviewed and approved by the INM.  Any reports which resulted in the replacement of a component part were also sent to NAVSEA BuShips, the Department of the Navy in Washington, D.C., for its review and approval.

Before shipment, the turbine typically was tested at the site of manufacture.  A detailed test agenda for on-site testing was approved by the U.S. Navy.  The agenda included tests for power output at various levels of steam pressure, vibration and noise tests, bearing temperature tests and the like.  The test agenda was then conducted on the turbine.  The performance of the test agenda was closely monitored by the INM and all test results were submitted to him.  The manufacturer then prepared a final report on the prototype turbine, including all test reports.  This final report then was submitted for approval by the on-site INM.  Following INM approval, the final report was forwarded to NAVSEA or Buships in Washington, D.C., where further approval was required before the manufacturer could ship the turbine.

Following the completion of the test agenda, the turbine was typically fully

disassembled and inspected. This disassembly and inspection was carried on in the personal presence of the on-site INM. One or more of the INM's mechanical engineers would also attend the disassembly inspection. Any abnormalities discovered at this point would lead to rejection of the turbine or to modifications and re-testing. A report of each tear down was prepared and was then approved and signed by the INM.

Paralleling the manufacture of the prototype, the U.S. Navy would prepare a Request for Quotation on the production models of the turbine, subject to any changes developed during the production and testing of the prototype turbine unit. The resulting quotations would then be subject to a similar review as that described above with respect to the prototype unit, including quotation review meeting(s). Approval of the quotation would eventually be given to one or more vendors. Often two vendors were selected to supply production units. In many instances, the manufacturer of the prototype unit would secure part or all of the contract work for the production units, but in some instances the manufacturer of the prototype would not be selected for the production contract.

The manufacturing process for the production units then proceeded under the same level and intensity of U.S. Navy supervision as described above for the prototype unit. The INM, assisted by Navy civilian inspectors and mechanical engineers as described above, would oversee and approve virtually every aspect of the manufacturer and testing of the turbine. As before, a test agenda for the production units was approved by the U.S. Navy and all reports from the tests were approved by the on-site INM. Following the completion of the test series, each individual turbine was fully torn down in the presence of mechanical engineers working for the INM. Any abnormalities were noted and resolved. A final report was prepared for each individual turbine, incorporating these test reports, and was approved both by the on-site INM and by the Department of the Navy in Washington, D.C. Re-assembly of each turbine was then approved by the U.S. Navy civilian inspections headed up by James Moodie prior to shipment.

The first production unit was then shipped to the shipyard with construction responsibilities for the first vessel. The turbine was typically installed by shipyard

B0166523.1

7

personnel acting under supervision of engineers from the Supervisor of Shipbuilding, who was subordinate to the Commander of Naval Sea Systems.  Typically, the involvement of the turbine vendor at this stage of the process (i.e., from delivery of the turbine to completion of the sea trials) was the presence on-site of an engineer acting in a liaison and troubleshooting capacity.

Once the turbine was installed, it was typically tested in place by the shipyard using an artificial load and under less than full power.  This testing was reviewed and approved by U.S. Navy personnel at the shipyard.  Any deficiencies discovered at this stage were required to be remedied by Westinghouse.

Once the ship was launched and outfitted, sea trials followed.  The first sea trial was called the "builder's trial" and was conducted by the shipyard using its personnel with senior U.S. Navy personnel on board for observation and approval.  Representatives from the major component vendors would also attend such trials.  (I have participated personally on two occasions as the Westinghouse turbine representative on the builder's trial on the initial vessels of a new class.)

Following successful completion of the builder's trials, the U.S. Navy would conduct its own sea trial, called an "acceptance trial."  Acceptance trials were fully conducted and staffed by U.S. Navy officers, civilian employees and crew, with shipyard and manufacturers' representatives along to observe.  As before, any deficiencies discovered in the turbine during acceptance trials would be the responsibility of Westinghouse to correct.

Following the acceptance trials, the vessel was commissioned and would typically embark on a "shakedown cruise."  During this cruise, the operation of all components of the vessel were further evaluated and tested under the widest possible range of operating conditions.

During the launching, outfitting, and sea trials of the first vessel in the new class, other vessels in the class may be under construction on a trailing schedule.  Each and every vessel would go through essentially the same construction, inspection, testing, sea

trials, and shakedown procedure as described above for the first vessel for the class.

All equipment, including the turbines supplied by Westinghouse for the USS Shenandoah, was built in accordance with the U.S. Navy specifications in existence at the time and were approved by the U.S. Navy.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that if called as a witness, I could competently testify to the foregoing facts, all of which are within my own personal knowledge.

Executed this _15_ day of _October_____, 2001 at Sunnyvale, California.

_____
JAMES M. GATE

## STATE OF CALIFORNIA
## COUNTY OF SANTA CLARA

Personally appeared before me this __15th__ day of __Oct__ 2001, James M. Gate, who made oath that the statements contained in the affidavit above are true and correct to the best of his knowledge.

Subscribed and sworn to before me this __15th__ day of __Oct_____ 2001. My Commission expires: __Aug 30th 2005__

_____
Notary Public

PAVNEET SINGH
Commission # 1316493
Notary Public - California
Santa Clara County
My Comm. Expires Aug 20, 2005

B0166523.1

9

 

NAVAL VESSEL REGISTER

**This information resides on a DOD interest computer.
Important conditions, restrictions, and disclaimers apply.**

# SHENANDOAH (AD 26)

## DESTROYER TENDER

| | | | |
|---|---|---|---|
| Class: | AD 26 | UIC: | 04644 |
| Status: | Disposed of by MARAD sale | Fleet: | |
| | | Homeport: | |
| Date status changed: | 03/01/1982 | | |
| Maintenance Category: | | Berth: | |
| Force: | | | |
| | | MARAD Type: | |

| | | | |
|---|---|---|---|
| Builder: | TODD PAC/TACOMA | | |
| | | Delivery Date: | 08/13/1945 |
| Award Date: | 08/10/1944 | Age (since delivery) (At time of disposal): | 36.6 years |
| Keel Date: | 09/16/1944 | Commission Date: | 08/13/1945 |
| Launch Date: | 03/29/1945 | Decommission Date: | |
| Age (since launch)(At time of disposal) | 37.0 years | Years from Commission to Decommission: | |
| | | Stricken Date: | |

| | | | |
|---|---|---|---|
| Overall Length: | | Waterline Length: | |
| Extreme Beam: | | Waterline Beam: | |
| Maximum Navigational Draft: | | Draft Limit: | |
| Light Displacement: | | Full Displacement: | |
| Dead Weight: | | | |
| Hull Material: | | | |
| Number of Propellers: | | | |
| Propulsion Type: | | | |
| Accommodations: | | Officers: | Enlisted: |

Custodian: MARITIME ADMINISTRATION (NATIONAL DEFENSE RESERVE FLEET)

Ships Program Manager:

EXHIBIT
tabbies
H

Planning Yard:

*No changes to this information were reported since 02/01/1999*

---

| RELATED LINKS | COMMENTS/FAQ's | DOD DISCLAIMER |
| SHIPS | SERVICE CRAFT | HOME |

| Related Links | Comments and FAQ's | DoD Disclaimer | Ships | Service Craft | Home |

**NAVSHIPSO**
NAVSEA Shipbuilding Support Office
Norfolk Naval Shipyard Detachment
3751 Island Avenue, Third Floor
Philadelphia, PA 19153-3297
(215) 365-5767
(215)365-5506 (fax)

NSLC PACIFIC
E MAIL webMASTER

1

IN THE 134th DISTRICT COURT
DALLAS, TEXAS

---o0o---

In re all Asbestos Cases )
by Baron & Budd, P.C., and )
Set for Trial on July 13, 1992 )
)
------------------------------ )



DEPOSITION OF JAMES MARK GATE

Tuesday, June 30, 1992 - 9:20 o'clock a.m.

