DOCKET NO. 875

BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)

(FILED IN LAM 3 02-368)

ORIGINATING FROM
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **BARBARA CATANIA, ET AL**<br>**Plaintiffs** | **CIVIL ACTION** |
| | **NOS. 02-368** |
| **VERSUS** | **SEC. "D"** |
| **ACANDS, INC., ET AL.**<br>**Defendants** | **MAG. DIV. (1)** |

## MOTION TO VACATE CONDITIONAL TRANSFER ORDER

NOW INTO COURT, through undersigned counsel, come plaintiffs, Barbara and Micheal Catania, who file this Motion to Vacate Conditional Transfer Order on the basis that the Conditional Transfer Order entered on or about May 21, 2002, was invalid as there is no federal jurisdiction for the rendering of this transfer order, for the reasons set forth in the memorandum attached hereto, at well as for the reasons set forth below:

(1)    The action was originally filed in state court, was improperly removed by third party defendant, DSM Copolymer, Inc., without a basis for federal jurisdiction, and United States Magistrate Judge Stephen C. Riedlinger, after holding a hearing on April 29, 2002 on plaintiffs' motion to remand this matter back to state court, issued his Magistrate Judge's Report on June 4, 2002 recommending that the Middle District Court remand all of plaintiffs' claims to the state court, except the third party demand of Viacom, Inc.

**OFFICIAL FILE COPY** IMAGED JUN 21 '02

against DSM Copolymer, Inc.  See Exhibit "A" attached to plaintiffs' supporting memorandum.

(2)     United States Magistrate Judge Stephen C. Riedlinger was correct in his recommendation to decline to exercise supplemental jurisdiction under 28 U.S.C. §1367(c) over the plaintiffs' main demand, and any other counterclaims or cross claims between or among the plaintiffs and defendants, and to remand all such claims back to state court, except for the third party demand of Viacom, Inc. against DSM Copolymer, Inc.;

(3)     Vacation of the Conditional Transfer Order/Remand is warranted because DSM Copolymer, Inc.'s attempted removal fails on its face because federal officer authority was not established;

(4)     Vacation of the Conditional Transfer Order/Remand is warranted because DSM Copolymer, Inc. does not meet the requirement for removal under 28 U.S.C. §1442(a)(1);

(5)     Vacation of the Conditional Transfer Order/Remand is warranted because DSM Copolymer, Inc. failed to satisfy the first prong of the federal officer removal statute because it was not shown that it was acting under federal direction;

(6)     Vacation of the Conditional Transfer Order/Remand is warranted because DSM Copolymer, Inc. does not have a colorable defense;

(7)     Vacation of the Conditional Transfer Order/Remand is warranted because DSM Copolymer, Inc. failed to show a unique federal interest to justify removal;

(8)     Vacation of the Conditional Transfer Order/Remand is warranted because DSM Copolymer, Inc. failed to show a conflict between state law and federal mandate;

(9)     Vacation of the Conditional Transfer Order/Remand is warranted because DSM Copolymer, Inc. has not established that the Defense Protection Act of 1950, 50 U.S.C. § 2061, et seq., provides a colorable defense in this matter;

(10)    Vacation of the Conditional Transfer Order/Remand is warranted because DSM Copolymer, Inc.'s attempted removal fails the third prong of the federal officer removal statute because DSM Copolymer, Inc. has not shown a nexus between the government's control and plaintiffs' legal theories;

(11)    Vacation of the Conditional Transfer Order/Remand is also warranted because Viacom, Inc.'s third party demand was filed after the state court deadline date of January 28, 2002, for filing same, Viacom, Inc. failed to seek leave of court prior to

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUN 20 2002

FILED
CLERK'S OFFICE

filing its third party demand against DSM Copolymer, Inc. in this matter, and Viacom, Inc.'s third party demand was filed in a court which no longer had jurisdiction over the matter.

WHEREFORE, plaintiffs respectfully submit that the conditional transfer order should be vacated.

Respectfully submitted,

ROUSSEL AND ROUSSEL

GEROLYN P. ROUSSEL, TA– 1134
PERRY J. ROUSSEL, JR. – 20351
JULES K. BOUDREAUX - 24309
1710 Cannes Drive
LaPlace, LA 70068
Telephone: (985)651-6591
ATTORNEYS FOR PLAINTIFFS,
BARBARA AND MICHAEL CATANIA

## CERTIFICATE OF SERVICE

I hereby certify that a copy of **Plaintiffs' Motion to Vacate Conditional Transfer Order** has been served upon the parties listed below (as reflected on Attachment "A") by mailing same to each, properly addressed and postage prepaid, on this 19 th day of June, 2002.

JULES K. BOUDREAUX

COUNSEL LIST

**ACANDS, INC.**
Kay Barnes Baxter
Barfield & Associates, P.A.
400 Poydras Street, Suite 1460
New Orleans, LA 70130

**ANCO INSULATIONS, INC.**
**(SUCCESSOR TO THE ABER COMPANY, INC.)**
Julie DiFulco Robles
Hailey, McNamara, Hall, Larmann
    & Papale, L.L.P.
One Galleria Blvd., Suite 1400
P.O. Box 8288
Metairie LA 70001-8288

**BABCOCK BORSIG POWER, INC.**
**(FORMERLY DB RILEY, INC.**
**FORMERLY RILEY STOKER CORPORATION)**
James F. d'Entremont
Deutsch, Kerrigan & Stiles
755 Magazine Street
New Orleans, LA 70130-3672

**COMBUSTION ENGINEERING, INC.**
Larry G. Canada
Galloway, Johnson, Tompkins, Burr & Smith
701 Poydras Street
One Shell Square
Suite 4040
New Orleans LA 70139

**THE DOW CHEMICAL COMPANY**
Gregory E. Bodin/ David M. Bienvenu, Jr.
TAYLOR, PORTER, BROOKS & PHILLIPS, L.L.P.
P.O. Box 2471
Baton Rouge, LA 70821

**EAGLE, INC.**
**(FORMERLY EAGLE ASBESTOS & PACKING COMPANY, INC.)**
Lawrence G. Pugh, III
Montgomery, Barnett, Brown,
  Read, Hammond & Mintz
3200 Energy Centre
1100 Poydras Street
New Orleans, LA 70163-3200

ATTACHMENT "A"

**EXXON MOBIL CORPORATION (FORMERLY EXXON CORPORATION, FORMERLY HUMBLE OIL & REFINING COMPANY, FORMERLY ESSO STANDARD OIL COMPANY, FORMERLY STANDARD OIL COMPANY OF NEW JERSEY)**
**and DSM COPOLYMER, INC:**
Gregory M. Anding
Gary A. Bezet
KEAN, MILLER, HAWTHORNE, D'ARMOND, McCOWAN & JARMAN, L.L.P.
One American Place, 22nd Floor
P.O. Box 3513
Baton Rouge, LA 70821-3513

**THE FLINTKOTE COMPANY**
Valerie T. Schexnayder
Hailey, McNamara, Hall, Larmann,
   & Papale, L.L.P.
One Galleria Blvd., Suite 1400
P.O. Box 8288
Metairie LA 70011-8288

**FOSTER-WHEELER CORPORATION**
Lynn M. Luker/Patrick D. McMurtray
Lynn Luker & Associates, L.L.C.
616 Girod Street
Suite 200
New Orleans LA 70130

**GARLOCK, INC.**
Glenn L.M. Swetman/ Troy Bell
Aultman, Tyner, Ruffin & Yarborough, Ltd.
400 Poydras Street
Suite 2250
New Orleans LA 70130

**GENERAL ELECTRIC COMPANY**
Cory R. Cahn
Slater Law Firm
650 Poydras Street
Suite 2600
New Orleans LA 70130-6101

**THE MCCARTY CORPORATION**
**(SUCCESSOR TO MCCARTY BRANTON, INC., AND PREDECESSOR AND SUCCESSOR TO MCCARTY INSULATION SALES, INC.)**
Susan B. Kohn / Michael D. Harold
Simon, Peragine, Smith & Redfearn, L.L.P.
30th Floor Energy Centre
1100 Poydras Street
New Orleans, LA 70163-3000

**OWENS - ILLINOIS, INC.**
**and UNIROYAL, INC.**
W. Scott Brown
Forman, Perry, Watkins, Krutz & Tardy, PLLC
Suite 1200, One Jackson Place
188 East Capitol Street
Post Office Box 22608
Jackson, MS 39225-2608

**REILLY-BENTON COMPANY, INC.**
Stephen N. Elliott/ William L. Brockman
Bernard, Cassisa, Elliott & Davis
1615 Metairie Road
P.O. Box 55490
Metairie LA 70055-5490

**RHONE-POULENC AG COMPANY**
**(FORMERLY BENJAMIN-FOSTER, DIVISION OF AMCHEM PRODUCTS, FORMERLY UCAR CORP.,**
**FORMERLY AM-CHEM PRODUCTS, INC.)**
A. Wendel Stout, III
Deutsch, Kerrigan & Stiles
755 Magazine Street
New Orleans, LA 70130-3672

**TAYLOR-SEIDENBACH, INC.**
C. Kelly Lightfoot
HAILEY, MCNAMARA, HALL,
 LARMANN & PAPALE, LLP
Suite 1400, One Galleria Blvd.
Post Office Box 8288
Metairie, LA   70001-8288

**VIACOM, INC.**
**(FORMERLY CBS CORPORATION, FORMERLY WESTINGHOUSE ELECTRIC CORPORATION)**
William L. Schuette, Jr./ Leon Gary, Jr.
Jones, Walker, Waechter, Poitevent,
 Carre're & Dene'gre, L.L.P.
5th Floor, Four United Plaza
8555 United Plaza Blvd.
Baton Rouge, LA 70809-7000

**PANEL SERVICE LIST (Excerpted from CTO-213)**
**DOCKET NO. 875**
**IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)**

*Barbara Catania, et al. v. ACandS, Inc., et al.*, M.D. Louisiana, C.A. No. 3:02-368

Kay B. Baxter
Duncan & Courington, L.L.C.
322 Lafayette Street
New Orleans, LA 70130

Troy N. Bell
Aultman, Tyner, Ruffin & Yarborough, Ltd.
400 Poydras Street
Suite 1900
New Orleans, LA 70130

Gary A. Bezet
Kean, Miller, Hawthorne, D'Armond, et al.
One American Place, 22nd Floor
P.O. Box 3513
Baton Rouge, LA 70821

David M. Bienvenu, Jr.
P.O. Box 2471
Baton Rouge, LA 70821

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114

Jules K. Boudreaux
Roussel & Roussel
1710 Cannes Drive
LaPlace, LA 70068

William L. Brockman
Bernard, Cassisa, Elliott & Davis
1615 Metairie Road
P.O. Box 55490
Metairie, LA 70055

W. Scott Brown
Forman, Perry, Watkins, Krutz & Tardy
1515 Poydras Street
Suite 1420
New Orleans, LA 70112

Cory R. Cahn
Slater Law Firm
Poydras Center, Suite 2600
650 Poydras Street
New Orleans, LA 70130

Larry G. Canada
Galloway, Johnson, Tompkins, Burr & Smith
One Shell Square
701 Poydras Street, Suite 4040
New Orleans, LA 70139

Edward J. Cass
Gallagher, Sharp, Fulton & Norman
Bulkley Building, 7th Floor
1501 Euclid Avenue
Cleveland, OH 44115

Adam M. Chud
Shea & Gardner
1800 Massachusetts Avenue, N.W.
Washington, DC 20036

David A. Damico
Burns, White & Hickton
2400 Fifth Avenue Place
120 Fifth Avenue
Pittsburgh, PA 15222

Raymond P. Forceno
Forceno & Hannon
Philadelphia Bourse Building
Suite 1000
Independence Mall East
Philadelphia, PA 19106

Ellen B. Furman
Goldfein & Joseph
1600 Market Street
33rd Floor
Philadelphia, PA 19103

Leon Gary, Jr.
Jones, Walker, Waechter, et al.
8555 United Plaza Boulevard
5th Floor
Baton Rouge, LA 70809

Susan M. Hansen
Brownson & Ballou
4800 U.S. Bank Place
601 Second Avenue, South
Minneapolis, MN 55402

PANEL SERVICE LIST (Cont.) MDL-875

Susan B. Kohn
Simon, Peragine, Smith & Redfearn
Energy Centre, 30th Floor
1100 Poydras Street
New Orleans, LA 70163

Reginald S. Kramer
Oldham & Dowling
195 South Main Street
Suite 300
Akron, OH 44308

David C. Landin
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Gene Locks
Greitzer & Locks
1500 Walnut Street
Philadelphia, PA 19102

Patrick D. McMurtray
Luker, Sibal & McMurtray, L.L.C.
616 Girod Street
Suite 200
New Orleans, LA 70130

Ronald L. Motley
Ness, Motley, Loadholt, Richardson & Poole
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC 29465

Dwight C. Paulsen, III
Lemle & Kelleher, L.L.P.
601 Poydras Street
Suite 2100
New Orleans, LA 70130

John J. Repcheck
Marks, O'Neill, O'Brien & Courtney
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219

Julie Robles
Hailey, McNamara, Hall, Larmann & Papale
One Galleria Boulevard, Suite 1400
P.O. Box 8288
Metairie, LA 70001

John D. Roven
John Roven & Associates
2190 North Loop West
Suite 410
Houston, TX 77018

Valerie T. Schexnayder
Hailey, McNamara, Hall, Larmann & Papale
One Galleria Boulevard, Suite 1400
P.O. Box 8288
Metairie, LA 70001

Richard D. Schuster
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216

Neil Selman
Selman, Breitman & Burgess
11766 Wilshire Boulevard
Sixth Floor
Los Angeles, CA 90025

Robert N. Spinelli
Kelley, Jasons, McGuire & Spinelli, L.L.P.
Centre Square West
15th Floor
Philadelphia, PA 19102

Robert E. Swickle
Jaques Admiralty Law Firm, P.C.
1370 Penobscot Building
Detroit, MI 48226

Andrew J. Trevelise
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

James K. Weston, II
Tom Riley Law Firm
4040 First Avenue, N.E.
P.O. Box 998
Cedar Rapids, IA 52406

DOCKET NO. 875

BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)

(FILED IN LAM 3 02-368)

ORIGINATING FROM
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| BARBARA CATANIA, ET AL<br>**Plaintiffs** | CIVIL ACTION |
| | NO. 02-368 |
| **VERSUS** | |
| | SEC. "D" |
| ACANDS, INC., ET AL.<br>**Defendants** | MAG. DIV. (1) |

<u>MEMORANDUM IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER</u>

**MAY IT PLEASE THE COURT:**

Plaintiffs, Barbara and Michael Catania, have filed an Opposition to the Conditional Transfer Order entered on May 21, 2002, and pursuant thereto file this Motion to Vacate the Conditional Transfer Order.

The Conditional Transfer Order was invalid as there is no federal jurisdiction for the rendering of this order. This action was originally filed in state court, was improperly removed by third party defendant, DSM Copolymer, Inc., without a basis for federal jurisdiction, and United States Magistrate Judge Stephen C. Riedlinger, after holding a hearing on April 29, 2002, on plaintiffs' motion to remand this matter back to state court, issued his Magistrate Judge's Report on June 14, 2002, recommending that the Middle District Court remand all of plaintiffs' claims to the state court, except the third party demand of Viacom, Inc. against DSM Copolymer, Inc. Exhibit "A". As clearly recognized by Magistrate Judge Stephen C. Riedlinger, considerations of judicial economy, convenience and fairness to the litigants clearly support the severing of the third party demand against DSM

Copolymer, Inc., and the remanding of the main demand back to state court.  Accordingly, plaintiffs' motion to vacate conditional transfer order should be granted.

## BACKGROUND

Plaintiff, Barbara Catania, is dying from mesothelioma, an incurable tumor of the lining of the lung caused by asbestos exposure.[1]  She and her husband, Michael, filed suit on October 31, 2001, in Civil District Court for the Parish of Orleans, State of Louisiana.  Pursuant to La. Code of Civ. Pro. art. 1551, a pretrial and scheduling conference was held on January 8, 2002.  All parties worked together with the court to select the dates in the Scheduling Order, and an order was issued in relation to same on January 14, 2002. See Exhibit "B"- attached Exhibit "1".   The case was set for trial on June 10, 2002, pursuant to La. Code of Civ. Pro. art. 1573, due to the fact that Barbara Catania is not likely to survive beyond 6 months.

On February 13, 2002, defendant, ExxonMobil Corporation, under the signature of Gregory M. Anding, along with certain other defendants, filed a Motion to Transfer Venue based on *forum non conveniens*, and the case was transferred to 19th Judicial District Court for the Parish of East Baton Rouge on March 4, 2001.  Thereafter, on an untimely and improperly filed Third-Party Demand against DSM Copolymer, Inc. (hereinafter "DSM"), who is represented by the same attorneys who represent ExxonMobil Corporation, the case was removed by DSM to the United States District Court, Middle District of Louisiana.

On April 19, 2002, plaintiffs filed a motion to remand in the United States District Court, Middle District of Louisiana, which was argued orally on April 29, 2002, before United States Magistrate Judge Stephen C. Riedlinger.[2]  Exhibit "B".   On or about May 21, 2002, plaintiffs received notice of a conditional transfer order filed by the Judicial Panel on Multidistrict Litigation involving the above-referenced action.  On June 5, 2002, plaintiffs properly filed a Notice of Opposition to Conditional Transfer Order with this court, and pursuant thereto file this Motion to Vacate the Conditional Transfer Order.  On June 14, 2002, Judge Riedlinger issued his Magistrate Judge's Report recommending that the Middle District Court remand all of plaintiffs' claims to the state

---

[1]     Barbara Catania has been the secretary to the LSU system President for approximately 20 years.  She was only forty-nine (49) years old when she was diagnosed with mesothelioma.  She has never worked on or at the facility of DSM, the third-party defendant who removed this case to federal court.

[2]     Plaintiffs also filed a Reply Memorandum in Support of Motion to Remand on April 28, 2002, and a Supplemental Memorandum in Support of Motion to Remand on May 2, 2002.  Exhibits "C" and "D".

court, except the third party demand of Viacom, Inc. against DSM Copolymer, Inc.[3] Exhibit "A". As was clearly recognized by Magistrate Judge Stephen C. Riedlinger, considerations of judicial economy, convenience and fairness to the litigants clearly supports the severing of the third party demand against DSM Copolymer, Inc., and the remanding of the main demand back to state court. Accordingly, Plaintiffs, Barbara and Michael Catania, seek to vacate the conditional transfer order entered in this matter on or about May 21, 2002.

I.   **UNITED STATES MAGISTRATE JUDGE STEPHEN C. RIEDLINGER WAS CORRECT IN HIS RECOMMENDATION TO DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION UNDER 28 U.S.C. 1367 (c) OVER THE PLAINTIFFS' MAIN DEMAND, AND ANY OTHER COUNTERCLAIMS OR CROSS CLAIMS BETWEEN OR AMONG THE PLAINTIFFS AND DEFENDANTS, AND TO REMAND ALL SUCH CLAIMS BACK TO STATE COURT, EXCEPT FOR THE THIRD PARTY DEMAND OF VIACOM, INC. AGAINST DSM COPOLYMER, INC.**

On June 14, 2002, Judge Riedlinger issued his Magistrate Judge's Report recommending that the Middle District Court remand all of plaintiffs' claims to the state court, except the third party demand of Viacom, Inc. against DSM Copolymer, Inc. Exhibit "A". As was clearly recognized by Magistrate Judge Stephen C. Riedlinger, considerations of judicial economy, convenience and fairness to the litigants clearly support the severing of the third party demand against DSM Copolymer, Inc., and the remanding of the main demand back to state court. In support of his recommendation to remand the main demand back to state court, Judge Riedlinger provided the following:

> As an alternative to remanding the entire case, the plaintiffs urged the court to exercise its discretionary authority under 28 U.S.C. 1367 by severing the third party demand against DSM Copolymer and remanding the remainder of the case.[4]
>
> Under section 1367(c), this court may decline to exercise supplemental jurisdiction if:
> (1) the claim raises a novel or complex issue of state law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.
>
> Plaintiffs relied on <u>Crocker v. Borden, Inc.</u>, 852 F.Supp. 1322, 1329-30 (E.D. La. 1994), to support their alternative position. As in <u>Crocker</u>, the plaintiffs' claims are exclusively based on state law, and if the main demand is not remanded the plaintiffs face the potential of transfer to multi-district litigation.

---

[3]   Plaintiffs will be filing plaintiffs' written objections to the remainder of the Magistrate Judge's Report in the near future.

[4]   There is no dispute that there is no independent basis for exercising original jurisdiction over the main demand. As to the main demand, this court may exercise only supplemental jurisdiction under 1367(a).

DSM Copolymer argued that its liability for alleged exposure to asbestos will be an issue in the main demand even though it was not sued directly by the plaintiffs. Consequently, DSM Copolymer would be involved in discovery in both federal and state court if the main demand is severed and remanded. Ultimately, DSM Copolymer's employee and non-employee witnesses would be subject to testifying in two trials on the same issue arising out of the same occurrence. Finally, DSM Copolymer maintained that it is entitled to a federal forum for the determination of its federal defenses.

As noted previously, section 1367(c) permits this court to decline to exercise supplemental jurisdiction in exceptional circumstances when there are other compelling reasons for declining jurisdiction. In arguing strenuously for a remand, the plaintiffs repeatedly note that the state court judge in Orleans Parish, invoking Louisiana Code of Civil Procedure Article 1573, assigned this case for trial on an expedited basis. Under that procedural rule, the state trial court is required to grant a plaintiff who is not expected to live for more than six months preferential treatment when assigning the case for trial. Based on that procedural rule, the case was assigned for trial on June 10, 2002. There is no comparable Federal Rule of Civil Procedure. Although under Rule 16, Federal Rules of Civil Procedure, the court may fix the dates for the final pretrial conference and the trial early in the litigation, Rule 16 does not require preferential treatment for any party.

Considerations of judicial economy, convenience and fairness to the litigants support granting the plaintiffs' request to sever the third party demand against DSM Copolymer and remand the main demand to state court. Plaintiffs have asserted no claim against DSM Copolymer. Whether the third party demand against it is litigated in this court or in state court, DSM Copolymer and its employees will be involved in discovery. Although DSM Copolymer complains that its employee and non-employee witnesses will be involved in two trials, this is not necessarily so. It would appear that if either of the defenses relied upon by DSM Copolymer to support removal is successful - a decision which would be made in federal court - it would no longer be involved in the state court case. To the extent DSM Copolymer remains involved in litigating the third party demand in this court and the main demand in state court, discovery could be coordinated in a manner which would reduce duplication of effort and thereby reduce its expenses. Lastly, the absence of a federal procedural rule which gives the plaintiffs an opportunity to obtain an expedited trial while plaintiff Barbara Catania is still alive constitutes an exceptional circumstance and a compelling reason for this court to decline to exercise supplemental jurisdiction over the main demand.

## RECOMMENDATION

It is the recommendation of the magistrate judge that the motion of plaintiffs Barbara Catania and Michael Catania to remand be denied, insofar as the plaintiffs sought remand of the entire case. It is the further recommendation of the magistrate judge that this court decline to exercise supplemental jurisdiction under 28 U.S.C. 1367(c) over the plaintiffs' main demand, and any other counterclaims or cross claims between or among the plaintiffs and the defendants, and all such claims be remanded to the state court, this court retaining jurisdiction only over the third party demand of Viacom, Inc. against DSM Copolymer, Inc.

Accordingly, from the above, in accordance with Judge Riedlinger's recommendation, all claims except the third party demand against DSM Copolymer should be remanded to state court. Accordingly, there is no federal jurisdiction over the main demand in this matter, and plaintiffs' motion to vacate should be granted.

4

## II.   DSM'S ATTEMPTED REMOVAL FAILS ON ITS FACE BECAUSE BECAUSE FEDERAL OFFICER AUTHORITY WAS NOT ESTABLISHED.

In the Notice of Removal it is stated that defendant, DSM, seeks to remove this case on the basis of 28 U.S.C. 1442(a)(1) and on this Court's Federal question jurisdiction as contained in 28 U.S.C. 1331.  On the face of the Notice of Removal, the federal courts lack subject matter jurisdiction[5].

First of all, the plaintiffs' petition is grounded solely on state law.  The plaintiffs' made no claims against DSM in their petition.  Second, the third party demand of Viacom, Inc. makes no claims against DSM other than state claims for contribution based on negligence and strict liability as set forth in *Halphen v. Johns-Manville Sales Corp.*, 484 So. 2d 110 (La. 1986).  Moreover, nowhere in its notice of removal did DSM provide the court with any admissible evidence that DSM was a person acting under any officer of the United States.  In fact, the only thing even attached to DSM's removal pleadings was a non-published case constituting hearsay.  As stated above, in response to plaintiffs' motion to remand, DSM then filed an opposition to same then attaching numerous documents in support of its argument for removal of this matter to federal court.  Plaintiffs submit that said documents/exhibits fell short of establishing the threshold requirements which would support removal of this action to federal court by DSM.

In the case at bar, Barbara Catania is dying from the asbestos-related disease, mesothelioma.  Barbara never visited the DSM facility, nor did she work at the DSM facility.  Barbara Catania has been the secretary to the LSU system President for approximately 20 years.  Barbara Catania was exposed to asbestos through family members bringing home asbestos on their clothing from working at facilities as alleged in her petition.  DSM established no evidence to show that Mrs. Catania's family members, who worked for the Local 53 Asbestos Union as independent contracts, were somehow following federal orders or a federal directive in bringing home asbestos on their clothing.

---

[5]   After the filing of DSM's notice of removal, DSM then submitted in opposition to plaintiffs' motion to remand many new documents that were not attached to its removal notice, and that were properly objected to by counsel for plaintiffs on the basis of untimeliness and hearsay.

Plaintiffs further noted that as in *Lalonde*, DSM abandoned any reliance on 28 U.S.C. 1442(a)(2) in support of removal jurisdiction, as it failed to brief this issue and/or present any credible evidence to support federal jurisdiction in the federal court under said statute.

Likewise, DSM also failed to produce any evidence to make a colorable claim to its entitlement to any benefits/immunities derived from the Defense Protection Act of 1950, 50 U.S.C. 2061, et seq. and/or to rebut plaintiffs' arguments presented in plaintiffs' motion to remand for the innapplicability of the Defense Protection Act of 1950 to the claims presented in this matter.

DSM alleges that removal to federal court is appropriate under 28 U. S. C. 1442(a)(1), the federal officer statute. The party seeking removal bears the burden of establishing federal jurisdiction. *Wilson v. Republic Iron & Steel Co.*, 257 U. S. 92, 97, 42 S. Ct. 35, 37, 66 L. Ed 144 (1921). Further, regarding the applicability of 28 U. S. C. § 1442(a)(1), "[i]f the right to removal is doubtful, the case should be remanded [to state court]." *See Gauthe v. Asbestos Corp.*, 1997 WL 3255 (E. D. La. 1997); *Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 947 (E. D. N. Y. 1992); *Ruffin v. Armco Steel Corp.*, 959 F. Supp. 770 (S. D. Tex. 1997), *order vacated on other grounds*, 1999 WL 318023 (S. D. Tex. 1999); *Bahrs v. Hughes Aircraft Co.*, 795 F. Supp. 965, 969 (D. Ariz. 1992). It has been held that removal by a "person acting under" a federal officer must be predicated upon a showing that the acts that formed the basis for the state civil suit were performed pursuant to an officer's direct orders or to comprehensive and detailed regulations. *Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 947 (E.D. N.Y. 1992). Regulation of a corporation by the government is insufficient to meet this test, and the "rule that appears to emerge from the case law is one of 'regulation plus...'." *Id.*; *Ryan v. Dow Chemical Co.*, 781 F. Supp. 934 (E.D. N.Y. 1992); *Bahrs v. Hughes Aircraft Co.*, 795 F. Supp. 965 (D. Ariz. 1992). DSM bears the burden of establishing that it actually did act under the specific authority of the federal government in causing Barbara Catania's secondary exposure to asbestos. The only support DSM attached to its notice of removal was the unpublished ruling in *Vera G. LaLonde, et al. vs. Delta Filed Erection, et al.* No. 96-3244-B-M3, United States District Court (M. D. La. 8/5/98), which is inapplicable to the instant case. In fact, the plaintiff in *LaLonde* actually worked for or on the premises of DSM and alleged that DSM caused his injuries. Neither is true in the instant case.

Nothing presented by DSM establishes that the government or a federal officer specified the use of asbestos in its facility. Moreover, nothing presented by DSM establishes that DSM specified or controlled the procedures used by the Local 53 Asbestos Union in handling asbestos. In the instant case, DSM has not shown that **"strong government intervention and the threat that a defendant will be sued in state court based on actions which follow federal direction."** *Mouton v. Flexitallic, Inc.*, 1999 WL 225438 (E.D. La. 1999), p. 2. Without this showing, DSM has not carried its burden of establishing federal jurisdiction over a suit initiated in state court, and the suit should be remanded to state court. *Ryan v. Dow Chemical Co.*, 781 F.Supp. 934, 939 (E.D. N.Y. 1992); *Good v. Armstrong World Industries, Inc.*, 914 F.Supp. 1125, 1127 (E.D. Penn. 1996).

In the case of *Good v. Armstrong World Industries, Inc.*, 914 F.Supp. 1125, 1127 (E.D. Penn. 1996), a former member of the United States Navy filed suit for personal injuries from asbestos exposure from

Viacom/Westinghouse generators. Viacom filed a notice of removal under the federal officer removal statute alleging that it designed and manufactured the turbine generators in accordance with specifications and regulations mandated by the Navy, and was entitled to remove the case to federal court pursuant to the federal officer removal statute, 28 U.S.C. 1442. The plaintiffs filed a motion for remand alleging that Westinghouse did not meet the statutory requirement for removal.

The *Good* court stated that "removal must be predicated upon a showing that the acts forming the basis of the state suit were performed pursuant to an officer's direct orders or comprehensive and detailed regulations." *Id*. at p. 1128. "By contract, if the corporation establishes only that the relevant acts occurred under the general auspices of federal direction then it is not entitled to 28 U.S.C. 1442(a)(1) removal." *Id*. at p. 1128; see also *Mouton v. Flexitallic, Inc.*, 1999 WL 225438 (E.D. La. 1999), p. 2; *Ryan v. Dow Chemical Co.*, 781 F.Supp. 934, 947 (E.D. N.Y. 1992); *Fung v. Abex Corp.*, 816 F.Supp. 569 (N.D. Cal. 1992).

The *Good* court stated that nothing presented by Westinghouse established that the Secretary of the Navy specified the use of asbestos in its turbine generators. No document relied upon by Westinghouse even mentioned asbestos. Thus, Westinghouse did not meet its burden to make a causal connection between the state claim and the conduct undertaken pursuant to the direction given by an officer of the federal government. *Id*. at p. 1130.

In the case at bar, DSM had provided absolutely no evidence showing that the asbestos used by the Local 53 Asbestos workers were pursuant to specifications outlined and at the direction given, by an officer of the federal government. Nothing presented by DSM shows any specification for the work done by the Local 53 Asbestos Union, and whether asbestos was a requirement of the job. Moreover, nothing presented by DSM shows that DSM had any control over the safety of these independent contractors or over the procedures used by these independent contractors for cleaning up after completing their tasks at the DSM facility. Without this showing, DSM cannot meet its burden of making a causal connection between the state claim being asserted in this matter (the conduct of carrying asbestos to Barbara Catania from clothing worn by family members) and the conduct undertaken pursuant to the direction given by an officer of the federal government. Thus, plaintiffs' motion to vacate conditional transfer order should be granted, and this case should be remanded to the state court from which it was removed.

III.   **DSM'S UNSUPPORTED ALLEGATIONS OF FEDERAL OFFICER AUTHORITY DO NOT SUPPORT REMOVAL UNDER THE FEDERAL OFFICER REMOVAL STATUTE.**

A.   **DSM Does Not Meet the Statutory Requirement for Removal Under 28 U. S. C. 1442(a)(1).**

Even if DSM met its threshold burden by providing evidentiary support for its factual allegations, which is denied, those allegations are wholly insufficient to support a finding of federal officer authority as required by §1442(a)(1).   An action may be removed to federal court if defendant shows that the suit involves:

> The United States of any agency thereof or any officer (or any person <u>acting under that officer</u>) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office or on account of any right, title or authority claimed under an Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

28 U. S. C. 1442(a)(1) (emphasis added).

To properly invoke this Court's federal officer jurisdiction under §1442(a)(1), DSM must meet the criteria set forth in *Mesa v. California*, 489 U.S. 121, 124-25, 134-35, 109 S. Ct. 959, 962, 103 L. Ed. 2d 99 (1989). First, DSM must show that it was acting under the direction and control of a specific federal officer at the time the alleged tort was committed. *Id.* Second, DSM must show that it has a colorable federal defense to plaintiff's claims. *Id.* And third, DSM must show that a causal nexus existed between the tortious conduct that resulted in plaintiff's injuries and the alleged federal authority. *Id.* DSM must establish all three elements for removal to be proper. *Gauthe*, 1997 WL 3255 at *2.

1.   **DSM Fails the First Prong of the Federal Officer Removal Statute Because it Has Not Shown That it Was Acting under Federal Direction.**

Under the first prong of federal-officer removal, the defendant must show that it is being sued for actions taken at the direction of a federal officer. *See Mesa*, 109 S. Ct. 959, 962. The well-accepted test for establishing whether a defendant was "acting under" a federal officer requires a showing that the acts forming the basis of the action were performed "pursuant to an officer's direct orders or to comprehensive and detailed regulations." *Good v. Armstrong World Industries, Inc.*, 914 F.Supp. 1125, 1127 (E.D. Penn. 1996); *Overly v. Raybestos-Manhattan*, C-96-2853 SI., 1996 WL 532150 (N.D. Cal. Sept. 9, 1996); *Ryan v. Dow Chemical Co.*, 781 F. 934, 947 (E. D. N. Y. 1992). Indeed, the vast majority of courts that have considered this issue have interpreted this first element as requiring direct orders/regulations from the federal government. *See Ruffin v. Armco Steel Corp.*, 959 F. Supp. 770 (S. D. Tex. 1997), *order vacated on other grounds*, 1999 WL 318023 (S. D. Tex. 1/29/99); *Gauthe v. Asbestos Corp.*, 1997 WL 3255 (E. D. La. Jan. 2, 1997); *Bahrs v. Hughes Aircraft Co.*, 795 F. Supp. 965, 969 (D. Ariz. 1992); *Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 947 (E. D. N. Y. 1992); *Good v. Armstrong World Indust., Inc.*, 914 F. Supp. 1125, 1128 (E. D. Pa. 1996); *Overly v. Raybestos-*

*Manhattan*, No. C-96-2853 SI., 1996 WL 532150 (N.D. Cal. Sept. 9, 1996); *Arness v. Boeing North America, Inc.*, 997 F. Supp. 1268 (C. D. Cal. 1998); *Pack v. AC&S, Inc.*, 838 F. Supp. 1099 (D. Md. 1993). If, on the other hand, a defendant only establishes that the relevant acts occurred under the "general auspices" of federal direction, it is **not** entitled to removal under § 1442(a)(1). *Good v. Armstrong World Indus., Inc.*, 914 F. Supp. 1125, 1128 (E. D. Pa. 1996) (allegations of general control and direction of Navy insufficient to show defendant acted pursuant to direct orders or comprehensive and detailed regulations).

And there is no question that the burden rests squarely on DSM. *See Wilson v. Republic Iron & Steel Co.*, 257 U. S. 92, 97, 42 S. Ct. 35, 37, 66 L. Ed 144 (1921). It was incumbent upon DSM to show through specific facts that it was acting under the authority of a federal officer. *See Fowler v. Southern Bell Telephone & Telegraph Co.*, 343 F. 2d 150, 154 (5th Cir. 1965) (incumbent upon defendants to show that they were federal officers acting within their duties).

Specifically relevant to the case at bar, DSM has not established that the safety or procedures of the Local 53 Asbestos Union independent contractors were under the direction and control of a federal officer, nor has it shown that asbestos installation was required at the direction of a federal officer. *Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 947 (E.D.N.Y. 1992). Plaintiffs further note that none of said exhibits offered by DSM Copolymer reference any direct order or instruction from the United States Government that asbestos had to be used in the DSM facility, or that the United States Government gave specific instruction to DSM to not take adequate precautions to protect workers on their premises (and their resulting family members) from exposure to deadly asbestos fibers, or to not warn workers on their premises of the deadly hazards of asbestos exposure to themselves and their resulting family members, the lack thereof of such evidence clearly indicating DSM's inability to claim any protection provided under government contractor immunity.[6] To the contrary, DSM's own Exhibit "C", at Section "15(e)", establishes that DSM was contractually required to comply with safety, sanitary, and factory inspection laws of the State of Louisiana in its operating agreement entered into in regards to the

---

[6]        As such, DSM has failed to meet the following requirements needed in order to qualify as a federal officer, or "person" acting under him, as set forth in case of *Mesa v. California*, 489 U.S. 121, 131-132, 109 S.Ct. 959, 966, 103 L.Ed.2d 99 (1989), which requires that DSM: (1) demonstrate that it acted under the direction of a federal officer, (2) raise a federal defense to the plaintiffs' claims, and (3) demonstrate a causal nexus between plaintiffs' claims and acts it performed under color of federal office. Likewise, for these same reasons, the case of *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 19, 60 S.Ct. 413, 84 L.Ed. 554 (1940), is inapplicable to the facts of this case.

Baton Rouge facility. Exhibit "E". Accordingly, plaintiffs' motion to vacate should be granted, and this action should be remanded back to the state court in which it was originally filed.

Similarly, a federal district court in California found that the attempted federal officer removal of Avondale Shipyard, the defendant, failed this first prong of federal-officer removal test because there was no evidence that a federal officer was involved in shipyard safety. *Overly v. Raybestos-Manhattan*, No. C-96-2853 SI., 1996 WL 532150 (N.D. Cal. Sept. 9, 1996). In *Overly*, the plaintiff was exposed to asbestos while working at the Avondale Shipyards. *Id.* at p.1. After the plaintiff contracted an asbestos-related disease, he sued the defendant, alleging that the defendant's failure to warn about the hazards of asbestos caused his injury. *Id.* The defendant removed, alleging federal officer jurisdiction because it was under "rigid guidelines" imposed by the federal government for the "design of ships." *Id.* The court rejected the defendant's attempted federal officer removal because it provided no evidence showing that the government controlled asbestos-related warnings or safety: "Although Avondale has established that it was under substantial control by the government regarding the installation of certain products containing asbestos, it has not done so with regard to the warning of individuals of the presence of asbestos on the job site." *Id.* at *3.

To establish that the defendant acted under the control of a federal officer, for purposes of § 1442(a)(1), therefore, the defendant must show that the government authority under which it worked directly interfered with its ability to fulfill its state law obligation to Barbara Cantania. *Ruffin, 959 F.Supp.* at 776. In *Ruffin*, the defendant failed to meet this burden and the case was remanded to state court. The court concluded that "the mere fact that the government possessed the power to control or regulate employee safety neither establishes that the power was ever used nor that operational mandates of this type were ever issued. Without such proof, [the defendant] cannot satisfy the statutory requirements for removal under §1442(a)(1)." *Id.* at 776.

DSM has neither established that it acted pursuant to direct and detailed orders by the federal government regarding the activities of independent contractors working at its facilities nor that any federal duty under which it may have been required to act in any way interfered with its state imposed duty of safety towards these independent contractors. DSM has not established the first prong of the *Mesa* test and, therefore, this motion to vacate should be granted and plaintiffs' case remanded to state court.

### 2.    DSM Does Not Have a Colorable Federal Defense.

Nor can DSM satisfy the second prong of the federal officer removal test. To qualify for federal-officer jurisdiction under § 1442(a)(1), a defendant must establish that it has a colorable federal defense to the plaintiff's

claims. *See Mesa*, 109 S. Ct. at 968. DSM asserts that it may rely on the government contractor defense, *see Boyle v. United Technologies Corp.*, 487 U. S. 500, 108 S. Ct. 2510, 101 L. Ed. 2d 442 (1988), and/or defenses and immunities available under the Defense Protection Act of 1950, 50 U. S. C. 2061, *et seq.* For the reasons set forth below, neither the government contractor defense nor the Defense Protection Act of 1950 provide DSM with a colorable federal defense to Plaintiff's claims.[7] Therefore, DSM has failed to establish this second prong of the *Mesa* test and Plaintiff's motion to vacate should be granted and the matter remanded to state court.

a.   **Application of the Government Contractor Defense Must Be Predicated Upon Both a Federal Interest and a Conflict Between Duties Imposed by State Law and Duties Imposed by Federal Authority.**

DSM suggests that it can rely upon the government contractor defense articulated in *Boyle v. United Technologies Corp.*, 487 U. S. 500, 108 S. Ct. 2510, 101 L Ed. 2d 442 (1988).[8] But before the Court can consider whether this serves as a colorable federal defense in this case, DSM bears the burden of establishing that two requisite conditions are met: whether the case concerns a unique federal issue and whether there was a significant conflict between federal policy and state law. *Boyle*, 108 S. Ct. at 2515. If either of these conditions are not met, a defendant cannot rely upon the federal contractor defense. *Dorse v. Eagle-Picher Industries, Inc.*, 898 F. 2d 1487, 1490 (11th Cir. 1990) (state law not displaced where no conflict existed

---

[7]   It is well-settled law that "a defense that raises a federal question is inadequate to confer federal jurisdiction." *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 808, 106 S.Ct. 3229, 3232, 92 L.Ed. 2d 650 (1986) (citing *Louisville & Nashville R. Co. v. Mottley*, 211 U.. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908). The federal question in removal cases must be disclosed on the face of the plaintiff's complaint and must be essential to the plaintiff's cause of action; it is not enough that the federal question arises by way of a defense to that action. *Oliver v. Trunkline Gas Co.*, 789 F.2d 341, 343 (5th Cir. 1986); *PAAC v. Rizzo*, 502 F.2d 306, 313 (3d Cir. 1974); *Border City S. & L. Ass'n v. Kennecorp Mtg.*, 523 F. Supp. 190, 192 (S.D. Ohio 1981); *Bruan, Gordon & Co. v. Hellmers*, 502 F. Supp. 897, 900 (S.D. N.Y. 1980); 1A Moore's Federal practice, Sec. 0.160 (1974); C. Wright, Law of Federal Courts, Sec. 38 at 179 (1976). A case may not be removed to federal court on the basis of a federal defense, even if the defense is anticipated in plaintiff's complaint and even if the parties concede that the federal defense is the only question truly at issue. *Franchise Tax Bd. of California v. Constr. Laborers Trust for Southern California*, 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983); *Thomas v. Burlington Industries, Inc.*, 763 F. Supp. 1570, 1575 (S.D. Fla. 1991).

[8]   To establish the applicability of the government contractor defense, the defendant must satisfy a three-part test: 1) the United States approved reasonably precise specifications; 2) the equipment conformed to those specifications; and 3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not the United States. *Boyle*, 108 S. Ct. at 2518. *Boyle* involved a products liability action against an independent contractor that supplied military helicopters to the United States; not a failure to warn action. While the Fifth Circuit has applied the *Boyle* test to failure to warn actions, it recognized the difficulty a defendant would have "establishing an identifiable federal interest or policy in the existence of method of warning and a significant conflict between that federal interest or policy and the operation of state law." *Garner v. Santoro*, 865 F. 2d 629, 635 (5th Cir. 1989), *cited in Ruffin*, 959 F. Supp. at 774.

between federal contractual duties and state duty of care — contractor could comply with both obligations).  In

this case, because DSM cannot meet these two requisite conditions, it cannot rely on the government contractor

defense.

### 1.    No Unique Federal Interest Justifies Removal.

Since asbestos products have been banned for a long time and are no longer used in most equipment,

any federal interest in this case is meager at best.  This case does not involve work presently taking place by

contractors of the government or employees or agents of the government, and no chilling effect would be

presented in regards to future work performed by government contractors as this case involves exposures to

asbestos occurring prior to 1970, for which asbestos is no longer utilized by said contractors, etc.  Using

precisely this reasoning, the Eastern District of Pennsylvania rejected an asbestos manufacturer's claim that it

was entitled to the federal-contractor defense to support its attempted federal-officer removal:

> The impact of this personal injury action on the federal interest in protecting future defense procurement
> — the fundamental point of the government contract defense — is speculative. It is common knowledge
> that asbestos is no longer used in the design and manufacture of equipment, so that this lawsuit cannot
> interfere with a federal program involving products that contain asbestos. Therefore, the adjudication of
> this personal injury action in state court does not threaten the enforcement of a federal policy sufficient
> to warrant removal.

*Good v. Armstrong World Indus., Inc.*, 914 F. Supp. 1125, 1131 (E.D. Pa. 1996).

### 2.    No Conflict Exists Between State Law and Federal Mandate.

Even if the Court determines that a federal interest does exist in this case, that federal interest "merely

established a necessary, not a sufficient, condition for the displacement of state law." *Boyle,* 108 S. Ct at 507.

The court must then determine whether a conflict exists between state law and federal mandate.  Displacement

of state law "will occur only where. . . a 'significant conflict' exists between an identifiable 'federal policy or

interest and the [operation] of state law or the application of state law would 'frustrate specific objectives' of

federal legislation." *Id.* The *Boyle* court offered an example of a situation in which federal mandate does not

conflict with state imposed duty:

> If, for example, the United States contracts for the purchase and installation of an air
> conditioning-unit, specifying the cooling capacity but not the precise manner of construction, a
> state law imposing upon the manufacturer of such units a duty of care to include a certain safety
> feature would not be a duty  identical to anything promised the Government, but neither would
> it be contrary. The contractor could comply with both its contractual obligations and the state-
> prescribed duty of care. No one suggests that state law would generally be pre-empted in this
> context.

12

*Id.*[9]  This example clearly highlights the facts applicable to the case at bar are clearly outside the removal statutes.

Therefore, even if the Court determined that there is a federal interest in this case, DSM would still have to establish a conflict exists between its duties imposed by state law and its duties imposed by federal authority. Indeed, in a similar situation, the Eleventh Circuit determined that the evidence did not support the requirements for the government contractor defense where "the contractor could comply with both its contractual obligations and the state-prescribed duty of care." *Dorse*, 898 F. 2d at 1490.  The Ninth Circuit clearly articulated this requirement in the failure to warn context:

> *Boyle* displaces state law only when the Government, making a discretionary, safety-related military procurement decision contrary to the requirements of state law, incorporates this decision into a military contractor's contractual obligations, thereby limiting the contractor's ability to accommodate safety in a different fashion.

*In re Hawaii Asbestos Cases*, 960 F. 2d 806, 813 (9th Cir. 1992).

DSM still has not established that its duties imposed by federal authority in any way conflict with its duties of care imposed by state law.  Specifically, under Louisiana law, an employer has a duty to provide a safe work place for its employees or persons working on its premises. *See, e.g., Jones v. Trailer*, 636 So. 2d 1112, 1122 (La. App. 4th Cir.) , *writ denied sub nom., Rome v. Traylor*, 642 So. 2d 193 (La. 1994)  (referring to La. R. S. § 23.13) ; *Canzoneri v. Smith*, 381 So. 2d 973, 975-76 (La. App. 4th Cir 1980).  This duty includes a duty to warn of work-related dangers and how to avoid them. *Canzoneri*, 381 So. 2d at 976; *Miller v. Lambert*, 380 So. 2d 695, 700 (La. Ct. App. 1980).   Accordingly, DSM had a duty, imposed by state law, to warn its employees or independent contractors of the dangers of asbestos on the job site. Plaintiffs further show DSM's own Exhibit "C" attached to its opposition to plaintiffs' motion to remand, at Section "15(e)", establishes that DSM was contractually required to comply with safety, sanitary, and factory inspection laws of the State of Louisiana in its operating agreement entered into in regards to the Baton Rouge facility.  Exhibit "E".  DSM was obligated under both federal and state law to provide a safe place to work for those working on its premises and their resulting family members, including protection from exposure to deadly asbestos fibers.  As such, there was no conflict between federal and state law in regards to warning of the hazards of asbestos and taking necessary precautions to protect the workers and their family members from being exposed to asbestos.  This is not the

---

[9]      *Boyle* involved a different set of facts.  In that case, the state-imposed duty of care was directly contrary to the duty imposed by contract with the federal government. *Boyle*, 108 S. Ct. at 2517.

13

situation as was in *Boyle v. United Technologies Corporation*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442

(1988), wherein in *Boyle* the state-imposed duty of care that was the asserted basis of the contractor's liability

was precisely contrary to the duty imposed by the Government contract.[10]  In this case, the obligations of DSM

were the same under both federal and state law.  Furthermore, this case does not involve the United States as

a party, and is merely between private litigants.  Certainly, DSM cannot be shielded from state court liability

applying state law from its breach of substantially identical duties imposed by both federal and state law, not to

mention its agreed upon contractual duty to follow the laws of the State of Louisiana to protect citizens such as

Barbara Catania from exposure to deadly asbestos fibers.  DSM Copolymer could have complied with its alleged

contractual obligations and the state-prescribed duty of care.

This case also does not result from injury to products manufactured and sold to the U.S. Government by

DSM, but instead results from DSM's failure to warn and protect workers on its premises and their resulting

family members from exposure to deadly asbestos fibers, despite its contractual and state imposed obligations

to protect such individuals from these hazards.  Nothing in DSM's notice of removal in any way suggests that

the alleged federal authority conflicted with this state imposed duty to warn.  Where no conflict with state law

exists, DSM is not entitled to rely upon the government contractor defense.  Assuming DSM did work under the

direct and detailed supervision of the federal government, DSM provides no evidence that anything about that

supervision prevented it from warning the employees of the independent contractors about the dangers associated

with asbestos.  Thus, the government contractor defense is not available in this case.

### b.   DSM Has Not Established That the Defense Protection Act of 1950, 50 U. S. C. § 2061, et seq., Provides a Colorable Federal Defense in this Case.

DSM asserts that it may rely on "defenses and immunities" available under the Defense Protection Act

of 1950.  Such "defenses and immunities" are articulated in 50 U. S. C. 2157, which provides in part:

> No person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this act [sections 2061 to 2071 of this Appendix], notwithstanding that any such rule, regulation, or order shall thereafter be declared by judicial or other competent authority to be invalid.

28 U. S. C. 2157.

_____

[10]   *Boyle* is also distinguishable on the basis that *Boyle* involved a case alleging a design defect in regards to a piece of machinery manufactured by a contractor, which allegation is not present in regards to Viacom, Inc.'s Third Party Demand asserted against DSM in this matter.  As such, the test pronounced in *Boyle* is inapplicable to this matter.

14

On the face of the statute, it is clear that this immunity provision only applies to acts resulting from compliance with the Defense Protection Act. Nothing in DSM's notice of removal suggests that it was acting under the Defense Protection Act. Therefore, § 2157 does not provide DSM with a colorable federal defense.

Even if DSM had alleged that it was acting pursuant to the Defense Protection Act, § 2157 does not provide immunity to contractors for the tortious conduct alleged in Plaintiffs' petition or in the Third Party Demand. The purpose of the statute is to shield contractors from liability from having to "re-prioritize its outstanding contracts in order to give the required preference to a compelled DPA [Defense Protection Act] contract." *See Hercules Inc. v. U. S.*, 24 F. 3d 188, 204 (Fed. Cir. 1994). The *Hercules* court concluded that the plain language of the statute "reinforces the view that the immunity from suit provided by section 707 [50 U. S. C. 2157] does not extend to tort suits in which it is alleged that the item produced by the DPA is inherently dangerous. *Id.* The instant case involves a tort action arising out of Barbara Catania's secondary exposure to asbestos dust for the clothing of independent contractors; it does not involve damages arising from the re-prioritization of contracts. Therefore, following the reasoning in *Hercules*, DSM cannot rely on 50 U. S. C. 2157 to shield it from liability in this case.

1. **DSM's Attempted Removal Fails the Third Prong of the Federal Officer Removal Statute Because it Has Not Shown a Nexus Between the Government's Control and Plaintiff's Legal Theories.**

Under the third prong for federal-officer jurisdiction, DSM must show that a nexus exists between actions for which it is being sued and the directives of the federal government. *Ryan*, 781 F. Supp. at 945; *Ruffin*, 959 F. Supp. at 775. To determine whether a causal nexus exists, "[t]he critical analysis is to what extent defendants acted under the federal direction at the time they were engaged in conduct now being sued upon." *Bahrs v. Hughes Aircraft Co.*, 795 F. Supp. 965, 969 (D. Ariz. 1992) (internal quotes omitted). To meet this burden, a defendant must "by direct averment exclude the possibility that [the state action] was based on acts or conduct of his not justified by his federal duty." *Mesa*, 109 S. Ct. at 966. Simply put, DSM must show that the federal authority under which it operated "directly interfered with its ability to fulfill its state law obligation" of care. *See Ruffin*, 959 F. Supp. at 776, *citing Ryan*, 781 F. Supp. at 950. This factor is similar to the determination of whether DSM acted under federal authority.[11] And when making this determination, most courts require "direct

---

[11]     The causal nexus requirement is necessarily predicated upon the existence of federal authority. In some cases, the two requirements are combined into one test. *See Arness v. Boeing North American, Inc.*, 997 F. Supp. 1268, 1273 (c). D. Cal. 1998).

and detailed control" by the federal officer over the specific conduct of the defendant that forms the basis for the plaintiff's tort claims. *Bahrs*, 795 F. Supp. at 969.

In this case, as has been previously noted, DSM has provided no evidence showing that a federal officer exercised "direct and detailed" control over the procedures of the Local 53 Asbestos Union workers or over their handling of asbestos. In fact, there is no evidence showing that asbestos-related safety measures used by the Local 53 Asbestos workers or anything else was ever under federal direction and control. Likewise, since DSM has failed to present any evidence that the government restricted DSM's ability to notify individuals of the presence of asbestos in the work environment and the resulting hazards of exposure to same, there is no causal connection between the control allegedly exercised by the United States over DSM and the legal theory under which Viacom, Inc. seeks to hold DSM liable.[12]   Furthermore, this case does not involve the United States as a party, and is merely between private litigants.   This case also does not result from injury to products manufactured and sold to the U.S. Government by DSM, but instead results from DSM's failure to warn and protect workers on its premises and their resulting family members from exposure to deadly asbestos fibers, despite its contractual and state imposed obligations to protect such individuals from these hazards.   DSM Copolymer, Inc. has certainly failed to meet its burden of establishing jurisdiction in this Court.

Likewise, DSM's reliance on the case of *Willingham v. Morgan*, 395 U.S. 402, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969),is also misplaced as that case dealt with federal officials who were named as defendants for recent alleged improper acts, certainly not the case here, which therefore mandated the application of a different relaxed standard in consideration of what should be considered "acts under color of such offices" and "causal connection" for removal for those federal officials. *Willingham* also required the broader test for "acts under color of such office" and "causal connection" supporting removal to federal court due to a "scattergun" complaint filed by the inmate petitioner, which is certainly not the case here. Viacom, Inc.'s late filed third party demand is clear in its allegations against DSM, which put DSM in a position to come forth with specific evidence showing that it was acting under color of federal authority and in enforcement of federal law, and to exclude by direct evidence the possibility that DSM's actions involving asbestos were based on acts or conduct of its own not justified by

---

[12]   Plaintiffs further show that the self-serving affidavit of Robert R. Dennis, Jr. attached as Exhibit "F" to DSM's opposition, mentions nothing of why workers on the premises of the DSM facilities were not warned of the hazards of asbestos to themselves and their resulting family members, or why adequate precautions were not taken by DSM to protect the workers on its premises and their resulting family members from exposure to deadly asbestos fibers.   Plaintiffs further show that Mr. Dennis makes allegations covering time periods when he was not even employed with DSM which are certainly not based upon his personal knowledge.

any federal authority or federal law regarding DSM's misuse of asbestos and failure to warn of the hazards of asbestos, which DSM clearly failed to present in support of its removal pleadings filed herein. In short, DSM has failed to present a colorable basis supporting its rights to any federal immunity and/or defense in this matter to warrant removal of this matter to federal court. Accordingly, DSM has failed to meet its burden of establishing federal jurisdiction over plaintiffs' state court suit, and, therefore, DSM should not be entitled to wrest jurisdiction of this case from the state court pursuant to the attempted misplacement of 28 U.S.C. 1442 and/or the government contractor defense.

*Bahrs v. Hughes Aircraft Co.*, 795 F. Supp. 965, 969 (D. Ariz. 1992), is directly on point. In *Bahrs*, General Dynamics was sued for dumping toxic waste, including TCE, into the ground, which eventually seeped into the ground and injured the plaintiffs. *Id.* at 967. General Dynamics sought to remove, alleging that federal-officer jurisdiction was appropriate because, when performing the work that created the toxic waste, they were fulfilling a government contract. The court rejected the defendant's attempt to invoke federal officer jurisdiction because, while the federal government may have exercised control over the procedures that created the toxic TCE waste, there was no evidence that it exercised "direct and detailed" control over the conduct that caused the plaintiffs' injuries, the waste-disposal procedures: "While the government officials were undoubtedly most interested in the production of war materials, the record before this Court does not demonstrate the government's necessary control over the method of waste disposal. The mere fact that the government possessed the power to exercise control over the project does not establish that the power was in fact ever exercised." *Id.* at 970. Thus, the court found no nexus existed between the control exercised by the federal government and the tortious conduct that formed the basis of the plaintiff's lawsuit against General Dynamics. *Id.*

IV.    **VACATION OF THE CONDITIONAL TRANSFER ORDER/REMAND IS ALSO WARRANTED BECAUSE VIACOM, INC.'S THIRD PARTY DEMAND WAS FILED AFTER THE STATE COURT DEADLINE DATE OF JANUARY 28, 2002, FOR FILING SAME, VIACOM, INC. FAILED TO SEEK LEAVE OF COURT PRIOR TO FILING ITS THIRD PARTY DEMAND AGAINST DSM COPOLYMER, INC. IN THIS MATTER, AND VIACOM, INC.'S THIRD PARTY DEMAND WAS FILED IN A COURT WHICH NO LONGER HAD JURISDICTION OVER THE MATTER.**

Pursuant to the Scheduling Order[13] entered in this matter on January 14, 2002, "[a]ll

_____

[13]    In accordance with La. Code of Civ. Pro. art. 1551, a pretrial and scheduling conference was held in this matter on January 8, 2002, and an order was issued in relation to same on January 14, 2002. See Exhibit "B"- attached Exhibit "1". In accordance with La. Code of Civ. Pro. art. 1551(B), the January 14, 2002, order thereafter controlled the subsequent course of the action, including the deadline date for filing third party demands in this matter. As this case was set for trial on an expedited basis pursuant to La. Code of Civ. Pro. art. 1573, due to the fact that Barbara Catania is suffering from mesothelioma and is not likely to survive beyond 6 months, the following of the jointly agreed upon dates by plaintiffs and defendants alike in this matter is of the utmost

amendments to petitions, cross-claims and third-party demands were to be filed and served by **January 28,**

**2002."**[14]   See Exhibit "B"- attached Exhibit "1".   On March 4, 2002, Judge Michael G. Bagneris, Civil Court

Judge for the Parish of Orleans, transferred this matter to East Baton Rouge Parish.  Exhibit "B"- attached Exhibit

"3".   Then, on March 8, 2002, after missing the deadline date of January 28, 2002, for filing third party

demands, and without seeking leave of court, counsel for Viacom, Inc. filed a third party demand against DSM

in this matter.[15]   Plaintiffs further show that said third party demand was apparently filed in the Civil District

Court for the Parish of Orleans on or about March 8, 2002, when said court no longer had jurisdiction over the

matter as Judge Bagneris had issued an order transferring the matter to East Baton Rouge Parish on March 4,

2002.  See Exhibit "B"- attached Exhibit "3".

_____

importance.  As was recognized in the case of *McDuffie v. AcandS, Inc.*, 2000-2779 (La. App. 4th Cir. 2/14/01); 781 So.2d 628, wherein Viacom, Inc. had likewise missed another deadline established pursuant to a scheduling order entered in that matter, '[t]he need for an orderly disposition is particularly evident in cases involving numerous parties, where the possible negative consequences of allowing parties to miss deadlines is much more likely".

[14]      The Scheduling Order violated by Viacom was never vacated and/or modified by any state court judge.  Furthermore, Viacom did not file an application for supervisory writs regarding the Scheduling Order entered on January 14, 2002, and, moreover, consented to the provisions with regard to the deadline for filing third-party demands.  Exhibit "D"- attached Exhibit "2".  As such, at the time of the improper filing of Viacom's third-party demand, the January 14, 2002, Scheduling Order was still in full force and effect and the doctrine of "law of the case" applied to the matter.

Plaintiffs further show that the federal district court should have authority to strike a third-party demand (upon which federal removal is based) that was filed in violation of an order entered by a state court judge.  If the federal court did not have such authority, this would allow a defendant to unilaterally violate orders issued a state court judge that the defendant did not like, and then effectively prevent such misconduct from being addressed by the respective state court judge due to a subsequent removal notice filed the third party defendant.  Such a result would foster certain defendants to improperly ignore orders of state court judges, knowing full well that there would be no consequences imposed for these improper actions should the federal court determine that it had no authority/jurisdiction to strike such a third-party demand that was the sole basis upon which removal was asserted in the federal court.  Should the federal court find that it has no authority to redress such an injustice, the defendant would effectively be rewarded for violating orders of state court judges, without any redress whatsoever available from the state court judges due to the ousting of jurisdiction from the state court pursuant to a removal notice.

[15]      Counsel for Viacom was present at and fully participated in the pretrial and scheduling conference held by Judge Bagneris on January 8, 2002, and agreed and consented to the deadline date of January 28, 2002, for filing third-party demands in the *Catania* matter.  Exhibit D - attached Exhibits "1" and "2".  Counsel for Viacom, Inc. was fully aware of the January 28, 2002, deadline for filing third party demands in this matter, as counsel for Viacom, Inc. was present at the hearing on February 28, 2002, wherein Owens-Illinois, Inc. and Uniroyal, Inc. had filed a motion for leave to file third party demand in the *Catania* matter, and, furthermore, had received a copy of plaintiffs' opposition to same prior to said hearing date.  Exhibit "B"- attached Exhibits "3" and "5".  Despite the foregoing, Viacom conveniently failed to request leave of court to be allowed to file a third-party demand outside of the deadline date imposed on the January 14, 2002, Scheduling Order.  Under Louisiana law, an existing order cannot be ignored by a litigant.

Plaintiffs expect that Viacom, Inc. will argue that it did not have notice of DSM's potential involvement in this suit prior to the January 28, 2002, cutoff date for filing third party demands in this matter. However, plaintiffs show that counsel for Viacom, Inc. was put on notice no later than January 14, 2002, of DSM's potential involvement in this matter, as counsel for Anco Insulations, Inc., Julie Robles, had deposited copies of the previous deposition testimony of Victor Reno (including a deposition of Victor Reno taken on July 24, 1996 wherein his work at the Copolymer facility was fully disclosed during the relevant time periods in the *Catania* matter) at Choice Copy Services, Inc. on January 14, 2002, and notified all counsel of same, including, but not limited to, counsel for Viacom, Inc., William Schuette and Avery Griffin. Exhibit "B"- attached Exhibit "6".

The case of *Curole v. Avondale Industries, Inc.*, 2001-C-1808 (La. App. 4 Cir. 10/17/01); 798 So.2d 319, provides that La. C.C.P. art. 1573 is an exception to the requirements of other procedural codal articles in the Louisiana Code of Civil Procedure. In support of this exception, the court provided:

> In the interest of justice, the trial court is required under La. C.C.P. art. 1573 to grant an exception to allow the plaintiffs preferential treatment and consideration, where the plaintiff ... is not expected to live for more than six months. The trial court has the discretion to set his dockets and set the time schedule for trial. The trial court has the discretion to set the trial date in this emergency medical situation to preserve the evidence and to allow the plaintiff ... to have his day in court.

*Curole*, 798 So.2d at 321. As such, when an expedited trial setting is granted pursuant to La. C.C.P. art. 1573, art. 1573 trumps Louisiana's other procedural codal articles to ensure that the dying plaintiff will have his or her day in court while still alive. In the *Catania* case, as articulated during oral argument, Viacom and the other defendants actually agreed to the January 28, 2002, deadline date for the filing of third-party demands in this matter. See Exhibit "C" - attached Exhibit "1"–transcript of January 8, 2002, where the parties were given an opportunity to argue any objections to the Scheduling Order and CMO and none were lodged by Viacom regarding the third-party demand requirements (also note at p. 37 that the trial date had not yet been set by the court). As recognized in the *Curole* decision, protecting the plaintiff's right to have his or her day in court while the plaintiff is still alive is the paramount concern when expedited consideration is granted pursuant to La. Code of Civ. Pro. art. 1573. As such, under Louisiana law, La. C.C.P. art.'s 1573 and 1551 override La. C.C.P. art.'s 1032 and 1033 regarding the filing of third-party demands when art.'s 1573 and 1551 are employed to protect a dying individual's bestowed right under Louisiana law to have her day in court while she is still alive.

Accordingly, from all of the above, it is clear that Viacom, Inc. was fully aware of DSM's potential involvement in this lawsuit well before the deadline date of January 28, 2002, for filing third party demands in this matter. Despite same, Westinghouse failed to timely file its third party demand in this matter, and,

19

furthermore, failed to seek leave of court to file its third party demand against DSM prior to its filing is same in clear violation of La. Code of Civ. Pro. art. 1551 and the Scheduling Order previously entered in this matter. Furthermore, Viacom, Inc. apparently filed its third party demand in a court which no longer had jurisdiction over this matter. Pursuant to 28 U.S.C. 1738, the federal courts should pay credence to the preferences given under La. C.C.P. art. 1573 and to Louisiana's long standing doctrine of "law of the case", and give full faith and credit to Judge Bagneris' unvacated and/or unmodified order which set the deadline date of January 28, 2002, for the filing of third-party demands in the *Catania* case, strike the third-party demand filed on behalf of Viacom, Inc., and thereafter remand this case back to the 19th Judicial District Court from which it was improperly removed. Accordingly, on these bases alone, plaintiffs' motion to vacate conditional transfer order should be granted, and this matter should be remanded back to state court from which it was improperly removed.

**WHEREFORE, FOR ALL OF THE REASONS SET FORTH ABOVE,** it is respectfully submitted that this Motion to Vacate Conditional Transfer should be granted and the action remanded to the state court from which it was improperly removed.

Respectfully submitted,
ROUSSEL AND ROUSSEL

GEROLYN P. ROUSSEL, TA– 1134
PERRY J. ROUSSEL, JR. – 20351
JULES K. BOUDREAUX - 24309
1710 Cannes Drive
LaPlace, LA 70068
Telephone: (985)651-6591
ATTORNEYS FOR PLAINTIFFS,
BARBARA AND MICHAEL CATANIA

## CERTIFICATE OF SERVICE

I hereby certify that a copy of **Plaintiffs' Memorandum in Support of Motion to Vacate Conditional Transfer Order** has been served upon the parties listed below (as reflected on Attachment "A") by mailing same to each, properly addressed and postage prepaid, on this 19th day of June, 2002.

JULES K. BOUDREAUX

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUN 20 2002

FILED
CLERK'S OFFICE

## COUNSEL LIST

**ACANDS, INC.**
Kay Barnes Baxter
Barfield & Associates, P.A.
400 Poydras Street, Suite 1460
New Orleans, LA 70130

**ANCO INSULATIONS, INC.**
**(SUCCESSOR TO THE ABER COMPANY, INC.)**
Julie DiFulco Robles
Hailey, McNamara, Hall, Larmann
    & Papale, L.L.P.
One Galleria Blvd., Suite 1400
P.O. Box 8288
Metairie LA 70001-8288

**BABCOCK BORSIG POWER, INC.**
**(FORMERLY DB RILEY, INC.**
**FORMERLY RILEY STOKER CORPORATION)**
James F. d'Entremont
Deutsch, Kerrigan & Stiles
755 Magazine Street
New Orleans, LA 70130-3672

**COMBUSTION ENGINEERING, INC.**
Larry G. Canada
Galloway, Johnson, Tompkins, Burr & Smith
701 Poydras Street
One Shell Square
Suite 4040
New Orleans LA 70139

**THE DOW CHEMICAL COMPANY**
Gregory E. Bodin/ David M. Bienvenu, Jr.
TAYLOR, PORTER, BROOKS & PHILLIPS, L.L.P.
P.O. Box 2471
Baton Rouge, LA 70821

**EAGLE, INC.**
**(FORMERLY EAGLE ASBESTOS & PACKING COMPANY, INC.)**
Lawrence G. Pugh, III
Montgomery, Barnett, Brown,
  Read, Hammond & Mintz
3200 Energy Centre
1100 Poydras Street
New Orleans, LA 70163-3200

ATTACHMENT "A"



**EXXON MOBIL CORPORATION (FORMERLY EXXON CORPORATION, FORMERLY HUMBLE OIL & REFINING COMPANY, FORMERLY ESSO STANDARD OIL COMPANY, FORMERLY STANDARD OIL COMPANY OF NEW JERSEY)**
**and DSM COPOLYMER, INC:**
Gregory M. Anding
Gary A. Bezet
KEAN, MILLER, HAWTHORNE, D'ARMOND, McCOWAN & JARMAN, L.L.P.
One American Place, 22nd Floor
P.O. Box 3513
Baton Rouge, LA 70821-3513

**THE FLINTKOTE COMPANY**
Valerie T. Schexnayder
Hailey, McNamara, Hall, Larmann,
   & Papale, L.L.P.
One Galleria Blvd., Suite 1400
P.O. Box 8288
Metairie LA 70011-8288

**FOSTER-WHEELER CORPORATION**
Lynn M. Luker/Patrick D. McMurtray
Lynn Luker & Associates, L.L.C.
616 Girod Street
Suite 200
New Orleans LA 70130

**GARLOCK, INC.**
Glenn L.M. Swetman/ Troy Bell
Aultman, Tyner, Ruffin & Yarborough, Ltd.
400 Poydras Street
Suite 2250
New Orleans LA 70130

**GENERAL ELECTRIC COMPANY**
Cory R. Cahn
Slater Law Firm
650 Poydras Street
Suite 2600
New Orleans LA 70130-6101

**THE MCCARTY CORPORATION**
**(SUCCESSOR TO MCCARTY BRANTON, INC., AND PREDECESSOR AND SUCCESSOR TO MCCARTY INSULATION SALES, INC.)**
Susan B. Kohn / Michael D. Harold
Simon, Peragine, Smith & Redfearn, L.L.P.
30th Floor Energy Centre
1100 Poydras Street
New Orleans, LA 70163-3000

**OWENS - ILLINOIS, INC.**
**and UNIROYAL, INC.**
W. Scott Brown
Forman, Perry, Watkins, Krutz & Tardy, PLLC
Suite 1200, One Jackson Place
188 East Capitol Street
Post Office Box 22608
Jackson, MS 39225-2608

**REILLY-BENTON COMPANY, INC.**
Stephen N. Elliott/ William L. Brockman
Bernard, Cassisa, Elliott & Davis
1615 Metairie Road
P.O. Box 55490
Metairie LA 70055-5490

**RHONE-POULENC AG COMPANY**
**(FORMERLY BENJAMIN-FOSTER, DIVISION OF AMCHEM PRODUCTS, FORMERLY UCAR CORP.,**
**FORMERLY AM-CHEM PRODUCTS, INC.)**
A. Wendel Stout, III
Deutsch, Kerrigan & Stiles
755 Magazine Street
New Orleans, LA 70130-3672

**TAYLOR-SEIDENBACH, INC.**
C. Kelly Lightfoot
HAILEY, MCNAMARA, HALL,
  LARMANN & PAPALE, LLP
Suite 1400, One Galleria Blvd.
Post Office Box 8288
Metairie, LA   70001-8288

**VIACOM, INC.**
**(FORMERLY CBS CORPORATION, FORMERLY WESTINGHOUSE ELECTRIC CORPORATION)**
William L. Schuette, Jr./ Leon Gary, Jr.
Jones, Walker, Waechter, Poitevent,
  Carre're & Dene'gre, L.L.P.
5th Floor, Four United Plaza
8555 United Plaza Blvd.
Baton Rouge, LA 70809-7000

**PANEL SERVICE LIST (Excerpted from CTO-213)**
**DOCKET NO. 875**
**IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)**

*Barbara Catania, et al. v. ACandS, Inc., et al.*, M.D. Louisiana, C.A. No. 3:02-368

Kay B. Baxter
Duncan & Courington, L.L.C.
322 Lafayette Street
New Orleans, LA 70130

Troy N. Bell
Aultman, Tyner, Ruffin & Yarborough, Ltd.
400 Poydras Street
Suite 1900
New Orleans, LA 70130

Gary A. Bezet
Kean, Miller, Hawthorne, D'Armond, et al.
One American Place, 22nd Floor
P.O. Box 3513
Baton Rouge, LA 70821

David M. Bienvenu, Jr.
P.O. Box 2471
Baton Rouge, LA 70821

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114

Jules K. Boudreaux
Roussel & Roussel
1710 Cannes Drive
LaPlace, LA 70068

William L. Brockman
Bernard, Cassisa, Elliott & Davis
1615 Metairie Road
P.O. Box 55490
Metairie, LA 70055

W. Scott Brown
Forman, Perry, Watkins, Krutz & Tardy
1515 Poydras Street
Suite 1420
New Orleans, LA 70112

Cory R. Cahn
Slater Law Firm
Poydras Center, Suite 2600
650 Poydras Street
New Orleans, LA 70130

Larry G. Canada
Galloway, Johnson, Tompkins, Burr & Smith
One Shell Square
701 Poydras Street, Suite 4040
New Orleans, LA 70139

Edward J. Cass
Gallagher, Sharp, Fulton & Norman
Bulkley Building, 7th Floor
1501 Euclid Avenue
Cleveland, OH 44115

Adam M. Chud
Shea & Gardner
1800 Massachusetts Avenue, N.W.
Washington, DC 20036

David A. Damico
Burns, White & Hickton
2400 Fifth Avenue Place
120 Fifth Avenue
Pittsburgh, PA 15222

Raymond P. Forceno
Forceno & Hannon
Philadelphia Bourse Building
Suite 1000
Independence Mall East
Philadelphia, PA 19106

Ellen B. Furman
Goldfein & Joseph
1600 Market Street
33rd Floor
Philadelphia, PA 19103

Leon Gary, Jr.
Jones, Walker, Waechter, et al.
8555 United Plaza Boulevard
5th Floor
Baton Rouge, LA 70809

Susan M. Hansen
Brownson & Ballou
4800 U.S. Bank Place
601 Second Avenue, South
Minneapolis, MN 55402

Susan B. Kohn
Simon, Peragine, Smith & Redfearn
Energy Centre, 30th Floor
1100 Poydras Street
New Orleans, LA 70163

Reginald S. Kramer
Oldham & Dowling
195 South Main Street
Suite 300
Akron, OH 44308

David C. Landin
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Gene Locks
Greitzer & Locks
1500 Walnut Street
Philadelphia, PA 19102

Patrick D. McMurtray
Luker, Sibal & McMurtray, L.L.C.
616 Girod Street
Suite 200
New Orleans, LA 70130

Ronald L. Motley
Ness, Motley, Loadholt, Richardson & Poole
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC 29465

Dwight C. Paulsen, III
Lemle & Kelleher, L.L.P.
601 Poydras Street
Suite 2100
New Orleans, LA 70130

John J. Repcheck
Marks, O'Neill, O'Brien & Courtney
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219

Julie Robles
Hailey, McNamara, Hall, Larmann & Papale
One Galleria Boulevard, Suite 1400
P.O. Box 8288
Metairie, LA 70001

John D. Roven
John Roven & Associates
2190 North Loop West
Suite 410
Houston, TX 77018

Valerie T. Schexnayder
Hailey, McNamara, Hall, Larmann & Papale
One Galleria Boulevard, Suite 1400
P.O. Box 8288
Metairie, LA 70001

Richard D. Schuster
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216

Neil Selman
Selman, Breitman & Burgess
11766 Wilshire Boulevard
Sixth Floor
Los Angeles, CA 90025

Robert N. Spinelli
Kelley, Jasons, McGuire & Spinelli, L.L.P.
Centre Square West
15th Floor
Philadelphia, PA 19102

Robert E. Swickle
Jaques Admiralty Law Firm, P.C.
1370 Penobscot Building
Detroit, MI 48226

Andrew J. Trevelise
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

James K. Weston, II
Tom Riley Law Firm
4040 First Avenue, N.E.
P.O. Box 998
Cedar Rapids, IA 52406

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUN 2 0 2002

FILED
CLERK'S OFFICE

## SCHEDULE PURSUANT TO RULE 7.2

BARBARA CATANIA AND MICHAEL CATANIA VS. ACANDS, INC., ANCO INSULATIONS, INC (SUCCESSOR TO THE ABER COMPANY, INC.); A.P. GREEN INDUSTRIES, INC.; BABCOCK BORSIG POWER, INC. (FORMERLY DB RILEY, INC., FORMERLY RILEY STOKER CORPORATION); COMBUSTION ENGINEERING, INC.; THE DOW CHEMICAL COMPANY; EAGLE, INC. (FORMERLY EAGLE ASBESTOS & PACKING COMPANY, INC.); EXXON MOBIL CORPORATION (FORMERLY EXXON CORPORATION, FORMERLY HUMBLE OIL & REFINING COMPANY, FORMERLY ESSO STANDARD OIL COMPANY, FORMERLY STANDARD OIL COMPANY OF NEW JERSEY); THE FLINTKOTE COMPANY; FOSTER-WHEELER CORPORATION; GARLOCK, INC.; GENERAL ELECTRIC COMPANY; KAISER ALUMINUM & CHEMICAL CORPORATION; THE MCCARTY CORPORATION (SUCCESSOR TO MCCARTY BRANTON, INC., AND PREDECESSOR AND SUCCESSOR TO MCCARTY INSULATION SALES, INC.); OWENS-ILLINOIS, INC.; REILLY-BENTON COMPANY, INC.; RHONE-POULENC AG COMPANY (FORMERLY BENJAMIN-FOSTER, DIVISION OF AMCHEM PRODUCTS, FORMERLY UCAR CORP., FORMERLY AM-CHEM PRODUCTS, INC.); TAYLOR-SEIDENBACH, INC.; UNIROYAL, INC.; AND VIACOM, INC. (FORMELY CBS CORPORATION, FORMERLY WESTINGHOUSE ELECTRIC CORPORATION), NO. 493,562, DIVISION "N", 19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE PARISH, STATE OF LOUISIANA; (ASSIGNED TO JUDGE JEWEL E. WELCH OF THE 19TH JUDICIAL DISTRICT COURT FOR THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA);

BARBARA CATANIA, ET AL VS. ACANDS, INC., ET AL, CIVIL ACTION, NO. 02-368, SECTION "D", MAG. DIV. (1), UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA; (JUDGE JAMES J. BRADY, UNITED STATES DISTRICT COURT JUDGE FOR THE MIDDLE DISTRICT OF LOUISIANA, IS ASSIGNED THIS ACTION, AS WELL AS UNITED STATES DISTRICT COURT MAGISTRATE STEPHEN C. RIEDLINGER);



JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUN 2 0 2002

FILED
CLERK'S OFFICE

**A**



# United States District Court

### Middle District of Louisiana

### Notice of Orders or Judgments
### Fed. R. Civ. P. 77(d)

**Date:** 06/14/02

**To:** Gerolyn Petit Roussel
Roussel & Roussel
1710 Cannes Drive
LaPlace, LA 70068

**Re: Case Number:** 3:02-cv-00368  **Instrument Number:** 33

This fax will be attempted five times. If you have not received a complete fax on that attempt it will be automatically printed and mailed to you. For questions, please call (225)389-3500.

Number of pages including cover sheet: 11



UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA



### NOTICE

PLEASE BE ADVISED THAT EFFECTIVE IMMEDIATELY AFTER HOURS DROP BOX
SERVICE HAS BEEN DISCONTINUED UNTIL FURTHER NOTICE.  IF YOU  HAVE A
NEED TO UTILIZE AFTER HOURS FILING, PLEASE CONTACT THE CLERK'S OFFICE
DURING BUSINESS HOURS FOR INSTRUCTIONS.

PLEASE BE ADVISED THAT THE VISITOR PARKING LOCATED AT THE
COURTHOUSE HAS BEEN RELOCATED TO THE CENTER ROW OF THE LOT.  THESE
PARKING SPACES ARE DESIGNATED AS SUCH.  PLEASE BE AWARE OF THIS WHILE
VISITING THE COURTHOUSE.

**FURTHER, EFFECTIVE IMMEDIATELY ALL MAIL SHOULD BE ADDRESSED TO
777 FLORIDA STREET, SUITE 139, BATON ROUGE, LA 70801-1712.  POST OFFICE
BOX 2630 IS NO LONGER A VALID ADDRESS FOR THE CLERK.**

THANK YOU FOR YOUR PATIENCE DURING THE IMPLEMENTATION OF THESE
CHANGES.

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


BARBARA CATANIA, ET AL

VERSUS

AcandS, INC., ET AL

CIVIL ACTION

NUMBER 02-368-D-1


### NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the U. S. District Court.

In accordance with 28 U.S.C. §636(b)(1), you have ten days after being served with the attached report to file written objections to the proposed findings of fact, conclusions of law, and recommendations set forth therein. Failure to file written objections to the proposed findings, conclusions and recommendations within ten days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

Baton Rouge, Louisiana, June _14_, 2002.


STEPHEN C. RIEDLINGER
UNITED STATES MAGISTRATE JUDGE


DKT. & ENTERED
DATE 6/14/02
NOTICE MAILED TO:

DATE_____ BY

Crsl 16

| INITIALS | DOCKET# |
|----------|---------|
|          | 33      |

FILED
U.S. DIST. COURT
MIDDLE DIST. OF LA.

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA
02 JUN 14 PH 4:01

SIGN_____
by DEPUTY CLERK

BARBARA CATANIA, ET AL

VERSUS

ACandS, INC., ET AL

CIVIL ACTION

NUMBER 02-368-D-1

### MAGISTRATE JUDGE'S REPORT

This matter is before the court on the motion of plaintiffs Barbara Catania and Michael Catania to remand. Record document number 11. The motion is opposed.

Plaintiffs filed suit in state court against numerous defendants contending that Barbara Catania contracted mesothelioma from exposure to asbestos when she was a child. Plaintiffs do not allege that Barbara Catania used any products containing asbestos or that she was present at any work site where asbestos-containing products were used. Plaintiffs claim that she was exposed to asbestos carried on the work clothes of her uncles. Defendant Viacom, Inc. learned that two of her uncles, Peter Giordano and Victor Reno, applied asbestos-containing insulation products at a facility owned by DSM Copolymer, Inc. Viacom then filed a third party demand naming DSM Copolymer as a third party defendant.[1] DSM Copolymer then removed the case to this court relying upon 28 U.S.C. §1442. Plaintiffs moved to remand.

---

[1] Record document number 12, memorandum in support, Exhibit 4.

The foregoing procedural history of this case understates the scope of the arguments made by the plaintiffs in support of their motion to remand.  Notwithstanding the breadth of the plaintiffs' procedural arguments, the issues before the court are quite straightforward: (1) did DSM Copolymer properly remove the case from state court, and (2) whether the third party demand should be severed and the remainder of the case remanded to state court. Other issues raised by the motion to remand should be addressed only if the court determines that the case was properly removed and decides not to remand the main demand.

There is no dispute that Viacom filed a third party demand against DSM Copolymer and that DSM Copolymer timely removed the case to this court.  DSM Copolymer based the removal on 28 U.S.C. §1442(a)(1), asserting subject matter jurisdiction under 28 U.S.C. §1331.  DSM Copolymer asserted in its notice of removal that Viacom's third party demand arises out of Barbara Catania's exposure to asbestos fibers which came from asbestos-containing products at DSM Copolymer's facility.  The alleged exposure occurred during periods when the facility was owned by the United States Government but operated by DSM Copolymer under the authority and direction of federal officers acting in their official capacities to direct the construction and operation of the plant, as well as during periods of ownership by DSM Copolymer but under continuing governmental control.  DSM Copolymer relied upon, and

2

attached to its notice of removal, the ruling denying the motion to remand filed by the plaintiffs in Vera G. LaLonde, et al v. Delta Field Erection, et al, CV 96-3244-B-3 (M.D. La. 1998).[2]  Although LaLonde involved alleged inhalation of silica dust, the ruling thoroughly analyzed the application of section 1442(a)(1) to the same DSM Copolymer facility.

As explained in the LaLonde ruling, the party removing a case relying on section 1442(a) must show: (1) that the removing defendant was acting under an officer of the United States or an agency thereof; (2) that there was a causal connection between the charged conduct and the asserted official authority; and (3) that the removing defendant has a colorable defense under federal law. Mesa v. California, 489 U.S. 121, 125-34, 109 S.Ct. 959, 962-67 (1989); Willingham v. Morgan, 395 U.S. 402, 409, 89 S.Ct. 1813, 1817 (1969).

DSM Copolymer has made the showing required by section 1442(a)(1).  The history of the DSM Copolymer facility was thoroughly set forth in the LaLonde decision and was repeated in DSM Copolymer's opposition memorandum.[3]  No useful purpose would be served by restating that history.  Plaintiffs' argument that DSM Copolymer has not shown it was acting under the direction of an

---

[2] Record document number 18, opposition memorandum, pp. 4-23, and Exhibit H.

[3] Id., Exhibits A-G.

3

officer of the United States or an agency thereof is factually unsupported and unpersuasive.

DSM Copolymer has also satisfactorily demonstrated that there is a causal connection between its alleged tortious conduct and the asserted official authority. The third party claim against DSM Copolymer is based on the allegation that it failed to provide a safe work place free from the dangers of asbestos exposure and failure to warn of such dangers. The affidavit of Robert R. Dennis, Jr. establishes that the use of asbestos-containing insulation products was essential to the operation of DSM Copolymer's facility and that the original plans and specifications for the design and construction of the facility required the use of asbestos-containing insulation.[4]

DSM Copolymer has asserted a colorable federal defense. In determining whether the case was properly removed, the court should not decide whether DSM Copolymer will ultimately prevail on that defense. Crocker v. Borden, Inc., 852 F.Supp. 1322, 1326-27 (E.D. La. 1994); Aikin v. Big Three Industries, Inc., 851 F.Supp. 819, 823 (E.D. Tex. 1994). Additionally, one of the most important reasons for removal under section 1442 is to have the validity of the defense determined by a federal court. LaLonde, supra, at n.

---

[4] Record document number 18, opposition memorandum, Exhibit F. See also, affidavits of Arley Ray Barker and Martin E. Samuels, explaining that through 1955 all aspects of the operation of the facility, including safety issues, were controlled by the United States. Id., Exhibits D and E.

4

14, _quoting_, <u>Willingham</u>, 395 U.S. at 407, 89 S.Ct. at 1816.  DSM
Copolymer has pled defenses based on its status as a government
contractor and under the Defense Protection Act of 1950.  These
same two defenses were asserted by DSM Copolymer in the <u>LaLonde</u>
case.[5]  Plaintiffs' arguments in support of their position that the
government contractor defense does not apply in this case are
addressed to the merits of the defense, not whether the defense is
at least colorable.  Relying on the <u>LaLonde</u> ruling, DSM Copolymer
has shown that it has asserted at least a colorable defense under
federal law.

As an alternative to remanding the entire case, the plaintiffs
urged the court to exercise its discretionary authority under 28
U.S.C. §1367 by severing the third party demand against DSM
Copolymer and remanding the remainder of the case.[6]

Under section 1367(c), this court may decline to exercise
supplemental jurisdiction if:

_____

[5] In <u>LaLonde</u>, the plaintiffs' claims were based on alleged
exposure to silica dust, whereas in this case the plaintiff alleged
exposure to asbestos.  The distinction is not dispositive because
in <u>LaLonde</u> the court relied, in part, on cases involving asbestos
exposure.   Record document number 18, opposition memorandum,
Exhibit H, pp. 13-18.  Because the claims in <u>LaLonde</u> against DSM
Copolymer were dismissed on other grounds, this court did not
decide whether the Defense Protection Act or the government
contractor defense was applicable.  <u>LaLonde</u>, record document number
189, Order and Reasons.

[6] There is no dispute that there is no independent basis for
exercising original jurisdiction over the main demand.  As to the
main demand, this court may exercise only supplemental jurisdiction
under section 1367(a).

5

> (1) the claim raises a novel or complex issue of state law,

> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

> (3) the district court has dismissed all claims over which it has original jurisdiction, or

> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

Plaintiffs relied on Crocker v. Borden, Inc., 852 F.Supp. 1322, 1329-30 (E.D. La. 1994), to support their alternative position. As in Crocker, the plaintiffs' claims are exclusively based on state law, and if the main demand is not remanded the plaintiffs face the potential of transfer to multi-district litigation.

DSM Copolymer argued that its liability for alleged exposure to asbestos will be an issue in the main demand even though it was not sued directly by the plaintiffs. Consequently, DSM Copolymer would be involved in discovery in both federal and state court if the main demand is severed and remanded. Ultimately, DSM Copolymer's employee and non-employee witnesses would be subject to testifying in two trials on the same issue arising out of the same occurrence. Finally, DSM Copolymer maintained that it is entitled to a federal forum for the determination of its federal defenses.

As noted previously, section 1367(c) permits this court to decline to exercise supplemental jurisdiction in exceptional circumstances when there are other compelling reasons for declining jurisdiction. In arguing strenuously for a remand, the plaintiffs

repeatedly note that the state court judge in Orleans Parish, invoking Louisiana Code of Civil Procedure Article 1573, assigned this case for trial on an expedited basis. Under that procedural rule, the state trial court is required to grant a plaintiff who is not expected to live for more than six months preferential treatment when assigning the case for trial. Based on that procedural rule, the case was assigned for trial on June 10, 2002.[7] There is no comparable Federal Rule of Civil Procedure. Although under Rule 16, Federal Rules of Civil Procedure, the court may fix the dates for the final pretrial conference and the trial early in the litigation, Rule 16 does not require preferential treatment for any party.

Considerations of judicial economy, convenience and fairness to the litigants support granting the plaintiffs' request to sever the third party demand against DSM Copolymer and remand the main demand to state court. Plaintiffs have asserted no claim against DSM Copolymer. Whether the third party demand against it is litigated in this court or in state court, DSM Copolymer and its employees will be involved in discovery. Although DSM Copolymer complains that its employee and non-employee witnesses will be involved in two trials, this is not necessarily so. It would appear that if either of the defenses relied upon by DSM Copolymer to support removal is successful--a decision which would be made in federal court--it would no longer be involved in the state court

---

[7] Record document number 12, memorandum in support, Exhibit 1.

7

case.   To the extent DSM Copolymer remains involved in litigating
the third party demand in this court and the main demand in state
court, discovery could be coordinated in a manner which would
reduce duplication of effort and thereby reduce its expenses.
Lastly, the absence of a federal procedural rule which gives the
plaintiffs an opportunity to obtain an expedited trial while
plaintiff Barbara Catania is still alive constitutes an exceptional
circumstance and a compelling reason for this court to decline to
exercise supplemental jurisdiction over the main demand.

### RECOMMENDATION

It is the recommendation of the magistrate judge that the
motion of plaintiffs Barbara Catania and Michael Catania to remand
be denied, insofar as the plaintiffs sought remand of the entire
case.   It is the further recommendation of the magistrate judge
that this court decline to exercise supplemental jurisdiction under
28 U.S.C. §1367(c) over the plaintiffs' main demand, and any other
counterclaims or cross claims between or among the plaintiffs and
the defendants, and all such claims be remanded to the state court,
this court retaining jurisdiction only over the third party demand
of Viacom, Inc. against DSM Copolymer, Inc.

Baton Rouge, Louisiana, June _14_, 2002.


STEPHEN C. RIEDLINGER
UNITED STATES MAGISTRATE JUDGE


8

B

COPY
ORIGINAL FILED
USDC MD/LA

UNITED STATES  DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

2002 APR 19  P 2: 53

BARBARA CATANIA, ET AL                    CIVIL ACTION  BY DEPUTY CLERK

VERSUS

ACANDS, INC., ET AL                       NO. 02-0368-D-M1

### MOTION TO REMAND

NOW INTO COURT, through undersigned counsel, come
plaintiffs, Barbara Catania and Michael Catania, who seek to have
this Honorable Court remand this case to the 19th Judicial
District Court of Louisiana from which it was removed on the
grounds that it was improperly removed by the third-party
defendant, DSM Copolymer, Inc., all as is more fully set forth in
Memorandum in Support of Motion To Remand attached hereto.

WHEREFORE, plaintiffs, Barbara and Michael Catania, pray
that this action be remanded to the state court from which it was
removed.

Respectfully submitted,

**ROUSSEL & ROUSSEL**

GEROLYN P. ROUSSEL - 1134
PERRY J. ROUSSEL, JR. - 20351
JULES K. BOUDREAUX - 24309
1710 Cannes Drive
LaPlace, LA  70068
Telephone:  (504) 651-6591
ATTORNEYS FOR PLAINTIFFS,
BARBARA AND MICHAEL CATANIA



EXHIBIT
B

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the **Motion To Remand** has been served upon counsel for all parties by FAX, hand delivery, or mailing same to each, properly addressed and postage prepaid, on this 19th day of April, 2002.

GEROLYN P. ROUSSEL

UNITED STATES   DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

BARBARA CATANIA, ET AL

VERSUS

ACANDS, INC., ET AL

CIVIL ACTION

NO. 02-0368-D-M1

## NOTICE OF HEARING

TO: ALL COUNSEL OF RECORD:

The plaintiffs, Barbara and Michael Catania, will bring for hearing a Motion To Remand this case to the State Court from which it was removed before Magistrate Judge Stephen C. Riedlinger on the 29th day of April, 2002, at 1:00 p.m. or as soon thereafter as counsel may be heard.

Respectfully submitted,

ROUSSEL & ROUSSEL

CAROLYN P. ROUSSEL - 1134
PERRY J. ROUSSEL, JR. - 20351
JULES K. BOUDREAUX - 24309
1710 Cannes Drive
LaPlace, LA  70068
Telephone:  (504) 651-6591
ATTORNEYS FOR PLAINTIFFS
BARBARA AND MICHAEL CATANIA

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the **Notice of Hearing** has been served on all counsel of record for all parties by FAX, hand delivery, or by placing same in the United States mail, postage prepaid and properly addressed on this 19th day of April, 2002.

CAROLYN P. ROUSSEL

UNITED STATES  DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

BARBARA CATANIA, ET AL                   CIVIL ACTION

VERSUS

ACANDS, INC., ET AL                      NO. 02-0368-D-M1

## TABLE OF AUTHORITIES

### CASES:

*Crocker v. Borden, Inc.,* ................................2,25,26
(E.D. La. 1994) 852 F.Supp. 1322, 1330

*McDuffie v. AcandS, Inc.,* 2000-2779 ........................ 3
(La. App. 4th Cir. 2/14/01); 781 So.2d 628,

*Halphen v. Johns-Manville Sales Corp.,* ....................... 6
484 So. 2d 110 (La. 1986)

*Wilson v. Republic Iron & Steel Co.,* .................... 7, 13
257 U. S. 92, 97, 42 S. Ct. 35, 37, 66 L. Ed 144 (1921)

*Gauthe v. Asbestos Corp.,* ...............................7,11,12
1997 WL 3255  (E. D. La. 1997)

*Ryan v. Dow Chemical Co.,* .....................7,8,9,10,12,13,22
781 F. Supp. 934, 947 (E. D. N. Y. 1992)

*Ruffin v. Armco Steel Corp.,* ....................7,12,14,17,22
959 F. Supp. 770 (S. D. Tex. 1997)

*Bahrs v. Hughes Aircraft Co.,* ..........................7,12,23
795 F. Supp. 965, 969 (D. Ariz. 1992)

*Vera G. LaLonde, et al. vs.* .................................. 8
*Delta Filed Erection, et al.*
No. 96-3244-B-M3,
United States District Court (M. D. La. 8/5/98)

*Mouton v. Flexitallic, Inc.,* ...............................9,10
1999 WL 225438 (E.D. La. 1999)

*Good v. Armstrong World Industries, Inc.,* ..........9,11,12,13,18
914 F.Supp. 1125, 1127 (E.D. Penn. 1996)

*Fung v. Abex Corp.,* ........................................... 9
816 F.Supp. 569 (N.D. Cal. 1992)

*Mesa v. California,* 489 U.S. 121, 124-25, .............11,12,15,22
134-35, 109 S. Ct. 959, 962, 103 L. Ed. 2d 99 (1989)

*Overly v. Raybestos-Manhattan,* C-96-2853 SI., ...............12,14
1996 WL 532150 (N.D. Cal. Sept. 9, 1996)

*Gauthe,* 1997 WL 3255 at *2.................................11,12

*Arness v. Boeing North America, Inc.,* .......................13,22
997 F. Supp. 1268 (C. D. Cal. 1998)

*Pack v. AC&S, Inc.,* 838 F. Supp. 1099 (D. Md. 1993).............13

*Fowler v. Southern Bell Telephone & Telegraph Co.,* .............13
343 F. 2d 150, 154 (5th Cir. 1965)

*Boyle v. United Technologies Corp.,* .................15,16,17,18,19
487 U. S. 500, 108 S. Ct. 2510, 101 L. Ed. 2d 442 (1988)

*Garner v. Santoro,* 865 F. 2d 629, 635 ........................17
(5th Cir. 1989), *cited in Ruffin*, 959 F. Supp. at 774

*Dorse v. Eagle-Picher Industries, Inc.,* ...................17,18,19
898 F. 2d 1487, 1490 (11th Cir. 1990)

*Merrell Dow Pharmaceuticals Inc. v. Thompson,* .................16
478 U.S. 804, 808, 106 S.Ct. 3229, 3232, 92 L.Ed. 2d 650 (1986)
(citing *Louisville & Nashville R. Co. v. Mottley*, 211 U.. 149, 29
S.Ct. 42, 53 L.Ed. 126 (1908)

*Oliver v. Trunkline Gas Co.,* .................................16
789 F.2d 341, 343 (5th Cir. 1986)

*PAAC v. Rizzo,* 502 F.2d 306, 313 (3d Cir. 1974)...............16

*Border City S. & L. Ass'n v. Kennecorp Mtg.,* .................16
523 F. Supp. 190, 192 (S.D. Ohio 1981)

*Bruan, Gordon & Co. v. Hellmers,* .............................16
502 F. Supp. 897, 900 (S.D. N.Y. 1980

1A Moore's Federal practice, Sec. 0.160 (1974).................16

C. Wright, Law of Federal Courts, Sec. 38 at 179 (1976)........16

*Franchise Tax Bd. of California* ...............................16
*v. Constr. Laborers Trust for Southern California*, 463 U.S. 1, 103
S.Ct. 2841, 77 L.Ed.2d 420 (1983)

*Thomas v. Burlington Industries, Inc.,* .......................16
763 F. Supp. 1570, 1575 (S.D. Fla. 1991)

*In re Hawaii Asbestos Cases,* ..................................19
960 F. 2d 806, 813 (9th Cir. 1992)

*Jones v. Trailer,* 636 So. 2d 1112, 1122 .......................19
(La. App. 4th Cir.) , *writ denied sub nom.*

*Rome v. Traylor,* 642 So. 2d 193 (La. 1994) ....................19
(referring to La. R. S. § 23.13)

*Canzoneri v. Smith,* 381 So. 2d 973, ...........................20
975-76 (La. App. 4th Cir 1980)

*Miller v. Lambert,* 380 So. 2d 695, ............................20
700(La. Ct. App. 1980)

*Hercules Inc. v. U. S.,* 24 F. 3d 188, .........................21
204 (Fed. Cir. 1994)

*In re Wilson Industries, Inc.,* ...............................27
886 F.2d 93 (5th Cir. 1989)

*Carl Heck Engineers, Inc. V.* .................................27
*Lafouche Parish Police Jury,* 622 F.2d 133, 136 (5th Cir. 1980)

*Murjani v. All State Ins. Co.,* ...............................27
679 F.Supp. 601 (M.D. La. 1988)

*Caringal v. Karteria Shipping, Ltd.,* .........................27
108 F.Supp.2d 651 (E.D. La. 2000)

## STATUTES:

La. Code of Civ. Pro. art. 1551 ...........................1,3,5

La. Code of Civ. Pro. art. 1551(B)...........................3

La. Code of Civ. Pro. art. 1573 ...........................2,3

La. R. S. § 23.13 ...........................................18

28 U.S.C. 1331 ..............................................5

28 U. S. C. 1367©) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24,25

28 U. S. C. 1367©)(2) – (4) (1990). . . . . . . . . . . . . . . . . . . . . . . . .24,26,27

28 U.S.C. 1442(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . .5,7,10,11,14,15,25

28 U.S.C. 1442 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

Defense Protection Act of 1950, . . . . . . . . . . . . . . . . . . . . . . . . . . . .15,20
50 U. S. C. 2061, *et seq.*

28 U. S. C. 2157 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

50 U. S. C. 2157 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19,20

COPY
ORIGINAL FILED
USDC MD/LA

2002 APR 19 P 2: 53

SIGN_____
DEPUTY CLERK

UNITED STATES   DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

BARBARA CATANIA, ET AL

VERSUS

ACANDS, INC., ET AL

CIVIL ACTION

NO. 02-0368-D-M1

## MEMORANDUM IN SUPPORT OF MOTION TO REMAND

**MAY IT PLEASE THE COURT:**

**I.   INTRODUCTION**.

Plaintiff, Barbara Catania, is dying from mesothelioma, an incurable tumor of the lining of the lung caused by asbestos exposure.[1]  She and her husband, Michael, filed suit on October 31, 2001, in Civil District Court for the Parish of Orleans, State of Louisiana.[2]  Pursuant to La. Code of Civ. Pro. art. 1551, a pretrial and scheduling conference was held on January 8, 2002.  All parties worked together with the court to select the dates in the Scheduling Order, and an order was issued in relation to same on January 14, 2002. See Exhibit "1".   The case

---

[1]Barbara Catania has been the secretary to the LSU system President for approximately 20 years.  She was only forty-nine (49) years old when she was diagnosed with mesothelioma.  She has never worked on or at the facility of DSM, the third-party defendant who removed this case to federal court.

[2]This civil action was originally filed in the Civil District Court for the Parish of Orleans, State of Louisiana, in proceeding number 2001-18122, Division "H", and subsequently transferred on grounds of forum non-convenience to the 19th Judicial District Court for Parish of East Baton Rouge, State of Louisiana, in proceeding number 493,562, Division "N", from which it was removed to this Honorable Court.

- 1 -

was set for trial on June 10, 2002, pursuant to La. Code of Civ. Pro. art. 1573, due to the fact that Barbara Catania is not likely to survive beyond 6 months.

On February 13, 2002, defendant, ExxonMobil Corporation, under the signature of Gregory M. Anding[3], filed a Motion to Transfer Venue based on *forum non conveniens*, and the case was transferred to 19th Judicial District Court for the Parish of East Baton Rouge on March 4, 2001. Thereafter, on an untimely and improperly filed Third-Party Demand against DSM Copolymer, Inc. (hereinafter "DSM"), who is represented by the same attorneys who represent ExxonMobile Corporation, the case was removed by DSM to this federal court. As was made apparent by counsel for ExxonMobile Corporation at the recent hearing on it Motion to Quash and Stay all Discovery, their intent is to have this case transferred to the MDL-875 in the United States District Court for the Eastern District of Pennsylvania, where the entire case will be stayed indefinitely.[4] If the case is not remanded to state court, certainly Barbara Catania will die before she receives her day in court. As secretary to LSU's President, Mrs. Catania has spent her entire adult life serving the students and faculty of our great university, LSU. The

---

[3]Other defendants joined in the Motion to Transfer Venue, but as can be seen from the signature block, Gregory M. Anding signed on behalf of the other defendants. Exhibit "2".

[4]See the case of *Crocker v. Borden, Inc.*, (E.D. La. 1994) 852 F.Supp. 1322, 1330, wherein the MDL is discussed.

- 2 -

courts of this state should not abandon her now at the time of her need.

Plaintiffs, Barbara and Michael Catania, seek to remand this civil proceeding to the state court from which it was removed. It is respectfully submitted that this action should be remanded to state court because this court is without jurisdiction to hear this case or, in the alternative, this court should abstain from exercising its jurisdiction in this case.

**II.   REMAND IS WARRANTED BECAUSE VIACOM, INC.'S THIRD PARTY DEMAND WAS FILED AFTER THE STATE COURT DEADLINE DATE OF JANUARY 28, 2002, FOR FILING SAME, VIACOM, INC. FAILED TO SEEK LEAVE OF COURT PRIOR TO FILING ITS THIRD PARTY DEMAND AGAINST DSM COPOLYMER , INC. IN THIS MATTER, AND VIACOM, INC.'S THIRD PARTY DEMAND WAS FILED IN A COURT WHICH NO LONGER HAD JURISDICTION OVER THE MATTER.**

Pursuant to the Scheduling Order[5] entered in this matter on January 14, 2002, "[a]ll amendments to petitions, cross-claims and third-party demands were to be filed and served by **January**

---

[5]In accordance with La. Code of Civ. Pro. art. 1551, a pretrial and scheduling conference was held in this matter on January 8, 2002, and an order was issued in relation to same on January 14, 2002. See Exhibit "1". In accordance with La. Code of Civ. Pro. art. 1551(B), the January 14, 2002, order thereafter controlled the subsequent course of the action, including the deadline date for filing third party demands in this matter. As this case was set for trial on an expedited basis pursuant to La. Code of Civ. Pro. art. 1573, due to the fact that Barbara Catania is suffering from mesothelioma and is not likely to survive beyond 6 months, the following of the jointly agreed upon dates by plaintiffs and defendants alike in this matter is of the utmost importance. As was recognized in the case of *McDuffie v. AcandS, Inc.*, 2000-2779 (La. App. 4th Cir. 2/14/01); 781 So.2d 628, wherein Viacom, Inc. had likewise missed another deadline established pursuant to a scheduling order entered in that matter, '[t]he need for an orderly disposition is particularly evident in cases involving numerous parties, where the possible negative consequences of allowing parties to miss deadlines is much more likely".

**28, 2002.**"  See Exhibit "1".  On March 4, 2002, Judge Michael G.

Bagneris, Civil Court Judge for the Parish of Orleans,

transferred this matter to East Baton Rouge Parish.  Exhibit "3".

Then, on March 8, 2002, after missing the deadline date of

January 28, 2002, for filing third party demands, and without

seeking leave of court, counsel for Viacom, Inc. filed a third

party demand against DSM in this matter.[6]  Exhibit "4".

Plaintiffs further show that said third party demand was

apparently filed in the Civil District Court for the Parish of

Orleans on or about March 8, 2002, when said court no longer had

jurisdiction over the matter as Judge Bagneris had issued an

order transferring the matter to East Baton Rouge Parish on March

4, 2002.  See Exhibit "3".

Plaintiffs expect that Viacom, Inc. will argue that it did

not have notice of DSM's potential involvement in this suit prior

to the January 28, 2002, cutoff date for filing third party

demands in this matter.  However, plaintiffs show that counsel

for Viacom, Inc. was put on notice no later than January 14,

2002, of DSM's potential involvement in this matter, as counsel

for Anco Insulations, Inc., Julie Robles, had deposited copies of

the previous deposition testimony of Victor Reno (including a

---

[6]Counsel for Viacom, Inc. was fully aware of the January 28,
2002, deadline for filing third party demands in this matter, as
counsel for Viacom, Inc. was present at the hearing on February
28, 2002, wherein Owens-Illinois, Inc. and Uniroyal, Inc. had
filed a motion for leave to file third party demand in the
*Catania* matter, and, furthermore, had received a copy of
plaintiffs' opposition to same prior to said hearing date.
Exhibits "3" and "5".

deposition of Victor Reno taken on July 24, 1996 wherein his work
at the Copolymer facility was fully disclosed during the relevant
time periods in the *Catania* matter) at Choice Copy Services, Inc.
on January 14, 2002, and notified all counsel of same, including,
but not limited to, counsel for Viacom, Inc., William Schuette
and Avery Griffin.  Exhibit "6".

Accordingly, from all of the above, it is clear that Viacom,
Inc. was fully aware of DSM's potential involvement in this
lawsuit well before the deadline date of January 28, 2002, for
filing third party demands in this matter.  Despite same,
Westinghouse failed to timely file its third party demand in this
matter, and, furthermore, failed to seek leave of court to file
its third party demand against DSM prior to its filing of same,
in clear violation of La. Code of Civ. Pro. art. 1551 and the
Scheduling Order previously entered in this matter.  Furthermore,
Viacom, Inc. apparently filed its third party demand in a court
which no longer had jurisdiction over this matter.  Accordingly,
on these bases alone, plaintiffs' motion to remand should be
granted, and this matter should be remanded back to state court
from which it was improperly removed.

## III. DSM'S ATTEMPTED REMOVAL FAILS ON ITS FACE BECAUSE DSM HAS NOT ESTABLISHED FEDERAL OFFICER AUTHORITY.

In the Notice of Removal it is stated that defendant, DSM,
seeks to remove this case on the basis of 28 U.S.C. 1442(a)(1)
and on this Court's Federal question jurisdiction as contained in
28 U.S.C. 1331.  On the face of the Notice of Removal, this Court
lacks subject matter jurisdiction.

- 5 -

First of all, the plaintiffs' petition is grounded solely on state law. The plaintiffs' made no claims against DSM in its petition. Second, the third party demand of Viacom, Inc. makes no claims against DSM other than state claims for contribution based on negligence and strict liability as set forth in *Halphen v. Johns-Manville Sales Corp.*, 484 So. 2d 110 (La. 1986). Moreover, nowhere in its notice of removal does DSM provide the court with any admissible evidence that DSM was a person acting under any officer of the United States. In the instant case, the only thing presented to undersigned counsel and the court is a non-published case discussing alleged facts never attempted to be established in this case, and thus, clearly hearsay. DSM cannot rely upon information apparently presented in an entirely different law suit that neither the Court nor plaintiffs have the benefit of reviewing. Moreover, it seems that none of the information alleges that the federal government maintained control over the activities of the Local 53 Asbestos Union workers or their procedures in handling asbestos.

In the case at bar, Barbara Catania is dying from the asbestos-related disease, mesothelioma. Barbara never visited the DSM facility, nor did she work at the DSM facility. Barbara Catania has been the secretary to the LSU system President for approximately 20 years. Barbara Catania was exposed to asbestos through family members bringing home asbestos on their clothing from working at facilities as alleged in her petition. DSM established no evidence to shows that Mrs. Catania's family

members, who worked for the Local 53 Asbestos Union as
independent contracts, were somehow following federal orders or a
federal directive in bringing home asbestos on their clothing.

DSM alleges that removal to federal court is appropriate
under 28 U. S. C. 1442(a)(1), the federal officer statute.  The
party seeking removal bears the burden of establishing federal
jurisdiction.  *Wilson v. Republic Iron & Steel Co.*, 257 U. S. 92,
97, 42 S. Ct. 35, 37, 66 L. Ed 144 (1921).  Further, regarding
the applicability of  28 U. S. C. § 1442(a)(1), "[i]f the right
to removal is doubtful, the case should be remanded [to state
court]."  *See Gauthe v. Asbestos Corp.*, 1997 WL 3255  (E. D. La.
1997); *Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 947 (E. D. N.
Y. 1992); *Ruffin v. Armco Steel Corp.*, 959 F. Supp. 770 (S. D.
Tex. 1997)*, order vacated on other grounds*, 1999 WL 318023 (S. D.
Tex. 1999); *Bahrs v. Hughes Aircraft Co.*, 795 F. Supp. 965, 969
(D. Ariz. 1992).  It has been held that removal by a "person
acting under" a federal officer must be predicated upon a showing
that the acts that formed the basis for the state civil suit were
performed pursuant to an officer's direct orders or to
comprehensive and detailed regulations.  *Ryan v. Dow Chemical
Co.*, 781 F. Supp. 934, 947 (E.D. N.Y. 1992).  Regulation of a
corporation by the government is insufficient to meet this test,
and the "rule that appears to emerge from the case law is one of
'regulation plus...'."  *Id.*; *Ryan v. Dow Chemical Co.*, 781 F.
Supp. 934 (E.D. N.Y. 1992); *Bahrs v. Hughes Aircraft Co.*, 795 F.
Supp. 965 (D. Ariz. 1992).

- 7 -

DSM bears the burden of establishing that it actually did act under the specific authority of the federal government in causing Barbara Catania's secondary exposure to asbestos.  The only support DSM offers is the unpublished ruling in *Vera G. LaLonde, et al. vs. Delta Filed Erection, et al.* No. 96-3244-B-M3, United States District Court (M. D. La. 8/5/98), which is inapplicable to the instant case.  While the *LaLonde* ruling appears to rely upon contractual agreements and affidavits, no such evidence is attached to DSM's notice of removal in the instant case.  Moreover, the plaintiff in *LaLonde* actually worked for or on the premises of DSM and alleged that DSM caused his injuries.  Neither is true in the instant case.

DSM presents the Court with a thumb-nail sketch of its corporate history, again, without any evidentiary support.  DSM focuses primarily on the period of time between 1942 and 1955, when the DSM facility was allegedly owned by the federal government.  During that time period, DSM alleges that its sole function was the operation of the facility under the authority of the U. S. government.  DSM does not allege that the federal government maintained any control over safety or the activities of the Local 53 Asbestos Union workers at the facility, nor do they present any evidence that asbestos products were required by the government to be installed by the Local 53 independent contractors at their facility.

Nothing presented by DSM establishes that the government or a federal officer specified the use of asbestos in its facility.

- 8 -

Moreover, nothing presented by DSM establishes that DSM specified
or controlled the procedures used by the Local 53 Asbestos Union
in handling asbestos.  In the instant case, DSM has not shown
that "**strong government intervention and the threat that a
defendant will be sued in state court based on actions which
follow federal direction.**"  *Mouton v. Flexitallic, Inc.*, 1999 WL
225438 (E.D. La. 1999), p. 2.  Without this showing, DSM has not
carried its burden of establishing federal jurisdiction over a
suit initiated in state court, and the suit should be remanded to
state court.  *Ryan v. Dow Chemical Co.*, 781 F.Supp. 934, 939
(E.D. N.Y. 1992); *Good v. Armstrong World Industries, Inc.*, 914
F.Supp. 1125, 1127 (E.D. Penn. 1996).

In the case of *Good v. Armstrong World Industries, Inc.*, 914
F.Supp. 1125, 1127 (E.D. Penn. 1996), a former member of the
United States Navy filed suit for personal injuries from asbestos
exposure from Viacom/Westinghouse generators.  Viacom filed a
notice of removal under the federal officer removal statute
alleging that it designed and manufactured the turbine generators
in accordance with specifications and regulations mandated by the
Navy, and was entitled to remove the case to federal court
pursuant to the federal officer removal statute, 28 U.S.C. 1442.
The plaintiffs filed a motion for remand alleging that
Westinghouse did not meet the statutory requirement for removal.

The *Good* court stated that "removal must be predicated upon
a showing that the acts forming the basis of the state suit were
performed pursuant to an officer's direct orders or comprehensive

and detailed regulations." *Id.* at p. 1128. "By contract, if the
corporation establishes only that the relevant acts occurred
under the general auspices of federal direction then it is not
entitled to 28 U.S.C. 1442(a)(1) removal." *Id.* at p. 1128; see
also *Mouton v. Flexitallic, Inc.,* 1999 WL 225438 (E.D. La. 1999),
p. 2; *Ryan v. Dow Chemical Co.,* 781 F.Supp. 934, 947 (E.D. N.Y.
1992); *Fung v. Abex Corp.,* 816 F.Supp. 569 (N.D. Cal. 1992).

The *Good* court stated that nothing presented by Westinghouse
established that the Secretary of the Navy specified the use of
asbestos in its turbine generators. No document relied upon by
Westinghouse even mentioned asbestos. Thus, Westinghouse did not
meet its burden to make a causal connection between the state
claim and the conduct undertaken pursuant to the direction given
by an officer of the federal government. *Id.* at p. 1130.

In the case at bar, DSM had provided absolutely no evidence
showing that the asbestos used by the Local 53 Asbestos workers
were pursuant to specifications outlined and at the direction
given, by an officer of the federal government. Nothing
presented by DSM shows any specification for the work done by the
Local 53 Asbestos Union, and whether asbestos was a requirement
of the job. Moreover, nothing presented by DSM shows that DSM
had any control over the safety of these independent contractors
or over the procedures used by these independent contractors for
cleaning up after completing their tasks at the DSM facility.
Without this showing, DSM cannot meet its burden of making a
causal connection between the state claim being asserted in this

- 10 -

matter (the conduct of carrying asbestos to Barbara Catania from clothing worn by family members) and the conduct undertaken pursuant to the direction given by an officer of the federal government.    Thus, this case should be remanded to the state court from which it was removed.

## IV.  DSM'S UNSUPPORTED ALLEGATIONS OF FEDERAL OFFICER AUTHORITY, EVEN IF TAKEN AS TRUE, DO NOT SUPPORT REMOVAL UNDER THE FEDERAL OFFICER REMOVAL STATUTE.

### A.   DSM Does Not Meet the Statutory Requirement for Removal Under 28 U. S. C. 1442(a)(1).

Even if DSM met its threshold burden by providing evidentiary support for its factual allegations, which is denied, those allegations are wholly insufficient to support a finding of federal officer authority as required by §1442(a)(1).  An action may be removed to federal court if defendant shows that the suit involves:

> The United States of any agency thereof or any officer (or any person <u>acting under that officer</u>) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office or on account of any right, title or authority claimed under an Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

28 U. S. C. 1442(a)(1) (emphasis added).

To properly invoke this Court's federal officer jurisdiction under §1442(a)(1), DSM must meet the criteria set forth in *Mesa v. California*, 489 U.S. 121, 124-25, 134-35, 109 S. Ct. 959, 962, 103 L. Ed. 2d 99 (1989).  First, DSM must show that it was acting under the direction and control of a specific federal officer at the time the alleged tort was committed.  *Id.*  Second, DSM must

- 11 -

show that it has a colorable federal defense to plaintiff's claims.  *Id.*  And third, DSM must show that a causal nexus existed between the tortious conduct that resulted in plaintiff's injuries and the alleged federal authority.  *Id.*  DSM must establish all three elements for removal to be proper.  *Gauthe*, 1997 WL 3255 at *2.

### 1.   DSM Fails the First Prong of the Federal Officer Removal Statute Because it Has Not Shown That it Was Acting under Federal Direction.

Under the first prong of federal-officer removal, the defendant must show that it is being sued for actions taken at the direction of a federal officer.  *See Mesa,* 109 S. Ct. 959, 962.  The well-accepted test for establishing whether a defendant was "acting under" a federal officer requires a showing that the acts forming the basis of the action were performed "pursuant to an officer's direct orders or to comprehensive and detailed regulations."  *Good v. Armstrong World Industries, Inc.,* 914 F.Supp. 1125, 1127 (E.D. Penn. 1996); *Overly v. Raybestos-Manhattan*, C-96-2853 SI., 1996 WL 532150 (N.D. Cal. Sept. 9, 1996); *Ryan v. Dow Chemical Co.,* 781 F. 934, 947 (E. D. N. Y. 1992).  Indeed, the vast majority of courts that have considered this issue have interpreted this first element as requiring direct orders/regulations from the federal government.  *See Ruffin v. Armco Steel Corp.,* 959 F. Supp. 770 (S. D. Tex. 1997), order vacated on other grounds, 1999 WL 318023 (S. D. Tex. 1/29/99); *Gauthe v. Asbestos Corp.,* 1997 WL 3255 (E. D. La. Jan. 2, 1997); *Bahrs v. Hughes Aircraft Co.,* 795 F. Supp. 965, 969 (D. Ariz.

- 12 -

1992); *Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 947 (E. D. N. Y. 1992); *Good v. Armstrong World Indust., Inc.*, 914 F. Supp. 1125, 1128 (E. D. Pa. 1996); *Overly v. Raybestos-Manhattan*, No. C-96-2853 SI., 1996 WL 532150 (N.D. Cal. Sept. 9, 1996); *Arness v. Boeing North America, Inc.*, 997 F. Supp. 1268 (C. D. Cal. 1998); *Pack v. AC&S, Inc.*, 838 F. Supp. 1099 (D. Md. 1993). If, on the other hand, a defendant only establishes that the relevant acts occurred under the "general auspices" of federal direction, it is **not** entitled to removal under § 1442(a)(1). *Good v. Armstrong World Indus., Inc.*, 914 F. Supp. 1125, 1128 (E. D. Pa. 1996) (allegations of general control and direction of Navy insufficient to show defendant acted pursuant to direct orders or comprehensive and detailed regulations).

And there is no question that the burden rests squarely on DSM. *See Wilson v. Republic Iron & Steel Co.*, 257 U. S. 92, 97, 42 S. Ct. 35, 37, 66 L. Ed 144 (1921). It was incumbent upon DSM to show through specific facts that it was acting under the authority of a federal officer. *See Fowler v. Southern Bell Telephone & Telegraph Co.*, 343 F. 2d 150, 154 (5th Cir. 1965) (incumbent upon defendants to show that they were federal officers acting within their duties).

Specifically relevant to the case at bar, DSM has not established that the safety or procedures of the Local 53 Asbestos Union independent contractors were under the direction and control of a federal officer, nor has it shown that asbestos installation was required at the direction of a federal officer. *Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 947 (E.D.N.Y. 1992). Accordingly,

- 13 -

this action should be remanded back to the state court in which it was originally filed.

Similarly, a federal district court in California found that the attempted federal officer removal of Avondale Shipyard, the defendant, failed this first prong of federal-officer removal test because there was no evidence that a federal officer was involved in shipyard safety. *Overly v. Raybestos-Manhattan*, No. C-96-2853 SI., 1996 WL 532150 (N.D. Cal. Sept. 9, 1996). In *Overly*, the plaintiff was exposed to asbestos while working at the Avondale Shipyards. *Id.* at p.1. After the plaintiff contracted an asbestos-related disease, he sued the defendant, alleging that the defendant's failure to warn about the hazards of asbestos caused his injury. *Id.* The defendant removed, alleging federal officer jurisdiction because it was under "rigid guidelines" imposed by the federal government for the "design of ships." *Id.* The court rejected the defendant's attempted federal officer removal because it provided no evidence showing that the government controlled asbestos-related warnings or safety: "Although Avondale has established that it was under substantial control by the government regarding the installation of certain products containing asbestos, it has not done so with regard to the warning of individuals of the presence of asbestos on the job site." *Id.* at *3.

To establish that the defendant acted under the control of a federal officer, for purposes of § 1442(a)(1), therefore, the defendant must show that the government authority under which it worked directly interfered with its ability to fulfill its state law obligation to Barbara Cantania. *Ruffin, 959 F.Supp.* at 776.

- 14 -

In *Ruffin*, the defendant failed to meet this burden and the case was remanded to state court. The court concluded that "the mere fact that the government possessed the power to control or regulate employee safety neither establishes that the power was ever used nor that operational mandates of this type were ever issued. Without such proof, [the defendant] cannot satisfy the statutory requirements for removal under §1442(a)(1)." *Id.* at 776.

DSM has neither established that it acted pursuant to direct and detailed orders by the federal government regarding the activities of independent contractors working at its facilities nor that any federal duty under which it may have been required to act in any way interfered with its state imposed duty of safety towards these independent contractors. DSM has not established the first prong of the *Mesa* test and, therefore, this case should be remanded to state court.

### 2.   DSM Does Not Have a Colorable Federal Defense.

Nor can DSM satisfy the second prong of the federal officer removal test. To qualify for federal-officer jurisdiction under § 1442(a)(1), a defendant must establish that it has a colorable federal defense to the plaintiff's claims. *See Mesa*, 109 S. Ct. at 968. DSM asserts that it may rely on the government contractor defense, *see Boyle v. United Technologies Corp.*, 487 U. S. 500, 108 S. Ct. 2510, 101 L. Ed. 2d 442 (1988), and/or defenses and immunities available under the Defense Protection Act of 1950, 50 U. S. C. 2061, *et seq.* For the reasons set forth below, neither the government contractor defense nor the Defense Protection Act of 1950 provide DSM with a colorable federal defense to Plaintiff's

claims.[7]  Therefore, DSM has failed to establish this second prong

of the *Mesa* test and Plaintiff's motion to remand should be

granted.

      a.    **Application of the Government Contractor Defense
Must Be Predicated Upon Both a Federal Interest and
a Conflict Between Duties Imposed by State Law and
Duties Imposed by Federal Authority.**

DSM suggests that it can rely upon the government contractor

defense articulated in *Boyle v. United Technologies Corp.*, 487 U.

S. 500, 108 S. Ct. 2510, 101 L Ed. 2d 442 (1988).[8]  But before the

_____

[7]It is well-settled law that "a defense that raises a
federal question is inadequate to confer federal jurisdiction."
*Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 808,
106 S.Ct. 3229, 3232, 92 L.Ed. 2d 650 (1986) (citing *Louisville &
Nashville R. Co. v. Mottley*, 211 U.. 149, 29 S.Ct. 42, 53 L.Ed.
126 (1908).  The federal question in removal cases must be
disclosed on the face of the plaintiff's complaint and must be
essential to the plaintiff's cause of action; it is not enough
that the federal question arises by way of a defense to that
action.  *Oliver v. Trunkline Gas Co.*, 789 F.2d 341, 343 (5th Cir.
1986);  *PAAC v. Rizzo*, 502 F.2d 306, 313 (3d Cir. 1974);  *Border
City S. & L. Ass'n v. Kennecorp Mtg.*, 523 F. Supp. 190, 192 (S.D.
Ohio 1981);  *Bruan, Gordon & Co. v. Hellmers*, 502 F. Supp. 897,
900 (S.D. N.Y. 1980); 1A Moore's Federal practice, Sec. 0.160
(1974); C. Wright, Law of Federal Courts, Sec. 38 at 179 (1976).
A case may not be removed to federal court on the basis of a
federal defense, even if the defense is anticipated in
plaintiff's complaint and even if the parties concede that the
federal defense is the only question truly at issue.  *Franchise
Tax Bd. of California v. Constr. Laborers Trust for Southern
California*, 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983);
*Thomas v. Burlington Industries, Inc.*, 763 F. Supp. 1570, 1575
(S.D. Fla. 1991).

[8]To establish the applicability of the government contractor
defense, the defendant must satisfy a three-part test: 1) the
United States approved reasonably precise specifications; 2) the
equipment conformed to those specifications; and 3). the supplier
warned the United States about the dangers in the use of the
equipment that were known to the supplier but not the United
States. *Boyle*, 108 S. Ct. at 2518.  *Boyle* involved a products
liability action against an independent contractor that supplied
military helicopters to the United States; not a failure to warn
action.  While the Fifth Circuit has applied the *Boyle* test to
failure to warn actions, it recognized the difficulty a defendant

Court can consider whether this serves as a colorable federal defense in this case, DSM bears the burden of establishing that two requisite conditions are met: whether the case concerns a unique federal issue and whether there was a significant conflict between federal policy and state law. *Boyle*, 108 S. Ct. at 2515. If either of these conditions are not met, a defendant cannot rely upon the federal contractor defense. *Dorse v. Eagle-Picher Industries, Inc.*, 898 F. 2d 1487, 1490 (11th Cir. 1990) (state law not displaced where no conflict existed between federal contractual duties and state duty of care — contractor could comply with both obligations). In this case, because DSM cannot meet these two requisite conditions, it cannot rely on the government contractor defense.

### 1.   No Unique Federal Interest Justifies Removal.

Since asbestos products have been banned for a long time and are no longer used in most equipment, any federal interest in this case is meager at best. Using precisely this reasoning, the Eastern District of Pennsylvania rejected an asbestos manufacturer's claim that it was entitled to the federal-contractor defense to support its attempted federal-officer removal:

> The impact of this personal injury action on the federal interest in protecting future defense procurement — the fundamental point of the government contract defense — is speculative. It is common knowledge that asbestos is no longer used in the design and manufacture of equipment, so that this lawsuit cannot interfere with a federal program involving

---

would have "establishing an identifiable federal interest or policy in the existence of method of warning and a significant conflict between that federal interest or policy and the operation of state law." *Garner v. Santoro*, 865 F. 2d 629, 635 (5th Cir. 1989), *cited in Ruffin*, 959 F. Supp. at 774.

products that contain asbestos. Therefore, the adjudication of
this personal injury action in state court does not threaten
the enforcement of a federal policy sufficient to warrant
removal.

*Good v. Armstrong World Indus., Inc.*, 914 F. Supp. 1125, 1131 (E.D.

Pa. 1996).

### 2.   No Conflict Exists Between State Law and Federal Mandate.

Even if the Court determines that a federal interest does

exist in this case, that federal interest "merely established a

necessary, not a sufficient, condition for the displacement of

state law." *Boyle,* 108 S. Ct at 507.  The court must then

determine whether a conflict exists between state law and federal

mandate.   Displacement of state law "will occur only where. . . a

'significant conflict' exists between an identifiable 'federal

policy or interest and the [operation] of state law or the

application of state law would 'frustrate specific objectives' of

federal legislation." *Id.*  The *Boyle* court offered an example of a

situation in which federal mandate does not conflict with state

imposed duty:

> If, for example, the United States contracts for the
> purchase and installation of an air conditioning-unit,
> specifying the cooling capacity but not the precise
> manner of construction, a state law imposing upon the
> manufacturer of such units a duty of care to include a
> certain safety feature would not be a duty  identical to
> anything promised the Government, but neither would it
> be contrary.  The contractor could comply with both its
> contractual obligations and the state-prescribed duty of
> care.  No one suggests that state law would generally be
> pre-empted in this context.

- 18 -

*Id.*[9]  This example clearly highlights the facts applicable to the
case at bar are clearly outside the removal statutes.

Therefore, even if the Court determined that there is a
federal interest in this case, DSM would still have to establish a
conflict exists between its duties imposed by state law and its
duties imposed by federal authority.  Indeed, in a similar
situation, the Eleventh Circuit determined that the evidence did
not support the requirements for the government contractor defense
where "the contractor could comply with both its contractual
obligations and the state-prescribed duty of care."  *Dorse*, 898 F.
2d at 1490.  The Ninth Circuit clearly articulated this requirement
in the failure to warn context:

> *Boyle* displaces state law only when the Government,
> making a discretionary, safety-related military
> procurement decision contrary to the requirements of
> state law, incorporates this decision into a military
> contractor's contractual obligations, thereby limiting
> the contractor's ability to accommodate safety in a
> different fashion.

*In re Hawaii Asbestos Cases*, 960 F. 2d 806, 813 (9th Cir. 1992).

DSM still has not established that its duties imposed by
federal authority in any way conflict with its duties of care
imposed by state law.  Specifically, under Louisiana law, an
employer has a duty to provide a safe work place for its employees
or persons working on its premises.  *See, e.g.*, *Jones v. Trailer*,
636 So. 2d 1112, 1122 (La. App. 4th Cir.) , *writ denied sub nom.*,
*Rome v. Traylor*, 642 So. 2d 193 (La. 1994)  (referring to La. R. S.

---

[9]*Boyle* involved a different set of facts.  In that case, the
state-imposed duty of care was directly contrary to the duty
imposed by contract with the federal government.  *Boyle*, 108 S.
Ct. at 2517.

§ 23.13) ; *Canzoneri v. Smith*, 381 So. 2d 973, 975-76 (La. App. 4th Cir 1980).  This duty includes a duty to warn of work-related dangers and how to avoid them.  *Canzoneri*, 381 So. 2d at 976; *Miller v. Lambert*, 380 So. 2d 695, 700 (La. Ct. App. 1980). Accordingly, DSM had a duty, imposed by state law, to warn its employee or independent contractors of the dangers of asbestos on the job site.  Its failure to do so was in direct violation of state law.  And nothing in DSM's notice of removal in any way suggests that the alleged federal authority conflicted with this state imposed duty to warn.  Where no conflict with state law exists, DSM is not entitled to rely upon the government contractor defense.  Assuming DSM did work under the direct and detailed supervision of the federal government, DSM provides no evidence that anything about that supervision prevented it from warning the employees of the independent contractors about the dangers associated with asbestos.  Thus, the government contractor defense is not available in this case.

       **b.**    **DSM Has Not Established That the Defense Protection Act of 1950, 50 U. S. C. § 2061, et seq., Provides a Colorable Federal Defense in this Case.**

DSM asserts that it may rely on "defenses and immunities" available under the Defense Protection Act of 1950.  Such "defenses and immunities" are articulated in 50 U. S. C. 2157, which provides in part:

> No person shall be held liable for damages or penalties for any act or failure to act <u>resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this act [sections 2061 to 2071 of this Appendix]</u>, notwithstanding that any such rule, regulation, or order shall thereafter be declared by judicial or other competent authority to be invalid.

28 U. S. C. 2157.

On the face of the statute, it is clear that this immunity provision only applies to acts resulting from compliance with the Defense Protection Act.  Nothing in DSM's notice of removal suggests that it was acting under the Defense Protection Act. Therefore, § 2157 does not provide DSM with a colorable federal defense.

Even if DSM had alleged that it was acting pursuant to the Defense Protection Act, § 2157 does not provide immunity to contractors for the tortious conduct alleged in Plaintiffs' petition or in the Third Party Demand.  The purpose of the statute is to shield contractors from liability from having to "re-prioritize its outstanding contracts in order to give the required preference to a compelled DPA [Defense Protection Act] contract." See Hercules Inc. v. U. S., 24 F. 3d 188, 204 (Fed. Cir. 1994). The Hercules court concluded that the plain language of the statute "reinforces the view that the immunity from suit provided by section 707 [50 U. S. C. 2157] does not extend to tort suits in which it is alleged that the item produced by the DPA is inherently dangerous.  Id.  The instant case involves a tort action arising out of Barbara Catania's secondary exposure to asbestos dust for the clothing of independent contractors; it does not involve damages arising from the re-prioritization of contracts. Therefore, following the reasoning in Hercules, DSM cannot rely on 50 U. S. C. 2157 to shield it from liability in this case.

1.   **DSM's Attempted Removal Fails the Third Prong of the Federal Officer Removal Statute Because it Has Not Shown a Nexus Between the Government's Control and Plaintiff's Legal Theories.**

Under the third prong for federal-officer jurisdiction, DSM must show that a nexus exists between actions for which it is being sued and the directives of the federal government. *Ryan*, 781 F. Supp. at 945; *Ruffin*, 959 F. Supp. at 775.  To determine whether a causal nexus exists, "[t]he critical analysis is to what extent defendants acted under the federal direction at the time they were engaged in conduct now being sued upon." *Bahrs v. Hughes Aircraft Co.*, 795 F. Supp. 965, 969 (D. Ariz. 1992) (internal quotes omitted).  To meet this burden, a defendant must "by direct averment exclude the possibility that [the state action] was based on acts or conduct of his not justified by his federal duty." *Mesa*, 109 S. Ct. at 966.  Simply put, DSM must show that the federal authority under which it operated "directly interfered with its ability to fulfill its state law obligation" of care.  *See Ruffin*, 959 F. Supp. at 776, *citing Ryan*, 781 F. Supp. at 950.  This factor is similar to the determination of whether DSM acted under federal authority.[10]  And when making this determination, most courts require "direct and detailed control" by the federal officer over the specific conduct of the defendant that forms the basis for the plaintiff's tort claims. *Bahrs*, 795 F. Supp. at 969.

---

[10]The causal nexus requirement is necessarily predicated upon the existence of federal authority.  In some cases, the two requirements are combined into one test.  *See Arness v. Boeing North American, Inc.*, 997 F. Supp. 1268, 1273 ©. D. Cal. 1998).

In this case, as has been previously noted, DSM has provided no evidence showing that a federal officer exercised "direct and detailed" control over the procedures of the Local 53 Asbestos Union workers or over their handling of asbestos. In fact, there is no evidence showing that asbestos-related safety measures used by the Local 53 Asbestos workers or anything else was ever under federal direction and control. This lack of an evidentiary foundation, once again, requires that this case be remanded to state court.

*Bahrs v. Hughes Aircraft Co.*, 795 F. Supp. 965, 969 (D. Ariz. 1992), is directly on point. In *Bahrs*, General Dynamics was sued for dumping toxic waste, including TCE, into the ground, which eventually seeped into the ground and injured the plaintiffs. *Id.* at 967. General Dynamics sought to remove, alleging that federal-officer jurisdiction was appropriate because, when performing the work that created the toxic waste, they were fulfilling a government contract. The court rejected the defendant's attempt to invoke federal officer jurisdiction because, while the federal government may have exercised control over the procedures that created the toxic TCE waste, there was no evidence that it exercised "direct and detailed" control over the conduct that caused the plaintiffs' injuries, the waste-disposal procedures: "While the government officials were undoubtedly most interested in the production of war materials, the record before this Court does not demonstrate the government's necessary control over the method of waste disposal. The mere fact that the government possessed the power to exercise control over the project does not establish that

the power was in fact ever exercised."  *Id.* at 970.   Thus, the

court found no nexus existed between the control exercised by the

federal government and the tortious conduct that formed the basis

of the plaintiff's lawsuit against General Dynamics.   *Id.*

**V.   IN THE UNLIKELY EVENT THAT THE COURT DETERMINES THAT THE THIRD PARTY CLAIMS AGAINST DSM SHOULD REMAIN IN FEDERAL COURT, THE COURT SHOULD EXERCISE ITS DISCRETION TO REMAND ALL OF PLAINTIFFS' CLAIMS TO STATE COURT.**

In the event that the Court determines that removal is

appropriate for the third-party claims against DSM, plaintiffs

respectfully request that the Court exercise its discretion to

remand all of plaintiffs' claims to state court.   Specifically, 28

U. S. C. 1367 provides the Court may decline to exercise

supplemental jurisdiction if:

*       *       *

2.   the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; [11]

3.   the district court has dismissed all claims over which it has original jurisdiction;   or;

4.   in exceptional cases, three are other compelling reasons for declining jurisdiction.

28 U. S. C. 1367©)(2) - (4) (1990).

Barbara Catania has sued multiple defendants for her asbestos-

related deadly disease of mesothelioma.   She did not sue DSM.   Only

DSM has removed this case to federal court.   If, in the Court's

determination, the state law claims predominate, or if no federal

_____

[11]A court has supplemental jurisdiction over all claims so related to the claims over which it has original jurisdiction that "they form part of the same case or controversy . . "   28 U. S. C 1367(a).

- 24 -

issue remains in the case, it is in the Court's discretion to remand plaintiffs' claims to state court.   Therefore, in the event that the Court determines that the claims against DSM should remain in federal court, plaintiffs request that the Court sever Viacom third-party demand against DSM and remand the remaining claims to state court.

In the case of  *Crocker v. Borden, Inc.*, (E.D. La. 1994) 852 F.Supp. 1322,  a third-party defendant, pursuant to 28 U.S.C. § 1442(a)(1), removed ten civil actions from state court.   In determining whether to exercise supplemental jurisdiction over plaintiffs' state law claims, the Court looked to 28 U.S.C. 1367 which grants the district court the discretion to decline supplemental jurisdiction if it determined that any one of the four following circumstances were present: (1) the claim raises a novel or complex issue of state law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.   The Court noted that it was apparent that while allowing federal courts to take supplemental jurisdiction over state law claims, Congress intended for federal courts to have the discretion to decline such jurisdiction when circumstances so warrant.   While the court determined that it had supplemental jurisdiction over the main demands in the asbestos actions, it then had to decide the difficult question of whether

it should decline to exercise that jurisdiction.   In considering
this issue the Court stated:

> ...In reaching this decision pursuant to 28 U.S.C.
> §1367, the Court shall bear in mind the considerations
> of judicial economy, convenience, and fairness to the
> litigants embraced in <u>United Mine Workers</u> and so often
> repeated.   Important to this inquiry is the fact that
> there are approximately 3,000 plaintiffs whose suits
> are pending in the state court, their chosen forum.
> Their claims against the defendants are exclusively
> derived from state law.   The 10 plaintiffs in Flight 2
> whose cases were removed have trial dates pending in
> state court in about one month.   Their cases have been
> pending for almost three years.
>
> If these cases are not remanded, they must be
> transferred to the United States District Court for the
> Eastern District of Pennsylvania, where literally many
> thousands of asbestos cases filed in federal are
> presently pending in MDL-875.   <u>If history is any
> indicator, these cases most assuredly will not be tried
> for several years, perhaps not until the turn of the
> century.   There is no reason to believe that, in terms
> of expediency and efficiency, these cases ought to be
> in federal court where they would be tried with all due
> haste.   Unfortunately, quite the opposite appears to be
> truth.</u>

(emphasis added) *Crocker*, 852 F.Supp. at 1330.

After further discussion, the Court remanded the main
demands to state court, and severed the third-party claim which
remained in federal court.   In making its ruling, the Court
provided:

> Upon due consideration of the policies of judicial
> economy, convenience, and fairness to the parties, as
> outlined herein, the Court finds that the main demand
> ought to be severed from OCF's third-party claims
> against Westinghouse for exposures to asbestos
> contained in marine turbines constructed for the Navy
> and that the Court should decline supplemental
> jurisdiction over the main demands and the third-party
> claims unrelated to the Westinghouse marine turbines
> and remand them to state court.   Clearly state claims
> substantially predominate over the lone federal claim.
> 28 U.S.C. §1367©)(2).   Further, the compelling reasons

- 26 -

> outlined above convince this Court that as a matter of
> fairness to the litigants, the main demands ought to be
> remanded for trial.   28 U.S.C. 1367(4).

*Id.*

It is respectfully submitted, therefore, that in the event
that the Court determines that removal is appropriate for the
third-party claims against DSM, the Court should exercise its
discretion to remand all of plaintiffs' claims to state court.

## VI.   THIRD PARTY CLAIM FOR CONTRIBUTION

The Federal Fifth Circuit Court of Appeals permits a third-
party to remove and sever its claim only when "the third-party
complaint states a separate and independent claim which, if sued
upon alone, could have been brought properly in federal court."
*In re Wilson Industries, Inc.*, 886 F.2d 93 (5th Cir. 1989); *Carl
Heck Engineers, Inc. V. Lafouche Parish Police Jury*, 622 F.2d
133, 136 (5th Cir. 1980).  A claim for contribution between joint
tortfeasors is not "separate and independent" from a plaintiff's
tort claims and therefore does not provide basis for removal. *Id.*
see also *Murjani v. All State Ins. Co.*, 679 F.Supp. 601 (M.D. La.
1988); *Caringal v. Karteria Shipping, Ltd.*, 108 F.Supp.2d 651
(E.D. La. 2000).  Viacom's Third Party Demand only asserts
contribution from DSM and cannot be the basis for removal to
federal court.   *Id.*   Thus, this case should be remanded to the
state court from which it was removed.

## VII. CONCLUSION.

DSM bears the burden of satisfying the requirements of the federal officer removal statute.  DSM has not tendered any evidence to support its allegations of federal authority over the activities of the independent contractors during the years of Barbara Catania's secondary exposure to asbestos nor do they show that a federal officer required the use of asbestos at its facility.  For this reason alone, plaintiff's motion to remand should be granted.  But even if DSM had tendered such evidence, DSM's allegations do not satisfy the requirements of the federal officer removal statute.  For these reasons, removal of this action to federal court is improper.  Plaintiff respectfully requests that its motion to remand be granted.  In the alternative, if the Court determines that DSM's removal is proper, Plaintiff respectfully requests that the Court sever the Third Party Demand against DSM and remand all remaining claims to state court so that Barbara Catania can have her day in court before she dies.

WHEREFORE, it is respectfully submitted that this action should be remanded to the state court from which it was removed.

Respectfully submitted,

ROUSSEL & ROUSSEL

CAROLYN P. ROUSSEL - 1134
PERRY J. ROUSSEL, JR. - 20351
JULES K. BOUDREAUX - 24309
1710 Cannes Drive
LaPlace, LA  70068
Telephone:  (504) 651-6591
ATTORNEYS FOR PLAINTIFFS,
BARBARA AND MICHAEL CATANIA

- 28 -

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing pleading has been served upon counsel for all parties by FAX, hand delivery, or mailing same to each, properly addressed and postage prepaid, on this 19th day of April, 2002.

GEROLYN P. ROUSSEL

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NO. 2001-18122

DIVISION "H"
SECTION 12

BARBARA CATANIA AND MICHAEL CATANIA

VERSUS

ACandS, INC., ET AL.

FILED: _____

DEPUTY CLERK

**FILED JAN 14 PM 2:39 CIVIL DISTRICT COURT**

## <u>SCHEDULING ORDER</u>

In order to facilitate the orderly, efficient, and expeditious disposition of this matter, it is hereby ordered that this claim be governed by the following scheduling order:

1. All amendments to petitions, cross-claims and thirty-party demands shall be filed and served by **January 28, 2002**. Responsive pleadings to any such amended petitions, cross-claims, and third-party demands shall be filed by **February 15, 2002**. A status conference shall be held on **February 28, 2002, at 11:00 a.m.** At the conference, all outstanding exceptions shall be heard. Any other motions to be heard at this conference shall be filed and served in accordance with the Louisiana Code of Civil Procedure by **February 15, 2002**, and all responses thereto by **February 25, 2002**. In the event that exceptions to the amended pleadings are denied, answers shall be filed by **March 8, 2002**.

2. Plaintiffs, plaintiffs in cross-claim and third-party plaintiffs shall file a list of witnesses that may be called to testify at the trial of this matter by **January 31, 2002**. The witness list shall provide a current municipal address and a short, meaningful summary of the anticipated testimony of each witness. Any witness testifying by prior trial testimony or by deposition shall be so designated and the testimony shall be described by date and case caption. If requested by any party, the designating party shall furnish a copy of the prior



trial testimony or deposition transcript to the requesting party within two (2) days of the receipt of the request. Appropriate page and line designations of prior trial or deposition testimony shall be exchanged no later than seven (7) days prior to trial. Parties shall file their counter designations no later than three (3) days prior to trial. Plaintiffs, plaintiffs in cross-claim and third-party plaintiffs shall file a list of exhibits by **January 31, 2002.** Exhibits shall be numbered and exhibit numbers shall correlate with the exhibit's number on the exhibit list. An exhibit exchange will be held at the office of counsel for plaintiffs on **Monday, June 3, 2002 at 2:00 p.m.**

3.   Plaintiffs shall file their expert witness list and deliver their medical and economic expert witness reports for all experts who are expected to testify at trial, to defendants on or before **January 31, 2002.** Expert reports are not required for any other experts. It is understood that the requirement to produce medical and economic expert reports only pertains to those experts retained solely for the purpose of litigation and not to experts involved in the examination, evaluation, treatment and diagnosis of plaintiff in the ordinary course of events. Plaintiffs shall provide necessary authorizations to defendants, upon request issued in accordance with the Code of Civil Procedure, in order to allow access to, any and all charts, records, correspondence, files, notes, reports, and any other documents, records or materials pertaining to plaintiff, of any providers examining, diagnosing, treating and/or evaluating plaintiff. Such authorization shall be provided in a timely manner. Plaintiffs shall also simultaneously produce to the designated defense medical liaison counsel radiographs, CT scans, test results, pathology material, including without limitation blocks, micrographs, slides and other such things prepared by or provided to their expert medical witnesses, which are in the possession of counsel for plaintiff.

4.   Defendants, third-party defendants, and defendants in cross-claim shall file a list of witnesses that may be called to testify at the trial of this matter by **February 22, 2002.** The witness list shall provide a current municipal address and a short, meaningful summary of the anticipated testimony of each witness. Any witness testifying by prior

trial testimony or by deposition shall be so designated and the testimony shall be described by date and case caption. If requested by any party, the designating party shall furnish a copy of the prior trial testimony or deposition transcript to the requesting party within two (2) days of the receipt of that request. Appropriate page and line designations of prior trial or deposition testimony shall be exchanged no later than seven (7) days prior to trial. Parties shall file their counter designations no later than three (3) days prior to trial. Defendants, third-party defendants and defendants in cross-claim shall file an exhibit list by **February 22, 2002.** Exhibits shall be numbered and exhibit numbers shall correlate with the exhibit's number of the exhibit list.

5.   Defendants shall file their expert witness lists and deliver their medical and economic expert reports for all such experts who are expected to testify at trial, by **February 22, 2002.** Expert reports are not required for any other experts. Defendants shall also produce radiographs, CT scans, test results, pathology material, including without limitation blocks, micrographs, slides and other such things prepared by or provided to their expert medical witnesses, which are in the possession and/or control of counsel. As to any such items which are not in the possession and/or control of counsel, counsel will, on or before **February 22, 2002,** make such materials available and provide any necessary authorizations in order to allow access to such materials by plaintiff's experts.

6.   The discovery cut-off date shall be **May 3, 2002.** All motions to compel discovery shall heard on **May 8, 2002, at 10:00 a.m.**

7.   All dispositive motions, including motions for summary judgment, shall be filed and served in accordance with the Louisiana Code of Civil Procedure by **May 10, 2002.** Responses to these motions shall be filed and faxed or hand delivered by **May 20, 2002.** These motions will be heard on **May 23, 2002, at 10:00 a.m.**

8.   All Motions in <u>Limine</u> shall be filed and served in accordance with the Louisiana Code of Civil Procedure and will be heard on **May 23, 2002 at 10:00 a.m.**

9.    In order to ensure the orderly, efficient and expeditious implementation of this Order, status conference and hearings shall be held as follows:

> February 28, 2002 at 11:00 a.m.,
>
> May 8, 2002 at 10:00 a.m., and
>
> May 23, 2002 at 10:00 a.m.

Additional status conference and/or hearing dates may be scheduled upon request and as circumstances dictate.

10.   Trial of this matter is hereby ordered to begin on June 10, 2002 at 8:30 a.m. and is estimated to take approximately nine (9) days.

THUS DONE AND SIGNED this ___14th___ day of _January_, 2002, in New Orleans, Louisiana.

_Michael Bagneris_
**MICHAEL G. BAGNERIS**
**CIVIL DISTRICT JUDGE**

A TRUE COPY

_Capella_
DEPUTY CLERK, CIVIL D...
PARISH OF ...

_Catania SCH ORD - v.1/14/02_

CIVIL DISTRICT COURT

PARISH OF ORLEANS

STATE OF LOUISIANA

| | |
|---|---|
| BARBARA CATANIA AND MICHAEL CATANIA | NUMBER: 2001-18122 |
| VERSUS | SECTION: 12 |
| ACANDS, INC., ET AL. | DIV.: "H" |

## MOTION TO TRANSFER VENUE

Defendants, ExxonMobil Corporation, Kaiser Aluminum and Chemical Corporation, The Dow Chemical Company and Anco Insulations, Inc. (collectively, "Defendants"), move this Court, pursuant to Louisiana Code of Civil Procedure article 123, to transfer this matter to the Parish of East Baton Rouge for the reasons stated in the accompanying Memorandum in Support.

WHEREFORE, ExxonMobil Corporation, Kaiser Aluminum and Chemical Corporation, The Dow Chemical Company and Anco Insulations, Inc. pray that this matter be transferred, pursuant to Louisiana Code of Civil Procedure article 123, to the Parish of East Baton Rouge.

Respectfully submitted,

_Greg M. Anding_

Gary A. Bezet (#3036)
Barrye Panepinto Miyagi (#21794)
Robert E. Dille (#23037)
Gregory M. Anding (#23622)
KEAN, MILLER, HAWTHORNE, D'ARMOND, McCOWAN & JARMAN, L.L.P.
One American Place, 22nd Floor (70825)
P. O. Box 3513
Baton Rouge, LA 70821-3513
Telephone: (225) 387-0999

**Attorneys for ExxonMobil Corporation**

591686_1

**EXHIBIT**

**2**

And

*David Redmann* /w/permission by GMA

Dwight C. Paulsen III (#19729)
Lawrence J. Hand, Jr. (#23770)
David E. Redmann, Jr. (#23267)
Michael S. Sepcich (#24877)
LEMLE & KELLEHER, L.L.P.
601 Poydras St., Suite 2100
New Orleans, LA 70130-6097
Telephone: (504) 586-1241

**Attorneys for Kaiser Aluminum**
**& Chemical Corp.**

And

*David Bienvenue* /w/permission by GMA

David Bienvenue (#20700)
TAYLOR, PORTER, BROOKS
& PHILLIPS, L.L.P.
P. O. Box 2471
Baton Rouge, Louisiana 70821
Telephone: (225) 387-3221

**Attorneys for The Dow Chemical**

And

*Julie Robles* /w/permission by GMA

Julie Robles  (#14213)
HAILEY, MCNAMARA, HALL,
LARMANN & PAPALE. LLP
One Galleria Blvd., Suite 1400
Metairie, Louisiana 70001
Telephone: (504) 836-6500

**Attorneys for Anco Insulations, Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been mailed, postage

prepaid, to all counsel of record.

Baton Rouge, Louisiana, this /3 day of  February, 2002.

*Greg M. Anding*
Gregory M. Anding

591686_1

## CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

### STATE OF LOUISIANA

NO. 01-18122        DIVISION "H"        SECTION 12

### BARBARA CATANIA, ET AL

### VERSUS

### ACandS, INC., ET AL

### <u>JUDGMENT</u>

This matter came before the Court for hearing on February 28, 2002, on various exceptions and motions filed by the defendants, including a Motion to Transfer Venue filed by defendants ExxonMobil Corporation, Kaiser Aluminum and Chemical Corporation, The Dow Chemical Company, and Anco Insulation, Inc.

PRESENT: *See Attached Sign In Sheet*

WHEN, after considering the pleadings, testimony, evidence, law, and argument of counsel,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Motion to Transfer Venue pursuant to La. C.C.P. art. 123 to East Baton Rouge Parish is granted. Though a plaintiff's choice of forum is entitled to great weight, the court finds that the defendants have demonstrated sufficient factors which militate in favor of a transfer of this matter to East Baton Rouge Parish. See *Lamb v. Highlines Construction Co.,* 451 So.2d 269 (La.App. 4th Cir. 1989) and *E. Sondheimer v. Hibernia Corp.,* 97-2460 (La.App. 4 Cir. 12/10/97); 704 So.2d 386, *writ denied,* 98-95 (La. 3/13/98); 713 So.2d 470. In *Sondheimer,* the 4th circuit reversed the trial courts denial of a motion to transfer venue, holding that the transfer to a judicial district in which the *underlying* business had been transacted was warranted, stating:

First, the circumstances of this case represent a well-



recognized exception to this supposed principle of deference – where the plaintiff does not live in the chosen forum and the key operative events did not occur there, the plaintiffs choice of forum gets no deference. Second, this principle only applies to a motion to dismiss and not to a motion to transfer venue to a more convenient forum.

Furthermore, the court also relies upon the Louisiana Supreme Court case of *Guidry v. Smith International Acquisition Corp., et al.*, La. 2001-1108, 793 So. 2d 203, 2001 La. LEXIS 1822 (La. 06/01/01), wherein the court reversed the Fourth Circuit's decision upholding this court's denial of a Motion to Transfer Venue upon *forum non conveniens* and adopted the reasons assigned in the dissent of Judge Tobias. Judge Tobias concluded:

> The provisions of La. C.C.P. art. 123 relating to *forum non conveniens* . . . exists to make the forum convenient to the parties, not the lawyers. Here, the only reason that venue is appropriate in Orleans Parish is happenstance: Safeguard's merger into Smith several months after Guidry sustained his alleged injury. Smith had its Louisiana registered office in Orleans Parish and thus became an "accidental" party-defendant.

In accordance with the *Sondheimer* case and *Guidry*, this court specifically finds that the requirements for a forum non conveniens transfer are met in the instant case.

Convenience of the parties and witnesses. The location of the exposure was East Baton Rouge Parish. Plaintiff Barbara Catania alleges injuries as a result of asbestos exposure from contact with her three uncles who were insulators. Plaintiff and her three uncles reside in East Baton Rouge Parish. Each of these men assert that they have work histories and asbestos-related injuries stemming from work with asbestos-containing products at facilities located primarily in East Baton Rouge Parish. Each of these men have filed their own suits alleging that they have an asbestos-related disease and filed those suits in East Baton Rouge Parish. Presumably

1

the bulk of plaintiff's witnesses (and presumably their family members, uncles and the co-workers of their uncles) live either in the vicinity of East Baton Rouge or close by. It appears that all defendants named in the instant action are amenable to suit in East Baton Rouge Parish.

Access to the sources of proof and evidence, as well as viewing of the premises, if required. Clearly, since the majority of the facts giving rise to this litigation center around the Baton Rouge work sites where the plaintiff's uncles allegedly were exposed to the very asbestos fibers plaintiff claims are the source of her injuries from visiting with her uncles in their Baton Rouge homes, it appears that the documents relating to the uncles' employment would be found at these Baton Rouge work site premises and/or the Asbestos Workers Union Local 53, also located in Baton Rouge.

Cost of obtaining attendance of witnesses. While the court appreciates plaintiffs' statements that the Baton Rouge witnesses, including the uncles, "find the Parish of Orleans a more convenient forum for the trial of this matter," this *preference* does not outweigh the fact that these very essential fact witnesses reside in East Baton Rouge Parish and will most likely appear as witnesses in the ongoing lawsuits by the plaintiff's uncles in East Baton Rouge Parish. As to the expert witnesses, the court presumes these witnesses, who are no strangers to asbestos litigation, are equally flexible with their travel plans.

Advantages and obstacles to a fair trial. The plaintiffs have failed to identify any factors which would demonstrate that they would not be able to receive a fair trial in East Baton Rouge Parish. Indeed, in light of the ongoing litigation involving plaintiff's uncles in East Baton Rouge Parish, the court believes that it would be more advantageous and an efficient use of judicial resources for the East Baton Rouge

2

court to hear all of these claims in a consolidated hearing, given the presumably inter-related facts and circumstances giving rise to the respective claims.

Therefore, upon consideration of the location where the *majority* of the acts giving rise to this action occurred (East Baton Rouge Parish), the ongoing and related litigation in East Baton Rouge Parish relative to the asbestos claims of the plaintiff's uncles, which necessarily arise from the same set of circumstances and/or facts as the instant case, the overall convenience to the parties and the witnesses, the court finds that the interests of justice warrant that this matter be transferred to East Baton Rouge Parish.

JUDGMENT READ, RENDERED, AND SIGNED at New Orleans, Louisiana, on this the _____4th_____ day of ____March____, 2002.

_Michael Bagneris_

**J U D G E**

3

*Catania v. ACANDS, Inc., et al*, No. 01-18122
Hearing on Exceptions and Status Conference
Thursday, February 28, 2002

No. 11:24 am
FILED
FEB 2 8 2002
DEPUTY CLERK
CIVIL DISTRICT COURT

| NAME | PHONE NUMBER | E-MAIL ADDRESS | CLIENT |
|---|---|---|---|
| Tralula Johnson | 585-7650 | tshoct@monbae.com | Eagle, Inc. |
| Sue Kohn | 567-2906 | suckohn@spsr-law.com | McCarty |
| Kevin Webb | 513-0571 | kwebb@dks.law.com | Babcock Borsig Inc / McClennah |
| Troy N. Bell | 578-7646 | Tnbell@autmotipdr.com | Garlock Inc |
| W. Scott Brown | 717-4385 | wsbrown@EPUK.com | Uniroyal Inc. Chas-Illinois, Inc. |
| Robert Knight | 834-2612 | KnightC a bernard-cassisa.com | Reilly Benton Co. Inc |
| Julia Robles | 836-6500 | jrobles@haileymcnamara.com | Anco Insulations |
| Jules Boudreaux | (985)651-6571 | ROUSSEE PE@BELLSOUTH.NET | Plaintiffs |
| Gerolyn Rousse | (985)651-6571 | " | Plaintiffs |
| Greg Arding | (205)380-3495 | Greg Arshag@keennillie.com | Exxonmobil |
| David Brumman | (205)387-7221 | david@tphs.com | The Dow Chemical Company |
| Kay Baxter | 568-1562 | KBaxter@barfiddlaw.com | AC and S, Inc. |
| William Cody | (504)523-7333 | wcody@slidterlawfirm.com | G.E. |
| Meg Griffin | (225)219-2060 | Agriffin@prewudka.com | Westinghouse/Viacom |

| NAME | PHONE NO. | E-MAIL ADDRESS | CLIENT |
|------|-----------|----------------|--------|
| Lynn Luker | 525-5500 | Lynn.Luker@LSMlaw.com | Foster Wheeler |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS**

**STATE OF LOUISIANA**

NO. 2001-18122          **DIVISION "H"**          SECTION 12

**BARBARA CATANIA AND MICHAEL CATANIA**

**versus**

**AC and S, INC., ET AL**

---

**ANSWER AND INCIDENTAL DEMANDS OF VIACOM, INC.**

---

**NOW INTO COURT** comes Viacom, Inc., successor in interest to CBS Corporation, formerly known as Westinghouse Electric Corporation ("Westinghouse"), responding to the Petition for Damages filed by plaintiffs, Barbara Catania and Michael Catania, and generally denies each and every allegation, unless specifically admitted herein, and in further response to the petition submits the following answer, affirmative defenses and incidental demands:

**ANSWER**

1.

For Westinghouse to safely respond to the vague and overbroad allegations in the petition, it must qualify its answer and affirmative defenses to identify the allegations applicable to Westinghouse and limit its response to those allegations accordingly.

2.

The allegations made by the plaintiffs against defendants other than Westinghouse or premises owners require no response from Westinghouse. To the extent that any response is deemed necessary, each such allegation is denied.

3.

In response to paragraph 1, Westinghouse admits that it is a foreign corporation authorized to do and doing business in Louisiana. The remainder of the allegations of paragraph 1 are denied.

4.

Westinghouse denies the allegation of venue, as stated in paragraph 2 of the

B0183629.1



petition, for lack of information sufficient to justify a belief therein. The allegation that venue is proper constitutes a legal conclusion that requires no response. The remainder of the allegations in paragraph 2 are denied.

5.

To the extent that the allegations in paragraphs 3, 4 and 5 of the petition pertain to Westinghouse, the allegations are denied.

6.

The allegations contained in paragraphs 5, 6, 7, 8, 9, 10, and 11 do not pertain to and require no response from Westinghouse. To the extent that any response is deemed necessary, the allegations are denied for lack of sufficient information to justify a belief therein.

7.

Westinghouse denies the allegations contained in paragraph 12.

8.

To the extent the allegations contained in paragraph 13 of the petition pertain to Westinghouse, the allegations are denied.

9.

Westinghouse denies the allegations contained in paragraphs 14 and 15. Specifically, Westinghouse denies that it is answerable for the conduct of those handling asbestos or that it manufactured, distributed, or sold defective asbestos that was unreasonably dangerous or that caused harm to the plaintiff.

10.

To the extent the allegations contained in paragraph 16 through 43 of the petition pertain to Westinghouse, the allegations are denied.

11.

Westinghouse denies the allegations contained in Paragraph 44.  Specifically, Westinghouse denies that it had care, custody and control over defective asbestos that presented an unreasonable risk of harm that resulted in injury to the plaintiffs. Westinghouse further denies that it is strictly liable to the plaintiffs under Louisiana law.

B0183629.1

12.

Westinghouse denies the allegations contained in Paragraph 45. Specifically, Westinghouse denies that it owned defective asbestos that presented an unreasonable risk of harm that resulted in injury to the plaintiffs. Westinghouse further denies that it is strictly liable to the plaintiffs under Louisiana law.

13.

To the extent the allegations in paragraphs 46 and 47 of the petition pertain to Westinghouse, the allegations are denied. Specifically, Westinghouse denies that it is answerable for the conduct of those handling asbestos that presented an unreasonable risk of harm that resulted in injury to the plaintiffs. Westinghouse further denies that it is strictly liable to the plaintiffs under Louisiana law.

14.

Westinghouse denies the allegations contained in Paragraph 48. Specifically, Westinghouse denies that it was involved in an ultra-hazardous activity in the handling of asbestos which resulted in injury to the plaintiffs. Westinghouse further denies that it is strictly liable to the plaintiffs under Louisiana law

15.

Westinghouse denies the allegations contained in paragraph 49.

16.

Westinghouse denies the allegations contained in paragraphs 50 through 51.

**AFFIRMATIVE DEFENSES**

17.

To the extent that facts pleaded and developed through discovery provide a basis for affirmative defenses, Westinghouse specifically pleads the affirmative defenses of lack of causation, intervening cause, superseding cause, fault of third-parties, contributory negligence, comparative fault, failure to mitigate damages, prescription, lis pendens, and claim-splitting.

B0183629.1

## INCIDENTAL DEMANDS

### 18.

Westinghouse, assuming the position of third-party plaintiff herein, asserts third

party demands against DSM Copolymer, Inc. and Claims Resolution Management

Corporation as successor to the interest of Johns-Manville Corporation.

### 19.

Made defendants by cross-claim are the following:

a.   ACand S, INC., a foreign corporation, authorized to do and doing business in the State of Louisiana, and whose agent for service of process is C. T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, LA 70809.

b.   ANCO INSULATIONS, INC. (SUCCESSOR TO THE ABER COMPANY, INC.), a foreign corporation authorized to do and doing business in the State of Louisiana, and whose agent for service of process is Thomas E. Balhoff, Roedel, Parsons, Koch, Frost, 8440 Jefferson Highway, Suite 301, Baton Rouge, LA 70809

c.   A. P. GREEN INDUSTRIES, INC., a foreign corporation authorized to do and doing business in the State of Louisiana, who may be served through the Louisiana Long Arm Statute at Connecticut Valley, Claims Service Co., Inc., 525 Brook Street, P. O. Box 950, Rocky Hill, CT 06067.

d.   BABCOCK BORSIG POWER, INC. (FORMERLY DB RILEY, INC., FORMERLY RILEY STOKER CORPORATION), a foreign corporation authorized to do and doing business in the State of Louisiana, and whose agent for service of process is C. T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, LA 70809.

e.   THE DOW CHEMICAL COMPANY, a foreign corporation authorized to do and doing business in the State of Louisiana, and whose agent for service of process is C. T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, LA 70809.

f.   EAGLE, INC., a domestic corporation authorized to do and doing business in the State of Louisiana, and whose agent for service of process is Lawrence G. Pugh, III, Montgomery, Barnett, Brown., Read, Hammond & Mintz, 3200 Energy Centre, 1100 Poydras Street, New Orleans, LA 70163-3200

g.   EXXON MOBIL CORPORATION, (FORMERLY EXXON CORPORATION, FORMERLY HUMBLE OIL & REFINING COMPANY, FORMERLY ESSO STANDARD OIL COMPANY, FORMERLY STANDARD OIL COMPANY OF NEW JERSEY), a foreign corporation authorized to do and doing business in the State of Louisiana, and whose agent for service of process is Corporation Service Company, 320 Somerulos Street, Baton Rouge, LA 70802.

h.   THE FLINTKOTE COMPANY, a foreign corporation authorized to do and doing business in the State of Louisiana, who may be served through the Louisiana Long Arm Statute at The Flintkote Company, Attention: CHRISTINE M. HAMILTON, Three Embarcadero Center, Suite 1109, San Francisco, California 94111-4047.

D0183629.1

i.   FOSTER-WHEELER CORPORATION, a foreign corporation authorized to do and doing business in the State of Louisiana, who may be served through the Louisiana Long Arm Statute at Foster-Wheeler Corporation, 666 Fifth Avenue, New York, New York 10022.

j.   GARLOCK, INC., a foreign corporation authorized to do and doing business in the State of Louisiana, and whose agent for service of process is C. T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, LA 70809.

k.   THE McCARTY CORPORATION, a foreign corporation authorized to do and doing business in the State of Louisiana, and whose agent for service of process is Paul H. Spaht, 445 North Boulevard, Suite 300, Baton Rouge, LA 70802

l.   REILLY-BENTON COMPANY, INC., a domestic corporation authorized to do and doing business in the State of Louisiana, and whose agent for service of process is Deutsch, Kerrigan & Stiles, 755 Magazine Street, New Orleans, LA 70130

m.   RHONE-POULENC AG COMPANY, a foreign corporation authorized to do and doing business in the State of Louisiana, and whose agent for service of process is C. T. Corporation Systems, 8550 United Plaza Boulevard, Baton Rouge, LA 70809.

n.   TAYLOR-SEIDENBACH, INC., a domestic corporation authorized to do and doing business in the State of Louisiana, and whose agent for service of process is Ralph I. Shepard, 731 S. Scott Street, New Orleans, LA 70130

20.

Plaintiffs, Barbara Catania and Michael Catania, asserted claims against Westinghouse relating to Barbara Catania's alleged exposure to asbestos on the clothing of her uncles, Peter Giordano, Russell Reno, and Victor Reno; and her alleged contraction of an asbestos-related illness.

21.

Westinghouse has denied all allegations of fault and liability.   Furthermore, Westinghouse has denied plaintiffs' allegations that Barbara Catania contracted an asbestos-related injury or disease.  In the event that Westinghouse is found in any way at fault in this matter, Westinghouse asserts claims for contribution against the named third-party defendants and defendants in cross-claim.

22.

Westinghouse asserts premise liability against Copolymer for failing to provide a safe place in which to work free from the dangers of asbestos.

B0183629.1

23.

One of the premises on which plaintiff's uncle, Victor Reno, worked was owned by and in the custody of DSM Copolymer, Inc., and was unreasonably dangerous due to the presence of asbestos-containing products, which resulted in the exposure of plaintiff to asbestos fibers with no precautions taken to minimize the risk of danger or warn plaintiff's uncle of such danger. The unreasonably dangerous condition of the premises and the negligence of DSM Copolymer, Inc. were causes of the plaintiffs' injuries.

24.

DSM Copolymer, Inc. negligently, recklessly, willfully, and/or because of gross and wanton negligence, fault, or strict liability, failed to properly discharge its duties to plaintiff's uncle in the following:

a.   Failed to provide plaintiff's uncle with a safe work place;

b.   Failed to provide plaintiff's uncle with safety equipment;

c.   Failed to provide plaintiff's uncle with correct, adequate, or proper safety equipment;

d.   Recklessly and negligently failed to disclose, warn or reveal critical medical and safety information to plaintiff's uncle regarding asbestos hazards in general and with regard to those specific hazards at plaintiff's uncle's work site;

e.   Recklessly concealed and negligently omitted to reveal critical medical and safety information from plaintiff's uncle regarding the safety and health risks associated with the asbestos-containing products at his work sites;

f.   Failed to timely remove asbestos hazards from the work place;

g.   Failed to properly supervise or monitor the work areas for compliance with safety regulations; and

h.   Failed to provide a safe and suitable means of eliminating the amount of asbestos dust in the air.

25.

Copolymer is strictly liable for hazardous things in their garde, care, custody or right of control; and/or any other acts or omissions as may be revealed in discovery or at trial.

26.

The above-described negligence, fault, strict liability and wilful misconduct of Copolymer was a proximate cause of the plaintiff's injuries.

B0183629.1

27.

The Claims Resolution Management Corporation, a subsidiary of the Manville Personal Injury Settlement Trust, has succeeded to the liabilities of Johns-Manville Corporation, and is the entity subject to claims for contribution or for establishing credits or offsets with respect to the liability of Johns-Manville Corporation.

28.

Johns-Manville Corporation, at all relevant times, was a miner, manufacturer, seller, distributor, supplier, and/or user of asbestos products and was engaged in or materially participated in the business of manufacturing or facilitating the manufacturing of asbestos products, or representing themselves as a manufacturer or asbestos products, or was a professional vendor of asbestos or asbestos containing products, which were expected to and did reach Barbara Catania, and whereby she was exposed to it.

29.

The products mined, manufactured, distributed, supplied, sold, and/or used by the Johns-Manville Corporation were defective, unreasonably dangerous, and unreasonably dangerous *per se*. The plaintiff and other similarly situated individuals were foreseeable users and/or bystanders who were exposed to these products. These defects include, without limitation, the following:

a. The mining, manufacture, sale, supply, distribution and use of products that are unreasonably dangerous or unreasonably dangerous per se;

b. The mining, manufacture, sale, supply, distribution and use of products that possess inherent and known properties that make them unreasonably dangerous by presenting potential for causing serious injury and health problems to those who would be foreseeably exposed to them;

c. Lack of warning or of sufficient warning of the hazards these products would present in the course of their normal foreseeable use or intended use;

d. Lack of safety instruction or of sufficient safety instruction for eliminating or reducing the health risks associated with the intended use of these products;

e. Failure to inspect these products to assure sufficiency and adequa cy of warnings and safety cautions;

f. Failure to test or adequately test these products for defects or hazards that they could present to the intended or foreseeable users;

g. Failure to truthfully report or adequately report the results of product testing, and medical studies associated with foreseeable hazards of these products by intended or foreseeable users;

h. Failure to properly design these products where the nature of the product did not require use of asbestos mineral or where alternate, equally suitable substances were readily available;

i. Defects in the composition and construction of these products;

j. Failure to recall these products mined, manufactured, sold, supplied and distributed;

k. Failure to properly package these products so that they could be safely transported, handled, stored, or disposed of; and

l. Over warranting the safety of these products that were manufactured, sold, or supplied by the third party defendants.

30.

The fault and defective products of Johns-Manville Corporation are a proximate case of plaintiff's alleged illness or injury, if any.

31.

Johns-Manville Corporation was negligent in engaging in the substandard conduct enumerated above and this negligence was a proximate cause of plaintiff's alleged injury or illness, if any.

32.

Johns-Manville Corporation is liable for negligence, fault, and strict products liability in connection with the manufacturing, distributing and design of asbestos–containing products which were defective in design, unreasonably dangerous *per se*, and for failure to warn plaintiff and others of the asbestos hazards posed by its products.

33.

Plaintiffs filed suit against numerous defendants including Westinghouse contending that Barbara Catania suffered injuries as a result of exposure to asbestos on the clothing of her uncles, Peter Giordano, Russell Reno, and Victor Reno.

34.

Defendants, Reilly-Benton Company, Inc., Eagle, Inc., The McCarty Corporation, Taylor-Seidenbach, Inc., Anco Insulations, Inc., The Dow Chemical Company, Exxon Mobil Corporation, are either contractors, premises owners, or employers that supplied or used

B0183629.1

asbestos-containing products at sites at which Barbara Catania's uncles worked.

35.

Defendants, A. P. Green Industries, Inc., Babcock Borsig Power, Inc., The Flintkote Company, Foster-Wheeler Corporation, Garlock, Inc., Rhone-Poulenc AG Company, and AcandS, Inc., are manufacturers of asbestos containing products used at sites at which Barbara Catania's uncles worked.

36.

Solely in the event that plaintiff proves that Barbara Catania's injuries are related to asbestos exposure, Westinghouse contends that Ms. Catania inhaled asbestos fibers released from products manufactured, supplied and/or used by the parties defendants herein, that the asbestos-containing products were defective, that defendants herein were negligent in the manner in which they manufactured or used such products and that such defendants failed to provide an adequate warning of the hazards associated with the use of such products.

37.

Westinghouse adopts by reference all of the allegations made against the parties named as defendants in its cross claim that are asserted by the plaintiffs in the petition for damages as if copied and attached hereto, *in extenso*, insofar as they assert fault, negligence, strict liability, and other bases of liability against the defendants herein.

38.

Solely in the event that Westinghouse is held liable to plaintiffs on the principal demand, it is entitled to contribution and/or indemnification, and set offs from any parties the plaintiff have settled with on any amount it may be required to pay to plaintiff.

39.

Westinghouse adopts by reference all of the allegations made against the parties named as defendants in its cross claim that are asserted by the plaintiffs in the petition for damages as if copied and attached hereto, *in extenso*, insofar as they assert fault, negligence, strict liability, and other bases of liability against the defendants herein.

B0183629.1

40.

Solely in the event that Westinghouse is held liable to plaintiffs on the principal demand, it is entitled to contribution and/or indemnification, and set offs from any parties the plaintiffs have settled with on any amount it may be required to pay to plaintiff.

### REQUEST FOR JURY

41.

Westinghouse reserves its right to request a trial by jury.

WHEREFORE, Westinghouse prays that after due proceedings there be judgment in its favor dismissing plaintiffs' demands as their costs. Alternatively, and solely in the event that Westinghouse is held liable to plaintiffs, it prays for judgment against parties it has made third-party demands and cross claims against for contribution and/or tort indemnification, and set offs for any parties the plaintiffs may have settled with on any amount it may be required to pay to plaintiffs.

Respectfully submitted,

*Charles C. Fitzgerald*

JONES, WALKER, WAECHTER, POITEVENT,
CARRÈRE & DENÈGRE, L.L.P.
LEON GARY, JR. (Bar #5959)
WILLIAM L. SCHUETTE (Bar Roll No. #2098)
AVERY LEA GRIFFIN (Bar Roll No. #22914)
OLIVIA S. TOMLINSON (Bar Roll No. #27114)
CHARLES G. FITZGERALD (Bar Roll No. #27463)
8555 United Plaza Blvd., Fifth Floor
Baton Rouge, LA 70809
Telephone: (225) 248-2000
Telefax: (225) 248-3051

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading has been served upon all counsel of record by facsimile, mail, hand delivery, or by placing the same with any court appointed document repository.

Baton Rouge, Louisiana, this _8_ day of _March_ 2002.

*Charles C. Fitzgerald*

B0183629.1

**PLEASE SERVE :**
**THIRD PARTY DEFENDANTS DSM COPOLYMER, INC. AND JOHNS-MANVILLE CORPORATION WITH THE FOLLOWING:**

    1.   Viacom, Inc.'s Answer and Incidental Demands
    2.   Plaintiffs' Original Petition for Damages
    3.   Scheduling Order

**DSM COPOLYMER, INC.,**
FORMERLY KNOWN AS
COPOLYMER RUBBER AND CHEMICAL CORPORATION
Through its agent for service of process:
C. T. Corporation Systems
8550 United Plaza Boulevard
Baton Rouge, LA 70809

**JOHNS-MANVILLE CORPORATION**
n/k/a CLAIMS RESOLUTION MANAGEMENT CORPORATION, A SUBSIDIARY OF THE
MANVILLE PERSONAL INJURY SETTLEMENT TRUST
*(Via the Louisiana Long Arm Statute)*
Through its registered agent for service of process:
2860 Willow Oaks Corporate Drive
6th Floor
P. O. Box 10415
Fairfax, Virginia 22031

**PLEASE SERVE:**
**CROSS CLAIM DEFENDANTS LISTED BELOW WITH THE FOLLOWING:**

    1.   Answer and Incidental Demands of Viacom, Inc.

Acand S, INC.
Through its agent for service of process:
C. T. Corporation Systems
8550 United Plaza Boulevard
Baton Rouge, LA 70809

ANCO INSULATIONS, INC. (SUCCESSOR TO THE ABER COMPANY, INC.)
Through its agent for service of process:
Thomas E. Balhoff
Roedel, Parsons, Koch, Frost, et al
8440 Jefferson Highway, Suite 301
Baton Rouge, LA 70809

A. P. GREEN INDUSTRIES, INC.
*(Via the Louisiana Long Arm Statute)*
Connecticut Valley Claims Service Co., Inc.
525 Brook Street
P. O. Box 950
Rocky Hill, CT  06067

D0183620.1

BABCOCK BORSIG POWER, INC.  (FORMERLY DB RILEY, INC.
FORMERLY RILEY STOKER CORPORATION)
Through its agent for service of process:
C. T. Corporation Systems
8550 United Plaza Boulevard
Baton Rouge, LA 70809

THE DOW CHEMICAL COMPANY
Through its agent for service of process:
C. T. Corporation Systems
8550 United Plaza Boulevard
Baton Rouge, LA 70809

EAGLE, INC.
Through its agent for service of process:
Lawrence G. Pugh, III
Montgomery, Barnett, Brown., Read,
        Hammond & Mintz
3200 Energy Centre
1100 Poydras Street
New Orleans, LA 70163-3200

EXXON MOBIL CORPORATION
(FORMERLY EXXON CORPORATION,
FORMERLY HUMBLE OIL & REFINING COMPANY,
FORMERLY ESSO STANDARD OIL COMPANY,
FORMERLY STANDARD OIL COMPANY OF NEW JERSEY)
Through its agent for service of process:
Corporation Service Company
320 Somerulos Street
Baton Rouge, LA 70802

THE FLINTKOTE COMPANY
(Via the Louisiana Long Arm Statute)
The Flintkote Company
ATTN: CHRISTINE M. HAMILTON
Three Embarcadero Center
Suite 1109
San Francisco, California 94111-4047

FOSTER-WHEELER CORPORATION
(Via the Louisiana Long Arm Statute)
666 Fifth Avenue
New York, New York 10022

GARLOCK, INC.
Through its agent for service of process:
C. T. Corporation Systems
8550 United Plaza Boulevard
Baton Rouge, LA 70809

THE McCARTY CORPORATION
Through its agent for service of process:
Paul H. Spaht
445 North Boulevard
Suite 300
Baton Rouge, LA 70802

B0183629.1

REILLY-BENTON COMPANY, INC.
Through its agent for service of process:
Deutsch, Kerrigan & Stiles
755 Magazine Street
New Orleans, LA 70130

RHONE-POULENC AG COMPANY
Through its agent for service of process:
C. T. Corporation Systems
8550 United Plaza Boulevard
Baton Rouge, LA 70809

TAYLOR-SEIDENBACH, INC.
Through its agent for service of process:
Ralph I. Shepard
731 S. Scott Street
New Orleans, LA 70130

D0183629.1




ROUSSEL & ROUSSEL
A PROFESSIONAL CORPORATION
ATTORNEYS AND COUNSELORS AT LAW
LOCATED ON BELLE TERRE BOULEVARD
1710 CANNES DRIVE
LAPLACE, LOUISIANA 70068

February 27, 2002                              **By Fax**

Kay B. Baxter/                              Kelly Lightfoot/
David Barfield/                            Claude Greco/
Lara Ashley Coleman                        Dominic Ovella/
Lynn Luker                                 Valerie Schexnayder/
Larry Canada                               Antonio Papale/
Larry Pugh                                 Julie Robles
Glenn Swetman/                             John Cosmich
Troy Bell                                  Dwight Paulsen/
Thomas Tyner                               David Redmann
Susan Kohn                                 Benjamin Slater, III/
Stephen Elliott/                           Cory R. Cahn
Eugene McEachin, Jr                        William Schuette/
Andre Broussard/                           Leon Gary
Wendell Stout/                             Gregory M. Anding
Janet MacDonell                            Gregory E. Bodin/
Lisa Winter/                               David M. Bienvenu, Jr.
Theodore White

        Re:   Barbara Catania, et al v. ACandS, Inc., et al
              CDC No. 2001-18122; Div. "H-12"

Dear Counselors:

        Enclosed please find a copy of Plaintiffs' Opposition to the Motion for Leave
to File Third Party Demand Filed on Behalf of Owens-Illinois, Inc. and Uniroyal, Inc.
which has been filed with the Court in the above-referenced matter.

                                Sincerely,

                                Jules B. Boudreaux

JKB/ifs
Enclosure

EXHIBIT
tabbies®
5

Group Send Report

```
Time      : Feb-27-02  08:53pm
Tel line 1 : 504-651-6592
Name      : ROUSSEL & ROUSSEL
```

Job number        :   760

Date              :   Feb-27 07:07pm

Document Pages    :   23

Start time        :   Feb-27 07:07pm

End time          :   Feb-27 08:53pm

Successful

    Fax number

    ☎5045681560-01019
    ☎16019689425-01019
    ☎5045255599
    ☎5045252456
    ☎5045857688
    ☎5045289640
    ☎16015832677-01019
    ☎5045692999
    ☎5048389438
    ☎5045661201
    ☎5048366565
    ☎16019603241-01019
    ☎5045849142
    ☎5045281080
    ☎12252483051-01019
    ☎12253468049-01019
    ☎12253889133-01019

Unsuccessful

                                                                Pages sent

# ROUSSEL & ROUSSEL
### A PROFESSIONAL CORPORATION
## ATTORNEYS AND COUNSELORS AT LAW
LOCATED ON BELLE TERRE BOULEVARD
1710 CANNES DRIVE
LAPLACE, LOUISIANA 70068

NOTARY PUBLIC
PROFESSIONAL ENGINEERING

FAX (985) 651-6592
TELEPHONE (985) 651-6591



LOUISIANA        MISSISSIPPI

February 27, 2002

**By Fax**

Kay B. Baxter/
David Barfield/
Lara Ashley Coleman
Lynn Luker
Larry Canada
Larry Pugh
Glenn Swetman/
Troy Bell
Thomas Tyner
Susan Kohn
Stephen Elliott/
Eugene McEachin, Jr
Andre Broussard/
Wendell Stout/
Janet MacDonell
Lisa Winter/
Theodore White

Kelly Lightfoot/
Claude Greco/
Dominic Ovella/
Valerie Schexnayder/
Antonio Papale/
Julie Robles
John Cosmich
Dwight Paulsen/
David Redmann
Benjamin Slater, III/
Cory R. Cahn
William Schuette/
Leon Gary
Gregory M. Anding
Gregory E. Bodin/
David M. Bienvenu, Jr.

Re:   Barbara Catania, et al v. ACandS, Inc., et al
      CDC No. 2001-18122; Div. "H-12"

Dear Counselors:

Enclosed please find a copy of Plaintiffs' Opposition to the Motion for Leave to File Third Party Demand Filed on Behalf of Owens-Illinois, Inc. and Uniroyal, Inc. which has been filed with the Court in the above-referenced matter.

Sincerely,

Jules K. Boudreaux

JKB/lfs
Enclosure

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA *FILED*

NO. 2001-18122                    DIVISION "H" 2002 FEB 27 P 3:33 SECTION 12

BARBARA CATANIA AND MICHAEL CATANIA

*CIVIL*
VERSUS *DISTRICT COURT*

ACandS, INC., ET AL.

FILED: _____        _____
                                              DEPUTY CLERK

### PLAINTIFFS' OPPOSITION TO THE MOTION FOR LEAVE TO FILE THIRD PARTY DEMAND FILED ON BEHALF OF OWENS-ILLINOIS, INC. AND UNIROYAL, INC.

Defendants, Owens-Illinois, Inc. and Uniroyal, Inc., have field a Motion for Leave to File Third Party Demand. For the reasons set forth below, the motion should be denied.

Pursuant to the Scheduling Order entered in this matter on January 14, 2002, "[a]ll amendments to petitions, cross-claims and third-party demands were to be filed and served by **January 28, 2002**." See Exhibit "1". On February 22, 2002, Owens-Illinois, Inc. and Uniroyal, Inc. apparently filed a motion for leave to file third party demand, for which a copy of said pleading was not provided to counsel for plaintiffs until February 27, 2002. In support of their motion, Owens-Illinois, Inc. and Uniroyal, Inc. represent that they "did not become aware of DSM Copolymer's role in this lawsuit until February 6, 2002, when Victor Reno was deposed." Plaintiffs submit that this is entirely incorrect, as counsel for Owens-Illinois, Inc. and Uniroyal, Inc. (which is the same counsel that currently represents Owens-Illinois and Uniroyal in this matter) was present at, and fully participated in the deposition of Victor Reno given back on July 24, 1996, wherein Victor Reno was fully deposed as to work at the Copolymer facility during the relevant time periods in this matter. See Exhibit "2"-Deposition of Victor Reno taken on 7/24/96 at pp. 2, 12-17, 20-23, 27, 28, 66, and 88-91. Plaintiffs further note that counsel for Anco Insulations, Inc., Julie Robles, further deposited additional copies of the previous depositions of Victor Reno (including the 7/24/96 deposition of Victor Reno) at Choice Copy Services, Inc. on January 14, 2002, and notified all counsel of

same, including, but not limited to counsel for Owens-Illinois, Inc. and Uniroyal, Inc. Exhibit "3". Accordingly, from all of the above, it is clear that Owens-Illinois, Inc. and Uniroyal, Inc. were clearly aware of DSM Copolymer's role in this lawsuit well before the cutoff date of January 28, 2002 for filing third party demands in this matter. Plaintiffs further show that as this case has been set for trial on an expedited basis pursuant to La. Code of Civ. Pro. art. 1573, clearly any allowance by this court of "late filed" third party demands will surely prejudice plaintiffs, retard the progress of this litigation, and make it virtually impossible to uphold the previously set deadlines established to ensure the meeting of the June 10, 2002, trial date in this matter. As such, it is clear that Owens-Illinois, Inc. and Uniroyal have not met their burden to establish any justification for their failure to timely file a third party demand against DSM Copolymer in this matter, and accordingly, the motion for leave to file third party demand of Owens-Illinois and Uniroyal should be denied.

WHEREFORE, it is respectfully submitted that the Motion for Leave to File Third Party Demand filed on behalf of Owens-Illinois, Inc. and Uniroyal, Inc. should be denied.

Respectfully submitted,

ROUSSEL & ROUSSEL

GEROLYN P. ROUSSEL - 1134
PERRY J. ROUSSEL, JR. - 20351
JULES K. BOUDREAUX - 24309
1710 Cannes Drive
LaPlace, LA 70068
Telephone: (504) 651-6591
Attorneys for Petitioners

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing pleading has been served upon counsel for all parties by FAX, hand delivery, or mailing same, properly addressed and postage prepaid, on this 27th day of February, 2002.

GEROLYN P. ROUSSEL

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NO. 2001-18122

DIVISION "H"
SECTION 12

BARBARA CATANIA AND MICHAEL CATANIA

VERSUS

ACandS, INC., ET AL.

FILED: _____

_____
DEPUTY CLERK

FILED
2002 JAN 14   P 2:39
CIVIL DISTRICT COURT

## SCHEDULING ORDER

In order to facilitate the orderly, efficient, and expeditious disposition of this matter, it is hereby ordered that this claim be governed by the following scheduling order:

1.    All amendments to petitions, cross-claims and thirty-party demands shall be filed and served by **January 28, 2002**. Responsive pleadings to any such amended petitions, cross-claims, and third-party demands shall be filed by **February 15, 2002**. A status conference shall be held on **February 28, 2002, at 11:00 a.m.** At the conference, all outstanding exceptions shall be heard. Any other motions to be heard at this conference shall be filed and served in accordance with the Louisiana Code of Civil Procedure by **February 15, 2002**, and all responses thereto by **February 25, 2002**. In the event that exceptions to the amended pleadings are denied, answers shall be filed by **March 8, 2002**.

2.    Plaintiffs, plaintiffs in cross-claim and third-party plaintiffs shall file a list of witnesses that may be called to testify at the trial of this matter by **January 31, 2002**. The witness list shall provide a current municipal address and a short, meaningful summary of the anticipated testimony of each witness. Any witness testifying by prior trial testimony or by deposition shall be so designated and the testimony shall be described by date and case caption. If requested by any party, the designating party shall furnish a copy of the prior



EXHIBIT
1

trial testimony or deposition transcript to the requesting party within two (2) days of the receipt of the request.  Appropriate page and line designations of prior trial or deposition testimony shall be exchanged no later than seven (7) days prior to trial.  Parties shall file their counter designations no later than three (3) days prior to trial.  Plaintiffs, plaintiffs in cross-claim and third-party plaintiffs shall file a list of exhibits by **January 31, 2002.** Exhibits shall be numbered and exhibit numbers shall correlate with the exhibit's number on the exhibit list.  An exhibit exchange will be held at the office of counsel for plaintiffs on **Monday, June 3, 2002 at 2:00 p.m.**

Plaintiffs shall file their expert witness list and deliver their medical and economic expert witness reports for all experts who are expected to testify at trial, to defendants on or before **January 31, 2002.**  Expert reports are not required for any other experts.  It is understood that the requirement to produce medical and economic expert reports only pertains to those experts retained solely for the purpose of litigation and not to experts involved in the examination, evaluation, treatment and diagnosis of plaintiff in the ordinary course of events.  Plaintiffs shall provide necessary authorizations to defendants, upon request issued in accordance with the Code of Civil Procedure, in order to allow access to, any and all charts, records, correspondence, files, notes, reports, and any other documents, records or materials pertaining to plaintiff, of any providers examining, diagnosing, treating and/or evaluating plaintiff.  Such authorization shall be provided in a timely manner.  Plaintiffs shall also simultaneously produce to the designated defense medical liaison counsel radiographs, CT scans, test results, pathology material, including without limitation blocks, micrographs, slides and other such things prepared by or provided to their expert medical witnesses, which are in the possession of counsel for plaintiff.

4.      Defendants, third-party defendants, and defendants in cross-claim shall file a list of witnesses that may be called to testify at the trial of this matter by **February 22, 2002.** The witness list shall provide a current municipal address and a short, meaningful summary of the anticipated testimony of each witness.  Any witness testifying by prior

trial testimony or by deposition shall be so designated and the testimony shall be described by date and case caption.  If requested by any party, the designating party shall furnish a copy of the prior trial testimony or deposition transcript to the requesting party within two (2) days of the receipt of that request.  Appropriate page and line designations of prior trial or deposition testimony shall be exchanged no later than seven (7) days prior to trial.  Parties shall file their counter designations no later than three (3) days prior to trial.  Defendants, third-party defendants and defendants in cross-claim shall file an exhibit list by **February 22, 2002**.  Exhibits shall be numbered and exhibit numbers shall correlate with the exhibit's number of the exhibit list.

5.   Defendants shall file their expert witness lists and deliver their medical and economic expert reports for all such experts who are expected to testify at trial, by **February 22, 2002**.  Expert reports are not required for any other experts.  Defendants shall also produce radiographs, CT scans, test results, pathology material, including without limitation blocks, micrographs, slides and other such things prepared by or provided to their expert medical witnesses, which are in the possession and/or control of counsel.  As to any such items which are not in the possession and/or control of counsel, counsel will, on or before **February 22, 2002**, make such materials available and provide any necessary authorizations in order to allow access to such materials by plaintiff's experts.

6.   The discovery cut-off date shall be **May 3, 2002**.  All motions to compel discovery shall heard on **May  8, 2002, at 10:00 a.m.**

7.   All dispositive motions, including motions for summary judgment, shall be filed and served in accordance with the Louisiana Code of Civil Procedure by **May 10, 2002**.  Responses to these motions shall be filed and faxed or hand delivered by **May 20, 2002**.  These motions will be heard on **May 23, 2002, at 10:00 a.m.**

8.   All Motions in Limine shall be filed and served in accordance with the Louisiana Code of Civil Procedure and will be heard on **May 23, 2002 at 10:00 a.m.**

9.   In order to ensure the orderly, efficient and expeditious implementation of this Order, status conference and hearings shall be held as follows:

February 28, 2002 at 11:00 a.m.,

May 8, 2002 at 10:00 a.m., and

May 23, 2002 at 10:00 a.m.

Additional status conference and/or hearing dates may be scheduled upon request and as circumstances dictate.

10.   **Trial of this matter is hereby ordered to begin on June 10, 2002 at 8:30 a.m. and is estimated to take approximately nine (9) days.**

**THUS DONE AND SIGNED** this _14th_ day of _January_, 2002, in New Orleans, Louisiana.

_Michael Bagneris_

**MICHAEL G. BAGNERIS**
**CIVIL DISTRICT JUDGE**

A TRUE COPY

DEPUTY CLERK, CIVIL DISTRICT COURT
PARISH OF ORLEANS
STATE OF LA

*Catania SCH ORD - v.1/14/02*

1   19TH JUDICIAL DISTRICT COURT
2   PARISH OF EAST BATON ROUGE
3   STATE OF LOUISIANA
4
5 ********************************************
6 VICTOR RENO, SR.
7
8                NO. 421,011
9   -vs-
10              DIVISION "I"
11
12
13 OWENS-CORNING FIBERGLAS, ET AL
14 ********************************************
15
16 TESTIMONY OF MR. VICTOR RENO, SR., taken by
17 DEFENDANTS, pursuant to notice, at the law
18 offices of Covert and Braud, 10621 North Oak
19 Hills Parkway, Baton Rouge, Louisiana 70884, on
20 July 24, 1996.
21
22 REPORTED BY:  PAUL W. WILLIAMS
23          CERTIFIED SHORTHAND REPORTER
24          STATE OF LOUISIANA
25

### PAGE 2

2

1 FOR THE PLAINTIFF:
2 COVERT AND BRAUD
3 10621 NORTH OAK HILLS PARKWAY
4 POST OFFICE BOX 82080
5 BATON ROUGE, LOUISIANA 70884-2080
6 BY:  GEORGE R. COVERT, ESQ.
7
8 FOR OWENS-CORNING FIBERGLAS CORPORATION:
9 FRILOT, PARTRIDGE, KOHNKE AND CLEMENTS
10 3600 ENERGY CENTRE
11 NEW ORLEANS, LOUISIANA 70163
12 BY:  JOHN J. HAINKEL, III, ESQ.
13
14 FOR OWENS ILLINOIS AND UNIROYAL:
15 FORMAN, PERRY, WATKINS AND KRUTZ
16 SUITE 1200, ONE JACKSON PLACE
17 188 EAST CAPITOL STREET
18 JACKSON, MISSISSIPPI 39201
19 BY:  FORREST REN WILKES, ESQ.
20
21 FOR PITTSBURGH CORNING CORPORATION:
22 PORTEOUS, HAINKEL, JOHNSON AND SARPY
23 704 CARONDELET STREET
24 NEW ORLEANS, LOUISIANA 70130
25 BY:  EDWIN A. ELLINGHAUSEN, III, ESQ.

3

1 FOR COMBUSTION ENGINEERING:
2 GALLOWAY, JOHNSON, TOMPKINS AND BURR
3 4040 ONE SHELL SQUARE
4 NEW ORLEANS, LOUISIANA 70139
5 BY:  ELIZABETH D. MACKAY, ESQ.
6
7 FOR GARLOCK, INC.:
8 AULTMAN, TYNER, MCNEESE, RUFFIN AND LA
9 TEXACO CENTER, 18TH FLOOR
10 NEW ORLEANS, LOUISIANA 70130
11 BY:  TROY N. BELL, ESQ.
12
13 FOR BABCOCK AND WILCOX:
14 BLUE WILLIAMS
15 3421 NORTH CAUSEWAY BOULEVARD
16 METAIRIE, LOUISIANA 70002
17 BY:  PAMELA F. NOYA, ESQ.
18
19 FOR THE MCCARTY CORPORATION:
20 SIMON, PERAGINE, SMITH AND REDFEARN
21 3000 ENERGY CENTRE
22 NEW ORLEANS, LOUISIANA 70163
23 BY:  DOUGLAS W. REDFEARN, ESQ.
24
25

### PAGE 4

4

1           STIPULATION
2
3 It is stipulated and agreed by and among the
4 various parties that the testimony of the
5 witness may be taken by defendants, pursuant to
6 notice, at the time and place hereinbefore
7 noted; that the testimony of the witness may be
8 taken down in shorthand (Stenotype) by Paul W.
9 Williams, and by him transcribed, the
10 formalities of signing, sealing, certification
11 and filing being waived, and all objections,
12 save as to the form of the question, being
13 reserved to the time of trial.
14
15 It is further stipulated the witness may be duly
16 sworn by Paul W. Williams, Certified Court
17 Reporter, in and for the State of Louisiana.
18
19
20
21
22
23
24
25

EXHIBIT

PAUL W. WILLIAMS, INC. -- 3535 N. CAUSEWAY -- (504)832-0937

5

1           VICTOR RENO, SR.,

2 having been first duly sworn, was examined

3 and testified as follows:

4 EXAMINATION BY MR. HAINKEL:

5 Q.     My name is John Hainkel, sir, and I

6 represent Owens-Corning Fiberglas Corporation,

7 one of the defendants in the lawsuit filed on

8 your behalf.

9           We are here today to take your

10 deposition, which is a series of questions that

11 I am going to ask you, and the other lawyers

12 will probably have some questions, too, about

13 your work history, your medical history, that

14 kind of thing.

15           It is an informal proceeding, and you

16 are under oath, so we expect that you will tell

17 us the truth.

18           If you don't know the answer to a

19 question, that is fine, too.

20           You have to answer out loud, 'yes" or

21 "no," and explain your answer, if you need to,

22 because Mr. Williams can't take down nods.

23           If you have any confusion with any of my

24 questions, let me know, because I want you to be

25 answering what I am asking you, and us to be

PAGE 6

6

1 straight on that.   Okay?

2 A.      Okay.

3 Q.      Have you ever given a deposition before?

4 A.      Yes, sir.

5 Q.      Okay.   Did it have to do with an

6 asbestos-related lawsuit?

7 A.      No, sir.

8 Q.      I have you as Victor Reno.   What is

9 your middle initial?

10 A.      I don't have any.

11 Q.      Senior, Junior, The Third?

12 A.      No; just --

13 Q.      Mr. Reno, what is your address?

14 A.      I am at 7767 Dave Hayden Court.

15 Q.      That is here in Baton Rouge?

16 A.      Baton Rouge, 70809.

17 Q.      How long have you lived there?

18 A.      About, oh, a little over two years.

19 Q.      Prior to that time, where did you live?

20 A.      I lived on 11480 Foster Road; I was

21 there 24 years.

22 Q.      You were born and raised in the Baton

23 Rouge area?

24 A.      No; I was born and raised in Fordoche,

25 Louisiana.

7

1 Q.      Does anyone live with you at the Dave

2 Hayden residence?

3 A.      Well, my wife.

4 Q.      Her name is?

5 A.      Dorothy J.

6 Q.      How long have you and Dorothy been

7 married?

8 A.      Forty-four years.

9 Q.      Do you have any children?

10 A.      Yes, we do.

11 Q.      What are their names and ages?

12 A.      Victor Joseph is -- he is 43, Victor

13 Joseph, and James Brian is 41, and Tamr    ean

14 -- I think she is 37.

15 Q.      Do they live in the Baton Rouge area?

16 A.      Yes, they do.

17 Q.      Did you ever work with any of your sons?

18 A.      Yes.

19 Q.      Okay.   At Exxon?

20 A.      Well, I don't think at Exxon.

21 Q.      What does Victor do, your son?

22 A.      He is in business with me.

23 Q.      Right now?

24 A.      Yes.

25 Q.      How about your second son?

PAGE 8

8

1 A.      Also.

2 Q.      What business is that?

3 A.      Insulation contracting.

4 Q.      What is the name of the company?

5 A.      Insulation Sales; Insulation Sales and

6 Service.

7 Q.      How long have you been in operation?

8 A.      Twenty-four years.

9 Q.      We'll come back to your work with

10 insulation contractors in a minute.

11           Do you have any brothers who may have

12 worked in the insulation industry, or worked at

13 Exxon with you?

14 A.      Yes, sir.

15 Q.      Who would that be?

16 A.      Russell.

17 Q.      Okay.

18 A.      And Tony.

19 Q.      Let's start with Russell.   Did you-all

20 work together, or you work together now?

21 A.      We worked together.   As a matter of fact, Tony got

22 me on, and they all worked with me.   Russell

23 worked with me most of the time, just about 95

24 percent of the time.

## 9

1 Q.     That is with the insulation contractors?

2 A.     Yes.

3 Q.     The same thing with Tony; Tony and

4 Russell worked with you?

5 A.     Tony not as much as Russell.   And Tony

6 stayed with me the whole time until he retired.

7 Q.     How is your wife's health, generally?

8 A.     Not good.

9 Q.     Does she work outside of the home?

10 A.     No.   She can't anymore; she used to.

11 Q.     Her health does not have anything to do

12 with alleged exposure to asbestos-containing

13 products?

14 A.     I don't know.   As a matter of fact, she

15 is thinking about going to Mayo Clinic and check

16 it out.   She has a lot of problems.

17 Q.     Is that pulmonary or lung problems, or

18 cancer --

19 A.     Just -- I don't know, just -- she just

20 -- I really don't know.

21 Q.     How about your two sons and your

22 daughter; do they have any problems that, from a

23 medical standpoint, that you believe may be

24 related to exposure to asbestos?

25 A.     No, I don't -- not that I know of.   And

   PAGE 10

## 10

1 Tammy, also, I don't think so; V. J., possible.

2      MS. MACKAY:

3           "B. J."?

4      THE WITNESS:

5           Victor; V. J.

6 EXAMINATION BY MR. HAINKEL:

7 Q.     What type of problem do you think he

8 has, or do you know?

9 A.     He had a lot of respiratory problems, I

10 know that.

11 Q.     How about Russell or Tony; do they have

12 their own lawsuits or any problems that you

13 understand may be related to exposure to

14 asbestos?

15 A.     Well, repeat that for me, please?

16 Q.     Russell and Tony, your brothers?

17 A.     Yes.

18 Q.     Does either one of them have any medical

19 problems that you know of that may be or is

20 claimed to be related to exposure to asbestos?

21 A.     Only what they tell me, that's all I --

22      MR. COVERT:

23           I represent Russell.   I think we

24 are taking his deposition soon, so --

25      THE WITNESS:

## 11

1           My understanding, Tony is

2 already -- he filed suit, and he has got a

3 settlement; I think he already received money,

4 the best of my knowledge.

5      MR. HAINKEL:

6           Is Tony your client, too?

7      MR. COVERT:

8           No.

9      MR. HAINKEL:

10           Russell has a suit, the fellow

11 next week?

12      MR. COVERT:

13           Right.

14 EXAMINATION BY MR. HAINKEL:

15 Q.     What's your education?

16 A.     Lacking a week of completing ten years,

17 tenth grade; Lacking a week, two weeks, of

18 completing the tenth grade.

19 Q.     Besides that, do you have any other type

20 of formal education; trade school or --

21 A.     No, sir.

22 Q.     Let's start with your first job.   What

23 was that?

24      MR. COVERT:

25           I have received the Social

   PAGE 12

## 12

1 Security printout about a week ago, so if you

2 want to use that, that might help us.

3      MR. HAINKEL:

4           Off the record.

5      (DISCUSSION OFF THE RECORD)

6 EXAMINATION BY MR. HAINKEL:

7 Q.     I have a copy of your Social Security

8 Administration records that you just saw me get

9 from Mr. Covert.

10           What I have begins in about 1950.   Is

11 that when you believe you first started working?

12 A.     I believe that is about right.

13 Q.     And I have you -- or at least this

14 document reflects -- that you began working with

15 Insulation Engineers, Incorporated.

16 A.     That is correct; at Exxon.

17 Q.     What type of work were you doing for

18 Insulation Engineers?

19 A.     I was just a helper, mixing, as you call

20 it, "mud," the cement for them, insulation

21 cement.

22 Q.     Were you a member of the Local 53, or

23 any other union?

24 A.     Not -- I was just on permit then.   I

25 didn't have a membership card at the time.   I

13

1 got it later.

2 Q.    All right.   Was that particular job one
3 that was full-time at the Exxon facility, or
4 were you moving around?

5 A.    Moving around.

6 Q.    Where else, for instance, besides Exxon,
7 would you have worked when you were working with
8 Insulation Engineers?

9 A.    I think, oh -- I believe at UniRoyal,
10 which was UniRoyal at the time.   And I think
11 Gulf States Utilities right here (indicating) on
12 Gulf States Road.   Copolymer, that is Baton
13 Rouge, and, oh, I don't know, that's --

14 Q.    I have you down -- at least looking at
15 this sheet -- not necessarily full-time, but at
16 least from 1950 to 1954, off and on you were
17 working for Insulation Engineers; does that
18 sound right?

19 A.    That sounds right.

20 Q.    Insulation Engineers was what; an
21 insulation contractor?

22 A.    Yes, sir.

23 Q.    During that four-year period of time,
24 were there any particular brands that they
25 carried, that you remember?

PAGE 14

14

1 A.    I keep thinking, all the mud and cement
2 we mixed, that was Eagle-Picher, I think that,
3 but I really --

4 Q.    You don't --

5 A.    I think Johns-Manville was some,
6 Owens-Corning, that is -- I mean, I just can't
7 quite remember that.

8 Q.    Let's talk about the types.   You
9 indicated that you were working as a helper.
10 Throughout the entire time you were at
11 Insulation Engineers, were you working as a
12 helper, or did you eventually get your card
13 and --

14 A.    Eventually.   I worked as a helper maybe
15 about one year, and I started working with --

16 Q.    You were a mechanic?

17 A.    Yes; right.

18 Q.    You mentioned mixing cement.   What
19 other types of products did you use that you
20 believe may have contained asbestos while you
21 were working?

22 A.    Well, I think everything we used
23 contained asbestos, I mean.

24 Q.    Besides cements, obviously, we are
25 talking about pipe covering.

15

1 A.    Pipe covering, yes.

2 Q.    Block?

3 A.    Blocks.

4 Q.    Mastics; did you-all use mastics?

5 A.    Used mastic, too

6 Q.    Did you use any type of spray
7 insulation?

8 A.    Oh, no; I don't think so -- I don't
9 recall.

10 Q.    How about blankets, or cloth?

11 A.    We used that, yes.

12 Q.    You mentioned Eagle-Picher.   I assu
13 you attribute that name or connect that nar    p
14 with cement?

15 A.    Yes, that is right.

16 Q.    How about pipe covering; do you remember
17 the brand name or manufacturer's name?

18 A.    That would be J-M, O-C, it was -- it was
19 Careytemp and -- I don't know, it is just --
20 it's a brand -- does not exist now, to my
21 knowledge.

22 Q.    I know we are going back a long time,
23 and --

24 A.    Quite awhile back.

25 Q.    -- you probably haven't gotten to think

PAGE 16

16

1 about this for a long time, and most of us,
2 since we do this for a living, we are vaguely
3 familiar with some of the products.

4    What we need to know is what you can
5 remember using and the brand names and the
6 companies' names, if you remember them.   So,
7 that is why I am asking you all of these
8 detailed questions.

9    The blankets and the cloth, do you
10 remember who manufactured that?

11 A.    No, I sure don't.

12 Q.    How about the mastic?

13 A.    I think some of that was Benjamin
14 Foster, and I think Lion Oil, I believe that
15 was, and Vamasco, something like that, I think
16 that was another brand, Vamasco.

17 Q.    Does the name "Pabco" ring a bell?

18 A.    Yes, Pabco.

19 Q.    What do you attribute that name to?

20 A.    I think that is when I was working at
21 Exxon with Standard Asbestos.   I worked for them
22 quite awhile.

23 Q.    I know this is confusing.   I will try
24 to confine myself to this period of time with
25 Insulation Engineers.

17

1 A.    Yes.

2 Q.    And we'll move on to the other companies
3 you might have worked with.

4       Insofar as Insulation Engineers is
5 concerned, you have given us some of the sites.
6 I think you said you worked for them at -- that
7 would have been Exxon, UniRoyal, GSU, Copolymer?

8 A.    Yes.

9 Q.    Is that accurate?

10 A.    Yes.

11 Q.    And we have gone through cement, pipe
12 covering, block, mastic, blankets and cloth as
13 products you believe may have contained asbestos
14 that you might have utilized at these sites?

15 A.    That is correct.

16 Q.    Okay.  Any other types of products that
17 you can remember that you might have used --

18 A.    You have different types of cement we
19 used.

20 Q.    Sure.

21 A.    You had numerous kinds, so I couldn't
22 even --

23 Q.    Besides Eagle-Picher, do you relate any
24 other manufacturer with cements, at least during
25 that period of time?

PAGE 18

18

1 A.    No, I don't -- no.

2 Q.    Moving down the sheet here, Dyer
3 Investment Company, 1951.  Well, you only made
4 14 bucks and six cents, so I think we will pass
5 on that.

6 A.    Pass them, yes.

7 Q.    Now, 1952, I have you at Standard for
8 about almost a year.

9 A.    That is correct.

10 Q.    Do you remember what brands or products
11 they were carrying when you worked at Standard?

12 A.    Well, I keep thinking, I think maybe
13 Careytemp and -- I think -- it is kind of tough
14 to remember all of that now.

15 Q.    That is why I am telling you, if you
16 don't remember, that is okay, too.

17 A.    We used -- I think we used Owens-
18 Corning, also.

19 Q.    Okay.

20 A.    That was -- I can remember working on
21 the pipe rack at Exxon, and also there again --
22 also at UniRoyal.

23 Q.    That job, or your tenure with Standard
24 looks like it was about a year.  Was that
25 different jobs, or --

19

1 A.    Different jobs, yes.

2 Q.    Exxon and UniRoyal?

3 A.    And UniRoyal, yes.

4 Q.    Anywhere else that you can --

5 A.    It was about, oh -- also another job at
6 Exxon, I think it was a lab, Exxon Lab Building,
7 I worked in there, also.

8 Q.    You mentioned a pipe rack.  You were
9 insulating a pipe rack at Exxon?

10 A.    Yes.

11 Q.    Same thing at UniRoyal?

12 A.    Same at UniRoyal, and vessels and
13 equipment.

14 Q.    And would that be the same types of
15 products we spoke about that you might have used
16 when you mentioned types; pipe covering, cement
17 block?

18 A.    The same type, yes.

19 Q.    How about Calsilite, Ruberoid; does that
20 ring a bell?

21 A.    Yes, that does.

22 Q.    Do you associate that name with --

23 A.    Yes, but I don't know which -- at what
24 time, which company.

25 Q.    What type of products?

PAGE 20

20

1 A.    It was -- oh, a lot of them use 85
2 percent magnesia, most of it was then.

3 Q.    Back in the early fifties, would it be
4 fair to say you were mostly using 85 percent
5 magnesia?

6 A.    Yes.

7 Q.    Then it was a time when you moved to
8 calcium silicate type products?

9 A.    Yes.

10 Q.    Do you remember when that was?

11 A.    No, I don't.

12 Q.    Schuller International, Incorporated, I
13 have you there for about, oh, a year and a half,
14 give or take, and between '53 and '55; does that
15 ring a bell?

16 A.    Who?

17 Q.    S-c-h-u-l-l-e-r.  Does that ring a
18 bell?

19 A.    I don't remember that one.

20 Q.    Aber Company, I have you starting in
21 1953, and working fairly steady with some breaks
22 until about 1963.

23 A.    That is correct.

24 Q.    Tell me about your work with them.

25 Were you working as a mechanic, or in the shop,

1 or --
2 A.    I was working as a foreman out there,
3 and mechanic, combination.
4 Q.    And were you assigned to any particular
5 site, or were you in all jobs?
6 A.    No; worked all over, now, a lot of work
7 all over Exxon, primarily all the plants.
8 Q.    Okay.
9 A.    Copolymer, Gulf States, Solvay, where
10 most of the plants are now, Stauffer Chemical,
11 Allied -- yes, Allied.
12 Q.    What about Kaiser in Gramercy; did you
13 work there?
14 A.    Yes.  Shell Norco, I worked up at --
15 probably have some time there.  I worked at --
16 I think it was two or three years at Kaiser in
17 Baton Rouge, also.
18 Q.    Did you ever do any work that you can
19 remember at the James River Paper Mill or
20 Crown-Zellerbach in St. Francisville?
21 A.    Yes, I did work there, also.
22 Q.    You spent --
23 A.    I think it was for Aber, I believe.
24 Q.    It seems like you spent a long time with
25 Aber.  Do you remember what types of products
    PAGE 22

22
1 they handled?
2 A.    Mostly Unibestos.
3 Q.    What kind of cement?  Who made the
4 cement they would handle; do you remember?
5 A.    We have used some J-M, Johns-Manville
6 cement, and Eagle-Picher cement, and -- I think
7 Delta -- I don't know if I am right, but it's --
8 Q.    Delta Maid?
9 A.    I think Delta Maid, yes.
10 Q.    You are not sure?
11 A.    No, I am not sure.
12 Q.    Rock Wool, does that --
13 A.    Rock Wool, we did use Rock Wool, I did
14 remember that.
15 Q.    Did you-all use mastics when you were
16 employed at Aber?
17 A.    Yes.
18 Q.    Do you remember who manufactured the
19 mastic?
20 A.    Well, I keep thinking most of it was by
21 Vamasco then, and also Benjamin Foster -- that
22 is right; not a tremendous amount of Benjamin
23 Foster.
24 Q.    You are familiar, then.
25     Do you know Sonny Anderson and Harold

23
1 Johnson?
2 A.    Yes, I do.
3 Q.    Do you see them, even now, in your
4 business?
5 A.    Yes, sir; uh-huh.
6 Q.    Next, I have you working intermittently
7 from about '54 to '57 with -- looks like
8 Caldwell and McCann, George A. Caldwell.
9 A.    That was Kaiser Aluminum.
10 Q.    What kind of work were you doing at
11 Kaiser?
12 A.    Maintenance work, insulation
13 maintenance.
14 Q.    Whose products did they carry, if you
15 remember?
16 A.    I think they carried different products,
17 because he was just -- he had a maintenance --
18 he was not an insulation company, so he
19 primarily bought it wherever he could get it,
20 you know, different manufacturers.
21 Q.    So, that was not --
22 A.    Wasn't no special type.
23 Q.    Caldwell was not confined to just
24 insulation maintenance?
25 A.    No, it was not.
    PAGE 24

24
1 Q.    Did you do anything but insulation with
2 them?
3 A.    No; that's all I did with them.
4 Q.    Were you using, at least insofar as
5 block and pipe covering are concerned, 85
6 percent magnesia, or were you using calcium
7 silicate products?
8 A.    Well, I think we were using both.  And
9 did a lot of turbines out there, put a lot of
10 blankets on turbines.
11 Q.    Where; at Kaiser?
12 A.    At Kaiser, yes.
13 Q.    Do you remember the brand name or
14 manufacturer's name of the blankets?
15 A.    No, I don't.  A lot of turbines at Gulf
16 States, you know.
17 Q.    Do you distinguish -- I want to make
18 sure when we say "blankets," we are talking
19 about the same thing.  There is cloth --
20 A.    I know it.
21 Q.    -- which is something much thinner than
22 a blanket.
23 A.    Uh-huh.  Blankets come in different --
24 one, two, two-and-a-half, three-inch thick.
25 Q.    Did you ever use cloth --

25

1 A.    Asbestos cloth.

2 Q.    -- in the 1950s?

3 A.    Yes; that is what we made the blankets
4 out of.

5 Q.    You made your own blankets on occasion?

6 A.    Yes.

7        Do you have me down with J-M,
8 Johns-Manville, down there?   Seemed like --

9 Q.    I have you down for a lot of people, so
10 -- we'll probably get to there somewhere along
11 the line.

12 A.    I thought I worked for Johns-Manville
13 prior to that.

14 Q.    You worked at Gabler.   They handled, I
15 think, maybe, Johns-Manville products?

16 A.    No; I worked directly for
17 Johns-Manville.

18 Q.    Okay.

19 A.    I worked for Gabler just a short period
20 of time.   That was at Burnside, at the aluminum
21 plant in Burnside.

22 Q.    What were you doing there?

23 A.    Oh, just laying some insulation, some
24 vessels.

25 Q.    That would have been in the -- that

PAGE 26

26

1 would have been in 1954.

2 A.    I think I also worked for them in Dow
3 Chemical.

4 Q.    I have you one quarter in '54, one
5 quarter in '57, one quarter in '58, for Gabler.
6 You worked at the aluminum plant in Burnside,
7 Dow --

8 A.    Dow Chemical.

9 Q.    Do you remember what the manufacturer's
10 name or brand name of the products Gabler
11 handled?

12 A.    No, I don't.

13 Q.    Don's Auto Repair, was that insulation
14 work?

15 A.    No; I don't think so.

16 Q.    McCarty Corporation, I have you there
17 just for a little while, '57, '58.   I have you
18 a little while in '66 and '67.   Do you remember
19 that work?

20 A.    Yes.

21 Q.    Okay.

22 A.    I worked for Johns-Manville before
23 McCarty, because McCarty-Branton bought out
24 Johns-Manville over here, so I worked for them
25 before.   I worked for -- I thought I worked for

27

1 the shop for Johns-Manville -- as a matter of
2 fact, at the airport, used to be Ryan Airport,
3 that is where the office was, the shop was.   I
4 worked in the shop for them for quite awhile.

5 Q.    Since you brought it up, sir, let's talk
6 about that.   That was in the mid-fifties?

7 A.    Somewhere around there, yes.

8 Q.    The shop by Ryan Airport?

9 A.    Yes.

10 Q.    And you were fabricating --

11 A.    Fabricating, yes.

12 Q.    And what is it that you were
13 fabricating; Ts and Ls?

14 A.    Ts, Ls; we used to make pipe covering
15 out of -- we made the oversize.   That is before
16 the manufacturer started making large sizes.
17 We used to cut it on bevel saws and just make
18 pipe covering.

19 Q.    Okay.

20 A.    Actually, we'd score the blocks and fit
21 it around vessels.

22 Q.    Using J-M products to do that?

23 A.    J-M products, yes; all J-M.   Plus, I
24 worked at Copolymer for J-M.

25 Q.    McCarty, were you working in their shop,

PAGE 28

28

1 or out in the field for McCarty?

2 A.    I was out in the field for McCarty.

3 Q.    And if you can remember, what plants did
4 you work with McCarty --

5 A.    I don't remember.   I kept all my W-2s,
6 W-4s, from '61 -- prior to that, I didn't keep
7 them, but I got them all since then.

8 Q.    I have you for about a quarter at AC&S,
9 Incorporated.   Do you remember working for
10 AC&S?

11 A.    Arm --

12 Q.    Armstrong Contracting and Supply?

13 A.    Yes.   I think that was at -- that was
14 at Gramercy, Kaiser Aluminum at Gramercy.

15 Q.    You have a good memory.

16    MR. WILKES:

17        What year was that?

18    MR. ELLINGHAUSEN:

19        '58.

20 EXAMINATION BY MR. HAINKEL:

21 Q.    Do you remember what you-all were doing
22 out there?

23 A.    Working on some boilers.

24 Q.    Were you-all using any sprayed asbestos
25 insulation on that job, that you can remember?

29

1 A.    Yes; on that job, they -- the -- I

2 didn't -- I did not participate in that myself,

3 but they were using some.

4 Q.    Do you remember who that was

5 manufactured by?

6 A.    No, I don't.

7 Q.    I have you about a quarter in 1958 -- do

8 you remember working for Austin?

9 A.    Yes; Lake Charles.

10 Q.    What were you doing up there?

11 A.    We was insulating some towers, tall

12 towers.

13 Q.    Do you remember the brand names or

14 manufacturers' names of any of the products?

15 A.    I think Keene; maybe Keene, yes.  I

16 think that is one we used there.

17 Q.    Looks like you hooked up with Anco --

18 A.    That is correct.

19 Q.    Which, of course, came from Aber?

20 A.    Anco bought out Aber, and the same

21 people -- we just continued, which -- which, as

22 a matter of fact, I was at Dow Chemical at the

23 time.

24 Q.    I have you working intermittently with

25 them up until about 1970.

   PAGE 30

30

1 A.    Yes, sir.

2 Q.    And the sixties.  In the sixties, do

3 you remember the brand names or manufacturers'

4 names of the products that Anco was handling?

5 A.    The pipe covering was, I would say, most

6 all -- all Unibestos.

7 Q.    How about cement?

8 A.    Well, cement, that was -- that was, I

9 think, Eagle-Picher, I think, and --

10 Q.    I have you intermittently working for

11 Mechanical Insulations, Incorporated from about

12 '67 to '72.

13 A.    Two and a half years, about.

14 Q.    Where were you working for Mechanical?

15 A.    Well, I did some -- most -- more or less

16 commercial work, just scattered out all over

17 Baton Rouge, Shreveport, Monroe.

18 Q.    Do you remember what the brand names or

19 manufacturers' names of the products were?

20 A.    No, I don't.  I think mostly it was --

21 I think a lot of it was J-M.

22 Q.    Okay.

23 A.    I worked also for Aber Company at Warren

24 Air Force Base in Cheyenne, Wyoming, for six or

25 nine months, and running -- I think that was all

31

1 J-M pipe covering.

2 Q.    Before I get to the last two, which are

3 Insulation Sales and R-Square Investment, did

4 there ever come a time in the sixties where you

5 remember labels, caution labels, or warnings

6 appearing on the boxes of the insulation

7 products that you might have been using?

8 A.    Never seen -- I didn't think they

9 existed then.

10 Q.    Okay.

11 A.    Were they out then?

12 Q.    When was the first time that you lea  d

13 that exposure to products that may have

14 contained asbestos was -- another rule you  ave

15 to -- I have to tell you, Paul is going to throw

16 his Certs at us, or something, so let me finish

17 -- when do you first remember learning that

18 exposure to asbestos could be hazardous to your

19 health?

20 A.    It is around '70.

21 Q.    At that time, do you, personally, you,

22 Mr. Reno, remember taking any precautions?

23 A.    Yes, sir.  As a matter of fact, I went

24 in business in 1971, and I did make sure we

25 didn't handle any asbestos whatsoever, because

   PAGE 32

32

1 we had a few lawsuits against us.  They dropped

2 them all, because I -- I had records showing at

3 no time did I ever buy any insulation with

4 asbestos.

5 Q.    When you went in business in 1971, were

6 you working out in the field, you, personally,

7 or were you --

8 A.    I was working out, yes; personally, yes.

9 Q.    If you had to go do a maintenance job,

10 what precautions, if any, would you take when

11 doing tearout work, for instance?

12 A.    Really, only precaution we took was just

13 filter -- I mean, just something on your nose,

14 that's all, that is about it.

15 Q.    Would it be one of the little paper

16 masks or respirators?

17 A.    Well, paper mask, yes.  Now, we worked

18 the plants, and we had -- they started giving us

19 respirators after.

20 Q.    In your work with Insulation Sales,

21 whose responsibility was it to see that a safe

22 work environment was provided; the plant you

23 were working at or Insulation Sales?

24 A.    Well, the plant saw that we -- you know,

25 actually, insulation Sales really didn't do any

65

1    Just like a plaintiff's attorney,
2 "Do you want to get up?"
3    MS. MACKAY:
4        Okay. Those are all of the
5 questions I have.
6 EXAMINATION BY MR. BELL:
7 Q.    My name is Troy Bell, and I have a few
8 questions for you.
9        Did you ever work with or around a
10 gentleman by the name of Columbus Daigle?
11 A.    Yes, sir.
12 Q.    Where did you work with him, sir?
13 A.    Dow Chemical, quite a bit.
14 Q.    Okay.
15 A.    As a matter of fact, come to think of
16 it, we did a lot of boilers at Dow Chemical.
17 Since you brought that up, that is where we
18 worked on the boilers, over there with him.
19 Q.    What about a man by the name of Billy
20 Caldwell?
21 A.    Yes; him, also.
22 Q.    Where?
23 A.    Oh, at Dow Chemical. We worked at
24 Monsanto Chemical, also.
25 Q.    I will probably pronounce the last name
PAGE 66

66

1 wrong, but Mr. Covert will help me out.
2        Percy Barrient?
3 A.    Yes, sir.
4 Q.    Where did you work with him?
5 A.    Oh, Dow Chemical quite a bit, and --
6 Q.    Any other work sites?
7 A.    Exxon, I think. At Copolymer, we
8 worked together for quite a few years.
9 Q.    What about Ike Simoneaux?
10 A.    Ike Simoneaux, yes. We worked at -- I
11 think Triad Chemical, now, I think, in
12 Donaldsonville, and also worked for -- also what
13 used to be Allied Chemical, up at the ethylene
14 plant up in Geismar.
15 Q.    Who is Dr. Thomas Flynn?
16 A.    He is a doctor that operated on me,
17 neurosurgeon that operated on my back.
18 Q.    What about Todd Joliet?
19 A.    Joliet, he --
20 Q.    Joliet?
21 A.    He was a chiropractor.
22    MR. BELL:
23        Those are all of the questions I
24 have for now; I reserve my rights to ask some
25 after the picture books are shown.

67

1    MR. WILKES:
2        I am going to wait until after
3 you have looked at the books, so that I may have
4 some questions for you then.
5 EXAMINATION BY MS. NOYA:
6 Q.    I have a few questions about the boilers
7 again.
8 A.    Yes.
9 Q.    You said in 1958 you worked on some
10 boilers?
11 A.    Yes.
12 Q.    I want to make sure I have it.
13 A.    Yes.
14 Q.    You have given a little bit of this
15 testimony.
16        At what location did you work
17 specifically with Babcock and Wilcox boilers?
18 A.    Well, I think at Kaiser and Gulf States
19 Utilities, and -- I don't know what kind is at
20 Dow Chemical. I worked on all of the boilers
21 at Dow Chemical. I have -- they have quite a
22 few there. They may be Babcock and Wilcox,
23 also -- I don't know -- or Combustion. I don't
24 know.
25 Q.    Now, do you remember the dates that you
PAGE 68

68

1 worked there?
2 A.    Um, no, ma'am.
3 Q.    Just 1958?
4 A.    Yes.
5 Q.    What employers were you with when you
6 worked there?
7 A.    I was with Aber Company, Anco, and one
8 time I worked with Standard Asbestos, and
9 Insulation Engineers.
10 Q.    You were exposed to B&W boilers when you
11 worked for all of these companies?
12 A.    Yes; uh-huh.
13 Q.    Okay.
14 A.    The best of my knowledge, I was.
15 Q.    How do you know they were B&W boilers?
16 A.    Because I was -- well, on the name --
17 you know, the name, you know, I mean, I just
18 knew it. I mean, you see it, the big stamp all
19 over the place.
20 Q.    You saw the name?
21 A.    Yes; uh-huh.
22 Q.    What did you do when you were by the
23 boilers; did you erect them? What work did you
24 do whenever you were around the B&W --
25 A.    Well, we usually weld pins, and we shot

85

1 the fibrous adhesive is identified as "V-17A."

2 EXAMINATION BY MR. HAINKEL:

3 Q. Do you recognize anything on this next
4 page?

5 A. No, I don't.

6 Q. How about this page?

7 A. No.

8 Q. This page?

9 A. Uh-uh.

10 Q. This page?

11 A. No -- Quik-Set -- wait; I recognize
12 that.

13 Q. That would be "8043," Quik-Set Finishing
14 Cement?

15 A. Yes.

16 Q. Anything else?

17 A. I recognize "R-17," Asbestospray.

18 Q. Where do you think you might have used
19 Asbestospray?

20 A. And I recognize this "8045," Forty-Eight
21 Insulations.

22 Q. Do you --

23 A. Yes.

24 Q. Do you have a time and place for the
25 Forty-Eight products?

PAGE 86

86

1 A. No, I don't.

2 Q. How about this page?

3 A. Um, no, I don't.

4 Q. This one?

5 A. I can remember using that "128C," Gold
6 Bond Joint Compound.

7 Q. Do you remember using that Gold Bond
8 Joint Compound?

9 A. Yes, I do.

10 Q. Was that at your house, or on the job?

11 A. Not at my house; on the job.

12 Q. This one?

13 A. I don't recall that one.

14 Q. Down here?

15 A. No, I don't recall that one.

16 Q. Anything on here?

17 A. No, I don't.

18 Q. Anything here?

19 A. No, nothing there.

20 Q. Here?

21 A. Nothing there.

22 Q. Nothing here?

23 A. Nothing here.

24 Q. Here?

25 A. No.

87

1 Q. What about --

2 A. I don't recall that, either.

3 Q. This one?

4 A. I can recall that. I used that quite
5 a bit at Exxon.

6 Q. "C-22" is Sprayed Limpet Asbestos.

7 Do you remember using Sprayed Limpet
8 Asbestos at Exxon?

9 A. We used that also on turbines at Gulf
10 States Utilities.

11 Q. What would the Sprayed Limpet have been
12 used on at Exxon?

13 A. It would be -- no, it was a spray
14 urethane. This was used on turbines at Kaiser
15 Aluminum after -- and we started, that took the
16 place of a lot of blocks.

17 Q. I was asking you about Exxon and Sprayed
18 Limpet. Did you --

19 A. I don't think I used that at Exxon.

20 Q. Do you remember Limpet at all?

21 A. Yes, I do.

22 Q. And do you associate its use with any
23 particular facility?

24 A. Used to spray onto -- we used it on
25 turbines.

PAGE 88

88

1 Q. Do you remember where?

2 A. Oh, I think one was at Gulf States
3 Utilities, and Kaiser Aluminum.

4 Q. Moving on to Volume 3 --

5 A. Nothing on that first page.

6 Q. What about this one?

7 A. No; that was -- I did all of that --

8 Q. Kaytherm; you can remember Kaytherm?

9 A. Yes, I can.

10 Q. You are looking at Pictures "8011,"
11 "8028." What kind of product was that?

12 A. Cal Sil pipe covering and blocks.

13 Q. How about this page?

14 A. J-M, yes.

15 Q. Okay.

16 A. The same Cal Sil pipe covering and
17 blocks.

18 Q. Referencing "BH-1" and "8023"?

19 A. Yes.

20 Q. That would be Kaylo pipe covering?

21 A. That is pipe covering and block. Both
22 of them came in both cases. This part was
23 block, and that is pipe covering.

24 EXAMINATION BY MR. WILKES:

25 Mr. Reno, my name is Ben Wilkes, and I

### 89

1 told you I might have some questions for you.

2 Have you looked through the books?

3 Other than the name "Kaylo" on these two

4 packages, is there any other name that you

5 recognize as having seen during your work

6 history?

7 A. What do you mean?

8 Q. Well, is there any other -- for

9 instance --

10 A. The manufacturing, you mean?

11 Q. Yes. Do you recognize Owens-Illinois

12 as a manufacturer of Kaylo that you saw while

13 you were working, or you do you associate the

14 name "Kaylo" with another manufacturer?

15 A. Well, I associate Kaylo with

16 Owens-Corning, and there is Owens-Illinois here.

17 Q. So, during your work career, you recall

18 seeing Kaylo packages with the name

19 "Owens-Illinois" on them?

20 A. I -- tell you the truth, I can't be sure

21 whether it is Owens-Illinois or Owens-Corning.

22 Q. Okay.

23 A. But I know I worked with Kaylo, I do

24 know that.

25 Q. Do you remember the first time that you

PAGE 90

### 90

1 remember working with Kaylo during your work

2 career, what year that would have been?

3 A. Oh, I think when I first went to work up

4 at Exxon.

5 Q. Do you recall what year that was?

6 A. I think it was '50, '51, '52, something

7 like that.

8 Q. Earlier in your testimony, you described

9 working with various manufacturers, pipe

10 coverings. I believe you described working

11 with Ruberoid; is that right?

12 A. I did work with Ruberoid.

13 Q. Working a lot with Pabco; is that right?

14 A. Yes; right.

15 Q. And working a lot with Unibestos; is

16 that correct?

17 A. (Witness nods head affirmatively) mostly

18 with Unibestos, yes.

19 Q. And did I hear you right earlier, when

20 you said that you really weren't around

21 Owens-Illinois that much, or am I misstating

22 that?

23 MR. ELLINGHAUSEN:

24 Object to that question.

25 THE WITNESS:

### 91

1 I don't recall; I don't know.

2 MR. ELLINGHAUSEN:

3 That wasn't his testimony.

4 THE WITNESS:

5 I know it is Kaylo, but I don't

6 recall if it was Owens-Corning or

7 Owens-Illinois; I can't be sure.

8 MR. WILKES:

9 Okay, that's all I have.

10 MR. HAINKEL:

11 Next page, we have "Z-18A" and

12 "8135," both Kaylo. I think we thoroughly

13 covered that.

14 MR. ELLINGHAUSEN:

15 Not thoroughly, no.

16 EXAMINATION BY MR. HAINKEL:

17 Q. We have "8003," which is Pabco. You

18 recognize that product?

19 A. Right.

20 Q. And we have talked at length about that.

21 A. Yes.

22 Q. "8121," Carey Super-Light, looks like 85

23 Percent Magnesia.

24 A. 85 Percent, yes, I can remember working

25 with that.

PAGE 92

### 92

1 Q. Do you recognize that picture?

2 A. Oh, yeah, I can recognize that one.

3 Q. That is the McCarty Corporation Thermal

4 Insulation picture. Why do you recognize that

5 picture?

6 A. I worked for them, and known it for

7 years.

8 Q. Do you remember --

9 A. I seen their trucks all over.

10 Q. Do you remember if they had their own

11 boxes?

12 A. Yes, they did have their own boxes.

13 Q. Next page is "8010," "AA-7," "8001,"

14 "8012," all of which look to be Carey products.

15 A. Yes.

16 Q. Now, would it be fair to say that you

17 can remember Carey pipe covering and block and

18 cement?

19 A. Yes, that is correct.

20 Q. Do you believe you used those products

21 at Exxon?

22 A. I'm not sure.

23 Q. I'm going to skip this page. There is

24 a page that -- this should not be in here. We

25 have gone through that picture page. The same



## VSI-FAX Cover Page

| | |
|---|---|
| **To:** | Gerolyn Roussel; Kay Baxter; Patrick McMurtray; Larry Canada; Troy Bell; Susan Kohn; W. Scott Brown; A. Stout; David Barfield; James Dentremont; Alison Borison; Cory Cahn; David Redmann; Olivia Tomlinson; Gregory Anding; Robert Knight; Ashley Carter; Kay Dupuy; William Schuette; Avery Griffin |
| **Fax:** | 9856516592 |
| **Subject:** | Catania, Barbara |
| **Date:** | 01/15/2002 11:42 AM |
| **Pages:** | 7 , including cover page |
| | |
| **From:** | Stacey Sepulvado |
| **E-mail:** | |
| **Phone:** | 504 836 6500 |
| **Fax:** | 504 836 6565 |
| **Company:** | Hailey McNamara Hall Larmann & Papale LLP |
| **Address:** | 1 Galleria Blvd, Suite 1400 P O Box 8288 Metairie, LA 70011-8288USA |



EXHIBIT
3
ALL-STATE LEGAL

1750-54874-JDR

# HAILEY, McNAMARA, HALL, LARMANN & PAPALE, L.L.P.

### ATTORNEYS AT LAW

W. MARVIN HALL •
LAURENCE E. LARMANN • †
ANTHONY B. PAPALE, III •
RICHARD T. SIMMONS, JR •
DOMINIC J. OVELLA
MICHAEL R. MENTZ
DAVID R. PLOEGER, R
JOHN T. CULOTTA • • •
MICHAEL J. VONDENSTEIN
C. KELLY LIGHTFOOT
JOHN E. UNSWORTH, JR
JULIE D'ULISO ROBLES
CLAUDE E. GRECO
VALERIE T. SCHEXNAYDER
W. EVAN PLAUCHE
KURT D. ENGELHARDT
CAROLINE D. IBOS
ROBERT D. FORD
W. GLENN DANOS
F. THEODORE LE CLERCQ • • •
BARBARA B. O'DONNELL
JOSEPH L. SPILMAN, III • • V

SUITE 1400
ONE GALLERIA BLVD.
METAIRIE, LA 70001
TELEPHONE: (504) 836-6500
TELECOPIER: (504) 836-6565
www.haileymcnamara.com

MAILING ADDRESS
P.O. BOX 8288
METAIRIE, LA 70011-8288

OF COUNSEL
JAMES W. HAILEY, JR. •
HENRY D. McNAMARA, JR

WILLIAM R. SEAY, JR
JAMES W. HALEY •
ALAINE B. CORCORAN
KEVIN O. LARMANN
DAVID C. CHROME, JR
GABRIEL J. VENINATA
ROWENA A. AVIER
KELLY F. OWERS
FOINT C. ICPIO
KELLY E. COVINGTON
LORI E A. DEMARCAY
DANIELA A. RAYN
MARC J. BITAR E
MELISSA L. ADERHOLD
MICHAEL H. ABRAHAM
NICOLE F.A. BEYER
JAY L N. HEBLEY
PHILIP C. BRICKMAN
AMBER J. CATANZARO, JR
ABBE D. STASS
ANNE L. MEDO
GEORGIA G. VAUGHAN
CHAPMAN H. HUBER

ALSO LICENSED IN.
† ALABAMA TEXAS
‡ NORTH CAROLINA
• TEXAS
§ TENNESSEE
V MISSISSIPPI, D.C.
◊ MARYLAND
V ALABAMA
◊ MISSISSIPPI

January 14, 2002

Ms. Gerolyn P. Roussel
**Roussel and Roussel**
1710 Cannes Drive
LaPlace, Louisiana 70068

> Re:  Barbara Catania and Michael Catania v.
> ACandS, Inc., et al.
> CDC No. 2001-18122; Div. "H", Sec. 12
> Our File No.: 1750-54874-JDR

Dear Gerolyn:

Please be advised that the following records will remain at Choice Copy Services, Inc., a copy of which you should already have in your possession:

1. Document Number: BC-ANC-0001
   Description:  Petition For Damages in the case of <u>Peter Giordano, Sr., et al. v. Owens-Corning Fiberglas Corporation,</u> No. 429,885; Div. "I".

2. Document Number: BC-ANC-0002
   Description:  First Supplemental and Amending Petition for Damages in the case of <u>Peter Giordano, Sr., et al. v. Owens-Corning Fiberglas Corporation,</u> No. 429,885; Div. "I".

Ms. Gerolyn P. Roussel
January 14, 2002
Page -2-

3.      Document Number: BC-ANC-0003
        Description:    Second Supplemental and Amending Petition for
                        Damages in the case of <u>Peter Giordano, Sr., et al. v.</u>
                        <u>Owens-Corning    Fiberglas    Corporation</u>,    No.
                        429,885; Div. "I".

4.      Document Number: BC-ANC-0004
        Description:    Plaintiffs' Answers to Defendants' Master Set of
                        Interrogatories and Requests for Production of
                        Documents in the case of <u>Peter Giordano, Sr., et al.</u>
                        <u>v.  Owens-Corning  Fiberglas  Corporation</u>,  No.
                        429,885; Div. "I".

5.      Document Number: BC-ANC-0005
        Description:    Plaintiffs' Supplemental Responses To Discovery
                        Requests Propounded by Defendants in the case of
                        <u>Peter  Giordano,  Sr.,  et  al.  v.  Owens-Corning</u>
                        <u>Fiberglas Corporation</u>, No. 429,885; Div. "I".

6.      Document Number: BC-ANC-0006
        Description:    Plaintiffs'  Supplemental  Answers  to  Master
                        Discovery (Supplemental Answers to Request for
                        Production No. 12) in the case of <u>Peter Giordano,</u>
                        <u>Sr., et al. v. Owens-Corning Fiberglas Corporation</u>,
                        No. 429,885; Div. "I".

7.      Document Number: BC-ANC-0007
        Description:    Plaintiffs'  Supplemental  Answers  to  Master
                        Discovery (Supplemental Answers to Interrogatory
                        No.'s 11(a), 15 (a-f, k) and 16 (a-b)) in the case of
                        <u>Peter  Giordano,  Sr.,  et  al.  v.  Owens-Corning</u>
                        <u>Fiberglas Corporation</u>, No. 429,885; Div. "I".

8.      Document Number: BC-ANC-0008
        Description:    First  Amended  Work  History  Sheet  of  Peter
                        Giordano, Sr.

9.      Document Number: BC-ANC-0009
        Description:    Petition for Damages in the case of <u>Victor Reno,</u>
                        <u>Sr., v. Owens-Corning Fiberglas Corporation, et al.</u>,
                        19th JDC No. 421,011; Div. "I".

Ms. Gerolyn P. Roussel
January 14, 2002
Page -3-

10.     Document Number: BC-ANC-00010
        Description:    Notice of Lawsuit and Request for Waiver of
                        Service for Summons in the case of <u>Vincent L.
                        Reno, et al., v. Armstrong World Industries, et al.</u>,
                        USDC-MDLA No. 99-734-C-M2.

11.     Document Number: BC-ANC-00011
        Description:    Plaintiff's Answers to the Interrogatories
                        Propounded by The Babcock & Wilcox Company
                        in the case of <u>Vincent L. Reno, et al., v. Armstrong
                        World Industries, et al.</u>, USDC-MDLA No.
                        99-734-C-M2.

12.     Document Number: BC-ANC-00012
        Description:    Plaintiffs' Responses to the Request for Production
                        of Documents Propounded by The Babcock &
                        Wilcox Company in the case of <u>Vincent L. Reno, et
                        al., v. Armstrong World Industries, et al.</u>,
                        USDC-MDLA No. 99-734-C-M2.

13.     Document Number: BC-ANC-00013
        Description:    Social Security Earnings Record Information on
                        Victor Reno.

14.     Document Number: BC-ANC-00014
        Description:    Deposition of Peter Giordano, Sr. taken on May 4,
                        2000 in the case of <u>Peter Giordano, Sr. v.
                        Owens-Corning Fiberglas Corporation</u>, No.
                        429,885; Div. "I".

15.     Document Number: BC-ANC-00015
        Description:    Deposition of Vincent L. Reno taken on April 7,
                        2000 in the case of <u>Vincent L. Reno, et ux, v.
                        Armstrong World Industries, et al.</u>, USDC-MDLA
                        No. 99-734-C-M2.

16.     Document Number: BC-ANC-00016
        Description:    Deposition of Mr. Victor Reno, Sr. taken on July
                        24, 1996 in the case of <u>Victor Reno, Sr. v.
                        Owens-Corning Fiberglas, et al.</u>, 19th JDC No.
                        421,011; Div. "I".

Ms. Gerolyn P. Roussel
January 14, 2002
Page -4-

17.   Document Number: BC-ANC-00017
      Description:     Deposition of Russell Reno taken on July 30, 1996
                       in the case of <u>Russell Reno v. Owens-Corning
                       Fiberglass Corporation, et al.</u>, 19th JDC No.
                       419,400 Div. "B".

18.   Document Number: BC-ANC-00018
      Description:     Deposition of Victor Reno taken on January 26,
                       2000 in the cases of <u>Isaac Russell, et al. v.
                       Metropolitan Life Insurance Company, et al.</u>, 18th
                       JDC No. 26,408, <u>Murphy J. Ewing, et al. v.
                       Armstrong World Industries, Inc., et al</u>, 15th JDC
                       No. 96-68014; and <u>Leroy Chauvin v. Metropolitan
                       Life Insurance Company, et al.</u>, 24th JDC No.
                       464-245; Div. "Y".

19.   Document Number: BC-ANC-00019
      Description:     Deposition of Victor Reno taken on November 11,
                       1997 in the case of <u>Theodore F. LeBlanc, et al. v.
                       Armstrong World Industries, et al.</u>, 19th JDC No.
                       429.257; Div. "I".

The following document has been deposited with **Digital Legal Services**:

1.    Document Number: BC-ANC-00020
      Description:     Louisiana Reference Lab Records from Baton Rouge
                       General Medical Center, Blue Bonnet Location.

With kind regards, I remain

                                          Very truly yours,

                                          *Julie*

                                          **JULIE DiFULCO ROBLES**

JDR/srs

cc:    All Counsel of Record



## VSI-FAX Cover Page

**To:** Gerolyn Roussel; Kay Baxter; Patrick McMurtray; Larry Canada; Troy Bell; Susan Kohn; W. Scott Brown; A. Stout; David Barfield; James Dentremont; Alison Borison; Cory Cahn; David Redmann; Olivia Tomlinson; Gregory Anding; Robert Knight; Ashley Carter; Kay Dupuy; William Schuette; Avery Griffin

**Fax:** 9856516592

**Subject:** Catania, Barbara

**Date:** 01/15/2002 11:42 AM

**Pages:** 7, including cover page

**From:** Stacey Sepulvado

**E-mail:**

**Phone:** 504 836 6500

**Fax:** 504 836 6565

**Company:** Hailey McNamara Hall Larmann & Papale LLP

**Address:** 1 Galleria Blvd, Suite 1400
P O Box 8288
Metairie, LA 70011-8288USA

Received  Jan-15-02  11:47am    From-Hailey McNamara        To-ROUSSEL & ROUSSEL        Page 01



EXHIBIT
6

1750-54874-JDR

# HAILEY, McNAMARA, HALL, LARMANN & PAPALE, L.L.P.

### ATTORNEYS AT LAW

W. MARVIN HALL
LAURENCE E. LARMANN
ANTON DE PAPALE JR.
RICHARD T. SIMMONS, JR.
DOMINIC C. GVELA
MICHAEL P. MENTZ
DAVID R. KRUSOR
JOHN T. CULOTTA
MICHAEL J. VONDENSTEN
C. KELLY LIGHTFOOT
JOHN E. UNSWORTH, JR.
JULIE D FULCO ROBLES
CLAUDE A. GREGG
VALERIE T. SCHEXNAYDER
W. RYAN PLACIUS
KURT D. ENGELHARDT
CAROLYN E D IRVIN
ROBERT D. FORD
W. GLENN DUHAS
F. THEODORE LE CLERCQ
BARBARA D. O'DONNELL
JOSEPH L. SPILMAN, III

SUITE 1400
ONE GALLERIA BLVD.
METAIRIE, LA 70001
TELEPHONE: (504) 836-6500
TELECOPIER: (504) 836-6565
www.haileymcnamara.com

MAILING ADDRESS:
P.O. BOX 8288
METAIRIE, LA 70011-8288

OF COUNSEL
JAMES W. HAILEY, JR.
HENRY D. McNAMARA, JR.

WILLIAM R. SEAY, JR.
JAMES W. HALEY
ALLAIN F. CORECHAN
KEVIN O. LARMANN
DAVID S. JEROME JR.
GABRIELLE WENINATA
ROSEM A. AGUR
NELLYE G HEA
FRANT LORIO
PAUL S. CHIKHISON
JAMES ROMANSKY
DOMINGA A. PARIN
MANEL J. HITLES
MELISSA L. ADERHOLD
MICHAEL H. ABRAHAM
NICOLE A. BOYER
JAY L. H. NEBLE
PHILIP O. BUCKMAN
ANDREA CANNELLA, JR.
AMIE E. STASS
ANNE L. MEND
GREGORY F. VANDINA
CHARLES D. HUBER

January 14, 2002

Ms. Gerolyn P. Roussel
**Roussel and Roussel**
1710 Cannes Drive
LaPlace, Louisiana 70068

> Re:  Barbara Catania and Michael Catania v.
>       ACandS, Inc., et al.
>       CDC No. 2001-18122; Div. "H"; Sec. 12
>       Our File No.: 1750-54874-JDR

Dear Gerolyn:

Please be advised that the following records will remain at Choice Copy Services, Inc., a copy of which you should already have in your possession:

1.  Document Number: BC-ANC-0001
    Description:   Petition For Damages in the case of <u>Peter Giordano,
                   Sr., et al. v. Owens-Corning Fiberglas Corporation</u>,
                   No. 429,885; Div. "I".

2.  Document Number: BC-ANC-0002
    Description:   First Supplemental and Amending Petition for
                   Damages in the case of <u>Peter Giordano, Sr., et al. v.
                   Owens-Corning   Fiberglas   Corporation</u>,   No.
                   429,885; Div. "I".

Ms. Gerolyn P. Roussel
January 14, 2002
Page -2-

3.  Document Number: BC-ANC-0003
    Description:   Second Supplemental and Amending Petition for Damages in the case of Peter Giordano, Sr., et al. v. Owens-Corning Fiberglas Corporation, No. 429,885; Div. "I".

4.  Document Number: BC-ANC-0004
    Description:   Plaintiffs' Answers to Defendants' Master Set of Interrogatories and Requests for Production of Documents in the case of Peter Giordano, Sr., et al. v. Owens-Corning Fiberglas Corporation, No. 429,885; Div. "I".

5.  Document Number: BC-ANC-0005
    Description:   Plaintiffs' Supplemental Responses To Discovery Requests Propounded by Defendants in the case of Peter Giordano, Sr., et al. v. Owens-Corning Fiberglas Corporation, No. 429,885; Div. "I".

6.  Document Number: BC-ANC-0006
    Description:   Plaintiffs' Supplemental Answers to Master Discovery (Supplemental Answers to Request for Production No. 12) in the case of Peter Giordano, Sr., et al. v. Owens-Corning Fiberglas Corporation, No. 429,885; Div. "I".

7.  Document Number: BC-ANC-0007
    Description:   Plaintiffs' Supplemental Answers to Master Discovery (Supplemental Answers to Interrogatory No.'s 11(a), 15 (a-f, k) and 16 (a-b)) in the case of Peter Giordano, Sr., et al. v. Owens-Corning Fiberglas Corporation, No. 429,885; Div. "I".

8.  Document Number: BC-ANC-0008
    Description:   First Amended Work History Sheet of Peter Giordano, Sr.

9.  Document Number: BC-ANC-0009
    Description:   Petition for Damages in the case of Victor Reno, Sr., v. Owens-Corning Fiberglas Corporation, et al., 19th JDC No. 421,011; Div. "I".

Ms. Gerolyn P. Roussel
January 14, 2002
Page -3-

10.  Document Number: BC-ANC-00010
     Description:  Notice of Lawsuit and Request for Waiver of
                   Service for Summons in the case of Vincent L.
                   Reno, et al., v. Armstrong World Industries, et al.,
                   USDC-MDLA No. 99-734-C-M2.

11.  Document Number: BC-ANC-00011
     Description:  Plaintiff's   Answers   to   the   Interrogatories
                   Propounded by The Babcock & Wilcox Company
                   in the case of Vincent L. Reno, et al., v. Armstrong
                   World  Industries,  et  al.,  USDC-MDLA  No.
                   99-734-C-M2.

12.  Document Number: BC-ANC-00012
     Description:  Plaintiffs' Responses to the Request for Production
                   of Documents Propounded by The Babcock &
                   Wilcox Company in the case of Vincent L. Reno, et
                   al.,  v.  Armstrong  World  Industries,  et  al.,
                   USDC-MDLA No. 99-734-C-M2.

13.  Document Number: BC-ANC-00013
     Description:  Social Security Earnings Record Information on
                   Victor Reno.

14.  Document Number: BC-ANC-00014
     Description:  Deposition of Peter Giordano, Sr. taken on May 4,
                   2000 in the case of Peter Giordano, Sr., et al. v.
                   Owens-Corning   Fiberglas   Corporation,   No.
                   429.885; Div. "I".

15.  Document Number: BC-ANC-00015
     Description:  Deposition of Vincent L. Reno taken on April 7,
                   2000 in the case of Vincent L. Reno, et ux, v.
                   Armstrong World Industries, et al., USDC-MDLA
                   No. 99-734-C-M2.

16.  Document Number: BC-ANC-00016
     Description:  Deposition of Mr. Victor Reno, Sr. taken on July
                   24, 1996 in the case of Victor Reno, Sr. v.
                   Owens-Corning Fiberglas, et al., 19th JDC No.
                   421,011; Div. "I".

Ms. Gerolyn P. Roussel
January 14, 2002
Page -4-

17.     Document Number: BC-ANC-00017
        Description:    Deposition of Russell Reno taken on July 30, 1996
                        in the case of Russell Reno v. Owens-Corning
                        Fiberglass Corporation, et al., 19th JDC No.
                        419.400 Div. "B".

18.     Document Number: BC-ANC-00018
        Description:    Deposition of Victor Reno taken on January 26,
                        2000 in the cases of Isaac Russell, et al. v.
                        Metropolitan Life Insurance Company, et al., 18th
                        JDC No. 26,408, Murphy J. Ewing, et al. v.
                        Armstrong World Industries, Inc., et al., 15th JDC
                        No. 96-68014; and Leroy Chauvin v. Metropolitan
                        Life Insurance Company, et al., 24th JDC No.
                        464-245; Div. "Y".

19.     Document Number: BC-ANC-00019
        Description:    Deposition of Victor Reno taken on November 11,
                        1997 in the case of Theodore F. LeBlanc, et al. v.
                        Armstrong World Industries, et al., 19th JDC No.
                        429.257; Div. "I".

The following document has been deposited with **Digital Legal Services**:

1.      Document Number: BC-ANC-00020
        Description:    Louisiana Reference Lab Records from Baton Rouge
                        General Medical Center, Blue Bonnet Location.

With kind regards, I remain

Very truly yours,

*Julie*

**JULIE DiFULCO ROBLES**

JDR/srs

cc:     All Counsel of Record

**C**

UNITED STATES  DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

BARBARA CATANIA, ET AL          CIVIL ACTION

VERSUS                          MAG. STEPHEN C. RIEDLINGER

ACANDS, INC., ET AL             NO. 02-0368-D-M1

## REPLY MEMORANDUM IN SUPPORT OF MOTION TO REMAND

**MAY IT PLEASE THE COURT:**

**I.    INTRODUCTION.**

Plaintiffs submit this reply memorandum in regards to the opposition to motion to remand filed in this matter on behalf of Viacom, Inc. ("Viacom"), DSM Copolymer, Inc. and ExxonMobil Corporation (hereinafter collectively referred to as "DSM"), and The Dow Chemical Company ("Dow").

**I.    PLAINTIFFS' REPLY TO VIACOM'S OPPOSITION REGARDING VIACOM'S UNTIMELY FILING OF THIRD PARTY DEMAND IN THIS MATTER.**

In Viacom, Inc.'s opposition to Plaintiffs' Motion to Remand, Viacom makes many representations that are clearly incorrect, and unsupported in fact.  First, Viacom incorrectly alleges that "plaintiffs do not contend that Mrs. Catania used any asbestos-containing products", when plaintiffs clearly have alleged exposure of Mrs. Catania from her use of asbestos-containing materials brought home by her uncles.  Viacom then represents that "Viacom's exceptions were denied by Judge Bagneris on February 28, 2002", which is also incorrect. As can be seen from reviewing plaintiffs' Exhibit "1", Judge Bagneris specifically declined to rule on any



exceptions/motions that were set for hearing on February 28, 2002,
pending his decision on the Motion to Transfer Venue filed by
certain defendants in this matter.  Exhibit "1"-Transcript from
2/28/02 hearing at pp. 4 and 48-51.  On March 4, 2002, Judge
Bagneris granted the Motion to Transfer Venue and transferred the
case to the 19th Judicial District Court, Parish of East Baton
Rouge.  As Judge Bagneris decided to transfer this matter, he never
ruled on any of the exceptions filed on behalf of Viacom in this
matter, leaving same for the allotted Judge sitting in the
transferee court.  Surely if Judge Bagneris had made such a ruling
or issued such an order, counsel for Viacom would have attached
same to its opposition.  As Judge Bagneris made no such ruling,
this is something Viacom cannot do.  Accordingly, Viacom's
representation that Judge Bagneris made such a ruling is incorrect.

Viacom then argues that "the scheduling order ignores the fact
that Judge Bagneris did not possess the authority to abrogate
rights granted to Viacom by the Louisiana legislature", and that
the "Louisiana Supreme Court has recognized that local rules
regulating legal proceedings that conflict with legislative
enactments are null and void", and then cites cases that are
inapposite to the facts presented in this matter.[1]  Viacom seems

_____

[1]The case of *Krueger v. Tabor*, 546 So.2d 1317 (La. App. 3
Cir. 1989), cited by Viacom in its opposition, is clearly
distinguishable from the facts presented in this matter.  *Krueger*
did not deal with a Scheduling Order entered in accordance with
La. Code of Civil Procedure art. 1551, or with a defendant such
as Viacom who had missed the deadline date for filing third party
demands despite its active participation in the selection of the
cutoff dates, including the cutoff date for filing third party
demands that was entered on the Scheduling Order pursuant to art.

confused as to the Louisiana statutory authority that allowed Judge Bagneris to impose various deadlines, including deadlines for filing third party demands, which is Louisiana Code of Civil Procedure art. 1551. Judge Bagneris did not rely upon a local rule in imposing this deadline, and as such, Viacom's reliance on the case of *Rodrigue v. Rodrigue*, 591 So.2d 1171 (La. 1992), is also misplaced. Furthermore, as Viacom concedes that the Louisiana Code of Civil Procedure is controlling in these regards, Viacom cannot legitimately dispute that La. Code of Civil Procedure art. 1551 gave Judge Bagneris the authority to impose the third party demand deadline date, which thereafter controlled the subsequent course of action. Furthermore, counsel for plaintiffs and counsel for defendants, including, but not limited to, counsel for Viacom, all jointly agreed upon the dates entered on the Scheduling Order signed by Judge Bagneris in this matter. See Exhibit "2". Viacom should not now be allowed to "turn tail" from its earlier agreements made in this matter. Likewise, from a quick review of plaintiffs' motion to remand filed in this matter, it is clear that Viacom was in a position to file its third party demand against DSM Copolymer, Inc. prior to the January 28, 2002, cutoff date for filing said third party demands.

Viacom next seeks to distort the legal effect of Judge Bagneris' March 4, 2002, Order, which transferred this case to the

---

1551. Likewise, *Krueger* did not deal with a case that had been set for trial on an expedited basis pursuant to La. Code of Civil Procedure art. 1573, due to the fact that Barbara Catania is not likely to survive beyond 6 months. Accordingly, *Krueger* is inapplicable to this matter.

19th Judicial District Court for the Parish of East Baton Rouge. Clearly, Judge Bagneris' March 4th Order vested sole jurisdiction over the *Catania* case in the 19th Judicial District Court as of March 4, 2002. Likewise, it is also equally apparent that Judge Bagneris never entered an order vacating the March 4, 2002, transfer order in this matter. As such, Viacom, Inc.'s late filed third party demand was filed in a court clearly without jurisdiction over the matter, and, accordingly, is null, void, and without legal effect.

## II. **PLAINTIFFS' REPLY TO OPPOSITION TO MOTION TO REMAND FILED ON BEHALF OF VIACOM, DSM, AND DOW.**

Plaintiffs first object to all of the documents/exhibits attached to DSM's opposition on the basis that said documents are hearsay. Moreover, much of the information contained in the affidavits contain double hearsay. Furthermore, these documents present many new issues that were not raised by DSM in its notice of removal filed in this matter on April 9, 2002.[2]   DSM is not

---

[2]Plaintiffs further note that as in *Lalonde*, DSM has abandoned any reliance on 28 U.S.C. 1442(a)(2) in support of removal jurisdiction, as it has failed to brief this issue and/or present any credible evidence to support federal jurisdiction in this court under said statute.

Likewise, DSM has also failed to produce any evidence to make a colorable claim to its entitlement to any benefits/immunities derived from the Defense Protection Act of 1950, 50 U.S.C. 2061, et seq. and/or to rebut plaintiffs' arguments presented in plaintiffs' motion to remand for the inapplicability of the Defense Protection Act of 1950 to the claims presented in this matter.  Accordingly, DSM has conceded this issue and/or waived its right to make such an argument to this Court in support of removal jurisdiction.

allowed to ambush plaintiffs with new claims/issues not specifically raised in its original notice of removal filed in this matter. Accordingly, plaintiffs move that said documents/exhibits be stricken from the record in this matter and none of said documents/exhibits be considered by this Court.

Without waiving the foregoing objection, and out of an abundance of caution in the event this court does not strike said documents/exhibits and decides to consider same, plaintiffs provide the following reply to same. Plaintiffs submit that said documents/exhibits fall short of establishing the threshold requirements which would support removal of this action to federal court by DSM. First, plaintiffs note that none of said exhibits reference any direct order or instruction from the United States Government that asbestos had to be used in the DSM facility, or that the United States Government gave specific instruction to DSM to not take adequate precautions to protect workers on their premises (and their resulting family members) from exposure to deadly asbestos fibers, or to not warn workers on their premises of the deadly hazards of asbestos exposure to themselves and their resulting family members, the lack thereof of such evidence clearly indicating DSM's inability to claim any protection provided under government contractor immunity.[3]   To the contrary, DSM's own

_____

[3]As such, DSM has failed to meet the following requirements needed in order to qualify as a federal officer, or "person" acting under him, as set forth in case of *Mesa v. California*, 489 U.S. 121, 131-132, 109 S.Ct. 959, 966, 103 L.Ed.2d 99 (1989), which requires that DSM: (1) demonstrate that it acted under the direction of a federal officer, (2) raise a federal defense to the plaintiffs' claims, and (3) demonstrate a causal nexus

Exhibit "C", at Section "15(e)", establishes that DSM was contractually required to comply with safety, sanitary, and factory inspection laws of the State of Louisiana in its operating agreement entered into in regards to the Baton Rouge facility. Likewise, since DSM has failed to present any evidence that the government restricted DSM's ability to notify individuals of the presence of asbestos in the work environment and the resulting hazards of exposure to same, there is no causal connection between the control allegedly exercised by the United States over DSM and the legal theory under which Viacom, Inc. seeks to hold DSM liable.[4]   DSM was obligated under both federal and state law to provide a safe place to work for those working on its premises and their resulting family members, including protection from exposure to deadly asbestos fibers.  As such, there was no conflict between federal and state law in regards to warning of the hazards of asbestos and taking necessary precautions to protect the workers and their family members from being exposed to asbestos.  This is

between plaintiffs' claims and acts it performed under color of federal office.  Likewise, for these same reasons, the case of *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 19, 60 S.Ct. 413, 84 L.Ed. 554 (1940), is inapplicable to the facts of this case.

[4]Plaintiffs further show that the self-serving affidavit of Robert R. Dennis, Jr. attached as Exhibit "F" to DSM's opposition, mentions nothing of why workers on the premises of the DSM facilities were not warned of the hazards of asbestos to themselves and their resulting family members, or why adequate precautions were not taken by DSM to protect the workers on its premises and their resulting family members from exposure to deadly asbestos fibers.  Plaintiffs further show that Mr. Dennis makes allegations covering time periods when he was not even employed with DSM which are certainly not based upon his personal knowledge.

not the situation as was in *Boyle v. United Technologies Corporation*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), wherein in *Boyle* the state-imposed duty of care that was the asserted basis of the contractor's liability was precisely contrary to the duty imposed by the Government contract.[5] In this case, the obligations of DSM were the same under both federal and state law. Furthermore, this case does not involve the United States as a party, and is merely between private litigants.  Certainly, DSM cannot be shielded from state court liability applying state law from its breach of substantially identical duties imposed by both federal and state law, not to mention its agreed upon contractual duty to follow the laws of the State of Louisiana to protect citizens such as Barbara Catania from exposure to deadly asbestos fibers.  DSM Copolymer could have complied with its alleged contractual obligations and the state-prescribed duty of care. Furthermore, this case does not involve work presently taking place by contractors of the government or employees or agents of the government, and no chilling effect would be presented in regards to future work performed by government contractors as this case involves exposures to asbestos occurring prior to 1970, for which asbestos is no longer utilized by said contractors, etc.  This case also does not result from injury to products manufactured and sold

---

[5]*Boyle* is also distinguishable on the basis that *Boyle* involved a case alleging a design defect in regards to a piece of machinery manufactured by a contractor, which allegation is not present in regards to Viacom, Inc.'s Third Party Demand asserted against DSM in this matter.  As such, the test pronounced in *Boyle* is inapplicable to this matter.

to the U.S. Government by DSM, but instead results from DSM's failure to warn and protect workers on its premises and their resulting family members from exposure to deadly asbestos fibers, despite its contractual and state imposed obligations to protect such individuals from these hazards.  DSM Copolymer, Inc. has certainly failed to meet its burden of establishing jurisdiction in this Court.

Likewise, DSM's reliance on the case of *Willingham v. Morgan*, 395 U.S. 402, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969),is also misplaced as that case dealt with federal officials who were named as defendants for recent alleged improper acts, certainly not the case here, which therefore mandated the application of a different relaxed standard in consideration of what should be considered "acts under color of such offices" and "causal connection" for removal for those federal officials.  *Willingham* also required the broader test for "acts under color of such office" and "causal connection" supporting removal to federal court due to a "scattergun" complaint filed by the inmate petitioner, which is certainly not the case here.  Viacom, Inc.'s late filed third party demand is clear in its allegations against DSM, which put DSM in a position to come forth with specific evidence showing that it was acting under color of federal authority and in enforcement of federal law, and to exclude by direct evidence the possibility that DSM's actions involving asbestos were based on acts or conduct of its own not justified by any federal authority or federal law regarding DSM's misuse of asbestos and failure to warn of the

- 8 -

hazards of asbestos, which DSM clearly failed to present to this court in support of its removal pleadings filed herein. In short, DSM has failed to present a colorable basis supporting its rights to any federal immunity and/or defense in this matter to warrant removal of this matter to federal court. Accordingly, DSM has failed to meet its burden of establishing federal jurisdiction over plaintiffs' state court suit, and, therefore, DSM should not be entitled to wrest jurisdiction of this case from the state court pursuant to the attempted misplacement of 28 U.S.C. 1442 and/or the government contractor defense.

Plaintiffs likewise find insulting and quite disingenuous counsel for DSM's allegations that plaintiffs are somehow creating further delay in getting this matter to trial, when DSM is fully aware of the guaranteed long term delay that would result in getting this case to trial if the case is not remanded as this matter will be transferred to the MDL. Defendants themselves refer to the MDL as the "Black Hole", and the guaranteed delay was clearly recognized by the Eastern District of Louisiana in the case of *Crocker v. Borden, Inc.* (E.D. La. 1994) 852 F.Supp. 1322, cited in plaintiffs' motion to remand. Equally offensive is DSM's attempted "down playing" of the seriousness of Mrs. Catania's condition, as DSM is fully aware that Barbara Catania is suffering from malignant mesothelioma, and since she is an employee of the State, she is not entitled to Social Security Benefits. They are aware, also, that her husband is unemployed. Accordingly, Barbara Catania has to drag herself to work despite her terminal condition

in order to pay her bills and keep her insurance in effect. Fortunately, the President of LSU has been very accommodating and supportive, ostensibly because of Mrs. Catania's twenty plus years with the University.   From the above, it is clear that DSM has failed to meet its burden in establishing jurisdiction in this Court, and, from this Court's own experience with the MDL and the statements made in the *Crocker* case, it is of paramount importance that this matter not be transferred to the MDL so that Barbara Catania will have her day in court while she is still alive.   As such, this case is the perfect example of a case meeting "exceptional circumstance" for remand of this matter back to state court in toto, or, in the alternative, should this court find jurisdiction over the claims asserted by Viacom, Inc. against DSM, of all claims save Viacom, Inc.'s Third Party Demand against DSM Copoylmer, Inc. in this matter.[6]

Wherefore, plaintiffs' respectfully request that plaintiffs' motion to remand be granted, or, in the alternative, if the Court determines that DSM's removal is proper, plaintiffs respectfully request that the Court sever the Third Party Demand against DSM and

---

[6]   The Dow Chemical Company's reliance on the case of *Anderson v. Red River Waterway Com'n*, 231 F.3d. 211 (5th Cir. 2000) is misplaced, as *Anderson* dealt with severance and remand under 28 U.S.C. 1441c, not 28 U.S.C. 1367 as was utilized by the Eastern District of Louisiana in the case of *Crocker v. Borden, Inc.*, (E.D. La. 1994) 852 F.Supp. 1322.   Furthermore, *Anderson* did not involve 28 U.S.C. 28 U.S.C. 1442, or the potential transfer to MDL which would guarantee that Mrs. Catania would never see her day in court while she is alive.

remand all remaining claims to state court so that Barbara Catania
can have her day in court before she dies.

Respectfully submitted,

ROUSSEL & ROUSSEL

GEROLYN P. ROUSSEL - 1134
PERRY J. ROUSSEL, JR. - 20351
JULES K. BOUDREAUX - 24309
1710 Cannes Drive
LaPlace, LA  70068
Telephone:  (504) 651-6591
ATTORNEYS FOR PLAINTIFFS,
BARBARA AND MICHAEL CATANIA

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing pleading has been
served upon counsel for all parties by FAX, hand delivery, or
mailing same to each, properly addressed and postage prepaid, on
this 28th day of April, 2002.

GEROLYN P. ROUSSEL

CIVIL DISTRICT COURT

PARISH OF ORLEANS

STATE OF LOUISIANA

No. 2001-18122                          Division "H"

BARBARA CATANIA

VERSUS

AC AND S, INC., ET AL

_____

*********************************************************

_____

*A RULE HEARING PROCEEDINGS* held in the above-entitled cause, before the **Honorable Michael G. Bagneris, Judge,** presiding on **THURSDAY, FEBRUARY 28, 2002.**

REPORTED BY:

R.J. BURAS, JR., CSR.



1

1    APPEARANCES:

2    JULES BOUDREAUX, ESQ.

3    GEROLYN ROUSSELL, ESQ.

4         Representing Barbara Catania

5

6    TONYA JOHNSON, ESQ.

7         Representing Eagle, Incorporated

8

9    SUE KOHN, ESQ.

10        Representing McCarthy Corporation

11

12   KEVIN WEBB, ESQ.

13        Representing  Eagle Incorporated

14

15   TROY N. BELL, ESQ.

16        Representing Garlock

17

18   W. SCOTT BROWN, ESQ.

19        Representing Uniroyal, Inc., and Owens-Illinois

20

21   ROBERT KNIGHT, ESQ.

22        Representing Reilly Benton Company, Inc.

23

24   JULIE ROBLES, ESQ.

25        Representing Anco Industries

26

27   GREG ANDING, ESQ.

28        Representing Exxon/Mobile

29

30   DAVID BIENVENU, ESQ.

31        Representing The Dow Chemical Company

32

1    <u>APPEARANCES (CONT):</u>

2    **KAY BAXTER, ESQ.**

3         Representing AC and S, Incorporated

4

5    **WILLIAM CODY, ESQ.**

6         Representing General Electric

7

8    **AVERY GRIFFIN, ESQ.**

9         Representing Westinghouse/Viacom

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32

3

## P R O C E E D I N G S

<u>THURSDAY, FEBRUARY 28, 2002</u>

BY THE COURT:

    Let the plaintiff and liaison counsel make their appearance for the record.

BY MS. ROUSSELL:

    Gerolyn Roussell for the plaintiffs.

BY MR. BOUDREAUX:

    Jules Boudreaux for the plaintiffs.

BY MS. ROBLES:

    Julie Robles here on behalf of Anco Insulations, and as liaison counsel for the defense.

BY THE COURT:

    There are eight matters before the court today, and all of the matters have been briefed.  Most of the -- in fact, all but one of the exceptions, the court has dealt with extensively, not necessarily in this case, but cases like this case.  And, I say, "all but one," so, I'm going to ask that we limit the discussion just to the issue, which is not unfamiliar to the Court, but I think it's only the second time that I probably encountered it in one of these type cases.

    So, I'm going to find out if there is anymore information on that issue.  The other issues we've beaten to death.  So, the only issue that I'm interesting in hearing more on is the issue of forum non conveniens.

4

BY MR. ANDING:

Your Honor, Greg Anding on behalf of
Exxon-Mobile.

I filed the motion.  I originally
asked the other two premises defendants to
join in and they did, Kaiser and Dow, and
then Ms. Robles as liaison counsel joined
in.

And so, my first point to the Court
would be the fact that the other
defendants have not joined in the motion,
I don't believe is an indication of
whether they agree or don't agree with it.
I didn't ask any others to join in that
particular motion --

BY THE COURT:

Let me --

BY MR. ANDING:

-- I'm sorry --

BY THE COURT:

-- that's the issue I want hear a
little more about, but I don't necessarily
want to hear it from you --

BY MR. ANDING:

-- right --

BY THE COURT:

-- at this point --

BY MR. ANDING:

-- all right.

BY THE COURT:

I got a couple of questions for the
plaintiffs.

In reading your memorandum, I kept getting the impression that you were addressing venue more so than the issue of forum non conveniens, and I understand how the concepts have some overlapping, obviously.

I don't believe -- maybe I better ask this question to the mover first.  I don't believe there is much of a debate that Orleans Parish is a proper venue.  And, let me double-check on that.  Do you dispute that, counsel?

BY MR. ANDING:

Not at this time, no, sir.

BY THE COURT:

So, the issue would not be whether Orleans is a proper venue to bring this matter.  The issue then becomes whether East Baton Rouge Parish is a more convenient forum for which is -- and, East Baton Rouge is also a proper Parish of venue, so the question would become whether it is a more convenient forum?

Plaintiffs seems to indicate that the choice of plaintiff should prevail in an issue where there's more than one Parish to choose from, then whichever Parish that the plaintiffs seek to bring the action should outweigh any other consideration, but that doesn't seem to -- that concept doesn't seem to reconcile itself with what I believe was the *Sondheimer* decision, and

6

1       I'm wondering if you would address that?

2  BY MR. BOUDREAUX:?

3       Judge, the first note, the *Sondheimer*

4  decision involved a case where the venue

5  itself was not proper in Orleans Parish.

6  If you read the opinion in that case the

7  venue itself is not proper in Orleans

8  Parish.  And, in addition to that, if you

9  look at the factors that you look at for

10  forum non conveniens, which are laid out

11  in the *Lamb* case, which is a Fourth

12  Circuit case --

13  BY THE COURT:

14       Right --

15  BY MR. BOUDREAUX:

16       -- when you look at the factors in

17  that case you didn't have any --

18  BY THE COURT:

19       They were four, correct?  Is it three

20  or four?

21  BY MR. BOUDREAUX:

22       -- That's correct, Your Honor.

23  BY THE COURT:

24       Yeah --

25  BY MR. BOUDREAUX:

26       -- there were no witnesses who were in

27  Orleans Parish.  The defendant himself

28  allegedly was not in Orleans Parish.  All

29  the witnesses to the case, all of the

30  actions that took place were not in

31  Orleans Parish.  The court looked at those

32  factors in addition to the fact that venue

7

was not technically proper in New Orleans
in the first place in making its decision.

Now, in this case, as you've seen from
our brief, we have a lot of differences
here.  First of all we have, which I don't
think they have come out and conceded that
venue is proper in this case, but we've
alleged in our petition, and it's been
testified to by two of the plaintiff's
uncles for whom they had brought the
asbestos home on their clothes, which
exposed Mrs. Catania to the asbestos which
resulted in her condition.

Two of the uncles worked for Taylor-
Seidenback, Inc., who is a defendant in
who has a registered office here in New
Orleans -

BY THE COURT:

You are giving me venue, Counsel.

BY MR. BOUDREAUX:

-- but, Judge, if I'm tying it in,
when you look at that you've also got
numerous witnesses in this case who are
actually in Orleans Parish.  And, we've
laid out the witnesses in our brief.

Our first note we have --

BY THE COURT:

That's the witnesses -- I mean,  those
witnesses that you are talking about -- if
you are talking about -- you are talking
about the executives that would be in the
--

8

BY MR. BOUDREAUX:

—— I'm talking about certain of
Barbara Catania's main treating physicians
for her mesothelioma ——

BY THE COURT:

—— Let me stop you there.

In every case, and the courts have
addressed this in the forum non conveniens
matters, when you start talking about
experts, and that's what you are talking
about experts ——

BY MR. BOUDREAUX:

—— we are talking about treating
physicians, Your Honor ——

BY THE COURT:

—— who is an expert.

He's not going to testify as to facts,
right?  He's going to give his expert
opinion about the physical condition of
his patient, or her patient.  So, experts
are going to be all over the board.

I'm talking about, and what the cases
seem to deal with is, is where are the
fact witnesses?  Where did the accident
occur?  And, in this instance, where even
does the plaintiff reside?

BY MR. BOUDREAUX:

Judge, in addition to the expert
witnesses ——

BY THE COURT:

Okay ——

BY MR. BOUDREAUX:

9

1        -- we have also listed numerous fact
2     witnesses --
3   BY THE COURT:
4        -- Okay --
5   BY MR. BOUDREAUX:
6        -- who certain of which were actually
7     plaintiffs in their own cases which were
8     all filed in Orleans Parish --
9   BY THE COURT:
10       -- Slow that one down.  Slow that one
11    down.
12       Fact witnesses to your client,
13    Catania?
14  BY MR. BOUDREAUX:
15       -- Catania --
16  BY THE COURT:
17       -- Catania.
18       Fact witnesses to her case?
19  BY MR. BOUDREAUX:
20       That's correct, Your Honor.
21  BY THE COURT:
22       Okay.
23  BY MR. BOUDREAUX:
24       Who are listed as fact witnesses in
25    her case.
26  BY THE COURT:
27       Now, you are talking about her uncles?
28  BY MR. BOUDREAUX:
29       No, Your Honor.  I'm talking about
30    additional fact witnesses who have been
31    listed who were Local 53 Union Insulators
32    like her uncles who actually filed

10

lawsuits here in Orleans Parish and
prosecuted and got those to trial and/or
resolved, and some are still pending in
Orleans Parish.

So, we have fact witnesses --

BY THE COURT:

Did they live in Orleans Parish?

BY MR. BOUDREAUX:

Certain of them did, Your Honor.
Certain of those did.  And, we referenced
one of those in our supporting opposition,
Mr. Leon Campiere.

In addition to that --

BY THE COURT:

Which facts are they going to be able
to address?

BY MR. BOUDREAUX:

-- they are going to talk about
exposures, Your Honor.  These clients
worked at the same sites in the same time
periods for which the asbestos was
utilized on those premises and were, in
fact, eventually brought home on clothes
of certain of these -- certain of her
uncles.

BY MS. ROBLES:

Your Honor, if I may?

BY THE COURT:

Sure.

BY MS. ROBLES:

The witnesses that he is talking about
are witnesses to, in general as to the

work sites, these are not witnesses who
will actually testify to asbestos exposure
to Barbara Catania.

The two uncles or three, if you count
all three, who actually will or have
already testified that they were around
their niece Barbara Catania with dust on
their clothing all live in the Baton Rouge
area.

So, these are other workers at various
locations up and down the river, including
some of those locations in the Baton Rouge
area --

BY THE COURT:

Okay --

BY MR. BOUDREAUX:

And, as I said before, these clients
they worked all over the place.  The Local
53 union insulators they worked tons of
locations.  These people routinely worked
around and with one another on various job
sites during various time periods, Your
Honor.

In addition to that we have local
witnesses here who are specific to the
defendants that we've named in this suit.
Ralph Shepard is one who is one of the
individuals who was an officer of Taylor-
Seidenbach, for which we've already
discussed that Taylor-Seidenbach, we've
alleged in our petition, was the employer
of various of these uncles, and they

12

1  failed to take certain precautions or

2  means, or steps necessary to protect their

3  workers and resulting family members from

4  being exposed to asbestos.

5      Ralph Shepard is one such individual.

6  We have Fred Schuber, Jr.  --

7  BY THE COURT:

8      Let me ask you a question, Counsel.

9      Do you have any fact witnesses here

10  who actually witnessed the exposure of

11  your client to the asbestos?

12  BY MR. BOUDREAUX:

13      -- discovery is still proceeding in

14  those regards, Your Honor.

15  BY THE COURT:

16      So, the answer is, no?

17  BY MR. BOUDREAUX:

18      No, the answer is not "no."  The

19  answer is, "discovery is still proceeding

20  in those regards."  At this time,

21  unfortunately, I can't --

22  BY THE COURT:

23      The answer is, no, but we are still

24  maintaining discovery in order to find

25  someone.

26  BY MS. ROUSSELL:

27      Judge, might I just add something --

28  BY THE COURT:

29      Sure.

30  BY MS. ROUSSELL:

31      -- with your permission.

32      These three uncles work virtually all

13

different places.  One of them worked extensively out of state.

Her exposure came through their clothing.  So, the fact witnesses who are going to say, "I work with Uncle Pete at this location or Uncle Vic at this location," would not have seen her exposure because her exposure occurred at their house.

However, none of those witnesses, Uncle Pete, Uncle Vic, Uncle Russell, Barbara Catania, the plaintiff, or Michael Catania are indicating that Orleans Parish is inconvenient to them.  They are more than happy to travel here to testify.  So, it's clearly not inconvenient to them.

BY THE COURT:

Then, why didn't they file their lawsuits here?  If it's so convenient, why did they file their lawsuits in East Baton Rouge?

BY MS. ROUSSELL:

Well, you'd have to talk with their attorney.  I would assume because they -- the attorney is located --

BY THE COURT:

So, it's more convenient to the attorney.  If it was convenient for them, they would have done the same thing.  They would come down here, so convenient and nice and cozy.  They would have made that little nice trip down here to Orleans

14

Parish and filed their lawsuit here, but they opted to file -- they opted to file their lawsuit in East Baton Rouge.

BY MR. ANDING:

And, they were deposed in East Baton Rouge, too, Your Honor.

BY MS. ROUSSELL:

-- but, Judge, that was a decision -- venue was certainly was proper here in Orleans Parish, and their attorney could have file here, but their attorney was located in Baton Rouge, and that's why, I would assume, their suit was filed in Baton Rouge --

BY THE COURT:

And, I would assume that that's correct.  And, Judge Tobias just recently wrote a decision indicating that the forum non conveniens article is specifically not designed for the convenience of the attorneys.  He says that specifically. It's designed not for the convenience of the attorneys, and he also indicated that it's not really designed for the expert witnesses who will travel anyplace, you know.  It was designed for the convenience of the parties and the fact witnesses, you know.  And, there's a large emphasis on location, you know?

BY MS. ROUSSELL:

And, Judge, many of the parties -- several of the parties are domiciled here

15

as Mr. Boudreaux has indicated.  Fred
Schuber, who will be testifying in this
case, his business is here and he is here.
Warren Watters, Ralph Shepard -- there are
many of the fact witnesses who are here.
Some of the Local 53 witnesses who are
going to be testifying are here.

So, it's convenient not only for the
attorneys, it's convenient for the
parties. And, the ones that the defendants
are arguing it's not convenient for are
not here saying it's not convenient for
them.  They are more -- they are arguing
the three uncles.  The three uncles are
more than happy to travel here to testify.
It's convenient to them.

BY THE COURT:

The fact that they are more than happy
to come testify for their niece does not
make this a forum that's convenient for
them.  That's not the factor.  The factor
that they don't mind doing it isn't a
question -- isn't one of the things we put
on the scale to determine whether or not
East Baton Rouge Parish versus Orleans
Parish would be the more convenient
parish, because, if that is the case, all
we've got to do --  we can talk forum non
conveniens out the window and then just
have all the witnesses everywhere, you
know, the one from Brazile, you know,
indicate, "I don't mind.  I'll fly to

16

Orleans Parish, not a problem at all."

You know, if that were the case?

BY MS. ROUSSELL:

But, Judge, the issue then is, is it's their burden of proof to show that this is an inconvenient forum.

And, what I'm trying to indicate --

BY THE COURT:

That's not their burden, Counsel.

Their burden is to go down those four steps and indicate what factors they put on the scale, and what factors plaintiff has to put on the scale, and then in weighing them make a determination as to how they fall out under 123.  That's the burden.  The burden is not to prove a negative to show that it's inconvenient.

BY MR. BOUDREAUX:

And, Judge, since you mentioned the four factors, I think we should address the four factors.

The first factor is the convenience of the parties and the witnesses --

BY THE COURT:

We are going to address them, but that isn't the reason why?  We will.

BY MR. BOUDREAUX:

-- as we've said before, Your Honor --

BY THE COURT:

-- Let me just get to it, Counsel.  One second.  Okay, got it.  Convenience of the witness, okay.  Convenience of the

17

parties or witnesses.

BY MR. BOUDREAUX:

-- There are numerous witnesses, Your Honor, who actually are Orleans Parish residents who will testify at the trial of this matter.

In addition, Your Honor, there are, as I stated before, there are various expert witnesses who are treating physicians, and/or rendered treatment to Barbara Catania in this matter, who do business in New Orleans, and reside in New Orleans, who will be witnesses in this case, one of which is her actual treating, Dr. Paul Schwarzenberger, who's actually treating her for her mesothelioma, and he's a renowned expert in his field, and he's located here in New Orleans.

We have Dr. Sartor. We have Dr. Charles Mary, who's in Jefferson Parish --

BY THE COURT:

All experts. Which I don't have a problem with, but I'm saying they are all expert witnesses.

And, as I said before, experts will travel anyplace. The fact of the matter is you have, for any expert anywhere in the nation, and the ones you are talking about right now is Orleans Parish, is just as convenient to get to Orleans as it is to get to Baton Rouge.

BY MS. ROUSSELL:

18

1          And, that's why forum non conveniens

2     should be denied, because it is just as

3     convenient to be here as to be there --

4     BY THE COURT:

5          I'm saying for the experts, for the

6     experts --

7     BY MS. ROUSSELL:

8          -- But, these -- this physician is a

9     treating --

10    BY THE COURT:

11         -- have expert will travel.

12         Go ahead -

13    BY MS. ROUSSELL:

14         -- and, they don't typically.

15         Dr. Schwarzenberger does not typically

16    show up in litigation.  He's the treating

17    Oncologist here.  He's not what I call, "a

18    litigation expert."  He's is a treating

19    physician.

20    BY THE COURT:

21         And he's with --

22    BY MS. ROUSSELL:

23         L.S.U. Medical Center --

24    BY THE COURT:

25         -- No, no, I know where -- that wasn't

26    my point.  It goes back to what Judge

27    Tobias' point was in the *Guidry* case where

28    you talk about the convenience of the

29    lawyers.  I'm going  -- and I could be --

30    well, in the average case it's not the

31    client determines who their experts are.

32    It's the lawyer determines who's the

19

expert.  That's both sides, plaintiff and defendant.

    Plaintiffs have their cadre of experts.  Defendants have their cadre of experts.  You know, where ever they might be as long as they are going to be supporting the view of the party that's retaining.

BY MS. ROUSSELL:

    But, that's not true as to a treating physician.  This is her treating Oncologist.  He's not our litigation expert.  He is a treating physician of her.

BY THE COURT:

    Who she was dealing with prior to --

BY MS. ROUSSELL:

    Long before contact with my office, yes --

BY THE COURT:

    -- Okay.

BY MR. BOUDREAUX:

    And, in addition to that, Your Honor, the defendants have listed numerous witnesses who reside in Orleans Parish who are going to be called as witnesses at the trial of this matter.

    And, if you look at their witness list, Your Honor --

BY THE COURT:

    Well, do you know what they are going to say?  They are going to say the same

thing your uncles are saying.  That's what
they are going to say.  "We don't mind
traveling up to Baton Rouge.  We do it all
the time."

BY MR. BOUDREAUX:

    -- I understand that, Your Honor.

    And, they've also -- if you look at
their witness list, most of their
witnesses are either in Orleans Parish or
they are out-of-state witnesses, Your
Honor.

    I know you've referenced it's just as
to travel to Baton Rouge as it is to New
Orleans.  Well, one of the other factors
is the cost of obtaining attendance of
witnesses.  I'd respectfully, you know,
from my personal experience, let the Court
know it's not that easy to travel out of
Baton Rouge.  It's a lot more expensive to
fly out of Baton Rouge.  It's a lot
cheaper and it's a lot easier to fly into
New Orleans.

    And, that's going to apply across the
board, not only to certain facts witnesses
for the plaintiffs and defendants alike,
but there are also witnesses who are
actually the defendants are trying to
schedule their depositions as we speak,
who are relatives of our clients and are
listed witnesses in this case, who are
also out-of-state witnesses, Your Honor.

    And, it's going to be cheaper, it's

21

going to be fast, and it's going to be
easier to get those out-of-state witnesses
coming through the New Orleans Airport
than it's going to be in Baton Rouge.

BY THE COURT:

What if the Court wanted the jury, and
I'm not saying this is the case, but what
if the Court wanted the jury to inspect
the site to see what was going on?  What
happens then?  We show them pictures.

BY MR. BOUDREAUX:

Well, Judge, but -- and here's the
next thing.  Generally, they don't have
pictures.  And generally, the site as it
is today is not the way the site was many
years ago.  Most of the times the asbestos
has been pulled out and what we have and
what we rely upon are the witnesses'
testimony in this case.  I mean, site
inspections most of the times don't apply
in these cases because we are talking
about stuff in this case that took place
in the fifties and sixties.

So, that factor for the forum of non
conveniens is really not going to apply to
this case because it's going to come out
through the testimony of the witnesses,
Your Honor.

BY MR. ANDING:

Your Honor, can I interject a few
points?

BY MR. BOUDREAUX:

22

1           And if I could --
2     BY THE COURT:
3           No, let him finish.  Write your notes.
4     BY MR. BOUDREAUX:
5           If I could address, too -- now, we've
6     covered three of the factors already, Your
7     Honor, and the fourth one is the
8     advantages and obstacles to a fair trial.
9           Your Honor, we came in here January 8
10    and asked this Court for an expedited
11    trial setting pursuant to the Louisiana
12    Code of Civil Procedure Article, I believe
13    it's 1573.
14          It's a serious case, Your Honor, and I
15    know the Court is aware of that.
16    Mesothelioma is not something that you can
17    beat, and it's something that's going,
18    unfortunately, probably tell its tale
19    within the next six months, Your Honor.
20          We came in, and we asked for that
21    date.  This suit was filed on October 31,
22    2001.  The defendants took the depositions
23    of her uncles in previous litigation many
24    years ago, Your Honor.  They were well
25    aware of what we were alleging, not only
26    in the petition, but they were aware of
27    the actual substance of what was going to
28    be revealed by those witnesses through the
29    depositions that they'd taken in previous
30    cases.
31          This is not a case where they were
32    starting from scratch.  This is a case

23

where they knew the people who were going to be involved.  They knew what they were going to say.  They knew that a long time ago, Your Honor.

I cited a case in my brief that says that if they are going to even assert a forum non conveniens order it must be done within a reasonable time period, Your Honor.

This case is on a fast track. It's on a fast track for a reason because, unfortunately, our client is not going to be alive for too much longer.

What did they do?  They didn't file this thing until, I believe, sometime in February.  We are coming up upon a two -- I think we have two more months to discover.  We've got a trial date on June 10, Your Honor.

If you look at the advantages and obstacles to a fair trial, if this case were to get transferred to East Baton Rouge Parish, what's going to happen, more likely than not, and I could probably say -- I would probably guarantee it, my client is not going to get to court while she's alive.  It's not going to happen.

This case is on a fast track.  We came in.  We agreed to setup certain deadlines, and dates for doing this and that, to meet the June 10 trial date, Your Honor.

BY THE COURT:

24

1          Let me ask you a question.  Do you
2     know whether or not the uncles who have
3     filed their litigation have a trial date?
4     BY MR. BOUDREAUX:
5          Most of -- to my knowledge, most of
6     the uncles' cases were resolved, Your
7     Honor.  One of them, I believe, may be up
8     in MDL.
9     BY THE COURT:
10          I was under the impression that the
11     cases were pending in the East Baton
12     Parish.
13     BY MR. BOUDREAUX:
14          I'm not the attorney for them --
15     BY MS. ROBLES:
16          Giordano's is.
17     BY MR. ANDING:
18          Giordano's is pending.  We deposed Mr.
19     Reno.  He said that his was still pending
20     that it was not settled.  But, as far as
21     whether they have trial dates, I don't
22     know.
23     BY MR. BOUDREAUX:
24          As I said, I don't represent them.
25     I'm not aware of all the particulars --
26     BY THE COURT:
27          I was just trying to address your
28     speed argument, Counsel, which I
29     understand, you know, being on the fast
30     track, because clearly, to me, if this
31     were to go to East Baton Rouge Parish, it
32     would seem to me that it would be

25

```
 1            consolidated or should be consolidated
 2            with the uncle's case.
 3       BY MS. ROUSSELL:
 4               Judge, that would be impossible.  And
 5            one of them is up in the MDL, which is --
 6       BY THE COURT:
 7               Why would it be impossible?
 8       BY MS. ROUSSELL:
 9               -- well, it's out of state.
10       BY THE COURT:
11               No, I'm talking about the one in East
12            Baton Parish --
13       BY MR. ANDING:
14               Gardano's --
15       BY MS. ROUSSELL:
16               -- I would think that the facts would
17            be so different at this point.  Half of
18            the -- at least a good portion of those
19            defendants have settled those cases
20            already.  They may have a few straggling
21            defendants, but it's not a situation where
22            -- I'm sure the defendants would even
23            object to consolidation.  They always
24            object when we try, as plaintiffs, to
25            consolidate cases.  I'm sure they would
26            object here if we tried to consolidate
27            those cases --
28       BY THE COURT:
29               I'm just saying that if it went there
30            -- I'm sure you always have objections,
31            and the judge has to resolve the
32            objections.  It would seem to me that the
```

26

facts are totally overlapping.  The same
asbestos that the uncles are saying that
they got from these plants got on their
uniforms, and where was the uniform coming
into contact with, you know, in East Baton
Rouge when she was around her uncles.

So, all of the plant information, all
of the contact information, the site
information, seemingly all of the fact
witnesses around that would be in that
vicinity.  So, it would seem -- I'm just
saying, if it went that way, that it would
seem to me that that would be a perfect
case for consolidation regardless of
objection.

BY MS. ROUSSELL:

And, Judge, not all of the uncles'
exposures was in East Baton Rouge Parish.
Local 53 members literally built --

BY THE COURT:

I know they had one in Iberville --

BY MS. ROUSSELL:

-- well, they literally built the
plants up and down the Mississippi River.

But, as far as consolidation, we have
attempted in Avondale litigation where the
years were identical --

BY THE COURT:

-- except they don't have any plants
here.  Except all the litigation comes
here.  Ain't got nary a plant.  Got a lot
of offices.  Got nary a plant, but got

1    every litigation you can think of.

2         That's all right.  Go on.

3    BY MS. ROUSSELL:

4         -- Entergy plant -- they actually do

5    and we have had litigation with plants

6    that are located here and the shipyards as

7    well, but the point being --

8    BY THE COURT:

9         That's Jefferson --

10   BY MS. ROUSSELL:

11        -- Todd Shipyards, Halter Marine,

12   Bolin (phonetic), the NOPSI plants.

13   BY MR. ANDING:

14        Not these guys --

15   BY THE COURT:

16        Those are not -- yeah, that's a

17   different kind of facility.

18        Go on, Counsel.

19   BY MR. BOUDREAUX:

20        Okay, Judge.

21        As I said before, the reasonable time

22   period for which this should have

23   involved, Your Honor, they had the

24   information.  We're moving on a fast track

25   to get it to trial on June 10 while she's

26   alive. The case I cited, you know,

27   directly

28   supports plaintiff's position.

29        For the fourth factor, certainly, this

30   would be an obstacle to a fair trial for

31   my client because it's going to basically

32   prevent her from getting her justice while

28

1          she's alive.
2     BY THE COURT:
3               Let me ask the defendants to respond
4          to the factors that counsel articulated,
5          but in reverse order.  Tell me about the
6          --
7     BY MR. ANDING:
8               Reasonable time --
9     BY THE COURT:
10              No, I'm talking about -- right now we
11         did go through a lot of things to insure,
12         as much as you can insure something of
13         that nature, that this woman has an
14         opportunity to be present at her trial.
15         And, we don't know what the prospects of
16         that is, but, certainly, with a time
17         certain, at least we are moving towards a
18         date that hopefully she will be able to
19         participate in pursuing this claim.
20              Tell me why that is not a argument
21         that would undermine all of your other
22         arguments as it relates to being the best
23         thing to do in the interest of justice.
24    BY MR. ANDING:
25              Your Honor, first of all, the case
26         that the plaintiff cited, and Mr.
27         Boudreaux is referring to, if you look at
28         it there was a motion to transfer file
29         after trial on the merits while the case
30         was under advisement.  It wasn't the
31         situation that we have here where we filed
32         it shortly after the uncles' depositions

29

1    were taken.

2        The argument that we had these

3    depositions, and we were there for my

4    client, Exxon, we weren't at any of their

5    previous depositions.  I don't believe

6    Anco was.  I don't believe Dow was.  So,

7    we weren't at any of these previous

8    depositions.

9        We got their witness list on January

10    31.  We deposed Mr. and Mrs. Catania on

11    January 30, and we finished deposing the

12    uncles on February 7.  I filed the motion

13    February 13, six (6) days later.

14        So, I mean, we did it as soon as we

15    had -- in their petition they didn't

16    allege Mrs. Catania's residence.  We

17    didn't -- I mean, once we started getting

18    medical records we could see that she

19    lived in East Baton Rouge Parish, but

20    until then we didn't have that proof.  We

21    believed it, but we didn't have the proof

22    --

23    BY MS. ROBLES:

24        Your Honor, I'm sorry, let me

25    interrupt Greg for a second.

26        We had requested Mrs. Catania's

27    deposition the week prior to the thirtieth

28    when it actually took place, but counsel

29    was not available herself, and the

30    earliest date she gave us was the

31    thirtieth of January.

32    BY THE COURT:

Forget about the -- I'm not trying to put a hat on anybody's head as it relates to any delay.  Clearly, we've been moving this matter I think in an expeditious manner.

I'm talking about the likelihood of plaintiff being able to participate in her trial if this matter was sent off to East Baton Rouge.

BY MR. ANDING:

Your Honor, at this point, you know, in most mesothelioma cases we had when we get the affidavits that say, "They got six (6) months to live."  The gentleman or the lady is in bed on oxygen.

Ms. Catania is still going to work every day.  She was able come to New Orleans for her deposition, sit through a day long deposition.

It's definitely disputed whether or not in six (6) months Ms. Catania will still be with us.

BY MS. ROBLES:

Judge, in fact, I would point out that there is some question, apparently, amongst the experts as to whether or not her condition is malignant.  I believe that plaintiff's expert was deposed the other day or yesterday, and there's been some change in his testimony that he now thinks she has a malignant condition, but before he wasn't sure it was malignant.

31

I'm not sure that Ms. Catania will not be with us, but I can say this, I don't think that the defendants would object to an expedited setting in Baton Rouge.  I mean, yes, we will have to work with the court's calendar up there, but the defendants are not trying to say it shouldn't be expedited at all.

It's just that from a convenience standpoint, and from a matter of efficiency and expeditiously moving the matter, it will be more convenient up there.

My client, for example, its principal place of business is in Baton Rouge.

We are taking thirteen (13) witnesses in the next two (2) weeks.  Seven (7) or eight (8) of them are being taken in Baton Rouge.  The only ones that are being taken in this area are actually being taken in La Place at counsel's office because she represents them.

The vast majority of the witnesses, the sites, the information that we need is in Baton Rouge.  Ms. Catania's employer is in Baton Rouge.  Our experts are in Baton Rouge.

BY THE COURT:

Oh, you mean your particular client's expert.

BY MS. ROBLES:

The defense, yes.

32

1          And, Judge, the point is that I think
2      that in that --
3  BY THE COURT:
4          Most of defense -- where are most of
5      defense's experts, where are they, the
6      expert witnesses, not the fact witnesses?
7  BY MS. ROBLES:
8          Out of state.
9  BY MR. ANDING:
10          Your Honor, Mr. Boudreaux kept
11      referring to their treating physician.
12      I've got a few things that I want to just
13      have in the record, but one of them is
14      plaintiff's witness list.  I've gone
15      through it and I count, not including the
16      two or three witnesses that they list as
17      their clients and don't give us an address
18      for, forty (40) of their witnesses are in
19      East Baton Rouge Parish, eleven (11) are
20      in Orleans Parish, and the rest are out of
21      state.
22          All of the treating physicians, if you
23      flip through here, I promise you there are
24      more Baton Rouge doctors than there are
25      Orleans Parish doctors.
26  BY MR. BIENVENU:
27          Judge, I would like to address the
28      concerns --
29  COURT REPORTER'S NOTE:
30          (Thereupon, the Reporter requested
31      counsel to identify himself for the
32      record.)

33

BY MR. BIENVENU:

    -- David Bienvenu for Dow Chemical.

    -- on the fairness of the justice issue because I think it is probably the most important factor that the court will consider.  It may be fourth on the list, but today it's problem number one, and there are two issues.

    Number one, the rule that requires a preferential setting applies not only to this court, but it applies in East Baton Rouge Parish as well.

    And, this court should assume, and should not dispute, that a judge in East Baton Rouge Parish when faced with same facts and applying the same law, would do the same thing for an exigent or a dying claim that any other judge would do.

    And, the court does not require that a setting be created, but to the extent this plaintiff is exigent and the evidence is in the record that it would be incumbent upon that judge to give this plaintiff a preferential setting.

    And, I can assure you there are trial settings that exist in the month of June in the 19th Judicial District Court.  I'm in several of them already.  And, there are asbestos settings that have been set aside in several divisions.

    So, the Court should not assume that because the case is transferred she loses

34

her trial date.  I think the more rational and logical assumption is that judges in the 19th JDC will apply the law.  And, to the extent the plaintiff gets, is entitled to a trial date, she should get a trial date, and would get a trial date applying the law properly.

Secondly, if Mrs. Catania's health is going to be deteriorating in the next three months, and presently your testimony was she's still working, but if her health is going to deteriorate in the month of June, how could it possibly be less convenient for her to be closer to her home in Baton Rouge in a deteriorating state of health than driving to Baton Rouge and being here -- and driving here to New Orleans for two weeks?

Plaintiff's choice of forum is giving heightened and deference when the plaintiff's choice of forum happens to be their own domicile and that's when the interest of the plaintiff is greatest.

Generally, courts recognize plaintiffs have a right to sue where they live if venue exists there.  This is not that case.

And, this court should not assume that she will not get justice, or she will not get a fair trial, or she will not get a quick trial in Baton Rouge simply because Baton Rouge is a different Parish than

35

1    Orleans Parish.

2    BY MR. BOUDREAUX:

3         Your Honor, just so --

4    BY THE COURT:

5         I wasn't assuming that.  And, I think

6    for the purpose of plaintiff, I don't know

7    if plaintiffs were assuming that.  I think

8    plaintiff was simply making the point that

9    they had a date certain right now.  There

10   is no date certain in Baton Rouge.  I

11   think that was the only -- but I

12   understand your argument fully, Counsel.

13   BY MR. BIENVENU:

14        One other thing, to the extent that

15   this record is transferred to Baton Rouge,

16   and I'm not sure --

17   BY THE COURT:

18        They are not held to the date --

19   BY MR. BIENVENU:

20        -- Well, they may not be held to the

21   date, but I think it may be law in the

22   case that she's entitled to a preferential

23   trial setting --

24   BY THE COURT:

25        -- Well, that's just law, not law of

26   the case, but that's just law --

27   BY MR. BIENVENU:

28        -- well, but with that finding it may

29   just be administrative act to find a trial

30   date.

31   BY MR. ANDING:

32        Your Honor, for the sake of

36

completeness before plaintiffs respond, I
do want to introduce their witness list as
Exhibit "A". The three uncles' petitions,
just so that we will have it in evidence.
Peter Giordano, Vic Reno and Russell
Reno's petitions as Exhibit "B", "C" and
"D" respectively.

And, the depositions transcripts of
the three uncles, Peter Giordano, Vic Reno
and Russell Reno taken in this case.

And, it's important not to lose sight
of the fact that we are talking about
witnesses in Orleans Parish and all, not
one of these gentlemen, through whom Ms.
Catania claims exposure talks about any
work or any exposure in the Parish of
Orleans.

Just about all of their exposure comes
from Kaiser in Baton Rouge. They talk
about Exxon in Baton Rouge. They talk
about GSU in Baton Rouge. They talk about
Dow over in Plaquemines --

BY THE COURT:

They never argued that. They are just
arguing that their place of business for
those defendants are here in Orleans.

BY MR. ANDING:

-- right, but I think -- I understand,
but I think for the sake of completeness
and so that when an Appeals Court sees
this they will see that none of these
gentlemen worked anywhere other than

37

1    primarily Baton Rouge and then out of
2    state.
3    BY THE COURT:
4        Well, let me ask this question.  Do we
5    have objections to the admissions?
6    BY MS. ROUSSELL:
7        Judge, we do have objections to that.
8    If, however, it is going to be allowed, we
9    would ask to be allowed to introduce their
10   witness list because their witness shows
11   the number of witnesses here in Orleans
12   Parish and out of state.
13   BY THE COURT:
14       All right.
15       I'm going to allow everything but the
16   depositions.  You can introduce the
17   witness list and you can introduce the
18   lawsuits, but the depositions --
19   BY MR. ANDING:
20       Your Honor, can I make just a proffer
21   of them?
22   BY THE COURT:
23       -- Certainly.
24   BY MR. ANDING:
25       The proffer will be proffers -- they
26   are labeled "E", "F" and "G".  So, we can
27   just keep them that way for the proffers.
28   And then, the petitions -- well, the
29   witness exhibit list and the petitions are
30   exhibits "A" through "D".
31   BY MS. ROUSSELL:
32       And the depositions you are proffering

38

1    are?

2    BY MR. ANDING:

3         The three uncles taken in this case.

4    BY MR. BOUDREAUX:

5         And, I'd like to offer, file and

6    introduce, once we get them, of course,

7    the witness list of all the defendants in

8    this case.

9         And, I'd further like to --

10   BY THE COURT:

11        Once we get them?

12   BY MR. BOUDREAUX:

13        -- I don't have all of them.

14   Unfortunately, the defendants -- certain

15   defendants have not sent them to me yet,

16   Your Honor.

17        To the extent, once we get them, I

18   would like to supplement that and offer,

19   file and introduce those witness lists -

20   BY THE COURT:

21        Were they due?

22   BY MR. BOUDREAUX:

23        Yes, as Plaintiff's Exhibit 1.

24        But, they have not provided a copy to

25   us, nor am I aware of whether or not they

26   were timely filed.

27   BY MS. ROUSSELL:

28        Judge, we didn't come here with the

29   expectation that they would be introducing

30   things into evidence.  They were supposed

31   to set their positions forward in their --

32   BY THE COURT:

1          Well, they didn't come here with that

2     expectation either.  It's my questions

3     that are obviously prompting the

4     evidentiary submissions --

5  BY MS. ROUSSEL:

6          -- so, we'd ask --

7  BY THE COURT:

8          -- but, I'm going to tell everybody

9     who has not gotten you their list, today

10    is Thursday, they got until tomorrow at

11    the end of business to get their lists to

12    you.

13         And, yes, we are going to hold that

14    matter open to allow you to file the list.

15  BY MR. BOUDREAUX:

16         If I could address a few points made

17    by counsel.

18         The depositions of the three uncles

19    were actually deposited by Mrs. Robles at,

20    I believe, Choice Copy Services on January

21    15, 2002, and all the defendants were

22    notified of that as early as January 15 by

23    no less than liaison counsel for the

24    defendants, Julie Robles.

25         For them to make representations that

26    they were not in possession of or access

27    to information regarding the exposure

28    sites and exposures of the uncles, Your

29    Honor, with that information I think it is

30    not a very valid argument by the

31    defendants.

32         Plaintiffs also responded to master

40

discovery in this case fully disclosing
the address for Barbara and Michael
Catania, and plaintiffs also provided to
counsel for Kaiser, who has recently filed
for bankruptcy protection via a letter,
the specific location of where -- of
actually all of the residences I believe
for which Barbara Catania had lived.

There was an argument made about if
the condition of Barbara Catania
deteriorates, which it will, Your Honor,
she is going to be in New Orleans because
her treating Oncologist is Dr.
Schwarzenberger in this case.  Your Honor,
he's one of the best Oncologist around the
country.  If she's going to be somewhere
when she gets sick, she's going to be here
in New Orleans being treated by Dr.
Schwarzenberger so he can do whatever he
can to aid her in fighting this disease.

Judge, you  -- I mean, I've been
before this Court on numerous occasions
asking for trial dates and expedited trial
dates, and I know how busy your docket is,
and I know it's not the easiest thing to
put cases for expedited trial setting.
And, I'm also aware of the fact that
judges have lot of times a lot of cases
that are set for expedited trial settings.

I don't know what the situation would
be in Baton Rouge, but certainly that's an
issue that Your Honor knows quite well and

41

I think that any judges in Baton Rouge would also face as well.

There was also a reference made to my client is still working, Your Honor. My client has to work. My client works for L.S.U. She does not have Social Security benefits coming to her. She's got no insurance unless she continues to work. She's got no income from her husband. My client has no choice but to get up and go to work every day so that she can keep her insurance benefits in place, and so that they can make money to pay their bills, Your Honor. That argument is actually quite insulting I think.

And, the last thing I'd like to mention is, is it was referenced by, I believe, Ms. Robles that the deposition they took of one of our experts, who was also a treating in this case, yesterday or Tuesday I believe in Seattle. Dr. Hammar said she's got malignant mesothelioma, Your Honor, which is the terminal condition. There's no question about that.

I mean, we've got an affidavit from Schwarzenberger. This case is set for trial for June for a reason, because she's not going to be here by June, Your Honor. We need to keep this case on the track that it's on. The defendants have known about this information for a long time.

42

1      They are coming to this court trying to
2      upset the deadlines that we all agreed to.
3      This case needs to stay on its track.
4    BY THE COURT:
5          You mean you don't believe she will be
6      here beyond June.  Hopefully, she's here
7      for June.  That's the whole purpose --
8    BY MR. BOUDREAUX:
9          Well, for the trial, Your Honor --
10   BY THE COURT:
11         -- Yes.
12         You addressed the argument to the
13     first point under forum non conveniens,
14     and actually you did one, three and four.
15     You skipped two.
16   BY MR. BOUDREAUX:
17         I briefly touched upon two,
18     Your Honor --
19   BY THE COURT:
20         -- Okay --
21   BY MR. BOUDREAUX:
22         -- I think --
23   BY THE COURT:
24         --  I'm sorry.  I missed it --
25   BY MR. BOUDREAUX:
26         -- My indication was when you asked
27     about a visit to the site to look at the
28     site, sources of proof and evidence --
29   BY THE COURT:
30         -- yes --
31   BY MR. BOUDREAUX:
32         -- and like I said before, most of the

43

time, and I wish this wasn't the case, but
unfortunately more times than not it is
the case, they don't have any documents.
They've been destroyed via document
retention policies or otherwise, or lost
in mass floods or hurricanes, or whatever
you want to call it.

So, as far as sources of proof and
evidence, Your Honor, like I said, site
inspections of these plants for exposures
and things that took place in the fifties
and sixties would more likely than not not
accurately reflect the condition of those
plans today.

The evidence is going to be basically
the witness testimony and their
recollection.  And, as far as any other
evidence, like I said, God knows I wish
there were invoices, and I wish there were
the contracts, and I wish there were the
sales.  I mean, everything that we can
show how much asbestos was in these
plants.

But, most of the times, Judge, they
don't have them and they tell us, "Nope,
it's gone, got rid of it, document
retention policy."

So, in this case when you are looking
at the witnesses and you look at the big
picture here, for not only the plaintiffs
witnesses, but the defendants' witnesses,
the out-of-state witnesses, this is the

44

most conveniens forum to have this trial,
Your Honor.

And, when you look at all the other
factors that plaintiffs have presented,
and what's going to come along down the
road has her condition deteriorates, with
all that in place, Your Honor.

And, when you look at their witnesses,
you are going to see they don't have any
witnesses in Baton Rouge.  And, if they
do, I wouldn't say they are more than a
handful, if that many, which I don't thing
there are.  Their witnesses are going to
be from all around the country, Your
Honor, and they are not going to be from
Baton Rouge.

So, when you look at the big picture
on this New Orleans is the most convenient
forum for this.  This case is on fast
track setting to get it to trial while
she's alive.  The deadlines are in place.
We need to keep the trial here, Your
Honor.

BY THE COURT:

I'm going to let you respond, and then
if you got anything to say to what she's
going to say, I'll let you end it, and
that's the end.

BY MR. ROBLES:

Judge, I don't want to beat a dead
horse.  I just want to point out --

BY THE COURT:

45

1           Hold it, then.  No response from you

2      then --

3  BY MR. ROBLES:

4           -- Wait.  I'm sorry.  For the sake of

5      accuracy, the master discovery responses

6      were not provided to the defense per Your

7      Honor's order.  I mean, she was timely but

8      it was after the plaintiff's deposition.

9      So, that argument is kind of a nonissue.

10          Also for the sake of accuracy, the

11      plaintiff herself testified that her

12      treating doctors are doctors Miletello and

13      McCarthy who are located in Baton Rouge.

14      Those doctors in addition to the fact that

15      Our Lady of the Lake Hospital is where or

16      Baton Rouge General, I'm not sure which,

17      but both of which are in Baton Rouge.

18      Those are the hospitals where she has had

19      actual X-rays, testing, including biopsy.

20      So, the pathology and the specimens are

21      actually in Baton Rouge.

22          All I can say, Judge, is I think that

23      David Bienvenu made a good point.  From an

24      expeditious handling standpoint and from

25      the standpoint of another judge looking at

26      this case, we can't assume that we can't

27      get an expeditious setting.  And, as I

28      said the defense purpose is not to upset

29      it --

30  BY THE COURT:

31          Okay.  You are whipping a dead horse

32      --

BY MS. ROBLES:

      -- Sorry, Judge.  Thank you.

BY MR. BOUDREAUX:

      Judge, one more point, Your Honor, in
response or rebuttal to what was stated.

BY THE COURT:

      Just now?

BY MR. BOUDREAUX:

      Yes.  The doctors in Baton Rouge, for
which they keep touting to this court, the
doctors in Baton Rouge, Your Honor,
actually missed the disease of
mesothelioma.  They did not diagnose the
disease.  They kept missing it.  When they
found out or when they suspected that it
was mesothelioma, what did they do?  They
referred Barbara to Dr. Schwarzenberger in
New Orleans, Your Honor, and that's what
took place.

      So when you are looking at the true
physicians in this case, who diagnosed the
disease, and who have done all the leg
work, and all the buildup, and actually
trying to let her know exactly what she
has that happened in New Orleans, Your
Honor.  The physicians -- it didn't happen
in Baton Rouge.  And, when it happened --
when they found out or suspected in Baton
Rouge, they sent her to New Orleans.

BY THE COURT:

      Okay.  As I said when I started out,
this was the -- this is an issue that I've

1    only had once before as it relates to

2    asbestos matters and all of your arguments

3    I'm going to have to consider.  I'm going

4    to wrestle with this over the weekend and

5    you'll have a decision on Monday.

6  BY MS. JUPITER:

7        Judge, are we going to hear the other

8    motion?

9  BY THE COURT:

10       No.  I'm taking -- depending on, and I

11   don't know, depending on what I do with

12   the forum non conveniens.  If I go with

13   the mover on forum non conveniens,

14   obviously, there's the other matters I

15   would leave to East Baton Rouge.

16       If I go with plaintiffs on the forum

17   non conveniens, I'm going to rule across

18   the board.  I'm going to rule on

19   everything else that was before me,

20   because as I said before that's stuff

21   that's wrote.  I mean, we've had it any

22   number of times.

23  BY MS. ROBLES:

24       With two exceptions, Judge.  I think

25   there is also a motion to extend the

26   expert deadline with regard to Dr. Roggi

27   because the defendants do not have

28   sufficient time, and did not have

29   sufficient time to get that report in on

30   time.

31       There's also a motion to allow the

32   filing of third party demand by Owens-

48

Illinois and Uniroyal.  I'm not presuming
to argue for them, but in addition to the
usual exceptions, there are a few other
loose ends.

BY THE COURT:

But you've articulated that -- not
you, but it's been articulated in a
memorandum.

BY MS. ROBLES:

I believe so.

BY THE COURT:

And, I'm going to base my decision on
a memorandum.

BY MR. BROWN:

Judge, if I may, I'm sorry.  Scott
Brown on behalf of Uniroyal.  I'll be very
brief.

With my motion --

BY THE COURT:

That will be a first.

BY MR. BROWN:

-- I did not attach a copy of the
proposed third party demand.  However, I
believe you received a copy through the
mail as did everyone in this room.  Just
for the sake of clarity I'd like to offer
and introduce this into the record, so it
can be with the third party demand, as
Exhibit "A".  It's the proposed third
party demand.

BY MR. BOUDREAUX:

Plaintiffs would object on the basis

49

1           of --
2    BY THE COURT:
3               Is it the memorandum that you are
4           trying to -- what are you --
5    BY MR. BROWN:
6               No, Judge.  It's the actual third
7           party demand that I will file if I'm
8           granted motion, if I'm granted leave to
9           file it.
10   BY THE COURT:
11              Well, you don't enter that yet.
12   BY MR. BROWN:
13              Well, okay.
14   BY THE COURT:
15              Yeah.  I'm going to make a decision on
16           it.
17   BY MR. BROWN:
18              Well, my motion is -- it doesn't fully
19           set out -- to be honest with you, it
20           doesn't fully set out the reasons.  I
21           think having a third party in the record
22           will give you a better view of all the
23           facts that --
24   BY THE COURT:
25              Too late.
26   BY MR. BOUDREAUX:
27              Thank you, Your Honor.
28   BY THE COURT:
29              That's why we got motions.  I mean,
30           that's why we got time lines.  So,
31           hopefully, it will set it out enough for
32           me to rule.

1    BY MR. BOUDREAUX:

2          Thank you, Judge.

3    BY MS. ROBLES:

4          Thank you, Judge.

5    BY THE COURT:

6          Thank you.

7    COURT REPORTER'S NOTE:

8          (Thereupon, the Rule Hearing

9       Proceeding was hereby concluded.)

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS
STATE OF LOUISIANA

REPORTER'S CERTIFICATE

I, R. J. Buras, Jr., CCR do hereby certify that:

I am an official Shorthand reporter of the Civil District Court of the State of Louisiana, in and for the Parish of Orleans, Louisiana, and that as such I reported in stenotype the proceedings had in the within-entitled matter at the time and place therein set forth; and that the same is a full, true and correct transcription of said stenotype notes as taken by me in said matter to the best of my ability.

R. J. Buras, Jr., CCR, RPR

OFFICIAL SEAL
R. J. BURAS, JR.
Certified Court Reporter
in and for the State of Louisiana
Certificate Number 87034
Certificate expires 12-31-02

**D**

RECEIVED

MAY 0 2 2002

U.S. DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA
DEPUTY CLERK

UNITED STATES  DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

BARBARA CATANIA, ET AL  CIVIL ACTION

VERSUS  MAG. STEPHEN C. RIEDLINGER

ACANDS, INC., ET AL  NO. 02-0368-D-M1

### SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION TO REMAND

**MAY IT PLEASE THE COURT:**

**I.    INTRODUCTION.**

Plaintiffs submit this supplemental memorandum in support of motion to remand in this matter.

At the hearing held on April 29, 2002, the court questioned whether it had authority to strike the third-party demand which brought DSM Copolymer, Inc. ("DSM") into the case and upon which removal to federal court was based.   It is submitted that the United States District Court, Middle District of Louisiana, does have the authority to strike Viacom, Inc.'s untimely filed third-party demand against DSM in this matter.[1]   The case of *Curole v.*

---

[1]La. C.C.P. art. 1113 provides, "A defendant who does not bring in as a third-party defendant a person who is liable to him for all or part of the principal demand does not on that account lose his right or cause of action against such person...." Accordingly, no prejudice will occur by dismissing the third-party demand.  On the contrary, extreme prejudice will result to plaintiffs if the third-party demand is not dismissed as this matter will be transferred to the MDL, and Barbara Catania will

- 1 -



*Avondale Industries, Inc.*, 2001-C-1808 (La. App. 4 Cir. 10/17/01);
798 So.2d 319, provides that La. C.C.P. art. 1573 is an exception
to the requirements of other procedural codal articles in the
Louisiana Code of Civil Procedure.  In support of this exception,
the court provided:

> In the interest of justice, the trial court is required
> under La. C.C.P. art. 1573 to grant an exception to allow
> the plaintiffs preferential treatment and consideration,
> where the plaintiff ... is not expected to live for more
> than six months.  The trial court has the discretion to
> set his dockets and set the time schedule for trial.  The
> trial court has the discretion to set the trial date in
> this emergency medical situation to preserve the evidence
> and to allow the plaintiff ... to have his day in court.

*Curole*, 798 So.2d at 321.  As such, when an expedited trial setting
is granted pursuant to La. C.C.P. art. 1573, art. 1573 trumps
Louisiana's other procedural codal articles to ensure that the
dying plaintiff will have his or her day in court while still
alive.  In the *Catania* case, as articulated during oral argument,
Viacom and the other defendants actually agreed to the January 28,
2002, deadline date for the filing of third-party demands in this
matter.  See Exhibit "1"-transcript of January 8, 2002, where the
parties were given an opportunity to argue any objections to the
Scheduling Order and CMO and none were lodged by Viacom regarding

---

not have her day in court while she is still alive.  The
guaranteed delay of the MDL was clearly recognized by the Eastern
District of Louisiana in the case of *Crocker v. Borden, Inc.*
(E.D. La. 1994) 852 F.Supp. 1322, cited in plaintiffs' motion to
remand.

the third-party demand requirements (also note at p. 37 that the trial date had not yet been set by the court).  As recognized in the *Curole* decision, protecting the plaintiff's right to have his or her day in court while the plaintiff is still alive is the paramount concern when expedited consideration is granted pursuant to La. Code of Civ. Pro. art. 1573.  As such, under Louisiana law, La. C.C.P. art.'s 1573 and 1551 override La. C.C.P. art.'s 1032 and 1033 regarding the filing of third-party demands when art.'s 1573 and 1551 are employed to protect a dying individual's bestowed right under Louisiana law to have her day in court while she is still alive.

Plaintiffs further show that the Scheduling Order violated by Viacom was never vacated and/or modified by any state court judge.  Furthermore, Viacom did not file an application for supervisory writs regarding the Scheduling Order entered on January 14, 2002, and, moreover, consented to the provisions with regard to the deadline for filing third-party demands.  Exhibit "2".[2]  As such, at the time of the improper filing of Viacom's third-party demand, the January 14, 2002, Scheduling Order was still in full force and effect and the doctrine of "law of the case" applied to the

---

[2]Additionally, Exhibit "1" shows that Viacom did not lodge any objection at the hearing held on the wording of the Scheduling Order.

matter.[3]  Among the reasons assigned for application of the law of

the case principle are:

> ". . . **the avoidance of indefinite relitigation of the
> same issue; the desirability of consistency of the result
> in the same litigation; and the efficiency, and the
> essential fairness to both sides, of affording a single
> opportunity for the argument and decision of the matter
> at issue.**"

*Succession of Cameron*, 446 So.2d 948, 951 (La.App. 3d Cir. 1984).

Counsel for Viacom was present at and fully participated in the

pretrial and scheduling conference held by Judge Bagneris on

January 8, 2002, and agreed and consented to the deadline date of

January 28, 2002, for filing third-party demands in the *Catania*

matter.  Exhibits "1" and "2".  Viacom also conveniently failed to

---

[3]  Certainly, a federal district court should have authority
to strike a third-party demand (upon which federal removal is
based) that was filed in violation of an order entered by a state
court judge.  If the federal court did not have such authority,
this would allow a defendant to unilaterally violate orders
issued by a state court judge that the defendant did not like,
and then effectively prevent such misconduct from being addressed
by the respective state court judge due to a subsequent removal
notice filed by the third-party defendant.  Such a result would
foster certain defendants to improperly ignore orders of state
court judges, knowing full well that there would be no
consequences imposed for these improper actions should the
federal court determine that it had no authority/jurisdiction to
strike such a third-party demand that was the sole basis upon
which removal was asserted in the federal court.  Should the
federal court find that it has no authority to redress such an
injustice, the defendant would effectively be rewarded for
violating orders of state court judges, without any redress
whatsoever available from the state court judges due to the
ousting of jurisdiction from the state court pursuant to a
removal notice.

request leave of court to be allowed to file a third-party demand outside of the deadline date imposed on the January 14, 2002, Scheduling Order.   An existing order cannot be ignored by a litigant.[4]  Clearly, the doctrine of "law of the case" applies to this matter.

In the *Succession of Cameron*, 446 So.2d 948 (La.App. 3rd Cir. 1984), a party moved to relitigate the same issue determined in a prior hearing.   The trial judge refused to relitigate the same issue on grounds of res judicata.   The Appeal Court stated that although the issue was not res judicata,

> **"the trial judge was justified in refusing to try anew the identical factual issues already tried and decided in the same case.  He was justified in regarding his earlier ruling as having binding force under the procedural principle known as "law of the case".**

*Id*. at 951.   "The doctrine of law of the case prohibits relitigation of matters decided, expressly or by necessary implication, in prior judicial proceedings. *Signal Oil & Gas Co. v. Barge W-701*, 654 F.2d 1164 (5th Cir. 1981), *cert. denied*, 455

---

[4]Moreover, Viacom filed its third-party demand **after** the transfer occurred via order dated March 4, 2002.  In fact, ExxonMobile, who is represented by the same attorneys as DSM, filed a Petition for Letters Rogatory in Civil District Court for the Parish of Orleans on March 5, 2002, seeking to obtain an order for the issuance of an out-of-state deposition subpoena to Frank Parker, III, and, on March 8, 2002, the court refused to issue the order stating: "See Judgment dated 3-4-02 granting Mtn. to Transfer Venue to East Baton Rouge."  Exhibit "3".

U.S. 944, 102 S.Ct. 1440, 71 L.Ed.2d 656 (1981)." *Miller v. Miller*, 480 So.2d 789, note 3 (La.App. 3d Cir. 1985).

"The law of the case principle relates to (a) **the binding force of trial court rulings during later stages of the trial,** (b) the conclusive effects of appellate rulings at the trial on remand, and (c) the rule that an appellate court will ordinarily not reconsider its own rulings of law on a subsequent appeal in the same case." *Petition of Sewerage & Water Board Of New Orleans*, 278 So.2d 81, 83 (La. 1973); *Barnett v. Jabusch*, 649 So.2d 1158, 1161 (La.App. 3d Cir. 1995).

Plaintiffs further submit that the United States District Court, Middle District of Louisiana, should also pay full faith and credit to Judge Bagneris' order entered on January 14, 2002, pursuant to 28 U.S.C. §1738, which provides the following:

### §1738. State & Territorial statutes & judicial proceedings; full faith & credit

The Acts of the legislature of any State, Territory, or Possession of the United States, or copies thereof, shall be authenticated by affixing the seal of such State, Territory, or Possession thereto.

The records and judicial proceedings of any court of any such State, Territory or Possession, or copies thereof, shall be proved or admitted in other courts within the United States and its Territories and Possessions by the attestation of the clerk and seal of the court annexed, if a seal exists, together with

a certificate of a judge of the court that the
said attestation is in proper form.

Such Acts, records and judicial
proceedings or copies thereof, so
authenticated, shall have the same full faith
and credit in every court within the United
States and its Territories and Possessions as
they have by law or usage in the courts of
such State, Territory or Possession from which
they are taken.

Pursuant to 28 U.S.C. §1738, this court should pay credence to the

preferences given under La. C.C.P. art. 1573 and to Louisiana's

long standing doctrine of "law of the case", and give full faith

and credit to Judge Bagneris' unvacated and/or unmodified order

which set the deadline date of January 28, 2002, for the filing of

third-party demands in the *Catania* case, strike the third-party

demand filed on behalf of Viacom, Inc., and thereafter remand this

case back to the 19th Judicial District Court from which it was

improperly removed.

Respectfully submitted,

ROUSSEL & ROUSSEL

GEROLYN P. ROUSSEL - 1134
PERRY J. ROUSSEL, JR. - 20351
JULES K. BOUDREAUX - 24309
1710 Cannes Drive
LaPlace, LA  70068
Telephone:  (504) 651-6591
ATTORNEYS FOR PLAINTIFFS,
BARBARA AND MICHAEL CATANIA

- 7 -

### CERTIFICATE OF SERVICE

I certify that a copy of the foregoing pleading has been served upon counsel for all parties by FAX, hand delivery, or mailing same to each, properly addressed and postage prepaid, on this 1st day of May, 2002.

GEROLYN P. ROUSSEL

CIVIL DISTRICT COURT

PARISH OF ORLEANS

STATE OF LOUISIANA

No. 2001-18122                    Division "H"

BARBARA CATANIA, ET AL

VERSUS

A C AND S, INC., ET AL

*****************************************************

*A RULE HEARING PROCEEDINGS* held in the above-entitled cause, before the *Honorable Michael G. Bagneris, Judge,* presiding on *TUESDAY, JANUARY 08, 2002.*

REPORTED BY:

R.J. BURAS, JR. CSR.

EXHIBIT

1

1

**APPEARANCES:**

JULES BOUDREAUX, ESQ.

GEROLYN ROUSSEL, ESQ.

    Representing Plaintiff, Barbara Catania

ANNE MEDO, ESQ.

    Representing Taylor Seidenback

VALERIE SCHEXNAYDER, ESQ.

    Representing The Flintkote Company

DORIS BOBADILLA, ESQ.

    Representing Combustion Engineering, Inc.

JAMES D'ENTREMONT, ESQ.

    Representing Babock Borsig, Inc.

KEVIN J. WEBB, ESQ.

    Representing AmChem Products

W. SCOTT BROWN, ESQ.

    Representing Uniroyal and Owens-Illinois

KAY BARNES BAXTER, ESQ.

    Representing AC and S, Inc.

E. ASHLEY CARTER, ESQ.

    Representing Foster Wheeler/AP Green

DAVE REDMANN, ESQ.

    Representing Kaiser Aluminum

GREG ANDING, ESQ.

    Representing Exxon Mobil Corporation

SUE KOHN, ESQ.

    Representing McCarty

ALISON BORISON, ESQ.

    Representing Eagle, Inc.

AVERY GRIFFIN, ESQ.

    Representing WEC

WILLIAM L. BROCKMAN, ESQ.

    Representing Reilly-Benton Company, Inc.

1    <u>Conti:</u>

2    **JULIE ROBLES, ESQ.**

3         Representing ANCO

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32

P R O C E E D I N G S

<u>TUESDAY, JANUARY 8, 2002</u>

BY THE COURT:

    Let's get the caption of the case and the appearance of counsel.

BY MS. ROUSSEL:

    *Barbara and Michael Catania Versus AC and S, Inc, et al*, Civil Action Number 2001-18122.

    And, Gerolyn Roussel for plaintiffs.

BY MR. BOUDREAUX:

    Jules Boudreaux, also, representing the plaintiffs.

BY MS. ROBLES:

    Julie Robles here on behalf of ANCO Electric, Inc., and acting as Defense liaison in connection with scheduling matters.

BY THE COURT:

    Instead of going through that, because I knew everybody was about to make their appearance, would you mind taking that pad that you have right there, pass it around, and let everybody sign-up who is here?

BY MS. ROBLES:

    Sure.

BY THE COURT:

    So, that we'd have a written record of it and we can proceed, all right?

    Would plaintiff counsel tell the bench why you're here?

BY MS. ROUSSEL:

4

1          Yes, Judge.  This is actually in
2     connection with a scheduling order and a
3     CMO, and in addition with we have now
4     filed an affidavit from the treating
5     physician of Ms. Catania indicating that
6     she is not expected to live beyond six
7     months.  So, we're here seeking a trial
8     date as well, and that's why everybody is
9     here.  They were asked to bring their
10    calendars.
11          There are a couple of problems with
12    regard to the scheduling order and CMO.
13    We had hammered through all of these same
14    problems in the *McDuffy* case and we would
15    be agreeable to implementing the same CMO
16    that we have in the *McDuffy* case, the
17    scheduling order wording as well, which
18    we're just modifying the dates.  I think
19    we're in agreement as to most of the dates
20    with the exception of a couple.
21   BY MS. ROBLES:
22          Judge, we've -- she referenced the
23    McDuffy's Scheduling Order.  What we had
24    done is start with your base order, went
25    and looked at McDuffy and I think we've
26    hammered out most of any other changes
27    that we've got.  Have you had a chance to
28    finish looking at the Case Management
29    Order?
30   BY MS. ROUSSEL:
31          I did.  And, there are still a couple
32    of problems, all of which we had actually

1          argued in McDuffy, but, Judge, if you

2          would like us to go through the specifics

3          --

4     BY THE COURT:

5          You actually argued them in McDuffy?

6     BY MS. ROUSSEL:

7          Yes, we did.

8     BY THE COURT:

9          And, did I rule?

10    BY MS. ROUSSEL:

11         You ruled in our favor on some of them

12         and against us on others of us.  And, we

13         all lived with it as it was.

14    BY THE COURT:

15         What do you think I'm going to do this

16         time around?

17    BY MS. ROUSSEL:

18         Hopefully, the same thing, but what

19         they are doing is, is they are putting in

20         things that are --

21    BY THE COURT:

22         I'm going to be consistent.  If I

23         ruled one way, that's the way I'm going to

24         rule.  I'm going to rule that way until

25         somebody upstairs tells me I can't rule

26         that way --

27    BY MS. ROUSSEL:

28         Okay, then --

29    BY THE COURT:

30         -- so, whatever I ruled in McDuffy

31         that's what I'm going to rule here.

32    BY MS. ROUSSEL:

1      -- okay.  So, the language in the
2      McDuffy in the CMO and Scheduling Order is
3      what you want to have?
4    BY THE COURT:
5          That's not the same thing.  In my
6      view, that's not the same thing, because
7      there could have been language in the
8      McDuffy Order that was agreed to that
9      wasn't before the court that for reasons
10      of counsel they don't want to agree to in
11      this matter --
12    BY MS. ROUSSEL:
13          Okay --
14    BY THE COURT:
15          -- I don't know, all right?
16    BY MS. ROUSSEL:
17          -- okay --
18    BY THE COURT:
19          All I'm saying is, is on those issues
20      that we have already addressed in a matter
21      -- however I addressed it before that's
22      how I address it now.
23    BY MS. ROUSSEL:
24          -- okay, then, let me raise a couple
25      of points.  One of the things that they
26      have in here is the requirement of expert
27      -- disclosure of expert reports.   We
28      argued that in McDuffy and you ruled in
29      our favor on that indicating that experts'
30      reports are not discoverable.  The case
31      law and the Codal authority for that --
32      for our position is Louisiana Code of

7

1    Civil Procedure 1424 indicates expert
2    reports are not discoverable.  The *Stump*
3    (phonetic)  Louisiana Supreme Court case
4    and the *Katz* Fourth Circuit case which
5    specifically states that it's not in the
6    Judge's discretion to require disclosure
7    of expert reports.
8  BY THE COURT:
9         These are expert reports that -- I'll
10    withdraw the comment.
11         Why can't she use the legal basis that
12    she just articulated to prevent you from
13    obtaining her expert reports?
14  BY MS. ROBLES:
15         Judge, I think there are two reasons
16    why this should be an exception, if you
17    want to call it that.  The code articles
18    indicate that expert reports are
19    discoverable under certain circumstances.
20    And I think that those circumstances,
21    while Ms. Roussel might not agree that
22    they are present initially, I think those
23    circumstances will develop.
24         And what I'm talking about is we will
25    probably have a pathologist, or someone,
26    look at the medical records, at which
27    point she will take that expert's
28    deposition.  And we would also, if she
29    requests it, have to give up our expert
30    report, at which point she would waive and
31    have to give up her expert report.
32         In a situation where you have an

8

1          expedited trial setting being requested,

2          and under extraordinary circumstances such

3          as this, and the defendants are more than

4          willing to go with an expedited trial

5          date.  What we are asking for is some

6          consideration in order to adequately

7          represent and defend our clients.

8     BY THE COURT:

9          Let me just ask a basic question.  And

10         I'm familiar with the Louisiana Code of

11         Evidence.  Since we are on a fast track in

12         this particular matter, what is the

13         practical problem with exchanging expert

14         reports.  I mean, if in fact -- if in fact

15         trials are supposed to be a search for

16         truth, why in the world do we -- we are

17         supposed to know, or you should know.

18         Everybody should know.  No one should come

19         in being ambushed by what anyone is going

20         to say.  In spite of the insulation that

21         you may have by certain case law, what is

22         the practical problem?  I'm asking you why

23         don't you want to give them the

24         information.

25    BY MS. ROUSSEL:

26         The practical problem with regard to

27         expert reports is that what typically

28         happens when they are disclosed is they

29         will be misconstrued.  A half of sentence

30         will be taken out of context and argued to

31         the jury, et cetera, et cetera.

32         And the code in the cases has a very

1      fine line between an attorney, on behalf
2      of their client, being able to do full
3      preparation for their own case without the
4      eyes of the defendants being upon them.
5           We are not here saying that treating
6      physicians or medical --
7  BY THE COURT:
8           My problem with that is -- my problem
9      with that is, and woe the lawyer who
10     allows an attorney to argue half sentences
11     to the court, and the same thing for the
12     judge who happens to be sitting or
13     presiding over that case.
14          But all of the case law, and the Codal
15     article that you cite, all of that came
16     actually before the Dauber (phonetic)
17     ruling.  And with the advent of Dauber,
18     and as a gatekeeper of what gets in and
19     what gets out, when I have a Dauber
20     hearing expert reports have to come in.
21     They have to -- if someone is raising the
22     issue as to whether or not the methodology
23     was properly done, or if the guys properly
24     qualified, or the whole thing about
25     kicking out junk science, we have to know
26     exactly what the expert did, and relied
27     upon, in order for that expert to reach
28     the conclusion that he's giving you in a
29     particular case.
30          And just as a practical matter,
31     though, I would think that you would want
32     to know everything that their experts are

10

going to say, and they would want to know
everything that your experts are going to
say --

BY MS. ROUSSEL:

And I find that out by taking their
deposition which the code in the case is
allowed.  But, what this would require us
to do is also pay for the preparation of
expert reports that we, otherwise, may not
have to pay for.

BY THE COURT:

Wait, wait, wait.  No.  I'm talking
about expert reports that you have, not
that you'd have to go obtain an expert
report.  If you have an expert report that
you presumably already paid for, that's
what we are talking about.  We are not
saying that -- this Court is not saying
that if you have an expert you have to get
that expert to do a report and pay for
that report.  I mean, let's not --

BY MS. ROUSSEL:

Well, that's what this order
requires is that we produce expert reports
for those medical experts that we intend
to use, and economic experts that we
intend to use.  And I have not even looked
at it that closely to see if every other
kind of expert that we have to use.

BY THE COURT:

Okay.  Well, let's change it to those
expert reports that you have.  I mean, if

11

1          that's your concern.  If your concern is
2          that -- I mean certainly the thrust of
3          that provision in the CMO wasn't to get
4          you to go out and buy expert reports.
5          It's just that in the normal course of
6          litigation generally reports are
7          submitted.  And if you have the reports,
8          then the Court is encouraging exchanging
9          of the reports.  We are not saying that
10         for every expert you have, you have to as
11         a matter of law go out and acquire a
12         report from that expert.  But if you have
13         a written report then let's exchange it.
14    BY MS. ROBLES:
15             Your Honor, I don't think the
16         defendants would have any problem with
17         that whatsoever.  And I think we would
18         have to work on the wording some kind of
19         way, and we would ask that we would be
20         provided with, say, an economic report, or
21         a cite specific.  You know, if there's
22         something specific we would like to get
23         that.
24    BY THE COURT:
25             The only reports that I'm talking
26         about are reports that -- reports that
27         have been done, or reports that plaintiff
28         in their ordinary course of preparing for
29         litigation would obtain, and the same
30         thing for defendant.
31             Oh, and I see hands in the back.  Yes.
32    BY MS. KOHN:

12

1          Judge, the problem with that is that

2      --

3   BY THE COURT:

4          Identify yourself first for the

5      record.

6   BY MS. KOHN:

7          I'm sorry, Your Honor.  Sue Kohn for

8      McCarty.

9          Judge, the problem with that is that

10     Ms. Roussel won't ask her experts to issue

11     any reports, so we are right back where we

12     started.

13  BY THE COURT:

14         Well, if she doesn't ask her experts

15     to issue any reports, she doesn't have any

16     reports.

17  BY MS. KOHN:

18         Judge, the whole point of this is it

19     really does expedite the medical

20     discovery, and if we are going to be stuck

21     with an expedited trial date, it really

22     does move things along faster.  I know Ms.

23     Roussel doesn't care what any other

24     plaintiff's lawyer does, but everybody

25     else we deal with --

26  BY THE COURT:

27         This is my first.  This is my first

28     hearing on the CMO.  My very, very first.

29     And I have an inordinate -- I have an

30     inordinate number of asbestosis cases and

31     generally on CMO's, and scheduling orders,

32     I don't think I've ever had a hearing on a

                    13

1      scheduling order.

2          So I don't want to know about what the

3      past cases do either.

4  BY MS. KOHN:

5          I'm just saying, Judge, you know, we

6      exchanged expert reports.  I don't recall

7      any plaintiff ever being hurt by it.  It

8      just expedites the medical process.  And

9      what if we are willing to pay for her

10     pathologist to issue a report if she

11     doesn't want to have to pay for it?

12     Because otherwise we are right back where

13     we started.

14  BY MS. ROBLES:

15        Well, and I would point out, too, that

16     in the event that she prevails at trial

17     her costs are going to be recouped.

18  BY THE COURT:

19        One second.  Counsel?

20  BY MS. GRIFFIN:

21        Your Honor, I think we are going to

22     have to go and define expert reports

23     because I can see letters, correspondence,

24     stated opinion by an expert should be

25     considered a report.  Or Ms. Roussel can

26     go to the experts and say, "Don't call it

27     a report.  Write me a casual letter

28     stating your opinion.

29        Oh, I'm sorry.  Avery Griffin on

30     behalf of Westinghouse."

31  BY MR. REDMANN:

32        Dave Redmann for Kaiser Aluminum.

1      Your Honor, the cost of any expert
2  report is going to be nickle and dime
3  money in the scope of the money the
4  parties are going to spend to work up this
5  case.
6      The real issue is, I think as Ms. Kohn
7  was hinting at, if we are going to try to
8  rush this thing through our experts cannot
9  prepare to respond to whatever the
10  plaintiff's expert say until they know
11  what their opinions are.
12      The problem is, is that frequently
13  deposition dates are pushed back to the
14  very end.  It really makes it very hard to
15  work up the medical aspects of the case
16  without the expert reports.  You know,
17  this is, again, it's done in every other
18  case.
19      But if we are going to keep anything
20  like that schedule that's been proposed,
21  then we need the expert reports fairly
22  early on so that we can have our experts
23  work up those issues.
24      And the other thing is a lot of time
25  it saves money.  I mean, if an economist
26  or a pathologist issues a report, and that
27  report -- based on the report nobody
28  really thinks any depositions can be
29  taken.  A lot of times you won't even
30  depose an economist because you look at
31  the report and you understand what the
32  calculations are, what the opinion is, and

15

1    that's it, you move on, no need for a

2    deposition.

3        So it's necessary to work with the

4    schedule.  It's a small amount of money in

5    the scheme of working up this case.  And

6    in the long run I think it saves as much

7    money as it cost —

8  BY MS. ROUSSEL:

9        If the defendants are finished, I'd

10   like to comment as well.

11       And, Judge, from those comments that

12   we've just heard, what is an expert

13   report?  What is a letter?  What is

14   discoverable?  That's specifically why

15   Code of Civil Procedure, Article 1424

16   says, "the court shall not order the

17   production or inspection of any writing

18   obtained or prepared by that adverse

19   party, including their experts."

20       Those are the problems we get into,

21   and in a case like this, most of the

22   experts are people over whom we don't even

23   have control.  They are treating medical

24   doctors whose records are fully

25   discoverable.

26       And so that's not what we are arguing

27   about here.  What we are arguing about

28   here are expert witnesses with whom we

29   consult and/or who is litigation only

30   expert witnesses.

31  BY THE COURT:

32       Well, those are the ones you want the

16

1    report from.  That's the ones I want the
2    report from, if I'm a counsel.
3    BY MS. ROUSSEL:
4        But those are the ones that Code of
5    Civil Procedure 1424 stop, Katz and the
6    rest of the cases protect.  And they can
7    take their depositions.  That's what we
8    do.  We'd be happy.  Let them tell us who
9    they want to take depositions of.  We can
10   schedule those depositions.
11   BY THE COURT:
12       Counsel, I wasn't dropped on this
13   bench.  Certainly they can take the
14   deposition.  But when you have an expert
15   report the questions that you are going to
16   be asking at the deposition become much
17   more salient.  You understand exactly --
18   you are able to focus.
19       When you are going to a deposition and
20   he is an expert --  An expert in what?
21   Well, you call it, you know.  Then you got
22   to go through the whole scheme of things
23   under light, you know, in order to try to
24   pin down what exactly this expert is going
25   to be saying.
26       If you have an expert report, you
27   know, first of all you can just pretty
28   much skip all the stuff dealing with his
29   background because the "CV" is going to be
30   attached to that.  And then you go right
31   into, "This is what I did.  This is my
32   conclusion based on what it was that I

17

did.  And this is why I related to the
incident."  You got "A", "B" and "C" so
you know when you go into the deposition
you are going to ask him about "A", "B"
and "C".

You are not going to ask about "X",
"Y" and "Z" even though it falls under
that particular specialty.  Why?  Because
it's not relevant to this case.  How do
you know that?  Because I got the expert's
report.  I mean that's why we do these
things.

Now, it's understandable that laws
exist.  Laws basically -- discovery laws
exist so that we can have, particularly in
Louisiana, liberal discovery, you know.
Liberal discovery is really the course of
events.  Usually I'm here trying --
usually, I'm here telling defendant,
"Yeah.  Yeah.  Yeah.  Yeah, I know they
are trawling, but they got a right to
trawl," you know.  "Go ahead and turn over
the information."  All right.

Now, I hear where the plaintiff is
trying to protect themselves with some
type of armor against discovery of what
everybody knows is going to be relevant,
you know, at litigation, and trying to do
that while at the same time going on a
greased track.  We are on a lightning
track here, you know.  We are trying to
get this matter to trial within six

1      months.
2    BY MS. ROUSSEL:
3          But, Judge, if you read the wording of
4      what they propose, "Plaintiff shall file
5      their expert witness list and deliver
6      their medical and economic expert witness
7      reports to defendants on or before a
8      certain date."
9          That does a couple of things.  It
10     makes us go and get reports, which
11     otherwise we wouldn't normally do for
12     certain of these witnesses.
13   BY THE COURT:
14         Let me ask you a question.  If we're
15     limit to the witnesses, the experts who
16     are going to testify, not everybody and
17     their cousin.  We are talking about the
18     experts who are going to testify.  Would
19     you still have a problem?
20         I know you all don't.
21   BY MS. ROUSSEL:
22         Judge, I do have a problem with
23     turning over expert reports and being
24     required --
25   BY THE COURT:
26         Period?
27   BY MS. ROUSSEL:
28         Period.  And being required to obtain
29     expert reports.
30   BY THE COURT:
31         Well, fine.  You know what we are
32     going to do?  We are going to order it.

1      We are going -- we've made the record.

2      You are going to go ahead and appeal it.

3      And then that expedited track that you

4      want to get on is slowed down from the

5      get-go.

6    BY MS. ROUSSEL:

7          Okay.  And let me just make clear that

8      we are only dealing with medical and

9      economic expert reports.  That's all the

10      defendants are looking for here.

11    BY THE COURT:

12          And, expert reports from those

13      witnesses, those expert witnesses, who are

14      going to testify.

15    BY MS. ROUSSEL:

16          From all expert witnesses who are

17      going testify.

18    BY THE COURT:

19          Who are going to testify.

20    BY MS. ROUSSEL:

21          And, if one -- only if one already

22      exists.

23    BY THE COURT:

24          No.  No.  That was your first

25      argument.

26    BY MS. ROUSSEL:

27          Okay.

28    BY THE COURT:

29          All right.

30    BY MS. ROUSSEL:

31          I'm just clarifying.

32    BY THE COURT:

20

1          You are trying to get it right so that

2          you can phrase it right when you take it

3          up.

4     BY MS. ROUSSEL:

5          Because it applies to both the

6          defendants and plaintiffs.

7     BY THE COURT:

8          I understand.

9          That will be all expert reports from

10         expert witnesses who will testify in this

11         litigation will be turned over to the

12         defendants, and the defendants will do the

13         same thing to the plaintiff.

14    BY MR. REDMANN:

15         Here's my proposal, Your Honor.  I

16         think the issue of the need for the expert

17         reports is one of timing.  One way you

18         could deal with it is you could just say

19         either we are going to have a three-month

20         longer discovery schedule, and you don't

21         have to produce expert reports, or we have

22         a schedule along the lines, you know, I

23         mean -- you know, if we want to have

24         things taken up, that's a way to deal with

25         it.

26    BY THE COURT:

27         Counsel, if plaintiffs have a right to

28         appeal this matter, we are going to let

29         this go up.  We are going to let the

30         appellate court say whether or not under

31         theses circumstances where a party

32         obviously based on the affidavit we

received, is -- that the plaintiff is
predicted unfortunately not to live past
six months, we are going to give an
expedited trial date so that the plaintiff
has an opportunity to be a part of the
litigation.  And because of that I think
that the discovery component in this
situation should be one where the expert
reports are in fact traded between
plaintiff and defendant.

I think that regardless of what 1424
says this is an exceptional situation.
It's not one where you have the time to do
discovery over a protracted period of
time, two or three years.  We are going to
court on a fast track and anything that we
can do to have discovery focused, you
know, and get at the truth, which is what
a trial is supposed to be about, this
Court is going to do.  And I'm going to
let the Fourth Circuit say I'm wrong.

BY MS. ROUSSEL:

And, Judge, what I understand, because
all of the defendants are here and
represented, that they are in favor of
this expert disclosure requirement which
applies to all of the defendants as well.

BY THE COURT:

I don't care if they agree with or
not.

BY MS. ROUSSEL:

Okay.  Well, all of them are shaking

1       their heads yes.  I just want it for the
2       record because this flows both ways.
3    BY THE COURT:
4           They don't have to agree.  I making it
5       an order.
6    BY MS. ROUSSEL:
7           Okay.
8    BY THE COURT:
9           This is an order of the court until
10      otherwise affected by the Fourth Circuit.
11   BY MS. ROUSSEL:
12          Now, Judge, with regards to medical
13      treating physicians whose --
14   BY THE COURT:
15          But for the record all of them did nod
16      their heads.
17   BY MS. ROUSSEL:
18          Affirmatively.
19   BY THE COURT:
20          Affirmatively.
21   BY MS. ROUSSEL:
22          Judge, with regard to -- in a
23      Mesothelioma case, there are massive
24      amounts of physicians involved in
25      diagnosis and treatment.  Those are
26      experts who are experts nevertheless that
27      people over whom we have no control and
28      cannot require them to turn over an expert
29      report.
30          However, everything that they've done
31      is in a medical record of some form.  Does
32      that meet the requirement for your

1    requirement for expert reports?

2    BY THE COURT:

3         I'm sorry.  Say that once more?

4    BY MS. ROUSSEL:

5         Yes.  Treating physicians -- in a

6    mesothelioma case the patient goes through

7    numerous types of testing.  Those doctors,

8    and/or medical professionals, are experts.

9    And what they've done is set forth in

10   their medical record, and/or their reports

11   within the medical records.  Does that

12   qualify?  What I'm saying is, do I have to

13   go out and ask them for additional medical

14   expert reports because I have no control

15   over those people, and many of them don't

16   come to trial unless I subpoena them.

17   BY THE COURT:

18        You are making a mountain out of a

19   mole hill.  Those forms that doctors fill

20   out, whether they are called reports or

21   not, as the part of the normal treatment

22   of a patient is just that.  It's part of

23   the medical records.

24        An expert report is that document that

25   has been crafted, not so much for the well

26   being of the patient, it's a document

27   crafted so that that patient's counsel

28   will understand what it is that the expert

29   believes is the injury that the -- or an

30   ailment that the patient-plaintiff has,

31   and why it is that that patient has that

32   particular injury or ailment in that

24

1    expert's opinion.

2        In other words it's a document that's

3    crafted not to put in the medical record.

4    It's a document that's crafted to put in

5    your file.

6    BY MS. ROUSSEL:

7        Okay.  So diagnosing and treating --

8    people involved in the diagnosis and --

9    BY THE COURT:

10       The medical record.

11   BY MS. ROUSSEL:

12       Okay.  And no additional expert report

13   is necessary from them?

14   BY THE COURT:

15       Medical records.

16   BY MS. ROUSSEL:

17       Okay.  I just wanted to get a

18   clarification on that.

19   BY MS. ROBLES:

20       Your Honor?

21   BY THE COURT:

22       Yes.

23   BY MS. ROBLES:

24       Perhaps I'm suspicious.  If there is

25   correspondence in the doctor's file that

26   has already been generated, we do not want

27   to be in a situation where that is called

28   out, and not being a "medical record", but

29   rather something else.  And then also

30   playing semantics where it's called it's

31   not a report.

32       So I don't want to be in a situation

25

1    where counsel for plaintiff is deciding
2    for the defendants what is or is not
3    relevant, and what is or is not part of
4    the medical record of a physician.
5   BY THE COURT:
6        Medical records are going to be kept
7    in either the doctor's officer or the
8    hospital or both.  That's where the
9    medical records are.  I'm assuming that
10   defense counsel already requests the
11   medical records.  I'm assuming that you
12   also would request, not of the medical
13   institution or the doctor's office, but of
14   counsel for the expert reports.
15       Expert reports, as a general rule,
16   don't go into the medical records.  As a
17   general rule unless they changed things
18   since I was practicing.
19  BY MS. ROBLES:
20       Pardon me, Your Honor.  I think some
21   doctors, some physicians, do keep one big
22   file where it's divided into
23   correspondence, radiography, pathology,
24   office visits.  It's divided but it's
25   within the "medical record."
26  BY THE COURT:
27       But if it's in the medical -- if it's
28   in there you get it when you subpoena the
29   medical record.
30  BY MR. REDMANN:
31       Here's the thing, Your Honor.  Ms.
32   Roussel gives us authorization to get

records saying, "Don't turn over any letters to my lawyer."  My suggestion is, is that all experts fall into one of two classes.  Either they are treating physicians, in which case we ought to get every scrap of paper that they've ever generated, or they are retained litigation experts, in which case we ought to get a report.  It ought to be -- each expert ought to be in either or category.

And the problem is, is that we have treating physicians who have generated special letters, in some cases to Ms. Roussel, and her position is that's not discoverable.

So, I think the ruling ought to be -- take your pick.  Either of the treating physician, in which case we get everything they've generated, or it's a retained litigation expert, in which case we get a single report.  And just everybody falls into an either or.

And, the problem has to do with the authorization she gives us.

BY THE COURT:

And, what happens if somebody falls into both.  You have a treating physician who is also a -- someone who is going to --

BY MR. REDMANN:

Well, in other words if a treating physician testifies --

27

1    BY THE COURT:
2            -- who's also generated an expert
3        report.
4    BY MS. ROBLES:
5            Well, there also may be litigation
6        experts who have X-rays or other materials
7        beyond a simple report that we are going
8        to need also those other materials.
9    BY MR. REDMANN
10           The original materials, I don't think
11       that's what we are fighting about, about
12       slides and blocks and X-rays and that kind
13       of thing.  I think the problem is, is that
14       in other cases Ms. Roussel's gotten
15       treating physicians, people she didn't
16       hire to send her reports, and then take
17       the position that we couldn't get those
18       reports.
19           So my point is let's make it an either
20       or.  If she wants to say a given doctor is
21       a litigation expert, then we get one
22       report from that doctor.  If she wants to
23       say that that doctor is a treating
24       physician, that's fine, but then we get
25       every scrap of paper that that doctor has
26       generated about the plaintiffs.
27    BY MS. ROUSSEL:
28           First, let me state for the record
29       that his position on what I've done and
30       not done in the past is incorrect.
31           But with regard to this particular
32       thing my objection as to disclosure of

1    expert reports, and I want to state that
2    objection for the record.  However, I
3    understand your ruling is that if someone
4    is going to testify, if they fall into the
5    classification of treating physician, then
6    their medical records are the medical
7    records.
8        However, if they are litigation
9    experts, somebody else consulted outside
10   of that, then I need to produce to them an
11   expert report.
12   BY THE COURT:
13       That's correct.  The treating
14   physician -- the medical records is going
15   to be -- you are entitled to everything in
16   the medical record.
17   BY MR. REDMANN
18       Including any letters he may have
19   written to Ms. Roussel?
20   BY THE COURT:
21       Anything in the medical record.
22   BY MR. REDMANN
23       Okay.  But what if he keeps letters to
24   Ms. Roussel about this plaintiff separate?
25   BY THE COURT:
26       Then we will cross that bridge when we
27   get to it, Counsel.
28   BY MR. REDMANN
29       Okay.
30   BY THE COURT:
31       I'm just saying the medical records
32   are the medical records, and the written

29

1    report from a medical expert is just that.

2    That medical expert's written report.

3       You subpoena your medical records and

4    I'm ordering both sides to exchange the

5    expert reports of those experts that are

6    going to testify at the litigation.

7  BY MS. ROUSSEL:

8       Now, Judge, and many of these experts,

9    such as James Malache (phonetic) and Frank

10    Parker, are more general experts with

11    general testimony that they've taken

12    depositions on the specific issues, and

13    trial testimony has been given.  In lieu

14    of an expert report can we submit to them

15    deposition testimony of the same areas

16    that we plan to have them testify on so

17    that we don't have to incur the additional

18    cost of getting that kind of expert

19    report?

20  BY MS. ROBLES:

21       I don't think we are looking for

22    generic experts like that, and I don't

23    think you are looking for that from us.  I

24    think if there is somebody, say, "cite

25    specific" that is strictly hired for this

26    case to look at specifically some

27    information in this case, for instance,

28    the plaintiff's house because she's a

29    bystander.  I'm just throwing that out.

30    We would look for that.  We are not

31    looking at state of the art reports.

32  BY MS. ROUSSEL:

1    So but I think the judge has already
2    ruled that other than treating
3    individuals, that expert reports have to
4    be disclosed, and so specific testimony
5    areas have to be covered.
6        What we're agreeable to doing, or what
7    we are requesting from the Court, is that
8    we be able to substitute in lieu of an
9    actual report where they have to sit down
10   and craft that prior testimony.
11       And, yes, we would like that from the
12   defendants as well because typically what
13   we get from them is two hundred witnesses
14   that they've not even retained.  We need
15   to know specifically which ones are they
16   planning to call in this case and what
17   testimony are they going to be offering.
18  BY THE COURT:
19       Well, you would know that by the
20   reports that you get, you know.  Because
21   if you got -- experts I'm talking about.
22  BY MS. ROUSSEL:
23       Correct.
24  BY THE COURT:
25       You know, if they have two hundred
26   experts listed, and you only have ten
27   reports, well I can assure that a hundred
28   and ninety of those folks are not
29   testifying.
30  BY MS. ROUSSEL:
31       But the question is can we submit, in
32   lieu of an expert report, prior testimony

31

covering those areas?

BY THE COURT:

I would think that -- again, I would think that's an area -- let me back up. Courts give bold statements.  And then the counsel that's involved really as professionals ought to be able to work out the details that's involved.

I'm not going to sit on this bench and work out every detail that may possibly come up in this particular litigation.  If you have a problem and you can't work something out, we are going to do exactly what we did in this instance.  We'll come back.  All right?

You talk about substituting in the depositions for the written report, that seems as if it would be a reasonable thing to do.  All right?  That seems as if it would be a reasonable thing to do.  There might be some opposition which we have not heard as to why that would not be a reasonable thing to do, and if that's the case, we will deal with that at the time that comes up, at the time that comes up.

Right now I'm saying that you exchange the reports.  Which form that report takes, I would hope that as professionals in the field you all are able to work that out.

If not I'll come back.  We'll say what it is.  But I can tell you one thing the

32

more often that I have to come back here
and deal with that, then you can forget
about the expedited trial date.  Because
all we are going to keep doing is pushing
that further and further and further back.

    Yes, Counsel?

BY MS. GRIFFIN:

    Avery Griffin on behalf of
Westinghouse again.  Your Honor, I'm
going to object to prior depositions being
submitted on these experts.  Research is
ongoing.  These experts are changing their
opinion and a deposition that was taken
three years ago might not necessarily be
the most accurate reflection of this
expert's opinion.

BY THE COURT:

    Then you cream that expert when he
comes on because you bring up your
deposition that says this is what your
counsel represented was your view in this
particular matter, now you are saying
this, you know, and then impeach it.

    If they are going to give you
something that does not represent
presently what that expert thinks, you
know, then impeach him with it.

BY MS. GRIFFIN:

    But, Your Honor, we need to know that
going into trial instead of being ambushed
at trial with it.

BY MS. ROBLES:

33

1          I think, Judge, if you give us a
2      chance to try to work out the language
3      maybe --
4  BY THE COURT:
5          Yeah.  I'm going to let you'll work
6      that out because that's why you have -- I
7      mean you cannot work out pretrial
8      everything that occurs, or will occur, at
9      trial.  If that were the case there would
10     be no need for trials.  All we can do is
11     try to get some basic rules in terms of
12     governing the trial and that's all we can
13     do.
14  BY MS. ROBLES:
15         We have to go back and fix that
16     language because of the Judge's ruling so
17     I can have the opportunity to consult with
18     the rest of the defendants and get with
19     Ms. Roussel, Judge.
20  BY MS. ROUSSEL:
21         The other thing is with regard to
22     exhibits and in here they have
23     sequentially numbered exhibits.  We don't
24     have a problem with numbering our
25     exhibits, but we assign a number to each
26     defendant.  That way if we have to pull
27     out or defend that, their group of
28     documents doesn't effect the numbers on
29     the other ones.  So that we might have,
30     for example, ".1" and then "2.1" and then
31     "3.1" for another defendant.
32         So we have numbered exhibits and it's

34

worked well in the past.  Sequentially
numbered means we need to renumber
everything.  So I don't know if that was a
miss statement or --

BY MS. ROBLES:

No, this is the same language that's
been in previous reports and I think the
main objective is to have numbering so
that the reports, or the documents, are
identifiable.  That we don't have this
mass of documents without some kind of
identification system.

BY MS. ROUSSEL:

And what was in McDuffy (phonetic) was
exhibits shall be numbered period, not
sequentially numbered.

BY THE COURT:

That's fine.

BY MS. ROUSSEL:

Okay.

BY THE COURT:

We obviously just want to be able to
refer to the exhibit by some symbol.
Whether it's a number or alphabet, a light
bulb, you know, as long as we can refer to
it.

BY MS. ROUSSEL:

All right.  The next problem was
plaintiff -- the requirement is on us for
us to collect CT scans, X-rays, et cetera,
et cetera.  That's a massive amount of
expense.  We don't have a problem with the

35

defendants getting that.  We've already
given Julie authorizations to get that.
But according to the CMO the requirement
is upon us to do that.  We just ask that
that be taken out of there.  It's item
number 3 where it says, "Plaintiffs shall
simultaneous produce radiographs, CT
scans, test results, slides," et cetera,
et cetera, and it's the scheduling order.

BY MS. ROBLES:

I mean I think as long as we have an
authorization, or something --

BY MR. REDMANN

In their possession.  Whatever you
have you turn over at that point.

BY MS. ROBLES:

If you have it otherwise give us the
ability to get it.  I mean it's not --

BY MR. REDMANN

Whatever is in your or your expert's
possession.

BY MS. ROUSSEL:

I don't have anything at this point
and we've already given you authorizations
to get that.

BY THE COURT:

Then you are in compliance.

BY MS. ROBLES:

Yes.  I mean just say in your
possession.  We'll add the "in your
possession" language.

BY MR. REDMANN

36

1          Either in your plaintiffs or
2      plaintiff's expert's possession.
3   BY MS. ROUSSEL:
4          Well, the plaintiff's experts will
5      include the treating doctors and people
6      from the hospital.  That's in their
7      possession.
8   BY MR. REDMANN
9          Well, retained litigation experts.
10  BY THE COURT:
11         You all can work out the language in
12      that.
13  BY MS. ROBLES:
14         We can fix it.
15  BY THE COURT:
16         You know what you are trying to do
17      there.  You are just trying -- they are
18      trying to have access those particular
19      diagnostic tests.
20  BY MS. ROBLES:
21         We can work that out, Your Honor.
22  BY MS. ROUSSEL:
23         Okay.  The date for our disclosure of
24      witnesses is January 31.  We just ask that
25      theirs be two weeks later.
26  BY MS. ROBLES:
27         And, Judge, again, on an expedited
28      track we have cooperated with banged out
29      dates which would allow her to get a June
30      trial date, if that's agreeable to Your
31      Honor.
32         I have also taken it upon myself to

1        already be in discovery as far as issuing
2        subpoenas and getting authorizations so
3        that -- you know.  We're on track.
4    BY THE COURT:
5            What is your point?
6    BY MS. ROBLES:
7            The point is, is that I think we are
8        pushing the limits of our abilities at
9        this point because it's going to take --
10   BY THE COURT:
11           How much time do you need?
12   BY MS. ROBLES:
13           We put in there that we get a month
14       after her.
15   BY MS. ROUSSEL:
16           And, Judge, the problem is that we
17       want to start.  They already know our
18       treating doctors, et cetera, et cetera,
19       from the information they have.  As of
20       this point we don't know the first witness
21       they intend to call.  We need to start
22       taking depositions ourselves.
23           So we are just asking that, you know,
24       a week or two weeks after we provide our
25       witness list, that they provide theirs.
26       If they need to add someone else this has
27       authority for them to either request
28       consent from me or come to court and get
29       authority to add additional witnesses.
30       But we need to start taking their
31       witnesses' deposition as well.
32   BY THE COURT:

38

1       They all know that they can request
2   consent.  Forget about that.  So they know
3   they would be back in court.
4       What you have to say, Counsel?
5   BY MR. BIENVENU:
6       My name is David Bienvenu and I
7   represent Dow Chemical.  It is almost
8   impossible for me in a case like this to
9   know which witnesses I will list until I
10  have their witnesses and some opportunity
11  to depose them.
12  BY THE COURT:
13      Well, you would have her witness.
14  BY MR. BIENVENU:
15      I also need to depose them so I'm able
16  to determine what the testimony is so I
17  know what witnesses I need to even
18  respond.
19  BY MS. ROBLES:
20      Under the proposed scheduling order we
21  would be required, the defendants were
22  agreeable by the way to moving all the
23  experts, the fact and experts to the same
24  day.  We would be required to disclose our
25  experts by March 1, which if you think
26  about a June trial date, that still gives
27  two and a half months, three months.  So I
28  think it's adequate time plus it gives us
29  time to even gather information.
30      And I want to correct something.  We
31  know about two doctors.  We don't know
32  about all of this lady's doctors.

39

BY THE COURT:

We're not even about to go there.  You got three weeks after, and if that works a hardship come back into the courtroom. But make sure that if you have a good cause as to why that should be extended if that's going to be your argument.  Three weeks.

BY MS. ROUSSEL:

One other thing in here, and I don't think Julie's going to have a serious problem with this, is that on item number 7 in the scheduling order indicates all dispositive motions, including motions for summary judgement, shall be filed and faxed or hand-delivered by a certain date. The code requires service and what we've had in the past is unless there's compliance with service we don't get exhibits, or we only get part of it.  And so we just -- and I have talked with Julie about this and I don't think she has a problem.

BY MS. ROBLES:

The case management -- I'm sorry, Gerolyn.  The case management order requires us to serve in accordance with the Code of Civil Procedure, so -- and I think these two documents go hand-in-hand.

BY MS. ROUSSEL:

Okay.  Then I ask that item 7 be modified to comply with the case

management order because it does seem to
change the requirements of the CMO.  You
don't have a problem with that, do you?

BY THE COURT:

    That's fine.

BY MS. ROUSSEL:

    Okay.

BY MS. GRIFFIN:

    The code allows faxing.  Your Honor,
the code is a service, by fax is allowed.
You have to file a certificate.

BY MS. ROUSSEL:

    Not if there is a hearing date.  It's
got to be done the good old fashion way.
But if it says serve in accordance with
Louisiana Code of Civil Procedure that
takes care of it.

BY THE COURT:

    That's correct.  Thank you.

    I have an En Banc meeting and we are
going to try to get you together on some
trial dates.  I'm going to ask my law
clerk to go ahead and assist with a June
trial.

BY MS. ROUSSEL:

    Judge, we do just have one additional
thing.

BY THE COURT:

    I got to go.  It's 10:00 o'clock.  I
chair the meeting.

BY MS. ROUSSEL:

    Then we'll hammer it with Julie and

41

1    we'll come back if we can't agree to
2    something.
3  BY THE COURT:
4        Okay.
5  BY MS. ROBLES:
6        Thank you, Judge.

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

## REPORTER'S CERTIFICATE

I, R. J. Buras, Jr., CCR do hereby certify that:

I am an official Shorthand reporter of the Civil District Court of the State of Louisiana, in and for the Parish of Orleans, Louisiana, and that as such I reported in stenotype the proceedings had in the within-entitled matter at the time and place therein set forth; and that the same is a full, true and correct transcription of said stenotype notes as taken by me in said matter to the best of my ability.



R. J. Buras, Jr., CCR

OFFICIAL SEAL
R. J. BURAS, JR.
Certified Court Reporter
In and for the State of Louisiana
Certificate Number 87034
Certificate expires 12-31-02

43

# HAILEY, McNAMARA, HALL, LARMANN & PAPALE, L.L.P.

### ATTORNEYS AT LAW

W. MARVIN HALL •
LAURENCE E. LARMANN •
ANTONIO E. PAPALE, JR. •
RICHARD T. SIMMONS, JR. •
DOMINIC J. OVELLA
MICHAEL P. MENTZ
DAVID K. PERSONS
JOHN T. CULOTTA • ††
MICHAEL J. VONDENSTEIN
C. KELLY LIGHTFOOT
JOHN E. UNSWORTH, JR.
JULIE DIFULCO ROBLES
CLAUDE A. GRECO
VALERIE T. SCHEXNAYDER
W. EVAN PLAUCHÉ
KURT D. ENGELHARDT
CAROLINE D. IBOS
ROBERT D. FORD
W. GLENN BURNS
F. THEODORE LE-CLERCQ †✩◇
BARBARA B. O'DONNELL
JOSEPH L. SPILMAN, III ▽△∨

SUITE 1400
ONE GALLERIA BLVD.
METAIRIE, LA 70001
TELEPHONE: (504) 836-6500
TELECOPIER: (504) 836-6565
www.haileymcnamara.com

MAILING ADDRESS:
P.O. BOX 8288
METAIRIE, LA. 70011-8288

January 14, 2002

OF COUNSEL
JAMES W. HAILEY, JR. •
HENRY D. McNAMARA, JR.

WILLIAM R. SEAY, JR.
JAMES W. HAILEY, III
ALAYNE R. CORCORAN
KEVIN O. LARMANN
DAVID K. GROOME, JR.
GABRIEL J. VENINATA
ROGER A. JAVIER
KELLY E. O'HARA
ERIN F. LORIO
KELLY L. COVINGTON
LORIE G. DEMARCAY
DARREN A. PATIN
MARC J. BITNER
MELISSA L. ADERHOLD
MICHAEL H. ABRAHAM
NICOLE A. BOYER
JAMIE N. HEBERT
PHILIP C. BRICKMAN
JAMES L. CANNELLA, JR.
AMIE D. STASSI
ANNE E. MEDO
SERENA C. VAUGHAN
SHANNON H. HUBER

• PROFESSIONAL CORP.
ALSO ADMITTED IN
† SOUTH CAROLINA
†† TEXAS
✩ TENNESSEE
△ WASHINGTON, D.C.
▽ MARYLAND
∨ ALABAMA
◇ MISSISSIPPI

**VIA HAND DELIVERY**

Honorable Michael G. Bagneris
**Civil District Court**
**Parish of Orleans**
421 Loyola Avenue, Room 304
New Orleans, Louisiana 70112

> Re:   Barbara Catania and Michael Catania v.
>        ACandS, Inc., et al.
>        CDC No. 2001-18122; Div. "H", Sec. 12
>        Our File No.: 1750-54874-JDR

Dear Judge Bagneris:

In accordance with your instructions, the parties have conferred and submit the attached Case Management Order and Scheduling Order for your approval and signature.

The *only* item on which agreement could not be reached is at Page 5 of the Case Management Order pertaining to the deadline for responding to Master Discovery by the respective parties. Because we were unable to reach agreement, we are submitting this to you with blanks and have agreed to allow the Court to decide on the deadline dates.

Defendants would like to receive plaintiffs' Responses to Master Discovery, which was propounded on January 11, 2002, within the delays allowed by law, i.e. fifteen (15) days. Counsel for plaintiff is concerned about her ability to respond to the discovery within that time frame and desires thirty (30) days in which to respond.



EXHIBIT
2

If the Court has any questions or would like to discuss these matters further with counsel for plaintiff, Gerolyn Roussel, or the undersigned defense counsel liaison, we are available at the Court's convenience.

Respectfully submitted,

JULIE DiFULCO ROBLES

JDR/srs
Enclosures

cc:   **VIA FACSIMILE AND U.S. MAIL**

All Counsel of Record
(w/enclosures)

**3**

# CIVIL DISTRICT COURT

## PARISH OF ORLEANS

## STATE OF LOUISIANA

BARBARA CATANIA AND MICHAEL CATANIA

NUMBER: 2001-18122

VERSUS

SECTION: 12

ACANDS, INC., ET AL.

DIV.: "H"

---

## PETITION FOR LETTERS ROGATORY

Defendant, EXXONMOBIL CORPORATION ("Exxon"), respectfully represents:

1.

Counsel for Exxon requires information and testimony from Plaintiffs' expert, Mr. Frank Parker III ("Parker"), who resides at 200 Brantley Lane, Magnolia, TX 77355-1750. Parker is a party to the subject litigation and is located outside the State of Louisiana. Parker possesses information regarding the subject litigation.

2.

It is necessary and desirable that Parker appear for a deposition on April 25, 2002 at 10:00 a.m., at the Houston Airport Marriott, 18700 JFK Blvd., (B/T Terminals B & C), Houston, Texas.

3.

Louisiana Revised Statute 13:3823 authorizes this Court to issue a commission in the form of a Letter Rogatory addressed to the appropriate authority in another state.

606296_1





EXHIBIT
3

**WHEREFORE,** Exxon prays that the Letter Rogatory be issued to the appropriate authorities in the State of Texas for assistance in compelling the appearance of Mr. Frank Parker, III for his deposition and for him to bring all documents listed in Exhibit "A".

Submitted by:

Gary A. Bezet (#3036)
Barrye Panepinto Miyagi (#21794)
Robert E. Dille (#23037)
Gregory M. Anding (#23622)
Scott Johnson (#24732)
KEAN, MILLER, HAWTHORNE, D'ARMOND,
McCOWAN & JARMAN, L.L.P.
One American Place, 22nd Floor (70825)
P. O. Box 3513
Baton Rouge, Louisiana 70821-3513
Telephone: (225) 387-0999
Facsimile: (225) 388-9133

Attorneys for ExxonMobil Corporation

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been mailed, postage prepaid to all counsel of record.

Baton Rouge, Louisiana this 5ᵗʰ day of March, 2002.

Gregory M. Anding

606296_1

CIVIL DISTRICT COURT

PARISH OF ORLEANS

STATE OF LOUISIANA

BARBARA CATANIA AND MICHAEL
CATANIA

NUMBER: 2001-___

VERSUS

SECTION: 12

ACANDS, INC., ET AL.

DIV.: "H"

## ORDER

Considering the foregoing petition,

IT IS ORDERED that the letter rogatory attached hereto be issued to the appropriate

authority in Montgomery County, Texas, ordering the issuance of a deposition subpoena and

a subpoena duces tecum to Mr. Frank Parker, III.

NEW ORLEANS, LOUISIANA, this ___ day of ___March___

2002.

*See Judgment dated
3-1-02
granting Mtn to Transfer
Venue to East Baton Rouge*

*BC*

B Capella
JUDGE, CIVIL DISTRICT COURT   Minute Clerk

A TRUE COPY

DEPUTY CLERK, CIVIL DISTRICT COURT
PARISH OF ORLEANS
STATE OF LA.

E

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

## all to whom these presents shall come. Greeting:



virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf,

e seal of the National Archives of the United States, that the attached reproduction(s) is a true and

opy of documents in his custody.

| SIGNATURE | | |
|---|---|---|
| *Robert W Coren* | | |
| NAME Robert W. COren | DATE 7/22/97 | |
| TITLE Chief, NWDTC | | |
| NAME AND ADDRESS OF DEPOSITORY | | |
| The National Archives Washington, D.C. 20408 | | |

NA FORM APR 85 1407-A





...is rubber and located at Baton Rouge, Louisiana (said plant and all ...
...equipment therein to be herein after called the "Plant") for a term of five (5)...
from the date of the completion of the Plant and its readiness for operation.

NOW, THEREFORE, for and in consideration of the premises and of the mutual covenants hereinafter set forth, the parties hereto hereby mutually agree as follows:

Section 1. From and after the date of this contract and concurrently with the design and construction of the Plant, Operator, as agent for Reserve and for the account and at the expense and risk of Reserve, shall undertake all things necessary for the subsequent operation of the Plant for the production of synthetic rubber of the Butadiene-Styrene Copolymer type, such as is suitable and fit for manufacture of tires and tubes (said rubber to be hereinafter called "Synthetic Rubber"), including the training of personnel, and, with the prior approval of Reserve, the erection and operation of pilot plants, if any, for experimental purposes and the conducting of testing, research, laboratory, experimental and development work in connection with the process or processes for the manufacture of Synthetic Rubber.

Section 2. During the term of this contract following completion of the Plant and its readiness for operation, Operator shall operate the Plant for the production of Synthetic Rubber, as agent for Reserve and for the account and at the expense and risk of Reserve, but it is hereby expressly understood that all persons hired in operating the Plant, or engaged in the performance of this contract by Operator, shall be employed or retained by Operator and shall not be employees of Reserve for any purpose whatsoever.

Reserve shall reimburse Operator for Operator's costs hereunder, as defined herein, and shall pay to Operator the overhead and management charge hereinafter specified in Section 5 hereof.

Section 3. For the purposes of this contract, Operator's costs hereunder shall include all costs and expenses of whatsoever kind or character incurred by Operator in connection with the management, operation, repair and maintenance of the Plant, the manufacture and production of Synthetic Rubber, including, but without limitation, the following:

(a) All salaries and wages, whether full-time or part-time, and commission (or portions) for work performed at the Plant or elsewhere ...
...materials supplies accessory for the operation of the Plant and ...

operation ... of the ...
and ... services of technical consultants and directors ... or otherwise
... the ... services furnished by the companies owning capital stock ...
... (such companies being hereinafter collectively called the "Constituent ...
... from their own personnel or personnel of their subsidiaries, as hereinaft...
provide in this subsection (a), of this Section J, whether rendered on ...
plant site and whether on a full-time or part-time basis, all extra compensation
paid to employees engaged in the performance of this contract and all discontinu...
... paid to such employees, the amount directly chargeable to Operator for ...
group insurance, retirement income plan and all other welfare and employee relief
plans maintained by Operator for the benefit of its employees.

It is understood that Operator will enter into certain contracts with
Constituent companies under the terms of which the Constituent Companies will mak...
available to Operator, (for the purposes of enabling Operator to carry out its ...
tract with ... to manufacture Synthetic Rubber) from their personnel or from ...
the personnel of their subsidiaries, if any, executives to serve upon Operation...
management committee; services of chemists and engineers to serve upon Operati...
technical committee; and, if requested by Operator, they will make available ...
Operator, from their own personnel or from the personnel of their subsidiaries,
... or from other sources, patent and patent attorneys to serve upon Operat...
... committee; and will furnish such other services as may be mutually agreed ...
... between Operator and such Constituent Companies. It is further understood
that Operator may enter into additional service contracts for professional services
... engineering and medical services. Amounts payable by Operator to the Constitu...
... Companies or other parties with whom it may contract under such service ...
... are expressly excluded from the computation of Operator's costs under ...
this contract and such amounts will be payable out of operating funds made avail...
... to Operator, ...

... and service contracts shall ...

... It is further understood ...

... therein said alterations or improvements or replacements ... shall done to the manufacturing buildings or equipment facilities connected ... with required for the efficient performance of this contract and for which Oper- ... tor is not reimbursed under the Lease Contract, or otherwise; and the cost of all ... maintenance and repairs including the cost of replacing, repairing or reconditioning ... any of the machinery or equipment comprising the Plant, damaged or destroyed, but ... only to the extent that the damage to or destruction of said machinery or equipment ... is not covered by insurance and only to the extent that the replacing, repairing ... or reconditioning is necessary to the efficient operation of the Plant.

It is hereby understood that title to any and all property of whatever ... character, the cost of which is paid by Reserve pursuant to this subsection (b) of ... this Section 3, shall vest directly in Reserve or Defense Plant Corporation, as ... the respective interests of each may appear and that title to such property shall ... in no event vest in Operator.

(c)  The amount of all taxes, licenses, fees or other charges levied by ... any competent governmental authority, including those levied on the property covered ... by the Lease Contract, or for the privilege of operating the Plant, or on the pro- ... ... ... therein, or on any materials or supplies, including the amount of ... any payments made by Operator under the Social Security Act (employer's contribu- ... tion), and any applicable Federal, state or local taxes, assessments or charges ... (excluding any taxes on net income and any excess profits taxes) which Operator may ... be required to pay to such governmental authority, and which are incurred in connec- ... tion with the performance of this contract, and including the amount of any addi- ... tional taxes or contributions required to be paid by Operator at any time during ... the performance of this contract or within five (5) years thereafter pursuant to ... the Unemployment Compensation Act of any state and arising out of the layoff or ... discharge of persons on account of the intermittent operation of the Plant or ter- ... mination or completion of this contract.

(d)  The amount of all premiums or other costs of any bonds or insurance, ... including public liability, employers' liability, property damage, workmen's com- ... ... ... fidelity, fire, theft, burglary or other insurance, which Operator is ... required or permitted to carry under Section 10 hereof, or under the terms of the ... Lease Contract.

(e) The amount, if any, paid by Operator as damages for any injury to death of a person or persons, or for any injury to property, the liability for which is incurred by Operator during the term of this contract arising through the occupancy of the Plant, or through the performance of this contract, or through the performance of the Lease Contract, but such amount, if any, shall be included herein only to the extent that Operator is actually out-of-pocket therefor without indemnity of any kind through insurance coverage or otherwise and only to the extent that Operator is legally liable for such damages as determined by due process of law or pursuant to a settlement made with the express approval of Reserve, and provided that the liability of Reserve under this subsection (e) of this Section j shall be limited in accordance with the provisions of Section 11 hereof.

(f) The cost of all power, water, steam, fuel, compressed air, telephone and telegraph services and other utilities and services, and all costs incident thereto which are not paid by Defense Plant Corporation; provided, however, that the cost of such utilities and services shall be computed in accordance with the provisions of Section 12 hereof.

(g) The amount expended for retreating or reprocessing Synthetic Rubber produced in the performance of this contract and found unsatisfactory for use in the manufacture of automobile tires and tubes.

(h) The cost of operating any pilot plants which may be used, with the approval of Reserve, for experimental operation of the process or processes used or intended to be used in the production of Synthetic Rubber, including the cost of all materials used or consumed in such experimental operation.

(i) The cost of conducting all research, experimental, laboratory and developmental work, including all cost under contracts or subcontracts for technical or other consultant advice, in connection with the process or processes used or intended to be used by Operator in the manufacture of Synthetic Rubber in the Plant; provided, however, that such cost shall be included only to the extent approved in advance by Reserve and in accordance with arrangements to be mutually satisfactory to Operator and Reserve, and provided further that no cost for technical services rendered under contracts entered into or to be entered into by and between Operator and its Consultant Companies, as hereinabove defined in subsection (a) of Section 6, shall be included hereunder.

... during the cost of any audit required by Reserve, and expenses
... incurred in connection with the termination of this contract or
... Lease Contract.

(k)   The cost of training of personnel required for the performance
of this contract, including expenses incurred in the procurement of suitable labor
therefor and including any moving expenses of such personnel, provided that the
expenses are approved in advance by Reserve.

(l)   The cost of all materials and supplies necessary for the manufacture
of synthetic rubber hereunder which are not furnished to Operator by Reserve
as provided in Section 7 hereof, including the cost of all transportation charges
paid by Operator with respect to such materials and supplies.

(m)   The amount of any expenses incurred in the performance of this con-
tract in connection with travelling and sustenance, provided that such allowances
are approved in advance by Reserve.

(n)   The net cost of disposing of all waste solids, liquids and gases
resulting from manufacturing operations at the Plant and the cost of disposing
of ... obsolete equipment, junk and debris.

(o)   The amount of any costs of the character described in this contract
which may be incurred during any period within the term of this contract in which
operation of the Plant is suspended and also all costs incurred in placing the Plant
in stand-by or operating condition.

(p)   The amount of all charges properly incurred by Operator pursuant to
the express provisions of the Lease Contract for which reimbursement is not receiv-
ed thereunder from Defense Plant Corporation.

(q)   The cost of conducting all testing involved in Operator's operation
of the Plant, including the testing of the finished product to be produced for
Reserve and the testing of raw materials.

... Operational. The determination of the items of cost, as defined herein
shall be in accordance with Operator's established accounting methods. Such ...
... shall be subject to approval by Reserve, but no material change shall be ...
... they conform to good accounting practice and if the costs are reas...
... in therefrom. Operator shall maintain complete records with ...
... Lease Contract with accurate records and Reserve ...
... to check or audit inspection and ...

... world and ... within six (6) months ... conclusion ... of this contract, Reserve will notify Operator ...

... Reserve will advise Operator in writing of any dif-
ference with any item or cost, is determined by Operator for the ...
... then or thereafter will not disagree with such costs. In the event
... parties hereto fail to agree on the inclusion of any item of cost, such
... question shall be submitted for determination to an independent
certified public accountant, approved by both parties, who shall be given access to
this contract, and to the applicable records and whose decision shall be conclusive
upon both parties. In the event of inability of the parties hereto to agree upon
the selection of such certified public accountant, either party may request the
Secretary of the American Institute of Accountants to designate an independent cer-
tified public accountant, and the designation so made shall be accepted by both
parties. The expenses of any such submission shall be borne by the party whose con-
tention is not sustained, or if the contention of neither party is wholly sustained,
such expense shall be borne by either party, or by both parties in proportionate
amounts, as shall be determined by said certified public accountant.

Section 4. (a) For purposes of this Section 5, the term "Contract Year"
shall mean each of the several consecutive fiscal periods of twelve (12) months
(or part thereof in the event of the cancellation or expiration of this contract
prior to the end of any such period), the first such period commencing with the
date upon which Operator shall make the first delivery of Synthetic Rubber hereunder.

The overhead and management charge for the production in the Plant shall
be an amount equal to one and one-half cents ($.015) per pound for the first fifteen
thousand (15,000) long tons (a long ton comprising two thousand two hundred forty
(2,240) pounds) of Synthetic Rubber produced for Reserve in any one Contract Year,
and one and one-quarter cents ($.0125) per pound for the second fifteen thousand
(15,000) long tons in the same Contract Year, one cent ($.01) per pound for the
third fifteen thousand (15,000) long tons in the same Contract Year, eighty-five one-
hundredths of a cent ($.0085) per pound for the fourth fifteen thousand (15,000)
long tons in the same Contract Year, and seven-tenths of a cent ($.007) per pound
... production in excess of sixty thousand (60,000) long tons in the
... Contract Year ... this or points determined in a manner mutually satis-
factory to Operator and Reserve.

(b) If the overhead and management charge for production in the Plant during any Contract Year shall be less than One Hundred Twenty Thousand Dollars ($120,000), Reserve shall pay the difference to Operator. If the said charge, similarly computed for any fractional part of such twelve (12) months' period preceding the expiration or prior termination of this contract is less than an amount in ratable proportion to One Hundred Twenty Thousand Dollars ($120,000), Reserve shall likewise pay the difference to Operator.

(c) It is understood that for the purpose of computing the overhead and management charge, Synthetic Rubber produced in the performance of this contract shall be construed to mean Synthetic Rubber actually acceptable to Reserve; and that if said charge is originally computed on such production as proving acceptable to Reserve, said charge may not again be computed on the same production following retreatment or reprocessing by which it is made acceptable to Reserve.

(d) It is further understood that said charge is designed to compensate and compensation for executive management and legal, medical, technical and other general services and facilities incident to the operation of the Plant (except attorneys' fees incurred under the provisions of Sections 8 and 11 hereof), which services and facilities Operator will purchase from the Constituent Companies or from their subsidiaries, if any, or from other parties under service contracts, hereinabove referred to in subsection (a) of Section 1 hereof. It is accordingly understood that no salaries of Operator's corporate officers (except the salary of one officer who shall be general manager of the Plant and who shall have no other employment), no compensation for executive, legal, medical, technical, and other general services, and no other expense of conducting Operator's corporate offices (except those direct expenses which are entirely and directly attributable to the operation of the Plant and which shall be charged as costs under this contract) shall be otherwise charged hereunder.

- 6 -

... ... after receipt by Operator of ... ...
... ... and report to Reserve the railroad ... weights of ...
... ... of ... styrene both before and after unloading, its difference ...
... ... of the styrene so received.

Operator as agent for Reserve shall use its best efforts to procure all
materials (other than butadiene and styrene) necessary for the manufacture of
synthetic Rubber at the Plant, but to the extent that Operator is unable to obtain
such materials, Reserve shall endeavor to obtain such materials and to make arrange-
ments for delivery thereof to Operator at the Plant.   Title to all materials pur-
chased by Operator hereunder shall vest directly in Reserve.   Subject to the
availability of such materials and the capacity of the Plant, Operator shall use
its best efforts to produce such quantities of Synthetic Rubber as may be specified
by Reserve, as hereinafter provided in Section 9 hereof, and Operator shall deliver
the same to Reserve, loaded on cars at the Plant, it being understood, however, that
Operator does not make any representations, warranties, or guaranties, either
expressed or implied, which would render it liable or responsible, financially or
otherwise, for the quantity or quality of the production at the Plant.

Section 8.   Reserve shall indemnify and save Operator ... unless against,
and from all claims, demands, causes of action, damages, suits and costs (including
attorneys' fees) whatsoever arising out of or in any way connected with alleged in-
fringement of patent or patent applications, or any other patent or patent rights ...
claims asserted by any person, firm or corporation whatsoever, as the result of any
action of Operator hereunder as agent for Reserve or as the result of any action
hereafter the date of commencement of operations in the Plant by Operator, or by
any third party connected with Operator in anticipation of the manufacture of ...
thetic Rubber under this contract; and Reserve shall take all necessary action
(including defense of any suit or suits) and shall bear all costs and expenses the...
upon (including attorneys' fees) incurred in connection with the defense, ...
settlement or payment of any such claims, demands, causes of action or suits, but
Operator shall have no responsibility whatsoever under this Section 8 for any ...
actions not pertinent to the manufacture of Synthetic Rubber under or in connection
with this contract.   Operator shall give to Reserve prompt written notice of any
suit or claim or infringement against it arising from its operations hereunder ...

services which it may be able to provide from its own organization.

It is understood that arrangements shall be effectuated by Reserve thereby during the term of this contract, Operator shall become entitled to receive such technical information with respect to the manufacture of Synthetic Rubber as shall be in possession of Reserve under the Agreement on Exchange and Use of Technical Information, dated December 19, 1941 (hereinafter called "Exchange Agreement"), and under the Supplementary Agreement to the Exchange Agreement, dated June 12, 1942, to both of which agreements Reserve is a party. Operator hereby agrees that in consideration of the establishment by Reserve of a means by which Operator can obtain such technical information, Operator will make available, from time to time during the term of this contract, to Reserve and/or to any Processor as the term "Processor" is defined in the Exchange Agreement, for the purpose of satisfying the requirement of reciprocation, provided for in Section 4 of Article III of the Exchange Agreement, all technical information which Operator now possesses or hereafter may acquire relating to the manufacture of Synthetic Rubber and to processes and apparatus which are used, or may be used, in the manufacture of Synthetic Rubber, whether such Synthetic Rubber processes or apparatus have been patented, patents applied therefor, or whether the same are patentable or unpatentable. All such technical information shall be maintained secret and confidential and Operator shall establish and maintain all reasonable safeguards, including secrecy contracts, to prevent any disclosure thereof to any third parties without the prior written consent of Reserve. Disclosures of such technical information shall be subject to all rules and regulations now or hereafter promulgated by the United States Government with respect thereto.

Operator may file such applications for Letters Patent, covering its improvements and developments in Synthetic Rubber, and in processes and apparatus for manufacturing Synthetic Rubber, as, in its judgment, may seem fit, without cost to Reserve, and Reserve shall not assert any right or title in or to any such improvements or developments, applications for Letters Patent or Letters Patent issued thereon; provided, however, that Reserve shall have no obligation hereunder ... whether use or part ... as herein defined ... any ... inventions, improvements, or technical information ...

... and/or hereby grants to Reserve an ... right in Reserve the ...
... to use it as agent or on its behalf, a non-exclusive, irrevocable and
royalty-free license under its patents and patent rights (including patents here-
... issue, and patents which may be hereafter issued on any application now pending
hereafter ... (during the term of this contract) to manufacture, to use, and
to sell ... manufacture Synthetic Rubber (said patents and patent rights being hereinafter
called the "Operator's Patents"). Operator agrees to confer upon request of Reserve,
made at any time up to the expiration of the tenth year after the end of the ...
al Emergency which has been proclaimed by the President of the United States, or
... for commercial operations (in contradistinction to government operations),
under Operator's Patents, to any operator of a government-built Synthetic Rubber
plant, whether such operator be vendee, lessee, or transferee of such plant, a
reasonable form and in any event on terms at least as favorable as those then
being maintained by Operator.

Section 9. Beginning at the end of the calendar quarter during which
Plant is completed and is made ready for operation, the Plant shall be operated
on a semi-quarterly basis, such quarters to begin on the first day of January,
April, July and October, respectively, of each year. Reserve shall notify Operator
in writing, not less than six (6) weeks prior to the beginning of such calendar
quarter, of the total amount of Synthetic Rubber which Reserve desires Operator to
produce at the Plant during such calendar quarter, which amount shall be manufac-
tured as nearly as practicable in daily quantities of a uniform amount during such
calendar quarter. Reserve shall take delivery of the Synthetic Rubber hereunder at
the Plant, or provide storage therefor. If Reserve shall fail to give to Operator
the six (6) weeks' notice herein required prior to the commencement of any ...
quarterly period, production during such new quarterly period shall be at the same
rate as in the immediately preceding quarterly period. If the Plant is shut down
temporarily, Reserve will reimburse Operator for maintaining on its pay roll such
... as may be needed for guarding and maintaining the Plant during such shut-
down period and such other employees as Operator will need at the Plant if and when
... plant shut down is to be removed, and when operations are resumed, Reserve will
... Operator for all costs and expenses properly incurred in connection with
the assembling of operating personnel.

Section ___: It is understood that in the performance of this contract Operator is acting as agent for Reserve, for the account and at the expense and risk of the latter, and, accordingly, the Operator shall in no event be liable for, but shall be held harmless by Reserve against, any damage to or loss or destruction of property (whether owned by Reserve, Defense Plant Corporation, or others) or any injury to or death of persons, in any manner, arising out of or in connection with the work hereunder (including reasonable fees of attorneys retained with the consent of Reserve), unless it be shown to have been caused directly or had faith or willful misconduct on the part of an officer of Operator, or any representative of Operator having supervision and direction of the Plant as a whole, acting within the scope of his authority and employment, or unless it results from the failure of Operator to carry such insurance coverage as Operator may be required to carry under the provisions of Section 20 hereof.

It is further understood that raw materials of the type required for the production of synthetic rubber are subject to an element of loss due to shrinkage, spoilage, and the like, in the course of storage and processing.

Section 12: Operator, as agent for Reserve and with its approval, shall arrange for the furnishing to the Plant of such utilities and services as may be necessary or desirable for the operation of the Plant, including without limitation those enumerated in subsection (f) of Section 1 hereof, it being understood that all charges and expenses thereby incurred by Operator as a result of contractual obligations, penalties, guaranties, deposits or otherwise, shall be for the account of Reserve and shall be included in that part of Operator's cost hereunder described in such subsection (f) of Section 3 hereof.

Section 13: On or before the twentieth day of each calendar month during the term of this contract, Operator shall render to Reserve a comprehensive report, in form satisfactory to Reserve, reflecting the elements of cost for the preceding calendar month, together with actual tonnage of synthetic rubber produced during the preceding calendar month and showing both monthly and cumulative up-to-date figures on production and actual costs of production.

-12-

... on the part of Operator, its agent, or Reserve, in excess of the sum of Five Thousand Dollars ($5,000) or more, shall be first submitted to ... the approval price to executing. All arrangements or agreements, pursuant ... which Operator may ... furnish supplies or services to the operation of the plant, shall be first submitted to Reserve for approval prior to execution.

Section 15. The following representations and stipulations pursuant to the Act of June 30, 1936 (49 Stat. 2036; U.S. Code, Title 41, Secs. 35-45) (Walsh-Healey Act) form a part of the requirements and conditions of this contract, it being understood that in the event of any amendments to or modifications of said Act, the said representations and stipulations shall be amended or modified accordingly:

(a) Operator (hereinafter in this Section 15 called "Contractor") is the manufacturer of or a regular dealer in the materials, supplies, articles, or equipment to be manufactured or used in the performance of this contract.

(b) All persons employed by Contractor in the manufacture or furnishing of the materials, supplies, articles, or equipment used in the performance of this contract will be paid, without subsequent deduction or rebate on any account, not less than the minimum wages as determined by the Secretary of Labor to be the prevailing minimum wages for persons employed on similar work or in the particular or similar industries or groups of industries currently operating in the locality in which the materials, supplies, articles, or equipment are to be manufactured or furnished under this contract; Provided, however, That this stipulation with respect to minimum wages shall apply only to purchases or contracts relating to such industries as have been the subject matter of a determination by the Secretary of Labor.

(c) No person employed by Contractor in the manufacture or furnishing of the materials, supplies, articles, or equipment used in the performance of this contract shall be permitted to work in excess of eight (8) hours in any one (1) day or in excess of forty (40) hours in any one (1) week, unless such person is paid such applicable overtime rate as has been set by the Secretary of Labor; Provided, That the provisions of this subsection (c) shall not apply to any employer who shall have entered into an agreement with his employees pursuant to the provisions of paragraphs 1 or 2 of subsection (b) of section 7 of an Act entitled "Fair Labor Standards Act of 1938."

(d) No male person under sixteen (16) years of age and no female person under eighteen (18) years of age and no convict labor will be employed by Contractor ...

...for the production of this article or any of the materials...
...equipment furnished under this contract...

(e)  No part of this contract will be performed nor will any of the MATE-
RIALS, supplies, articles, or equipment to be manufactured or furnished under this
contract be manufactured or fabricated in any plants, factories, buildings, or sur-
roundings or under working conditions which are insanitary or hazardous or danger-
ous to the health and safety of employees engaged in the performance of this con-
tract.  Compliance with the safety, sanitary, and factory inspection laws of the
State in which the work or part thereof is to be performed shall be prima-facie
evidence of compliance with this subsection (e).

(f)  Any breach or violation of any of the foregoing representations and
stipulations shall render the party responsible therefor liable to the United
States of America for liquidated damages, in addition to damages for any other
breach of this contract, in the sum of Ten Dollars ($10) per day for each male per-
son under sixteen (16) years of age or each female person under eighteen (18) years
of age, or each convict laborer knowingly employed in the performance of this con-
tract; and a sum equal to the amount of any deductions, rebates, refunds, or under-
payment of wages due to any employee engaged in the performance of this contract;
and, in addition, the agency of the United States entering into this contract shall
have the right to cancel same and to make open-market purchases or enter into other
contracts for the completion of the original contract, charging any additional cost
to the original contractor.  Any sums of money due to the United States of America,
by reason of any violation of any of the representations and stipulations of this
contract as set forth herein may be withheld from any amounts due on this contract
or may be recovered in suit brought in the name of the United States of America
by the Attorney General thereof.  All sums withheld or recovered as deductions,
rebates, refunds, or underpayments of wages shall be held in a special deposit ac-
count and shall be paid, on order of the Secretary of Labor, directly to the em-
ployees who have been paid less than minimum rates of pay as set forth in such con-
tracts and on whose account such sums were withheld or recovered:  Provided, That no
claims by employees for such payments shall be entertained unless made within one
(1) year from the date of actual notice to the Contractor of the withholding or recov-
ery of such sums by the United States of America.

(g)  Contractor shall post a copy of the stipulations in a conspicuous and
accessible place at the site of the contract work and shall keep posted...

... are required in the Regulations under the Act available for inspection by authorized representatives of the Secretary of Labor.

(b) The foregoing stipulations shall be deemed inoperative if this contract is for a definite amount not in excess of Ten Thousand Dollars ($10,000).

Section 16. No member of or delegate to the Congress of the United States of America or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise therefrom, but this provision shall not be construed to extend to this contract if made with a corporation for its general benefit.

Section 17. In the performance of this contract, Operator shall use only such unmanufactured articles, materials and supplies as have been mined or produced in the United States and only such manufactured articles, materials and supplies as have been manufactured in the United States substantially all from articles, materials or supplies mined, produced or manufactured, as the case may be, in the United States. The foregoing provisions shall not apply to such articles, materials or supplies of the class or kind to be used, or such articles, materials or supplies from which they are manufactured as are not mined, produced or manufactured, as the case may be, in the United States, in sufficient and reasonably available commercial quantities and of a satisfactory quality, or to such articles, materials or supplies as may be expressly excepted from the provision of this Section 17 by Reserve.

Section 18. Operator warrants that it has not employed any person to solicit or secure this contract upon any agreement for a commission, percentage, brokerage, or contingent fee. Breach of this warranty shall give the Government the right to terminate this contract or, in its discretion, to deduct from payments due the Operator the amount of such commission, percentage, brokerage or contingent fee. This warranty shall not apply to commissions payable by Operator upon contracts or sales secured or made through bona fide established commercial or selling agencies maintained by Operator for the purpose of securing business.

Section 19. Reserve shall have the right to terminate this contract at any time prior to the date of the completion of the Plant and its readiness for

-16-

in anticipation of performance of this contract

whether this is as Contract, or otherwise, and Reserve shall be liable for any obligations, commitments and claims as Operator may have ... taken or incurred in connection therewith as of the date of such termination.

This contract shall automatically terminate upon the cancellation or termination of the Lease Contract. In addition, either Reserve or Operator shall have the right to terminate this contract during the term hereof upon not less than ninety (90) days' written notice to the other party. At the expiration or prior termination of this contract, Reserve shall pay to Operator all the costs as defined herein not already paid to Operator by Reserve, and in addition Reserve shall pay to Operator that proportionate part of the overhead and management charge, as defined in Section 5 hereof, which remains unpaid. In the event that this contract is terminated by Reserve or by Operator, at any time, Operator shall use its best efforts to sell, at the request of Reserve and for its account, any materials or supplies which Operator may hold at such time, payment for which has been previously made by Reserve, and Operator shall account to Reserve for any credits or ...

... no ... return which may arise as a result of the termination of this contract. In the event of the termination of this contract, otherwise than because of the default of the Operator, Operator shall have the right, when Reserve desires, to ... operations at any time within five (5) years and six (6) months from the date of the completion of the Plant and its readiness for operation, to enter in ... contract with Reserve for the operation of the Plant on terms and conditions ... favorable to Operator as those which Reserve is willing to offer to any other party, provided Operator shall accept such terms and conditions within thirty (30) days after receipt of notice thereof.

Section 20. The failure of either party hereto to insist, in any one ... instance, upon performance of any of the terms, covenants or conditions ... this contract, shall not be construed as a waiver or a relinquishment of the future performance of any such term, covenant or condition of the other party

- 17 -

hereto, but the obligation of such other party with respect to such future periods shall continue in full force and effect.

Section 21. Operator shall not sell, assign, or pledge its interest upon this contract, nor any of its rights, powers, privileges, duties or obligations hereunder, without the prior written consent of Reserve. Reserve may assign its interest under this contract to any other branch of the Government, and upon assignment such other branch of the Government shall acquire all the rights, powers and privileges of Reserve hereunder, and shall be bound by all duties and obligations of Reserve hereunder, and Reserve shall thereupon cease to have any rights, powers, privileges, duties or obligations hereunder, it being expressly understood that any such assignment by Reserve of its interest in this contract to any other branch of the Government shall be subject to all the rights, powers and privileges of Operator hereunder, and shall be conditioned upon such transferee's assumption of the duties and obligations of Reserve hereunder.

Section 22. In the performance of this contract, Operator shall comply with and give all stipulations and representations required by any applicable Federal, state, municipal or local law, and any applicable rules, orders, regulations or requirements of any governmental department or bureau, but nothing herein contained shall be construed as preventing Operator from contesting in good faith the validity of any such law, rule, order, regulation or requirement, or in contesting in good faith any charge that Operator has not complied therewith.

Section 23. If the performance of this contract is interrupted or prevented by reason of labor shortage or labor disputes, from whatever cause arising and whether or not the demands of employees of Operator shall be reasonable and within Operator's power to concede, or if the performance of this contract is interrupted or prevented by reason of acts of God, acts or requirements of the Government, weather, flood, fire, explosion, accident, sabotage, inability to obtain materials, or any cause beyond Operator's reasonable control, whether or

-13-

disability of Operator shall be suspended during the period of the continuance of the actual disability, but for no longer period because of such causes, and the performance of this contract shall be resumed as soon as practicable after such disability is removed.

Section 24. The term of this contract shall be for a period commencing with the date hereof and ending five (5) years after the date of the completion of the Plant and its readiness for operation.

Section 25. In the employment of workers for the performance of this contract, Operator shall not discriminate against any worker because of race, color, or national origin.

Section 26. All notices of every nature to be given to Reserve pursuant to this contract, may be addressed to "Rubber Reserve Company, 811 Vermont Ave., N. W., Washington, D. C.," and all such notices to be given to Operator pursuant to this contract, may be addressed to "Copolymer Corporation, Baton Rouge, La.," unless otherwise directed in advance by either party. Any notice shall be deemed to have been duly given if and when enclosed in a properly sealed envelope, addressed as aforesaid, registered and deposited, postage and registry fee prepaid, in a post office or branch post office regularly maintained by the United States Government.

Section 27. Operator hereby expressly covenants with Reserve that it will not during the term of this contract, shall not engage in any business other than the manufacture of synthetic rubber for the account of Reserve under the terms of this contract, and shall not declare any dividends, nor increase nor decrease its capital stock, without the prior approval of Reserve; provided, however, that Reserve will permit Operator to declare sufficient dividends to avoid liability for surtax under Section 102 of the Income Tax Law, or any similar provision of the Federal and/or tax laws. Operator further agrees that whenever requested by Reserve so to do, it shall and demand upon its subscribing shareholders to purchase any part of the authorized capital stock of Operator then remaining unissued.

Section 28. This contract shall be construed according to the laws of the State of Louisiana.

IN WITNESS WHEREOF, Rubber Reserve Company and Copolymer Corporation have caused this contract to be executed by their respective officers, duly



IN WITNESS WHEREOF, the parties have caused their respective corporate seals to be hereunto affixed, duly attested by their respective officers, as of the day and year first above written.

ATTEST:                              KEASBY RESERVE COMPANY

_____              By _____
            Secretary                            President

ATTEST:                              COPOLYMER CORPORATION

_____              By A. S. Woodland
            Secy.                                P...

## NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

**To all to whom these presents shall come, Greeting:**

By virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf,

under the seal of the National Archives of the United States, that the attached reproduction(s) is a true and

correct copy of documents in his custody.



| SIGNATURE |  |
|---|---|
| *Robert W. Coren* |  |
| NAME | DATE |
| Robert W. Coren | 7-22-97 |
| TITLE |  |
| Chief, NWDTC |  |
| NAME AND ADDRESS OF DEPOSITORY |  |
| The National Archives Washington, D.C. 20408 |  |

NA FORM APR 85 1407-A

Plancor 876

AGREEMENT OF LEASE

THIS AGREEMENT made and entered into as of the 23rd day of November, 1942, by and between Defense Plant Corporation (hereinafter referred to as "Defense Corporation"), a corporation created by Reconstruction Finance Corporation pursuant to Section 5d of the Reconstruction Finance Corporation Act, as amended, to aid the Government of the United States (hereinafter sometimes called the "Government") in its National Defense Program, and Copolymer Corporation (hereinafter called "Lessee), a corporation organized and doing business under the laws of the State of Louisiana;

WITNESSETH:

WHEREAS, the expansion of plant capacity within the United States for the production of synthetic rubber is important in the interest of the National Defense Program; and

WHEREAS, Defense Corporation is now in the process of causing to be established a plant for the manufacture of synthetic rubber of the butadiene-styrene copolymer type, to be located at or near Baton Rouge, Louisiana, it being contemplated that such plant will be designed to have an estimated annual productive capacity of approximately thirty thousand (30,000) long tons of such synthetic rubber; and

WHEREAS, it is proposed that Defense Corporation shall lease said plant, including the site, buildings, machinery and equipment, (hereinafter sometimes called the "Plant") to Lessee; and

WHEREAS, it is contemplated that the Lessee and Rubber Reserve Company, a corporation likewise created by Reconstruction Finance Corporation (hereinafter called "Rubber Reserve"), will, within six (6) months from the date hereof, enter into an agreement for the manufacture of synthetic rubber in said Plant;

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, it is agreed by and between the parties hereto as follows:

ONE:  Defense Corporation hereby agrees to lease, and does hereby lease, subject to termination or cancelation as hereinafter provided, the Plant to Lessee and Lessee agrees to lease, and does hereby lease the Plant from Defense Corporation for a term commencing with the date of completion thereof and its readiness for operation and ending on a date five years thereafter.  Defense Corporation and Lessee each agrees, upon the written request of the other, to execute and deliver such additional instruments of Lease as may be necessary to carry out the provisions of this agreement.

PLANCOR NO.    876

REPRODUCED AT THE NATIONAL ARCHIVES

Copolymer Corporation
(Synthetic Rubber)

TWO:  The consideration of this lease is the sum of One Dollar ($1) per year, payable by Lessee to Defense Corporation on or before the first day of each year of the term hereof, and the mutual covenants herein contained.

THREE:  This lease shall terminate automatically upon the expiration, termination, or cancelation of the proposed agreement for the operation of the Plant between Lessee and Rubber Reserve described in the preamble hereof and may be terminated by either party hereto upon written notice to the other in the event such proposed agreement is not entered into within six (6) months from the date of this Agreement of Lease.

FOUR:  In addition to the provisions for termination set forth in paragraph THREE hereof, Defense Corporation may, by notice in writing to Lessee, cancel this lease in the event (a) a receiver or trustee is appointed for Lessee or its property, or Lessee makes an assignment for the benefit of creditors, or Lessee becomes insolvent, or a petition is filed by or against Lessee pursuant to any of the provisions of the United States Bankruptcy Act, as amended, for the purpose of adjudicating Lessee a bankrupt, or for the reorganization of Lessee, or for the purpose of effecting a composition or rearrangement with Lessee's creditors, and such receiver or trustee is not discharged or any such petition filed against Lessee is not dismissed within sixty (60) days; or (b) of any violation of any of the terms, conditions or covenants of this lease by Lessee and the failure of Lessee to cure such violation within thirty (30) days from the giving of a written notice thereof by Defense Corporation to Lessee.  Upon the expiration, termination or cancelation of this lease Defense Corporation shall have the right to invoke any remedy permitted by law or in equity for the protection of its interests hereunder, and Lessee hereby expressly waives all rights which it may have to redeem or to be served with any further notice of Defense Corporation's intention to cancel or terminate this lease other than as herein provided.

FIVE:  Upon the expiration of the term of this lease provided in paragraph ONE hereof, or upon cancelation or termination as provided in paragraph THREE hereof, Lessee shall have and is hereby granted, for a period of six (6) months after such expiration, cancelation or termination (hereinafter referred to as the "Negotiation Period") the right to negotiate with Defense Corporation for the purchase or lease of the Plant, or any portion thereof, and upon the establishment by the Lessee and Defense Corporation of mutually satisfactory terms and conditions, Defense Corporation will sell or lease, as the case may be, the property covered thereby to Lessee.

PLANCOR NO.   S 7 6

- 2 -

REPRODUCED AT THE NATIONAL ARCHIVES

Copolymer Corporation
(Synthetic Rubber)

It is understood and agreed (without in any way limiting the provisions of paragraph SIX hereof) that Lessee shall have no rights under the provisions of this paragraph FIVE, in the event of the sale, lease or other disposition of the Plant by Defense Corporation, other than in the event of a transfer or conveyance to another branch of the Government, pursuant to paragraph SIXTEEN hereof. In the event of any sale to Lessee pursuant to the provisions of paragraphs FIVE or SIX hereof, transfer of title shall be made without any representations or warranties whatsoever on the part of Defense Corporation. It is understood that the provisions of this paragraph shall not be applicable in the event of a cancelation of this lease pursuant to the provisions of paragraph FOUR hereof, or in the event the proposed agreement between Lessee and Rubber Reserve for the operation of the Plant shall not have been entered into within six (6) months from the date of this Agreement of Lease, or in the event that after execution, such agreement between Lessee and Rubber Reserve shall be terminated or canceled because of a violation by Lessee of any of the provisions thereof.

SIX: Defense Corporation agrees, to the extent that it lawfully may, that it will not during the term of this lease, and for a period of six (6) months thereafter, sell or lease the Plant, or any part thereof, to any party or parties other than to another branch of the Government (in which event such sale shall be in all respects subject to paragraph SIXTEEN hereof) unless it shall first have offered the same for sale or lease to Lessee at a price or rental and upon terms and conditions equal to the best offer received by Defense Corporation, and Lessee shall have failed or refused to purchase or lease the same within thirty (30) days after Defense Corporation shall have made such offer to Lessee. It is understood that the provisions of this paragraph shall not be applicable in the event of a cancelation of this lease pursuant to the provisions of paragraph FOUR hereof, or in the event the proposed agreement between Lessee and Rubber Reserve for the operation of the Plant shall not have been entered into within six (6) months from the date of this Agreement of Lease, or in the event that after execution, such agreement between Lessee and Rubber Reserve shall be terminated or canceled because of a violation by Lessee of any of the provisions thereof.

SEVEN: So long as this lease remains in full force and effect Lessee shall procure and maintain at its cost insurance on the buildings and on the

Copolym          Corporation
(Synthetic Rubber)

achinery and equipment covered by this lease against fire, windstorm, and such other hazards, in such companies and in such amounts as shall be satisfactory to or required by Defense Corporation. The policies evidencing such insurance shall be made payable to, and shall be delivered to, Defense Corporation. In the event of loss under any of the policies, the proceeds may, upon the written request of Lessee promptly made and subject to approval of Defense Corporation, be used by Lessee for the repair, restoration or replacement of the property damaged or destroyed and, thereupon, to that end, Defense Corporation shall promptly make available to Lessee the insurance proceeds received by Defense Corporation. Any property acquired in replacement shall be the property of Defense Corporation and so identified and shall be subject to all the terms and provisions of this Lease.

EIGHT: Lessee agrees to save Defense Corporation harmless against any liability whatsoever because of accidents or injuries to persons or property occurring in the operation of the Plant or the use of the machinery and equipment by Lessee. Lessee also agrees that during the term of this lease, it will procure and maintain at its cost public liability insurance and property damage insurance in such amounts and with such companies as Defense Corporation shall approve or require. The policies evidencing such insurance shall name Defense Corporation as an assured, and shall be delivered to Defense Corporation.

NINE: Lessee shall use reasonable care in the use and operation of the Plant, including the site, buildings and the machinery and equipment covered by this Lease, and shall keep the same in good state of repair, ordinary wear and tear excepted (but shall not be liable for any loss thereof or damage thereto except that resulting from Lessee's negligence or wilful misconduct) and upon the expiration, termination or cancelation of this lease, Lessee shall forthwith yield and place Defense Corporation in peaceful possession of the Plant, including the site and buildings and all the machinery and equipment covered by this lease, free and clear of any liens and claims other than those resulting from claims against Defense Corporation.

TEN: Lessee agrees to pay to the proper authority, when and as the same become due and payable, all taxes, assessments and similar charges, which at any time during the term of this lease may be taxed, assessed or imposed upon Defense Corporation or Lessee with respect to or upon the Plant, or any part thereof, or upon the occupier thereof or upon the use of the Plant, or any part thereof.

PLANCOR NO.     8 7 6

- 4 -

DPC MINUTE DOCUMENT NO.   1 8 2 9

REPRODUCED AT THE NATIONAL ARCHIVES

Lessee also agrees to pay all claims or charges for or on account of water, light, heat, power and any other service or utility furnished to or with respect to the Plant, or any part thereof.

ELEVEN: Lessee agrees, in the use and operation of the Plant, or any part thereof, to comply with and give all stipulations and representations required by all applicable Federal, state, municipal and local laws and the rules, orders, regulations and requirements of any departments and bureaus and all local ordinances, and regulations, provided that nothing herein contained shall be construed as preventing Lessee from contesting in good faith the validity thereof or whether it has complied therewith. Lessee further agrees to indemnify and hold Defense Corporation harmless from any liability or penalty which may be imposed by Federal, state or local authority or any department or bureau thereof by reason of any asserted violation by Lessee of such laws, rules, orders, ordinances, regulations or requirements. Notwithstanding the generality of the foregoing, Lessee agrees further that in the performance of this agreement, it will not discriminate against any worker because of race, creed, color or national origin.

TWELVE: Lessee agrees that it will not, without the prior written consent of Defense Corporation, use such Plant for any purpose except for the manufacture of synthetic rubber under the terms of its agreement with Rubber Reserve.

THIRTEEN: So long as this lease remains in effect, and for a period of one (1) year thereafter, Lessee shall maintain and make available to Defense Corporation for audit and inspection, its records pertaining to the operations of the Plant. Defense Corporation shall have the right to inspect the Plant at all reasonable times during the continuance of this lease.

FOURTEEN: Lessee will not without the prior written consent of Defense Corporation sell, assign, or pledge this lease or any of its rights or obligations hereunder or sublease or permit the use by others of any of the property covered by this lease.

FIFTEEN; The failure of Defense Corporation to insist, in any one or more instances, upon performance of any of the terms, covenants or conditions of this agreement shall not be construed as a waiver or a relinquishment of the future performance of any such term, covenant or condition, but Lessee's obligation with respect to such future performance shall continue in full force and effect.

REPRODUCED AT THE NATIONAL ARCHIVES

SIXTEEN: It is contemplated that the Plant may be transferred and conveyed to another branch of the Government and upon such transfer, such branch of the Government shall succeed to all the rights, powers, privileges, discretion and obligations of Defense Corporation hereunder. In the event of such transfer, Defense Corporation shall cease to have any rights, duties or obligations hereunder. Any transfer by Defense Corporation of the leased property shall be subject to the rights of Lessee under this Agreement of Lease.

SEVENTEEN: All notices of every nature to be given pursuant to this Agreement of Lease may be addressed, if to Defense Corporation, to "Defense Plant Corporation, 811 Vermont Avenue, N. W., Washington, D. C.", or, if to Lessee, to "Copolymer Corporation, c/o Harry H. Kahn, 160 North LaSalle Street, Chicago, Illinois", or, as to either party, addressed as may from time to time be otherwise directed in advance by such party. Any notice shall be deemed to have been duly given if and when enclosed in a properly sealed envelope or wrapper, addressed as aforesaid, registered and deposited, postage and registry fee prepaid, in a post office regularly maintained by the United States Government.

EIGHTEEN: No member of or Delegate to the Congress of the United States of America shall be admitted to any share or part of this agreement or to any benefit arising therefrom.

IN WITNESS WHEREOF, the parties hereto have caused their corporate seals to be hereunto affixed and these presents to be signed by their duly authorized officers, as of the day and year first above written.

WITNESSES:

_Saul B. Newman_

_Jean R. Switzer_

WITNESSES:

_C. Mudderlings._

_Harry Hurst_

DEFENSE PLANT CORPORATION

By _____
                    Vice  President

Attest: _____
                          Secretary

COPOLYMER CORPORATION

By _A. S. Needlander_
                          President

Attest: _____
                          Secretary

DISTRICT OF COLUMBIA, ss:

Personally before me, the undersigned authority, a Notary Public in and for the District of Columbia, there came and appeared _Jean R. Switzer_ _____, a subscribing witness to the foregoing document, well

REPRODUCED AT THE NATIONAL ARCHIVES

Copolymer Corporation
(Synthetic Rubber)

known to me, Notary, who being first duly sworn, did depose and say:
That she knows _Hans A. Klagsbrunn_ & _Leo Nielson_ , the
individuals described in and who executed the foregoing document; that she was
present and saw said _Hans A. Klagsbrunn_ & _Leo Nielson_ execute the same,
and that she thereupon, at the same time, subscribed her name as witness thereto.

Jean R. Switzer
Affiant

Sworn to and subscribed before me, this 5th day of December,
1942.

Thomas S. Kelly 3rd
Notary Public
My commission expires September 1, 1946

State of Illinois
County of Cook  } ss:

Personally before me, the undersigned authority, a Notary Public in
and for the County of Cook, State of Illinois, there came and ap-
peared C. M. Dulings & Harry Hiwolf, a subscribing witness to the
foregoing document, well known to me, Notary, who being first duly sworn, did
depose and say:
That he knows C. A. Freedlander and N. M. Jackson the individuals
described in and who executed the foregoing document; that he was present and
saw said C. A. Freedlander and N. M. Jackson execute the same,
and that he thereupon, at the same time, subscribed his name as witness thereto.

Harry Hiwolf
C. M. Dulings.
Affiant

Sworn to and subscribed before me, this 25 day of November,
1942.

Notary Public
My commission My Commission Expires Nov. 12, 1946

In consideration of the execution by Defense Plant Corporation of the
foregoing Agreement of Lease, each of the undersigned corporations (hereinafter
called "Guarantor") hereby guarantees to Defense Plant Corporation the full obser-
vance and performance by Copolymer Corporation (hereinafter called "Lessee") of
any and all duties, covenants and obligations of Lessee under said Agreement of
Lease; provided, however, that the total monetary liability of each Guarantor

REPRODUCED AT THE NATIONAL ARCHIVES

*Cushing* [signature]

*Harry H. Wolf* [signature]

ATTEST: [signatures]
President
Secretary

State of Illinois }
County of Cook } ss

Personally before me, the undersigned authority, a Notary Public in and for the County of Cook, State of Illinois, there came and appeared _____ C. W. _____, a subscribing witness to the foregoing document, well known to me, Notary, who being first duly sworn, did depose and say: That he knows _____, the individuals described in and who executed the foregoing document; that he was present and saw said _____ execute the same, and that he thereupon, at the same time, subscribed his name as witness thereto.

_____ Cushing [signature]
Affiant

Sworn to and subscribed before me, this 2?th day of November 194?.

_____ [signature]
Notary Public,
My commission expires Nov. 12, 1945.

State of Illinois }
County of Cook } ss

Personally before me, the undersigned authority, a Notary Public in and for the County of Cook, State of Illinois, there came and appeared _____ Harry H. Wolf, a subscribing witness to the foregoing document, well known to me, Notary, who being first duly sworn, did depose and say: That he knows _____, the individuals described in and who executed the foregoing document; that he was present and saw said _____ execute the same, and that he there- upon, at the same time, subscribed his name as witness thereto.

_____ Harry H. Wolf [signature]
Affiant

Sworn to and subscribed before me, this 2?th day of November

_____ [signature]
Notary Public,
My commission expires  My Commission Expires Nov. 12, 1945.

876

DPC MINUTE DOCUMENT NO.  1829

The term of this Guaranty Agreement shall be co-extensive with, and limited to, the term of the Agreement of Lease, provided that any cause of action accruing to or any rights, duties or obligations arising in favor of, Defense Corporation during or with respect to the term of such Agreement of Lease may be enforced at any time within the period of the applicable statute or statutes of limitation.

IN WITNESS WHEREOF, each Guarantor has caused this guaranty to be executed by its officer, duly authorized so to do, and its corporate seal to be hereunto affixed, duly attested by its officers, as of the 23rd day of November 1942.

WITNESSES:

O. W. Sullings.

Harry H. Wolf

WITNESSES:

O. W. Sullings.

Harry H. Wolf

WITNESSES:

O. W. Sullings.

Harry H. Wolf

WITNESSES:

O. W. Sullings.

Harry H. Wolf

WITNESSES:

O. W. Sullings.

Harry H. Wolf

WITNESSES:

O. W. Sullings.

Harry H. Wolf

DAYTON RUBBER MANUFACTURING COMPANY

By A. L. Friedlander
President

Attest: E. F. Rike
Asst. Secretary

PENNSYLVANIA RUBBER COMPANY

By Hugh W. Jenkins
President

Attest: E. H. DuPuy
Secretary

SEARS, ROEBUCK AND CO.

By
President

Attest:
Secretary

GATES RUBBER COMPANY

By
President

Attest:
Secretary

MANSFIELD TIRE & RUBBER CO.

By
President

Attest:
Secretary

LAKE SHORE TIRE & RUBBER CO.

By M. H. Clarke
Vice President

Attest:
Secretary

PLANTOR NO.    876

- 9 -

DPO MINUTE DOCUMENT NO.  1820