875

BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUL 1 0 2002

FILED
CLERK'S OFFICE

MDL DOCKET NO. 875

IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)

(FILED IN LAM 3 02-368)

originating from

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| BARBARA CATANIA, ET AL | CIVIL ACTION |
| | NUMBER: 02-368 |
| VERSUS | SECTION D |
| ACANDS, INC., ET AL. | MAGISTRATE 1 |

---

**OPPOSITION TO MOTION TO VACATE CONDITIONAL TRANSFER
ORDER FILED ON BEHALF OF DSM COPOLYMER, INC.
AND EXXONMOBIL CORPORATION**

DSM Copolymer, Inc. ("DSM") and ExxonMobil Corporation ("ExxonMobil") submit this

Opposition to Plaintiffs' Motion to Vacate Conditional Transfer Order. DSM has removed three

prior asbestos cases[1] on the very basis which it removed this case. Each of those cases was

transferred to this Court and remained with this Court, despite plaintiffs' motions to vacate in two

of the cases.

---

[1] In Re Asbestos Product Liability Litigation, MDL 875 (Geraldine Palmer Westbrook, et al.,
v. Owens-Corning Fiberglas Corp., et al., Civil Action No. 99-526-B-M1, United States District
Court for the Middle District of Louisiana; Joseph Keller, Sr., et al, v. Owens-Corning Fiberglas
Court Corporation, et al., Civil Action No. 99-546-C-M3, United States District Court for the Middle
District of Louisiana; Victor Reno, Sr. v. Owens-Corning Fiberglas Corp., Civil Action No. 99-504,
United States District Court for the Middle District of Louisiana).

644156_1

OFFICIAL FILE COPY

IMAGED JUL 1 2 '02

## I.    BACKGROUND

Barbara Catania and Michael Catania ("plaintiffs") filed suit in state court against several defendants for injuries allegedly resulting from Barbara Catania's ("Catania's") exposure to asbestos-containing products.  Plaintiffs allege in their petition that "Barbara Catania, during the time period of 1951 to 1969, on countless occasions would sleep over and/or visit at the residences of her uncles, Victor Reno, Russell Reno, and Peter Giordano.  During this time period, plaintiff's uncles, Victor Reno, Russell Reno, and Peter Giordano were employed as insulators with the Asbestos Workers's Union Local 53 and/or other employers.  On a daily basis during these employments, they were exposed to dangerously high levels of toxic substances, including asbestos, in the normal routine course of their work, that they brought home on their clothing, thereby resulting in the exposure of Barbara Catania to asbestos."

Defendant, Viacom, Inc. ("Viacom"), filed a third party demand ("third party demand"), naming DSM[2] as a third party defendant and alleging that Catania was exposed to asbestos-containing products from DSM's facility as a result of Victor Reno's work at DSM's facility during the period plaintiffs allege that Catania was exposed to asbestos-containing products from her uncles.  It is further alleged that this exposure resulted in Catania's alleged asbestos-related disease of mesothelioma.  DSM is sued in negligence and strict liability.

DSM removed the action to the Middle District of Louisiana on the basis of the "federal officer removal" statute, 28 U.S.C. § 1442, because it involves a controversy concerning acts undertaken by a federal officer, or someone acting under him, and involves a property holder whose title is derived from such United States officers.  Plaintiffs filed a Motion to Remand.  The issues

---

[2]For convenience, references to "DSM" are intended to embrace DSM and its activities conducted under its prior names as well.  The prior names of the corporation will be used only where the context requires that the distinction be made.

were briefed and argued before Magistrate Judge Stephen Riedlinger of the United States District for the Middle District of Louisiana, who issued a Report on June 14, 2002. Magistrate Judge Riedlinger denied plaintiffs' Motion to Remand, finding that DSM Copolymer had shown it was acting under the direction of an officer of the United States or an agency thereof, that there is a causal connection between DSM's alleged tortious conduct and the asserted official authority, and that DSM had asserted a color able federal defense. However, based on 28 U.S.C. § 1367, Magistrate Riedlinger recommended that the third party demand be severed, and the remaining claims remanded to state court. Plaintiffs, DSM, ExxonMobil, the Dow Chemical Company ("Dow"), and Viacom filed partial objections to the Magistrate Judge's Report ("Report"). DSM, ExxonMobil, Dow, and Viacom objected to the report to the extent it recommended severance and remand of the main demand. These arguments are outlined in Viacom's and Dow's Oppositions to Motion to Vacate, which DSM and ExxonMobil hereby adopt. As of this date, the District Court has not ruled on the recommendations contained in the Report.

On May 21, 2002, the Judicial Panel on Multidistrict Litigation issued a Conditional Transfer Order, transferring this action to the Eastern District of Pennsylvania. Plaintiffs have filed a Motion to Vacate Conditional Transfer Order ("Motion to Vacate"). The basis of plaintiffs' Motion to Vacate is that "the Conditional Transfer Order was invalid, as there is no federal jurisdiction for the rendering of this order. The action was originally filed in State Court, was improperly removed by the third party defendant, DSM Copolymer, Inc., without a basis for federal jurisdiction . . . ."[3]

## II.   ARGUMENT

DSM and ExxonMobil note that plaintiffs' memorandum in support of Motion to Vacate fails to properly address the propriety of the conditional transfer order. Rather, plaintiffs incorrectly focus

---

[3]See plaintiffs' Memorandum in Support of Motion to Vacate, p. 1.

on whether removal was proper and essentially reiterate all of the arguments set forth in their Motion to Remand. The Report found that removal was proper. That issue is not before this Court and is not relevant to the propriety of the transfer.

**A.     Federal Jurisdiction Existed for Issuance of the Conditional Transfer Order by the Judicial Panel on Multidistrict Litigation**

The basis underlying plaintiffs' allegation of lack of federal jurisdiction of the United States District Court, Middle District of Louisiana, is fallacious. The Magistrate Judge found the removal to be proper. He merely recommended that the district court decline to exercise supplemental jurisdiction under 28 U.S.C. Section 1367(c) over the plaintiffs' main demand, and that all such claims be remanded to the state court, with the district court retaining jurisdiction only over the third party demand of Viacom against DSM.[4]   This is not a recommendation that there is no federal jurisdiction. Nevertheless, plaintiffs argue that "there is no federal jurisdiction over the main demand in this matter, and plaintiffs' Motion to Vacate should be granted."[5]

Plaintiffs have wholly misconstrued the Report. First, the Report contains recommendations which are conditional until ruled upon by the district court. Because objections to the Report have been filed by plaintiffs, DSM, ExxonMobil, Dow, and Viacom, the district judge is required to conduct a *de novo* review regarding the objected-to issues. See Rule 72 of the Federal Rules of Civil Procedure.

Second, the lack of federal jurisdiction was **not** the basis for the Magistrate Judge's recommendations. Rather, the Magistrate Judge recommended that the Court decline to exercise jurisdiction under 28 U.S.C. § 1367 (which DSM and ExxonMobil believe to be an erroneous

---

[4] See Magistrate Judge's Report page 8.

[5] See Plaintiffs' Memorandum in Support of Motion to Vacate Conditional Transfer Order, page 4.

recommendation), which presupposes the existence of federal jurisdiction.[6]   Consequently, federal jurisdiction existed at the time of the Conditional Transfer Order and continues to exist today.

### B.   Transfer of this Case Is Appropriate, Given the Purpose Underlying Establishment of the Multidistrict Litigation.

The purpose of Multidistrict Litigation is the coordination and consolidation of pretrial proceedings.  See 28 U.S.C. §1407(a).  Specifically, "transfers **shall** be made by the judicial panel on multidistrict litigation authorized by this Section **upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions**."   28 U.S.C. §1407(a) (emphasis provided).  The statute further provides that "each action so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated: Provided, however, that the panel may separate any claim, cross-claim, counter-claim, or third-party claim and remand any of such claims before the remainder of the action is remanded." *Id.* (emphasis provided).  "The essential purpose of Congress in enacting §1407 was to permit the centralization in one district of all pretrial proceedings internally 'when civil actions involving one or more common questions of facts are pending in different districts'." *New York City Municipal Securities Litigation,* Matter of 572 F.2d 49, 51.  As stated in the Report of the House Judiciary Committee "the objective of the legislation is to provide centralized management under court supervision of pretrial proceedings of Multidistrict Litigation to assure the 'just and efficient conduct' of such actions." *Id.*

---

[6]DSM and ExxonMobil respectfully disagree with the Magistrate Judg's Report on this issue.. Specifically, DSM and ExxonMobil assert that the Magistrate Judge erroneously relied upon 28 U.S.C. §1367 as authority to decline to exercise federal jurisdiction in this case.  The supplemental jurisdiction provided by 28 U.S.C. §1367 is not applicable to cases removed pursuant to 28 U.S.C. §1442, which creates its own unique form of federal jurisdiction and ancillary jurisdiction.   These arguments are set forth more fully in this memorandum and in Viacom's Opposition to Motion to Vacate, which DSM adopts in its entirety.

When one considers the purpose of Congress in enacting the Multidistrict legislation, transfer of this case to the Eastern District of Pennsylvania fits within that purpose. This case, just as Westbrook, Keller and Reno, is properly before this Court.

### C.   Historical Background of the Present Case.

While believing the propriety of removal is not properly before this Court, out of an abundance of caution, DSM and ExxonMobil address the validity of the removal. The issues presented in plaintiffs' Motion to Remand and now, in their Motion to Vacate, involving the very same DSM facility, were considered by Magistrate Dalby in *Verna G. LaLonde, et al. v. Delta Field Erection, et al*, C.A. No. 96-3244-B-M3, United States District Court, Middle District of Louisiana, and in a thorough opinion, she found a sufficient basis for exercising jurisdiction under the federal officer removal statute. A copy of the ruling is attached as an exhibit to this Opposition. The Court in *LaLonde* succinctly summarized the historical perspective that is needed to understand precisely why federal officer removal is appropriate in this case:

> As World War II approached, it became evident that the United States would be cut off from 90% of its natural rubber supply. The development of a synthetic rubber industry became a national military goal of top priority, especially after Pearl Harbor, after which access to the bulk of the country's natural rubber sources in fact were cut off. The situation was rather pressing because prior peacetime commercial attempts to develop a viable synthetic rubber process had failed. The issue was of such import that President Roosevelt took the rather unusual step of asking the Chief Justice of the Supreme Court to lead a wartime commission to investigate rubber production. (The Chief Justice declined because the project would be inconsistent with his function as a judicial officer.) Ultimately, Congress gave the Reconstruction Finance Corporation[7] authority to take the steps necessary to organize a synthetic rubber industry in the shortest possible time, which it accomplished through the Rubber Reserve Company, by pooling patent and research information, building

---

[7] A Corporation created and owned by the United States government to produce synthetic rubber. (Footnote not in original text.)

plants, and signing agreements with contractors to operate those plants under federal supervision.   To say that the success of this effort was crucial to Allied victory in World War II hardly is an exaggeration.  The federal government's active participation in the production of synthetic rubber continued through the Korean War.[8]

The site of what today is DSM's facility was acquired in October and November of 1942 by agents of the United States government as part of the government's efforts described above.  The design and construction of the plant was accomplished under the auspices of the Defense Plant Corporation, an instrumentality of the United States Government created on August 22, 1940 under Section 5(d) of the Reconstruction Finance Corporation Act (Public Law 2, 72nd Congress, 47 Stat. 5) by the Reconstruction Finance Corporation, itself an instrumentality of the United States Government created on January 22, 1932 under the same act.

DSM's facility was originally two distinct plants built by the Defense Plant Corporation:  a butadiene plant known as Plancor 152, and a synthetic rubber plant known as Plancor 876.[9]  Both plants were designed to technical specifications established by the United States Government and were built under the direct supervision of federal officers of the United States.  The original plans and specifications for the plants were prepared by the Government and required the use of asbestos-containing insulation products.[10]  This type of insulation was essential to the operation of DSM's facilities because of the high operating temperatures that were required in the production processes.[11]  After the construction of the facility was completed, the facility was operated by DSM under the

---

[8]Exhibit "B," *LaLonde, supra,* at n. 7, *citing, General Tire & Rubber Co., v. Firestone Tire & Rubber Co.,* 489 F.2d 1105, 1107-08 (6th Cir. 1973); *Reed v. Fina Oil & Chemical Company,* 995 F. Supp. 705, 708-09 (E.D. Tex. 1998); *In re President's Commission on Organized Crime Subpoena of Scarfo,* 783 F.2d 370, 377 (3rd Cir. 1986).

[9]See, Exhibits "C" and "D," respectively.

[10]Exhibit "E."

[11]Exhibit "E."

supervision of the Government.[12]

During the period of government ownership of the facility, the Government controlled production specifications, manufacturing requirements, operating procedures, testing procedures, safety requirements, and safety meetings at the facility.[13] DSM was essentially an employee of the Government exclusively producing government-owned rubber under government direction with government-owned equipment on a government-owned facility.   As recognized by Magistrate Dalby in *LaLonde, supra,* "from 1942 through 1955, DSM operated a government-owned synthetic rubber plant as 'agent for ... and for the account and at the expense and risk of' the Rubber Reserve Corporation," which was "a subsidiary of the Reconstruction Finance Corporation."[14]

During the term of the Operating Agreement, a field representative from the Rubber Reserve Corporation regularly visited the facility.   The extent of the Rubber Reserve Corporation's control over the manner in which DSM operated the plant was succinctly described in *LaLonde*:

> The field representative's responsibilities included overseeing DSM's operations and ensuring that DSM was following government imposed production specifications, government imposed operating procedures, and government imposed laboratory product testing procedures and operations in the manufacturing of synthetic rubber. The United States, through the Rubber Reserve Corporation, controlled what type of rubber was produced at the facility, how much of it was produced, and when each type of rubber was produced. DSM could alter these requirements only with permission from the federal government....

\* \* \*

> The   federal   government   imposed   numerous   safety

---

[12]See copy of the Operating Agreement, Exhibit "f."

[13]See copies of Affidavits of Arley Ray Baker and Martin E. Samuels, attached hereto as Exhibits "G" and "H" respectively. DSM and ExxonMobil will provide the original affidavits, which are in the suit record in *LaLonde,* if this Court deems it necessary.

[14]Exhibit "B," *LaLonde* at p. 4. *See also,* Exhibits "C," "D," and "F."

requirements at the facility, such as the wearing of protective equipment. The United States required that safety meetings be held in each department on a monthly basis, and, in addition, required plant-wide safety meetings to be held on a monthly basis. The government dictated the topics of these meetings.

In summary, DSM operated a federal government-owned facility, exclusively for the government, under the oversight and ultimate control of officers of the federal government.[15]

This relationship continued until 1955 when the Government sold the facility to DSM.[16] However, the sale did not end the period of government control over DSM.

In 1953, the Congress passed the Rubber Producing Facilities Disposal Act of 1953 (Public Law 205, 83rd Congress, 67 Stat. 408), which authorized the sale of government-owned rubber producing facilities to private companies. Because of the importance the production of synthetic rubber played in the national defense, however, Congress required that all acts of sale contain and be expressly contingent upon a National Security Clause. The National Security Clause was designed to obligate plant owners to maintain their operations in conformity with pre-sale operations and specifications and guarantee that they could resume, with only 180 days notice, production of synthetic rubber in accordance with government specifications and at wartime production volumes.[17]

In 1956, President Dwight D. Eisenhower, in Executive Order No. 10678,[18] directed that the Federal Facilities Corporation be the entity charged with the responsibility for administering the contracts of sale executed pursuant to the Rubber Producing Disposal Act. In addition, President Eisenhower gave the Federal Facilities Corporation the authority and duty to oversee and administer

---

[15]Exhibit "B," *LaLonde* at pp. 6-7; See also, Exhibits "F", "G", "H", and a copy of the affidavit of Robert Dennis, attached as Exhibit "I."

[16]See, Exhibits "C" and "D."

[17]See, 50 App. U.S.C.A. §1941e(h).

[18]21 F.R. 7199, as amended by Ex. Ord. No. 10720, July 11, 1957, 22 F.R. 5521.

the National Security Clauses contained in the acts of sale "in accordance with the needs and requirements of the national defense as determined by the Secretary of Defense."[19]

On April 21, 1955, DSM purchased Plancor 152 and Plancor 876 from the Rubber Producing Facilities Disposal Commission, which was the instrumentality of the United States Government created under the Rubber Producing Facilities Disposal Act of 1953 to sell the government-owned rubber plants.  As required by the Act, both acts of sale contained and were expressly conditioned on a "National Security Clause," which, according to the Acts of Sale, "shall be effective for a period of ten years from the date hereof."[20]   The National Security Clause obligated DSM to maintain the facility for a ten (10) year period such that it could, with only 180 days notice, resume production for the Government a specified annual capacity of synthetic rubber in accordance with government specifications.[21]   Additionally, the Government, through the Federal Facilities Corporation, was given the right and duty to conduct periodic inspections of the facility for the purpose of determining whether DSM was operating and maintaining the facility in a manner consistent with the National Security Clauses.  Furthermore, in the event that DSM failed to meet its obligations under the National Security Clauses,  the Government had "the unconditional right to immediate possession and use of the Facility" for the purpose of restoring it to a condition capable of producing the specified annual capacity of rubber.[22]   These National Security Clauses were conditions of the sale from the government and placed a continuing obligation upon DSM to operate and maintain the plants in their pre-sale conditions.

---

[19]*Id.* at §2.

[20]See, Exhibits "C" and "D."

[21]See, Exhibit "C," pp. 12-15 and Exhibit "D," pp. 15-19, and Exhibit "E."

[22]See, Exhibit "C," p. 13, and Exhibit "D," p. 16.

Thus, by virtue of the Rubber Producing Facilities Disposal Act and the National Security Clauses in the acts of sale conveying the plants to DSM, government oversight and control of DSM did not end until April, 1965.

In this case, the plaintiffs allege that Ms. Catania was exposed to asbestos-containing products brought home by her uncles and on her uncles' clothing from various facilities from 1951 to 1969. Pursuant to its third party demand, Viacom alleges that DSM was one of those facilities. Additionally, one of the uncles testified that his work at DSM was in the early 1950's. Because DSM was under government oversight and control for approximately fifteen of the alleged exposure years, DSM asserted, and the Magistrate Judge agreed, that removal of this action is proper under 28 U.S.C. §1442(a).

DSM and ExxonMobil's will next address each of the averments set forth in plaintiffs' Motion to Vacate.

**1.    DSM and ExxonMobil deny that this case was improperly removed without a basis for federal jurisdiction. The remainder of this averment is admitted. This action was properly removed by DSM pursuant to 28 U.S.C. §1442(a)(1).**

DSM has made a sufficient showing of the validity and appropriateness of its removal under 28 U.S.C. § 1442 removal as explained above. An analysis of each of the required elements under Section 1442 are fully discussed in the following sections of this memorandum as well.

**2.    This averment is denied. The district court had no discretion to sever the main demand in a removal brought under 28 U.S.C. §1442.**

DSM and ExxonMobil also adopt and incorporate by reference all arguments set forth by Viacom and Dow in their Oppositions to Motion to Vacate Conditional Transfer Order regarding the propriety of severance of the third party demand, and all issues related thereto.

**3.    This averment is denied. ExxonMobil and DSM made a sufficient showing of federal officer authority.**

This issue is addressed by DSM and ExxonMobil under averment number 5 herein.

**4.    This averment is denied.  DSM met the requirements for removal under 28 U.S.C. §1442(a)(1).**

Under the statutory language and the controlling Supreme Court precedents, a government contractor seeking to remove a civil action under Section 1442(a)(1) must show:

> 1.    that the removing defendant was acting under an officer of the United States or an agency thereof;
>
> 2.    that there was a causal connection between the charged conduct and the asserted official authority; and
>
> 3.    that the removing defendant has a colorable defense under federal law.

*Mesa v. California*, 489 U.S. 121, 125-134, 109 S.Ct. 959, 962-967 (1989); *Willingham v. Morgan*, 395 U.S. 402, 409, 89 S.Ct. 1813, 1817 (1969).

Furthermore, the federal officer removal statute is not to be construed narrowly. *Willingham, supra,* 395 U.S. at 406.  Rather, the statute should be broadly construed to achieve its purpose. *Id.* If the requirements of 1442(a)(1) are met, the right to removal is absolute, not discretionary. *Id.*

**5.    This averment is denied.  DSM was acting under an officer of the United States or an agency thereof.**

It is indisputable that DSM was "acting under an officer of the United States or an agency thereof" for the years that Ms. Catania was allegedly exposed to asbestos-containing products from DSM's facility.  The plaintiffs allege that Ms. Catania was exposed to asbestos-containing products from various facilities from 1951 through 1969.  Viacom alleges that DSM was one of those facilities.  Catania's uncle testified that he worked at DSM in the early 1950's.

From 1951 through 1955, DSM was owned by the United States and operated by DSM under an Operating Agreement.  During this period of time, DSM was acting as "an agent for ... and for

the account and at the expense and risk of" the Rubber Reserve Corporation, which was an instrumentality of the United States government.[23]  All aspects of DSM's operations were under the control and supervision of the Rubber Reserve Corporation, including production specifications, manufacturing schedules, operating procedures, safety procedures, and laboratory product testing.[24] This governmental control through 1955 alone makes the entire action removable.[25]

For the period 1955 through 1965, DSM was acting under the control of the Department of Defense, through the Federal Facilities Corporation, in accordance with the section 7(h) of the Rubber Producing Facilities Disposal Act, Executive order No. 10678, and the National Security Clauses in the acts of sale by which DSM acquired the facility.  During this period of time, DSM was statutorily and contractually obligated to conduct its operations in a manner consistent with prior operating procedures and practices so that it could resume, with only 180 days notice, the production of government-specified synthetic rubber in government-specified production amounts.  Failure to operate the facilities in accordance with these specifications could result in the immediate seizure of the facilities by the government, at DSM's expense.  By inclusion of these clauses, the government assured that it would continue to have control over the plant.  The government satisfied itself that it had that control by inspections.[26]

The National Security Clauses contained in the acts of sale transferring Plancors 152 and 876 to DSM allowed the government to inspect the plants to insure that DSM was meeting its obligations.  Enforcement of the National Security Clause was the responsibility of the Federal

---

[23]Operating Agreement, attached as Exhibit "F," Section 1.

[24]Exhibits "F," "G," "H" and "I."

[25]Exhibit "B," *LaLonde* at p. 4, fn. 4 (citations omitted).

[26]See Exhibit "J."

Facilities Corporation from 1955 through September 1961.[27] From September 1961 through 1965 those duties were assigned to the Utilization and Disposal Service division of the General Services Administration.[28] Records obtained from the National Archives and Records Administration show that these agencies carried out their responsibilities via regular inspections of DSM's facilities.[29]

These documents clearly establish that DSM's facilities were inspected at least nine times from February 1956 through June 1964. The inspection reports show that the inspectors were very interested in the production capacities of the two plants and making sure that these capacities met the requirements of the National Security Clause. Several of the inspection reports also reflect that the government inspectors inquired on a regular basis concerning the safety records at the plants. Those reports also show that the inspectors were concerned that the facilities were being properly maintained. The inspections demonstrate that the federal government assured itself on a regular basis that DSM was complying with the terms of the National Security Clauses.

The affidavit of Robert Dennis clearly provides that keeping the plant ready to produce rubber to governmental standards meant continuing to use the asbestos-containing insulation which the original government plans specified.[30] According to Mr. Dennis, there was no other insulation available during the 1950's and 60's which could accomplish the task of keeping the steam at the temperatures necessary for the production of synthetic rubber. Therefore, by requiring DSM to be ready to produce rubber to government standards and retaining the right to take over possession and use of the facilities if it did not, the federal government maintained control over DSM.

_____

[27]See Exhibit "K," Executive Order No. 10539.

[28]See Pub.L. 87-190, Aug 30, 1961, 75 Stat. 418 and GSA Order No. AIM 5430.23.

[29]See Exhibit "J."

[30]Exhibit "I."

14

The regular inspections of DSM's facilities by the federal government, the consequences set forth in the National Security Clauses, and the technical requirements for producing synthetic rubber during the 1950's and 60's assured that the federal government had control over DSM through the expiration of the National Security Clause in 1965.

In light of the foregoing, it is simply beyond doubt that DSM was "acting under an officer of the United States or an agency thereof." *See, LaLonde, supra; Gurda Farms, Inc. v. Monroe County Legal Assistance Corp.,* 358 F. Supp. 841, 843-45 (S.D.N.Y. 1991) (private attorneys offering assistance to migrant farm workers under a federal program and who were governed by complex regulations, guidelines, and evaluation schemes met the "acting under" prong of federal officer removal").

### 6.    This averment is denied.  DSM has a colorable federal defense.

DSM has asserted the government contractor defense and Defense Production Act.  All that is required to meet this prong is the assertion of a **colorable** federal defense. *Mesa.*  The question is not whether the claimed defense is meritorious, but only whether a colorable claim to such a defense has been made.  Thus, the removing party need not prove that it can sustain the defense, nor is it required to prove its case prior to removal. *Willingham,* 395 U.S. at 406, 89 S. Ct. at 1816. *See also, LaLonde, supra,* at p. 13 (stating: "[t]he federal defense need only be a 'colorable' one, not necessarily one that ultimately will prove meritorious.")

Whether DSM may or may not ultimately prevail on the federal defenses it has raised is irrelevant. *Akin v. Big Three Industries, Inc.*, 851 F. Supp. 819, 823 (E.D. Tx. 1994).  Thus, a detailed analysis of whether a removing defendant has or can meet all of the elements of the defense it raises is inappropriate.  For example, in *Crocker v. Borden, Inc.*, 852 F. Supp. 1322 (E.D. La. 1994), the court held that the defendant presented a colorable claim to a federal defense, despite

plaintiffs' arguments that the defendant could not establish one of the elements of that defense. Also, in *Torres v. CBS News*, 854 F. Supp. 245, 247 (S.D.N.Y. 1994), the court stated that "while plaintiff is correct that the bulk of authority on the issue of immunity in the circumstances alleged in this case would militate against the success of such defense [citations omitted], the defense is a colorable one at this time."

In *LaLonde*, Magistrate Dalby, in a thorough analysis of the government contractor defense under facts indistinguishable from those presented in this case, found that DSM presented a "colorable" issue as to the applicability of the government contractor defense or some variation of it. Although the plaintiffs raise various issues as to whether the defense can prevail, their arguments actually support the exercise of jurisdiction by this Court. As noted by Magistrate Dalby, it is precisely because of the nuances and uncertainties that may arise in the application of the government contractor defense that the exercise of jurisdiction by this Court is warranted. "One of the most important reasons for removal is to have the validity the defense of official immunity tried in a federal court." *LaLonde, supra*, at n. 14, *quoting, Willingham, supra*, 395 U.S. at 407, 89 S.Ct. At 1816.

7.   **This averment is denied. There is without question a unique federal interest justifying removal.**

This issue is addressed under averment number 8 below.

8.   **This averment is denied insofar as plaintiffs' contention that the removing party must show a specific impairment of a federal interest. To the extent that there is any such requirement, it has been met by DSM.**

In *Murray v. Murray*, 621 F.2d 103 (5th Cir. 1980), the Fifth Circuit set forth the policy and rationale underlying federal officer removal. "[F]ederal officers are entitled to, and the interest of national supremacy requires, the protection of a federal forum in those actions commenced in state court that could arrest, restrict, impair, or interfere with the exercise of federal authority by federal

officials." *Murray v. Murray*, 621 F.2d at 106.  *Murray* involved a garnishment action, and the

Court ultimately held that a garnishment action, which does not affect the Unites States' substantive

obligation, is not removable under Section 1442(a)(1).  *Id.* at 107.  In the *LaLonde* decision,

Magistrate Dalby recognized that the Murray panel's holding "specifically reaffirmed that the statute

'permits the removal of those actions commenced in state court that expose a federal official [or

person acting under him] to potential civil liability . . . for an act *performed in the past* under color

of office.'"[31]

Continuing, Magistrate Dalby noted:

> Insofar as frustration of federal interests is an independent concern here, the Court would note that, quite clearly, the imposition of a future liability against a government contractor for past work can as much impair federal interests as would a current liability during the term of an ongoing agreement:

> [T]he extent of a contractor's liability may, undoubtedly will, affect future dealings between the contractor and the government.... Speculative federal interests in the obligations of war contractors are numerous.  War contractors might be expected to increase the price of war materials to correspond to any extension in their potential liability.  Such adjustments might have a significant effect on the federal treasury.  If potential liability increased dramatically, future war contractors might attach conditions to the use of their products, or balk at supplying the military with any products whatsoever.  Thus, the government's military capacities might be affected.

> *In Re "Agent Orange" Product Liability Litigation,* 506 F. Supp. 737, 746-47 & n.5 (E.D.N.Y.), *rev'd on other grounds,* 635 F.2d 987 (2nd Cir. 1980), *quoted* in *Bynum v. FMC Corp.,* 770 F.2d 556, 570 n.18 (5th Cir. 1985).

> That the synthetic rubber produced at DSM Copolymer in the late 1940s and early 1950s has long since made its way to its appointed tasks on distant shores, for wars that now recede into the history of a waning century, is of no moment here.  What maters here is the continuing ability of the federal government to be able to

---

[31]See *LaLonde*, Exhibit "B," p. 20.

respond in times of national need, and to be able to bring the resources of private industry to bear in such times. Removal by this wartime supplier of this strategic and critical material, on the basis of a federal contractor defense, therefore, is clearly consonant with the policies underlying the federal officer removal statute.[32]

9.   **This averment is denied. DSM has presented colorable defenses: the government contractor's defense and the Defense Production Act[33] of 1950, 50 U.S.C. §2061 *et seq.*, or some variation.**

DSM has presented ample facts which demonstrate that either the government contractor's defense, the Defense Production Act, or some variation of these two defenses may apply in light of the unique relationship that existed between DSM and the Government from 1942 through 1965. [34] A federal court, not a state court, should decide the proper application of these defenses to this case.

10.   **This averment is denied. There is clearly a causal connection between its alleged tortious conduct and the asserted official authority.**

There is a causal connection between the charged conduct and the asserted official authority. The "causal connection" requirement does **not** require that the alleged wrongful act or omission itself was specifically directed or compelled by federal duty or law. "Rather, the controlling decisions require only a showing that the defendant committed the alleged act or omission while performing its federal duties." *LaLonde*, at p. 10; *see also, Willingham, supra.*

It is alleged that DSM was negligent because it "fail[ed] to provide a safe place in which to work free from the dangers of asbestos" and that DSM failed to "warn plaintiff's uncle of such danger."[35]   The affidavit of Robert Dennis establishes that the use of asbestos-containing insulation

---

[32]Exhibit "B," *LaLonde, supra,* at pp. 20-21 (citations in original text).

[33]Plaintiffs designate this as the "Defense Protection Act."

[34]See discussion herein, *supra.*

[35]Viacom's Incidental Demand, paras. 22-24.

products was essential to the operation of DSM's facilities and that the government's original plans and specifications for the design and construction of the facility required the use of asbestos-containing insulation. The affidavits of Arley Baker and Martin Samuels establish that, through 1955, absolutely all aspects of DSM's operations were controlled by the United States government, including safety issues. The affidavit of Robert Dennis and the Acts of Sale containing the "National Security Clauses" establish that from 1956 through 1965, DSM was obligated to continue to operate the plant in a manner consistent with its operation when the government owned the facility. Thus, the claims against DSM arise out of the operation and maintenance of a facility that was owned by the government and operated exclusively on behalf of and under the direction of the government.

11.     **The averment set forth in paragraph 11 is denied.  Viacom's third party demand was properly filed.**

DSM and ExxonMobil adopt and incorporate by reference herein the arguments set forth by Viacom and Dow in their Oppositions to Motion to Vacate on this issue.

### III.    CONCLUSION

For the reasons set forth herein, DSM and ExxonMobil respectfully request that plaintiffs' Motion to Vacate Conditional Transfer Order by denied.

Respectfully submitted:

Gary A. Bezet (#3056)
Robert E. Dille (#23037)
Gregory M. Anding (#23622)
Scott D. Johnson (#24732)
Carol L. Galloway (#16930)
KEAN, MILLER, HAWTHORNE, D'ARMOND,
McCOWAN & JARMAN, L.L.P.
One American Place, 22nd Floor (70825)
P. O. Box 3513
Baton Rouge, LA  70821-3513

Telephone: (225) 387-0999
Facsimile: (225) 388-9133

**Attorneys for ExxonMobil Corporation and DSM
Copolymer, Inc.**

## PROOF OF SERVICE

JUL 1 0 2002

FILED

I certify that a copy of the foregoing pleading has been served upon all represented parties

by mailing a copy to their counsel of record at their last known address as listed below.  No

unrepresented parties are involved in this matter.  This _____ day of July, 2002.

_____
Carol L. Galloway

Gerolyn P. Roussel
ROUSSEL & ROUSSEL
LaPlace, LA 70068
1-985-651-6591
Counsel for Plaintiffs, Barbara Catania and Michael Catania

Leon Gary, Jr.
William L. Schuette
Olivia S. Tomlinson
JONES, WALKER, WAECHTER, POITEVENT, CARRERE & DENEGRE
8555 United Plaza Boulevard
Four United Plaza, Fifth Floor
Baton Rouge, LA 70809-7000
1-225-248-2000
Counsel for Viacom, Inc., successor in interest to CBS Corporation formerly known as Westinghouse Electric Corporation

David A. Barfield
Kay Barnes Baxter
BARFIELD & ASSOCIATES
400 Poydras Street, Suite 1460
New Orleans, LA 70130
1-504-568-1562
Counsel for AcandS, Inc.

