JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

MDL 875

MAY 06 2003

FILED CLERK'S OFFICE

**BEFORE THE JUDICAL PANEL ON MULTIDISTRICT LITIGATION**

**In Re Asbestos Products Liability Litigation (No. VI)**

**MDL. No. 875**

**REPLY IN SUPPORT OF MOTION TO VACATE THE CONDITIONAL TRANSFER ORDER CTO-223 WITH RESPECT TO CASE NO. 3-03-52 (E.D. TENN):**

PLEADING NO. 3882

CHRISTOPHER TODD UPTON; LESLIE DARNELL JONES; JEFFERY LYNN KEYLON; JAMES DAVID PARTEN; TIMOTHY EDWARD ROBBINS; AND PAUL STEVEN VANCE,
PLAINTIFFS,

VS.

THE UNITED STATES OF AMERICA; BNFL INC.; AMERICAN TECHNOLOGIES, INC.; AND R&R ELECTRIC CORPORATION,
DEFENDANTS.

---

COME NOW PLAINTIFFS, Christopher Todd Upton, Leslie Darnell Jones, Jeffery Lynn Keylon, James David Parten, Timothy Edward Robbins, and Paul Steven Vance, by and through their undersigned counsel, and submit their REPLY IN SUPPORT OF MOTION TO VACATE THE CONDITIONAL TRANSFER ORDER CTO-223 WITH RESPECT TO CASE NO. 3-03-52 (E.D. TENN), in support of which they state as follows:

On April 22, 2003, the United States filed a response in opposition to Plaintiffs' Motion to Vacate the Conditional Transfer Order entered in this case. The United States

RECEIVED CLERK'S OFFICE
2003 MAY -5 A 11:09
JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

IMAGED MAY 8 '03 OFFICIAL FILE COPY

argues only that the case should be transferred because it involves asbestos. But that is only the threshold question. The United States has failed to address the considerations that justify a transfer of a *particular* case to MDL No. 875 once it is determined that this threshold requirement has been met. The question presented is whether Plaintiffs' specific claims satisfy the criteria for transfer. As described below, they do not.

**1. Individual Questions of Fact Overwhelmingly Predominate Over Any Common Questions of Fact.**

Contrary to the United States' assertion, this case has almost nothing in common with MDL No. 875. Although it does allege some personal injuries resulting from exposure to asbestos, *in conjunction with other substances*, this case is neither a mass tort case nor a products liability case. It is not, in short, a typical "asbestos case."

MDL No. 875 deals with concealment of *hazards and dangers* inherent in asbestos. In those consolidated cases, plaintiffs were, at least in general, aware that they were being exposed to asbestos, but were deceived regarding the potential health effects of that exposure. Central issues in MDL No. 875 are failure to warn of the dangers of asbestos, breach of warranty, market control, and the duty of care owed to asbestos product workers and users.

This case has nothing to do with any of the above. Unlike MDL No. 875, in this case, what the parties knew about the *hazards* presented by asbestos is irrelevant. The central question in this case is what the parties knew about the *presence* of asbestos (and other hazardous substances) in certain equipment that one Defendant salvaged from a United States Department of Energy facility and sold to two other Defendants for demolition work that was ultimately performed by Plaintiffs. These facts are entirely unique to this case and entirely irrelevant to every other case in the asbestos MDL.

Consequently, discovery in this case will focus on what information was available regarding the presence of asbestos and other hazardous substances in these particular pieces of equipment, what sampling was performed, to whom the information and sample results were forwarded, and what decisions the recipients made about disclosure of the information and sampling results to Plaintiff workers. Those critical issues are entirely unique to this case, and have no bearing on any of the other cases in MDL No. 875.

Indeed the *only* common question with MDL No. 875 involves the effect that asbestos exposure has and will have on Plaintiffs. This is the one common fact that the United States references in its brief. But even with respect to that question, individualized issues predominate. In this case, it is the *synergistic* effects of Plaintiffs' exposure to *multiple* hazardous substances that is critical.

Discovery in MDL No. 875 does not address what happens when Plaintiffs suffer acute exposure to multiple carcinogens in the same time frame. The Panel has no authority to transfer into MDL No. 875 those portions of this case that involve other hazardous substances that were present in the equipment that Plaintiffs demolished. The question of Plaintiffs' exposure to those other substances will have to remain in the Eastern District of Tennessee even if the Panel transfers the asbestos-related claims to the Eastern District of Pennsylvania.

As the cases would not follow parallel timing if separated along the lines of the type of substance at issue, the first court to reach the issue of Plaintiffs' harm would not have the benefit of any factual determination regarding the degree and duration of Plaintiffs' exposure to the substances addressed by the other court, much less the synergistic effects of that exposure. Thus, neither court will be able adequately to address Plaintiffs' harm. The

substances must all be dealt with simultaneously in one court if Plaintiffs' harm is to be properly evaluated and compensated.

**2.      Transfer Will Not Further Justice and Efficiency of These Proceedings.**

The United States brushes off the fact that this case involves substances other than asbestos.  However, this fact is indeed significant from an efficiency standpoint as well as a commonality of facts standpoint.  If the asbestos issues are transferred to the Eastern District of Pennsylvania while all other issues remain in the Eastern District of Tennessee, justice, efficiency, and the convenience of the parties will not be served.

A partial transfer of only the asbestos issues would force  the parties to litigate simultaneously the exact same background facts – the extent of Defendants' knowledge of the presence of, and Plaintiffs' exposure to, hazardous substances – in both the Eastern District of Tennessee and the Eastern District of Pennsylvania.  The very same witness testimony and documents will be relevant and required in both cases.  As one of the primary purposes of consolidating similar cases is to *avoid* duplicative discovery, actually *causing* duplicative discovery would be entirely contrary to the purpose of multidistrict litigation.

Most important, splitting the same factual situation into two cases presents a *significant* risk of inconsistent adjudication – one court could dismiss one of the cases on the grounds that that Defendants did not know the substances were present, or had no duty to disclose their presence, while the other could find that Defendants did know and did have a duty.  It would be manifestly unjust to require Plaintiffs to bear this risk.

Further, in addition to the whistleblower case referenced in Plaintiffs' Motion to Vacate the Conditional Transfer Order, there are two additional cases pending in the

Eastern District of Tennessee, before the very same judge, involving the same parties and the equipment that is at issue in this case. *See R&R Electric Corp. v. BNFL, Inc.*, No. 3:01-CV-605 (E.D. Tenn.) and *The Coy/Superior Team v. BNFL, Inc.*, No. 3:01-CV-634 (E.D. Tenn.) (complaints attached hereto).

These cases are contract disputes centering on misrepresentations regarding the presence of asbestos in the equipment that Defendants obtained and Plaintiffs demolished. Discovery in those related cases, as well as the whistleblower case, is well underway. In fact, Plaintiffs have already provided *all* of their documents to Defendant BNFL in conjunction with BNFL's deposition of Plaintiff Christopher Todd Upton on *exactly* the issues presented in this case. The Eastern District of Tennessee is clearly in the best position to unravel all of the issues surrounding knowledge of the presence of asbestos and other hazardous substances, as well as who bears ultimate responsibility for those substances. It makes no sense, and would be entirely inefficient, to separate this case from the three related cases pending before that court.

