**MDL 875**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

JUN 2 4 2003

FILED
CLERK'S OFFICE

IN RE: ASBESTOS PRODUCTS LIABILITY :
LITIGATION (NO. VI)                              :            MDL Docket No. 875
--------------------------------------------------------------:

*C. Ann Jones and The Reverend George A. Jones*, E.D. La., C.A. No. 03-1010
        § K, Mag. 5 (Duval, J)

## MOTION TO VACATE CONDITIONAL TRANSFER ORDER

Plaintiffs, C. ANN JONES and THE REVEREND GEORGE A. JONES, pursuant to Rule

12(c) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, move the Panel to

vacate its order of May 30, 2003, conditionally transferring the above-captioned case to the United

States District Court for the Eastern District of Pennsylvania. This motion is based on the attached

Memorandum in Support of Motion to Vacate Conditional Transfer Order and such other materials

as may be presented to the Panel at the time of the hearing on the motion.

Pursuant to Rule 12(c), Movants request the Clerk to set this motion for hearing at the next

session of the Panel and respectfully request the opportunity to present oral argument to the Panel

at the time of the hearing.

New Orleans, Louisiana, this 23rd day of June, 2003.

Respectfully submitted,

MARTZELL & BICKFORD

SCOTT R. BICKFORD T.A. (1165)
SPENCER R. DOODY (27795)
TIFFANY G. CHASE (24343)
338 Lafayette Street
New Orleans, LA 70130
(504) 581-9065
(504) 581-7635 Fax

PLEADING NO. 3922

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

2003 JUN 24 A 9: 37

RECEIVED
CLERK'S OFFICE

OFFICIAL FILE COPY   IMAGED JUN 2 5 '03

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

JUN 2 4 2003

FILED
CLERK'S OFFICE

IN RE:  ASBESTOS PRODUCTS LIABILITY  :
LITIGATION (NO. VI)                              :               MDL  Docket No. 875
--------------------------------------------------------------:

*C. Ann Jones and The Reverend George A. Jones*, E.D. La., C.A. No. 03-1010
§ K, Mag. 5 (Duval, J)


# MEMORANDUM  IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER


Movants C. Ann Jones and The Reverend George A. Jones file this Memorandum, pursuant to Rule 12(c) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, in support of their Motion to Vacate the Conditional Transfer Order of the Panel, issued on May 30, 2003, ordering transfer of the captioned case to the Eastern District of Pennsylvania for pre-trial proceedings in accordance with 28 U.S.C.A. § 1407.  Notice of Opposition to the Conditional Transfer Order was filed on June 6, 2003.

## I. NATURE OF CASE AND PROCEDURAL HISTORY

The Petition for Damages in this matter was filed on February 28, 2003, in the Civil District Court for the Parish of Orleans, State of Louisiana.  Included as defendants are Meyer's Auto Parts, Inc. and its owners, who are alleged to have employed George Jones, supplied the products with which he worked,  and  owned the premises on which the asbestos exposure occurred.  Also made defendants are  numerous manufacturers (e.g., Dana Corp., Volkswagen of America Inc., Nissan North America Inc., Honeywell International Inc., etc.) of asbestos-containing products.

1

As against Meyer's Auto Parts and its owners, Movants contend that the exposure of George Jones to asbestos and asbestos-containing products while in their employ and on their premises was a substantial contributing cause of his development of malignant pleural mesothelioma. Movants also have alleged that these defendants had *garde* (*see* Argument B *infra*) of the asbestos and asbestos-containing products and are thus strictly liable under Article 2317 of the Louisiana Civil Code. As suppliers, these same defendants are allege to have known or – because of the volume of business and merchandising practices – should have known of the defects of the asbestos-containing products they sold and negligently failed to warn of their health hazards.

As against the various manufacturer defendants, Movants allege that the asbestos-containing products placed into the stream of commerce by these defendants were defective and unreasonably dangerous in their design and marketing, which defects constitute breaches of implied and expressed warranties.

On April 9, 2003, the defendants timely removed the action to federal court, alleging fraudulent joinder of Meyer's Auto Parts, Inc. and its owners in order to defeat federal diversity jurisdiction. The action was allotted to United States District Judge Stanford Duval, Eastern District of Louisiana. Plaintiffs countered that diversity was incomplete and moved to remand on April 15, 2003. Defendants opposed the remand motion on April 23, 2003. Judge Duval took the matter under submission on April 30, 2003, and subsequently allowed the filing of additional memoranda by both parties.[1] A ruling is expected before the end of June 2003.

---

[1] The motion to remand and all memoranda filed in support of and opposition thereto are attached to this Memorandum as Exhibits A through D.

2

## II. ARGUMENT

The criteria governing the transfer of actions for coordinated pretrial proceedings are set forth

in 28 U.S.C.A. § 1407, which provides in pertinent part as follows:

> "When civil actions involving one or more common questions of fact are pending in
> different districts, such actions may be transferred to any district for coordinated or
> consolidated pretrial proceedings. Such transfers shall be made by the judicial panel
> on multi-district litigation . . . upon its determination that transfers for such
> proceedings will be for the convenience of parties and witnesses and will promote
> the just and efficient conduct of such actions." 28 U.S.C.A. § 1407(a)

It is important to note that the statute requires the Panel to determine the advisability of a transfer

before such a transfer.  Thus, the Conditional Transfer Order ("CTO") is an administrative device

to expedite matters; it is not a decision or judgment by the panel which must be reversed before such

order can be vacated.  *In re Grain Shipments*, 319 F. Supp. 533 (J.P.M.L. 1970).

### A.   Principles Of Comity And Judicial Economy Mandate Vacation Of The Conditional Transfer Order

The purposes of §1407 are to prevent duplicative discovery, avoid the possibility of

conflicting rulings, and provide for the convenience of the parties and the court.  As noted above,

Judge Duval currently has under submission Plaintiffs' Motion to Remand, which has been

thoroughly briefed by all parties.  A resolution of the motion obviously will have a significant effect

on  the need for a determination by this Panel, since the motion challenges the jurisdiction of the

federal court itself.

Multidistrict panels previously have recognized that, under principles of comity, transfer is

inappropriate where the potential transferor court has important motions under consideration. *See,*

*e.g., In re Resource Exploration, Inc., Securities Litigation*, 483 F. Supp. 817 (J.P.M.L. 1980); *In*

*re Air Crash Disaster at Tenerife, Canary Islands on March 27, 1977.*, 435 F. Supp. 927, fn.3

3

(J.P.M.L. 1977).  In *Resource*, the Panel concluded that principles of comity warranted a deferral of transfer when the potential transferor court had a summary judgment motion under consideration. Similarly, in *Tenerife*, the Panel concluded that its ruling on transfer should be deferred to allow the potential transferor judge to rule on a pending motion. *See also In re Professional Hockey Antitrust Litigation*, 352 F. Supp. 1405 (J.P.M.L. 1973).[2]

In this instance, principles of comity are further supported by policies of judicial economy. If the CTO is not vacated, Plaintiffs' remand motion – now ripe for decision – will have to await study and review by the Panel, which may require additional time to become familiar with the civilian doctrine of *garde*, upon which is premised the principal argument in favor of remand to state court.  With respect, Movants submit that resolution of their remand motion is better left for disposition by Judge Duval.   Additionally, the pending motion to remand does not involve any discovery or related issues relative to MDL 875, nor is there any indication that a ruling on the motion to remand would create any conflicting rulings.  Finally, a transfer of this action at the

---

[2]    Significantly, the pending motions in the instant matter do not present any potential for conflicting rulings in lower courts, unlike the pending dispositive motions in *In re Commonwealth Oil/Tesoro Petroleum Securities Litigation*, 458 F. Supp. 225 (J.P.M.L. 1978). In that case, the Panel observed that complex questions of fact shared by other cases involved in the multidistrict litigation would form the underpinnings of a decision on the pending dispositive motions. The Panel therefore determined that the potential transferee court was in the best position to avoid the possibility of conflicting rulings and thus should rule on the pending motions.

The potential transferee court has also been favored when motions are not ripe for decision at the time the Conditional Transfer Order issues. See, e.g., *In re Practice of Naturopathy Litigation*, 434 F. Supp. 1240 (J.P.M.L. 1977).  In the present case, however, the Movants' motion to remand to state court was fully briefed and submitted to the court prior to the issuance of the CTO .  Following submission of the matter, the potential transferor judge allowed Movants to file a supplemental memorandum in support of their motion and then specifically requested a response from the Defendants on the newly raised questions. Clearly, the potential transferor judge had already begun the decision making process prior to the issuance of the CTO.

4

present time runs the risk that the defendants' asserted basis for federal jurisdiction (diversity of citizenship) will be found not to exist. Then, the action would have to transferred back to the local federal court, to be returned to state court.   Deferral of a decision on that crucial jurisdiction question until the matter can be heard by the MDL Panel will result in a tremendous inconvenience to the parties and occasion a delay in resolution of this action. Vacation of the CTO of May 30, 2003, unquestionably will promote principles of comity and judicial economy. Alternatively, the Panel should defer a ruling on transfer until the remand motion has been resolved by Judge Duval.

**B.**      **Uncommon Factual Issues Exist.**

The first prerequisite for transfer pursuant to 28 U.S.C.A. § 1407 is that common questions of fact must be present, the implication being that it is more economical or convenient to conduct pre-trial proceedings on the common issues in one forum. Certainly, the claims against the manufacturers of asbestos-containing products, as in cases previously transferred to the Eastern District of Pennsylvania, involve common questions of fact. However, the claims asserted in this case against the alleged employer and premises owners involve factual and legal issues unique to this case – and it is upon these factual questions that jurisdiction rests.

Movants have alleged claims against Meyer's Auto Parts and its owners grounded in the civilian doctrine of *garde*. Under this theory, the responsibility for the damages occasioned by things in an individual's custody falls on that individual, rather than on innocent third persons. The rationale for this doctrine is that the owner or custodian is in a better position than the victim to "detect, evaluate, and take steps to eliminate an unreasonable risk of harm which arise from a thing." *See* discussion in Memorandum in Support of Motion to Remand (Ex. A)  at 7 (citing *Sizler v. Liberty Mutual Insurance Co.,* 558 So. 2d 1106, 1112 (La. 1990)).

For purposes of imposition of liability under Louisiana Civil Code Article 2317, an inquiry must be made into whether an individual has *garde* of a thing. That inquiry is fact specific, looking to whether an individual has the right of direction and control over a thing and whether the individual derives some benefit from the thing. Ownership plus physical custody equals *garde*.

This factual inquiry implicates the business relationships of Meyer's Auto Parts, Inc. and its owners but shares no common issues of fact with the cases previously transferred to the MDL 875 Panel's control. A determination that the Plaintiffs have stated a valid claim against these defendants will mandate remand to state court. It is respectfully suggested that these uncommon factual issues are best resolved by the potential transferor court.

Additionally, there is a significant unresolved question concerning the employment status of George Jones, the outcome of which is also determinative of whether federal jurisdiction exists. That inquiry has been fully briefed and submitted to Judge Duval in conjunction with the motion to remand (see Exs. C & D) and is ripe for decision. As with the question of *garde,* this issue is best resolved by the potential transferor court.

## C.   Transfer Will Be Unjust and Inefficient.

George Jones has malignant pleural mesothelioma. He does not have long to live. Louisiana law provides a mechanism for an expedited trial under such circumstances. If the defendants' basis for federal jurisdiction is defeated, then Reverend Jones can secure a preferential trial setting in state court. In order for him to do so, however, the issue of the propriety of the removal must be decided quickly. The oft-quoted maxim – justice delayed is justice denied – rings particularly true in this case.

Whether federal jurisdiction exists in this case is under submission to the potential transferor

6

judge.  Any additional discovery that may be needed on the issues relating to *garde* and employer/employee relationship involves local defendants only.  These parties thus would suffer hardship if the remand motion were to be heard by the potential transferee court.  In addition to the extreme prejudice to Reverend Jones of any delay in resolution of this issue, all parties would have to bear travel costs to present evidence and argument to a panel that may determine that federal jurisdiction does not exist.  Neither justice nor efficiency will be served by the transfer of this action to the MDL prior to a ruling on the remand.

### III. CONCLUSION

A transfer pursuant to 28 U.S.C.A. § 1407 requires a Panel to affirmatively determine that transfer (1) will be for the convenience of the parties and witnesses, and (2) will promote the just and efficient conduct of the cases.  For the foregoing reasons, Movants, C. Ann Jones and George A. Jones, submit that neither of the requisite findings can be made and thus respectfully ask that the Panel vacate the Conditional Transfer Order of May 30, 2003.   Alternatively, if the CTO is not vacated, Movants *pray* the CTO be stayed pending a ruling by the potential transferor court on the pending motion to remand to state court for want of federal jurisdiction.

Respectfully submitted,

MARTZELL & BICKFORD

SCOTT R. BICKFORD, T.A. (1165)
SPENCER R. DOODY (27795)
TIFFANY G. CHASE (24343)
338 Lafayette Street
New Orleans, LA 70130
(504) 581-9065
(504) 581-7635 Fax

7

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**Certificate of Service**

JUN 2 4 2003

FILED
CLERK'S OFFICE

I hereby certify that a copy of the above and foregoing pleading has been served upon all

counsel to all parties listed on the attached Service List by delivery of same by U.S. Mail, fax or

overnight delivery, properly addressed and postage prepaid this 23rd day of June, 2003.

SCOTT R. BICKFORD

RECEIVED
CLERK'S OFFICE
2003 JUN 24 A 9: 38
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

Troy N. Bell
Aultman, Tyner, Ruffin, et al
400 Poydras St., Ste. 1900
New Orleans, LA 70130

Scott R. Bickford
Martzell & Bickford
338 Lafayette St.
New Orleans, LA 70130

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114

William F. Bologna
W. F. Bologna & Associates
1515 Poydras Street, Ste. 2323
New Orleans, LA 70112

Edward J. Cass
Gallagher, Sharp, Fulton &
Newman
Bulkley Bldg., 7th Floor
1501 Euclid Avenue
Cleveland, OH 44115

Adam M. Chud
Shea & Gardner
1800 Massachusetts Ave., N.W.
Washington, DC 20036

David. A. Damico
Burns, White & Hickton
Fifth Avenue Pl., Ste. 2400
120 Fifth Avenue
Pittsburgh, PA 15222

Raymond P. Forceno
Forceno & Hannon
Philadelphia Bourse Building
Ste. 100
Independence Mall East
Philadelphia, PA 19106

Ellen B. Furman
Goldfein & Joseph
1600 Market Street, 33rd Floor
Philadelphia, PA 19103

Susan M. Hansen
Brownson & Ballou
4800 U.S. Bank Place
601 Second Avenue, South
Minneapolis, MN 55402

Avram C. Herman
Herman & Herman
111 Veterans Memorial Blvd.
Suite 1506
Metairie, LA 70005

Reginald S. Kramer
Buckingham, Doolittle & Burroughs
50 South Main Street
P.O. Box 1500
Akron, OH 44309

David C. Landin
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Gene Locks
Greitzer & Locks
1500 Walnut Street
Philadelphia, PA 19102

Lynn M. Luker
Joyce M. Dombourian
Luker, Sibal & McMurtray, L.L.C.
616 Girod Street, Suite 200
New Orleans, LA 70130

Janet MacDonell, Esq.
J. Nicole Heyman, Esq.
Deutsch, Kerrigan & Stiles
755 Magazine Street
New Orleans, LA 70130

Eugene M. McEachin, Jr.
Bernard, Cassisa, Elliott & Davis
1615 Metairie Road
P.O. Box 55490
Metairie, LA 70055-5490

Ronald L. Motley
Ness, Motley, Loadholt, et al.
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC 29464

Michael T. Pulaski
McCranie, Sistruck, Anzelmo, Hardy,
Maxwell & McDaniel, PC
434 N. Columbia Street, Suite 200
Covington, LA 70433

Kelly McCarthy Rabalais
LeBlanc, Tusa & Butler, LLC
2121 Airline Drive, Ste. 405
Metairie, LA 70001

John J. Repcheck
Marks, O'Neill, O'Brien &   Courtney
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219

John D. Roven
Roven, Kaplan & Wells
2190 North Loop West, Ste. 410
Houston, TX 77018

Richard D. Schuster
Vorys, Sater, Seymour & Pease
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216

Neil Selman
Selman, Breitman & Burgess
11766 Wilshire Blvd.
Sixth Floor
Los Angeles, CA 90025

Eric Shuman
McGlinchey Stafford
643 Magazine Street
New Orleans, LA 70130

Robert N. Spinelli
Kelley, Jasons, McGuire & Spinelli
Centre Square West - 15th Floor
Philadelphia, PA 19102

| | | |
|---|---|---|
| Robert E. Swickly<br>Jaques Admiralty Law Firm, P.C.<br>1370 Penobscot Building<br>Detroit, MI 48226<br><br>Leonard Tavera<br>Towle, Denison, Smith & Tavera<br>10866 Wilshire Blvd., Ste. 500<br>Los Angeles, CA 90024<br><br>Andrew J. Trevelise<br>Reed Smith LLP<br>2500 One Liberty Place<br>1650 Market Street<br>Philadelphia, PA 19103<br><br>James K. Weston, II<br>Tom Riley Law Firm<br>4040 First Avenue, N.E.<br>P.O. Box 998<br>Cedar Rapids, IA 52406<br><br>Lance B. Williams<br>McCraney, Sistrunk, Anzelmo<br>434 N. Columbia Street<br>Suite 200<br>Covington, LA 70433 | | |

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

RECEIVED
U.S. DISTRICT COURT   JUN 2 4 2003
EAST DISTRICT OF LA
FILED
CLERK'S OFFICE
2003 APR 15  PM 4: 57

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| C. ANN JONES AND | * | CIVIL ACTION NO. 03-1010 |
| THE REV. GEORGE A. JONES | * | |
| | * | |
| VERSUS | * | SECTION: "K" |
| | * | |
| MEYER'S AUTO PARTS, INC., | * | |
| DAVID M. GOLDBERG AND | * | MAG.: 5 |
| MADELINE L. GOLDBERG, d/b/a | * | |
| MEYER'S AUTO PARTS, INC. | * | |
| SEALING EQUIPMENT PRODUCTS | * | |
| COMPANY, INC. (SEPCO), DANA | * | |
| CORPORATION, Individually and as | * | |
| Successor to VICTOR MANUFACTURING | * | |
| AND GASKET CO., VOLKSWAGEN | * | |
| OF AMERICA, INC., HONEYWELL | * | |
| INTERNATIONAL, INC. NISSAN | * | |
| NORTH AMERICA, INC., BORG- | * | |
| WARNER CORP., DAIMLER CHRYSLER, | * | |
| GENERAL MOTORS CORPORATION | * | |
| STANDARD MOTOR PARTS, INC. | * | |
| FORM MOTOR COMPANY, EDISON | * | |
| INTERNATIONAL, INC., HONDA | * | |
| NORTH AMERICA, INC., TOYOTA | * | |
| MOTOR NORTH AMERICA, INC. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

RECEIVED
CLERK'S OFFICE
2003 JUN 24  A  9: 38
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

## MOTION TO REMAND

NOW INTO COURT, through undersigned counsel, come Plaintiffs who move the Court

to remand this action because this Court does not have jurisdiction pursuant to 28 U.S.C. 1332



EXHIBIT
A

due to incomplete diversity.  For this and for the reasons set forth in the accompanying

memorandum, Plaintiffs' pray this motion be granted.

