MDL 875

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

SEP 1 6 2003

FILED
CLERK'S OFFICE

1  **James E. McCandlish OSB No. 75246**
   **Wm. Keith Dozier, Jr. OSB No. 01247**
2  Griffin and McCandlish
   111 SW Naito Parkway, 2nd Floor
3  Portland, OR  97204
   Telephone:  503-224-2349
4  Facsimile:  503-224-3634
   E-mail:  j@mccandlish.com
5  E-mail:  kdozier@mccandlish.com

6

7       Of Attorneys for Plaintiffs

8

9               BEFORE THE JUDICIAL PANEL ON
                MULTI-DISTRICT LITIGATION

10

11  IN RE ASBESTOS PRODUCTS LIABILITY      )    MDL Docket No. 875
    LITIGATION (No. VI, Schedule CTO-227 - Tag )
12  Along Cases)                           )    CTO-227 Oregon District Court, Div.
                                           )    1, Civil Action No. 03-8
13  ─────────────────────────────         )
                                           )    ***Roy Jones v. Railko Limited, et.al.***
14                                         )
                                           )
15                                         )

16          CONSOLIDATED NOTICE OF OPPOSITION AND MOTION
17          TO VACATE THE CONDITIONAL TRANSFER ORDER

18          Plaintiff below, Roy Jones ("Plaintiff"), gives Notice pursuant to Rule 7.4(c) of

19  the Rules of Procedure of the Judicial Panel on Multidistrict Litigation ("MDL Rule" and "MDL

20  Panel" as appropriate ) of his Opposition to the Conditional Transfer Order.  Plaintiff moves

21  herein that his Notice of Opposition be consolidated with his Motion to Vacate pursuant to MDL

22  Rule 7.4(d)  to Vacate the Conditional Transfer Order entered under Schedule CTO-227 - Tag

23  Along Cases, as it specifically applies to *Roy Jones v. Railko Limited, et.al.* Oregon District

24  Court No. 03-8.  Plaintiff relies on the attached brief, together with exhibits and the declaration

25  of Plaintiff's counsel in support of the Motion to Vacate.

26

**Griffin McCandlish**
111 SW Naito Parkway - Second Floor
Portland, OR 97204
TEL: (503) 224-2348  FAX: (503) 224-3634

**OFFICIAL FILE COPY**  IMAGED SEP 16 '03

1    DATED this _15th_ day of September, 2003.

2                              Respectfully submitted,

3

4                              James E. McCandlish
                               Wm. Keith Dozier, Jr.
5                              GRIFFIN & McCANDLISH
                               111 S.W. Naito Parkway, 2nd Floor
6                              Portland, OR 97204-3500
                               Tel: 503.224.2349
7                              Of Attorneys for Plaintiff

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Page 2 -** CONSOLIDATED NOTICE OF OPPOSITION AND
MOTION TO VACATE THE CONDITIONAL
TRANSFER ORDER

**Griffin McCandlish**
111 SW Naito Parkway - Second Floor
Portland, OR 97204
TEL: (503) 224-2348  FAX: (503) 224-3634

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

SEP 1 6 2003

FILED
CLERK'S OFFICE

1    **James E. McCandlish OSB No. 75246**
     Griffin and McCandlish
2    111 SW Naito Parkway - 2nd Floor
     Portland, OR 97204
3    Telephone: 503-224-2349
     Facsimile: 503-224-3634
4    E-mail: j@mccandlish.com

5          Of Attorneys for Plaintiffs

6

7

8

9                    BEFORE THE JUDICIAL PANEL ON
                       MULTI-DISTRICT LITIGATION
10

11   IN RE ASBESTOS PRODUCTS LIABILITY          )    MDL Docket No. 875
     LITIGATION (No. VI, Schedule CTO-227 - Tag )
12   Along Cases)                                )    CTO-227 Oregon District Court, Div.
                                                 )    1, Civil Action No. 03-8
13   _____ )
                                                 )    ***Roy Jones v. Railko Limited, et al.***
14                                               )
                                                 )
15                                               )
                                                 )
16                                               )

17   BRIEF IN SUPPORT OF OPPOSITION TO THE  CONDITIONAL TRANSFER ORDER

18

19          I. *Summary*.  Defendant is asking this court to extend MDL jurisdiction into a

20   new arena unrelated to the asbestos exposures through the 1960's, which resulted in a flood of

21   lawsuits in the 1970's for physical injuries suffered by workers.  Defendant deliberately hid the

22   hazardous nature of the marine ACM parts in the late 1990's, decades  after manufacturers and

23   distributors were aware of the dangers and the resulting notice requirements.   The only common

24   fact is that "ACM" is involved.  But the nature of the Oregon litigation is such that any hazardous

25   product, vinyl chloride for example, could be substituted for ACM.  Concealing the hazardous

26   nature of such substances at the expense of downstream users is outrageous.  The only legitimate

RECEIVED
CLERK'S OFFICE
SEP 16  A 10:49
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

**Griffin McCandlish**
111 SW Naito Parkway - Second Floor
Portland, OR 97204
TEL: (503) 224-2348  FAX: (503) 224-3634

1    concern from plaintiff's perspective to offset the increase in expense and delay attendant with

2    becoming an add-on in Pennsylvania is the punitive damages potential of the case.   Oregon law

3    just took the starch out of this argument by adopting the single digit ratio limitation as discussed

4    below.  It is for the panel to decide in balancing interests whether to disrupt the Oregon litigation.

5           II. *Argument*

6                   A. **Reasoning behind MDL  Docket No. 875**.  The panel consolidated

7    the pre-trial proceedings of the myriad asbestos cases nationwide because these cases "involve

8    common questions of fact relating to injuries or wrongful death allegedly caused by exposure to

9    asbestos or asbestos containing products".  *In re Asbestos Products Liability Litigation*, No. VI,

10   771 F.Supp. 415, 417 (1991).  The defining commonality of these cases is described later in the

11   opinion by language quoted from the Judicial Conference Ad Hoc Committee on Asbestos

12   Litigation (March, 1991):

13                        "It is a tale of danger known in the 1930s, exposure inflicted upon
                          millions of Americans in the 1940s and 1950s, injuries that began
14                        to take their toll in the 1960s, and a flood of lawsuits beginning in
                          the 1970's.  On the basis of past and current filing data, and
15                        because of a latency period that may last as long as 40 years for
                          some asbestos related diseases, a continuing stream of claims can
16                        be expected".  *Id.* at 418.

