MDL 875

JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

APR 12 2004

FILED CLERK'S OFFICE

BEFORE THE JUDICIAL PANEL ON MULI-DISTRICT LITIGATION

IN RE: ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)

CIVIL ACTION NO.: MDL 875

---

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

WILLIE H. BROWN AND EDDIE J. WILLIAMS — PLAINTIFFS

V. — CAUSE NO.: 1:04cv30(GRo)

ILLINOIS CENTRAL RAILROAD COMPANY — DEFENDANT

---

**RESPONSE AND BRIEF OF DEFENDANT
ILLINOIS CENTRAL RAILROAD COMPANY
IN OPPOSITION TO
PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER**

---

Defendant Illinois Central Railroad Company properly removed this matter to Federal Court. None of the Plaintiffs are truly FELA Plaintiffs, and they do not qualify for the "borrowed servant" exception. Illinois Central, a diverse Defendant, lawfully removed this case to Federal Court. This case was then properly transferred to the MDL.

**A. JURISDICTION IS PROPER IN FEDERAL COURT**

Based upon the residency of Illinois Central when compared to the residency of the Plaintiffs, total diversity exists and therefore diversity jurisdiction is appropriate under 28 U.S.C. §1332. The bar to removal in 28 U.S.C. §1445 does not apply because this is not an FELA case. Rather, Plaintiffs have fraudulently alleged an FELA cause of action in an attempt to defeat federal jurisdiction.

OFFICIAL FILE COPY

IMAGED APR 13 '04

## B. THIS CASE IS PROPERLY IN THE MDL

Plaintiffs contend that the Conditional Transfer Order should be vacated because of an assertion that this matter is not properly in Federal Court. However, this case was properly removed to Federal Court, and because it involves a claim for asbestos-related injuries, it must be transferred. Pursuant to MDL Order No. 875, all actions involving asbestos claims must be transferred to the United States District Court for the Eastern District of Pennsylvania and to the docket of Judge Charles Weiner. This is not a discretionary procedure.

## C. COMPANION CASE ALREADY IN MDL

Plaintiffs admit that they are in the same position as the Plaintiffs in Wicker, et al v. Illinois Central Railroad Company. That case has been finally transferred to the MDL by the Order attached hereto as Exhibit "A". As Plaintiffs note, the Plaintiffs in Wicker and the Plaintiffs in this case "all worked at the same place and their jobs were exactly the same". (Plaintiffs' Brief at p. 3, para. 7).[1]

This Panel has repeatedly held that the mere pendency of Motions and even Motions to Remand should not prohibit or delay transfers to the MDL. (Contrary to Plaintiffs' assertions at Plaintiffs' Motion, pp. 10-12).

---

[1]Judge Gex's remand order referenced on p. 3 of Plaintiffs' Motion is a moot order due to lack of jurisdiction. Additionally, at the time of that order, neither the parties nor Judge Gex had obtained the Contract between Illinois Central and David Joseph Company that is discussed at Section "D" of this Response.

**D. PLAINTIFFS' "BORROWED-SERVANT" ALLEGATION IS A FRAUDULENT CLAIM**

**Brown and Williams admit in their Complaint that they were employees of David Joseph.** Illinois Central acquired from David Joseph Company a copy of the 1971 contract governing the relationship between Illinois Central and David Joseph Company. Under this contract (Exhibit "B" to Response), David Joseph Company (hereinafter "Joseph") agreed to equip and maintain a train car dismantling facility at McComb, Mississippi, at Joseph's sole expense. Joseph agreed to **furnish all labor and equipment for the dismantling, burning and disposal of all railroad cars or other equipment delivered by the railroad company to Joseph.**

Joseph Company further agreed to purchase the railroad cars and other equipment delivered to it by Illinois Central; however, **Illinois Central reserved the right to designate parts of those cars which it desired to purchase**, and then Joseph agreed to sell such parts back to the railroad company based on an agreed schedule of prices.

In furtherance of the contract existing between Joseph and Illinois Central, a Lease Agreement ("C") was executed whereby Joseph acquired property upon which to provide its independent contractor services.

Brown and Williams have submitted numerous affidavits containing irrelevant allegations seeking to establish that Illinois Central supervised or controlled work of the Joseph employees, including Brown and Williams. The Panel's observation of the contract should reveal that the assertions by these affiants relate to nothing more than acts by Illinois Central in facilitation of the terms of the contract.

That is, the contract provided that Illinois Central should designate particular parts of the dismantled railroad cars they wish to buy-back from Joseph. Somehow Brown and Williams contend that Illinois Central's act of designating those parts converts all of the employees of Joseph into Illinois Central's "borrowed-servants". Such a contention is baseless. Rather, the facts set forth in the Affidavits "demonstrate merely the kind of cooperation necessary" to allow Joseph Company to perform its contract with Illinois Central. See Dominix v. Illinois Central Railroad Company 934 F.Supp. 223 (S.D. Miss. 1996).

The affidavits submitted by Brown and Williams further fail to address any of the factors established by the Fifth Circuit for determining whether or not one is a "borrowed-servant":

A. Who has control over the employee and the work he is performing, beyond their suggestion and details or cooperation?

B. Whose work is being performed?

C. Is there an agreement, understanding, or reading of the minds between the original and the borrowing employer?

D. Did the employer agree to the new situation?

E. Did the original employer terminate his relationship with the employee?

F. Who furnished the tools and place for performance?

G. Was the period of employment over a considerable length of time?

H. Who had the right to discharge the employee?

I. Who had the obligation to pay the employee?

See, Capps v. N.L. Baroid - NL Industries, Inc., 784 F. 2nd 615, 616-617 (5th Circuit 1986). Illinois Central asserts that these factors were not addressed by Brown and Williams because an application of those factors negates any "borrowed-servant" claim.

The affidavit of Hussey (Exhibit "D"), the lease agreement ("C"), and the contract ("B") demonstrate that Brown and Williams have fraudulently asserted jurisdictional claims. Having admitted that they are employees of Joseph, Brown and Williams have no basis to allege an FELA cause of action against Illinois Central.

Glaringly absent from the affidavits submitted by Brown and Williams is any allegation that Brown and Williams were "borrowed-servants". **More importantly, there is no allegation that they were borrowed servants at the time of any work-related injury.**

Other than designating the parts which Illinois Central would purchase, Illinois Central had no control over these employees. The contract provided that Joseph would furnish all of the labor. The work that Brown and Williams were performing was the work of Joseph in dismantling the railroad cars under the contract. There was no agreement between Joseph and Illinois Central that its employee would be "borrowed". There was no "new situation". That is, Brown and Williams were at all times employees of Joseph. The contract provided that Joseph would furnish **all equipment** necessary for the dismantling, burning, and disposal of the railroad cars and equipment. There was no "new employment" wherein Brown and Williams were first associated with Joseph and then later with Illinois Central. Only Joseph had the right to terminate Brown and Williams. Brown and Williams were paid by Joseph. The train cars upon which they worked were owned by Joseph.

