JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

NOV - 5 2004

FILED
CLERK'S OFFICE

**MDL  875**

## BEFORE THE JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

In re **Welding Rod Products Liability Litigation**    *

                  *   MDL No. 875

                  *   **MDL No. 1535**

*Mardie McKeithen, et al. v. Exxon Mobil*      *

*Corporation, et al., M.D. Louisiana, C.A. No. 04-*    *

*365*                                  *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**PLEADING NO. 4297**

## OPPOSITION TO PLAINTIFFS' MOTION TO VACATE THE CONDITIONAL
## TRANSFER ORDER ON BEHALF OF REMOVING DEFENDANTS[1]

        This Panel should deny plaintiffs' motion to vacate the conditional transfer order

because it is undisputed that transferring this case to the multidistrict litigation ("MDL")

proceedings in the Northern District of Ohio will serve the "convenience of the parties and

witnesses and will promote the just and efficient conduct of this litigation." 28 U.S.C. § 1407(a).

Critically, plaintiffs do not contest the appropriateness of transfer under the standards set forth in

Section 1407(a), which is the only issue properly before the Panel. Rather, plaintiffs contend

---

[1]    "Removing Defendants" are Lincoln Electric Company; Praxair, Inc.; Union Carbide
Corporation f/k/a Union Carbide Chemicals and Plastics Company, Inc.; Sandvik, Inc.;
The ESAB Group, Inc.; Allegheny Technologies Incorporated f/k/a TDY Industries, Inc.
f/k/a Teledyne Industries, Inc.; Eutectic Corporation; Hobart Brothers Company; A.O.
Smith Corporation; The BOC Group, Inc. f/k/a Airco, Inc.; Airgas-Gulf States, Inc.; and
Viacom, Inc., Successor by Merger to CBS Corporation f/k/a Westinghouse Electric
Corporation.

**OFFICIAL FILE COPY**
IMAGED NOV -8 '04

42197.doc

that this case should be remanded to Louisiana state court on the grounds that there is no federal jurisdiction. That, however, is an invalid basis for challenging an MDL transfer because the Panel is not empowered to rule on the merits of a motion to remand. Indeed, the Panel routinely has rejected the same argument advanced by plaintiffs here and, in case after case – including several times in these MDL proceedings – held that the MDL court is the proper forum for resolving motions to remand. Accordingly, plaintiffs' motion should be denied, and the case should be transferred to the MDL court.

Furthermore, there *is* federal jurisdiction over this case. Plaintiffs improperly combine two wholly-distinct and unrelated lawsuits – one based on exposure to asbestos and one based on exposure to welding fumes – because certain defendants to the asbestos claims share Louisiana citizenship with plaintiffs. Although plaintiffs are free to pursue their asbestos claims in an appropriate forum, basic principles of civil procedure prevent them from combining unrelated claims to avoid federal court jurisdiction. Under the doctrine of "fraudulent misjoinder," the citizenship of the asbestos defendants should not be considered and thus, there is federal diversity jurisdiction.

Finally, plaintiffs contend that the Notice of Removal was technically deficient because not every defendant consented in writing to removal. In fact, every defendant to the welding claims did give consent, as stated in the Notice of Removal. All but one defendant consented in writing. The other defendant verbally consented to removal and has now cured any technical failure by submitting a written consent. Binding precedent holds that federal jurisdiction cannot be defeated on a mere technicality like the one alleged by plaintiffs. As discussed further below, plaintiffs' motion to vacate the conditional transfer order should be denied.

42197.doc

## I.   PROCEDURAL BACKGROND

### A.   The Welding Rod MDL Proceedings

On June 23, 2003, the Panel transferred three actions involving "claims of personal injuries allegedly caused by exposure to welding fumes" to the Northern District of Ohio "for coordinated or consolidated pretrial proceedings." *See* 6/23/03 Transfer Order at 2. The Panel determined that these actions "share[d] factual questions concerning, *inter alia*, whether exposure to welding fumes causes the conditions claimed of by plaintiffs and whether defendants knew or should have known of any health risks associated with exposure to welding fumes." *Id.*   The Panel ruled that "[c]entralization under Section 1407 is thus necessary to eliminate duplicative discovery; prevent inconsistent pretrial rulings, especially with respect to class certification; and conserve the resources of the parties, their counsel, and the judiciary." *Id.* Since that time, approximately 150 welding rod cases have been transferred to the MDL court in the Northern District of Ohio for consolidated or coordinated pretrial proceedings.

### B.   Plaintiffs' Petition States Two Separate and Independent Causes of Action Against Different Sets of Defendants.

In their Petition, plaintiffs combine two entirely separate causes of action against different defendants arising out of distinct sets of facts.  In "Part A" of their Petition, entitled "Asbestos Exposure," plaintiffs allege that Millard McKeithen ("McKeithen") was exposed to asbestos and asbestos-containing products.[2]   Plaintiffs allege that this exposure caused McKeithen to suffer various *lung conditions*, including adeno carcinoma, and that he "died as a result of mesthelioma on February 18, 2003," Pet., Part A ¶ 14. Plaintiffs assert negligence and strict liability claims against a host of defendants, including miners, manufacturers, sellers and

distributors of asbestos, as well as employers whose premises contained asbestos (the "Asbestos Defendants"). *See, e.g., id.* Part A ¶¶ 16, 63 & Exhs. B & C to the Petition. Plaintiffs also assert fraud and conspiracy claims based on an alleged long-running, industry-wide conspiracy among certain Asbestos Defendants to conceal the alleged adverse health effects of asbestos exposure. *Id.* Part A ¶¶ 21–62.

Separately, in "Part B" of their Petition, entitled "Welding Rod Exposure," plaintiffs assert negligence and strict liability claims against a different set of defendants – "manufacturers, sellers, suppliers or large industrial consumers of welding products" (the "Welding Defendants") (*id.* Part B ¶¶ 13) – for an entirely different injury—neurological damages—based on McKeithen's "exposure to welding fumes" (*id.* Part B ¶ 3). Plaintiffs allege that "[p]eople who suffer from manganese poisoning suffer from debilitating neurological problems that affect their ability to think, talk, eat, move, sleep, and work."[3] *Id.* Part B ¶ 6. In contrast to the lung conditions that McKeithen allegedly suffered from exposure to asbestos, plaintiffs claim that, as a result of exposure to welding fumes, McKeithen developed "symptoms indicative of * * * manganese poisoning" and that he "suffered permanent neurological and physical damage" *Id.* Part B ¶¶ 9-10. Plaintiffs' entire claim against the Welding Defendants is premised on an alleged connection between exposure to welding fumes and neurological injury. *See, e.g., id.* Part B ¶¶ 9-11, 23, 25, 26, 29, 30, 32-33, 82, 86.

---

[2]   The Petition is attached as Exhibit A to the Notice of Removal. The Notice of Removal, including the Exhibits, is attached to this Opposition as Exhibit 1.

[3]   Plaintiffs' allegations in Part B track numerous lawsuits already transferred to the welding rod MDL.

42197.doc

C.      **The Welding Defendants Properly Removed this Case to Federal Court.**

This case originally was filed in Louisiana state court.  Removing Defendants timely filed a Notice of Removal in the United States District Court for the Middle District of Louisiana.  Removing Defendants stated that "[a]ll Welding Defendants served as of this date consent to this Notice of Removal."[4]  Exh. 1 ¶ 17.  As the Notice of Removal explained, there is complete diversity of citizenship between plaintiffs and the Welding Defendants, and the amount in controversy exceeds $75,000.  *See id.* ¶¶ 7-9.  In addition, the Notice explained that the claims against the Asbestos Defendants "are so wholly distinct from Plaintiffs' purported claim against the Welding Defendants that they warrant severance," *id.* ¶ 11, and therefore, under the doctrine of fraudulent misjoinder, the citizenship of the Asbestos Defendants should be disregarded.

D.      **The Panel Conditionally Transferred The Welding Rod Claims To The Welding Rod MDL And The Asbestos Claims To The Asbestos MDL.**

Because plaintiffs' welding rod claims involve issues identical to those in the welding rod MDL, Removing Defendants noticed this case for transfer to the MDL.  Removing Defendants also filed a motion to stay the proceedings in the Middle District of Louisiana, which the court granted pending the final transfer decision by the Panel.  The Panel subsequently entered a Conditional Transfer Order ("CTO") separating the welding rod claims in Part B of the Petition and transferring Part B of the case to the welding rod MDL.  *See MDL-875 CTO-236, With Separation, Remand And MDL-1535 CTO-14,* Exh. 2.  The Panel transferred plaintiffs' asbestos claims to the asbestos MDL in the Eastern District of Pennsylvania where it will be consolidated or coordinated with similar asbestos cases.  *See id.*

---

[4]      The Removing Defendants submitted written consents of the other Welding Defendants, with the exception of one, Deloro Stellite Company ("Deloro").  Deloro did, however,

*(continued on next page)*

42197.doc

Significantly, in challenging the CTO, plaintiffs do not contest that this case involves common questions of fact to the numerous other welding rod cases that have already been transferred to the MDL.  Nor do plaintiffs dispute that transferring this case would promote economy and consistency.

## II.   ARGUMENT

### A.   The Plaintiff's Motion To Remand Is Irrelevant To The Issue Before The Panel.

It is undisputed that transfer of this action is appropriate under Section 1407. There are "common questions of fact," namely "whether exposure to welding fumes causes conditions claimed of by plaintiffs and whether defendants knew or should have known of any health risks associated with exposure to welding fumes," *see* 6/23/03 Transfer Order at 1, and transfer "will be for the convenience of the parties and witnesses and will promote the just and efficient conduct" of this litigation.  Just as here, parties routinely oppose MDL transfer by arguing that the case should be remanded to state court.  But that issue "has no bearing on a motion to transfer." *In re Antibiotic Drugs*, 299 F. Supp. 1403 (J.P.M.L. 1969).  Indeed, "Section 1407 does not empower the MDL Panel to decide questions going to the jurisdiction or the merits of a case, including issues relating to a motion to remand." *In re Ivy*, 901 F.2d 7, 9 (2d Cir. 1990).[5]  Time and time again, the Panel has rejected the very same arguments made by plaintiffs and has held that pending motions to remand provide no basis for vacating a transfer order, as such motions "can be presented to and decided by the transferee judge." *In re*

---

provide oral consent to removal, and it has now filed a written notice confirming that consent.  Exh. 4.

[5]   *Accord In re Air Crash Disaster at Fla. Everglades*, 368 F. Supp. 812, 812 (J.P.M.L. 1973) (Section 1407 "does not empower the Panel to entertain" the question of remand).

- 6 -

*California Wholesale Elec. Antitrust Litig.*, 2001 WL 733534, at *1 (J.P.M.L. June 8, 2001).[6]  If that were not enough, several times in these very proceedings, the Panel has ruled that the welding rod cases should be transferred to the MDL court despite pending motions to remand. *See Welding Rod Prods. Liab. Litig.*, MDL-1535, Transfer Orders entered June 16, 2004, August 5, 2004, and October 18, 2004, Exh. 3.

Here, the rationale for transfer is particularly compelling because the transferor court stayed its proceedings pending the Panel's final transfer decision and, thus, the transferor court does not presently have the remand motion under consideration.[7]  Accordingly, there is no gain in judicial efficiency by permitting that court to decide the motion to remand before the Panel's transfer decision.  To the contrary, the case should be transferred because "[c]onsistency and economy are both served by resolution of [motions to remand] by a single court after transfer by the JPML."  *Aikins v. Microsoft Corp.*, 2000 WL 310391, at *1 (E.D. La. March 24, 2000).  In sum, this Panel should do what it regularly does in these precise circumstances – enter the transfer order and allow the MDL court to decide any motions to remand.

---

[6]    *Accord In re Rezulin Prods. Liab. Litig.*, 2004 WL 1965587, at *1 (J.P.M.L. Aug. 19, 2004) (rejecting argument that pending motion to remand can defeat transfer to MDL court); *In re UICI "Association-Group" Ins. Litig.*, 305 F. Supp. 2d. 1360, 1362 (J.P.M.L. Feb. 20, 2004) (same); *In re Silica Prods. Liab. Litig.*, 280 F. Supp. 2d. 1381, 1383 (J.P.M.L. 2003) (same); *In re Adelphia Communications Corp. Sec. & Derivative Litig.*, 273 F. Supp. 2d. 1353, 1355 (J.P.M.L 2003) (same); *In re Ford Motor Co. Crown Victoria Police Interceptor Prods. Liab. Litig.*, 229 F. Supp. 2d. 1377, 1378 (J.P.M.L. 2002) (same); *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 2002 WL 31108228, at *1 (J.P.M.L. March 4, 2002) (same); *In re Wireless Tel. Replacement Prot. Programs Litig.*, 180 F. Supp. 2d. 1381, 1382 (J.P.M.L. 2002) (same); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 170 F. Supp. 2d. 1346, 1347 (J.P.M.L. 2001) (same);  *see also In re Air Crash Disaster*, 368 F. Supp. at 812 (the MDL court "certainly has the power to determine the question of remand")

42197.doc

**B.**     <u>In Any Event, This Case Was Properly Removed To Federal Court.</u>

    **1.**     <u>Complete Diversity Exists Between Plaintiffs And Welding Defendants.</u>

        It is undisputed that plaintiffs, who are citizens of Louisiana, and the Welding Defendants, who are citizens of states other than Louisiana, are completely diverse. Nor is there any dispute that the amount in controversy exceeds $75,000. Thus, there is federal diversity jurisdiction over the welding claims. *See* 28 U.S.C. §1332. Plaintiffs attempt to defeat federal jurisdiction, however, by arguing that the Court must consider non-diverse Asbestos Defendants. This contention should be rejected because plaintiffs' claims against the Asbestos Defendants are entirely unrelated to the claims against the Welding Defendants. Thus, the citizenship of plaintiffs have the non-diverse Asbestos Defendants should not be considered in determining whether there is federal jurisdiction.

        Under the Federal Rules, parties may not join actions that do not arise "out of the same transaction, occurrence, or series of transactions or occurrences." Fed. R. Civ. P. 20(a). Similarly, under Louisiana law, plaintiffs may only join multiple defendants where there is a "community of interest," La. Code Civ. Pro. art. 463 – that is, where the causes of action arise out of the same "operative facts," not "separate occurrences." *Laborde v. American Nat'l Prop. & Cas. Co.*, 780 So. 2d 501, 503 (La. App. 3rd Cir. 2001).[8] Courts refuse to permit plaintiffs to combine unrelated lawsuits to defeat diversity jurisdiction. *Tapscott v. MS Dealer Service Corp.*, 77 F.3d 1353, 1360 (11th Cir. 1996), *abrogated on other grounds, Cohen v. Office Depot, Inc.*,

---

[7]    The transferor court denied plaintiffs' motion to lift the stay to consider the pending motion to remand.

204 F.3d 1069 (11th Cir. 2000); *see also In re Benjamin Moore & Co.*, 309 F.3d 296, 298 (5th Cir. 2002) ("misjoinder of plaintiffs should not be allowed to defeat diversity jurisdiction."). In *Tapscott*, plaintiffs combined one lawsuit against a group of defendants relating to automobile service contracts with a lawsuit against a group of defendants relating to service contracts on retail products. Although the claims were based on the same provision of state law, the "alleged transactions involved" were "wholly distinct," and there was "no real connection" between the two sets of claims. Thus, the Court held that the claims against the non-diverse defendants were fraudulently misjoined. *Id.* at 1360. *Accord Smith v. Nationwide Mut. Ins. Co.*, 286 F. Supp. 2d. 777, 781 (S.D. Miss. 2003) (plaintiffs fraudulently misjoined non-diverse defendants by combining "unrelated lawsuits"—one asserting negligence claims arising out of an automobile accident and the other asserting separate claims against insurance companies). Similarly, in *Laborde*, the plaintiff attempted to combine in a single case three causes of action arising out of separate automobile accidents. The court observed that the "operative facts which give rise to [plaintiff's] actions are derived from three separate occurrences." *Id.* at 503. Without "common facts * * * relating to liability," the court held that "the claims were improperly joined." *Id.* at 503.

Just as in *Tapscott*, *Smith*, and *Laborde*, there is no factual overlap between plaintiffs' distinct sets of claims. Plaintiffs simply fail to allege any facts that show a common thread between their claims based on McKeithen's exposure to asbestos and those based on his exposure to welding fumes. Nor do plaintiffs allege facts that show any connection between the

---

[8] The court need not decide whether state or federal joinder rules apply (or whether (or to what extent) Louisiana and Federal joinder rules differ) because, under either standard, plaintiffs have improperly combined two entirely different lawsuits.

manufacture, sale, supply and distribution of asbestos-containing products with the manufacture, sale, supply and distribution of welding products.  And, critically, the Petition draws a marked distinction between the lung damage allegedly caused by asbestos exposure and the neurological damage allegedly caused by welding fumes exposure.  Plaintiffs allege that "[w]hen inhaled or otherwise ingested, asbestos causes irreparable and progressive lung damage."  Pet. Part A, ¶ 11; *see also id.* Part A ¶ 14 (discussing multiple lung conditions allegedly suffered by McKeithen from asbestos exposure, including "pulmonary or bronchogenic cancer," "mesothelioma," "impaired pulmonary capacity" and "adenocarcinoma"); *id.* Part A ¶ 17 (referring to "respiratory disease"); *id.* Part A ¶ 41 (referring to "occurrence of lung cancer and asbestosis"); *id.* Part A ¶ 55 (same).  With respect to the welding claims, plaintiffs allege that "[p]eople who suffer from manganese poisoning suffer from debilitating neurological problems that affect their ability to think, talk, eat, move, sleep, and work."  *Id.* Part B ¶ 6; *see also id* Part B ¶ 7 (manganese exposure causes "progressive, disabling, neurological damage"), *id.* Part B ¶ 9 (McKeithen developed "symptoms indicative of the condition known as manganism"), *id.* Part B ¶ 10 (as a "result of exposure to welding fumes," McKeithen "suffered permanent neurological and physical damage"); *id.* Part B ¶ 11 (McKeithen was unaware of "neurological injuries"); *id.* Part B ¶ 68 ("Defendants knew, or in the exercise of ordinary care should have known, that welding fumes would cause neurological damage to workers like Plaintiff.");  *id.* Part B ¶ 72 ("Plaintiffs suffered, and continue[] to suffer, severe neurological injuries"); *see also id.* Part B ¶¶ 23, 25-26, 29-30, 32-33, 35-36, 39, 42, 57, 62, 78, 82, 86 (alleging that welding fumes cause neurological injuries).  In fact, plaintiffs' entire case against the Welding Defendants rests on the purported premise that the Welding Defendants knew that exposure to welding fumes caused neurological injury.  *See, e.g., id.* Part B ¶ 10.

42197.doc

Plaintiffs' Petition simply fails to allege that the transactions or occurrences that form the basis of the welding claims have any relationship to the transactions or occurrences that form the basis of the asbestos claims. And this critical fact distinguishes this case from cases relied upon by plaintiffs. *See, e.g., Bright v. No Cuts, Inc.*, 2003 WL 22434232, at * 2 (E.D. La. Oct. 27, 2003) (joining claims alleg[ing] one series of events leading to [plaintiff's] ultimate death."); *Johnson v. Glaxo Simth Kline*, 214 F.R.D. 416, 420-21 (S.D. Miss. 2002) (permitting joinder of claims against pharmacy for filling drug prescription and doctor for prescribing same drug that purportedly caused plaintiff's injuries). In sharp contrast, here, there are two wholly unrelated series of events, leading to distinct injuries: lung damages and neurological injuries.[9] *Id.*

In short, the asbestos claims are "wholly distinct" from those involved in the welding fumes claims, and there is "no real connection" between the two sets of claims. *Tapscott*, 77 F.3d at 1360; *Laborde*, 780 So. 2d at 503 (joinder improper where there are no "common facts * * * relating to liability").[10]

---

[9]   No efficiency would be gained by combining these two unrelated lawsuits alleging purported industry-wide conspiracies against different defendants and involving unrelated products that allegedly resulted in distinct injuries. To the contrary, joinder would require a jury to hear voluminous evidence wholly unrelated to each of the independent lawsuits, which would likely cause jury confusion and prejudice to the defendants. *Cf. Ross v. Life Investors Ins. Co. of Am.*, 309 F. Supp. 2d 842, 850 (S.D. Miss. 2004) (noting these as factors considered in fraudulent misjoinder consideration).

[10]   Plaintiffs try to rehabilitate their pleading by arguing in their memorandum that "the decedent died from adeno carcinoma caused by exposure to welding fumes and also to asbestos" and that "the cause of injury to the lungs and the resulting death could have been caused either by asbestos or welding fumes or by both." Plaintiffs' Mem. at 7-8. This assertion simply is not supported in the Petition, and in fact, is directly contradicted by plaintiffs' allegations against Welding Defendants, which rely exclusively on the premise of Welding Defendants knew of an alleged connection between exposure to

***(continued on next page)***

42197.doc

## 2. Plaintiffs' Reliance On A Technical Error Does Not Defeat Federal Jurisdiction.

Finally, plaintiffs attempt to defeat this Court's jurisdiction on a technicality, contending that the removal was deficient because not all of the "properly joined" defendants gave consent. *See* Plaintiffs' Mem. at 4. This is not so. Critically, it is undisputed that (1) Deloro timely gave oral consent to removal, (2) the Notice of Removal stated that all of the Welding Defendants (who, as discussed above, are the only properly joined defendants) consented to removal,[11] (3) Deloro has cured the technical defect by its written notice of consent (attached as Exh. 4), and (4) there is *actual* federal jurisdiction because of the complete diversity between plaintiffs and the Welding Defendants. What plaintiffs are really claiming is that the failure of one defendant, Deloro, to submit a timely written consent is enough to defeat federal

---

welding fumes and neurological injury. Plaintiffs may not avoid removal by making allegations in a brief that were not asserted in, and indeed are contrary to, the pleadings. *See Christianson v. Colt Indus. Operating Corp.*, 798 F.2d 1051, 1060 n.12 (7th Cir. 1986) (citing *Bender v. Williamsport Area School Dist.*, 106 S. Ct. 1326 (1986)); *Preston v. Grant Adver., Inc.*, 375 F.2d 439, 440-441 (5th Cir. 1967); *see also United States v. Best Care Home Health, Inc.*, 2002 WL 31248025, at *6 (D. Minn. Oct. 7, 2002) (plaintiff "cannot amend a pleading indirectly, through a memorandum").

Nor can plaintiffs defeat removal with the conclusory assertion that Asbestos Defendants and Welding Defendants are jointly and severally liable for the death of McKeithen. *See Jernigan v. Ashland Oil, Inc.*, 989 F.2d 812, 817 (5th Cir. 1993) (affirming denial of remand where claims against non-diverse defendants were "nothing more than conclusionary allegations, wholly lacking in specific factual support.").

[11] Plaintiffs list a host of defendants whom they contend did not consent to removal. Every one of these, with the exception of Deloro, is an Asbestos Defendant. As the Asbestos Defendants were improperly joined in this action, their citizenship is disregarded. *See, e.g., Jernigan*, 989 F. 2d. at 815 (consent not required for improperly or fraudulently joined defendants; noting it would be "nonsensical" to require such consent "as removal in those cases is based on the contention that no other proper defendant exists."); *see supra* Section II (A)(1) (discussing improper joinder of Asbestos Defendants).

- 12 -

42197.doc

jurisdiction.  As explained below, under the weight of Sixth Circuit authority, this argument must fail.[12]

The Sixth Circuit holds that parties "may cure technical deficiencies in a petition for removal." *Gafford v. Gen'l Elec. Co.*, 997 F.2d 150, 164 (6th Cir. 1993).  As the *Gafford* court observed, "[b]etter, if the jurisdiction in fact exists, to permit the petition for removal to be amended to reflect it. * * * Virtually all of the commentators and the great weight of judicial authority favor the rule adopted by this decision." *Id.* (internal quotations omitted).  *Accord Tech Hills II Assoc. v. Phoenix Home Life Mut. Ins. Co.*, 5 F.3d 963, 969 (6th Cir. 1993); *Klein v. Manor Healthcare Corp.*, 1994 WL 91786, at *3-4 (6th Cir. Mar. 22, 1994) (unpublished) (holding that notice of removal could be amended after the deadline for removal to cure a procedural deficiency – the failure to explain one defendant's initial failure to join the removal petition), Exh. 5.  Following these Sixth Circuit holdings, district courts have held, in cases nearly identical to this one, that the failure to obtain a timely written consent to removal can be cured.  For example, in *Callahan v. Callahan*, 247 F. Supp. 2d 935, 940 (S.D. Ohio 2002), a defendant filed a notice of removal stating that the "other defendant in the action * * * has agreed to the removal effected by this notice."  Even though the other defendant did not join in the removal or file a timely written consent, the court held that the notice of removal sufficiently indicated that the other defendant "intended to consent."  *Id.*  To the extent that "any procedural defect occurred," the defendants "cured that deficiency" by submitting affidavits of the other defendant and his counsel consenting to the removal.  *Id.*  Similarly, in *Jordan v. Murphy*, 111 F.

---

[12] Sixth Circuit law applies because the "law of the circuit where the transferee court sits governs questions of federal law in MDL proceedings." *In re Bridgestone/Firestone, Inc., ATX, ATX II Liab. Litig.*, 128 F. Supp. 2d. 1198, 1200 (S.D. Ind. 2001) (applying law of transferee court to motion to remand).

Supp. 2d 1151, 1153 (N.D. Ohio 2000), the court held that, "[g]iven the current stance of liberal amendment standards as applied to removal actions," a late-filed amendment to the notice of removal along with a written statement of consent, were sufficient to "perfect removal" to federal court. *See also Scaccia v. Lemmie*, 236 F. Supp. 2d 830, 835-836 (S.D. Ohio 2002) (denying motion to remand based on "alleged procedural defect" where the notice of removal asserted that all defendants had consented to removal, and non-removing defendants filed a statement indicating their consent); *City of Tipp City v. City of Dayton*, 204 F.R.D. 388, 391 n.1 (S.D. Ohio 2001) ("Where jurisdiction, in fact, exists, the Sixth Circuit has allowed amendment of the Notice of Removal to reflect it."); *Greenwood v. Delphi Auto. Sys., Inc.*, 197 F.R.D. 597, 599-600 (S.D. Ohio 2000) (holding that the signing of notice of removal by licensed attorneys who were not members of the bar of that Court was a curable defect, where plaintiff had not challenged the "jurisdictional basis for the removal, and it is obvious that all of the Defendants intended to consent to or join in the removal.").

Here, all of the defendants intended to and, in fact, *did* consent; the Notice of Removal reflected this unanimous consent, and any deficiency has now been cured with a separate filing. The long line of cases cited above makes very clear that where, as here, there *is* federal jurisdiction, a motion to remand should not be granted because of a minor technical glitch. Just as the courts held in *Callahan*, *Jordan*, and *Scaccia*, this court should hold that the defendants' removal was proper and deny the motion to remand.

### III.   CONCLUSION

For the foregoing reasons, plaintiffs' motion to vacate the conditional transfer order should be denied.

Respectfully Submitted,

*Richard E. Sarver/SHK*

Richard E. Sarver, 23558
Stephen H. Kupperman, 7890
Celeste R. Coco-Ewing, 25002
Mark J. Fernandez, 27459
    Of
BARRASSO USDIN KUPPERMAN FREEMAN &
SARVER, LLC
909 Poydras Street, Suite 1800
New Orleans, Louisiana 70112
Telephone: (504) 589-9700

Counsel for defendants Lincoln Electric Company;
Praxair, Inc.; Union Carbide Corporation f/k/a
Union Carbide Chemicals and Plastics Company,
Inc.; Sandvik, Inc.; The ESAB Group, Inc.;
Allegheny Technologies Incorporated f/k/a TDY
Industries, Inc. f/k/a Teledyne Industries, Inc.;
Eutectic Corporation; Hobart Brothers Company;
A.O. Smith Corporation; The BOC Group, Inc. f/k/a
Airco, Inc; Airgas-Gulf States, Inc. and Viacom,
Inc., successor by merger to CBS Corporation f/k/a
Westinghouse Electric Corporation

- 15 -

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

NOV - 5 2004

FILED
CLERK'S OFFICE

## C E R T I F I C A T E

I hereby certify that a copy of the above and foregoing Opposition to Motion To

Vacate Conditional Transfer Order has been served upon all counsel of record listed on the

attached Panel Attorney Service List by placing same in the United States mail, postage prepaid

and properly addressed, this 4th day of November, 2004.

