JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

NOV 3 0 2004

FILED
CLERK'S OFFICE



MDL DOCKET NO. 875
BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION
IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)

CONDITIONAL TRANSFER ORDER (CTO-237) FILED OCTOBER 14, 2004

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

OPPOSITION TO MOTION, AND INCORPORATED BRIEF,
TO VACATE CTO-237, TRANSFERRING *RALPH JOSEPH LANDRY V.
NORTHROP GRUMMAN SHIP SYSTEMS, INC., ET AL., CASE NO 04-430*, FROM
THE U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF
LOUISIANA TO THE U.S. DISTRICT COURT FOR THE EASTERN
DISTRICT OF PENNSYLVANIA

NOW INTO COURT, through undersigned counsel, come defendants Peter Territo and

Northrop Grumman Ship Systems, Inc., who hereby oppose the Motion to Vacate CTO-237 filed by

plaintiff Ralph Joseph Landry for the reasons set forth below.

1.

On July 29, 1991, the Judicial Panel on Multidistrict Litigation ("Panel"), faced with the fact

that approximately 30,000 asbestos related injury and death cases were pending in federal courts

across the nation, found that the asbestos cases involved common questions of fact relating to

injuries or wrongful death allegedly caused by exposure to asbestos or asbestos containing products

and that centralization under 28 U.S.C. § 1407 in the Eastern District of Pennsylvania would best

serve the convenience of the parties and witnesses and promote the just and efficient conduct of such

litigation. As a result, the Panel ordered that all such actions pending as of that date, which were not

OFFICIAL FILE COPY IMAGED NOV 3 0 '04

in trial, be so transferred and assigned to the Honorable Charles R. Weiner. *In re Asbestos Products Liability Litigation (No. VI)*, 771 F. Supp. 415 (MDL No. 875, 1991). In so determining, the Panel acknowledged that in 1977 the Panel had previously determined that, "Many factual questions unique to each action or to a group of actions already pending in a single district clearly predominate, and that therefore transfer is unwarranted..." *Id.* at 418. In fact, in 1977, the Panel had gone so far as to find that the only questions of fact common to all actions related to the state of scientific and medical knowledge. *In re Asbestos and Asbestos Insulation Material Products Liability Litigation*, 431 F. Supp. 906 (No. 269, 1977). The 1991 Panel, acknowledging these facts, found:

> "They insist that the situation that warranted denial then not only still prevails but has been magnified by the greatly increased number of actions and parties in federal asbestos personal injury/wrongful death litigation–more than 30,000 pending federal actions now, as opposed to the 103 actions subject to the Panel's 1977 decision. In our view, it is precisely this change that now leads us to conclude that centralization of all federal asbestos personal injury/wrongful death actions, in the words of 28 U.S.C. § 1407(a), "will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." In short, we are persuaded that this litigation has reached a magnitude, not contemplated in the record before us in 1977, that threatens the administration of justice and that requires a new, streamlined approach."

*In re Asbestos Products Liability Litigation (No. VI)*, 771 F. Supp. 415, 418 (MDL No. 875, 1991).

As is clear from the above statements, the 1991 Panel was cognizant of the fact that the approximately 30,000 cases pending at that time had numerous factual questions unique to each of them, nonetheless, the Panel ordered all such cases transferred. The 1991 Panel did not qualify the cases which were to be transferred, and subsequent tag along cases, any further than actions relating to injuries or wrongful death allegedly caused by exposure to asbestos or asbestos containing products. Ralph Joseph Landry has brought an action precisely in that category; he alleges that he

2

has been injured in that he has allegedly developed mesothelioma as a result of exposure to asbestos and/or asbestos containing products.   Therefore, plaintiff's argument that because the target defendant here is his employer, which is rather unique to Louisiana, the matter should not be transferred, is without merit.   In 1991, the Panel determined the class of cases that would be transferred and this case falls within that class.   Further, there is no reason to believe that Judge Weiner, who the Panel noted was thoroughly familiar with the issues in asbestos litigation and had a track record of accomplishment and successful innovation, is any less capable of handling unique issues than the judges of the Eastern District of Louisiana.   Many states have unique and differing laws which can come into play in asbestos litigation which Judge Weiner has surely handled efficiently over the years.

2.

Plaintiff also seeks to have the Panel vacate its conditional transfer order of this matter on the grounds that Landry is a living mesothelioma victim and his case cannot be tried in the Eastern District of Pennsylvania.   The Panel's words in 1991 are instructive on this point also:

> "It is not surprising, therefore, that parties and courts involved in such actions might urge that inclusion of their actions in multidistrict proceedings is inappropriate.   The Panel, however, must weight the interests of all the plaintiffs and all the defendants, and must consider multiple litigation as a whole in light of the purposes of the law.   It is this perspective that leads us to conclude that centralization in a single district **of all pending federal personal injury and wrongful death asbestos actions in necessary.**   (Citations omitted.) (Emphasis added.)   *In re Asbestos Products Liability Litigation (No. VI)*, 771 F. Supp. 415, 420 (MDL No. 875, 1991).

The 1991 Panel decision is clear.   All federal personal injury asbestos cases are subject to transfer.   Plaintiff urges the Panel to vacate CTO-237 on the grounds that the Court handling MDL

3

875 can remand an action to the transferor court before the conclusion of pretrial proceedings and that MDL 875 has used criteria that involve serious hardship or disease in determining to do so. Plaintiff cites to *In re Asbestos Litigation*, 7 F. Supp. 2d 93 (D. Mass 1998) where the Court ordered the parties to identify cases which were pending in the MDL for possible remand to transferor courts using serious disease or hardship as one of the criteria. However, what plaintiff fails to note is that the issue there was the question of remand to the transferor court after the cases had been transferred to the MDL, not whether the cases should be transferred in the first instance. Serious hardship or disease is not a criteria which has been expressed for preventing transfer. As shown above, transfer of cases to MDL 875 is to be made when an action relates to injury or wrongful death allegedly caused by exposure to asbestos or asbestos containing products. Once transferred, at the appropriate time, plaintiff has available to him procedural vehicles to seek to have the case remanded to the transferor court, Eastern District of Louisiana.

3.

Finally, plaintiff asks the Panel to vacate its conditional transfer order of this matter on the grounds that he asserts that the removal of the case to the Eastern District of Louisiana was improper. The determination as to whether the removal was proper is clearly for the Courts to make, not counsel. However, defendants maintain that the removal was proper pursuant to more recent case law all as set forth in defendants' Opposition to Motion to Remand attached hereto as Exhibit A.

For the foregoing reasons, Peter Territo and Northrop Grumman Ship Systems, Inc. oppose plaintiff's Motion to Vacate CTO-237 and pray that the Conditional Transfer Order be entered transferring this matter to the Eastern District of Pennsylvania.

4

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

NOV 3 0 2004

FILED
CLERK'S OFFICE

Respectfully submitted,

PLAUCHÉ MASELLI
LANDRY & PARKERSON L.L.P.

Andrew L. Plauché, Jr. (Bar No. 11023)
Wendy K. Lappenga (Bar No. 24512)
201 St. Charles Avenue, Suite 4240
New Orleans, Louisiana  70170-4240
Telephone:   504.582.1142; Fax:  504.582.1172
Attorneys for Peter Territo

and

Gordon P. Wilson, La. Bar No. 20426
Lugenbuhl, Wheaton, Peck, Rankin & Hubbard
601 Poydras Street, Suite 2775
New Orleans, LA  70130
Telephone:   504-568-1990; Fax: 504-310-9195
Co-Counsel for Peter Territo

and

Brian C. Bossier, T.A., Bar No. 16818
Edwin A. Ellinghausen, III, Bar No. 1347
Christopher T. Grace, Bar No. 26901
Jason T. Little, Bar No. 28403
Erin H. Boyd, Bar No. 20120
Blue Williams, L.L.P.
3421 North Causeway Boulevard, Ninth Floor
Metairie, Louisiana  70002
Telephone:   504-831-4091; Fax:  504-849-3022
Attorneys for Northrop Grumman Ship
Systems, Inc. f/k/a Avondale Industries, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing pleading has been forwarded
to all counsel of record directly involved in this action listed below, parties listed on the attached

5

panel service list and to the Clerk of Court for the United States District Court Eastern District of Louisiana, by facsimile, by-hand delivery or by depositing a copy thereof, postage prepaid, in the United States mail, addressed to them on this _23rd_ day of November, 2004.

Ed Ellinghausen
Brian Bossier, Esq.
Blue Williams, L.L.P.
3421 N. Causeway Blvd., 9th Floor
Metairie, Louisiana 70002

Gordon Wilson
Lugenbuhl, Burke, Wheaton,
Peck, Rankin & Hubbard
601 Poydras Street, Suite 2775
New Orleans, LA 70130-6017

Sam M. Rosamond, III
Crawford Lewis, PLLC
400 Poydras Street, Suite 2100
New Orleans, Louisiana 70130

Alison Borison
Mongomery, Barnett, Brown, Read, Hammond,
& Mintz
3200 Energy Centre,
1100 Poydras St
New Orleans LA 70163

**PANEL SERVICE LIST (Excerpted from CTO-237)**
**DOCKET NO. 875**
**IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)**

*Mary F. DeLancey, et al. v. Chicago Insurance Co.*, E.D. Louisiana, C.A. No. 2:04-2355
*Ralph Joseph Landry v. Northrop Grumman Ship Systems, Inc., et al.*,
E.D. Louisiana, C.A. No. 2:04-2574

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114

Brian C. Bossier
Blue Williams, LLP
3421 N. Causeway Boulevard
9th Floor
Metairie, LA 70002

Edward J. Cass
Gallagher, Sharp, Fulton &
Norman
Bulkley Building, 7th Floor
1501 Euclid Avenue
Cleveland, OH 44115

Adam M. Chud
Shea & Gardner
1800 Massachusetts Avenue, N.W.
Washington, DC 20036

David A. Damico
Burns, White & Hickton
Fifth Avenue Place, Suite 2400
120 Fifth Avenue
Pittsburgh, PA 15222

Raymond P. Forceno
Forceno & Hannon
111 S. Independence Mall East
Suite 1000, The Bourse
Philadelphia, PA 19106-2574

Ellen B. Furman
Goldfein & Hosmer
1600 Market Street
33rd Floor
Philadelphia, PA 19103

Susan M. Hansen
Brownson & Ballou
4800 U.S. Bank Place
601 Second Avenue, South
Minneapolis, MN 55402

Reginald S. Kramer
Oldham & Dowling
195 South Main Street
Suite 300
Akron, OH 44308-1314

David C. Landin
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Gene Locks
Greitzer & Locks
1500 Walnut Street
Philadelphia, PA 19102

Ben L. Mayeaux
Laborde & Neuner
P.O. Drawer 52828
1001 W. Pinhook Road
Suite 200
Lafayette, LA 70505

Ronald L. Motley
Motley Rice, LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464

Andrew L. Plauche, Jr.
Plauche, Maselli, Landry &
Parkerson, LLP
201 St. Charles Avenue
Suite 4240
New Orleans, LA 70170-4240

