**875**

### UNITED STATES OF AMERICA
### JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**JUL 2 6 2005**

FILED
CLERK'S OFFICE

| | | |
|---|---|---|
| CHARLES E. HAMRICK and<br>WANDA HAMRICK, his wife, | MDL-875 | |
| Plaintiffs, | | |
| v. | Civil Action No. 2:05-0287 | |
| A & I COMPANY, et al., | | |
| Defendants. | | |

### DEFENDANT McDONNELL DOUGLAS CORPORATION'S
### OPPOSITION TO PLAINTIFFS' MOTION TO
### VACATE CONDITIONAL TRANSFER ORDER

### INTRODUCTION

Comes now defendant McDonnell Douglas Corporation ("MDC") and files this Opposition to Plaintiffs' Motion to Vacate Conditional Transfer Order to transfer this action as a tag-along action to the Multi-District Litigation ("MDL") No. 875 In Re Asbestos Product Liability Litigation proceedings in the United States District Court for the Eastern District of Pennsylvania ("MDL 875"), on the following grounds:

1.      Plaintiffs fail to articulate, let alone make the requisite strong showing for, any valid basis for this Panel to vacate its June 6, 2005 Conditional Transfer Order ("CTO") to transfer this related tag-along asbestos action from the Southern District of West Virginia to MDL-875.

2.      There is nothing unique about this case, including Plaintiffs' belated Motion to Remand, that warrants vacating the CTO – simply stated, this action is

{C0962802.1}551286.1

## OFFICIAL FILE COPY

IMAGED JUL 2 7 2005

similar to thousands of asbestos personal injury actions that have been transferred from federal district courts throughout the country to MDL-875 for coordinated proceedings ever since MDL-875 was established in 1991, and similar to thousands more such actions that no doubt will continue to be transferred to MDL-875 in the future.

3.     Vacating the CTO based on the conclusory reasons advanced by Plaintiffs would completely undermine the primary reason for having MDL proceedings in general, and the main purpose of MDL-875 in particular.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     SUMMARY

Defendant McDonnell Douglas Corporation ("MDC") respectfully submits that this Panel should deny Plaintiffs' request to vacate the Conditional Transfer Order ("CTO") the Panel issued on June 6, 2005, conditionally transferring this related tag-along asbestos action to the Multi-District Litigation ("MDL") No. 875 In Re Asbestos Product Liability Litigation proceedings in the United States District Court for the Eastern District of Pennsylvania ("MDL-875"), for the simple reason that Plaintiffs have not articulated any legitimate reason for doing so.

As this Panel knows, a party seeking to vacate a CTO must make a strong showing on specific grounds for such relief before it can be granted.  Here, Plaintiffs fall far short of that meeting that burden.  While Plaintiffs claim that the CTO should be vacated because this action is purportedly "unique" – allegedly because Plaintiffs filed a belated motion to remand the case – and transfer to the MDL proceedings would not promote judicial economy, they altogether fail to

explain or substantiate those conclusory allegations.  Contrary to Plaintiffs' bald assertions, this asbestos action, including Plaintiffs' tardy remand motion, is not unique so as to warrant vacating the CTO, nor will transferring the action to MDL 875 defeat goals of judicial economy or unduly inconvenience the parties. Accordingly, Plaintiffs' Motion should be denied.

## II.   **BACKGROUND**

Plaintiffs Charles E. Hamrick and his spouse Wanda Hamrick initially filed this asbestos personal injury action in the Circuit Court of Kanawha County, West Virginia (the "State Court") (Case No. 05-C-54), on February 4, 2005, against thirty-three defendants, including MDC.   Plaintiffs allege that Mr. Hamrick contracted mesothelioma caused by exposure to asbestos during his entire working career, including while he served in the United States Air Force ("USAF") and, after retiring from the military, while he worked for the DOD at the following USAF military bases, from 1952 to 1995:  Andrews AFB in Maryland, Edwards AFB in California, Weisbough AFB in Germany, and Eglin AFB in Florida. Plaintiffs allege that, while stationed at these U.S. military bases, Mr. Hamrick was exposed to asbestos from the various defendants' respective products, including asbestos in C-47, C-118, C-133, B-66 and F-101 aircraft (hereinafter the "Subject Aircraft") built by MDC for the USAF, pursuant to military equipment procurement contracts with the United States Government, Department of Defense ("DOD" or "Government").   See Deposition of Charles Hamrick ("Plaintiff's Depo.") at pp. 31:3-48:12, attached as Exhibit A).

On April 6, 2005, MDC removed this personal injury asbestos case from the State Court to the United States District Court for the Southern District of West Virginia on "federal officer" and "federal enclave" removal jurisdiction grounds.  On April 27, 2005, MDC filed a Notice of Potential Tag Along Action, requesting this Panel to transfer this action as a related tag-along action to the

{C0962802.1}551286.1

MDL-875 proceedings before the Honorable Charles Weiner to the United States District Court for the Eastern District of Pennsylvania, where all asbestos product liability cases pending in the federal courts are to be transferred for coordinated pre-trial matters. MDL 875 was established in 1991, and since that time, Judge Weiner has disposed of tens of thousands of asbestos suits.[1]

On June 6, 2005, the MDL Judicial Panel Clerk issued a conditional transfer order ("CTO") transferring this case to MDL 875, as anticipated.

On June 7, 2005, MDC filed in the Southern District of West Virginia a Motion to Stay the action pending transfer of the action to MDL 875. Plaintiffs never filed any opposition to that motion before the Court issued a stay order on June 14, 2005. Plaintiffs filed their Motion to Lift Temporary Stay and their Motion to Remand in the Southern District of West Virginia on June 17, 2005. The only reason Plaintiffs want to lift the stay is so the Southern District of West Virginia court can hear their belatedly-filed Motion to Remand. However, as set forth in MDC's Opposition to Plaintiffs' Motion to Remand, a copy of which (the brief only) is attached hereto as Exhibit B, MDC properly removed this case to federal court.

On July 6, 2005, Plaintiffs filed their Motion to Vacate the CTO, claiming – in conclusory fashion without any factual or evidentiary explanation or support whatsoever – that the CTO should be vacated because (a) this action is purportedly so "unique" – based on Plaintiffs' remand motion – that it should not be part of MDL-875; and (b) transfer to MDL-875 would inconvenience the parties and defeat judicial economy goals.

---

[1] On July 29, 1991, the MDL Judicial Panel entered an order transferring all asbestos personal injury cases pending in federal courts to the Eastern District of Pennsylvania for coordinated pretrial proceedings pursuant to 28 U.S.C. § 1407. That order also applies to "tag-along actions," or actions involving common questions of fact filed after January 17, 1991.

III.   **ARGUMENT**

   A.   **Plaintiffs Must Satisfy a Heavy Burden of Proof Before the CTO Can Be Vacated**

   The hurdle for vacating a conditional transfer order is high.  Indeed, the party requesting such relief must make a strong showing on specific grounds demonstrating "no common questions of fact relating to injuries…allegedly caused by exposure to asbestos or asbestos containing products" in order to support its motion for vacating the CTO.  <u>In re Asbestos Products Liability Litigation</u> (No. VI), 771 F.Supp.415 (J.P.M.L. 1991)  The Panel has previously rejected distinctions based on the <u>pendency of motions</u> or other matters before the transferor court, the uniqueness of a party's status, the type of defendant, the docket condition of any specific federal district, the stage of pretrial proceedings, the presence of unique claims or additional claims not relating to asbestos injury or death, and/or the unanimity of opposition to transfer by the parties as grounds for carving out exceptions to transfer to MDL-875's extraordinary docket.  <u>See In re Asbestos Products Liability Litigation</u> (No. VI), 170 F. Supp.2d 1348 (J.P.M.L. 2001) (emphasis added).

   B.   **Plaintiffs Fail to Satisfy Their Burden for Vacating the CTO**

   Plaintiffs fall miserably short of satisfying their burden.  In their slightly more than one page brief in support of the Motion to Vacate, they fail to state any specific grounds for vacating the CTO, nor do they proffer any supporting facts or evidence.  Instead, Plaintiffs engage in purely cursory rhetoric that is of no avail, as explained more fully below.

   C.   **Contrary to Plaintiffs' Unsupported Assertion, Their Case is Not Unique**

   Plaintiffs contend that the Panel should vacate the CTO because their case is unique.  Aside from the fact that the Panel has declined to vacate CTOs on

{C0962802.1}551286.1

uniqueness grounds, Plaintiffs offer nothing – no facts or evidence – to support their claim that this case is "unique." The reason they do not do so is simple: they cannot because this action is not unique. Rather, this case is similar to literally thousands of asbestos cases which have been previously transferred to MDL-875 from virtually every federal district court in this country. Numerous future cases – similar to this one – no doubt will likewise be transferred to MDL-875 in the future. There is nothing special or unique about Plaintiffs' claims – they have alleged broad traditional products liability theories against numerous manufacturing defendants based on Mr. Hamrick's purported exposure to asbestos in defendants' respective products, just like almost every other asbestos plaintiff has alleged such theories. There is nothing unique about Mr. Hamrick's alleged exposure – he claims he was exposed during his working career, just like thousands of other claimants have alleged occupational exposure. The fact that he alleges exposure to asbestos in military equipment while stationed at military bases does not distinguish his case from numerous other military exposure cases that have been part of the MDL proceedings.

**D.     The Fact That Plaintiffs Filed a Motion to Remand Does Not Warrant Vacating the CTO**

Nor does the fact that Plaintiffs have belatedly requested the transferor court to remand the case back to state court constitute grounds to vacate the CTO. Plaintiffs are under the misguided impression that their filing such a motion makes this action unique so as to warrant vacating the CTO. To the contrary, asbestos plaintiffs frequently file remand motions after removal, albeit such plaintiffs typically do so promptly after removal, before a CTO is issued and before the district court subsequently stays the action, unlike Plaintiffs here.

Plaintiffs' argument that this Panel should vacate the CTO pending a ruling by the transferor court on their Motion to Remand is unavailing. Plaintiffs delayed

{C0962802.1}551286.1

filing their motion for almost three months, until after the transferor court stayed the entire action pending a decision by this Panel regarding the CTO. A district court may wait for a transfer order without ruling on a motion to remand. In re Asbestos Products Liability Litigation, 170 F. Supp.2d 1348, 1349 n.1 (J.P.M.L. 2001) ("[T]hose courts wishing to address [motions to remand] have adequate time in which to do so, those courts concluding that such issues should be addressed by the transferee judge need not rule on them, and the process of 1407 transfer in MDL 875 can continue without any unnecessary interruption or delay.") (emphasis added).[2] Here, the transferor court already determined that a stay is appropriate.  Indeed, a majority of courts have concluded that it is appropriate to stay preliminary proceedings while a motion to transfer and consolidate is pending before the MDL Judicial Panel because a stay provides for consistent treatment of similar issues and will reduce the burden on the Court. Id. at 1362; see also Moore v. Wyeth-Ayerst Laboratories, 236 F. Supp.2d 509, 511 (D. Md. 2002) (stay of consideration of motion to remand warranted pending transfer to MDL); Knearem v. Bayer Corp, 2002 WL 1173551 at 1 (D. Kan. May 7, 2002) (staying action pending transfer to MDL because it would allow the transferee judge to deal with the common issues raised by remand motions); Jackson v. Johnson & Johnson, Inc., 2001 WL 34048067, at 2-3 (W.D. Tenn. Apr. 2, 2001) ("[t]he general rule is for federal court to defer ruling on pending motions to remand in MDL litigation until after the [MDL Judicial Panel] has transferred the case to the MDL court.").

---

[2]   The following three factors should be considered in determining whether a stay is appropriate: (1) judicial efficiencies in avoiding duplicative litigation; (2) potential prejudice to the party seeking the stay; and (3) hardship to other party if the action is not stayed. Rivers v. Walt Disney Co., 980 F. Supp. 1358, 1360 (C.D. Cal. 1997).  The transferor court obviously has already decided that these factors favor staying the action.

The transferor court has not lifted that stay, indicating (at least thus far) that it will not entertain Plaintiffs' remand motion until the issue regarding transfer of this action to MDL-875 is resolved by this Panel.  Consequently, there is no reason for the Panel to vacate the CTO.

Furthermore, either the transferor court or the MDL court is fully capable of deciding Plaintiffs' remand motion.  Thus, there is no reason to defer a ruling on the CTO.

Finally, Plaintiffs' argument that the CTO should be vacated because the case will eventually be tried in state court is quite presumptuous, particularly in light of MDC's strong showing why federal subject matter jurisdiction on both "federal officer" and "federal enclave" grounds is proper.  In any event, this contention is not a basis for vacating the CTO.

### E. Transfer of the Case to MDL-875 Will Best Serve Judicial Economy and Efficiency, and Will Not Unduly Inconvenience the Parties

Transfer of this action to MDL-875 will promote judicial economy and efficiency, and will not unfairly inconvenience the parties.

This case involves numerous questions of fact common with cases already pending in the MDL-875 proceedings.  As this Panel well knows, there are numerous military contractors being sued by asbestos plaintiffs in the MDL proceedings.  Mesothelioma, the particular disease that Mr. Hamrick has allegedly contracted, is shared by many asbestos plaintiffs in the MDL proceedings; it is not a new disease.  As a result, there are numerous common questions of fact pertaining to exposure, medical and causation matters, as well as various defenses raised by MDC and the other defendants, including the "government contractor" defense under Boyle v. United Technologies, Inc., 487 U.S. 500, 101 L.Ed. 442, 108 S.Ct. 2510 (1988) and its progeny.

{C0962802.1}551286.1

The parties, including Plaintiffs, will not be severely prejudiced by transfer of the action to the MDL proceedings.  In fact, Plaintiffs have not provided any explanation whatsoever as to how they, let alone the other parties, will be unfairly inconvenienced by a transfer.  It is clear that the case can be fairly and efficiently litigated in the MDL proceedings.  Plaintiffs' counsel has offices in Pennsylvania and no doubt is familiar with the MDL proceedings as counsel of record in numerous other cases pending there.

## IV.    CONCLUSION

MDC respectfully submits that the Panel should deny Plaintiffs' Motion to Vacate the Conditional Transfer Order, and transfer this action to MDL-875.

