

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUL 2 6 2005

FILED
CLERK'S OFFICE

UNITED STATES OF AMERICA
JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | | |
|---|---|---|
| IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (No. VI) | ) ) | CASE NO. MDL 875 |
| CHARLES E. HAMIRCK, et al., | ) ) | CASE NO. 2:05-286 (Southern District of West Virginia) |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| A & I CO., et al., | ) ) ) | **RESPONSE OF DEFENDANT PRATT & WHITNEY TO PLAINTIFF'S MOTION TO VACATE CONDITIONAL TRANSFER ORDER** |
| Defendants. | ) ) ) | |

Defendant Pratt & Whitney ("Defendant"), by and through undersigned counsel, submits

its response to Plaintiff's Motion To Vacate Conditional Transfer Order ("Plaintiff's Motion")

pursuant to Rule 7.4(f) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation,

and states as follows:

　　1.　　Defendant admits that Plaintiff filed the instant action in Kanawha County, West

Virginia, alleging injuries in relation to his exposure to asbestos-containing products.

　　2.　　Defendant is without knowledge of the accuracy of the diagnosis of Malignant

Mesothelioma, though Defendant understands that this is Plaintiff's claim.

　　3.　　Defendant admits that it removed the case pursuant to 28 U.S.C. § 1441, 1442 and

1446. Defendant has two separate bases for removal. First, plaintiffs alleged injuries arise from

**OFFICIAL FILE COPY**

IMAGED JUL 2 7 2005

alleged exposures to asbestos from Defendant's products on federal enclaves, therefore the federal courts have original "Federal Enclave" jurisdiction and the case is properly removed pursuant to 28 U.S.C. § 1441.  Second, Defendant removed the case on "Federal Officer" grounds as authorized by 28 U.S.C. §1442.

4.      Defendant admits that Plaintiff has moved to remand this action, but Defendant believes that Motion To Remand is meritless.  Defendant's position is fully set forth in Defendant Pratt & Whitney's Memorandum of Points and Authorities In Opposition To Motion to Remand, which was filed in the District Court in this action and is attached hereto as Exhibit A.

5.      Defendant denies the statement set forth in paragraph 5 of Plaintiff's Motion. Defendants believe this panel has probably faced similar issues in the past.  Defendant further states that it is well established that asbestos cases, filed in or removed to Federal Court, are transferred to the MDL on asbestos.

6.      Defendant denies the statement set forth in paragraph 6 of Plaintiff's Motion.

7.      Defendant states that the only real basis for Plaintiff's Motion is the assertion of a Motion to Remand.  That motion is without merit as can be seen from Exhibit A hereto.

Accordingly, Defendant requests that Plaintiff's Motion to Vacate the Conditional Transfer Order be denied.

imanage8451211

Respectfully submitted,

Richard A. Dean
richard.dean@tuckerellis.com
Tucker Ellis & West LLP
1150 Huntington Bldg.
925 Euclid Ave
Cleveland, OH 44115-1475
Telephone:    216.592.5000
Telefax:        216.592.5009

*Attorneys for Defendant Pratt & Whitney*

3

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUL 2 6 2005

## CERTIFICATE OF SERVICE

FILED
CLERK'S OFFICE

I hereby certify that a true and correct copy of the foregoing *Response of Defendant Pratt*

*& Whitney to Plaintiff's Motion to Vacate Conditional Transfer Order* was served upon counsel

listed on the attached service list and on the service list on Exhibit A via first class mail this *25*

day of July 2005.

Richard A. Dean
*Attorney for Defendant Pratt & Whitney*

imanage8451211

# INVOLVED COUNSEL LIST (CTO-248)
# DOCKET NO. 875
# IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)

John W. Amberg
Bryan Cave, LLP
120 Broadway
Suite 300
Santa Monica, CA 90401

Robert M. Arentson, Jr.
Baker, Donelson, Bearman, Caldwell
& Berkowitz
P.O. Box 14167
Jackson, MS 39236-4167

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114

Rita M. Biser
Kay Casto & Chaney
P.O. Box 2031
Charleston, WV 25327

Jessica A. Blake
Robinson & McElwee
P.O. Box 1791
Charleston, WV 25326-1791

Apryll H. Boggs
Hendrickson & Long, PLLC
214 Capitol Street
P.O. Box 11070
Charleston, WV 25301

Timothy W. Bouch
Leath, Bouch & Crawford
P.O. Box 59
Charleston, SC 29402-0059

Stefan G. Bourn
Forman, Perry, Watkins, Krutz &
Tardy, LLP
P.O. Box 22608
Jackson, MS 39225-2608

Craig E. Brasfield
Forman, Perry, Watkins, Krutz &
Tardy, LLP
P.O. Box 22608
Jackson, MS 39225-2608

Lisa N. Busch
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, NY 10038

Barry C. Campbell
Baker, Donelson, Bearman, Caldwell
& Berkowitz
P.O. Box 14167
Jackson, MS 39236-4167

Ashley E. Cannady
Watkins & Eager
P.O. Box 650
Jackson, MS 39205-0650

Edward J. Cass
Gallagher, Sharp, Fulton & Norman
Bulkley Building, 7th Floor
1501 Euclid Avenue
Cleveland, OH 44115

Adam M. Chud
Goodwin Procter LLP
901 New York Avenue, N.W.
Washington, DC 20001

Lawrence M. Coco, III
Baker, Donelson, Bearman, Caldwell
& Berkowitz
P.O. Box 14167
Jackson, MS 39236-4167

Alexandra B. Cunningham
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Edward J. Currie, Jr.
Currie, Johnson, Griffin, Gaines &
Myers
P.O. Box 750
Jackson, MS 39205-0750

David A. Damico
Burns, White & Hickton, LLC
Four Northshore Center
106 Isabella St.
Pittsburgh, PA 15212

David R. Danadio
Brayton & Purcell
222 Rush Landing Road
Novato, CA 94948-6169

J. Tyler Dinsmore
Flaherty, Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV 25338-3843

David W. Dogan, III
Dogan & Wilkinson, PLLC
P.O. Box 23062
Jackson, MS 39225-3062

Paula L. Durst
Spilman, Thomas & Battle
P.O. Box 273
Charleston, WV 25321-0273

John A. Eaves, Jr.
John Arthur Eaves Law Office
101 North State Street
Jackson, MS 39201

John B. Edwards
Dogan & Wilkinson, PLLC
P.O. Box 1618
Pascagoula, MS 39568-1618

A. L. Emch
Jackson & Kelly
P.O. Box 553
1600 Laidley Tower
Charleston, WV 25322-0553

Charles M. Evert
Evert & Weathersby, LLC
3405 Piedmont Road, Suite 225
Atlanta, GA 30305

Eric K. Falk
Davies, McFarland & Carroll
One Gateway Center
Tenth Floor
Pittsburgh, PA 15222

Stephen A. Fennell
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036

Matthew J. Fischer
Schiff Hardin LLP
6600 Sears Tower
233 S. Wacker Drive
Chicago, IL 60606-6473

Raymond P. Forceno
Forceno & Hannon
111 S. Independence Mall East
The Bourse, Suite 1000
Philadelphia, PA 19106-2574

Ellen B. Furman
Goldfein & Hosmer
1600 Market Street, 33rd Floor
Philadelphia, PA 19103

INVOLVED COUNSEL LIST (CTO-248) MDL-875

Christian H. Gannon
Segal, McCambridge, Singer &
Mahoney, Ltd.
805 3rd Avenue
New York, NY 10022

J. G. Goodykoontz
Steptoe & Johnson
P.O. Box 2190
Clarksburg, WV 26302-2190

Lucien C. Gwin, Jr.
Gwin, Lewis & Punches
P.O. Box 1344
Natchez, MS 39121-1344

Susan M. Hansen
Brownson & Ballou
4800 U.S. Bank Place
601 Second Avenue, South
Minneapolis, MN 55402

Freddie N. Harrington, Jr.
Scott, Sullivan, Streetman & Fox
2450 Valleydale Road
P.O. Box 380548
Birmingham, AL 35244

Sheila J. Hendricks
Campbell Cherry Harrison Davis Dove
P.O. Box 5229
Jackson, MS 39296-5229

Jeffrey P. Hubbard
Wells, Moore, Simmons & Hubbard
P.O. Box 1970
Jackson, MS 39215-1970

A. Timothy Jones
Hawkins & Parnell, LLP
The Woodrums Building
602 Virginia Street East
Suite 200
Charleston, WV 25301

G. Patterson Keahey
Law Offices of
· G. Patterson Keahey, Jr., PC
One Independence Plaza
Suite 612
Birmingham, AL 35209

Reginald S. Kramer
Oldham & Dowling
195 South Main Street, Suite 300
Akron, OH 44308-1314

Richard L. Lancianese
Baker & Lancianese
River Tower, 3rd Floor
1108 Third Avenue, Suite 300
Huntington, WV 25701

David C. Landin
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Robert R. Leight
Pietragallo, Bosick & Gordon
One Oxford Center
38th Floor
Pittsburgh, PA 15219

Brian S. Lindsay
Jenkins Fenstermaker
P.O. Box 2688
Huntington, WV 25726-2688

William H. Liston, III
Liston/Lancaster
P.O. Box 645
Winona, MS 38967-0645

Gene Locks
Greitzer & Locks
1500 Walnut Street
Philadelphia, PA 19102

Charles M. Love, III
Bowles, Rice, McDavid, Graff & Love
P.O. Box 1386
Charleston, WV 25325-1386

Genevieve MacSteel
McGuire Woods, LLP
1345 Avenue of the Americas
7th Floor
New York, NY 10105

Kimberly P. Mangum
Barfield & Associates
P.O. Drawer 3979
233 East Capitol Street
Jackson, MS 39207-3979

Scott A. Matthews
Dell, Moser, Lane & Loughney
525 William Penn Place
Suite 3700
Pittsburgh, PA 15219

Bruce E. Mattock
Goldberg, Persky & White, PC
1030 Fifth Avenue
3rd Floor
Pittsburgh, PA 15219-6295

Ronald L. Motley
Motley Rice, LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29465

Lori Streets Muldoon
Pullin, Fowler & Flanagan
901 Quarrier Street
Charleston, WV 25301

Bryan S. Neft
Pietragallo, Bosick & Gordon
One Oxford Center
38th Floor
Pittsburgh, PA 15219

Janna Nuzum
Steptoe & Johnson
P.O. Box 2190
Clarksburg, WV 26302-2190

Richard P. O'Leary
McCarter & English, L.L.P.
245 Park Avenue
27th Floor
New York, NY 10022

Joseph L. Orszulak
Marks, O'Neill, O'Brien & Courtney
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219

E. Spencer Parris
Jones, Martin, Parris & Tessener
410 Glenwood Avenue
Suite 200
Raleigh, NC 27603

Timothy Peck
Smith Moore LLP
P.O. Box 21927
Greensboro, NC 27420

Ronald G. Peresich
Page, Mannino, Peresich &
McDermott
P.O. Drawer 289
759 Vieux Marche' Mall
Biloxi, MS 39533-0289

Michael S. Polk
Sieben, Polk, LaVerdiere, & Dusich
999 Westview Drive
Hastings, MN 55033-2495

William C. Reeves
Smith, Reeves & Yarborough, PLLC
6360 I-55 North
Suite 201
Jackson, MS 39211

Giovanni Regina
Waters, McPherson, McNeill, P.C.
300 Lighting Way
Secaucus, NJ 07096

INVOLVED COUNSEL LIST (CTO-248) MDL-875                                        PAGE 3 OF 3

John J. Repcheck
Marks, O'Neill, O'Brien & Courtney
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219

G. Kenneth Robertson
Farmer, Cline & Arnold
P.O. Box 3842
Charleston, WV 25338

Robert M. Rolfe
Hunton & Williams
Riverfront Plaza
951 East Byrd Street
Richmond, VA 23219

John D. Roven
Roven, Kaplan & Wells
2190 North Loop West
Suite 410
Houston, TX 77018

Richard D. Schuster
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216

Scott S. Segal
Segal Law Firm
810 Kanawha Blvd, East
Charleston, WV 25301

Neil Selman
Selman, Breitman & Burgess
11766 Wilshire Boulevard
Sixth Floor
Los Angeles, CA 90025

Ann M. Sico
Bernard, Cassisa, Elliott & Davis
P.O. Box 55490
1615 Metairie Road
Metairie, LA 70055-5490

Mark R. Smith
Holcomb Dunbar, PA
P.O. Drawer 707
Oxford, MS 38655-0707

Robert N. Spinelli
Kelley, Jasons, McGuire & Spinelli
Centre Square West
15th Floor
Philadelphia, PA 19102

Matthew R. Straus
L'Abbate, Balkan, Colavita & Contini
1050 Franklin Avenue
Garden City, NY 11530

James P. Streetman, III
Scott, Sullivan, Streetman & Fox
P.O. Box 13847
Jackson, MS 39236-3847

B. Luke Styer
Campbell, Woods, Bagley, Emerson,
McNeer & Herndon
P.O. Box 1835
Charleston, WV 25719-1835

Minor C. Sumners, Jr.
1907 Dunbarton Drive
Suite F
Jackson, MS 39216

Robert E. Swickle
Jaques Admiralty Law Firm, P.C.
1570 Penobscot Building
The Maritime Asbestosis Legal Clinic
Detroit, MI 48226

Thomas W. Tardy, III
Forman, Perry, Watkins, Krutz &
Tardy, LLP
P.O. Box 22608
Jackson, MS 39225-2608

Dwight E. Tarwater
Paine, Tarwater, Bickers & Tillman
First Tennessee Plaza
800 S. Gay Street
Suite 1100
Knoxville, TN 37929

Grady F. Tollison, Jr.
Tollison, Austin & Twiford
P.O. Box 1216
103 N. Lamar Avenue
Oxford, MS 38655-1216

Andrew J. Trevelise
Reed Smith, LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

Thomas W. Tyner
Aultman, Tyner & Ruffin, Ltd.
P.O. Box 750
315 Hemphill Street
Hattiesburg, MS 39403-0750

Carey R. Varnado
Montague, Pittman & Varnado
P.O. Drawer 1975
Hattiesburg, MS 39403-1975

Michael B. Victorson
Jackson & Kelly
P.O. Box 553
Charleston, WV 25322-0553

Michael N. Watts
Holcomb Dunbar, PA
P.O. Box 707
Oxford, MS 38655-0707

James K. Weston, II
Tom Riley Law Firm
4040 First Avenue, N.E.
P.O. Box 998
Cedar Rapids, IA 52406

Susan B. Windham
Aultman, Tyner & Ruffin, Ltd.
P.O. Box 750
Hattiesburg, MS 39403-0750

Corey T. Zurbach
Spilman, Thomas & Battle
P.O. Box 273
Charleston, WV 25321

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUL 2 6 2005

FILED
CLERK'S OFFICE

# EXHIBIT A

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUL 26 2005

FILED
CLERK'S OFFICE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

CHARLES E. HAMRICK and            )
WANDA HAMRICK, his wife,          )
                                  )
            Plaintiffs,           )
                                  )
v.                                )       Civil Action No. 2:05-CV-0286
                                  )
A & I COMPANY, et al.,            )
                                  )
            Defendants.           )

**DEFENDANT PRATT & WHITNEY'S
MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO MOTION TO REMAND**

## I.   INTRODUCTION

Defendant Pratt & Whitney (hereinafter "Pratt") removed this case from the Circuit Court

of Kanawha County to this court.  Plaintiff has now filed a motion to remand the case to state

court.  Pratt submits this opposition to plaintiff's motion to remand.  Substantively the court has

subject matter jurisdiction of the claims that the plaintiffs have alleged against Pratt and, as a

result, removal was proper.

## II.   RELEVANT PLEADINGS AND PROCEDURAL BACKGROUND

Plaintiffs filed this case on February 4, 2005 in the Circuit Court for Kanawha County,

West Virginia.  In that complaint plaintiffs generally alleged that Charles Hamrick had suffered

personal injuries as a result of exposure to asbestos containing products manufactured and sold

by defendants.  Plaintiffs generally alleged that defendants were negligent in a variety of ways,

[see Complaint ¶ 9], claiming failure to warn, [see Id. ¶ 9(a)]; failure to test, [see Id. ¶ 9(g)]; and

74908.00184.842616.1

EXHIBIT A

failure to remove asbestos [see Id. ¶ 9(i)].  Thus, it is clear that plaintiffs' complaint transcends so-called failure to warn claims.

Pratt was served on March 8, 2005.  Defendant removed this case to federal court on April 6, 2005.

Pratt removed on two separate grounds –

(1)      Federal enclave removal pursuant to U.S. Constitution, art. 1, section 8, cl.17 and 28 U.S.C. § 1331.

(2)      Federal officer removal based on 28 U.S.C. § 1442 (a)(1).

On June 6, 2005 The Judicial Panel on Multi-District Litigation issued a Conditional Order of Transfer of this case to the pending MDL for asbestos in Philadelphia.  [See attached Exh. A].  Plaintiff has filed a motion opposing that Conditional Transfer.  Pratt's response to that motion is not due until July 29, 2005.


## III.     **RELEVANT FACTS**

The deposition of Charles Hamrick was taken on March 7, 2005.  That deposition is attached as Exhibit B.  (The transcript of his testimony, and Exhibit A-3 and A-4 to that deposition, are attached.  The deposition exhibits will be referred to as "Depo. Exh. A-3" and "A-4".  The other deposition exhibits are not necessary for the Court's consideration of this motion).

Mr. Hamrick joined the Air Force in 1951.  [See Depo. Exh. A-3].  He was trained as a sheet metal worker.  [Exh. B, p. 12].  He was an aircraft mechanic in the Air Force for 20 years.  [Exh. B, p. 14].  He worked on a number of different airplanes.  [See Depo. Exh. A-4 (which is a

2

list of planes on which Mr. Hamrick worked)].[1]

Significantly, plaintiff testified that he worked on or around the F-100 and the B-52 aircraft. Pratt is a manufacturer of engines used to power airplanes [See Id.] Pratt has supplied a number of engines to the U.S. Air Force for use in military aircraft. It supplied an engine, known as the J-57, to power both the F-100 and B-52 aircraft. [See declaration of Allan Shiffler, attached hereto as Exh. C, ¶ 3].

Mr. Hamrick's work as an aircraft mechanic for the military was performed at a number of Air Force bases including Edwards Air Force Base [Exh. B, p. 16], Andrews Air Force Base [Id., p. 32] and bases in Guam and the Marshall Islands [Id.] After his retirement from active Air Force duties he worked for 23 years as a civilian at Eglin Air Force Base [Id. at 32]. All of Mr. Hamrick's exposure to asbestos, including the alleged exposure from work on Pratt engines, occurred while he performed work on the above military bases.

## IV.   PRATT'S REMOVAL WAS APPROPRIATE

As noted before, Pratt removed on two separate grounds – (1) federal enclave jurisdiction and (2) federal officer grounds. The motion to remand must be denied if this Court determines that either one of these bases was appropriate.

### A. This Court Has Federal Enclave Jurisdiction Over Plaintiffs' Claim Against Pratt.

Under 28 U.S.C. § 1441, cases bought in state court can be removed by defendants if the district court would have original jurisdiction over the claim. *See* 28 U.S.C. § 1441(a). Where federal enclave jurisdiction exists, a case can be removed under § 1441. *See, e.g., Fung v. Abex Corp.*, 816 F. Supp. 569, 571 (N.D. Cal. 1992); *Akin v. Big Three Industries, Inc.*, 851 F. Supp.

---

[1] This list was written by Mr. Hamrick's wife, but he told her what to write. Exh. B, p.16.

