

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT 1 2 2005

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

**MDL NO. - 875**

### IN THE UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF TEXAS
### GALVESTON DIVISION

---

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISCRICT OF PENNSYLVANIA

**IN RE: ASBESTOS PRODUCTS**
   **LIABILITY LITIGATION (NO. VI)**

---

| | | |
|---|---|---|
| **FELIX T. RAMIREZ, ISIDRO DELGADO** | □ | |
| **CHARLES R. ROANE, LOUIS R. SUAREZ** | □ | |
| **STERLING A. BROOKS, BILL G TAYLOR** | □ | |
| **JOHN SMILEY and BURNETT L. BELL** | □ | |
| | □ | **CIVIL ACTION NO-** |
| **V** | □ | **G-98-630** |
| | □ | |
| **UNION PACIFIC RAILROAD COMPANY** | □ | |

## PLAINTIFF, BURNETT L. BELL'S RESPONSE TO DEFENDANT UNION PACIFIC RAILROAD COMPANY'S MOTION TO VACATE CONDITIONAL REMAND

Now Comes Burnett L. Bell, and responds to Defendant's Motion to Vacate Conditional Remand as follows:

### I.

1.     This case is ripe and suitable for remand.

IMAGED OCT 1 3 2005

OFFICIAL FILE COPY

2.      Both parties have worked to resolve and settle this matter on their own. All attempts have failed. Plaintiff, Burnett L. Bell, in attempt to reach a compromise on this case, requested and was granted a settlement conference that was conducted in United District Court for the Eastern District of Pennsylvania. The parties were unable to reach a compromise.

3.      There is no merit to most of the assertions and statements contained in Defendant's Motion to vacate conditional remand. The Defendant has pleaded no new fact that would warrant a remand. All information contained therein was already within the custody of the court and all parties involved in this matter.

4.      Defendant's motion to vacate conditional remand is another attempt, among other plethora of filings by the Defendant, to delay the progress of this case. Mr. Bell is entitled to a trial on the merits of this case by the jury of his peers.

5.      Defendant insists that this case should be tried, not on its merits, but through court filings of objections and motions.

**II.**

6.      Mr. Bell was diagnosed with asbestosis in 1998. Ever since the diagnosis, the Defendant had enough time to make all the requests and file all the motions it is currently filing. It must be obvious to all that Defendant's motion is another attempt to delay the prosecution of this case. This shameless delay tactics by the Defense counsel should not be tolerated.

7.      On paragraph 3 of Defendant's brief, Defendant claims that it had no CT scan and PFT report from Dr. Chandrashekar at Memorial Hospital Southwest until just recently. This

statement is utterly false. Defendant has had this information since 2002. The CT scan was conducted on December 13, 2001. Not recently, as claimed by Defendant's attorney. (*See exhibit "A"*) The CT scan is the more accurate device to diagnose asbestosis. Defendant continues to insist that X-Rays are more accurate. (*See Exhibit "B"*) Defendant has chosen to ignore the CT scan results and instead focus on its own inconclusive X-ray report from its *own* doctor. Even the B-Reading from Dr. Arthur Frank is based on X-ray report. Mr. Bell was unable to perform the PFT test because he was unable to breath due to the effects of the asbestosis. He should not be punished because he is suffering from a disease caused by Defendant's negligence.

8.      On paragraph 4, Defendant stated that Plaintiff "produced a report from October 2004 of yet another previously undisclosed expert, pulmonologist Louis Hamer..." This statement is totally false. The Defendant did not properly preface the statement. After a conference call with the district clerk, Mr. Lassman in Pennsylvania, both Plaintiff's attorney and Defendant's attorney agreed that Plaintiff should locate a pulmonologist to give a concise and unequivocal report of Mr. Bell's diagnosis. (*See Exhibit "C."*) Plaintiff was able to locate Dr. Hamer. Dr. Harmer's report was indisputable – that Mr. Bell has asbestosis. (*Exhibit "D"*)

9.      Defendant's attorney was not satisfied with the report, and demanded that Mr. Bell must present himself for further tests by the Defendant's doctor. Mr. Bell, even though immobile, complied with the request. After such tests, Defendant's doctor, Dr. Robert M. Ross, basically trivialized Mr. Bell's illness by stating that the illness was minimal at best. Dr. Ross' report created more confusion to the disparity. His report was inconclusive at best. (*Dr. Ross' Report is enclosed as exhibit "E"*)

10.     The insistence of Defendant's attorney that Plaintiff's counsel should "speak with Dr. Frank and Dr. Schonfeld to clear up the issue of their actual diagnosis" is insulting. (See paragraph 6) What clarification is required? Defense attorney's double-talk is menacing. On one hand he wants to conduct depositions of these doctors, on the other hand he wants Plaintiff's counsel to talk to them. Defendant has questioned and disregarded all reports and information furnished by Plaintiff.   Dr. Ross's medical report is equivocal and inconclusive. Defendant's attorney should concentrate on deposing its own doctor.

11.     On Defendant's brief paragraph 7, Defense attorney is making a caricature of settlement negotiations by stating that Plaintiff's counsel has made demands of $1.3 million, $1 million, $2 million, and currently $300,000. Defense counsel failed to state his offers of settlement. Defense counsel's attempt to bias the minds of the panel is childish. Mr. Bell's last demand to settle this claim, has been, and remains at $300,000. (*See exhibit "F"*) Mr. Nebel's attempt to distort the truth is typical of the way he has conducted this settlement negotiations - he has failed to acknowledge the obvious facts. The Railroad has not offered the $300,000 to settle this case. If that amount is offered and Plaintiff does not accept, then the Defendant can argue that the Plaintiff is wavering on his demand. Absent such offer, Defendant's attorney has no basis for the insinuations contained in his paragraph 7.

### III.

12.     Defense attorney is aware of all the parties to the lawsuit, all the experts, all the expert reports, all the information necessary to conduct the trial on the merits of this case. The insistence that some secret would be uncovered during deposition is another attempt to convince the panel to prolong this case. Failure to remand this case serves no purpose whatsoever.

13.     Rather than the filings/motions and counter-filings/Motions from both sides, the more prudent approach would be for the court to remand this case to Texas so that Mr. Bell will have his day in court. Mr. Bell's health is failing him everyday. To continue to prolong this case would be a total injustice to a man who is entitled to compensation for the ills caused be his employer.

14.     Mr. Nebel would like this matter to be stayed in Pennsylvania till the death of Mr. Bell. Fortunately, the judicial system in America does not work on Mr. Nebel's schedule and dispositions.

15.     The documents contained in Defendant's motion were the same documents already submitted on numerous occasions by both parties.

16.     Defendant's counsel, by his own admission, stated on paragraph 11 of his brief, that the parties are no in agreement on basic issues such as Plaintiff's diagnosis, and that only the experts can clarify the issues. I agree. The jury will decide who is right; which diagnosis to believe, and who should or should not pay. Since the panel will not make that decision, the case must be remanded for further proceeding. Defendant's attorney has not made good faith effort to settle this dispute. He has instead advised his clients to trivialize Mr. Bell's sickness.

## IV.

17.     Based on the information and counter-argument to Defendant's motion to vacate conditional remand, Plaintiff, Mr. Burnett L. Bell asks the panel to remand this case to Texas for proper adjudication on the merits rather than the request for delays by Defendant's counsel.

