MDL 8751

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

FEB 21 2006

FILED
CLERK'S OFFICE

# UNITED STATES OF AMERICA
## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

IN RE: ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)       **MDL DOCKET NO. 875**

*Cecil Reuben Jackson, et al v. Kimberly-Clark Corp.*, TXE 1 05-769
*Thomas Vodry Allen, et al v. Kimberly-Clark Corp., et al*, TXE 1 05-876
*Newbern Brown Adkins, et al v. Kimberly-Clark Corp., et al*, TXE 1 05-882

## MOTION TO VACATE THE
## PANEL'S CONDITIONAL TRANSFER ORDER (CTO- 257)

TO THE HONORABLE JUDGE OF SAID COURT:

PLEASE TAKE NOTICE that, *Cecil Reuben Jackson, et al., Thomas Vodry Allen, et al., and Newbern Brown Adkins, et al.* (collectively referred to herein as "Plaintiffs"), by their undersigned counsel, hereby move, pursuant to Rule 7.4(d) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, to vacate the Conditional Transfer Order (CTO-257) of the Judicial Panel on Multidistrict Litigation, dated January 24, 2006, that conditionally transferred the above-captioned actions to the Eastern District of Pennsylvania for consolidation with *In re Asbestos Products Liability Litigation* (No. VI), MDL No. 875.

Accompanying this Motion is Plaintiffs' Brief in Support of Plaintiffs' Motion to Vacate the Panel's Conditional Transfer Order (CTO-257) and the Affidavit of Chris Portner.

THEREFORE, Plaintiffs' respectfully request that the Judicial Panel on Multidistrict Litigation vacate the Conditional Transfer Order (CTO-257).

**OFFICIAL FILE COPY**

IMAGED FEB 2 1 2006

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

FEB 2 1 2006

FILED
CLERK'S OFFICE

Respectfully submitted,

**REAUD, MORGAN & QUINN, L.L.P.**
801 Laurel Street
P. O. Box 26005
Beaumont, TX  77720-6005
(409) 838-1000
(409) 833-8236 (FAX)

By /s/ Chris Portner
    Glen W. Morgan
    Texas Bar No. 14438900

    Chris Portner
    Texas Bar No. 24007858

    Lawyers for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of February, 2006, I have served a true copy of the above and foregoing on the persons identified on the Panel Service List attached hereto.

/s/ Chris Portner
Chris Portner



Page 1 of 2

**PANEL SERVICE LIST (Excerpted from CTO-257)**
**DOCKET NO. 875**
**IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)**

*Cecil Reuben Jackson, et al. v. Kimberly-Clark Corp.,* E.D. Texas, C.A. No. 1:05-769
*Thomas Vodry Allen, et al. v. Kimberly-Clark Corp., et al.,* E.D. Texas, C.A. No. 1:05-876
*Newbern Brown Adkins, et al. v. Kimberly-Clark Corp., et al.,* E.D. Texas, C.A. No. 1:05-882

Kent M. Adams
Adams & Coffey
550 Fannin, Suite 800
P.O. Box 7505
Beaumont, TX 77726-7505

Robert L. Adams
Kacal, Adams & Law
One Riverway, Suite 1200
Houston, TX 77056

Jerry L. Beane
Andrews & Kurth
BankOne Center
1717 Main Street, Suite 3700
Dallas, TX 75201

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114

John G. Bissell
Strong, Pipkin, Bissell & Ledyard
1111 Bagby Street, Suite 2300
Houston, TX 77002

Paula H. Blazek
Germer Gertz
550 Fannin Street, Suite 700
Beaumont, TX 77701

Eugene W. Brees, II
Whitehurst, Harkness, Ozmun & Brees
P.O. Box 1802
Austin, TX 78767

George Read Carlton
Godwin Pappas Langley Ronquillo
1201 Elm Street
Suite 1700
Dallas, TX 75270

Edward J. Cass
Gallagher, Sharp, Fulton & Norman
Bulkley Building, 7th Floor
1501 Euclid Avenue
Cleveland, OH 44115

Adam M. Chud
Goodwin Procter, LLP
901 New York Avenue, N.W.
Washington, DC 20001

Sandra F. Clark
Mehaffy & Weber, P.C.
P.O. Box 16
Beaumont, TX 77704

David A. Damico
Burns, White & Hickton, LLC
Four Northshore Center
106 Isabella St.
Pittsburgh, PA 15212

James D. Dowell
Rienstra, Dowell & Flatten
595 Orleans Street, Suite 1007
Beaumont, TX 77701

Gary D. Elliston
DeHay & Elliston, L.L.P.
3500 Bank of America Plaza
901 Main Street
Dallas, TX 75202-3736

Michael M. Essmyer
Essmyer & Tritico
4300 Scotland
Houston, TX 77007

Raymond P. Forceno
Forceno & Hannon
111 S. Independence Mall East
The Bourse, Suite 1000
Philadelphia, PA 19106-2574

Ellen B. Furman
Goldfein & Hosmer
1600 Market Street, 33rd Floor
Philadelphia, PA 19103

Susan M. Hansen
Brownson & Ballou
225 South Sixth Street, Suite 4800
Minneapolis, MN 55402

Frank G. Harmon, III
Crain, Caton, James
1401 McKinney, Suite 1900
Houston, TX 77010

Kathryn Oakes Hermes
DeHay & Elliston, L.L.P.
901 Main Street, Suite 3500
Dallas, TX 75202

John L. Hill, Jr.
Locke Liddell & Sapp, LLP
600 Travis Street
3400 JP Morgan Chase Tower
Houston, TX 77002

Paul J. Holmes
Paul J. Holmes, PC
550 Fannin
P.O. Box 3746
Beaumont, TX 77701

Gail C. Jenkins
Jenkins & Martin
P.O. Box 26008
2615 Calder, Suite 500
Beaumont, TX 77720-6008

D. Allan Jones
Orgain, Bell & Tucker, L.L.P.
P.O. Box 1751
Beaumont, TX 77704-1751

George J. Kacal, Jr.
Kacal, Adams & Law
One Riverway, Suite 1200
Houston, TX 77056

J. Frank Kinsel, Jr.
Cantey & Hanger, L.L.P.
2100 Burnett Plaza
801 Cherry Street
Ft. Worth, TX 76102

Reginald S. Kramer
Oldham & Dowling
195 South Main Street, Suite 300
Akron, OH 44308-1314

PANEL SERVICE LIST (Excerpted from CTO-257) - MDL-875                    Page 2 of 2

David C. Landin
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Gene Locks
Greitzer & Locks
1500 Walnut Street
Philadelphia, PA 19102

C. Robert Mace
Tekell, Book, Matthews & Limmer
4300 One Houston Center
1221 McKinney
Houston, TX 77010

D. Ferguson McNiel
Vinson & Elkins
1001 Fannin Street, Suite 2300
Houston, TX 77002

Peter A. Moir
Quilling, Selander, Cummiskey, et al.
2001 Bryan Street
Bryan Tower, Suite 1800
Dallas. TX 75201

Ronald L. Motley
Motley Rice, LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29465

John J. Mundy
Mundy & Singley
816 Congress Avenue, Suite 1230
Austin, TX 78701

James R. Old, Jr.
Germer Gertz
550 Fannin Street, Suite 1700
Beaumont, TX 77701

David Arthur Oliver, Jr
Porter & Hedges, L.L.P.
1000 Main Street, 36th Floor
Houston, TX 77002-6336

Rex Wayne Peveto
Peveto Law Firm
118 Border Street
Orange, TX 77630

Franklin A. Poff
Crisp, Boyd & Poff
2301 Moores Lane
P. O. Box 6297
Texarkana, TX 75505

James H. Powers
Powers & Frost, L.L.P.
2400 One Houston Center
1221 McKinney Street
Houston, TX 77010

John J. Repcheck
Marks, O'Neill, O'Brien & Courtney
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219

H. Tracy Richardson, III
Strong, Pipkin, Nelson & Bissell
1400 San Jacinto Building
595 Orleans
Beaumont, TX 77013

James M. Riley, Jr.
Coats Rose Yale Ryman & Lee
3 Greenway Plaza, Suite 2000
Houston, TX 77046

Lauren Miller Robbins
Munisteri Sprott Rigby Newsom
 & Robbins
3323 Richmond Avenue, Suite A
Houston, TX 77098

John D. Roven
Roven-Kaplan, LLP
2190 North Loop West, Suite 410
Houston, TX 77018

Richard D. Schuster
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216

Neil Selman
Selman, Breitman & Burgess
11766 Wilshire Boulevard,
Sixth Floor
Los Angeles, CA 90025

Robert N. Spinelli
Kelley, Jasons, McGuire & Spinelli
Centre Square West, 15th Floor
Philadelphia, PA 19102

Robert E. Swickle
Jaques Admiralty Law Firm, P.C.
1570 Penobscot Building
The Maritime Asbestosis Legal Clinic
Detroit, MI 48226

Thomas W. Taylor
Andrews & Kurth
600 Travis, Suite 4200
Houston, TX 77002-2778

Andrew J. Trevelise
Reed Smith, LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

Thomas J. Ward, Jr.
Law Office of T. John Ward
P.O. Box 1231
Longview, TX 75606-1231

James L. Ware
Sheehy, Serpe & Ware, P.C.
2500 Two Houston Centre
909 Fannin
Houston, TX 77010-1003

James K. Weston II
Tom Riley Law Firm
4040 First Avenue, N.E.
P.O. Box 998
Cedar Rapids, IA 52406

Gene M. Williams
Shook, Hardy & Bacon, LLP
Chase Tower, Suite 1600
600 Travis Street
Houston, TX 77002-2911

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

FEB 2 1 2006

FILED
CLERK'S OFFICE

# UNITED STATES OF AMERICA
## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

IN RE: ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)    MDL DOCKET NO. 875
*Cecil Reuben Jackson, et al v. Kimberly-Clark Corp.*, TXE 1 05-769
*Thomas Vodry Allen, et al v. Kimberly-Clark Corp., et al*, TXE 1 05-876
*Newbern Brown Adkins, et al v. Kimberly-Clark Corp., et al*, TXE 1 05-882

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION TO VACATE THE PANEL'S CONDITIONAL TRANSFER ORDER (CTO- 257)

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, *Cecil Reuben Jackson, et al., Thomas Vodry Allen, et al., and Newbern Brown Adkins, et al.* (collectively referred to herein as "Plaintiffs"), and file this Brief in Support of Plaintiffs' Motion to Vacate the Panel's Conditional Transfer Order (CTO-257) which conditionally transferred the above captioned actions to the United States District Court for the Eastern District of Pennsylvania for coordination or consolidation with *In re Asbestos Products Liability Litigation* (No. VI), MDL No. 875. This Motion is based upon the following:

## A. INTRODUCTION

1.    This case began over ten years ago when Plaintiff and many other plaintiffs sued Defendant Kimberly Clark Corporation ("Kimberly Clark") and many other defendants for personal injuries resulting from exposure to asbestos containing materials in the case styled *Cause No. B-150,896; Inez Martin, et al vs. ACandS, Inc., et al*; In the 60th Judicial District Court of Jefferson County, Texas

("*Martin*").    The claims against Kimberly Clark are claims for premises liability resulting from Plaintiffs' exposure to asbestos containing products at the Coosa Pines Newsprint Mill.

2.    On March 31, 2005, the claims of Harold Edward Horton, et al were severed from the *Martin* case for trial into a case styled Cause No. B-150,896-AI; *Harold Edward Horton, Deceased, et al vs. Kimberly-Clark Corporation, et al.*  On September 9, 2005, the claims of Cecil Reuben Jackson and his family were severed from the *Martin* case for trial into a case styled Cause No. B-150,896-AJ; *Nina S. Jackson, Individually and as Independent Executrix of the Estate of Cecil R. Jackson, Deceased and as Representative of the Wrongful Death Beneficiaries, et al vs. Kimberly-Clark Corporation, et al* ("*Jackson*"). On November 8, 2005 the claims of certain cancer Plaintiffs from the *Martin* case were severed from the *Martin* case into a case styled Cause No. B-150,896-AK; *Newbern Brown Adkins, et al vs. Lincoln Electric Company, et al* ("*Adkins*").  On November 29, 2005, the claims of Thomas Vodry Allen, et al were severed from the *Adkins* case into a case styled Cause No. B-150,896-AN; *Thomas Vodry Allen, et al vs. Kimberly-Clark Corporation, et al.*

3.    On November 17, 2005, the *Jackson* case was improperly removed to federal court by Kimberly Clark on the basis of diversity jurisdiction. On December 29, 2005, the *Allen* case was improperly removed to federal court by Kimberly Clark on the basis of Federal Enclave jurisdiction and Federal Officer jurisdiction. On December 29, 2005, the *Adkins* case was improperly removed to federal court by Kimberly Clark on the basis of Federal Enclave jurisdiction and Federal Officer jurisdiction. On January 3, 2006, Kimberly Clark amended its notice of Removal in the *Jackson* case to improperly allege Federal Enclave and Federal Officer jurisdiction (although Kimberly Clark failed to seek leave of Court to allege Federal Officer jurisdiction). The *Adkins* and *Allen* cases were then consolidated into the *Jackson* case. Therefore, all of the Plaintiffs represented by Reaud,

Morgan and Quinn, L.L.P. that were removed from the 60th Judicial District Court of Jefferson County, Texas by Kimberly Clark Corporation are now in the *Jackson* case.

4.     These cases were improperly removed by Kimberly Clark. Kimberly Clark removed these cases alleging diversity of citizenship, Federal Enclave jurisdiction, and Federal Officer jurisdiction. However, Kimberly Clark's removal was frivolous and made in bad faith. For the reasons explained below, these cases do not belong in Federal Court. Therefore, Plaintiffs' respectfully request that this Honorable Court Vacate the Panel's Conditional Transfer Order because these cases were improperly removed.

## B. DIVERSITY OF CITIZENSHIP

5.     Kimberly Clark has alleged that diversity of citizenship was a basis for removal in the individual case of *Jackson*. Kimberly Clark has not alleged that any of the other cases before this Honorable Court were removed on the basis of diversity of citizenship. However, the law is clear that Kimberly Clark cannot remove a lawsuit filed in Texas on the basis of diversity of citizenship if Kimberly Clark is a citizen of the State of Texas. 28. U.S.C. §1441(b).

6.     It is abundantly clear that Kimberly Clark is a citizen of the State of Texas because its principal place of business is located in Dallas, Texas. In the Fifth Circuit, a corporation's principal place of business is determined by the total activity test. *See Teal Energy USA, Inc. v. GT, Inc.*, 369 F.3d 873, 876 (5th Cir. 2004). The test requires the court to consider the corporation's nerve center and place of activities. *Id.* When a corporation's operations are far flung, the sole nerve center of the corporation is more significant in determining the principal place of business. *Id.* Furthermore, it is clear that a corporation has one and only one principal place of business. *J.A. Olson Company v. City of Winona, Mississippi*, 818 F2d 401, 406 (5th Cir. 1987). Kimberly Clark admits that its executive offices are located in Dallas, Texas but suggests that because one of its operating units is headquartered in Roswell, Georgia, that its principal place of business is located is Georgia. This clearly is not an appropriate application of the total activity test.

3

### B.1. KIMBERLY CLARK'S BUSINESS OPERATIONS ARE FAR FLUNG

7.     The first determination that must be made when applying the total activity test is whether or not the corporation's business operations are far flung.  The Fifth Circuit has clearly ruled that **"when considering a corporation whose operations are far flung, the sole never center of that corporation is more significant in determining principal place of business . . .,** when a corporation has its sole operation in one state and executive offices in another, the place of activity is regarded as more significant . . ."(emphasis added).[1]

8.     Kimberly Clark business operations are certainly far flung.  Attached hereto as Exhibit "A" is a copy of Kimberly Clark's Form 10-K that was filed with the Securities and Exchange Commission for the fiscal year that ended on December 31, 2004.  Item 2 of the Form 10-K clearly demonstrates that Kimberly Clark has production and service facilities in eighteen states.  *See* pages 6-8 of Exhibit "A"[2].  The Form 10-K also reveals that Kimberly Clark has Operating Segments and Geographic Headquarters in Georgia, Wisconsin, Australia, Korea, and the United Kingdom and has an administrative Center in Tennessee and the United Kingdom.  *See* page 6 of Exhibit "A".  Finally, the Form 10-K reveals that the principal executive offices and world headquarters are located in Dallas, Texas.  *See* page 1 and 6 of Exhibit "A".  Kimberly Clark's Form 10-K clearly establishes that its business operations are far flung as the term is used regarding the total activity test.

### B.2. KIMBERLY CLARK'S OPERATIONS IN GEORGIA

9.     Kimberly Clark argues that its principal place of business is located in Georgia because one of its operating units is based in Roswell, Georgia.  However, Kimberly Clark never suggests that the Roswell facility has any control over any of the other operational units of Kimberly Clark.  Furthermore, Kimberly Clark never suggests that the facility located in Roswell, Georgia is Kimberly Clark's largest facility or that the Business-to-Business unit located in Roswell, Georgia is in fact the largest or most profitable unit.  In fact, Kimberly Clark has three main units: Personal Care, Consumer Tissue, and Business-to Business.  *See* Exhibit "A", page 5.  The Business-to-Business unit located in Roswell, Georgia appears to be the smallest unit if measured in net sales or operating profits.  *See* Page 22 and Page 26 of Exhibit "A".  These numbers demonstrate two

---

[1] *See Teal Energy*, 369 F.3d at 876 (quoting *J.A.Olson*, 818F.2d at 411).

[2] There are two sets of page numbers on Kimberly Clark's securities filings.  For purposes of this motion, Plaintiff shall refer to the page numbers on the top of the page.

things. First of all, they show that Kimberly Clark's business operations are far flung. Second of all, they establish that there is not a single place of activity that dominates the business operations of Kimberly Clark. This further supports the nerve center analysis to determine the principal place of business of Kimberly Clark.

### B.3.   KIMBERLY CLARK'S PREVIOUS ALLEGATIONS REGARDING ITS PRINCIPAL PLACE OF BUSINESS

10.   Kimberly Clark has admitted that its principal place of business is located in Texas on many occasions in the past. On such example occurred on November 2, 2004, when Kimberly Clark filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction and Supporting Brief in the United States District Court for the Eastern District of Texas, Marshall Division. A copy of the motion is attached hereto as Exhibit "B". The basis for Kimberly Clark's motion was that diversity did not exist because both it and the plaintiff were citizens of the state of Texas. *See* page 1 and 2 of Exhibit "B". Furthermore, Kimberly Clark attached an affidavit of John William Wesley to the Motion. *See* Exhibit "B". In the Affidavit, Mr. Wesley swore that "Kimberly-Clark Corporation has its principal place of business in the City of Irving, Dallas County, Texas." *See* Exhibit "B". The Court granted Kimberly Clark's motion to dismiss for lack of subject matter jurisdiction. A copy of the Order is attached hereto as Exhibit "C".

11.   Kimberly Clark has filed pleadings in Texas, Wisconsin, and Georgia (and possibly other states) stating that its principal place of business is Texas. Furthermore, in its Notice of Removal in this case Kimberly Clark initially stated that its principal place of business is in Texas (the Notice of Removal was later amended to allege that its principal place of business was Georgia). Therefore, because Kimberly Clark's principal place of business is Texas, the removal of the Jackson case on the basis of diversity of citizenship was improper.

### C. FEDERAL ENCLAVE CLAUSE

12.   Kimberly Clark also claims that this Honorable Court has jurisdiction over this matter pursuant to U.S. CONST. Art. I. § 8, cl. 17. However, in order to remove a case pursuant to the Federal Enclave Clause all of the defendants in the case are required to join in the removal petition. *See Tri-Cities Newspapers, Inc. v. Tri-Cities Printing Pressman & Asst. Local 349*, 427 F.2d 325, 326-327 (5th Cir. 1970). However, Kimberly Clark Corporation is the only defendant that sought removal.

In this case, The BOC Group, Inc., CertainTeed Corporation, Cooper Industries, Inc., Dana Corporation, General Dynamics Corporation, Hobart Brothers Company, John Crane, Inc., the Lincoln Electric Company, Maremont Corp., Union Carbide Chemicals & Plastics Company and Kimberly-Clark Corporation are defendants.[3]  Furthermore, Kimberly Clark Corporation has not even suggested that the other defendants intended to join or consent in the removal.  Therefore, Plaintiffs object to the improper removal of these cases on the basis of the Federal Enclave Clause.

13.    Furthermore, Kimberly Clark has presented absolutely no evidence to suggest that the Coosa Pines Newsprint Mill was a federal enclave.  Kimberly Clark's counsel simply argues (without any evidentiary support) that:

(a)    Kimberly Clark's predecessor leased and purchased property from the United States;

(b)    A Newsprint Mill was erected on this land by Kimberly Clark or its predecessor (not the United States Government);

(c)    A powerhouse and water filtration plant were built for the U.S. Government at some point in time;

(d)    Kimberly Clark later leased the powerhouse and water filtration plant from a third party (it is unclear to Plaintiffs' counsel whether Kimberly Clark is alleging that this third party was the US Government);

(e)    The United States Government maintained facilities near the Coosa Pines Mill;

(f)    The United States Government maintained easements through the Mill property;

(g)    Kimberly Clark was required to maintain the facilities and be able to supply power, water and other services to the United States Government in times of national emergency;

---

[3] These defendants remain in the cases of all of the Plaintiffs before this Honorable Court other than the individual case of Cecil Reuben Jackson.  The only remaining defendants in the *Jackson* case are Kimberly Clark and Cooper Industries.  Plaintiffs' counsel agreed to non-suit Cooper Industries before this case was improperly removed.  However,

(h)    In toxic exposure cases, if the Plaintiffs were exposed to substances on a government facility then federal enclave jurisdiction applies;

(i)    Kimberly Clark was to build no structures or additions without approval; and

(j)    Kimberly Clark was obligated to accommodate United States Government personnel at the facility.

14.    Kimberly Clark has not alleged, much less proved, that at the time of Plaintiffs' exposures to asbestos on the Kimberly Clark premises that all or a portion of the land upon which the Plaintiffs were exposed was owned by the United States Government.  Although Plaintiffs' counsel is not aware of the entire history of the Coosa Pines Newsprint Mill, Mr. Pinkerton, the past President of the U.S. Newsprint and Forest Products Division of Kimberly Clark, was questioned regarding these matters in some detail on April 16, 2004 and testified as follows:

Q.    Now, is that the powerhouse that you just told us about a moment ago that was built by the United States Government?
A.    Yes. Yes. *See* Exhibit "D", page 72, lines 2-5.

Mr. Pinkerton then testified:

Q.    All right.  Now, did you say the U.S. Government built this power plant what year?
A.    About 1944 or '45.

Q.    All right.
A.    Right at the end of the second World War.

Q.    And did they also provide all the steam lines that ran throughout the facility?
A.    Not to our plant because it didn't exist at that point in time.  Our plant was built in '48, '49.

Q.    Okay.  So, when the government built that powerhouse, what was it for?
A.    For the generation I mentioned earlier of the smokeless powder, tetrol, TNT. It was one of the largest -- the Kingsport Ordnance is one -- and all over the country.

---

due to the removal Plaintiffs' counsel has not yet non-suited Cooper Industries.  Plaintiffs' counsel will non-suit Cooper Industries before the *Jackson* case is tried.

Q.    Well, who was making that product or those products?

A.    One of the contractors there was Du Pont. I don't know who the others are or had -- operating those plants for the government.

Q.    I'm sorry. I got confused. I thought that Mr. Adams was asking you questions about a power plant that was built for Kimberly-Clark.

A.    No. **It was bought by us as a part of the property that we bought to build our mill. The power plant and the water filtration plant were government constructions which came with our purchase of the plant -- of the plant site for the building of our papermill.**

Q.    I got you. Okay. **So, the government originally built it but then abandoned it if by no other means than selling it?**

A.    **That's right**.

Q.    Okay. And then, y'all built the facility -- Kimberly-Clark built the facility --

A.    The papermill, uh-huh.

Q.    -- and ran all the steam lines and everything that connected back to that power plant?

A.    That's correct. *See* Exhibit "D", page 73, line 5 – page 74, line 15 (*emphasis added*).

He then testified:

Q.    At any -- let me back up. Was the power plant purchased from the government before 1948?

A.    It would have been in that area. And I wouldn't want to say before '48 or right after '48, because I was hired to go to work for that facility at that time. And that's when the whole thing was unfolding, and I wasn't involved in that process then.

Q.    Okay. So, the facility itself was built --

A.    **The original facility was built in 1948 and '49**.

Q.    **Okay. And of course they had to buy the powerhouse from the government before that**?

A.    **That's correct**.

Q.    And who was responsible for making repairs or modifications to that powerhouse, the original powerhouse?

MR. ADAMS: Objection, form.

A.    We didn't modify that powerhouse until – of substance until 19 -- some of my part in 1983, '84, when we put in scrubbers and precipitators.

Q.    All right. Well, at that time did you call out the government to come do that?

A.      No. No. **We acquired the whole property in 1948 from the government or thereabouts**.

Q.      All right. And so, if there had been repairs or maintenance, it was performed by Kimberly-Clark or a subcontractor or a contractor; but you didn't call the government out to come take care of that power plant?

A.      That's correct. See Exhibit "D", page 76, line 2 – Page 77, line 3 (*emphasis added*).

15.     Therefore, Mr. Pinkerton's testimony clearly reveals that Kimberly Clark purchased land from the United States Government upon which Kimberly Clark built the Coosa Pines Mill. The fact that certain buildings were present upon the land at the time of purchase is clearly not sufficient to invoke Federal Enclave jurisdiction. Mr. Pinkerton did not testify that the powerhouse and water filtration plant were leased from the United States Government as suggested by Kimberly Clark in its Notice of Removal. Mr. Pinkerton clearly testified that these buildings were purchased along with the land used to build the Coosa Pines Mill. Therefore, there is no basis for Federal Enclave jurisdiction in these cases.

### D. FEDERAL OFFICER JURISDICTION

16.     Kimberly Clark also suggests that its Removal was appropriate based upon Federal Officer Jurisdiction. In order to remove a case based upon Federal Office Jurisdiction, Kimberly Clark must establish the following:

(a)     that it is a person within the meaning of 28 U.S.C. §1442(a)(1),

(b)     that Kimberly Clark was acting at the direction of a federal officer of the United States and that a causal nexus exists between Kimberly Clark's actions under color of federal office and the plaintiffs' claims; and

(c)     Kimberly Clark must assert a colorable claim to a federal defense. *See Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387, 398 (5th Cir. 1998).

## D. (1) KIMBERLY CLARK HAS FAILED TO ESTABLISH THAT IT WAS ACTING AT THE DIRECTION OF A FEDERAL OFFICER OF THE UNITED STATES AND THAT A CAUSAL NEXUS EXISTS BETWEEN KIMBERLY CLARK'S ACTIONS UNDER COLOR OF FEDERAL OFFICE AND THE PLAINTIFFS' CLAIMS

17.    Kimberly Clark has alleged that it was acting at the direction of the Secretary of War. However, Kimberly Clark has presented absolutely no evidence to support this allegation. Furthermore, Kimberly Clark has not suggested that the Secretary of War had direct and detailed control over the operation in question. *See Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398-400 (5th Cir. 1998); *Reed v. Fina Oil & Chem. Co.*, 995 F.Supp. 705, 710 (E.D. Tex. 1998).  In *Reed*, the Court found that the Defendant "must show that 'the plaintiff[s'] states court action is derived from activities performed pursuant to federal direction.'" *Id.* (*quoting Winters v. Diamond Shamrock Chem. Co.*, 901 F.Supp. 1195, 1199 (E.D. Tex. 1995)).  The Court then determined that the Defendant had provided evidence that "almost every aspect of the actual operation of the plant was supervised or dictated by the federal government." *Id.*  Clearly this level of control was not present at the Coosa Pines Newsprint Mill.

18.    Kimberly Clark has not even presented an argument to meet its burden that a causal nexus exists between Kimberly Clark's actions under color of federal office and the plaintiffs' claims.  In order to meet its burden that a causal nexus exists between Kimberly Clark's action under color of federal officer and the plaintiffs' claims, Kimberly Clark must prove that the federal officer had direct and detailed control over (i) Kimberly Clark's failure to warn anyone about the hazards of asbestos, and (ii) Kimberly Clark's failure to provide plaintiffs with proper respiratory protection to protect the plaintiffs from the asbestos.  *See Faulk v. Owens Corning Fiberglass Corp.*, 48 F.Supp.2d 653, 660-664 (E.D.Tex. 1999).  In *Faulk*, the Court held:

> **There is no causal nexus between the acts performed under color of federal office (the federally-controlled production of Avgas, butadiene, and steel) and the**

**plaintiffs' claims (the non-federally controlled failure to warn about asbestos).**
*Id.* at 661.

Furthermore, the Court explained:

> Defendants want this court to read *Winters, Reed,* and *Akin* as extending *Boyle* to provide the federal officer defense to Defendants who, although manufacturing products with specifications dictated by a federal officer, nonetheless act negligently by failing to warn about dangerous conditions despite no impediment by the federal officer to do so. Indeed, of all the myriad of documents removing Defendants submitted to this Court, there is no direction or control by the federal officer relating to warning Plaintiffs about asbestos. In *Winters, Reed,* and *Akin,* the federal officer really did "make them do it" since they were acting at the direction and control of an officer of the United States *and* a causal nexus existed between their actions under color of federal office and the plaintiffs' claims. Not so in this case.
>
> Here, there is no federal officer "direction" or "control" as to whether to warn Plaintiffs about asbestos. Rather, there are detailed, government specifications relating to the production of Avgas, butadiene, and steel-nothing about warning about asbestos. The federal officer remained completely silent as to whether to *warn* about the use of asbestos; this silence is fatal to the "causal nexus" necessary for the second prong. Thus, Defendants fail to meet the second prong of the *Mesa* test. *Id.* at 664.

19.    Kimberly Clark's argument, unsupported by evidence, is not even as strong as the Defendant in *Faulk*.  At least the Defendant in Faulk presented evidence that the government controlled certain aspects of the work at the plant.  Here Kimberly Clark simply argues that the government had the right to request services.  Therefore, Kimberly Clark has failed to establish that a causal nexus exists between Kimberly Clark's actions under color of federal office and the Plaintiffs' claims.  Clearly removal on the basis of Federal Officer jurisdiction was improper.

## D. (2) KIMBERLY CLARK HAS FAILED TO ESTABLISH A COLORABLE CLAIM TO A FEDERAL DEFENSE

20.    In its Notice of Removal, Kimberly Clark states that it "will assert as Defenses at lease the following:  (a) Its' required compliance with its obligations to the U.S. Government pursuant to the lease, (b) its lack of knowledge of the alleged hazards of asbestos and (3) the state of the art of the knowledge of the hazards of asbestos in the U.S. Government and in U.S. Industry at the relevant

times." *See* Paragraph 10 of The Notice of Removal of Defendant, Kimberly Clark Corporation. However, in order to establish federal officer jurisdiction, Kimberly Clark must <u>assert a colorable claim to a federal defense</u>.   Clearly, Kimberly Clark's defense that it lacked knowledge about the hazards of asbestos is not a "federal defense".   Furthermore, Kimberly Clark cannot invoke federal jurisdiction by submitting evidence about the state of the art of the knowledge of the hazards of asbestos.

21.   Finally, Kimberly Clark suggests that it has a colorable federal defense because of "its required compliance with its obligations to the U.S. Government pursuant to the lease."   *See* Paragraph 10 of The Notice of Removal of Defendant, Kimberly Clark Corporation.   Of course, the lease was not attached to the Notice of Removal as an exhibit.   However, it is hard for Plaintiffs' counsel to image an obligation under the lease that would have prevented Kimberly Clark from (i) warning anyone about the hazards of asbestos, or (ii) providing plaintiffs with proper respiratory protection to protect the plaintiffs from the asbestos.   Furthermore, as set forth above, Mr. Pinkerton has testified that the land in question was purchased.   Therefore, Kimberly Clark has failed to prove that it has a colorable federal defense.

### E. KIMBERLY CLARK'S REMOVAL WAS NOT TIMELY

22.   Kimberly Clark was added as a Defendant in the *Martin* lawsuit on February 23, 1995. Therefore, Kimberly Clark's removal of this case over ten years after it was filed is not timely. Plaintiffs have objected to Kimberly Clark's late removal.

23.   Kimberly Clark Corporation admits that the thirty day limitation set forth in 28 U.S.C. 1446(b) begins to run when the Defendant receives sufficient notice of removability via receipt of "other paper".   Kimberly Clark then states that the first pleading filed by Plaintiffs in this case identifying the Coosa Pines Newsprint Mill occurred on December 14, 2005.   However, Kimberly Clark has received a tremendous amount of "other paper" during these cases identifying the Coosa

Pines Newsprint Mill as the premises in question.  Below are just two of the many examples of "other paper" provided to Kimberly Clark more than thirty days prior to removal.

24.     During the deposition of S.B. Pinkerton, the past President of the U.S. Newsprint and Forest Products Division of Kimberly Clark, Plaintiffs' counsel unambiguously stated "[w]ell, **these cases involve people being exposed to asbestos-containing products at the Coosa Pines facility in sufficient quantities to cause an asbestos related disease, and death in some cases.**"(*emphasis added*).  *See* Exhibit "D", Page 57, lines 21-24.

25.     On April 6, 2004, Plaintiffs' counsel clearly stated that a witness that Mr. Adams had offered to tender as a corporate representative "likely has little or no specific knowledge about the Coosa Pines facility **which is where my clients worked.**" (*emphasis added*) *See* Page 7, lines 12-14 of the April 6, 2004 hearing transcript on Defendant's Motion for Protection in the *Martin* case, a copy of which is attached hereto as Exhibit "E".  Later during that same hearing, Mr. Adams conceded that Plaintiffs' counsel had informed him of the premises at issue in this lawsuit.  He stated "[t]his case is many years old as Mr. Morgan has pointed out.  Only since February 17th of this year have we learned for the first time and that was in response to a letter I wrote Mr. Morgan on February 17th what facility or facilities it was that he was even complaining of with respect to Kimberly Clark and it was after February 17th of this year that we learned that it was the Coosa Pines facility."  *See* Page 11, lines 14-20 of Exhibit "E".

26.     Therefore, Kimberly Clark Corporation received significant amounts of "other paper" that informed Kimberly Clark Corporation that the sole premises at issue was the Coosa Pines Newsprint Mill.  Furthermore, Kent Adams, counsel for Kimberly Clark Corporation, conceded that he was informed by Plaintiffs' counsel that the sole premises at issue was the Coosa Pines Newsprint Mill.  Kimberly Clark Corporation's removal occurred more than thirty days after it first

13

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

FEB 21 2006

FILED
CLERK'S OFFICE

became ascertainable to Kimberly Clark Corporation that the cases were allegedly removable and

therefore, the removal was not timely.

## CONCLUSION

27.    These case were improperly removed by Kimberly Clark on the basis of diversity of

citizenship, Federal Enclave jurisdiction and Federal Officer jurisdiction.   Kimberly Clark then

moved to transfer these cases to MDL – 875.   Since there was no legitimate basis to remove these

cases from state court, Plaintiffs' respectfully request that this Honorable Court Vacate the Panel's

Conditional Transfer Order (CTO-257).

Respectfully submitted,

**REAUD, MORGAN & QUINN, L.L.P.**
801 Laurel Street
P. O. Box 26005
Beaumont, TX  77720-6005
(409) 838-1000
(409) 833-8236 (FAX)

By /s/ Chris Portner
     Glen W. Morgan
     Texas Bar No. 14438900

     Chris Portner
     Texas Bar No. 24007858

     Lawyers for Plaintiff

### CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of February, 2006, I have served a true copy of the above
and foregoing on the persons identified on the Panel Service List attached hereto.

/s/ Chris Portner
Chris Portner

**PANEL SERVICE LIST (Excerpted from CTO-257)**
**DOCKET NO. 875**
**IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)**

*Cecil Reuben Jackson, et al. v. Kimberly-Clark Corp.,* E.D. Texas, C.A. No. 1:05-769
*Thomas Vodry Allen, et al. v. Kimberly-Clark Corp., et al.,* E.D. Texas, C.A. No. 1:05-876
*Newbern Brown Adkins, et al. v. Kimberly-Clark Corp., et al.,* E.D. Texas, C.A. No. 1:05-882

Kent M. Adams
Adams & Coffey
550 Fannin, Suite 800
P.O. Box 7505
Beaumont, TX 77726-7505

Robert L. Adams
Kacal, Adams & Law
One Riverway, Suite 1200
Houston, TX 77056

Jerry L. Beane
Andrews & Kurth
BankOne Center
1717 Main Street, Suite 3700
Dallas, TX 75201

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114

John G. Bissell
Strong, Pipkin, Bissell & Ledyard
1111 Bagby Street, Suite 2300
Houston, TX 77002

Paula H. Blazek
Germer Gertz
550 Fannin Street, Suite 700
Beaumont, TX 77701

Eugene W. Brees, II
Whitehurst, Harkness, Ozmun & Brees
P.O. Box 1802
Austin, TX 78767

George Read Carlton
Godwin Pappas Langley Ronquillo
1201 Elm Street
Suite 1700
Dallas, TX 75270

Edward J. Cass
Gallagher, Sharp, Fulton & Norman
Bulkley Building, 7th Floor
1501 Euclid Avenue
Cleveland, OH 44115

Adam M. Chud
Goodwin Procter, LLP
901 New York Avenue, N.W.
Washington, DC 20001

Sandra F. Clark
Mehaffy & Weber, P.C.
P.O. Box 16
Beaumont, TX 77704

David A. Damico
Burns, White & Hickton, LLC
Four Northshore Center
106 Isabella St.
Pittsburgh, PA 15212

James D. Dowell
Rienstra, Dowell & Flatten
595 Orleans Street, Suite 1007
Beaumont, TX 77701

Gary D. Elliston
DeHay & Elliston, L.L.P.
3500 Bank of America Plaza
901 Main Street
Dallas, TX 75202-3736

Michael M. Essmyer
Essmyer & Tritico
4300 Scotland
Houston, TX 77007

Raymond P. Forceno
Forceno & Hannon
111 S. Independence Mall East
The Bourse, Suite 1000
Philadelphia, PA 19106-2574

Ellen B. Furman
Goldfein & Hosmer
1600 Market Street, 33rd Floor
Philadelphia, PA 19103

Susan M. Hansen
Brownson & Ballou
225 South Sixth Street, Suite 4800
Minneapolis, MN 55402

Frank G. Harmon, III
Crain, Caton, James
1401 McKinney, Suite 1900
Houston, TX 77010

Kathryn Oakes Hermes
DeHay & Elliston, L.L.P.
901 Main Street, Suite 3500
Dallas, TX 75202

John L. Hill, Jr.
Locke Liddell & Sapp, LLP
600 Travis Street
3400 JP Morgan Chase Tower
Houston, TX 77002

Paul J. Holmes
Paul J. Holmes, PC
550 Fannin
P.O. Box 3746
Beaumont, TX 77701

Gail C. Jenkins
Jenkins & Martin
P.O. Box 26008
2615 Calder, Suite 500
Beaumont, TX 77720-6008

D. Allan Jones
Orgain, Bell & Tucker, L.L.P.
P.O. Box 1751
Beaumont, TX 77704-1751

George J. Kacal, Jr.
Kacal, Adams & Law
One Riverway, Suite 1200
Houston, TX 77056

J. Frank Kinsel, Jr.
Cantey & Hanger, L.L.P.
2100 Burnett Plaza
801 Cherry Street
Ft. Worth, TX 76102

Reginald S. Kramer
Oldham & Dowling
195 South Main Street, Suite 300
Akron, OH 44308-1314

PANEL SERVICE LIST (Excerpted from CTO-257) - MDL-875                    Page 2 of 2

David C. Landin
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Gene Locks
Greitzer & Locks
1500 Walnut Street
Philadelphia, PA 19102

C. Robert Mace
Tekell, Book, Matthews & Limmer
4300 One Houston Center
1221 McKinney
Houston, TX 77010

D. Ferguson McNiel
Vinson & Elkins
1001 Fannin Street, Suite 2300
Houston, TX 77002

Peter A. Moir
Quilling, Selander, Cummiskey, et al.
2001 Bryan Street
Bryan Tower, Suite 1800
Dallas. TX 75201

Ronald L. Motley
Motley Rice, LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29465

John J. Mundy
Mundy & Singley
816 Congress Avenue, Suite 1230
Austin, TX 78701

James R. Old, Jr.
Germer Gertz
550 Fannin Street, Suite 1700
Beaumont, TX 77701

David Arthur Oliver, Jr
Porter & Hedges, L.L.P.
1000 Main Street, 36th Floor
Houston, TX 77002-6336

Rex Wayne Peveto
Peveto Law Firm
118 Border Street
Orange, TX 77630

Franklin A. Poff
Crisp, Boyd & Poff
2301 Moores Lane
P. O. Box 6297
Texarkana, TX 75505

James H. Powers
Powers & Frost, L.L.P.
2400 One Houston Center
1221 McKinney Street
Houston, TX 77010

John J. Repcheck
Marks, O'Neill, O'Brien & Courtney
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219

H. Tracy Richardson, III
Strong, Pipkin, Nelson & Bissell
1400 San Jacinto Building
595 Orleans
Beaumont, TX 77013

James M. Riley, Jr.
Coats Rose Yale Ryman & Lee
3 Greenway Plaza, Suite 2000
Houston, TX 77046

Lauren Miller Robbins
Munisteri Sprott Rigby Newsom
 & Robbins
3323 Richmond Avenue, Suite A
Houston, TX 77098

John D. Roven
Roven-Kaplan, LLP
2190 North Loop West, Suite 410
Houston, TX 77018

Richard D. Schuster
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216

Neil Selman
Selman, Breitman & Burgess
11766 Wilshire Boulevard,
Sixth Floor
Los Angeles, CA 90025

Robert N. Spinelli
Kelley, Jasons, McGuire & Spinelli
Centre Square West, 15th Floor
Philadelphia, PA 19102

Robert E. Swickle
Jaques Admiralty Law Firm, P.C.
1570 Penobscot Building
The Maritime Asbestosis Legal Clinic
Detroit, MI 48226

Thomas W. Taylor
Andrews & Kurth
600 Travis, Suite 4200
Houston, TX 77002-2778

Andrew J. Trevelise
Reed Smith, LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

Thomas J. Ward, Jr.
Law Office of T. John Ward
P.O. Box 1231
Longview, TX 75606-1231

James L. Ware
Sheehy, Serpe & Ware, P.C.
2500 Two Houston Centre
909 Fannin
Houston, TX 77010-1003

James K. Weston II
Tom Riley Law Firm
4040 First Avenue, N.E.
P.O. Box 998
Cedar Rapids, IA 52406

Gene M. Williams
Shook, Hardy & Bacon, LLP
Chase Tower, Suite 1600
600 Travis Street
Houston, TX 77002-2911

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

FEB 2 1 2006

FILED
CLERK'S OFFICE

## UNITED STATES OF AMERICA
### BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

IN RE: ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)      MDL DOCKET NO. 875
*Cecil Reuben Jackson, et al v. Kimberly-Clark Corp.*, TXE 1 05-769
*Thomas Vodry Allen, et al v. Kimberly-Clark Corp., et al*, TXE 1 05-876
*Newbern Brown Adkins, et al v. Kimberly-Clark Corp., et al*, TXE 1 05-882

### AFFIDAVIT OF CHRIS PORTNER IN SUPPORT OF MOTION
### TO VACATE THE PANEL'S CONDITIONAL TRANSFER ORDER (CTO-257)

STATE OF TEXAS                    §

COUNTY OF JEFFERSON          §

BEFORE ME, the undersigned Notary Public, on this day personally appeared Chris Portner, who being by me duly sworn on his oath deposed and said as follows:

"My name is Chris Portner. I am an attorney working on behalf of *Cecil Reuben Jackson, Deceased, et al, Thomas Vodry Allen, et al, and Newbern Brown Adkins, et al,* in the above-captioned actions. I am fully able to make this affidavit. The statements in this affidavit are based upon my personal knowledge and are true and correct.

1.      I submit this affidavit in support of Plaintiffs' Motion to Vacate the Panel's Conditional Transfer Order (CTO-257).

2.      Attached hereto as Exhibit A is a true and correct copy of Kimberly Clark's Form 10-K that was filed with the United States Securities and Exchange Commission for the fiscal year that ended on December 31, 2004.

3.      Attached hereto as Exhibit B is a true and correct copy of Kimberly Clark Corporation's November 2, 2004 Motion to Dismiss for Lack of Subject Matter Jurisdiction and Supporting Brief filed in Civil Action No. 2-02-CV-240-DF, *Dewayne Eddington, Individually and as Next Friend of Devvyn Eddington, and as Representative of the Estate of Jajah Eddington, Deceased vs. Kimberly-Clark Corporation*; In the United States District Court for the Eastern District of Texas, Marshall Division.

4.      Attached hereto as Exhibit C is a true and correct copy of the Court's December 2, 2002 Order granting Kimberly Clark Corporation's Motion to Dismiss for Lack of Subject Matter Jurisdiction in Civil Action No. 2-02-CV-240-DF, *Dewayne Eddington, Individually and as Next Friend of Devvyn Eddington, and as Representative of the Estate of Jajah Eddington, Deceased vs. Kimberly-Clark Corporation*; In the United States District Court for the Eastern District of Texas, Marshall Division..

5.      Attached hereto as Exhibit D is a true and correct copy of Oral and Videotaped Deposition of S. B. Pinkerton dated April 16, 2004 taken in the case styled Cause No. B-150,896; *Inez Martin, et al vs. ACandS, Inc., et al*; In the 60th Judicial District Court of Jefferson County, Texas.

6.      Attached hereto as Exhibit E is a true and correct copy of the Reporter's Record dated April 6, 2004 regarding Motion for Protection taken in the case styled Cause No. B-150,896; *Inez Martin, et al vs. ACandS, Inc., et al*; In the 60th Judicial District Court of Jefferson County, Texas.

Further Affiant sayeth not."

Chris Portner

SWORN TO AND SUBSCRIBED BEFORE ME on this 17th day of February, 2006, to certify which witness my hand and seal of office.



Notary Public, State of Texas
Danyel Marquardt
My Commission Expires 08/31/2009

# EXHIBIT

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

FEB 2 1 2006

FILED
CLERK'S OFFICE

# "A"

Download: [PDF] [RTF] [XLS]

Table of Contents

---

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

# FORM 10-K

**(Mark One)**

☒  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2004**

**OR**

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from            to**

**Commission file number 1-225**

---

# KIMBERLY-CLARK CORPORATION

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **39-0394230** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **P. O. Box 619100, Dallas, Texas** | **75261-9100** |
| (Address of principal executive offices) | (Zip Code) |

**Registrant's telephone number, including area code: (972) 281-1200**

PLAINTIFF'S
EXHIBIT
A

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock—$1.25 Par Value | New York Stock Exchange |
| | Chicago Stock Exchange |
| | Pacific Exchange |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒  .  No ☐  .

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.    ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act).    Yes ☒   .  No ☐   .

The aggregate market value of the registrant's common stock held by non-affiliates on June 30, 2004 (based on the closing stock price on the New York Stock Exchange) on such date was approximately $32.7 billion.

As of February 16, 2005, there were 481,269,591 shares of the Corporation's common stock outstanding.

### Documents Incorporated By Reference

Certain information contained in the definitive Proxy Statement for the Corporation's Annual Meeting of Stockholders to be held on April 28, 2005 is incorporated by reference into Part III hereof.

Table of Contents

# KIMBERLY-CLARK CORPORATION
## TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| **Part I** |  |  |  |
| Item 1. | Business | | 1 |
| Item 2. | Properties | | 6 |
| Item 3. | Legal Proceedings | | 12 |
| Item 4. | Submission of Matters to a Vote of Security Holders | | 12 |
| Item 4A. | Executive Officers | | 12 |
| **Part II** |  |  |  |
| Item 5. | Market for the Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | | 14 |
| Item 6. | Selected Financial Data | | 15 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | | 16 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | | 38 |
| Item 8. | Financial Statements and Supplementary Data | | 41 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | | 79 |
| Item 9A. | Controls and Procedures | | 79 |
| Item 9B. | Other Information | | 82 |
| **Part III** |  |  |  |
| Item 10. | Directors and Executive Officers of the Registrant | | 83 |
| Item 11. | Executive Compensation | | 83 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | | 83 |
| Item 13. | Certain Relationships and Related Transactions | | 84 |
| Item 14. | Principal Accountant Fees and Services | | 84 |
| **Part IV** |  |  |  |
| Item 15. | Exhibits and Financial Statement Schedules | | 85 |
| **Signatures** | | | 87 |

Table of Contents

# PART I

### BUSINESS
**ITEM 1.**

Kimberly-Clark Corporation was incorporated in Delaware in 1928. As used in Items 1, 2, 3, 6, 7, 7A, 8 and 9A of this Form 10-K, the term "Corporation" refers to Kimberly-Clark Corporation and its consolidated subsidiaries. In the remainder of this Form 10-K, the terms "Kimberly-Clark" or "Corporation" refer only to Kimberly-Clark Corporation. For financial information by business segment and geographic area, and information about principal products and markets of the Corporation, reference is made to Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" and to Item 8, Note 16 to the Consolidated Financial Statements.

**Recent Developments**

The Corporation is a global health and hygiene company focused on building its personal care, consumer tissue and business-to-business operations. Since 2000, the Corporation has completed 14 acquisitions, each of which was accounted for as a purchase, in its core businesses and three strategic divestitures, including the following transactions:

- On February 8, 2000, the Corporation acquired Safeskin Corporation ("Safeskin"), a leading maker of disposable gloves for health care, high-technology and scientific industries, in a merger transaction in which the outstanding Safeskin shares were converted into shares of Kimberly-Clark common stock. The transaction was valued at approximately $750 million.

- On July 5, 2000, the Corporation acquired a majority of the shares of privately held S-K Corporation of Taiwan, which held trademark and distribution rights in Taiwan for the Corporation's global brands including Kleenex, Huggies and Kotex. Prior to the acquisition, the Corporation owned approximately 3 percent of S-K Corporation.

- On December 20, 2000, the Corporation purchased an additional 33.3 percent ownership interest in its Taiwanese affiliate, Taiwan Scott Paper Corporation, increasing its ownership interest to 100 percent.

- On January 31, 2001, the Corporation acquired Linostar S.p.A., a leading Italian-based diaper manufacturer that produced and marketed Lines, Italy's second largest diaper brand.

- Prior to 2001, the Corporation and its joint venture partner, Amcor Limited ("Amcor"), held a 50/50 ownership interest in Kimberly-Clark Australia Pty. Ltd. ("KCA"). In July 2001, the Corporation purchased an additional 5 percent ownership interest in KCA for A$77.5 million (approximately $39 million), and exchanged options with Amcor for the purchase by the Corporation of the remaining 45 percent ownership interest. In June 2002, the option was exercised, and the Corporation purchased the remaining 45 percent interest from Amcor for A$697.5 million (approximately $390 million). As a result of these transactions, KCA became a consolidated subsidiary effective July 1, 2001 and a wholly-owned subsidiary on June 30, 2002.

- During the first quarter of 2003, the Corporation purchased the Klucze tissue business in Poland.

- During the third quarter of 2003, the Corporation acquired an additional 49 percent interest in Kimberly-Clark Peru S.A. and the remaining 50 percent interest in its tissue joint venture in Brazil (Klabin Kimberly S.A.). The cost of these acquisitions totaled approximately $200 million.

- On November 30, 2004, the Corporation distributed to its stockholders all of the outstanding shares of common stock of Neenah Paper, Inc. ("Neenah Paper"). Neenah Paper was formed in April 2004 to facilitate the spin-off of the Corporation's U.S. fine paper and technical paper businesses and its Canadian pulp mills (the "Spin-off"). See Notes 1 and 2 to the Consolidated Financial Statements for additional information regarding the Spin-off.

In January 2004, the Corporation announced changes to reorganize its personal care and consumer tissue businesses into two separate North Atlantic personal care and consumer tissue groups and to put its operations in developing and emerging markets into one group. The wet wipes business became part of the personal care segment instead of the consumer tissue segment. In addition, the Corporation's North American pulp operations

1

**Table of Contents**

**PART I**
(Continued)

were included in its business-to-business segment. The Corporation continues to have three global businesses led by individuals who have the accountability and the authority to make global decisions. The goal of this new structure is to help increase the Corporation's speed in translating consumer and customer insights into innovative products, to streamline decision making and to help deliver cost reductions on a sustainable basis.

Primarily as a result of significant productivity gains, the Corporation had available diaper manufacturing capacity in North America and Europe. Therefore, the Corporation executed a plan to cease diaper manufacturing and scale-back distribution operations at its facility in New Milford, Conn., which now is focused solely on the production of tissue products. Some diaper production capacity was also redeployed from the Barton-upon-Humber facility in the U.K. Diaper machines from these locations will now support growth in other markets, thereby reducing the capital spending required for this business. These steps are consistent with the Corporation's strategies to drive growth in developing and emerging markets and improve its cost structure in North America and Europe. Costs to implement this plan total approximately $40 million before tax, including about $37 million recorded in 2004. The balance of the plan costs will be recorded in 2005 as they are incurred.

**Description of the Corporation**

The Corporation is principally engaged in the manufacturing and marketing of a wide range of health and hygiene products around the world. Most of these products are made from natural or synthetic fibers using advanced technologies in fibers, nonwovens and absorbency.

The Corporation is organized into operating segments based on product groupings. These operating segments have been aggregated into three reportable global business segments: Personal Care; Consumer Tissue; and Business-to-Business. Each reportable segment is headed by an executive officer who reports to the Chief Executive Officer and is responsible for the development and execution of global strategies to drive growth and profitability of the Corporation's worldwide personal care, consumer tissue and business-to-business operations. These strategies include global plans for branding and product positioning, technology, research and development programs, cost reductions including supply chain management, and capacity and capital investments for each of these businesses. The principal sources of revenue in each of our global business segments are described below. Revenue, profit and total assets of each reportable segment are described in the financial statements contained in Item 8 of this Form 10-K.

The Personal Care segment manufactures and markets disposable diapers, training and youth pants and swimpants; baby wipes; feminine and incontinence care products; and related products. Products in this segment are primarily for household use and are sold under a variety of brand names, including Huggies, Pull-Ups, Little Swimmers, GoodNites, Kotex, Lightdays, Depend, Poise and other brand names.

The Consumer Tissue segment manufactures and markets facial and bathroom tissue, paper towels, napkins and related products for household use. Products in this segment are sold under the Kleenex, Scott, Cottonelle, Viva, Andrex, Scottex, Hakle, Page and other brand names.

The Business-to-Business segment manufactures and markets disposable, single-use, health and hygiene products to the away-from-home marketplace. These products include facial and bathroom tissue, paper towels, napkins, wipers, surgical gowns, drapes, infection control products, sterilization wrap, disposable face masks and exam gloves, respiratory products, other disposable medical products and other products. Products in this segment are sold under the Kimberly-Clark, Kleenex, Scott, Kimwipes, WypAll, Surpass, Safeskin, Tecnol, Ballard and other brand names.

Products for household use are sold directly, and through wholesalers, to supermarkets, mass merchandisers, drugstores, warehouse clubs, variety and department stores and other retail outlets. Products for away-from-home use are sold through distributors and directly to manufacturing, lodging, office building, food service, health care establishments and high volume public facilities. In addition, certain products are sold to converters.

2

**Table of Contents**

**PART I**
(Continued)

Approximately 13 percent of net sales were to Wal-Mart Stores, Inc. in 2004, 2003 and 2002, primarily in the Personal Care and Consumer Tissue businesses.

**Patents and Trademarks**

The Corporation owns various patents and trademarks registered domestically and in many foreign countries. The Corporation considers the patents and trademarks which it owns and the trademarks under which it sells certain of its products to be material to its business. Consequently, the Corporation seeks patent and trademark protection by all available means, including registration.

**Raw Materials**

Superabsorbent materials are important components in disposable diapers, training and youth pants and incontinence care products. Polypropylene and other synthetics and chemicals are the primary raw materials for manufacturing nonwoven fabrics, which are used in disposable diapers, training and youth pants, wet wipes, feminine pads, incontinence and health care products, and away-from-home wipers.

Cellulose fiber, in the form of kraft pulp or fiber recycled from recovered pulp, is the primary raw material for the Corporation's tissue products and is an important component in disposable diapers, training pants, feminine pads and incontinence care products.

Most recovered paper, synthetics, pulp and recycled fiber are purchased from third parties. The Corporation considers the supply of such raw materials to be adequate to meet the needs of its businesses. See "Factors That May Affect Future Results—Raw Materials."

**Competition**

For a discussion of the competitive environment in which the Corporation conducts its business, see "Factors That May Affect Future Results—Competitive Environment."

**Research and Development**

Research and development expenditures are directed toward new or improved personal care, tissue and health care products and nonwoven materials. Consolidated research and development expense was $279.7 million in 2004, $279.1 million in 2003 and $287.4 million in 2002.

**Environmental Matters**

Total worldwide capital expenditures for voluntary environmental controls or controls necessary to comply with legal requirements relating to the protection of the environment at the Corporation's facilities are expected to be approximately $20 million in 2005 and $12 million in 2006. Of these amounts, approximately $4 million in 2005 and $1 million in 2006 are expected to be spent at facilities in the U.S. For facilities outside of the U.S., capital expenditures for environmental controls are expected to be approximately $16 million in 2005 and $11 million in 2006.

Total worldwide operating expenses for environmental compliance are expected to be approximately $152 million in both 2005 and 2006. Operating expenses for environmental compliance with respect to U.S. facilities are expected to be approximately $77 million in both 2005 and 2006. Operating expenses for environmental compliance with respect to facilities outside the U.S. are expected to be approximately $75 million in both 2005 and 2006. Operating expenses include pollution control equipment operation and maintenance costs, governmental payments, and research and engineering costs.

Total environmental capital expenditures and operating expenses are not expected to have a material effect on the Corporation's total capital and operating expenditures, consolidated earnings or competitive position. However, current environmental spending estimates could be modified as a result of changes in the Corporation's plans, changes in legal requirements or other factors.

Case MDL No. 875    Document 4723    Filed 02/21/06    Page 31 of 324

Table of Contents

**PART I**
(Continued)

### Employees

In its worldwide consolidated operations, the Corporation had more than 60,000 employees as of December 31, 2004.

### Factors That May Affect Future Results

Certain matters discussed in this Form 10-K, or documents a portion of which are incorporated herein by reference, concerning, among other things, the business outlook, including new product introductions, cost savings, anticipated financial and operating results, strategies, contingencies and contemplated transactions of the Corporation, constitute forward-looking statements and are based upon management's expectations and beliefs concerning future events impacting the Corporation. There can be no assurance that these events will occur or that the Corporation's results will be as estimated.

The assumptions used as a basis for the forward-looking statements include many estimates that, among other things, depend on the achievement of future cost savings and projected volume increases. In addition, many factors outside the control of the Corporation, including the prices and availability of the Corporation's raw materials, potential competitive pressures on selling prices or advertising and promotion expenses for the Corporation's products, energy costs, and fluctuations in foreign currency exchange rates, as well as general economic conditions in the markets in which the Corporation does business, also could impact the realization of such estimates.

The following factors, as well as factors described elsewhere in this Form 10-K, or in other SEC filings, among others, could cause the Corporation's future results to differ materially from those expressed in any forward-looking statements made by, or on behalf of, the Corporation.

These factors are described in accordance with the provisions of the Private Securities Litigation Reform Act of 1995, which encourages companies to disclose such factors.

*Competitive Environment.*    The Corporation experiences intense competition for sales of its principal products in its major markets, both domestically and internationally. The Corporation's products compete with widely advertised, well-known, branded products, as well as private label products, which are typically sold at lower prices. The Corporation has several major competitors in most of its markets, some of which are larger and more diversified than the Corporation. The principal methods and elements of competition include brand recognition and loyalty, product innovation, quality and performance, price, and marketing and distribution capabilities. Inherent risks in the Corporation's competitive strategy include uncertainties concerning trade and consumer acceptance, the effects of recent consolidations of retailers and distribution channels, and competitive reaction. Aggressive competitive reaction may lead to increased advertising and promotional spending by the Corporation in order to maintain market share. Increased competition with respect to pricing would reduce revenue and could have an adverse impact on the Corporation's financial results. In addition, the Corporation relies on the development and introduction of new or improved products as a means of achieving and/or maintaining category leadership. In order to maintain its competitive position, the Corporation must develop technology to support its products.

*Cost Savings Strategy.*    The Corporation's anticipated cost savings are expected to result from reducing material costs and manufacturing waste and realizing productivity gains and distribution efficiencies in each of its business segments. The Corporation's strategic investments in its information systems should also allow further cost savings through streamlining of its back office operations. There can be no assurance that such cost savings will be achieved.

4

Table of Contents

**PART I**
(Continued)

*Raw Materials.*    Cellulose fiber, in the form of kraft pulp or recycled fiber from recovered pulp, is used extensively in the Corporation's tissue products and is subject to significant price fluctuations due to the cyclical nature of the pulp markets. Recycled fiber accounts for approximately 28 percent of the Corporation's overall fiber requirements.

On a worldwide basis prior to the Spin-off, the Corporation supplied approximately 40 percent of its virgin fiber needs from internal pulp manufacturing operations. The Spin-off has reduced the internal pulp supply to approximately 10 percent. This reduction in pulp integration could increase the Corporation's commodity price risk. Specifically, increases in pulp prices could adversely affect the Corporation's earnings if selling prices for its finished products are not adjusted or if such adjustments significantly trail the increases in pulp prices. Derivative instruments have not been used to manage these risks.

A number of the Corporation's products, such as diapers, training and youth pants, and incontinence care products contain certain materials which are principally derived from petroleum. These materials are subject to price fluctuations based on changes in petroleum prices, availability and other factors. The Corporation purchases these materials from a number of suppliers. Significant increases in prices for these materials could adversely affect the Corporation's earnings if selling prices for its finished products are not adjusted or if adjustments significantly trail the increases in prices for these materials.

Although the Corporation believes that the supplies of raw materials needed to manufacture its products are adequate, global economic conditions, supplier capacity constraints and other factors could materially affect the availability of or prices for those raw materials.

*Energy Costs.*    The Corporation's manufacturing operations utilize electricity, natural gas and petroleum-based fuels. To ensure that it uses all forms of energy cost effectively, the Corporation maintains ongoing energy efficiency improvement programs at all of its manufacturing sites. The Corporation's contracts with energy suppliers vary as to price, payment terms, quantities and duration. Kimberly-Clark's energy costs are also affected by various market factors including the availability of supplies of particular forms of energy, energy prices and local and national regulatory decisions. There can be no assurance that the Corporation will be fully protected against substantial changes in the price or availability of energy sources. Derivative instruments are used to hedge a portion of natural gas price risk when management deems it prudent to do so.

*Volume Forecasting.*    The Corporation's anticipated financial results reflect forecasts of future volume increases in the sales of its products. Challenges in such forecasting include anticipating consumer preferences, estimating sales of new products, estimating changes in population characteristics (such as birth rates and changes in per capita income), anticipating changes in technology and competitive responses and estimating the acceptance of the Corporation's products in new markets. As a result, there can be no assurance that the Corporation's volume increases will occur as estimated.

*Foreign Market Risks.*    Because the Corporation and its equity companies have manufacturing facilities in 40 countries and their products are sold in more than 150 countries, the Corporation's results may be substantially affected by foreign market risks. The Corporation is subject to the impact of economic and political instability in developing countries. The extremely competitive situation in European personal care and tissue markets, and the challenging economic environments in Argentina, Brazil, Colombia, Mexico, Venezuela and developing countries in Eastern Europe, Asia and elsewhere in Latin America, may slow the Corporation's sales growth and earnings potential. In addition, the Corporation is subject to the movement of various currencies against each other and versus the U.S. dollar. Exposures, arising from transactions and commitments denominated in non-local currencies, are systematically hedged through foreign currency forward, option and swap contracts. See Item 7A, "Management's Discussion and Analysis – Risk Sensitivity." Translation exposure for the Corporation with respect to foreign operations is not hedged. There can be no assurance that the Corporation will be fully protected against substantial foreign currency fluctuations.

5

Case MDL No. 875 Document 4723 Filed 02/21/06 Page 33 of 324

Table of Contents

**PART I**
(Continued)

*Contingencies.* The costs and other effects of pending litigation and administrative actions against the Corporation cannot be determined with certainty. Although management believes that no such proceedings will have a material adverse effect on the Corporation, there can be no assurance that the outcome of such proceedings will be as expected. See Item 3, "Legal Proceedings."

One of the Corporation's North American tissue mills has an agreement to provide its local utility company a specified amount of electric power for each of the next 12 years. In the event that the mill was shut down, the Corporation would be required to continue to operate the power generation facility on behalf of its owner, the local utility company. The net present value of the cost to fulfill this agreement as of December 31, 2004 is estimated to be approximately $120 million. Management considers the probability of closure of this mill to be remote.

**Available Information**

The Corporation makes available financial information, news releases and other information on the Corporation's Web site at www.kimberly-clark.com . There is a direct link from the Web site to the Corporation's Securities and Exchange Commission filings via the EDGAR database, where the Corporation's annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and any amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934 are available free of charge as soon as reasonably practicable after the Corporation files such reports and amendments with, or furnishes them to, the Securities and Exchange Commission. Stockholders may also contact Stockholder Services, P.O. Box 612606, Dallas, Texas 75261-2606 or call 972-281-1521 to obtain a hard copy of these reports without charge.

**PROPERTIES**
**ITEM 2.**

Management believes that the Corporation's production facilities are suitable for their purpose and adequate to support its businesses. The extent of utilization of individual facilities varies, but they generally operate at or near capacity, except in certain instances such as when new products or technology are being introduced or when mills are being shut down. Various facilities contain pollution control, solid waste disposal and other equipment which have been financed through the issuance of industrial revenue or similar bonds and are held by the Corporation under lease or installment purchase agreements.

The principal facilities of the Corporation (including the Corporation's equity companies) and the products or groups of products made at such facilities are as follows:

**World Headquarters Location**
Dallas, Texas

**Operating Segments and Geographic Headquarters**
Roswell, Georgia
Neenah, Wisconsin
Milsons Point, Australia
Seoul, Korea
Reigate, United Kingdom

**Administrative Centers**
Knoxville, Tennessee
Brighton, United Kingdom

6

Case MDL No. 875    Document 4723    Filed 02/21/06    Page 34 of 324

Table of Contents

**PART I**
(Continued)

### Worldwide Production and Service Facilities

**United States**

**Alabama**
Mobile—tissue products

**Arizona**
Tucson—health care products

**Arkansas**
Conway—feminine care and incontinence care products and nonwovens
Maumelle—wet wipes and nonwovens

**California**
Fullerton—tissue products

**Connecticut**
New Milford—tissue products

**Georgia**
LaGrange—nonwovens

**Idaho**
Pocatello—health care products

**Kentucky**
Owensboro—tissue products

**Mississippi**
Corinth—nonwovens, wipers and towels

**North Carolina**
Hendersonville—nonwovens
Lexington—nonwovens

**Oklahoma**
Jenks—tissue products

**Pennsylvania**
Chester—tissue products

**South Carolina**
Beech Island—diapers, wet wipes and tissue products

**Tennessee**
Loudon—tissue products

7

**Table of Contents**

**PART I**
(Continued)

**Texas**
Del Rio—health care products
Fort Worth—health care products
Paris—diapers and training, youth and swim pants
San Antonio—personal cleansing products and systems

**Utah**
Draper—health care products
Ogden—diapers

**Washington**
Everett—tissue products, wipers and pulp

**Wisconsin**
Marinette—tissue products
Neenah—diapers, training pants, feminine care and incontinence care products and nonwovens

**Outside the United States**

**Argentina**
Bernal—tissue products
Pilar—feminine care and incontinence care products
San Luis—diapers

**Australia**
Albury—nonwovens
Ingleburn—diapers
Lonsdale—diapers and feminine care and incontinence care products
Millicent—pulp and tissue products
Tantanoola—pulp
Warwick Farm—tissue products

**Bahrain**
&ast; East Riffa—tissue products

**Belgium**
Duffel—tissue products

**Bolivia**
La Paz—tissue products
Santa Cruz—tissue products

**Brazil**
Bahia—tissue products
Correia Pinto—tissue products
Cruzeiro—tissue products
Mogi das Cruzes—tissue products
Porto Alegre—feminine care products
Suzano—diapers, wet wipes and incontinence care products

---

&ast;  Equity company production facility

8

Case MDL No. 875   Document 4723   Filed 02/21/06   Page 36 of 324

**Table of Contents**

**PART I**
(Continued)

**Canada**
Huntsville, Ontario—tissue products and wipers
St. Hyacinthe, Quebec—feminine care and incontinence care products

**China**
Beijing—feminine care products and diapers
Guangzhou—tissue products
Nanjing—feminine care products
Shanghai—tissue products

**Colombia**
Barbosa—wipers, business and correspondence papers and notebooks
Puerto Tejada—tissue products
Tocancipa—diapers and feminine care products
\* Villa Rica—diapers and incontinence care products

**Costa Rica**
Belen—tissue products
Cartago—diapers and feminine care and incontinence care products

**Czech Republic**
Jaromer—diapers and incontinence care products
Litovel—feminine care products

**Dominican Republic**
Santo Domingo—tissue products

**Ecuador**
Babahoyo—tissue products
Mapasingue—tissue products, diapers and feminine care products

**El Salvador**
Sitio del Niño—tissue products

**France**
Rouen—tissue products
Villey-Saint-Etienne—tissue products

**Germany**
Forchheim—feminine care and incontinence care products
Koblenz—tissue products
Mainz—tissue products
Reisholz—tissue products

**Honduras**
Villanueva—health care products

**India**
\* Pune—feminine care products and diapers

---

\*  Equity company production facility

9

Table of Contents

**PART I**
(Continued)

**Indonesia**
Jakarta—tissue products

**Israel**
Afula—diapers and feminine care and incontinence care products
Hadera—tissue products
Nahariya—tissue products

**Italy**
Alanno—tissue products
Romagnano—tissue products
Villanovetta—tissue products

**Korea**
Anyang—feminine care products, diapers and tissue products
Kimcheon—tissue products and nonwovens
Taejon—feminine care products, diapers and nonwovens

**Malaysia**
Kluang—tissue products, feminine care products and diapers

**Mexico**
Acuña—health care products
* Bajio—tissue products, fine papers and notebooks
* Cuautitlan—feminine care products, diapers and nonwovens
* Ecatepec—tissue products
Empalme—health care products
Magdalena—health care products
* Morelia—tissue products, pulp and fine papers
* Naucalpan—tissue products and specialty papers
Nogales—health care products
* Orizaba—tissue products, fine papers and pulp
* Ramos Arizpe—tissue products and diapers
* San Rafael—fine papers
* Texmelucan—tissue products
* Tlaxcala—diapers, nonwovens and wet wipes

**Peru**
Puente Piedra—tissue products
Villa—diapers and feminine care and incontinence care products

**Philippines**
San Pedro, Laguna—feminine care products, diapers and tissue products

**Poland**
Klucze—tissue products

**Saudi Arabia**
* Al-Khobar—diapers and feminine care and tissue products

10

---

* Equity company production facility

Case MDL No. 875　Document 4723　Filed 02/21/06　Page 38 of 324

Table of Contents

**PART I**
(Continued)

**Singapore**
Tuas—diapers

**Slovak Republic**
Piestany—health care products

**South Africa**
Cape Town—tissue, feminine care and incontinence care products
Springs—tissue products and diapers

**Spain**
Aranguren—tissue products
Arceniega—tissue products and personal cleansing products and systems
Calatayud—diapers
Salamanca—tissue products
Telde, Canary Islands—tissue products

**Switzerland**
Balsthal—tissue products and specialty papers
Niederbipp—tissue products
Reichenburg—tissue products

**Taiwan**
Chung Li—tissue products, feminine care products and diapers
Hsin-Ying—tissue products
Ta-Yuan—tissue products

**Thailand**
Hat Yai—disposable gloves
Pathumthani—feminine care products, diapers and tissue products
Samut Prakarn—tissue products

**Turkey**
Istanbul—diapers

**United Kingdom**
Barrow—tissue products
Barton-upon-Humber—diapers and nonwovens
Flint—tissue products and nonwovens
Northfleet—tissue products

**Venezuela**
Maracay—tissue products and diapers

**Vietnam**
Binh Duong—feminine care products
Hanoi—feminine care products

11

Table of Contents

**PART I**
(Continued)

## LEGAL PROCEEDINGS
**ITEM 3.**

As of December 31, 2004, the Corporation, along with many other nonaffiliated companies, was a party to lawsuits with allegations of personal injury resulting from asbestos exposure on the defendants' premises and allegations that the defendants manufactured, sold, distributed or installed products which cause asbestos-related lung disease. These general allegations are often made against the Corporation without any apparent evidence or identification of a specific product or premises of the Corporation. The Corporation has denied the allegations and raised numerous defenses in all of these asbestos cases. All asbestos claims have been tendered to the Corporation's insurance carriers for defense and indemnity. The financial statements reflect appropriate accruals for the Corporation's portion of the costs estimated to be incurred in connection with resolving these claims.

The Corporation is subject to federal, state and local environmental protection laws and regulations with respect to its business operations and is operating in compliance with, or taking action aimed at ensuring compliance with, such laws and regulations. The Corporation has been named a potentially responsible party under the provisions of the federal Comprehensive Environmental Response, Compensation and Liability Act, or analogous state statutes, at a number of waste disposal sites.

In management's opinion, none of these legal proceedings nor the Corporation's compliance obligations with environmental protection laws and regulations, individually or in the aggregate, is expected to have a material adverse effect on the Corporation's business, financial condition, results of operations or liquidity.

## SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS
**ITEM 4.**

No matters were submitted to a vote of security holders during the fourth quarter of 2004.

### ITEM 4A.   EXECUTIVE OFFICERS

The names and ages of the executive officers of the Corporation as of February 22, 2005, together with certain biographical information, are as follows:

**Robert E. Abernathy** , 50, was elected Group President – Developing and Emerging Markets effective January 19, 2004. He is responsible for the Corporation's businesses in Asia, Latin America, Eastern Europe, the Middle East and Africa. Mr. Abernathy joined the Corporation in 1982. His past responsibilities in the Corporation have included operations and major project management in North America. He was appointed Vice President – North American Diaper Operations in 1992; Managing Director of Kimberly-Clark Australia Pty. Limited in 1994; and Group President of the Corporation's Business-to-Business segment in 1998.

**Mark A. Buthman** , 44, was elected Senior Vice President and Chief Financial Officer in 2003. Mr. Buthman joined the Corporation in 1982. He has held various positions of increasing responsibility in the operations, finance and strategic planning areas of the Corporation. Mr. Buthman was appointed Vice President of Finance in 2002 and Vice President of Strategic Planning and Analysis in 1997.

**Thomas J. Falk** , 46, was elected Chairman of the Board and Chief Executive Officer in 2003 and President and Chief Executive Officer in 2002. Prior to that, he served as President and Chief Operating Officer since 1999. Mr. Falk previously had been elected Group President—Global Tissue, Pulp and Paper in 1998, where he was responsible for the Corporation's global tissue businesses. Earlier in his career, Mr. Falk had responsibility for the Corporation's North American Infant Care, Child Care and Wet Wipes businesses. Mr. Falk joined the Corporation in 1983 and has held other senior management positions in the Corporation. He has been a director

12

Table of Contents

**PART I**
(Continued)

of the Corporation since 1999. He also serves on the board of directors of Centex Corporation, Grocery Manufacturers of America, Inc. and the University of Wisconsin Foundation, and serves as a trustee of the Boys & Girls Clubs of America.

**Steven R. Kalmanson** , 52, was elected Group President—North Atlantic Personal Care effective January 19, 2004. He is responsible for the Corporation's global personal care segment, and its North American Sales, Marketing Services and Supply Chain and Logistics organizations. Mr. Kalmanson joined the Corporation in 1977. His past responsibilities have included various marketing and business management positions within the consumer products businesses. He was appointed President, Adult Care in 1990; President, Child Care in 1991; President, Family Care in 1995; and Group President of the Corporation's Consumer Tissue segment in 1996.

**W. Dudley Lehman** , 53, was elected Group President—Business-to-Business effective January 19, 2004. He is responsible for the Corporation's global Business-to-Business segment, which includes the K-C Professional Tissue and Wiper business, the Health Care business, Nonwovens manufacturing and the Research and Sales functions. Mr. Lehman joined the Corporation in 1976 and held various marketing positions in the infant care and feminine care businesses before becoming Director of Training Pants in 1988. He was appointed President of the Child Care Sector in 1990; President of the Infant Care Sector in 1991; and Group President of the Infant Care and Child Care Sectors in 1995. Mr. Lehman is a director of Snap-on Incorporated.

**Ronald D. Mc Cray** , 47, was elected Senior Vice President—Law and Government Affairs and Chief Compliance Officer effective November 16, 2004. His responsibilities include the Corporation's legal affairs, internal audit and government relations activities. Mr. Mc Cray joined the Corporation in 1987 as Senior Attorney. He was appointed Vice President and Chief Counsel in 1996. He was elected Vice President and Secretary in 1999, Vice President, Associate General Counsel and Secretary in 2001 and Senior Vice President—Law and Government Affairs in 2003. He is a director of Knight-Ridder, Inc.

**Robert P. van der Merwe** , 52, was elected Group President—North Atlantic Family Care effective January 19, 2004. He is responsible for the Corporation's global consumer tissue segment, and its European Marketing Services, Integrated Supply Chain and Customer Management organizations. Mr. van der Merwe joined the Corporation in 1980 as Brand/Marketing Manager in South Africa. In 1985, he became Director of World Support Group—Personal Care. From 1987 to 1993, Mr. van der Merwe left the Corporation to become Managing Director of Xerox's Southern African operations. He returned to the Corporation in 1994 as Director of Global Projects and became Director of the World Support Group—Personal Care in 1995. He became President of the Adult Care Sector later that year and was appointed President—Feminine Care Sector in 1997. He was appointed President—Kimberly-Clark Europe in 1998 and was elected Group President—Kimberly-Clark Europe, Middle East & Africa in 1998.

13

**Table of Contents**

## PART II

**ITEM 5.** MARKET FOR THE REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

The dividend and market price data included in Item 8, Note 18 to the Consolidated Financial Statements is incorporated in this Item 5 by reference.

Quarterly dividends have been paid continually since 1935. Dividends are paid on or about the second business day of January, April, July and October. The Automatic Dividend Reinvestment service of EquiServe Trust Company, N.A. is available to Kimberly-Clark stockholders of record. The service makes it possible for Kimberly-Clark stockholders of record to have their dividends automatically reinvested in common stock and to make additional cash investments up to $3,000 per quarter.

Kimberly-Clark common stock is listed on the New York, Chicago and Pacific stock exchanges. The ticker symbol is KMB.

As of February 16, 2005, the Corporation had 35,773 holders of record of its common stock.

For information relating to securities authorized for issuance under equity compensation plans, see Part III, Item 12 of this Form 10-K.

The Corporation regularly repurchases shares of Kimberly-Clark common stock pursuant to publicly announced share repurchase programs. All share repurchases by the Corporation were made through brokers on the New York Stock Exchange. During 2004, the Corporation purchased $1.6 billion worth of its common stock. The following table contains information for shares repurchased during the fourth quarter of 2004. None of the shares in this table were repurchased directly from any officer or director of the Corporation.

| Period (2004) | Shares Purchased | Average Cost Per Share | Cumulative Number of Shares Purchased Pursuant To The Programs | Remaining Shares That May be Repurchased |
|---|---|---|---|---|
| October 1 to 31 | 1,228,000 (a) | $ 62.51 | 20,000,000 | 25,000,000 |
| November 1 to 30 | 2,027,000 (b) | 61.84 | 2,027,000 | 22,973,000 |
| December 1 to 31 | 3,510,000 (b) | 64.64 | 5,537,000 | 19,463,000 |
| Total | 6,765,000 | | | |

(a) All share repurchases between October 1, 2004 and October 31, 2004 were made pursuant to a share repurchase program authorized by the Corporation's board of directors on February 18, 2003 and publicly announced the same day, which allowed for the repurchase of 20 million shares in an amount not to exceed $1.5 billion. No shares remain to be repurchased under this program after October 31, 2004.

(b) All share repurchases between November 1, 2004 and December 31, 2004 were made pursuant to a share repurchase program authorized by the Corporation's board of directors on June 8, 2004 and publicly announced the same day, which allows for the repurchase of 25 million shares in an amount not to exceed $2.25 billion.

In addition, during November and December, 25,085 shares at a cost of $1,585,849 and 15,353 shares at a cost of $994,515, respectively, were purchased from current or former employees in connection with the exercise of employee stock options and other awards. No such shares were purchased in October.

14

**Table of Contents**

**PART II**
(Continued)

### SELECTED FINANCIAL DATA
### ITEM 6.

| | Year Ended December 31(a) | | | | |
|---|---|---|---|---|---|
| | **2004** | **2003** | **2002(b)** | **2001(b)(c)** | **2000(b)(c)** |
| | (Millions of dollars, except per share amounts) | | | | |
| Net Sales | $15,083.2 | $14,026.3 | $13,231.5 | $12,923.6 | $12,468.5 |
| Gross Profit | 5,068.5 | 4,794.4 | 4,693.8 | 4,573.8 | 4,523.9 |
| Operating Profit | 2,506.4 | 2,331.6 | 2,368.3 | 2,272.9 | 2,507.9 |
| Share of Net Income of Equity Companies | 124.8 | 107.0 | 113.3 | 154.4 | 186.4 |
| Income from: | | | | | |
|     Continuing operations | 1,770.4 | 1,643.6 | 1,627.4 | 1,571.1 | 1,723.5 |
|     Discontinued operations, net of income taxes | 29.8 | 50.6 | 58.6 | 38.8 | 77.1 |
|     Cumulative effect of accounting change, net of income taxes | — | — | (11.4) | — | — |
| Net income | 1,800.2 | 1,694.2 | 1,674.6 | 1,609.9 | 1,800.6 |
|   Per share basis: | | | | | |
|     Basic | | | | | |
|       Continuing operations | 3.58 | 3.24 | 3.15 | 2.97 | 3.19 |
|       Discontinued operations | .06 | .10 | .11 | .07 | .15 |
|       Cumulative effect of accounting change, net of income taxes | — | — | (.02) | — | — |
|       Net income | 3.64 | 3.34 | 3.24 | 3.04 | 3.34 |
|     Diluted | | | | | |
|       Continuing operations | 3.55 | 3.23 | 3.13 | 2.95 | 3.17 |
|       Discontinued operations | .06 | .10 | .11 | .07 | .14 |
|       Cumulative effect of accounting change, net of income taxes | — | — | (.02) | — | — |
|       Net income | 3.61 | 3.33 | 3.22 | 3.02 | 3.31 |
| Cash Dividends Per Share | | | | | |
|   Declared | 1.60 | 1.36 | 1.20 | 1.12 | 1.08 |
|   Paid | 1.54 | 1.32 | 1.18 | 1.11 | 1.07 |
| Total Assets | $17,018.0 | $16,779.9 | $15,639.6 | $15,059.1 | $14,520.7 |
| Long-Term Debt | 2,298.0 | 2,733.7 | 2,844.0 | 2,424.0 | 2,000.6 |
| Stockholders' Equity | 6,629.5 | 6,766.3 | 5,650.3 | 5,646.9 | 5,767.3 |

(a)   Income statement data present the results of Neenah Paper's fine and technical papers businesses as discontinued operations.

(b)   During 2001, the Emerging Issues Task Force ("EITF") of the Financial Accounting Standards Board ("FASB") issued EITF 01-9, *Accounting for Consideration Given by a Vendor to a Customer or a Reseller of the Vendor's Products* . Under EITF 01-9, the cost of promotion activities offered to customers is classified as a reduction in sales revenue. In addition, the estimated redemption value of consumer coupons is required to be recorded at the time the coupons are issued and classified as a reduction in sales revenue. The Corporation adopted EITF 01-9 effective January 1, 2002, and reclassified the expected redemption value of coupons and other applicable promotional activities from expense to a reduction in revenue, which reduced net sales by $1.1 billion for 2000 and $1.2 billion for 2001. The adoption of EITF 01-9 did not change reported earnings for prior years but did require the recording of a cumulative effect of a change in accounting principle in 2002, equal to an after-tax charge of approximately $.02 per share, which resulted from a change in the period for recognizing the costs of coupons.

(c)   On January 1, 2002, the Corporation adopted Statement of Financial Accounting Standards ("SFAS") 142, *Goodwill and Other Intangible Assets* . Under this standard, goodwill and intangible assets having indefinite lives are no longer amortized but are subject to annual impairment tests with any impairment loss recognized in the period of impairment. The Corporation recorded goodwill amortization of $87.7 million in 2000 and $94.4 million in 2001. The effect of this amortization, net of applicable income taxes, on basic and diluted earnings per share was $.16 in 2000 and $.18 in 2001.

Case MDL No. 875 Document 4723 Filed 02/21/06 Page 43 of 324

Table of Contents

**PART II**
(Continued)

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### Introduction

This management's discussion and analysis of financial condition and results of operations is intended to provide investors with an understanding of the Corporation's past performance, its financial condition and its prospects. The following will be discussed and analyzed:

- Overview of Business
- Overview of 2004 Results
- Results of Operations and Related Information
- Liquidity and Capital Resources
- Variable Interest Entities
- Critical Accounting Policies and Use of Estimates
- Contingencies and Legal Matters
- New Accounting Standards
- Business Outlook
- Information Concerning Forward-Looking Statements

### Overview of Business

The Corporation is a global health and hygiene company with manufacturing facilities in 37 countries and its products are sold in more than 150 countries. The Corporation's products are sold under such well-known brands as Kleenex, Scott, Huggies, Pull-Ups, Kotex and Depend. The Corporation has three reportable global business segments: Personal Care, Consumer Tissue and Business-to-Business. These global business segments are described in greater detail in Item 1 of this Form 10-K and in Note 16 to the Consolidated Financial Statements.

In managing this global business, the Corporation's management believes that developing new and improved products, responding effectively to competitive challenges, obtaining and maintaining leading market shares, controlling costs, and managing currency and commodity risks are important to the long-term success of the Corporation. The discussion and analysis of results of operations and other related information will refer to these factors.

- Product innovation—Past results and future prospects depend in large part on product innovation. The Corporation relies on its ability to develop and introduce new or improved products to drive sales and volume growth and to achieve and/or maintain category leadership. In order to develop new or improved products, the technology to support those products must be developed. Research and development expenditures are directed towards new or improved personal care, tissue and health care products and nonwoven materials.

- Competitive environment—Past results and future prospects are significantly affected by the competitive environment in which we operate. We experience intense competition for sales of our principal products in our major markets, both domestically and internationally. Our products compete with widely advertised, well-known, branded products, as well as private label products, which are typically sold at lower prices. We have several major competitors in most of our markets, some of which are larger and more diversified. The principal methods and elements of competition include brand recognition and loyalty, product innovation, quality and performance, price, and marketing and distribution capabilities.

16

**Table of Contents**

**PART II**
(Continued)

Aggressive competitive actions in 2003 and 2004 have required increased promotional spending to support new product introductions and enable competitive pricing in order to protect the position of the Corporation's products in the market. We expect competition to continue to be intense in 2005.

- Market shares—Achieving leading market shares in our principal products has been an important part of our past performance. We hold the number 1 or 2 brand position in more than 80 countries. Achieving and maintaining leading market shares is important because of ongoing consolidation of retailers and the trend of leading merchandisers seeking to stock only the top competitive brands.

- Cost controls—To maintain our competitive position, we must control our manufacturing, distribution and other costs. We have achieved cost savings from reducing material costs and manufacturing waste and realizing productivity gains and distribution efficiencies in each of our business segments. Our ability to control costs can be affected by changes in the price of oil, pulp and other commodities we consume in our manufacturing processes. Our strategic investments in information systems should also allow further cost savings through streamlining administrative activities.

- Foreign currency and commodity risks—As a multinational enterprise, we are exposed to changes in foreign currency exchange rates, and we are also exposed to commodity prices. Our ability to effectively manage these risks can have a material impact on our results of operations.

On November 30, 2004, the Corporation distributed to its stockholders all of the shares of common stock of Neenah Paper, Inc. ("Neenah Paper"), a wholly-owned subsidiary formed in April 2004 to facilitate the spin-off of the U.S. fine and technical papers businesses and the Canadian pulp mills (the "Spin-off"). In accordance with Statement of Financial Accounting Standards ("SFAS") 144, *Accounting for the Impairment or Disposal of Long-Lived Assets,* prior period Consolidated Income Statements and Cash Flow Statements and related disclosures present the results of Neenah Paper's fine paper and technical paper businesses, which were previously included in the Business-to-Business segment, as discontinued operations. Prior to the Spin-off, the Corporation internally consumed approximately 90 percent of the pulp produced by the Canadian pulp business. In connection with the Spin-off, the Corporation entered into a long-term pulp supply agreement to purchase a substantial portion of the pulp produced by Neenah Paper. Because we will continue to incur pulp costs in our operations, the results of Neenah Paper's Canadian pulp business have not been reported as discontinued operations in accordance with the provisions of SFAS 144. The following discussion and analysis is based on a comparison of the Corporation's continuing operations.

**Overview of 2004 Results**

During 2004, the Corporation continued to face intense competition in most of its markets. In particular, the diaper and pants categories in North America and Europe continued to be affected by the competitive pricing pressures that began in late 2002. The tissue businesses were also adversely affected by higher fiber costs, and all of the businesses faced higher materials input costs. Despite these challenges, improved results were achieved in 2004:

- Net sales grew 7.5 percent.

- Net sales advanced in each of the three business segments and in each geographic region.

- Innovative and improved products such as Huggies Convertibles diaper pants, Huggies diapers with Triple-Leak Protection, Pull-Ups training pants with easy-open sides, gender specific GoodNites youth pants, Anti-viral Kleenex tissue, Scott Coreless Jumbo bathroom tissue and Kotex Lightdays everyday pantiliners contributed to increased sales volumes.

17

Case MDL No. 875  Document 4723  Filed 02/21/06  Page 45 of 324

Table of Contents

**PART II**
(Continued)

- Operating profit increased 7.5 percent and income and diluted earnings per share from continuing operations increased 7.7 percent and 9.9 percent, respectively.
  - Increased sales volumes more than offset the effect of lower net selling prices.
  - Cost savings of nearly $160 million helped to temper the effects of higher costs for fiber, other materials, energy and distribution of over $180 million.
- Cash flow from operations in 2004 set a record for the fourth consecutive year.
  - The Corporation repurchased 24.8 million shares of its common stock for about $1.6 billion.
  - Annual cash dividends were increased by 17.6 percent in 2004 and will increase another 12.5 percent in 2005.

Market Shares

U.S. market shares are tracked on a sales dollar basis with information provided by A.C. Nielsen for distribution through the food, drug and mass merchandising channels, excluding Wal-Mart, warehouse clubs, dollar stores and certain other outlets. These customers do not report market share information publicly. The A.C. Nielsen data provides coverage ranging from approximately 40 percent to 60 percent of the retail value of products sold, depending upon the product category.

Shown below are the Corporation's U.S. market shares for key categories for full years 2002 through 2004:

| Category | 2004 | 2003 | 2002 |
|---|---|---|---|
| Diapers | 38% | 38% | 40% |
| Training, Youth and Swim Pants | 69% | 68% | 73% |
| Feminine Care | 20% | 22% | 23% |
| Adult Incontinence Care | 56% | 56% | 55% |
| Baby Wipes | 40% | 41% | 42% |
| Facial Tissue | 51% | 53% | 54% |
| Bathroom Tissue | 29% | 28% | 27% |
| Paper Towels | 19% | 19% | 19% |

18

Table of Contents

## PART II
(Continued)

### Results of Operations and Related Information

This section contains a discussion and analysis of net sales, operating profit and other information relevant to an understanding of 2004 results of operations. This discussion and analysis compares 2004 results to 2003, and 2003 results to 2002. Each of those discussions focuses first on consolidated results, and then the results of each reportable business segment.

#### *Analysis of Consolidated Net Sales*

*By Business Segment*

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2004** | **2003** | **2002** |
|  | (Millions of dollars) | | |
| Personal Care | $ 5,975.1 | $ 5,652.9 | $ 5,485.5 |
| Consumer Tissue | 5,343.0 | 5,046.7 | 4,635.2 |
| Business-to-Business | 3,957.9 | 3,477.7 | 3,256.7 |
| Intersegment sales | (192.8) | (151.0) | (145.9) |
| Consolidated | $15,083.2 | $14,026.3 | $13,231.5 |

*By Geographic Area*

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2004** | **2003** | **2002** |
|  | (Millions of dollars) | | |
| United States | $ 8,683.5 | $ 8,335.8 | $ 8,314.4 |
| Canada | 911.0 | 801.8 | 831.4 |
| Intergeographic sales | (554.4) | (515.6) | (601.2) |
| Total North America | 9,040.1 | 8,622.0 | 8,544.6 |
| Europe | 3,098.3 | 2,892.5 | 2,482.8 |
| Asia, Latin America and other | 3,488.8 | 3,061.6 | 2,751.5 |
| Intergeographic sales | (544.0) | (549.8) | (547.4) |
| Consolidated | $15,083.2 | $14,026.3 | $13,231.5 |

Commentary:

*2004 versus 2003*

| | Percent Change in Sales Versus Prior Year | | | | |
|---|---|---|---|---|---|
| | | Change Due To | | | |
| | | Volume | | | |
| Total | Total Volume | Organic Growth | Acquisitions | Net | |

Case MDL No. 875 Document 4723 Filed 02/21/06 Page 47 of 324

| | Change | | | | Price | Currency | Other |
|---|---|---|---|---|---|---|---|
| Consolidated | 8 | 5 | 4 | 1 | (1) | 3 | 1 |
| Personal Care | 6 | 4 | 4 | — | (2) | 3 | 1 |
| Consumer Tissue | 6 | 3 | 1 | 2 | — | 4 | (1) |
| Business-to-Business | 14 | 7 | 7 | — | (1) | 3 | 5 |

Consolidated net sales increased 7.5 percent from 2003. Sales volumes advanced approximately 5 percent with contributions from each of the business segments. About 1 percentage point of the increase in sales volumes

19

Case MDL No. 875   Document 4723   Filed 02/21/06   Page 48 of 324

Table of Contents

**PART II**
(Continued)

was due to the consolidation, in August 2003, of Klabin Kimberly S.A. ("Klabin"), a former equity affiliate and Brazil's largest tissue manufacturer. Currency effects added more than 3 percent to the increase primarily due to strengthening of the euro, British pound, and Australian and Canadian dollars. Slightly lower net selling prices were offset by a more favorable product mix.

- Worldwide personal care net sales rose 5.7 percent due to higher sales volumes, mainly in North America, favorable currency effects in Europe and Australia and better product mix in Central America, partially offset by lower net selling prices primarily in North America and Europe.

  In North America, net sales increased nearly 5 percent driven by a more than 6 percent sales volume increase reflecting higher sales of Huggies diapers and double-digit growth for child care products—GoodNites youth underpants, Pull-Ups training pants, Little Swimmers swimpants—and incontinence brands Poise and Depend. Net selling prices declined about 2 percent primarily in response to competitive activity. Favorable Canadian dollar exchange rate effects also contributed to the increase in net sales. The increased child care volumes are due to strong category growth through increased consumer usage. Market share for feminine care products declined as a result of significant competitive activity.

  Net sales in Europe were even with last year as 10 percent favorable currency effects were offset by almost 7 percent lower sales volumes and a 3 percent reduction in net selling prices. Lower sales volumes for diapers and feminine care products, resulting from aggressive competitive price reductions and promotion spending, more than offset higher sales volumes for child and adult care products. Except for child care, which benefited from a prior year price increase, net selling prices declined due to competitive activity.

  In the developing and emerging markets, net sales increased about 10 percent with higher sales volumes and favorable currency effects each contributing about 5 percent, while improved product mix essentially offset lower net selling prices. Advances in sales volumes and favorable currency were realized in both Korea and Australia. Latin America and Israel also recorded higher sales volumes.

- Worldwide consumer tissue net sales increased 5.9 percent on higher sales volumes, primarily in North America, the consolidation of Klabin and favorable currency effects, principally in Europe, partially offset by lower intersegment sales. Net selling prices were even with the prior year.

  In North America, net sales increased almost 4 percent with higher sales volumes and net selling prices each contributing about 2 percent. The higher sales volumes were led by increased sales for Scott bathroom tissue and private label, partially offset by lower sales volumes for Kleenex facial tissue. In the third quarter of 2004, the Corporation implemented list price increases on its bathroom and facial tissue products and on paper towels. These price increases along with a reduction in trade promotion spending in the fourth quarter contributed to the higher net selling prices. In facial tissue products, the Corporation's main competitor did not match the Corporation's price increases in some product codes, which is reflected in the Corporation's lower market share for the category. The third quarter 2004 introduction of Kleenex Anti-viral facial tissue contributed to a slight increase in net sales due to product mix.

  In Europe, net sales increased nearly 9 percent because of an almost 11 percent favorable effect from currency tempered by lower net selling prices that reflect the continuing competitive marketplace. Sales volumes were nearly 1 percent higher primarily due to increased sales of Andrex products in the United Kingdom.

  In the developing and emerging markets, net sales advanced approximately 20 percent on a sales volume increase of more than 11 percent, of which about 7 percentage points was attributable to the consolidation of Klabin, favorable currency effects of almost 5 percent, primarily in Australia, and a favorable product mix.

20

Case MDL No. 875   Document 4723   Filed 02/21/06   Page 49 of 324

Table of Contents

**PART II**
(Continued)

- Worldwide net sales for products in the business-to-business segment increased 13.8 percent driven by nearly 7 percent higher sales volumes, more than 3 percent favorable currency effects and higher intersegment sales, tempered by less than 2 percent lower net selling prices. Sales volume growth was led by more than an 8 percent volume increase in global health care. Professional products achieved more than 5 percent higher sales volumes and higher sales of nonwoven products provided additional benefit. The favorable currency effects were principally due to Europe. Despite price increases in the fourth quarter for professional products in North America, net selling prices for the year declined due to price erosion in contract business across the segment.

*2003 versus 2002*

| | Percent Change in Sales Versus Prior Year | | | | | | |
| | | Change Due To | | | | | |
| | | | Volume | | | | |
| | Total Change | Total Volume | Organic Growth | Acquisitions | Net Price | Currency | Other |
|---|---|---|---|---|---|---|---|
| Consolidated | 6 | 2 | 1 | 1 | (1) | 4 | 1 |
| Personal Care | 3 | — | — | — | — | 3 | — |
| Consumer Tissue | 9 | 4 | 2 | 2 | — | 5 | — |
| Business-to-Business | 7 | 3 | 3 | — | (2) | 5 | 1 |

Consolidated net sales increased 6.0 percent over 2002. In addition to favorable currency effects of about 4 percent, higher sales volumes of more than 2 percent more than offset slightly lower net selling prices. The favorable currency effects, primarily in Europe and Australia, were tempered by unfavorable currency effects in Latin America. Slightly less than one-half of the increased sales volumes were due to the consolidation of Klabin and the February 2003 acquisition of the Klucze tissue business in Poland.

- Worldwide sales of personal care products increased 3.1 percent due to favorable currency exchange rates. Overall sales volumes and net selling prices were the same as 2002.

   In North America, net sales increased about 1 percent. Favorable Canadian exchange rate effects and product mix more than offset lower net selling prices of about 1 percent. Increased sales volumes for training pants and incontinence care products were offset by decreased sales volume for diapers that were affected by aggressive competitive actions. Training-pants products achieved an all-time record for annual shipments even though U.S. market share for 2003 was below the prior year's full year share.

   Net sales in Europe increased about 4 percent as favorable currency effects more than offset 7 percent lower sales volumes due to aggressive competitive consumer promotion activity. Lower diaper sales volumes were partially offset by increased sales volumes for incontinence care products and training pants.

   In the developing and emerging markets, net sales increased about 8 percent. Currency effects were approximately 3 percent favorable. Sales volumes and net selling prices each contributed about 2 percent with favorable product mix adding 1 percent. Net sales in Asia grew on higher sales volumes in Australia and currency effects in both Australia and Korea. In Latin America, net sales declined as higher net selling prices were more than offset by lower sales volumes and unfavorable currency. Net sales for the other geographies rose because of higher sales volumes and favorable currency in South Africa and higher sales volumes and favorable product mix in Eastern Europe.

- Worldwide sales of consumer tissue products increased 8.9 percent due to favorable currency effects, primarily in Europe and nearly 4 percent higher sales volumes. Overall net selling prices were essentially even with 2002.

21

Case MDL No. 875  Document 4723  Filed 02/21/06

**Table of Contents**

**PART II**
(Continued)

In North America, net sales increased more than 1 percent on 2 percent higher sales volumes partially offset by lower net selling prices. While overall U.S. market share in the facial category for 2003 was below 2002, there was sequential improvement in both the third and fourth quarters of the year.

Net sales in Europe increased more than 20 percent driven by favorable currency effects and higher sales volumes of about 5 percent, primarily due to the Klucze acquisition. Net selling prices were flat versus 2002.

In the developing and emerging markets, net sales advanced nearly 15 percent as sales volumes increased almost 10 percent, primarily due to Klabin. Favorable currency effects, primarily in Australia, added 4 percent, while higher net selling prices were partially offset by a less favorable product mix.

- Worldwide sales of products in the business-to-business segment increased 6.8 percent as a result of favorable currency effects and 3 percent higher sales volumes, tempered by net selling prices that were more than 1 percent lower. The higher sales volumes were driven by advances for professional products in North America, Latin America and Asia and increased sales volumes of global health care products.

*Analysis of Consolidated Operating Profit*

*By Business Segment*

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2004 | 2003 | 2002 |
| | (Millions of dollars) | | |
| Personal Care | $1,253.2 | $1,221.0 | $1,157.1 |
| Consumer Tissue | 803.1 | 728.2 | 807.3 |
| Business-to-Business | 656.6 | 602.8 | 574.9 |
| Other income (expense), net | (51.2) | (112.5) | (73.7) |
| Unallocated—net | (155.3) | (107.9) | (97.3) |
| Consolidated | $2,506.4 | $2,331.6 | $2,368.3 |

*By Geographic Area*

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2004 | 2003 | 2002 |
| | (Millions of dollars) | | |
| United States | $1,953.1 | $1,862.7 | $1,923.8 |
| Canada | 122.0 | 131.7 | 100.5 |
| Europe | 221.0 | 202.9 | 191.0 |
| Asia, Latin America and other | 416.8 | 354.7 | 324.0 |
| Other income (expense), net | (51.2) | (112.5) | (73.7) |
| Unallocated—net | (155.3) | (107.9) | (97.3) |
| Consolidated | $2,506.4 | $2,331.6 | $2,368.3 |

Note:Unallocated—net consists of expenses not associated with the business segments or geographic areas.

22

Case MDL No. 875   Document 4723   Filed 02/21/06   Page 51 of 324

**Table of Contents**

**PART II**
(Continued)

*Commentary:*
*2004 versus 2003*

| | Total Change | Percent Change in Operating Profit Versus Prior Year | | | | |
|---|---|---|---|---|---|---|
| | | **Change Due To** | | | | |
| | | Volume | Net Price | Fiber Cost | Currency | Other (a) |
| Consolidated | 8 | 11 | (8) | (2) | 3 | 4 |
| Personal Care | 3 | 12 | (9) | (1) | 2 | (1) |
| Consumer Tissue | 10 | 4 | — | (6) | 4 | 8 |
| Business-to-Business | 9 | 14 | (9) | (4) | 4 | 4 |

(a) Includes the benefits of cost savings programs and the impact of higher energy and distribution costs.

Consolidated operating profit increased 7.5 percent as the higher sales volumes, about $160 million of benefit from cost savings programs and total favorable currency effects of over $70 million more than offset the lower net selling prices, higher fiber costs and increased energy and distribution expenses. Operating profit as a percentage of net sales was 16.6 percent, the same as last year.

- Operating profit for personal care products increased 2.6 percent. The higher sales volumes, more than $85 million in cost savings and favorable currency effects, primarily in Australia and Canada, were partially offset by the lower net selling prices, higher raw material and distribution costs, increased advertising expenses, and costs associated with a plan to streamline diaper operations. Primarily as a result of significant productivity gains, the Corporation had available diaper manufacturing capacity in North America and Europe. Therefore, the Corporation executed a plan to cease diaper manufacturing and scale-back distribution operations at its facility in New Milford, Conn. Some production capacity was also redeployed from the Barton-upon-Humber facility in the U.K. Diaper machines from these locations will now support growth in other markets, thereby reducing the capital spending required for this business. These steps are consistent with the Corporation's strategies to drive growth in developing and emerging markets and improve its cost structure in North America and Europe.

  Costs to implement the infant care plan described above will total approximately $40 million before tax, including about $37 million recorded in 2004. The balance of the plan costs will be recorded in 2005 as they are incurred. Of the total 2004 cost, approximately $10 million was for employee severance recorded at the time employees were notified of their termination benefits, about $3 million for other cash costs, principally for equipment removal, and $24 million for asset write offs primarily related to the original equipment installation costs. These costs were recorded in cost of products sold.

  Operating profit in North America increased about 1 percent as the benefits of the higher sales volumes and cost savings programs were partially offset by the lower selling prices, costs of the infant care plan and higher advertising and distribution costs. In Europe, operating profit declined because of the negative impacts of the competitive environment on selling prices and sales volumes. Operating profit in the developing and emerging markets increased over 7 percent, principally due to higher sales volumes and favorable currency effects, partially offset by higher marketing expenses.

- Operating profit for consumer tissue products improved 10.3 percent driven by cost savings of almost $60 million, favorable currency effects of about $25 million and lower marketing expenses tempered by approximately $45 million of higher fiber costs, higher other raw material and energy costs and increased distribution expense. In North America, operating profit grew nearly 6 percent because of the higher sales volumes and net selling prices, cost savings, and lower marketing expenses, partially offset by higher fiber costs and increased costs for energy and distribution. Operating profit in Europe

Case MDL No. 875 Document 4723 Filed 02/21/06 Page 52 of 324

23

Case MDL No. 875 Document 4723 Filed 02/21/06 Page 53 of 324

Table of Contents

**PART II**
(Continued)

advanced more than 8 percent principally on the strength of cost savings and favorable currency, tempered by the lower net selling prices. In the developing and emerging markets, operating profit rose more than 20 percent primarily due to favorable product mix, the higher sales volumes and currency effects.

- Operating profit for business-to-business products increased 8.9 percent. In addition to the higher sales volumes and favorable currency, the segment benefited from more than $14 million in cost savings, primarily in the professional business, and lower start-up costs compared to 2003. These gains were tempered by the lower net selling prices, higher fiber costs, increased other raw materials costs, higher energy and distribution expenses, and higher general and administrative costs. Our professional and global health care businesses both had higher sales volumes in North America and Europe.

- Other income (expense), net in 2003 included charges of $34 million consisting of $15.6 million for a legal judgment in Europe and $18.4 million for the costs associated with the redemption of $400 million of debentures; and nearly $20 million for charges to write-off an investment in an historic restoration project and to recognize impairment of a nonstrategic facility outside of North America.

- The higher unallocated—net expenses in 2004 were primarily due to the write off of a consolidated investment in an historic renovation project, higher corporate charitable contributions and increased general business taxes.

*2003 versus 2002*

| | Percent Change in Operating Profit Versus Prior Year | | | | | |
|---|---|---|---|---|---|---|
| | | Change Due To | | | | |
| | Total Change | Volume | Net Price | Fiber Cost | Currency | Other (a) |
| Consolidated | (2) | 4 | (3) | (3) | 3 | (3) |
| Personal Care | 6 | (1) | 1 | — | 2 | 4 |
| Consumer Tissue | (10) | 6 | (2) | (7) | 3 | (10) |
| Business-to-Business | 5 | 8 | (9) | (3) | 6 | 3 |

(a) Includes pension, energy and other costs, net of cost savings achieved.

Consolidated operating profit decreased 1.5 percent. Higher promotional spending, increased fiber, distribution and energy costs, increased pension expense of approximately $134 million and a higher level of expenses in other income (expense), net more than offset the benefits of cost reduction programs of about $190 million, favorable currency effects and increased sales volumes. Each of the three business segments incurred more than $40 million of the higher pension costs. Operating profit as a percentage of net sales decreased from 17.9 percent in 2002 to 16.6 percent in 2003.

- Operating profit for personal care products increased 5.5 percent primarily because the benefits of cost reduction programs and favorable currency effects more than offset the lower net selling prices, lower sales volumes and higher raw materials and distribution costs. Although the competitive environment remained intense through product pricing and promotional activity, North America achieved strong fourth quarter results compared with the high level of incremental promotional spending in the year-ago quarter associated with diaper and training pant count changes at that time. North American operating profit for the full year increased because the aggressive cost reduction efforts more than offset lower net selling prices and the higher pension costs. Operating profit in Europe declined as lower sales volumes more than offset the benefits of cost savings programs. Operating profit in the developing and emerging markets increased because of the higher net selling prices and favorable currency, tempered by higher distribution and marketing costs.

24

Table of Contents

**PART II**
(Continued)

- Operating profit for consumer tissue products decreased 9.8 percent because the increased sales volumes and cost reductions were more than offset by higher fiber, distribution and energy costs, the higher pension costs and increased promotional spending. In each of the major regions—North America, Europe and the developing and emerging markets—operating profit declined generally due to the same factors that affected the segment overall.

- Operating profit for the business-to-business segment increased 4.9 percent as the benefits of cost savings programs, the higher sales volumes and favorable currency effects more than offset lower net selling prices, higher fiber and other materials costs, higher distribution and energy expenses, and the increased pension costs. Operating profit for professional products rose in both North America and Europe primarily due to cost reductions and favorable currency effects. Operating profit for health care products increased because of the higher sales volumes, cost savings and favorable currency effects, tempered by the lower net selling prices.

In 2002, the Corporation recorded charges of approximately $43 million related to business improvement and other programs. Charges related to the plans to streamline manufacturing and administrative operations in Latin America and Europe totaled $14.3 million and $19.1 million, respectively, and consisted principally of employee severance of $16.8 million and asset write-off and disposal costs of $8.4 million. The Corporation also recorded charges of approximately $3 million for employee severance to complete actions that had been initiated in 2001 and approximately $4 million for a one-time national security tax levied on all corporations in Colombia.

The above 2002 charges were recorded in the business segments as follows: personal care $14.8 million; consumer tissue $21.8 million; business-to-business $6.6 million. On a geographic basis, these charges were included as follows: North America $5.8 million; Europe $19.1 million; Asia, Latin America and other $18.3 million. These charges were included in the consolidated income statement as follows: cost of products sold—$19.1 million, consisting principally of employee severance and asset write-off costs; marketing, research and general expenses—$24.1 million, consisting principally of severance, training and other integration costs in Europe.

- Other income (expense), net in 2003 included the previously mentioned charges of $34 million and nearly $20 million. Included in 2002 were $21 million of charges related to the settlement in December 2002 of securities and shareholder derivative litigation involving Safeskin Corporation ("Safeskin") and a charge of $26.5 million for the write-off of tax credits in Brazil. The litigation predated the Corporation's February 2000 acquisition of Safeskin. In addition, the Corporation recorded currency transaction losses in 2003 compared with gains in 2002. Operating losses related to the Corporation's participation in affordable housing and historic renovation projects increased compared with 2002.

*Additional Income Statement Commentary*

*Synthetic Fuel Partnerships*

In April 2003, the Corporation acquired a 49.5 percent minority interest in a synthetic fuel partnership. In October 2004, the Corporation acquired a 49 percent minority interest in an additional synthetic fuel partnership. These partnerships are variable interest entities that are subject to the requirements of FIN 46 (Revised December 2003), *Consolidation of Variable Interest Entities*, an Interpretation of ARB 51, ("FIN 46R"). Although these partnerships are variable interest entities ("VIEs"), the Corporation is not the primary beneficiary, and the entities have not been consolidated. Synthetic fuel produced by the partnerships is eligible for synthetic fuel tax credits through 2007.

The production of synthetic fuel results in pretax losses. In 2004 and 2003, these pretax losses totaled $158.4 million and $105.5 million, respectively, and are reported as nonoperating expense on the Corporation's

25

Table of Contents

**PART II**
(Continued)

income statement. The synthetic fuel tax credits, as well as tax deductions for the nonoperating losses, reduce the Corporation's income tax expense. In 2004 and 2003, the Corporation's participation in the synthetic fuel partnership resulted in $144.4 million and $94.1 million of tax credits, respectively, and the nonoperating losses generated an additional $55.4 million and $37.2 million, respectively, of tax benefits, which combined to reduce the Corporation's income tax provision by $199.8 million and $131.3 million, respectively. The effect of these benefits increased net income by $41.4 million, $.08 per share in 2004 and $25.8 million, $.05 per share in 2003. The effects of these tax credits are shown separately in the Corporation's reconciliation of the U.S. statutory rate to its effective income tax rate in Note 14 to the Consolidated Financial Statements.

Because the partnerships have received favorable private letter rulings from the IRS and because the partnerships' test procedures conform to IRS guidance, the Corporation's loss exposure under the synthetic fuel partnerships is minimal.

*2004 versus 2003*

- Interest expense decreased primarily because of a lower average level of debt, partially offset by higher interest rates.

- The Corporation's effective income tax rate was 22.0 percent in 2004 compared with 23.3 percent in 2003. The lower effective tax rate was primarily due to the incremental benefits from the synthetic fuel partnership entered into in 2004.

- The Corporation's share of net income of equity affiliates increased $17.8 million from 2003 primarily due to higher earnings at Kimberly-Clark de Mexico, S.A. de C.V. ("KCM"). KCM's results were boosted by a sales gain of more than 10 percent, with continued double-digit volume growth in its consumer businesses and higher selling prices.

- Minority owners' share of subsidiaries' net income increased $18.3 million primarily due to higher returns on the preferred securities held by the minority interest in the Corporation's consolidated foreign financing subsidiary (as described below under *Financing Commentary* ).

- Income from discontinued operations, net of income taxes decreased 41.1 percent due to transaction costs for the Spin-off and to a lesser extent because 2004 includes 11 months' results versus 12 months in 2003 as the Spin-off occurred on November 30, 2004.

- As a result of the Corporation's share repurchase program, the average number of common shares outstanding declined, which benefited 2004 results by $.07 per share.

*2003 versus 2002*

- Interest expense decreased primarily due to lower interest rates, partially offset by a higher average level of debt.

- The Corporation's effective income tax rate was 23.3 percent in 2003 compared with 28.6 percent in 2002. The lower effective tax rate was primarily due to the benefits from the synthetic fuel partnership described above.

- The Corporation's share of net income of equity affiliates was $107.0 million in 2003 compared with $113.3 million in 2002. The decrease was primarily due to lower earnings at Kimberly-Clark de Mexico, S.A. de C.V. ("KCM") primarily because of depreciation in the value of the peso. KCM's operating profit benefited from higher sales volumes of about 6 percent and cost savings programs. However, these positive factors could not overcome higher fiber and other materials costs and negative currency effects.

26

Case MDL No. 875   Document 4723   Filed 02/21/06   Page 56 of 324

**Table of Contents**

## PART II
(Continued)

- Minority owners' share of subsidiaries' net income decreased 4.3 percent primarily due to Kimberly-Clark Australia Pty. Ltd. becoming a wholly-owned subsidiary on June 30, 2002.

- Income from discontinued operations, net of income taxes decreased 13.7 percent primarily because of lower unit sales volumes and higher fiber costs.

- As a result of the Corporation's share repurchase program, the average number of common shares outstanding declined, which benefited 2003 results by $.07 per share.

### Liquidity and Capital Resources

|  | Year Ended December 31 | |
|---|---|---|
|  | 2004 | 2003 |
|  | (Millions of dollars) | |
| Cash provided by operations | $ 2,726.2 | $ 2,552.2 |
| Capital spending | 535.0 | 872.9 |
| Acquisitions of businesses, net of cash acquired | — | 258.5 |
| Ratio of total debt and preferred securities to capital (a) | 37.7% | 37.1% |
| Pretax interest coverage—times | 11.5 | 11.2 |

(a) Capital is total debt and preferred securities plus stockholders' equity and minority owners' interest in subsidiaries.

*Cash Flow Commentary:*

- Cash provided by operations increased $174.0 million or 6.8 percent to a record $2.7 billion reflecting the higher level of net income and noncash charges included in net income.

- In 2004, the Corporation contributed $200 million to its pension plan trusts compared with $181.9 million in 2003. The significant level of cash provided by operations in 2004 allowed the Corporation to make a contribution of $100 million to its U.S. defined benefit pension plan in December 2004, which had originally been planned for 2005. While the Corporation is not required to make a contribution in 2005 to the U.S. plan, the benefit of an additional contribution will be evaluated. About $38 million will be contributed to plans outside the U.S. in 2005.

*Contractual Obligations:*

The following table presents the Corporation's total contractual obligations for which cash flows are fixed or determinable.

|  | Total | 2005 | 2006 | 2007 | 2008 | 2009 | 2010+ |
|---|---|---|---|---|---|---|---|
|  | (Millions of dollars) | | | | | | |
| Contractual obligations |  |  |  |  |  |  |  |
| Long-term debt | $2,883 | $ 585 | $ 65 | $337 | $ 20 | $ 5 | $1,871 |
| Interest payments on long-term debt | 1,255 | 149 | 120 | 116 | 92 | 91 | 687 |
| Operating leases | 240 | 76 | 57 | 32 | 22 | 17 | 36 |
| Unconditional purchase obligations | 2,024 | 488 | 364 | 312 | 242 | 200 | 418 |
| Open purchase orders | 1,084 | 1,084 | — | — | — | — | — |
| Total contractual obligations | $7,486 | $2,382 | $606 | $797 | $376 | $313 | $3,012 |

27

Table of Contents

**PART II**
(Continued)

*Obligations Commentary:*

- The unconditional purchase obligations are for the purchase of raw materials, primarily pulp (including the new long-term pulp agreement with Neenah Paper), and utilities, principally electricity. Although the Corporation is primarily liable for payments on the above operating leases and unconditional purchase obligations, based on historic operating performance and forecasted future cash flows, management believes the Corporation's exposure to losses, if any, under these arrangements is not material.

- The open purchase orders displayed in the table represent amounts the Corporation anticipates will become payable within the next year for goods and services it has negotiated for delivery.

The above table does not include future payments that the Corporation will make for other postretirement benefit obligations. Those amounts are estimated using actuarial assumptions, including expected future service, to project the future obligations. Based upon those projections, the Corporation anticipates making payments for these obligations within a range from approximately $80 million in 2005 to more than $90 million by 2014.

The table also does not include anticipated payments related to the synthetic fuel partnerships. Such payments will only be made if the partnerships produce synthetic fuel in future years. The Corporation estimates that it will make payments to these partnerships of approximately $160 million in 2005, 2006 and 2007, and will receive income tax benefits and credits in excess of these amounts.

Deferred taxes, minority interest and payments related to pension plans are also not included in the table.

A consolidated financing subsidiary has issued preferred securities that are in substance perpetual and are callable by the subsidiary in November 2008 and each 20-year anniversary thereafter. Management currently anticipates that these securities will not be called in November 2008, the next call date, and therefore they are not included in the above table (see *Financing Commentary* below and Note 5 to the Consolidated Financial Statements for additional detail regarding these securities).

*Investing Commentary:*

- During 2004, the Corporation's capital spending of $535.0 million, which is equal to 3.5 percent of net sales, was below the long-term targeted range of 5 percent to 6 percent of net sales. The lower level of spending in 2004 resulted from productivity gains and success in leveraging the global scale of existing production capacity. Management believes the capital spending target range of 5 percent to 6 percent is appropriate.

- The net increase in time deposits in 2003 was primarily attributable to investment of cash accumulated in Korea.

*Financing Commentary:*

- At December 31, 2004, total debt and preferred securities was $4.2 billion, the same as the prior year end.

- There were no changes in the Corporation's credit ratings in 2004. In July 2003, Standard & Poor's ("S&P") revised the Corporation's credit rating for long-term debt from AA to AA-. Moody's Investor Service maintained its short- and long-term ratings but changed the Corporation's outlook to negative from stable, indicating that a ratings downgrade could be possible. These changes were primarily based on the Corporation's business performance in the heightened competitive environment and because S&P changed the way in which it evaluates liabilities for pensions and other postretirement benefits.

28

**Table of Contents**

**PART II**
(Continued)

Management believes that these actions will not have a material adverse effect on the Corporation's access to credit or its borrowing costs since these credit ratings remain strong. The Corporation's commercial paper continues to be rated in the top category.

- At December 31, 2004, the Corporation had $1.2 billion of revolving credit facilities. These facilities, unused at December 31, 2004, permit borrowing at competitive interest rates and are available for general corporate purposes, including backup for commercial paper borrowings. The Corporation pays commitment fees on the unused portion but may cancel the facilities without penalty at any time prior to their expiration. Of these facilities, $600 million expires in September 2005 and the balance expires in November 2009. The Corporation anticipates that these facilities will be renewed when they expire.

- In February 2001, the Corporation formed a Luxembourg-based financing subsidiary. The subsidiary issued 1 million shares of voting-preferred securities with an aggregate par value of $520 million to a nonaffiliated entity for cash proceeds of $516.5 million. In June 2004, the nonaffiliated entity invested an additional $125 million, increasing the aggregate par value of the voting-preferred securities held by the nonaffiliated entity (the "Securities"). In conjunction with this transaction, the fixed annual rate of return on the Securities was increased from 4.47 percent to 4.56 percent. Approximately 97 percent of these funds were loaned to the Corporation which used them to reduce its outstanding commercial paper. See Note 5 to the Consolidated Financial Statements for additional information.

- For the full year 2004, the Corporation repurchased approximately 24.8 million shares of its common stock at a cost of about $1.6 billion, including 6.8 million shares repurchased during the fourth quarter at a cost of approximately $429 million. The monthly detail of share repurchases for the fourth quarter of 2004 is included in Part II Item 5 of this Form 10-K. On June 8, 2004, the Corporation's board of directors authorized the repurchase of an additional 25 million shares of the Corporation's common stock during the next several years.

Management believes that the Corporation's ability to generate cash from operations and its capacity to issue short-term and long-term debt are adequate to fund working capital, capital spending, payment of dividends, repurchases of common stock and other needs in the foreseeable future.

**Variable Interest Entities**

The Corporation has variable interests in the following financing and real estate entities and in the synthetic fuel partnerships described above.

*Financing Entities*

The Corporation holds a significant variable interest in two financing entities that were used to monetize long-term notes received from the sale of certain nonstrategic timberlands and related assets, which were sold in 1999 and 1989 to nonaffiliated buyers. These transactions qualified for the installment method of accounting for income tax purposes and met the criteria for immediate profit recognition for financial reporting purposes contained in SFAS 66, *Accounting for Sales of Real Estate* . These sales involved notes receivable with an aggregate face value of $617 million and a fair value of approximately $593 million at the date of sale. The notes receivable are backed by irrevocable standby letters of credit issued by money center banks, which aggregated $617 million at December 31, 2004.

Because the Corporation desired to monetize the $617 million of notes receivable and continue the deferral of current income taxes on the gains, in 1999 the Corporation transferred the notes received from the 1999 sale to a noncontrolled financing entity, and in 2000 it transferred the notes received from the 1989 sale to another noncontrolled financing entity. The Corporation has minority voting interests in each of the financing entities

29

Table of Contents

## PART II
(Continued)

(collectively, the "Financing Entities"). The transfers of the notes and certain other assets to the Financing Entities were made at fair value, were accounted for as asset sales and resulted in no gain or loss. In conjunction with the transfer of the notes and other assets, the Financing Entities became obligated for $617 million in third-party debt financing. A nonaffiliated financial institution has made substantive capital investments in each of the Financing Entities, has majority voting control over them and has substantive risks and rewards of ownership of the assets in the Financing Entities. The Corporation also contributed intercompany notes receivable aggregating $662 million and intercompany preferred stock of $50 million to the Financing Entities, which serve as secondary collateral for the third-party lending arrangements. In the unlikely event of default by both of the money center banks that provided the irrevocable standby letters of credit, the Corporation could experience a maximum loss of $617 million under these arrangements.

The Corporation has not consolidated the Financing Entities because it is not the primary beneficiary of either entity. Rather, it will continue to account for its ownership interests in these entities using the equity method of accounting. The Corporation retains equity interests in the Financing Entities for which the legal right of offset exists against the intercompany notes. As a result, the intercompany notes payable have been offset against the Corporation's equity interests in the Financing Entities for financial reporting purposes.

See Note 5 to the Consolidated Financial Statements for a description of the Corporation's Luxembourg-based financing subsidiary, which is consolidated because the Corporation is the primary beneficiary of the entity.

### Real Estate Entities

Effective March 31, 2004, the Corporation adopted FIN 46R for its real estate entities described below. In 1994, the Corporation began participating in the U.S. affordable and historic renovation real estate markets. Investments in these markets are encouraged by laws enacted by the United States Congress and related federal income tax rules and regulations. Accordingly, these investments generate income tax credits and tax losses that are used to reduce the Corporation's income tax liabilities. The Corporation has invested in these markets through (i) partnership arrangements in which it is a limited partner, (ii) limited liability companies ("LLCs") in which it is a nonmanaging member and (iii) investments in various funds in which the Corporation is one of many noncontrolling investors. These entities borrow money from third parties generally on a nonrecourse basis and invest in and own various real estate projects.

Adoption of FIN 46R required the Corporation to consolidate ten apartment projects and two hotels because it was the primary beneficiary of each of these real estate ventures. The carrying amount of the assets that serve as collateral for $98.4 million of obligations of these ventures was $147.5 million at December 31, 2004, and these assets are classified as property, plant and equipment on the consolidated balance sheet. The Corporation also has guaranteed $14.6 million of the obligations of these ventures.

The Corporation accounts for its interests in real estate entities that are not consolidated under FIN 46R by the equity method of accounting or by the effective yield method, as appropriate, and has accounted for the related income tax credits and other tax benefits as a reduction in its income tax provision. As of December 31, 2004, the Corporation had a net equity of $21.2 million in its nonconsolidated real estate entities. The Corporation has earned income tax credits totaling approximately $71.8 million, $59.3 million and $49.9 million for December 31, 2004, 2003 and 2002, respectively. As of December 31, 2004, total permanent financing debt for the nonconsolidated entities was $221.9 million. A total of $7.6 million of the permanent financing debt is guaranteed by the Corporation and the remainder of this debt is not supported or guaranteed by the Corporation. Except for the guaranteed portion, permanent financing debt is secured solely by the properties and is nonrecourse to the Corporation. From time to time, temporary interim financing is guaranteed by the

30

Table of Contents

## PART II
(Continued)

Corporation. In general, the Corporation's interim financing guarantees are eliminated at the time permanent financing is obtained. At December 31, 2004, $27.9 million of temporary interim financing associated with these nonconsolidated real estate entities was guaranteed by the Corporation.

If the Corporation's investments in its nonconsolidated real estate entities were to be disposed of at their carrying amounts, a portion of the tax credits may be recaptured and may result in a charge to earnings. As of December 31, 2004, this recapture risk is estimated to be $31.1 million. The Corporation has no current intention of disposing of these investments during the recapture period, nor does it anticipate the need to do so in the foreseeable future in order to satisfy any anticipated liquidity need. Accordingly, the recapture risk is considered to be remote.

At December 31, 2004, the Corporation's maximum loss exposure for its nonconsolidated real estate entities is estimated to be $87.8 million and was comprised of its net equity in these entities of $21.2 million, its permanent financing guarantees of $7.6 million, its interim financing guarantees of $27.9 million and the income tax credit recapture risk of $31.1 million.

## Critical Accounting Policies and Use of Estimates

The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of net sales and expenses during the reporting period. Actual results could differ from these estimates, and changes in these estimates are recorded when known. The critical accounting policies used by management in the preparation of the Corporation's consolidated financial statements are those that are important both to the presentation of the Corporation's financial condition and results of operations and require significant judgments by management with regard to estimates used. The critical judgments by management relate to consumer and trade promotion and rebate accruals, pension benefits, retained insurable risks, excess and obsolete inventory, allowance for doubtful accounts, useful lives for depreciation and amortization, future cash flows associated with impairment testing for goodwill and long-lived assets and for determining the primary beneficiary of variable interest entities, deferred tax assets and potential income tax assessments, and contingencies. The Corporation's critical accounting policies have been reviewed with the Audit Committee of the Board of Directors.

### Promotion and Rebate Accruals

Among those factors affecting the accruals for promotions are estimates of the number of consumer coupons that will be redeemed and the type and number of activities within promotional programs between the Corporation and its trade customers. Rebate accruals are based on estimates of the quantity of products distributors have sold to specific customers. Generally, the estimates for consumer coupon costs are based on historical patterns of coupon redemption, influenced by judgments about current market conditions such as competitive activity in specific product categories. Estimates of trade promotion liabilities for promotional program costs incurred, but unpaid, are generally based on estimates of the quantity of customer sales, timing of promotional activities and forecasted costs for activities within the promotional programs. Settlement of these liabilities sometimes occurs in periods subsequent to the date of the promotion activity. Trade promotion programs include introductory marketing funds such as slotting fees, cooperative marketing programs, temporary price reductions, favorable end of aisle or in-store product displays and other activities conducted by the customers to promote the Corporation's products. Promotion accruals as of December 31, 2004 and 2003 were $263.3 million and $222.0 million, respectively. Rebate accruals as of December 31, 2004 and 2003 were $163.0 million and $136.4 million, respectively.

31

Case MDL No. 875   Document 4723   Filed 02/21/06

<u>**Table of Contents**</u>

**PART II**
(Continued)

*Pension Benefits*

The Corporation and its subsidiaries in North America and the United Kingdom have defined benefit pension plans (the "Principal Plans") and/or defined contribution retirement plans covering substantially all regular employees. Certain other subsidiaries have defined benefit pension plans or, in certain countries, termination pay plans covering substantially all regular employees. The funding policy for the qualified defined benefit plans in North America and the defined benefit plans in the United Kingdom is to contribute assets to fully fund the accumulated benefit obligation ("ABO"). Subject to regulatory and tax deductibility limits, any funding shortfall will be eliminated over a reasonable number of years. Nonqualified U.S. plans providing pension benefits in excess of limitations imposed by the U.S. income tax code are not funded. Funding for the remaining defined benefit plans outside the U.S. is based on legal requirements, tax considerations, investment opportunities, and customary business practices in such countries.

Consolidated pension expense for defined benefit pension plans was $154.8 million in 2004 compared with $165.9 million for 2003. Pension expense is calculated based upon a number of actuarial assumptions applied to each of the defined benefit plans. The weighted-average expected long-term rate of return on pension fund assets used to calculate pension expense was 8.32 percent in 2004 compared with 8.42 percent in 2003 and will be 8.29 percent in 2005. The expected long-term rate of return on pension fund assets was determined based on several factors, including input from our pension investment consultants and projected long-term returns of broad equity and bond indices. We also considered our U.S. plan's historical 10-year and 15-year compounded annual returns of 10.92 percent and 9.66 percent, respectively, which have been in excess of these broad equity and bond benchmark indices. We anticipate that on average the investment managers for each of the plans comprising the Principal Plans will generate annual long-term rates of return of at least 8.5 percent. Our expected long-term rate of return on the assets in the Principal Plans is based on an asset allocation assumption of about 70 percent with equity managers, with expected long-term rates of return of approximately 10 percent, and 30 percent with fixed income managers, with an expected long-term rate of return of about 6 percent. We regularly review our actual asset allocation and periodically rebalance our investments to our targeted allocation when considered appropriate. Also, when deemed appropriate, we execute hedging strategies using index options and futures to limit the downside exposure of certain investments by trading off upside potential above an acceptable level. We executed such hedging strategies in 2003 and 2002. No hedging instruments are currently in place. We will continue to evaluate our long-term rate of return assumptions at least annually and will adjust them as necessary.

We determine pension expense on the fair value of assets rather than a calculated value that averages gains and losses ("Calculated Value") over a period of years. Investment gains or losses represent the difference between the expected return calculated using the fair value of assets and the actual return based on the fair value of assets. We recognize the variance between actual and expected gains and losses on pension assets in pension expense more rapidly than we would if we used a Calculated Value for plan assets. As of December 31, 2004, the Principal Plans had cumulative unrecognized investment losses and other actuarial losses of approximately $1.7 billion. These unrecognized net losses may increase our future pension expense if not offset by (i) actual investment returns that exceed the assumed investment returns, or (ii) other factors, including reduced pension liabilities arising from higher discount rates used to calculate our pension obligations, or (iii) other actuarial gains, including whether such accumulated actuarial losses at each measurement date exceed the "corridor" determined under SFAS 87, *Employers' Accounting for Pensions*.

The discount (or settlement) rate we used to determine the present value of our future U.S. pension obligations at December 31, 2004 was based on a yield curve constructed from a portfolio of high quality corporate debt securities with maturities ranging from 1 year to 30 years. Each year's expected future benefit payments were discounted to their present value at the appropriate yield curve rate thereby generating the overall discount rate for our U.S. pension obligations. For our non-U.S. Principal Plans, we established discount rates

32

Table of Contents

**PART II**
(Continued)

using the long-term local government bond rates increased by the interest rate spread between the U.S. discount rate and long-term U.S. government bond rates. The weighted-average discount rate for the Principal Plans decreased to 5.77 percent at December 31, 2004 from 5.97 percent at December 31, 2003.

We estimate that our consolidated pension expense will approximate $160 million in 2005. This estimate reflects the effect of the actuarial losses and is based on an expected weighted-average long-term rate of return on assets in the Principal Plans of 8.50 percent, a weighted-average discount rate for the Principal Plans of 5.77 percent and various other assumptions. Pension expense beyond 2005 will depend on future investment performance, the Corporation's contributions to the pension trusts, changes in discount rates and various other factors related to the covered employees in the plans.

If the expected long-term rate of return on assets for our Principal Plans was lowered by 0.25 percent, our annual pension expense would increase by approximately $9 million. If the discount rate assumptions for these same plans were reduced by 0.25 percent, our annual pension expense would increase by approximately $13 million and our December 31, 2004 minimum pension liability would increase by about $147 million.

The fair value of the assets in our defined benefit plans was $4.0 billion at December 31, 2004 and December 31, 2003. Lower discount rates have caused the projected benefit obligations (the "PBO") of the defined benefit plans to exceed the fair value of plan assets by approximately $1.2 billion at December 31, 2004 and December 31, 2003. Primarily due to the lower discount rates, the ABO of our defined benefit plans exceeded plan assets by about $.9 billion at the end of 2004. At the end of 2003, the ABO exceeded the fair value of plan assets by about $.8 billion. On a consolidated basis, the Corporation contributed about $200 million to pension trusts in 2004 compared with $181.9 million in 2003. In addition, the Corporation made direct benefit payments of $21.4 million in 2004 compared to $29.7 million in 2003. While the Corporation is not required to make a contribution in 2005 to the U.S. plan, the benefit of a contribution will be evaluated. About $38 million will be contributed to plans outside the U.S. in 2005.

The discount rate used for each country's pension obligation is identical to the discount rate used for that country's other postretirement obligation. The discount rates displayed for the two types of obligations for the Corporation's consolidated operations may appear different due to the weighting used in the calculation of the two weighted-average discount rates.

*Retained Insurable Risks*

We retain selected insurable risks, primarily related to property damage, workers' compensation, and product, automobile and premises liability based upon historical loss patterns and management's judgment of cost effective risk retention. Accrued liabilities for incurred but not reported events, principally related to workers compensation and automobile liability, are based upon loss development factors provided to us by our external insurance brokers.

*Excess and Obsolete Inventory*

We require all excess, obsolete, damaged or off-quality inventories including raw materials, in-process, finished goods, and spare parts to be adequately reserved for or to be disposed of. Our process requires an ongoing tracking of the aging of inventories to be reviewed in conjunction with current marketing plans to ensure that any excess or obsolete inventories are identified on a timely basis. This process requires judgments be made about the salability of existing stock in relation to sales projections. The evaluation of the adequacy of provision for obsolete and excess inventories is performed on at least a quarterly basis. No provisions for future obsolescence, damage or off-quality inventories are made.

33

Table of Contents

## PART II
(Continued)

### *Allowance for Doubtful Accounts*

We provide an allowance for doubtful accounts that represents our best estimate of the accounts receivable that will not be collected. We base our estimate on, among other things, historical collection experience, a review of the current aging status of customer receivables, and a review of specific information for those customers that are deemed to be higher risk. When we become aware of a customer whose continued operating success is questionable, we closely monitor collection of their receivable balance and may require the customer to prepay for current shipments. If a customer enters a bankruptcy action, we monitor the progress of that action to determine when and if an additional provision for non-collectibility is warranted. We evaluate the adequacy of the allowance for doubtful accounts on at least a quarterly basis. The allowance for doubtful accounts at December 31, 2004 and 2003 was $42.5 million and $47.9 million, respectively, and our write-off of uncollectible accounts was $13.6 million and $15.5 million in 2004 and 2003, respectively.

### *Property and Depreciation*

Estimating the useful lives of property, plant and equipment requires the exercise of management judgment, and actual lives may differ from these estimates. Changes to these initial useful life estimates are made when appropriate. Property, plant and equipment are tested for impairment in accordance with SFAS 144, *Accounting for the Impairment or Disposal of Long-Lived Assets,* whenever events or changes in circumstances indicate that the carrying amounts of such long-lived assets may not be recoverable from future net pretax cash flows. Impairment testing requires significant management judgment including estimating the future success of product lines, future sales volumes, growth rates for selling prices and costs, alternative uses for the assets and estimated proceeds from disposal of the assets. Impairment testing is conducted at the lowest level where cash flows can be measured and are independent of cash flows of other assets. An asset impairment would be indicated if the sum of the expected future net pretax cash flows from the use of the asset (undiscounted and without interest charges) is less than the carrying amount of the asset. An impairment loss would be measured based on the difference between the fair value of the asset and its carrying amount. We determine fair value based on an expected present value technique in which multiple cash flow scenarios that reflect a range of possible outcomes and a risk free rate of interest are used to estimate fair value.

The estimates and assumptions used in the impairment analysis are consistent with the business plans and estimates we use to manage our business operations and to make acquisition and divestiture decisions. The use of different assumptions would increase or decrease the estimated fair value of the asset and would increase or decrease the impairment charge. Actual outcomes may differ from the estimates. For example, if our products fail to achieve volume and pricing estimates or if market conditions change or other significant estimates are not realized, then our revenue and cost forecasts may not be achieved, and we may be required to recognize additional impairment charges.

### *Goodwill and Other Intangible Assets*

We test the carrying amount of goodwill annually as of the beginning of the fourth quarter and whenever events or circumstances indicate that impairment may have occurred. Impairment testing is performed in accordance with SFAS 142, *Goodwill and Other Intangible Assets.* Impairment testing is conducted at the operating segment level of our businesses and is based on a discounted cash flow approach to determine the fair value of each operating segment. The determination of fair value requires significant management judgment including estimating future sales volumes, growth rates of selling prices and costs, changes in working capital, investments in property and equipment and the selection of an appropriate discount rate. We also test the sensitivities of these fair value estimates to changes in our growth assumptions of sales volumes, selling prices and costs. If the carrying amount of an operating segment that contains goodwill exceeds fair value, a possible

34

Table of Contents

**PART II**
(Continued)

impairment would be indicated. If a possible impairment is indicated, we would estimate the implied fair value of goodwill by comparing the carrying amount of the net assets of the unit excluding goodwill to the total fair value of the unit. If the carrying amount of goodwill exceeds its implied fair value, an impairment charge would be recorded. We also use judgment in assessing whether we need to test more frequently for impairment than annually. Factors such as unexpected adverse economic conditions, competition, product changes and other external events may require more frequent assessments. We have completed our annual goodwill impairment testing and have determined that none of our $2.7 billion of goodwill is impaired.

We have no intangible assets with indefinite useful lives. We have other intangible assets with a gross carrying amount of approximately $276 million and a net carrying amount of about $185 million. These intangibles are being amortized over their estimated useful lives and are tested for impairment whenever events or circumstances indicate that impairment may have occurred. If the carrying amount of an intangible asset exceeds its fair value based on estimated future undiscounted cash flows, an impairment loss would be indicated. The amount of the impairment loss to be recorded would be based on the excess of the carrying amount of the intangible asset over its discounted future cash flows. We use judgment in assessing whether the carrying amount of our intangible assets is not expected to be recoverable over their estimated remaining useful lives. The factors considered are similar to those outlined in the goodwill impairment discussion above.

*Primary Beneficiary Determination of Variable Interest Entities*

The determination of the primary beneficiary of variable interest entities under FIN 46R requires estimating the probable future cash flows of each VIE using a computer simulation model, determining the variability of such cash flows and their present values. Estimating the probable future cash flows of each VIE requires the exercise of significant management judgment. The resulting present values are then allocated to the various participants in each VIE in accordance with their beneficial interests. The participant that is allocated the majority of the present value of the variability is the primary beneficiary and is required to consolidate the VIE under FIN 46R.

*Deferred Income Taxes and Potential Assessments*

As of December 31, 2004, the Corporation has recorded deferred tax assets related to income tax loss carryforwards and income tax credit carryforwards totaling $519.5 million and has established valuation allowances against these deferred tax assets of $252.4 million, thereby resulting in a net deferred tax asset of $267.1 million. As of December 31, 2003, the net deferred tax asset was $220.1 million. These income tax losses and credits are in non-U.S. taxing jurisdictions and in certain states within the U.S. In determining the valuation allowances to establish against these deferred tax assets, the Corporation considers many factors, including the specific taxing jurisdiction, the carryforward period, income tax strategies and forecasted earnings for the entities in each jurisdiction. A valuation allowance is recognized if, based on the weight of available evidence, the Corporation concludes that it is more likely than not that some portion or all of the deferred tax asset will not be realized.

As of December 31, 2004, United States income taxes and foreign withholding taxes have not been provided on approximately $4.0 billion of unremitted earnings of subsidiaries operating outside the U.S. in accordance with Accounting Principles Board ("APB") Opinion 23, *Accounting for Income Taxes, Special Areas*. These earnings are considered by management to be invested indefinitely. However, they would be subject to income tax if they were remitted as dividends, were lent to the Corporation or a U.S. affiliate, or if the Corporation were to sell its stock in the subsidiaries. It is not practicable to determine the amount of unrecognized deferred U.S. income tax liability on these unremitted earnings. We periodically determine whether our non-U.S. subsidiaries will invest their undistributed earnings indefinitely and reassess this determination as appropriate. The

35

Case MDL No. 875   Document 4723   Filed 02/21/06   Page 65 of 324

Table of Contents

**PART II**
(Continued)

Corporation currently is evaluating the effect of the American Jobs Creation Act on the unremitted earnings of its non-U.S. subsidiaries and expects to complete that evaluation by June 30, 2005. At this time, it is not possible to reasonably estimate the amount of unremitted earnings that may be repatriated and the income tax effects of such repatriation.

The Corporation records liabilities in current income taxes for potential assessments. The accruals relate to uncertain tax positions in a variety of taxing jurisdictions and are based on what management believes will be the ultimate resolution of these positions. These liabilities may be affected by changing interpretations of laws, rulings by tax authorities, or the expiration of the statute of limitations. The Corporation's U.S. federal income tax returns have been audited through 2001. IRS assessments of additional taxes have been paid through 1998. Refund actions are pending in Federal District Court or the IRS Appeals Office for the years 1987 through 1998. Management currently believes that the ultimate resolution of these matters, individually or in the aggregate, will not have a material effect on the Corporation's business, financial condition, results of operations or liquidity.

**Contingencies and Legal Matters**

*Litigation*

The following is a brief description of certain legal and administrative proceedings to which the Corporation or its subsidiaries is a party or to which the Corporation's or its subsidiaries' properties are subject. In management's opinion, none of the legal and administrative proceedings described below, individually or in the aggregate, is expected to have a material adverse effect on the Corporation's business, financial condition, results of operations or liquidity.

As of December 31, 2004, the Corporation, along with many other nonaffiliated companies, was a party to lawsuits with allegations of personal injury resulting from asbestos exposure on the defendants' premises and allegations that the defendants manufactured, sold, distributed or installed products which cause asbestos-related lung disease. These general allegations are often made against the Corporation without any apparent evidence or identification of a specific product or premises of the Corporation. The Corporation has denied the allegations and raised numerous defenses in all of these asbestos cases. All asbestos claims have been tendered to the Corporation's insurance carriers for defense and indemnity. The financial statements reflect appropriate accruals for the Corporation's portion of the costs estimated to be incurred in connection with resolving these claims.

*Contingency*

One of the Corporation's North American tissue mills has an agreement to provide its local utility company a specified amount of electric power for each of the next 12 years. In the event that the mill was shut down, the Corporation would be required to continue to operate the power generation facility on behalf of its owner, the local utility company. The net present value of the cost to fulfill this agreement as of December 31, 2004 is estimated to be approximately $120 million. Management considers the probability of closure of this mill to be remote.

*Environmental Matters*

The Corporation has been named a potentially responsible party under the provisions of the federal Comprehensive Environmental Response, Compensation and Liability Act, or analogous state statutes, at a number of waste disposal sites, none of which, individually or in the aggregate, in management's opinion, is likely to have a material adverse effect on the Corporation's business, financial condition, results of operations or liquidity.

36

Table of Contents

**PART II**
(Continued)

## New Accounting Standards

In November 2004, the FASB issued SFAS 151, *Inventory Costs - an amendment of ARB No. 43, Chapter 4*. SFAS 151 clarifies the accounting for abnormal amounts of idle facility expenses, freight, handling costs, and spoilage. It also requires that allocation of fixed production overheads to inventory be based on the normal capacity of production facilities. SFAS 151 is effective for inventory costs incurred during fiscal years beginning after June 15, 2005. Adoption of SFAS 151 will not have a material effect on the Corporation's financial position, results of operations or cash flows.

In December 2004, the FASB issued SFAS 123 (revised 2004), *Share-Based Payment* ("SFAS 123R"), which revises SFAS 123, *Accounting for Stock-Based Compensation* . SFAS 123R also supersedes APB 25, *Accounting for Stock Issued to Employees* , and amends SFAS 95, *Statement of Cash Flows* . In general, the accounting required by SFAS 123R is similar to that of SFAS 123. However, SFAS 123 gave companies a choice to either recognize the fair value of stock options in their income statements or to disclose the pro forma income statement effect of the fair value of stock options in the notes to the financial statements. SFAS 123R eliminates that choice and requires the fair value of all share-based payments to employees, including the fair value of grants of employee stock options, be recognized in the income statement, generally over the option vesting period. SFAS 123R must be adopted no later than July 1, 2005. Early adoption is permitted.

SFAS 123R permits adoption of its requirements using one of two transition methods:

1. A modified prospective transition ("MPT") method in which compensation cost is recognized beginning with the effective date (a) for all share-based payments granted after the effective date and (b) for all awards granted to employees prior to the effective date that remain unvested on the effective date.

2. A modified retrospective transition ("MRT") method which includes the requirements of the MPT method described above, but also permits restatement of financial statements based on the amounts previously disclosed under SFAS 123's pro forma disclosure requirements either for (a) all prior periods presented or (b) prior interim periods of the year of adoption.

The Corporation is currently evaluating the timing and manner in which it will adopt SFAS 123R.

As permitted by SFAS 123, the Corporation currently accounts for share-based payments to employees using APB 25's intrinsic value method and, as such, has recognized no compensation cost for employee stock options. Accordingly, adoption of SFAS 123R's fair value method will have a slight effect on results of operations, although it will have no impact on overall financial position. The impact of adoption of SFAS 123R cannot be predicted at this time because it will depend on levels of share-based payments granted in the future. However, had SFAS 123R been adopted in prior periods, the effect would have approximated the SFAS 123 pro forma net income and earnings per share disclosures shown in Note 1 to the Consolidated Financial Statements.

SFAS 123R also requires the benefits of tax deductions in excess of recognized compensation cost to be reported as a financing cash flow, rather than as an operating cash flow as currently required, thereby reducing net operating cash flows and increasing net financing cash flows in periods after adoption. While those amounts cannot be estimated for future periods (because they depend on, among other things, when employees will exercise the stock options and the market price of the Corporation's stock at the time of exercise), the amount of operating cash flows generated in prior periods for such excess tax deductions was $30.9 million, $7.4 million and $9.9 million in 2004, 2003 and 2002, respectively.

## Business Outlook

For 2005, the Corporation is targeting sales growth of 3 to 5 percent, consistent with its long-term objective. Based on plans to drive innovation, the gain is expected to come largely from improvement in sales volumes,

37

Case MDL No. 875   Document 4723   Filed 02/21/06   Page 67 of 324

**Table of Contents**

**PART II**
(Continued)

with price, mix and currency assumed to be about flat. The Corporation is targeting to deliver $150 million in cost savings, which should help improve operating profit margin by up to 20 basis points despite inflationary cost increases. The Corporation expects to deliver earnings of $3.70 to $3.85 per share for the year, representing mid to high single-digit growth compared with net income from continuing operations of $3.55 in 2004.

Cash flow is expected to continue to be strong which will enable the Corporation to again return a significant amount of cash to shareholders in 2005. Common share repurchases are currently targeted to be at least $1 billion during the year and dividends on common stock have been increased by 12.5 percent effective with the April payment. Capital spending is estimated to be $800 million in 2005, which should be toward the low end of the Corporation's long-term target of 5 to 6 percent of net sales.

For the first quarter of 2005, earnings are expected to be in a range of 92 to 94 cents per share compared with earnings per share from continuing operations of 88 cents in 2004. This would represent growth of approximately 5 to 7 percent, similar to the expected level of improvement for the full year. The Corporation is planning to step up its marketing spending in the quarter compared with the prior year to support a very active schedule of product launches, including Huggies toiletries, new Pull-Ups training pants with Wetness Indicators and Scott Extra Soft bathroom tissue. The Corporation also expects to face continued cost increases in the first quarter, particularly for fiber as well as resin and other oil-based materials.

### Information Concerning Forward-Looking Statements

Certain matters discussed in this report concerning, among other things, the business outlook, including new product introductions, cost savings, anticipated financial and operating results, strategies, contingencies and contemplated transactions of the Corporation, constitute forward-looking statements and are based upon management's expectations and beliefs concerning future events impacting the Corporation. There can be no assurance that these events will occur or that the Corporation's results will be as estimated.

The assumptions used as a basis for the forward-looking statements include many estimates that, among other things, depend on the achievement of future cost savings and projected volume increases. In addition, many factors outside the control of the Corporation, including the prices and availability of the Corporation's raw materials, potential competitive pressures on selling prices or advertising and promotion expenses for the Corporation's products, and fluctuations in foreign currency exchange rates, as well as general economic conditions in the markets in which the Corporation does business, also could impact the realization of such estimates.

For a description of these and other factors that could cause the Corporation's future results to differ materially from those expressed in any such forward-looking statements, see Item I of this Annual Report on Form 10-K entitled "Factors That May Affect Future Results."

### QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK
**ITEM 7A.**

As a multinational enterprise, the Corporation is exposed to risks such as changes in foreign currency exchange rates, interest rates and commodity prices. A variety of practices are employed to manage these risks, including operating and financing activities and, where deemed appropriate, the use of derivative instruments. Derivative instruments are used only for risk management purposes and not for speculation or trading. All foreign currency derivative instruments are either exchange traded or are entered into with major financial institutions. The Corporation's credit exposure under these arrangements is limited to these agreements with a positive fair value at the reporting date. Credit risk with respect to the counterparties is considered minimal in view of the financial strength of the counterparties.

Case MDL No. 875   Document 4723   Filed 02/21/06

Table of Contents

PART II
(Continued)

Presented below is a description of our most significant risks (foreign currency risk, interest rate risk and commodity price risk) together with a sensitivity analysis, performed annually, of each of these risks based on selected changes in market rates and prices. These analyses reflect our view of changes which are reasonably possible to occur over a one-year period.

*Foreign Currency Risk*

Foreign currency risk is managed by the systematic use of foreign currency forward, option and swap contracts. The use of these instruments allows management of transactional exposure to exchange rate fluctuations because the gains or losses incurred on the derivative instruments will offset, in whole or in part, losses or gains on the underlying foreign currency exposure. Prior to 2004, foreign currency risk was managed by the selective, rather than the systematic, use of foreign currency forward, option and swap contracts. Management does not foresee or expect any significant change in its foreign currency risk exposures or in the strategies it employs to manage them in the near future.

Foreign currency contracts and transactional exposures are sensitive to changes in foreign currency exchange rates. We perform an annual test to quantify the effects that possible changes in foreign currency exchange rates would have on our annual operating profit based on the foreign currency contracts and transactional exposures of the Corporation and its foreign affiliates at the current year-end. The balance sheet effect is calculated by multiplying each affiliate's net monetary asset or liability position by a 10 percent change in the foreign currency exchange rate versus the U.S. dollar. The results of this sensitivity test are presented in the following paragraph.

As of December 31, 2004, a 10 percent unfavorable change in the exchange rate of the U.S. dollar against the prevailing market rates of foreign currencies involving balance sheet transactional exposures would have resulted in a net pretax loss of approximately $43 million. These hypothetical losses on transactional exposures are based on the difference between the December 31, 2004 rates and the assumed rates. In the view of management, the above hypothetical losses resulting from these assumed changes in foreign currency exchange rates are not material to the Corporation's consolidated financial position, results of operations or cash flows.

The translation of the balance sheets of our non-U.S. operations from local currencies into U.S. dollars is also sensitive to changes in foreign currency exchange rates. Consequently, we perform an annual test to determine if changes in currency exchange rates would have a significant effect on the translation of the balance sheets of our non-U.S. operations into U.S. dollars. These translation gains or losses are recorded as unrealized translation adjustments ("UTA") within stockholders' equity. The hypothetical increase in UTA is calculated by multiplying the net assets of these non-U.S. operations by a 10 percent change in the currency exchange rates. The results of this sensitivity test are presented in the following paragraph.

As of December 31, 2004, a 10 percent unfavorable change in the exchange rate of the U.S. dollar against the prevailing market rates of our foreign currency translation exposures would have reduced stockholders' equity by approximately $638 million. These hypothetical adjustments in UTA are based on the difference between the December 31, 2004 exchange rates and the assumed rates. In the view of management, the above UTA adjustments resulting from these assumed changes in foreign currency exchange rates are not material to the Corporation's consolidated financial position.

*Interest Rate Risk*

Interest rate risk is managed through the maintenance of a portfolio of variable- and fixed-rate debt composed of short- and long-term instruments. The objective is to maintain a cost-effective mix that management

39

Table of Contents

## PART II
(Continued)

deems appropriate. At December 31, 2004, the debt portfolio was composed of approximately 35 percent variable-rate debt and 65 percent fixed-rate debt. The strategy employed to manage exposure to interest rate fluctuations consists primarily of a target mix of fixed and floating rate debt. The Corporation's target for variable rate debt is 40 percent to 50 percent and is designed to balance the Corporation's cost of financing with its interest rate risk.

We perform two separate tests to determine whether changes in interest rates would have a significant effect on our financial position or future results of operations. Both tests are based on our consolidated debt levels at the time of the test. The first test estimates the effect of interest rate changes on our fixed-rate debt. Interest rate changes would result in gains or losses in the market value of fixed-rate debt due to differences between the current market interest rates and the rates governing these instruments. With respect to fixed-rate debt outstanding at December 31, 2004, a 10 percent decrease in interest rates would have increased the fair value of fixed-rate debt by about $110 million. The second test estimates the potential effect on future pretax income that would result from increased interest rates applied to our current level of variable-rate debt. With respect to commercial paper and other variable-rate debt, a 10 percent increase in interest rates would not have had a material effect on the future results of operations or cash flows.

*Commodity Price Risk*

The Corporation is subject to commodity price risk, the most significant of which relates to the price of pulp. Selling prices of tissue products are influenced, in part, by the market price for pulp, which is determined by industry supply and demand. On a worldwide basis prior to the Spin-off, the Corporation supplied approximately 40 percent of its virgin fiber needs from internal pulp manufacturing operations. The Spin-off has reduced the internal pulp supply to approximately 10 percent. As previously discussed under Factors That May Affect Future Results, increases in pulp prices could adversely affect earnings if selling prices are not adjusted or if such adjustments significantly trail the increases in pulp prices. Derivative instruments have not been used to manage these risks.

In addition, the Corporation is subject to price risk for utilities, primarily natural gas, which are used in its manufacturing operations. Derivative instruments are used to hedge a portion of this risk when it is deemed prudent to do so by management.

Management does not believe that these risks are material to the Corporation's business or its consolidated financial position, results of operations or cash flows.

40

Table of Contents

**PART II**
(Continued)

ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

## KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
### CONSOLIDATED INCOME STATEMENT

|  | Year Ended December 31 | | |
|---|---|---|---|
|  | **2004** | **2003** | **2002** |
|  | (Millions of dollars, except per share amounts) | | |
| **Net Sales** | $15,083.2 | $14,026.3 | $13,231.5 |
| Cost of products sold | 10,014.7 | 9,231.9 | 8,537.7 |
| **Gross Profit** | 5,068.5 | 4,794.4 | 4,693.8 |
| Marketing, research and general expenses | 2,510.9 | 2,350.3 | 2,251.8 |
| Other (income) expense, net | 51.2 | 112.5 | 73.7 |
| **Operating Profit** | 2,506.4 | 2,331.6 | 2,368.3 |
| Nonoperating expense | (158.4) | (105.5) | — |
| Interest income | 17.9 | 18.0 | 15.7 |
| Interest expense | (162.5) | (167.8) | (181.9) |
| **Income Before Income Taxes, Equity Interests, Discontinued Operations and Cumulative Effect of Accounting Change** | 2,203.4 | 2,076.3 | 2,202.1 |
| Provision for income taxes | (483.9) | (484.1) | (629.9) |
| Share of net income of equity companies | 124.8 | 107.0 | 113.3 |
| Minority owners' share of subsidiaries' net income | (73.9) | (55.6) | (58.1) |
| **Income From Continuing Operations** | 1,770.4 | 1,643.6 | 1,627.4 |
| **Income From Discontinued Operations, Net of Income Taxes** | 29.8 | 50.6 | 58.6 |
| **Income Before Cumulative Effect of Accounting Change** | 1,800.2 | 1,694.2 | 1,686.0 |
| Cumulative effect of accounting change, net of income taxes | — | — | (11.4) |
| **Net Income** | $ 1,800.2 | $ 1,694.2 | $ 1,674.6 |
| **Per Share Basis** | | | |
| **Basic** | | | |
| Continuing operations | $ 3.58 | $ 3.24 | $ 3.15 |
| Discontinued operations | .06 | .10 | .11 |
| Cumulative effect of accounting change | — | — | (.02) |
| Net income | $ 3.64 | $ 3.34 | $ 3.24 |
| **Diluted** | | | |
| Continuing operations | $ 3.55 | $ 3.23 | $ 3.13 |
| Discontinued operations | .06 | .10 | .11 |
| Cumulative effect of accounting change | — | — | (.02) |
| Net income | $ 3.61 | $ 3.33 | $ 3.22 |

See Notes to Consolidated Financial Statements.

41

Case MDL No. 875 Document 4723 Filed 02/21/06

Table of Contents

**PART II**
(Continued)

### KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
### CONSOLIDATED BALANCE SHEET

|  | December 31 | |
|---|---|---|
|  | **2004** | **2003** |
|  | (Millions of dollars) | |
| **ASSETS** | | |
| **Current Assets** | | |
| Cash and cash equivalents | $ **594.0** | $ 290.6 |
| Accounts receivable, net | **2,038.3** | 1,955.1 |
| Inventories | **1,670.9** | 1,563.4 |
| Deferred income taxes | **278.2** | 281.4 |
| Other current assets | **380.5** | 347.6 |
| **Total Current Assets** | **4,961.9** | 4,438.1 |
| **Property, Plant and Equipment, net** | **7,990.5** | 8,263.4 |
| **Investments in Equity Companies** | **444.4** | 427.7 |
| **Goodwill** | **2,702.9** | 2,649.1 |
| **Other Assets** | **918.3** | 1,001.6 |
|  | **$17,018.0** | $16,779.9 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **Current Liabilities** | | |
| Debt payable within one year | $ **1,214.7** | $ 864.3 |
| Trade accounts payable | **983.2** | 857.9 |
| Other payables | **265.5** | 283.5 |
| Accrued expenses | **1,431.6** | 1,374.7 |
| Accrued income taxes | **448.0** | 367.2 |
| Dividends payable | **194.2** | 171.1 |
| **Total Current Liabilities** | **4,537.2** | 3,918.7 |
| **Long-Term Debt** | **2,298.0** | 2,733.7 |
| **Noncurrent Employee Benefit and Other Obligations** | **1,621.7** | 1,614.4 |
| **Deferred Income Taxes** | **840.3** | 880.6 |
| **Minority Owners' Interests in Subsidiaries** | **368.4** | 298.3 |
| **Preferred Securities of Subsidiary** | **722.9** | 567.9 |
| **Stockholders' Equity** | | |
| Preferred stock—no par value—authorized 20.0 million shares, none issued | **—** | — |
| Common stock—$1.25 par value—authorized 1.2 billion shares; issued 568.6 million shares at December 31, 2004 and 2003 | **710.8** | 710.8 |
| Additional paid-in capital | **348.6** | 406.9 |
| Common stock held in treasury, at cost—85.7 million and 67.0 million shares at December 31, 2004 and 2003 | **(5,047.5)** | (3,818.1) |
| Accumulated other comprehensive income (loss) | **(1,226.0)** | (1,565.4) |
| Retained earnings | **11,865.9** | 11,059.2 |
| Unearned compensation on restricted stock | **(22.3)** | (27.1) |
| **Total Stockholders' Equity** | **6,629.5** | 6,766.3 |

$17,018.0    $16,779.9

See Notes to Consolidated Financial Statements.

42

Table of Contents

**PART II**
(Continued)

### KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
### CONSOLIDATED STATEMENT OF STOCKHOLDERS' EQUITY

| | Common Stock Issued | | Additional Paid-in Capital | Treasury Stock | | Unearned Compensation on Restricted Stock | Retained Earnings | Accumulated Other Compre-hensive Income (Loss) | Compre-hensive Income |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | Shares | Amount | | | | |
| | (Dollars in millions, shares in thousands) | | | | | | | | |
| Balance at December 31, 2001 | 568,597 | $ 710.8 | $ 415.6 | 47,587 | $(2,748.2) | $ (34.6) | $ 8,999.5 | $ (1,696.2) | |
| Net income | — | — | — | — | — | — | 1,674.6 | — | $ 1,674.6 |
| Other comprehensive income: | | | | | | | | | |
| Unrealized translation | — | — | — | — | — | — | — | 96.4 | 96.4 |
| Minimum pension liability | — | — | — | — | — | — | — | (555.7) | (555.7) |
| Other | — | — | — | — | — | — | — | (2.2) | (2.2) |
| Total comprehensive income | | | | | | | | | $ 1,213.1 |
| Options exercised and other awards | — | — | (7.7) | (1,627) | 76.6 | — | — | — | |
| Option and restricted share income tax benefits | — | — | 9.9 | — | — | — | — | — | |
| Shares repurchased | — | — | — | 11,980 | (683.6) | — | — | — | |
| Net issuance of restricted stock, less amortization | — | — | 1.2 | (98) | 4.6 | 9.4 | — | — | |
| Dividends declared | — | — | — | — | — | — | (620.1) | — | |
| Balance at December 31, 2002 | 568,597 | 710.8 | 419.0 | 57,842 | (3,350.6) | (25.2) | 10,054.0 | (2,157.7) | |
| Net income | — | — | — | — | — | — | 1,694.2 | — | $ 1,694.2 |
| Other comprehensive income: | | | | | | | | | |
| Unrealized translation | — | — | — | — | — | — | — | 742.8 | 742.8 |
| Minimum pension liability | — | — | — | — | — | — | — | (146.2) | (146.2) |
| Other | — | — | — | — | — | — | — | (4.3) | (4.3) |
| Total comprehensive income | | | | | | | | | $ 2,286.5 |
| Options exercised and other awards | — | — | (18.0) | (988) | 49.0 | — | — | — | |
| Option and restricted share income tax benefits | — | — | 7.4 | — | — | — | — | — | |
| Shares repurchased | — | — | — | 10,569 | (537.1) | — | — | — | |
| Net issuance of restricted stock, less amortization | — | — | (1.5) | (415) | 20.6 | (1.9) | — | — | |
| Dividends declared | — | — | — | — | — | — | (689.0) | — | |
| Balance at December 31, 2003 | 568,597 | 710.8 | 406.9 | 67,008 | (3,818.1) | (27.1) | 11,059.2 | (1,565.4) | |
| Net income | — | — | — | — | — | — | 1,800.2 | — | $ 1,800.2 |
| Other comprehensive income: | | | | | | | | | |
| Unrealized translation | — | — | — | — | — | — | — | 415.8 | 415.8 |
| Minimum pension liability | — | — | — | — | — | — | — | (47.8) | (47.8) |
| Other | — | — | — | — | — | — | — | (4.2) | (4.2) |
| Total comprehensive income | | | | | | | | | $ 2,164.0 |
| Options exercised and other awards | — | — | (88.9) | (6,239) | 378.9 | — | — | — | |
| Option and restricted share income tax benefits | — | — | 30.9 | — | — | — | — | — | |
| Shares repurchased | — | — | — | 25,061 | (1,617.3) | — | — | — | |
| Net issuance of restricted stock, less amortization | — | — | (.3) | (136) | 9.0 | 4.8 | — | — | |
| Dividends declared | — | — | — | — | — | — | (791.0) | — | |
| Spin-off of Neenah Paper, Inc. | — | — | — | — | — | — | (202.5) | (24.4) | |
| Balance at December 31, 2004 | 568,597 | $ 710.8 | $ 348.6 | 85,694 | $(5,047.5) | $ (22.3) | $11,865.9 | $ (1,226.0) | |

See Notes to Consolidated Financial Statements.

43

Table of Contents

PART II
(Continued)

## KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
### CONSOLIDATED CASH FLOW STATEMENT

| | Year Ended December 31 | | |
|---|---|---|---|
| | 2004 | 2003 | 2002 |
| | (Millions of dollars) | | |
| **Continuing Operations:** | | | |
| **Operating Activities** | | | |
| Income from continuing operations | $ 1,770.4 | $ 1,643.6 | $ 1,627.4 |
| Depreciation and amortization | 800.3 | 745.3 | 704.4 |
| Deferred income tax (benefit) provision | (19.4) | (50.8) | 189.0 |
| Net losses on asset dispositions | 45.5 | 35.0 | 37.7 |
| Equity companies' earnings in excess of dividends paid | (30.1) | (9.6) | (8.2) |
| Minority owners' share of subsidiaries' net income | 73.9 | 55.6 | 58.1 |
| Decrease (increase) in operating working capital | 133.0 | 118.2 | (197.8) |
| Postretirement benefits | (54.4) | (59.9) | (118.5) |
| Other | 7.0 | 74.8 | 49.4 |
| **Cash Provided by Operations** | 2,726.2 | 2,552.2 | 2,341.5 |
| **Investing Activities** | | | |
| Capital spending | (535.0) | (872.9) | (861.3) |
| Acquisitions of businesses, net of cash acquired | — | (258.5) | (410.8) |
| Investments in marketable securities | (11.5) | (10.8) | (9.0) |
| Proceeds from sales of investments | 38.0 | 29.4 | 44.9 |
| Net increase in time deposits | (22.9) | (149.0) | (36.9) |
| Proceeds from dispositions of property | 30.7 | 7.6 | 4.8 |
| Other | 5.3 | (5.9) | (19.0) |
| **Cash Used for Investing** | (495.4) | (1,260.1) | (1,287.3) |
| **Financing Activities** | | | |
| Cash dividends paid | (767.9) | (671.9) | (612.7) |
| Net decrease in short-term debt | (54.7) | (424.2) | (423.9) |
| Proceeds from issuance of long-term debt | 38.7 | 540.8 | 823.1 |
| Repayments of long-term debt | (199.0) | (481.6) | (154.6) |
| Proceeds from preferred securities of subsidiary | 125.0 | — | — |
| Proceeds from exercise of stock options | 290.0 | 31.0 | 68.9 |
| Acquisitions of common stock for the treasury | (1,598.0) | (546.7) | (680.7) |
| Other | (9.0) | (18.3) | (34.9) |
| **Cash Used for Financing** | (2,174.9) | (1,570.9) | (1,014.8) |
| **Effect of Exchange Rate Changes on Cash and Cash Equivalents** | 4.1 | 18.6 | 14.7 |
| **Cash Provided by (Used for) Continuing Operations** | 60.0 | (260.2) | 54.1 |
| **Discontinued Operations:** | | | |
| Cash provided by discontinued operations | 30.0 | 56.3 | 75.9 |
| Cash payment from Neenah Paper, Inc. | 213.4 | — | — |

| | | | |
|---|---|---|---|
| Cash Provided by Discontinued Operations | 243.4 | 56.3 | 75.9 |
| Increase (Decrease) in Cash and Cash Equivalents | 303.4 | (203.9) | 130.0 |
| Cash and Cash Equivalents, beginning of year | 290.6 | 494.5 | 364.5 |
| Cash and Cash Equivalents, end of year | $ 594.0 | $ 290.6 | $ 494.5 |

See Notes to Consolidated Financial Statements.

44

Table of Contents

KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### Note 1. Accounting Policies

*Basis of Presentation*

The consolidated financial statements include the accounts of Kimberly-Clark Corporation and all subsidiaries in which it has a controlling financial interest (the "Corporation"). All significant intercompany transactions and accounts are eliminated in consolidation. Certain reclassifications have been made to conform prior year data to the current year presentation.

On November 30, 2004, the Corporation completed the spin-off of Neenah Paper, Inc. ("Neenah Paper"), a wholly-owned subsidiary that owned the Corporation's Canadian pulp business and its U.S. fine paper and technical paper businesses (the "Spin-off"). The Spin-off was accomplished by a distribution of all of the shares of Neenah Paper's common stock to the Corporation's stockholders, and no gain or loss was recorded by the Corporation. Holders of common stock received a divided of one share of Neenah Paper for every 33 shares of stock held. Based on a private letter ruling received from the Internal Revenue Service, receipt of the Neenah Paper shares in the distribution was tax-free for U.S. federal income tax purposes. As a result of the Spin-off the Corporation's prior period Consolidated Income Statements and Cash Flow Statements and related disclosures present the fine paper and technical paper businesses as discontinued operations, which is discussed in Note 2. The December 31, 2003 Consolidated Balance Sheet and prior period Consolidated Statements of Stockholders Equity and Comprehensive Income and related disclosures are presented on their historic basis, and unless otherwise noted, the information contained in the notes to the consolidated financial statements relates to the Corporation's continuing operations.

*Use of Estimates*

The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of net sales and expenses during the reporting periods. Actual results could differ from these estimates, and changes in these estimates are recorded when known. Estimates are used in accounting for, among other things, consumer and trade promotion and rebate accruals, pension benefits, retained insurable risks, excess and obsolete inventory, allowance for doubtful accounts, useful lives for depreciation and amortization, future cash flows associated with impairment testing for goodwill and long-lived assets, determining the primary beneficiary of variable interest entities, deferred tax assets and potential income tax assessments, and contingencies.

*Cash Equivalents*

Cash equivalents are short-term investments with an original maturity date of three months or less.

*Inventories and Distribution Costs*

Most U.S. inventories are valued at the lower of cost, using the Last-In, First-Out (LIFO) method for financial reporting purposes, or market. The balance of the U.S. inventories and inventories of consolidated operations outside the U.S. are valued at the lower of cost, using either the First-In, First-Out (FIFO) or weighted-average cost methods, or market. Distribution costs are classified as cost of products sold.

*Available-for-Sale Securities*

Available-for-sale securities, consisting of debt securities issued by non-U.S. governments and unaffiliated corporations, are carried at market value. Securities with maturity dates of one year or less are included in other

45

Table of Contents

## KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

current assets and were $6.6 million and $8.7 million at December 31, 2004 and 2003, respectively. Securities with maturity dates greater than one year are included in other assets and were $13.0 million and $10.5 million at December 31, 2004 and 2003, respectively. The securities are held by the Corporation's consolidated foreign financing subsidiary described in Note 5. Unrealized holding gains or losses on these securities are recorded in other comprehensive income until realized. No significant gains or losses were recognized in income for any of the three years ended December 31, 2004.

*Property and Depreciation*

For financial reporting purposes, property, plant and equipment are stated at cost and are depreciated principally on the straight-line method. Buildings are depreciated over their estimated useful lives, primarily 40 years. Machinery and equipment are depreciated over their estimated useful lives, primarily ranging from 16 to 20 years. For income tax purposes, accelerated methods of depreciation are used. Purchases of computer software are capitalized. External costs and certain internal costs (including payroll and payroll-related costs of employees) directly associated with developing significant computer software applications for internal use are capitalized. Training and data conversion costs are expensed as incurred. Computer software costs are amortized on the straight-line method over the estimated useful life of the software, which generally does not exceed five years.

Estimated useful lives are periodically reviewed and, when warranted, changes are made to them. Long-lived assets, including computer software, are reviewed for impairment whenever events or changes in circumstances indicate that their cost may not be recoverable. An impairment loss would be recognized when estimated undiscounted future cash flows from the use and eventual disposition of an asset group, which are identifiable and largely independent of other assets groups, are less than the carrying amount of the asset group. Measurement of an impairment loss would be based on the excess of the carrying amount of the asset over its fair value. Fair value is generally measured using discounted cash flows. When property is sold or retired, the cost of the property and the related accumulated depreciation are removed from the balance sheet and any gain or loss on the transaction is included in income.

The cost of major maintenance performed on manufacturing facilities, composed of labor, materials and other incremental costs, is charged to operations as incurred. Start-up costs for new or expanded facilities are expensed as incurred.

*Goodwill and Other Intangible Assets*

Goodwill represents costs in excess of fair values assigned to the underlying net assets of acquired businesses. Goodwill is not subject to systematic amortization, but rather is tested for impairment annually and whenever events and circumstances indicate that an impairment may have occurred. Impairment testing compares the carrying amount of the goodwill with its fair value. Fair value is estimated based on discounted cash flows. When the carrying amount of goodwill exceeds its fair value, an impairment charge would be recorded. The Corporation has completed the required annual testing of goodwill for impairment and has determined that none of its goodwill is impaired.

The Corporation has no intangible assets with indefinite useful lives. Intangible assets with finite lives are amortized over their estimated useful lives and are reviewed for impairment whenever events or changes in circumstances indicate that their carrying amount may not be recoverable. An impairment loss would be recognized when estimated undiscounted future cash flows from the use of the asset are less than its carrying amount. Measurement of an impairment loss would be based on discounted future cash flows compared to the carrying amount of the asset.

46

Table of Contents

### KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Investments in Equity Companies*

Investments in companies over which the Corporation exercises significant influence and that, in general, are at least 20 percent owned are stated at cost plus equity in undistributed net income. These investments are evaluated for impairment in accordance with the requirements of Accounting Principles Board ("APB") Opinion 18, *The Equity Method of Accounting for Investments in Common Stock* . An impairment loss would be recorded whenever a decline in value of an equity investment below its carrying amount is determined to be other than temporary. In judging "other than temporary," the Corporation would consider the length of time and extent to which the fair value of the investment has been less than the carrying amount of the equity company, the near-term and longer-term operating and financial prospects of the equity company, and its longer-term intent of retaining the investment in the equity company.

*Revenue Recognition*

Sales revenue for the Corporation and its reportable business segments is recognized at the time of product shipment or delivery, depending on when title passes, to unaffiliated customers, and when all of the following have occurred: a firm sales agreement is in place, pricing is fixed or determinable, and collection is reasonably assured. Sales are reported net of estimated returns, consumer and trade promotions, rebates and freight allowed.

*Sales Incentives and Trade Promotion Allowances*

The cost of promotion activities provided to customers is classified as a reduction in sales revenue. In addition, the estimated redemption value of consumer coupons is recorded at the time the coupons are issued and classified as a reduction in sales revenue. On January 1, 2002, the Corporation adopted Emerging Issues Task Force ("EITF") 01-9, *Accounting for Consideration Given by a Vendor to a Customer or a Reseller of the Vendor's Products* . The adoption of EITF 01-9 did not change reported earnings for 2001 but did require the recording of a cumulative effect of a change in accounting principle in 2002, equal to an after-tax charge of approximately $.02 per share, which resulted from a change in the period for recognizing the costs of coupons.

*Advertising Expense*

Advertising costs are expensed in the year the related advertisement is first presented by the media. For interim reporting purposes, advertising expenses are charged to operations as a percentage of sales based on estimated sales and related advertising expense for the full year.

*Research Expense*

Research and development costs are charged to expense as incurred.

*Environmental Expenditures*

Environmental expenditures related to current operations that qualify as property, plant and equipment or which substantially increase the economic value or extend the useful life of an asset are capitalized, and all other such expenditures are expensed as incurred. Environmental expenditures that relate to an existing condition caused by past operations are expensed as incurred. Liabilities are recorded when environmental assessments and/or remedial efforts are probable and the costs can be reasonably estimated. Generally, the timing of these accruals coincides with completion of a feasibility study or a commitment to a formal plan of action. At environmental sites in which more than one potentially responsible party has been identified, a liability is recorded for the estimated allocable share of costs related to the Corporation's involvement with the site as well

47

Table of Contents

## KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

as an estimated allocable share of costs related to the involvement of insolvent or unidentified parties. At environmental sites in which the Corporation is the only responsible party, a liability for the total estimated costs of remediation is recorded. Liabilities for future expenditures for environmental remediation obligations are not discounted and do not reflect any anticipated recoveries from insurers.

### Foreign Currency Translation

The income statements of foreign operations, other than those in hyperinflationary economies, are translated into U.S. dollars at rates of exchange in effect each month. The balance sheets of these operations are translated at period-end exchange rates, and the differences from historical exchange rates are reflected in stockholders' equity as unrealized translation adjustments.

The income statements and balance sheets of operations in hyperinflationary economies are translated into U.S. dollars using both current and historical rates of exchange. The effect of exchange rates on monetary assets and liabilities is reflected in income. Operations in Turkey and Russia (prior to 2003) are deemed to be hyperinflationary.

### Derivative Instruments and Hedging

All derivative instruments are recorded as assets or liabilities on the balance sheet at fair value. Changes in the fair value of derivatives are either recorded in income or other comprehensive income, as appropriate. The gain or loss on derivatives designated as fair value hedges and the offsetting loss or gain on the hedged item attributable to the hedged risk are included in current income in the period that changes in fair value occur. The gain or loss on derivatives designated as cash flow hedges is included in other comprehensive income in the period that changes in fair value occur and is reclassified to income in the same period that the hedged item affects income. The gain or loss on derivatives that have not been designated as hedging instruments is included in current income in the period that changes in fair value occur.

### Stock-Based Employee Compensation

The Corporation's stock-based employee compensation plan is described in Note 12. The Corporation continues to account for stock-based compensation using the intrinsic-value method permitted by APB Opinion 25, *Accounting for Stock Issued to Employees* . No employee compensation for stock options has been charged to earnings because the exercise prices of all stock options granted under this plan have been equal to the market value of the Corporation's common stock at the date of grant. The following presents information about net income and earnings per share ("EPS") as if the Corporation had applied the fair value expense recognition requirements of Statement of Financial Accounting Standards ("SFAS") 123, *Accounting for Stock-Based Compensation* , to all employee stock options granted under the plan.

|  | Year Ended December 31 | | |
|  | 2004 | 2003 | 2002 |
|---|---|---|---|
|  | (Millions of dollars) | | |
| Net income, as reported | $1,800.2 | $1,694.2 | $1,674.6 |
| Less: Stock-based employee compensation determined under the fair value requirements of SFAS 123, net of income tax benefits | 38.6 | 55.6 | 70.2 |
| Pro forma net income | $1,761.6 | $1,638.6 | $1,604.4 |

48

Table of Contents

**KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

| | Year Ended December 31 | | |
|---|---|---|---|
| | 2004 | 2003 | 2002 |
| Earnings per share | | | |
| Basic—as reported | $ 3.64 | $ 3.34 | $ 3.24 |
| Basic—pro forma | $ 3.56 | $ 3.23 | $ 3.10 |
| Diluted—as reported | $ 3.61 | $ 3.33 | $ 3.22 |
| Diluted—pro forma | $ 3.53 | $ 3.22 | $ 3.09 |

Pursuant to the requirements of SFAS 123, the weighted-average fair value of the individual employee stock options granted during 2004, 2003 and 2002 have been estimated as $15.49, $9.09 and $16.57, respectively, on the date of grant. The fair values were determined using a Black-Scholes option-pricing model using the following assumptions:

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Dividend yield | 2.49% | 3.05% | 1.97% |
| Volatility | 26.45% | 26.49% | 26.91% |
| Risk-free interest rate | 3.83% | 2.83% | 4.30% |
| Expected life—years | 5.9 | 5.8 | 5.8 |

In December 2004, the FASB issued SFAS 123 (revised 2004), *Share-Based Payment* ("SFAS 123R"), which revises SFAS 123, *Accounting for Stock-Based Compensation* . SFAS 123R also supersedes APB 25, *Accounting for Stock Issued to Employees* , and amends SFAS 95, *Statement of Cash Flows* . In general, the accounting required by SFAS 123R is similar to that of SFAS 123. However, SFAS 123 gave companies a choice to either recognize the fair value of stock options in their income statements or to disclose the pro forma income statement effect of the fair value of stock options in the notes to the financial statements. SFAS 123R eliminates that choice and requires the fair value of all share-based payments to employees, including the fair value of grants of employee stock options, be recognized in the income statement, generally over the option vesting period. SFAS 123R must be adopted no later than July 1, 2005. Early adoption is permitted.

SFAS 123R permits adoption of its requirements using one of two transition methods:

1. A modified prospective transition ("MPT") method in which compensation cost is recognized beginning with the effective date (a) for all share-based payments granted after the effective date and (b) for all awards granted to employees prior to the effective date that remain unvested on the effective date.

2. A modified retrospective transition ("MRT") method which includes the requirements of the MPT method described above, but also permits restatement of financial statements based on the amounts previously disclosed under SFAS 123's pro forma disclosure requirements either for (a) all prior periods presented or (b) prior interim periods of the year of adoption.

The Corporation is currently evaluating the timing and manner in which it will adopt SFAS 123R.

As permitted by SFAS 123, the Corporation currently accounts for share-based payments to employees using APB 25's intrinsic value method and, as such, has recognized no compensation cost for employee stock options. Accordingly, adoption of SFAS 123R's fair value method will have a slight effect on results of operations, although it will have no impact on overall financial position. The impact of adoption of SFAS 123R cannot be predicted at this time because it will depend on levels of share-based payments granted in the future.

49

Table of Contents

## KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

However, had SFAS 123R been adopted in prior periods, the effect would have approximated the SFAS 123 pro forma net income and earnings per share disclosures as shown above.

SFAS 123R also requires the benefits of tax deductions in excess of recognized compensation cost to be reported as a financing cash flow, rather than as an operating cash flow as currently required, thereby reducing net operating cash flows and increasing net financing cash flows in periods after adoption. While those amounts cannot be estimated for future periods (because they depend on, among other things, when employees will exercise the stock options and the market price of the Corporation's stock at the time of exercise), the amount of operating cash flows generated in prior periods for such excess tax deductions was $30.9 million, $7.4 million and $9.9 million in 2004, 2003 and 2002, respectively.

*Accounting Standards Changes*

On January 1, 2003, the Corporation adopted SFAS 143, *Accounting for Asset Retirement Obligations*. SFAS 143 addresses the accounting and reporting for the retirement of long-lived assets and related retirement costs. Adoption of SFAS 143 did not have a material effect on the Corporation's financial statements.

On January 1, 2003, the Corporation adopted SFAS 146, *Accounting for Costs Associated with Exit or Disposal Activities* . SFAS 146 addresses financial accounting and reporting for costs associated with exit or disposal activities and nullified EITF 94-3, *Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity (Including Certain Costs Incurred in a Restructuring)*. Adoption of SFAS 146 had no effect on the Corporation's financial statements.

On January 1, 2003, the Corporation adopted Financial Accounting Standards Board ("FASB") Interpretation ("FIN") 45, *Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others*. FIN 45 requires disclosure of guarantees. It also requires liability recognition for the fair value of guarantees made after December 31, 2002. Adoption of FIN 45 did not have a material effect on the Corporation's financial statements.

In May 2003, FASB issued SFAS 150, *Accounting for Certain Financial Instruments with Characteristics of Both Liabilities and Equity*. SFAS 150 requires that certain instruments classified as part of stockholders' equity or between stockholders' equity and liabilities be classified as liabilities. The Corporation has no instruments that would be affected by SFAS 150.

In December 2003, the FASB issued FIN 46 (Revised December 2003), *Consolidation of Variable Interest Entities, an Interpretation of ARB 51* , ("FIN 46R"). FIN 46R requires consolidation of entities in which the Corporation is the primary beneficiary, despite not having voting control. Likewise, it does not permit consolidation of entities in which the Corporation has voting control but is not the primary beneficiary. The Corporation has adopted FIN 46R for all of its applicable variable interest entities – its financing entities in 2003, and its real estate entities and synthetic fuel partnerships in 2004. The adoption of FIN 46R did not have a material effect on the Corporation's financial statements.

In December 2003, the FASB issued SFAS 132 (revised 2003), *Employers' Disclosures about Pensions and Other Postretirement Benefits* , ("SFAS 132R"). SFAS 132R revises the disclosures for pension plans and other postretirement benefit plans. The Corporation has adopted these disclosure requirements.

Effective April 1, 2004, the Corporation adopted FASB Staff Position 106-2 ("FSP 106-2"), Accounting and Disclosure Requirements Related to the Medicare Prescription Drug, Improvement and Modernization Act of 2003. See Note 11.

50

Table of Contents

## KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**Note 2.Discontinued Operations**

In connection with the Spin-off discussed in Note 1, the Corporation received a $213.4 million cash payment from Neenah Paper. The Consolidated Income Statements, Cash Flow Statements and related disclosures present the results of Neenah Paper's fine paper and technical paper businesses, which were previously included in the Business-to-Business segment, as discontinued operations for all periods presented. Prior to the Spin-off, the Corporation internally consumed approximately 90 percent of the pulp produced by the Canadian pulp business. In connection with the Spin-off, the Corporation entered into a long-term pulp supply agreement with Neenah Paper (as discussed in Note 9 ) , whereby the Corporation will continue to consume a substantial portion of the pulp produced by Neenah Paper. Because the Corporation will continue to incur pulp costs in its continuing operations, the results of Neenah Paper's Canadian pulp business are not included in discontinued operations.

Summarized financial information for discontinued operations is presented below:

|  | 2004(a) | 2003 | 2002 |
|---|---|---|---|
|  | (Millions of dollars) | | |
| Net sales | $317.7 | $321.7 | $334.8 |
| Income before income taxes | 59.2 | 80.7 | 95.3 |
| Provision for income taxes | (29.4) | (30.1) | (36.7) |
| Income from discontinued operations | 29.8 | 50.6 | 58.6 |

(a)  Includes operations through November 30, 2004; also included are transaction costs related to the Spin-off.

A summary of the assets, liabilities and accumulated other comprehensive income of Neenah Paper that were spun off is presented below:

|  | November 30, 2004 |
|---|---|
|  | (Millions of dollars) |
| **Assets** | |
| Current assets | $  191.3 |
| Property, plant and equipment, net | 375.4 |
| Timberlands | 5.3 |
| Other assets | 45.7 |
|  | 617.7 |
| **Liabilities and Accumulated Other Comprehensive Income** | |
| Current liabilities | 67.3 |
| Long-Term Debt | 225.0 |
| Noncurrent employee benefits and other obligations | 57.2 |
| Deferred income taxes and other liabilities | 41.3 |
| Accumulated other comprehensive income | 24.4 |
|  | 415.2 |
| Total Distribution Charged to Retained Earnings | $  202.5 |

51

Table of Contents

**KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**Note 3. Acquisitions and Intangible Assets**

*Acquisitions*

During the first quarter of 2003, the Corporation purchased the Klucze tissue business in Poland. This acquisition was consistent with the Corporation's strategy of growing its global consumer tissue business and provides it with a strong platform to expand its business. The allocation of the purchase price to the fair value of assets and liabilities acquired was completed in 2003 and resulted in recognition of goodwill and other intangible assets of approximately $20 million.

During the third quarter of 2003, the Corporation acquired an additional 49 percent interest in Kimberly-Clark Peru S.A. and the remaining 50 percent interest in its tissue joint venture in Brazil (Klabin Kimberly S.A.). The cost of these acquisitions totaled approximately $200 million. These acquisitions were a result of the partners in each of the ventures exercising their options to sell their ownership interest to the Corporation. The allocation of the purchase price to the fair value of assets and liabilities acquired was completed in 2004 and resulted in recognition of goodwill and other intangible assets of approximately $140 million.

Prior to 2001, the Corporation and its joint venture partner, Amcor Limited ("Amcor"), held a 50/50 ownership interest in Kimberly-Clark Australia Pty. Ltd ("KCA"). In July 2001, the Corporation purchased an additional 5 percent ownership interest in KCA for A$77.5 million (approximately $39 million), and exchanged options with Amcor for the purchase by the Corporation of the remaining 45 percent ownership interest. In June 2002, the option was exercised, and the Corporation purchased the remaining 45 percent interest from Amcor for A$697.5 million (approximately $390 million). The acquisition of KCA reflects the Corporation's strategy to expand its three business segments within Australia. As a result of these transactions, KCA became a consolidated subsidiary effective July 1, 2001 and a wholly-owned subsidiary on June 30, 2002. The Corporation recognized total goodwill on this series of transactions of approximately $350 million, reflecting the Corporation's expectation of continued growth and profitability of KCA.

The costs of other acquisitions relating primarily to increased ownership and expansion outside North America in 2003 and 2002 were $3.0 million and $16.2 million, respectively. The Corporation recognized goodwill on these other acquisitions of $1.2 million in 2003 and $8.9 million in 2002.

*Goodwill*

The changes in the carrying amount of goodwill by business segment are as follows:

| | Personal Care | Consumer Tissue | Business-to-Business | Total |
|---|---|---|---|---|
| | | (Millions of dollars) | | |
| Balance at January 1, 2003 | $425.4 | $ 339.7 | $1,489.8 | $2,254.9 |
| Acquisitions | 1.8 | 143.4 | 24.1 | 169.3 |
| Currency and other | 87.6 | 111.0 | 26.3 | 224.9 |
| Balance at December 31, 2003 | 514.8 | 594.1 | 1,540.2 | 2,649.1 |
| Currency and other | 28.3 | 16.4 | 9.1 | 53.8 |
| Balance at December 31, 2004 | $543.1 | $ 610.5 | $1,549.3 | $2,702.9 |

52

Case MDL No. 875  Document 4723  Filed 02/21/06  Page 86 of 324

Table of Contents

### KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Other Intangible Assets*

Intangible assets subject to amortization are included in Other Assets and consist of the following at December 31:

| | 2004 | | 2003 | |
|---|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Gross Carrying Amount | Accumulated Amortization |
| | (Millions of dollars) | | | |
| Trademarks | $213.5 | $ 60.7 | $204.8 | $ 50.0 |
| Patents | 40.8 | 24.6 | 40.4 | 20.6 |
| Other | 21.5 | 6.0 | 21.5 | 4.2 |
| Total | $275.8 | $ 91.3 | $266.7 | $ 74.8 |

Amortization expense for intangible assets was approximately $14 million in 2004, $13 million in 2003 and $12 million in 2002. Amortization expense is estimated to be approximately $14 million in 2005, $13 million in 2006 and 2007, $11 million in 2008 and $9 million in 2009.

### Note 4. Debt

Long-term debt is composed of the following:

| | Weighted-Average Interest Rate | Maturities | December 31 | |
|---|---|---|---|---|
| | | | 2004 | 2003 |
| | | | (Millions of dollars) | |
| Notes and debentures | 5.77% | 2005 – 2038 | $2,309.8 | $2,342.9 |
| Industrial development revenue bonds | 2.58% | 2006 – 2037 | 300.7 | 381.3 |
| Bank loans and other financings in various currencies | 7.22% | 2005 – 2031 | 272.9 | 194.9 |
| Total long-term debt | | | 2,883.4 | 2,919.1 |
| Less current portion | | | 585.4 | 185.4 |
| Long-term portion | | | $2,298.0 | $2,733.7 |

Fair value of total long-term debt, based on quoted market prices for the same or similar debt issues, was approximately $3.0 billion and $3.1 billion at December 31, 2004 and 2003, respectively. Scheduled maturities of long-term debt for the next five years are $585.4 million in 2005, $64.8 million in 2006, $336.7 million in 2007, $19.7 million in 2008 and $5.1 million in 2009.

At December 31, 2004, the Corporation had $1.2 billion of revolving credit facilities. These facilities, unused at December 31, 2004, permit borrowing at competitive interest rates and are available for general corporate purposes, including backup for commercial paper borrowings. The Corporation pays commitment fees on the unused portion but may cancel the facilities without penalty at any time prior to their expiration. Of these facilities, $600 million expires in September 2005 and the balance expires in November 2009.

http://investor.kimberly-clark.com/EdgarDetail.cfm?CIK=55785&FID=1193125-05-3623...  11/19/2005

Case MDL No. 875   Document 4723   Filed 02/21/06   Page 87 of 324

Table of Contents

## KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Debt payable within one year is as follows:

| | December 31 | |
|---|---|---|
| | 2004 | 2003 |
| | (Millions of dollars) | |
| Commercial paper | $ 526.3 | $533.5 |
| Current portion of long-term debt | 585.4 | 185.4 |
| Other short-term debt | 103.0 | 145.4 |
| Total | $1,214.7 | $864.3 |

At December 31, 2004 and 2003, the weighted-average interest rate for commercial paper was 2.3 percent and 1.0 percent, respectively.

### Note 5. Preferred Securities of Subsidiary

In February 2001, the Corporation formed a Luxembourg-based financing subsidiary. The subsidiary issued 1 million shares of voting-preferred securities (the "Securities") with an aggregate par value of $520 million to a nonaffiliated entity for cash proceeds of $516.5 million. The Securities are entitled to a 98 percent vote and pay no dividend but accrue a fixed annual rate of return of 4.56 percent. Prior to September 2003, the Securities accrued a variable rate of return. The Securities are in substance perpetual and are callable by the subsidiary at par value plus any accrued but unpaid return on the Securities in November 2008 and each 20-year anniversary thereafter. The subsidiary also issued voting-preferred and common securities to the Corporation for total cash proceeds of $500 million. These securities are entitled to a combined two percent vote and the common securities are entitled to all of the residual equity after satisfaction of the preferred interests. Approximately 97 percent of the subsidiary's funds have been loaned to the Corporation. These long-term loans bear fixed annual interest rates. The remaining funds are invested in other financial assets. Prior to September 2003, the loans accrued interest at a variable rate. The Corporation is the primary beneficiary of the subsidiary and, accordingly, consolidates the subsidiary in the accompanying financial statements. The preferred and common securities of the subsidiary held by the Corporation and the intercompany loans have been eliminated in the consolidated financial statements. The return on the Securities is included in minority owners' share of subsidiaries' net income in the Corporation's consolidated income statement. The Securities are shown as Preferred Securities of Subsidiary on the consolidated balance sheet.

In June 2004, the nonaffiliated entity invested an additional $125 million, thereby increasing the aggregate par value of the Securities that it held. In conjunction with this transaction, the fixed annual rate of return on the Securities was increased from 4.47 to 4.56 percent. The subsidiary loaned these funds to the Corporation, which used them to reduce its outstanding commercial paper.

### Note 6. Stockholders' Equity

*Stockholders' Equity*

On June 21, 1988, the board of directors of the Corporation adopted a shareholder rights plan by declaring a distribution of one preferred share purchase right for each outstanding share of the Corporation's common stock. On November 19, 2004, the board terminated the shareholder rights plan by accelerating the expiration date of the rights from June 8, 2005 to November 19, 2004.

54

Table of Contents

### KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Other Comprehensive Income (Loss)*

The changes in the components of other comprehensive income (loss) are as follows:

| | Year Ended December 31 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2004 | | | | 2003 | | | 2002 | | |
| | Pretax Amount | Tax Effect | Spin-Off | Net Amount | Pretax Amount | Tax Effect | Net Amount | Pretax Amount | Tax Effect | Net Amount |
| | (Millions of dollars) | | | | | | | | | |
| Unrealized translation | $415.8 | $ — | $(60.1) | $355.7 | $ 742.8 | $ — | $ 742.8 | $ 96.4 | $ — | $ 96.4 |
| Minimum pension liability | (75.6) | 27.8 | 36.3 | (11.5) | (231.8) | 85.6 | (146.2) | (869.2) | 313.5 | (555.7) |
| Deferred losses on cash flow hedges | (5.8) | 1.8 | (.6) | (4.6) | (5.5) | 1.3 | (4.2) | (2.6) | .6 | (2.0) |
| Unrealized holding losses on securities | (.2) | — | — | (.2) | (.1) | — | (.1) | (.2) | — | (.2) |
| Other comprehensive income (loss) | $334.2 | $29.6 | $(24.4) | $339.4 | $ 505.4 | $86.9 | $ 592.3 | $(775.6) | $314.1 | $(461.5) |

Accumulated balances of other comprehensive income (loss), net of applicable income taxes are as follows:

| | December 31 | |
|---|---|---|
| | 2004 | 2003 |
| | (Millions of dollars) | |
| Unrealized translation | $ (385.3) | $ (741.0) |
| Minimum pension liability | (829.6) | (818.1) |
| Deferred losses on cash flow hedges | (10.9) | (6.3) |
| Unrealized holding losses on securities | (.2) | — |
| Accumulated other comprehensive income (loss) | $(1,226.0) | $(1,565.4) |

At December 31, 2004, unremitted net income of equity companies included in consolidated retained earnings was about $812 million.

### Note 7.  Risk Management

As a multinational enterprise, the Corporation is exposed to risks such as changes in foreign currency exchange rates, interest rates and commodity prices. A variety of practices are employed to manage these risks, including operating and financing activities and, where deemed appropriate, the use of derivative instruments. Derivative instruments, including some that are not designated as either fair value or cash flow hedges, are used only for risk management purposes and not for speculation or trading. All foreign currency derivative instruments are either exchange traded or are entered into with major financial institutions. The Corporation's credit exposure under these arrangements is limited to those agreements with a positive fair value at the reporting date. Credit risk with respect to the counterparties is considered minimal in view of the financial strength of the counterparties.

*Foreign Currency Exchange Risk*

Foreign currency exchange risk is managed by the systematic use of foreign currency forward, option and swap contracts. The use of these instruments allows management of transactional exposure to exchange rate fluctuations because the gains or losses incurred on the derivative instruments will offset, in whole or in part,

55

Table of Contents

## KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

losses or gains on the underlying foreign currency exposure. Prior to 2004, foreign currency risk was managed by the selective, rather than the systematic, use of foreign currency forward, option and swap contracts. Management does not foresee or expect any significant change in such exposures in the near future or in the strategies it employs to manage them.

*Foreign Currency Translation Risk*

Translation adjustments result from translating foreign entities' financial statements to U.S. dollars from their functional currencies. Translation exposure, which results from possible changes in translation rates between functional currencies and the U.S. dollar, is not hedged. The risk to any particular entity's net assets is minimized to the extent that the entity is financed with local currency borrowing. In addition, many of the Corporation's non-U.S. operations buy the majority of their inputs and sell the majority of their outputs in their local currency, thereby minimizing the effect of currency rate changes on their local operating profit margins.

*Interest Rate Risk*

Interest rate risk is managed through the maintenance of a portfolio of variable- and fixed-rate debt composed of short- and long-term instruments. The objective is to maintain a cost-effective mix that management deems appropriate. Management does not foresee or expect any significant changes in its exposure to interest rate fluctuations in the near future or in the strategies it employs to manage them.

*Commodity Price Risk*

The Corporation is subject to commodity price risk, the most significant of which relates to the price of pulp. Selling prices of tissue products are influenced, in part, by the market price for pulp, which is determined by industry supply and demand. On a worldwide basis prior to the Spin-off, the Corporation supplied approximately 40 percent of its virgin fiber needs from internal pulp manufacturing operations. The Spin-off has reduced the internal pulp supply to approximately 10 percent, and this reduction in pulp integration could increase the Corporation's commodity price risk. Specifically, increases in pulp prices could adversely affect earnings if selling prices are not adjusted or if such adjustments significantly trail the increases in pulp prices. Derivative instruments have not been used to manage these risks.

In addition, the Corporation is subject to price risk for utilities, primarily natural gas, which are used in its manufacturing operations. Derivative instruments are used to hedge a portion of this risk when it is deemed prudent to do so by management.

*Effect of Derivative Instruments on Results of Operations and Other Comprehensive Income*

*Fair Value Hedges*

The Corporation's fair value hedges were effective in 2004, 2003 and 2002 and consequently resulted in no income effect. In addition, during these years, all of the Corporation's designated derivatives for firm commitments continued to qualify for fair value hedge accounting.

*Cash Flow Hedges*

The Corporation's cash flow hedges were effective in 2004, 2003 and 2002 and consequently resulted in no net income effect. During the same period in which the hedged forecasted transactions affected earnings, the Corporation reclassified $9.0 million, $9.9 million and $5.4 million, respectively, of after-tax losses from

56

Table of Contents

## KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

accumulated other comprehensive income to earnings. At December 31, 2004, the Corporation expects to reclassify $13.8 million of after-tax losses from accumulated other comprehensive income primarily to cost of sales during the next twelve months, consistent with the timing of the underlying hedged transactions. The maximum maturity of cash flow derivatives in place at December 31, 2004 is December 31, 2005.

### Other

In 2001, the Corporation entered into forward contracts to purchase Australian dollars related to the acquisition of the remaining 45 percent ownership interest in KCA for A$697.5 million (approximately $390 million). These contracts were settled in conjunction with the completion of this acquisition in June 2002. These forward contracts did not qualify for hedge accounting under SFAS 133 and were marked to market each period with the resulting gains or losses included in other (income) expense, net. During 2002, net gains on these contracts were approximately $17 million.

### Note 8. Variable Interest Entities

The Corporation has variable interests in the following financing and real estate entities and synthetic fuel partnerships described in Note 13.

### Financing Entities

The Corporation holds a significant variable interest in two financing entities that were used to monetize long-term notes received from the sale of certain nonstrategic timberlands and related assets, which were sold in 1999 and 1989 to nonaffiliated buyers. These transactions qualified for the installment method of accounting for income tax purposes and met the criteria for immediate profit recognition for financial reporting purposes contained in SFAS 66, *Accounting for Sales of Real Estate* . These sales involved notes receivable with an aggregate face value of $617 million and a fair value of approximately $593 million at the date of sale. The notes receivable are backed by irrevocable standby letters of credit issued by money center banks, which aggregated $617 million at December 31, 2004.

Because the Corporation desired to monetize the $617 million of notes receivable and continue the deferral of current income taxes on the gains, in 1999 the Corporation transferred the notes received from the 1999 sale to a noncontrolled financing entity, and in 2000 it transferred the notes received from the 1989 sale to another noncontrolled financing entity. The Corporation has minority voting interests in each of the financing entities (collectively, the "Financing Entities"). The transfers of the notes and certain other assets to the Financing Entities were made at fair value, were accounted for as asset sales and resulted in no gain or loss. In conjunction with the transfer of the notes and other assets, the Financing Entities became obligated for $617 million in third-party debt financing. A nonaffiliated financial institution has made substantive capital investments in each of the Financing Entities, has majority voting control over them and has substantive risks and rewards of ownership of the assets in the Financing Entities. The Corporation also contributed intercompany notes receivable aggregating $662 million and intercompany preferred stock of $50 million to the Financing Entities, which serve as secondary collateral for the third-party lending arrangements. In the unlikely event of default by both of the money center banks that provided the irrevocable standby letters of credit, the Corporation could experience a maximum loss of $617 million under these arrangements.

The Corporation has not consolidated the Financing Entities because it is not the primary beneficiary of either entity. Rather, it will continue to account for its ownership interests in these entities using the equity method of accounting. The Corporation retains equity interests in the Financing Entities for which the legal right of offset exists against the intercompany notes. As a result, the intercompany notes payable have been offset against the Corporation's equity interests in the Financing Entities for financial reporting purposes.

57

Case MDL No. 875   Document 4723   Filed 02/21/06   Page 68 of 160

Table of Contents

**KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

See Note 5 for a description of the Corporation's Luxembourg-based financing subsidiary, which is consolidated because the Corporation is the primary beneficiary of the entity.

*Real Estate Entities*

Effective March 31, 2004, the Corporation adopted FIN 46R for its real estate entities described below. In 1994, the Corporation began participating in the U.S. affordable and historic renovation real estate markets. Investments in these markets are encouraged by laws enacted by the United States Congress and related federal income tax rules and regulations. Accordingly, these investments generate income tax credits and tax losses that are used to reduce the Corporation's income tax liabilities. The Corporation has invested in these markets through (i) partnership arrangements in which it is a limited partner, (ii) limited liability companies ("LLCs") in which it is a nonmanaging member and (iii) investments in various funds in which the Corporation is one of many noncontrolling investors. These entities borrow money from third parties generally on a nonrecourse basis and invest in and own various real estate projects.

Adoption of FIN 46R required the Corporation to consolidate ten apartment projects and two hotels because it was the primary beneficiary of each of these real estate ventures. The carrying amount of the assets that serve as collateral for $98.4 million of obligations of these ventures was $147.5 million at December 31, 2004, and these assets are classified as property, plant and equipment on the consolidated balance sheet. The Corporation also has guaranteed $14.6 million of the obligations of these ventures.

The Corporation accounts for its interests in real estate entities that are not consolidated under FIN 46R by the equity method of accounting or by the effective yield method, as appropriate, and has accounted for the related income tax credits and other tax benefits as a reduction in its income tax provision. As of December 31, 2004, the Corporation had a net equity of $21.2 million in its nonconsolidated real estate entities. The Corporation has earned income tax credits totaling approximately $71.8 million, $59.3 million and $49.9 million in 2004, 2003 and 2002, respectively. As of December 31, 2004, total permanent financing debt for the nonconsolidated entities was $221.9 million. A total of $7.6 million of the permanent financing debt is guaranteed by the Corporation and the remainder of this debt is not supported or guaranteed by the Corporation. Except for the guaranteed portion, permanent financing debt is secured solely by the properties and is nonrecourse to the Corporation. From time to time, temporary interim financing is guaranteed by the Corporation. In general, the Corporation's interim financing guarantees are eliminated at the time permanent financing is obtained. At December 31, 2004, $27.9 million of temporary interim financing associated with these nonconsolidated real estate entities was guaranteed by the Corporation.

If the Corporation's investments in its nonconsolidated real estate entities were to be disposed of at their carrying amounts, a portion of the tax credits may be recaptured and may result in a charge to earnings. As of December 31, 2004, this recapture risk is estimated to be $31.1 million. The Corporation has no current intention of disposing of these investments during the recapture period, nor does it anticipate the need to do so in the foreseeable future in order to satisfy any anticipated liquidity need. Accordingly, the recapture risk is considered to be remote.

At December 31, 2004, the Corporation's maximum loss exposure for its nonconsolidated real estate entities is estimated to be $87.8 million and was comprised of its net equity in these entities of $21.2 million, its permanent financing guarantees of $7.6 million, its interim financing guarantees of $27.9 million and the income tax credit recapture risk of $31.1 million.

Table of Contents

## KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**Note 9.    Leases and Commitments**

*Leases*

The future minimum obligations under operating leases having a noncancelable term in excess of one year as of December 31, 2004, are as follows:

|  | Amount |
|---|---|
|  | (Millions of dollars) |
| Year Ending December 31: |  |
| 2005 | $    75.7 |
| 2006 | 56.9 |
| 2007 | 31.6 |
| 2008 | 22.5 |
| 2009 | 16.9 |
| Thereafter | 36.1 |
| Future minimum obligations | $    239.7 |

Operating lease obligations have been reduced by approximately $4 million for rental income from noncancelable sublease agreements.

Consolidated rental expense under operating leases was $195.9 million, $186.7 million and $166.3 million in 2004, 2003 and 2002, respectively.

*Purchase Commitments*

In conjunction with the Spin-off, the Corporation entered into a long-term pulp supply agreement with Neenah Paper. Under the agreement, the Corporation has agreed to purchase annually declining specified minimum tonnages of pulp. Minimum commitments under the agreement are estimated to be approximately $301 million in 2005, $244 million in 2006, $235 million in 2007 and $174 million in 2008. These commitments represent approximately 20, 16, 15 and 11 percent, respectively, of the Corporation's total requirements for virgin pulp in 2004. The Corporation purchased approximately $21 million under that agreement in 2004.

Under the agreement, the prices for pulp will be based on published industry index prices, subject to certain minimum and maximum prices, less agreed-upon discounts. The commitments are structured as supply-or-pay and take-or-pay arrangements. Accordingly, if the Corporation does not purchase the specified minimums, it must pay for the shortfall based on the difference between the contract price and any lower price Neenah Paper obtains for the pulp, plus ten percent of the difference. If Neenah Paper does not supply the specified minimums, it must pay for the shortfall based on the difference between the contract price and any higher price that the Corporation pays to purchase the pulp, plus ten percent of that difference. Either party can elect a two-year phase-down period for the agreement, to begin no earlier than January 1, 2009 under which the minimum commitments would be approximately $135 million in the first year and $90 million in the second year. Either party may terminate the pulp supply agreement for certain events specified in the agreement.

The Corporation has entered into other long-term contracts for the purchase of raw materials, principally pulp, and utilities, principally electricity. The minimum purchase commitments extend beyond 2009. Commitments under these contracts are approximately $187 million in 2005, $120 million in 2006, $77 million in 2007, $68 million in 2008 and $65 million in 2009. Total commitments beyond the year 2009 are $328 million.

59

Table of Contents

## KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Although the Corporation is primarily liable for payments on the above-mentioned leases and purchase commitments, management believes the Corporation's exposure to losses, if any, under these arrangements is not material.

### Note 10.  Contingencies and Legal Matters

*Litigation*

The following is a brief description of certain legal and administrative proceedings to which the Corporation or its subsidiaries is a party or to which the Corporation's or its subsidiaries' properties are subject. In management's opinion, none of the legal and administrative proceedings described below, individually or in the aggregate, is expected to have a material adverse effect on the Corporation's business, financial condition, results of operations or liquidity.

As of December 31, 2004, the Corporation, along with many other nonaffiliated companies, was a party to lawsuits with allegations of personal injury resulting from asbestos exposure on the defendants' premises and allegations that the defendants manufactured, sold, distributed or installed products which cause asbestos-related lung disease. These general allegations are often made against the Corporation without any apparent evidence or identification of a specific product or premises of the Corporation. The Corporation has denied the allegations and raised numerous defenses in all of these asbestos cases. All asbestos claims have been tendered to the Corporation's insurance carriers for defense and indemnity. The financial statements reflect appropriate accruals for the Corporation's portion of the costs estimated to be incurred in connection with resolving these claims.

*Contingency*

One of the Corporation's North American tissue mills has an agreement to provide its local utility company a specified amount of electric power for each of the next 12 years. In the event that the mill was shut down, the Corporation would be required to continue to operate the power generation facility on behalf of its owner, the local utility company. The net present value of the cost to fulfill this agreement as of December 31, 2004 is estimated to be approximately $120 million. Management considers the probability of closure of this mill to be remote.

*Environmental Matters*

The Corporation has been named a potentially responsible party under the provisions of the federal Comprehensive Environmental Response, Compensation and Liability Act, or analogous state statutes, at a number of waste disposal sites, none of which, individually or in the aggregate, in management's opinion, is likely to have a material adverse effect on the Corporation's business, financial condition, results of operations or liquidity.

### Note 11.  Postretirement and Other Benefits

*Pension Plans*

Substantially all regular employees in North America and the United Kingdom are covered by defined benefit pension plans (the "Principal Plans") and/or defined contribution retirement plans. Certain other subsidiaries have defined benefit pension plans or, in certain countries, termination pay plans covering substantially all regular employees. The funding policy for the qualified defined benefit plans in North America and the defined benefit plans in the United Kingdom is to contribute assets to fully fund the accumulated benefit obligation ("ABO"). Subject to regulatory and tax deductibility limits, any funding shortfall will be eliminated

60

Table of Contents

### KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

over a reasonable number of years. Nonqualified U.S. plans providing pension benefits in excess of limitations imposed by the U.S. income tax code are not funded. Funding for the remaining defined benefit plans outside the U.S. is based on legal requirements, tax considerations, investment opportunities, and customary business practices in such countries.

In accordance with SFAS 87, *Employers' Accounting for Pensions,* the Corporation recorded a minimum pension liability for underfunded plans representing the excess of the unfunded ABO over previously recorded net pension liabilities. The minimum pension liability is included in noncurrent employee benefit and other obligations on the balance sheet. An offsetting charge is included as an intangible asset to the extent of unrecognized prior service cost, and the balance is included in accumulated other comprehensive income. The principal cause of the increase in additional minimum pension liability in 2004 was a decrease in the discount rates used to estimate the ABO.

Information about the minimum pension liability follows:

|  | December 31 | |
| --- | --- | --- |
|  | 2004 | 2003 |
|  | (Millions of dollars) | |
| Minimum pension liability | $1,341.6 | $1,325.4 |
| Less intangible asset | 52.8 | 56.1 |
| Accumulated other comprehensive loss | $1,288.8 | $1,269.3 |

#### *Other Postretirement Benefit Plans*

Substantially all North American retirees and employees are covered by health care and life insurance benefit plans. Certain benefits are based on years of service and/or age at retirement. The plans are principally noncontributory for employees who were eligible to retire before 1993 and contributory for most employees who retire after 1992, except that the Corporation provides no subsidized benefits to most employees hired after 2003.

On December 8, 2003, the Medicare Prescription Drug, Improvement and Modernization Act of 2003 (the "Act") became law. Among other things, the Act provides a prescription drug benefit under Medicare (Medicare Part D) and a federal subsidy to sponsors of retiree health care benefit plans that provide a prescription drug benefit that is at least actuarially equivalent to Medicare Part D. Effective April 1, 2004, the Corporation adopted FSP 106-2, which reduced the Corporation's accumulated postretirement benefit obligation by approximately $72 million and resulted in an unrecognized actuarial gain of a similar amount. Adoption resulted in a reduction in postretirement benefits cost of $5.8 million in 2004.

Prior to 2004, certain U.S. plans limited the Corporation's cost of future annual per capita retiree medical benefits to no more than 200 percent of the 1992 annual per capita cost. These plans reached this limitation (the "Cap") and were amended during 2003. Among other things, the amendments index the Cap by 3 percent annually beginning in 2005 for certain employees retiring on or before April 1, 2004 and limit the Corporation's future cost for retiree health care benefits to a defined fixed per capita cost for certain employees retiring after April 1, 2004. The consolidated weighted-average health care cost trend rate is expected to be 8.45 percent in 2005, 7.67 percent in 2006 and to decrease to 5.67 percent in 2011 and thereafter.

61

Table of Contents

## KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Summarized financial information about postretirement plans, excluding defined contribution retirement plans, is presented below.

| | Pension Benefits | | Other Benefits | |
|---|---|---|---|---|
| | **Year Ended December 31** | | | |
| | 2004 | 2003 | 2004 | 2003 |
| | (Millions of dollars) | | | |
| **Change in Benefit Obligation** | | | | |
| Benefit obligation at beginning of year | $ 5,233.8 | $ 4,392.5 | $ 852.6 | $ 751.4 |
| Service cost | 87.4 | 76.1 | 17.8 | 16.2 |
| Interest cost | 296.2 | 288.0 | 48.2 | 48.9 |
| Actuarial loss | 182.3 | 500.8 | 33.5 | 87.2 |
| Currency and other | 155.9 | 289.8 | 10.4 | 33.5 |
| Benefit payments from plans | (296.3) | (283.7) | (67.8) | (84.6) |
| Direct benefit payments | (21.4) | (29.7) | — | — |
| Spin-off of Neenah Paper | (367.3) | — | (49.4) | — |
| Benefit obligation at end of year | 5,270.6 | 5,233.8 | 845.3 | 852.6 |
| **Change in Plan Assets** | | | | |
| Fair value of plan assets at beginning of year | 4,027.9 | 3,406.6 | — | — |
| Actual gain on plan assets | 332.8 | 491.0 | — | — |
| Employer contributions | 200.0 | 181.9 | 59.4 | 77.8 |
| Currency and other | 103.1 | 232.1 | 8.4 | 6.8 |
| Benefit payments | (296.3) | (283.7) | (67.8) | (84.6) |
| Spin-off of Neenah Paper | (323.3) | — | — | — |
| Fair value of plan assets at end of year | 4,044.2 | 4,027.9 | — | — |
| **Funded Status** | | | | |
| Benefit obligation in excess of plan assets | (1,226.4) | (1,205.9) | (845.3) | (852.6) |
| Unrecognized net actuarial loss and transition amount | 1,650.6 | 1,635.1 | 163.8 | 148.7 |
| Unrecognized prior service cost | 48.0 | 51.6 | 11.2 | 6.9 |
| Net amount recognized | $ 472.2 | $ 480.8 | $(670.3) | $(697.0) |
| **Amounts Recognized in the Balance Sheet** | | | | |
| Prepaid benefit cost | $ 25.3 | $ 19.0 | $ — | $ — |
| Accrued benefit cost | (894.7) | (863.6) | (670.3) | (697.0) |
| Intangible asset | 52.8 | 56.1 | — | — |
| Accumulated other comprehensive income | 1,288.8 | 1,269.3 | — | — |
| Net amount recognized | $ 472.2 | $ 480.8 | $(670.3) | $(697.0) |

The Corporation uses December 31 as the measurement date for all of its postretirement plans.

62

Case MDL No. 875    Document 4723    Filed 02/21/06

Table of Contents

## KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Information for the Principal Plans and All Other Pension Plans*

| | Principal Plans | | All Other Pension Plans | | Total | |
|---|---|---|---|---|---|---|
| | Year Ended December 31 | | | | | |
| | 2004 | 2003 | 2004 | 2003 | 2004 | 2003 |
| | (Millions of dollars) | | | | | |
| Projected benefit obligation ("PBO") | $4,882.1 | $4,904.3 | $388.5 | $329.5 | $5,270.6 | $5,233.8 |
| ABO | 4,558.9 | 4,562.9 | 361.6 | 301.8 | 4,920.5 | 4,864.7 |
| Fair value of plan assets | 3,794.2 | 3,804.3 | 250.0 | 223.6 | 4,044.2 | 4,027.9 |

*Information for Pension Plans With an ABO in Excess of Plan Assets*

| | December 31 | |
|---|---|---|
| | 2004 | 2003 |
| | (Millions of dollars) | |
| PBO | $5,120.3 | $5,133.0 |
| ABO | 4,780.4 | 4,774.4 |
| Fair value of plan assets | 3,890.0 | 3,917.0 |

*Components of Net Periodic Benefit Cost*

| | Pension Benefits | | | Other Benefits | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31 | | | | | |
| | 2004 | 2003 | 2002 | 2004 | 2003 | 2002 |
| | (Millions of dollars) | | | | | |
| Service cost | $ 87.4 | $ 76.1 | $ 67.7 | $17.8 | $16.2 | $12.5 |
| Interest cost | 296.2 | 288.0 | 272.1 | 48.2 | 48.9 | 49.7 |
| Expected return on plan assets(a) | (324.0) | (286.3) | (330.7) | — | — | — |
| Amortization of prior service cost (benefit) and transition amount | 7.3 | 8.7 | 5.8 | (.7) | (1.5) | (2.1) |
| Recognized net actuarial loss (gain) | 83.3 | 74.0 | 14.4 | 4.0 | 1.9 | (2.7) |
| Other | 4.6 | 5.4 | 2.4 | (1.5) | — | — |
| Net periodic benefit cost | $ 154.8 | $ 165.9 | $ 31.7 | $67.8 | $65.5 | $57.4 |

(a) The expected return on plan assets is determined by multiplying the fair value of plan assets at the prior year-end (adjusted for estimated current year cash benefit payments and contributions) by the expected long-term rate of return.

*Weighted-Average Assumptions used to determine Benefit Obligations at December 31*

| | Pension Benefits | | Other Benefits | |
|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 |
| Discount rate | 5.68% | 5.92% | 5.85% | 6.01% |
| Rate of compensation increase | 3.67% | 3.51% | — | — |

63

Table of Contents

## KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Weighted-Average Assumptions used to determine Net Cost for years ended December 31*

| | Pension Benefits | | | Other Benefits | | |
|---|---|---|---|---|---|---|
| | 2004 | 2003 | 2002 | 2004 | 2003 | 2002 |
| Discount rate | 5.92% | 6.62% | 6.98% | 6.01% | 6.76% | 7.24% |
| Expected long-term return on plan assets | 8.32% | 8.42% | 9.19% | — | — | — |
| Rate of compensation increase | 3.51% | 3.56% | 3.90% | — | — | — |

*Expected Long-Term Rate of Return and Investment Strategies for the Principal Plans*

The expected long-term rate of return on pension fund assets was determined based on several factors, including input from pension investment consultants and projected long-term returns of broad equity and bond indices. The Corporation also considered the U.S. plan's historical 10-year and 15-year compounded annual returns of 10.92 percent and 9.66 percent, respectively, which have been in excess of these broad equity and bond benchmark indices. The Corporation anticipates that on average the investment managers for each of the plans comprising the Principal Plans will generate annual long-term rates of return of at least 8.5 percent. The Corporation's expected long-term rate of return on the assets in the Principal Plans is based on an asset allocation assumption of about 70 percent with equity managers, with expected long-term rates of return of approximately 10 percent, and 30 percent with fixed income managers, with an expected long-term rate of return of about 6 percent. The Corporation regularly reviews its actual asset allocation and periodically rebalances its investments to the targeted allocation when considered appropriate. Also, when deemed appropriate, the Corporation executes hedging strategies using index options and futures to limit the downside exposure of certain investments by trading off upside potential above an acceptable level. The Corporation executed such hedging strategies in 2003 and 2002. No hedging instruments are currently in place. The Corporation will continue to evaluate its long-term rate of return assumptions at least annually and will adjust them as necessary.

*Plan Assets*

The Corporation's pension plan asset allocations for its Principal Plans are as follows:

| | | Percentage of Plan Assets at December 31 | |
|---|---|---|---|
| Asset Category | Target Allocation 2005 | 2004 | 2003 |
| Equity securities | 70% | 73% | 72% |
| Debt securities | 30 | 27 | 28 |
| Total | 100% | 100% | 100% |

The plan assets did not include a significant amount of the Corporation's common stock.

*Cash Flows*

While the Corporation is not required to make a contribution in 2005 to the U.S. plan, the benefit of a contribution will be evaluated. About $38 million will be contributed to plans outside the U.S. in 2005.

64

Case MDL No. 875   Document 4723   Filed 02/21/06   Page 100 of 324

Table of Contents

## KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Estimated Future Benefit Payments*

The following benefit payments, which reflect expected future service, as appropriate, are anticipated to be paid:

|  | Pension Benefits | Other Benefits |
|---|---|---|
|  | (Millions of dollars) | |
| 2005 | $ 313 | $ 80 |
| 2006 | 311 | 81 |
| 2007 | 314 | 82 |
| 2008 | 322 | 82 |
| 2009 | 327 | 83 |
| Years 2010 – 2014 | 1,812 | 455 |

*Health Care Cost Trends*

Assumed health care cost trend rates affect the amounts reported for postretirement health care benefit plans. A one-percentage-point change in assumed health care trend rates would have the following effects on 2004 data:

|  | One-Percentage-Point | |
|---|---|---|
|  | Increase | Decrease |
|  | (Millions of dollars) | |
| Effect on total of service and interest cost components | $ 2.9 | $ 2.4 |
| Effect on postretirement benefit obligation | 42.7 | 35.6 |

*Defined Contribution Retirement Plans*

Contributions to defined contribution retirement plans are primarily based on the age and compensation of covered employees. The Corporation's contributions, all of which were charged to expense, were $47.6 million, $44.9 million and $41.7 million in 2004, 2003 and 2002, respectively.

*Investment Plans*

Voluntary contribution investment plans are provided to substantially all North American and most European employees. Under the plans, the Corporation matches a portion of employee contributions. Costs charged to expense under the plans were $30.8 million, $32.3 million and $29.2 million in 2004, 2003 and 2002, respectively.

## Note 12.   Stock Compensation Plans

The Corporation's Equity Participation Plans and its Outside Directors' Compensation Plan (the "Plans") provide for awards of stock options and restricted stock to employees and outside directors, and (prior to 1999) participation shares to employees of the Corporation. As of December 31, 2004, the number of shares of common stock available for stock option and restricted share awards under the Plans aggregated 34.4 million shares.

*Stock Options*

Stock options granted to outside directors, executives and other key employees are granted at not less than the market value at the date of grant, expire 10 years after the date of grant and generally become exercisable over three years.

65

Table of Contents

## KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

In connection with the Spin-off, the number and exercise prices of outstanding options were proportionately adjusted to maintain the aggregate intrinsic value of the options before and after the Spin-off. As a result of the adjustment, the number of outstanding options increased by .5 million shares and the average exercise price decreased by approximately $.83. In addition, certain stock options previously granted to Neenah Paper employees were converted to Neenah Paper options with terms and amounts that maintained the aggregate intrinsic value of the options. None of the information for 2003, 2002, the options outstanding at the beginning of 2004 nor grants for 2004 reflect adjustments made in connection with the Spin-off.

Data concerning stock option activity follows (options in thousands):

| | 2004 | | 2003 | | 2002 | |
|---|---|---|---|---|---|---|
| | Number of Options | Weighted-Average Exercise Price | Number of Options | Weighted-Average Exercise Price | Number of Options | Weighted-Average Exercise Price |
| Outstanding—Beginning of year | 34,374 | $ 53.73 | 30,308 | $ 54.77 | 26,665 | $ 52.73 |
| Granted | 3,933 | 64.21 | 5,612 | 44.56 | 5,742 | 60.99 |
| Exercised | (6,238) | 46.49 | (988) | 31.27 | (1,627) | 42.34 |
| Canceled, forfeited or converted (a) | (863) | 58.08 | (558) | 57.32 | (472) | 58.24 |
| Neenah Paper spin-off adjustment | 514 | 55.39 | — | — | — | — |
| Outstanding—End of year(b) | 31,720 | 55.45 | 34,374 | 53.73 | 30,308 | 54.77 |
| Exercisable—End of year | 22,493 | 55.57 | 23,516 | 53.52 | 18,671 | 49.98 |

(a) Includes .4 million options that were converted into Neenah Paper options.

(b) Data concerning stock options at December 31, 2004 follows (options in thousands):

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Exercise Price Range | Number Of Options | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Life (Years) | Number of Options | Weighted-Average Price |
| $15.56 – $ 41.27 | 1,043 | $ 36.19 | .9 | 1,043 | 36.19 |
| 42.42 – 46.53 | 4,924 | 43.82 | 8.0 | 1,405 | 43.80 |
| 47.51 – 50.64 | 4,587 | 48.13 | 3.3 | 4,576 | 48.13 |
| 52.00 – 57.41 | 6,546 | 53.00 | 4.2 | 6,546 | 53.00 |
| 58.25 – 60.99 | 5,354 | 59.99 | 6.5 | 3,542 | 59.98 |
| 61.90 – 69.75 | 9,219 | 66.27 | 7.1 | 5,334 | 68.53 |
| 84.84 – 185.40 | 47 | 117.75 | 3.4 | 47 | 117.75 |
| | 31,720 | 55.45 | 5.8 | 22,493 | 55.57 |

### Restricted Stock Awards

The Plans provide for restricted stock awards (shares or share equivalents) not to exceed 18.0 million shares. All restricted stock awards vest and become unrestricted shares in three to 10 years from the date of grant. Although participants are entitled to cash dividends and may vote such awarded shares, the sale or transfer of such shares is limited during the restricted period.

66

Table of Contents

## KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Data concerning restricted stock awards follows:

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
|  | (Shares in thousands) | | |
| Number of shares awarded | 645 | 526 | 80 |
| Weighted-average price per share | $64.21 | $44.54 | $59.79 |

The value of restricted stock awards is based on the market value of the Corporation's common stock at date of grant and recorded at the date of the award as unearned compensation on restricted stock in a separate component of stockholders' equity. Unearned compensation is amortized to compensation expense over the periods of restriction. During 2004, 2003 and 2002, $19.4 million, $18.2 million and $16.8 million, respectively, was charged to compensation expense under the Plans. The tax effect of differences between compensation expense for financial statement and income tax purposes is recorded as additional paid-in capital.

*Participation Shares*

Prior to 1999, key employees were awarded participation shares that were payable in cash at the end of the vesting period. The amount of cash paid to participants was based on the increase in the book value of the Corporation's common stock during the award period. Participants did not receive dividends on the participation shares, but their accounts were credited with dividend shares payable in cash at the maturity of the award. Neither participation nor dividend shares were shares of common stock. Amounts expensed related to participation shares were $11.1 million and $13.1 million in 2003 and 2002, respectively. Final payments for matured shares were made in February 2004.

### Note 13.  Synthetic Fuel Partnerships

In April 2003, the Corporation acquired a 49.5 percent minority interest in a synthetic fuel partnership. In October 2004, the Corporation acquired a 49 percent minority interest in an additional synthetic fuel partnership. These partnerships are variable interest entities that are subject to the requirements of FIN 46R. Although these partnerships are variable interest entities, the Corporation is not the primary beneficiary, and the entities have not been consolidated. Synthetic fuel produced by the partnerships is eligible for synthetic fuel tax credits through 2007.

The production of synthetic fuel results in pretax losses. In 2004 and 2003, these pretax losses totaled $158.4 million and $105.5 million, respectively, and are reported as nonoperating expense on the Corporation's income statement. The synthetic fuel tax credits, as well as tax deductions for the nonoperating losses, reduce the Corporation's income tax expense. In 2004 and 2003, the Corporation's participation in the synthetic fuel partnership resulted in $144.4 million and $94.1 million of tax credits, respectively, and the nonoperating losses generated an additional $55.4 million and $37.2 million, respectively, of tax benefits, which combined to reduce the Corporation's income tax provision by $199.8 million and $131.3 million, respectively. The effect of these benefits increased net income by $41.4 million, $.08 per share in 2004 and $25.8 million, $.05 per share in 2003. The effects of these tax credits are shown separately in the Corporation's reconciliation of the U.S. statutory rate to its effective income tax rate in Note 14.

Because the partnerships have received favorable private letter rulings from the IRS and because the partnerships' test procedures conform to IRS guidance, the Corporation's loss exposure under the synthetic fuel partnerships is minimal. Application of FIN 46R to these entities did not have any effect on the Corporation's consolidated financial statements.

67

Table of Contents

### KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**Note 14.   Income Taxes**

An analysis of the provision for income taxes for income from continuing operations follows:

| | Year Ended December 31 | | |
| | 2004 | 2003 | 2002 |
|---|---|---|---|
| | (Millions of dollars) | | |
| Current income taxes: | | | |
| United States | $192.0 | $302.6 | $233.6 |
| State | 35.4 | 37.7 | 13.6 |
| Other countries | 275.9 | 194.6 | 193.7 |
| Total | 503.3 | 534.9 | 440.9 |
| Deferred income taxes: | | | |
| United States | 30.8 | 1.5 | 174.4 |
| State | (20.7) | (33.9) | 6.0 |
| Other countries | (29.5) | (18.4) | 8.6 |
| Total | (19.4) | (50.8) | 189.0 |
| Total provision for income taxes | $483.9 | $484.1 | $629.9 |

Income from continuing operations before income taxes is earned in the following tax jurisdictions:

| | Year Ended December 31 | | |
| | 2004 | 2003 | 2002 |
|---|---|---|---|
| | (Millions of dollars) | | |
| United States | $1,578.1 | $1,571.2 | $1,662.9 |
| Other countries | 625.3 | 505.1 | 539.2 |
| Total income before income taxes | $2,203.4 | $2,076.3 | $2,202.1 |

68

Case MDL No. 875   Document 4723   Filed 02/21/06   Page 104 of 324

Table of Contents

## KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Deferred income tax assets (liabilities) are composed of the following:

| | December 31 | |
|---|---|---|
| | 2004 | 2003 |
| | (Millions of dollars) | |
| **Net current deferred income tax asset attributable to:** | | |
| Pension, postretirement and other employee benefits | $ 86.9 | $ 105.6 |
| Other accrued expenses | 162.0 | 127.5 |
| Prepaid royalties | 27.2 | 27.2 |
| Other | 9.5 | 28.2 |
| Valuation allowances | (7.4) | (7.1) |
| Net current deferred income tax asset | $ 278.2 | $ 281.4 |
| **Net noncurrent deferred income tax asset attributable to:** | | |
| Accumulated depreciation | $ 32.6 | $ (15.2) |
| Income tax loss carryforwards | 304.1 | 333.7 |
| State tax credits | 67.6 | 57.0 |
| Pension and other postretirement benefits | 37.3 | 28.5 |
| Other | 71.5 | 44.5 |
| Valuation allowances | (219.7) | (218.3) |
| Net noncurrent deferred income tax asset included in other assets | $ 293.4 | $ 230.2 |
| **Net noncurrent deferred income tax liability attributable to:** | | |
| Accumulated depreciation | $(1,312.7) | $(1,318.3) |
| Pension, postretirement and other employee benefits | 521.9 | 531.5 |
| Installment sales | (188.1) | (188.1) |
| Foreign tax credits and loss carryforwards | 160.1 | 83.2 |
| Prepaid royalties | — | 27.2 |
| Other | 3.8 | 6.4 |
| Valuation allowances | (25.3) | (22.5) |
| Net noncurrent deferred income tax liability | $ (840.3) | $ (880.6) |

Valuation allowances increased $4.5 million and $7.3 million in 2004 and 2003, respectively. Valuation allowances at the end of 2004 primarily relate to the portion of income tax loss carryforwards of $1,083.6 million, that potentially are not usable primarily in jurisdictions outside the United States. If not utilized against taxable income, $440.4 million of the loss carryforwards will expire from 2005 through 2024. The remaining $643.2 million has no expiration date.

Realization of income tax loss carryforwards is dependent on generating sufficient taxable income prior to expiration of these carryforwards. Although realization is not assured, management believes it is more likely than not that all of the deferred tax assets, net of applicable valuation allowances, will be realized. The amount of the deferred tax assets considered realizable could be reduced or increased if estimates of future taxable income change during the carryforward period.

Table of Contents

## KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Presented below is a reconciliation of the income tax provision computed at the U.S. federal statutory tax rate to the provision for income taxes.

| | Year Ended December 31 | | | | | |
|---|---|---|---|---|---|---|
| | 2004 | | 2003 | | 2002 | |
| | Amount | Percent | Amount | Percent | Amount | Percent |
| | (Millions of dollars) | | | | | |
| Income from continuing operations before income taxes | $2,203.4 | | $2,076.3 | | $2,202.1 | |
| Tax at U.S. statutory rate applied to income from continuing operations | $ 771.2 | 35.0% | $ 726.7 | 35.0% | $ 770.7 | 35.0% |
| State income taxes, net of federal tax benefit | 9.6 | .4 | 2.5 | .1 | 12.7 | .6 |
| Synthetic fuel credits | (144.4) | (6.6) | (94.1) | (4.5) | — | — |
| Net operating losses realized | (9.2) | (.4) | (16.7) | (.8) | (14.8) | (.7) |
| Other—net(a) | (143.3) | (6.4) | (134.3) | (6.5) | (138.7) | (6.3) |
| Provision for income taxes | $ 483.9 | 22.0% | $ 484.1 | 23.3% | $ 629.9 | 28.6% |

(a) Other —net is comprised of numerous items, none of which is greater than 1.6 percent of income from continuing operations.

At December 31, 2004, U.S. income taxes have not been provided on approximately $4.0 billion of unremitted earnings of subsidiaries operating outside the U.S. These earnings, which are considered to be invested indefinitely, would become subject to income tax if they were remitted as dividends, were lent to the Corporation or a U.S. affiliate, or if the Corporation were to sell its stock in the subsidiaries.

The American Jobs Creation Act (the "Act") provides, among other things, a special one-time deduction for certain earnings from outside the U.S. that are repatriated (as defined in the Act) on or before December 31, 2005. The Act also extends the foreign tax credit carryover period from 5 to 10 years, and the Corporation has reflected this in its income tax provision. The Corporation currently is evaluating the effect of the Act on the unremitted earnings of its non-U.S. subsidiaries and expects to complete that evaluation by June 30, 2005.

Determination of the amount of unrecognized deferred U.S. income tax liability on these unremitted earnings is not practicable. Because the Corporation has not yet completed its evaluation of the effect of the Act on unremitted earnings, at this time it is not possible to reasonably estimate the amount of unremitted earnings that may be repatriated and the income tax effects of such repatriation.

The Corporation records liabilities in current income taxes for potential assessments. The accruals relate to uncertain tax positions in a variety of taxing jurisdictions and are based on what management believes will be the ultimate resolution of these positions. These liabilities may be affected by changing interpretations of laws, rulings by tax authorities, or the expiration of the statute of limitations. The Corporation's U.S. federal income tax returns have been audited through 2001. IRS assessments of additional taxes have been paid through 1998. Refund actions are pending in Federal District Court or the IRS Appeals Office for the years 1987 through 1998. Management currently believes that the ultimate resolution of these matters, individually or in the aggregate, will not have a material effect on the Corporation's business, financial condition, results of operations or liquidity.

70

Table of Contents

## KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**Note 15.   Earnings Per Share**

A reconciliation of the average number of common shares outstanding used in the basic and diluted EPS computations follows:

| | Average Common Shares Outstanding | | |
|---|---|---|---|
| | **2004** | **2003** | **2002** |
| | (Millions) | | |
| Basic | 495.2 | 507.0 | 517.2 |
| Dilutive effect of stock options | 3.4 | 1.2 | 2.5 |
| Dilutive effect of restricted stock awards | .6 | .4 | .3 |
| Diluted | 499.2 | 508.6 | 520.0 |

Options outstanding that were not included in the computation of diluted EPS because their exercise price was greater than the average market price of the common shares are summarized below:

| Description | 2004 | 2003 | 2002 |
|---|---|---|---|
| Average number of share equivalents (millions) | 5.4 | 20.5 | 10.7 |
| Weighted-average exercise price | $70.13 | $60.19 | $65.89 |
| Expiration date of options | 2007 to 2012 | 2006 to 2013 | 2006 to 2012 |
| Options outstanding at year-end | 5.4 | 20.2 | 11.4 |

The number of common shares outstanding as of December 31, 2004, 2003 and 2002 was 482.9 million, 501.6 million and 510.8 million, respectively.

**Note 16.   Business Segment and Geographic Data Information**

The Corporation is organized into operating segments based on product groupings. These operating segments have been aggregated into three reportable global business segments: Personal Care; Consumer Tissue; and Business-to-Business. Each reportable segment is headed by an executive officer who reports to the Chief Executive Officer and is responsible for the development and execution of global strategies to drive growth and profitability of the Corporation's worldwide personal care, consumer tissue and business-to-business operations. These strategies include global plans for branding and product positioning, technology, research and development programs, cost reductions including supply chain management, and capacity and capital investments for each of these businesses. The principal sources of revenue in each global business segment are described below. The accounting policies of our reportable segments are the same as those described in Note 1.

- The Personal Care segment manufactures and markets disposable diapers, training and youth pants and swimpants; baby wipes; feminine and incontinence care products; and related products. Products in this segment are primarily for household use and are sold under a variety of brand names, including Huggies, Pull-Ups, Little Swimmers, GoodNites, Kotex, Lightdays, Depend, Poise and other brand names.

- The Consumer Tissue segment manufactures and markets facial and bathroom tissue, paper towels, napkins and related products for household use. Products in this segment are sold under the Kleenex, Scott, Cottonelle, Viva, Andrex, Scottex, Hakle, Page and other brand names.

- The Business-to-Business segment manufactures and markets disposable, single-use, health and hygiene products to the away-from-home marketplace. These products include facial and bathroom tissue, paper towels, napkins, wipers, surgical gowns, drapes, infection control products, sterilization wrap, disposable face masks and exam gloves, respiratory products, other disposable medical products and other products. Products in this segment are sold under the Kimberly-Clark, Kleenex, Scott, Kimwipes, WypAll, Surpass, Safeskin, Tecnol, Ballard and other brand names.

71

Table of Contents

**KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Approximately 13 percent of net sales were to Wal-Mart Stores, Inc. in 2004, 2003 and 2002, primarily in the Personal Care and Consumer Tissue businesses.

Information concerning consolidated operations by business segment and geographic area, as well as data for equity companies, is presented in the following tables:

*Consolidated Operations by Business Segment*

| | Personal Care | Consumer Tissue | Business-to-Business | Intersegment Sales | All Other | Consolidated Total |
|---|---|---|---|---|---|---|
| | | | (Millions of dollars) | | | |
| **Net Sales** | | | | | | |
| **2004** | **$5,975.1** | **$5,343.0** | **$3,957.9** | **$ (192.8)** | **$ —** | **$ 15,083.2** |
| 2003 | 5,652.9 | 5,046.7 | 3,477.7 | (151.0) | — | 14,026.3 |
| 2002 | 5,485.5 | 4,635.2 | 3,256.7 | (145.9) | — | 13,231.5 |
| **Operating Profit (a)** | | | | | | |
| **2004** | **1,253.2** | **803.1** | **656.6** | **—** | **(206.5)** | **2,506.4** |
| 2003 | 1,221.0 | 728.2 | 602.8 | — | (220.4) | 2,331.6 |
| 2002 | 1,157.1 | 807.3 | 574.9 | — | (171.0) | 2,368.3 |
| **Depreciation and Amortization** | | | | | | |
| **2004** | **286.9** | **310.7** | **194.0** | **—** | **8.7** | **800.3** |
| 2003 | 264.4 | 300.2 | 178.2 | — | 2.5 | 745.3 |
| 2002 | 259.4 | 273.3 | 169.5 | — | 2.2 | 704.4 |
| **Assets (b)** | | | | | | |
| **2004** | **4,813.3** | **5,881.5** | **4,745.2** | **—** | **1,578.0** | **17,018.0** |
| 2003 | 4,781.9 | 5,796.5 | 4,850.1 | — | 1,351.4 | 16,779.9 |
| 2002 | 4,381.8 | 4,965.4 | 4,768.6 | — | 1,523.8 | 15,639.6 |
| **Capital Spending** | | | | | | |
| **2004** | **242.5** | **202.3** | **89.4** | **—** | **.8** | **535.0** |
| 2003 | 344.4 | 366.6 | 141.0 | — | 20.9 | 872.9 |
| 2002 | 323.2 | 306.9 | 227.1 | — | 4.1 | 861.3 |

(a)  Segment operating profit excludes other income (expense), net and income and expenses not associated with the business segments.

(b)  Data for 2003 and 2002 does not reflect the Spin-off. Segment assets exclude assets not allocated to business segments.

*Sales of Principal Products*

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| | (Billions of dollars) | | |
| Consumer tissue products | $ 5.3 | $ 4.8 | $ 4.4 |
| Diapers | 3.2 | 3.0 | 3.0 |
| Away-from-home professional products | 2.3 | 2.1 | 1.9 |
| All other | 4.3 | 4.1 | 3.9 |
| Consolidated | $15.1 | $14.0 | $13.2 |

72

Table of Contents

## KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Consolidated Operations by Geographic Area*

| | United States | Canada | Inter-geographic Items(a) | Total North America | Europe | Asia, Latin America & Other | Inter-geographic Items | All Other | Consolidated Total |
|---|---|---|---|---|---|---|---|---|---|
| | | | | (Millions of dollars) | | | | | |
| **Net Sales** | | | | | | | | | |
| 2004 | $8,683.5 | $911.0 | $ (554.4) | $9,040.1 | $3,098.3 | $3,488.8 | $ (544.0) | $ — | $ 15,083.2 |
| 2003 | 8,335.8 | 801.8 | (515.6) | 8,622.0 | 2,892.5 | 3,061.6 | (549.8) | — | 14,026.3 |
| 2002 | 8,314.4 | 831.4 | (601.2) | 8,544.6 | 2,482.8 | 2,751.5 | (547.4) | — | 13,231.5 |
| **Operating Profit (b)** | | | | | | | | | |
| 2004 | 1,953.1 | 122.0 | — | 2,075.1 | 221.0 | 416.8 | — | (206.5) | 2,506.4 |
| 2003 | 1,862.7 | 131.7 | — | 1,994.4 | 202.9 | 354.7 | — | (220.4) | 2,331.6 |
| 2002 | 1,923.8 | 100.5 | — | 2,024.3 | 191.0 | 324.0 | — | (171.0) | 2,368.3 |
| **Net Property (c)** | | | | | | | | | |
| 2004 | 4,256.2 | 25.1 | — | 4,281.3 | 1,875.2 | 1,834.0 | — | — | 7,990.5 |
| 2003 | 4,458.3 | 269.8 | — | 4,728.1 | 1,809.3 | 1,726.0 | — | — | 8,263.4 |
| 2002 | 4,525.1 | 215.2 | — | 4,740.3 | 1,534.0 | 1,345.1 | — | — | 7,619.4 |

(a) Intergeographic net sales include $368.0 million, $345.4 million and $387.4 million by operations in Canada to the U.S. in 2004, 2003 and 2002, respectively.

(b) Geographic operating profit excludes other income (expense), net and income and expenses not associated with geographic areas.

(c) Data for 2003 and 2002 does not reflect the Spin-off.

*Equity Companies' Data by Geographic Area*

| | Net Sales | Gross Profit | Operating Profit | Net Income | Corporation's Share of Net Income |
|---|---|---|---|---|---|
| | | | (Millions of dollars) | | |
| **For the year ended:** | | | | | |
| **December 31, 2004** | | | | | |
| Latin America | $1,756.8 | $611.4 | $ 423.2 | $251.1 | $ 119.8 |
| Asia and Middle East | 66.2 | 23.7 | 10.1 | 10.0 | 5.0 |
| Total | $1,823.0 | $635.1 | $ 433.3 | $261.1 | $ 124.8 |
| **For the year ended:** | | | | | |
| **December 31, 2003** | | | | | |
| Latin America(a) | $1,687.8 | $608.4 | $ 378.2 | $214.3 | $ 102.0 |
| Asia and Middle East | 62.3 | 21.9 | 10.1 | 10.1 | 5.0 |
| Total | $1,750.1 | $630.3 | $ 388.3 | $224.4 | $ 107.0 |
| **For the year ended:** | | | | | |
| **December 31, 2002** | | | | | |
| Latin America | $1,824.2 | $690.6 | $ 435.2 | $229.8 | $ 108.9 |
| Asia and Middle East | 54.2 | 19.5 | 9.2 | 8.9 | 4.4 |
| Total | $1,878.4 | $710.1 | $ 444.4 | $238.7 | $ 113.3 |

Case MDL No. 875   Document 4723   Filed 02/21/06   Page 111 of 324

(a)   As of August 2003, the Corporation consolidated Klabin-Kimberly S.A., its Brazilian affiliate.

73

Case MDL No. 875   Document 4723   Filed 02/21/06   Page 112 of 324

Table of Contents

### KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

| | Current Assets | Non-Current Assets | Current Liabilities | Non-Current Liabilities | Stock-holders' Equity |
|---|---|---|---|---|---|
| | | | (Millions of dollars) | | |
| **December 31, 2004** | | | | | |
| Latin America | $784.2 | $ 891.1 | $ 505.8 | $ 475.2 | $694.3 |
| Asia and Middle East | 37.5 | 40.0 | 19.7 | .3 | 57.6 |
| Total | $821.7 | $ 931.1 | $ 525.5 | $ 475.5 | $751.9 |
| **December 31, 2003** | | | | | |
| Latin America | $685.7 | $ 887.1 | $ 368.0 | $ 530.7 | $674.2 |
| Asia and Middle East | 31.0 | 38.6 | 18.7 | .9 | 50.0 |
| Total | $716.7 | $ 925.7 | $ 386.7 | $ 531.6 | $724.2 |
| **December 31, 2002** | | | | | |
| Latin America | $745.4 | $1,109.6 | $ 598.9 | $ 358.0 | $898.1 |
| Asia and Middle East | 28.9 | 30.7 | 17.9 | .7 | 41.0 |
| Total | $774.3 | $1,140.3 | $ 616.8 | $ 358.7 | $939.1 |

Equity companies are principally engaged in operations in the Personal Care and Consumer Tissue businesses.

At December 31, 2004, the Corporation's equity companies and ownership interest were as follows: Kimberly-Clark Lever, Ltd. (India) (50%), Kimberly-Clark de Mexico, S.A. de C.V. and subsidiaries (47.9%), Olayan Kimberly-Clark Arabia (49%), Olayan Kimberly-Clark (Bahrain) WLL (49%) and Tecnosur S.A. (Colombia) (34.3%).

Kimberly-Clark de Mexico, S.A. de C.V. is partially owned by the public and its stock is publicly traded in Mexico. At December 31, 2004, the Corporation's investment in this equity company was $381.5 million, and the estimated fair value of the investment was $1.9 billion based on the market price of publicly traded shares.

### Note 17.   Supplemental Data (Millions of dollars)

*Supplemental Income Statement Data*

| | December 31 | | |
|---|---|---|---|
| Summary of Advertising and Research Expenses | 2004 | 2003 | 2002 |
| Advertising expense | $421.3 | $401.9 | $400.2 |
| Research expense | 279.7 | 279.1 | 287.4 |

74

Table of Contents

## KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Supplemental Balance Sheet Data*

| | December 31 | |
| --- | --- | --- |
| **Summary of Accounts Receivable, net** | 2004 | 2003 |
| Accounts Receivable: | | |
| From customers | $ 1,905.4 | $ 1,815.1 |
| Other | 195.5 | 207.6 |
| Less allowance for doubtful accounts and sales discounts | (62.6) | (67.6) |
| Total | $ 2,038.3 | $ 1,955.1 |

Accounts receivable are carried at amounts that approximate fair value.

| | December 31 | |
| --- | --- | --- |
| **Summary of Inventories** | 2004 | 2003 |
| Inventories by Major Class: | | |
| At the lower of cost determined on the FIFO or weighted-average cost methods or market: | | |
| Raw materials | $ 332.7 | $ 353.8 |
| Work in process | 225.9 | 186.8 |
| Finished goods | 1,044.6 | 935.2 |
| Supplies and other | 235.4 | 238.1 |
| | 1,838.6 | 1,713.9 |
| Excess of FIFO or weighted-average cost over LIFO cost | (167.7) | (150.5) |
| Total | $ 1,670.9 | $ 1,563.4 |

FIFO or weighted-average value of total inventories determined on the LIFO method were $768.5 million and $663.8 million at December 31, 2004 and December 31, 2003, respectively.

| | December 31 | |
| --- | --- | --- |
| **Summary of Property, Plant and Equipment, net** | 2004 | 2003 |
| Property, Plant and Equipment: | | |
| Land | $ 279.6 | $ 276.5 |
| Buildings | 2,437.9 | 2,272.4 |
| Machinery and equipment | 11,770.6 | 12,061.7 |
| Construction in Progress | 335.0 | 568.9 |
| | 14,823.1 | 15,179.5 |
| Less accumulated depreciation | (6,832.6) | (6,916.1) |
| Total | $ 7,990.5 | $ 8,263.4 |

| December 31 |
| --- |

| Summary of Accrued Expenses | 2004 | 2003 |
|---|---|---|
| Accrued advertising and promotion | $ 286.3 | $ 240.6 |
| Accrued salaries and wages | 389.6 | 374.1 |
| Other | 755.7 | 760.0 |
| Total | $ 1,431.6 | $ 1,374.7 |

75

Table of Contents

## KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Supplemental Cash Flow Statement Data(a)*

| Summary of Cash Flow Effects of Decrease (Increase) in Operating Working Capital (b) | Year Ended December 31 | | |
|---|---|---|---|
| | 2004 | 2003 | 2002 |
| Accounts receivable | $(135.9) | $ (63.3) | $(129.6) |
| Inventories | (192.9) | (109.8) | 66.2 |
| Prepaid expenses | 27.0 | (14.8) | (14.5) |
| Trade accounts payable | 99.4 | (9.4) | 88.5 |
| Other payables | (22.5) | 32.0 | (8.3) |
| Accrued expenses | 115.9 | (.4) | (22.0) |
| Accrued income taxes | 163.9 | 140.0 | (219.1) |
| Currency | 78.1 | 143.9 | 41.0 |
| Decrease (increase) in operating working capital | $ 133.0 | $ 118.2 | $(197.8) |

| Other Cash Flow Data | Year Ended December 31 | | |
|---|---|---|---|
| | 2004 | 2003 | 2002 |
| Interest paid | $175.3 | $178.1 | $183.3 |
| Income taxes paid | 368.7 | 410.4 | 621.4 |

| Interest Expense | Year Ended December 31 | | |
|---|---|---|---|
| | 2004 | 2003 | 2002 |
| Gross interest cost | $169.0 | $180.3 | $192.9 |
| Capitalized interest on major construction projects | (6.5) | (12.5) | (11.0) |
| Interest expense | $162.5 | $167.8 | $181.9 |

(a)  Excludes the effects of the Spin-off.

(b)  Excludes the effects of acquisitions and dispositions.

76

Table of Contents

## KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**Note 18.   Unaudited Quarterly Data**

| | 2004 | | | | 2003 | | | |
|---|---|---|---|---|---|---|---|---|
| | Fourth | Third | Second | First | Fourth(a) | Third | Second | First |
| | (Millions of dollars, except per share amounts) | | | | | | | |
| Net sales | $3,901.4 | $3,783.0 | $3,687.3 | $3,711.5 | $3,623.1 | $3,562.3 | $3,464.2 | $3,376.7 |
| Gross profit | 1,318.9 | 1,239.1 | 1,254.8 | 1,255.7 | 1,247.7 | 1,188.4 | 1,180.5 | 1,177.8 |
| Operating profit | 641.4 | 616.9 | 624.7 | 623.4 | 601.2 | 584.0 | 586.2 | 560.2 |
| Income (loss) from: | | | | | | | | |
| Continuing operations | 449.8 | 433.9 | 442.9 | 443.8 | 446.4 | 407.2 | 404.2 | 385.8 |
| Discontinued operations, net of income taxes | (4.5) | 7.4 | 11.4 | 15.5 | 13.1 | 12.5 | 13.1 | 11.9 |
| Net income | 445.3 | 441.3 | 454.3 | 459.3 | 459.5 | 419.7 | 417.3 | 397.7 |
| Per share basis: | | | | | | | | |
| Basic | | | | | | | | |
| Continuing operations | .92 | .88 | .89 | .88 | .89 | .80 | .80 | .76 |
| Discontinued operations | — | .02 | .02 | .04 | .02 | .03 | .02 | .02 |
| Net income | .92 | .90 | .91 | .92 | .91 | .83 | .82 | .78 |
| Diluted | | | | | | | | |
| Continuing operations | .92 | .87 | .88 | .88 | .88 | .80 | .79 | .75 |
| Discontinued operations | (.01) | .02 | .02 | .03 | .03 | .03 | .03 | .03 |
| Net income | .91 | .89 | .90 | .91 | .91 | .83 | .82 | .78 |
| Cash dividends declared per share | .40 | .40 | .40 | .40 | .34 | .34 | .34 | .34 |
| Market price per share:(b) | | | | | | | | |
| High | 66.20 | 69.00 | 66.98 | 65.16 | 59.30 | 52.95 | 54.33 | 47.91 |
| Low | 58.74 | 62.58 | 62.34 | 56.19 | 50.75 | 47.04 | 45.18 | 42.92 |
| Close | 65.81 | 64.59 | 65.88 | 63.10 | 59.09 | 51.32 | 52.14 | 45.46 |

(a)  During the fourth quarter, the Corporation recorded the acquisition of a 49.5 percent minority interest in a synthetic fuel partnership. The tax benefits and credits related to the operation of the partnership increased fourth quarter net income by $25.8 million, or $.05 per share. See Note 13.

(b)  Historical market prices do not reflect any adjustment for the Spin-off.

77

Table of Contents

**PART II**
(Continued)

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders of
Kimberly-Clark Corporation:

We have audited the accompanying consolidated balance sheets of Kimberly-Clark Corporation and subsidiaries as of December 31, 2004 and 2003, and the related consolidated statements of income, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2004. Our audits also included the financial statement schedule listed in the Index at Item 15. These financial statements and financial statement schedule are the responsibility of the Corporation's management. Our responsibility is to express an opinion on the financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Kimberly-Clark Corporation and subsidiaries at December 31, 2004 and 2003, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2004, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, the financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

As discussed in Note 1 to the consolidated financial statements, effective January 1, 2002, the Corporation changed its method of accounting for customer coupons.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of the Corporation's internal control over financial reporting as of December 31, 2004, based on the criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 22, 2005 expressed an unqualified opinion on management's assessment of the effectiveness of the Corporation's internal control over financial reporting and an unqualified opinion on the effectiveness of the Corporation's internal control over financial reporting.

/s/ D ELOITTE & T OUCHE LLP
Deloitte & Touche LLP
Dallas, Texas
February 22, 2005

78

Table of Contents

**PART II**
(Continued)

### ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

### ITEM 9A. CONTROLS AND PROCEDURES

**Disclosure Controls and Procedures**

As of December 31, 2004, an evaluation was performed under the supervision and with the participation of the Corporation's management, including the Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of the Corporation's disclosure controls and procedures. Based on that evaluation, the Corporation's management, including the Chief Executive Officer and Chief Financial Officer, concluded that the Corporation's disclosure controls and procedures were effective as of December 31, 2004.

**Internal Control Over Financial Reporting**

*Management's Report on the Financial Statements*

Kimberly-Clark Corporation's management is responsible for all aspects of the business, including the preparation of the consolidated financial statements in this annual report. The consolidated financial statements have been prepared using generally accepted accounting principles considered appropriate in the circumstances to present fairly the Corporation's consolidated financial position, results of operations and cash flows on a consistent basis. Management also has prepared the other information in this annual report and is responsible for its accuracy and consistency with the consolidated financial statements.

As can be expected in a complex and dynamic business environment, some financial statement amounts are based on estimates and judgments. Even though estimates and judgments are used, measures have been taken to provide reasonable assurance of the integrity and reliability of the financial information contained in this annual report. These measures include an effective control-oriented environment in which the internal audit function plays an important role and an Audit Committee of the board of directors that oversees the financial reporting process.

The consolidated financial statements have been audited by the independent registered public accounting firm, Deloitte & Touche LLP. During their audits, Deloitte & Touche LLP was given unrestricted access to all financial records and related data, including minutes of all meetings of stockholders and the board of directors and all committees of the board. Management believes that all representations made to the independent registered public accountants during their audits were valid and appropriate.

*Audit Committee Oversight and the Corporation's Code of Conduct*

The Audit Committee of the Board of Directors, which is composed solely of independent directors, assists the Board in fulfilling its responsibility for oversight of the quality and integrity of the accounting, auditing and financial reporting practices of the Corporation; the audits of its consolidated financial statements; and internal control over financial reporting. The Audit Committee reviews with the auditors any relationships that may affect their objectivity and independence. The Audit Committee also reviews with management, the internal auditors and the independent registered public accounting firm the quality and adequacy of the Corporation's internal control over financial reporting, including compliance matters related to the Corporation's code of conduct, and the results of the internal and external audits. The Audit Committee has reviewed and recommended that the audited consolidated financial statements included in this report be included in Form 10-K for filing with the SEC.

79

Case MDL No. 875   Document 4723   Filed 02/21/06   Page 119 of 324

Table of Contents

**PART II**
(Continued)

The Corporation's code of conduct, among other things, contains policies for conducting business affairs in a lawful and ethical manner everywhere it does business, for avoiding potential conflicts of interest and for preserving confidentiality of information and business ideas. Internal controls have been implemented to provide reasonable assurance that the code of conduct is followed.

*Management's Report on Internal Control Over Financial Reporting*

Management is responsible for establishing and maintaining an adequate system of internal control over financial reporting, including safeguarding of assets against unauthorized acquisition, use or disposition. This system is designed to provide reasonable assurance to management and the board of directors regarding preparation of reliable published financial statements and safeguarding of the Corporation's assets. This system is supported with written policies and procedures, contains self-monitoring mechanisms and is audited by the internal audit function. Appropriate actions are taken by management to correct deficiencies as they are identified. All internal control systems have inherent limitations, including the possibility of circumvention and overriding of controls, and, therefore, can provide only reasonable assurance as to the reliability of financial statement preparation and such asset safeguarding.

The Corporation has assessed the effectiveness of its internal control over financial reporting as of December 31, 2004. In making this assessment, it used the criteria described in "Internal Control—Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on this assessment, management believes that, as of December 31, 2004, the Corporation's internal control over financial reporting is effective.

Deloitte & Touche LLP has issued its report on management's assessment and on the effectiveness of the Corporation's internal control over financial reporting. That report appears below.

/s/ Thomas J. Falk                          /s/ Mark A. Buthman
Thomas J. Falk                              Mark A. Buthman
Chairman of the Board and                   Senior Vice President and
Chief Executive Officer                     Chief Financial Officer

February 22, 2005

Table of Contents

**PART II**
(Continued)

### Report of Independent Registered Public Accounting Firm

To the Board of Directors and Stockholders of
Kimberly-Clark Corporation:

We have audited management's assessment, included in the accompanying Management's Report on Internal Control Over Financial Reporting, that Kimberly-Clark Corporation and Subsidiaries maintained effective internal control over financial reporting as of December 31, 2004 based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Corporation's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the Corporation's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, management's assessment that the Corporation maintained effective internal control over financial reporting as of December 31, 2004, is fairly stated, in all material respects, based on the criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Also in our opinion, the Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2004, based on the criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

81

Table of Contents

**PART II**
(Continued)

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements and financial statement schedule of the Corporation as of and for the year ended December 31, 2004 and our report dated February 22, 2005 expressed an unqualified opinion on those financial statements and financial statement schedule and included an explanatory paragraph regarding a change in the Corporation's method of accounting for customer coupons.

/s/ D ELOITTE & T OUCHE LLP
Deloitte & Touche LLP
Dallas, Texas
February 22, 2005

### Changes in Internal Control Over Financial Reporting

There have been no changes in the Corporation's internal control over financial reporting identified in connection with the evaluation described above in "Management's Report on Internal Control Over Financial Reporting" that occurred during the Corporation's fourth fiscal quarter that have materially affected, or are reasonably likely to materially affect, the Corporation's internal control over financial reporting.

**OTHER INFORMATION**

**ITEM 9B.**

None.

82

**Table of Contents**

---

## PART III

### ITEM 10.  DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

The section of the 2005 Proxy Statement captioned "Certain Information Regarding Directors and Nominees" under "Proposal 1. Election of Directors" identifies members of the board of directors of the Corporation and nominees, and is incorporated in this Item 10 by reference.

Item 4A of this Form 10-K identifies executive officers of the Corporation and is incorporated in this Item 10 by reference.

The section of the 2005 Proxy Statement captioned "Corporate Governance—Board of Directors and Board Committees—Audit Committee" under "Proposal 1. Election of Directors" identifies members of the Audit Committee of the Board of Directors and an audit committee financial expert, and is incorporated in this Item 10 by reference.

The section of the 2005 Proxy Statement captioned "Section 16(a) Beneficial Ownership Reporting Compliance" is incorporated in this Item 10 by reference.

The section of the 2005 Proxy Statement captioned "Corporate Governance—Other Corporate Governance Policies—Corporate Governance Policies" identifies how stockholders may obtain a copy of the Corporation's Corporate Governance Policies without charge and is incorporated in this Item 10 by reference.

The section of the 2005 Proxy Statement captioned "Corporate Governance—Other Corporate Governance Policies—Code of Conduct" identifies how stockholders may obtain a copy of the Corporation's Code of Conduct without charge and is incorporated in this Item 10 by reference.

The section of the 2005 Proxy Statement captioned "Corporate Governance—Board of Directors and Board Committees" identifies how stockholders may obtain a copy of charters of the Audit, Management Development and Compensation, and Nominating and Corporate Governance Committees of the Board of Directors without charge and is incorporated in this Item 10 by reference.

### ITEM 11.  EXECUTIVE COMPENSATION

The information in the section of the 2005 Proxy Statement captioned "Executive Compensation" is incorporated in this Item 11 by reference.

### ITEM 12.  SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

The information in the section of the 2005 Proxy Statement captioned "Security Ownership of Management" is incorporated in this Item 12 by reference.

83

Table of Contents

**PART III**
(Continued)

The following table gives information about the Corporation's common stock that may be issued upon the exercise of options, warrants and rights under all of the Corporation's equity compensation plans as of December 31, 2004.

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (in millions) (a) | Weighted-average exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (in millions) (c) |
|---|---|---|---|
| Equity compensation plans approved by stockholders (1) | 31.5(2) | $ 55.36 | 33.6(3) |
| Equity compensation plans not approved by stockholders (4) | .2(5) | 71.37(5) | .8 |
| Total | 31.7 | $ 55.45 | 34.4 |

(1)  Includes the 1992 Equity Participation Plan and 2001 Equity Participation Plan.
(2)  Does not include .7 million restricted share units granted under the 2001 Equity Participation Plan. Upon vesting, a share of the Corporation's common stock is issued for each restricted share unit.
(3)  Includes 16.4 million shares that may be granted as restricted shares or restricted share units under the 2001 Equity Participation Plan.
(4)  Includes the 1999 Restricted Stock Plan, Outside Directors' Compensation Plan and certain acquired equity compensation plans. See below for descriptions of the 1999 Restricted Stock Plan and Outside Directors' Compensation Plan.
(5)  Includes .1 million options at a weighted-average exercise price of $92.21 granted under equity compensation plans assumed by the Corporation in connection with acquisitions to honor existing obligations of acquired entities. The Corporation will not make any additional grants or awards under such plans, although the terms of one acquired deferred compensation plan provide for issuance of a de minimus number of shares of the Corporation's common stock for reinvested dividends on deferred amounts.

*1999 Restricted Stock Plan.* In 1999, the Corporation's Board of Directors approved the 1999 Restricted Stock Plan under which certain key employees could be granted, in the aggregate, up to 2,500,000 shares of the Corporation's common stock or awards of restricted stock units. These restricted stock awards vest and become unrestricted shares in three to ten years from the date of grant. Although plan participants are entitled to cash dividends and may vote such awarded shares, the sale or transfer of such shares is limited during the restricted period. The market value of the Corporation's stock at the date of grant determines the value of the restricted stock award. Although no additional awards can be granted under this plan, unvested restricted share units are credited with dividends that are converted to additional restricted share units.

*Outside Directors' Compensation Plan.* In 2001, the Corporation's Board of Directors approved the Outside Directors' Compensation Plan. A maximum of 1,000,000 shares of the Corporation's common stock is available for grant under this plan. The Corporation's Board of Directors may grant awards in the form of stock, stock appreciation rights, restricted shares, restricted share units, or any combination of cash, options, stock, stock appreciation rights, restricted shares or restricted share units under this plan.

**CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS**
ITEM 13.

The information in the section of the 2005 Proxy Statement captioned "Certain Transactions and Business Relationships" is incorporated in this Item 13 by reference.

**PRINCIPAL ACCOUNTANT FEES AND SERVICES**
ITEM 14.

The information in the sections of the 2005 Proxy Statement captioned "Principal Accounting Firm Fees" and "Audit Committee Approval of Audit and Non-Audit Services" under "Proposal 2. Approval of Auditors" is incorporated in this Item 14 by reference.

84

**Table of Contents**

PART IV

### EXHIBITS AND FINANCIAL STATEMENT SCHEDULES
**ITEM 15.**

**(a)  Documents filed as part of this report.**

1.  Financial statements.

   The financial statements are set forth under Item 8 of this report on Form 10-K.

2.  Financial statement schedules.

   The following information is filed as part of this Form 10-K and should be read in conjunction with the financial statements contained in Item 8:

   Report of Independent Registered Public Accounting Firm

   Schedule for Kimberly-Clark Corporation and Subsidiaries:

   Schedule II Valuation and Qualifying Accounts

   All other schedules have been omitted because they were not applicable or because the required information has been included in the financial statements or notes thereto.

3.  Exhibits.

| | |
|---|---|
| Exhibit No. (3)a. | Restated Certificate of Incorporation, dated June 12, 1997, and Certificate Eliminating Series A Junior Participating Preferred Stock, dated November 19, 2004, filed herewith. |
| Exhibit No. (3)b. | By-Laws, as amended April 24, 2003, incorporated by reference to Exhibit No. (3)b of the Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2003. |
| Exhibit No. (4). | Copies of instruments defining the rights of holders of long-term debt will be furnished to the Securities and Exchange Commission on request. |
| Exhibit No. (10)a. | Management Achievement Award Program, as amended and restated, incorporated by reference to Exhibit No. (10)a of the Corporation's Annual Report on Form 10-K for the year ended December 31, 1997. |
| Exhibit No. (10)b. | Executive Severance Plan, as amended and restated, incorporated by reference to Exhibit No. (10)b of the Corporation's Annual Report on Form 10-K for the year ended December 31, 2002. |
| Exhibit No. (10)c. | Fourth Amended and Restated Deferred Compensation Plan for Directors, incorporated by reference to Exhibit No. (10)c of the Corporation's Annual Report on Form 10-K for the year ended December 31, 1996. |
| Exhibit No. (10)d. | Executive Officer Achievement Award Program, incorporated by reference to Exhibit No. (10)d of the Corporation's Annual Report on Form 10-K for the year ended December 31, 2002. |
| Exhibit No. (10)e. | 1992 Equity Participation Plan, as amended, incorporated by reference to Exhibit No. (10)e of the Corporation's Annual Report on Form 10-K for the year ended December 31, 2000. |
| Exhibit No. (10)f. | Deferred Compensation Plan, as amended, incorporated by reference to Exhibit No. (10)f of the Corporation's Annual Report on Form 10-K for the year ended December 31, 2002. |
| Exhibit No. (10)g. | Outside Directors' Stock Compensation Plan, as amended, incorporated by reference to Exhibit No. (10)g of the Corporation's Annual Report on Form 10-K for the year ended December 31, 2002. |

85

Case MDL No. 875   Document 4723   Filed 02/21/06   Page 125 of 324

**Table of Contents**

**PART IV**
(Continued)

| | |
|---|---|
| Exhibit No. (10)h. | Supplemental Benefit Plan to the Kimberly-Clark Corporation Pension Plan, as amended, incorporated by reference to Exhibit No. (10)h of the Corporation's Annual Report on Form 10-K for the year ended December 31, 2002. |
| Exhibit No. (10)i. | Second Supplemental Benefit Plan to the Kimberly-Clark Corporation Pension Plan, as amended and restated, incorporated by reference to Exhibit No. (10)i of the Corporation's Annual Report on Form 10-K for the year ended December 31, 2002. |
| Exhibit No. (10)j. | Retirement Contribution Excess Benefit Program, as amended and restated, incorporated by reference to Exhibit No. (10)j of the Corporation's Annual Report on Form 10-K for the year ended December 31, 2000. |
| Exhibit No. (10)k. | 1999 Restricted Stock Plan, as amended, incorporated by reference to Exhibit No. (10)k of the Corporation's Annual Report on Form 10-K for the year ended December 31, 2000. |
| Exhibit No. (10)l. | Outside Directors' Compensation Plan, as amended and restated, incorporated by reference to Exhibit No. (10)l of the Corporation's Annual Report on Form 10-K for the year ended December 31, 2002. |
| Exhibit No. (10)m. | 2001 Equity Participation Plan, incorporated by reference to Exhibit No. (10)m of the Corporation's Annual Report on Form 10-K for the year ended December 31, 2001. |
| Exhibit No. (10)n. | Form of Award Agreements under 2001 Equity Participation Plan, filed herewith. |
| Exhibit No. (10)o. | Summary of Outside Directors' 2005 Compensation pursuant to the Outside Directors' Compensation Plan, filed herewith. |
| Exhibit No. (12). | Computation of ratio of earnings to fixed charges for the five years ended December 31, 2004, filed herewith. |
| Exhibit No. (21). | Subsidiaries of the Corporation, filed herewith. |
| Exhibit No. (23). | Consent of Independent Registered Public Accounting Firm, filed herewith. |
| Exhibit No. (24). | Powers of Attorney, filed herewith. |
| Exhibit No. (31)a. | Certification of Chief Executive Officer required by Rule 13a-14(a) or Rule 15d-14(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), filed herewith. |
| Exhibit No. (31)b. | Certification of Chief Financial Officer required by Rule 13a-14(a) or Rule 15d-14(a) of the Exchange Act, filed herewith. |
| Exhibit No. (32)a. | Certification of Chief Executive Officer required by Rule 13a-14(b) or Rule 15d-14(b) of the Exchange Act and Section 1350 of Chapter 63 of Title 18 of the United States Code, furnished herewith. |
| Exhibit No. (32)b. | Certification of Chief Financial Officer required by Rule 13a-14(b) or Rule 15d-14(b) of the Exchange Act and Section 1350 of Chapter 63 of Title 18 of the United States Code, furnished herewith. |

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

KIMBERLY-CLARK CORPORATION

February 22, 2005                    By:        /s/   M ARK A. B UTHMAN

**Mark A. Buthman**
**Senior Vice President and**
**Chief Financial Officer**

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| | | |
|---|---|---|
| /s/   T HOMAS J. F ALK<br>**Thomas J. Falk** | Chairman of the Board and Chief Executive Officer and Director (principal executive officer) | February 22, 2005 |
| /s/   M ARK A. B UTHMAN<br>**Mark A. Buthman** | Senior Vice President and Chief Financial Officer<br>(principal financial officer) | February 22, 2005 |
| /s/   R ANDY J. V EST<br>**Randy J. Vest** | Vice President and Controller<br>(principal accounting officer) | February 22, 2005 |

**Directors**

| | |
|---|---|
| Dennis R. Beresford | Claudio X. Gonzalez |
| John F. Bergstrom | Mae C. Jemison |
| Pastora San Juan Cafferty | Linda Johnson Rice |
| Robert W. Decherd | Marc J. Shapiro |
| Thomas J. Falk | G. Craig Sullivan |

By:        /s/   R ONALD D. M C C RAY                    February 22, 2005

**Ronald D. Mc Cray**
**Attorney-in-Fact**

87

Case MDL No. 875   Document 4723   Filed 02/21/06   Page 127 of 324

Table of Contents

## KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
### SCHEDULE II
### VALUATION AND QUALIFYING ACCOUNTS
### FOR THE YEARS ENDED DECEMBER 31, 2004, 2003 AND 2002
(Millions of dollars)

| Description | Balance at Beginning of Period | Additions — Charged to Costs and Expenses | Additions — Charged to Other Accounts (a) | Deductions — Write-Offs and Reclassifications | Balance at End of Period |
|---|---|---|---|---|---|
| **December 31, 2004** | | | | | |
| Allowances deducted from assets to which they apply | | | | | |
| Allowance for doubtful accounts | $ 47.9 | $ 8.8 | $ 4.0 | $ 18.2[b][c] | $ 42.5 |
| Allowances for sales discounts | 19.7 | 233.1 | .1 | 232.8[d] | 20.1 |
| **December 31, 2003** | | | | | |
| Allowances deducted from assets to which they apply | | | | | |
| Allowance for doubtful accounts | $ 48.4 | $ 11.9 | $ 6.5 | $ 18.9[b] | $ 47.9 |
| Allowances for sales discounts | 19.2 | 228.2 | 1.6 | 229.3[d] | 19.7 |
| **December 31, 2002** | | | | | |
| Allowances deducted from assets to which they apply | | | | | |
| Allowance for doubtful accounts | $ 49.8 | $ 10.4 | $ .2 | $ 12.0[b] | $ 48.4 |
| Allowances for sales discounts | 20.0 | 218.8 | .6 | 220.2[d] | 19.2 |

(a) Includes bad debt recoveries and the effects of changes in foreign currency exchange rates. Also includes the beginning balances resulting from acquisitions made during the year and from the consolidation of Klabin Kimberly S.A., the Corporation's Brazilian affiliate in 2003.

(b) Primarily uncollectible receivables written off.

(c) Includes $4.6 million of Neenah Paper balances spun off in November 2004.

(d) Sales discounts allowed.

88

Case MDL No. 875   Document 4723   Filed 02/21/06   Page 128 of 324

Table of Contents

### KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES

#### SCHEDULE II
#### VALUATION AND QUALIFYING ACCOUNTS
#### FOR THE YEARS ENDED DECEMBER 31, 2004, 2003 AND 2002
(Millions of dollars)

| Description | Balance at Beginning of Period | Additions | | Deductions (a) | Balance at End of Period |
|---|---|---|---|---|---|
| | | Charged to Costs and Expenses | Charged to Other Accounts | | |
| **December 31, 2004** | | | | | |
| Deferred Taxes | | | | | |
| Valuation Allowance | $ 247.9 | $ (12.4) | $ — | $ (16.9) | $ 252.4 |
| **December 31, 2003** | | | | | |
| Deferred Taxes | | | | | |
| Valuation Allowance | $ 240.6 | $ 15.1 | $ — | $ 7.8 | $ 247.9 |
| **December 31, 2002** | | | | | |
| Deferred Taxes | | | | | |
| Valuation Allowance | $ 177.2 | $ 55.3 | $ — | $ (8.1) | $ 240.6 |

(a) Includes the net currency effects of translating valuation allowances at current rates under Statement of Financial Accounting Standards No. 52 of $(18.4) million in 2004, $(9.3) million in 2003 and $1.5 million in 2002.

89

Table of Contents

## Exhibit Index

| | |
|---|---|
| Exhibit No. (3)a. | Restated Certificate of Incorporation, dated June 12, 1997, and Certificate Eliminating Series A Junior Participating Preferred Stock, dated November 19, 2004, filed herewith. |
| Exhibit No. (3)b. | By-Laws, as amended April 24, 2003, incorporated by reference to Exhibit No. (3)b of the Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2003. |
| Exhibit No. (4). | Copies of instruments defining the rights of holders of long-term debt will be furnished to the Securities and Exchange Commission on request. |
| Exhibit No. (10)a. | Management Achievement Award Program, as amended and restated, incorporated by reference to Exhibit No. (10)a of the Corporation's Annual Report on Form 10-K for the year ended December 31, 1997. |
| Exhibit No. (10)b. | Executive Severance Plan, as amended and restated, incorporated by reference to Exhibit No. (10) b of the Corporation's Annual Report on Form 10-K for the year ended December 31, 2002. |
| Exhibit No. (10)c. | Fourth Amended and Restated Deferred Compensation Plan for Directors, incorporated by reference to Exhibit No. (10)c of the Corporation's Annual Report on Form 10-K for the year ended December 31, 1996. |
| Exhibit No. (10)d. | Executive Officer Achievement Award Program, incorporated by reference to Exhibit No. (10)d of the Corporation's Annual Report on Form 10-K for the year ended December 31, 2002. |
| Exhibit No. (10)e. | 1992 Equity Participation Plan, as amended, incorporated by reference to Exhibit No. (10)e of the Corporation's Annual Report on Form 10-K for the year ended December 31, 2000. |

**Table of Contents**

| | |
|---|---|
| Exhibit No. (10)f. | Deferred Compensation Plan, as amended, incorporated by reference to Exhibit No. (10)f of the Corporation's Annual Report on Form 10-K for the year ended December 31, 2002. |
| Exhibit No. (10)g. | Outside Directors' Stock Compensation Plan, as amended, incorporated by reference to Exhibit No. (10)g of the Corporation's Annual Report on Form 10-K for the year ended December 31, 2002. |
| Exhibit No. (10)h. | Supplemental Benefit Plan to the Kimberly-Clark Corporation Pension Plan, as amended, incorporated by reference to Exhibit No. (10)h of the Corporation's Annual Report on Form 10-K for the year ended December 31, 2002. |
| Exhibit No. (10)i. | Second Supplemental Benefit Plan to the Kimberly-Clark Corporation Pension Plan, as amended and restated, incorporated by reference to Exhibit No. (10)i of the Corporation's Annual Report on Form 10-K for the year ended December 31, 2002. |
| Exhibit No. (10)j. | Retirement Contribution Excess Benefit Program, as amended and restated, incorporated by reference to Exhibit No. (10)j of the Corporation's Annual Report on Form 10-K for the year ended December 31, 2000. |
| Exhibit No. (10)k. | 1999 Restricted Stock Plan, as amended, incorporated by reference to Exhibit No. (10)k of the Corporation's Annual Report on Form 10-K for the year ended December 31, 2000. |
| Exhibit No. (10)l. | Outside Directors' Compensation Plan, as amended and restated, incorporated by reference to Exhibit No. (10)l of the Corporation's Annual Report on Form 10-K for the year ended December 31, 2002. |
| Exhibit No. (10)m. | 2001 Equity Participation Plan, incorporated by reference to Exhibit No. (10)m of the Corporation's Annual Report on Form 10-K for the year ended December 31, 2001. |
| Exhibit No. (10)n. | Form of Award Agreements under 2001 Equity Participation Plan, filed herewith. |
| Exhibit No. (10)o. | Summary of Outside Directors' 2005 Compensation pursuant to the Outside Directors' Compensation Plan, filed herewith. |
| Exhibit No. (12). | Computation of ratio of earnings to fixed charges for the five years ended December 31, 2004, filed herewith. |
| Exhibit No. (21). | Subsidiaries of the Corporation, filed herewith. |
| Exhibit No. (23). | Consent of Independent Registered Public Accounting Firm, filed herewith. |
| Exhibit No. (24). | Powers of Attorney, filed herewith. |
| Exhibit No. (31)a. | Certification of Chief Executive Officer required by Rule 13a-14(a) or Rule 15d-14(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), filed herewith. |

Case MDL No. 875   Document 4723   Filed 02/21/06   Page 131 of 324

**Table of Contents**

Exhibit No. (31)b.     Certification of Chief Financial Officer required by Rule 13a-14(a) or Rule 15d-14(a) of the Exchange Act, filed herewith.

Exhibit No. (32)a.     Certification of Chief Executive Officer required by Rule 13a-14(b) or Rule 15d-14(b) of the Exchange Act and Section 1350 of Chapter 63 of Title 18 of the United States Code, furnished herewith.

Exhibit No. (32)b.     Certification of Chief Financial Officer required by Rule 13a-14(b) or Rule 15d-14(b) of the Exchange Act and Section 1350 of Chapter 63 of Title 18 of the United States Code, furnished herewith.

Exhibit No (3)a

RESTATED

CERTIFICATE OF INCORPORATION

OF

KIMBERLY-CLARK CORPORATION

JUNE 12, 1997

## RESTATED CERTIFICATE OF INCORPORATION
## OF
## KIMBERLY-CLARK CORPORATION

The date of filing of the original certificate of incorporation of this Corporation with the Secretary of State was June 29, 1928.

### ARTICLE I

The name of this Corporation is KIMBERLY-CLARK CORPORATION.

### ARTICLE II

Its registered office in the State of Delaware is located at Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle. The name and address of its registered agent is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

### ARTICLE III

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware. The Corporation shall possess and may exercise all powers and privileges necessary or convenient to effect such purpose and all powers and privileges now or hereafter conferred by the laws of Delaware upon corporations formed under the General Corporation Law of Delaware.

### ARTICLE IV

The total number of shares of all classes of capital stock which the Corporation shall have the authority to issue is one billion, two hundred and twenty million (1,220,000,000) shares which shall be divided into two classes as follows:

(a)   Twenty million (20,000,000) shares of Preferred Stock without par value; and

(b)   One billion, two hundred million (1,200,000,000) shares of Common Stock of the par value of One Dollar and Twenty-five Cents ($1.25) per Share.

### ARTICLE V

A statement of the voting powers and of the designations, preferences and relative, participating, optional or other special rights, and the qualifications, limitations and restrictions thereof, of each class of stock of the Corporation, is as follows:

(1)   *In General*

No holders of shares of this Corporation of any class, or of bonds, debentures or other securities convertible into stock of any class, shall be entitled as of right to subscribe for, purchase, or receive any stock of any class whether now or hereafter authorized, or any bonds, debentures or other securities whether now or hereafter authorized, convertible into stock of any class, or any stock into which said bonds, debentures or other securities may be convertible, and all such additional shares of stock, debentures or other securities, together with the stock into which the same may be converted, may be issued and disposed of by the Board of Directors to such persons and on such terms and for such consideration (as far as may be permitted by law) as the Board of Directors in their absolute discretion may deem advisable.

1

All persons who shall acquire stock in the Corporation shall acquire the same subject to the provisions of this Certificate of Incorporation.

## (2) *Preferred Stock*

The Preferred Stock may be issued from time to time in one or more series, with such distinctive serial designations as may be stated or expressed in the resolution or resolutions providing for the issue of such stock adopted from time to time by the Board of Directors; and in such resolution or resolutions providing for the issue of shares of each particular series, the Board of Directors is also expressly authorized to fix: the consideration for which the shares of such series are to be issued; the number of shares constituting such series; the rate of dividends upon which and the times at which dividends on shares of such series shall be payable and the preference, if any, which such dividends shall have relative to dividends on shares of any other class or classes or any other series of stock of the Corporation; whether such dividends shall be cumulative or noncumulative, and if cumulative, the date or dates from which dividends on shares of such series shall be cumulative; the voting rights, if any, to be provided for shares of such series; the rights, if any, which the holders of shares of such series shall have in the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation; the rights, if any, which the holders of shares of such series shall have to convert such shares into or exchange such shares for shares of any other class or classes or any other series of stock of the Corporation and the terms and conditions, including price and rate of exchange, of such conversion or exchange; the redemption price or prices and other terms of redemption, if any, for shares of such series; and any and all other preferences and relative, participating, optional or other special rights and qualifications, limitations or restrictions thereof pertaining to shares of such series.

## (3) *Common Stock*

(a) Subject to preferences and rights to which holders of stock other than the Common Stock may have become entitled by resolution or resolutions of the Board of Directors as hereinbefore provided, such dividends (payable in cash, stock, or otherwise) as may be determined by the Board of Directors may be declared and paid out of funds legally available therefor upon the Common Stock from time to time.

(b) In the event of any liquidation, dissolution or winding up of the affairs of the Corporation, the holders of the Common Stock shall be entitled to share ratably in all assets available for distribution to the shareholders, subject to preferences and rights to which the holders of stock other than the Common Stock may have become entitled by resolution or resolutions of the Board of Directors as hereinbefore provided.

(c) The holders of Common Stock shall be entitled to one vote for each of the shares held by them of record at the time for determining holders thereof entitled to vote.

## (4) *Series A Junior Participating Preferred Stock*

Pursuant to authority conferred by this Article V upon the Board of Directors of the Corporation, the Board of Directors created a series of 2,000,000 shares of Preferred Stock designated as Series A Junior Participating Preferred Stock by filing an Amended Certificate of Designations of the Corporation with the Secretary of State of the State of Delaware on July 12, 1995, and the voting powers, designations, preferences and relative, participating and other special rights, and the qualifications, limitations and restrictions thereof of the Series A Junior Participating Preferred Stock of the Corporation are as set forth in Annex 1 hereto and are incorporated herein by reference.

2

## ARTICLE VI

(1) The following corporate action shall require the approval, given at a stockholders' meeting or by consent in writing, of the holders of at least two-thirds of the stock issued and outstanding and entitled to vote thereon:

(a) the dissolution of the Corporation, or

(b) the sale, lease, exchange or conveyance of all or substantially all of the property and assets of the Corporation, or

(c) the adoption of an agreement of merger or consolidation, but no stockholder approval shall be required for any merger or consolidation which, under the Laws of Delaware, need not be approved by the stockholders of the Corporation.

(2) The number of authorized shares of any class or classes of stock may be increased or decreased by the approval of the holders of a majority of all of the stock of the Corporation entitled to vote thereon, except to the extent that, in the resolution or resolutions providing for the issuance of a class or series of stock, the Board of Directors shall specify that approval of the holders of one or more classes or series of stock shall be required to increase or decrease the number of authorized shares of one or more classes or series of stock.

(3) Any action required or permitted to be taken by the stockholders of the Corporation must be effected at a duly called annual or special meeting of stockholders of the Corporation and may not be effected by any consent in writing by such stockholders, except for stockholder approvals required by Section (1) of this Article VI.

(4) Meetings of stockholders of the Corporation may be called only by the Board of Directors pursuant to a resolution adopted by the affirmative vote of a majority of the entire Board of Directors, by the Chairman of the Board, or by the Chief Executive Officer.

## ARTICLE VII

The private property of the stockholders of the Corporation shall not be subject to the payment of corporate debts to any extent whatever.

## ARTICLE VIII

(1) *Power of the Board of Directors.* The business and affairs of the Corporation shall be managed under the direction of its Board of Directors. In furtherance, and not in limitation, of the powers conferred by the Laws of the State of Delaware, the Board of Directors is expressly authorized:

(a) to make, alter, amend or repeal the By-Laws of the Corporation; *provided, however,* that no By-Laws hereafter adopted shall invalidate any prior act of the Directors that would have been valid if such By-Laws had not been adopted;

(b) to determine the rights, powers, duties, rules and procedures that affect the power of the Board of Directors to direct the business and affairs of the Corporation, including the power to designate and empower committees of the Board of Directors, to elect, appoint and empower the officers and other agents of the Corporation, and to determine the time and place of, and the notice requirements for, Board meetings, as well as quorum and voting requirements (except as otherwise provided in this Certificate of Incorporation) for, and the manner of taking, Board action; and

(c) to exercise all such powers and do all such acts as may be exercised by the Corporation, subject to the provisions of the laws of the State of Delaware, this Certificate of Incorporation, and any By-Laws of the Corporation.

3

(2) *Number of Directors.* The number of Directors constituting the entire Board of Directors shall be not less than 11 nor more than 25. The specific number of Directors constituting the entire Board of Directors shall be as authorized from time to time exclusively by the affirmative vote of a majority of the entire Board of Directors. As used in this Certificate of Incorporation, the term "entire Board of Directors" means the total authorized number of Directors that the Corporation would have if there were no vacancies.

(3) *Classified Board.* At the 1986 Annual Meeting of Stockholders, the Directors shall be divided into three classes, with respect to the time that they severally hold office, as nearly equal in number as possible, with the initial term of office of the first class of Directors to expire at the 1987 Annual Meeting of Stockholders, the initial term of office of the second class of Directors to expire at the 1988 Annual Meeting of Stockholders and the initial term of office of the third class of Directors to expire at the 1989 Annual Meeting of Stockholders. Commencing with the 1987 Annual Meeting of Stockholders, Directors elected to succeed those Directors whose terms have thereupon expired shall be elected for a term of office to expire at the third succeeding Annual Meeting of Stockholders after their election, and upon the election and qualification of their successors. A person elected as a Director shall be deemed a Director as of the time of such election. If the number of Directors is changed, any increase or decrease shall be apportioned among the classes so as to maintain or attain, if possible, an equal number of Directors in each class, but in no case will a decrease in the number of Directors shorten the term of any incumbent Director. If such equality is not possible, the increase or decrease shall be apportioned among the classes in such a way that the difference in the number of Directors in any two classes shall not exceed one.

(4) *Nominations.* Subject to the rights of holders of any series of Preferred Stock or any other class of capital stock of the Corporation (other than the Common Stock) then outstanding, nominations for the election of Directors may be made by the affirmative vote of a majority of the entire Board of Directors or by any stockholder of record entitled to vote generally in the election of Directors. However, any stockholder of record entitled to vote generally in the election of Directors may nominate one or more persons for election as Directors at a meeting only if a written notice of such stockholder's intent to make such nomination or nominations, meeting the requirements described below, has been given, either by personal delivery or by United States mail, postage prepaid, to the Secretary of the Corporation, and received by the Corporation, not less than 50 days nor more than 75 days prior to the meeting; *provided, however,* that in the event that less than 60 days' notice or prior public disclosure of the date of the meeting is given or made to stockholders, notice by the stockholder to be timely must be so received not later than the close of business on the 10th day following the day on which such notice of the date of meeting was mailed or such public disclosure was made, whichever first occurs. Each such notice to the Secretary shall set forth: (i) the name and address of record of the stockholder who intends to make the nomination; (ii) a representation that the stockholder is a holder of record of shares of the Corporation entitled to vote at such meeting and intends to appear in person or by proxy at the meeting to nominate the person or persons specified in the notice; (iii) the name, age, business and residence addresses, and principal occupation or employment of each nominee; (iv) a description of all arrangements or understandings between the stockholder and each nominee and any other person or persons (naming such person or persons) pursuant to which the nomination or nominations are to be made by the stockholder; (v) such other information regarding each nominee proposed by such stockholder as would be required to be included in a proxy statement filed pursuant to the proxy rules of the Securities and Exchange Commission; and (vi) the consent of each nominee to serve as a Director of the Corporation if so elected. The Corporation may require any proposed nominee to furnish such other information as may reasonably be required by the Corporation to determine the eligibility of such proposed nominee to serve as a Director of the Corporation. The presiding officer of the meeting may, if the facts warrant, determine that a nomination was not made in accordance with the foregoing procedure, and if he should so determine, he shall so declare to the meeting and the defective nomination shall be disregarded.

4

(5) *Vacancies*. Subject to the rights of the holders of any series of Preferred Stock or any other class of capital stock of the Corporation (other than the Common Stock) then outstanding, any vacancies in the Board of Directors for any reason and any newly created Directorships resulting by reason of any increase in the number of Directors may, if occurring prior to the expiration of the term of office of the class in which such vacancy or increase occurs, be filled only by the Board of Directors, acting by the affirmative vote of a majority of the remaining Directors then in office, although less than a quorum, and any Directors so elected shall hold office until the next election of the class for which such Directors have been elected and until their successors are elected and qualified.

(6) *Removal of Directors*. Subject to the rights of the holders of any series of Preferred Stock or any other class of capital stock of the Corporation (other than the Common Stock) then outstanding, (i) any Director, or the entire Board of Directors, may be removed from office at any time prior to the expiration of his or their term of office, but only for cause and only by the affirmative vote of the holders of record of outstanding shares representing at least eighty percent (80%) of the voting power of all of the shares of capital stock of the Corporation then entitled to vote generally in the election of Directors, voting together as a single class, and (ii) any Director may be removed from office by the affirmative vote of a majority of the entire Board of Directors, at any time prior to the expiration of his term of office, but only for cause.

## ARTICLE IX

Whenever a compromise or arrangement is proposed between this Corporation and its creditors or any class of them or between this Corporation and its stockholders or any class of them, any court of equitable jurisdiction within the State of Delaware may, on the application in a summary way of this Corporation or of any creditor or stockholder thereof, or on the application of any receiver or receivers appointed for this Corporation under the provisions of section 291 of Title 8 of the Delaware Code or on the application of trustees in dissolution or of any receiver or receivers appointed for this Corporation under the provisions of section 279 of Title 8 of the Delaware Code order a meeting of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this Corporation, as the case may be, to be summoned in such manner as the said Court directs. If a majority in number representing three-fourths in value of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this Corporation, as the case may be, agree to any compromise or arrangement and to any reorganization of this Corporation as a consequence of such compromise or arrangement, the said compromise or arrangement and the said reorganization shall, if sanctioned by the Court to which the said application has been made, be binding on all the creditors or class of creditors, and/or on all the stockholders or class of stockholders, of this Corporation, as the case may be, and also on this Corporation.

## ARTICLE X

(1) *Certain Definitions*. For the purposes of this Article X and the second proviso of Article XI:

A. "Business Combination" means:

(i) any merger or consolidation of the Corporation or any Subsidiary with (a) an Interested Stockholder or (b) any other Person (whether or not itself an Interested Stockholder) which is, or after such merger or consolidation would be, an Affiliate or Associate of an Interested Stockholder; or

(ii) any sale, lease, exchange, mortgage, pledge, transfer or other disposition (in one transaction or a series of transactions) to or with, or proposed by or on behalf of, an Interested Stockholder or an Affiliate or Associate of an Interested Stockholder of any assets of the Corporation or any Subsidiary having an aggregate Fair Market Value of not less than one percent (1%) of the total assets of the Corporation as reported in the consolidated balance sheet of the Corporation as of the end of the most recent quarter with respect to which such balance sheet has been prepared; or

5

(iii) the issuance or transfer by the Corporation or any Subsidiary (in one transaction or a series of transactions) of any securities of the Corporation or any Subsidiary to, or proposed by or on behalf of, an Interested Stockholder or an Affiliate or Associate of an Interested Stockholder in exchange for cash, securities or other property (or a combination thereof) having an aggregate Fair Market Value of not less than one percent (1%) of the total assets of the Corporation as reported in the consolidated balance sheet of the Corporation as of the end of the most recent quarter with respect to which such balance sheet has been prepared; or

(iv) the adoption of any plan or proposal for the liquidation or dissolution of the Corporation, or any spin-off or split-up of any kind of the Corporation or any Subsidiary, proposed by or on behalf of an Interested Stockholder or an Affiliate or Associate of an Interested Stockholder; or

(v) any reclassification of securities (including any reverse stock split), or recapitalization of the Corporation, or any merger or consolidation of the Corporation with any Subsidiary or any other transaction (whether or not with or into or otherwise involving an Interested Stockholder) which has the effect, directly or indirectly, of increasing the percentage of the outstanding shares of (a) any class of equity securities of the Corporation or any Subsidiary or (b) any class of securities of the Corporation or any Subsidiary convertible into equity securities of the Corporation or any Subsidiary, represented by securities of such class which are directly or indirectly owned by an Interested Stockholder and all of its Affiliates and Associates; or

(vi) any agreement, contract or other arrangement providing for anyone or more of the actions specified in clauses (i) through (v) of this Section (1) A.

B. "Affiliate" or "Associate" have the respective meanings ascribed to such terms in Rule 12b-2 of the General Rules and Regulations under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as in effect on January 1, 1986.

C. "Beneficial Owner" has the meaning ascribed to such term in Rule 13d-3 of the General Rules and Regulations under the Exchange Act, as in effect on January 1, 1986.

D. "Continuing Director" means: (i) any member of the Board of Directors of the Corporation who (a) is neither the Interested Stockholder involved in the Business Combination as to which a vote of Continuing Directors is provided hereunder, nor an Affiliate, Associate, employee, agent, or nominee of such Interested Stockholder, or the relative of any of the foregoing, and (b) was a member of the Board of Directors of the Corporation prior to the time that such Interested Stockholder became an Interested Stockholder; and (ii) any successor of a Continuing Director described in clause (i) who is recommended or elected to succeed a Continuing Director by the affirmative vote of a majority of Continuing Directors then on the Board of Directors of the Corporation.

E. "Fair Market Value" means: (i) in the case of stock, the highest closing sale price during the 30-day period immediately preceding the date in question of a share of such stock on the Composite Tape for New York Stock Exchange-Listed Stocks, or, if such stock is not reported on the Composite Tape, on the New York Stock Exchange, or, if such stock is not listed on such Exchange, on the principal United States securities exchange registered under the Exchange Act on which such stock is listed, or, if such stock is not listed on any such exchange, the highest closing bid quotation with respect to a share of such stock during the 30-day period preceding the date in question on the National Association of Securities Dealers, Inc. Automated Quotations System or any similar interdealer quotation system then in use, or, if no such quotation is available, the fair market value on the date in question of a share of such stock as determined by a majority of the Continuing Directors in good faith; and (ii) in the case of property other than cash or stock, the fair market value of such property on the date in question as determined by a majority of the Continuing Directors in good faith.

6

F. "Interested Stockholder" means any Person (other than the Corporation or any Subsidiary, any employee benefit plan maintained by the Company or any Subsidiary or any trustee or fiduciary with respect to any such plan when acting in such capacity) who or which:

(i) is, or was at any time within the two-year period immediately prior to the date in question, the Beneficial Owner of five percent (5%) or more of the voting power of the then outstanding Voting Stock of the Corporation; or

(ii) is an assignee of, or has otherwise succeeded to, any shares of Voting Stock of the Corporation of which an Interested Stockholder was the Beneficial Owner at any time within the two-year period immediately prior to the date in question, if such assignment or succession shall have occurred in the course of a transaction, or series of transactions, not involving a public offering within the meaning of the Securities Act of 1933, as amended.

For the purpose of determining whether a Person is an Interested Stockholder, the outstanding Voting Stock of the Corporation shall include unissued shares of Voting Stock of the Corporation of which the Interested Stockholder is the Beneficial Owner but shall not include any other shares of Voting Stock of the Corporation which may be issuable pursuant to any agreement, arrangement or understanding, or upon the exercise of conversion rights, warrants or options, or otherwise, to any Person who is not the Interested Stockholder.

G. A "Person" means any individual, partnership, firm, corporation, association, trust, unincorporated organization or other entity, as well as any syndicate or group deemed to be a person under Section 14 (d) (2) of the Exchange Act.

H. "Subsidiary" means any corporation of which the Corporation owns, directly or indirectly, (i) a majority of the outstanding shares of equity securities of such corporation, or (ii) shares having a majority of the voting power represented by all of the outstanding shares of Voting Stock of such corporation. For the purpose of determining whether a corporation is a Subsidiary, the outstanding Voting Stock and shares of equity securities thereof shall include unissued shares of which the Corporation is the Beneficial Owner but shall not include any other shares of Voting Stock of the corporation which may be issuable pursuant to any agreement, arrangement or understanding, or upon the exercise of conversion rights, warrants or options, or otherwise, to any Person who is not the corporation.

I. "Voting Stock" means outstanding shares of capital stock of the relevant corporation entitled to vote generally in the election of Directors.

(2) *Higher Vote for Business Combinations.* In addition to any affirmative vote required by law or by this Certificate of Incorporation, and except as otherwise expressly provided in Section (3) of this Article, any Business Combination shall require the affirmative vote of the holders of record of outstanding shares representing at least eighty percent (80%) of the voting power of the then outstanding shares of the Voting Stock of the Corporation, voting together as a single class, voting at a stockholders' meeting and not by consent in writing. Such affirmative vote shall be required notwithstanding the fact that no vote may be required, or that a lesser percentage may be specified, by law or in any agreement with any national securities exchange or otherwise.

(3) *When Higher Vote Is Not Required.* The provisions of Section (2) of this Article shall not be applicable to any particular Business Combination, and such Business Combination shall require only such affirmative vote, if any, of the stockholders as is required by law and any other provision of this Certificate of Incorporation, if the conditions specified in either of the following paragraphs A and B are met.

A. *Approval by Continuing Directors.* The Business Combination shall have been approved by the affirmative vote of a majority of the Continuing Directors, even if the Continuing Directors do not constitute a quorum of the entire Board of Directors.

7

B. *Form of Consideration, Price and Procedure Requirements* . All of the following conditions shall have been met:

(i) With respect to each share of each class of Voting Stock of the Corporation (including Common Stock), the holder thereof shall be entitled to receive on or before the date of the consummation of the Business Combination (the "Consummation Date"), consideration, in the form specified in subsection (3) (B) (ii) hereof, with an aggregate Fair Market Value as of the Consummation Date at least equal to the highest of the following:

(a) the highest per share price (including any brokerage commissions, transfer taxes and soliciting dealers' fees) paid by the Interested Stockholder to which the Business Combination relates, or by any Affiliate or Associate of such Interested Stockholder, for any shares of such class of Voting Stock acquired by it (1) within the two-year period immediately prior to the first public announcement of the proposal of the Business Combination (the "Announcement Date") or (2) in the transaction in which it became an Interested Stockholder, whichever is higher;

(b) the Fair Market Value per share of such class of Voting Stock of the Corporation on the Announcement Date; and

(c) the highest preferential amount per share, if any, to which the holders of shares of such class of Voting Stock of the Corporation are entitled in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation.

(ii) The consideration to be received by holders of a particular class of outstanding Voting Stock of the Corporation (including Common Stock) as described in subsection (3)(B)(i) hereof shall be in cash or if the consideration previously paid by or on behalf of the Interested Stockholder in connection with its acquisition of beneficial ownership of shares of such class of Voting Stock consisted in whole or in part of consideration other than cash, then in the same form as such consideration. If such payment for shares of any class of Voting Stock of the Corporation has been made in varying forms of consideration, the form of consideration for such class of Voting Stock shall be either cash or the form used to acquire the beneficial ownership of the largest number of shares of such class of Voting Stock previously acquired by the Interested Stockholder.

(iii) After such Interested Stockholder has become an Interested Stockholder and prior to the Consummation Date: (a) except as approved by the affirmative vote of a majority of the Continuing Directors, there shall have been no failure to declare and pay at the regular date therefor any full quarterly dividends (whether or not cumulative) on the outstanding Preferred Stock of the Corporation, if any; (b) there shall have been (1) no reduction in the annual rate of dividends paid on the Common Stock of the Corporation (except as necessary to reflect any subdivision of the Common Stock), except as approved by the affirmative vote of a majority of the Continuing Directors, and (2) an increase in such annual rate of dividends as necessary to reflect any reclassification (including any reverse stock split), recapitalization, reorganization or any similar transaction which has the effect of reducing the number of outstanding shares of Common Stock, unless the failure so to increase such annual rate is approved by the affirmative vote of a majority of the Continuing Directors; and (c) such Interested Stockholder shall not have become the Beneficial Owner of any additional shares of Voting Stock of the Corporation except as part of the transaction which results in such Interested Stockholder becoming an Interested Stockholder.

(iv) After such Interested Stockholder has become an Interested Stockholder, neither such Interested Stockholder nor any Affiliate or Associate thereof shall have received the benefit, directly or indirectly (except proportionately as a stockholder of the Corporation), of any loans, advances, guarantees, pledges or other financial assistance or any tax credits or other tax advantages provided by the Corporation.

8

(v) A proxy or information statement describing the proposed Business Combination and complying with the requirements of the Exchange Act and the General Rules and Regulations thereunder (or any subsequent provisions replacing such Act, rules or regulations) shall be mailed to the stockholders of the Corporation at least 45 days prior to the consummation of such Business Combination (whether or not such proxy or information statement is required to be mailed pursuant to such Act or subsequent provisions thereof).

(4) *Powers of Continuing Directors.* A majority of the Continuing Directors shall have the power and duty to determine, on the basis of information known to them after reasonable inquiry, all facts necessary to determine compliance with this Article, including, without limitation, (A) whether a Person is an Interested Stockholder, (B) the number of shares of Voting Stock of the Corporation beneficially owned by any Person, (C) whether a Person is an Affiliate or Associate of another, (D) whether the requirements of paragraph B of Section (3) have been met with respect to any Business Combination, and (E) whether the assets which are the subject of any Business Combination have, or the consideration to be received for the issuance or transfer of securities by the Corporation or any Subsidiary in any Business Combination has, an aggregate Fair Market Value of not less than one percent (1%) of the total assets of the Corporation as reported in the consolidated balance sheet of the Corporation as of the end of the most recent quarter with respect to which such balance sheet has been prepared; and the good faith determination of a majority of the Continuing Directors on such matters shall be conclusive and binding for all the purposes of this Article.

(5) *No Effect on Fiduciary Obligations .*

A. Nothing contained in this Article shall be construed to relieve the members of the Board of Directors or an Interested Stockholder from any fiduciary obligation imposed by law.

B. The fact that any Business Combination complies with the provisions of Section (3) of this Article shall not be construed to impose any fiduciary duty, obligation or responsibility on the Board of Directors, or any member thereof, to approve such Business Combination or recommend its adoption or approval to the stockholders of the Corporation, nor shall such compliance limit, prohibit or otherwise restrict in any manner the Board of Directors, or any member thereof, with respect to evaluations of or actions and responses taken with respect to such Business Combination.

(6) *Effect on Other Provisions.* The provisions of this Article X are in addition to, and shall not alter or amend, the provisions of Section (1) of Article VI of this Certificate of Incorporation.

## ARTICLE XI

The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation in the manner now or hereafter prescribed by law, and all rights and powers conferred herein on stockholders, directors and officers are subject to this reserved power; *provided that* , notwithstanding the fact that a lesser percentage may be specified by the General Corporation Law of Delaware, the affirmative vote of the holders of record of outstanding shares representing at least eighty percent (80%) of the voting power of all of the shares of capital stock of the Corporation then entitled to vote generally in the election of Directors, voting together as a single class, shall be required to amend, alter, change, repeal, or adopt any provision or provisions inconsistent with, Section (2) of Article V, Sections (3) and (4) of Article VI, and Articles VIII and XI (except for the second proviso of this Article XI) of this Certificate of Incorporation unless such amendment, alteration, change, repeal or adoption of any inconsistent provision or provisions is declared advisable by the Board of Directors by the affirmative vote of at least seventy-five percent (75%) of the entire Board of Directors; *and provided further that,* notwithstanding the fact that a lesser percentage may be specified by the General Corporation Law of Delaware, the affirmative vote of the holders of record of outstanding shares representing at least eighty percent (80%) of the voting power of all the outstanding Voting Stock of the Corporation, voting together as a Single class, shall be required to amend, alter or repeal, or adopt any provision or provisions inconsistent with, any provision of Article X or this proviso of this Article XI, unless such amendment, alteration, repeal, or adoption of any inconsistent provision or provisions is declared advisable by the Board of Directors

9

Case MDL No. 875 Document 4723 Filed 02/21/06 Page 141 of 324

by the affirmative vote of at least seventy-five percent (75%) of the entire Board of Directors and by a majority of the Continuing Directors.

## ARTICLE XII

No Director shall be personally liable to the Corporation or its stockholders for monetary damages for any breach of fiduciary duty by such Director as a Director. Notwithstanding the foregoing, a Director shall be liable to the extent provided by applicable law (i) for breach of the Director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) pursuant to Section 174 of the General Corporation Law of the State of Delaware or (iv) for any transaction from which the Director derived an improper personal benefit. No amendment to or repeal of these provisions shall apply to or have any effect on the liability or alleged liability of any Director of the Corporation for or with respect to any acts or omissions of such Director occurring prior to such amendment or repeal.

10

ANNEX 1

# AMENDED
## CERTIFICATE OF DESIGNATIONS
of
### SERIES A JUNIOR PARTICIPATING PREFERRED STOCK
of
### KIMBERLY-CLARK CORPORATION
(Pursuant to Section 151 of the
Delaware General Corporation Law)

Kimberly-Clark Corporation, a corporation organized and existing under the General Corporation Law of the State of Delaware (hereinafter called the "Corporation"), hereby certifies that (i) a Certificate of Designations for the Series A Participating Preferred Stock of the Corporation (the "Preferred Stock") was filed with the Secretary of State of the State of Delaware on July 1, 1988, (ii) no shares of the Preferred Stock have been issued or are outstanding, and (iii) the Board of Directors of the Corporation adopted the following resolution amending in their entireties the voting powers, preferences and relative, participating, optional and other special rights of the Preferred Stock as the following resolution was adopted by the Board of Directors of the Corporation as required by Section 151 of the General Corporation Law at a meeting duly called and held on June 8, 1995:

RESOLVED, that pursuant to the authority granted to and vested in the Board of Directors of this Corporation (hereinafter called the "Board of Directors" or the "Board") in accordance with the provisions of the Certificate of Incorporation, the Board of Directors hereby amends the provisions of the Series A Junior Participating Preferred Stock of the Corporation to state the designation and number of shares, and to fix the relative rights, preferences, and limitations thereof as follows:

Series A Junior Participating Preferred Stock:

Section 1. *Designation* and *Amount*. The shares of such series shall be designated as "Series A Junior Participating Preferred Stock" (the "Series A Preferred Stock") and the number of shares constituting the Series A Preferred Stock shall be 2,000,000. Such number of shares may be increased or decreased by resolution of the Board of Directors; *provided,* that no decrease shall reduce the number of shares of Series A Preferred Stock to a number less than the number of shares then outstanding plus the number of shares reserved for issuance upon the exercise of outstanding options, rights or warrants or upon the conversion of any outstanding securities issued by the Corporation convertible into Series A Preferred Stock.

Section 2. *Dividends and Distributions* .

(A) Subject to the rights of the holders of any shares of any series of Preferred Stock (or any similar stock) ranking prior and superior to the Series A Preferred Stock with respect to dividends, the holders of shares of Series A Preferred Stock, in preference to the holders of Common Stock, par value $1.25 per share (the "Common Stock"), of the Corporation, and of any other junior stock, shall be entitled to receive, when, as and if declared by the Board of Directors out of funds legally available for the purpose. quarterly dividends payable in cash on the first day of March, June, September and December in each year (each such date being referred to herein as a "Quarterly Dividend Payment Date"), commencing on the first Quarterly Dividend Payment Date after the first issuance of a share or fraction of a share of Series A Preferred Stock, in an amount per share (rounded to the nearest cent) equal to the greater of (a) $1 or (b) subject to the provision for adjustment hereinafter set forth, 100 times the aggregate per share amount of all cash dividends, and 100 times the aggregate per share amount (payable in kind) of all non-cash dividends or other distributions, other than a dividend payable in shares of Common Stock or a subdivision of the Outstanding shares of Common Stock (by reclassification or otherwise ), declared on the Common Stock since the immediately preceding Quarterly Dividend Payment Date or, with respect to the first Quarterly Dividend Payment Date, since the first issuance of any

A-1

share or fraction of a share of Series A Preferred Stock. In the event the Corporation shall at any time declare or pay any dividend on the Common Stock payable in shares of Common Stock, or effect a subdivision or combination or consolidation of the outstanding shares of Common Stock (by reclassification or otherwise than by payment of a dividend in shares of Common Stock) into a greater or lesser number of shares of Common Stock, then in each such case the amount to which holders of shares of Series A Preferred Stock were entitled immediately prior to such event under clause (b) of the preceding sentence shall be adjusted by multiplying such amount by a fraction, the numerator of which is the number of shares of Common Stock outstanding immediately after such event and the denominator of which is the number of shares of Common Stock that were outstanding immediately prior to such event.

(B) The Corporation shall declare a dividend or distribution on the Series A Preferred Stock as provided in paragraph (A) of this Section immediately after it declares a dividend or distribution on the Common Stock (other than a dividend payable in shares of Common Stock); provided that, in the event no dividend or distribution shall have been declared on the Common Stock during the period between any Quarterly Dividend Payment Date and the next subsequent Quarterly Dividend Payment Date, a dividend of $1 per share on the Series A Preferred Stock shall nevertheless be payable on such subsequent Quarterly Dividend Payment Date.

(C) Dividends shall begin to accrue and be cumulative on outstanding shares of Series A Preferred Stock from the Quarterly Dividend Payment Date next preceding the date of issue of such shares, unless the date of issue of such shares is prior to the record date for the first Quarterly Dividend Payment Date, in which case dividends on such shares shall begin to accrue from the date of issue of such shares, or unless the date of issue is a Quarterly Dividend Payment Date or is a date after the record date for the determination of holders of shares of Series A Preferred Stock entitled to receive a quarterly dividend and before such Quarterly Dividend Payment Date, in either of which events such dividends shall begin to accrue and be cumulative from such Quarterly Dividend Payment Date. Accrued but unpaid dividends shall not bear interest. Dividends paid on the shares of Series A Preferred Stock in an amount less than the total amount of such dividends at the time accrued and payable in such shares shall be allocated pro rata on a share-by-share basis among all such shares at the time outstanding. The Board of Directors may fix a record date for the determination of holders of Shares of Series A Preferred Stock entitled to receive payment of a dividend or distribution declared thereon, which record date shall be not more than 60 days prior to the date fixed for the payment thereof.

Section 3. *Voting Rights.* The holders of shares of Series A Preferred Stock shall have the following voting rights:

(A) Subject to the provision for adjustment hereinafter set forth, each share of Series A Preferred Stock shall entitle the holder thereof to 100 votes on all matters submitted to a vote of the stockholders of the Corporation. In the event the Corporation shall at any time declare or pay any dividend on the Common Stock payable in shares of Common Stock, or effect a subdivision or combination or consolidation of the outstanding shares of Common Stock (by reclassification or otherwise than by payment of a dividend in Shares of Common Stock) into a greater or lesser number of shares of Common Stock, then in each such case the number of votes per share to which holders of shares of Series A Preferred Stock were entitled immediately prior to such event shall be adjusted by multiplying such number by a fraction. the numerator of which is the number of shares of Common Stock outstanding immediately after such event and the denominator of which is the number of shares of Common Stock that were outstanding immediately prior to such event.

(B) Except as otherwise provided herein, in any other Certificate of Designations creating a series of Preferred Stock or any similar stock, or by law, the holders of shares of Series A Preferred Stock and the holders of shares of Common Stock and any other capital stock of the Corporation having general voting rights shall vote together as one class on all matters submitted to a vote of stockholders of the Corporation.

(C) Except as set forth herein, or as otherwise provided by law, holders of Series A Preferred Stock shall have no special voting rights and their consent shall not be required (except to the extent they are entitled to vote with holders of Common Stock as set forth herein) for taking any corporate action.

A-2

Section 4. *Certain Restrictions.*

(A) Whenever quarterly dividends or other dividends or distributions payable on the Series A Preferred Stock as provided in Section 2 are in arrears, thereafter and until all accrued and unpaid dividends and distributions, whether or not declared, on shares of Series A Preferred Stock outstanding shall have been paid in full, the Corporation shall not:

(i) declare or pay dividends, or make any other distributions, on any shares of stock ranking junior (either as to dividends or upon liquidation, dissolution or winding up) to the Series A Preferred Stock;

(ii) declare or pay dividends, or make any other distributions, on any shares of stock ranking on a parity (either as to dividends or upon liquidation, dissolution or winding up) with the Series A Preferred Stock, except dividends paid ratably on the Series A Preferred Stock and all such parity stock on which dividends are payable or in arrears in proportion to the total amounts to which the holders of all such shares are then entitled;

(iii) redeem or purchase or otherwise acquire for consideration shares of any stock ranking junior (either as to dividends or upon liquidation, dissolution or winding up) to the Series A Preferred Stock, provided that the Corporation may at any time redeem, purchase or otherwise acquire shares of any such junior stock in exchange for shares of any stock of the Corporation ranking junior (either as to dividends or upon dissolution, liquidation or winding up) to the Series A Preferred Stock; or

(iv) redeem or purchase or otherwise acquire for consideration any shares of Series A Preferred Stock, or any shares of stock ranking on a parity with the Series A Preferred Stock, except in accordance with a purchase offer made in writing or by publication (as determined by the Board of Directors) to all holders of such shares upon such terms as the Board of Directors, after consideration of the respective annual dividend rates and other relative rights and preferences of the respective series and classes, shall determine in good faith will result in fair and equitable treatment among the respective series or classes.

(B) The Corporation shall not permit any subsidiary of the Corporation to purchase or otherwise acquire for consideration any shares of stock of the Corporation unless the Corporation could, under paragraph (A) of this Section 4, purchase or otherwise acquire such shares at such time and in such manner.

Section 5. *Reacquired Shares.* Any shares of Series A Preferred Stock purchased or otherwise acquired by the Corporation in any manner whatsoever shall be retired and cancelled promptly after the acquisition thereof. All such shares shall upon their cancellation become authorized but unissued shares of Preferred Stock and may be reissued as part of a new series of Preferred Stock subject to the conditions and restrictions on issuance set forth herein, in the Certificate of Incorporation, or in any other Certificate of Designations creating a series of Preferred Stock or any similar stock or as otherwise required by law.

Section 6. *Liquidation, Dissolution* or *Winding Up.* Upon any liquidation, dissolution or winding up of the Corporation, no distribution shall be made (1) to the holders of shares of stock ranking junior (either as to dividends or upon liquidation, dissolution or winding up) to the Series A Preferred Stock unless, prior thereto, the holders of shares of Series A Preferred Stock shall have received $100 per share, plus an amount equal to accrued and unpaid dividends and distributions thereon, whether or not declared, to the date of such payment, provided that the holders of shares of Series A Preferred Stock shall be entitled to receive an aggregate amount per share, subject to the provision for adjustment hereinafter set forth, equal to 100 times the aggregate amount to be distributed per share to holders of shares of Common Stock, or (2) to the holders of shares of stock ranking on a parity (either as to dividends or upon liquidation, dissolution or winding up) with the Series A Preferred Stock, except distributions made ratably on the Series A Preferred Stock and all such parity stock in proportion to the total amounts to which the holders of all such shares are entitled upon such liquidation, dissolution or winding up. In the event the Corporation shall at any time declare or pay any dividend on the Common Stock payable in shares of Common Stock, or effect a subdivision or combination or consolidation of the outstanding shares of Common Stock (by reclassification or otherwise than by payment of a dividend in shares of Common Stock) into a greater or lesser number of shares of Common Stock, then in each such case the aggregate amount to which holders of shares of Series A Preferred Stock were entitled immediately prior to such event

A-3

under the provision in clause (1) of the preceding sentence shall be adjusted by multiplying such amount by a fraction the numerator of which is the number of shares of Common Stock outstanding immediately after such event and the denominator of which is the number of shares of Common Stock that were outstanding immediately prior to such event.

Section 7. *Consolidation, Merger, Etc.* In case the Corporation shall enter into any consolidation, merger, combination or other transaction in which the shares of Common Stock are exchanged for or changed into other stock or securities, cash and/or any other property, then in any such case each share of Series A Preferred Stock shall at the same time be similarly exchanged or changed into an amount per share, subject to the provision for adjustment hereinafter set forth, equal to 100 times the aggregate amount of stock, securities, cash and in or any other property (payable in kind), as the case may be, into which or to which each share of Common Stock is changed or exchanged. In the event the Corporation shall at any time declare or pay any dividend on the Common Stock payable in shares of Common Stock, or effect a subdivision or combination or consolidation of the outstanding shares of Common Stock (by reclassification or otherwise than by payment of a dividend in shares of Common Stock) into a greater or lesser number of shares of Common Stock, then in each such case the amount set forth in the preceding sentence with respect to the exchange or change of shares of Series A Preferred Stock shall be adjusted by multiplying such amount by a fraction, the numerator of which is the number of shares of Common Stock outstanding immediately after such event and the denominator of which is the number of shares of Common Stock that were outstanding immediately prior to such event.

Section 8. *No Redemption.* The shares of Series A Preferred Stock shall not be redeemable.

Section 9. *Rank.* The Series A Preferred Stock shall rank, with respect to the payment of dividends and the distribution of assets, junior to all series of any other class of the Corporation's Preferred Stock.

Section 10. *Amendment.* The Certificate of Incorporation of the Corporation shall not be amended in any manner which would materially alter or change the powers, preferences or special rights of the Series A Preferred Stock so as to affect them adversely without the affirmative vote of the holders of at least two-thirds of the outstanding shares of Series A Preferred Stock, voting together as a single class.

A-4

## CERTIFICATE ELIMINATING

## SERIES A JUNIOR PARTICIPATING PREFERRED STOCK

### OF

### KIMBERLY-CLARK CORPORATION

The undersigned, Timothy C. Everett, does hereby certify that:

1. The undersigned is the duly elected and acting Vice President and Secretary of Kimberly-Clark Corporation, a Delaware corporation (the "Corporation").

2. Pursuant to authority conferred by the Certificate of Incorporation of the Corporation upon the Board of Directors of the Corporation (the "Board"), the Board on November 16, 2004 adopted the following resolutions which relate to the previously-issued dividend of one right (each, a "Right" and collectively, the "Rights") in respect of each share of Common Stock, par value $1.25 per share, of the Corporation to purchase shares of Series A Junior Participating Preferred Stock, without par value, of the Corporation ("Series A Preferred Stock") pursuant to an Amended and Restated Rights Agreement, dated as of June 21, 1988, as amended and restated on June 8, 1995 and as further amended on November 19, 2004 (the "Rights Agreement"), between the Corporation and First National Bank of Boston, a national banking association, each such Right representing the right to purchase one one-hundredth of a share of Series A Preferred Stock upon the terms and subject to the conditions set forth in the Rights Agreement:

WHEREAS, none of the authorized shares of the Corporation's Series A Junior Participating Preferred Stock (the "Series A Preferred Stock") issuable under the Rights Agreement upon the exercise of the Rights are outstanding, and none of the authorized shares of Series A Preferred Stock issuable upon the exercise of the Rights will be issued pursuant to that certain Certificate of Designations of Rights, Preferences and Privileges of Series A Junior Participating Preferred Stock of the Corporation filed with the Secretary of State of the State of Delaware, as amended on July 12, 1995 and February 18, 2000 (the "Certificate of Designations"); and

WHEREAS, the Board has determined that it would be desirable and in the best interests of the Corporation and its stockholders to eliminate the Series A Preferred Stock issuable upon the exercise of the Rights.

NOW, THEREFORE, BE IT

RESOLVED, that the Corporation be, and hereby is, authorized and directed to file with the Secretary of State of the State of Delaware a certificate containing these resolutions, with the effect under the General Corporation Law of the State of Delaware of eliminating from the Certificate of Incorporation of this Corporation all matters set forth in the Certificate of Designations with respect to the Series A Preferred Stock.

RESOLVED, that the Chief Executive Officer, the Senior Vice President – Law and Government Affairs and the Vice President and Secretary of the Corporation be, and each of them hereby is, authorized and directed, jointly and severally, for and on behalf of the Corporation, to execute and deliver any and all certificates, agreements, instruments and other documents, and to take any and all steps and do any and all things which they may deem necessary or advisable in order to effectuate the purposes of each and all of the foregoing resolutions.

3. I further declare under penalty of perjury that the matters set forth in this Certificate are true and correct of my own knowledge.

This Certificate was executed in Dallas, Texas on November 19, 2004.

KIMBERLY-CLARK CORPORATION

By:   /s/ Timothy C. Everett
Name: Timothy C. Everett
Title:  Vice President and Secretary

2

Exhibit (10)n

## KIMBERLY-CLARK CORPORATION
## 2001 EQUITY PARTICIPATION PLAN
## AWARD AGREEMENT

This Award, granted this _____day of _____, by Kimberly-Clark Corporation, a Delaware corporation (the "Corporation"), to _____(the "Employee") subject to the terms and conditions of the 2001 Equity Participation Plan (the "Plan"), and the applicable Attachment to this Award Agreement.

NOW, THEREFORE, it is agreed as follows:

1. Number of Performance-Vested Restricted Share Units Granted . The Corporation hereby grants to the Employee Performance-Vested Restricted Share Units at a target level of _____(the "Target Level"), subject to Attachments A-1 and A-2 and the Corporation's attainment of the Performance Goals established by the Committee. The actual number of Restricted Share Units earned by the Employee at the end of the Restricted Period may range from 0 to _____ % of the Target Level. During the Restricted Period, the Employee may not sell, assign, transfer, or otherwise dispose of, or mortgage, pledge or otherwise encumber the Award.

2. Number of Time-Vested Restricted Share Units Granted . The Corporation hereby grants to the Employee the right to receive _____Restricted Share Units of the $1.25 par value common stock of the Corporation, subject to the terms and conditions of Attachment B. During the Restricted Period, the Employee may not sell, assign, transfer, or otherwise dispose of, or mortgage, pledge or otherwise encumber the Restricted Share Units. The Restricted Share Units shall be subject to forfeiture until the Employee becomes vested in such Awards according to the following schedule:

   33% of the Restricted Share Units shall vest on _____, _____
   33% of the Restricted Share Units shall vest on _____, _____
   34% of the Restricted Share Units shall vest on _____, _____

3. Number of Shares Optioned; Option Price . The Corporation grants to the Employee the right and option to purchase in his own name, subject to the terms and conditions of Attachment C, all or any part of an aggregate of _____shares of the $1.25 par value common stock of the Corporation at a purchase price of $ _____per share. This option shall not be an incentive stock option within the meaning of Section 422 of the Internal Revenue Code of 1986, as amended (the "Code"). This option shall be subject to forfeiture until the Employee becomes vested in such Awards according to the following schedule:

   30% of the Restricted Share Units shall vest on _____, _____
   30% of the Restricted Share Units shall vest on _____, _____
   40% of the Restricted Share Units shall vest on _____, _____

4.  Defined Terms . Terms which are capitalized are defined herein or in the Plan and have the same meaning set forth herein or in the Plan, unless the context indicates otherwise.

5.  Noncompete . Employee has until the end of the one hundred twenty (120) day period beginning from the date of grant of this option to sign and return both this Award Agreement and the attached Noncompete Agreement. If Employee does not sign and return both this Award Agreement and the attached Noncompete Agreement on or before the end of such one hundred twenty (120) day period then this Agreement shall not be binding on and shall be voidable by the Corporation, in which case it shall have no further force or effect.

IN WITNESS WHEREOF, the Corporation has caused this Award to be executed in its behalf by its Chairman of the Board of Directors and Chief Executive Officer, and to be sealed with its corporate seal and attested by its Secretary or Assistant Secretary, as of the day and year first above written, which is the date of this Award.

KIMBERLY-CLARK CORPORATION

By:_____

Title: Chairman of the Board and
Chief Executive Officer

I acknowledge receipt of a copy of the Plan and the Attachments to this Agreement, a copy of which was annexed hereto, and represent that I am familiar with the terms and provisions thereof. I hereby accept this Award subject to all the terms and provisions of the Plan and this Agreement including its Attachments. I hereby agree to accept as binding, conclusive, and final all decisions and interpretations of the Board of Directors and the Committee, upon any questions arising under the Plan. I acknowledge that I have no future rights to Award grants under this or any plans offered by the employer, including but not limited to, upon termination of the Plan or upon severance of my employment. As a condition of this Award, I authorize the Corporation to withhold and pay over to governmental taxing authorities in accordance with applicable federal, state or local laws any taxes required to be withheld as a result of this Award.

_____
(Employee)

Case MDL No. 875 Document 4723 Filed 02/21/06 Page 149 of 324

Attachment A-1

## KIMBERLY-CLARK CORPORATION
## PERFORMANCE RESTRICTED STOCK UNIT
## _____ AWARD AGREEMENT

This Award, granted this _____ day of _____, by Kimberly-Clark Corporation, a Delaware corporation (hereinafter called the "Corporation"), subject to the terms and conditions of the 2001 Equity Participation Plan (the "Plan") and the Award Agreement.

W I T N E S S E T H :

WHEREAS, the Corporation has adopted the 2001 Equity Participation Plan (the "Plan") to encourage those employees who materially contribute, by managerial, scientific or other innovative means, to the success of the Corporation or of an Affiliate, to acquire an ownership interest in the Corporation, thereby increasing their motivation for and interest in the Corporation's or the Affiliate's long-term success;

NOW, THEREFORE, it is agreed as follows:

1. <u>Number of Share Units Granted</u> . The Corporation hereby grants to the Employee Performance Restricted Stock Units ("PRSUs") at a target level set forth in the Award Agreement (the "Target Level"), subject to the terms, conditions and restrictions set forth herein and in the Plan, and the Corporation's attainment of the Performance Goals established by the Committee. The actual number of PRSUs earned by the Employee at the end of the Restricted Period may range from 0 to _____% of the Target Level.

2. <u>Transferability Restrictions</u> .

   (a) <u>Restricted Period</u> . During the Restricted Period, the Employee may not sell, assign, transfer, or otherwise dispose of, or mortgage, pledge or otherwise encumber the Award. The Award shall be subject to forfeiture until the end of the Restricted Period on _____. Employee becomes 100% vested in the number of PRSUs earned based on attainment of the Performance Goal at the end of the Restricted Period as approved and authorized by the Committee.

   The Restricted Period shall begin on the date of the granting of this Award, and shall end upon the vesting of the Award under this paragraph 2. Holders of Awards shall have none of the rights of a shareholder with respect to such shares including, but not limited to, any right to receive dividends in cash or other property or other distribution or rights in respect of such shares except as otherwise provided in this Agreement, nor to vote such shares as the record owner thereof.

   During the Restricted Period, the Employee will be paid in cash within 60 days an amount equal to any dividends and other distributions which would have been paid on shares of Common Stock, based on the Target Level of PRSUs

granted under this Award. The amount equal to any dividends and other distributions on the Award shall be paid to the Employee if, as and when dividends are declared and paid by the Corporation with respect to its outstanding shares of Common Stock. In the case of dividends paid in property other than cash, the amount of the dividend shall be deemed to be the fair market value of the property at the time of the payment of the dividend, as determined in good faith by the Corporation. The Corporation shall not be required to segregate any cash or other property of the Corporation. Any amounts which become payable to an Employee shall be paid from the general assets of the Corporation.

(b)  Termination of Employment . Employee shall forfeit any unvested Award upon termination of employment unless such termination (i) is due to a Qualified Termination of Employment, or (ii) if more than six months after the date of grant, due to death, Retirement, Total and Permanent Disability, or the shutdown or divestiture of a business unit. An authorized leave of absence shall not be deemed to be a termination of employment. A termination of employment with the Corporation or an Affiliate to accept immediate reemployment with the Corporation or an Affiliate likewise shall not be deemed to be a termination of employment.

(c)  Death, Retirement, or Total and Permanent Disability . In the event that more than six months after the date of grant the Employee's termination of employment is due to death, Retirement, or Total and Permanent Disability, it shall result in pro rata vesting, as determined by the Committee, and the number of shares that are considered to vest shall be determined at the end of the Restricted Period, prorated for the number of full months of employment during the Restricted Period prior to the Participant's termination of employment, and shall be paid within 90 days following the end of the Restricted Period.

(d)  Shutdown or Divestiture . In the event that more than six months after the date of grant the Employee's termination of employment is due to the shutdown or divestiture of the Corporation's or its Affiliate's business it shall result in pro rata vesting, as determined by the Committee, and the number of shares that are considered to vest shall be determined at the end of the Restricted Period, prorated for the number of full years of employment during the Restricted Period prior to the Participant's termination of employment, and shall be paid within 90 days following the end of the Restricted Period.

(e)  Qualified Termination of Employment . In the event of a Qualified Termination of Employment all restrictions will lapse and the shares will become fully vested and the number of shares that shall be considered to vest shall be the greater of the Target Level or the number of shares which would have vested based on the attainment of the Performance Goal as of the end of the prior calendar year and shall be paid within 10 days following the last day of employment of the Employee with the Corporation.

(f) Payment of Awards . The payment of the Award shall be made in shares of Common Stock. Except as may otherwise be provided in subparagraph 2(e), the payment of an Award shall be made within 90 days following the date of vesting of the Award under the previous subparagraphs unless the Employee elects to defer payment under paragraph 3.

(g) Payment of Withholding Taxes . No shares of Common Stock, nor any cash payment, may be delivered under this Award, unless prior to or simultaneously with such issuance, the Employee or, in the event of his death, the person succeeding to his rights hereunder, shall pay to the Corporation such amount as the Corporation advises is required under applicable federal, state or local laws to withhold and pay over to governmental taxing authorities by reason of the delivery of such shares of Common Stock and any cash payment pursuant to this Award. The Corporation may, in its discretion, withhold payment of required withholding taxes with cash or shares of Common Stock which otherwise would be delivered following the date of vesting of the Award under this paragraph 2.

3. Deferral of Award . An Employee may elect to defer payment of his Award. Except as may otherwise be determined by the Committee such election shall: (i) be in writing; (ii) be delivered to the Secretary of the Corporation prior to December 31 of the calendar year preceding the date of vesting of the Award; (iii) specify the year of payment of the Award which is no more than five years after the date of vesting of the Award and (iv) be irrevocable in all respects after December 31 of the calendar year preceding the date of vesting of the Award with respect to which the election relates. The Retirement Trust Committee of the Corporation may, in its sole and absolute discretion, grant the Employee's request to defer payment of his Award. In the event of termination of employment prior to the date elected to pay the Award due to any reason other than Retirement, the payment of an Award shall be made within 90 days following the date of termination of employment. In the event of termination of employment due to Retirement, the payment of an Award shall be made as specified in the Employee's deferral request. Except as may otherwise be determined by the Committee whenever an Award has been deferred the Employee will be paid in cash an amount equal to any dividends and other distributions which would have been declared and paid with respect to the shares of Common Stock if delivery had not been deferred. Notwithstanding the foregoing, no such election, revocation or modification of a deferral election may be made within six months of another such election, revocation or modification if the exemption afforded by Rule 16b-3 under Section 16 would not be available as a result thereof.

4. Nontransferability . Neither the Award nor the Employee's right to receive payment for vested Awards may be assigned or transferred except upon the death of the Employee (i) by will, (ii) by the laws of descent and distribution or (iii) pursuant to a designation by the Employee of a beneficiary or beneficiaries, provided that no such designation shall be effective unless filed with the Committee prior to the death of such Employee.

5. Compliance with Law . No payment may be made under this Award, unless prior to the issuance thereof, the Corporation shall have received an opinion of counsel to the effect that this Award by the Corporation to the Employee will not constitute a violation of the Securities Act of 1933, as amended. As a condition of this Award, the Employee

shall, if requested by the Corporation, submit a written statement in form satisfactory to counsel for the Corporation, to the effect that any shares received under this Award shall be for investment and not with a view to the distribution thereof within the meaning of the Securities Act of 1933, as amended, and the Corporation shall have the right, in its discretion, to cause the certificates representing shares hereunder to be appropriately legended to refer to such undertaking or to any legal restrictions imposed upon the transferability thereof by reason of such undertaking.

The Award granted hereby is subject to the condition that if the listing, registration or qualification of the shares subject hereto on any securities exchange or under any state or federal law, or if the consent or approval of any regulatory body shall be necessary as a condition of, or in connection with, the granting of the Award or the delivery of shares thereunder, such shares may not be delivered unless and until such listing, registration, qualification, consent or approval shall have been effected or obtained. The Corporation agrees to use its best efforts to obtain any such requisite listing, registration, qualification, consent or approval.

The Employee is solely responsible for obtaining/providing whatever exchange control approvals, permits, licenses, or notices, which may be necessary for the Employee to hold the Award, or to receive any payment of cash or shares or to hold or sell the shares subject to the Award, if any. Neither Kimberly-Clark nor its Affiliates will be responsible for obtaining any such approvals, licenses or permits, or for making any such notices, nor will the Corporation nor its Affiliates be liable for any fines or penalties the Employee may incur for failure to obtain any required approvals, permits or licenses or to make any required notices.

6.  No Right of Continued Employment . The granting of this Award does not confer upon the Employee any legal right to be continued in the employ of the Corporation or its Affiliates, and the Corporation and its Affiliates reserve the right to discharge the Employee whenever the interest of the Corporation or its Affiliates may so require without liability to the Corporation or its Affiliates, the Board of Directors of the Corporation or its Affiliates, or the Committee, except as to any rights which may be expressly conferred on the Employee under this Award.

7.  Discretion of the Corporation, Board of Directors and the Committee . Any decision made or action taken by the Corporation or by the Board of Directors of the Corporation or by the Committee arising out of or in connection with the construction, administration, interpretation and effect of this Award shall be within the absolute discretion of the Corporation, the Board of Directors of the Corporation or the Committee, as the case may be, and shall be conclusive and binding upon all persons.

8.  Inalienability of Benefits and Interest . This Award and the rights and privileges conferred hereby shall not be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, and any such attempted action shall be void and no such benefit or interest shall be in any manner liable for or subject to debts, contracts, liabilities, engagements, or torts of the Employee.

9.  Delaware Law to Govern . The Plan is governed by and subject to the laws of the United States of America. All questions pertaining to the construction, interpretation,

regulation, validity and effect of the provisions of this Award and any rights under the Plan shall be determined in accordance with the laws of the State of Delaware.

10. <u>Purchase of Common Stock</u>. The Corporation and its Affiliates may, but shall not be required to, purchase shares of Common Stock of the Corporation for purposes of satisfying the requirements of this Award. The Corporation and its Affiliates shall have no obligation to retain and shall have the unlimited right to sell or otherwise deal with for their own account, any shares of common stock of the Corporation purchased for satisfying the requirements of this Award.

11. <u>Notices</u>. Any notice to be given to the Corporation under this Award shall be addressed to the Corporation in care of its Director of Compensation located at the World Headquarters, and any notice to be given to the Employee under the terms of this Award may be addressed to him at his address as it appears on the Corporation's records, or at such other address as either party may hereafter designate in writing to the other. Any such notice shall be deemed to have been duly given if and when enclosed in a properly sealed envelope or wrapper addressed as aforesaid, registered and deposited, postage and registry fee prepaid, in a post office or branch post office regularly maintained by the United States Government.

12. <u>Changes in Capitalization</u>. In the event there are any changes in the common stock or the capitalization of the Corporation through a corporate transaction, such as any merger, any acquisition through the issuance of capital stock of the Corporation, any consolidation, any separation of the Corporation (including a spin-off or other distribution of stock of the Corporation), any reorganization of the Corporation (whether or not such reorganization comes within the definition of such term in section 368 of the Code), or any partial or complete liquidation by the Corporation, recapitalization, stock dividend, stock split or other change in the corporate structure, appropriate adjustments and changes shall be made by the Committee in (a) the number of shares subject to this Award, and (b) such other provisions of this Award as may be necessary and equitable to carry out the foregoing purposes.

13. <u>Effect on Other Plans</u>. All benefits under this Award shall constitute special compensation and shall not affect the level of benefits provided to or received by the Employee (or the Employee's estate or beneficiaries) as part of any employee benefit plan of the Corporation or an Affiliates. This Award shall not be construed to affect in any way the Employee's rights and obligations under any other plan maintained by the Corporation or an Affiliate on behalf of employees.

14. <u>Discretionary Nature of Award</u>. The grant of an Award is a one-time benefit and does not create any contractual or other right to receive a grant of Awards or benefits in lieu of Awards in the future. Future grants, if any, will be at the sole discretion of Kimberly-Clark, including, but not limited to, the timing of any grant, the number of PRSUs and vesting provisions. The value of the Award is an extraordinary item of compensation outside the scope of the Employee's employment contract, if any. As such, the Award is not part of normal or expected compensation for purposes of calculating any severance, resignation, redundancy, end of service payments, bonuses, long-service awards, pension or retirement benefits or similar payments.

Case MDL No. 875   Document 4723   Filed 02/21/06   Page 154 of 324

15. <u>Data Privacy</u> . The Employee hereby authorizes their employer to furnish Kimberly-Clark (and any agent of Kimberly-Clark administering the Plan or providing Plan recordkeeping services) with such information and data as it shall request in order to facilitate the grant of Awards and administration of the Plan and the Employee waives any data privacy rights such Employee might otherwise have with respect to such information.

16. <u>Conflict with Plan</u> . This Award is awarded pursuant to and subject to the Plan. This Agreement is intended to supplement and carry out the terms of the Plan. It is subject to all terms and provisions of the Plan and, in the event of a conflict, the Plan shall prevail.

17. <u>Successors</u> . This Award shall be binding upon and inure to the benefit of any successor or successors of the Corporation.

18. <u>Amendments</u> . The Committee may at any time alter or amend this Award to the extent (1) permitted by law, (2) permitted by the rules of any stock exchange on which the common stock or any other security of the Corporation is listed, and (3) permitted under applicable provisions of the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended (including rule 16b-3 thereof).

19. <u>Defined Terms</u> . Terms which are capitalized are defined herein or in the Plan and have the same meaning set forth in the Plan, unless the context indicates otherwise.

**Performance Goal for Kimberly-Clark Corporation**
**Performance Restricted Stock Unit Awards**
**Granted _____**

[Performance Goal as determined by Compensation Committee
at time of grant to be set forth on this Attachment A-2]

## KIMBERLY-CLARK CORPORATION
### TIME-VESTED RESTRICTED SHARE UNIT
#### _____AWARD AGREEMENT

This Award, granted this _____day of _____, by Kimberly-Clark Corporation, a Delaware corporation (hereinafter called the "Corporation"), subject to the terms and conditions of the 2001 Equity Participation Plan (the "Plan") and the Award Agreement.

### W I T N E S S E T H :

WHEREAS, the Corporation has adopted the 2001 Equity Participation Plan (the "Plan") to encourage those employees who materially contribute, by managerial, scientific or other innovative means, to the success of the Corporation or of an Affiliate, to acquire an ownership interest in the Corporation, thereby increasing their motivation for and interest in the Corporation's or the Affiliate's long-term success;

NOW, THEREFORE, it is agreed as follows:

1. <u>Number of Share Units Granted</u> . The Corporation hereby grants to the Employee the right to receive the number of Time-Vested Restricted Share Units of the $1.25 par value common stock of the Corporation set forth in the Award Agreement, subject to the terms, conditions and restrictions set forth herein and in the Plan.

2. <u>Transferability Restrictions</u> .

   (a) <u>Restricted Period</u> . During the Restricted Period, the Employee may not sell, assign, transfer, or otherwise dispose of, or mortgage, pledge or otherwise encumber the Award. The Restricted Share Units shall be subject to forfeiture until the Employee becomes vested in such Award according to the schedule set forth in the Award Agreement.

   The Restricted Period shall begin on the date of the granting of this Award, and shall end upon the vesting of the Award according to the schedule set forth in the Award Agreement. Holders of Awards shall have none of the rights of a shareholder with respect to such shares including, but not limited to, any right to receive dividends in cash or other property or other distribution or rights in respect of such shares except as otherwise provided in this Agreement, nor to vote such shares as the record owner thereof.

   During the Restricted Period, the Employee will be paid in cash within 60 days an amount equal to any dividends and other distributions which would have been paid on shares of Common Stock, based on the Restricted Share Units granted under this Award. The amount equal to any dividends and other distributions on the Award shall be paid to the Employee if, as and when dividends are declared and paid by the Corporation with respect to its outstanding shares of Common Stock. In the case of dividends paid in

property other than cash, the amount of the dividend shall be deemed to be the fair market value of the property at the time of the payment of the dividend, as determined in good faith by the Corporation. The Corporation shall not be required to segregate any cash or other property of the Corporation. Any amounts which become payable to an Employee shall be paid from the general assets of the Corporation.

(b)  Termination of Employment . Employee shall forfeit any unvested Award upon termination of employment unless such termination (i) is due to a Qualified Termination of Employment, or (ii) if more than six months after the date of grant, due to death, Retirement, Total and Permanent Disability, or the shutdown or divestiture of a business unit. An authorized leave of absence shall not be deemed to be a termination of employment. A termination of employment with the Corporation or an Affiliate to accept immediate reemployment with the Corporation or an Affiliate likewise shall not be deemed to be a termination of employment.

(c)  Death, Retirement, or Total and Permanent Disability . In the event that more than six months after the date of grant the Employee's termination of employment is due to death, Retirement, or Total and Permanent Disability, it shall result in pro rata vesting, as determined by the Committee, and the number of shares that are considered to vest shall be prorated for the number of full months of employment during the Restricted Period prior to the Participant's termination of employment, and shall be paid within 90 days following the Participant's termination of employment.

(d)  Shutdown or Divestiture . In the event that more than six months after the date of grant the Employee's termination of employment is due to the shutdown or divestiture of the Corporation's or its Affiliate's business it shall result in pro rata vesting, as determined by the Committee, and the number of shares that are considered to vest shall be determined at the end of the Restricted Period, prorated for the number of full years of employment during the Restricted Period prior to the Participant's termination of employment, and shall be paid within 90 days following the end of the Restricted Period.

(e)  Qualified Termination of Employment . In the event of a Qualified Termination of Employment all restrictions will lapse and the shares will become fully vested and shall be paid within 10 days following the last day of employment of the Employee with the Corporation.

(f)  Payment of Awards . The payment of the Award shall be made in shares of Common Stock. Except as may otherwise be provided in subparagraph 2(e), the payment of an Award shall be made within 90 days following the date of vesting of the Award under the previous subparagraphs unless the Employee elects to defer payment under paragraph 3.

(g)  Payment of Withholding Taxes . No shares of Common Stock, nor any cash payment, may be delivered under this Award, unless prior to or simultaneously with such issuance, the Employee or, in the event of his death, the person

succeeding to his rights hereunder, shall pay to the Corporation such amount as the Corporation advises is required under applicable federal, state or local laws to withhold and pay over to governmental taxing authorities by reason of the delivery of such shares of Common Stock and any cash payment pursuant to this Award. The Corporation may, in its discretion, withhold payment of required withholding taxes with cash or shares of Common Stock which otherwise would be delivered following the date of vesting of the Award under this paragraph 2.

3. <u>Deferral of Award</u> . An Employee may elect to defer payment of his Award. Except as may otherwise be determined by the Committee such election shall: (i) be in writing; (ii) be delivered to the Secretary of the Corporation prior to December 31 of the calendar year preceding the date of vesting of the Award; (iii) specify the year of payment of the Award which is no more than five years after the date of vesting of the Award and (iv) be irrevocable in all respects after December 31 of the calendar year preceding the date of vesting of the Award with respect to which the election relates. The Retirement Trust Committee of the Corporation may, in its sole and absolute discretion, grant the Employee's request to defer payment of his Award. In the event of termination of employment prior to the date elected to pay the Award due to any reason other than Retirement, the payment of an Award shall be made within 90 days following the date of termination of employment. In the event of termination of employment due to Retirement, the payment of an Award shall be made as specified in the Employee's deferral request. Except as may otherwise be determined by the Committee whenever an Award has been deferred the Employee will be paid in cash an amount equal to any dividends and other distributions which would have been declared and paid with respect to the shares of Common Stock if delivery had not been deferred. Notwithstanding the foregoing, no such election, revocation or modification of a deferral election may be made within six months of another such election, revocation or modification if the exemption afforded by Rule 16b-3 under Section 16 would not be available as a result thereof.

4. <u>Nontransferability</u> . Neither the Award nor the Employee's right to receive payment for vested Awards may be assigned or transferred except upon the death of the Employee (i) by will, (ii) by the laws of descent and distribution or (iii) pursuant to a designation by the Employee of a beneficiary or beneficiaries, provided that no such designation shall be effective unless filed with the Committee prior to the death of such Employee.

5. <u>Compliance with Law</u> . No payment may be made under this Award, unless prior to the issuance thereof, the Corporation shall have received an opinion of counsel to the effect that this Award by the Corporation to the Employee will not constitute a violation of the Securities Act of 1933, as amended. As a condition of this Award, the Employee shall, if requested by the Corporation, submit a written statement in form satisfactory to counsel for the Corporation, to the effect that any shares received under this Award shall be for investment and not with a view to the distribution thereof within the meaning of the Securities Act of 1933, as amended, and the Corporation shall have the right, in its discretion, to cause the certificates representing shares hereunder to be appropriately legended to refer to such undertaking or to any legal restrictions imposed upon the transferability thereof by reason of such undertaking.

Case MDL No. 875 Document 4723 Filed 02/21/06 Page 135 of 160

The Award granted hereby is subject to the condition that if the listing, registration or qualification of the shares subject hereto on any securities exchange or under any state or federal law, or if the consent or approval of any regulatory body shall be necessary as a condition of, or in connection with, the granting of the Award or the delivery of shares thereunder, such shares may not be delivered unless and until such listing, registration, qualification, consent or approval shall have been effected or obtained. The Corporation agrees to use its best efforts to obtain any such requisite listing, registration, qualification, consent or approval.

The Employee is solely responsible for obtaining/providing whatever exchange control approvals, permits, licenses, or notices, which may be necessary for the Employee to hold the Award, or to receive any payment of cash or shares or to hold or sell the shares subject to the Award, if any. Neither Kimberly-Clark nor its Affiliates will be responsible for obtaining any such approvals, licenses or permits, or for making any such notices, nor will the Corporation nor its Affiliates be liable for any fines or penalties the Employee may incur for failure to obtain any required approvals, permits or licenses or to make any required notices.

6. <u>No Right of Continued Employment</u> . The granting of this Award does not confer upon the Employee any legal right to be continued in the employ of the Corporation or its Affiliates, and the Corporation and its Affiliates reserve the right to discharge the Employee whenever the interest of the Corporation or its Affiliates may so require without liability to the Corporation or its Affiliates, the Board of Directors of the Corporation or its Affiliates, or the Committee, except as to any rights which may be expressly conferred on the Employee under this Award.

7. <u>Discretion of the Corporation, Board of Directors and the Committee</u> . Any decision made or action taken by the Corporation or by the Board of Directors of the Corporation or by the Committee arising out of or in connection with the construction, administration, interpretation and effect of this Award shall be within the absolute discretion of the Corporation, the Board of Directors of the Corporation or the Committee, as the case may be, and shall be conclusive and binding upon all persons.

8. <u>Inalienability of Benefits and Interest</u> . This Award and the rights and privileges conferred hereby shall not be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, and any such attempted action shall be void and no such benefit or interest shall be in any manner liable for or subject to debts, contracts, liabilities, engagements, or torts of the Employee.

9. <u>Delaware Law to Govern</u> . The Plan is governed by and subject to the laws of the United States of America. All questions pertaining to the construction, interpretation, regulation, validity and effect of the provisions of this Award and any rights under the Plan shall be determined in accordance with the laws of the State of Delaware.

10. <u>Purchase of Common Stock</u> . The Corporation and its Affiliates may, but shall not be required to, purchase shares of Common Stock of the Corporation for purposes of satisfying the requirements of this Award. The Corporation and its Affiliates shall have no obligation to retain and shall have the unlimited right to sell or otherwise deal with for their own account, any shares of common stock of the Corporation purchased for satisfying the requirements of this Award.

11. Notices . Any notice to be given to the Corporation under this Award shall be addressed to the Corporation in care of its Director of Compensation located at the World Headquarters, and any notice to be given to the Employee under the terms of this Award may be addressed to him at his address as it appears on the Corporation's records, or at such other address as either party may hereafter designate in writing to the other. Any such notice shall be deemed to have been duly given if and when enclosed in a properly sealed envelope or wrapper addressed as aforesaid, registered and deposited, postage and registry fee prepaid, in a post office or branch post office regularly maintained by the United States Government.

12. Changes in Capitalization . In the event there are any changes in the common stock or the capitalization of the Corporation through a corporate transaction, such as any merger, any acquisition through the issuance of capital stock of the Corporation, any consolidation, any separation of the Corporation (including a spin-off or other distribution of stock of the Corporation), any reorganization of the Corporation (whether or not such reorganization comes within the definition of such term in section 368 of the Code), or any partial or complete liquidation by the Corporation, recapitalization, stock dividend, stock split or other change in the corporate structure, appropriate adjustments and changes shall be made by the Committee in (a) the number of shares subject to this Award, and (b) such other provisions of this Award as may be necessary and equitable to carry out the foregoing purposes.

13. Effect on Other Plans . All benefits under this Award shall constitute special compensation and shall not affect the level of benefits provided to or received by the Employee (or the Employee's estate or beneficiaries) as part of any employee benefit plan of the Corporation or an Affiliates. This Award shall not be construed to affect in any way the Employee's rights and obligations under any other plan maintained by the Corporation or an Affiliate on behalf of employees.

14. Discretionary Nature of Award . The grant of an Award is a one-time benefit and does not create any contractual or other right to receive a grant of Awards or benefits in lieu of Awards in the future. Future grants, if any, will be at the sole discretion of Kimberly-Clark, including, but not limited to, the timing of any grant, the number of Restricted Share Units and vesting provisions. The value of the Award is an extraordinary item of compensation outside the scope of the Employee's employment contract, if any. As such, the Award is not part of normal or expected compensation for purposes of calculating any severance, resignation, redundancy, end of service payments, bonuses, long-service awards, pension or retirement benefits or similar payments.

15. Data Privacy . The Employee hereby authorizes their employer to furnish Kimberly-Clark (and any agent of Kimberly-Clark administering the Plan or providing Plan recordkeeping services) with such information and data as it shall request in order to facilitate the grant of Awards and administration of the Plan and the Employee waives any data privacy rights such Employee might otherwise have with respect to such information.

16. Conflict with Plan . This Award is awarded pursuant to and subject to the Plan. This Agreement is intended to supplement and carry out the terms of the Plan. It is subject to all terms and provisions of the Plan and, in the event of a conflict, the Plan shall prevail.

17. Successors . This Award shall be binding upon and inure to the benefit of any successor or successors of the Corporation.

18. Amendments . The Committee may at any time alter or amend this Award to the extent (1) permitted by law, (2) permitted by the rules of any stock exchange on which the common stock or any other security of the Corporation is listed, and (3) permitted under applicable provisions of the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended (including rule 16b-3 thereof).

19. Defined Terms . Terms which are capitalized are defined herein or in the Plan and have the same meaning set forth in the Plan, unless the context indicates otherwise.

## KIMBERLY-CLARK CORPORATION
## OPTION AWARD
## _____AWARD AGREEMENT

This Award, granted this _____day of _____, by Kimberly-Clark Corporation, a Delaware corporation (hereinafter called the "Corporation"), subject to the terms and conditions of the 2001 Equity Participation Plan (the "Plan") and the Award Agreement.

### W I T N E S S E T H :

WHEREAS, the Corporation has adopted the 2001 Equity Participation Plan (the "Plan") to encourage those employees who materially contribute, by managerial, scientific or other innovative means, to the success of the Corporation or of an Affiliate, to acquire an ownership interest in the Corporation, thereby increasing their motivation for and interest in the Corporation's or the Affiliate's long-term success;

NOW, THEREFORE, it is agreed as follows:

1. <u>Number of Shares Optioned; Option Price</u> . The Corporation grants to the Employee the right and option to purchase in his own name, on the terms and conditions hereinafter set forth, all or any part of an aggregate of the number of shares of the $1.25 par value common stock of the Corporation, and at the purchase price per share, set forth in the Award Agreement. This option shall not be an incentive stock option within the meaning of Section 422 of the Internal Revenue Code of 1986, as amended (the "Code").

2. <u>Exercise of Option</u> .

   (a) <u>Limitations on Exercise</u> . This option shall be subject to forfeiture until the Employee becomes vested in such Awards according to the schedule set forth in the Award Agreement. This option shall not be exercisable until at least one year has expired after the granting of this option, during which time the Employee shall have been in the continuous employ of the Corporation or an Affiliate; provided, however, that the option shall become exercisable immediately in the event of a Qualified Termination of Employment of a Participant, without regard to the limitations set forth below in this subsection. Provided, however, that if the Employee's employment is terminated for any reason other than death, Retirement, or Total and Permanent Disability, this option shall only be exercisable for three months following such termination and only for the number of shares which were exercisable on the date of such termination. In no event, however, may this option be exercised more than ten (10) years after the date of its grant.

   The above provisions of Section 2(a) notwithstanding, to the extent provided by rules of the Committee referred to in the Plan (hereinafter referred to as the "Committee"), this option is not exercisable during any period during which the

Employee's right to make deposits to the Kimberly-Clark Corporation Salaried Employees Incentive Investment Plan is suspended pursuant to a provision of such plan or rules adopted thereunder to comply with regulations regarding hardship withdrawals promulgated by the Internal Revenue Service.

A leave of absence shall not be deemed to be a termination of employment. A termination of employment with the Corporation or an Affiliate to accept immediate reemployment with the Corporation or an Affiliate likewise shall not be deemed to be a termination of employment.

(b) Exercise after Death, Retirement, or Disability . If the Employee dies, Retires or becomes Totally and Permanently Disabled without having exercised this option in full, the remaining portion of this option, determined without regard to the limitations in subsection 2(a), may be exercised within the earlier of (i) three years from the date of death or Total and Permanent Disability or five years from the date of Retirement, as the case may be, or (ii) the remaining period of this option. In the case of an Employee who dies, this option may be exercised by the person or persons to whom the Employee's rights under this option shall pass by will or by applicable law or, if no such person has such rights, by his executor or administrator. "Retirement" means termination of employment on or after the date the Participant has attained age 55.

(c) Method of Exercise . This option shall be exercised by delivering to the Corporation, at the office of the Treasurer located at the World Headquarters, written notice of the number of shares with respect to which option rights are being exercised and by paying in full the option price of the shares at the time being acquired. Payment may be made in cash, a check payable to the Corporation, or in shares of the Corporation's common stock transferable to the Corporation and having a fair market value on the transfer date equal to the amount payable to the Corporation. The date of exercise shall be deemed to be the date the Corporation receives the written notice and payment for the shares being purchased. The Employee shall have none of the rights of a stockholder with respect to shares covered by such options until the Employee becomes record holder of such shares.

(d) Payment of Withholding Taxes . No shares of common stock may be purchased under this option, unless prior to or simultaneously with such purchase, (i) the Participant, (ii) in the event of his death, the person succeeding to his rights hereunder or, (iii) in the event of a transfer of an option under Section 8 hereof, either the Participant, the Immediate Family Members or the entity succeeding to his rights hereunder, shall pay to the Corporation such amount as the Corporation advises is required under applicable federal, state or local laws to withhold and pay over to governmental taxing authorities by reason of the purchase of such shares of common stock pursuant to this option. Other than a purchase of shares pursuant to an option which had previously been transferred under Section 8 hereof, payment of required withholding taxes may be made with shares of the Corporation's common stock which otherwise would be distributable upon exercise of the option, pursuant to the rules of the Committee.

Case MDL No. 875    Document 4723    Filed 02/21/06    Page 164 of 324

3. <u>Nontransferability</u>. Except as may otherwise be provided under Section 8 hereof, this option shall be transferable only by will or by the laws of descent and distribution, and during the Employee's lifetime shall be exercisable only by him.

4. <u>Compliance with Law</u>. No shares of common stock may be purchased under this option, unless prior to the purchase thereof, the Corporation shall have received an opinion of counsel to the effect that the issuance and sale of such shares by the Corporation to the Employee will not constitute a violation of the Securities Act of 1933, as amended. As a condition of exercise, the Employee shall, if requested by the Corporation, submit a written statement in form satisfactory to counsel for the Corporation, to the effect that any shares of common stock purchased upon exercise of this option will be purchased for investment and not with a view to the distribution thereof within the meaning of the Securities Act of 1933, as amended, and the Corporation shall have the right, in its discretion, to cause the certificates representing shares of common stock purchased hereunder to be appropriately legended to refer to such undertaking or to any legal restrictions imposed upon the transferability thereof by reason of such undertaking.

The option granted hereby is subject to the condition that if the listing, registration or qualification of the shares subject hereto on any securities exchange or under any state or federal law, or if the consent or approval of any regulatory body shall be necessary as a condition of, or in connection with, the granting of the option or the delivery or purchase of shares thereunder, such option may not be exercised in whole or in part unless and until such listing, registration, qualification, consent or approval shall have been effected or obtained. The Corporation agrees to use its best efforts to obtain any such requisite listing, registration, qualification, consent or approval.

5. <u>No Right of Continued Employment</u>. The granting of this option does not confer upon the Employee any legal right to be continued in the employ of the Corporation or its Affiliates, and the Corporation and its Affiliates reserve the right to discharge the Employee whenever the interest of the Corporation or its Affiliates may so require without liability to the Corporation or its Affiliates, the Board of Directors of the Corporation or its Affiliates, or the Committee, except as to any rights which may be expressly conferred on the Employee under this option.

6. <u>Discretion of the Corporation, Board of Directors and the Committee</u>. Any decision made or action taken by the Corporation or by the Board of Directors of the Corporation or by the Committee arising out of or in connection with the construction, administration, interpretation and effect of this option shall be within the absolute discretion of the Corporation, the Board of Directors of the Corporation or the Committee, as the case may be, and shall be conclusive and binding upon all persons.

7. <u>Modification of Awards</u>. The Committee may in its sole and absolute discretion, by written notice to the Employee, limit the period in which this option may be exercised to a period ending at least three months following the date of such notice, and/or limit or eliminate the number of shares subject to option after a period ending at least three months following the date of such notice.

8.    <u>Inalienability of Benefits and Interest</u>. This option and the rights and privileges conferred hereby shall not be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, and any such attempted action shall be void and no such benefit or interest shall be in any manner liable for or subject to debts, contracts, liabilities, engagements, or torts of the Employee. Notwithstanding any restriction on the transferability of the option otherwise contained herein, the Participant may, with the prior specific written consent of the Corporate Secretary, or his delegate, transfer for no payment or other consideration any such exercisable, unexpired, unexercised options to an Immediate Family Member, a trust for the benefit of Immediate Family Members or a partnership in which the partnership interests are owned by Immediate Family Members and the Participant. The Corporate Secretary or his delegate may condition his/her prior consent to receipt of an agreement by the grantee and any proposed transferee containing such terms and conditions and undertakings as would be deemed appropriate in his/her sole and absolute discretion (including without limitation an agreement by the transferee that the transferee will not exercise any options unless the shares to be issued upon such exercise are covered by an effective registration statement under the Securities Act of 1933 or such exercise is exempt from the registration requirement of such Act). No attempted transfer will be valid without the Corporate Secretary's or his delegate's written consent. Immediate Family Members of the grantee are parents, parents-in law, children (including adopted children), grandchildren, and siblings or a trust exclusively for the benefit of one or more of the foregoing. The spouse of the grantee is an Immediate Family Member but only if Options are transferred to a trust, partnership or other entity in which all of the other beneficiaries or owners of which include either (i) the Participant, (ii) other Immediate Family Member(s) and/or (iii) a trust, partnership or other entity in which all of the other beneficiaries or owners of which include either the Participant and/or other Immediate Family Member (s).

9.    <u>Delaware Law to Govern</u>. All questions pertaining to the construction, interpretation, regulation, validity and effect of the provisions of this option shall be determined in accordance with the laws of the State of Delaware.

10.   <u>Purchase of Common Stock</u>. The Corporation and its Affiliates may, but shall not be required to, purchase shares of common stock of the Corporation for purposes of satisfying the requirements of this option. The Corporation and its Affiliates shall have no obligation to retain and shall have the unlimited right to sell or otherwise deal with for their own account, any shares of common stock of the Corporation purchased for satisfying the requirements of this option.

11.   <u>Notices</u>. Any notice to be given to the Corporation under this option shall be addressed to the Corporation in care of its Treasurer located at the World Headquarters, and any notice to be given to the Employee under the terms of this option may be addressed to him at his address as it appears on the Corporation's records, or at such other address as either party may hereafter designate in writing to the other. Any such notice shall be deemed to have been duly given if and when enclosed in a properly sealed envelope or wrapper addressed as aforesaid, registered and deposited, postage and registry fee prepaid, in a post office or branch post office regularly maintained by the United States Government.

12. <u>Changes in Capitalization</u> . In the event there are any changes in the common stock or the capitalization of the Corporation through a corporate transaction, such as any merger, any acquisition through the issuance of capital stock of the Corporation, any consolidation, any separation of the Corporation (including a spin-off or other distribution of stock of the Corporation), any reorganization of the Corporation (whether or not such reorganization comes within the definition of such term in section 368 of the Code), or any partial or complete liquidation by the Corporation, recapitalization, stock dividend, stock split or other change in the corporate structure, appropriate adjustments and changes shall be made by the Committee in (a) the number of shares and the option price per share of stock subject to this option, and (b) such other provisions of this option as may be necessary and equitable to carry out the foregoing purposes, provided, however that no such adjustment or change may be made to the extent that such adjustment or change will result in the disallowance of a deduction to the Corporation under section 162(m) of the Code or any successor section.

13. <u>Effect on Other Plans</u> . All benefits under this option shall constitute special compensation and shall not affect the level of benefits provided to or received by the Employee (or the Employee's estate or beneficiaries) as part of any employee benefit plan of the Corporation or an Affiliates. This option shall not be construed to affect in any way the Employee's rights and obligations under any other plan maintained by the Corporation or an Affiliate on behalf of employees.

14. <u>Successors</u> . This option shall be binding upon and inure to the benefit of any successor or successors of the Corporation.

15. <u>Amendments</u> . The Committee may at any time alter or amend this option to the extent (1) permitted by law, (2) permitted by the rules of any stock exchange on which the common stock or any other security of the Corporation is listed, (3) permitted under applicable provisions of the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended (including rule 16b-3 thereof), and (4) that such action would not result in the disallowance of a deduction to the Corporation under section 162(m) of the Code or any successor section (including the rules and regulations promulgated thereunder). Notwithstanding anything to the contrary contained herein, the Committee may not take any action that would result in any amount payable under this option qualifying as "applicable employee remuneration" as so defined for purposes of section 162(m) of the Code.

16. <u>Defined Terms</u> . Terms which are capitalized are defined herein or in the Plan and have the same meaning set forth in the Plan, unless the context indicates otherwise.

Exhibit No. (10)o

### Outside Directors' Compensation

Each Outside Director of Kimberly-Clark Corporation will receive the following compensation for their services as a director, in accordance with the terms of the Corporation's Outside Directors' Compensation Plan (dated as of November 12, 2003) (the "Plan"). The compensation elements listed below supersede or are in lieu of all other cash or stock options currently set out under the Plan:

- A cash Retainer in the amount of $70,000, payable in quarterly installments in advance. No separate meeting fees will be payable for attending board and committee meetings.

- A grant of 2,000 Restricted Share Units. This grant will be made effective as of the first business day of the year. Directors joining the Board during the year will receive a pro-rata grant of Restricted Share Units upon the effective date of their election to the Board.

- The Chairman of each of the Audit, Compensation, and Nominating and Corporate Governance Committees will each receive an additional grant of 300 Restricted Share Units.

- The Lead Director will receive an additional grant of 500 Restricted Share Units.

- The Restricted Period for the Restricted Share Units shall commence on the date of grant and expire on the date each recipient retires from or otherwise terminates service on the Board. The Restricted Share Units may not be transferred during the Restricted Period.

Exhibit No. (12)

### KIMBERLY-CLARK CORPORATION AND SUBSIDIARIES
### Computation of Ratio of Earnings to Fixed Charges

Case MDL No. 875   Document 4723   Filed 02/21/06   Page 167 of 324

**(Dollar amounts in millions)**

| | | | Year Ended December 31 | | |
|---|---|---|---|---|---|
| | **2004** | **2003** | **2002** | **2001** | **2000** |
| **Consolidated Companies** | | | | | |
| Income from continuing operations before income taxes | $2,203.4 | $2,076.3 | $2,202.1 | $2,099.3 | $2,310.5 |
| Interest expense | 162.5 | 167.8 | 181.9 | 191.4 | 221.4 |
| Interest factor in rent expense | 65.3 | 62.6 | 55.5 | 53.3 | 48.5 |
| Amortization of capitalized interest | 13.2 | 12.4 | 11.7 | 10.4 | 9.3 |
| **Equity Affiliates** | | | | | |
| Share of 50%-owned: | | | | | |
| Income before income taxes | 2.3 | 2.7 | (2.2) | (.6) | 43.0 |
| Interest expense | — | 1.2 | 2.7 | 5.5 | 7.5 |
| Interest factor in rent expense | — | — | .1 | .8 | .9 |
| Amortization of capitalized interest | — | — | — | .2 | .5 |
| Distributed income of less than 50%-owned | 94.5 | 96.7 | 104.3 | 103.8 | 96.4 |
| **Earnings** | $2,541.2 | $2,419.7 | $2,556.1 | $2,464.1 | $2,738.0 |
| **Consolidated Companies** | | | | | |
| Interest expense | $ 162.5 | $ 167.8 | $ 181.9 | $ 191.4 | $ 221.4 |
| Capitalized interest | 6.5 | 12.5 | 11.0 | 19.6 | 20.9 |
| Interest factor in rent expense | 65.3 | 62.6 | 55.5 | 53.3 | 48.5 |
| **Equity Affiliates** | | | | | |
| Share of 50%-owned: | | | | | |
| Interest and capitalized interest | — | 2.6 | 2.7 | 5.5 | 7.5 |
| Interest factor in rent expense | — | — | .1 | .8 | .9 |
| **Fixed Charges** | $ 234.3 | $ 245.5 | $ 251.2 | $ 270.6 | $ 299.2 |
| Ratio of earnings to fixed charges | 10.85 | 9.86 | 10.18 | 9.11 | 9.15 |

Note: The Corporation is contingently liable as guarantor, or directly liable as the original obligor, for certain debt and lease obligations of S.D. Warren Company, which was sold in December 1994. The buyer provided the Corporation with a letter of credit from a major financial institution guaranteeing repayment of these obligations. No losses are expected from these arrangements and they have not been included in the computation of earnings to fixed charges.

Exhibit No. (21)

KIMBERLY-CLARK CORPORATION
CONSOLIDATED SUBSIDIARIES

The following list includes certain companies that were owned directly or indirectly by Kimberly-Clark Corporation, a Delaware corporation, Dallas, Texas, as of December 31, 2004.

This list includes all subsidiaries. The place of incorporation or organization is next to the name of the company.

*Consolidated Subsidiaries*

1194127 Ontario Inc., Ontario Canada
*Abdelia Comercial Ltda., Brazil
*Arabian Medical Products Manufacturing Company, Saudi Arabia
Avent, Inc., Delaware
Avent de Honduras, S.A. de C.V., Honduras
Avent, S.A. de C.V., Mexico
Avent Slovakia, Inc., Delaware
Avent Slovakia s.r.o., Slovakia
*Bacraft S.A. Industria de Papel, Brazil

Case MDL No. 875   Document 4723   Filed 02/21/06   Page 168 of 324

Ballard Medical Products, Utah
Ballard Medical Products (Canada) Inc., Ontario, Canada
Balmoral Participacoes Ltda., Brazil
Beco, Inc., Wisconsin
*Colombiana Kimberly Colpapel S.A., Colombia
Delaware Overseas Finance, Inc., Delaware
Durafab, Inc., Texas
Elfi Papier GmbH, Germany
Excell Paper Sales Co., Pennsylvania
Excell Paper Sales LLC, Delaware
*Fisbra Industria e Comecio de Produtos Higienicos Ltda., Brazil
*Gerinconfort Industria e Comercio de Productus Higienicos Ltd., Brazil
*H-K Overseas Holland B.V., Netherlands
Hakle Kimberly Deutschland GmbH, Germany
Hakle Kimberly Papiervertriebs GmbH, Austria
Hakle-Kimberly Switzerland GmbH, Switzerland
Hercules Global Investments, Cayman Islands
Historic Hospitality Investments LLC, Texas
*Hogla Kimberly Limited, Israel
*Hogla Kimberly Marketing Limited, Israel
Hopewell International Insurance Ltd. (Inactive), Bermuda
Housing Horizons, LLC, Texas
Industrial Helvetia S.A., Chile
Industrial Mimosa S.A., Uruguay

K-C Advertising, Inc., Delaware
K-C Equipment Finance L.P., United Kingdom
K-C Financial Services Investment Company, Delaware
K-C Guernsey I Ltd., Isle of Guernsey
K-C Guernsey II Ltd., Isle of Guernsey
K-C Handelsgesellschaft MbH, Austria
K-C Holder Spain S.L., Spain
K-C Nevada, Inc., Nevada
K-C Worldwide, LLC, Delaware
Kalayaan Land Corporation, Philippines
KC Tower Corporation, Delaware
KCA Nominees, Pty. Ltd., Australia
*KCA Retirement Fund Pty. Limited, Australia
KCC Comercial Ltda., Sao Paulo, Brazil
KCK Tissue, Argentina
*K.C.S.A. Holdings (Proprietary) Limited, South Africa
*Kimberly Bolivia S.A., Bolivia
Kimberly-Clark (Barbados) Holding Ltd., Barbados
Kimberly-Clark (China) Investment Co., Ltd., People's Republic of China
Kimberly-Clark (Hong Kong) Ltd., Hong Kong
Kimberly-Clark Argentina S.A., Argentina
Kimberly-Clark Argentina Holdings S.A., Argentina
Kimberly-Clark Asia Holdings Pte. Ltd., Singapore
Kimberly-Clark Asia Pacific Pte. Ltd., Singapore
Kimberly-Clark Australia Consolidated Holdings Pty. Limited, Australia
Kimberly-Clark Australia Holdings Pty. Limited, Australia
*Kimberly-Clark Australia Pty. Limited, Australia
Kimberly-Clark B.V., Netherlands
Kimberly-Clark Bahrain Holdings S.P., Bahrain
Kimberly-Clark Brasil Holdings Limitada, Brazil
Kimberly-Clark Brasil Industria e Comercio de Produtos de Hygiene Ltda., Brazil
Kimberly-Clark Canada Holdings, Inc., Ontario, Canada
Kimberly-Clark Canada Hungarian Holdings Co., Ontario
Kimberly-Clark Canada Inc., Ontario, Canada
Kimberly-Clark Canada Inc. Kanadischen Rechts & Company KG, Germany
Kimberly-Clark Canada Services Corporation, Ontario, Canada
Kimberly-Clark Cayman Islands Company, Cayman Islands
Kimberly-Clark Cayman Islands Finance Company, Cayman Islands
Kimberly-Clark Cayman Islands Holding Company, Cayman Islands
Kimberly-Clark (Cyprus) Ltd., Cyprus
Kimberly-Clark CBG (Handan) Hygienic Products Co., Ltd., People's Republic of China
Kimberly-Clark CBG Hygienic Products Company Limited, Chengdu, People's Republic of China
*Kimberly-Clark Central American Holdings, S.A., Panama
Kimberly-Clark Chengdu Hygienic Products Services Company Ltd., People's Republic of China
*Kimberly-Clark Chile S.A., Chile

Kimberly-Clark Colombia Limitada, Colombia
*Kimberly-Clark de Centro America, S.A., El Salvador
Kimberly-Clark Denmark Holdings ApS, Denmark
Kimberly-Clark do Brasil Limitada, Brazil
Kimberly-Clark Dominican Republic S.A., Dominican Republic
*Kimberly-Clark Dominicana, S.A., Dominican Republic
Kimberly-Clark Dublin Finance Ltd., United Kingdom
*Kimberly-Clark Ecuador, S.A., Ecuador
Kimberly-Clark Europe Limited, United Kingdom
Kimberly-Clark European Investment B.V., Netherlands
Kimberly-Clark European Services Limited, United Kingdom
Kimberly-Clark Far East Pte. Limited, Singapore
Kimberly-Clark Finance Ltd., United Kingdom
Kimberly-Clark Financial Services, Inc., Tennessee
Kimberly-Clark Foreign Sales Corporation B.V., Netherlands
Kimberly-Clark Forestal S.A., Spain
Kimberly-Clark Foundation, Inc., Wisconsin
Kimberly-Clark France Operations, France
Kimberly-Clark France Ventures, France
Kimberly-Clark Global Finance Ltd., Bermuda
Kimberly-Clark Global Partnership, L.P., Texas
Kimberly-Clark Global Sales, Inc., Delaware
*Kimberly-Clark Guatemala S.A., Guatemala
Kimberly-Clark Hellas EPE, Greece
Kimberly-Clark Holding Kft., Hungary
Kimberly-Clark Holding Limited, United Kingdom
Kimberly-Clark Holland Holdings B.V., Netherlands
Kimberly-Clark Hygiene Products Private Ltd., India
Kimberly-Clark Inc., Ontario, Canada
Kimberly-Clark Integrated Services Corporation, Delaware
Kimberly-Clark International Services Corporation, Delaware
Kimberly-Clark International, S.A., Panama
Kimberly-Clark Investment Corporation, Panama
Kimberly-Clark Irish Finance Corporation Ltd., United Kingdom
*Kimberly-Clark Kenko Industria e Comercio Ltda., Sao Paulo, Brazil
Kimberly-Clark Latin America, Inc., Delaware
Kimberly-Clark Latin America Investments, Inc., Delaware
Kimberly-Clark Lda., Portugal
Kimberly-Clark Limited, United Kingdom
Kimberly-Clark Luxembourg S.a.r.l., Luxembourg
Kimberly-Clark Luxembourg Holdings S.a.r.l., Luxembourg
*Kimberly-Clark Malta Holding Co. Ltd., Malta
*Kimberly-Clark Malta Investment Company Limited, Malta
Kimberly-Clark Manufacturing (Thailand) Limited, Thailand
Kimberly-Clark Mediterranean Finance Company Ltd., Malta

Kimberly-Clark N.V., Belgium
Kimberly-Clark Netherlands Holdings B.V., Netherlands
Kimberly-Clark North Asia Co., Ltd, South Korea
Kimberly-Clark 000, Russia
Kimberly-Clark Pacific Finance Company, Cayman Islands
Kimberly-Clark Pacific Holdings Pty Limited, Australia
Kimberly-Clark Paper (Guangzhou) Company Limited, People's Republic of China
Kimberly-Clark Paper (Shanghai) Company Limited, People's Republic of China
Kimberly-Clark Paraguay S.A., Paraguay
Kimberly-Clark Patriot Holdings, Inc., Cayman Islands
Kimberly-Clark Pension Trusts Ltd., United Kingdom
Kimberly-Clark Pennsylvania, LLC, Delaware
Kimberly-Clark Personal Hygienic Products (Nanjing) Co. Ltd., People's Republic of China
Kimberly-Clark Personal Hygienic Products Company Limited, Beijing, People's Republic of China
*Kimberly-Clark Peru S.R.L., Peru
Kimberly-Clark PHC International, Inc., Delaware
*Kimberly-Clark Philippines Inc., Philippines
Kimberly-Clark Philippine Holdings, Inc., Philippines
Kimberly-Clark Poland Holdings Sp. z.o.o., Poland
Kimberly-Clark Products (Malaysia) Sdn. Bdh., Malaysia
Kimberly-Clark Produtos Para Saude Limitada, Brazil
Kimberly-Clark Puerto Rico, Inc., Delaware
Kimberly-Clark Pulp, Inc., Delaware
Kimberly-Clark S.A., Poland
Kimberly-Clark S.L., Spain
Kimberly-Clark S.N.C., France
Kimberly-Clark S.p.A., Italy
Kimberly-Clark s.r.l., Italy
Kimberly-Clark s.r.o., Czech Republic
Kimberly-Clark SUD, S.p.A., Italy
Kimberly-Clark Sales Corporation B.V., Netherlands
Kimberly-Clark Scandinavia ApS, Denmark
Kimberly-Clark Services Asia-Pacific, Australia
Kimberly-Clark Singapore Pte. Ltd., Singapore
Kimberly-Clark Singapore Finance Pte. Ltd., Singapore
*Kimberly-Clark of South Africa (Pty.) Limited, South Africa
*Kimberly-Clark Southern Africa (Holdings) (Pty) Ltd., South Africa
Kimberly-Clark Taiwan, Cayman Islands
Kimberly-Clark Thailand Limited, Thailand
Kimberly-Clark Tissue do Brasil Limitada, Brazil
Kimberly-Clark Trading Limited Liability Company, Hungary
Kimberly-Clark Trading (Malaysia) Sdn. Bdh., Malaysia
Kimberly-Clark Treasury Asia-Pacific, Australia
Kimberly-Clark U.K. Operations Limited, United Kingdom
Kimberly-Clark Ukraine LLC, Ukraine

*Kimberly-Clark Venezuela, C.A., Venezuela
Kimberly-Clark Ventures, LLC, Delaware
Kimberly-Clark Vietnam Co., Ltd., Vietnam
Kimberly-Clark West Indies Finance Company, Cayman Islands
Kimberly-Clark Worldwide Australia Holdings Pty. Limited, Australia
Kimberly-Clark Worldwide Taiwan Investment Ltd., Taiwan, Republic of China
Kimberly-Clark Worldwide, Inc., Delaware
Kimberly-Clark Zimbabwe (Private) Limited, South Africa
*KIMNICA, S.A., Nicaragua
*KS&J Industria e Comecio Ltda., Brazil
La Ada de Acuna, S.A. de C.V., Mexico
La Compania Que Innova, S.A. de C.V., Mexico
*Manlak Investments (Pty.) Limited, South Africa
*Marsbaum Participacoes Ltda., Brazil
MFS Holdings, LLC, Delaware
Mimo Brasil Limitada, Brazil
Mimo Uruguay S.A., Uruguay
Minnetonka Limitada, Brazil
Minnetonka Overseas Investments Limited, Cayman Islands
*Molett Marketing Limited, Israel
Mountain Tree Farm Company, Washington
Nueva Arizona, S.A., Argentina
*Ovisan Syhhi Bez Sanay Ve Ticaret a.s., Turkey
*Papeles Absorbentes, S.A., Guatemala
*Papeles del Cauca S.A., Colombia
PLS Holdings, LLC, Delaware
Portola S.L., Spain
P.T. Kimberly-Lever Indonesia, Indonesia
*Rakefet Marketing & Trading Services Ltd., Israel
Ridgeway Insurance Company Limited, Bermuda
Safeskin (B.V.I.) Limited, British Virgin Islands
Safeskin Corporation (Malaysia) Sdn. Bhd., Malaysia
Safeskin Corporation (Thailand) Limited, Thailand
Safeskin Industries (Thailand) Limited, Thailand
Safeskin Latex (Thailand) Limited, Thailand
Safeskin Medical & Scientific (Thailand) Limited, Thailand
Scott CB Holding Company, Delaware
Scott S.A., France
Scott Executive Pension Trustees Limited, United Kingdom
Scott Paper Company, Delaware
*Scott Paper Co. de Costa Rica S.A., Costa Rica
*Scott Paper Co. Honduras S.A. de C.V., Honduras
Scott Paper Eastern China Inc., Delaware
Scott Trading Ltd., Thailand
Servicios Papeleros Centroamericanos, S.A., El Salvador

*Shikma Improvement of Individual Life Limited, Israel
S-K Corporation, Taiwan
Syzygy, Inc., Delaware
Taiwan Scott Paper Corporation, Taiwan
Tawneydown-ALFA GmbH (Inactive), Germany
TELA-Kimberly Deutschland GmbH, Germany
TELA-Kimberly Switzerland GmbH, Switzerland
Three Rivers Timber Company, Washington
Tiscorp, L.P., United Kingdom
*YuHan-Kimberly, Limited, Korea

* Indicates a company that is not wholly owned directly or indirectly by the Corporation.

Exhibit No. (23)

## CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We consent to the incorporation by reference in Kimberly-Clark Corporation's Registration Statements on Form S-8 (Nos. 33-49050, 33-58402, 33-64063, 33-64689, 333-02607, 333-06996, 333-17367, 333-38385, 333-43647, 333-71661, 333-85099, 333-94139, 333-51922, 333-61010, 333-62358, 333-89314, and 333-104099) and No. 333-105990 on Form S-3 of our reports dated February 22, 2005 relating to the financial statements and financial statement schedule of Kimberly-Clark Corporation (which report expresses an unqualified opinion and includes an explanatory paragraph regarding a change in the Corporation's method of accounting for customer coupons) and management's report of the effectiveness of internal control over financial reporting appearing in this Annual Report on Form 10-K of Kimberly-Clark Corporation for the year ended December 31, 2004.


/s/ Deloitte & Touche
    LLP
Deloitte & Touche LLP
Dallas, Texas
February 24, 2005

Exhibit No. (24)

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that the undersigned does hereby constitute and appoint Mark A. Buthman, Randy J. Vest and Ronald D. Mc Cray, and each of them, with full power to act alone, his true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign Kimberly-Clark Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2004, and to file the same with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents or any one of them, or his substitute or their substitutes, lawfully do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 23rd day of February, 2005.


/s/ Dennis R. Beresford
Dennis R. Beresford

### POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that the undersigned does hereby constitute and appoint Mark A. Buthman, Randy J. Vest and Ronald D. Mc Cray, and each of them, with full power to act alone, his true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign Kimberly-Clark Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2004, and to file the same with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents or any one of them, or his substitute or their substitutes, lawfully do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 23rd day of February, 2005.

/s/ John F. Bergstrom
John F. Bergstrom

Case MDL No. 875  Document 4723  Filed 02/21/06  Page 175 of 324

POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that the undersigned does hereby constitute and appoint Mark A. Buthman, Randy J. Vest and Ronald D. Mc Cray, and each of them, with full power to act alone, her true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution, for her and in her name, place and stead, in any and all capacities, to sign Kimberly-Clark Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2004, and to file the same with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done, as fully to all intents and purposes as she might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents or any one of them, or his substitute or their substitutes, lawfully do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 23rd day of February, 2005.

/s/ Pastora San Juan Cafferty
Pastora San Juan Cafferty

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that the undersigned does hereby constitute and appoint Mark A. Buthman, Randy J. Vest and Ronald D. Mc Cray, and each of them, with full power to act alone, his true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign Kimberly-Clark Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2004, and to file the same with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents or any one of them, or his substitute or their substitutes, lawfully do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 23rd day of February, 2005.

/s/ Robert W. Decherd
Robert W. Decherd

Case MDL No. 875   Document 4723   Filed 02/21/06   Page 177 of 324

POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that the undersigned does hereby constitute and appoint Mark A. Buthman, Randy J. Vest and Ronald D. Mc Cray, and each of them, with full power to act alone, his true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign Kimberly-Clark Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2004, and to file the same with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents or any one of them, or his substitute or their substitutes, lawfully do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 23rd day of February, 2005.

/s/ Thomas J. Falk
Thomas J. Falk

Case MDL No. 875 Document 4723 Filed 02/21/06 Page 178 of 324

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that the undersigned does hereby constitute and appoint Mark A. Buthman, Randy J. Vest and Ronald D. Mc Cray, and each of them, with full power to act alone, his true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign Kimberly-Clark Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2004, and to file the same with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents or any one of them, or his substitute or their substitutes, lawfully do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 23rd day of February, 2005.

/s/ Claudio X. Gonzalez
Claudio X. Gonzalez

Case MDL No. 875 Document 4723 Filed 02/21/06 Page 179 of 324

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that the undersigned does hereby constitute and appoint Mark A. Buthman, Randy J. Vest and Ronald D. Mc Cray, and each of them, with full power to act alone, her true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution, for her and in her name, place and stead, in any and all capacities, to sign Kimberly-Clark Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2004, and to file the same with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done, as fully to all intents and purposes as she might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents or any one of them, or his substitute or their substitutes, lawfully do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 23rd day of February, 2005.

/s/ Mae C. Jemison
Mae C. Jemison

Case MDL No. 875   Document 4723   Filed 02/21/06   Page 180 of 324

### POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that the undersigned does hereby constitute and appoint Mark A. Buthman, Randy J. Vest and Ronald D. McCray, and each of them, with full power to act alone, her true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution, for her and in her name, place and stead, in any and all capacities, to sign Kimberly-Clark Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2004, and to file the same with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done, as fully to all intents and purposes as she might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents or any one of them, or his substitute or their substitutes, lawfully do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 23rd day of February, 2005.

/s/ Linda Johnson Rice
Linda Johnson Rice

### POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that the undersigned does hereby constitute and appoint Mark A. Buthman, Randy J. Vest and Ronald D. Mc Cray, and each of them, with full power to act alone, his true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign Kimberly-Clark Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2004, and to file the same with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents or any one of them, or his substitute or their substitutes, lawfully do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 23rd day of February, 2005.

/s/ Marc J. Shapiro
Marc J. Shapiro

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that the undersigned does hereby constitute and appoint Mark A. Buthman, Randy J. Vest and Ronald D. Mc Cray, and each of them, with full power to act alone, his true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign Kimberly-Clark Corporation's Annual Report on Form 10-K for the fiscal year ended December 31, 2004, and to file the same with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents or any one of them, or his substitute or their substitutes, lawfully do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 23rd day of February, 2005.

/s/ G. Craig Sullivan
G. Craig Sullivan

**Exhibit (31)a**

## CERTIFICATIONS

I, Thomas J. Falk, Chief Executive Officer of Kimberly-Clark Corporation, certify that:

1. I have reviewed this annual report on Form 10-K of Kimberly-Clark Corporation (the "registrant");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

February 22, 2005

/s/ T HOMAS J. F ALK
Thomas J. Falk
Chief Executive Officer

Exhibit (31)b

## CERTIFICATIONS

I, Mark A. Buthman, Chief Financial Officer of Kimberly-Clark Corporation, certify that:

1.  I have reviewed this annual report on Form 10-K of Kimberly-Clark Corporation (the "registrant");

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

February 22, 2005

/s/ M ARK A. B UTHMAN
Mark A. Buthman
Chief Financial Officer

Exhibit (32)a

**Certification of Chief Executive Officer**

**Pursuant to Section 1350 of Chapter 63 of Title 18 of the United States Code**

I, Thomas J. Falk, Chief Executive Officer of Kimberly-Clark Corporation, certify that, to my knowledge:

(1)   the Form 10-K, filed with the Securities and Exchange Commission on February 24, 2005 ("accompanied report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)   the information contained in the accompanied report fairly presents, in all material respects, the financial condition and results of operations of Kimberly-Clark Corporation.

/s/ THOMAS J. FALK
Thomas J. Falk
Chief Executive Officer
February 22, 2005

Exhibit (32)b

**Certification of Chief Financial Officer**

**Pursuant to Section 1350 of Chapter 63 of Title 18 of the United States Code**

I, Mark A. Buthman, Chief Financial Officer of Kimberly-Clark Corporation, certify that, to my knowledge:

(1)   the Form 10-K, filed with the Securities and Exchange Commission on February 24, 2005 ("accompanied report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)   the information contained in the accompanied report fairly presents, in all material respects, the financial condition and results of operations of Kimberly-Clark Corporation.

/s/ MARK A. BUTHMAN
Mark A. Buthman
Chief Financial Officer
February 22, 2005

**End of Filing**

Powered By EDGAR Online

© 2005 | EDGAR Online, Inc.

# EXHIBIT

# "B"

FILED-CLERK
U.S. DISTRICT COURT
02 NOV - 4 PM 1: 37
TEXAS-EASTERN
BY _____

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

DEWAYNE EDDINGTON, INDIVIDUALLY §
AND AS NEXT FRIEND OF DEVVYN §
EDDINGTON, AND AS REPRESENTATIVE §
OF THE ESTATE OF JAJAH EDDINGTON, §
DECEASED §
§          CIVIL ACTION NO. 2-02CV - 240 DF
§
VS. §          JUDGE FOLSOM
§
KIMBERLY-CLARK CORPORATION §
§
§
§

## DEFENDANT KIMBERLY-CLARK CORPORATION'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION AND SUPPORTING BRIEF

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, Defendant Kimberly-Clark Corporation (hereinafter, "Defendant") moves this Court to dismiss this action for lack of subject matter jurisdiction and would show the Court as follows:

1.      This action should be dismissed because the Court lacks subject matter jurisdiction over this controversy. Plaintiffs have alleged jurisdiction based on diversity pursuant to 28 U.S.C. § 1332. To exercise such jurisdiction, however, the matter in controversy (a) must exceed $75,000, exclusive of interest and costs, and (b) must be between the citizens of different states. 28 U.S.C. § 1332. Neither of these prerequisites are satisfied.

2.      Both Plaintiff Dewayne Eddington and Defendant Kimberly-Clark Corporation are citizens of the State of Texas. In their Complaint, Plaintiffs acknowledge that Dewayne Eddington "is a citizen of the State of Texas."[1] Pursuant to 28 U.S.C. § 1332, Defendant is also a Texas citizen. 28 U.S.C. § 1332 recognizes a corporation "shall be deemed to be a citizen of any State . . . where it has its principal place of business." 28 U.S.C. § 1332(c)(1). Defendant's

---

[1] See Plaintiffs' Original Complaint at 1.
DEFENDANT'S MOTION TO DISMISS FOR LACK OF SUBJECT
MATTER JURISDICTION AND SUPPORTING BRIEF


PLAINTIFF'S
EXHIBIT
B

PAGE 1



principal place of business is in Dallas, Texas. *See* Affidavit of John William Wesley at ¶ 3, attached hereto as Exhibit A. Because Plaintiff Dewayne Eddington and Defendant are both citizens of Texas, there is no diversity of citizenship, and therefore no subject matter jurisdiction under 28 U.S.C. § 1332.

3.   Furthermore, the $75,000 amount in controversy threshold requirement for diversity jurisdiction is not satisfied in this case. Plaintiffs have not alleged that the amount in controversy in this matter exceeds $75,000, exclusive of interest and costs as required under 28 U.S.C. § 1332.

4.   Moreover, the Court lacks subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims do not "arise under the Constitution, laws, or treaties of the United States."[2]  Rather, Plaintiffs' claims arise exclusively under state law.

5.   Because the Court lacks subject matter jurisdiction over this matter, this action should be dismissed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

FOR THESE REASONS, Defendant Kimberly-Clark Corporation requests that the Court dismiss this action for lack of subject matter jurisdiction and that Defendant be awarded such other and further relief to which it may be justly entitled.

---

[2] 28 U.S.C. 1331

Respectfully submitted,

*w permission*
*CSS*

C. Michael Moore, Attorney-in-charge
  Texas State Bar No. 14323600
  cmoore@lockeliddell.com
Jennifer G. Jackson
  Texas State Bar No. 10474900
  JJackson@lockeliddell.com
C. Scott Jones
  Texas State Bar No. 24012922
  sjones@lockeliddell.com
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201
(214) 740-8000 (Telephone)
(214) 740-8800 (Facsimile)

Of Counsel:

LOCKE LIDDELL & SAPP LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201
(214) 740-8000 (Telephone)
(214) 740-8800 (Facsimile)

**ATTORNEYS FOR DEFENDANT
KIMBERLY-CLARK CORPORATION**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on counsel below by certified mail, return receipt requested, on this the 4th day of November, 2002:

Mark P. McMahon
Erskine & McMahon, L.L.P.
P.O. Box 3485
Longview, Texas 75606

C. Scott Jones

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| DEWAYNE EDDINGTON, INDIVIDUALLY AND AS NEXT FRIEND OF DEVVYN EDDINGTON, AND AS REPRESENTATIVE OF THE ESTATE OF JAJAH EDDINGTON, DECEASED | § § § § § § | |
| VS. | § § | CIVIL ACTION NO. 2-02CV - 240 DF |
| KIMBERLY-CLARK CORPORATION | § § § § | |

## AFFIDAVIT OF JOHN WILLIAM WESLEY

STATE OF TEXAS          §
COUNTY OF DALLAS     §

BEFORE ME, the undersigned authority, on this day personally appeared John William Wesley, and having been duly sworn by me, deposed and made the following affidavit.

1.     My name is John William Wesley.  I am over 21 years of age, of sound mind, and fully capable of making this affidavit.  All of the facts set forth herein are based on my own personal knowledge gained from my employment at Kimberly-Clark Corporation.  I am able to swear, and I do hereby swear that such facts are true and correct.

2.     I am employed by Kimberly-Clark Corporation in the capacity of Chief Counsel – Mergers and Acquisition.   I have been employed by Kimberly-Clark Corporation for approximately 2 and ½ years.

3.     Kimberly-Clark Corporation was incorporated in and exists under the laws of State of Delaware.  Kimberly-Clark Corporation has its principal place of business in the City of Irving, Dallas County, Texas.

EXECUTED this 1st day of November, 2002.



John William Wesley,
Chief Counsel – Mergers and Acquisitions
of Kimberly-Clark Corporation

SUBSCRIBED AND SWORN to before me on November 1, 2002, to certify witness my hand and official seal.

_____
Notary Public, in and for State of Texas

_____
Printed Name of Notary

My Commission Expires:

DENISE L. BUNCH
Notary Public, State of Texas
My Commission Expires 09-06-04

_____

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

DEWAYNE EDDINGTON, INDIVIDUALLY § 
AND AS NEXT FRIEND OF DEVVYN § 
EDDINGTON, AND AS REPRESENTATIVE § 
OF THE ESTATE OF JAJAH EDDINGTON, § 
DECEASED §     CIVIL ACTION NO. 2-02CV - 240 DF
§
§
VS. §     JUDGE FOLSOM
§
KIMBERLY-CLARK CORPORATION §
§
§
§

## ORDER GRANTING DEFENDANT KIMBERLY-CLARK CORPORATION'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

Having considered Defendant Kimberly-Clark Corporation's Motion to Dismiss for Lack of Subject Matter Jurisdiction and Supporting Brief ("Motion to Dismiss"), the Court finds the Motion well taken and grants the Motion and orders as follows:

**IT IS ORDERED, ADJUDGED, AND DECREED** that Defendant Kimberly-Clark Corporation's Motion to Dismiss is **GRANTED**.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that all of Plaintiffs' claims in the above-entitled and numbered case against Defendant Kimberly-Clark Corporation are dismissed with prejudice.

SIGNED this _____ day of _____, 2002.

_____
UNITED STATES DISTRICT JUDGE

**PAGE 1**

**ORDER**

# EXHIBIT

# "C"

EOD DEC 4 '02

FILED-CLERK
U.S. DISTRICT COURT

02 DEC 4 AM 10: 48

TEXAS EASTERN

BY_____

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

EDDINGTON                    §
                             §
v.                           §          2:02-cv-240  — DF
                             §
KIMBERLY-CLARK CORPORATION.  §

## ORDER

Having considered Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction (Dkt. No. 3), the Court finds the Motion well taken and concludes that is should be GRANTED. Notably, plaintiff has not responded to Defendant's motion and its attached affidavit, which established facts that demonstrate that the parties lack complete diversity. It is therefore

ORDERED that Defendant's Motion to Dismiss (Dkt. No. 3) is GRANTED. Furthermore, it is

ORDERED that all of Plaintiffs' claims are DISMISSED WITHOUT PREJUDICE to filing in a proper court. *See* FED. R. CIV. P. 41(b).

Signed this 2nd day of December, 2002.

_____
DAVID FOLSOM
UNITED STATES DISTRICT JUDGE

PLAINTIFF'S
EXHIBIT
C

PAGE 1

# EXHIBIT

# "D"

713.523.5400
Houston

**CSR**
**INCORPORATED**
CHARLOTTE**SMITH**REPORTING

409.839.4407
Beaumont

NO. B-150,896

| | | |
|---|---|---|
| INEZ MARTIN, ET AL | ) | IN THE DISTRICT COURT OF |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| VS. | ) | JEFFERSON COUNTY, TEXAS |
| | ) | |
| ACandS, INC., ET AL | ) | |
| | ) | |
| Defendants. | ) | 60TH JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**ORAL AND VIDEOTAPED DEPOSITION OF**

**S. B. PINKERTON**

**April 16, 2004**

**Volume 1 of 1**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION of S. B. PINKERTON, produced

as a witness at the instance of the Plaintiffs, and duly sworn, was

taken in the above-styled and numbered cause on April 16, 2004,

from 9:10 a.m. to 11:32 a.m., before Starla Foust, CSR, in and for

the State of Texas, reported by machine shorthand at the offices of

Adams & Coffey, 550 Fannin, Suite 800, Beaumont, Texas, pursuant to

the Texas Rules of Civil Procedure and the provisions stated on the

record or attached hereto.



PLAINTIFF'S
EXHIBIT
D



# A P P E A R A N C E S

FOR THE PLAINTIFFS:
    MR. GLEN MORGAN
    MR. DAVID FERRELL
    MR. CHRIS PORTNER
    Reaud, Morgan & Quinn
    801 Laurel Street
    Beaumont, Texas 77701

FOR THE DEFENDANT:  Kimberly-Clark Corporation
    MR. KENT ADAMS
    Adams & Coffey
    550 Fannin, Suite 800
    Beaumont, Texas 77701

FOR THE DEFENDANT:  Kimberly-Clark Corporation
    MR. LANE YOUNG
    Hawkins Parnell & Thackston
    303 Peachtree Street, NE, Suite 4000
    Atlanta, Georgia 30308

FOR THE DEFENDANT:  Kimberly-Clark Corporation
    MS. SARAH TURNIPSEED
    Nelson Mullins
    999 Peachtree Street, Suite 1400
    Atlanta, Georgia 30309

FOR THE DEFENDANTS:  Lincoln Electric, Hobart Brothers
Company, The BOC Group, and Cooper Industries
    MS. DONNA POLIDORO
    Strong Pipkin Bissell & Ledyard
    1111 Bagby, Suite 2300
    Houston, Texas 77002

VIDEOGRAPHER:
    Mr. Ryan Lewis
    Complete Litigation Support
    185 North 11th Street
    Beaumont, Texas 77702

3

# I N D E X

Appearances.................................... Page 2

Stipulations stated in text.................... Page 4

S. B. PINKERTON

    Examination by MR. GLEN MORGAN............ Page 4

    Examination by MR. KENT ADAMS............. Page 66

    Re-Examination by MR. GLEN MORGAN......... Page 72

    Re-Examination by MR. KENT ADAMS.......... Page 77

Signature and Changes......................... Page 82

Reporter's Certificate........................ Page 79

**P R O C E E D I N G S**

THE REPORTER:  Please state the stipulations.

MR. MORGAN:  Pursuant to the Texas Rules.

THE REPORTER:  Will the witness read and sign his deposition?

MR. ADAMS:  Yes.  You can send it to me.

THE VIDEOGRAPHER:  We are on the record at 9:10.

**S. B. PINKERTON,**

having been first duly sworn, testified as follows:

**EXAMINATION**

**BY MR. MORGAN:**

Q.    Could you please state your full name for the record?

A.    Sanford Brown Pinkerton.

Q.    Mr. Pinkerton, what is your address?

A.    1415 Springhill -- one word -- Road, Sylacauga -- that's S-y-l-a-c-a-u-g-a, Alabama, 35150.

Q.    How old of a man are you?

A.    78.9.  I'll be 79 on May 29.

Q.    Are you a married man?

A.    Yes.

Q.    Children?

A.    One surviving child.

Q.    What about your educational background after high

09:11 AM 1 school?

2  A. I graduated from Georgia Tech in Naval Science and

3 Tactics in 1946 and in Chemical Engineering in 1948.

4  Q. What did you do after 1948 from a work standpoint?

09:11 AM 5  A. I, after a brief honeymoon, went to work with

6 Kimberly-Clark immediately on June 29, 1948.

7  Q. And how long did you work for Kimberly-Clark?

8  A. Almost 40 years.

9  Q. What positions did you hold while you were at

09:12 AM 10 Kimberly-Clark during those almost 40 years?

11  A. It's rather -- 40 years covers a lot of jobs.  I

12 first was called -- hired for our Alabama Papermill to be

13 built, which did not then exist, as a service engineer in the

14 marketing and sales section.  And over the years there I was

09:12 AM 15 sales coordinator, marketing administrator, district sales

16 manager.

17    Then after a -- from 1956 to '59, I was

18 transferred to our -- Nino, Wisconsin, in the technical

19 department -- technical sales division of Kimberly-Clark,

09:13 AM 20 returning to Alabama in September of 1959 back into the

21 marketing end, and ultimately then moved -- ended up being

22 general sales manager, vice-president of sales.  And on May 1

23 of 1981, I was named president of the operation.

24  Q. President of what operation?

09:13 AM 25  A. Of the U.S. Newsprint and Forest Products Division

of Kimberly-Clark.

Q.    If you were president of the U.S. Newsprint Forest Products Division of Kimberly-Clark, that made you one of the presidents of how many divisions?

A.    There were several.  I really don't recall, maybe six or eight.

Q.    And when you became president of this division in 1981, where were you geographically located?

A.    In Alabama there at the Coosa Pines mill.

Q.    And how long did you remain at the Coosa Pines mill?

A.    To retirement.  I became -- on May 1 of 1987, I became a senior executive consultant for a period of one year; and on May 1 of 1988 became fully retired.

Q.    Throughout your tenure with Kimberly-Clark, were you ever stationed at the Coosa Pines mill before May of '81?

A.    Oh, yes.  That's where I spent most of my time was at the Coosa Pines mill.

Q.    Okay.  So, when you were --

A.    In these various sales capacities, my office was at the mill.

Q.    Okay.  And in your sales capacity and in your marketing capacity, did it call on you to go out in the field and call on customers --

A.    Yes.

09:15 AM  1    Q.   -- or were you a home-based type of sales?

2    A.   No, no.  I --

3        MR. ADAMS:  Let Mr. Morgan finish his question

4  before you start to answer.

09:15 AM  5        THE WITNESS:  All right.

6    A.   Pardon me.

7    Q.   I'm through.  Go ahead.

8    A.   The answer is, yes.  I traveled extensively.

9    Q.   How much time, if you had to give us an estimate of

09:15 AM  10  travel time versus office time?  Would you break that down?

11    A.   It varied, of course, by these different

12  assignments that I had over the years.  There were times that

13  I would spend at least half of the time on the road traveling.

14  And during periods when I was, like, marketing administrator,

09:16 AM  15  I would spend no more than 15 to 20 percent of the time in

16  travel.

17    Q.   All right.  At any point in time up until May 1st,

18  '81, did you have any responsibility for the running of the

19  mill?

09:16 AM  20    A.   No.

21    Q.   On May 1st, 1981, until May 1st, 1987, did you have

22  responsibility for the daily running of the mill?

23    A.   Yes.

24    Q.   Okay.  When were you first contacted about giving

09:16 AM  25  this deposition?

09:16 AM 1    A.    Last week, I guess.

2    Q.    What -- Do you still receive a retirement --

3    A.    Yes.

4    Q.    -- from Kimberly-Clark?

09:16 AM 5    A.    Yes.

6    Q.    And does it come from Kimberly-Clark?

7    A.    Yes.

8    Q.    And do they mail that to you?

9    A.    Yes.

09:17 AM 10   Q.    Have you had any interaction with Kimberly-Clark,

11   the company, since your retirement other than receiving your

12   retirement check?

13   A.    No.

14   Q.    Are there any reunions, benefits, any -- I don't

09:17 AM 15  mean anything by this -- but old-timers days out there that

16   would cause you to go back out there?

17   A.    Shortly after retirement some of my pals in the

18   maintenance groups -- the carpenters, the painters, the

19   millwrights -- would have me out for their Christmas

09:17 AM 20  luncheons; and I would go back into the mill.  Two or three

21   times associates would be retiring and they would have a

22   coffee and I went out.  I have not been in the mill, though,

23   for a number of years now.

24   Q.    Now, of course, the mill sold in, what, 1997?

09:18 AM 25   A.    I wouldn't want -- I wouldn't want to say.  I

09:18 AM 1    wasn't there.

2            Q.    You do understand that --

3            A.    I understand it was sold to Alliance, and Alliance

4    subsequently sold it.  But I wasn't party to that, and I --

09:18 AM 5            Q.    I understand.  You were gone by then?

6            A.    Yeah.

7            Q.    Who took your spot when you left?

8            A.    A man named Bob Vandenheuvel succeeded me as

9    president of the unit.

09:18 AM 10            Q.    And do you know how long he remained president?

11            A.    Not really, two or three years, I think, was the

12    length of his term.  I'm not positive.

13            Q.    Do you know the successors until the plant was

14    sold?

09:18 AM 15            A.    Yes, I guess.

16            Q.    And if you don't mind, could you at least take a

17    stab at spelling your replacement?

18            A.    Bob.  His name is R. C. V-a-n-d-e-n-h-e-u-v-e-l,

19    Vandenheuvel.

09:19 AM 20            Q.    All right.  And who replaced him, if you know?

21            A.    Things were sort of strange.  At that point I'm not

22    sure for a while he was replaced at all, and there was a

23    hiatus.  And then he ultimately was replaced by a man named

24    Ben Knight.

09:19 AM 25            Q.    And then anyone after Mr. Knight?

09:19 AM 1    A.    I believe that he was the president when the mill

2  was sold to Alliance.

3    Q.    Did you know Mr. Knight?

4    A.    Sure.

09:19 AM 5    Q.    How did you know him?

6    A.    He worked for me when I was president.  He was in

7  the forest products end of the business, and he worked for me

8  in land disposition.

9    Q.    Is he currently in the -- in Alabama?  Do you know?

09:20 AM 10   A.    He is retired living in Alabama, yes.

11   Q.    Whereabouts, if you know?

12   A.    Some small town between the mill and Birmingham.  I

13 have forgotten.

14   Q.    How far is the mill from Birmingham?

09:20 AM 15   A.    About 45 miles there, 40 miles.

16   Q.    Okay.  And how far do you live from Birmingham?

17   A.    I live in Sylacauga, 15 miles farther away from

18 Birmingham.  Just over 50 miles from Birmingham.

19   Q.    Do you see Mr. Knight at all?

09:21 AM 20   A.    No.

21   Q.    How about Mr. Vandenheuvel?

22   A.    I haven't seen him for years now.

23   Q.    Do you know if he is still in the Birmingham area?

24   A.    No.  He is retired and living in the Atlanta --

09:21 AM 25 greater Atlanta area.

09:21 AM 1   Q.   How do you know that?

2   A.   We exchange Christmas cards.

3   Q.   Are you listed in the Sylacauga phone book?

4   A.   Yes.   Sylacauga.

09:21 AM 5   Q.   Sorry.

6   A.   It's an Indian word which means buzzard's roost.

7   Q.   Don't get me started.   I have got some Indian words

8   for you.

9        Who was the president immediately before you?

09:22 AM 10   A.   A man named Randy Salter.

11   Q.   S-a-l-t-e-r?

12   A.   Yes.

13   Q.   And is he alive?

14   A.   I think he just passed away.

09:22 AM 15   Q.   And had he been there for some time in that

16   position before you or just shortly?

17   A.   Randy would have been president probably in the

18   three to five-year range.

19   Q.   What about the man that was before him?

09:22 AM 20   A.   Time has a funny way of eroding memory.   To my

21   recollection prior to Randy's being president, the title for

22   that job was general manager; and it was occupied by a man

23   named Clark Hook.

24   Q.   And is Mr. Hook still with us?

09:23 AM 25   A.   No.   He is deceased.

09:23 AM 1     Q.    Now, I understand you had a meeting with some of

2     the lawyers from Kimberly-Clark on -- was it Wednesday or

3     Thursday or both days?

4               MR. ADAMS:   You don't need to answer when you

09:23 AM 5     met with us or where you met with us or anything like that.

6     You are instructed not to answer that.

7               MR. MORGAN:   Let's just break and call the

8     judge.

9               MR. ADAMS:   There is a phone right over there,

09:24 AM 10    Glen.

11              MR. MORGAN:   I know.   I was just going to

12    say -- I'm looking at -- Well, it's Friday.   So, we can do

13    that.   Let's break and do that.

14              MR. ADAMS:   Okay.

09:24 AM 15             THE VIDEOGRAPHER:   Off the record at 9:24.

16              (A BRIEF RECESS WAS TAKEN.)

17              THE VIDEOGRAPHER:   We are on the record at

18    9:26.

19              MR. MORGAN:   While we are on the record, I

09:26 AM 20    want to object so as I don't waive anything that --

21    Rule 199.2b1 requires Kimberly-Clark when presenting a

22    corporate representative to notify us within -- quote -- a

23    reasonable time before the deposition -- end quote -- the name

24    of the individual that will be presented to testify on

09:27 AM 25    Kimberly-Clark's behalf; and for each individual they are to

09:27 AM 1    set forth or designate the matters upon which the individual

2    will testify.

3              That has not been done in this case, although

4    we sent you a letter April the 7th requesting that

09:27 AM 5    information.  And so, since I have not had the gentleman's

6    name or the areas that he will be testifying about, I will ask

7    him the questions that I have.  But when I find out the scope,

8    et cetera, then I may ask you to bring him back at another

9    time so I have had time to prepare for the deposition in the

09:27 AM 10   areas where he can testify about.

11             MR. ADAMS:  And just so you will know,

12   Mr. Pinkerton is offered in response to your deposition notice

13   of April 13th as the person that Kimberly-Clark has located to

14   date who is most responsive to your notice.

09:28 AM 15            MR. MORGAN:  Well, I mean, telling me after

16   the deposition started, that general statement I don't think

17   complies with the rules.  For instance --

18        Q.    (By Mr. Morgan)  Mr. Pinkerton, are you the highest

19   ranking safety individual with knowledge of safety policies

09:28 AM 20   and practices at the Kimberly-Clark facility regarding

21   asbestos?  Were you ever a safety individual?

22        A.    No.

23        Q.    Okay.  And are you the most knowledgeable person

24   about the installation and removal of asbestos-containing

09:28 AM 25   products on the Kimberly-Clark premises?

09:28 AM 1    A.    No.

2    Q.    And are you the highest ranking safety individual

3  or have you ever been the highest ranking safety individual

4  with knowledge of contractor safety policies and practices at

09:28 AM 5  the Kimberly-Clark facility?

6            MR. ADAMS:  I object to your line of

7  questioning.  Because as I stated, Mr. Pinkerton is the person

8  that Kimberly-Clark has identified to us as the one most

9  responsive to the areas of inquiry in your notice.

09:28 AM 10           MR. MORGAN:  I'm just trying to show that no

11  matter what you call him, he is not responsive at all to my

12  notice.

13           MR. ADAMS:  I -- You know --

14           MR. MORGAN:  Let me go ahead and do this, if

09:29 AM 15  you don't mind.

16           MR. ADAMS:  Yeah.

17    Q.    (By Mr. Morgan) Are you or have you ever been the

18  highest ranking safety individual with knowledge of contractor

19  safety policies and practices at the Kimberly-Clark facility?

09:29 AM 20    A.    If I understand your question, as president I was

21  responsible for all activities of the operation.

22    Q.    Did you have a safety department when you were

23  president?

24    A.    Yes.

09:29 AM 25    Q.    Was there a safety individual --

09:29 AM 1     A.   Yes.

2     Q.   -- that was in charge of the safety department?

3     A.   Yes.

4     Q.   Okay.  What was his name?

09:29 AM 5     A.   Will Morris.

6     Q.   Is Mr. Morris still alive?

7     A.   I believe so.

8     Q.   Where does he live, if you know?

9     A.   I have no idea.

09:29 AM 10     Q.   Do you recall where he did live?

11     A.   No.

12     Q.   And was he a long tenured Kimberly-Clark employee?

13     A.   I think so.  It depends on the term.  But he was

14 not a new hire in-and-out person.

09:30 AM 15     Q.   And did he stay after you left?

16     A.   I think so, yes.

17     Q.   Okay.  Have you ever been told that we are looking

18 for someone who is the most knowledgeable person about the

19 installation and removal of asbestos-containing products on

09:30 AM 20 Kimberly-Clark's premises?

21     A.   Say that again.

22     Q.   Yes, sir.  Mr. Adams just showed you the notice.

23 That's not the first time you have seen that, I take it?

24     A.   No.

09:30 AM 25     Q.   Okay.  When was the first time you saw that?

09:30 AM 1      A.   I suppose Wednesday of this week.

2      Q.   Okay.  In looking at who we wanted according to

that notice, did you ever tell anybody that you really -- you

didn't fit any of these categories?

09:31 AM 5           MR. ADAMS:  No.  I instruct you not to answer

that question.  That invades the attorney-client privilege.

7           MR. MORGAN:  Is he your client?

8           MR. ADAMS:  I am representing this gentleman

for the purpose of this deposition, yes.

09:31 AM 10     Q.   (By Mr. Morgan) If I were to ask you who would be

the most knowledgeable person that you know of regarding the

installation and removal of asbestos-containing products on

Kimberly-Clark's premises, who would you tell me?

14          MR. ADAMS:  Objection, form.

09:32 AM 15     A.   I couldn't tell you.  Excuse me.

16     Q.   All right.  And what about if I asked you for the

highest ranking safety individual with knowledge of safety

policies and practices at the Kimberly-Clark facility

regarding asbestos, who would you tell me would be that

09:32 AM 20 person?

21     A.   You mean now or when I worked?

22     Q.   You can tell me the two different people if you

would like.  There is not one now.

24     A.   During my employment, I assumed the responsibility

09:32 AM 25 ultimately for mill safety.  I established our policies and

17

09:32 AM 1    our procedures.

2        Q.    Yes, sir.  But if I asked you who was the highest

3    ranking safety individual with knowledge of safety practices

4    and policies at the Kimberly-Clark facility regarding

09:32 AM 5    asbestos, who would you tell me that would be?

6                 MR. ADAMS:  Objection, form.

7        Q.    Go ahead.

8        A.    Probably Will Morris.  I don't know.

9        Q.    Okay.  And if I asked you who would be the highest

09:32 AM 10   ranking safety individual with knowledge of contractor safety

11   policies and practices at the Kimberly-Clark facility, would

12   that be the same person, Mr. Morris?

13       A.    Probably, yes.

14       Q.    All right.  And then if I asked you to tell me who

09:33 AM 15   you felt like was the most knowledgeable person concerning

16   asbestos-containing products that were manufactured at the

17   Kimberly-Clark facility, who do you think that would be?

18       A.    I wouldn't know.

19       Q.    Okay.  Would you consider yourself to be the most

09:33 AM 20   knowledgeable person about any asbestos-containing products

21   that Kimberly-Clark manufactured?

22       A.    No.

23       Q.    And would you be -- would you consider yourself to

24   be the most knowledgeable person about the installation and

09:33 AM 25   removal of asbestos-containing products on Kimberly-Clark's

09:33 AM

1    premises?

2                    MR. ADAMS:  Objection, form.

3         Q.    You can answer.

4         A.    I'm not -- I don't consider myself qualified in

09:33 AM  5    that area because I never was called upon to be qualified in

6    that area.

7         Q.    Okay.

8         A.    We had people who were.  I was not one of them.

9         Q.    Do you know what the -- For instance, do you know

09:34 AM  10   what the threshold limit values were for asbestos?

11        A.    No.

12        Q.    Do you know what the PELs were?

13        A.    No.

14        Q.    Do you know what a PEL is?

09:34 AM  15       A.    No.

16        Q.    Do you know what the OSHA rules and regulations

17   were concerning exposure to asbestos?

18        A.    No.

19        Q.    Do you know any of the safety rules or regulations

09:34 AM  20   concerning procedures to be used while working with

21   asbestos-containing products?

22        A.    No.

23        Q.    Do you know prior to 1981 what the policy or

24   practice was by Kimberly-Clark in terms of handling

09:35 AM  25   asbestos-containing products?

09:35 AM    1       A.    No.

            2       Q.    Do you know prior to 1981 if there was a policy in

            3   place for handling asbestos-containing products?

            4       A.    No.

09:35 AM    5       Q.    Do you know if there was any policy or practice in

            6   place prior to 1981 concerning contractor safety regarding

            7   working with asbestos-containing products on the

            8   Kimberly-Clark facilities?

            9       A.    No.

09:35 AM   10       Q.    Do you know if there were any safety guidelines set

           11   up to determine if there were asbestos-containing airborne

           12   fibers at the Kimberly-Clark facility?

           13       A.    No.

           14       Q.    Do you know prior to 1981 anything about proper

09:36 AM   15   removal of asbestos-containing products on the Kimberly-Clark

           16   premises?

           17       A.    No.

           18       Q.    Prior to 1981 do you know how many insulators were

           19   on the payroll?

09:36 AM   20       A.    No.

           21       Q.    Do you know how many contractors were utilized in

           22   either the application or removal of asbestos-containing

           23   products?

           24       A.    No.

09:36 AM   25       Q.    Prior to 1981 did you have any education or

09:37 AM 1   training --

2               MR. ADAMS:  Objection, form, of the last

3   question.  I'm sorry.

4               MR. MORGAN:  Pardon me?

09:37 AM 5               MR. ADAMS:  I object to the form of the last

6   question.  I'm sorry for the interruption.

7     Q.   (By Mr. Morgan) Prior to 1981 did you have any

8   education or training in the hazards of asbestos?

9     A.   No.

09:37 AM 10     Q.   Prior to 1981 did you have responsibility for

11   safety of either Kimberly-Clark employees or contractor

12   employees on the Kimberly-Clark premises regarding exposure to

13   asbestos-containing products?

14     A.   No.

09:37 AM 15     Q.   Did you ever prior to 1981 oversee any

16   construction, be it new or a modification to the facility,

17   when it was necessary to use asbestos-containing products or

18   remove asbestos-containing products?

19               MR. ADAMS:  Objection, form.

09:37 AM 20     A.   I'm not sure I followed that.

21     Q.   Okay.  I'm sorry.  It was two questions in one.

22               Did you ever have a responsibility to oversee

23   the safety during construction of a new portion of the

24   facility?

09:38 AM 25     A.   No.

09:38 AM 1      Q.    And my next question is sort of the same thing.

2   Prior to 1981 did you have any responsibility for overseeing

3   safety for contractors or employees if the facility was making

4   a modification that involved asbestos-containing products?

09:38 AM 5              MR. ADAMS:   Objection, form.

6      A.    No.

7      Q.    Can you tell us how many feet of piping was

8   insulated at Kimberly-Clark's facility with

9   asbestos-containing products prior to 1981?

09:38 AM 10     A.    No.

11     Q.    Do you know if any air monitoring was conducted

12  prior to 1981 to determine the presence of asbestos fibers in

13  the air?

14     A.    No.

09:39 AM 15     Q.    Do you know if midget impingers -- Do you know what

16  a midget impinger is?

17     A.    No.

18     Q.    Do you know the brands of any asbestos-containing

19  products that were utilized on the Kimberly-Clark facility?

09:39 AM 20     A.    No.

21     Q.    Do you know that asbestos-containing products were

22  in fact on the Coosa Pines facility prior to 1981?

23     A.    No.

24     Q.    When did you learn of the hazards of asbestos?

09:40 AM 25     A.    I don't know that I know of the hazards of

asbestos.

Q.    Do you know if Kimberly-Clark sold any asbestos-containing products?

A.    No.

Q.    They might have.  You just don't know?

A.    They might have.  I don't believe we did from the Coosa Pines facility.

Q.    All right.  Do you know if Kimberly-Clark purchased asbestos fibers?

A.    I don't know that.

Q.    They could have.  Again, you just don't know?

A.    That's correct.

Q.    Have you ever heard of Calidria?

A.    No.

Q.    After 1981 -- During your tenure as president, I guess is the best way.  I want to go from '81 to the time you left, was there a contractor safety policy or procedure put in place?

A.    I would assume there was.

Q.    Well, don't do that.

A.    All right.

Q.    If you know, tell me.  If you don't know, tell me you don't know.

A.    I don't know.

Q.    Okay.  Were there any rules and regulations set

09:41 AM  1    forth for the employees of Kimberly-Clark in ways to handle

2    asbestos-containing products?

3         A.    I don't know.

4         Q.    If I went back through the questions I asked you

09:42 AM  5    prior to 1981 in terms of policies and procedures and

6    asbestos-containing products and the brands, et cetera, and

7    asked those same questions for your tenure as president until

8    you left from '81 forward, would the answer be the same thing,

9    you don't know?

09:42 AM  10        A.    I'm afraid I would have to go down those item by

11   item --

12        Q.    Okay.

13        A.    -- to give you a meaningful answer to that.

14        Q.    All right.  Was there any asbestos abatement done

09:42 AM  15   at any point from '81 forward to determine the type of product

16   that was in place?

17             MR. ADAMS:   Objection, form.

18        A.    Not that I was involved in.  I can't say that it

19   didn't happen.  As chief executive officer of the facility,

09:43 AM  20   any serious hazard, injury, customer problem, whatever, would

21   be brought to my attention.  Otherwise, we had responsible

22   people managing these operating areas; and I didn't involve

23   myself in the micro-management of their responsibility.

24        Q.    All right.  And that's my question.  If I needed to

09:43 AM  25   find out the specifics about contractor safety policies and

09:43 AM 1    any steps that Kimberly-Clark may have taken to ensure their

2    safety or the Kimberly-Clark employees' safety, then you told

3    me earlier Mr. Morris would be the guy to ask about that,

4    right?

09:43 AM 5    A.    In all probability, yes.

6    Q.    And if -- You said his name was Will Morris?

7    A.    Will, yes.

8    Q.    Was it formally William?  Do you know?

9    A.    I don't know.

09:43 AM 10    Q.    Okay.  And who would I ask -- if I wanted to ask

11    questions about the type of products that were purchased to be

12    installed, who would I ask, in your opinion -- the type of

13    asbestos-containing products?

14              MR. ADAMS:  Objection, form.

09:44 AM 15    A.    During my tenure?

16    Q.    Just period.  If I asked you today who you would go

17    ask to determine that, who would that be?

18              MR. ADAMS:  Same objection.

19    A.    Should I answer it?

09:44 AM 20              MR. ADAMS:  Go ahead, if you have an answer.

21    A.    Probably I would say the purchasing department.

22    Q.    And who would be the head guy there?

23    A.    Now?

24    Q.    No.  Just who would you go ask in your mind?

09:44 AM 25    A.    I don't even remember for sure who was in charge of

09:44 AM 1    purchasing.  That's another one of those rolling jobs.  I

2    can't give you a name.

3         Q.    All right.

4         A.    I'm not being evasive.  I just don't remember.

09:45 AM 5         Q.    Okay.  Did Kimberly-Clark have a document retention

6    policy?

7         A.    Yes, we did.

8         Q.    Do you recall what it was?

9         A.    No.

09:45 AM 10        Q.    But it was a habit, a practice, if you will, maybe

11   even perhaps a rule --

12        A.    It's a corporate policy as opposed to a divisional

13   policy.

14        Q.    All right.  So, the documents that were generated

09:45 AM 15   in the daily running of the premise were maintained?

16        A.    Yes.

17        Q.    Were there any other plants in Alabama besides the

18   Coosa Pines facility?

19             MR. ADAMS:  Objection, form.  You mean any

09:45 AM 20   other Kimberly-Clark plants?

21             MR. MORGAN:  Yes.

22        A.    In Alabama?

23        Q.    Yes, sir.

24        A.    We had chipping mills, outside saw mills associated

09:46 AM 25   with my division; but we had no other corporate operating

09:46 AM 1    divisions in Alabama that I know of.

2        Q.    All right.  And the products made by the Coosa

3    Pines facility, what were they?

4        A.    Newsprint and groundwood printing papers and market

09:46 AM 5    pulp.

6        Q.    Newsprint and --

7        A.    Groundwood, this is paperback books, magazines,

8    uncoated.

9        Q.    Kimberly-Clark the company made several products;

09:47 AM 10   is that right?

11       A.    A number of products, yes.

12       Q.    What type of products did they make?

13       A.    Well, we are most famous for Kleenex, Kotex,

14   Delsey --

09:47 AM 15       Q.    What was the third one?

16       A.    Delsey, the toilet tissue -- Huggies diapers.

17   Those are the most well-known products that we made.  We made

18   all kind of other things like stationary bond papers.  In my

19   case it was lumber.  I mentioned lumber.

09:48 AM 20       Q.    No, like, paper towels?

21       A.    Paper towels, yes.

22       Q.    Paper plates?

23       A.    No, not to my knowledge.

24       Q.    Boxes?

09:48 AM 25       A.    No.

09:48 AM 1    Q.    Coated paper?

2    A.    No.  We did at one point in time, but no more, not

3  for quite a while.

4    Q.    Well, give me an example of coated paper.

09:48 AM 5    A.    Coated paper is your slick magazine stock for

6  McCall's, Better Homes and Gardens, Playboy magazine.

7              MR. ADAMS:  I never read any of those.

8              MR. MORGAN:  No.  You just looked at all the

9  pictures.

09:49 AM 10              MR. ADAMS:  In McCall's, that's right.

11    A.    Those mills, those papermills were sold back in the

12  Seventies.  Did you ever read a book called Good to Great?

13              MR. ADAMS:  Let's just answer Mr. Morgan's

14  questions.

09:49 AM 15              THE WITNESS:  All right.

16              MR. ADAMS:  He's got --

17              THE WITNESS:  Not time for coffee?

18              MR. ADAMS:  Yes, sir.

19    Q.    (By Mr. Morgan) Here's my next question:  What is

09:49 AM 20  the book Good to Great?

21    A.    This is a book about corporate management.  And it

22  features Darwin Smith and his disposition of our

23  Kimberly-Clark coated mills and concentration on consumer

24  products and competition with Procter and Gamble.  It's

09:49 AM 25  becoming quite a classic.  He was one of my --

09:49 AM 1      MR. ADAMS:  Just answer his question.

2      MR. MORGAN:  He is.  Just leave him alone.

3   Q.   (By Mr. Morgan) He was one of your --

4   A.   My good friends and mentors.

09:50 AM 5      THE VIDEOGRAPHER:  Off the record at 9:50.

6      (A BRIEF RECESS WAS TAKEN.)

7      THE VIDEOGRAPHER:  On the record at 10:10.

8   Q.   (By Mr. Morgan) Mr. Pinkerton, did you say earlier

9   that you instituted some safety policies when you were

10:09 AM 10  president?

11   A.   Yes.

12   Q.   Did you give an order that they be done, or how did

13   that come about?

14   A.   Well, when I became president, I re-established a

10:10 AM 15  labor management safety committee and put it in place to --

16   The week I got my job, I sent a directive to all of my

17   operating supervisors that I wanted a list of the three most

18   hazardous items in their area of responsibility, and

19   personally went out and viewed these things with them and

10:10 AM 20  effected some immediate corrections to safety hazards which

21   existed in the mill.

22      We had regular monthly meetings of that labor

23   management group on safety.  We were told that the hourly paid

24   people were attending those meetings and the salaried people

10:11 AM 25  were not that dedicated.  I called a management meeting with

29

10:11 AM  1   the labor union officers and my salaried supervisors and told

2   them of this information I had received.  And I said,

3   "Effective immediately, any salaried person who does not

4   attend the regular safety meetings without doctor's written

10:11 AM  5   permission will be fired."

6              We had reasonably good attendance after that.

7       Q.   Or a lot of sick people.

8       A.   That's right.  And we from a -- we also at that

9   same time constructed a health and safety and physical fitness

10:12 AM 10   facility.  We brought two doctors on stream.  We proposed

11   annual physical exams for all of our employees at no cost.

12   And that was well received.  So, what else did we do in

13   safety?

14              We were totally dedicated to the safety of our

10:12 AM 15   employees.  And they knew that, and our safety record improved

16   to where we were one of the tops in the nation in man hours

17   without a lost time accident.

18              We put in place safety dinners.  When I was

19   there, my predecessors had recognized ten years without a lost

10:12 AM 20   time accident.  I moved it up to one year, and changed the

21   recognition from an after work steak for the employee to a

22   formal dinner for the employee and his or her spouse.  That

23   was well received.

24              And the people recognized our commitment to

10:13 AM 25   safety.  So, all in all, we had a million man hours -- safe

10:13 AM  1  man hours.  And we had bands and families and tours, and

2  people took their spouse to show them where they worked and

3  the like.  So, it was -- there was no question in the minds of

4  anyone of our positive commitment to the safety of our

10:13 AM  5  employees.

6      Q.    All right.  Let's go back sort of through things.

7  You asked them to identify the three worst hazards in the

8  plant?

9      A.    That's correct.

10:13 AM  10      Q.    Normally those are falling objects, slip and falls,

11  housekeeping?

12      A.    That's right.

13      Q.    And I don't know.  I forget the third one.  But in

14  your case when you had this meeting and they identified for

10:14 AM  15  you the three worst hazards, what were they?

16      A.    Slipping and falling was one of them in areas.  We

17  had some areas that didn't have adequate lighting for people

18  to move.  We corrected that.

19          One of the things that's most meaningful to

10:14 AM  20  me, I was shown a chlorine unloading dock.  It was -- tank

21  cars were spotted and the material was unloaded oftentimes at

22  night and there was no light.  I called our maintenance

23  manager; and he said, "Yes.  We have been trying to get around

24  to it."

10:14 AM  25          And I told him, "We will inspect that in the

10:14 AM  1    morning at 9:00 o'clock, the finished job."

2                         And we were rather Draconian in some of our

3        approaches, but we got there.  And we were doing it for two

4        reasons.  One to be -- to show these people we were safe, and

10:15 AM  5    one to be damn sure that it was in fact a safe practice.

6              Q.    Okay.  So, the three things -- housekeeping was

7        one.  Lighting was another.  And what was the third?

8              A.    Well, it varied.  But whether it was the powerhouse

9        or the papermill or the pulpmill or the wood yard -- We had

10:15 AM  10   equipment in the wood yard which was not what I considered

11       appropriate.  And it was completely replaced.

12             Q.    Okay.  So --

13             A.    There was really a variety of things.  It varied

14       depending on the area.

10:15 AM  15             Q.    All right.  They identified for you what was

16       causing people to be injured at work through some type of

17       unsafe practice that they found in different parts of the

18       plant, right?

19             A.    That's correct.

10:16 AM  20             Q.    And the injuries we are talking about are, again,

21       things that require -- might require surgery, like a back

22       surgery or you cut your finger or something drops on your head

23       or you trip and hurt yourself, right?

24             A.    Correct.

10:16 AM  25             Q.    Now, did y'all use chemicals in the facility?

10:16 AM 1      A.    Yes.

2      Q.    Were there any tests done to -- or I'm sorry.  Any

3   policies put into place when you became president to change

4   how the chemicals were handled on the premises by the

10:16 AM 5   employees?

6                MR. ADAMS:   Objection, form.

7                Go ahead.

8      A.    I never changed any -- I did not change any of the

9   standard operating procedures for materials handling,

10:16 AM 10   unloading storage, and the like.  That never occurred.

11      Q.    All right.  Now, you are here as Kimberly-Clark.

12   That's -- I know you are Mr. Pinkerton, but I have asked them

13   to please present Kimberly-Clark to me for me to ask

14   Kimberly-Clark some questions.  And I have told them the areas

10:17 AM 15   that I want to ask about.  And Mr. Adams made a comment to the

16   judge that you are very knowledgeable.

17                And so -- and if I'm just asking you

18   questions, I would find out how knowledgeable you are.  And I

19   need you to tell me -- You know, based on that notice in front

10:17 AM 20   of you, what matters listed there do you think you can testify

21   about?

22      A.    (Reading) Really, I'm not qualified to testify on

23   behalf of any of these four items in this document.

24      Q.    Okay.  And as Kimberly-Clark sitting here at the

10:18 AM 25   table under oath, can you tell me when Kimberly-Clark first

33

10:18 AM 1    learned that exposures to asbestos could cause severe

2    disability or even death?

3         A.    I can't tell you by my knowledge when that

4    occurred.   I can't -- the fact is, anything of major

10:18 AM 5    consequence I assumed -- and they were, in many cases --

6    brought to my attention.   During my presidency no one ever

7    brought to my attention any risk or occurrence involving

8    asbestos.   So, therefore, it's a non-issue in my memory.

9         Q.    Okay.   And since no one brought anything to you

10:19 AM 10   about any risk of injury or damage occurring or potential

11   damage even, you never did anything then to change anything

12   that was being done on the premises?

13        A.    That's correct.

14        Q.    And from 1948 to 1981, up through those years

10:19 AM 15   before you became president, you basically were in the

16   marketing, slash, sales portion of the company?

17        A.    That's correct.

18        Q.    During that time, did they give you any safety

19   training or education involving asbestos or the exposure to

10:20 AM 20   asbestos to where you could learn it was harmful?

21        A.    No.

22        Q.    Was there any kind of new president class, for lack

23   of a better term, where before you became president they said,

24   "Okay.   Look, we need you to -- there is a few things we want

10:20 AM 25   you to learn about this" and sort of gave you some courses or

10:20 AM 1  some education about safety?

2      A.    No.

3      Q.    All right.  You went from a salesperson, even

4  though you may have been general manager, the head guy, the

10:20 AM 5  big hauncho, et cetera -- you went from there to president of

6  the company having brought with you whatever experience or

7  training you had to that position?

8      A.    That's correct.

9      Q.    And from 1981 to 1988 when you left, did you attend

10:21 AM 10  and did Kimberly-Clark either provide or make available to you

11  any type of safety training where you would learn about the

12  hazards of different particular products or substances?

13      A.    No.

14      Q.    Okay.  And in terms of what Kimberly-Clark does

10:21 AM 15  know -- and again, you are here as Kimberly-Clark.  What does

16  Kimberly-Clark in the person of Mr. Pinkerton know about the

17  hazards of asbestos and when did you learn that?

18              MR. ADAMS:  Objection, form.

19      A.    I honestly do not know of the hazards of asbestos.

10:22 AM 20      Q.    Okay.  Well, again, I know you met with some

21  lawyers.  We have been told that.  Do you know if everybody in

22  the room was a lawyer or not?

23      A.    Well, they didn't have badges on.

24      Q.    They did or did not?

10:22 AM 25      A.    Did not.  You know, "I am a lawyer."  I don't know.

10:22 AM 1    Q.    Well, they are not sheriffs.

2    A.    I didn't ask for diplomas.

3    Q.    Okay.  So then, that leads to my next question.  I

4  assume you met with Mr. Adams and Mr. Young and

10:22 AM 5  Ms. Turnipseed; is that right?

6            MR. ADAMS:  Glen, he met with lawyers only.

7  And I will be happy to tell you who all the lawyers were if

8  that makes you happy.

9            MR. MORGAN:  Okay.

10:22 AM 10            MR. ADAMS:  There was myself; Ms. Turnipseed;

11  at different times Ms. Himple; Mr. Young; Ms. Davis, a lawyer

12  from my firm.  That was it.  That's all the people he met

13  with.

14            MR. MORGAN:  All right.

10:23 AM 15    Q.    (By Mr. Morgan) Okay.  And so, if you will, because

16  after that meeting -- and the contact occurred about a week

17  ago you say.  You had a meeting Wednesday, I believe you said.

18  I assume you met yesterday, as well?

19            MR. ADAMS:  Now, Glen, you are violating Judge

10:23 AM 20  Sanderson's ruling that he just gave us.

21            MR. MORGAN:  Okay.  Well, let me ask this

22  then.  I'm trying to establish -- because you are going to

23  object to form here in a minute.

24    Q.    (By Mr. Morgan) If you will, tell me what matters

10:23 AM 25  you have been asked to testify about.

10:23 AM 1     A.   I'm not sure I can answer that.  I don't know that

2   I've been asked to testify -- to testify about anything.  I'm

3   here to provide what information I can relevant to the

4   subject, and I certainly have nothing to hide.  I just -- I

10:24 AM 5   simply -- I don't know how to answer your question.

6     Q.   Well, I mean, we looked at the notice --

7     A.   Yes.

8     Q.   -- of what I wanted to talk about.  You said you

9   are not really qualified or knowledgeable to talk about any of

10:24 AM 10   those subjects.

11     A.   Right.

12     Q.   So --

13     A.   If this had ever risen during my tenure anywhere

14   that I could -- to which I could make reference or testify, I

10:24 AM 15   would be delighted.  But it never -- it never reached that

16   kind of a level that it came to my office.

17     Q.   No.  I understand that.  And I appreciate your

18   honesty about that.  It's just that I'm trying to get some

19   information about that facility.

10:24 AM 20        Do you know that asbestos-containing products

21   were utilized at that facility?

22     A.   Yes.

23     Q.   And how do you know that?

24     A.   Documents that I have seen.

10:24 AM 25     Q.   What documents have you seen?

10:24 AM 1          A.    I can't identify them all.

2                   MR. ADAMS:  We showed Mr. Pinkerton the

3          documents yesterday that we produced to you.

4          Q.    Okay.  What does that tell you after looking at

10:25 AM 5    those documents about the presence of asbestos-containing

6          products on the Coosa Pines facility in Alabama?

7          A.    Well, you are asking for an opinion, I suppose.

8          Q.    Sure.

9          A.    One, it tends to confirm that's -- that in fact it

10:25 AM 10   was there.  Generally the implication was that it was not

11         in -- ever exposed in any hazardous condition.

12         Q.    Did you see any comment about, perhaps, violating

13         OSHA in those documents?

14         A.    I really don't remember.

10:25 AM 15        Q.    Well, when did you see them?

16         A.    I saw them -- a lot of documents yesterday.

17         Q.    Okay.

18         A.    If you could put one in front of me, I'll tell you

19         whether I saw it or not.  But, you know, it's like your

10:26 AM 20   questions, there are a lot of them.

21         Q.    I would like to do it this way.  If I could see the

22         documents you looked at, then maybe I can pick them out and

23         hand them to you.

24                  MR. ADAMS:  You got them.  We produced them to

10:26 AM 25   you.

10:26 AM 1        MR. MORGAN:  I'd like to see what the witness

2  reviewed.

3        MR. ADAMS:  And I just told you.  What he

4  reviewed were the documents we produced in response to request

10:26 AM 5  for production.  Do you have them with you?

6        MR. MORGAN:  No.

7        MR. ADAMS:  Would you like to borrow my copy?

8        MR. MORGAN:  I would like to see the ones he

9  saw.

10:26 AM 10        MR. ADAMS:  Well, he saw --

11        MR. MORGAN:  I think under the Rules I have a

12  right to see what the witness --

13        MR. ADAMS:  I agree.  I'm just trying to

14  establish -- I'm telling you what he saw.  And I assume --

10:26 AM 15        MR. MORGAN:  Don't tell me, show me.  That's

16  what the Rules say that --

17        MR. ADAMS:  You have got to say, "Please."

18        MR. MORGAN:  Please.

19        MR. ADAMS:  All right.  Hang on.  I will be

10:26 AM 20  right back.

21        THE VIDEOGRAPHER:  Off the record at 10:27.

22        (A BRIEF RECESS WAS TAKEN.)

23        THE VIDEOGRAPHER:  On the record at 10:32.

24   Q.    (By Mr. Morgan) Mr. Pinkerton, we have been handed

10:31 AM 25  the other documents that you looked at.  When you went through

10:31 AM 1   the documents yesterday, were any portions of those documents

2   highlighted or in any way enhanced?

3        A.   Some of them might have been, yeah.

4        Q.   And by highlighted, I mean something where there is

10:32 AM 5   a marker --

6        A.   Yeah, like that.

7        Q.   Okay.

8             MR. ADAMS:   I don't -- I think -- just to save

9   you some time, I think Mr. Pinkerton is mistaken; and I don't

10:32 AM 10  think that's the case.  And I don't think you will find any

11  that are highlighted, because I don't recall showing him any

12  highlighted documents.

13            MR. MORGAN:   Well, the witness --

14            MR. ADAMS:   I understand.  I just wanted to

10:32 AM 15  save you some time.  Because you can look through those, and I

16  don't think you will see any.  And those are the documents I

17  showed him.

18       A.   A lot of paper passed.

19       Q.   (By Mr. Morgan) Yes, sir.

10:32 AM 20            MR. ADAMS:   Maybe I'm wrong.  Go ahead.

21       A.   You have paper you have never seen before.

22       Q.   I understand.  But this -- you know, this kind of

23  thing, you know, kind of stands out a little bit when it's

24  that kind of stuff.  And you say you recall seeing some of

10:32 AM 25  that?

10:32 AM 1    A.    I think I did, yeah.

2    Q.    Okay.

3    A.    I don't know if it's related to these documents or

4 others.  I don't know.

10:33 AM 5    Q.    What other documents did you see yesterday?

6    A.    I don't know.  That's my problem.

7    Q.    Let me do this.  It's been represented to us that

8 this stack of documents that we are now going through were the

9 ones that you looked at yesterday --

10:33 AM 10    A.    Yes.

11    Q.    -- so, assuming that's the case, then we should

12 find some documents that have some highlighted on them, based

13 on your recollection of yesterday?

14    A.    Well, I can't speak to that, maybe, whatever.

10:33 AM 15    Q.    I thought you just told me that there were.

16    A.    Well, I said -- I thought I recalled seeing some,

17 yes.

18    Q.    Okay.  All right.  Did you notice in there that

19 there were comments about perhaps the condition of some the

10:33 AM 20 Kimberly-Clark premises -- or areas of the Kimberly-Clark

21 premise at the Coosa Pines facility were such that it would

22 violate OSHA policies concerning asbestos-containing products?

23    A.    I could well have seen something that referred to

24 that, yes.

10:34 AM 25    Q.    And did --

10:34 AM   1    A.    See, one of the things people do is --

2                MR. ADAMS:  Just answer the question.

3         A.    I got you.

4         Q.    Well, if you don't mind, tell me what you were

10:34 AM   5   going to say so that maybe that will help us.

6         A.    I was asked -- I wanted to be informed any time we

7    were out of compliance of anything.  The first statement that

8    was made to me when I assumed my job -- we will not operate

9    this mill one day out of environmental compliance.  That was

10:34 AM  10   my marching orders on day one.

11        Q.    Okay.

12        A.    That's really what I'm talking about.

13        Q.    All right.  And again, just so we will make sure,

14   while you were the president of the U.S. Newsprint Forest

10:35 AM  15   Product Division, is that the same thing as like the plant

16   manager?

17        A.    No.  Not in this case because it involved

18   marketing, and it involved woodlands, the sales function, the

19   financial function.  It was the equivalent of a corporate

10:35 AM  20   entity reporting to the parent -- within the company to the

21   corporate entity.

22        Q.    Okay.  So, you were the plant manager of the Coosa

23   Pines facility?

24        A.    The vice-president of operations reported to me.

10:35 AM  25        Q.    Okay.  Well, then let me ask you this, maybe this

10:35 AM 1    will explain it:  Was there somebody that had the day-to-day

2    responsibility for running the facility at Coosa Pines --

3         A.    Yes.

4         Q.    -- that would be considered to be the plant

10:35 AM 5    manager?

6         A.    Yes.

7         Q.    Who was that?

8         A.    A man named Sam Rollinson, now deceased.

9         Q.    R-a-w-l-i-n-s-o-n?

10:35 AM 10        A.    R-o-l-l-i-n-s-o-n, Rollinson.

11        Q.    And who preceded him in that position?

12        A.    That position when I assumed the presidency was not

13   filled, and I don't remember who assumed that before that

14   time.

10:36 AM 15        Q.    During your tenure as president, this '81 to '87

16   time period -- '88, Mr. Rollinson was the plant manager?

17        A.    Yes.

18        Q.    Did he remain in that position when you retired?

19        A.    I think so.  Yes, I think so.

10:37 AM 20        Q.    And he was there when you took that position?

21        A.    He was not there when I took that position.  I was

22   without middle manager for a period of maybe one year.  And he

23   came in and then assumed the job as vice-president of

24   operations.

10:37 AM 25        Q.    Who had that position during that year?  Who

10:37 AM 1   assumed that?

2   A.   That was -- I assumed that position operating --

3 working with the different operating department heads during

4 that year.

10:37 AM 5   Q.   Okay. So, technically then I guess you are saying

6 '87 to -- I'm sorry. '81 to '82 you were the plant manager?

7   A.   More or less, yes.

8   Q.   But still with all these other responsibilities as

9 well?

10:37 AM 10   A.   Yes.

11   Q.   Who would have been, if you will, the vice plant

12 manager, the assistant plant manager back then?

13   A.   There really wouldn't have been because these

14 different operating areas like the papermill, groundwood,

10:38 AM 15 pulpmill, utilities, reported directly to me -- maintenance.

16   Q.   Okay. Well -- so, the -- was -- the vice-president

17 of operations, is that what you called him, the plant manager?

18   A.   Yes.

19   Q.   So, he was -- in terms of who reported to him, help

10:38 AM 20 me there. Who reported to the plant manager?

21   A.   During Mr. Rollinson's term?

22   Q.   Yes, sir.

23   A.   Then these -- the pulpmill, papermill, utilities,

24 maintenance, personnel -- would all have reported to him --

10:38 AM 25 purchasing.

10:38 AM 1    Q.    Okay.  And then he reports to you?

2    A.    That's correct.

3    Q.    And then once he assumed that position and all

4    these people reporting to him -- and he was reporting to you.

10:39 AM 5    Who else was reporting to you directly?

6    A.    The vice-president of sales, the vice-president of

7    forest products, the controller.  I guess that's it.

8    Q.    Okay.  And did we -- did I ask you if you can

9    remember any plant manager before Mr. Rollinson?

10:39 AM 10    A.    I mentioned that we had a -- Clark Hook was a

11    general manager of the mill and had been the mill manager or

12    equivalent of the operations -- vice-president of operations

13    prior to that.  I don't think we had the title vice-president

14    of operations prior to Sam Rollinson.

10:40 AM 15    Q.    And Clark Hook?

16    A.    Yes.

17    Q.    H-o-o-k?

18    A.    Yes.

19    Q.    Is he still around?

10:40 AM 20    A.    He is deceased.

21    Q.    All right.  If I wanted to know about the

22    relationship between a contractor on the Kimberly-Clark

23    premises and Kimberly-Clark in terms of responsibility of work

24    and all that, who should I ask?  Who would be the person most

10:40 AM 25    knowledgeable about that in your opinion?

10:40 AM 1      A.    You mean in the management of a contracted job on a

2      day-to-day basis?  Is that what you are asking?

3      Q.    Yes, sir.

4      A.    See, usually you would have a project engineer who

10:41 AM 5      worked for the chief of engineering assigned to that -- a

6      task.  And depending upon the scope of that task, you would

7      have a project engineer, the head of engineering, maybe the

8      vice-president of operations interested in that kind of a

9      project.

10:41 AM 10            And if it was of an even larger scale -- like

11      one of the things we had was a 35 million-dollar rebuild of

12      the wood yard and pulpmill.  I assumed the involvement in

13      regular review meetings of that kind of a project.

14      Q.    Did Kimberly-Clark retain the right to halt work if

10:41 AM 15      they felt like that was necessary of a subcontractor or of a

16      contractor?

17            MR. ADAMS:  Objection, form.

18      A.    I really don't know.  That's never occurred that I

19      know about.

10:42 AM 20      Q.    Again, you are not saying that it hasn't occurred.

21      You are just saying, not that anyone has brought it to your

22      attention?

23      A.    Being called upon to terminate a contract in

24      process?

10:42 AM 25      Q.    No.  I'm sorry.  To halt work.  Let's say that you

10:42 AM 1   are -- whoever this liaison is between Kimberly-Clark and the

2   contractor goes out one day and sees something being done that

3   either is not pursuant to the contract or is in violation of

4   some safety policy or procedures.  Did the Kimberly-Clark

10:42 AM 5   representative have the ability to stop that work?

6       A.    They had the authority to do it.

7       Q.    Yes, sir.  And did they also have the authority to

8   if they felt like that one particular aspect of a job was not

9   moving fast enough to direct the contractor to adjust his man

10:42 AM 10   power to help make this other part come up to speed with the

11   rest of it?

12            MR. ADAMS:  Objection, form.

13       Q.    Go ahead.

14            THE WITNESS:  That means I answer?

10:43 AM 15            MR. ADAMS:  If you have an answer.

16       A.    That type of thing happened in all your review

17   meetings.  We had weekly review meetings; and if you were

18   behind in your schedule, I would say, "What are your plans to

19   bring yourself up to speed?"  Or an engineer would ask that

10:43 AM 20   question.  Our Kimberly-Clark people would ride herd on the

21   per chart of the project.

22       Q.    All right.  And could they -- could

23   Kimberly-Clark -- did they have the authority to tell the

24   contractor, "We don't want you doing this one thing today.

10:43 AM 25   Instead we would like you to work on this today."  Is that

10:43 AM  1    what we just said we were talking about?

2         A.    We could do that, sure.

3         Q.    And did Kimberly-Clark have a right to expel --

4    whether it did or not is not important right now.  But did it

10:44 AM  5    have the right to expel a contractor if it felt it needed to

6    do so?

7         A.    I would assume so with cause.

8         Q.    Okay.

9         A.    Those are -- usually things like that are written

10:44 AM  10   into the contract.

11        Q.    All right.

12        A.    Termination.

13        Q.    And I guess, subcontractor or contractor employees

14   could not just -- did not just have free run of the facility;

10:44 AM  15   is that right?

16        A.    That's correct.

17        Q.    They were limited to certain areas, couldn't go to

18   work unless -- in a portion of the facility unless

19   Kimberly-Clark directed them to?

10:44 AM  20        A.    That's correct.

21        Q.    We have gone through most of the records; and as

22   you can see, we have just been sort of thumbing through them.

23   And we found a document that was highlighted out of there; so,

24   apparently there was some highlighted document in there.

10:44 AM  25             MR. ADAMS:  Objection.

10:44 AM 1     Q.     Good memory.

2                    MR. ADAMS:  Objection.  What happened, Glen,

3     was I accidentally gave you some of my highlighted documents

4     which I did not show to the witness.  But go ahead and ask him

10:45 AM 5     about it.

6                    MR. MORGAN:  Well, they are in the stack of

7     what he saw.

8                    MR. ADAMS:  I understand.  But I mixed my

9     stacks up.  But that's fine.  You can go ahead and ask him

10:45 AM 10    about them, if you want to ask him about them.

11                   MR. MORGAN:  Well, I don't believe that.

12         Q.    (By Mr. Morgan) But anyway, that aside --

13                   MR. ADAMS:  Well, I object to your side-bar

14    comment.

10:45 AM 15                   MR. MORGAN:  That's okay.  I object to a lot

16    of things you do.

17                   MR. ADAMS:  Well, we will both object.

18         Q.    (By Mr. Morgan) This one here, this document here

19    is a document KM67.  It's dated 1986 -- September the 9th,

10:45 AM 20    1986.  And it's sent to unit managers in the United States and

21    Canada.  Now, tell me -- on a corporate set-up who are the

22    unit managers?

23         A.     I would -- that's a pretty general term, as you can

24    see.  I could assume that it would mean that whoever the chief

10:45 AM 25    executive officer of each operating facility is.  I don't

10:46 AM 1    know.

2        Q.    Well, did you ever receive things from

3    Kimberly-Clark that was only addressed to unit managers?

4        A.    I don't recall so.  Most of the things are

10:46 AM 5    pointedly directed.

6        Q.    Okay.  Well, so, I'm looking at a document that is

7    addressed to unit managers in the U.S. and Canada, and having

8    been with the company all of those years, who was the unit

9    manager either above you, below you, or was it you --

10:46 AM 10       A.    Well, the --

11       Q.    -- in 1986?

12       A.    In 1986 the manager above me was at the corporate

13    level, not the local level.

14       Q.    Okay.

10:46 AM 15       A.    That would have been Marv Gade of the executive

16    committee of Kimberly-Clark.

17       Q.    Okay.  What was his last name?

18       A.    G-a-d-e, Gade.

19       Q.    Is Mr. Gade still alive?

10:46 AM 20       A.    He is still alive.

21       Q.    Do you know where he lives?

22       A.    He lives in either Naples, Florida, or Linville

23    Highlands, North Carolina, depending upon the season.

24       Q.    And Linville Highlands, do you know how to spell

10:47 AM 25    Linville?

10:47 AM  1          MR. YOUNG:  It's two different towns.

2      A.    No.  I'm not talking about Highlands and Linville.

3          MR. YOUNG:  Oh, you're not?

4      A.    There's a golf club, a private club right above

10:47 AM  5  Linville called Linville Highlands.

6      Q.    And is it L-y-n --

7      A.    L-i-n-v-i-l-l-e.

8      Q.    L-i-n-v-i-l-l-e.  Okay.

9          MR. YOUNG:  It's one of the nicest places

10:47 AM  10  around.

11          MR. MORGAN:  I'm not surprised you know about

12  that.

13      A.    It's where I had my honeymoon, off the record.

14      Q.    (By Mr. Morgan) Okay.  So, he would have been the

10:47 AM  15  unit manager above you.  Did you ever learn --

16      A.    He was not a unit manager.

17      Q.    What was he?

18      A.    He was a member of -- the corporate executive

19  vice-president is responsible for many units.

10:48 AM  20      Q.    Well, in 1986 were you a unit manager?

21      A.    I would presume so.

22      Q.    Well, and I don't know.

23      A.    And neither do I.

24      Q.    Well, yesterday you were shown a document, among

10:48 AM  25  others as we discussed, that was addressed to unit managers,

10:48 AM   1   dated September 19th, 1986, that discussed asbestos.  That was

2   the actual subject discussed.  Do you recall reviewing this

3   document?

4              MR. ADAMS:  Why don't you show it to him,

10:49 AM   5   Glen, so he can see.

6        A.   Let me see it.

7        Q.   (Tendering)

8        A.   (Reviewing) I might have seen this, but I saw a lot

9   of things.  That's as definitive as I can be.

10:50 AM   10       Q.   Okay.  Do you recall seeing that document back in

11  1986?

12       A.   No.

13       Q.   Is Mr. Gasper -- was he still there when you left

14  in 1986, or do you know him?

10:50 AM   15       A.   I don't know him.

16       Q.   Do you know if he was still with the company when

17  you left?

18       A.   Until that document, I don't remember ever hearing

19  his name before.

10:50 AM   20       Q.   Did you even know that Kimberly-Clark had a

21  corporate industrial hygienist?

22       A.   Not really, no.

23       Q.   Okay.  Before reading this document, did you know

24  that you had employees that had died from exposure to asbestos

10:51 AM   25  while working for Kimberly-Clark?

10:51 AM 1      A.    I don't know that --

2                  MR. ADAMS:  Objection, form.  Go ahead.

3      A.    I don't know that any of our employees ever died as

4  a result of asbestos.

10:51 AM 5      Q.    Okay.  Well, I guess that answered my question,

6  which was:  Before this, did you know?  And the answer is, no?

7      A.    Uh-huh.

8      Q.    Also, did you know before reading this that two

9  employees in 1986 were diagnosed with having asbestos-related

10:51 AM 10  diseases?

11      A.    I did not know.

12                  MR. ADAMS:  Objection, form.

13      Q.    Did you know or -- Do you know about latency when

14  it comes to asbestos?

10:52 AM 15      A.    No.

16      Q.    Did you know in 1986 as the president of this

17  entity called the U. S. Newsprint and Forest Products Division

18  that -- let me change that.

19                  If the corporation knew in 1981 that asbestos

10:53 AM 20  was harmful to employees and people if they are exposed to

21  sufficient quantities of it, would you have liked to have

22  known that?

23                  MR. ADAMS:  Objection, form.

24      A.    That is sort of suppositional, isn't it?

10:53 AM 25      Q.    I'm not real sure.

10:53 AM 1    A.    Anytime our corporate people knew of anything I

2    needed to know about, when they came to Coosa Pines, would

3    make it a point to come to my office and review with me what

4    they were covering with the various involved and responsible

10:53 AM 5    people within the operation.

6              And during my time, never did anybody come to

7    my office and say, "We have an asbestos problem or otherwise."

8    It was simply something which never surfaced to the level that

9    people apparently thought that I should know about it.

10:54 AM 10   Therefore, I don't recall seeing any document yesterday which

11   was pointedly directed toward me.

12    Q.    And yet you were their boss, right?

13    A.    That's correct.

14    Q.    And my point is:  If you had the knowledge that

10:54 AM 15   asbestos was harmful, then wouldn't you have taken steps to

16   see to it that the employees were not exposed to it?

17              MR. ADAMS:  Objection, form.

18    A.    If I had knowledge of any -- you have already heard

19   me say -- any high-risk or hazardous circumstance or material,

10:54 AM 20   I would have responded to it to the fullest extent of my

21   ability.

22    Q.    And if there was a problem -- and by that I mean,

23   if employees were being exposed to asbestos and perhaps

24   violations of OSHA were occurring, is that the kind of thing

10:55 AM 25   that should have been reported to you?

10:55 AM 1                MR. ADAMS:   Objection, form.

2        A.    I suppose so.  I would think so.

3        Q.    Well, is that the kind of thing you wanted reported

4   to you?

10:55 AM 5        A.    Certainly.  Any hazard I wanted to know about.

6        Q.    And did you tell them that?

7        A.    I think it was patently clear, at least on our

8   plant-site.  I can't speak for the corporation in total.

9        Q.    No, sir.  I'm just talking about you.  You had your

10:55 AM 10  monthly meetings.  And you told me earlier that you wanted to

11  know about the hazards, and you did things to correct them.

12                So, I'm asking you:  Do you think that the

13  people understood your commitment to safety and that any

14  hazards or things like that should be brought to your

10:55 AM 15  attention?

16       A.    Yes.

17       Q.    And for instance, if there were violations

18  occurring of OSHA, that's something that they should have

19  reported to you; but they never did?

10:56 AM 20       A.    Because I'm the guy that goes to jail.

21       Q.    Who is Mr. McDonnell, M-c-D-o-n-n-e-l-l?

22       A.    I'm not familiar with him.

23       Q.    All right.  Yesterday you would have been shown

24  Coosa River Newsprint Pulp and Forest Products Company

10:57 AM 25  Base-line Industrial Hygiene Survey that was done from August

10:57 AM 1   the 30th to November 12th, 1982.  The report itself is dated

2   February 11th, 1983, from Mr. Gasper.  Do you recall seeing

3   that?

4          MR. ADAMS:  Why don't you show him the

10:57 AM 5   document, Glen, so he can look at it.

6      A.   I don't know Gasper.

7          MR. MORGAN:  I don't know where it is in your

8   stack.

9          MR. ADAMS:  Well, show him the one you have,

10:57 AM 10  the one you are asking him about.

11         MR. MORGAN:  Well, again, it's just -- it's

12  not the one you looked at.

13     Q.   (Tendering)

14     A.   (Reviewing)

10:58 AM 15     Q.   (By Mr. Morgan) Do you recall seeing that?

16     A.   I think so.

17     Q.   Is that the kind of report that would have been

18  sent to you?

19     A.   If in fact it was considered of a level that I

10:58 AM 20  should know.  And that's just always a judgment on the part of

21  my deputies and whether we need to take this to the -- to

22  whomever.  See, I don't know this guy Gasper.

23     Q.   Yes, sir.  Can you pass that back to me and let me

24  ask you a question or two about it?

10:59 AM 25     A.   Sure.

10:59 AM 1    Q.    But this came from the corporate industrial

2    hygienist.  Do you know where he was located?

3    A.    I didn't even know we had one.

4    Q.    Okay.  And so, in the Kimberly-Clark Corporation

10:59 AM 5    was it their practice or policy for something like this to be

6    generated and to bypass the president of this division and

7    give it to the facility?

8                MR. ADAMS:   Objection, form.

9    A.    Well, I think you know the answer to that.

10:59 AM 10   Bypassing is not -- on responsible items is certainly not

11   appropriate.

12   Q.    Well, I know it wouldn't be appropriate.  But you

13   don't recall ever getting this survey, do you?

14   A.    No.  No.

10:59 AM 15   Q.    And yet, just in glancing over it, did you see some

16   items that indicate that there is a problem with some of the

17   asbestos that was on the premises?

18   A.    Well, the comment in that report that said asbestos

19   is present but not considered to such a level as to be a

11:00 AM 20   problem; and quite often that would cause this thing to be

21   intercepted at a lower level.

22   Q.    Shouldn't it come down?

23   A.    Not necessarily.

24   Q.    So, it's okay to bypass --

11:00 AM 25   A.    No.  I'm talking about -- you mean down corporately

57

11:00 AM 1    to division or from a line organization within the mill?

2         Q.    No.  I'm talking about this is the corporate

3    industrial hygienist that to me is at home office, whether he

4    is or not --

11:00 AM 5         A.    Yes, somewhere.

6         Q.    -- but he is the corporate one for everybody.  And

7    it seems like if this is a Coosa River survey of industrial

8    hygiene that it wouldn't be sent maybe over here to somebody

9    else, some other division or some other facility in some other

11:01 AM 10   state.  But it would at least make it down -- it would come to

11   you, and from you it would go down to Mr. Rollinson or some

12   other people.

13        A.    Quite often --

14              MR. ADAMS:  Let Mr. Morgan finish.

11:01 AM 15        A.    That's not necessarily true, is all I can say.

16        Q.    Okay.  So, it wasn't in your opinion and based on

17   your recollection the policy of Kimberly-Clark to notify the

18   higher-ups, like yourself.  It might bypass them and go down

19   to the facility itself?

11:01 AM 20        A.    That's correct.

21        Q.    Okay.  Well, these cases involve people being

22   exposed to asbestos-containing products at the Coosa Pines

23   facility in sufficient quantities to cause an asbestos-related

24   disease, and death in some cases.  And we filed suit on that

11:02 AM 25   ground and that premise and we have asked to depose somebody

11:02 AM  1   about that and we even set forth the areas.

2   And we have asked to be told in advance what

3   areas you are going to be testifying about.  We have not

4   received any information from the attorneys about that.  And

11:02 AM  5   you have told us that as regarding those subjects, you are not

6   really qualified; and you also said you don't really know

7   exactly why you are here in terms of what areas you have been

8   asked to testify about.

9   So, I think based upon that -- and have I

11:02 AM  10   stated all that correctly?

11   MR. ADAMS:  Objection, form.  And I instruct

12   you not to answer that question.

13   MR. MORGAN:  I don't think we can do that

14   anymore.

11:03 AM  15   MR. ADAMS:  Oh, sure we can.  Pursuant to the

16   Rules, I can instruct a witness not to answer a question that

17   because of the way it's asked could not possibly elicit a fair

18   answer.  And you have asked multiple questions.  You have made

19   jury arguments.  You have made allegations in it.  So, there

11:03 AM  20   is no way he could possibly answer that question the way you

21   asked it.

22   MR. MORGAN:  Form over substance, I think.

23   Q.     (By Mr. Morgan) But you told me -- just to make

24   sure I'm right.  You told me that you are not really qualified

11:03 AM  25   to testify about any of those matters laid out in the notice;

11:03 AM 1     is that correct?

2              MR. ADAMS:  Objection, form.

3        A.    That's correct.

4        Q.    And you told me that you don't really know what --

11:03 AM 5     you really weren't asked to testify about any particular

6     matter today, correct?

7              MR. ADAMS:  Objection, form.

8        A.    That's correct.

9              MR. MORGAN:  What were the other ones I said

11:04 AM 10    awhile ago?

11             MR. ADAMS:  You said --

12             MR. MORGAN:  There's no matter that he was set

13    forth to testify about, nor does he know one.  He is not -- he

14    doesn't know about those.

11:04 AM 15            MR. ADAMS:  Most of that was that speech that

16    you gave at the beginning of it.  So, that's why.

17       Q.    (By Mr. Morgan) Okay.  So, in light of that -- no.

18    There was one.

19             And Mr. Adams said that you had a lot of

11:04 AM 20    knowledge if I would just ask you.  So, assuming that the

21    purpose of this deposition is to determine the amount of

22    asbestos-containing products at the Coosa Pines facility, you

23    can't help us there?

24       A.    That's correct.

11:04 AM 25       Q.    And assuming that we want to know the types of

11:04 AM 1   asbestos-containing products at the Coosa Pines facility, you

2   can't help me there?

3      A.   That's correct.

4      Q.   And in terms of the brand of asbestos-containing

11:05 AM 5   products at the Coosa Pines facility, you can't help me there?

6      A.   That's correct.

7      Q.   And in terms of exposure to asbestos-containing

8   products by employees or contractors, you can't help me there?

9      A.   That's correct.

11:05 AM 10      Q.   In terms of any policies or practices concerning

11   the monitoring of asbestos-containing products, you can't help

12   me there?

13      A.   That's true.

14      Q.   In terms of warnings to contractors concerning

11:05 AM 15   working around asbestos-containing products, you can't help me

16   there?

17      A.   That's correct.

18      Q.   We talked about Kimberly-Clark retaining the right

19   to control the work, not only the scope of work, meaning what

11:06 AM 20   they are doing, but the order in which they do it and

21   approving the plans for the contractors work, correct?

22           MR. ADAMS:  Objection, form.

23      A.   If I understand you, that's correct.

24      Q.   Okay.  In other words, so -- I will go through it a

11:06 AM 25   again, to sort of clean it up.

11:06 AM   1      Kimberly-Clark had the right to determine and

2      direct what work was being done by the contractor on what

3      day --

4                    MR. ADAMS:  Objection, form.

11:06 AM   5      Q.    -- is that right?

6                    MR. ADAMS:  Same objection.

7      A.    Yes.

8      Q.    And Kimberly-Clark approved the plans for the work

9      that was going to be done by the contractor before it was

11:06 AM  10      done, correct?

11      A.    That's correct.

12      Q.    And then they also would approve and in many cases

13      specify the materials that were being used on the premises by

14      the contractors; is that fair?

11:07 AM  15                    MR. ADAMS:  Objection, form.

16      A.    That's not quite that black and white.  But that's

17      not necessarily true.

18      Q.    Well, engineering-wise if you had a job to be done

19      by a contractor, wouldn't you specify the products that were

11:07 AM  20      necessary?  And the contractor might be able to choose within

21      brands that would qualify for that application, but none the

22      less, Kimberly-Clark told them what the work was and what

23      technical specifications would be necessary?

24                    MR. ADAMS:  Objection, form.

11:07 AM  25      A.    Much of that was done with subcontracting work that

11:07 AM 1   we didn't involve ourselves in.  That's -- the big reason is

2   that we didn't retain the right to specify who they would buy

3   a quarter-horse motor from.

4         Q.    That's right.  What you said was:  You need to use

11:07 AM 5   a quarter-horse power motor on this thing.  You didn't really

6   care what kind they got.  But you wanted a quarter-horse power

7   motor.  That's my point.  You may have specified the size of

8   the motor, the horse power of the motor.  But you didn't tell

9   them what brand to go buy; is that right?

11:08 AM 10        A.    That's true.

11        Q.    Okay.  And before a contractor could go to work,

12   they had to have special hazard permits issued if any of the

13   work might be hazardous to a Kimberly-Clark employee; is that

14   right?

11:08 AM 15        A.    That's true.

16        Q.    And again, the contractor or subcontractor had to

17   comply with Kimberly-Clark's safety policies or procedures,

18   didn't they?

19        A.    That's correct.

11:08 AM 20        Q.    Do you know of any employee of Kimberly-Clark that

21   was diagnosed with an asbestos-related disease?

22        A.    Well, one of my old golf buddies had; but it was

23   purportedly related to his tenure at Pascagoula or some place

24   prior to coming to Kimberly-Clark.

11:09 AM 25        Q.    Okay.  What type of disease did he have?

11:09 AM 1     A.    I really don't know, accepting he told me -- it was

2    on the golf course that he was -- this is sort of hazy.  But I

3    recall him telling me that he was drawing some kind of moneys

4    from an asbestos settlement related to a place where he had

11:09 AM 5    worked.

6    Q.    Okay.  And did that not involve a cancer?

7    A.    He ultimately died of lung cancer.

8    Q.    Okay.  When was this that you learned of that?

9    A.    This would have been sometime after my retirement.

11:10 AM 10    Q.    Okay.  Any other employee that you know of that was

11    diagnosed with an asbestos-related disease?

12    A.    No.  I'm not sure he had a disease relevant.  I

13    just know that he was being compensated.  Or I don't know

14    that.  He told me that he was being compensated.

11:10 AM 15    Q.    Just to complete everything.  He told you that he

16    was diagnosed or had some asbestos problem?

17    A.    No.  No.

18    Q.    Just one day he told you I'm getting some money

19    because of an asbestos problem?

11:10 AM 20    A.    Correct.

21    Q.    Which made you think he must have had one or he

22    wouldn't get compensated, right?

23    MR. ADAMS:  Objection, form.

24    A.    I wouldn't want to extrapolate the logic into that.

11:10 AM 25    Q.    Are you even able to tell us today in 2004 what

11:11 AM 1   steps should have been taken back -- by Kimberly-Clark back in

2   the years at least when you were the president?

3            MR. ADAMS:  Objection, form.

4       A.   No.  I can't tell you that.

11:11 AM 5       Q.   And I guess let me -- I didn't ask the question

6   right.

7            Can you tell us today in 2004 what steps

8   should have been taken that weren't taken to ensure that the

9   employees and the contractors on the premises of the Coosa

11:11 AM 10  Pines facility in Alabama weren't exposed to asbestos in

11  quantities sufficient to cause them to contract an

12  asbestos-related disease?

13           MR. ADAMS:  Objection, form.

14      A.   That's sort of convoluted, isn't it?

11:11 AM 15      Q.   No, sir, not really.  And I usually ask those kinds

16  of questions, but that was not one of them.  I am just being

17  very technical in my question.  I wanted to get the facility

18  in there.  I wanted to get, you know, those kinds of things.

19  So, stay with me.

11:11 AM 20           Can you tell us today what steps should have

21  been taken back when you were president to ensure that the

22  employees or contractors at the Coosa Pines facility weren't

23  exposed to asbestos in quantities sufficient to cause disease?

24           MR. ADAMS:  Objection, form.

11:12 AM 25      A.   You still left me somewhere around second base.

11:12 AM 1     Q.    All right.  I will talk slower and maybe louder.

2     A.    I am not prepared today to tell you what I should

3  have done 10, 15, or 20 years ago.

4     Q.    Well, I think that's the answer.  Sitting here

11:12 AM 5  today, you don't know if anything different should have been

6  done at all?

7     A.    I really don't.

8     Q.    You really don't know even what was done back then,

9  do you?

11:12 AM 10     A.    Related to --

11          MR. ADAMS:  Objection, form.  Go ahead.

12     A.    Related to asbestos?

13     Q.    Yes, sir.

14     A.    The answer to that is:  Yes.  I don't know what

11:12 AM 15  should have been done then.  As I said earlier, the subject

16  never was raised.  I had all kind of other subjects related to

17  operations, sales, productivity, the market.  No one ever put

18  on my table anything that said, "You have got an asbestos

19  problem, or might have one," or "Is asbestos in the mill and

11:13 AM 20  you should" -- It never arose.

21     Q.    Well, in looking at these documents, having seen

22  what was written while you were there, you are still not in a

23  position today to say, "Gosh, in looking at that, we should

24  have done something different than we did"?

11:13 AM 25     A.    Not really, no.

11:13 AM 1      Q.     Okay.

2              MR. MORGAN:  You know, I'd like to know some

3      information about some of the things we had asked about; but

4      this gentleman doesn't appear to have that.

11:13 AM 5              So, at this time I don't have any further

6      questions.

7              MR. ADAMS:  Do you have any questions?

8              MS. POLIDORO:  No.

9              MR. ADAMS:  Just a couple.

**EXAMINATION**

11:14 AM 10

11     **BY MR. ADAMS:**

12     Q.     Mr. Pinkerton, first tell me again, when were you

13     born?

14     A.     May 29, 1925.

11:14 AM 15     Q.     And so, this -- in a couple of weeks, you will turn

16     79 years old; is that correct, sir?

17     A.     That's correct.

18     Q.     And you retired from KCC how many years ago?

19     A.     May 1, 1988.

11:14 AM 20     Q.     So, that's 16 years ago?

21     A.     16 years ago almost next week.

22     Q.     Okay.  The Coosa Pines mill that you were president

23     of from '81 to '87, how many acres of ground did that mill

24     itself cover?

11:14 AM 25     A.     The mill ground proper was, I think, 640 acres,

11:14 AM 1    there about.

2        Q.    And during the time that you were president,

3    approximately how many employees were there?

4        A.    About 1200.

11:14 AM 5        Q.    Oh, by the way, the gentleman you were talking

6    about a little while ago who said he was receiving some

7    compensation who ultimately died of lung cancer as you

8    appreciate it, what was his name?

9        A.    His name was J. W. Smith.

11:15 AM 10       Q.    Did he have a nickname?

11       A.    Bugle.

12       Q.    What did he do?

13       A.    He was -- had a number of jobs.  He was a

14    pipefitter.  He was a foreman of a sheet metal shop.  He was a

11:15 AM 15   project foreman, small projects around the mill.

16       Q.    Was he one of your golfing buddies?

17       A.    He was.

18       Q.    And he was a craft worker at the mill?

19       A.    Yes.

11:15 AM 20       Q.    I just wanted to ask you a couple of questions

21    about paper-making.  What type of paper did this mill make?

22       A.    Primarily newsprint paper with some groundwood

23    specialities for conversion into paperback books, magazines,

24    and the like.

11:15 AM 25       Q.    Is that paper-making process a wet process or a dry

11:15 AM 1   process?

2      A.    Very wet.

3      Q.    Can you explain that?

4      A.    Well, we were making in those days as I recall

11:15 AM 5   about 1,500 tons of paper a day; and we were using 40 million

6   gallons of water a day in the process.

7      Q.    And Mr. Morgan asked you whether or not you

8   manufactured any asbestos-containing products at the Coosa --

9   at the Kimberly-Clark facility in question.  To your

11:16 AM 10   knowledge -- and by the way, were you ever involved in product

11   formulation?

12      A.    Yes.

13      Q.    Did any of the products that were ever made by the

14   Coosa Pines mill to your knowledge ever contain asbestos?

11:16 AM 15      A.    No.

16      Q.    Now, did -- speaking about asbestos, did any

17   asbestos product manufacturers ever furnish to you any

18   warnings about the hazards of asbestos while you were employed

19   at Kimberly-Clark?

11:16 AM 20      A.    No.

21      Q.    At any other time?

22      A.    No.

23      Q.    During the time you were president of

24   Kimberly-Clark, were any parts of the mill out of service --

11:17 AM 25   in other words, shut down or closed?

11:17 AM   1      A.     We were in a growth process; and, yes, we shut down

2    what we called the No. 1 craft pulpmill and replaced it with a

3    larger system.  We -- one of the boilers in our power system

4    was down and had been down.  We didn't shut it down during my

11:17 AM   5    tenure.

6      Q.     Which boiler was that?

7      A.     This was in our power generating -- which we

8    acquired from the government.

9      Q.     Did that boiler have a name?

11:17 AM  10      A.     We called it the AOW boiler or powerhouse because

11    that's Alabama Ordnance Works was the name of the munitions

12    facility where we built our mill.

13      Q.     I should have asked you that.  There was a power

14    plant at this mill; is that correct?

11:17 AM  15      A.     That's correct.

16      Q.     Who built that power plant?

17      A.     That was built by the government for power during

18    the era when they were making tetrol and TNT and

19    nitrocellulose at Childersburg, Alabama.

11:18 AM  20      Q.     Was that built by the United States Government or

21    the Alabama government?

22      A.     Built by the United States Government.

23      Q.     Okay.  Did -- when contractors were at the mill,

24    did Kimberly-Clark's employees control the actual work being

11:18 AM  25    done by individual craft workers?  And let me break that down

11:18 AM 1    a little bit.  Would Kimberly-Clark employees tell the craft

2    workers when to report to work and when to go home?

3         A.    Yes.

4         Q.    And do you know if there was a person in charge of

11:18 AM 5    administering contractors, or would it vary from project to

6    project?

7         A.    It would vary.

8         Q.    You were shown some documents yesterday with

9    respect to things that happened after you retired or during --

11:18 AM 10   I'm sorry -- during the time you were president that had to do

11   with asbestos; is that correct?

12        A.    That's correct.

13        Q.    Do you recall seeing any documents with respect to

14   air sampling or monitoring that was done in the plant?  Do you

11:19 AM 15   recall anything like that right now?

16        A.    I'm not sure.

17        Q.    All right.  Let me ask you a quick question or two.

18   Just a second, sir, I'm going to find what I'm looking for in

19   one second, I think.

11:21 AM 20             MR. MORGAN:  Are you looking for the

21   highlighted documents?

22             MR. ADAMS:  Yes.  Did y'all pull those out?

23             MR. MORGAN:  Just that one, but we put it

24   back.  If you will bring the other ones out, we will look at

11:21 AM 25   them.

11:21 AM 1             MR. ADAMS:  I'm getting close, but that's not

2  the one I'm looking for.

3             MR. MORGAN:  Do you want our copy?

4             MR. ADAMS:  Do you have the one that you

11:21 AM 5  showed him that was highlighted at the top?  Hang on a second.

6             MR. MORGAN:  That's the one you are looking

7  for?

8             MR. ADAMS:  I think that's the one I'm looking

9  for.  I will know it when I find it.

11:22 AM 10            MR. MORGAN:  Do you have them in numerical

11  order?

12             MR. ADAMS:  I have them in whatever order we

13  sent them to you.

14             MR. MORGAN:  It was page 67.

11:22 AM 15            MR. ADAMS:  Page 67.

16     Q.   (By Mr. Adams) I think this is what I want right

17  here.  This is it.  The -- Mr. Morgan showed you a document

18  entitled Base-line Industrial Hygiene Survey.  And there was

19  one question I wanted to ask you about.  And that was this

11:22 AM 20  paragraph right here that begins with -- "Only one sample for

21  asbestos was collected."  Would you read the first two

22  sentences of that, please?

23     A.   (Reading) Only one sample for asbestos was

24  collected.  This sample indicated that ambient asbestos

11:23 AM 25  concentrations in the powerhouse were below existing and

11:23 AM 1    pending standards.

2         Q.    Now, is that the powerhouse that you just told us

3    about a moment ago that was built by the United States

4    Government?

11:23 AM 5         A.    Yes.  Yes.

6         Q.    Thank you.

7              MR. ADAMS:  Mr. Pinkerton, that's all I have.

8    Thank you very much, sir.

9                        RE-EXAMINATION

11:23 AM 10   BY MR. MORGAN:

11        Q.    Mr. Pinkerton, can you tell me where else asbestos

12   was found on the Kimberly-Clark facility?

13        A.    I think -- I'm not sure.  I would say asbestos is

14   not that uncommon in most operating areas of the mill where

11:23 AM 15   insulation is required.

16        Q.    Okay.  And I take it that at some point in time the

17   mill work was done -- power-wise was done by steam?

18        A.    Much of it, yes.

19        Q.    And so, when we were talking about a powerhouse,

11:24 AM 20   what was that?  Was it a steam powerhouse?

21        A.    It was a 25,000 KVA electro-generating plant,

22   coal-fired, 250,000 tons a year coal.

23        Q.    All right.  And was it used to produce the steam?

24        A.    It was our process steam generator and auxiliary

11:24 AM 25   electricity generator.

11:24 AM 1     Q.    All right.  And was there another steam generating

2     facility besides that?

3     A.    Well, there was steam that was generated by

4     recovery boilers in the craft pulpmill, as well.

11:24 AM 5     Q.    All right.  Now, did you say the U.S. Government

6     built this power plant what year?

7     A.    About 1944 or '45.

8     Q.    All right.

9     A.    Right at the end of the second World War.

11:24 AM 10     Q.    And did they also provide all the steam lines that

11     ran throughout the facility?

12     A.    Not to our plant because it didn't exist at that

13     point in time.  Our plant was built in '48, '49.

14     Q.    Okay.  So, when the government built that

11:25 AM 15     powerhouse, what was it for?

16     A.    For the generation I mentioned earlier of the

17     smokeless powder, tetrol, TNT.  It was one of the largest --

18     the Kingsport Ordnance is one -- and all over the country.

19     Q.    Well, who was making that product or those

11:25 AM 20     products?

21     A.    One of the contractors there was Du Pont.  I don't

22     know who the others are or had -- operating those plants for

23     the government.

24     Q.    I'm sorry.  I got confused.  I thought that

11:25 AM 25     Mr. Adams was asking you questions about a power plant that

11:25 AM  1    was built for Kimberly-Clark.

2         A.    No.  It was bought by us as a part of the property

3    that we bought to build our mill.  The power plant and the

4    water filtration plant were government constructions which

11:25 AM  5    came with our purchase of the plant -- of the plant site for

6    the building of our papermill.

7         Q.    I got you.  Okay.  So, the government originally

8    built it but then abandoned it if by no other means than

9    selling it?

11:26 AM  10        A.    That's right.

11        Q.    Okay.  And then, y'all built the facility --

12    Kimberly-Clark built the facility --

13        A.    The papermill, uh-huh.

14        Q.    -- and ran all the steam lines and everything that

11:26 AM  15    connected back to that power plant?

16        A.    That's correct.

17        Q.    And in addition to that power plant, there were

18    other areas to help generate steam for the power that the

19    facility might need?

11:26 AM  20        A.    And for the recovery of chemicals in our craft

21    pulpmill.

22        Q.    Okay.  And so -- and when we were talking about

23    other facilities for the generation of steam, we are talking

24    about boilers?

11:26 AM  25        A.    That's true.

11:26 AM 1      Q.    How many boilers were on the Kimberly-Clark

2   facility?

3      A.    Well, it varies according to the date.  But we

4   originally only had one recovery boiler.  Then we expanded the

11:27 AM 5   mill and had a second recovery boiler.  Then we expanded the

6   mill again and had a third recovery boiler.

7      Q.    Okay.  What year did you go to two recovery

8   boilers?

9      A.    I believe that was in -- when we put in our third

11:27 AM 10   paper machine, which would have been 1956 or '57, thereabouts.

11      Q.    All right.  And what about the third one?

12      A.    It was concurrent with the installation of craft

13   pulp -- our rolled fluff pulpmill in about 1967.

14      Q.    Okay.  And size-wise were they all about the same

11:27 AM 15   size?

16      A.    No.  No.  They were sequentially larger based on

17   the expanded operation.

18      Q.    Okay.  Can you give us some idea of the largest

19   boiler that we are talking about, not the original power

11:28 AM 20   plant, but the largest -- the third boiler, recovery boiler?

21      A.    I'm afraid my memory bank goes out.  They are

22   discussed in terms of tonnage or tons, and I really don't --

23   can't answer that question.

24      Q.    Okay.

11:28 AM 25            THE VIDEOGRAPHER:  About six minutes of the

11:28 AM 1  tape left.

2        Q.   At any -- let me back up.  Was the power plant

3  purchased from the government before 1948?

4        A.   It would have been in that area.  And I wouldn't

11:29 AM 5  want to say before '48 or right after '48, because I was hired

6  to go to work for that facility at that time.  And that's when

7  the whole thing was unfolding, and I wasn't involved in that

8  process then.

9        Q.   Okay.  So, the facility itself was built --

11:29 AM 10       A.   The original facility was built in 1948 and '49.

11       Q.   Okay.  And of course they had to buy the powerhouse

12  from the government before that?

13       A.   That's correct.

14       Q.   And who was responsible for making repairs or

11:29 AM 15  modifications to that powerhouse, the original powerhouse?

16            MR. ADAMS:   Objection, form.

17       A.   We didn't modify that powerhouse until -- of

18  substance until 19 -- some of my part in 1983, '84, when we

19  put in scrubbers and precipitators.

11:30 AM 20       Q.   All right.  Well, at that time did you call out the

21  government to come do that?

22       A.   No.  No.  We acquired the whole property in 1948

23  from the government or thereabouts.

24       Q.   All right.  And so, if there had been repairs or

11:30 AM 25  maintenance, it was performed by Kimberly-Clark or a

11:30 AM 1  subcontractor or a contractor; but you didn't call the

2  government out to come take care of that power plant?

3      A.    That's correct.

4      Q.    And that power plant operated for Kimberly-Clark at

11:30 AM 5  the Coosa Pines facility from 1948 when it began to be your

6  baby until 1983 when y'all made some modifications?

7      A.    That's correct.

8      Q.    And I assume it's still there today?

9      A.    It's still operating.

11:31 AM 10     Q.    Okay.  Do you know if there is any air monitoring

11  responsibility on the part of corporations for things like

12  asbestos?

13     A.    I don't know about asbestos.  Air monitoring of

14  stack gases, yes.  But the asbestos I have no idea about.

11:32 AM 15     Q.    Okay.

16               MR. MORGAN:  Let me go off the record.  He

17  needs to change the tape anyway.

18               Have you got some questions?

19               MR. ADAMS:  I have got two real quick.  Do you

20  want me to ask them real quick?

21               MR. MORGAN:  Go ahead.

22                      **RE-EXAMINATION**

23  **BY MR. ADAMS:**

24     Q.    Did Kimberly-Clark sell this mill, to the best you

11:32 AM 25  know?

11:32 AM   1      A.      Yes.   They sold it.

2      Q.      When was that; and to whom was it sold, as far as

3   you know?

4      A.      Well, it was sold to Alliance.   I really don't know

11:32 AM   5   the year that it was sold.

6      Q.      After --

7      A.      After I retired.

8              MR. ADAMS:   Thank you, sir.

9              Thank you, Glen.

11:32 AM  10              THE VIDEOGRAPHER:   Off the record at 11:32.

11              (PROCEEDINGS CONCLUDED)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NO. B-150,896

| | |
|---|---|
| INEZ MARTIN, ET AL | ) IN THE DISTRICT COURT OF |
| Plaintiffs, | ) |
| VS. | ) JEFFERSON COUNTY, TEXAS |
| ACandS, INC., ET AL | ) |
| Defendants. | ) 60TH JUDICIAL DISTRICT |

REPORTER'S CERTIFICATION
DEPOSITION OF S. B. PINKERTON
April 16, 2004

I, STARLA L. FOUST, a Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, S. B. PINKERTON, was duly sworn by the Officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on _____, to the witness or to the attorney for the witness for examination, signature and returned to me by _____;

That the amount of time used by each party at the deposition is as follows:

MR. GLEN MORGAN - 1:44

MR. KENT ADAMS - 0:10

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

MR. GLEN MORGAN, Attorney for Plaintiffs

1   MR. DAVID FERRELL, Attorney for Plaintiffs

2   MR. CHRIS PORTNER, Attorney for Plaintiffs

3   MR. KENT ADAMS, Attorney for Defendant

4   MR. LANE YOUNG, Attorney for Defendant

5   MS. SARAH TURNIPSEED, Attorney for Defendant

6   MS. DONNA POLIDORO, Attorney for Defendants

7   I further certify that I am neither counsel for, related

8   to, nor employed by any of the parties or attorneys in the

9   action in which this proceeding was taken, and further that I

10  am not financially or otherwise interested in the outcome of

11  the action.

12  Further certification requirements pursuant to Rule 203

13  of TRCP will be certified to after they have occurred.

14  Certified to by me this _21st_ of _April_, _2004_.

15

16

17  STARLA L. FOUST, Texas CSR 5946
    Expiration Date:    12-31-05
18  Charlotte Smith Reporting, Inc.
    Firm Registration No. 273
19  235 Orleans Street
    P. O. Box 4049
20  Beaumont, Texas   77704-4049
    (409) 839-4407

21

22

23

24

25

FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition was/was not returned to the deposition officer on _____;

If returned, the attached Changes and Signature pages contains any changes and the reasons therefor;

If returned, the original deposition was delivered to _____, Custodial Attorney;

That $_____ is the deposition officer's charges to the Plaintiff for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein and filed with the Clerk.

Certified to by me this _21st_ day of _April_, _2004_.


STARLA L. FOUST, Texas CSR 5946
Expiration Date:    12-31-05
Charlotte Smith Reporting, Inc.
Firm Registration No. 273
235 Orleans Street
P. O. Box 4049
Beaumont, Texas   77704-4049
(409) 839-4407

## CHANGES AND SIGNATURE

**PAGE**       **LINE**       **CHANGE**                         **REASON**

1 _____
2 _____
3 _____
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

1    I, S. B. PINKERTON, have read the foregoing deposition

2  and hereby affix my signature that same is true and correct,

3  except as noted above.

4

5                                    _____

6                                    S. B. PINKERTON

7  THE STATE OF _____)

8  COUNTY OF _____)

9    Before me, _____, on this day

10 personally appeared S. B. PINKERTON, known to me (or proved to

11 me under oath or through _____) (description of

12 identity card or other document) to be the person whose name

13 is subscribed to the foregoing instrument and acknowledged to

14 me that they executed the same for the purposes and

15 consideration therein expressed.

16    Given under my hand and seal of office this _____ day of

17 _____, _____.

18

19                                    _____

20                                    NOTARY PUBLIC IN AND FOR
                                       THE STATE OF _____

21

22

23

24

25

**A**

abandoned 74:8
abatement 23:14
ability 46:5 53:21
able 61:20 63:25
above-styled 1:17
ACandS 1:5 79:5
accepting 63:1
accident 29:17,20
accidentally 48:3
acknowledged 83:13
acquired 69:8 76:22
acres 66:23,25
action 80:9,11
activities 14:21
actual 51:2 69:24
Adams 1:20 2:7,7 3:6,8
  4:6 7:3 12:4,9,14
  13:11 14:6,13,16
  15:22 16:5,8,14 17:6
  18:2 20:2,5,19 21:5
  23:17 24:14,18,20
  25:19 27:7,10,13,16
  27:18 28:1 32:6,15
  34:18 35:4,6,10,19
  37:2,24 38:3,7,10,13
  38:17,19 39:8,14,20
  41:2 45:17 46:12,15
  47:25 48:2,8,13,17
  51:4 52:2,12,23 53:17
  54:1 55:4,9 56:8
  57:14 58:11,15 59:2,7
  59:11,15,19 60:22
  61:4,6,15,24 63:23
  64:3,13,24 65:11 66:7
  66:9,11 70:22 71:1,4
  71:8,12,15,16 72:7
  73:25 76:16 77:19,23
  78:8 79:21 80:3
addition 74:17
address 4:16
addressed 49:3,7 50:25
adequate 30:17
adjust 46:9
administering 70:5
administrator 5:15
  7:14
advance 58:2
affix 83:2
afraid 23:10 75:21
ago 35:17 59:10 65:3
  66:18,20,21 67:6 72:3
agree 38:13
ahead 7:7 14:14 17:7
  24:20 32:7 39:20
  46:13 48:4,9 52:2
  65:11 77:21
air 21:11,13 70:14
  77:10,13
airborne 19:11

AL 1:2,5 79:2,5
Alabama 4:18 5:12,20
  6:9 10:9,10 25:17,22
  26:1 37:6 64:10
  69:11,19,21
alive 11:13 15:6 49:19
  49:20
allegations 58:19
Alliance 9:3,3 10:2
  78:4
ambient 71:24
amount 59:21 79:18
annual 29:11
answer 7:4,8 12:4,6
  16:5 18:3 23:8,13
  24:19,20 27:13 28:1
  36:1,5 41:2 46:14,15
  52:6 56:9 58:12,16,18
  58:20 65:4,14 75:23
answered 52:5
anybody 16:3 53:6
anymore 58:14
Anytime 53:1
anyway 48:12 77:17
AOW 69:10
apparently 47:24 53:9
appear 66:4
Appearances 3:2
appeared 83:10
application 19:22
  61:21
appreciate 36:17 67:8
approaches 31:3
appropriate 31:11
  56:11,12
approve 61:12
approved 61:8
approving 60:21
approximately 67:3
April 1:12,18 13:4,13
  79:8
area 10:23,25 18:5,6
  28:18 31:14 76:4
areas 13:6,10 14:9
  23:22 30:16,17 32:14
  40:20 43:14 47:17
  58:1,3,7 72:14 74:18
arguments 58:19
arose 65:20
asbestos 13:21 16:19
  17:5 18:10,17 20:8
  21:12,24 22:1,9 23:14
  33:1,8,19,20 34:17,19
  51:1,24 52:4,14,19
  53:7,15,23 56:17,18
  63:4,16,19 64:10,23
  65:12,18,19 68:14,16
  68:17,18 70:11 71:21
  71:23,24 72:11,13
  77:12,13,14
asbestos-containing

13:24 15:19 16:12
  17:16,20,25 18:21,25
  19:3,7,11,15,22 20:13
  20:17,18 21:4,9,18,21
  22:3 23:2,6 24:13
  36:20 37:5 40:22
  57:22 59:22 60:1,4,7
  60:11,15 68:8
asbestos-related 52:9
  57:23 62:21 63:11
  64:12
aside 48:12
asked 16:16 17:2,9,14
  23:4,7 24:16 30:7
  32:12 35:25 36:2
  41:6 57:25 58:2,8,17
  58:18,21 59:5 66:3
  68:7 69:13
asking 32:17 37:7 45:2
  54:12 55:10 73:25
aspect 46:8
assigned 45:5
assignments 7:12
assistant 43:12
associated 25:24
associates 8:21
assume 22:19 35:4,18
  38:14 47:7 48:24
  77:8
assumed 16:24 33:5
  41:8 42:12,13,23 43:1
  43:2 44:3 45:12
assuming 40:11 59:20
  59:25
Atlanta 2:11,14 10:24
  10:25
attached 1:22 81:4
attend 29:4 34:9
attendance 29:6
attending 28:24
attention 23:21 33:6,7
  45:22 54:15
attorney 79:15,25 80:1
  80:2,3,4,5,6 81:7
attorneys 58:4 80:8
attorney-client 16:6
August 54:25
authority 46:6,7,23
auxiliary 72:24
available 34:10
awhile 59:10
a.m 1:18,18

**B**

B 1:11,15 3:4 4:9 79:7
  79:11 83:1,5,10
baby 77:6
back 5:20 8:16,20 13:8
  23:4 27:11 30:6
  31:21 38:20 43:12
  51:10 55:23 64:1,1,21

65:8 70:24 74:15
  76:2
background 4:25
badges 34:23
Bagby 2:17
bands 30:1
bank 75:21
base 64:25
based 32:19 40:12
  57:16 58:9 75:16
Base-line 54:25 71:18
basically 33:15
basis 45:2
Beaumont 1:21 2:5,8
  2:21 80:20 81:20
becoming 27:25
began 77:5
beginning 59:16
begins 71:20
behalf 12:25 32:23
believe 10:1 15:7 22:6
  35:17 48:11 75:9
Ben 9:24
benefits 8:14
best 22:16 77:24
better 27:6 33:23
big 34:5 62:1
Birmingham 10:12,14
  10:16,18,18,23
Bissell 2:17
bit 39:23 70:1
black 61:16
Bob 9:8,18
BOC 2:16
boiler 69:6,9,10 75:4,5
  75:6,19,20,20
boilers 69:3 73:4 74:24
  75:1,8
bond 26:18
book 11:3 27:12,20,21
books 26:7 67:23
born 66:13
borrow 38:7
boss 53:12
bought 74:2,3
Box 81:19 81:19
Boxes 26:24
brand 60:4 62:9
brands 21:18 23:6
  61:21
break 7:10 12:7,13
  69:25
brief 5:5 12:16 28:6
  38:22
bring 13:8 46:19 70:24
Brothers 2:15
brought 23:21 29:10
  33:6,7,9 34:6 45:21
  54:14
Brown 4:15
buddies 62:22 67:16

Bugle 67:11
build 74:3
building 74:6
built 5:13 69:12,16,17
  69:20,22 72:3 73:6,13
  73:14 74:1,8,11,12
  76:9,10
business 10:7
buy 62:2,9 76:11
buzzard's 11:6
bypass 56:6,24 57:18
Bypassing 56:10
B-150,896 1:1 79:1

**C**

C 2:1 4:1 9:18
Calidria 22:13
call 6:23,24 12:7 14:11
  76:20 77:1
called 5:12 18:5 27:12
  28:25 30:22 43:17
  45:23 50:5 52:17
  69:2,10
Canada 48:21 49:7
cancer 63:6,7 67:7
capacities 6:20
capacity 6:22,23
card 83:12
cards 11:2
care 62:6 77:2
Carolina 49:23
carpenters 8:18
cars 30:21
case 13:3 26:19 30:14
  39:10 40:11 41:17
cases 33:5 57:21,24
  61:12
categories 16:4
cause 1:17 8:16 33:1
  47:7 56:20 57:23
  64:11,23
causing 31:16
certain 47:17
certainly 36:4 54:5
  56:10
certificate 3:10 81:12
certification 79:7 80:12
  81:1
certified 79:9 80:13,14
  81:14
certify 79:10 80:7
cetera 13:8 23:6 34:5
change 32:3,11 52:18 77:17 82:2
changed 29:20 32:8
changes 3:9 81:4,5 82:1
charge 15:2 24:25 70:4
charges 81:8
Charlotte 80:18 81:18
chart 46:21
check 8:12

**Chemical** 5:3
**chemicals** 31:25 32:4 74:20
**chief** 23:19 45:5 48:24
**child** 4:24
**Childersburg** 69:19
**Children** 4:23
**chipping** 25:24
**chlorine** 30:20
**choose** 61:20
**CHRIS** 2:4 80:2
**Christmas** 8:19 11:2
**circumstance** 53:19
**Civil** 1:21
**Clark** 11:23 44:10,15
**class** 33:22
**classic** 27:25
**clean** 60:25
**clear** 54:7
**Clerk** 81:13
**client** 16:7
**close** 71:1
**closed** 68:25
**club** 50:4,4 ''
**coal** 72:22
**coal-fired** 72:22
**coated** 27:1,4,5,23
**coffee** 8:22 27:17
**Coffey** 1:20 2:7
**collected** 71:21,24
**come** 8:6 28:13 46:10 53:3,6 56:22 57:10 76:21 77:2
**comes** 52:14
**coming** 62:24
**comment** 32:15 37:12 48:14 56:18
**comments** 40:19
**commitment** 29:24 30:4 54:13
**committee** 28:15 49:16
**company** 2:16 8:11 26:9 33:16 34:6 41:20 49:8 51:16 54:24
**compensated** 63:13,14 63:22
**compensation** 67:7
**competition** 27:24
**complete** 2:20 63:15
**completely** 31:1
**compliance** 41:7,9
**complies** 13:17
**comply** 62:17
**concentration** 27:23
**concentrations** 71:25
**concerning** 17:15 18:17 18:20 19:6 40:22 60:10,14
**CONCLUDED** 78:11
**concurrent** 75:12

**condition** 37:11 40:19
**conducted** 21:11
**confirm** 37:9
**confused** 73:24
**connected** 74:15
**consequence** 33:5
**consider** 17:19,23 18:4
**consideration** 83:15
**considered** 31:10 42:4 55:19 56:19
**constructed** 29:9
**construction** 20:16,23
**constructions** 74:4
**consultant** 6:13
**consumer** 27:23
**contact** 35:16
**contacted** 7:24
**contain** 68:14
**contains** 81:5
**contract** 45:23 46:3 47:10 64:11
**contracted** 45:1
**contractor** 14:4,18 17:10 19:6 20:11 22:17 23:25 44:22 45:16 46:2,9,24 47:5 47:13 61:2,9,19,20 62:11,16 77:1
**contractors** 19:21 21:3 60:8,14,21 61:14 64:9 64:22 69:23 70:5 73:21
**control** 60:19 69:24
**controller** 44:7
**conversion** 67:23
**convoluted** 64:14
**Cooper** 2:16
**coordinator** 5:15
**Coosa** 6:9,10,16,18 21:22 22:7 25:18 26:2 37:6 40:21 41:22 42:2 53:2 54:24 57:7,22 59:22 60:1,5 64:9,22 66:22 68:8,14 77:5
**copies** 81:10
**copy** 38:7 71:3 81:12
**corporate** 12:22 25:12 25:25 27:21 41:19,21 48:21 49:12 50:18 51:21 53:1 56:1 57:2 57:6
**corporately** 56:25
**corporation** 2:6,9,12 52:19 54:8 56:4
**corporations** 77:11
**correct** 22:12 30:9 31:19,24 33:13,17 34:8 44:2 47:16,20 53:13 54:11 57:20 59:1,3,6,8,24 60:3,6,9

60:17,21,23 61:10,11 62:19 63:20 66:16,17 69:14,15 70:11,12 74:16 76:13 77:3,7 83:2
**corrected** 30:18
**corrections** 28:20
**correctly** 58:10
**cost** 29:11
**counsel** 79:24 80:7
**country** 73:18
**COUNTY** 1:4 79:4 83:8
**couple** 66:9,15 67:20
**course** 7:11 8:24 63:2 76:11
**courses** 33:25
**COURT** 1:2 79:2
**cover** 66:24
**covering** 53:4
**covers** 5:11
**craft** 67:18 69:2,25 70:1 73:4 74:20 75:12
**CSR** 1:19 80:17 81:17
**currently** 10:9
**Custodial** 81:7
**customer** 23:20
**customers** 6:24
**cut** 31:22

**D**

**D** 3:1 4:1
**daily** 7:22 25:15
**damage** 33:10,11
**damn** 31:5
**Darwin** 27:22
**date** 13:14 75:3 80:17 81:17
**dated** 48:19 51:1 55:1
**DAVID** 2:3 80:1
**Davis** 35:11
**day** 41:9,10 46:2 61:3 63:18 68:5,6 81:14 83:9,16
**days** 8:15 12:3 68:4
**day-to-day** 42:1 45:2
**death** 33:2 57:24
**deceased** 11:25 42:8 44:20
**dedicated** 28:25 29:14
**Defendant** 2:6,9,12 80:3,4,5
**Defendants** 1:6 2:15 79:6 80:6
**definitive** 51:9
**delighted** 36:15
**delivered** 81:6,11
**Delsey** 26:14,16
**department** 5:19 14:22 15:2 24:21 43:3

**depending** 31:14 45:6 49:23
**depends** 15:13
**depose** 57:25
**deposition** 1:10,15 4:5 7:25 12:23 13:9,12,16 16:9 59:21 79:7,12,14 79:19,22 81:2,3,6,8,9 81:11 83:1
**deputies** 55:21
**description** 83:11
**designate** 13:1
**determine** 19:11 21:12 23:15 24:17 59:21 61:1
**diagnosed** 52:9 62:21 63:11,16
**diapers** 26:16
**died** 51:24 52:3 63:7 67:7
**different** 7:11 16:22 31:17 34:12 35:11 43:3,14 50:1 65:5,24
**dinner** 29:22
**dinners** 29:18
**diplomas** 35:2
**direct** 46:9 61:2
**directed** 47:19 49:5 53:11
**directive** 28:16
**directly** 43:15 44:5
**disability** 33:2
**discussed** 50:25 51:1,2 75:22
**disease** 57:24 62:21,25 63:11,12 64:12,23
**diseases** 52:10
**disposition** 10:8 27:22
**district** 1:2,6 5:15 79:2 79:6
**division** 5:19,25 6:3,7 25:25 41:15 52:17 56:6 57:1,9
**divisional** 25:12
**divisions** 6:4 26:1
**dock** 30:20
**doctors** 29:10
**doctor's** 29:4
**document** 25:5 32:23 47:23,24 48:18,19 49:6 50:24 51:3,10,18 51:23 53:10 55:5 71:17 83:12
**documents** 25:14 36:24 36:25 37:3,5,13,16,22 38:4,25 39:1,1,12,16 40:3,5,8,12 48:3 65:21 70:8,13,21
**doing** 31:3 46:24 60:20
**DONNA** 2:16 80:6
**Draconian** 31:2

**drawing** 63:3
**drops** 31:22
**dry** 67:25
**Du** 73:21
**duly** 1:17 4:10 79:11

**E**

**E** 2:1,1 3:1 4:1,1
**earlier** 24:3 28:8 54:10 65:15 73:16
**education** 19:25 20:8 33:19 34:1
**educational** 4:25
**effected** 28:20
**Effective** 29:3
**eight** 6:6
**either** 19:22 20:11 34:10 46:3 49:9,22
**Electric** 2:15
**electricity** 72:25
**electro-generating** 72:21
**elicit** 58:17
**employed** 68:18 80:8
**employee** 15:12 29:21 29:22 62:13,20 63:10
**employees** 20:11,12 21:3 23:1 24:2 29:11 29:15 30:5 32:5 47:13 51:24 52:3,9,20 53:16,23 60:8 64:9,22 67:3 69:24 70:1
**employment** 16:24
**ended** 5:21
**engineer** 5:13 45:4,7 46:19
**engineering** 5:3 45:5,7
**engineering-wise** 61:18
**enhanced** 39:2
**ensure** 24:1 64:8,21
**entitled** 71:18
**entity** 41:20,21 52:17
**environmental** 41:9
**equipment** 31:10
**equivalent** 41:19 44:12
**era** 69:18
**eroding** 11:20
**establish** 35:22 38:14
**established** 16:25
**estimate** 7:9
**et** 1:2,5 13:8 23:6 34:5 79:2,5
**evasive** 25:4
**everybody** 34:21 57:6
**exactly** 58:7
**examination** 3:5,6 4:11 66:10 79:16
**example** 27:4
**exams** 29:11
**exchange** 11:2
**Excuse** 16:15

executed 83:14
executive 6:13 23:19
 48:25 49:15 50:18
exhibits 81:10
exist 5:13 73:12
existed 28:21
existing 71:25
expanded 75:4,5,17
expel 47:3,5
experience 34:6
Expiration 80:17 81:17
explain 42:1 68:3
exposed 37:11 52:20
 53:16,23 57:22 64:10
 64:23
exposure 18:17 20:12
 33:19 51:24 60:7
exposures 33:1
expressed 83:15
extensively 7:8
extent 53:20
extrapolate 63:24

**F**

facilities 19:8 74:23
facility 13:20 14:5,19
 16:18 17:4,11,17
 19:12 20:16,24 21:3,8
 21:19,22 22:7 23:19
 25:18 26:3 29:10
 31:25 36:19,21 37:6
 40:21 41:23 42:2
 47:14,18 48:25 56:7
 57:9,19,23 59:22 60:1
 60:5 64:10,17,22 68:9
 69:12 72:12 73:2,11
 74:11,12,19 75:2 76:6
 76:9,10 77:5
fact 21:22 31:5 33:4
 37:9 55:19
fair 58:17 61:14
falling 30:10,16
falls 30:10
familiar 54:22
families 30:1
famous 26:13
Fannin 1:20 2:8
far 10:14,16 78:2
farther 10:17
fast 46:9
features 27:22
February 55:2
feet 21:7
felt 17:15 45:15 46:8
 47:5
FERRELL 2:3 80:1
fibers 19:12 21:12 22:9
field 6:23
filed 57:24 81:13
filled 42:13
filtration 74:4

financial 41:19
financially 80:10
find 13:7 23:25 32:18
 39:10 40:12 70:18
 71:9
fine 48:9
finger 31:22
finish 7:3 57:14
finished 31:1
fired 29:5
firm 35:12 80:18 81:18
first 4:10 5:12 7:24
 15:23,25 32:25 41:7
 66:12 71:21
fit 16:4
fitness 29:9
five-year 11:18
Florida 49:22
fluff 75:13
followed 20:20
following 79:10,23
follows 4:10 79:19
foregoing 83:1,13
foreman 67:14,15
forest 5:25 6:2 10:7
 41:14 44:7 52:17
 54:24
forget 30:13
forgotten 10:13
form 16:14 17:6 18:2
 20:2,5,19 21:5 23:17
 24:14 25:19 32:6
 34:18 35:23 45:17
 46:12 52:2,12,23
 53:17 54:1 56:8
 58:11,22 59:2,7 60:22
 61:4,15,24 63:23 64:3
 64:13,24 65:11 76:16
formal 29:22
formally 24:8
formulation 68:11
forth 13:1 23:1 58:1
 59:13
forward 23:8,15
found 31:17 47:23
 72:12
four 32:23
Foust 1:19 79:9 80:17
 81:17
free 47:14
Friday 12:12
friends 28:4
front 32:19 37:18
full 4:13
fullest 53:20
fully 6:14
function 41:18,19
funny 11:20
furnish 68:17
further 66:5 80:7,9,12
 81:1

**G**

G 4:1
Gade 49:15,18,19
gallons 68:6
Gamble 27:24
Gardens 27:6
gases 77:14
Gasper 51:13 55:2,6,22
general 5:22 11:22
 13:16 34:4 44:11
 48:23
Generally 37:10
generate 74:18
generated 25:14 56:6
 73:3
generating 69:7 73:1
generation 73:16 74:23
generator 72:24,25
gentleman 16:8 66:4
 67:5
gentleman's 13:5
geographically 6:8
Georgia 2:11,14 5:2
getting 56:13 63:18
 71:1
give 7:9 23:13 25:2
 27:4 28:12 33:18
 56:7 75:18
given 79:13,22 83:16
giving 7:24
glancing 56:15
Glen 2:3 3:5,7 12:10
 35:6,19 48:2 51:5
 55:5 78:9 79:20,25
go 6:23 7:7 8:16,20
 14:14 17:7 22:16
 23:10 24:16,20,24
 30:6 32:7 39:20
 46:13 47:17 48:4,9
 52:2 57:11,18 60:24
 62:9,11 65:11 70:2
 75:7 76:6 77:16,21
goes 46:2 54:20 75:21
going 12:11 35:22 40:8
 41:5 58:3 61:9 70:18
golf 50:4 62:22 63:2
golfing 67:16
good 27:12,20 28:4
 29:6 48:1
Gosh 65:23
government 69:8,17,20
 69:21,22 72:4 73:5,14
 73:23 74:4,7 76:3,12
 76:21,23 77:2
graduated 5:2
Great 27:12,20
greater 10:25
ground 57:25 66:23,25
groundwood 26:4,7
 43:14 67:22

group 2:16 28:23
groups 8:18
growth 69:1
guess 8:1 9:15 22:16
 43:5 44:7 47:13 52:5
 64:5
guidelines 19:10
guy 24:3,22 34:4 54:20
 55:22
G-a-d-e 49:18

**H**

habit 25:10
half 7:13
halt 45:14,25
hand 37:23 83:16
handed 38:24
handle 23:1
handled 32:4
handling 18:24 19:3
 32:9
Hang 38:19 71:5
happen 23:19
happened 46:16 48:2
 70:9
happy 35:7,8
harmful 33:20 52:20
 53:15
hauncho 34:5
Hawkins 2:10
hazard 23:20 54:5
 62:12
hazardous 28:18 37:11
 53:19 62:13
hazards 20:8 21:24,25
 28:20 30:7,15 34:12
 34:17,19 54:11,14
 68:18
hazy 63:2
head 24:22 31:22 34:4
 45:7
heads 43:3
health 29:9
heard 22:13 53:18
hearing 51:18
help 41:5 43:19 46:10
 59:23 60:2,5,8,11,15
 74:18
herd 46:20
hereto 1:23
hiatus 9:23
hide 36:4
high 4:25
higher-ups 57:18
highest 13:18 14:2,3,18
 16:17 17:2,9
Highlands 49:23,24
 50:2,5
highlighted 39:2,4,11
 39:12 40:12 47:23,24
 48:3 70:21 71:5

high-risk 53:19
Himple 35:11
hire 15:14
hired 5:12 76:5
Hobart 2:15
hold 5:9
home 57:3 70:2
Homes 27:6
home-based 7:1
honestly 34:19
honesty 36:18
honeymoon 5:5 50:13
Hook 11:23,24 44:10
 44:15
horse 62:8
hourly 28:23
hours 29:16,25 30:1
housekeeping 30:11
 31:6
Houston 2:18
Huggies 26:16
hurt 31:23
hygiene 54:25 57:8
 71:18
hygienist 51:21 56:2
 57:3
H-o-o-k 44:17

**I**

idea 15:9 75:18 77:14
identified 14:8 30:14
 31:15
identify 30:7 37:1
identity 83:12
immediate 28:20
immediately 5:6 11:9
 29:3
impinger 21:16
impingers 21:15
implication 37:10
important 47:4
improved 29:15
includes 79:24
Indian 11:6,7
indicate 56:16
indicated 71:24
individual 12:24,25
 13:1,19,21 14:2,3,18
 14:25 16:17 17:3,10
 69:25
industrial 51:21 54:25
 56:1 57:3,7 71:18
Industries 2:16
INEZ 1:2 79:2
information 13:5 29:2
 36:3,19 58:4 66:3
 79:22
informed 41:6
injured 31:16
injuries 31:20
injury 23:20 33:10

inquiry 14:9
inspect 30:25
installation 13:24
  15:19 16:12 17:24
  75:12
installed 24:12
instance 1:16 13:17
  18:9 54:17
instituted 28:9
instruct 16:5 58:11,16
instructed 12:6
instrument 83:13
insulated 21:8
insulation 72:15
insulators 19:18
interaction 8:10
intercepted 56:21
interested 45:8 80:10
interruption 20:6
invades 16:6
involve 23:22 57:21
  62:1 63:6
involved 21:4 23:18
  41:17,18 53:4 68:10
  76:7
involvement 45:12
involving 33:7,19
in-and-out 15:14
issued 62:12
item 23:10,11
items 28:18 32:23
  56:10,16

**J**

J 67:9
jail 54:20
JEFFERSON 1:4 79:4
job 11:22 28:16 31:1
  41:8 42:23 45:1 46:8
  61:18
jobs 5:11 25:1 67:13
judge 12:8 32:16 35:19
judgment 55:20
JUDICIAL 1:6 79:6
June 5:6
jury 58:19

**K**

KCC 66:18
KENT 2:7 3:6,8 79:21
  80:3
Kimberly-Clark 2:6,9
  2:12 5:6,7,10,19 6:1,3
  6:15 8:4,6,10 12:2,21
  13:13,20,25 14:5,8,19
  15:12 16:18 17:4,11
  17:17,21 18:24 19:8
  19:12,15 20:11,12
  21:19 22:2,8 23:1
  24:1,2 25:5,20 26:9
  27:23 32:11,13,14,24

32:25 34:10,14,15,16
  40:20,20 44:22,23
  45:14 46:1,4,20,23
  47:3,19 49:3,16 51:20
  51:25 56:4 57:17
  60:18 61:1,8,22 62:13
  62:20,24 64:1 68:9,19
  68:24 70:1 72:12
  74:1,12 75:1 76:25
  77:4,24
Kimberly-Clark's
  12:25 15:20 16:13
  17:25 21:8 62:17
  69:24
kind 26:18 33:22 36:16
  39:22,23,24 45:8,13
  53:24 54:3 55:17
  62:6 63:3 65:16
kinds 64:15,18
Kingsport 73:18
Kleenex 26:13
KM67 48:19
knew 29:15 52:19 53:1
Knight 9:24,25 10:3,19
know 9:10,13,20 10:3,5
  10:9,11,23 11:1 12:11
  13:11 14:13 15:8
  16:11 17:8,18 18:9,9
  18:12,14,16,19,23
  19:2,5,10,14,18,21
  21:11,15,15,18,21,25
  21:25 22:2,5,8,10,11
  22:22,22,23,24 23:3,9
  24:8,9 26:1 30:13
  32:12,19 34:15,16,19
  34:20,21,25,25 36:1,5
  36:20,23 37:19 39:22
  39:23 40:3,4,6 44:21
  45:18,19 49:1,21,24
  50:11,22 51:14,15,16
  51:20,23 52:1,3,6,8
  52:11,13,16,16 53:2,9
  54:5,11 55:6,7,20,22
  56:2,3,9,12 58:6 59:4
  59:13,14,25 62:20
  63:1,10,13,13 64:18
  65:5,8,14 66:2,2 70:4
  71:9 73:22 77:10,13
  77:25 78:3,4
knowledge 13:19 14:4
  14:18 16:17 17:3,10
  26:23 33:3 53:14,18
  59:20 68:10,14
knowledgeable 13:23
  15:18 16:11 17:15,20
  17:24 32:16,18 36:9
  44:25
known 52:22 83:10
Kotex 26:13
KVA 72:21

**L**

L 79:9 80:17 81:17
labor 28:15,22 29:1
lack 33:22
laid 58:25
land 10:8
LANE 2:10 80:4
larger 45:10 69:3 75:16
largest 73:17 75:18,20
latency 52:13
Laurel 2:5
lawyer 34:22,25 35:11
lawyers 12:2 34:21
  35:6,7
leads 35:3
learn 21:24 33:20,25
  34:11,17 50:15
learned 33:1 63:8
leave 28:2
Ledyard 2:17
left 9:7 15:15 22:17
  23:8 34:9 51:13,17
  64:25 76:1
length 9:12
letter 13:4
Let's 12:7,13 27:13
  30:6 45:25
level 36:16 49:13,13
  53:8 55:19 56:19,21
Lewis 2:19
liaison 46:1
light 30:22 59:17
lighting 30:17 31:7
liked 52:21
limit 18:10
limited 47:17
Lincoln 2:15
line 14:6 57:1 82:2
lines 73:10 74:14
Linville 49:22,24,25
  50:2,5,5
list 28:17
listed 11:3 32:20
Litigation 2:20
little 39:23 67:6 70:1
live 10:16,17 15:8,10
lives 49:21,22
living 10:10,24
local 49:13
located 6:8 13:13 56:2
logic 63:24
long 5:7 6:10 9:10
  15:12
look 33:24 39:15 55:5
  70:24
looked 27:8 36:6 37:22
  38:25 40:9 55:12
looking 12:12 15:17
  16:2 37:4 49:6 65:21
  65:23 70:18,20 71:2,6

71:8
lost 29:17,19
lot 5:11 29:7 37:16,20
  39:18 48:15 51:8
  59:19
louder 65:1
lower 56:21
lumber 26:19,19
luncheons 8:20
lung 63:7 67:7
L-i-n-v-i-l-l-e 50:7,8
L-y-n 50:6

**M**

machine 1:19 75:10
magazine 27:5,6
magazines 26:7 67:23
mail 8:8
maintained 25:15
maintenance 8:18
  30:22 43:15,24 76:25
major 33:4
making 21:3 68:4 69:18
  73:19 76:14
man 4:19,21 9:8,23
  11:10,19,22 29:16,25
  30:1 42:8 46:9
management 27:21
  28:15,23,25 45:1
manager 5:16,22 11:22
  30:23 34:4 41:16,22
  42:5,16,22 43:6,12,12
  43:17,20 44:9,11,11
  49:9,12 50:15,16,20
managers 48:20,22
  49:3,7 50:25
managing 23:22
manufactured 17:16,21
  68:8
manufacturers 68:17
marching 41:10
marker 39:5
market 26:4 65:17
marketing 5:14,15,21
  6:23 7:14 33:16
  41:18
married 4:21
MARTIN 1:2 79:2
Marv 49:15
material 30:21 53:19
materials 32:9 61:13
matter 14:11 59:6,12
matters 13:1 32:20
  35:24 58:25
McCall's 27:6,10
McDonnell 54:21
mean 8:15 13:15 16:21
  25:19 36:6 39:4 45:1
  48:24 53:22 56:25
meaning 60:19
meaningful 23:13

30:19
means 11:6 46:14 74:8
meeting 12:1 28:25
  30:14 35:16,17
meetings 28:22,24 29:4
  45:13 46:17,17 54:10
member 50:18
memory 11:20 33:8
  48:1 75:21
mentioned 26:19 44:10
  73:16
mentors 28:4
met 12:5,5 34:20 35:4,6
  35:12,18
metal 67:14
micro-management
  23:23
middle 42:22
midget 21:15,16
miles 10:15,15,17,18
mill 6:9,11,16,18,21
  7:19,22 8:20,22,24
  10:1,12,14 16:25
  28:21 41:9 44:11,11
  57:1 65:19 66:22,23
  66:25 67:15,18,21
  68:14,24 69:12,14,23
  72:14,17 74:3 75:5,6
  77:24
million 29:25 68:5
million-dollar 45:11
mills 25:24,24 27:11,23
millwrights 8:19
mind 9:16 14:15 24:24
  41:4
minds 30:3
minute 35:23
minutes 75:25
mistaken 39:9
mixed 48:8
modification 20:16
  21:4
modifications 76:15
  77:6
modify 76:17
moment 72:3
money 63:18
moneys 63:3
monitoring 21:11
  60:11 70:14 77:10,13
monthly 28:22 54:10
Morgan 2:3,4 3:5,7 4:3
  4:12 7:3 12:7,11,19
  13:15,18 14:10,14,17
  16:7,10 20:4,7 25:21
  27:8,19 28:2,3,8 35:9
  35:14,15,21,24 38:1,6
  38:8,11,15,18,24
  39:13,19 48:6,11,12
  48:15,18 50:11,14
  55:7,11,15 57:14

58:13,22,23 59:9,12
59:17 66:2 68:7
70:20,23 71:3,6,10,14
71:17 72:10 77:16,21
79:20,25
**Morgan's** 27:13
**morning** 31:1
**Morris** 15:5,6 17:8,12
24:3,6
**motor** 62:3,5,7,8,8
**move** 30:18
**moved** 5:21 29:20
**moving** 46:9
**Mullins** 2:13
**multiple** 58:18
**munitions** 69:11
**M-c-D-o-n-n-e-l-l**
54:21

**N**

**N** 2:1 3:1 4:1
**name** 4:13 9:18 12:23
13:6 15:4 24:6 25:2
49:17 51:19 67:8,9
69:9,11 83:12
**named** 5:23 9:8,23
11:10,23 42:8
**Naples** 49:22
**nation** 29:16
**Naval** 5:2
**NE** 2:11
**necessarily** 56:23 57:15
61:17
**necessary** 20:17 45:15
61:20,23
**need** 12:4 32:19 33:24
55:21 62:4 74:19
**needed** 23:24 47:5 53:2
**needs** 77:17
**neither** 50:23 80:7
**Nelson** 2:13
**never** 18:5 27:7 32:8,10
33:11 36:15,15 39:21
45:18 53:6,8 54:19
65:16,20
**new** 15:14 20:16,23
33:22
**newsprint** 5:25 6:2
26:4,6 41:14 52:17
54:24 67:22
**nicest** 50:9
**nickname** 67:10
**night** 30:22
**Nino** 5:18
**nitrocellulose** 69:19
**non-issue** 33:8
**Normally** 30:10
**North** 2:20 49:23
**NOTARY** 83:19
**noted** 83:3
**notice** 13:12,14 14:9,12

15:22 16:3 32:19
36:6 40:18 58:25
**notify** 12:22 57:17
**November** 55:1
**number** 8:23 26:11
67:13
**numbered** 1:17
**numerical** 71:10

**O**

**O** 4:1 80:19 81:19
**oath** 32:25 83:11
**object** 12:20 14:6 20:5
35:23 48:13,15,17
**objection** 16:14 17:6
18:2 20:2,19 21:5
23:17 24:14,18 25:19
32:6 34:18 45:17
46:12 47:25 48:2
52:2,12,23 53:17 54:1
56:8 58:11 59:2,7
60:22 61:4,6,15,24
63:23 64:3,13,24
65:11 76:16
**objects** 30:10
**occupied** 11:22
**occurred** 32:10 33:4
35:16 45:18,20 80:13
**occurrence** 33:7
**occurring** 33:10 53:24
54:18
**offered** 13:12
**office** 6:20 7:10 36:16
53:3,7 57:3 83:16
**officer** 23:19 48:25
79:12,23 81:3
**officers** 29:1
**officer's** 81:8
**offices** 1:20
**oftentimes** 30:21
**Oh** 6:17 50:3 58:15
67:5
**okay** 6:19,22 7:24
10:16 12:14 13:23
15:4,17,25 16:2 17:9
17:19 18:7 20:21
22:25 23:12 24:10
25:5 31:6,12 32:24
33:9,24 34:14,20 35:3
35:9,15,21 37:4,17
39:7 40:2,18 41:11,22
41:25 43:5,16 44:1,8
47:8 48:15 49:6,14,17
50:8,14 51:10,23 52:5
56:4,24 57:16,21
59:17 60:24 62:11,25
63:6,8,10 66:1,22
69:23 72:16 73:14
74:7,11,22 75:7,14,18
75:24 76:9,11 77:10
77:15

**old** 4:19 62:22 66:16
**old-timers** 8:15
**once** 44:3
**ones** 38:8 40:9 59:9
70:24
**operate** 41:8
**operated** 77:4
**operating** 23:22 25:25
28:17 32:9 43:2,3,14
48:25 72:14 73:22
77:9
**operation** 5:23,24
14:21 53:5 75:17
**operations** 41:24 42:24
43:17 44:12,12,14
45:8 65:17
**opinion** 24:12 37:7
44:25 57:16
**opposed** 25:12
**oral** 1:10,15 79:12
**order** 28:12 60:20
71:11,12
**orders** 41:10
**Ordnance** 69:11 73:18
**organization** 57:1
**original** 75:19 76:10,15
81:2,6,9
**originally** 74:7 75:4
**Orleans** 80:19 81:19
**OSHA** 18:16 37:13
40:22 53:24 54:18
**outcome** 80:10
**outside** 25:24
**oversee** 20:15,22
**overseeing** 21:2
**o'clock** 31:1

**P**

**P** 2:1,1 4:1 80:19 81:19
**page** 3:2,3,5,6,7,8,9,10
71:14,15 82:2
**pages** 81:4
**paid** 28:23
**painters** 8:18
**pals** 8:17
**paper** 26:20,21,22 27:1
27:4,5 39:18,21 67:21
67:22 68:5 75:10
**paperback** 26:7 67:23
**papermill** 5:12 31:9
43:14,23 74:6,13
**papermills** 27:11
**papers** 26:4,18
**paper-making** 67:21,25
**paragraph** 71:20
**Pardon** 7:6 20:4
**parent** 41:20
**Parnell** 2:10
**part** 46:10 55:20 74:2
76:18 77:11
**particular** 34:12 46:8

59:5
**parties** 79:24 80:8
81:13
**parts** 31:17 68:24
**party** 9:4 79:18
**Pascagoula** 62:23
**pass** 55:23
**passed** 11:14 39:18
**patently** 54:7
**payroll** 19:19
**Peachtree** 2:11,14
**PEL** 18:14
**PELs** 18:12
**pending** 72:1
**people** 16:22 18:8
23:22 28:24,24 29:7
29:24 30:2,17 31:4,16
35:12 41:1 44:4
46:20 52:20 53:1,5,9
54:13 57:12,21
**percent** 7:15
**performed** 76:25
**period** 6:13 24:16
42:16,22
**periods** 7:14
**permission** 29:5
**permits** 62:12
**person** 13:13,23 14:7
15:14,18 16:11,20
17:12,15,20,24 29:3
34:16 44:24 70:4
83:12
**personally** 28:19 83:10
**personnel** 43:24
**phone** 11:3 12:9
**physical** 29:9,11
**pick** 37:22
**pictures** 27:9
**Pines** 6:9,10,16,18
21:22 22:7 25:18
26:3 37:6 40:21
41:23 42:2 53:2
57:22 59:22 60:1,5
64:10,22 66:22 68:14
77:5
**Pinkerton** 1:11,15 3:4
4:9,15,16 13:12,18
14:7 28:8 32:12
34:16 37:2 38:24
39:9 66:12 72:7,11
79:7,11 83:1,5,10
**pipefitter** 67:14
**piping** 21:7
**Pipkin** 2:17
**place** 19:3,6 22:18
23:16 28:15 29:18
32:3 62:23 63:4
**places** 50:9
**Plaintiff** 81:9
**Plaintiffs** 1:3,16 2:2
79:3,25 80:1,2

**plans** 46:18 60:21 61:8
**plant** 9:13 30:8 31:18
41:15,22 42:4.16 43:6
43:11,12,17,20 44:9
69:14,16 70:14 72:21
73:6,12,13,25 74:3.4
74:5,5,15,17 75:20
76:2 77:2,4
**plants** 25:17,20 73:22
**plant-site** 54:8
**plates** 26:22
**Playboy** 27:6
**please** 4:2,13 32:13
38:17,18 71:22
**point** 7:17 9:21 23:15
27:2 53:3,14 62:7
72:16 73:13
**pointedly** 49:5 53:11
**policies** 13:19 14:4,19
16:18,25 17:4,11 23:5
23:25 28:9 32:3
40:22 60:10 62:17
**policy** 18:23 19:2,5
22:17 25:6,12,13 46:4
56:5 57:17
**POLIDORO** 2:16 66:8
80:6
**Pont** 73:21
**portion** 20:23 33:16
47:18
**portions** 39:1
**PORTNER** 2:4 80:2
**position** 11:16 34:7
42:11,12,18,20,21,25
43:2 44:3 65:23
**positions** 5:9
**positive** 9:12 30:4
**possibly** 58:17,20
**potential** 33:10
**powder** 73:17
**power** 46:10 62:5,6,8
69:3,7,13,16,17 73:6
73:25 74:3,15,17,18
75:19 76:2 77:2,4
**powerhouse** 31:8 69:10
71:25 72:2,19,20
73:15 76:11,15,15,17
**power-wise** 72:17
**practice** 18:24 19:5
25:10 31:5,17 56:5
**practices** 13:20 14:4,19
16:18 17:3,11 60:10
**preceded** 42:11
**precipitators** 76:19
**predecessors** 29:19
**premise** 25:15 40:21
57:25
**premises** 13:25 15:20
16:13 18:1 19:16
20:12 32:4 33:12
40:20 44:23 56:17

61:13 64:9
**prepare** 13:9
**prepared** 65:2
**preparing** 81:9
**presence** 21:12 37:5
**present** 32:13 56:19
**presented** 12:24
**presenting** 12:21
**presidency** 33:6 42:12
**president** 5:23,24 6:2,7
9:9,10 10:1,6 11:9,17
11:21 14:20,23 22:15
23:7 28:10,14 32:3
33:15,22,23 34:5
41:14 42:15 52:16
56:6 64:2,21 66:22
67:2 68:23 70:10
**presidents** 6:4
**presume** 50:21
**pretty** 48:23
**Primarily** 67:22
**printing** 26:4
**prior** 11:21 18:23 19:2
19:6,14,18,25 20:7,10
20:15 21:2,9,12,22
23:5 44:13,14 62:24
**private** 50:4
**privilege** 16:6
**probability** 24:5
**probably** 11:17 17:8,13
24:21
**problem** 23:20 40:6
53:7,22 56:16,20
63:16,19 65:19
**procedure** 1:22 22:17
**procedures** 11:1 18:20
23:5 32:9 46:4 62:17
**proceeding** 80:9
**PROCEEDINGS**
78:11
**process** 45:24 67:25,25
68:1,6 69:1 72:24
76:8
**Procter** 27:24
**produce** 72:23
**produced** 1:16 37:3,24
38:4
**product** 23:15 41:15
68:10,17 73:19
**production** 38:5
**productivity** 65:17
**products** 5:25 6:3 10:7
13:25 15:19 16:12
17:16,20,25 18:21,25
19:3,7,15,23 20:13,17
20:18 21:4,9,19,21
22:3 23:2,3,24 24:11,13
26:2,9,11,12,17 27:24
34:12 36:20 37:6
40:22 44:7 52:17
54:24 57:22 59:22

60:1,5,8,11,15 61:19
68:8,13 73:20
**project** 45:4,7,9,13
46:21 67:15 70:5,6
**projects** 67:15
**proper** 19:14 66:25
**property** 74:2 76:22
**proposed** 29:10
**proved** 83:10
**provide** 34:10 36:3
73:10
**provisions** 1:22
**PUBLIC** 83:19
**pull** 70:22
**pulp** 26:5 54:24 75:13
**pulpmill** 31:9 43:15,23
45:12 69:2 73:4
74:21 75:13
**purchase** 74:5
**purchased** 22:8 24:11
76:3
**purchasing** 24:21 25:1
43:25
**purportedly** 62:23
**purpose** 16:9 59:21
**purposes** 83:14
**pursuant** 1:21 4:3 46:3
58:15 79:22 80:12
**put** 22:17 28:15 29:18
32:3 37:18 65:17
70:23 75:9 76:19

---

### Q

**qualified** 18:4,5 32:22
36:9 58:6,24
**qualify** 61:21
**quantities** 52:21 57:23
64:11,23
**quarter-horse** 62:3,5,6
**question** 7:3 14:20 16:6
20:3,6 21:1 23:24
27:19 28:1 30:3 35:3
36:5 41:2 46:20 52:5
55:24 58:12,16,20
64:5,17 68:9 70:17
71:19 75:23
**questioning** 14:7
**questions** 13:7 20:21
23:4,7 24:11 27:14
32:14,18 37:20 58:18
64:16 66:6,7 67:20
73:25 77:18
**quick** 70:17 77:19,20
**Quinn** 2:4
**quite** 27:3,25 56:20
57:13 61:16
**quote** 12:22,23

---

### R

**R** 2:1 4:1 9:18
**raised** 65:16

ran 73:11 74:14
**Randy** 11:10,17
**Randy's** 11:21
**range** 11:18
**ranking** 13:19 14:2,3
14:18 16:17 17:3,10
**reached** 36:15
**read** 4:4 27:7,12 71:21
83:1
**reading** 32:22 51:23
52:8 71:23
**real** 52:25 77:19,20
**really** 6:5 9:11 16:3
31:13 32:22 36:9
37:14 41:12 43:13
45:18 51:22 58:6,6,24
59:4,5 62:5 63:1
64:15 65:7,8,25 75:22
78:4
**reason** 62:1 82:2
**reasonable** 12:23
**reasonably** 29:6
**reasons** 31:4 81:5
**Reaud** 2:4
**rebuild** 45:11
**recall** 6:5 15:10 25:8
39:11,24 49:4 51:2,10
53:10 55:2,15 56:13
63:3 68:4 70:13,15
**recalled** 40:16
**receive** 8:2 49:2
**received** 29:2,12,23
58:4
**receiving** 8:11 67:6
**RECESS** 12:16 28:6
38:22
**recognition** 29:21
**recognized** 29:19,24
**recollection** 11:21
40:13 57:17
**record** 1:22 4:7,14
12:15,17,19 28:5,7
29:15 38:21,23 50:13
77:16 78:10 79:13,24
**records** 47:21
**recovery** 73:4 74:20
75:4,5,6,7,20
**reference** 36:14
**referred** 40:23
**regarding** 13:20 16:11
16:19 17:4 19:6
20:12 58:5
**Registration** 80:18
81:18
**regular** 28:22 29:4
45:13
**regulations** 18:16,19
22:25
**related** 40:3 62:23 63:4
65:10,12,16 80:7
**relationship** 44:22

**relevant** 36:3 63:12
**remain** 6:10 42:18
**remained** 9:10
**remember** 24:25 25:4
37:14 42:13 44:9
51:18
**removal** 13:24 15:19
16:12 17:25 19:15,22
**remove** 20:18
**repairs** 76:14,24
**replaced** 9:20,22,23
31:11 69:2
**replacement** 9:17
**report** 55:1,17 56:18
70:2
**reported** 1:19 41:24
43:15,19,20,24 53:25
54:3,19
**Reporter** 4:2,4 79:9
**Reporter's** 3:10 79:7
**reporting** 41:20 44:4,4
44:5 80:18 81:18
**reports** 44:1
**representative** 12:22
46:5
**represented** 40:7
**representing** 16:8
**request** 38:4
**requesting** 13:4
**require** 31:21,21
**required** 72:15
**requirements** 80:12
**requires** 12:21
**respect** 70:9,13
**responded** 53:20
**response** 13:12 38:4
**responsibilities** 43:8
**responsibility** 7:18,22
16:24 20:10,22 21:2
23:23 28:18 42:2
44:23 77:11
**responsible** 14:21
23:21 50:19 53:4
56:10 76:14
**responsive** 13:14 14:9
14:11
**rest** 46:11
**result** 52:4
**retain** 45:14 62:2
**retaining** 60:18
**retention** 25:5
**retired** 6:14 10:10,24
42:18 66:18 70:9
78:7
**retirement** 6:12 8:2,11
8:12,17 63:9
**retiring** 8:21
**returned** 79:16 81:2,4
81:6
**returning** 5:20
**reunions** 8:14

**review** 45:13 46:16,17
53:3
**reviewed** 38:2.4
**reviewing** 51:2.8 55:14
**re-established** 28:14
**Re-Examination** 3:7.8
72:9 77:22
**ride** 46:20
**right** 7:5,17 9:20 12:9
16:16 17:14 22:8,21
23:14,24 24:4 25:3,14
26:2,10 27:10,15 29:8
30:6,12 31:15,18,23
32:11 34:3 35:5,14
36:11 38:12,19,20
40:18 41:13 44:21
45:14 46:22 47:3,4,5
47:11,15 50:4 53:12
54:23 58:24 60:18
61:1,5 62:2,4,9,14
63:22 64:6 65:1
70:15,17 71:16,20
72:23 73:1,5,8,9
74:10 75:11 76:5,20
76:24
**risen** 36:13
**risk** 33:7:12
**River** 54:24 57:7
**road** 4:17 7:13
**rolled** 75:13
**rolling** 25:1
**Rollinson** 42:8,10,16
44:9,14 57:11
**Rollinson's** 43:21
**room** 34:22
**roost** 11:6
**rule** 12:21 25:11 80:12
81:1,11
**rules** 1:21 4:3 13:17
18:16,19 22:25 38:11
38:16 58:16
**ruling** 35:20
**run** 47:14
**running** 7:18,22 25:15
42:2
**Ryan** 2:19
**R-a-w-l-i-n-s-o-n** 42:9
**R-o-l-l-i-n-s-o-n** 42:10

---

### S

**S** 1:11,15 2:1 3:4 4:1,9
52:17 79:7,11 83:1,5
83:10
**safe** 29:25 31:4,5
**safety** 13:19,19,21 14:2
14:3,4,18,19,22,25
15:2 16:17,17,25 17:3
17:3,10,10 18:19 19:6
19:10 20:11,23 21:3
22:17 23:25 24:2,2
28:9,15,20,23 29:4,9

29:13,14,15,18,25
30:4 33:18 34:1,11
46:4 54:13 62:17
salaried 28:24 29:1,3
sales 5:14,15,15,19,22
5:22 6:20,22 7:1
33:16 41:18 44:6
65:17
salesperson 34:3
Salter 11:10
Sam 42:8 44:14
sample 71:20,23,24
sampling 70:14
Sanderson's 35:20
Sanford 4:15
SARAH 2:13 80:5
save 39:8,15
saw 15:25 25:24 37:16
37:19 38:9,10,14 48:7
51:8
saying 43:5 45:20,21
scale 45:10
schedule 46:18
school 5:1
Science 5:2
scope 13:7 45:6 60:19
scrubbers 76:19
seal 83:16
season 49:23
second 64:25 70:18,19
71:5 73:9 75:5
section 5:14
see 10:19 37:12,15,21
38:1,8,12 39:16 40:5
41:1 45:4 47:22
48:24 51:5,6 53:16
55:22 56:15
seeing 39:24 40:16
51:10 53:10 55:2,15
70:13
seen 10:22 15:23 36:24
36:25 39:21 40:23
51:8 65:21
sees 46:2
sell 77:24
selling 74:9
send 4:6
senior 6:13
sent 13:4 28:16 48:20
55:18 57:8 71:13
sentences 71:22
September 5:20 48:19
51:1
sequentially 75:16
serious 23:20
served 81:12
service 5:13 68:24
set 13:1 19:10 22:25
58:1 59:12
settlement 63:4
set-up 48:21

Seventies 27:12
severe 33:1
sheet 67:14
sheriffs 35:1
shop 67:14
shorthand 1:20 79:9
shortly 8:17 11:16
show 14:10 30:2 31:4
38:15 48:4 51:4 55:4
55:9
showed 15:22 37:2
39:17 71:5,17
showing 39:11
shown 30:20 50:24
54:23 70:8 81:13
shut 68:25 69:1,4
sick 29:7
side-bar 48:13
sign 4:4
signature 3:9 79:16
81:4 82:1 83:2
simply 36:5 53:8
sir 15:22 17:2 25:23
27:18 39:19 43:22
45:3 46:7 54:9 55:23
64:15 65:13 66:16
70:18 72:8 78:8
site 74:5
sitting 32:24 65:4
six 6:6 75:25
size 62:7 75:15
size-wise 75:14
slash 33:16
slick 27:5
slip 30:10
Slipping 30:16
slower 65:1
small 10:12 67:15
Smith 27:22 67:9 80:18
81:18
smokeless 73:17
sold 8:24 9:3,4,14 10:2
22:2 27:11 78:1,2,4,5
somebody 42:1 57:8,25
sorry 11:5 20:3,6,21
32:2 43:6 45:25
70:10 73:24
sort 9:21 21:1 30:6
33:25 47:22 52:24
60:25 63:2 64:14
speak 40:14 54:8
speaking 68:16
special 62:12
specialities 67:23
specifications 61:23
specifics 23:25
specified 62:7
specify 61:13,19 62:2
speech 59:15
speed 46:10,19
spell 49:24

spelling 9:17
spend 7:13,15
spent 6:17
spot 9:7
spotted 30:21
spouse 29:22 30:2
Springhill 4:17
stab 9:17
stack 40:8 48:6 55:8
77:14
stacks 48:9
standard 32:9
standards 72:1
standpoint 5:4
stands 39:23
Starla 1:18 79:9 80:17
81:17
start 7:4
started 11:7 13:16
state 1:19 4:2,13 57:10
79:10 83:7,20
stated 1:22 3:3 14:7
58:10
statement 13:16 41:7
States 48:20 69:20,22
72:3
stationary 26:18
stationed 6:16
stay 15:15 64:19
steak 29:21
steam 72:17,20,23,24
73:1,3,10 74:14,18,23
steps 24:1 53:15 64:1,7
64:20
stipulations 3:3 4:2
stock 27:5
stop 46:5
storage 32:10
strange 9:21
stream 29:10
Street 2:5,11,14,20
80:19 81:19
Strong 2:17
stuff 39:24
subcontracting 61:25
subcontractor 45:15
47:13 62:16 77:1
subject 36:4 51:2 65:15
subjects 36:10 58:5
65:16
submitted 79:14
subscribed 83:13
subsequently 9:4
substance 58:22 76:18
substances 34:12
succeeded 9:8
successors 9:13
sufficient 52:21 57:23
64:11,23
suit 57:24
Suite 1:20 2:8,11,14,17

supervisors 28:17 29:1
Support 2:20
suppose 16:1 37:7 54:2
suppositional 52:24
sure 9:22,10:4 20:20
24:25 31:5 36:1 37:8
41:13 47:2 52:25
55:25 58:15,24 63:12
70:16 72:13
surfaced 53:8
surgery 31:21,22
surprised 50:11
survey 54:25 56:13
57:7 71:18
surviving 4:24
sworn 1:17 4:10 79:11
Sylacauga 4:17 10:17
11:3,4
system 69:3,3
S-a-l-t-e-r 11:11
S-y-l-a-c-a-u-g-a 4:18

T

table 32:25 65:18
Tactics 5:3
take 9:16 15:23 55:21
72:16 77:2
taken 1:17 12:16 24:1
28:6 38:22 53:15
64:1,8,8,21 79:23
80:9
talk 36:8,9 65:1
talked 60:18
talking 31:20 41:12
47:1 50:2 54:9 56:25
57:2 67:5 72:19
74:22,23 75:19
tank 30:20
tape 76:1 77:17
task 45:6,6
Tech 5:2
technical 5:18,19 61:23
64:17
technically 43:5
tell 16:3,13,15,19,22
17:5,14 21:7 22:22,22
32:19,25 33:3 35:7,24
37:4,18 38:15 41:4
46:23 48:21 54:6
62:8 63:25 64:4,7,20
65:2 66:12 70:1
72:11
telling 13:15 38:14 63:3
ten 29:19
Tendering 51:7 55:13
tends 37:9
tenure 6:15 22:15 23:7
24:15 36:13 42:15
62:23 69:5
tenured 15:12
term 9:12 15:13 33:23

43:21 48:23
terminate 45:23
Termination 47:12
terms 18:24 23:5 34:14
43:19 44:23 58:7
60:4,7,10,14 75:22
testified 4:10
testify 12:24 13:2,10
32:20,22 35:25 36:2,2
36:14 58:8,25 59:5,13
testifying 13:6 58:3
testimony 79:13,23
tests 32:2
tetrol 69:18 73:17
Texas 1:4,19,21,21 2:5
2:8,18,21 4:3 79:4,10
80:17,20 81:17,20
text 3:3
Thackston 2:10
Thank 72:6,8 78:8,9
thereabouts 75:10
76:23
therefor 81:5
thing 21:1 23:8 39:23
41:15 46:16,24 53:24
54:3 56:20 62:5 76:7
things 9:21 26:18 28:19
30:6,19 31:6,13,21
33:24 41:1 45:11
47:9 48:16 49:2,4
51:9 54:11,14 64:18
66:3 70:9 77:11
think 9:11 11:14 13:16
15:13,16 17:17 32:20
38:11 39:8,9,10,10,16
40:1 42:19,19 44:13
54:2,7,12 55:16 56:9
58:9,13,22 63:21 65:4
66:25 70:19 71:8,16
72:13
third 26:15 30:13 31:7
75:6,9,11,20
thought 40:15,16 53:9
73:24
three 8:20 9:11 11:18
28:17 30:7,15 31:6
threshold 18:10
thumbing 47:22
Thursday 12:3
time 6:17 7:9,10,10,13
7:15,17 11:15,20
12:23 13:9,9 15:23,25
22:16 27:2,17 29:9,17
29:20 33:18 39:9,15
41:6 42:14,16 53:6
66:5 67:2 68:21,23
70:10 72:16 73:13
76:6,20 79:18,23
times 7:12 8:21 35:11
tissue 26:16
title 11:21 44:13

TNT 69:18 73:17
today 24:16 46:24,25
  59:6 63:25 64:7,20
  65:2,5,23 77:8
toilet 26:16
told 15:17 24:2 28:23
  29:1 30:25 32:14
  34:21 38:3 40:15
  54:10 58:2,5,23,24
  59:4 61:22 63:1,14,15
  63:18 72:2
tonnage 75:22
tons 68:5 72:22 75:22
top 71:5
tops 29:16
total 54:8
totally 29:14
tours 30:1
towels 26:20,21
town 10:12
towns 50:1
training 20:1,8 33:19
  34:7,11
transcript 79:12,14
  81:10
transferred 5:18
travel 7:10,16
traveled 7:8
traveling 7:13
TRCP 80:13 81:1
trip 31:23
true 57:15 60:13 61:17
  62:10,15 74:25 79:13
  83:2
trying 14:10 30:23
  35:22 36:18 38:13
turn 66:15
Turnipseed 2:13 35:5
  35:10 80:5
two 8:20 9:11 16:22
  20:21 29:10 31:3
  50:1 52:8 55:24
  70:17 71:21 75:7
  77:19
type 7:1 23:15 24:11,12
  26:12 31:16 34:11
  46:16 62:25 67:21
types 59:25

__U__

U 52:17
uh-huh 52:7 74:13
ultimately 5:21 9:23
  16:25 63:7 67:7
uncoated 26:8
uncommon 72:14
understand 9:2,3,5
  12:1 14:20 36:17
  39:14,22 48:8 60:23
understood 54:13
unfolding 76:7

union 29:1
unit 9:9 48:20,22 49:3
  49:7,8 50:15,16,20,25
United 48:20 69:20,22
  72:3
units 50:19
unloaded 30:21
unloading 30:20 32:10
unsafe 31:17
use 20:17 31:25 62:4
usually 45:4 47:9 64:15
utilities 43:15,23
utilized 19:21 21:19
  36:21
U.S 5:25 6:2 41:14 49:7
  73:5

__V__

values 18:10
Vandenheuvel 9:8,19
  10:21
varied 7:11 31:8,13
varies 75:3
variety 31:13
various 6:20 53:4
vary 70:5,7
versus 7:10
vice 43:11
vice-president 5:22
  41:24 42:23 43:16
  44:6,6,12,13 45:8
  50:19
VIDEOGRAPHER
  2:19 4:7 12:15,17
  28:5,7 38:21,23 75:25
  78:10
VIDEOTAPED 1:10
  1:15
viewed 28:19
violate 40:22
violating 35:19 37:12
violation 46:3
violations 53:24 54:17
Volume 1:13
VS 1:4 79:4
V-a-n-d-e-n-h-e-u-v-e-l
  9:18

__W__

W 67:9
waive 12:20
want 8:25,25 12:20
  22:16 32:15 33:24
  46:24 48:10 59:25
  63:24 71:3,16 76:5
  77:20
wanted 16:2 24:10
  28:17 36:8 39:14
  41:6 44:21 54:3,5,10
  62:6 64:17,18 67:20
  71:19

War 73:9
warnings 60:14 68:18
wasn't 9:1,4 57:16 76:7
was/was 81:2
water 68:6 74:4
way 11:20 22:16 37:21
  39:2 58:17,20,20 67:5
  68:10
ways 23:1
Wednesday 12:2 16:1
  35:17
week 8:1 16:1 28:16
  35:16 66:21
weekly 46:17
weeks 66:15
well-known 26:17
went 5:5 8:22 23:4
  28:19 34:3,5 38:25
weren't 59:5 64:8,10,22
wet 67:25 68:2
Whereabouts 10:11
white 61:16
William 24:8
Wisconsin 5:18
witness 1:16 4:4 7:5
  27:15,17 38:1,12
  39:13 46:14 48:4
  58:16 79:11,13,15,16
wood 31:9,10 45:12
woodlands 41:18
word 4:17 11:6
words 11:7 60:24 68:25
work 5:4,5,7 29:21
  31:16 44:23 45:14,25
  46:25 47:18 60:19
  60:19,21 61:2,8,22,25
  62:11,13 69:24 70:2
  72:17 76:6
worked 10:6,7 16:21
  30:2 45:5 63:5
worker 67:18
workers 69:25 70:2
working 18:20 19:7
  43:3 51:25 60:15
Works 69:11
World 73:9
worst 30:7,15
wouldn't 8:25,25 17:18
  43:13 53:15 56:12
  57:8 61:19 63:22,24
  76:4
written 29:4 47:9 65:22
wrong 39:20

__X__

X 3:1

__Y__

yard 31:9,10 45:12
yeah 9:6 14:16 39:3,6
  40:1

War 73:9
year 6:13 29:20 42:22
  42:25 43:4 72:22
  73:6 75:7 78:5
years 5:8,10,11,14 7:12
  8:23 9:11 10:22
  29:19 33:14 49:8
  64:2 65:3 66:16,18,20
  66:21
yesterday 35:18 37:3
  37:16 39:1 40:5,9,13
  50:24 53:10 54:23
  70:8
Young 2:10 35:4,11
  50:1,3,9 80:4
y'all 31:25 70:22 74:11
  77:6

__0__

0:10 79:21

__1__

1 1:13,13 5:22 6:12,14
  66:19 69:2
1st 7:17,21,21
1,500 68:5
1:44 79:20
10 65:3
10:10 28:7
10:27 38:21
10:32 38:23
11th 2:20 55:2
11:32 1:18 78:10
1111 2:17
12th 55:1
12-31-05 80:17 81:17
1200 67:4
13th 13:13
1400 2:14
1415 4:17
15 7:15 10:17 65:3
16 1:12,18 66:20,21
  79:8
185 2:20
19 76:18
19th 51:1
1925 66:14
1944 73:7
1946 5:3
1948 5:3,4,6 33:14 76:3
  76:10,22 77:5
1956 5:17 75:10
1959 5:20
1967 75:13
1981 5:23 6:8 7:21
  18:23 19:2,6,14,18,25
  20:7,10,15 21:2,9,12
  21:22 22:15 23:5
  33:14 34:9 52:19
1982 55:1
1983 55:2 76:18 77:6
1986 48:19,20 49:11,12

50:20 51:1,11,14 52:9
  52:16
1987 6:12 7:21
1988 6:14 34:9 66:19
199.2b1 12:21
1997 8:24

__2__

2 3:2
20 7:15 65:3
2004 1:12,18 63:25
  64:7 79:8
203 80:12 81:1
203.3 81:12
2300 2:17
235 80:19 81:19
25,000 72:21
250,000 72:22
273 80:18 81:18
29 4:20 5:6 66:14

__3__

30th 55:1
303 2:11
30308 2:11
30309 2:14
35 45:11
35150 4:18

__4__

4 3:3,5
40 5:8,10,11 10:15 68:5
4000 2:11
4049 80:19 81:19
409 80:20 81:20
45 10:15 73:7
48 73:13 76:5,5
49 73:13 76:10

__5__

50 10:18
550 1:20 2:8
57 75:10
59 5:17
5946 80:17 81:17

__6__

60TH 1:6 79:6
640 66:25
66 3:6
67 71:14,15

__7__

7th 13:4
72 3:7
773 3:8
77002 2:18
77701 2:5,8
77702 2:21
77704-4049 80:20
  81:20

**78.9** 4:20
**79** 3:10 4:20 66:16

---
**8**
---
**800** 1:21 2:8
**801** 2:5
**81** 6:16 7:18 22:16 23:8
  23:15 42:15 43:6
  66:23
**82** 3:9 43:6
**839-4407** 80:20 81:20
**84** 76:18
**87** 42:15 43:6 66:23
**88** 42:16

---
**9**
---
**9th** 48:19
**9:00** 31:1
**9:10** 1:18 4:8
**9:24** 12:15
**9:26** 12:18
**9:50** 28:5
**999** 2:14

# EXHIBIT

# "E"

REPORTER'S RECORD

VOLUME _____ OF _____ VOLUMES

CAUSE NO. B-150,896

INEZ MARTIN, ET AL              ) IN THE DISTRICT COURT OF

                               )

VS.                            ) JEFFERSON COUNTY, TEXAS

                               )

AC&S, INC., ET AL              ) 60TH JUDICIAL DISTRICT

*******************************************************************

MOTION FOR PROTECTION

*******************************************************************

On the 6th day of April, 2004, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable Milton Gunn Shuffield,

Judge presiding, held in Beaumont, Jefferson County, Texas:

Proceedings reported by Computer Stenotype Machine.

PLAINTIFF'S
EXHIBIT
tabbies
E

ORIGINAL

```
 1                    A P P E A R A N C E S

 2   MR. GLEN W. MORGAN          MR. KENT M. ADAMS

 3   Reaud, Morgan & Quinn       Adams & Coffey

 4   SBOT NO. 014438900          SBOT NO. 000869200

 5   801 Laurel                  550 Fannin, Suite 800

 6   Beaumont, Texas  77701      Beaumont, Texas  77701

 7   PHONE:  409-838-1000        PHONE:  409-838-6767

 8

 9   ATTORNEY FOR PLAINTIFFS     ATTORNEY FOR KIMBERLY-CLARK

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  I've got a motion for protective

2  order which I looked at.  I didn't see a response.  I presume

3  that it will just be an oral response?

4          MR. MORGAN:  Yes, Your Honor.

5          MR. ADAMS:  Out of fairness, I just dumped

6  this on counsel this morning and we --

7          THE COURT:  I understand.

8          MR. ADAMS:  We apologize about the -- I found

9  this in my car.

10          THE COURT:  Mine is a clip-on.  I'll take it

11  off as soon as I get out of here.

12          Let me ask you a question.  I was trying to figure

13  out -- you know, I'm usually reluctant to handle hearings from

14  another court because as you can imagine, each of the judges

15  has their own propencities; so I thought there must be a trial

16  settings and I had it punched up on the computer and the

17  computer showed that this was stayed in January because of a

18  bankruptcy.

19          MR. ADAMS:  Well, the way this proceeded,

20  Judge, there have been severance -- I think Glen has set up

21  several groups of plaintiffs against these various defendants

22  over time and it's kind of now it's our turn but we don't have

23  a trial setting yet.  So that's correct.

24          THE COURT:  So I guess the question is why

25  couldn't this wait until Sanderson gets back?

1      MR. ADAMS:  Well, the deposition is scheduled

2  for tomorrow and he won't be back until Thursday.  And so that

3  was the issue and -- and Mr. Morgan as been very accommodating.

4  We just -- there is just this one issue and that is my witness

5  says he can't or doesn't choose to travel.  He's 75 years old

6  and he's had five hip replacements and doesn't like to get on

7  airplanes.  In fact, he's only been on one airplane apparently

8  once in the last 10 or 15 years and he's in Florida and so he

9  doesn't work for me anymore.  He's retired, as I said.  And so

10  we've offered in this motion to pay Mr. Morgan's reasonable

11  travel expenses to go to Florida, coach.

12      THE COURT:  You're not going to fill his jet's

13  tank?

14      MR. ADAMS:  We were going to take him on the

15  commercial Continental.  Those planes are actually quite nice

16  and so that was -- you know, so we don't want him to be out any

17  money or anything on account of this for this retired person.

18  And I would point out to the Court that the plaintiffs are all

19  residents of Alabama and Mississippi and so we're going to have

20  this same issue for Judge Sanderson to deal with with respect

21  to where those depositions will take place, either in Texas or

22  Alabama or Mississippi.  And so anyway, we're kind of at an

23  impasse and so we need some help from the Court.

24      THE COURT:  Well, I wait to hear from

25  Mr. Morgan.  To me the most -- well, let me hear -- let me hear

1  from him.

2            MR. MORGAN:  Judge, I don't think this is

3  Mr. Adams at all.  I want to say that up front.

4            Up front, I really want to say thank you so much for

5  taking your time out to hear us and allowing us to proceed in a

6  less than lawyer dress fashion.  Judge Mehaffy would not be

7  happy with us right now, and I'm so uncomfortable in the court

8  room dressed like this.  I prefer it somewhere else; but

9  nonetheless, thank you so much for it.

10           We began trying to get dates for depositions from

11 Kimberly-Clark through Mr. Adams months ago and we got no

12 response in terms of dates and we began writing letters and

13 trying to get things and ultimately we just noticed a

14 deposition and maybe even sent a cover letter that said if the

15 date's not good, let me know.  But it was obviously trying to

16 make something happen and we got a motion to quash on that and

17 so that went away.  There may have been a second notice of

18 deposition because again we didn't get a date and there was

19 another motion to quash and I might be wrong about that but I

20 know it's happened at least once, I think twice.

21           And so ultimately we got some dates from -- from

22 Kimberly-Clark through Mr. Adams, 7th and 8th of April were

23 good dates for this deposition.  And we had noticed the

24 deposition of a corporate representative the most knowledgeable

25 about the following areas at the Kimberly-Clark facility in

1   Childersburg, Alabama, known as Coosa River News Print and/or

2   Coosa Pines.  It was the installation and removal of

3   asbestos-containing products on the premises, the highest

4   ranking safety individual with knowledge of safety policies and

5   practices at that same facility regarding asbestos, the highest

6   ranking safety with knowledge of contractor safety policies and

7   practices at that facility and any asbestos-containing products

8   that were manufactured at that same facility.  And so that's

9   who we wanted.  We -- that's who they quashed and then

10  ultimately gave us April 7th and 8th as the day they would be

11  available.

12          Now, in the meantime Kimberly-Clark decided they

13  would like to bring in another lawyer from Atlanta by the name

14  of Lane Young with Hawkins, Parnell & Thackston and I was --

15  after we picked the 7th, I was told that Mr. Young was not

16  available for the 7th and they wanted to put it off.

17          I said, Well, it's just a corporate rep.  I can't

18  imagine if you're available, why you would need a second

19  lawyer.  I need to go.  We're set for trial in April and I may

20  be tied up -- where am I pointing -- in Judge Floyd's court.

21  So, I need to keep the 7th because it looks like middle to the

22  latter part of the month we may be going over there so I need

23  to get this thing going.  I'm sorry that Mr. Young can't make

24  it, but I need to get going.

25          So we got down to yesterday, Monday before the

1   Wednesday deposition, and I get a letter saying that to date

2   Kimberly-Clark has been unable to locate an individual with

3   knowledge responsive to the specific areas of inquiry contained

4   in the plaintiff's counsel notice.  So they wait until two days

5   before, after giving me the dates, after having the notice and

6   having quashed it twice, they give me something that says we

7   don't really have anybody specific to that and they say but we

8   are prepared to make available as a corporate representative

9   Mr. James Bernd, B-e-r-n-d, a former employee of Kimberly-Clark

10  who retired as executive vice-president of household products

11  in 1995.  He will be able to testify regarding Kimberly-Clark

12  corporate policies, however, he has little -- he likely has

13  little or no specific knowledge about the Coosa Pines facility

14  which is where my clients worked.  So it says, Please advise

15  whether you wish to depose Mr. Bernd or whether you prefer to

16  postpone deposition until they've located a witness or

17  witnesses responsive to your counsel's specific request.

18           So me being like I am, I think, Well, they want

19  Mr. Young to be present so now they're at the last minute since

20  nothing else worked now they're saying, Well, you know, we'll

21  throw somebody up but he's really not even the person you want.

22  He has no specific knowledge of the Coosa Pines facility which

23  is all you're asking about but we'll do it.  And it even says,

24  "Please note that Mr. Bernd has not yet returned our numerous

25  calls, does not yet know you may want to depose him next week

1  and he may prefer to be deposed in Florida where he lives."

2            So, again, it doesn't sound like a real well thought

3  out plan by Kimberly-Clark.  And, again, I will say this is not

4  Mr. Adams.  I don't think he has anything to do other than a

5  message carrier from his client and I think that perhaps

6  Kimberly-Clark has just decided that if we stick our head in

7  the sand long enough, maybe none of this thing is really out

8  there and it will go away.

9            So while I normally would work and say, That's fine.

10 Let's just -- we'll take it next week, et cetera.  It puts me

11 in the position to have to oppose it and to take the technical

12 position that I'm about to take which is, number one, there is

13 no evidence before this court.  There is nothing from which

14 they have given you to make a decision.  They've not given you

15 a doctor's excuse.  They've not given you any type of

16 restrictions placed on the man.  They've not even shown you

17 this is the guy responsive.

18            I'm going to offer into evidence Mr. Adams --

19 Mr. Coffey's -- Mr. Adams' letter that says just what I told

20 you and they don't offer any limitations on him.  It just says

21 he would prefer to take it in Florida.  It doesn't say he can't

22 travel to Texas.  Corporate representatives are normally taken

23 in county of suit.  So given the fact that they've presented no

24 evidence, that in their motion on its face it says he has

25 traveled on an airplane.  So if he's traveled on an airplane, I

1   don't know why he couldn't travel on an airplane again.  So it

2   puts you in a position to be unable to grant their request

3   because there is no evidence.  And, yet, they could have easily

4   have had an affidavit, they could have gone and got a doctor's

5   excuse.  They could have gone and gotten something but here is

6   what I think will happen anyway:  I think tomorrow no one will

7   show up.  I think if you deny their relief in this request, I

8   don't think that this gentleman will show up.  And they'll take

9   the position, Well, you know, he's old and he can't travel.

10          And in response to some further motion that I may

11   file in Judge Sanderson's court to mitigate any exposure they

12   may have, they're going to say,  Well, you know, we had a

13   hearing in advance.  Judge Shuffield wouldn't grant it.  We

14   offered to fly the plaintiff's counsel to Florida so it

15   wouldn't be any cost to him.  This is a seventy-something year

16   old man who couldn't travel.

17          I think all this is set up.  They want delay.  They

18   want you to grant delay that I would not grant them.  Once they

19   have no choice but to just cause the delay themselves, this is

20   all in mitigation of what will happen down the court -- down

21   the hall once Judge Sanderson gets back.

22          So, you know, I would ask the Court, under these

23   circumstances, that you deny their relief in the face of no

24   evidence that Kimberly-Clark has given Mr. Adams to present to

25   you and to allow the deposition to go forward as noticed with

1  my firm belief that it will not happen so it's not likely the

2  guy will get on the -- on the plane because you're not ordering

3  him to show, you're just going to deny the relief.

4         THE COURT:  I don't think I have the -- he's

5  not an employee of the party?

6         MR. MORGAN:  Right.

7         THE COURT:  I don't think I have any authority

8  to order him to get on an airplane.

9         MR. MORGAN:  One last thing that their motion

10 sort of addresses that I have not, apparently they sold this

11 facility.  Kimberly-Clark sold this facility in 1997 and

12 retained the liabilities for the asbestos litigation.  I can't

13 believe in today's world, a corporation did that without

14 leaving itself the ability to go back and get documents from

15 the facility, to get witnesses.  You know, these -- these

16 plaintiffs instituted the suit against Kimberly-Clark probably

17 1994 maybe.  It wasn't long after that.  So they were in this

18 litigation in 1997 when they sold it.  So I can't imagine that

19 they would just sell it and say, You keep all the documents and

20 you keep all the employees and we won't ever come ask you

21 again.

22         I think we'll find it when we go and look that

23 probably they retained some cooperation rights with the new

24 owners for these cases and other cases like them.  So but,

25 again, they've not given you anything to look at to show you

1 that we can't get someone responsive which may be, again, an

2 issue down the hall a week or so later if they don't present

3 someone responsive; but I don't think it's for today for your

4 consideration.

5       MR. ADAMS:  If I may briefly reply, Your

6 Honor.  And I do appreciate Mr. Morgan's approach to this

7 throughout.  It has been a very civil discussion between the

8 two of us.  I just want to make the Court aware of that and I

9 adjoin Mr. Morgan in thanking the Court for taking the time to

10 hear this today and I won't get into all the details of the

11 merits of the case.  It's not your case.  We don't want to

12 belabor that or take advantage of your patience but just to

13 give you a quick nutshell.

14       This case is many years old as Mr. Morgan has

15 pointed out.  Only since February 17th of this year have we

16 learned for the first time and that was in response to a letter

17 I wrote Mr. Morgan on February 17th what facility or facilities

18 it was that he was even complaining of with respect to

19 Kimberly-Clark and it was after February 17th of this year that

20 we learned that it was the Coosa Pines facility.  And up until

21 that point in time, the case has essentially been informally

22 stayed again us by Mr. Morgan as he has proceeded on behalf of

23 groups of plaintiffs against other defendants.

24       Our firm got involved in this sometime after 1997.

25 I don't recall exactly when we got involved in this case, but

1  so we were not involved at the time of the sale of this plant.

2  It's my understanding and we stated in our motion that the

3  paper mill was sold in 1997 to an outfit called Alliance and

4  subsequently sold to an outfit called Bowater who currently

5  operates the plant and that the employees pretty much all

6  remained with the plant when it was sold as well as the

7  documents.  So Kimberly-Clark has informed me that

8  Kimberly-Clark has no one who is a -- who is an employee of

9  Kimberly-Clark responsive to Mr. Morgan's deposition notice.

10 What we have done is Kimberly-Clark has located Mr. Bernd in

11 Florida who was a former vice-president of Kimberly-Clark, a

12 former member of the board of directors, retired in his

13 seventies and we're not able to contact him before I wrote the

14 letter.  Mr. Morgan is correct.  We've contacted him since that

15 time.  He is willing to give the deposition tomorrow morning in

16 Florida or Thursday or some other time but he's unwilling to

17 travel to Texas, although he does respect the Court and wants

18 to be cooperative with respect to litigation and also with

19 respect to Kimberly-Clark who he has respect for but he just

20 doesn't want to get on an airplane because he has hip problems.

21         So anyway, to make a long story short, we're willing

22 to comply with the subpoena or the deposition notice -- I'm

23 sorry -- in terms of producing a witness tomorrow or at some

24 later time in Florida but we're not able to produce him in

25 Texas and that's the purpose of the motion for protection.  So

1  we would ask the Court to enter an order allowing us to tender

2  this gentleman even by telephone if that would make life easier

3  for Mr. Morgan tomorrow or Thursday in Florida or next week or

4  whenever would suit his convenience.  And, once again, we renew

5  the offer to pay Mr. Morgan's expenses to go to Florida and

6  back for the deposition.  Recognizing that, you know, this is a

7  court of law and we interact with the citizens not only in

8  Texas but in this case of Florida and there has got to be some

9  respect that this gentleman is 75 years old and has had all

10  these hip surgeries.

11        I anticipate -- Mr. Morgan and I have talked briefly

12  about   it -- I anticipate that he's going to prefer that we

13  depose all of his plaintiffs in Alabama where they live.  These

14  aren't Texas residents.  None of the plaintiffs are, to my

15  knowledge.  And so we'll have to get into that whole issue of

16  are we going to have to fly all these people to Texas for

17  deposition or are we going to be expected to go to Alabama to

18  take their deposition?  And, you know, I think we'll be happy

19  to show some flexibility there but we're just asking the Court

20  before the fact and understanding this thing has evolved over

21  the last few days, for some protection with respect to this

22  notice.

23        THE COURT:  Well, I mean, I think there are

24  basically two issues here.  The first issue is where the

25  deposition of this gentleman takes place.  I don't have the

1   authority to order it to take place here in Beaumont.  And at

2   the same time I don't have the ability at this juncture to

3   weigh the issues of whether you could have produced somebody in

4   Texas tomorrow as noticed to begin with.  I mean, if you don't

5   have anybody, you don't have anybody.  So to me it doesn't --

6   to me procedurally I don't think it matters whether I quash the

7   depositions or I don't quash the depositions.  It's ultimately

8   going to be resolved by Judge Sanderson in a motion for

9   sanctions for failure to show or a motion for sanctions for,

10  you know, not having a good faith effort to get someone to the

11  deposition.

12          Do you see that indifferently?  I mean, the issue is

13  whether they could have had someone here tomorrow whether it's

14  quashed or not, correct?

15          MR. ADAMS:  Well, I think the issue is whether

16  or not it's reasonable for plaintiff to insist that this

17  retired nonemployee of Kimberly-Clark be deposed in Beaumont,

18  Texas as opposed to Florida and particularly when his clients

19  are from Alabama.  So they're using the benefit of Texas court

20  for these out of state folks and they want us to show respect

21  to them but not to this gentleman from Florida.

22          THE COURT:  And whether that's reasonable or

23  not will ultimately be decided by Judge Sanderson, not by this

24  court.

25          MR. ADAMS:  Yes, sir.  Yes, sir.

1              MR. MORGAN:  And the other issue I think is

2    whether -- I should probably just show you the letter.  It

3    says, "Again, to date, Kimberly-Clark has not been able to

4    locate an individual with knowledge in response to the specific

5    areas of inquiry contained in your notice.  The notice seeks an

6    individual with knowledge of four specifically identified areas

7    concerning the Coosa Pines facility and its operations.  Again,

8    Kimberly-Clark sold the Coosa Pines facility in 1997.

9    Accordingly, Kimberly-Clark no longer owns the facility.

10   Kimberly-Clark has endeavored to locate current or former

11   Kimberly-Clark employees who may have information regarding the

12   Coosa Pines facility.  Kimberly-Clark has done so by canvassing

13   current employees and by attempting to locate former employees

14   who may be knowledgeable.  Despite Kimberly-Clark's efforts,

15   Kimberly-Clark has been unsuccessful in its search to locate

16   individuals with information responsive to Plaintiffs'

17   counsel's notice.  Kimberly-Clark is continuing its

18   investigation in an effort to locate such witnesses."

19              So, they're telling me in this letter Friday we

20   don't have anybody.  The next page now by the way there is a

21   guy named Mr. Bernd who he'll have a little bit of knowledge

22   about the corporate relationships but he doesn't have anything

23   about what you want to know about but this is the guy we're

24   going to put up.

25              So the first issue I think is that we have a

1   situation where they have not produced anyone and they've

2   quashed the attempts for us to take someone.  They give us the

3   day for the deposition that we've been trying to take and we

4   didn't just pick it, they told us April 7th or the 8th or some

5   other dates.  I picked the 7th for the reasons I stated and

6   they say okay and everything is fine and we got it noticed and

7   the videographer is notified and the court reporter is

8   notified, it's noticed for Beaumont and no one said anything

9   about that until we get this letter and now -- except in

10  between there is some talk about Mr. Young can't be present for

11  this deposition.  So now they tell me we don't have anybody

12  responsive to your request but we're going put this guy up and

13  now we want you to order the plaintiff to travel to Florida and

14  we'll pay his coach fair to get there but travel to Florida to

15  go see that Mr. Bernd does not know anything about what you

16  want to know about and then come back and then when Mr. Young

17  is back -- they don't say this -- but I assume that once

18  Mr. Young gets back, then we'll find somebody else.  You know,

19  our investigation is ongoing.

20          A corporation, as you know, has a history and it

21  knows its history.  It just has to designate someone to tell it

22  and so they've got to go out and educate people who are with

23  them to come in and be a corporate representative.  They can't

24  just go out and say, This guy used to work for us.  He doesn't

25  really know much but he's agreed to come testify and we'll say

1    he's a corporate rep but we want you to do things differently,

2    et cetera.  So we -- again, Judge, I submit that the best way

3    for us to go in this situation is -- I said I wish that Judge

4    Sanderson was here because I think we're in the first phase of

5    a long line of things that are about to happen and I would like

6    for him to see from the beginning what's going on with this

7    defendant.  But I would ask in light of the circumstances with

8    this guy not being the individual by their own admissions and I

9    guess I should tender this.

10             (EXHIBIT NO. 1 MARKED)

11             MR. MORGAN:  By their own admission, they

12    don't have anyone that's responsive, I don't know why I should

13    be required to travel to Florida and take that deposition when

14    I think what he's saying is if the notice stays as is, he's not

15    going to show and then they'll just sort of handle that

16    situation as it comes up.

17             MR. ADAMS:  Well, Judge, that letter has not

18    been -- I need to supplement the letter and I can't recall if

19    I've done it in writing to Mr. Morgan or not but as you'll see

20    on the second page of the letter that we have not yet spoken to

21    Mr. Bernd.

22             We have since spoken to Mr. Bernd.  Kimberly-Clark

23    has advised me that Mr. Bernd is the person most knowledgeable

24    with respect to the matters addressed in the deposition notice,

25    currently, as far as Kimberly-Clark is currently aware.  So

1  it's incorrect to state that Mr. Bernd is not the most

2  knowledgeable person that Kimberly-Clark can locate responsive

3  to the deposition notice.  He is, and I'm authorized to make

4  that representation on behalf of Kimberly-Clark.  So the only

5  other issue then is his availability and when we're discussing

6  the April 7th and 8th dates, those were dates that I was

7  available.  I let Mr. Morgan know that, you know, we still had

8  to get all the details worked out.

9         THE COURT:  How long ago was that?

10        MR. ADAMS:  I believe it was sometime last

11 week, Judge.  And we've been working on this.  Mr. Bernd was --

12 we tried to call him many times last week and he never did

13 return our calls.  We left messages on his telephone answering

14 machine over there in Stuart, Florida and evidently he was out

15 of town or something and he got back to -- he got back to us

16 very late Friday.  So I haven't even met with him yet, so I've

17 got to meet with him, but I did find out today or last night --

18 I don't remember the exact chronology -- very recently, that

19 he's -- that he does not wish to get on an airplane because of

20 his hip problems.  I didn't know that last week.  And, you

21 know, I certainly I want Mr. Morgan to be able to get the

22 deposition that he needs to get.  I respect that.  But this is

23 a situation that's beyond our control.  The man is retired.  We

24 don't own the plant.  The people who worked at the plant stayed

25 with the plant.  We haven't been able to find any witnesses who

1  are more knowledgeable than this gentleman about it because we

2  haven't found anybody that's knowledgeable about it at all.

3          THE COURT:  All right.  Well, let me ask you

4  this, Mr. Morgan.  Let's say I don't quash it, the deposition

5  time comes and goes tomorrow and no one shows up, then what's

6  the next step, you go down to the -- down the hall and file a

7  motion for sanctions?

8          MR. MORGAN:  Probably something that includes

9  that.  I think I need a witness to come testify.  Taken in

10  context what he said is this is the most knowledgeable person

11  Kimberly-Clark has been able to find.  Remember they haven't

12  found anybody.  This guy knows at least where the place was.

13  So when he tells you this is the most knowledgeable guy that we

14  have found, it's not telling you anything because the letter

15  says he doesn't know anything about it.

16          MR. ADAMS:  I've supplemented the letter by

17  what I say today because the letter was written on April 2nd.

18          MR. MORGAN:  So what I would anticipate filing

19  is some type of motion really to compel, to order them to

20  produce someone that can respond to this and make him be

21  present on a date certain.

22          Again, I'm okay with agreeing on the days.  We just

23  need to get something done.  I don't think they should go

24  through all this and just decide, Well, we're really not

25  producing anybody and we quash it and we quash it.  This is a

1   new way to quash it.  And by presenting someone who really

2   doesn't know much about the facility and continue delaying that

3   without anything happening at all, I think there ought to be

4   some burden placed upon them to work within the system

5           THE COURT:  All right.  And then what would

6   you envision happening if I did grant the motion to quash?

7   Pretty much the same thing, correct?

8           MR. MORGAN:  No.  Then there is no motion to

9   compel.  They weren't ordered to produce anyone.  I'm not going

10  to go to Florida.  When you grant the motion, then I've got to

11  go get on a plane -- well, it's set for tomorrow.  So somehow I

12  got to get on a plane and get there tomorrow to take advantage

13  of their generosity and take this guy's deposition in Florida

14  and again, you know --

15          THE COURT:  Well --

16          MR. ADAMS:  We offered to do it Thursday as

17  well, Your Honor.

18          THE COURT:  If Judge Sanderson is convinced --

19  whatever I do here today, if Judge Sanderson ultimately comes

20  up for his consideration and if he's convinced this is the only

21  person they can produce, I can't imagine him -- I don't think

22  he would have the authority to tell Kimberly-Clark or tell him

23  he has to come here, he has to be produced here.  If he was

24  still employed, that would be a different matter.  He's a

25  citizen right now, correct?  I mean, just he's not even --

1          MR. ADAMS:  He's retired.

2          MR. MORGAN:  In direct answer to your

3  question, no, he's not.  He's a corporate representative.

4          THE COURT:  Because they designated him?

5          MR. MORGAN:  Yes, sir.  So as a corporate

6  representative you have every right to order Kimberly-Clark to

7  present anybody that is responsive to their request, if it's a

8  corporate representative type of deposition.  The rules say

9  that we can, with specificity and they say we've done that, put

10  the areas that we want the guy to testify and then we have to

11  go and get one or more that comply with this and they have to

12  give us the names, et cetera, and the depositions are taken in

13  the county of suit as a corporate rep.

14          THE COURT:  Will it be reciprocity in the

15  sense that you'll be tendering your plaintiffs here?

16          MR. MORGAN:  Historically, what's happened on

17  that is because of the age and infirmity of some of these

18  plaintiffs that are in their eighties and nineties and they

19  can't breathe, et cetera, and leaving their house for overnight

20  type of trips and traveling through the Houston airport, et

21  cetera, is so traumatic on these people, they're not well

22  educated, et cetera, that traditionally both Judges Clark,

23  Sanderson and Floyd have always allowed those depositions to

24  occur in Alabama where the defense group travels to Alabama and

25  one witness is presented after another and in many cases we

1 have done it on a double track or a triple track system even

2 and gotten those done.

3        THE COURT:  And I don't think that's -- I

4 don't think that anybody would argue if truly their health

5 prevents it that that is unreasonable.  But under the scenario

6 or the circumstance here, although they're not eighty or ninety

7 -- he's not eighty or ninety, he's retired.  He's seventy, and

8 he's got a hip problem.

9        MR. MORGAN:  And doesn't want to fly.

10        MR. ADAMS:  I believe he's 75 -- four or five,

11 Your Honor.  It's either 74 or 75 and I think it's -- I think

12 Mr. Morgan makes the point for me that he's elderly, he's not

13 in great health, he doesn't want to get on an airplane and go

14 through the Houston airport either.  He is educated; and as far

15 as him being a corporate representative, I'll dedesignate him

16 right now.  He's no longer a corporate representative.

17        MR. MORGAN:  Then he's not responsive to our

18 request at all because I'm asking for a corporate rep.

19        MR. ADAMS:  Yeah, but what he's asking for is

20 someone knowledgeable about what asbestos products were

21 installed at the mill, what asbestos products were purchased

22 for that mill, what asbestos products were used at the mill.

23        The problem is that the people who are most capable

24 of answering that are the people that own the mill, the Bowater

25 people, who we don't represent and are not a party to the

1  lawsuit.  And so we have some practical problems that are not

2  of Mr. Morgan's making and they're not of Kimberly-Clark's

3  making.  That's just a reality of what happens when you're

4  litigating over facts that occurred a long time ago.  These

5  were exposures that go back for 20, 30, 40 years ago allegedly

6  at a mill which we don't own and haven't owned for going on

7  seven years now.

8              MR. MORGAN:  But you sold it after the

9  litigation so.

10             MR. ADAMS:  And I think those are proper

11  questions for Mr. Morgan to ask this witness.  He was on the

12  board of directors at the time.  He can ask him about the

13  ownership of that facility, what he knows about it, what he

14  knows about the sale of it, the transactions, the retention of

15  liability, the retention of documents and so forth and cover

16  those topics.  But I'm just telling the Court everything I've

17  learned, it sounds to me like the witnesses who are really

18  responsive to Mr. Morgan's request the way he has it drawn are

19  not employees of Kimberly-Clark.  They're employees of Bowater,

20  and this thing is in Alabama.  So I'm not exactly sure how we

21  go about -- they're probably not going to invite us on their

22  premises to start deposing people.  I'm not sure yet how we're

23  going to go about this; but I would point out, Your Honor, that

24  I've only been informed of the work site in question for a

25  little over 30 days in this litigation that Mr. Morgan points

1  out is seven or eight years old.  So from the standpoint of

2  discovery between plaintiffs and Kimberly-Clark, this is almost

3  a brand new lawsuit.  In fact, Mr. Morgan has still not

4  identified who his trial plaintiffs are, we have not deposed

5  them, we have not gotten IMEs.  And when we're talking about

6  all these matters, I'm not suggesting in any way he's being

7  uncooperative or stonewalling us; but this litigation from a

8  discovery standpoint between these two parties is in its

9  infancy, even though the lawsuit itself is old.  So these are

10  things we're going to have to work through and we want to

11  cooperate as fully as possible and that's why we worked hard to

12  find Mr. Bernd and try to make him available but just like

13  Mr. Morgan's clients, he doesn't want to get on an airplane.

14           MR. MORGAN:  In light of his withdrawal as a

15  corporate rep, Mr. Bernd is no longer responsive to our request

16  at all so that issue seems to be off the table since that is

17  who I'm asking for.  The -- he can't be right about not having

18  to produce someone since they don't own the facility anymore

19  nor does any current employee know anything about it.  That is

20  not the law.  You know, I mean if you need a case on that, I

21  can get something back to you where a corporation has an

22  obligation to educate its current employees to be able to be

23  responsive to this type of thing because it does have a history

24  and the corporation still exists and it knows what it did and

25  it knows when it did it and where it did it.  It's just that

1  maybe there is no one right now that was there when it happened

2  but the corporation knows so it has to be trained and educated

3  on what happened.  If Mr. Adams is saying that we're in the --

4  we're in the process of training someone and educate them, et

5  cetera, that's one thing; but he's saying we don't know

6  anything about anything.  We sold the plant in 1997 and now

7  it's somebody else's problem and, you know, we retain the

8  liabilities and now, you know, I don't think we can go in there

9  and talk to their employees and I don't think we can go in

10 there and get their documents, et cetera.  That's -- that's

11 certainly not what the law is and it's not what their

12 responsibility is under the rules and, again, I think in light

13 of the withdrawal of him as a corporate rep, this ought to be a

14 moot situation now.

15          MR. ADAMS:  Well, I think -- I didn't see his

16 deposition notice because I don't recall it being drawn that

17 way.

18          MR. MORGAN:  Because I don't want to depose

19 someone who is not a corporate representative.

20          MR. ADAMS:  Thank you.  Very briefly, if I may

21 read into the record, Mr. Morgan is seeking, Kimberly-Clark's

22 corporate representative with the most knowledge regarding the

23 following four areas relative to Kimberly-Clark's facility in

24 Childersburg, Alabama:  "The installation and removal of

25 asbestos-containing products on Kimberly-Clark's premises, the

1   highest ranking safety individual with knowledge of safety

2   policies and practices at the Kimberly-Clark facility regarding

3   asbestos, the highest ranking safety individual with knowledge

4   of contractor safety policies and practices of Kimberly-Clark

5   facilities and asbestos-containing products manufactured at the

6   Kimberly-Clark facility."

7           What I can represent to the Court is that persons

8   available to Kimberly-Clark most knowledgeable about those four

9   areas is Mr. James Bernd of Stuart, Florida; and I can make him

10  available tomorrow or Thursday or at some later time in

11  Florida.  Is he 30(b)(6) or the state equivalent of a corporate

12  representative of Kimberly-Clark?  No.  And there will be

13  someone else at some point but that person certainly will not

14  be knowledgeable or responsive to the four areas of

15  Mr. Morgan's request.  So with respect to those four areas,

16  Mr. Bernd is a witness available to Kimberly-Clark most

17  knowledgeable but he's not our employee, he's retired and he,

18  because of his health, has asked us that he not be required to

19  travel on an airplane.

20                  THE COURT:  When is Sanderson returning?

21                  MR. ADAMS:  Thursday.

22                  THE COURT:  This Thursday?

23                  MR. ADAMS:  Well, I believe that's true.

24                  MR. MORGAN:  Is he coming back Thursday or is

25  he out Thursday?

1              THE COURT:  Well, Friday is a holiday.

2              MR. MORGAN:  Oh, I know.

3              MR. ADAMS:  The reason I say that is because I

4    think there is a hearing on another case before Judge Sanderson

5    on Thursday that is supposedly going forward.  But I heard it

6    two different ways.

7              MR. MORGAN:  I don't know.  But, again, in

8    light of his comments, I may -- I may one day want to depose

9    Mr. Bernd as a fact witness but I asked for a corporate

10   representative and that seems to me to be no longer an issue

11   from their standpoint.

12             THE COURT:  But the question is whether they

13   can get a corporate representative here tomorrow.

14             MR. ADAMS:  I can get somebody here, but he

15   won't be someone knowledgeable about the four areas of your

16   notice.  That's the problem.

17             MR. MORGAN:  But the motion is to protect Mr.

18   Bernd from traveling to Texas and they're now saying that he's

19   no longer a corporate representative so he's not responsive to

20   the thing -- to the notice.  So I haven't asked for Mr. Bernd

21   to be deposed at this moment.

22             In light of that, they're just saying there is a guy

23   out there that used to work for us that knows a little bit

24   about this facility; and if you want to depose him, go to

25   Florida.  And I say maybe one day I'll do that but I want a

1  corporate representative so when he tells me things, he's

2  binding upon the corporation.  And if you don't have anybody,

3  that's -- that's your position.  And explain it to the judge

4  later when I say nobody showed up on Wednesday responsive to my

5  request.  But they're asking you today to prevent Mr. Bernd

6  from having to travel to Texas.  You don't -- in light of what

7  he just told you, you don't have any control over him, you

8  can't order Kimberly-Clark to produce him in Texas.  So -- and

9  I think in light of my motion -- my notice, that it's a moot --

10 it's a moot point.

11          THE COURT:  Well, we still have the issue of

12 whether the deposition, there is a certificate of nonappearance

13 taken tomorrow or not.  That's -- that's the real issue as I

14 understand.

15          MR. ADAMS:  Yes.  Just to be --

16          MR. MORGAN:  Even saying if you want to take

17 Mr. Bernd, take him in Florida.  I say, Okay.  Fine.  It

18 doesn't -- I'm still going to take a certificate tomorrow if

19 they don't show up with a corporate representative because

20 Mr. Bernd is not a corporate representative.

21          MR. ADAMS:  That's the whole reason for the

22 motion for protection, Your Honor.  He sought -- he sought a

23 corporate representative most knowledgeable about four areas.

24 He didn't seek a corporate representative most knowledgeable

25 about Kimberly-Clark corporation.  So the person available to

1  the corporation -- we may be arguing about semantics here --

2  but the person available to the corporation at this point in

3  time, some 35 days or so after we've first been informed by the

4  plaintiff attorney what facility he's concerned about that we

5  owned at one time is Mr. Jim Bernd of Stuart, Florida, who

6  doesn't work for us anymore, he's retired but he is willing to

7  testify, to come testify on behalf of Kimberly-Clark.  I'm not

8  sure if Mr. Morgan's concerns about this term corporate

9  representative and maybe we're using the terms -- maybe I'm not

10  using the terms -- term correctly.  He is -- he has been asked

11  to testify by Kimberly-Clark on behalf of Kimberly-Clark but

12  he's not a corporate representative because he doesn't work for

13  the corporation.  He's retired so -- and if the deposition

14  notice were to merely ask for the corporate representative of

15  Kimberly-Clark, we could bring one of a multitude of people of

16  those who are currently employed by Kimberly-Clark but those

17  people aren't knowledgeable about the four areas that he

18  inquires about in his deposition notice.  And with respect to

19  that notice, the most knowledgeable people undoubtedly are

20  people that worked for Bowater Paper and still work at that

21  mill and are not under our control.  The witness available to

22  us most knowledgeable about those four areas is this gentleman

23  who is in Florida who no longer works for us who doesn't want

24  to get on an airplane and that's where we are.

25                 THE COURT:  Well, we can debate this all day

1   long.  I tell you what I'm going to do, I think under the

2   circumstances, my inclination would be to grant the motion to

3   quash the protection or that you produce a corporate

4   representative here in Beaumont within 10 days and then next --

5   Judge Sanderson will be back in his office on Thursday and he

6   can modify or change this in any form or fashion.

7           And, Glen, to the extent you think that, you know,

8   they've manufactured this whole dilemma, you can file a motion

9   for sanctions and have Judge Sanderson hear it if you just

10  truly think this is an end run to avoid the scheduling conflict

11  of whoever that is up in Atlanta.  But I mean to me to bring

12  a -- under the circumstances, the way this has unfolded, to

13  bring a court reporter and a videographer in to go through all

14  of that to take a certificate of nonappearance, the same issue

15  is going to be there within 10 days and, that is:  Did they

16  engage in sanctionable conduct to get this quashed?  And, two,

17  can they designate a nonemployee as their corporate rep?  And,

18  three, can they force you to go to Florida to take it or do

19  they have to bring someone to Beaumont?

20          MR. MORGAN:  Well, I think by your ruling, you

21  take away the first part you mention.  There is no sanctions

22  and there is no motion to compel in light of this because

23  you've basically put the deposition off for 10 days and said

24  produce someone here in 10 days.  So either they'll go find me

25  somebody in 10 days to come testify or they'll, again, take the

1 position we can't find anybody.  At that point we'll be back

2 saying, Well, you know, we've already tried to get these

3 depositions.  But I think the ruling -- I mean, again, not that

4 it really matters but I think the ruling does take out any

5 complaint that I may have about Mr. Bernd or the fact that they

6 didn't want to go forward on this day and chose not to produce.

7 　　　　　　THE COURT:  They'll still have the same

8 Hobson's choice within the 10-day period.

9 　　　　　　MR. MORGAN:  I think they'll have to find

10 someone that is a corporate representative that can bind the

11 corporation to show up within 10 days in light of the order.

12 　　　　　　THE COURT:  And if that person shows up and

13 says, I don't know anything, then you're exactly where you were

14 here and you can say, you know, that -- their argument is I

15 can't -- I can't create someone with knowledge, you know,

16 corporate knowledge.  And your argument is, you know, you've

17 got the duty to educate your people and keep them and you can

18 tell Judge Sanderson, Look, this is the chronology of events.

19 I mean, it's obvious that -- it's obvious to me that they've

20 manufactured this dilemma if that's what you think the evidence

21 supports.

22 　　　　So to me, while I'm sure you're disappointed, all

23 this really does is postpone the resolution of the issue for no

24 longer than 10 days and let's the person who really is managing

25 this case, and that's Judge Sanderson, let him make the

```
 1  ultimate decision on the issue.
 2              MR. MORGAN:  Well, again, thanks for your
 3  time.  We appreciate it.
 4              THE COURT:  Sure.
 5              MR. ADAMS:  Thank you very much, Judge.  We
 6  appreciate it.
 7          (HEARING WAS CONCLUDED)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1  THE STATE OF TEXAS:

2  COUNTY OF JEFFERSON:

3

4       I, BRANDI R. SEWELL, Official Court Reporter in and for

5  the 136th District Court of Jefferson County, State of Texas,

6  do hereby certify that the above and foregoing contains a true

7  and correct transcription of all portions of evidence and other

8  proceedings requested by Counsel for the parties to be included

9  in this volume of the Reporter's Record, in the above-styled

10  and numbered cause, all of which occurred in open court or in

11  chambers and were reported by me.

12       I further certify that this Reporter's Record of the

13  proceedings truly and correctly reflects the exhibits, if any,

14  offered by the respective parties.

15       I further certify that the total cost for the preparation

16  of this Reporter's Record is $_____ and was paid by

17  _____.

18       WITNESS MY OFFICIAL HAND this the _14_ day of

19  _April_, 2004.

20

21       _Brandi R. Sewell_

22       BRANDI R. SEWELL, CSR, RPR
         Official Court Reporter

23       136th District Court
         Jefferson County, Texas

24       1001 Pearl, Beaumont, Texas   77701
         (409)835-8514

25       Certification No. 5336
         Expiration Date:  12-31-05

CENTURY TOWER
550 FANNIN, SUITE 800
POST OFFICE BOX 7505
BEAUMONT, TEXAS 77726-7505

TELEPHONE (409) 838-6767
FAX (409) 838-6950

WWW.ADAMSCOFFEY.COM

# ADAMS
## & ──
# COFFEY

A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

BEAUMONT ★ DALLAS ★ HOUSTON

OTHER OFFICES:

Dallas, Texas
TELEPHONE (972) 506-6600
FAX (972) 506-6620

HOUSTON, TEXAS
TELEPHONE (713) 659-6767
FAX (713) 759-6830

April 2, 2004

**VIA FAX**

Mr. Glen Morgan
Reaud, Morgan & Quinn
801 Laurel Street
P. O. Box 26005
Beaumont, Texas  77720-6005

Re:   **Martin v. KCC**
      **Our File No.:  3028.001**

Dear Glen,

I am writing in response to Plaintiffs' Notice of Intention to Take the Deposition of Kimberly-Clark's corporate representative in the above-styled matter. As you know, we have been searching for some time to locate a witness or witnesses knowledgeable about the Coosa Pines facility, during the time Kimberly-Clark owned that facility. To date we have had little success. Kimberly-Clark sold the operating mill in 1997. As we understand it, the new and subsequent owners retained all or most of the employees who were working at the facility when Kimberly-Clark owned the mill. As such, Kimberly-Clark did not roll Coosa Pines employees into its work force after the sale of the facility; consequently, we have encountered difficulty in locating responsive witnesses. In addition, plant records probably responsive to this notice remain at the plant.

Again, to date, Kimberly-Clark has not been able to locate an individual with knowledge responsive to the specific areas of inquiry contained in Plaintiffs' counsel's notice. The notice seeks an individual with knowledge of four specifically identified areas concerning the Coosa Pines facility and its operations. Again, Kimberly-Clark sold the Coosa Pines facility in 1997. Accordingly, Kimberly-Clark no longer owns the facility. Kimberly-Clark has endeavored to locate current or former Kimberly-Clark employees who may have information regarding the Coosa Pines facility. Kimberly-Clark has done so by canvassing current employees and by attempting to locate and contact former employees who may be knowledgeable. Despite Kimberly-Clark's efforts, Kimberly-Clark has been unsuccessful in its search to locate individuals with information responsive to Plaintiffs' counsel's notice. Kimberly-Clark is continuing its investigation in an effort to locate such witnesses.



Mr. Glen Morgan
April 2, 2004
Page 2

At this time, Kimberly-Clark is prepared to make available as a corporate representative, Mr. James D. Bernd, a former employee of Kimberly-Clark, who retired as Executive Vice President, Household Products, in 1995. Mr. Bernd will be able to testify regarding Kimberly-Clark corporate policies. However, he likely has little or no specific knowledge about the Coosa Pines facility. Please advise whether Plaintiffs wish to depose Mr. Bernd or whether you would prefer to postpone depositions until Kimberly-Clark has located a witness or witnesses responsive to Plaintiffs' counsel's specific requests. Please note, Mr. Bernd has not yet returned our numerous calls, does not yet know you may want to depose him next week and he may prefer to be deposed in Florida, where he lives. Further, he may not be available next week. In any event, I will advise you as soon as we locate a witness actually knowledgeable about Coosa Pines. Thanks in advance.

Sincerely,

*/s/ Kent M. Adams*

Kent M. Adams

KMA/jr

CENTURY TOWER
550 FANNIN, SUITE 800
POST OFFICE BOX 7505
BEAUMONT, TEXAS 77726-7505

TELEPHONE (409) 838-6767
FAX (409) 838-6950

WWW.ADAMSCOFFEY.COM

# ADAMS
### &
# COFFEY

A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

BEAUMONT ★ DALLAS ★ HOUSTON

OTHER OFFICES:

DALLAS, TEXAS
TELEPHONE (972) 506-6600
FAX (972) 506-6620

HOUSTON, TEXAS
TELEPHONE (713) 659-6767
FAX (713) 759-6830

## NOTICE

This facsimile transmission is intended only for the addressee listed below. It may contain information that is privileged, confidential or otherwise protected from disclosure. Any review, dissemination, or use of this transmission or its contents by persons other than the addressee is strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone and mail the original to us at the above address.

## TELECOPY COVER SHEET

TO:    Mr. Glen Morgan                          409-833-8236

FROM:    Kent M. Adams

DATE:    April 2, 2004

RE:    Cause No. B-150,896; *Inez Martin, et al vs. ACandS, Inc., et al*

Pages(s)    ___3___

Sent via fax only __x__

We are transmitting from an automatic facsimile transceiver, Fax No. (409) 838-6950. SHOULD YOU HAVE ANY PROBLEMS RECEIVING THIS TELECOPY, PLEASE CALL (409) 838-6767 AND ASK FOR Lori Couthran.