**8751**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

UNITED STATES OF AMERICA
JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

MAR - 1 2006

FILED
CLERK'S OFFICE

| | | |
|---|---|---|
| CHARLES RICH | ) | |
| N. D. Ohio, C.A. No. 1:98-14094 | ) | Before The Judicial Panel |
| | ) | on Multidistrict Litigation |
| ESTATE OF CHARLES WILLE | ) | |
| N. D. Ohio, C.A. No. 1:98-12997 | ) | |
| | ) | CIVIL ACTION NO. 2 MDL 875 |
| ESTATE OF JAMES E. JACKSON, | ) | |
| N.D. Ohio, C.A. No. 1:99-10802 | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| A-C PRODUCT LIABILITY TRUST, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' RESPONSE TO
## DEFENDANTS' MOTION TO VACATE CONDITIONAL REMAND ORDER

NOW COMES Plaintiff Charles Rich and Plaintiffs' Willard E. Bartel and David C. Peebles,

Administrators of the Estate of Charles Wille, deceased, and  Dorothy A. Jackson, Personal

Representative of the Estate of James E. Jackson, deceased,  respectively, by and through counsel

undersigned and hereby respond in opposition to Defendants' Motion To Vacate Conditional Remand

Order for the reasons more fully set forth in Plaintiffs' accompanying Brief In Support attached hereto

and incorporated herein.

Respectively submitted,

Maritime Asbestos Legal Clinic
a Division of The Jaques Admiralty Law Firm, P.C.

By:

DUANE C. MARSDEN
DONALD A. KRISPIN
Attorneys for Plaintiffs'
645 Griswold, Ste. 1500
Detroit, MI 48226
(313) 961-1080

Dated: February 28, 2006

OFFICIAL FILE COPY

IMAGED MAR 0 2 2006

2006 MAR - 1  A 11: 47

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

RECEIVED
CLERK'S OFFICE

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR - 1 2006

FILED
CLERK'S OFFICE

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT on this _28th_ day of February, 2006, a copy of this

Plaintiffs' Response To Defendants' Motion To Vacate Conditional Remand Order and the

accompanying Brief in Support of Plaintiffs' Response To Defendants' Motion To Vacate

Conditional Remand Order were mailed to all counsel on the attached Panel Service List.

Duane C. Marsden

RECEIVED
CLERK'S OFFICE

2006 MAR - 1  A 11: 47

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

**PANEL SERVICE LIST (Excerpted from CRO)**
**DOCKET NO. 875**
**IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)**

*Charles Rich v. A-C Product Liability Trust, E.D. Pennsylvania*
(N.D. Ohio, C.A. No. 1:98-14094)

*Charles Wille v. A-C Product Liability Trust, E.D. Pennsylvania*
(N.D. Ohio, C.A. No. 1:98-12997)

*James Jackson v. A-C Product Liability Trust, E.D. Pennsylvania*
(N.D. Ohio, C.A. No. 1:99-10802)

James W. Bartlett, III
Semmes, Bowen & Semmes
250 West Pratt Street, 16th Floor
Baltimore, MD 21201

Reginald S. Karmer
Oldham & Dowling
195 South Main Street, Suite 300
Akron, OH 44308-1314

Neil Selman
Selman, Breitman & Burgess
11766 Wilshire Boulevard, Sixth Floor
Los Angeles, CA 90025

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114

Robert N. Spinelli
Kelley, Jasons, McGuire & Spinelli
Centre Square West, 15th Floor
Philadelphia, PA 19102

Edward J. Cass
Gallagher, Sharp, Fulton & Norman
Bulkley Building, 7th Floor
1501 Euclid Avenue
Cleveland, OH 44115

David C. Landin
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Adam M. Chud
Goodwin Proctor, LLP
901 New York Avenue, NW
Washington, DC 20001

Gene Locks
Greitzer & Locks
1500 Walnut Street
Philadelphia, PA 19102

Andrew J. Trevelise
Reed Smith, LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

David A. Damico
Burns, White, & Hickton, LLC
Four Northshore Center
106 Isabella St.
Pittsburgh, PA 15212

James K. Weston, II
Tom Riley Law Firm
4040 First Avenue, N.E.
PO Box 998
Cedar Rapids, IA 52406

John J. Repcheck
Marks, O'Neill, O'Brien & Courtney
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219

John D. Roven
Roven-Kaplan, LLP
2190 North Loop West, Ste. 410
Houston, TX 77018

Richard D. Schuster
Vorrys, Sater, Seymour & Pease, LLP
52 East Gay Street
PO Box 1008
Columbus, OH 43216

Ronald L. Motley
Motley Rice, LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29465

Raymond P. Forceno
Forceno & Hannon
111 S. Independence Mall East
The Bourse, Suite 1000
Philadelphia, PA 19106-2574

Ellen B. Furman
Goldfein & Hosmer
1600 Market Street, 33rd Floor
Philadelphia, PA 19103

Susan M. Hansen
Brownson & Ballou
225 South Sixth Street, Suite 4800
Minneapolis, MN 55402

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR - 1 2006

FILED
CLERK'S OFFICE

UNITED STATES OF AMERICA
JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

CHARLES RICH                              )
N.D. Ohio, C.A. No. 1:98-14094            )        Before The Judicial Panel
                                          )        on Multidistrict Litigation
CHARLES WILLE,                            )
N. D. Ohio, C.A. No. 1:98-12997           )
                                          )        CIVIL ACTION NO. 2 MDL 875
JAMES E. JACKSON,                         )
N.D. Ohio, C.A. No. 1:99-10802            )
                                          )
            Plaintiffs,                   )
                                          )
v.                                        )
                                          )
A-C PRODUCT LIABILITY TRUST, et al.,      )
                                          )
            Defendants.                   )

---

## BRIEF IN SUPPORT OF PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO VACATE CONDITIONAL REMAND ORDER

Plaintiff Charles Rich and Plaintiffs Willard E. Bartel and David C. Peebles,

Administrators of the Estates of Charles Wille, deceased, and Dorothy A. Jackson, Personal

Representative of the Estate of James E. Jackson, deceased, respectively, and by and through

counsel undersigned submit this *Brief in Support of their Response in Opposition* to *Defendants'*

*Motion To Vacate Conditional Remand Order* in connection with the above- styled causes.

### I. FACTS

In each of these causes notices of Suggestion of Remand were issued by the Transferee

Court, the late Judge R. Weiner presiding, on October 31, 2005 (see Exhibits A1- A3).  The

Court was fully aware of its prior rulings and procedures when it issued the Suggestions of

Remand in these causes. The Transferee Court was also cognizant of the fact that in the two

1

above causes, <u>Rich</u> and <u>Jackson</u> respectively, many of the Defendants herein had filed objections to *Plaintiff's Motion For Reinstatement And Remand*, attached hereto as exhibits B1 and B2, which raised the identical issues as presented in *Defendants' Motion To Vacate Conditional Remand Order* which is now before the Panel. The Court was further aware of Plaintiffs' replies to Defendants' oppositions when the late Judge Weiner issued notices of Suggestions of Remands accordingly (see Exhibits C1 and C2).

In the *<u>Wille</u>* cause, Defendants did not file a written objection, however, counsel herein were present at the settlement conference and had ample opportunity to voice their objections to the Court at that time or previously in writing. Whatever objections, if any, would have been given due consideration by the Court in its ruling and issuing its notice of Suggestion of Remand.

The Court was further apprised of the fact that, in each cause, numerous other non-shipowner Defendants were contemporaneously dismissed voluntarily when Plaintiffs' filed their motions for reinstatement and remand. More noteworthy, however, is the amount of discovery that took place prior to the filing of Motions to Reinstate and Remand. In addition to the underlying Plaintiffs themselves testifying under oath, five co-workers did so also. Their testimony provided extensive product/ manufacturer identification and Plaintiffs' exposure thereto. These facts were conspicuously absent in Defendants' brief now before the Panel.

## II. LAW AND ARGUMENT

Great weight is attached to a Transferee Judge's indication that a suggestion of remand is appropriate. <u>*See*</u> *In re Richardson- Merrill, Inc. v. Bendectin Products Liability, 606 F. Supp. 715 (Jud.Pan.Mult.Lit. 1985)* and *In re Data General Corporation Anti Trust Litigation 510 F. Supp.*

1220 (Jud.Pan.Mult.Lit. 1979). In the latter case, *In re Data General Corporation Anti Trust Litigation, Supra,* the panel notes, "in our original opinion in this litigation, and we [sic] have repeatedly emphasized throughout the panel's history, Section 1407[1] contemplates that the degree and matter of coordinated or consolidated pretrial proceedings is left entirely to the discretion of the Trial Judge." *Id.* at 1226. See also, *In re Equity Funding Corporation of America Securities Litigation, 375 F. Supp. 1378, 1384 (Jud.Pan.Mult.Lit. 1974).* The late Judge Weiner's notice of Suggestion Of Remand in each of the above- styled causes is an obvious indication that he believed his role under Section 1407 had concluded. See, *In re Air Crash Disaster Near Dayton, Ohio, on March 9, 1967, 386 F. Supp. 908 (Jud.Pan.Mult.Lit. 1975).*

As aforestated, in each of these causes Defendants  including the non-shipowners herein had the opportunity to state their objections in writing or orally to the Transferee Court to Plaintiffs' Motions for Reinstatement and Remand and indeed did so. If they did not appreciate how the Court interpreted and carried out its rulings there were other remedies available to them. Getting what one could term a second bite of the apple should not be one of them. Indeed, this Panel has often indicated that the Panel is not an appellate forum for litigants dissatisfied with the rulings of the Transferee Court. See, *In re Glenn W. Turner Enterprises Litigation, 368 F. Supp. 805 (Jud.Pan.Mult.Lit. 1973)* and *In re Plumbing Fixtures Litigation, 332 F. Supp. 1047 (Jud.Pan.Mult.Lit. 1971).*

It should be further noted, that Defendants in these actions are not prejudiced in having these cases remanded. Each Defendant will have an opportunity, or several, at the Trial Court

---

[1] 28 U.S.C. § 1407

3

level to file dispositive motions.

## III. CONCLUSION

For the reasons stated above, Plaintiffs' respectively request that Defendants' Motion To Vacate Conditional Transfer Order in the above styled causes be denied and the stay lifted so that these cases may be remanded to the Transferor Court, United States District Court Northern District of Ohio Eastern Division.

**WHEREFORE**, Plaintiffs respectively request that this Honorable Panel deny Defendants' Motion To Vacate Conditional Transfer Order thereby lifting the stay so that these causes may be remanded appropriately and for any other relief deemed just in the premises.

Respectively submitted,


By: _____
DUANE C. MARSDEN
DONALD A. KRISPIN
Maritime Asbestosis Legal Clinic
Division of the Jaques Admiralty Law Firm, P.C.
645 Griswold, Ste. 1500
Detroit, MI 48226
(313)961-1080


Dated: February 28, 2006

4

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR - 1 2006

FILED
CLERK'S OFFICE

UNITED STATES OF AMERICA
JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | | |
|---|---|---|
| CHARLES RICH<br>N.D. Ohio, C.A. No. 1:98-14094 | ) ) ) | Before The Judicial Panel<br>on Multidistrict Litigation |
| CHARLES WILLE,<br>N. D. Ohio, C.A. No. 1:98-12997 | ) ) ) | |
| JAMES E. JACKSON,<br>N.D. Ohio, C.A. No. 1:99-10802 | ) ) ) | CIVIL ACTION NO. 2 MDL 875 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| A-C PRODUCT LIABILITY TRUST, et al., | ) ) | |
| Defendants. | ) | |

**EXHIBITS FOR**
**BRIEF IN SUPPORT OF PLAINTIFFS' RESPONSE IN OPPOSITION**
**TO DEFENDANTS' MOTION TO VACATE CONDITIONAL REMAND ORDER**

RECEIVED
CLERK'S OFFICE
2006 MAR - 1 A II: 47
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION



## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: ASBESTOS PRODUCTS LIABILITY : LITIGATION (NO. VI)

————————————————————— x

**FILED** OCT 3 1 2005

This Document Relates to:

CIVIL ACTION NO. 2 MDL 875

The Jaques Admiralty Law Firm

United States District Court
Northern District of Ohio

RICH., C.A. No. 1:98 CV 14094

[In the event the above-listed case is a multiple plaintiff (victim) action, this transfer is for the above-named party only, or said parties representative, and any spousal or dependent actions.]:

————————————————————— x


### SUGGESTION OF REMAND


THIS MATTER being reviewed this date upon Plaintiff's Motion To Remand to the United States District Court for the Northern District of Ohio, and the Court having reviewed this case and having had settlement conferences with the parties, and now believing that such motion is appropriate since few defendants remain for trial;

THE COURT FINDS that the issue of punitive damages must be resolved at a further date with regard to the entire MDL action, and therefore any claims for punitive or exemplary

EXHIBIT
A1

damages are hereby ORDERED severed from this case and retained by the Court within its jurisdiction over MDL 875 in the Eastern District of Pennsylvania.

THE COURT SUGGESTS that the within entitled matter should be REMANDED to the United States District Court for the Northern District of Ohio for resolution of all outstanding motions and such further action as may be deemed proper by that Court.

BY THE COURT:

Date: 10/31/2005

Charles R. Weiner          J.

ENTERED

NOV - 1 2005

CLERK OF COURT

2



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)

                                x

This Document Relates to:          :       CIVIL ACTION NO. 2 MDL 875

The Jaques Admiralty Law Firm    :

United States District Court       :
Northern District of Ohio

Estate of WILLE., C.A. No. 1:98 CV 12997

[In the event the above-listed case is a multiple
plaintiff (victim) action, this transfer is for the
above-named party only, or said parties repre-
sentative, and any spousal or dependent actions.]:

                                  x

FILED   OCT 3 1 2005

## SUGGESTION OF REMAND

THIS MATTER being reviewed this date upon Plaintiff's Motion To Remand to the United States District Court for the Northern District of Ohio, and the Court having reviewed this case and having had settlement conferences with the parties, and now believing that such motion is appropriate since few defendants remain for trial;

THE COURT FINDS that the issue of punitive damages must be resolved at a further date with regard to the entire MDL action, and therefore any claims for punitive or exemplary

EXHIBIT

A2

damages are hereby ORDERED severed from this case and retained by the Court within its jurisdiction over MDL 875 in the Eastern District of Pennsylvania.

THE COURT SUGGESTS that the within entitled matter should be REMANDED to the United States District Court for the Northern District of Ohio for resolution of all outstanding motions and such further action as may be deemed proper by that Court.

BY THE COURT:

Date: __10/31/2005__

Charles   R.   Weiner                    J.

ENTERED

NOV - 1 2005

CLERK OF COURT

2



## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: ASBESTOS PRODUCTS LIABILITY     :
LITIGATION (NO. VI)                    :
                                       :
—————————————————————————x

This Document Relates to:              :        CIVIL ACTION NO. 2 MDL 875

The Jaques Admiralty Law Firm          :

United States District Court           :
Northern District of Ohio              :

Estate of JACKSON., C.A. No. 1:99 CV 10802   :        **FILED   OCT 3 1 2005**

[In the event the above-listed case is a multiple   :
plaintiff (victim) action, this transfer is for the   :
above-named party only, or said parties repre-   :
sentative, and any spousal or dependent actions.]:
—————————————————————————x

### SUGGESTION OF REMAND

THIS MATTER being reviewed this date upon Plaintiff's Motion To Remand to the

United States District Court for the Northern District of Ohio, and the Court having reviewed this case

and having had settlement conferences with the parties, and now believing that such motion is

appropriate since few defendants remain for trial;

THE COURT FINDS that the issue of punitive damages must be resolved at a further

date with regard to the entire MDL action, and therefore any claims for punitive or exemplary

**EXHIBIT**
_A3_

damages are hereby ORDERED severed from this case and retained by the Court within its jurisdiction over MDL 875 in the Eastern District of Pennsylvania.

THE COURT SUGGESTS that the within entitled matter should be REMANDED to the United States District Court for the Northern District of Ohio for resolution of all outstanding motions and such further action as may be deemed proper by that Court.

BY THE COURT:

Date: 10/31/2005

Charles   R.   Weiner          J.

ENTERED

NOV - 1 2005

CLERK OF COURT

2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CASE NO. 1:98CV14094                )
CHARLES P. RICH,                    )
                                    )
      Plaintiff,                )
                                    )        CIVIL ACTION NO. 2 MDL 875
v.                                  )
                                    )
A-C PRODUCT LIABILITY TRUST, *et al.*,   )
                                    )
      Defendants.               )
                                    )

---

## JOINT MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR REINSTATEMENT AND REMAND OF CHARLES P. RICH CAUSE

Various non-shipowner Defendants in these actions,[1] by their undersigned counsel,

submit this memorandum in opposition to that part of Plaintiff's Motion for Reinstatement and

Remand (hereinafter "the Motion") that seeks the reinstatement and remand of this action as to

"33 Product Manufacturer Defendants."

### I.  FACTS

On May 2, 1996, this Court entered an Order, Pleading No. 113, which is attached hereto

as Exhibit A.  By this Order the Court administratively dismissed all cases filed in the Northern

District of Ohio assigned to the MARDOC portion of MDL 875.  The Order further provided that

the cases could be individually reinstated upon application to the Court demonstrating the

following:

---

[1]Bryan Steam Corp., Coffin Turbo Pump, Inc., Crosby Valve, Inc., Elliott
Turbomachinery Co., Inc., Foster Wheeler LLC, General Electric Co., and Ingersoll-Rand Corp.

EXHIBIT
B1

1.   Each Plaintiff requesting reinstatement must provide to this Court satisfactory evidence that the plaintiff has an asbestos-related personal injury compensable under the law.

2.   For each defendant which the plaintiff desires to pursue, the plaintiff must provide probative evidence of exposure to products connected to, or supplied, manufactured or installed by said defendant, or, if the defendant is a shipowner, evidence of service upon the defendant's ship(s).

Exhibit A at 2.

On March 17, 1997, this Court entered an Order, Pleading No. 182, administratively dismissing all actions filed subsequent to the Court's Order of May 2, 1996 and all as yet unfiled cases and making them subject to the terms for reinstatement set forth in the May 2, 1996 Order. Pleading No. 182 is attached hereto as Exhibit B.

The Complaint in this case was filed in the United States District Court for the Northern District of Ohio in 1998.  The case was transferred to this Court pursuant to a Conditional Transfer Order.

## II.  ARGUMENT

A.   Plaintiff has not made the requisite showings for the reinstatement of his case against the non-shipowner Defendants.

The May 2, 1996 Order requires a plaintiff who seeks reinstatement of his case to "provide [as to each defendant] probative evidence of exposure to products connect to, or supplied, manufactured or installed **by said defendant** . . . ." (Emphasis added).  Thus, each plaintiff is required, with respect to the non-shipowner Defendants, to provide specific probative evidence of exposure to products manufactured by each Defendant in order to obtain

reinstatement as to that Defendant.  Plaintiff has not even attempted to comply with this requirement, as his Motion is devoid of any probative evidence of exposure to products of any of the 33 non-shipowner Defendants as to which he seeks reinstatement.

The reinstatement criteria of the May 2, 1996 Order were included in the Order for a purpose, namely, to require a plaintiff to demonstrate exposure to a defendant's products before that defendant is compelled to incur the expenses associated with discovery in each case.  To do otherwise would be unnecessarily involve that defendant in protracted, resource-depleting depositions and other procedures.

An example of the extent of discovery that can ensue when discovery is permitted without such a showing occurred in *Stark v. Armstrong World Industries, Inc.*, Case Nos. 1:94CV11464 and 1:09CV20002 (N.D. Ohio).  The *Stark* cases, one of which had been filed in Ohio and the other in Louisiana, were consolidated by this Court and remanded to the Northern District of Ohio, where the consolidated cases were assigned to Judge Dan Aaron Polster.  The disclosure criteria of the May 2, 1996 Order were not imposed on the *Stark* cases before remand, but the plaintiff prior to remand had dismissed 101 of the 115 defendants named in the consolidated actions, leaving 14 defendants in the cases. After remand,  Judge Polster issued a Case Management Plan.  In accordance with the schedule set forth in that Plan, the plaintiff designated 25 co-worker, fact witnesses.  Depositions of 16 of those fact witnesses were taken. The plaintiff's deposition was taken three times.  The plaintiff also designated seven expert witnesses, and depositions of most of those experts were taken.  The several defendants each named several experts, and depositions of some those experts were taken.  After the close of discovery, the majority of the remaining manufacturer defendants filed motions for summary

3

judgment on the basis of lack of probative evidence of the plaintiff's exposure to the movants' products. Judge Polster granted all of those motions for summary judgment.

Thus, in *Stark,* 101 defendants were spared the unnecessary costs of discovery. Most of the remaining 14 defendants, however, because the plaintiff never had to comply with the reinstatement criteria of the May 2, 1996 Order, had to incur those costs of discovery – only to be dismissed later due to lack of probative evidence of exposure to their products.

Here, this Court should not allow Plaintiff to totally disregard the reinstatement criteria of the May 2, 1996 Order, because to do so would be to require the 33 non-shipowner Defendants as to which Plaintiff seeks reinstatement to incur unnecessary and resource-depleting litigation expenses.

B.      Plaintiff has not provided counsel for each Defendant with Defendant-specific information that is a prerequisite to remand.

Without reinstatement, of course, remand is not possible. Even if reinstatement were to be granted, this case cannot be remanded in its current status.

The goal of the Multi-District Litigation ("MDL") process is to reduce transaction costs, streamline the pretrial and settlement procedures, and, if possible, dispose of cases without the need for a trial. Remand from this Court should be considered only after all pretrial proceedings have been completed, information has been provided, and all avenues for settlement have been exhausted. Moreover, retention of this action is necessary to adhere to the MDL Panel's overall goal of efficiently managing the national asbestos litigation in a cost-effective and just manner.

To this end, early in the MDL process this Court issued Orders establishing a procedure for settlement conferences that are to take place before remand can be considered. This

4

procedure requires a plaintiff to set forth certain information, including:

> (4)     a specific, not generic, description of all asbestos-containing products with exposure dates and specific manner in which plaintiff claims he was exposed, and location of exposure;

> (5)     the specific name of each asbestos-containing product to which exposure is alleged as well as the name of the manufacturer, distributor, and supplier of those products and the name of any company who performed any work involving asbestos at plaintiff's place of employment;

> (6)     with respect to each product identified, inclusive dates of exposure and each job site at which the exposure occurred;

> (7)     a listing of all product identification witnesses by name, address and telephone number and a statement as to whether or not each witness has been deposed in any case.  If so, the date and location of the depositions and the identity of the court reporter or stenographer.

Pretrial Order No. 3 at ¶ 4A2c, Pleading No. 333, attached hereto as Exhibit C; see also

Administrative Order No. 3 at ¶ II A.  Only after this information is submitted to counsel for

each defendant at least 20 days prior to a scheduled settlement conference may the case be

considered for remand.  Pretrial Order No. 3 at ¶¶ 4A3, 5.  No such information has ever been

provided to counsel for the 33 non-shipowner Defendants as to which Plaintiff seeks

reinstatement and remand.

## III.  CONCLUSION

As Plaintiff has failed to provide the probative evidence against the non-shipowner

Defendants required for reinstatement under this Court's Orders of May 2, 1996 and March 17,

1997 and has failed to provide each Defendant's counsel with the information required by

Pretrial Order No. 3, this Court should deny that part of the Motions seeking reinstatement and

remand of Plaintiff's case as to the non-shipowner Defendants.

George F. Fitzpatrick, Jr.
Swanson, Martin & Bell
One IBM Plaza, Suite 2900
330 North Wabash Avenue
Chicago, Illinois 60611
(312) 321-9100

Counsel for Coffin Turbo Pump, Inc. and
Crosby Valve, Inc.

James W. Bartlett, III
Semmes, Bowen & Semmes
250 West Pratt Street, 16th Floor
Baltimore, Maryland 21201
(410) 576-4833

Counsel for Foster Wheeler LLC

John A. Heller
Sidley & Austin
One First National Bank
Chicago, Illinois 60603
(312) 853-7704

Counsel for General Electric Co.

Gregg L. Spyridon
Spyridon, Koch & Palermo
Lakeway Three, Suite 3010
3838 N. Causeway Boulevard
Metairie, Louisiana 70002

Counsel for Bryan Steam Corp. and Ingersoll-
Rand Corp.

Kevin O. Kadlec
Bonezzi, Switzer, Murphy & Polito
1400 Leader Building
526 Superior Avenue
Cleveland, Ohio 44114
(216) 875-2767

Counsel for Elliott Turbomachinery Co., Inc.

Eric H. Mann
Gallagher, Sharp, Fulton & Norman
1501 Euclid Avenue
Cleveland, Ohio 44115
(216) 241-5310

Counsel for A-C Product Liability Trust

Nicholas L. Evanchan
Evanchan & Palmisano, LLP
One GOJO Plaza
Akron, Ohio 44311-1076
(330) 208-4520

Counsel for Foster Wheeler LLC


<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this _29th_ day of October 2004, a copy of the foregoing

Joint Memorandum in Opposition was mailed to all counsel on the attached service list.


James W. Bartlett, III
Counsel for Foster Wheeler LLC


B0473758.WPD

## SERVICE LIST

Duane C. Marsden
Jaques Admiralty Law Firm, P.C.
645 Griswold, Suite 1370
Detroit, MI 48226-4116

Margaret Barr Bruemmer, Trustee
4806 Batz Road
Westport, WI 53597

Matthew C. O'Connell
Sutter O'Connell Mannion & Farchione Co.
3600 Erieview Tower
1301 E. 9th St.
Cleveland, OH 44114

Jeffrey Healy
John P. Patterson
Tucker, Ellis & West, LLP
925 Euclid Ave., Ste. 1150
Cleveland, OH 44115

Eric Horne
Eckert, Seamans, Cherin & Mallott
600 Grant St., 44th Floor
Pittsburgh, PA 15219

Robin Harvey
Baker & Hostetler LLP
312 Walnut Street
Suite 2650
Cincinnati, OH 45202-4038

Reginald Kramer
Oldham & Dowling
195 S. Main Street, Ste. 300
Akron, OH 44308

Richard D. Schuster
Vorys, Sater, Seymour and Pease
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216

Sheila M. Burke
Burns, White & Hickton
120 Fifth Avenue
2400 5th Ave. Pl.
Pittsburgh, PA 15222

James T. Millican
Weston Hurd Fallon Paisley & Howle
2500 Terminal Tower
50 Public Square
Cleveland, OH 44113

8

Laura Hong
Squire, Sanders & Dempsey
4900 Society Center
127 Public Square
Cleveland, OH 44114

Evan Palik
McMahon, DeGulis, Hoffman & Lombardi
Caxton Bldg., Ste. 650
812 Hron Rd.
Cleveland, OH 44115

Frederick P. Vergon, Sr.
Smith, Marshall, Weaver & Vergon
500 National City
East Sixth Building
Cleveland, OH 44114

Jennifer A. Whelan
Cetrulo & Capone
2 Seaport Lane
Boston, MA 02210

Richard C. Binzley
Thompson Hine, LLP
3900 Key Center
127 Public Square
Cleveland, OH 44114

Ruth S. Kochenderfer
Shaw Pittman LLP
1650 Tysons Blvd., 14th Fl.
McLean, VA 22101

John W. Lebold
Sherwin Williams Company
101 Prospect Avenue, N.W.
1100 Midland Bldg.
Cleveland, OH 44115

Raymond F. Geoffroy, III
Hunton & Williams
903 E. Byrd St.
Richmond, VA 23219

Alexander W. Saksen
Kirkpatrick & Lockhart, LLP
535 Smithfield St.
Pittsburgh, PA 15222

A Y McDonald Industries, Inc.
4800 Chavenelle Road
Dubuque, IA-52002-2631

Exxon Mobil Corporation
5959 Las Colinas Blvd.
Irving, TX 75039-2298

Wheatley Gaso Ooperations
6750 S. 57th W. Avenue
Tulsa, OK 74131

Pentair Pump Grp., Inc.
f/k/a Fairbanks Morse Pump
1101 Myers Pkwy. Key
Ashland, OH 44805

Uniroyal Goodrich Tire Co.
1 Parkway South
Greenville, SC 29615

MAY-06-'96 MON 08:30 ID:                    TEL NO:

EXHIBIT A

*R X*
*(Jorde Rye)*
**#113**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:  ASBESTOS PRODUCTS     :
LIABILITY LITIGATION (No. VI)   :
_____ X

    This Document Relates To:    :

       ALL ACTIONS         :
--------------------------------x

**FILED MAY 2 1996**

CIVIL ACTION NO. 2 MDL 875
(Maritime Actions)

Weiner, J.                           May 1, 1996

### MEMORANDUM OPINION AND ORDER

      In response to a discovery request of defense counsel, and after several telephone conferences, this Court, on July 18, 1995, entered Pretrial Order No. 6 (MARDOC) directing Plaintiffs' counsel to produce materials in 262 Mardoc cases.  Despite being granted several extensions of time to comply with the directives of the July 18, 1995 order, plaintiffs' counsel failed to do so.  As a result, defendants moved to dismiss plaintiffs' cases.  Following the entry of Show Cause Orders, the Court held a hearing on February 28, 1996 and heard argument and statements of all counsel. The parties have further supplemented their positions with additional written statements.  The Court, having considered all of the material presented, will grant the motion of the defendants as modified by the attached order.

## Background of Action

On July 29, 1991, the Judicial Panel On Multidistrict Litigation entered an order establishing MDL 875 and consolidating before this Court 26,639 civil asbestos personal-injury lawsuits, pending in 87 federal districts. At that time 4,022 of the actions transferred were in the Northern District of Ohio. The Panel Order provided for the transfer of overlooked cases and newly filed cases as "tag-along actions"[1]. The size of MDL 875 has now grown from 26,639 to 58,478, or an increase of 119.5%. During this same period, the number of cases in MDL 875 from the Northern District of Ohio has risen from 4,022 to 23,154, or an increase of 475.7%. At the same time, this Court has supervised the termination of 4,223 cases in the Northern District of Ohio jurisdiction, primarily traditional, land-based cases. The remaining 18,209 cases are predominantly Mardoc actions. The Panel statistics disclose that this Court has now disposed of more than 20,000 cases[2]. With only 37,000 cases remaining, approximately 50% are the Mardoc actions.

This Court has, in the conduct of its proceedings, taken

---

1.  Rule 12, Rules of Judicial Panel On Multidistrict Litigation.

2.  Although the Panel statistics show 20,560, this Court is aware of substantially more cases that are settled among the parties without the completion of terminating paperwork. Excluding Mardoc actions, this Court believes that the number of remaining cases is between 10,000 and 15,000.

2

very seriously all of the objectives of the Panel[3] while engaging in its pretrial activities.  Where the parties and their counsel have been cooperative and reasonable, the Court has been able to effectuate settlements.  A major obstacle occurs, however, when either side displays a lack of trust or credibility, or becomes entrenched and confrontational, such as when the parties refuse to cooperate in the disclosure of basic information which informs all parties of the nature of the claims.

### Facts

In the Mardoc cases, there is routinely filed with each action an IDF (Initial Data Form) as required by the standing asbestos orders for the Northern District of Ohio.  The information contained on this form is not authenticated, and, except for naming ships that the plaintiff may have sailed on, it provides no real medical or exposure history for the plaintiff.  Until recently the parties have been at a standoff; Plaintiffs seek settlements and defendants have demanded proof of an asbestos-related medical condition and exposure to their product.[4]  The defendants complain

------------------------------------------

3.  Judicial Panel On Multidistrict Litigation, Docket No. 875, Order dated July 29, 1991, pages 9-12.

4.  This has always been the starting position of the parties; however, in the land cases, the Plaintiffs have learned to supply defendants with medical records, test results, and at least one expert report, together with an affidavit of exposure.  In most instances the affidavit of exposure suffices because the worksite of the plaintiff has been subject to thorough discovery and the credibility gap has been narrowed.  The defendants then treat the action in the form of a claim and make an offer based upon the historical averages achieved between the plaintiff's attorney and the defendant for the location.

that Plaintiffs have not provided them with the materials they need
to make a settlement offer or proceed to trial.   Both sides seek
assistance of the Court.   After several conferences with the
parties, the Court entered, on July 18, 1995, Pretrial Order No. 6
(MARDOC), requiring Plaintiffs' counsel to provide to defense
counsel the necessary materials[5] in 262 randomly selected cases in
order that they could be evaluated for medical and exposure
criteria and for settlement.   At this Court's scheduled conference
on August 18, 1995, Plaintiffs' counsel advised the Court that he
could complete the disclosure of the required information in 30
days.   The Court ordered that this discovery be produced by
plaintiffs to the defendants no later than September 21, 1995.
Plaintiffs failed to produce the discovery by the discovery
deadline, and after several more telephone conferences, defense
counsel moved to dismiss the 261[6] cases.   This Court issued Show

_____

5.   The order specifically sets forth the materials to be provided:
     "copies of all medical records and reports, expert
     reports, x-ray records and reports, pathology reports,
     pulmonary function test results and reports, autopsy
     results and death certificates as applicable, work
     history and work records, social security records,
     answers to interrogatories, and evidence of specific
     exposure to each named defendant in each plaintiff's
     case.

6.   After the process began, it was discovered that one of the 262
numbers was in error and the parties proceeded with the remaining
261.

4

Cause orders on November 15, 1995, and a subsequent Notice of Hearing on February 1, 1996.

More than 7 months have passed since the Court issued its order of July 18, 1995, and by all rational standards plaintiffs' counsel has had adequate time and opportunity to comply with discovery in these matters.  In fact, Plaintiffs have advised the Court that they have produced all of the discovery materials required.  At the hearing on February 28, 1996, defendants produced two legal record boxes (approximately 12"H x 14"W x 24"L) which they identified as the total discovery received.  Included in the boxes was 261 file folders, many with IDF forms, and many with recent letters from a "B" reader radiologist.  It has been this Court's experience that one medical case could easily fill two legal record boxes.  The parties agreed that the discovery produced included no documentation or evidence relating to plaintiffs' exposure to specific products.  The Court also repeatedly asked Plaintiffs if they had any malignancy cases ready for trial and Plaintiffs did not identify any such cases.

## Discussion

The Judicial Panel on Multidistrict Litigation, convinced that the administration of justice in the federal court system was threatened by burgeoning numbers nationally of asbestos related personal-injury lawsuits, sought to relieve the burden, to provide

for uniform case management, and to reduce the transaction costs by transferring these cases to a multidistrict jurisdiction.  This Court has remained mindful of the Panel's priorities as set forth in the Panel order of July 29, 1991, and has initiated case management policies in conjunction with counsel representing all parties to achieve these goals.

Plaintiffs' counsel has taken the position that these 261 cases adequately reflect the nature of all of his filings, and that the "package"[7] is now ripe for settlement.  Defense counsel, although it was their expert who devised the method for selecting the 261 "random" cases, are more reluctant to characterize the 261 cases as a representative of the whole in all respects, but rather they urge the Court to find that the discovery provided is representative of the whole.  Defense counsel urge the Court to dismiss with prejudice the 261 cases due to plaintiffs' counsel's lack of compliance with this Court's orders.  Defense counsel also argue that even in the cases where some discovery has been provided, it is insufficient for the cases to proceed to settlement or trial.

The judicial system has been faced with an onslaught of personal injury, asbestos cases for more than twenty years.  Plaintiffs have sought damages against a multitude of defendants.  The courts have found that asbestos fibers are potentially

_____

7.  Counsel in the asbestos litigation are prone to describe a group of cases, whether it is 5 or 5,000 in number, as a "package".

hazardous to one's health.   Sufficiency of exposure remains an
unknown, however, and many plaintiffs initiated litigation without
injury, but rather with knowledge of exposure.   The reasoning
supporting this litigation has been the concern for the running of
tolling statutes which may begin when the party becomes aware of an
injury.   Injury can and has been defined in many ways resulting in
inconsistent case law and approaches to this type of litigation
among the states.

This Court is guided by the principles set forth by Judge
Ginsberg in In Re Korean Air Lines Disaster of September 1, 1983,
829 F.2d 1171 (D.C.Cir. 1987).   She concludes that a transferee
court's responsibility in the context of a 28 U.S.C. §1407 transfer
is to follow the law of the transferee circuit, although the law of
the transferor jurisdiction merits consideration.   In the matter
before us, the Court feels that the law of the United States Court
of Appeals for the Third Circuit is clear and that the United
States Court of Appeals for the Sixth Circuit would draw a similar
analysis to this problem.

Pennsylvania has recently joined a growing number of
states which have analyzed this problem.

Four years ago Pennsylvania was a "one-injury" state.
That is, if an exposed party sought damages as a result of his or
her pleural disease which was causing some restriction in lung
capacity, the party would also seek damages for fear of contracting
other asbestos-related cancers, and for the increased risk in

contracting such malignancies which have longer latency periods. The combination of longer latency periods and separate but multiple diseases flowing from the same exposure caused the Pennsylvania courts to review the course of the products liability law. In 1992, Pennsylvania became a "two injury" state and joined a growing number of states by holding that in asbestos cases, the plaintiff is entitled to bring a second action for a subsequently diagnosed malignancy, thereby eliminating claims for risk and fear, and reducing the potential for speculative damages being awarded for an injury that may not occur. Marinari v. Asbestos Corporation, Ltd., 417 Pa. Super. 440, 612 A.2d 1021 (1992)[8]

Ohio is also among the many states which has adopted this rule. In Quick v. Sun Oil Co., et al., (No. 82-0292, Ct. Comm. Pleas, Lucas Co., Ohio, 10/84), Judge Sumner E. Walters found that the discovery of one asbestos-related disease does not trigger the statute of limitations for other separate and distinct, later-discovered asbestos diseases.

More recently, the issue of injury in an asbestos-related action was tested before the Pennsylvania Supreme Court in Giffear v. Johns-Manville Corporation, et al., (No.J-157-1995, Pa., April 4, 1996) The Giffear Court focused on the distinction between "injury" and "harm", and determined that a physical injury

─────────────────────────

8. New York, New Jersey, Maryland, Delaware, Indiana, Illinois, California and Hawaii also follow the two-disease rule.

sufficient to maintain a tort action must be accompanied by harm. The Court concluded that asymptomatic pleural thickening or scarring is not a compensable injury which gives rise to a cause of action for damages for a physical injury or for emotional distress. (Supra, pg 10,11,14)

If the action is brought under the Jones Act or the F.E.L.A. statutes, the plaintiff is not relieved from his burden of proof relating to injury. These laws protect the railroad workers and mariners who might otherwise have a problem in proving responsibility for an injury sustained by providing them with a federal cause of action for the same injury against their employer in addition to their tort claims against negligent manufacturers or distributors. While the plaintiff's burden to establish liability may be eased, a compensable injury remains a requirement for recovery. In holding that an action for an asbestos-related injury does not exist in a F.E.L.A. case, Circuit Judge Seitz of the United States Court of Appeals for the Third Circuit Court stated: "We believe, however, that subclinical injury resulting from exposure to asbestos is insufficient to constitute the actual loss or damage to a plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law....Requiring manifest injury as a necessary element of an asbestos-related tort action avoids these problems and best serves the underlying purpose of tort law: the compensation of victims who have suf-

fered." Schweitzer v. Consolidated Rail Corp. (Conrail), 758 F.2d 936, 942 (3d Cir.1985)

Many states have created administrative vehicles to hold in abeyance these asymptomatic cases until counsel finds that the plaintiff is actually suffering from an impairment. Before an action is activated, certain criteria must be met. This Court has found that the use such an administrative device can reduce the Clark's burden and still provide an atmosphere for settlement between the parties. Illinois, Maryland, Connecticut, Arizona and Hawaii utilize this procedure.

This is the atmosphere that exists today where every plaintiff's counsel has a working agreement with all or most of the principal defendants and the cases are submitted as claims. Criteria has been established and agreed to and this has resulted in large block settlements of cases or trials where there has been a good faith difference of opinion.

Soon after the multidistrict cases were sent to this Court, the Court convened counsel from the New England states and block settlements were achieved and agreements to treat future cases as claims resulted. This procedure has proved effective in many places in the nation and, as a result, there are no real blocks of cases unsettled[9] except for these Mardoc actions. In the

9. In several instances, plaintiffs may still have remaining in their cases some of the peripheral defendants whose presence represents a very small percentage of the value of the case. In other circumstances, plaintiffs may have settled with all but one primary defendant and these situations are being addressed.

Mardoc actions, none of the defendants have settled and plaintiffs have claims against an average of more than 80 defendants.

Although this Court retains a vigilant concern for all parties to the litigation, the Court has prioritized from the onset the victims of asbestos related disease, and in particular, those who suffer with malignant conditions as well as their families. The Court's focus is to administer these cases as it has all the others by seeing that they are resolved in an equitable and expeditious manner either by settlement or by trial while making certain there will be sufficient resources available to compensate those who are deserving.

## Findings

The Court, having spent many hours in conference with all counsel and after a hearing makes the following determinations:

Plaintiffs' counsel has failed to comply with this Court's order of July 18, 1995.  Plaintiffs' counsel has admitted that no details relating to exporure have been supplied and most of the documentation is described as new radiologist's reports and IDFs.  The defendants claim that all medical records, work records, social security records, answers to interrogatories, etc., as

_____

9.  (...continued)
represents a very small percentage of the value of the case.  In other circumstances, plaintiffs may have settled with all but one primary defendant and these situations are being addressed.

11

required by the court order, have not been received by them. Plaintiffs' counsel has supplemented his argument presented at the hearing by submitting a copy of the "medicals" from one of the 261 cases[10]. It contains nine pages, none of which are dated earlier than September, 1995.

The second determination of the Court is that Plaintiffs' counsel has not provided critical material necessary for defendants either to evaluate the cases so that a meaningful dialogue can take place or for the cases to be prepared for trial if that fails. Plaintiffs' counsel categorizes his proof of exposure as follows[11]:

1) Everyone knows that the products of this manufacturer were all over the ships and could be found upon almost every ship;

2) This manufacturer advertised asbestos products in a marine catalogue and therefore it must have made and sold products to which the plaintiff was exposed, and;

3) Counsel has assured the Court that he can and will obtain statements from numerous Chief Engineers that these products were in use all over the ships.

---

10.  Pablo E. Hernandez v. American Ship, et al., Civil Action No. 90-0000, Northern District of Ohio

11.  In this instance the Court is discussing the "manufacturer" defendants, as each plaintiff's sailing record will disclose the vessels upon which he sailed.

Plaintiffs' counsel takes the position that this specific evidence and discovery can await trial preparation and is not necessary for the filing of a case or for the settlement process.

Plaintiffs' counsel has presented, as part of the discovery package, doctor's reports that state that a significant number of the plaintiffs have no asbestos related injury. Defense counsel have advised the Court that the medicals received pursuant to this Court's order of July 18, 1995, _infra_, consist of a scant number of documents and only recent "medical" reports prepared in November, 1995, after this Court's order of July 18, 1995. The statements made to the Court disclose that only a fraction of the recently diagnosed plaintiffs have an asbestos-related condition, and many of these may be open to question. Numerous cases have either no diagnosis of an asbestos-related condition, or there is scant credible medical evidence. Further, the Court is informed that few, if any, of these plaintiffs have provided any evidence of a compensable injury sufficient to sustain a cause of action.

The Court believes that it is the responsibility of counsel to only file those cases which are ripe and ready to proceed. To file cases by the thousands and expect the Court to sort out the actionable claims is improper and a waste of the Court's time. Other victims suffer while the Court is clogged with such filings.

The Court enters its orders accordingly.

IN THE UNITED STATES DISTRICT COURT

# 113

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:  ASBESTOS PRODUCTS         :
LIABILITY LITIGATION (No. VI)     :
                                        X

This Document Relates To:        :        CIVIL ACTION NO. 2 MDL 875

                                 :        (Maritime Actions)

ALL ACTIONS                      :

---------------------------------X

### Order

THE COURT HEREBY ORDERS that the cases filed in the Northern District of Ohio by the Plaintiffs assigned to the Mardoc portion of MDL 875, ARE ADMINISTRATIVELY DISMISSED WITHOUT PREJUDICE AND WITH ALL STATUTES OF LIMITATION TOLLED. The Court is specifically preserving the rights of the named plaintiffs to maintain an action should their circumstances warrant the furtherance of their case. Counsel is advised that this Court shall maintain jurisdiction, and that these cases may be individually reinstated upon application to the Court with the following showing:

14

1.   Each plaintiff requesting reinstatement must pro-
vide to this Court satisfactory evidence that the
plaintiff has an asbestos-related personal injury
compensable under the law.

2.   For each defendant which the plaintiff desires to
pursue, the plaintiff must provide probative evi-
dence of exposure to products connected to, or
supplied, manufactured or installed by said defen-
dant, or, if the defendant is a shipowner, evidence
of service upon the defendant's ship(s).

THE COURT FURTHER ORDERS that each case to be reinstated
shall be accompanied with the payment of a filing fee, unless such
case, both in its present form and in its earlier submissions,
contained Jones Act claims ONLY[12].  Counsel shall further be
entitled to amend his pleadings as necessary to set forth proper
claims, substitute parties and name defendants at the time of
reinstatement; PROVIDING HOWEVER, defendants may insert any and all
defenses to which they may be entitled.  The Court will issue
shortly hereafter a list of the affected actions in the Northern

---

12.  The Court has examined the prior policy of allowing these
cases to be filed en masse without filing fees and finds that it is
inappropriate to continue.  This policy issue has been assigned by
Chief Judge George W. White of the Northern District of Ohio to the
MDL.  Specifically, the Court notes that 28, U.S.C. §1916 provides
that certain seamen's suits may proceed without prepayment of
costs, but that common law tort actions are not included therein.
Plaintiffs' counsel, without payment of any fees, has filed more
than 17,000 cases.  The costs applicable to these filings are great
and the burden and cost to the court system has been considerable.

MAY-06- 96 MON 08:39 ID:                    TEL NO:                    8348 P17

District of Ohio.  All pending motions in these cases are hereby denied without prejudice and with leave to resubmit with the original filing date remaining in effect should the case be reinstated.

For the purposes of appeal, THIS IS NOT A FINAL ORDER.

BY THE COURT

Date: 5/2/96

*Charles R. Weiner*

Charles R. Weiner, Judge

ENTERED: 5/2/96

CLERK OF COURT

16

**EXHIBIT B**



CRW

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:  ASBESTOS PRODUCTS           :
LIABILITY LITIGATION (No. VI)       :
_____X

This Document Relates To:           :       CIVIL ACTION NO. 2 MDL 875
                                    :            (Maritime Actions)
ALL ACTIONS          **F I L E D**
- - - - - - - - - - - - - - - - - - -

                     MAR 17 1997

Weiner, J.                                          March 14, 1997
                     MICHAEL E. KUNZ, Clerk
                     By _____ Dep. Clerk        FILED MAR 17 1997
                          **ORDER**

        THE COURT, having reviewed the motions, submittals,

statements and arguments of the parties, and having conducted an

omnibus hearing on February 19, 1997, determines as follows:

        This Court, in the management of its docket and in the

interest of fairness to ALL parties in the MARDOC portion of MDL

875, entered an order with a memorandum opinion on May 2, 1996.

The Court choses not to reiterate the terms of that order, but to

amplify them as follows:

                1.   The administrative process by which the cases

                subject to the order were determined may have caused some

                actions to be inadvertantly omitted from the case list

                subject to the order.  This administrative error may be

                brought to the attention of the Court at any time by an

                affidavit of a party or counsel, which, if unopposed,

                will correct the case list.

2.   As to actions filed subsequent to the Court's order of May 2, 1996, and cases yet unfiled, it is this Court's intention that they be administratively transferred to the Court's inactive docket of cases administratively dismissed without prejudice as established by the order of May 2, 1996, and that they be subject to the same terms for reinstatement set forth therein.   Plaintiffs may continue to seek routine amendments to their complaints while the cases remain in this status.   At the time of reinstatement of any case, answers are to be filed and the action will then proceed according to this Court's orders.

3.   Until further order, all cases subject to this order and the order of May 2, 1996 shall remain subject to the jurisdiction of this Court.

This is not a final order for the purposes of appeal, nor does this action by the Court resolve any case on its merits at this time.

BY THE COURT

Charles R. Weiner, Judge

Date: 3/17/97

ENTERED: 3/17/97

CLERK OF COURT

2

λc: all counsel on 02md575 as of 3/17/97

**EXHIBIT C**

# FILED JAN 07 1992

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:  ASBESTOS PRODUCTS LIABILITY         :
        LITIGATION (NO. VI)                        :
                                 x      CIVIL ACTION
                                      NO. MDL 875

THIS DOCUMENT RELATES TO:  ALL ACTIONS:
                                      x

### PRETRIAL ORDER NO. 3

## TABLE OF CONTENTS

1. PROCEDURE ................................................... 1

    A.  JOINT DEFENSE PRIVILEGE.................................. 1

    B.  SERVICE OF PLEADINGS ................................... 2

    C.  NO WAIVER OF RIGHT OF REPRESENTATION ................... 3

2. ORGANIZATION OF PERIPHERAL DEFENDANTS' COUNSEL .............. 4

    A. DESIGNATION OF REPRESENTATIVES ......................... 4

    B. RIGHT OF PERIPHERAL DEFENDANT COUNSEL TO DISSENT ....... 5

    C. ENTRY OF ORDERS ....................................... 5

3. PROCEDURES FOR DISMISSAL ................................... 5

    I. LETTER MOTION PROCEDURES ............................... 5

    II. SHORT FORM SUMMARY JUDGMENT PROCEDURES.................. 6

4. SETTLEMENT CONFERENCES...................................... 8

5. REMAND ..................................................... 10

6. EFFECT ..................................................... 11

EXHIBIT "A" .................................................... 12

EXHIBIT "B" .................................................... 14

EXHIBIT "C" .................................................... 16

EXHIBIT "D" .................................................... 18

ENTERED: 1/8/92

CLERK OF COURT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)

THIS DOCUMENT RELATES TO: ALL ACTIONS:

CIVIL ACTION
NO. MDL 875

**FILED**

JAN 0 7 1992

MICHAEL E. KUNZ, Clerk

By_____Dep. Clerk

## PRETRIAL ORDER NO. 3

IT IS HEREBY ORDERED:

1.  **PROCEDURE**

    A.  **Joint Defense Privilege**

    The Court recognizes that, in order to maintain the cost-effective administration of these cases, it is necessary that counsel work together to coordinate discovery, pursue settlement discussions, and conduct other activities in these cases. Cooperative or collective efforts by or among the defendants in the administration and handling of these consolidated cases shall not waive the attorney-client privilege, the joint defense privilege, the protection afforded attorney-work product, or any other privilege to which a party, or its counsel, may otherwise be entitled. The designation of any attorney to act as spokesperson for a group of plaintiffs or defendants, such as lead counsel and liaison counsel, shall not preclude other counsel from participating to the extent necessary to represent the individual interests of their clients, as long as such participation does not involve duplication or unnecessary delay. Cooperative or collective efforts among defense counsel relating to this

litigation are encouraged and shall not be discoverable, and shall not be communicated to the trier of fact.

**B.   Service of Pleadings**

Any document filed with the Court must be served on liaison counsel for all other parties.  A party serving a pleading, motion, brief, memorandum, discovery requests or discovery response that relates to "All Actions" shall serve that document on liaison counsel prior to the submission to the Court or Clerk.  A certificate of service shall accompany each document specifying the name and address of those served, the date of service and the manner of service.  It is hereby Ordered by the Court that Conant Scott Rogers of Conant Corporation shall be the designated agent of the Court for the service of all documents filed with the Court relating to "All Actions".  Service of such documents that relate to individual actions shall be on all parties in accordance with the Federal Rules of Civil Procedure. Except as stated above, liaison counsel shall not accept service of pleadings on behalf of parties other than their own clients.

**C.   No Waiver of Right of Representation**

1. The defendants shall cooperate in good faith to avoid filing of duplicative motions.  No party shall waive any rights by failing to attend a hearing on such motion unless the attendance of the party has been ordered by the Court.  The designation of any attorney to act as spokesperson for a group of plaintiffs or defendants shall not preclude other counsel from participating to the extent necessary to represent the individual

-2-

interests of their clients, as long as such participation does not involve duplication or unnecessary delay.

    2. To further reduce the amount of unnecessary paperwork that would otherwise be filed with the Court and exchanged among counsel, each defendant (including direct defendants, third-party defendants, and defendants against whom cross claims are asserted) shall be deemed to have joined in and plead any dispositive motion against plaintiff where the granting of the motion would benefit it or all defendants generally. For example, if one defendant moves for summary judgment on the ground that plaintiff's claims are barred by the statute of limitations, it shall not be necessary for co-defendants to file duplicative motions, adopting the reasoning of the initial motion. All co-defendants shall be deemed to have joined in the initial motion unless specifically stated otherwise, and no specific pleading is required.

2. ORGANIZATION OF PERIPHERAL DEFENDANTS' COUNSEL

    A. Designation of Representatives

    Paragraph 6 at page 9 of Pretrial Order No. 1 entered by this court on September 17, 1991 is amended as follows:  the contact person for the peripheral defendants for communication relating to "All Actions" from the Court, Plaintiffs' Lead or Liaison Counsel and Defendants' Liaison Counsel shall be David Craig Landin.  Liaison counsel for peripheral defendants shall be: David Craig Landin and John J. Repcheck.

-3-

Duties of Peripheral Defendants' Liaison Counsel shall include:

(1) Maintain and distribute to co-counsel and to Plaintiff's Liaison Counsel and Defendants' Co-Liaison Counsel an up-to-date service list;

(2) Receive and, as appropriate, distribute to peripheral defendants' co-counsel Orders from the Court and documents from opposing parties and counsel;

(3) When necessary, provide notices to all participating counsel, either directly or by appropriate means.

(4) In the event that David Landin or his partner, James H. Price, III of McGuire, Woods, Battle & Boothe is unavailable, other Peripheral Defendants' liaison counsel shall serve as contact source for communications from the Court, Plaintiffs' Lead or Liaison Counsel and Defendants' Liaison Counsel.

B. **Right of Peripheral Defendant Counsel to Dissent**

Other counsel for peripheral defendants who disagree with actions of their liaison counsel or who have individual or divergent positions, may present written and oral arguments, conduct examinations at hearings or depositions, and otherwise act separately on behalf of their client(s) as appropriate.

-4-

C. <u>Entry of Orders</u>

No proposed Order relating to "All Actions" shall be submitted to the Court by any party without fifteen (15) days written notice to Liaison Counsel for plaintiffs, Liaison Counsel for the defendants and Liaison Counsel for the peripheral defendants.

3. <u>PROCEDURES FOR DISMISSAL</u>

The following procedures establish a mechanism for the fair, prompt and cost-effective resolution of requests for dismissals and short-form summary judgment motions by defendants:

I. <u>Letter Motion Procedures</u>.

A. Any time after the expiration of sixty (60) days after a moving party ("Movant") has filed an answer to plaintiff's complaint, the Movant may send a letter motion to plaintiff and all other parties of record with a proposed Order for Dismissal together with a supporting affidavit and other documents, if appropriate, stating that the Movant is entitled to a dismissal on one or more of the following grounds:

1. Movant did not come into existence until after plaintiff's alleged asbestos exposure;

2. Movant never manufactured, distributed, sold or otherwise supplied any asbestos-containing product prior to or at the time of plaintiff's alleged exposure;

3. Movant never manufactured, distributed, sold or otherwise supplied any asbestos-containing product to plaintiff's

employer or performed any work involving asbestos at plaintiff's place(s) of employment;

4. Any time after the expiration of one hundred eighty (180) days after the filing of plaintiff's complaint, movant may seek dismissal pursuant to these letter motion procedures based on the absence of evidence of exposure to Movant's asbestos-containing products; or other appropriate grounds.

B. Any opposition by a party ("Respondent") to Movant's request for dismissal shall be in letter form to the Movant delivered within thirty (30) days of receipt of Movant's letter. The letter shall set forth the specific evidentiary basis for opposition together with supporting documents, if appropriate.

C. If no opposition is received by the Movant within such thirty (30) day period, the Movant may file with the Court a proposed Order of Dismissal in the form attached hereto as Exhibit "A", which Order shall be entered by the Court.

D. If there is opposition from a Respondent, the Movant may proceed under Section II.

II. Short Form Summary Judgment Procedures.

A. Upon the expiration of such thirty (30) day period set forth in Section I.B. above, the Movant and/or any Respondent may commence discovery within a sixty (60) day period solely on those issues raised by the Movant's letter motion and responses in opposition to determine whether proper grounds for a dismissal exist. The discovery limitations set forth herein shall be

applicable solely to the procedures established by this Order and shall not operate as limitations on any other discovery rights or obligations.

B. If the stated basis for opposition to dismissal is a need for further discovery and no discovery has been commenced by a Respondent within such sixty (60) day period, a Movant may submit a proposed Order to the Court in the form attached hereto as Exhibit "B", which Order shall be entered by the Court.

C. If discovery is commenced by Movant or a Respondent within such sixty (60) day period, upon the completion of such discovery a Movant may submit a short form motion for summary judgment to the Court, in the form attached hereto as Exhibit "C", stating that discovery has failed to establish a genuine issue of material fact as to the proposed grounds for dismissal, along with a proposed Order. Such motion shall be deemed a contested Rule 56 Motion unless certified as "uncontested".

D. If the motion is certified as uncontested, the proposed order granting summary judgment shall be entered by the Court.

E. Any Respondent wishing to oppose a short form motion for summary judgment may file within twenty (20) days a short form response not to exceed two (2) pages in the form attached hereto as Exhibit "D", setting forth any facts not included in paragraphs 6 and 7 of defendant's short form motion.

F. Movant may file within ten (10) days a reply to said response not to exceed one (1) page.

G.  The Court may request that the parties submit memoranda of law not to exceed five (5) pages in support of their respective positions.

H.  This short form summary judgment motion procedure also shall be available to any defendant seeking summary judgment under Rule 56 on any other basis that may be asserted appropriately under said Rule.  Nothing in this Order shall affect the right of any party to file a standard motion for summary judgment under Rule 56.

I.  A Movant may group more than one case in a letter motion or Rule 56 Motion under this Order.

J.  The procedures set forth in Sections 3.I. and 3.II. of this Order shall also apply with respect to applications by third-party defendants seeking dismissal of third-party claims.

4.  SETTLEMENT CONFERENCES

A. The Court hereby establishes a procedure for Settlement Conferences in all cases consolidated under Civil Action No. MDL 875.  The Court encourages all counsel to request settlement conferences, consistent with this Order.

1. Until further Order of the Court, for all cases subject to settlement conferences to be held in 1992 and thereafter, plaintiffs and third-party plaintiffs shall specify the basis for liability as to each defendant in the form of a sworn affidavit.  The information contained in the affidavit shall include, at a minimum, the information requested under Subsection 2.c, including all subparts.

2. No settlement conference shall occur unless the following procedure is followed:

    a. Counsel requesting a settlement conference must do so in writing and must identify by court, term, if applicable, and number, and full name of plaintiff and each defendant, each case to be discussed at the conference;

    b. A copy of the request for a settlement conference must be served on counsel for each party and a certification of service must accompany the written request;

    c. Counsel must certify that he or she has submitted to each party or parties' representative in the case, copies of all medical expert reports in counsel's possession and a verified affidavit of the claimant or, if the claimant is deceased, the executor or administrator of the plaintiff's estate, setting forth (if not previously supplied by way of discovery) the following information:

    (1) the name, address, social security number, and date of birth of claimant;

    (2) the identity of the specific defendants against whom plaintiff's claim is being made;

    (3) a complete employment history including location, employer, type of employment and inclusive dates of each;

    (4) a specific, not generic, description of all asbestos-containing products with exposure

dates and specific manner in which plaintiff claims
he was exposed, and location of exposure;

(5) the specific name of each asbestos
containing product to which exposure is alleged as
well as the name of the manufacturer, distributor,
and supplier of those products and the name of any
company who performed any work involving asbestos
at plaintiff's place of employment;

(6) with respect to each product identified,
inclusive dates of exposure and each job site at
which the exposure occurred;

(7) a listing of all product identification
witnesses by name, address and telephone number and
a statement as to whether or not each witness has
been deposed in any case. If so, the date and
location of the depositions and the identity of the
court reporter or stenographer.

3. Plaintiff shall submit the above information to
counsel for each defendant at least 20 days prior to a scheduled
conference. Failure to provide such information by this deadline
shall relieve defense counsel from participating in the
conference.

5. **REMAND**

Cases which are not settled, following a good faith attempt
by all parties, shall be subject to remand. All requests for a
suggestion of remand shall be accompanied by a written Statement

-10-

of Position regarding the remand.  It shall be served upon all remaining parties to the action no less than five (5) days prior to a telephone or personal conference on the matter which shall be scheduled by the party requesting the remand.  The Statement of Position shall set forth the names of all remaining parties, the efforts made to settle the case, the current status of settlement negotiations with each remaining party, and the envisioned impediments to settlement.  Opposing counsel may respond in writing or orally at the conference.  All parties shall be prepared to fully discuss A.D.R. solutions for the action.  The Court shall enter such orders following the conference as may be appropriate.

6.  **EFFECT**

To the extent that any provisions of this order are inconsistent with those set forth in any pretrial order earlier entered by this Court, the provisions of this Order shall govern.

THE COURT:

_Charles R. Weiner_
CHARLES R. WEINER, J.

DATED: 1/3/92

EXHIBIT "A"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:  ASBESTOS PRODUCTS LIABILITY  :
         LITIGATION (NO. VI)       :
                            x     CIVIL ACTION NO. MDL 875
                            :
THIS DOCUMENT RELATES TO:     :
                            x

## ORDER OF DISMISSAL

AND NOW, this _____ day of _____, 199_, pursuant to MDL 875 Pretrial Order No. 3, Section 3.I.C., upon consideration of the request for dismissal of defendant ABC Insulation Company, Inc. ("ABC"), all counsel of record having been served with its letter motion requesting dismissal by agreement, and there being no opposition to the entry of this Order;

IT IS HEREBY ORDERED that the request for dismissal is granted with prejudice as to the claims of _____ and without prejudice as to all crossclaims against defendant ABC for the following reason(s):

_____ 1. Movant did not come into existence until after plaintiff's alleged asbestos exposure.

_____ 2. Movant never manufactured, distributed, sold or otherwise supplied any asbestos-containing

-12-

product prior to or at the time of plaintiff's alleged exposure.

_____ 3. Movant never manufactured, distributed, sold or otherwise supplied any asbestos-containing product to plaintiff's employer or performed any work involving asbestos at plaintiff's place(s) of employment.

_____ 4. The absence of evidence of exposure to Movant's asbestos-containing products;

_____ 5. Other grounds.

SO ORDERED:

_____
HONORABLE CHARLES R. WEINER, U.S.D.J.

-13-

EXHIBIT "B"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:   ASBESTOS PRODUCTS LIABILITY :
         LITIGATION (NO. VI)      :
                               x     CIVIL ACTION NO. MDL 875
                               :

THIS DOCUMENT RELATES TO:      :
                               x

### ORDER GRANTING SUMMARY JUDGMENT

AND NOW, this _____ day of _____, 199_,
upon consideration of the Motion for Summary Judgment of defendant
ABC Insulation Company, Inc. ("ABC"), the Court finds as follows:

1.   ABC served a letter motion demanding dismissal of
this matter upon all counsel of record on _____,
199_, and

2.   One or more parties ("opposing parties") opposed the
demand of ABC for a dismissal of this matter, and

3.   Said opposing parties failed to commence discovery
within sixty (60) days of the date of notice of opposition or
otherwise come forward with evidence to substantiate that there is
a genuine issue of material fact in this matter.

THEREFORE, pursuant to Section 3.II.B of MDL 875
Pretrial Order No. 3, and for good cause shown.

IT IS on this _____ day of _____,
199_,

-14-

ORDERED that the letter motion of ABC Insulation Company, Inc. for Summary Judgment is GRANTED and summary judgment is hereby entered in favor of ABC Insulation Company, Inc. on all claims asserted by _____.  All crossclaims asserted against ABC Insulation Company, Inc. are dismissed without prejudice.

SO ORDERED:

_____
HONORABLE CHARLES R. WEINER, U.S.D.J..

-15-

## EXHIBIT "C"

### Short Form Motion for Summary Judgment

_____ hereby moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and Section 3.II. of the Court's MDL 875 Pretrial Order No. 3 dated _____ (the "Order"), in all cases on the list attached hereto as Exhibit "A". The grounds for the motion are as follows:

1. Plaintiffs in each case allege exposure to asbestos products manufactured, distributed, sold or installed by defendants [during the period from _____ to _____] [in the course of their employment at _____].

2. On _____, movant delivered a letter motion pursuant to Section 3.I. A. of the Order, notifying all parties that movant is entitled to dismissal for the following reason(s):

    a. _____

    b. _____

    c. _____

3. Written opposition was served within the required thirty-day period by the following parties on the following grounds:

-16-

4.  Discovery was commenced by the following parties within the sixty (60) day period set forth in Section 3.II.C. of the Order:

5.  All discovery undertaken by the above party(ies) has been completed, and there are no pending discovery disputes.

6.  The facts on which movant relies in support of its motion are as follows:

7.  Evidence adduced in discovery relevant to the facts on which movant relies is as follows:

8.  Movant contends that the evidence adduced in discovery is insufficient to create a genuine issue of material fact.

WHEREFORE, defendant respectfully requests that the Court grant its motion and enter summary judgment in its favor and against _____ on all claims.  All crossclaims asserted against _____ shall be dismissed without prejudice.

-17-

EXHIBIT "D"

Short Form Opposition to Motion for Summary Judgment

_____ ("Respondent") hereby opposes

the short form motion for summary judgment of defendant

_____, in all cases on the list attached hereto as

Exhibit "A".  The grounds for the opposition are as follows:

1.  The stated grounds for the motion are as follows:

2.  Facts relevant to a disposition of the motion not

presented in defendant's motion, or presented in a form that

Respondent contends is inaccurate or incomplete are as follows:

3.  Respondent contends that the evidence adduced in

discovery is sufficient to create a genuine issue of material

fact, and summary judgment should not be granted.

WHEREFORE, Respondent respectfully requests that the

Court deny the motion for summary judgment.

-18-

```
************ -COMM. JOURNAL- ******************* DATE MAR-12-2002 ***** TIME 17:30 ********

       MODE = MEMORY TRANSMISSION          START=MAR-12 17:26     END=MAR-12 17:30

         FILE NO.=661

  STN   COMM.    ONE-TOUCH/   STATION NAME/TEL NO.              PAGES    DURATION
  NO.             ABBR NO.

  001   OK        ≊           435#21082#2#18047888218#          020/020  00:02:55


                                          -SEMMES,BOWEN SEMMES    -

  *************************************** -        - **** -     410 539 5223- ********
```

# Semmes, Bowen & Semmes

A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

OFFICES IN
WASHINGTON, D.C.
HAGERSTOWN, MARYLAND
SALISBURY, MARYLAND
McLEAN, VIRGINIA

250 WEST PRATT STREET
BALTIMORE, MARYLAND 21201

TELEPHONE 410-539-5040

FAX 410-539-5223

WWW.SEMMES.COM

## FAX COVER SHEET

**PLEASE DELIVER THE FOLLOWING MATERIALS AS SOON AS POSSIBLE TO:**

COMPANY:    Hunton & Williams

ATTENTION:    Raymond F. Geoffroy, III        FAX NO.:    **804-788-8218**

    DIRECT DIAL NUMBER OF PERSON RECEIVING FAX:    804-788-7313

FROM:   James W. Bartlett, III

NUMBER OF PAGES:    20  (INCLUDING COVER SHEET)

DATE TRANSMITTED:   03/12/02

    DIRECT DIAL NUMBER OF PERSON SENDING FAX:    410-576-4833

MESSAGE:

FILE NO.:  21082-2        HARD COPY TO FOLLOW BY MAIL:  NO

The information contained in this facsimile message is attorney-privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to the above address via the U.S. Postal Service.    Thank You.

06-14-02   11:25am   From-Hunton & Williams                    +87139                                      EXHIBIT D

FILED SEP 0 1992

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: ASBESTOS PRODUCTS LIABILITY      :
LITIGATION (NO. VI)                     :
                                        :
                                        x      CIVIL ACTION NO. MDL 875
_____        (Including MARDOC, FELA,
                                                and TIREWORKER cases)

This Document Relates to:               :
    ALL ACTIONS                         :
                                        x
_____

## ADMINISTRATIVE ORDER NO. 3

It is the intention of the Court that the cases be resolved through negotiation wherever possible. The Court and all parties agree that, as that process proceeds, it is often necessary to give special attention to certain cases. Although all settlements represent steps toward the Court's ultimate goal, special efforts to resolve these cases are not a substitute for broad-based negotiations designed to reduce the docket backlog.

In accordance with **ADMINISTRATIVE ORDER NO. 2** Plaintiffs' counsel has previously submitted information to the Court relating to their malignancy and asbestosis cases. The Court has determined to give a priority to malignancy, death and total disability cases where the substantial contributing cause is an asbestos-related disease or injury. The following procedures are hereby established for review, settlement and/or further action in these cases:

I    SELECTED CASES

Selected cases are identified by disease category. In each case, plaintiff's counsel must have a written medical opinion by a board certified specialist setting forth that exposure to asbestos or asbestos-containing products is a substantial contributing cause to the condition or death of plaintiff (plaintiff's decedent). The disease categories are:
A.    Mesothelioma, living and deceased.
B.    Lung Cancer, living and deceased.
C.    Other malignancies, living and deceased.
D.    Asbestosis, total disability deceased or total disability living.

II    PROCEDURES FOR PLAINTIFFS' COUNSEL

The Court will process all cases previously identified by Plaintiffs' counsel pursuant to **ADMINISTRATIVE ORDER NO. 2** as mesothelioma and lung cancer in accordance herewith **UNLESS** the

Court is advised that such cases do not meet the above criteria. Plaintiffs' counsel must affirmatively identify all other malignancy and asbestosis cases which meet the requirements hereof.  In all instances hereunder, the cases shall be identified by plaintiff's name, the transferor jurisdiction, and the individual case number assigned by the transferor district. The Court will advise plaintiffs' counsel (with a copy to defense, plaintiff's and peripheral liaison counsel) when his/her cases are ready for processing.  Plaintiffs' counsel shall then take the following steps:

A.   Identify to the Court all remaining viable defendants from whom plaintiff expects to recover damages.

B.   Provide the necessary fact information for defense counsel to process the cases for settlement. (work history, exposure information, date of birth/death, medical history, smoking history, Social Security Number, and printout or release etc.)

C.   Provide defense counsel with X-rays and pathology in plaintiff's possession, together with necessary releases for medical and employment records.

D.   Provide a reasonable settlement demand to each remaining defendant.

E.   Notify the Court when each of the above requirements is completed.

## III   PROCEDURES FOR DEFENSE COUNSEL

Each defendant shall be prepared to identify the counsel who will be available and able to conduct all settlement negotiations with any particular plaintiffs' counsel.  Defense counsel shall take the following steps in these proceedings:

A.   Within fifteen (15) days of receipt of notice that plaintiffs' counsel has complied with the requirements set forth in Section II above, notify the Court and Plaintiff's counsel by telephone and in writing as to any discrepancies in such notice, and set forth in detail all necessary additional information.

B.   Within forty-five (45) days of receipt of the information from the plaintiff necessary to engage in settlement negotiations and the demand from plaintiffs' counsel, defense counsel shall review the same and accept such terms or make a reasonable offer for settlement.

## IV   SETTLEMENT NEGOTIATIONS

Following the initial procedures, all counsel shall make themselves readily available for personal and telephone settlement conferences. **AT THIS TIME, NEGOTIATION IS TO BE ONGOING AND _IN GOOD FAITH_.** All counsel are to report no less than once a week by telephone to the Court as to their progress. The Court will be available on a regular basis for participation in a settlement conference, either by telephone or in person. If, after thirty (30) days, any party feels that his/her opponent is not negotiating in good faith, they may request the Court to forward the matter to the Mediation Committee for a recommendation. If a request is made to refer the matter to the Mediation Committee, such request shall be honored by the Court. When the Court determines that further settlement discussions are unlikely to be productive, the Court will hold a termination conference to discover the status of all remaining parties to the action(s) in negotiation and to determine whether the case is to be forwarded to the Mediation Committee. A referral may be of one or a number of cases. If no request for referral is made, and the parties have been unable to resolve their differences, the Court shall determine whether the matter is appropriate for immediate remand.

## V   MEDIATOR

The Court shall appoint a neutral mediator for each case who is familiar with the jurisdiction. Once the Mediator is selected, he/she shall hear all referrals for that jurisdiction subject to resignation or Court reassignment. Upon receipt of a referral from the Court, the Mediator shall take the following action:

A.  Provide notice to each party of the time and place of a mediation hearing , which hearing shall take place no sooner than ten (10) days after such notice, but as soon thereafter as possible.

B.  Each party may provide a short position statement to his/her opponent and to the Mediator no less than five (5) days prior to the hearing.

C.  The Mediator shall set forth his/her own rules for proceeding on the referral and shall advise the participants.

D.  At the hearing the Mediator shall attempt to mediate settlement as to all parties. As to any case in the group that is not so resolved, the Mediator shall determine whether the participants have negotiated in good faith. This determination shall be made on a case by-case-basis.

E.  The Mediator shall make a report to the Court setting forth his/her determination regarding the good or bad faith of all parties to the negotiations. Upon receipt of the report from the Mediator, the Court shall allow those parties who have been negotiating in good faith a reasonable time to complete a settlement. There shall be a presumption that where the plaintiff has acted in good faith and one or more defendants have been found to be acting in bad faith, the case will be immediately remanded for trial as to such defendants. If all parties are acting in good faith the Court will make additional efforts to settle the case. If no settlement is achieved the matter will be remanded. The Court will act promptly in all respects upon receipt of a report from the Mediator.

F.  All information provided to the Mediator by the parties shall be kept in confidence except as set forth to the Court in the Mediator's report.

## VI   GOOD FAITH NEGOTIATIONS

In order for the participants to the settlement negotiations to be in good faith, there must be a reasonable relationship between their demand/offer and the following criteria:

A.  Historical settlement averages between the same defendants with the same plaintiff's counsel in the same jurisdiction in similar cases. Variances from such historical criteria can be justified by the following factors:

1.  Severity/mildness of disease.
2.  Lack of exposure to product.
3.  Personal factors, i.e.; smoking, age, occupation, etc.
4.  Other persuasive evidence.

B.  Historical averages by disease category for cases that have been previously settled in that jurisdiction with that plaintiff's counsel and with that defendant.

C.  If there is no historical settlement average by disease category between plaintiff's counsel and the defendant in the jurisdiction from which the case arises, then comparable settlement averages for similar cases in that same jurisdiction with that defendant shall be confidentially provided to the Mediator.

   Because different viewpoints of the same case are
equally understandable, a finding of bad faith is not necessary
in all instances where the parties are unable to reconcile their
differences and settle.


BY THE COURT:


Date: _____9/8/92_____

CHARLES R. WEINER, J.


ENTERED: _____9/8/92_____

CLERK OF COURT.

*16-3-04*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI) ) | |
| ) | |
| ) | |
| THIS DOCUMENT RELATES TO MARITIME ) ASBESTOS CASE: ) | Civil Action No. 2 MDL-875 |
| ) | |
| United States District Court Northern District of ) Ohio, Eastern Division ) | |
| ) | |
| ) | |
| CHARLES P. RICH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No.  1:98CV14094 |
| v. ) | |
| ) | |
| A-C PRODUCT LIABILITY TRUST, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

## GOULDS PUMPS, INC.'S JOINDER IN JOINT MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR REINSTATEMENT AND REMAND OF CHARLES P. RICH CAUSE

Defendant Goulds Pumps, Inc. ("Goulds") joins the Joint Memorandum in Opposition to Plaintiff's Motion for Reinstatement and Remand of Charles P. Rich Cause, dated October 29, 2004, for the reasons set forth therein.  Goulds opposes Plaintiff's request to reinstate this action and remand it to the United States District Court for the Northern District of Ohio, and requests that the Court deny the Reinstatement Motion.

Robin E. Harvey
Baker & Hostetler LLP
312 Walnut Street, Ste. 3200
Cincinnati, OH 45202

Reginald S. Kramer
Oldham & Dowling
195 S. Main Street, Ste. 300
Akron, OH 44308

Richard D. Schuster
Vorys, Sater, Seymour & Pease
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216-1008

Sheila Burke
Burns, White & Hickton
120 Fifth Avenue
2400 5th Ave. Pl.
Pittsburgh, PA 15222

James T. Millican
Weston, Hurd, Fallon, Paisley & Howley
2500 Terminal Tower
50 Public Square
Cleveland, OH 44113-2241

Laura K. Hong
Squire, Sanders & Dempsey
4900 Society Center
127 Public Square
Cleveland, OH 44114

Evan Palik
McMahon, DeGulis, Hoffman & Lombardi
Caxton Bldg., Ste. 650
812 Huron Road
Cleveland, OH 44115

Frederick P. Vergon, Sr.
Smith, Marshall, Weaver & Vergon
500 National City
East Sixth Building
Cleveland, OH 44114

Jennifer A. Whelan
Cetrulo & Capone
2 Seaport Lane
Boston, MA 02210

Richard C. Binzley
Byron J. Horn
Thompson, Hine & Flory
3900 Key Tower
127 Public Square
Cleveland, OH 44114

John W. Lebold
Sherwin Williams Company
101 Prospect Avenue, N.W.
1100 Midland Bldg.
Cleveland, OH 44115

Raymond Geoffroy, III
Hunton & Williams
903 East Byrd Street
Richmond, VA 23219

Alexander W. Saksen
Kirkpatrick & Lockhart
535 Smithfield Street
Pittsburgh, PA 15222

Kenneth F. Krawchak
Swartz, Campbell & Detweiler
55 Public Sq., Ste. 1120
Cleveland, OH 44113-1901

Barbara Stutz
Robert A. Bunda
Bunda, Stutz & DeWitt
One SeaGate, Ste. 650
Toledo, OH 43604

Randall L. Solomon
Baker & Hostetler
3200 National City Center
1900 East Ninth Street
Cleveland, OH 44114-3485

William F. Scully, Jr.
Williams, Sennett & Scully
55 Public Square, Ste. 1850
Cleveland, OH  44113

Keith Ganther
Brent M. Buckley
Buckley, King & Bluso
1400 Bank One Center
600 Superior Avenue
Cleveland, OH  44114-2652

Francis M. Hadden
Hecker Brown Sherry & Johnson
1700 two Logan Square
18th & Arch Streets
Philadelphia, PA  19103

James F. Israel
Israel, Wood & Puntil, P.C.
310 Grant Street, Ste. 501
Pittsburgh, PA  15219

Thomas C. Conniff
McElroy, Deutsch & Mulvaney
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, NJ  07962-2075

Barbara J. Arison
Frantz Ward LLP
55 Public Square, 19th Fl.
Cleveland, OH  44113

Kevin C. Alexandersen
Daniel J. Michalec
Gallagher, Sharp, Fulton & Norman
1501 Euclid Avenue, 7th Fl.
Cleveland, OH  44115

Robert L. Davis
3600 Carew Tower
Cincinnati, OH  45202

Samuel R. Martillotta
Mansour Gavin Gerlack & Manos LPA
55 Public Square, Ste. 2150
Cleveland, OH  44113-1994

Ted T. Amsden
Dykema Gossett
400 Renaissance Center
Detroit, MI  48243-1668

Bruce P. Mandel
Ulmer & Berne
1300 East Ninth Street, Ste. 900
Cleveland, OH  44114-1583

Ernest W. Auciello
Gallagher, Sharp, Fulton & Norman
Bulkley Bldg., 7th Flr.
1501 Euclid Avenue
Cleveland, OH  44115

R. Patrick Baughman
Baughman , Henderson & Joyce, LLP
55 Public Square, Ste. 2215
Cleveland, OH  44113

J. Steven Levy
White & Williams, LLP
1800 One Liberty Place
Philadelphia, PA  19103-7395

Gary D. Hermann
Hermann, Cahn & Schneider
1301 E. 9th Street, Ste. 500
Cleveland, OH  44114

Ruth S. Kochenderfer

COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CASE NO. 1:99CV10802 ) | |
| JAMES E. JACKSON, ) | |
| ) | |
| Plaintiff, ) | CIVIL ACTION NO. 2 MDL 875 |
| ) | |
| v. ) | |
| ) | |
| A-C PRODUCT LIABILITY TRUST, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## JOINT MEMORANDUM IN OPPOSITION TO PLAINTIFF'S
## MOTION FOR REINSTATEMENT AND REMAND OF JAMES E. JACKSON CAUSE

Various non-shipowner Defendants in these actions,[1] by their undersigned counsel,

submit this memorandum in opposition to that part of Plaintiff's Motion for Reinstatement and

Remand (hereinafter "the Motion") that seeks the reinstatement and remand of this action as to

"31 Product Manufacturer Defendants."

### I.  FACTS

On May 2, 1996, this Court entered an Order, Pleading No. 113, which is attached hereto

as Exhibit A.  By this Order the Court administratively dismissed all cases filed in the Northern

District of Ohio assigned to the MARDOC portion of MDL 875.  The Order further provided that

the cases could be individually reinstated upon application to the Court demonstrating the

following:

---

[1]Argo International Corp., Auburn Manufacturing Co., Aurora Pump Division of General
Signal Corp., A.B. Boyd Co., Bryan Steam Corp., Foster Wheeler LLC, General Electric Co.,
Indian Head Industries, Inc., Pecora Corp., and Preferred Utilities Mfg. Corp.

EXHIBIT
B2

1.    Each Plaintiff requesting reinstatement must provide to this Court satisfactory evidence that the plaintiff has an asbestos-related personal injury compensable under the law.

2.    For each defendant which the plaintiff desires to pursue, the plaintiff must provide probative evidence of exposure to products connected to, or supplied, manufactured or installed by said defendant, or, if the defendant is a shipowner, evidence of service upon the defendant's ship(s).

Exhibit A at 2.

On March 17, 1997, this Court entered an Order, Pleading No. 182, administratively dismissing all actions filed subsequent to the Court's Order of May 2, 1996 and all as yet unfiled cases and making them subject to the terms for reinstatement set forth in the May 2, 1996 Order. Pleading No. 182 is attached hereto as Exhibit B.

The Complaint in this case was filed in the United States District Court for the Northern District of Ohio in 1999. The case was transferred to this Court pursuant to a Conditional Transfer Order.

## II.  ARGUMENT

A.    Plaintiff has not made the requisite showings for the reinstatement of his case against the non-shipowner Defendants.

The May 2, 1996 Order requires a plaintiff who seeks reinstatement of his case to "provide [as to each defendant] probative evidence of exposure to products connect to, or supplied, manufactured or installed **by said defendant** . . . ." (Emphasis added). Thus, each plaintiff is required, with respect to the non-shipowner Defendants, to provide specific probative evidence of exposure to products manufactured by each Defendant in order to obtain

2

reinstatement as to that Defendant.  Plaintiff has not even attempted to comply with this requirement, as his Motion is devoid of any probative evidence of exposure to products of any of the 31 non-shipowner Defendants as to which he seeks reinstatement.

The reinstatement criteria of the May 2, 1996 Order were included in the Order for a purpose, namely, to require a plaintiff to demonstrate exposure to a defendant's products before that defendant is compelled to incur the expenses associated with discovery in each case.  To do otherwise would be unnecessarily involve that defendant in protracted, resource-depleting depositions and other procedures.

An example of the extent of discovery that can ensue when discovery is permitted without such a showing occurred in *Stark v. Armstrong World Industries, Inc.,* Case Nos. 1:94CV11464 and 1:09CV20002 (N.D. Ohio).  The *Stark* cases, one of which had been filed in Ohio and the other in Louisiana, were consolidated by this Court and remanded to the Northern District of Ohio, where the consolidated cases were assigned to Judge Dan Aaron Polster.  The disclosure criteria of the May 2, 1996 Order were not imposed on the *Stark* cases before remand, but the plaintiff prior to remand had dismissed 101 of the 115 defendants named in the consolidated actions, leaving 14 defendants in the cases.  After remand, Judge Polster issued a Case Management Plan.  In accordance with the schedule set forth in that Plan, the plaintiff designated 25 co-worker, fact witnesses.  Depositions of 16 of those fact witnesses were taken. The plaintiff's deposition was taken three times.  The plaintiff also designated seven expert witnesses, and depositions of most of those experts were taken.  The several defendants each named several experts, and depositions of some those experts were taken.  After the close of discovery, the majority of the remaining manufacturer defendants filed motions for summary

3

judgment on the basis of lack of probative evidence of the plaintiff's exposure to the movants' products.  Judge Polster granted all of those motions for summary judgment.

Thus, in *Stark,* 101 defendants were spared the unnecessary costs of discovery.  Most of the remaining 14 defendants, however, because the plaintiff never had to comply with the reinstatement criteria of the May 2, 1996 Order, had to incur those costs of discovery – only to be dismissed later due to lack of probative evidence of exposure to their products.

Here, this Court should not allow Plaintiff to totally disregard the reinstatement criteria of the May 2, 1996 Order, because to do so would be to require the 31 non-shipowner Defendants as to which Plaintiff seeks reinstatement to incur unnecessary and resource-depleting litigation expenses.

   B.     Plaintiff has not provided counsel for each Defendant with Defendant-specific
          information that is a prerequisite to remand.

Without reinstatement, of course, remand is not possible.  Even if reinstatement were to be granted, this case cannot be remanded in its current status.

The goal of the Multi-District Litigation ("MDL") process is to reduce transaction costs, streamline the pretrial and settlement procedures, and, if possible, dispose of cases without the need for a trial.  Remand from this Court should be considered only after all pretrial proceedings have been completed, information has been provided, and all avenues for settlement have been exhausted.  Moreover, retention of this action is necessary to adhere to the MDL Panel's overall goal of efficiently managing the national asbestos litigation in a cost-effective and just manner.

To this end, early in the MDL process this Court issued Orders establishing a procedure for settlement conferences that are to take place before remand can be considered.  This

procedure requires a plaintiff to set forth certain information, including:

> (4)    a specific, not generic, description of all asbestos-containing products with exposure dates and specific manner in which plaintiff claims he was exposed, and location of exposure;

> (5)    the specific name of each asbestos-containing product to which exposure is alleged as well as the name of the manufacturer, distributor, and supplier of those products and the name of any company who performed any work involving asbestos at plaintiff's place of employment;

> (6)    with respect to each product identified, inclusive dates of exposure and each job site at which the exposure occurred;

> (7)    a listing of all product identification witnesses by name, address and telephone number and a statement as to whether or not each witness has been deposed in any case.  If so, the date and location of the depositions and the identity of the court reporter or stenographer.

Pretrial Order No. 3 at ¶ 4A2c, Pleading No. 333, attached hereto as Exhibit C; see also

Administrative Order No. 3 at ¶ II A.  Only after this information is submitted to counsel for

each defendant at least 20 days prior to a scheduled settlement conference may the case be

considered for remand.  Pretrial Order No. 3 at ¶¶ 4A3, 5.  No such information has ever been

provided to counsel for the 31 non-shipowner Defendants as to which Plaintiff seeks

reinstatement and remand.

### III.   CONCLUSION

As Plaintiff has failed to provide the probative evidence against the non-shipowner

Defendants required for reinstatement under this Court's Orders of May 2, 1996 and March 17,

1997 and has failed to provide each Defendant's counsel with the information required by

Pretrial Order No. 3, this Court should deny that part of the Motions seeking reinstatement and

remand of Plaintiff's case as to the non-shipowner Defendants.

James W. Bartlett, III
Semmes, Bowen & Semmes
250 West Pratt Street, 16th Floor
Baltimore, Maryland 21201
(410) 576-4833

Counsel for Foster Wheeler LLC

John A. Heller
Sidley & Austin
One First National Bank
Chicago, Illinois 60603
(312) 853-7704

Counsel for General Electric Co.

James E. Wynne
Butzel Long
150 W. Jefferson, Suite 900
Detroit, Michigan 48226
(313) 225-7097

Counsel for Indian Head Industries, Inc.

Gregg L. Spyridon
Spyridon, Koch & Palermo
Lakeway Three, Suite 3010
3838 N. Causeway Boulevard
Metairie, Louisiana 70002

Counsel for Argo International Corp., Auburn
Manufacturing Co., Aurora Pump Division of
General Signal Corp., A.B. Boyd Co., Bryan
Steam Corp., Ingersoll-Rand Corp., Pecora
Corp., and Preferred Utilities Mfg. Corp.

Eric H. Mann
Gallagher, Sharp, Fulton & Norman
1501 Euclid Avenue
Cleveland, Ohio 44115
(216) 241-5310

Counsel for A-C Product Liability Trust

Nicholas L. Evanchan
Evanchan & Palmisano, LLP
One GOJO Plaza
Akron, Ohio 44311-1076
(330) 208-4520

Counsel for Foster Wheeler LLC

6

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th day of October 2004, a copy of the foregoing

Joint Memorandum in Opposition was mailed to all counsel on the attached service list.

James W. Bartlett, III
Counsel for Foster Wheeler LLC

B0473713.WPD

## SERVICE LIST

Duane C. Marsden
Jaques Admiralty Law Firm, P.C.
645 Griswold, Suite 1370
Detroit, MI 48226-4116

Ruth S. Kochenderfer
Walter Andrews
Shaw Pittman
1650 Tysons Blvd., 4th Fl.
McLean, VA 22101


Richard C. Binzley
Byron J. Horn
Thompson, Hine & Flory
3900 Key Center
127 Public Square
Cleveland, OH 44114

Jeffrey Healy
John P. Patterson
Tucker, Ellis & West, LLP
925 Euclid Ave., Ste. 1150
Cleveland, OH 44115


Eric Horne
Eckert, Seamans, Cherin & Mallott
600 Grant St., 44th Floor
Pittsburgh, PA 15219

Kenneth F. Krawchak
Swartz, Campbell & Detweiler
55 Public Sq., Ste. 1120
Cleveland, OH 44113-1901


Barbara Stutz
Robert A. Bunda
Bunda, Stutz & DeWitt
One SeaGate, Suite 650
Toledo, OH 43604

Robin Harvey
Baker & Hostetler LLP
312 Walnut Street
Suite 2650
Cincinnati, OH 45202-4038


Matthew C. O'Connell
Sutter O'Connell Mannion & Farchione Co.
3600 Erieview Tower
1301 E. 9th St.
Cleveland, OH 44114

Richard D. Schuster
Vorys, Sater, Seymour and Pease
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216

8

William F. Scully, Jr.
Williams, Sennett & Scully
55 Public Sq., Suite 1850
Cleveland, OH 44113

Barbara J. Arison
Frantz Ward LLP
55 Public Sq., 19th Fl.
Cleveland, OH 44113

Keith Ganther
Brent M. Buckley
Buckley, King & Bluso
1400 Bank One Center
Cleveland, OH 44114-2652

Sheila Burke
Burns, White & Hickton
120 Fifth Avenue
2400 5th Ave. Pl.
Pittsburgh, PA 15222

Robert L. Davis
3600 Carew Tower
Cincinnati, OH 45202

Francis M. Hadden
Hecker Brown Sherry & Johnson
1700 Two Logan Sq.
18th & Arch Streets
Philadelphia, PA 19103

Samuel R. Martillotta
Mansour Gavin Gerlack & Manos LPA
55 Public Square, Suite 2150
Cleveland, OH 44113-1994

James F. Israel
Israel, Wood & Puntil, P.C.
310 Grant St., Ste. 501
Pittsburgh, PA 15219

James T. Millican
Weston Hurd Fallon Paisley & Howle
2500 Terminal Tower
50 Public Square
Cleveland, OH 44113

Thomas C. Conniff
McElroy, Deutsch & Mulvaney
1300 Mount Kemble Ave.
P.O. Box 2075
Morristown, NJ 07962-2075

9

Laura Hong
Squire, Sanders & Dempsey
4900 Society Center
127 Public Square
Cleveland, OH 44114

Margaret Bruemmer
1556 E. Goodrich Lane
Milwaukee, WI 53217

Evan Palik
McMahon, DeGulis, Hoffman & Lombardi
Caxton Bldg., Ste. 650
812 Hron Rd.
Cleveland, OH 44115

Ted T. Amsden
Dykema Gossett
400 Renaissance Center
Detroit, MI 48243-1668

I. Steven Levy
White & Williams, LLP
1800 One Liberty Place
Philadelphia, PA 19103-7395

Bruce P. Mandel
Ulmer & Berne
Suite 900
1300 East Ninth Street
Cleveland, OH 44114

Reginald Kramer
Oldham & Dowling
195 S. Main Street, Ste. 300
Akron, OH 44308

Frederick P. Vergon, Sr.
Smith, Marshall, Weaver & Vergon
500 National City
East Sixth Building
Cleveland, OH 44114

R. Patrick Baughman
Baughman, Henderson & Joyce, LLP
55 Public Square, Suite 2215
Cleveland, OH 44113

Jennifer A. Whelan
Cetrulo & Capone
2 Seaport Lane
Boston, MA 02210

John W. Lebold
Sherwin Williams Company
101 Prospect Avenue, N.W.
1100 Midland Bldg.
Cleveland, OH 44115

Gary D. Hermann
Hermann, Cahn & Schneider
130 E. 9th St., Ste. 500
Cleveland, OH 44114

B0473713.WPD

EXHIBIT A

#113

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| IN RE: ASBESTOS PRODUCTS | : | |
| LIABILITY LITIGATION (No. VI) | : | **FILED MAY 2 1996** |
| ——————————————————X | | |
| This Document Relates To: | : | CIVIL ACTION NO. 2 MDL 875 |
| | : | (Maritime Actions) |
| ALL ACTIONS | : | |
| ------------------------------------X | | |

Weiner, J.

May 1, 1996

## MEMORANDUM OPINION AND ORDER

In response to a discovery request of defense counsel, and after several telephone conferences, this Court, on July 18, 1995, entered Pretrial Order No. 6 (MARDOC) directing Plaintiffs' counsel to produce materials in 262 Mardoc cases. Despite being granted several extensions of time to comply with the directives of the July 18, 1995 order, plaintiffs' counsel failed to do so. As a result, defendants moved to dismiss plaintiffs' cases. Following the entry of Show Cause Orders, the Court held a hearing on February 28, 1996 and heard argument and statements of all counsel. The parties have further supplemented their positions with additional written statements. The Court, having considered all of the material presented, will grant the motion of the defendants as modified by the attached order.

## Background of Action

On July 29, 1991, the Judicial Panel On Multidistrict Litigation entered an order establishing MDL 875 and consolidating before this Court 26,639 civil asbestos personal-injury lawsuits, pending in 87 federal districts. At that time 4,022 of the actions transferred were in the Northern District of Ohio. The Panel Order provided for the transfer of overlooked cases and newly filed cases as "tag-along actions"[1]. The size of MDL 875 has now grown from 26,639 to 58,478, or an increase of 119.5%. During this same period, the number of cases in MDL 875 from the Northern District of Ohio has risen from 4,022 to 23,154, or an increase of 475.7%. At the same time, this Court has supervised the termination of 4,223 cases in the Northern District of Ohio jurisdiction, primarily traditional, land-based cases. The remaining 18,209 cases are predominantly Mardoc actions. The Panel statistics disclose that this Court has now disposed of more than 20,000 cases[2]. With only 37,000 cases remaining, approximately 50% are the Mardoc actions.

This Court has, in the conduct of its proceedings, taken

---

1.  Rule 12, Rules of Judicial Panel On Multidistrict Litigation.

2.  Although the Panel statistics show 20,560, this Court is aware of substantially more cases that are settled among the parties without the completion of terminating paperwork. Excluding Mardoc actions, this Court believes that the number of remaining cases is between 10,000 and 15,000.

2

very seriously all of the objectives of the Panel[3] while engaging in its pretrial activities.  Where the parties and their counsel have been cooperative and reasonable, the Court has been able to effectuate settlements.  A major obstacle occurs, however, when either side displays a lack of trust or credibility, or becomes entrenched and confrontational, such as when the parties refuse to cooperate in the disclosure of basic information which informs all parties of the nature of the claims.

## Facts

In the Mardoc cases, there is routinely filed with each action an IDF (Initial Data Form) as required by the standing asbestos orders for the Northern District of Ohio.  The information contained on this form is not authenticated, and, except for naming ships that the plaintiff may have sailed on, it provides no real medical or exposure history for the plaintiff.  Until recently the parties have been at a standoff; Plaintiffs seek settlements and defendants have demanded proof of an asbestos-related medical condition and exposure to their product.[4]  The defendants complain

---

3.  Judicial Panel On Multidistrict Litigation, Docket No. 875, Order dated July 29, 1991, pages 9-12.

4.  This has always been the starting position of the parties; however, in the land cases, the Plaintiffs have learned to supply defendants with medical records, test results, and at least one expert report, together with an affidavit of exposure.  In most instances the affidavit of exposure suffices because the worksite of the plaintiff has been subject to thorough discovery and the credibility gap has been narrowed.  The defendants then treat the action in the form of a claim and make an offer based upon the historical averages achieved between the plaintiff's attorney and the defendant for the location.

3

that Plaintiffs have not provided them with the materials they need to make a settlement offer or proceed to trial.   Both sides seek assistance of the Court.   After several conferences with the parties, the Court entered, on July 18, 1995, Pretrial Order No. 6 (MARDOC), requiring Plaintiffs' counsel to provide to defense counsel the necessary materials[5] in 262 randomly selected cases in order that they could be evaluated for medical and exposure criteria and for settlement.  At this Court's scheduled conference on August 18, 1995, Plaintiffs' counsel advised the Court that he could complete the disclosure of the required information in 30 days.   The Court ordered that this discovery be produced by plaintiffs to the defendants no later than September 21, 1995. Plaintiffs failed to produce the discovery by the discovery deadline, and after several more telephone conferences, defense counsel moved to dismiss the 261[6] cases.  This Court issued Show

---

5.   The order specifically sets forth the materials to be provided: "copies of all medical records and reports, expert reports, x-ray records and reports, pathology reports, pulmonary function test results and reports, autopsy results and death certificates as applicable, work history and work records, social security records, answers to interrogatories, and evidence of specific exposure to each named defendant in each plaintiff's case.

6.  After the process began, it was discovered that one of the 262 numbers was in error and the parties proceeded with the remaining 261.

Cause orders on November 15, 1995, and a subsequent Notice of
Hearing on February 1, 1996.

More than 7 months have passed since the Court issued its
order of July 18, 1995, and by all rational standards plaintiffs'
counsel has had adequate time and opportunity to comply with
discovery in these matters.  In fact, Plaintiffs have advised the
Court that they have produced all of the discovery materials
required.  At the hearing on February 28, 1996, defendants produced
two legal record boxes (approximately 12"H x 14"W x 24"L) which
they identified as the total discovery received.  Included in the
boxes was 261 file folders, many with IDF forms, and many with
recent letters from a "B" reader radiologist.  It has been this
Court's experience that one medical case could easily fill two
legal record boxes.  The parties agreed that the discovery produced
included no documentation or evidence relating to plaintiffs'
exposure to specific products.  The Court also repeatedly asked
Plaintiffs if they had any malignancy cases ready for trial and
Plaintiffs did not identify any such cases.


## Discussion

The Judicial Panel on Multidistrict Litigation, convinced
that the administration of justice in the federal court system was
threatened by burgeoning numbers nationally of asbestos related
personal-injury lawsuits, sought to relieve the burden, to provide

5

for uniform case management, and to reduce the transaction costs by transferring these cases to a multidistrict jurisdiction. This Court has remained mindful of the Panel's priorities as set forth in the Panel order of July 29, 1991, and has initiated case management policies in conjunction with counsel representing all parties to achieve these goals.

Plaintiffs' counsel has taken the position that these 261 cases adequately reflect the nature of all of his filings, and that the "package"[7] is now ripe for settlement. Defense counsel, although it was their expert who devised the method for selecting the 261 "random" cases, are more reluctant to characterize the 261 cases as a representative of the whole in all respects, but rather they urge the Court to find that the discovery provided is representative of the whole. Defense counsel urge the Court to dismiss with prejudice the 261 cases due to plaintiffs' counsel's lack of compliance with this Court's orders. Defense counsel also argue that even in the cases where some discovery has been provided, it is insufficient for the cases to proceed to settlement or trial.

The judicial system has been faced with an onslaught of personal injury, asbestos cases for more than twenty years. Plaintiffs have sought damages against a multitude of defendants. The courts have found that asbestos fibers are potentially

---

7.  Counsel in the asbestos litigation are prone to describe a group of cases, whether it is 5 or 5,000 in number, as a "package".

6

hazardous to one's health.  Sufficiency of exposure remains an unknown, however, and many plaintiffs initiated litigation without injury, but rather with knowledge of exposure.  The reasoning supporting this litigation has been the concern for the running of tolling statutes which may begin when the party becomes aware of an injury.  Injury can and has been defined in many ways resulting in inconsistent case law and approaches to this type of litigation among the states.

This Court is guided by the principles set forth by Judge Ginsberg in In Re Korean Air Lines Disaster of September 1, 1983, 829 F.2d 1171 (D.C.Cir. 1987).  She concludes that a transferee court's responsibility in the context of a 28 U.S.C. §1407 transfer is to follow the law of the transferee circuit, although the law of the transferor jurisdiction merits consideration.  In the matter before us, the Court feels that the law of the United States Court of Appeals for the Third Circuit is clear and that the United States Court of Appeals for the Sixth Circuit would draw a similar analysis to this problem.

Pennsylvania has recently joined a growing number of states which have analyzed this problem.

Four years ago Pennsylvania was a "one-injury" state.  That is, if an exposed party sought damages as a result of his or her pleural disease which was causing some restriction in lung capacity, the party would also seek damages for fear of contracting other asbestos-related cancers, and for the increased risk in

7

contracting such malignancies which have longer latency periods.
The combination of longer latency periods and separate but multiple
diseases flowing from the same exposure caused the Pennsylvania
courts to review the course of the products liability law.  In
1992, Pennsylvania became a "two injury" state and joined a growing
number of states by holding that in asbestos cases, the plaintiff
is entitled to bring a second action for a subsequently diagnosed
malignancy, thereby eliminating claims for risk and fear, and
reducing the potential for speculative damages being awarded for an
injury that may not occur. Marinari v. Asbestos Corporation, Ltd.,
417 Pa. Super. 440, 612 A.2d 1021 (1992)[8]

Ohio is also among the many states which has adopted this
rule.  In Quick v. Sun Oil Co., et al., (No. 82-0292, Ct. Comm.
Pleas, Lucas Co., Ohio, 10/84), Judge Sumner E. Walters found that
the discovery of one asbestos-related disease does not trigger the
statute of limitations for other separate and distinct, later-
discovered asbestos diseases.

More recently, the issue of injury in an asbestos-related
action was tested before the Pennsylvania Supreme Court in Giffear
v. Johns-Manville Corporation, et al., (No.J-157-1995, Pa., April
4, 1996)  The Giffear Court focused on the distinction between
"injury" and "harm", and determined that a physical injury

---

8.  New York, New Jersey, Maryland, Delaware, Indiana, Illinois,
California and Hawaii also follow the two-disease rule.

8

sufficient to maintain a tort action must be accompanied by harm.
The Court concluded that asymptomatic pleural thickening or
scarring is not a compensable injury which gives rise to a cause of
action for damages for a physical injury or for emotional distress.
(Supra, pg 10,11,14)

If the action is brought under the Jones Act or the
F.E.L.A. statutes, the plaintiff is not relieved from his burden of
proof relating to injury.  These laws protect the railroad workers
and mariners who might otherwise have a problem in proving
responsibility for an injury sustained by providing them with a
federal cause of action for the same injury against their employer
in addition to their tort claims against negligent manufacturers or
distributors.  While the plaintiff's burden to establish liability
may be eased, a compensable injury remains a requirement for
recovery.  In holding that an action for an asbestos-related injury
does not exist in a F.E.L.A. case, Circuit Judge Seitz of the
United States Court of Appeals for the Third Circuit Court stated:
"We believe, however, that subclinical injury resulting from
exposure to asbestos is insufficient to constitute the actual loss
or damage to a plaintiff's interest required to sustain a cause of
action under generally applicable principles of tort law....Requir-
ing manifest injury as a necessary element of an asbestos-related
tort action avoids these problems and best serves the underlying
purpose of tort law: the compensation of victims who have suf-

9

fered." Schweitzer v. Consolidated Rail Corp. (Conrail), 758 F.2d 936, 942 (3d Cir.1985)

Many states have created administrative vehicles to hold in abeyance these asymptomatic cases until counsel finds that the plaintiff is actually suffering from an impairment.  Before an action is activated, certain criteria must be met.  This Court has found that the use such an administrative device can reduce the Clerk's burden and still provide an atmosphere for settlement between the parties.  Illinois, Maryland, Connecticut, Arizona and Hawaii utilize this procedure.

This is the atmosphere that exists today where every plaintiff's counsel has a working agreement with all or most of the principal defendants and the cases are submitted as claims. Criteria has been established and agreed to and this has resulted in large block settlements of cases or trials where there has been a good faith difference of opinion.

Soon after the multidistrict cases were sent to this Court, the Court convened counsel from the New England states and block settlements were achieved and agreements to treat future cases as claims resulted.  This procedure has proved effective in many places in the nation and, as a result, there are no real blocks of cases unsettled[9] except for these Mardoc actions.  In the

---

9.  In several instances, plaintiffs may still have remaining in their cases some of the peripheral defendants whose presence represents a very small percentage of the value of the case.  In other circumstances, plaintiffs may have settled with all but one primary defendant and these situations are being addressed.

Mardoc actions, none of the defendants have settled and plaintiffs have claims against an average of more than 80 defendants.

Although this Court retains a vigilant concern for all parties to the litigation, the Court has prioritized from the onset the victims of asbestos related disease, and in particular, those who suffer with malignant conditions as well as their families. The Court's focus is to administer these cases as it has all the others by seeing that they are resolved in an equitable and expeditious manner either by settlement or by trial while making certain there will be sufficient resources available to compensate those who are deserving.

## Findings

The Court, having spent many hours in conference with all counsel and after a hearing makes the following determinations:

Plaintiffs' counsel has failed to comply with this Court's order of July 18, 1995. Plaintiffs' counsel has admitted that no details relating to exposure have been supplied and most of the documentation is described as new radiologist's reports and IDFs. The defendants claim that all medical records, work records, social security records, answers to interrogatories, etc., as

---

9.   (...continued)
represents a very small percentage of the value of the case.  In other circumstances, plaintiffs may have settled with all but one primary defendant and these situations are being addressed.

11

required by the court order, have not been received by them. Plaintiffs' counsel has supplemented his argument presented at the hearing by submitting a copy of the "medicals" from one of the 261 cases[10]. It contains nine pages, none of which are dated earlier than September, 1995.

The second determination of the Court is that Plaintiffs' counsel has not provided critical material necessary for defendants either to evaluate the cases so that a meaningful dialogue can take place or for the cases to be prepared for trial if that fails. Plaintiffs' counsel categorizes his proof of exposure as follows[11]:

1) Everyone knows that the products of this manufacturer were all over the ships and could be found upon almost every ship;

2) This manufacturer advertised asbestos products in a marine catalogue and therefore it must have made and sold products to which the plaintiff was exposed, and;

3) Counsel has assured the Court that he can and will obtain statements from numerous Chief Engineers that these products were in use all over the ships.

_____

10.  Pablo E. Hernandez v. American Ship, et al., Civil Action No. 90-0000, Northern District of Ohio

11.  In this instance the Court is discussing the "manufacturer" defendants, as each plaintiff's sailing record will disclose the vessels upon which he sailed.

12

Plaintiffs' counsel takes the position that this specific evidence and discovery can await trial preparation and is not necessary for the filing of a case or for the settlement process.

Plaintiffs' counsel has presented, as part of the discovery package, doctor's reports that state that a significant number of the plaintiffs have no asbestos related injury. Defense counsel have advised the Court that the medicals received pursuant to this Court's order of July 18, 1995, infra, consist of a scant number of documents and only recent "medical" reports prepared in November, 1995, after this Court's order of July 18, 1995. The statements made to the Court disclose that only a fraction of the recently diagnosed plaintiffs have an asbestos-related condition, and many of these may be open to question. Numerous cases have either no diagnosis of an asbestos-related condition, or there is scant credible medical evidence. Further, the Court is informed that few, if any, of these plaintiffs have provided any evidence of a compensable injury sufficient to sustain a cause of action.

The Court believes that it is the responsibility of counsel to only file those cases which are ripe and ready to proceed. To file cases by the thousands and expect the Court to sort out the actionable claims is improper and a waste of the Court's time. Other victims suffer while the Court is clogged with such filings.

The Court enters its orders accordingly.

13

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

# 113

IN RE:  ASBESTOS PRODUCTS          :
LIABILITY LITIGATION (No. VI)      :
_____ x

This Document Relates To:          :        CIVIL ACTION NO. 2 MDL 875
                                   :           (Maritime Actions)
ALL ACTIONS                        :
-----------------------------------x

### Order

THE COURT HEREBY ORDERS that the cases filed in the Northern District of Ohio by the Plaintiffs assigned to the Mardoc portion of MDL 875, ARE ADMINISTRATIVELY DISMISSED WITHOUT PREJUDICE AND WITH ALL STATUTES OF LIMITATION TOLLED. The Court is specifically preserving the rights of the named plaintiffs to maintain an action should their circumstances warrant the furtherance of their case. Counsel is advised that this Court shall maintain jurisdiction, and that these cases may be individually reinstated upon application to the Court with the following showing:

14

1.  Each plaintiff requesting reinstatement must provide to this Court satisfactory evidence that the plaintiff has an asbestos-related personal injury compensable under the law.

2.  For each defendant which the plaintiff desires to pursue, the plaintiff must provide probative evidence of exposure to products connected to, or supplied, manufactured or installed by said defendant, or, if the defendant is a shipowner, evidence of service upon the defendant's ship(s).

THE COURT FURTHER ORDERS that each case to be reinstated shall be accompanied with the payment of a filing fee, unless such case, both in its present form and in its earlier submissions, contained Jones Act claims ONLY[12].  Counsel shall further be entitled to amend his pleadings as necessary to set forth proper claims, substitute parties and name defendants at the time of reinstatement; PROVIDING HOWEVER, defendants may insert any and all defenses to which they may be entitled.  The Court will issue shortly hereafter a list of the affected actions in the Northern

---

12.  The Court has examined the prior policy of allowing these cases to be filed en mass without filing fees and finds that it is inappropriate to continue.  This policy issue has been assigned by Chief Judge George W. White of the Northern District of Ohio to the MDL.  Specifically, the Court notes that 28, U.S.C. §1916 provides that certain seamen's suits may proceed without prepayment of costs, but that common law tort actions are not included therein.  Plaintiffs' counsel, without payment of any fees, has filed more than 17,000 cases.  The costs applicable to these filings are great and the burden and cost to the court system has been considerable.

MAY-06-96 MON 08:39 ID:                    TEL NO:

District of Ohio.  All pending motions in these cases are hereby denied without prejudice and with leave to resubmit with the original filing date remaining in effect should the case be reinstated.

For the purposes of appeal, THIS IS NOT A FINAL ORDER.

BY THE COURT

*Charles R. Weiner*
Charles R. Weiner, Judge

Date:  5/2/96

ENTERED:  5/2/96

CLERK OF COURT

16

EXHIBIT B

(182)

CRW

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:  ASBESTOS PRODUCTS
LIABILITY LITIGATION (No. VI)

                         CIVIL ACTION NO. 2 MDL 875
This Document Relates To:           (Maritime Actions)

ALL ACTIONS **F I L E D**

MAR 17 1997

MICHAEL E. KUNZ, Clerk     March 14, 1997

By _____ Dep. Clerk     FILED MAR 17 1997

Weiner, J.

**ORDER**

THE COURT, having reviewed the motions, submittals, statements and arguments of the parties, and having conducted an omnibus hearing on February 19, 1997, determines as follows:

This Court, in the management of its docket and in the interest of fairness to ALL parties in the MARDOC portion of MDL 875, entered an order with a memorandum opinion on May 2, 1996. The Court choses not to reiterate the terms of that order, but to amplify them as follows:

1. The administrative process by which the cases subject to the order were determined may have caused some actions to be inadvertantly omitted from the case list subject to the order. This administrative error may be brought to the attention of the Court at any time by an affidavit of a party or counsel, which, if unopposed, will correct the case list.

2.    As to actions filed subsequent to the Court's order of May 2, 1996, and cases yet unfiled, it is this Court's intention that they be administratively transferred to the Court's inactive docket of cases administratively dismissed without prejudice as established by the order of May 2, 1996, and that they be subject to the same terms for reinstatement set forth therein.    Plaintiffs may continue to seek routine amendments to their complaints while the cases remain in this status.    At the time of reinstatement of any case, answers are to be filed and the action will then proceed according to this Court's orders.

3.    Until further order, all cases subject to this order and the order of May 2, 1996 shall remain subject to the jurisdiction of this Court.

This is not a final order for the purposes of appeal, nor does this action by the Court resolve any case on its merits at this time.

                              BY THE COURT

                              *Charles R. Weiner*
                              ─────────────────────
                              Charles R. Weiner, Judge

Date: __3/17/97__

        ENTERED: ___3/17/97_____

            CLERK OF COURT

                        2

λc: all counsel on camd 575 as of 3/17/97

FILED JAN 07 1992

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:  ASBESTOS PRODUCTS LIABILITY : 
        LITIGATION (NO. VI)          :     CIVIL ACTION
_____ X       NO. MDL 875

THIS DOCUMENT RELATES TO:  ALL ACTIONS:
_____ X

## PRETRIAL ORDER NO. 3

### TABLE OF CONTENTS

.................................................................. 1

1. PROCEDURE ...................................................... 1

    A.  JOINT DEFENSE PRIVILEGE .................................. 2

    B.  SERVICE OF PLEADINGS .................................... 3

    C.  NO WAIVER OF RIGHT OF REPRESENTATION .................... 4

2. ORGANIZATION OF PERIPHERAL DEFENDANTS' COUNSEL ................ 4

    A. DESIGNATION OF REPRESENTATIVES ........................... 5

    B. RIGHT OF PERIPHERAL DEFENDANT COUNSEL TO DISSENT ......... 5

    C. ENTRY OF ORDERS .......................................... 5

3. PROCEDURES FOR DISMISSAL ...................................... 5

    I. LETTER MOTION PROCEDURES ................................. 6

    II. SHORT FORM SUMMARY JUDGMENT PROCEDURES .................. 8

4. SETTLEMENT CONFERENCES ........................................ 10

5. REMAND ........................................................ 11

6. EFFECT ........................................................ 12

EXHIBIT "A" ...................................................... 14

EXHIBIT "B" ...................................................... 16

EXHIBIT "C" ...................................................... 18

EXHIBIT "D" ......................................................

ENTERED: 1/8/92

CLERK OF COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:  ASBESTOS PRODUCTS LIABILITY
         LITIGATION (NO. VI)

THIS DOCUMENT RELATES TO:  ALL ACTIONS:

:    CIVIL ACTION
:    NO. MDL 875

FILED

JAN 07 1992

MICHAEL E. KUNZ, Clerk

By_____Dep. Clerk

## PRETRIAL ORDER NO. 3

IT IS HEREBY ORDERED:

1. **PROCEDURE**

    A. **Joint Defense Privilege**

        The Court recognizes that, in order to maintain the cost-effective administration of these cases, it is necessary that counsel work together to coordinate discovery, pursue settlement discussions, and conduct other activities in these cases. Cooperative or collective efforts by or among the defendants in the administration and handling of these consolidated cases shall not waive the attorney-client privilege, the joint defense privilege, the protection afforded attorney-work product, or any other privilege to which a party, or its counsel, may otherwise be entitled. The designation of any attorney to act as spokesperson for a group of plaintiffs or defendants, such as lead counsel and liaison counsel, shall not preclude other counsel from participating to the extent necessary to represent the individual interests of their clients, as long as such participation does not involve duplication or unnecessary delay. Cooperative or collective efforts among defense counsel relating to this

litigation are encouraged and shall not be discoverable, and shall not be communicated to the trier of fact.

B. Service of Pleadings

Any document filed with the Court must be served on liaison counsel for all other parties. A party serving a pleading, motion, brief, memorandum, discovery requests or discovery response that relates to "All Actions" shall serve that document on liaison counsel prior to the submission to the Court or Clerk. A certificate of service shall accompany each document specifying the name and address of those served, the date of service and the manner of service. It is hereby Ordered by the Court that Conant Scott Rogers of Conant Corporation shall be the designated agent of the Court for the service of all documents filed with the Court relating to "All Actions". Service of such documents that relate to individual actions shall be on all parties in accordance with the Federal Rules of Civil Procedure. Except as stated above, liaison counsel shall not accept service of pleadings on behalf of parties other than their own clients.

C. No Waiver of Right of Representation

1. The defendants shall cooperate in good faith to avoid filing of duplicative motions. No party shall waive any rights by failing to attend a hearing on such motion unless the attendance of the party has been ordered by the Court. The designation of any attorney to act as spokesperson for a group of plaintiffs or defendants shall not preclude other counsel from participating to the extent necessary to represent the individual

-2-

interests of their clients, as long as such participation does not involve duplication or unnecessary delay.

2. To further reduce the amount of unnecessary paperwork that would otherwise be filed with the Court and exchanged among counsel, each defendant (including direct defendants, third-party defendants, and defendants against whom cross claims are asserted) shall be deemed to have joined in and plead any dispositive motion against plaintiff where the granting of the motion would benefit it or all defendants generally. For example, if one defendant moves for summary judgment on the ground that plaintiff's claims are barred by the statute of limitations, it shall not be necessary for co-defendants to file duplicative motions, adopting the reasoning of the initial motion. All co-defendants shall be deemed to have joined in the initial motion unless specifically stated otherwise, and no specific pleading is required.

## 2. ORGANIZATION OF PERIPHERAL DEFENDANTS' COUNSEL

### A. Designation of Representatives

Paragraph 6 at page 9 of Pretrial Order No. 1 entered by this court on September 17, 1991 is amended as follows: the contact person for the peripheral defendants for communication relating to "All Actions" from the Court, Plaintiffs' Lead or Liaison Counsel and Defendants' Liaison Counsel shall be David Craig Landin. Liaison counsel for peripheral defendants shall be David Craig Landin and John J. Repcheck.

-3-

Duties of Peripheral Defendants' Liaison Counsel shall
include:

(1) Maintain and distribute to co-counsel and to
Plaintiff's Liaison Counsel and Defendants' Co-Liaison
Counsel an up-to-date service list;

(2) Receive and, as appropriate, distribute to
peripheral defendants' co-counsel Orders from the Court
and documents from opposing parties and counsel;

(3) When necessary, provide notices to all participating
counsel, either directly or by appropriate means.

(4) In the event that David Landin or his partner, James
H. Price, III of McGuire, Woods, Battle & Boothe is
unavailable, other Peripheral Defendants' liaison
counsel shall serve as contact source for communications
from the Court, Plaintiffs' Lead or Liaison Counsel and
Defendants' Liaison Counsel.

B. Right of Peripheral Defendant Counsel to Dissent

Other counsel for peripheral defendants who disagree
with actions of their liaison counsel or who have individual or
divergent positions, may present written and oral arguments,
conduct examinations at hearings or depositions, and otherwise ac
separately on behalf of their client(s) as appropriate.

C. <u>Entry of Orders</u>

No proposed Order relating to "All Actions" shall be submitted to the Court by any party without fifteen (15) days written notice to Liaison Counsel for plaintiffs, Liaison Counsel for the defendants and Liaison Counsel for the peripheral defendants.

3. <u>PROCEDURES FOR DISMISSAL</u>

The following procedures establish a mechanism for the fair, prompt and cost-effective resolution of requests for dismissals and short-form summary judgment motions by defendants:

I. <u>Letter Motion Procedures.</u>

A. Any time after the expiration of sixty (60) days after a moving party ("Movant") has filed an answer to plaintiff's complaint, the Movant may send a letter motion to plaintiff and all other parties of record with a proposed Order for Dismissal together with a supporting affidavit and other documents, if appropriate, stating that the Movant is entitled to a dismissal o one or more of the following grounds:

1. Movant did not come into existence until after plaintiff's alleged asbestos exposure;

2. Movant never manufactured, distributed, sold otherwise supplied any asbestos-containing product prior to or a1 the time of plaintiff's alleged exposure;

3. Movant never manufactured, distributed, sold otherwise supplied any asbestos-containing product to plaintiff'

-5-

employer or performed any work involving asbestos at plaintiff's place(s) of employment;

    4.  Any time after the expiration of one hundred eighty (180) days after the filing of plaintiff's complaint, movant may seek dismissal pursuant to these letter motion procedures based on the absence of evidence of exposure to Movant's asbestos-containing products; or other appropriate grounds.

    B.  Any opposition by a party ("Respondent") to Movant's request for dismissal shall be in letter form to the Movant delivered within thirty (30) days of receipt of Movant's letter. The letter shall set forth the specific evidentiary basis for opposition together with supporting documents, if appropriate.

    C.  If no opposition is received by the Movant within such thirty (30) day period, the Movant may file with the Court a proposed Order of Dismissal in the form attached hereto as Exhibit "A", which Order shall be entered by the Court.

    D.  If there is opposition from a Respondent, the Movant may proceed under Section II.

II.  <u>Short Form Summary Judgment Procedures</u>.

    A.  Upon the expiration of such thirty (30) day period set forth in Section I.B. above, the Movant and/or any Respondent may commence discovery within a sixty (60) day period solely on those issues raised by the Movant's letter motion and responses i opposition to determine whether proper grounds for a dismissal exist. The discovery limitations set forth herein shall be

applicable solely to the procedures established by this Order and shall not operate as limitations on any other discovery rights or obligations.

B. If the stated basis for opposition to dismissal is a need for further discovery and no discovery has been commenced by a Respondent within such sixty (60) day period, a Movant may submit a proposed Order to the Court in the form attached hereto as Exhibit "B", which Order shall be entered by the Court.

C. If discovery is commenced by Movant or a Respondent within such sixty (60) day period, upon the completion of such discovery a Movant may submit a short form motion for summary judgment to the Court, in the form attached hereto as Exhibit "C", stating that discovery has failed to establish a genuine issue of material fact as to the proposed grounds for dismissal, along with a proposed Order. Such motion shall be deemed a contested Rule 56 Motion unless certified as "uncontested".

D. If the motion is certified as uncontested, the proposed order granting summary judgment shall be entered by the Court.

E. Any Respondent wishing to oppose a short form motion for summary judgment may file within twenty (20) days a short form response not to exceed two (2) pages in the form attached hereto as Exhibit "D", setting forth any facts not included in paragraph 6 and 7 of defendant's short form motion.

F. Movant may file within ten (10) days a reply to said response not to exceed one (1) page.

-7-

G.   The Court may request that the parties submit memoranda of law not to exceed five (5) pages in support of their respective positions.

H.   This short form summary judgment motion procedure also shall be available to any defendant seeking summary judgment under Rule 56 on any other basis that may be asserted appropriately under said Rule.   Nothing in this Order shall affect the right of any party to file a standard motion for summary judgment under Rule 56.

I.   A Movant may group more than one case in a letter motion or Rule 56 Motion under this Order.

J.   The procedures set forth in Sections 3.I. and 3.II. of this Order shall also apply with respect to applications by third-party defendants seeking dismissal of third-party claims.

4.   <u>SETTLEMENT CONFERENCES</u>

A. The Court hereby establishes a procedure for Settlement Conferences in all cases consolidated under Civil Action No. MDL 875.   The Court encourages all counsel to request settlement conferences, consistent with this Order.

1. Until further Order of the Court, for all cases subject to settlement conferences to be held in 1992 and thereafter, plaintiffs and third-party plaintiffs shall specify the basis for liability as to each defendant in the form of a sworn affidavit.   The information contained in the affidavit shall include, at a minimum, the information requested under Subsection 2.c, including all subparts.

-8-

2. No settlement conference shall occur unless the following procedure is followed:

a. Counsel requesting a settlement conference must do so in writing and must identify by court, term, if applicable, and number, and full name of plaintiff and each defendant, each case to be discussed at the conference;

b. A copy of the request for a settlement conference must be served on counsel for each party and a certification of service must accompany the written request;

c. Counsel must certify that he or she has submitted to each party or parties' representative in the case, copies of all medical expert reports in counsel's possession and a verified affidavit of the claimant or, if the claimant is deceased, the executor or administrator of the plaintiff's estate, setting forth (if not previously supplied by way of discovery) the following information:

(1) the name, address, social security number, and date of birth of claimant;

(2) the identity of the specific defendants against whom plaintiff's claim is being made;

(3) a complete employment history including location, employer, type of employment and inclusive dates of each;

(4) a specific, not generic, description of all asbestos-containing products with exposure

dates and specific manner in which plaintiff claims he was exposed, and location of exposure;

(5) the specific name of each asbestos containing product to which exposure is alleged as well as the name of the manufacturer, distributor, and supplier of those products and the name of any company who performed any work involving asbestos at plaintiff's place of employment;

(6) with respect to each product identified, inclusive dates of exposure and each job site at which the exposure occurred;

(7) a listing of all product identification witnesses by name, address and telephone number and a statement as to whether or not each witness has been deposed in any case. If so, the date and location of the depositions and the identity of the court reporter or stenographer.

3.   Plaintiff shall submit the above information to counsel for each defendant at least 20 days prior to a scheduled conference.   Failure to provide such information by this deadline shall relieve defense counsel from participating in the conference.

5.   **REMAND**

Cases which are not settled, following a good faith attempt by all parties, shall be subject to remand.   All requests for a suggestion of remand shall be accompanied by a written Statement

-10-

of Position regarding the remand.  It shall be served upon all remaining parties to the action no less than five (5) days prior to a telephone or personal conference on the matter which shall be scheduled by the party requesting the remand.  The Statement of Position shall set forth the names of all remaining parties, the efforts made to settle the case, the current status of settlement negotiations with each remaining party, and the envisioned impediments to settlement.  Opposing counsel may respond in writing or orally at the conference.  All parties shall be prepared to fully discuss A.D.R. solutions for the action.  The Court shall enter such orders following the conference as may be appropriate.

6.  <u>EFFECT</u>

To the extent that any provisions of this order are inconsistent with those set forth in any pretrial order earlier entered by this Court, the provisions of this Order shall govern.

THE COURT:

_____
CHARLES R. WEINER, J.

DATED: 1/3/92

-11-

EXHIBIT "A"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:   ASBESTOS PRODUCTS LIABILITY :
         LITIGATION (NO. VI)     :
                        x      CIVIL ACTION NO. MDL 875
                      :
THIS DOCUMENT RELATES TO:   :
                      X

## ORDER OF DISMISSAL

AND NOW, this _____ day of _____, 199_, pursuant to MDL 875 Pretrial Order No. 3, Section 3.I.C., upon consideration of the request for dismissal of defendant ABC Insulation Company, Inc. ("ABC"), all counsel of record having been served with its letter motion requesting dismissal by agreement, and there being no opposition to the entry of this Order;

IT IS HEREBY ORDERED that the request for dismissal is granted with prejudice as to the claims of _____ and without prejudice as to all crossclaims against defendant ABC for the following reason(s):

_____ 1. Movant did not come into existence until after plaintiff's alleged asbestos exposure.

_____ 2. Movant never manufactured, distributed, sold or otherwise supplied any asbestos-containing

-12-

product prior to or at the time of plaintiff's alleged exposure.

   \_\_\_\_\_ 3. Movant never manufactured, distributed, sold or otherwise supplied any asbestos-containing product to plaintiff's employer or performed any work involving asbestos at plaintiff's place(s) of employment.

   \_\_\_\_\_ 4. The absence of evidence of exposure to Movant's asbestos-containing products;

   \_\_\_\_\_ 5. Other grounds.

SO ORDERED:

_____
HONORABLE CHARLES R. WEINER, U.S.D.J.

-13-

EXHIBIT "B"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:  ASBESTOS PRODUCTS LIABILITY  :
      LITIGATION (NO. VI)      :
                                x       CIVIL ACTION NO. MDL 875
                                :
THIS DOCUMENT RELATES TO:       :
                                X

### ORDER GRANTING SUMMARY JUDGMENT

AND NOW, this _____ day of _____, 199__, upon consideration of the Motion for Summary Judgment of defendant ABC Insulation Company, Inc. ("ABC"), the Court finds as follows:

1.  ABC served a letter motion demanding dismissal of this matter upon all counsel of record on _____, 199__, and

2.  One or more parties ("opposing parties") opposed the demand of ABC for a dismissal of this matter, and

3.  Said opposing parties failed to commence discovery within sixty (60) days of the date of notice of opposition or otherwise come forward with evidence to substantiate that there is a genuine issue of material fact in this matter.

THEREFORE, pursuant to Section 3.II.B of MDL 875 Pretrial Order No. 3, and for good cause shown:

IT IS on this _____ day of _____, 199__,

-14-

ORDERED that the letter motion of ABC Insulation Company, Inc. for Summary Judgment is GRANTED and summary judgment is hereby entered in favor of ABC Insulation Company, Inc. on all claims asserted by _____. All crossclaims asserted against ABC Insulation Company, Inc. are dismissed without prejudice.

SO ORDERED:

_____
HONORABLE CHARLES R. WEINER, U.S.D.J.

-15-

## EXHIBIT "C"

### Short Form Motion for Summary Judgment

_____ hereby moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and Section 3.II. of the Court's MDL 875 Pretrial Order No. 3 dated _____ (the "Order"), in all cases on the list attached hereto as Exhibit "A". The grounds for the motion are as follows:

1.  Plaintiffs in each case allege exposure to asbestos products manufactured, distributed, sold or installed by defendants [during the period from _____ to _____] [in the course of their employment at _____].

2.  On _____, movant delivered a letter motion pursuant to Section 3.I. A. of the Order, notifying all parties that movant is entitled to dismissal for the following reason(s):

   a. _____

   b. _____

   c. _____

3.  Written opposition was served within the required thirty-day period by the following parties on the following grounds:

4. Discovery was commenced by the following parties within the sixty (60) day period set forth in Section 3.II.C. of the Order:

5. All discovery undertaken by the above party(ies) has been completed, and there are no pending discovery disputes.

6. The facts on which movant relies in support of its motion are as follows:

7. Evidence adduced in discovery relevant to the facts on which movant relies is as follows:

8. Movant contends that the evidence adduced in discovery is insufficient to create a genuine issue of material fact.

WHEREFORE, defendant respectfully requests that the Court grant its motion and enter summary judgment in its favor ar against _____ on all claims. All crossclaims asserted against _____ shall be dismissed without prejudice.

-17-

## EXHIBIT "D"

Short Form Opposition to Motion for Summary Judgment

_____ ("Respondent") hereby opposes

the short form motion for summary judgment of defendant

_____, in all cases on the list attached hereto as

Exhibit "A". The grounds for the opposition are as follows:

1.  The stated grounds for the motion are as follows:

2.  Facts relevant to a disposition of the motion not presented in defendant's motion, or presented in a form that Respondent contends is inaccurate or incomplete are as follows:

3.  Respondent contends that the evidence adduced in discovery is sufficient to create a genuine issue of material fact, and summary judgment should not be granted.

WHEREFORE, Respondent respectfully requests that the Court deny the motion for summary judgment.

-18-

\*\*\*\*\*\*\*\*\*\*\*\*\*\* —COMM. JOURNAL— \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* DATE MAR-12-2002 \*\*\*\*\* TIME 17:30 \*\*\*\*\*\*\*

MODE = MEMORY TRANSMISSION      START=MAR-12 17:26    END=MAR-12 17:30

FILE NO.=661

| STN NO. | COMM. | ONE-TOUCH/ ABBR NO. | STATION NAME/TEL NO. | PAGES | DURATION |
|---------|-------|---------------------|----------------------|-------|----------|
| 001 | OK | ☎ | 435#21082#2#18047888218# | 020/020 | 00:02:55 |

-SEMMES, BOWEN SEMMES    -

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* -    - \*\*\*\* -    410 539 5223- \*\*\*\*\*\*\*\*

# SEMMES, BOWEN & SEMMES

A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

250 WEST PRATT STREET
BALTIMORE, MARYLAND 21201

TELEPHONE 410-539-5040

FAX 410-539-5223

WWW.SEMMES.COM

OFFICES IN
WASHINGTON, D.C.
HAGERSTOWN, MARYLAND
SALISBURY, MARYLAND
McLEAN, VIRGINIA

## FAX COVER SHEET

### PLEASE DELIVER THE FOLLOWING MATERIALS AS SOON AS POSSIBLE TO:

COMPANY:   Hunton & Williams

ATTENTION:   Raymond F. Geoffroy, III     FAX NO.:   **804-788-8218**

DIRECT DIAL NUMBER OF PERSON RECEIVING FAX:   804-788-7313

FROM:   James W. Bartlett, III

NUMBER OF PAGES:   20 (INCLUDING COVER SHEET)

DATE TRANSMITTED:   03/12/02

DIRECT DIAL NUMBER OF PERSON SENDING FAX:   410-576-4833

MESSAGE:

FILE NO.:   21082-2      HARD COPY TO FOLLOW BY MAIL:   NO

The information contained in this facsimile message is attorney-privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to the above address via the U.S. Postal Service.    Thank You.

06-14-02    11:25am    From-Hunton & Williams

FILED SEP 0 1992

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: ASBESTOS PRODUCTS LIABILITY : 
LITIGATION (NO. VI) : 
                                    x    CIVIL ACTION NO. MDL 875
                                         (Including MARDOC, FELA,
                                         and TIREWORKER cases)

This Document Relates to:          : 
    ALL ACTIONS                    : 
                                    x

## ADMINISTRATIVE ORDER NO. 3

It is the intention of the Court that the cases be resolved through negotiation wherever possible. The Court and all parties agree that, as that process proceeds, it is often necessary to give special attention to certain cases. Although all settlements represent steps toward the Court's ultimate goal, special efforts to resolve these cases are not a substitute for broad-based negotiations designed to reduce the docket backlog.

In accordance with **ADMINISTRATIVE ORDER NO. 2** Plaintiffs' counsel has previously submitted information to the Court relating to their malignancy and asbestosis cases. The Court has determined to give a priority to malignancy, death and total disability cases where the substantial contributing cause is an asbestos-related disease or injury. The following procedures are hereby established for review, settlement and/or further action in these cases:

### I    SELECTED CASES

Selected cases are identified by disease category. In each case, plaintiff's counsel must have a written medical opinion by a board certified specialist setting forth that exposure to asbestos or asbestos-containing products is a substantial contributing cause to the condition or death of plaintiff (plaintiff's decedent). The disease categories are:
    A.    Mesothelioma, living and deceased.
    B.    Lung Cancer, living and deceased.
    C.    Other malignancies, living and deceased.
    D.    Asbestosis, total disability deceased or total disability living.

### II    PROCEDURES FOR PLAINTIFFS' COUNSEL

The Court will process all cases previously identified by Plaintiffs' counsel pursuant to **ADMINISTRATIVE ORDER NO. 2** as mesothelioma and lung cancer in accordance herewith **UNLESS** the

Court is advised that such cases do not meet the above criteria. Plaintiffs' counsel must affirmatively identify all other malignancy and asbestosis cases which meet the requirements hereof. In all instances hereunder, the cases shall be identified by plaintiff's name, the transferor jurisdiction, and the individual case number assigned by the transferor district. The Court will advise plaintiffs' counsel (with a copy to defense, plaintiff's and peripheral liaison counsel) when his/her cases are ready for processing. Plaintiffs' counsel shall then take the following steps:

A. Identify to the Court all remaining viable defendants from whom plaintiff expects to recover damages.

B. Provide the necessary fact information for defense counsel to process the cases for settlement. (work history, exposure information, date of birth/death, medical history, smoking history, Social Security Number, and printout or release etc.)

C. Provide defense counsel with X-rays and pathology in plaintiff's possession, together with necessary releases for medical and employment records.

D. Provide a reasonable settlement demand to each remaining defendant.

E. Notify the Court when each of the above requirements is completed.

## III   PROCEDURES FOR DEFENSE COUNSEL

Each defendant shall be prepared to identify the counsel who will be available and able to conduct all settlement negotiations with any particular plaintiffs' counsel. Defense counsel shall take the following steps in these proceedings:

A. Within fifteen (15) days of receipt of notice that plaintiffs' counsel has complied with the requirements set forth in Section II above, notify the Court and Plaintiff's counsel by telephone and in writing as to any discrepancies in such notice, and set forth in detail all necessary additional information.

B. Within forty-five (45) days of receipt of the information from the plaintiff necessary to engage in settlement negotiations and the demand from plaintiffs' counsel, defense counsel shall review the same and accept such terms or make a reasonable offer for settlement.

## IV   SETTLEMENT NEGOTIATIONS

Following the initial procedures, all counsel shall make themselves readily available for personal and telephone settlement conferences. **AT THIS TIME, NEGOTIATION IS TO BE ONGOING AND IN GOOD FAITH.** All counsel are to report no less than once a week by telephone to the Court as to their progress. The Court will be available on a regular basis for participation in a settlement conference, either by telephone or in person. If, after thirty (30) days, any party feels that his/her opponent is not negotiating in good faith, they may request the Court to forward the matter to the Mediation Committee for a recommendation. If a request is made to refer the matter to the Mediation Committee, such request shall be honored by the Court. When the Court determines that further settlement discussions are unlikely to be productive, the Court will hold a termination conference to discover the status of all remaining parties to the action(s) in negotiation and to determine whether the case is to be forwarded to the Mediation Committee. A referral may be of one or a number of cases. If no request for referral is made, and the parties have been unable to resolve their differences, the Court shall determine whether the matter is appropriate for immediate remand.

## V   MEDIATOR

The Court shall appoint a neutral mediator for each case who is familiar with the jurisdiction. Once the Mediator is selected, he/she shall hear all referrals for that jurisdiction subject to resignation or Court reassignment. Upon receipt of a referral from the Court, the Mediator shall take the following action:

A.   Provide notice to each party of the time and place of a mediation hearing , which hearing shall take place no sooner than ten (10) days after such notice, but as soon thereafter as possible.

B.   Each party may provide a short position statement to his/her opponent and to the Mediator no less than five (5) days prior to the hearing.

C.   The Mediator shall set forth his/her own rules for proceeding on the referral and shall advise the participants.

D.   At the hearing the Mediator shall attempt to mediate settlement as to all parties. As to any case in the group that is not so resolved, the Mediator shall determine whether the participants have negotiated in good faith. This determination shall be made on a case by-case-basis.

E.   The Mediator shall make a report to the Court setting forth his/her determination regarding the good or bad faith of all parties to the negotiations. Upon receipt of the report from the Mediator, the Court shall allow those parties who have been negotiating in good faith a reasonable time to complete a settlement. There shall be a presumption that where the plaintiff has acted in good faith and one or more defendants have been found to be acting in bad faith, the case will be immediately remanded for trial as to such defendants. If all parties are acting in good faith the Court will make additional efforts to settle the case. If no settlement is achieved the matter will be remanded. The Court will act promptly in all respects upon receipt of a report from the Mediator.

F.   All information provided to the Mediator by the parties shall be kept in confidence except as set forth to the Court in the Mediator's report.

## VI   GOOD FAITH NEGOTIATIONS

In order for the participants to the settlement negotiations to be in good faith, there must be a reasonable relationship between their demand/offer and the following criteria:

A.   Historical settlement averages between the same defendants with the same plaintiff's counsel in the same jurisdiction in similar cases. Variances from such historical criteria can be justified by the following factors:
   1.   Severity/mildness of disease.
   2.   Lack of exposure to product.
   3.   Personal factors, i.e.; smoking, age, occupation, etc.
   4.   Other persuasive evidence.

B.   Historical averages by disease category for cases that have been previously settled in that jurisdiction with that plaintiff's counsel and with that defendant.

C.   If there is no historical settlement average by disease category between plaintiff's counsel and the defendant in the jurisdiction from which the case arises, then comparable settlement averages for similar cases in that same jurisdiction with that defendant shall be confidentially provided to the Mediator.

Because different viewpoints of the same case are equally understandable, a finding of bad faith is not necessary in all instances where the parties are unable to reconcile their differences and settle.

BY THE COURT:

Date: _____9/8/92_____

_____
CHARLES R. WEINER, J.

ENTERED: _____9/8/92_____

CLERK OF COURT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE:  REINSTATEMENT OF CAUSES | ) |
| ASBESTOS PRODUCTS LIABILITY | ) |
| LITIGATION (NO. VI) | ) CIVIL ACTION NO. 2 MDL 875 |
| | ) |
| _____ | ) |
| | ) |
| THIS DOCUMENT RELATES TO ONE | ) |
| MARITIME ASBESTOS CASE: | ) |
| | ) |
| NORTHERN DISTRICT OF OHIO | ) |
| CASE NO. 1:98CV14094 | ) |
| | ) |
| CHARLES P. RICH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| A Y MCDONALD INDUSTRIES, INC., et al., | ) |
| | ) |
| Defendants. | ) |

## OMNIBUS REPLY TO DEFENDANTS' JOINT MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR REINSTATEMENT AND REMAND OF CHARLES P. RICH CAUSE

NOW COMES Plaintiff, Charles P. Rich, by and through counsel undersigned, and hereby files Plaintiff's Omnibus Reply to Defendants' Joint Memorandum in Opposition to Plaintiff's Motion for Reinstatement and Remand of Charles P. Rich Cause, for the reasons more fully set forth below.[1]

---

[1] Defendants Bryan Steam Corp., Coffin Turbo Pump, Inc., Crosby Valve, Inc., Elliott Turbomachinery Co., Inc., Foster Wheeler, LLC, General Electric Co. and Ingersoll-Rand Corp. filed Joint Memorandum in Opposition to Plaintiff's Motion for Reinstatement and Remand of Charles P. Rich Cause to which Defendant Goulds Pump, Inc. joined.

1



EXHIBIT

C1

As this Court is aware, Plaintiff filed a Motion for Reinstatement and Remand of his above-styled cause as Plaintiff suffers from a terminal asbestos-related malignancy commonly referred to as mesothelioma.  In accordance with this Court's Orders, Plaintiff has substantially pared down the number of Defendants in this cause and indeed has filed an Amended Complaint naming only those Defendants who manufactured and/or supplied products to which Plaintiff was exposed during both his sailing career and his employment at refineries in Montana.  Numerous other manufacturer/ supplier defendants were dismissed from this cause.  Additionally, Plaintiff will dismiss Bryan Steam Corporation, Crosby Valve, Inc. and Ingersoll-Rand Corp., three  Defendants who were among the joint participants in Defendants' Opposition to Plaintiff's Motion for Reinstatement and Remand.

As to the other Defendants who filed opposition papers and/or joinders in opposition, Plaintiff replies most strenuously that these Defendants belong in this action and their oppositions to Plaintiff's Motion for Reinstatement and Remand are without merit.  During Plaintiff's deposition, he testified extensively regarding products manufactured and/or supplied by numerous Defendants, including  all but two of the aforementioned Defendants that are opposing this Motion.  Excerpts from Plaintiff's deposition transcript wherein he testified being exposed to products manufactured and/or supplied by opposing Defendants are attached hereto and incorporated herein as Exhibits A through F.  Also included, where applicable, are pages from American Bureau of Shipping Records showing that a vessel upon which Plaintiff sailed utilized boilers and engines manufactured by some of the opposing Defendants herein.  Plaintiff worked in the engine room where these products were located and testified being exposed to asbestos-containing products utilized in this machinery.

2

Plaintiff has met the conditions this Court requires in reinstating and remanding this cause to the trial court from which it was brought. Plaintiff has brought forth enough probative evidence to ultimately withstand summary judgment, although this is not required at this stage of the proceedings. As is the usual practice in these matters, Plaintiff would welcome a settlement conference before this Court in an attempt to resolve this matter prior to remand.

WHEREFORE, Plaintiff respectfully requests this Honorable Court grant Plaintiff's Motion for Reinstatement and Remand and any other relief the Court deems just in the premises.

Respectfully submitted,

MARITIME ASBESTOSIS LEGAL CLINIC,
A division of THE JAQUES ADMIRALTY
LAW FIRM, P.C.

By: _____
ROBERT E. SWICKLE (40437)
DUANE C. MARSDEN
Attorneys for Plaintiff
645 Griswold, Ste. 1370
Detroit, MI 48226-4116
(313) 961-1080

Dated: November 15, 2004

3

Rich v. A-C Product Liability Trust, et al.    CHARLES P. RICH    January 14, 2004

Case MDL No. 875   Document 4744   Filed 03/01/06   Page 129 of 207

**3**

**Page 1**

```
 1         IN THE UNITED STATES DISTRICT COURT

 2        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3

 4   IN RE: REINSTATEMENT OF      )
     CAUSES ASBESTOS PRODUCTS     )
 5   LIABILITY LITIGATION         )
     (No. VI),                    )   Civil No. 2 MDL 875
 6                                )
     THIS DOCUMENT RELATES TO     )
 7   ONE MARITIME ASBESTOS CASE)  )
                                  )
 8   NORTHERN DISTRICT OF OHIO    )
     CASE NO. 1:98CV14094         )   VIDEO DEPOSITION
 9                                )
     CHARLES P. RICH,             )        OF
10                                )
            Plaintiff,            )   CHARLES P. RICH
11   vs.                          )
                                  )
12   A-C PRODUCT LIABILITY        )
     TRUST, et al.                )
13                                )
            Defendants.           )
14
                            27 North 27th Street
15                          Billings, Montana
                            January 14, 2004
16   APPEARANCES:

17        Duane C. Marsden, Esq.,
          THE JAQUES ADMIRALTY LAW FIRM, P.C.
18        1370 Penobscot Building
          Detroit, Michigan  48226
19
                    For the Plaintiff.
20
          Eric H. Mann
21        GALLAGHER SHARP FULTON & NORMAN
          1501 Euclid Avenue
22        Cleveland, Ohio  44155

23                  For Ingersoll Rand, Goulds
                    Pumps and A-C Product
24                  Liability Trust.

25
```

**Page 4**

```
 1   APPEARANCES (Continued):

 2        James A. Bryne, Esq.,
          LAW OFFICE OF EVAN J. PALIK
 3        918 Terminal Tower
          80 Public Square
 4        Cleveland, Ohio  44113

 5                  For John Crane, Inc.

 6        David E. Wilson, Esq.,
          BURG, SIMPSON, ELDREDGE, HERSH
 7            JARDINE PC
          40 Inverness Drive East
 8        Englewood, Colorado  80112

 9                  For IMO Industries.

10        Christopher S. Marks, Esq.,
          WILLIAMS, KASTNER & GIBBS, PLLC
11        601 Union Street, Suite 4100
          Seattle, Washington  98101-2380
12
                    For Defendant Viacom, Inc.
13
          Alexander W. Saksen, Esq.,
14        KIRKPATRICK & LOCKHART LLP
          535 Smithfield Street
15        Pittsburgh, Pennsylvania  15222

16                  For Sterling Crane Co.

17        Gregory S. Rosse, Esq.,
          COLOMBATTO, KLIMENKO & ROSSE
18        130 Sutter Street, 7th Floor
          San Francisco, California  94104
19
                    For General Cable Corp.
20
          Troy C. Bailey, Esq.,
21        CETRULO & CAPONE LLP
          Two Seaport Lane
22        Boston, Massachusetts  02210

23                  For Sherwin Williams.

24

25
```

**Page 2**

```
 1   APPEARANCES (Continued):

 2        George F. Fitzpatrick, Jr.
          SWANSON, MARTIN & BELL
 3        One IBM Plaza
          Chicago, Illinois  60611
 4
                    For Coffin Turbo Pump and
 5                  Crosby Valve, Inc..

 6        John A. Heller, Esq.,
          SIDLEY AUSTIN BROWN & WOOD, LLP
 7        10 S. Dearborn Street
          Chicago, Illinois  60603
 8
                    For Defendant G.E.
 9
          Kevin O. Kadlec, Esq.,
10        BONEZZI SWITZER MURPHY & POLITO
          526 Superior Avenue, Suite 1400
11        Cleveland, Ohio  44114-1491

12                  For Elliott Turbo
                    Machinery Corp.
13
          Kelly M. Leister
14        SWARTZ CAMPBELL
          1601 Market Street, 34th Floor
15        Philadelphia, Pennsylvania  19103

16                  For Defendant Roper Pump.

17        Raymond F. Geoffroy, III, Esq.,
          HUNTON & WILLIAMS
18        901 East Byrd Street
          Richmond, Virginia  23219
19
                    For Defendant Dover
20                  Resources, Gardner Denver,
                    Viking Pump, Rockbest.
21
          John P. Patterson, Esq.,
22        TUCKER ELLIS & WEST LLP
          925 Euclid Avenue, Suite 1150
23        Cleveland, Ohio  44115

24                  For Defendant Chesterton.

25
```

**Page 4**

```
 1   APPEARANCES (Continued):

 2        Jim Bartlett, Esq., (Via phone)
          SEMMES, BOWEN & SEMMES
 3        250 West Pratt Street, 16th Floor
          Baltimore, Maryland  21201
 4
                    For Foster Wheeler.
 5
          Bryon Horn, Esq., (Via phone)
 6        THOMPSON HINE, LLP
          3900 Key Center
 7        127 Public Square
          Cleveland, Ohio  44114
 8
                    For Various Ship Owners.
 9
          Joseph C. Blasko, Esq., (Via phone)
10        VORYS SATER SEYMOUR & PEASE
          52 East Gay Street
11        Columbus, Ohio  43216

12                  For Defendant Goodrich.

13        Jennifer Budner, Esq., (Via phone)
          SEGAL, McCAMBRIDGE, SINGER &
14            MAHONEY, PC
          805 Third Avenue, 19th Floor
15        New York, New York  10022

16                  For Defendants Garlock,
                    Anchor, Coltec.
17
     Also present: Pohney Rich
18                  Joel Hageman,
                    Videographer
19

20

21

22

23

24

25
```

EXHIBIT

_A_

5

```
1              The video deposition of CHARLES P.
2      RICH, produced, sworn and examined upon his oath
3      on the 14th day of January, 2004, commencing at
4      9:18 a.m., at 27 North 27th Street, Billings,
5      Montana, before me, Frances L. Kunz, a
6      free-lance shorthand reporter, a Notary Public
7      within and for the State of Montana, pursuant to
8      Notice and the Federal Rules of Civil Procedure,
9      for the examination of the said CHARLES P. RICH,
10     plaintiff, called for examination by the
11     plaintiff herein, in a certain suit and matter
12     in controversy now pending and undetermined in
13     the said U.S. District Court, being Civil Action
14     No. 2 MDL 875.
15
16
17
18
19
20
21
22     "mm-hmm" is yes
23     "huh-uh" is no
24
25
```

7

```
1                  E X H I B I T S
2      Number   Description                      Page
3        1   Vessel Service History
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

6

```
1                  I N D E X
2                                           Page
3      Examination by Mr. Marsden            10
4      Examination by Mr. Fitzpatrick        90
5      Examination by Mr. Mann               115
6      Examination by Mr. Kadlec             148
7      Examination by Mr. Wilson             152
8      Examination by Ms. Leister            163
9      Examination by Mr. Goeffroy           174
10     Examination by Mr. Marks              206
11     Examination by Mr. Mr. Patterson      211
12     Examination by Mr. Mr. Saksen         223
13     Examination by Ms. Budner             260
14     Examination by Mr. Bryne              290
15     Further Examination by Ms. Budner     297
16     Further Examination by Mr. Mann       298
17     Further Examination by Mr. Saksen     299
18
19
20
21
22
23
24
25
```

8

```
1              MR. HAGEMAN:  Here begins Videotape
2      No. 1 of Volume No. 1 in the deposition of
3      Charles P. Rich, in the matter of Charles P.
4      Rich, plaintiff, versus A-C Product Liability
5      Trust, et al., defendants, in the Northern
6      District of Ohio, Case No. 1:98CV14094.
7              The date today is January 14th, 2004.
8      The time on the video monitor is 9:18 a.m.
9              My name is Joel Hageman.  I'm a notary
10     public and the videotape operator today.  My
11     address is 3719 Corbin Drive, Billings, Montana
12     59102.
13             The court reporter today is Fran Kunz.
14             Counsel, please voice identify
15     yourselves and state whom you represent.
16             MR. MARSDEN:  Duane Marsden for
17     plaintiff.
18             MR. FITZPATRICK:  George Fitzpatrick
19     for Coffin Turbo Pump, Inc. and Crosby Valve,
20     Inc.
21             MR. WILSON:  David Wilson, IMO.
22             MS. LEISTER:  Kelly Leister, Roper Pump
23     Company.
24             MR. KADLEC:  Kevin Kadlec, representing
25     Elliott,
```

Rich v. A-C Product Liability Trust, et al.     CHARLES P. RICH     January 14, 2004

Case MDL No. 875   Document 4744   Filed 03/01/06   Page 131 of 207

53

1    Q.   Okay.
2         Did you have occasion to remove that
3    insulation to work on these things or not?
4    A.   Occasionally, yes.
5    Q.   Okay.
6         Do you recall the manufacturers of the
7    generators themselves?
8    A.   Well, there was GE, and there was
9    Westinghouse, and there was Elliott,
10   Allis-Chalmers.
11   Q.   Elliott, is that the full name of it?
12   A.   Yeah, Elliott.
13   Q.   Okay.
14   A.   And Allis-Chalmers.
15        And did I say GE and Westinghouse?
16   Q.   Right.
17   A.   I don't think -- if I remember, I don't
18   think Delaval made a generator, but I can't
19   really recall that.
20   Q.   Do you remember what Delaval made, if
21   anything?
22   A.   Yeah, I can remember they made
23   turbines, steam turbines, and they made
24   centrifuge, like lube oil purifiers, things like
25   that.

54

1    Q.   Okay.
2    A.   Maybe compressors too.
3    Q.   All right.
4    A.   Worthington made compressors also.
5    Q.   And now, as far as the generators that
6    you mentioned, did you work on all those?
7    A.   Yes.
8    Q.   Okay.
9    A.   Whenever the need arose, and they
10   needed repair or maintenance, yeah, I worked on
11   them.
12   Q.   All right.  Okay.
13        And other than Delaval, do you recall
14   who manufactured the turbines?
15   A.   Well, there was also Elliott made
16   turbines.  Westinghouse made turbines.  GE made
17   turbines.
18        Did I mention, I said Delaval, didn't
19   I?
20   Q.   Yes.
21   A.   I'm sure there were others.
22        Worthington, I think Worthington made a
23   turbine.
24   Q.   Okay.
25        Now, you testified earlier that you

55

1    worked in the engine room throughout your
2    Merchant seaman career, right?
3    A.   That's right.
4    Q.   And is the -- can you explain, you've
5    explained a great deal about the engine room to
6    us, but can you explain what the conditions were
7    in the engine room in most instances?
8    A.   Mm, dependent on where you were at,
9    where you were sailing.  The South Pacific, it
10   was hot, like if you were traveling around the
11   Equator.
12        The last couple of ships I was on, I
13   was on a Persian Gulf run, and it was double hot
14   there.  A lot of times your engine room
15   temperature would be over 120.
16   Q.   Okay.
17   A.   You could pretty near count on it being
18   hot except, oh, like in the North Atlantic, it
19   wouldn't be bad, because, you know, the weather
20   outside was cool.  But if the weather outside
21   was hot, your engine room would be double hot.
22   Q.   And when you were performing these
23   various maintenance operations, what were the
24   conditions like?
25   A.   Well, you carried the sweat rag with

56

1    you all the time.
2    Q.   And when you were working with the
3    insulation material, what was the conditions
4    like?
5    A.   Well, it would be the same, hot and
6    dusty usually.
7    Q.   Okay.
8         And that -- was that aboard each of
9    these vessels or just one or --
10   A.   Well, no, it was aboard, you know,
11   different ones, dependent on where you were
12   sailing at, what part of the world you were in.
13   Q.   Oh, in terms of heat?
14   A.   In terms of heat, yeah.
15   Q.   Right.
16        But I mean in terms of the maintenance
17   duties and the conditions that would be -- that
18   would arise, was that throughout your maritime
19   career?
20   A.   Well, I would say so, yes.
21   Q.   Okay.
22        Sir, I'd like to now -- and if you want
23   to take a break, we can take a break -- but
24   after you got done sailing, where did you work
25   after that?

137

```
 1        A.  Well, we never had many that would
 2  for very many years, but we did have some that
 3  would go for several months.
 4        Q.  All right.
 5            Were any of the Goulds pumps in that
 6  category?
 7        A.  I can't tell you.
 8        Q.  You can't say?
 9        A.  I can't remember.
10        Q.  Fair enough.
11            The Roper pump is a different brand of
12  pump.  That's not a Goulds pump, am I correct?
13        A.  No.
14        Q.  All right.
15            You mentioned a gear pump.  Was the
16  Roper pump a gear pump?
17        A.  The Roper was a gear pump.
18        Q.  Because gear pump and centrifugal pump
19  are different things?
20        A.  Yes, sure.
21        Q.  I'm following you so far.
22            You mentioned a series of brand names
23  of generators -- and I'm jumping back to your
24  shipboard experience now.  Another company I'm
25  representing today is Allis-Chalmers.
```

139

```
 1  question, whether I was asking about the main
 2  propulsion generator, so I need to ask you, on
 3  this Wheeler Hills, was Allis-Chalmers the brand
 4  of the main propulsion generator, or was the
 5  generator of some other function, the
 6  Allis-Chalmers generator?
 7        A.  Oh, I can't tell you for sure.  I can't
 8  recall for sure.
 9            But the -- yeah, the generator and the
10  turbine were two different -- were two different
11  makes.
12        Q.  Okay.
13        A.  I said they was Allis-Chalmers, both
14  Allis-Chalmers, but there was an
15  Allis-Chalmers/Elliott that they used to team up
16  together.  I can't remember whether the turbine
17  was Elliott or whether the generator was
18  Elliott.
19            But on those T-2s quite a lot, I was on
20  a lot of different ones that I didn't sail on,
21  and I know they'd team up an Allis-Chalmers and
22  an Elliott together.  Which one was the
23  generator and which one was the turbine, I can't
24  remember.
25        Q.  Okay.
```

138

```
 1        A.  Yeah.
 2        Q.  You mentioned Allis-Chalmers as a brand
 3  name of generators?
 4        A.  Right.
 5        Q.  Did I get that right?
 6        A.  You got it right.
 7        Q.  Do you recall which of your ships that
 8  you rode on had an Allis-Chalmers generator
 9  aboard?
10        A.  Yeah, you mean for the main
11  propulsion?
12        Q.  Any Allis-Chalmers generator.
13        A.  Well, I can remember on the T-2 tankers
14  I was on.  I think -- I know that the Wheeler
15  Hills had it on, had an Allis-Chalmers
16  generator, main generator and turbine too.
17        Q.  And the turbine -- both on the -- both
18  on the Wheeler Hills?
19        A.  Yeah.
20        Q.  Okay.
21            Do you remember any other ships where
22  the turbine or generator were Allis-Chalmers?
23        A.  I can't remember for sure whether the
24  Hobkirks Hill did or not.
25        Q.  Was the -- now, you asked me about my
```

140

```
 1            And so you do recall the Allis-Chalmers
 2  name on the Wheeler Hills?
 3        A.  Right.
 4        Q.  But again you're not sure whether it
 5  was the generator or the turbine?
 6        A.  I can't remember for sure.
 7        Q.  And I --
 8        A.  I know that it was -- I know it was on
 9  there, but I can't remember for sure which it
10  was.
11        Q.  When the -- in that kind of ship when
12  the turbine is driving the generator, does that
13  mean that generator is the main propulsion
14  generator?
15        A.  Right.  Right.
16        Q.  And so in that situation, the generator
17  is powering the electrical motor that drives the
18  propellers that drive the ship?
19        A.  That's right.
20        Q.  Okay.  I just wanted to be sure I
21  understood all of that.
22            Did you say -- when you referred to
23  other ships you've seen it on you've seen that
24  kind of setup on where you have the Elliott and
25  the Allis-Chalmers teamed up, and you're not
```

Rich v. A-C Product Liability Trust, et al.    CHARLES P. RICH    January 14, 2004

Case MDL No. 875   Document 4744   Filed 03/01/06   Page 133 of 207

143

1   sure which one was the turbine and which one was
2   the generator, are we talking about other ships
3   that you helped build in the shipyards or
4   something else?

5       A.  Oh, ones that I would go on and, you
6   know, visit, things like that.

7       Q.  Okay.  All right.

8           Because --

9       A.  Meet them in some other port and maybe
10  go over there and visit.

11      Q.  Okay.

12          So you aren't talking about generators
13  or turbines that you worked on, but that you saw
14  in other ships just because you were visiting?

15          MR. MARSDEN:  Objection.

16  BY MR. MANN:

17      Q.  Did I get that -- did I get that right?

18      A.  Well, no, that's not necessarily right.

19      Q.  Okay.

20      A.  Because on those, I was on two of those
21  turboelectric tankers.

22      Q.  Okay.

23      A.  And that I sailed on.

24      Q.  Okay.

25      A.  And then I was aboard several others,

142

1   and I can remember the Allis-Chalmers/Elliott
2   pair, the configuration of them were all the
3   same.  They were direct drive.

4       Q.  Okay.

5       A.  The turbine and the generator were
6   direct drive.

7       Q.  Did you ever have occasion on the
8   turbine on those turboelectric setups, was the
9   other turboelectric setup, was that the Hobson
10  Hills?

11      A.  Hobkirks.

12      Q.  Hobkirks Hill?

13      A.  Yeah.

14      Q.  Was that the other turboelectric setup
15  that you sailed on?

16      A.  Yeah.

17      Q.  Did you ever do -- were you an
18  electrician on either of those voyages?

19      A.  I was on the -- I was chief electrician
20  on the Hobkirks Hill.

21      Q.  Okay.

22          And on the Wheeler Hills, what was your
23  rating?

24      A.  Oiler.

25      Q.  As an electrician on the Hobkirk Hills,

1   did you do any repair or maintenance or
2   disassembly of the turbine?

3       A.  Not the main -- not the main propulsion
4   turbine, no.

5       Q.  Okay.

6           And that's the one that might have been
7   Allis-Chalmers?

8       A.  Yes.

9       Q.  Or if it wasn't, it was the generator?

10      A.  Yes.

11      Q.  Okay.

12          On the Wheeler Hills, did you ever have
13  occasion to disassemble, take the covering off
14  or otherwise do maintenance on that turbine?

15      A.  No.

16      Q.  It sounds to me like from your
17  testimony, that these turboelectric setups were
18  the only -- the only time from your sailing
19  career that you recall the Allis-Chalmers brand
20  name.  Am I getting that right?

21      A.  Well, that's all I can recall.  I
22  remember that pretty plain because they were the
23  latest thing out at the time, turboelectric
24  drive ship.  If you had a job on one of those,
25  you were just kind of a step up.

144

1       Q.  So at that time, it was a very modern
2   ship?

3       A.  Oh, yeah.  They were the latest
4   propulsion out.

5       Q.  Okay.

6       A.  Other than diesel electric, I mean they
7   were the main steam propulsion.  Steam
8   propulsion.

9       Q.  The turbine on the turboelectrics,
10  again with the understanding that you're not
11  sure which brand name goes with the turbine --

12      A.  Right.

13      Q.  -- what did the turbines have to do
14  with asbestos products, if anything?

15      A.  Well, they would be insulated.

16      Q.  Were they insulated by the crews -- if
17  you know this, were they insulated by the crews
18  building the ship, or did they arrive from the
19  manufacturer with insulation on them, or do you
20  know?

21      A.  They were insulated -- I can't say
22  that.  But they came out of the shipyard
23  insulated.

24      Q.  Meaning when the vessel was launched?

25      A.  No -- no, not when it was launched.

Rich v. A-C Product Liability Trust, et al.    CHARLES F. RICH    January 14, 200

Case MDL No. 875   Document 4744   Filed 03/01/06   Page 134 of 207

145

147

1  After it was outfitted.

2      Q.  Okay, next I -- well, what's the

3  difference?

4      A.  Well, launching is long ways from being

5  outfitted.

6      Q.  Oh, okay.  The ship's not done being

7  built when it's launched?

8      A.  No.

9      Q.  Okay, I understand.

10      But by the time it's outfitted, the

11  turbine -- by the time it's ready for a voyage,

12  the turbine is insulated?

13      A.  Right.

14      Q.  You just don't when that happened?

15      A.  Well, it happened in the shipyards.

16      Q.  Happened in the shipyard, okay.

17      So as far as you know, the turbine

18  didn't arrive from the manufacturer with

19  insulation on it?

20      A.  I don't know that.

21      Q.  You don't know who manufactured the

22  insulation that was applied to the turbine?

23      A.  No, I don't.

24      Q.  Do you know the -- can you describe the

25  nature of the insulation that is -- that goes on

1  procedures or construction or --

2      A.  I said myself shut down -- I didn't

3  actually shut it down myself, because we had a

4  crew of people working there.

5      Q.  Okay.

6      A.  But I supervised the shutdown of it, is

7  what I intended to say.

8      Q.  Did that involve demolition?

9      A.  No, no.  It just involved shutting down

10  the plant.

11      Q.  Okay.

12      A.  And then after it was shut down, we

13  sold off the products, and after that, it was

14  demolished.

15      Q.  The equipment, the pumps, for example,

16  things like that were all sold off?

17      A.  Yeah.

18      Q.  One thing, when you referred to stills,

19  that's a shorthand way of saying something like

20  distillation unit or something like that?

21      A.  Right.  Right.

22      MR. MANN:  Okay, I believe those are

23  all the questions I have.  Thanks for your

24  patience, sir.

25      //

146

148

1  the turbine before it's applied, and what does

2  it look like -- what's the nature of it?

3      A.  Well, as far as I remember, all that I

4  ever saw came in a powdered form that you mixed

5  up like a mortar and was applied.  Pretty smooth

6  job.

7      Q.  You don't know the manufacturer of

8  that?

9      A.  No.

10      Q.  Okay.

11      And you did not participate in that on

12  the T-2s?

13      A.  No.

14      Q.  Good back to the refinery, can you give

15  me some idea of the latest time in your career

16  when you, yourself, worked on, either yourself

17  or with assistance, on a Goulds pump?

18      A.  No, I can't tell you that.

19      Q.  Would you have been doing that up until

20  the last year of your employment there?

21      A.  Oh, I'm sure I would have, yeah.

22      Q.  When you said earlier that you,

23  yourself, shut down the plant, what were you

24  referring to?  You're not just talking about

25  locking the gate.  Did you have to do certain

1      EXAMINATION

2  BY MR. KADLEC:

3      Q.  I'll just -- I'll be very brief.  I

4  just wanted to follow up on what he was talking

5  about because I have a very similar situation

6  with my client, Elliott.

7      A.  Oh.

8      Q.  Sir, it's my understanding that --

9      THE REPORTER:  State your name --

10      MR. KADLEC:  I'm sorry, Kevin Kadlec.

11      MR. BARTLETT:  Kevin, would you speak

12  up, please?

13      MR. KADLEC:  Sure?

14  BY MR. KADLEC:

15      Q.  It's my understanding that the turbine

16  that we were talking about, the

17  Elliott/Allis-Chalmers turbine/generator

18  combination, that they came to the shipyard, and

19  they were not insulated.

20      Did you ever -- do you recall that?

21      MR. MARSDEN:  Objection.  That wasn't

22  his testimony.

23      THE WITNESS:  I don't recall ever

24  seeing one

25  BY MR. KADLEC:

151

1      Q.  I'm not asking.  I'm telling you
2  that --
3          MR. MARSDEN:  Well, no, you're
4  characterizing his testimony, and you
5  mischaracterized his testimony.
6          MR. KADLEC:  I'm not talking about his
7  testimony.  It's my understanding, I said.
8  BY MR. KADLEC:
9      Q.  That they come to the shipyard with no
10 insulation on them.  And can you tell me one way
11 or the other whether that's --
12     A.  I can't tell you if that's true or not,
13 because I never saw them as they came into the
14 shipyard.
15     Q.  And it's also my understanding that the
16 turbine is insulated with a blanket.  Is that
17 true?  Do you remember seeing that?
18     A.  Well, it might be.  It might be.
19         But, you know, it was pretty smooth,
20 whatever it was.
21     Q.  And that blanket is underneath a layer
22 of sheet metal that covers it; isn't that right?
23     A.  That could be.
24     Q.  And so when the generator -- or, I'm
25 sorry, when the turbine is operating, and the

150

1  sheet metal is on there, insulation is basically
2  encapsulated under that sheet metal; is that
3  right?
4      A.  That could be.  That could be.
5      Q.  Okay.
6      A.  I can't -- I can't tell you for sure
7  because that's --
8      Q.  You can't tell me for sure on the
9  Elliott Allis-Chalmers main drive that you are
10 familiar with whether that insulation that's
11 under that sheet metal actually contained
12 asbestos or not; is that right?
13     A.  Well, I was told that it did.
14     Q.  But you don't have any personal
15 knowledge of that fact?
16     A.  No, I didn't never dig into it to see
17 whether it was or not.  I didn't do that.  That
18 was kind of general knowledge that it was.
19     Q.  But there was also wool blankets were
20 used on the turbines as well, do you remember
21 that?
22     A.  No, I don't remember any wool
23 blankets.
24     Q.  When you sailed on a ship on its maiden
25 voyage, were they pretty much repair free?

152

1      A.  No, on the other hand.  Pretty much not
2  repair free because that's when you had to get
3  all the bugs out of it.  Anything that wasn't
4  working right, why, would usually show up on the
5  first voyage.
6      Q.  And how about after that first voyage
7  when you did the shakedown cruise; is that the
8  term for it?
9      A.  Yeah.
10     Q.  You take care of those initial problems
11 that occur --
12     A.  You try to do next --
13     Q.  -- is usually the next voyage, then,
14 pretty much an easy voyage as far as repairs go?
15     A.  Well, it should have been, but it
16 didn't always work that way.  But that was kind
17 of the general opinion, that that's the way it
18 should be.
19         Kind of depended on your captain and
20 your chief engineer, how they got things done
21 that needed to be done.
22         MR. KADLEC:  All right.  That's all I
23 have.  Thanks.
24 //
25 //

1                    EXAMINATION
2  BY MR. WILSON:
3      Q.  Good morning -- or good afternoon,
4  Mr. Rich.
5      A.  How do you do.
6      Q.  My name is David Wilson, and I
7  represent IMO Industries.  I just want to go
8  back a little bit to right before we took one of
9  the first breaks.
10         You had volunteered that you thought
11 Delaval made generators.  Do you have any
12 recollection of working with a Delaval
13 generator?
14     A.  I don't remember saying that Delaval
15 generator, no.  I remember saying centrifuges,
16 oil purifiers and centrifuges and turbines.  I
17 don't remember saying anything about generators.
18     Q.  I apologize if I misspoke there.
19         Did you say -- what did you say, oil --
20     A.  Oil centrifuge.
21     Q.  Oil centrifuge.
22         Is that what you meant when you said
23 centrifuge lubricator?
24     A.  Yeah, for lubricating oil, yeah.
25     Q.  Okay.

Rich v. A-C Product Liability Trust, et al.      CHARLES P. RICH      January 14, 2004

Case MDL No. 875   Document 4744   Filed 03/01/06   Page 136 of 207

207

```
 1    inch-and-a-half.  One of them might have been
 2    two.
 3            And the Gardner Denver is very like the
 4    size that I've already told you.
 5        Q.  I understand that.
 6            And I understand that you had some
 7    other pumps out at the Jet Fuel Refinery with
 8    larger diameter on the outlet?
 9        A.  Oh, yes.
10        Q.  What I'm saying is, these pumps that we
11    just talked about, Gardner Denver, Blackmer and
12    Viking, the outlets on those pumps, were they on
13    the lower range, the lower size of the pumps
14    that you had out there at the refinery, or were
15    they in the middle?
16        A.  Average.
17        Q.  Average?
18        A.  Average.
19        Q.  And was it the only time that -- the
20    only time that you repacked Gardner Denver pumps
21    would be when you were out at the refinery?
22        A.  That's the only time that I can recall,
23    yes.
24        Q.  That's the only time?
25        A.  Now, I don't recall any of that
```

206

```
 1    particular style pump on ships that I sailed on,
 2    but there might have been, but they weren't the
 3    same style as the pumps we had at the refinery.
 4        Q.  You say there might have been.  You
 5    don't have a specific recollection of seeing a
 6    Gardner Denver pump?
 7        A.  No, I do not.
 8        Q.  Likewise, you wouldn't have a specific
 9    recollection of working on a Gardner Denver pump
10    on a marine vessel?
11        A.  I can't say that I would, no.
12            MR. GEOFFROY:  All right.  Sir, I thank
13    you for your time.  I'm going to look over my
14    notes, and there may be a couple of questions
15    I'll have later.
16            MR. MARSDEN:  I think you've got it
17    covered.
18            MR. GEOFFROY:  I appreciate it.
19                    EXAMINATION
20    BY MR. MARKS:
21        Q.  Mr. Rich, good afternoon.
22        A.  How are you?
23        Q.  I'm well.  And you?
24        A.  Good.
25        Q.  Okay, I think we're nearing the home
```

208

```
 1    stretch.
 2        A.  I hope so.
 3        Q.  My name is Christopher Marks.
 4        A.  How do you do.
 5        Q.  I want to go back to the ships, dig
 6    even deeper back.
 7            MR. BARTLETT:  Mr. Marks, can you speak
 8    up a bit, please?
 9            MR. MARKS:  Absolutely.
10    BY MR. MARKS:
11        Q.  Mr. Rich, I want to ask you about the
12    ship work.  We have been talking about the oil
13    rigs, the oil refinery before a bit.
14            Good back to your testimony with your
15    attorney, do you associate a particular turbine
16    manufacturer with any of the ships that you
17    worked on?
18        A.  Turbine manufacturer?
19        Q.  Yeah, a particular turbine manufacturer
20    with a particular ship?
21        A.  No.  No, I don't.
22            Are you talking about like main
23    propulsion turbines?
24        Q.  All turbines, main propulsion or
25    turbine generators.
```

```
 1        A.  No.  Well, I remember GE, and then I
 2    remember Westinghouse, but I can't tell you --
 3    and then I remember the Elliott Allis-Chalmers
 4    like I testified before, but I couldn't
 5    remember --
 6        Q.  Right.
 7        A.  -- what make was the turbine or what
 8    make was the generator.
 9            I remember GE and Westinghouse, but I
10    couldn't tell you which make was on which ship
11    it was on.
12        Q.  I had the list from before, but I
13    wanted to ask if you could identify a make with
14    a particular ship?
15        A.  I don't believe I can.  Other than
16    those tankers that I mentioned that had the
17    Elliott Allis-Chalmers?
18        Q.  The combo?
19        A.  The combo, yeah.
20        Q.  All right.
21            Do you recall specifically with respect
22    to any of those ships working on a turbine on
23    that ship?
24        A.  No.  Not other than the auxiliary
25    turbines, like I testified on feed pumps and
```

## THE RECORD, 1946.
### VESSELS OF THE UNITED STATES AND CANADIAN LAKES VESSELS

| No. Off. No. | Sig. Ltrs. | Name of Vessel | Former Name | Owner | Port or Regiment | Type | No. of Bulkheads Watertight Decks & Tonnage | Construction | Fuel and Capacity | Dimensions | Builders | Type and Machinery |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | WEYMOUTH. | | | | | | | | | | |
| 14272 | | R. O'Brien & Co., Inc. Boston, Mass. United States | | | Boston, Mass. | Sgl Sc MV Trawler | | Steel: 1 Dk | Oil Rad | 102.5′ 22.1′ 10.6′ | | |
| 14273 | | WHARF BARGE | | City of Greenville Greenville, Miss. United States | Greenville, Miss. | | Double Deck Covered Wharf Barge | Steel: 1 Dk Trans Frmg Wharf Barge 2 WT Long BH | | | | |
| 14274 | | WHARTON. | | War Shipping Administration (Operator) United States of America (Navy Dept.) United States | Los Angeles, Cal. | Tw Sc Pass Transport | | Steel: 3 Dks & Supr'g Dk Long Frmg 1 WT to 2nd Dk 1 WT to 3rd Dk | Oil Rad Tel Rad D/F Fath/GC | 518′ 73′ 518.6′ 72.2′ B18′ | | |
| 14275 | ANSB | WHEATON VICTORY. | | War Shipping Administration (Operator) United States Los Angeles, Cal. | | Sgl Sc MV | AP Sq Sgl Sc D's 132′ 1664 FP 806′ 6″ | Steel: 3 Dks Metal Arc Welded Long Frmg Red Dk 1 WT to 3rd Dk HSC, 11′3″ 15′ C-43(8) | Oil 2882 tons Rad Tel Rad D/F Fath/GC C-38(8) | 488′ 6″ 62′ 439.1′ 62.1′ | | |
| 14276 | | WHEELER HILLS | | War Shipping Administration (Operator) United States San Francisco, Cal. | | Sgl Sc Tanker Mchy Aft | 34 D's 132′ 1664 1061 | Steel: 3 Dks Metal Arc Welded Long Frmg 2 QT Long BH 8 WT to 2nd Dk 1 CT Long BH | Oil 1460 tons Rad Tel Rad D/F Fath/GC | 503′ 68′ 504′ 68.3′ | | |
| 14277 | WGXV | WHEELOCK WHITNEY | | W.A. Shepard Central Barge Co. Chicago, Ill. United States | | Tw Sc MV Towboat | | Steel: 1 Dk | Oil Rad | 114.2′ 26.3′ 6.2′ | | |
| 14278 | KUWM | WHIPPET | | War Shipping Administration (Operator) American Tankers, Inc. Washington, D.C. United States New Orleans, La. | Wilmington, Del. | Sgl Sc Tanker | | Steel: 2 Dks Metal Arc Welded Trans Frmg Red Dk 6 WT to Upper Dk 7 WT to 2nd Dk 6 CT to 2nd Dk 1 CT Long BH 39′7″4″ Forward Tanks fitted for carriage of Liquids having a Flash Point below 16.0°F. | Oil 2087 tons Rad Tel Rad D/F Fath/GC | 417′8¼″ 57′ 422.8′ 57.7′ | | |
| 14279 | NIIQ | WHIPPOORWILL | | United States of America (Navy Dept.) Washington, D.C. FP United States | | Sgl Sc Mine Sweeper | D's 47′ 94 133 170 11 Ho | Steel: 2 Dks Trans Frmg Metal Arc Welded 8 WT to Upper Dk 8 WT to 2nd Dk | Oil 266 tons | 180′ 33′4¼″ | | |
| 14280 | | WHIRLWIND. | | Seaboard Sand & Gravel Corp. New York, N.Y. United States | | Barge Dredge | | Wood | | 148′ 38.1′ 0.8′ | | |

Rich v. Rich Corporation et al.    CHARLES RICH    January 14, 2004

Case Modular No. 1:04 5 75 Transcript 4744 Filed 03/01/06 Page 138 of 207

9

1     MR. BYRNE:  James Byrne, representing
2  one of the defendants.
3     MR. SAKSEN:  Alexander Saksen,
4  representing several defendants.
5     MR. BAILEY:  Troy Bailey, representing
6  Sherwin Williams.
7     MR. ROSSE:  Greg Rosse, representing
8  General Cable Corporation.
9     MR. MARKS:  Christopher Marks,
10  Williams, Kastner & Gibbs, Seattle, for
11  defendant Viacom.
12     MR. PATTERSON:  John Patterson,
13  representing several defendants.
14     MR. MANN:  Eric Mann, Gallagher, Sharp,
15  Fulton & Norman in Cleveland, Ohio, representing
16  a number of defendants.
17     MR. HELLER:  John Heller, on behalf of
18  certain defendants.
19     MR. GEOFFROY:  Ray Geoffroy, several
20  defendants.
21     MR. BARTLETT:  This is Jim Bartlett,
22  representing Foster Wheeler.
23     And by the way, some of you were very
24  hard to hear when you were identifying
25  yourselves, so if you should speak up to object

10

1  or whatever before you move forward to ask
2  questions, if you would keep your voice up, we
3  on the phone would certainly appreciate it.
4     MS. BUDNER:  Jennifer Budner, Segal,
5  McCambridge, Singer & Mahoney for Garlock,
6  Anchor and Coltec.
7     MR. HORN:  Byron Horn, Thompson Hine,
8  LLP, representing various ship owners.
9     MR. BLASKO:  Joseph Blasko from Vorys,
10  Sater, Seymour & Pease, representing Goodrich.
11     CHARLES P. RICH,
12  having been first duly sworn to state the truth,
13  the whole truth, and nothing but the truth,
14  testified upon his oath as follows:
15     BY MR. MANN:  Duane, this is Eric
16  Mann.
17     Before we start, could we have a
18  stipulation that an objection made on behalf of
19  one defendant will stand on behalf of all
20  defendants?
21     MR. MARSDEN:  Yeah, that's fine.
22     MR. MANN:  Thank you.
23     EXAMINATION
24  BY MR. MARSDEN:
25     Q.  Good morning, Mr. Rich.

11

1     A.  Good morning.
2     Q.  Are you comfortable?
3     A.  Well, I'm here.
4     Q.  Okay.  We'll try to get you through
5  this.  I'm good to ask you a series of
6  questions.
7     MR. MARSDEN:  Before I do that, I just
8  want to state for the record that this
9  deposition is being taken pursuant to notice,
10  amended notice, and rules of the court and is
11  being -- is in accordance with the Federal Rules
12  of Civil Procedure
13  BY MR. MARSDEN:
14     Q.  Can you please state your name for the
15  -- to the jury?
16     A.  My name is Charles Rich.
17     Q.  Okay.
18     And where do you reside, sir?
19     A.  I reside at Sand Springs, Montana.
20  It's in the Missouri Breaks country of north
21  central Montana.
22     Q.  Okay.
23     And how long have you lived there?
24     A.  Well, actually all my life.  I was
25  raised there with the exception of different

12

1  periods in my life when I was away working.
2     Q.  Okay.
3     Do you own some property there?
4     A.  Not very much.  We did have some, but
5  we don't anymore.
6     Q.  Okay.
7     And at the peak of your -- well, let me
8  rephrase that.
9     How much property did you own at one
10  time?
11     A.  Well, we had a small ranch.  It was
12  probably about 12 sections total.
13     Q.  Okay.
14     And a section is a square mile --
15     A.  Yes.
16     Q.  -- is that correct?
17     A.  Yes.
18     Q.  Now, did you raise livestock on that
19  ranch?
20     A.  It's a cow outfit.
21     Q.  Okay.
22     Are you married, sir?
23     A.  Yes.
24     Q.  And how long have you been married?
25     A.  46 -- or 56 years

EXHIBIT

Rich v. A-C Product Liability Trust, et al.     CHARLES P. RICH     January 14, 2004

Case MDL No. 875   Document 4744   Filed 03/01/06   Page 139 of 207

19

1    Q.  Okay.

2        And after that?

3    A.  After that, I went aboard the

4    turboelectric tanker named the Wheeler Hills,

5    and I was oiler on that ship.

6    Q.  Okay.

7        Did you always work in the engine room?

8    A.  Yes.

9        Well, I say I always did.  There was

10   times I was in and out of there when I served as

11   electrician, but most of my work was in the

12   engine room.

13   Q.  Okay.

14       Now, what types of vessels were these?

15   A.  The Ames Victory was a cargo ship.  I

16   was on it in World War II, and it was a

17   freighter, 10,000-ton freighter with a

18   10,000-horsepower turbine engine, and it hauled

19   nothing but ammunition.

20   Q.  Did it have one or two boilers?

21   A.  Two boilers.

22   Q.  Okay.

23   A.  And they were B & W boilers.

24   Q.  All right.

18

1        And the next vessel?

2    A.  Wheeler Hills.  That was a

3    turboelectric tanker, and I was oiler on that

4    ship.

5        And I can't remember the make of the

6    boilers on there.  It was either B & W, or they

7    might have been Foster Wheeler.  I can't

8    remember that.

9    Q.  Okay?

10       And that was a tanker?

11   A.  Yes.

12   Q.  All right.

13       And the others?

14   A.  Then there was another turboelectric

15   tanker, the Hobkirks Hill, and I was chief

16   electrician on that ship.

17       And the same thing there, it had two

18   boilers, and I can't recall the make of them.

19   Q.  Okay.

20   A.  But they were either B & W or Foster

21   Wheeler.  They were sectional header boilers, I

22   remember that.

23   Q.  And the last one or two there?

24   A.  Well, then you've got -- then they've

25   got the Oriental.

20

1    Q.  What kind of vessel was that?

2    A.  It was a cargo ship.

3    Q.  Okay.

4    A.  And I don't remember the tonnage of it

5    or the horsepower, but I would guess it was

6    probably about 10,000 horsepower.

7        And it had two boilers on it, and they

8    were D type boilers.  And I don't know if I can

9    recall the make of them.

10       They might have been -- they were a D

11   type boiler, but they might been Foster

12   Wheeler.  They weren't B & W.  They might have

13   been Foster Wheeler; they might have been

14   Combustion Engineering, but I don't recall

15   that.

16   Q.  Okay.

17       And the last remaining ships?

18   A.  Well, the remaining ships was for --

19   that Oriental, incidently, was for when I went

20   on that, Isthmian Steamship Line was operating

21   it, and when I got off of it, the Chilean Line

22   was operating it, and they changed the name --

23   Chilean changed the name to the Maipo,

24   M-A-I-P-O.

25       The next two ships were both for

1    Isthmian Steamship Company.  The first one was

2    the Steel Advocate.  I was third engineer on

3    that.  The last one was the Steel Voyager.

4        See, Isthmian had a subsidiary -- or

5    U.S. Steel had a subsidiary, which was Isthmian,

6    and these were both C-3 type ships, cargo

7    ships.

8    Q.  Okay.

9    A.  And that was -- I was third engineer on

10   both of those.

11   Q.  Okay.

12       Now, can you explain for us what an

13   engine room looks like aboard a steam vessel

14   such as you sailed on here?

15   A.  Well, it's full of boilers and engine

16   and pipes and valves, and pretty -- a lot -- lot

17   of machinery, pumps and things like that.

18   Q.  Now, did -- were they all similar in

19   nature in terms of what was in the engine rooms?

20   A.  No, they weren't.

21       On the Victory ships, the boilers were

22   on a lower level than the operating platform,

23   the throttle platform.  The same on the C-3s.

24       On the tankers, the T-2 tankers, the

25   engine room was forward of the boiler room.

Case MDL No. 875    Document 4744    Filed 03/01/06    Page 140 of 207

| 1 | 2 | 3 | 4 | 5, 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|
| Sig. No. / Opr. No. / STA Lrm. | Name of Vessel, Former Name, Owner, Port of Registry — Flag | Type — Water Ballast Tons | Construction — No. of Hatches, Number of Holds, Bulkheads, Larger Hatch, Longer Hold | Fuel and Capacity Appliances / Dimensions | Tonnage | Builders — Hull No., Date Built | Type and Particulars of Machinery | Hull Classification |

**12757** STATHES J. YANNAGHAS, Kassos Steamship Navigation Co. Ltd., Piraeus, Greece — Syros, Greece — Greek

**12758** STAVROS COUMANTAROS, John Coumantaros, Piraeus, Greece — Syros, Greece — Greek

**12759** STEAMER BAY, United States of America (Navy Dept.), Washington, D.C. — United States

**12760** STEEL ADMIRAL, Isthmian S.S. Co., New York, N.Y. — United States

**12761** STEEL ADVOCATE, Isthmian S.S. Co., New York, N.Y. — United States

**12762** STEEL AGE, Isthmian S.S. Co., New York, N.Y. — United States

**12763** STEEL ARCHITECT, Isthmian S.S. Co., New York, N.Y. — United States

The ⚓ and ⓔ prefixed to the Classification symbols denote vessels built under the supervision of the Bureau, the latter being applicable only to Great Lakes Vessels. The publication of the particulars of unclassed vessels is for general information only. While extreme care is used in the preparation of all information, the Bureau accepts no responsibility for any errors or omissions.

STEEL VENDOR. ............ New York, N.Y.

STEEL VOYAGER. ........... New York, N.Y.

STEELWORKER. ............. New York, N.Y.

SUTTON. .................. Wilmington, Del.

SMOUNTAIN. ............... Cristoobal Co., S.A., Panama, R.P.

...FIELD. ................

-STE

Rich v. A-C Product Liability Trust, et al.     CHARLES P. RICH     January 14, 2004

Case MDL No. 875   Document 4744   Filed 03/01/06   Page 142 of 207

55

```
 1     Q.   Okay.
 2          Did you have occasion to remove that
 3   insulation to work on these things or not?
 4     A.   Occasionally, yes.
 5     Q.   Okay?
 6          Do you recall the manufacturers of the
 7   generators themselves?
 8     A.   Well, there was GE, and there was
 9   Westinghouse, and there was Elliott,
10   Allis-Chalmers.
11     Q.   Elliott, is that the full name of it?
12     A.   Yeah, Elliott.
13     Q.   Okay.
14     A.   And Allis-Chalmers.
15          And did I say GE and Westinghouse?
16     Q.   Right.
17     A.   I don't think -- if I remember, I don't
18   think Delaval made a generator, but I can't
19   really recall that.
20     Q.   Do you remember what Delaval made, if
21   anything?
22     A.   Yeah, I can remember they made
23   turbines, steam turbines, and they made
24   centrifuge, like lube oil purifiers, things like
25   that.
```

54

```
 1     Q.   Okay.
 2     A.   Maybe compressors too.
 3     Q.   All right.
 4     A.   Worthington made compressors also.
 5     Q.   And now, as far as the generators that
 6   you mentioned, did you work on all those?
 7     A.   Yes.
 8     Q.   Okay.
 9     A.   Whenever the need arose, and they
10   needed repair or maintenance, yeah, I worked on
11   them.
12     Q.   All right.  Okay.
13          And other than Delaval, do you recall
14   who manufactured the turbines?
15     A.   Well, there was also Elliott made
16   turbines.  Westinghouse made turbines.  GE made
17   turbines.
18          Did I mention, I said Delaval, didn't
19   I?
20     Q.   Yes.
21     A.   I'm sure there were others.
22          Worthington, I think Worthington made a
23   turbine.
24     Q.   Okay.
25          Now, you testified earlier that you
```

56

```
 1   worked in the engine room throughout your
 2   Merchant seaman career, right?
 3     A.   That's right.
 4     Q.   And is the -- can you explain, you've
 5   explained a great deal about the engine room to
 6   us, but can you explain what the conditions were
 7   in the engine room in most instances?
 8     A.   Mm, dependent on where you were at,
 9   where you were sailing.  The South Pacific, it
10   was hot, like if you were traveling around the
11   Equator.
12          The last couple of ships I was on, I
13   was on a Persian Gulf run, and it was double hot
14   there.  A lot of times your engine room
15   temperature would be over 120.
16     Q.   Okay.
17     A.   You could pretty near count on it being
18   hot except, oh, like in the North Atlantic, it
19   wouldn't be bad, because, you know, the weather
20   outside was cool.  But if the weather outside
21   was hot, your engine room would be double hot.
22     Q.   And when you were performing these
23   various maintenance operations, what were the
24   conditions like?
25     A.   Well, you carried the sweat rag with
```

```
 1   you all the time.
 2     Q.   And when you were working with the
 3   insulation material, what was the conditions
 4   like?
 5     A.   Well, it would be the same, hot and
 6   dusty usually.
 7     Q.   Okay.
 8          And that -- was that aboard each of
 9   these vessels or just one or --
10     A.   Well, no, it was aboard, you know,
11   different ones, dependent on where you were
12   sailing at, what part of the world you were in.
13     Q.   Oh, in terms of heat?
14     A.   In terms of heat, yeah.
15     Q.   Right.
16          But I mean in terms of the maintenance
17   duties and the conditions that would be -- that
18   would arise, was that throughout your maritime
19   career?
20     A.   Well, I would say so, yes.
21     Q.   Okay.
22          Sir, I'd like to now -- and if you want
23   to take a break, we can take a break -- but
24   after you got done sailing, where did you work
25   after that?
```

EXHIBIT

C

207

1    inch-and-a-half. One of them might have been

2    two.

3         And the Gardner Denver is very like the

4    size that I've already told you.

5    Q.  I understand that.

6         And I understand that you had some

7    other pumps out at the Jet Fuel Refinery with

8    larger diameter on the outlet?

9    A.  Oh, yes.

10   Q.  What I'm saying is, these pumps that we

11   just talked about, Gardner Denver, Blackmer and

12   Viking, the outlets on those pumps, were they on

13   the lower range, the lower size of the pumps

14   that you had out there at the refinery, or were

15   they in the middle?

16   A.  Average.

17   Q.  Average?

18   A.  Average.

19   Q.  And was it the only time that -- the

20   only time that you repacked Gardner Denver pumps

21   would be when you were out at the refinery?

22   A.  That's the only time that I can recall,

23   yes.

24   Q.  That's the only time?

25   A.  Now, I don't recall any of that

206

1    particular style pump on ships that I sailed on,

2    but there might have been, but they weren't the

3    same style as the pumps we had at the refinery.

4    Q.  You say there might have been. You

5    don't have a specific recollection of seeing a

6    Gardner Denver pump?

7    A.  No, I do not.

8    Q.  Likewise, you wouldn't have a specific

9    recollection of working on a Gardner Denver pump

10   on a marine vessel?

11   A.  I can't say that I would, no.

12        MR. GEOFFROY:  All right. Sir, I thank

13   you for your time. I'm going to look over my

14   notes, and there may be a couple of questions

15   I'll have later.

16        MR. MARSDEN:  I think you've got it

17   covered.

18        MR. GEOFFROY:  I appreciate it.

19             EXAMINATION

20   BY MR. MARKS:

21   Q.  Mr. Rich, good afternoon.

22   A.  How are you?

23   Q.  I'm well. And you?

24   A.  Good.

25   Q.  Okay, I think we're nearing the home

1    stretch.

2    A.  I hope so.

3    Q.  My name is Christopher Marks.

4    A.  How do you do.

5    Q.  I want to go back to the ships, dig

6    even deeper back.

7        MR. BARTLETT:  Mr. Marks, can you speak

8    up a bit, please?

9        MR. MARKS:  Absolutely.

10   BY MR. MARKS:

11   Q.  Mr. Rich, I want to ask you about the

12   ship work. We have been talking about the oil

13   rigs, the oil refinery before a bit.

14        Good back to your testimony with your

15   attorney, do you associate a particular turbine

16   manufacturer with any of the ships that you

17   worked on?

18   A.  Turbine manufacturer?

19   Q.  Yeah, a particular turbine manufacturer

20   with a particular ship?

21   A.  No.  No, I don't.

22        Are you talking about like main

23   propulsion turbines?

24   Q.  All turbines, main propulsion or

25   turbine generators.

208

1    A.  No.  Well, I remember GE, and then I

2    remember Westinghouse, but I can't tell you --

3    and then I remember the Elliott Allis-Chalmers

4    like I testified before, but I couldn't

5    remember --

6    Q.  Right.

7    A.  -- what make was the turbine or what

8    make was the generator?

9        I remember GE and Westinghouse, but I

10   couldn't tell you which make was on which ship

11   it was on?

12   Q.  I had the list from before, but I

13   wanted to ask if you could identify a make with

14   a particular ship?

15   A.  I don't believe I can. Other than

16   those tankers that I mentioned that had the

17   Elliott Allis-Chalmers?

18   Q.  The combo?

19   A.  The combo, yeah.

20   Q.  All right.

21        Do you recall specifically with respect

22   to any of those ships working on a turbine on

23   that ship?

24   A.  No.  Not other than the auxiliary

25   turbines, like I testified on feed pumps and

| 1 | 2 | | | 3 | 4 | | | | Tonnage | | | Builders | | Class Contemplated |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Name of Vessel, Former Name, Owner, Port of Registry, Flag | Type, Water Ballast Tons | Construction, Decks, No. of Hatches, No. or Longit. Bulkheads | Fuel and Capacity, Equipment | Dimensions Registered, Length, Breadth, Depth, Draft, Freeboard | | | | Gross, Under Deck, Net | | | Ship Place, New, Engine, Boiler | Hull No., Date Built, Date Engine, Date Boiler | Type and Particulars of Machinery |

| AMERICAN TRAVELER.. United States War Shipping Administration Washington, D.C. | So MV | Steel | Oil | Oil Rad Tel | 435′6″  63′  40′ | DH 27′7″ Fbd 12′5½″ | | — — — | North Carolina S.B. Co. Wilmington, N.C. | 287 | 2 Cyl Stm Turb | Class Contemplated |

| AMERICAN VICTORY.. United States War Shipping Administration Washington, D.C. (Hammond Shipping Co., Ltd. Operators) Los Angeles, Cal. | Sg1 So | Steel; 3 Dks Welded (Gunwale Bar riveted) 34 Metal Arc Wd 1848 5 Ha 1624 5 Ho 1063 7 Wt to End Dk WT to 3rd Dk 38″x22′4″ 81′ | Oil 1845 tons Rad DF Rad SC C-38(S) Sub S(S) | 435′6″  63′  38″ DH 28′0″ Fbd 0′7″ | 455′0″ 34.5′ 7607 4561 10725 15200 | California S.B. Corp. Los Angeles, Cal. Allis-Chalmers Mfg. Co. | 9-1939 6-1945 6-1945 6-1945 | V76 2 Cyl Stm Turb SHP 6000D11 Gears 2 WTB HS 102832 WP 525 Lbs SHP SBP-CL | ✠ AMS 6-45 |

| AMERICAN VOYAGER.. United States War Shipping Administration Washington, D.C. | Sg1 So MV | Wood; 1 Dk 1 Ha 5′x3′ | Oil Rad Tel | 103′ 26′ 11.9′ | 164 88 | Al Larsen Los Angeles, Cal. Atlas Imperial Eng. Co. | | Oil Eng 6 Cyl 13″x16″ | ✠ A1 ⑭ 6-45 |

| AMERICANA.......... United States War Shipping Administration Washington, D.C. | So MV | Steel; 1 Dk 5 BH | Oil Rad Tel | 209.7′ 16.8′ | 831 | Detroit S.B. Co. | | Oil Eng BHP 400 | — — |

| AMERICANO........... Seamer Sland Americans, Inc. New York, N.Y. United States | Oil | Oil | 80.7′ 11.1′ | 164 88 | Tacoma, Wash. | 1944 | Oil Eng BHP 400 | EAC |

| AMERIGO VESPUCCI.. United States Donald S. Morgan New York, N.Y. | Sg1 So MV | Steel; 3 Dks Orlop Dk Welded (Metal Arc Wd Frames riveted) 125 1644 1288 5 Ha 188 5 Ho 7 Wt to 3rd Dk 1 WT to 2nd Dk 5 Ha 38″x22′4″ 72′6″ | Oil 1721 tons Rad DF Fath Co C-38(S) | 417′9″  60′  37′4″ 422.8′ 67 34.5′ | 7176 4380 10725 16195 | New England S.B. Corp. So. Portland, Me. General Electric Co. Babcock & Wilcox Co. | 242 9-1943 9-1943 9-1943 | 2 Cyl TE 24½″ 37″ 70″x48″ IHP 2500 2 WTB HS 102832 WP 240 Lbs SHP SBP-CL | ✠ A1 ⑭ 9-45 |

| AMERIKI............ United States ex William H. Todd ex Shanona II War Shipping Administration Washington, D.C. (Loaned to Greek Govt.) Greek | Sg1 So AP, 20′ D′k 132′ DB 308′0″ FP | Steel; 3 Dks Metal Arc Welded 120 1644 1298 5 Ha 183 5 Ho 7 WT to 3rd Dk 1 WT to 2nd Dk 5 Ha 38″x20′ 81′ | Oil 1721 tons Rad DF Fath C-38(S) | 435′6″ 56′10″ 37′4″ 439.1′ 67 34.5′ | 7176 4380 10668 16190 | Oregon S.B. Corp. Portland, Ore. Iron Fireman Machinery Co. Henry Vogt Machine Co. | 1317 2-1945 2-1945 2-1945 | 2 Cyl Stm Turb SHP A550DR Gears 2 WTB HS 102832 WP 525 Lbs SBP-CL | ✠ AMS 12-45 B3 12-46 An MS 12-46 EAC |

| AMES VICTORY....... United States War Shipping Administration Washington, D.C. | Sg1 So AP, D′k 132′ DB 308′0″ FP | Steel; 3 Dks Metal Arc Welded 34 1644 1288 5 Ha 188 5 Ho 7 WT to 3rd Dk WT to 2nd Dk 5 Ho 38″x22′4″ 81′ | Oil 2982 tons Rad DF Rad SC C-38(S) | 436′6″ 62′ 38′ 439.1′ 62.1′ 34.5′ | 7606 4553 10668 16190 | Oregon S.B. Corp. So. Portland, Ore. Oregon Ship Bldg. Corp. Henry Vogt Machine Co. | 263 9-1943 9-1943 9-1943 | 2 Cyl Stm Turb SHP A550DR Gears 2 WTB HS 102832 WP 525 Lbs SBP-CL | AS 12-45 Dkd 12-45 B3 12-46 An MS 12-46 EAC |

| AMETHYST.......... United States of America War Shipping Administration Washington, D.C. | Tw Sc MV ex Yacht | Steel; 1 Dk 6 BH | Oil | 135.8′ 23.5′ 12.9′ | 560 169 | Craig S.B. Co. Long Beach, Cal. Winton Engine Co. | 7-1931 | 2 Oil Engs 6 Cyl 14″x16″ | ✠ AMS 11-45 Dkd 7-45 |

1042

1043

ORI

The ⊕ and ⊕ prefixed to the Classification symbols denote vessels built under the supervision of the Bureau, the latter being
applicable only to Great Lakes Vessels. The publication of the particulars of unclassed vessels is for general information only.
While extreme care is used in the preparation of all information, the Bureau accepts no responsibility for any errors or omissions.

5

1          The video deposition of CHARLES P.
2  RICH, produced, sworn and examined upon his oath
3  on the 14th day of January, 2004, commencing at
4  9:18 a.m., at 27 North 27th Street, Billings,
5  Montana, before me, Frances L. Kunz, a
6  free-lance shorthand reporter, a Notary Public
7  within and for the State of Montana, pursuant to
8  Notice and the Federal Rules of Civil Procedure,
9  for the examination of the said CHARLES P. RICH,
10  plaintiff, called for examination by the
11  plaintiff herein, in a certain suit and matter
12  in controversy now pending and undetermined in
13  the said U.S. District Court, being Civil Action
14  No. 2 MDL 875.
15
16
17
18
19
20
21
22  "mm-hmm" is yes
23  "huh-uh" is no
24
25

6

1                I N D E X
2                                      Page

3  Examination by Mr. Marsden              10
4  Examination by Mr. Fitzpatrick          90
5  Examination by Mr. Mann                 115
6  Examination by Mr. Kadlec               148
7  Examination by Mr. Wilson               152
8  Examination by Ms. Leister              163
9  Examination by Mr. Goeffroy             174
10  Examination by Mr. Marks                206
11  Examination by Mr. Mr. Patterson        211
12  Examination by Mr. Mr. Saksen           223
13  Examination by Ms. Budner               260
14  Examination by Mr. Bryne                290
15  Further Examination by Ms. Budner       297
16  Further Examination by Mr. Mann         298
17  Further Examination by Mr. Saksen       299
18
19
20
21
22
23
24
25

7

1                E X H I B I T S
2  Number  Description                        Page
3     1  Vessel Service History
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

8

1          MR. HAGEMAN:  Here begins Videotape
2  No. 1 of Volume No. 1 in the deposition of
3  Charles P. Rich, in the matter of Charles P.
4  Rich, plaintiff, versus A-C Product Liability
5  Trust, et al., defendants, in the Northern
6  District of Ohio, Case No. 1:98CV14094.
7          The date today is January 14th, 2004.
8  The time on the video monitor is 9:18 a.m.
9          My name is Joel Hageman.  I'm a notary
10  public and the videotape operator today.  My
11  address is 3719 Corbin Drive, Billings, Montana
12  59102.
13          The court reporter today is Fran Kunz.
14          Counsel, please voice identify
15  yourselves and state whom you represent.
16          MR. MARSDEN:  Duane Marsden for
17  plaintiff.
18          MR. FITZPATRICK:  George Fitzpatrick
19  for Coffin Turbo Pump, Inc. and Crosby Valve,
20  Inc.
21          MR. WILSON:  David Wilson, IMO.
22          MS. LEISTER:  Kelly Leister, Roper Pump
23  Company.
24          MR. KADLEC:  Kevin Kadlec, representing
25  Elliott.

EXHIBIT

45

1    it?

2        A.  I don't remember that part.

3        Q.  Okay.

4        A.  I don't recall that.  I remember the

5    Chesterton.

6        Q.  You remember Chesterton, okay.

7            And did that packing come in various

8    diameters?

9        A.  Yeah, it did.

10       Q.  Okay.

11       A.  All the way from quarter inch up.

12           Probably like depending on what you

13   were packing, if you were packing a pump or a

14   big valve, it might be half-inch.

15       Q.  All right.

16           Now, you mentioned pumps being in the

17   engine room.  What type of pumps were in the

18   engine room?

19       A.  Well, there was centrifugal pumps;

20   there were steam reciprocating pumps.

21           Usually the steam reciprocating pumps

22   were there just for standby in case your

23   centrifugal -- in case your rotary pump broke

24   down.

25           There were different, you know,

46

1    electric-powered pumps that were run with

2    electric motors.  And there were gear pumps;

3    there were vane pumps.  Different -- they had

4    different ways of transmitting fluid.

5        Q.  Okay, so fluid went into these pumps;

6    is that right?

7        A.  Pardon?

8        Q.  You're saying fluid was in these pumps?

9        A.  Oh, yes.

10       Q.  Oh, I see.

11           And how did the fluid stay in there

12   without leaking?

13       A.  Well --

14       Q.  Were there shafts in these pumps?

15       A.  Yeah, they would have a cylindrical

16   shaft and packing around the shaft.

17       Q.  Packing?

18       A.  Yes.

19       Q.  Is that different packing than what you

20   were talking about with the valves, or similar

21   packing?

22       A.  It was similar.  Similar, yes.

23       Q.  So, was this a heat application or cold

24   application?

25       A.  Well, there again, it depended on the

47

1    application.  If it was steam or hot water or

2    hot oil, it would be -- there would be heat

3    there.

4        Q.  Okay.

5        A.  If it was cold water --

6        Q.  And if it would be heat, what was the

7    packing material comprised of?

8        A.  Well, the same as on the valves.  It

9    would be usually asbestos with -- impregnated

10   with the graphite and zinc for lubrication.

11       Q.  I see.

12           Now, there's all these different types

13   of pumps.  And some of them are electric, and

14   some of them are steam driven; is that correct?

15       A.  Yes.

16       Q.  Okay.

17           Do you remember the manufacturers of

18   the pumps onboard the ships that you sailed

19   aboard?

20       A.  Well, let's see.  I remember

21   Worthington, and I remember Coffin, and I

22   remember Goulds, and I remember Fairbanks Morse

23           And there were a lot of others, but --

24       Q.  Okay.

25       A.  -- those are the ones that --

48

1        Q.  The ones that stand out for you right

2    now aboard the ships?

3        A.  Yes.

4        Q.  Okay.

5            MS. BUDNER:  Could you read back that

6    last answer because it's cutting in and out, and

7    I couldn't hear?

8            (Whereupon, the record was read by the

9    reporter.)

10   BY MR. MARSDEN:

11       Q.  Okay, Mr. Rich, you just mentioned

12   something else.  Can you restate that?

13       A.  Gardner Denver.

14       Q.  Gardner Denver.

15       A.  Yeah.

16       Q.  And that's -- is that another pump

17   manufacturer?

18       A.  Yeah.

19       Q.  Okay.

20           And these pumps worked as you described

21   earlier with regard to the types of pumps, the

22   centrifugal pumps and so forth, correct?

23       A.  Okay.

24       Q.  Okay.

25       A.  Yeah.

**49**

1    Now, there was a pump or two that I
2  don't remember that was steam driven, but the
3  one I remember most plainly steam driven was
4  Coffin.
5    Q.  I see.
6    A.  They were a good pump.
7    Q.  Okay.
8    And what fluid did they transfer?
9    A.  Boiler feed mostly.
10    Q.  Okay.
11    So they were --, are those the ones that
12  are referred to as feed pumps?
13    A.  As what?
14    Q.  Feed pumps?
15    A.  Yeah.
16    Q.  Oh, okay.
17    A.  All the Coffin pumps I ever worked with
18  were boiler feed pumps.
19    Q.  I see.
20    Now, you had mentioned turbines and
21  generators.  Can you explain to us what a
22  turbine is, or what a generator is?
23    A.  Well, a turbine is -- steam turbine is
24  an apparatus that drives something, either a
25  pump or an engine.

**50**

1    Steam goes in it one end and exhausts
2  out the other end, and it's got a rotor shaft on
3  it with a lot of blading on the shaft.
4    You got moving blading on the shaft,
5  stationary vanes around the case on the inside.
6  Your steam goes through it and exhausts out the
7  other end and drives -- drives the turbine.
8    Q.  Okay.
9    Now, is there electrical applications
10  within the turbine or electrical wiring or any
11  of that type of thing?
12    A.  No, not -- no, not if it's a steam
13  turbine.
14    Q.  Okay.
15    A.  There might be in the generator that it
16  drives.
17    Q.  Oh, I see.
18    A.  Like your -- you had a lot of standby
19  generators and then main generators that were
20  driven with steam turbines.
21    Q.  Oh, okay.
22    A.  But there wouldn't be anything
23  electrical in the turbine itself.
24    Q.  So the turbine, the steam turbine
25  operates the generator to create electricity; is

**51**

1  that how it works?
2    A.  Yes.
3    Q.  Oh, I see.
4    A.  Yes.
5    Q.  And as an electrician aboard the ships,
6  did you have occasion to work with those
7  generators?
8    A.  Oh, all the time, yeah.
9    Q.  Okay.
10    Now, can you explain the different
11  sizes of a generator --
12    A.  Well --
13    Q.  -- different types of generators you
14  worked with?
15    A.  Yeah, they were all kinds.  They were
16  AC and DC both, and all different sizes.
17    The generator was sized usually
18  according to the kW output of it, but, oh, they
19  were all --
20    Q.  Is that kilowatts?
21    A.  Yeah.
22    Q.  Okay.
23    A.  But, oh, they could anywhere from 60
24  kilowatts up.
25    Now, the main -- the main generator for

**52**

1  the turboelectric tankers, I can't recall the
2  kilowatt rating of them, but I know that the
3  horsepower rating would be usually at least
4  10,000.
5    Q.  I see.
6    And how did you work on them?  What
7  would you have to do to work on a generator?
8  Were they covered with anything or not?
9    A.  Well, the generator itself usually
10  wouldn't be covered with anything.  They were --
11  a lot of them run off of a continuous shaft.
12  From the turbine, the shaft would go right
13  through direct drive.  It wouldn't be belted or
14  geared or anything, usually run direct drive.
15    And, oh, something might go wrong with
16  a generator, you might have to work on it.  If
17  it was a DC generator, you would have to replace
18  the brushes on it.  Usually the AC generators,
19  there wasn't much maintenance on them.
20    Q.  I see.
21    A.  You might have to renew a bearing once
22  in a while.
23    The turbine part, yes, it would be
24  covered, be insulated.  The generator part
25  usually wouldn't be.

**105**

1    A. Well, they use it around the drilling

2 rig.

3    Q. And what is drilling mud?

4    A. Well, it's bentonite.

5    Q. And how is that used?

6    A. Well, they used it in drilling to -- if

7 they lose circulation with their drill, they

8 will dump it down the hole, and it will fill in

9 the cavities in the -- in the hole.

10    Q. Okay.

11       Do you know if there's heat generated

12 from the drilling process?

13    A. I don't know. Not that I know of.

14    Q. Did you ever haul any insulation

15 products?

16    A. Well, I don't remember. If I did, it

17 wasn't a lot.

18    Q. But, and who is the company, who were

19 you working for at the time you were driving

20 truck?

21    A. C. Brewer out of Roundup.

22    Q. Roundup, Montana?

23    A. Yeah.

24    Q. Which is east of here?

25    A. North.

**106**

1    Q. North.

2       And how long did you drive truck for C.

3 Brewer?

4    A. Probably nearly a year.

5    Q. Okay, what was your next job?

6    A. I guess the refinery.

7    Q. Okay.

8       Did you ever serve in the military?

9    A. Mm, actually, yes. I'm considered --

10 the Merchant Marine in World War II, they didn't

11 recognize us as military, but 40 years later,

12 they did.

13       I have a military discharge, a regular

14 military discharge. I have a discharge from the

15 Coast Guard. I have a discharge from the

16 Merchant Marine. 40 years after World War II,

17 they give us veterans status.

18    Q. Okay. All right.

19       So the service that you -- when you

20 were serving as a Merchant Marine, that's

21 considered your military service?

22    A. Yes.

23    Q. Did you ever sail on the maiden voyage

24 of a ship other than the Victory Ames?

25    A. No. No.

**107**

1    I sailed on another one that was -- it

2 had only been out a couple of trips, but it

3 wasn't a maiden voyage.

4    Q. And which one was that?

5    A. Wheeler Hills.

6    It came out of -- I believe it came out

7 of Portland, Oregon too, but I'm not -- remember

8 for sure. I caught it in San Francisco, but I

9 think it was built in Portland. It was a

10 tanker, T-2 tanker.

11    Q. Let me see if I have any other general

12 questions, and then I'll ask you some questions

13 of my clients and then pass and allow other

14 lawyers to ask questions.

15    I want to ask you, when you were

16 talking about at Jet Fuel, you were talking

17 about pumps in the control room, and you said

18 that they were all electrical motor driven, does

19 that mean they're not steam driven?

20    A. Yeah, they were not steam driven.

21    Q. Okay.

22    I represent Coffin Turbo Pump, and you

23 mentioned them, and I will pass on that you

24 think it's a good pump.

25    A. Yeah, it was. It was sure an

**108**

1 improvement over what we had before that for

2 boiler feed.

3    Q. And why was it an improvement, in your

4 mind?

5    A. Well, one thing, they didn't require as

6 much maintenance as old pumps we had before

7 that. The pumps we had before that were a lot

8 of them motor driven, and they were a triplex

9 pump, had three pistons, and they required more

10 maintenance.

11    Q. And you had to watch some of the gauges

12 on a Coffin pump, but other than that it would

13 pretty much run by itself; is that accurate?

14    A. It was steam driven --

15    Q. Correct?

16    A. -- yeah, but pretty automatic.

17    Q. Did you personally ever open up a

18 Coffin Turbo pump?

19    A. I've opened them up. I've opened them

20 up, yeah.

21    Q. Okay.

22    A. Or helped open them up, I should say.

23    Q. Did you ever receive training to do

24 repairs on a Coffin Turbo pump?

25    A. No. No.

**5**

```
 1          The video deposition of CHARLES P.
 2   RICH, produced, sworn and examined upon his oath
 3   on the 14th day of January, 2004, commencing at
 4   9:18 a.m., at 27 North 27th Street, Billings,
 5   Montana, before me, Frances L. Kunz, a
 6   free-lance shorthand reporter, a Notary Public
 7   within and for the State of Montana, pursuant to
 8   Notice and the Federal Rules of Civil Procedure,
 9   for the examination of the said CHARLES P. RICH,
10   plaintiff, called for examination by the
11   plaintiff herein, in a certain suit and matter
12   in controversy now pending and undetermined in
13   the said U.S. District Court, being Civil Action
14   No. 2 MDL 875.
15
16
17
18
19
20
21
22   "mm-hmm" is yes
23   "huh-uh" is no
24
25
```

**7**

```
 1             E X H I B I T S
 2   Number   Description                    Page
 3     1  Vessel Service History
 4
 5
 6
 7
 8
 9
10
11      .
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**6**

```
 1              I N D E X
 2                                      Page
 3   Examination by Mr. Marsden           10
 4   Examination by Mr. Fitzpatrick       90
 5   Examination by Mr. Mann             115
 6   Examination by Mr. Kadlec           148
 7   Examination by Mr. Wilson           152
 8   Examination by Ms. Leister          163
 9   Examination by Mr. Goeffroy         174
10   Examination by Mr. Marks            206
11   Examination by Mr. Mr. Patterson    211
12   Examination by Mr. Mr. Saksen       223
13   Examination by Ms. Budner           260
14   Examination by Mr. Bryne            290
15   Further Examination by Ms. Budner   297
16   Further Examination by Mr. Mann     298
17   Further Examination by Mr. Saksen   299
18
19
20
21
22
23
24
25
```

**8**

```
 1          MR. HAGEMAN:  Here begins Videotape
 2   No. 1 of Volume No. 1 in the deposition of
 3   Charles P. Rich, in the matter of Charles P.
 4   Rich, plaintiff, versus A-C Product Liability
 5   Trust, et al., defendants, in the Northern
 6   District of Ohio, Case No. 1:98CV14094.
 7          The date today is January 14th, 2004.
 8   The time on the video monitor is 9:18 a.m.
 9          My name is Joel Hageman.  I'm a notary
10   public and the videotape operator today.  My
11   address is 3719 Corbin Drive, Billings, Montana
12   59102.
13          The court reporter today is Fran Kunz.
14          Counsel, please voice identify
15   yourselves and state whom you represent.
16          MR. MARSDEN:  Duane Marsden for
17   plaintiff.
18          MR. FITZPATRICK:  George Fitzpatrick
19   for Coffin Turbo Pump, Inc. and Crosby Valve,
20   Inc.
21          MR. WILSON:  David Wilson, IMO.
22          MS. LEISTER:  Kelly Leister, Roper Pump
23   Company.
24          MR. KADLEC:  Kevin Kadlec, representing
25   Elliott.
```

109

1   Q.   Okay.
2        Are you aware that there are special
3   tools that are required to do the repairs?
4   A.   Oh, I'm sure there are.  I'm sure there
5   are.
6   Q.   Okay.
7        You haven't used those tools in order
8   to actually do the maintenance?
9   A.   No, but I have -- I was present when
10  they were used.  I remember there was pretty
11  near all the time I ever helped work on a Coffin
12  pump, there was a representative of the company
13  there.
14  Q.   Okay.
15       And they would be giving direction as
16  to what needed to be done or doing the work
17  themselves?
18  A.   Yeah.  Yeah.  Usually giving direction
19  on what was to be done, and anybody of us that
20  were available would help.
21  Q.   Okay.
22       And that is because the Coffin pump was
23  a very high tolerance, very detailed pump?
24  A.   It was a good pump, yeah.
25  Q.   Now, you talked earlier about rope

110

1   packing.  And I want to see if you agree with me
2   that you would not use that type of rope packing
3   with a Coffin Turbo pump?
4   A.   No, because they were an extra
5   high-speed pump, and generally if they had to be
6   repacked, they came with a molded formed
7   packing.
8   Q.   Right.
9        And it was a ring?
10  A.   A ring, yeah.
11  Q.   And it was graphite coated?
12  A.   Yeah, yeah.
13  Q.   And that ring was already preshaped?
14  A.   Yeah, preshaped, that's right.
15  Q.   It would slide right on and slide right
16  off?
17  A.   That's right.
18  Q.   And when you had that packing put on or
19  come off, it was not a dusty process?
20  A.   No, not compared to some of the
21  others.
22  Q.   Okay.
23       Did you ever replace any gaskets on a
24  Coffin pump?
25  A.   The only thing I can remember, it

111

1   seemed like I helped replace a gasket on the
2   housing.
3   Q.   On the outside of the pump?
4   A.   Yeah.
5   Q.   So where the pump is connected,
6   connecting to the pipe?
7   A.   Well, where the rotor part of the pump
8   is.
9   Q.   Okay.
10       And that was the only occasion that
11  you've changed a gasket on a Coffin pump?
12  A.   That's all I remember.
13  Q.   And do you know as you sit here whether
14  that gasket contained asbestos?
15  A.   Well, I'm sure it did.
16  Q.   Okay.
17       Do you know where the gasket came from?
18  A.   No, I don't.
19  Q.   Do you know if that was the first time
20  that the Coffin pump was repaired, that
21  particular Coffin pump?
22  A.   As far as I know, yeah.
23  Q.   On what ship was this?
24  A.   Mm, the Steel Advocate.
25  Q.   And so that was a brand-new Coffin

112

1   pump?
2   A.   It was put on that ship new, yes.
3   Q.   Okay.
4        And how long after did you sail?
5        MR. MARSDEN:  Objection, vague.
6   BY MR. FITZPATRICK:
7   Q.   Yeah, let me -- maybe it was a vague
8   question.
9        How long after that Coffin pump was put
10  on that ship did you do repair on the Coffin
11  pump?
12  A.   Probably a year.
13  Q.   Okay.
14  A.   I really only got one sour note about
15  the Coffin company.  One of my best friends got
16  killed working for them.
17  Q.   Working for Coffin?
18  A.   Yeah.  That's the only sour note I
19  got.
20       They had a good pump; they had a good
21  product.
22  Q.   And was he a Coffin employee?
23  A.   No -- yes, he was a Coffin employee.
24  He went to work -- I sailed with him on the
25  Oriental.  He was first engineer and, I was

113

1   chief electrician on the Oriental.
2       And when he got off the Oriental, he
3   got married and moved to New Orleans and went to
4   work for Coffin company, and he was working on a
5   Coffin pump in the engine room, and something
6   dropped on him and killed him.
7       Q.  Mm.  I'm sorry to hear that.
8       A.  Yeah, he was a good friend.
9       Q.  Okay.
10      Do you know whether he was an employee
11  of Coffin --
12      A.  Yeah.
13      Q.  -- or one of the distributors?
14      A.  He'd went to work for Coffin company.
15      Q.  All right.
16      So other than the one time where you
17  may have changed an asbestos-containing gasket
18  that you described, did you have -- do you have
19  any other recollection of any other asbestos
20  exposure any way related to a Coffin pump?
21      A.  Not really that I know of.
22      I can remember a time or two when we
23  had a little trouble with the Coffin pumps.  It
24  seemed like getting them regulated, something
25  about the regulation, you know, for the rpm of

114

1   them.
2       And we did some adjusting -- I helped
3   do a little adjusting on the governor, or
4   whatever it was that controlled the speed on
5   them.  I don't really remember.  I think it was
6   some kind of a governor.
7       Q.  But that wouldn't have exposed you to
8   any asbestos, that work you did?
9       A.  No, not unless there was some on the,
10  you know, the casing where we were working.
11      Q.  You mean insulation on the casing?
12      A.  Yeah.
13      Q.  All right.
14      Have you ever seen a brand-new Coffin
15  pump just new from the factory?
16      A.  The only new ones I ever saw is what
17  they put on the C-3s I was on.  I had seen them
18  put a new pump on the Steel Advocate and one on
19  the Steel Voyager.
20      Q.  All right.
21      And the pump that comes from Coffin is
22  not insulated at all?
23      A.  Not as -- well, not as they came out.
24      Q.  Correct.
25      And then someone else would put

115

1   insulation on the Coffin pump?
2       A.  I guess that's the way it was.
3       Q.  Do you have any basis for disagreeing
4   with me if I tell you that Coffin never
5   insulated any of their pumps?
6       A.  Well, I wouldn't -- I wouldn't argue
7   with you on that.
8       MR. FITZPATRICK:  That's all I have,
9   Mr. Rich.  Thank you very much.
10      EXAMINATION
11  BY MR. MANN:
12      Q.  How do you do sir.  My name is Eric
13  Mann.
14      A.  How do you do.
15      Q.  I've a few questions very similar to
16  what Mr. Fitzpatrick was asking you, but about
17  another couple of companies.
18      Are you good to go, or do you need a
19  break or rest for any reason?
20      A.  No, I don't.
21      Q.  Okay, good.
22      And please let me know if I'm not
23  speaking clearly or if one of my questions is
24  phrased in a confusing way, and you don't
25  understand it.

116

1       A.  All right.
2       Q.  When I ask you something, if I haven't
3   made the question understandable, please don't
4   guess at my meaning.  Just ask me to fix up the
5   question.
6       A.  Okay.
7       Q.  And if I'm really bad, your attorney
8   will correct me also.
9       One of the companies I represent is
10  Goulds Pumps.  I thought I heard you say that
11  name as a name you remembered from your sailing
12  career; is that correct?
13      A.  Yes, I remember Goulds pumps from both
14  places, from the sailing and from the refinery.
15      Q.  I heard you mention it in connection
16  with that too, and I was good to ask you about
17  the sailing first.
18      Are you able to tell me, if I was
19  correct about the kinds of pumps you recall, I
20  heard you say that, and I'm not talking about
21  brand names but rather functions here,
22  centrifugal pumps were used.  Did I get that
23  word right?
24      A.  Right.
25      Q.  Did I hear you say steam reciprocating

Case MDL No. 875   Document 4744   Filed 03/01/06   Page 153 of 207

Rich v. A-C Product Liability Trust, et al.     CHARLES P. RICH     January 14, 2004

53

1    Q.   Okay.

2         Did you have occasion to remove that

3    insulation to work on these things or not?

4    A.   Occasionally, yes.

5    Q.   Okay.

6         Do you recall the manufacturers of the

7    generators themselves?

8    A.   Well, there was GE, and there was

9    Westinghouse, and there was Elliott,

10   Allis-Chalmers.

11   Q.   Elliott, is that the full name of it?

12   A.   Yeah, Elliott.

13   Q.   Okay.

14   A.   And Allis-Chalmers.

15        And did I say GE and Westinghouse?

16   Q.   Right.

17   A.   I don't think -- if I remember, I don't

18   think Delaval made a generator, but I can't

19   really recall that.

20   Q.   Do you remember what Delaval made, if

21   anything?

22   A.   Yeah, I can remember they made

23   turbines, steam turbines, and they made

24   centrifuge, like lube oil purifiers, things like

25   that.

54

1    Q.   Okay.

2    A.   Maybe compressors too.

3    Q.   All right.

4    A.   Worthington made compressors also.

5    Q.   And now, as far as the generators that

6    you mentioned, did you work on all those?

7    A.   Yes.

8    Q.   Okay.

9    A.   Whenever the need arose, and they

10   needed repair or maintenance, yeah, I worked on

11   them.

12   Q.   All right.  Okay.

13        And other than Delaval, do you recall

14   who manufactured the turbines?

15   A.   Well, there was also Elliott made

16   turbines.  Westinghouse made turbines.  GE made

17   turbines.

18        Did I mention, I said Delaval, didn't

19   I?

20   Q.   Yes.

21   A.   I'm sure there were others.

22        Worthington, I think Worthington made a

23   turbine.

24   Q.   Okay.

25        Now, you testified earlier that you

55

1    worked in the engine room throughout your

2    Merchant seaman career, right?

3    A.   That's right.

4    Q.   And is the -- can you explain, you've

5    explained a great deal about the engine room to

6    us, but can you explain what the conditions were

7    in the engine room in most instances?

8    A.   Mm, dependent on where you were at,

9    where you were sailing.  The South Pacific, it

10   was hot, like if you were traveling around the

11   Equator.

12        The last couple of ships I was on, I

13   was on a Persian Gulf run, and it was double hot

14   there.  A lot of times your engine room

15   temperature would be over 120.

16   Q.   Okay.

17   A.   You could pretty near count on it being

18   hot except, oh, like in the North Atlantic, it

19   wouldn't be bad, because, you know, the weather

20   outside was cool.  But if the weather outside

21   was hot, your engine room would be double hot.

22   Q.   And when you were performing these

23   various maintenance operations, what were the

24   conditions like?

25   A.   Well, you carried the sweat rag with

56

1    you all the time.

2    Q.   And when you were working with the

3    insulation material, what was the conditions

4    like?

5    A.   Well, it would be the same, hot and

6    dusty usually.

7    Q.   Okay.

8         And that -- was that aboard each of

9    these vessels or just one or --

10   A.   Well, no, it was aboard, you know,

11   different ones, dependent on where you were

12   sailing at, what part of the world you were in.

13   Q.   Oh, in terms of heat?

14   A.   In terms of heat, yeah.

15   Q.   Right.

16        But I mean in terms of the maintenance

17   duties and the conditions that would be -- that

18   would arise, was that throughout your maritime

19   career?

20   A.   Well, I would say so, yes.

21   Q.   Okay.

22        Sir, I'd like to now -- and if you want

23   to take a break, we can take a break -- but

24   after you got done sailing, where did you work

25   after that?

EXHIBIT

E

137

1    A.  Well, we never had many that would go
2  for very many years, but we did have some that
3  would go for several months.
4    Q.  All right.
5         Were any of the Goulds pumps in that
6  category?
7    A.  I can't tell you.
8    Q.  You can't say?
9    A.  I can't remember.
10   Q.  Fair enough.
11        The Roper pump is a different brand of
12  pump.  That's not a Goulds pump, am I correct?
13   A.  No.
14   Q.  All right.
15        You mentioned a gear pump.  Was the
16  Roper pump a gear pump?
17   A.  The Roper was a gear pump.
18   Q.  Because gear pump and centrifugal pump
19  are different things?
20   A.  Yes, sure.
21   Q.  I'm following you so far.
22        You mentioned a series of brand names
23  of generators -- and I'm jumping back to your
24  shipboard experience now.  Another company I'm
25  representing today is Allis-Chalmers.

138

1    A.  Yeah.
2    Q.  You mentioned Allis-Chalmers as a brand
3  name of generators?
4    A.  Right.
5    Q.  Did I get that right?
6    A.  You got it right.
7    Q.  Do you recall which of your ships that
8  you rode on had an Allis-Chalmers generator
9  aboard?
10   A.  Yeah, you mean for the main
11  propulsion?
12   Q.  Any Allis-Chalmers generator.
13   A.  Well, I can remember on the T-2 tankers
14  I was on.  I think -- I know that the Wheeler
15  Hills had it on, had an Allis-Chalmers
16  generator, main generator and turbine too.
17   Q.  And the turbine -- both on the -- both
18  on the Wheeler Hills?
19   A.  Yeah.
20   Q.  Okay.
21        Do you remember any other ships where
22  the turbine or generator were Allis-Chalmers?
23   A.  I can't remember for sure whether the
24  Hobkirks Hill did or not.
25   Q.  Was the -- now, you asked me about my

139

1  question whether I was asking about the main
2  propulsion generator, so I need to ask you, on
3  this Wheeler Hills, was Allis-Chalmers the brand
4  of the main propulsion generator, or was the
5  generator of some other function, the
6  Allis-Chalmers generator?
7    A.  Oh, I can't tell you for sure.  I can't
8  recall for sure.
9         But the -- yeah, the generator and the
10  turbine were two different -- were two different
11  makes.
12   Q.  Okay.
13   A.  I said they was Allis-Chalmers, both
14  Allis-Chalmers, but there was an
15  Allis-Chalmers/Elliott that they used to team up
16  together.  I can't remember whether the turbine
17  was Elliott or whether the generator was
18  Elliott.
19        But on those T-2s quite a lot, I was on
20  a lot of different ones that I didn't sail on,
21  and I know they'd team up an Allis-Chalmers and
22  an Elliott together.  Which one was the
23  generator and which one was the turbine, I can't
24  remember.
25   Q.  Okay.

140

1         And so you do recall the Allis-Chalmers
2  name on the Wheeler Hills?
3    A.  Right.
4    Q.  But again you're not sure whether it
5  was the generator or the turbine?
6    A.  I can't remember for sure.
7    Q.  And I --
8    A.  I know that it was -- I know it was on
9  there, but I can't remember for sure which it
10  was.
11   Q.  When the -- in that kind of ship when
12  the turbine is driving the generator, does that
13  mean that generator is the main propulsion
14  generator?
15   A.  Right.  Right.
16   Q.  And so in that situation, the generator
17  is powering the electrical motor that drives the
18  propellers that drive the ship?
19   A.  That's right.
20   Q.  Okay.  I just wanted to be sure I
21  understood all of that.
22        Did you say -- when you referred to
23  other ships you've seen it on you've seen that
24  kind of setup on where you have the Elliott and
25  the Allis-Chalmers teamed up, and you're not

Case MDL No. 875 Document 4774 Filed 03/01/06 Page 155 of 207

Rich v. A-C Product Liability Trust, et al.    CHARLES F. MICHO    5/14/2004

141

1 sure which one was the turbine and which one was
2 the generator, are we talking about other ships
3 that you helped build in the shipyards or
4 something else?
5 A. Oh, ones that I would go on and, you
6 know, visit, things like that.
7 Q. Okay. All right.
8 Because --
9 A. Meet them in some other port and maybe
10 go over there and visit.
11 Q. Okay.
12 So you aren't talking about generators
13 or turbines that you worked on, but that you saw
14 in other ships just because you were visiting?
15 MR. MARSDEN: Objection.
16 BY MR. MANN:
17 Q. Did I get that -- did I get that right?
18 A. Well, no, that's not necessarily right.
19 Q. Okay.
20 A. Because on those, I was on two of those
21 turboelectric tankers.
22 Q. Okay.
23 A. And that I sailed on.
24 Q. Okay.
25 A. And then I was aboard several others,

142

1 and I can remember the Allis-Chalmers/Elliott
2 pair, the configuration of them were all the
3 same. They were direct drive.
4 Q. Okay.
5 A. The turbine and the generator were
6 direct drive.
7 Q. Did you ever have occasion on the
8 turbine on those turboelectric setups, was the
9 other turboelectric setup, was that the Hobson
10 Hills?
11 A. Hobkirks.
12 Q. Hobkirks Hill?
13 A. Yeah.
14 Q. Was that the other turboelectric setup
15 that you sailed on?
16 A. Yeah.
17 Q. Did you ever do -- were you an
18 electrician on either of those voyages?
19 A. I was on the -- I was chief electrician
20 on the Hobkirks Hill.
21 Q. Okay.
22 And on the Wheeler Hills, what was your
23 rating?
24 A. Oiler.
25 Q. As an electrician on the Hobkirk Hills,

143

1 did you do any repair or maintenance or
2 disassembly of the turbine?
3 A. Not the main -- not the main propulsion
4 turbine, no.
5 Q. Okay.
6 And that's the one that might have been
7 Allis-Chalmers?
8 A. Yes.
9 Q. Or if it wasn't, it was the generator?
10 A. Yes.
11 Q. Okay.
12 On the Wheeler Hills, did you ever have
13 occasion to disassemble, take the covering off
14 or otherwise do maintenance on that turbine?
15 A. No.
16 Q. It sounds to me like from your
17 testimony, that these turboelectric setups were
18 the only -- the only time from your sailing
19 career that you recall the Allis-Chalmers brand
20 name. Am I getting that right?
21 A. Well, that's all I can recall. I
22 remember that pretty plain because they were the
23 latest thing out at the time, turboelectric
24 drive ship. If you had a job on one of those,
25 you were just kind of a step up.

144

1 Q. So at that time, it was a very modern
2 ship?
3 A. Oh, yeah. They were the latest
4 propulsion out.
5 Q. Okay.
6 A. Other than diesel electric, I mean they
7 were the main steam propulsion. Steam
8 propulsion.
9 Q. The turbine on the turboelectrics,
10 again with the understanding that you're not
11 sure which brand name goes with the turbine --
12 A. Right.
13 Q. -- what did the turbines have to do
14 with asbestos products, if anything?
15 A. Well, they would be insulated.
16 Q. Were they insulated by the crews -- if
17 you know this, were they insulated by the crews
18 building the ship, or did they arrive from the
19 manufacturer with insulation on them, or do you
20 know?
21 A. They were insulated -- I can't say
22 that. But they came out of the shipyard
23 insulated.
24 Q. Meaning when the vessel was launched?
25 A. Right -- no, not when it was launched.

RICH V. A.P. (Tooga Liability Trust) et al.     CHARLES P. RICH     January 14, 2004

Case MDL No. 875 - Document 4744 - Filed 03/01/06 - Page 156 of 207

151

```
 1    Q.  I'm not asking.  I'm telling you
 2  that --
 3       MR. MARSDEN:  Well, no, you're
 4  characterizing his testimony, and you
 5  mischaracterized his testimony.
 6       MR. KADLEC:  I'm not talking about his
 7  testimony.  It's my understanding, I said.
 8  BY MR. KADLEC:
 9    Q.  That they come to the shipyard with no
10  insulation on them.  And can you tell me one way
11  or the other whether that's --
12    A.  I can't tell you if that's true or not,
13  because I never saw them as they came into the
14  shipyard.
15    Q.  And it's also my understanding that the
16  turbine is insulated with a blanket.  Is that
17  true?  Do you remember seeing that?
18    A.  Well, it might be.  It might be.
19       But, you know, it was pretty smooth,
20  whatever it was.
21    Q.  And that blanket is underneath a layer
22  of sheet metal that covers it; isn't that right?
23    A.  That could be.
24    Q.  And so when the generator -- or, I'm
25  sorry, when the turbine is operating, and the
```

151

```
 1    A.  No, on the other hand.  Pretty much not
 2  repair free because that's when you had to get
 3  all the bugs out of it.  Anything that wasn't
 4  working right, why, would usually show up on the
 5  first voyage.
 6    Q.  And how about after that first voyage
 7  when you did the shakedown cruise; is that the
 8  term for it?
 9    A.  Yeah.
10    Q.  You take care of those initial problems
11  that occur --
12    A.  You try to do next --
13    Q.  -- is usually the next voyage, then,
14  pretty much an easy voyage as far as repairs go?
15    A.  Well, it should have been, but it
16  didn't always work that way.  But that was kind
17  of the general opinion, that that's the way it
18  should be.
19       Kind of depended on your captain and
20  your chief engineer, how they got things done
21  that needed to be done.
22       MR. KADLEC:  All right.  That's all I
23  have.  Thanks.
24  //
25  //
```

150

```
 1  sheet metal is on there, insulation is basically
 2  encapsulated under that sheet metal; is that
 3  right?
 4    A.  That could be.  That could be.
 5    Q.  Okay.
 6    A.  I can't -- I can't tell you for sure
 7  because that's --
 8    Q.  You can't tell me for sure on the
 9  Elliott Allis-Chalmers main drive that you are
10  familiar with whether that insulation that's
11  under that sheet metal actually contained
12  asbestos or not; is that right?
13    A.  Well, I was told that it did.
14    Q.  But you don't have any personal
15  knowledge of that fact?
16    A.  No, I didn't never dig into it to see
17  whether it was or not.  I didn't do that.  That
18  was kind of general knowledge that it was.
19    Q.  But there was also wool blankets were
20  used on the turbines as well, do you remember
21  that?
22    A.  No, I don't remember any wool
23  blankets.
24    Q.  When you sailed on a ship on its maiden
25  voyage, were they pretty much repair free?
```

152

```
 1            EXAMINATION
 2  BY MR. WILSON:
 3    Q.  Good morning -- or good afternoon,
 4  Mr. Rich.
 5    A.  How do you do.
 6    Q.  My name is David Wilson, and I
 7  represent IMO Industries.  I just want to go
 8  back a little bit to right before we took one of
 9  the first breaks.
10       You had volunteered that you thought
11  Delaval made generators.  Do you have any
12  recollection of working with a Delaval
13  generator?
14    A.  I don't remember saying that Delaval
15  generator, no.  I remember saying centrifuges,
16  oil purifiers and centrifuges and turbines.  I
17  don't remember saying anything about generators.
18    Q.  I apologize if I misspoke there.
19       Did you say -- what did you say, oil --
20    A.  Oil centrifuge.
21    Q.  Oil centrifuge.
22       Is that what you meant when you said
23  centrifuge lubricator?
24    A.  Yeah, for lubricating oil, yeah.
25    Q.  Okay.
```

**205**

1  inch-and-a-half. One of them might have been
2  two.
3       And the Gardner Denver is very like the
4  size that I've already told you.
5       Q. I understand that.
6       And I understand that you had some
7  other pumps out at the Jet Fuel Refinery with
8  larger diameter on the outlet?
9       A. Oh, yes.
10      Q. What I'm saying is, these pumps that we
11 just talked about, Gardner Denver, Blackmer and
12 Viking, the outlets on those pumps, were they on
13 the lower range, the lower size of the pumps
14 that you had out there at the refinery, or were
15 they in the middle?
16      A. Average.
17      Q. Average?
18      A. Average.
19      Q. And was it the only time that -- the
20 only time that you repacked Gardner Denver pumps
21 would be when you were out at the refinery?
22      A. That's the only time that I can recall,
23 yes.
24      Q. That's the only time?
25      A. Now, I don't recall any of that

**206**

1  particular style pump on ships that I sailed on,
2  but there might have been, but they weren't the
3  same style as the pumps we had at the refinery.
4       Q. You say there might have been. You
5  don't have a specific recollection of seeing a
6  Gardner Denver pump?
7       A. No, I do not.
8       Q. Likewise, you wouldn't have a specific
9  recollection of working on a Gardner Denver pump
10 on a marine vessel?
11      A. I can't say that I would, no.
12      MR. GEOFFROY: All right. Sir, I thank
13 you for your time. I'm going to look over my
14 notes, and there may be a couple of questions
15 I'll have later.
16      MR. MARSDEN: I think you've got it
17 covered.
18      MR. GEOFFROY: I appreciate it.
19           EXAMINATION
20 BY MR. MARKS:
21      Q. Mr. Rich, good afternoon.
22      A. How are you?
23      Q. I'm well. And you?
24      A. Good.
25      Q. Okay, I think we're nearing the home

**207**

1  stretch.
2       A. I hope so.
3       Q. My name is Christopher Marks.
4       A. How do you do.
5       Q. I want to go back to the ships, dig
6  even deeper back.
7       MR. BARTLETT: Mr. Marks, can you speak
8  up a bit, please?
9       MR. MARKS: Absolutely.
10 BY MR. MARKS:
11      Q. Mr. Rich, I want to ask you about the
12 ship work. We have been talking about the oil
13 rigs, the oil refinery before a bit.
14      Good back to your testimony with your
15 attorney, do you associate a particular turbine
16 manufacturer with any of the ships that you
17 worked on?
18      A. Turbine manufacturer?
19      Q. Yeah, a particular turbine manufacturer
20 with a particular ship?
21      A. No. No, I don't.
22      Are you talking about like main
23 propulsion turbines?
24      Q. All turbines, main propulsion or
25 turbine generators.

**208**

1       A. No. Well, I remember GE, and then I
2  remember Westinghouse, but I can't tell you --
3  and then I remember the Elliott Allis-Chalmers,
4  like I testified before, but I couldn't
5  remember --
6       Q. Right.
7       A. -- what make was the turbine or what
8  make was the generator.
9       I remember GE and Westinghouse, but I
10 couldn't tell you which make was on which ship
11 it was on.
12      Q. I had the list from before, but I
13 wanted to ask if you could identify a make with
14 a particular ship?
15      A. I don't believe I can. Other than
16 those tankers that I mentioned that had the
17 Elliott Allis-Chalmers.
18      Q. The combo?
19      A. The combo, yeah.
20      Q. All right.
21      Do you recall specifically with respect
22 to any of those ships working on a turbine on
23 that ship?
24      A. No. Not other than the auxiliary
25 turbines, like I testified on feed pumps and

Case MDL No. 875   Document 4744   Filed 03/01/06   Page 158 of 207

Rich v. A-C Product Liability Trust, et al.        CHARLES P. RICH        January 14, 2004

45

1   it?
2       A.   I don't remember that part.
3       Q.   Okay.
4       A.   I don't recall that.  I remember the
5   Chesterton.
6       Q.   You remember Chesterton, okay.
7            And did that packing come in various
8   diameters?
9       A.   Yeah, it did.
10      Q.   Okay.
11      A.   All the way from quarter inch up.
12           Probably like depending on what you
13   were packing, if you were packing a pump or a
14   big valve, it might be half-inch.
15      Q.   All right.
16           Now, you mentioned pumps being in the
17   engine room.  What type of pumps were in the
18   engine room?
19      A.   Well, there was centrifugal pumps;
20   there were steam reciprocating pumps.
21           Usually the steam reciprocating pumps
22   were there just for standby in case your
23   centrifugal -- in case your rotary pump broke
24   down.
25           There were different, you know,

46

1   electric-powered pumps that were run with
2   electric motors.  And there were gear pumps;
3   there were vane pumps.  Different -- they had
4   different ways of transmitting fluid.
5       Q.   Okay, so fluid went into these pumps;
6   is that right?
7       A.   Pardon?
8       Q.   You're saying fluid was in these pumps?
9       A.   Oh, yes.
10      Q.   Oh, I see.
11           And how did the fluid stay in there
12   without leaking?
13      A.   Well --
14      Q.   Were there shafts in these pumps?
15      A.   Yeah, they would have a cylindrical
16   shaft and packing around the shaft.
17      Q.   Packing?
18      A.   Yes.
19      Q.   Is that different packing than what you
20   were talking about with the valves, or similar
21   packing?
22      A.   It was similar.  Similar, yes.
23      Q.   So, was this a heat application or cold
24   application?
25      A.   Well, there again, it depended on the

47

1   application.  If it was steam or hot water or
2   hot oil, it would be -- there would be heat
3   there.
4       Q.   Okay.
5       A.   If it was cold water --
6       Q.   And if it would be heat, what was the
7   packing material comprised of?
8       A.   Well, the same as on the valves.  It
9   would be usually asbestos with -- impregnated
10   with the graphite and zinc for lubrication.
11      Q.   I see.
12           Now, there's all these different types
13   of pumps.  And some of them are electric, and
14   some of them are steam driven; is that correct?
15      A.   Yes.
16      Q.   Okay.
17           Do you remember the manufacturers of
18   the pumps onboard the ships that you sailed
19   aboard?
20      A.   Well, let's see.  I remember
21   Worthington, and I remember Coffin, and I
22   remember Goulds, and I remember Fairbanks Morse.
23           And there were a lot of others, but --
24      Q.   Okay.
25      A.   -- those are the ones that --

48

1       Q.   The ones that stand out for you right
2   now aboard the ships?
3       A.   Yes.
4       Q.   Okay.
5            MS. BUDNER:  Could you read back that
6   last answer because it's cutting in and out, and
7   I couldn't hear?
8            (Whereupon, the record was read by the
9   reporter.)
10   BY MR. MARSDEN:
11      Q.   Okay, Mr. Rich, you just mentioned
12   something else.  Can you restate that?
13      A.   Gardner Denver.
14      Q.   Gardner Denver.
15      A.   Yeah.
16      Q.   And that's -- is that another pump
17   manufacturer?
18      A.   Yeah.
19      Q.   Okay.
20           And these pumps worked as you described
21   earlier with regard to the types of pumps, the
22   centrifugal pumps and so forth, correct?
23      A.   Yeah.
24      Q.   Okay.
25      A.   Yeah.

EXHIBIT

73

1    Q.   Now, was that -- what -- the packing
2  that was used on the heated applications, what
3  did that contain?
4    A.   On the what applications?
5    Q.   On the heated applications?  Heat,
6  heated --
7    A.   Oh, if it was hot material?
8    Q.   Right.
9    A.   Well, that was usually -- that was
10  usually rated asbestos impregnated with
11  graphite.
12    Q.   Okay.
13    A.   And then there was a zinc compound.
14  Some of it was impregnated.  Some of it had this
15  zinc compound; some of it that you added when
16  you put the packing in.
17    Q.   Okay.
18       And the names of the manufacturers that
19  you just stated, did they make that type of
20  packing?
21    A.   Yes.  Yes.
22    Q.   Okay.  All right.
23       And you testified that there were pumps
24  in the control room as well as transfer pumps
25  outside.

74

1       So, are those different types of
2  pumps?  Are they driven by different --
3    A.   Yeah.  Well, most -- they were all
4  electrical motor driven, but some of them were
5  centrifugal pumps, some were gear pumps, some
6  were vane pumps.  I guess that's about all,
7  centrifugal, and gear pumps and vane pumps.
8    Q.   Okay.
9       And how many, rough estimation, how
10  many pumps were at the refinery that you worked
11  at for 20 years?
12    A.   Oh, boy, I don't know.  There were a
13  lot of them.  There were a lot of them.
14    Q.   Okay.
15    A.   There might have been 100 --
16    Q.   Okay.
17    A.   -- which probably isn't many for a big
18  refinery, but this was a small refinery.
19    Q.   I see.
20       And do you recall the manufacturers of
21  the pumps at the refinery?
22    A.   Oh, okay, there were Goulds.  There
23  were Viking.  There were Gardner Denver.  There
24  were Jacuzzi.
25       Mm, there were a lot more, but I'd have

75

1  to do some thinking on it, I guess.
2    Q.   Okay.  Well, we'll come back to that.
3       Now, how long were you a truck driver?
4    A.   Oh, there at the refinery only about a
5  couple of months.
6    Q.   Okay.
7    A.   But before that, I had drove truck
8  other places.
9    Q.   Right.
10       How long were you a maintenance
11  man/welder?
12    A.   At the refinery?
13    Q.   Right.
14    A.   Well, from the time I started until off
15  and on when I wasn't driving truck, up until --
16  well, up until the end of it.  Even after I was
17  plant superintendent, I did a lot of that work.
18    Q.   Oh, you did?
19    A.   Yeah.
20    Q.   Oh, okay.
21       So, would it be -- basically would it
22  be safe to say that you did that off and on for
23  the entire time you were there?
24    A.   Yes.  Yes, it would.
25    Q.   Okay.

76

1       Now, explain to me what -- or explain
2  to us, rather, what you did as an operator?
3    A.   Mm, you tended stills.  You kept your
4  -- you kept -- everything was hand-fired.
5  There wasn't anything automatic about that
6  plant.  Even your boilers were hand-fired.  Your
7  still fires were all hand-fired.
8       You had temperature recorders there
9  on a main gauge board.  You had to keep your
10  temperatures in each one, for each one of your
11  product just at a certain degree.  And if it got
12  a little too cold, you'd have to kick a fire
13  up.  If it got a little too warm, you'd have to
14  cut a fire.
15    Q.   I see.
16    A.   It was all hand-operated plant.
17    Q.   Now, as an operator, did you also say
18  that you were like in charge of a crew or a --
19    A.   Well, it was -- yeah, you was in charge
20  of the shift.
21       There would be just you and one other
22  person.  The other person would be doing the
23  transferring of the fuels and loading trucks and
24  things like that, and then the operator.
25    Q.   Okay.

chief electrician on the Oriental.

And when he got off the Oriental, he got married and moved to New Orleans and went to work for Coffin company, and he was working on a Coffin pump in the engine room, and something dropped on him and killed him.

Q.  Mm.  I'm sorry to hear that.

A.  Yeah, he was a good friend.

Q.  Okay.

Do you know whether he was an employee of Coffin --

A.  Yeah.

Q.  -- or one of the distributors?

A.  He'd went to work for Coffin company.

Q.  All right.

So other than the one time where you may have changed an asbestos-containing gasket that you described, did you have -- do you have any other recollection of any other asbestos exposure any way related to a Coffin pump?

A.  Not really that I know of.

I can remember a time or two when we had a little trouble with the Coffin pumps.  It seemed like getting them regulated, something about the regulation, you know, for the rpm of

114

them.

And we did some adjusting -- I helped do a little adjusting on the governor, or whatever it was that controlled the speed on them.  I don't really remember.  I think it was some kind of a governor.

Q.  But that wouldn't have exposed you to any asbestos, that work you did?

A.  No, not unless there was some on the, you know, the casing where we were working.

Q.  You mean insulation on the casing?

A.  Yeah.

Q.  All right.

Have you ever seen a brand-new Coffin pump just new from the factory?

A.  The only new ones I ever saw is what they put on the C-3s I was on.  I had seen them put a new pump on the Steel Advocate and one on the Steel Voyager.

Q.  All right.

And the pump that comes from Coffin is not insulated at all?

A.  Not as -- well, not as they came out.

Q.  Correct.

And then someone else would put

insulation on the Coffin pump?

A.  I guess that's the way it was.

Q.  Do you have any basis for disagreeing with me if I tell you that Coffin never insulated any of their pumps?

A.  Well, I wouldn't -- I wouldn't argue with you on that.

MR. FITZPATRICK:  That's all I have, Mr. Rich.  Thank you very much.

EXAMINATION

BY MR. MANN:

Q.  How do you do sir.  My name is Eric Mann.

A.  How do you do.

Q.  I've a few questions very similar to what Mr. Fitzpatrick was asking you, but about another couple of companies.

Are you good to go, or do you need a break or rest for any reason?

A.  No, I don't.

Q.  Okay, good.

And please let me know if I'm not speaking clearly or if one of my questions is phrased in a confusing way, and you don't understand it.

116

A.  All right.

Q.  When I ask you something, if I haven't made the question understandable, please don't guess at my meaning.  Just ask me to fix up the question.

A.  Okay.

Q.  And if I'm really bad, your attorney will correct me also.

One of the companies I represent is Goulds Pumps.  I thought I heard you say that name as a name you remembered from your sailing career; is that correct?

A.  Yes, I remember Goulds pumps from both places, from the sailing and from the refinery.

Q.  I heard you mention it in connection with that too, and I was good to ask you about the sailing first.

Are you able to tell me, if I was correct about the kinds of pumps you recall, I heard you say that, and I'm not talking about brand names but rather functions here, centrifugal pumps were used.  Did I get that word right?

A.  Right.

Q.  Did I hear you say steam reciprocating

Case MDL No. 875    Document 4744    Filed 03/04/06    Page 161 of 207

Rich v. A-C Product Liability Trust, et al.    CHARLES P. RICH    January 19, 2004

117    119

1  pumps or just reciprocating?

2      A.  No, not -- you didn't hear me say steam

3  reciprocating pumps with Goulds.  The only

4  Goulds I was familiar with was centrifugal

5  pumps.

6      Q.  Oh, and actually I was good you ask

7  which of these kinds were Goulds pumps, so you

8  kind of got ahead of me there but that's good.

9      Did I understand you to say that from

10  your sailing, the only kind of Goulds brand pump

11  you recall is a centrifugal pump?

12      A.  That's the only kind I recall.

13      Q.  Okay.

14      Are you able to tell me which of the

15  ships that you sailed on you recall a Goulds

16  pump from?

17      A.  No, I can't recall that.

18      Q.  Are you able to tell me if you recall

19  ever doing any repair or maintenance or

20  disassembly of any kind on a Goulds pump?

21      A.  Well --

22      MR. MARSDEN:  Objection.

23  BY MR. MANN:

24      Q.  During your sailing career, is what I

25  should be concentrating on.

118

1      A.  That would be hard for me to answer

2  because I couldn't recall specifically.

3      Q.  That's because you've done a lot of

4  work on a lot of different kinds?

5      A.  A lot of work on a lot of different

6  kind of pumps.

7      Q.  Let me ask you, then, how you would

8  know -- and let's still focus on your sailing

9  career for right now -- how you would know a

10  pump was a Goulds pump as opposed to something

11  else, another brand?

12      A.  Well, they had their name stamped on

13  them in big letters.

14      Q.  Correct.

15      Does that mean, then, that Goulds pumps

16  were not -- the Goulds pump you recall, the

17  type of pump you recall as a Goulds pump was not

18  covered with insulations or blankets or anything

19  like that?

20      A.  No, I don't recall the outside of the

21  pump being --

22      Q.  Being covered?

23      A.  -- being covered, no.

24      Q.  If you don't specifically recall taking

25  apart or working on a Goulds pump, then I take

1  it --

2      MR. MARSDEN:  Objection.

3  BY MR. MANN:

4      Q.  Let me ask you again.

5      Do you recall during your sailing

6  career, again focusing on just your sailing

7  career, if you don't recall working on a Goulds

8  pump specifically from that time, you can't tell

9  me whether any specific item in the Goulds pumps

10  contained asbestos or did not contain asbestos,

11  can you?

12      A.  Well, yes, I can.  I can't recall

13  working on any particular, specifically on any

14  Goulds pump while I was sailing, but I worked on

15  a lot of them at the refinery.

16      Q.  I'm good to ask you separately about

17  that.

18      A.  Yeah.

19      Q.  So for sailing, you can't recall doing

20  that?

21      A.  No.

22      Q.  Okay.

23      A.  But I probably worked on them.

24      And as far as asking me about -- what

25  was the other part of your question?

120

1      Q.  Well, let me move on to the refinery,

2  because it sounds to me like you recall a little

3  more about there.

4      A.  Well, it happened since I sailed, you

5  know.

6      Q.  In the refinery?

7      A.  Yeah.

8      Q.  Yes.  And let me go on, then.

9      You spoke about -- one thing I keep not

10  getting is the name of the refinery.  It was in

11  Mosby?

12      A.  Jet Fuel Refinery.

13      Q.  Oh, that was the name of the company?

14      A.  That was the name of the company.

15      Q.  All right.

16      And you mentioned several times that

17  some of the other work you did in your career,

18  you did after the refinery shut down?

19      A.  Well, after the refinery shut down, I

20  have just been ranching.

21      Q.  Right.

22      And you worked right up until the

23  refinery shut down?

24      A.  I shut it down.

25      Q.  Okay.

**121**

1   And you said you had worked there 20
2   years, so am I right that it shut down in 1975?
3       A.  Right.
4       Q.  Okay.
5       Does that refinery, does any of it
6   still stand, or has it all been demolished?
7       A.  It's all been demolished.
8       Q.  You mentioned at least a couple of
9   locations for pumps, if I understood you
10  correctly.
11      Was there a pump room at the refinery?
12      A.  Not a room that was specifically used
13  as a pump room.  The control room was -- was
14  also a pump room.
15      Q.  All right.
16      And then you also mentioned that in
17  addition to pumps inside the control room, there
18  were pumps outdoors as well?
19      A.  Yes.  Yes.
20      Q.  What can -- can you tell me in which
21  location were you were recalling Goulds pumps,
22  or were they in both places?
23      A.  Well, you mean at the refinery?
24      Q.  At the refinery, yeah.
25      A.  Well, there were Goulds pump -- there

**122**

1   was a Goulds pump in the control room.  There
2   was a Goulds pump for the cooling water,
3   circulating water --
4       Q.  Okay.
5       A.  -- through your cooler boxes.
6       There was a Goulds pump in the lead
7   house -- two Goulds pumps in the lead house.
8       Q.  The lead house is then separate from
9   the control room?
10      A.  Right.
11      Q.  And you mentioned there was a Goulds
12  pump in the control room.  Is that the one
13  that's circulating the water?
14      A.  No, no.
15      Q.  Okay, so that's --
16      A.  The one that's circulating the water
17  was outside.
18      Q.  That's okay.  That's one of the outdoor
19  pumps, all right.
20      In the control room, what function did
21  that Goulds pump have, if you recall?
22      A.  It was a water pump.
23      Q.  All right.
24      And so we have in the control room a
25  Goulds water pump and then a cooling water pump

**123**

1   that is outside, so that's another transfer
2   pump, if I've got that right?
3       A.  Right.
4       Q.  And then we have two Goulds pumps in
5   the lead house.
6       What's the lead house do?
7       A.  Well, that's where you lead your
8   gasoline.
9       Q.  Okay, so that's where lead is actually
10  added to the gasoline product?
11      A.  Right.
12      Q.  And what -- and I know some of the
13  questions I ask, the answers may seem obvious to
14  an engineering type like yourself, but they are
15  not to me.
16      What were the Goulds pumps doing in the
17  lead house, what was their function?
18      A.  Well, circulating the gasoline.
19      There was also another, a Roper pump in
20  the lead house, and then this Goulds pump, we
21  batched that when we leaded that gasoline, we
22  batched it.  We would make up a 1000-barrel
23  batch of gasoline, which is essentially white
24  gas before your lead and your additives are
25  added to it, and then this one Goulds pump in

**124**

1   the lead house would circulate that tank.
2       The Roper pump was a gear pump.  It's
3   the one that you added your lead with.  They had
4   an eductor system which you run this gasoline by
5   a high-pressure eductor nozzle, and it would
6   take the lead out of your lead drum and supply
7   it to the gas in this system, and then you had
8   to circulate this gasoline for about 24 hours.
9       Q.  Is the Roper pump a different brand, or
10  is that a variety of pump?
11      A.  A different brand.
12      Q.  Okay.
13      A.  A different brand.
14      Q.  Did I understand you to say that when
15  we started talking about the lead house, there
16  were two Goulds pumps in the lead house?
17      A.  Yeah.
18      Q.  Okay.
19      Did they both do the same thing,
20  circulating this gasoline?
21      A.  Yeah.
22      Q.  And so circulating this gasoline, this
23  particular batch for 24 hours was part of the
24  mixing process?
25      A.  Right.

**EXHIBIT**
C2

125

1    Q.   To make sure the lead stays suspended
2  in the fluid?
3    A.   Right, yes.
4    Q.   Goodness.
5         Now, you mentioned to me earlier when
6  we started talking about this, that -- and I'm
7  just forgetting.  When you said that the only
8  Goulds pumps that you were familiar were
9  centrifugal pumps, did that include this
10 refinery work, or was that just the ship type?
11   A.   No, it included the refinery.
12   Q.   Okay.  So all of the --
13   A.   I never worked with a Goulds pump that
14 wasn't a centrifugal pump.
15   Q.   Okay.
16        And I just wasn't -- my notes just
17 aren't too good on that.
18        So all of these pumps on the premises
19 of Jet Fuel Refinery are centrifugal pumps?
20   A.   No, no, not all of them.
21   Q.   Oh, I'm sorry.
22        I mean all of the Goulds pumps?
23   A.   Oh, yes.
24   Q.   That's what I meant.  And I'm going to
25 be focusing just on the Goulds products for most

126

1  of my questions.
2         Did you ever -- let's talk about the
3  water pumps that you mentioned.  I think you
4  said there was one in the control room, and
5  there was one outdoors, and these are both
6  transfer pumps that move water around?
7    A.   Right.
8    Q.   Is that cold water?
9    A.   Yeah.
10   Q.   Did you ever have to disassemble or fix
11 or work on those, either of those water pumps?
12   A.   Oh, yes.
13   Q.   Okay.
14        Were there any asbestos components in
15 those?
16   A.   Well, just the packing.
17   Q.   All right.
18        What was the nature of the packing in
19 these two Goulds water pumps?  Were these two
20 pumps basically identical, or were
21 they --
22   A.   Yeah, they were identical.
23   Q.   Okay.
24        And what was the nature of the packing
25 used in those?

127

1    A.   You mean -- well, it was packing.
2    Q.   Was it preformed, or was it --
3    A.   No, no.
4    Q.   -- the string type, or how did it work?
5    A.   No, it wasn't -- it wasn't actually a
6  string type packing.  It was a packing that come
7  in bulk in a roll on a reel, and you'd just reel
8  off what you needed.
9         It was, for the two pumps we were
10 talking about, it was probably 3/8ths or 7/16ths
11 in size, square packing, asbestos with graphite
12 impregnated.
13   Q.   Is this the braided sort of appearance
14 that you described in other places?
15   A.   Braided, right.
16   Q.   You don't know if Goulds manufactured,
17 you don't believe Goulds manufactured that
18 packing, do you?
19   A.   Oh, no, they didn't.  Probably, except
20 maybe to have when the pump was new, that, I
21 wouldn't know.
22   Q.   Do you know if you ever -- do you
23 believe you were the first one to disassemble
24 either of these pumps, or do you think they had
25 been worked on before?

128

1    A.   Oh, I think they had been worked on
2  before.  I don't know that.
3    Q.   These were not hot applications; these
4  were cold water applications?
5    A.   Cold water.
6    Q.   I mean these two particular pumps.
7    A.   Well, except the gasoline.
8    Q.   Well, I was good to talk about those
9  separately.
10        But these two that were circulating
11 water were not hot applications, were they?
12   A.   No.
13   Q.   When the -- did you remove packing from
14 those on -- from either of these two pumps on
15 more than one occasion?
16   A.   Oh, yes.  Several.
17   Q.   How often would it be necessary to do
18 that?  How long would it go, can you give some
19 average for that?
20   A.   That's a question that's hard to
21 answer.  Just whenever it needed doing.  You
22 know, if your shaft would get worn a little, or
23 a bearing would get worn a little, and the shaft
24 was maybe running out of round, and it would eat
25 out the packing, and you'd have to repack it.

Case MDL No. 875   Document 4744   Filed 03/01/06   Page 164 of 207

Rich v. A-C Product Liability Trust, et al.    CHARLES P. RICH    January 14, 2004

129

1    Or if it would go to leaking bad.
2        Q.  Would that typically take a matter of a
3    few years to happen or a matter of weeks?  Can
4    you give me any idea in your experience?
5        A.  No set -- no set time on that.  Just
6    you done the work as it needed doing.
7        Q.  As you became -- when you became
8    manager of this plant, how many people worked
9    there under your supervision or direction who
10   would -- who you could give the job to of
11   repairing pumps like these two we are talking
12   about?
13       Were there two people who did that or
14   20 people, what can you tell me?
15       A.  No.  No.  There were six people besides
16   myself.
17       Q.  And was it necessary for you to be
18   active or hands-on with every pump repair on the
19   premises, or could other people do it without
20   your help sometimes?
21       A.  Well --
22       MR. MARSDEN:  Objection.
23       When are we talking about here?
24   BY MR. MANN:
25       Q.  During the time that you were plant

130

1    manager, let's start there.
2        A.  Well, it depends.  If you had the man
3    broke in so he knew what he was doing, who could
4    apply packing to a pump without tightening up
5    too much and burning up the shaft, then you
6    could turn him loose and let him do it.
7        A lot of people didn't know that until
8    they'd had quite a little experience.
9        I've had that happen.  I've had a man
10   pack a pump, tighten his packing too tight, and
11   it would burn up the shaft, and then there you'd
12   be where you'd have to get a whole new pump or a
13   new shaft or something.
14       So, yeah, you had people that after
15   they'd had experience, you could -- you could
16   turn them loose and let them do it.
17       Q.  All right.
18       And that's what I was trying to find
19   out.  You could, you could delegate some of
20   these repairs.  You didn't have to do every
21   single one on the premises yourself?
22       A.  No.
23       (Whereupon, a short recess was taken.)
24   BY MR. MANN:
25       Q.  Okay, Mr. Rich, we were talking about

131

1    the water pumps that were Goulds water pumps,
2    Goulds brand pumps at the refinery.
3        Can you give me some idea how many
4    times you, yourself, had to work hands-on on
5    those two pumps, the ones that circulated water?
6        A.  No, I can't tell you that.
7        Q.  Okay.
8        Would it be --
9        A.  We had another Goulds pump that -- we
10   might have had several more, but we had another
11   that was a jet fuel loading pump.
12       Q.  Okay, let me make a note of that, and
13   then I want to ask you a couple more about these
14   water pumps.
15       Well, can you specifically recall the
16   condition of the packing when you opened the
17   Goulds water pumps that we have been discussing,
18   whether it was dry, whether it was damp, what
19   condition it was in?
20       A.  I can't tell you.
21       Q.  Okay.
22       A.  That's been a long time ago.
23       All I can tell you is that if it needed
24   replacing or renewing or packing added, we did
25   it.

132

1        Q.  Of course.
2        Yeah, and that's what I'm saying, you
3    said earlier sometimes you could get away with
4    adding packing; sometimes you'd have to pull out
5    the old packing and replace it completely?
6        A.  That's right.  That's right.
7        Q.  Let me skip ahead to this fuel loading
8    pump you just mentioned.  Was that also a
9    centrifugal pump, or was that a different kind?
10       A.  Yes, centrifugal.
11       Q.  Was this -- so this was not in the lead
12   house; this was somewhere else?
13       A.  Outside.
14       Q.  Okay.
15       And can you tell me anything about the
16   model number or size or capacity of this Goulds
17   pump that was used for fuel loading?
18       A.  Four-inch.
19       Q.  Four inch would be -- what does that
20   refer to?
21       A.  Well, it refers to your outlet
22   diameter.
23       Q.  Okay.
24       And as pumps in the refinery industry
25   go, is this a big, medium or small one?

133

1     A.  Oh, it would have been one of the
2  larger ones.
3     Q.  All right.
4        How large would the housing be on this
5  pump?  If you -- if we had it in this room, are
6  we talking about something two feet high or four
7  feet high or --
8     A.  Oh, no, it was something that you could
9  have set it on half of this table here.
10     Q.  So, it would be a couple or three or
11  four feet long and two or three feet high or --
12     A.  Well, the pump itself would have been
13  about like from here to this edge of the table
14  (indicating).
15     Q.  All right.
16     A.  If you're adding the motor on that --
17  now some of them were belt driven, and some were
18  direct driven.  If you added the motor on it, it
19  would have been that long probably (indicating).
20     Q.  Oh, I see.
21     A.  But some of them were belt driven also.
22     Q.  Did the same -- did the manufacturer of
23  the pump supply the motor, or was that something
24  supplied from somewhere else?
25     A.  No, it was supplied somewhere else.

134

1     Q.  Was that true whether it was direct
2  drive or belt drive?
3     A.  Yeah, as I remember, it was.
4        Now, I don't remember if there was a
5  motor on that was a direct drive, it wouldn't
6  have been -- it wouldn't have had the Goulds
7  stamp on it.  It would have had some other
8  stamp.
9     Q.  Sure.  Okay.
10        Did you ever have to yourself, either
11  yourself or with someone else, disassemble this
12  fuel loading pump, take it apart and do any
13  maintenance on it?
14     A.  Oh, yes.
15     Q.  More than one occasion for this pump?
16     A.  I'm sure there was.
17     Q.  Can you recall the condition of the
18  packing on this pump on any occasion?
19     A.  I can't recall the condition of the
20  packing on any of those pumps because there was
21  so many of them.  There was so much of that work
22  you had to do.  It would be hard for me to
23  recall what happened 20 years ago on such and
24  such a pump.
25     Q.  I appreciate you not guessing and

135

1  speculating about that.
2        Besides -- besides the packing, what
3  kind of packing would be appropriate to use on
4  this fuel loading pump?
5     A.  Well, this same type of packing.  You
6  could use this -- in fact, that's what we used
7  mostly, would be this braided asbestos packing
8  that had the graphite impregnated with it,
9  because it supplied the -- the graphite supplied
10  the lubrication for the shaft.
11     Q.  Do you have any recollection of any of
12  the Goulds pumps that you worked on in the
13  refinery using any kind of preformed packing?
14     A.  No.
15     Q.  All right.
16        Those were other brands?
17     A.  Right.
18     Q.  All right.
19     A.  In fact, there was only one other brand
20  that I do remember that used preformed packing,
21  and that was Jacuzzi.
22     Q.  Okay.
23        There were -- was it two Goulds pumps
24  in the lead house?
25     A.  Yes.

136

1     Q.  And what size pumps were these?
2     A.  One was a four-inch, and the other one
3  was, oh, must have been three.
4     Q.  Okay.
5        And do you have any recollection
6  yourself of taking those apart, doing
7  maintenance on them in any way?
8     A.  There wasn't a pump there that I didn't
9  do maintenance on.
10     Q.  You mean in the whole refinery?
11     A.  In the whole refinery.
12     Q.  Okay.
13        Can you give me any idea of how many
14  times you've worked on these pumps in the lead
15  house?
16     A.  No, I can't recall that.
17     Q.  All right.
18        Would it be fair to say that typically
19  a pump would -- unless there was some
20  misfortune, it would not be unusual for a pump
21  to go at least several months between necessity
22  and replacing packing?
23     A.  Yeah, that's true.  That's true.
24     Q.  Would some go for years between,
25  between those jobs?

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE:  REINSTATEMENT OF CAUSES ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI) | ) ) ) | CIVIL ACTION NO.  2 MDL 875 |

IN RE:  REINSTATEMENT OF CAUSES
ASBESTOS PRODUCTS LIABILITY            )
LITIGATION (NO. VI)                                  )
_____)
                                                               )        CIVIL ACTION NO.  2 MDL 875
THIS DOCUMENT RELATES TO ONE      )
MARITIME ASBESTOS CASE:                  )
                                                               )
NORTHERN DISTRICT OF OHIO          )
CASE NO. 1:98CV14094                           )
                                                               )
CHARLES P. RICH,                                   )
                                                               )
            Plaintiff,                                        )
v.                                                              )
                                                               )
A-C PRODUCT LIABILITY TRUST, *et al.*,  )
                                                               )
            Defendants.                                    )

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing *Plaintiff's Omnibus Reply to Defendants' Joint Memorandum in Opposition to Plaintiff's Motion for Reinstatement and Remand of Charles P. Rich Cause* and this *Certificate of Service* was served upon the following counsel of record on the 15th day of November, 2004, by first class mail with adequate postage thereupon, and deposited in the United States Post Office in Detroit, Michigan:

Margaret Barr Bruemmer, Trustee
4806 Batz Road
Westport, WI 53597
*A-C Product Liability Trust*

Matthew C. O'Connell
Sutter O'Connell Mannion & Farchione
3600 Erieview Tower
1301 East 9th St.
Cleveland, OH 44114
*Anchor Packing Co.; Crane Company Crosby Steam & Valve Co.; Garlock, Inc.*

Jeffrey A. Healy
Tucker, Ellis & West, LLP
925 Euclid Avenue
1150 Huntington Bldg.
Cleveland, OH 44115
*A. W. Chesterton Co.*

George F. Fitzpatrick, Jr.
Swanson, Martin & Bell
One IBM Plaza  Ste 2900
Chicago, IL 60611
*Coffin Turbo Pump; Crosby Valve, Inc.*

Gregg L. Spyridon
Spyridon Koch Palermo
3 Lakeway Ctr, Ste. 3010
3838 North Causeway Blvd.
Metairie, LA 70002
*Crane Company*

Kevin Kadlec
Bonezzi Switzer Murphy, Polito
1400 Leader Bldg.
526 Superior Ave.
Cleveland, OH 44114
*Elliott Turbomachinery Co., Inc.*

Frederick P. Vergon, Sr.
Smith Marshall Weaver & Vergon
500 National City
East Sixth Building
Cleveland, OH 44114
*Ernst Gage Co.*

Richard C. Binzley
Thompson Hine, LLP
3900 Key Center
127 Public Square
Cleveland, OH 44114
*Exxon Company USA;*
*Keystone Shipping Co.;*
*Standard Oil of New Jersey*

Nicholas L. Evanchan
Evanchan & Palmisano
One GOJO Plaza, Ste. 300
Akron, OH 44311
*Foster Wheeler Company*

Sheila M. Burke
Burns White & Hickton
120 Fifth Ave
2400 Fifth Ave Place
Pittsburgh, PA 15222
*General Cable Company*

Reginald Kramer
Oldham & Dowling
195 S. Main Street, Suite 300
Akron, OH 44308
*General Electric Company*

Ruth S. Kochenderfer
Shaw Pittman LLP
1650 Tysons Blvd. 14th Fl
McLean, VA 22102
*Goulds Pumps, Inc.*

James T. Millican
Weston Hurd Fallon Paisley, Howley
2500 Terminal Tower
50 Public Square
Cleveland, OH 44113
*IMO Industries, Inc.*

Evan Palik
McMahon DeGulis Hoffman & Lombardi
Caxton Bldg., Ste. 650
812 Huron Road
Cleveland, OH 44115
*John Crane, Inc.*

John W. Lebold
Sherwin-Williams Company
101 Prospect Avenue, N.W.
1100 Midland Bldg.
Cleveland, OH 44115
*Sherwin-Williams Co.*

Robin Harvey
Baker & Hostetler LLP
312 Walnut Street, Ste. 2650
Cincinnati, OH 45202-4038
*Uniroyal Chemical Co., Inc.*

Eric L. Horne
Eckert Seamans Cherin & Mellott
600 Grant Street, 44th Floor
Pittsburgh, PA 15219
*Westinghouse Electric Corp.*

Laura Hong
Squire, Sanders & Dempsey
4900 Key Tower
127 Public Square
Cleveland, OH 44114-1304
*Dover Resources, Inc.;*
*Flexitallic, Inc.; Rockbestos Co.*
*Viking Pump, Inc.*

Richard D. Schuster
Vorys Sater Seymour & Pease
52 East Gay Street
P. O. Box 1008
Columbus, OH 43216
*B. F. Goodrich, n/k/a Goodrich Corp.*
*Worthington Pump, a/k/a Worthington Corp.*

Kevin C. Alexandersen
Gallagher, Sharp, Fulton & Norman
1501 Euclid Avenue, 7th Floor
Cleveland, OH 44115
*Ingersoll-Rand Corp.*

Jennifer Whelan
Cetrulo & Capone
2 Seaport Lane
Boston, MA
*Sherwin-Williams*

Kelly M. Leister
Swartz Campbell
1601 Market St., 34th Fl.
Philadelphia, PA 19103
*Roper Pump*

Raymond F. Geoffroy, III
Hunton & Williams
903 E. Byrd St.
Richmond, VA 23219
*Dover Resources; Gardner Denver;*
*Viking Pump, Rockbestos*

Alexander W. Saksen
Kirkpatrick & Lockhart, LLP
535 Smithfield St.
Pittsburgh, PA 15222
*Sterling, Crane Co.*

James Bartlett
Semmes, Bowen & Semmes
250 W. Pratt St., 16th F.
Baltimore, MD 21201
*Foster Wheeler*

A Y McDonald Industries, Inc.
4800 Chavenelle Rd.
Dubuque, IA 52002-2631

Exxon Mobil Corporation
5959 Las Colinas Blvd.
Irving, TX 75039-2298

Wheatley Gaso Operations
6750 S. 57th W Ave
Tulsa, OK 74131

Pentair Pump Grp., Inc.
f/k/a Fairbanks Morse Pump
1101 Myers Pkwy Key
Ashland, OH 44805

Uniroyal Goodrich Tire Co.
1 Parkway South
Greenville, SC 29615

*Eileen M. Chmielewski*
EILEEN M. CHMIELEWSKI

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:  REINSTATEMENT OF CAUSES                )
ASBESTOS PRODUCTS LIABILITY                    )
LITIGATION (NO. VI)                            ) CIVIL ACTION NO. 2 MDL 875
                                               )
_____       )
                                               )
THIS DOCUMENT RELATES TO ONE                   )
MARITIME ASBESTOS CASE:                        )
                                               )
NORTHERN DISTRICT OF OHIO                      )
CASE NO. 1:99CV10802                           )
                                               )
DOROTHY ANN JACKSON, Personal                  )
Representative of the Estate of                )
JAMES E. JACKSON, Dec'd. (D/OD 5/30/03)        )
                                               )
            Plaintiff,                         )
                                               )
v.                                             )
                                               )
A-C PRODUCT LIABILITY TRUST, et al.,           )
                                               )
            Defendants.                        )

---

## PLAINTIFF'S REPLY TO DEFENDANTS' JOINT MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR REINSTATEMENT AND REMAND OF JAMES E. JACKSON CAUSE

NOW COMES Plaintiff, Dorothy Ann Jackson, Personal Representative of the Estate of

James E. Jackson, Dec'd., by and through counsel undersigned, The Maritime Asbestosis Legal

Clinic, a division of the Jaques Admiralty Law Firm, P.C., and hereby files this reply to Defendants'

1



Joint Memorandum in Opposition to Plaintiff's Motion for Reinstatement and Remand of James E. Jackson Cause, for the reasons set forth below.[1]

As this Court is aware, Plaintiff filed a Motion for Reinstatement and Remand of the above-styled cause on behalf of her decedent who suffered and died from a terminal asbestos-related malignancy, commonly referred to as mesothelioma.  In accordance with this Court's Orders, Plaintiff has substantially pared down the number of defendants in this cause and, indeed, has voluntarily dismissed with prejudice numerous defendants originally named in this matter. Additionally, Plaintiff will dismiss Goulds Pumps, Inc., which filed its own opposition papers to Plaintiff's Motion, as well as A. B. Boyd Co., Indian Head Industries, Inc., Pecora Corp. and Preferred Utilities Mfg. Corp., which were among the Defendants filing joint opposition papers.

As to the other Defendants who filed opposition papers and/or joinders in opposition, Plaintiff replies most strenuously that these Defendants belong in this action and their oppositions to Plaintiff's Motion for Reinstatement and Remand are without merit.   During Plaintiff's decedent's deposition, conducted at two separate time periods due to his debilitating health, Plaintiff's decedent's testimony provides enough probative evidence to have this cause remanded to the trial court where further discovery may take place.  Additionally, Mr. Richard R. Murray, Plaintiff's decedent's supervisor during the six to seven year period on the *Range Sentinel* provided testimony regarding product identification and exposure experienced by the crew of that vessel,

---

[1]Defendants A-C Product Liability Trust, Argo International Corp., Auburn Manufacturing Co., Aurora Pump Division of General Signal Corp., A.B. Boyd Co., Bryan Steam Corp., Foster Wheeler, LLC, General Electric Co., Goulds Pumps, Inc., Indian Head Industries, Inc., Pecora Corp. and Preferred Utilities Mfg. Corp. filed Joint Memorandum in Opposition to Plaintiff's Motion for Reinstatement and Remand of James E. Jackson Cause to which Defendant Garlock Sealing Technologies, LLC joined.

2

including that of Mr. Jackson. Excerpts from Plaintiff's decedent's and Mr. Murray's deposition transcripts providing the basis for going forward against opposing Defendants are attached hereto and incorporated herein as Exhibits A through G. Also included are pages from American Bureau of Shipping Records showing that a particular vessel upon which Plaintiff's decedent sailed utilized boilers and engines manufactured by some of the opposing Defendants herein. Plaintiff worked in the engine room where these products were located and testified being exposed to asbestos-containing products utilized in this machinery. Plaintiff has met the conditions this Court requires and reinstating and remanding this cause to the trial court from which it was brought. Plaintiff is entitled to discovery as directed by the trial court prior to dispositive motions being brought. As is the usual practice in these matters, Plaintiff would welcome a settlement conference before this Court in an attempt to resolve this matter prior to remand.

WHEREFORE, Plaintiff respectfully requests this Honorable Court grant Plaintiff's Motion for Reinstatement and Remand and the other relief the Court deems just in the premises.

Respectfully submitted,

MARITIME ASBESTOSIS LEGAL CLINIC,
A division of THE JAQUES ADMIRALTY
LAW FIRM, P.C.

By: _____
ROBERT E. SWICKLE (40437)
DUANE C. MARSDEN
Attorneys for Plaintiff
645 Griswold, Ste. 1370
Detroit, MI 48226-4116
(313) 961-1080

Dated: November 18, 2004

3

1          IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2
   IN RE: REINSTATEMENT OF CAUSES
3  ASBESTOS PRODUCTS LIABILITY
   1:99CV10802
4  LITIGATION (NO. VI)

5  THIS DOCUMENT RELATES TO ONE
   MARITIME ASBESTOS CASE
6
   CASE NO. 1:99CV10802
7
   JAMES E. JACKSON,
8
              Plaintiff,
9
        vs.
10
   A-C PRODUCT LIABILITY TRUST, et al.,
11
              Defendants.
12
   '
13 DEPOSITION OF:    JAMES E. JACKSON

14 DATE:             April 2, 2003

15 TIME:             10:27 AM

16
   LOCATION:         Town & Country Inn
17                   2008 Savannah Highway
                     Charleston, SC
18
   TAKEN BY:         Counsel for the Plaintiff
19
   REPORTED BY:      TERRI L. BRUSSEAU,
20                   Registered Professional
                     Reporter, CP, CRR
21
   Computer-Aided Transcription By:
22
          A. WILLIAM ROBERTS, JR., & ASSOCIATES
23
   Charleston, SC                    Greenville, SC
24 (843) 722-8414                    (864) 234-7030

25 Columbia, SC                      Charlo
   (803) 731-5224                    (704)
     A. WILLIAM ROBERTS, JR., & ASSOCIATES (800.

EXHIBIT

A

COPY

Page 46

```
1    things for the attorney or is this another list?
2         MR. BRUCH:  Objection.  Are you
3    referring to Exhibit 3?
4         MR. LANE/MR. ROSEN/MR. BARTLETT:
5    Objection.
6         THE WITNESS:  I couldn't tell you
7    offhand.
8    BY MR. LANE:
9         Q.  Well, let's talk about Exhibit 3.
10   You've got -- the first one on there you list is
11   A-C Product Liability, Allis-Charlmers.  Is that --
12   is that something that you recall seeing over your
13   work career on these ships?
14        MR. MANN:  I want a continuing
15   objection to all questions which identify anything
16   on this list because of the lack of foundation and
17   the leading nature of the question.
18        MR. LANE:  Okay.
19        MR. MANN:  So it's an objection just to
20   substance and form.
21        MR. LANE:  Okay.
22        MR. BRUCH:  And that objection is made
23   on behalf of all Defendants as we agreed to
24   previously.
25        MR. LANE:  Okay.
```

Page 47

```
1    BY MR. LANE:
2         Q.  Is that -- is that a company name that
3    you recall?
4         A.  Allis-Charlmers made pumps.
5         Q.  They made what?
6         A.  Pumps.
7         Q.  Pumps?  And were those pumps on ships
8    you worked on?
9         A.  Yeah.
10        Q.  The next one you list was -- Number 2
11   on Exhibit 3 is A. P. Green Industries?
12        A.  Green was on there.
13        Q.  Is that a name that you recall seeing
14   over your work career or not?
15        A.  Yeah.
16        Q.  Okay.  And did they make some asbestos
17   stuff that you were around or you --
18        A.  Well, mostly all of your boiler
19   equipment and spare parts.
20        Q.  Okay.  And A. P. Green made those?
21        A.  Made them.
22        Q.  Okay.
23        A.  How many, I couldn't tell you.
24        Q.  Okay.  Number 3 on your list, you list
25   Acorn Iron & Supply Company.  Is that a name that
```

Page 48

```
1    you recalled or not?
2         A.  Name I recall.
3         Q.  And you recall -- you've got under
4    there they made some asbestos products.  Do you
5    recall that?
6         A.  Yeah.
7         Q.  Okay.  If I took you through each
8    company's name that's on Exhibit 3, would each of
9    these be companies -- tell me whether or not each
10   of these would be companies that you with your wife
11   wrote down that you remember seeing over your work
12   career on the ships.
13        MR. BARTLETT/DEFENSE:  Objection.
14        THE WITNESS:  Some of them.
15   BY MR. LANE:
16        Q.  Some of them?  Which ones wouldn't be?
17        MR. BARTLETT/DEFENSE:  Objection
18   withdrawn.
19   BY MR. LANE:
20        Q.  Do you know?
21        A.  Not offhand.
22        Q.  Okay.  Let me ask you about some more
23   companies on -- on this list and see if we can get
24   somewhere with this.  You list A. W. Chesterton?
25        A.  Chesterton.  What -- what -- what do
```

Page 49

```
1    they make?
2         Q.  Well, you've got under there asbestos
3    packing.
4         A.  Well, anybody who made asbestos, I
5    probably come in contact with.
6         Q.  Okay.  And is Chesterton one you recall
7    or is that one that you don't recall?
8         A.  I can't really recall that one.
9         Q.  Okay.  Another one you have on here is
10   Foster Wheeler Corporation.  Do you recall seeing
11   that somewhere over your work career?
12        A.  Yes, that's a -- see, that's
13   insulation.
14        Q.  Okay.
15        A.  Asbestos.
16        Q.  And were you around that company's
17   products in your work career?
18        A.  (Witness moved head up and down.)
19        Q.  You list under there boilers.  Did they
20   make boilers or --
21        MR. BARTLETT/DEFENSE:  Objection.
22        THE WITNESS:  Equipment for it.
23   BY MR. LANE:
24        Q.  Equipment for it.  And you have Garlock
25   listed as Number 17.  Is that a company you recall
```

13 (Pages 46 to 49)

Page 74

1      A.  Had diesel.
2      Q.  So the -- so the ships that you served
3  on in the -- in the late '60s, they -- they had
4  turbines?
5      A.  They had turbines.
6      Q.  But -- but after that once you started
7  getting into the '70s, you started serving on
8  diesel-powered ships?
9      A.  Right.
10     Q.  You gave some testimony before, and I
11 wasn't sure exactly what you were testifying about
12 when you said sometimes the engine room crews would
13 work when there was a leak in the turbine.  Are you
14 talking about the turbine itself leaking or the --
15 or the pipes going to the turbine leaking?
16     A.  Well, again, the turbines -- the
17 turbines themselves are leaking.
18     Q.  The turbines themselves?
19     A.  (Witness moved head up and down.)
20     Q.  Weren't the turbines enclosed in a --
21 in a steel casing?
22     A.  In a casing.
23     Q.  All right.
24     A.  So what you have to do is send the work
25 gang out, go on out and try to open up the casing

Page 75

1  and go in there and see what you can get out of
2  that.
3      Q.  And when you would do that, the turbine
4  would have to be shut down, is that correct?
5      A.  (Witness moved head up and down.)
6      Q.  And as a result, the ship would not be
7  under power unless there was more than one turbine
8  on the ship?
9      A.  They had more than one turbine.
10     Q.  Did all the ships you served on that
11 had turbines have more than one?
12     A.  (Witness moved head up and down.)
13     Q.  Is that yes?
14     A.  More than one.
15     Q.  How many times during your career did
16 you ever work on a work gang that attempted to
17 remove the casing of the turbine while you were at
18 sea under power?
19     A.  Not too many times.
20     Q.  Can you tell me, was it less than five
21 times, more than five times?
22     A.  Maybe about three or four times.
23     Q.  Were you ever serving on board a ship
24 when a -- a turbine was removed or installed, the
25 entire turbine?

Page 76

1      A.  Not offhand.
2      Q.  Can you identify for me by manufacturer
3  name any of the turbines that you believe you
4  worked on when you were on board these ships?  Can
5  you tell me who made the turbine?
6      A.  I think Allis-Charlmers.
7      Q.  Okay.
8      A.  I think it made one.
9      Q.  Okay.  Any others?
10     A.  I think G. E. made one.
11     Q.  On what ship?  If you know.
12     A.  Offhand -- offhand I couldn't tell you.
13     Q.  So you think a turbine that you recall
14 may have been made by General Electric but you
15 can't tell me what ship it was on?
16     A.  (Witness moved head back and forth.)
17     Q.  And can you tell me whether or not you
18 ever did any work on that particular turbine?
19     A.  (Witness moved head back and forth.)
20     Q.  Your answer's no?
21     A.  I can't remember.
22     Q.  All right.  Did you ever work as an
23 electrician on board ships?
24     A.  As a helper.
25     Q.  As a helper?  What was the function of

Page 77

1  a blower in the engine room?
2      A.  Function of a blower is when you don't
3  keep any oil in it, blew on it.
4      Q.  Okay.
5      A.  Function of a blower really don't keep
6  it up.  Oil at low level.  There's so many -- so
7  many things could cause a malfunction in the air
8  blower.
9      Q.  Okay.  So you would have to work on the
10 blower sometimes.  Do you associate any
11 asbestos-containing products with blowers?
12     A.  Sometimes.
13     Q.  What products?
14     A.  Well -- well, after a period of 33
15 years, I'm forgetting.
16     Q.  So you can't remember any particular
17 asbestos-containing products that you would
18 associate with a blower?
19     A.  (Witness moved head up and down.)
20     Q.  Am I right?
21     A.  Right.
22     Q.  Can you tell me the manufacturer of any
23 of the blowers that you worked on when you were on
24 board ships?
25     A.  Not offhand.

20 (Pages 74 to 77)

Page 86

1  help clean up peanuts that lay around.
2      Q.  Okay.  So this kind of maintenance is
3  cleaning and so on?
4      A.  (Witness moved head up and down.)
5      Q.  Did you -- did you repair machinery at
6  the peanut factory?
7      A.  Yeah.
8      Q.  What kind of machinery was that?
9      A.  Peanut machines.
10     Q.  Okay.  Was there -- were there pipes or
11 boilers in the peanut factory?
12     A.  Yeah.
13     Q.  Did you do work on any of those?
14     A.  (Witness moved head up and down.)
15     Q.  Were they insulated?
16     A.  Some of them, yes.
17     Q.  Did you have to disturb any of that
18 insulation to do that work?
19     A.  No.
20     Q.  Okay.  About -- were there any other
21 jobs that we haven't covered that you've had in
22 your life?  We've got, of course, the sea
23 experience and we've got the bricklaying and the
24 work at the peanut factory.  Are there any other
25 jobs that you remember having that we haven't

Page 87

1  talked about?
2      A.  I think we've about covered everything.
3      Q.  Okay.  You mentioned another brand of
4  turbine when you were talking with Mr. Kramer.  You
5  said that one of the turbines you saw in your
6  career was made by Allis-Charlmers.  Do you
7  remember that?
8      A.  (Witness moved head up and down.)
9      Q.  Is that a yes?
10     A.  Yes.
11     Q.  Do you remember what ship that turbine
12 was on?
13     A.  Not offhand.
14     Q.  Do you remember then -- you don't
15 remember then if you ever had to repair or -- or go
16 in -- or work on that turbine in any way, do you?
17     A.  (Witness moved head back and forth.)
18     Q.  It has been mentioned in your questions
19 and answers with your attorney that the list that
20 is Exhibit 3 was made after you saw other lists.
21 Do I understand that correctly?
22     A.  A list of other turbines?
23     Q.  Well, I'm not just talking about
24 turbines now.  I'm asking you about a list of
25 products or -- that you have seen that showed

Page 88

1  company names and product names on it before you
2  put -- you and your wife put together that Exhibit
3  3.  Do you remember that?
4      A.  Yeah.
5      Q.  Do you still have that list that you
6  worked from in your possession?
7      A.  No, I don't have it.
8      Q.  Did you return that to your attorneys?
9      A.  I think he got it.
10     Q.  Besides that list, forgive me, I wasn't
11 clear, did you see pictures or photographs of
12 products or machinery or pictures of product
13 containers as part of looking at that list or did
14 you just see a written list?
15     A.  Yes, a written list.
16     Q.  Okay.  You did not see pictures or
17 photographs?
18     A.  (Witness moved head back and forth.)
19         MR. MANN:  Speaking on behalf of my
20 clients, I would ask that anything that Mr. Jackson
21 or his wife was shown prior to the creation of this
22 list that they worked -- that is Exhibit 3, that
23 they may have looked at, that that be produced.  I
24 think we're clearly entitled to have any of that,
25 and I would reserve any -- any questioning -- I

Page 89

1  will reserve the right to question further after
2  production of those materials.
3          MR. HERKE:  Join in that.  I think
4  everybody else does as well.
5          MR. LANE:  We'll consider that.
6          MR. MANN:  Thank you.
7  BY MR. MANN:
8      Q.  Can you tell me, sir, if you've ever
9  heard of a -- if you've ever heard of an entity
10 called A-C Product Liability Trust?
11     A.  (Witness moved head back and forth.)
12     Q.  All right.  Can you tell me if an
13 entity like that was listed on the list of
14 companies that you saw from your attorneys?
15     A.  (Witness moved head back and forth.)
16     Q.  You don't know?
17     A.  (Witness moved head back and forth.)
18     Q.  Okay.  Is that a no?
19     A.  Can't -- can't recall.
20     Q.  Can't recall.  Thank you, sir.  Can you
21 tell me if the company named Allis-Charlmers -- if
22 their name was shown on the list of materials that
23 you saw from your attorney?
24     A.  Well, see, Allis-Charlmers, they been
25 around a long time.

23 (Pages 86 to 89)

James Jackson    April 2, 2003

Page 90

```
1      Q.  So you believe you remembered that
2   without the use of that list?
3      A.  Allis-Charlmers didn't come on
4   yesterday.
5      MR. MANN: All right. Okay. I believe
6   those are all the questions I have, sir.  Thank
7   you.
8      THE WITNESS: All right.
9           EXAMINATION
10  BY MR. BRUCH:
11     Q.  Mr. Jackson, my name is Dan Bruch.  And
12  in your position as a wiper, what would you do
13  during a shift?  Was your shift eight hours a day
14  on the ship?
15     A.  (Witness moved head up and down.)
16     Q.  And other than Friday, can you tell the
17  Jury what you would do during an eight-hour shift
18  as a wiper?
19     A.  Well, to break it down to you, we would
20  eat at eight o'clock, and we'd come back down 8:10,
21  8:15 and eat -- eat breakfast.  And other job we
22  just -- we just mess around.
23     Q.  What do you mean you just mess around?
24  What were your job duties during an eight-hour
25  shift?  As a wiper.
```

Page 91

```
1      A.  Wipe the boiler off, go find something
2   to do.  Stay out -- stay out of the chief's way.
3      Q.  Stay out of the chief's way?  Now, have
4   you ever heard of a company called Johns-Manville?
5      A.  (Witness moved head back and forth.)
6      Q.  Is that a no?
7      A.  I haven't talked with him.
8      Q.  On -- when you -- on some of the ships
9   that you served on, they were federal ships; isn't
10  that correct, owned by the Federal Government?
11     A.  (Witness moved head up and down.)
12     Q.  Did you ever receive any instructions
13  from the Federal Government about your job or the
14  safety of your job?
15     A.  (Witness moved head back and forth.)
16     Q.  Is that a no?
17     A.  I got awards off of every ship I go on.
18  Awards.
19     Q.  Who were the awards from?
20     A.  From the captain.
21     Q.  Okay.  Did you ever get any
22  instructions or how to -- about safety from the
23  Federal Government while you were operating on
24  federal ships?
25     A.  They have gave me awards, also.
```

Page 92

```
1      Q.  Not awards, I'm saying any instructions
2   about safety.
3      A.  About safety, yeah.
4      Q.  Oh, these were awards about safety?
5      A.  About safety and awards about carry on,
6   do a good job and stuff like that.
7      Q.  Now, in your capacity as a helper -- as
8   a wiper, I mean, was your job to help other people?
9      A.  (Witness moved head up and down.)
10     Q.  In all of your career while you were
11  serving on ships, were you responsible for ordering
12  products that you worked with or worked around?
13     A.  Well, I did like that.  We -- we always
14  worked together.  If you got a job too much for
15  you, say, come over here Jack and give me a hand.
16  And say we'd finish up early and we call it a day.
17  I'm okay.
18     Q.  So you never personally ordered the
19  products, is that correct?
20     A.  (Witness moved head back and forth.)
21     Q.  You got them from somewhere on the
22  ship, is that correct?
23     A.  Chief engineer.
24     Q.  Chief engineer.  Now, when -- what date
25  was Exhibit 3 prepared?  Was that prepared
```

Page 93

```
1   yesterday or today or last year or when?
2      A.  Not today.
3      Q.  You can't remember when you prepared
4   that exhibit?
5      A.  (Witness moved head back and forth.)
6      Q.  Do you remember ever looking at the
7   Complaint that you filed in this lawsuit to prepare
8   that exhibit?
9      A.  (Witness moved head back and forth.)
10     Q.  You can't remember any of the documents
11  that you looked at in preparing that exhibit?
12     A.  Can't remember.
13     Q.  Who was present with you when you
14  prepared Exhibit 3 other than your wife?  Anybody
15  else present?
16     A.  No idea.
17     Q.  You can't remember who was present?
18     A.  (Witness moved head back and forth.)
19     Q.  Sir, do you know what Acorn Iron &
20  Supply Company manufactures or produces?
21     A.  (Witness moved head back and forth.)
22     Q.  Is that a no?
23     A.  I don't know.
24     MR. BRUCH:  Thank you very much.
25  That's all the questions I have.
```

24 (Pages 90 to 93)

1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

     IN RE: REINSTATEMENT OF CAUSES
3    ASBESTOS PRODUCTS LIABILITY
     1:99CV10802
4    LITIGATION (NO. VI)

5    THIS DOCUMENT RELATES TO ONE
     MARITIME ASBESTOS CASE

6
     CASE NO. 1:99CV10802

7
     JAMES E. JACKSON,

8
              Plaintiff,

9
          vs.

10
     A-C PRODUCT LIABILITY TRUST, et al.,

11
              Defendants.

12
     ,

13   DEPOSITION OF:   JAMES E. JACKSON

14   DATE:            April 2, 2003

15   TIME:            10:27 AM

16
     LOCATION:        Town & Country Inn
17                    2008 Savannah Highway
                      Charleston, SC

18
     TAKEN BY:        Counsel for the Plaintiff
19
     REPORTED BY:     TERRI L. BRUSSEAU,
20                    Registered Professional
                      Reporter, CP, CRR

21   ─────────────────────────────────────
     Computer-Aided Transcription By:
22
          A. WILLIAM ROBERTS, JR., & ASSOCIATES
23
     Charleston, SC              Greenville, SC
24   (843) 722-8414              (864) 234-7030

25   Columbia, SC               Charl[EXHIBIT]
     (803) 731-5224             (704)
     A. WILLIAM ROBERTS, JR., & ASSOCIATES (800

EXHIBIT
B

Page 46

1  things for the attorney or is this another list?
2          MR. BRUCH: Objection. Are you
3  referring to Exhibit 3?
4          MR. LANE/MR. ROSEN/MR. BARTLETT:
5  Objection.
6          THE WITNESS: I couldn't tell you
7  offhand.
8  BY MR. LANE:
9      Q.  Well, let's talk about Exhibit 3.
10  You've got -- the first one on there you list is
11  A-C Product Liability, Allis-Charlmers. Is that --
12  is that something that you recall seeing over your
13  work career on these ships?
14          MR. MANN: I want a continuing
15  objection to all questions which identify anything
16  on this list because of the lack of foundation and
17  the leading nature of the question.
18          MR. LANE: Okay.
19          MR. MANN: So it's an objection just to
20  substance and form.
21          MR. LANE: Okay.
22          MR. BRUCH: And that objection is made
23  on behalf of all Defendants as we agreed to
24  previously.
25          MR. LANE: Okay.

Page 47

1  BY MR. LANE:
2      Q.  Is that -- is that a company name that
3  you recall?
4      A.  Allis-Charlmers made pumps.
5      Q.  They made what?
6      A.  Pumps.
7      Q.  Pumps? And were those pumps on ships
8  you worked on?
9      A.  Yeah.
10      Q.  The next one you list was -- Number 2
11  on Exhibit 3 is A. P. Green Industries?
12      A.  Green was on there.
13      Q.  Is that a name that you recall seeing
14  over your work career or not?
15      A.  Yeah.
16      Q.  Okay. And did they make some asbestos
17  stuff that you were around or you --
18      A.  Well, mostly all of your boiler
19  equipment and spare parts.
20      Q.  Okay. And A. P. Green made those?
21      A.  Made them.
22      Q.  Okay.
23      A.  How many, I couldn't tell you.
24      Q.  Okay. Number 3 on your list, you list
25  Acorn Iron & Supply Company. Is that a name that

Page 48

1  you recalled or not?
2      A.  Name I recall.
3      Q.  And you recall -- you've got under
4  there they made some asbestos products. Do you
5  recall that?
6      A.  Yeah.
7      Q.  Okay. If I took you through each
8  company's name that's on Exhibit 3, would each of
9  these be companies -- tell me whether or not each
10  of these would be companies that you with your wife
11  wrote down that you remember seeing over your work
12  career on the ships.
13          MR. BARTLETT/DEFENSE: Objection.
14          THE WITNESS: Some of them.
15  BY MR. LANE:
16      Q.  Some of them? Which ones wouldn't be?
17          MR. BARTLETT/DEFENSE: Objection
18  withdrawn.
19  BY MR. LANE:
20      Q.  Do you know?
21      A.  Not offhand.
22      Q.  Okay. Let me ask you about some more
23  companies on -- on this list and see if we can get
24  somewhere with this. You list A. W. Chesterton?
25      A.  Chesterton. What -- what -- what do

Page 49

1  they make?
2      Q.  Well, you've got under there asbestos
3  packing.
4      A.  Well, anybody who made asbestos, I
5  probably come in contact with.
6      Q.  Okay. And is Chesterton one you recall
7  or is that one that you don't recall?
8      A.  I can't really recall that one.
9      Q.  Okay. Another one you have on here is
10  Foster Wheeler Corporation. Do you recall seeing
11  that somewhere over your work career?
12      A.  Yes, that's a -- see, that's
13  insulation.
14      Q.  Okay.
15      A.  Asbestos.
16      Q.  And were you around that company's
17  products in your work career?
18      A.  (Witness moved head up and down.)
19      Q.  You list under there boilers. Did they
20  make boilers or --
21          MR. BARTLETT/DEFENSE: Objection.
22          THE WITNESS: Equipment for it.
23  BY MR. LANE:
24      Q.  Equipment for it. And you have Garlock
25  listed as Number 17. Is that a company you recall

**Page 50**

1  or don't recall seeing over your work career?
2      A.  Asbestos.  Asbestos, Garlock.
3      Q.  What -- what kind of asbestos did you
4  recall?
5      A.  I can't remember, but I do know it's
6  asbestos.
7      Q.  You just recall Garlock asbestos?  And
8  did you work with that product or work around
9  others using it, or how would you have been around
10  it?
11      A.  Around, using it and working with it.
12      Q.  Okay.  And you have listed as Number 18
13  General Electric Company.
14      A.  Right here.
15      Q.  Do you recall seeing that over your
16  work career?
17      A.  Yeah.  B. F. Goodrich, yeah, we used
18  their paint.
19      Q.  Well, I'm up on General Electric,
20  Number 18.
21      A.  18.  Okay.
22      Q.  Do you need to take a break, sir?
23      A.  Not right now.
24          MRS. JACKSON:  Yes.  Yeah, he needs to
25  take a break.

**Page 51**

1          MR. LANE:  Your wife says it would be a
2  good time for you to take a break.  I think we'll
3  take about a five-minute break.
4          VIDEO TECHNICIAN:  We will now go off
5  the record.  The time is approximately 11:17.
6          (A recess transpired.)
7          VIDEO TECHNICIAN:  We are now back on
8  the record.  The time is approximately 11:29.
9  BY MR. LANE:
10      Q.  Mr. Jackson, let me ask you a little
11  more about your work and then we'll go to another
12  subject.  On any of the jobs that you worked around
13  asbestos dust, were you ever provided with a
14  respirator?
15      A.  Yes, 3M.
16      Q.  3M?  And what kind of protection --
17  what was 3M?
18      A.  The same kind you use at home.
19      Q.  Is it a canister type or just a face
20  mask?
21      A.  Just a 3M face mask.
22      Q.  And when were you allowed -- yeah.
23  When did you start having one of those available?
24      A.  After we started complaining.
25      Q.  When was that?  About when was it?  It

**Page 52**

1  was in the '80s, '90s, '70s?
2      A.  Probably up in -- up in the '70s.
3      Q.  Okay.  Now, that -- the 3M mask you're
4  talking about, is that a paper mask?
5      A.  (Witness moved head up and down.)
6      Q.  Okay.  Did that keep you from breathing
7  the dust that you're working in?
8      A.  Ain't did nothing to you.
9      Q.  Okay.  Did you ever receive any
10  warnings from any of the manufacturers of the
11  equipment or the asbestos materials you worked
12  around as to any dangers of working in the dust?
13          MR. FITZPATRICK/DEFENSE:  Objection.
14      A.  (Witness moved head back and forth.)
15  BY MR. LANE:
16      Q.  You never did?
17      A.  Never.
18      Q.  Did you ever see a warning on any of
19  the products you worked around?
20      A.  Not really.
21      Q.  Were you ever told that asbestos was a
22  cancer-causing substance?
23          MR. ROSEN/DEFENSE:  Objection.
24          THE WITNESS:  Years ago, yeah.
25  BY MR. LANE:

**Page 53**

1      Q.  When would that have been that you
2  caused --
3      A.  Huh?
4      Q.  -- that you were told it caused cancer?
5      A.  Probably up in the '70s.
6      Q.  Okay.  Are you sure about the date?
7      A.  No.
8      Q.  Okay.  What did you do --
9          MR. LANE:  I'm going -- I'm going to
10  object to the laughter in the room and ask if you
11  think something's funny about this, maybe we ought
12  to step outside and abandon this process right now.
13  BY MR. LANE:
14      Q.  What would you have done -- what did
15  you do in response to that?  Is that when you tried
16  to get some protection?
17      A.  Well, I can't get protection.  I don't
18  carry that kind of weight.
19      Q.  Okay.
20      A.  You had to go to the chief.  From the
21  chief, then you go to the man.
22      Q.  What -- what would you have done if you
23  had been given a warning by the manufacturers that
24  asbestos could cause cancer?
25          MR. BARTLETT/DEFENSE:  Objection.

Videotaped Deposition of:  RICHARD R. MURRAY

Taken on:  June 10, 2004

Dorothy A. Jackson vs. A-C Product Liability Trust, et al.

Pages 1 to 201

# COMPRESSED TRANSCRIPT

*Angell Reporting Service, Inc.*
2460 N. Courtenay Parkway, Suite 111
Merritt Island, FL 32953
(321) 449-9800 (321)   (800) 805-DEPO
Fax (321) 453-1348

33

1   A.   Yes.
2       I believe it was.  Yes.
3   Q.   Okay.  You're familiar with that name?
4   A.   Yes.  Durametallic is a familiar name in
5   that material.
6       MR. GEOFFROY:  Objection to form.
7   BY MR. MARSDEN:
8   Q.   Okay.  How do you recall that name, if you
9   know?
10  A.   Well, on the boxes that it came in.
11  Q.   And what type of product do you associate
12  that name with?
13  A.   I associate it with these spiral-wound
14  asbestos-lined gaskets.
15  Q.   Okay.
16      Now, are you familiar with sheet packing
17  material, sir?
18  A.   Yes.
19  Q.   And can you describe for us how you're
20  familiar with that and where it was used?
21  A.   Yeah.  We would -- we would buy the sheet
22  packing which came in various thicknesses, and it
23  would come in a -- usually something like a 4-by-4
24  sheet of it.  Some of it, the thinner material, would
25  come in a roll.  It could be rolled up; but the

ANGELL REPORTING SERVICE, INC.

34

1   heavier stuff, we used it to make specific gaskets
2   that we didn't have a replacement for.  We would
3   fabricate the gasket ourself.
4   Q.   Okay.  And do you recall what the sheet
5   packing was made of?
6   A.   Well, it was -- it had a mica-type finish
7   on it, on the outside, and it was extremely
8   compressed.  A lot of it had wire inserted in it to
9   add more strength to it; and, you know, it was just
10  common for us to work with this material, cut it
11  and --
12  Q.   Did that material contain asbestos or not?
13  A.   Oh, yes.  There was asbestos in it.  Sure.
14  Q.   Okay.
15      And how would you fabricate the use of this
16  product?
17  A.   Well, we'd -- we'd cut it.  We'd cut it
18  with hand tools, shears if you could use a shear, a
19  pair of aviation shears; or you'd have to use a saw
20  or we had -- we had gasket-making cutters that would
21  make a perfect circle, and then we'd punch out the
22  bolt holes either -- either use a -- after you cut
23  the gasket, basically you'd lay it over the pipe and
24  tap it with a ball-peen hammer usually and bang on it
25  until you perforated it enough.  Then you'd push out

ANGELL REPORTING SERVICE, INC.

35

1   the piece.
2   Q.   And what you mean by "fabricate," you
3   mean -- do you mean that you were able to cut this to
4   various sizes?  Correct?
5   A.   Yeah.
6   Q.   Right.
7   A.   Yeah.
8   Q.   Versus a preformed gasket that came
9   preformed round from the manufacturer, correct?
10  A.   Yes, that's correct.
11  Q.   Did you have occasion to use any of the
12  preformed gaskets?
13  A.   Yes.  If they were available, we'd use the
14  preformed gasket.
15  Q.   But, otherwise, you'd have to use the sheet
16  packing material to cut and cut it to size; is that
17  correct?
18  A.   That's correct.
19  Q.   And you said that sheet packing material
20  came in various thicknesses, some of it thin enough
21  to roll, others not; is that right?
22  A.   That's correct.
23  Q.   Okay.
24      And where would you use that as opposed to
25  those other spiral-wound gaskets that you talked

ANGELL REPORTING SERVICE, INC.

36

1   about earlier?
2   A.   Well, we might -- we might use it on an oil
3   pipe versus a steampipe; but we had a lot of chill
4   water piping on the ship for air-conditioning, and
5   we'd also fabricate gaskets for that system.
6   Q.   Okay.  Were any of these sheet packing type
7   gasket material, was that ever used on the steam
8   lines?
9   A.   Yes.
10  Q.   Okay.
11      Would it be used more for the lower
12  pressure steam versus the high-pressure steam?
13  A.   Usually lower pressured.
14  Q.   Okay.
15  A.   Up to 350 pound.
16  Q.   All right.
17      And would any of those, those sheet packing
18  type gaskets, be used in or around the boilers on the
19  Range Sentinel?
20  A.   Yes.  We had occasions to use them.
21  Q.   All right.
22      Now, do you recall the manufacturers of the
23  sheet packing material or preformed gasket material
24  that you just described?
25  A.   Well, Garlock was a big name in it.

ANGELL REPORTING SERVICE, INC.

37

1  Chesterton was another name in it that we used
2  commonly.
3          I can't particularly think of another name
4  or so right now.
5      Q.   Okay.
6          And let's -- let's talk about -- you talked
7  about using these various tools to cut that material,
8  punch it out and so forth. What occurred when you
9  did that? Was there anything -- did it create a
10 certain condition in the engine room?
11     A.   Well, yeah. A lot of times we'd take it
12 back to the machine shop and make it.
13     Q.   Okay.
14     A.   But, yeah, if you'd cut it with a saw, of
15 course, it would -- the particles would create dust.
16 A lot of times you'd have to use a hull saw, a metal
17 hull saw, and cut through it. It was very tough
18 material.
19     Q.   Okay. Did Mr. Jackson ever have occasion
20 to perform those types of tasks aboard the Range
21 Sentinel?
22         MR. GEOFFROY: Objection to form.
23         THE WITNESS: Yes, he was involved in
24 repair work.
25 BY MR. MARSDEN:

38

1      Q.   Okay. And did he work closely with you or
2  not in doing those types of activities?
3          MR. GEOFFROY: Objection to form.
4          THE WITNESS: Yes, many occasions.
5  BY MR. MARSDEN:
6      Q.   Now, when you -- you described how you cut
7  the new material. What happened -- how did you
8  replace the old material? What kind of procedures
9  did you go through to replace the old material or
10 remove it rather?
11     A.   Well, to gain access we had to remove the
12 insulating pads around -- if it was a flange, had to
13 remove the insulating cover; and then under the cover
14 itself usually was a wrapping of loose cloth which
15 was -- the only product that would hold up to the
16 heat was an asbestos-type product, and we'd set it
17 all aside and then take the bolted flange apart; and
18 we had a device called a spreader that we would clamp
19 on it, and it would spread it far enough apart that
20 you could get the file in between it to clean up the
21 faces; and if we had an exact replacement in spares,
22 we'd use that. Otherwise, we'd have to fabricate
23 something.
24     Q.   Okay.
25          And, again, that means cutting the sheet

39

1  packing to size, correct?
2      A.   Yeah. That's correct.
3      Q.   Now, would the old gasket --
4          And I'm talking about the type of gaskets
5  that are made from sheet packing.
6          Would they come off a steam line easily, or
7  was it difficult to get it off?
8      A.   Well, there would always be some of it that
9  would stick, and that's when you'd use a file or a
10 hacksaw blade, drawing it back and forth through
11 there, because to be able to clean it any better we'd
12 have to disassemble another piece of the pipe; so we
13 try and contain it to the one that was leaking, not
14 mess with -- you know, as they say, if it isn't
15 broke, don't fix it.
16     Q.   Right.
17          Now, would you ever have occasion to use
18 other types of tools to clean the flange face where a
19 gasket was -- remnants of the gasket were stuck onto
20 it?
21     A.   Yeah. If it was accessible, we could use a
22 wire wheel or a wire brush itself but, you know, a
23 power -- a power tool, a wire wheel.
24     Q.   Okay.
25          Now, you mentioned earlier some auxiliary

40

1  equipment in the engine room or auxiliary areas. I
2  believe you referred to them as various types of
3  pumps; is that correct?
4      A.   Yes.
5      Q.   And what types of pumps were aboard the
6  Range Sentinel, sir?
7      A.   Well, we had oil pumps, water pumps, air
8  pumps, whatever product we had to move around if it
9  was a pumpable liquid, you know, oil, heavy oil,
10 light oil, lubricating oil, hydraulic oil.
11     Q.   And were these pumps operated by steam or
12 were they electric or both?
13     A.   A combination.
14     Q.   Okay. And the steam pumps, they were
15 connected by a steam line, correct?
16     A.   That's correct.
17     Q.   Okay. And when you had to -- or, first of
18 all, did you ever have to work on the pumps on the
19 Range Sentinel?
20     A.   Yes.
21     Q.   And what types of -- what types of work
22 would you have to do on the pumps?
23     A.   Well, renewing gaskets, leaking gaskets, on
24 them, a steam-driven pump; and a lot of times the
25 regulating valve for the steam pump, we'd have to

45

1     A.   Well, there'd always be some.  We'd get in
2  there with a scraper, various type scrapers.  A lot
3  of times you'd take something like a hacksaw blade or
4  a screwdriver and work it in there and keep -- keep
5  pulling it out until you got all the old packing out.
6     Q.   Okay.  Did you ever have occasion or not to
7  utilize airhoses to clean the packing gland?
8     A.   Yeah.  Occasionally you'd use some airhose,
9  some air pressure, to help, but a lot of times you
10  could do it.  Sometimes you'd get even a vacuum, and
11  you could help use -- a vacuum cleaner would help you
12  get some of it out.
13     Q.   Okay.
14          Now, was Mr. Jackson working with you,
15  assisting you, when you performed those types of
16  activities or not?
17     A.   Many of the occasions he was helping.  Yes.
18     Q.   Okay.
19     A.   If he wasn't helping with the actual work,
20  he'd be cleaning it up after.
21     Q.   Okay.
22          And do you recall -- of the pump packing
23  material do you recall the manufacturers that --
24  whose material you utilized aboard the Range
25  Sentinel?

46

1     A.   Well, Chesterton was a big supplier; but a
2  lot of this packing material, we'd get it out of the
3  federal supply system, and we'd order it by a stock
4  number.  We'd never specify any particular brand, and
5  whatever -- whatever we got, John Crane or -- you
6  know, they still had the name on the box but --
7     Q.   Right.
8     A.   -- but we -- we couldn't really specify
9  what material we wanted.
10     Q.   You'd use whatever you had?
11     A.   Well, we'd -- we'd use whatever came under
12  this federal stock number for the various sizes.
13     Q.   Okay.
14          You mentioned John Crane.  Did you utilize
15  John Crane's packing aboard the Range Sentinel?
16     A.   Yes.  Yes, we used Crane.
17     Q.   Okay.
18          Did you ever -- do you recall whether or
19  not Garlock made that type of material as well?
20          MR. STARR:  Objection.  Form.
21  BY MR. MARSDEN:
22     Q.   Go ahead.
23     A.   Yes.  There was Garlock packing material,
24  Garlock packing sheet material, also.
25     Q.   Okay.

47

1          Now, talk about the pump packing and this
2  rope-type packing that came in various diameters and
3  some of which you said was lubricated.
4          Was there ever utilized aboard the Range
5  Sentinel rope-type packing that wasn't lubricated?
6     A.   Yes.  Through the boiler -- the soot leaks
7  from the boiler, we would stop soot leaks most of the
8  time using an as -- well, it was an asbestos
9  rope-type material and it came in a bundle.  It was
10  wrapped around a little dowel type for a center, and
11  it was just wrapped all around it; and I guess they
12  bought it by the pound perhaps.  I'm not sure.
13     Q.   Okay.
14     A.   But you'd take that and use a sharp
15  instrument and stuff it in wherever you had soot
16  leaks around the boiler, try and contain the soot
17  leaks so it would, you know, go on up the stack.
18     Q.   Now, what diameters were -- did that
19  material come in?
20     A.   That was probably at least half inch and
21  up.
22     Q.   Okay.
23     A.   It went up to perhaps even an inch thick.
24     Q.   And how many layers would you have to use
25  stuffing it in there to prevent those soot leaks?

48

1     A.   Well, externally on the boiler you'd use
2  the smaller stuff, but internally in the boiler, when
3  a boiler was shut down, between the sectional headers
4  and the boiler there was asbestos rope; and if it got
5  burned away or it got wasted, it was leaking there,
6  we'd recaulk it was the term, caulk it with rope
7  packing.
8     Q.   Okay.  And how many layers of that rope
9  packing might you have to put in that space?
10     A.   Well, if it was all gone -- sometimes it
11  would be three or four deep.
12     Q.   Okay.
13     A.   So, you know, you'd use quite a bit of it.
14     Q.   And how big a space is that top to bottom
15  or around or --
16     A.   Well, sometimes a sectional header was
17  maybe twelve feet, fifteen feet long, and it was a
18  serpentine shape; so you'd use a lot -- you'd use a
19  lot of rope packing.
20     Q.   That rope-type packing, was that utilized
21  around the manhole covers on the boiler as well or
22  not?
23     A.   No, not the manhole covers.  They were a
24  Flexitallic type.
25     Q.   Okay.

133

```
1      Q.   Okay.  So it would be used around the
2  burner throat in the boiler, but it wasn't really
3  gasket-type material, rope packing material, that
4  would be used in --
5      A.   No.
6      Q.   -- valves or flanges?
7      A.   No.
8      Q.   Okay.  Let me ask you some questions about
9  Garlock.
10         You identified a couple of Garlock products
11 that were used on the Range Sentinel.  Do you
12 remember that?
13     A.   Yes.
14     Q.   Can you give me a list of the specific
15 Garlock products that you remember were used?
16     A.   Well, they had a gray sheet which was a
17 very, very hard product.  It wasn't very pliable, and
18 it had wire inserted through it; and we would use it
19 in a particular -- where a gasket was subject to
20 fairly often failure, we would use that Garlock.  It
21 would hold up much better than any other product.
22     Q.   Okay.  So you said you would use this gray
23 sheet, hard product that Garlock produced when you
24 were having, I guess, a problem gasket?
25     A.   Yes.
```

ANGELL REPORTING SERVICE, INC.

134

```
1      Q.   And I take it, the gray sheet that you're
2  referring to is sheet packing?
3      A.   Yes, it's sheet packing, fairly thick, like
4  almost sometimes an eighth of an inch thick would be
5  what we'd use.
6      Q.   Now, this wouldn't be used -- this wouldn't
7  be the regular material used for gaskets around the
8  ship.  It would be used for problem gaskets?
9      A.   No.  It was available for anything, but it
10 would hold up when everything else so to speak would
11 fail.  It was the kind of product that would hold up.
12     Q.   Now, how do you know that this gray sheeted
13 material that you were using for problem gaskets was
14 manufactured by Garlock?
15         MR. MARSDEN:  Objection.  He just
16 answered your question otherwise so --
17         MR. STARR:  I'm sorry.  He answered
18 my question how he knew it was
19 unmanufactured by Garlock?
20         MR. MARSDEN:  It was used for only
21 problem gaskets.
22         MR. STARR:  No.  No.  That's not what
23 I'm asking, Counselor.
24         MR. MARSDEN:  All right.
25 BY MR. STARR:
```

ANGELL REPORTING SERVICE, INC.

135

```
1      Q.   How do you know that the material you used
2  was unmanufactured by Garlock?  Did it have any
3  identifying features?
4      A.   Yeah.  The name was printed right on it.
5      Q.   It was actually on the gray sheeted
6  material or in the packaging?
7      A.   No.  It was on both.  As I recall, it was a
8  silvery name, Garlock, with a big "G" on it and it
9  was -- it was printed all over the sheet.  You know,
10 the sheet might be 4 feet by 4 feet, and the name
11 appeared about every foot on the sheet and in
12 repetition, just --
13     Q.   Okay.  How did the sheet material come?
14 Did it come in a spool that you had to roll out?
15     A.   Well, some of the Garlock, the thinner
16 Garlock, was able to be rolled, the sheet was able to
17 be rolled up; but once you got above about an eighth
18 of an inch, it was pretty hard to roll it and it
19 came -- it came in a little wooden frame that would
20 protect it with cardboard on each side of it, but
21 that Garlock was a very good product.
22     Q.   Let's talk about the thinner material for a
23 second.
24         How did you know that the thinner material
25 was manufactured by Garlock?  Was it the same answer
```

ANGELL REPORTING SERVICE, INC.

136

```
1  you gave me as far as the heavy material?
2      A.   It was the same kind of a printing logo,
3  yes, where the name repeated itself all over.
4      Q.   Even on the thinner material?
5      A.   Yeah.
6      Q.   Besides the sheet packing material did you
7  ever use any precut Garlock gaskets?
8      A.   Yes.
9      Q.   How did those precut gaskets come packaged?
10     A.   They were in like a brown paper.
11     Q.   Individually wrapped?
12     A.   Yeah, most of them were individually
13 wrapped.  Sometimes there would be -- there might be
14 five or six of them in a package but it had like this
15 brown -- I don't want to call it a wax paper on the
16 inside.  Well, similar to a wax paper but the brown
17 paper and then it was in a box.
18     Q.   Would there basically be one packaged in a
19 box or numerous gaskets in a box?
20     A.   Usually -- I don't recall there being much
21 more than only five in a box, but then there might be
22 five boxes in a bigger box.
23     Q.   Okay.  And did this box have the same
24 identifying Garlock logo as the other material that
25 you described, such as the silver name?
```

ANGELL REPORTING SERVICE, INC.

137

1     A.   No.  It had the same name with the big "G"
2  and it didn't -- the name didn't repeat itself all
3  over the box.  It was just --
4     Q.   Okay.  Is there any other Garlock material
5  that you associate with gaskets?
6     A.   With sheet gaskets or --
7     Q.   With sheet gaskets or with precut gaskets.
8     A.   Well, precut.
9         We used Garlock pump packing.
10    Q.   Okay.  We'll get to the pump packing.
11  We'll keep it separate from the gaskets.
12    A.   No.  No.  I can't recall any other.
13        Yeah, I do.  Oil paper.  We had what they
14  called an oil and water gasket which was like a brown
15  material and that was Garlock, too.
16    Q.   How did that come packaged?
17    A.   It came in a roll.
18    Q.   "In a roll."
19        Was the roll in a box?
20    A.   A lot of times, no, it wasn't in a box.
21    Q.   Were there any identifying features on the
22  roll?
23    A.   The name imprinted on it.
24    Q.   On the sides of the roll that we were
25  referring to?

138

1     A.   Yeah, a couple of places.  Yeah.
2     Q.   How was a leaky gasket brought to your
3  attention?
4     A.   Well, if I didn't see it myself and make
5  note of it, any of the other watch standers would,
6  you know, leave a note over by the log desk.
7     Q.   Was a leaky gasket something that was
8  replaced immediately?
9     A.   Well, depending on the operation of the
10  ship at the time.  If it was a nonvital system, you
11  know, you could isolate it sometimes and go ahead and
12  work on it and fix it.  The sooner you could fix it,
13  obviously the less trouble you'd have.
14        The first thing you would do is try to
15  tighten it up if you could stop it.  That usually
16  wasn't successful, though.  You try to tighten it up
17  a little bit more, but some of these you had to wait
18  until the power plant was shut down.
19    Q.   Was that just because of the nature of the
20  piping system the leaky gasket was attached to?
21    A.   Yeah.  It would have been on the steam
22  system.
23    Q.   When would the plant be shut down?
24    A.   Well, whenever we got into port, we'd shut
25  one boiler down or the other boiler.  We always had

139

1  one boiler on the line and usually at least two turbo
2  generators.
3     Q.   If you had a leaky gasket and you weren't
4  scheduled to be in port for a while and it was part
5  of a vital system that couldn't be shut down, would
6  there be like a quick fix that you would use, a
7  temporary solution?
8     A.   No, only -- no.  There was no quick fixes.
9        A couple of times I remember when we'd be
10  underway we had a major gasket leaking and we shut
11  the ship down at sea.
12    Q.   What happened?  How long did it take to
13  replace that gasket?
14    A.   Well, to the time you could get the
15  pressure off the particular gasket area.  If it was
16  the boiler itself, it would probably take at least
17  twelve hours to cool the boiler down so you could
18  stop steaming; but some of the other systems maybe we
19  could -- as soon as we could shut down -- if it was
20  not the boiler itself, we could shut it down even
21  though we had to stop the ship.  Then we could
22  replace the gasket.
23    Q.   Okay.
24    A.   But a couple of times we shut everything
25  down and just drifted until we fixed it.

140

1     Q.   Let's talk about the time it takes to
2  replace the gasket.  I'm not talking about a vital
3  system.
4        Once the piping system is isolated and you
5  can actually go in and take off the flange and things
6  of that nature, from start time to finish how long
7  would it take to replace a gasket?
8     A.   Well, if you had all the insulation out of
9  the way --
10    Q.   Let's talk about even with insulation on.
11    A.   I'd say almost three, four hours.
12    Q.   Okay.  Out of that three or four hours how
13  long would it take to remove the insulation?
14    A.   Insulation maybe 20 minutes.
15    Q.   Twenty minutes to remove the insulation.
16        What would be the next step in replacing a
17  gasket?
18    A.   Removing the bolting.
19    Q.   How long would it take to remove the
20  bolting?
21    A.   Well, sometimes you couldn't.  We'd wind up
22  having to take a torch and cut it.
23    Q.   Then you would have to replace that section
24  of the pipe?
25    A.   No.  We'd cut the bolts because you

149

1   asbestos dust.
2        In the grand scheme of asbestos-containing
3   products that you've already mentioned, how much dust
4   would be created from making a new gasket out of the
5   heavy gauge sheet packing, sheet packaging?
6        MR. MARSDEN: Objection. Vague.
7        THE WITNESS: How was that? The thin
8   one versus the thicker one?
9   BY MR. STARR:
10       Q.   I'll rephrase the question.
11       I know you described numerous processes,
12  not just packaging material or gasket material, on
13  numerous products that actually created asbestos dust
14  when they were in use.
15       A.   Yeah.
16       Q.   Just as far as gaskets go, how much dust
17  would be created when making a new gasket rather than
18  cutting insulation that was going over a pipe or
19  dealing with insulation over a boiler?  Would it be
20  less dust than those other materials?  More dust?
21  The same?
22       A.   I'd say it would be about the same.
23       And we're still going to clean the flanges
24  so we're going to take a file or a hacksaw blade or
25  something to get in between the flanges and clean it

ANGELL REPORTING SERVICE, INC.

150

1   as thoroughly as you possibly could.
2        Q.   Cutting a gasket would be roughly the same
3   amount of dust associated with, say, cutting pipe
4   insulation?
5        MR. MARSDEN: Objection.  It's asked
6   and answered.
7        THE WITNESS: Not that much.  Not
8   that much dust.
9   BY MR. STARR:
10       Q.   Not as much as cutting pipe insulation?
11       A.   Yeah.  Cutting the pipe insulation created
12  a lot more dust.
13       Q.   Let's talk a little bit about cleaning the
14  flange.
15       Obviously, if the gasket didn't come out
16  clean, it was required to clean the excess packaging
17  material off the flange?
18       A.   Yeah.
19       Q.   How would that be done?
20       A.   Usually a file or a hacksaw blade.  You
21  know, you couldn't spread the flanges too far for
22  fear of springing the pipe somewhere else.  You'd
23  work in a confined area, and a file used to work just
24  about as good as anything; but, of course, as you're
25  drawing it back and forth, the dust and metal and

ANGELL REPORTING SERVICE, INC.

151

1   everything, that residue that's there, is falling
2   down.
3        Q.   Now, would that be the job responsibility
4   of an engineer, of the engineer who is repairing the
5   pipe?
6        A.   Usually.
7        Q.   Would that be something that Mr. Jackson as
8   a wiper would have to do?
9        A.   No. He usually wouldn't do that. That
10  would be a little -- they'd want somebody with a
11  little higher skill level working on that.
12       Q.   I think you testified about this
13  previously.
14       When you were removing a gasket, it's not
15  possible to determine who the manufacturer is of the
16  removed gasket, is it?
17       A.   Usually not.  For information later
18  sometimes you could see some of the steel jacketing
19  around -- the Flexitallic part of the gasket would
20  have a stamped manufacturer's name, you know.
21       Q.   How about when you -- when you receive the
22  sheet packing --
23       Strike that.
24       I know you testified that a lot of times
25  dealing with the federal supply program you wouldn't

ANGELL REPORTING SERVICE, INC.

152

1   know exactly what type of material you're getting; is
2   that correct?
3        A.   That's correct.  Yeah.
4        Q.   You might not be able to answer my next
5   question, but with specific reference to Garlock and
6   Garlock gaskets, either preformed -- first Garlock
7   preformed gaskets, is it possible for you to give me
8   a percentage of times that you were using a Garlock
9   preformed gasket compared to another manufacturer's
10  preformed gasket?
11       A.   No, I couldn't give you a time but I can
12  say I would say most all the fellows had a preference
13  for Garlock because the very name of it. It was a
14  much better product.
15       Q.   But you still would not be able to give me
16  a percentage of the amount of times?
17       A.   I couldn't say that. No.
18       Q.   How about with Garlock -- the sheet packing
19  to make -- to cut your own gaskets?  Is there a
20  specific percentage, a number, that you can give me
21  of the amount of times that the Garlock sheet packing
22  material was used over another manufacturer's sheet
23  packing material?
24       A.   No.  There was an equal amount -- in most
25  of the cases an equal amount of anybody and

ANGELL REPORTING SERVICE, INC.

153

1 everybody's brand, whoever supplied it.
2     Q.   Okay.
3          Let's talk about pumps a little bit, and
4 hopefully I can cut this a little bit shorter.
5          I note one of the other defense counsel
6 asked you about John Crane packing.
7     A.   Uh-huh.  Yes.
8     Q.   I don't know if you remember all your
9 answers to that; but as far as the steps in replacing
10 the packing and things of that nature, would that be
11 the same no matter who manufactured the packing?
12    A.   Yes.
13    Q.   Is there anything specific about Garlock
14 packing that was different from other types of
15 manufacturers' packing that you remember?
16    A.   No.  Just that it held up better.
17    Q.   Do you remember how the Garlock packing,
18 referring to the pumps now, came packaged?
19    A.   Yeah.  It came in a cardboard box.
20 Depending on the size of the gland it came in a
21 rolled position if it was precut and preformed; but
22 even if it wasn't, it came in almost like a coil and
23 it would be in a cardboard box maybe 3 inches by 4
24 inches by maybe 8 inches long.
25          Some of the boxes were a big flat box, a

ANGELL REPORTING SERVICE, INC.

154

1 big flat box, a box about three inches deep, a box
2 that was 1 foot by 1 foot, and the packing would be
3 in a big coil in there.
4     Q.   This is rope packing we're referring to?
5     A.   No.  This is pump packing.
6     Q.   Pump packing?
7     A.   Yeah.
8     Q.   Did you ever have occasion to use rope
9 packing manufactured by Garlock on the ship?
10    A.   I don't recall that.
11    Q.   I think you already testified about how
12 long it would take to replace the packing in the
13 pumps.
14         That's all the questions I have now for
15 you, sir.  I'm going to let someone else have a
16 chance; and if I remember any other questions, I'll
17 ask at the end.
18    A.   Okay.  Thank you.
19    Q.   Thank you very much.
20    A.   Yeah.
21               CROSS EXAMINATION
22 BY MR. RUTLEDGE:
23    Q.   Mr. Murray, my name is Michael Rutledge.
24         Earlier you testified that you were
25 familiar with the name "Bryan Steam" and that you

ANGELL REPORTING SERVICE, INC.

155

1 associate them with heat exchangers.  How do you know
2 those heat exchangers were manufactured by Bryan
3 Steam?
4     A.   Well, I remember the nameplate on them.
5     Q.   I know earlier you testified the nameplate
6 had the primary material that those products were
7 made of; is that correct?
8     A.   Well, not particularly.  If it had specific
9 material in the tube, it might specify, you know,
10 cooper nickel.
11    Q.   Let me make it specific.
12         Did the nameplate specify anything for a
13 Bryan Steam heat exchanger?
14    A.   I can't say it did in particular.
15         MR. MARSDEN:  Objection.  Vague.
16 BY MR. RUTLEDGE:
17    Q.   Did it specify anything as to the
18 composition of the Bryan Steam heat exchanger?
19    A.   No.  I don't think it did.
20    Q.   Other than the manufacturer do you remember
21 anything else that nameplate specified?
22    A.   The temperature range, usually it had the
23 temperature range; and if it was an inspected
24 product, it would have a Maltese cross on it from the
25 ABS inspectors and whatnot.

ANGELL REPORTING SERVICE, INC.

156

1     Q.   How many different types of Bryan Steam
2 heat exchangers do you remember aboard the Range
3 Centennial?
4     A.   I'd say there was just a few.
5     Q.   When you say a few, a few different times
6 or a few total?
7     A.   Two, two or three total types of heat
8 exchangers.  They were all tube-within-shell heat
9 exchangers.
10    Q.   Okay.  Let me rephrase this just to make
11 sure I'm clear.
12         How many total Bryan Stem heat exchangers
13 do you remember aboard the Range Centennial?
14         MR. MARSDEN:  It's Range Sentinel.
15 BY MR. RUTLEDGE:
16    Q.   Range Sentinel.
17    A.   I'd say there was about six.
18    Q.   Of those six it's my understanding you said
19 there were two or three different types?
20    A.   Yeah.
21    Q.   Do you know model numbers for any of those
22 types?
23    A.   No.  I couldn't recall them.
24    Q.   Okay.  Do you associate those six Bryan
25 Steam heat exchangers with any particular

ANGELL REPORTING SERVICE, INC.

Videotaped Deposition of:  RICHARD R. MURRAY

Taken on:  June 10, 2004

Dorothy A. Jackson vs. A-C Product Liability Trust, et al.

Pages 1 to 201

## COMPRESSED TRANSCRIPT

*Angell Reporting Service, Inc.*

2460 N. Courtenay Parkway, Suite 111
Merritt Island, FL 32953
(321) 449-9800 (321)   (800) 805-DEPO
Fax (321) 453-1348



EXHIBIT

161

1    A.   No.  I can't recall any.
2    Q.   Okay.  Another product you mentioned was
3 Argo International.  What do you associate with Argo
4 International?
5    A.   I remember gauge glass gaskets.
6    Q.   Okay.  Where would those have been located?
7    A.   The gauge glasses were on the boiler.
8    Q.   Okay.  And do you contend that product
9 contained asbestos?
10   A.   All of them did at the time.  Yeah, they
11 all had it.  I think it was --
12            I also remember Argo Marine.
13   Q.   What's Argo Marine?
14            I'm sorry.  How do you remember Argo
15 Marine?
16   A.   Well, I just remember that name, that
17 labeling name.
18   Q.   Okay.
19   A.   Whether it's the same company or whatever,
20 I'm not sure.
21   Q.   Do you have any specific recollection of
22 Mr. Jackson working on the Argo gauge glass gaskets?
23   A.   No.
24   Q.   I think that's all I have.  Thank you.
25   A.   Okay.  Thank you.

ANGELL REPORTING SERVICE, INC.

---

162

1            (Off the record.)
2            CROSS EXAMINATION
3 BY MR. GEOFFROY:
4    Q.   Mr. Murray, my name is Ray Geoffroy.  I've
5 got some questions for you generally about the Range
6 Sentinel -- and that is the only vessel I want to
7 talk to you about today -- and then some others about
8 some of the gasket materials that you discussed
9 earlier.
10           First of all, you've told us a little bit
11 about the size of the crew for the Range Sentinel.
12 How large was the crew for the engine room?
13   A.   About a 40-man engine crew.
14   Q.   Within those 40 men there were several
15 different groups of ratings, right?
16   A.   Yes.
17   Q.   What were some of those ratings?
18   A.   Well, there was two Third Assistant
19 Engineers, one Second Assistant Engineer, one First
20 Assistant Engineer, the one Chief Engineer.  Then
21 there was a plumber/machinist.  There was an
22 electrician and an assistant electrician.  There were
23 two utility men which were general purpose guys.
24   Q.   When you say "two utility," general purpose
25 repair-type guys?

ANGELL REPORTING SERVICE, INC.

---

163

1    A.   Yes.
2    Q.   Okay.
3    A.   There was a refrigeration engineer and
4 three wipers.  I'm pretty sure that's it.
5    Q.   Now, with the exception of the wipers, the
6 ratings that you just described, each of those, the
7 folks who held those ratings, part of their job
8 duties, their specific job duties, was to repair
9 either machinery or product on the machinery, right?
10   A.   Uh-huh, correct.
11   Q.   And then the wipers, you already testified
12 their main job responsibility was custodial, right?
13   A.   Right.
14   Q.   And you were a watch stander, correct?
15   A.   Correct.
16   Q.   Mr. Jackson was a day worker as a wiper?
17   A.   That's correct.
18   Q.   Your shift and Mr. Jackson's shift didn't
19 always match up at the same time, correct?
20   A.   Not always.
21   Q.   Sometimes you'd be with him on a shift for
22 four hours.  Other days you wouldn't have the same
23 shift with him at all.  Isn't that right?
24   A.   That's correct.
25   Q.   Okay.

ANGELL REPORTING SERVICE, INC.

---

164

1            We talked a lot about -- a lot today about
2 repair work and how Mr. Jackson actually -- his main
3 job was custodial.
4            When he did assist you or others in a
5 repair-type job, that was a small part of his daily
6 working responsibility, correct?
7    A.   Yes.
8    Q.   Earlier you testified, when you were on the
9 Range Sentinel, that you worked on steampipes to
10 repair leaks, right?
11   A.   Correct.
12   Q.   In response to some questions from
13 plaintiff's counsel, Mr. Marsden, you described what
14 a flange is, right?
15   A.   Yes.
16   Q.   And you described the different types of
17 gaskets that you would use or that were used to join
18 a flange, right --
19   A.   Right.
20   Q.   -- to join pipes?
21            And you talked quite a bit about
22 Flexitallic?
23   A.   Yes.
24   Q.   I take it, from your responses it sounds
25 that Flexitallic was the primary spiral-wound

ANGELL REPORTING SERVICE, INC.

1            IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2

     IN RE: REINSTATEMENT OF CAUSES
3    ASBESTOS PRODUCTS LIABILITY                    COPY
     1:99CV10802
4    LITIGATION (NO. VI)                        VIDEOTAPE

5    THIS DOCUMENT RELATES TO ONE
     MARITIME ASBESTOS CASE
6
     CASE NO. 1:99CV10802
7
     JAMES E. JACKSON,
8
            Plaintiff,
9
        vs.
10
     A-C PRODUCT LIABILITY TRUST, et al.,
11
            Defendants.
12

13   DEPOSITION OF:   JAMES E. JACKSON - VOL. II

14   DATE:           May 5, 2003

15   TIME:           10:20 AM

16
     LOCATION:       Jackson Residence
17                   1935 Piper Drive
                     Charleston, SC
18
     TAKEN BY:       Counsel for the Plaintiff
19
     REPORTED BY:    TERRI L. BRUSSEAU,
20                   Registered Professional
                     Reporter, CP, CRR
21   _____

22   Computer-Aided Transcription By:

23       A. WILLIAM ROBERTS, JR., & ASSOCIATES

24   Charleston, SC                  Greenville, SC
     (843) 722-8414                  (864) 234-7030

25   Columbia, SC                    Charlo[tte]
     (803) 731-5224                  (704)
     A. WILLIAM ROBERTS, JR., & ASSOCIATES (800)

EXHIBIT
D

Page 147

1 it had numbers on it that I had crossed over.
2     Q.  Okay.  Why did you cross those over?
3     A.  Because I identified them.
4     Q.  Okay.  What about them made you
5 identify them?  Was it the name of the company or
6 was it a description of what they made or produced?
7     A.  It was the name of the company.
8     Q.  Okay.  And how did you recognize that
9 name?
10     A.  I recognized the name because I had
11 identified it more than one time.
12     Q.  You had identified it more than one
13 time?
14     A.  Right.
15     Q.  How did you identify it more than one
16 time?
17     A.  Because I had worked around it.
18     Q.  Okay.  Well, let me ask you a question
19 then going back to when we were talking just a few
20 minutes ago.  You remember us talking about
21 wicking?
22     A.  Yeah.
23     Q.  Okay.  You had listed Auburn
24 Manufacturing along with wicking.  Do you identify
25 Auburn Manufacturing with wicking?

Page 148

1     A.  Some of it.
2     Q.  Okay.  Why do you identify Auburn
3 Manufacturing with wicking?
4     A.  Well, because it's two different -- two
5 different objects.
6     Q.  I'm sorry, could you explain that for
7 me?
8     A.  There's two different -- two different
9 wickings offered for manufacturing.  And wicking --
10 there's two different -- two different --
11     Q.  Let me make sure I understand you.  Are
12 you telling me that Auburn makes two different
13 types of wicking?
14     A.  Auburn makes two different wickings.
15     Q.  Did you see the Auburn name on
16 the wicking?
17     A.  Well, no.
18     Q.  How did you know that it was Auburn
19 wicking?
20     A.  Taking a guess.
21     Q.  You were taking a guess?
22     A.  Yeah.
23     Q.  Okay.  About those -- I don't want to
24 go back through the whole list of products that we
25 talked about.

Page 149

1     A.  Okay.
2     Q.  Can you tell me which of those
3 products, and I'll -- I'll run through them if I
4 need to, but can you tell me from your own memory
5 what products you remember seeing a particular name
6 on that caused you to identify it on the list?
7     A.  Well, wicking is a product --
8     Q.  In addition to wicking.  Any of the
9 products that we've talked about this morning, can
10 you tell me names of particular companies that you
11 recall seeing that you worked with while you were
12 on ships?
13     A.  Well, I work with wicking because it
14 was a main -- it was a main product.  I'm always
15 going to get wicking to -- to fix a gasket.  I'm
16 always going to get wicking to patch a hole up.
17 I'm always going to get wicking to -- to do
18 something with it.
19     Q.  Okay.
20     A.  So wicking was one of the main patches
21 that we really used.
22     Q.  Okay.  What about some of these other
23 products, say asbestos cement or firebrick or
24 heaters, are there any names that you know you saw
25 that you can associate with those products?

Page 150

1     DEFENSE:  Objection to the form.
2     THE WITNESS:  Well, mostly -- mostly
3 when you deal with wickings, you're dealing with a
4 lot of firebrick.  A lot of firebrick.  And
5 wicking -- and wicking brings a lot of stuff to the
6 ship and easy to work with.  Very easy.  And I
7 would rather work with wickings than work with
8 anything else because once you get it on your hand,
9 you can wash it off.  And this is why I prefer to
10 work with wicking.
11 BY MR. HERKE:
12     Q.  Okay.  Mr. Jackson, is it fair to say
13 that in producing Exhibit 3, you recognized some
14 names and you knew you worked with some products,
15 and so you circled those names just because you
16 recognized the names and not because you knew you
17 had worked with that particular product, that
18 particular company's product?  Did you understand
19 my question, sir?
20     A.  Repeat it again.
21     Q.  Okay, sir.  Is it fair to say that in
22 producing Exhibit 3, the list of company names --
23     A.  Right.
24     Q.  -- that you just circled names that you
25 recognized, and you may have worked with their

8 (Pages 147 to 150)

1                    IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

    IN RE: REINSTATEMENT OF CAUSES
3   ASBESTOS PRODUCTS LIABILITY
    1:99CV10802
4   LITIGATION (NO. VI)

5   THIS DOCUMENT RELATES TO ONE
    MARITIME ASBESTOS CASE

6

    CASE NO. 1:99CV10802
7

    JAMES E. JACKSON,
8

                 Plaintiff,
9

          vs.
10

    A-C PRODUCT LIABILITY TRUST, et al.,
11

                 Defendants.
12

13  DEPOSITION OF:    JAMES E. JACKSON

14  DATE:             April 2, 2003

15  TIME:             10:27 AM

16
    LOCATION:         Town & Country Inn
17                    2008 Savannah Highway
                      Charleston, SC

18
    TAKEN BY:         Counsel for the Plaintiff
19
    REPORTED BY:      TERRI L. BRUSSEAU,
20                    Registered Professional
                      Reporter, CP, CRR

21
    Computer-Aided Transcription By:
22
            A. WILLIAM ROBERTS, JR., & ASSOCIATES
23
    Charleston, SC                    Greenville, SC
24  (843) 722-8414                    (864) 234-7030

25  Columbia, SC                      Char
    (803) 731-5224                    (704
      A. WILLIAM ROBERTS, JR., & ASSOCIATES (80

EXHIBIT
E

Page 46

1   things for the attorney or is this another list?
2          MR. BRUCH: Objection. Are you
3   referring to Exhibit 3?
4          MR. LANE/MR. ROSEN/MR. BARTLETT:
5   Objection.
6          THE WITNESS: I couldn't tell you
7   offhand.
8   BY MR. LANE:
9      Q.  Well, let's talk about Exhibit 3.
10  You've got -- the first one on there you list is
11  A-C Product Liability, Allis-Charlmers. Is that --
12  is that something that you recall seeing over your
13  work career on these ships?
14         MR. MANN: I want a continuing
15  objection to all questions which identify anything
16  on this list because of the lack of foundation and
17  the leading nature of the question.
18         MR. LANE: Okay.
19         MR. MANN: So it's an objection just to
20  substance and form.
21         MR. LANE: Okay.
22         MR. BRUCH: And that objection is made
23  on behalf of all Defendants as we agreed to
24  previously.
25         MR. LANE: Okay.

Page 47

1   BY MR. LANE:
2      Q.  Is that -- is that a company name that
3   you recall?
4      A.  Allis-Charlmers made pumps.
5      Q.  They made what?
6      A.  Pumps.
7      Q.  Pumps? And were those pumps on ships
8   you worked on?
9      A.  Yeah.
10     Q.  The next one you list was -- Number 2
11  on Exhibit 3 is A. P. Green Industries?
12     A.  Green was on there.
13     Q.  Is that a name that you recall seeing
14  over your work career or not?
15     A.  Yeah.
16     Q.  Okay. And did they make some asbestos
17  stuff that you were around or you --
18     A.  Well, mostly all of your boiler
19  equipment and spare parts.
20     Q.  Okay. And A. P. Green made those?
21     A.  Made them.
22     Q.  Okay.
23     A.  How many, I couldn't tell you.
24     Q.  Okay. Number 3 on your list, you list
25  Acorn Iron & Supply Company. Is that a name that

Page 48

1   you recalled or not?
2      A.  Name I recall.
3      Q.  And you recall -- you've got under
4   there they made some asbestos products. Do you
5   recall that?
6      A.  Yeah.
7      Q.  Okay. If I took you through each
8   company's name that's on Exhibit 3, would each of
9   these be companies -- tell me whether or not each
10  of these would be companies that you with your wife
11  wrote down that you remember seeing over your work
12  career on the ships.
13         MR. BARTLETT/DEFENSE: Objection.
14         THE WITNESS: Some of them.
15  BY MR. LANE:
16     Q.  Some of them? Which ones wouldn't be?
17         MR. BARTLETT/DEFENSE: Objection
18  withdrawn.
19  BY MR. LANE:
20     Q.  Do you know?
21     A.  Not offhand.
22     Q.  Okay. Let me ask you about some more
23  companies on -- on this list and see if we can get
24  somewhere with this. You list A. W. Chesterton?
25     A.  Chesterton. What -- what -- what do

Page 49

1   they make?
2      Q.  Well, you've got under there asbestos
3   packing.
4      A.  Well, anybody who made asbestos, I
5   probably come in contact with.
6      Q.  Okay. And is Chesterton one you recall
7   or is that one that you don't recall?
8      A.  I can't really recall that one.
9      Q.  Okay. Another one you have on here is
10  Foster Wheeler Corporation. Do you recall seeing
11  that somewhere over your work career?
12     A.  Yes, that's a -- see, that's
13  insulation.
14     Q.  Okay.
15     A.  Asbestos.
16     Q.  And were you around that company's
17  products in your work career?
18     A.  (Witness moved head up and down.)
19     Q.  You list under there boilers. Did they
20  make boilers or --
21         MR. BARTLETT/DEFENSE: Objection.
22         THE WITNESS: Equipment for it.
23  BY MR. LANE:
24     Q.  Equipment for it. And you have Garlock
25  listed as Number 17. Is that a company you recall

13 (Pages 46 to 49)

# THE RECORD, 1963.

SIR

| No. Off. No. Sig. Ltrs. | Name of Vessel, Former Name, Owner, Sto Port of Registry, Flag | Type, Water Ballast, Size Tank Tons | Construction — Bulkheads, Decks, Freeboard Deadrise | Fuel and Capacity, Appliances | Dimensions | Tonnage | Builders, Hull No., Date Built | Type and Particulars of Machinery | Hull Classification |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11463 | SIRIUS, ex Trade Wind, United States of America, Washington, D.C. | Sgl Sc AP DB 48'7"/9" FP 380' | Steel; 3 Dks 1711 tons Shell Seams 90 Trans Frmg Sides Long Frmg Btm Dk & 2nd Dk | Oil Red Tel Radar C-39(S) | 488'9" 68' 40'6" 438'0" 67'3" 27.7' | 8315 4873 13800 | Moore D.D. Co. Oakland D.D. & Repair Co. 4-1943 | 2 Cyl Stm Turb SHP 6600 DR Gears 2 WTB HS W478, WP 520 Lbs FD SH SBP/CL | †A ① 4-56 SS No 2, San Francisco |
| 11464 | SIROCCO, 255,442, WC6614, Mobile, Ala., United States | Sgl Sc MV ex Yacht | Wood; 1 Dk | Oil DH; GG | 108.5' 18.1' 9.3' | — 88 | Fellows & Stewart, Inc. Wilmington, Cal. General Motors Corp. | 2 Oil Engs 6 Cyl 4⅞"×5⅞" BHP 320 | †AM ① Oil Engs ... |
| 11465 | SISTER KATINGO, 277,936, KPJC, Nautilus Petroleum Charters Corp., New York, N.Y., United States | Sgl Sc Tanker Moly Alt | Steel; 1 Dk Metal Arc Welded (Gunwale, Centre Shell & 2 Side Shell Seams each side riveted) Long Frmg 1 CT p.o.s 1 CT Long BH | Oil 2205 tons Red Tel Red Phone BSGC Radar Loran C-51(S) | 630' 90' 45'3" P327 88'3" 45.5 Dk 34'4" Fbd 11'2½" Dr 8' | 20668 31061 33081 42751 | Bethlehem Pacific Coast Steel Corp. Shipbuilding Division San Francisco Bethlehem Steel Co. 12-1958 Foster-Wheeler Corp. | 2 Cyl Stm Turb SHP 15000 DR Gears 2 WTB HS W478 DS V 700 Lbs SH SV 635 Lbs FD SH SBP/CL | †AMS ① RMCL-12-58 An MS 10-63 ... |
| 11466 | SISYLIANA, IBOY, Lloyd Triestino Soc. per Azioni di Navigazione, Trieste, Venice, Italy | Sgl Sc | Steel; 2 Dks Or top Dk Metal Arc Welded Seam Strap & riveted Trans Frmg 7 WT to Fbd Dk 1 WT to 2nd Dk 1 OT p.o.s | Oil 205 tons Red Tel Red DF BSGC Radar | 411'8" 191' 37'4" 411.5' 57' 34.8' 98.2' 24.1' 24' 10.5' BK 2" Dr 0' | 7169 10852 10833 12241 | J. A. Jones Construction Co., Inc. Wilmington, N.C. Panama City, Fla. General Machinery Corp. 6-1944 | 4 Cyl Stm Turb SHP 6000 DR Gears 2 WTB HS 102325 WP 240 Lbs FD SH SBP/CL | †A ① ... |
| 11467 | SITRA, ex Christine Moran, Bahrain Petroleum Co., Ltd., Awali, Bahrain, Bahrain | Sgl Sc MV Tug | Steel; 1 Dk Metal Arc Welded Trans Frmg 4 OT | Oil 87 tons Red Phone | Dk 11'49' Fbd 1'2" Dr 0' | 183 77 | Gulfport Boiler & Tank Co., Inc. Port Arthur, Tex. General Motors Corp. 12-1942 | Oil Eng 8 Cyl 8½"×10½" 18 Cyl 8½"×10½" BA/2 Cyc SI SR Gears FD SH BHP 1200 SBP/OB | †A ① ... |
| 11468 | SIVAS, ex Placedo, ex Tanoro, TCBM, 591, D. B. Deniz Nakliyati, T.A.S., Istanbul, Turkey, Turkish | Sgl Sc MV Tanker Moly Alt | Steel; 1 Dk Metal Arc Welded (1 Dk, 1 Side & Bottom Shell Seam each side riveted) Long Frmg 4 CT Long BH 1 Ha.SC. 1 OT Long BH | Oil 143 tons Red Tel Red DF DSGC Radar | 309' 49'18' 21'10½' 309.2' 48.1' 21'3' 294' 18.7' 9'8' Fbd 10'4' Dr 0' | 2360 3790 5980 | Bethlehem-Sparrows Point, Inc. Sparrows Point, Md. Panama City, Fla. Combustion Engineering, Inc. 6-1944 | 2 Cyl Stm Turb SHP 4000 DR Gears 2 WTB HB W478 WP 485 Lbs FD SH SBP/CL | †AMS ① ... |
| 11469 | SIWANOY, 244,382, KHZG, Socony Mobil Oil Co., Inc. | Sgl Sc Tanker Moly Alt | Steel; 1 Dk Metal Arc Welded (Side Shell Seams riveted) | Oil Red DF Red DF | | 10667 | John Shipyard, Inc. Sparrows Point, Md. ... | | |

Videotaped Deposition of:  RICHARD R. MURRAY

Taken on:  June 10, 2004

Dorothy A. Jackson vs. A-C Product Liability Trust, et al.

Pages 1 to 201

## COMPRESSED TRANSCRIPT

*Angell Reporting Service, Inc.*

2460 N. Courtenay Parkway, Suite 111
Merritt Island, FL 32953
(321) 449-9800 (321)   (800) 805-DEPO
Fax (321) 453-1348



EXHIBIT

F

69

```
 1      Q.   Okay.
 2           Is Bryan Steam a name you're familiar with
 3  or not?
 4      A.   Yes.  I remember that name.
 5      Q.   And do you associate that name with
 6  anything aboard the Range Sentinel or not?
 7      A.   I'm pretty sure there were heat exchangers
 8  there of that manufacturer.
 9      Q.   Okay.
10           Is Indian Head Industries a name you're
11  familiar with or not?
12           MR. KLIFFEL:  Object to form.
13           BILL Kliffel.
14           THE WITNESS:  I remember the name of
15      the Indian Head products that we had.
16  BY MR. MARSDEN:
17      Q.   In what type of products do you associate
18  that name with aboard the Range Sentinel?
19           MR. HORN:  Duane, I'm going to have
20      to ask you to speak up.  I couldn't hear
21      your question.
22           MR. MARSDEN:  Okay.
23  BY MR. MARSDEN:
24      Q.   I said, in what type of products do you
25  associate Indian Head Industries with aboard the
```

70

```
 1  Range Sentinel?
 2      A.   Sheet packing is what I recall them being
 3  involved with.
 4      Q.   Okay.
 5      A.   And an adhesive.  I'm pretty sure there was
 6  a glue that was made by them.
 7      Q.   All right.
 8           Is Union Carbide a name you're
 9  associated -- you're familiar with?
10           MR. PROELS:  Objection.  Form.
11           Sebastian Proels.
12           THE WITNESS:  Yes.  I'm familiar with
13      the name.
14  BY MR. MARSDEN:
15      Q.   Okay.  And do you -- do you associate Union
16  Carbide with any products aboard the Range Sentinel
17  or not?
18      A.   Yes.
19           MR. PROELS:  Objection.
20  BY MR. MARSDEN:
21      Q.   And what products do you associate with
22  Union Carbide aboard the Range Sentinel?
23      A.   We had grinding -- grinding wheels,
24  grinding products, that I can recall with their name
25  on them.
```

71

```
 1      Q.   Okay.  Did any of those products, to your
 2  knowledge, contain asbestos or not?
 3      A.   I couldn't say for sure if they had
 4  asbestos in them, but a lot of times we'd be using
 5  them on products that had asbestos in them so, you
 6  know, it would generate dust and debris when we'd be
 7  using them grinding.
 8           MR. PROELS:  Objection.  Move to
 9      strike.
10  BY MR. MARSDEN:
11      Q.   Is Argo International a name you're
12  familiar with or not?
13           MR. RUTLEDGE:  Objection.  Form.
14  BY MR. MARSDEN:
15      Q.   Go ahead.
16      A.   Yes.  Argo I recall.
17      Q.   Do you associate that name with the Range
18  Sentinel in any fashion?
19      A.   Yeah.  I remember Argo, the name "Argo," on
20  stuff.
21      Q.   Do you recall what products aboard the
22  Range Sentinel you associate with Argo International?
23      A.   I can't recall exactly what it was but --
24  no, I can't recall exactly what.
25      Q.   Okay.
```

72

```
 1           Was Mr. Jackson a good worker, sir?
 2      A.   Oh, yes.  Yes.  Very good, willing, good
 3  shipmate.
 4      Q.   Okay.
 5           Sir, that's all the questions I have for
 6  you today.  I believe these folks will have some
 7  questions for you.
 8           I thank you.
 9      A.   Thank you.
10           MR. PROELS:  Go off the record for a
11      minute.
12           MR. SIME:  It's 12:16.  We're off the
13      record.
14           (Off the record.)
15           MR. SIME:  It's 12:17.  We're back on
16      the record.
17                 CROSS EXAMINATION
18  BY MR. PROELS:
19      Q.   Mr. Murray, my name is Sebastian Proels.  I
20  have a few questions for you as well.
21           I'd like to ask you a couple of questions
22  about your background.
23           You stated that you did go to high school.
24  Did you graduate from high school?
25      A.   Yes, sir.
```

153

1    everybody's brand, whoever supplied it.
2        Q.   Okay.
3            Let's talk about pumps a little bit, and
4    hopefully I can cut this a little bit shorter.
5            I note one of the other defense counsel
6    asked you about John Crane packing.
7        A.   Uh-huh.  Yes.
8        Q.   I don't know if you remember all your
9    answers to that; but as far as the steps in replacing
10   the packing and things of that nature, would that be
11   the same no matter who manufactured the packing?
12       A.   Yes.
13       Q.   Is there anything specific about Garlock
14   packing that was different from other types of
15   manufacturers' packing that you remember?
16       A.   No.  Just that it held up better.
17       Q.   Do you remember how the Garlock packing,
18   referring to the pumps now, came packaged?
19       A.   Yeah.  It came in a cardboard box.
20   Depending on the size of the gland it came in a
21   rolled position if it was precut and preformed; but
22   even if it wasn't, it came in almost like a coil and
23   it would be in a cardboard box maybe 3 inches by 4
24   inches by maybe 8 inches long.
25           Some of the boxes were a big flat box, a

154

1    big flat box, a box about three inches deep, a box
2    that was 1 foot by 1 foot, and the packing would be
3    in a big coil in there.
4        Q.   This is rope packing we're referring to?
5        A.   No.  This is pump packing.
6        Q.   Pump packing?
7        A.   Yeah.
8        Q.   Did you ever have occasion to use rope
9    packing manufactured by Garlock on the ship?
10       A.   I don't recall that.
11       Q.   I think you already testified about how
12   long it would take to replace the packing in the
13   pumps.
14           That's all the questions I have now for
15   you, sir.  I'm going to let someone else have a
16   chance; and if I remember any other questions, I'll
17   ask at the end.
18       A.   Okay.  Thank you.
19       Q.   Thank you very much.
20       A.   Yeah.
21               CROSS EXAMINATION
22   BY MR. RUTLEDGE:
23       Q.   Mr. Murray, my name is Michael Rutledge.
24           Earlier you testified that you were
25   familiar with the name "Bryan Steam" and that you

155

1    associate them with heat exchangers.  How do you know
2    those heat exchangers were manufactured by Bryan
3    Steam?
4        A.   Well, I remember the nameplate on them.
5        Q.   I know earlier you testified the nameplate
6    had the primary material that those products were
7    made of; is that correct?
8        A.   Well, not particularly.  If it had specific
9    material in the tube, it might specify, you know,
10   cooper nickel.
11       Q.   Let me make it specific.
12           Did the nameplate specify anything for a
13   Bryan Steam heat exchanger?
14       A.   I can't say it did in particular.
15           MR. MARSDEN:  Objection.  Vague.
16   BY MR. RUTLEDGE:
17       Q.   Did it specify anything as to the
18   composition of the Bryan Steam heat exchanger?
19       A.   No.  I don't think it did.
20       Q.   Other than the manufacturer do you remember
21   anything else that nameplate specified?
22       A.   The temperature range, usually it had the
23   temperature range; and if it was an inspected
24   product, it would have a Maltese cross on it from the
25   ABS inspectors and whatnot.

156

1        Q.   How many different types of Bryan Steam
2    heat exchangers do you remember aboard the Range
3    Centennial?
4        A.   I'd say there was just a few.
5        Q.   When you say a few, a few different times
6    or a few total?
7        A.   Two, two or three total types of heat
8    exchangers.  They were all tube-within-shell heat
9    exchangers.
10       Q.   Okay.  Let me rephrase this just to make
11   sure I'm clear.
12           How many total Bryan Stem heat exchangers
13   do you remember aboard the Range Centennial?
14           MR. MARSDEN:  It's Range Sentinel.
15   BY MR. RUTLEDGE:
16       Q.   Range Sentinel.
17       A.   I'd say there was about six.
18       Q.   Of those six it's my understanding you said
19   there were two or three different types?
20       A.   Yeah.
21       Q.   Do you know model numbers for any of those
22   types?
23       A.   No.  I couldn't recall them.
24       Q.   Okay.  Do you associate those six Bryan
25   Steam heat exchangers with any particular

157

1 applications?
2      When I say "applications," I mean earlier
3 you testified some were used to transfer hydraulic
4 oil and seawater.
5      A.   Yeah.
6      No.  I can't exactly -- as I recall, they
7 were saltwater heat exchangers, saltwater being the
8 cooling medium.
9      Q.   Okay.
10      A.   And at least one of them was a hydraulic,
11 hydraulic oil cooler.
12      Q.   Do you remember any of them being located
13 outside of the engine room?
14      A.   Yes.
15      Q.   How many were located outside of the engine
16 room?
17      A.   About three of them.
18      Q.   Okay.  Do you remember where those three
19 Bryan Steam heat exchangers were located?
20      A.   Yeah.
21      They weren't steam.  They cooled -- by
22 seawater they cooled hydraulic fluid.
23      One was in what they call the stern
24 thruster room.
25      Q.   Okay.

ANGELL REPORTING SERVICE, INC.

158

1      A.   And the other -- another one of them was up
2 in the hydraulic crane room.  There was a hydraulic
3 crane.
4      I don't remember where that other one was.
5 There was about three of them.
6      Q.   The other three would have been in the
7 engine room then?
8      A.   Yes.
9      Q.   Okay.
10      A.   Or the auxiliary machine room.
11      Q.   Okay.
12      Do you have any specific recollection of
13 Mr. Jackson working on any of those six heat
14 exchangers?
15      A.   No specifics, no.
16      Q.   Did you, yourself, work on those at any
17 time?
18      A.   Yeah.
19      Q.   Okay.  How often did you work on them?
20      A.   Oh, probably at least every six months.
21      Q.   Was that regularly scheduled maintenance?
22      A.   Yeah.  Punch the tubes, clean them out,
23 examine them, you know.
24      Q.   Was he ever around when you were working on
25 them?

ANGELL REPORTING SERVICE, INC.

159

1      A.   Yes.
2      Q.   Okay.
3      When you say "punch the tubes," what does
4 punching the tubes mean?
5      A.   Well, taking something like a gun cleaning
6 brush, passing it through the individual tubes to
7 thoroughly clean them out of any marine growth.
8      Q.   Are those tubes lined?
9      It's my understanding you're on the inside
10 of the tube.
11      Are those tubes lined with asbestos?
12      A.   No.
13      Q.   What do you believe in the heat exchangers
14 contained asbestos, in any of the six heat
15 exchangers?
16      A.   The gaskets.
17      Q.   Okay.  Again, I know you answered some of
18 these questions with regard to the other heat
19 exchangers.  I want to make sure your testimony is
20 the same for the Bryan heat exchangers.
21      Were you present for the installation?
22      A.   No.
23      Q.   Were you ever there when they were taken
24 out or removed?
25      A.   Well, we took them out ourselves several

ANGELL REPORTING SERVICE, INC.

160

1 different times to repair them.
2      Q.   Okay.  Why did you have to take them out?
3      A.   Leaks.
4      Q.   Okay.
5      When you say several times, can you give me
6 an approximate number?
7      A.   Three, four.
8      Q.   Okay.  Do these heat exchangers have
9 insulating pads?
10      A.   A couple of them did.
11      Q.   Okay.  When you say "a couple," can you
12 tell me how many?
13      A.   Two.
14      Q.   Two?
15      A.   Yeah.
16      Q.   Were those located in the engine room or
17 outside the engine room?
18      A.   In the engine room.
19      Q.   The two that had the insulating pads, was
20 Mr. Jackson around when that work was performed?
21      A.   Well, he was on the ship.  Whether he was
22 in the immediate area, I couldn't say.
23      Q.   Okay.
24      Do you associate any particular logo with
25 Bryan Steam?

ANGELL REPORTING SERVICE, INC.

161

1      A.   No.  I can't recall any.
2      Q.   Okay.  Another product you mentioned was
3  Argo International.  What do you associate with Argo
4  International?
5      A.   I remember gauge glass gaskets.
6      Q.   Okay.  Where would those have been located?
7      A.   The gauge glasses were on the boiler.
8      Q.   Okay.  And do you contend that product
9  contained asbestos?
10     A.   All of them did at the time.  Yeah, they
11 all had it.  I think it was --
12          I also remember Argo Marine.
13     Q.   What's Argo Marine?
14          I'm sorry.  How do you remember Argo
15 Marine?
16     A.   Well, I just remember that name, that
17 labeling name.
18     Q.   Okay.
19     A.   Whether it's the same company or whatever,
20 I'm not sure.
21     Q.   Do you have any specific recollection of
22 Mr. Jackson working on the Argo gauge glass gaskets?
23     A.   No.
24     Q.   I think that's all I have.  Thank you.
25     A.   Okay.  Thank you.

ANGELL REPORTING SERVICE, INC.

162

1              (Off the record.)
2              CROSS EXAMINATION
3  BY MR. GEOFFROY:
4      Q.   Mr. Murray, my name is Ray Geoffroy.  I've
5  got some questions for you generally about the Range
6  Sentinel -- and that is the only vessel I want to
7  talk to you about today -- and then some others about
8  some of the gasket materials that you discussed
9  earlier.
10          First of all, you've told us a little bit
11 about the size of the crew for the Range Sentinel.
12 How large was the crew for the engine room?
13     A.   About a 40-man engine crew.
14     Q.   Within those 40 men there were several
15 different groups of ratings, right?
16     A.   Yes.
17     Q.   What were some of those ratings?
18     A.   Well, there was two Third Assistant
19 Engineers, one Second Assistant Engineer, one First
20 Assistant Engineer, the one Chief Engineer.  Then
21 there was a plumber/machinist.  There was an
22 electrician and an assistant electrician.  There were
23 two utility men which were general purpose guys.
24     Q.   When you say "two utility," general purpose
25 repair-type guys?

ANGELL REPORTING SERVICE, INC.

163

1      A.   Yes.
2      Q.   Okay.
3      A.   There was a refrigeration engineer and
4  three wipers.  I'm pretty sure that's it.
5      Q.   Now, with the exception of the wipers, the
6  ratings that you just described, each of those, the
7  folks who held those ratings, part of their job
8  duties, their specific job duties, was to repair
9  either machinery or product on the machinery, right?
10     A.   Uh-huh, correct.
11     Q.   And then the wipers, you already testified
12 their main job responsibility was custodial, right?
13     A.   Right.
14     Q.   And you were a watch stander, correct?
15     A.   Correct.
16     Q.   Mr. Jackson was a day worker as a wiper?
17     A.   That's correct.
18     Q.   Your shift and Mr. Jackson's shift didn't
19 always match up at the same time, right?
20     A.   Not always.
21     Q.   Sometimes you'd be with him on a shift for
22 four hours.  Other days you wouldn't have the same
23 shift with him at all.  Isn't that right?
24     A.   That's correct.
25     Q.   Okay.

ANGELL REPORTING SERVICE, INC.

164

1          We talked a lot about -- a lot today about
2  repair work and how Mr. Jackson actually -- his main
3  job was custodial.
4          When he did assist you or others in a
5  repair-type job, that was a small part of his daily
6  working responsibility, correct?
7      A.   Yes.
8      Q.   Earlier you testified, when you were on the
9  Range Sentinel, that you worked on steampipes to
10 repair leaks, right?
11     A.   Correct.
12     Q.   In response to some questions from
13 plaintiff's counsel, Mr. Marsden, you described what
14 a flange is, right?
15     A.   Yes.
16     Q.   And you described the different types of
17 gaskets that you would use or that were used to join
18 a flange, right --
19     A.   Right.
20     Q.   -- to join pipes?
21          And you talked quite a bit about
22 Flexitallic?
23     A.   Yes.
24     Q.   I take it, from your responses it sounds
25 that Flexitallic was the primary spiral-wound

ANGELL REPORTING SERVICE, INC.

1            IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2
    IN RE: REINSTATEMENT OF CAUSES
3   ASBESTOS PRODUCTS LIABILITY
    1:99CV10802
4   LITIGATION (NO. VI)

5   THIS DOCUMENT RELATES TO ONE
    MARITIME ASBESTOS CASE
6
    CASE NO. 1:99CV10802
7
    JAMES E. JACKSON,
8
                    Plaintiff,
9
            vs.
10
    A-C PRODUCT LIABILITY TRUST, et al.,
11
                    Defendants.
12
    /
13  DEPOSITION OF:    JAMES E. JACKSON

14  DATE:            April 2, 2003

15  TIME:            10:27 AM

16
    LOCATION:        Town & Country Inn
17                   2008 Savannah Highway
                     Charleston, SC
18
    TAKEN BY:        Counsel for the Plaintiff
19
    REPORTED BY:     TERRI L. BRUSSEAU,
20                   Registered Professional
                     Reporter, CP, CRR

21
    Computer-Aided Transcription By:
22
            A. WILLIAM ROBERTS, JR., & ASSOCIATES
23
    Charleston, SC                 Greenville, SC
24  (843) 722-8414                 (864) 234-7030

25  Columbia, SC                   Char
    (803) 731-5224                 (704
      A. WILLIAM ROBERTS, JR., & ASSOCIATES (80

EXHIBIT
G

James Jackson   April 2, 2003

Page 74

1    A.  Had diesel.
2    Q.  So the -- so the ships that you served
3  on in the -- in the late '60s, they -- they had
4  turbines?
5    A.  They had turbines.
6    Q.  But -- but after that once you started
7  getting into the '70s, you started serving on
8  diesel-powered ships?
9    A.  Right.
10    Q.  You gave some testimony before, and I
11  wasn't sure exactly what you were testifying about
12  when you said sometimes the engine room crews would
13  work when there was a leak in the turbine.  Are you
14  talking about the turbine itself leaking or the --
15  or the pipes going to the turbine leaking?
16    A.  Well, again, the turbines -- the
17  turbines themselves are leaking.
18    Q.  The turbines themselves?
19    A.  (Witness moved head up and down.)
20    Q.  Weren't the turbines enclosed in a --
21  in a steel casing?
22    A.  In a casing.
23    Q.  All right.
24    A.  So what you have to do is send the work
25  gang out, go on out and try to open up the casing

Page 76

1    A.  Not offhand.
2    Q.  Can you identify for me by manufacturer
3  name any of the turbines that you believe you
4  worked on when you were on board these ships?  Can
5  you tell me who made the turbine?
6    A.  I think Allis-Charlmers.
7    Q.  Okay.
8    A.  I think it made one.
9    Q.  Okay.  Any others?
10    A.  I think G. E. made one.
11    Q.  On what ship?  If you know.
12    A.  Offhand -- offhand I couldn't tell you.
13    Q.  So you think a turbine that you recall
14  may have been made by General Electric but you
15  can't tell me what ship it was on?
16    A.  (Witness moved head back and forth.)
17    Q.  And can you tell me whether or not you
18  ever did any work on that particular turbine?
19    A.  (Witness moved head back and forth.)
20    Q.  Your answer's no?
21    A.  I can't remember.
22    Q.  All right.  Did you ever work as an
23  electrician on board ships?
24    A.  As a helper.
25    Q.  As a helper?  What was the function of

Page 75

1  and go in there and see what you can get out of
2  that.
3    Q.  And when you would do that, the turbine
4  would have to be shut down, is that correct?
5    A.  (Witness moved head up and down.)
6    Q.  And as a result, the ship would not be
7  under power unless there was more than one turbine
8  on the ship?
9    A.  They had more than one turbine.
10    Q.  Did all the ships you served on that
11  had turbines have more than one?
12    A.  (Witness moved head up and down.)
13    Q.  Is that yes?
14    A.  More than one.
15    Q.  How many times during your career did
16  you ever work on a work gang that attempted to
17  remove the casing of the turbine while you were at
18  sea under power?
19    A.  Not too many times.
20    Q.  Can you tell me, was it less than five
21  times, more than five times?
22    A.  Maybe about three or four times.
23    Q.  Were you ever serving on board a ship
24  when a -- a turbine was removed or installed, the
25  entire turbine?

Page 77

1  a blower in the engine room?
2    A.  Function of a blower is when you don't
3  keep any oil in it, blew on it.
4    Q.  Okay.
5    A.  Function of a blower really don't keep
6  it up.  Oil at low level.  There's so many -- so
7  many things could cause a malfunction in the air
8  blower.
9    Q.  Okay.  So you would have to work on the
10  blower sometimes.  Do you associate any
11  asbestos-containing products with blowers?
12    A.  Sometimes.
13    Q.  What products?
14    A.  Well -- well, after a period of 33
15  years, I'm forgetting.
16    Q.  So you can't remember any particular
17  asbestos-containing products that you would
18  associate with a blower?
19    A.  (Witness moved head up and down.)
20    Q.  Am I right?
21    A.  Right.
22    Q.  Can you tell me the manufacturer of any
23  of the blowers that you worked on when you were on
24  board ships?
25    A.  Not offhand.

20 (Pages 74 to 77)

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

Videotaped Deposition of:  RICHARD R. MURRAY

Taken on:  June 10, 2004

Dorothy A. Jackson vs. A-C Product Liability Trust, et al.

Pages 1 to 201

# COMPRESSED TRANSCRIPT

*Angell Reporting Service, Inc.*
2460 N. Courtenay Parkway, Suite 111
Merritt Island, FL 32953
(321) 449-9800 (321)   (800) 805-DEPO
Fax (321) 453-1348

61

1   turbine, and it would exhaust into a condenser where
2   it would be condensed back into water, condensate;
3   and then we'd pump it back into the boiler via the
4   feed pump and make steam again and repeat the
5   process. It was pretty much a closed-cycle system
6   except, everywhere that you had valves, you're bound
7   to have some leakage so --
8       Q.  Okay.  Now, was the steampipe connected to
9   the turbine by way of flange, flanges?
10      A.  Yes.  Valves and flanges.
11      Q.  And gaskets?
12      A.  And, of course, gaskets.
13      Q.  Okay.
14      A.  And on the turbine there were inspection
15  covers and the two halves of the turbine, of course,
16  so you could gain access to the turbine itself, the
17  casing would come apart, but that was -- that was
18  pretty much a major shipyard item, to open up the
19  main turbine.
20      Q.  Uh-huh.
21          And do you recall aboard the Range Sentinel
22  whether or not you were aboard the vessel when that
23  type of work was being done?
24      A.  Yes.  I seen the turbine completely
25  disassembled, rotating assembly, everything sent

ANGELL REPORTING SERVICE, INC.

62

1   ashore for work.
2       Q.  Was Mr. Jackson onboard the Range Sentinel
3   at that time as well?
4       A.  Yeah.  Yeah.
5           It was an opportunity to see the ship
6   completely taken apart.
7       Q.  Were you working in close proximity to the
8   people that were working on the turbine?
9       A.  Yes.  We worked with them and, you know,
10  what we called we'd pick their brain.
11      Q.  And Mr. Jackson was there as well, is that
12  correct, or not?
13      A.  Yes, he was there.
14      Q.  Okay.
15          And do you recall the manufacturer of this
16  steam turbine aboard the Range Sentinel?
17      A.  That was -- Westinghouse was the
18  manufacturer.
19      Q.  Okay.  Of the steam turbine?
20      A.  Yes.
21      Q.  Okay.
22      A.  GE made them and Westinghouse and I think
23  perhaps Worthington.  There was only -- I think only
24  about three companies that made the main -- the main
25  turbines.

ANGELL REPORTING SERVICE, INC.

63

1       Q.  But you believe --
2           MR. KRAMER:  Excuse me.  This is --
3   BY MR. MARSDEN:
4       Q.  -- there was Westinghouse --
5           MR. KRAMER:  Excuse me.  This is Reg
6   Kramer.
7           I'm going to object and move that his
8   answer be stricken as not responsive.
9   BY MR. MARSDEN:
10      Q.  But do you believe that the -- Westinghouse
11  manufactured the steam turbine aboard the Range
12  Sentinel or not?
13      A.  I'm not sure who.  I think it was
14  Westinghouse.
15          No.  I believe it was a GE on the Range
16  Sentinel.
17      Q.  You believe it was the GE.  Okay.
18          Was there other Westinghouse equipment
19  aboard the Range Sentinel?  Do you recall or not?
20      A.  Yeah.  I think the forced draft blowers on
21  the boiler were Westinghouse.
22          Now, there were a lot of components from a
23  lot of different companies.
24      Q.  Okay.
25          Okay.  Now, how big is that steam turbine,

ANGELL REPORTING SERVICE, INC.

64

1   did you say, from one end to the other?
2       A.  It was about fifteen feet from the front to
3   the back of it, and in diameter it was about -- about
4   ten, fifteen feet in diameter.
5       Q.  Okay.
6           I want to get back to an area that we left
7   earlier.
8           Is Greene Tweed a name you're familiar with
9   or not?
10          MR. STARR:  Objection.  Form.
11          THE WITNESS:  Yes.  I remember the
12      name.
13  BY MR. MARSDEN:
14      Q.  And how -- do you associate that name with
15  any particular product aboard the Range Sentinel?
16      A.  Insulating products.
17      Q.  Okay.  Were those insulating products --
18  did they contain asbestos or not?
19          MR. STARR:  Objection.  Form.
20          THE WITNESS:  I'm sure they did.
21  BY MR. MARSDEN:
22      Q.  Is General Refractories a name you're
23  familiar with or not?
24      A.  Yes.  I recall General Refractory.
25      Q.  Okay.  Is that -- do you associate that

ANGELL REPORTING SERVICE, INC.

65

1   name with anything aboard the Range Sentinel?
2       A.   The high-temperature insulation.
3       Q.   Okay.  Is that -- did its application --
4   was its application utilized in the boiler area or
5   not?
6       A.   I would say throughout the high
7   temperature, the boiler and the turbines and the
8   connecting steampiping.
9       Q.   Okay.
10           Now, sir, during the 1970s, from '71 to
11  '78, when you and Mr. Jackson were aboard the Range
12  Sentinel, do you recall ever seeing any warnings on
13  any of the material that you described for us today,
14  any of the asbestos-containing material that you
15  described for us today?
16      A.   No.  There was never any warnings on it.
17      Q.   Okay.
18           And did you have occasion to actually look
19  at the instructions sheet and everything that came
20  with a lot of these products?
21      A.   Yeah.  There wasn't much of -- to speak of
22  of an instruction sheet with it.
23      Q.   Okay.  But there were no warnings; is that
24  correct?
25      A.   No.  No warnings.

ANGELL REPORTING SERVICE, INC.

66

1       Q.   And did these manufacturers of any of these
2   asbestos-containing products ever supply the
3   government or the ship with -- to your knowledge,
4   with respiratory devices?
5            MR. MELCHERS:   Objection.  Lack of
6   foundation.
7   BY MR. MARSDEN:
8       Q.   Or not?
9       A.   No.
10      Q.   Okay.
11           MR. MARSDEN:   We'll go off the record
12  for a second.  Let me just check my
13  notes.
14           MR. SIME:   It's 11:50.  We're off the
15  record.
16           (Whereupon, a recess was taken.)
17           MR. SIME:   It's 12:08.  We're back on
18  the record.
19  BY MR. MARSDEN:
20      Q.   Okay.  Mr. Murray, we were talking a little
21  while ago about the -- what you identified as the
22  General Electric turbine aboard the Range Sentinel.
23           Why was asbestos insulation utilized around
24  the -- in and around the GE turbine aboard the Range
25  Sentinel?

ANGELL REPORTING SERVICE, INC.

67

1            MR. KRAMER:   Objection.  Assumes
2   facts not the evidence.
3            Reg Kramer.
4            THE WITNESS:   Well, all heat engines,
5   they wanted to keep as much heat contained
6   in the unit as possible for efficiency; so
7   the boiler generated approximately
8   780-degree superheated steam, and it would
9   pass through insulated steam lines
10  directly to the control valve for the
11  header or stern turbine, and it would --
12  you know, had to be kept as insulated so
13  it would stay as hot as possible to gain
14  the maximum efficiency.
15  BY MR. MARSDEN:
16      Q.   And what type of -- specifically what type
17  of insulation was utilized on the GE turbine?
18      A.   Well, it was a combination of a block and
19  molded material to a product that was commonly
20  referred to as a "mud," and it was wired onto the
21  turbine casing, to the steel casing, the cast steel
22  casing, and then it was covered with a cloth-type
23  product, which again it was -- certainly it was an
24  asbestos-type material.
25      Q.   Okay.

ANGELL REPORTING SERVICE, INC.

68

1       A.   And then places that you might have to gain
2   access for just a general inspection would be fitted
3   with a removable insulating pad so you didn't have to
4   disturb everything.  Just take the pad off.  Then you
5   could open up an opening and do whatever kind of an
6   examination you had to.
7       Q.   Okay.  Thank you.
8            And what is a heat exchanger?
9       A.   Well, a heat exchanger usually would be a
10  cooler that would use seawater to take the product --
11  for instance, to condense the steam in the main
12  condenser, which was right underneath the turbines,
13  it's a heat exchanger.  Also, it would condense the
14  steam back into condensate; and then you got oil
15  coolers that had seawater passing through them to get
16  the heat of the lubricating oil down to operational
17  temperatures.
18      Q.   Now, did these heat exchangers utilize any
19  asbestos insulation aboard the Range Sentinel or not?
20      A.   A lot of them had pads that were fabricated
21  with asbestos in them.
22      Q.   And do you recall the manufacturer of the
23  heat exchangers aboard the Range Sentinel?
24      A.   Well, Harrison and Elliott are two names
25  that come to mind for heat exchangers.

ANGELL REPORTING SERVICE, INC.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing *Plaintiff's Cast-Pros Defendants' Joint Memorandum in Opposition to Plaintiff's Motion for Reinstatement and Remand of James E. Jackson Cause* was sent by regular U.S. Mail, postage prepaid on November 18, 2004 to the following counsel of record:

Richard C. Binzley.
Byron J. Horn
Thompson, Hine & Flory
3900 Key Center
127 Public Square
Cleveland, OH 44114

David Landin
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074

Gregg L. Spyridon
Spyridon, Koch, Wallace & Palermo, LLC
Three Lakeway Center Suite 3010
3838 North Causeway Boulevard
Metairie, LA 70002

Kevin O. Kadlec
Bonezzi, Switzer, Murphy & Polito Co.
1400 Leader Bldg.
526 Superior Ave.
Cleveland, OH 44114

Kenneth F. Krawchak
Swartz, Campbell & Detweiler
55 Public Sq., Ste. 1120
Cleveland, OH 44113-1901

Robin Harvey
Baker & Hostetler LLP
312 Walnut Street
Suite 2650
Cincinnati, OH 452024038

Ruth S. Kochenderfer
Walter Andrews
Shaw Pittman
1650 Tysons Blvd., 4th Fl.
McLean, VA 22102

Jeffrey Healy
John P. Patterson
Tucker, Ellis & West, LLP
925 Euclid Ave., Ste. 1150
Cleveland, OH 44115

George F. Fitzpatrick, Jr.
Swanson, Martin & Bell
One IBM Plaza, Ste. 2900
330 North Wabash Avenue
Chicago, IL 60611

Eric Horne
Eckert, Seamans, Cherin & Mallott
600 Grant St., 44th Floor
Pittsburgh, PA 15219

Barbara Stutz
Robert A. Bunda
Bunda, Stutz & DeWitt
One SeaGate, Suite 650
Toledo, OH 43604

Randall L. Solomon
Baker & Hostetler
3200 National City Center
Cleveland, OH 44114

Matthew C.  O'Connell
Sutter O'Connell Mannion & Farchione Co.
3600 Erieview Tower
1301 E. 9th St.
Cleveland, OH 44114

William F.  Scully, Jr.,
Williams, Sennett & Scully
55 Public Sq., Ste. 1850
Cleveland, OH 44113

Keith Ganther
Brent M. Buckley
Buckley, King & Bluso
1400 Bank One Center
Cleveland, OH 441142652

Sheila Burke
Burns, White & Hickton
12O Fifth Avenue
2400 5th Ave. Pl.
Pittsburgh, PA 15222

Francis M. Hadden
Hecker Brown Sherry & Johnson
1700 Two Logan Sq.
18th & Arch Streets
Philadelphia, PA 19103

James F. Israel
Israel, Wood & Puntil, P.C.
310 Grant St., Ste. 501
Pittsburgh, PA 15219

Thomas C. Conniff
McElroy, Deutsch & Mulvaney
1300 Mount Kemble Ave.
P O Box 2075
Morristown, NJ 079622075

Richard D. Schuster
Vorys, Sater, Seymour and Pease
52 East Gay Street
P. O. Box 1008
Columbus, OH 43216

Barbara J. Arison
Frantz Ward LLP
55 Public Sq., 19th Fl.
Cleveland, OH 44113

Kevin C. Alexandersen
Daniel J. Michalec
Gallagher, Sharp, Fulton & Norman
1501 Euclid Avenue, 7th Floor
Cleveland, OH 44115

Robert L. Davis
3600 Carew Tower
Cincinnati, OH 45202

Samuel R. Martillotta
Mansour Gavin Gerlack & Manos LPA
55 Public Square, Suite 2150
Cleveland, OH 44113-1994

James T. Millican
Weston Hurd Fallon Paisley & Howle
2500 Terminal Tower
50 Public Square
Cleveland, OH 44113

Laura Hong
Squire, Sanders & Dempsey
4900 Society Center
127 Public Square
Cleveland, OH 44114

Margaret Bruemmer
1556 E. Goodrich Lane
Milwaukee, WI 53217


Ted T. Amsden
Dykema Gossett
400 Renaissance Center
Detroit, MI 482431668


Bruce P. Mandel
Ulmer & Berne
Suite 900
1300 East Ninth Street
Cleveland, OH 44114


Reginald Kramer
Oldham & Dowling
195 S. Main Street, Ste. 300
Akron, OH 44308


Ernest W. Auciello
Gallagher, Sharp, Fulton & Norman
Bulkley Bldg. 7th Floor
1501 Euclid Avenue
Cleveland, OH 44115


R. Patrick Baughman
Baughman, Henderson & Joyce, LLP
55 Public Square, Suite 2215
Cleveland, OH 44113


John W. Lebold
Sherwin Williams Company
101 Prospect Avenue, N.W.
1100 Midland Bldg
Cleveland, OH 44115


Evan Palik
McMahon, DeGulis, Hoffman & Lombardi
Caxton Bldg., Ste. 650
812 Huron Rd.
Cleveland, OH 44115


I. Steven Levy
White & Williams, LLP
1800 One Liberty Place
Philadelphia, PA 191037395


Nicholas L. Evanchan
Evanchan & Palmisano
One GOJO Plaza, Ste. 300
Akron, OH 44311


James W. Bartlett, III
Semmes, Bowen & Semmes
250 W. Pratt St.
Baltimore, MD 21201


Frederick P.Vergon, Sr.
Smith, Marshall, Weaver & Vergon
500 National City
East Sixth Building
Cleveland, OH 44114


Jennifer A. Whelan
Cetrulo & Capone
2 Seaport Lane
Boston, MA 02210


Gary D. Hermann
Hermann, Cahn & Schneider
1301 E. 9th St., Ste. 500
Cleveland, OH 44114


_Eileen M. Chmielewski_
EILEEN M. CHMIELEWSKI