At the Office of Ropers, Majeski, Kohn,
Bentley, Wagner & Kane
670 Howard Street
San Francisco, California 94105

Pursuant to Notice

Property of: Ness, Motley
Main P1 File Room
Charleston, SC

Reported by: KAY C. HILL, CSR, CM
(CSR No. 2368)



2

APPEARANCES OF COUNSEL:

        For Plaintiff:

                C. ANDREW WATERS, Attorney at Law
                Baron & Budd, P.C.
                The Centrum
                3102 Oak Lawn Avenue, Suite 1100
                Dallas, Texas 75219
                (214) 521-3605

        For Defendant Westinghouse Electric Corporation:

                BRICKFORD Y. BROWN, Attorney at Law
                HENRY N. WARE, JR., Attorney at Law
                McGuire, Woods, Battle & Boothe
                One James Center
                Richmond, Virginia 23219
                (804) 775-1124

                        ---o0o---

                    I N D E X

DEPOSITION OF JAMES MARK GATE                          PAGE

        Examination by Mr. Waters                        3, 46

        Examination by Mr. Brown                         46, 48

                        ---o0o---

EXHIBIT NO.              DESCRIPTION                    PAGE

        1       Notices of Oral Deposition,
                19 pages
                                                          3

                        ---o0o---

3

JAMES MARK GATE,

having been duly sworn, testified as follows:


EXAMINATION BY MR. WATERS

Q.   Could you state your full name for the record?

MR. BROWN:   Before we get going, if I might have this marked as Gate Deposition Exhibit No. 1, which is simply the formal and court filed copy of Westinghouse objections.  You may have to rearrange the pages, but Westinghouse objections to the Notice of Deposition and the Request for Production of Documents, so to speak.

[Deposition Exhibit No. 1 was marked for identification.]

MR. WATERS:   Just for the record, I will make the stipulation we are taking this deposition pursuant to the rules of Texas procedure, which means, in essence, all the objections except form of responsiveness are reserved to the time of trial.

Q.   Can you state your full name for the record, sir?

A.   James Mark Gate.

Q.   What is your date of birth, Mr. Gate?

A.   It is February 24th, 1930.

Q.   So you are 62 years of age?

24

Q.    During your tenure at Westinghouse, what other types of vessels would you provide marine turbines for?

A.    Cargo vessels, tankers, destroyers, cruisers, and the submarines and the anti-aircraft carriers.

Q.    When did Westinghouse last supply marine turbines for cargo vessels and tankers?

A.    1980's.

Q.    Early eighties, late eighties?

A.    I can't -- it would be early eighties.

Q.    Now, we talked a little while ago about vessels that are built overseas for which Westinghouse marine turbines are provided.  Would those be limited to submarines and carriers at the present time?

A.    No.

Q.    What types of vessels would those be?

A.    It was a cargo vessel for the Iranian Navy.

Q.    This is back in the seventies?

A.    Yes.

Q.    Is that the only example of an overseas sale you are aware of?

A.    Yes.

Q.    Is Westinghouse involved with the actual installation of a marine turbine on a vessel when it is installed, for instance, on a submarine?  Are the Westinghouse personnel there who supervise the

A.   No.

Q.   Just to clarify, is your response that you did not know, or is your response that no, Westinghouse never recommended any materials?

A.   No, Westinghouse never recommended any such materials.

Q.   And what is your knowledge based on in that regard?

A.   The naval architect is responsible to cover the turbines and the other piping insulation in the engine room so that personnel will not be burned.

Q.   And is that the case today, that responsibility of the naval architect?

A.   Yes.

Q.   And was that the case in 1953?

A.   Yes.

Q.   Do you have any knowledge as to what was the situation from 1910 to 1953?

A.   No.

Q.   Does Westinghouse provide written materials to its customers with respect to the operation and maintenance and installation of Westinghouse marine turbines?

A.   Yes.

Q.   Do those written materials make any reference to

35

1    arranging for insulation of the turbines, would that hold

2    true in both the commercial and the military context?

3         A.   Yes.

4         Q.   But with regard to vessels constructed prior to

5    1953, you wouldn't have any knowledge as to whether or not

6    Westinghouse would have specified or recommended use of

7    certain insulating materials?

8         A.   No.

9         Q.   Where were were you born, Mr. Gate?

10        A.   Philadelphia, Pennsylvania.

11        Q.   Are you aware that asbestos can cause diseases

12   or injuries, as you sit here today?

13        A.   Yes.

14             MR. BROWN:   Let me object to the form of the

15   question on the basis that I think the information is that

16   under certain circumstances, certain exposures over

17   certain periods of time, that asbestos can cause certain

18   diseases in susceptible individuals.

19             MR. WATERS:   I am not asking you for

20   interrogatories, I am asking what he knows, but that's

21   fine.

22        Q.   When did you first become aware that asbestos

23   could cause injuries or cause health problems?

24        A.   During the hearings with Johns Manville.

25        Q.   When was that, approximately?

Deposition of James M. Gate - February 16, 1994

Page 1 to Page 131

HILL REPORTING SERVICE - SAN FRANCISCO





CONDENSED TRANSCRIPT
PREPARED BY:

HILL REPORTING SERVICE
353 SACRAMENTO STREET
SUITE 600
SAN FRANCISCO, CA   94111
Phone:   [800] 492-2002
FAX:   [415] 433-5994



EXHIBIT
J

## Page 1

```
[1]        IN THE DISTRICT COURT OF TRAVIS COUNTY, TEXAS
[2].                    53rd JUDICIAL DISTRICT
[3]                      ---oOo---
[4]    RONDLE EUGENE GORDON AND MARY       )
       GORDON,                             )
[5]                                        )
                                           )
[6]              Plaintiffs,               )   No. 91-17002a
                                           )
[7]    vs.                                 )
                                           )
[8]    FIBREBOARD CORPORATION, et al.,     )
                                           )
[9]              Defendants.               )
[13]           DEPOSITION OF JAMES M. GATE
[14]    Wednesday, February 16, 1994 - 11:00 o'clock a.m.
[15]     at Ropers, Majeski, Kohn, Bentley, Wagner & Kane
                    670 Howard Street
[16]          San Francisco, California 94105
[17]                 Pursuant to Notice
```

## Page 2

```
[1]   APPEARANCES OF COUNSEL:
[2]        For Plaintiff:
[3]             C. ANDREW WATERS, Attorney at Law
                Baron & Budd
[4]             The Centrum, 3102 Oak Lawn Ave. Ste. 1100
                Dallas, Texas 75219
[5]             (214) 521-3605
[6]        For Defendant:
[7]             MARK A. HENDRIX, Attorney at Law
                Vial, Hamilton, Koch & Knox
[8]             1717 Main Street, Suite 7520
                Dallas, Texas 75201
[9]             (214) 712-4590
[10]                  ---oOo---
```

## Page 3

```
[1]                      I N D E X
[2]    DEPOSITION OF JAMES M. GATE
[3]      Examination by Mr. Waters                PAGE
[4]      Examination by Mr. Hendrix                  5
[5]                                                130
                      ---oOo---
                INDEX OF EXHIBITS
[7]    (All exhibits are bound in a volume separate from the
        deposition transcript.)
       EXHIBIT NO.    DESCRIPTION                  PAGE
[10]        1     List of drawings (oversize)
                  DD692-6100-100-ALT.                 8
[11]        2     Drawing list 2-A-9824-45, 11 pp.   24
[12]        3     Ships listing, WITEK, #WAR200136.  25
[13]        3A    Ships listing, CECIL, #WAR200135.  56
[14]        3B    Ships listing, AULT, #WAR200134.   56
[15]        4     Affidavit of James M. Gate,
                  No. 91-17002A, 2-3-94, 2 pages.    34
[17]        5     Contractual document, 20012 -
                  99 pages.
[18]        5A    Contract NY-51075, 13 pages.       91
[19]        6     Documents for Charles P. Cecil,
                  2A9433-1 to 208 incl., 10 pages.  123
[21]        7     Documents for Charles P. Cecil,
                  Service Department, Duplicate
                  Record of 5A1177-1 to 5A1177-104   92
[22]              incl., 8 pages.
[23]        8     Documents, AULT, 2A9508-1 to
                  2A9508-40 incl., 10 pages.         92
[25]        9     Documents, AULT, 2A9508-41 to
                  2A9508-80 incl., 10 pages.         93
```