Troy N. Bell
AULTMAN, TYNER McNEESE RUFFIN & LAIRD
The Texaco Center
400 Poydras Street, Suite 1900
New Orleans, LA 70130
1-504-528-9616
Counsel for General Electric Company

David M. Bienview, Jr.
TAYLOR, PORTER, BROOKS & PHILLIPS

644156_1

451 Florida
Bank One Centre, 8th Floor
Baton Rouge, LA 70801
1-225-387-3221
Counsel for The Dow Chemical Company

Cory Cahn
SLATER LAW FIRM
650 Poydras Street, Suite 2600
New Orleans, LA 70130
1-504-523-7333
Counsel for General Electric Company

Larry G. Canada
GALLOWAY, JOHNSON, TOMPKINS & BURR
One Shell Square, Suite 4040
New Orleans, LA 70139
1-504-525-6802
Counsel for Combustion

Ashley Carter
John Childers
LYNN LUKER & ASSOCIATES
616 Girod Street, Suite 200
New Orleans, La 70130
1-504-525-5000
Counsel for Foster Wheeler, L.L.C.

Lawrence G. Pugh, III
Edward McGowan
Tonya S. Johnson
MONTGOMERY, BARNETT, BROWN, READ, HAMMOND & MINTZ
3200 Energy Centre
1100 Poydras Street
New Orleans, LA 70163
1-504-585-3200
Counsel for Eagle, Inc.

Robert A. Knight
BERNARD, CASSISA, ELLIOT & DAVIS
1615 Metairie Road
P.O. Box 55490
Metairie, LA 70055
1-504-834-2612
Counsel for Reilly-Benton Company, Inc.

Susan B. Kohn

644156_1

SIMON, PERAGINE, SMITH & REDFEARN
1100 Poydras Street, 30th Floor
Energy Center
New Orleans, LA 70163
1-504-569-2030
Counsel for McCarty Corporation

Julie D. Robles
C. Kelly Lightfoot
Valerie Schexnayder
Serena C. Vaughan
HAILEY, McNAMARA, HALL, MARMANN AND PAPALE
One Garreria Boulevard
Suite 1400
P.O. Box 8288
Metairie, LA  70011
1-504-836-6500
Counsel for Flintkote Company, Anco Insulations, Inc. and Taylor-Seidenbach, Inc.

James F. d'Entremont
Kevin J. Webb
DEUTSCH, KERRIGAN & STILES
755 Magazine Street
New Orleans, LA 70130
1-504-581-5141
Counsel for AM Chem Products or Benjamin Foster, a Division of AM Chem and Babcock Borsig
Power, Inc. f/k/a, D B Reilly, Inc.

David E. Redmann
Lemle & Kelleher
21st Floor
601 Poydras Street
New Orleans, LA 70130-6097
1-504-586-1241
Counsel for Kaiser Aluminum Company, Monsanto Company

W. Scott Brown
FOREMAN, PERRY WATKINS, KRUTZ & TARDY
1515 Poydras Street, Suite 1420
New Orleans, LA 70112
1-504-799-4383
Counsel for Uni-Royal, Inc. and Owens Illinois, Inc.

644156_1

BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUL 1 0 2002

FILED
CLERK'S OFFICE

MDL DOCKET NO. 875

IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)

(FILED IN LAM 3 02-368)

originating from

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| BARBARA CATANIA, ET AL | CIVIL ACTION |
| NUMBER: 02-368 | |
| VERSUS | |
| | SECTION D |
| AcandS, INC., ET AL. | MAGISTRATE 1 |

## NOTICE OF JOINDER PURSUANT TO MDL RULE 7.2(c) AND (g)

**NOW INTO COURT**, through undersigned counsel, come DSM Copolymer, Inc. ("DSM") and ExxonMobil Corporation ("ExxonMobil") and respectfully aver that presently pending before this Honorable Court is a Conditional Transfer Order, along with the Report and Recommendations of the Honorable Stephen Riedlinger, United States Magistrate for the Middle District of Louisiana pertaining to a Motion to Remand. Plaintiffs herein, Barbara Catania and Michael Catania, opposed the Conditional Transfer Order and moved to remand. Further, plaintiffs have partially opposed the Magistrate's Report and Recommendations. In addition thereto, various defendants and third party defendant, including ExxonMobil and DSM, filed Oppositions to the Motion to Remand, as well as to the Magistrate's Report and Recommendations.

644156_1

2002 JUL 10  A 10: 41

CLERK'S OFFICE
RECEIVED

Pursuant to MDL Rule 7.2(c) and (g), DSM and ExxonMobil notify this Honorable Court that they take the following positions with regard to the pending Motions:

1. This matter was properly removed to Federal Court.

2. This matter should be transferred to the Judicial Panel on Multidistrict Litigation.

3. This matter should not be remanded to state court in whole or in part.

4. That plaintiffs' Motion to Vacate the Conditional Transfer Order should be denied for the reasons set forth in the opposition memoranda filed by DSM Copolymer, Inc. and ExxonMobil Corporation and other defendants.

5. That plaintiffs' Motion to Remand should be denied for the reasons set forth in the opposition memoranda filed by DSM Copolymer, Inc. and ExxonMobil Corporation and other defendants.

DSM and ExxonMobil hereby adopt and join in the positions as set forth by Viacom, Inc., the Dow Chemical Company and oppose those Motions and dispute the positions as set forth by plaintiffs for the reasons as set forth by the referenced parties as well as for the reasons provided in ExxonMobil's and DSM's Opposition to Motion to Transfer.

Respectfully submitted;

Gary A. Bezet (#3036)
Robert E. Dille (#23037)
Gregory M. Anding (#23622)
Scott D. Johnson (#24732)
Carol L. Galloway (#16930)
KEAN, MILLER, HAWTHORNE, D'ARMOND, McCOWAN & JARMAN, L.L.P.
One American Place, 22nd Floor (70825)
P. O. Box 3513
Baton Rouge, LA 70821-3513
Telephone: (225) 387-0999
Facsimile: (225) 388-9133

*Attorneys for ExxonMobil Corporation and DSM Copolymer, Inc.*

644156_1

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**PROOF OF SERVICE**

JUL 1 0 2002

FILED
CLERK'S OFFICE

I certify that a copy of the foregoing pleading has been served upon all represented parties

by mailing a copy to their counsel of record at their last known address as listed below.  No

unrepresented parties are involved in this matter.  This _____ day of July, 2002.

_____
Carol L. Galloway

Gerolyn P. Roussel
ROUSSEL & ROUSSEL
LaPlace, LA 70068
1-985-651-6591
Counsel for Plaintiffs, Barbara Catania and Michael Catania

Leon Gary, Jr.
William L. Schuette
Olivia S. Tomlinson
JONES, WALKER, WAECHTER, POITEVENT, CARRERE & DENEGRE
8555 United Plaza Boulevard
Four United Plaza, Fifth Floor
Baton Rouge, LA 70809-7000
1-225-248-2000
Counsel for Viacom, Inc., successor in interest to CBS Corporation formerly known as
Westinghouse Electric Corporation

David A. Barfield
Kay Barnes Baxter
BARFIELD & ASSOCIATES
400 Poydras Street, Suite 1460
New Orleans, LA 70130
1-504-568-1562
Counsel for AcandS, Inc.

Troy N. Bell
AULTMAN, TYNER McNEESE RUFFIN & LAIRD
The Texaco Center
400 Poydras Street, Suite 1900
New Orleans, LA  70130
1-504-528-9616
Counsel for General Electric Company



David M. Bienview, Jr.
TAYLOR, PORTER, BROOKS & PHILLIPS

644156_1

451 Florida
Bank One Centre, 8th Floor
Baton Rouge, LA 70801
1-225-387-3221
Counsel for The Dow Chemical Company

Cory Cahn
SLATER LAW FIRM
650 Poydras Street, Suite 2600
New Orleans, LA 70130
1-504-523-7333
Counsel for General Electric Company

Larry G. Canada
GALLOWAY, JOHNSON, TOMPKINS & BURR
One Shell Square, Suite 4040
New Orleans, LA 70139
1-504-525-6802
Counsel for Combustion

Ashley Carter
John Childers
LYNN LUKER & ASSOCIATES
616 Girod Street, Suite 200
New Orleans, La 70130
1-504-525-5000
Counsel for Foster Wheeler, L.L.C.

Lawrence G. Pugh, III
Edward McGowan
Tonya S. Johnson
MONTGOMERY, BARNETT, BROWN, READ, HAMMOND & MINTZ
3200 Energy Centre
1100 Poydras Street
New Orleans, LA 70163
1-504-585-3200
Counsel for Eagle, Inc.

Robert A. Knight
BERNARD, CASSISA, ELLIOT & DAVIS
1615 Metairie Road
P.O. Box 55490
Metairie, LA 70055
1-504-834-2612
Counsel for Reilly-Benton Company, Inc.

Susan B. Kohn

644156_1

SIMON, PERAGINE, SMITH & REDFEARN
1100 Poydras Street, 30th Floor
Energy Center
New Orleans, LA 70163
1-504-569-2030
Counsel for McCarty Corporation

Julie D. Robles
C. Kelly Lightfoot
Valerie Schexnayder
Serena C. Vaughan
HAILEY, McNAMARA, HALL, MARMANN AND PAPALE
One Garreria Boulevard
Suite 1400
P.O. Box 8288
Metairie, LA 70011
1-504-836-6500
Counsel for Flintkote Company, Anco Insulations, Inc. and Taylor-Seidenbach, Inc.

James F. d'Entremont
Kevin J. Webb
DEUTSCH, KERRIGAN & STILES
755 Magazine Street
New Orleans, LA 70130
1-504-581-5141
Counsel for AM Chem Products or Benjamin Foster, a Division of AM Chem and Babcock Borsig
Power, Inc. f/k/a, D B Reilly, Inc.

David E. Redmann
Lemle & Kelleher
21st Floor
601 Poydras Street
New Orleans, LA 70130-6097
1-504-586-1241
Counsel for Kaiser Aluminum Company, Monsanto Company

W. Scott Brown
FOREMAN, PERRY WATKINS, KRUTZ & TARDY
1515 Poydras Street, Suite 1420
New Orleans, LA 70112
1-504-799-4383
Counsel for Uni-Royal, Inc. and Owens Illinois, Inc.

644156_1

06/14/02

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

BARBARA CATANIA, ET AL

VERSUS

AcandS, INC., ET AL

CIVIL ACTION

NUMBER 02-368-D-1

### NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the U. S. District Court.

In accordance with 28 U.S.C. §636(b)(1), you have ten days after being served with the attached report to file written objections to the proposed findings of fact, conclusions of law, and recommendations set forth therein. Failure to file written objections to the proposed findings, conclusions and recommendations within ten days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

Baton Rouge, Louisiana, June 14, 2002.

STEPHEN C. RIEDLINGER
UNITED STATES MAGISTRATE JUDGE

DKT. & ENTERED
DATE 6/14/02
NOTICE MAILED TO:
DATE_____ BY PS

Cral 16



| INITIALS | DOCKET# |
|----------|---------|
| PS | 33 |

FILED
U.S. DIST. COURT
MIDDLE DIST. OF LA.

02 JUN 14 PH 4: 01

SIGN_____
by DEPUTY CLERK

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

BARBARA CATANIA, ET AL

VERSUS

ACandS, INC., ET AL

CIVIL ACTION

NUMBER 02-368-D-1

### MAGISTRATE JUDGE'S REPORT

This matter is before the court on the motion of plaintiffs Barbara Catania and Michael Catania to remand. Record document number 11. The motion is opposed.

Plaintiffs filed suit in state court against numerous defendants contending that Barbara Catania contracted mesothelioma from exposure to asbestos when she was a child. Plaintiffs do not allege that Barbara Catania used any products containing asbestos or that she was present at any work site where asbestos-containing products were used. Plaintiffs claim that she was exposed to asbestos carried on the work clothes of her uncles. Defendant Viacom, Inc. learned that two of her uncles, Peter Giordano and Victor Reno, applied asbestos-containing insulation products at a facility owned by DSM Copolymer, Inc. Viacom then filed a third party demand naming DSM Copolymer as a third party defendant.[1] DSM Copolymer then removed the case to this court relying upon 28 U.S.C. §1442. Plaintiffs moved to remand.

---

[1] Record document number 12, memorandum in support, Exhibit 4.

The foregoing procedural history of this case understates the scope of the arguments made by the plaintiffs in support of their motion to remand.  Notwithstanding the breadth of the plaintiffs' procedural arguments, the issues before the court are quite straightforward: (1) did DSM Copolymer properly remove the case from state court, and (2) whether the third party demand should be severed and the remainder of the case remanded to state court.  Other issues raised by the motion to remand should be addressed only if the court determines that the case was properly removed and decides not to remand the main demand.

There is no dispute that Viacom filed a third party demand against DSM Copolymer and that DSM Copolymer timely removed the case to this court.  DSM Copolymer based the removal on 28 U.S.C. §1442(a)(1), asserting subject matter jurisdiction under 28 U.S.C. §1331.  DSM Copolymer asserted in its notice of removal that Viacom's third party demand arises out of Barbara Catania's exposure to asbestos fibers which came from asbestos-containing products at DSM Copolymer's facility.  The alleged exposure occurred during periods when the facility was owned by the United States Government but operated by DSM Copolymer under the authority and direction of federal officers acting in their official capacities to direct the construction and operation of the plant, as well as during periods of ownership by DSM Copolymer but under continuing governmental control.  DSM Copolymer relied upon, and

2

attached to its notice of removal, the ruling denying the motion to remand filed by the plaintiffs in <u>Vera G. LaLonde, et al v. Delta Field Erection, et al</u>, CV 96-3244-B-3 (M.D. La. 1998).[2]  Although <u>LaLonde</u> involved alleged inhalation of silica dust, the ruling thoroughly analyzed the application of section 1442(a)(1) to the same DSM Copolymer facility.

As explained in the <u>LaLonde</u> ruling, the party removing a case relying on section 1442(a) must show:  (1) that the removing defendant was acting under an officer of the United States or an agency thereof; (2) that there was a causal connection between the charged conduct and the asserted official authority; and (3) that the removing defendant has a colorable defense under federal law. <u>Mesa v. California</u>, 489 U.S. 121, 125-34, 109 S.Ct. 959, 962-67 (1989); <u>Willingham v. Morgan</u>, 395 U.S. 402, 409, 89 S.Ct. 1813, 1817 (1969).

DSM Copolymer has made the showing required by section 1442(a)(1).  The history of the DSM Copolymer facility was thoroughly set forth in the <u>LaLonde</u> decision and was repeated in DSM Copolymer's opposition memorandum.[3]  No useful purpose would be served by restating that history.  Plaintiffs' argument that DSM Copolymer has not shown it was acting under the direction of an

---

[2] Record document number 18, opposition memorandum, pp. 4-23, and Exhibit H.

[3] <u>Id.</u>, Exhibits A-G.

3

officer of the United States or an agency thereof is factually unsupported and unpersuasive.

DSM Copolymer has also satisfactorily demonstrated that there is a causal connection between its alleged tortious conduct and the asserted official authority.   The third party claim against DSM Copolymer is based on the allegation that it failed to provide a safe work place free from the dangers of asbestos exposure and failure to warn of such dangers.   The affidavit of Robert R. Dennis, Jr. establishes that the use of asbestos-containing insulation products was essential to the operation of DSM Copolymer's facility and that the original plans and specifications for the design and construction of the facility required the use of asbestos-containing insulation.[4]

DSM Copolymer has asserted a colorable federal defense.   In determining whether the case was properly removed, the court should not decide whether DSM Copolymer will ultimately prevail on that defense.   Crocker v. Borden, Inc., 852 F.Supp. 1322, 1326-27 (E.D. La. 1994); Aikin v. Big Three Industries, Inc., 851 F.Supp. 819, 823 (E.D. Tex. 1994).   Additionally, one of the most important reasons for removal under section 1442 is to have the validity of the defense determined by a federal court.   LaLonde, supra, at n.

---

[4] Record document number 18, opposition memorandum, Exhibit F. See also, affidavits of Arley Ray Barker and Martin E. Samuels, explaining that through 1955 all aspects of the operation of the facility, including safety issues, were controlled by the United States.   Id., Exhibits D and E.

14, quoting, Willingham, 395 U.S. at 407, 89 S.Ct. at 1816.  DSM Copolymer has pled defenses based on its status as a government contractor and under the Defense Protection Act of 1950.  These same two defenses were asserted by DSM Copolymer in the LaLonde case.[5]  Plaintiffs' arguments in support of their position that the government contractor defense does not apply in this case are addressed to the merits of the defense, not whether the defense is at least colorable.  Relying on the LaLonde ruling, DSM Copolymer has shown that it has asserted at least a colorable defense under federal law.

As an alternative to remanding the entire case, the plaintiffs urged the court to exercise its discretionary authority under 28 U.S.C. §1367 by severing the third party demand against DSM Copolymer and remanding the remainder of the case.[6]

Under section 1367(c), this court may decline to exercise supplemental jurisdiction if:

_____

[5] In LaLonde, the plaintiffs' claims were based on alleged exposure to silica dust, whereas in this case the plaintiff alleged exposure to asbestos.  The distinction is not dispositive because in LaLonde the court relied, in part, on cases involving asbestos exposure.  Record document number 18, opposition memorandum, Exhibit H, pp. 13-18.  Because the claims in LaLonde against DSM Copolymer were dismissed on other grounds, this court did not decide whether the Defense Protection Act or the government contractor defense was applicable.  LaLonde, record document number 189, Order and Reasons.

[6] There is no dispute that there is no independent basis for exercising original jurisdiction over the main demand.  As to the main demand, this court may exercise only supplemental jurisdiction under section 1367(a).

5

(1) the claim raises a novel or complex issue of state law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

Plaintiffs relied on Crocker v. Borden, Inc., 852 F.Supp. 1322, 1329-30 (E.D. La. 1994), to support their alternative position. As in Crocker, the plaintiffs' claims are exclusively based on state law, and if the main demand is not remanded the plaintiffs face the potential of transfer to multi-district litigation.

DSM Copolymer argued that its liability for alleged exposure to asbestos will be an issue in the main demand even though it was not sued directly by the plaintiffs. Consequently, DSM Copolymer would be involved in discovery in both federal and state court if the main demand is severed and remanded. Ultimately, DSM Copolymer's employee and non-employee witnesses would be subject to testifying in two trials on the same issue arising out of the same occurrence. Finally, DSM Copolymer maintained that it is entitled to a federal forum for the determination of its federal defenses.

As noted previously, section 1367(c) permits this court to decline to exercise supplemental jurisdiction in exceptional circumstances when there are other compelling reasons for declining jurisdiction. In arguing strenuously for a remand, the plaintiffs

6

repeatedly note that the state court judge in Orleans Parish, invoking Louisiana Code of Civil Procedure Article 1573, assigned this case for trial on an expedited basis.  Under that procedural rule, the state trial court is required to grant a plaintiff who is not expected to live for more than six months preferential treatment when assigning the case for trial.  Based on that procedural rule, the case was assigned for trial on June 10, 2002.[7] There is no comparable Federal Rule of Civil Procedure.  Although under Rule 16, Federal Rules of Civil Procedure, the court may fix the dates for the final pretrial conference and the trial early in the litigation, Rule 16 does not require preferential treatment for any party.

Considerations of judicial economy, convenience and fairness to the litigants support granting the plaintiffs' request to sever the third party demand against DSM Copolymer and remand the main demand to state court.  Plaintiffs have asserted no claim against DSM Copolymer.  Whether the third party demand against it is litigated in this court or in state court, DSM Copolymer and its employees will be involved in discovery.  Although DSM Copolymer complains that its employee and non-employee witnesses will be involved in two trials, this is not necessarily so.  It would appear that if either of the defenses relied upon by DSM Copolymer to support removal is successful--a decision which would be made in federal court--it would no longer be involved in the state court

---

[7] Record document number 12, memorandum in support, Exhibit 1.

case.  To the extent DSM Copolymer remains involved in litigating the third party demand in this court and the main demand in state court, discovery could be coordinated in a manner which would reduce duplication of effort and thereby reduce its expenses. Lastly, the absence of a federal procedural rule which gives the plaintiffs an opportunity to obtain an expedited trial while plaintiff Barbara Catania is still alive constitutes an exceptional circumstance and a compelling reason for this court to decline to exercise supplemental jurisdiction over the main demand.

### RECOMMENDATION

It is the recommendation of the magistrate judge that the motion of plaintiffs Barbara Catania and Michael Catania to remand be denied, insofar as the plaintiffs sought remand of the entire case.   It is the further recommendation of the magistrate judge that this court decline to exercise supplemental jurisdiction under 28 U.S.C. §1367(c) over the plaintiffs' main demand, and any other counterclaims or cross claims between or among the plaintiffs and the defendants, and all such claims be remanded to the state court, this court retaining jurisdiction only over the third party demand of Viacom, Inc. against DSM Copolymer, Inc.

Baton Rouge, Louisiana, June 14, 2002.


STEPHEN C. RIEDLINGER
UNITED STATES MAGISTRATE JUDGE


8

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

VERA G. LALONDE, ET AL.

VERSUS

DELTA FIELD ERECTION, ET AL.

CIVIL ACTION

NO. 96-3244-B-M3

## RULING

This removed silicosis wrongful death action comes before the Court on plaintiff's motion to remand (rec.doc.no. 43), which has been referred to the undersigned for decision (rec.doc.no. 124). The sole issue remaining before the Court on the motion to remand is whether removal of the case by defendant DSM Copolymer ("DSM") was proper as a "federal officer removal" under 28 U.S.C. § 1442(a)(1):

Section 1442(a)(1) provides in pertinent part for the removal of any action against the "United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office." 28 U.S.C. § 1442(a)(1). In their state court petition, plaintiffs allege that between 1947 and 1976, the decedent John D. Lalonde performed sandblasting work for various employers at various locations owned or operated by various premises owners, including DSM. Plaintiffs allege that DSM and the other

---

<sup></sup>Although fraudulent joinder initially was urged as an alternative basis for removal by other removing defendants, it since has been established beyond question that diversity jurisdiction is not present in this case because DSM, which is an indisputably non-fraudulently joined defendant, has its principal place of business in Baton Rouge, Louisiana. *See* rec.doc.nos. 95 & 96. Defendant DSM also initially relied, in addition, upon 28 U.S.C. § 1442(a)(2). DSM apparently has abandoned any such reliance, however, as DSM has not raised any argument in opposition to plaintiff's motion to remand under subparagraph (a)(2), instead arguing exclusively under subparagraph (a)(1). In that the removing party bears the burden of establishing proper removal, the Court will treat DSM's lack of briefing and proof with regard to subparagraph (a)(2) as an abandonment of that claimed basis for removal.

DKT. & ENTERED

DATE_____
NOTICE MAILED TO:
DATE 8/6/95 BY ____

Counsel (25)
DLD
JS




premises owner defendants failed to provide Mr. Lalonde with proper supervision, instruction, and warnings concerning hazards associated with sandblasting, and failed to provide adequate equipment and take other adequate safeguards to guard against the risks associated with inhalation of silica dust. In its notice of removal, DSM alleged, *inter alia*, that DSM properly removed the action under Section 1442(a)(1) as a person acting under the authority of a federal officer because part of the alleged silica exposure occurred at a government-owned synthetic rubber plant operated by DSM for and under the direction and control of an instrumentality of the federal government from 1943 through 1955. DSM further alleged that by virtue of the terms of the agreement whereby DSM purchased the plant from the federal government in 1955, federal authority and control continued for an additional ten years, that is, until 1965.

The Court will begin the jurisdictional analysis in this case at the point where all questions of federal lower court jurisdiction necessarily begin -- with the language used by Congress in the statutory jurisdictional grant. *Cf. Marathon Oil Co. v. Ruhrgas*, ___ F.3d ___, 1998 WL 329842, slip op. at *2 (June 22, 1998)( federal courts other than the Supreme Court derive their jurisdiction wholly from the authority of Congress).[2] On its face, Section 1442(a)(1) requires two showings for removal in the context presented here. First, the removing defendant must be a "person acting under [any] officer ... of the United States or of any agency thereof." And, second, the removing defendant must be "sued ... for [an] act under color of such office."

_____

[2]The Court begins with the statutory language of Section 1442(a)(1) in large part because of the many varied jurisprudential statements of the elements required for removal and of the showing required to satisfy each element. Rather than extensively contrasting and harmonizing other lower federal court cases, the court's approach in this ruling is to draw the required elements, and their meaning, directly from the relevant statutory language and Supreme Court precedent.

The Supreme Court, in turn, has construed the second, "color of office" statutory element as requiring two showings. First, the high court has "interpreted the 'color of office' test to require a showing of a 'causal connection' between the charged conduct and asserted official authority." *Willingham v. Morgan*, 395 U.S. 402, 409, 89 S.Ct. 1813, 1817, 23 L.Ed.2d 396 (1969). And second, the Supreme Court has interpreted the "color of office" element as requiring that the removing defendant, in addition, raise a colorable federal defense. *E.g., Mesa v. California*, 489 U.S. 121, 125-34, 109 S.Ct. 959, 962-67, 103 L.Ed.2d 99 (1989).[3]

Accordingly, under the statutory language and the controlling Supreme Court precedents, a government contractor seeking to remove a civil action under Section 1442(a)(1) must show:

1)   that the removing defendant was acting under an officer of the United States or of an agency thereof;

2)   that there was a causal connection between the charged conduct and the asserted official authority; and

3)   that the removing defendant has a colorable defense under federal law.

28 U.S.C. § 1442(a)(1); *Willingham, supra; Mesa, supra.*

---

[3]If Section 1442(a)(1) were interpreted to permit removal of any suit arising from the performance of federal duties (*e.g.*, a simple vehicular accident) without the requirement of a colorable federal defense, then a question would arise as to whether Congress had exceeded the maximum possible grant of federal question jurisdiction permitted by the constitution. *See Mesa*, 489 U.S. at 134-39, 109 S.Ct. at 967-70.

Federal officer removal under Section 1442(a)(1) is to be distinguished from removal of federal question cases under 28 U.S.C. 1441, where removal generally cannot be predicated on the presence of a federal defense.

*"Acting Under"*

Neither the Supreme Court nor the Fifth Circuit have established what is required to show that a government contractor is "acting under" an officer of the United States or of an agency thereof.  Cases from other federal district courts, which of course are not binding on this court, vary in their approach to what is required under this element.

The following specific facts bear on DSM's claim that it was acting under an officer of the United States or an agency thereof.  Under an Operating Agreement in force from 1942 through1955,[4]  DSM[5] operated a government-owned synthetic rubber plant as "agent for ... and for the account and at the expense and risk of" the Rubber Reserve Corporation. The Rubber Reserve Corporation was a subsidiary of the Reconstruction Finance Corporation, which was created as an instrumentality of the United States government.[6] The Operating Agreement reflects that the Reconstruction Finance Corporation was authorized under federal law to create a corporation to produce, *inter alia*, strategic and critical materials as defined by the President, that the President had designated synthetic rubber as a strategic and critical material under the law, that the production of this material and expansion of capacity was important to the interests of the federal government and its national defense program, and that the Reconstruction Finance Corporation had created

---

[4]The period in question raised by the plaintiffs' petition spans from 1947 through 1976.  If a particular claim is removable under Section 1442(a)(1), then the entire action becomes removable. *See Spencer v. New Orleans Levee Board*, 737 F.2d 435, 438 (5th Cir. 1984); *Arango v. Guzman Travel Advisors Corp.*, 621 F.2d 1371, 1376 (5th Cir. 1980); *Fowler v. Southern Bell Telephone & Telegraph Co.*, 343 F.2d 150, 152 (5th Cir. 1965).  If the federal issues later drop from the case, the district court has the discretion to decline to exercise continued discretion over the nonfederal elements of the case.  *Spencer*, 737 F.2d 438; *Ewell v. Petro Processors of Louisiana, Inc.*, 655 F.Supp. 933, 936-37 (M.D. La. 1987)..

[5]Or, actually, its predecessor-in-interest, which will be referred to as "DSM" for ease of reference.

[6]*Operating Agreement*, Section 1 (rec.doc.no. 119, exhibit "A"); *Baker Affidavit*, para. 2 (rec.doc.no. 65, exhibit "C").

-4-

and empowered the Rubber Reserve Corporation to produce synthetic rubber and related materials.[7]

Under Section 27 of the agreement, DSM specifically agreed that it would not engage in any business other than the manufacture of synthetic rubber for the Rubber Reserve Corporation under the Operating Agreement. Under Section 21 of the agreement, DSM could not assign its obligations under the contract; but the Rubber Reserve Corporation could assign its interests "to any other branch of the Government," which then would acquire all of the Rubber Reserve Corporation's rights under the agreement. Under Section 7 of the agreement, the Rubber Reserve Corporation supplied DSM with all of the butadiene and styrene needed for producing the synthetic rubber, and the title to any additional raw materials purchased by DSM vested directly in the Rubber Reserve

---

[7] *Operating Agreement*, preamble (rec.doc.no. 113, exhibit "A"). As a side note, the Court would observe that prior reported decisions reflect that the background for this case comes directly from the pages of history. As World War II approached, it became evident that the United States would be cut off from 90% of its natural rubber supply. The development of a synthetic rubber industry became a national military goal of top priority, especially after Pearl Harbor, after which access to the bulk of the country's natural rubber sources in fact were cutoff. The situation was rather pressing because prior peacetime commercial attempts to develop a viable synthetic rubber process had failed. The issue was of such import that President Roosevelt took the rather unusual step of asking the Chief Justice of the Supreme Court to lead a wartime commission to investigate rubber production. (The Chief Justice declined because the project would be inconsistent with his function as a judicial officer.) Ultimately, Congress gave the Reconstruction Finance Corporation authority to take the steps necessary to organize a synthetic rubber industry in the shortest possible time, which it accomplished through the Rubber Reserve Company, by pooling patent and research information, building plants, and signing agreements with contractors to operate those plants under federal supervision. To say that the success of this effort was crucial to Allied victory in World War II hardly is an exaggeration. The federal government's active participation in the production of synthetic rubber continued through the Korean War. *See generally General Tire & Rubber Co. v. Firestone Tire & Rubber Co.*, 489 F.2d 1105, 1107-08 (6th Cir. 1973); *Reed v. Fina Oil & Chemical Company*, 995 F.Supp. 705, 708-09 (E.D. Tex. 1998); *In re President's Commission on Organized Crime Subpoena of Scarfo*, 783 F.2d 370, 377 (3rd Cir. 1986). The Court points to this historical information merely by way of background, as the operating agreement contains the essential legal details (bare and unadorned as they may be) that are necessary for decision here and neither counsel supplied the historic backdrop from which these issues arise.

Corporation.[8] Title to the production as well as the raw materials rested in the government, which paid an operating fee to DSM for its services.[8]

During the term of the agreement, a field representative from the Rubber Reserve Corporation regularly visited the facility. The field representative's responsibilities included overseeing DSM's operations and ensuring that DSM was following government imposed production specifications, government imposed operating procedures, and government imposed laboratory product testing procedures and operations in the manufacturing of synthetic rubber. The United States, through the Rubber Reserve Corporation, controlled what type of rubber was produced at the facility, how much of it was produced, and when each type of rubber was produced. DSM could alter these requirements only with permission from the federal government. If government requirements were not followed, the field representative would bring the matter to the attention of the manager of the section where the problem was observed. If no results were obtained, the field representative would raise the matter with the plant manager, and as a last resort, would go to the federal government in Washington, which had authority to enforce compliance.[10]

The federal government imposed numerous safety requirements at the facility, such as the wearing of protective equipment. The United States required that safety meetings be held in each department on a monthly basis, and, in addition, required plant-wide safety

---

[8]*Operating Agreement*, (rec.doc.no. 113, exhibit "A").

[9]*Baker Affidavit*, para. 6 (rec.doc.no. 65, exhibit "C").

[10]*Baker Affidavit*, paras. 3-7 (rec.doc.no. 65, exhibit "C").

meetings be held on a monthly basis.  The government dictated the topics of these meetings.[11]

In summary, DSM operated a federal government-owned facility, exclusively for the government, under the oversight and ultimate control of officers of the federal government. The Court therefore concludes that the foregoing facts are sufficient to establish that DSM was "acting under an officer of the United States or of an agency thereof" for purposes of removal under Section 1442(a)(1).

Plaintiffs cite a number of district court decisions, such as *Overly v. Raybestos-Manhattan*, 1996 WL 532150 (N.D. Cal. 1996), which they contend requires the government contractor to show that the specific alleged acts giving rise to the underlying claims were also specifically directed by a federal officer.  That is, plaintiffs argue that *Overly* and similar cases require a showing of a federal directive ordering DSM *not* to warn Lalonde of the hazards of silica dust or *not* to provide him with adequate protective equipment.[12]  The Court specifically rejects and declines to follow these lower court cases to the extent plaintiff urges their applicability to the context presented here.[13]  The Court

[11] *Samuels Affidavit*, paras. 4-5 (rec.doc.no. 65, exhibit "D").  Although Samuels was in charge of laboratory testing for developmental products, his affidavit speaks to the government's imposition of safety requirements for the entire facility and its practices regarding safety meetings for the entire facility.  It would not be unreasonable for a supervisor of a single department to have knowledge of the level of control exercised generally by the government over the entire facility.