**3.      Transfer Will Not Conserve Defendants' Resources for Other Asbestos Claims.**

The six individual Plaintiffs in this case are the only individuals who were exposed to asbestos and hazardous substances from the unique pieces of salvage equipment at issue here. There is no class of potential Plaintiffs waiting in the wings to sue these Defendants for asbestos issues.    Aside from the United States, it is unlikely that any of these Defendants will ever be sued for asbestos-related injuries again, as *none* of them is in any type of asbestos-related business. Asbestos, among other substances, simply happened to be present in these particular pieces of salvage equipment. Therefore, there is no need to "conserve" these Defendants' resources for future asbestos claims or to prioritize Plaintiffs'

claims against these Defendants based on degree of injury, as MDL No. 875 is intended to accomplish.

**WHEREFORE**, Plaintiffs respectfully request that the Panel vacate the Conditional Transfer Order filed on March 13, 2003 with regard to this matter.

DATED: May 2, 2003.

Suzanna K. Moran

John D. Fognani, Esq.
Suzanna K. Moran, Esq.
Brian D. Gonzales, Esq.
FOGNANI GUIBORD HOMSY & ROBERTS, LLP
1700 Lincoln St. Suite 2222
Denver, Colorado 80203
Telephone: 303-382-6200
Facsimile: 303-382-6210

COUNSEL FOR PLAINTIFFS

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAY 06 2003

FILED
CLERK'S OFFICE

CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of May 2003, I have placed true and correct copy of Plaintiffs' **REPLY IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER CTO-233** in the U.S. Mail with first class postage addressed to:

Melinda Meador, Esq.
Bass Berry & Simms, PLC
900 S. Gay Street, Suite 1700
P.O. Box 1509
Knoxville, TN 37901-1509

Martin B. Bailey, Esq.
Charles W. Van Beke, Esq.
Wagner, Myers & Sanger, P.C.
P.O. Box 1308
Knoxville, TN 37901

Stuart F. James, Esq.
Goins, Carpenter & James
Suite 401, The Flatiron Building
707 Georgia Avenue
Chattanooga, TN 37402

J. Charles Kruse, Esq.
Special Litigation Counsel
Civil Division, Torts Branch
(Environmental Torts Section)
P.O. Box 340, Ben Franklin Station
Washington, D.C. 20044

The Honorable Judge Thomas W. Phillips
United States District Court, Knoxville
800 Market Street, Suite 130
Knoxville, TN 37902

The Honorable Judge Charles R. Weiner
United States District Court
Eastern District of Pennsylvania
Office of the Clerk of Court
U.S. Courthouse
601 Market Street, Room 2609
Philadelphia, PA 19106-1797

RECEIVED
CLERK'S OFFICE
2003 MAY -5 A 11:09
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

19247

Selma Jones

*Christopher T. Upton, et al. v. United States of America, et al.*, E.D. Tennessee, C.A. No. 3:03-52

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114

Edward J. Cass
Gallagher, Sharp, Fulton & Norman
Bulkley Building
7th Floor
1501 Euclid Avenue
Cleveland, OH 44115

Adam M. Chud
Shea & Gardner
1800 Massachusetts Avenue, N.W.
Washington, DC 20036

David A. Damico
Burns, White & Hickton
Fifth Avenue Place, Suite 2400
120 Fifth Avenue
Pittsburgh, PA 15222

Raymond P. Forceno
Forceno & Hannon
Philadelphia Bourse Building
Suite 1000
Independence Mall East
Philadelphia, PA 19106

Ellen B. Furman
Goldfein & Joseph
1600 Market Street
33rd Floor
Philadelphia, PA 19103

Susan M. Hansen
Brownson & Ballou
4800 U.S. Bank Place
601 Second Avenue, South
Minneapolis, MN 55402

Reginald S. Kramer
Buckingham, Doolittle & Burroughs
50 South Main Street
P.O. Box 1500
Akron, OH 44309

David C. Landin
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Gene Locks
Greitzer & Locks
1500 Walnut Street
Philadelphia, PA 19102

Suzanna K. Moran
Fognani, Guibord, Homsy & Roberts
1700 Lincoln Street
Suite 2222
Denver, CO 80203

Ronald L. Motley
Ness, Motley, Loadholt, Richardson
& Poole
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC 29464

John J. Repcheck
Marks, O'Neill, O'Brien & Courtney
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219

John D. Roven
Roven, Kaplan & Wells
2190 North Loop West
Suite 410
Houston, TX 77018

Richard D. Schuster
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216

Neil Selman
Selman, Breitman & Burgess
11766 Wilshire Boulevard
Sixth Floor
Los Angeles, CA 90025

Robert N. Spinelli
Kelley, Jasons, McGuire & Spinelli
Centre Square West
15th Floor
Philadelphia, PA 19102

Robert E. Swickle
Jaques Admiralty Law Firm, P.C.
1370 Penobscot Building
Detroit, MI 48226

Andrew J. Trevelise
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

James K. Weston, II
Tom Riley Law Firm
4040 First Avenue, N.E.
P.O. Box 998
Cedar Rapids, IA 52406

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAY 06 2003

FILED
CLERK'S OFFICE

IN THE NINTH JUDICIAL DISTRICT FOR THE STATE OF TENNESSEE
ROANE COUNTY- CIRCUIT DIVISION

R & R ELECTRIC, CORP.
629 West Rich St.
Columbus, OH
PLAINTIFF,

v.

BNFL, INC.
2908 Poston Avenue
Nashville, TN 37203
DEFENDANT.

COPY

CIVIL ACTION
NO. 12384

SIX PERSON JURY DEMANDED

Filed 11-8 20 01 Time
ANGELA RANDOLPH
By [signature] D.C.

## COMPLAINT

Comes the Plaintiff R & R ELECTRIC, CORP. ("R & R") by and through counsel and for its Complaint against the Defendant BNFL states to this Honorable Court as follows:

1. R & R is an Ohio Corporation with its principle place of business being 629 West Rich Street, Columbus, OH.

2. R & R is authorized to do business in the State of Tennessee with its local address being 124 Commanche Way, Lake City, TN.

3. BNFL is a foreign corporation and does business in the State of Tennessee and whose agent for service of process is Prentice-Hall, 2908 Poston Avenue, Nashville, Davidson County, TN 37203.

4. The acts complained of herein occurred in Roane County, TN and this Court is of proper venue and has jurisdiction over the parties and the subject matter of this dispute.

5. In 1999, BNFL and ATI entered into an agreement, Purchase Order No. ORT9809028, for ATI to purchase and remove certain equipment that had been utilized in the old K-25 plant located in Roane County, Oak Ridge, TN and titled this Agreement Electrical Enterprises.

6. ATI and R & R entered into an agreement by which R & R agreed to process

equipment for the purpose of salvaging and reselling the equipment or certain parts thereof.

7. Items of the equipment processed by R & R from ATI pursuant to ATI's agreement with BNFL included four (4) hydro cooled generators weighing approximately Four Hundred Sixty One Thousand (461,000) pounds each.

8. At all times material hereto BNFL represented the materials to be removed were free of any asbestos contaminants.

9. R & R avers that at all times material hereto BNFL had knowledge that R & R had agreed to process the generators and for reason of their immense size would have to dismantle them on sight prior to removal from the K-25 reservation.

10. R & R avers that it was required to meet with BNFL representatives at a scheduled meeting prior to beginning the process of removing and dismantling the generators.

11. That at this scheduled meeting on February 22, 2000 all safety issues, work hazards and plans of operation for removal and dismantling of the generators by R & R had to be reviewed and approved by representatives of BNFL.