Respectfully submitted,
**MARTZELL & BICKFORD**

SCOTT R. BICKFORD T.A. (1165)
**SPENCER R. DOODY (27795)**
**TIFFANY G. CHASE (24343)**
338 Lafayette Street
New Orleans, LA 70130
(504) 581-9065
(504) 581-7635 Fax


## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing pleading has been served upon:

Avram C. Herman, Esq.
Herman & Herman
111 Veterans Blvd., Suite 1506
Metairie, LA 70005
**Counsel for Meyer's Auto Parts, Inc.**

Lynn Luker
Joyce M. Dombourian
Lynn Luker & Associates, L.L.C.
616 Girod Street
New Orleans, LA 70130
**Counsel for Sealing Equipment**

William F. Bologna
William F. Bologna & Associates
1515 Poydras Street, Suite 2323
New Orleans, LA 70112-3723
**Counsel for Daimler Chrysler Corporation**

2

Paul V. Cassisa, Sr.
Bernard Cassisa Elliott & Davis
1615 Metairie Road
Post Office Box 55490
Metairie, LA  70055-5490
**Counsel for General Motors Corporation and Reilly-Benton**

Kelly M. Rabalais
LeBlanc, Tusa & Butler, L.L.C.
2121 Airline Drive
Suite 405
Metairie, LA  70001
**Counsel for Ford Motor Company**

Leonard Tavera
Towle, Denison, Smith & Tavera
10866 Wilshire Blvd, Suite 500
Los Angeles, CA  90024
**Counsel for EIS Standard Motor Products**

Mr. Eric Shuman
McGlinchey, Stafford
643 Magazine Street
New Orleans, LA 70130
**Counsel for Honeywell International, Inc., Honda North America, Inc. and Toyota Motors North America, Inc.**

Mr. Michael T. Pulaski
McCranie, Sistruck, Anzelmo, Hardy,
Maxwell & McDaniel, PC
434 N. Columbia Street, Suite 200
Covington, LA  70433
**Counsel for Nissan North America, Inc.**

Mr. Troy Bell
Aultman, Tyner, Ruffin & Yarborough
400 Poydras Street
New Orleans, LA 70130
**Counsel for Borg-Warner**

3

Ms. Janet McDonald
Deutsch, Kerrigan & Stiles
755 Magazine Street
New Orleans, LA  70130
**Counsel for Dana Corporation**

by hand or by mailing the same to each properly addressed and postage prepaid on this 15th day

of April, 2003.

SPENCER R. DOODY

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| C. ANN JONES AND | * | CIVIL ACTION NO. 03-1010 |
| THE REV. GEORGE A. JONES | * | |
| | * | |
| VERSUS | * | SECTION: "K" |
| | * | |
| MEYER'S AUTO PARTS, INC., | * | |
| DAVID M. GOLDBERG AND | * | MAG.: 5 |
| MADELINE L. GOLDBERG, d/b/a | * | |
| MEYER'S AUTO PARTS, INC. | * | |
| SEALING EQUIPMENT PRODUCTS | * | |
| COMPANY, INC. (SEPCO), DANA | * | |
| CORPORATION, Individually and as | * | |
| Successor to VICTOR MANUFACTURING | * | |
| AND GASKET CO., VOLKSWAGEN | * | |
| OF AMERICA, INC., HONEYWELL | * | |
| INTERNATIONAL, INC. NISSAN | * | |
| NORTH AMERICA, INC.,  BORG- | * | |
| WARNER CORP., DAIMLER CHRYSLER, | * | |
| GENERAL MOTORS CORPORATION | * | |
| STANDARD MOTOR PARTS, INC. | * | |
| FORM MOTOR COMPANY, EDISON | * | |
| INTERNATIONAL, INC., HONDA | * | |
| NORTH AMERICA, INC., TOYOTA | * | |
| MOTOR NORTH AMERICA, INC. | * | |

* * * * * * * * * * * * * * * * *

## MEMORANDUM IN SUPPORT OF MOTION TO REMAND

NOW INTO COURT, through undersigned counsel, come Plaintiffs who file this
memorandum in support of their motion to remand.  Plaintiffs submit that remand is proper for the

reasons set forth herein.

## BACKGROUND

Plaintiffs filed the instant lawsuit in the Civil District Court for the Parish of Orleans on February 28, 2003, alleging damages arising from Reverend Jones' contraction of malignant mesothelioma, a asbestos-related lung cancer for which there is no cure. Specifically, Plaintiffs have alleged that Rev. Jones was exposed to asbestos-containing brake products manufactured, distributed, supplied and/or sold by the Defendants while Rev. Jones working in the capacity of a mechanic at various period from 1963 until 1985. Due to the injury to Rev. Jones' health, Plaintiffs have alleged damages including but not limited to medical expenses, physical and mental pain and suffering, and loss of income.

Defendants Honeywell International, Inc., Toyota Motor Sales U.S.A., Inc., Honda North America, Inc., Volkswagen of America, Inc. and Daimler Chrysler Corporation removed this action to federal court on April 9, 2003. The removing defendants' stated grounds for removal was diversity jurisdiction, contingent upon the veracity of its fraudulent joinder allegations.

## BURDEN ON REMOVING DEFENDANTS

In a removal action, the defendant bears the burden of establishing federal jurisdiction over the state-court suit. *See Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 42 S.Ct. 35, 66 L.Ed. 144 (1921). Because a removal deprives the state court of an action properly before it, significant federalism concerns arise, *see Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804, 809, 106 S.Ct. 3229, 3233, 92 L.Ed.2d 650 (1986), mandating strict construction of the removal statute. *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 107, 61 S.Ct. 868, 872, 85 L.Ed. 1214 (1941); *Willy v. Coastal Corp.*, 855 F.2d 1160, 1164 (5th Cir.1988).*Carpenter v. Wichita Falls Independent School Dist.*, 44 F.3d 362, 365-366 (5th Cir.1995) Removal cannot be based simply upon conclusory

2

allegations. *Allen v. R & H Oil & Gas Co.*, 63 F.3d 1326, 1335 (5th Cir. 1995).

"The burden of persuasion placed upon those who cry 'fraudulent joinder' is indeed a heavy one." *B., Inc. v. Miller Brewing Co.*, 663 F.2d 545, 549 (5th Cir.1981); *Ford, et al. v. Elsbury, et al.*, 32 F.3d 931, 935 (5th Cir.1994). "Where charges of fraudulent joinder are used to establish federal jurisdiction, the removing party has the burden of proving the claimed fraud. *Dodson v. Spiliada Maritime Corp.*, et al., 951 F.2d 40, 42 (5th Cir.1992). In order to establish that a plaintiff fraudulently joined an in-state defendant to preclude exercise by a federal court of diversity jurisdiction, the removing party must show that there is <u>no possibility</u> that the plaintiff would be able to establish a cause of action against the in-state defendant in state court or that there has been outright fraud in the plaintiffs' pleadings of jurisdictional facts. *See Dodson*, 951 F.2d at 42; *B., Inc.*, 663 F.2d at 549. Fraudulent joinder must be proven by clear and convincing evidence. *Wyble v. E.I. duPont de Nemours & Co.,* 17 F. Supp. 2d 641, 643 (E.D. Tex. 1998).

The removing parties cannot carry this burden. Their assertion of federal court jurisdiction, predicated on a fraudulent joinder, requires that <u>no possibility</u> exists for Plaintiffs to establish a cause of action in state court. Plaintiffs' petition defeats defendants' attempt to meet this requirement, and their Motion for Remand must be granted.

## I.    Diversity Is Incomplete Since Meyer's Auto Parts, Inc., and David Goldberg Are Louisiana Residents.

The removing party does not challenge Plaintiffs' jurisdictional allegations that Meyer's Auto Parts, Inc., and David Goldberg are Louisiana residents. (See Petition, Paragraph 19). Indeed, the Secretary of State database information sheet cited by the removing party demonstrates that Meyer's Auto Parts, Inc., is a Louisiana corporation. (See Notice of Removal, Exhibit B). Therefore, the Court's sole concern is whether there is a possibility that Plaintiffs have set forth a valid cause of

3

action against these in-state Defendants.

 With respect to Meyer's Auto Parts, Inc., a corporation's capacity to sue and be sued in a federal court is "determined by the law under which it was organized." Fed.R.Civ.P. 17(b); *see* 6A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure §§ 1561, at 447 (1990). *see also Oklahoma Natural Gas Co. v. Oklahoma,* 273 U.S. 257, 260, 47 S.Ct. 391, 392, 71 L.Ed. 634 (1927) (capacity of dissolved corporation "concerns the fundamental law of the corporation enacted by the state which brought the corporation into being"); Wright, Miller & Kane, *supra* §§ 1563 at 455 ("The federal courts have held that the capacity of a dissolved corporation to sue and be sued is determined by the law of the state in which it was organized"). In particular, state corporate law determines the ability of a dissolved corporation to be sued  for the purposes of ascertaining diversity jurisdiction. *See Ripalda v. American Operations Corp.,* 977 F.2d 1464, 193 (1992) .

 Applied here, a plaintiff has a right to bring a cause of action against a corporation whose charter has been revoked under Louisiana law.  This right has been codified at least twice in Louisiana law and is similarly recognized in the jurisprudence.  Regarding revocation of an company's articles of incorporation, La. R.S. 12:163 provides in pertinent part:

> §§ 163. Failure to file annual reports; revocation and reinstatement of articles and limitation on authority to do business with the state.
>
> A. Where a corporation has failed to designate and maintain a registered office, or to designate and maintain a registered agent pursuant to the provisions of R.S. 12:104, for a period of ninety consecutive days, or where a corporation has failed to file an annual report for three consecutive years, according to the records of the secretary of state, the secretary of state shall revoke the articles of incorporation and franchise of such corporation....
>
> **G. Any revocation of a corporation's articles of incorporation and franchise under the provisions of this Section shall not affect any cause of action against such corporation**

4

**or the right to proceed against any property owned by the corporation** nor shall such revocation prohibit a corporation from selling property belonging to the corporation in the same manner as if the revocation had not occurred.

(West 2003) (emphasis added).

Consistent therewith, La. Code Civ. Pro. art. 85 governs the venue for actions against inactive corporations, and applies **exclusively** to such actions. Regarding venue, La. C.C.P. art. 85 presupposes a plaintiff's right to sue an inactive corporation and provides in pertinent part:

Action against domestic corporation; charter revoked by secretary of state

An action against a domestic corporation, the charter and franchise of which have been administratively revoked by the secretary of state in accordance with R.S. 12:163, may be brought in any parish where the suit could have been brought prior to revocation.

Accordingly, the fact of revocation of a corporate charter does not prevent this suit against Meyer's Auto Parts, Inc. for its tortuous actions prior to that revocation.

Nor is David Goldberg immune from suit as an individual or as a former shareholder of Meyer's Auto Parts, Inc. David Goldberg is not immune from suit as an individual or as a former shareholder of Meyer's Auto Parts, Inc. By failing to follow the legal requirements for dissolution, Meyer's Auto Parts, Inc. allowed itself to become inactive, leading to the administrative revocation. Moreover, even if Meyer's Auto Parts, Inc. *was* legally dissolved, shareholders of legally dissolved corporations enjoy only the limitation of liability protection accorded them prior to dissolution, since they can be liable for corporate debts to the extent of their receipt of corporate assets upon dissolution. La. R.S. 12:142. Shareholders of corporations that do not bother to legally dissolve do not enjoy this protection under the statute, however, since it provides no protection to shareholders of corporations whose charters are revoked.

Action against David Goldberg d/b/a Meyers Auto Parts is also proper because Goldberg is

5

continuing to do business individually under the former corporate name and in the same location. Although the Goldberg Affidavit submitted with the Notice of Removal affirms that Meyer's Auto Parts, Inc., no longer has a corporate charter, that same affidavit carefully does not state that Meyer's Auto Parts is no longer in business. Indeed, such a representation could not be made, since it would not be true. Attached hereto as Exhibit A is a copy of the affidavit of David M. Goldberg, dated April 12, 1997, in which he states that he is the owner of Meyers Auto Parts, a business organized under the laws of the State of Louisiana, and that he intends to conduct business in Louisiana operating under the name "The Hub Cap King." This Affidavit is recorded as Non-Real Estate Instrument no. 3641 in the Orleans Parish Conveyance Office.

Meyers Auto Parts also entered into a lease with Infinity Outdoor Systems, Inc. for an outdoor advertising sign at some point prior to 2002 and extended that lease on a month to month basis, beginning in January 2002. Attached hereto is Exhibit B, which documents this extension and encloses a check made payable to Meyers Auto Parts. The letter enclosing the check and referencing the month to month lease is addressed to David Goldberg at 2222 South Broad Street and is recorded as Instrument no. 230034 in the Orleans Parish Conveyance Office.

David Goldberg has thus elected to continue doing business in his individual capacity as Meyers Auto Parts and to do so from the same location in which Rev. Jones worked and was exposed to asbestos. The lease with Infinity Outdoor, Inc. identifies Meyer Auto Parts as the owner/agent of this property. As such, both David Goldberg, as the owner of Meyer's Auto Parts, and Meyer's Auto Parts, Inc., as an inactive corporation whose charter was revoked, are properly named as defendants in this litigation because both had garde of the property and materials to which Plaintiff George Jones was exposed to asbestos.

6

**II**      **Louisiana recognizes a cause of action in strict liability for things under our care, custody and control.**

Plaintiffs have pled at least three theories of recovery against Meyer's Auto Parts, Inc., and David Goldberg.  Since Plaintiffs need only to demonstrate that the removing party has not shown that there is no possibility that the plaintiff would be able to establish one of these three causes of action against the in-state defendants, Plaintiffs focus here on their cause of action under La. C.C. art. 2317, governing strict liability for things under one's care, custody and control.

Louisiana Civil Code article 2317 provides in pertinent part:

> We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody.

In order to establish strict liability under Louisiana Civil Code Article 2317, a plaintiff must satisfy three criteria:  1) the thing which caused damage must be in the custody or control of the defendant;  2) the thing must contain a vice which creates an unreasonable risk of injury; and 3) the injury must have been caused by the vice.  *Sistler v. Liberty Mutual Insurance Co.*, 558 So. 2d 1106, 1112 (La. 1990).  The *Sistler* Court explained the policy underlying the finding of strict liability against those who have garde of a thing that injures another:

> Rather than the loss falling upon some innocent third person, the loss resulting from the creation of the risk falls upon the person to whom society allots its care, custody, or control (garde).  The rationale is the owner is in a better position than the innocent victim to detect, evaluate and take steps to eliminate an unreasonable risk of harm which arises from a thing.

*Sistler*, 558 So.2d at 1112.  (citations omitted).

Custody for the purposes of art. 2317 requires that the defendant have the right of direction

7

and control over the thing and derive some benefit from the thing. *Doughty v. Insured Lloyds Ins. Co.*, 576 So. 2d 461 (La. 1991). Ownership plus physical custody constitute an undisputed showing of garde. *Loescher v. Parr*, 324 So. 2d 441 (La. 1975). Further, there is an irrebuttable presumption that the custodian of a thing that caused damage had knowledge of the defective condition of the thing. *2304 Manhattan Blvd. Partnership v. Louisiana Power & Light Co.*, 643 So.2d 1282 (La.App. 5 Cir. 1994). Once a plaintiff has established an injury by a thing in the custody and control of another, a defendant may raise only three defenses: 1) act of God, 2) fault of the victim, or 3) fault of a third party. *Entrevia v. Hood*, 427 So.2d 1146 (La. 1983); *Sanders v. Posi-Seal Intern.*, 635 So.2d 760, 762 (La. Ct. App. 1st Cir. 1994). Finally, *Garde* is an issue of fact. *Ehrman v. Holiday Inn*, 653 So.2d 732 (La.App. 4 Cir. 1995).

That the inhalation of asbestos fibers can cause injury is well established. Plaintiffs have alleged that either and/or both of the in-state defendants had in their custody and control the property and asbestos-containing brake products to which Rev. Jones was exposed over the course of his capacity as a mechanic, and that, as a result, the in-state defendants may be held accountable pursuant to article 2317 for any damages that Plaintiffs may prove at trial. See Petition, Paragraph 31.

Over the course of his employment as a mechanic 1963 until 1985, Rev. Jones was continuously exposed to asbestos in the care, custody and control of either of the in-state defendants. See Petition, Paragraphs 22, 25, 29-32, 39-41. Attached as Exhibit C is an affidavit executed by Rev. Jones, dated April 15, 2003, in which Plaintiff testified to facts including but not limited to the following: that from approximately 1969 to 1975 George Jones worked with his father, Louin Jones,

8

at a garage connected to Meyer's Auto Parts, Inc (Meyer's Garage); that Meyer's Auto Parts, Inc.

rented space in the Meyer's Garage to Louin Jones between 1969 and 1975; that other individuals

who were direct employees of Meyer's Auto Parts, Inc., worked in the Meyer's Garage between

1969 and 1975; that the primary automobile work conducted at the Meyer's Auto Garage between

1969 and 1975 was brake and muffler work; that between 1969 and 1975, Louin Jones and George

Jones performed literally hundreds of brake jobs at the Meyer's Garage; Louin Jones and George

Jones would return all used brake parts, including brake shoes, to Meyer's Auto Parts;   that

employees of Meyer's Auto Parts would preform brake work in Meyer's Garage between 1969 and

1975;  that Louin Jones and George Jones were exposed to asbestos-containing dust created during

those brake jobs at Meyer's Garage preformed by employees of Meyer's Auto Parts; that they were

further exposed to dusts, which George Jones believes to be asbestos-containing, during weekly

cleanings of Meyer's Garage; that Louin Jones and George Jones were exposed to asbestos-

containing dusts from brake shoes provided to them by Meyer's Auto Parts which were then placed

upon Meyer's Auto Parts customers' automobiles; that Louin Jones and George Jones were further

exposed to asbestos containing dusts from brake components removed from Meyer's Auto Parts

customers automobiles; that said brake shoes were the property of Meyer's Auto Parts; and that at

all times the new and used brake components used in brake jobs at Meyer's Garage were the

property of Meyer's Auto Parts.

The Louisiana Code of Civil Procedure sets forth a system of fact pleading. So long as the

facts constituting the claim or defense are alleged or proved the party may be granted any relief to

which he is entitled under the fact pleadings and evidence, and the "theory of the case" need not be

pled. *See Cox v. W. M. Heroman & Co., Inc.,* 298 So.2d 848 (La. 1974). Whether or not Rev. Jones was exposed to the in-state defendants' asbestos-containing brake products in the capacity of an employee is irrelevant to the in-state defendants' liability to Plaintiffs under La. C.C. art. 2317. For, more fundamental than any allegation contained in the petition which characterizes Rev. Jones' relationship to the in-state defendants as one of employer/employee is the allegation that Rev. Jones was *exposed* to asbestos over which the in-state defendants owned and had garde.

In this case Rev. George Jones has alleged exposure to asbestos containing materials over which the in-state defendants had care, custody and control. He has alleged exposure in a facility owned and operated by in-state defendants. Again, his employment status is irrelevant to his ability to bring a cause of action[1]

> Respectfully submitted,
> **MARTZELL & BICKFORD**
>
> **SCOTT R. BICKFORD T.A. (1165)**
> **SPENCER R. DOODY (27795)**
> **TIFFANY G. CHASE (24343)**
> 338 Lafayette Street
> New Orleans, LA 70130
> (504) 581-9065
> (504) 581-7635 Fax

---

[1] Had Meyer's Auto Parts been George Jones employer, Jones could still maintain an action against them despite workman compensation bars. Under Louisiana law mesothelioma which occurs due to exposure pre-1976 has been held to be exempt from the workmen's compensation statute bar against suit. Citations Omitted.