17   Mr. Jones' complaint does not fall within this time frame, nor within the "mass tort disasters"

18   context the opinion later quotes (*Id.* at 419).  The court found that handling the increasingly

19   numerous cases individually was leading to slow dispositions, high costs and variable outcomes.

20   *Id.* at 419-420.

21                        "The large number of asbestos lawsuits pending throughout the
                          country threatens to overwhelm the courts and deprive all litigants,
22                        in asbestos as well as other civil cases, of meaningful resolution of
                          their claims".  *Id.* at 419.
23
     Railko's attempt to drag Jones into the nearly 100,000 case MDL litigation stands this argument
24
     on its head.  Railko's effort is an attempt to derail Jones' lawsuit by burying it in pre-trial
25
     intricacies that have nothing to do with the remaining pre-trial issues in his Oregon case.
26

**Page 2** - BRIEF IN SUPPORT OF CONSOLIDATED NOTICE
        OF OPPOSITION AND MOTION TO VACATE THE
        CONDITIONAL TRANSFER ORDER

**Griffin McCandlish**
111 SW Naito Parkway - Second Floor
Portland, OR 97204
TEL: (503) 224-2348  FAX: (503) 224-3634

1  B. **Standards for Transfer**.

2  1. **Definition of "tag-along"**.  MDL Rule 1.1 defines a "tag-along

3  action" as "a civil action pending in a district court and involving common questions of fact with

4  actions previously transferred under Section 1407."  The only common question of fact known to

5  plaintiff is that asbestos is involved.  However, asbestos is not involved *causally* except in as

6  much as it is a regulated hazard.  That regulated hazard could be have been any regulated

7  substance that was unsafe to handle without following specific safety protocols.

8  2. **Case law**.  Plaintiff could find no transfer to the MDL

9  proceeding that remotely stretches the concept to the facts of this case.  The Panel did allow

10  transfer to the MDL of a legal negligence case underlying an underlying asbestos litigation case.

11  *Huber et. al. v. Davis, et.al.* Docket No. 87, C.A. No. 2:02-304 (U.S.Dis. Ct, W.D. Pa., August

12  9, 2002). Huber had argued that his claims did not involve claims of asbestos related injuries.

13  More specifically, Huber was suing his lawyer for failing to represent him adequately in "state

14  court asbestos personal injury litigation".  The court correctly saw that trial of a legal negligence

15  case involves proving the underlying case as a matter of causation.  The pretrial issues are

16  essentially the same as the underlying traditional asbestos injury claim.

17  There are no common questions of fact known to plaintiff that the experience and

18  specialization of the eastern district of Pennsylvania assists in resolving.  The remaining

19  discovery has nothing to do with that which is occurring in Pennsylvania who until otherwise

20  enlightened, sees no basis in fact for a commonality finding.  The remaining discovery matters

21  are unique to the cover up theory of this case.

22  3. **Punitive Damages**.  The Panel has retained jurisdiction in other cases over

23  punitive damages after remanding a case because of the potential for depleting already

24  insufficient resources that would otherwise be available to injured plaintiffs.  That concern has

25  been vastly tempered by *Bocci v. Key Pharmaceuticals, Inc. et. al.,* (September 10, 2003), a copy

26  of which is attached as Ex. 2, on remand from the United States Supreme Court, 538 Us ____,

**Page 3 -** BRIEF IN SUPPORT OF CONSOLIDATED NOTICE
OF OPPOSITION AND MOTION TO VACATE THE
CONDITIONAL TRANSFER ORDER

**Griffin McCandlish**
111 SW Naito Parkway - Second Floor
Portland, OR 97204
TEL: (503) 224-2348  FAX: (503) 224-3634

1   123 S Ct 1781, 155 L Ed 2d 662 (2003).  An extraordinary case in Oregon (let alone the United

2   States) cannot escape the single digit ratio between actual damages and punitive damages as an

3   absolute ceiling.

4              DATED this ___ 15 ___ day of September, 2003.

5                                    Respectfully submitted,

6                                    _____

7                                    James E. McCandlish
                                     GRIFFIN & McCANDLISH
                                     111 S.W. Naito Parkway, 2nd Floor
8                                    Portland, OR 97204-3500
                                     Tel: 503.224.2349
9                                    Of Attorneys for Plaintiff

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Page 4 -** BRIEF IN SUPPORT OF CONSOLIDATED NOTICE
OF OPPOSITION AND MOTION TO VACATE THE
CONDITIONAL TRANSFER ORDER

**Griffin McCandlish**
111 SW Naito Parkway - Second Floor
Portland, OR 97204
TEL: (503) 224-2348  FAX: (503) 224-3634

1 **James E. McCandlish OSB No. 75246**
   Griffin and McCandlish
2  111 SW Naito Parkway - 2nd Floor
   Portland, OR  97204
3  Telephone:  503-224-2349
   Facsimile:  503-224-3634
4  E-mail:  j@mccandlish.com

5     Of Attorneys for Plaintiffs

6

7

8

9              BEFORE THE JUDICIAL PANEL ON
               MULTI-DISTRICT LITIGATION

10

11  IN RE ASBESTOS PRODUCTS LIABILITY    )   MDL Docket No. 875
    LITIGATION (No. VI, Schedule CTO-227 - Tag )
12  Along Cases)                          )   CTO-227 Oregon District Court, Div.
                                          )   1, Civil Action No. 03-8
13  ──────────────────────────────        )
                                          )   *Roy Jones v. Railko Limited, et.al.*
14                                         )
                                          )
15                                         )
                                          )
16

17     DECLARATION OF JAMES E. McCANDLISH  IN SUPPORT OF
          OPPOSITION TO THE CONDITIONAL TRANSFER ORDER

18     I, James E. McCandlish, do declare:

19        1. My firm represents Roy Jones, in the matter of *Jones v. Railko Limited and*