The Fifth Circuit clearly recognizes that where allegations of the Complaint are made in a fraudulent attempt evade removal, the case is removable and should not be remanded to State Court. Yawn v. Southern Railway Company, 591 F. 2nd 312 (5th Cir. 1971), citing Great Northern RY v. Alexander 246 U. S. 276, 38 S. Ct. 237, 62 L. Ed. 713 (1918) and Boyle v. Chicago R. I. NP. RY., 42 F. 2nd 633, 634 (8th Cir. 1920).

Furthermore, even if the Court were limited to simply a review of the Complaint, in Lirette v. N.L. Sperry Sun, Inc., 810 F.2d 533 (5th Cir. 1987), the Court noted that the Complaint alleged "an employee-employer relationship with Sperry Sun". The Plaintiff alleged that he was assigned to a vessel and facts establishing the cause of his injuries. He alleged that Sperry Sun negligently failed to provide him with a safe place to work and with safe and adequate equipment. The Court held that these allegations were sufficient to state a Jones Act Claim.

To the contrary in the case at bar, while Brown and Williams have alleged a "borrowed-servant" relationship with Illinois Central, no allegation has been made regarding facts showing the cause of either Brown or Williams' injury. Brown and Williams only allege that they were exposed to asbestos while performing their work. Unlike the Plaintiff in Lirette, Brown and Williams cannot allege, without fraud, that Illinois Central failed to provide them with a safe place to work or failed to provide them safe and adequate equipment inasmuch as the contract clearly provided that the place where they worked was obtained through a lease by Joseph. Under the contract, all of the equipment to perform the contract was supplied by Joseph.

In summary, the "control" Defendants exercised with regard to Joseph employees such as Brown and Williams was a designation of the parts of the railroad cars that they

wanted to buy-back under the contract's price schedule. Nothing in the affidavits submitted by Brown and Williams reflect any further control either over the Affiants, or more importantly, Plaintiffs Brown and Williams.

Kelley v. Southern Pacific, 419 U.S. 318, 324-326, 95 S.Ct. 472 (1974) discusses the three methods by which a Plaintiff can establish employment with a railroad under the FELA even though he is nominally employed by another. The first of those methods is that the employee could be serving as a "borrowed-servant" of the railroad. This is the approach taken by Brown and Williams in this suit. The Supreme Court in Kelley noted the important distinction between mere agency and the need to demonstrate a master-servant relationship. The Supreme Court rejected the lower Court's mere "responsibility test" noting that this would cause the employees of a contracting company to be borrowed servants "whenever it agreed to perform a service and subsequently engage another company to perform that service for it on its premises". At the time Kelley was decided in 1974, the Court cited Linstead v. Chesapeake and Ohio R. Co., 276 U. S. 280, 48 S.Ct. 241, 72 L. Ed. 453 (1928) as the leading case on the borrowed-servant doctrine.

The Court in Linstead noted the important distinction between "control" and merely delegating or giving orders which were a necessary part of the contract:

> "It sometimes happens that one wishes a certain work to be done for his benefit and neither has persons in his employee who can do it nor is willing to take such persons into its general service. He may then enter into an agreement with another. If that other furnishes him with men to do the work and places them under his exclusive control and the performance of it, those men become pro hoc vice servants of him when they are furnished.

But, on the other hand, one may prefer to enter into an agreement with another and that other, for a consideration, shall himself perform the work through servants of his own selection, retaining the direction and control of them.

In the first case, he to whom the workmen are furnished is responsible for their negligence and the conduct of the work, because the work is his and they are for the time his workmen.

In the second case, he who agrees to furnish the completed work through servants over whom he retains control is responsible for the their negligence and their conduct of it, because, though it is done for the ultimate benefit of the other, it is still in its doing his own work.

To determine whether a given case falls within the one class or the other we must inquire whose is the work being performed, a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work. **Here we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is a part of a larger undertaking.**" Linstead at 33 - 34.

The facts in this case establish that the work to be performed by Joseph, including its employees Brown and Williams, was the dismantling, burning, and disposal of railroad cars delivered and sold to Joseph by Illinois Central. Incidental to that contract was Illinois Central's designation of parts which it desired to buy-back from Joseph. Necessarily,

Illinois Central gave certain directions to the employees of Joseph in identifying those parts with which it wished to buy-back. But the work of cutting out those parts, or otherwise fulfilling the "larger undertaking" of dismantling, burning, and disposing of railroad cars was the work of Joseph.

The Affidavit of Hussey, the lease agreement, and the contract clearly demonstrate that the right of control remained with Joseph. While Brown and Williams allege that Illinois Central failed to provide them with a safe place to work, the only place that they worked was that place provided by Joseph, not Illinois Central, under the lease.

* * * *

In addition to fraudulently alleging "borrowed-servant" status, Brown and Williams have also fraudulently alleged that they were engaged in interstate commerce as required for the application of the FELA. See Fawler v. Seaboard Coast Line Railroad Company, 68 F. 2nd 17, 19 (5th Cir. 1981). At the time of any work performed on the cars by Brown and Williams, the cars were owned by Joseph under the contract. The cars were being either "dismantled, burned, or disposed of" under the contract and were not destined for travel in interstate freight service.

**CONCLUSION**

In this case Brown and Williams have admitted they were employees of Joseph and cannot establish any "borrowed-servant" relationship with Illinois Central merely by using the words "borrowed-servant" and pointing out that Illinois Central designated the parts that it wished to buy-back from Joseph. If these Plaintiffs can maintain a "borrowed-servant" status, any employee of any contractor in a relationship with a railroad company may

simply allege, without reference to facts, a status of "borrowed-servant", and thereby deprive a diverse railroad company of its right to a federal forum.

There is no evidence that Brown and Williams were engaged in interstate commerce at the time of their employment with Joseph.

This case was properly removed to Federal Court. Since it involves allegations of asbestos-related injuries, this case was properly transferred to the MDL. There it should remain along with Wicker, *supra*, a case which Plaintiffs admit involves the same allegations.

Plaintiffs' Motion to Vacate the Conditional Transfer Order should be denied.