Bryan Power

RECEIVED
CLERK'S OFFICE

2004 NOV -4  P 3: 40

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

42197.doc

INVOLVED COUNSEL LIST (CTO-236)
DOCKET NO. 875
IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)

INVOLVED COUNSEL LIST (CTO-14)
DOCKET NO. 1535
IN RE WELDING ROD PRODUCTS LIABILITY LITIGATION

Lawrence E. Abbott
Abbott, Simses & Kuchler
400 Lafayette Street
Suite 200
New Orleans, LA 70130

Barbara Lee Arras
Phelps Dunbar, LLP
Canal Place
365 Canal Street
Suite 2000
New Orleans, LA 70130-6534

John H. Beisner
O'Melveny & Myers, LLP
1625 Eye Street, N.W.
Washington, DC 20006-4001

Gary A. Bezet
Kean, Miller, Hawthorne, et al.
One American Place
22nd Floor
P.O. Box 3513
Baton Rouge, LA 70821-3513

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114

Claire E. Breaux
Duplass, Zwain, Bourgeois & Morton
3838 North Causeway Blvd.
Suite 2900
Metairie, LA 70002

Tara L. Burregi
Chopin Wagar Cole Richard Reboul &
Kutcher
Two Lakeway Center
3850 N. Causeway Blvd.
Suite 900
Metairie, LA 70002

Edward J. Cass
Gallagher, Sharp, Fulton & Norman
Bulkley Building
7th Floor
1501 Euclid Avenue
Cleveland, OH 44115

Adam M. Chud
Shea & Gardner
1800 Massachusetts Avenue, N.W.
Washington, DC 20036

John R. Climaco
Climaco, Lefkowitz, Peca, Wilcox &
Garofoli
The Halle Building, Suite 900
1228 Euclid Avenue
Cleveland, OH 44115

Patrick E. Costello
Mouledoux, Bland, LeGrand &
Brackett
650 Poydras Street
Suite 2150
New Orleans, LA 70130

David A. Damico
Burns, White & Hickton
Fifth Avenue Place, Suite 2400
120 Fifth Avenue
Pittsburgh, PA 15222

Michael B. DeSanctis
Jenner & Block
601 13th Street, N.W.
Suite 1200 South
Washington, DC 20005

Richard M. Edmonson
Armstrong Allen, PLLC
4450 Old Canton Road
Suite 210
Jackson, MS 39211

Raymond P. Forceno
Forceno & Hannon
111 S. Independence Mall East
Suite 1000
The Bourse
Philadelphia, PA 19106-2574

Ellen B. Furman
Goldfein & Hosmer
1600 Market Street
33rd Floor
Philadelphia, PA 19103

Susan M. Hansen
Brownson & Ballou
4800 U.S. Bank Place
601 Second Avenue, South
Minneapolis, MN 55402

Sessions Ault Hootsell, III
Phelps Dunbar, LLP
Canal Place
365 Canal Street
Suite 2000
New Orleans, LA 70130

James B. Irwin, V
Irwin, Fritchie, Urquhart & Moore
400 Poydras Street
Suite 2700
New Orleans, LA 70130

Jay M. Jalenak, Jr.
Kean, Miller, Hawthorne, et al.
One American Place
22nd Floor
P.O. Box 3513
Baton Rouge, LA 70821

Reginald S. Kramer
Oldham & Dowling
195 South Main Street
Suite 300
Akron, OH 44308-1314

Stephen H. Kupperman
Barrasso Usdin Kupperman Freeman
& Sarver, LLP
LL & E Tower
909 Poydras Street
Suite 1800
New Orleans, LA 70112

David C. Landin
Hunton & Williams
Riverfront Plaza
East Tower
951 East Byrd Street
Richmond, VA 23219

Katharine R. Latimer
Spriggs & Hollingsworth
1350 I Street, N.W., Suite 900
Washington, DC 20005

INVOLVED COUNSEL LIST (CTO-236) MDL-875 AND (CTO-14) MDL-1535          PAGE 2 OF 2

Gene Locks
Greitzer & Locks
1500 Walnut Street
Philadelphia, PA 19102

Deirdre C. McGlinchey
McGlinchey Stafford
1811 Tower Drive
Suite A
Monroe, LA 71201

John F. McKay
McKay Law Firm
7465 Exchange Place
Baton Rouge, LA 70806-2203

M. Scott Minyard
Baker, Donelson, Bearman, Caldwell
& Berkowitz
P. O. Box 14167
Jackson, MS 39236

Barrye Panepint Miyagi
Kean, Miller, Hawthorne, et al.
One American Place
22nd Floor
P.O. Box 3513
Baton Rouge, LA 70821-3513

Gayla M. Moncla
Kean, Miller, Hawthorne, et al.
One American Place
22nd Floor
P.O. Box 3513
Baton Rouge, LA 70821-3513

Ronald L. Motley
Motley, Rice, LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464

Mark A. Nelson
Bryan, Nelson, Randolph & Weathers
P.O. Drawer 18109
Hattiesburg, MS 39404-8109

Michael M. Noonan
McGlinchey Stafford
643 Magazine Street
P.O. Box 60643
New Orleans, LA 70160-0643

John J. Repcheck
Marks, O'Neill, O'Brien & Courtney
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219

John D. Roven
Roven, Kaplan & Wells
2190 North Loop West
Suite 410
Houston, TX 77018

Richard E. Sarver
Barrasso Usdin Kupperman Freeman
& Sarver, LLP
LL & E Tower
909 Poydras Street
Suite 1800
New Orleans, LA 70112

Richard D. Schuster
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216

Neil Selman
Selman, Breitman & Burgess
11766 Wilshire Boulevard
Sixth Floor
Los Angeles, CA 90025

David B. Siegel
Crowell & Moring, LLP
1001 Pennsylvania Avenue
Washington, DC 20004

Michael Royce Sistrunk
McCranie, Sistrunk, Anzelmo, et al.
3445 N. Causeway Boulevard
Suite 800
Metairie, LA 70002

Robert N. Spinelli
Kelley, Jasons, McGuire & Spinelli
Centre Square West
15th Floor
Philadelphia, PA 19102

Robert E. Swickle
Jaques Admiralty Law Firm, P.C.
1570 Penobscot Building
The Maritime Asbestosis Legal Clinic
Detroit, MI 48226

Andrew J. Trevelise
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

Joseph R. Ward, Jr.
Ward & Condrey, LLC
527 E. Boston Street
Suite 200
Covington, LA 70433

James K. Weston, II
Tom Riley Law Firm
4040 First Avenue, N.E.
P.O. Box 998
Cedar Rapids, IA 52406

Forrest R. Wilkes
Forman, Perry, Watkins, Krutz &
Tardy, LLC
1515 Poydras St.
Suite 1300
New Orleans, LA 70112

Gary M. Zwain
Duplass, Zwain, Bourgeois & Morton
3838 North Causeway Blvd.
Suite 2900
Metairie, LA 70002

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

NOV - 5 2004

FILED
CLERK'S OFFICE

# BEFORE THE JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

In re **Welding Rod Products Liability Litigation**   *       MDL No. 875
                                                       *    **MDL No. 1535**
*Mardie McKeithen, et al. v. Exxon Mobil*             *
*Corporation, et al., M.D. Louisiana, C.A. No. 04-*   *
*365*                                                 *
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## REASONS WHY ORAL ARGUMENT NEED NOT BE HEARD ON OPPOSITION TO PLAINTIFFS' MOTION TO VACATE THE CONDITIONAL TRANSFER ORDER ON BEHALF OF REMOVING DEFENDANTS[1]

Oral argument need not be heard on the *McKeithen* plaintiffs' Motion to Vacate the Conditional Transfer Order. Plaintiffs' central objection to transfer is that a remand motion is pending in the district court. However, this Panel has already ruled that transfer of cases with remand motions pending is warranted. Accordingly, no oral argument is necessary on plaintiffs' motion.

---

[1]   "Removing Defendants" are Lincoln Electric Company; Praxair, Inc.; Union Carbide Corporation f/k/a Union Carbide Chemicals and Plastics Company, Inc.; Sandvik, Inc.; The ESAB Group, Inc.; Allegheny Technologies Incorporated f/k/a TDY Industries, Inc. f/k/a Teledyne Industries, Inc.; Eutectic Corporation; Hobart Brothers Company; A.O. Smith Corporation; The BOC Group, Inc. f/k/a Airco, Inc.; Airgas-Gulf States, Inc; and Viacom, Inc., Successor by Merger to CBS Corporation f/k/a Westinghouse Electric Corporation.

Respectfully Submitted,

Richard E. Sarver, 23558
Stephen H. Kupperman, 7890
Celeste R. Coco-Ewing, 25002
Mark J. Fernandez, 27459
        Of
BARRASSO USDIN KUPPERMAN FREEMAN &
SARVER, LLC
909 Poydras Street, Suite 1800
New Orleans, Louisiana 70112
Telephone: (504) 589-9700

Counsel for defendants Lincoln Electric Company;
Praxair, Inc.; Union Carbide Corporation f/k/a
Union Carbide Chemicals and Plastics Company,
Inc.; Sandvik, Inc.; The ESAB Group, Inc.;
Allegheny Technologies Incorporated f/k/a TDY
Industries, Inc. f/k/a Teledyne Industries, Inc.;
Eutectic Corporation; Hobart Brothers Company;
A.O. Smith Corporation; The BOC Group, Inc. f/k/a
Airco, Inc; Airgas-Gulf States, Inc. and Viacom,
Inc., successor by merger to CBS Corporation f/k/a
Westinghouse Electric Corporation

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

NOV - 5 2004

FILED
CLERK'S OFFICE

## C E R T I F I C A T E

I hereby certify that a copy of the above and foregoing Reasons Why Oral Argument Need Not Be Heard On Opposition to Motion To Vacate Conditional Transfer Order has been served upon all counsel of record listed on the attached Panel Attorney Service List by placing same in the United States mail, postage prepaid and properly addressed, this 4th day of November, 2004.

Bryan Power

DC1:604462.1

RECEIVED
CLERK'S OFFICE

2004 NOV -4  P 3: 40

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

INVOLVED COUNSEL LIST (CTO-236)
DOCKET NO. 875
IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)

INVOLVED COUNSEL LIST (CTO-14)
DOCKET NO. 1535
IN RE WELDING ROD PRODUCTS LIABILITY LITIGATION

Lawrence E. Abbott
Abbott, Simses & Kuchler
400 Lafayette Street
Suite 200
New Orleans, LA 70130

Barbara Lee Arras
Phelps Dunbar, LLP
Canal Place
365 Canal Street
Suite 2000
New Orleans, LA 70130-6534

John H. Beisner
O'Melveny & Myers, LLP
1625 Eye Street, N.W.
Washington, DC 20006-4001

Gary A. Bezet
Kean, Miller, Hawthorne, et al.
One American Place
22nd Floor
P.O. Box 3513
Baton Rouge, LA 70821-3513

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114

Claire E. Breaux
Duplass, Zwain, Bourgeois & Morton
3838 North Causeway Blvd.
Suite 2900
Metairie, LA 70002

Tara L. Burregi
Chopin Wagar Cole Richard Reboul &
Kutcher
Two Lakeway Center
3850 N. Causeway Blvd.
Suite 900
Metairie, LA 70002

Edward J. Cass
Gallagher, Sharp, Fulton & Norman
Bulkley Building
7th Floor
1501 Euclid Avenue
Cleveland, OH 44115

Adam M. Chud
Shea & Gardner
1800 Massachusetts Avenue, N.W.
Washington, DC 20036

John R. Climaco
Climaco, Lefkowitz, Peca, Wilcox &
Garofoli
The Halle Building, Suite 900
1228 Euclid Avenue
Cleveland, OH 44115

Patrick E. Costello
Mouledoux, Bland, LeGrand &
Brackett
650 Poydras Street
Suite 2150
New Orleans, LA 70130

David A. Damico
Burns, White & Hickton
Fifth Avenue Place, Suite 2400
120 Fifth Avenue
Pittsburgh, PA 15222

Michael B. DeSanctis
Jenner & Block
601 13th Street, N.W.
Suite 1200 South
Washington, DC 20005

Richard M. Edmonson
Armstrong Allen, PLLC
4450 Old Canton Road
Suite 210
Jackson, MS 39211

Raymond P. Forceno
Forceno & Hannon
111 S. Independence Mall East
Suite 1000
The Bourse
Philadelphia, PA 19106-2574

Ellen B. Furman
Goldfein & Hosmer
1600 Market Street
33rd Floor
Philadelphia, PA 19103

Susan M. Hansen
Brownson & Ballou
4800 U.S. Bank Place
601 Second Avenue, South
Minneapolis, MN 55402

Sessions Ault Hootsell, III
Phelps Dunbar, LLP
Canal Place
365 Canal Street
Suite 2000
New Orleans, LA 70130

James B. Irwin, V
Irwin, Fritchie, Urquhart & Moore
400 Poydras Street
Suite 2700
New Orleans, LA 70130

Jay M. Jalenak, Jr.
Kean, Miller, Hawthorne, et al.
One American Place
22nd Floor
P.O. Box 3513
Baton Rouge, LA 70821

Reginald S. Kramer
Oldham & Dowling
195 South Main Street
Suite 300
Akron, OH 44308-1314

Stephen H. Kupperman
Barrasso Usdin Kupperman Freeman
& Sarver, LLP
LL & E Tower
909 Poydras Street
Suite 1800
New Orleans, LA 70112

David C. Landin
Hunton & Williams
Riverfront Plaza
East Tower
951 East Byrd Street
Richmond, VA 23219

Katharine R. Latimer
Spriggs & Hollingsworth
1350 I Street, N.W., Suite 900
Washington, DC 20005

INVOLVED COUNSEL LIST (CTO-236) MDL-875 AND (CTO-14) MDL-1535

Gene Locks
Greitzer & Locks
1500 Walnut Street
Philadelphia, PA 19102

Deirdre C. McGlinchey
McGlinchey Stafford
1811 Tower Drive
Suite A
Monroe, LA 71201

John F. McKay
McKay Law Firm
7465 Exchange Place
Baton Rouge, LA 70806-2203

M. Scott Minyard
Baker, Donelson, Bearman, Caldwell
& Berkowitz
P. O. Box 14167
Jackson, MS 39236

Barrye Panepint Miyagi
Kean, Miller, Hawthorne, et al.
One American Place
22nd Floor
P.O. Box 3513
Baton Rouge, LA 70821-3513

Gayla M. Moncla
Kean, Miller, Hawthorne, et al.
One American Place
22nd Floor
P.O. Box 3513
Baton Rouge, LA 70821-3513

Ronald L. Motley
Motley, Rice, LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464

Mark A. Nelson
Bryan, Nelson, Randolph & Weathers
P.O. Drawer 18109
Hattiesburg, MS 39404-8109

Michael M. Noonan
McGlinchey Stafford
643 Magazine Street
P.O. Box 60643
New Orleans, LA 70160-0643

John J. Repcheck
Marks, O'Neill, O'Brien & Courtney
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219

John D. Roven
Roven, Kaplan & Wells
2190 North Loop West
Suite 410
Houston, TX 77018

Richard E. Sarver
Barrasso Usdin Kupperman Freeman
& Sarver, LLP
LL & E Tower
909 Poydras Street
Suite 1800
New Orleans, LA 70112

Richard D. Schuster
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216

Neil Selman
Selman, Breitman & Burgess
11766 Wilshire Boulevard
Sixth Floor
Los Angeles, CA 90025

David B. Siegel
Crowell & Moring, LLP
1001 Pennsylvania Avenue
Washington, DC 20004

Michael Royce Sistrunk
McCranie, Sistrunk, Anzelmo, et al.
3445 N. Causeway Boulevard
Suite 800
Metairie, LA 70002

Robert N. Spinelli
Kelley, Jasons, McGuire & Spinelli
Centre Square West
15th Floor
Philadelphia, PA 19102

Robert E. Swickle
Jaques Admiralty Law Firm, P.C.
1570 Penobscot Building
The Maritime Asbestosis Legal Clinic
Detroit, MI 48226

Andrew J. Trevelise
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

Joseph R. Ward, Jr.
Ward & Condrey, LLC
527 E. Boston Street
Suite 200
Covington, LA 70433

James K. Weston, II
Tom Riley Law Firm
4040 First Avenue, N.E.
P.O. Box 998
Cedar Rapids, IA 52406

Forrest R. Wilkes
Forman, Perry, Watkins, Krutz &
Tardy, LLC
1515 Poydras St.
Suite 1300
New Orleans, LA 70112

Gary M. Zwain
Duplass, Zwain, Bourgeois & Morton
3838 North Causeway Blvd.
Suite 2900
Metairie, LA 70002

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

NOV – 5 2004

FILED
CLERK'S OFFICE

1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

COPY
ORIGINAL FILED
USDC MD/LA

2004 JUN -3  A 11: 41

SIGN
BY DEPUTY CLERK

| | |
|---|---|
| MARDIE McKEITHEN INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF MILLARD McKEITHEN, DAVID McKEITHEN, JERRY McKEITHEN, AND SUSAN McKEITHEN RODRIGUEZ | CIVIL ACTION NO. 04-365-C-M3 |

VERSUS

EXXON MOBILE CORPORATION,
LINCOLN ELECTRIC COMPANY, HOBART
BROTHERS COMPANY, ILLINOIS TOOL
WORKS, INC., THE ESAB GROUP. INC.,
SELECT ARC, INC., THE NATIONAL
ELECTRIC MANUFACTURERS ASSOCIATION,
THE FERROALLOYS ASSOCIATION, ARICO,
INC., PRAXAIR, INC., TDY INDUSTRIES, INC.,
VIACOM, INC., WESTINGHOUSE ELECTRIC
CORPORATION, CATERPILLAR, INC.,
GENERAL ELECTRIC COMPANY, UNION
CARBIDE CORPORATION, UNION CARBIDE
CHEMICALS AND PLASTICS COMPANY, INC.,
EUTECTIC CORORATION, A.O. SMITH
CORPORATION, SANDVIK, INC., DELORO
STELLITE COMPANY, INC., MILLER
ELECTRIC MANUFACTURING CO., INC., J.W.
HARRIS CO., INC., INDUSTRIAL WELDING
SUPPLIES OF HATTIESBURG, INC., AIRGAS-
GULF STATES, INC., JOHN DOE
DEFENDANTS A-Z, A.P. GREEN INDUSTRIES,
INC., GREAT AMERICAN INSURANCE
COMPANY AS INSURER FOR A.P. GREEN
INDUSTRIES, INC. AND A.P. GREEN
SERVICES INC., A.P. GREEN SERVICES, INC.,
THE ANCHOR PACKING COMPANY, ANCO
INSULATIONS, INC., ASTEN GROUP, INC.,
COMBUSTION, INC., CROWN CORK AND
SEAL, DB RILEY, INC. EAGLE, INC.
(FORMERLY EAGLE ASBESTOS & PACKING
CO., INC.), GENERAL REFACTORIES
COMPANY, THE FLINTKOTE COMPANY,

SECTION: " C "

MAGRISTATE NO. "3"

JUDGE  Tyson

MAGISTRATE  Dalby

- 1 -

36923

FOSTER WHEELER ENERGY CORPORATION, *
GARLOCK, INC., GENERAL REFACTORIES *
COMPANY, GEORGIA PACIFIC *
CORPORATION, HARBISON-WALKER *
REFACTORIES COMPANY (FORMERLY *
KNOWN AS INDRESCO, INC.), KELLY- *
MOORE PAINT COMPANY, INC., M.H. *
DETRICK COMPANY, THE McCARTY *
CORPORATION, METROPOLITAN LIFE *
INSURANCE COMPANY, MINNESOTA *
MINING AND MANUFACTURING COMPANY, *
NORTH AMERICAN REFACTORIES *
COMPANY, OWENS-CORNING FIBERGLASS *
CORPORATION, OWENS-ILLINOIS, INC., *
PITTSBURGH CORNING CORPORATION C/O *
PPG INDUSTRIES, INC., PROKO INDUSTRIES, *
INC., RILEY STOKER CORPORATION, ROCK *
WOOL MANUFACTURING COMPANY, *
REILLY-BENTON CO., INC., SYNKOLOID, A *
DIVISION OF MURALO CO., INC., U.S. *
MINERAL PRODUCTS COMPANY, *
UNIROYAL, INC. (FORMERLY UNITED *
STATES RUBBER COMPANY, INC.), *
UNIROYAL HOLDING, INC. (FORMERLY *
UNITED STATES RUBBER COMPANY, INC.), *
W.R. GRACE & CO.,-CONN., BURDEN *
CONTRUCTION CORP., JNO L & R S *
MORRISON PTRS (MORRISON ENGINEERING *
& CONSTRUCTION COMPANY), *
CONTINENTAL CONSTRUCTORS, INC., *
GRIFFIN & KICKSON, STOCKSTILL & *
PEARSON, YUBA INDUSTRIES, INC., T L *
JAMES & COMPANY, INC. & AFFILIATES, *
WILSON P. ABRAHAM CONSTRUCTION *
COMPANY, E H REEDER CONSTRUCTION *
COMPANY, INC., OL SIMS COMPANY OF *
LOUISIANA, INC., J RICH STEERS, INC. *
(MORRISON KNUDSEN COMPANY, INC.), *
ROGERS TERMINAL & SHIPPING *
CORPORATION, RYAN STEVEDORING *
COMPANY, INC., ATLAS CONSTRUCTION *
COMPANY, BAGWELL-NEAL, INC., T C *
TABESON CONSTRUCTION COMPANY, *
ARTHUR G. McKEE & COMPANY, FRAZIER *
MORTON CONSTRUCTION COMPANY, *
MCCAA ELECTRIC, INC., FLENNIKEN *

36923

CONSTRUCTION COMPANY, INC., BATON          *
ROUGE MARINE CONTRACTORS, INC., BOH        *
BROTHERS CONSTRUCTION COMPANY,             *
TUDOR CONSTRUCTION COMPANY, CAJUN          *
ELECTRIC POWER COOPERATIVE, PERCY J.       *
MATHERINE CONTRACTOR, INC., ATLAS          *
ASSOCIATES, INC., FOSTER G. NEAL, JE       *
REMEDIATION TECHNOLOGIES, INC.,            *
JACOBS CONSTRUCTORS, INC. AND THEIR        *
OFFICERS AND DIRECTORS (FORMERLY           *
KNOWN AS H.E. WIESE, INC.), SCHUYLKILL     *
PRODUCTS CO., INC., SCHUYLKILL METALS      *
CORPORATION, POINTE COUPEE                 *
CONSTRUCTORS, INC.                         *

* * * * * * * * * * * * * * * * * * * * * * * * * * *

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1441 and 1446, Defendants, Lincoln Electric Company;

A.O. Smith Corporation; Praxair, Inc.; The ESAB Group, Inc.; Eutectic Corporation; Allegheny

Technologies Incorporated f/k/a TDY Industries, Inc. f/k/a Teledyne Industries, Inc.; Hobart

Brothers Company; The BOC Group, Inc. f/k/a Airco, Inc.; Sandvik, Inc.; and Viacom, Inc.,

successor by merger to CBS Corporation f/k/a Westinghouse Electric Corporation; Airgas-Gulf

States, Inc.; and Union Carbide Corporation f/k/a Union Carbide Chemicals and Plastics

Company, Inc. (collectively "Removing Defendants"), with full reservation of any and all rights,

defenses and objections, including but not limited to lack of personal jurisdiction, prescription,

venue, peremption, prematurity, lis pendens, improper cumulation of parties and/or claims, and

misjoinder of parties and/or claims, hereby remove to this Court the state court action above-

captioned action, Docket No. 516204 pending in Division "B" of the Nineteenth Judicial District

Court for the Parish of East Baton Rouge, State of Louisiana, to this Court.   In support of

removal, removing defendants state as follows:

- 3 -

36923

1.     This Notice of Removal is timely pursuant to 28 U.S.C. § 1446(b), in that it is being filed within thirty (30) days after the first receipt by a defendant, through service, of the Petition.   Airgas-Gulf States, Inc. was the first-served defendant, and it was served with the Petition on May 4, 2004.

2.     The Nineteenth Judicial District Court for the Parish of East Baton Rouge is located within the district of the United States District Court for the Middle District of Louisiana.

3.     Pursuant to 28 U.S.C. § 1446(a), a copy of all process, pleadings, and orders served upon the removing defendants, which papers include the Petition, is attached hereto as Exhibit A.

## THE ASBESTOS CASE

4.     In this Petition, Plaintiffs allege that, while working "intermittently" at various locations in the 1970s, 1980s, and 1990s, Millard McKeithen ("McKeithen") was exposed to asbestos and asbestos-containing products. *See* Petition at A ¶¶ 7, 64.  Plaintiffs further allege that, as a result of exposure to asbestos, McKeithen developed "lung damage." *See id.* at A ¶ 14. Specifically, plaintiffs allege McKeithen developed "one or more" of the following conditions as a result of the exposure to asbestos:  "(i) asbestosis; (ii) pulmonary or bronchogenic cancer; cancer of various sites and organs;  (iii) mesothelioma;  (iv) impaired pulmonary capacity; (v) reduced lung volume; (vi) pleural plaques and/or pleural thickening; (vii) interstitial lung fibrosis as well as any and all lung damage;  (viii) increased susceptibility to one of the foregoing diseases and other illnesses;  (ix) mental anguish associated with the preceding conditions; (x) squamous cell carcinoma and with the fear of developing the preceding conditions and died as a result of mesthelioma on February 18, 2003)." *Id.* at A ¶ 14.

36923

5.    Plaintiffs seek relief against a host of defendants (collectively "Asbestos Defendants") for the purported asbestos-related-injuries.   *See id.* at Exh. B.   Particularly, plaintiffs allege a vast, industry-wide conspiracy beginning in 1935 and spanning decades among certain Asbestos Defendants to conceal the alleged adverse health effects of asbestos exposure. *Id.* at A ¶¶ 21 – 62.  Plaintiffs also allege (a) that the miners, manufacturers, sellers, suppliers, and distributors of asbestos (among the Asbestos Defendants) are strictly liable for damages purportedly caused by asbestos exposure, *see id.* at A ¶¶ 16-20, (b) that certain Asbestos Defendants failed to provide a safe place to work "free from the dangers of asbestos," *id.* at A ¶¶ 62 -67, and (c) that certain Asbestos Defendants are liable for supplying asbestos products to which McKeithen was exposed, *id.* at A p. 27.

## WELDING CASE

6.    Plaintiffs combine their Asbestos Case with a separate and wholly unrelated case against a separate group of defendants, the Welding Defendants.  In the Welding Case, *see* Petition at B ¶¶ 1-96, plaintiffs contend that McKeithen developed "neurological damage" — which plaintiffs allege is "indicative of the condition known as manganism, or manganese poising", *see id.* at B ¶ 9 — as a result of "exposure to welding fumes containing the air borne/chemical substance manganese," *see id.* at B ¶ 3.  Plaintiffs assert claims against the Welding Defendants alleging the Welding Defendants concealed and/or failed to disclose the purported harmful effects of welding fumes, *id.* at B ¶¶ 1-99.

## THIS COURT HAS DIVERSITY JURISDICTION

7.    This Court has original jurisdiction of this action under 28 U.S.C. § 1332, and the action is therefore removable to this Court on that basis.

8.    The properly joined parties to this action are completely diverse:

- 5 -

a.    Plaintiffs, Mardie McKeithen, individually and on behalf of the Estate of Millard McKeithen, and children David McKeithen and Jerry McKeithen, are described in the Petition as residents of the State of Louisiana. *Id.* at A¶1.  Plaintiff Susan McKeithen Rodriguez is described in the Petition as a resident of the State of Texas. *Id.*

b.    Defendant A.O. Smith Corporation is a Delaware corporation with its principal place of business in Wisconsin.

c.    Defendant Airgas-Gulf States, Inc. f/k/a Gulf States Airgas, Inc. is a Delaware corporation with its principal place of business in Alabama.

d.    Defendant Caterpillar, Inc. is a Delaware corporation with its principal place of business in Illinois.

e.    Defendant Deloro Stellite Company, Inc. is a Delaware corporation with its principal place of business in Missouri.

f.    Defendant The ESAB Group, Inc. is an Ohio corporation with its principal place of business in South Carolina.

g.    Defendant Eutectic Corporation is a New York corporation with its principal place of business in Wisconsin.

h.    Defendant General Electric Company is a New York corporation with its principal place of business in New York.

i.    Defendant Hobart Brothers Company is an Ohio corporation with its principal place of business in Illinois.

36923

j.      Defendant Illinois Tool Works, Inc. is an Delaware corporation with its principal place of business in Illinois

k.      Defendant Industrial Welding Supply Co. of Hattiesburg, Inc. is a Mississippi corporation with its principal place of business in Mississippi.

l.      Defendant J.W. Harris Co., Inc. is an Ohio corporation with its principal place of business in Ohio.

m.      Defendant Lincoln Electric Company is an Ohio corporation with its principal place of business in Ohio.

n.      Defendant Miller Electric Manufacturing Co., Inc. is a Wisconsin corporation with its principal place of business in Illinois.

o.      Defendant The National Electric Manufacturers Association is a Delaware corporation with its principal place of business in Virginia.

p.      Defendant Praxair, Inc. is a Delaware corporation with its principal place of business in Connecticut.

q.      Defendant Sandvik, Inc. is a Delaware corporation with its principal place of business in Michigan.

r.      Defendant Select-Arc, Inc. is an Ohio corporation with its principal place of business in Ohio.

s.      Defendant TDY Industries, Inc. f/k/a Teledyne Industries, Inc. is a California corporation with its principal place of business in Pennsylvania.

36923

t.      Defendant Viacom, Inc. f/k/a CBS Corporation f/k/a Westinghouse Electric Company is a Delaware corporation with its principal place of business in New York.

u.      Defendant The BOC Group, Inc. f/k/a Airco, Inc. is a Delaware corporation with its principal place of business in New Jersey.

v.      Defendant The Ferroalloys Association is a District of Columbia corporation with its principal place of business in the District of Columbia;

w.      Union Carbide Corporation ("Union Carbide"), f/k/a Union Carbide Chemicals" is a New York corporation with its principal place of business in Connecticut.

x.      The identity of John Doe Defendants A-Z are unknown, and their citizenship must be disregarded for purposes of determining diversity jurisdiction. *See Doleac v. Michalson*, 264 F.3d 470, 475 (5th Cir. 2001).

9.      The $75,000 amount in controversy requirement of 28 U.S.C. § 1332 is satisfied in this case. As is proper under Louisiana law, the Petition does not quantify an amount of damages. Nevertheless, where the plaintiff has not pled a specific amount of damages, "a court can determine that removal was proper if it is facially apparent that the claims are likely above" the jurisdictional amount. *Allen v. R & H Oil & Gas Co.*, 63 F.3d 1326, 1335 (5th Cir. 1995). Here, plaintiffs allege significant and permanent injuries, including but not limited to permanent neurological and physical damage, severe physical and mental pain, loss of wages, loss of earning capacity, disability, medical expenses, loss of enjoyment of life, and death. *Id.* at

- 8 -

36923

B ¶ 91. Thus, it is readily apparent from the face of the petition that such damages, if proven as a matter of law and fact, could exceed the sum of $75,000.

10.   The citizenship of the Asbestos Defendants, all named as defendants in this action, can and should be disregarded for purposes of analyzing whether complete diversity exists pursuant to the "fraudulent joinder,"[1] doctrine, as is more fully set forth below.

### NON-DIVERSE DEFENDANTS ARE FRAUDULENTLY JOINED

11.   Although the Petition may state causes of action against the Asbestos Defendants, those claims are so wholly distinct from Plaintiffs' purported claim against the Welding Defendants that they warrant severance and remand to State Court. *See* La. Code Civ. Pro. art. 463; Fed. R. Civ. P. 20, 21; *Tapscott v. MS Dealer Serv. Corp.*, 77 F.3d 1353 (11th Cir. 1996), *abrogated on other grounds sub. nom.*, *Cohen v. Office Depot, Inc.*, 77 F.3d 1353 (11th Cir. 2000); *see also In re Benjamin Moore & Co.*, 309 F.3d 296, 298 (5th Cir. 2002) (misjoinder "should not be allowed to defeat diversity jurisdiction"). Accordingly, the citizenship of the Asbestos Defendants should be ignored for purposes of removal. *See Jernigan v. Ashland Oil, Inc.*, 989 F.2d 812, 817 (5th Cir.) (concluding "the [in-state defendants] were improperly joined, so their citizenship is to be disregarded for purposes of determining diversity jurisdiction"), *cert. denied*, 510 U.S. 868 (1993).