Louis L. Plotkin
Gertler, Gertler, Vincent & Plotkin
Gertler Building, 3rd Floor
127 Carondelet Street
New Orleans, LA 70130

John J. Repcheck
Marks, O'Neill, O'Brien &
Courtney
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219

John D. Roven
Roven, Kaplan & Wells
2190 North Loop West
Suite 410
Houston, TX 77018

Richard D. Schuster
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216

Neil Selman
Selman, Breitman & Burgess
11766 Wilshire Boulevard
Sixth Floor
Los Angeles, CA 90025

Robert N. Spinelli
Kelley, Jasons, McGuire & Spinelli,
L.L.P.
Centre Square West
15th Floor
Philadelphia, PA 19102

Robert E. Swickle
Jaques Admiralty Law Firm, P.C.
1570 Penobscot Building
The Maritime Asbestosis Legal
Clinic
Detroit, MI 48226

Andrew J. Trevelise
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

James K. Weston, II
Tom Riley Law Firm
4040 First Avenue, N.E.
P.O. Box 998
Cedar Rapids, IA 52406

Gordon P. Wilson
Lugenbuhl, Wheaton, et al.
601 Poydras Street
Suite 2775
New Orleans, LA 70130

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

NOV 3 0 2004

FILED
CLERK'S OFFICE

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| RALPH JOSEPH LANDRY | * | CIVIL ACTION NO. 04-2574 |
| | * | |
| VERSUS | * | SECTION "C" |
| | * | |
| NORTHROP GRUMMAN SHIP | * | |
| SYSTEMS, INC., ET AL | * | MAG. SECTION 4 |
| | * | |

\*     \*     \*     \*     \*     \*     \*

FILED:_____

_____
**DEPUTY CLERK**

## OPPOSITION TO MOTION TO REMAND AND FOR AN AWARD OF FEES AND COSTS

**MAY IT PLEASE THE COURT:**

### PREAMBLE

Plaintiff, Ralph Joseph Landry has filed suit against various parties, including Northrop

Grumman Ship Systems, Inc., f/k/a Avondale Industries, Inc. (hereinafter, "Avondale"), its alleged

executive officer, Peter Territo (Avondale and its alleged executive officer, Peter Territo, are

hereinafter collectively referred to as the "Avondale Interests"). The Avondale Interests submit this

Memorandum in Opposition to the Motion to Remand filed by plaintiff to show that Avondale and

Peter Territo qualify as individuals acting under the direct supervision and control of certain federal



officers and that the claims made against the Avondale Interests are based on acts performed under the direction of those federal officers, which in turn qualifies the Avondale Interests for the procedural protections provided by the United States Congress in the Federal Rules of Civil Procedure.

# TABLE OF CONTENTS

PREAMBLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

LIST OF EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.   PROCEDURAL AND FACTUAL HISTORY . . . . . . . . . . . . . . . . . . . . . . 7

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      A.    Background on the Federal Officer Removal Statute . . . . . . . . . . . . . . . 9

      B.    The Three Prong Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      C.    *Fung v. Abex Corporation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      D.    Contract Specifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      E.    Certain Materials Must be Used . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      F.    Inspections of Materials and Workmanship . . . . . . . . . . . . . . . . . . . . 21

      G.    Safety Inspections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      H.    Contract Specified Safe Handling Procedures For Asbestos . . . . . . . . . . . . 25

      I.    Dock and Sea Trials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

      J.    *Lalonde v. Delta Field Erection* . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      K.    *Blackman v. Asbestos Defendants* . . . . . . . . . . . . . . . . . . . . . . . . . 33

      L.    The Avondale Interests Can Assert Colorable Federal Defenses . . . . . . . . . . 36

      M.    Federal Contractor Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

      N.    Other Recent Decisions Also Support Removal . . . . . . . . . . . . . . . . . . . 41

      O.    Plaintiff's Motion for Attorney's Fees and Costs . . . . . . . . . . . . . . . . . . 44

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

# LIST OF EXHIBITS

| Exhibit | Description |
|---|---|
| A | *Lalonde v. Delta Field Erection* |
| B | Affidavit of Danny Joyce |
| | A    Walsh Healey Stds. 51 |
| | B    Walsh Healey Stds. 69 |
| | C    Walsh Healey Stds. 68 |
| C | *Guidroz v. The Anchor Packing Company* |
| D | General Dynamics Contract |
| E | Affidavit of R.D. Church |
| | A    General and Specific Provisions for DE1078 Contract |
| F | Affidavit of Kenneth Cantrelle |
| | A    DE1078 Specifications |
| G | Affidavit of Gerald Labiche |
| | A    Std's, Spec's & Qualified Prod. List |
| | B    Insulation Schedule DE1078 |
| H | Trial Testimony of Leroy Rome |
| I | Affidavit of Peter Territo |
| J | Affidavit of Edward Blanchard |
| K | Affidavit of John Brinser |
| L | Deposition Testimony of Melvin Hebert |
| M | *Blackman v. Asbestos Defendants* |
| N | *Cobb v. Sipco Serv. & Marine, Inc.* |
| O | *Teague, et al. v. Bell Helicopter Servs. Inc.* |
| P | *Williams v. Todd Shipyards Corp.* |
| Q | *Delancey, et al. v. General Electric, et al.* |

R          *Fink v. Todd Shipyards, et al.*

S          *In re Welding Rod Product Liability Litigation*

T.         Plaintiff's Motion to Remand submitted in *Fink v. Todd Shipyards, et al.*

## I.     INTRODUCTION

This is one of the many lawsuits which have been filed in recent years by present or former employees of Avondale alleging harm caused by the inhalation of asbestos fibers. In most cases, the possible exposure to asbestos took place prior to the 1970's. Almost all of the disease processes caused by over-exposure to asbestos dust – such as asbestosis, lung cancer, or mesothelioma – typically do not manifest until twenty or more years after over-exposure commences.

There is no disputing the fact that insulating materials which contained asbestos were once in heavy use at shipbuilding and repairing facilities owned and run by Avondale. From its humble beginnings in 1938 as a small tugboat and barge repair outfit through its proud emergence in the 1960's and early 1970's as one of the nation's preeminent private ship construction companies, federal regulatory authorities responsible for the safety of marine vessels and federal agencies for whom vessels were constructed by Avondale required Avondale to install certain asbestos-containing products in boats and ships. As will be shown in more detail later in this memorandum, these were not broad, general requirements, nor were they requirements that the federal government simply assumed would be complied with by Avondale. Rather, the requirements were specified in minute detail, encompassed all aspects of the acquisition and installation of insulating materials, and were enforced by an extraordinarily rigorous inspection and control system. The supervisory control exercised by federal agencies was designed to ensure that private contractors like Avondale met all federal specifications and complied with all applicable federal regulations, including asbestos safety standards specified in the shipbuilding contracts.

## II. PROCEDURAL AND FACTUAL HISTORY

On August 19, 2004, plaintiff filed a Petition for Damages in the Civil District Court for the Parish of Orleans, State of Louisiana, asserting claims of negligence, strict liability, products liability, *etc.* against various defendants asserting that he worked at Avondale from March 1972 to March 1974 as an electrician aboard six DE 1078 Class Ocean Escort Vessels being constructed for the U.S. Navy under Job No. C6-1400.[1]  With respect to the Avondale Interests, plaintiffs assert claims in negligence and strict liability.[2]  Specifically, plaintiff's petition asserts that the Avondale Interests are guilty of:

a.  failing to provide to him respirators which, when worn, would prevent or reduce his inhalation of dangerous levels of asbestos dust and fibers;

b.  **allowing the use of asbestos-containing insulation or building products instead of substituting safer, alternative asbestos-free materials and products;**

c.  failing to warn or inform Mr. Landry regarding the dangers involved in inhaling asbestos dust and fibers;

d.  failing to provide adequate ventilation and implement proper administrative and engineering controls to eliminate and/or reduce Mr. Landry's exposure to asbestos dust and fibers;

e.  failing to conduct adequate air monitoring or dust sampling to detect asbestos in the air;

f.  failing to isolate work activities involving handling of asbestos and not wetting down asbestos when it was handled. (Emphasis added.) [3]

Plaintiff goes on to assert additional allegations of fault:

---

[1] Petition, ¶ 3.

[2] Petition, ¶ 5, 8, 9 and 10.

[3] Petition, ¶ 5.

> "The defendant, Northrop Grumman Ship Systems, Inc., formerly Avondale
> Industries, Inc., is strictly liable to the plaintiff as a premises owner who maintained
> the *garde* over unreasonably dangerous objects (to wit various DE 1078 Class Ocean
> Escort Vessels being constructed at the Shipyard, which were insulated with
> asbestos-containing materials and products), causing injury to Ralph Landry."[4]

In sum, despite plaintiff's convenient assertion in his Motion to Remand that "To the extent

necessary, plaintiff represents that he is only proceeding under a failure to warn theory in

establishing that Avondale failed to provide a safe place to work[5]," the allegations against the

Avondale Interests transcend beyond a "failure to warn" claim. Plaintiff's allegations, in his Petition,

are not based solely on a failure to warn theory. In fact, as shown above, in addition to allegations

of strict liability, plaintiff specifically alleges that both Avondale and Peter Territo allowed the use

of asbestos-containing insulation or building materials instead of substituting safer, alternative

asbestos-free materials. Plaintiff makes this allegation despite the fact that, as will be seen below,

the Avondale Interests were required by the terms of the contracts for the construction of the DE

1078 Class Ocean Escort Vessels, the very ships on which Mr. Landry alleges he worked, and the

United States Navy to utilize asbestos-containing products. Mr. Landry has attempted to manipulate

his state court pleadings in his Motion to Remand by making the statement that "to the extent

necessary" he is proceeding only under a failure to warn theory. However, jurisdiction is determined

based upon the claims made in the complaint at the time the petition for removal is filed.[6] Plaintiff's

petition, at the time the petition for removal was filed, clearly contained far more than a failure to

---

[4]  Petition, ¶ 8.

[5]  Plaintiff's Motion to Remand, page 9.

[6]  *Moham v. Jones, Walker, Waechter, Poitevent, Carrere & Denegre, L.L.P., et al.*, 2000 WL
335841 (E.D. La. 2000); *Cavallini v. State Farm Mut. Auto Ins. Co.*, 44 F. 3d 256, 264 (5th Cir.
1995); and *Brown v. Southwestern Bell Telephone Co, et al.*, 901 F. 2d 1250 (5th Cir. 1990).

warn theory.

On this basis, several prior decisions of the U.S. District Court for the Eastern District of

Louisiana cited by plaintiff are distinguishable - - *Gauthe v. Asbestos Corp.*, 1997 U.S. Dist. Lexis

112, p. 17 (E.D. La. Jan. 2, 1997), and *Mouton v. Flexitallic, Inc.*, 1999 U.S. Dist. LEXIS 5632 (E.D.