Respectfully submitted,

McDONNELL DOUGLAS CORPORATION
By Counsel

Michael B. Victorson (WVSBN; 3868)
JACKSON KELLY PLLC
1600 Laidley Tower
Post Office  Box  553
Charleston, West Virginia  25322
(304) 340-1000

Robert E. Boone III *(Pro Hac Vice Pending)*
BRYAN CAVE LLP
120 Broadway, Suite 300
Santa Monica, California 90401
(310) 576-2385

*Counsel for*
*McDonnell Douglas Corporation*

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUL 2 6 2005

FILED
CLERK'S OFFICE

UNITED STATES OF AMERICA
JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

CHARLES E. HAMRICK and                    MDL-875
WANDA HAMRICK, his wife,

        Plaintiffs,

v.                                        Civil Action No.  2:05-0287

A & I COMPANY, et al.,

        Defendants.

## CERTIFICATE OF SERVICE

      I, Michael B. Victorson, counsel for Defendant McDonnell Douglas Corporation, do hereby certify that I have served a true and exact copy of the foregoing **DEFENDANT McDONNELL DOUGLAS CORPORATION'S OPPOSITION TO PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER** upon counsel for the plaintiffs and counsel for defendants, by depositing the same in the regular course of the United States Mail, postage prepaid, on this 25th day of July, 2005, addressed as follows:

David P. Chervenick, Esquire
Jason T. Shipp, Esquire
Goldberg, Persky & White
1030 Fifth Avenue
Pittsburgh, PA 15219
*Counsel for Plaintiffs*

Scott S. Segal, Esquire
The Segal Law Firm
810 Kanawha Boulevard, East
Charleston, WV 25301
Counsel for Plaintiffs

{C0962802.1}551286.1

Stephen P. Goodwin, Esquire
Goodwin & Goodwin, LLP
P. O. Box 2107
Charleston, WV 25328-2107
*Counsel for A&I Company*

John J. Kurowski, Esquire
The Kurowski Law Firm
24 Bronze Pointe N
Belleville, IL 62226
*Counsel for AW Chesterton Company*

Joseph S. Beeson, Esquire
Jessica A. Blake, Esquire
Robinson & McElwee
P. O. Box 1791
Charleston, WV 25326
*Counsel for Cooper Industries, Inc.*

Albert H. Parnell, Esquire
A. Tim Jones, Esquire
Hawkins & Parnell
4000 SunTrust Plaza
303 Peachtree Street, N.E.
Atlanta, GA 30308-3283
*Counsel for Dana Corporation*

Paula L. Durst, Esquire
Spilman Thomas & Battle, PLLC
300 Kanawha Boulevard East
P. O. Box 273
Charleston, WV 25321-0273
*Counsel for EI du Pont de Nemours & Company*

Scott A. Matthews, Esquire
Dell, Moser, Land & Loughney
525 William Penn Place, Suite 3700
Pittsburgh, PA 15219
*Counsel for Foster Wheeler*

J. Tyler Dinsmore, Esquire
Flaherty Sensabaugh & Bonasso
200 Capitol Street
Charleston, WV 25301
*Counsel for General Motors Corporation*

Corey T. Zurbach, Esquire
Spilman Thomas & Battle, PLLC
P. O. Box 273
Charleston, WV 25321-0273
*Counsel for Goodrich Corporation*

David K. Hendrickson, Esquire
R. Scott Long, Esquire
Apryll H. Boggs, Esquire
Cathrine T. Gardill, Esquire
Hendrickson & Long
214 Capitol Street
P. O. Box 11070
Charleston, WV 25339
*Counsel for Honeywell International, Inc.,*
*Ingersoll-Rand Company, Owens-Illinois, Inc.,*
*Uniroyal, Inc. and Viacom, Inc.*

Stephen M. Fowler, Esquire
Lori Streets Muldoon, Esquire
David L. Watson, Esquire
Pullin Fowler & Flanagan
JamesMark Building
901 Quarrier Street
Charleston, WV 25301
*Counsel for Lockheed Martin Corporation*

Charles M. Love, III, Esquire
Bowles Rice McDavid Graff & Love
P. O. Box 1386
Charleston, WV 25325-1386
*Counsel for Metropolitan Life Insurance Company*

R. Carter Elkins, Esquire
B. Luke Styer, Esquire
Campbell Woods Bagley et al
517 Ninth Street, Suite 1000
Post Office Box 1835
Huntington, West Virginia 25719-1835
*Counsel for Pneumo Abex Corporation*

Robert H. Sweeney, Jr., Esquire
Brian S. Lindsay, Esquire
Jenkins Fenstermaker PLLC
P. O. Box 2688
Huntington, WV 25726-2688
*Counsel for Vimasco Corporation*

Janna Nuzum, Esquire
J. G. Goodykoontz, Esquire
Steptoe & Johnson
Post Office Pox 2190
Clarksburg, West Virginia 26302-2190
*Counsel for Pratt & Whitney*

Edward J. Cass, Esquire
Gallagher, Sharp, Fulton & Norman
Bulkley Building, 7th Floor
1501 Euclid Avenue
Cleveland, Ohio 44115

Adam M. Chud, Esquire
Goodwin Procter LLP
901 new York Avenur, N. W.
Washington, DC 20001

Alexandra B. Cunningham, Esquire
David C. Landin, Esquire
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219

David A. Damico
Burns, White & Hickton, LLC
Four Northshore Center
106 Isabella Street
Pittsburgh, Pennsylvania 15212

Eric K. Falk, Esquire
Davies, McFarland & Carroll
One Gateway Center
Tenth Floor
Pittsburgh, Pennsylvania 15222

Stephen A. Fennell
Steptoe & Johnson LLP
1330 Connecticut Avennue, N. W.
Washington, DC 20036

Matthew J. Fischer
Schiff Hardin LLP
6600 Sears Tower
233 S. Wacker Drive
Chicago, Illnois 60606-6473

Raymond P. Forceno
Forceno & Hannon
111 S. Independence mall East
The Bourse, Suite 1000
Philadelphia, Pennsylvania 19106-2574

Ellen B. Furman
Goldbein & Hosmer
1600 Market Street
33rd Floor
Philadelphia, Pennsylvania 19103

Susan M. Hanson, Esquire
Brownson & Ballou
225 South Sixth Street, Suite 4800
Minneapolis,MN 55402

Reginald S. Kramer
Oldham & Dowling
195 South Main Street
Suite 300
Akron, Ohio 44308-1314

Richard L. Lancianese, Esquire
Baker & Lancianese
River Tower, 3rd
1108 Third Avenue
Suite 300
Huntington, West Virginia 25701

Robert R. Leight, Esquire
Pietragallo, Bosick & Gordon
One Oxford Center
38th Floor
Pittsburgh, Pennsylvania 15219

Gene Locks, Esquire
Greitzer & Locks
1500 Walnut Street
Philadelphia Pennsylvania 19102

Ronald L. Motley, Esquire
Motley Rice LLC
28 Bridgeside Blvd.
Mt. Pleasant, South Carolina 29465

Richard C. Binzley, Esquire
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, Ohio 44114

Rita  M. Biser, Esquire
Kay Casto & Chaney
Post Office Box 25327
Charleston, West Virginia 25327

Joseph L. Orszulak, Esquire
John J. Repcheck, Esquire
Marks, O'Neill, O'Brien & Courtney
3200 Gulf Tower
707 Grant Street
Pittsburgh, Pennsylvania 15219

Bryan S. Neft, Esquire
Pietragallo, Bosick & Gordon
One Oxford Center
38th Floor
Pittsburgh, Pennsylvania 15219

G. Kenneth Robertson, Esquire
Farmer, Cline & Arnold
Post Office Box 3842
Charleston, West Virginia 25338

John D. Roven, Esquire
Roven, Kaplan & Wells
2190 North Loop West
Suite 410
Houston, Texas 77018

Richard D. Schuster, Esquire
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
Post Office Box 1008
Columbus, Ohio 43216

Neil Selman, Esquire, Esquire
Selman, Breitman & Burgess
11766 Wishire Boulevard
Sixth Floor
Los Angeles, California 90025

Robert N. Spinelli, Esquire
Kelley, Jasons, McGuire & Spinelli
Centre Square West
15th Floor
Philadelphia, Pennsylvania 19102

Robert E. Swickle, Esquire
Jaques Admiralty Law Firm, P. C.
1570 Penobscot Building
The Maritime Asbestos Legal Clinic
Detroit, Michigan 48226

Dwight E. Tarwater, Esquire
Paine, Tarwater, Bickers & Tillman
First Tennessee Plaza
800 S. Gay Street
Suite 1100
Knoxville, Tennessee 37929

Andrew J. Trevelise, Esquire
Reed Smith, LLP
2500 Liberty Place
1650 Market Street
Philadelphia, Pennsylvania 12103

James K. Weston, II, , Esquire
Tom Riley Law Firm
4040 First Avenue, N. E.
Post Office Box 998
Cedar Rapids, Indiana 52406

Michael B. Victorson

**Page 1**

```
 1        IN THE CIRCUIT COURT OF KANAWHA COUNTY
                      WEST VIRGINIA
 2
 3   IN RE: ASBESTOS PERSONAL INJURY LITIGATION,
               JUDGE RONALD E. WILSON,
 4
 5               CIVIL ACTION
                 NO. 03-C-9600
 6
 7   CHARLES E. HAMRICK and
     WANDA HAMRICK, his wife,
 8
             Plaintiffs,
 9
     vs               CIVIL ACTION
10                    NO.: 05-C-54
11   20TH CENTURY GLOVE CORPORATION OF TEXAS, also
     known as, Guard Line, Inc., et al.,
12
             Defendants.
13
14
15       The video deposition of CHARLES E. HAMRICK,
     taken upon oral examination, pursuant to notice
16   and pursuant to the West Virginia Rules of Civil
     Procedure, before James D. Nielsen, Court
17   Reporter and Notary Public in and for the State
     of West Virginia, Monday, March 7, 2005, at
18   11:00 a.m., at 13 Elk Street, Webster Springs,
     West Virginia.
19
20
21
22        JOHNNY JACKSON & ASSOCIATES, INC.
                 606 Virginia Street, East
23           Charleston, West Virginia 25301
                    (304) 346-8340
24
```

**Page 2**

```
 1               APPEARANCES
 2   Counsel on behalf of the Plaintiffs:
 3       GOLDBERG, PERSKY & WHITE, P.C.
         Lee W. Davis, Esquire
 4       1030 Fifth Avenue, Third Floor
         Pittsburgh, PA 15219
 5       (412) 471-3980
 6   Defense Liaison Counsel:
 7       JACKSON & KELLY, PLLC
         Michael B. Victorson, Esquire
 8       1600 Laidley Tower
         Post Office Box 553
 9       Charleston, WV 25322-0553
         (304) 340-1000
10
     Counsel on behalf of the Defendant, Leerjet and
11   Pratt & Whitney:
12       STEPTOE & JOHNSON, PLLC
         Robert E. Gifford, Esquire
13       Kelly Little, Esquire
         Bank One Center, 6th Floor
14       P.O. Box 2190
         Clarksburg, WV 26302-2190
15       (304) 624-8000
16   Counsel on behalf of the Defendant, Honeywell
     International and Boeing:
17
         DAVIES, MCFARLAND & CARROLL, P.C.
18       Eric K. Falk, Esquire
         One Gateway Center
19       10th Floor
         Pittsburgh, PA 15222-1416
20       (412) 281-0737
21
22
23
24
```

**Page 3**

```
 1   APPEARANCES CONT.
 2   Counsel on behalf of the Defendant, McDonnell
     Douglas Corporation:
 3
         BRYAN CAVE, LLP
 4       Christopher L. Dueringer, Esquire
         120 Broadway
 5       Suite 300
         Santa Monica, CA 90401
 6       (310) 576-2100
 7       and
 8       DAVIES, MCFARLAND & CARROLL, P.C.
         Stephen J. Dalesio, Esquire
 9       One Gateway Center
         10th Floor
10       Pittsburgh, PA 15222-1416
         (412) 281-0737
11
     Counsel on behalf of the Defendant, General
12   Electric Company:
13       PIETRAGALLO BOSICK & GORDON
         Brian Green, Esquire
14       One Oxford Centre
         Thirty-Eighth Floor
15       Pittsburgh, PA 15220
         (412) 263-1815
16
17   Counsel on behalf of the Defendant, General
     Motors:
18
         FLAHERTY, SENSABAUGH & BONASSO, PLLC
19       Tyler Dinsmore, Esquire
         200 Capitol Street
20       P.O. Box 3843
         Charleston, WV 25338-3843
21       (304) 347-4234
22
23
24
```

**Page 4**

```
 1   APPEARANCES CONT.
 2   Counsel on behalf of the Defendant, Borg-Warner
     Corporation:
 3
         BAKER & LANCIANESE
 4       Richard Lancianese, Esquire
         River Tower - Suite 300
 5       1108 Third Avenue
         Huntington, WV 25705
 6       (304) 522-6906
 7   Counsel on behalf of the Defendant, Dana
     Corporation and A. W. Chesterton Company, Inc.:
 8
         HAWKINS & PARNELL
 9       Margaret Droppleman, Esquire
         602 Virginia Street, East, Suite 200
10       Charleston, WV 25314
         (304) 345-8545
11
     Counsel on behalf of the Defendant, Garlock
12   Sealing Technologies, LLC:
13       KAY, CASTO & CHANEY, PLLC
         Rita Massie Biser, Esquire
14       1300 Bank One Center
         P.O. Box 2031
15       Charleston, WV 25327
         (304) 345-8900
16
     Counsel on behalf of the Defendant, Goodrich
17   Corporation:
18       HUNTON & WILLIAMS
         Carson W. Johnson, Esquire
19       951 East Byrd Street
         Richmond, VA 23219
20       (804) 788-8200
21
22
23
24
```

Page 5

```
1   APPEARANCES CONT.
2   Counsel on behalf of the Defendant, Columbia
    Paint and Cooper Industries:
3
      ROBINSON & McELWEE
4     Mark H. Hayes, Esquire
      400 Fifth-Third Center
5     700 Virginia Street, East
      Charleston, WV 25301
6     (304) 347-8354
7   Counsel on behalf of the Defendant, Viacom,
    Westinghouse Electric, Ingersol-Rand, Owens-
8   Illinois and Famous Furnace:
9     HENDRICKSON & LONG, PLLC
      Jeffry H. Hall, Esquire
10    214 Capitol Street
      P.O. Box 11070
11    Charleston, WV 25301
      (304) 346-5500
12
    Counsel on behalf of the Defendant, Lockheed
13  Martin:
14    PULLIN, FOWLER & FLANAGAN
      Frank Oliverio, Esquire
15    1200 Dorsey Avenue, Suite 1
      Morgantown, WV 26505
16    (304) 225-2200
17  Counsel on behalf of the Defendant,
    Durametallic:
18
      MARKS, O'NEILL, REILLY, O'BRIEN & COURTNEY
19    Susan L. Loughran, Esquire
      707 Grant Street, Suite 2600
20    Pittsburgh, PA 15219
      (412) 391-6171
21
22
23
24
```