819, 821-22 (E.D. Tex. 1994); *Reed v. Fina Oil & Chemical Co.*, 995 F. Supp. 705, 713 (E.D. Tex 1998); *Anderson v. Crown Cork & Seal*, 93 F. Supp.2d 697 (E.D. Va. 2000). Federal courts have repeatedly held that where plaintiff alleges injury from exposure to a toxic substance, federal enclave jurisdiction exists if the exposure occurred on a military base or other federal enclave. "In a toxic exposure case such as this, when the plaintiffs' claims arise out of exposure to chemicals on base...enclave jurisdiction is properly involved." *Reed*, 995 F. Supp. At 713; *Akin v. Ashland Chemical Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998) ("Personal injury actions which arise from incidents occurring in federal enclaves may be removed to federal district court as a part of federal question jurisdiction.")

At his deposition, the only testimony of any asbestos exposure related to Mr. Hamrick's service was while in the Air Force and, more specifically, at United States Air Force bases including Edwards, Andrews and Eglin. Accordingly, this court has Federal Enclave Jurisdiction over plaintiffs' claims. The concept of "federal enclave" jurisdiction is based on the concept that the federal government has the right to adjudicate disputes arising from activities on land and premises that it owns and controls.

The case of *Akin v. Big Three Industries, Inc.*, 851 F.Supp.819 (E.D. Tex. 1994) is exactly on point. In *Akin*, approximately two hundred employees of Tinker Air Force Base in Oklahoma City brought a toxic tort action against various manufacturers alleging adverse health effects from work performed on jet engines manufactured for the U.S. Air Force. Defendants removed based on federal enclave and federal officer bases.

Citing *Mater v. Holley*, 200 F.2d 123 (5th Cir. 1952), the Court in *Akin* noted that the United Sates has exclusive power over lands purchased for its use, including "Forts Magazines

4

and Arsenals"[2] and that it "would be incongruous to hold that although the United States has exclusive sovereignty in the area here involved, its courts are without power to adjudicate controversies arising there ..." 200 F.2d at 124. Then the Court concluded

> The present conflict presents a compelling argument for holding that federal enclave jurisdiction exists over the tort claims. The United States Air Force is entrusted with this nation's defense. The Air Force entreated plaintiffs' to perform important maintenance tasks on jet engines. All plaintiffs' performed all duties on Tinker Air Force Base. And the plaintiffs' now claim that these very duties – repairing jet engines – resulted in personal injuries. As a result, this court holds that in a toxic exposure case such as this, when the plaintiffs' claims arise out of exposure to chemicals on base in furtherance of their employment duties, enclave jurisdiction is properly invoked. The result of this holding is that the case presents a question arising under federal law, 28 U.S.C.§ 1331 and is removable under 28 U.S.C. § 1441(a).

851 F.Supp. at 822.

Plaintiffs' only argument against federal enclave removal is that the plaintiff did not manifest his disease while located on a federal enclave. They argue that the development of Mr. Hamrick's disease arose in West Virginia and not on a military base citing *lex loci delicti* principles from West Virginia. Plaintiffs' argument regarding choice of law is completely misplaced and is beside the point. There is absolutely no authority to support plaintiffs' argument that the court should engage in a choice of law analysis to determine whether or not federal enclave jurisdiction exists. Even though West Virginia law could theoretically be the substantive law that applies to plaintiffs' claims, that does not rob this Court of jurisdiction. Moreover, even assuming that West Virginia state courts have concurrent jurisdiction, and would apply West Virginia law, the result is the same. Federal enclave jurisdiction is properly invoked "even

---

[2] United Sates Constitution, article I, §  8, cl.17.

though state law would apply to the action...and federal jurisdiction is not affected by concurrent jurisdiction in state courts." *Fung*, 816 F. Supp. at 571.

Furthermore, plaintiffs ignore the most crucial fact when determining whether federal enclave jurisdiction exists: the place where the exposure to asbestos allegedly occurred. Plaintiffs' argument flies in the face of the many federal cases discussed herein that find federal enclave jurisdiction exists where plaintiff was exposed on federal enclaves—regardless of where plaintiff happens to be when the damage manifests itself. *See, e.g., Reed v. Fina Oil & Chemical Co.*, 995 F. Supp. 705, 713 (E.D. Tex 1998); *Akin v. Big Three Industries, Inc., et al.*, 851 F. Supp. 819, 822 (E.D. Tex 1994); *Akin v. Ashland Chemical Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998); *Fung v. Abex Corporation*, 816 F. Supp. 569, 571 (N.D. Cal. 1992) (because the alleged exposure to asbestos occurred on federal enclaves, the case was properly removed on the basis of federal enclave jurisdiction).

Whether or not plaintiffs' claims should be governed by West Virginia law is irrelevant. It is the place of exposure that controls the question of federal enclave jurisdiction. That is not only the clear holding in *Akin* (heeding that plaintiffs' toxic exposure claims "arose out of exposure to chemicals on base") but the very premise of "federal enclave" jurisdiction to begin with. Because the United States has exclusive control over the Air Force Bases where plaintiff was allegedly exposed, its courts must also have the authority to adjudicate disputes arising from that exposure. It would be "incongruous to hold that although the United States has exclusive sovereignty in the area here involved, its courts are without power to adjudicate controversies arising there...." *Akin*, 851 F. Supp. at 822, *quoting Mater v. Holley*, 200 F. 2d 123 (5th Cir. 1952).

Pratt has provided ample authority to support its argument that for purposes of federal enclave jurisdiction, in a toxic tort case the Court must focus on the place of the alleged exposure. Plaintiffs cite no case to the contrary, instead relying on the unsupported and illogical notion that federal enclave jurisdiction exists only if the exposure occurs and the disease manifests itself on a federal enclave. If that were the law, it would be impossible for a federal court to exercise enclave jurisdiction in any case where there was a latency period between exposure and injury. As the cases cited herein make clear, plaintiffs are wrong on this point of law.

Based on the foregoing, it is clear that removal was appropriate under federal enclave principles. Nonetheless, Pratt will also demonstrate the appropriateness of its other basis for removal.

## B. The Court Has Federal Officer Jurisdiction Over Plaintiffs' Claim Against Pratt

At his deposition, plaintiff testified that in connection with his service in the Air Force he was exposed to asbestos through work on various parts of the F-100 and B-52. Since Pratt made the engines for these planes, it is able to remove under the federal officer removal statute.

The federal officer removal statute, 28 U.S.C. § 1442, provides:

> (a) A civil action or criminal prosecution commenced in a State court against any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
>
> (1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office ...[3]

---

[3] Plaintiffs do not and cannot contest that Pratt is a "person" within this statute since it is well settled that corporate entities are "persons" for purposes of this section. *See Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387, 398 (5th Cir. 1998).

7

This provision is satisfied if the party seeking removal can "(1) demonstrate that it acted under the direction of a federal officer, (2) raise a federal defense to plaintiffs' claims, and (3) demonstrate a causal nexus between plaintiffs' claims and acts it performed under the color of federal officer. *See Niemann v. McDonnel Douglas Corp.,* 721 F. Supp. 1019 (S.D. Ill. 1989); *Fung v. Abex,* 816 F. Supp. 569, 571-72 (N.D. Cal. 1992) *citing Mesa v. California,* 489 U.S. 121 (1989). *See also Virden v. Altria Group, Inc.,* 304 F. Supp. 2d 832, 843 (N.D. W. Va. 2004); *Jamison v. Wiley,* 14 F.3d 222, 238-40 (4th Cir. 1994) (stating that 1442(a)(1) "guarantee[s] a federal officer the right to remove an action commenced against him in state court when he can allege a 'colorable' federal defense to that action 'arising out of [his] duty to enforce federal law.'") Pratt can satisfy all of these elements.

*Niemann* is directly on point.  It was a case involving civilian aircraft repairmen who brought actions against manufacturers of military aircraft claiming injuries from asbestos exposure.  Given the requirements of compliance with detailed government contracts and specifications for those aircraft, the court concluded the government contract defense was applicable.  As will be demonstrated hereafter, the same is true for the engines on military aircraft.

### 1.  Pratt Acted Under The Direction Of A Federal Officer.

Pratt must show that the acts forming the basis of the state court suit were performed pursuant to an officer's direct orders or comprehensive and detailed regulations.  The federal official must have direct and detailed control over the defendant. *See Fung,* 816 F. Supp. at 572.

In *Fung,* the court found that General Dynamics satisfied this provision by showing that

its work in building submarines was monitored by the Government at all times.

In addition, it was "required to construct and repair the vessels in accordance with the applicable and approved specifications incorporated into the contracts." Further, all contract "supplies were subject to inspection, test, and approval by the government." In addition, "the government also performed extensive dock and sea trials prior to commission, to ensure complete conformity with design specifications." *Id.* at 572-73. The Court concluded that under these circumstances the Government exercised "direct and detailed control over the construction of the vessels" which fulfilled the "acting under" required of § 1442(a)(1). *Id.*

In this case, the military was heavily involved in the design of the J-57 engines at issue. The Declarations of Mike Gentile, (Exhibit D), and Allan Shiffler, (Exhibit C), which have been filed concurrently with this memorandum, conclusively establish the pervasive government control over the design and manufacture of the J-57 engines. Mike Gentile is retired from the Air Force, and was directly involved with the Air Force's oversight of Pratt's development and manufacture of the J-57. [See Exh. D at ¶¶ 2-3]. He was a "federal officer" overseeing the production of engines pursuant to detailed contractual requirements. His declaration establishes that he and members of his technical group reviewed all drawings for the engine, including part drawings, and had to approve them before production began. [*Id.* at ¶¶ 5-6]. The part drawings call for specific materials, including asbestos. [*Id.* at ¶ 6]. All drawings were reviewed and approved prior to commencing production of the J-57. [*Id.*] Further, he and his technical group reviewed all engineering drawings, hardware drawings, and support equipment in connection with Pratt's design and manufacture of the J-57. [*Id.* at ¶¶ 3-4]. Gentile also states that he actually visited Pratt during manufacture and testing to ensure compliance with all specifications.

9

[*Id.*]

The Declaration of Allan Shiffler, a former Pratt project engineer for the J-57, discusses the involvement of the Air Force and Navy in the production of the J-57. He states that during design development for the J-57, Pratt performed its work under the immediate supervision by representatives of the United States Navy and the Air Force. [*See* Exh. C at ¶¶ 6-7]. The Navy and Air Force reviewed all design drawings, approved all materials used (including asbestos) and exercised tight control over Pratt to insure compliance with all of the specifications. [*See* Id. at ¶¶ 6-12]. In the developmental stage, Pratt submitted detailed drawings to the Air Force for its approval before manufacturing began. These drawings included part drawings, which specified material to be used. [*See* Id. at ¶ 8]. Attached to the Shiffler Declaration are four drawings of parts used in the J-57 that specifically required the use of asbestos. [*See* Id. at ¶ 8 and drawings attached thereto.].

These declarations show conclusively that the military (both the Air Force and the Navy) were heavily involved in all aspects of design and manufacture of the J-57 engine. As Shiffler puts it "virtually no aspect of the development, manufacture and testing of the J-57 engines escaped this close control." [*See* Shiffler Dec. at¶ 7]. This establishes that Pratt was acting under the direction of federal officers when it designed and produced the engine. *See Fung*, 816 F. Supp. at 572-73.

## 2. Pratt Can Raise a Colorable Federal Defense—The Government Contractor Defense

To remove under the federal officer statute, the defendant must show that it can assert a colorable federal defense. The question is not whether Pratt will prevail on the merits, but only whether a colorable claim to such defense has been made. *See Fung,* 816 F. Supp. at 573. *See*

*also Jamison v. Wiley*, 14 F.3d 222, 238 (4th Cir. 1994) ("The defendant need not prove that he will actually prevail on his ... defense in order to obtain removal; indeed, one of the most important reasons for removal is to have the validity of the [federal defense] tried in a federal court.")  UTC has a colorable defense under the "government contractor" immunity defense as stated in *Boyle v. United Technologies, Inc.* 487 U.S. 500 (1988).

To establish the defense, Pratt must show that (1) the United states approved reasonably precise specifications, (2) the equipment conformed to those specifications, and (3) the supplier warned the United States about dangers in the use of the equipment that were known to the supplier but not the United States. *See Boyle*, 487 U.S. at 513.  Pratt can prove all three of these elements.

First, based on the Shiffler and Gentile Declarations, it is clear that the federal officers working for the United States government approved reasonably precise specifications with respect to the design and manufacture of the J-57 engine.  [*See* Shiffler Dec., Exh.C].  This establishes the first prong of the *Boyle* test.

Second, Shiffler affirmatively declares that before taking delivery of any finished engine, the military would sign a "document entitled DD250, certifying conformity with the specifications ordered."  [See Shiffler Dec. at ¶ 10].  Thus, any J-57 that plaintiff could have been exposed to on a military plane must have conformed to the detailed specifications discussed herein.  Pratt can prove the second prong of the *Boyle* test.

Beyond just approving part drawings that called out the use of asbestos, the military actually required Pratt to use asbestos in gaskets during the 1950s when Mr. Hamrick on active duty.  [*See Mil-A-7021* which became effective October 25, 1956, attachment 1 to Exh. E,

11

Declaration of Richard Dean].   Thus, the government not only approved the use of asbestos materials in the J-57 engine—it required it.

As to the third prong of the *Boyle* test, Pratt can demonstrate that the Air Force was aware of the dangers of asbestos, such that asbestos was not a danger known to Pratt but not to the Air Force.   Thus, Pratt had no duty to warn the Air Force for purposes of the military contractor defense.   *See Neimann*, 721 F. Supp. 1019 (S.D. Ill. 1989).

The *Niemann* court determined that the U.S. Air Force had full knowledge of the dangers of asbestos containing materials as early as the 1950s.   *See Neimann v. McDonnell Douglas Corp.*, 721 F. Supp. 1019, 1027-28 (S.D. Ill. 1989).   The *Neimann* court had access to depositions from Air Force personnel that established, beyond dispute, that the government was fully aware of the dangers associated with asbestos in the 1950s.   *See Id.*   The testimony came from and Industrial Toxicologist and Industrial Hygienist that worked for the Air Force, and convinced the Court that there was no duty to warn the Air Force of the dangers of using asbestos materials in its aircraft.   *See Id.   See also Ramey v. Martin-Baker Aircraft Co*, 874 F.2d 946, 950-51 (4th Cir. 1989) (holding that because of the government's demonstrated knowledge of the risk of asbestos, the third element of *Boyle* was satisfied regardless of the level of defendant's knowledge of the risks).

One of the depositions analyzed by the *Niemann* court was from Walter Melvin, M.D., who was an industrial toxicologist physician who served in the Air Force from 1951-1978.   [*See Deposition of Walter Melvin, M.D.*, Exh. E, attachment 2 at p. 5].   He testified in his deposition that he was aware of the dangers of asbestos as early as the 1940s.   [*Id.* at p. 14:18-25].   By the mid-1950's, the Air Force was collecting particle counts from work on asbestos-containing

products on its aircraft. [*Id.* at 32:8-33:21]. He testified that during from roughly mid 1953 going forward, the Air Force knew about threshold limit values and what dangers might be posed by asbestos. [*Id.* at 52:25-55:17].

Another deposition reviewed by the *Niemann* court was from Alvin Meyer, who was an industrial toxicologist with the Air Force. From 1948 to 1954 he was the Chief Industrial Hygienist for the Air Material Command, and from 1962-69 he was the most senior industrial hygienist in the Air Force. [*See Deposition of Alvin F. Meyer, Jr.,* Exh. E, attachment 3, at 32:17-33:9; 50:3-51:1]. He testified that he was aware of the dangers of asbestos as he performed his duties from 1948-52. [*Id.* at 36:10-20]. The Air Force did not ban asbestos outright, but adopted practice standards to minimize the risk of asbestos in the early 50's, and adopted threshold limit values as a result of its knowledge of the dangers of asbestos as early as 1955. [*Id.* at 41:12-43:13; 82:4-11].

This testimony shows that in the early 1950's the Air Force was already aware of the dangers of asbestos and was taking steps to minimize the risk. The testimony discussed above convinced the *Neimann* court that there was no duty to warn the Air Force of the dangers of using asbestos materials in its aircraft. *See Id. See also Ramey v. Martin-Baker Aircraft Co*, 874 F.2d 946, 950-51 (4th Cir. 1989) (holding that because of the government's demonstrated knowledge of the risk of asbestos, the third element of *Boyle* was satisfied regardless of the level of defendant's knowledge of the risks). This same result is compelled here.

Thus, it is clear that Pratt has a colorable defense under the federal contractor immunity defense set forth in *Boyle*. Accordingly, it may remove the case under 28 U.S.C. § 1442(a).

13

### 3. There Is A Clear Causal Connection Between Plaintiffs Claims and The Acts Pratt Performed Under Color of Federal Office

As set forth above, the United States Government exercised extensive control over the design of the J-57 engine. This included the aspects of the design that called for and utilized certain asbestos-containing materials. [*See* Shiffler Dec., Exh. C, at ¶¶ 8 and part drawings specifying asbestos attached thereto]. The J-57 was designed, under the military's control, to include asbestos containing materials. Pratt was required to produce the J-57s in precise conformity with all of the approved specifications. Pratt was required to manufacture the J-57 in exactly the way the military commanded. Where plaintiffs claim that there was something wrong with the design of military equipment, as is the case here, courts routinely find the requisite "causal connection" for federal officer removal where defendant can demonstrate the requisite control through military specifications. *See, e.g., Fung v. Abex Corp.*, 816 F. Supp. 569, 573 (N.D. Cal. 1992) *citing Boyle* and *Neimann.*

Because Pratt can demonstrate that it designed and built the J-57 under pervasive and specific military control, and because the military specified that gaskets must include asbestos during the 1950s, it is entitled to remove this case under 28 U.S.C. § 1442.

### CONCLUSION

Plaintiff's motion to remand should be denied. Pratt's removal was appropriate. There is no dispute that all of plaintiff's asbestos exposure took place on United States Air Force bases and as a result there is federal enclave jurisdiction. Plaintiff makes no serious argument to the contrary. In addition to federal enclave jurisdiction, removal was also appropriate on federal officer grounds.

14

Respectfully submitted,

Robert E. Gifford (wvsb #6318)
Kelly J. Little (wvsb #7279)
Janna M. Nuzum (wvsb #9134)
STEPTOE & JOHNSON PLLC
Of Counsel
Bank One Center
P. O. Box 2190
Clarksburg, WV   26302-2190
PH:  (304) 624-8000

**_Counsel for Defendant Pratt & Whitney_**

15

## CERTIFICATE OF SERVICE

I do hereby certify that on this _____21 st_____ day of July, 2005, I served upon

counsel as listed below, a copy of the foregoing "Defendant Pratt & Whitney's,

Answer to Complaint, Answer to Cross Claims and Cross Claim for

Contribution/Indemnity" by depositing a true copy thereof in the United States

mail, postage prepaid and addressed to:

David P. Chervenick, Esquire
Bruce E. Mattock, Esquire
Lee W. Davis, Esquire
Goldberg, Persky & White, P.C.
1030 Fifth Avenue
Pittsburgh, PA 15219

Scott S. Segal, Esquire
The Segal Law Firm
810 Kanawha Boulevard, East
Charleston, WV 25301
*Counsel for Plaintiffs*

A. Timothy Jones, Esquire
Hawkins & Parnell, LLP
602 Virginia Street, East, Suite 200
Charleston, WV 25301-2154
*Counsel for A.W. Chesterton Company*
*Counsel for Dana Corporation*

Michael B. Victorson, Esquire
Jackson Kelly PLLC
1600 Laidley Tower
P.O. Box 553
Charleston, WV 25322-0553
*Counsel for Beech Aircraft Company*
*Counsel for The Goodyear Tire & Rubber Company*
*Counsel for McDonnel Douglas Corporation*

Eric K. Falk, Esquire
Davies, McFarland & Carroll, P.C.