18.   This case was filed in 1998. Defendant had enough time to procure all information it is currently seeking. If Defendant's counsel is serious about deposing the Plaintiff's experts, he can conduct the deposition when the case is remanded to Texas. Mr. Bell is almost ninety years old. He should be able to testify in this matter before his death. I would be an injustice if Mr. Bell dies before this case is tried and adjudicated. That seems to be the Defense counsel's wish.

The Motion to vacate remand filed by Defense counsel is frivolous and calculated for the main purpose of delaying the prosecution of this case.

Respectfully submitted,

EZEOKE & EZEOKE, P.C.

By: _____
Alphonsus O. Ezeoke
Texas Bar No. 24025356
7100 Regency Square, Suite 190
Houston, Texas  77036
Tel. (713)952-5291
Fax. (713)952-5294
Attorney for Plaintiff
Burnett L. Bell

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT 1 2 2005

FILED
CLERK'S OFFICE

## CERTIFICATE OF SERVICE

I certify that on October 07, 2005, a true and correct copy of Plaintiff's Response to Defendant's Motion to Vacate Conditional Remand was served on the following:

1. By facsimile transmission on Defense counsel, Roger H. Nebel at 713-621-6746.

2. United States District Court, Southern District of Texas, Galveston Division

3. United District Court For the Eastern District of Pennsylvania

Alphonsus O. Ezeoke



RECEIVED
CLERK'S OFFICE
2005 OCT 12 P 1:46
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

## COUNSEL LIST

ALPHONSUS O. EZEOKE
EZEOKE & EZEOKE, P.C.
Bar No. 24025356
7100 Regency Square, Suite 190
Houston, Texas 77036
(713) 952-5291 TEL
(713) 952-5294 (FAX)
ATTORNEY FOR PLAINTIFF, BURNETT L. BELL


Roger H. Nebel
Forman Perry Watkins Krutz & Tardy LLP
1717 St. James Place, Suite 600
Houston, Texas 77056
TEL (713) 402-1717
FAX (713) 621-6746
ATTORNEY FOR DEFENDANT, UNION PACIFIC RAILROAD COMPANY

**DOKET NO. 875**
**IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)**

*Felix T. Ramirez, et al v. Union Pacific Railroad Co., E.D. Pennsylvania, (S.D. Texas, C.A. No. 3:98-630)*

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114

Edward J. Cass
Gallagher, Sharp, Fulton & Norman
Bulkley Building, 7th Floor
1501 Euclid Avenue
Cleveland, OH 44115

Adam M. Chud
Goodwin Procter LLP
901 New York Avenue, N.W.
Washington, DC 20001

David Lee Crawford
Phelps Dunbar, LLP
3040 Post Oak Boulevard
Suite 900
Houston, TX 77056-5705

David A. Damico
Burns, White & Hickton, LLC
Four Northshore Center
106 Isabella St.
Pittsburg, PA 15212

Raymond P. Forceno
Forceno & Hannon
111 S. Independence Mall East
The Bourse, Suite 1000
Philadelphia, PA 19106-2574

Ellen B. Furman
Goldfein & Hosmer
1600 Market Street
33rd Floor
Philadelphia, PA 19103

Susan M. Hansen
Brownson & Ballow
225 South Sith Street
Suite 4800
Minneapolis, MN 55402

Reginald S. Kramer
Oldham & Dowling
195 South Main Street
Suite 300
Akron, OH 44308-1314

David C. Ladin
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Gene Locks
Greitzer & Locks
1500 Walnut Street
Philadelphia, PA 19102

Ronald L. Motley
Motley Rice, LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29465

Roger Henry Nebel
Forman, Perry, Watkins, Krutz &
Tardy, LLP
1717 St. James Place
Suite 600
Houston, TX 77056

John J. Repcheck
Marks, O'Neill, Obrien & Courtney
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219

John D. Roven
Roven-Kaplan, LLP
2190 North Loop West
Suite 410
Houston, TX 77018

Arthur Sadin
Sadin Law Firm, P.C.
1104 S. Friendship Drive
Suite A
Friendswood, TX 77546

Richard D. Schuster
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216

Neil Selman
Selman, Breitman & Burguess
11766 Wilshire Boulevard
Sixth Floor
Los Angeles, CA 90025

Robert N. Spinelli
Kelley, Jasons, McGuire & Spinelli
Centre Square West
15th Floor
Philadelphia, PA 19102

Robert E. Swickle
Jaques Admiralty Law Firm, P.C.
1570 Penobscot Building
The Maritime Asbestosis Legal Clinic
Detroit, MI 48226

Andrew J. Trevelise
Reed Smith, LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

James K. Weston, II
Tom Ridley Law Firm
4040 First Avenue, N.E.
P.O. Box 998
Cedar Rapids, IA 52406

SCHEDULE

A.     FELIX T. RAMIREZ, ISIDRO DELGADO, CHARLES R. ROANE, LOUIS R.
       SUAREZ, STERLING A. BROOKS, BILL G. TAYLOR, JOHN SMILEY and
       BURNETT L. BELL VS. UNION PACIFIC RAILROAD COMPANY.

B.     IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT
       OF PENNSYLVANIA IN REGARDING: ASBESTOS PRODUCTS LIABILITY
       CIVIL ACTION NO. LITIGATION (NO.VI) MDL 875, transferred from THE
       UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
       TEXAS, GALVESTON DIVISION.

C.     Hon. Charles Weiner, Presiding Judge of the United States District Court for the
       Eastern District of Pennsylvania, transferred from Hon. Samuel Kent, Presiding
       Judge of the United States District Court for the Southern District of Texas,
       Galveston Division

# EXHIBIT "A"

Case MDL No. 875 Document 4632 Filed 12/12/05 Page 12 of 44

CCAR1-2304          CMORR - PRODUCTION DATABASE - HOSPITAL 1
12/26/01  09:55

RV,HD=3 TITLE= ANCILLARY RESULTS: BELL,
  * PRINT *          (Q9S$$P)
M-MODE DIMENSIONS:                    LA        4.1 CM (2.0-3.8CM)
AO ROOT      3.4 CM (2.2-3.7CM)       LVID-D    4.6 CM (4.0-5.6CM)
IVS-D        1.2 CM (0.7-1.1CM)       LVP-D     1.2 CM (0.7-1.1CM)
                                      COMMENTS:
                                      EJECTION FRACTION 60%.  NORMAL WAL
NORMAL LV SIZE AND FUNCTION.          NO PERICARDIAL EFFUSION.
MILD LEFT VENTRICULAR HYPERTROPHY.
NORMAL RV FUNCTION.