## Page 4

```
[1]    EXHIBIT NO.    DESCRIPTION                  PAGE
[2]         10    Documents, AULT, 2A9426-1 to
                  624 incl., 10 pages.               93
[4]         11    AULT, Service Department
                  Duplicate Record of 2A9687-1
                  to 2A9687-308, 13 pages.           93
[6]         12    WITEK, Service Department
                  Duplicate Record of Turbine
                  No. 5A1261-1 to 68 incl.,          93
[7]               9 pages.
[8]         13    WITEK, Service Department
                  Duplicate Record of 5A1095-1
[9]               to 5A1095-200, 12 pages.           93
[10]        14    Letter, C. Andrew Water of Baron
                  & Bud, P.C. to Robert A. Thackston,
[11]              Esq., 2-10-94, with enc. 3 pages. 123
[12]                   ---oOo---
       CERTIFIED QUESTIONS:
       Page 31, Line 8; Page 126, Line 23;
       Page 127, Line 13.
                      ---oOo---
```

## Page 5

```
[1]    JAMES M. GATE, [2] having been duly sworn, testified as follows:
[4]    EXAMINATION BY MR. WATERS
[5]      Q. Can you state your name for the record, sir?
[6]      A. James Marr Gate.
[7]      Q. Mr. Gate, I've just been handed what we will [8] mark
```

## Page 6 (right column continuation)

Plaintiff's Exhibit 1 ultimately, which appears to [9] be a large chart. Can you tell me what this document [10] is?

[11]  A. It's a drawing, and it's one of the – it's [12] the list of drawings for a turbine-generator set.

[13]  Q. Have you seen that document before the [14] deposition, did you see it?

[15]  A. Yes.

[16]  Q. Can you tell me where the document came from?

[17]  A. It came from the WITEK drawing list, I think [18] that you have, and it should be one of the listed [19] drawings.

[20]  Q. On one of the documents that you provided?

[21]  A. Yes.

[22]  MR. HENDRIX: I object. Mr. Gate has not [23] provided documents, counsel for Westinghouse has [24] provided documents pursuant to discovery request by the [25] plaintiffs in this case.

## Page 6

[1]  MR. WATERS: Q. What is the hull number [2] of the WITEK, do you recall?

[3]  A. Oh, we have to look that up.

[4]  Q. Let's get that figured out, in fact, we [5] should just get the numbers of all three figured out.

[6]  MR. HENDRIX: 848, the WITEK is.

[7]  MR. WATERS: Q. Is that correct, Mr. [8] Gate?

[9]  MR. HENDRIX: He said he didn't know.

[10]  THE WITNESS: I would have to look.

[11]  MR. WATERS: Q. Let's go ahead and look, [12] try to shortcut the process.

[13]  A. The WITEK is 848.

[14]  MR. WATERS: Q. And the AULT?

[15]  MR. HENDRIX: Andy, this is –

[16]  MR. WATERS: I want to get it on the record.

[17]  MR. HENDRIX: AULT is 698, the CECIL is 835.

[18]  THE WITNESS: 698 for the AULT and the CECIL [19] is 835.

[20]  MR. WATERS: Q. So this document, which [21] we're going to mark as Plaintiff's Exhibit 1 is – can [22] you tell me again where it came from?

[23]  A. This document came out of the archives at [24] Westinghouse.

[25]  Q. At Sunnyvale?

## Page 7

[1]  A. Yes.

[2]  Q. Okay. And when was it – did you request [3] this document be pulled?

[4]  A. I pulled it two days ago.

[5]  Q. Okay. And did you pull it from a particular [6] file?

[7]  A. No, it came out of archives.

[8]  Q. Came out of archives. How was it stored in [9] archives?

[10]  A. Stored by drawing number.

[11]  Q. What is the drawing number, or where would we [12] find it on here?

[13]  A. Let me see.  Right here, 39-J-861.

[14]  Q. 39-J-861?

[15]  A. Right.

[16]  Q. Okay. And what is this drawing number here [17] to the left of that?

[18]  A. That's the General Electric drawing number [19] for this drawing.

[20]  Q. Okay. So am I correct that we have two [21] drawing numbers, one General Electric and one [22] Westinghouse?

[23]  A. Yes, but I think there's also a third.

[24]  Q. Okay?

[25]  A. You also have a third called the Bureau of

## Page 8

[1] Ships plan number, it's the one long the bottom.

[2]  Q. Why don't you read it for the record?

[3]  A. DD692-6100-100 ALT. [4] [Deposition Exhibit No. 1 was marked for [5] identification.]

[6]  MR. WATERS: Q. All right.  And am I [7] correct, sir, that the Westinghouse drawing number [8] would be 39-J-861?

[9]  A. That is correct.

[10]  Q. Okay. Am I correct, sir, that this drawing [11] pertains to turbine generators?

[12]  A. No, this drawing – right –

[13]  Q. It pertains to more than that?

[14]  A. It lists, it pertains to the list of drawings [15] for ship's service generating unit, that's what it [16] pertains to.

to 1990 has nothing to [5] do with anything in this case.

[6]   MR. WATERS:  Q. Do you know how the [7] information was stored or available prior to 1990?  I [8] understand it's been available since 1990 in the form [9] of a hard copy, what I'm trying to ascertain is where [10] was the information prior to 1990?

[11]   A. I don't know.

[12]   Q. Prior to 1990 if you had wanted to determine [13] whether or not main propulsion turbines aboard the [14] WITEK were manufactured by Westinghouse, how would you [15] have gone about doing that?

[16]   A. I would have gone over to the Service [17] Department, found the hard copy or printout of this [18] document, which is kept in the manual there, and looked [19] it up.

[20]   Q. So, am I correct, then, that there was such a [21] printout prior to 1990, the difference was that you [22] didn't have it at your desk?

[23]   A. Yes.

[24]   Q. Okay.  Have you ever found any mistakes on [25] the ships list?

Page 49

[1]   A. With respect to –

[2]   Q. Not these, but just anything?

[3]   A. I have not, I have not.

[4]   Q. Is it a fair statement, Mr. Gate, that you [5] cannot tell me with certainty that the listing provided [6] on Exhibit No. 3 is complete?

[7]   MR. HENDRIX:  Complete as it relates to the [8] WITEK.

[9]   MR. WATERS:  Q. Yes?

[10]   A. It is complete, to my knowledge, as to what [11] the Service Department who makes the listing of ships [12] and publishes that listing, that I can say that it is [13] correct.

[14]   Q. Okay.  And you base that on the fact that you [15] presume that department would put everything on here [16] that's supposed to be on here?

[17]   A. That is correct.

[18]   Q. How big is the ships list?

[19]   A. It's about that thick. (Indicating)

[20]   Q. Which is, shall we say two inches?

[21]   A. Close to two inches.

[22]   Q. Okay. Other than your discussions with [23] Mr. Mann, have you had discussions with anyone else [24] other than Westinghouse attorneys about this case and [25] these vessels?

Page 50

[1]   MR. HENDRIX:  I'm sorry, I didn't hear the [2] question.

[3]   (The record was read by the reporter as [4] follows : [5] "Question:  Other than your discussions with [6] Mr. Mann, have you had discussions with anyone [7] else other than Westinghouse attorneys about this [8] case and these vessels?")

[9]   THE WITNESS:  I had no discussions with [10] anyone about this case, I did talk to Mr. Mann about [11] four ships when I saw him, and talked to him over the [12] phone.

[13]   MR. HENDRIX:  But he's asking you if you [14] talked to anybody else other than the lawyers [15] representing Westinghouse or Mr. Mann about this case [16] or the three vessels in question.

[17]   THE WITNESS:  The answer is no.

[18]   MR. WATERS:  Q. Was the purpose of your [19] trip to Washington specifically to meet with Mr. Mann?

[20]   A. No.