[12] In *Overly*, for example, the element of "federal direction" applied by the *Overly* court was not satisfied because, while the federal government directed Avondale to install asbestos products, it gave no direction to Avondale regarding workplace warnings pertaining to asbestos exposure.

[13] *Overly* and similar cases pertain to government contractors acting as independent contractors in filling government procurement contracts at their own plants.  The cases do not involve a government contractor acting exclusively as an agent for the federal government in operating a government-owned facility.

Many of these same cases apply a similarly chary approach to the "causal connection" element.  As will be outlined in the following section of this ruling, the chary approach to the causal connection element applied
(continued...)

instead looks to Supreme Court precedent regarding application of Section 1442(a)(1), which reveals that, unlike the case with other removal statutes, there is no rule of interpretation disfavoring removal under Section 1442(a)(1). On the contrary, the statute is not "narrow" or "limited" and is not to be given a "narrow, grudging interpretation"; the test for removal under Section 1442(a)(1) "should be broader, not narrower, than the test for official immunity." *Willingham*, 395 U.S. at 405 & 406-07, 89 S.Ct. at 1815 & 1816; *accord Peterson v. Blue Cross/Blue Shield of Texas*, 508 F.2d 55, 58 (5ᵗʰ Cir. 1975). Any requirement that a contractor who is running a federal production facility exclusively for the government has to show that the specific details of the negligent act were done only at the instance of precise and detailed instructions from a federal officer in order for the contractor to be "acting under" a federal officer is an "unduly grudging" requirement.

Here, DSM was no less acting under federal authority when it followed the general directives of federal authority in running the government-owned plant than it was when it was following a specific order from a federal officer regarding a particular aspect of plant operations. Every act taken in running the plant was taken under delegated federal authority. DSM did not cease to be running the plant for and under federal authority when it made operational decisions (such as specific decisions regarding worker safety) within the ambit of its duties without a specific express federal directive as to the particulars, for DSM acted exclusively for and under the federal government in its operation of this facility.

---

[13](...continued)
in these cases is not supported by relevant Supreme Court precedent concerning removal of civil, as opposed to criminal, actions.

Any state court suit which concerns the operations of a government-owned defense production facility triggers the strong federal policy interests protecting against possible state interference with federal functions[14] -- regardless of whether the plant is being run directly by the United States or by a contractor retained and controlled by the federal government.  Whether a federal officer directly mandated the specific alleged act or omission in question has little, if anything, to do with the core policy question of whether federal interests potentially are impacted by the state court suit.  The Court accordingly finds this requirement to be an unduly grudging one that is neither compelled by the text of Section 1442(a)(1) nor supported by the policies underlying under that section.

### "Causal Connection"

District court cases such as *Overly* apply the "causal connection" element, much like the "acting under" element, in a manner that would require the removing party to demonstrate that the federal government specifically directed, *i.e.* "caused," the removing party to commit the precise act or omission which forms the basis of the state law claim.[15] As noted previously, Supreme Court decisions do interpret "the 'color of office' test to require a showing of a 'causal connection' between the charged conduct and asserted official authority." *Willingham*, 395 U.S. at 409, 89 S.Ct. at 1817.  But, as will be shown below, the "causal connection" required in civil cases under Supreme Court precedent is of a different nature from that required in cases such as *Overly*. In particular, the governing

---

[14]These policy interests are discussed in more depth in the final section of this ruling.

[15]In *Overly*, the element of "causal nexus" was not satisfied because the federal government exercised no control over Avondale with regard to warning of workplace hazards from asbestos.  Thus, in this case, *Overly* would require DSM to establish that the federal government specifically directed DSM to not warn contractor's employees about the dangers of inhaling silica dust during sandblasting maintenance operations.

precedents from the Supreme Court do not require a showing in a civil case that the alleged wrongful act or omission itself was specifically directed or compelled by federal duty or law. Rather, the controlling decisions require only a showing that the defendant committed the alleged act or omission while performing its federal duties.

In *Willingham*, a federal prisoner alleged that the penitentiary warden, chief medical officer and others had inoculated him with "a deleterious foreign substance" and had assaulted, beaten, and tortured him in various ways. In connection with what the Supreme Court described as "a 'scattergun' complaint, charging numerous wrongs on numerous different (and unspecified) dates," the prisoner alleged in seeking remand that the penitentiary officials "had been acting 'on a frolic of their own which had no relevancy [to] their official duties as employees or officers of the United States." 395 U.S. at 407 & 408-09, 89 S.Ct. at 1816 & 1817. The prisoner urged that his suit therefore was not removable because the wrongs alleged did not grow out of defendants' conduct under color of office. *See* 395 U.S. at 407, 89 S.Ct. at 1816.

The *Willingham* Court rejected this invitation to focus the inquiry on whether the wrongs alleged were authorized. Instead, the high court framed the question as "whether [the officials] adequately demonstrated a basis for removal by showing that their only contact with respondent occurred while they were executing their federal duties inside the penitentiary." 395 U.S. at 408, 89 S.Ct. at 1816. The Supreme Court answered this question in the affirmative, in the following passage:

> In a civil suit of this nature, we think it was sufficient for petitioners to have shown that their relationship to respondent derived solely from their official duties. Past cases have interpreted the "color of office" test to require a showing of a "causal connection" between the charged conduct and

-10-

> asserted official authority. .... "It is enough that (petitioners')
> acts or (their) presence at the place in performance of (their)
> official duty constitute the basis, though mistaken or false, of
> the state prosecution." .... *In this case, once petitioners had
> shown that their only contact with respondent occurred inside
> the penitentiary, while they were performing their duties, we
> believe that they had demonstrated the required "causal
> connection." The connection consists, simply enough, of the
> undisputed fact that petitioners were on duty, at their place of
> federal employment, at all the relevant times.* If the question
> raised is whether they were engaged in some kind of "frolic of
> their own" in relation to respondent, then they should have the
> opportunity to present their version of the facts to a federal, not
> a state, court. This is exactly what the removal statute was
> designed to accomplish.

395 U.S. at 409, 89 S.Ct. at 1817 (emphasis added; citations and footnote omitted).

Explaining its reference to "a civil suit of this nature," the high court noted that in a criminal

case, a more detailed showing of causal connection "might be necessary because of the

more compelling state interest in conducting criminal trials in the state courts." 395 U.S.

at 409 n.4, 89 S.Ct. at 1817 n.4. *Willingham* supports the conclusion that the "causal

connection" inquiry is not one of whether the federal agent's alleged wrong was federally

authorized, but rather is one of whether the alleged wrong occurred within the course of

the agent's performance of the agent's federal duties. *Accord Magnin v. Teledyne

Continental Motors*, 91 F.3d 1424, 1427-28 (11th Cir. 1996)(similar reading of *Willingham*).

In the instant case, from 1943 through 1955, DSM operated the government-owned

synthetic rubber plant for the federal government, pursuant to the Operating Agreement

entered into between DSM and the federal instrumentality involved. The statement that

DSM's federal duty *was* the operation of the synthetic rubber plant – in all of its facets and

with all that that undertaking necessarily entailed -- is not at all an oversimplification or

overgeneralization. Rather, it is an entirely accurate statement of an essential material

-11-

fact.  It is what DSM contractually bound itself to do, as an agent of the federal government.

Against this backdrop, it is clear that the requisite "causal connection" exists between the state court suit and DSM's discharge of its federal duties.  Mr. Lalonde was sandblasting in order to maintain and refurbish plant equipment for continued use.  The question is not whether a specific federal law or order directed DSM not to warn Lalonde about the hazards of silica exposure (or even to maintain the plant equipment), but rather the question is whether that alleged failure to warn occurred while DSM was in the performance of its federal duties, *i.e.*, in the course of its operation of the plant as an agent for the federal government.  The Court therefore holds that the requisite causal connection is satisfied here.  To the extent that some lower district court cases would hold to the contrary, the Court specifically rejects the analytical underpinnings of those cases.[4]

### Colorable Federal Defense

As noted, the existence of a "causal connection" alone is not sufficient to satisfy the "color of office" requirement under the statute.  The federal officer or agent, in addition, must raise a colorable defense under federal law.  *Mesa*, 489 U.S. at 125-34, 109 S.Ct. at 962-67.  It is equally well-established, however, that the validity of the federal defense is

---

[4]In passing, the Court would note that cases such as *Overly* are distinguishable from this case on their facts because the government contractors in those cases were performing work under a government contract as independent contractors at a contractor-owned facility that also was used for other, non-government contract work.  In such a context, under this Court's reading of the law, the causal connection requirement arguably would distinguish tort claims arising in the course of non-government contract work from claims arising in the course of government contract work.  No such distinction is needed in this case because all work being done at the government-owned facility in question here, up through 1955, was federal government work done for the government as an agent of the government.  In any event, this Court eschews reliance upon cases such as *Overly* not because of their distinguishing facts but instead because of their legal analysis.  To the extent *Overly* implies that in all situations the causal connection requirement should be applied in a manner that requires the removing defendant to prove that the actual act or omission was itself specifically federally mandated, this Court expressly rejects such a reading of the federal officer removal statute.

-12-

a "distinct subject" that involves "wholly different inquiries" that have "no connection whatever with the question of jurisdiction." *Mesa*, 489 U.S. at 129, 109 S.Ct. at 964, quoting *The Mayor v. Cooper*, 6 Wall. 247, 254, 19 L.Ed. 851 (1868).[5] The federal defense need only be a "colorable" one, not necessarily one that ultimately will prove meritorious.

In the instant case, DSM seeks to assert two federal defenses. First, DSM relies upon the government contractor defense. Second, DSM asserts immunity pursuant to the Defense Production Act, 50 U.S.C. § 2157.

Plaintiffs contend that DSM may not rely on the government contractor defense because DSM has not shown that the federal government prohibited DSM from warning Lalonde about the dangers of silica dust or from providing him with additional protective equipment. Plaintiffs rely in this regard upon the Ninth Circuit decision in *In re Hawaii Federal Asbestos Cases*, 960 F.2d 806 (9th Cir. 1992), in which Navy sailors brought products liability actions against asbestos manufacturers who supplied asbestos insulation used in navy vessels. The Ninth Circuit, in an alternative holding, applied the standards established in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), for determining when a products liability claim against a supplier of military equipment is barred by the government contractor defense.[6] Under *Boyle*, "liability

___

[5]*See also Willingham*, 395 U.S. at 405, 89 S.Ct. at 1815 ("the test for removal should be broader, not narrower, than the test for official immunity"); *id.*, 395 U.S. at 407, 89 S.Ct. at 1815 ("one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court"). *Accord Magnin*, 91 F.3d at 1429 ("The scope of our inquiry here is only whether [the removing defendant] has advanced a colorable federal defense (including an assertion that he complied with all his federal law obligations), not whether his defense will be successful.")

[6]The Ninth Circuit's primary holding was that the asbestos insulation did not constitute military equipment and that the government contractor defense did not apply to suppliers of nonmilitary equipment. 960 F.2d at 810-12. This proposition itself hardly is a foregone conclusion, as there currently is a split of circuit authority on this issue. *See, e.g., Carley v. Wheeled Coach*, 991 F.2d 1117 (3d Cir.), *cert. denied*, 510
(continued...)

for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not the United States." 487 U.S. at 512, 108 S.Ct. at 2518. In *In re Hawaii Federal Asbestos Cases*, the Ninth Circuit rejected the government contractor defense *on the merits* because the asbestos manufacturers conceded that the Navy had not prohibited them from placing warnings on their insulation products. The Ninth Circuit held that the manufacturers therefore had failed to establish that they had acted in compliance with reasonably precise specifications as required under *Boyle*. 960 F.2d at 812-13.

That the specifics of the *Boyle* test (and, by extension, the Ninth Circuit's *In re Hawaii Federal Asbestos Cases* decision) apply to a government contractor hired under a performance contract to operate a federally-owned production facility exclusively for and as an agent of the federal government, under federal oversight and control, is subject to some question. Indeed, the Supreme Court established the existence and contours of a federal defense for contractors hired by the federal government under a performance contract long before *Boyle*. In *Yearsley v. W.A. Ross Construction Co.* 309 U.S. 19, 60 S.Ct. 413, 84 L.Ed. 554 (1940), in an action removed to federal court, a landowner sought to recover damages from a contractor retained by the federal government to build dikes in the Missouri River for the purpose of improving navigation. The work done had been

---

[5](...continued)
U.S. 868, 114 S.Ct. 191, 126 L.Ed.2d 150 (1993). Moreover, the Ninth Circuit's holding on this issue appears to be flatly contradicted by the Supreme Court's *Yearsley* decision discussed in the text, *infra*.

authorized and directed by the government.  The *Yearsley* Court concluded that there could be no liability on the part of the contractor, who had acted as an agent of the federal government, unless the contractor either had exceeded its authority or the authority was not validly conferred. 309 U.S. at 20-21, 60 S.Ct. at 414.  Significantly, one of the principal questions in *Boyle* was whether, and, under what circumstances, the Supreme Court should extend its prior holding in *Yearsley* concerning the performance contract context to a manufacturer supplying military equipment as an independent contractor under a procurement contract.  *See Boyle*, 487 U.S. at 505-06, 108 S.Ct. at 2515.

The specific elements that would apply to under *Yearsley* and *Boyle* for a contractor-agent in the context presented here are far from clear.  One federal court of appeals has suggested that *Yearsley* establishes a separate and "analytically distinct" "government agency defense" that turns upon (1) whether the government itself would be subject to liability on account of sovereign immunity; (2) whether the contractor actually acted as an agent of the government rather than simply as an independent contractor; and (3) whether the agent was acting within the course and scope of its duties.  *See Shaw v. Grumman Aerospace Corp.*, 778 F.2d 736, 739-40 (11th Cir. 1985), *cert. denied*, 487 U.S. 1233, 108 S.Ct. 2896, 101 L.Ed.2d 930 (1988).  Although another portion of the *Shaw* decision was expressly rejected by the Supreme Court in *Boyle*, *Shaw*'s reading of *Yearsley* was not addressed in *Boyle*.  *See* 487 U.S. at 513, 108 S.Ct. at 2519.  Subsequent to *Boyle*, at least one district court has followed *Shaw*'s reading of *Yearsley*.  *See Amtreco, Inc. v. O.H. Materials, Inc.*, 802 F.Supp. 443 (M.D. Ga. 1992).

Fifth Circuit *dicta* suggests a possibly more limited reading of *Yearsley* than that advanced in *Shaw*.  In *Bynum v. FMC Corp.*, 770 F.2d 556 (5th Cir. 1985), the court

-15-

suggested that the *Yearsley* defense required a showing of an actual agency relationship with the government but that the defense may not be available to contractors who fail to follow government specifications or mismanufacture a product. 770 F.2d at 564. But this standard would not necessarily require rejection of DSM's defense here, because the failure to provide warnings or protective equipment that perhaps were not required by government specifications would not constitute a failure to follow government specifications. Moreover, the *Bynum dicta* predates *Boyle*'s reading of *Yearsley*. In this rapidly changing area of the law -- where even seemingly established circuit precedent is subject to reinterpretation[8] -- it would be quite difficult to conclude that a removing defendant could not, as a matter of law, raise a colorable federal defense based merely on *dicta* that now is nearly fifteen years old.

It further has been suggested that the restriction of sovereign immunity in the Federal Torts Claim Act, adopted in 1948, perhaps may lead to a similar curtailing of the reach of the defense available to performance contractor-agents under *Yearsley*. *See Valori v. Johns-Manville Sales Corp.*, 1985 WL 6074, slip op. at 8* (D.N.J. 1985).[9]

---

[7] *See also Ward v. Humble Oil & Refining Co.*, 321 F.2d 775, 780 (5th Cir. 1963)(applying *Yearsley* in context of mineral rights suit to quiet title).

[8] *Compare McGonigal v. Gearhart Industries, Inc.*, 851 F.2d 774, 778 (5th Cir. 1988)(government contractor defense not available to contractor that negligently manufactured, rather than defectively designed, grenade that exploded prematurely), *and Mitchell v. Lone Star Ammunition, Inc.*, 913 F.2d 242, 246–47 (5th Cir. 1990)(government contractor defense not available to contractor where claim was based on manufacturing defect rather than design defect), *with Bailey v. McDonnell Douglas Corp.*, 989 F.2d 794 (5th Cir. 1993)(reinterpreting *McGonigal* and *Mitchell* and concluding that the defense is not limited to design defects as opposed to manufacturing defects).

[9] Of course, a portion of the time span potentially involved in this case predates 1948 to a limited extent, as plaintiff claims that he worked at various defendant facilities from 1947 through 1976. In a related vein, the Fifth Circuit made an alternative holding in *Hansen v. Johns-Manville Products Corp.*, 734 F.2d 1036 (5th Cir. 1984), to the effect that even if there were a "government specifications" defense under Texas law (for which there was no supporting caselaw), any such defense would not apply where work under the

(continued...)

The foregoing establishes that questions remain as to the continuing reach of *Yearsley* in this particular context. However, even if *Boyle* has completely supplanted any vestige of *Yearsley*, and even if *Boyle* states the test that is applicable to the factual setting presented here,[9] the Court does not find at this stage of the proceedings that either *Boyle* or the Ninth Circuit's decision in *In re Hawaii Federal Asbestos Cases* necessarily compel a ruling in plaintiffs' favor on the government contractor defense. The Ninth Circuit's decision, which is not binding authority in this Court, concluded that the asbestos manufacturers there could not establish that were acting in compliance with "reasonably precise specifications" because they had conceded that the Navy did not prohibit them from placing warnings on their insulation products. 960 F.2d at 812. However, arguably, if the Navy approved specifications for the product that did not call for the warnings and the manufactured product conformed to those specifications, then the first two elements of *Boyle would* be satisfied.[11] The only question remaining would be whether the asbestos manufacturers failed to warned the United States about dangers associated with the use

---

[9](...continued)
government contract occurred during only five of the plaintiff's twenty-six years of employment at the single facility involved there. The Court does not find—to the extent, if any, that a similar factual situation is presented here—that *Hansen* is controlling on the question of whether a colorable *federal* defense has been asserted, because *Hansen* concerned Texas law, not the federal common law that was applied under *Boyle* (which was decided four years after *Hansen*) and *Yearsley*. Any extension of *Hansen* to the federal contractor defense would be a matter to be considered on the merits.

[10]The *Boyle* test was stated in the context of a defective design products liability suit brought against a manufacturer of military equipment by a person injured by the military equipment. The instant case presents a suit against a plant operator for injuries allegedly caused to a worker by unsafe working conditions. The different context arguably might require some reformulation of the *Boyle* test to better fit the context presented.

[11]To recap, under *Boyle*, "liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not the United States." 487 U.S. at 512, 108 S.Ct. at 2518.

-17-

of asbestos that were known to the asbestos manufacturers but not to the United States.[12]
On that issue, Fifth Circuit authority suggests that the decision to forego safety precautions
for wartime sailors might have been a knowing and conscious one by the federal
government. *Cf. Gordon v. Lykes Brothers Steamship Co., Inc.*, 835 F.2d 96, 100 (5th Cir.
1988)(government decision not to establish a safety program for World War II merchant
seamen working with asbestos was immunized by the discretionary function exception).
Thus, this Court cannot predict with any degree of certaintly that the Fifth Circuit either
would follow the same analysis or reach the same result as that of the Ninth Circuit.

Furthermore, in the context of this case, it is not entirely clear that a *Boyle*-like
analysis leads to a conclusion that the government contractor defense is not available
here. If, for example, the federal government specified safety requirements for the facility
and DSM complied with those requirements, it is arguable that the first two elements of a
*Boyle* analysis would be satisfied. If the government-specified requirements did not include
the giving of warnings to workers or the taking of further precautions regarding silica
exposure, and the government was unaware that such warnings and/or precautions were
necessary, then, arguably, the question becomes whether DSM knew of the necessity for
the warning yet failed to warn the government of silica hazards resulting from the absence
of such warnings and precautions. Such an inquiry is not one to be resolved at this stage,
but rather is one for the merits. The mere fact that DSM may not have warned the

---

[12]The Ninth Circuit apparently reads *Boyle*'s first element to require the contractor to show that
something omitted (such as a warning) was explicitly required to be omitted under the specifications. This
reading of *Boyle* is subject to question. Arguably, if the product conforms to the approved specifications, *i.e.*,
everything that is called for is present, then the *absence* of an allegedly required feature (such as a warning
or a safety shield) would be a matter addressed by the question of whether the contractor then warned the
United States about the hazards of this omission in a circumstance where the United States already was not
aware of the hazards.

-18-

government. by itself. is not dispositive of the issue -- the relative knowledge of DSM and the government also is a factor in applying *Boyle's* third element.[13]

The Court notes these many questions and uncertainties in the application of a government contractor defense to the facts of this case simply to illustrate that it cannot be stated categorically at this time that the federal contractor defense is unavailable to DSM.[14]  Nuances such as whether, or to what extent, certain judicial decisions survive other decisions plainly are matters for resolution on the merits of the defense, not for resolution at the jurisdictional stage. That DSM raises a colorable federal defense that can be conclusively resolved only at a later stage in these proceedings suffices to sustain jurisdiction.

The Court accordingly need not reach the question of whether DSM has raised a colorable federal defense under the Defense Production Act.

## Interference with Federal Function

The Court therefore concludes that DSM has established the prerequisites for removal under Section 1442(a)(1)(action under a federal officer, the causal connection required for action under color of office, and the presence of a colorable federal defense). Plaintiffs appear to suggest, however, that DSM further must affirmatively demonstrate that

---

[13]*Cf. Garner v. Santoro.* 865 F.2d 629, 638 (5th Cir. 1989)(mere failure to warn government of toxicity of paint used by shipyard worker did not support district court's refusal to allow government contractor defense to go to the jury because the third *Boyle* element further required consideration of whether the United States was aware of the danger presented by the paint's toxicity).

[14]Indeed, the situation here would appear to present a paradigm case for removal under Section 1442(a)(1), at least in the sense that the application of federal law here is subject to much uncertainty. *Cf. Willingham*, 395 U.S. at 407, 89 S.Ct. at 1816 ("one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court"); *id.* at 409, 89 S.Ct. at 1817 ("[T]hey should have the opportunity to present their version of the facts to a federal, not a state, court. This is exactly what the removal statute was designed to accomplish. Petitioners sufficiently put in issue the questions of official justification and immunity; the validity of their defenses should be determined in the federal courts.").

the current action "could arrest, restrict, impair, or interfere with either the actions of a federal official or the operations of the federal government," relying on the Fifth Circuit's decision in *Murray v. Murray. See* 621 F.2d at 107. Plaintiffs suggest that this action cannot impair federal interests because the death and suit arise almost 40 years after all operations have ceased under the contract between DSM and the federal corporate intermediaries.

The Court does not read the *Murray* decision as establishing a requirement that the removing party show, in addition to the three elements discussed above, a specific impairment of federal interests in the given case. *Murray* does stand as authority regarding the policy and rationale underlying federal officer removal: "that federal officers are entitled to, and the interest of national supremacy requires, the protection of a federal forum in those actions commenced in state court that could arrest, restrict, impair, or interfere with the exercise of federal authority by federal officials." 621 F.2d at 106. The *Murray* court referred back to this underlying rationale in holding that a garnishment action – which does not affect the United States' substantive obligation – is not removable under Section 1442(a)(1). *Id.*, at 107. In so doing, the *Murray* panel specifically reaffirmed that the statute "permits the removal of those actions commenced in state court that expose a federal official [or person acting under him] to potential civil liability ... for an act *performed in the past* under color of office." *Id.*, at 107 (emphasis added).

Insofar as frustration of federal interests is an independent concern here, the Court would note that, quite clearly, the imposition of a future liability against a government contractor for past work can as much impair federal interests as would a current liability during the term of an ongoing agreement:

-20-

> [T]he extent of a contractor's liability may, undoubtedly will, affect future dealings between the contractor and the government. .... Speculative federal interests in the obligations of war contractors are numerous. War contractors might be expected to increase the price of war materials to correspond to any extension in their potential liability. Such adjustments might have a significant effect on the federal treasury. If potential liability increased dramatically, future war contractors might attach conditions to the use of their products, or balk at supplying the military with any products whatsoever. Thus, the government's military capacities might be affected.

*In re "Agent Orange" Product Liability Litigation*, 506 F.Supp. 737, 746-47 & n.5 (E.D.N.Y.), *rev'd on other grounds* 635 F.2d 987 (2nd Cir. 1980), *quoted in Bynum v. FMC Corp.*, 770 F.2d 556, 570 n.18 (5th Cir. 1985).

That the synthetic rubber produced at DSM Copolymer in the late 1940's and early 1950's has long since made its way to its appointed tasks on distant shores, for wars that now recede into the history of a waning century, is of no moment here. What matters here is the continuing ability of the federal government to be able to respond in times of national need, and to be able to bring the resources of private industry to bear in such times. Removal by this wartime supplier of this strategic and critical material, on the basis of a federal contractor defense, therefore is clearly consonant with the policies underlying the federal officer removal statute.

## CONCLUSION

Accordingly, for the foregoing reasons, plaintiff's motion to remand (rec.doc.no. 43) is DENIED.

Baton Rouge, Louisiana, this _5th_ day of _August_ 1998.

_____
UNITED STATES MAGISTRATE JUDGE

-21-

## Act of Sale, Vendor's Lien and Special Mortgage

### UNITED STATES OF AMERICA

### State of Louisiana

BE IT KNOWN, That on this 21st day of the month of
April, in the year 1955,

Before me, *ALVIN B. RUBIN* , a notary
public duly commissioned and qualified in and for the Parish
of East Baton Rouge, State of Louisiana, therein residing,
and in the presence of the witnesses hereinafter named and
undersigned,

PERSONALLY CAME AND APPEARED:

Holman A. Pettibone, a resident of Winnetka, Illi-
nois, Leslie R. Rounds, a resident of Kennebunkport, Maine,
and Everett R. Cook, a resident of Memphis, Tennessee, each
being of full age of majority and each of whom, being first
duly sworn, did depose and say:

That they are the members of the Rubber Producing
Facilities Disposal Commission, an instrumentality of the
United States Government created by an Act of Congress known
as the "Rubber Producing Facilities Disposal Act of 1953" ..



(Public Law 205, 83d Congress, 67 Stat. 408), and that they appear and act herein as such commission (hereinafter called the Vendor); each of which said appearers, acting in his capacity aforesaid, declares as follows:

That Reconstruction Finance Corporation was created as an instrumentality of the United States Government on January 22, 1932, by an Act of Congress known as the "Reconstruction Finance Corporation Act" (Public Law 2, 72d Congress, 47 Stat. 5);

That Defense Plant Corporation was created as an instrumentality of the United States Government on August 22, 1940, by said Reconstruction Finance Corporation pursuant to Section 5(d) of said Reconstruction Finance Corporation Act as amended (6 Fed. Reg. 2971);

That said Defense Plant Corporation was dissolved on July 1, 1945, and its rights and assets transferred to said Reconstruction Finance Corporation by Act of Congress (Public Law 109, 79th Congress, 59 Stat. 310);

That the rubber producing facilities of said Reconstruction Finance Corporation were transferred on June 30, 1954, to Federal Facilities Corporation, an instrumentality of the United States Government created by the Secretary of the Treasury pursuant to an Executive Order of the President of the United States (Executive Order No. 10539, 19 Fed. Reg. 3827);

-3-

That through one or more of the aforesaid instrumentalities the United States Government has acquired and now owns certain rubber producing facilities;

That said Rubber Producing Facilities Disposal Commission has been authorized by said Rubber Producing Facilities Disposal Act of 1953 to sell such facilities in the manner provided by said Act and to execute and deliver such deeds or other instruments appropriate to effectively transfer to the purchasers thereof the title to such facilities, no matter by what officer, agent, department, Government corporation, or instrumentality of the Government title to such facilities is held; and

That the Vendor does, by these presents, grant, bargain, sell, convey, transfer, assign, set over, abandon and deliver, without any representation or warranty whatsoever, express or implied, not even for the return of the purchase price, unto COPOLYMER CORPORATION, a corporation of the State of Louisiana (hereinafter called the Purchaser), represented herein by _A. L. FREEDLANDER_, its _____ President, duly authorized to act herein under and by virtue of a resolution of the board of directors of said corporation adopted on the _29th_ day of _MARCH_, 1955 a duly certified copy of which is annexed hereto and made a part hereof, accepting and purchasing for itself, its successors and assigns, and acknowledging due delivery and possession thereof, all of the

right, title, and interest of the United States of America
(hereinafter called the Government) and of every officer,
agent, department, Government Corporation, or instrumentality
thereof, in and to the following described property, consti-
tuting the manufacturing plant and property known as Plancor
152 of the rubber producing facilities of the Government
(said plant and property being hereinafter called the Facil-
ity), situated in the Parish of East Baton Rouge, in the
State of Louisiana, to wit:

Group A:   The following described tract or parcel of
land:

A certain tract or parcel of land, situated in the Third
Ward of the Parish of East Baton Rouge, State of Louisiana,
and being part of sections thirty-seven (37), thirty-eight
(38), and forty (40), Township Six (6) South, Range One (1)
West, Greensburg Land District of Louisiana, containing
thirty-five and 96/100 (35.96) acres, and being designated as
lots 68 and 69 of Monte Sano Highland Farms on a map made by
A. G. Mundinger, civil engineer and surveyor, on September
24, 1941, and more particularly described as follows:

Beginning at a point, which is the point of intersection of
the south boundary line of Shada Avenue with the east right
of way line of the Louisiana and Arkansas Railway Company,
which point of beginning is marked with a concrete monument;
thence running from said point of beginning north eighty-one
degrees (81°) thirty-four minutes (34') east a distance of
eleven hundred forty-five and 76/100 (1145.76) feet along the
south boundary line of Shada Avenue to a point, which point
is marked with a concrete monument; thence south nine degrees
(9°) three minutes (3') east a distance of fifteen hundred
sixty-nine (1569) feet to a point, which point lies on the
center line of Monte Sano Bayou; thence in a northwesterly
direction following the meander of the center line of said
Monte Sano Bayou to the point of intersection thereof with
the east right of way line of the Louisiana and Arkansas Rail-
way Company; thence north eighty-one degrees  (81°) west a
distance of thirty-one and 54/100 (31.54) feet along the east

-5-

right of way line of said railway company; thence north eight degrees (8°) fifty-nine minutes (59') west a distance of one thousand ninety-seven and 35/100 (1097.35) feet along the east right of way line of said railway company to the point of beginning.

The above-described property was acquired by Defense Plant Corporation by conveyance from Standard Oil Company of Louisiana by act before Claiborne B. Robertson, Notary Public, dated April 24, 1942, recorded in Book 513, folio 302, of the Conveyance Records of East Baton Rouge Parish, Louisiana.

Group B:  The following servitudes granted to the Defense Plant Corporation or its successor, the Reconstruction Finance Corporation, running in favor of the above-described property, together with and in addition to all other servitudes, rights of way, and permits appurtenant to or acquired by the Government for use in connection with the above-described land and facilities thereon, including, but not by way of limitation:

1.    Servitude granted by Esso Standard Oil Company to Reconstruction Finance Corporation on March 24, 1949 granting a servitude of passage and right-of-way for the construction, installation, operation and maintenance of a three inch pipe line and the right of exclusive use and operation of an existing four inch pipe line owned by Esso Standard Oil Company, said pipe lines pass through and under property owned by Esso Standard Oil Company, together with a license of passage over and under the property of Gulf States Utilities Company for maintenance and operation of said four inch pipe line, all as more fully shown and described in that certain act recorded in Book 821, folio 286 of the Conveyance Records of East Baton Rouge Parish, Louisiana.

2.    Servitude granted by Illinois Central Railroad Company to the Reconstruction Finance Corporation on May 14, 1948, granting a right to lay, maintain, repair, renew and operate a three inch steel pipe line for the transmission of

brine to be encased in a larger pipe, to be placed at least
four feet below the tracks of the railroad company under the
tracks of the railroad company, approximately two hundred five
(205) feet north of mile post L-363, Baton Rouge, Louisiana,
all as more fully shown and described in that certain act re-
corded in Book 828, folio 347, of the Conveyance Records of
East Baton Rouge Parish, Louisiana.

3.    Servitude granted by Gulf States Utilities Company
to the Reconstruction Finance Corporation on October 13, 1949
granting a right-of-way for the purpose of constructing, main-
taining and operating a three inch brine pipe line under and
across a tract of land situated in the Parish of East Baton
Rouge, Louisiana, in Sections 42 and 43, Township Six (6)
South, Range One (1) West, Greensburg Land District of Louisi-
ana, all as more fully shown and described in that certain
act recorded in Book 838, folio 294 of the Conveyance Records
of East Baton Rouge Parish, Louisiana.

4.    Servitude granted by Esso Standard Oil Company to
the Reconstruction Finance Corporation on May 15, 1952, grant-
ing a servitude of passage and right-of-way for the laying,
installing, constructing, maintaining, using, and removing of
pipelines, telephone and telegraph lines, electric power
transmission lines, roads, bridges, passageways and appurten-
ant facilities over, across and under a tract or parcel of
land in Sections 38 and 40, Township 6 South, Range 1 West,
Greensburg Land District of Louisiana, all as more fully
shown and described in that certain act recorded in Book 988,
page 130, of the Conveyance Records of East Baton Rouge
Parish, Louisiana.