12. At this meeting BNFL representatives assured R & R that the generators and all their attached components contained no asbestos. This representation is set forth in an Enhanced Work Plan ("E.W.P") Document signed by representatives of BNFL attached hereto as Exhibit A.

13. Relying upon this representation R & R began removal and dismantling the generators which are now located at the Building 1415 site in the old K-25 plant.

14. That during the process of removal and dismantling in April, 2000 asbestos lead wire insulation was discovered on the generators prior to the moving of the generators to the Building 1415 site.

15. That the presence of asbestos was brought to the attention of R & R subcontractors that were dismantling the generators. BNFL stopped further work on the generators; in order to have the asbestos wiring removed so as to abate the asbestos hazard..

16. Thereafter BNFL reassured ATI and R & R that there was no asbestos remaining on the generators or the components and allowed R & R to proceed with the dismantling process.

17. Relying on these representations R & R resumed work. That by necessity this process included the use of saws and other dusts creating activities on portions of the generators and their components.

18. This removal process required the use of tools, leased cranes, railroad cars and other equipment by R & R.

19. After proceeding for some time with the dismantling process, R & R was informed by a previous on-site purchaser that asbestos had been encountered in similar generator components sold by BNFL from an adjacent location in the K-25 plant.

20. Upon receiving this warning, R & R immediately stopped work on the generators and had independent tests performed on components of the generators which had been represented by BNFL to be asbestos free.

21. These tests indicated the presence of unsafe levels of asbestos in the material samples from the generators being disassembled by R & R.

22. Subsequently, representatives of the State of Tennessee performed tests on the generators and surrounding ground and determined that asbestos was present at unsafe levels.

23. Thereafter, R & R informed BNFL on several occasions asbestos had been discovered in the components of the generators and requested BNFL remove the generators from the Building 1415 work site.

24. To date no action has been taken and the generators contaminated with asbestos remain at the work site of R & R.

25. The cutting activities used by R & R to disassemble components of the generators has dispersed the asbestos contaminants onto the area surrounding the generators and the R & R equipment both leased and owned located at the site.

26. For reason the generators are contaminated with asbestos and BNFL has refused to remove them from the site, R & R cannot proceed with the dismantling of the

generators or their components and can not remove the contaminated tools and equipment from the 1415 work site.

27. R & R has continued to incur economic loss as it awaits the removal of the generators and abating of asbestos from its equipment, tools and surroundings from 1415 site.

28. R & R avers BNFL supplied false information in its E.W.P. regarding the asbestos in the generators which was meant to guide R & R in its business endeavor to process, dismantle and sell components of the generators.

29. R & R avers BNFL failed to exercise reasonable care in either obtaining or communicating the information regarding the presence of asbestos in the four (4) generators.

30. R & R has suffered economic losses while justifiably relying upon the information provided by BNFL to them in their E.W.P. regarding the presence of asbestos on the generators and their components; particularly R & R has expended monies for labor, materials, tools and rental fees.

31. R & R has been deprived of profits from sales of the generator components as the result of BNFL failing to abate the asbestos contamination.

WHEREFORE, Plaintiff demands compensation from the Defendant BNFL for economic losses, lost profit and prejudgment interest in accordance with Tenn.Code.Ann. §47-14-123 in the amount of Three Hundred Thirty Five Thousand Nine Hundred Forty Six Dollars ($335,946.00) and for other relief to which it may be entitled.

BUXTON LAW OFFICE
ATTORNEYS AT LAW

BY: GEORGE H. BUXTON, III

BY: HAROLD P. COUSINS, JR.
ATTORNEYS FOR PLAINTIFF
31 E. TENNESSEE AVENUE
OAK RIDGE, TN 37830
19445-10.013

**COST BOND**

We, the undersigned, hereby acknowledge ourselves as sureties in the cost of this cause in accordance with Tenn.Code.Ann. §20-12-120.

R & R ELECTRICAL CORPORATION

BY: ______________________
JERRY REESE

ITS: PRESIDENT

BUXTON LAW OFFICE
ATTORNEYS AT LAW

BY: ______________________
GEORGE H. BUXTON, III

Phase 3 – Work Plan Meeting

| Task Name: N761 Synchronous Condenser Removal | Work Plan Meeting Date: 2/14/00 |
|---|---|
| Group Manager: Larry Brede | EWP Number: SC-AT-01 |
| PARTICIPANTS ARE AS IDENTIFIED IN PHASE 1 | |
| EWP MEETING ATTENDANCE | |

| Name | Discipline |
|---|---|
| | |
| Lawrence M. Brede | Subcontracts Manager |
| David L. Graves | A.S.H.O. |
| David Miller | Contractor ATI |
| J. R. Jamison | BNFL, Engineering |
| Gerald W. Reese | Contractor ATI |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Note: If the required SME disciplines are not in attendance, their review is mandatory prior to approval.

Is a Field Walkdown necessary? ☒ Yes ☐ No

EXHIBIT A

EWP Number: EWP-SC-AT-01



## Attachment 1 - ENHANCED WORK PLAN TASK PLAN
### Phase 3 – Work Plan Meeting

Task Name: Work Instructions EWP Number:

| Work Plan Action # | Work Plan Action Description with types of work activities required | Required Step |
|---|---|---|
| 1.0 | Remove upper and bells off of synchronous condensers. | |
| 1.1 | Remove the end cap (~1,000#) from the end bells as required by either unbolting or hot cutting. | |
| 1.2 | Attach rigging to the previously cut individual upper end bell section (~12,000#). Use existing lifting holes with shackles attached or lifting lugs as available. If none are available create lifting holes by hot cutting holes at locations where the lifted load will be balanced. | |
| 1.3 | Lift each upper end bell and place directly into an approximately 50 cy open top trailer. Each section must be loaded into a single trailer. Ship off site for recycle. | |
| 1.4 | Mechanically remove the generator fields (~12,800#) from the ends of the shaft. Load onto truck and ship off-site for recycle. | |
| | | |
| 2.0 | Remove the excitor, duty starter, and bearing pedestals. Total weight of these sections is approximately 20,000#. | |
| 2.1 | Shim the rotor in place. | |
| 2.2 | Unbolt or hot cut the excitor and cut the leads to separate from the condenser body. Rig out and load into open top trailer. Ship off site for recycle. | |
| 2.3 | Unbolt or hot cut the duty starter and cut the leads to separate from the condenser body. Rig out and load into open top trailer. Ship off site for recycle. | |
| 2.4 | Mechanically disconnect and remove the top (~1,000#) and bottom (~1,000#) halves of the pedestal bearings and pedestal unit. Load onto truck and ship off-site for recycle. | |
| 2.5 | Mechanically remove the drive motor stator (~10,000). Load onto truck and ship off-site for recycle. | |
| | | |
| 3.0 | Attach rigging and remove the bottom half of the end bells (~14,000# each) and the spacer ring (~25,000#). Load onto truck and ship off-site for recycle. | |
| | | |
| 4.0 | Remove the rotor from the stator. The rotor weighs approximately 180,000#. | |
| 4.1 | Basket-hitch both ends of the shaft and lift the rotor so that it is free of the stator. Move the rotor sequentially such that it moves the maximum distance possible until the rigging is immediately adjacent to the condenser. Set the rotor back down and rig back where there is more shaft. | |
| 4.2 | Once the rotor body is clear of the stator, rig the shaft and the rotor body and continue to move sequentially until the entire rotor can be pulled out. | |
| 4.3 | Load the rotor onto a rail car and ship for recycle. | |
| | | |
| 5.0 | Remove the stator unit. The stator weighs approximately 150,000#. | |
| 5.1 | Rig the stator unit by basket hitching under the condenser body. Lift the stator off of the pit and reset on the long portion of the concrete monolith such that the body is located over concrete slab. The rigging can remain attached to the condenser during the following steps. | X |
| 5.2 | Disconnect the interior supports for each bushing while the exterior bolts are still holding its weight. | X |
| 5.3 | From underneath the condenser unbolt the bushings, flanges, and other attachments connected to the bottom plate. | X |
| 5.4 | Cut the lead from the top of each bushing and allow the bushing to drop on the concrete. This step must be completed after all the work under the condenser is completed. | |
| 5.5 | After all attachments have been removed, lift the stator onto a rail car and ship for recycle. | |
| | | |
| 6.0 | These steps can be completed in series or in parallel. The only mandatory sequential steps are highlighted in the "Required Step" box. | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Attachment 1 - ENHANCED WORK PLAN FASH TCAN