10

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing pleading has been served upon:

Avram C. Herman, Esq.
Herman & Herman
111 Veterans Blvd., Suite 1506
Metairie, LA 70005
**Counsel for Meyer's Auto Parts, Inc.**

Lynn Luker
Joyce M. Dombourian
Lynn Luker & Associates, L.L.C.
616 Girod Street
New Orleans, LA 70130
**Counsel for Sealing Equipment**

William F. Bologna
William F. Bologna & Associates
1515 Poydras Street, Suite 2323
New Orleans, LA 70112-3723
**Counsel for Daimler Chrysler Corporation**

Paul V. Cassisa, Sr.
Bernard Cassisa Elliott & Davis
1615 Metairie Road
Post Office Box 55490
Metairie, LA 70055-5490
**Counsel for General Motors Corporation and Reilly-Benton**

Kelly M. Rabalais
LeBlanc, Tusa & Butler, L.L.C.
2121 Airline Drive
Suite 405
Metairie, LA 70001
**Counsel for Ford Motor Company**

Leonard Tavera

11

Towle, Denison, Smith & Tavera
10866 Wilshire Blvd, Suite 500
Los Angeles, CA  90024
**Counsel for EIS Standard Motor Products**

Mr. Eric Shuman
McGlinchey, Stafford
643 Magazine Street
New Orleans, LA 70130
**Counsel for Honeywell International, Inc., Honda North America, Inc. and Toyota Motors North America, Inc.**

Mr. Michael T. Pulaski
McCranie, Sistruck, Anzelmo, Hardy,
Maxwell & McDaniel, PC
434 N. Columbia Street, Suite 200
Covington, LA  70433
**Counsel for Nissan North America, Inc.**

Mr. Troy Bell
Aultman, Tyner, Ruffin & Yarborough
400 Poydras Street
New Orleans, LA 70130
**Counsel for Borg-Warner**

Ms. Janet McDonald
Deutsch, Kerrigan & Stiles
755 Magazine Street
New Orleans, LA  70130
**Counsel for Dana Corporation**

by hand or faxing  the same to each properly addressed and postage prepaid on this 15th day of
April, 2003.

F:\Clients\Jones.George\Pleadings\final mem remand.wpd

STATE OF LOUISIANA
PARISH OF ORLEANS

    Before me the undersigned Notary Public duly commissioned and qualified in the State and Parish aforesaid PERSONALY CAME AND APPEARED: David M Goldberg, owner of MEYERS AUTO PARTS, a company organized under the laws of the State of Louisiana after being duly sworn, depose and say:

That he is the owner of MEYERS AUTO PARTS, a business organized under the laws of the State of Louisiana and the appearer intends to conduct business in Louisiana operating under the name THE HUB CAP KING at 2222 S. Broad St., New Orleans, LA 70125

/s/ _____

Sworn to and subscribed
before me, Notary, this
12th day of April, 1997

_____
Notary Public

Non-Real Estate 3641
INSTR. No. _____
Conveyance Office
Parish of Orleans

T/NAME 210    8.00

97-19034

AP 24

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

2003 JUN 24 A 9: 37

RECEIVED
CLERK'S OFFICE

EXHIBIT

A



**VERIFIED**

Date _1-28-02 Cu_

December 28, 2001

Meyers Auto Parts
Attn: David Goldberg
2222 S. Broad St.
New Orleans, LA  70125

<u>CERTIFIED MAIL</u>
<u>RETURN RECEIPT REQUESTED</u>

P 210 811 121

Re: Infinity Outdoor Systems, Inc.
Lease with Meyers Auto Parts
Located at Broad St. between
Melpomene & Thalia Sts.
Lease No. 156(1289)

Dear Mr. Goldberg:

 Enclosed please find Check NO. _____086242_____ made payable to Meyers Auto Parts from Infinity Outdoor, Inc. for the month of January 2002. Your receipt of and acceptance of Check No. _____086242_____ confirms that, Meyers Auto Parts, owner/agent of the property located at Broad St. between Melpomene & Thalia Sts., desires to extend on a month-to-month basis the lease with Infinity Outdoor, Inc. for an outdoor advertising sign on the above referenced property.

 This lease will continue on a month-to-month basis under all terms and conditions of the lease signed May 27, 1988.

 We have enclosed a copy of the lease agreement should you prefer to sign the agreement.

 Further, this letter confirms that under Louisiana law, Meyers Auto Parts, as Lessor, must give Infinity Outdoor, Inc. thirty days notice of any intention to terminate this month-to-month lease.

 Finally, this letter further confirms that a copy of this letter will be filed into the appropriate property records of Orleans Parish in order that any potential buyer of this property will be notified of the existence of this month-to-month lease.

 If you have any questions, please contact Ricky Childress at our New Orleans office (504) 246-0500.

Sincerely,

INFINITY OUTDOOR, INC.

By: _____
  BRIAN CUYLER
  General Manager
Date:_____

**INSTR. No.** _230034_
CONVEYANCE OFFICE
PARISH OF ORLEANS

01-28-02 6:01 1399    LEASE  140    10.00

8001 Townsend Place, New Orleans, LA 70126  (504) 246-0500  Fax: (504) 243-0766
WWW.VIACOMOUTDOOR.COM

**EXHIBIT**

_B_

PARISH OF ORLEANS

STATE OF LOUISIANA

## A F F I D A V I T

BEFORE ME, the undersigned authority, personally came and appeared, GEORGE JONES who, after being duly sworn did depose and say that he has personal knowledge of the following facts:

1.  That from approximately 1969 to 1975 George Jones worked with his father, Louin Jones, at a garage connected to Meyer's Auto Parts, Inc (Meyer's Garage);

2.  That Meyer's Auto Parts, Inc. rented space in the Meyer's Garage to Louin Jones between 1969 and 1975;

3.  That other individuals who were direct employees of Meyer's Auto Parts, Inc., worked in the Meyer's Garage between 1969 and 1975;

4.  That the primary automobile work conducted at the Meyer's Auto Garage between 1969 and 1975 was brake and muffler work.

5.  That between 1969 and 1975, Louin Jones and George Jones preformed literally hundreds of brake jobs at the Meyer's Garage;

6.  That Louin Jones and George Jones were paid by Meyer's Auto Parts to do brake jobs on the automobiles owned by the customers of Meyer's Auto Parts. Meyer's Auto Parts

EXHIBIT

C

would supply the new brake linings (shoes) to Louin Jones and George Jones and would

take back the used brake parts (shoes) after they were removed from the customer's car;

7.    Louin Jones and George Jones would be paid by Meyer's Auto Parts for each brake job

preformed on the customer's car.  The customer would pay Meyer's Auto Parts for the

work and for the parts installed on the car and Meyer's would buy back from the

customer, by way of a credit, used brake parts taken off of the customer's car;

8.    Louin Jones and George Jones would return all used brake parts, including brake shoes,

to Meyer's Auto Parts;

9.    That employees of Meyer's Auto Parts would preform brake work in Meyer's Garage

between 1969 and 1975;

10.   That Louin Jones and George Jones were exposed to asbestos-containing dust created

during those brake jobs at Meyer's Garage preformed by employees of Meyer's Auto

Parts.  That they were further exposed to dusts, which George Jones believes to be

asbestos-containing, during weekly cleanings of Meyer's Garage;

11.   That Louin Jones and George Jones were exposed to asbestos-containing dusts from

brake shoes provided to them by Meyer's Auto Parts which were then placed upon

Meyer's Auto Parts  customers' automobiles.  Louin Jones and George Jones were further

exposed to asbestos-containing dusts from brake components removed from Meyer's

Auto Parts customers automobiles.  Said brake shoes were the property of Meyer's Auto

Parts.

12.     That at all times the new and used brake components used in brake jobs at Meyer's

Garage were the property of Meyer's Auto Parts.

_George Jones_
GEORGE JONES

SWORN TO AND SUBSCRIBED
BEFORE ME THIS _15_ DAY
OF _April_, 2003.

NOTARY PUBLIC

-3-

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| C. ANN JONES AND | * | CIVIL ACTION NO. 03-1010 |
| THE REV. GEORGE A. JONES | * | |
| | * | |
| VERSUS | * | SECTION: "K" |
| | * | |
| MEYER'S AUTO PARTS, INC., | * | |
| DAVID M. GOLDBERG AND | * | MAG.: 5 |
| MADELINE L. GOLDBERG, d/b/a | * | |
| MEYER'S AUTO PARTS, INC. | * | |
| SEALING EQUIPMENT PRODUCTS | * | |
| COMPANY, INC. (SEPCO), DANA | * | |
| CORPORATION, Individually and as | * | |
| Successor to VICTOR MANUFACTURING | * | |
| AND GASKET CO., VOLKSWAGEN | * | |
| OF AMERICA, INC., HONEYWELL | * | |
| INTERNATIONAL, INC. NISSAN | * | |
| NORTH AMERICA, INC.,  BORG- | * | |
| WARNER CORP., DAIMLER CHRYSLER, | * | |
| GENERAL MOTORS CORPORATION | * | |
| STANDARD MOTOR PARTS, INC. | * | |
| FORM MOTOR COMPANY, EDISON | * | |
| INTERNATIONAL, INC., HONDA | * | |
| NORTH AMERICA, INC., TOYOTA | * | |
| MOTOR NORTH AMERICA, INC. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## NOTICE OF HEARING

TO:   ALL COUNSEL OF RECORD

PLEASE TAKE NOTICE that the hearing on Plaintiffs' Motion for Remand before the

Honorable Stanwood R. Duval, Jr., Judge, Section K, is set for **Wednesday, April 30, 2003** at

**9:30 a.m.**, or as soon thereafter as counsel may be heard.

New Orleans, Louisiana, this 15th day of April, 2003.

**Respectfully submitted,**
**MARTZELL & BICKFORD**

SCOTT R. BICKFORD T.A. (1165)
**SPENCER R. DOODY** (27795)
**TIFFANY G. CHASE** (24343)
338 Lafayette Street
New Orleans, LA 70130
(504) 581-9065
(504) 581-7635 Fax

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing pleading has been served upon:

Avram C. Herman, Esq.
Herman & Herman
111 Veterans Blvd., Suite 1506
Metairie, LA 70005
**Counsel for Meyer's Auto Parts, Inc.**

Lynn Luker
Joyce M. Dombourian
Lynn Luker & Associates, L.L.C.
616 Girod Street
New Orleans, LA 70130
**Counsel for Sealing Equipment**

William F. Bologna
William F. Bologna & Associates
1515 Poydras Street, Suite 2323
New Orleans, LA 70112-3723
**Counsel for Daimler Chrysler Corporation**

Paul V. Cassisa, Sr.
Bernard Cassisa Elliott & Davis
1615 Metairie Road
Post Office Box 55490
Metairie, LA  70055-5490
**Counsel for General Motors Corporation and Reilly-Benton**

Kelly M. Rabalais
LeBlanc, Tusa & Butler, L.L.C.
2121 Airline Drive
Suite 405
Metairie, LA  70001
**Counsel for Ford Motor Company**

Leonard Tavera
Towle, Denison, Smith & Tavera
10866 Wilshire Blvd, Suite 500
Los Angeles, CA  90024
**Counsel for EIS Standard Motor Products**

Mr. Eric Shuman
McGlinchey, Stafford
643 Magazine Street
New Orleans, LA 70130
**Counsel for Honeywell International, Inc., Honda North America, Inc. and Toyota Motors North America, Inc.**

Mr. Michael T. Pulaski
McCranie, Sistruck, Anzelmo, Hardy,
Maxwell & McDaniel, PC
434 N. Columbia Street, Suite 200
Covington, LA  70433
**Counsel for Nissan North America, Inc.**

3

Mr. Troy Bell
Aultman, Tyner, Ruffin & Yarborough
400 Poydras Street
New Orleans, LA 70130
**Counsel for Borg-Warner**

Ms. Janet McDonald
Deutsch, Kerrigan & Stiles
755 Magazine Street
New Orleans, LA  70130
**Counsel for Dana Corporation**


by hand or by mailing the same to each properly addressed and postage prepaid on this 15th day

of April, 2003.

**SPENCER R. DOODY**


F:\Clients\Jones.George\Pleadings\notice of hearing.wpd

4

8UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| C. ANN JONES AND | * | CIVIL ACTION |
| THE REV. GEORGE A. JONES | | |
| | * | NO.  2:03-cv-01010 |
| VERSUS | | |
| | * | SECTION:  K |
| MEYER'S AUTO PARTS, INC., DAVID M. | | |
| GOLDBERG AND MADELINE L. GOLDBERG, | * | MAGISTRATE:  5 |
| d/b/a MEYER'S AUTO PARTS, INC.,  SEALING | | |
| EQUIPMENT PRODUCTS COMPANY, INC. | * | |
| (SEPCO), DANA CORPORATION, | | |
| Individually and as Successor to VICTOR | * | |
| MANUFACTURINGAND GASKET CO., | | |
| VOLKSWAGEN OF AMERICA, INC., | * | |
| HONEYWELL INTERNATIONAL, INC., | | |
| NISSAN NORTH AMERICA, INC., BORG- | * | |
| WARNER CORP., DAIMLERCHRYSLER, | | |
| GENERALMOTORS CORPORATION, | * | |
| STANDARD MOTOR PARTS, INC., | | |
| FORD MOTOR COMPANY, EDISON | * | |
| INTERNATIONAL INC., HONDA NORTH | | |
| AMERICA, INC., TOYOTA MOTOR NORTH | * | |
| AMERICA, INC. | | |

\*       \*       \*       \*       \*       \*       \*       \*

## OPPOSITION to MOTION TO REMAND

### Introduction and Outline of Argument

This is certainly not the first time that a plaintiff has joined a local vendor in an attempt to circumvent federal jurisdiction in a products liability action against non-resident manufacturers.  *See* Badon v. RJR Nabisco, Inc., 224 F.3d 382 (5 Cir. 2000)(tobacco); In Re: Gas Water Heater, Products Liability Litigation, 1996 U.S. Dist. Lexis 18945 (E.D. La. 1996)(Duval, J.)(denying remand).  In initiating this maneuver, Jones's Petition largely relied on an allegation that Meyer's Auto Parts, Inc.'s was liable based on its pure status as Jones'

EXHIBIT
B
tabbies

APR 2 8 2003

employer.  Jones then testified that he was *not* employed by Meyers. Exhibit A, Jones deposition Vol. II (4/15/03) at 35.  Plaintiffs now rest on their allegation that Meyer's had garde of its retail brake and clutch parts and is automatically strictly liable for and obliged to warn of entirely latent defects in the parts. [1]   However, well established Louisiana law holds that a retailer is not strictly liable for defects in his merchandise, nor obliged to discover and then warn of latent product defects.  In turn, well established federal law holds that the insertion of such a retailer in a lawsuit does not defeat federal jurisdiction.

To evade substantive law which is specifically inhospitable to their claim against Meyer's, plaintiffs cloak this element of their suit under the rubric of garde, offering it as a freewheeling surrogate for Louisiana products liability law.  Labels aside, plaintiffs ultimately ask this Court to burden Louisiana retailers with strict liability plus a duty to discover wholly latent defects.  In this, plaintiffs demand that the Court accomplish an unprecedented expansion of Louisiana's tort law, an invitation any federal court must decline.  Erie R.R. v. Tompkins, 304 U.S. 64, 82 L. Ed. 1188, 58 S.Ct. 817 (1938).


**Standard for Review.**

In Travis v. Irby, No. 02-60005, 2003 U.S. App. LEXIS 6001 (5 Cir. 3/28/03) the Fifth Circuit observed that it and district courts sometimes held that a removing defendant needed to show "absolutely no possibility" of a claim against a non-diverse party, and sometimes accepted

---

[1]      Plaintiffs' Motion suggests that David Goldberg is not a tortfeasor per se, but as a shareholder remains exposed to corporate debts.  The question is whether plaintiffs have a reasonable basis to recover against Meyer's Auto Parts, Inc.   If they do not, Goldberg's status is irrelevant.

a non-absolute showing. Finding that "[T]he insertion of 'absolutely no' into the possibility test

is fairly recent." the Court held:

> Plaintiffs appear to argue that *any mere theoretical possibility* of recovery
> under local law – no matter how remote or fanciful– suffices to preclude
> removal.  We reject this contention.  As cited authorities reflect, there
> must at least be arguably a *reasonable basis* for predicting that state law
> would allow recovery in order to preclude a finding of fraudulent joinder.

> Id. , ___ F.3d at ___, citing Badon v. R J R Nabisco, Inc. 236 F.3d 282,
> 286 n.4 (5 Cir. 2000)(emphasis by the Court)

In the instant case, there is not even a slight basis for a finding that state law allows

recovery against Meyer's for having failed to recognize or discover a purely latent "toxic effect"

defect.  "[I]t is settled in Louisiana that the non-manufacturer seller of a defective product is not

responsible for damages in tort absent a showing that he knew or should have known that the

product sold was defective."  Jones v. Employers Mut. Liability Ins. Co., 430 So.2d 357, 359

(La. App. 3 Cir. 1983); *accord* Kelley v. Price-Macemon, Inc., 992 F.2d 1408, 1413 (5 Cir.

1993).  Louisiana law also unequivocally holds that a retailer does not have a duty to test its

goods for inherent defects, and that even a limited inspection or test does not expose the seller to

liability for latent defects.  Weber v. Caterpillar Mach. Corp., 542 So.2d 544 (La. App. 5 Cir.),

*writs denied*, 548 So.2d 332, 334 (La. 1989)(retailer of forklift not required to warn user about

operating machine with doors taken off.)  Like Meyer's, the dealer in Weber "had no input into

the design, testing, or manufacture of" the product, and because the "'defect' in the forklift was

not discoverable by simple inspection; thus, there is no legal basis for imposing liability on [the

dealer]."  Id. at 553[2]

---

[2]       The Motion turns on the law,  unlike Willard v. Board of Comm'rs, 2003 U.S. Dist. Lexis 5333
(E. D. La. 3/28/03)(Duval, J.) where the legal consequence of garde was apparent and a factual dispute
followed as to who possessed that status *vis a vis* a structure.  If necessary, the Court can "pierce the

**"Garde" is not an all-encompassing theory of products liability.**

If "strict liability based on temporary physical custody and/or ownership of products in the stream of commerce" exists, then all retailers and wholesalers are strictly liable without fault and must test and warn about products passing through their shops. This is not the state of affairs because plaintiffs' proffered regime is not the law.