20  *Keystone Shipping Co.*, Oregon District Court Civil Case No. 6-003-00008-AA, assigned to

21  Judge Ann Aiken.   This case was filed on January 3, 2003.

22        2. On or about July 21, 2001, my firm substituted for a prior law firm that had

23  been representing Mr. Jones in a state court action based upon the same June, 1999, machining

24  work.  Jones machined a set of Railko stern-tube billets to replace the bearings being pulled from

25  the SS Denali's in dry dock at Portland, Oregon.  That state court action, *Jones v. Alaska Tanker*

26

SEP 1 6 2003

FILED
CLERK'S OFFICE

**Page 1** - DECLARATION OF JAMES E. McCANDLISH  IN
            SUPPORT OF OPPOSITION TO THE
            CONDITIONAL TRANSFER ORDER

**Griffin McCandlish**
111 SW Naito Parkway - Second Floor
Portland, OR 97204
TEL: (503) 224-2348  FAX: (503) 224-3634

1   *Co., Cascade General Inc. and Simplex Turmar Inc.* (Multnomah County Circuit Court Case No.

2   010605669 was originally filed by prior plaintiff's counsel in June, 2001.   The case was set for

3   trial on January 6, 2003, before state court Judge Beckman in Portland.  On the first day of trial,

4   the court granted plaintiff's motion to add Railko as a defendant based on newly discovered

5   evidence, and reset the case. Recently, the state court over plaintiff's objection dismissed Railko

6   without prejudice from the state court lawsuit on the technical ground that the federal action was

7   filed a few days before the addition of Railko occurred in the state court case.

8           3. Prior to representing Jones in the state court matter, my firm had previously

9   represented Jones' employer, Tom Weisner, the owner and sole proprietor of Liberty Ironworks

10  in *Weisner v. Cascade General Corp. and Alaska Tanker Corp.*, Multnomah County Circuit

11  Court Civil Case No. 0007-07122. This case was settled prior to representing Mr. Jones. My

12  firm had substituted for previous counsel on or about February 25, 2002. The original complaint

13  was filed in July, 2000.

14          4. The current status of the litigants in both Jones' state and federal litigation is as

15  follows:

16              a. State Court: the recent dismissal without prejudice of Railko leaves

17  Alaska Tanker ("ATC") as the only contested defendant.  Both Simplex-Turmar and Cascade

18  General have settled, having each agreed to a Covenant Not to Enforce Judgment and Separate

19  Loan Agreement.  However, both of these defendants are participating at trial under separate

20  Mary Carter Agreements.

21              b. Federal Court: the court just cancelled a Rule 16 conference in

22  deference to the MDL conditional transfer order.

23          5. Railko shipped the billets in three separate crates to an intermediary on behalf

24  of ATC, which then had them stored at Cascade General on behalf of ATC.  Cascade General is

25  a ship repair company with dock space in Portland that had the dry dock contract to repair the SS

26  Denali, a large ocean going oil tanker operated by ATC.  The contract between ATC and Cascade

**Page 2 -** DECLARATION OF JAMES E. McCANDLISH IN
SUPPORT OF OPPOSITION TO THE
CONDITIONAL TRANSFER ORDER

**Griffin McCandlish**
111 SW Naito Parkway - Second Floor
Portland, OR 97204
TEL: (503) 224-2348  FAX: (503) 224-3634

1    General set the lost profit and cost of drydock together ("demurrage") at $65,000 per day.

2           6. Discovery in the state court case led me to conclude that Railko deliberately

3    failed to include the required ACM labels and warnings in the crates shipped from England to

4    Portland. The motive for doing this was financial. The consequence is that the end users will

5    likely fail to take needed precautions to protect themselves from exposure to air born asbestos in

6    the several day grinding job. The decision to replace the stern tube bearings in a large vessel

7    frequently cannot be made until the ship is out of the water on dry land. At that point, any delay

8    is critical financially because of the demurrage. As with the June, 1999, drydocking in question,

9    finding an OHSA compliant machine shop available to machine the bearings for a proper fit in

10   the particular ship on a rush basis is a real problem. One must either incur the delay with the

11   additional costs attendant because of increased demurrage and increased costs due to OHSA

12   compliance on the one hand; or trick an unsuspecting machinist into doing the work on a "down

13   and dirty" basis. The machining of the new bearings at the dry dock process is supervised by a

14   Railko representative, either an employee traveling directly from England or as in the 6/99 job, a

15   Railko trained independent contractor hired by Railko's North American representative.

16          7. Just before trial of the state court case, I observed an unrelated set of Railko

17   WA80H billets stored in the original crates at Cascade General for a different customer to see

18   whether warnings and labels accompanied the crates. There were none. This same process was

19   just repeated on July 22, 2003, with a wholly different set of Railko crates being stored at Alaska

20   Tanker. None of the crates or billets had ACM labels or warnings regarding the WA80H billets,

21   which are approximately 20-25% crysolite asbestos. The intentional nature of Railko's conduct

22   is cemented by a 1997 Fax from the Railko employee involved in duping another small Oregon

23   machine shop into doing the work without OSHA mandated safeguards. This job involved the

24   installation of the stern tube bearings that Jones was in fact working on replacing in the Denali.

25   In that memo, the Railko employee states that he had to go to Woodburn, which is thirty five

26   miles away from the Portland docks to get the billets machined "because of the asbestos

**Page 3 -** DECLARATION OF JAMES E. McCANDLISH IN
SUPPORT OF OPPOSITION TO THE
CONDITIONAL TRANSFER ORDER

**Griffin McCandlish**
111 SW Naito Parkway - Second Floor
Portland, OR 97204
TEL: (503) 224-2348 FAX: (503) 224-3634

1   problem". That memo is attached as Ex. 1

2            8.   In the course of the *Weisner* and *Jones* state court cases, at least fifteen

3   depositions have been taken.  Additionally, plaintiff had subpoenaed or otherwise made

4   arrangements for at least 3 additional Oregon based witnesses to testify at the 1/6/03 state court

5   trial. In the course of the Weisner and Jones state court cases, several thousand pages of

6   documents have been exchanged in the discovery process.  Discovery has just begun between

7   Plaintiff and Railko..  Several depositions, perhaps in England or by telephone, remain to be

8   conducted.  The remaining federal defendant, Keystone Shipping, has just produced documents,

9   and a small number of depositions may be necessary.  In short, a major share of case discovery

10  has already been accomplished.