Respectfully submitted,

UPSHAW, WILLIAMS, BIGGERS,
BECKHAM & RIDDICK, LLP

BY: ______________________

GLENN F. BECKHAM
MBN: 2309
OF COUNSEL TO DEFENDANT(S)

OF COUNSEL:

UPSHAW, WILLIAMS, BIGGERS,
BECKHAM & RIDDICK, LLP
POST OFFICE DRAWER 8230
GREENWOOD, MISSISSIPPI 38935-8230
Tel: (662) 455-1613
Fax: (662) 453-9245

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

APR 12 2004

FILED
CLERK'S OFFICE

**CERTIFICATE OF SERVICE**

I, Glenn F. Beckham, of counsel to Defendant(s), hereby certify that I have this day mailed with postage prepaid, a true and correct copy of the above and foregoing document unto:

Honorable C.E. Sorey, II
21 North Florida Street
Mobile, Alabama 36607

Honorable Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, Ohio 44114

Honorable Edward J. Cass
Gallagher, Sharp, Fulton & Norman
Bulkley Building
7th Floor
1501 Euclid Avenue
Cleveland, Ohio 44115

Honorable Adam M. Chud
Shea & Gardner
1800 Massachusetts Avenue, N.W.
Washington, DC 20036

Honorable David A. Damico
Burns, White & Hickton
Fifth Avenue Place, Suite 2400
120 Fifth Avenue
Pittsburgh, Pennsylvania 15222

Honorable Raymond P. Forceno
Forceno & Hannon
Philadelphia Bourse Building, Suite 1000
Independence Mall East
Philadelphia, Pennsylvania 19106

Honorable Ellen B. Furman
Goldfein & Hosmer
1600 Market Street
33rd Floor
Philadelphia, Pennsylvania 19103

Honorable Susan M. Hansen
Brownson & Ballou
4800 U.S. Bank Place
601 Second Avenue, South
Minneapolis, Minnesota 55402

Honorable Reginald S. Kramer
Oldham & Dowling
195 South Main Street, Suite 300
Akron, Ohio 44308-1314

Honorable David C. Landin
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219

Honorable Gene Locks
Greitzer & Locks
1500 Walnut Street
Philadelphia, Pennsylvania 19102

Honorable Ronald L. Motley
Motley, Rice, LLC
28 Bridgeside Boulevard
Mt. Pleasant, South Carolina 29464

Honorable John J. Repcheck
Marks, O'Neill, O'Brien & Courtney
3200 Gulf Tower
707 Grant Street
Pittsburgh, Pennsylvania 15219

Honorable John D. Roven
Roven, Kaplan & Wells
2190 North Loop West, Suite 410
Houston, Texas 77018

Honorable Richard D. Schuster
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
Post Office Box 1008
Columbus, Ohio 43216

Honorable Neil Selman
Selman, Breitmann & Burgess
11766 Wilshire Boulevard, Sixth Floor
Los Angeles, California 90025

Honorable Robert N. Spinelli
Kelley, Jasons, McGuire & Spinelli
Centre Square West, 15th Floor
Philadelphia, Pennsylvania 19102

Honorable Robert E. Swickle
Jaques Admiralty Law Firm, P.C.
1570 Penobscot Building
The Maritime Asbestosis Legal Clinic
Detroit, Michigan 48226

Honorable Andrew J. Trevelise
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, Pennsylvania 19103

Honorable James K. Weston, II
Tom Riley Law Firm
4040 First Avenue, N.E.
Post Office Box 998
Cedar Rapids, Iowa 52406

SO CERTIFIED, this the 5th day of April, 2004.

GLENN F. BECKHAM

JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

DEC 04 2003

FILED CLERK'S OFFICE

**DOCKET NO. 875**

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

**IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)**

**BEFORE WM. TERRELL HODGES,* CHAIRMAN, JOHN F. KEENAN, BRUCE M. SELYA,* JULIA SMITH GIBBONS, D. LOWELL JENSEN, J. FREDERICK MOTZ* AND ROBERT L. MILLER, JR., JUDGES OF THE PANEL**

*Dawn Yates, et al. v. Electric Boat Corp.*, D. Connecticut, C.A. No. 3:03-245
*Thomas R. Wicker, et al. v. Illinois Central Railroad Co.*, S.D. Mississippi, C.A. No. 1:03-208
*Louis Paul Miller v. Quigley Co., Inc., et al.*, S.D. Mississippi, C.A. No. 1:03-217
*Roy Jones v. Railko, Ltd., et al.*, D. Oregon, C.A. No. 6:03-8

**TRANSFER ORDER**

Before the Panel are motions brought, pursuant to Rule 7.4, R.P.J.P.M.L., 199 F.R.D. 425, 435-36 (2001), by plaintiffs in one District of Connecticut action, two Southern District of Mississippi actions and one District of Oregon action. Movants seek to vacate the Panel's orders conditionally transferring their respective action to the Eastern District of Pennsylvania for inclusion in the centralized pretrial proceedings occurring there in this docket before Judge Charles R. Weiner.

On the basis of the papers filed and hearing session held, the Panel finds that these four actions involve common questions of fact with actions in this litigation previously transferred to the Eastern District of Pennsylvania, and that transfer of the actions to the Eastern District of Pennsylvania for inclusion in the coordinated or consolidated pretrial proceedings occurring in that district will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. We find that transfer of the actions is appropriate for reasons expressed by the Panel in its original decision in this docket directing centralization of all pending federal court actions not then in trial involving allegations of personal injury or wrongful death caused by asbestos or asbestos containing products. *See In re Asbestos Products Liability Litigation (No. VI)*, 771 F.Supp. 415 (J.P.M.L. 1991). In particular, we note that in the Panel's original decision distinctions based on such matters as the pendency of motions or other matters before the transferor court,[1] the uniqueness of a party's status, the type of defendant, the

---

*Judges Hodges and Selya took no part in the decision of this matter. Also, Judge Motz took no part in the disposition of this matter with respect to the Southern District of Mississippi *Miller* action.

[1]Some plaintiffs have argued that transfer should be denied or deferred in order to permit the resolution of motions to remand their action to state court. There is no need to delay transfer in order to accommodate such an interest. We note that: 1) as a practical matter, there is a lag time of at least three or four months from the filing of an action, its identification as a potential tag-along action, issuance of a conditional transfer order, stay of transfer when a party timely objects to the conditional transfer, briefing on the question of transfer, the Panel hearing session, and the issuance of the Panel's subsequent order; 2) Panel Rule 1.5, R.P.J.P.M.L., 199 F.R.D. at 427, expressly provides that the pendency of a conditional transfer order does not in any way i) suspend orders and pretrial proceedings in the district court in which the action that is the subject of the conditional transfer order is (continued...)