12.   The causes of action against the Asbestos Defendants relate to the alleged personal injury and wrongful death of McKeithen resulting from his exposure to asbestos - containing products. These causes of action never mention or implicate the Welding Defendants;

---

[1]   "Fraudulent joinder" is used as a term-of-art. *See* Moore's Federal Practice, ¶ 107.14[c][2], at 107-56 (fraudulent joinder does not require a showing of fraud).

36923

indeed, the claims against the Asbestos Defendants and the claims against the Welding Defendants are based on wholly separate and distinct factual allegations.  *Compare* Petition at A ¶¶ 1-67, *with id.* at B ¶¶ 1-95.  Each, that is, the factual allegations in the Asbestos Case and the factual allegations in the Welding Case, purportedly resulted in wholly separate and distinct damages, *compare id.* at A ¶¶ 11, 14 (discussing lung damage allegedly caused by asbestos exposure), *with id.* at B ¶¶ 7, 9, 10 (discussing neurological damage alleged caused by exposure to welding fumes).

13.    Plaintiffs fail to allege that there is any factual and legal overlap between the claims against the Asbestos Defendants and the claims against the Welding Defendants. Plaintiffs sole attempt to connect the two distinct actions is a single conclusory allegation that all defendants under "A. Asbestos Exposure" and all defendants under "B. Welding Rod Exposure" are "joint tortfeasors and are liable jointly and in solido unto plaintiffs."  *Id.* at B at ¶ 95.  The Petition does not provide any facts or allegations to form a basis for any type of joint liability. To the contrary, plaintiffs allege that the cause of death was mesothelioma, an asbestos-signature disease that has nothing whatsoever to do with manganese in welding consumables.  *See, e.g.*, *Jenkins v. Lindsey*, 693 So. 2d 238, 241 (La. App. 4 Cir. 1997) ("No case has held that a tortfeasor who causes a first accident is responsible for injuries sustained in a subsequent accident, where the subsequent accident is not a foreseeable consequence of the first accident.").  Such conclusory assertions are insufficient as a matter of law to plead the alleged relationships.  *See Jernigan*, 989 F.2d at 817 (affirming denial of remand where claims against non-diverse

36923

defendants were "nothing more than conclusionary allegations, wholly lacking in specific factual support").

14.    Thus, it is clear that the two supposed streams of tortious conduct – one alleged against the Asbestos Defendants and one alleged against the Welding Defendants – which resulted in alleged distinct damages – one in "lung damage" and the other in "neurological damage" – are misjoined. Thus, diversity jurisdiction exists as to Plaintiffs' claims against the Welding Defendants, because "fraduelent misjoinder" of defendants is not permissible "to circumvent diversity jurisdiction." *See In re Benjamin Moore & Co.*, 318 F.3d 626, 630-31 (5th Cir. 2002); *see also Laborde v. Am. Nat'l Prop. & Cas. Cos.*, 780 So. 2d 501, 503 (La. App. 3 Cir.) (plaintiff improperly joined defendants from three separate accidents where there were "no common facts among the three tortfeasors relating to liability" and "[a]s to damages, the plaintiff has the burden of proving what damages were caused by each accident"), *writ denied*, 791 So. 2d 634 (La. 2001).

15.    Under similar circumstances where a complaint merely alleged separate claims against separate diverse and non-diverse defendants, the Eleventh Circuit held that joinder of the non-diverse defendants was fraudulent. *Tapscott*, 77 F.3d at 1359-60. Citing *Tapscott*, the Fifth Circuit adopted the fraudulent misjoinder principle in *In re Benjamin Moore & Co.*, 309 F.3d at 298 (holding misjoinder "should not be allowed to defeat diversity jurisdiction"); *In re Benjamin Moore & Co.*, 318 F.3d at 630-31 (noting with approval the *Tapscott* principle of fraudulent misjoinder); *see also Mallard v. Prudential Ins. Co. of Am.*, No. 95-908, 1996 WL 170126, at *3 (M.D. Ala. Mar. 29, 1996) ("The court will not allow these Plaintiffs to defeat the

Defendants' right to have their claims determined in a federal forum by the artifice of joining their claims with totally separate claims of other non-diverse parties."); *Turpeau v. Fidelity Fin. Serv., Inc.*, 936 F. Supp. 975, 978-79 (N.D. Ga. 1996), *aff'd*, 112 F.3d 1173 (11th Cir. 1997).

16.     Like the claims in *Tapscott*, the claims against the Welding Defendants in the present case are wholly distinct and separate from the claims against the Asbestos Defendants. Thus, the joinder of the Welding Defendants with the Asbestos Defendants is an improper and fraudulent attempt to defeat diversity jurisdiction.

17.     All Welding Defendants served as of this date consent to this Notice of Removal. *See Jones v. Houston Indep. Sch. Dis.*, 979 F.2d 1004 (5th Cir. 1992).  Copies of these consents are attached hereto as Exhibit B.  Consent to or joinder in this removal by the Asbestos Defendants is unnecessary because no consent is required of misjoined parties, and the Asbestos Defendants joined with the Welding Defendants are improperly or fraudulently joined in this action. *Jernigan*, 989 F.2d at 815.

**WHEREFORE,** removing defendants pray that the above action, now pending against them in the Nineteenth Judicial District Court, Parish of Baton Rouge, State of Louisiana, be removed to the United States District Court for the Middle District of Louisiana.

36923

Respectfully submitted,

Richard E. Sarver, T.A., 23558
Stephen H. Kupperman, 7890
Celeste R. Coco-Ewing, 25002
Mark J. Fernandez, 27459
BARRASSO USDIN KUPPERMAN
 FREEMAN & SARVER, L.L.C.
909 Poydras St., Ste. 1800
New Orleans, Louisiana 70112
Telephone: (504) 589-9700
Telefax: (504) 589-9701

Counsel for defendants, Lincoln Electric Company;
A.O. Smith Corporation; Praxair, Inc.; The ESAB
Group, Inc.; Eutectic Corporation; Allegheny
Technologies Incorporated f/k/a TDY Industries,
Inc. f/k/a Teledyne Industries, Inc.; Hobart Brothers
Company; The BOC Group, Inc. f/k/a Airco, Inc.;
Sandvik, Inc.; Viacom, Inc., successor by merger to
CBS Corporation f/k/a Westinghouse Electric
Corporation; Airgas-Gulf States, Inc.; and Union
Carbide Corporation f/k/a Union Carbide Chemicals
and Plastics Company, Inc.

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing document has been served upon
all counsel of record by hand delivery, facsimile transmission, electronic transmission, overnight
mail, or depositing with the U.S. post office, postage prepaid, this 3rd day of June, 2004.

36923

401281605000

MARDIE McKEITHEN
INDIVIDUALLY AND ON BEHALF OF
THE ESTATE OF MILLARD McKEITHEN,
DAVID McKEITHEN,
JERRY McKEITHEN, AND
SUSAN McKEITHEN RODRIGUEZ

NUMBER 516,203  SEC. 23

19TH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

VERSUS

EXXON MOBIL CORPORATION, ET AL

COST OK TO Amt $160
#8974
JAN 26 2004
BY
DY. CLERK OF COURT

PETITION FOR DAMAGES

## A. ASBESTOS EXPOSURE

NOW INTO COURT, through undersigned counsel, come plaintiffs, Mardie McKeithen individually and on behalf of the Estate of Millard McKeithen, and children, David McKeithen, Jerry McKeithen, all residents of the State of Louisiana, and Susan McKeithen Rodriquez, a resident of the State of Texas, with respect offer the allegations that follow:

1.

Plaintiffs are adult resident citizens of the State of Louisiana with the exception of Susan McKeithen Rodriguez who is a major and resides in Texas, and were the respective wife and major children of Millard McKeithen, deceased.

2.

Defendants, identified in Exhibit "B" and Exhibit "C" annexed hereto, are all either foreign corporations licensed to do and doing business in the State of Louisiana or domestic corporations licensed to do and doing business in the State of Louisiana, or are individuals that are liable unto the Plaintiffs, for the claims asserted herein. Exhibit "B" and Exhibit "C", annexed hereto, set forth a listing of defendants involved in the above captioned matter, as well as their respective agents for service of process, domiciles and/or principal places of business.

3.

The Plaintiffs have joined together in this action pursuant to Article 463 of the Louisiana Code of Civil Procedure and assert that there is a community of interest between the parties joined; each of the actions cumulated is within the jurisdiction of the court and because East Baton Rouge Parish, St. Charles Parish, Calcasieu Parish, Caddo Parish, and other sites are the sites of exposure, venue is proper in this parish; and all of the actions cumulated are mutually consistent and employ the same form of procedure. Additionally, the Plaintiffs assert their rights to relief jointly, severally, solidarily and in the alternative in respect of or arising out of the same transaction, occurrence or series of transactions or occurrences and there are questions of law or fact common to all that will arise in this action.

4.

The Plaintiffs deceased husband and father had substantial exposure to Defendants' asbestos-containing products in this Parish at the location or locations described in Exhibit "A." Therefore, venue properly lies in this parish.

FAX COPY FILED 1/22/04
ORIGINAL FILED 1/26/04

EXHIBIT
A

5.

The damages suffered by Plaintiffs, exclusive of interest and costs, exceed the minimum jurisdictional limits of the Court.

6.

The Defendants, identified in Exhibit "B" attached hereto and made part hereof, are all either foreign corporations licensed to do and doing business in the State of Louisiana or domestic corporations licensed to do business and doing business in the State of Louisiana, that are liable to the Plaintiffs for the claims asserted herein.

7.

Each Defendant corporation or its predecessor-in-interest, with the exception of the Metropolitan Life Insurance Company, is, or at all times material hereto, has been engaged in the mining, processing and/or manufacturing, sale and distribution of asbestos and asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products.

Plaintiffs would show that for a period of many years, Millard McKeithen, deceased, worked with and/or was exposed to asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products while working in various shipyards, steel mills, refineries, paper mills, chemical plants and/or other facilities in the State of Louisiana and elsewhere in the United States. Millard McKeithen's work sites, trades and years of exposure to asbestos include, but are not limited to those identified in Exhibit "A." Plaintiffs would show that Millard McKeithen was exposed, on numerous occasions, to asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products produced and/or sold by Defendants and, in so doing, have inhaled great quantities of asbestos fibers. Further Plaintiffs allege, as more specifically set out below, that Millard McKeithen has suffered injuries proximately caused by their exposure to asbestos-containing products designed, manufactured and sold by Defendants.

8.

Plaintiffs allege that Millard McKeithen was exposed to asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products in his occupation including, but not limited to, those set forth in Exhibit "A." In that each exposure to such products caused or contributed to Millard McKeithen's injuries and death. Plaintiffs state that the Defendants are liable jointly, severally and in solido for all of Plaintiffs' damages complained herein.

## BACKGROUND

9.

During various lengthy periods of time, the deceased, Millard McKeithen, who died on February 18, 2003 has suffered occupational exposure to asbestos and asbestos containing products designed, mined, manufactured, sold, distributed, supplied and/or maintained on various premises by the defendants.

10.

During each of Millard McKeithen's occupational exposure period each of the defendants designed, tested, evaluated, manufactured, packaged, furnished, stored, handled, transported, installed, supplied and/or sold asbestos containing products for use at, including but not limited to, each Plaintiff's job site listed on Exhibit "C" where Millard McKeithen was exposed to asbestos-containing products, construction materials, insulation, and products that contained fibrous, incombustible, chemical-resistant mineral substances commonly called "asbestos".

11.

When inhaled or otherwise ingested, asbestos causes irreparable and progressive lung damage that can manifest itself as asbestos-related pleural disease, asbestosis, mesothelioma, pulmonary and bronchogneic carcinoma, gastrointestinal cancer, cardiac disease, and other diseases and injuries.

12.

Each of the defendants knew or should have known through industry and medical studies, the existence of which were unknown to the Plaintiffs or Millard McKeithen, of the health hazards inherent in the asbestos-containing products they were selling. Instead of warning Millard McKeithen and the general public about these dangers, certain defendants ignored or actively concealed such information, or condoned such concealment, in order to sell asbestos or asbestos-containing products and avoid litigation by those who were injured from asbestos inhalation. Those defendants who have engaged in intentional misconduct, fraud or concealment or conspiracy to defraud or conceal the dangers of asbestos-containing products are specifically set forth and their conduct specifically described hereinafter in the section which, in addition to negligence or strict liability, identifies other forms of specified misconduct as set out herein and similarly identified by name of the particular defendant above the specific counts of misconduct.

13.

In connection with their work at, including but not limited to, the deceased, Millard McKeithen's job sites listed on Exhibit "C" during the exposure period, Millard McKeithen was exposed to and inhaled or otherwise ingested significant quantities of asbestos as well as other dangerous materials and/or airborne contaminants, including but not limited to, toxic fibers and silica dusts, having neither knowledge nor reason to believe that these materials were dangerous.

14.

As direct and proximate contributing result of having inhaled, ingested or otherwise been exposed to asbestos as well as other dangerous materials and/or airborne contaminants, including but not limited to, toxic fibers and silica dust, while working at, including but not limited to, each Plaintiff's job site listed on Exhibit "C" during the exposure period, Millard McKeithen has received injuries, both physically and mentally, including, without limitation, one or more of the following conditions: (i) asbestosis; (ii) pulmonary or bronchogenic cancer; cancer of various sites and organs; (iii) mesothelioma; (iv) impaired pulmonary capacity; (v) reduced lung volume; (vi) pleural plaques and/pr pleural thickening; (vii) interstitial lung

fibrosis as well as any and all lung damage; (viii) increased susceptibility to one of the foregoing diseases and other illnesses; (ix) mental anguish associated with the preceding conditions; (x) adenocarcinoma; (xi) squamous cell carcinoma and with the fear of developing the preceding conditions and died as a result of mesthelioma on February 18, 2003.

15.

Because of the latency period of the above injuries and other injuries caused by asbestos, as well as other dangerous materials and/or airborne contaminants, including but not limited to, toxic fibers and silica dusts and because of the active concealment by some defendants of the causes and effects of exposure to asbestos, the Plaintiffs have only recently discovered the injuries to their husband and father, Millard McKeithen, and not more than one year preceding this filing of the initial Petition for Damages.

## STRICT LIABILITY OF ASBESTOS
## MINERS/MANUFACTURERS/SELLERS/SUPPLIERS/DISTRIBUTORS

16.

The defendant identified in Exhibit "B" are all mines, manufacturers, sellers, distributors and/or suppliers of asbestos products or were insurers of miners, manufacturers, sellers, distributors and/or suppliers of asbestos products and were engaged in or materially participated in the business of manufacturing, or facilitating the manufacturing of asbestos products, or representing themselves as manufacturers of asbestos, products, or are professional vendors of asbestos or asbestos containing products, which were expected to and did reach, including but not limited to, each Plaintiffs' exposures site listed on Exhibit "C" where Plaintiffs were exposed to them.

17.

The products mined, manufactured, sold, distributed, supplied and/or used by these defendants were defective, unreasonably dangerous, and unreasonably dangerous per se, to the Plaintiffs who were intended and foreseeable users and bystanders that were exposed to these products. These defects include, without limitation, the following:

    a.    the mining, manufacture, sale, supply, distribution and use of products that are unreasonably dangerous, or unreasonably dangerous per se;

    b.    the mining, manufacture, sale, supply, distribution and use of products that possess inherent and known properties that make them unreasonably dangerous by presenting high potential for causing serious injury, such as respiratory disease, cancer, and other health problems to those who would be foreseeably exposed to them in each Plaintiffs' respective trade;

    c.    lack of warning or of sufficient warning of the hazards these products would present in the course of their normal foreseeable use or intended use;

    d.    lack of safety instructions or of sufficient safety instructions for eliminating or reducing the health risks associated with the intended use of these products;

    e.    failure of defendants to inspect these products to assure sufficiency and adequacy of warnings and safety cautions;

    f.    failure to test or adequately test these products for defects or hazards that they could present to the intended or foreseeable users;

g.    failure to truthfully report or adequately report the results of product testing, and medical studies associated with foreseeable hazards of these products by intended or foreseeable users;

h.    failure to properly design these products where the nature of the product did not require use of asbestos mineral or where alternate, equally suitable substances were readily available;

i.    defects in the composition and construction of these products;

j.    failure to recall these products mined, manufactured, sold, distributed and supplied;

k.    failure to properly package these products so they could be safely transported, handled, stored or disposed of;

l.    over-warranting the safety of these products that were manufactured, sold, supplied or used by Defendants;

m.    failing to timely and adequately warn Plaintiffs of the dangerous characteristics and serious health hazards associated with exposure to asbestos, asbestos-containing products, and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products;

n.    failing to provide Plaintiffs with information as to what would be reasonably safe and sufficient wearing apparel and proper protective equipment and appliances, if in truth there were any, to protect Plaintiffs from being harmed and disabled by exposure to asbestos, asbestos-containing products, and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products;

o.    failing to place timely and adequate warnings on the containers of said asbestos, or asbestos-containing products, or on the asbestos-containing products themselves, and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products to warn of the dangerous to health of coming into contact with said asbestos-containing products and/or machinery;

p.    failing to take reasonable precautions to exercise reasonable care to publish, adopt and enforce a safety plan and/or safe method of handling and installing asbestos and/or asbestos-containing products, or utilizing the machinery requiring or calling for the use of asbestos and/or asbestos-containing products in a safe manner;

q.    failing to develop and utilize a substitute material to eliminate asbestos fibers in the asbestos-containing products, and/or the machinery requiring or calling for the use of asbestos and/or asbestos-containing products;

r.    failing to properly design and manufacture asbestos, asbestos-containing products, and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products for safe use under conditions of use that were reasonably anticipated;

s.    failing to properly test said asbestos-containing products or machinery before they were released for consumer use; and

t.      failing to recall and/or remove from the stream of commerce said asbestos-containing products or machinery requiring or calling for the se of asbestos and/or asbestos-containing products despite knowledge of the unsafe and dangerous nature of such products or machinery.

18.

Defendants are liable to Plaintiffs in strict liability for things in their garde, possession, custody or control, pursuant to 2317 of the La. Civil Code that have caused harm to these Plaintiffs; and other defects or fault as may be revealed in discovery or at trial and is further liable under La. Civil Code Articles 2315, 2315.1, 2315.2, 2317.1, 2320 and 2322, and plaintiff asserts the doctrine of contra non valentum against all defendants.

19.

The defective conditions of defendants' products and fault, as noted above, are a proximate cause of Plaintiffs' injuries complained of in paragraph 9.

20.

Plaintiffs also allege that each and every one of the foregoing defendants were also negligent in engaging in the substandard conduct enumerated above and that this negligence was also a proximate cause of the Plaintiffs' injuries.

## FRAUD AND CONSPIRACY BY INDUSTRIAL HYGIENE FOUNDATION, ASBESTOS TEXTILE INSTITUTE AND QUEBEC ASBESTOS MINING ASSOCIATION AND THEIR MEMBERS: A.P. GREEN INDUSTRIES, INC., ASBESTOS CORPORATION LIMITED, EAGLE-PITCHER LEAD CO., GAF CORPORATION, GARLOCK INC., H.K. PORTER, JOHNS'MANVILLE CORP., NATIONAL GYPSUM COMPANY, OWENS'CORNING FIBERGLASS CORPORATION, RAPID AMERICAN CORPORATION, TURNER & NEWALL, LTD., AND UNIROYAL, INC.,

21.

Since 1935, the Industrial Hygiene Foundation ("IHF") by and through the IHF members: A.P. Green Industries, Inc., Asbestos Corporation Limited ("ACL"), Eagle-Picher Lead Co., GAF Corporation (and all predecessors ("GAF"), Johns-Manville Corporation ("JM"), and Owens-Corning Fiberglas Corporation ("OCF") held itself out to the public as an independent research organization whose purpose was the advancement of healthful industrial work conditions.

22.

The IHF, through its agents, Daniel C. Braun and Paul Gross, knowingly participated in an asbestos industry conspiracy, along with A.P. Green Industries, Inc., ACL, Eagle-Picher Lead Co., GAF, JM, and OCF among others, as hereinafter described. The purposes of the conspiracy was to suppress and misrepresent information about the dangers of exposure to

asbestos and asbestos-containing products, thus creating the impression that there were no dangers associated with the use of asbestos or asbestos-containing products.

23.

The Defendants and their co-conspirators, at all times material, were aware that the Plaintiffs and others similarly situated were being regularly exposed to asbestos and asbestos-containing products and that such exposure was hazardous long before the public or these Plaintiffs were aware of such dangers.

24.

Plaintiffs allege that the IHF, through its agent, Daniel C. Braun, at the behest of its co-conspirators, suppressed the publication of important scientific data regarding the hazards of asbestos by excluding from a report, prepared and published by the IHF, all references to the connection between asbestosis and lung cancer.

25.

Mr. Vandiver Brown, corporate counsel, of Johns-Manville Corp., was a member of both the IHF's Board of Trustees and the IHF's Legal Committee.

26.

The following conspirators were members of the trade association known as the Quebec Asbestos Producers Association, (also known as the Quebec Asbestos Mining Association (QAMA)): JM, ACL, GAF, National Gypsum Co., Rapid-American Corporation (as the successor of Philip Carey), Turner & Newall, Ltd. (individually and as a successor to Bell Asbestos) and others. These conspirators, hereinafter referred to as QAMA, participated in a conspiracy to misrepresent the work of Dr. Leroy Gardner published by Arthur Vorwald in the AMA Archives of Industrial Health in 1951 through their agent, Ivan Sabourin.

27.

In the 1950s, Ivan Sabourin of the Quebec Asbestos Mining Association, was a member of the QAMA Legal Committee, along with Vandiver Brown of JM and as laison for IHF entered into an agreement where the associations would carry on activities on behalf of the individual members of both associations. These acts included agreements not to publish information that may call into question the health effects related to asbestos, to attempt to target and pressure independent scientist from publication of information derogatory of asbestos and its health effects and to promote the existing TLV levels as proper and safe for workers.

28.

The defendants and conspirators, individually and as agents of one another and as co-conspirators, agreed and conspired among themselves and with asbestos manufacturers and distributors to withhold certain information from the Plaintiffs and others, similarly situated, so that the Plaintiffs and others, similarly situated, would continue to be exposed to asbestos and asbestos-containing products.  The Defendants and their co-conspirators knew full well that such continued exposure would cause injury to those so exposed.

29.

In or around 1950, QAMA began to formulate a plan to influence public opinion regarding the relationship between asbestos and cancer by gaining control over the production of medical literature on this subject.  The QAMA with the knowledge, consent and assistance of the IHF, used this control to edit the resulting literature so that damaging information about asbestos would be excluded.  These associations altered research and disseminated this literature to the public and to organizations and legislative bodies responsible for regulatory control of asbestos with the specific intent of misrepresenting the existing scientific information and suppressing contrary scientific data in their possession and control.

30.

In 1950, QAMA bean to implement this plan to gain control over the medical literature by contracting with the Saranac Laboratories to perform an evaluation of the relationship between asbestos exposure and cancer.  After a preliminary report, authored by Arthur Vorwald in 1952, indicated that a cancer/asbestos relationship might exist in experimental animals, QAMA refused to further fund the study, which was terminated and never publicly discussed.

31.

As a result of the termination of this study, QAMA fraudulently withheld information form the public and affirmative misrepresented to the public and responsible legislative and regulatory bodies that asbestos did not cause cancer.  Said affirmative misrepresentations made by conspirators' agents, K.W. Smith, M.D., Paul Cartier, M.D., A.J. Vorwald, M.D., A.J. Lanza, M.D, Vandiver Brown and Ivan Sabourin, were directed to <u>inter alia</u>, U.S. government officials; Canadian government officials; U.S. National Cancer Institute as well as other medical organizations; and the general public.

32.

Subsequently, the QAMA and IHF conspirators contracted with the Defendants, IHF and the Mellon Institute to have Dr. Daniel Braun study the relationship between asbestos exposure, asbestosis and lung cancer. In 1957, Drs. Braun and Traun, reported to the QAMA that asbestosis did increase a worker's chances of developing lung cancer. This report was kept confidential and a revised report was published which deleted these risks.

33.

In December of 1957, Dr. Kenneth W. Smith of JM wrote to Ivan Sabourin of QAMA offering suggestions for changes in the Braun/Traun report, which would make the exclusion of the cancer data more believable.

34.

In 1958, QAMA requested that the report of Drs. Braun and Traun, which contained findings regarding the increased incidence of cancer in persons with asbestosis, be edited to exclude such findings. The IHF agreed and published a version of the study, which contained a conclusion that asbestos exposure alone did not increase the incidence of lung cancer; a conclusion known by the IHF to be patently false.

35.

The IHF's publication of the edited version of the Braun/Traun Report constituted a material misrepresentation as well as a fraudulent concealment of the risks associated with exposure to asbestos. Such publication furthered the aims of the asbestos industry conspiracy by creating the misleading impression that exposure to asbestos did not create an increased risk of cancer, thereby reinforcing the myth of safety already created by the asbestos industry and its co-conspirators.

36.

In 1958, the QAMA held a symposium at which the edited work of Drs. Braun and Traun were publicized in an effort to influence public opinion by providing "official knowledge," as characterized by Ivan Sabourin, that the inhalation of asbestos dust would not cause cancer.

37.

The QAMA sponsorship of the symposium was not widely publicized. To keep such sponsorship discreet, publicity was carefully orchestrated by a committee of QAMA.

38.

The publication of the Braun/Traun Report by the IHF and the symposium, which showcased the edited report, lent greater credibility to the arguments put forth by the asbestos industry, that the current Threshold Limit Value ("TLV") for asbestos exposure was safe and thus, furthered the goals of the conspiracy. By this time both QAMA, IHF and the constituent members were fully aware that asbestos presented a significant cancer risk and that the TLV standards they sponsored (and had gained wide acceptance) would not protect those so exposed.

39.

In 1967, QAMA conspirators determined at their trade association meeting that they would intentionally mislead consumers regarding the extent of risks involved in the inhalation of asbestos products.

40.

In 1952, a symposium regarding the health effects of asbestos was held at the Saranac Laboratories.  The following conspirators were in attendance:  Raybestos-Manhattan and QAMA members, by way of their agents, Cartier, Sabourin and LaChance.

41.

At this meeting, the occurrence of lung cancer and asbestosis in product users was discussed as well as the carcinogenic properties of all fiber types of asbestos.  In an affirmative attempt to mislead the public regarding the extent of health risks associated with asbestos, and in an effort to fraudulently conceal those risks from the public, these Defendants conspired to prevent publication of the record of this 1952 Saranac Symposium and successfully did so.  In addition, the conspirators induced Dr. Arthur Vorwald not to announce the results of his and Gardner's animal studies demonstrating excess cancers in animals and thereby fraudulently misrepresented existing secret data which could not be publicized owing to the secrecy provisions contained in the 1936 Saranac agreement heretofore described.

42.

The following conspirators were members of the trade organization known as the Asbestos Textile Institute ("ATI"):  ACL, Garlock Inc., H.K. porter, JM, National Gypsum Company, Uniroyal, Inc., and others.

43.

In 1947, these conspirators, members of the ATI, received a report from W.C.L. Hemeon, an engineer for the IHF, regarding asbestosis, which emphasized the inadequacy of the then existing TLV and suggested that the TLV be re-evaluated. The members of the ATI joined in the IHF conspiracy with the result that neither the ATI nor the IHF published this report. The concealment of these material facts, regarding asbestos exposure, from the public and the affirmative misrepresentation to the public and class of persons exposed to asbestos, that the existing TLV was acceptable, is fraud. Thereafter, the IHF and the other conspirators mentioned above, withheld this report and other additional information regarding the TLV dust standards from The American Conference of Governmental Industrial Hygienists (ACGIH), thereby further influencing the view that the existing TLVs were safe.

44.

In 1965, Dr. Paul Gross, then the Director of the IHF's Research Laboratory, became a member of the ACGIH's Threshold Limit Committee and was able to perpetuate the view that the industry sponsored TLV was safe, correct and proper. This was done with the knowledge and approval of QAMA, IHF and ATI.

45.

Dr. Gross was given primary responsibility for setting TLVs for mineral dust, including asbestos. Dr. Gross failed to share with the Committee, the public, the IHF and other associations' knowledge regarding the hazards of asbestos (Braun/Traun Report) and the questionability efficacy of the TLV set for asbestos (Hemeon Report).

46.

The ACGIH Threshold Limit Committee issued an annual list of TLVs for a variety of industrial gases, vapors, dusts, fumes and mists during the 1940s, 1950s, 1960s and 1970s. TLVs were used to indicate the maximum allowable concentrations of, inter alia, certain dusts, including asbestos. The TLV for asbestos was set in 1946 as 5 MPPCF (five million particles per cubic foot of air). They remained at this dangerous level until rewritten by the U.S. Government in 1971).

47.

The TLVs promulgated by the ACGIH were often accepted by governmental agencies as well-established, scientifically supported standards.

48.

While a member of the Threshold Limit Value Committee, Dr. Gross continued to perform asbestos-related research and consulting work for asbestos companies, including JM, the IHF and presumably with the knowledge and benefit to ATI and QAMA.

49.

The IHF, itself, played a critical role in the development of the asbestos TLV and exerted tremendous effort to insure that its credibility was maintained. In 1967, the IHF sponsored workshops on TLVs. The IHF obtained form 5the Threshold Limit Value Committee, the important position as a "transfer agent" of data to be submitted to that Committee. The IHF also offered to collect and interpret data regarding the efficacy of the current TLV on behalf of trusting Industrial Hygiene Association.

50.

The staff of the IHF was intimately involved in the Threshold Limit Value Committee's work there, providing, at least the appearance of, industry cooperation with the Threshold Limit Value Committee while in fact manipulating the data for the benefit of the IHF, QAMA, ATI and their respective members.