La. Apr. 14, 1999) - - as well as *Overly v. Raybestos-Manhattan*, 1996 WL 532150 (N.D. Cal. 1996),

the foundation for *Gauthe* and *Mouton,* and *Westbrook v. Asbestos Defendants*, 2001 WL 902642

(N.D. Cal.).

### III. ARGUMENT

**A.     Background on the Federal Officer Removal Statute**

The Avondale Interests are entitled to remove this case based on 28 U.S.C. §1442(a)(1),

which reads in relevant part:

> (A)     A Civil Action . . . commenced in a state court against any of the following
> persons may be removed by them to a district court of the United States for
> the district and division embracing the place wherein it is pending:
>
> (1)     Any officer of the United States or any agency thereof,  or person **acting
> under him**, for any act under color of such office . . . .

(*emphasis added.*)   The intense United States government presence at Avondale during the

construction of vessels on which the plaintiff worked was of such a direct and detailed nature that

the Avondale Interests are entitled to defend this claim in federal court.

It is true that ordinarily a cause of action does not arise under federal law unless the plaintiff's

well-pleaded complaint raises issues of federal law.[7]  Nevertheless, a plaintiff cannot avoid federal

---

[7] *Franchise Tax Bd. v. Constructional Laborers' Vacation Trust,* 463 U.S. 1, 9-10, 103 S.Ct.
2841, 2846, 77 L.Ed.2d (1983).

jurisdiction simply by omitting from his petition federal law essential to his claim or by casting in state law terms a claim that can be made only under federal law.[8]  Thus, although the well-pleaded complaint rule is well established, equally well established is the exception to that rule by which a person acting under the direction of federal officers who can present a colorable federal defense can remove a case to federal court.[9]

It should be noted at the outset that the federal officer removal statute is not being asserted as a **defense** to the claims made against the Avondale Interests.  Rather, the federal officer removal statute is a procedural device available to certain federal officers of the United States government -- and individuals acting under those federal officers -- to have claims made against them heard in federal court.  According to the United States Supreme Court, the federal officer removal statute:

> . . . merely serves to overcome the "well-pleaded complaint" rule which would otherwise preclude removal even if a federal defense were alleged.[10]

Accordingly, the Avondale Interests are not attempting to avail themselves of federal jurisdiction based solely on defenses arising under federal substantive law.  Avondale and the executive officers qualify as persons "acting under" an officer of the United States government who are entitled to have the claims made against them adjudicated in federal court.

## B.    The Three Prong Test

The United States Supreme Court has set forth the criteria which must be met in order for a defendant to remove a case under 28 U.S.C. §1442(a)(1).  In *Mesa v. California, supra,* the Court

---

[8]  *Harper v. San Diego Transit Corp.*, 764 F.2d 663 (9th Cir. 1985).

[9]  *Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 939 (E.D.N.Y. 1992).

[10]  *Mesa v. California*, 489 U.S. 121, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989), *citing, inter alia,*
*Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 491, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983).

set forth a three prong test which requires the "person" acting "under a federal officer" to:

(1)   Demonstrate that he acted under the direction of a federal officer;

(2)   Raise a federal defense to the plaintiff's claim; and

(3)   Demonstrate a causal nexus between plaintiff's claims and acts he performed under color of federal office.[11]

In order to satisfy the "acting under" requirement of the test, the Avondale Interests must first establish that they qualify as "persons."[12]  That Avondale and the executive officers are persons cannot be the subject of serious dispute.[13]

The Avondale Interests must next demonstrate that they acted under the direction of a federal officer.  In determining whether a person "acted under" the direction of a federal officer to the extent required, the courts have found several categories of governmental oversight persuasive.  The Avondale Interests have collected several of those categories below:

♦   A federal official must have "direct and detailed" control.[14]

♦   A defendant must demonstrate he is governed by "exceedingly complex regulations, guidelines and evaluation schemes."[15]

---

[11]   *Mesa, supra.  See also Fung v. Abex Corp.*, 816 F. Supp. 569 (N.D. Cal. 1992); *Crocker v. Borden, Inc.*, 852 F. Supp. 1322 (E.D. La. 1994); *Lalonde v. Delta Field Erection*, No. 96-3244-B-M3 (M.D. La. August 5, 1998) (attached as Exhibit "A").

[12]   *Fung,* 816 F. Supp. at 572, *citing International Primate Protection League v. Administration of Tulane Educ. Fund*, 500 U.S. 72, 111 S.Ct. 1700, 114 L.Ed.2d 134 (1991).

[13]   Avondale, the corporation, also qualifies as a "person" for the purposes of the federal officer removal statute.  *See, e.g, Peterson v. Blue Cross/Blue Shield of Texas*, 508 F.2d 55 (5th Cir. 1975); *Fung,* 816 F. Supp. at 572.

[14]   816 F. Supp. at 572, *citing Ryan v. Dow Chem. Corp.*, 781 F. Supp. 934, 947 (E.D.N.Y. 1992).

[15]   816 F. Supp. at 572, *citing Gurda Farms, Inc. v. Monroe County Legal Assis. Corp.*, 358 F. Supp. 841 (S.D.N.Y. 1973).

- ♦    A defendant must show that he is "so intimately involved with government functions as to occupy essentially the position of an employee of the government."[16]

- ♦    A defendant must demonstrate that he was subject to "regulation plus. . . ."[17]

- ♦    A defendant must show strong government intervention and the threat that a defendant will be sued in state court "based on actions taken pursuant to federal direction."[18]

Considering the "acting under" analysis, courts often look to these factors to determine whether the "causal nexus" requirement has been met.   In fact, in *Winters v. Diamond Shamrock*,[19] the United States Fifth Circuit Court of Appeals thoroughly analyzed the federal officer removal statute, holding that it is to be liberally construed, and clarified the test for removal such that the "acting under" and "causal nexus" factors are truly one intertwined factor and not two separate factors.[20]   Accordingly, the Avondale Interests will present details concerning "strong government involvement" as proof of satisfaction of both factors.   Following these details is a brief survey of some recent decisions that provide an overview and analytical tone of the issue at hand.

### C.    *Fung v. Abex Corporation*

One federal court has considered the *Mesa* factors in the context of the removal of an asbestos personal injury claim.   Review of the rationale of that case is helpful in determining the merits of this removal.   In *Fung v. Abex Corp., supra,* the plaintiffs filed suit in California state court

---

[16]   *Willingham v. Morgan*, 395 U.S. 402, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969); *and Bakalis v. Crossland Sav. Bank*, 781 F. Supp. 140, 145 (S.D.N.Y. 1991).

[17]   *Ryan, supra, and Bahrs v. Hughes Aircraft*, 795 F. Supp. 965 (D. Ariz. 1992).

[18]   *Gulti v. Zuckerman*, 723 F. Supp. 353 (E.D. Pa. 1989).

[19]   149 F.3d 387, 398-400 (5th Cir. 1998).

[20]   *See also Lalonde, supra.*

alleging injuries caused by exposure to asbestos while working on United States Naval vessels under construction. The plaintiffs sued General Dynamics and 277 other defendants.[21] General Dynamics removed the case to federal court and based the removal upon 28 U.S.C. §1442(a)(1), the federal officer removal statute.

The *Fung* court acknowledged that a defendant is not entitled to federal officer removal simply because he is a participant in a regulated industry. However, the *Fung* court stated that the "control requirement can be satisfied by strong government intervention and the threat that a defendant will be sued in state court based upon actions taken pursuant to federal direction."[22]

Looking at the particular facts established by General Dynamics, the *Fung* court recognized that General Dynamics was under the direct control of the Secretary of the Navy and was authorized to build submarines under federal contracts. Most importantly, the *Fung* court considered important various other aspects of the relationship between the government and General Dynamics in denying plaintiff's motion for remand:

> While the government contracted defendant to build submarines in the instant case, it monitored General Dynamic's performance at all times and required the defendant to construct and repair the vessels in accordance with the applicable and approved specifications incorporated into the contracts. In addition, all contract supplies were subject to inspection, test, and approval by the government. The government also performed extensive dock and sea trials on the submarines prior to commission, to insure complete conformity with design specifications. Given the fact that defendant has established that the government, under the direction of the Secretary of Navy, exercised "direct and detailed" control over the construction of the vessels, the acting under requirement of §1442(a)(1) has been

---

[21]  816 F. Supp. at 570-71.

[22]  816 F.Supp. at 572.

satisfied.[23]

As will be shown, the DE 1078s on which plaintiff worked were built under government contract. In addition, the Avondale Interests were required to construct these vessels in accordance with applicable and approved specifications incorporated into the contracts. Moreover, all of the contract supplies, as in *Fung,* were subject to inspection, tests, and approval by the government. As in *Fung,* the government also performed extensive dock and sea trials on the ships prior to commission to insure complete conformity with design specifications.

Finally, the Avondale Interests were subject to rigorous safety standards incorporated into the contracts themselves and monitored on a regular and, in some cases, daily basis. In short, the Avondale Interests can demonstrate that the government, acting under the direction of the Secretary of Navy and numerous other federal officers, exercised direct and detailed control over the construction of the vessels on which it is alleged that the plaintiff sustained injury.

### D.   Contract Specifications

The DE 1078 Class Ocean Escort Vessel project, on which plaintiff worked, was the largest construction contract in the history of Avondale. A total of 20 Destroyer Escorts were built stem-to-stern at Avondale pursuant to the contractual provisions between Avondale and the United States Navy.[24] A close review of the contract provisions reveals the extraordinarily thorough control and supervisory authority exercised by federal officials at Avondale.

The contract at issue in *Fung* between General Dynamics and the United States Navy to construct submarines is very similar to the DE 1078 contract between Avondale and the United

---

[23]   816 F.Supp. at 572-73.

[24]   *See* Exhibit B.

States Navy.[25] Both contracts are "cascading" contracts; that is to say, contracts that contain general provisions referencing more and more specific provisions that are incorporated into the contract as the references "cascade" over one another.

The Avondale DE 1078 contract is built upon originating documents entitled "General Provisions" and "Special Provisions." The Special Provisions primarily concern themselves with contract amounts, payment schedules, performance updates, and provisions for contract amendment. The General Provisions, a form document used by the Navy as a template for its procurement contracts and referred to as "BUSHIPS [Bureau of Ships] Vessels Form," also relate to payment and inspection, but also to governmental liability, lien and title information, and proof of compliance with federal procurement law.[26] The Special Provisions, into which are incorporated the General Provisions, are executed by "Edward J. Haley, Contracting Officer, Bureau of Ships, Department of the Navy" on the one hand, and "Henry Z. Carter, President [Avondale Shipyards, Inc.]" on the other.

The Special Provisions cascade again with a reference in Article 2 thereof to the "Specifications for Building Ocean Escort DE 1078 Class," a set of extensively detailed construction specifications that provide more and more specific engineering information covering all aspects of the shipbuilding process.[27] These specifications, although themselves extremely detailed, refer to certain "Military Standards" that are military construction guidelines published by the United States

---

[25]  A copy of the General Dynamics contract is attached as Exhibit D.

[26]  The General Provisions and Special Provisions of the DE 1078 Contract are attached to the Affidavit of R.D. Church, attached as Exhibit E.