Page 6

```
1   APPEARANCES CONT.
2   Counsel on behalf of the Defendant, Abex and
    Graybar Electric:
3
      CAMPBELL, WOODS, BAGLEY, EMERSON, McNEER &
4     HERNDON
      Charles F. Bagley, III, Esquire
5     Suite 1000
      517 Ninth Street
6     Post Office Box 1835
      Huntington, WV 25719
7     (304) 529-2391
8   Counsel on behalf of the Defendant, Foster
    Wheeler:
9
      DELL, MOSER, LANE & LOUGHNEY, LLC
10    Michael Cohen, Esquire
      525 William Penn Place
11    Suite 3700
      Pittsburgh, PA 15219
12    (412) 471-1180
13  Counsel on behalf of the Defendant, Pratt &
    Whitney:
14
      TUCKER, ELLIS & WEST
15    Richard Dean, Esquire
      925 Euclid Avenue
16    Suite 1150
      Cleveland, OH 4415
17    (216) 592-5000
18
19
20
21
22
23
24
```

Page 7

```
1                  INDEX
2      CHARLES E. HAMRICK - DEPONENT
3
4   EXAMINATION BY:
5       Mr. Davis . . . . . . . . . . .  10
6       Mr. Gifford . . . . . . . . . .  27
7       Mr. Dueringer . . . . . . . . .  38
8       Mr. Davis . . . . . . . . . . .  48
9       Mr. Gifford . . . . . . . . . .  50
10
11
12  EXHIBITS:
13      Exhibit A  . . . . . . . . . .  53
14
15
16
17
18
19
20
21
22
23
24
```

Page 8

```
1          MR. VICTORSON:  The deposition
2   of Mr. Hamrick is being taken today
3   pursuant to order allowing the
4   deposition to take place at this time
5   entered by Judge Recht after a motion
6   that was filed by Mr. Davis.
7          It's understood both by the
8   court and by all counsel that by
9   appearing today no defenses have been
10  waived, including those relating to
11  jurisdiction and to process and service
12  of process.
13         It is my understanding at this
14  point that no defendant has actually
15  received service of process in this case
16  at this point.  Those of us who are here
17  are here as a result of Mr. Davis having
18  kindly provided courtesy information
19  relative to the suit and to have
20  provided us with that information.
21         Anything else you want?
22         MR. GIFFORD:  Furthermore --
23  this is Rob Gifford also on behalf of
24  the defense -- Judge Recht indicated
```

Page 9

```
1    there was no requirement to have formal
2    pro hac vice papers filed, but hereafter
3    if this case should proceed with
4    additional deposition testimony
5    defendants make reasonable efforts to
6    have such papers filed and orders
7    entered accordingly.
8         And furthermore, just so it's
9    very clear, that no defendant has given
10   up the right with regard to removal and
11   no court should look upon this
12   deposition as being a special appearance
13   or limited appearance and there is no
14   waiver of any of that at this time.
15        MR. VICTORSON:  Is that all
16   correct?
17        MR. DAVIS:  That's all correct.
18        MR. VICTORSON:  You may
19   proceed.
20        MR. DAVIS:  Mr. Hamrick, I'm
21   going to ask you most of the questions
22   in the beginning and then some of these
23   other people may have questions, okay.
24        We can go on the video.
```

Page 10

```
1         CHARLES E. HAMRICK, DEPONENT, SWORN
2              EXAMINATION
3    BY MR. DAVIS:
4    Q.  Good morning, Mr. Hamrick.
5    A.  Good morning.
6    Q.  Can you tell the ladies and gentlemen of
7    the jury your name?
8    A.  Charles E. Hamrick.
9    Q.  Where are we right now, Mr. Hamrick?
10   A.  Cherry Falls, it's right outside of
11   Webster Springs.
12   Q.  Suburb of Webster Springs?
13   A.  No, it's unincorporated.
14   Q.  So it's not even a suburb?
15   A.  No.
16   Q.  Mr. Hamrick, we're going to ask you a
17   few questions today about your career and your
18   health.  First I want to start with is, where
19   were you born?
20   A.  Bergoo, West Virginia, right up the
21   road.
22   Q.  Right up the road from where we're at
23   now?
24   A.  Right.
```

Page 11

```
1    Q.  And did you go to high school?
2    A.  Yes.
3    Q.  Did you graduate?
4    A.  No.
5    Q.  What did you do when you left high
6    school?
7    A.  I worked at a service station for about
8    a year for my uncle and then worked coal mines
9    about a month and then I went and joined the Air
10   Force.
11   Q.  Let me ask you about this service
12   station quickly.  What did you do at the service
13   station?
14   A.  I pumped gas, changed tires.
15   Q.  Did you do any mechanical work on cars?
16   A.  No.
17   Q.  So this was just pumping gas and
18   changing tires?
19   A.  Right, yes, washing, you know.
20   Q.  Washing cars?
21   A.  Yeah.
22   Q.  And then you worked for a month in the
23   coal mines?
24   A.  Right.
```

Page 12

```
1    Q.  And then you went to the Air Force?
2    A.  Right.
3    Q.  Let's talk about your Air Force career
4    then.
5    A.  Okay.
6    Q.  When you enlisted in the Air Force where
7    did you go first?
8    A.  I went to Charleston.
9    Q.  South Carolina?
10   A.  No, I went --
11   Q.  West Virginia?
12   A.  West Virginia, and then I got records
13   and all that.  And then I went to Amarillo.
14   Q.  Amarillo, Texas?
15   A.  Uh-huh.
16   Q.  What did you do there?
17   A.  Basic training mainly.
18   Q.  And what did you do after basic in
19   Amarillo?
20   A.  I left there, I went to Fort Belvoir,
21   Virginia to commercial sheet metal school.
22   Q.  So you were in school for sheet metal
23   work?
24   A.  Right.
```

Page 13

1    Q. And this is all part of the Air Force?
2    A. Right. That was Army there but they --
3  it's a school that's --
4    Q. So it was an Army facility --
5    A. Right.
6    Q. -- but they were teaching Air Force
7  personnel?
8    A. Right.
9    Q. Namely you?
10   A. Yeah, I was one of them.
11   Q. I take it at that point you became a
12 sheet metal worker for the Air Force?
13   A. Yes, and then I went -- went overseas.
14   Q. And where did you go overseas?
15   A. I went to -- which I didn't name,
16 because you know, I didn't work aircraft over
17 there.
18   Q. Where did you go?
19   A. Erding, Germany.
20   Q. And what were you doing there?
21   A. I ended up being the Air Police.
22   Q. Air Police?
23   A. Yeah, for about three months, four
24 months.

Page 14

1    Q. And then what did you do?
2    A. Well, I got in a Jeep accident. And I
3  was in the hospital six months.
4    Q. Did you break bones?
5    A. I fractured skull and knocked my left
6  eye out.
7    Q. Now, at some point did you start doing
8  mechanical work on aircraft?
9    A. Yes. I come back to the hospital in
10 Virginia, and then they sent me over to Fort
11 Myers down at the hospital and wanted me to be
12 in the Honor Guard and stuff and I didn't want
13 it. So I ended up going to Andrews Air Force
14 Base.
15   Q. Is that where you took up aircraft
16 mechanic?
17   A. Right, that's where I got in there, back
18 in April of '52.
19   Q. How long were you an aircraft mechanic
20 in the Air Force?
21   A. Twenty years.
22   Q. Now --
23   A. Well, about 19 years actually, in the
24 aircraft work.

Page 15

1    Q. Aircraft work?
2    A. Right.
3    Q. And just generally what was your job
4  doing aircraft work? Were you repairing --
5    A. Repairing aircraft and -- well, working
6  the engine parts and stuff like that.
7    Q. Were you rebuilding engines?
8    A. No -- yes, consider that was the cowling
9  that goes around the engines and everything,
10 which has your asbestos and all that.
11   Q. What kind of asbestos or what did it
12 look like in the cowling?
13   A. It's fluffy like, you know, and snow
14 white.
15   Q. What aircraft, do you remember that,
16 what you're talking about?
17   A. Oh, I guess I worked F-51s, B-24s and
18 B-25s.
19   Q. Have the asbestos as you've described?
20   A. Right. And then C-47s, 46s and 118s and
21 I believe that was it there.
22   Q. Now, I had previously asked you before
23 we got here today to write down a list of all
24 the aircraft that you could remember working

Page 16

1  on.
2    A. Right.
3    Q. I'm going to show you this list that you
4  gave to me and it's in the back of a book that's
5  titled Air Force Flight Test Center, Edwards Air
6  Force Base, California, 1957.
7    A. Right.
8    Q. Was this your book?
9    A. Yes.
10   Q. And in the back you've written some
11 places and some aircraft designations?
12   A. Right.
13   Q. I'm going to show this to you. Is this
14 the list that you wrote or did your wife
15 actually write the list?
16   A. No, she didn't write this.
17   Q. Did you write that?
18   A. Oh, wait a minute, yeah, she did too.
19   Q. You told her what to write?
20   A. Right. She wrote it, yeah.
21   Q. Were those all the plane designations,
22 to the best of your ability, that you worked
23 on?
24   A. Yes, I'm sure there's some more but...

Page 17

1    Q.  That's what you could remember last
2  weekend?
3    A.  Right, uh-huh.
4    Q.  At the top of the page in the back of
5  this book it also lists several bases where you
6  worked?
7    A.  Yes.
8    Q.  Were those the bases that you worked on
9  planes while a member of the military?
10   A.  Yes.
11   Q.  What was the highest rank you had?
12   A.  Staff Sergeant.
13   Q.  Now, I'm just going to ask you generally
14  about all these aircraft, because there's many,
15  many on this list.
16   A.  Right.
17   Q.  When you were doing aircraft work did
18  you repair the brakes on the aircraft?
19   A.  Yes.  I did that mainly when I was the
20  Civil Service.
21   Q.  So this is later after your military
22  work?
23   A.  Right.
24   Q.  So the ladies and gentlemen of the jury

Page 18

1  understand, your first 19 years you're doing
2  military repair on planes and you're in the
3  military?
4    A.  Right.
5    Q.  And then for the last 23 years --
6    A.  Right.
7    Q.  -- you were a civilian employee?
8    A.  Right.
9    Q.  And you were still working on the same
10  planes?
11   A.  Right.
12   Q.  Where were you based when you were doing
13  that?
14   A.  Eglin Air Force Base, Florida.
15   Q.  So you're doing basically the same job?
16   A.  Yes, sir.
17   Q.  Different company, one was the U.S.
18  government?
19   A.  Well, and the other was Civil Service,
20  it's the same -- well, really the same thing,
21  just different pay.
22   Q.  Yeah, a little different pay.
23   A.  Right.
24   Q.  Now, you mentioned doing brake work on

Page 19

1  these planes, do you believe that some of these
2  brakes contained asbestos?
3    A.  Yes.
4    Q.  Why is it that you believe that?
5    A.  Well, when they ordered them and
6  everything you'd tell them what you needed and
7  they'd --
8    Q.  Send it out?
9    A.  Send it out.
10   Q.  When you did the brake work would you
11  have to clean off the old brakes?
12   A.  Right.
13   Q.  Can you generally describe what you
14  would do with that brake work?
15   A.  Well, you blow them off and clean them
16  to where you can get to the rivets and
17  everything and drill the pads off.
18   Q.  So you were actually putting new pads on
19  the shoe -- the metal shoe?
20   A.  Right.
21   Q.  Would you drill the new pads?
22   A.  No, the pads their selves would be
23  already drilled.
24   Q.  And you'd have to rivet them onto the

Page 20

1  shoe?
2    A.  Right.  I'd have to drill the old ones
3  off.
4    Q.  Oh, I see.  So it took a drill to get
5  the rivet off the old one?
6    A.  Right.
7    Q.  All of this work, the replacement of
8  brakes, did this create dust?
9    A.  Yes.
10   Q.  And did you breathe that dust?
11   A.  Yes.
12   Q.  Now, inside some of these aircraft --
13  and I won't go through them, and you know better
14  than anybody in this room -- were there any
15  other places that you know of any asbestos
16  products that were used?
17   A.  Not right offhand I don't.
18   Q.  Did you ever rebuild any engines?
19   A.  I helped, yes.
20   Q.  Were you a member of the military or a
21  Civil Service man?
22   A.  Civil Service.
23   Q.  What year about do you think you were
24  doing that?

Page 21

1    A. Let's see, we'll go back to '72.
2    Q. So you were a Civil Service member --
3    A. Right.
4    Q. -- at Eglin and you did engine rebuilds
5    --
6    A. Right.
7    Q. -- at that point?
8    A. Yes.
9    Q. Were you using any gaskets or packing in
10   that work?
11   A. Oh, yes.
12   Q. Do you believe those products contained
13   asbestos?
14   A. Not offhand I don't.
15   Q. When you were doing sheet metal work did
16   you ever have to do any welding?
17   A. No.
18   Q. Other people did that work?
19   A. Right.
20   Q. Now, you spent 23 years in the Civil
21   Service, when did you leave the Civil Service?
22   A. I retired out of there in -- 5th of
23   January of '95.
24   Q. What did you do after you retired at

Page 22

1    Eglin in '95?
2    A. Nothing.
3    Q. Nothing? Did you move back here?
4    A. No.
5    Q. How long until you came back?
6    A. I come back here in October of 2001.
7    Q. Have you lived in Webster Springs since
8    then?
9    A. Yes, lived here.
10   Q. Now, it's my understanding you have four
11   children from a prior marriage?
12   A. Yes.
13   Q. And how is their health as best you
14   know?
15   A. Good, as far as I know. Well, my oldest
16   boy had stents and stuff put in his heart.
17   Q. That was recently, right?
18   A. Yes.
19   Q. But other than that everybody is doing
20   well?
21   A. Yes.
22   Q. Good, good. All right, let's talk a
23   little bit what's transpired since you've moved
24   back to Webster Springs.