16

The Tenth Floor, One Gateway Center
Pittsburgh, PA 15222-1416
*Counsel for Boeing North American, Inc.*
*Counsel for Honeywell International, Inc.*

Richard L. Lancianese, Esquire
Baker & Lancianese
1108 Third Avenue, Suite 300
Huntington, WV 25701
*Counsel for Burns International Services Corporation*

Joseph S. Beeson, Esquire
Robinson & McElwell, PLLC
P.O. Box 1791
Charleston, WV 25326
*Counsel for Columbia Paint Corporation d/b/a Columbia Paint Town*
*Counsel for Cooper Industries, Inc.*

Robert R. Leight, Esquire
Pietragallo, Bosick & Gordon
One Oxford Centre, 38th Floor
Pittsburgh, PA 15219
*Counsel for Curtiss-Wright Corporation*

Paula L. Durst, Esquire
Spilman Center
300 Kanawha Boulevard, East
Post Office Box 273
Charleston, WV 25321-0273
*Counsel for E.I. du Pont de Nemours & Company*

Joseph L. Orszulak, II, Esquire
Marks, O'Neill, O'Brien & Courtney, P.C.
Gulf Tower, Suite 2600
707 Grant Street
Pittsburgh, PA 15219
*Counsel for Flowserve US, Inc. f/k/a Flowserve FSD Corporation*

Scott A. Matthews, Esquire
Dell, Moser, Lane & Loughney, LLC
525 William Penn Place, Suite 3700
Pittsburgh, PA 15219
*Counsel for Foster Wheeler, L.L.C.*

Rita Massie Biser, Esquire

17

Kay Casto & Chaney PLLC
P.O. Box 2031
Charleston, WV 25327
*Counsel Garlock Sealing Technologies LLC*

Bryan S. Neft, Esquire
Nora Barry Fischer, Esquire
Pietragallo, Bosick & Gordon
One Oxford Centre, 38th Floor
Pittsburgh, PA 15219
*Counsel for General Electric Company*

J. Tyler Dinsmore, Esquire
Flaherty, Sensabaugh & Bonasso, PLLC
200 Capitol Street
Charleston, WV 25301
*Counsel for General Motors Corporation and its former division,*
*Allison Transmission*

John D. Epps, Esquire
Alexandra B. Cunningham, Esquire
Hunton & Williams LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
*Counsel for Goodrich Corporation*

J. Greg Goodykoontz, Esquire
Steptoe & Johnson PLLC
P.O. Box 2190
Clarksburg, WV 26302-2190
*Counsel for Learjet, Inc.*

Lori Streets Muldoon, Esquire
Stephen M. Fowler, Esquire
Pullin, Fowler & Flanagan, PLLC
901 Quarrier Street
Charleston, WV 25301
*Counsel for Lockheed Martin Corporation*

Charles M. Love, III, Esquire
Bowles Rice McDavid Graff & Love LLP
P.O. Box 1386
600 Quarrier Street
Charleston, WV 25325-1386
*Counsel for Metropolitan Life Insurance Company*

Edward W. Rugeley, III, Esquire
Corey T. Zurbuch, Esquire
Spilman, Thomas & Battle, PLLC
P.O. Box 273
Charleston, WV 25321-0273
*Counsel for Northrop Grumman Corporation*

David K. Hendrickson, Esquire
Apryll H. Boggs, Esquire
Hendrickson & Long, P.L.L.C.
214 Capitol Street
P.O. Box 11070
Charleston, WV 25339
*Counsel for Owens-Illinois, Inc.*
*Counsel for Viacom, Inc.*

Brian S. Lindsay, Esquire
Jenkins Fenstermaker, PLLC
P.O. Box 2688
Huntington, WV 25726-2688
*Counsel for Vimasco Corporation*

R. Carter Elkins, Esquire
B. Luke Styer, Esquire
Campbell, Woods, Bagley,

Emerson, McNeer & Herndon. P.L.L.C.
517 Ninth Street, Suite 1000
P.O. Box 1835
Huntington, WV 25719
*Counsel for Pneumo Abex LLC*

Matthew J. Fischer, Esquire
Schiff Hardin LLP
6600 Sears Tower
Chicago, IL 60606
*Counsel for Rolls Royce Corporation*

Counsel for Defendant Pratt &
Whitney

19

# EXHIBIT A

# UNITED STATES OF AMERICA
## JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

**CHAIRMAN:**
Judge Wm. Terrell Hodges
United States District Court
Middle District of Florida

**MEMBERS:**
Judge John F. Keenan
United States District Court
Southern District of New York

Judge D. Lowell Jensen
United States District Court
Northern District of California

Judge J. Frederick Motz
United States District Court
District of Maryland

Judge Robert L. Miller, Jr.
United States District Court
Northern District of Indiana

Judge Kathryn H. Vratil
United States District Court
District of Kansas

Judge David R. Hansen
United States Court of Appeals
Eighth Circuit

**DIRECT REPLY TO:**

Michael J. Beck
Clerk of the Panel
One Columbus Circle, NE
Thurgood Marshall Federal
Judiciary Building
Room G-255, North Lobby
Washington, D.C. 20002

Telephone: [202] 502-2800
Fax:          [202] 502-2888

http://www.jpml.uscourts.gov

June 6, 2005

TO INVOLVED COUNSEL

Re:  MDL-875 -- In re Asbestos Products Liability Litigation (No. VI)

(See Attached Schedule CTO-248)

Dear Counsel:

Attached hereto is a copy of a conditional transfer order filed today by the Panel involving the above-captioned matter.  This matter is transferred pursuant to Rule 7.4 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, 199 F.R.D. 425, 435-36 (2001).  Copies of Rule 5.2, dealing with service, and Rules 7.4 and 7.5, regarding "tag-along" actions, are attached for your convenience.

Inasmuch as there is an unavoidable time lag between notification of the pendency of the tag-along action and the filing of a conditional transfer order, counsel are required by Rule 7.4(b) to notify this office **BY FACSIMILE**, at (202) 502-2888, of any official changes in the status of the tag-along action.  These changes could involve dismissal of the action, remand to state court, transfer to another federal court, etc., as indicated by an order filed by the district court.  Your cooperation would be appreciated.

**NOTICE OF OPPOSITION DUE ON OR BEFORE:**   <u>June 21, 2005</u>   **(4 p.m. EST)**
(Facsimile transmission is suggested.)

If you are considering opposing this conditional transfer order, please review Rules 7.4 and 7.5 of the Panel Rules before filing your Notice of Opposition.

A list of involved counsel is attached.

Very truly,

Michael J. Beck
Clerk of the Panel

By

Deputy Clerk

Attachments

JPML Form 39

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUN – 6 2005

FILED
CLERK'S OFFICE

## *DOCKET NO. 875*

## *BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION*

## *IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)*

## *(SEE ATTACHED SCHEDULE)*

## *CONDITIONAL TRANSFER ORDER (CTO-248)*

On July 29, 1991, the Panel transferred 21,937 civil actions to the United States District Court for the Eastern District of Pennsylvania for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. Since that time, 79,788 additional actions have been transferred to the Eastern District of Pennsylvania. With the consent of that court, all such actions have been assigned to the Honorable Charles R. Weiner.

It appears that the actions on this conditional transfer order involve questions of fact which are common to the actions previously transferred to the Eastern District of Pennsylvania and assigned to Judge Weiner.

Pursuant to Rule 7.4 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, 199 F.R.D. 425, 435-36 (2001), these actions are transferred under 28 U.S.C. § 1407 to the Eastern District of Pennsylvania for the reasons stated in the order of July 29, 1991, 771 F.Supp. 415 (J.P.M.L. 1991), and, with the consent of that court, assigned to the Honorable Charles R. Weiner.

This order does not become effective until it is filed in the Office of the Clerk of the United States District Court for the Eastern District of Pennsylvania. The transmittal of this order to said Clerk shall be stayed fifteen (15) days from the entry thereof and if any party files a notice of opposition with the Clerk of the Panel within this fifteen (15) day period, the stay will be continued until further order of the Panel.

FOR THE PANEL:

*Michael J. Beck*

Michael J. Beck
Clerk of the Panel

**SCHEDULE CTO-248 - TAG-ALONG ACTIONS**
**DOCKET NO. 875**
**IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)**

**DIST. DIV. C.A. #**               **CASE CAPTION**

ALABAMA NORTHERN
  ALN 2  05-796              Lisa Bracknell, et al. v. Aearo Co.

CALIFORNIA NORTHERN
  CAN 4  05-202              Twila Hartford, et al. v. Atlas Turner, Inc., et al.

MINNESOTA
  MN  0  04-4236             Edmund Joseph Casey v. Garlock Sealing Technologies, LLC, et al.

MISSISSIPPI NORTHERN
  MSN 3  03-236              Lemon Covington, et al. v. Garlock Sealing Technologies, LLC, et al.

NORTH CAROLINA WESTERN
  NCW 1  05-95               Faye Winchester Nicholson, etc. v. Anchor Packing Co., et al.

NEW YORK EASTERN
  NYE 1  05-1681             Barbara L. Horick, etc. v. A.W. Chesterton Co., et al.
  NYE 1  05-1777             Lorraine Caitlin, etc. v. A.W. Chesterton Co., et al.
  NYE 1  05-1812             Tiffany Alders, et al. v. A.W. Chesterton Co., et al.
  NYE 1  05-1981             Ellen L. McIntosh, etc. v. A.W. Chesterton Co., et al.
  NYE 1  05-2047             Lucille M. Ray v. A.W. Chesterton Co., et al.

WEST VIRGINIA SOUTHERN
  WVS 2  05-286              Charles E. Hamrick, et al. v. A&I Co., et al.

# EXHIBIT B

**1**

```
 1          IN THE CIRCUIT COURT OF KANAWHA COUNTY
                         WEST VIRGINIA
 2

 3    IN RE:  ASBESTOS PERSONAL INJURY LITIGATION,
                  JUDGE RONALD E. WILSON,
 4

 5                                CIVIL ACTION
                                  NO. 03-C-9600
 6
      CHARLES E. HAMRICK and
 7    WANDA HAMRICK, his wife,

 8

 9              Plaintiffs,

      vs                          CIVIL ACTION
10                                NO.: 05-C-54

11    20TH CENTURY GLOVE CORPORATION OF TEXAS, also
      known as, Guard Line, Inc., et al.,
12

13              Defendants.

14

15         The video deposition of CHARLES E. HAMRICK,
      taken upon oral examination, pursuant to notice
16    and pursuant to the West Virginia Rules of Civil
      Procedure, before James D. Nielsen, Court
17    Reporter and Notary Public in and for the State
      of West Virginia, Monday, March 7, 2005, at
18    11:00 a.m., at 13 Elk Street, Webster Springs,
      West Virginia.
19

20

21

22           JOHNNY JACKSON & ASSOCIATES, INC.
                  606 Virginia Street, East
23              Charleston, West Virginia 25301
                      (304) 346-8340
24
```

**2**

```
 1                    APPEARANCES

 2    Counsel on behalf of the Plaintiffs:

 3        GOLDBERG, PERSKY & WHITE, P.C.
          Lee W. Davis, Esquire
 4        1030 Fifth Avenue, Third Floor
          Pittsburgh, PA 15219
 5        (412) 471-3980

 6    Defense Liaison Counsel:

 7        JACKSON & KELLY, PLLC
          Michael B. Victorson, Esquire
 8        1600 Laidley Tower
          Post Office Box 553
 9        Charleston, WV 25322-0553
          (304) 340-1000
10
      Counsel on behalf of the Defendant, Leerjet and
11    Pratt & Whitney:

12        STEPTOE & JOHNSON, PLLC
          Robert E. Gifford, Esquire
13        Kelly Little, Esquire
          Bank One Center, 6th Floor
14        P.O. Box 2190
          Clarksburg, WV 26302-2190
15        (304) 624-8000

16    Counsel on behalf of the Defendant, Honeywell
      International and Boeing:
17
          DAVIES, MCFARLAND & CARROLL, P.C.
18        Eric K. Falk, Esquire
          One Gateway Center
19        10th Floor
          Pittsburgh, PA 15222-1416
20        (412) 281-0737

21

22

23

24
```

**1**

```
 1    APPEARANCES CONT.

 2    Counsel on behalf of the Defendant, McDonnell
      Douglas Corporation:
 3
          BRYAN CAVE, LLP
 4        Christopher L. Dueringer, Esquire
          120 Broadway
 5        Suite 300
          Santa Monica, CA 90401
 6        (310) 576-2100

 7        and

 8        DAVIES, MCFARLAND & CARROLL, P.C.
          Stephen J. Dalesio, Esquire
 9        One Gateway Center
          10th Floor
10        Pittsburgh, PA 15222-1416
          (412) 281-0737
11
      Counsel on behalf of the Defendant, General
12    Electric Company:

13        PIETRAGALLO BOSICK & GORDON
          Brian Green, Esquire
14        One Oxford Centre
          Thirty-Eighth Floor
15        Pittsburgh, PA  15220
          (412) 263-1815
16

17    Counsel on behalf of the Defendant, General
      Motors:
18
          FLAHERTY, SENSABAUGH & BONASSO, PLLC
19        Tyler Dinsmore, Esquire
          200 Capitol Street
20        P.O. Box 3843
          Charleston, WV  25338-3843
21        (304) 347-4234

22

23

24
```

**4**

```
 1    APPEARANCES CONT.

 2    Counsel on behalf of the Defendant, Borg-Warner
      Corporation:
 3
          BAKER & LANCIANESE
 4        Richard Lancianese, Esquire
          River Tower - Suite 300
 5        1108 Third Avenue
          Huntington, WV  25705
 6        (304) 522-6906

 7    Counsel on behalf of the Defendant, Dana
      Corporation and A. W. Chesterton Company, Inc.:
 8
          HAWKINS & PARNELL
 9        Margaret Droppleman, Esquire
          602 Virginia Street, East, Suite 200
10        Charleston, WV 25314
          (304) 345-8545
11
      Counsel on behalf of the Defendant, Garlock
12    Sealing Technologies, LLC:

13        KAY, CASTO & CHANEY, PLLC
          Rita Massie Biser, Esquire
14        1300 Bank One Center
          P.O. Box 2031
15        Charleston, WV  25327
          (304) 345-8900

16    Counsel on behalf of the Defendant, Goodrich
17    Corporation:

18        HUNTON & WILLIAMS
          Carson W. Johnson, Esquire
19        951 East Byrd Street
          Richmond, VA 23219
20        (804) 788-8200

21

22

23

24
```

**5**

APPEARANCES CONT.

Counsel on behalf of the Defendant, Columbia
Paint and Cooper Industries:

    ROBINSON & McELWEE
    Mark H. Hayes, Esquire
    400 Fifth-Third Center
    700 Virginia Street, East
    Charleston, WV 25301
    (304) 347-8354

Counsel on behalf of the Defendant, Viacom,
Westinghouse Electric, Ingersol-Rand, Owens-
Illinois and Famous Furnace:

    HENDRICKSON & LONG, PLLC
    Jeffry H. Hall, Esquire
    214 Capitol Street
    P.O. Box 11070
    Charleston, WV  25301
    (304) 346-5500

Counsel on behalf of the Defendant, Lockheed
Martin:

    PULLIN, FOWLER & FLANAGAN
    Frank Oliverio, Esquire
    1200 Dorsey Avenue, Suite 1
    Morgantown, WV  26505
    (304) 225-2200

Counsel on behalf of the Defendant,
Durametallic:

    MARKS, O'NEILL, REILLY, O'BRIEN & COURTNEY
    Susan L. Loughran, Esquire
    707 Grant Street, Suite 2600
    Pittsburgh, PA 15219
    (412) 391-6171

**7**

INDEX

CHARLES E. HAMRICK - DEPONENT

EXAMINATION BY:

    Mr. Davis . . . . . . . . . . 10

    Mr. Gifford . . . . . . . . . . 27

    Mr. Dueringer . . . . . . . . . 38

    Mr. Davis . . . . . . . . . . 48

    Mr. Gifford . . . . . . . . . . 50

EXHIBITS:

    Exhibit A . . . . . . . . . . 53

**6**

APPEARANCES CONT.

Counsel on behalf of the Defendant, Abex and
Graybar Electric:

    CAMPBELL, WOODS, BAGLEY, EMERSON, McNEER &
    HERNDON
    Charles F. Bagley, III, Esquire
    Suite 1000
    517 Ninth Street
    Post Office Box 1835
    Huntington, WV  25719
    (304) 529-2391

Counsel on behalf of the Defendant, Foster
Wheeler:

    DELL, MOSER, LANE & LOUGHNEY, LLC
    Michael Cohen, Esquire
    525 William Penn Place
    Suite 3700
    Pittsburgh, PA 15219
    (412) 471-1180

Counsel on behalf of the Defendant, Pratt &
Whitney:

    TUCKER, ELLIS & WEST
    Richard Dean, Esquire
    925 Euclid Avenue
    Suite 1150
    Cleveland, OH 4415
    (216) 592-5000

**8**

    MR. VICTORSON:  The deposition
of Mr. Hamrick is being taken today
pursuant to order allowing the
deposition to take place at this time
entered by Judge Recht after a motion
that was filed by Mr. Davis.

    It's understood both by the
court and by all counsel that by
appearing today no defenses have been
waived, including those relating to
jurisdiction and to process and service
of process.

    It is my understanding at this
point that no defendant has actually
received service of process in this case
at this point.  Those of us who are here
are here as a result of Mr. Davis having
kindly provided courtesy information
relative to the suit and to have
provided us with that information.

    Anything else you want?

    MR. GIFFORD:  Furthermore --
this is Rob Gifford also on behalf of
the defense -- Judge Recht indicated

**9**

1  there was no requirement to have formal
2  pro hac vice papers filed, but hereafter
3  if this case should proceed with
4  additional deposition testimony
5  defendants make reasonable efforts to
6  have such papers filed and orders
7  entered accordingly.
8          And furthermore, just so it's
9  very clear, that no defendant has given
10 up the right with regard to removal and
11 no court should look upon this
12 deposition as being a special appearance
13 or limited appearance and there is no
14 waiver of any of that at this time.
15         MR. VICTORSON:  Is that all
16 correct?
17         MR. DAVIS:  That's all correct.
18         MR. VICTORSON:  You may
19 proceed.
20         MR. DAVIS:  Mr. Hamrick, I'm
21 going to ask you most of the questions
22 in the beginning and then some of these
23 other people may have questions, okay.
24         We can go on the video.

**10**

1      CHARLES E. HAMRICK, DEPONENT, SWORN
2                EXAMINATION
3  BY MR. DAVIS:
4      Q.  Good morning, Mr. Hamrick.
5      A.  Good morning.
6      Q.  Can you tell the ladies and gentlemen of
7  the jury your name?
8      A.  Charles E. Hamrick.
9      Q.  Where are we right now, Mr. Hamrick?
10     A.  Cherry Falls, it's right outside of
11 Webster Springs.
12     Q.  Suburb of Webster Springs?
13     A.  No, it's unincorporated.
14     Q.  So it's not even a suburb?
15     A.  No.
16     Q.  Mr. Hamrick, we're going to ask you a
17 few questions today about your career and your
18 health.  First I want to start with is, where
19 were you born?
20     A.  Bergoo, West Virginia, right up the
21 road.
22     Q.  Right up the road from where we're at
23 now?
24     A.  Right.