-*-

*Preliminary*

*Prelim*



# Memorial Hermann South East
11800 Astoria Blvd.
Houston, Tx 77089
281/929-6247

| Name: | BELL, BURNETT L | ID: | 33562862 | BSA: | 2.26 | Date: | 12/13/01 |
| Doctor: | Krishna Chandrasekhar | Height: | 71.0 in | Age: | 85 | Room: | OP |
| Tech: | BOBBIE, C.PFT, SCOTT | Weight: | 235.0 lbs | Sex: | Male | Race: | Caucasian |



## Memorial Hermann South East
11800 Astoria Blvd.
Houston, Tx 77089
281/929-6247

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Name: | BELL, BURNETT L | ID: | 33562862 | BSA: | 2.26 | Date: | 12/13/01 |
| Doctor: | Krishna Chandrasekhar | Height: | 71.0 in | Age: | 85 | Room: | OP |
| Tech: | BOBBIE. C.PFT. SCOTT | Weight: ~~235.0 lbs~~ 197.0 lbs | | Sex: | Male | Race: | Caucasian |

Although the FEV1 and FEF25-75% are reduced, the FEV1/FVC ratio is increased.
The expiratory time was less than six seconds, which may underestimate the
degree of obstruction. The MVV is reduced. The lung volumes are reduced.
Following administration of bronchodilators, there is no significant
response. The reduced diffusing capacity indicates a severe loss of
functional alveolar capillary surface.

Conclusions: The reduced lung volumes, increased FEV1/FVC ratio and diffusion
defect suggest an interstitial process such as fibrosis or interstitial
inflammation. moderately severe airway obstruction is present. A clinical trial
of bronchodilators may be beneficial in view of the airway obstruction. In view
of the severity of the diffusion defect, studies with exercise would be helpful
to evaluate the presence of hypoxemia.

Pulmonary Function Diagnosis:
Moderately ~~severe Obstructive Airways Disease~~  Moderately scare
Severe Restriction -~~Interstitial~~
Severe Diffusion Defect

This preliminary report should not be used clinically unless reviewed and
signed by a physician.

_____ M.D.

DR.K.CHANDRASEKHAR

## Memorial Hermann  South East
11800 Astoria Blvd.
Houston, Tx  77089
281/929-6247

| Name: | BELL, BURNETT L | ID: | 33562862 | BSA: | 2.26 | Date: | 12/13/01 |
|---|---|---|---|---|---|---|---|
| Doctor: | Krishna Chandrasekhar | Height: | 71.0 in | Age: | 85 | Room: | OP |
| Tech: | BOBBIE, C.PFT, SCOTT | Weight: | 235.0 lbs | Sex: | Male | Race: | Caucasian |

### PRE-BRONCH                                    POST-BRONCH

|  | Actual | Pred. | %Pred. |  | Actual | %Pred | %Chng |
|---|---|---|---|---|---|---|---|
| Hgb (gm/dL) | 12.9 | | | | | | |

12/26/2001  09:30   281-929-6469          MHSE CARDIOLOGY                    PAGE  04

## Memorial Hermann  South East
11800 Astoria Blvd.
Houston, Tx  77089
281/929-6247

| Name: | BELL, BURNETT L | ID: | 33562862 | BSA: | 2.26 | Date: | 12/13/01 |
|-------|-----------------|-----|----------|------|------|-------|----------|
| Doctor: | Krishna Chandrasekhar | Height: | 71.0 in | Age: | 85 | Room: | OP |
| Tech: | BOBBIE, C.PFT. SCOTT | Weight: | 235.0 lbs | Sex: | Male | Race: | Caucasian |

Medication: None

Diagnosis: Asbestosis

SHORTNESS OF BREATH/DYSPNEA

Dyspnea: After any exertion

Cough: Non-productive     Wheeze: Rare

Yrs Quit: 0     Pk Yrs: 0     Pks/Day: 0     Yrs Smk: 0     Tbco Prod:

Post-Test Comments:
PATIENT'S EFFORTS, AND UNDERSTANDING WAS GOOD.HE BECAME TRIED AND SHORT OF BREATH ON POST TESTING.

|  | PRE-BRONCH | | | POST-BRONCH | | |
|--|------------|--|--|-------------|--|--|
|  | **Actual** | **Pred.** | **%Pred.** | **Actual** | **%Pred** | **%Chng** |
| **SPIROMETRY** | | | | | | |
| FVC (L) | 1.99 | 3.91 | 51 | 1.97 | 50 | -1 |
| FEV1 (L) | 1.59 | 3.00 | 53 | 1.50 | 50 | -5 |
| FEV1/FVC (%) | 80 | 77 | | 76 | | -4 |
| FEF 25% (L/sec) | 3.51 | 7.25 | 48 | 2.19 | 30 | -38 |
| FEF 50% (L/sec) | 1.89 | 3.93 | 48 | 1.84 | 47 | -2 |
| FEF 75% (L/sec) | 0.68 | 0.95 | 71 | 0.34 | 36 | -49 |
| FEF 25-75% (L/sec) | 1.54 | 2.84 | 54 | 1.29 | 45 | -16 |
| FEF Max (L/sec) | 3.51 | 7.80 | 45 | 2.49 | 32 | -29 |
| FIVC (L) | 1.80 | | | 1.62 | | -10 |
| FIF 50% (L/sec) | 1.51 | 4.07 | 37 | 1.42 | 35 | -6 |
| FIF Max (L/sec) | 1.72 | | | 1.50 | | -13 |
| MVV (L/min) | 48 | 112 | 43 | 33 | 30 | -31 |
| **LUNG VOLUMES** | | | | | | |
| SVC (L) | 1.98 | 4.46 | 44 | 1.96 | 44 | -1 |
| IC (L) | 1.41 | 3.29 | 43 | 1.51 | 46 | 7 |
| ERV (L) | 0.57 | 1.17 | 49 | 0.45 | 39 | -21 |
| TGV (L) | 2.57 | 3.99 | 64 | | | |
| RV (Pleth) (L) | 2.00 | 2.81 | 71 | | | |
| TLC (Pleth) (L) | 3.97 | 7.28 | 55 | | | |
| RV/TLC (Pleth) (%) | 50 | 40 | | | | |
| **DIFFUSION** | | | | | | |
| DLCOunc (ml/min/mmHg) | 9.61 | 33.68 | 29 | | | |
| DLCOcor (ml/min/mmHg) | 10.24 | 33.68 | 30 | | | |
| DL/VA (ml/min/mmHg/L) | 3.26 | 4.63 | 70 | | | |
| VA (L) | 3.14 | 7.28 | 43 | | | |
| **BLOOD GASES** | | | | | | |
| Inspired O2 (%) | 21.00 | | | | | |
| pH () | 7.39 | | | | | |
| PaCO2 (mmHg) | 42.2 | | | | | |
| PaO2 (mmHg) | 93.4 | 72.5 | 129 | | | |
| SaO2 Calc (%) | 97.0 | | | | | |
| Base Excess () | 0.5 | | | | | |
| HCO3 (mEq/L) | 25.5 | | | | | |

**DOCTOR COPY**

Name:  **BELL, BURNETT L**

MED REC #: (0001)0000-50260884                    ORD PHYS: CHANDRASEKHAR, KRISHNA

---

**IMAGING SERVICES**

---

**CT CHEST HIGH RESOLU W/CON**  Accession:   01-347-2423       12/13/01   1039
                                              Test Completed:    12/13/01   1040

**REPORT:**
DATE/TIME OF DICTATION:  12/13/01 1730

CT CHEST HIGH RESOLUTION  12/13/01

HISTORY: Asbestosis

TECHNIQUE AND FINDINGS: Multiple contiguous  7.5 mm transaxial CT images were
obtained through the thorax after IV contrast administration.Additionally,
contiguous high resolution 1.3 mm transaxial images were obtained through the
lung at 10 mm intervals. No prior similar examinations are available for
comparison.