[21]   Q. Was the purpose of your trip to Washington [22] specifically to go to the naval shipyard and see what [23] you could find out about this case?

[24]   A. No.

[25]   Q. Okay.  Can you tell me what the purpose of

Page 51

[1] your trip to Washington was?

[2]   A. Yes.  The purpose was that the – I call them [3] NAFC, but it's Naval Systems Command requested I be [4] there for three days to discuss a communication link [5] between Westinghouse and NAFC with respect to the ICR [6] gas turbines which we are presently designing.

[7]   Q. Okay.  At the time you met with Mr. Mann, [8] were you accompanied by a Westinghouse attorney?

[9]   A. No.

[10]   Q. Did you discuss the LEXINGTON with Mr. Mann?

[11]   A. No.

[12]   Q. What was the fourth ship that you discussed [13] with Mr. Mann?

[14]   A. NORTH CAROLINA.

[15]   Q. And why did you discuss the NORTH CAROLINA [16] with Mr. Mann?

[17]   A. That's attorney-client privilege.

[18]   MR. HENDRIX:  If it has relation to do with [19] development of –

[20]   MR. WATERS:  Q. Let me try to clear it up [21] real quick.  Did your discussions with Mr. Mann [22] concerning the NORTH CAROLINA have anything to do with [23] this case?

[24]   A. No.

[25]   Q. Okay, then I won't ask you anything about it

Page 52

[1] any more.

[2]   Let me talk to you now briefly about [3] contracts.

[4]   Did you investigate or do research to see if [5] there were any contracts between Westinghouse and the [6] Navy concerning the provision of turbine – marine [7] turbine units aboard these vessels?

[8]   A. The only document that I found with respect [9] to these three ships and the contract is the ones that [10] I gave to counsel here.

[11]   MR. WATERS:  Okay.  Are those included in [12] the documents you provided earlier?

[13]   MR. HENDRIX:  Yes.

[14]   MR. WATERS:  Q. Did you find a [15] contract – I don't think I saw one, but did you find a [16] contract for the ship's service turbines aboard the [17] WITEK?

[18]   A. Yes, it seemed to be a contractual document.

[19]   Q. Well, I guess I just don't really know what [20] to look for.  Contracts to me may be a different thing. [21] Can you explain to me what the contracting procedure [22] was between the Navy and Westinghouse with respect to [23] the provision of maritime turbine equipment?

[24]   A. Well, I can't answer that question.

[25]   MR. HENDRIX:  That's too general a question,

Page 53

[1] it's too vague.  If you want to talk about the specific [2] ships, be may be able to discuss it with you but in [3] general it's possible to discuss.

[4]   MR. WATERS:  Q. Let me ask you there, and [5] you may not know, since you weren't with Westinghouse [6] in the 1940s, but in the 1940s was there a specific [7] contract or contractual document for each and every [8] ship to which Westinghouse provided marine turbines or [9] marine power generation equipment?

[10]   A. No.

[11]   Q. Was there one general, overencompassing [12] contract between Westinghouse and the Navy for the [13] provision of such materials, if you know?

[14]   A. It's too vague, it's too vague.

[15]   The contractual procedures of yesterday and [16] today are the same.

[17]   Q. The procedures have not changed from 1953 to [18] the present?

[19]   A. That is correct.

[20]   Q. Okay.  Do you know what the procedures were [21] in 1943?

[22]   A. No.  I would have to read records.

[23]   Q. Okay.  It's a fair statement then that prior [24] to 1953 you don't have any personal knowledge of the [25] contracting procedures between Westinghouse and the

Page 54

[1] U.S. Navy?

[2]   A. That is correct.

[3]   Q. When you provided portions of the ships list [4] to counsel, Mr. Gate, was it in the form of a full [5] page?

[6]   MR. HENDRIX:  I object, assumes facts not in [7] evidence.

[8]   MR. WATERS:  Q. Well, did you provide [9] what I'm looking at as Exhibit No. 3 to Westinghouse [10] counsel?

[11]   A. Yes.

[12]   Q. And when you provided it to them, did you [13] provide it to them in the form of a full page, or in the [14] form that's presented here with Exhibit No. 3.

[15]   MR. HENDRIX:  I object, it's not relevant [16] nor reasonably calculated to lead to admissible [17] evidence.  The answer to the previous question is in no [18] way related to this case, and if the provision, when [19] you provided it to quote unquote Westinghouse counsel, [20] if it was in anticipation of litigation, or in [21] furtherance of an attorney's investigation in a case [22] that you were

BSA

Deposition of James M. Gate - February 16, 1994

XMAX(17)

seen any written materials [15] that indicated to you that Westinghouse specified [16] or recommended or utilized asbestos-containing [17] insulation on land-based turbines? Is that a fair [18] statement?")

[19]   MR. HENDRIX:  You can answer that question [20] unless it was a case that you were acting as a [21] consultant or assisting an attorney in investigation of [22] a case in which you are not listed as an expert, at [23] which time it would fall under the attorney-client or [24] work product privilege.  If you have seen documents in [25] that area at that time, you can't tell him about those.

### Page 109

[1] otherwise you can.
[2]   MR. WATERS:  Q. Have you seen any other [3] any such documents, Mr. Gate?
[4]   A. Not that I can recall.
[5]   Q. Okay.  Westinghouse is a big company, is [6] Westinghouse a major manufacturer of marine power [7] generation systems?
[8]   MR. HENDRIX:  Q. What do you mean by major [9] manufacturer?
[10]   MR. WATERS:  Who are the major manufacturers [11] of marine power generation systems?
[12]   MR. HENDRIX:  Still object, I don't know [13] what you mean by major manufacturers.
[14]   THE WITNESS:  There's G.E., DeLaval, and [15] ourselves.
[16]   Q. How do you spell –
[17]   A. D-e-L-a-v-a-L.
[18]   Q. Are there any others, I hadn't heard of that [19] one.
[20]   A. Oh, yeah, back in the old days there were, I [21] think there was Worthington, there are two others back [22] in those days.
[23]   Q. Smaller ones that disappeared, or whatever?
[24]   A. Right.
[25]   Q. Okay.  Is it a fair statement then that

### Page 110

[1] Westinghouse along with G.E. and DeLaval would have [2] been major manufacturers from say the forties to the [3] present of marine power generation equipment?
[4]   A. Yes.
[5]   (Discussion off the record.)
[6]   MR. WATERS:  Q. Mr. Gate, have you ever [7] seen any documents that discussed the shipment of [8] turbines with or without insulation in place in the [9] 1940s?
[10]   A. No.
[11]   Q. Is it a fair statement, Mr. Gate, that when [12] Westinghouse shipped marine turbines to customers, [13] Westinghouse knew that at some point in time they would [14] need to be insulated?
[15]   A. No, That's the subject of the naval architect [16] and the shipyard.
[17]   Q. Is it your testimony that they could be, they [18] could operate and be functional and be used without [19] thermal insulation?
[20]   A. If they could get by with the government [21] regulations or the regulations set up by the Maritime [22] Administration of the Coast Guard.
[23]   Q. Have you ever heard of that happening?
[24]   A. No.
[25]   MR. HENDRIX:  I don't think – be asked you,

### Page 111

[1] basically the question be asked you is have you ever [2] seen a marine turbine that was not insulated.
[3]   MR. WATERS:  Q. In use?
[4]   A. Main turbine, main propulsion, or generator [5] set, is that right?
[6]   MR. HENDRIX:  That's not what be asked.
[7]   MR. WATERS:  Q. I asked marine turbines, [8] in doing so I included both.
[9]   (Deponent confers with his attorney off the [10] record.)
[11]   MR. HENDRIX:  I'm going to object to you [12] talking to him before the answer.  I'll rephrase if [13] there is confusion.
[14]   Q. Try to do it simply.  Mr. Gate, have you ever [15] observed in operation a marine turbine, either a main [16] service turbine or a main propulsion turbine, being [17] utilized without thermal insulation in place?
[18]   A. The answer is no, I have not seen it.
[19]   Q. Do you think it would be a safe or unsafe [20] practice for a vessel to use one of those turbines [21] without thermal insulation?
[22]   MR. HENDRIX:  "Those" being main propulsion [23] or turbine-generator set?
[24]   MR. WATERS:  Q. Either of the two?