Group C:  The following described servitude and right

of way over the property constituting Plancor 572 of the

rubber producing facilities of the Government is hereby con-

veyed to and created in favor of the Purchaser:

A servitude on and the rights to use for the purpose of
maintaining, repairing, replacing and removing the existing
equipment and pipelines listed and described in Group E
hereof on and over a certain tract of land described in the
conveyance from Standard Oil Company of Louisiana to Defense
Plant Corporation by Act before John T. Laycock, Notary Pub-
lic, dated April 27, 1943, recorded in Book 532, page 295
of the Conveyance Records of East Baton Rouge Parish, Louis-
iana, and situated in what was formerly the Third Ward of the

Parish of East Baton Rouge, Louisiana, being parts of Sections 38, 40, 41 and 42 of Township 6 South, Range 1 West, Greensburg Land District of Louisiana, containing 39.28 acres and being part of Tract D-1, as designated and shown on a map made by A. G. Mundinger, Civil Engineer and Surveyor, dated August 14, 1942, revised March 24, 1943; including the right of ingress and egress to and from the land subject to this servitude over said 39.28 acre tract for all purposes reasonably necessary for the exercise of the rights hereby created. The portion of said tract of land over which this servitude is reserved is shown on a map entitled and numbered "Map of Plancor 572 Showing Meter Installation Site & Plancor 152 and Plancor 876 pipe line locations, Esso Standard Oil Company, Louisiana Division, Drawing No. 1174, Sheet 1 of 1, Drawer 36, December 19, 1954", and is described according to that map as follows:  The beginning point of said portion is the monument at SW corner of Tract D-1 as shown on map by A. G. Mundinger, C.E., dated August 14, 1942, thence along the following bearings for the distances shown:  N 8°59'W - 951.42'; N 81° 01' E - 50.0'; N 8° 59' W - 1475.21'; N 41o 01'E - 91.38'; S 8° 59' E - 38.83'; S 41° 01' W - 57.44'; S 8° 59' E - 126.31'; N 81° 01' E - 6.00'; S 8° 59' E - 99.00'; S 81° 01' W - 6.00'; S 8° 59' E - 342.69'; N 81° 01' E - 167.00'; S 8° 59' E - 12.00'; S 81° 01' W - 167.00'; S 8° 59' E - 15.00'; S 81° 01' W - 6.00'; S 8° 59' E - 319.00'; N 81° 01' E - 449.00'; S 8° 59' E - 337.00'; N 81° 01' E - 25.00'; S 8° 59' E - 35.67'; N 81° 01' E - 32.00'; S 8° 59' E - 30.00'; S 81° 01' W - 47.00'; N 8° 59' W -45.67'; S 81° 01' W - 25.00'; N 8° 59' W - 342.00'; S 81° 01' W - 434.00'; S 8° 59' E - 174.00'; N 81° 01' E - 15.00'; S 8° 59' E - 100.00'; S 81° 01' W - 15.00'; S 8° 59' E - 275.21'; S 36° 01' W - 77.21'; S 8° 59' E - 888.74'; N 88° 28' W - 20.04' to the point of beginning.  (A print of the said map will be attached to and made a part hereof before execution and delivery of this Act.)

This servitude shall run in favor of the Purchaser, its successors and assigns, but shall terminate whenever said equipment and pipelines shall cease to be used for the maintenance or operation of the rubber producing facilities presently known as Plancors 152 and 876; and failure to remove said equipment and pipelines within sixty days following such termination shall be deemed an abandonment thereof.

Group D:  All buildings, structures, and improvements located on the land and servitudes described in Groups A, B and C.

Group E:   All other tenements, hereditaments, and appur-
tenances belonging to or in any wise appertaining to the
above-described property, including, but not limited to, the
following:

>Certain existing equipment and pipelines now or
>formerly part of the rubber producing facilities
>located on land which is a part of, adjoins, or
>is near the site of the above-mentioned Plancor
>572, being the 39.28 acre tract of land referred
>to in Group C, and being described as follows:

(a) A concrete meter house, meter and instruments
    therein and piping immediately appurtenant to
    said meter and instruments.

(b) Pipe lines in the following sizes and approx-
    imate lengths now or formerly used for the
    purposes indicated, the locations of which
    are shown on the map referred to in Group C
    above:

    1 - 3" - 1010' Purge from Plancor 152
    1 - 4" - 1880' Plancor 152 superfractionator
                   overhead to ILA spheres
    1 - 3" - 1880' ILA spent $C_4$ to Plancor 152
    1 - 4" - 2330' Superfractionator feed to
                   Plancor 152
    1 - 4" - 1500' Slop from Plancor 152 to
                   Refinery
    1 - 4" - 1500' Quench oil from Refinery to
                   Plancor 152
    1 - 3" -  430' Inert gas to Plancor 152
    1 - 4" -  830' Tail gas from Plancor 152 to
                   boiler plant
    1 - 3" -  830' Instrument air to Plancor 152
    1 - 4" - 1460' Heavy naphtha from Plancor 152
    1 - 4" - 1500' Hydrogen from Plancor 152 to
                   Refinery
    1 - 4" -  830' Treated water to Plancors 152
                   & 876

Group F:   All tangible personal property and fixtures of
the Government directly pertaining to the Facility or located

upon the above-described property, including, but not limited to, all manufacturing, maintenance, repair, laboratory, automotive and service machinery and equipment, all office and cafeteria furniture, fixtures and equipment, and all tanks, towers, reactors, condensers, compressors, pumps, pipes, mills, shops, electric substations, meters and transformers; except, however, all raw materials, work in process, finished products, repair parts, spare parts, supplies, and stores now located at, or in transit to, the Facility, and tank cars owned by the Government, all of which are excluded from the property conveyed to the Purchaser by this Act of Sale.

It is expressly declared that, to comply with R. S. 9:1104 of the State of Louisiana, all of the tangible personal property and fixtures described in Group F above, together with all items of similar property hereafter acquired by the Purchaser in renewal, replacement or substitution of all or any part thereof, are made immovable by destination and are to be considered and dealt with as a whole and are to be considered as part of the land.

TO HAVE AND TO HOLD the above-described property unto the Purchaser, its successors and assigns, forever, subject, however, to the following:

All existing servitudes, easements, rights of way, and licenses over, under, or across the above-mentioned

premises, and all restrictive covenants, reservations, and grants pertaining to the Facility, now of record.

This sale is made and accepted for and in consideration of the price and sum of Five Million Thirteen Thousand One Hundred Sixty-One and 51/100 Dollars ($5,013,161.51), of which amount the sum of One Million Two Hundred Fifty-Three Thousand Two Hundred Ninety and 38/100 Dollars ($1,253,290.38) was paid in cash at the time of the execution of this Act of Sale, the receipt of which is hereby acknowledged by the Vendor. And to represent the balance of the purchase price, the Purchaser (who is also referred to hereinafter as the Mortgagor) has executed its promissory note in the sum of Three Million Seven Hundred Fifty-Nine Thousand Eight Hundred Seventy-One and 13/100 Dollars ($3,759,871.13) of even date herewith, payable to the order of the Vendor (who is also referred to hereinafter as the Mortgagee) at the offices of the Vendor in the City of Washington, D. C., or at such other place as the holder of the note shall designate in writing from time to time. The promissory note further provides for the payment of interest thereon semi-annually at the rate of four per cent per annum until paid, and for payment of the principal thereof in instalments over a period of ten years as follows:  3% on April 21 in 1956 and 1957, 7% on April 21, 1958, 8% on  April 21, 1959, 10% on April 21, 1960, 12% on April 21, 1961, 14% on April 21 in 1962, 1963, and 1964, and 15% on April 21, 1965.

And the said promissory note, after having been paraphed "Ne Varietur" by me, Notary, in order to identify

the same herewith, has been delivered by the Purchaser unto
the Vendor, who hereby acknowledged the receipt thereof.

And, in order to secure the payment of said promis-
sory note, in principal and interest, according to its tenor,
and to the provisions hereinafter contained, and to secure
the faithful performance of all of the obligations contained
herein, and the reimbursement and payment of attorneys' fees,
taxes, paving assessments, premiums of insurance, costs,
charges, and all expenses, whatsoever, Vendor's lien and
privilege are retained, and the said Purchaser does, by
these presents, specially mortgage, affect, and hypothecate
the property, conveyed to the Purchaser by this Act of Sale
(except motor vehicles requiring registration under the laws
of the State of Louisiana) and all property hereafter ac-
quired by the Purchaser in renewal, replacement or substitu-
tion thereof (hereinafter sometimes called the Mortgaged
Property), unto and in favor of the Vendor and any future
holder or holders of the said note, the Purchaser hereby
confessing judgment in favor of the Vendor and any future
holder or holders of said note, for the full amount of the
said promissory note or obligation, together with all inter-
est, taxes, paving instalments, premiums of insurance,
attorney fees, and all costs, charges, advances and expenses,
whatsoever, and the said Purchaser hereby binds and obligates
itself not to sell, alienate or encumber or deteriorate any

-12-

of the foregoing property to the prejudice of this Act or to permit or suffer the same to be sold, alienated, encumbered or deteriorated to the prejudice of this Act.

And the Purchaser agrees for itself and its successors and assigns as follows:

The Purchaser accepts the terms, conditions, restrictions, and reservations contained in Section 7(h) of the Rubber Producing Facilities Disposal Act of 1953, and this conveyance is made expressly subject to, and the Purchaser, for itself, its successors and assigns, hereby agrees to accept the same subject to, the following National Security Clause, which shall be effective for a period of ten years from the date hereof:

    (a)  The Purchaser will maintain at all times in accordance with sound practice in the industry, normal wear and tear excepted, the Facility, together with all replacements thereof and additions and improvements thereto, so that the same shall be, at all times during said ten-year period, either in a condition (1) currently to produce specification (97%) butadiene produced from basic raw materials at a rate of not less than 23,000 short tons per year (assigned annual capacity), or (2) so that it can be placed in a condition to produce specification (97%) butadiene at such rate of assigned annual capacity within a period of 180 days after written notice from the Government to activate the plant or to reconvert same, as the case may be:  provided, however, that such 180-day period shall be extended, upon written approval to the Purchaser from the Government, for such additional period as shall be necessary in the event the Purchaser is unable to comply therewith by reason of its inability to procure essential materials, unavailability of labor, act of God, fire, earthquake, flood, explosion, storm, strike, or other cause or causes reasonably beyond its control; and provided, further, that in the event of major damage to or

complete destruction of the Facility where the Purchaser is without fault or negligence, the Purchaser shall immediately notify the Government of the happening and of the cause or causes occasioning same, whereupon the Government will cause an examination to be made and will thereafter notify the Purchaser promptly of the extent, if any, that restoration of the assigned annual capacity so destroyed or damaged must be made, such restoration to be effected at the Purchaser's expense within a reasonable period of time to be agreed upon between the Purchaser and the Government.  However, in any case where such restoration is so deemed necessary by the Government, the Purchaser may elect to invoke the privilege of substituting new separate facilities pursuant to and in accordance with paragraph (g) or (h) of this National Security Clause.  Such restoration shall not be required in the event of major damage to or complete destruction of the Facility caused directly or indirectly by (1) hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack, (i) by any government or sovereign power (de jure or de facto), or by any authority maintaining or using military, naval or air forces; or (ii) by military, naval or air forces; or (iii) by an agent of any such government, power, authority or forces, it being understood that any discharge, explosion or use of any weapon of war employing atomic fission or radioactive force shall be conclusively presumed to be such a hostile or warlike action by such a government, power, authority or forces; (2) insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an occurrence.

(b)   The Government shall have the right to conduct an inspection or survey of the Facility at any time, subject to reasonable prior written notice thereof to the Purchaser, for the purpose of determining whether the Purchaser is in default under this National Security Clause.

(c)  Failure to maintain the Facility as required above, or failure to observe any of the other conditions of this National Security Clause, shall give the Government the unconditional right to immediate possession and use of the Facility for the purpose of restoring it to a condition to produce at the rate of such assigned annual capacity, but all costs incidental to such restoration shall be borne exclusively by the Purchaser.

(d)   The Purchaser will not sell, lease, mortgage, or otherwise encumber the Facility without expressly making such sale, lease, mortgage or encumbrance subject to the provisions of this National Security Clause for the remainder of its term.  It is the express intention of both the Purchaser and the Vendor that the covenants herein contained shall be binding on subsequent owners or occupants of the Facility, and that the Purchaser shall remain liable for any violations of said covenants by such subsequent owners or occupants unless the Purchaser shall have been expressly released in writing from such obligation by the Government.

(e)   The Government in exercising its rights and in carrying out its obligations under this National Security Clause shall act through such officer, department or agency of the Government as shall be designated by duly constituted authority.

(f)   During the term of this National Security Clause, the Purchaser shall preserve the "Asset Property Records" pertaining to the Facility and acquired from the Government concurrently with this conveyance; and shall maintain and keep current thereafter an adequate record of the fixed assets of the Facility; the Purchaser shall also preserve until the expiration of said term all drawings, tracings, prints, and other documents in its possession (hereinafter called documents) pertaining to the construction, modification, maintenance, or theory and method of operation of the Facility.  At any time within said term, upon request of the Government, the Purchaser shall make available to the Government such of the aforesaid records, documents, or any designated portion thereof as shall be essential to the Government for the purposes of paragraphs (b) and (c) of this National Security Clause, and shall upon request from time to time furnish copies thereof to the Government at the Government's expense.  The Government will maintain confidential such documents and copies thereof as the Purchaser shall designate, and, to the extent requested by the Purchaser, shall examine them only at the Facility. The Purchaser may offer to the Government any of such records and documents that it considers to be obsolete, and the Purchaser will be relieved of the obligation to preserve them if the Government accepts the offer or grants permission for destruction or other disposition.

(g)   The Purchaser may at any time during the term of this National Security Clause notify the Government

in writing that it desires to substitute for all or any
part of the facilities hereby conveyed to the Purchaser
new separate facilities of equivalent productive capacity
for the production of specification (97%) butadiene or
for the production of a different product which must be
at least as satisfactory, and be generally acceptable
for the same general uses and purposes, as specification
(97%) butadiene, and upon receiving approval in writing
thereto from the Government, may proceed to effect such
substitution. In such event, all of the terms and pro-
visions of this National Security Clause shall apply
with equal force and effect to such substituted facili-
ties and shall no longer apply to the facilities to which
they applied originally.

(h) In lieu of proceeding as permitted by paragraph
(g) of this National Security Clause, the Purchaser may
at any time during the term of this Clause substitute
for all or any part of the facilities hereby conveyed to
the Purchaser new separate facilities of equivalent pro-
ductive capacity for the production of specification (97%)
butadiene, or for the production of a different product
which must be at least as satisfactory, and be generally
acceptable for the same general uses and purposes, as
specification (97%) butadiene. Sixty days after written
notice by the Purchaser to the Government of the comple-
tion of such new separate facilities, all of the terms
and provisions of this National Security Clause shall
apply with equal force and effect to such new separate
facilities and shall no longer apply to facilities for
which the new separate facilities are to be substituted,
unless within such 60-day period the Government notifies
the Purchaser in writing that it disapproves the pro-
posed substitution, in which event the terms and pro-
visions of this National Security Clause shall remain
applicable to the facilities to which they applied
originally.

The Vendor's lien and special mortgage on the pro-
perty conveyed hereby is subject, however, to the same servi-
tudes, easements, rights of way, licenses, restrictive
covenants, reservations, grants and National Security Clause
to which the Act of Sale is subject as hereinabove set forth.

The maximum amount of the obligations of the Mortga-

-16-

gor, as herein stipulated, at any time outstanding, which this Mortgage shall secure, is hereby fixed at 150% of the original principal amount of the Note.

And, in consideration of the acceptance of the Note by the Mortgagee and as part of the security therefor, the said appearer on behalf of the Mortgagor, acting in his capacity aforesaid, declared that the Mortgagor does agree and stipulate as follows:

Section 1. That the Mortgagor will duly and punctually pay or cause to be paid the principal of and the interest on the Note at the times and at the place or places and in the manner specified therein.

Section 2. That the Mortgagor now owns and is lawfully possessed of the Mortgaged Property, other than the after-acquired property referred to in the granting clauses hereof, and is duly authorized to operate the Facility and will take all steps and do all acts necessary under federal, state, or local law to maintain, extend, or renew its corporate existence, its authority to operate the Facility, and its right to transact business in the State of Louisiana.

Section 3. That the Mortgagor has good and legal right to mortgage the Mortgaged Property to the Mortgagee, and will execute, acknowledge, and deliver, or cause to be executed, acknowledged, and delivered, all such further deeds,

mortgages, assignments, and transfers, or other assurances in
law, as may be required by the Mortgagee for the better mort-
gaging to the Mortgagee of all and singular the property
hereby mortgaged or intended so to be.

Section 4.   That the Mortgagor will cause the Mort-
gage and every supplemental indenture or instrument purporting
to create or assure a lien upon the Mortgaged Property to
secure the Note to be recorded and filed and re-recorded and
re-filed to the extent necessary to make effective and main-
tain the lien intended to be created hereby and thereby.

Section 5.   That the Mortgage is and always will be
kept, so long as any indebtedness secured hereby remains un-
paid, a lien upon all of the Mortgaged Property, subject only
to the matters and things hereinabove referred to; that it
will not create, or suffer to be created or to arise, or allow
to exist, any other lien or charge having priority to, prefer-
ence over, or parity with the lien of the Mortgage upon the
Mortgaged Property, or any part thereof; and that, within six
months after the same shall be payable, it will pay or cause
to be discharged, or will make adequate provision for the
satisfaction or discharge of, all lawful claims and demands
of mechanics, laborers, materialmen and others for labor per-
formed or materials furnished after the date hereof, which,
if unpaid, might by law be given precedence over the Mortgage
upon the Mortgaged Property or any part thereof; but that the

-18-

Mortgagor shall not be required to pay any such lien, charge,
or claim so long as in good faith it shall contest the valid-
ity or the amount thereof by appropriate legal proceedings,
unless thereby, in the judgment of the Mortgagee, the security
afforded by the Mortgage will be materially impaired or en-
dangered.

Section 6.  That, except as otherwise provided in
the foregoing National Security Clause, the Mortgagor will at
all times maintain the Mortgaged Property free from waste or
nuisance of any kind, and in good repair, working order, and
condition, and from time to time will make all needful and
proper repairs thereto and renewals and replacements thereof;
and will complete in good, workmanlike manner any repair or
construction work undertaken by it on any of the buildings,
structures, improvements or fixtures comprising a part of the
Mortgaged Property.

Section 7.  That the Mortgagor will pay, on or be-
fore the date on which the same shall become delinquent, all
taxes (both general and special), assessments, and government-
al charges lawfully levied or assessed against the Mortgaged
Property or any part thereof, or against the lien or interest
of the Mortgagee in respect of the Mortgaged Property, or
against the Note, so that the lien and priority of the Mort-
gage will be fully preserved at the cost of the Mortgagor
without expense to the Mortgagee, and will promptly exhibit

to the Mortgagee upon request the receipt or receipts evidencing such payment; provided, however, that the Mortgagor shall not be required to pay any such taxes, assessments, or governmental charges so long as in good faith it shall contest the validity or amount thereof by appropriate legal proceedings, unless thereby, in the judgment of the Mortgagee, the security afforded by the Mortgage will be materially impaired or endangered.

Section 8. That, except as to defects, if any, in the title to the Mortgaged Property conveyed to the Mortgagor by the foregoing Act of Sale, the Mortgagor promptly will pay and settle all claims against any of the Mortgaged Property arising on or subsequent to the date of the Mortgage which affect the rights of the Mortgagee, or will prevent such claims from affecting such rights, and will appear in and defend any action or proceeding arising on or subsequent to such date purporting to affect the lien of the Mortgage, or the rights or powers of the Mortgagee, and will pay all expenses incident thereto.

Section 9. That the Mortgagor will maintain, at its own expense, fire and extended coverage insurance (including vandalism and malicious mischief) on the Mortgaged Property, with loss payable to the Mortgagee, without contribution, in an amount at least equal to the unpaid balance of the Note or sufficient to comply with the provisions of any coinsurance

-20-

clause in the policy or policies therefor, whichever is great-
er, but not in excess of the full insurable value thereof as
determined by a qualified appraiser; that the Mortgagor will
maintain, at its own expense, steam boiler and machinery
insurance (including steam piping) on the Mortgaged Property,
with loss payable to the Mortgagee, in an amount equal to the
unpaid balance of the Note or $3,000,000, whichever is less,
the policy or policies therefor to be noncancellable by the
insurer without 30 days prior written notice to the Mortgagee;
that all such policies of insurance shall be in such form, and
with such insurance company or companies as the Mortgagee
shall require or approve; that the Mortgagor will deliver the
originals of all such policies to the Mortgagee or copies cer-
tified by the insurer to be exact duplicates of the originals,
except as to the rate or rates, which need not be stated; that
any proceeds from such insurance received by the Mortgagee
shall be made available to the Mortgagor for the repair, re-
storation, or replacement of the damaged or destroyed property
or for the installation of facilities having an equivalent
substitutional use in the operation of the Facility, under
such terms and conditions as the Mortgagee deems necessary or
appropriate to insure actual application of such proceeds to
such purpose and to subject to the lien of the Mortgage the
property acquired by the use of such proceeds; and that all
of such proceeds not used for such purpose within two years

after receipt thereof by the Mortgagee shall be applied by
it, first, to the payment of the accrued and unpaid interest
on the Note, second, to the payment of the unpaid instalments
of principal of the Note in the inverse order of their matur-
ity, and third, to the payment of any other indebtedness
secured by the Mortgage; and the remainder, if any, shall be
paid over to the Mortgagor.

Section 10.  That the Mortgagor may (a) sell or
otherwise dispose of in the regular course of operation of
the Facility any of the machinery, equipment or other proper-
ty described in Group F of the granting clauses of the fore-
going Act of Sale which, in the judgment of the Mortgagor, has
become worn out, obsolete or otherwise unfit for use, provided
the property so disposed of is replaced with other property
becoming subject to the lien of the Mortgage and of equal
value and having the same or equivalent substitutional use in
the operation of the Facility, and (b) to make such altera-
tions of, install such additional machinery and equipment in,
and do such rehabilitation work on, the Mortgaged Property as
it shall deem necessary, provided the security of the Mort-
gage is not thereby impaired.

Section 11.  That all judgments, decrees, and
awards pursuant to proceedings for condemnation of the Mort-
gaged Property, as rent or otherwise and whether for a tem-
porary taking or otherwise, are hereby assigned in their

entirety to the Mortgagee, which shall apply the same, first, to the payment of the accrued and unpaid interest on the Note, second, to the payment of the unpaid instalments of principal of the Note in the inverse order of their maturity, and, third, to the payment of any other indebtedness secured by the Mortgage, and the remainder, if any, shall be paid over to the Mortgagor; that the Mortgagee is hereby authorized in the name of the Mortgagor to execute and deliver valid acquittances for, and appeal from, any such judgment, decree, or award; and that settlement shall be made pursuant to any proceedings for condemnation only with the consent of the Mortgagee.

Section 12.   That the Mortgagee may, at any time, and without notice to any other person, make any mutually satisfactory arrangements with the Mortgagor and may deal with the Mortgagor with respect thereto, or grant to the Mortgagor any indulgences or forbearances or any extensions of the time for payment of any indebtedness secured hereby, or may release portions of the Mortgaged Property from the lien hereof, all without affecting the liability for the payment of the indebtedness secured hereby or the lien of the Mortgage upon the Mortgaged Property or any remainder thereof for the full amount of the indebtedness then remaining unpaid.

Section 13.   That the Mortgagor will permit the Mortgagee, through its agents, to inspect the Mortgaged Pro-

-23-

perty or any portion thereof at any time and from time to
time for the purpose of determining whether the Mortgagor is
in default under the provisions of the Mortgage; and will
furnish to the Mortgagee promptly and fully at any reasonable
time, upon written request, certified copies of such finan-
cial statements and reports as the Mortgagor shall send to
its stockholders and of such regular or periodic reports, if
any, as the Mortgagor is required to file with the Securities
and Exchange Commission.

Section 14.   That the following shall constitute
events of default under the Mortgage:

(a)   Default in the payment of the principal
of the Note or any instalment thereof when due;

(b)   Default in the payment of any instalment
of interest on the Note when due and the continu-
ation of such default for 30 days;

(c)   Default by the Mortgagor in the observance
of any other covenant or condition of the Mortgage
and the continuation thereof for a period of 30 days
after written notice from the Mortgagee;

(d)   The entry of a decree or order by any
court of competent jurisdiction appointing a receiv-
er of the Mortgagor, or of any of the Mortgaged
Property, or adjudicating the Mortgagor insolvent
or a bankrupt, or approving as properly filed a peti-
tion seeking reorganization of the Mortgagor under
the Bankruptcy Act or any other federal or state
law, and the failure of the Mortgagor to procure a
cancellation, stay, vacation, or discharge of such
decree or order within a period of 60 days there-
after;

(e)   The making by the Mortgagor of an assign-
ment for the benefit of creditors, or the filing
by the Mortgagor of a voluntary petition in

bankruptcy or a consent to the appointment of a re-
ceiver of the Mortgagor or of all or any part of
the Mortgaged Property; or

(f)  The rendering of a final judgment for the
payment of money against the Mortgagor and the
failure of the Mortgagor to discharge or cause it to
be discharged, within 90 days from its entry, or,
within that period, to appeal therefrom or from the
order, decree, or process upon or pursuant to which
said judgment was granted, based, or entered and
secure a stay of execution pending such appeal.

Section 15.  That upon the occurrence of an event of

default as defined in Section 14, the Mortgagee, if and so

long as the event or events of default in question remain un-

remedied, without notice and without affecting the lien of

the Mortgage or the priority of said lien or any right of the

Mortgagee hereunder:

(a)  May perform or fulfill such defaulted
covenant or condition to such extent as the Mort-
gagee shall determine and enter upon the Mort-
gaged Property, inspect, repair, and maintain the
same, and perform such other acts thereon as the
Mortgagee shall deem advisable for any of the
aforesaid purposes, and all funds so advanced by
the Mortgagee in performing or fulfilling such
defaulted covenants or conditions, with interest
thereon from the date expended or advanced until
repaid at the rate of 4% per annum, shall be addi-
tional indebtedness secured hereby, and shall be
repaid promptly without demand, and be included
in any decree foreclosing the Mortgage and be paid
out of the rents or proceeds of sale of said pro-
perty, if not otherwise paid by the Mortgagor
(but nothing herein contained shall be construed
as requiring the Mortgagee to expend or advance
funds for any of the aforesaid purposes);

(b)  May declare all sums secured hereby im-
mediately due and payable and enforce any of the
rights that accrue to the Mortgagee hereunder, in-
cluding the power of sale, or foreclose the Mort-
gage.

Section 16.  That upon the occurrence of an event of default the Mortgagor will assign, transfer, and set over unto the Mortgagee all the rents, issues, and profits then due and thereafter becoming due under or by virtue of any lease, whether written or verbal, or any agreement for the use or occupancy of the Mortgaged Property, or any part or parts thereof, which may have been theretofore made or agreed to; that the demand of the Mortgagee following the occurrence of any event of default shall constitute such assignment and transfer, it being the intention hereby to establish in any event of default followed by demand of the Mortgagee an absolute transfer and assignment to the Mortgagee of all such leases and agreements and all the avails thereunder; and that such rents, issues, and profits shall be applied, first, to the payment of all cost and expense of acting on such assignment, and, second, to the payment of any indebtedness then due and secured hereby or incurred hereunder.

Section 17.  That upon the commencement of any foreclosure proceeding, the court in which such proceeding is filed, at any time thereafter, either before or after sale, and without notice to the Mortgagor or any party claiming under the Mortgagor (such notice being hereby expressly waived) and also without reference to the then value of the Mortgaged Property, to the use of said property as a homestead, or to the solvency or insolvency of any person liable for any of

said indebtedness, or other grounds for extraordinary relief, may at the option of the Mortgagee appoint a receiver for the benefit of the Mortgagee, with power to take immediate posses- sion of the Mortgaged Property, manage, rent, and collect the rents, issues, and profits thereof during the pendency of such foreclosure suit, and, in case of sale and a deficiency, during the statutory period of redemption, if any, and such rents, issues, and profits, when collected, may be applied toward the payment of any indebtedness then due and secured hereby and the costs, taxes, insurance, and other items neces- sary for the protection and preservation of the Mortgaged Property, including the expense of such receivership; and that, in connection with the aforesaid proceeding, or if the Mortgagee, after default, shall bring, intervene in, or defend any other action to protect or establish any of its rights hereunder, the Mortgagor will pay, in addition to costs and disbursements allowed by law, the reasonable costs of bringing, intervening in, or defending any such action, including rea- sonable attorneys' fees, all of which shall be added to the indebtedness secured hereby.

Section 18.   That in case of foreclosure of the Mortgage, and whether or not any order or decree shall have been entered therein, a reasonable sum shall be allowed for attorneys' fees of the plaintiff in such proceedings, and in addition thereto a reasonable sum for stenographers' fees and

for all funds expended for documentary evidence and the cost
of a complete abstract of title and title reports for the
purpose of such foreclosure, such sums to be secured by the
lien of the Mortgage; that there shall be included in any
judgment or decree foreclosing the Mortgage and be paid out
of said rents or the proceeds of any sale made in pursuance
of any such judgment or decree:  (a)  all costs and expenses
of such suit or suits, advertising, sale, and conveyance,
including attorneys' and stenographers' fees, outlays for
documentary evidence, and cost of complete abstract of title
and title report; (b)  all funds advanced by the Mortgagee,
if any, for purposes authorized in the Mortgage, with inter-
est as herein provided; (c)  all the accrued interest remain-
ing unpaid on the indebtedness hereby secured; and (d) all
the said principal sum remaining unpaid; and that the excess
of the proceeds, if any, shall be paid to the Mortgagor or as
the court may direct.

Section 19.  That every right and remedy provided
in the Mortgage shall be cumulative of every other right or
remedy of the Mortgagee, whether herein or by law conferred;
and that no acceptance of the performance of any obligation
as to which the Mortgagor shall be in default, or waiver of
performance of any obligation, shall be construed as a waiver
of any other default then, theretofore, or thereafter exist-
ing.

-28-

Section 20.  That the Mortgagor hereby waives, to the extent permitted by law, the benefits of all valuation, appraisement, homestead, exemption, stay, redemption, and moratorium laws, now in force or which may hereafter become law.

Section 21.  That the act of the Mortgagee in exercising its option electing to declare the entire indebtedness secured hereby due and payable by reason of any of the events of default specified in Section 14 may be evidenced by the filing of proceedings to foreclose the Mortgage, by the filing of a suit to obtain possession of the Mortgaged Property, by the filing of a suit upon the Note or upon any other indebtedness secured hereby, or by the depositing of a letter, enclosed in an envelope properly sealed and stamped, in the United States mails, and addressed to the Mortgagor in care of Harry H. Kahn, Suite 1440, 120 South La Salle Street, Chicago 3, Illinois, stating that the Mortgagee has exercised its option and has elected to declare the entire indebtedness due and payable by reason of an event of default, which shall be specified and described in such letter; and that the Mortgagee may from time to time rescind any action on its part in declaring the unmatured portion of indebtedness due and payable, but said rescission shall not constitute a waiver of the right to declare a default on account of any then existing or subsequently occurring event of default.

Section 22.  That the term "Mortgagor" shall include the successors and assigns of Copolymer Corporation; that if the Commission shall cease to exist, the term "Mortgagee" shall include such agencies or instrumentalities of the Government as shall be designated from time to time by the President of the United States as successors to the Commission's rights and interests in the Note and the Mortgage; and that if the Note shall cease to be held by the Commission or any successor agency or instrumentality of the Government, the term "Mortgagee" shall thereafter include any lawful owner, holder, or pledgee of the Note.

Section 23.  That the unenforceability or invalidity of any one or more provisions, clauses, sentences, and paragraphs hereof, shall not render any other provisions, clauses, sentences, or paragraphs herein contained unenforceable or invalid.

Section 24.  That the Act of Sale, Vendor's Lien and Special Mortgage may be executed in any number of counterparts, of which the one retained and filed with the Register of Conveyances and Recorder of Mortgages in the Parish of the State of Louisiana where the property is situated will control in case of discrepancy, but in all other respects each counterpart will be an original and such counterparts shall together constitute but one and the same instrument.

Section 25.  That if the Mortgagor shall pay the Note in accordance with its terms and all other indebtedness secured by the Mortgage, then and only then the Mortgage shall be null and void, the Mortgaged Property shall become wholly free of the indebtedness hereby secured, and the Mortgagee shall, at the request and cost of the Mortgagor, execute and deliver to the Mortgagor a release or satisfaction of the Mortgage.

The production of mortgage, conveyance, and United States District Court and Circuit Court certificates, and State and Parish tax researches on the above described property, are hereby expressly waived by the parties hereto, who declare that all taxes due and exigible, including those assessed for the year 1954, have been paid, and who exonerate me, notary, from all responsibility for the non-production and non-annexation hereto of said certificates and researches. State and Parish taxes for the year 1955 have been pro-rated as of 12:00 o'clock P.M., April 20, 1955.