Phase 3 – Work Plan Meeting

**Work Activity Hazard Assessment**
(Reference Hazards Assessment and Controls Checklist – Attachment 4)

| Work Plan Action # | Specific Work Activity | Hazard(s) | Hazard Control(s) |
|---|---|---|---|
| 1.0, 2.0, 3.0, 4.0, 5.0 | Working near condenser pit. | • Fall from height could injure personnel.<br>OR 6' OFF THE GROUND [initials]<br>• Unique entry requirements if personnel fall into pit. | • ① Wear fall protection while working within 6' from the edge of the pit. Flag off a 6' boundary in between the edges of the monolith.<br>② Once the lower halves of the end bells and the spacer ring are removed it will create exposure to the pit. The space from the condenser to the edge of the pit will be covered with a wooden platform (typically 2" x 6" lumber with a plywood top). When the platform is not in place the area will be flagged off as listed above.<br>• Notify PSS in the weekly status report that work will be commencing near the pits and could present access problems. |
| 5.3 | Working under the condenser. | Low overhead clearance. Potential for bolts to fall onto personnel. | Wear hard hat at all times under the condenser. Do not locate any portion of the body under the bushing/attachment during unbolting activities. |
| 1.2, 1.3, 2.3, 3.0, 4.1, 4.2, 5.1, 5.3 | Handling rigging and metal edges. | • Potential for pinches and cuts.<br>• Rigging will be heavy. | • Wear leather gloves whenever handling metal rigging or metal pieces, particularly cut edges.<br>• Use crane to lift as possible. No more than 50#/person will be lifted by hand. |
| 1.3, 1.4, 2.2, 2.3, 2.4, 2.5, 3.0, 4.3, 5.5 | Shipping non-hazardous materials off site. | Potential for an overweight load. | Verify load weight prior to shipping. Complete overweight shipment paperwork and coordination as required. |
| 1.1, 1.2, 2.1, 2.3 | Hot cutting. | • Cutting through lead based paint.<br>• Storing compressed gas cylinders.<br>• Exposure to ultra-violet light.<br>• Cutting near drained oil lines.<br>• Potential for clothes catching fire. | • Person using torch will wear respirator. This individual must also have lead awareness training and blood-lead on their physical.<br>• Inspect cylinders and connections prior to use. Storage areas must be located a minimum of 50' from the active work area.<br>• Cutter will wear shade factor 6 eye protection.<br>• The oil residuals in the condensers are non-flammable. Drain as much of these oils as possible as a best management practice.<br>• Wear flame retardant PPE as needed. Leather PPE is required anytime there is blow-back potential during cutting activities. |
|  | All work. | Potential cold work conditions. | Wear thermal clothing as required. Use K761 for warming if needed. |
| 3.2, 5.3, 5.4 | Manually disconnecting attachments. | Manual lifting of awkward or heavy load. | Use crane to lift as possible. No more than 50#/person will be lifted by hand |
| 1.1, 2.2, 2.3 | Disconnecting bolts with an air hammer. Using crane. | Potential high-noise work. | Wear hearing protection as directed by the HSO. HSO will monitor high-noise activities and determine 85dB boundary. |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Attachment 1 - ENHANCED WORK PLANNING
Phase 3 – Work Plan Meeting

| BOUNDING CONDITIONS | | |
|---|---|---|
| Item | Description | Response |
| | Disturb potential ACM (located on piping in pit under condenser). | Stop work on that condenser. Personnel who contacted potential ACM will not leave work area until checked by abatement subcontractor. Notify the supervisor or foreman who will arrange for Performance Abatement to remove the hazard. |
| | Inclement weather. | Stop all outdoor work during lightning storms, high wind, or severe rain and move under cover. |
| 1.1, 1.2, 1.3, 3.0, 4.1, 4.2, 5.1, 5.5 | A load exceeds 90% of either the crane or rigging capacity. | Do not conduct this lift. Get equipment sufficient to exceed the load rating. If this type of equipment is not available generate a critical lift plan for that particular lift before conducting that work. Conduct the lift as required by this plan. |
| | | |
| | | |
| | | |
| | | |

**Equipment, Materials, Tools, and Services**

☐ NEW PURCHASES (Place * next to items that need to be purchased and check "New Purchases" box)

mobile crane ✓
rigging material ✓
oxy-acetylene ✓
All oxy - propane [illegible] ASAP

| OTHER INFORMATION | Yes | No |
|---|---|---|
| Description: | | X |

**TRAINING**

Required specialized, Classroom, or On-The-Job

Load Awareness (hot cutter only).
Fire watch.



ENHANCED WORK PLAN TAS[illegible] PLAN
Phase 3 – Work Plan Meeting

Page 5 of 7

| Task Name: K762 Synchronous Condenser Removal | Assessment Date: 1/1-4/00 |
|---|---|
| Group Manager: Larry Brede | EWP Number: SC-AT-01 |

ENGINEERING & TECHNOLOGY

| Description | | Yes | No | Description | | Yes | No |
|---|---|---|---|---|---|---|---|
| Structural Analysis (Building or System) | | | X | Excavation and Penetration > 2 inches (hidden utility) | | | X |
| Special Equipment Design, Spec/Procurement | | | X | Floor/Wall Penetration > 2 inches (hidden utility) | | | X |
| Floor Loading Evaluation | IFTE-002 B-OC-441 | | X | Greater than 1 kW Electrical Load | | | X |
| Deenergization/Isolation | IFTE-003 | | X | Emergency lighting affected | | | X |

FIRE PROTECTION

| Description | | Yes | No | Description | | Yes | No |
|---|---|---|---|---|---|---|---|
| Provisions Required for Storage of Compressed Gas Cylinders | [illegible]-003 | X | | Hot Work (Permit required) | [illegible]-007 AO-[illegible]-007 | X | |
| Provisions Required for Storage of Flammable Liquids | IHS-007 | | X | Plasma Arc | IT-OC-413 | | X |
| Additional Fire Extinguisher(s) Required | IHS-009 | | X | Welder | | | X |
| Non-Sparking Tools Required | [illegible]-AC-007 | | X | Torch – oxyacet | | X | |
| Sprinkler System Outage Required - Riser No ____ | [illegible] | | X | Aisles and exit ways affected or obstructed – | | | X |
| | | | | | | | X |
| Combustible materials generated | IHS-008 | | X | Other | | | |