Louisiana's federal courts have uniformly decided that a non-manufacturer seller of a product is not a proper defendant in a tort claim, and have denied motions to remand, upon recognizing that such sellers have no duty to test a product to discern a latent defect. This trend has been particularly evident in the tobacco and pharmaceutical contexts, where plaintiffs allege that the product produces a long-term health risk, the very defect alleged by Jones. Knowles v. American Tobacco Co., 1998 U.S. Dist. Lexis 22195 (E.D. La.   7/10/98)(Lemmon, J.)(distinguishing contrary decisions which relied on redhibition, not alleged by Jones); Strickland v. Brown Morris Pharmacy, Inc., No. 96-815, 1996 U.S. Dist. Lexis 14131 (E.D. La. 9/19/96)(Fallon, J.); Zehner v. Nondskog Ind., Inc., No. 92-2508, 1992 U.S. Dist. Lexis 13382 (E.D. La. 9/2/92)(Feldman, J.); Cf. Sisters of Mercy Ministries, Inc. v. Viso, 2001 U.S. Dist. Lexis 21220 (E.D. La. 12/10/01)(Duval, J.); Jackson v. Pneumatic Prod. Corp., 2001 U.S. Dist. LEXIS 18264  (E.D. La. 10/26/01)(Duval, J.).   Each of these opinions recognize that under Louisiana law, "[t]he seller does not have to make minute inspections or disassemble the product to look for latent defects and, unlike the manufacturer, he is not presumed to know the latent

---

pleadings" and utilize a summary judgment like procedure to determine whether there is a valid claim against the non-diverse party. Travis, supra. Jones' affidavit, generated under uncertain circumstances on the same day as his last deposition, differs in certain respects from his testimony. The Court may disregard an affidavit which contradicts testimony. Hyde v. Stanley Tools, 107 F.Supp. 2d 992 (E.D. La. 2000).   If the Court finds the affidavit relevant it should withhold  ruling on the Motion until Jones' deposition (set for April 25, 2003) is complete.

defects in the products he sells." Harris v. Atlanta Stove Works, Inc., 428 So.2d 1040, 1043 (La. App. 1 Cir.), *writ denied*, 434 So.2d 1106 (La. 1983). Knowledge of alleged inherent defects are not imputed to a retail seller like Meyer's. Holloway v. Gulf Mtrs., Inc., 588 So.2d 1322 (La. App. 2 Cir. 1991). Because the non-manufacturer seller has no duty to inspect the product for latent defects prior to sale, it has no duty warn of such defects. Delanzo v. ABC Corp., 572 So.2d 648 (La. App. 5 Cir. 1990). Plaintiffs' arguments are analogous to those asserted against dealers who sell products in sealed containers, who "can reasonably rely on the assumption that the product is not defective." Reeves v. Great Atlantic & Pacific Tea Co., 370 So.2d 202, 209 (La. App. 3 Cir.), *writ denied*, 370 So.2d 835 (La. 1979).[3]

The only exception to this rule applies to a seller deemed to be a "professional vendor". Kelley, *supra* at 1413 n. 9. This unique retailer labors under strict liability and a duty to inspect and warn. Given Goldberg's affidavit on the Notice of Removal (and reality) plaintiffs do not argue that Meyer's Auto Parts, Inc. was such a retailer. This makes sense, because a "professional vendor" "does more than simply sell a certain product or products; it must engage in practices whereby it is capable of controlling the equality of the product, such that the courts are justified in treating the retailer like a manufacturer. We do not believe that the supreme court in *Rowell* [*v. Carter Mobile Homes, Inc.*, 500 So.2d 748 (La. 1987)] intended to expand the scope of Chappuis to impose manufacturer liability on all retailers who are simply in the business of selling a product". Hoerner v. Anco Insulations, Inc., 812 So.2d 45, 60 (La. App. 4 Cir. 2002), citing Nelton v. Astro-Lounger Manufacturing Co., Inc., 542 So.2d 128, 132 (La.

---

[3]     The defect here is not like a cracked engine block, occurring in a discrete unit and discoverable on very close inspection or test. The hazard is allegedly inherent in all brake and clutch parts because they release sub-microscopic fibers causing a disease which does not manifest itself until decades after the product is used. Meyer's Auto Parts, Inc. would have had to hire epidemiologists, microscopists and toxicologists to start looking for the assigned defect; the experts might have told Meyer's that friction products do not present a significant asbestos hazard, as informed experts now understand.

App. 1 Cir. 1989); Parks v. Baby Fair Imports, Inc., 726 So.2d 62 (La. App. 5 Cir. 1998)(even K-Mart's actions in specifying fiber content and color of fabric and adopting quality inspection program did not render it a "manufacturer/seller").

Louisiana first adopted strict liability for defective products in Weber v. Fidelity & Cas. Ins. Co., 250 So.2d 754 (La. 1971). See Chauvin v. Sisters of Mercy Health Systems, 818 So.2d 833 (La. App. 4 Cir. 2002). In Hulin v. Fibreboard, 178 F.3d 316 (5 Cir. 1999) the Court observed that up to the Weber decision "the Louisiana delictual articles, Civil Code articles 2315-2322, were virtually identical to those of the French Civil Code, and contained no literal basis for strict liability based on defective products".[4] Weber extended strict liability into the products field but only against "A manufacturer of a product…if the injury might reasonably have been anticipated" Weber at 755. While subsequent developments have reshaped Weber, no version of Louisiana strict liability has encompassed the non-manufacturing seller. See Louisiana Products Liability Act, R.S. 9:2800.53(1)(b)(defining "manufacturer" to include a "seller…who exercises control over or influences a characteristic of the design, construction or quality of the product…"). The non-manufacturing seller "can have no tort liability for a defective product unless [it] knew or should have known that the product was defective and failed to declare

---

[4]   In Louisiana asbestos cases the applicable substantive law is that which was in effect when plaintiff encountered substantial exposures to asbestos. Austin v. Abney Mills, Inc. 01-1598 (La. (La.9/4/02), 824 So.2d 1137. Up to 1971, there was no strict liability for defective products. Chauvin, supra. In today's law there is no strict liability garde. C.C. Art. 2317.1, "Damage caused by ruin, vice, or defect in things" now reads:

> The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.

it...because the alleged defect...was not readily apparent, [defendant] as a matter of law could not be found liable for failing to discover it." Ferruzzi v. R.J. Tricon Co., 645 So.2d 685, 688 (La. App. 4 Cir. 1994).

Louisiana's strict liability framework is composed of defined legal structures. Rozell v. Louisiana Animal Breeders Co-op., Inc., 434 So.2d 404 (La. 1983) explained the doctrine that "fault or negligence must exist before tort liability can be established." Cf. Greenburg v. Fourroux, 300 So.2d 641, 646 (La. App. 3 Cir. 1974), writ denied 303 So.2d 181 (La. 1974); ("Civil Code Article 2531 fixes the liability of a seller in good faith and no other additional relief can be granted."). Louisiana law is not written ad hoc to fit any convenient issue or defendant.

**Meyer's did not have garde of its retail products.**

Mere presence of a thing on one's premises does not equal garde. Haydel v. Hercules Transport, Inc., 94-0016 (La.App. 1 Cir, 4/7/95); 654 So. 2d 408, 414. Garde is more complex concept, and the key is a finding that the defendant has a meaningful "right of direction and control" over the defective thing. Friou v. Phillips Petroleum Co., 948 F.2d 972, 975 (5 Cir. 1991)("This Court has held that "custody" or "garde,", for the purposes of article 2317, means control and supervision [citation omitted]. Plaintiffs' counsel...conceded that Phillips did not have "operational control." Plaintiffs therefore cannot prevail on this theory and the district court appropriately granted summary judgment for Phillips on this issue.")

In opinions conducting such an analysis, one sees the same type of policy evaluations that support Louisiana's legislative and judicial decisions excluding retail conduits from strict products liability. The jurisprudence holds that before a person is to be held to have garde of a thing, he must have had the substantial opportunity to derive some benefit from and devote

attention to that thing – not merely have touched it.[5]  Only in this fashion might the person be

burdened with the substantial duty under Art. 2317 to detect and do something about that thing's

defects.  For example, Mix v. Krewe of Petronius, 675 So.2d 792 (La. App. 4 Cir. 1996),

involved a trip over a defective stairway in an auditorium rented by the krewe.  The Fourth

Circuit held that the krewe did not have *garde* despite its lease and physical control over the site

at the time of the accident because "the lease term was for a matter of hours, rather than months

or years; lessee had no opportunity to inspect, re-paint or reconfigure the lighting system, and

Petronius had no guardianship that would have given it the right of direction and control of the

steps, landing and lighting system".  Id. at 797.[6]  Plaintiffs implicitly concede, as they must, that

Meyer's Auto Parts, Inc. never had an opportunity to delve into and remedy latent defects in the

respective manufacturers' proprietary composition of their brakes and clutch parts.  *See* Doughty

v. Insured Lloyds, 576 So.2d 461 (La. 1991).

**"Garde" fails as a matter of fact.**

Plaintiffs assert that Jones was exposed to harmful dust while removing and replacing

brakes and clutches.  Motion to Remand at 8.  Accepting this *arguendo*, there remains a

disconnect with theory.  When Jones was installing new parts, those parts were not owned by or

in the custody of Meyer's Auto Parts, Inc. (if that is where they came from) because Meyer's had

sold the parts to its customers, who then elected to have Jones do the installation.  "The customer

would pay Meyer's Auto Parts for the...parts installed on the car".  Jones affidavit, para. 7.  If

---

[5] *See* Willard, *supra* "[T]he cases also considered such things as whether the party charged with garde took an active role in overseeing the project, and whether the object in question was to be permanently or only temporarily affixed to the surrounding property" (citation omitted).

[6] Under Mix and Friou, *supra*, the two-car garage where Jones and his father worked near Meyer's was in the senior Jones' garde, because he rented it for six years and maintained "operational control".  Exhibit A, Jones 4/15/03 deposition at 34-36.

-8-

Jones was exposed to dust from new parts sold by Meyers, that was dust "owned" by the owners of cars being repaired. Similarly, old brake shoes removed from cars were not in Meyer's *garde* (for the sake of argument) until such time that "Meyer's would buy back from the customer, by way of a credit, used brake parts taken off the customer's car". Jones affidavit, para. 7. Up to the time the used parts were removed by Jones or his father, the parts belonged to the owner of the vehicle. During removal of brake shoes -- intervals during which alleged exposures occurred – the brakes were not yet in Meyer's control. Only after Jones' alleged exposure to the used brake's dust during part removal, were used parts handed over to Meyer's. Jones' conclusory statements [Affidavit para. 11, 12] that "said brake shoes were the property of Meyer's Auto Parts" and that "at all time the new and used brake components used in brake jobs at Meyer's Garage were the property of Meyer's Auto Parts" are beyond his personal knowledge; inconsistent with his deposition; and not dispositive of any issue.

**Conclusion**

In <u>Boone v. General Motors Acceptance Corp.</u>, 682 F.2d 552 (5 Cir. 1982) a purchaser sued General Motors, alleging "design defect and internal vices" in his Cadillac, and sought to add the local dealership as a defendant. The question ultimately before the Fifth Circuit was whether the non-diverse dealer was an indispensable party under Rule 19 such that joinder was required. The Fifth Circuit reversed the district court's finding that the plaintiff could not obtain complete relief without naming the dealership because "the thrust of his claim is concerned with design defects and 'internal vices'." <u>Id</u>. at 553. It held that the selling dealership was not an indispensable party, and that strong policies underlying diversity jurisdiction would not permit a claimant alleging defects attributable to the designer/manufacturer to deprive that defendant of his federal forum by asserting groundless claims against the local seller. <u>Id</u>. at 554. Louisiana

-9-

law does not make a retail conduit for auto parts strictly liable for those parts, or obliged to discover and warn of latent defects in design or composition.

The federal courts have a "virtually unflagging obligation" to exercise the jurisdiction conferred upon them.  Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976).  Classic diversity jurisdiction exists here because there is no reasonable basis to predict that state substantive law will allow plaintiffs to recover against Meyer's Auto Parts, Inc. or any person whose liability may be related to Meyer's.

For these reasons, defendants request that the Court deny plaintiffs' Motion to Remand.

Respectfully submitted,

_____

ERIC SHUMAN (2107)
MCGLINCHEY STAFFORD, PLLC
643 Magazine Street
New Orleans, LA 70130
Telephone:  (504) 586-1200
Telefax: (504 596-2800
ATTORNEYS for HONEYWELL
INTERNATIONAL, INC., TOYOTA MOTOR
SALES U.S.A., INC., HONDA NORTH
AMERICA, INC. AND VOLKSWAGEN OF
AMERICA, INC.

## CERTIFICATE OF SERVICE

I certify that on this 22nd day of April, 2003 a copy of the foregoing pleading has been served upon:

Scott R. Bickford, Esq.
Martzell & Bickford
338 Lafayette Street
New Orleans, LA 70130
ATTORNEYS FOR PLAINTIFFS

Lynn Luker, Esq.
Luker and Associates
616 Girod Street, Suite 200
New Orleans, LA 70130
ATTORNEYS FOR SEPCO

Eugene M. McEachin, Esq.
Bernard, Cassisa, Elliott & Davis
1615 Metairie Road
Metairie, LA 70055-5490
ATTORNEYS FOR GENERAL MOTORS CORPORATION

Troy N. Bell, Esq.
Aultman, Tyner, McNeese, Ruffin
The Texaco Center
400 Poydras Street, Suite 2250
New Orleans, LA 70130
ATTORNEYS FOR BORG-WARNER

Avram C. Herman, Esq.
Herman & Herman
111 Veterans Blvd., Suite 1506
Metairie, LA 70005
ATTORNEYS FOR MEYER'S AUTO PARTS, INC.

William F. Bologna, Esq.
William F. Bologna & Associates
1515 Poydras Street, Suite 2323
New Orleans, LA  70112-3723
ATTORNEYS FOR DAIMLERCHRYSLER

Janice Cullotta, Esq.
Deutsch, Kerrigan & Stiles
755 Magazine Street
New Orleans, LA  70130
ATTORNEYS FOR ABEX

Kelly M. Rabalais, Esq.
LeBlanc, Tusa & Butler, L.L.C.
2121 Airline Drive
Suite 405
Metairie, LA  70001
ATTORNEYS FOR FORD MOTOR COMPANY

Leonard Tavera, Esq.
Towle, Denison, Smith & Tavera
10866 Wilshire Blvd., Suite 500
Los Angeles, CA  90024
ATTORNEYS FOR STANDARD MOTOR PARTS, INC.

LanceWilliams, Esq.
McCranie, Sistrunk, Anzelmo, Hardy,
  Maxwell & McDaniel, PC
434 N.Columbia Street, Suite 200
Covington, LA  70433
ATTORNEYS FOR NISSAN NORTH AMERICA, INC.

Nicole Heymann, Esq.
Deutsch, Kerrigan & Stiles
755 Magazine Street
New Orleans, LA  70130
ATTORNEYS FOR DANA CORPORATION

by depositing a copy of same into the United States mail, postage prepaid and properly addressed.

ERIC SHUMAN

1

1      UNITED STATES DISTRICT COURT

2      EASTERN DISTRICT OF LOUISIANA

3

4
C. ANN JONES AND THE              CIVIL ACTION
5  REV. GEORGE A. JONES            NO. 03-1010

6  Versus

7  MEYER'S AUTO PARTS, INC.           SECTION K
   DAVID M. GOLDBERG AND MADELINE     MAG. 5
8  L. GOLDBERG, d/b/a Meyers
   AUTO PARTS, INC., SEALING
9  EQUIPMENT PRODUCTS COMPANY,
   INC. (SEPCO), DANA CORPORATION,
10 Individually and as Successor
   to VICTOR MANUFACTURING AND
11 GASKET CO., VOLKSWAGEN OF
   AMERICA, INC., HONEYWELL
12 INTERNATIONAL, INC., NISSAN
   NORTH AMERICA, INC.,
13 BORG-WARNER CORP., DAIMLER
   CHRYSLER, GENERAL MOTORS
14 CORPORATION, STANDARD MOTOR
   PARTS, INC., FORD MOTOR COMPANY,
15 EDISON INTERNATIONAL INC.,
   HONDA NORTH AMERICA, INC.,
16 TOYOTA MOTOR NORTH AMERICA, INC.

17

18

19      Videotape deposition of MR. GEORGE A.

20 JONES, taken ta the law office of MARTZELL &

21 BICKFORD, 338 Lafayette Street, New Orleans,

22 Louisiana, April 15, 2003.

23

24

25



34

1  arrested for, so once I guess the employee

2  (sic) reads your application he sees that and

3  most times it's really hard to get

4  employment.  You become more at the bottom of

5  the list.

6    MR. BICKFORD:

7        Mr. Jones, he asked you what happened

8  next.  Could you tell him what happened next.

9    THE WITNESS:

10       Yeah.  That's what I'm explaining.  I

11 was just trying to give him an explanation of

12 what took place, you know.

13 BY MR. SHUMAN:

14   Q.   That's okay.

15   A.   And the next point was that my dad

16 spoke to Mr. Meyers, and Mr. Meyers agreed

17 that I can come and work with my father.

18   Q.   Now, at that time, was your father

19 employed by Meyers Auto Parts?  I think you

20 told us he was like working next door to them

21 or something like that.

22   A.   Right. He was not employed by Meyers

23 per se.  In other words, he didn't receive a

24 check on a weekly basis from Meyers, but he

25 would pay Mr. Meyers for the use of his stall

35

1  that was next to his business.

2     Q.   So in 1969 you started working with

3  your father?

4     A.   Yes.

5     Q.   At this location near the Meyers Auto

6  Parts store?

7     A.   Right.

8     Q.   Were you on the payroll of Meyers Auto

9  Parts?

10    A.   No, I was not.

11    Q.   How long did this arrangement last

12  where you were working with your father at a

13  location near Meyers?

14    A.   Until '75.

15    Q.   Let me ask you some questions about

16  that.  They will be similar to the questions

17  I was asking about the Salcedo Street

18  location.

19    A.   Okay.

20    Q.   But bear with me because it's a change

21  in location. Was the work you were doing from

22  1969 to 1975 with your father similar to the

23  work you were doing at Salcedo, or was it of

24  a significantly different type or nature?

25    A.   Similar, same thing.

36

1    Q.   So you would describe it as general

2   automobile repair?

3   A.   Right.

4    Q.   The building where the work was done,

5   tell me about that.  Large or small, open or

6   closed?

7    A.   It wasn't a great big old building.  It

8   was enough for two cars to go into, and there

9   were racks, they had two racks in there also.

10  It had an open -- from the garage door and

11  they had an opening in the back that air

12  could, you know, flow through it so you

13  wouldn't become too hot.

14   Q.   Was this a wood building, tin roof?

15  Tell me how it was built.

16   A.   It had -- when I first started it had

17  like a masonite siding, they had brick, and

18  the top of it had a flat roof.

19   Q.   This masonite siding, can you tell me

20  what that looked like?

21   A.   Blocks.

22   Q.   Concrete blocks?

23   A.   Concrete blocks.

24   Q.   It wasn't like a flat panel or

25  corregated panel?

F.

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2003 APR 24  PM 5: 00

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| C. ANN JONES AND | * | CIVIL ACTION NO. 03-1010 |
| THE REV. GEORGE A. JONES | * | |
| | * | |
| VERSUS | * | SECTION: "K" |
| | * | |
| MEYER'S AUTO PARTS, INC., ET AL | * | |
| | * | MAG.: 5 |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MOTION FOR LEAVE TO FILE REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO REMAND

NOW INTO COURT, through undersigned counsel, come Plaintiffs, who move this Honorable Court to grant their Motion for Leave to File a Reply to Defendants' Opposition to Plaintiffs' Motion to Remand. Plaintiffs show that a reply to Defendants' opposition is necessary because their Opposition contains statements of law and fact that necessitate a reply.

WHEREFORE, Plaintiffs pray their motion for leave be granted.