11           9.   Roy Jones has a separate claim with separate counsel for asbestos related

12  disease for exposures incurred in the railroad and ship yards suffered decades ago.  The damages

13  sought in the federal complaint relate principally to the coverup and fraud.  Part of that damage is

14  the fear that the Railko caused exposure will exacerbate the already documented and unrelated

15  lung damage extant.  Plaintiff did not plead and does not intend to try to establish that the June,

16  1999, exposure has actually negatively impacted the health of his lungs.  Rather, the only burden

17  accepted by Plaintiff is to prove that his fear is reasonable.

18           10.  I have searched for evidence that Railko has ever been involved in asbestos

19  litigation and have found none.  I have asked counsel for Railko whether that is in fact correct,

20  and have not yet heard the answer.

21           11.  My firm does not do asbestos litigation work.

22           12.  The convenience of the witnesses is served by staying in Oregon.

23           13.  I declare under penalty of the perjury laws of the United States and the State

24  of Oregon that the foregoing is true and correct.

25           DATED this  1 5   day of September, 2003.

26

**Page 4 -** DECLARATION OF JAMES E. McCANDLISH  IN
SUPPORT OF OPPOSITION TO THE
CONDITIONAL TRANSFER ORDER

**Griffin McCandlish**
111 SW Naito Parkway - Second Floor
Portland, OR 97204
TEL: (503) 224-2348  FAX: (503) 224-3634

1

James E. McCandlish
GRIFFIN & McCANDLISH
111 S.W. Naito Parkway, 2nd Floor
Portland, OR 97204-3500
Tel: 503.224.2349
Of Attorneys for Plaintiff

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Page 5** - DECLARATION OF JAMES E. McCANDLISH  IN
SUPPORT OF OPPOSITION TO THE
CONDITIONAL TRANSFER ORDER

**Griffin McCandlish**
111 SW Naito Parkway - Second Floor
Portland, OR 97204
TEL: (503) 224-2348  FAX: (503) 224-3634

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

SEP 1 6 2003

FILED
CLERK'S OFFICE

# CERTIFICATE OF SERVICE

I certify that on the 15th day of September, 2003, I caused the foregoing Plaintiff's Consolidated Notice of Opposition and Motion to Vacate the Conditional Transfer Order; Brief in Support of Consolidated Notice of Opposition and Motion to Vacate the Conditional Transfer Order; and the Declaration of James E. McCandlish in Support of Opposition to the Conditional Transfer Order along with the enclosed Exhibits, to be served on each of the Required Panel Service List Parties listed below:

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH. 44114

Daniel F. Knox
Schwabe, Williamson & Wyatt
Pacwest Center
1211 SW 5th Avenue
Suites 1600-1900
Portland, OR. 97204-3795

Richard D. Schuster
Vorys, Sater, Seymour & Pease
52 East Gay Street
PO Box 1008
Columbus, OH. 43216

Edward J. Cass
Gallager Sharp Fulton & Norman
Bulkley Building
7th Floor
1501 Euclid Avenue
Cleveland, OH. 44115

Reginald S. Kramer
Oldham & Downing
195 South Main Street
Suite 300
Akron, OH. 44308-1314

Neil Selman
Selman Breitman & Burgess
11766 Wilshire Boulevard
Sixth Floor
Los Angeles, CA. 90025

Adam M. Chud
Shea & Gardner
1800 Massachusetts Avenue, NW
Washington, D.C. 20036

David C. Landin
Hunton & Williams
Riverfront Plaza
East Tower
951 East Byrd Street
Richmond, VA. 23219

Robert N. Spinelli
Kelley Jasons McGuire &Spinelli LLP
Centre Square West
15th Floor
Philadelphia, PA. 19102

David A. Damico
Burns White & Hickton
Fifth Avenue Place, Suite 2400
120 Fifth Avenue
Pittsburgh, PA. 15222

Gene Locks
Greitzer & Locks
1500 Walnut Street
Philadelphia, PA. 19102

Robert E. Swickle
Jaques Admiralty Law Firm PC
1370 Penobscot Building
Detroit, MI. 48226

John R. Dudrey
Williams Fredrickson, LLC
1515 SW 5th Avenue, Suite 844
Portland, OR. 97201-5447

Andrew J. Trevelise
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA. 19103

Raymond P. Forceno
Forceno & Hannon
Philadelphia Bourse Building
Suite 1000
Independence Mall East
Philadelphia, PA. 19106

Ronald L. Motley
Ness, Motley, Loadholt, Richardson & Poole
28 Bridgeside Blvd.
PO Box 1792
Mt. Pleasant, S.C. 29464

James K. Weston, II
Tom Riley Law Firm
4040 First Avenue, N.E.
PO Box 998
Cedar Rapids, IA. 52406

Ellen B. Furman
Goldfein & Hosmer
1600 Market Street
33rd Floor
Philadelphia, PA. 19103

RECEIVED
CLERK'S OFFICE
2003 SEP 16  A 10: 50

John J. Repcheck                          Susan M. Hansen              John D. Roven
Marks, O'Neill, O'Brien & Courtney        Brownson & Ballou            Roven, Kaplan & Wells
3200 Gulf Tower                           4800 U.S. Bank Place         2190 North Loop West, Suite 410
707 Grant Street                          601 Second Avenue, South     Houston, TX. 77018
Pittsburgh, PA. 15219                     Minneapolis, MN. 55402

☒   By depositing on September 15, 2003, said true copy in the U.S. Post Office at Portland, Oregon, in a sealed
    envelope with postage fully prepaid thereon, addressed as above and that between the same post office and
    the address to which said copy was mailed, there is regular communication by U.S. Mail.