EXHIBIT A

docket condition of any specific federal district, the stage of pretrial proceedings, the presence of unique claims or additional claims not relating to asbestos injury or death, and/or the unanimity of opposition to transfer by the parties to an action, were considered and rejected by the Panel as grounds for carving out exceptions to transfer in this extraordinary docket. We are not persuaded to depart from this approach in dealing with the question of transfer of the actions now before the Panel.

We note that under Judge Weiner's stewardship, as of November 21, 2003, i) over 73,700 actions have been closed in the transferee district, and ii) over 1,250 actions or claims therein have been returned to their originating transferor districts. To any parties that believe the uniqueness of their particular situation renders continued inclusion of their action in MDL-875 unnecessary or inadvisable, we note that whenever the transferee judge deems remand of any claims or actions appropriate, procedures are available whereby this may be accomplished with a minimum of delay. *See* Rule 7.6, R.P.J.P.M.L., 199 F.R.D. at 436-38. We are confident that Judge Weiner will continue to promptly review arguments for returning transferred actions or claims to their transferor courts and will take all appropriate steps to assure their speedy return whenever he is convinced that retention in the MDL-875 proceedings is no longer needed.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, these four actions are transferred to the Eastern District of Pennsylvania and, with the consent of that court, assigned to the Honorable Charles R. Weiner for inclusion in the coordinated or consolidated pretrial proceedings occurring there in this docket.

FOR THE PANEL:

John F. Keenan
Acting Chairman

(...continued)
pending, or ii) limit the pretrial jurisdiction of that court; and 3) accordingly, those courts wishing to address such motions have adequate time in which to do so, those courts concluding that such issues should be addressed by the transferee judge need not rule on them, and the process of 1407 transfer in MDL-875 can continue without any unnecessary interruption or delay.

THIS AGREEMENT, made and entered into this 28 day of October, 1971, by and between the ILLINOIS CENTRAL RAILROAD COMPANY, hereinafter referred to as Railroad Company, and THE DAVID J. JOSEPH COMPANY, hereinafter referred to as Joseph Company;

W I T N E S S E T H:

WHEREAS, Railroad Company desires to have Joseph Company perform car dismantling services subject to the terms and conditions of this agreement and Joseph Company is agreeable to performing such services; and

WHEREAS, Joseph Company intends to lease a parcel of Railroad Company's property at McComb, Mississippi and to equip a car dismantling facility thereat for the purpose of performing the aforesaid service for Railroad Company;

NOW, THEREFORE, in consideration of the mutual covenants hereinafter contained, it is hereby understood and agreed as follows:

1. Joseph Company agrees to equip and maintain a car dismantling facility at McComb, Mississippi at Joseph Company's sole risk and expense. It is understood and agreed that Joseph Company will install and maintain a box car afterburner as a part of the aforesaid facility as soon as practicable.

2. Joseph Company will furnish all labor and equipment for the dismantling, burning and disposal of all railroad cars and other equipment delivered by Railroad Company to Joseph Company's facility. It is understood that Railroad Company will deliver approximately 2,000 railroad cars and other equipment per year to Joseph Company's facility and that the deliveries will be evenly spaced to the extent such spacing is practicable. It is further understood that nothing herein shall be construed to obligate Railroad Company to deliver a minimum quantity of railroad cars and other equipment or to restrict Railroad Company to delivery of a maximum quantity of railroad cars and other equipment. Joseph Company hereby agrees to purchase the railroad cars and other equipment delivered to it by Railroad Company on the basis hereinafter provided and to treat and retain or dispose of the

EXHIBIT B

material contained therein as its own property, subject to the understanding that Railroad Company shall have the right from time to time to designate any part or parts of such railroad cars or other equipment which it desires to purchase and Joseph Company agrees to sell such part or parts to Railroad Company on the basis hereinafter provided. Joseph Company shall not sell any part or parts which are designated by Railroad Company without Railroad Company's prior written consent.

3. It is understood and agreed that Joseph Company will only perform dismantling services for Railroad Company at the aforesaid facility unless otherwise consented to in writing by Railroad Company.

4. Joseph Company agrees to purchase all railroad cars and other equipment delivered by Railroad Company under this agreement F.O.T. to Joseph Company's facility at McComb, Mississippi. The purchase price to be paid by Joseph Company for railroad cars and other equipment delivered in each calendar month shall be determined by a formula using the composit average of the high side quotation for No. 1 Railroad Heavy Melting Steel for the Chicago, Birmingham and St. Louis Markets as published in Iron Age Magazine in the last issue dated in the previous calendar month and said formula will be applicable to the metallic content of the railroad cars and other equipment. Formulae for determining price of various categories of cars and equipment are shown on Schedule A attached hereto and made a part hereof. Any other formula that becomes necessary will be arrived at by mutual agreement of the authorized representatives of the parties hereto prior to any handling by Joseph Company. Deductions for non-metallic material in standard types of cars is shown on Schedule B attached hereto and made a part hereof. Deductions for any other cars or equipment will be arrived at by mutual agreement of the authorized representatives of the parties hereto prior to any handling by Joseph Company.

It is understood that all parts designated by Railroad Company as usable, exclusive of journal brasses, will be returned to Railroad Company F.O.B. Joseph Company's facility at the price

of Forty Dollars ($40.00) per gross ton over the current monthly formula purchase price for cars containing wood as shown in item 2 of the attached Schedule A. Journal brasses designated by Railroad Company will be returned to Railroad Company F.O.B. Joseph Company's facility at a price of $0.30 per pound.

5. The parties hereto will each keep a record of the number and purchase price of the railroad cars and other equipment sold to Joseph Company and the number and purchase price of the parts sold to Railroad Company under this agreement. At the end of each calendar month, Railroad Company will prepare a statement for that month showing the net amount due from one party hereto to the other. The amount owed under the said statement shall be paid within thirty (30) days from the date thereof.

6. This agreement may be terminated at any time by either party hereto by giving six months' notice in writing to the other party.

IN WITNESS WHEREOF, the parties have executed this agreement as of the date first above mentioned.