51.

In 1953, conspirator National Gypsum through its agents, in response to an inquiry from the Indian Division of Industrial Hygiene regarding health hazards of asbestos spray products, refused to mail a proposed response to that division indicating that respirators should be worn by applicators of the products. National Gypsum's response distorted and fraudulently misrepresented the need for applicators of asbestos spray products to wear respirators and fraudulently concealed from such applicators the need for respirators. This was done despite knowledge from its respective associations that protection was needed, ventilation was necessary, that there was mounting evidence that asbestos did cause cancer, and that the TLV levels were insufficient to protect workers.

52.

In 1955, conspirator Johns-Manville Corporation, through its agent Kenneth Smith, caused to be published in the AMA Archives of Industrial Health, an article entitled "Pulmonary Disability in Asbestos Workers." This published study materially altered the results of an earlier 1949 study concerning the same set of workers. The purpose of the

alteration was to present research, which mis-stated the actual risks that asbestos presented. This alteration of Dr. Smith's study constituted a fraudulent and material misrepresentation regarding the extent of the risk associated with asbestos inhalation.

53.

In 1955, the National Cancer Institute held a meeting at which conspirator JM, individually and as an agent for other co-conspirators, including QAMA, IHF and ATI and A. Vorwald, as an agent of co-conspirators, affirmatively misrepresented that there were no existing animal studies concerning the relationship between asbestos exposure and cancer when, in fact, the conspirators were in secret possession of several studies which demonstrated that positive evidence did exist.

54.

In 1957, these conspirators, including members of the QAMA, IHF and ATI, rejected a proposed unrestricted research study on cancer and asbestos, thereby avoiding any possibility of publication of literature, which would conflict with the IHF's edited version concealing from the public, material facts regarding asbestos exposure.   This rejection constituted and affirmative misrepresentation of the then-existing knowledge regarding asbestos exposure and lung cancer.

55.

In 1964, conspirators, who were members of the ATI, met to formulate a plan for rebutting the association between lung cancer and asbestos exposure that had been recently publicized by Dr. Irving J. Selikoff.  Thereafter, these members of the ATI embarked upon an aggressive campaign to further suppress the association between asbestos exposure and lung cancer.

56.

The Defendant and IHF acting through their agents, Dr. Daniel C. Braun and Dr. Paul Gross, approved and ratified the conspiratorial acts described above and furthered the conspiracy by active and knowing participation in activities which suppressed the hazards of asbestos exposure and pressured non-industry aligned researchers from publication of their work.

57.

The acts of the Defendants and the conspirators as described above, which proximately caused injury to the Plaintiffs, constitute a fraudulent concealment and/or a fraudulent misrepresentation in the following manner:

a.    The material published or caused to be published by the defendants was false and incomplete in that the Defendant; and the conspirators knowingly and deliberately deleted references to the health hazards of asbestos and asbestos-related products known to them.

b.    The Defendants and the conspirators individually, as members of a conspiracy, and as agents of other conspirators, intended that the publication of false and misleading reports and/or the nondisclosure of documented reports of the health hazards of asbestos.

1.    maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-related products by assuring the public that asbestos was safe;

2.    assist in the continued pecuniary gain of the conspirators through the sale of their products;

3.    influence in the proposed legislation to regulate asbestos exposure by assuring those charged with such responsibilities that asbestos was safe and that current regulations, e.g., the asbestos TLV, were sufficient to protect workers and consumers;

4.    to provide a defense in lawsuits brought for injury resulting from asbestos disease, and;

5.    to counter arguments by independent researchers that asbestos exposure was hazardous.

58.

Defendants individually, as members of the conspiracy, and as the agents of other co-conspirators intended that the public rely upon these false and misleading published reports regarding the safety of asbestos and asbestos-related products.  In the absence of publicly available medical and scientific data regarding the hazards of asbestos and asbestos-related

products, the public continued to rely on these false and misleading reports which resulted in their continued exposure to those products.

59.

The Defendants, individually as members of the conspiracy and as agents of other conspirators, were in a position of superior knowledge regarding the health hazards of asbestos and, therefore, the public had a right to rely on the Defendants' reports regarding the safety of asbestos and the absence of publicly available medical and scientific data regarding the hazards of asbestos and asbestos-related products.

60.

The absence of information regarding the hazards of asbestos and asbestos-related products was knowingly caused by the Defendants and their co-conspirators. The Defendants knew that such reliance on the published reports regarding asbestos and its health effects, would result in the exposure of the Plaintiffs and persons similarly situated to asbestos and their subsequent development of an asbestos-related disease.

61.

The failure of the Defendants properly report and publish the results of studies undertaken at the request of its members unnecessarily increased the risk that workers would be exposed to asbestos and subsequently develop asbestos-related diseases by creating an impression that exposure to asbestos was safe.

62.

Plaintiffs have been injured in part as a result of the above-described conduct, which amounts to negligence, fault, fraud and conspiracy on the part of the Defendants.

STRICT LIABILITY AND NEGLIGENCE ACTION AGAINST
Exxon Mobil Corporation (Louisiana)
The Dow Chemical Company (Louisiana)
Formosa Plastics Corporation, Louisiana (Louisiana)
Union Carbide Corporation (Louisiana)
Rhodia, Inc. f/k/a Rhone-Poulenc (Louisiana)
Vista Corporation
Dow, Inc. f/k/a Dow Badische (Texas)
Exxon Mobil Corporation (Texas)
E. I. Du Pont De Nemours and Company (Texas)
Hoechst Celanese Corporation a/k/a CNA Holdings, Inc. (Texas)
Monsanto Chemical Company (Texas)
BASF Corporation (Texas)
Shell Oil Company (Texas)
Arco, Inc. a/k/a Arco of the Panhandle, Inc. (Texas)
Phillips, Inc. (Texas)
Phillips Petroleum Company a/k/a ConocoPhillips Company (Texas)

THE FOLLOWING PARAGRAPHS APPLY TO THOSE PLAINTIFFS LISTED
ON EXHIBIT "C" ATTACHED HERETO:

63.

The respective Plaintiffs, identified in Exhibit "C," hereby allege premise liability against the respective defendants listed herein (hereinafter the "premise defendants"), in failing to provide a safe place in which to work free from the dangers of asbestos.

64.

Decedent, Millard McKeithen, was exposed to asbestos and asbestos containing materials while working at Exxon Mobil Corporation (FKA Standard Oil Corporation and FKA as Exxon Corporation) at its Baton Rouge, Louisiana, facilities. Decedent, Millard McKeithen, worked at the Exxon plant in Baton Rouge, Louisiana, intermittently beginning in the 1970s, 1980s and also in the 1990s. Defendant, Exxon Mobil Corporation, at all times relevant to this complaint, has either been the operator and/or the manager and/or the owner and occupier of the Baton Rouge facilities. Decedent was exposed to asbestos and asbestos containing materials while he was an invitee at the Baton Rouge, Louisiana, facilities. The use of asbestos and asbestos containing materials at the Baton Rouge facility created a dangerous condition at the facility.

Defendant, Exxon Mobil, is liable to decedent, Millard McKeithen, for its failure to exercise reasonable care to protect decedent from the foreseeable dangers associated with exposure to asbestos. Defendant, Exxon Mobil, as the premises operator and/or manager and/or owner and occupier, has a non-delegable duty to keep the premises safe for invitees. Defendant Exxon Mobil knew or should have known of the unreasonable risk of harm inherent in exposure to asbestos and asbestos-containing materials but failed to protect plaintiff from said risk of harm. Defendant Exxon Mobil's failure to protect decedent from known and/or foreseeable dangers constitutes negligence. Said negligence was a proximate cause of decedent's asbestos-related injuries, damages and resulting death.

64A.

Decedent, Millard McKeithen, was exposed to asbestos and asbestos containing materials while working at The Dow Chemical Company at its Shreveport, Louisiana, facilities. Decedent, McKeithen, worked at The Dow Chemical Company plant in Shreveport, Louisiana, intermittently in the 1970s, 1980s and also in the 1990s. Defendant, The Dow Chemical

Company, at all times relevant to this complaint, has either been the operator and/or the manager and/or the owner and occupier of the Shreveport, Louisiana, facilities. Decedent was exposed to asbestos and asbestos containing materials while he was an invitee at the Shreveport facilities. The use of asbestos and asbestos containing materials at the Shreveport, Louisiana, facility created a dangerous condition at the facility.

Defendant, The Dow Chemical Company, is liable to decedent, McKeithen, for its failure to exercise reasonable care to protect decedent from the foreseeable dangers associated with exposure to asbestos. Defendant, The Dow Chemical Company, as the premises operator and/or manager and/or owner and occupier, has a non-delegable duty to keep the premises safe for invitees. Defendant, The Dow Chemical Company knew or should have known of the unreasonable risk of harm inherent in exposure to asbestos and asbestos-containing materials but failed to protect plaintiff from said risk of harm. Defendant, The Dow Chemical Company's failure to protect decedent from known and/or foreseeable dangers constitutes negligence. Said negligence was a proximate cause of decedent's asbestos-related injuries, damages and resulting death.

64B.

Decedent, McKeithen, was exposed to asbestos and asbestos containing materials while working at Formosa Plastics Corporation, Louisiana at its Baton Rouge, Louisinaa, facilities. Decedent, McKeithen, worked at the Formosa Plastics Corporation, Louisiana in Baton Rouge, Louisiana, intermittently in the 1970s, 1980s and also in the 1990s. Defendant, Formosa Plastics Corporation, Louisiana, at all times relevant to this complaint, has either been the operator and/or the manager and/or the owner and occupier of the Baton Rouge, Louisiana, facilities. Decedent was exposed to asbestos and asbestos containing materials while he was an invitee at the Baton Rouge, Louisiana, facilities. The use of asbestos and asbestos containing materials at the Baton Rouge, Louisiana, facility created a dangerous condition at the facility.

Defendant, Formosa Plastics Corporation, Louisiana, is liable to decedent, McKeithen, for its failure to exercise reasonable care to protect decedent from the foreseeable dangers associated with exposure to asbestos. Defendant, Formosa Plastics Corporation, Louisiana, as the premises operator and/or manager and/or owner and occupier, has a non-delegable duty to keep the premises safe for invitees. Defendant, Formosa Plastics Corporation, Louisiana, knew or should have known of the unreasonable risk of harm inherent in exposure to asbestos and

asbestos-containing materials but failed to protect plaintiff from said risk of harm. Defendant, Formosa Plastics Corporation, Louisiana's failure to protect decedent from known and/or foreseeable dangers constitutes negligence. Said negligence was a proximate cause of decedent's asbestos-related injuries, damages and resulting death.

64C.

Decedent, McKeithen, was exposed to asbestos and asbestos containing materials while working at Union Carbide Corporation at its Hahnville, Louisiana, facilities. Decedent, McKeithen, worked at the Union Carbide Corporation plant in Hahnville, Louisiana, intermittently in the 1970s, 1980s and also in the 1990s. Defendant, Union Carbide Corporation, at all times relevant to this complaint, has either been the operator and/or the manager and/or the owner and occupier of the Hahnville, Louisiana, facilities. Decedent was exposed to asbestos and asbestos containing materials while he was an invitee at the Hahnville, Louisiana, facilities. The use of asbestos and asbestos containing materials at the Hahnville, Louisiana, facility created a dangerous condition at the facility.

Defendant, Union Carbide Corporation, is liable to decedent, McKeithen, for its failure to exercise reasonable care to protect decedent from the foreseeable dangers associated with exposure to asbestos. Defendant, Union Carbide Corporation, as the premises operator and/or manager and/or owner and occupier, has a non-delegable duty to keep the premises safe for invitees. Defendant Union Carbide Corporation knew or should have known of the unreasonable risk of harm inherent in exposure to asbestos and asbestos-containing materials but failed to protect plaintiff from said risk of harm. Defendant Union Carbide Corporation's failure to protect decedent from known and/or foreseeable dangers constitutes negligence. Said negligence was a proximate cause of decedent's asbestos-related injuries, damages and resulting death.

64D.

Decedent, McKeithen, was exposed to asbestos and asbestos containing materials while working at Rhodia, Inc. f/k/a Rhone-Poulenc at its Baton Rouge, Louisiana, facilities. Decedent, McKeithen, worked at the Rhodia, Inc. f/k/a Rhone-Poulenc plant in Baton Rouge, Louisiana, intermittently in the 1970s, 1980s and also in the 1990s. Defendant, Rhodia, Inc. f/k/a Rhone-Poulenc, at all times relevant to this complaint, has either been the operator and/or the manager and/or the owner and occupier of the Baton Rouge, Louisiana, facilities. Decedent

was exposed to asbestos and asbestos containing materials while he was an invitee at the Baton Rouge, Louisiana, facilities. The use of asbestos and asbestos containing materials at the Baton Rouge, Louisiana, facility created a dangerous condition at the facility.

Defendant, Rhodia, Inc. f/k/a Rhone-Poulenc, is liable to decedent, McKeithen, for its failure to exercise reasonable care to protect decedent from the foreseeable dangers associated with exposure to asbestos. Defendant, Rhodia, Inc. f/k/a Rhone-Poulenc, as the premises operator and/or manager and/or owner and occupier, has a non-delegable duty to keep the premises safe for invitees. Defendant, Rhodia, Inc. f/k/a Rhone-Poulenc knew or should have known of the unreasonable risk of harm inherent in exposure to asbestos and asbestos-containing materials but failed to protect plaintiff from said risk of harm. Defendant, Rhodia, Inc. f/k/a Rhone-Poulenc's failure to protect decedent from known and/or foreseeable dangers constitutes negligence. Said negligence was a proximate cause of decedent's asbestos-related injuries, damages and resulting death.

### 64E.

Decedent, McKeithen, was exposed to asbestos and asbestos containing materials while working at Vista Corporation at its Calcasieu Parish facilities. Decedent, McKeithen, worked at the Vista Corporation plant in Calcasieu Parish, Louisiana, intermittently in the 1970s, 1980s and also in the 1990s. Defendant, Vista Corporation, at all times relevant to this complaint, has either been the operator and/or the manager and/or the owner and occupier of the Calcasieu Parish facilities. Decedent was exposed to asbestos and asbestos containing materials while he was an invitee at the Calcasieu Parish facilities. The use of asbestos and asbestos containing materials at the Calcasieu facility created a dangerous condition at the facility.

Defendant, Vista Corporation, is liable to decedent, McKeithen, for its failure to exercise reasonable care to protect decedent from the foreseeable dangers associated with exposure to asbestos. Defendant, Vista Corporation, as the premises operator and/or manager and/or owner and occupier, has a non-delegable duty to keep the premises safe for invitees. Defendant, Vista Corporation knew or should have known of the unreasonable risk of harm inherent in exposure to asbestos and asbestos-containing materials but failed to protect plaintiff from said risk of harm. Defendant, Vista Corporation's failure to protect decedent from known and/or foreseeable dangers constitutes negligence. Said negligence was a proximate cause of decedent's asbestos-related injuries, damages and resulting death.

64F.

Decedent, McKeithen, was exposed to asbestos and asbestos containing materials while working at Dow, Inc. f/k/a Dow Badische at its Freeport, Texas, facilities. Decedent, McKeithen, worked at the Dow, Inc. f/k/a Dow Badische plant in Freeport, Texas, intermittently in the 1970s, 1980s and also in the 1990s. Defendant, Dow, Inc. f/k/a Dow Badische, at all times relevant to this complaint, has either been the operator and/or the manager and/or the owner and occupier of the Freeport, Texas, facilities. Decedent was exposed to asbestos and asbestos containing materials while he was an invitee at the Freeport, Texas, facilities. The use of asbestos and asbestos containing materials at the Freeport, Texas, facility created a dangerous condition at the facility.

Defendant, Dow, Inc. f/k/a Dow Badische, is liable to decedent, McKeithen, for its failure to exercise reasonable care to protect decedent from the foreseeable dangers associated with exposure to asbestos. Defendant, Dow, Inc. f/k/a Dow Badische, as the premises operator and/or manager and/or owner and occupier, has a non-delegable duty to keep the premises safe for invitees. Defendant, Dow, Inc. f/k/a Dow Badische knew or should have known of the unreasonable risk of harm inherent in exposure to asbestos and asbestos-containing materials but failed to protect plaintiff from said risk of harm. Defendant, Dow, Inc. f/k/a Dow Badische's failure to protect decedent from known and/or foreseeable dangers constitutes negligence. Said negligence was a proximate cause of decedent's asbestos-related injuries, damages and resulting death.

64G.

Decedent, McKeithen, was exposed to asbestos and asbestos containing materials while working at Exxon Mobil Corporation at its Houston, Texas, Baytown, Texas, and Brownsville, Texas, facilities. Decedent, McKeithen, worked at the Exxon Mobil Corporation plant in Houston, Texas, Baytown, Texas, and Brownsville, Texas, intermittently in the 1970s, 1980s and also in the 1990s. Defendant, Exxon Mobil Corporation, at all times relevant to this complaint, has either been the operator and/or the manager and/or the owner and occupier of the Houston, Texas, Baytown Texas, and Brownsville, Texas, facilities. Decedent was exposed to asbestos and asbestos containing materials while he was an invitee at the Houston, Texas, Baytown, Texas, and Brownsville, Texas, facilities. The use of asbestos and asbestos containing materials at the Freeport, Texas facility created a dangerous condition at the facility.

Defendant, Exxon Mobil Corporation, is liable to decedent, McKeithen, for its failure to exercise reasonable care to protect decedent from the foreseeable dangers associated with exposure to asbestos. Defendant, Exxon Mobil Corporation, as the premises operator and/or manager and/or owner and occupier, has a non-delegable duty to keep the premises safe for invitees. Defendant, Exxon Mobil Corporation knew or should have known of the unreasonable risk of harm inherent in exposure to asbestos and asbestos-containing materials but failed to protect plaintiff from said risk of harm. Defendant, Exxon Mobil Corporation's failure to protect decedent from known and/or foreseeable dangers constitutes negligence. Said negligence was a proximate cause of decedent's asbestos-related injuries, damages and resulting death.

64H.

Decedent, McKeithen, was exposed to asbestos and asbestos containing materials while working at E. I. Du Pont De Nemours and Company at its Victoria, Texas, facilities. Decedent, McKeithen, worked at the E. I. Du Pont De Nemours and Company plant in Victoria, Texas, intermittently in the 1970s, 1980s and also in the 1990s. Defendant, E. I. Du Pont De Nemours and Company, at all times relevant to this complaint, has either been the operator and/or the manager and/or the owner and occupier of the Victoria, Texas, facilities. Decedent was exposed to asbestos and asbestos containing materials while he was an invitee at the Victoria, Texas, facilities. The use of asbestos and asbestos containing materials at the Victoria, Texas facility created a dangerous condition at the facility.

Defendant, E. I. Du Pont De Nemours and Company, is liable to decedent, McKeithen, for its failure to exercise reasonable care to protect decedent from the foreseeable dangers associated with exposure to asbestos. Defendant, E. I. Du Pont De Nemours and Company, as the premises operator and/or manager and/or owner and occupier, has a non-delegable duty to keep the premises safe for invitees. Defendant, E. I. Du Pont De Nemours and Company knew or should have known of the unreasonable risk of harm inherent in exposure to asbestos and asbestos-containing materials but failed to protect plaintiff from said risk of harm. Defendant, E. I. Du Pont De Nemours and Company's failure to protect decedent from known and/or foreseeable dangers constitutes negligence. Said negligence was a proximate cause of decedent's asbestos-related injuries, damages and resulting death.

64I.

Decedent, McKeithen, was exposed to asbestos and asbestos containing materials while working at Hoechst Celanese Corporation a/k/a CNA Holdings, Inc. at its Corpus Christi, Texas, facilities. Decedent, McKeithen, worked at the Hoechst Celanese Corporation a/k/a CNA Holdings, Inc. plant in Corpus Christi, Texas, intermittently in the 1970s, 1980s and also in the 1990s. Defendant, Hoechst Celanese Corporation a/k/a CNA Holdings, Inc., at all times relevant to this complaint, has either been the operator and/or the manager and/or the owner and occupier of the Corpus Christi, Texas, facilities. Decedent was exposed to asbestos and asbestos containing materials while he was an invitee at the Corpus Christi, Texas, facilities. The use of asbestos and asbestos containing materials at the Corpus Christi, Texas facility created a dangerous condition at the facility.

Defendant, Hoechst Celanese Corporation a/k/a CNA Holdings, Inc., is liable to decedent, McKeithen, for its failure to exercise reasonable care to protect decedent from the foreseeable dangers associated with exposure to asbestos. Defendant, Hoechst Celanese Corporation a/k/a CNA Holdings, Inc., as the premises operator and/or manager and/or owner and occupier, has a non-delegable duty to keep the premises safe for invitees. Defendant, Hoechst Celanese Corporation a/k/a CNA Holdings, Inc. knew or should have known of the unreasonable risk of harm inherent in exposure to asbestos and asbestos-containing materials but failed to protect plaintiff from said risk of harm. Defendant, Hoechst Celanese Corporation a/k/a CNA Holdings, Inc.'s failure to protect decedent from known and/or foreseeable dangers constitutes negligence. Said negligence was a proximate cause of decedent's asbestos-related injuries, damages and resulting death.

64J.

Decedent, McKeithen, was exposed to asbestos and asbestos containing materials while working at Monsanto Chemical Company at its Texas City, Texas, facilities. Decedent, McKeithen, worked at the Monsanto Chemical Company plant in Texas City, Texas, intermittently in the 1970s, 1980s and also in the 1990s. Defendant, Monsanto Chemical Company, at all times relevant to this complaint, has either been the operator and/or the manager and/or the owner and occupier of the Texas City, Texas, facilities. Decedent was exposed to asbestos and asbestos containing materials while he was an invitee at the Texas

City, Texas, facilities. The use of asbestos and asbestos containing materials at the Texas City, Texas facility created a dangerous condition at the facility.

Defendant, Monsanto Chemical Company, is liable to decedent, McKeithen, for its failure to exercise reasonable care to protect decedent from the foreseeable dangers associated with exposure to asbestos. Defendant, Monsanto Chemical Company, as the premises operator and/or manager and/or owner and occupier, has a non-delegable duty to keep the premises safe for invitees. Defendant, Monsanto Chemical Company knew or should have known of the unreasonable risk of harm inherent in exposure to asbestos and asbestos-containing materials but failed to protect plaintiff from said risk of harm. Defendant, Monsanto Chemical Company's failure to protect decedent from known and/or foreseeable dangers constitutes negligence. Said negligence was a proximate cause of decedent's asbestos-related injuries, damages and resulting death.

### 64K.

Decedent, McKeithen, was exposed to asbestos and asbestos containing materials while working at BASF Corporation at its Freeport, Texas, facilities. Decedent, McKeithen, worked at the BASF Corporation plant in Freeport, Texas, intermittently in the 1970s, 1980s and also in the 1990s. Defendant, BASF Corporation, at all times relevant to this complaint, has either been the operator and/or the manager and/or the owner and occupier of the Freeport, Texas, facilities. Decedent was exposed to asbestos and asbestos containing materials while he was an invitee at the Freeport, Texas, facilities. The use of asbestos and asbestos containing materials at the Freeport, Texas facility created a dangerous condition at the facility.

Defendant, BASF Corporation, is liable to decedent, McKeithen, for its failure to exercise reasonable care to protect decedent from the foreseeable dangers associated with exposure to asbestos. Defendant, BASF Corporation, as the premises operator and/or manager and/or owner and occupier, has a non-delegable duty to keep the premises safe for invitees. Defendant, BASF Corporation knew or should have known of the unreasonable risk of harm inherent in exposure to asbestos and asbestos-containing materials but failed to protect plaintiff from said risk of harm. Defendant, BASF Corporation's failure to protect decedent from known and/or foreseeable dangers constitutes negligence. Said negligence was a proximate cause of decedent's asbestos-related injuries, damages and resulting death.

64L.

Decedent, McKeithen, was exposed to asbestos and asbestos containing materials while working at Shell Oil Company at its Deer Park, Texas, facilities. Decedent, McKeithen, worked at the Shell Oil Company plant in Deer Park, Texas, intermittently in the 1970s, 1980s and also in the 1990s. Defendant, Shell Oil Company, at all times relevant to this complaint, has either been the operator and/or the manager and/or the owner and occupier of the Deer Park, Texas, facilities. Decedent was exposed to asbestos and asbestos containing materials while he was an invitee at the Deer Park, Texas, facilities. The use of asbestos and asbestos containing materials at the Deer Park, Texas facility created a dangerous condition at the facility.

Defendant, Shell Oil Company, is liable to decedent, McKeithen, for its failure to exercise reasonable care to protect decedent from the foreseeable dangers associated with exposure to asbestos. Defendant, Shell Oil Company, as the premises operator and/or manager and/or owner and occupier, has a non-delegable duty to keep the premises safe for invitees. Defendant, Shell Oil Company knew or should have known of the unreasonable risk of harm inherent in exposure to asbestos and asbestos-containing materials but failed to protect plaintiff from said risk of harm. Defendant, Shell Oil Company's failure to protect decedent from known and/or foreseeable dangers constitutes negligence. Said negligence was a proximate cause of decedent's asbestos-related injuries, damages and resulting death.

64M.

Decedent, McKeithen, was exposed to asbestos and asbestos containing materials while working at Arco, Inc. a/k/a Arco of the Panhandle, Inc. at its Houston, Texas, facilities. Decedent, McKeithen, worked at the Arco, Inc. a/k/a Arco of the Panhandle, Inc. plant in Houston, Texas, intermittently in the 1970s, 1980s and also in the 1990s. Defendant, Arco, Inc. a/k/a Arco of the Panhandle, Inc., at all times relevant to this complaint, has either been the operator and/or the manager and/or the owner and occupier of the Houston, Texas, facilities. Decedent was exposed to asbestos and asbestos containing materials while he was an invitee at the Houston, Texas, facilities. The use of asbestos and asbestos containing materials at the Houston, Texas facility created a dangerous condition at the facility.

Defendant, Arco, Inc. a/k/a Arco of the Panhandle, Inc., is liable to decedent, McKeithen, for its failure to exercise reasonable care to protect decedent from the foreseeable

dangers associated with exposure to asbestos. Defendant, Arco, Inc. a/k/a Arco of the Panhandle, Inc., as the premises operator and/or manager and/or owner and occupier, has a non-delegable duty to keep the premises safe for invitees. Defendant, Arco, Inc. a/k/a Arco of the Panhandle, Inc. knew or should have known of the unreasonable risk of harm inherent in exposure to asbestos and asbestos-containing materials but failed to protect plaintiff from said risk of harm. Defendant, Arco, Inc. a/k/a Arco of the Panhandle, Inc.'s failure to protect decedent from known and/or foreseeable dangers constitutes negligence. Said negligence was a proximate cause of decedent's asbestos-related injuries, damages and resulting death.

64N.

Decedent, McKeithen, was exposed to asbestos and asbestos containing materials while working at Phillips, Inc. at its Houston, Texas, facilities. Decedent, McKeithen, worked at the Phillips, Inc. plant in Houston, Texas, intermittently in the 1970s, 1980s and also in the 1990s. Defendant, Phillips, Inc., at all times relevant to this complaint, has either been the operator and/or the manager and/or the owner and occupier of the Houston, Texas, facilities. Decedent was exposed to asbestos and asbestos containing materials while he was an invitee at the Houston, Texas, facilities. The use of asbestos and asbestos containing materials at the Houston, Texas facility created a dangerous condition at the facility.

Defendant, Phillips, Inc., is liable to decedent, McKeithen, for its failure to exercise reasonable care to protect decedent from the foreseeable dangers associated with exposure to asbestos. Defendant, Phillips, Inc., as the premises operator and/or manager and/or owner and occupier, has a non-delegable duty to keep the premises safe for invitees. Defendant, Phillips, Inc. knew or should have known of the unreasonable risk of harm inherent in exposure to asbestos and asbestos-containing materials but failed to protect plaintiff from said risk of harm. Defendant, Phillips, Inc.'s failure to protect decedent from known and/or foreseeable dangers constitutes negligence. Said negligence was a proximate cause of decedent's asbestos-related injuries, damages and resulting death.

64O.

Decedent, McKeithen, was exposed to asbestos and asbestos containing materials while working at Phillips Petroleum Company a/k/a ConocoPhillips Company at its Old Ocean, Texas, facilities. Decedent, McKeithen, worked at the Phillips Petroleum Company a/k/a ConocoPhillips Company plant in Old Ocean, Texas, intermittently in the 1970s, 1980s and

also in the 1990s. Defendant, Phillips Petroleum Company a/k/a ConocoPhillips Company, at all times relevant to this complaint, has either been the operator and/or the manager and/or the owner and occupier of the Old Ocean, Texas, facilities. Decedent was exposed to asbestos and asbestos containing materials while he was an invitee at the Old Ocean, Texas, facilities. The use of asbestos and asbestos containing materials at the Old Ocean, Texas facility created a dangerous condition at the facility.

Defendant, Phillips Petroleum Company a/k/a ConocoPhillips Company, is liable to decedent, McKeithen, for its failure to exercise reasonable care to protect decedent from the foreseeable dangers associated with exposure to asbestos. Defendant, Phillips Petroleum Company a/k/a ConocoPhillips Company, as the premises operator and/or manager and/or owner and occupier, has a non-delegable duty to keep the premises safe for invitees. Defendant, Phillips Petroleum Company a/k/a ConocoPhillips Company knew or should have known of the unreasonable risk of harm inherent in exposure to asbestos and asbestos-containing materials but failed to protect plaintiff from said risk of harm. Defendant, Phillips Petroleum Company a/k/a ConocoPhillips Company's failure to protect decedent from known and/or foreseeable dangers constitutes negligence. Said negligence was a proximate cause of decedent's asbestos-related injuries, damages and resulting death.

64P.

The premises on which the decedent, Millard McKeithen, was injured were owned by, and were in the custody of the premise defendants, and were unreasonably dangerous due to the presence of asbestos-containing products, which resulted in the exposure of Plaintiffs to airborne asbestos fibers with no precautions taken to minimize the risk of danger or warn Plaintiffs of such danger. The unreasonably dangerous condition of the premises and the negligence of the premise defendants were causes of the Plaintiffs' injuries.

65.