[27]  A copy of the "Specifications for Building Ocean Escort DE 1078 Class" is an Exhibit to the Affidavit of Ken Cantrelle, attached as Exhibit F.

government for inclusion-by-reference in military contracts.[28]   The Military Standards set forth

requirements for, among other things, materials used in the construction process, test procedures for

assuring compliance with government specifications, and techniques for the proper application or

use of materials or equipment.[29]

## E.    Certain Materials Must be Used

The most significant source of asbestos to which plaintiff could have been exposed while on-

board the DE 1078's during the construction process are the insulation materials applied to piping

and other machinery associated with the steam-driven engines built to power the DE 1078's when

underway.[30]   In order for Avondale to determine the kinds of insulation materials used in the

insulation process and the requirements for proper insulation installation, it is necessary to review

the section of the DE 1078 Specifications entitled "Thermal Insulation for Machinery, Equipment

and Piping." [31]   In that section, Avondale is bound by the requirements of a Military Standard

referenced as MIL-STD 769.[32]   MIL-STD 769B, the version of that standard effective at the

commencement of the contract on January 14, 1966, sets forth several Military Specifications that

---

[28]  *See* Affidavit of Gerald Labiche, attached as Exhibit G.

[29]  *See* Exhibit G.

[30]  *See* trial testimony of Leroy Rome given in *Douglas Abadie, et al. v. Metropolitan Life Insurance*, No. 424-010, 24th Judicial District Court for the Parish of Jefferson, State of Louisiana. Mr. Rome is a long-time insulator at Avondale who was called to testify by counsel for Owens-Corning Fiberglass, one of the defendants.  His testimony is a useful overview of how asbestos-containing insulation was installed at Avondale.  It is attached here as Exhibit H.

[31]  This section appears as Section 9390-2 at p. 252 of the DE 1078 Specifications, an exhibit to the Cantrelle Affidavit, Exhibit F.

[32]  *See* footnote 31.

mandate the nature and kind of materials that can be used in the insulation process.[33]  Among the

Military Specifications referenced in MIL-STD 769B are:

| | |
|---|---|
| MIL-C-2908 | Cements, finishing, Insulation |
| MIL-A-3316 | Adhesives, Fire-Resistant, Thermal Insulation |
| MIL-I-15091 | Insulation Felt, Thermal, *Asbestos* Fiber |
| SS-C-192 | Cement, Portland |
| SS-C-466 | Cloth, thread, and tape, *asbestos* |
| MIL-C-788 | Cloth, Brattice, cotton, fire-resistant |
| MIL-I-2818 | Insulation blanket, thermal, fibrous mineral |
| MIL-I-2781 | Insulation, pipe, thermal |
| MIL-I-2819 | Insulation block, thermal |
| MIL-C-2861 | Cement, insulation, high temperature |
| MIL-I-15091 | Insulation felt, thermal, *asbestos* fiber |
| MIL-A-15199 | Adhesive, *asbestos* cloth to pipe, insulation |
| MIL-I-15349 | Insulation tape, thermal |
| MIL-B-19564 | Bedding compound, thermal insulation pipe covering |
| MIL-C-19656 | Coating compounds, thermal insulation pipe covering, fire and water resistant, vapor barrier and weather resistant |
| MIL-C-22395 | Compound, end sealing, thermal insulation pipe covering, fire, and weather resistant |
| MIL-I-24244 | Insulation materials, thermal, with special corrosion and chloride requirements |
| MIL-P-52350 | Paper, *asbestos*[34] |

While clear from the descriptions of each Military Specification listed above that asbestos-containing

materials were mandated by the United States Navy, a sampling review of one or two of them is

further proof of the extent to which Avondale and its supervisors were required to use asbestos

containing materials.[35]

_____

[33]  A copy of the MIL-STD 769B is attached to the Affidavit of Gerald Labiche, Exhibit G.

[34]  Copies of the Military Specifications listed here are exhibits to the Labiche Affidavit, Exhibit G.

[35]  A specification-by-specification analysis of all of the detailed requirements of the DE 1078 contact is obviously impossible if this memorandum is going to remain manageable.  Nevertheless, the Avondale Interests have provided as exhibits an extensive sampling of the portions of the contract that bear on the question now before the Court.  The Avondale Interests invites the Court to review all of the exhibits in order to get the full flavor of the "direct and detailed" control

For example MIL-I-2819[36] is six pages long and sets forth requirements for materials, thicknesses, density, strength, thermal conductivity, packing-for-shipment, testing procedures, *etc.* for the procurement and use of block thermal insulation.  Beyond those specific requirements, a government contractor – in this instance Avondale – is required under §3.1 of MIL-I-2819 to abide as follows:

> The insulation block furnished under this specification shall be a product which has been tested, and passed the qualification tests specified herein, and has been tested and approved for listing on the applicable qualified products list.[37]

The applicable "qualified products list" referred to above is the object of the next "cascading" step taken in compliance with the terms of the DE 1078 contract.

A simple review of the referenced list – labeled in its heading "QPL-2819-32" – refers to product brand names and their manufacturers approved for use in compliance with MIL-I-2819. Some of those "qualified products" and their manufacturers are:

| | | |
|---|---|---|
| ♦ | Super Caltemp | Fibreboard Paper Products Corp., Pabco Industrial Insulation Division |
| ♦ | Pabco | Fibreboard Paper Products Corp., Pabco Industrial Insulation Division |
| ♦ | Thermobestos | Johns-Manville Sales Corp. |
| ♦ | Kaylo | Owens-Corning Fiberglas Corp. |
| ♦ | Careytemp Block Insulation | The Phillip Carey Manufacturing Co. |

---

exercised by the Navy.

[36]  MIL-C-2819 is attached as an exhibit to the Labiche Affidavit, Exhibit G.

[37]  *See* footnote 31.

♦      Calsilite                    Ruberoid Company

Not even the plaintiff would dispute that each and every one of the products listed above was, during

the contract's term, an asbestos-containing product.

The same exercise undertaken above can be undertaken for, as another example, MIL-I-1781,

the Military Specification for Thermal Insulation for Pipe.[38] The products and manufacturers listed

on the applicable QPL-2781-34 will be similarly familiar to the court and the parties because they

represent the bulk of the asbestos-containing products used at Avondale during the time plaintiff

worked there – namely, pipe covering.

As a final note, the Avondale Interests invite the Court to survey the various Military

Specifications and qualified products lists that are incorporated into the DE 1078 contract by virtue

of Military Standard 769B and attached as exhibits hereto.  The Court will discover that:

♦      The Military Specification for *Asbestos* Cloth, Thread and Tape (SS-
       C-466E) sets for the following requirement in paragraph 3.1:

       "*Asbestos* Cloth, Thread, and Tape shall be made of good-quality
       *chrysotile asbestos* and organic fiber."

♦      The Military Specification for High Temperature Cement Insulation
       (MIL-C-2861C) sets forth the following requirement at paragraph 3.1:

       "The insulation cement shall be composed of a dry mixture of
       refractory material of rock or mineral wool, *asbestos fibers,* and clay
       binder, thoroughly mixed to obtain uniform distribution of the
       ingredients."

♦      The Military Specification for *Asbestos* Fiber Thermal Insulation Felt
       (MIL-I-15091C) sets forth the following requirement at paragraph
       3.1:

       "The [Type A] insulation shall be composed of *asbestos fibers,* and

_____

        [38]   Copies of MIL-I-2781 and the applicable QPL-2781-34 are exhibits to the Labiche
Affidavit, Exhibit G.

cotton and binding materials if required."

"The [Type B] insulation shall be composed of *asbestos fibers,* treated with a suitable repellant agent, and a cotton fabric encasement."

"The *asbestos* fiber shall be *amosite.*"

- The Military Specification for *Asbestos* Cloth Adhesive (MIL-A-15199B) sets forth the following requirement at paragraph 3.1:

   "Fibrous adhesive cement shall be composed of a mixture of sodium silicate and short *asbestos fibers* thoroughly mixed to obtain uniform distribution of the ingredients.  The cement shall not contain any other materials which would have a deleterious effect upon metal, *asbestos* lagging and thermal insulation to which applied."

- The Military Specification for Thermal Insulation Tape (MIL-I-15349B) sets forth the following requirement in paragraph 3.1:

   "Thermal insulating tape shall be composed of woven *asbestos (chrysotile)* jacket enclosing an *asbestos fiber* or fiberglas felting or silver."

- The Military Specification for *Asbestos Paper* (MIL-P-52350) sets forth the following requirement in paragraph 3.1:

   "The *asbestos* paper shall be a single-ply, smoothly surfaced asbestos felting; or two-ply *asbestos* lamination."

- The qualified products list referenced in the Military Specification for metallic-*asbestos* spiral gaskets (MIL-G-16265D) lists as an approved gasket the product designated "Flexitallic."  [Emphasis supplied.]

In *Fung,* the Court found that removal was proper in part because General Dynamics had constructed the vessels "in accordance with the applicable and approved specifications incorporated into the contracts."[39]  The same is true for the Avondale Interests, inasmuch as the above-listed asbestos specifications are incorporated in the DE 1078 contract and made mandatory therein.

---

[39] *Fung,* 816 F.Supp. at 572-73.

### F.   Inspections of Materials and Workmanship

The "direct and detailed" control exercised by the United States Navy over the construction

of the DE 1078's was not limited to the mandatory use of asbestos-containing materials.  In fact,

Article 6 of the General Provisions authorized material inspection:

> All supplies (which term throughout this clause includes without
> limitation raw materials, components, intermediate assemblies, and
> end products) shall be subject to inspection and tests by the
> Government, to the extent practicable and *at all times and places*
> *including the period of manufacture or construction,* and in any
> event prior to final acceptance of the vessels[40] [emphasis supplied].

In addition to material inspection, the Navy was authorized to inspect all aspects of the ship

construction process, and even had the authority to suspend construction under Article 15 of the

General Provisions:

> The Contracting Officer may, at any time, and from time to time, by written notice
> to the Contractor, *suspend* in whole or in part the construction of the vessels[41]
> [emphasis supplied].

In order to accommodate the large number of inspectors called for under the contract,

Avondale was required to provide office space for Navy personnel under Article 8 of the Special

Provisions:

> ARTICLE 8.
>
> NUCLEUS CREW – A crew furnished by the Government of not to
> exceed fifty-four (54) persons referred hereinafter in this Article as
> the "Nucleus Crew" shall be present at contractor plant for a period
> of approximately six months for each vessel.  The facilities shall be
> available to the nucleus crew beginning six months prior to the
> contract delivery date or ship delivery date, whichever is earlier, and
> shall continue until the ship is delivered.  The nucleus crew shall have

---

[40]  A copy of the general requirements are attached to the Church Affidavit, Exhibit E.

[41]  *See also* the Affidavit of Peter Territo, attached as Exhibit I.