Page 23

1        You got married didn't you?
2    A. Yes, I got married last June.
3    Q. Congratulations.
4    A. Thank you.
5    Q. And a little after that you had a
6    hernia?
7    A. Yes.
8    Q. So you hadn't been married that long and
9    you had the first of two hernia surgeries?
10   A. Right.
11   Q. The first hernia surgery went okay?
12   A. Yes.
13   Q. Had you had any other real health
14   conditions prior to this time?
15   A. Just -- I had a bad colon, they had to
16   take out 10 percent.
17   Q. Of your colon?
18   A. My colon, and then it collapsed.
19   Q. But that wasn't cancer?
20   A. No.
21   Q. So you had this hernia surgery, and
22   other than the colon problem that was it?
23   A. Well, I had a -- let's see, not too long
24   after I got back I had a heart attack. They

Page 24

1    said I had a heart attack. I went to Charleston
2    and they -- I was there two or three days and
3    come back.
4    Q. Nothing?
5    A. No, heart in good shape.
6    Q. All right. Now, you went in -- the
7    second hernia reappeared or appeared?
8    A. Appeared, yes.
9    Q. And you went in for surgery on that?
10   A. Yes.
11   Q. Why don't you describe for the ladies
12   and gentlemen of the jury what happened during
13   that second hernia procedure?
14   A. Well, everything -- after they sent it
15   off, you know, to have it checked, it come back
16   with the cancer in it.
17   Q. Did they give you a type or a disease
18   name when they came back? What's your
19   understanding of the diagnosis?
20   A. That --
21   Q. Mesothelioma?
22   A. Right.
23   Q. And it was at your second hernia
24   surgery?

Page 25

1    A. Right.
2    Q. And when was all this transpiring?
3    A. Let's see --
4    Q. Six months ago?
5    A. Yeah, about six months ago.
6    Q. How were you feeling up until then?
7    A. Great.
8    Q. And what did you weigh then?
9    A. About 222.
10   Q. And what do you weigh today?
11   A. I don't know, but the last time I was
12   weighed at the hospital it was 128.
13   Q. When was that?
14   A. About six months -- well, about six
15   months ago.
16   Q. Let me talk about life here in Webster
17   Springs before you got ill. What did you like
18   to do with your time?
19   A. I hunt, fish.
20   Q. You live right on a river here?
21   A. Right.
22   Q. You're outdoors kind of guy?
23   A. Yes, sir.
24   Q. Do you have any other activities that

Page 26

1    you like to enjoy?
2    A. No.
3    Q. Hunt and fishing?
4    A. Hunt and fishing man I guess.
5    Q. Now, can you describe for the ladies and
6    gentlemen of the jury what has transpired in the
7    last six months since you've gotten ill?
8    A. Well, I had another operation.
9    Q. Right.
10   A. Well, it was formed around my
11   gallbladder, and they took my gallbladder out.
12   Q. This was all related?
13   A. Yes, related to that.
14   Q. To the cancer?
15   A. Yes. And since that I got -- well, bed
16   -- bedfast and I've been that way for almost six
17   months.
18   Q. You haven't been able to get out of
19   bed?
20   A. No. I sit up once in a while a little
21   bit and that's it.
22   Q. Mr. Hamrick, what's your hope for the
23   future right now?
24   A. Well, I hope to get better, because --

Page 27

1    just starting a new life and this happens.
2    Excuse me.
3         MR. DAVIS: That's all right.
4    Mr. Hamrick, I think that's all the
5    questions I have. Some of these other
6    lawyers may have some questions in a few
7    minutes, they're going to want to talk.
8         They're going to want to have a
9    little talk together, but we'll give you
10   a few minutes, okay, and then we'll come
11   back, all right?
12        THE DEPONENT: Okay.
13        MR. DAVIS: Thank you, you can
14   go off the record.
15        (Break.)
16        EXAMINATION
17   BY MR. GIFFORD:
18   Q. Mr. Hamrick, my name is Rob Gifford,
19   we've met off the record and we're already peas
20   in a pod since we're both Jeff Gordon fans,
21   right?
22   A. Right.
23   Q. I appreciate your time. I just want to
24   ask you some quick questions to try to develop

Page 28

1    your background history, okay.
2         As I understand, once you left high
3    school and you went into the Air Force through
4    Charleston, West Virginia, there's an Air
5    National Guard Base there.
6    A. At that time, right.
7    Q. Did you do any work there?
8    A. No.
9    Q. Just paperwork?
10   A. Just paperwork.
11   Q. And as I understand, once you got out of
12   your basic training you were sent to a Fort
13   Belvoir over in Virginia?
14   A. Right.
15   Q. And you did sheet metal school there?
16   A. Right.
17   Q. Do you know how long you may have been
18   there?
19   A. Not right offhand. I think it was six
20   weeks, I'm not sure.
21   Q. And then once you got done with that
22   they shipped you over to Germany?
23   A. Yes, sir.
24   Q. Was that a straight job, I mean, from

Page 29

1  Virginia right to Germany?
2      A.  Yes.
3      Q.  And where were you stationed there?
4      A.  Erding.
5      Q.  How long were you in Germany with the
6  Air Force?
7      A.  About -- at that time about two or three
8  months -- no, four months.
9      Q.  Do you know what time frame that would
10 have been, year-wise?  Is that 1954?  '55?
11     A.  1951.
12     Q.  1951?
13     A.  Uh-huh.
14     Q.  So you were there four months, 1951, you
15 had a jeep accident?
16     A.  Yes.
17     Q.  It sounds like you had some pretty bad
18 injuries?
19     A.  Yes.
20     Q.  And you were laid up for a while?
21     A.  About six months.
22     Q.  And was all that six months in Germany
23 or did they ship you back stateside?
24     A.  No, they shipped me -- it was about

Page 30

1  three months over there and then about two or
2  three months in the states.
3      Q.  And as I understand at that time they
4  said, Enlistee Hamrick, we're going to put you
5  on the Honor Guard and we're going to send you
6  down to Fort Myers?
7      A.  That's -- well, I didn't know it until I
8  got to Fort Myers.
9      Q.  You didn't want to do that?
10     A.  No.
11     Q.  Now, in Germany did you work on any
12 aircraft?
13     A.  Not then, no.
14     Q.  You were Air Police?
15     A.  Right, at that time.
16     Q.  And what were your jobs as Air Police?
17 What were your duties?
18     A.  You guard the base and -- well,
19 communications there.
20     Q.  At Fort Myers that would have been
21 around 1952 you would have been there?
22     A.  Right, uh-huh.
23     Q.  And how long were you at Fort Myers?
24     A.  About two weeks.

Page 31

1      Q.  And did you work on any aircraft there?
2      A.  No.
3      Q.  And then from Fort Myers as I understand
4  you then were sent up to Andrews Air Force Base
5  in April of 1952?
6      A.  Right.
7      Q.  And is it fair to say that you served at
8  the Andrews Air Force Base from April 1952 until
9  you retired from the military?
10     A.  No.
11     Q.  Where did you go from Air Force Base --
12 Andrews Air Force Base in April '52, what was
13 your next --
14     A.  That there, Eniwetok.
15         THE REPORTER:  Can you repeat
16     that, please?
17     Q.  Is that A-N-A-T-O-C-K, in the Pacific?
18     A.  Yes, uh-huh, where they have the H- and
19 A-bomb tests.
20         MR. FALK:  E-N-I-W-E-T-O-K,
21     Marshall Islands.
22     A.  Marshall Islands, yeah.
23     Q.  You were in the Marshall Islands?
24     A.  Yeah, that's where I was at.

Page 32

1      Q.  Let's break it down like this if we
2  can.  You got there at the Andrews Air Force
3  Base in April '52, and you served there for how
4  long until they sent you to the Marshall
5  Islands?
6      A.  January of '56.
7      Q.  And from April '52 to January '56 while
8  you were at the Andrews Air Force Base --
9      A.  Uh-huh.
10     Q.  -- were you mostly doing sheet metal
11 work?
12     A.  Yes.
13     Q.  And when you went to the Marshall
14 Islands in January 1956, how long did you -- how
15 long were you stationed there?
16     A.  About eleven months.
17     Q.  So probably until 1957?
18     A.  Yes, I come back.
19     Q.  And then where did you go from the
20 Marshall Islands in 1957?  You have listed also
21 Guam on your --
22     A.  Yeah.
23     Q.  I don't want to get you out of
24 sequence.  So you're at the Marshall Islands,

Page 33

1    1957, and then you come back?
2       A.  Edwards Air Force Base.
3       Q.  You come back to --
4       A.  California.
5       Q.  And while you're at the Marshall Islands
6    in 1956 until sometime in '57 were you working
7    on aircraft there?
8       A.  Yes.
9       Q.  And was that mostly sheet metal work?
10      A.  Yes.
11      Q.  When you came back at Andrews Air Force
12   Base in 1957 after the Marshall Islands --
13      A.  Right.
14      Q.  -- how long did you stay there?
15      A.  At Edwards?  Approximately five years.
16      Q.  And that would have been 1957 to 1962,
17   right?
18      A.  '61 -- well, it was December of '61.
19      Q.  And from that time frame while you're at
20   Andrews Air Force Base from 1957 to December
21   1961 are you working on aircraft?
22      A.  Yes.
23      Q.  And you're working in your
24   classification as a sheet metal worker?

Page 34

1       A.  Yes.
2       Q.  Where did you go to in December 1961?
3       A.  Eglin Air Force Base, Florida.
4       Q.  And that's down in Florida?
5       A.  Yeah, Eglin.
6       Q.  And what was your classification when
7    you went there in 1961 or 1962?
8       A.  Sheet metal.
9       Q.  Sheet metal?  And did you stay at Eglin
10   until you retired from the military, from '61
11   until you retired from the military?
12      A.  '61, no.
13      Q.  Well, we can take our time if we need to
14   -- it looks like you may have retired in 1972
15   from the military?
16      A.  January of -- of -- January of '72.
17      Q.  I guess I'm trying to fill-in to see if
18   once you got to Eglin in 1961 you stayed there
19   until you retired?
20      A.  No, I went back to Germany.
21      Q.  Do you know how long you would have been
22   in Germany?
23      A.  About -- let's see, three years.
24      Q.  And this is going to be a tough

Page 35

1    question, but once you get there in 1961 at
2    Eglin, and you go to Germany, do you have a time
3    frame in your mind when that Germany trip would
4    have been?
5       A.  Yes.  I come back from over there in
6    '67, January '67.
7       Q.  So using your math, that's three years,
8    you would have been there from '64 to '67?
9       A.  Yep.
10      Q.  And what was your job in Germany?
11      A.  Sheet metal.
12      Q.  Was it at a particular base?
13      A.  Yeah, but I can't talk about it.
14      Q.  You can't?
15      A.  No.
16      Q.  Is that one of the classified jobs?
17      A.  Yes, uh-huh.
18      Q.  If it was declassified you could talk
19   about it?
20      A.  Yes.
21      Q.  When you came back -- let me ask you,
22   when you were at Germany for those three years
23   was it sheet metal work?
24      A.  Yes.

Page 36

1       Q.  When you came back from '67 to '72 at
2    Eglin Air Force Base in the military what did
3    you do?  Sheet metal work?
4       A.  Sheet metal.
5       Q.  And then you retired in 1972 from the
6    Air Force?
7       A.  Right, January.
8       Q.  Honorable discharge?
9       A.  Yes.
10      Q.  And you became what they call a civilian
11   employee?
12      A.  Right.
13      Q.  What was the difference between a
14   civilian employee and being in the military?
15      A.  None.
16      Q.  Is it fair to say that all the time that
17   you were in the military from 1954 or 1951 to
18   your retirement in 1972 when you worked on
19   aircraft you had manuals provided by the
20   Department of Defense?
21      A.  Yes.
22      Q.  How did you know how to do your job?
23      A.  Mainly learn it.
24      Q.  And if you had a question about which

Page 37

1    nut went on which bolt, were you just allowed to
2    figure it out on your own?
3        A. I generally knew.
4        Q. But if you had something complex did you
5    have to go to the manual?
6        A. I went to the manual or someone higher
7    that knew, knew about it.
8        Q. And from -- and my last questions then
9    will just be about from 1972 to the time you
10   retired in 1995.
11       A. Uh-huh.
12       Q. Basically did your job remain the same
13   at civilian employee?
14       A. Yes, it was in the test wing.
15       Q. And so you're mainly taking sheet metal
16   on and putting sheet metal off?
17       A. Well, they had to modify them and
18   everything. I can't talk about all of it.
19       Q. There's some jobs you worked on from '72
20   to '95 that were classified?
21       A. Oh, yes.
22       Q. Was all of your schooling that you went
23   to in the Air Force, was it mainly focused on
24   sheet metal work?

Page 38

1        A. Sheet metal, fiberglass, plastic.
2        Q. At one point in time fiberglass became
3    fairly routine in the aircraft?
4        A. Yes.
5            MR. GIFFORD: That's all the
6        questions I have for you, sir. I
7        appreciate your time. I'm going to let
8        another gentleman ask you questions and
9        we're probably going to have to go off
10       the record so I can move my body out of
11       the way, okay.
12           THE DEPONENT: Okay.
13           MR. GIFFORD: Thank you.
14           THE DEPONENT: Thank you.
15           (Break.)
16           EXAMINATION
17   BY MR. DUERINGER:
18       Q. Mr. Hamrick, hi.
19       A. Yes.
20       Q. My name is Chris Dueringer and I
21   appreciate your time this morning.
22       A. Thank you.
23       Q. Earlier you said you worked on C-47
24   aircraft?

Page 39

1        A. Right.
2        Q. Was all your work on C-47 aircraft while
3    you were in the military?
4        A. Yes.
5        Q. Was all your work on C-47 aircraft the
6    sheet metal work that you discussed earlier?
7        A. Well, that there was at Andrews, C-46s,
8    45s, 47s, 118s.
9        Q. I'm just talking about the C-47 now.
10       A. Oh, okay.
11       Q. On for just the C-47, was that sheet
12   metal work that you did on the C-47?
13       A. Yes.
14       Q. And was this sheet metal work just
15   around the cowling, is that the work that you
16   did?
17       A. Mainly that's what I did.
18       Q. Do you recall any other work, sheet
19   metal work you did, or was it mainly what you
20   remember is around the cowling?
21       A. Mainly around the cowling.
22       Q. Do you know the age of any of the C-47
23   aircraft that you worked on?
24       A. No, it goes on back.

Page 40

1        Q. And all your work on C-47 was at
2    Andrews; is that right?
3        A. Right.
4        Q. Do you know the cowling, whether that
5    was an original cowling on the plane or whether
6    it had been replaced by others in the past? You
7    don't know?
8        A. No, I don't know.
9        Q. You also said you worked on the C-118?
10       A. Right.
11       Q. Was all your work on the C-118 while you
12   were in the military as well?
13       A. Yes.
14       Q. Was that at Andrews Air Force Base as
15   well, sir?
16       A. Yes, it was.
17       Q. Was your work on the C-118, that sheet
18   metal work, around the cowling mainly?
19       A. No, all over.
20       Q. All over?
21       A. Uh-huh.
22       Q. What other areas of the C-118 -- I'm
23   just talking about just the C-118 -- what other
24   areas do you recall working around?