**11**

1      Q.  And did you go to high school?
2      A.  Yes.
3      Q.  Did you graduate?
4      A.  No.
5      Q.  What did you do when you left high
6  school?
7      A.  I worked at a service station for about
8  a year for my uncle and then worked coal mines
9  about a month and then I went and joined the Air
10 Force.
11     Q.  Let me ask you about this service
12 station quickly.  What did you do at the service
13 station?
14     A.  I pumped gas, changed tires.
15     Q.  Did you do any mechanical work on cars?
16     A.  No.
17     Q.  So this was just pumping gas and
18 changing tires?
19     A.  Right, yes, washing, you know.
20     Q.  Washing cars?
21     A.  Yeah.
22     Q.  And then you worked for a month in the
23 coal mines?
24     A.  Right.

**12**

1      Q.  And then you went to the Air Force?
2      A.  Right.
3      Q.  Let's talk about your Air Force career
4  then.
5      A.  Okay.
6      Q.  When you enlisted in the Air Force where
7  did you go first?
8      A.  I went to Charleston.
9      Q.  South Carolina?
10     A.  No, I went --
11     Q.  West Virginia?
12     A.  West Virginia, and then I got records
13 and all that.  And then I went to Amarillo.
14     Q.  Amarillo, Texas?
15     A.  Uh-huh.
16     Q.  What did you do there?
17     A.  Basic training mainly.
18     Q.  And what did you do after basic in
19 Amarillo?
20     A.  I left there, I went to Fort Belvoir,
21 Virginia to commercial sheet metal school.
22     Q.  So you were in school for sheet metal
23 work?
24     A.  Right.

**13**

1   Q. And this is all part of the Air Force?

2   A. Right. That was Army there but they --

3   it's a school that's --

4   Q. So it was an Army facility --

5   A. Right.

6   Q. -- but they were teaching Air Force

7   personnel?

8   A. Right.

9   Q. Namely you?

10   A. Yeah, I was one of them.

11   Q. I take it at that point you became a

12   sheet metal worker for the Air Force?

13   A. Yes, and then I went -- went overseas.

14   Q. And where did you go overseas?

15   A. I went to -- which I didn't name,

16   because you know, I didn't work aircraft over

17   there.

18   Q. Where did you go?

19   A. Erding, Germany.

20   Q. And what were you doing there?

21   A. I ended up being the Air Police.

22   Q. Air Police?

23   A. Yeah, for about three months, four

24   months.

**14**

1   Q. And then what did you do?

2   A. Well, I got in a Jeep accident. And I

3   was in the hospital six months.

4   Q. Did you break bones?

5   A. I fractured skull and knocked my left

6   eye out.

7   Q. Now, at some point did you start doing

8   mechanical work on aircraft?

9   A. Yes. I come back to the hospital in

10   Virginia, and then they sent me over to Fort

11   Myers down at the hospital and wanted me to be

12   in the Honor Guard and stuff and I didn't want

13   it. So I ended up going to Andrews Air Force

14   Base.

15   Q. Is that where you took up aircraft

16   mechanic?

17   A. Right, that's where I got in there, back

18   in April of '52.

19   Q. How long were you an aircraft mechanic

20   in the Air Force?

21   A. Twenty years.

22   Q. Now --

23   A. Well, about 19 years actually, in the

24   aircraft work.

**1**

1   Q. Aircraft work?

2   A. Right.

3   Q. And just generally what was your job

4   doing aircraft work? Were you repairing --

5   A. Repairing aircraft and -- well, working

6   the engine parts and stuff like that.

7   Q. Were you rebuilding engines?

8   A. No -- yes, consider that was the cowling

9   that goes around the engines and everything,

10   which has your asbestos and all that.

11   Q. What kind of asbestos or what did it

12   look like in the cowling?

13   A. It's fluffy like, you know, and snow

14   white.

15   Q. What aircraft, do you remember that,

16   what you're talking about?

17   A. Oh, I guess I worked F-51s, B-24s and

18   B-25s.

19   Q. Have the asbestos as you've described?

20   A. Right. And then C-47s, 46s and 118s and

21   I believe that was it there.

22   Q. Now, I had previously asked you before

23   we got here today to write down a list of all

24   the aircraft that you could remember working

**16**

1   on.

2   A. Right.

3   Q. I'm going to show you this list that you

4   gave to me and it's in the back of a book that's

5   titled Air Force Flight Test Center, Edwards Air

6   Force Base, California, 1957.

7   A. Right.

8   Q. Was this your book?

9   A. Yes.

10   Q. And in the back you've written some

11   places and some aircraft designations?

12   A. Right.

13   Q. I'm going to show this to you. Is this

14   the list that you wrote or did your wife

15   actually write the list?

16   A. No, she didn't write this.

17   Q. Did you write that?

18   A. Oh, wait a minute, yeah, she did too.

19   Q. You told her what to write?

20   A. Right. She wrote it, yeah.

21   Q. Were those all the plane designations,

22   to the best of your ability, that you worked

23   on?

24   A. Yes, I'm sure there's some more but...

**17**

1    Q. That's what you could remember last
2  weekend?
3    A. Right, uh-huh.
4    Q. At the top of the page in the back of
5  this book it also lists several bases where you
6  worked?
7    A. Yes.
8    Q. Were those the bases that you worked on
9  planes while a member of the military?
10    A. Yes.
11    Q. What was the highest rank you had?
12    A. Staff Sergeant.
13    Q. Now, I'm just going to ask you generally
14  about all these aircraft, because there's many,
15  many on this list.
16    A. Right.
17    Q. When you were doing aircraft work did
18  you repair the brakes on the aircraft?
19    A. Yes. I did that mainly when I was the
20  Civil Service.
21    Q. So this is later after your military
22  work?
23    A. Right.
24    Q. So the ladies and gentlemen of the jury

**18**

1  understand, your first 19 years you're doing
2  military repair on planes and you're in the
3  military?
4    A. Right.
5    Q. And then for the last 23 years --
6    A. Right.
7    Q. -- you were a civilian employee?
8    A. Right.
9    Q. And you were still working on the same
10  planes?
11    A. Right.
12    Q. Where were you based when you were doing
13  that?
14    A. Eglin Air Force Base, Florida.
15    Q. So you're doing basically the same job?
16    A. Yes, sir.
17    Q. Different company, one was the U.S.
18  government?
19    A. Well, and the other was Civil Service,
20  it's the same -- well, really the same thing,
21  just different pay.
22    Q. Yeah, a little different pay.
23    A. Right.
24    Q. Now, you mentioned doing brake work on

**19**

1  these planes, do you believe that some of these
2  brakes contained asbestos?
3    A. Yes.
4    Q. Why is it that you believe that?
5    A. Well, when they ordered them and
6  everything you'd tell them what you needed and
7  they'd --
8    Q. Send it out?
9    A. Send it out.
10    Q. When you did the brake work would you
11  have to clean off the old brakes?
12    A. Right.
13    Q. Can you generally describe what you
14  would do with that brake work?
15    A. Well, you blow them off and clean them
16  to where you can get to the rivets and
17  everything and drill the pads off.
18    Q. So you were actually putting new pads on
19  the shoe -- the metal shoe?
20    A. Right.
21    Q. Would you drill the new pads?
22    A. No, the pads their selves would be
23  already drilled.
24    Q. And you'd have to rivet them onto the

**20**

1  shoe?
2    A. Right. I'd have to drill the old ones
3  off.
4    Q. Oh, I see. So it took a drill to get
5  the rivet off the old one?
6    A. Right.
7    Q. All of this work, the replacement of
8  brakes, did this create dust?
9    A. Yes.
10    Q. And did you breathe that dust?
11    A. Yes.
12    Q. Now, inside some of these aircraft --
13  and I won't go through them, and you know better
14  than anybody in this room -- were there any
15  other places that you know of any asbestos
16  products that were used?
17    A. Not right offhand I don't.
18    Q. Did you ever rebuild any engines?
19    A. I helped, yes.
20    Q. Were you a member of the military or a
21  Civil Service man?
22    A. Civil Service.
23    Q. What year about do you think you were
24  doing that?

21

1    A. Let's see, we'll go back to '72.

2    Q. So you were a Civil Service member --

3    A. Right.

4    Q. -- at Eglin and you did engine rebuilds

5    --

6    A. Right.

7    Q. -- at that point?

8    A. Yes.

9    Q. Were you using any gaskets or packing in

10   that work?

11   A. Oh, yes.

12   Q. Do you believe those products contained

13   asbestos?

14   A. Not offhand I don't.

15   Q. When you were doing sheet metal work did

16   you ever have to do any welding?

17   A. No.

18   Q. Other people did that work?

19   A. Right.

20   Q. Now, you spent 23 years in the Civil

21   Service, when did you leave the Civil Service?

22   A. I retired out of there in -- 5th of

23   January of '95.

24   Q. What did you do after you retired at

22

1    Eglin in '95?

2    A. Nothing.

3    Q. Nothing?  Did you move back here?

4    A. No.

5    Q. How long until you came back?

6    A. I come back here in October of 2001.

7    Q. Have you lived in Webster Springs since

8    then?

9    A. Yes, lived here.

10   Q. Now, it's my understanding you have four

11   children from a prior marriage?

12   A. Yes.

13   Q. And how is their health as best you

14   know?

15   A. Good, as far as I know.  Well, my oldest

16   boy had stents and stuff put in his heart.

17   Q. That was recently, right?

18   A. Yes.

19   Q. But other than that everybody is doing

20   well?

21   A. Yes.

22   Q. Good, good.  All right, let's talk a

23   little bit what's transpired since you've moved

24   back to Webster Springs.

23

1    Q. You got married didn't you?

2    A. Yes, I got married last June.

3    Q. Congratulations.

4    A. Thank you.

5    Q. And a little after that you had a

6    hernia?

7    A. Yes.

8    Q. So you hadn't been married that long and

9    you had the first of two hernia surgeries?

10   A. Right.

11   Q. The first hernia surgery went okay?

12   A. Yes.

13   Q. Had you had any other real health

14   conditions prior to this time?

15   A. Just -- I had a bad colon, they had to

16   take out 10 percent.

17   Q. Of your colon?

18   A. My colon, and then it collapsed.

19   Q. But that wasn't cancer?

20   A. No.

21   Q. So you had this hernia surgery, and

22   other than the colon problem that was it?

23   A. Well, I had a -- let's see, not too long

24   after I got back I had a heart attack.  They

24

1    said I had a heart attack.  I went to Charleston

2    and they -- I was there two or three days and

3    come back.

4    Q. Nothing?

5    A. No, heart in good shape.

6    Q. All right.  Now, you went in -- the

7    second hernia reappeared or appeared?

8    A. Appeared, yes.

9    Q. And you went in for surgery on that?

10   A. Yes.

11   Q. Why don't you describe for the ladies

12   and gentlemen of the jury what happened during

13   that second hernia procedure?

14   A. Well, everything -- after they sent it

15   off, you know, to have it checked, it come back

16   with the cancer in it.

17   Q. Did they give you a type or a disease

18   name when they came back?  What's your

19   understanding of the diagnosis?

20   A. That --

21   Q. Mesothelioma?

22   A. Right.

23   Q. And it was at your second hernia

24   surgery?

**25**

1    A. Right.

2    Q. And when was all this transpiring?

3    A. Let's see --

4    Q. Six months ago?

5    A. Yeah, about six months ago.

6    Q. How were you feeling up until then?

7    A. Great.

8    Q. And what did you weigh then?

9    A. About 222.

10    Q. And what do you weigh today?

11    A. I don't know, but the last time I was

12 weighed at the hospital it was 128.

13    Q. When was that?

14    A. About six months -- well, about six

15 months ago.

16    Q. Let me talk about life here in Webster

17 Springs before you got ill.  What did you like

18 to do with your time?

19    A. I hunt, fish.

20    Q. You live right on a river here?

21    A. Right.

22    Q. You're outdoors kind of guy?

23    A. Yes, sir.

24    Q. Do you have any other activities that

**26**

1 you like to enjoy?

2    A. No.

3    Q. Hunt and fishing?

4    A. Hunt and fishing man I guess.

5    Q. Now, can you describe for the ladies and

6 gentlemen of the jury what has transpired in the

7 last six months since you've gotten ill?

8    A. Well, I had another operation.

9    Q. Right.

10    A. Well, it was formed around my

11 gallbladder, and they took my gallbladder out.

12    Q. This was all related?

13    A. Yes, related to that.

14    Q. To the cancer?

15    A. Yes.  And since that I got -- well, bed

16 -- bedfast and I've been that way for almost six

17 months.

18    Q. You haven't been able to get out of

19 bed?

20    A. No.  I sit up once in a while a little

21 bit and that's it.

22    Q. Mr. Hamrick, what's your hope for the

23 future right now?

24    A. Well, I hope to get better, because --

**27**

1 just starting a new life and this happens.

2 Excuse me.

3        MR. DAVIS:  That's all right.

4    Mr. Hamrick, I think that's all the

5    questions I have.  Some of these other

6    lawyers may have some questions in a few

7    minutes, they're going to want to talk.

8        They're going to want to have a

9    little talk together, but we'll give you

10    a few minutes, okay, and then we'll come

11    back, all right?

12        THE DEPONENT:  Okay.

13        MR. DAVIS:  Thank you, you can

14    go off the record.

15            (Break.)

16        EXAMINATION

17 BY MR. GIFFORD:

18    Q. Mr. Hamrick, my name is Rob Gifford,

19 we've met off the record and we're already peas

20 in a pod since we're both Jeff Gordon fans,

21 right?

22    A. Right.

23    Q. I appreciate your time.  I just want to

24 ask you some quick questions to try to develop

**28**

1 your background history, okay.

2        As I understand, once you left high

3 school and you went into the Air Force through

4 Charleston, West Virginia, there's an Air

5 National Guard Base there.

6    A. At that time, right.

7    Q. Did you do any work there?

8    A. No.

9    Q. Just paperwork?

10    A. Just paperwork.

11    Q. And as I understand, once you got out of

12 your basic training you were sent to a Fort

13 Belvoir over in Virginia?

14    A. Right.

15    Q. And you did sheet metal school there?

16    A. Right.

17    Q. Do you know how long you may have been

18 there?

19    A. Not right offhand.  I think it was six

20 weeks, I'm not sure.

21    Q. And then once you got done with that

22 they shipped you over to Germany?

23    A. Yes, sir.

24    Q. Was that a straight job, I mean, from

Charles E. Hamrick

3.7.05

29

1    Virginia right to Germany?
2        A.  Yes.
3        Q.  And where were you stationed there?
4        A.  Erding.
5        Q.  How long were you in Germany with the
6    Air Force?
7        A.  About -- at that time about two or three
8    months -- no, four months.
9        Q.  Do you know what time frame that would
10   have been, year-wise?  Is that 1954?  '55?
11       A.  1951.
12       Q.  1951?
13       A.  Uh-huh.
14       Q.  So you were there four months, 1951, you
15   had a jeep accident?
16       A.  Yes.
17       Q.  It sounds like you had some pretty bad
18   injuries?
19       A.  Yes.
20       Q.  And you were laid up for a while?
21       A.  About six months.
22       Q.  And was all that six months in Germany
23   or did they ship you back stateside?
24       A.  No, they shipped me -- it was about

30

1    three months over there and then about two or
2    three months in the states.
3        Q.  And as I understand at that time they
4    said, Enlistee Hamrick, we're going to put you
5    on the Honor Guard and we're going to send you
6    down to Fort Myers?
7        A.  That's -- well, I didn't know it until I
8    got to Fort Myers.
9        Q.  You didn't want to do that?
10       A.  No.
11       Q.  Now, in Germany did you work on any
12   aircraft?
13       A.  Not then, no.
14       Q.  You were Air Police?
15       A.  Right, at that time.
16       Q.  And what were your jobs as Air Police?
17   What were your duties?
18       A.  You guard the base and -- well,
19   communications there.
20       Q.  At Fort Myers that would have been
21   around 1952 you would have been there?
22       A.  Right, uh-huh.
23       Q.  And how long were you at Fort Myers?
24       A.  About two weeks.

31

1        Q.  And did you work on any aircraft there?
2        A.  No.
3        Q.  And then from Fort Myers as I understand
4    you then were sent up to Andrews Air Force Base
5    in April of 1952?
6        A.  Right.
7        Q.  And is it fair to say that you served at
8    the Andrews Air Force Base from April 1952 until
9    you retired from the military?
10       A.  No.
11       Q.  Where did you go from Air Force Base --
12   Andrews Air Force Base in April '52, what was
13   your next --
14       A.  That there, Eniwetok.
15           THE REPORTER:  Can you repeat
16       that, please?
17       Q.  Is that A-N-A-T-O-C-K, in the Pacific?
18       A.  Yes, uh-huh, where they have the H- and
19   A-bomb tests.
20           MR. FALK:  E-N-I-W-E-T-O-K,
21       Marshall Islands.
22       A.  Marshall Islands, yeah.
23       Q.  You were in the Marshall Islands?
24       A.  Yeah, that's where I was at.

32

1        Q.  Let's break it down like this if we
2    can.  You got there at the Andrews Air Force
3    Base in April '52, and you served there for how
4    long until they sent you to the Marshall
5    Islands?
6        A.  January of '56.
7        Q.  And from April '52 to January '56 while
8    you were at the Andrews Air Force Base --
9        A.  Uh-huh.
10       Q.  -- were you mostly doing sheet metal
11   work?
12       A.  Yes.
13       Q.  And when you went to the Marshall
14   Islands in January 1956, how long did you -- how
15   long were you stationed there?
16       A.  About eleven months.
17       Q.  So probably until 1957?
18       A.  Yes, I come back.
19       Q.  And then where did you go from the
20   Marshall Islands in 1957?  You have listed also
21   Guam on your --
22       A.  Yeah.
23       Q.  I don't want to get you out of
24   sequence.  So you're at the Marshall Islands,

**33**

1  1957, and then you come back?

2      A. Edwards Air Force Base.

3      Q. You come back to --

4      A. California.

5      Q. And while you're at the Marshall Islands

6  in 1956 until sometime in '57 were you working

7  on aircraft there?

8      A. Yes.

9      Q. And was that mostly sheet metal work?

10     A. Yes.

11     Q. When you came back at Andrews Air Force

12 Base in 1957 after the Marshall Islands --

13     A. Right.

14     Q. -- how long did you stay there?

15     A. At Edwards?  Approximately five years.

16     Q. And that would have been 1957 to 1962,

17 right?

18     A. '61 -- well, it was December of '61.

19     Q. And from that time frame while you're at

20 Andrews Air Force Base from 1957 to December

21 1961 are you working on aircraft?

22     A. Yes.

23     Q. And you're working in your

24 classification as a sheet metal worker?

**35**

1  question, but once you get there in 1961 at

2  Eglin, and you go to Germany, do you have a time

3  frame in your mind when that Germany trip would

4  have been?

5      A. Yes.  I come back from over there in

6  '67, January '67.

7      Q. So using your math, that's three years,

8  you would have been there from '64 to '67?

9      A. Yep.

10     Q. And what was your job in Germany?

11     A. Sheet metal.

12     Q. Was it at a particular base?

13     A. Yeah, but I can't talk about it.

14     Q. You can't?

15     A. No.

16     Q. Is that one of the classified jobs?

17     A. Yes, uh-huh.

18     Q. If it was declassified you could talk

19 about it?