The lungs are diffusely hyperinflated with areas of pleural/parenchymal
scarring and fibrosis more confined to the lung bases and the periphery of the
lungs. A tiny indeterminate nodule measuring approximately 2 mm in diameter
seen in the left upper lobe laterally on image 13. Another tiny 3 mm in
diameter left lower lobe nodule is seen on image #23. Tiny punctate nodule is
seen in the right lung base laterally image #23. The heart size is normal. The
thoracic aortic caliber and appearance are normal. No definite enlarged hilar
or mediastinal lymph nodes are present. A tiny subcentimeter anterior
mediastinal lymph node is present on image #12.  No  evidence of calcified
pleural plaques is present.

Limited axial images  obtained through the abdomen demonstrate a small
approximately 10 mm in diameter low attenuation lesion within the hepatic dome
on image #30 and 31. Multiple low attenuation lesions are seen within both
kidneys. The largest  is seen in the left superior renal pole measuring
approximately 2.5 cm in diameter and demonstrates fluid attenuation. Two other
similar  appearing lesions are seen in the right superior renal pole measuring
approximately 1.7 and 1.3 cm in diameter respectively. The larger lesion does
not definitely demonstrate fluid attenuation while the smaller lesion does.
Another small approximately 1.5 cm in diameter low attenuation lesion with
fluid density is seen in the left mid renal pole. Another 4 mm in diameter low
attenuation lesion is seen in the left mid renal pole is difficult to further
characterize. The visualized portions of the remaining upper abdominal organs
are normal.

Diffuse osteoporosis and thoracic spondylosis are present.

                                        **BELL, BURNETT L**
                                        (0001)0000-50260884    PT: C    LOC:RADC
                                        10/20/1916    85 YRS    MALE
                                        ADM PHYS: CHANDRASEKHAR, KRISHNA
                                        ACCT# 000033562862

CONTINUE...

Print Dt.: 12/14/01    0832       MEMORIAL HOSP. SOUTHEAST

# EXHIBIT "B"

**Business Communications Company, Inc.**
25 Van Zant Street, Suite 13, Norwalk, Connecticut 06855-1781.
Telephone: 203.853-4266. Fax: 203.853-0348

# B-140 Medical Imaging: An Evolving Technology

Eddie M. Zanrosso

Published February 2000

$3,450.00 for full report
(add 15% for PDF version)

## INTRODUCTION

### THE EVOLUTION OF DIAGNOSTIC IMAGING

The field has evolved in two complementary ways. New imaging technologies or modalities have been introduced. In addition, the field is being transformed from analog imaging to digital imaging. Some of the new modalities such as CT and MRI are inherently digital in nature because of their need for signal processing and electronic data acquisition. Older modalities such as X-ray and ultrasound are entering the digital age. New uses for diagnostic imaging such as interventional radiology and electrophysiology have developed.

The impact of this is far reaching. Once an image is in digital form it can be sent over telephone lines or microwave links to a specialist at a remote location. The radiologist can then view and overlay images from different modalities on his workstation, which can be located in the hospital or at home. He may even access the images over the Internet.

The rooms full of X-ray film will eventually be changed to jukebox systems storing laser disks. Imagine how much silver is tied up in stored X-ray film. The images stored on optical media in a computer-controlled jukebox cannot be misplaced like X-ray films.

### REASONS FOR DOING THE STUDY

Diagnostic imaging is an evolving part of modern medicine. It is entering a new era of digital imaging. The field has evolved from the early X-rays by Roentgen over 100 years ago to imaging of organs by computerized tomography (CT) and magnetic resonance imaging (MRI), which are 20 years old. Medical imaging is used for diagnosis of the leading causes of death, heart attacks, strokes, and cancer. What was once called the radiology department is now called the diagnostic imaging department because of the wealth of new technologies available beyond X-rays. A trauma victim's internal injuries are imaged with a CT scanner. Breast cancer, a leading cause of death in women, is detected with mammography and ultrasound.

Diagnostic imaging is an important part of medical diagnosis. Its application ranges from the use of a dentist's X-ray to find tooth decay to angiograms done to aid a cardiologist in

Case MDL No. 875 Document 4633 Filed 10/12/05 L Page 20 of 44

performing an angioplasty. The aging baby boomer population will need the new imaging capabilities for cancer and heart disease detection. This report will discuss the current and emerging opportunities in diagnostic imaging. It will also describe the various imaging modalities and how they differ. The report will examine the opportunities for startup companies in the fields of diagnostic imaging. The differences and similarities between different modalities and their uses will also be discussed.

Sales of diagnostic imaging companies have been frequent in the 1990s. These sales and the partnerships between companies will be discussed.

The industry has been changing due to cost containment, primarily within managed care and Medicare. This has led to a wider range of systems with the inclusion of entry-level machines. Entry-level machines are also important for sales to emerging nations. To shorten hospital stays, emphasis has been placed on interventional radiology for less invasive surgery.

## GOAL OF THE REPORT

The goal of this report is to describe the changes in the diagnostic imaging suite and the business and technology opportunities that exist and will develop in the near future. The industry has several large multinational companies. However, there are many viable mid-sized companies specializing in one or two types of imaging, often for specialized imaging. Startup companies are numerous, especially in the fields of teleradiology and digital X-ray imaging where there is enormous room for innovation.

The revolution in medical imaging is being fueled not only by new medical imaging technology but also by advances in computer hardware and software. New systems such as spiral CT or multislice CT would not be possible without today's faster processors. Large mass-storage systems such as the optical disk enable the storage of the massive amount of data from diagnostic imaging systems. Better software algorithms for image analysis and compression make the process more accurate and efficient. The growth of diagnostic imaging is an important source of revenue for computer manufacturers such as Compaq and Mercury and for software companies such as ISG Technologies, a Canadian company specializing in software for diagnostic imaging. There are many opportunities for new software companies in diagnostic imaging.

## STUDY OBJECTIVES

The study objectives are to describe the current technology and the products of diagnostic imaging and to show how modern technology is changing the products.

Emerging opportunities and the reasons that they are attractive are examined. The dynamics of the diagnostic imaging business is explored. New applications for imaging systems will also be discussed.

## INFORMATION SOURCES

The information sources for this report include company web sites and press releases. Financial information is from Securities and Exchange Commission (SEC) filings, primarily

10-K and 10-Q forms. Statistical data on sales is from the Bureau of Census.

**Related BCC Reports**

- BCC reports covering the material presented in this report include:
- B-122 Telemedicine: Opportunities for Medical and Electronic Product Providers
- B-129 The Catheter Business: How Much? Who? Where?
- C-047N Cancer Treatment and Diagnostic Products
- C-140R Trends in the Noninvasive, Minimally Invasive Medical Device Market
- C-177 New Therapeutics & Diagnostics for Women's Disorders
- GB-157 The Dental Market: Techniques, Equipment and Materials

## ANALYST CREDENTIALS

The author is a physicist with over 15 years of experience in medical imaging. His research and development background includes X-ray systems and detector design.