[25]   A. With respect to safety, I would feel that it

### Page 112

[1] would be unsafe.
[2]   Q. Okay.  So as far as you're concerned, main [3] propulsion and ship's service turbines should be [4] insulated for use?
[5]   A. For safety reasons.
[6]   Q. Is it a fair statement, sir, that you have no [7] personal knowledge as to what materials were used to [8] insulate Westinghouse marine turbines aboard ships?
[9]   A. That is correct.
[10]   Q. Is it a fair statement that you don't know if [11] blankets were used on ships – let me start that over.
[12]   Is it a fair statement you don't know whether [13] Westinghouse marine turbines aboard U.S. Navy [14] destroyers were insulated with blankets or not?
[15]   A. They were insulated according to the general [16] specification of ships.
[17]   Q. Okay.  But you don't know with respect to any [18] given ship as to how it would have been insulated, with [19] blankets or some other mechanism?
[20]   A. It's stated in the general specification of [21] ships as to how to do it.
[22]   Q. But your personal knowledge, what you know as [23] you sit here, Mr. Gates, the Westinghouse turbine [24] expert, you do not know how a given Westinghouse [25] turbine would have been insulated on a given ship?

### Page 113

[1]   MR. HENDRIX:  Which one?
[2]   MR. WATERS:  Q. Any one?
[3]   A. No.
[4]   Q. The answer is no?
[5]   A. No.
[6]   Q. To determine that, what would you do, what [7] could you do, if anything?
[8]   A. I don't know.
[9]   Q. Okay.  Do you have any present intention to [10] attempt to research that issue?
[11]   A. No.
[12]   Q. Am I correct, sir, that Westinghouse will [13] provide an engineer to supervise installation of marine [14] turbines aboard ship?
[15]   A. No.
[16]   Q. That's not correct?
[17]   A. No.
[18]   Q. Would Westinghouse appoint a liaison or some [19] other individual to be present when marine turbines [20] were installed aboard Navy ships?
[21]   A. No.
[22]   Q. Is it your testimony then that there would [23] never be Westinghouse personnel present when that took [24] place?
[25]   A. No.

### Page 114

[1]   Q. Under what circumstances would Westinghouse [2] personnel be present?
[3]   A. When specifically contracted for.
[4]   Q. Do you have personal knowledge, Mr. Gate, of [5] circumstances where Westinghouse shipped marine [6] turbines to a shipyard to be placed on a certain [7] vessel, and in fact they were placed on a different [8] vessel?
[9]   A. No.
[10]   Q. Is that something that has occurred in your [11] career, but you can't recall a specific occasion?
[12]   A. I don't know, I can't recall, I don't know.
[13]   Q. You don't know if it's happened or not?
[14]   A. That's right.
[15]   Q. All right.  Did the Navy send personnel to [16] attend the turbine testing, do they do that as a matter [17] of course?
[18]   A. Where, turbine testing are we –
[19]   Q. I guess you do it here at Sunnyvale, or when [20] you used to do it at Lester (ph)?
[21]   A. The Navy has personnel present in place [22] permanently.
[23]   Q. And that's one of their functions?
[24]   A. That is correct.
[25]   Q. Now, Westinghouse is responsible for meeting

### Page 115

[1] the Navy specifications and requirements concerning the [2]

# ORIGINAL

1

```
 1        IN THE CIRCUIT COURT OF JACKSON COUNTY
                   STATE OF MISSISSIPPI
 2

 3
      IN RE:   ASBESTOS PERSONAL INJURY CASES NOS.
 4              88-5422(1), 88-5420(2), 89-5153(2),
                90-5274(2), 91-5000(2), 91-5135(2),
 5              89-5088(2), 89-5252(2), 90-5352(2),
                88-5181(2), 90-5387(2), 89-5121(2),
 6              90-5069(2), 89-5268(2), 91-5187(2),
                91-5119(2), 90-5247(2), 90-5322(2),
 7              90-5045(2), 91-5098(2), 90-5369(2),
                91-5135(2), AND 90-5178(2)
 8

 9
                   30(b)(6) DEPOSITION OF
10        WESTINGHOUSE ELECTRIC CORPORATION
                 JAMES M. GATE, DESIGNEE
11
          Taken at the Westin Canal Place, 100
12        Rue I'berville, New Orleans, Louisiana,
          on Wednesday, June 3, 1992, beginning
13        at 9:10 a.m.

14

15   APPEARANCES:

16        ALWYN H. LUCKEY, ESQUIRE
          Richard F. Scruggs, P.A.
17        734 Delmas Avenue
          Pascagoula, Mississippi 39567
18
                        AND
19
          DAVID LYLE, ESQUIRE
20        Ness, Motley, Loadholt, Richardson & Poole
          151 Meeting Street, Suite 600
21        Charleston, South Carolina 29402
                ATTORNEYS FOR PLAINTIFFS
22

23

24

25
```

Property of: Ness, Motley
Main Pl File Room
Charleston, SC

EXHIBIT
tabbies
K

4

```
 1    APPEARANCES:   (Continued)

 2            ROBERT R. ELARBEE, ESQUIRE
              Freeman & Hawkins
 3            2800 First Atlanta Tower
              Atlanta, Georgia 30383
 4                ATTORNEY FOR ARMSTRONG WORLD
                  INDUSTRIES, INC., FLEXITALLIC
 5                GASKET COMPANY, GAF CORPORATION,
                  UNION CARBIDE AGRICULTURAL
 6                PRODUCTS COMPANY, INC., MAGNOLIA
                  WELDING SUPPLY COMPANY, INC.,
 7                NORTH BROTHERS COMPANY, EARL M.
                  JORGENSEN COMPANY, KENTILE FLOORS,
 8                INC., RHONE-POULENC AG COMPANY,
                  MOBILE WELDING SUPPLY CO., INC.,
 9                TURNER & NEWALL AND PLC/TURNER
                  ASBESTOS FIBRES, LTD.
10
              JEFFERY P. HUBBARD, ESQUIRE
11            Wells, Moore, Simmons, Stubblefield
                & Neeld
12            1300 Deposit Guaranty Plaza
              Jackson, Mississippi 39201
13                ATTORNEY FOR ERICSSON RADIO
                  SYSTEMS, INC.
14
              SUSAN COCO, ESQUIRE
15            Bryan, Nelson, Randolph, Land & Weathers
              4936 West Hardy Street
16            Hattiesburg, Mississippi 39401
                  ATTORNEY FOR KENTILE FLOORS, INC.
17
              RICK NORTON, ESQUIRE
18            Bryan, Nelson, Randolph, Land & Weathers
              4936 West Hardy Street
19            Hattiesburg, Mississippi 39401
                  ATTORNEY FOR M.H. DETRICK COMPANY
20
              MONTE BARTON, ESQUIRE
21            Copeland, Cook, Taylor & Bush
              1700 Capital Towers
22            125 South Congress Street
              Jackson, Mississippi 39201
23                ATTORNEY FOR PHELPS-DODGE INDUSTRIES,
                  INC.
24

25
```