United States revenue stamps in the amount of $ _699.60_ have been annexed to the original hereof and duly cancelled.

Thus done and passed at Baton Rouge, Louisiana, on the day and in the month and year hereinabove written, in the presence of ___DUDLEY C. FOLEY, JR___ and ___J. M. STONNELL___, the undersigned

-31-

competent witnesses, who have signed these presents together with said appearers and me, notary, after due reading of the whole.

RUBBER PRODUCING FACILITIES DISPOSAL COMMISSION

By

/s/ *Holman D. Pettibone*

*Leslie R. Pounds*

*Everett R. Cook*

Constituting all of the members thereof

Witnesses:

/s/ *Dudley C Foley Jr*

*J. M. Stonnell*

COPOLYMER CORPORATION

By

/s/ *A. L. Freedlander*

President

(Notarial
   Seal)

/s/ *Alvin B. Rubin*

Notary Public

My commission ~~expires~~ IS FOR LIFE.
                                  ABR

## Act of Sale, Vendor's Lien and Special Mortgage

UNITED STATES OF AMERICA

State of Louisiana

BE IT KNOWN, That on this 21st day of the month of April, in the year 1955,

Before me, _ALVIN B. RUBIN_, a notary public duly commissioned and qualified in and for the Parish of East Baton Rouge, State of Louisiana, therein residing, and in the presence of the witnesses hereinafter named and undersigned,

PERSONALLY CAME AND APPEARED:

Holman D. Pettibone, a resident of Winnetka, Illinois, Leslie R. Rounds, a resident of Kennebunkport, Maine, and Everett R. Cook, a resident of Memphis, Tennessee, each being of full age of majority and each of whom, being first duly sworn, did depose and say:

That they are the members of the Rubber Producing Facilities Disposal Commission, an instrumentality of the United States Government created by an Act of Congress known as the "Rubber Producing Facilities Disposal Act of 1953" (Public Law 205, 83d Congress, 67 Stat. 408), and that they



- 2 -

appear and act herein as such commission (hereinafter called
the Vendor);  each of which said appearers, acting in his
capacity aforesaid, declares as follows:

That Reconstruction Finance Corporation was cre-
ated as an instrumentality of the United States Government
on January 22, 1932, by an Act of Congress known as the
"Reconstruction Finance Corporation Act" (Public Law 2, 72d
Congress, 47 Stat. 5);

That Defense Plant Corporation was created as an
instrumentality of the United States Government on August
22, 1940, by said Reconstruction Finance Corporation pur-
suant to Section 5(d) of said Reconstruction Finance Corpo-
ration Act as amended (6 Fed. Reg. 2971);

That said Defense Plant Corporation was dissolved
on July 1, 1945, and its rights and assets transferred to
said Reconstruction Finance Corporation by Act of Congress
(Public Law 109, 79th Congress, 59 Stat. 310);

That the rubber producing facilities of said Re-
construction Finance Corporation were transferred on June
30, 1954, to Federal Facilities Corporation, an instrumen-
tality of the United States Government created by the
Secretary of the Treasury pursuant to an Executive Order of
the President of the United States (Executive Order No.10539,
19 Fed. Reg. 3827);

- 3 -

That through one or more of the aforesaid instrumentalities the United States Government has acquired and now owns certain rubber producing facilities;

That said Rubber Producing Facilities Disposal Commission has been authorized by said Rubber Producing Facilities Disposal Act of 1953 to sell such facilities in the manner provided by said Act and to execute and deliver such deeds or other instruments appropriate to effectively transfer to the purchasers thereof the title to such facilities, no matter by what officer, agent, department, Government corporation, or instrumentality of the Government title to such facilities is held;  and

That the Vendor does, by these presents, grant, bargain, sell, convey, transfer, assign, set over, abandon and deliver, without any representation or warranty whatsoever, express or implied, not even for the return of the purchase price, unto COPOLYMER CORPORATION, a corporation of the State of Louisiana (hereinafter called the Purchaser), represented herein by _A. L. FREEDLANDER_, its ——— President, duly authorized to act herein under and by virtue of a resolution of the board of directors of said corporation adopted on the _28th_ day of _MARCH_, 19_55_, a duly certified copy of which is annexed hereto and made a part hereof, accepting and purchasing for itself, its successors and assigns, and acknowledging due delivery and possession thereof, all of the

- 4 -

right, title, and interest of the United States of America
(hereinafter called the Government) and of every officer,
agent, department, Government corporation, or instrumental-
ity thereof, in and to the following described property,
constituting the manufacturing plant and property known as
Plancor 876 of the rubber producing facilities of the
Government (said plant and property being hereinafter called
the Facility), situated in the Parish of East Baton Rouge,
in the State of Louisiana, to wit:

    Group A:  The following described tract or parcel
of land:

    A certain tract or parcel of land situated in
Sections 37 and 38, Township Six (6) South, Range
One (1) East, in the Parish of East Baton Rouge,
State of Louisiana, being a portion of Lot Seventy
(70) Monte Sano Highland Farms, containing fourteen
and 77/100 (14.77) acres, and described according
to a map by A. G. Mundinger, C. E. and Surveyor,
dated Baton Rouge, Louisiana, September 29, 1942, as
follows, to-wit:

Begin at a point marked by a concrete monument, in
the south side line of Shada Avenue at its inter-
section with the western side line of Lot Seventy
(70) of said Monte Sano Highland Farms;  thence
proceed north eighty-one degrees thirty-four minutes
east (81°34') along the said southern side line of
Shada Avenue, a distance of four hundred and forty-
eight and 1/10 (448.1) feet to a point in the east
line of said Lot Seventy (70) of Monte Sano Highland
Farms and corner;  thence proceed south sixteen
degrees forty-seven minutes (16°47') east along the
said east line of said Lot Seventy (70) Monte Sano
Highland Farms, a distance of two hundred Eighty-
four and 1/10 (284.1) feet and corner;  thence pro-
ceed south eighty-one degrees thirty-four minutes
(81°34') west ninety-five and 9/10 (95.9) feet and

- 5 -

corner;  thence proceed south eight degrees twenty-
six minutes (8°26') east a distance of one hundred
and ninety-eight and 1/10 (198.1) feet to the south-
ern side line of Woodlawn Avenue and corner;  thence
proceed in a southeasterly direction along the
southern side line of said Woodlawn Avenue along the
arc of a curve having a radius of four hundred thir-
teen and 54/100 (413.54) feet to the western side
line of a thirty-five (35) foot street named Midland
Place and corner;  thence south ten degrees fifty-
six minutes (10°56') west along the western side line
of said Midland Place, a distance of sixty-seven and
56/100 (67.56) feet to a point of curve;  thence
continuing along the western side line of said Mid-
land Place in a southerly direction following the
arc of a curve having a radius of two hundred and
eighty-eight and 2/10  (288.2) feet, a distance of
one hundred sixty-five and 99/100 (165.99) feet to
a point of tangency;  thence proceed along the
western side line of Midland Place south twenty-two
degrees four minutes east (22°4') to the northeast
corner of Lot Nine (9) Block Three (3) Park Manor
Subdivision and corner;  thence proceed south sixty-
seven degrees fifty-six minutes (67°56') west along
the northern line of said Lot Nine (9) a distance of
eighteen and 35/100 (18.35) feet and corner;  thence
proceed south eight degrees twenty-six minutes (8°26')
east a distance of six hundred eighty-five and 4/10
(685.4) feet to the center of Monte Sano Bayou and
corner;  thence proceed along the center of said
Monte Sano Bayou and following the meanderings thereof
in a general westerly direction to the southwest
corner of said Lot Seventy (70) Monte Sano Highland
Farms and corner;  thence proceed north nine degrees
and three minutes (9°3') west along the said western
line of said Lot Seventy (70) Monte Sano Highland
Farms, a distance of fifteen hundred sixty-nine and
no/100 (1569.00) feet to the point of beginning.

The above-described property was acquired by De-

fense Plant Corporation by the following conveyances:

The act of sale by Ira Eugene Barksdale to Defense

Plant Corporation, dated November 16, 1942, filed for

record in the office of Clerk of Court of East Baton

- 6 -

Rouge Parish, Louisiana, on November 16, 1942, and
recorded in Book 526, page 279, Original No. 43,
Bundle No. 1524.

The act of sale by Hubert D. Crook & Mrs. Lillian
Coker Crook to Defense Plant Corporation, dated Novem-
ber 13, 1942, filed for record in the office of Clerk
of Court of East Baton Rouge Parish, Louisiana, on
November 14, 1942, and recorded in Book 526, page 205,
Original No. 14, Bundle No. 1524.

The act of sale by Mrs. Bess Moore Heap to De-
fense Plant Corporation, dated November 13, 1942,
filed for record in the office of Clerk of Court of
East Baton Rouge Parish, Louisiana, on November 16,
1942, and recorded in Book 526, page 277, Original
No. 42, Bundle No. 1524.

The act of sale by Joseph L. McMillan to Defense
Plant Corporation, dated November 13, 1942, filed for
record in the office of Clerk of Court of East Baton
Rouge Parish, Louisiana, on November 14, 1942, and
recorded in Book 526, page 212, Original No. 17,
Bundle No. 1524.

The act of sale by Charlie M. McCaa and Frank A.
Picken & Mrs. Bertha Moore Picken to Defense Plant
Corporation, dated November 13, 1942, filed for record
in the office of Clerk of Court of East Baton Rouge

- 7 -

Parish, Louisiana, on November 14, 1942, and recorded in Book 526, page 203, Original No. 13, Bundle No. 1524.

The act of sale by John L. Henry and Sarah Lindsey Henry (who declared that the correct spelling of their name was H-e-n-e-r-i-e) to Defense Plant Corporation, dated October 13, 1942, filed for record in the office of Clerk of Court of East Baton Rouge Parish, Louisiana, on November 14, 1942, and recorded in Book 526, page 209, Original No. 16, Bundle No. 1524.

The act of sale by Joseph Albert Samson, Jr., to Defense Plant Corporation, dated November 13, 1942, filed for record in the office of Clerk of Court of East Baton Rouge Parish, Louisiana, on November 14, 1942, and recorded in Book 526, page 230, Original No. 26, Bundle No. 1524.

The act of sale by Charlie M. McCaa and Walter E. Sadler to Defense Plant Corporation, dated November 13, 1942, filed for record in the office of Clerk of Court of East Baton Rouge Parish, Louisiana, on November 14, 1942, and recorded in Book 526, page 228, Original No. 25, Bundle No. 1524.

The act of sale by Charlie M. McCaa and Marvin H. Owens & Mrs. Wilda Givens Owens to Defense Plant Corporation, dated November 13, 1942, filed for record in

- 8 -

the office of the Clerk of Court of East Baton Rouge
Parish, Louisiana, on November 14, 1942, and recorded
in Book 526, page 207, Original No. 15, Bundle No. 1524.

The act of sale by Charlie M. McCaa to Defense
Plant Corporation, dated November 13, 1942, filed for
record in the office of Clerk of Court of East Baton
Rouge Parish, Louisiana, on November 14, 1942, and re-
corded in Book 526, page 214, Original No. 18, Bundle
No. 1524.

Group B:  The following servitudes granted to
Reconstruction Finance Corporation, running in favor
of the above-described property, together with and in
addition to all other servitudes, rights of way, and
permits appurtenant to or acquired by the Government
for use in connection with the above-described land
and the facilities thereon, including, but not by way
of limitation:

1.  Servitude granted by Esso Standard Oil Com-
pany to Reconstruction Finance Corporation on March
24, 1949 granting a servitude of passage and right-
of-way for the construction, installation, operation
and maintenance of a three inch pipe line and the right
of exclusive use and operation of an existing four inch
pipe line owned by Esso Standard Oil Company, said pipe
lines pass through and under property owned by Esso
Standard Oil Company, together with a license of passage
over and under the property of Gulf States Utilities Com-
pany for maintenance and operation of said four inch
pipe line, all as more fully shown and described in that
certain act recorded in Book 821, folio 286 of the Con-
veyance Records of East Baton Rouge Parish, Louisiana.

- 9 -

2. Servitude granted by Illinois Central Railroad Company to the Reconstruction Finance Corporation on January 20, 1949, granting a right to lay, maintain, repair, renew and operate a three inch steel pipe line for the transmission of brine to be encased in a larger pipe, to be placed at least four feet below the tracks of the railroad company under the tracks of the rail-road company, approximately two hundred five (205) feet north of mile post L-363, Baton Rouge, Louisiana, all as more fully shown and described in that certain act recorded in Conveyance Book 828, page 347, of the Conveyance Records of East Baton Rouge Parish, Louisiana.

3. Servitude granted by Gulf States Utilities Company to the Reconstruction Finance Corporation on October 13, 1949 granting a right-of-way for the purpose of constructing, maintaining and operating a three inch brine pipe line under and across a tract of land situated in the Parish of East Baton Rouge, Louisiana, in Sections 42 and 43, Township Six (6) South, Range One (1) West, Greensburg Land District of Louisiana, all as more fully shown and described in that certain act recorded in Book 838, folio 294 of the Conveyance Records of East Baton Rouge Parish, Louisiana.

4. Servitude granted by Esso Standard Oil Company to Reconstruction Finance Corporation on May 15, 1952, granting a servitude of passage and right-of-way for the laying, installing, constructing, maintaining, using, and removing of pipe lines, telephone and telegraph lines, electric power transmission lines, roads, bridges, passageways and appurtenant facilities over, across and under a tract or parcel of land in Sections 38 and 40, Township Six (6) South, Range One (1) West, Greensburg Land District of Louisiana, all as more fully shown and described in that certain act recorded in Book 988, page 130, of the Conveyance Records of East Baton Rouge Parish, Louisiana.

Group C: The following described servitude and

right of way over the property constituting Plancor

572 of the rubber producing facilities of the Govern-

ment is hereby conveyed to and created in favor of the

Purchaser:

- 10 -

A servitude on and the rights to use for the purpose of maintaining, repairing, replacing and removing the existing equipment and pipelines listed and described in Group E hereof on and over a certain tract of land described in the conveyance from Standard Oil Company of Louisiana to Defense Plant Corporation by Act before John T. Laycock, Notary Public, dated April 27, 1943, recorded in Book 532, page 295 of the Conveyance Records of East Baton Rouge Parish, Louisiana, and situated in what was formerly the Third Ward of the Parish of East Baton Rouge, Louisiana, being parts of Sections 38, 40, 41 and 42 of Township 6 South, Range 1 West, Greensburg Land District of Louisiana, containing 39.28 acres and being part of Tract D-1, as designated and shown on a map made by A. G. Mundinger, Civil Engineer and Surveyor, dated August 14, 1942, revised March 24, 1943; including the right of ingress and egress to and from the land subject to this servitude over said 39.28 acre tract for all purposes reasonably necessary for the exercise of the rights hereby created. The portion of said tract of land over which this servitude is reserved is shown on a map entitled and numbered "Map of Plancor 572 Showing Meter Installation Site & Plancor 152 and Plancor 876 pipe line locations, Esso Standard Oil Company, Louisiana Division, Drawing No. 1174, Sheet 1 of 1, Drawer 36, December 19, 1954," and is described according to that map as follows: The beginning point of said portion is the monument at SW corner of Tract D-1 as shown on map by A. G. Mundinger, C.E., dated August 14, 1942, thence along the following bearings for the distances shown: N 8° 59' W - 951.42'; N 81° 01' E - 50.0'; N 8° 59' W - 1475.21'; N 41° 01' E - 91.38'; S 8° 59' E - 38.83'; S 41° 01' W - 57.44'; S 8° 59' E - 126.31'; N 81° 01' E - 6.00'; S 8° 59' E - 99.00'; S 81° 01' W - 6.00'; S 8° 59' E - 342.69'; N 81° 01' E - 167.00'; S 8° 59' E - 12.00'; S 81° 01' W - 167.00'; S 8° 59' E - 15.00'; S 81° 01' W - 6.00'; S 8° 59' E - 319.00'; N 81° 01' E - 449.00'; S 8° 59' E - 337.00'; N 81° 01' E - 25.00'; S 8° 59' E - 35.67'; N 81° 01' E - 32.00'; S 8° 59' E - 30.00'; S 81° 01' W - 47.00'; N 8° 59' W - 45.67'; S 81° 01' W - 25.00'; N 8° 59' W - 342.00'; S 81° 01' W - 434.00'; S 8° 59' E - 174.00'; N 81° 01' E - 15.00'; S 8° 59' E - 100.00'; S 81° 01' W - 15.00'; S 8° 59' E - 275.21'; S 36° 01' W - 77.21'; S 8° 59' E - 888.74'; N 88° 28' W - 20.04' to the point of beginning. (A print of the said map will be attached to and made a part hereof before execution and delivery of this Act.)

- 11 -

This servitude shall run in favor of the Purchaser, its successors and assigns, but shall terminate whenever said equipment and pipelines shall cease to be used for the maintenance or operation of the rubber producing facilities presently known as Plancors 152 and 876;  and failure to remove said equipment and pipelines within sixty days following such termination shall be deemed an abandonment thereof.

Group D:  All buildings, structures, and improvements located on the land and servitudes described in Groups A, B and C.

Group E:  All other tenements, hereditaments, and appurtenances belonging to or in any wise appertaining to the above-described property, including, but not limited to, the following:

Certain existing equipment and pipelines now or formerly part of the rubber producing facilities located on land which is a part of, adjoins, or is near the site of the above-mentioned Plancor 572, being the 39.28 acre tract of land referred to in Group C, and being described as follows:

Pipe lines in the following sizes and approximate lengths now or formerly used for the purposes indicated, the locations of which are shown on the map referred to in Group C above:

| | | |
|---|---|---|
| 1 - 10" | - 830' | 200# steam to Plancor 876 |
| 1 - 2" & 3" | - 1880' | Butadiene from Refinery to Plancor 876 |
| 1 - 3" | - 1500' | Brine from Solvay to Plancor 876 |
| 1 - 4" | - 830' | Treated water to Plancors 152 & 876 |

Group F:  All tangible personal property and fixtures of the Government directly pertaining to the Facility or located upon the above-described property,

- 12 -

including, but not limited to, all manufacturing, maintenance, repair, laboratory, pilot plant, automotive and service machinery and equipment, all office and cafeteria furniture, fixtures and equipment, and all tanks, towers, reactors, condensers, compressors, pumps, pipes, mills, shops, electric substations, meters and transformers; except, however, all raw materials, work in process, finished products, repair parts, spare parts, supplies, and stores now located at, or in transit to, the Facility, and tank cars owned by the Government, all of which are excluded from the property conveyed to the Purchaser by this Act of Sale.

It is expressly declared that, to comply with R. S. 9:1104 of the State of Louisiana, all of the tangible personal property and fixtures described in Group F above, together with all items of similar property hereafter acquired by the Purchaser in renewal, replacement or substitution of all or any part thereof, are made immovable by destination and are to be considered and dealt with as a whole and are to be considered as part of the land.

TO HAVE AND TO HOLD the above-described property unto the Purchaser, its successors and assigns, forever, subject, however, to the following:

- 13 -

All existing servitudes, easements, rights of way, and licenses over, under, or across the above-mentioned premises, and all restrictive covenants, reservations, and grants pertaining to the Facility, now of record.

This sale is made and accepted for and in consideration of the price and sum of Five Million Twenty-Five Thousand Six Hundred Sixty-Eight and 99/100 Dollars ($5,025,668.99), of which amount the sum of One Million Two Hundred Fifty-Six Thousand Four Hundred Seventeen and 25/100 Dollars ($1,256,417.25) was paid in cash at the time of the execution of this Act of Sale, the receipt of which is hereby acknowledged by the Vendor. And to represent the balance of the purchase price, the Purchaser (who is also referred to hereinafter as the Mortgagor) has executed its promissory note in the sum of Three Million Seven Hundred Sixty-Nine Thousand Two Hundred Fifty-One and 74/100 Dollars ($3,769,251.74) of even date herewith, payable to the order of the Vendor (who is also referred to hereinafter as the Mortgagee) at the offices of the Vendor in the City of Washington, D. C., or at such other place as the holder of the note shall designate in writing from time to time. The promissory note further provides for the payment of interest thereon semi-annually at the rate of four per cent per annum until paid, and for payment of the principal thereof in instalments over a period of ten years as follows: 3% on April 21 in 1956 and 1957, 7% on April 21, 1958, 8% on April 21, 1959, 10% on April 21, 1960, 12% on April 21, 1961, 14% on April 21 in 1962, 1963, and 1964, and 15% on April 21, 1965.

- 14 -

And the said promissory note, after having been paraphed "Ne Varietur" by me, Notary, in order to identify the same herewith, has been delivered by the Purchaser unto the Vendor, who hereby acknowledged the receipt thereof.

And, in order to secure the payment of said promissory note, in principal and interest, according to its tenor, and to the provisions hereinafter contained, and to secure the faithful performance of all of the obligations contained herein, and the reimbursement and payment of attorneys' fees, taxes, paving assessments, premiums of insurance, costs, charges, and all expenses, whatsoever, Vendor's lien and privilege are retained, and the said Purchaser does, by these presents, specially mortgage, affect, and hypothecate the property, conveyed to the Purchaser by this Act of Sale (except motor vehicles requiring registration under the laws of the State of Louisiana) and all property hereafter acquired by the Purchaser in renewal, replacement or substitution thereof (hereinafter sometimes called the Mortgaged Property), unto and in favor of the Vendor and any future holder or holders of the said note, the Purchaser hereby confessing judgment in favor of the Vendor and any future holder or holders of said note, for the full amount of the said promissory note or obligation, together with all interest, taxes, paving instalments, premiums of insurance, attorney fees, and all costs, charges,

- 15 -

advances and expenses, whatsoever, and the said Purchaser hereby binds and obligates itself not to sell, alienate or encumber or deteriorate any of the foregoing property to the prejudice of this Act or to permit or suffer the same to be sold, alienated, encumbered or deteriorated to the prejudice of this Act.

And the Purchaser agrees for itself and its successors and assigns as follows:

The Purchaser accepts the terms, conditions, restrictions, and reservations contained in Section 7(h) of the Rubber Producing Facilities Disposal Act of 1953, and this conveyance is made expressly subject to, and the Purchaser, for itself, its successors and assigns, hereby agrees to accept the same subject to, the following National Security Clause, which shall be effective for a period of ten years from the date hereof:

> (a)  The Purchaser will maintain at all times in accordance with sound practice in the industry, normal wear and tear excepted, the Facility, together with all replacements thereof and additions and improvements thereto, so that the same shall be, at all times during said ten-year period, either in a condition (1) currently to produce net GR-S rubber at a rate of not less than 49,000 long tons per year (assigned annual capacity), or (2) so that it can be placed in a condition to produce GR-S rubber at such rate of assigned annual capacity within a period of 180 days after written notice from the Government to activate the plant or to reconvert same, as the case may be: provided, however, that such 180-day period shall be extended, upon written approval to the Purchaser from the Government, for such additional period as

- 16 -

shall be necessary in the event the Purchaser is unable to comply therewith by reason of its inability to procure essential materials, unavailability of labor, act of God, fire, earthquake, flood, explosion, storm, strike, or other cause or causes reasonably beyond its control;  and provided, further, that in the event of major damage to or complete destruction of the Facility where the Purchaser is without fault or negligence, the Purchaser shall immediately notify the Government of the happening and of the cause or causes occasioning same, whereupon the Government will cause an examination to be made and will thereafter notify the Purchaser promptly of the extent, if any, that restoration of the assigned annual capacity so destroyed or damaged must be made, such restoration to be effected at the Purchaser's expense within a reasonable period of time to be agreed upon between the Purchaser and the Government.  However, in any case where such restoration is so deemed necessary by the Government, the Purchaser may elect to invoke the privilege of substituting new separate facilities pursuant to and in accordance with paragraph (g) or (h) of this National Security Clause.  Such restoration shall not be required in the event of major damage to or complete destruction of the Facility caused directly or indirectly by (1) hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack, (i) by any government or sovereign power (de jure or de facto), or by any authority maintaining or using military, naval or air forces;  or (ii) by military, naval or air forces;  or (iii) by an agent of any such government, power, authority or forces, it being understood that any discharge, explosion or use of any weapon of war employing atomic fission or radioactive force shall be conclusively presumed to be such a hostile or warlike action by such a government, power, authority or forces;  (2) insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an occurrence.

(b)  The Government shall have the right to conduct an inspection or survey of the Facility at any time, subject to reasonable prior written

- 17 -

notice thereof to the Purchaser, for the purpose
of determining whether the Purchaser is in de-
fault under this National Security Clause.

(c)  Failure to maintain the Facility as
required above, or failure to observe any of the
other conditions of this National Security Clause,
shall give the Government the unconditional right
to immediate possession and use of the Facility
for the purpose of restoring it to a condition to
produce at the rate of such assigned annual capa-
city, but all costs incidental to such restora-
tion shall be borne exclusively by the Purchaser.

(d)  The Purchaser will not sell, lease,
mortgage, or otherwise encumber the Facility
without expressly making such sale, lease, mort-
gage or encumbrance subject to the provisions of
this National Security Clause for the remainder
of its term.  It is the express intention of both
the Purchaser and the Vendor that the covenants
herein contained shall be binding on subsequent
owners or occupants of the Facility, and that the
Purchaser shall remain liable for any violations
of said covenants by such subsequent owners or
occupants unless the Purchaser shall have been
expressly released in writing from such obliga-
tion by the Government.

(e)  The Government in exercising its rights
and in carrying out its obligations under this
National Security Clause shall act through such
officer, department or agency of the Government
as shall be designated by duly constituted author-
ity.

(f)  During the term of this National Security
Clause, the Purchaser shall preserve the "Asset
Property Records" pertaining to the Facility and
acquired from the Government concurrently with
this conveyance, and shall maintain and keep cur-
rent thereafter an adequate record of the fixed
assets of the Facility;  the Purchaser shall also
preserve until the expiration of said term all
drawings, tracings, prints, and other documents
in its possession (hereinafter called documents)
pertaining to the construction, modification,
maintenance, or theory and method of operation of
the Facility.  At any time within said term, upon

- 18 -

request of the Government, the Purchaser shall
make available to the Government such of the afore-
said records, documents, or any designated portion
thereof as shall be essential to the Government
for the purposes of paragraphs (b) and (c) of this
National Security Clause, and shall upon request
from time to time furnish copies thereof to the
Government at the Government's expense.  The Gov-
ernment will maintain confidential such documents
and copies thereof as the Purchaser shall desig-
nate, and, to the extent requested by the Pur-
chaser, shall examine them only at the Facility.
The Purchaser may offer to the Government any of
such records and documents that it considers to
be obsolete, and the Purchaser will be relieved
of the obligation to preserve them if the Govern-
ment accepts the offer or grants permission for
destruction or other disposition.

(g)  The Purchaser may at any time during the
term of this National Security Clause notify the
Government in writing that it desires to substi-
tute for all or any part of the facilities hereby
conveyed to the Purchaser new separate facilities
of equivalent productive capacity for the produc-
tion of GR-S rubber or for the production of a
different product which must be at least as satis-
factory, and be generally acceptable for the same
general uses and purposes, as GR-S rubber, and
upon receiving approval in writing thereto from
the Government, may proceed to effect such sub-
stitution.  In such event, all of the terms and
provisions of this National Security Clause shall
apply with equal force and effect to such substi-
tuted facilities and shall no longer apply to the
facilities to which they applied originally.

(h)  In lieu of proceeding as permitted by
paragraph (g) of this National Security Clause,
the Purchaser may at any time during the term of
this Clause substitute for all or any part of the
facilities hereby conveyed to the Purchaser new
separate facilities of equivalent productive capa-
city for the production of GR-S rubber, or for the
production of a different product which must be
at least as satisfactory, and be generally accept-
able for the same general uses and purposes, as
GR-S rubber.  Sixty days after written notice by
the Purchaser to the Government of the completion

- 19 -

of such new separate facilities, all of the terms and provisions of this National Security Clause shall apply with equal force and effect to such new separate facilities and shall no longer apply to facilities for which the new separate facilities are to be substituted, unless within such 60-day period the Government notifies the Purchaser in writing that it disapproves the proposed substitution, in which event the terms and provisions of this National Security Clause shall remain applicable to the facilities to which they applied originally.

The Vendor's lien and special mortgage on the property conveyed hereby is subject, however, to the same servitudes, easements, rights of way, licenses, restrictive covenants, reservations, grants and National Security Clause to which the Act of Sale is subject as hereinabove set forth.

The maximum amount of the obligations of the Mortgagor, as herein stipulated, at any time outstanding, which this Mortgage shall secure, is hereby fixed at 150% of the original principal amount of the Note.

And, in consideration of the acceptance of the Note by the Mortgagee and as part of the security therefor, the said appearer on behalf of the Mortgagor, acting in his capacity aforesaid, declared that the Mortgagor does agree and stipulate as follows:

Section 1. That the Mortgagor will duly and punctually pay or cause to be paid the principal of and the interest on the Note at the times and at the place or places and in the manner specified therein.

- 20 -

Section 2.  That the Mortgagor now owns and is lawfully possessed of the Mortgaged Property, other than the after-acquired property referred to in the granting clauses hereof, and is duly authorized to operate the Facility and will take all steps and do all acts necessary under federal, state, or local law to maintain, extend, or renew its corporate existence, its authority to operate the Facility, and its right to transact business in the State of Louisiana.

Section 3.  That the Mortgagor has good and legal right to mortgage the Mortgaged  Property to the Mortgagee, and will execute, acknowledge, and deliver, or cause to be executed, acknowledged, and delivered, all such further deeds, mortgages, assignments, and transfers, or other assurances in law, as may be required by the Mortgagee for the better mortgaging to the Mortgagee of all and singular the property hereby mortgaged or intended so to be.

Section 4.  That the Mortgagor will cause the Mortgage and every supplemental indenture or instrument purporting to create or assure a lien upon the Mortgaged Property to secure the Note to be recorded and filed and re-recorded and re-filed to the extent necessary to make effective and maintain the lien intended to be created hereby and thereby.

Section 5.  That the Mortgage is and always will be kept, so long as any indebtedness secured hereby remains

- 21 -

unpaid, a lien upon all of the Mortgaged Property, subject only to the matters and things hereinabove referred to; that it will not create, or suffer to be created or to arise, or allow to exist, any other lien or charge having priority to, preference over, or parity with the lien of the Mortgage upon the Mortgaged Property, or any part thereof;  and that, within six months after the same shall be payable, it will pay or cause to be discharged, or will make adequate provision for the satisfaction or discharge of, all lawful claims and demands of mechanics, laborers, materialmen and others for labor performed or materials furnished after the date hereof, which, if unpaid, might by law be given precedence over the Mortgage upon the Mortgaged Property or any part thereof;  but that the Mortgagor shall not be required to pay any such lien, charge, or claim so long as in good faith it shall con-test the validity or the amount thereof by appropriate legal proceedings, unless thereby, in the judgment of the Mortgagee, the security afforded by the Mortgage will be materially impaired or endangered.

Section 6.  That, except as otherwise provided in the foregoing National Security Clause, the Mortgagor will at all times maintain the Mortgaged Property free from waste or nuisance of any kind, and in good repair, working order, and condition, and from time to time will

- 22 -

make all needful and proper repairs thereto and renewals and
replacements thereof;  and will complete in good, workmanlike
manner any repair or construction work undertaken by it on
any of the buildings, structures, improvements or fixtures
comprising a part of the Mortgaged Property.

Section 7.  That the Mortgagor will pay, on or before
the date on which the same shall become delinquent, all taxes
(both general and special), assessments, and governmental charg-
es lawfully levied or assessed against the Mortgaged Property
or any part thereof, or against the lien or interest of the
Mortgagee in respect of the Mortgaged Property, or against the
Note, so that the lien and priority of the Mortgage will be
fully preserved at the cost of the Mortgagor without expense
to the Mortgagee, and will promptly exhibit to the Mortgagee
upon request the receipt or receipts evidencing such payment;
provided, however, that the Mortgagor shall not be required
to pay any such taxes, assessments, or governmental charges
so long as in good faith it shall contest the validity or
amount thereof by appropriate legal proceedings, unless there-
by, in the judgment of the Mortgagee, the security afforded
by the Mortgage will be materially impaired or endangered.

Section 8.  That, except as to defects, if any,
in the title to the Mortgaged Property conveyed to the
Mortgagor by the foregoing Act of Sale, the Mortgagor
promptly will pay and settle all claims against any of the

- 23 -

Mortgaged Property arising on or subsequent to the date of
the Mortgage which affect the rights of the Mortgagee, or
will prevent such claims from affecting such rights, and
will appear in and defend any action or proceeding arising
on or subsequent to such date purporting to affect the lien
of the Mortgage, or the rights or powers of the Mortgagee,
and will pay all expenses incident thereto.