INDUSTRIAL SAFETY, INDUSTRIAL HYGIENE, AND RADIATION SAFETY

| Description | | Yes | No | Description | | Yes | No |
|---|---|---|---|---|---|---|---|
| Lockout/Tagout Required Electrical ____ Mechanical ____ | [illegible] [illegible]-414 MIC-[illegible] | | X | Respiratory Equipment Required – (for [illegible]) Supplied Air ____ Negative Pressure Full Face _X_ Cartridge GMC P-100 _X_ GMC P-100 ____ | [illegible]-[illegible]-401 | X | |
| High Noise (≥85dBA) Noise Monitoring Required | [illegible]-412 | X | | | | | |
| Hearing Protection Required: Plugs ____ Muffs ____ | [illegible] | | | Source/Bulk Samples Required – Lead ____ PCB ____ Asbestos ____ Other ____ | MIC-IS-001 | | X |
| Confined Space Entry Required Permit Required ☐ Yes ☐ No | IT-IS-004 | | X | Area Postings Required – Area is already marked | [illegible]-IS-417 IT-XS-211 | | X |
| Temperature Extremes Heat Stress Monitoring Required | [illegible]-414 | | X | Specify Overhead Hazard | | | |
| Special Ventilation Required – | IT-IS-441 | | X | Job-Specific EWP Required | IT-XS-416 | | X |
| Air Monitoring: Atmospheric Personal | [illegible]-IS-412 | | X | Previous Radiological Survey Required | [illegible]-413 | | X |
| | | | | Work Area/Equipment Radiological Screening | | | X |
| ☐ Initial ☐ Continuous ☐ Intermittent Task ____ LEL/O2 ____ | | | | Other – | | | |

EWP Number: EWP-SC-AT-01

Att[illegible]ment 1 - ENHANCED WORK P[illegible]

Phase 4 – EWP Follow-up

## QUALITY ASSURANCE

| Description | | Yes | No | Description | | Yes | No |
|---|---|---|---|---|---|---|---|
| Records Generated | | X | | Are any of the generated records Quality Records (If Yes, forward to Project File Section) | [illegible] | | X |
| Description: [illegible] work permits, shipping [illegible] | | | | Identify Quality Records [illegible] | | | |

## MATERIAL DISPOSITION

☐ D&D Workshop ☐ Survey Center ☐ Karr Hollow ☐ Disposal ■ Other Recycle Vendor ☐ N/A

## WASTE MANAGEMENT

| Waste or Material Category | | Yes | No | Waste or Material Category | | Yes | No |
|---|---|---|---|---|---|---|---|
| Radioactive Recyclable Metals<br>Description | [illegible] | | X | Non-Radioactive ACM<br>Description | [illegible] | | X |
| Non-Radioactive Recyclable Metals<br>Description – copper and steel | [illegible] | X | | Radioactive PCB Waste<br>Description | [illegible] | | X |
| LLW Debris<br>Description | [illegible] | | X | Non-Radioactive PCB Waste<br>Description – | [illegible] | | X |
| Non-Debris LLW<br>Description | [illegible] | | X | Mixed Waste<br>Description | [illegible] | | X |
| Non-Radioactive, Non-Hazardous Solid Waste<br>Description – | [illegible] | | X | Hazardous Waste<br>Description – | [illegible] | | X |
| Radioactive ACM<br>Description | [illegible] | | X | Triple Waste<br>Description | [illegible] | | X |
| Has Waste Minimization been addressed?<br>100% recycle | | | | | [illegible] | X | |
| Waste Container Type(s):<br>N/A | | | | | [illegible] | | |
| Segregation/Compatibility Issues<br>None | | | | | [illegible] | | |
| Size Restrictions<br>None | | | | | [illegible] | | |
| Other<br>Materials sold to recycle vendor as available. | | | | | | | |

## TRANSPORTATION

DOT Function-Specific Requirements

| COMMUNICATION | CONTAINMENT |
|---|---|
| Marking Requirements:<br>None. | Loading Instructions:<br>Bulk load into open top container. |
| Labeling Requirements:<br>None. | Blocking and Bracing Requirements:<br>None. |
| Placard Requirements:<br>None. | Other:<br>None. |

EWP Number: EWP-SC-AT-01

Attachment 1 - ENHANCED WORK PLANNING
Phase 4 – EWP Follow-up

Page _ of _

| Task Name: K762 Synchronous Condenser Removal | | EWP Number: SC-AT-01 |
|---|---|---|
| EWP Task Plan in-hand (indicates mandatory steps, sequences, etc.)? | | ☐ Yes ☐ No |
| **APPROVALS** | | |
| ESO/AESO | David L. Graves (Print Name) | 02/11/00 Date |
| SME - ATI | David R. Miller (Print Name) | 2/22/00 Date |
| SME – R&R Equipment | Gerald W. Reese (Print Name) | 2/22/00 Date |
| SME – Engineering | J. R. Jamison (Print Name) | 2/22/00 Date |
| SME | (Print Name) | / / Date |
| SME | (Print Name) | / / Date |
| SME | (Print Name) | / / Date |
| SME | (Print Name) | / / Date |
| Group Manager | Lawrence M. Brede (Print Name) | 2/22/00 Date |

**REVISIONS**

| Date | Field Change | Reason |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

Reminder: For safety significant systems, prior to starting the work activity, submit a copy of the approved EWP Task Plan Phase 1 through Phase 4 to the Project File Station

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
NORTHERN DIVISION

FILED
2001 DEC 27 A 10:09
U.S. DIST. COURT
EASTERN DIST. TENN.
BY_______ DEP. CLERK

THE COY/SUPERIOR TEAM
a Tennessee Partnership,

Plaintiff

vs.

BNFL, INC.,
a Delaware Corporation

Defendant

CIVIL ACTION NO. 3:01-CV-634

Plaintiff Demands Trial By Jury

**COMPLAINT**

COMES now the plaintiff in this matter and states as follows:

1.

Plaintiff brings this action against defendant for breach of contract, declaratory judgment, indemnification, and negligent misrepresentation.

THE PARTIES

2.

Coy Construction, LLC ("Coy") is a Tennessee company with its principal place of business in Oak Ridge, Tennessee. Superior Abatement, Inc. ("Superior") is a New Jersey corporation with its principal place of business in Fairfield, New Jersey. In late 1999, Coy and Superior formed a partnership for the purpose of seeking and entering into a contract with BNFL, Inc. ("BNFL"). That partnership is referred to by BNFL in the contract developed by BNFL as Coy/Superior Abatement, Inc., although no such entity exists or ever existed as a corporation. The partnership has referred to itself most often as the Coy/Superior Team and BNFL and others

have often used that designation as well. Throughout this complaint plaintiff will be referred to as the Coy/Superior Team or as Coy/Superior.

3.

BNFL, Inc., a wholly-owned subsidiary of a foreign corporation, is incorporated in the State of Delaware, has its principal place of business in Fairfax, Virginia, and does business throughout the country. Its registered agent for service in Tennessee is The Prentice Hall Corporation System, 2908 Poston Avenue, Nashville, Tennessee, 37203.

JURISDICTION AND VENUE

4.

This Court has jurisdiction over this litigation pursuant to 28 U.S.C. § 1332 in that plaintiff is a citizen of Tennessee and defendant is a citizen of a state other than Tennessee and the amount in controversy, exclusive of interest and costs, exceeds the amount of Seventy-Five Thousand Dollars ($75,000.00).

5.