RECEIVED
APR 30 2003

Fee_____
Process_____
X Dktd_____
CtRmDep_____
Doc No._____

DATE OF ENTRY
APR 3 0 2003

EXHIBIT
C

Respectfully submitted,
**MARTZELL & BICKFORD**


SCOTT R. BICKFORD T.A. (1165)
**SPENCER R. DOODY (27795)**
**TIFFANY G. CHASE (24343)**
338 Lafayette Street
New Orleans, LA 70130
(504) 581-9065
(504) 581-7635 Fax


## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing pleading has been served upon:

Avram C. Herman, Esq.
Herman & Herman
111 Veterans Blvd., Suite 1506
Metairie, LA 70005
**Counsel for Meyer's Auto Parts, Inc.**

Lynn Luker
Joyce M. Dombourian
Lynn Luker & Associates, L.L.C.
616 Girod Street
New Orleans, LA 70130
**Counsel for Sealing Equipment**

William F. Bologna
William F. Bologna & Associates
1515 Poydras Street, Suite 2323
New Orleans, LA 70112-3723
**Counsel for Daimler Chrysler Corporation**

2

Paul V. Cassisa, Sr.
Bernard Cassisa Elliott & Davis
1615 Metairie Road
Post Office Box 55490
Metairie, LA 70055-5490
**Counsel for General Motors Corporation and Reilly-Benton**

Kelly M. Rabalais
LeBlanc, Tusa & Butler, L.L.C.
2121 Airline Drive
Suite 405
Metairie, LA 70001
**Counsel for Ford Motor Company**

Leonard Tavera
Towle, Denison, Smith & Tavera
10866 Wilshire Blvd, Suite 500
Los Angeles, CA 90024
**Counsel for EIS Standard Motor Products**

Mr. Eric Shuman
McGlinchey, Stafford
643 Magazine Street
New Orleans, LA 70130
**Counsel for Honeywell International, Inc., Honda North America, Inc. and Toyota Motors North America, Inc.**

Mr. Michael T. Pulaski
McCranie, Sistruck, Anzelmo, Hardy,
Maxwell & McDaniel, PC
434 N. Columbia Street, Suite 200
Covington, LA 70433
**Counsel for Nissan North America, Inc.**

Mr. Troy Bell
Aultman, Tyner, Ruffin & Yarborough
400 Poydras Street
New Orleans, LA 70130
**Counsel for Borg-Warner**

Ms. Janet McDonald
Deutsch, Kerrigan & Stiles
755 Magazine Street
New Orleans, LA  70130
**Counsel for Dana Corporation**

by hand or facsimile on this 24th day of April, 2003.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| C. ANN JONES AND | * | CIVIL ACTION NO. 03-1010 |
| THE REV. GEORGE A. JONES | * | |
| | * | |
| VERSUS | * | SECTION: "K" |
| | * | |
| MEYER'S AUTO PARTS, INC., ET AL | * | |
| | * | MAG.: 5 |

* * * * * * * * * * * * * * * * * *

## ORDER

Considering the foregoing:

IT IS HEREBY ORDERED that Plaintiffs are granted leave to file a reply to the Defendants'

Opposition to the Plaintiffs' Motion to Remand.

Signed this _25_ day of April 2003 in New Orleans, Louisiana.

_____
U.S. District Court Judge

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

C. ANN JONES AND           *      CIVIL ACTION NO. 03-1010
THE REV. GEORGE A. JONES   *
                             *
VERSUS                        *      SECTION: "K"
                             *
MEYER'S AUTO PARTS, INC., ET AL   *
                             *      MAG.: 5

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO MOTION TO REMAND**

NOW INTO COURT, through undersigned counsel, come Plaintiffs who file the following

reply to the opposition to their Motion to Remand and who represent as follows:

**I.**    **The Defendants Have Misconstrued the Burden of Proof Which a Removing Party Must Meet to Show Fraudulent Joinder.**

The removing defendants imply that a recent Fifth Circuit decision has lessened the standard

which a removing defendant must meet in order to prove fraudulent joinder.   That implication is

erroneous.  The cited case, *Travis v. Irby*, No. 02-60005, 2003 WL 1614211 (5th Cir.  (Miss. March

28, 2003)), does indeed explore the various articulations of the standard, but concludes that "[t]he

court determines whether that party has *any possibility of recovery* against the party whose joinder

is questioned.  If there is arguably a *reasonable basis* for predicting that the state law might impose

liability on the facts involved, then there is no fraudulent joinder.  This *possibility, however, must be reasonable*, not merely theoretical" *Id.*, at p.4 (emphasis in original) (quoting *Great Plains Trust Co. V. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002))  Plaintiffs submit that such "reasonable possibility" has been the standard all along, and it is one that their pleading clearly meets.

In order to prove fraudulent joinder, the removing defendants must show that there exists either (1) actual fraud in the pleading of the basis for jurisdiction or (2) that Plaintiffs cannot state a cause of action against the non-diverse party in state court.  *Travis,* p.3;  *Griggs v. State Farm Lloyds,* 181 F.3d 694, 698 (5th Cir. 1999)  Here, the removing defendants have not contested that Meyer's Auto Parts, Inc. ("Meyer's") and David Goldberg ("Goldberg") are Louisiana domiciliaries, so the focus becomes whether Plaintiffs can state a cause of action against Meyer's and Goldberg in a Louisiana court. Although the *Travis* court noted the similarities between the test for fraudulent joinder and the test for a Rule 12(b)(6) motion to dismiss for failure to state a claim, and recognized that a district court may pierce the pleadings in a fraudulent joinder case and consider summary judgment-type evidence, *Travis,* p.4, the same court also emphasized that the "burden of persuasion on those who claim fraudulent joinder is a heavy one." *Id.* (Citing *B. Inc. V. Miller Brewing Co.,* 663 F.2d 545, 549 (5th Cir. 1981)  That heavy burden requires a reviewing court to consider any contested issues of fact and any ambiguities of state law in the light most favorable to the plaintiff. *Id.* Under this test, the removing defendants have failed to carry this heavy burden because Louisiana law clearly places liability for the asbestos products and asbestos dust loose in Meyer's building, where both Meyer's operated its auto parts business and George Jones worked, squarely on Meyer's and/or Goldberg.

**II**     **Plaintiffs have established more that a possibility of stating a claim against Meyer's and Goldberg in a Louisiana court under both Civil Code Articles 2315 and 2317.**

In their petition, Plaintiffs pled as follows:

For all times pertinent, **EMPLOYER DEFENDANTS** had the *garde* of the asbestos and asbestos-containing products to which Petitioner **GEORGE A. JONES** was exposed to and is thereby strictly liable pursuant to Louisiana Code Article 2317.

Petitioner's Original Petition, Paragraph 31. In paragraph 30, Plaintiffs pled in pertinent part:

In addition to the foregoing acts of negligence, **EMPLOYER DEFENDANTS** made the following acts and/or omissions...

d)      Failing to provide clean, respirable air and proper ventilation....

f)      Failing to warn individuals working on their premises, **including independent contractors** and employees, of the risks associated with direct and bystander exposure to asbestos;

(emphasis added).

In their notice of removal, the defendants spend far too much time on the rubric of "Employer Defendant." In their opposition to Plaintiffs' Motion to Remand, the defendants spend far too much time trying to divert the Court's attention from the facts which compel remand by nominating Meyer's as a "supplier" or "retail outlet." Simply put, the allegations at issue place Mr. George Jones within the confines of a facility owned, operated and controlled by Meyers. The petition further alleges that Meyer's failed to warn people in its garage, working its customer's cars, working in asbestos dusts created by Meyer's employees and others that asbestos was hazardous. Plaintiffs have alleged that Meyer's failure to warn applied to employees and independent contractors working in the Meyer facility alike. The removing defendants have not challenged that Plaintiffs pled a cause of action against Meyer's under Article 2315 due to its failure to warn independent contractors that asbestos was hazardous. The Court should remand this action on this theory of recovery alone. However, Plaintiffs' allegations that Meyer's is strictly liable to them for

3

*garde* under Article 2317 constitute a separate and independent basis for remand. The instant reply will focus on this basis.

To recover under Article 2317, a plaintiff must prove that he was injured by a thing which was in the care were custody of the defendant and that such thing was defective. *Celestine v. Union Oil Co. of California*, 652 So.2d 1299, 1303 (La. 1995). A thing is defective for the purposes of strict liability of if it presents an unreasonable risk of harm. *Id.* There is an irrebuttable presumption that the custodian had knowledge of the defective condition. *Id.* Accordingly, once the plaintiff has established a defect and custody, the only defenses available to the defendant are the fault of the victim, the fault of the third person, or causation by irresistible force. *Id.* Pared for relevance, in order to establish the strict liability of Meyer's and/or Goldberg, Plaintiff need only prove that he was *injured* by a *defective product or place* in their *custody*.

Applied here, it appears uncontested that Plaintiff's contraction of malignant mesothelioma, a disease whose only known cause is exposure to asbestos, constitutes an injury. The first element of the strict liability claim, the injury, is established. The second element of the strict liability claim is that the thing which caused the injury was defective. As noted above, a thing is considered defective if it presents an unreasonable risk of harm. It is settled that regular exposure to asbestos and the dust accompanying the use of asbestos presents an unreasonable risk of harm. *Halphen v. Johns-Manville Sales Corp.*, 484 So.2d 110 (La.1986). The second element of the strict liability claim is established. The third and final element of the strict liability claim is that the defective thing or place was in the custody, or *garde*, of the defendants. Here, as with respect to the first two elements, the removing defendants bear the burden of proof that there is no possibility that Plaintiffs can establish that *garde* over the injurious asbestos-containing products and/or facility belonged to

4

pMeyer's and/or Goldberg. The removing defendants have woefully failed in this regard.

Instead of disproving the possibility that Plaintiffs have a cause of action against the in-state defendants under Article 2317, the removing defendants have only shown (or attempted to show) that Meyer's and/or Goldberg, as retailers, cannot be found liable for products they sold pursuant to the Louisiana Product Liability Act and the case law it superseded. However, Plaintiff's cause of action against the instate defendants is not based on a theory of products liability, but is instead based upon a theory of *garde* under Article 2317. The removing defendants' limited discussion of *garde* is found on pp. 7-9 of their opposition and contains erroneous statements of the law and facts which compel remand.

For instance, the removing defendants allege that "policy evaluations support Louisiana's legislative and judicial decisions excluding retail conduits from strict liability." Opp. at 7. However, the removing defendants fail to cite authority, and more egregiously fail to complete the sentence. To the extent Louisiana jurisprudence has fixed the liability of a seller in good faith, it has done so in the *product liability context* and the terms "good faith," and "seller" bear no relationship to strict liability analysis for *garde* of defective things. Along the same lines, the removing defendants allege at p. 8 that Meyer's "never had an opportunity to delve into and remedy latent defects in respective manufacturers' proprietary composition of their brakes and clutch products." While a retailer's ability to detect and remedy defects *may* be of relevance in a product liability context, knowledge and an ability to cure defects, the exercise of care, and the use of reasonable caution, are of no moment to strict liability analysis under 2317.[1] And while Plaintiffs' causes of action against

---

[1] As the removing defendant conceded, p. 6, the substantive law which governs Louisiana asbestos cases is the law which was in effect when the plaintiff encountered substantial expenditures to asbestos. It is undisputed that prior to the Louisiana Tort Revision of 1996,

brake manufacturers arise in part in products liability, Plaintiffs causes of action against Meyer's and Goldberg do not.

Where the removing defendants finally discuss the concept of *garde* (instead of products liability), their statements of the law do not compel remand when applied to the facts. For instance, the removing defendants have represented that in order to find *garde* over a thing, a person must have had the "opportunity to derive some benefit from and devote attention to that thing – not merely have touched it." *Opp.*, p. 7. But instead of challenging Plaintiffs' assertion that Meyer's and Goldberg were custodians of at least some of the products and premises which caused Plaintiffs' injuries with facts unique to this case, the defendants seek to apply the distinguishable set of facts before the court in *Mix v. Krewe of Petronious*, 675 So.2d 792 (La. App. 4 Cir. 1996). There, the court held that an organization which leased an auditorium "for a matter of hours" was not liable in *garde* for the auditorium's structural defects because the organization did not have the "right of direction or control" over the facility. *Id* at 797. The disconnect defies response.

Admittedly, the removing defendants do make two allegations of fact supposedly unique to this case. However, the defendants' first allegation, that "[d]uring removal of brake shoes -- intervals during which alleged exposures occurred -- the brakes were not yet in Meyer's control," is made without supporting authority or reference to Plaintiffs' petition, Mr. Jones' deposition, Mr. Jones' affidavit, or Mr. Goldberg's affidavit. Moreover, the relevance of this allegation (even if proven) turns on Mr. Jones' only having been exposed to asbestos during such "intervals." This conclusory allegation alone cannot defeat the facts pled in Plaintiffs' petition, and the facts sworn in Mr. Jones' affidavit and deposition testimony, particularly when construed in the light most

---

liability pursuant to Article 2317 was strict.

favorable to Plaintiffs. *See Exhibit A.*

The second allegation, that the "garage where Jones and his father worked near Meyer's was in the senior Jones' *garde*, because he rented it" is unsupported by the facts of this case and Article 2317 jurisprudence. First, Mr. Jones' affidavit and deposition testimony demonstrate that while Mr. Jones' father may have engaged in a quasi-lease of a portion of the facility where his son sustained injurious asbestos exposure, Meyer's own injurious operation and the injurious and defective products which were under Meyer's control were located in the same facility. *See Exhibit A.* Second, Article 2317 jurisprudence holds that unless the fault of a third party was the *sole cause* of the plaintiff's harm, the third party fault does not absolve the defendant of its own strict liability. *See Myers v. Burger King Corp.*, 638 So.2d 369 (La. App. 4 Cir. 1994) (emphasis added). Accordingly, unless the defendants can prove that Mr. Jones' father was solely responsible for his son's exposure – a question of fact for the jury – the alleged existence of a quasi-lease between Meyer's and Mr. Jones' father does not exonerate the in-state defendants of liability under Article 2317.

For all of these reasons, Plaintiffs pray that their Motion to Remand be granted.

Respectfully submitted,
**MARTZELL & BICKFORD**

**SCOTT R. BICKFORD T.A. (1165)**
**SPENCER R. DOODY (27795)**
**TIFFANY G. CHASE (24343)**
338 Lafayette Street
New Orleans, LA 70130
(504) 581-9065
(504) 581-7635 Fax

7

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing pleading has been served upon:

Avram C. Herman, Esq.
Herman & Herman
111 Veterans Blvd., Suite 1506
Metairie, LA 70005
**Counsel for Meyer's Auto Parts, Inc.**

Lynn Luker
Joyce M. Dombourian
Lynn Luker & Associates, L.L.C.
616 Girod Street
New Orleans, LA 70130
**Counsel for Sealing Equipment**

William F. Bologna
William F. Bologna & Associates
1515 Poydras Street, Suite 2323
New Orleans, LA 70112-3723
**Counsel for Daimler Chrysler Corporation**

Paul V. Cassisa, Sr.
Bernard Cassisa Elliott & Davis
1615 Metairie Road
Post Office Box 55490
Metairie, LA  70055-5490
**Counsel for General Motors Corporation and Reilly-Benton**

Kelly M. Rabalais
LeBlanc, Tusa & Butler, L.L.C.
2121 Airline Drive
Suite 405
Metairie, LA  70001
**Counsel for Ford Motor Company**

Leonard Tavera
Towle, Denison, Smith & Tavera
10866 Wilshire Blvd, Suite 500
Los Angeles, CA  90024
**Counsel for EIS Standard Motor Products**

Mr. Eric Shuman
McGlinchey, Stafford
643 Magazine Street
New Orleans, LA 70130
**Counsel for Honeywell International, Inc., Honda North America, Inc. and Toyota Motors North America, Inc.**

Mr. Michael T. Pulaski
McCranie, Sistruck, Anzelmo, Hardy,
Maxwell & McDaniel, PC
434 N. Columbia Street, Suite 200
Covington, LA  70433
**Counsel for Nissan North America, Inc.**

Mr. Troy Bell
Aultman, Tyner, Ruffin & Yarborough
400 Poydras Street
New Orleans, LA 70130
**Counsel for Borg-Warner**

Ms. Janet McDonald
Deutsch, Kerrigan & Stiles
755 Magazine Street
New Orleans, LA  70130
**Counsel for Dana Corporation**

by hand or facsimile on this 24th day of April, 2003.

PARISH OF ORLEANS

STATE OF LOUISIANA

## **A F F I D A V I T**

BEFORE ME, the undersigned authority, personally came and appeared, GEORGE JONES who, after being duly sworn did depose and say that he has personal knowledge of the following facts:

1.      That from approximately 1969 to 1975 George Jones worked with his father, Louin Jones,  at a garage connected to Meyer's Auto Parts, Inc (Meyer's Garage);

2.      That Meyer's Auto Parts, Inc. rented space in the Meyer's Garage to Louin  Jones between 1969 and 1975;

3.      That other individuals who were direct employees of Meyer's Auto Parts, Inc., worked in the Meyer's Garage between 1969 and 1975;

4.      That the primary automobile work conducted at the Meyer's Auto Garage between 1969 and 1975 was brake and muffler work.

5.      That between 1969 and 1975, Louin Jones and George Jones preformed literally hundreds of brake jobs at the Meyer's Garage;

6.      That Louin Jones and George Jones  were paid  by Meyer's Auto Parts to do brake jobs on the automobiles owned by the customers of Meyer's Auto Parts.  Meyer's Auto Parts



EXHIBIT

tabbies®

would supply the new brake linings (shoes) to Louin Jones and George Jones and would take back the used brake parts (shoes) after they were removed from the customer's car;

7.   Louin Jones and George Jones would be paid by Meyer's Auto Parts for each brake job preformed on the customer's car.  The customer would pay Meyer's Auto Parts for the work and for the parts installed on the car and Meyer's would buy back from the customer, by way of a credit, used brake parts taken off of the customer's car;

8.   Louin Jones and George Jones would return all used brake parts, including brake shoes, to Meyer's Auto Parts;

9.   That employees of Meyer's Auto Parts would preform brake work in Meyer's Garage between 1969 and 1975;

10.   That Louin Jones and George Jones were exposed to asbestos-containing dust created during those brake jobs at Meyer's Garage preformed by employees of Meyer's Auto Parts.  That they were further exposed to dusts, which George Jones believes to be asbestos-containing, during weekly cleanings of Meyer's Garage;

11.   That Louin Jones and George Jones were exposed to asbestos-containing dusts from brake shoes provided to them by Meyer's Auto Parts which were then placed upon Meyer's Auto Parts customers' automobiles.  Louin Jones and George Jones were further exposed to asbestos-containing dusts from brake components removed from Meyer's Auto Parts customers automobiles.  Said brake shoes were the property of Meyer's Auto Parts.

-2-

12.   That at all times the new and used brake components used in brake jobs at Meyer's

Garage were the property of Meyer's Auto Parts.


*George Jones*
GEORGE JONES

SWORN TO AND SUBSCRIBED
BEFORE ME THIS _15_ DAY
OF _April_, 2003.


NOTARY PUBLIC

-3-

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2003 JUN -6 PM 2: 03

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

C. ANN JONES AND                                        *        CIVIL ACTION
THE REV. GEORGE A. JONES

                                                                            03-1010
VERSUS

                                                        *        SECTION: K

MEYER'S AUTO PARTS, INC., DAVID M.
GOLDBERG AND MADELINE L. GOLDBERG,  *        MAGISTRATE: 5
d/b/a MEYER'S AUTO PARTS, INC.,  SEALING
EQUIPMENT PRODUCTS COMPANY, INC.        *
(SEPCO), DANA CORPORATION,
Individually and as Successor to VICTOR        *
 MANUFACTURINGAND GASKET CO.,
VOLKSWAGEN OF AMERICA, INC.,                *
HONEYWELL INTERNATIONAL, INC.,
NISSAN NORTH AMERICA, INC., BORG-        *
WARNER CORP., DAIMLERCHRYSLER,
 GENERALMOTORS CORPORATION,                *
STANDARD MOTOR PARTS, INC.,
FORD MOTOR COMPANY, EDISON                *
INTERNATIONAL INC., HONDA NORTH
AMERICA, INC., TOYOTA MOTOR NORTH    *
AMERICA, INC.
*        *        *        *        *        *        *        *

RECEIVED
JUN 1 0 2003
S. D. OF CAL.