☐   By causing a true copy thereof to be hand-delivered to the above address.

☐   By sending a true copy thereof via overnight courier in a sealed, prepaid envelope to the above address.

☐   By facsimile to the above-listed telephone number.

☐   By electronic transmission on September 15, 2003, to the above-listed e-mail address without the complaint
    attached to the Requests for Admission.

                                          James E. McCandlish, OSB 75246
                                          Wm. Keith Dozier, Jr. OSB 01247
                                          Of Attorneys for Plaintiff

CERTIFICATE OF SERVICE                                    James E. McCandlish
PAGE 2                                                    111 S.W. Naito Parkway, 2nd Fl.
                                                          Portland, OR 97204
                                                          Tel: 503.224.2349

FAXED

– 6 FEB 1997

# Pages: 1

PLAINTIFF'S
EXHIBIT

1

B3

# RAILKO LIMITED

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

SEP 16 2003

FILED
CLERK'S OFFICE

Loudwater
High Wycombe
Buckinghamshire
HP10 9QU
England

## FAX TRANSMISSION
197cT.

Tel:  +44(0)1628 524901
Fax:  +44(0)1628 810761

---

**COMPANY: SIMPLEX-TURMAR INC**

**TO: TONY DIBENEDETTO**          **FAX No: 001 718 460 1464**

**FROM: DAVID NEWELL**     **DATE: 06.02.97**       **PAGES: 1+/**

---

**OUR REF: QUOTE No 53875**

### REF: B.T.ALASKA/ DENALI - RAILKO STERN TUBE BEARINGS.

Tony

Many thanks for your enquiry. I personally attended the fitting on both these vessels at Portland. Denali was fitted in February 1994, and B.T.Alaska in September 1995. As well as fitting the bearings we also arranged the machining in a small workshop in Woodburn, Oregon (because of the asbestos problem).

Both ships have a history of seal and bearing problems due to vibration which is noted in my fitting reports. Both vessels have been re-engined and suffer from tailshaft vibration ( you should note that some of the port engineers admit this and others deny it). The vibration causes shock damage to the bottom of the Railko bearing at the aft end, therefore the problem is not excessive wear but mechanical damage to the bearing. Due to these problems we have recommended that the owners have in their possession a spare set of bearings - in case an emergency situation arises, and Railko is unable to meet a short delivery schedule.

The size differences between the vessels is small and I would therefore recommend that we size the replacements as being suitable for each ship. In this instance we would supply billets, these could then be machined to the exact requirements of the ship at the time of fitting.

RAI000027

FILED: September 10, 2003

IN THE COURT OF APPEALS OF THE STATE OF OREGON



PLAINTIFF'S
EXHIBIT

2 - A

PAUL R. BOCCI, JR.,
guardian ad litem for Paul R. Bocci, III,
an incapacitated individual,

Plaintiff,

v.

KEY PHARMACEUTICALS, INC.,
a foreign corporation,
SCHERING-PLOUGH CORPORATION,
a foreign corporation,
and SCHERING CORPORATION,
a foreign corporation,

Defendants,

and

MILES, INC.,
an Indiana corporation,
MILES, INC., PHARMACEUTICAL DIVISION,
an Indiana corporation,
LEGACY HEALTH SYSTEM,
an Oregon corporation,
LEGACY IMMEDIATE CARE CLINIC,
FREDERICK D. EDWARDS, M.D.,
and THE EUGENE CLINIC,
a partnership,

Defendants.

_____

FREDERICK D. EDWARDS, M.D.,

Respondent,

v.

KEY PHARMACEUTICALS, INC.,
a foreign corporation,
SCHERING-PLOUGH CORPORATION,
a foreign corporation,
and SCHERING CORPORATION,
a foreign corporation,


PLAINTIFF'S
EXHIBIT
2 - b

Appellants.

A9210-07050; A86556

On remand from the United States Supreme Court, *Key Pharmaceuticals, Inc., et al. v. Frederick D. Edwards*, 538 US ___, 123 S Ct 1781, 155 L Ed 2d 662 (2003).

Appeal from Circuit Court, Multnomah County.

William C. Snouffer, Judge.

Submitted on remand April 21, 2003.

William F. Gary, James E. Mountain, Jr., Sharon A. Rudnick, and Harrang Long Gary Rudnick P.C. for appellants.

Daniel M. Holland, Ronald B. Terzerbach, Mary H. Spillane, Margaret A. Sundberg, and Williams, Kastner & Gibbs PLLC for respondent.

Before Landau, Presiding Judge, and Armstrong and Brewer, Judges.

LANDAU, P. J.

Judgment in favor of Edwards for punitive damages vacated and remanded with instructions to allow defendants' motion for a new trial unless Edwards agrees to remittitur of punitive damages to $3.5 million within 28 days of entry of the appellate judgment; otherwise affirmed.

LANDAU, P. J.

This case is before us for a third time. Defendants Key Pharmaceuticals, Inc., Schering-Plough Corporation, and Schering Corporation (collectively Key), seek a reversal of a punitive damage award entered in 1994 in favor of cross-claim plaintiff Frederick D. Edwards, M.D. (Edwards). For the reasons set forth below, we conclude that Key is entitled to a remittitur of part of the punitive damage award or to a new trial.

The pertinent facts were set forth in this court's original opinions, *Bocci v. Key Pharmaceuticals, Inc.*, 158 Or App 521, 974 P2d 758 (1999) (*Bocci I*), *vacated and remanded*, 332 Or 39, 22 P3d 758, *opinion on remand*, 178 Or App 42, 35 P3d 1106 (2001) (*Bocci II*). We summarized those facts in *Bocci II*:

"Plaintiff Bocci was a long-time user of defendant Key's prescription asthma medication Theo-Dur, a timed-release theophylline product. In October 1990, Bocci was prescribed the antibiotic ciprofloxacin for a skin rash, but failed to tell the prescribing physician that he was taking Theo-Dur. On October 27, 1990, Bocci went to an urgent care clinic where Edwards worked complaining of nausea, vomiting, and diarrhea. Edwards diagnosed gastroenteritis and sent Bocci home. Edwards did not diagnose theophylline toxicity, because Theo-Dur had been promoted to him as a safe drug, and he did not believe that a patient on a stable dose of the drug could develop a serious toxicity problem. Shortly after Edwards sent him home, Bocci experienced seizures and was admitted to a hospital emergency room. He was treated for theophylline toxicity. He suffered permanent brain damage from the

PLAINTIFF'S
EXHIBIT
2-c

seizures.