ILLINOIS CENTRAL RAILROAD COMPANY

By [signature]
Title VICE PRESIDENT-MATERIALS MANAGEMENT

THE DAVID J. JOSEPH COMPANY

By M A Danner
Title TREAS

9/1/71

SCHEDULE "A"

Scrap Pricing

1.   All Steel Cars on Own Wheels

Composite minus thirteen dollars ($13.00) per gross ton


2.   Cars Containing Wood on Own Wheels

Composite minus fifteen dollars ($15.00) per gross ton


3.   Wrecked Car Bodies Loaded onto Other Cars

Composite minus eighteen dollars ($18.00) per gross ton

9/1/71

SCHEDULE "B"

SUGGESTED Wood/Non-Metallic Allowances

| | | |
|---|---|---|
| 40' Box Cars | floor 3120<br>sides 2340<br>ends   790 | 6250 lbs. |
| 50' Box Cars | floor 3900<br>ends   790<br>sides 2185 | 6875 lbs. |
| 40' Gondola Floor or Flat Car | | 4000 lbs. |
| 50' Gondola Floor or Flat Car | | 5000 lbs. |
| 65' Gondola Floor | | 6200 lbs. |
| Stock Car Single Deck | | 10400 lbs. |
| Stock Car Double Deck | | 13500 lbs. |
| Steel Exterior Reefer | | 10000 lbs. |

Lease #3240  La. Div.

Indenture made as of the 30th day of August 1971

between Illinois Central Railroad Company, a corporation, as Lessor (hereafter called "Railroad"), David J. Joseph Company

after called the "Lessee") whose billing and mailing address is 801 W. 8th Street Cincinnati, Ohio 45203

WITNESSETH, that the parties hereto, for and in consideration of the performance of the covenants, conditions and agreements hereafter expressed agree as follows:

Railroad leases to Lessee and Lessee leases from Railroad upon the terms, covenants and conditions herein contained the property outlined in red on print attached hereto and made a part hereof, hereafter called "Premises", located at or near Mc Comb

County of Pike, State of Mississippi

particularly described as follows:

7.4 acres more or less as shown outlined in red on the attached print dated July 13, 1971.

The term commencing on the 1st day of September, 1971, and ending on the 31st day of August, 1976, unless sooner terminated as hereinafter provided,

used exclusively as dismantling of freight cars and for no purpose without the express written consent of Railroad. Lessee agrees to pay as rent for said demised premises the sum 5,400.00 per annum/which includes taxes on land only to be paid to the Railroad in MONTHLY installments of $ 450.00 each in advance on the 1st day of each month.

The Lessee agrees concurrently with the execution of this lease to deposit with Railroad, as security only, and as collateral the faithful performance of all of the terms, covenants and conditions of this lease, including the payment of rent, the sum of ........................ Said sum shall be retained by Railroad as collateral security only, and not as rent.

In the event of default in the payment of any installment of rent, or in the event of default in payment of any other charges or obligations of the Lessee under this lease, or in the event of a filing of a petition in Bankruptcy, either in straight bankruptcy, or so called provisions of the Relief Bankruptcy Act; or in the event of the insolvency of the Lessee, resulting in default in the terms and conditions of this lease; Railroad shall be permitted to resort to said fund for the purpose of reimbursing itself for such applying said deposit to the last maturing installments of rent due under the terms of this lease, exclusive of any extension of, and the obligations of the Lessee upon said lease shall be reduced by the application of such funds to the last maturing installments of rent; and

In the event of the default of Lessee under any other provision of said lease, the said fund may be resorted to by Railroad to itself whole on account of any such other default.

In the event of the termination of this lease for any cause not occurring through the default of Lessee, the balance of any sums remaining in the collateral security fund, after the satisfaction of any obligations of Lessee, shall be refunded and delivered to Lessee. Said fund shall bear no interest.

Lessee accepts this lease subject to all lawful outstanding existing liens and superior rights, if any, in and to said Premises, including, but not limited to, the Railroad Company's Consolidated Mortgage dated November 1, 1949, and supplements thereto, to Morgan Guaranty Trust Company of New York (Formerly Guaranty Trust Company of New York), Trustee, if the same is applicable to said Premises. Lessee agrees it shall not have any claim against Railroad for damages on account of any deficiency in title of Premises leased hereby and agrees that in the ev[...]iod in which Lessee is deprived of possession [...] sole remedy of Lessee shall be the right to return of a proportionate share of rent paid in advance [...] ion of Premises by title superior to that of Railroad.

Lessee shall pay all taxes, license fees or other ch[...] or which may be assessed against said [...]n, except special assessments for public [...]ure, Lessee, the business conducted on said Premises [...]d by Railroad upon presentation by Rail-

EXHIBIT C

... the rental here... reserved ... stipulated to be paid by Lessee shall be increased by ... ments or improvements, the rental here... ...m amount of such assessments.

Lessee has examined Premises and knows the condition of said Premises and has received the ... in good order and ... acknowledges that no representations as to the condition and repair thereof have been made by the Railroad or its agents ... that are not herein expressed. Lessee accepts Premises subject to any and ...ces prior to or at the execution of this lease, telephone, telegraph, communication and signal lines or any other similar ...ting easements, Railroad facilities, pipe lines, ... thereof provided such future installations do not interfere with Lessee's use of ...s together with any future installations thereof ... necessary to relocate any of Railroad's facilities by reason of this lease, or Lessee's ...s. Should it at any time become necessary ... Premises, Lessee shall bear and pay the cost of so doing.

No improvement shall be constructed by Lessee on the Premises without prior written consent of Railroad. Such consent ...ot relieve Lessee of any responsibility otherwise imposed by law or the terms of this lease. Lessee shall not enter into ...tract for labor, materials or services for improvements on Premises without stipulating that no lien shall arise or be claimed ...unt thereof against the title or interest of Railroad and that any such lien shall be limited to the interest of the Lessee and to the rights of Railroad under the terms of this lease. Prior to any construction Lessee shall furnish Railroad with copies ...contracts, contractors' sworn statement together with full and complete waivers of lien from all contractors, subcontractors, ...s, material men and others furnishing services or material to the Premises.

Lessee shall not interfere with or obstruct drainage ditches or drain pipes on or below the surface of the ground as the ...ay now exist on Premises, nor shall Lessee put or permit any contaminous matter to enter into any drainage ditch or drain ... Premises. If it should become necessary to make any change or alteration in any existing drainage ditch, drain pipe or ... on the surface or below the surface of the ground on Premises by reason of any improvements that Lessee may desire to con... thereon, Lessee shall, at its own expense, make such changes or alterations in a manner satisfactory to the Chief Engineer ...road or his authorized representative.