The premise defendants negligently, recklessly, willfully and/or because of gross and wanton negligence, fault, or strict liability, failed to properly discharge its duties to Plaintiffs in the following:

    a.    failed to provide Plaintiffs with a safe work place;

    b.    failed to provide Plaintiffs with safety equipment;

c.   failed to provide Plaintiffs with correct, adequate, or proper safety equipment;

d.   recklessly and negligently failed to disclose, warn or reveal critical medical and safety information to Plaintiffs regarding asbestos hazards in general and with regard to those specific hazards at Plaintiffs work site;

e.   recklessly concealed and negligently omitted to reveal critical medical and safety information from Plaintiffs regarding the safety and health risks associated with the asbestos and asbestos-containing products at this work sites;

f.   failed to timely remove asbestos hazards from the work place;

g.   failed to properly supervise or monitor the work areas for compliance with safety regulations; and

h.   failed to provide a safety and suitable means of eliminating the amount of asbestos dust in the air.

66.

The premise defendants are strictly liable for hazardous things in their guarde, care, custody or right of control; and/or any other acts or omissions as may be revealed in discovery or at trial and are further liable under La. Civil Code Articles 2315, 2315.1, 2315.2, 2317.1, 2320 and 2322; plaintiffs assert the doctrine of contra non valentum against all defendants, and all Texas law and equity remedies available against the Texas defendants including punitive damages.

67.

The above-described negligence, fault, strict liability and willful misconduct of these defendants were proximate causes of the Plaintiffs' injuries.

CLAIMS AGAINST
McCARTY CORPORATION AND ANCO INSULATIONS, INC.

While plaintiff was working at various plants in, inter alia: East Baton Rouge Parish, Iberville Parish areas and others, he was exposed to asbestos products supplied by the defendants, McCarty Corporation and Anco Insulations, Inc. and all defendants on Exhibit "B."

McCarty Corporation and Anco Insulations, Inc. supplied and distributed asbestos products and placed asbestos products in various plants in East Baton Rouge Parish and Iberville Parish in locations including Exxon Mobil Corporation, Copolymer Corporation, and Dow Chemical Corporation where the plaintiff ingested asbestos and asbestos dust. Defendants are liable to the Plaintiffs for the injury and death of Millard McKeithen and the Plaintiffs reassert and reallege paragraphs 1 and 67 of this petition as it relates to the McCarty Corporation and Anco Insulations, Inc.

## B. WELDING ROD EXPOSURE

1.  The plaintiffs referenced above appear on their own behalf as stated in the petition, A. Asbestos Exposure, Paragraph 1, as follows:

2.  Made defendant herein are:

   A.  Lincoln Electric Company ("Lincoln"), a corporation incorporated under the laws of Ohio that is qualified to do business in Louisiana and doing business in Louisiana, with C.T. Corporation System, 8550 United Plaza Blvd., Baton Rouge, LA 70809, as its agent for service of process;

   B.  Hobart Brothers Company ("Hobart"), a corporation incorporated under the laws of Ohio that is qualified to do business in Louisiana and doing business in Louisiana, with C.T. Corporation System, 8550 United Plaza Blvd., Baton Rouge, LA 70809, as its agent for service of process;

   C.  Illinois Tool Works, Inc. ("Illinois Tool Works"), a corporation incorporated under the laws of Delaware that is qualified to do business in Louisiana and doing business in Louisiana, with C.T. Corporation System, 8550 United Plaza Blvd., Baton Rouge, LA 70809, as its agent for service of process;

   D.  The ESAB Group, Inc. ("ESAB"), a corporation incorporated under the laws of Ohio that has done and is doing business in Louisiana but is not qualified to do business in Louisiana, with The Corporation Trust Company, The Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801, as its agent for service of process;

   E.  Select Arc, Inc. ("Select Arc"), a corporation incorporated under the laws of Ohio that has done and is doing business in Louisiana but is not qualified to do business in Louisiana, with Paul E. Zimmer, 2700 Ketting Tower, 40 N. Main St., Dayton, OH 45423, as its agent for service of process;

   F.  The National Electric Manufacturers Association ("NEMA"), a trade organization comprised of manufacturers that has a section devoted to the manufacturer of welding products known as "NEMA Electric Welding Section" or "NEMA Arc Welding Section";

   G.  The Ferroalloys Association ("TFA"), an association and industry advocacy group that includes the producers of chromium, manganese, silicone, and vanadium ferroalloys that sponsored a manganese subcommittee that includes representative from welding manufacturers, the AWS, and the NEMA;

   H.  Airco, Inc., ("Airco"), now known as The BOC Group, Inc., a corporation incorporated under the laws of Delaware that is qualified to do business in Louisiana and doing business in Louisiana, with C. T, Corporation System, 8550 United Plaza Blvd., Baton Rouge, LA 70809, as its agent for service of process;

   I.  Praxair, Inc. ("Praxair"), a corporation incorporated under the laws of Delaware that is qualified to do business in Louisiana and doing business in Louisiana, with The Prentice-Hall Corporation System, Inc., 701 South Peters Street, Second Floor, New Orleans, LA 70130, as its agent for service of process;

   J.  TDY Industries, Inc. ("Teledyne"), formerly known as Teledyne Industries, Inc., a corporation incorporated under the laws of California that is qualified to do business in Louisiana and doing business in Louisiana, with C. T. Corporation System, 8550 United Plaza Blvd., Baton Rouge, LA 70809, as its agent for service of process;

K.  Viacom, Inc. ("Viacom"), a corporation incorporated under the laws of Delaware that is qualified to do business in Louisiana and doing business in Louisiana with Corporation Service Company, 320 Somerulos Street, Baton Rouge, LA 70802-6129, as its agent for service of process;

L.  Westinghouse Electric Corporation ("Westinghouse"), now known as CBS Corporation, a corporation incorporated under the laws of Pennsylvania that is qualified to do business in Louisiana and doing business in Louisiana, with C.T. Corporation System, 8550 United Plaza Blvd., Baton Rouge, LA 70809, as its agent for service of process;

M.  Caterpillar, Inc. ("Caterpillar"), a corporation incorporated under the laws of Delaware that is qualified to do business in Louisiana and doing business in Louisiana, with C.T. Corporation System, 8550 United Plaza Blvd., Baton Rouge, LA 70809, as its agent for service of process;

N.  General Electric Company ("General Electric"), a corporation incorporated under the laws of New York that is qualified to do business in Louisiana and doing business in Louisiana, with C.T. Corporation System, 8550 United Plaza Blvd., Baton Rouge, LA 70809, as its agent for service of process;

O.  Union Carbide Corporation ("Union Carbide"), a corporation incorporated under the laws of New York that is qualified to do business in Louisiana and doing business in Louisiana, with C.T. Corporation System, 8550 United Plaza Blvd., Baton Rouge, LA 70809, as its agent for service of process;

P.  Union Carbide Chemicals and Plastics Company, Inc. ("Union Carbide Chemicals"), now known as Union Carbide Corporation, a corporation incorporated under the laws of New York that is qualified to do business in Louisiana and doing business in Louisiana, with C.T. Corporation System, 8550 United Plaza Blvd., Baton Rouge, LA 70809, as its agent for service of process;

Q.  Eutectic Corporation ("Eutectic"), a corporation organized under the laws of New York that has done and is doing business in Louisiana, but is not qualified to do business in Louisiana, with Thomas E. Heftler, Esquire, 180 Maiden Lane, New York, New York 10004, as its agent for service of process;

R.  A. O. Smith Corporation ("Smith"), a corporation incorporated under the laws of New York that is qualified to do business in Louisiana and doing business in Louisiana, and its successor in interest St De Aosco, Inc., with Prentice-Hall Corporation System, 1006 Hibernia Bank Building, New Orleans, LA 70112, as its agent for service of process;

S.  Sandvik, Inc. ("Sandvik"), a corporation incorporated under the laws of Delaware that has done and is doing business in Louisiana, but is not qualified to do business in Louisiana, with C. T. Corporation System, 818 W. 7th Street, Los Angeles, CA 90017, as its agent for service of process;

T.  Deloro Stellite Company, Inc. ("Deloro"), a corporation incorporated under the laws of Delaware that has done and is doing business in Louisiana, but is not qualified to do business in Louisiana, with C. T. Corporation System, 818 W. 7th Street, Los Angeles, CA 90017, as its agent for service of process;

U.  Miller Electric Manufacturing Co., Inc. ("Miller Electric"), a corporation incorporated under the laws of Wisconsin that has done and is doing business in Louisiana, with C.T. Corporation System, 44 E. Mifflin St., Madison, WI 53703, as its agent for service of process;

V.  J. W. Harris Co., Inc. ("J. W. Harris"), a corporation incorporated under the laws of Ohio that has done and is doing business in Louisiana, with Stephen M. Nechemias, 425 Walnut St., No. 1800, Cincinnati, OH 45202, as its agent for service of process;

W.  Industrial Welding Supplies of Hattiesburg, Inc. ("Industrial Welding"), formerly known as Nordan Smith, a corporation incorporated under the laws of Mississippi doing business in Louisiana whose agent for service of process is C.T. Corporation System, 8550 United Plaza Blvd., Baton Rouge, LA 70809;

X.  Airgas-Gulf States, Inc. ("Airgas"), a corporation incorporated under the laws of Delaware that is qualified to do business in Louisiana and doing business in Louisiana, with C. T. Corporation System, 8550 United Plaza Blvd., Baton Rouge, LA 70809, as its agent for service of process;

Y.  John Doe Defendants A-Z, whose identities are unknown to the Plaintiffs at this time, but when those parties' true identities are discovered, the pleadings will be amended by substituting their true names and giving proper notice to these parties, pursuant to the L.C.C.P. These Defendants include sellers, suppliers, distributors, and manufacturers that, at any time relevant to these proceedings, supplied welding equipment, supplies, and steel/metal products containing manganese to Avondale Shipyard, Avondale, Louisiana, and also include unknown members of AWS, NEMA and TFA, whose negligence and breaches caused or contributed to cause the Plaintiffs' damages and injuries.

3.  This action is brought pursuant to Louisiana law on behalf of Mardie McKeithen indivudally and on behalf of the Estate of Millard McKeithen, and children, David McKeithen, Jerry McKeithen, and Susan McKeithen, for the survival claims and wrongful death of their husband and father, Millard McKeithen, on February 18, 2003, who sustained direct and/or consequential affects, injury and damage as a result of the exposure to welding fumes containing the air borne metal/chemical substance manganese.

## FACTS

4.  Over the years, deceased, Millard McKeithen, was at various times exposed to toxic fumes resulting from welding while working at his livelihood.

5.  The ordinary and intended use of welding products causes emission of fumes that contain manganese ("welding fumes").

6.  Since 1837, manganese has been medically recognized as toxic to the human central nervous system in levels that exceed the trace amounts normally found in the human body. Toxicity of manganese causes progressive, disabling neurological damage known as manganese poisoning. People who suffer from manganese poisoning suffer from debilitating neurological problems that affect their ability to think, talk, eat, move, sleep, and work.

7.    Persons exposed to welding fumes absorb them into their body primarily through inhalation. Manganese exposure for a period as short as 49 days causes manganese poisoning and progressive, disabling, neurological damage.

8.    While working, deceased, Millard McKeithen, was exposed to welding fumes while using welding products and equipment or working in the proximity of other persons using welding products or equipment.

9.    As a direct and proximate result of exposure to welding fumes, deceased, Millard McKeithen, developed ongoing and related symptoms indicative of the condition known as manganism, or manganese poisoning.

10.    As a direct and proximate result of exposure to welding fumes, deceased, Millard McKeithen, suffered permanent neurological and physical damage, severe physical and mental pain, loss of wages, loss of earning capacity, disability, medical expenses, and loss of enjoyment of life in varying degrees.

11.    At all relevant times, deceased, Millard McKeithen (hereinafter "Plaintiff") was ignorant of the dangerous nature of welding fumes, manganese, and the neurological injuries that could occur because of exposure to welding fumes.

12.    Any reasonable persons, including Plaintiff, if adequately informed of the hazards of exposure to welding fumes, would not have willingly exposed themselves to welding fumes in workplaces without necessary precautionary measures.

13.    All of the Defendants are or were manufacturers, sellers, suppliers or large industrial consumers of welding products.

14.    Through industry and medical studies, unknown to the Plaintiff, the Defendants knew or should have known of the health hazards inherent in the products they were selling, distributing, or using. The Defendants ignored or deliberately and fraudulently concealed that information, or condoned the concealment, and/or conspired with, advised, encouraged, or aided others and/or each other to do so, in order to sell their products and/or avoid the costs of safety precautions, and/or avoid litigation by people injured by welding fumes. The actions or inactions demonstrate a reckless disregard for the rights and safety of others.

15.    The Defendants committed numerous tortious acts that included fraudulently and negligently misrepresenting, concealing, suppressing, and omitting material information

about the health effects of welding fumes and precautionary measures as specifically alleged below.

16.   NEMA is a trade organization comprised of manufacturers that has a section devoted to the manufacturers of welding products known as "NEMA Electric Welding Section" or "NEMA Arc Welding Section" ("NEMA Welding Section").

17.   TFA is an industry advocacy group consisting of producers of chromium, manganese, silicon, and vanadium ferroalloys that sponsored a manganese subcommittee that includes representatives from welding manufacturers and the AWS and NEMA. The TFA's membership included management representatives of companies that produce welding products and large consumers that purchase the products for use in their operations.

18.   The Defendants created committees within these trade organizations and then used the committees to fraudulently and negligently misrepresent, conceal, suppress, and omit material information about the health effects of welding fumes and necessary precautionary measures.

19.   Specific examples of the trade association committees controlled by Defendants and their activities are identified below.

20.   The Defendants controlled and used the committees to conceal the dangers from people exposed to welding fumes by:

      a.    limiting individual membership on relevant committees exclusively or primarily to employees of the Defendants or their designated representatives;

      b.    maintaining, through Defendants' delegates, majority or exclusive voting control of the committees at all times;

      c.    selecting the assignments or proposals considered by each committee;

      d.    funding projects chosen by Defendants;

      e.    using the Defendants' delegates to prepare the written records of the business transacted by each committee;

      f.    reviewing and editing, to the satisfaction of the Defendants, studies performed by consultants hired by the committees.

21.   From at least 1937 to the present, the Defendants, by their actions and through trade association committees they controlled, undertook studies, issued product labels and other health and safety information, and issued specifications and standards for ventilation, safety equipment, and other precautionary measures.

22.    At all times, the Defendants acted with the intent to conceal the health hazards of welding fumes, and specifically manganese, knowing that their studies, publications, specifications, and standards would be adopted and relied upon by manufacturers, sellers, and large consumers of welding products as the authoritative source for warnings, instructions, and precautionary measures printed on product labels and otherwise distributed in the stream of commerce.

23.    The Defendants had actual knowledge about the causal relationship between manganese-containing welding fumes and neurological injury. The Defendants concealed this information from workers exposed to welding fumes.

24.    The causal connection between neurological injuries and welding fumes containing manganese has been scientifically documented since 1932.

25.    In 1932, a medical article was published documenting two cases of welders with neurological injury caused by manganese poisoning from welding fumes. The copy of this article or a summary of the medical article was received in the libraries of many or all Defendants.

26.    In 1937, NEMA's Welding Section received further notice of the contents of the 1932 medical article through a welding safety booklet published by an insurance company stating that manganese in welding fumes "causes a disease similar to *paralysis agitans* [Parkinson's disease]."

27.    In 1944, NEMA's Welding Section received notice of a claim of manganese poisoning in a welder.

28.    In 1958, the AWS-sponsored Z49 Committee issued a technical document, (not intended for use by welders) approved by the AWS Technical Committee, an oversight committee for AWS activities, reflecting its knowledge that manganese in welding fumes is a potentially toxic substance.

29.    In 1966, at a meeting of a task group of the AWS Filler Metal Committee, members of the committee reviewed an industrial hygiene article identifying manganese as a toxic substance in welding fumes, and the Committee discussed neurological injuries in welders.

30.    In 1970, the AWS Task Group on Welding Fumes received notice, through a literature search submitted by a consultant hired by the Task Group on Welding Fumes, that

welding fumes could cause neurological damage due to manganese poisoning, and that the symptoms of manganese poisoning resemble the symptoms of Parkinson's Disease.

31.    In 1970, the AWS Task Group on Welding Fumes received notice, through a welding fume study conducted by a consultant hired by the Task Group on Welding Fumes, that welding fumes could easily exceed the recommended occupational exposure guidelines, even when ventilation standards specified by Defendants were followed.

32.    Beginning in the late 1970s, the AWS Safety and Health Committee received notice of claims of welders suffering neurological injuries from manganese in welding fumes.

33.    In 1978, the AWS Safety and Health Committee received notice, through a literature search report submitted by a consultant hired by the Committee, that welders can suffer neurological damage from manganese in welding fumes.   A portion of this report is quoted below:

"Although a number of cases...have been reported, there are no recent studies reported in the literature which explore the magnitude of the problem of chronic manganese poisoning in welders.   In future epidemiological studies of various welding populations, the prevalence of this disease should be investigated.

...

Early symptoms of chronic manganism include restlessness, irritability and a tendency to laugh or cry without purpose.  These symptoms may be followed by apathy, visual hallucinations, uncontrollable impulse, flight of ideas, mental confusion or euphoria.

Mask-like facial expression, spastic grin, muscle rigidity, slow gait with sliding of the feet, increased and abnormal reflexes, monotonous blurred speech with poor articulation, tremors, irregular handwriting, impaired hearing, double vision, abnormal reactions to pain, touch, heat and pressure, excessive salivation and perspiration, sexual impotence and diminution of libido have been described by various authors.... Mental activity is reported to be slowed, judgment impaired and memory weakened, but intelligence remains normal.

...

The observation that manganism resembles Parkinson's Disease deserves emphasis.  Although no data on the prevalence of Parkinsonism in welders are available, there is a concern that some cases of manganese poisoning could be mistakenly diagnosed as Parkinson's Disease. Further investigations may be warranted.

Manganism, like Parkinsonism, responds favorably to treatment with the drug levodopa (L-dopa), indicating that the two diseases may share certain biological abnormalities:   depletion of dopamine (a neurotransmitter in the basal ganglia of the brain) and depletion of melanin pigment content of the nerve cells of the substantia nigra, also in the brain."

34.    In 1978, the same consultant described above in paragraph 35 reported to the AWS Safety and Health Committee that manganese poisoning from welding fumes could be misdiagnosed as idiopathic Parkinson's Disease, and that the problem was so widespread that it required an epidemiological study.

35.    In 1979, the AWS Research Committee and the AWS Executive Committee on Safety and Health concluded that there was sufficient evidence to justify the funding of an epidemiological study that would include the study of neurological problems in welders. The committee voted to undertake this epidemiological study, although it was never completed.

36.    In 1983, the AWS Safety and Health Committee received notice through an independent literature search that manganese poisoning is "readily confused with Parkinson's Disease," and also that in a study in India, 40% of the welders studied suffered "neurological injury."

37.    Beginning in the late 1970s and early 1980s, the Defendants through the AWS Safety and Health Committee and NEMA Welding Section sponsored "Industry Defense Committee," receiving notice of claims of manganese poisoning filed as lawsuits against companies in the welding industry.

38.    In 1984, the chairperson of the AWS Safety and Health Committee admitted that "manganese fumes can cause a disease quite similar to Parkinson's Disease after six months to two years of exposure." The Defendants were aware of this admission.

39.    Beginning in 1985 and continuing to the present, certain Defendants admitted in their Material Safety Data Sheets ("MSDS"), that are technical documents of limited distribution, their knowledge that manganese in welding fumes could cause neurological damage.

40.    Because not all Defendants attended each meeting, it was a regular practice of the trade association committees to publish written minutes that were disseminated to all committee members including those not in attendance, for the purpose of ratifying and adopting the actions taken and decisions made at the meetings.

41.    At a meeting of NEMA's Welding Section held on March 16, 1937, the Defendants in attendance agreed to and did intentionally, knowingly, and recklessly conceal known hazards associated with welding fumes by forming a "Dust and Smoke Committee" to

preempt investigation of welding fume hazards by independent sources that were not controlled by the Defendants.

42.     During meetings of NEMA's Welding Section held between January 20 and June 23, 1938, the Defendants in attendance agreed to and did intentionally, knowingly, and recklessly conceal known hazards of welding fumes by changing the language of a publication issued by an insurance company to delete the original statement in the publication that manganese in welding fumes causes a disabling illness similar to Parkinson's Disease.

43.     In 1939-40, at meetings of NEMA's Welding Section, the Defendants in attendance agreed to and did intentionally, knowingly, and recklessly conceal the hazards of welding fumes by purporting to undertake an investigation of the health hazards of welding fumes and then, upon its completion, changing the conclusions of the study, so as to falsely represent that welding fumes were not harmful to welders.

44.     In 1949, as part of a scheme to create and disseminate false evidence useful in defending against claims brought by persons injured by exposure to welding fumes, Defendant members of NEMA's Arc Welding Section agreed to and did intentionally, knowingly, and recklessly conceal known hazards of welding fumes by providing information for and causing publication in a welding trade journal of a two-part article that made the misrepresentation that welding fumes were not toxic.

45.     In 1949 and 1951, at meetings of NEMA's Arc Welding Section which considered precautionary measures, the Defendants in attendance agreed to and did intentionally, knowingly, and recklessly conceal the health hazards of welding fumes by rejecting the adoption of any precautionary product labels for welding products because the Defendants feared that welders would be afraid to use welding products if they saw precautionary product labels, and therefore sales of welding products would be reduced.

46.     In 1952, the Defendants reorganized the AWS Safety Recommendations Committee and called a meeting to consider the furnishing of safety and health information at which they agreed to, and did intentionally, knowingly, and recklessly conceal the health hazards of welding fumes by rejecting the adoption of any precautionary product labels for welding products.

47.     In 1952, at a meeting of the AWS Safety Recommendations Committee, the Defendants in attendance agreed to, and did intentionally, knowingly, and recklessly adopt a

policy of refuting existing reports of welding fume hazards by publishing their own reports that misrepresented exposure to welding fumes as safe.

48.     In 1957, the Defendants agreed to, and did intentionally, knowingly, and recklessly conceal the health hazards of welding fumes by sponsoring the publication of an article in the *Welding Engineer* trade publication that made the misrepresentation that "toxic gases are not produced by electrode coatings."

49.     In 1966, at meetings of the AWS A5 Filler Metal Committee and a task group, the Defendants in attendance intentionally, knowingly, and recklessly agreed to publication in a trade journal of an article misrepresenting the health hazards of welding fumes as causing only "temporary disability."

50.     In 1966, at meetings of the A5 Filler Metal Committee of the AWS and a Task Group of that committee, the Defendants in attendance agreed to, and did intentionally, knowingly, and recklessly conceal health hazards of welding fumes by establishing industry-wide specifications for precautionary product labels that failed to warn workers of the danger of manganese in welding fumes. This precautionary label stated:

> Welding may produce fumes and gases hazardous to health.
> Avoid breathing these fumes and gases.   Use adequate
> ventilation.  See USAS Z49.1 "Safety in Welding & Cutting,"
> published by the American Welding Society.

51.     In 1966, at meetings of the A5 Filler Metal Committee of the AWS and a Task Group of that committee, the Defendants in attendance established industry-wide specifications for precautionary product labels which did intentionally, knowingly, and recklessly omit instructions about necessary ventilation, precautionary measures, and other information, needed to protect workers against the toxic effect of manganese.

52.     In 1966-67, through votes on a ballot distributed to the Defendants through the A5 Filler Metal Committee of the AWS, the Defendants did intentionally, knowingly, and recklessly approve, as part of the AWS required specifications for most welding products, a precautionary product label concealing health hazards from welding fumes and omitting instructions about necessary ventilation, precautionary measures, and other information.

53.     From 1975-79, the Defendants, through the AWS Committee on Safety and Health, did intentionally, knowingly, and recklessly conceal the known hazards of welding fumes by providing information that misrepresented the hazards associated with welding fumes

as part of a deliberate scheme to prevent an independent standard-setting organization from lowering the occupational exposure guidelines for iron oxide and general welding fumes.

54.    In 1979, at meetings of a joint AWS-NEMA committee consisting of a special Task Group of the A5 Filler Metal Committee of the AWS and the Labeling and Safe Practices Committee of NEMA's Arc Welding Section, Defendants intentionally, knowingly, and recklessly established industry-wide specifications for precautionary product labels that concealed the health hazards of welding fumes by omitting any reference to the toxic effects of manganese in welding fumes.

55.    In 1979, at meetings of a joint AWS-NEMA committee consisting of a special Task Group of the A5 Filler Metal Committee of the AWS and the Labeling and Safe Practices Committee of NEMA, the Defendants did intentionally, knowingly, and recklessly establish industry specifications for precautionary measures and other information needed by workers to protect against the toxic effects of manganese in welding fumes.

56.    In 1979, through votes on a ballot distributed to the Defendants through the AWS-NEMA Joint Committee On Precautionary Labels and the A5 Filler Metal Committee of the AWS, the Defendants did intentionally, knowingly, and recklessly approve as part of the required industry-wide specifications for most welding products a precautionary product label concealing health hazards and omitting instructions about necessary ventilation, precautionary measures, and other information. This precautionary label stated in pertinent part:

> "WARNING: Protect yourself and others. Read and understand this label.
> FUMES AND GASES can be dangerous to your health.
> Read and understand the manufacturer's instructions and your employer's safety practices.
> Keep your head out of the fumes.
> Use enough ventilation, exhaust at the arc, or both, to keep the fumes and gases from your breathing zone, and the general area.
> See American National Standard Z49.1 "Safety in Welding and Cutting" published by the American Welding Society."

57.    Beginning in 1979 and continuing until the present time, at meetings of the AWS Technical Council and Board of Directors, the Defendants in attendance did intentionally, knowingly, and recklessly conceal the health hazards of welding fumes by failing and refusing to perform an epidemiological study, recommended by other AWS committees and an independent consultant retained by the Defendants, to investigate the neurological effects of welding fumes on persons exposed to welding fumes.

58.    In 1980, at meetings of NEMA's Ad Hoc Committee on Precautionary Labeling, the Defendants in attendance did intentionally, knowingly, and recklessly conceal health hazards of welding fumes by approving industry specifications for precautionary product labels for welding power sources that omitted reference to the toxic effects of manganese in welding fumes on persons exposed to welding fumes.

59.    Beginning in 1980, at meetings of the NEMA Ad Hoc Committee on Precautionary Labeling, the Defendants in attendance did intentionally, knowingly, and recklessly approve industry specifications for precautionary product labels for welding power sources that omitted necessary instructions about ventilation, precautionary measures, and other information needed to protect against the toxic effects of manganese in welding fumes.

60.    Beginning in 1980 and continuing until 1996, at meetings of the NEMA MSDS Task Force Committee and the AWS SH-4 Ad Hoc Committee on Suggestions and Changes to NEMA Publication EW 5-1982, the Defendants in attendance did intentionally, knowingly, and recklessly agree to conceal health hazards of welding fumes by adopting a recommended format for the Hazardous Material and Health Hazard Data sections of the Material Safety Data Sheets (MSDS) for welding products that omitted reference to the manganese content of welding fumes, the neurological damage caused by manganese in welding fumes, and necessary instructions for protection against the health hazards of welding fumes.

61.    Beginning in 1993 and continuing to the present time, the Defendants, through the AWS Safety and Health Committee and NEMA Welding Section, did intentionally, knowingly, and recklessly seek to conceal the health hazards of manganese in welding fumes by appointing designated representatives to become committee members of, and providing funding for, a trade organization called The Ferroalloys Association ("TFA"), which opposes restrictions on the guidelines for manganese exposure levels established by various authorities.

62.    In 1993-95, the Defendants, through the above described organization sponsored by the AWS Safety and Health Committee and NEMA Welding Section, as part of a scheme to prevent the lowering of occupational exposure guidelines for manganese in welding fumes established by the American Conference of Governmental Industrial Hygienists ("ACGIH"), did intentionally, knowingly, and recklessly seek to conceal the health hazards of manganese in welding fumes by providing false and misleading information that exposure to manganese in welding fumes did not cause neurological injury.

## FIRST WELDING CLAIM - - NEGLIGENCE

63.    The Plaintiffs reallege and incorporate the foregoing allegations.

64.    At all relevant times, it was reasonably foreseeable by the Defendants that welders and persons in proximity to welding fumes, including deceased, Millard McKeithen, would be exposed to welding fumes containing manganese by using welding products or working in proximity of other workers using welding products.

65.    The Defendants assumed a duty to exercise reasonable care for the safety of the Plaintiffs and those they represent.

66.    Because exposure to welding fumes presents a risk of physical harm, all Defendants had a legal duty to exercise reasonable care for the safety of the Plaintiff when making representations about welding safety and health in warning labels, publications, and instructions for ventilation and other precautionary measures.

67.    The Defendants knew, or in the exercise of ordinary care should have known, that persons exposed to welding fumes would act in reliance upon representations made by the Defendants about the health hazards associated with welding fumes and the precautionary measures required to protect against those health hazards.

68.    The Defendants knew, or in the exercise of ordinary care should have known, that welding fumes would cause neurological damage to workers like Plaintiff.

69.    The Defendants breached their duty of reasonable care and were negligent, without regard to whether the acts were intentional, knowing, or reckless.

70.    Beginning in 1970, the Defendants violated OSHA standards about publication of information about health hazards through MSDS guidelines that omitted necessary instructions about target organs, ventilation, precautionary measures, and other information needed to protect against the toxic effects of manganese in welding fumes.

71.    The Defendants violated industry standards about health and safety as set forth in the Z49 documents adopted by the AWS sponsored Z49.1 committee beginning in 1950 by failing to publish adequate warning of precautionary instructions and other information to welders or persons in the proximity of welding fumes about the standard.

72.    As a direct and proximate result of the Defendants' negligent acts and omissions, Plaintiffs suffered, and continues to suffer, severe neurological injuries, and Plaintiffs' spouses suffered damages for loss of consortium.

SECOND WELDING CLAIM - - NEGLIGENCE-SALE OF PRODUCT

73.     The Plaintiffs reallege and incorporate the foregoing allegations.

74.     Lincoln, ESAB, Select Arc, Hobart, Illinois Tool Works, Airco, Praxair, Teledyne, Deloro Stellite, Sandvik, Westinghouse, Eutectic, Miller Electric, J.W. Harris, Industrial Welding, and Airgas (collectively, the "seller Defendants"), during some or all relevant times, manufactured, sold, or distributed welding products that were supplied to Plaintiff's work sites.