> access to Contractor's plant and to the vessels at all reasonable times
> during such periods. The Contractor agrees to furnish office facilities
> for ten (10) persons and conference room, suitably furnished, for daily
> meetings of the nucleus crew.[42]

Access to the vessels while under construction by the Navy Inspectors was unlimited.[43] Estimates

as to the number of Navy Inspectors at the Avondale Shipbuilding facility during the construction

of the DE 1078's at any given time ranged from between 50 to 100.[44]

Further specifics of the inspection regime of government officials at Avondale can be found

in the affidavits of Edward Blanchard, John Brinser and Peter Territo. Mr. Blanchard, who is now

retired, finished his career as the vice-president of production at Avondale. John Brinser, who was

head of the Quality Assurance Department at Avondale, was previously employed by Combustion

Engineering and has very detailed knowledge of the contract specifications and methods of insuring

compliance of those contract specifications.[45]

In sum, the inspection system – designed and implemented by the United States Navy to

ensure that the proper materials were used or installed and to ensure that these materials were

incorporated in the proper manner – was thorough, all-encompassing, and included the authority for

United States Navy inspectors to order that any problems found be corrected by Avondale prior to

acceptance of the vessels by the United States Navy.

### G.   Safety Inspections

Given the significant presence of Navy Inspectors at Avondale during the construction of the

---

[42]  *See* Exhibit I; and the Affidavit of Eddie Blanchard, Exhibit J.

[43]  *See* Article 9 of the Special Provisions.

[44]  *See* Exhibits I and J as well as the Affidavit of John Brinser, attached as Exhibit K.

[45]  *See* Affidavit of John Brinser, Exhibit K.

DE 1078's, it is not surprising that Navy personnel also undertook safety inspections.  In fact, the entirety of the Walsh-Healey Act was incorporated into the contract by reference.[46]  In addition, safety regulations promulgated by the Longshoremen and Harbor Workers' Compensation Act, as well as by the Department of Labor, were incorporated into the contract for the Destroyer Escorts by reference.[47]   Similarly, shipbuilding safety requirements appearing in the Code of Federal Regulations were incorporated by Clause 60 of the General Provisions, including regulations for respiratory equipment and ventilation.

Peter Territo, a former director of safety at Avondale who worked there during the construction of the Destroyer Escorts, spells out, in his affidavit, the pervasive exercise of supervision and control over all aspects of safety by the United States Navy and by other agencies of the United States Government.[48]  Mr. Territo's sworn statement, which is also supported by the sworn statements of John Brinser and Eddie Blanchard, relates his personal knowledge of the continuous exercise of safety supervision by government officials, including safety inspectors from the United States Navy, during the Destroyer Escort 1078 project.

Still more compelling evidence that the United States Navy had a safety inspection system in place at Avondale during the construction of the Destroyer Escorts was provided in sworn testimony given by Mr. Melvin Hebert, a plaintiff in an unrelated case brought by him to collect damages allegedly resulting from his exposure to asbestos at Avondale.  Mr. Hebert has sued Avondale, among others.

---

[46] *See* Article 44 of the General Provisions, attached to Exhibit E and the text of that law attached as an Exhibit to the Affidavit of Danny Joyce, Exhibit B.

[47] *See* Article 60 of the General Provisions, attached to Exhibit E.

[48] *See* Affidavit of Peter Territo, Exhibit I.

Mr. Hebert was a coordinator at Avondale and specifically performed his job on the Destroyer Escorts. A coordinator at Avondale had the job of receiving Navy deficiency reports that resulted from Navy inspections and routing those reports to the various Avondale craftsmen who were then instructed to correct any problems in the construction process found by Navy inspectors.[49]

In his deposition,[50] Mr. Hebert explained the inspection system on the Destroyer Escorts and there can be no doubt from reviewing his testimony that the Navy exercised very careful and attentive direction and control over the shipbuilding process at Avondale. Most importantly, at the end of his cross-examination, the following exchange took place:

> Q.    You've testified about your recollection of government inspectors on these jobs. Were you aware of the fact that, for example, on the Destroyer Escorts project, that there were daily safety walk-throughs by United States Navy inspectors?
>
> A.    Uh-huh.
>
> Q.    You were aware of that?
>
> A.    (Witness nods head affirmatively).
>
> Q.    Were you aware of the fact that, just like everybody else at Avondale, Mr. Territo and Mr. O'Donnell and the other safety persons at Avondale were supervised, and their activities were controlled and inspected by the United States Navy on a daily basis during the Destroyer Escorts project, for example?
>
> A.    Yes.[51]

---

[49] Dep. testimony of Mr. Melvin Hebert given on July 30, 1996 *In Re: Asbestos Plaintiffs v. Borden, Inc., et al.*, Civil District Court for the Parish of Orleans, State of Louisiana. This deposition transcript is attached as Exhibit L.

[50] Dep. of Melvin Hebert, Exhibit L, pp. 186-226.

[51] Dep. of Melvin Hebert, p. 226.

@PFDesktop:\ODMA\MHODMA\IMANAGE;PMLP.138969.1

**H.    Contract Specified Safe Handling Procedures For Asbestos**

The various safety regulations incorporated into the contract on the Destroyer Escorts project set forth specific dust control safety standards related to asbestos, as can be seen from reviewing the affidavit of Danny Joyce.  As can also be seen by reviewing that affidavit, the Walsh-Healey Act authorized the United States government to cancel any contract with a contractor who was found to be in violation of the safety standards.  The government was further authorized by law not to award another contract for three years to any firm responsible for violations, unless the Secretary of Labor recommended otherwise.  As stated by Mr. Territo in his affidavit, all of the asbestos safety regulations made part of the government contracts were enforced by continuous and regular inspections by the United States Navy and by safety inspectors from the Department of Labor.

**I.    Dock and Sea Trials**

In *Fung,* the court found that removal was proper in part because the "government also performed extensive dock and sea trials on the submarines prior to commission, to ensure complete conformity with design specifications."[52]  Similarly, United States Navy Inspectors were either present at or performed builder's trials, preliminary acceptance trials and final sea trials for each of the DE 1078's constructed at Avondale.[53]  Section 9080-1c of the Specifications provides for these trials as follows:

> Trials shall prove the ship to be in conformity with contract, applicable plans, and specifications.  Trials shall be conducted in the following sequence:
>
> -    Builders trials;
> -    Dock and sea trials;

---

[52]  816 F.Supp. at 573.

[53]  *See* Exhibits I and J.

    -    Preliminary Acceptance trial; and

    -    Final Acceptance trial.

\*      \*      \*

Builders trials will be witnessed by the Supervisor and other Navy Representatives. The preliminary acceptance trial will be witnessed by the Department's Board of Inspection and Survey and other Naval Representatives.

The Final Acceptance Trial will be conducted by, and at the expense of, the Department.[54]

The affidavits of Peter Territo, Eddie Blanchard and John Brinser establish that the testing procedures involving builder's trials, preliminary acceptance trials, and final sea trials were conducted, with Navy inspectors on-board, for each of the DE 1078's constructed at Avondale.

### J.   *Lalonde v. Delta Field Erection*

In *Lalonde v. Delta Field Erection, supra*[55], the court held that the federal government contractor, DSM, "was 'acting under an officer of the United States or of an agency thereof' for purposes of removal under §1442(a)(1)" because DSM "operated a federal government-owned facility, exclusively for the government, under the oversight and ultimate control of officers of the federal government."   While Avondale may not have been a government-owned facility, the work performed under the DE 1078 contract was performed exclusively for the government under the direct oversight and control of officers of the federal government.   This control was both overwhelming and pervasive and most decidedly meets the requirement that Avondale "acted under" the federal government.

---

[54]   *See* Exhibit F and attachments thereto.

[55]   *See* Exhibit A and the attached April 21, 1998 Order from United States District Judge Frank J. Polozola referring jurisdiction in *Lalonde* to the United States Magistrate Judge for decision.

In a detailed analysis, the *Lalonde* court concluded:

> Plaintiffs cite a number of district court decisions, such as *Overly v. Raybestos-Manhattan*, 1996 WL 532150 (N.D. Cal. 1996), which they contend requires the government contractor to show that the specific alleged acts giving rise to the underlying claims were also specifically directed by a federal officer. That is, plaintiffs argue that *Overly* and similar cases require a showing of a federal directive ordering DSM *not* to warn Lalonde of the hazards of silica dust or *not* to provide him with adequate protective equipment. The Court specifically rejects and declines to follow these lower court cases to the extent plaintiff urges their applicability to the context presented here.[56]

After specifically rejecting *Overly*[57] and other cases the plaintiff therein relied so heavily on in his

Motion to Remand, the court went on to state:

> The Court instead looks to Supreme Court precedent regarding application of §1442(a)(1) which reveals that, unlike the case with other removal statutes, there is no rule of interpretation disfavoring removal under §1442(a)(1). On the contrary, the statute is not "narrow" or "limited" and is not to be given a "narrow, grudging interpretation", the test for removal under §1442(a)(1) "should be broader, not narrower, than the test for official immunity."[58] Any requirement that a contractor who is running a federal production facility exclusively for the government has to show that the specified details of the negligent act were done only at the instance of precise and detailed instructions from a federal officer in order for the

---

[56] *Lalonde*, at p. 7.

[57] *Overly* is specifically founded on plaintiff's theory of liability being limited, unlike here, to a failure to warn theory: "In this case, the liability asserted by the plaintiffs is limited to the failure to warn theory of products liability." *Overly*, p. 8. Accordingly, Overly's progeny are likewise inapplicable, *e.g.*, *Gauthe v. Asbestos Corp.*, 1997 U.S. Dist. Lexis 112, p. 17 (E.D. La. Jan. 2, 1997)("Thus, no "design defect" allegations are made with respect to the Avondale Interests, and the failure to provide a safe work environment is limited specifically to the failure to warn."). Note, in this case, plaintiff does present a claim for errors in the design and construction/manufacturing process: "failing to use non-asbestos containing products including on jobs where non-asbestos containing products were specified."

[58] *Lalonde*, at p. 8 (citing *Willingham*, 395 U.S. at 405 & 406-07, 89 S.Ct. At 1815 & 1816, accord *Peterson v. Blue Shield of Texas*, 508 F.2d 55, 58 (5th Cir. 1975).

Page -27-

contractor to be "acting under" a federal officer is an "unduly grudging" requirement.

Every act taken in running the plant was taken under delegated federal authority. DSM **did not cease to be running the plant for and under federal authority when it made operational decisions (such as specific decisions regarding worker safety) within the ambit of its duties without a specific express federal directive as to the particulars, for DSM acted exclusively for and under the federal government in its operation of this facility.**[59]

Like DSM, Avondale acted exclusively for and under the federal government in its operation under the DE 1078 shipbuilding contract.   Although plaintiff urges this Court to find *Lalonde* inapplicable simply because the Avondale facility was not owned and operated by the United States Navy, this suggestion is erroneous because the basis for the federal officer defense is to:

[protect] against possible state interference with federal functions – regardless of whether the plant is being run directly by the United States or by a contractor retained and controlled by the federal government. Whether a federal officer directly mandated the specific alleged act of omission in question has little, if anything, to do with the core policy questions of whether federal interests potentially are impacted by the state court suit.[60]

As demonstrated in previous sections, (1) Navy officers and other government inspectors closely monitored compliance, on a daily basis, by Avondale with safety regulations made part of the contracts; (2) the use of asbestos insulation was required by the Navy and its officers; (3) asbestos safety regulations were specifically incorporated into the Navy contracts;  and (4) Navy inspectors constantly monitored the ship construction process for compliance with all terms of the contract.  Taken together, these facts establish that the Avondale Interests were "acting under" the direction of the federal government and that the causal connection is met because the acts

---

[59] *Lalonde*, at p. 8 (emphasis added).