Page 41

1  A. Well, in the cockpit, inside and out.
2  Q. Around the cockpit?
3  A. Yeah, you know, if it needed -- cracks
4  or anything, why, we repaired it and all that.
5  Q. So you worked around the cowling and the
6  cockpit on the C-118?
7  A. Oh, yes.
8  Q. Any other areas of the C-118 you
9  remember working around or is that mainly it?
10  A. I think that's mainly it.
11  Q. Did you know the age of any of the C-118
12  aircraft that you worked on?
13  A. No, not right offhand.
14  Q. So you don't know whether any of the
15  cowling was original cowling or anything?
16  A. No.
17  Q. You don't know the manufacturer of the
18  cowling?
19  A. No.
20  Q. Any parts?
21  A. No.
22  Q. Was all your work on the C-118 also at
23  Andrews?
24  A. No, I think we did some in Germany.

Page 42

1  Q. At the Air Force Base in Germany?
2  A. Yeah.
3  Q. So all your work on the C-118 was either
4  at Andrews or at the Air Force Base --
5  A. Yeah.
6  Q. -- in Germany; is that right?
7  A. Uh-huh.
8  Q. On that list that you dictated to your
9  wife that's written in that book that your
10  attorney showed you earlier --
11  A. Yes, sir.
12  Q. -- sir, you also listed the F-101
13  aircraft, do you recall ever working on an F-101
14  aircraft?
15  A. Yeah, but I -- let's see, 101, 100, that
16  was -- I don't know whether that was Edwards or
17  Eglin.
18  Q. So it was either at Edwards or at Eglin?
19  A. Yes.
20  Q. But you don't -- do you recall any work
21  you did on the F-101?
22  A. Just repair work.
23  Q. Again, sheet metal work?
24  A. Yeah, all sheet metal work.

Page 43

1  Q. Do you specifically recall working or is
2  that just a general memory you have?
3  A. Well, that's just, I guess, a general
4  memory, you know, work order or something, go
5  and do it.
6  Q. Would that have been sheet metal work
7  around the cowling again, if you remember?
8  A. I don't -- I don't remember right
9  offhand.
10  Q. So on the F-101 you just can't remember
11  specifically any work you were doing on that
12  plane; is that right?
13  A. I did sheet metal work, but...
14  Q. But other than that you can't recall?
15  A. Right.
16  Q. You don't know the age of any F-101
17  planes you worked on; is that right?
18  A. Right.
19  Q. And you don't -- I'm going to take a
20  guess here. You don't know the manufacturer of
21  any cowlings that you may have worked around on
22  F-101s; is that right?
23  A. No. See, that was test plane, and a lot
24  of that stuff, you know, I can't talk about it

Page 44

1  or anything.
2  Q. I understand. On that list that you
3  dictated to your wife that's in the book, it's
4  also written down there a B-66; do you recall
5  ever working on a B-66?
6  A. Yes.
7  Q. Where did you work on a B-66?
8  A. Eglin Air Force Base.
9  Q. Eglin Air Force Base?
10  A. Uh-huh.
11  Q. And was that also sheet metal work that
12  you did on the B-66?
13  A. Yes.
14  Q. Was that work also around the cowling on
15  a B-66?
16  A. Yeah. And then, you know -- I know one
17  of them things I didn't put down, I think, that
18  D-7.
19  Q. A D-7?
20  A. 87-D.
21  Q. Okay, 87-D?
22  A. Uh-huh.
23  Q. Back to the B-66, do you recall any
24  sheet metal work other than working around the

11 (Pages 41 to 44)

Page 45

1  cowling on a B-66?
2      A. Well, it could be on the wings or
3  anywhere, you know, that repair work.
4      Q. So you worked around the cowling and
5  then on the wings?
6      A. Usually.
7      Q. Repairing the skin?
8      A. Skin, yes.
9      Q. So other than the work around the
10  cowling and repairing the skin on the wings do
11  you recall any other work on a B-66 while you
12  were at Eglin?
13      A. Not right offhand, because so many of
14  them...
15      Q. And did you know the age of any of the
16  B-66 aircraft you worked on?
17      A. No.
18      Q. So you don't know whether any of the
19  parts you worked around were original; is that
20  right?
21      A. No, I don't know, you know.
22      Q. One more plane I wanted to ask you
23  about, and that was on that list that you
24  dictated to your wife that's in the book.

Page 46

1      A. Uh-huh.
2      Q. It's a C-133?
3      A. Yes.
4      Q. Do you recall working on a C-133?
5      A. Oh, yes.
6      Q. And where was that?
7      A. That was Edwards Air Force Base.
8      Q. Edwards Air Force Base, okay. So you
9  only worked on the C-133 when you were in the
10  military; is that right?
11      A. Right.
12      Q. And was that also sheet metal work you
13  did on the C-133?
14      A. Right, uh-huh.
15      Q. Was that also sheet metal work around
16  the cowling?
17      A. Oh, yes.
18      Q. Do you recall any sheet metal work other
19  than around the cowling on C-133?
20      A. Well, the same ways, you repair the skin
21  and everything.
22      Q. Well, then other than the skin or the
23  work around the cowling on C-133, is that all
24  the work you remember on a C-133?

Page 47

1      A. Right, uh-huh.
2      Q. Do you remember the age of any of the
3  planes you worked on in C-133 aircraft?
4      A. No, because that was back...
5      Q. Long time ago?
6      A. Long time ago, that was back in -- oh,
7  shoot, I can't -- just can't remember.
8      Q. That's okay. So you don't know whether
9  any of the parts you worked around were original
10  parts on C-133 aircraft; is that right?
11      A. Right.
12      Q. And when you were at Eglin were you ever
13  in the military when you were in Eglin or were
14  you in Civil Service at Eglin?
15      A. Both.
16      Q. Oh, you were both?
17      A. I was right at two years military.
18      Q. Two years military at Eglin and the rest
19  of the time --
20      A. The rest was 23 years Civil Service.
21      Q. When you worked on the F-101 at Eglin
22  was that just when you were in the military or
23  was that also when you were in Civil Service, if
24  you remember?

Page 48

1      A. I think some of that was done when I was
2  in the military.
3      Q. In the military?
4      A. Yeah.
5      Q. Is that the same for the B-66?
6      A. Yes.
7      Q. It was all done while you were in the
8  military? So for the F-101, the B-66, the C-47,
9  the C-118, the C-133, it sounds like all that
10  work was while you were in the military; is that
11  right?
12      A. Yes.
13          MR. DUERINGER: I don't have
14      any other questions, sir. Thank you
15      very much for your time.
16          THE DEPONENT: Okay, thank you.
17          EXAMINATION
18  BY MR. DAVIS:
19      Q. Mr. Hamrick, it's Lee Davis again. I
20  just want to ask you a couple follow-up
21  questions.
22      Both during your time in the military
23  and while you were a Civil Service employee
24  while you were performing work on planes were

Page 49

1  there other people around you performing
2  different work while you were present?
3  A.  Oh, yes.
4  Q.  Now, we've talked about this book, and
5  this was your wife's handwriting, but this was
6  your book from 1957?
7  A.  Yes, sir.
8  Q.  We're going to -- I'm going to have this
9  book copied at my office and I'm going to attach
10  it as Exhibit 1 to this deposition, all right?
11  A.  Okay.
12         MR. DAVIS:  With that --
13         MR. DEAN:  Excuse me, there's a
14     sheet in that book --
15         MR. DAVIS:  Yeah, all the
16     sheets are going to be copied, there's a
17     -- I believe it's an MOS, and some kind
18     of -- one discharge paper from the Civil
19     Service, that will be copied as well.
20     Anything that was in there you guys will
21     get.
22         There's one more question.
23         MR. GIFFORD:  And just one
24     possible follow-up.

Page 50

1         EXAMINATION
2  BY MR. GIFFORD:
3  Q.  Mr. Hamrick, again, it's Rob Gifford,
4  thank you for your time.
5      When you were in the Air Force, either
6  in the United States or in Germany, did you live
7  on the base whenever you were in the military?
8  A.  Yes.
9  Q.  The complete time for the 21 years or
10  so?
11  A.  No, there was short periods of time.
12  Q.  While you were in the military were you
13  ever involved in helping out, not just doing
14  sheet metal work on aircraft, but also tearing
15  out or rebuilding parts of the air base?
16  A.  Yes.
17  Q.  What would you be doing in those
18  projects?
19  A.  Tearing...
20  Q.  Tearing buildings down?
21  A.  Oh, well, yeah, I tore some of the --
22  helped tear down old buildings and so forth.
23  Q.  Would you be helping rebuilding ones on
24  the bases?

Page 51

1  A.  No, just we'd have, you know, help tear
2  them down, and they would be replaced, you know,
3  with something else.
4  Q.  Is this your homestead here?  Is this
5  your home you grew up in?
6  A.  No.
7  Q.  Where was your home located here in
8  Webster Springs?
9  A.  Mainly above Parcoal Road, up here at --
10  back up on the hill.
11  Q.  Is that home still standing?
12  A.  As far as I know it is.
13  Q.  Why is it that you bought this house
14  when you came back?  Is this somewhere you --
15  A.  Well, my father and mother used to own
16  this, and then when they passed away they left
17  it to my sisters.  Well, me and my brothers
18  signed it over to them.  And they had it until
19  here recently and I bought it.
20  Q.  You mentioned that you had a wife --
21  your first wife?
22  A.  Yes.
23  Q.  Was she also from Bergoo?
24  A.  No, she's -- she's from Maryland.

Page 52

1  Q.  She was from Maryland?  What was her
2  name?
3  A.  Dagmey, Elizabeth.
4  Q.  And you have four children?
5  A.  Yes.
6  Q.  And how many sons and how many
7  daughters?
8  A.  Two sons and two daughters.
9  Q.  Do they live in this area?
10  A.  No, I take that back, I'm sorry.
11         MR. DAVIS:  Three boys.
12  A.  Three boys and one daughter.
13  Q.  One of them is going to get mad at you
14  for calling him a girl.
15      Do they live in this area?
16  A.  No.
17  Q.  Where do they live?
18  A.  Two of them -- one lives in Florida and
19  two in Alabama and the other one I think is in
20  Texas.
21  Q.  When you lived in Florida did you live
22  in Shalimar, Florida?
23  A.  Yes.
24  Q.  And you owned a home down there?

Page 53

1   A. Yes.

2           MR. GIFFORD:  That's all I

3   have, thank you.

4           MR. DAVIS:  There are no more

5   questions, Mr. Hamrick, with that we'll

6   conclude this deposition.  We'll waive

7   your signature.  Thank you for your

8   time.

9           THE DEPONENT:  Thank you.

10          (Read and sign waived.)

11  (This deposition concluded at 12:32 p.m.)

12  (Exhibit A. marked for identification.)

13

14

15

16

17

18

19

20

21

22

23

24

Page 54

1   STATE OF WEST VIRGINIA, To-wit:

2       I, James D. Nielsen, a Notary Public and
    Court Reporter within and for the State

3   aforesaid, duly commissioned and qualified, do
    hereby certify that the deposition of CHARLES E.

4   HAMRICK, was duly taken by me and before me at
    the time and place specified in the caption

5   hereof.

6       I do further certify that said
    proceedings were correctly taken by me in

7   stenotype notes, that the same were accurately
    transcribed out in full and reduced to

8   typewriting, and that said transcript is a true
    record of the testimony given by said witness.

9

        I further certify that I am neither
10  attorney or counsel for, nor related to or
    employed by, any of the parties to the action in

11  which these proceedings were had, and further I
    am not a relative or employee of any attorney or

12  counsel employed by the parties hereto or
    financially interested in the action.

13

14

        My commission expires the 15th day of May
15  2006.

16      Given under my hand and seal this 10th
    day of March 2005.

17

18

19

20          _____
            James D. Nielsen
            Court Reporter

21          Notary Public

        22

23

24

COPY - The original was filed in
the Clerk's Offic    t Charleston o

JUL 2 1 2005

TERESA L. DEPPNER, CLERK
U.S. District & Bankruptcy Court
Southern District of West Virginia

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

CHARLES E. HAMRICK and
WANDA HAMRICK, his wife

                  Plaintiff,

      v.

A & I COMPANY, et al.,

                Defendants.