20     A. Yes.

21     Q. When you came back -- let me ask you,

22 when you were at Germany for those three years

23 was it sheet metal work?

24     A. Yes.

**34**

1      A. Yes.

2      Q. Where did you go to in December 1961?

3      A. Eglin Air Force Base, Florida.

4      Q. And that's down in Florida?

5      A. Yeah, Eglin.

6      Q. And what was your classification when

7  you went there in 1961 or 1962?

8      A. Sheet metal.

9      Q. Sheet metal?  And did you stay at Eglin

10 until you retired from the military, from '61

11 until you retired from the military?

12     A. '61, no.

13     Q. Well, we can take our time if we need to

14 -- it looks like you may have retired in 1972

15 from the military?

16     A. January of -- of -- January of '72.

17     Q. I guess I'm trying to fill-in to see if

18 once you got to Eglin in 1961 you stayed there

19 until you retired?

20     A. No, I went back to Germany.

21     Q. Do you know how long you would have been

22 in Germany?

23     A. About -- let's see, three years.

24     Q. And this is going to be a tough

**36**

1      Q. When you came back from '67 to '72 at

2  Eglin Air Force Base in the military what did

3  you do?  Sheet metal work?

4      A. Sheet metal.

5      Q. And then you retired in 1972 from the

6  Air Force?

7      A. Right, January.

8      Q. Honorable discharge?

9      A. Yes.

10     Q. And you became what they call a civilian

11 employee?

12     A. Right.

13     Q. What was the difference between a

14 civilian employee and being in the military?

15     A. None.

16     Q. Is it fair to say that all the time that

17 you were in the military from 1954 or 1951 to

18 your retirement in 1972 when you worked on

19 aircraft you had manuals provided by the

20 Department of Defense?

21     A. Yes.

22     Q. How did you know how to do your job?

23     A. Mainly learn it.

24     Q. And if you had a question about which

**37**

1  nut went on which bolt, were you just allowed to

2  figure it out on your own?

3      A.  I generally knew.

4      Q.  But if you had something complex did you

5  have to go to the manual?

6      A.  I went to the manual or someone higher

7  that knew, knew about it.

8      Q.  And from -- and my last questions then

9  will just be about from 1972 to the time you

10  retired in 1995.

11      A.  Uh-huh.

12      Q.  Basically did your job remain the same

13  at civilian employee?

14      A.  Yes, it was in the test wing.

15      Q.  And so you're mainly taking sheet metal

16  on and putting sheet metal off?

17      A.  Well, they had to modify them and

18  everything.  I can't talk about all of it.

19      Q.  There's some jobs you worked on from '72

20  to '95 that were classified?

21      A.  Oh, yes.

22      Q.  Was all of your schooling that you went

23  to in the Air Force, was it mainly focused on

24  sheet metal work?

**38**

1      A.  Sheet metal, fiberglass, plastic.

2      Q.  At one point in time fiberglass became

3  fairly routine in the aircraft?

4      A.  Yes.

5          MR. GIFFORD:  That's all the

6      questions I have for you, sir.  I

7      appreciate your time.  I'm going to let

8      another gentleman ask you questions and

9      we're probably going to have to go off

10      the record so I can move my body out of

11      the way, okay.

12          THE DEPONENT:  Okay.

13          MR. GIFFORD:  Thank you.

14          THE DEPONENT:  Thank you.

15          (Break.)

16          EXAMINATION

17  BY MR. DUERINGER:

18      Q.  Mr. Hamrick, hi.

19      A.  Yes.

20      Q.  My name is Chris Dueringer and I

21  appreciate your time this morning.

22      A.  Thank you.

23      Q.  Earlier you said you worked on C-47

24  aircraft?

**39**

1      A.  Right.

2      Q.  Was all your work on C-47 aircraft while

3  you were in the military?

4      A.  Yes.

5      Q.  Was all your work on C-47 aircraft the

6  sheet metal work that you discussed earlier?

7      A.  Well, that there was at Andrews, C-46s,

8  45s, 47s, 118s.

9      Q.  I'm just talking about the C-47 now.

10      A.  Oh, okay.

11      Q.  On for just the C-47, was that sheet

12  metal work that you did on the C-47?

13      A.  Yes.

14      Q.  And was this sheet metal work just

15  around the cowling, is that the work that you

16  did?

17      A.  Mainly that's what I did.

18      Q.  Do you recall any other work, sheet

19  metal work you did, or was it mainly what you

20  remember is around the cowling?

21      A.  Mainly around the cowling.

22      Q.  Do you know the age of any of the C-47

23  aircraft that you worked on?

24      A.  No, it goes on back.

**40**

1      Q.  And all your work on C-47 was at

2  Andrews; is that right?

3      A.  Right.

4      Q.  Do you know the cowling, whether that

5  was an original cowling on the plane or whether

6  it had been replaced by others in the past?  You

7  don't know?

8      A.  No, I don't know.

9      Q.  You also said you worked on the C-118?

10      A.  Right.

11      Q.  Was all your work on the C-118 while you

12  were in the military as well?

13      A.  Yes.

14      Q.  Was that at Andrews Air Force Base as

15  well, sir?

16      A.  Yes, it was.

17      Q.  Was your work on the C-118, that sheet

18  metal work, around the cowling mainly?

19      A.  No, all over.

20      Q.  All over?

21      A.  Uh-huh.

22      Q.  What other areas of the C-118 -- I'm

23  just talking about just the C-118 -- what other

24  areas do you recall working around?

41

1  A. Well, in the cockpit, inside and out.

2  Q. Around the cockpit?

3  A. Yeah, you know, if it needed -- cracks

4  or anything, why, we repaired it and all that.

5  Q. So you worked around the cowling and the

6  cockpit on the C-118?

7  A. Oh, yes.

8  Q. Any other areas of the C-118 you

9  remember working around or is that mainly it?

10  A. I think that's mainly it.

11  Q. Did you know the age of any of the C-118

12  aircraft that you worked on?

13  A. No, not right offhand.

14  Q. So you don't know whether any of the

15  cowling was original cowling or anything?

16  A. No.

17  Q. You don't know the manufacturer of the

18  cowling?

19  A. No.

20  Q. Any parts?

21  A. No.

22  Q. Was all your work on the C-118 also at

23  Andrews?

24  A. No, I think we did some in Germany.

42

1  Q. At the Air Force Base in Germany?

2  A. Yeah.

3  Q. So all your work on the C-118 was either

4  at Andrews or at the Air Force Base --

5  A. Yeah.

6  Q. -- in Germany; is that right?

7  A. Uh-huh.

8  Q. On that list that you dictated to your

9  wife that's written in that book that your

10  attorney showed you earlier --

11  A. Yes, sir.

12  Q. -- sir, you also listed the F-101

13  aircraft, do you recall ever working on an F-101

14  aircraft?

15  A. Yeah, but I -- let's see, 101, 100, that

16  was -- I don't know whether that was Edwards or

17  Eglin.

18  Q. So it was either at Edwards or at Eglin?

19  A. Yes.

20  Q. But you don't -- do you recall any work

21  you did on the F-101?

22  A. Just repair work.

23  Q. Again, sheet metal work?

24  A. Yeah, all sheet metal work.

4

1  Q. Do you specifically recall working or is

2  that just a general memory you have?

3  A. Well, that's just, I guess, a general

4  memory, you know, work order or something, go

5  and do it.

6  Q. Would that have been sheet metal work

7  around the cowling again, if you remember?

8  A. I don't -- I don't remember right

9  offhand.

10  Q. So on the F-101 you just can't remember

11  specifically any work you were doing on that

12  plane; is that right?

13  A. I did sheet metal work, but...

14  Q. But other than that you can't recall?

15  A. Right.

16  Q. You don't know the age of any F-101

17  planes you worked on; is that right?

18  A. Right.

19  Q. And you don't -- I'm going to take a

20  guess here. You don't know the manufacturer of

21  any cowlings that you may have worked around on

22  F-101s; is that right?

23  A. No. See, that was test plane, and a lot

24  of that stuff, you know, I can't talk about it

44

1  or anything.

2  Q. I understand. On that list that you

3  dictated to your wife that's in the book, it's

4  also written down there a B-66; do you recall

5  ever working on a B-66?

6  A. Yes.

7  Q. Where did you work on a B-66?

8  A. Eglin Air Force Base.

9  Q. Eglin Air Force Base?

10  A. Uh-huh.

11  Q. And was that also sheet metal work that

12  you did on the B-66?

13  A. Yes.

14  Q. Was that work also around the cowling on

15  a B-66?

16  A. Yeah. And then, you know -- I know one

17  of them things I didn't put down, I think, that

18  D-7.

19  Q. A D-7?

20  A. 87-D.

21  Q. Okay, 87-D?

22  A. Uh-huh.

23  Q. Back to the B-66, do you recall any

24  sheet metal work other than working around the

45

1  cowling on a B-66?

2      A. Well, it could be on the wings or

3  anywhere, you know, that repair work.

4      Q. So you worked around the cowling and

5  then on the wings?

6      A. Usually.

7      Q. Repairing the skin?

8      A. Skin, yes.

9      Q. So other than the work around the

10  cowling and repairing the skin on the wings do

11  you recall any other work on a B-66 while you

12  were at Eglin?

13      A. Not right offhand, because so many of

14  them...

15      Q. And did you know the age of any of the

16  B-66 aircraft you worked on?

17      A. No.

18      Q. So you don't know whether any of the

19  parts you worked around were original; is that

20  right?

21      A. No, I don't know, you know.

22      Q. One more plane I wanted to ask you

23  about, and that was on that list that you

24  dictated to your wife that's in the book.

46

1      A. Uh-huh.

2      Q. It's a C-133?

3      A. Yes.

4      Q. Do you recall working on a C-133?

5      A. Oh, yes.

6      Q. And where was that?

7      A. That was Edwards Air Force Base.

8      Q. Edwards Air Force Base, okay. So you

9  only worked on the C-133 when you were in the

10  military; is that right?

11      A. Right.

12      Q. And was that also sheet metal work you

13  did on the C-133?

14      A. Right, uh-huh.

15      Q. Was that also sheet metal work around

16  the cowling?

17      A. Oh, yes.

18      Q. Do you recall any sheet metal work other

19  than around the cowling on C-133?

20      A. Well, the same ways, you repair the skin

21  and everything.

22      Q. Well, then other than the skin or the

23  work around the cowling on C-133, is that all

24  the work you remember on a C-133?

47

1      A. Right, uh-huh.

2      Q. Do you remember the age of any of the

3  planes you worked on in C-133 aircraft?

4      A. No, because that was back...

5      Q. Long time ago?

6      A. Long time ago, that was back in -- oh,

7  shoot, I can't -- just can't remember.

8      Q. That's okay. So you don't know whether

9  any of the parts you worked around were original

10  parts on C-133 aircraft; is that right?

11      A. Right.

12      Q. And when you were at Eglin were you ever

13  in the military when you were in Eglin or were

14  you in Civil Service at Eglin?

15      A. Both.

16      Q. Oh, you were both?

17      A. I was right at two years military.

18      Q. Two years military at Eglin and the rest

19  of the time --

20      A. The rest was 23 years Civil Service.

21      Q. When you worked on the F-101 at Eglin

22  was that just when you were in the military or

23  was that also when you were in Civil Service, if

24  you remember?

48

1      A. I think some of that was done when I was

2  in the military.

3      Q. In the military?

4      A. Yeah.

5      Q. Is that the same for the B-66?

6      A. Yes.

7      Q. It was all done while you were in the

8  military? So for the F-101, the B-66, the C-47,

9  the C-118, the C-133, it sounds like all that

10  work was while you were in the military; is that

11  right?

12      A. Yes.

13          MR. DUERINGER:  I don't have

14      any other questions, sir.  Thank you

15      very much for your time.

16          THE DEPONENT:  Okay, thank you.

17              EXAMINATION

18  BY MR. DAVIS:

19      Q. Mr. Hamrick, it's Lee Davis again.  I

20  just want to ask you a couple follow-up

21  questions.

22          Both during your time in the military

23  and while you were a Civil Service employee

24  while you were performing work on planes were

49

1  there other people around you performing
2  different work while you were present?
3      A. Oh, yes.
4      Q. Now, we've talked about this book, and
5  this was your wife's handwriting, but this was
6  your book from 1957?
7      A. Yes, sir.
8      Q. We're going to -- I'm going to have this
9  book copied at my office and I'm going to attach
10 it as Exhibit 1 to this deposition, all right?
11     A. Okay.
12         MR. DAVIS:  With that --
13         MR. DEAN:  Excuse me, there's a
14     sheet in that book --
15         MR. DAVIS:  Yeah, all the
16     sheets are going to be copied, there's a
17     -- I believe it's an MOS, and some kind
18     of -- one discharge paper from the Civil
19     Service, that will be copied as well.
20     Anything that was in there you guys will
21     get.
22         There's one more question.
23         MR. GIFFORD:  And just one
24     possible follow-up.

50

1              EXAMINATION
2  BY MR. GIFFORD:
3      Q. Mr. Hamrick, again, it's Rob Gifford,
4  thank you for your time.
5          When you were in the Air Force, either
6  in the United States or in Germany, did you live
7  on the base whenever you were in the military?
8      A. Yes.
9      Q. The complete time for the 21 years or
10 so?
11     A. No, there was short periods of time.
12     Q. While you were in the military were you
13 ever involved in helping out, not just doing
14 sheet metal work on aircraft, but also tearing
15 out or rebuilding parts of the air base?
16     A. Yes.
17     Q. What would you be doing in those
18 projects?
19     A. Tearing...
20     Q. Tearing buildings down?
21     A. Oh, well, yeah, I tore some of the --
22 helped tear down old buildings and so forth.
23     Q. Would you be helping rebuilding ones on
24 the bases?

51

1      A. No, just we'd have, you know, help tear
2  them down, and they would be replaced, you know,
3  with something else.
4      Q. Is this your homestead here?  Is this
5  your home you grew up in?
6      A. No.
7      Q. Where was your home located here in
8  Webster Springs?
9      A. Mainly above Parcoal Road, up here at --
10 back up on the hill.
11     Q. Is that home still standing?
12     A. As far as I know it is.
13     Q. Why is it that you bought this house
14 when you came back?  Is this somewhere you --
15     A. Well, my father and mother used to own
16 this, and then when they passed away they left
17 it to my sisters.  Well, me and my brothers
18 signed it over to them.  And they had it until
19 here recently and I bought it.
20     Q. You mentioned that you had a wife --
21 your first wife?
22     A. Yes.
23     Q. Was she also from Bergoo?
24     A. No, she's -- she's from Maryland.

52

1      Q. She was from Maryland?  What was her
2  name?
3      A. Dagmey, Elizabeth.
4      Q. And you have four children?
5      A. Yes.
6      Q. And how many sons and how many
7  daughters?
8      A. Two sons and two daughters.
9      Q. Do they live in this area?
10     A. No, I take that back, I'm sorry.
11         MR. DAVIS:  Three boys.
12     A. Three boys and one daughter.
13     Q. One of them is going to get mad at you
14 for calling him a girl.
15         Do they live in this area?
16     A. No.
17     Q. Where do they live?
18     A. Two of them -- one lives in Florida and
19 two in Alabama and the other one I think is in
20 Texas.
21     Q. When you lived in Florida did you live
22 in Shalimar, Florida?
23     A. Yes.
24     Q. And you owned a home down there?

53

1    A. Yes.

2         MR. GIFFORD:  That's all I

3    have, thank you.

4         MR. DAVIS:  There are no more

5    questions, Mr. Hamrick, with that we'll

6    conclude this deposition.  We'll waive

7    your signature.  Thank you for your

8    time.

9         THE DEPONENT:  Thank you.

10             (Read and sign waived.)

11      (This deposition concluded at 12:32 p.m.)

12      (Exhibit A. marked for identification.)

13

14

15

16

17

18

19

20

21

22

23

24

---

54

1  STATE OF WEST VIRGINIA, To-wit:

2        I, James D. Nielsen, a Notary Public and
   Court Reporter within and for the State
3  aforesaid, duly commissioned and qualified, do
   hereby certify that the deposition of CHARLES E.
4  HAMRICK, was duly taken by me and before me at
   the time and place specified in the caption
5  hereof.

6        I do further certify that said
   proceedings were correctly taken by me in
7  stenotype notes, that the same were accurately
   transcribed out in full and reduced to
8  typewriting, and that said transcript is a true
   record of the testimony given by said witness.

9

        I further certify that I am neither
10 attorney or counsel for, nor related to or
   employed by, any of the parties to the action in
11 which these proceedings were had, and further I
   am not a relative or employee of any attorney or
12 counsel employed by the parties hereto or
   financially interested in the action.

13

14

        My commission expires the 15th day of May
15 2006.

16      Given under my hand and seal this 10th
   day of March 2005.

17

18

19      _____

20      James D. Nielsen
        Court Reporter
21      Notary Public

22

23

24

PLAINTIFF'S EXHIBIT A-3

PENGAD-Bayonne, N. J.

**(1) NAME** (PRINT CLEARLY)

HAMRICK (Last Name)     CHARLES (First Name)     E. (Middle Name)

**ARMY SERIAL NUMBER**: AF 24 419 122

**MILITARY OCCUPATIONAL SPECIALIST**

**(2) BIRTHPLACE OF SOLDIER** (PRINT CLEARLY) (GIVE CITY AND STATE OF U.S. OR NAME OF FOREIGN COUNTRY): Rargoo, W. Va.

**HEIGHT**: FT. 6   IN. 0

**(3) DATE OF BIRTH OF SOLDIER**: Dec. (MONTH)   9 (DAY)   31 (YEAR)

**WEIGHT**: 199 LBS

**(4) CITIZEN** [X]

HOW LONG IN U.S. ___ YEARS

TAKEN OUT FIRST PAPERS

NON-CITIZEN

**RACE**: Caucasian

**(5)(G) MARITAL STATUS**: S

NUMBER OF DEPENDENTS: 0

**(6) BIRTHPLACE OF FATHER** (GIVE CITY AND STATE OF U.S. OR NAME OF FOREIGN COUNTRY)

**(7) BIRTHPLACE OF MOTHER**

**(8)(G) EDUCATION**

YEAR LEFT SCHOOL 1948

| SCHOOL | GRADUATED | NAME AND LOCATIONS OF INSTITUTIONS ATTENDED | MAJOR SUBJECT OR SPECIALIZATION | DEGREE AND DATE RECEIVED |
|---|---|---|---|---|
| GRAMMAR SCHOOL | 8 | WebsterSp, W. Va. | | |
| HIGH SCHOOL | 2 | WebsterSp, W. Va. | Academic | 1946 / 1948 |
| COLLEGE OR UNIVERSITY | | | | |
| POST GRADUATE | | | | |

**(9)(G) LANGUAGES** (CHECK APPROPRIATE SPACES) S-SPEAKS R-READS W-WRITES

FOREIGN LANGUAGES (8-38)

| | S | R | W | | S | R | W |
|---|---|---|---|---|---|---|---|
| SPANISH (8-35) | | | | FRENCH (8-36) | | | |
| GERMAN (8-37) | | | | OTHER (8-38) | | | |

**(10)(G) ARMY AREA OR COMMAND OF ENLISTMENT OR ON INDUCTION**

**(11)(G) SPORTS IN WHICH QUALIFIED**

SCHOOL OR TEAM

| | EXCELS | TRACK | BASKET BALL | BOXING |
|---|---|---|---|---|
| BASE BALL | | | | |
| FOOT BALL | | SOFT BALL | WRESTLING | |
| | | TENNIS | OTHER | |

**(12)(G) TALENT FOR FURNISHING PUBLIC ENTERTAINMENT** — SINGING THEATRICAL

**(13)(G) MAIN OCCUPATION** (OCCUPATIONAL DICTIONARY CODE): None

JUST WHAT DID YOU DO?