---

## TABLE OF CONTENTS

| Title | P.Nos. |
|---|---|
| **INTRODUCTION** | **XIV** |
| REASONS FOR DOING THE STUDY | XIV |
| THE EVOLUTION OF DIAGNOSTIC IMAGING | XIV |
| GOAL OF THE REPORT | XIV |
| REASONS FOR THE STUDY | XV |
| STUDY OBJECTIVES | XV |
| INFORMATION SOURCES | XVI |
| RELATED BCC PUBLICATIONS | XVI |
| ANALYST CREDENTIALS | XVI |
| **SUMMARY** | **XVII** |
| **OVERVIEW OF DIAGNOSTIC IMAGING** | **1** |
| THE ELECTROMAGNETIC SPECTRA IN DIAGNOSTIC IMAGING | 1 |
| IONIZING AND NONIONIZING RADIATION | 1 |
| Image Quality Versus Radiation Dose | 2 |
| X-RAY IMAGING | 2 |
| COMPUTER ADVANCES AND DIAGNOSTIC IMAGING | 2 |
| PICTURE ARCHIVAL AND COMMUNICATIONS SYSTEMS (PACS) | 2 |
| ACR-NEMA STANDARDS | 3 |

EXHIBIT "C"

# EZEOKE  &  EZEOKE  P.C

*Attorneys & Counselors at Law*
*7100 Regency Square, Suite 190,  Houston, Texas 77036*
TEL: (713) 952-5291          E-mail: attorneyezeoke@aol.com          FAX: (713) 952-5294

January 27, 2005

VIA FACSIMILE: 713-621-6746

Roger Nebel
Forman Perry Watkins Krutz & Tardy, LLP
1717 St. James Place, Suite 600
Houston, Texas 77063

**RE:** Case Number: G-98-630; *Burnett Bell et al v. Union Pacific Railroad Company*, In the
United States District Court for the Southern District of Texas, Galveston Division.

Dear Mr. Nebel:

It has been one week since we spoke concerning the intended examination by your doctor on
my client, Mr. Burnett Bell. To date, I have not heard from you or from your doctor.

During the telephone conversation with Mr. Lassman, we all agreed that I would procure the
services of a doctor who would give an "unequivocal" report on Mr. Bell's sickness.

Dr. Hamer wrote a report that was "unequivocal" as to the extent and severity of Mr. Bell's
illness from the asbestosis.

You have since demanded that the Railroad's doctor examine Mr. Bell. That was not part of
the agreement with Mr. Lassman. We have not objected to the Railroad's doctor's examination.

When I spoke with you on January 19, 2005, you asked me to call the Railroad's doctor and
set up an appointment for him to see Mr. Bell. You also stated that the examination must be done at
the doctor's clinic. When you were told that Mr. Bell has become immobile and uses oxygen tank to
breathe, you said that the medical examination must be done at the clinic. When I asked you who
would pay for Mr. Bell's transportation from his house to the clinic, you said that we should pay for
it and that you would ask the Railroad for reimbursement.

In essence, your position is that we should make all arrangements for your doctor to conduct
the examination on Mr. Bell. We should also pay the bill for his transportation and all collateral
expenses.

I now know for a fact that you are not taking Mr. Bell's case seriously. I will do everything
within my power to make sure that this case is remanded from Pennsylvania so that the jury would
get a crack at it. You have basically stalled the progress of this case and Mr. Lassman seems to buy
into this delay tactic.

Every citizen is entitled to his/her case in court and should not be precluded from doing so.

1

Mr. Bell's case has been on my desk since the year 2002. I would think that any normal case should have been presented to the jury by now.

I have been very patient in dealing with this matter. I know you will agree with me that I have been patient. But my patience could not be at the detriment of my client. You are busy, but I can guarantee you that you are not as busy as I am. I still make time for my cases, litigate, negotiate and dispose of all my cases. To date, I do not have any case from 2002 that is still pending. I usually aggressively prosecute my cases.

I had convinced my client to be patient to see if this case would settle before trial. I have convinced my client that you are dealing in good faith. I am now convinced that you are not dealing with this matter in good faith.

You have continued to insist to Bruce Lassman that there is no need to remand this case to Texas because we may still agree on the amount of settlement. I do not have such confidence. I am convinced that you do not intend to litigate this case. Actually, you are hoping that the case would die in Philadelphia and never to be remanded.

Unless Mr. Lassman can convince me on why this matter is not ripe for a remand, I would advise my client to go to his congressman for further help. The Railroad maintains that their last offer is $60,000. My client's last demand is $300,000. The parties are too far apart. Further negotiations are not necessary, nor would they be fruitful. Therefore, it is fair to say we have reached an impasse.

We will not agree to the medical examination of Mr. Bell by the Railroad's doctor unless:

1. The examination would be conducted at Mr. Bell's house or,
2. The Railroad pays for the transportation of Mr. Bell and his medical equipment to the clinic or facility where the test would be conducted.
3. That if such test is conducted, the Railroad would give us the result within fourteen days (14 days) from the date of the examination.
4. After the medical examination, the railroad would agree to a remand based on an impasse in negotiation.

If the Railroad agrees to all the conditions stated above, we are still amenable to the medical examination. If the Railroad disagrees with any of the four issues, we would take further action to assure that the case is remanded to Texas regardless of the Railroad's objections. You have one week to respond to this letter.

If you need more information, please do not hesitate to call me at (713) 952-5291

Sincerely,

Alphonsus O. Ezeoke
Attorney at Law

2

# EZEOKE & EZEOKE ⚖ P.C

*Attorneys & Counselors at Law*
*7100 Regency Square, Suite 190, Houston, Texas 77036*

TEL: (713) 952-5291      E-mail: attorneyezeoke@aol.com      FAX: (713) 952-5294

November 8, 2004

Bruce Lassman
Court Clerk
6613 US District Court House
District of Pennsylvania
601 Market Street
Philadelphia, PA 19106

RE: ***Burnett Bell v. Union Pacific Railroad Company***: Civil Action No: G-98-630; In
the United States District Court for the Southern District of Texas, Galveston Division.

Dear Mr. Lassman:

Enclosed please find the medical evaluation of Mr. Burnett Bell's sickness as we
discussed during the teleconference on September 29, 2004, with Mr. Roger Nebel,
the attorney for Pacific Railroad.

The contentious issue on Dr. Frank and Dr Chandrasekhar MD., concerned their
report which the defendant's attorney claimed were ambiguous.

I hope that the report from Dr. Louis Hamer, MD, is more unequivocal for
everyone.

Dr. Hamer is currently the treating physician for Mr. Bell. He is available for
questioning, and has agreed to testify at trial.

There is really nothing new as to his report. All doctors that treated Mr. Bell
arrived at the same conclusion.

Our demand is still at $300,000.

1

If you need more information, please do not hesitate to call me at (713) 952-5291

Sincerely,

Alphonsus O. Ezeoke
Attorney at Law

Cc: Roger Nebel
    FAX: 713-621-6746

EXHIBIT "D"

*Louis Hamer, M.D.*
**Board Certified Pulmonary & Critical Care Medicine**
*Tel: (713) 944-3500*

## CONSULTATION

| | |
|---|---|
| **PATIENT NAME:** | Bell, Burnett L. |
| **DATE OF CONSULTATION:** | 10/26/04 |
| **REFERRING PHYSICIAN:** | |

**REASON FOR THE CONSULTATION**
Chronic dyspnea and difficulty breathing.

**HISTORY OF PRESENT ILLNESS**

The patient is an 88-year-old man. He came to my office complaining of chronic dyspnea. He can walk a small distance without a wheelchair, but quickly becomes short of breath. He also notes some coughing. He denies any phlegm production. He does not complain of chest pain. He denies any fever.