5

```
 1    APPEARANCES:  (Continued)

 2         EDWARD B. McDONOUGH, JR., ESQUIRE
           McDonough & Broome
 3         1400 First National Bank Building
           Mobile, Alabama 36633
 4              ATTORNEY FOR J.P. STEVENS & CO.,
                INC. AND A.W. CHESTERTON COMPANY
 5
           SCOTT S. CAIRNS, ESQUIRE
 6         HENRY N. WARE, JR., ESQUIRE
           McGuire, Woods, Battle & Boothe
 7         One James Center
           Richmond, Virginia 23219
 8              ATTORNEYS FOR WESTINGHOUSE ELECTRIC
                CORPORATION
 9
           JAMES A. BYRNE, ESQUIRE
10         Baughman & Associates Co., L.P.A.
           55 Public Square, Suite 2215
11         Cleveland, Ohio 44113
                ATTORNEY FOR USX CORPORATION
12
           R. DAVID KAUFMAN, ESQUIRE
13         Brunini, Grantham, Grower & Hewes
           Trustmark Bank Building, Suite 1400
14         Jackson, Mississippi 39201
                ATTORNEY FOR IMO INDUSTRIES
15
           HAROLD O. GRISSOM, JR., ESQUIRE
16         Compton, Crowell & Hewitt
           146 Porter Avenue
17         Biloxi, Mississippi 39533
                ATTORNEY FOR ROCK WOOL MANUFACTURING
18              COMPANY, DRESSER INDUSTRIES, INC.,
                ALLIED EQUIPMENT COMPANY AND
19              WORTHINGTON CORPORATION

20

21    REPORTED BY:

22         CANDACE O'BARR HOLLEMAN, C.S.R.
           COURT REPORTER & NOTARY PUBLIC
23

24

25
```