Section 9.  That the Mortgagor will maintain, at
its own expense, fire and extended coverage insurance (in-
cluding vandalism and malicious mischief) on the Mortgaged
Property, with loss payable to the Mortgagee, without con-
tribution, in an amount at least equal to the unpaid bal-
ance of the Note or sufficient to comply with the provi-
sions of any coinsurance clause in the policy or policies
therefor, whichever is greater, but not in excess of the
full insurable value thereof as determined by a qualified
appraiser;  that the Mortgagor will maintain, at its own
expense, steam boiler and machinery insurance (including
steam piping) on the Mortgaged Property, with loss payable
to the Mortgagee, in an amount equal to the unpaid balance
of the Note or $3,000,000, whichever is less, the policy or
policies therefor to be noncancellable by the insurer with-
out 30 days prior written notice to the Mortgagee;  that
all such policies of insurance shall be in such form, and
with such insurance company or companies, as the Mortgagee

- 24 -

shall require or approve;  that the Mortgagor will deliver
the originals of all such policies to the Mortgagee or copies
certified by the insurer to be exact duplicates of the orig-
inals, except as to the rate or rates, which need not be
stated;  that any proceeds from such insurance received by
the Mortgagee shall be made available to the Mortgagor for
the repair, restoration, or replacement of the damaged or
destroyed property or for the installation of facilities
having an equivalent substitutional use in the operation of
the Facility, under such terms and conditions as the Mort-
gagee deems necessary or appropriate to insure actual appli-
cation of such proceeds to such purpose and to subject to
the lien of the Mortgage the property acquired by the use of
such proceeds;  and that all of such proceeds not used for
such purpose within two years after receipt thereof by the
Mortgagee shall be applied by it, first, to the payment of
the accrued and unpaid interest on the Note, second, to the
payment of the unpaid instalments of principal of the Note
in the inverse order of their maturity, and third, to the
payment of any other indebtedness secured by the Mortgage;
and the remainder, if any, shall be paid over to the Mort-
gagor.

Section 10.  That the Mortgagor may (a) sell or
otherwise dispose of in the regular course of operation of
the Facility any of the machinery, equipment or other

- 25 -

property described in Group F of the granting clauses of the foregoing Act of Sale which, in the judgment of the Mortgagor, has become worn out, obsolete or otherwise unfit for use, provided the property so disposed of is replaced with other property becoming subject to the lien of the Mortgage and of equal value and having the same or equivalent substitutional use in the operation of the Facility, and (b) to make such alterations of, install such additional machinery and equipment in, and do such rehabilitation work on, the Mortgaged Property as it shall deem necessary, provided the security of the Mortgage is not thereby impaired.

Section 11.  That all judgments, decrees, and awards pursuant to proceedings for condemnation of the Mortgaged Property, as rent or otherwise and whether for a temporary taking or otherwise, are hereby assigned in their entirety to the Mortgagee, which shall apply the same, first, to the payment of the accrued and unpaid interest on the Note, second, to the payment of the unpaid instalments of principal of the Note in the inverse order of their maturity, and, third, to the payment of any other indebtedness secured by the Mortgage, and the remainder, if any, shall be paid over to the Mortgagor; that the Mortgagee is hereby authorized in the name of the Mortgagor to execute and deliver valid acquittances for, and appeal from, any such judgment, decree, or award; and that settlement shall be made pursuant to any proceedings for condemnation only with the consent of the Mortgagee.

- 26 -

Section 12.  That the Mortgagee may, at any time, and without notice to any other person, make any mutually satisfactory arrangements with the Mortgagor and may deal with the Mortgagor with respect thereto, or grant to the Mortgagor any indulgences or forbearances or any extensions of the time for payment of any indebtedness secured hereby, or may release portions of the Mortgaged Property from the lien hereof, all without affecting the liability for the payment of the indebtedness secured hereby or the lien of the Mortgage upon the Mortgaged Property or any remainder thereof for the full amount of the indebtedness then remaining unpaid.

Section 13.  That the Mortgagor will permit the Mortgagee, through its agents, to inspect the Mortgaged Property or any portion thereof at any time and from time to time for the purpose of determining whether the Mortgagor is in default under the provisions of the Mortgage; and will furnish to the Mortgagee promptly and fully at any reasonable time, upon written request, certified copies of such financial statements and reports as the Mortgagor shall send to its stockholders and of such regular or periodic reports, if any, as the Mortgagor is required to file with the Securities and Exchange Commission.

Section 14.  That the following shall constitute events of default under the Mortgage:

- 27 -

(a)  Default in the payment of the principal of the Note or any instalment thereof when due;

(b)  Default in the payment of any instalment of interest on the Note when due and the continuation of such default for 30 days;

(c)  Default by the Mortgagor in the observance of any other covenant or condition of the Mortgage and the continuation thereof for a period of 30 days after written notice from the Mortgagee;

(d)  The entry of a decree or order by any court of competent jurisdiction appointing a receiver of the Mortgagor, or of any of the Mortgaged  Property, or adjudicating the Mortgagor insolvent or a bankrupt, or approving as properly filed a petition seeking reorganization of the Mortgagor under the Bankruptcy Act or any other federal or state law, and the failure of the Mortgagor to procure a cancellation, stay, vacation, or discharge of such decree or order within in a period of 60 days thereafter;

(e)  The making by the Mortgagor of an assignment for the benefit of creditors, or the filing by the Mortgagor of a voluntary petition in bankruptcy or a consent to the appointment of a receiver of the Mortgagor or of all or any part of the Mortgaged Property;  or

(f)  The rendering of a final judgment for the payment of money against the Mortgagor and the failure of the Mortgagor to discharge or cause it to be discharged, within 90 days from its entry, or, within that period, to appeal therefrom or from the order, decree, or process upon or pursuant to which said judgment was granted, based, or entered and secure a stay of execution pending such appeal.

Section 15.  That upon the occurrence of an event of default as defined in Section 14, the Mortgagee, if and so long as the event or events of default in question remain unremedied, without notice and without affecting the

- 28 -

lien of the Mortgage or the priority of said lien or any right of the Mortgagee hereunder:

(a)  May perform or fulfill such defaulted covenant or condition to such extent as the Mortgagee shall determine and enter upon the Mortgaged Property, inspect, repair, and maintain the same, and perform such other acts thereon as the Mortgagee shall deem advisable for any of the aforesaid purposes, and all funds so advanced by the Mortgagee in performing or fulfilling such defaulted covenants or conditions, with interest thereon from the date expended or advanced until repaid at the rate of 4% per annum, shall be additional indebtedness secured hereby, and shall be repaid promptly without demand, and be included in any decree foreclosing the Mortgage and be paid out of the rents or proceeds of sale of said property, if not otherwise paid by the Mortgagor (but nothing herein contained shall be construed as requiring the Mortgagee to expend or advance funds for any of the aforesaid purposes);

(b)  May declare all sums secured hereby immediately due and payable and enforce any of the rights that accrue to the Mortgagee hereunder, including the power of sale, or foreclose the Mortgage.

Section 16.  That upon the occurrence of an event of default the Mortgagor will assign, transfer, and set over unto the Mortgagee all the rents, issues, and profits then due and thereafter becoming due under or by virtue of any lease, whether written or verbal, or any agreement for the use or occupancy of the Mortgaged Property, or any part or parts thereof, which may have been theretofore made or agreed to; that the demand of the Mortgagee following the occurrence of any event of default shall constitute such assignment and transfer, it being the intention hereby to establish in any

event of default followed by demand of the Mortgagee an ab-
solute transfer and assignment to the Mortgagee of all such
leases and agreements and all the avails thereunder;  and
that such rents, issues, and profits shall be applied, first,
to the payment of all cost and expense of acting on such
assignment, and, second, to the payment of any indebtedness
then due and secured hereby or incurred hereunder.

 Section 17.  That upon the commencement of any
foreclosure proceeding, the court in which such proceeding
is filed, at any time thereafter, either before or after
sale, and without notice to the Mortgagor or any party
claiming under the Mortgagor (such notice being hereby ex-
pressly waived), and also without reference to the then
value of the Mortgaged Pro erty, to the use of said prop-
erty as a homestead, or to the solvency or insolvency of
any person liable for any of said indebtedness, or other
grounds for extraordinary relief, may at the option of the
Mortgagee appoint a receiver for the benefit of the Mortga-
gee, with power to take immediate possession of the Mort-
gaged Property, manage, rent, and collect the rents, issues,
and profits thereof during the pendency of such foreclosure
suit, and, in case of sale and a deficiency, during the
statutory period of redemption, if any, and such rents,
issues, and profits, when collected,may be applied toward
the payment of any indebtedness then due and secured hereby

and the costs, taxes, insurance, and other items necessary
for the protection and preservation of the Mortgaged Prop-
erty, including the expense of such receivership;  and that,
in connection with the aforesaid proceeding, or if the Mort-
gagee, after default, shall bring, intervene in, or defend
any other action to protect or establish any of its rights
hereunder, the Mortgagor will pay, in addition to costs and
disbursements allowed by law, the reasonable costs of bring-
ing, intervening in, or defending any such action, including
reasonable attorneys' fees, all of which shall be added to
the indebtedness secured hereby.

Section 18.  That in case of foreclosure of the
Mortgage, and whether or not any order or decree shall have
been entered therein, a reasonable sum shall be allowed for
attorneys' fees of the plaintiff in such proceedings, and in
addition thereto a reasonable sum for stenographers' fees
and for all funds expended for documentary evidence and the
cost of a complete abstract of title and title reports for
the purpose of such foreclosure, such sums to be secured by
the lien of the Mortgage;  that there shall be included in
any judgment or decree foreclosing the Mortgage and be paid
out of said rents or the proceeds of any sale made in pur-
suance of any such judgment or decree:  (a) all costs and
expenses of such suit or suits, advertising, sale, and con-
veyance, including attorneys' and stenographers' fees, outlays

- 31 -

for documentary evidence, and cost of complete abstract of
title and title report;  (b) all funds advanced by the Mort-
gagee, if any, for purposes authorized in the Mortgage, with
interest as herein provided;  (c) all the accrued interest
remaining unpaid on the indebtedness hereby secured;  and
(d) all the said principal sum remaining unpaid;  and that
the excess of the proceeds, if any, shall be paid to the
Mortgagor or as the court may direct.

Section 19.  That every right and remedy provided
in the Mortgage shall be cumulative of every other right or
remedy of the Mortgagee, whether herein or by law conferred;
and that no acceptance of the performance of any obligation
as to which the Mortgagor shall be in default, or waiver of
performance of any obligation, shall be construed as a
waiver of any other default then, theretofore, or thereafter
existing.

Section 20.  That the Mortgagor hereby waives, to
the extent permitted by law, the benefits of all valuation,
appraisement, homestead, exemption, stay, redemption, and
moratorium laws, now in force or which may hereafter become
law.

Section 21.  That the act of the Mortgagee in
exercising its option electing to declare the entire indebt-
edness secured hereby due and payable by reason of any of
the events of default specified in Section 14 may be

- 32 -

evidenced by the filing of proceedings to foreclose the Mortgage, by the filing of a suit to obtain possession of the Mortgaged Property, by the filing of a suit upon the Note or upon any other indebtedness secured hereby, or by the depositing of a letter, enclosed in an envelope properly sealed and stamped, in the United States mails, and addressed to the Mortgagor in care of Harry H. Kahn, Suite 1440, 120 South LaSalle Street, Chicago 3, Illinois, stating that the Mortgagee has exercised its option and has elected to declare the entire indebtedness due and payable by reason of an event of default, which shall be specified and described in such letter; and that the Mortgagee may from time to time rescind any action on its part in declaring the unmatured portion of indebtedness due and payable, but said rescission shall not constitute a waiver of the right to declare a default on account of any then existing or subsequently occurring event of default.

Section 22. That the term "Mortgagor" shall include the successors and assigns of Copolymer Corporation; that if the Commission shall cease to exist, the term "Mortgagee" shall include such agencies or instrumentalities of the Government as shall be designated from time to time by the President of the United States as successors to the Commission's rights and interests in the Note and the Mortgage; and that if the Note shall cease to be held by

-33-

the Commission or any successor agency or instrumentality of the Government, the term "Mortgagee" shall thereafter include any lawful owner, holder, or pledgee of the Note.

Section 23.  That the unenforceability or invalidity of any one or more provisions, clauses, sentences, and paragraphs hereof, shall not render any other provisions, clauses, sentences, or paragraphs herein contained unenforceable or invalid.

Section 24.  That the Act of Sale, Vendor's Lien and Special Mortgage may be executed in any number of counterparts, of which the one retained and filed with the Register of Conveyances and Recorder of Mortgages in the Parish of the State of Louisiana where the property is situated will control in case of discrepancy, but in all other respects each counterpart will be an original and such counterparts shall together constitute but one and the same instrument.

Section 25.  That if the Mortgagor shall pay the Note in accordance with its terms and all other indebtedness secured by the Mortgage, then and only then the Mortgage shall be null and void, the Mortgaged Property shall become wholly free of the indebtedness hereby secured, and the Mortgagee shall, at the request and cost of the Mortgagor, execute

-34-

and deliver to the Mortgagor a release or satisfaction of the Mortgage.

The production of mortgage, conveyance, and United States District Court and Circuit Court certificates, and State and Parish tax researches on the above described property, are hereby expressly waived by the parties hereto, who declare that all taxes due and exigible, including those assessed for the year 1954, have been paid, and who exonerate me, notary, from all responsibility for the non-production and non-annexation hereto of said certificates and researches.   State and Parish taxes for the year 1955 have been pro-rated as of 12:00 o'clock P.M., April 20, 1955.

United States revenue stamps in the amount of $___1938.40___ have been annexed to the original hereof and duly cancelled.

Thus done and passed at Baton Rouge, Louisiana, on the day and in the month and year hereinabove written, in the presence of _DUDLEY C FOLEY, JR_ and _____J M STONNELL_____, the undersigned competent witnesses, who have signed these

-35-

presents together with said appearers and me, notary, after
due reading of the whole.

RUBBER PRODUCING FACILITIES DISPOSAL COMMISSION

By /s/ *Holman D. Pettibone*

*Leslie R. Rounds*

*Everett R. Cook*

Constituting all of the members thereof

Witnesses:

/s/ *Dudley C Foley Jr*

*J M Stonell*

COPOLYMER CORPORATION

By /s/ *A. L. Freedlander*

President

(Notarial
   Seal)

/s/ *Alvin B Rubin*

Notary Public

My commission ~~expires~~ *is for life*

50 App. USCA § 1941r, Termination of Commission;  administration after termination          Page 2

Act Mar. 31, 1955, c. 19, § 4, 69 Stat. 16, provided that: "Notwithstanding the provisions of section 20 of the Rubber Producing Facilities Disposal Act of 1953 [this section], the Commission established by that Act [sections 1941 to 1941y of this Appendix] shall cease to exist at the close of the thirtieth day following the termination of the transfer period provided for in section 25(c) of that Act [section 1941w(c) of this Appendix], unless no sale of Plancor Numbered 877 is recommended by the Commission pursuant to section 25(c) of that Act [section 1941w(c) of this Appendix], in which event the Commission shall cease to exist at the close of the one hundred and thirtieth day following the date of enactment of this Act [March 31, 1955]."

## TEXT

## EXECUTIVE ORDERS

## EXECUTIVE ORDER NO. 10678

< Sept. 20, 1956, 21 F.R. 7199, as amended by Ex. Ord. No. 10720, July 11, 1957, 22 F.R. 5521 >

## ADMINISTRATION OF FUNCTIONS OF COMMISSION

By virtue of the authority vested in me by section 20 of the Rubber Producing Facilities Disposal Act of 1953, 67 Stat. 414, as amended or modified (50 U.S.C.App. 1941r), and by section 6(d) of the act of March 21, 1956, 70 Stat. 53 [set out as a note under section 1941f of this Appendix], and as President of the United States, it is ordered as follows:

Section 1. Subject to the provisions of section 2 of this order, the Federal Facilities Corporation (hereinafter referred to as the Corporation) is hereby designated as the agency to administer the contracts of sale or lease of the Government-owned rubber producing facilities made pursuant to the Rubber Producing Facilities Disposal Act of 1953, as amended [sections 1941 to 1941y of this Appendix], and to administer other matters involving the Rubber Producing Facilities Disposal Commission, including all powers and authority conferred upon the said Commission by sections 4, 5, and 6 of the said act of March 21, 1956 [set out as notes under sections 1941f and 1941y of

this Appendix], and also including the winding up of the affairs of the Commission. The said contracts are hereby transferred to the Corporation.

Sec. 2. The administration of the national-security clause contained in such contracts of sale, including any contract of sale made under the act of March 31, 1955, 69 Stat. 15 [enacting section 1941w and notes set out under sections 1938, 1941w, and 1941r of this Appendix], or under the said act of March 21, 1956 [set out as notes under sections 1941f and 1941y of this Appendix] and the administration of the national-security clause (including the recapture clause) contained in any lease of the unsold facilities made under any of the aforesaid acts shall be carried out in accordance with the needs and requirements of the national defense as determined by the Secretary of Defense.

*159623 Sec. 3. The records, property, liabilities, employees, and unexpended balances of appropriations, allocations, and other funds, available or to be made available, of the Rubber Producing Facilities Disposal Commission are hereby transferred to the Corporation, for use or employment by the Corporation in connection with the administration or performance of its functions and duties under section 1 of this order, or for other disposition as determined, consonant with law, by the Corporation.

Sec. 4. All matters placed under the administration or jurisdiction of the Corporation by sections 1 and 3 of this order shall be subject to direction and control by the Administrator of General Services.

Sec. 5. This order shall become effective on September 24, 1956.

DWIGHT D. EISENHOWER

## REFERENCES

## LIBRARY REFERENCES

American Digest System



Copyright (c) West Group 1999 No claim to original U.S. Govt. works

# NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

## all to whom these presents shall come. Greeting:

virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf,

e seal of the National Archives of the United States, that the attached reproduction(s) is a true and

opy of documents in his custody.



| SIGNATURE | |
|---|---|
| *Robert W Coren* | |
| NAME   Robert W. COren | DATE   7/22/97 |
| TITLE   Chief, NWDTC | |
| NAME AND ADDRESS OF DEPOSITORY | |
| The National Archives Washington, D.C. 20408 | |

NA FORM APR 85 1407-A



........................................................ (1,000) tons ......
......tic rubber and located at Baton Rouge, Louisiana (said plant and ......
......quipment therein to be hereinafter called the "Plant"), for a term of five ......
from the date of the completion of the Plant and its readiness for operation.

NOW, THEREFORE, for and in consideration of the premises and of the
mutual covenants hereinafter set forth, the parties hereto hereby mutually agree
as follows:

Section 1.  From and after the date of this contract and concurrently
the design and construction of the Plant, Operator, as agent for Reserve and in
the second and at the expense and risk of Reserve, shall undertake all preparations
necessary for the subsequent operation of the Plant for the production of synthetic
rubber of the Butadiene-Styrene Copolymer type, such as is suitable and fit for the
manufacture of tires and tubes (said rubber to be hereinafter called "Synthetic
Rubber"), including the training of personnel; and, with the prior approval of Re-
serve, the erection and operation of pilot plants, if any, for experimental purposes,
and the conducting of testing, research, laboratory, experimental and development
work in connection with the process or processes for the manufacture of Synthetic
Rubber.

Section 2.  During the term of this contract following completion of the
Plant and its readiness for operation, Operator shall operate the Plant for the
production of Synthetic Rubber, as agent for Reserve and for the account and at the
expense and risk of Reserve, but it is hereby expressly understood that all persons
managing and operating the Plant, or engaged in the performance of this contract,
by Operator shall be employed or retained by Operator and shall not be employees
of Reserve for any purpose whatsoever.

Reserve shall reimburse Operator for Operator's costs hereunder, as here-
in defined, and shall pay to Operator the overhead and management charge hereinafter
specified in Section 5 hereof.

Section 3.  For the purposes of this contract, Operator's costs hereunder
shall include all costs and expenses of whatsoever kind or character incurred by
Operator in connection with the management, operation, repair and maintenance of the
Plant and the manufacture and production of Synthetic Rubber, including, but without
limitation, the following:

(a)  All salaries and wages, whether full time or part time, and for
overtime or for regular time, for work performed at the Plant or elsewhere,
together with all preparations necessary for the operation of the Plant and all .......

management or operation or the maintenance of the Plant and/or
and render the services of technical, consultant, engineering or other professional
... than services furnished by the companies owning capital stock of
...(said companies being hereinafter collectively called the "Constituent Com-
panies") from their own personnel or personnel of their subsidiaries, as hereinafter
provided in this subsection (a) of this Section 3, whether performed on or off
plant site and whether on a full-time or part-time basis; all extra compensation
paid to employees engaged in the performance of this contract and all discontinu...
wages paid to such employees, the amount directly chargeable to Operator for all
group insurance, retirement income plan and all other welfare and employee-related
plans maintained by Operator for the benefit of its employees.

It is understood that Operator will enter into certain contracts with
Constituent companies under the terms of which the Constituent Companies will make
available to Operator (for the purposes of enabling Operator to carry out its con-
tract with Reserve to manufacture Synthetic Rubber) from their personnel or from
the personnel of their subsidiaries, if any, executives to serve upon Operator's
management committee, services of chemists and engineers to serve upon Operator's
technical committee; and, if requested by Operator, they will make available to
Operator from their own personnel or from the personnel of their subsidiaries
as it may from other sources, an attorney and patent attorney to serve upon Operator's
... committee and will furnish such other services as may be mutually agreed
upon between Operator and such Constituent Companies. It is further understood
that Operator may enter into additional service contracts for professional services
including legal and medical services. Amounts payable by Operator to the Constituent
... any other parties with whom it may contract, under such service
contracts, are expressly excluded from the computation of Operator's costs under
this Section 3, and such amounts shall be payable out of the funds made available

...manufacturing said alterations, improvements, replacements
and additions to the manufacturing buildings or equipment facilities connected
with, required for the efficient performance of this contract and the cost of which
for is not reimbursed under the Lease Contract, or otherwise; and the cost of all
maintenance and repairs including the cost of replacing, repairing or reconditioning
any of the machinery or equipment comprising the Plant, damaged or destroyed, but
only to the extent that the damage to or destruction of said machinery or equipment
is not covered by insurance and only to the extent that the replacing, repairing
or reconditioning is necessary to the efficient operation of the Plant.

It is hereby understood that title to any and all property of whatever
character, the cost of which is paid by Reserve pursuant to this subsection (b) of
this Section 3, shall vest directly in Reserve or Defense Plant Corporation, as
their respective interests of each may appear and that title to such property shall
at no event vest in Operator.

(c)   The amount of all taxes, licenses, fees or other charges levied by
any competent governmental authority, including those levied on the property covered
by the Lease Contract, or for the privilege of operating the Plant, or on the product
or manufactured therein, or on any materials or supplies, including the amount of
any payments made by Operator under the Social Security Act (employer's contribu-
tion), and any applicable Federal, state or local taxes, assessments or charges
(excluding any taxes on net income and any excess-profits taxes) which Operator may
be required to pay to such governmental authority, and which are incurred in connec-
tion with the performance of this contract, and including the amount of any addi-
tional taxes or contributions required to be paid by Operator at any time during
the performance of this contract or within five (5) years thereafter pursuant to
the Unemployment Compensation Act of any state and arising out of the layoff or
discharge of persons on account of the intermittent operation of the Plant or ter-
mination or completion of this contract.

(d)   The amount of all premiums or other costs of any bonds or insurance,
including public liability, employers liability, property damage, workmen's com-
pensation, fidelity (fire), theft, burglary or other insurance, which Operator is
required or permitted to carry under Section 10 hereof, or under the terms of the
Lease Contract.

(e) The amount, if any, paid by Operator as damages for any injury to death of a person or persons, or for any injury to property, the liability for which is incurred by Operator during the term of this contract arising through the occupancy of the Plant, or through the performance of this contract, or through the performance of the Lease Contract, but such amount, if any, shall be included herein only to the extent that Operator is actually out-of-pocket therefor without indemnity of any kind through insurance coverage or otherwise and only to the extent that Operator is legally liable for such damages as determined by due process of law or pursuant to a settlement made with the express approval of Reserve, and provided that the liability of Reserve under this subsection (e) of this Section j shall be limited in accordance with the provisions of Section 11 hereof.

(f) The cost of all power, water, steam, fuel, compressed air, telephone and telegraph services and other utilities and services, and all costs incident thereto which are not paid by Defense Plant Corporation; provided, however, that the cost of such utilities and services shall be computed in accordance with the provisions of Section 12 hereof.

(g) The amount expended for retreating or reprocessing Synthetic Rubber produced in the performance of this contract and found unsatisfactory for use in the manufacture of automobile tires and tubes.

(h) The cost of operating any pilot plants which may be used, with the approval of Reserve, for experimental operation of the process or processes used or intended to be used in the production of Synthetic Rubber, including the cost of all materials used or consumed in such experimental operation.

(i) The cost of conducting all research, experimental, laboratory and developmental work, including all cost under contracts or subcontracts for technical or consultant advice, in connection with the process or processes used or intended to be used by Operator in the manufacture of Synthetic Rubber in the Plant; provided, however, that such cost shall be included only to the extent approved by Reserve and in accordance with arrangements to be mutually satisfactory to Reserve and Operator, and provided further that no cost for technical services under contracts entered into or to be entered into by and between Operator and the Constituent Companies, as hereinabove defined in subsection (a) of Section 1, shall be included hereunder.

... Contractor to account ... incurred in connection with this
contract, including the cost of any audits required by Reserve, and expenses
of whatsoever ... incurred in connection with the termination of this contract
or the Lease Contract.

(k)  The cost of training of personnel required for the performance of
this contract, including expenses incurred in the procurement of suitable labor
... or and ... including any moving expenses of such personnel, provided that such
expenses are approved in advance by Reserve.

(l)  The cost of all materials and supplies necessary for the manufacture
of synthetic rubber hereunder or which are not furnished to Operator by Reserve as
provided in Section 7 hereof, including the cost of all transportation charges in-
curred by Operator with respect to such materials and supplies.

(m)  The amount of any expenses incurred in the performance of this con-
tract in connection with travelling and sustenance, provided that such allowances
are approved in advance by Reserve.

(n)  The net cost of disposing of all waste solids, liquids and gases
resulting from manufacturing operations at the Plant and the cost of disposing of
... obsolete equipment, junk and debris.

(o)  The amount of any costs of the character described in this contract
which may be incurred during any period within the term of this contract in which
operation of the Plant is suspended and also all costs incurred in placing the Plant
in stand-by or operating condition.

(p)  The amount of all charges properly incurred by Operator pursuant to
the express provisions of the Lease Contract for which reimbursement is not recover-
able ... from Defense Plant Corporation.

(q)  The cost of conducting all testing involved in Operator's operation
of the Plant including the testing of the finished product to be produced for
Reserve and the testing of raw materials.

Section 9.  The determination of the items of cost, as defined herein,
shall be ... in accordance with Operator's established accounting methods.  Such ac-
counting method shall be subject to approval by Reserve, but no material change shall ...
... if they conform to good accounting practice and in the review ...
... therefrom.  Operator shall maintain a complete separate system ...
... under this contract.  All accounting records relating ...
... this contract shall be subject to inspection and audit ...

finds with any item of cost as determined by Operator for
or thereafter will not disagree with such costs). In the event
hereto fail to agree on the inclusion of any item of cost, as de-
such question shall be submitted for determination to an independent
certified public accountant, approved by both parties, who shall be given access to
this contract and to the applicable records and whose decision shall be conclusive
upon both parties. In the event of inability of the parties hereto to agree upon
the selection of such certified public accountant, either party may request the
Secretary of the American Institute of Accountants to designate an independent cer-
tified public accountant, and the designation so made shall be accepted by both
parties. The expense of any such submission shall be borne by the party whose con-
tention is not sustained, or if the contention of neither party is wholly sustained,
such expense shall be borne by either party, or by both parties in proportionate
amounts, as shall be determined by said certified public accountant.

Section 5. (a) For purposes of this Section 5, the term "Contract Year"
shall mean each of the several consecutive fiscal periods of twelve (12) months
(or part thereof in the event of the cancellation or expiration of this contract
prior to the end of any such period), the first such period commencing with the
date upon which Operator shall make the first delivery of Synthetic Rubber hereunder.

The overhead and management charge for the production in the Plant shall
be an amount equal to one and one-half cents ($.015) per pound for the first fifteen
thousand (15,000) long tons (a long ton comprising two thousand two hundred forty
(2,240) pounds) of Synthetic Rubber produced for Reserve in any one Contract Year,
one and one-quarter cents ($.0125) per pound for the second fifteen thousand
(15,000) long tons in the same Contract Year, one cent ($.01) per pound for the
third fifteen thousand (15,000) long tons in the same Contract Year, eighty-five one-
hundredths of a cent ($.0085) per pound for the fourth fifteen thousand (15,000)
long tons in the same Contract Year, and seven-tenths of a cent ($.007) per pound
for long tons in excess of sixty thousand (60,000) long tons in the
same Contract Year on the basis of weights determined in a manner mutually satis-
factory to Operator and Reserve.

(b)  If the overhead and management charge for production in the Plant during any Contract Year shall be less than One Hundred Twenty Thousand Dollars ($120,000), Reserve shall pay the difference to Operator.  If the said charge, similarly computed for any fractional part of such twelve (12) months' period preceding the expiration or prior termination of this contract is less than an amount in ratable proportion to One Hundred Twenty Thousand Dollars ($120,000), Reserve shall likewise pay the difference to Operator.

(c)  It is understood that for the purpose of computing the overhead and management charge, Synthetic Rubber produced in the performance of this contract shall be construed to mean Synthetic Rubber actually acceptable to Reserve; and that if said charge is originally computed on such production as may thereupon prove acceptable to Reserve, said charge may not again be computed on the same production following retreatment or reprocessing by which it is made acceptable to Reserve.

(d)  It is further understood that said charge is designed to cover cost of and compensation for executive management and legal, medical, technical and other general services and facilities incident to the operation of the Plant (except attorneys' fees incurred under the provisions of Sections 8 and 11 hereof), which services and facilities Operator will purchase from the Constituent Companies or from their subsidiaries, if any, or from other parties under service contracts, hereinabove referred to in subsection (a) of Section 1 hereof. It is accordingly understood that no salaries of Operator's corporate officers (except the salary of one officer who shall be general manager of the Plant and who shall have no other employment), no compensation for executive, legal, medical, technical, and other general services, and no other expense of conducting Operator's corporate offices except those direct expenses which are entirely and directly attributable to the operation of the Plant and which shall be charged as costs under this contract, shall be otherwise charged hereunder.

... an itemized statement covering ... ...
... as have been paid for by Operator ... give directly to ...
... the date of such statement and for ... ...
... receive any Operator from Reserve. On or before the twentieth day of each
calendar month during the term of this contract, Operator shall render to Reserve
an itemized statement of the amount of the overhead and management charge for each
preceding calendar month.

Reserve shall pay to Operator the amount of each weekly statement of cost
and the amount of each monthly statement covering overhead and management charge
within ten (10) days after receipt thereof.   In the event of the failure of Opera-
tor to receive any payment when due hereunder, Operator may give Reserve written
notice of such default and upon the failure of Reserve to make said payment within
ten (10) days thereafter, may suspend performance thereunder pending receipt of said
payment.

Any item of cost, as defined in Section 3 hereof, the liability for which
is incurred by Operator during the term of this contract, but the settlement for
which is not made until after the termination of this contract, shall be paid by
Reserve to Operator upon receipt of invoice or invoices from Operator, provided such
invoice or invoices are submitted to Reserve within five (5) years after the date
of termination of this contract.

Section 4.   Reserve shall supply to Operator, f.o.b. the Plant, all ...
time and all styrene, meeting the respective specifications set forth in Exhibit
"A" attached hereto, as they may be from time to time modified by Reserve, in such
quantities as may be required from time to time in the manufacture of synthetic
rubber pursuant to this contract, and Operator will use its best efforts to make
within ninety-six (96) hours from receipt of same such tests as are necessary to
determine whether such specifications are met.   If such tests disclose that such
specifications are not met, Operator shall immediately notify Reserve in order that
notice be reasonably given to the manufacturer of such materials.

As soon as may be practicable after receipt by Operator of a shipment of
... , Operator shall determine for and report to Reserve the butadiene ...
by means of slip tube gauging device, the gauge readings to be converted to ...

- 4 -

reasonable after receipt by Operator of such materials,
shall make a report to Reserve on the railroad scale weights of the
styrene both before and after unloading, its differences
between the weight of the styrene so received.

Operator as agent for Reserve shall use its best efforts to procure all
materials (other than butadiene and styrene) necessary for the manufacture of
Synthetic Rubber at the Plant, but to the extent that Operator is unable to obtain
such materials, Reserve shall endeavor to obtain such materials and to make arrange-
ments for delivery thereof to Operator at the Plant.  Title to all materials pur-
chased by Operator hereunder shall vest directly in Reserve.  Subject to the
availability of such materials and the capacity of the Plant, Operator shall use
its best efforts to produce such quantities of Synthetic Rubber as may be specified
by Reserve, as hereinafter provided in Section 9 hereof, and Operator shall deliver
the same to Reserve loaded on cars at the Plant; it being understood, however, that
Operator does not make any representations, warranties, or guaranties, either
expressed or implied, which would render it liable or responsible, financially or
otherwise, for the quantity or quality of the production at the Plant.