This Court also has jurisdiction over this litigation pursuant to 28 U.S.C. §1331 in that at issue is non-compliance with: the Clean Air Act (CAA), 42 U.S.C. §7401 et. seq.; the National Emissions Standards for Hazardous Air Pollutants (NESHAP), 40 C.F.R. 61.140-61,157 Subpart M, issued under the CAA, 42 U.S.C. §7412.112; the Occupational Safety and Health Act, 29 U.S.C. §651 et seq., and the construction industry standards issued under it, 29 C.F.R. §1926.1101 et. seq.; the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601 et. seq.; and the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901, et seq.

6.

Venue is proper in this Court pursuant to 28 U.S.C. §1391 in that the events giving rise to plaintiff's claims occurred in this judicial district, including the entering into and performance of the contract at issue.

7.

There are no contractual impediments to bringing this action. Any contract provisions that might be considered controlling for the claims asserted by plaintiff have been followed or waived by the parties.

FACTUAL ALLEGATIONS

8.

Plaintiff was formed for the purpose of bidding on and performing a demolition and salvage subcontract offered and awarded by defendant for work at the U.S. Department of Energy's (DOE) K-25 site, now known as the East Tennessee Technology Park (ETTP), in Oak Ridge, Tennessee.

9.

Defendant is a large firm engaged in many types of work, but for purposes of this action is engaged in an activity known as the Three-Building Decontamination And Decommissioning and Recycle Project under Contract No. DE-AC05-970R22576 with DOE (the "prime contract"), the three buildings being the K-29, K-31 and K-33 buildings at DOE's ETTP site. The prime contract was entered into on August 25, 1997, has been modified several times, and work continues to be performed under it by the defendant.

10.

In November 1999, BNFL issued Request For Proposal (RFP) No. 5284-SC99-1115 for a

subcontract to be awarded by it, under the prime contract, for the demolition of buildings K-791, K-791N and K-791S, adjuncts to building K-33.

11.

The prime contract contained the general framework for dealing with and disposing of wastes, including hazardous substances such as asbestos. Specifically, the prime contract required that BNFL assure that the removal of asbestos-containing material (ACM) would be performed according to NESHAP regulations, citing 40 C.F.R. 61.152 Subpart M, and OSHA regulations, specifically 29 C.F.R. 1910.1001.

12.

The prime contract contained, as part of its option 1a, the demolition of the K-792 switchyard, including the removal and disposal of two Westinghouse and two Allis Chalmers synchronous condensers located inside the K-792 switchyard, weighing approximately 200 tons each. That option was exercised by DOE on June 30, 1998 by modification A005 to the prime contract. Buildings K-791, K-791N and K-791S are within the K-792 switchyard.

13.

Soon after the prime contract was awarded, BNFL developed a CERCLA Removal Action Work Plan, implementing DOE's Action Memorandum for the site, issued August 25, 1997. DOE's Action Memorandum approved the removal action proposed in the Engineering Evaluation/Cost Analysis for Equipment Removal and Building Decontamination for Buildings K-29, K-31, and K-33, East Tennessee Technology Park, Oak Ridge, Tennessee. (DOE/OR/02-1579&D2) of June 1997.

14.

The presence and handling of asbestos was addressed in all the documents. The

CERCLA Removal Action Plan summed it up in its section 5.3.3.4, by stating that "asbestos will be removed, segregated, and sent to a commercial disposal facility." The Action Plan also stated that removal would comply with NESHAP guidance.

15.

Under DOE's Action Plan, asbestos, and other hazardous materials, such as PCBs, as well as radioactively contaminated material, were not to be sold or otherwise transferred to private entities. They were to be separated and to be segregated from other materials and equipment being demolished and salvaged, following procedures set out in the prime contract and its implementing documents. Disposal of asbestos, other hazardous materials, and radioactively contaminated material could only be done through approved, written disposal plans.

16.

Following the conditions imposed by the prime contract, the RFP issued by BNFL for the demolition of buildings K-791, K-791N and K-791S contained the statement of work intended to go in the subcontract. In a section titled Existing Conditions it stated that "BNFL has removed all known asbestos-containing materials and PCB containing materials. If the Subcontractor encounters any suspect materials in the execution of work, it shall notify the BNFL STR [Subcontract Technical Representative] immediately."

17.

The RFP contained reference to specific locations where asbestos might be thought to be present, but which BNFL could confirm were asbestos free. The four synchronous condensers were described (2 each for K-791N and K-791S), but no mention was made of whether asbestos was in the machines.

18.

The RFP put bidders on notice that they would have to comply with all applicable requirements of BNFL's Safety and Health program. The OSHA requirements for construction work, as set out in 29 C.F.R. 1926, were also referred to.

19.

Safety regulations were present in many forms and places to deal with handling asbestos, but none was imposed.

20.

The RFP provided that no hazardous wastes were to be generated while performing the work. Asbestos is a hazardous waste. The RFP also provided that if hazardous wastes had to be generated, prior BNFL approval was required and a waste management plan had to be developed for BNFL's approval.

21.

In a pre-bid meeting on December 6, 1999, BNFL emphasized that if a subcontractor suspected the presence of asbestos, BNFL was to be notified immediately and it, BNFL, would remove all known asbestos containing materials (ACM).

22.

Among Coy and Superior it was decided that the bid would be submitted in Coy's name. In its December 20, 1999 bid for the work, Coy described the work as it understood it in the RFP. The word "**Exclusions**" appeared in bold type in Coy's submittal. Three materials were excluded - asbestos containing materials, PCB containing materials, and radioactive contaminants. BNFL took no exception to those materials being excluded.

23.

In BNFL's December 14, 1999 response to the questions of prospective subcontractors, asbestos was mentioned several times as not being present or being present in particular places among the buildings to be demolished. Where asbestos was known to be present the bidders were informed BNFL would have its on-site asbestos abatement subcontractor remove the material before the demolition subcontractor began work in that area.

24.

Coy's bid to BNFL was $89,000.00 to demolish the buildings. It was known to both parties that the cost to demolish the buildings would far exceed that amount and that the value of the subcontract to Coy/Superior was the value of the salvageable material, primarily the copper. Copper was expected to be retrieved from, among other things, the wires and coils inside the synchronous condensers. Also included in Coy/Superior's calculation was an expected $78,000.00 for 100,000 pounds of copper expected to be salvaged from building K-791. That copper was included in the RFP.

25.

On December 29, 1999, BNFL notified Coy Construction of its selection and of BNFL's intent to award a subcontract within 10 days. The subcontract was executed on January 6, 2000, by BNFL and Coy Construction. Coy Construction was unable to post the required performance bond of $98,200.00. Superior Abatement, Inc. was allowed to post it and, as a result, Superior Abatement was joined in the subcontract through revision 1 to the subcontract executed on February 6, 2000 through an entity BNFL titled Coy/Superior Abatement, Inc. although the manager of Coy Construction signed as such and the vice president for operations of Superior Abatement signed as vice president. In its letter of February 3, 2000, transmitting revision 1,

BNFL referred to Superior Abatement, Inc. as a partner, and that in fact was the case.

26.

The subcontract executed by BNFL and Coy, later revised to be Coy/Superior, contained the Statement of Work contained in the RFP, including the provisions referred to above in paragraphs 16, 17, 18 and 20. It also contained, as part of the statement of work, removal (and salvage) of the 100,000 pounds of copper in building K-791. In fact, BNFL allowed another subcontractor, who had no subcontract for that work, to take the 100,000 pounds of copper, depriving Coy/Superior of a significant portion of its bid and bargain.