## MOTION FOR LEAVE
## TO FILE A SUPPLEMENTAL OPPOSITION TO MOTION TO REMAND

Defendants HONEYWELL INTERNATIONAL, INC., TOYOTA MOTOR SALES

U.S.A., INC., HONDA NORTH AMERICA, INC. AND VOLKSWAGEN OF AMERICA, INC.

respectfully request that the Court grant them leave to file their Supplemental Opposition to

Motion to Remand.  In a telephone conference held May 29, 2003 the Court stated that

defendants would have until June 6, 2003 to file a Supplemental Opposition.

DATE OF ENTRY
JUN 1 0 2003

EXHIBIT
D

Respectfully submitted,

June 6th, 2003

Eric Shuman
McGlinchey Stafford, PLLC
643 Magazine Street
New Orleans, LA 70130
Telephone: (504) 586-1200
Facsimile: (504) 596-2800

ATTORNEYS for HONEYWELL
INTERNATIONAL, INC., TOYOTA MOTOR
SALES U.S.A., INC., HONDA NORTH
AMERICA, INC. AND VOLKSWAGEN OF
AMERICA, INC.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

C. ANN JONES AND                              *         CIVIL ACTION
THE REV. GEORGE A. JONES
                                                        03-1010
VERSUS

                                              *         SECTION: K

MEYER'S AUTO PARTS, INC., DAVID M.
GOLDBERG AND MADELINE L. GOLDBERG,   *         MAGISTRATE: 5
d/b/a MEYER'S AUTO PARTS, INC.,  SEALING
EQUIPMENT PRODUCTS COMPANY, INC.      *
(SEPCO), DANA CORPORATION,
Individually and as Successor to VICTOR   *
 MANUFACTURINGAND GASKET CO.,
VOLKSWAGEN OF AMERICA, INC.,          *
HONEYWELL INTERNATIONAL, INC.,
NISSAN NORTH AMERICA, INC., BORG-     *
WARNER CORP., DAIMLERCHRYSLER,
 GENERALMOTORS CORPORATION,           *
STANDARD MOTOR PARTS, INC.,
FORD MOTOR COMPANY, EDISON            *
INTERNATIONAL INC., HONDA NORTH
AMERICA, INC., TOYOTA MOTOR NORTH     *
AMERICA, INC.
*       *       *       *       *       *       *       *

## O R D E R

CONSIDERING THE FOREGOING "Motion for Leave to File Supplemental Opposition to Remand" filed on behalf of HONEYWELL INTERNATIONAL, INC., TOYOTA MOTOR SALES U.S.A., INC., HONDA NORTH AMERICA, INC. AND VOLKSWAGEN OF AMERICA, INC.,

IT IS ORDERED that the motion be and is granted, and that defendants' Supplemental Opposition to Motion to Remand be filed.

CA 03-1010 "K"

New Orleans, Louisiana, this 9th day of June , 2003.

JUDGE

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| C. ANN JONES AND<br>THE REV. GEORGE A. JONES | * | CIVIL ACTION |
| | * | |
| VERSUS | | NO. 2:03-cv-01010 |
| | * | |
| MEYER'S AUTO PARTS, INC., DAVID M. | | SECTION: K |
| GOLDBERG AND MADELINE L. GOLDBERG, | * | |
| d/b/a MEYER'S AUTO PARTS, INC.,  SEALING | | MAGISTRATE: 5 |
| EQUIPMENT PRODUCTS COMPANY, INC. | * | |
| (SEPCO), DANA CORPORATION, | | |
| Individually and as Successor to VICTOR | * | |
| MANUFACTURINGAND GASKET CO., | | |
| VOLKSWAGEN OF AMERICA, INC., | * | |
| HONEYWELL INTERNATIONAL, INC., | | |
| NISSAN NORTH AMERICA, INC., BORG- | * | |
| WARNER CORP., DAIMLERCHRYSLER, | | |
| GENERALMOTORS CORPORATION, | * | |
| STANDARD MOTOR PARTS, INC., | | |
| FORD MOTOR COMPANY, EDISON | * | |
| INTERNATIONAL INC., HONDA NORTH | | |
| AMERICA, INC., TOYOTA MOTOR NORTH | * | |
| AMERICA, INC. | | |

\*       \*       \*       \*       \*       \*       \*       \*

## SUPPLEMENTAL OPPOSITION to MOTION TO REMAND

**Outline of Supplemental Opposition.**

Although plaintiffs now rely on the suggestion that Meyer's Auto Parts, Inc. briefly employed Jones's in 1964, Jones was employed by Meyer Goldberg, not Meyer's Auto Parts, Inc.   Goldberg cannot be sued and Meyer's Auto Parts, Inc. cannot assume Goldberg's liabilities.   Louisiana's Supreme Court has not decided whether a mesothelioma plaintiff may

sue his employer for pre-1976 asbestos exposures. Finally, but most critically, plaintiffs utterly lack a reasonable basis in fact for their negligence claim against *any* 1964 employer.

## In 1964 Jones worked for Meyer Goldberg.

On Jones' Social Security printout "Meyers Auto Parts" appears below Meyer Goldberg's name, while corporate employers using proper names are shown as corporations, *e.g.* "Carolyn Park, Inc." or "Ellis F. Robert Inc." Meyers Auto Parts, Inc. incorporated April 29, 1964, *after* the cited pay period. Louisiana Secretary of State database, Exhibit A, attached. Social Security states that Jones earned $377.19 in 1964's first quarter and $98.13 in the second quarter. If Jones started January 2, 1964 [$377.19/12 weeks = $31.43/week] he earned $98.13 in about the first three weeks of April; if he did not start immediately after New Years he earned it sooner.[1] And the Court has no information about Jones's 1964 work and can only speculate that he worked around asbestos, the only relevant nexus.

## There is no claim against Meyer Goldberg.

Meyer Goldberg died in August 1979; Madeleine Goldberg (now deceased) was the succession representative. [Goldberg affidavit, Exhibit C.] No action lies against a non-diverse deceased individual. Thompson v. Roadster, 895 F.Supp. 113 (E.D. La. 1995); Martinez v. USA, 1998 U.S. Dist. Lexis 2492 (E.D. La. 3/2/98).

## Meyer's Auto Parts, Inc. is not responsible for Goldberg's pre-corporate torts.

Plaintiffs have suggested that Meyers Auto Parts, Inc. may assume Goldberg's liabilities. But holding a corporation liable for torts of an individual officer – let alone torts committed before the corporation came into being -- conflicts with a fundamental rationale for the existence

---

[1] Circumstances indicate that Jones did not earn $98.13 by working sporadically through the second quarter. Jones ran into trouble with the law in 1964 and was incarcerated from about 1964 to 1969. He did not identify Meyer's as a work place between 1959 and 1969. Exhibit B, Jones Deposition April 15, 2003 at 29.

of corporations. <u>Robinson v. Heard</u>, 2001-1697 (La. 2/26/02), 809 So.2d 943, 945, *citing* C.C. Art. 24. ("The personality of a juridical person is distinct from that of its members"); La. C.C.P. Art. 736 ("A person who does business under a trade name is the proper defendant in an action to enforce an obligation created by or arising out of the doing of such business."). Louisiana courts strictly adhere to these distinctions. <u>Nichols Construction Corp. v. Spell</u>, 315 So.2d 801, 804 (La. App. 1 Cir. 1975)(corporation formed four months after accident used the same equipment and performed same the jobs as an individual "doing business as" under company name; corporation's exception of no cause/no right of action to claim arising during the "d/b/a" period was maintained). <u>Welch v. Furman</u>, 496 So.2d 484 (La. App. 1 Cir. 1986)(though corporation filed articles of incorporation three weeks prior to a contract date, it was not the proper defendant in an action on the contract where corporation formally came into existence through issuance of the certificate of incorporation fourteen days after the contract was executed); *see also* <u>Tomeny v. Boykin</u>, 391 So.2d 85 (La. App. 4 Cir. 1980). Exceptions may exist for cases of outright fraud or deceit [*Cf.* <u>Riggins v. Dixie Shoring Co., Inc.</u>, 590 So.2d 1164, 1167-69 (La.1992)] but no one could asserts that Goldberg presciently incorporated Meyer's Auto Parts, Inc. to evade personal liability for a disease that someone might manifest decades later.

**There is no reasonable basis in fact for Jones' negligence claim against the employer.**

Under <u>Travis v. Irby</u>, 326 F.3d 644 (5 Cir. 3/28/03) there "must at least be arguably a reasonable basis for predicting that state law would allow recovery" to find that a defendant has *not* been fraudulently joined. That test, citing <u>Badon v. RJR Nabisco, Inc.</u>, 236 F.3d 282, (5 Cir. 2000) clearly allows removal where claims against non-diverse defendants have no basis in fact. <u>In re: Diet Drugs Products Liability Litigation</u>, 220 F.Supp. 2d 414, 423 (E.D. Pa. 2002)(citing <u>Badon</u>); <u>In re Rezulin Products Liability Litigation</u>, 133 F.Supp. 2d 272, 281 (S.D.N.Y. 2001);

*Cf.* FRCP 11(b)(3) (contentions of fact must "have evidentiary support or...[be] likely to have evidentiary support after a reasonable opportunity for further investigation or discovery."). This is *not* a novel development in Fifth Circuit jurisprudence. <u>Parks v. New York Times Co</u>, 308 F.2d 474, 477 (5 Cir. 1962)("there can be no fraudulent joinder unless it be clear that there can be no recovery under the law of the state on the cause alleged, or on the facts in view of the law as they exist when the petition to remand is heard.")

Jones claims that a proprietor of a parts store or garage "knew or should have known" in 1964 that it was unreasonably dangerous to even allow ordinary mechanical work on an ordinary car. But the *first* publicized reports that asbestos contact (other than certain massive industrial exposures) might pose health risks came out in the mid-1960's. <u>Scientific American</u>, *Asbestos Revisited*, July 1997 at 70, 74 [attached].[2]  Plaintiffs advocates have long asserted that major asbestos suppliers like Johns-Manville kept asbestos hazard data to themselves through the 1970's. <u>Pathology of Asbestos-Associate Diseases</u>, Roggli et al, Chapter 12, *Medicolegal Aspects: Plaintiff's Attorney*, at 349-51 [attached]. In March 1971 EPA first listed asbestos as a

_____

[2]  <u>ACandS Inc. v. Godwin</u>, 667 A.2d 116, 129 (Md. App. 1995) "[O]ur review ... will concentrate on the period from the late 1950s to the early 1970s. Prior to that period, whenever medical literature that was relatively widely distributed in this country had directed attention to asbestos, the focus, generally speaking, had been on the health risks of persons exposed to raw asbestos in mining and manufacturing, particularly in textile manufacturing. In the late 1950s no producer of asbestos products placed any health warnings on its products. During the mid-1960s some manufacturers began to affix health warnings.....Published in December 1965 was an important public health study of the effects of exposure to asbestos on those who installed asbestos products. See I.J. Selikoff, et al., *The Occurrence of Asbestosis Among Insulation Workers in the United States*, 135 Annals N.Y. Acad. of Sci. 139 (1965) (the Selikoff Study). ...Of significance to the punitive damages issue before this Court is the Secretary of Labor's recognition in 1972 that, with proper precautions, asbestos would not be a health hazard...."

*See also* International Commission on Occupational Health (ICOH) website http://www.icoh.org.sg/eng/news/asbestos1.html:

The pioneering work of British, South African, and Italian investigators (Doll, 1955; Wagner, Sleggs, Marchand, 1960; Vigliani, 1964) laid the foundation for the definitive investigations by Irving Selikoff and his colleagues of insulation workers in the United States. Selikoff's monumental studies showed, first, the greatly increased mortality experience of insulation workers (Selikoff, Hammond, Churg, 1964), and later, the synergistic relationship between tobacco smoking and asbestos work (Selikoff, Hammond, Churg, 1969).

hazardous air pollutant.  OSHA did not exist in 1964 and first formulated an asbestos standard in 1972.  Insulation companies did not provide product warnings until 1964.  Borel v. Fibreboard Paper Products Corp., 493 F.2d 1976 (5 Cir. 1974).  The first warnings on automotive friction materials were issued [by AlliedSignal, Honeywell's predecessor] in 1973.  It begs credulity to suggest that Goldberg was negligent by letting an employee do a routine brake job in 1964.

And, because plaintiff alleges that automotive and parts *manufacturers* failed to warn of product hazards, his argument against Goldberg defeats itself.  If manufacturers failed to warn about hazards, then Goldberg could not possess the knowledge he needed to stop or warn his employees about working on cars.  In Re Rezulin Products Liability Litigation, *supra* at 295 (non-diverse pharmacists could not possess information which they allegedly failed to pass to customers, given allegations that drug manufacturers failed to warn pharmacists).[3]

## Can plaintiff sue his employer for pre-1976 asbestos exposures?

Austin v. Abney Mills, Inc., 2001-1598 (La. 9/4/02), 824 So.2d 1137) held that the substantive law applicable to a claim for the latent asbestos disease mesothelioma (Jones's diagnosis) was that in effect at the time plaintiff had "substantial exposure" to asbestos.  That decision was outcome determinative in Austin because the law in effect when plaintiff became disabled in 1998 unequivocally barred suit against the employer. Id. at 1140  But as Justice Weimar explained in Powell v. Weaver, 2001-2937 (La. 02/97/03), 841 So.2d 742 [concurrence] Austin did not end the inquiry:

> ...Austin does not represent the last word on the continued viability of executive officer tort suits in Louisiana.  At present there exists a conflict in the courts of

---

[3]    And it is difficult to rationalize that fifteen weeks work for Goldberg caused Jones' disease, where no epidemiologic evidence shows that even *long-term* work with automotive friction materials causes disease.  Conde v. Velsicol Chem. Corp. (S.D. Ohio 1992) 804 F.Supp. 972, 1025-26  *aff'd* 24 F.3d 809 (6 Cir. 1994)("Epidemiologic studies are the primary generally accepted methodology for demonstrating a causal relation between a chemical compound and a set of symptoms or a disease.")

appeal as to whether asbestos is both an oxygen compound and a metal compound so as to render asbestos-related disease a covered occupational disease under the worker's compensation law and the sole remedy of employees suffering from such diseases. See and compare <u>Brunet v. Avondale Industries, Inc.</u> 99-1354 (La. App. 5 Cir. 12/5/00), 772 So.2d 974, writ not considered, 01-0171 (La. 3/23/01),<u>787 So. 2d 1006,</u> and <u>Gautreaux v. Rheem Manufacturing Company,</u> 96-2193 (LA. App. 4 Cir. 12/27/96), 694 So.2d 977 writ denied, 97-0222 (La. 3/14/97), <u>690 So. 2d 39.</u> The final word cannot be written on this chapter until the conflict between Brunet and Gautreaux is resolved.

*Accord* <u>Austin</u>, *supra* at 1145 ("[W]hether mesothelioma was a covered disease [under worker's compensation] prior to 1975 is not at issue here…"). If the Court finds this particular issue dispositive, the parties should be provided time to brief that matter.

## Conclusion

What has been transpiring can only be characterized as a sham, at the unfair expense not only of [manufacturer] but of many individuals and small enterprises that are being unfairly dragged into court simply to prevent the adjudication of lawsuits against [manufacturer], the real target, in a federal forum. As aptly stated by our Court of Appeals in <u>Boyer</u>…."so long as federal diversity jurisdiction exists…the need for its assertion may well be greatest when plaintiff tires hardest to defeat it.

<u>In re: Diet Drugs Product Liability Litigation</u>, *supra* at 425 (citations omitted

No matter what words are employed, the fact remains that Goldberg/Meyers Auto Parts alleged liability is rooted in its retail sale of automotive parts. Under Louisiana law, such non-manufacturing sellers are not obliged to test goods for latent defects and are not responsible for tort damages arising from latent defects. Plaintiffs would undo that entire body of law via semantics, recasting the retailer as a temporary "custodian" of his wares, or alternatively, rely on purely theoretical allegations. "Plaintiffs appear to argue that *any mere theoretical possibility* of recovery under local law - no matter how remote or fanciful - suffices to preclude removal. We reject this contention". <u>Travis</u>, *supra* at 652.

For these reasons and those stated in their earlier memorandum defendants request that the Court deny plaintiffs' Motion to Remand.

Respectfully submitted,

_____

ERIC SHUMAN (2107)
MCGLINCHEY STAFFORD, PLLC
643 Magazine Street
New Orleans, LA 70130
Telephone: (504) 586-1200
Telefax: (504 596-2800
ATTORNEYS for HONEYWELL
INTERNATIONAL, INC., TOYOTA MOTOR
SALES U.S.A., INC., HONDA NORTH
AMERICA, INC. AND VOLKSWAGEN OF
AMERICA, INC.

## CERTIFICATE OF SERVICE

I certify that on this _____ day of June, 2003 a copy of the foregoing pleading has been served upon:

Scott R. Bickford, Esq.
Martzell & Bickford
338 Lafayette Street
New Orleans, LA 70130
ATTORNEYS FOR PLAINTIFFS

Lynn Luker, Esq.
Luker and Associates
616 Girod Street, Suite 200
New Orleans, LA 70130
ATTORNEYS FOR SEPCO

Eugene M. McEachin, Esq.
Bernard, Cassisa, Elliott & Davis
1615 Metairie Road
Metairie, LA 70055-5490
ATTORNEYS FOR GENERAL MOTORS CORPORATION

Troy N. Bell, Esq.
Aultman, Tyner, McNeese, Ruffin
The Texaco Center
400 Poydras Street, Suite 2250
New Orleans, LA 70130
ATTORNEYS FOR BORG-WARNER

Avram C. Herman, Esq.
Herman & Herman
111 Veterans Blvd., Suite 1506
Metairie, LA 70005
ATTORNEYS FOR MEYER'S AUTO PARTS, INC.

William F. Bologna, Esq.
William F. Bologna & Associates
1515 Poydras Street, Suite 2323
New Orleans, LA 70112-3723
ATTORNEYS FOR DAIMLERCHRYSLER

Janice Cullotta, Esq.
Deutsch, Kerrigan & Stiles
755 Magazine Street
New Orleans, LA 70130
ATTORNEYS FOR ABEX

Kelly M. Rabalais, Esq.
LeBlanc, Tusa & Butler, L.L.C.
2121 Airline Drive
Suite 405
Metairie, LA 70001
ATTORNEYS FOR FORD MOTOR COMPANY

Leonard Tavera, Esq.
Towle, Denison, Smith & Tavera
10866 Wilshire Blvd., Suite 500
Los Angeles, CA 90024
ATTORNEYS FOR STANDARD MOTOR PARTS, INC.

LanceWilliams, Esq.
McCranie, Sistrunk, Anzelmo, Hardy,
  Maxwell & McDaniel, PC
434 N.Columbia Street, Suite 200
Covington, LA 70433
ATTORNEYS FOR NISSAN NORTH AMERICA, INC.

Nicole Heymann, Esq.
Deutsch, Kerrigan & Stiles
755 Magazine Street
New Orleans, LA 70130
ATTORNEYS FOR DANA CORPORATION

by depositing a copy of same into the United States mail, postage prepaid and properly addressed.