"Bocci sued Key and Edwards * * *. Edwards cross-claimed against Key for negligence and fraud on the ground that Key had failed to provide adequate information concerning the potential toxicity of Theo-Dur. The jury returned verdicts in favor of Bocci and Edwards against Key. The jury awarded Bocci more than $5 million in compensatory damages and $35 million in punitive damages. The jury awarded Edwards $500,000 in compensatory damages and $22[.5] million in punitive damages."

178 Or App at 45-46. The jury's award was based on a special verdict that included findings that, on Edwards's cross-claims against Key, the latter was negligent and had made fraudulent misrepresentations to Edwards that caused him damage. The jury further found that Key had acted with wanton disregard for the health and safety of others and had knowingly withheld from or misrepresented to the Food and Drug Administration (FDA) or prescribing physicians information known to be material and relevant to theophylline toxicity.

After trial, Key moved for a judgment notwithstanding the verdict or, in the alternative, a new trial or remittitur, making numerous arguments. One of those arguments was that the combined punitive damage awards to Bocci and Edwards were unconstitutionally excessive, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. As noted in our previous opinion, Key urged the trial court to apply the criteria for examining punitive damage awards set forth in ORS 30.925(2). Key argued that the "imposition in this case of actual damages in the combined amount exceeding $5.5 million by itself serves as a significant and retributive measure" and that the amount of the compensatory damages awarded should be considered in determining excessiveness. In their responses, Edwards and Bocci each presented arguments as to why their respective punitive damage awards were constitutional. In its reply to those arguments, Key posited that the issue was

"whether, *in combination*, they [*i.e.*, the punitive damage awards to Edwards and Bocci] exceed the maximum amount tolerable under the Due Process Clause because *both* awards are premised on the same factual basis and because the jury had before it all of the evidence pertaining to the totality of the wrongful conduct sought to be punished."

(Emphasis added.) The trial court accepted Key's formulation of the issue, applying the criteria set forth in ORS 30.925 to the combined awards to both Edwards and Bocci, but upheld the awards.

Key appealed, arguing, among other things, that the punitive damage award was excessive. Meanwhile, Key settled with Bocci, leaving the challenge as to the award of damages to Edwards only. Key contended that the trial court should have reviewed the punitive damages award to Edwards independently of the award to Bocci. According to Key, an award of $22.5 million in punitive damages is excessive in relation to the $500,000 that the jury awarded Edwards for compensatory damages.

We affirmed the judgment by an equally divided court, with the court dividing on a question unrelated to the punitive damages issue. In a concurring opinion, Judge Riggs, then a member of this court, explained on behalf of four members of this court that he would have rejected Key's challenge to the punitive damages award:

"Key argues for the first time on appeal that the trial court erred in failing to review the punitive damage award to Edwards independently of the punitive damage award to Bocci * * *. Not only did Key fail to preserve this issue in the trial court, but it waived any argument on this point by specifically requesting the court to review the punitive damage awards in their entirety * * *."

PLAINTIFF'
EXHIBIT
2-d

*Bocci I*, 158 Or App at 547 (Riggs, J., concurring).

Key petitioned for review. Meanwhile, the Oregon Supreme Court decided *Parrott v. Carr Chevrolet, Inc.*, 331 Or 537, 17 P3d 473 (2001), in which it evaluated a punitive damages award in light of recent pertinent decisions from the United States Supreme Court, in particular, *BMW of North America, Inc. v. Gore*, 517 US 559, 116 S Ct 1589, 134 L Ed 2d 809 (1996). The Oregon Supreme Court remanded this case for reconsideration in light of *Parrott*. *Bocci v. Key Pharmaceuticals, Inc.*, 332 Or 39, 22 P3d 758 (2001).

In *Bocci II*, we evaluated the punitive damages award in light of *Parrott* and the authorities it discussed. We expressly adopted the concurring opinion in *Bocci I* as to the scope of the question before us. That is, we concluded that, by specifically requesting that the trial court evaluate the punitive damages awards in their entirety, Key waived any argument that the punitive damages should have been evaluated separately. *Bocci II*, 178 Or App at 47. We ultimately concluded that, evaluated in their entirety, the punitive damages awards were not excessive. *Id.* at 51. The Oregon Supreme Court denied review, and Key petitioned for a writ of certiorari.

Meanwhile, the United States Supreme Court once again ventured into the realm of reviewing state court punitive damages awards in *State Farm v. Campbell*, 538 US ___, 123 S Ct 1513, 155 L Ed 2d 585 (2003). In that case, the Court concluded that the Utah Supreme Court had erred in reinstating a verdict for $145 million in punitive damages in a case involving $1 million in compensatory damages. The plaintiff insureds brought an action against the defendant automobile liability insurer for fraud, bad faith failure to settle within policy limits, and intentional infliction of emotional distress. The jury ultimately awarded the plaintiffs $2.6 million in compensatory damages and $145 million in punitive damages. The trial court, however, reduced the damages to $1 million in compensatory and $25 million in punitive damages. The Utah Supreme Court reinstated the original $145 million punitive damages award, relying in significant part on evidence concerning the defendant's national business practices over the preceding 20 years to meet corporate fiscal goals by capping payouts on claims. *State Farm*, 538 US at ___, 123 S Ct at 1518-19.

The United States Supreme Court reversed and remanded. In evaluating the punitive damages award, the Court turned to the three-factor test that it had earlier announced in *Gore*, which requires courts to evaluate, *de novo*, punitive damages awards in light of

"(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."