Lessee shall not erect or maintain or allow to be erected or maintained any building, structure or physical obstruc... any kind adjacent to or over any railroad track at distances less than those prescribed by lawful authority; and in the ...e of any such clearances prescribed by lawful authority, no building, structure or physical obstruction shall be erected, ...ined or allowed to exist within eight and one-half (8½) feet of the center line of any railroad track or at a height of less than ...-three (23) feet above the top of the rails of the track (with suitable increase in such clearances where required because of ...ure and/or super-elevation of the track), except as to wires, the overhead minimum clearance of which shall be in accord... with specifications of the then current National Electrical Safety Code, and in no case less than twenty-seven (27) feet, ...y-five (25) feet in the case of wires or cables suspended from messengers), above the top of rails of any railroad track. ...edge of or notice to Railroad of Lessee's failure to perform this covenant and Railroad's continued operation over any rail... track thereafter shall not be a waiver of this covenant.

Lessee shall, at its expense, maintain Premises and any improvement erected thereon by it or leased to it by Railroad at ...nes during the term of this lease in accordance with accepted engineering, sanitary, fire and accident prevention practices. ...e will keep the Premises free of noxious vegetation and debris and shall not permit or allow any condition constituting a ...nce to exist.

Railroad shall have the right at any time, but not the obligation, to inspect Premises to assure itself that there has been ...liance with the terms of this lease, but the exercise by Railroad of such right, or the failure to exercise the same, shall not ...e Lessee of any obligation imposed upon Lessee under the terms of this lease.

No signs or advertisements except those of the Lessee's business shall be displayed on Premises and shall not be erected ... to obstruct the view at grade crossings ... without Lessee first obtaining written consent of Railroad.

No intoxicating liquors shall be sold or dispensed on Premises without ... in amounts prescribed by Railroad. ...delivering to Railroad dram shop or other appropriate insurance ...

Lessee shall pay for all utility service brought to and/or consumed on the Premises and agrees that artificial lighting ... be by electricity only. Any electrical installation on Premises, where oil or flammable liquids are handled or stored, except ...ibroken original containers, shall conform to and be maintained in accordance with the provisions of the then current edition ...e National Electrical Code with respect to Class I Hazardous Locations. Lessee agrees that the portion of any track or ...g, whether the property of Lessee or Railroad, upon which cars of flammable or explosive liquids are placed for storage, load... or unloading shall be adequately protected against the hazard of fire or explosion due to stray electrical currents or static dis...ge. This protection shall conform to the rules for recommended practice relative to the protection of said track or sidings from ...or explosion due to stray current as set forth in the then current specifications of the Association of American Railroads. ...see will comply with all provisions of the then current AAR Circulars Nos. 17 and 17-F with respect to tank installations, ...age and handling of anhydrous ammonia, including the unloading thereof from railroad tank cars. Lessee also agrees to comply ... all applicable Federal, State, and Municipal Laws, Rules and Regulations governing the handling of flammable or explosive ...ids and anhydrous ammonia.

...I. Lessee agrees that at all times during the continuance of this lease it will exercise such care, and cause such precautions ...e taken, as shall adequately protect the facilities, buildings and structures plus contents thereof on said Premises, and all ...erty, of whatever description, including, but not limited to that belonging to the parties hereto, situated on Premises, against dangers to which they may be exposed from fire regardless of cause.

...4. Lessee agrees to assume, indemnify and save harmless Railroad against (a) any penalty or damage or charges imposed on ...lroad for any violation of any laws or ordinances occasioned by the act or neglect of Lessee or those holding under Lessee, ... any and all liability, loss, cost, damage and expense (including attorneys' fees), arising out of or from any accident or other ...urrence on or about Premises or attributable to occupancy of Premises by Lessee or attributable to the operation of engines, ...s or other equipment over and upon any side, spur, industry or other track connecting Premises with the main line of Railroad, located on any part of Premises, causing injury to any person (including the parties hereto and their employees) or property (in...ding that belonging to the parties hereto), and (c) all claims and any and all loss, cost, damage or expense, including, but not ...ited to, that occurring to the parties hereto, arising out of any failure of Lessee in any respect to comply with and perform all ... requirements and provisions of this lease. ~~The indemnity provided for in this paragraphs 7 and 15 of this lease ... The Railroad ...~~ ~~...~~ The indemnity provided for in this paragraph shall be applicable ... due to negligence of Railroad.




...for loss, damage or ... thereof, together ... all cases, with any ... injury ... respect ... in its custody or possession, ... attributable to the ... attorneys' fees and costs incurred or susta... ad, arising from or in any man... of any ... ce of or storage of explosive material or othe... ntly dangerous commodities on Prem...

See new Paragraph 15 on attached rider "A".

Lessee agrees at all times during the term hereof, at its own expense, to keep the improvements on the demised premises against loss by fire and those risks now or hereafter normally covered by the term "extended coverage" for not less than ...ndred percent (100%) of their full insurable value in companies acceptable to the Railroad. Lessee further agrees Railroad ...e named as one of the insured and furnished a duplicate original of said insurance policy which shall further provide for 30) days prior written notice to Railroad of any change in coverage or cancellation thereof.

...a further consideration Lessee agrees, at Lessee's sole cost, to secure, prior to the effective date of this lease, and to ...n effect at all times during the term hereof, a policy of insurance satisfactory to Railroad insuring Railroad from and against ...d all damages, claims, demands, causes of action, suits, judgments, attorneys' fees, costs and expenses resulting or arising ...eath of or injury to persons whomsoever, or loss or destruction of or damage to property whatsoever and to whomsoever be... ...g, resulting from, growing out of or incidental to the use or occupancy of Premises, or any part thereof, by Lessee, or any ...or persons whomsoever, with or without the consent of Lessee, or arising from or growing out of Railroad operation or main...e by Railroad, or from any causes whatsoever. Said liability policy shall provide coverage of not less than Three Hundred ...and Dollars ($300,000) for death or injury to one person, and not less than Five Hundred Thousand Dollars ($500,000) for ...or injury to more than one person occasioned in any one accident or occurrence, and not less than One Hundred Thousand ...s ($100,000) for loss or destruction of or damage to property. It is understood and agreed by Lessee that furnishing of such ...of insurance and the acceptance by Railroad is not intended to and shall not limit, affect or modify the obligations of ... ...e under any provisions of this lease. Said insurance policy shall specifically refer to and cover the indemnity provided ... this lease and shall further provide for thirty (30) days prior written notice to Railroad of any change in coverage or cancel... thereof. A certificate of insurance evidencing the insurance required hereunder, and any renewal thereof, shall be furnished ...oad.