75.     Millard McKeithen was exposed to welding fumes containing manganese from products sold by the seller Defendants, while using the products and/or working in the proximity of others using the products.

76.     The seller Defendants had the duty, as product sellers, to exercise reasonable care for the safety of the Plaintiff.

77.     These duties included the responsibility for the following safety and health matters relating to welding fumes:

    A.     the investigation of the health hazards;

    B.     writing and publishing adequate and timely precautionary product labels and other health and safety information;

    C.     writing and publishing adequate and timely specifications and standards about ventilation, safety equipment, and other precautionary measures; and/or

    D.     Such other acts of negligence and omissions as will be shown at the trial of this matter. All of which acts are in violation of the laws of Louisiana.

78.     The Defendants knew, or in the exercise of reasonable care should have known, that welding fumes would cause neurological damage to welders and employees working in the proximity of others using the products such as Plaintiff herein.

79.     The Defendants breached their duty of reasonable care to the Plaintiff and was negligent, without regard to whether the acts were intentional, knowing, or reckless.

80.     Beginning in 1970, the Defendants violated OSHA standards about publication of information about health hazards through MSDS guidelines that omitted necessary instructions about target organs, ventilation, precautionary measures, and other information needed to protect against the toxic effects of manganese in welding fumes.

81.     The Defendants violated industry standards about health and safety as set forth in the Z49 documents adopted by the AWS-sponsored Z49.1 committee beginning in 1950 by failing to publish adequate and timely warning of precautionary instructions and other information to welders or persons in the proximity to welding fume about the standard.

82.     As a direct and proximate result of the Defendants' negligent acts and omissions, deceased, Millard McKeithen, suffered, and continues to suffer, severe neurological injuries, and Plaintiff's spouse suffered damages for loss of consortium.

### THIRD WELDING CLAIM - - STRICT LIABILITY
### -SALE OF UNREASONABLY DANGEROUS PRODUCT

83.     The Plaintiffs reallege and incorporate the foregoing allegations.

84.     The seller Defendants identified above in paragraph 81 manufacture, sell, or distribute welding products that produce, or cause the production of, manganese-containing welding fumes, that the products were expected to and did reach various locations in Louisiana and elsewhere without substantial change in the condition in which they were sold.

85.     Millard McKeithen was exposed to welding fumes containing manganese from products sold by the seller Defendants, while using the products or working in the proximity of others using the products.

86.     The seller Defendants' products are unreasonably dangerous because, when used for their reasonably foreseeable and intended purposes in the welding process, they produce harmful fumes that cause neurological injuries.

87.     The seller Defendants' products are defective because:

    A.     adequate and timely warnings were not provided to users that the products produce harmful fumes;

B. adequate and timely instructions were not provided to users about ventilation, safety equi

    C.     the Defendants failed to test or investigate the health hazards associated with the products;

    D.     the design of the products does not protect the user from exposure to the harmful fumes; and/or

    E.     Such other acts of negligence and omissions as will be shown at the trial of this matter. All of which acts are in violation of the laws of Louisiana.

88.     The defects in the seller Defendants' products existed when the products left the Defendants' control.

43

89.    The defects in the seller Defendants' products were the proximate cause of the Plaintiffs' injuries and damages.

90.    At all relevant times, the deceased, Millard McKeithen, had no knowledge of the defects in the seller Defendants' products.

## WELDING DAMAGES

91.    As a proximate result of all the Defendants' breaches of their duties to Millard McKeithen, he sustained welding fume-related injuries, conditions, damages, and death, including past mental and physical pain and suffering; past medical treatment and medical expenses; past lost wages and disability; past impairment of earning capacity; a diminution in his quality and enjoyment of life; emotional distress; and Mardie McKeithen individually and on behalf of the Estate of Millard McKeithen and her children named in this petition make a claim for the survival damages due Millard McKeithen prior to his death.

92.    Millard McKeithen's spouse and children have suffered and will continue to suffer loss of love and affection, guidance, nurture and loss of consortium for the substantial interference in their relationship with the deceased, including loss of the aid, comfort, companionship, society, and services of the deceased.

93.    The claim of some of the plaintiffs is sufficient for the jurisdictional amount in this court.

94.    Plaintiffs herein rely solely and exclusively on state laws, and do not rely on nor invoke federal causes of action, federal law or regulation, nor federal questions in seeking their remedies.

95.    Plaintiffs allege that all defendant named in the petition under "A. Asbestos Exposure" from paragraphs 1 – 67 and all defendants named in the petition under "B. Welding Rod Exposure" from paragraphs 1 – 95 are joint tort feasors and are liable jointly and in solido unto the plaintiffs.

401281605044

WHEREFORE, on the basis of all of the foregoing petition under "A. Asbestos Exposure set out in paragraphs 1 through 67, and under "B. Welding Rod Exposure" set out in paragraphs 1 through 95, Plaintiffs request that defendants be served with this petition and that there be judgment against these defendants in solido under all claims under Louisiana law and/or Texas law and/or in equity, plus interest from date of judicial demand, and for all costs of this suit, in a sum sufficient to compensate Plaintiffs for the following:

a.   all past medical costs or expenses related thereto;

b.   all past, present and future lost earnings;

c.   all past, present and future mental suffering, anguish, and pain;

d.   all past, present and future physical pain and suffering;

e    loss of quality of life;

f.   conscious pain and suffering prior to death;

g.   loss of love and affection; nurture and guidance, past and future;

h.   loss of consortium, past and future; and

i.   All other forms or relief provided by law or equity together with legal interest from the date of judicial demand until paid, plus costs of these proceedings.

THE PLAINTIFFS DEMAND A TRIAL BY JURY.

Respectfully submitted,

McKAY LAW FIRM

BY:   _John F. McKay_

John F. McKay (#9361)
7465 Exchange Place
Baton Rouge, Louisiana 70806
Telephone:  (225) 924-3641
Facsimile:   (225) 924-3644

ATTORNEY FOR PLAINTIFFS

CIVIL

- ☑ 01-DAMAGES
- ☐ 02-CONTRACT
- ☐ 03 PRISONER SUIT
- ☐ 04 EXEC... PROCESS
- ☐ 05 SUIT... 
- ☐ 06-EVICTION
- ☐ 07-WORKMENS COMPENSATION
- ☐ 08-JUDICIAL REVIEW
- ☐ 09-PROPERTY RIGHTS
- ☐ 10-INJUNCTION MANDAMUS

- ☐ 11-COMM. PROP. PARTITIONS
- ☐ 12-PUBLIC SERV. COMM.
- ☐ 13 OTHER...
- ☐ 14...
- ☐ 16...
- ☐ 17...
- ☐ 18-
- ☐ 19-
- ☐ 20-

CERTIFIED TRUE COPY
APR 26 2004
DEPUTY CLERK

066520
FILED
2004 APR 26 PM 1:38
DOUG WELBORN
CLERK OF COURT E.B.R. PARISH

EXHIBIT "A"

MARDIE McKEITHEN, ET AL

VS.

THE DOW CHEMICAL COMPANY, ET AL

| Name | Address | City State Zip | Spouse | SSN | Disease Process | Years Exposed | Employer | Job Site | Location | Trade or Job |
|---|---|---|---|---|---|---|---|---|---|---|
| Mardie McKeithen Individually and a/b/o The Estate of Millard McKeithen | 3310 Hwy 449 | Pine Grove, LA 70453 | | | | | | | | |
| David McKeithen | | | | | | | | | | |
| Jerry McKeithen | | | | | | | | | | |
| Susan McKeithen Rodriguez | | | | | | | | | | |
| Millard McKeithen | 3310 Hwy 449 | Pine Grove, LA 70453 | Mardie McKeithen | 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 | Exsanguination, Pulmonary Hemorrhage, Adenocarcinoma of the Lungs | | | | | |

46

MARDIE McKEITHEN, ET AL VS.
THE DOW CHEMICAL COMPANY, ET AL

EXHIBIT "B"

MINER/MANUFACTURER/SELLER/SUPPLIER/DISTRIBUTOR DEFENDANTS
AND/OR FORMER EMPLOYERS

1.  A.P. Green Industries, Inc.
    A Delaware corporation authorized to do and doing business in the State of Louisiana,
    with its principal place of business in Missouri, and with an agent for service of process,
    to-wit:  Darcy Roper, Connecticut Valley Claims Service Co., Inc., 525 Brook Street,
    P.O. Box 950, Rocky Hill, CT 06067.

2.  Great American Insurance Company
    As Insurer for A.P. Green Industries, Inc. and A.P. Green Services, Inc.
    A company authorized to do and doing business in the State of Louisiana, who may be
    served through the Louisiana Secretary of State.

3.  A.P. Green Services, Inc.
    A corporation authorized to do and doing business in the State of Louisiana, and who
    may be served pursuant to the Louisiana Long Arm Statute:  700 Green Blvd., Mexico,
    MO 54265.

4.  The Anchor Packing Company
    Through its agent for service of process:
    CT Corporation Systems
    8550 United Plaza Blvd.
    Baton Rouge, LA 70809

5.  Anco Insulations, Inc.
    A domestic corporation duly organized, created and existing under and by virtue of the
    laws of the State of Louisiana, with its principal place of business in Baton Rouge,
    Louisiana, with an agent for service, to wit:  Thomas E. Balhoff, Roedel, Parsons,
    Koch, Frost, et al, 8440 Jefferson Hwy, Suite 301, Baton Rouge, Louisiana 70809-7652.

6.  Asten Group, Inc.
    (via the Louisiana Long-Arm Statute)
    4399 Corporate Road
    Charleston, SC 29411

7.  Combustion, Inc.
    3220 Williams Blvd.
    Kenner, LA 70062

8.  Crown Cork and Seal
    (via the Louisiana Long-Arm Statute)
    9300 Ashton Road
    Philadelphia, PA 19136

9.  DB Riley, Inc.
    A corporation duly organized, created and existing under and by virtue of the laws of
    the State of Massachusetts, with its principal place of business in Boston,
    Massachusetts, who may be served via the Louisiana Long Arm Statute:  5 Neponsete
    Street, Worcester, MA 01606.

10. Eagle, Inc.
    (Formerly Eagle Asbestos & Packing Co., Inc.)
    A corporation duly organized, created and existing under and by virtue of the laws of
    the State of Louisiana, with its principal place of business in New Orleans, Louisiana,
    with an agent for service in the State of Louisiana, to-wit:  Lawrence G. Pugh, III –
    3200 Energy Centre, 1100 Poydras Street, New Orleans, LA 70136-3200.

11.     General Refractories Company
(via the Louisiana Long-Arm Statute)
225 City Avenue, Suite 114
Bala Cynwyd, PA 19009

12.     The Flintkote Company
(via the Louisiana Long-Arm Statute)
Through its agent for service of process:
2 Embarcadero Center, Suite 1600
San Francisco, CA 94111

13.     Foster Wheeler Energy Corporation
(via the Louisiana Long-Arm Statute)
Perryville Corporate Park
Clinton, NJ 08809

14.     Garlock, Inc.
Through its agent for service of process:
CT Corporation Systems, 8550 United Plaza Blvd., Baton Rouge, LA 70809

15.     General Refractories Company
(via the Louisiana Long-Arm Statute)
225 City Avenue, Suite 114
Bala Cynwyd, PA 19009

16.     Georgia Pacific Corporation
Through its agent for service of process:
CT Corporation Systems
8550 United Plaza Blvd.
Baton Rouge, LA 70809

17.     Harbison-Walker Refractories Company
(formerly known as Indresco, Inc.)
A foreign corporation authorized to do and doing business in the State of Louisiana with
an agent for service of process to wit:  C. T. Corporation Systems, 8550 United Plaza
Boulevard, Baton Rouge, LA 70809

18.     Kelly-Moore Paint Company, Inc.
(via the Louisiana Long-Arm Statute)
987 Commercial Street
San Carlos, CA 94070

19.     M.H. Detrick Company
(via the Louisiana Long-Arm Statute)
19444 South 97th Avenue
Mokena, Illinois 60448

20.     The McCarty Corporation
A corporation duly organized, created and existing under and by virtue of the laws of
the State of Louisiana, with its principle place of business in Baton Rouge, Louisiana,
with agent for service in the State of Louisiana, to-wit:  Paul H. Spaht, 445 N. Blvd.,
Suite 300, Baton Rouge, LA 70802.

21.     Metropolitan Life Insurance Company
Through the Secretary of State
State of Louisiana
Post Office Box 94125
Baton Rouge, LA 70804-4125

22. Minnesota Mining and Manufacturing Company
Through its agent for service of process:
CT Corporation Systems
8550 United Plaza Blvd.
Baton Rouge, LA 70809

23. North American Refractories Company
(via the Louisiana Long-Arm Statute)
1228 Euclid Avenue
5th Floor, The Halle Building
Cleveland, OH 44115

24. Owens-Corning Fiberglass Corporation
Through its agent for service of process:
CT Corporation Systems, 8550 United Plaza Blvd., Baton Rouge, LA 70809

25. Owens-Illinois, Inc.
One Seagate
Toledo, OH 43666

26. Pittsburgh Corning Corporation
c/o PPG Industries, Inc.
Through its agent for service of process:
CT Corporation Systems, 8550 United Plaza Blvd., Baton Rouge, LA 70809

27. Proko Industries, Inc.
(via the Louisiana Long-Arm Statute)
18601 LBJ Freeway, Suite 400
Mesquite, TX 75150

28. Riley Stoker Corporation
(via the Louisiana Long-Arm Statute)
5 Neponset Street
Worcester, MA 01606

29. Rock Wool Manufacturing Company
(via the Louisiana Long-Arm Statute)
E.S. Cusick
203 North Seventh Street
Leeds, AL 35095

30. Reilly-Benton Co., Inc.
A corporation duly organized, created and existing under and by virtue of the laws of
the State of Louisiana, with its principle place of business in New Orleans, Louisiana,
with agent for service in the State of Louisiana, to-wit:  Deutsch, Kerrigan & Stiles, 755
Magazine Street, New Orleans, LA 70130.

31. Synkoloid, A Division of Muralo Co., Inc.
(via the Louisiana Long-Arm Statute)
148 E. 5th Street
Bayonne, NJ 07002

32. U.S. Mineral Products Company
(via the Louisiana Long-Arm Statute)
Furnace Steet
Stanhope, NJ 07874

33. Uniroyal, Inc.
(Formerly United States Rubber Company, Inc.)
A corporation duly organized, created and existing under and by virtue of the laws of
the State of New Jersey, with its principle place of business in Naugatuck, Connecticut
and who may be served pursuant to the Louisiana Long Arm Statute in c/o Legal
Department, 70 Great Hill Rd., Naugatuck, CT 06770.

34. Uniroyal Holding, Inc.
(formerly United States Rubber Company, Inc.
Through its agent for service of process:
The Prentice-Hall Corporation System, Inc.
203 Carondelet Street, Suite 811
New Orleans, LA 70130

35. W.R. Grace & Co.-Conn.
Through its agent for service of process:
The Prentice-Hall Corporation System, Inc.
203 Carondelet Street, Suite 811
New Orleans, LA 70130

36. Burden Construction Corp
2901 S Harvard
Tulsa, OK 74117

37. JNO L & R S Morrison Ptrs
Morrison Engineering & Construction Company
New Roads, LA 70760

38. Continental Constructors, Inc.
P.O. Box 2627, 7960 Airline Hwy
Baton Rouge, LA 70821

39. Griffin & Dickson
P.O. Box 1204
Kilgore, TX 75662

40. Stockstill & Pearson
439 N 11th Street
Baton Rouge, LA 70802

41. Yuba Industries, Inc.
612 Howard Street
San Francisco, CA 94105

42. T L James & Company, Inc. & Affiliates
P.O. Box 1260
Ruston, LA 71273-1260

43. Wilson P Abraham Construction Company
120 International Pkwy, Suite 112
Heathrow, FL 32746-5032

44. E H Reeder Construction Company, Inc.
2821 Hawes Ave
Dallas, TX 75235

45. OL Sims Company of Louisiana, Inc.
P.O. Box 1828
Hattiesburg, MS 39403

46. J Rich Steers, Inc.
Morrison Knudsen Company, Inc.
17 Battery Place
New York, NY 10004

47. Rogers Terminal & Shipping Corporation
Minneapolis, MI 55440

48. Ryan Stevedoring Company, Inc.
Baton Rouge, LA

49. Atlas Construction Company
P.O. Box 1260
Ruston, LA 71273-1260

50. Bagwell-Neal, Inc.
4828 E Brookstown
Baton Rouge, LA 70805

51. T C Bateson Construction Company
2845 Ladybird Lane
Dallas, TX 75220-1413

52. Arthur G. McKee & Company
6200 Oak Tree Blvd
Independence, OH 44131

53. Frazier Morton Construction Company
Box 21
Greenwood, MS 38930

54. Mccaa Electric, Inc.
Box 15087 Broadview Station
Baton Rouge, LA 70815

55. Flenniken Construction Company, Inc.
Box 1807
Shreveport, LA 71166

56. Baton Rouge Marine Contractors, Inc.
1940 Tower Road
Port Allen, LA 70767

57. Boh Brothers Construction Company
P.O. Box 53266
New Orleans, LA 70153-3266

58. Tudor Construction Company
1412 Centre Court Drive, Suite 500
P.O. Box 12653
Alexandria, LA 71315-2653

59. Cajun Electric Power Cooperative
136 S Main Street, Suite 1000
Salt Lake City, UT 84101-1685

60. Percy J. Matherine Contractor, Inc.
P.O Box 74070
Baton Rouge, LA 70874-4070

61.   Atlas Associates, Inc.
103 Black Street
Hot Springs, AR 71913-4002

62.   Foster G. Neal
7430 LA Hwy 3050
Morganza, LA 70759

63.   JE Remediation Technologies, Inc.
1111 S Arroyo Pkwy
Pasadena, CA 91105-3254

64.   Jacobs Constructors, Inc. and their officers and directors
(formerly known as H.E. Wiese, Inc.)
Through their agent for service of process:
C.T. Corporation System
8550 United Plaza Blvd.
Baton Rouge, LA 70809

65.   Schuylkill Products Co Inc
Box 73916
Baton Rouge, LA 70807

66.   Schuylkill Metals Corporation
P.O. Box 74040
Baton Rouge, LA 70874-4040

67.   Pointe Coupee Constructors Inc
1338 St Rose
Baton Rouge, LA 70806

MARDIE McKEITHEN, ET AL VS.
THE DOW CHEMICAL COMPANY, ET AL

EXHIBIT "C"

PREMISE DEFENDANTS LISTED WITH THE APPROPRIATE PLAINTIFFS:

Exxon Mobil Corporation (Louisiana)

The Dow Chemical Company (Louisiana)

Formosa Plastics Corporation, Louisiana (Louisiana)

Union Carbide Corporation (Louisiana)

Rhodia, Inc. f/k/a Rhone-Poulenc (Louisiana)

Vista Corporation

Dow, Inc. f/k/a Dow Badische (Texas)

Exxon Mobil Corporation (Texas)

E. I. Du Pont De Nemours and Company (Texas)

Hoechst Celanese Corporation a/k/a CNA Holdings, Inc. (Texas)

Monsanto Chemical Company (Texas)

BASF Corporation (Texas)

Shell Oil Company (Texas)

Arco, Inc. a/k/a Arco of the Panhandle, Inc. (Texas)

Phillips, Inc. (Texas)

Phillips Petroleum Company a/k/a ConocoPhillips Company (Texas)

MARDIE McKEITHEN, ET AL VS.
THE DOW CHEMICAL COMPANY, ET AL

SERVICE LIST

PLEASE HOLD SERVICE

## CONSENT TO REMOVAL

*Mardi McKeithen, et al. v. Exxon Mobil Corporation, et al.., No. 516203 "23"*
*in the 19th Judicial District Court for the Parish of East Baton Rouge, State of Louisiana*

I, _Michael M. Noor_ of the law firm _Preis, Hardy & Stapleton_

counsel for defendant

_Caterpillar Inc —_

hereby consent to removal of the above-captioned actions as noticed by Lincoln Electric Company; Hobart Brothers Company; The ESAB Group, Inc.; The BOC Group, Inc. f/k/a Airco, Inc.; Praxair, Inc.; Allegheny Technologies Incorporated f/k/a TDY Industries, Inc. f/k/a Teledyne Industries, Inc.; Viacom, Inc., successor by merger to CBS Corporation f/k/a Westinghouse Electric Corporation; Union Carbide Corporation f/k/a Union Carbide Chemicals and Plastics Company, Inc.; Eutectic Corporation; A.O. Smith Corporation; Sandvik, Inc.; and Airgas-Gulf States, Inc.

Counsel for Defendant

36046

EXHIBIT
B

## CONSENT TO REMOVAL

*Mardi McKeithen, et al. V. A.O. Exxon Mobil Corporation, et al.*, No. 516203 "23"
in the 19th Judicial District Court for the Parish of East Baton Rouge, State of Louisiana

I, David M. Melancon, of the law firm of Irwin Fritchie Urquhart & Moore, LLC, counsel

for defendant, General Electric Company, hereby consent to removal of the above-captioned actions

as noticed by Lincoln Electric Company; Lincoln Electric Holding; A.O. Smith Corporation; Praxair,

Inc.; the ESAB Group, Inc.; Eutectic Corporation; Allegheny Technologies Incorporated f/k/a/ TDY

Industries, Inc. f/k/a Teledyne Industries, Inc.; Hobart Brothers company; BOC Financial Corp.; The

BOC Group, Inc. f/k/a Airco, Inc.; Sandvik, Inc.; and Viacom, Inc., successor by merger to CBS

Corporation f/k/a Westinghouse Electric Corporation; and Airgas-Gulf States, Inc.

IRWIN FRITCHIE URQUHART & MOORE LLC

By _David M. Milan_____

James B. Irwin (#07172)
David M. Melancon (#23216)
Texaco Center
400 Poydras Street, Suite 2700
New Orleans, Louisiana 70130
Telephone: 504-310-2100
Facsimile: 504-310-2101

Counsel for defendant, General Electric
Company

MAY-17-2004 MON 05:34 PM BARRASSO USDIN KUPPERMAN   FAX NO. 504 589 9702

## CONSENT TO REMOVAL

*Mardi McKeithen, et al. v. Exxon Mobil Corporation, et al.,* No. 516203 "23"
in the 19th Judicial District Court for the Parish of East Baton Rouge, State of Louisiana

I, Joseph R. Ward of the law firm Ward & Condrey,

counsel for defendant Illinois Tool Works Inc and Miller Electric Manufacturing Company

hereby consent to removal of the above-captioned actions as noticed by Lincoln Electric
Company; Hobart Brothers Company; The ESAB Group, Inc.; The BOC Group, Inc. f/k/a Airco,
Inc.; Praxair, Inc.; Allegheny Technologies Incorporated f/k/a TDY Industries, Inc. f/k/a
Teledyne Industries, Inc.; Viacom, Inc., successor by merger to CBS Corporation f/k/a
Westinghouse Electric Corporation; Union Carbide Corporation f/k/a Union Carbide Chemicals
and Plastics Company, Inc.; Eutectic Corporation; A.O. Smith Corporation; Sandvik, Inc.; and
Airgas-Gulf States, Inc.

Counsel for Defendant

36046

MARDIE McKEITHEN                                   NUMBER 516203  SEC. 23
INDIVIDUALLY AND ON BEHALF OF
THE ESTATE OF MILLARD McKEITHEN,        19TH JUDICIAL DISTRICT COURT
DAVID McKEITHEN,
JERRY McKEITHEN, AND                        PARISH OF EAST BATON ROUGE
SUSAN McKEITHEN RODRIGUEZ
                                                    STATE OF LOUISIANA
VERSUS

EXXON MOBIL CORPORATION, ET AL.


## CONSENT TO REMOVAL

I, Mark A. Nelson, of the law firm, Bryan Nelson P.A., counsel for the defendant, Industrial

Welding Supplies of Hattiesburg, Inc. d/b/a Nordan Smith, hereby consent to removal of the above-

captioned actions as noticed by Lincoln Electric company; Hobart Brothers Company; The ESAB Group,

Inc.; The BOC Group, Inc. f/k/a Airco, Inc.; Praxair, Inc.; Allegheny Technologies Incorporated f/k/a

TDY Industries, Inc. f/k/a Teledyne Industries, Inc.; Viacom, Inc., successor by merger to CBS

Corporation f/k/a Westinghouse Electric Corporation; Union Carbide Corporation f/k/a Union Carbide

Chemicals and Plastics Company, Inc.; Eutectic Corporation; A.O. Smith Corporation; Sandvik, Inc.;

and Airgas-Gulf States, Inc.

                    Respectfully submitted,


                    MARK A. NELSON, LA Bar No. 15024
                    BRYAN NELSON P.A.
                    Post Office Box 18109
                    Hattiesburg, MS  39404-8109
                    Telephone:.    601-261-4100
                    Facsimile:     601-261-4106
                    E-mail:        mnelson@bnrw.com
                    *Counsel for Industrial Welding Supplies of*
                    *Hattiesburg, Inc.*

## CONSENT TO REMOVAL

*Mardi McKeithen, et al. v. Exxon Mobil Corporation, et al.,* No. 516203 "23"
in the 19th Judicial District Court for the Parish of East Baton Rouge, State of Louisiana

I, BARBARA L. ARRAS of the law firm PHELPS DUNBAR LLP

counsel for defendant

J. W. HARRIS CO Inc.

hereby consent to removal of the above-captioned actions as noticed by Lincoln Electric

Company; Hobart Brothers Company; The ESAB Group, Inc.; The BOC Group, Inc. f/k/a Airco,

Inc.; Praxair, Inc.; Allegheny Technologies Incorporated f/k/a TDY Industries, Inc. f/k/a

Teledyne Industries, Inc.; Viacom, Inc., successor by merger to CBS Corporation f/k/a

Westinghouse Electric Corporation; Union Carbide Corporation f/k/a Union Carbide Chemicals

and Plastics Company, Inc.; Eutectic Corporation; A.O. Smith Corporation; Sandvik, Inc.; and

Airgas-Gulf States, Inc. without waiving any right to challenge

service.

Barbara L. Arras
Counsel for Defendant

36046

## CONSENT TO REMOVAL

Mardie McKeithen, et al. v. Exxon Mobil Corporation, No. 516-203 "23"
19th Judicial District Court, Parish of East Baton Rouge, State of Louisiana

I, S. Ault Hootsell III of the law firm Phelps Dunbar LLP, counsel for defendant National

Electrical Manufacturers Association (NEMA) hereby consent on behalf of NEMA to removal of

the above-captioned action as noticed by Lincoln Electric Company; Hobart Brothers Company; The

ESAB Group, Inc.; The BOC Group, Inc. f/k/a Airco, Inc.; Praxair, Inc.; Allegheny Technologies

Incorporated f/k/a TDY Industries, Inc. f/k/a Teledyne Industries, Inc.; Viacom, Inc., successor by

merger to CBS Corporation f/k/a Westinghouse Electric Corporation; Union Carbide Corporation

f/k/a Union Carbide Chemicals and Plastics Company, Inc.; Eutectic Corporation; A.O. Smith

Corporation, Sandvik, Inc.; and Airgas-Gulf States, Inc.

NEMA has not been served and reserves all rights, including its right to challenge sufficiency

of process, service of process and personal jurisdiction under the Federal Rules of Civil Procedure.

S. Ault Hootsell III
Counsel for Defendant, National
Electrical Manufacturers Association

NO:99454806.1

## CONSENT TO REMOVAL

*Mardie McKeithen, et al. v. Exxon Mobil Corporation, et al.*, No. 516203 "23"
19th Judicial District Court for the Parish of East Baton Rouge, State of Louisiana

I, Kyle P. Kirsch, of the law firm of McCranie, Sistrunk, Anzelmo, Hardy, Maxwell &

McDaniel, counsel for defendant, Select-Arc, Inc., co-defendant in the above-captioned action,

hereby consents to removal of the above-captioned actions as noticed by Lincoln Electric Company;

Lincoln Electric Holdings;   Praxair, Inc.; The ESAB Group, Inc.; Allegheny Technologies

Incorporated f/k/a TDY Industries, Inc., f/k/a Teledyne Industries, Inc.; Hobart Brothers Company;

BOC Financial Corp.; The BOC Group, Inc. f/k/a Airco, Inc.; Viacom, Inc., successor by merger

to CBS Corporation f/k/a Westinghouse Electric Corporation; A.O. Smith Corporation; Eutectic

Corporation; Sandvick, Inc.; and Airgas-Gulf States, Inc.

Respectfully Submitted,

MICHAEL SISTRUNK, ESQ. (#12111)
KYLE P. KIRSCH, ESQ. (#26363)
McCRANIE, SISTRUNK, ANZELMO, HARDY,
      MAXWELL & McDANIEL
3445 N. Causeway Blvd., Suite 800
Metairie, Louisiana 70002
Telephone: (504) 831-0946
ATTORNEY FOR DEFENDANT,
SELECT-ARC, INC.

2

# UNITED STATES OF AMERICA
# JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

**CHAIRMAN:**
Judge Wm. Terrell Hodges
United States District Court
Middle District of Florida

**MEMBERS:**
Judge John F. Keenan
United States District Court
Southern District of New York

Judge D. Lowell Jensen
United States District Court
Northern District of California

Judge J. Frederick Motz
United States District Court
District of Maryland

Judge Robert L. Miller, Jr.
United States District Court
Northern District of Indiana

Judge Kathryn H. Vratil
United States District Court
District of Kansas

Judge David R. Hansen
United States Court of Appeals
Eighth Circuit

**DIRECT REPLY TO:**

Michael J. Beck
Clerk of the Panel
One Columbus Circle, NE
Thurgood Marshall Federal
Judiciary Building
Room G-255, North Lobby
Washington, D.C. 20002

Telephone: [202] 502-2800
Fax:          [202] 502-2888

http://www.jpml.uscourts.gov

September 16, 2004

TO INVOLVED COUNSEL

Re:  MDL-875 -- In re Asbestos Products Liability Litigation (No. VI)
Re:  MDL-1535 -- In re Welding Rod Products Liability Litigation

*Mardie McKeithen, etc. v. Exxon Mobile Corp.*, et al., M.D. Louisiana, C.A. No. 3:04-365

Dear Counsel:

Attached hereto is a copy of a conditional transfer order filed today by the Judicial Panel on Multidistrict Litigation involving the above-captioned action.  This action is transferred pursuant to Rule 7.4 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, 199 F.R.D. 425, 435-36 (2001).  Copies of Rule 5.2, dealing with service, and Rules 7.4 and 7.5, regarding "tag-along" actions, are attached for your convenience.