[60] *Id.* at 9.

complained of were "under color" of federal office.

If it were otherwise, officers charged with the duty to implement federal policies could almost never carry out their duties. Under such a regime, federal law would be cold comfort because federal employees, state and local officials, and private persons would rarely agree to act under federal direction for fear of facing state and local civil or criminal penalties. Furthermore, if plaintiff's likely interpretations of the degree and nature of federal direction is correct, many courts, including the Supreme Court, have misread the statute.[61]

In *Lalonde* the court correctly noted that:

> the "causal connection" required in civil cases under Supreme Court precedent is of a different nature from that required in cases such as *Overly*. In particular, the governing precedents from the Supreme Court do not require a showing in a civil case that the alleged wrongful act or omission itself was specifically directed or compelled by federal duty or law. Rather, the controlling decisions require only a showing that the defendant committed the alleged act or omission while performing its federal duties.[62]

Accordingly, the "causal connection" inquiry is not whether the federal agent's alleged wrong was federally authorized, but rather whether the alleged wrong occurred within the course of the agent's performance of the agent's federal duties:[63]

> Mr. Lalonde was sandblasting in order to maintain and refurbish plant equipment for continued use. The question is not whether a specific

---

[61] See *Willingham v. Morgan*, 395 U.S. 402 (1969); *Cleveland, C., C. & I. R. Co. v. McClung*, 119 U.S. 454 (1886); *Tennessee v. Davis*, 100 U.S. 257 (1880); *Allman v. Henley*, 302 F.2d 559 (5th Cir. 1962); *Gurda Farms, Inc. v. Monroe County Legal Assis. Corp.*, 358 F. Supp. 841 (S.D. N.Y. 1973); *Dixon v. Georgia Indigent Legal Serv., Inc.*, 388 F. Supp. 1156 (S.D. Ga. 1974), *aff'd without opinion*, 532 F.2d 1371 (5th Cir. 1976); *State of Oregon v. Cameron*, 290 F. Supp. 36 (D.Or 1968).

[62] *Lalonde*, at 10.

[63] *Id.* at 11.

> federal law or order directed DSM not to warn Lalonde about the hazards of silica exposure (or even to maintain the plant equipment), but rather the question is whether that alleged failure to warn occurred while DSM was in the performance of its federal duties, *i.e.*, in the course of its operation of the plant as an agent for the federal government. The Court therefore holds that the requisite causal connection is satisfied here. To the extent that some lower district court cases would hold to the contrary, the Court specifically rejects the analytical underpinnings of those cases.[64]

Plaintiff has alleged that the Avondale Interests failed to provide plaintiff with any warnings about the potential hazards of asbestos. Plaintiff argues that the Avondale Interests alleged failure to warn is unrelated to any contract requirements for the use of asbestos.

First, this argument ignores that particular asbestos products and federal safety standards were specifically incorporated by reference into the contracts (such as the Walsh-Healey Act). Second, any allegation that plaintiff's claims are limited to a failure to warn are belied by his own petition. Plaintiff's assertions against the Avondale Interests include, among other things, claims for: (1) failing to provide to him respirators which, when worn, would prevent or reduce his inhalation of dangerous levels of asbestos dust and fibers; (2) allowing the use of asbestos-containing insulation or building products instead of substituting safer, alternative asbestos-free materials and products; (3) failing to warn or inform Mr. Landry regarding the dangers involved in inhaling asbestos dust and fibers; (4) failing to provide adequate ventilation and implement proper administrative and engineering controls to eliminate and/or reduce Mr. Landry's exposure to asbestos dust and fibers; (5) failing to conduct adequate air monitoring or dust sampling to detect asbestos in the air; and (6) failing to isolate work activities involving handling of asbestos and not wetting down asbestos when it was handled, in addition to allegations of strict liability.

---

[64] *Id.* at 12; See also, *Miller*, 275 F.3d at 418.

These contentions indisputably allege more than a mere failure to warn (which is demonstrated by plaintiff's own assertion in his Motion to Remand that "to the extent necessary" he is only asserting a failure to warn claim) and also certainly invoke the statutory duty found in Louisiana Revised Statute 23:13, which provides, in pertinent part as follows:

> Every employer shall furnish employment which shall be reasonably safe for the employees therein. They shall furnish and use safety devices and safeguards, shall adopt and use methods and processes reasonably adequate to render such employment and the place of employment safe in accordance with the accepted and approved practice in such or similar industry or places of employment considering the normal hazard of such employment, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees.

This statutory duty provides the basis for all so-called "executive officer" liability in Louisiana.[65]  It is extremely doubtful that plaintiff would limit his claim strictly to a failure to warn. Avondale and its supervisors had a duty under Louisiana Revised Statute 23:13 and under federal regulations to provide a safe workplace, not to simply warn its employees that the workplace was unsafe. The negligence alleged in this lawsuit cannot be disentangled from Revised Statute 23:13 because any state law duty owed by Avondale and its employees to other employees is derived from that statute.

An appreciation of this point is crucial because the implications are dispositive of the "causal nexus" issue as is demonstrated by plaintiff's attempt to now limit his claim to failure to warn and use of that impermissibly limited claim to distinguish all cases which are favorable to the Avondale Interests. First, unlike in a products liability case, there is no independent "failure to warn" cause of action that plaintiff can bring against his employer's supervisors. Second, the supervisors can

---

[65] *See e.g., Pisciotta v. Allstate Ins. Co.*, 385 So. 2d 1176, 1185 (La. 1980) (see n.1, p.1185, and accompanying text).

always raise as a defense that they used "devices and safeguards," and "methods and processes" that were "accepted and approved" in the shipbuilding and ship repairing industry. In the context of this lawsuit, the defense is and will be that Avondale complied with federal regulations and that this compliance was ensured by the pervasive surveillance of Avondale's activities by federal inspectors. Third, Avondale was compelled by officers of the United States to use asbestos-containing insulation and, thus, was not free to use the one "control measure" available under the Walsh-Healey Act that would have completely eliminated the potential hazard, e.g., using non-asbestos insulation. Fourth, federal asbestos requirements did not require all employees who might be exposed to asbestos to wear respirators, but also prohibited the use of respirators except where acceptable "control measures" were impractical to create safe asbestos dust levels. Fifth, Avondale was not required by federal law to completely enclose or isolate asbestos insulation work so long as safe asbestos dust levels were maintained, through the use, if necessary, of other control measures such as dilution and exhaust ventilation, "methods and processes" approved by federal law.

In short, considering the allegations, affidavits, and testimony before the Court, the Avondale Interests have met the "causal nexus" test - *i.e.*, they have shown that they have been sued in state court for actions taken pursuant to federal direction, *i.e.*, compliance with military specifications promulgated and enforced by the U.S. Navy.[66]

---

[66] See, *e.g.*, *Akin v. Big Three Indus., Inc.*, 851 F. Supp. 819, 823-24 (E.D. Tex. 1994) (stating, "plainly, when a government contractor builds a product pursuant to Air Force specifications and is later sued because compliance with those specifications allegedly causes personal injuries, the nexus requirement is satisfied"); *Teague v. Bell Helicopter Servs.*, 2003 U.S. Dist. Lexis 2088 (N. D. Tex. 02/12/2003)(asbestos plaintiff's motion to remand denied where helicopter manufacturer acted pursuant to the directions of the federal government in contracting to design and manufacture military helicopters. (A copy of *Teague* is attached as Exhibit "O"); *Williams v. Todd Shipyards Corp.*, 1996 U.S. Dist. LEXIS 22676 (S.D. Tex. Mar. 29, 1996)(asbestos plaintiff's motion to remand denied where shipyard that produced military vessels "demonstrated a causal nexus between the claims against and the acts it performed under color of federal office.").

### K.   *Blackman v. Asbestos Defendants*

In *Blackman v. Asbestos Defendants*,[67] the court denied the plaintiff's motion to remand in a case strikingly similar to the case at hand.  The defendant, Thiokol Corporation  ("Thiokol"), participated in the "design testing, manufacture and assembly of solid rocket motors for the Minuteman Missile", a ballistic missile weapons system of the United States Government.[68] Thiokol produced First Stage and Third Stage solid rocket motors under direct contract with the United States Air Force ("USAF").

Other than the substitution of the USAF for the U.S .Navy, the facts are nearly identical to those at hand.  Just like the Avondale  DE 1078 contract, the USAF provided and approved all drawings, specifications and applicable data to Thiokol for the Third Stage solid rocket motors.  The contract between the USAF and Thiokol mandated that Thiokol conform to those specifications.  All changes to the specifications had to be approved by USAF officials and on-site USAF officials monitored the production phase of the Stage Three motors.   The specifications and drawings mandated the use of asbestos materials; "specifically drawing number 1144378 require[d] the use of asbestos felt, and drawing number 1128524 specifi[ed] the use of a rubber substance, partially made with asbestos fibers."[69]

Like the dock and sea trials designed to meet the performance expectations of the U.S. Navy, in *Blackman,* the USAF contracted with Thiokol to produce and design Fist Stage rocket motors to

---

(A copy of *Williams* is attached as Exhibit "P")

[67]  No. C-97-3066, 1997 WL 703773 (N.D. Cal. Nov. 3, 1997), attached as Exhibit "M".

[68]  *Id.* at p. 1.

[69]  *Id.* at p.1.

meet the USAF's performance specifications. The USAF officials maintained an on-site office at

Thiokol to review and approve the design phase of the First Stage rocket motor's production. The

USAF also monitored, reviewed and approved all changes to the solid rocket motor's development

phase. Notably, the drawings and specifications for the Stage One rockets also required the use of

asbestos materials.

In *Blackman*, the plaintiff was employed by Kaiser Aerospace & Electronics ("Kaiser") who

assembled the First Stage and Third Stage rocket motor parts for Thiokol in the 1960's and 1970's.

Plaintiff allegedly drilled holes in the "cones used on various missiles that had two types of asbestos

insulation lining the inside of them."[70] Plaintiff filed suit against various defendants for negligence,

strict liability, false representation, intentional tort and conspiracy with regard to his asbestos-related

personal injuries and Thiokol timely removed on the basis on federal officer removal jurisdiction

under 28 U.S.C. §1442(a)(1).