Civil Action No.  2:05-0287

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND OF DEFENDANT MCDONNELL DOUGLAS CORPORATION

Michael B. Victorson (WVSBN: 3868)
JACKSON KELLY PLLC
1600 Laidley Tower
Post Office  Box  553
Charleston, West Virginia  25322
(304) 340-1000

Robert E. Boone III
BRYAN CAVE LLP
120 Broadway, Suite 300
Santa Monica, California 90401
(310) 576-2385

*Counsel for McDonnell Douglas Corporation*



## TABLE OF CONTENTS

I.    SUMMARY OF ARGUMENT ...................................................................................1

II.   FACTUAL AND PROCEDURAL BACKGROUND.........................................................4

III.  FEDERAL OFFICER REMOVAL JURISDICTION IS PROPER.....................................9

   A.  The Test For "Federal Officer" Removal Jurisdiction.........................................................9

   B.  MDC Is a "Person" Within the Meaning of Section 1442(a)(1)
       As a Matter of Law ...............................................................................................10

   C.  MDC Acted·Under the Direction of Federal Officers When it Built the Subject
       Military Aircraft.....................................................................................................10

       1.  MDC Acted Under the Direction of Federal Officers When It Assembled the
           Subject Aircraft................................................................................................12

       2.  MDC also satisfies the "acting under" requirement based on the Government's
           mandate that MDC install GFAE-CI components on the Subject Aircraft .................14

       3.  MDC also satisfies the "acting under" requirement based on the Government's
           mandate that MDC comply with military specifications that required the use
           of asbestos......................................................................................................15

   D.  There Is a "Causal Nexus" Between MDC's Action Under Color of Federal
       Office and Plaintiffs' Claims .................................................................................15

   E.  MDC Has a "Colorable Federal Defense," i.e., Government Contractor Defense
       and Derivative Sovereign Immunity ......................................................................16

IV.   FEDERAL QUESTION (FEDERAL ENCLAVE) JURISDICTION IS PROPER ..........20

V.    CONCLUSION....................................................................................................22

{C0961922.1}

# TABLE OF AUTHORITIES

**Cases**

Anderson v. Crown Cork & Seal,
   93 F. Supp. 2d 697 (E.D. Va. 2000) ............................................................................... 22

Good v. Armstrong World Industries, Inc.,
   914 F. Supp. 1125 (E.D. Pa. 1996) ............................................................................... 13

Gulati v. Zuckerman,
   723 F. Supp 353 (E.D. Pa. 1989 ................................................................................... 11

In re Aircraft Crash Litigation Frederick, Maryland,
   752 F. Supp. 1326 (S.D. Ohio 1990) ............................................................................ 16

Int'l Bus. Machs. Corp v. Vaughn,
   98 So. 2d 747 (Fla. 1957) .............................................................................................. 22

International Primate Protection League v. Administrators of Tulane Educational Fund,
   500 U.S. 72 (1991) ....................................................................................................... 13

Mesa v. California,
   489 U.S. 121 (1989) ......................................................................................... 11, 17, 19

Niemann v. McDonnell Douglas Corporation,
   721 F. Supp. 1019 (S.D. Ill. 1989) .................................................................... 4, 18, 20

Pack v. AC&S,
   838 F. Supp. 1099 (D. Md. 1993) .................................................................... 12, 15, 20

State of Nebraska ex rel. Department of Social Services v. Benston,
   146 F.3d 676 (9th Cir. 1998) ....................................................................................... 13

U.S. v. Aerodex,
   469 F.2d 1003 (5th Cir. 1972) ..................................................................................... 14

U.S. v. Bornstein,
   423 U.S. 303 (1976) ..................................................................................................... 14

Winters v. Diamond Shamrock Chemical Co.,
   149 F.3d 387 (5th Cir. 1998) ....................................................................................... 11

Yearsley v. W.A. Ross Construction Co.,
   309 U.S. 18 (1940)4, 18, 20, 21

**Statutes**

18 U.S.C. § 7(3) ............................................................................................................. 22

28 U.S.C. § 1441(b) ............................................................................................. 2, 6, 21, 22

28 U.S.C. § 1442(a)(1) ....................................................................... 2, 10, 11, 19, 20

28 U.S.C. §§ 1331 ................................................................................................. 2, 6, 22

31 U.S.C. § 3730(a) ....................................................................................................... 14

{C0961922.1}

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

CHARLES E. HAMRICK and
WANDA HAMRICK, his wife

        Plaintiff,

Civil Action No.  2:05-0287

     v.

A & I COMPANY, et al.,

        Defendants.

**MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO PLAINTIFF'S MOTION TO REMAND
OF DEFENDANT MCDONNELL DOUGLAS CORPORATION**

COMES NOW Defendant McDonnell Douglas Corporation ("MDC") and submits the following Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion to Remand this case to the District Court of Kanawha County.

## I.   SUMMARY OF ARGUMENT

This Court should deny Plaintiffs' Motion to Remand because there exists "federal officer" removal jurisdiction over this action pursuant to 28 U.S.C. § 1442(a)(1) and "federal enclave" removal jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1441(b).  Contrary to Plaintiffs' assertions, MDC has in fact made the requisite showing – in its removal petition and in this Opposition – that it has the right to have this case adjudicated in federal court on both such grounds.

Plaintiffs allege broad claims for strict liability, negligence and breach of express and implied warranties against MDC based on Charles Hamrick's purported exposure to asbestos in C-47, C-118, C-133, B-66 and F-101 military combat aircraft (hereinafter, the "Subject Aircraft") built by MDC for the United States Air Force ("USAF"), pursuant to military

equipment procurement contracts with the United States Government, Department of Defense ("DOD" or "Government"), while Mr. Hamrick served in the USAF and/or worked for the DOD at various USAF military bases during a 20-year span.

"Federal officer" removal jurisdiction exists here because (1) MDC is a "person" within the meaning of Section 1442(a)(1); (2) MDC acted under the direction of a federal officer when it included asbestos-containing components in the Subject Aircraft; (3) there is a causal connection between Plaintiffs' claims and MDC's Government ordered conduct; and (4) MDC has asserted a colorable federal defense to Plaintiffs' claims.

Plaintiffs do not and cannot contest that MDC is a "person" within the statute because it is well-settled that corporate entities are considered "persons" for purposes of Section 1442(a)(1).

Furthermore, MDC has proffered undisputed evidence[1] that it was acting under the direction and control of federal officers while assembling C-47, C-118, C-133, B-66 and F-101 aircraft for the Government.   DOD personnel were intimately involved in and exercised extensive control over all phases of the procurement process, including design, manufacture, assembly, testing and modification, for all of the Subject Aircraft.  USAF officers and technical staff, and in particular, those from its Air Material Command ("AMC") unit, were stationed at MDC's facilities and at AMC's headquarters at Wright Field in Dayton, Ohio, and actively participated in, supervised and oversaw all of these phases, down to the most minute detail, to ensure that MDC complied with the design requirements for the aircraft and its contractual obligations to the Government.  The designs of the aircraft were fixed by Detail Specifications, Change Orders and design drawings, all of which were reviewed and approved or issued by federal officers.  MDC was not free to make any changes to the aircraft design without prior

---

[1]   Even if Plaintiff could proffer admissible controverting evidence, MDC still is entitled to have this matter adjudicated in federal court.  MDC only has to make a showing that removal jurisdiction exists.  A motion to remand is not an appropriate juncture at which to determine the merits of the case.

{C0961922.1}

express review and authorization from the Government.

Not only did the Government approve all aspects of the Subject Aircraft design, but the Government officials in fact dictated many of the design features.  For instance, the Government required MDC to install certain components which allegedly contained asbestos, such as engines, assemblies and gaskets.  Such equipment was designated by the USAF as "Government Furnished Aircraft Equipment – Contractor Installed" ("GFAE-CI") in the procurement contracts,[2] which expressly mandated that MDC install such equipment on the planes.  The Government selected, reviewed and approved the design of, and separately procured, GFAE-CI components from their original equipment manufacturers ("OEMs"), not MDC.   The Government dealt directly with those OEMs during those procurement processes.  MDC had no choice but to install GFAE-CI components on the aircraft.  Furthermore, the Government also required compliance with numerous material specifications, promulgated by the Government, many of which mandated the use asbestos in the aircraft.

There is no question that a causal nexus exists between Plaintiffs' claims and MDC's conduct under the direction and control of federal officers.  Plaintiffs are suing MDC based on Charles Hamrick's purported exposure to Government-mandated and Government-furnished asbestos-containing components that MDC was required to install in aircraft it assembled.  Since MDC's use of such asbestos-containing components was specifically compelled by the Government, MDC easily satisfies the causal nexus requirement.

MDC has asserted two separate and well-founded colorable federal defenses to Plaintiffs' claims.  First, MDC has asserted the "government contractor defense," as recognized by the Supreme Court in Boyle v. United Technologies Corp., 487 U.S. 500 (1988).  Plaintiffs cannot credibly contend that this defense is not a "colorable" one based on the known facts in this case, including the undisputed evidence proffered by MDC, as well as the plethora of decisions by

---

[2]      GFAE-CI components are also specified in the Detail Specifications, which are incorporated by reference into each of the production contracts.

sister federal and state courts upholding the defense, including the grant of summary judgment in favor of MDC on identical grounds in Niemann v. McDonnell Douglas Corp., 721 F. Supp. 1019 (S.D. Ill. 1989), which involved alleged asbestos exposure arising from the very same C-118 aircraft identified in this lawsuit, as well other military aircraft built by MDC for the USAF pursuant to the same procurement scheme as the Subject Aircraft involved here. MDC also has asserted a colorable defense of derivative sovereign immunity against Plaintiffs' claims pursuant to the doctrine set forth in Yearsley v. W.A. Ross Construction Co., 309 U.S. 18 (1940).

Federal enclave jurisdiction also is proper. It is well-established that toxic exposure claims arising from aircraft maintenance performed on USAF bases are undeniably subject to "federal enclave" removal jurisdiction. Akin v. Big Three Industries, 851 F. Supp. 819, 822 (E.D. Tex. 1994). Plaintiffs' contention that their claims instead "arose" in West Virginia is based on their erroneous so-called "choice of law" analysis under West Virginia law. However, whether subject matter jurisdiction exists under a federal statute – i.e., the "federal enclave" removal jurisdiction statute – does not involve any choice of law analysis – under any state law – regarding the substantive rights of the parties. Indeed, federal subject matter jurisdiction merely pertains to the right to adjudicate the case in federal court. MDC has demonstrated that right here based on Plaintiffs' allegations that Mr. Hamrick was exposed to asbestos in MDC aircraft at numerous USAF bases.

Accordingly, both "federal enclave" and "federal officer" jurisdiction are proper and Plaintiffs' Motion to Remand should be denied.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Charles E. Hamrick and his spouse Wanda Hamrick initially filed this asbestos personal injury action in the Circuit Court of Kanawha County, West Virginia (Case No. 05-C-54), on February 4, 2005, against various defendants, including MDC. Plaintiffs allege that Mr. Hamrick contracted mesothelioma caused by exposure to asbestos while he served in the USAF and worked for the DOD at the following USAF military bases from 1952 to 1995: Andrews AFB in Maryland, Edwards AFB in California, Weisbough AFB in Germany, and Eglin AFB in

{C0961922.1}

Florida. Plaintiffs allege that, while stationed at these U.S. military bases, Mr. Hamrick was exposed to asbestos from his work on the Subject Aircraft assembled by MDC's predecessors, Douglas Aircraft Company ("DAC") and McDonnell Aircraft Company.[3] See Deposition of Charles Hamrick ("Plaintiff's Depo.") at pp. 31:3-48:12 (attached hereto as Exhibit A).

Contrary to Plaintiffs' contention, their claims are not strictly limited to so-called failure to warn theories. Instead, Plaintiff's Complaint broadly alleges that MDC was negligent and breached such warranties, and that MDC's products (i.e., the Subject Aircraft) to which Mr. Hamrick was supposedly exposed were defectively designed, because MDC included asbestos-containing components in those aircraft, in addition to claiming that MDC failed to warn Mr. Hamrick about purported dangers of asbestos used in the planes. See Complaint at ¶ 9 ("they produced, supplied and/or sold, and/or used, and/or specified, and/or delivered products containing asbestos …"), ¶ 13 ("strictly liable … for selling and/or using and/or specifying asbestos containing products … [and] selling products that were unreasonably safe"), and ¶¶ 16-17.

On April 7, 2005, MDC removed this action to this Court on two separate grounds: (a) "federal officer" grounds pursuant to 28 U.S.C. § 1442 (a)(1); and (b) "federal enclave" grounds pursuant to 28 U.S.C. Sections 1331 and 1441(b).[4] Plaintiffs did absolutely nothing for almost three months to challenge this Court's jurisdiction over this matter, even though Plaintiffs now (incorrectly) contend that MDC (and Defendant Pratt & Whitney) improperly removed the case, and that the Court should lift its recent order staying the case pending transfer to MDL-875 so it can rule on Plaintiff's Motion to Remand because time is of the essence due to Mr. Hamrick's medical condition.

---

[3]   Douglas Aircraft Company merged with McDonnell Aircraft Company in 1967 to form McDonnell Douglas Corporation. Douglas Aircraft Company and McDonnell Aircraft Company will collectively be referred to herein as "MDC."

[4]   MDC also joined in co-Defendant Pratt & Whitney's Notice of Removal on identical grounds.

{C0961922.1}

As set forth in detail herein, in the accompanying Affidavit of Larry L. Fogg ("Fogg Aff.") (filed separately herewith) and the Declaration of Donald W. Douglas, Jr.[5] (deceased) ("Douglas Decl.") (attached as Exhibit A to the Affidavit of Robert E. Boone III ("Boone Aff.")), and in MDC's removal petition MDC properly removed the action on both "federal officer" and "federal enclave" grounds.  As to "federal officer" jurisdiction, the evidence is undisputed that MDC built C-47, C-118, C-133, B-66 and F-101 aircraft pursuant to military procurement contracts with the USAF[6] and in compliance with reasonably precise design specifications, as well as detailed design drawings, which were reviewed and approved by the USAF.  Fogg Aff. ¶¶ 7,10,11,18,31; Douglas Decl. ¶ 28.  Government personnel were intimately involved in the design, development and testing of the Subject Aircraft and their components and systems, and monitored MDC's performance under the contracts at all times and required MDC to construct the aircraft in accordance with the applicable and approved specifications and drawings incorporated into the contracts.  Fogg Aff. ¶¶ 7,31; Douglas Decl. ¶ 12.  All contracts, and aircraft built thereunder, were subject to inspection, testing and approval by the USAF.  Fogg Aff. ¶¶ 10, 33; Douglas Decl. ¶¶ 12-15.  In addition, the USAF performed extensive flight tests of the aircraft and their components and systems prior to commission to ensure complete conformity with the design specifications.  Douglas Decl. ¶¶ 12, 41.

Federal officers, including officers from the USAF, participated in, supervised and directed virtually all aspects of the design, testing and production phases of the Subject Aircraft.  Id. at ¶ 12.  During these phases, the military had stationed at the various MDC facilities a resident contracting officer/representative, along with a full staff of scientists, engineers,

---

[5]   Mr. Douglas' declaration was executed on May 4, 2000, in support of MDC's Opposition to Plaintiffs' Motion to Remand in the Rellin v. Allied Signal, Inc. (D. C. Hawaii 2000). He passed away on October 3, 2004.

[6]   The USAF was previously known as the United States Army Air Corps ("USAAC"), or alternatively, as the Army Air Forces ("AAF").  The USAAC, AAF and USAF will collectively be referred to herein as the "USAF."

{C0961922.1}

procurement officers, technicians and security personnel. Id. These federal officers supervised and directed the design, testing and production of the aircraft, including without limitation ordering changes in the design, testing and/or manufacture of the aircraft. Id. Military officers, engineers, contact administrators and technicians had, and exercised, complete access to MDC's facilities to oversee the design, development and production of the aircraft. Id. Federal officers were present at MDC's facilities daily during the design and development years of the aircraft programs to ensure that the designs complied with all applicable government specifications. Id.