**(14)(G) SECOND BEST OCCUPATION**

JUST WHAT DID YOU DO?

**(15)(G) ADDITIONAL OCCUPATIONS, HOBBIES, ETC.**

RADIO    PHOTOGRAPHY    OTHER

**(16)(G) FORM 8 DATE**

**(17)(G) OTHER TESTS**

| TEST NO. | GRADE SCORE |
|---|---|
| AFQT-2 | 10 Jan 51 IV 21 |
| | 26 Jan 54 83 Qual |
| AFPT 53450 | |

| (18A) APTITUDE AREAS | GRADE SCORE | | (18B) APTITUDE SCORE AREAS | GRADE SCORE |
|---|---|---|---|---|
| MECH | | | MECH | 6 |
| OLER | | | EQP OPR | 9 |
| MDR SPV | | | SERV | 8 |
| TECH SPV | | | CRAFTS | 7 |
| ELECTS | | | | 7 |

**(19)(G) TRADE TEST RATINGS** — TYPE, SER. NO., SCORE

**(20)(G) HIGHEST POSITION OF LEADERSHIP** (INCLUDING MILITARY)

**EMPLOYER** (GIVE FIRM NAME — NOT NAME OF FOREMAN OR BOSS)

ADDRESS OF EMPLOYER (STREET) (CITY) (STATE)

DEPT, SHOP OR BRANCH

LAST DATE OF EMPLOYMENT

**(13) MAIN CIVILIAN OCCUPATION**

**(22) SERVICE SCHOOLS**

# SOLDIER'S QUALIFICATION CARD

NOTE: DO NOT ATTEMPT TO FILL OUT THIS CARD WITHOUT FIRST READING INSTRUCTIONS CONTAINED IN TM 12-425 AND TM 12-425A VERY CAREFULLY

(21)-(2) PREVIOUS MILITARY EXPERIENCE —

(22) RECORD OF CURRENT SERVICE

| DATE | ORGANIZATION AND STATION | GRADE | PRINCIPAL DUTY | SPEC SER NO. |
|------|--------------------------|-------|----------------|--------------|
| 24Aug52 | 1401st Maint Sq AFFB DC | A/3c | Sr Airfr Repmn | 53450 |
| 1Dec52 | 1401st Maint Sq AFFB DC | A/2c | Riveter | 53450 |
| 7Aug53 | 1401st Maint Sq AAFB DC | A/2c | Riveter | 53450 |
| 1Oct54 | 1401st Fldw Maint Sq, AAFB | A/1c | Riveter | 53450 |

(28) REMARKS FSSD 27 Dec 51 // GERMANY

(30)-(2) ENLISTMENT — STATION Andrews AFB, Wash DC
ENLISTMENT DATE 10 Jan 51    TERM OF ENL'T 4 Yrs    BRANCH OR COMMAND RegAF

(31) DRIVES: AUTO X  1 4 TON TRUCK X  MOTORCYCLE
HOLDS: West Virginia STATE DRIVERS PERMIT

| WEAPON | COURSE | QUALIFIED | SCORE | DATE |
|--------|--------|-----------|-------|------|
| Carbine M1 | FAM | | | 19Aug52 |
| Carbine M1 | FAM | | 9 | 9Sep53 |

Engineer Scht'Belvoir  6  Sheet Metal  FIC  53350 May 51Sat

DA FORM 20  1 JUN 48  REPLACES WD AGO FORM 20.1 1 DEC. 1944, WHICH MAY BE USED.

IMPORTANT — UNDER NO CIRCUMSTANCES WILL THIS CARD BE FOLDED, ROLLED OR CREASED

THIS CARD MUST ACCOMPANY THE SOLDIER UPON TRANSFER

Base

Weisbough - German
Andrew AFB. = Maryland
AN-a-tock — Pacific
Edwards AFB. Cal.
Westover ~~~~~ Mass.
Guam AFB. Guam

F 104          A — 7
F 51           A — 17
F - 100    F - 111
F 80              Hill
F 86          Helicopen
F 101

B 52      B - 17
B - 47    B 24 & 25
B 29
B - 66        T - 38 & 39
B 45          T - 141
B - 36    C133  T - 33    SA 16
C - 47
C - 46
C - 45
C 97
C - 118
C - 130

PLAINTIFF'S
EXHIBIT
A-H

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| CHARLES E. HAMRICK and WANDA HAMRICK, | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 2:05-0286 |
| v. | ) ) ) | |
| A & I COMPANY, et al. | ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF ALLAN SHIFFLER

I, Allan J. Shiffler, first being duly sworn, declare and say:

1.     Prior to my retirement (as of March 31, 2003), I was the Legacy Engineering Manager for Program & Customer Technical Service within Pratt & Whitney located in East Hartford, Connecticut. I have personal knowledge of the facts contained in this affidavit.

2.     I joined Pratt & Whitney in 1966 and have been an engineer within the Engineering and Customer Technical Service Groups during my career at Pratt & Whitney. I was assigned as a project engineer on February 1, 1980 for the J-57 engine manufactured by Pratt & Whitney.  This assignment was concluded upon termination of the ongoing J-57–Component Improvement Program (CIP) funded by the Air Force via Oklahoma City Air Logistics Center (OC-ALC) on September, 2001.  There had been NO CIP activity on the J-57 since CY 1994.

3.     I submit this affidavit to attest to the level of supervision and control by the United States Military and its officers over the design and manufacture of the J-57 engine used primarily by the U.S. Air Force in jet airplanes.  The J-57 was used to power the B-52 and the F-100 among other planes.

74908.00184.841171.1

4.    I am aware of the extent of the involvement of the U.S. Navy and Air Force in the design and production of the J-57 engine.

5.    Pratt & Whitney has historically been affiliated with the U.S. Navy in the sense that when military contracts are entered into there are on site military personnel from the U.S. Navy to closely work with Pratt & Whitney in all aspects of engine development. U.S. Air Force personnel were also involved for J-57 engines delivered to the Air Force.

6.    There were detailed plans regarding the design and development of the J-57 engine, including specifications for construction and for use of specific materials in the construction of the engine.  The initial designs and plans and specifications were approved by the appropriate Navy and Air Force personnel and thereafter any changes to those plans and specifications could only be authorized by the Navy or Air Force through one of its officers.

7.    Pratt & Whitney, during all aspects of this work, i.e., design, manufacture, testing, for the J-57 engines, performed its work under the immediate supervision by the United States Navy or Air Force. This supervision and control was exercised through contract documents, design and construction drawings, written specifications and personal oversight of Pratt & Whitney's work by engineers and military specialists on site at Pratt & Whitney. The chain of Navy or Air Force authority between Pratt & Whitney and the Secretary of Navy was multitiered and staffed by officers of varying levels of responsibility, and virtually no aspect of the development, manufacture and testing of the J-57 engines escaped this close control.

8.    A contract with the U.S. Air Force to deliver a jet engine has a developmental stage and a production phase.  In the development phase, detailed plans are generated and eventually Pratt & Whitney would submit a set of detailed drawings to the Air Force for its approval before actual manufacture begins.  These detailed drawings would include actual part drawings which would have contained a description of the material to be used in various parts.  If

asbestos was to be used in a given part, it would have been so indicated in the drawing. These drawings were reviewed and approved by the U.S. Air Force personnel before production of engines commenced. Attached to this affidavit are four typical drawings of parts for the J-57 engine, each of which contained asbestos furnished under Contract Now 62-773-i. The drawings are for part numbers 11535, 117347, 181687 and 240886.

9.     Before actual production of J-57 engines could begin, there was an extensive set of general specifications for engines submitted by the Navy and Air Force, as well as specific military specifications known as MILSPECS already in place which covered all aspects of the engine construction.

10.     During the manufacture of the J-57, the military would have had access to the part drawings and those drawings would have been submitted to the military as part of the contracting process. The part drawings would have detailed whether asbestos was used in a particular part. When the Navy or Air Force took delivery of an engine, it signed a document entitled DD250, certifying conformity to the specifications ordered.

11.     As part of any particular contract, a bill of materials was completed and submitted to the government, which would have signed off on that bill of materials in its entirety. Attached to that bill of materials would have been the part drawings. If asbestos were contained within a part, that fact would be shown on the part drawing.

12.     Before shipment, the jet engines typically were tested at the site of manufacture. A detailed test agenda for on site testing was approved by the U.S. Navy or Air Force. The agenda included tests for power output at various operating conditions.

13.     Following completion of the test agenda, selected engines were typically fully disassembled and inspected. The disassembly and inspection was carried on in the presence of U.S. Military personnel.

Further affiant sayeth naught.

_June 22, 2005_
Date

Allan J. Shiffler





FURNISHED UNDER CONTRACT NO. 620073; CODE 77445



# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| CHARLES E. HAMRICK and | ) | |
| WANDA HAMRICK, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 2:05-0286 |
| | ) | |
| v. | ) | |
| | ) | |
| A & I COMPANY, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF MIKE GENTILE

I, Mike Gentile, first being duly sworn, declares:

1.     I am over the age of 18 years of age and of sound mind and body and otherwise competent to give this affidavit. I have personal knowledge of the facts contained in this affidavit.

2.     I served in the United States Air Force from 1961 to 1981. I joined the Air Force as an entry level mechanic and progressed to being a Chief Master Sergeant and Propulsion Power Plant Manager. I later became a Field Maintenance Maintenance Manager. In these later positions, I was involved in the technical aspects of all engines that were operated by the Strategic Air Command of the United States Air Force. The J-57 was such an engine.

3.     In 1972 through 1975 I was assigned to the Strategic Air Command Maintenance Standardization and Evaluation Team. A portion of the job of the specialized maintenance team in which I worked was to oversee the technical aspects of contractor compliance with procurement contracts, including those for jet engines. This included reviewing all engineering drawings, hardware drawings and support equipment and to actually meet with the contractor

and inspect his premises and facilities and determine whether the contractor was in a position to perform a contract. In addition, my group monitored and visited contractor sites during the manufacture and testing of engines to insure compliance with government specifications.

4.      My group performed these duties on the J-57 engine purchased from Pratt & Whitney. The J-57 was used to power the B-52 and F-100 and other planes flown by the Air Force.

5.      Before the technical group became involved in its oversight responsibilities, the engine would have had to go through the "development" stages of the contract. These responsibilities were handled by the Special Project Office ("SPO") at Wright Patterson Air Force Base. During the development phase of the contract, a contractor would submit detailed drawings of the engine including all the part drawings to this group. Prior to the manufacture of the engine, the SPO would have to approve all such drawings.

6.      In regard to Pratt & Whitney's contract to build J-57s, Pratt & Whitney submitted all part drawings to the SPO at the Wright Patterson Air Force Base and they would have been approved there. These part drawings would have called out for the material to be used in the various parts, and in those parts where asbestos was going to be used, it would have been so indicated in the part drawings. These drawings were reviewed and approved by the SPO officers at Wright Patterson before production of the J-57 commenced.

7.      What I have described above is the typical procedure that would have been used in the performance of all engine contracts between engine manufacturers and the U.S. Air Force. Before manufacturing began on any engine, detailed design drawings, including actual part drawings, would have been submitted to the U.S. Air Force and approved by it.

74908.00184.841175.1

8.    I retired from the Air Force in 1981.


July 13, 2005

_____
      Date

_____
      Mike Gentile

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

| | | |
|---|---|---|
| CHARLES E. HAMRICK and | ) | |
| WANDA HAMRICK, his wife | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No.  2:05-CV-0286 |
| | ) | |
| A & I COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF RICHARD A. DEAN

I, Richard A. Dean, hereby declare and state,

1.      I am an attorney licensed in Ohio and other jurisdictions.  I represent Pratt & Whitney in its asbestos litigation pending in various jurisdictions

2.      Attachment 1 is a true and accurate copy of Military Specification Number MIL-A-7021A dated October 25, 1956.

3.      Attachment 2 is a true and accurate copy of relevant pages from the transcript of the Deposition of Walter Melvin, M.D., Sc.d., taken on August 22, 1988 in the case of *Niemann et al. v. McDonnell Douglas Corp., et al.* and referenced in the decision in that case.

4.      Attachment 3 is a true and accurate copy of the relevant pages from the transcript of the deposition of Alvin F. Meyer, Jr. taken on June 16, 1988 in the case of *Niemann et al. v. McDonnell Douglas Corp., et al.*, and referenced in the decision in that case.

I declare that the foregoing is true and correct to the best of my belief and knowledge.

Executed this ____19____ day of July, 2005, at Cleveland, Ohio.


_____
Richard A. Dean

**ATTACHMENT 1**

MIL-A-7021A
25 OCTOBER 1956
Superseding
MIL-G-7021
15 September 1950

## MILITARY SPECIFICATION

### ASBESTOS SHEET, COMPRESSED, FOR FUEL, LUBRICANT, COOLANT, WATER, AND HIGH TEMPERATURE RESISTANT GASKETS

This specification has been approved by the Department of Defense and is mandatory for use by the Departments of the Army, the Navy, and the Air Force

1. **SCOPE**

1.1 **Scope.-** This specification covers compressed asbestos sheet for gaskets for use where resistance to hydrocarbon fuels, petroleum-base lubricants, coolant, water, and high temperature is required (see 6.1).

1.2 **Classification.-**

1.2.1 **Classes.-** The material shall be furnished in the following classes, as specified (see 6.2):

Class 1 - Fuel, lubricant, coolant, and high temperature resistant

Class 2 - Water resistant

1.2.2 **Forms.-** The material shall be furnished in sheet form or roll form. Sheet-form asbestos shall be furnished when the thickness exceeds 1/16 inch. Roll-form asbestos shall be furnished when the thickness is 1/16 inch or less.

2. **APPLICABLE DOCUMENTS**

2.1 The following specifications and standards, of the issue in effect on date of invitation for bids, form a part of this specification to the extent specified herein:

### SPECIFICATIONS

#### Federal

| | |
|---|---|
| O-M-232 | Methanol (Methyl Alcohol) |
| QQ-A-355 | Aluminum Alloy (ZnS), Plate and Sheet |
| QQ-B-613 | Brass (Copper-Zinc Alloy), Leaded and Non-Leaded; Plate, Rolled Bar, Sheet and Strip |
| QQ-M-44 | Magnesium Alloy (3.0 Aluminum, 1.0 Zinc); Plate and Sheet |
| QQ-P-330 | Phosphor Bronze Bars, Plates, Rods, Sheets, Strips, Flat Wire, and Structural and Special Shaped Sections |

FSC 5330

MIL-A-7021A

| | |
|---|---|
| LLL-B-631 | Boxes; Fiber Corrugated (for Domestic Shipment) |
| LLL-B-636 | Boxes, Fiber, Solid, (for Domestic Shipment) |
| PPP-B-585 | Boxes; Wood, Wirebound |
| PPP-B-601 | Boxes, Wood, Cleated-Plywood |
| PPP-B-621 | Boxes, Wood, Nailed and Lock-Corner |
| PPP-D-723 | Drums, Fiber |

**Military**

| | |
|---|---|
| JAN-P-108 | Packaging and Packing for Overseas Shipment – Boxes, Fiberboard (V-Board and W-Board), Exterior and Interior |
| MIL-C-132 | Crates, Open, Wood; Maximum Capacity 2,500 Pounds |
| MIL-E-5559 | Ethylene Glycol; Non-Corrosive (Anti-Freeze and Cooling Liquid for Aircraft Engines) |
| MIL-B-10377 | Box, Wood, Cleated, Veneer, Paper Overlaid |
| MIL-L-10547 | Liners, Case, Waterproof |
| MIL-S-18729 | Steel Plate, Sheet, and Strip, Alloy, 4130, Aircraft Quality |

**STANDARDS**

**Federal**

| | |
|---|---|
| FED. TEST METHOD STD NO. 601 | Rubber: Sampling and Testing |

**Military**

| | |
|---|---|
| MIL-STD-105 | Sampling Procedures and Tables for Inspection by Attributes |
| MIL-STD-129 | Marking for Shipment and Storage |

(Copies of specifications, standards, drawings, and publications required by contractors in connection with specific procurement functions should be obtained from the procuring activity or as directed by the contracting officer.)

3. **REQUIREMENTS**

3.1 **Qualification.-** The compressed asbestos sheets furnished under this specification shall be a product which has been tested and has passed the Qualification tests specified herein.

3.2 **Material.-** The compressed asbestos sheet shall be made from asbestos fiber bonded under pressure with a rubber compound and processed to form a pliable and resilient sheet capable of meeting the requirements of this specification. The material shall exhibit uniformity throughout as a result of thorough dispersion of ingredients. The composition shall be such that it will not cause weak spots or wicking.

3.3 **Dimensions and tolerances.-**

3.3.1 **Dimensions.-** Dimensions of sheets shall be as specified by the procuring activity.

2

MIL-A-7021A

**3.3.2  Tolerances.-**

**3.3.2.1  Thickness.-** Unless otherwise specified in the contract, the thickness of compressed asbestos sheets, when determined as specified in 4.5.2.1, shall not vary from that specified by more than the amount shown in table I.

TABLE I

Thickness tolerances

| Thickness (inch) | Tolerance (inch) | |
|---|---|---|
| | Plus | Minus |
| 1/64 and less | 0.005 | 0.002 |
| Over 1/64 and less than 1/16 | 0.005 | 0.005 |
| 1/16 and over | 0.008 | 0.008 |

**3.3.2.2  Linear dimensions.-** Unless otherwise specified in the contract, linear tolerances on sheet material shall be ±1/4 inch.

**3.4  Physical properties.-** The physical properties of the compressed asbestos sheet shall conform to the requirements specified in table II.

**3.5  Identification of product.-**

**3.5.1  Sheets.-** Unless otherwise specified, sheet material shall be legibly marked with a fuel- and oil-resistant lacquer, ink, or dye to show the specification number, class, manufacturer's name, and product identification. The marking fluid shall not be deleterious to the material. The color of the marking characters shall be red for class 1 and blue for class 2. The marking shall be applied in rows of recurring characters not less than 3/8 inch in height, spaced not over 5 inches apart, recurring either lengthwise or crosswise of the sheet and on one side only.

**3.5.2  Small parts (cut from sheet).-** When the shape and size of the material does not permit marking in accordance with the above, a red dot or a blue dot may be used to indicate the class. This dot shall appear on the face of the piece if the piece has a minimum of 1-inch surface dimension in each of two directions. In the event that the dimensions of the material are such that dot marking cannot be made in accordance with the above, the individual pieces shall be stacked for marking purposes and a painted identification stripe applied to the stacked edges.

**3.6  Workmanship.-** All details of workmanship shall be in accordance with high-grade manufacturing practices covering these classes of materials. The compressed asbestos shall be uniform in quality and condition, clean, sound, smooth, and free from foreign materials and from defects detrimental to fabrication, appearance, or performance of parts.