In 1998, Dr. Frank from the University of Texas Health Center at Tyler evaluated Mr. Burnett L. Bell for pulmonary disease. He diagnosed asbestos-related lung disease based on the abnormal x-ray findings and the long history of asbestos exposure.

Since being evaluated by Dr. Frank, Mr. Bell transferred his care to Dr. Chandreskan in Pasadena, Texas. Dr. Chandreskan ordered a CAT scan of the chest. The CAT scan of the chest revealed pleural scarring consistent with prior asbestos exposure. The CAT scan also showed scarring and fibrosis at the lung bases and periphery. These findings were consistent with asbestos-related lung disease. Dr. Chandreskan also ordered a pulmonary function test, which showed severe restrictive lung disease and a decreased diffusion capacity; there was no response to bronchodilators.

The patient currently takes bronchodilators through a nebulizer with very little relief. He is not using any other inhaled medicines or oxygen at this time.

**PAST MEDICAL HISTORY**

1. History of asbestos-related lung disease as noted above. The patient denies any other prior lung disease. He did not have a prior diagnosis of chronic bronchitis, emphysema, or pulmonary emboli. He also denies any history of tuberculosis or pertussis.
2. The initial evaluation by Dr. Frank mentions two pneumonias as a child. The patient and his son, however, claim that this is an inaccurate entry into the medical record. He apparently never had any pneumonia as a child.
3. History of two prior cerebrovascular accidents.
4. History of high cholesterol.
5. History of hypertension.
6. History of an enlarged heart. The patient never suffered a known heart attack.

**4004 Woodlawn Ave.**
**Pasadena, TX 77054**

**Burnett L. Bell**
Page 2 of 3

## SOCIAL HISTORY

The patient worked as a mechanic on the Railroad for 47 years.  During this time, he worked with brake shoes on a daily basis.  He also recalls riveting hot rails.  He remembers being burned once while riveting.

The patient was born in Louisiana, but moved to Houston in his early childhood.  He has spent his entire life in the Houston area.  He never smoked.  He also never drank, as a result of adverse conditioning as a child. He remembers being a small child and finding some gin in a cooler.  He thought it was ice water and inadvertently took a drink.  After this negative experience, alcohol always disgusted him.

## FAMILY HISTORY

Family history is not contributory.

## REVIEW OF SYSTEMS

The patient does become confused at times.  He has difficulty remembering dates. For example, he claims his friend Mr. Brooks died two to three weeks ago when in fact he died several years ago.  He also has difficulty hearing and comprehending speech.  His walking is also limited secondary to difficulty breathing.  The patient denies any chest pain.  He is not having vomiting, diarrhea, abdominal pain, or leg swelling.

## PHYSICAL EXAMINATION

VITAL SIGNS:  The blood pressure is 90/50 and pulses 80.  The respiratory rate is 18 and the O2 saturation is 96% on room air.
HEENT:  Examination shows no facial swelling or erythema.  The nasal mucosa is normal.
LYMPHATIC:  Examination shows no submandibular, cervical, or supraclavicular adenopathy.
NECK:  Examination of the neck does show some scarring on the right side of the neck.
HEART:  Examination reveals a regular rate and rhythm with a normal S1 and S2.  There is a faint systolic murmur.
LUNGS:  Auscultation of the lungs decreased breath sounds at the bases.  There is no wheezing audible.
ABDOMEN:  Examination of the abdomen shows no tenderness.  There is no hepatosplenomegaly.  There are normal bowel sounds.
EXTREMITIES:  Examination of the extremities shows no leg edema or calf tenderness.
NEUROLOGICAL:  Examination shows the patient to be confused at times.  He does stand independently.  His gait is very slow.  His steps are very small and he seems apprehensive while walking.  He has movement of all four extremities.  His grip is strong bilaterally.

## RADIOGRAPHIC DATA

I personally reviewed a CT scan from 2001.  There was fibrosis and interstitial changes at the bases consistent with pulmonary fibrosis. Some scarring of the pleura was also present, and, there may be some central bronchiectasis.

## PULMONARY FUNCTION TESTING

A pulmonary function test done in 2001 at Herman Memorial South East shows severe restrictive lung disease along with a decreased diffusion capacity.  There is no significant response to bronchodilators.

Bell_Burnett_L_Consultation_20_

**Burnett L. Bell**
Page 3 of 3

## IMPRESSION

<u>Asbestosis:</u>  The patient's history and radiographic findings are classic for asbestosis.  The patient worked on a daily basis around asbestos as a mechanic for the railroad.  This places him at a very high risk for asbestos-related lung disease.  The pleural scarring on the chest CT and the fibrosis at the lung bases further support the diagnosis of asbestosis, as does the restrictive pattern on pulmonary function testing.

## PLAN

1. The patient will begin Spiriva once daily through an inhaler.  He will try the samples first to see if the medication helps.  If he does not benefit from the Spiriva, he will not purchase additional medication.
2. The patient will continue to use his nebulizer on an as needed basis.
3. I will obtain an overnight pulse oximetry.   Patients with lung disease often desaturate at night and nocturnal oxygen can help prevent secondary pulmonary hypertension.
4. We will consider repeating the CT scan at the next visit to look for any progression of the disease.

**Louis Hamer, M.D.**
LH/SAG

EXHIBIT "E"

## ROBERT M. ROSS, M.D. FCCP

6550 Fannin, Suite 2403
Texas Medical Center
Houston, TX 77030

*Board Certified Pulmonary Diseases*
*Board Certified Internal Medicine*
*Occupational and Environmental Lung Diseases*
*NIOSH Certified B-Reader*

Tel: (713) 383-6100
Fax: (713) 383-6103

March 22, 2005

Mr. Roger H. Nebel
Forman, Perry, Watkins, Krutz & Tardy, PLLC
1717 St. James Place, Ste. 600
Houston, Texas 77056

Ramirez Group

Re: Mr. Burnett Bell
DOB: 10/20/16    SS#: 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
D/E: March 9, 2005

Dear Mr. Nebel,

I reviewed this 88-year-old man for independent medical evaluation regarding asbestos exposure. He is quite weak and was seen in a wheelchair. As well, his nurse, son and attorney were present.

Mr. Bell is from Galena Park, Texas. From approximately 1950 to the late 1970s, he worked as a mechanic for Southern Pacific Railroad. He worked primarily on boxcars and other cars, but not on engines. He retired in the late 1970s, as he had worked for almost forty years and was able to. Prior to the 1950s, he does not believe he had any significant industrial exposure and worked mostly in law enforcement.

He is a lifetime non-smoker.

Mr. Bell's memory is not very good. His son states that he is quite weak and can stand, but only for a very short period of time before tiring. As well, he can only walk a few steps before tiring. He denies any pain.

He takes Altace, Plavix, Lipitor, aspirin, vitamin B6 and folate. As well, he uses oxygen.

Functional inquiry is otherwise unremarkable.