6

```
 1                         I-N-D-E-X
 2   Examination by:
                                                  Page
 3        Mr. Lyle
                                                   8
 4        Mr. Luckey
                                                  67
 5   Exhibits:
 6        Exhibit 1, Notice of Deposition         7
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

O'BARR & ASSOCIATES, INC. (601)863-6545
POST OFFICE BOX 1623 GULFPORT, MISSISSIPPI 39502

7

1                    (Exhibit 1 was marked.)

2        MR. LYLE:

3                    As far as stipulations go, the

4        deposition is being taken pursuant to notice or

5        agreement of counsel pursuant to the Mississippi

6        Rules of Civil Procedure.  And all objections,

7        except as to the form of the question, will be

8        reserved until the time of trial or use of the

9        deposition.

10       MR. CAIRNS:

11                   Before we get started, I'd like to

12       clarify one thing with respect to the notice.

13       We received your notice on Monday.  And I think

14       in accordance with the conversation between Mr.

15       Dudley of our office and Mr. Scruggs on May

16       12th, we made it clear that Mr. Gate was being

17       produced to talk about marine turbines rather

18       than to the broad scope in what we think is not

19       as defined as would be required for a 30(b)(6)

20       type of notice that we received on Monday.  But

21       I think everyone understood Mr. Gate is being

22       produced as a witness to talk about marine

23       turbines.

24       MR. LYLE:

25                   Okay.  I think that is correct in my

8

1    understanding from speaking with Mr. Scruggs,

2    also.

3                    **JAMES M. GATE**

4         having been first duly sworn, was

5         examined and testified as follows:

6                    **EXAMINATION**

7    BY MR. LYLE:

8         Q.    Mr. Gate, my name is David Lyle.

9    I'm an attorney from Charleston, South

10   Carolina.  Mr. Luckey and I will be asking you

11   some questions today.

12              You have been placed under oath.  If

13   I ask you any question that you don't understand

14   or that you need me to rephrase, explain again

15   or anything of that nature, please tell me,

16   okay?  I want to make sure you understand the

17   question and that you give a correct answer to

18   the question.  Okay?

19        A.    I understand.

20        Q.    Okay.  If at any time you need to

21   take a break, get a glass of water, whatever,

22   just let us know, and we'll do that at your

23   convenience, also.  Okay?

24        A.    I understand.

25        Q.    The court reporter will be taking

31

1    regardless of who manufactured it?

2         A.    I don't know.

3         Q.    Okay.  The same question with the

4    sleeve that you referred to.  As you sit here

5    today, do you have any knowledge of your own

6    whether or not that sleeve on the turbines did

7    at one time contain asbestos or not contain

8    asbestos?

9         A.    I don't know.

10        Q.    Okay.  Do you have any knowledge as

11   we sit here today whether or not any of the

12   materials that were used in the construction of

13   the turbines by Westinghouse did or did not

14   contain asbestos?

15   MR. CAIRNS:

16             Object to the form of the question.

17   You have been referring to "the turbines."  Are

18   you asking generally across the board all of the

19   marine turbines, or are you referring

20   specifically to Ingalls?

21   MR. LYLE:

22             Generally.

23        A.    No.

24   MR. LYLE:

25        Q.    Okay.  Have you ever been told by

69

1    only be one counsel, we will let you conclude.

2    But it is unusual in my experience, at least, to

3    have two counsel from one set of clients

4    conducting the deposition.  But go ahead.

5    MR. LUCKEY:

6                I appreciate you allowing us to do

7    that.

8            Q.    Mr. Gate, you may have to bear with

9    me.  I know even less about marine turbines than

10   Mr. Lyle.  But I hope we can narrow down some of

11   these questions and get done with you today.

12               You had talked to us earlier about

13   the blankets, and I believe you called them

14   sleeves, that were removed from turbines in the

15   process of taking them down.  What other types

16   of insulation would be found on a marine

17   turbine?

18   MR. CAIRNS:

19               Object to the form of the question.

20   If Mr. Gate can answer that, he can.

21           A.    The many forms of insulation is

22   right in the specifications for ships.  In other

23   words, U.S. Maritime Commission allows for at

24   least two or three types of insulation.  And the

25   Coast Guard regulations also state two or three

1   types of insulation.  And the general

2   specifications for ships by the United States

3   Navy also delineates those types.

4   MR. LUCKEY:

5        Q.    Are you familiar with those types?

6        A.    I would have to have the

7   specifications in front of me.

8        Q.    Okay.  Without the specifications in

9   front of you, do you generally know what types

10   of insulations you are referring to?

11        A.    No.  I don't know what types of

12   insulation that are in each one of those

13   specifications.

14        Q.    That is actually not my question.

15   Without the regulations in front of you, what

16   types of insulation are you familiar with that

17   we'd find on a marine turbine?

18   MR. CAIRNS:

19        Again, I'm going to object to the

20   form of the question.  It's so overly general.

21   But if he can respond-- Do whatever you can do.

22        A.    You could have fiberglass.  You

23   could have felt wool.  You could have asbestos.

24   You could have many types.  You could have

25   paper.

*James Mark Gate*

1       IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSISSIPPI

2

3

4

5    IN RE:  ASBESTOS PERSONAL INJURY CASES — <u>ABRAMS</u> LEAD

6           GROUP I PLAINTIFFS

7        NOS.

8        88-5422(2), 89-5121(2), 90-5247(2), 88-5420(2),
           89-5252(2), 90-5069(2), 89-5153(2), 90-5352(2),

9        89-5268(2), 90-5045(2), 90-5274(2), 88-5181(2),
           91-5187(2), 91-5098(2), 91-5000(2), 90-5387(2),

10      91-5119(2), 90-5369(2), 91-5135(2), AND 90-5178(2)

11

12

13                  *** VOLUME II ***

*Property of: Ness, Motley
Main PI File Room
Charleston, SC*

14

15

16

17

18    THE FOLLOWING IS AN UNCERTIFIED AND UNPROOFREAD DAILY COPY

19    TRANSCRIPT OF THE PROCEEDINGS HAD IN THE ABOVE REFERENCED

20    CAUSE ON TUESDAY 29, 1993, BEFORE HONORABLE KATHY KING

21    JACKSON, CIRCUIT JUDGE.

22

23

24

25

**EXHIBIT**

**DAILY COPY**

UNDERLINED TEXT IS PHONETIC
THIS TRANSCRIPT HAS NOT BEEN PROOFREAD

1    naval specifications with the next witness, who's

2    a Westinghouse corporate employee.  I just state

3    that at the start, Your Honor.  So that -- I don't

4    want you to get impatient with us because I don't

5    know what --

6                BY THE COURT:  I've been impatient with

7    y'all, Mr. Motley.

8                BY MR. MOTLEY:  Well, Your Honor, I

9    haven't even said anything today.

10               BY THE COURT:  I said "y'all."  I mean

11   as a whole.

12               BY MR. MOTLEY:  I've kept my peace back

13   here.  But I'll just let you know that so -- in

14   advance, that we may be running up there quite a

15   bit.  We may not.  Mr. Williams may, may have

16   turned over a new leaf during lunch.

17               BY MR. WILLIAMS:  Don't count on it.

18               BY THE COURT:  Bring the jury in.

19   (JURY ENTERS THE COURTROOM)

20               BY THE COURT:  Be seated.  Who's your

21   next witness?

22               BY MR. WILLIAMS:  We call Mr. Jim Gate.

23               BY THE COURT:  Who?

24               BY MR. WILLIAMS:  Jim Gate, G-a-t-e.

25                    JAMES MARK GATE,

1    upon being called as a witness for and on behalf of the

2    defendant and having been first duly sworn, testified as

3    follows:

4                        BY MR. WILLIAMS:  May it please the

5           Court.

6                        BY THE COURT:  I'm ready.

7                        BY MR. WILLIAMS:  Thank you.

8    DIRECT EXAMINATION BY MR. WILLIAMS:

9         Q.   Would you state your full name for the record,

10   please?

11        A.   James Mark Gate.

12        Q.   And, Mr. Gate, what is your present residence

13   address?

14        A.   It's 13945 Markham Avenue, Saratoga, California.

15        Q.   All right, sir.  Would you give us, the Court and

16   the jury, the benefit of your educational background,

17   please?

18        A.   All right.  My educational background was that I

19   attend the Merchant Marine Academy in 1949.  And I graduated

20   in 1953; at which time I then went to work for Westinghouse.

21        Q.   And you are still working for Westinghouse today,

22   sir?

23        A.   Yes, I am.

24        Q.   So you've worked continuously for Westinghouse

25   since 1953?

1    Q.    Now where would the turbine -- the marine

2    turbine that you've just described, be located in the ship?

3    A.    Okay.  These turbines are located right in the

4    center of the ship mitchant wise, and lengthwise they're

5    generally toward the stern end of the ship.  In other

6    words, if this is forward, they're generally like the last

7    two thirds, or could be in the middle, depending upon the

8    number of turbines you have on your ship, or they could be

9    very close to the end, and this distance from the bull gear

10   to the propeller could be something like 20 foot.  That's

11   how some of them -- how close some of them are located.

12   Q.    All right.  And Mr. Gate, is that a picture of a

13   Westinghouse turbine that you've just shown us there?

14   A.    That could be a picture of any turbine.

15   Q.    Are most turbines basically the same in

16   design --

17   A.    Yes.

18   Q.    -- and appearance?

19   A.    Most turbines have the same appearance, the same

20   type of design; yes.

21   Q.    Do you know if others designed and sold turbines

22   to Ingalls, as well as Westinghouse?

23   A.    Yes.  There are -- We have our competitors, and

24   they're like GE and De Laval.  They are our competitors and

25   they make turbines just like this.

1    this is a C4 type cargo vessel.  It's one of their larger

2    ones.

3        Q.   All right, sir.  And when you received this

4    particular document, what, if anything, would you as the

5    engineer of Westinghouse -- what duties would you perform

6    in order to prepare a quotation?

7        A.   Okay.  We would review it and insure ourselves

8    what regulatory bodies, again, are called for in the

9    document, and we also would check the parameters, and then

10   we would see if we had machinery that could fit those

11   qualifications.  And if so, there could be very little we

12   would have to do, or we would design it new.  And then say

13   that okay, we give them the proposal, and then we would lay

14   out the machinery for what they would want, to meet these

15   qualifications.

16       Q.   All right, sir.  Now, the document -- if you

17   would, focus on the whole document again, please, Russ.  On

18   the first paragraph it talks about -- well, you're going to

19   have to come in a lighter tighter so that we can see the

20   first paragraph -- it talks about some of the regulatory

21   agencies that you've already discussed with us.  And you

22   said that, as I understand your testimony, you would take

23   -- for instance here it talks about the U.S. Public Health

24   or others that would be involved.  Explain to the Court and

25   jury the necessity of looking at this document and anything

1    A.    Okay.   Now these are the conditions that must be
2    met by the machinery that we propose to give, let's say,
3    and fulfill the requirements.   In other words, the main
4    requirement here is the first line, shaft horsepower.   And
5    in other words, they're saying that, sure, meet a load of a
6    17,500 shaft horsepower, and let's say the maximum design
7    is 22,000.   So we have to make sure that our requirements
8    are met.

9    Q.    Now as I understand what you said earlier, sir,
10   these would be the parameters that they would provide to
11   you in order for you to supply to them a turbine that would