Section 8.  Reserve shall indemnify and save Operator harmless against
and from all claims, demands, causes of action, damages, suits, and costs (including
attorneys' fees) whatsoever arising out of or in any way connected with alleged in-
fringement of patents or patent applications, or any other patent or patent rights
claims asserted by any person, firm or corporation whatsoever, as the result of any
action of Operator hereunder as agent for Reserve or as the result of any action
taken after the date of commencement of operations in the Plant by Operator, or by
any third party cooperating with Operator in anticipation of the manufacture of Syn-
thetic Rubber under this contract; and Reserve shall take all necessary action
(including defense of any credit or suits) and shall bear all continued expenses there-
under (including attorneys' fees) incurred in connection with the defense, adjust-
ment and payment of any such claim, demand, cause of action or suits, but
Reserve shall assume no responsibility whatsoever under this Section 8 for any
action not pertinent to the manufacture of Synthetic Rubber under or in connection
with this contract.  Operator shall give to Reserve prompt written notice of any
such claims or infringements against it arising from its operations hereunder.

... the ... and ... (or its employees thereof,) such technical information and services as it may be able to provide from its own organization.

It is understood that arrangements shall be effectuated by Reserve whereby during the term of this contract, Operator shall become entitled to receive such technical information with respect to the manufacture of Synthetic Rubber as shall be in possession of Reserve under the Agreement on Exchange and Use of Technical Information, dated December 19, 1941 (hereinafter called "Exchange Agreement"), and under the Supplementary Agreement to the Exchange Agreement, dated June 12, 1942, to both of which agreements Reserve is a party. Operator hereby agrees that in consideration of the establishment by Reserve of a means by which Operator can obtain such technical information, Operator will make available, from time to time during the term of this contract, to Reserve and/or to any Processor as the term "Processor" is defined in the Exchange Agreement), for the purpose of satisfying the requirement of reciprocation, provided for in Section 4 of Article III of the Exchange Agreement, all technical information which Operator now possesses or hereafter may acquire relating to the manufacture of Synthetic Rubber and to processes and apparatus which are used, or may be used, in the manufacture of Synthetic Rubber, whether such Synthetic Rubber processes or apparatus have been patented, patents applied therefor or whether the same are patentable or unpatentable. All such technical information shall be maintained secret and confidential) and Operator shall establish and maintain all reasonable safeguards, including secrecy contracts, to prevent any disclosure thereof to any third parties without the prior written consent of Reserve. Disclosure of such technical information shall be subject to all rules and regulations now or hereafter promulgated by the United States Government with respect thereto.

Operator may file such applications for Letters Patent, covering its improvements and developments in Synthetic Rubber, and in processes and apparatus for manufacture Synthetic Rubber, as, in its judgment, may seem fit, without cost to ... applications Reserve, and Reserve shall not assert any right or title in or to such improvements, developments, applications for Letters Patent or Letters Patent issued thereon; provided, however, that Reserve shall have no obligation hereunder to pay any compensation, whether or on account of the costs as herein defined or otherwise for any patents, inventions, improvements, or technical information ... in the control of Operator and used in the performance of this contract by Operator

... grants to Reserve ... in Reserve ... have thereto ... it as agent or on its behalf, a non-exclusive, irrevocable and royalty-free license under its patents and patent right (including patents now issued and patents which may be hereafter issued on any application now pending hereof or filed during the term of this contract) to manufacture, to use, and to sell, insofar as ... Synthetic Rubber (said patents and patent rights being hereinafter called "Operator's Patents"). Operator agrees to offer, upon request of Reserve, made at any time up to the expiration of the tenth year after the end of the National Emergency which has been proclaimed by the President of the United States, a license for commercial operations (in contradistinction to government operations) under Operator's Patents, to any operator of a government built Synthetic Rubber plant, whether such operator be vendee, lessee, or transferee of such plant, on reasonable terms and in any event on terms at least as favorable as those then being offered by Operator.

Section 9. Beginning at the end of the calendar quarter during which the Plant is completed and is made ready for operation, the Plant shall be operated on a calendar quarterly basis, such quarters to begin on the first day of January, April, July and October, respectively, of each year. Reserve shall notify Operator in writing, not less than six (6) weeks prior to the beginning of each calendar quarter, of the total amount of Synthetic Rubber which Reserve desires Operator to purchase at the Plant during such calendar quarter, which amount shall be manufactured as nearly as practicable in daily quantities of a uniform amount during such calendar quarter. Reserve shall take delivery of the Synthetic Rubber hereunder at the Plant, or provide storage therefor. If Reserve shall fail to give to Operator the six (6) weeks notice herein required prior to the commencement of any new quarterly period, production during such new quarterly period shall be at the same rate as in the immediately preceding quarterly period. If the Plant is shut down temporarily, Reserve will reimburse Operator for maintaining on its pay roll such of its employees needed for guarding and maintaining the Plant during such shut down period and such other employees as Operator will need at the Plant if and when operations thereof may be resumed, and when operations are resumed, Reserve will reimburse Operator for all costs and expenses properly incurred in connection with the reassembling of operating personnel.

Section 11. It is understood that in the performance of this contract, Operator is acting as agent for Reserve, for the account and at the expense and risk of the latter; and, accordingly, that Operator shall in no event be liable for, but shall be held harmless by Reserve against, any damage to or loss or destruction of property (whether owned by Reserve, Defense Plant Corporation, or others) or any injury to or death of persons, in any manner, arising out of or in connection with the work hereunder (including reasonable fees of attorneys retained with the consent of Reserve), unless it be shown to have been caused directly by bad faith or willful misconduct on the part of an officer of Operator, or any representative of Operator having supervision and direction of the Plant as a whole, acting within the scope of his authority and employment, or unless it results from the failure of Operator to carry such insurance coverage as Operator may be required to carry under the provisions of Section 10 hereof.

It is further understood that raw materials of the type required for the production of Synthetic Rubber are subject to an element of loss due to shrinkage, spoilage, and the like, in the course of storage and processing.

Section 12. Operator, as agent for Reserve, and with its approval, shall arrange for the furnishing to the Plant of such utilities and services as are necessary or desirable for the operation of the Plant, including without limitation those enumerated in subsection (f) of Section 3 hereof; it being understood that all charges and expenses thereby incurred by Operator as a result of contractual obligations, penalties, guaranties, deposits or otherwise, shall be for the account of Reserve and shall be included in that part of Operator's cost hereunder provided for in such subsection (f) of Section 3 hereof.

Section 13. On or before the twentieth day of each calendar month during the term of this contract, Operator shall render to Reserve a comprehensive report, in form satisfactory to Reserve, reflecting the elements of operation during the preceding calendar month, together with actual tonnage of Synthetic Rubber made during the preceding calendar month and showing both monthly and cumulative figures on production and actual costs of account...

... for the Plant production for a period of six (6) ... or ... of Reserves, in an ... of the ... in obligation on the part of Operator (as agent ... the sum of Five Thousand Dollars ($5,000) or more, shall ... be submitted to ... for approval prior to executing. All arrangements or agreements pursuant ... which Operator may it to furnish supplies or services to the operation of the Plant, shall be first submitted to Reserve for approval prior to execution.

Section 15. The following representations and stipulations pursuant to the Act of June 30, 1936 (49 Stat. 2036, U.S. Code, Title 41, Secs. 35-45) (Walsh-Healey Act), if any a part of the requirements and conditions of this contract, it being understood that in the event of any amendments to or modifications of said Act the said representations and stipulations shall be amended or modified accordingly:

(a) Operator (hereinafter in this Section 15 called "Contractor") is the manufacturer of or a regular dealer in the materials, supplies, articles, or equipment to be manufactured or used in the performance of this contract.

(b) All persons employed by Contractor in the manufacture or furnishing of the materials, supplies, articles, or equipment used in the performance of this contract will be paid, without subsequent deduction or rebate on any account, not less than the minimum wages as determined by the Secretary of Labor to be the prevailing minimum wages for persons employed on similar work or in the particular or similar industries or groups of industries currently operating in the locality in which the materials, supplies, articles, or equipment are to be manufactured or furnished under this contract; Provided, however, That this stipulation with respect to minimum wages shall apply only to purchases or contracts relating to such industries as have been the subject matter of a determination by the Secretary of Labor.

(c) No person employed by Contractor in the manufacture or furnishing of the materials, supplies, articles, or equipment used in the performance of this contract shall be permitted to work in excess of eight (8) hours in any one (1) day or in excess of forty (40) hours in any one (1) week, unless such person is paid such applicable overtime rate as has been set by the Secretary of Labor; Provided, That the provisions of this subsection (c) shall not apply to any employer who shall have entered into an agreement with his employees pursuant to the provisions of paragraphs 1 or 2 of subsection (b) of section 7 of an Act entitled "Fair Labor Standards Act of 1938".

(d) No male person under sixteen (16) years of age and no female person under eighteen (18) years of age and no convict labor will be employed by Contractor ...

... for its own production or for lading of any of the materials, ...
... or other ... equipment used ... this contract.

(e)  No part of this contract will be performed and none of the ... materials, supplies, articles, or equipment to be manufactured or furnished under this contract be manufactured or fabricated in any plants, factories, buildings, or surroundings or under working conditions which are insanitary or hazardous or dangerous to the health and safety of employees engaged in the performance of this contract.  Compliance with the safety, sanitary, and factory inspection laws of the State in which the work or part thereof is to be performed shall be prima facie evidence of compliance with this subsection (e).

(f)  Any breach or violation of any of the foregoing representations and stipulations shall render the party responsible therefor liable to the United States of America for liquidated damages, in addition to damages for any other breach of this contract, in the sum of Ten Dollars ($10) per day for each male person under sixteen (16) years of age or each female person under eighteen (18) years of age, or each convict laborer knowingly employed in the performance of this contract, and a sum equal to the amount of any deductions, rebates, refunds, or underpayment of wages due to any employee engaged in the performance of this contract; and, in addition, the agency of the United States entering into this contract shall have the right to cancel same and to make open-market purchases or enter into other contracts for the completion of the original contract, charging any additional cost to the original contractor.  Any sums of money due to the United States of America by reason of any violation of any of the representations and stipulations of this contract set forth herein may be withheld from any amounts due on this contract or may be recovered in a suit brought in the name of the United States of America by the Attorney General thereof.  All sums withheld or recovered as deductions, rebates, refunds, or underpayments of wages shall be held in a special deposit account and shall be paid, on order of the Secretary of Labor, directly to the employees who have been paid less than minimum rates of pay as set forth in such contracts and on whose account such sums were withheld or recovered: Provided, That no claim by any employee for such payments shall be entertained unless made within one (1) year from the date of actual notice to Contractor of the withholding or recovery of such sums by the United States of America.

(g)  Contractor shall post a copy of the stipulations in a prominent and easily accessible place at the site of the contract work and shall keep ...

-15-

...ployment records as are required in the Regulations under the Act available for inspection by authorized representatives of the Secretary of Labor.

(b) The foregoing stipulations shall be deemed inoperative if this contract is for a definite amount not in excess of Ten Thousand Dollars ($10,000).

Section 16. No member of or delegate to the Congress of the United States of America or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise therefrom, but this provision shall not be construed to extend to this contract if made with a corporation for its general benefit.

Section 17. In the performance of this contract, Operator shall use only such manufactured articles, materials and supplies as have been mined or produced in the United States and only such manufactured articles, materials and supplies as have been manufactured in the United States substantially all from articles, materials or supplies mined, produced or manufactured, as the case may be, in the United States. The foregoing provisions shall not apply to such articles, materials or supplies of the class or kind to be used, or such articles, materials or supplies from which they are manufactured as are not mined, produced or manufactured, as the case may be, in the United States, in sufficient and reasonably available commercial quantities and of a satisfactory quality, or to such articles, materials or supplies as may be expressly excepted from the provision of this Section 17 by the ...

Section 18. Operator warrants that it has not employed any person to solicit or secure this contract upon any agreement for a commission, percentage, brokerage or contingent fee. Breach of this warranty shall give the Government the right to terminate this contract or, in its discretion, to deduct from payments due the Operator the amount of such commission, percentage, brokerage or contingent fee. This warranty shall not apply to commissions payable by Operator upon contracts or sales secured or made through bona fide established commercial or selling agencies maintained by Operator for the purpose of securing business.

Section 19. Reserve shall have the right to terminate this contract at any time prior to the date of the completion of the Plant and its readiness for

... such ... liability ... Reserve ... operation shall ...
... all costs and thereafter ... expenses and losses such ...
... in ... anticipation of performance of this contract ...
which the Lease Contract, or otherwise, and Reserve shall be liable for any ...
... obligations by Operator on all such obligations, commitments and claims as Operator
may have undertaken or incurred in connection therewith as of the date of such
termination

This contract shall automatically terminate upon the cancellation or
termination of the Lease Contract. In addition, either Reserve or Operator shall
have the right to terminate this contract during the term hereof upon not less than
ninety (90) days' written notice to the other party. At the expiration or prior
termination of this contract, Reserve shall pay to Operator all the costs as de-
fined herein not already paid to Operator by Reserve, and in addition Reserve shall
pay to Operator that proportionate part of the overhead and management charges as
defined in Section 5 hereof, which remains unpaid. In the event that this contract
is terminated by Reserve or by Operator, at any time, Operator shall use its best
efforts to sell, at the request of Reserve and for its account, any materials or
supplies which Operator may hold at such time, payment for which has been previous-
ly made by Reserve, and Operator shall account to Reserve for any credits of what-
so ... nature which may arise as a result of the termination of this contract.
In the event of the termination of this contract, otherwise than because of the
default of the Operator, Operator shall have the right, when Reserve desires to
resume operations at any time within five (5) years and six (6) months from the
date of the completion of the Plant and its readiness for operation, to enter into
a contract with Reserve for the operation of the Plant on terms and conditions
as favorable to Operator as those which Reserve is willing to offer to any other
party, provided Operator shall accept such terms and conditions within thirty
(30) days after receipt of notice thereof.

Section 20. The failure of either party hereto to insist, in any one
or more instances, upon performance of any of the terms, covenants or conditions
of this contract shall not be construed as a waiver or a relinquishment of the
future performance of any such term, covenant or condition of the other party

- 17 -

...her to, but the obligation of such other party with respect to such future performance shall continue in full force and effect.

Section 21. Operator shall not sell, assign, or pledge its interests under this contract, nor any of its rights, powers, privileges, duties or obligations hereunder, without the prior written consent of Reserve. Reserve may assign its interest under this contract to any other branch of the Government, and upon such assignment such other branch of the Government shall acquire all the rights, powers and privileges of Reserve hereunder, and shall be bound by all duties and obligations of Reserve hereunder, and Reserve shall thereupon cease to have any rights, powers, privileges, duties or obligations hereunder, it being expressly understood that any such assignment by Reserve of its interest in this contract to any other branch of the Government shall be subject to all the rights, powers and privileges of Operator hereunder and shall be conditioned upon such transferee's assuming the duties and obligations of Reserve hereunder.

Section 22. In the performance of this contract, Operator shall comply with and give all stipulations and representations required by any applicable Federal, state, municipal or local law, and any applicable rules, orders, regulations or requirements of any governmental department or bureau, but nothing herein contained shall be construed as preventing Operator from contesting in good faith, the validity of any such law, rule, order, regulation or requirement, or in contesting in good faith any charge that Operator has not complied therewith.

Section 23. If the performance of this contract is interrupted or prevented by reason of labor shortage or labor disputes, from whatever cause arising and whether or not the demands of employees of Operator shall be reasonable and within Operator's power to concede, or if the performance of this contract is interrupted or prevented by reason of acts of God, acts or requirements of the Government, war, flood, fire, explosion, accident, sabotage, inability to obtain materials, or any cause beyond Operator's reasonable control, whether of...

18

disclos.... failure ... Operator shall be exco..... the .........
.. this contract until or to the extent ...... .....prevented from ......... ..
by one or more of such causes and the performance of this contract shall be .......
(?) as soon as practicable after such disability is removed.

Section 24.  The term of this contract shall be for a period not .....
with the date hereof and ending five (5) years after the date of the completion
the Plant and its readiness for operation.

Section 25.  In the employment of workers for the performance of this
contract, Operator shall not discriminate against any worker because of race,
color, or national origin.

Section 26.  All notices of every nature to be given to Reserve, ......
to this contract, may be addressed to "Rubber Reserve Company, 811 Vermont Avenue
N. W., Washington, D. C.," and all such notices to be given to Operator, .......
to this contract, may be addressed to "Copolymer Corporation, Baton Rouge, .....,"
unless otherwise directed in advance by either party.  Any notice shall be ......
to have been duly given if and when enclosed in a properly sealed envelope ...
addressed as aforesaid, registered and deposited, postage and registry fee ....
in a post office or branch post office regularly maintained by the United States
Government.

Section 27.  Operator hereby expressly covenants with Reserve that ....
nor during the term of this contract, shall not engage in any business other .....
in the manufacture of Synthetic Rubber for the account of Reserve under the term....
this contract, and shall not declare any dividends, nor increase nor decrease it.....
capital stock without the prior approval of Reserve; provided, however, that ......
Reserve shall permit Operator to declare sufficient dividends to avoid liability .....
therefor under Section 102 of the Income Tax Law, or any similar provision ....
in subsequent tax laws.  Operator further agrees that whenever requested by .......
to do so, it shall make demand upon its subscribing shareholders to purchase .....
any part .... the authorized capital stock of Operator then remaining un........

Section 28.  This contract shall be construed according to the ...
.. State of Louisiana.

IN WITNESS WHEREOF, Rubber Reserve Company and Copolymer Corporation
.... this contract to be executed by their respective officers, duly .........

IN WITNESS WHEREOF the respective corporate seals to be hereunto affixed, and signed by their respective officers, as of the day and year first above written.

ATTEST:

KIMBER RESERVE COMPANY

By _____
                                President

ATTEST:

COPOLYMER CORPORATION

By _____
                                Pr

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

𝔞ll to whom these presents shall come. Greeting:

irtue of the authority vested in me by the Archivist of the United States, I certify on his behalf,

e seal of the National Archives of the United States, that the attached reproduction(s) is a true and

opy of documents in his custody.



| SIGNATURE | | |
|---|---|---|
| *Robert W Coren* | | |
| NAME | | DATE |
| Robert W. Coren | | 7-22-97 |
| TITLE | | |
| Chief, NWDTC | | |
| NAME AND ADDRESS OF DEPOSITORY | | |
| The National Archives Washington, D.C. 20408 | | |

NA FORM APR 85 1407-A



Plancor 876

## AGREEMENT OF LEASE

THIS AGREEMENT made and entered into as of the 23rd day of November, 1942, by and between Defense Plant Corporation (hereinafter referred to as "Defense Corporation"), a corporation created by Reconstruction Finance Corporation pursuant to Section 5d of the Reconstruction Finance Corporation Act, as amended, to aid the Government of the United States (hereinafter sometimes called the "Government") in its National Defense Program, and Copolymer Corporation (hereinafter called "Lessee), a corporation organized and doing business under the laws of the State of Louisiana;

### WITNESSETH:

WHEREAS, the expansion of plant capacity within the United States for the production of synthetic rubber is important in the interest of the National Defense Program; and

WHEREAS, Defense Corporation is now in the process of causing to be established a plant for the manufacture of synthetic rubber of the butadiene-styrene copolymer type, to be located at or near Baton Rouge, Louisiana, it being contemplated that such plant will be designed to have an estimated annual productive capacity of approximately thirty thousand (30,000) long tons of such synthetic rubber; and

WHEREAS, it is proposed that Defense Corporation shall lease said plant, including the site, buildings, machinery and equipment, (hereinafter sometimes called the "Plant") to Lessee; and

WHEREAS, it is contemplated that the Lessee and Rubber Reserve Company, a corporation likewise created by Reconstruction Finance Corporation (hereinafter called "Rubber Reserve"), will, within six (6) months from the date hereof, enter into an agreement for the manufacture of synthetic rubber in said Plant;

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, it is agreed by and between the parties hereto as follows:

ONE:  Defense Corporation hereby agrees to lease, and does hereby lease, subject to termination or cancelation as hereinafter provided, the Plant to Lessee and Lessee agrees to lease, and does hereby lease the Plant from Defense Corporation for a term commencing with the date of completion thereof and its readiness for operation and ending on a date five years thereafter.  Defense Corporation and Lessee each agrees, upon the written request of the other, to execute and deliver such additional instruments of Lease as may be necessary to carry out the provisions of this agreement.

PLANCOR NO.    8 7 6

REPRODUCED AT THE NATIONAL ARCHIVES

Copolymer Corporation
(Synthetic Rubber)

TWO: The consideration of this lease is the sum of One Dollar ($1) per year, payable by Lessee to Defense Corporation on or before the first day of each year of the term hereof, and the mutual covenants herein contained.

THREE: This lease shall terminate automatically upon the expiration, termination, or cancelation of the proposed agreement for the operation of the Plant between Lessee and Rubber Reserve described in the preamble hereof and may be terminated by either party hereto upon written notice to the other in the event such proposed agreement is not entered into within six (6) months from the date of this Agreement of Lease.

FOUR: In addition to the provisions for termination set forth in paragraph THREE hereof, Defense Corporation may, by notice in writing to Lessee, cancel this lease in the event (a) a receiver or trustee is appointed for Lessee or its property, or Lessee makes an assignment for the benefit of creditors, or Lessee becomes insolvent, or a petition is filed by or against Lessee pursuant to any of the provisions of the United States Bankruptcy Act, as amended, for the purpose of adjudicating Lessee a bankrupt, or for the reorganization of Lessee, or for the purpose of effecting a composition or rearrangement with Lessee's creditors, and such receiver or trustee is not discharged or any such petition filed against Lessee is not dismissed within sixty (60) days; or (b) of any violation of any of the terms, conditions or covenants of this lease by Lessee and the failure of Lessee to cure such violation within thirty (30) days from the giving of a written notice thereof by Defense Corporation to Lessee. Upon the expiration, termination or cancelation of this lease Defense Corporation shall have the right to invoke any remedy permitted by law or in equity for the protection of its interests hereunder, and Lessee hereby expressly waives all rights which it may have to redeem or to be served with any further notice of Defense Corporation's intention to cancel or terminate this lease other than as herein provided.

FIVE: Upon the expiration of the term of this lease provided in paragraph ONE hereof, or upon cancelation or termination as provided in paragraph THREE hereof, Lessee shall have and is hereby granted, for a period of six (6) months after such expiration, cancelation or termination (hereinafter referred to as the "Negotiation Period") the right to negotiate with Defense Corporation for the purchase or lease of the Plant, or any portion thereof, and upon the establishment by the Lessee and Defense Corporation of mutually satisfactory terms and conditions, Defense Corporation will sell or lease, as the case may be, the property covered thereby to Lessee.

PLANCOR NO.    S 7 6                    - 2 -

Copolymer Corporation
(Synthetic Rubber)

It is understood and agreed (without in any way limiting the provisions of paragraph SIX hereof) that Lessee shall have no rights under the provisions of this paragraph FIVE, in the event of the sale, lease or other disposition of the Plant by Defense Corporation, other than in the event of a transfer or conveyance to another branch of the Government, pursuant to paragraph SIXTEEN hereof.  In the event of any sale to Lessee pursuant to the provisions of paragraphs FIVE or SIX hereof, transfer of title shall be made without any representations or warranties whatsoever on the part of Defense Corporation.  It is understood that the provisions of this paragraph shall not be applicable in the event of a cancelation of this lease pursuant to the provisions of paragraph FOUR hereof, or in the event the proposed agreement between Lessee and Rubber Reserve for the operation of the Plant shall not have been entered into within six (6) months from the date of this Agreement of Lease, or in the event that after execution, such agreement between Lessee and Rubber Reserve shall be terminated or canceled because of a violation by Lessee of any of the provisions thereof.

SIX:  Defense Corporation agrees, to the extent that it lawfully may, that it will not during the term of this lease, and for a period of six (6) months thereafter, sell or lease the Plant, or any part thereof, to any party or parties other than to another branch of the Government (in which event such sale shall be in all respects subject to paragraph SIXTEEN hereof) unless it shall first have offered the same for sale or lease to Lessee at a price or rental and upon terms and conditions equal to the best offer received by Defense Corporation, and Lessee shall have failed or refused to purchase or lease the same within thirty (30) days after Defense Corporation shall have made such offer to Lessee.  It is understood that the provisions of this paragraph shall not be applicable in the event of a cancelation of this lease pursuant to the provisions of paragraph FOUR hereof, or in the event the proposed agreement between Lessee and Rubber Reserve for the operation of the Plant shall not have been entered into within six (6) months from the date of this Agreement of Lease, or in the event that after execution, such agreement between Lessee and Rubber Reserve shall be terminated or canceled because of a violation by Lessee of any of the provisions thereof.

SEVEN:  So long as this lease remains in full force and effect Lessee shall procure and maintain at its cost insurance on the buildings and on the

Copolymer Corporation
(Synthetic Rubber)

machinery and equipment covered by this lease against fire, windstorm, and such other hazards, in such companies and in such amounts as shall be satisfactory to or required by Defense Corporation. The policies evidencing such insurance shall be made payable to, and shall be delivered to, Defense Corporation. In the event of loss under any of the policies, the proceeds may, upon the written request of Lessee promptly made and subject to approval of Defense Corporation, be used by Lessee for the repair, restoration or replacement of the property damaged or destroyed and, thereupon, to that end, Defense Corporation shall promptly make available to Lessee the insurance proceeds received by Defense Corporation. Any property acquired in replacement shall be the property of Defense Corporation and so identified and shall be subject to all the terms and provisions of this Lease.

EIGHT: Lessee agrees to save Defense Corporation harmless against any liability whatsoever because of accidents or injuries to persons or property occurring in the operation of the Plant or the use of the machinery and equipment by Lessee. Lessee also agrees that during the term of this lease, it will procure and maintain at its cost public liability insurance and property damage insurance in such amounts and with such companies as Defense Corporation shall approve or require. The policies evidencing such insurance shall name Defense Corporation as an assured, and shall be delivered to Defense Corporation.

NINE: Lessee shall use reasonable care in the use and operation of the Plant, including the site, buildings and the machinery and equipment covered by this Lease, and shall keep the same in good state of repair, ordinary wear and tear excepted (but shall not be liable for any loss thereof or damage thereto except that resulting from Lessee's negligence or wilful misconduct) and upon the expiration, termination or cancelation of this lease, Lessee shall forthwith yield and place Defense Corporation in peaceful possession of the Plant, including the site and buildings and all the machinery and equipment covered by this lease, free and clear of any liens and claims other than those resulting from claims against Defense Corporation.

TEN: Lessee agrees to pay to the proper authority, when and as the same become due and payable, all taxes, assessments and similar charges, which at any time during the term of this lease may be taxed, assessed or imposed upon Defense Corporation or Lessee with respect to or upon the Plant, or any part thereof, or upon the occupier thereof or upon the use of the Plant, or any part thereof.

PLANCOR NO.   876

DPC MINUTE DOCUMENT NO.   1329

- 4 -

REPRODUCED AT THE NATIONAL ARCHIVES

Lessee also agrees to pay all claims or charges for or on account of water, light, heat, power and any other service or utility furnished to or with respect to the Plant, or any part thereof.

ELEVEN:  Lessee agrees, in the use and operation of the Plant, or any part thereof, to comply with and give all stipulations and representations required by all applicable Federal, state, municipal and local laws and the rules, orders, regulations and requirements of any departments and bureaus and all local ordinances, and regulations, provided that nothing herein contained shall be construed as preventing Lessee from contesting in good faith the validity thereof or whether it has complied therewith.  Lessee further agrees to indemnify and hold Defense Corporation harmless from any liability or penalty which may be imposed by Federal, state or local authority or any department or bureau thereof by reason of any asserted violation by Lessee of such laws, rules, orders, ordinances, regulations or requirements.  Notwithstanding the generality of the foregoing, Lessee agrees further that in the performance of this agreement, it will not discriminate against any worker because of race, creed, color or national origin.

TWELVE:  Lessee agrees that it will not, without the prior written consent of Defense Corporation, use such Plant for any purpose except for the manufacture of synthetic rubber under the terms of its agreement with Rubber Reserve.

THIRTEEN:  So long as this lease remains in effect, and for a period of one (1) year thereafter, Lessee shall maintain and make available to Defense Corporation for audit and inspection, its records pertaining to the operations of the Plant.  Defense Corporation shall have the right to inspect the Plant at all reasonable times during the continuance of this lease.

FOURTEEN:  Lessee will not without the prior written consent of Defense Corporation sell, assign, or pledge this lease or any of its rights or obligations hereunder or sublease or permit the use by others of any of the property covered by this lease.

FIFTEEN;  The failure of Defense Corporation to insist, in any one or more instances, upon performance of any of the terms, covenants or conditions of this agreement shall not be construed as a waiver or a relinquishment of the future performance of any such term, covenant or condition, but Lessee's obligation with respect to such future performance shall continue in full force and effect.

- 5 -

PLANCOR NO.    8 7 6        DPC MINUTE DOCUMENT NO.  1 3 2 0

REPRODUCED AT THE NATIONAL ARCHIVES

Copolymer Corporation
(Synthetic Ru   r)

SIXTEEN:  It is contemplated that the Plant may be transferred and conveyed to another branch of the Government and upon such transfer, such branch of the Government shall succeed to all the rights, powers, privileges, discretion and obligations of Defense Corporation hereunder.  In the event of such transfer, Defense Corporation shall cease to have any rights, duties or obligations hereunder.  Any transfer by Defense Corporation of the leased property shall be subject to the rights of Lessee under this Agreement of Lease.

SEVENTEEN:  All notices of every nature to be given pursuant to this Agreement of Lease may be addressed, if to Defense Corporation, to "Defense Plant Corporation, 811 Vermont Avenue, N. W., Washington, D. C.", or, if to Lessee, to "Copolymer Corporation, c/o Harry H. Kahn, 160 North LaSalle Street, Chicago, Illinois", or, as to either party, addressed as may from time to time be otherwise directed in advance by such party.  Any notice shall be deemed to have been duly given if and when enclosed in a properly sealed envelope or wrapper, addressed as aforesaid, registered and deposited, postage and registry fee prepaid, in a post office regularly maintained by the United States Government.

EIGHTEEN:  No member of or Delegate to the Congress of the United States of America shall be admitted to any share or part of this agreement or to any benefit arising therefrom.

IN WITNESS WHEREOF, the parties hereto have caused their corporate seals to be hereunto affixed and these presents to be signed by their duly authorized officers, as of the day and year first above written.

WITNESSES:

_Sam D. Newman_

_Jean R. Switzer_

DEFENSE PLANT CORPORATION

By _____
                     Vice       President

Attest: _____
                          Secretary

WITNESSES:

_C. Giddings_

_Harry Wolf_

COPOLYMER CORPORATION

By _A. S. Needlander_
                          President

Attest: _____
                          Secretary

DISTRICT OF COLUMBIA, ss:

Personally before me, the undersigned authority, a Notary Public in and for the District of Columbia, there came and appeared _Jean R. Switzer_ _____, a subscribing witness to the foregoing document, well

REPRODUCED AT THE NATIONAL ARCHIVES

Copolym     orporation
(Synthet    Rubber)

known to me, Notary, who being first duly sworn, did depose and say:

That she knows Hans A. Klagsbrunn & Leo Nielson, the individuals described in and who executed the foregoing document; thatshe was present and saw said Hans A. Klagsbrunn & Leo Nielson execute the same, and thatshe thereupon, at the same time, subscribed her name as witness thereto.

_Jean R. Switzer_
Affiant

Sworn to and subscribed before me, this 5th day of December, 1942.

_Thomas P. Kelly 3rd_
Notary Public
My commission expires September 1, 1946

State of Illinois } ss:
County of Cook

Personally before me, the undersigned authority, a Notary Public in and for the County of Cook, State of Illinois, there came and appeared O. M. Gulings & A. Carey H West, a subscribing witness to the foregoing document, well known to me, Notary, who being first duly sworn, did depose and say:

That he knows A. L. Friedlander and J. M. Jackson the individuals described in and who executed the foregoing document; that he was present and saw said A. L. Friedlander and J. M. Jackson execute the same, and that he thereupon, at the same time, subscribed his name as witness thereto.

_Harry H West_

_O Gulings_
Affiant

Sworn to and subscribed before me, this 25 day of November, 1942.

_John A. ___
Notary Public
My commission My Commission Expires Nov. 12, 1946

In consideration of the execution by Defense Plant Corporation of the foregoing Agreement of Lease, each of the undersigned corporations (hereinafter called "Guarantor") hereby guarantees to Defense Plant Corporation the full observance and performance by Copolymer Corporation (hereinafter called "Lessee") of any and all duties, covenants and obligations of Lessee under said Agreement of Lease; provided, however, that the total monetary liability of each Guarantor

REPRODUCED AT THE NATIONAL ARCHIVES

WITNESSES:

Cushing

Harry Wolf

President

Attest: _Frederick Madden_

Secretary

State of Illinois,

County of Cook) ss

Personally before me, the undersigned authority, a Notary Public in and for the County of Cook, State of Illinois, there came and appeared C. W. Kalinge, well known to me, Notary, who being first duly sworn, did depose and say: That he knows _Wolf_ the individuals described in and who executed the foregoing document; that he was present and saw said _individuals_ execute the same, and that he thereupon, at the same time, subscribed his name as witness thereto.

Cushing

Affiant

Sworn to and subscribed before me, this 24 day of November, 194_.

John A. Cray

Notary Public,

My commission expires Nov. 12, 1943.

State of Illinois

County of Cook ss

Personally before me, the undersigned authority, a Notary Public in and for the County of Cook, State of Illinois, there came and appeared Harry Wolf, a subscribing witness to the foregoing document, well known to me, Notary, who being first duly sworn, did depose and say: That he knows the _Wolf_ the individuals described in and who executed the foregoing document; that he was present and saw said _individuals_ execute the same, and that he thereupon, at the same time, subscribed his name as witness thereto.