27.

Before performance began under the subcontract, Coy was required to submit its Demolition and Waste Management Plan to BNFL by January 17, 2000. It did. Nothing was mentioned about asbestos. No exception was taken by BNFL.

28.

Coy/Superior did not develop its own health and safety plan for the work. It came under BNFL's plan and BNFL's health and safety officer. No asbestos protection standards were emphasized by that plan or that officer.

29.

In early March 2000, while working in the switchyard buildings, Coy/Superior found copies of the manufactures' operating manuals for the Allis Chalmers and for the Westinghouse synchronous condensers. These manuals were in use in 1954, approximately when the synchronous condensers were installed during the construction of the K-33 building.

30.

The operating manuals referred to asbestos when describing the insulation around the

field windings and coils.

31.

Coy/Superior informed BNFL immediately of the finding of the operating manuals and of the manuals' references to asbestos in the insulation in the synchronous condensers.

32.

BNFL, using its asbestos abatement subcontractor, took grab samples at locations at the site and at places in the synchronous condensers and parts of the condensers chosen by BNFL. One site location had four synchronous condensers that were not part of Coy/Superior's work; the other location was.

33.

BNFL's asbestos abatement subcontractor took the samples as directed by BNFL and sent the samples to an analytical laboratory.

34.

It is now known that on March 20, 2000, the asbestos abatement subcontractor reported in writing to BNFL the results of the analysis of the grab samples. Asbestos had been found in some of the samples taken from both locations, including the one being worked by Coy/Superior.

35.

BNFL did not share the laboratory results or information with Coy/Superior at the time. It was not until September 28, 2000, that BNFL shared the March 20 report with Coy/Superior. That was well after the work had been finished and Coy/Superior discovered through its own testing, described below, that asbestos was present.

36.

Soon after BNFL received the results of the testing for asbestos in and around the

synchronous condensers, it informed Coy/Superior verbally that asbestos had been found in the exciters, or starters, for the condensers. BNFL had an enclosure built on the spot and had its asbestos abatement subcontractor remove that asbestos and dispose of it.

37.

At the same time, BNFL advised Coy/Superior verbally that the testing for asbestos on the motors and rotors of the condensers was negative. Not knowing the true results of BNFL's testing for asbestos, Coy/Superior had its workers cut into the synchronous condensers, reducing the condensers to pieces small enough to move. Coy/Superior's employees were wearing full-face respirators as they performed the work, but not because of any known or expected exposure to asbestos. Lead paint was known to be present and that called for the full-face respirator protection.

38.

Coy/Superior moved the synchronous condenser pieces to another location at ETTP for purposes of conducting salvage operations, an area that will be referred to as the "salvage work area." The sections of the synchronous condensers remain there today, having never left the ETTP site.

39.

Coy/Superior completed its demolition work under its subcontract with BNFL on May 12, 2000. On June 13, 2000, BNFL had Coy Construction sign a release and certification of final payment, still not having informed Coy/Superior of the complete test results which found asbestos present in the condensers.

40.

On July 13, 2000, Coy Superior offered to a potential buyer in Nabb, Indiana samples of

the copper components from the synchronous condensers Coy/Superior would be selling as scrap. As a precaution, the potential buyer asked that the wrapped copper be tested for the presence of asbestos.

41.

Immediately, Coy/Superior took eight grab samples for testing and analysis. On July 27, 2000, Coy/Superior learned that six of the eight tested positive for asbestos.

42.

During early August 2000, Coy/Superior informed its employees of the potential exposure to asbestos, and the associated health problems. Coy/Superior also advised DOE and the State of Tennessee's regulatory authorities of the possible release of asbestos at ETTP. All of this was in addition to numerous meetings with BNFL officials as well as correspondence to BNFL.

43.

In the meetings and through its correspondence, BNFL began moving to a position of a remediation plan being developed to deal with the problem of removal and disposal of the asbestos. Coy/Superior then did more extensive testing.

44.

On August 17, 2000, Coy/Superior took 26 samples from various places in the sections of the synchronous condensers at its salvage work area, and sent them to an analytical laboratory for testing.

45.

The laboratory, Enviro Techniques, Inc. of Paterson, New Jersey, received the samples on August 18, 2000 and analyzed them the same day. The laboratory faxed its report to

Coy/Superior on August 24, 2000. It reported the presence of asbestos in the insulation of copper windings in the Allis Chalmer synchronous condensers in amounts as high as 16%. The presence of asbestos from parts of the Westinghouse synchronous condensers was reported in amounts as high as 17%. Coy/Superior passed on the report to BNFL.

46.

The positions of Coy/Superior and BNFL began to be crystalized by an exchange of letters - Coy/Superior to BNFL, September 1, 2000; and BNFL's reply of September 12, 2000 - in what amounted to the formal initiation of a claim by Coy/Superior and its denial by BNFL.

47.

The issue of developing a remediation plan resulted in the submission by Coy/Superior of its proposed plan on September 18, 2000, as supplemented on September 27, 2000.

48.

BNFL responded on September 28, 2000, challenging much of what was in Coy/Superior's plan and revisiting and contesting facts advanced by Coy/Superior in earlier meetings and correspondence. BNFL concluded by taking Coy/Superior's plan under advisement.

49.

Also, on September 28 2000, BNFL finally provided Coy/Superior the results of the tests made on samples taken by BNFL's asbestos abatement subcontractor in March 2000 and reported to BNFL on March 20, 2000, but not reported by BNFL to Coy/Superior or, apparently, anyone else.

50.

On October 18, 2000, BNFL had its asbestos abatement subcontractor take 68 samples

from various locations of the sections of the synchronous condensers at the salvage work area used by Coy/Superior, and from the salvage yard itself. The samples were sent to the same analytical laboratory used by BNFL's subcontractor in March. The results of that analysis were reported to BNFL on October 24, 2000. On October 31, 2000, BNFL advised Coy/Superior that the results of BNFL's testing earlier in October were consistent with the results of Coy/Superior's testing in August 2000. At the same time BNFL advised Coy/Superior of what it, BNFL, thought was the most cost effective way to deal with the material, including asbestos abatement for some material and land filling for other material. BNFL offered to coordinate the land fill activity at Y-12, another DOE facility on its Oak Ridge reservation.

51.

Until some action would be taken to deal with the asbestos-containing material at the scrap yard, BNFL raised no concerns about leaving the material as is. In addition, Bechtel Jacobs, LLC, DOE's maintenance contractor for ETTP, placed air monitors at the salvage yard.

52.

Coy/Construction rejected most of what BNFL proposed because, among other things, the price BNFL put on asbestos abatement was so unrealistically low it would have resulted in a huge loss to Coy/Superior, simply adding to the losses Coy/Superior had already sustained. No acceptable remediation plan was ever developed.

53.

For the next year or better Coy/Superior and BNFL exchanged positions and counter positions with no resolution. BNFL's position was and is that the asbestos belongs to Coy/Superior and Coy/Superior must deal with it and dispose of it.

COUNT ONE

BREACH OF CONTRACT

54.

Plaintiff incorporates by reference the allegations in paragraphs 1 through 53.

55.

A written contract (referred to as a subcontract) was entered into on January 6, 2000, between Coy and BNFL, and was revised on February 6, 2000 to make Coy/Superior a party to the contract.

56.

Coy/Superior complied with all the duties and obligations required of it under the terms of that subcontract.