ERIC SHUMAN



1

1      UNITED STATES DISTRICT COURT

2      EASTERN DISTRICT OF LOUISIANA

3

4

5    C. ANN JONES AND THE              CIVIL ACTION
     REV. GEORGE A. JONES              NO. 03-1010

6    Versus

7    MEYER'S AUTO PARTS, INC.          SECTION K
     DAVID M. GOLDBERG AND MADELINE    MAG. 5
8    L. GOLDBERG, d/b/a Meyers
     AUTO PARTS, INC., SEALING
9    EQUIPMENT PRODUCTS COMPANY,
     INC. (SEPCO), DANA CORPORATION,
10   Individually and as Successor
     to VICTOR MANUFACTURING AND
11   GASKET CO., VOLKSWAGEN OF
     AMERICA, INC., HONEYWELL
12   INTERNATIONAL, INC., NISSAN
     NORTH AMERICA, INC.,
13   BORG-WARNER CORP., DAIMLER
     CHRYSLER, GENERAL MOTORS
14   CORPORATION, STANDARD MOTOR
     PARTS, INC., FORD MOTOR COMPANY,
15   EDISON INTERNATIONAL INC.,
     HONDA NORTH AMERICA, INC.,
16   TOYOTA MOTOR NORTH AMERICA, INC.

17

18

19        Videotape deposition of MR. GEORGE A.

20   JONES, taken ta the law office of MARTZELL &

21   BICKFORD, 338 Lafayette Street, New Orleans,

22   Louisiana, April 15, 2003.

23

24

25



⌐ ORIGINAL

29

1    Q.    The answer is always simple.  If you
2  don't remember something just tell me.
3    A.    I am just trying to figure it out.
4    Q.    And then in this same time period,
5  post-1959, you had talked about working for
6  T. Smith on the wharves.
7    A.    Yeah.
8    Q.    And that was around 1962.  That's what
9  we talked about before.
10   A.    Right.
11   Q.    And then you said you worked for a
12  ship cleaning, or as you, I think you called
13  it a ship scaling outfit.
14   A.    Ship scaling outfit.
15   Q.    So about what year does that take us
16  to?  We are after 1959.  We have talked about
17  ship scaling, we have taked about work on the
18  wharves, we have talked about your work at
19  Belgium Concrete, about what year do we get
20  to next after those particular projects?
21   A.    After those projects are over, it was
22  about 1964 I found myself getting in trouble.
23  From that time I was incarcerated until '69.
24   Q.    Right, and we mentioned that. Do you
25  have any specific recollection of the events

601 POYDRAS STREET, SUITE 2003
NEW ORLEANS, LOUISIANA 70130
PHONE (504) 525-9100
FAX (504) 525-9109

Gaudet, Kaiser & Pepper
Toll Free 1-888-525-9100

7967 OFFICE PARK BLVD.
BATON ROUGE, LOUISIANA 70809
PHONE (225) 926-9411

# AFFIDAVIT

**STATE OF LOUISIANA**

**PARISH OF ORLEANS**

BEFORE ME, personally came and appeared:

**DAVID M. GOLDBERG,**

who, after being duly sworn, did depose and state:

(1)     That he is the son of the late Meyer Goldberg, and that Meyer Goldberg died in August 1979;

(2)     That Madeline L. Goldberg, his mother, was the succession representative of the estate of Meyer Goldberg;

(3)     That Madeline L. Goldberg is deceased, having died in 1982.

DAVID M. GOLDBERG

SWORN TO AND SUBSCRIBED
BEFORE ME THIS ___ DAY OF
_____, 2003.

NOTARY PUBLIC

EXHIBIT
C

Case MDL No. 875 Document 3922 Filed 06/24/03 Page 89 of 104

# Pathology of Asbestos-Associated Diseases

## Victor L. Roggli
## S. Donald Greenberg
## Philip C. Pratt

At trial, a plaintiff may establish the manufacturers' actual knowledge by introducing as exhibits the internal correspondence and memoranda of the companies. For instance, a plaintiff may seek introduction of the correspondence between Johns-Manville and Raybestos Manhattan in 1935 that discussed whether the medical evidence of the hazards of asbestos should be published in a trade magazine known as *Asbestos*. As the publisher of the journal stated in a letter to Sumner Simpson, the president of Raybestos Manhattan, in 1935: "Always you have requested that for certain obvious reasons we publish nothing, and, naturally your wishes have been respected."[11] On October 1, 1935, Simpson forwarded the letter from the magazine's publisher to Vandiver Brown, secretary and general counsel of Johns-Manville. In reference to the study financed by the companies and performed by Dr. Anthony Lanza, Simpson stated:

As I see it personally, we would be just as well off to say nothing about it until our survey is complete. I think the less said about asbestos, the better off we are, but at the same time, we cannot lose track of the fact that there have been a number of articles on asbestos dust control and asbestosis in the British trade magazines.[12]

On October 3, 1935, Brown responded by saying, "I quite agree with you that our interests are best served by having asbestosis receive the minimum of publicity."[13]

The attitude of these corporate executives regarding whether to reveal the hazards of asbestos to the public is representative of that found in many other documents. In face of the mounting evidence concerning the relationship between asbestos and lung cancer, there was a proposal that the Asbestos Textile Institute, a trade organization, sponsor a study on the incidence of lung cancer among American asbestos workers. In minutes of the meeting of March 7, 1957, the member companies rejected their proposal and stated: "There is a feeling among certain members that such an investigation would stir up a hornets' nest and put the whole industry under suspicion."[14] The history of Johns-Manville's conduct with regard to the hazards of asbestos was reviewed in 1979 by an executive of that company, and his memorandum to the chief executive officer of Johns-Manville, John McKinney, sums up that company's attitude regarding the health and safety of the workers who would be exposed to their products. As the asbestos trials began to increase in number, C. G. Linke wrote, on January 12, 1979, "We must now face reality and ask ourselves whether or not we are playing semantic games in constructing our defense which may be appropriate for a court of law, but fade into incredulity under the stare of public opinion."[15] He continues by contrasting the position of Johns-Manville in trials against historical facts: "From an 'average man' point of view, here are a few examples: 1. *J. M. position*: Prior to 1964, we lacked scientific knowledge about cancer hazards of asbestos. *Fact*: In mid-'50s, J. M. officials

knew of scientific studies showing a relationship between cancer and asbestos." Further along, he states, "*J. M. position:* We have communicated openly with employees about illnesses. *Fact:* A current J. M. employee tells me it was company practice until the early '70s not to tell a person about his illness." Mr. Linke concludes: "John, looking at this company and its statements from a general public point of view, I can easily see why we have members of Congress calling us liars."

Documentary evidence concerning Manville's conduct with regard to the health and safety of its workers shows it was sordid; and, unfortunately, the conduct of the other principal manufacturers of asbestos products was not much better. Before Owens-Corning Fiberglas purchased the manufacturing facilities for Kaylo from Owens-Illinois, it knew that asbestos insulation workers were becoming ill from asbestosis.[16] In 1963, one of its executives wrote that asbestos in Kaylo "when breathed in the lungs causes asbestosis which often leads to lung cancer."[17] In 1969, the medical director of Owens-Corning Fiberglas was asked his opinions as to when the hazards of asbestos were first known. In a memorandum, he stated that the dangers have been "well known and well documented" since at least the early 1940s.[18]

When the companies were finally forced to place caution labels on their products in order to limit liability, a Pittsburgh Corning executive wrote to one of its lawyers in Texas, who, in 1969, was defending one of the first asbestos-related-disease lawsuits. The executive informed the lawyer that a decision had been made to place a caution label on Unibestos, a Pittsburgh Corning product, but that the company would delay placement of the caution label if the lawyer believed the decision to do so would prejudice the company's defense.[19]

Against this background of documents that will be introduced at trial, evidence concerning the medical and scientific literature seems to pale in comparison. In fact, the industrial physicians knew as much, if not more, about the hazards of asbestos-containing products than the rest of the scientific community. However, a plaintiff may present evidence—through a medical historian or a scientist who lived and worked through that period of time—that asbestos-related diseases have been recognized throughout the century. As stated by Dr. David Ozonoff, a professor of public health at Boston University and a medical historian:

The knowledge that exposure to asbestos could cause a serious chronic pulmonary disease called asbestosis was irrefutable and generally accepted by 1930. The suspicion that asbestos could cause cancer of the lung was first voiced in the 1930s, was considered a probable relationship by 1942, and was generally accepted by 1949. Epidemiological studies in the mid-1950s left little room for doubt. The index of suspicion relating asbestos exposure to the rare tumors called mesothelioma was high by 1953, and by 1960, the full extent of the relationship was being revealed. Exposure to asbestos in the course of work with asbestos-containing products posed the same hazards as expo-

MEDICOLEGAL ASPECTS: PLAINTIFF'S ATTORNEY

sures in the factory setting; The simple fact that "asbestos was asbestos" was evident from the medical record and confirmed by numerous case reports and studies showing harm to those who worked with asbestos products.[20]

Ironically, the asbestos companies usually present a medical historian to offer their defense that it was not until the publication of the Selikoff studies in 1964 that they either knew or should have known of the hazards of asbestos to insulation workers. The asbestos companies present evidence that the threshold limit value (TLV) for asbestos was established in 1946 as 5 million particles of asbestos per cubic foot of air, and this standard was not changed until 1969. Additionally, they contend that, prior to 1964, it was thought that exposures to asbestos below this TLV were safe and that insulation work usually produced concentrations of atmospheric asbestos less than 5 million particles per cubic foot of air.

The weakness in this defense is that several of the companies had actual knowledge that the TLV was not reliable.[21] In fact, the medical director of Johns-Manville, Dr. Kenneth Smith, testified that he was aware in the late 1940s and early 1950s that insulation workers were developing asbestosis.[22] Indeed, insulation workers were filing workers' compensation claims against the companies throughout the 1950s and 1960s, and these companies included Fibreboard, Owens-Corning, and Armstrong Contracting and Supply.[23] One corporate executive, in reviewing the number of workers' compensation claims filed by insulators, wrote in 1962 that the list of claims was "rather imposing."[24] Although the state-of-the-art expert for the manufacturers may be able to construct a defense solely with reference to the medical literature, a review of the corporate documents reveals not only that the companies should have known of the hazards, but that they did know that asbestos was causing disease in the workers who were using their products.

Not only must the plaintiff prove that the manufacturers knew or should have known about the hazards of asbestos, the plaintiff must demonstrate that he or she breathed asbestos fibers liberated from the use of one or more of the manufacturers' products. Since exposures to asbestos may have occurred decades earlier, recollection of the use of a specific product by name is extremely difficult. Plaintiffs have developed evidence concerning the market share of particular manufacturers over time, but, unlike the DES litigation, market share liability usually is unavailable in asbestos cases. However, evidence that a particular manufacturer sold its products to a specific shipyard or were placed on a specific job site is admissible in the form of sales records. A plaintiff may testify that she or he used a specific product over time, and this testimony may be buttressed by the testimony of co-workers that particular products were used. Court decisions concerning product identification evidence have usually required that, before a co-worker may testify as to the use of specific products, that co-worker must testify that the products were in the general vicinity of the plaintiff.[25]

# Asbestos Revisited

*Once considered safe enough to use in toothpaste,*
*this unique substance has intrigued people*
*for more than 2,000 years*

by James E. Alleman and Brooke T. Mossman

The future for asbestos appears downright grim. After two decades of horrendous headlines, this strange fiber probably represents the most feared contaminant on the earth. It is almost certainly the most expensive pollutant in terms of regulation and removal. This year alone, remediation efforts will cost several billion dollars—a staggering outlay, even for an era of enthusiastic environmental activity. Clearly, chaos has come to the world of asbestos. The magnitude of the crisis, however, clouds a crucial irony: the problem with asbestos would never have grown so bad had we not previously thought the material was so remarkably good.

The asbestos label actually applies to a family of silicate minerals, containing silicon and oxygen, that are notable for their fibrous structure [*see box on page 73*]. Seemingly blessed with useful attributes, such as softness, flexibility and resistance to fire, asbestos was once seen as the silk of a magic mineral world. Over the centuries, people have woven asbestos cloaks, tablecloths, theater curtains and flameproof suits for protection against fiery dangers. Asbestos insulation products not only saved energy but also shielded workers from potential burns. Brake shoes and clutch facings improved safety on race cars and school buses; efficient asbestos air filters were used in hospital ventilators, cigarette tips and military gas masks. Indeed, a poignant paradox of the asbestos story stems from its previous image as a guardian of human safety.

The first references to asbestos can be traced to several ancient philosophers. One of Aristotle's students, Theophrastus, probably deserves credit for the original citation in his classic text, *On Stones*, written around 300 B.C., in which he referred to an unnamed substance resembling rotten wood that, when doused with oil, would burn without being harmed. Over the next four centuries, various Greek and Roman scholars added successive insights on this unusual rock

and its ever expanding uses. In the first century the geographer Strabo identified the first Greek asbestos quarry on the island of Évvoia, where fibrous stone threads were combed and spun like wool to make an assortment of flame-resistant cloth items.

The Greek physician Dioscorides, in his first-century text *De Materia Medica*, reported that reusable handkerchiefs made of asbestos sold to theater patrons were cleansed and whitened with fire. Dioscorides' work also described an asbestos quarry on Mount Olympus in Cyprus and provided the first mention of the mineral's name: *amiantus*, meaning "undefiled," to reflect its resistance to fire. At least three other authors, including Plutarch, indicated that the eternal flames in the Acropolis were created with asbestos lamp wicks.

The informative account given in Pliny the Elder's first-century manuscript *Natural History* includes one of the most thorough discussions of the stone written in its early history. The mineral's current name can be traced to this text: Pliny referred to *asbestinon*, meaning "unquenchable." According to Pliny, asbestos was used in a number of woven products, from easy-to-clean tablecloths

## The Ups and Downs of Asbestos's Past

First mention of asbestos appeared in the Greek text *On Stones*, written by Theophrastus, one of Aristotle's students. Theophrastus referred to a substance that resembled rotten wood and burned (*right*) without being harmed when doused with oil.

Dioscorides' *De Materia Medica*, a first-century medical text, described reusable handkerchiefs made of asbestos that could be cleaned and whitened with fire.

Pliny the Elder referred to the substance *asbestinon* in his book *Natural History*.

300 B.C.E.    50 C.E.



DRAWING OF PIPE BY BRYAN CHRISTIE; ASBESTOS SAMPLE COURTESY OF MALCOLM ROSS; JASON GOLTZ (*photograph*)

*Asbestos Revisited*

and napkins to shrouds for deceased royalty placed in funeral pyres (the bodies would be incinerated by the heat even though the shrouds did not burn).

Over the next 1,000 years, asbestos continued to attract the attention of kings and chemists from western Europe to China. Even the Vatican laid claim to an asbestos burial gown reportedly found in an ancient Roman sarcophagus. Somewhere along the line, though, the fact that asbestos was a stone seems to have been forgotten.

A considerable amount of fantasy was attached to the possible source of the extraordinary fibers. Medieval alchemists started this trend with a rumor that asbestos grew as hair on fire-resistant salamanders, lending still another name, *salamandra,* to the stone. Works of alchemy frequently incorporated the imagery of an omnipotent salamander surrounded by flames. In the early 16th century France adopted this symbol as a royal emblem on flags, coins and fireplace mantles. (The French first took an interest in asbestos some 700 years earlier, when, according to popular legend, Emperor Charlemagne set an asbestos tablecloth on fire to intimidate his dinner guests.)

The salamander myth was just one of many. Lizard plumes and bird feathers were, for a time, each considered to be the source of asbestos. Attempts to define these fibers led to a bizarre system of nomenclature: several dozen names were eventually assigned to the different forms of asbestos, including "mountain leather," "incombustible linen," "rock floss" and "feathered alum."

Marco Polo serendipitously brought asbestos back to the realm of science. Writing in his diary after visiting a Chinese asbestos mining operation in the late 13th century, he completely debunked the salamander theory and pegged asbestos as a stone. Georgius Agricola, one of the founders of mineralogy, provided a critical boost to the scientific understanding of the substance in the 16th century with his publication *Textbook of Mineralogy.* After carefully reviewing and updating information about the various types of asbestos, its sources and uses, Agricola offered an unusual insight: one of the very few researchers to employ an asbestos taste test, he cautioned his readers that it might "sting the tongue a little."

## Asbestos Trade

In 1660, when England chartered the Royal Society, the world's scientific community was becoming increasingly fascinated by asbestos. The society published a series of eight reviews and letters on asbestos over the next 40 years. Later, in 1727, Franz E. Brückmann, a German mineralogist, wrote the first full volume on the topic; similar publications from two other leading scientists of the time, Martin F. Ledermüller and Torbern Bergman, soon followed. Ledermüller's publication was a cutting-edge treatise, depicting each of the known types of fibers with detailed colored engravings.

The range of commercial applications grew with each new publication. Fireproof coats, shirts and sleeve ruffles joined the original group of cloth items; there was also talk of making an indestructible "Book of Eternity," printed with gold on asbestos paper. Credit for another use belongs to a young inventor, Benjamin Franklin. While still a teenager, he carried a small purse woven from asbestos fiber, allegedly hoping that its contents wouldn't burn a proverbial hole in his pocket. During Franklin's first trip to England in 1724, he sold the purse to the British Museum's eventual benefactor, Sir Hans Sloane. (The purse is now in the Natural History Museum's collection.)

Even a group of devious entrepreneurs managed to earn a lucrative living during the late 1700s and early 1800s by exploiting the properties of asbestos. The most successful of these scoundrels were at the same time the most unscrupulous, selling false artifacts to a gullible audience of religious patrons. Cloth and wood relics, presented as miraculous, fire-resistant remnants of Christ's robe or cross but actually made of asbestos, were among the most popular. In a somewhat more innocent practice, a band of traveling stuntmen used fireproof asbestos gloves and capes to mystify audiences during their fiery shows. Another group, known as the Human Salamanders, was particularly famous for roasting handheld steaks while standing inside a bonfire.

In the 1820s a prominent Italian scientist converted this daredevil trick into the first truly successful asbestos business. Giovanni Aldini's ready-to-wear line of fireproof apparel, designed specifically for urban firemen, drew rave reviews and rapidly attracted clients from Paris to Geneva. Shortly thereafter, asbestos proscenium curtains began to



Vestal virgins (*left*) guarded the eternal flame at the shrine of Vesta, goddess of the hearth; the lamp's wick was made of asbestos.

Around the year 800, Charlemagne threw an asbestos tablecloth into the fire and pulled it out again unharmed in an attempt to impress some of his dinner guests.



COURTESY OF THE BRITISH LIBRARY

The hairs of fire-resistant salamanders (*left*) were considered to be the source of asbestos fibers by some medieval alchemists.

Marco Polo visited an asbestos mine in China during the latter half of the 13th century. He concluded that asbestos was a stone, not the hair of a woolly lizard.

06/06/03 FRI 16:27 FAX 5045962861 MCGLINCHEY PRODUCTS/SEC Ø028

**ASBESTOS ROOFING**

**1828:** First known U.S. patent for asbestos, issued for insulating material in steam engines
**1834:** U.K. patent for use of asbestos in safes
**1853:** U.K. patent for asbestos in lubricants used for bearings

Roofing felt made of asbestos

SCIENTIFIC AMERICAN

**1859:** U.K. patent for asbestos-lined fireboxes
**1865:** U.K. patent for asbestos insulating material for electrical wires
**1868:** U.S. patent for roofing felt made of asbestos



SCIENTIFIC AMERICAN

**Asbestos used as insulating material**

Fireproof apparel and theater curtains began to appear across Europe in the early part of the 19th century.

Purse made of asbestos (*below*) went to England with Benjamin Franklin in 1724.

COURTESY OF THE NATURAL HISTORY MUSEUM, LONDON

Royal Society, founded in England in 1660, published some of the first scientific papers about asbestos in the journal *Philosophical Transactions.*

*Textbook of Mineralogy,* written by Georgius Agricola in the 16th century, included a lengthy description of the properties of asbestos and where it could be found in places such as Greece, India and Egypt.

appear, installed to enhance stage safety and credited with saving many lives in theater fires.