*State Farm*, 538 US at ___, 123 S Ct at 1520. Applying the "*Gore* guideposts" to the facts of that case, the Court ultimately concluded that a punitive damages award roughly equal to the amount of compensatory damages likely would be justified. In the process, the Court commented that, among other things, the Utah Supreme Court had erred in basing its decision

PLAINTIFF EXHIBIT
2-e

on the defendant's so-called national policies, which the court characterized as "dissimilar acts, independent from the acts upon which liability was premised." *Id.* at ___, 123 S Ct at 1523. According to the Court, "[a]lthough evidence of other acts need not be identical to have relevance in the calculation of punitive damages, the Utah court erred here because evidence pertaining to claims that had nothing to do with a third-party lawsuit was introduced at length." *Id.* at ___, 123 S Ct at 1523.

The United States Supreme Court then acted on Key's petition in this case. It granted the petition, vacated our decision, and remanded to us for reconsideration in light of *State Farm*. The parties submitted briefing to us on the proper application of *State Farm*. In that supplemental briefing, Key argues that either the case should be reversed and remanded for a new trial or the punitive damages remitted to no more than $500,000. Edwards argues that we should simply affirm the existing punitive damages award. For the reasons that follow, we conclude that, in light of *State Farm*, we must remit the award of punitive damages to $2.5 million.

*State Farm* requires that we evaluate the punitive damages award in light of the three *Gore* guideposts, the first of which is, as we have mentioned, the "degree of reprehensibility of the defendant's conduct." *State Farm*, 538 US at ___, 123 S Ct at 1521. As the Court explained in *State Farm*, the relevant factors include whether

> "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."

*Id.* at ___, 123 S Ct at 1521.

Key contends that at least four of the relevant factors are completely absent in this case. According to Key, Edwards suffered no physical or economic injury apart from some "minimal" emotional distress. Moreover, it argues, Key's conduct was not a threat to Edwards's health or safety, nor were there repeated instances of reckless or indifferent conduct toward Edwards. At best, Key argues, the jury's verdict may be taken to "imply" that Key had engaged in trickery or deceit. That, says Key, is not enough to support a claim for punitive damages.

Edwards argues that Key has ignored the nature of the jury's verdict and the relevant evidence in this case. He argues that Key's liability was based on persistent and aggressive promotion of Theo-Dur with material misrepresentations as to its safety, which evinced an indifference to and reckless disregard of the health and safety of others. That indifference and reckless behavior, Edwards argues, caused physical and economic harm to both himself and Bocci.

Key insists that Edwards focuses improperly on unrelated acts of misconduct that, under *State Farm*, are irrelevant. In particular, Key argues that, as in *State Farm*, so also in this case, we must reject consideration of its promotional activities outside of Oregon. According to Key, punitive damages may not be awarded by reference to such out-of-state conduct. Similarly, Key argues, under *State Farm*, it is inappropriate to consider the effect of its conduct on anyone other than Edwards, whose award of punitive damages is at issue.

We address, in turn, each of the five factors relevant to the reprehensibility of Key's conduct, beginning with the nature of the harm caused. At the outset, we note that the Court's

PLAINTIFF'S
EXHIBIT

2-f

description of the first factor in *State Farm* does not, by its terms, limit the scope of the evaluation to the single person in favor of whom punitive damages were awarded. In support of its argument to the contrary, Key relies on a reference in the Court's opinion that cautions against consideration of "other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis." *State Farm*, 538 US at ___, 123 S Ct at 1523. The Court's caution was delivered in the context of a discussion of the Utah Supreme Court's consideration of evidence of the defendant insurer's "dissimilar acts" in other cases that "bore no relation" to the harm that the plaintiffs suffered. That is not the case here. There is nothing hypothetical about Bocci's claim against Key or the extensive and permanent brain damage that Key caused him. Moreover, Key's actions with respect to Bocci were not dissimilar at all. They were, in all material respects, the same acts that caused harm to Edwards. In any event, the evidence in this case shows that Key also caused Edwards emotional distress and associated physical harm of more than the "minimal" nature that Key describes.

We turn to whether Key's conduct evinced indifference or reckless disregard "of the health and safety of others." *State Farm*, 538 US at ___, 123 S Ct at 1521. Again, Key focuses on whether it disregarded the health and safety of Edwards, when the relevant factor is not so narrowly focused. What is more, Key ignores the jury's findings by clear and convincing evidence that Key acted with wanton disregard for the health and safety of others in knowingly and falsely promoting its product as safe. Key's argument that its out-of-state promotional activities are irrelevant is not well-taken. The Court in *State Farm* said that a jury "may not use evidence of out-of-state conduct to punish a defendant for action that was lawful in the jurisdiction where it occurred." 538 US at ___, 123 S Ct at 1522-23. It did not say that out-of-state conduct is *per se* irrelevant. To the contrary, it said that "evidence of repeated misconduct of the sort that injured" the plaintiff is entirely relevant. *Id.* at ___, 123 S Ct at 1523. In this case, there was evidence that Key engaged in nationwide misconduct in disseminating false and misleading information to the FDA and to physicians about Theo-Dur and that the dissemination of that misleading information led to Bocci's and Edwards's damages. That is not the sort of evidence that *State Farm* suggests is inappropriate to consider in evaluating punitive damages.

The third factor is whether "the target of the conduct had financial vulnerability." *State Farm*, 538 US at ___, 123 S Ct at 1521. Neither party addresses that factor.

Next, we consider whether the conduct "involved repeated actions or was an isolated incident." *Id.* at ___, 123 S Ct at 1521. As we have noted, there is evidence of Key's continuing misrepresentations concerning the safety of its product.

Finally, we consider whether "the harm was a result of intentional malice, trickery, or deceit, or mere accident." *Id.* at ___, 123 S Ct at 1521. Key acknowledges that it may be "implied" from the jury's verdict that trickery or deceit was involved. The jury, in fact, found that Key had knowingly withheld or misrepresented information to the FDA or prescribing physicians concerning theophylline toxicity and the safety of Theo-Dur. In short, contrary to what Key suggests to us, there is substantial evidence of four of the five relevant considerations as to the reprehensibility of its conduct.