The Lessee agrees, if requested by Railroad, that it will at its own expense erect and maintain a good substantial fence ...ricade on Premises separating the same from other property of Railroad on which Railroad operations are conducted.

If Lessee fails to substantially begin compliance with any obligations under the terms of this lease after receiving thirty ...days written notice from Railroad, the Railroad may, at its option, perform such obligations at the sole cost and risk of ...ee. Cost of work performed by Railroad for Lessee's account as referred to in this lease is hereby defined to be the cost of ...and material furnished by Railroad and rental on equipment used. To the cost of labor there shall be added 10% to cover ...vision and accounting. Also included will be the cost of vacation allowance, paid holiday allowance, health and welfare ...rance, Railroad Retirement and/or Social Security taxes, unemployment compensation and premiums on workmen's compensa... property damage and public liability insurance. To the cost of material there shall be added 15% to cover accounting, handl... ...nd transportation. In addition, the term "Cost" is defined to include taxes payable by Railroad under any excise, sales or ...tax based on the wages of labor, cost of material, or the gross cost of the work, as the case may be. Bills covering such ...and expense as herein defined shall be paid by Lessee within fifteen (15) days after the receipt thereof.

Failure or delay of Railroad to require full compliance with any one or more of the terms of this lease shall not be held as ...iver of a right to subsequently insist upon such compliance.

If for a period of five (5) days the rent, or any part thereof, shall be unpaid on the day when due, or if default shall be ...e by Lessee for a period of thirty (30) days after written notice in keeping or performing any of the other covenants or agree...s herein contained, or if bankruptcy, insolvency, receivership, foreclosure or any similar proceedings affecting Lessee shall ...nstituted and not dismissed for said period, Railroad may at its election declare this lease terminated and the term provided ...erein shall be ended. An abandonment of the Premises by Lessee for a period of thirty (30) days shall operate at the election ...ailroad as termination of this lease without notice. Failure of Lessee to occupy or use Premises for the purposes above ...cified shall at the election of Railroad be deemed an abandonment. Whenever or however ended Railroad shall have the right ...hout being guilty of any manner of trespass or forcible entry or detainer) either with or without notice or demand, and either ...or without process of law, to immediately take possession of Premises and any improvements thereon, and to remove there... ...the Lessee and/or any person or persons occupying Premises or any and every part thereof, and any and all effects that may ...hen on Premises or any part thereof, using such force as may be necessary, and to repossess and enjoy Premises. When the ...of this lease shall be ended for any cause Lessee covenants and agrees to give up and surrender to Railroad peaceably and ...ediately Premises and improvements thereon without further demand or notice and in good order, repair and condition, reason...e wear and tear excepted, failing which Railroad may restore Premises and improvements to good order, repair and condition at ...sole cost and risk of Lessee. Termination of this lease shall not affect the Railroad's rights with respect to Lessee's obliga...s for rent or otherwise and shall not prevent Railroad from pursuing such other actions or proceedings as it may deem advis...e. All sums due and unpaid under the terms of this lease shall bear interest at the maximum permitted rate under law.

...1. If the term of any lease made by the Lessee for any premises leased from Railroad shall be terminated or terminable after ...making of this lease because of any default by the Lessee under any such lease, such fact shall empower the Railroad, at the ...ilroad's sole option, to terminate this lease by notice to the Lessee.

22. This lease is made subject to the approval of any Governmental authority having jurisdiction thereover.

23. Railroad may terminate this lease and the tenancy hereby created at any time by giving Lessee sixty (60) days notice of ...ch intention. No termination of this lease shall release the parties, or either of them, from any liability or obligation that ...crued prior to said termination. In the event this lease is terminated pursuant to Paragraph 23 any unearned prepaid rentals ...ade by the Lessee under the terms and conditions of this lease shall be refunded to the Lessee on a prorata basis less any other ...onies which may be due Railroad.

24. All notices to be given to Lessee shall be considered as having been properly given upon mailing such notice by certified ...S. mail, postage prepaid, addressed to Lessee at its billing and mailing address set out heretofore. For the purposes of effect...ting termination of this lease, as provided in Paragraph 23 hereof, notice may be served upon lessee by (a) personally delivering ...otice of termination to Lessee; (b) by personally delivering notice to any of Lessee's employees on premises; (c) by posting ...aid notice of termination on premises; or (d) by mail as above provided. Utilization of any one or more of such methods for giving

... Manager – Real Estate ... 135 East 11th Place, Chicago, Illinois ...605, by U. S. certified mail, return receipt requested, and shall be con[sid]ered as having been properly given when ac[tual]ly rece[ived] by the Railroad.

25. L[e]ssee hereby agrees to remove bu[il]di[ngs], structures, foundations, footings, ma[nholes], ... [si]gns or signboards, debris or any other articles or facilities owned by Lessee or permitted to be placed on, above or below the surface of Premises by Lessee before the termination of this lease, and restore Premises to a condition satisfactory to Railroad, and if not so removed, such property shall, at the election of the Railroad, become Railroad's property, or Railroad may, at its election, remove and dispose of such property without any liability whatsoever to Lessee or have the same removed and restore Premises to a satisfactory condition and charge Lessee for all costs incident thereto, the Lessee hereby agreeing to pay such costs as additional rental.

26. Lessee agrees at its expense to comply with all the obligations imposed upon it under the terms of this lease and with all laws, rules, regulations and requirements of any Governmental authority having jurisdiction over Premises, the public ways adjacent thereto, the business conducted thereon, or the Lessee or Railroad. Lessee agrees to comply with the then current Association of American Railroad specification and circulars and other standards which will be furnished to Lessee upon written request to Railroad.

27. The invalidity or unenforceability of any provision of this lease shall not affect or impair any other provision.

28. Acceptance of money by the Railroad from Lessee after any default by Lessee or after the expiration of the agreement or after the service of any notice or after the commencement of any suit, or after final judgment for possession of said property, shall not waive such default or reinstate, continue or extend the term of the lease or affect any such notice or suit, as the case may be.

29. Lessee shall not assign this lease or sublet the demised Premises or any part thereof, without the written consent of the Railroad. Lessee shall not allow or permit any transfer of this lease, or any interest hereunder, by operation of law, or convey, mortgage, pledge or encumber this lease or any interest herein.

30. If the whole or any part of the demised Premises shall be taken or condemned by any competent authority for any purpose, or is sold by the Railroad under the threat of condemnation, the term of this lease shall end upon and not before the date when possession of the part so taken shall be required for such use or purpose, and without apportionment of the award. Current rent shall be apportioned as of the date of such termination and lessee shall have no right to share in the condemnation award or sales proceeds.