Inasmuch as there is an unavoidable time lag between notification of the pendency of the tag-along action and the filing of a conditional transfer order, counsel are required by Rule 7.4(b) to notify this office **BY FACSIMILE**, at (202) 502-2888, of any official changes in the status of the tag-along action.  These changes could involve dismissal of the action, remand to state court, transfer to another federal court, etc., as indicated by an order filed by the district court.  Your cooperation would be appreciated.

**NOTICE OF OPPOSITION DUE ON OR BEFORE:  October 1, 2004   (4 p.m. EST)**
(Facsimile transmission is suggested.)

If you are considering opposing this conditional transfer order, please review Rules 7.4 and 7.5 of the Panel Rules before filing your Notice of Opposition.

A list of involved counsel is attached.

Very truly,

Michael J. Beck
Clerk of the Panel

By
          Deputy Clerk

Attachments

JPML Form 39

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**SEP 1 6 2004**

FILED
CLERK'S OFFICE

## DOCKET NOS. 875 AND 1535

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

## MDL-875 – IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)
## MDL-1535 – IN RE WELDING ROD PRODUCTS LIABILITY LITIGATION

*Mardie McKeithen, etc. v. Exxon Mobil Corp., et al.*, M.D. Louisiana, C.A. No. 3:04-365

### MDL-875 CONDITIONAL TRANSFER ORDER (CTO-236)
### WITH SEPARATION, REMAND AND
### MDL-1535 CONDITIONAL TRANSFER ORDER (CTO-14)

On July 29, 1991, the Panel transferred 21,937 civil actions to the United States District Court for the Eastern District of Pennsylvania for coordinated or consolidated pretrial proceedings in MDL-875 pursuant to 28 U.S.C. § 1407. Since that time, 78,292 additional actions have been transferred to the Eastern District of Pennsylvania. With the consent of that court, all such actions in MDL-875 have been assigned to the Honorable Charles R. Weiner.

On June 23, 2003, the Panel transferred three civil actions to the United States District Court for the Northern District of Ohio for coordinated or consolidated pretrial proceedings in MDL-1535 pursuant to 28 U.S.C. § 1407. Since that time, 143 additional actions have been transferred to the Northern District of Ohio. With the consent of that court, all such actions in MDL-1535 have been assigned to the Honorable Kathleen McDonald O'Malley.

It appears that the action on this conditional transfer order (*McKeithen*) involves questions of fact which are common to: 1) the actions in MDL-875 previously transferred to the Eastern District of Pennsylvania and assigned to Judge Weiner; and 2) the actions in MDL-1535 previously transferred to the Northern District of Ohio and assigned to Judge O'Malley. *McKeithen* comprises two sets of claims, as follows: 1) asbestos claims contained in Section A of the complaint that involve common questions of fact with the previously transferred MDL-875 actions; and 2) welding rod claims contained in Section B of the complaint that involve common questions of fact with the previously transferred MDL-1535 actions.

Pursuant to Rule 7.4 of the <u>Rules of Procedure of the Judicial Panel on Multidistrict Litigation</u>, 199 F.R.D. 425, 435-36 (2001), *McKeithen* is transferred under 28 U.S.C. § 1407 to the Eastern District of Pennsylvania for the reasons stated in the order of July 29, 1991, 771 F.Supp. 415 (J.P.M.L. 1991), and, with the consent of that court, assigned to the Honorable Charles R. Weiner.

The welding rod claims contained in Section B of the complaint in *McKeithen* are hereby separated and remanded, under 28 U.S.C. § 1407(a), to the Middle District of Louisiana.

Pursuant to Rule 7.4 of the <u>Rules of Procedure of the Judicial Panel on Multidistrict Litigation</u>, 199 F.R.D. 425, 435-36 (2001), the welding rod claims contained in Section B of the complaint in *McKeithen* are transferred under 28 U.S.C. § 1407 to the Northern District of Ohio for the reasons stated in the order of June 23, 2003, 269 F.Supp.2d 1365 (J.P.M.L. 2003), and, with the consent of that court, assigned to the Honorable Kathleen McDonald O'Malley.

This order does not become effective until it is filed in the offices of i) the Clerk of the United States District Court for the Eastern District of Pennsylvania, and ii) the Clerk of the United States District Court for the Northern District of Ohio. The transmittal of this order to said Clerks shall be stayed fifteen (15) days from the entry thereof and if any party files a notice of opposition with the Clerk of the Panel within this fifteen (15) day period, the stay will be continued until further order of the Panel.

FOR THE PANEL:

Michael J. Beck

Michael J. Beck
Clerk of the Panel

RULE 5.2:     SERVICE OF PAPERS FILED

(a)     All papers filed with the Clerk of the Panel shall be accompanied by proof of previous or simultaneous service on all other parties in all actions involved in the litigation. Service and proof of service shall be made as provided in Rules 5 and 6 of the Federal Rules of Civil Procedure. The proof of service shall indicate the name and complete address of each person served and shall indicate the party represented by each. If a party is not represented by counsel, the proof of service shall indicate the name of the party and the party's last known address. The proof of service shall indicate why any person named as a party in a constituent complaint was not served with the Section 1407 pleading. The original proof of service shall be filed with the Clerk of the Panel and copies thereof shall be sent to each person included within the proof of service. After the "Panel Service List" described in subsection (d) of this Rule has been received from the Clerk of the Panel, the "Panel Service List" shall be utilized for service of responses to motions and all other filings. In such instances, the "Panel Service List" shall be attached to the proof of service and shall be supplemented in the proof of service in the event of the presence of additional parties or subsequent corrections relating to any party, counsel or address already on the "Panel Service List."

(b)     The proof of service pertaining to motions for transfer of actions pursuant to 28 U.S.C. §1407 shall certify that copies of the motions have been mailed or otherwise delivered for filing to the clerk of each district court in which an action is pending that will be affected by the motion. The proof of service pertaining to a motion for remand pursuant to 28 U.S.C. §1407 shall certify that a copy of the motion has been mailed or otherwise delivered for filing to the clerk of the Section 1407 transferee district court in which any action affected by the motion is pending.

(c)     Within eleven days of filing of a motion to transfer, an order to show cause or a conditional transfer order, each party or designated attorney shall notify the Clerk of the Panel, in writing, of the name and address of the attorney designated to receive service of all pleadings, notices, orders and other papers relating to practice before the Judicial Panel on Multidistrict Litigation. Only one attorney shall be designated for each party. Any party not represented by counsel shall be served by mailing such pleadings to the party's last known address. Requests for an extension of time to file the designation of attorney shall not be granted except in extraordinary circumstances.

(d)     In order to facilitate compliance with subsection (a) of this Rule, the Clerk of the Panel shall prepare and serve on all counsel and parties not represented by counsel, a "Panel Service List" containing the names and addresses of the designated attorneys and the party or parties they represent in the actions under consideration by the Panel and the names and addresses of the parties not represented by counsel in the actions under consideration by the Panel. After the "Panel Service List" has been received from the Clerk of the Panel, notice of subsequent corrections relating to any party, counsel or address on the "Panel Service List" shall be served on all other parties in all actions involved in the litigation.

(e)     If following transfer of any group of multidistrict litigation, the transferee district court appoints liaison counsel, this Rule shall be satisfied by serving each party in each affected action and all liaison counsel. Liaison counsel designated by the transferee district court shall receive copies of all Panel orders concerning their particular litigation and shall be responsible for distribution to the parties for whom he or she serves as liaison counsel.

RULE 7.4:    CONDITIONAL TRANSFER ORDERS FOR "TAG-ALONG ACTIONS"

(a)    Upon learning of the pendency of a potential "tag-along action," as defined in Rule 1.1 of these Rules, an order may be entered by the Clerk of the Panel transferring that action to the previously designated transferee district court on the basis of the prior hearing session(s) and for the reasons expressed in previous opinions and orders of the Panel in the litigation. The Clerk of the Panel shall serve this order on each party to the litigation but, in order to afford all parties the opportunity to oppose transfer, shall not send the order to the clerk of the transferee district court for fifteen days from the entry thereof.

(b)    Parties to an action subject to a conditional transfer order shall notify the Clerk of the Panel within the fifteen-day period if that action is no longer pending in its transferor district court.

(c)    Any party opposing the transfer shall file a notice of opposition with the Clerk of the Panel within the fifteen-day period. If a notice of opposition is received by the Clerk of the Panel within this fifteen-day period, the Clerk of the Panel shall not transmit said order to the clerk of the transferee district court until further order of the Panel. The Clerk of the Panel shall notify the parties of the briefing schedule.

(d)    Within fifteen days of the filing of its notice of opposition, the party opposing transfer shall file a motion to vacate the conditional transfer order and brief in support thereof. The Chairman of the Panel shall set the motion for the next appropriate hearing session of the Panel. Failure to file and serve a motion and brief shall be treated as withdrawal of the opposition and the Clerk of the Panel shall forthwith transmit the order to the clerk of the transferee district court.

(e)    Conditional transfer orders do not become effective unless and until they are filed with the clerk of the transferee district court.

(f)    Notices of opposition and motions to vacate such orders of the Panel and responses thereto shall be governed by Rules 5.12, 5.2, 7.1 and 7.2 of these Rules.

RULE 7.5:    MISCELLANEOUS PROVISIONS CONCERNING "TAG-ALONG ACTIONS"

(a)    Potential "tag-along actions" filed in the transferee district require no action on the part of the Panel and requests for assignment of such actions to the Section 1407 transferee judge should be made in accordance with local rules for the assignment of related actions.

(b)    Upon learning of the pendency of a potential "tag-along action" and having reasonable anticipation of opposition to transfer of that action, the Panel may direct the Clerk of the Panel to file a show cause order, in accordance with Rule 7.3 of these Rules, instead of a conditional transfer order.

(c)    Failure to serve one or more of the defendants in a potential "tag-along action" with the complaint and summons as required by Rule 4 of the Federal Rules of Civil Procedure does not preclude transfer of such action under Section 1407. Such failure, however, may be submitted by such a defendant as a basis for opposing the proposed transfer if prejudice can be shown. The inability of the Clerk of the Panel to serve a conditional transfer order on all plaintiffs or defendants or their counsel shall not render the transfer of the action void but can be submitted by such a party as a basis for moving to remand as to such party if prejudice can be shown.

(d)    A civil action apparently involving common questions of fact with actions under consideration by the Panel for transfer under Section 1407, which was either not included in a motion under Rule 7.2 of these Rules, or was included in such a motion that was filed too late to be included in the initial hearing session, will ordinarily be treated by the Panel as a potential "tag-along action."

(e)    Any party or counsel in actions previously transferred under Section 1407 or under consideration by the Panel for transfer under Section 1407 shall promptly notify the Clerk of the Panel of any potential "tag-along actions" in which that party is also named or in which that counsel appears.

**INVOLVED COUNSEL LIST (CTO-236)**
**DOCKET NO. 875**
**IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)**

**INVOLVED COUNSEL LIST (CTO-14)**
**DOCKET NO. 1535**
**IN RE WELDING ROD PRODUCTS LIABILITY LITIGATION**

Lawrence E. Abbott
Abbott, Simses & Kuchler
400 Lafayette Street
Suite 200
New Orleans, LA 70130

Barbara Lee Arras
Phelps Dunbar, LLP
Canal Place
365 Canal Street
Suite 2000
New Orleans, LA 70130-6534

John H. Beisner
O'Melveny & Myers, LLP
1625 Eye Street, N.W.
Washington, DC 20006-4001

Gary A. Bezet
Kean, Miller, Hawthorne, et al.
One American Place
22nd Floor
P.O. Box 3513
Baton Rouge, LA 70821-3513

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114

Claire E. Breaux
Duplass, Zwain, Bourgeois & Morton
3838 North Causeway Blvd.
Suite 2900
Metairie, LA 70002

Tara L. Burregi
Chopin Wagar Cole Richard Reboul &
Kutcher
Two Lakeway Center
3850 N. Causeway Blvd.
Suite 900
Metairie, LA 70002

Edward J. Cass
Gallagher, Sharp, Fulton & Norman
Bulkley Building
7th Floor
1501 Euclid Avenue
Cleveland, OH 44115

Adam M. Chud
Shea & Gardner
1800 Massachusetts Avenue, N.W.
Washington, DC 20036

John R. Climaco
Climaco, Lefkowitz, Peca, Wilcox &
Garofoli
The Halle Building, Suite 900
1228 Euclid Avenue
Cleveland, OH 44115

Patrick E. Costello
Mouledoux, Bland, LeGrand &
Brackett
650 Poydras Street
Suite 2150
New Orleans, LA 70130

David A. Damico
Burns, White & Hickton
Fifth Avenue Place, Suite 2400
120 Fifth Avenue
Pittsburgh, PA 15222

Michael B. DeSanctis
Jenner & Block
601 13th Street, N.W.
Suite 1200 South
Washington, DC 20005

Richard M. Edmonson
Armstrong Allen, PLLC
4450 Old Canton Road
Suite 210
Jackson, MS 39211

Raymond P. Forceno
Forceno & Hannon
111 S. Independence Mall East
Suite 1000
The Bourse
Philadelphia, PA 19106-2574

Ellen B. Furman
Goldfein & Hosmer
1600 Market Street
33rd Floor
Philadelphia, PA 19103

Susan M. Hansen
Brownson & Ballou
4800 U.S. Bank Place
601 Second Avenue, South
Minneapolis, MN 55402

Sessions Ault Hootsell, III
Phelps Dunbar, LLP
Canal Place
365 Canal Street
Suite 2000
New Orleans, LA 70130

James B. Irwin, V
Irwin, Fritchie, Urquhart & Moore
400 Poydras Street
Suite 2700
New Orleans, LA 70130

Jay M. Jalenak, Jr.
Kean, Miller, Hawthorne, et al.
One American Place
22nd Floor
P.O. Box 3513
Baton Rouge, LA 70821

Reginald S. Kramer
Oldham & Dowling
195 South Main Street
Suite 300
Akron, OH 44308-1314

Stephen H. Kupperman
Barrasso Usdin Kupperman Freeman
& Sarver, LLP
LL & E Tower
909 Poydras Street
Suite 1800
New Orleans, LA 70112

David C. Landin
Hunton & Williams
Riverfront Plaza
East Tower
951 East Byrd Street
Richmond, VA 23219

Katharine R. Latimer
Spriggs & Hollingsworth
1350 I Street, N.W., Suite 900
Washington, DC 20005

INVOLVED COUNSEL LIST (CTO-236) MDL-875 AND (CTO-14) MDL-1535          PAGE 2 OF 2

Gene Locks
Greitzer & Locks
1500 Walnut Street
Philadelphia, PA 19102

Deirdre C. McGlinchey
McGlinchey Stafford
1811 Tower Drive
Suite A
Monroe, LA 71201

John F. McKay
McKay Law Firm
7465 Exchange Place
Baton Rouge, LA 70806-2203

M. Scott Minyard
Baker, Donelson, Bearman, Caldwell
& Berkowitz
P. O. Box 14167
Jackson, MS 39236

Barrye Panepint Miyagi
Kean, Miller, Hawthorne, et al.
One American Place
22nd Floor
P.O. Box 3513
Baton Rouge, LA 70821-3513

Gayla M. Moncla
Kean, Miller, Hawthorne, et al.
One American Place
22nd Floor
P.O. Box 3513
Baton Rouge, LA 70821-3513

Ronald L. Motley
Motley, Rice, LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464

Mark A. Nelson
Bryan, Nelson, Randolph & Weathers
P.O. Drawer 18109
Hattiesburg, MS 39404-8109

Michael M. Noonan
McGlinchey Stafford
643 Magazine Street
P.O. Box 60643
New Orleans, LA 70160-0643

John J. Repcheck
Marks, O'Neill, O'Brien & Courtney
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219

John D. Roven
Roven, Kaplan & Wells
2190 North Loop West
Suite 410
Houston, TX 77018

Richard E. Sarver
Barrasso Usdin Kupperman Freeman
& Sarver, LLP
LL & E Tower
909 Poydras Street
Suite 1800
New Orleans, LA 70112

Richard D. Schuster
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216

Neil Selman
Selman, Breitman & Burgess
11766 Wilshire Boulevard
Sixth Floor
Los Angeles, CA 90025

David B. Siegel
Crowell & Moring, LLP
1001 Pennsylvania Avenue
Washington, DC 20004

Michael Royce Sistrunk
McCranie, Sistrunk, Anzelmo, et al.
3445 N. Causeway Boulevard
Suite 800
Metairie, LA 70002

Robert N. Spinelli
Kelley, Jasons, McGuire & Spinelli
Centre Square West
15th Floor
Philadelphia, PA 19102

Robert E. Swickle
Jaques Admiralty Law Firm, P.C.
1570 Penobscot Building
The Maritime Asbestosis Legal Clinic
Detroit, MI 48226

Andrew J. Trevelise
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

Joseph R. Ward, Jr.
Ward & Condrey, LLC
527 E. Boston Street
Suite 200
Covington, LA 70433

James K. Weston, II
Tom Riley Law Firm
4040 First Avenue, N.E.
P.O. Box 998
Cedar Rapids, IA 52406

Forrest R. Wilkes
Forman, Perry, Watkins, Krutz &
Tardy, LLC
1515 Poydras St.
Suite 1300
New Orleans, LA 70112

Gary M. Zwain
Duplass, Zwain, Bourgeois & Morton
3838 North Causeway Blvd.
Suite 2900
Metairie, LA 70002

3

A CERTIFIED TRUE COPY

JUN 16 2004

ATTEST _____
FOR THE JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUN 16 2004

FILED
CLERK'S OFFICE

## DOCKET NO. 1535

## JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

# IN RE WELDING ROD PRODUCTS LIABILITY LITIGATION

*Claudio B. Arredondo, et al. v. Lincoln Electric Co., et al.,* S.D. Texas, C.A. No. 2:03-441

*BEFORE WM. TERRELL HODGES, CHAIRMAN, JOHN F. KEENAN, BRUCE M. SELYA,\* D. LOWELL JENSEN, J. FREDERICK MOTZ,\* ROBERT L. MILLER, JR., AND KATHRYN H. VRATIL, JUDGES OF THE PANEL*

## TRANSFER ORDER

Before the Panel is a motion brought, pursuant to Rule 7.4, R.P.J.P.M.L., 199 F.R.D. 425, 435-36 (2001), by plaintiffs in this Southern District of Texas action to vacate the Panel's order conditionally transferring their action to the Northern District of Ohio for inclusion in the coordinated or consolidated pretrial proceedings occurring there in this docket. Defendants oppose the motion to vacate and urge inclusion of the action in the MDL-1535 proceedings.[1]

On the basis of the papers filed and hearing session held, the Panel finds that this action involves common questions of fact with the actions in this litigation previously transferred to the Northern District of Ohio, and that transfer of this action to the Northern District of Ohio for inclusion in the coordinated or consolidated pretrial proceedings in that district will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. The Panel further finds that transfer of this action is appropriate for reasons expressed by the Panel in its original order directing centralization in this docket. The Panel held that the Northern District of Ohio was a proper Section 1407 forum for actions involving claims for personal injuries allegedly caused by exposure to welding fumes. *See In re Welding Rod Products Liability Litigation,* 269 F.Supp.2d 1365 (J.P.M.L. 2003). We note that plaintiffs' motion to remand to state court can be presented to and decided by the transferee court. *See, e.g., In re Ivy,* 901 F.2d 7 (2nd Cir. 1990); *In re Prudential Insurance Company of America Sales Practices Litigation,* 170 F.Supp.2d 1346, 1347-48 (J.P.M.L. 2001).

---

\*    Judges Selya and Motz took no part in the disposition of this matter.

[1]    Responding defendants are Lincoln Electric Co.; ESAB Group, Inc.; Hobart Brothers Co.; TDY Industries, Inc.; BOC Group, Inc.; Viacom, Inc.; A.O. Smith Corp.; Sandvik, Inc.; Airgas-Gulf States, Inc.; Praxair, Inc.; Eutectic Corp.; and Union Carbide Corp.

- 2 -

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, this action is transferred to the Northern District of Ohio and, with the consent of that court, assigned to the Honorable Kathleen McDonald O'Malley for inclusion in the coordinated or consolidated pretrial proceedings occurring there in this docket.

FOR THE PANEL:

Wm. Terrell Hodges
Chairman

A CERTIFIED TRUE COPY

AUG - 5 2004

ATTEST ONE TWO JUDICIAL PANEL ON
FOR THE JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

FILED

AUG - 5 2004

FILED
CLERK'S OFFICE

*DOCKET NO. 2004 AUG -9 PM 1: 23*

## JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

## IN RE WELDING ROD PRODUCTS LIABILITY LITIGATION

*Raymond Dotson v. Hobart Brothers Co., et al.,* W.D. Louisiana, C.A. No. 5:04-375
*Lester Davis, et al. v. Lincoln Electric Holding, Inc., et al.,* E.D. Pennsylvania, C.A. No. 2:04-320
*Jesse Guillen, et al. v. Lincoln Electric Co., et al.,* S.D. Texas, C.A. No. 2:04-41
*Juan Canchola, et al. v. Lincoln Electric Co., et al.,* S.D. Texas, C.A. No. 2:04-42
*David M. Cirilo v. Lincoln Electric Co., et al.,* W.D. Texas, C.A. No. 5:04-115

## BEFORE WM. TERRELL HODGES, CHAIRMAN, JOHN F. KEENAN, D. LOWELL JENSEN, J. FREDERICK MOTZ,[*] ROBERT L. MILLER, JR., KATHRYN H. VRATIL AND DAVID R. HANSEN,[*] JUDGES OF THE PANEL

## TRANSFER ORDER

Before the Panel are motions brought, respectively, pursuant to Rule 7.4, R.P.J.P.M.L., 199 F.R.D. 425, 435-36 (2001), by plaintiffs in the five actions before the Panel. These plaintiffs seek to vacate the Panel's order conditionally transferring their actions to the Northern District of Ohio for inclusion in the coordinated or consolidated pretrial proceedings occurring there in this docket. Defendants oppose the motions and urge inclusion of all five actions in the MDL-1535 proceedings.[1]

On the basis of the papers filed and hearing session held, the Panel finds that these actions involve common questions of fact with the actions in this litigation previously transferred to the Northern District of Ohio, and that transfer of these actions to the Northern District of Ohio for inclusion in the coordinated or consolidated pretrial proceedings in that district will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. The Panel further finds that transfer of this action is appropriate for reasons expressed by the Panel in its original order directing centralization in this docket. The Panel held that the Northern District of Ohio was a proper Section 1407 forum for actions involving claims for personal injuries allegedly caused by exposure to welding fumes. *See In re Welding Rod Products Liability Litigation,* 269 F.Supp.2d 1365 (J.P.M.L. 2003). We note that plaintiffs' motions to remand to state court can be presented to and decided by the transferee court. *See, e.g., In re Ivy,* 901 F.2d 7 (2nd Cir. 1990); *In re*

---

[*]   Judges Motz and Hansen took no part in the disposition of this matter.

[1]   Responding defendants are Lincoln Electric Co.; ESAB Group, Inc.; Hobart Brothers Co.; TDY Industries, Inc.; BOC Group, Inc.; Viacom, Inc.; A.O. Smith Corp.; Sandvik, Inc.; Airgas-Gulf States, Inc.; Praxair, Inc.; Eutectic Corp.; and Union Carbide Corp.

- 2 -

*Prudential Insurance Company of America Sales Practices Litigation*, 170 F.Supp.2d 1346, 1347-48 (J.P.M.L. 2001).

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, these actions are transferred to the Northern District of Ohio and, with the consent of that court, assigned to the Honorable Kathleen McDonald O'Malley for inclusion in the coordinated or consolidated pretrial proceedings occurring there in this docket.

FOR THE PANEL:

Wm. Terrell Hodges
Chairman

A CERTIFIED TRUE COPY

OCT 1 8 2004

ATTEST _____ JUDICIAL PANEL ON
FOR THE JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT 1 8 2004

FILED
CLERK'S OFFICE

## DOCKET NO. 1535

## JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

## IN RE WELDING ROD PRODUCTS LIABILITY LITIGATION

*Ronald Utt v. A.O. Smith Corp., et al.,* D. Minnesota, C.A. No. 0:04-1479
*Roger Rice v. A.O. Smith Corp., et al.,* D. Minnesota, C.A. No. 0:04-1480
*Thomas Calder v. A.O. Smith Corp., et al.,* D. Minnesota, C.A. No. 0:04-1481
*Robert Carpenter v. A.O. Smith Corp., et al.,* D. Minnesota, C.A. No. 0:04-1567

2004 OCT 21  PM 4:20

## BEFORE WM. TERRELL HODGES, CHAIRMAN, JOHN F. KEENAN, D. LOWELL JENSEN, J. FREDERICK MOTZ,* ROBERT L. MILLER, JR., KATHRYN H. VRATIL AND DAVID R. HANSEN, JUDGES OF THE PANEL

### TRANSFER ORDER

Before the Panel is a motion brought, pursuant to Rule 7.4, R.P.J.P.M.L., 199 F.R.D. 425, 435-36 (2001), by Thermadyne Holding Corporation (Thermadyne) and Stoody Company (Stoody). These parties seek to vacate the Panel's order conditionally transferring four District of Minnesota actions, in which they have been named as defendants, to the Northern District of Ohio for inclusion in the coordinated or consolidated pretrial proceedings occurring there in this docket. Plaintiffs in these four actions oppose the defendants' motion and support inclusion of their actions in the MDL-1535 proceedings.

On the basis of the papers filed and hearing session held, the Panel finds that these actions involve common questions of fact with the actions in this litigation previously transferred to the Northern District of Ohio, and that transfer of these actions to the Northern District of Ohio for inclusion in the coordinated or consolidated pretrial proceedings in that district will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. The Panel further finds that transfer of these actions is appropriate for reasons expressed by the Panel in its original order directing centralization in this docket. The Panel held that the Northern District of Ohio was a proper Section 1407 forum for actions involving claims for personal injuries allegedly caused by exposure to welding fumes. *See In re Welding Rod Products Liability Litigation,* 269 F.Supp.2d 1365 (J.P.M.L. 2003).

Thermadyne and Stoody oppose transfer of these four actions on the grounds that they have been improperly named as defendants because they have not manufactured or sold the welding products at issue in these actions. We find, however, that the transferee court is better situated to determine the

_____
* Judge Motz took no part in the disposition of this matter.

- 2 -

merits of whether Thermadyne and Stoody belong in these actions, and, indeed, that the familiarity of the transferee judge with the parties and claims in this docket will further the expeditious resolution of this issue. Not only can defendants' motions to dismiss be presented to and decided by the transferee court, but also similar dispositive motions are already pending there. *See, e.g., In re Ivy*, 901 F.2d 7 (2nd Cir. 1990); *In re Prudential Insurance Company of America Sales Practices Litigation*, 170 F.Supp.2d 1346, 1347-48 (J.P.M.L. 2001). We point out that whenever the transferee judge deems remand of any claims or actions appropriate, procedures are available whereby this may be accomplished with a minimum of delay. *See* Rule 7.6, R.P.J.P.M.L., 199 F.R.D. at 436-38.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, these actions are transferred to the Northern District of Ohio and, with the consent of that court, assigned to the Honorable Kathleen McDonald O'Malley for inclusion in the coordinated or consolidated pretrial proceedings occurring there in this docket.

FOR THE PANEL:

Wm. Terrell Hodges
Chairman

4

## BEFORE THE JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

In re **Welding Rod Products Liability Litigation**   *
                                                       *   **MDL No. 1535**
*Mardie McKeithen, et al. v. Exxon Mobil*              *
*Corporation, et al., M.D. Louisiana, C.A. No. 04-*    *
*365*                                                  *
* * * * * * * * * * * * * * * * * * * * * * * * * * * *

## DELORO STELLITE COMPANY'S NOTICE OF CONSENT

Deloro Stellite Company ("Deloro"), by and through its counsel, submits the following Notice of Consent.

1.      Deloro is named as a defendant in the above-captioned action. The plaintiffs' claims against Deloro relate to injuries allegedly suffered by the plaintiffs' decedent resulting from exposure to welding fumes.

2.      On June 3, 2004, Defendants Lincoln Electric Company, A.O. Smith Corporation, Praxair, Inc., The ESAB Group, Inc., Eutectic Corporation, Allegheny Technologies Incorporated, Hobart Brothers Company, The BOC Group, Inc., Sandvik, Inc., Viacom, Inc., Airgas-Gulf States, Inc. and Union Carbide Corporation (the "Removing Defendants") timely filed a Notice of Removal in the United States District Court for the Middle District of Louisiana. The Removing Defendants stated that "[a]ll Welding Defendants served as of this date consent to this Notice of Removal." Notice of Removal ¶ 17.

3.      Prior to the filing of the Notice of Removal, counsel for the Removing Defendants contacted counsel for Deloro to inquire whether Deloro would consent to the removal of this action. Deloro, through its counsel, gave verbal consent to the removal before the Notice of Removal was filed.

4.     This Notice of Consent is to confirm in writing that Deloro consented to the Notice of Removal prior to its filing, and that Deloro continues to consent to the removal of this action.


Respectfully submitted,

**DUPLASS, ZWAIN, BOURGEOIS & MORTON**


_____
GARY M. ZWAIN (#13809)
Andrew D. WEINSTOCK (#18495)
Three Lakeway Center, Suite 2900
3838 N. Causeway Boulevard
Metairie, Louisiana 70002
(504) 832-3700 (telephone)
(504) 837-3119 (fax)

**Attorneys for Defendant,**
**Deloro Stellite Company, Inc.**

5

19 F.3d 1433 (Table), 1994 WL 91786 (6th Cir.(Ohio)), 5 NDLR P 87
**Unpublished Disposition**
NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA6 Rule 28 and FI CTA6 IOP 206 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Sixth Circuit.
Jack B. KLEIN; Jack B. Klein, Executor of the Estate of Carol Ann Klein,
Deceased, Plaintiffs-Appellants,
v.
MANOR HEALTHCARE CORPORATION, Jerry Cangelosi, Rob Vadis, Wanda I. Cordero,
Defendants-Appellees.
Nos. 92-4328, 92-4347.
March 22, 1994.