Pertinent to the court's discussion of the "acting under" requirement, the court found as

follows:

> The USAF directly controlled the design and development o the First
> Stage solid rocket motors. Thiokol contracted the manufacture these
> motors in accordance with design drawings and specifications
> submitted by Thiokol. The USAF asserted direct control by
> maintaining and on-site office at Thiokol to review, monitor, and
> approve the development and manufacturing of the First Stage
> motors. The drawings and specifications required the use of asbestos
> materials.
>
> The USAF also contracted with Thiokol to produce Third Stage solid
> rocket motors. The USAF supplied Thiokol with drawings and
> specifications to manufacture these motors. The USAF's designs
> required the use of asbestos material. Any design changes required
> USAF approval, and on-site officials monitored the production.

---

[70] *Id.*

> Accordingly, the Court finds that Thiokol was "acting under" the
> direct control of the USAF and its agents when manufacturing the
> Stage Three motors and designing the Stage One motors.[71]

The court went on to hold that because "Thiokol 'acted under' the direct control of the USAF

and its agents, there is a causal nexus."[72]

Finally, the court also addressed the issue of whether Thiokol had a colorable claim to a

federal defense.   In holding that Thiokol had raised a colorable defense, the court noted the

following:

> The USAF provided Thiokol with drawings and specifications to
> produce Third Stage solid rocket motors.  The USAF was also
> intricately involved with the production of the First Stage motors.
> The Court does not have to decide whether defendants' claims are
> meritorious.  *Fung*, 816 F. Supp. at 873.  As a result, the Court finds
> that Thiokol raised a colorable defense with regard to the first two
> prongs of the *Boyle* test.
>
> Finally, although Thiokol's papers do not allege that they warned the
> USAF of asbestos hazards, Thiokol satisfies the third prong of the
> *Boyle* test.  Thiokol is not an asbestos manufacturer; rather, Thiokol
> manufactures solid rocket motors for military missiles. **Thiokol had
> no greater opportunity to know of the dangers of asbestos in the
> 1970's than did the USAF, and therefore, did not owe a duty to
> warn the USAF of the asbestos hazards.**  As a result, Thiokol has
> successfully raised a colorable federal defense.[73]

Like Thiokol, Avondale is not an asbestos manufacturer, Avondale manufactured ships for

the U.S. Navy.  Like Thiokol, Avondale had no greater opportunity to know of the dangers of

---

[71]  *Id.* at p.2 (*citing Fung*, 816 F. Supp. at 573 (holding that constructing and repairing
submarines in accordance with specifications, approved by the Secretary of the Navy, satisfied the
"acting under" requirement); *see also Pack*, 838 F. Supp. at 1103 (holding that a supplier,
manufacturer, and designer of turbine generators, "acted under" the supervision of the "Secretary of
the Navy or the United States Maritime Commission or their agents").

[72]  *Blackman*, at p. 2.

[73]  *Id.* at 3.

asbestos in the 1970's than did the U. S. Navy, and therefore, Avondale did not owe a duty to warn the U.S. Navy of the asbestos hazards.    As the court in *Blackman* correctly recognized, any argument that the government contractor defense is inapplicable to the Avondale Interests because they allegedly failed to warn plaintiff of the dangers of asbestos is fatally flawed and should not be allowed to circumvent the protections intended by 28 U.S.C. §1442(a)(1).

**L.    The Avondale Interests Can Assert Colorable Federal Defenses**

The third prong of the test for removal requires that a removing party demonstrate it can assert a *colorable* federal defense to the claims made against it.  As explained in detail in *Mesa*:

> For purposes of removal, we only require [the removing party] to allege a colorable federal defense under federal law; "[t]he validity of the defense authorized to be made is a distinct subject.  It involves wholly different inquiries .... It has no connection whatever with the question of jurisdiction."[74]

The Avondale Interests' federal defense is the immunity provision contained in the Longshore and Harbor Workers' Compensation Act ("LHWCA") at 33 U.S.C. §933(i).  Under the third prong of the federal officer removal statute test, this defense need only be *colorable* to be sufficient.  33 U.S.C. §933(i) sets forth, in pertinent part, as follows:

> The right to compensation or benefits under this Act shall be the exclusive remedy to an employee when he is injured, or to his eligible survivors or legal representatives if he is killed, by the negligence or wrong of any other person or persons in the same employ: Provided, that this provision shall not affect the liability of a person other than an officer or employee of the employer.

The executive officers are persons who, at the time of the alleged delicts, were persons in the same employ as plaintiff, and an officer of plaintiff's employer, Avondale.  Avondale, likewise, qualifies as an "employer" under the LHWCA because it is in the business of building and repairing ships at

---

[74]  109 S.Ct. at 964, *quoting The Mayor v. Cooper*, 6 Wall 247, 254, 18 L.Ed. 851 (1868).

a facility situated adjacent to the navigable waters of the Mississippi River.[75]  Accordingly, under the immunity provisions of the LHWCA [33 U.S.C. §933(i)] plaintiff cannot make valid claims against the Avondale Interests.  Simply put, the Avondale Interests are asserting a colorable defense under the LHWCA that has not been rejected by any binding federal authority.

That such a defense is at least colorable is demonstrated in the case of *Fillinger v. Foster.*[76]  In *Fillinger*, the Alabama Supreme Court was faced with a factual and legal scenario directly on point with the instant action.   In *Fillinger*, a "shipfitter"[77] was injured within the concurrent jurisdiction of the LHWCA and the Alabama State Workers' Compensation Act.  After applying for his state compensation benefits, the plaintiff instituted suit against one of his co-employees who was alleged to have had the specific responsibility for his safety.  The parties did not dispute that the case fell within a zone of concurrent federal and state jurisdiction.  Neither did they dispute that the Alabama Workers' Compensation Act did *not*, at that time, provide for co-employee negligence immunity, while the LHWCA did.  The co-employee tort-feasor resisted the application of state law arguing LHWCA pre-emption.

The *Fillinger* court discussed the Louisiana Supreme Court's decision in *Poche v. Avondale Industries, Inc,* 339 So.2d 1212 (La. 1976):

> The Louisiana Supreme Court held that a land-based maritime
> employee covered by the LHWCA could sue a co-employee under
> that state's workmen's compensation law.  Earlier, Louisiana had

_____

[75]  *See* Affidavit of Territo, Exhibit I.

[76]  448 So.2d 321 (Ala. 1984), *cert denied*, 469 U.S. 872, 105 S.Ct. 223, 83 L.Ed.2d 153 (1984).

[77]  The plaintiff, classified by his employer as "shipfitter," was engaged at the time of his injury in operating a hand held grinder to smooth out welds on storage tanks that were being installed on ocean-going vessels at his employers' dockside facility.  *Fillinger*, 448 So. 2d at 322.

> merely recognized the overlap in compensation benefit levels only. The rationale of the *Poche* court was based on the election of remedies doctrine which has been severely criticized by the authorities and which has been held to be inapplicable in a case involving the LHWCA. The *Poche* court's decision was also based upon an interpretation of Louisiana's Workmen's Compensation law and upon prior Louisiana court decisions. ***The Poche decision was rendered before the Supreme Court's decision in Sun Ship, supra, wherein the court indicated that in a case involving the LHWCA and a state workmen's compensation scheme in which there was an indisputable preclusion of LHWCA remedies, the federal law would "pre-empt the state compensation exclusivity clause."*** We consider the *Poche* and *Umbehagen* decisions in view of these statements of the law in *Sun Ship, supra.* [*citations omitted and emphasis supplied.*]

*Fillinger, supra,* at 325. After drawing from supporting jurisprudence, the court reminded the litigants of the purpose of 33 U.S.C. §933(i) of the LHWCA which provides for co-employee immunity:

> The 1959 amendment to §[9]33 simply recognizes the problem [of co-employee suits] and solved it by forbidding such an action. In other words, the 1959 amendment to §[9]33 of the Act not only does not limit the provisions of §[90]5, but broadens them by insulating not only the employer, but also the fellow employees of the injured party from any liability and damages to the injured party. This is made clear by the legislative history of the amendment. *U.S. Code and Congressional and Administrative News*, 86th Cong., First Session 1959, Vol. 2, pages 2134-2136.

*Fillinger, supra,* at 326, quoting *Barnum v. SS MORMACTEAL*, 188 F.Supp 763 (E.D. Pa. 1960).

The court quoted directly from the Senate Report, referenced above, that explained how important it was for disputes within the "employee family" to be resolved within the framework of the LHWCA. Armed with that understanding of the precise holding in *Sun Ship*, the Alabama Supreme Court had no alternative:

> We are of the opinion that the LHWCA and the law of Alabama are in serious conflict as to the maintenance of co-employee suits, and because that is the case, we hold that federal law will preempt state

law. [*citations omitted.*]

*Fillinger, supra,* at 326.

Finally, it is without serious dispute that federal law governs the question of whether the LHWCA preempts state law.[78] In *Peter v. Hess Oil Virgin Islands Corp.*[79] and *Cobb v. Sipco Serv. & Marine, Inc.*[80] both courts held that where immunities available under state law and under the LHWCA are deemed to be conflicting, the LHWCA preempts strictly for that contradiction only. These decisions, along with the United States Supreme Court in *Sun Ship*, make clear that the United States Congress intended that disputes between longshore workers be resolved within the exclusive framework of the LHWCA.

## M.   Federal Contractor Immunity

In addition to the defenses available to the Avondale Interests under the LHWCA, the Avondale Interests also assert federal contractor immunities as a defense. The standard for that defense was set out by the United States Supreme Court in *Boyle v. United Tech. Corp.*[81] There, the Court held that the federal contractor defense is derived from the government's own immunity when performing discretionary functions, such as design selection for military equipment.[82]   To prevail under the federal contractor defense, the Avondale Interests have the burden of proving that: (1) reasonably precise specifications were approved by the United States; (2) the DE 1078's on which plaintiff worked conformed with those specifications, and (3) the Avondale Interests warned the

---

[78]  *Hetzel v. Bethlehem Steel Corp.*, 50 F.3d 360, 363 (5th Cir. 1995).

[79]  903 F.2d 935 (3rd Cir. 1990).

[80]  No. 95-2131, 1997 WL 159491 (E.D. La. March 27, 1997) attached as Exhibit N.

[81]  487 U.S. 500, 512, 108 S. Ct. 2510, 101 L.Ed. 2d. 442 (1988).

[82]  *Boyle,* 487 U.S. at 511.

United States of all dangers then known in using the asbestos-containing components the United States required be installed on those vessels that were unknown to the United States itself.[83]

Due to the similarity of the requirements between the test for federal officer removal and the first and second prongs of the test for the federal contractor defense, for the same reasons set out above that establish that the Avondale Interests satisfy the jurisdictional analysis, they also satisfy the first prongs of the federal contractor defense. The Avondale Interests always conformed to the exceptionally precise specifications for the construction of the DE 1078s that were drafted and approved by the United States Navy. Further, the vessels constructed at Avondale were ultimately accepted for delivery by the United States Navy following extensive inspections during construction and dock and sea trials thereafter. Thus, the vessels constructed at Avondale conformed with the specifications drafted and enforced by the United States Navy.