Federal officers controlled any and all design changes to the Subject Aircraft. That is, MDC could not change the design of the aircraft without prior authorization from Federal officers. Id. at ¶ 24. USAF-originated design changes were communicated through Change Orders or Contract Change Notifications, under which USAF officers directed MDC to make specific changes to the Subject Aircraft design. Id. at ¶ 23. Even design modifications proposed by MDC occurred only after a proposed change had been submitted to, and evaluated and approved by, federal officers. Id. at ¶ 24. Federal officer approval for design changes occurred through the ECP ("Engineering Change Proposal") process, which was specified in all aircraft production contracts. Id. Through this process MDC, at the request of federal officers, determined the feasibility and cost of the requested change, following which the Government evaluated, reviewed and either approved, approved in part, directed revisions of or rejected the changed design. Id. Federal officers retained absolute authority to accept, reject or modify any aspect or portion of an ECP. Id. Federal officers monitored all ECP changes to the aircraft at every stage and MDC could not proceed with any design change activity without prior Government review and approval. Id.

Perhaps more important, many of the component parts used in the Subject Aircraft were government-procured and government-furnished aircraft equipment ("GFAE-CI")[7] that MDC

---

[7]     GFAE component parts can be of two types: (1) GFAE-CI (Contractor installed GFAE) and (2) GFAE-GI (Government installed GFAE). MDC was required to install GFAE-CI

installed on these aircraft, during the manufacture and assembly of such aircraft, as required by MDC's procurement contracts with the Government and under the direction and control of federal officers. Fogg Aff. at ¶¶ 17-18. Federal officers, not MDC, selected and approved the design of, including the use of any asbestos in, GFAE-CI components used in the Subject Aircraft. Id. Further, federal officers independently procured these GFAE-CI component parts from their original equipment manufacturers ("OEMs"), supplied the components to MDC, and required MDC to install them on the aircraft. Id. That is, MDC had no choice but to install the Government selected and approved component parts, including any asbestos contained in them, on such aircraft. Now, Plaintiffs sue MDC for allegedly using asbestos in those components.

For instance, engines used on C-47 aircraft were GFAE-CI components procured by the Government from the engine manufacturer, Pratt & Whitney. The GFAE-CI Pratt & Whitney R-1830 engines included asbestos-copper gaskets. Id. at ¶¶ 25, 26. MDC was required by federal officers to install those engines, with those asbestos components, on C-47 aircraft.

Furthermore, MDC was required to comply with various Government-authored material specifications, including (1) Air Force-Navy Aeronautical Standards, which are prepared jointly by the United States Air Force, the Bureau of Aeronautics and the Aeronautical Standards Group of the Departments of the Air Force and Navy, and (2) Military Specifications, currently known as MIL specs, which required MDC to use Government-specified and approved materials, components and/or techniques that had been developed by the Government over many years of procuring, designing and manufacturing military equipment for use in the production of aircraft and were prepared "under the cognizance of the Munitions Board Standards Agency, as developed jointly by the technical service of the Army, Navy and the Air Force. Id. at ¶¶ 20, 21.

Numerous such material specifications mandated the use of asbestos. For instance, Government officials specifically required MDC to install Air Force-Navy Aeronautical

---

equipment on the Subject Aircraft pursuant to its procurement contracts with the Government. Fogg Aff. ¶ 17.

{C0961922.1}

Standard AN900 and AN4059 components on the Subject Aircraft. Id. at ¶¶ 22-26. Air Force-Navy Aeronautical Standard AN900 specified a gasket design comprised asbestos material encapsulated in copper sheet. Id. at ¶ 25. In addition, Air Force-Navy Aeronautical Standard AN4059 specified an engine accessory drive gasket comprised of sheet-form or roll-form asbestos. Id. at ¶ 22. As an example, pursuant to a Change Order issued by USAF Second Sergeant A. S. Wolfert, the Government directed MDC to install GFAE-CI AN4059 gaskets on C-47 aircraft. Id. at ¶ 12. Many of the gaskets used on the GFAE-CI engines built by the engine OEMs, such as Pratt & Whitney, were made in accordance with such material specifications, thus further demonstrating the level of control by federal officers over the Government's procurement of all military equipment. Id. at ¶ 26.

As to "federal enclave" removal grounds, it is undisputed that Mr. Hamrick's purported exposure to the alleged defective Subject Aircraft occurred at federal military bases while he served in the USAF or worked for the DOD. None of those federal enclaves is in West Virginia. Plaintiffs do not (and cannot) contend that Mr. Hamrick ever worked on any MDC aircraft in West Virginia or, for that matter, anywhere besides on the aforementioned military bases. Obviously, Plaintiffs' so-called "failure to warn" claims are not predicated on any failure by MDC to warn Mr. Hamrick while he has resided in West Virginia because any such warnings necessarily would have post-dated his alleged exposure outside the state at USAF military bases. Thus, Plaintiffs' claims against MDC clearly arose out of events occurring on a federal enclave.

## III.   FEDERAL OFFICER REMOVAL JURISDICTION IS PROPER

### A.   The Test For "Federal Officer" Removal Jurisdiction

28 U.S.C. § 1442(a)(1) governs federal officer removal jurisdiction, and states, in relevant part:

> (a) A civil action…commenced in a State court against any of the following may be removed by them to the district court of the Untied States for the distraction and division embracing the place where it is pending:

9

> (1) The United States or any agency thereof or any officer (or any person acting under that officer) or the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office...

28 U.S.C. § 1442(a)(1).

To establish federal officer removal jurisdiction, the removing party must (1) must be a "person" within the meaning of the statute; (2) demonstrate that it acted under the direction of a federal officer; (3) demonstrate a causal nexus between the plaintiff's claims and the acts the defendant performed under color of federal office; and (4) raise a colorable federal defense to the plaintiff's claims. See Mesa v. California, 489 U.S. 121, 124-35 (1989). As explained below, MDC satisfies each of these requirements.

### B.   MDC Is a "Person" Within the Meaning of Section 1442(a)(1) As a Matter of Law

As a matter of law, corporate entities are considered "persons" for purposes of Section 1442(a)(1). See Winters v. Diamond Shamrock Chemical Co., 149 F.3d 387, 398 (5th Cir. 1998) Thus, MDC satisfies this requirement.

### C.   MDC Acted Under the Direction of Federal Officers When it Built the Subject Military Aircraft

A corporate defendant is "acting under" the direction of a federal officer when that officer had "direct and detailed control" over the defendant." See Fung, 816 F. Supp. at 572-574. "This control requirement can be satisfied by strong government intervention and the threat that a corporate defendant will be sued in state court 'based upon actions taken pursuant to federal direction." Id. (quoting Gulati v. Zuckerman, 723 F. Supp 353, 358 (E.D. Pa. 1989)).

Courts have sustained removal on "federal officer" grounds and, in doing so, found the removing defendant satisfied the "acting under" prong under circumstances similar to, but less compelling than, those presented here. For example, in Fung, Navy personnel filed personal injury product liability actions against General Dynamics based on their alleged exposure to asbestos used in submarines General Dynamics built for the Navy pursuant to military

{C0961922.1}

procurement contracts. General Dynamics removed the actions on "federal officer" grounds, and plaintiffs moved for remand. In upholding "federal officer" removal jurisdiction, the court held that General Dynamics satisfied the "acting under" prong because it was "under the direct control of the Secretary of the Navy and authorized to build submarines under federal contract," the Government "monitored General Dynamics' performance at all times and required the defendant to construct and repair the [submarines] in accordance with the applicable and approved specifications incorporated into the contracts," "all contract supplies were subject to inspection, test, and approval by the government," and "the government also performed extensive dock and sea trial on the submarines prior to commission, to ensure complete conformity with design specifications." Id. at 572-73.

Similarly, in Pack v. AC&S, 838 F. Supp. 1099, 1103 (D. Md. 1993), the court found that defense contractor Westinghouse, which designed and manufactured turbine generators for the Navy, properly removed over 500 product liability actions against it on "federal officer" grounds. In denying plaintiffs' motion to remand, the court found that Westinghouse satisfied the "acting under" requirement by demonstrating that the Government (1) exercised "extensive control over the construction, design and testing of the turbines," (2) "monitored Westinghouse's performance and on occasion it returned drawings and specifications for revision," (3) specified and approved asbestos-containing components used, and (4) tested the turbines. Id. at 1103.

As explained below, MDC has shown that the Government exercised at least the same level of involvement and control over MDC's production of the Subject Aircraft, as the Government did with respect to the products at issue in the Fung and Pack cases. In fact, MDC submits that it has demonstrated a greater level of Government intervention than was demonstrated in Fung or Pack because neither of those decisions discussed evidence that the Government required General Dynamics or Westinghouse to install GFAE-CI components on that military equipment, like MDC has shown was the case here with respect to the Subject Aircraft.

Furthermore, Plaintiffs' reliance on Good v. Armstrong World Industries, Inc., 914 F.

{C0961922.1}

Supp. 1125, 1128 (E.D. Pa. 1996) is misplaced.  Good was decided at a time when the Supreme Court had held that removal under the federal officer removal statute was not available to the United States Government or to federal agencies.  See, e.g., International Primate Protection League v. Administrators of Tulane Educational Fund, 500 U.S. 72, 76 (1991).  However, in 1996 Congress enacted the Federal Courts Improvement Act of 1996, which amended Section 1442 to permit removal by the United States Government and by federal agencies, thereby effectively abrogating the International Primate decision.  See State of Nebraska ex rel. Department of Social Services v. Benston, 146 F.3d 676, 678 (9th Cir. 1998) (recognizing change in law)).  Consequently, there is no longer any reason to preclude removal under Section 1442 by corporate defendants acting under the control of the United States Government or a federal agency.  Simply put, the Good standard no longer applies and MDC is entitled to remove under Section 1442 based upon the direct control of the Government, the USAF and responsible military agencies such as AMC.  But even if the Good standard were to still apply, MDC has demonstrated that it incorporated asbestos-containing components pursuant to the express direction of specific federal officers through their direct involvement in the design and development of the Subject Aircraft, their selection of GFAE-CI and their execution of Change Orders requiring the installation of asbestos-containing parts.  Fogg Aff. ¶¶ 12,22-26; Douglas Decl. ¶ 13.

### 1.   MDC Acted Under the Direction of Federal Officers When It Assembled the Subject Aircraft

As discussed in the supporting Affidavit of Larry Fogg and Declaration of Donald Douglas, Jr., the Government was directly and closely involved in all phases during the production of the Subject Aircraft, including the initial design, design revision, manufacture and testing of those aircraft, for many years.  Federal officers and personnel were stationed and worked at the MDC facilities where the aircraft were manufactured.  Douglas Decl. ¶ 12.  USAF officers, engineers, contract administrators and technicians had, and exercised, complete access

{C0961922.1}

to MDC's facilities to review, approve and oversee the design, development, and production of the aircraft. Id. They were present at MDC's facilities daily to ensure that the design and manufacture of the aircraft complied with all applicable Government specifications and requirements. Id. Such presence, oversight and direction by military officials constitutes detailed and direct Governmental control. See Fung, 816 F. Supp. at 572-74 (concluding that control requirement satisfied when it is shown that Government exercised "direct and detailed" control over the defendant manufacturer).

Furthermore, the Government had authority to reject any aircraft that failed to conform to these specifications. As a Government contractor, MDC would be subject to liability and penalties under 31 U.S.C. 3729(a) of the False Claims Act ("FCA") for failure to deliver aircraft that conformed with contractual specifications. U.S. v. Aerodex, 469 F.2d 1003 (5th Cir. 1972) (manufacturer of aircraft engine component liable for failure to comply with specifications).[8] The FCA was enacted in 1863 (See Act of Mar. 2, 1863, ch. 67, 12 Stat. 696), and was originally aimed at stopping fraud perpetrated by contractors during the Civil War. U.S. v. Bornstein, 423 U.S. 303, 309 (1976).

The Government was continuously involved in the revision of the aircraft designs through Change Orders. Fogg Aff. ¶ 12. Government officials transmitted Change Orders directing MDC to accomplish specific design changes, including changes which specifically required the use of asbestos components as a heat-resistant material. Id. at ¶¶ 12, 26. Conversely, MDC could not change the Subject Aircraft design without prior Government authorization. Douglas Decl. ¶ 24. Design modifications occurred only after a proposed change had been submitted to, and evaluated and approved by, the Government. Id. Governmental approval for design changes occurred through the ECP process, which was specified in all aircraft production contracts. Id. Through this process MDC, at the request of the Government,

---

[8]     Under the FCA, the Attorney General may bring a civil action against the Government contractor. 31 U.S.C. § 3730(a). Alternatively, a private party ("relator") may bring a qui tam action on behalf of the Government. 31 U.S.C. § 3730(b)(1).

{C0961922.1}

determined the feasibility and cost of the requested change, following which the USAF evaluated, reviewed and either approved, approved in part, directed revisions of or rejected the changed design. Id. The Government retained absolute authority to accept, reject or modify any aspect or portion of an ECP. Id. The Government monitored all ECP changes to the aircraft at every stage. Id. MDC could not proceed with any design change activity without prior Government review and approval. Id.

Thus, MDC has satisfied the "acting under" requirement by demonstrating that the Government exercised "direct and detailed" control over the production of the Subject Aircraft. See Fung, supra; Pack, supra.

### 2. MDC also satisfies the "acting under" requirement based on the Government's mandate that MDC install GFAE-CI components on the Subject Aircraft

MDC was also "acting under" a federal officer by virtue of the undisputed fact that the Government required MDC to install certain alleged asbestos-containing GFAE-CI components and gaskets on the Subject Aircraft. USAF personnel required, directed and supervised MDC's installation of numerous GFAE-CI components on the aircraft. The Government, not MDC, selected these GFAE-CI components, such as the engines for each of the aircraft. Fogg Aff. at ¶¶ 17, 18. As the USAF's requirements for the aircraft evolved, so did the design of the aircraft. Concurrent with this design evolution, the USAF issued Change Orders directing MDC to install GFAE-CI asbestos-containing parts on later C-47 aircraft. Id. at ¶¶ 12, 22. The Government selected each of these asbestos-containing components on its own, separately procured them from OEMs, supplied them to MDC as GFAE-CI, and required MDC to install them on the aircraft during assembly. Id. at ¶¶ 17, 18. Courts have recognized that the inclusion of GFAE-CI permits greater Government control over an aircraft design. In the case of In re Aircraft Crash Litigation Frederick, Maryland, 752 F. Supp. 1326 (S.D. Ohio 1990), the USAF procured the subject GFAE-CI autopilot directly from the component manufacturer, Lear, and supplied it directly to the aircraft manufacturer, Boeing, for installation on C-135 aircraft. The court

{C0961922.1}

recognized that the Government procured aircraft subsystems as GFAE-CI directly from the subsystem manufacturer for installation by the airframe manufacturer because the GFAE-CI process allowed the Government to be directly involved in design and development of such subsystems. Id. at 1345.