MIL-A-7021A

## TABLE II

### Physical properties

| Properties | | Unit | Limits | |
|---|---|---|---|---|
| | | | Class 1 | Class 2 |
| **As received:** | | | | |
| Tensile strength | (4.5.5.1) | Psi, min | 2,000 | 1,500 |
| Compressibility | (4.5.3.1) | Percent | 12 ±5 | 12 ±5 |
| Recovery | (4.5.3.1) | Percent, min | 45 | 45 |
| Bend | (4.5.4.1) | - | No cracks | No cracks |
| **Oven aged:** | | | | |
| Bend | (4.5.4.2) | - | No cracks | No cracks |
| **Corrosion** | (4.5.6) | - | No corrosion | No corrosion |
| **Fluid immersion:** | | | | |
| Distilled water (Medium No. 10): | | | | |
| Tensile strength | (4.5.5) | Percent change, max | - | -45 |
| Thickness (temporary) | (4.5.2.2.1) | Percent change | - | +10 -0 |
| Water-alcohol: | | | | |
| Tensile strength | (4.5.5) | Percent change, max | -45 | - |
| Ethylene glycol: | | | | |
| Tensile strength | (4.5.5) | Percent change, max | -45 | - |
| Petroleum base oil (Medium No. 1): | | | | |
| Tensile strength | (4.5.5) | Percent change, max | -20 | - |
| Aromatic fuels (Medium No. 6 ): | | | | |
| Tensile strength | | Percent change, max | -60 | - |
| Thickness: | | | | |
| Temporary | | Percent change | +20 -0 | - |
| Permanent | | Percent change | +3 | - |
| Compressibility | | Actual value, percent max | 30 (no rupture) | - |

NOTE:  All tensile strength values are in weaker grain direction.
Requirements are based on 1/16-inch-thick material.

MIL-A-7021A

4.   QUALITY ASSURANCE PROVISIONS

4.1   Classification of tests.- The inspection and testing of compressed asbestos sheets shall be classified as follows:

(a)   Qualification tests:  Qualification tests are those tests performed on samples submitted for approval as qualified products.

(b)   Acceptance tests:  Acceptance tests are those tests performed on individual lots which have been submitted for acceptance.

4.2   Qualification tests.- Qualification tests shall be performed by the asbestos sheet manufacturer at his plant under the supervision of the Government Inspector, or as an alternate, at a commercial testing laboratory acceptable to the Inspector. However, the Bureau of Aeronautics reserves the right to conduct Qualification tests in a Government laboratory and to determine conformance of the material with qualification requirements of the specification on the basis of results of Government tests. The manufacturer shall, upon request, supply such samples as may be required for the performance of Government Qualification tests.

4.2.1   Report of Qualification tests.- The manufacturer shall furnish Qualification test reports acceptable to the Bureau of Aeronautics for each class of compressed asbestos sheet on which qualification approval is desired.  Qualification test reports shall show conformance of the compressed asbestos sheet with all qualification requirements of this specification and shall include the following information:

(a)   Reference to the authorizing letter (see 6.3.1).

(b)   The manufacturer's name and address.

(c)   Location and identity of the plant which produced the samples tested.-- Applicant shall certify in writing that he is the actual manufacturer of the product or the distributor completely responsible for the distribution of the product offered.

(d)   Identification of each product by manufacturer's product number.

(e)   Results of all tests conducted to determine conformance of the compressed asbestos sheet with the qualification requirements of this specification. These results shall include actual values obtained and, when test methods so specify, shall include individual values as well as averages.

The test report shall be signed by the director of the laboratory which conducted the tests, or his superior.

4.2.1.1   Submittal of Qualification test reports and samples.- The manufacturer shall forward three copies of the Qualification test report, together with 1 square foot of 1/16-inch-thick sample of the material tested, via the Government Inspector, to the Director, U. S. Naval Air Experimental Station, Naval Air Material Center, Naval Base, Philadelphia 12, Pennsylvania.  The manufacturer will be notified of final action by the Bureau of Aeronautics.

5

MIL-A-7021A

4.2.2  Tests.- Qualification tests of compressed asbestos sheets shall consist of all the tests of this specification, in each class upon which qualification is desired.

4.3  Acceptance tests.- The Acceptance tests shall consist of Visual and dimensional inspection (4.3.1.1) and the lot acceptance tests (4.3.2.2).

4.3.1  Sampling.-

4.3.1.1  Lot.- All material of the same thickness and class (or part number), manufactured at approximately the same time from the same batch or batches of compressed asbestos sheets and offered for delivery at one time, shall be considered a lot for purposes of inspection and tests.

4.3.1.2  Sampling for Visual and dimensional inspection.- A random sample shall be selected from each inspection lot of material offered for Government inspection of visual and dimensional inspection with lot acceptance based on the sampling inspection requirements of table III in conformance with Standard MIL-STD-105.

TABLE III

Sampling for Visual and dimensional inspection
AQL (approx) = 2.5 percent defective

| Number of sheets or parts in lot | Number of sheets or parts in sample | Acceptance number (defective) | Rejection number (defective) |
|---|---|---|---|
| 15 and under | 7 | 0 | 1 |
| 16 to 40 | 10 | 0 | 1 |
| 41 to 110 | 15 | 1 | 2 |
| 111 to 300 | 25 | 1 | 2 |
| 301 to 500 | 35 | 2 | 3 |
| 501 to 800 | 50 | 3 | 4 |
| 801 to 1,300 | 75 | 4 | 5 |
| 1,301 and over | 110 | 6 | 7 |

4.3.1.3  Sampling for lot acceptance tests.- A random sample of compressed asbestos sheets shall be selected in accordance with table IV from each inspection lot of material, and shall be tested as specified in 4.3.2.2 and in accordance with the test conditions specified in 4.4.

TABLE IV

Sampling for lot acceptance tests

| Number of sheets or parts in lot | Number of sheets or parts in sample 1/ |
|---|---|
| 110 and under | 3 |
| 111 to 300 | 5 |
| 301 to 800 | 7 |
| 801 to 1,300 | 10 |
| 1,301 and over | 25 |

1/ A sample large enough to perform all the required tests shall be taken from each sheet.

6

MIL-A-7021A

4.3.1.3.1  If the items in a lot are unsuitable for use as test samples, the contractor shall furnish with the lot 1 square foot of 1/16 ±0.016-inch-thick sheet of identical material.  The samples selected or furnished for lot acceptance shall be suitably marked and dated for identification with the lots represented.

4.3.2  Inspection and tests.-

4.3.2.1  Visual and dimensional inspection.-  Each of the samples or parts selected as specified in 4.3.1.2 shall be visually and dimensionally inspected by the Government Inspector to determine conformance with this specification with respect to requirements for which no test methods are specified herein.

4.3.2.2  Lot acceptance tests.-  Each of the samples selected as specified in 4.3.1.3 shall be subjected to each of the following tests described under "Test methods," to determine conformance with this specification:

|     |                                            |            |
|-----|--------------------------------------------|------------|
| (a) | Examination of product                     | (4.5.1)    |
| (b) | Tensile strength (As received)             | (4.5.5.1)  |
| (c) | Compressibility and recovery (As received) | (4.5.3.1)  |

4.3.2.3  Rejection and retest.-  Any sheet or part in the sample containing one or more visual or dimensional defects shall be rejected, and if the number of the defective sheets or parts exceeds the acceptance number for that sample, the lot represented by the sample shall be rejected.  Compressed asbestos material which has been rejected may be reworked or replaced to correct the defects and resubmitted for acceptance.  Before resubmitting, full particulars concerning previous rejection and the action taken to correct the defects found in the original shall be furnished the Inspector.  Material rejected after retest shall not be resubmitted without the specific approval of the procuring activity.

4.4  Test conditions.-

4.4.1  Temperature.-  Compressed asbestos sheet material shall be conditioned 60 minutes at 100°C (212°F) in a circulating air oven and cooled to room temperature in a desiccator prior to cutting specimens for the following "as received" tests:

|     |                              |            |
|-----|------------------------------|------------|
| (a) | Tensile strength             | (4.5.5.1)  |
| (b) | Compressibility and recovery | (4.5.3.1)  |
| (c) | Bending                      | (4.5.4.1)  |

Prior to test, cut conditioned specimens shall be kept in the desiccator and tested immediately after removal from the desiccator.

4.4.2  Tolerances on temperature and exposure time.-  Unless otherwise specified, tolerances for the test temperatures shall be ±5°C or ±9.6°F, and, for exposure time, shall be as follows:  60 ±5 minutes, 5 ±1/4 hour, 22 ±1/4 hour, and 70 ±1 hour.

4.5  Test methods.-

4.5.1  Examination of product.-  Compressed asbestos sheets shall be examined to determine conformance with this specification with respect to material, identification, workmanship, dimensions, and tolerances.

7

IF - MILITARY SPECIFICATIONS FILE

ISSUE 1-20, DECEMBER 1963

MIL-A-7021A

### 4.5.2  Thickness.-

4.5.2.1  As received.-  Thickness of the specimen shall be determined in accordance with Method 2011 of Federal Test Method Standard No. 601, except that a total force of 9 ±0.1 ounce shall be exerted by the dial micrometer on the specimen.

4.5.2.2  Change in thickness after immersion.-  Change in thickness shall be determined on specimens previously immersed in distilled water for 70 hours at 100°C (212°F) and on specimens previously immersed in Medium No. 6, Method 6001 of Federal Test Method Standard No. 601 for 22 hours at 23°C (73.4°F).

4.5.2.2.1  Change in thickness immediately after immersion (temporary).-  This test shall be conducted on both medium No. 6 and water-immersed specimens as specified in 4.5.2.2 in accordance with Method 6231 of Federal Test Method Standard No. 601.

4.5.2.2.2  Change in thickness, fuel immersion, after recovery(permanent).-  This test shall be conducted on the same specimens on which temporary change in thickness after immersion in Medium No. 6, Method 6001 of Federal Test Method Standard No. 601, has been made.  Permanent thickness data shall be obtained 22 hours after removal from the immersion medium, as specified in Method 6231 of Federal Test Method Standard No. 601.

### 4.5.3  Compressibility and recovery.-

4.5.3.1  As received.-  Compressibility and recovery shall be determined and calculated in accordance with the procedure outlined for compressed asbestos sheet in Method 3331 of Federal Test Method Standard No. 601.

4.5.3.2  Compressibility after fuel immersion.-  Compressibility as specified for "as received" condition in 4.5.3.1 shall be conducted on a new set of specimens which have been immersed for 22 hours at 23°C (73.4°F) in fluid conforming to Medium No. 6, Method 6001 of Federal Test Method Standard No. 601.  After removal from the immersion, medium specimens shall be blotted lightly with filter paper and test initiated within 15 seconds.

### 4.5.4  Bending.-

4.5.4.1  As received.-  Six specimens 1 by 6 inches, three cut with the grain and three cut across the grain, shall be preconditioned as specified in 4.4.1 and subjected to bending 180 degrees around a mandrel having a diameter equal to 12 times the least thickness of the material.

4.5.4.2  After oven aging.-  Six specimens 1 by 6 inches, three cut with the grain and three cut across the grain, shall be placed in a circulating air oven for 70 hours at 100°C (212°F).  After removal from the oven, the specimens shall be cooled in a desiccator for 30 35 minutes and then subjected to bending 180 degrees around a mandrel having a diameter equal to 16 times the least thickness of the material.

### 4.5.5  Tensile strength.-

4.5.5.2  As received.-  Tensile strength shall be determined in accordance with Method 4111 of Federal Test Method Standard No. 601, except that the rate of jaw separation shall be 12 inches per minute.  Tensile strength shall be conducted on specimens conditioned as specified in 4.4.1.  The specimens shall be tested both with and across the direction of rolling or forming for the purpose of establishing the direction of the weaker grain.  The 0.500-inch, No. X die, specified in Method 4111 of Federal Test Method Standard No. 601, shall be used for cutting tensile specimens.  Tests shall be run in triplicate, and the average of the specimens in the weaker direction shall be reported.

8

MIL-A-7021A

4.5.5.2  Tensile strength after immersion.- Three tensile specimens, cut in the weaker direction, shall be immersed in the media and conditions specified below, as specified in Method 6001 of Federal Test Method Standard No. 601. At the expiration of the immersion period, the specimens shall be immediately removed from the liquid. If the immersion medium is above room temperature, the specimen shall be immediately placed in a fresh sample of the same immersion medium at room temperature and allowed to remain for 30 ±5 minutes. Immediately after removal from the immersion medium or from the cooling liquid, the specimens shall be blotted lightly with filter paper. If the medium is an oil, the excess oil on the specimen shall be wiped off by means of a cloth and dipped quickly in acetone, then blotted lightly with filter paper. Tensile tests shall be conducted within 3 minutes after removal from the immersion medium or cooling liquid. Tensile strength shall be determined on the original unaged cross-sectional area previously recorded on the individual specimens. Change in tensile strength shall be calculated as follows:

$$\frac{O - E}{O} \times 100 = \text{percent change in tensile strength}$$

Where  O = the tensile strength before immersion
E = the tensile strength after immersion

4.5.5.2.1  Immersion media (change in tensile strength).- Each of the following liquids shall be used separately as the immersion medium at the indicated temperature and exposure times for class 1 materials, except distilled water which shall be used for class 2 only:

TABLE V

Immersion media

| Media | Specification or method | Temperature | Exposure hours |
|---|---|---|---|
| Water-alcohol | 50 percent Distilled water - 50 percent O-M-232 Grade A methanol (by wt) | 66°C | 22 |
| Ethylene glycol | MIL-E-5559 | 149°C | 5 |
| Petroleum base oil Medium No. 1 | Fed. Test Method Std No. 601 Method 6001 | 149°C | 5 |
| Aromatic fuel Medium No. 6 | Fed. Test Method Std No. 601 Method 6001 | 23°C | 22 |
| Distilled water Medium No. 10 | Fed. Test Method Std. No. 601 Method 6001 | 100°C | 70 |

4.5.6  Corrosion.- Test specimens 1 by 2 inches shall be cut from the compressed asbestos material and placed between alternate metal plates, which have been washed in toluene and dried to form a stack consisting of the following, in the order indicated:

Aluminum alloy   Specification QQ-A-355
Brass            Specification QQ-B-613
Bronze           Specification QQ-F-339 (Composition A)
Steel            Specification MIL-S-18729
Magnesium alloy  Specification QQ-M-44 (Condition A)

9

MIL-A-7021A

The metal plates shall be 1 by 2 inches by 1/16-inch minimum thickness, polished to 5 - 15 microinch rms finish.  The stack shall be laid together in a sandwich jig held together with four corner bolts and wing nuts.  Thirty pounds' pressure shall be applied to the stack and the corner wing nuts shall be finger tightened. - A control sandwich consisting of metal plates with filter paper (No. 2 Whatman or equivalent) shall be prepared.  The test sandwich, along with control sandwich, shall then be placed in a circulating air oven maintained at 70°C (158°F) for a period of 7 days.  At the end of this period, the metal surfaces shall be examined for evidence of progressive pitting or corrosion.  The material shall not adhere to the metal.  Discoloration is not considered or defined as corrosion.

## 5.  PREPARATION FOR DELIVERY

5.1  Interleaving.- Rolls and sheets shall be interleaved with suitable paper extending over the full area of contact between the sheets.

5.2  Packing.-

5.2.1  Level A.-

5.2.1.1  Flat sheets.- Compressed asbestos sheets in thicknesses exceeding 1/16 inch shall be furnished in flat sheets and packed in unsheathed crates conforming to Specification MIL-C-132 and shrouded in accordance with the appendix thereto.

5.2.1.1.1  Unless otherwise specified, a stack of interleaved flat sheets not exceeding 10 inches in height shall be packed in exterior shipping containers conforming to Specification JAN-P-108; PPP-B-621, class 2; PPP-B-585, class 3; or MIL-B-10377.  Sealed waterproof case liners conforming to Specification MIL-L-10547, type I, grade A or B, class 2, shall be used, except when boxes conforming to Specification JAN-P-108 have all joints sealed with water-resistant tape.  The gross weight of wood boxes shall not exceed 200 pounds.

5.2.1.2  Rolls.- Roll-form interleaved sheets shall be packed in fiber drums conforming to Specification PPP-D-723, type III, grade A.

5.2.2  Level B.-

5.2.2.1  Flat sheets.- Unless otherwise specified, a stack of interleaved flat sheets not exceeding 10 inches in height shall be packed in exterior shipping containers conforming to Table II, Special requirements for corrugated fiberboard, of Specification LLL-B-631; Table II, Special requirements for solid fiberboard, of Specification LLL-B-636; Specification PPP-B-585, class 1; PPP-B-601 (domestic type); PPP-B-621, class 1; or MIL-B-10377.  The gross weight of wood boxes shall not exceed 200 pounds or 70 pounds for fiberboard boxes.

5.2.3  Level C.-

5.2.3.1  Rolls.- Roll-form interleaved sheets shall be packed in fiber drums conforming to Specification PPP-D-723, type I, grade A.

5.2.3.1.1  Unless otherwise specified in the contract or order, the item shall be packed in accordance with the Consolidated Freight Classification Rules or Motor Freight Classification Rules in effect at time of shipment, whichever may be applicable.

10

F- MILITARY SPECIFICATIONS FILE                    ISSUE 1-10, DECEMBER, 1953

MIL-A-7021A

5.4  Marking of shipments.- In addition to any special marking required by the contract or order, interior packages and exterior shipping containers shall be marked in accordance with Standard MIL-STD-129. The identification shall be composed of the following information listed in the order shown:

> Stock No. or other identification number as specified
>   in the purchase document*
> ASBESTOS SHEET, COMPRESSED, FOR FUEL, LUBRICANT, COOLANT, WATER,
>   AND HIGH TEMPERATURE RESISTANT GASKETS
> Specification MIL-A-7021A
> Class
> Manufacturer's Designation No.
> Name of manufacturer

> *NOTE: The contractor shall enter the Federal Stock No. specified
> in the purchase document or as furnished by the procuring activity.
> When the Federal Stock No. is not provided or available from the
> procuring activity, leave space therefor and enter the Stock No.
> or other identification as provided by the procuring activity.

6.  NOTES

6.1  Intended use.-

6.1.1  Class 1.- This material is intended for use as gaskets to prevent leakage of fuel, lubricating oil, ethylene glycol, and water-alcohol mixture, especially throughout the powerplant system. This class is recommended for use in flanges of heavy construction with close bolt spacing where high-bolt torque may be applied.

6.1.2  Class 2.- This material is intended for use as gaskets to prevent leakage of water.

6.2  Ordering data.- Procurement documents should specify the following:

(a) Title, number, and date of this specification
(b) Class, dimensions, and thickness
(c) Part number (when applicable)
(d) Stock number
(e) Total quantity desired
(f) Selection of applicable levels of preservation and packaging,
      and packing.

> (1) Packaging (see 5.2)

>> (a) Level A (military package) affords protection of
>>      material during worldwide distribution or indeterminate
>>      storage or both.

>> (b) Level C (minimum military package) affords protection
>>      of material during shipment to initial domestic
>>      destinations with no expected storage prior to use
>>      and no transshipment.

11

MIL-A-7021A

    (2) Packing (see 5.3)

        (a) Level A (military pack) affords protection of material destined for worldwide distribution with indeterminate storage.

        (b) Level B (limited military pack) affords protection of material destined for domestic shipment with subsequent indeterminate indoor storage.

        (c) Level C (minimum military pack) affords protection of material for immediate use at the initial domestic destination.

6.3 **Provisions for qualification.**- With respect to products requiring qualification, awards will be made only for such products as have, prior to the bid opening date, been tested and approved for inclusion in the applicable Qualified Products List whether or not such products have actually been so listed by that date.