PHYSICAL EXAMINATION: He is a very pleasant man in a wheelchair. He can move very little. He is in no acute distress. He is wearing oxygen. Height 6', Weight 189lbs., B/P 140/66, heart rate 79, respiratory rate 14. Head and neck are unremarkable except for paucity of movement. The chest reveals reduced

Page 2

Independent Medical Evaluation

Mr. Burnett Bell
Ramirez Group
March 22, 2005

air entry, however, the lungs are clear with no rales or other adventitial sounds. Heart sounds S1, S2, no gallops or murmurs. The abdomen is unremarkable. The extremities reveal no clubbing.

PULMONARY FUNCTION: Unfortunately, Mr. Bell was unable to adequately perform spirometry or any other tests. Digital oxygen saturation on supplemental oxygen was 100%.

RADIOGRAPHIC INTERPRETATION: Mr. Bell was unable to stand, therefore, a portable x-ray was obtained. The x-rays shows extensive scapular overlay and a large gastric air bubble. However, there are no clear-cut plaques. There is no diffuse pleural thickening. The lung parenchymal markings are within normal limits.

Previous medical records are available for review consisting of: 1) Medical records from Memorial Hermann Hospital Southeast, Memorial Hermann Hospital (Volumes 1-4); 2) Medical reports of Dr. Louis Hamer, Dr. Arthur Frank, Dr. Krishna Chandrasekhar and a B-Reading of Dr. Schonfeld; 3) Oral Deposition of Mr. Burnette Bell.

The records indicate evaluation for diabetes, cerebrovascular disease and fevers. In 1994, he was admitted to the hospital because of a minor ischemic stroke. At that time, a chest x-ray revealed mild cardiomegaly and elevation of the right hemidiaphragm. It was otherwise unremarkable.

In 1995, he was admitted to the hospital with a change in his mental status and fever. A chest x-ray performed 11/30/95, again, revealed elevation of the right hemidiaphragm with adjacent sub-segmental atelectasis and blunting of the right costophrenic sulcus, consistent with a small effusion or scarring of the pleura. In 1998, he presented to the emergency room due to decreased conditioning, a purulent left-ear discharge and fever. A chest x-ray performed 11/2/98 was compared to chest x-rays performed on 10/30/98. The radiologist noted a cardiac silhouette at the upper limit of normal. The costophrenic angles were sharp, bilaterally. The bi-basilar sub-segmental atelectasis noted on an earlier chest x-ray had improved.

Mr. Bell was seen by Dr. Arthur Frank on 9/8/98. At that time, he was 81-years old. Dr. Frank felt there was evidence of "pleural asbestosis" (according to his B-reading, bilateral diffuse pleural thickening). In his report, he indicates that he had examined an x-ray dated 5/14/98 which revealed bilateral changes including a blunted right costophrenic angle, pleural thickening on the left and normal

Page 3
Independent Medical Evaluation

Mr. Burnett Bell
Ramirez Group
March 22, 2005

215
580 -2151

parenchymal markings which were graded as 0/1. It was Dr. Frank's opinion that he had "pleural asbestosis."

A B-reading report of a chest x-ray dated 5/14/98 is also available for review. The initials are "AJS," presumably Dr. Schonfeld. It was read as bilateral diffuse pleural thickening and no parenchymal abnormalities consistent with pneumoconiosis.

The records from Memorial Hermann Southeast indicate that on 12/13/01, Mr. Bell underwent a high resolution CT scan of the chest. The indication was "asbestosis." The radiologist noted that the lungs were diffusely hyperinflated with areas of pleural/parenchymal scarring and fibrosis more confined to the lung bases and the periphery of the lungs. His impression was diffuse pulmonary emphysema with areas of pleural/parenchymal scarring and fibrosis confined mainly to the lung bases and lung periphery. He also noted some scattered, tiny, indeterminate nodules in the both lungs. The blood gases are also available, dated 12/14/01. These were performed on room air. The PO2 was 94, PCO2 was 42 and the PH was 7.39. These findings are normal, with no evidence of hypoxemia.

Mr. Bell was seen by Dr. Lewis Hamer on 10/26/04. It is not clear from his note under what circumstances he came to see Dr. Hamer. However, he notes that he was under the care of Dr. Chandrasekhar in Pasadena, Texas, who ordered a CT scan of the chest (presumably the one from 2001). Dr. Hamer states that he personally reviewed the CT scan from 2001 and felt there were changes consistent with pulmonary fibrosis. He also states that some scarring of the pleura was also present and there may have been some central bronchiectasis.

Mr. Bell has been weak with neurological problems, which has made it difficult to obtain accurate spirometry or pulmonary function.

Multiple physicians throughout the years have listened to the lungs. They did not hear rales.

SUMMARY: This is an elderly man who suffers from long-term diabetes and cerebrovascular disease. Presently, he can do very little. Physical examination revealed the chest to be clear. Pulmonary function was unable to be obtained. Oxygen saturation on supplemental oxygen was excellent. The chest x-ray had to be done portable. It revealed significant air in the stomach with elevated diaphragms. There were no clear-cut pleural or parenchymal abnormalities consistent with pneumoconiosis. X-ray reports from treating radiologists throughout the years have shown mildly elevated diaphragms and minimal

Page 4

Independent Medical Evaluation

Mr. Burnett Bell
Ramirez Group
March 22, 2005

parenchymal changes that come and go. Dr. Schonfeld reviewed a chest x-ray
dated 5/14/98 and felt it showed no parenchymal abnormalities consistent with
pneumoconiosis. Dr. Frank reviewed, presumably, the same x-ray and also felt
the lung parenchymal markings were within normal limits. A high resolution CT
scan of the chest from 2001 indicated some findings compatible with
pleural/parenchymal fibrosis in the basis and peripheral lung fields, as well as
emphysematous changes. The blood gases in 2001 were entirely normal.

I would like to personally review the CT scan of the chest prior to rendering a
further opinion. I would also like to review Dr. Chandrasekhar's records.

If I can be of further assistance, please let me know.

Sincerely,

Robert M. Ross, M.D.

**Respiratory Consultants of Houston**
**6550 Fannin Suite 2403**
**Houston, Texas 77030**
**713-790-6250**
## Pulmonary Function Report

| | | | |
|---|---|---|---|
| Last Name: | Bell | First Name: | Burnett |
| Identification: | 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 | Date of Birth: | 10/20/1916 |
| Race: | Black | Sex: | male |
| Height: | 72 inch | Weight: | 189 lbs |
| Age: | 88 Years | Operator: | DW |
| Physician: | Dr. Ross | Pred. Module: | RCH2 |

| Date | 03/09/05 |
|---|---|
| Time | 11:15:44AM |

## Spirometry

| | | Pred | Pre | %Pred |
|---|---|---|---|---|
| FVC | [l] | 3.43 | 1.62 | 47 |
| FEV 1 | [l] | 2.62 | 1.54 | 59 |
| FEV 1 / FVC | [%] | | 95 | |
| FEF 50 | [l/s] | 3.75 | 2.76 | 74 |
| FEF 25-75 | [l/s] | 2.88 | 2.31 | 80 |
| PEF | [l/s] | 8.12 | 2.81 | 35 |
| FIV1 | [l] | | 1.33 | |
| PIF | [l/s] | | 2.22 | |
| FET | [s] | | 2.80 | |