12   do what they want it to do?

13   A.    That's right.

14   Q.    And that is propel a particular ship in a
15   certain fashion?

16   A.    That's right.   And in other words, the pressure
17   and the temperature, as I mentioned earlier, the vacuum,
18   and the propeller speed.   They're the important parameters
19   that we have to cover in our design.

20   Q.    Now, as I understood also, you said when you
21   received this particular request for quote, and you had
22   these parameters, you would just go to your files to see if
23   you had something that would fit these requirements?

24   A.    That is correct.   In other words, we just don't
25   start off with a fresh sheet of paper.   What we try to do

1    is see what we had in this horsepower requirement, the last

2    one that we put out, and then we would go back and check

3    the regulatory bodies which were called for in the

4    specifications a few pages earlier.

5         Q.    All right, sir.  Now, turning over on that same

6    document to Page 15 -- Now, Mr. Gate, if you would go to

7    the top of the page.  This is the same specification we

8    were just looking to.

9         A.    All right.

10        Q.    Page 15.  Can you read what that says?

11        A.    It says here, the following items will be

12   provided by the shipbuilder.

13        Q.    And in this case who is the shipbuilder?

14        A.    In this case it would be Ingalls.

15        Q.    All right, sir.  And go down to the bottom, and

16   the highlighted portion says what?

17        A.    Okay.  The highlighted portion says here that

18   the insulation and lagging, except for sheet metal lagging.

19        Q.    And what does it means when it says just that,

20   insulation lagging?

21        A.    It means that when we provide machinery, we do

22   not have to provide the insulation or the lagging.  In

23   other words, that would be provided by the shipbuilder.

24        Q.    All right, sir.  And go on down to the bottom --

25   the second paragraph on the bottom.  Let's see, where it

1    architect -- I'm sorry -- as an engineer working in the

2    marine turbine division on insulation of any kind?

3        A.    No.

4        Q.    All right, sir.  Is there any source where you

5    could go to find out what, if any, kind of insulation would

6    have been used on any particular type of turbine?

7        A.    Not really.  The only thing you can look at is

8    just the regulatory bodies as a guide.

9        Q.    Could Westinghouse have prohibited the use of

10   thermal insulation on any of these marine turbines?

11       A.    No, because if you took exception then you are

12   not in compliance with the contract.

13       Q.    Could Westinghouse have changed the type or the

14   placement of insulation on any of the marine turbines?

15       A.    No.

16       Q.    Now, Mr. Gate, we've been talking primarily about

17   commercial ships.  Did Westinghouse ever sell any turbines

18   to naval vessels, for -- to the navy?

19       A.    Yes, they did.

20       Q.    Were there any difference in the manner or method

21   of designing or specifying or planning drawings for turbines

22   used aboard naval vessels?

23       A.    No, not really.  They had specifications and they

24   had specifications which were adhered to.  I would say the

25   only thing that would be different between the navy and the

1    Maritime Administration is the amount of inspection required
2    by the navy.  In fact, the navy did have their own
3    inspection force at our plant and, therefore, whenever there
4    was an inspection we made sure that the naval inspector was
5    there.
6        Q.   Can you describe for the Court and jury your
7    involvement in the design and manufacture of equipment for
8    installation on naval vessels that were constructed at
9    Ingalls shipyard?
10        A.   Well, for naval vessels, yes, I was a turbine
11    designer.  And I was involved with a few of the turbines.
12    And I remember the submarines.  And I remember the LHA and
13    the LPH's.
14        Q.   Who designed the specifications for the
15    Westinghouse marine turbines for naval vessels?
16        A.   Well, the specifications -- we're talking about
17    ship specifications that the navy is giving us for an RFQ.
18        Q.   All right, sir.  An RF -- what was that again?  A
19    request for a quote, RFQ?
20        A.   Yeah, a request for a quote.
21        Q.   How detailed were those specifications, sir?
22        A    They are very detailed.  In fact, what happens is
23    that the -- every component that you have on a turbine, the
24    Navy has a military specification covering that component.
25    I mean, it's just endless.  Bearings are covered.  You have

1

IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSISSIPPI

2

3

4

5   IN RE:   ASBESTOS PERSONAL INJURY CASES - ABRAMS LEAD
6             GROUP I PLAINTIFFS

7             NOS.
8             88-5422(2), 89-5121(2), 90-5247(2), 88-5420(2),
              89-5252(2), 90-5069(2), 89-5153(2), 88-5181(2),
9             89-5268(2), 90-5045(2), 90-5274(2), 90-5352(2),
              91-5187(2), 91-5098(2), 91-5000(2), 90-5387(2),
10            91-5119(2), 90-5369(2), 91-5135(2), AND 90-5178(2)

11

12                                 Property of: Ness, Motley
                                   Main Pl File Room
13                                 Charleston, SC

14               *** VOLUME I ***

15

16

17

18   THE FOLLOWING IS AN UNCERTIFIED AND UNPROOFREAD DAILY COPY
19   TRANSCRIPT OF THE PROCEEDINGS HAD IN THE ABOVE REFERENCED
20   CAUSE ON WEDNESDAY, JUNE 30, 1993, BEFORE HONORABLE KATHY
21   KING JACKSON, CIRCUIT JUDGE.

22

23

24

25

**DAILY COPY**

UNDERLINED TEXT IS PHONETIC
THIS TRANSCRIPT HAS NOT BEEN PROOFREAD

1       BY THE COURT:  Anything before we bring
2   the jury in?

3       BY MR. SCRUGGS:  No, ma'am.

4       BY MR. BENTON:  No, ma'am.

5       BY THE COURT:  Bring them in when
6   they're ready, Mr. Bird.  We are ready.   You can
7   be seated it's going to be just a minute.

8   (JURY ENTERS THE COURTROOM)

9       BY THE COURT:  Be seated.  Good
10  morning.  Mr. Benton, you may proceed.

11      BY MR. BENTON:  Thank you, Your Honor.

12  Good morning, ladies and gentlemen of the jury.

13  BY MR. BENTON:

14  Q.   Mr. Gate, I owe you an apology this morning, sir.
15  My voice got a little too high yesterday afternoon, I'm
16  going to -- or a little too loud.  I'm going to do my best
17  to keep that down.  And I apologize to you, the Court and
18  the jury for that.

19      Let's go back real quick to where we left off
20  yesterday afternoon with the answers to interrogatories.

21  A.   Yes.

22  Q.   Do you recall that list?

23  A.   Yes.

24  Q.   Did you have an opportunity to go over those with
25  the Westinghouse lawyers last night at all?

1    A.    No.

2    Q.    Okay.  All right.  Why don't we put those back up

3    on the board.  We'll go through that real quick.  Can you

4    see the list here?

5    A.    No.

6    Q.    Why don't you, if it's all right with the Court,

7    step down.  And we're not going to go through each one of

8    them individually.

9                    BY MR. BENTON:  Janice, if you can just

10                   move it up slowly so Mr. Gate will have an

11                   opportunity to review it as it goes up.

12   BY MR. BENTON:

13   Q.    And my question to you, Mr. Gate, is:  Were you

14   aware that Westinghouse sold and manufactured at least some

15   of these products that contained asbestos?

16   A.    I am not aware of what products contained

17   asbestos.

18   Q.    Okay.  All right.  Why don't you have a seat for

19   just a second.

20   A.    Okay.

21   Q.    Thank you.  Now you testified yesterday, sir, that

22   Westinghouse, to your knowledge, didn't manufacture any

23   insulation products; do you recall that?

24   A.    I do.

25   Q.    Okay.  Have you ever heard of Mr. Tuffernell?

1      as eight turbines on them, can't they?

2          A.    That is correct.

3          Q.    And, Mr. Gate, you have never seen a warning on a

4      turbine manufactured by Westinghouse Electric Corporation

5      warning anybody about the hazards of asbestos, have you?

6          A.    I have not.

7          Q.    You don't have a single specification from any of

8      these regulatory bodies that you've been talking about that

9      prohibits Westinghouse Electric Corporation from warning

10     workers at Ingalls Shipyard by placing a warning on their

11     turbines about the hazard of asbestos, do you?

12         A.    We do not because we are unaware of any hazards.

13         Q.    I understand.

14             BY MR. MOTLEY:  What did he say?

15             BY MR. BENTON:  He said he was unaware of

16         any hazards.

17     BY MR. BENTON (continuing):

18         Q.    All right.  Now, let's talk about that.  But,

19     first, I want to ask you one thing.  Your contracts with the

20     shipyards required you to provide instruction manuals along

21     with your turbines sets, do they not?

22         A.    They do.

23         Q.    All right.  You stated that Westinghouse was not

24     aware of the dangers of asbestos.  Isn't it true, Mr. Gate,

25     that at least, at least by January 1953, Westinghouse

1    Electric Corporation knew about the hazards of asbestos?

2        A.    No.

3        Q.    Well, let me show you something here and see if

4    you've ever seen this.  This is Plaintiffs' Exhibit 6984.

5                    BY MR. BENTON:  Would you put that up on the

6                    board, please, Janice.

7    BY MR. BENTON (continuing):

8        Q.    Have you ever seen that?

9        A.    No, I have not.

10       Q     All right.  That's a Westinghouse Electric

11   Corporation document, isn't it?

12       A.    Yes, it says Westinghouse Electric Corporation,

13   Industrial Hygiene Lab, East Pittsburgh.

14       Q.    Okay.  And what's the date of it?

15       A.    The date of it?

16       Q.    Look down at the bottom, right-hand corner.

17       A.    The corner.  Oh, 1/2/53.

18       Q.    Okay.  Now, look over on the right column, I

19   think I've got it highlighted.  Right here.  What does that

20   say?

21       A.    It says:  Personal protective equipment, when it

22   is necessary to work in an area containing high dust

23   concentration, an airline respirator or a hose mask with or

24   without a blower may be used."

25       Q.    Now, read down on under "precautions" on the safe

1    want to use a host mask.

2          Q.    Okay.  Look over there under the section that

3    says "breathing."

4          A.    Yes.

5          Q.    Is it talking about any other dust besides

6    asbestos dust?

7          A.    It says dust from asbestos material may produce a

8    chronic -- may produce a chronic lung disease if it is

9    breathed in sufficient concentrations over a period of

10   years.  In some persons, the disease may develop much more

11   rapidly than in others.  That's what it states.

12         Q.    And this safe practice data sheet deals with

13   asbestos?

14         A.    It deals with dust.

15         Q.    Okay.  That's your interpretation?

16         A.    That's how I would have to interpret it.  It

17   deals with dust.

18         Q.    That's fine.  Let's go back to our general order.

19   Westinghouse Electric Corporation didn't give away these

20   turbines, did it?

21         A.    No.  We received compensation for the equipment

22   that we furnished.

23         Q.    In fact, if you'll look on the general order

24   there --

25                     BY MR. BENTON:  Y'all admitted those



**CANCER CENTER**
OF THIBODAUX REGIONAL

R. Clay Gould, MD
Radiation Oncologist

August 20, 2001

Ness, Motley, Loadhold, Richardson & Poole
ATTN:  Susan Zeutschel
1555 Poydras St.
Suite 1700
New Orleans, LA  70112

                                    Re:    James C. Turner
                                           DOB:  7/14/40; SSN: 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

To Whom It May Concern:

Please note Mr. James Turner has recurrent lung cancer.  His prognosis is poor and his life
expectancy is around 6 - 9 months.

If you need additional information, please call.

                              Sincerely,

                              R. Clay Gould, M.D.

608 North Acadia Road
Thibodaux, LA 70301
985 493 4338
985 449 2524 Fax

**EXHIBIT**
_A4_