Harry Wolf

Affiant

Sworn to and subscribed before me, this 24 day of November, 194_.

John A. Cray

Notary Public,

My commission expires Nov. 12, 1943.

876

**DPC MINUTE DOCUMENT NO. 1829**

The term of this Guaranty Agreement shall be co-extensive with, and limited to, the term of the Agreement of Lease, provided that any cause of action accruing to or any rights, duties or obligations arising in favor of, Defense Corporation during or with respect to the term of such Agreement of Lease may be enforced at any time within the period of the applicable statute or statutes of limitation.

IN WITNESS WHEREOF, each Guarantor has caused this guaranty to be executed by its officer, duly authorized so to do, and its corporate seal to be hereunto affixed, duly attested by its officers, as of the 23rd day of November 1942.

WITNESSES:
O. McCullings.
Harry H. Wolf

DAYTON RUBBER MANUFACTURING COMPANY
By A. L. Friedlander
President
Attest: E. F. Chiet
Asst. Secretary

WITNESSES:
O. McCullings.
Harry H. Wolf

PENNSYLVANIA RUBBER COMPANY
By _____
President
Attest: _____
Secretary

WITNESSES:
O. McCullings.
Harry H. Wolf

SEARS, ROEBUCK AND CO.
By _____
President
Attest: _____
Secretary

WITNESSES:
O. McCullings.
Harry H. Wolf

GATES RUBBER COMPANY
By _____
Vice President
Attest: _____
Secretary

WITNESSES:
O. McCullings.
Harry H. Wolf

MANSFIELD TIRE & RUBBER CO.
By _____
President
Attest: _____
Secretary

WITNESSES:
O. McCullings.
Harry H. Wolf

LAKE SHORE TIRE & RUBBER CO.
By _____
Vice President
Attest: _____
Secretary

PLAINTIFF NO.   876

- 9 -

STATE OF LOUISIANA

PARISH OF EAST BATON ROUGE

## AFFIDAVIT

BEFORE ME, the undersigned authority personally came and appeared:

**ARLEY RAY BAKER**

who, being duly sworn, did depose and state:

1.

My name is Arley Ray Baker. I was employed by the United States Government from November 1950 through April 1952, and my knowledge of government involvement at Copolymer Corporation, now known as DSM Copolymer, Inc., ("Copolymer") is limited to this period.

2.

During my employment with the United States Government, my title was Field Representative for the Rubber Reserve Corporation. Rubber Reserve Corporation was a subsidiary of Reconstruction Finance Corporation, which was created as an instrumentality of the United States Government.

3.

As Field Representative, I served as the resident inspector for the Government-owned facility, which was operated by Copolymer in Baton Rouge, Louisiana. I visited the facility approximately once a week throughout my tenure as Field Representative.

128814_1

A TRUE COPY

_____ 4/23/02

Deputy Clerk                    Date

U.S. District Court
Middle District of Louisiana
Baton Rouge, Louisiana



EXHIBIT

G

4.

While serving as Field Representative at that facility, it was my duty to oversee Copolymer's operations and to ensure that it was following government imposed production specifications, government imposed operating procedures, and government imposed laboratory product testing procedures and operations in the manufacturing of rubber.

5.

In addition to providing production, operating, and testing specifications, the United States Government also controlled what type of rubber was produced at Copolymer, how much of it was produced, and when each type of rubber was produced. If Copolymer desired to make any alterations to these requirements, it had to get permission from the United States Government to do so.

6.

The products manufactured by Copolymer were manufactured exclusively for the Government, under detailed governmental control, specifications, and monitoring. The products were owned by the Government. Copolymer received an operating fee from the Government for these services.

7.

If any of the government specifications, operating procedures or testing procedures were not being followed, I would bring this to the attention of the manager of the section where I had discovered the problem. If the problem continued, I would bring it to the attention of the plant manager. As a last resort, I would

128814_1

report the problem to the Government in Washington and they would get involved in enforcing Copolymer's compliance with the specifications. The governmental control over Copolymer was strictly enforced.


**WITNESSES:**

_____                    _____
                                           ARLEY RAY BAKER

_____



SWORN TO AND SUBSCRIBED BEFORE ME, Notary Public, this _27th_ day of _November_, 1996.


_____
        Notary Public, State of Louisiana
        My Commission expires at death.

STATE OF LOUISIANA

PARISH OF EAST BATON ROUGE

## AFFIDAVIT

BEFORE ME, the undersigned authority personally came and appeared:

### MARTIN E. SAMUELS

who, being duly sworn, did depose and state:

**1.**

My name is Martin E. Samuels.  I was employed by Copolymer Corporation, now known as DSM Copolymer, Inc., ("Copolymer") from January 15, 1943 through 1982 when I retired.

**2.**

From March of 1943 through approximately 1946, I was in charge of laboratory testing of rubber products at the government owned facility operated by Copolymer in Baton Rouge.  From 1946 through the 1970's, I was in charge of laboratory testing for developmental products at the same facility.

**3.**

During my employment in these positions, one of my responsibilities was the oversight of safety in my department.

**4.**

During the period of United States Government ownership of the Baton Rouge plant operated by Copolymer, the United States Government imposed numerous safety requirements at the facility including, but not limited to, the wearing of protective equipment.

129472_1

A TRUE COPY

_____  4/3/02

Deputy Clerk                Date

U.S. District Court
Middle District of Louisiana
Baton Rouge, Louisiana
3:96cv3244  #65          Page 90/93


EXHIBIT
H

5.

During the period of United States Government ownership of the Baton Rouge plant operated by Copolymer, the United States Government required that safety meetings be held in each department of the plant on a monthly basis.  Additionally, the United States Government required that safety meetings encompassing the entire plant be held on a monthly basis.  The government dictated the topics of these meetings.

6.

During the period of United States Government ownership of the Baton Rouge plant operated by Copolymer, the United States Government exercised a tremendous amount of control over the safety requirements at its facility.

MARTIN E. SAMUELS

SWORN TO AND SUBSCRIBED BEFORE ME, Notary Public, this __2nd__ day of ___December___, 1996.

_____
Notary Public, State of Louisiana
My Commission expires at death.

129472_1                                   -2-

STATE OF LOUISIANA

PARISH OF EAST BATON ROUGE

### AFFIDAVIT

My name is Robert R. Dennis, Jr.  I worked at Copolymer Corporation from 1952 until 1988.  I am a chemical engineer and was hired to work initially as a process engineer for Copolymer.  I continued to work in various engineering, production, maintenance and utilities capacities throughout the Baton Rouge facility until my retirement from Copolymer in December, 1987.

While employed at Copolymer, my job responsibilities included staying abreast of the current state of technology in use for the production, maintenance and  operation of the butadiene production unit and Styrene Butadiene Rubber manufacturing operations.  In the 1940s, 1950s and 1960s, there was no non-asbestos containing insulation product to my knowledge that was available which would provide the efficiencies and worker protection qualities necessary for pipes carrying steam throughout the facility.

While steam requirements varied throughout the plant, many of the areas of the plant required high-performance insulation to maintain temperature and pressure for delivery in use throughout the plants.  The original plant installation as designed by the government included asbestos containing insulation which exhibited properties that met this requirement. From superheated steam at temperatures up to 1,450° F to lower temperature steam, all lines throughout the plant had to be covered with insulation as both a safety and operational requirement.  Without proper steam temperature and pressure, the performance of the plant could not be guaranteed.

359312_1

EXHIBIT

E

A TRUE COPY

Paula _____ 4/23/02

Deputy Clerk
U.S. District Court
Middle District of Louisiana
Baton Rouge, Louisiana

Throughout the history of the Baton Rouge plant, the plant manufactured Styrene-Butadiene Rubber by emulsion polymerization.  For many years, until 1981, the Baton Rouge plant also manufactured butadiene monomer used in the Styrene-Butadiene Rubber facility.  Some of the manufacturing processes at Copolymer required, among other things, the generation and use of superheated steam at operating temperatures up to 1,450° F.  525° F steam was generated at the boilers routed throughout the plants through a series of pipes that had to be enclosed with insulation due to the need to retain its operating temperature of the steam up to the point it entered the Butadiene & Rubber production units.  At that point, this steam was then superheated up to a temperature of 1,450° F in the reactor sections of the butadiene plant.  The insulation served two purposes: (1) it prevented too much heat from being transferred out of the steam running through the pipe, thereby allowing the steam to remain at an adequate operating temperature and pressure for the processes; and (2) it prevented employees from coming in contact with the pipe and suffering severe injury.

When I began working at Copolymer in 1952, the plant was owned by the United States government, and operated by Copolymer under an operating agreement.  As a part of my duties as a process engineer, I reviewed various portions of the original plans and specifications for the construction of the plant to maintain the operational requirements of the facilities.  The original plant design and operation specifications were prepared at the direction of the United States government.  Those original design and operation specifications called for the use of asbestos-containing insulation in many locations throughout the plant, including the boilers and steam lines mentioned above.

Asbestos-containing insulation was in use in many areas throughout the plant.  Most of the asbestos-containing insulation in use at the plant when I began working for Copolymer was

359312_1

the same insulation that was installed during the original construction of the plant in the early 1940s.

The use of asbestos-containing insulation was the standard in many industries, including the synthetic rubber manufacturing industry, during the 1940s, 1950s, 1960s.  I am not aware of any type of non-asbestos containing insulation that was available during this time period that could have been used effectively on equipment which required the carriage of steam at long distances at a constant temperature and could handle operating temperatures up to  1,450° F in those portions of the plant that required such.  Without asbestos-containing insulation, it would not have been possible to maintain the process steam temperatures that were essential for the manufacture of butadiene and synthetic rubber.

To make the plant free of asbestos containing insulation in the 1950s and 1960s would have required at least two conditions:   (1) the existence of a non-asbestos containing product capable of being used effectively on equipment with operating temperatures up to 1,450° F (a condition which I do not believe existed); and (2) the shut down of the plant for an extended period of time so that asbestos containing insulation could be removed and replaced with non-asbestos containing insulation, assuming a comparable substitute was available.

During the 1950s and 1960s, I did not have any reason to believe that asbestos containing insulation presented a health hazard to employees working at the plant.


_Robert R. Dennis, Jr._
Robert R. Dennis, Jr.

SWORN TO AND SUBSCRIBED to before me, this ___3___ day of _Sept_, 1999, Baton Rouge, Louisiana.

Notary Public

359312_1

COPOLYMER RUBBER & CHEMICAL CORPORATION
PLANCOR 152

SR 486

This plant was inspected February 28, 1956.  A meeting was held with Col. C. M. Hulings, J. M. Stonall, Bob Gerlicker, and Charles McKay.

I inspected the plant in company with Messrs. Gerlicker and McKay.  The plant had recently been completely repainted.  Several changes had been made through removal of bottlenecks to increase production.  The major change was the revision of the second reactor.  The No. One reactor was modified under Government ownership to conform to the type of reactors at Neches Butane Products Company.  The alteration of the No. Two reactor resulted in a daily increase of production of 95 short tons.  This additional production was attained without increasing the number of operating personnel.

The engineering stores and spare parts warehouses for this Plancor and Plancor 876 have been consolidated for economy of operation.

The plant is being very well maintained, and appears in excellent condition.  The safety record is very good.

(Signed) G. F. Irwin



SR 41

## COPOLYMER RUBBER & CHEMICAL CORPORATION
### PLANCOR 876

This plant was inspected February 28, 1956. Met with Col. C. M. Hulings, Vice President, J. M. Stonell, Controller, and Bob Gerlicker, Superintendent of Production.

Inspected the plant with Mr. Gerlicker. The plant is in very good condition. Painting program was under way and about completed.

Production is slightly in excess of the assigned capacity of 49,700 long tons. The purchaser has spent about $875,000 in improvements, and will make a further expenditure of about $250,000 to install six additional reactors to increase cold high solids latex by about 600,000 pounds per month.

Asset Property Records of the plant as purchased are being properly maintained, and similar records are being kept on current plant additions.

Plant safety record is excellent, and the plant management is very safety-conscious.

(Signed) G. J. Irwin

GJI:S

G. J. IRWIN

August 14, 1956

Air Mail                                                        SR None

Col. C. M. Hulings
Executive Vice President
Copolymer Rubber & Chemical Corporation
P. O. Box 1029
Baton Rouge, Louisiana

Dear Col. Hulings:                    Re:  Plancor 876 & Plancor 152

   In accordance with the provisions of
the National Security Clause contained in the Sales
Contract between your company and the Rubber Producing
Facilities Disposal Commission, the undersigned and
Mr. W. C. Cronkrite will visit the subject plancors on
August 22.

   Will you please reserve two air-con-
ditioned single rooms at the Heidelberg Hotel for August
21, 22, and 23. We will arrive in Baton Rouge on Eastern
Airlines Flight 572 at 5:07 P.M. In making the reserva-
tions, please notify the hotel to be sure to hold the rooms
for us in the event of late arrival.

   It will be appreciated if you will ar-
range for someone to pick us up at the hotel Wednesday
morning about 8:30.

      Very truly yours,


      (Signed) G. J. Irwin

GJI:S
      G. J. IRWIN
      Director
      Office of Synthetic Rubber

COPOLYMER RUBBER & CHEMICAL CORPORATION
PLANCOR 152

This plant inspected in company with Mr.
Tom Crowell, General Superintendent, on August
22, 1956.

The unit is well maintained. No major
changes have been made since the plant was last
inspected. Production is at full capacity. One
additional compressor (500 H.P.) has been ordered
for installation. At present no spare compressor
is available, which causes partial shutdown when
it becomes necessary to overhaul or repair a com-
pressor.

The Asset Property Records are being properly
maintained, both the old ones and those for any
improvements or alterations.

(Signed) G. J. Irwin

GJI:S

G. J. IRWIN

COPOLYMER RUBBER AND CHEMICAL CORPORATION
PLANCOR 876

This plant inspected in company with Mr.
Tom Crowell, General Superintendent, August 22,
1956. The units are being well maintained and
production is almost at full capacity, even though
considerable construction is in progress.

The company has spent in excess of $1,000,000
for improvements since taking over the plant. Further
expenditures of $2,000,000 will result from installa-
tion of an additional stripping column; another water
well; a cooling tower; cooling coils in balance of re-
actors, and additional recovery equipment.

The steam plant at the Butyl Plant purchased
by Esso Standard has always supplied this plant and
Plancor 152 with steam. However, Esso has served notice
to Copolymer that they will discontinue to serve them
at the expiration of the present agreement, which expires
in a little over two years. Esso is crowded for space
in the Chemical Products Division, and proposes to
dismantle the steam plant and purchase their requirements
from Gulf States Utilities Company. Therefore, Copolymer
will necessarily be forced to install steam facilities
capable of producing 300,000 pounds per hour. They are
considering installation of an electric generator along
with the steam plant to provide their own electricity.

The property records are being properly maintained.

(Signed) G. J. Irwin

GJI:S

G. J. IRWIN

April 22, 1957

SR None

Copolymer Rubber & Chemical Corporation
P. O. Box 1029
Baton Rouge, Louisiana

Attention:   Col. C. M. Hulings
Executive Vice President

Gentlemen:          Re:  Plancors 152 and 876

In accordance with the provisions of the
National Security Clause contained in the Contracts
of Sale of the above plants to your Corporation,
the undersigned expects to visit your plants for
the purpose of making the semi-annual inspections
on April 29.

I expect to arrive in Baton Rouge via
Eastern Airlines Flight 385 at 3:18 P.M., April
28.  I will appreciate it if you will make a reserva-
tion for me at the Heidelberg Hotel for April 28 and
29.  It will be appreciated also if you will arrange
for someone to pick me up at the hotel the morning
of April 29.

Very truly yours,

(Signed) G. J. Irwin

G. J. IRWIN
Director
Office of Synthetic Rubber

GJI:S

COPOLYMER RUBBER & CHEMICAL CORPORATION
PLANCOR 152

Inspected this plant with T. B. Crowell on April 29, 1957, and found it in very good condition and extensive maintenance in progress. Roofs have been placed over all the heaters and the firebrick sides are all being replaced. Progressive replacements are being made in all the furnaces.

Productive capacity for butadiene has been raised from 23,000 S.T. annually, the assigned capacity in the Sales Contract, to 35,000 S.T.

Esso has notified Copolymer that they will no longer furnish steam after expiration of the present contract in 1958. Therefore, plans are under way to install 250,000 lbs./hr. steam capacity. Also electric generating equipment will be installed to supply their own needs. They intend replacing the large steam turbine drives on the cooling tower pump with electric drivers. This will effect considerable operating economy. Considering the cost of steam from Esso, and electricity from Gulf States Utility Company, it is believed that a three-year payout will be possible on the new facilities.

(Signed) G. J. Irwin

GJI:S

G. J. IRWIN

COPOLYMER RUBBER & CHEMICAL CORPORATION
PLANCOR 876

Inspected this plant April 29, 1957, in company with Mr. T. B. Crowell. A conference was held with Col. C. M. Hulings and Mr. J. M. Stonnell.

The plant is being well maintained; however, portions of it are affected by construction work in progress. Apparently all planned expansion is nearly completed in this plant.

Copolymer has raised the capacity of the plant from the assigned capacity contained in the Sales Contract of 49,000 L.T. per annum to 68,800 L.T. both based net rubber.

Col. C. M. Hulings, Executive Vice President for this plant and Plancor 152, will retire May 31, 1957. He will be succeeded by T. B. Crowell, who the Board of Directors has elected Vice President. Charles McKay, who is now in charge of maintenance at this plant as well as Plancor 152, will become Production Superintendent.

The plant personnel is maintaining a good safety record and management is very safety-minded.

Contrary to condition of demand for large production at other copolymer plants, this plant is behind delivery schedule due to large demand. They have a backlog of orders of about 3,500 L.T.

(Signed) G. J. Irwin


GJI:S                              G. J. IRWIN

October 9, 1957

Copolymer Rubber & Chemical Corporation
P. O. Box 1029
Baton Rouge, Louisiana

Attention:  Mr. T. B. Crowell

Gentlemen:            Re:  Plancors 152 and 876

In accordance with the requirements of
the National Security Clause contained in the
Contracts of Sale of the subject plants to your
Company, I expect to be in Baton Rouge on October
21 to visit the plants.

I will appreciate it if you will make a
reservation for me at the Heidelburg Hotel for
Sunday, October 20, and will contact you then.

Very truly yours,

(Signed) G. J. Irwin

G. J. IRWIN
Chief
GJI:S                 Office of Synthetic Rubber & Tin

10-21-57
now: Capitol House.

COPOLYMER RUBBER & CHEMICAL CORPORATION
PLANCOR 152

This plant was inspected October 21, 1957, the same date as Plancor 876, in company with Mr. McKay.

The plant is being well maintained and the Asset Property Records are being properly maintained.

As previously reported, Esso will not furnish steam to this plant after 1958.  New facilities are being installed to provide steam and electricity to this plant and Plancor 876.  The facilities include three 180,000 pound per hour steam boilers, and three 2,500 kwh electric generators, at a cost of approximately $3,000,000.  Through this equipment the steam-electric balance will be perfect, thereby making a large economic saving in operation of Plancors 152 and 876.

(Signed) G. J. Irwin


G. J. IRWIN

COPOLYMER RUBBER & CHEMICAL CORPORATION
PLANCOR 876

Inspected this plant to determine conformity with the provisions of the National Security Clause on October 21, 1957. Met with T. B. Crowell, Vice President, Charles McKay, Superintendent of Production, and J. M. Stonnel, Controller. The inspection was made in company with Mr. McKay.

All presently planned expansion work has been completed, However, ground has been broken for a new research laboratory. Study is being made regarding constructing another production line. However, this probably will not become a fact for two years, if it is approved.

The plant is being reasonably maintained. The Asset Property Records are in proper shape.

(Signed) G. J. Irwin


G. J. IRWIN

April 2, 1958

A/M

Mr. T. B. Crowell
Vice President
Copolymer Rubber & Chemical Corporation
P. O. Box 1029
Baton Rouge, Louisiana

Dear Mr. Crowell:          Re:  Plancors 876 and 152

        I expect to visit your plants on April
8 for the purpose of making the inspection required
in the provisions of the National Security Clause con-
tained in the Sales Contract.

        I will arrive in Baton Rouge at 3:18 P.M.
via Eastern Airlines Flight 385 on Monday, April 7.  I
will appreciate it if you will reserve a single room
for me at the new Capitol House for April 7 and 8.

        Will you please arrange to have someone
pick me up at the hotel at 8:30 Tuesday morning, April
8.

               Very truly yours,

               (Signed) G. J. Irwin

                G. J. IRWIN
                Chief
GJI:S            Office of Synthetic Rubber & Tin

COPOLYMER RUBBER & CHEMICAL CORPORATION
Plancor 152

Visited this plant April 8, 1958, for the purpose of making inspection required under provisions of the National Security Clause. Met with T. B. Crowell, Vice President and General Manager; J. M. Stonell, Comptroller, and Charles McKay, Production Manager. The plant was inspected in company with Mr. McKay.

Very good progress is being made on installation of the steam plant and electric generators. The new production equipment is being installed.

The plant is being very well maintained. Below are listed comparative maintenance figures. The comparisons are made between the amount spent for ten months of Fiscal Year 1955 prior to the sale of the plant.

| | |
|---|---|
| Fiscal Year July 1, 1954-April 30, 1955 or $50,859 per month | $508.597 |
| For Fiscal Year ending October 31, 1957 or $56,600 per month | 680,000 |
| For 4 months November 1957 through February 28, 1958 or 57,500 per month | 230,000 |
| Budget for period May 1, 1958-October 31, 1958 or $63,500 per month | 381,000 |

From these comparisons it is evident that the Company is spending more for maintenance than under Government operation.

Drawing and Property Records are in good shape.

(Signed) G. J. Irwin

G. J. IRWIN

COPOLYMER RUBBER & CHEMICAL CORPORATION
Plancor 876


Visited this plant April 8, 1958, for the purpose of making inspection required under provisions of the National Security Clause.  Met with T. B. Crowell, Vice President and General Manager; J. M. Stonell, Comptroller, and Charles McKay, Production Manager. The plant was inspected in company with Mr. McKay.

Equipment has been installed for manufacturing black masterbatch using one production line.  The system uses the Columbian Carbon Company plan for dispersion of carbon black.  The black is ground by means of a steam centrifuge system, which is unique.  In proportioning the black to the batches, an Omega loss-in-weight device is employed.  No other projects are underway.  However, preliminary plans have been made for adding a fifth line for rubber production to the plant.

This plant is well maintained.  Listed below are comparative maintenance costs between the Government operation and since the plant was acquired by the Company.

| | |
|---|---|
| Fiscal Year July 1, 1954-April 30, 1955<br>    the last year of Government operation, or $53,200<br>    per month | $532,000 |
| From November 1, 1956 through October 31, 1957<br>    or $74,200 per month | 890,000 |
| Budget November 1, 1957 through October 31, 1958<br>    or $87,400 per month | 1,048,900 |

Additional equipment has been installed and, of course, wages are higher, but still the maintenance costs are considerably higher than under Government operation.  Also, the equipment originally purchased is older by three years.

All property records and drawings are up to date.


(Signed) G. J. Irwin



G. J. IRWIN

COPOLYMER RUBBER AND CHEMICAL CORP.

BATON ROUGE, LA.

Plancors 152 and 876

Plancor 152:

I visited this plant September 12, 1960 in company with J. R. Winsor from Dallas office of GSA. We met with J. M. Stonell and Herb Henry. The plant was inspected in company with Red Taylor and a process engineer. The process was explained to Mr. Winsor.

The plant is well maintained. Work has started on two reactors using DOW catalyst. An additional boiler and electric generator are being installed.

Plancor 876:

We met with the same individuals mentioned above.

The sixth coagulation and finishing line is being installed which will give the plant a capacity of about 120,000 long tons of rubber per year.

The plant is well maintained.

G. J. Irwin

UTILIZATION AND DISPOSAL SERVICE
1114 Commerce Street

June 4, 1962

PO.Y-2   7UR

AIR MAIL

Dr. Paul Carpenter, President
Copolymer Rubber and Chemical Corp.
P. O. Box 2591
Baton Rouge, Louisiana

Dear Sir:

Confirming my telegram of even date, this is to advise that I will
be in Baton Rouge to inspect Plancors 152 and 876 on the morning of
Wednesday, June 6, 1962.

I will arrive at your plant at approximately 10:00 A.M. Wednesday.
You will recall that I accompanied Mr. G. J. Irwin on an inspection
of these Plancors in September 1960. It is hoped that I will be
able to perform the forthcoming inspection and interview with your
appropriate people in a matter of a few hours.

I will look forward to seeing Messrs. Stonell and Henry again as
they were very helpful when Mr. Irwin and I visited there before.

Sincerely yours,

James K. Winsor
Chief, Real Property Division

7UR:JKWinsor:gdo

UNITED STATES GOVERNMENT

*Memorandum*

GENERAL SERVICES ADMINISTRATION
Region 7
Dallas 2, Texas

TO   : File

Date:  June 22, 1962

FROM  : Chief, Real Property Division, 7UR

In reply refer to:  7UR

SUBJECT: Copolymer Rubber and Chemical Corp., Baton Rouge, La.
Plancor 152

On June 6, 1962, I visited Pl. 152 to make National Security Clause
inspection.  I met with President P. G. Carpenter, J. M. Stonell and
Engineering Manager H. C. Henry and discussed the Plancor in general.

Mr. Carpenter stated that the property has not been encumbered and the
Company has no intention to encumber the facility through lease, mortgage,
or otherwise.

Asset property records are available and have been kept up to date.
Mr. Stonell stated that it is their practice to make periodic microfilm
records of their papers and other records so that there is a continuing
accurate and detailed listing of all property.

I inspected the Plancor in the company of Mr. Henry.

Maintenance is satisfactory and the equipment appeared to be in good
condition.

Safety practices are carefully followed and normal precautions are observed
to reduce fire hazard and other possible causes of loss.

The assigned capacity in the sales contract is 23,000 short tons annually
of butadiene.  The present capacity of the plant is 55,000 short tons so
that the National Security Clause requirement is being well met in this
respect.

A new steam superheater is being installed to provide superheated steam
used in the dehydrogenation of butylene.  It is the company's plan when
the new superheater is completed to retire from service 4 smaller super-
heaters.  Eventually the 4 smaller superheaters may be removed entirely.

Mr. Henry will communicate with us concerning the substitution of super-
heaters at a later date.

James K. Winsor

2cc:  Regional Director, Office of Financial Management, 7BC
1cc:  Asst. Commissioner for Real Property, UR
Washington, D. C.
7UR:JKWinsor/gdo

UTILIZATION AND DISPOSAL SERVICE
1114 Commerce Street

June 4, 1963

7UR

Pls. 876 and 152

<u>AIR MAIL</u>

Dr. Paul Carpenter, President
Copolymer Rubber and Chemical Corp.
P. O. Box 2591
Baton Rouge, Louisiana

Dear Sir:

In order to make our annual inspections of Plancors 152 and 876
on schedule, I plan to be in Baton Rouge for such inspections
on the morning of Wednesday, June 12, 1963.

I will arrive at your Plant at approximately 10:00 A.M. Wednesday.
It will be a pleasure again to meet with you and Messrs. Stonell
and Henry and I hope that the inspections can be accomplished with
the usual efficiency.

Sincerely yours,

James K. Winsor
Chief, Real Property Division

7UR:JKWinsor:gdo

UNITED STATES GOVERNMENT

# *Memorandum*

GENERAL SERVICES ADMINISTRATION

TO    : File

Date: June 18, 1963

FROM  : Chief, Real Property Division

In reply refer to: 7UR

SUBJECT: Copolymer Rubber and Chemical Corp., Baton Rouge, La.
Plancor 876

On June 12, 1963, I visited Plancor 876 to make the National Security
Clause inspection. I met with Engineering Manager H. C. Henry and
discussed the Plancor in general.

It was determined that the property has not been encumbered and the
Company has no intention to encumber the facility through lease, mortgage
or otherwise.

Asset property records and drawings are being kept up to date.

I inspected the Plancor in the company of Mr. Henry and maintenance
was noted to be satisfactory and the equipment appeared to be in good
condition.

Safety practices, fire protection and general housekeeping are excellent.

The assigned capacity of the plant is 49,000 long tons annually of
GR-S synthetic rubber. The capacity at time of inspection was 120,000
long tons annually, thus the National Security Clause is being well met
in this respect.

James K. Winsor

cc:  Acting Asst. Commissioner for Real Property, UR
     Washington, D. C.
7UR:JKWinsor:gdo

UNITED STATES GOVERNMENT

# Memorandum

GENERAL SERVICES ADMINISTRATION

TO    :  File

Date:   June 18, 1963

FROM :  Chief, Real Property Division, 7UR

In reply refer to:

SUBJECT:  Copolymer Rubber and Chemical Corp.
          Baton Rouge, Louisiana
          Plancor 152

On June 12, 1963, I visited Plancor 152 to make the National Security
Clause inspection.  I met with Engineering Manager H. C. Henry and
discussed the Plancor in general.

It was determined that the property has not been encumbered and the
Company has no intention to encumber the facility through lease,
mortgage or otherwise.

Asset property records and drawings are being kept up to date.

I inspected the Plancor in the company of Mr. Henry and maintenance
was noted to be satisfactory and the equipment appeared to be in good
condition.

Safety practices, fire protection and general housekeeping are
excellent.

The assigned capacity of the plant is 23,000 short tons annually of
butadienne.  At present the capacity is 55,000 short tons.

The new steam superheater which was installed in 1962 was examined
and found to be operating satisfactorily.

cc:  Acting Asst. Commissioner
       for Real Property, UR
     Washington, D. C.
7UR:JKWinsor:gdo

James K. Winsor

Citation                    Search Result              Rank 5 of 5           Database
Exec. Order No. 10539                                                        PRES
 FR 3827, 1954 WL 5984 (Pres.)

EXECUTIVE ORDER 10539

PROVIDING FOR THE ADMINISTRATION OF FUNCTIONS RESPECTING RUBBER, TIN, AND ABACA
        HERETOFORE ADMINISTERED BY THE RECONSTRUCTION FINANCE CORPORATION

June 22, 1954

By virtue of the authority vested in me by the Rubber Act of 1948 (62 Stat. 101), as amended (50 U. S. C. App. 1921, et seq.), the joint resolution of June 28, 1947, 61 Stat. 190, as amended, the Abaca Production Act of 1950 (64 Stat. 435; 50 U. S. C. 541, et seq.), section 107(a)(1) of the Reconstruction Finance Corporation Liquidation Act, 67 Stat. 231, and section 301 of title 3 of the United States Code, it is hereby ordered as follows:

  SECTION 1.  The Secretary of the Treasury is hereby authorized and directed to cause to be organized a corporation under the authority and subject to the provisions of section 10 of the Rubber Act of 1948, 62 Stat. 105, as amended, 50 U. S. C. App. 1929.  The said corporation shall be known as the Federal Facilities Corporation.

  SEC. 2.  Executive Order No. 9942 [FN1] of April 1, 1948 (13 F. R. 1823), providing for the performance or certain functions under the Rubber Act of 1948, is hereby amended by deleting from sections 2 and 3 thereof the words 'Reconstruction Finance Corporation' and inserting in lieu thereof, in each case, the words 'Federal Facilities Corporation.'

  SEC. 3.  The Federal Facilities Corporation is hereby designated as the instrumentality of the United States which shall perform and exercise the functions heretofore performed and exercised by the Reconstruction Finance Corporation under the said joint resolution of June 28, 1947, as amended.

  SEC. 4. (a)  All functions vested in the President by the said Abaca Production Act of 1950 shall be performed and exercised through the General Services Administration, except the functions of the President under section 3(a) of the said act (with respect to directing increases or reductions of acreage) and his functions under subsections (c) and (d) of section 4 of said act (50 U. S. C. 542(a); 543(c); 543(d)).

  (b)  The letter of the President to the Chairman of the Board of Directors of the Reconstruction Finance Corporation of August 10, 1950, relating to abaca, is superseded by the provisions of subsection (a) of this section.

  SEC. 5.  The Director of the Bureau of the Budget shall carry out the provisions of section 10(d) of the Rubber Act of 1948, as amended (50 U. S. C. App. 1929(d)), section 4(d) of the Abaca Production Act of 1950 (50 U. S. C. 543(d)), and section 107(b) of the Reconstruction Finance Corporation Liquidation Act, as the said provisions relate to the provisions of sections 2,

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works



Exec. Order No. 10539                                           Page 5

3, and 4 of this order.

SEC. 6.  As used in this order, the term 'functions' shall be deemed to embrace powers, duties, responsibilities, authority, and discretion.

SEC. 7.  The provisions of sections 2, 3, and 4 of this order shall become effective at the close of June 30, 1954, or at an earlier time fixed by the Secretary of the Treasury after consultation with the Director of the Bureau of the Budget.  All other provisions hereof shall become effective immediately.

                    DWIGHT D. EISENHOWER
                    THE WHITE HOUSE,
                    June 22, 1954.

FN1  3 CFR, 1948 Supp., p. 106.
Exec. Order No. 10539, 19 FR 3827, 1954 WL 5984 (Pres.)
END OF DOCUMENT

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works