57.

BNFL breached the terms of the subcontract by entering into a salvage-value contract with Coy/Superior when there was no salvage value in the equipment available for salvage. BNFL should have known that there was no salvage value in the equipment prior to award of the subcontract, and it definitely knew during Coy/Superior's performance of the subcontract. In addition, BNFL allowed another company to take 100,000 pounds of salvageable copper from the site that was to become Coy/Superior's under the terms of the subcontract.

58.

BNFL breached its duty of good faith and fair dealing, a duty imposed on parties to a contract obligating them to do everything the contract presupposes each party will do to accomplish the contract's purposes. BNFL breached this duty by not thoroughly examining the synchronous condensers in advance of awarding the subcontract since there was at the site at the

time the operating manuals that would have put BNFL, and its bidders, on notice of the presence or potential presence of asbestos in the wrapping of coils and windings. In addition, BNFL breached its duty when it learned before Coy/Superior started cutting the synchronous condensers into parts that asbestos was there but did not inform Coy/Superior.

59.

As a result of BNFL's breach of the subcontract, Coy/Superior suffered a loss of $655,000.00 in revenue it had expected to realize in salvaging and selling marketable copper, and expenses in performing what was not expected to be an unprofitable subcontract. Coy/Superior also faces costs of $100,000.00 if it has to dispose of the asbestos containing material.

COUNT TWO

DECLARATORY JUDGMENT

60.

Plaintiff incorporates by reference the allegations in paragraphs 1 through 59.

61.

A justifiable controversy exists between the parties with adverse interests.

62.

BNFL relies on clause C.1.13 of the subcontract for its position that title to the asbestos-laden synchronous condensers is in Coy/Superior. That clause provides in part "the Subcontractor(s) shall assume total regulatory responsibility, liability, and title to the waste and recyclable material upon loading onto the Subcontractor(s) vehicles at the ETTP site."

63.

Coy/Superior claims that "wastes" as used in that subcontract provision, does not include hazardous wastes, nor could it.

64.

DOE's approval and implementation of BNFL's Removal Action Work Plan for the decontamination and removal of buildings and equipment, including Building K-33 and its switchyard was done under the Comprehensive Environmental Response Compensation and Liability Act of 1980 (CERCLA), 42 U.S.C. §§9601 et. seq.

65.

Under CERCLA asbestos is a hazardous waste substance. As long as a hazardous substance is on one or more lists identified at 42 U.S.C. §9601(14), it is a hazardous substance regardless of the volume or concentration found at the site in question. Among the §9601(14) lists on which asbestos appears as a hazardous substance are those for air pollutants, (Clean Air Act, 42 U.S.C. §7412, implemented through 40 C.F.R. 61.01); and those for toxic pollutants in water (Water Pollution Control Act, 33 U.S.C. §1317(a), implemented through 40 C.F.R. §401.15). CERLCA's own implementing regulations list asbestos as a hazardous substance. (40 C.F.R. §302.4 and Table 302.4).

66.

Nothing in DOE's actions, including its prime contract with BNFL, gave BNFL the right, authority, or ability to transfer title to the asbestos-laden synchronous condensers to Coy/Superior.

67.

Coy/Superior had neither the right, the ability, nor the responsibility to receive the asbestos-laden synchronous condensers.

68.

The asbestos-laden synchronous condensers have never left the ETTP site. Coy/Superior

has insisted that BNFL take back the synchronous condensers. BNFL has refused, insisting instead that Coy/Superior owns the synchronous condensers and the asbestos and is responsible for their disposal.

69.

Coy/Superior seeks a declaratory judgment to the effect that Coy/Superior is not the owner of the asbestos-laden synchronous condensers and has no responsibility for their disposal and that BNFL, as the custodian of the asbestos-laden synchronous condensers for DOE, has the responsibility and duty to take custody of those condensers and to store or dispose of those condensers as is appropriate and as would be in compliance with all applicable laws and regulations.

COUNT THREE

INDEMNIFICATION

70.

Plaintiff incorporates by reference the allegations in paragraphs 1 through 69.

71.

BNFL had a duty to inform Coy/Superior, before Coy/Superior started cutting into the synchronous condensers, that there was asbestos containing material in the condensers. Without knowing that, Coy/Superior proceeded to have its workers perform work on and with the asbestos-containing material without the protective equipment and procedures mandated by OSHA and its implementing regulations. Coy/Superior through its actions may have unknowingly released the hazardous substance, asbestos, into the environment in violation of the CAA and its implementing NESHAPs, and in violation of CERCLA and RCRA. Although the

U.S. Environmental Protection Agency has not listed asbestos as a hazardous waste under RCRA, it has been judicially determined to be so.

72.

For the unknown but possible claims and enforcement actions to be filed or taken against Coy/Superior, Coy/Superior asserts a right of indemnification from BNFL in that in the event such claims or enforcement actions are brought against Coy/Superior, BNFL will assume or pay for the defense of Coy/Superior and will pay in full all judgments, fines or penalties rendered or levied against Coy/Superior and all costs associated therewith.

COUNT 4

NEGLIGENT MISREPRESENTATION

73.

Plaintiff incorporates by reference the allegations in paragraphs 1 through 72.

74.

Defendant BNFL made negligent misrepresentations to plaintiff Coy/Superior without exercising reasonable care to determine the truth of such statements or with a reckless indifference to the truth of such statements. Specifically, BNFL negligently misrepresented the following material facts to Coy/Superior.

75.

At the time BNFL requested bids for the salvage work on buildings K-791, K-791N and K791S, it should have known, through a diligent search or even a walk-through of Building K-791, that there were in that building operating manuals for the synchronous condensers that would have alerted BNFL and prospective bidders to the potential presence of asbestos in the

copper insulation in the condensers.

76.

Once BNFL was informed by Coy/Superior of the operating manuals and the content of the operating manuals, BNFL had a duty to thoroughly test the synchronous condensers for asbestos and to provide all the results of that testing to Coy/Superior and to abate all asbestos found, rather than informing Coy/Superior that asbestos was not in places where BNFL's asbestos abatement contractor had found it, unknown to Coy/Superior, and allowing Coy/Superior to perform work on those places without knowing that asbestos had been found, putting Coy/Superior and its employees in danger of personal injury and unintended violation of various regulatory requirements.

WHEREFORE, plaintiff asks that a copy of this complaint be served on defendant and that defendant be required to answer within the time prescribed by law; and that plaintiff be given the following relief:

1. Damages for BNFL's breach of the contract in the amount of $755,000.00.

2. A declaratory judgment that the asbestos-laden synchronous condensers contain a hazardous waste, asbestos, are not the property of Coy/Superior, and that Coy/Superior has no responsibility for their disposal.

3. Within that declaratory judgment, that BNFL has been and is the custodian for DOE of the asbestos-laden synchronous condensers, and the hazardous asbestos waste, and has the responsibility for taking those condensers and disposing of them.

4. Indemnification from BNFL for the damages, fines and penalties from possible suits and enforcement actions brought against Coy/Superior, and that BNFL assume or pay for Coy/Superior's defense in such actions..

5. Plaintiff's costs, attorney's fees, and such other relief as this Court deems just and proper upon the hearing of this cause.

William P. Snyder, BPR #9859
Attorney for Plaintiffs

Of Counsel:

KRAMER, RAYSON, LEAKE,
RODGERS & MORGAN, LLP
P. O. Box 629
Knoxville, TN 37901-0629
(865) 525-5134