It was the steam engine, though, that made asbestos a superstar stone. These massive machines had been steadily pushed to their physical limits; further improvements in safety and efficiency awaited some breakthrough in technology. Asbestos alone tended to be too coarse and abrasive for the engine's moving parts. But mixed with rubber, it offered just the right combination, allowing workers to make more resilient internal components, such as steam gaskets and packings.

By the 1860s the use of asbestos had literally hit the roof. After dabbling in fireproof paint mixtures, a young New York building contractor, Henry Ward Johns, developed a flame-resistant tar paper tailor-made for an era all too frequently plagued by building fires. This roofing material, which blended asbestos fibers into a tar, burlap and manila paper sandwich, paved the way for an immense industry in asbestos-based construction products.

Mixtures of asbestos and cement were first used in building materials shortly after the turn of the century, beginning with a lightweight, high-strength construction panel invented by an Austrian engineer, Ludwig Hatschek. Once again, because of the intense concern about fire protection, Hatschek's invention created an overnight sensation. Other workers soon derived several related products from Hatschek's basic formula, including synthetic slate roof shingles, corrugated wall and roof panels, and decorative wall and ceiling moldings.

Dozens of products introduced in the first half of this century incorporated asbestos. Fireproof ships were constructed out of boards of asbestos and cement.

Blends of plastic and asbestos were used in buttons, telephones and electrical panels. Indeed, from its start, the plastics industry relied on the combination of plastic and asbestos; the fibers strengthened the mix, reduced weight and improved thermal resistance. Even after more advanced polymer materials began to dominate the market, asbestos remained an important binder and strengthening agent. Vinyl-asbestos tile, for instance, became a mainstay of the flooring industry. To this day, automobile brake shoes that contain asbestos are sold in repair shops around the country by mechanics unconvinced that a perfect replacement has been found.

### Asbestos Man

By 1939 the public's perception of asbestos could hardly have been more positive. That year the New York World's Fair included a prominent display from the company Johns-Manville that proudly celebrated the mineral's "service to humanity." A giant Asbestos Man greeted visitors to the company's pavilion and offered a thorough indoctrination about the extraordinary traits of asbestos. The fair itself was literally draped with asbestos, from rooftop coverings to underground pipelines.

After this wave of popularity just before World War II, the demand for asbestos was on the verge of surpassing the global supply. Lacking adequate domestic reserves, the world's military superpowers found themselves heavily reliant on foreign imports. The Germans attempted to amass an adequate stockpile, covertly shipping supplies from South Africa. For a time, the Allies feared that Germany had devised a chemical substitute, although subsequent top-secret Central Intelligence Agency studies disproved these rumors.

*Asbestos Revisited*



**1884:** U.K. patent for asbestos construction boards
**1885:** U.K. patent for asbestos membranes used to filter substances such as juices

The Indiana State Capitol (*left*) was mentioned in an 1894 advertising booklet for uses of asbestos entitled "Heat Insulation and Fire Protection in Prominent Buildings."

...ertisement for ...s from the 1870s

In this country, foreign sources of asbestos—such as the exchange program ...t up between the U.S. and the Soviet ...nion by the American entrepreneur ...rmand Hammer and the Soviet leader ...ladimir Lenin—were considered dangerously vulnerable. While Canadian ...ining operations tried valiantly to meet ...merican demands, the government imposed severe nationwide restrictions on ...nessential applications. Several hundred tons had to be supplied every day

for uses ranging from ships' engines to auto parts for army jeeps. Parachute flares, bazooka shells and torpedoes all carried asbestos; battlefield medics even used it as an easily sterilized surgical dressing.

The global boom in construction after World War II triggered the next, and probably last, asbestos rush. Structural engineers clearly valued the strength, durability and fireproof nature of asbestos-cement products and liberally

worked them into their designs. Highrise buildings became a reality in part because of an innovative spray-on asbestos coating that protected steel structures against fire-induced buckling.

The unusual properties of asbestos led to an absolutely startling range of uses. The U.S. Postal Service had it woven into fireproof mailbags. Fruit juice, wine and sugar producers purified their goods with asbestos filters. Heart surgeons used it for thread, and a toothpaste was

## What Is Asbestos?

...ix distinct types of asbestos have been identified: actinolite, ...amosite, anthophyllite, crocidolite, tremolite and chrysotile. ...contain long chains of silicon and oxygen that give rise to the ...rous nature of the mineral. Yet each is decidedly different in physical and chemical properties, depending on the other components of the ...ck, such as calcium, magnesium or iron.

The fireproof threads of asbestos are stronger ...an steel and quite resilient, making the stone ...pealing for a wide range of industrial applications. Yet the strength and resilience of asbestos ...o make it dangerous to human health. Asbestos fibers can penetrate bodily tissue, particularly the lungs, eventually causing tumors to ...velop.

The first five versions listed above (the so-called ...phibolic versions) are by far the strongest and ...fest—thus making them the ...st dangerous. The two most ...mmon amphibolic types, amosite and crocidolite (often referred ...s "brown" and "blue" asbestos, ...pectively), originate in remote ...ith African mines and were ...e mixed with insulation and ...ent until regulations were enacted prohibiting the use of amphibolic asbestos. The remaining ...hibolic versions—anthophyllite, tremolite and actinolite—were never commercially significant.

The sixth type of asbestos, chrysotile, once accounted for more than 95 percent of the asbestos used worldwide. Chrysotile differs significantly in texture, composition and behavior from the other forms of the mineral. Its crystal structure is snakelike (hence its alternate name, "serpentine"), and it is noticeably softer and more flexible than the other kinds. Because chrysotile is softer and can be broken down by the body more easily than the other forms, it does not damage tissue as extensively as the five amphibolic varieties.

An estimated 20 percent of buildings in the U.S. still contain products such as shingles, cement pipes and insulation made from chrysotile asbestos. Yet well-maintained asbestos in buildings will not spontaneously shed fibers into the air. Instead decay, renovation or demolition of the structures can lead to the release of fibers. Furthermore, most studies indicate that airborne levels of asbestos in buildings—even those in which the original asbestos has been disturbed—are significantly lower than current health standards set by the U.S. government to protect asbestos workers.

—*J.E.A. and B.T.M.*


CHRYSOTILE


CROCIDOLITE


AMOSITE

*...estos Revisited*



Telephones and various other household items were fabricated from a blend of asbestos and plastic.

Automobile brake shoes were made of asbestos.

Asbestos Industry Regulations were passed in England in 1931 to address concerns that exposure to asbestos led to lung damage, particularly among textile factory workers.

Lady Asbestos, from an early 20th-century advertising booklet

Asbestos Man (right), from 1939 World's Fair

made with its fibers. Modeling clays and artificial snow contained asbestos. Hollywood even gave the mineral a couple of bit parts, in the Wicked Witch of the West's burning broomstick in *The Wizard of Oz* and the man-made spider webs that hung across the reanimated ancient Egyptian's cave in *The Mummy*.

### Escalating Health Concerns

By the time the U.S. Environmental Protection Agency opened its doors in 1970, the commercial world of asbestos had expanded into thousands of products. Annual use in this country continued to climb for another three years, hitting an all-time high in 1973 of nearly a million tons. But shortly thereafter, the history of asbestos took a negative turn, driven by escalating concerns about human health.

Problems stemming from the inhalation of exceedingly high levels of asbestos in milling and manufacturing plants had actually been observed since the turn of the century. Reports of fibrotic lung damage, known as asbestosis, in Britain's dusty textile factories led to that country's enactment of the Asbestos Industry Regulations of 1931. Over the next several decades, however, the topic drew relatively little attention from the emerging industrial health field, despite the fact that medical investigators had also uncovered a worrisome link between asbestos and lung cancer, especially in smokers.

This mood started to change during the mid-1960s as it became apparent that even low levels of asbestos posed significant health hazards; this finding implied that much larger numbers of people, including thousands of World War II–era ship insulators, might be at risk

for lung damage. Disturbing results from around the world fingered the class of asbestos known as amphiboles as the principal culprits for inducing mesothelioma, a tumor found in the chest or gut. In response to these revelations, most industrial countries imposed regulations that limited exposure to just the amphiboles. But faced with increasing pressure from labor unions and ominous projections of a million-plus victims, the U.S. government chose to regulate the asbestos family as a whole.

Although the EPA's ban on all forms of asbestos was lifted in 1991, the political and legal climate for asbestos use in the U.S. is still troubled. Few people can recall this mineral's prior glory, and fewer still would ever dream of continuing its widespread use. Past generations may have considered asbestos to be an invaluable resource, but the present concern about its possible risk to human health obscures these memories.

To suggest that asbestos might still hold any redeeming qualities appears foolhardy. To qualify the mineral as a vital commodity of strategic global significance seems completely ridiculous. And yet this is precisely the case. The type of asbestos known as chrysotile (which is softer and less dangerous than the amphiboles), for example, remains an essential mineral for many crucial technologies, with the U.S. government holding military stockpiles to this day.

A prominent demonstration of this lingering importance can be found in the nation's space shuttle program. Each of the ship's solid-fuel boosters carries asbestos-impregnated rubber liners to protect the steel casings from the heat of takeoff. (The use of asbestos in aerospace applications began during the late 19th century, with the efforts to devel-

op a fireproof hot-air balloon. A replica of an early rocket, coated in asbestos to guard against catastrophic structural failure, can be seen today on the main floor of the Smithsonian Institution's Air and Space Museum, openly defiant of the current pressures to remove all asbestos from public areas.)

Asbestos also plays a vital role in the operation of the U.S. Navy's submarine forces. These underwater vessels could not operate without some means of self-contained oxygen production; fibrous mats woven out of asbestos represent a key component in the onboard electrolytic cells that split oxygen from water molecules.

Asbestos can also be found closer to home. At least 75 percent of the chlorine used today for bleach, cleansers and disinfectants comes from chemical industries whose manufacturing processes depend on asbestos products. In fact, the very water we drink might well have been processed with asbestos-treated chlorine as well as piped through an asbestos-cement conduit on its way to our houses. Enough of the asbestos-cement pipe has been used in all 50 states since 1930 to circle the earth eight times over and still run to the moon and back.

### A Rational Perspective

Admittedly, all these present-day applications (which rely mainly on the safer chrysotile form) do not require huge amounts of asbestos. Indeed, the consumption of asbestos in the U.S. has fallen by about 95 percent from the 1973 peak. Beyond our country's borders, though, many nations still consider chrysotile asbestos to be an important resource. In 1997 over two million tons of the substance will be processed

*Asbestos Revisited*

Wicked Witch of the West appeared in the 1939 movie *The Wizard of Oz* with a broom made of asbestos.

Postwar construction projects relied heavily on asbestos.



Wartime paraphernalia— including fireproof suits (*left*) and parachute flares— contained asbestos.

Health concerns began to surface in the U.S. during the 1960s, after studies revealed that low levels of asbestos exposure could be more dangerous than previously thought.

Asbestos use reached an all-time high in the U.S. in 1973.



Removal of asbestos (*above*) from schools, houses and public buildings has been ongoing.

The solid-fuel boosters on the space shuttle (*below*) are insulated with asbestos—one of many current applications of the mineral.

hroughout the world, mostly blended into asbestos-cement construction products for use in Asian, eastern European nd developing countries.

The public's view of asbestos will robably never return to its previous nthusiasm. Hindsight, however, suggests hat efforts to eradicate asbestos might ave been somewhat misjudged and misandled. The predicted rates of future ortality caused by both indoor and utdoor exposure to asbestos fiber now pear minuscule when compared with e risks associated with tobacco smoking and drug and alcohol abuse. The idely espoused and emotionally volae premise that "one fiber can kill" arably overstepped the bounds of scitific reality, triggering a purge of asstos from schools and other buildings

with dubious benefit in far too many instances.

Hoping to secure a rational perspective on the asbestos controversy, in 1988 the EPA joined Congress and a variety of concerned private institutions in asking a respected nonprofit organization, the Health Effects Institute, for an independent evaluation of the dilemma. The institute's report attempted to educate the public about the fallacies and economic consequences of rampant asbestos removal. In 1991 the American Medical Association published a second report that reached similar conclusions. These two documents emphasized that current contamination is extremely low compared with the unregulated workplace levels that originally gave rise to asbestos-related lung disease.

The global future for asbestos may hinge on supply as much as safety. Just as the ancient Greek asbestos mines eventually hit rock bottom, today's reserves are being depleted. Chemists have long searched for suitable substitutes, but a perfect solution has not yet been found. The original irony of asbestos has thus come full circle, to a present position where a substance so apparently evil could still be considered good, despite its tarnished image—quite fitting for this unquenchable stone.

---

**The Authors**

AMES E. ALLEMAN and BROOKE T. MOSS-
AN share an interest in the study of asbestos. Alan, a professor at Purdue University's School of il Engineering, pursues the practical applications l history of the mineral. Mossman, a professor at College of Medicine at the University of Vernt, investigates the medical effects of asbestos.

*Further Reading*

ASBESTOS: SCIENTIFIC DEVELOPMENTS AND IMPLICATIONS FOR PUBLIC POLICY. B. T. Mossman, J. Bignon, M. Corn, A. Seaton and J.B.L. Gee in *Science*, Vol. 247, pages 294–300; January 19, 1990.
ASBESTOS: A CHRONOLOGY OF ITS ORIGINS AND HEALTH EFFECTS. R. Murray in *British Journal of Industrial Medicine*, Vol. 47, No. 6, pages 361–365; June 1990.
THE SCHOOLROOM ASBESTOS ABATEMENT PROGRAM: A PUBLIC POLICY DEBACLE. M. Ross in *Environmental Geology*, Vol. 26, No. 3, pages 182–188; October 1995.



FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2003 MAY 29  P 12: 00

LORETTA G. WHYTE

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

C. ANN JONES AND                          *        CIVIL ACTION NO. 03-1010
THE REV. GEORGE A. JONES                  *
                                          *
VERSUS                                    *        SECTION: "K"
                                          *
MEYER'S AUTO PARTS, INC.,                 *
DAVID M. GOLDBERG AND                     *        MAG.:  5
MADELINE L. GOLDBERG, d/b/a               *
MEYER'S AUTO PARTS, INC.                  *
SEALING EQUIPMENT PRODUCTS                *
COMPANY, INC. (SEPCO), DANA               *
CORPORATION, Individually and as          *
Successor to VICTOR MANUFACTURING         *
AND GASKET CO., VOLKSWAGEN                 *
OF AMERICA, INC., HONEYWELL               *
INTERNATIONAL, INC. NISSAN                *
NORTH AMERICA, INC.,  BORG-               *
WARNER CORP., DAIMLER CHRYSLER,           *
GENERAL MOTORS CORPORATION                *
STANDARD MOTOR PARTS, INC.                *
FORM MOTOR COMPANY, EDISON                *
INTERNATIONAL, INC., HONDA                *
NORTH AMERICA, INC., TOYOTA               *
MOTOR NORTH AMERICA, INC.                 *
* * * * * * * * * * * * * * * * * * *     *



R E C E I V E D
JUN - 2 2003
S. R. BICKFORD

## MOTION AND INCORPORATED MEMORANDUM TO SEAL THE EXHIBITS

DATE OF ENTRY
JUN 0 2 2003

___ Fee _____
___ Process ____
_X_ Dktd _____
_✓_ CtRmDep _____
___ Doc.No. _____

NOW COME PLAINTIFFS, who move this Honorable Court for an Order to seal Exhibit C. The exhibit contains Social Security records and other personal information that cannot be redacted for purposes of plaintiffs' Motion to Remand. Accordingly, pursuant to the policy of the Judicial Conference of the United States and the E-Government Act of 2002, plaintiffs respectfully request that they be allowed to file Exhibit C under seal pursuant to this Court's directive.

Respectfully submitted,

MARTZELL & BICKFORD

SCOTT R. BICKFORD T.A. (1165)
SPENCER R. DOODY (27795)
TIFFANY G. CHASE (24343)
338 Lafayette Street
New Orleans, LA 70130
(504) 581-9065
(504) 581-7635 Fax

2

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing pleading has been served upon:

Avram C. Herman, Esq.
Herman & Herman
111 Veterans Blvd., Suite 1506
Metairie, LA 70005
**Counsel for Meyer's Auto Parts, Inc.**

Lynn Luker
Joyce M. Dombourian
Lynn Luker & Associates, L.L.C.
616 Girod Street
New Orleans, LA 70130
**Counsel for Sealing Equipment**

William F. Bologna
William F. Bologna & Associates
1515 Poydras Street, Suite 2323
New Orleans, LA 70112-3723
**Counsel for Daimler Chrysler Corporation**

Paul V. Cassisa, Sr.
Bernard Cassisa Elliott & Davis
1615 Metairie Road
Post Office Box 55490
Metairie, LA  70055-5490
**Counsel for General Motors Corporation and Reilly-Benton**

Kelly M. Rabalais
LeBlanc, Tusa & Butler, L.L.C.
2121 Airline Drive
Suite 405
Metairie, LA  70001
**Counsel for Ford Motor Company**

3

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| C. ANN JONES AND | * | CIVIL ACTION NO. 03-1010 |
| THE REV. GEORGE A. JONES | * | |
| | * | |
| VERSUS | * | SECTION: "K" |
| | * | |
| MEYER'S AUTO PARTS, INC., | * | |
| DAVID M. GOLDBERG AND | * | MAG.: 5 |
| MADELINE L. GOLDBERG, d/b/a | * | |
| MEYER'S AUTO PARTS, INC. | * | |
| SEALING EQUIPMENT PRODUCTS | * | |
| COMPANY, INC. (SEPCO), DANA | * | |
| CORPORATION, Individually and as | * | |
| Successor to VICTOR MANUFACTURING | * | |
| AND GASKET CO., VOLKSWAGEN | * | |
| OF AMERICA, INC., HONEYWELL | * | |
| INTERNATIONAL, INC. NISSAN | * | |
| NORTH AMERICA, INC.,  BORG- | * | |
| WARNER CORP., DAIMLER CHRYSLER, | * | |
| GENERAL MOTORS CORPORATION | * | |
| STANDARD MOTOR PARTS, INC. | * | |
| FORM MOTOR COMPANY, EDISON | * | |
| INTERNATIONAL, INC., HONDA | * | |
| NORTH AMERICA, INC., TOYOTA | * | |
| MOTOR NORTH AMERICA, INC. | * | |

* * * * * * * * * * * * * * * * * *

**O R D E R**

Considering the foregoing:

IT IS ORDERED that plaintiffs be, and they are hereby permitted to file under seal

Exhibit C, which is appended to the enclosed Supplemental Memorandum in Support of Motion

to Remand.

New Orleans, Louisiana, this _____ day of _____, 2003.

JUDGE, U.S.D.C., E.D. La.

FROM: 504-589-7654 USDC-EDLA    9-581-7635    PAGE: 1 OF 6    C    ROL: #125773

**FILE**
G. Jones

# United States District Court

# Eastern District of Louisiana



## Notice of Orders or Judgments
### Fed. R. Civ. P. 77(d)
### Fed. R. Crim. P. 49(c)

Date:

To:    06/02/03

**RECEIVED**
JUN - 2 2003
S. R. BICKFORD

Scott R. Bickford
Martzell & Bickford
338 Lafayette St.
New Orleans, LA  70130

Re: Case Number:                    Document Number:

2:03-cv-01010                    20

If this fax cannot be delivered as addressed,
please call (504) 589-7654.

Number of pages including cover sheet:

**Please visit our Web site at www.laed.uscourts.gov**
Motion dates are now available on our web site.