We turn, then, to consideration of the second of the *Gore* guideposts, namely, an evaluation of "the ratio between harm, or potential harm, to the plaintiff and the punitive damages award." *Id.* at ___, 123 S Ct 1524. The Court explained that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* ___, 123 S Ct 1524. The Court noted that in previous cases it had held that "an

PLAINTIF
EXHIBI

2-9

award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *Id.* ___, 123 S Ct 1524 (citing *Pacific Mutual Life Insurance Company v. Haslip*, 499 US 1, 23-24, 111 S Ct 1032, 113 L Ed 2d 1 (1991)). It then cited *Gore* for the same proposition, that is, that a 4-to-1 ratio may be close to the limits of constitutionality. *State Farm*, 538 US at ___, 123 S Ct at 1524 (citing *Gore*, 517 US at 581). The Court added, however, that a higher ratio might be appropriate "where a particularly egregious act resulted in only a small amount of economic damages." *State Farm*, 538 US at ___, 123 S Ct at 1524 (internal quotation marks omitted).

In this case, Key argues that the ratio of $22.5 million in punitive damages to $500,000 in compensatory damages awarded to Edwards is 45 to 1, which it argues is presumptively invalid. Edwards objects to the consideration of punitive and compensatory damages to Edwards independent of the damages awarded to Bocci on the ground that Key waived the argument at trial, as we held in *Bocci II*. Key acknowledges that we held that its argument was waived; it insists that we were wrong in so holding and that, in any event, in light of *State Farm*, we are now required to evaluate the ratio between the harm "to the plaintiff" and the punitive damage award. *State Farm*, 538 US at ___, 123 S Ct at 1524.

We need not devote too much time to resolving the question whether the relevant ratio of punitive to compensatory damages includes only Edwards's damages as opposed to Edwards's and Bocci's in combination. *Either way*, the ratio exceeds single digits.

As Key correctly notes, the ratio of Edwards's punitive damages ($22.5 million) to his compensatory damages ($500,000) is 45 to 1. That is clearly in excess of the single-digit neighborhood that the Court has suggested lies at the outer edge of constitutionality. The ratio of combined punitive damages ($55.5 million) to combined compensatory damages ($5.5 million) is in excess of 10 to 1. Even that ratio exceeds single digits. Indeed, it exceeds by two and a half times the ratio of 4 to 1 that the Court suggested "might be close to the line of constitutional impropriety." *State Farm*, 538 US at ___, 123 S Ct at 1524.

The question, then, is whether there are circumstances present in this case that would justify a ratio higher than 4 to 1. As we have noted, the Court suggested that a higher ratio may be appropriate when a "particularly egregious act" resulted in only a small amount of economic damages. *State Farm*, 538 US at ___, 123 S Ct at 1524. We would expect, for example, that intentionally malicious conduct that produces only a small amount of compensatory damages would justify a higher ratio.

In this case, there is, as we have noted, evidence of deceitful conduct involving the promotion of a prescription drug as "safe" when it was not, which resulted in misdiagnosis and consequent severe physical injury. It is conduct that is much more reprehensible and blameworthy than an isolated incident or mere accident. Thus, we are willing to approve a ratio in excess of the 4-to-1 ratio that apparently is something of a benchmark for the United States Supreme Court. But, having said that, we must also conclude that Key's conduct does not rise to the level of "particularly egregious," intentionally malicious acts that would justify a ratio in excess of single digits. Under the circumstances of this case, we conclude that the ratio of punitive to compensatory damages is excessive.

The final *Gore* guidepost is the "difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm*, 538 US at ___, 123 S Ct at 1520. Key offers no argument regarding that factor. Edwards argues that Key's misconduct in reporting misleading information could have subjected it to criminal

PLAINTIFF'S
EXHIBIT

2-h

tabbies

prosecution. In *State Farm*, however, the Court cautioned:

> "The existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action. When used to determine the dollar amount of the award, however, the criminal penalty has less utility. Great care must be taken to avoid use of the civil process to assess criminal penalties that can be imposed only after the heightened protections of a criminal trial have been observed, including, of course, its higher standards of proof. Punitive damages are not a substitute for the criminal process, and the remote possibility of a criminal sanction does not automatically sustain a punitive damages award."

538 US at ___, 123 S Ct at 1526.

Taking all relevant considerations into account, we conclude that the punitive damages award to Edwards exceeds the amount tolerable under the Due Process Clause. We conclude that a ratio of punitive to compensatory damages in the amount of 7 to 1 is constitutionally permissible.

Because only the award to Edwards is at issue on appeal, the 7-to-1 ratio must be applied to the compensatory damages awarded to Edwards. *See State Farm*, 538 US at ___, 123 S Ct at 1520 (the proper measure is the "disparity between the actual or potential harm *suffered by the plaintiff* and the punitive damages award"). Edwards was awarded $500,000 in compensatory damages. An appropriate amount of punitives therefore is seven times that amount, or $3.5 million.[1]

Judgment in favor of Edwards for punitive damages vacated and remanded with instructions to allow defendants' motion for a new trial unless Edwards agrees to remittitur of punitive damages to $3.5 million within 28 days of entry of the appellate judgment; otherwise affirmed.

_____

1. It could be argued--although Edwards does not make the point--that, because Key did not argue that the punitive damages awarded to Edwards should be evaluated independently of the damages awarded to Bocci, we should not apply the 7-to-1 ratio to Edwards's damages alone. On reflection, however, it becomes clear that that is not possible. Applying the 7-to-1 ratio to the combined compensatory damages clearly is unfair. It would permit Edwards to recover punitive damages based on compensatory damages to someone else, namely Bocci. Applying the 7-to-1 ratio to the combined compensatory damages in proportion to Edwards's share of the punitive damages likewise is not logical. We can envision no reason why Edwards's share of compensatory damages should be anything other than what the jury actually awarded. Finally, applying the 7-to-1 ratio to the combined compensatory damages in proportion to Edwards's share of the compensatory damages is tautological, that is, it makes no difference from simply applying the ratio to Edwards's actual share of the compensatory damages. We therefore conclude that the proper award of punitive damages to Edwards is seven times the compensatory damages that he actually was awarded, or $3.5 million.

Return to previous location.