31. All of the covenants, agreements, conditions and undertakings contained in this lease shall be binding upon and inure to the benefit of the legal representatives, successors or assigns of the respective parties hereto.

32. It is expressly agreed by and between the parties hereto that all of the agreements, terms and covenants contained in this lease are the only agreements entered into between the parties affecting the demised premises. The Lessee expressly acknowledges that the Railroad has made no agreements affecting the demised premises except those as are expressed therein.

33. Lessee shall have the right to use the tracks indicated in blue and green on the attached print dated July 13, 1971, (Hereafter called the "blue and green tracks") for switching purposes only. Lessee shall assume all liability, regardless of negligence of Railroad, while using said blue and green tracks. Lessee's movements on or about said blue and green tracks shall be under flag protection and in full accordance with Railroad Operating rules. Lessee shall secure permission from the Trainmaster or his authorized representative to use said blue and green tracks prior to such use.

IN WITNESS WHEREOF, the parties hereto have caused this lease to be executed in duplicate original as of the day and year first above written.

Illinois Central Railroad Company,

By R E Dobrich [signature]
Manager – Real Estate Operations
~~XXXXXXXXXXXXX~~

APPROVALS OF RAILROAD

Accounting R. A. Richetti [signature] 10/13/71
For Vice President & Comptroller

Form John F. Bell [signature]
Attorney

Execution John F. Bell [signature]
Attorney

DAVID J. JOSEPH COMPANY
Lessee

BY: M A Jasper [signature] TREAS

Corporation must sign by duly authorized officers
All partners in partnership must sign.



RIDER "A"

Par. 15. Lessee agrees not to store or allow to exist on the premises any explosive material or other inherently dangerous commodity. For the purposes of this lease the storage of oxygen on the premises for use in the normal operations of Lessee shall not constitute a violation of this provision.

By W A Garcia TREAS Dated 9/2/71

INOIS CENTRAL GULF RAILROAD
SUBSIDIARY COMPANY

EXTENSION RIDER

Louisiana DIVIS

01

LESSOR COPY

E APR. 1, 197_
SE NUMBER 1-1-03240EI
SE EXPIRES AUG. 31, 197_

LESSEE NAME AND ADDRESS

David J. Joseph Co.
801 W. 8th St.
Cincinnati, Ohio 45203

LEASE PURPOSE & LOCATION

DISMANTLING FREIGHT CARS
MC COMB MISS

NOTICE: YOUR LEASE WITH OUR COMPANY, NO. 32408

EXPIRES ON August 31, 1976

If you desire to continue occupying this property under the terms and conditions set forth below, please sign and return the original of this letter marked "LESSOR COPY" and "ACCOUNTING DEPT. COPY" in the enclosed stamped self-addressed envelope 30 days prior to the present expiration date. You should retain that copy marked "LESSEE COPY" and attach it to your copy of the lease.

IF YOU DO NOT RETURN THIS SIGNED EXTENSION RIDER 30 DAYS BEFORE EXPIRATION YOUR LEASE WILL BE TERMINATED AND YOU WILL HAVE TO VACATE THE PROPERTY AND REMOVE ALL OF YOUR IMPROVEMENTS BEFORE THE EXPIRATION DATE, LEAVING IT IN A NEAT AND ORDERLY CONDITION AS PROVIDED FOR UNDER THE TERMS OF YOUR PRESENT LEASE.

The undersigned hereby agree to renew the captioned lease until 8-31-81 upon the terms and condition and subject to the agreements therein contained, except rent shall be $6,000.00 per year

Yours very truly,
ILLINOIS CENTRAL GULF RAILROAD COMPANY

By [signature]
Manager-Real Estate Operations

233 North Michigan Avenue
Chicago, Illinois 60601

Acknowledged and Accepted this
Day of 7/27, 1976

DAVID J. JOSEPH COMPANY
BY: [signature] V-P

(Lessee)

Corporation must sign by duly authorized officer. All partners in partnership must sign.

FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

THOMAS R. WICKER
[and Plaintiffs listed on attached Exhibit "A"] PLAINTIFFS

vs. CIVIL ACTION NO. ___________

ILLINOIS CENTRAL RAILROAD COMPANY DEFENDANT

STATE OF ILLINOIS )
) SS.
COUNTY OF COOK )

**AFFIDAVIT OF RICH HUSEY**

After being duly sworn upon my oath, I depose and state that I am manager of U.S. Operations for Supply Management for Canadian National/Illinois Central Railroad Company and am duly authorized to make this affidavit, that I have been duly informed concerning the alleged cause of action against Illinois Central Railroad Company in the above-entitled suit, and that I am reliably informed and know that the matters and things contained herein are true and correct to the best of my knowledge, information and belief:

1. I am over eighteen years of age and am competent to render this affidavit.

2. I am currently employed as Manager of U.S. Operations for Supply Management for the Canadian National/Illinois Central Railroad Company and I am located in Homewood, Illinois. From approximately 1978 to 1984, I was employed by the Illinois Central Railroad Company as Materials Superintendent working at Illinois Central's McComb, Mississippi facility.

3. During the course of my employment at McComb, I was familiar with the David J. Joseph Company and was aware that they dismantled freight cars as an outside contractor for the Illinois Central.

EXHIBIT
D

4. The Illinois Central sold railroad cars to the David J. Joseph Company who would then dismantle the cars for salvage and, in some circumstances, they sold parts back to the Illinois Central.

5. David J. Joseph Company was responsible for hiring its own employees. David J Joseph Company was responsible for firing and disciplining its own employees. David J. Joseph Company was responsible for paying and providing any benefits to its employees engaged in the dismantlement of freight cars.

6. David J. Joseph Company provided all the tools and equipment to its employees that were necessary to perform the dismantling job.

7. David J. Joseph Company exercised complete control over its employees and instructed them on a day-to-day basis as to their particular duties

8. Illinois Central acted as a customer of David J. Joseph Company by purchasing dismantled parts from David J. Joseph Company after they had performed their salvage work. The relationship between Illinois Central and David J. Joseph Company provided economic benefit to David J. Joseph Company they sold these salvaged parts to outside sources, presumably for profit.

8. The relationship with David J. Joseph Company was ongoing throughout my tenure at McComb and was in place prior to my arrival at McComb in approximately 1978.

Further Affiant sayeth not.

Richard J. Hussey

In accordance with 28 U.S.C. §1746, the undersigned certifies under penalty of perjury that the foregoing is true and correct.

Dated: 9/20, 2003.

Richard J. Hussey