On Appeal from the United States District Court for the Northern District of Ohio, No. 91-02018;
David D. Dowd, Jr., District Judge.
N.D.Ohio
AFFIRMED.

Before: KENNEDY and GUY, Circuit Judges; and CONTIE, Senior Circuit Judge.

PER CURIAM.
**\*\*1** In this handicap discrimination case, plaintiff appeals the decision of the district court granting defendants' motion for summary judgment. On appeal, plaintiff argues that genuine issues of material fact exist as to whether defendants' conduct constitutes handicap discrimination within the meaning of the operative federal and state statutes. Plaintiff further argues that the district court erred by allowing defendants to amend their removal petition and by granting defendants' motion to strike certain evidentiary material. For the following reasons, we affirm.

I.

In 1986, Carol Klein was diagnosed with colon cancer. She received surgical treatment for her cancer and appeared to be well on her way to recovery. In 1987, Mrs. Klein, a licensed physical therapist ("LPT"), began her employment with Manor Healthcare Corporation ("Manor Care") in Euclid, Ohio, as the Director of Rehabilitative Services/Physical Therapy at Manor Care's Lakeshore facility. In her application, she revealed that she had had cancer, but that she felt the surgery had cured her. Unfortunately, her bout with cancer would resume in 1988, when it was discovered that the cancer had metastasized to her brain and lung. Again, she underwent surgery, which necessitated an extended leave of absence from her job with Manor Care. Although not fully recovered, she returned to work six months later. The illness had caused some weight and vision loss, and she was taking Dilantin, an anti-seizure medication. Despite her difficulties, it appears she competently discharged her duties with Manor Care through 1989.

In early 1990, Wanda Cordero became the administrator of the Lakeshore facility. This, at least according to Mrs. Klein's husband, Jack Klein ("plaintiff"), would mark the beginning of the end for Mrs. Klein's relationship with Manor Care. In the aftermath of Cordero's arrival, Mrs. Klein felt that her views were being ignored by the staff. Furthermore, plaintiff claims Cordero was not particularly receptive to his wife's request for assistance. As Cordero would later testify:

I spoke to Carol Klein in the physical therapy department. At this time she stated to me that, quote, she was overwhelmed with the paperwork, end quote. I asked her what we could do, what we could do, she stated she did not have an assistant. At this time I told her I could have Mimi Preisler or Terri [Steirer] here to help her. (App. 724.)

Cordero claims to have followed through on her promise. Initially, she assigned Preisler, an LPT, to assist Mrs. Klein while she regained her strength. Two other Manor Care employees, Agnes Puro and Dawn Geiser, took over for Preisler once Mrs. Klein returned to her normal duties. While Puro and Geiser were assisting Mrs. Klein, Preisler and her administrative assistant, Steirer, were also made

available to her on an as needed basis.

The adequacy of the assistance provided to Mrs. Klein by Cordero is a matter of some dispute. In support of his assertion that Mrs. Klein was in need of more assistance than was actually provided by Manor Care, plaintiff notes that Manor Care, following Mrs. Klein's first performance review, made it a "30-day objective" to recruit a licensed physical therapy assistant ("LPTA") to help her. In plaintiff's estimation, this indicates Manor Care's recognition of the fact that "even a healthy, normal, not handicapped person, such as Carol then was, could not treat patients, prepare charts and all paperwork for the State Examiner, Medicare and Medicaid, bill private insurance companies, as well as supervise her department *all on her own.*"

**\*\*2** Plaintiff also observes that of the people assigned to assist his wife, only one, Preisler, was an LPT. As he explains: "[U]nlicensed help was of very little practical benefit to Carol because unlicensed help lacked the educational and skill level as well as the statutory authorization to give Carol both quantitatively and qualitatively the level of assistance that she needed." Plaintiff further contends that even Preisler did little to ease Mrs. Klein's day-to-day burdens. In fact, plaintiff maintains that, far from providing assistance, "[t]he main purpose of [Preisler's] presence in Carol's department would seem to be so that Mimi Preisler could observe and report on Carol for ... Cordero since [Preisler] was instructed by ... Cordero '*to evaluate the situation* ' [in the department]." [FN1]

Irrespective of Preisler's true motives, one thing was for certain: Mrs. Klein was not her old self. Asked to detail the problems Mrs. Klein was experiencing, Cordero responded:

Well, there were several concerns, particularly in [regard] to memory, recalling a resident's name that she was taking care of. She was overwhelmed. What we would consider normal documentation having to rewrite things over and over again, not completing things, having seizures in the department, coughing up blood, *not knowing what treatments she was doing on residents.*

(App. 663; emphasis added.) In addition, Mrs. Klein began to behave erratically. On one occasion, believing that someone had stolen money from her locker, she erupted into a tirade, slamming doors and yelling in anger. Although no evidence was ever uncovered to substantiate her belief, her emotional outburst continued for two days. [FN2] Not surprisingly, her behavior was regarded as inappropriate for a nursing home.

In an attempt to address problems with Mrs. Klein's performance, a meeting was held in September of 1990. [FN3] Attending the meeting were: Mrs. Klein; Cordero; Rob Vadis, Cordero's supervisor; and Jerry Cangelosi, Manor Care's human resources manager. As a result of this meeting, Mrs. Klein resigned from her position with Manor Care, although exactly what prompted her decision is disputed. According to plaintiff, during the meeting "Carol was told she must resign or probably be terminated because her work performance was substandard [.]" The Manor Care representatives provide a somewhat different account of what took place during the meeting: "Although there was no request for her to resign, the subject was discussed and Mrs. Klein resigned."

Mrs. Klein finally succumbed to cancer in May 1991. The instant action was initiated on September 9, 1991, when plaintiff, individually and as executor of his wife's estate, filed a ten-count complaint in Ohio state court. Named as defendants were Manor Care, Cangelosi, Vadis, and Cordero. In addition to alleging various state claims, [FN4] plaintiff sued defendants for wrongful termination pursuant to sections 4112.02(A) and (J) of the Ohio Revised Code, and for handicap discrimination pursuant to section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

**\*\*3** On October 8, 1991, defendants Manor Care, Cangelosi, and Cordero filed a petition removing this matter to federal district court. [FN5] Defendant Vadis did not join in the petition due to the fact that he had not yet been served. On October 29, plaintiff, noting that defendants' petition had not explained Vadis's failure to join, moved for the case to be remanded to state court. [FN6] Plaintiff's motion was denied by the district court in an order dated November 21, 1992. The court reasoned: Removal in this case is predicated on the assertion of the federal handicap claim. Such a claim can only be asserted against the employer which in this case joined in the removal petition. Under such a scenario, only the defendants subject to the federal claim need sign the petition for removal. (App. 30.)

Subsequently, plaintiff twice moved for reconsideration of the November 21 order. Although the court did grant the second such motion, it permitted defendants to amend their removal petition to explain Vadis's non-joinder. [FN7] In deciding against remand once again, the court merely stated that "[a]fter the thirty days [from the defendants' receipt of plaintiff's state court complaint] has passed, it is still permissible for a party, granted leave, to amend its petition to correct any defects." (*Id.* at 35; citations omitted.) The court did not reassert its earlier contention that only Manor Care's signature

was needed to secure removal of the instant action.

On September 11, 1992, defendants filed a joint motion for summary judgment with respect to each of the claims listed in plaintiff's complaint. Plaintiff countered by filing a motion for partial summary judgment (pertaining to the state and federal handicap claims) three days later. On September 21, 1992, defendants moved to strike certain materials accompanying plaintiff's summary judgment motion. Defendants asserted that these materials were contrary to Rule 56 of the Federal Rules of Civil Procedure.

On November 6, 1992, the district court granted both defendants' summary judgment motion and the motion to strike. Plaintiff's timely appeal followed.

II.

On appeal, plaintiff first argues that the district court erred in permitting defendants to amend their removal petition to explain defendant Vadis's initial failure to join the petition. [FN8] This court reviews denials of remand motions under a *de novo* standard. *Her Majesty the Queen in Right of the Province of Ontario v. City of Detroit,* 874 F.2d 332, 338 (6th Cir.1989). Plaintiff maintains that "remand to state court is required where (as here) a resident defendant has not been joined in the Notice of Removal and that Notice fails to allege the non-joining, resident defendant was not served in the state court proceeding." Moreover, plaintiff claims, defendants should not have been allowed to cure their defective petition beyond the thirty-day removal period provided by 28 U.S.C. § 1446(b).

**4** Plaintiff cites numerous district court decisions to bolster his argument. *E.g., Howard v. George,* 395 F.Supp. 1079 (S.D.Ohio 1975); *Walsh v. American Airlines, Inc.,* 264 F.Supp. 514 (E.D.Ky.1967); *Gratz v. Murchison,* 130 F.Supp. 709 (D.Del.1955). For the most part, however, these decisions predate a developing line of cases within this circuit that severely undermines plaintiff's position. In recent years, this court has expressed a reluctance to interpret statutory removal provisions in a grudging and rigid manner, preferring instead to read them in a light of more consonant with a modern understanding of pleading practices. *See Tech Hills II Assocs. v. Phoenix Home Life Mut. Ins. Co.,* 5 F.3d 963 (6th Cir.1993) (holding that defendant was properly granted leave to amend its removal petition to cure defect in allegation of diversity of citizenship, even though thirty-day period under 28 U.S.C. § 1446(b) had expired); *Gafford v. General Elec. Co.,* 997 F.2d 150 (6th Cir.1993) (same); *see also Stanley Elec. Contractors, Inc. v. Darin & Armstrong Co.,* 486 F.Supp. 769 (E.D.Ky.1980) (same); *Jackson v. Metropolitan Life Ins. Co.,* 433 F.Supp. 707 (E.D.Ky.1977) (same). In *Gafford,* this court rejected the plaintiff's argument that the district court never should have allowed removal because the defendant's petition did not state its principal place of business. [FN9] The *Gafford* court articulated the rationale underlying its liberalized approach to permitting amendments to removal petitions:

Better, if the jurisdiction in fact exists, to permit the petition for removal to be amended to reflect it. It appears that the time has come to reexamine this entire matter and expressly adopt the approach ... that amendments to the jurisdictional allegations of removal petitions should be permitted in the same manner as amendments to any other pleading.

....

It must be made clear that this opinion is not to be construed as departing in any way from the precept that the *facts* giving rise to federal jurisdiction must be strictly construed and alleged with particularity. The decision holds only that the time has come to apply the principles of modern pleading relating to *amendments* to removal petitions, and that amendments should be permitted, to implement the spirit of the statute and rules cited herein, where the jurisdictional facts do indeed exist, and the parties are in law entitled to invoke the jurisdiction of the federal court.

....

Virtually all of the commentators and the great weight of judicial authority favor the rule adopted by this decision. Indeed, the strict view reflected by the earlier cases hereinabove cited has been expressly criticized.

For the above reasons, the court holds that a petition for removal may be amended under the same considerations governing the amendment of any other pleading containing jurisdictional allegations. 997 F.2d at 164 (quoting *Stanley,* 486 F.Supp. at 772-73); *see also Tech Hills,* 5 F.3d at 969. Furthermore, as the *Stanley* court noted:

**5** Not only does the technical construction in effect in days past cause serious adverse effects to attorneys and parties rightfully entitled to invoke the jurisdiction of the federal courts, but in some cases great and needless waste of judicial time and effort, real prejudice to the parties, and severe injustice results. For example, in *Roseberry v. Fredell* [174 F.Supp. 937 (E.D.Ky.1959)], the trial was

concluded when the losing party pointed out a technical defect in the removal petition, with the result that the cause had to be remanded to the state court for a retrial. In the instant case, substantial proceedings have occurred, including the payment into court of a large sum.
486 F.Supp. at 773 (footnote omitted).

Although *Gafford* and *Stanley* both involved a jurisdictional deficiency (*i.e.*, failure to adequately state grounds for diversity jurisdiction) in a defendant's removal petition, we think the reasoning of both courts is equally relevant in the context of an alleged procedural deficiency (*i.e.*, failure to include all defendants in a removal petition). Here, the parties did not dispute that the district court could, pursuant to a properly-drafted removal petition, exercise federal question jurisdiction over plaintiff's action; the only question was whether the failure to strictly comply initially with the niceties of the removal procedures could prevent the court from doing so. To preclude federal jurisdiction in this instance, we feel, would contravene the spirit of the more recent case law on the subject. We decline to so hold, and, accordingly, we reject plaintiff's argument founded on defendants' failure to initially explain Vadis's failure to join in his co-defendants' removal petition.

III.

Next, plaintiff challenges the district court's grant of defendants' motion to strike certain evidence submitted by plaintiff in support of his motion for partial summary judgment. The evidentiary material the court excluded includes tape recorded phone conversations between plaintiff and the decedent, and the decedent and her attorney. Through these recordings, plaintiff had hoped to demonstrate the decedent's poor physical condition, the enormity of her workload, her desire to have the assistance of an LPTA, and the fact that Manor Care and some of its administrators were "spying" on her. Also excluded was plaintiff's deposition testimony, in which he recounted conversations he allegedly had with the decedent regarding her job and working conditions. Finally, the court excluded certain documents, including letters from doctors and medical reports.

With regard to the recorded conversations, the district court deemed them to be inadmissible hearsay not falling within a recognized exception to the hearsay rule. Specifically, the court concluded that Rule 803(1) of the Federal Rules of Evidence (present sense impression) was inapplicable because, as it explained: "Clearly, the decedent did not describe any particular event which evidenced handicapped discrimination in the tapes, and certainly was not perceiving any such event as she spoke." (App. 44.) The court also found Rule 803(3) (then existing mental, emotional, or physical condition) inapposite because it found the decedent's then-existing mental or emotional condition irrelevant to the issue of defendants' liability. It stated: "The mere fact that someone is unhappy at work, that they do not feel that they get the recognition they deserve or that the fact that they do not like their superior does not give rise to any claim for relief." (*Id.*)

**6 The court used similar reasoning in excluding plaintiff's deposition testimony. This evidence, too, the court concluded was inadmissible hearsay. In particular, the court noted that "[w]hile Rule 804(2) excepts statements under belief of impending death, decedent's statements do not qualify because the statements do not go to the cause of her death." (*Id.* at 45; citation omitted.) As to plaintiff's documentary evidence, the court observed that under Rule 56(e) of the Federal Rules of Civil Procedure, "all documents accompanying a motion for summary judgment must be sworn or certified." (*Id.* at 46; citations omitted.) The court proceeded to strike the documents from plaintiff's summary judgment motion due to the fact that they had not been properly authenticated.

Plaintiff now disputes the court's hearsay determinations and maintains that all of the evidence in question was, indeed, properly authenticated. [FN10] Plaintiff's task on appeal is not an easy one. "We review admission of testimony and other evidence by the trial court under the abuse of discretion standard." *Mitroff v. Xomox Corp.*, 797 F.2d 271, 275 (6th Cir.1986) (citations omitted). An abuse of discretion occurs when the appellate court is "firmly convinced that a mistake has been made." *United States v. Phillips*, 888 F.2d 38, 40 (6th Cir.1989) (citation omitted).

Here, plaintiff has not overcome his heavy burden. Although we do not feel that the district court abused its discretion in making the challenged evidentiary rulings, we need not reach this conclusion to affirm the court's grant of summary judgment. In short, even had the district court considered the disputed evidence, such evidence would not have raised a genuine issue of material fact precluding the issuance of summary judgment in defendants' favor.

IV.

Finally, plaintiff contends that the district court erred in granting defendants' summary judgment motion as to his substantive federal and state claims. We review *de novo* a district court's grant of summary judgment. *EEOC v. University of Detroit*, 904 F.2d 331, 334 (6th Cir.1990). We examine the

grant of summary judgment to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Booker v. Brown & Williamson Tobacco Co., 879 F.2d 1304, 1310 (6th Cir.1989) (citation omitted). Although we must draw all justifiable inferences in favor of the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), there must be a disagreement regarding an item of material fact. Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir.1986). The evidence presented must be sufficient to permit the plaintiff to recover if accepted by the jury.

A.

Plaintiff's federal claim is premised upon section 504 of the Rehabilitation Act, which provides in relevant part:

**\*\*7** No otherwise qualified individual with a disability in the United States, as defined in section 706 (8) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a). As this court stated in Pesterfield v. Tennessee Valley Authority:

In order to establish a prima facie case under the [Rehabilitation] Act, the plaintiff must allege and prove (1) that he is a "handicapped person" under the Act, (2) that he is "otherwise qualified" for the position sought, (3) that he was excluded from the position "solely by reason of his handicap," and (4) that the position was part of a program or activity [receiving federal financial assistance.]"

941 F.2d 437, 441 (6th Cir.1991) (citing, inter alia, Southeastern Community College v. Davis, 442 U.S. 397, 406 (1979)).

The dispute in the instant case centers around the third prong of the above analysis, namely, whether the decedent is entitled to relief as an "otherwise qualified" handicapped person under the Rehabilitation Act. To resolve this question, we must determine whether the decedent was, in fact, "otherwise qualified" within the meaning of the Act. In School Board of Nassau County v. Arline, the Supreme Court instructed:

In the employment context, an otherwise qualified person is one who can perform "the essential functions" of the job in question. When a handicapped person is not able to perform the essential functions of the job, the court must also consider whether any "reasonable accommodation" by the employer would enable the handicapped person to perform those functions.

480 U.S. 273, 287 n. 17 (1987) (citation omitted); see also Jasany v. United States Postal Serv., 755 F.2d 1244, 1250 (6th Cir.1985) ("A 'qualified handicapped person' is one 'who, with or without reasonable accommodation, can perform the essential functions of the position in question.' ") (Citation omitted). Exactly what constitutes an essential function is a fact-specific inquiry that "should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved." Hall v. United States Postal Serv., 857 F.2d 1073, 1079 (6th Cir.1988).

Here, the district court held that the decedent was not "otherwise qualified" for purposes of the Rehabilitation Act. [FN11] We agree and write further only to clarify that our decision rests primarily on an assessment of the decedent's compromised physical condition, not on an evaluation of defendants' conduct. [FN12] During the time leading up to her resignation from Manor Care, the decedent's ability to perform the essential functions of her job had diminished to the point where no reasonable amount of accommodation, either from full-fledged LPTAs or otherwise, could have compensated for her handicap.

**\*\*8** Plaintiff challenges the district court's assessment of the decedent's mental and physical competence. As evidence that the decedent was in possession of her faculties, plaintiff cites the favorable review Manor Care's Medical Director gave to the department under the decedent's supervision. Plaintiff also notes that the department's billing was at a two-year high and that the decedent was able to secure further employment as an LPT for the period following her resignation and until six weeks before her death. Counterbalanced against this evidence--little of which speaks directly to the level of decedent's own performance--is the substantial evidence indicating that the decedent could no longer do the things LPTs do. In fact, she not only was ineffective but also had become hazardous to those under her charge. For those in the business of caring for the health and well-being of others, requesting assistance for completing paperwork is one thing; confusing patients and their treatments (as the decedent did) is something else entirely.

**B.**

The district court's grant of defendants' summary judgment motion also disposed of plaintiff's state law claims. For instance, plaintiff sought relief for handicap discrimination under the applicable state statute. Ohio Revised Code § 4112.02 provides in relevant part:

It shall be an unlawful discriminatory practice:

(A) For any employer, because of the ... handicap ... of any person, to discharge without just cause, to refuse to hire, or otherwise discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

The Ohio Code further provides:

(L) Nothing in divisions (A) to (E) of this section shall be construed to require a handicapped person to be employed or trained under circumstances that would significantly increase the occupational hazards affecting either the handicapped person, other employees, the general public, or the facilities in which the work is to be performed, or to require the employment or training of a handicapped person in a job that requires him routinely to undertake any task, the performance of which is substantially and inherently impaired by his handicap.

Ohio Rev.Code § 4112.02(L).

This provision is fatal to plaintiff's claim on two counts. Not only has he offered insufficient evidence to demonstrate that the decedent was capable of performing tasks that were inherent and routine in her position, but she was, as stated above, a hazard to her workplace environment. Accordingly, plaintiff's claim based on Ohio's anti-discrimination statute must fail.

Plaintiff's remaining state law claims also were properly dismissed. We reject plaintiff's related claims of breach of an implied contract, [FN13] promissory estoppel, [FN14] and intentional and/or negligent misrepresentation/deceit. [FN15] These claims are based on the assumption that the decedent had, in fact, been discriminated against. In light of our conclusion to the contrary, plaintiff's claims are without merit. We are also unpersuaded by plaintiff's claim of intentional infliction of emotional distress. [FN16] Although we voice no opinion as to whether plaintiff or the decedent actually suffered serious emotional distress, we do note that defendants' conduct was neither extreme nor outrageous, and, therefore, cannot serve as the basis for recovery under this tort.

**9** Finally, plaintiff charges defendants with unjust enrichment. Plaintiff maintains that defendants reaped the profits from a new therapy technique for burn patients developed by the decedent. Manor Care's profit sharing plan, plaintiff notes, allows employees to receive a percentage of profits earned from products or techniques they invent. As the district court pointed out, however, rather than developing the technique herself, the decedent had actually learned of it while attending a conference as a Manor Care representative. Upon returning from the conference, the decedent simply incorporated the technique into a therapeutic program. In other words, "[t]here is no evidence to suggest that decedent made any contribution to the development of the technique, itself." (App. 60.) For the foregoing reasons, the decisions of the district court granting defendants' motion to strike and defendants' motion for summary judgment are AFFIRMED.

FN1. In short, plaintiff accuses Cordero and various other members of the Manor Care staff of "spying" on his wife. That these Manor Care officials would carefully monitor the quality of care being administered by Mrs. Klein's department, however, is not inconsistent with the nursing home's primary objective of ensuring the well-being of its residents.

FN2. In support of his contention that his wife was still capable of providing a level of care consistent with Manor Care's standards, plaintiff cites a report issued by Dr. Lisa Meek, Manor Care's Medical Director. The report, dated September 1, 1990, gave a glowing review of her physical therapy department. Notwithstanding the fact that the report did not evaluate particular individuals, plaintiff argues that it represents an endorsement of his wife's performance because she was the only full-time LPT providing physical therapy services.

As further evidence of decedent's undiminished ability, plaintiff notes that she received

special recognition from the Ohio Department of Health for developing a very successful high voltage wound and skin program.

FN3. For plaintiff, the timing of this meeting is significant:

If Mimi Preisler ... could have been of real benefit to Carol, was indeed "assigned to help" Carol ... as opposed to being assigned to *evaluate* Carol and submit written *evaluations* on Carol's department's operation to ... Cordero ... that assignment was a *weekly* one and it only commenced on 8-30- 90 four working days before the "Tribunal of 5" was convened and seven working days before Carol's forced resignation on 9-12-90.

(Appellant's brief at 24) (Citations omitted; emphasis in original.)

FN4. These claims included: breach of implied contract (Count 3); promissory estoppel (Count 4); intentional and/or negligent misrepresentation/deceit (Count 5); unjust enrichment (Count 6); infliction of emotional distress (Count 7); bad faith (Count 8); loss of consortium/society (Count 9); and violation of public policy (Count 10).

FN5. Title 28 U.S.C. § 1441(a) provides:

Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending. For purposes of removal under this chapter, the citizenship of defendants sued under fictitious names shall be disregarded.

FN6. Title 28 U.S.C. § 1447(c) provides in relevant part:

A motion to remand the case on the basis of any defect in removal procedure must be made within 30 days after the filing of the notice of removal under section 1446(a). If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded. An order remanding the case may require payment of just

costs and any actual expenses....

FN7. Plaintiff had also moved to certify the issue of whether a section 504 claim could be asserted against an employee (*e.g.*, Vadis). The court denied this motion at the same time it granted plaintiff's motion for rehearing.

FN8. Title 28 U.S.C. § 1446 provides in relevant part:

(a) A defendant or defendants desiring to remove any civil action or criminal prosecution from a State court shall file in the district court of the United States for the district and division within which such action is pending a notice of removal signed pursuant to Rule 11 of the Federal Rules of Civil Procedure and containing a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such defendant or defendants in such action.

(b) The notice of removal of a civil action or proceeding shall be filed within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based, or within thirty days after the service of summons upon the defendant if such initial pleading has then been filed in court and is not required to be served on the

defendant, whichever period is shorter.

If the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order, or other paper from which it may first be ascertained that the case is one which is or has become removable, except that a case may not be removed on the basis of jurisdiction conferred by section 1332 of this title more than 1 year after commencement of the action.

Historically, courts have strictly construed the procedural requirements of § 1446. As the court in *Courtney v. Benedetto* explained:

Courts have consistently construed 28 U.S.C. § 1446(a) to require that all defendants either join the petition for removal or to consent to such removal. Furthermore, defendants mandated by 1446(a) to either join the petition for removal or to consent to such removal must do so within thirty (30) days of notice or service of process. The exceptions to the general rule that all defendants join or consent to the petition for removal exist when: (1) the non-joining defendant has not been served with service of process at the time the removal petition is filed; (2) the non-joining defendant is merely a nominal or formal party; and, (3) the removed claim is a separate and independent claim as defined by 28 U.S.C. § 1441(c). A necessary corollary to 1446(a) which requires the

petition for removal contain "a short and plain statement of the facts which entitle him or them to removal" is that the removal petition must set forth the reason why a defendant named in such action has not joined the petition for removal. A petition for removal filed by less than all defendants is considered defective if it does not contain an explanation for the non-joinder of those defendants.

627 F.Supp. 523, 525-26 (M.D.La.1986) (citations and footnotes omitted).

FN9. The defendant's petition stated in relevant part:

This action is a civil action of which this Court also has original jurisdiction under 28 U.S.C. § 1332, and is one which may be removed to this Court by the Petitioner pursuant to 28 U.S.C. § 1441(a) in that it is a civil action in which the matter in controversy exceeds the sum or value of Fifty Thousand Dollars exclusive of interest and cost, and is between citizens of different states. The Petitioner is a corporation organized and incorporated under the laws of the State of New York, *having its principal place of business in a state other than Kentucky,* and is therefore a citizen of a state other than Kentucky. The Respondent is a citizen of the Commonwealth of Kentucky.

997 F.2d at 163-64 (emphasis added). It was argued that the petition was invalid because, on its face, it failed to specify the state of the

petitioner's principal place of business.

FN10. Plaintiff also asserts that the district court should not have ruled on defendants' motion to strike before deciding their motion for summary judgment. This assertion, as defendants correctly point out, is "nonsensical since the Court cannot determine the Motion for Summary Judgment without determining first what materials may be considered."

FN11. Plaintiff asserts that the district court erroneously relied on the term "otherwise handicapped individual" as defined in *Bailey v. Tisch,* 683 F.Supp. 652 (S.D.Ohio 1988). The standard the court should have applied, according to plaintiff, was that of a "qualified handicapped individual." A person fitting this latter term is one "who can with reasonable accommodation perform the essential functions of the job in question." The key distinction between the above standards is that the former does not expressly take into account the measures taken by the employer. Notwithstanding any apparent discrepancy in the above standards, however, the district court's opinion here did, indeed, contain an analysis of defendants' attempt at accommodating the deceased. As the court concluded: "The evidence before the Court clearly indicates that Manor Healthcare made reasonable efforts to accommodate decedent's

handicap, and that even with these reasonable accommodations decedent was not otherwise qualified for the position." (App. 52; footnote omitted.) Plaintiff's argument, therefore, is without merit.

FN12. Plaintiff maintains that defendants never acknowledged the decedent's status as a handicapped person entitled to reasonable accommodation. Whether true or not, this assertion is irrelevant for purposes of determining liability under the Rehabilitation Act. So long as defendants provided adequate accommodation, their thoughts (or misconceptions) regarding the true nature of the decedent's ailment are irrelevant.

FN13. The decedent's employment with Manor Care was terminable at the will of either party. Notwithstanding this fact, plaintiff argues that defendants failed to fulfill their promise to provide the decedent with the assistance of an LPTA. This promise, plaintiff asserts, effectively altered the terms of the at-will relationship to add rights and obligations that did not previously exist. (See App. at 54-55 ("At-will employment arrangements are most often transformed by company policy, statements in handbooks, and oral and written representations made by management personnel.") (citation omitted)).

FN14. Plaintiff argues that defendants were "estopped from discharging decedent based upon [their] promises to provide additional help, not to discriminate based on her handicap, and to follow the disciplinary procedures contained in the employee handbook." (App. 55.)

FN15. As plaintiff alleged in his complaint:

[A]t the time Defendants made their oral and/or written representations to decedent, Carol Ann Klein, that it would honor their agreements with decedent, Carol Ann Klein; would not discriminate against [her] because of her handicap; and, would reasonably accommodate the same as aforesaid; in actuality said Defendants did not intend to do the same, but rather secretly intended the opposite, and deliberately and maliciously concealed their true intentions from decedent, Carol Ann Klein. In so doing, Defendants acted fraudulently and with malice, in reckless disregard for the rights of the decedent, Carol Ann Klein, all to Plaintiff's damage as aforesaid.

(App. 24-25.)

FN16. To prevail on such a claim, a plaintiff must establish:

1) that the actor either intended to cause emotional distress or knew or

should have known that actions taken would result in serious emotional distress to the plaintiff; 2) that the actor's conduct was so extreme and outrageous as to go "beyond all possible bounds of decency" and was such that it can be considered as "utterly intolerable in a civilized community"; 3) that the actor's actions were the proximate cause of plaintiff's psychic injury; and 4) that the mental anguish suffered by plaintiff is serious and of a nature that "no reasonable man could be expected to endure it[.]"

Pyle v. Pyle, 463 N.E.2d 98, 103 (Ohio Ct.App.1983) (citations omitted).

C.A.6 (Ohio),1994.
Klein v. Manor Healthcare Corp.
19 F.3d 1433 (Table), 1994 WL 91786 (6th Cir.(Ohio)), 5 NDLR P 87 Unpublished Disposition

END OF DOCUMENT

Copr. (C) 2004 West. No Claim to Orig. U.S. Govt. Works.