As to the last prong of the federal contractor defense, given the extensive presence and control of the construction of the DE 1078s by the United States Navy, the incorporation of the Walsh-Healey Act and safety regulations promulgated by the Longshoremen and Harbor Workers Compensation Act, as well as of the Department of Labor, into the contracts , it is also clear that Avondale had no knowledge of any dangers associated with the use of asbestos about which the United States government was not aware.

While there is **no** evidence that the Avondale Interests knew of any dangers in using asbestos about which the United States was not already aware, the Avondale Interests need not establish their ability to satisfy this third prong of the government contractor defense at this stage of the proceedings. Rather, they need only provide a "colorable" defense to justify the removal of this case

---

[83] *Id.* at 512, and *Winters v. Diamond Shamrock Chemical Co.*, 148 F. 3d 7, 400 (5th Cir. 1998).

under the federal officer removal provisions. Accordingly, as with the LHWCA defense, to determine whether a federal defense is "colorable" for jurisdictional purposes, a court should not delve into "the validity of the defense", which is "a distinct subject" and "involves wholly different inquiries apart from jurisdictional determination." *Faulk v. Owens-Corning Fiberglass Corp.*.[84] Therefore, the ultimate merits of the federal contractor defense asserted by the Avondale Interests should not be resolved here, while the "colorable" nature of the defense establishes that this removal was proper.

## N. Other Recent Decisions Also Support Removal

In addition to the recent *LaLonde* ruling discussed above, two other very recent rulings from other divisions of this District, which were cited in the Avondale Interests Notice of Removal and are briefly discussed in plaintiff's Motion to Remand, also establish that the federal officer removal here was appropriate.

In *Delancey, et al. v. General Electric, et al.*,[85] Judge Feldman denied plaintiff's motion to remand on April 1, 2004. There, General Electric ("GE") removed a similar asbestos case to federal court under the federal officer removal provisions asserting that the construction of GE turbines and the requirements that the turbines contained asbestos components to which plaintiff alleged he was exposed were subject to the specifications and control of United States government, specifically the United States Navy. Judge Feldman found that GE acted under the color of federal office for purpose of removal when it included asbestos-containing components in its turbines as required by the Navy specifications.

---

[84] 48 F. Supp. 2d 653 664 (E.D. Tex. 1999).

[85] U.S.D.C., E. Dist. La. No. 04-431, a copy is attached hereto as Exhibit Q.

The *Delancey* case is further similar to the instant matter in that, GE also asserted federal contractor immunities as its "colorable" federal defense. There, Judge Feldman also undertook an analysis of the requisites for sustaining removal based on federal contractor immunities providing the colorable defense set out in the United States Supreme Court case of *Boyle*, *supra*. And, as in *LaLonde*, Judge Feldman found that "although the ultimate applicability of the government contractor defense is yet to be satisfied, General Electric provided a colorable defense sufficient to require resolution of the case in a federal forum."[86]

A virtually identical ruling was even more recently rendered by Judge Thomas Porteous on April 20, 2004, in the case of *Fink v. Todd Shipyards, et al.*, Eastern District No. 04-430.[87] Once again, Judge Porteous found that federal officer removal was appropriate due to the Navy's control over the turbines made by G.E. Judge Porteous further agreed that G.E. established a "colorable" defense of federal contractor immunity and, once more, noted that "the moving party need not prove his case prior to removal, nor should the policy of protecting federal officers be "frustrated by a narrow, grudging interpretation of Section 1442 (a) (1)."[88] Judge Porteous also favorably cited the United States Supreme Court opinion in *Williamham* for the proposition that "removal under 28 U.S.C. 1442 (a) (1) is broadly construed."[89]

In his Motion to Remand, plaintiff asserts that the *Delancy* and *Fink* decisions are distinguishable from the case at hand. On the contrary, as plaintiff states, in those matters, "the

---

[86] *Delancey*, at page 6.

[87] A copy is attached hereto as Exhibit R.

[88] *Id.* at page 5, citing, *Willingham v. Morgan*, 395 U.S. 402, 89 U.S. S. Ct. 1813, 1816, 23 L. ed. 2d 396 (1969).

[89] *Id.* at page 6.

Page -42-

turbine's defective condition (its use of asbestos) was the direct result of the government's instructions."[90] Here, the same is true. The Avondale Interests' use of asbestos on the DE 1078s was the direct result of the government's instructions as has been thoroughly demonstrated above. Plaintiff attempts to distinguish the two situations merely by pointing out that he is making a failure to warn claim which was not the issue in the case of GE. However, as has been discussed, at the time of the filing of his petition, plaintiff was not simply making a failure to warn claim and he has simply attempted to manipulate his claims in an attempt to avoid this forum.

Plaintiff's counsel here was also counsel for plaintiff in *Fink*. In plaintiff's Motion to Remand in *Fink*, plaintiff framed the causal nexus test in this way: If GE could show that the federal government ***required*** GE to use asbestos (as opposed to some other safer substitute) the causal nexus test would be met.[91] In so doing, the plaintiff was essentially peddling a suitable version of the *Overly* causal nexus test to serve his needs. The Court, however, refused to acknowledge that plaintiff's version of the causal nexus test was a legitimate one.

In this case, plaintiff asserts that the causal nexus test cannot be met unless the government forbids the issuance of warnings. Plaintiff's manipulation of the mutability of *Overly* is a demonstration that the test itself is prone to abuse. But even if this Court applies the *Overly* test, the Avondale Interests can satisfy even the most demanding of its many versions because (1) the Navy required extensive use of asbestos aboard the DE 1078s and (2) the plaintiff accuses the Avondale Interests of failing to substitute asbestos-free alternatives. Although plaintiff here ignores that he makes claims beyond mere "failure to warn," he nevertheless bravely maintains his articulation of

---

[90] Plaintiff's Motion to Remand, page 11.

[91] Plaintiff's Motion to Remand, page 6, *Fink v. Todd Shipyards, et al.*, attached as Exhibit T.

the *Overly* test on page 11 of his memorandum as part of his attempt to distinguish *Fink*:

> Thus, the turbine's defective condition (its use of asbestos) was a direct result of the government's instructions. A causal nexus, therefore, was established between the government's actions and the plaintiff's injuries.

At some point, somewhere, some defendant is going to satisfy a causal nexus test that does not depend on the whim or the artful pleading of a plaintiff's petition.

One final decision supportive of the removal in this case can be found in Judge Kathleen McDonald O'Malley's ruling in *In Re*: Welding Rod Products Liability Litigation from the United States District Court for the Northern District of Ohio, Eastern Division.[92] Once again, the Federal Court found that the welding rod manufacturers there had properly removed the case under the federal officer provision due to the specific and precise contracts the Navy imposed on the welding rod manufacturers for the manufacture and composition of their welding rods. And, once more, the Court found that the military contractor immunities asserted by the welding rod manufacturers satisfied the requirement that the defendant establish a "colorable federal defense to the state law claims."[93]

Based on the foregoing and, specifically, these recent rulings in favor of removal under the federal officer provisions from this District, the Avondale Interests' removal of this matter is appropriate and plaintiff's Motion to Remand should be denied.

## O.     Plaintiff's Motion for Attorney's Fees and Costs

At the outset, the Avondale Interests have demonstrated that removal of this matter to this Court was proper and made in good faith. For that reason alone, plaintiff's motion for attorney's fees

---

[92] No. 1:03-CV-17000 (MDL Docket No. 1535), attached as Exhibit S.

[93] *Id.* at pp. 14-24.

and costs should be denied. Additionally, the Avondale Interests note that plaintiff failed to comply with Federal Rule of Civil Procedure 11 by failing to serve his motion for attorney's fees and costs pursuant to Federal Rule 5 and waiting the requisite 21 days after service for the pleadings to be withdrawn or corrected. For that reason also, plaintiff's motion for attorney's fees and costs should be denied.

## IV.  CONCLUSION

Plaintiff alleges that he sustained asbestos-related injuries while performing work at Avondale due to the fault of certain of Peter Territo, his co-employee (alleged executive officer), and Avondale itself. The United States Navy strictly supervised all facets of the Navy DE 1078's ship construction project, the largest in Avondale's fifty year history. Inspection of the asbestos-containing materials required by the DE 1078 contract specifications were regularly performed, and United States Navy inspectors closely monitored the safe application of those materials during all phases of construction.

The claims made against the Avondale Interests are based on the alleged failure to provide plaintiff with a safe working environment, free from the dangers of asbestos. However, the contract specifications mandated that asbestos-containing materials be used, and the United States Navy inspected those materials and the application of those materials. Moreover, the United States Navy, armed with the authority to suspend any part of the construction process, supervised the safe handling of materials and all other work place conditions as part of a safety regimen established under contract.

Furthermore, there is no distinction between the recent cases of *Delancey* and *Fink, supra*, despite plaintiff's assertions, where the Court denied motions to remand. The claim is the same - the use of asbestos at the instruction of the government caused injury to the plaintiff. Ralph Landry

specifically alleges in his Petition for Damages that the Avondale Interests allowing the use of asbestos containing materials rather than substitute asbestos free materials caused his damage. He cannot distinguish the case at hand from *Delancey* and *Fink* by attempting to limit his claim to a failure to warn theory solely for the purposes of his Motion to Remand. Accordingly, a causal nexus exists between the claims made against the Avondale Interests and the acts performed by them under explicit government direction.

Finally, the Avondale Interests have asserted two colorable federal defenses to these state law claims, immunity from negligence actions for damages arising from plaintiff's work at Avondale under 33 U.S.C. §933(i), Avondale itself is immune under 33 U.S.C. §905(a), and/or federal contractor immunities. Accordingly, all three parts of the three prong test under 28 U.S.C. §1442(a) have been met. Therefore, plaintiff's Motion to Remand must be denied.

Respectfully submitted:

PLAUCHÉ MASELLI
LANDRY & PARKERSON L.L.P.

Andrew L. Plauché, Jr. (Bar No. 11023)
Wendy K. Lappenga (Bar No. 24512)
201 St. Charles Avenue, Suite 4240
New Orleans, Louisiana 70170-4240
Telephone:    504.582.1142; Fax: 504.582.1172
Attorneys for Peter Territo

and

Gordon P. Wilson, La. Bar No. 20426
Lugenbuhl, Wheaton, Peck, Rankin & Hubbard
601 Poydras Street, Suite 2775
New Orleans, LA 70130
Telephone:    504-568-1990; Fax: 504-310-9195
Co-Counsel for Peter Territo

and

_Ed Ellinghausen_

Brian C. Bossier, T.A., Bar No. 16818
Edwin A. Ellinghausen, III, Bar No. 1347
Christopher T. Grace, Bar No. 26901
Jason T. Little, Bar No. 28403
Erin H. Boyd, Bar No. 20120
Blue Williams, L.L.P.
3421 North Causeway Boulevard, Ninth Floor
Metairie, Louisiana 70002
Telephone: 504-831-4091; Fax: 504-849-3022
Attorneys for Northrop Grumman Ship
Systems, Inc. f/k/a Avondale Industries, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served on all counsel of record by

placing a copy of the same in the United States mail, postage pre-paid and properly addressed, this

2nd day of November, 2004.