> **3. MDC also satisfies the "acting under" requirement based on the Government's mandate that MDC comply with military specifications that required the use of asbestos**

The Government's requirement that MDC install certain components which complied with material specifications, such as Air Force-Navy Aeronautical Standards and MIL specs, also satisfies the "acting under" requirement. Such specifications required the use of asbestos in certain parts, such as gaskets, which were incorporated into the aircraft and the GFAE-CI subsystems. These Government-authored material specifications included MIL specs as well as Air Force-Navy Aeronautical Standards prepared jointly by the United States Air Force, the Bureau of Aeronautics and the Aeronautical Standards Group of the Departments of the Air Force and Navy. By requiring MDC to comply with such specifications, the Government required MDC to use Government-specified and approved materials, such as asbestos, in the Subject Aircraft. Fogg Aff. ¶¶ 20-22, 25-27. Air Force-Navy Aeronautical Standard AN900 specified a gasket design comprised asbestos material encapsulated in copper sheet. Id. at ¶ 25. AN900 asbestos-copper gaskets were installed throughout the Pratt & Whitney R-1830 engines that MDC was required to install on C-47 aircraft as GFAE-CI. Id. at ¶ 26. Air Force-Navy Aeronautical Standard AN4059 specified an engine accessory drive gasket comprised of sheet-form or roll-form asbestos. Id. at ¶ 22. USAF Second Sergeant A. S. Wolfert directed MDC to install GFAE-CI AN4059 gaskets on C-47 aircraft. Id. at ¶¶ 12, 22.

MDC thus satisfies the "acting under" requirement based on the federal officers' mandate that MDC install asbestos-containing GFAE-CI components on the Subject Aircraft.

> **D. There Is a "Causal Nexus" Between MDC's Action Under Color of Federal Office and Plaintiffs' Claims**

MDC also satisfies the "causal nexus" requirement because Plaintiffs' claims arise directly from MDC's acts under color of federal office, i.e., Mr. Hamrick's alleged exposure to asbestos in aircraft manufactured by MDC pursuant to Government procurement contracts and under extensive Government control. In other words, there is a "causal nexus" between Plaintiffs' claims and the acts performed by MDC because Plaintiffs' state court action is based on MDC's conduct, which it was required to perform by federal officers pursuant to its federal duty. Mesa, 489 U.S. at 131-132.

In Fung, the court found the requisite causal nexus because the plaintiffs' alleged exposure occurred while they worked on submarines that were constructed with asbestos at the Government's direction and approval. 816 F. Supp. at 572-573. Similarly, in Akin v. Big Three Industries, 851 F. Supp. 819, 823-824 (E.D. Tex. 1994), the court held that "[p]lainly, when a government contractor builds a product pursuant to Air Force specifications and is later sued because compliance with those specifications allegedly causes personal injuries, the nexus requirement is satisfied" and removal jurisdiction is proper.

Here, MDC's use of alleged asbestos-containing components in the Subject Aircraft was specifically compelled by the Government. The Government required MDC to use GFAE-CI components that it procured directly from its OEMs and supplied to MDC for installation in the aircraft. The Government further required that MDC install components that complied with material specifications that mandated the use of asbestos in specific applications in the aircraft. MDC had no choice but to install such components on the aircraft in carrying out its obligations under its procurement contracts with the USAF. Had it not done so, the aircraft would not have complied with the Government-approved design specifications, MDC would have been in breach of those procurement contracts and subject to penalties under the FCA.

**E.      MDC Has a "Colorable Federal Defense," i.e., Government Contractor Defense and Derivative Sovereign Immunity**

MDC has raised a colorable federal defense to Plaintiffs' claims by asserting the

16                                                                {C0961922.1}

"government contractor" defense as stated in <u>Boyle v. United Technologies, Inc.</u>, 487 U.S. 500 (1988), and its progeny, including <u>Niemann v. McDonnell Douglas Corp.</u>, 721 F. Supp. 1019 (S.D. Ill. 1989) (in which MDC obtained a grant of summary judgment under <u>Boyle</u> against asbestos claims regarding the manufacture of the subject C-118, among other aircraft). Further, MDC has raised the separate and additional colorable federal defense of "derivative sovereign immunity" as set forth in <u>Yearsley v. W.A. Ross Construction Co.</u>, 309 U.S. 18 (1940).

Under <u>Boyle</u>, civil tort liability for design defects in military equipment cannot be imposed against the manufacturer under state law if (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States. 487 U.S. at 512.

The government contractor defense is based on federal law and, indeed, was created by the federal courts. By operation of the defense, federal law, <u>i.e.</u>, government contractor immunity, preempts state law product liability claims. Furthermore, the United States Supreme Court explicitly stated in <u>Boyle</u> that "civil liabilit[y] arising out of the performance of federal procurement contracts" is a "'uniquely federal' interest." <u>Id.</u> at 505-06. "[I]t is plain that the Federal Government's interest in the procurement of equipment is implicated by [product liability] suits [against the contractor] -- even though the dispute is one between private parties." <u>Id.</u> at 506. The rationale for the defense is based upon federal law, i.e., a military contractor should enjoy the same immunity as a federal officer enjoys under the discretionary function exception to the Federal Torts Claims Act ("FTCA"), 28 U.S.C. § 2680(a). <u>Id.</u> at 511. As the Supreme Court stated:

> "We think that the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function within the meaning of [28 U.S.C. § 2680(a)]. It often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness. And we are further of the view that permitting 'second-guessing' of these judgments . . . through state tort suits against

17

{C0961922.1}

contractors would produce the same effect sought to be avoided by the FTCA exemption. The financial burdens of judgments against the contractors would ultimately be passed through, substantially if not totally, to the United States itself, since defense contractors will predictably raise their prices to cover, or to insure against, contingent liability for the Government-ordered designs. To put the point differently: It makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production. In sum, we are of the view that state law which holds Government contractors liable for design defects in military equipment does in some circumstances present a 'significant conflict' with federal policy and must be displaced."

Id. at 511-12 (citations omitted).

It is indisputable that MDC's assertion of the government contractor defense is "colorable" within the meaning of § 1442(a)(1) so as to confer removal jurisdiction. The question at this stage is not whether MDC's claimed defense is meritorious or even whether MDC will likely prevail on that defense. Mesa, 489 U.S. at 128-29; see also Pack, 838 F. Supp. at 1103. Rather, the appropriate inquiry is whether this Court will be deciding a question of federal law. Akin, 851 F. Supp. at 823 ("The purpose of [the colorable claim to a federal defense] requirement is to ensure that the federal district court is passing on a question of federal law."). There can be no doubt that MDC's "government contractor" defense is colorable, especially in light Niemann, where MDC obtained a grant of summary judgment under Boyle against asbestos claims regarding the subject C-118 (as well as C-54) aircraft. See Fung, 816 F. Supp. at 569 (acknowledging Niemann decision). Indeed, the Fogg Affidavit and Douglas Declaration, and referenced exhibits thereto, clearly establish that (1) the Government approved reasonably precise specifications for the Subject Aircraft; (2) the Subject Aircraft conformed to those specifications; and (3) MDC warned the Government about the dangers in the use of the equipment that were known to MDC but not to the Government.[9]

---

[9]   As determined by the Niemann court, MDC had no duty to warn the USAF about the alleged hazards of asbestos, and thus satisfies the third prong of the Boyle test, because the USAF in fact already had superior knowledge about such hazards. Niemann, 721 F. Supp. at 1027-1028. MDC demonstrated the USAF's superior knowledge about asbestos through testimony by USAF Colonel Alvin F. Meyer, Jr. (Ret.) and USAF Colonel

18

Additionally, MDC's assertion of the defense of "derivative sovereign immunity" under Yearsley 309 U.S. 18 (1940), is "colorable" within the meaning of § 1442(a)(1) so as to confer removal jurisdiction. In Yearsley, a government contractor built dikes in the Mississippi River, which disturbed the flow of the river and washed away part of plaintiff's land. Id. at 19. The plaintiff sued the government contractor and the court found that the contractor was acting under the direction of the Government and, as such, that the plaintiff could only proceed against the Government under the takings clause of the Fifth Amendment to the United States Constitution. Id. at 20-21. The Supreme Court affirmed the Court of Appeals finding that "the work that the contractor had done in the river bed was all authorized and directed by the Government of the United States for the purpose of improving the navigation of this navigable river." Id. at 20. Based on this finding, the court stated, "it is clear that if this authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will." Id. at 21 (citations omitted).

Here, Plaintiffs' claims against MDC arise from alleged work on aircraft that were designed, manufactured and delivered by MDC pursuant to military procurement contracts with the USAF. Under such contracts, MDC was required to comply with extensive specifications to install on the aircraft GFAE-CI that allegedly exposed Mr. Hamrick to asbestos. In performance of its obligations under the contracts, MDC complied with all Government design specifications and installed such components as specifically authorized and required by the Government. Since the GFAE-CI components were separately procured by the Government under separate contracts

---

Walter Melvin, M.D. Their testimony is attached as Exhibits B and C to the Boone Aff. (Also attached as Exhibit D to the Boone Aff. is a separate affidavit by Colonel Meyer on the subject.) See also Ramey v. Martin-Baker Aircraft Co., 874 F.2d 946, 950-51 (4th Cir. 1989) (holding that because of the government's demonstrated knowledge of the risk of asbestos, the third element of Boyle was satisfied regardless of the level of defendant's knowledge of the risks). Defendant Pratt & Whitney discusses this testimony and subject in more detail in its Opposition to Plaintiffs' Motion to Remand, which MDC incorporates herein by reference.

{C0961922.1}

with other manufacturers, MDC did not have any input into the design or manufacture of those products.  MDC merely received the GFAE-CI components from the Government, and installed them into the aircraft as it was obligated to do under the contracts. Accordingly, MDC has clearly asserted a second, separate colorable federal defense to Plaintiffs' claims under the derivate sovereign immunity doctrine set forth in Yearsley.

## IV.    FEDERAL QUESTION (FEDERAL ENCLAVE) JURISDICTION IS PROPER

Removal is appropriate under 28 U.S.C. § 1441(b), which states that "[a]ny civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution . . . shall be removable without regard to citizenship or residence of the parties." Id. This Court has original jurisdiction over "all civil actions arising under the Constitution . . . of the United States." 28 U.S.C. § 1331.  This action arises under the Constitution because the "United States has power and exclusive authority 'in all Cases whatsoever . . . over all places purchased' by the government 'for the erection of 'Forts, Magazines, Arsenals, Dock-Yards, and other needful Buildings,' U.S. Const. art. I, § 8, cl. 17; 18 U.S.C. § 7(3). Such places are 'federal enclaves' within which the United States has exclusive jurisdiction.  Personal injury actions which arise from incidents occurring in federal enclaves may be removed to the federal district court as a part of federal question jurisdiction." Akin v. Ashland Chem. Co., 156 F.3d 1030, 1034 (10th Cir. 1998).  As such, this action is removable based on "federal enclave" grounds pursuant to 28 U.S.C. § 1441(b).

An Air Force base, such as those where Mr. Hamrick was stationed, is undeniably a federal enclave. See, e.g., 18 U.S.C. § 7(3); Akin, 156 F.3d at 1034; Anderson v. Crown Cork & Seal, 93 F. Supp. 2d 697, 702 (E.D. Va. 2000) ("[A]n Air Force base is a federal enclave."). Indeed, the Florida Supreme Court has specifically considered and found that Eglin AFB, one of the USAF bases where Mr. Hamrick allegedly performed work on MDC products, is a federal enclave subject to exclusive federal jurisdiction. See Int'l Bus. Machs. Corp v. Vaughn, 98 So. 2d 747 (Fla. 1957) (examining the deed of cession from the Governor of Florida to the United States Government in 1937 and finding that the cession vested the United States with exclusive

20                                    {C0961922.1}

jurisdiction over Eglin).

Moreover, toxic exposure claims arising from work on aircraft on USAF bases are undeniably removable under federal enclave jurisdiction. See Akin v. Big Three Industries, 851 F. Supp. 819, 822 (E.D. Tex. 1994) (holding that personal injury toxic exposure claims arising from USAF aircraft maintenance work occurring during such employment at an AFB are properly removed under federal enclave jurisdiction). Indeed, where plaintiffs' claims arise out of exposure on a USAF base in furtherance of their employment duties, enclave jurisdiction is properly invoked. Id. (emphasis added) Plaintiffs' failure to indicate the location of the exposure in their Complaint will not shield them from the consequences of federal enclave removal. Fung, 816 F. Supp at 571. MDC is absolutely justified to rely upon discovery, in this case Mr. Hamrick's deposition testimony, to determine that federal enclave jurisdiction exists. See, e.g., Akin, 851 F. Supp at 819 (federal enclave removal based upon responses to interrogatories).

Here, federal question jurisdiction is appropriate because Plaintiffs' claims arise out of events – that is, Mr. Hamrick's alleged exposure(s) to asbestos while performing sheet metal work on USAF military aircraft, that occurred on federal enclaves such as Andrews AFB, Edwards AFB and Eglin AFB. See Plaintiff's Depo, Exh. A, at 31:3-48:12. Plaintiffs' assertion that their claims arose in West Virginia when Mr. Hamrick was diagnosed with mesothelioma is nonsensical, because the disease is a mere manifestation of the alleged tort. Indeed, the location of the claimed exposure is the singularly relevant fact when determining the applicability of federal enclave jurisdiction. Akin, 156 F.3d at 1036, n. 4 (emphasis added). Thus, Plaintiffs' contention that this Court should engage in an a choice of law analysis to determine whether their claims arose under West Virginia law or federal law for purposes of deciding whether "federal enclave" jurisdiction is proper, is plainly wrong as a matter of law and nothing more than a "red herring." Consequently, removal based on federal enclave jurisdiction is proper and Plaintiffs' Motion to Remand should be denied.

{C0961922.1}

## V.   **CONCLUSION**

For all of the above reasons, MDC respectfully requests that the Court deny Plaintiffs' Motion to Remand.

McDONNELL DOUGLAS CORPORATION
By Counsel

Michael B. Victorson (WVSBN: 3868)
JACKSON KELLY PLLC
1600 Laidley Tower
Post Office Box 553
Charleston, West Virginia 25322
(304) 340-1000

Robert E. Boone III
BRYAN CAVE LLP
120 Broadway, Suite 300
Santa Monica, California 90401
(310) 576-2385

*Counsel for McDonnell Douglas Corporation*

22

{C0961922.1}