6.3.1 The attention of suppliers is called to this requirement, and manufacturers are urged to arrange to have the products that they propose to offer to the Federal Government, tested for qualification in order that they may be eligible to be awarded contracts or orders for the products covered by this specification. Requests for information pertaining to qualification of products covered by this specification should be addressed to the Director, U.S. Naval Air Experimental Station, Naval Air Material Center, Naval Base, Philadelphia 12, Pennsylvania, the activity responsible for qualification, with copies to the Commander, Wright Air Development Center, Wright-Patterson Air Force Base, Ohio, and the Bureau of Aeronautics, Navy Department, Washington 25, D. C.

        NOTICE: When Government drawings, specifications, or other data are used for any purpose other than in connection with a definitely related Government procurement operation, the United States Government thereby incurs no responsibility nor any obligation whatsoever; and the fact that the Government may have formulated, furnished, or in any way supplied the said drawings, specifications, or other data is not to be regarded by implication or otherwise as in any manner licensing the holder or any other person or corporation, or conveying any rights or permission to manufacture, use, or sell any patented invention that may in any way be related thereto.

Custodians:
  Army - Transportation Corps
  Navy - Bureau of Aeronautics
  Air Force

Other interest:
  Army - Q
  Navy - OShS

Preparing activity:
  Navy - Bureau of Aeronautics

12

**ATTACHMENT 2**

1

1

2

3

DISTRICT COURT, SOUTHERN DISTRICT OF ILLINOIS,
4    STATE OF ILLINOIS

5    Civil Action No. 85-5528

6

7    ———————————————————————————

8    CLARA NIEMANN, AMDR of the Estate of
     VINCENT M. NIEMANN,
9
     Plaintiff,
10
     vs.
11
     MCDONNELL DOUGLAS CORP., et al.,
12
     Defendant.
13

14   ———————————————————————————

15

16

17          DEPOSITION OF WALTER MELVIN, M.D., Sc.D.

18                   August 22, 1988

19

20   Pursuant to Notice taken on behalf of the
     Plaintiff at 2430 W. Prospect, Fort Collins,
21   Colorado 80525, at 1:40 p.m., before Carol M.
     Hicks, Certified Shorthand Reporter and Notary
22   Public within Colorado.

23

24

25

          A. WILLIAM ROBERTS, JR., & ASSOCIATES

5

1    School of Public Health in 1953; and a doctor of

2    science in industrial toxicology and industrial

3    hygiene from the Kettering Research Laboratory,

4    College of Medicine, University of Cincinnati,

5    1962.

6              Q.   Have you had any military

7    background, Dr. Melvin?

8              A.   Yes.

9              Q.   Would you tell us the extent of

10   your military background.

11             A.   I interned at the Walter Reed Army

12   Medical Research Center, Washington D.C., and at

13   Fitzsimons Army Center the following year, then I

14   was in service from 19--September 1951 to March of

15   1978.

16             Q.   From 1951 until '78?

17             A.   Yes.

18             Q.   Okay.  What was the highest rank

19   you attained?

20             A.   Colonel, full colonel, or 06.

21             Q.   Was that in the Air Force or the

22   Army?

23             A.   Air Force.

24             Q.   Okay.  Have you ever been stationed

25   at Scott Air Force Base?

         A. WILLIAM ROBERTS, JR., & ASSOCIATES

14

1     view.

2              Q.   Okay.  Would you mind telling me

3     what opinions you expressed concerning asbestosis?

4              A.   Yes.  It's my considered

5     professional opinion that the Air Force did not,

6     during the period of the 1940s to the present,

7     have any significant exposures in its aircraft

8     maintenance facilities to airborne asbestos fiber.

9              Q.   What is the basis of that opinion,

10    Doctor?

11             A.   Number one, professional judgment

12    and training.

13             Q.   Could you be specific about that,

14    please?  I mean, in order to form a professional

15    judgment, you had to be presented with certain

16    empirical data.  Could you describe that data for

17    me, please.

18             A.   Yes.  As I indicated, I first

19    became aware of the asbestos problem in the fall

20    of 1948, when an assistant professor of internal

21    medicine at the University of Colorado Medical

22    Center presented one lecture on asbestosis.  This

23    man had been trained, at least in part, by Leroy

24    U. Gardner at the Saranac Laboratory for Research

25    on tuberculosis.  This is at Saranac Lake in New

A. WILLIAM ROBERTS, JR., & ASSOCIATES

32

1   bases, if you know?

2           A.   It was, and I think still is common

3   at Air Force bases within certain commands.

4           Q.   Okay.  And when you were at Tinker,

5   what was your title?

6           A.   I was a director of occupational

7   health services.

8           Q.   Did you conduct any tests of air

9   quality in the sheet metal shop at Tinker to

10  determine whether there was any high asbestos

11  content?

12          A.   We did.  The base industrial

13  hygienist did, and there just wasn't a problem on

14  those base aircraft.

15          Q.   You say there wasn't a problem?

16          A.   No.

17          Q.   Okay.  Do you know if any of the

18  people who worked on those aircraft at that time

19  have since contracted asbestosis?

20          A.   Not to my knowledge.

21          Q.   Okay.

22          A.   By that, I mean I don't know.

23          Q.   Yes.  Do you know if anyone who

24  ever removed asbestos chafing strips from

25  reciprocating engine aircraft on any of the Air

       A. WILLIAM ROBERTS, JR., & ASSOCIATES

1      Force bases where you've been stationed, have

2      since contracted asbestosis?

3              A.   I don't know.

4              Q.   Well, Doctor, until you could

5      determine the answer to that question, you really

6      wouldn't be able to say that asbestos wasn't a

7      problem in the Air Force at that time, could you?

8                  MR. ARCHER:   Object to the form.

9      Excuse me, object to the form of the question.

10     It's misleading and very ambiguous, and, in

11     addition, misstates certain aspects of the

12     witness' prior testimony, or implies in a

13     misleading manner certain aspects of his prior

14     testimony.   You may answer.

15              A.   Samples were collected for asbestos

16     particle counts.

17              Q.   (BY MR. HAMILTON)   And when was

18     that?

19              A.   Well, sometime during those two

20     periods of time, mid-1953 to mid-1955, and, again,

21     mid-1958 to mid-1960.

22              Q.   Do you remember anything about the

23     results of those tests?

24              A.   Only in general.   The acceptable

25     standard.

A. WILLIAM ROBERTS, JR., & ASSOCIATES

1          A.   Yes.

2          Q.   That was the whole point of the

3    threshold limit values, trying to keep the

4    exposure underneath what the Air Force had adopted

5    as the TLV?

6          A.   Yes.

7          Q.   I think you had mentioned that the

8    Air Force had adopted its own version of the

9    threshold limit values; is that correct?

10         A.   Yes.

11         Q.   Was that the same measurement that

12   the ACGIH was using?

13         A.   That's right.  The Air Force

14   simply, with ACGIH permission, in this pamphlet,

15   161-6-1, just reproduced the booklet and just

16   incorporated it into the pamphlet.

17         Q.   So over the years I take it, then,

18   it was your job to ensure that, at least the

19   particular Air Force that you were stationed at,

20   that the threshold limited values were not

21   exceeded?

22         A.   Well, only during the two periods

23   of time that I mentioned.

24         Q.   Which were those again?

25         A.   Mid-1953 to mid-1955, mid-1958 to

A. WILLIAM ROBERTS, JR., & ASSOCIATES -

53

1   mid-1960 did I ever have base responsibility.  The

2   rest of the time I was either in academic training

3   programs or the commander of the Air Force

4   Regional Environmental Health Laboratory.

5              Q.   Would the base personnel, then,

6   report to you when you were in that regional

7   capacity?

8              A.   No.  The problem I had was the use

9   of the word report.

10              Q.   Okay.

11              A.   We were available to them as

12   consultants, and we provided analytical chemistry,

13   industrial hygiene engineering, consulting

14   functions to them.  We had no control over their

15   day-by-day activities.

16              Q.   Would it be a fair statement that

17   there was somebody at each Air Force base

18   responsible for monitoring threshold limit values

19   in the, say, in the sheet metal shops?

20              A.   It would be a fair statement, with

21   qualifications.  There was someone who may or may

22   not have been a trained graduate engineer.  There

23   were preventive medicine technicians who assumed

24   that function at certain of the smaller bases.

25              Q.   I guess what I'm driving at is that

A. WILLIAM ROBERTS, JR., & ASSOCIATES

1   the Air Force was aware that asbestos could pose a

2   hazard to workers during the time that you were in

3   the Air Force, and I guess one of the kinds,

4   exactly which specific hazards they might have

5   been aware of; would that be correct?

6           A.   I think we were making a good

7   effort, based on the state of knowledge in the

8   industrial hygiene practice at the particular

9   point in time.

10          Q.   And I take it, from your prior

11  testimony, that, at least specifically with the

12  hazard of lung cancer, that did not become

13  generally known until 1964 with the Selikoff

14  studies?

15          MR. ARCHER:  Object to the form of

16  the question, insofar as it refers to the areas

17  outside of asbestos where workers in asbestos

18  textile plants.  Subject to that, you can answer.

19          A.   I think that basically is true.

20  That is the one period in time, the one

21  international conference, that generated much

22  concern about these kinds of problems.  Not just

23  in the Air Force, but in industry generally.

24          Q.   (BY MR. DILLON)  Would it be a fair

25  statement, then, that since the Air Force was

A. WILLIAM ROBERTS, JR., & ASSOCIATES

1   aware of the ACGIH standards and threshold limit

2   values, nobody needed to warn the Air Force that

3   asbestos might pose a hazard to the workplace?

4   MR. HAMILTON:  Objection.  That's

5   not a fair statement of product liability law as

6   it exists in the state of Illinois.  Ignores the

7   concept of strict liability.

8   MR. ARCHER:  Seemed like a fair

9   question to me.

10   (The last question was read back.)

11   Q.   (BY MR. DILLON)  The point of my

12   question is that the Air Force already knew about

13   the threshold limit values and what dangers might

14   be posed by asbestos.

15   A.   Well, yes.

16   Q.   That's all I was looking for.

17   MR. DILLON:  That's all I have.

18   EXAMINATION

19   BY MR. ARCHER:

20   Q.   I have just a couple of questions,

21   Doctor.  When, based on your recollection or your

22   research in connection with this case, did the Air

23   Force first become aware that exposure to

24   asbestos, under any circumstances, some

25   circumstances, could be hazardous to worker

A. WILLIAM ROBERTS, JR., & ASSOCIATES

**ATTACHMENT 3**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

- - - - - - - - - - - - - - x
                            :
CLARA NIEMANN, Adminstrator of :
the Estate of Vincent Niemann, :
deceased,                   :
                            :
              Plaintiff,    :
                            :
       -vs-                 :        **CAUSE NO. 86-3365**
                            :
McDONNELL DOUGLAS CORPORATION, :
et al.,                     :
                            :
              Defendants.   :
                            :
- - - - - - - - - - - - - - x

# COPY

McLean, Virginia

Thursday, June 16, 1988

Deposition of:

ALVIN F. MEYER, JR.

called for examination on behalf of the defendants, pursuant to notice, in the office of A. F. Meyer & Associates, 6845 Elm Street, McLean, Virginia, commencing at 1:30 o'clock, p.m., before James D. Hall, CSR, a Notary Public for the State of Virginia at Large, when were present on behalf of the respective parties:

Reported by James D. Hall

TURNER REPORTING SERVICE
(703) 352-4579
4304 Beaumont Court, Fairfax, Virginia 22030

32

1    accidents and real problems as perceived and existing.

2         Q     Based upon your knowledge of the types of work

3    being undertaken at that time under your area of control,

4    were you aware of any risk from the use of asbestos

5    warranting steps to limit exposure to asbestos?

6         A     None that I can think of at this point.  None

7    that I can recollect.

8              MR. YANOWITCH:  Just asking for clarification,

9    you mean people in the Air Force whose responsibilities he

10   was familiar with.  Because I think the Colonel has already

11   answered certain dangers existed in public health --

12             THE WITNESS:  I interpreted in your purview "did

13   you say anything, and the answer is no.

14             BY MR. ARCHER:

15        Q     Colonel, what was your next area of assignment

16   in the military?

17        A     I left the US Air Force Europe, I was assigned

18   to the office of the Surgeon General, Headquarters Air

19   Materiel Command at Wright Patterson Air Force Base.

20        A     When was that assignment?

21        A     From 1948 till the summer of 1954.

22        Q     Where is Wright Patterson Air Force Base for

33

1  those who don't know?

2      A     It's located in Dayton, Ohio.

3      Q     Generally what were your duties as chief

4  industrial hygienist at that base?

5      A     My responsibility was to plan, manage, and

6  develop an industrial hygiene program and support the Air

7  Materiel Command's several logistic centers and to provide

8  through other officers assigned to the command consultative

9  services at Air Force bases, actually worldwide.

10     Q     Can you tell us, please, what generally the Air

11  Materiel Command is.

12     A     Well, the Air Materiel Command is now known as

13  Air Force Logistics Command.  Its functions now and then

14  are the same.  It operates the large Air Force centralized

15  depots and logistic centers for the support of the

16  operational forces of the Air Force.  These centers are

17  such that are characteristic and almost typical of the

18  aerospace industry complex.  As a matter of fact, some

19  aerospace facility complexes are in what used to be

20  operated by various companies as government-owned

21  contractor-operated repair facilities, and some still are.

22  But they range from everything from complete disassembly,

36

1    Q    You previously told us, Colonel, that before

2  this time that you had become aware that in certain limited

3  contexts exposure to asbestos could be potentially

4  hazardous to worker health.  Is that correct, sir?

5    A    That's correct.

6    Q    And those aspects which you mentioned were

7  limited to, as you understood it, situations of asbestos

8  mining or manufacture.  Is that also correct?

9    A    That's correct.

10    Q    Did you become aware at any time during your

11  service as chief industrial hygienist for the Air Materiel

12  Command that aspects of aircraft repair work would involve

13  exposure of civilian or military personnel to asbestos?

14    A    To a -- to a limited extent that they might be

15  exposed, along with other dusts, including some which were

16  considered at that time of equal or greater importance.

17    Q    And was it your understanding, sir, that there

18  were potential hazards associated with exposure to dust and

19  asbestos under certain conditions?

20    A    Yes.

21    Q    Did you recommend at any time during your

22  service as chief industrial hygienist for the Air Materiel

41

1   question.

2           THE WITNESS:   That is not correct.

3           MS. PATTON:   That again mischaracterizes his

4   prior testimony

5           BY MR. ARCHER:

6       Q   Are you telling me, Colonel, that you did

7   believe the work being undertaken, repair work being

8   undertaken on aircraft from 1943 to 1954 was a hazardous

9   condition in connection with this asbestos exposure?

10      A   No.

11      Q   Let's go back and try it again.   I apologize.

12          You've told me that you didn't recommend a total

13  ban on exposure to asbestos for repair work undertaken on

14  aircraft from 1943 to 1954.

15      A   That is correct.

16      Q   And I asked you why not.   Right?

17      A   Right.

18      Q   And you said one of the reasons is we have a

19  scant amount of resources and we have to allocate them

20  wherever they're best allocated.   Right?

21      A   Counsel, I think that's not really -- we're

22  proceeding from one point to another.   You could infer

42

1    that, but that isn't really what I said in that connection.

2        Q    Can you --

3        A    Let me see if I can answer -- let me see if I

4    can answer the question, which is:  Why did we not

5    recommend a complete ban on asbestos?  That's the question

6    as I understand it.

7        Q    Yes.  Yes, it is.

8        A    The answer to that question is that under the

9    circumstances of use as known to not only myself but to

10   others involved in this, was such that the available

11   precautions, if followed, should protect the worker within

12   the state of knowledge as it existed at that time.  No ban

13   was needed because the perceived state of knowledge, state

14   of the art was if did you the right things, you wouldn't

15   get exposed, period.

16            Is that --

17       Q    That's fine.

18       A    That's the answer.

19       Q    Do you recall what the right things were at that

20   time?

21       A    Certainly the right things were as follows:

22   Number one, if you're going to work with any dusty

43

1   operation, the operation should be evaluated to determine

2   whether or not there are excessive amounts present in the

3   breathing zone of the workers above established limits. If

4   there are, either provide ventilation, which may be local

5   exhaust ventilation, isolate the process and do it

6   remotely, put protective equipment on the individual such

7   as a press operator, gloves, and so on, and teach the

8   individual the proper work practices. Now, this is not

9   only just asbestos; this is any hazard.

10       Q     And were those standards adopted throughout the

11  Air Force to your knowledge in connection with the repair

12  work on aircraft at that time?

13       A     Yes.

14       Q     You mentioned an exposure limit. Do you recall

15  a particular exposure limit for asbestos at that time?

16       A     The exposure limit -- I don't remember the exact

17  million particles per cubic foot that was established at

18  that time, but the Air Force had decided to adopt the

19  American Conference of Governmental Industrial Hygienists'

20  threshold limit values as its basic benchmark for action in

21  the field of industrial hygiene.

22       Q     Are you familiar with the standard of five

50

1    the Surgeon General, the United States Air Force.

2         Q    When was that assignment, sir?

3         A    That was in the summer of 1962.

4         Q    What particular position did you have with the

5    Office of Surgeon General commencing in the summer of 1962?

6         A    I was chief of bioenvironmental engineering and

7    subsequently was chief of the Biomedical Sciences Corps.

8         Q    In that capacity were you the seniormost

9    industrial hygienist, if you will, for the Air Force at

10   that time?

11        A    Well, as chief of bioenvironmental engineering I

12   had another office or several other offices reporting to me

13   for the subspecialties of hygiene, sanitary engineering,

14   and so on.  I was responsible for the overall engineering.

15        Q    Reading your affidavit --

16        A    When I became chief of the Biomedical Sciences

17   Corps, there was a new chief of bioenvironmental

18   engineering.  I was responsible for all the allied health

19   professions and had associate chiefs for each of the

20   subspecialties, such as bioenvironmental engineering,

21   aviation physiology, optometry, and so forth.

22        Q    How long did you hold that position?

1    A       I retired in 1969.

2    Q       Who appointed you to these positions?

3    A       The Surgeon General of the Air Force.

4    Q       Is it fair to characterize your job

5    responsibilities as the chief policymaking individual for

6    industrial hygiene in the Air Force?

7    A       For recommending -- during the period of time

8    that I was the chief of bioenvironmental engineering I

9    would be the individual who would recommend to the Surgeon

10   General and through him to the chief of staff the policies.

11   After that, my successor while I was chief of the BSC would

12   have that responsibility.  And in that capacity I would not

13   be in the main stream of that.

14   Q       Did your responsibilities as chief of

15   bioenvironmental engineering or chief of the BSC involve

16   establishing policies, if any, related to potential

17   exposure to asbestos by civilian or military personnel?

18   A       Only in a general context of the overall

19   preventive and occupational health program and aerospace

20   medical health program.

21   Q       At this time, Colonel, 1962 to 1969, could you

22   tell me, if you can, approximately how many

82

1          Do you recall that question and answer being

2 given?

3     A     Yes.

4     Q     So is it your recollection, Colonel, that the

5 Air Force issued almost identical instructions with respect

6 to threshold limit values as long ago as 1955?

7     A     Both Army and Navy, like the Air Force, simply

8 took the American Conference of Governmental Industrial

9 Hygienists threshold limit values, because it would have no

10 standing as a document alone, and reissued them per se as

11 Air Force, Army, or Navy documents, so the answer is yes.

12    Q     On page nine, line eight.

13          Question:  Did you have any access to Navy

14 documents concerning particular problems that the Navy was

15 having with asbestos before 1962 through 1963?

16          Answer:  In general some information was

17 exchanged among the three military services as a matter of

18 routine.

19          Do you recall that question and answer?

20    A     Yes.

21    Q     And that's still your testimony today?

22    A     That's still my testimony.