Comments
Patient unable to perform test correctly. Attempted several times. Unacceptable and
unreproducible results. Best test reported out. DLCO and Lung volumes not done. Height
measured by armspan.--CAK/DW

BP=140/66   O2 SAT=100% (on 3L/min. via cn)   HR=79   RESP=14

| Last Name: | Bell | First Name: | Burnett |
|---|---|---|---|
| Identification: | 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 | Date of Birth: | 10/20/1916 |





C4/01/2005 14:53 FAX 713 621 6746    FORMAN PERRY DALLAS S R    ☒009/009

# ROBERT M. ROSS, M.D. FCCP

6550 Fannin, Suite 2403
Texas Medical Center
Houston, TX 77030

*Board Certified Pulmonary Diseases*
*Board Certified Internal Medicine*
*Occupational and Environmental Lung Diseases*
*NIOSH Certified B-Reader*

Tel: (713) 383-6100
Fax: (713) 383-6103

NAME: *Burnett Bell*   DOB: 10/20/16   SSN: 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

X-RAY DATE: 3/9/05   NEGATIVE? YES ☐  NO ☒

*Port Scandee*

## 4D. OTHER COMMENTS

*Large fundal bubble*

*RMR*   3/10/05

# EXHIBIT "F"

# EZEOKE & EZEOKE, P.C.

*Attorneys & Counselors at Law*

*7100 Regency Square, Suite 190,  Houston, Texas 77036*

TEL: (713) 952-5291          E-mail: attorneyezeoke@aol.com          FAX: (713) 952-5294

February 09, 2004

VIA FACSIMILE: (713) 621-6746

Roger H. Nebel
Forman Perry Watkins Krutz & Tardy L.L.P
1717 St James Place, Suite 600
Houston, Texas 77056

Dear Mr. Nebel:

I am in receipt of your letter dated January 02, 2004.

In that letter you stated your already noted positions on the issue of the deserved settlement of Mr. Bell's case.

During the settlement conference in Philadelphia, your representative, Kendra Smith and myself were instructed to come up with the most appropriate and sensible way to settle this case.

We were both apprised of the prevailing settlement offers out there for my client's type of illness. Pacific Railroad changed its settlement offer from the ridiculous $15,000 to $50,000. The considerable movement prompted my client to abandon his steadfast position of $1,000,000 to a modest $300,000.

The court required us to go back to our bases and continue negotiations until the third week of January, at which time, if there is no further movement, an impasse would be declared and the case would be ripe for a remand.

I went out of the country and was stuck overseas because our airline filed for bankruptcy while I was in Nigeria. I had to find another airline with available seats to make it back to US.

I returned on January 25, 2004. Since that time I have been discussing your letter with my client and his son.

The tone of your letter takes us back to the pre- settlement conference positions espoused by Pacific Railroad. My client was upset after reading your letter. I had to calm him down and inform him of the essence and advantage of continuing the negotiations.

1

There is no *misapprehension* of Mr. Bell's diagnosis. You fail to realize there are weaknesses to your defense but you seem more preoccupied with what you perceive as my potential weaknesses.

You are stuck on Dr. Frank's diagnosis and the B-Reading, and have completely been oblivious to the subsequent diagnosis of 2001.

Your tone continues to reverberate a sense that Mr. Bell does not deserve more money from the Railroad. You fail to consider that what a case is worth and what a plaintiff deserves are two different things. The settlement and jury verdict were not set by Mr. Bell or me. They were set by others.

If we continue to play these minor games, this case may end up in front of the jury. You seem to continue to underestimate my clients' resolve in this matter. Roger, I guaranty you that this case will end up in front of the jury. Mr. Bell feels that the $300,000 was an extraordinary concession. You will not get anything less than that if you really want to settle this matter. My client can afford to lose, can you?

We need to meet one more time before declaring an impasse. I would like to arrange a meeting with you in my office. I have been to your office for meetings. We need to change the venue and allow Mr. Jerome Bell to be present.

Please pick a convenient date so that I will inform my client. Our next meeting should be the last one before we commence the actual litigation.

I would like you to pick a date sometime this week. We have exceeded the time for us to report to the court in Philadelphia.


Sincerely,

Alphonsus O. Ezeoke
Attorney at law

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT 1 2 2005

FILED
CLERK'S OFFICE

Request of pltf. Burnett L. Bell in Ramirez, et al.,
PAE (TXS 3:98-630) for Extension of Time to File
Motion/Brief to Vacte CRO AND SEPARATION OF CLAIMS
WITH RESPECT TO THE REMAINING CLAIMS OF
PLTF. BURNETT L. BELL – GRANTED

(cdm 10/12/05)

# BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

## MDL NO. - 875

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISCRICT OF PENNSYLVANIA

IN RE: ASBESTOS PRODUCTS
        LIABILITY LITIGATION (NO. VI)

| | | |
|---|---|---|
| FELIX T. RAMIREZ, ISIDRO DELGADO | ☐ | |
| CHARLES R. ROANE, LOUIS R. SUAREZ | ☐ | |
| STERLING A. BROOKS, BILL G TAYLOR | ☐ | |
| JOHN SMILEY and BURNETT L. BELL | ☐ | |
| | ☐ | **CIVIL ACTION NO-** |
| V | ☐ | **G-98-630** |
| | ☐ | |
| UNION PACIFIC RAILROAD COMPANY | ☐ | |

## REQUEST FOR EXTENSION TO FILE RESPONSE
## TO MOTION TO VACATE REMAND

COMES NOW Plaintiff, Burnett L. Bell and files this request for extension to file response to

Motion to Vacate Conditional Remand and states as follows:

2005 OCT 12  A 11: 21
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION
RECEIVED
CLERK'S OFFICE

At the time the response was due on September 06, 2005, Plaintiff's attorney was on vacation to Africa. The Vacation started on August 23, 2005 and returned on September 22, 2005.

Defendant and its attorney were aware that Plaintiff's attorney was on vacation at that time. The vacation schedule was also announced in open court at a hearing in Galveston District Court on August 05, 2005.

Upon return from vacation, there was the issue of hurricane Rita. Plaintiff's attorney was able to return to the office on September 28, 2005. At that time, Plaintiff's attorney saw the brief and the motion to vacate the remand, and quickly filed the brief as soon as possible.

**Plaintiff's brief in response to Defendant's motion to vacate conditional remand is filed with this request**.

Plaintiff, Burnett L. Bell, urges the Panel to extend the time for him to file the brief in response to the Defendant's Motion to Vacate Conditional Remand so that justice may be served.

Respectfully submitted,

EZEOKE & EZEOKE, P.C.

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT 1 2 2005

FILED
CLERK'S OFFICE

## CERTIFICATE OF SERVICE

     I certify that on October 07, 2005, a true and correct copy of Plaintiff's Response to Defendant's Motion to Vacate Conditional Remand was served on the following:

1. By facsimile transmission on Defense counsel, Roger H. Nebel at 713-621-6746.

2. United States District Court, Southern District of Texas, Galveston Division

3. United District Court For the Eastern District of Pennsylvania

Alphonsus O. Ezeoke

2005 OCT 12 P 1:46

RECEIVED
CLERK'S OFFICE