

CENTURY TOWER
550 FANNIN, SUITE 800
POST OFFICE BOX 7505
BEAUMONT, TEXAS 77726-7505

TELEPHONE (409) 838-6767
FAX (409) 838-6950

# ADAMS
## & ##
# BOSWELL

A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

**JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

**MAR 1 3 2006** HOUSTON

BEAUMONT
**FILED** DALLAS
CLERK'S OFFICE

FOUNDED IN 1985
WWW.ADAMSBOSWELL.COM

March 10, 2006

**<u>VIA Federal Express Overnight</u>**
Mr. Michael J. Beck, Clerk of the Panel
Judicial Panel on Multi-District Litigation
Thurgood Marshall Federal Judiciary Building
One Columbus Circle, NE
Room G-255, North Lobby
Washington, DC 20002-8004

**Re:**   **ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)**   **MDL DOCKET NO. 875**
*Cecil Jackson, Deceased, et. al. v. Kimberly Clark Corporation*; **TXE 1:05-769**
*Thomas Vodry Allen, et al vs. Kimberly Clark Corporation, et a*; **TXE 1:05-876**
*Newbern Adkins, et al vs. Lincoln Electric Company, Inc., et al*; **TXE 1:05-882**

Dear Mr. Beck:

Enclosed please find the Exhibits that were inadvertently not attached to Defendant, Kimberly-Clark Corporation's Brief in Support of Response to Plaintiffs' Motion to Vacate Conditional Transfer Order No. 257.

Please be advised that the counsel on the list attached has been provided with a copy of this document by U.S. Mail.

I appreciate your consideration and courtesy in this regard.  Please do not hesitate to contact me if I can be of any assistance in this matter.

Very truly yours,

*/s/ Kent M. Adams*

KENT M. ADAMS

Attachment
KMA/llm



# OFFICIAL FILE COPY

**IMAGED** MAR 1 4 2006

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**PANEL SERVICE LIST (Excerpted from CTO-257)**

MAR 1 3 2006

**DOCKET NO. 875**

**IN RE: ASBESTOS PRODUCTS LIABILITY LITIGATION (NO.VI)** FILED
CLERK'S OFFICE

*Cecil Ruben Jackson, et al v. Kimberly Clark Corp.,* **E.D. Texas, C.A. No. 1:05-769**
*Thomas Vodry Allen, et al vs. Kimberly Clark Corp., et al;* **E.D. Texas , C.A. No. 1-05-876**
*Newbern Brown Adkins, et al v. Kimberl-Clark Corp., et a;* **E.D. Texas, C.A. No. 1-05-882**

Glen W. Morgan
Reaud, Morgan & Quinn, L.L.P.
801 Laurel Street
Beaumont, Texas 77720

Robert L. Adams
Kacal, Adams & Law
One Riverway, Suite 1200
Houston, Texas 77056

Jerry L. Beane
Andrews & Kurth
BankOne Center
1717 Main Street, Suite 3700
Dallas, Texas 75201

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114

John G. Bissell
Strong Pipkin, Bissell &
Ledyard
1111 Bagby Street
Suite 2300
Houston, Texas 77002

Paula H. Blazek
Germer Gertz
550 Fannin Street, Suite 700
Beaumont, Texas 77701

Eugene W. Brees II
Whitehurst Harkness, Ozmun &
Brees
P.O. Box 1802
Austin, Texas 78767

George Read Carlton
Godwin Pappas Langley
Ronquillo
1201 Elm Street
Suite 1700
Dallas, Texas 75207

Edward J. Cass
Gallagher Sharp, Fulton &
Norman
Buckley Building, 7th Floor
1501 Euclid Avenue
Cleveland, OH 44115

Adam M. Chud
Goodwin Procter, LLP
901 New York Avenue, NW
Washington, DC 20001

Sandra F. Clark
Mehaffy & Weber
P.O. Box 16
Beaumont, Texas 77704

David Damico
Burns White & Hickton
Fourth Northshore Center
106 Isabella St.
Pittsburgh, PA 15212

James D. Dowell
Rienstra, Dowell & Flatton
595 Orleans Street, Suite 1007
Beaumont, Texas 77701

Gary D. Elliston
DeHay & Elliston, LLP
3500 Bank of America Plaza
901 Main Street
Dallas, Texas 75202

Michael M. Essmyer
Essmyer & Tritico
4300 Scotland
Houston, Texas 77007

Raymond P. Forceno
Forceno & Hannon
111 S. Independence Mall East
The Bourse, Suite 1000
Philadelphia, PA 19106

Ellen B. Furman
Goldfein & Hosmer
1600 Market Street, 33rd Floor
Philadelphia, PA 19103

Susan M. Hansen
Brownson & Ballou
225 South Sixth Street
Suite 4800
Minneapolis, MN 55402

Frank G. Harmon, III
Crain, Caton, James
1401 McKinney, Suite 1900
Houston, Texas 77010

Kathryn Oakes Hermes
DeHay & Elliston LLP
901 Main Street, Suite 3500
Dallas, Texas 75202

John L. Hill, Jr.
Locke Liddell & Sapp
600 Travis Street
3400 JP Morgan Chase Tower
Houston, Texas

Paul J. Holmes
Paul J. Holmes, PC
550 Fannin
P.O. Box 3746
Beaumont, Texas 77701

Gail J. Jenkins
Jenkins & Martin
P.O. Box 26008
2615 Calder, Suite 500
Beaumont, Texas 77720

D. Allan Jones
Orgain, Bell & Tucker, LLP
P.O. Box 1751
Beaumont, Texas 77704

George J. Kacal, Jr.
Kacal, Adams, & Law
One Riverway, Suite 1200
Houston, Texas 77056

J. Frank Kinsel, Jr.
Cantey & Hanger, LLP
2100 Burnett Plaza
801 Cherry Street
Ft. Worth, Texas 76102

Reginald S. Kramer
Oldham & Dowling
195 South Main Street, Suite 300
Akron, OH 44308-1314

David C. Landin
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Gene Locks
Greitzer & Locks
1500 Walnut Street
Philadelphia, PA 19102

C. Robert Mace
Tekell, Book, Matthews &
Limmer
4300 One Houston Center
1221 McKinney
Houston, Texas 77010

D. Ferguson McNiel
Vinson & Elkins
1001 Fannin Street, Suite 2300
Houston, Texas 77002

Peter A. Moir
Quilling Selander, Cummiskey,
2001 Bryan Street
Bryan Tower, Suite 1800
Dallas, Texas 75201

Ronald L. Motley
Motley Rice LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC  29465

John J. Mundy
Mundy & Singley
816 Congress Avenue
 Suite 1230
Austin, Texas 78701

James R. Old, Jr.
Germer Gertz
550 Fannin Street, Suite 1700
Beaumont, Texas 77701

David Arthur Oliver, Jr.
Porter & Hedges, LLP
1000 main Street, Suite 1700
Beaumont, Texas 77701

Rex Wayne Peveto
Peveto Law Firm
118 Border Street
Orange, Texas 77630

Franklin A. Poff
Crisp, Boyd & Poff
2301 Moores Lane
P.O. Box 6297
Texarkana, Texas 75505

James H. Powers
Powers & Frost, LLP
2400 One Houston Center
1221 McKinney Street
Houston, Texas 77010

John J. Repcheck
Marks, O'Neil, O'Brien &
Courtney
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219

H. Tracy Richardson, III
Strong Pipkin Nelson & Bissell
1400 San Jancinto Building
595 Orleans
Beaumont, Texas 77013

James M. Riley, Jr.
Coats Rose Yale Ryman & Lee
3 Greenway Plaza, Suite 2000
Houston, Texas 77046

Lauren Miller Robbins
Munisteri Sprott Rigby Newsom
3323 Richmond Avenue, Suite A
Houston, Texas 77098

John D. Roven
Roven-Kaplan LLP
2190 North Loop West
Suite 410
Houston, Texas 77018

Richard D. Schuster
Vorys, Sater, Seymour & Pease
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216

Neil Selman
Selman, Breitman & Burgess
11766 Wilshire Boulevard
Sixth Floor
Los Angeles, CA 90025

Robert N. Spinelli
Kelley Jasons McGuire &
Spinelli
Center Square West, 15th Floor
Philadelphia, PA 19102

Robert E. Swickle
Jacques Admiralty Law Firm
1570 Penobscot Building
The Maritime Asbestosis Legal
Clinic
Detroit, MI 48226

Thomas W. Taylor
Andrews & Kurth
600 Travis, Suite 4200
Houston, Texas 77002

Andrew J. Trevelise
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

Thomas J. Ward, Jr.
Law Office of T. John Ward
P.O. Box 1231
Longview, Texas 75606

James L. Ware
Sheehy, Serpe & Ware
2500 Two Houston Centre
909 Fannin
Houston, Texas 77010

James K. Weston II
Tom Riley Law Firm
4040 First Avenue NE
P.O. Box 998
Cedar Rapids, IA 52406

Gene M. Williams
Shook, Hardy & Bacon
Chase Tower, Suite 1600
600 Travis Street
Houston, Texas 77002

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR 1 3 2006

FILED
CLERK'S OFFICE

EXBIBIT A

CONFORMED COPY

THIS LEASE, made between the Secretary of War, representing
the United States of America (hereinafter called the Government), and
Coosa River Newsprint Company, a corporation organized under the laws
of the State of Alabama (hereinafter called the Lessee);

WITNESSETH:

1. That the Secretary of War by virtue of the authority
contained in Section 1 of the Act of Congress approved July 2, 1940
(54 Stat. 712) as continued in effect by Section 13 of the Act of
Congress approved June 5, 1942 (56 Stat. 317), and in consideration of
the observance and performance by the Lessee of the covenants and con-
ditions hereinafter set forth, hereby leases to Lessee the property
hereinafter described located within and appurtenant to Alabama Ord-
nance Works, Talladega County, Alabama, for a period of five (5) years
commencing on ___June 30___ RAW _____, 1947, and such term shall be auto-
matically renewed for seven (7) successive additional five (5) year
terms for a total term of forty (40) years, unless Lessee shall give
the Government written notice of its election to terminate such lease
as of the end of any such five (5) year term, such notice to be given
on any date more than ninety (90) days prior to the expiration of such
five (5) year term.

2. A portion of the property included in this lease is de-
scribed as follows:

(A)  All the lands, together with the rights
appurtenant thereto lying within the following
described boundary lines described by reference
to that certain War Department O.C.E. Construction
Division drawing number 89-11 approved 12-20-46
which is attached hereto, marked Exhibit "A" and made
a part hereof:

Beginning at the Coosa River at Coordinate N20875, being the south boundary of the existing electric transmission right of way shown as "H" on Exhibit "A" between Coordinates N20800 and N21200, running thence along the south boundary of said transmission line right of way to the west boundary of the extension of "A" Street, running thence south along the western boundary of said Extension of "A" Street and the western boundary of "A" Street to a point midway between Coordinates N18400 and N18000, thence east parallel with Coordinate N18000 to the west boundary of "E" Street, thence south along the west boundary of "E" Street to the intersection of such boundary with Coordinate N16800, thence west along Coordinate N16800 to its intersection with Coordinate E4000, thence south along Coordinate E4000 to the center of Talladega Creek, thence down the center of such creek to the Coosa River, thence up the Coosa River to the point of beginning, together with all the improvements, facilities, buildings, structures, fixtures, tools, supplies and all other properties, real and personal, except as hereinafter specified which as of the beginning of the term hereof lie within the foregoing described boundary lines.

(B)  A right in common with the Government and with other persons invited or licensed by the Government or by the Lessee to use that certain street or highway extending from the south boundary of the above described lands to Alabama Highway No. 91.

The properties described in these sub-paragraphs A and B

- 2 -

are sometimes herein referred to as the "site area" properties.

Subject to such rules, regulations and restrictions as the Commanding Officer of said installation may prescribe for the safety and security of Government property, personnel employed by and invitees of the Lessee and contractors of Lessee shall have the right of access to and the right to patronize such cafeterias or restaurants as may be operated by private concessionaires on the Alabama Ordnance Works Reservation.

Lessee shall also have the right to construct, operate and maintain structures and facilities for the transmission of and to transmit steam, water, air, electric energy, gas and to provide similar services on, over and across a strip of land twenty feet (20) wide, described by reference to Exhibit "A" hereto as follows:

Ten (10) feet on each side of a line and the continuations thereof, beginning at the intersection of Coordinate E4800 and Coordinate N16652, running thence west along Coordinate N16652 to Coordinate E4000.

The Government reserves the permanent right in aid of any Government project for improvement of navigation on the Coosa River to flood and impound waters upon all of the foregoing described lands lying below elevation 408 feet above mean sea level as heretofore established by the United States Geodetic survey.

There are excepted from the terms of this lease the existing telephone lines extending from the Coosa River to the eastern boundary of the foregoing described lands, such telephone lines being indicated as "C" on Exhibit "A" hereto.  The Government reserves the right to operate, improve and maintain such telephone lines for the duration of this lease or renewal thereof.  Lessee shall, however, have the right to make connection with and use such lines to the extent of the capacity thereof not utilized by the Government and to construct and maintain the

- 3 -

necessary equipment and facilities to maintain or increase the capacity thereof.

The Government also reserves for the duration of this lease the non-exclusive right for itself, its lessees, licensees and permittees to use, operate and maintain the existing railroad spur track shown as "K" on Exhibit "A" hereto, and the right to use, operate, improve and maintain the ash basin shown as "D" on Exhibit "A" hereto, the drainage ditches identified as "E" on Exhibit "A" hereto and the exclusive right to make any material alteration in and to such ditches, except that lessee may make alterations as may be approved by the Commanding Officer of Alabama Ordnance Works or the successor to his authority; provided that in the event of danger to persons or property by reason of the Government's use of such ditches, Lessee may cover such ditches or take such other means to eliminate such danger to persons or property as may be required, provided such measures shall not interfere with the use by the Government of such ditches and ash basin.

The Government reserves for the duration of the lease of the above described lands and any renewal thereof to itself, its lessees, licensees and permittees, the non-exclusive use of and the right to maintain and improve the street or highway designated on Exhibit "A" hereto as "A" Street, throughout its course over such lands and the extension thereof to Alabama Highway No. 91. The Government also reserves the same right with respect to the street designated on Exhibit "A" hereto as 3rd Avenue. Notwithstanding the reservation to the Government of the rights in "A" Street and 3rd Avenue, Lessee may relocate such streets on the above described lands, provided that after such relocation such streets shall respectively terminate at the same points on the boundaries of the above described lands. The street easements if so relocated shall be of the same width and of the same or equivalent construction and the Government shall have the same rights on the streets as so relocated. Nothing herein contained shall be construed as an obliga-

- 4 -

tion upon the Government to maintain or improve said street or highway.

Except for said "A" Street and 3rd Avenue, the streets and avenues shown on Exhibit "A" within the above described boundary lines are not to be deemed streets or ways and may be closed and used by Lessee without restriction as if not shown on said Exhibit "A".

3. The Government reserves to itself for the duration of the lease of the site area the right in common with Lessee to use, operate, maintain and improve the existing sewage disposal plant on the above described property and the facilities used and useful in connection therewith. Nothing herein contained shall be construed as an obligation upon the Government to operate, maintain or improve said sewage disposal plant.

The Government shall have the right to remove the truck scale shown on Exhibit "A" hereto as "F" at any time within six (6) months after commencement of the term of this lease.

Lessee agrees that it will at its own cost and expense remove the existing fence and the lighting system thereof indicated on Exhibit "A" and extending along Coordinate E3600 and replace in good condition such fence and lighting system along the eastern boundary of the above described lands.

Notwithstanding the other provisions of this lease, Lessee shall not move the existing fence described in this paragraph or take possession of the above described lands lying east of such fence until powder and explosives stored on lands of the Government between such fence and Coordinate E4000 have been removed. If such powder and explosives have not been removed by the Government at the time Lessee notifies the Government in writing of its desire to take possession of the leased lands east of said fence, Lessee under the direction of the Commanding Officers, Alabama Ordnance Works and Coosa River Ordnance Plant, will move and re-warehouse such powder and explosives at its expense

- 5 -

in such locations at the Coosa River Ordnance Plant, Talladega, Alabama, as the Commanding Officer, Coosa River Ordnance Plant, may designate.

    4. There is also included in this lease the following described property:

        A. All lands, together with the rights appurtenant thereto lying within the following described boundary lines described by reference to Exhibit "A" attached hereto and made a part hereof: Beginning at the point of intersection of Coordinate E4800 with the north boundary of 8th Avenue, running thence along the north side of 8th Avenue to the west boundary of "I" Street, thence north along the west boundary of "I" Street to Coordinate N17450, running thence west parallel with Coordinate N17200 to the east boundary of "E" Street, thence south along the east boundary of "E" Street to the intersection of such east boundary with Coordinate N17200, thence east along Coordinate N17200 to Coordinate E4800, thence south along Coordinate E4800 to the point of beginning, together with all of the improvements, facilities, buildings, structures, fixtures, tools, supplies and all other properties, real and personal which, as of the beginning of the term hereof, lie within the foregoing described boundary lines.

        B. That certain fifty foot right of way and the electric transmission line, equipment and facilities thereof shown as "H" on Exhibit "A", the center line of such right of way beginning at the Coosa River at Coordinate N20900, running thence as shown on Exhibit

"A" to the substation located between Coordinates
N18800 and N19200, together with such substation,
the equipment, appliances and appurtenances thereof
and the right of way and electric facilities extend-
ing from such substation to the lands described in
this numbered paragraph.

The rights of the Lessee under this sub-paragraph B are subject to the
rights of Alabama Power Company under that certain lease dated February
16, 1944, as amended, between the Secretary of War and the Alabama Power
Company.  The Government reserves to itself and to persons authorized by
the Government the right to joint use of the facilities described in this
sub-paragraph B.

The Government reserves the right to maintain, operate and
lease the ammonia storage facility designated on Exhibit "A" hereto as
Station 301-A, a small portion of which projects over the boundary of
the lands described in this numbered paragraph.

The properties described in these sub-paragraphs A and B
are sometimes referred to as the "utility area" properties.

All the property included in this lease and described in
paragraphs numbered 2 and 4 is sometimes referred to herein as "the
leased property".

5.  The Lessee shall pay to the Government as rental for that
portion of the leased property including the site area described in
paragraph numbered 2 hereof at the rate of Four Hundred Eighty Dollars
($480.00) per annum, such rental being payable in monthly installments
in advance, the first of such installments being due and payable on
or before the first day of the calendar month following the beginning
of the term hereof, and subsequent installments thereof being due and
payable on or before the first day of each succeeding month.

The Lessee shall pay to the Government as rental for that
portion of the leased property described in paragraph numbered 4 hereof,

- 7 -

including the utility area, at the rate of Fifty Thousand Dollars
($50,000.00) per annum, such rental being payable in monthly installments
in advance, the first of such monthly payments being due and payable on
December 1, 1948 or on the first day of the calendar month immediately
succeeding the beginning of operations of Lessee's plant for the manu-
facture of newsprint and/or other pulpwood products on the leased
property, whichever date is earlier.  Subsequent payments for such
rent shall be due and payable monthly in advance on the first day of
each succeeding calendar month during the duration of this lease.

Until such date as rental shall become payable for the
properties described in paragraph numbered 4 hereof under the fore-
going provisions of this paragraph, Lessee shall pay to the Government rent
for the properties described in such paragraph at the rate of $7,500.00
per annum in monthly installments, the first of such installments being
due and payable on or before the first day of the calendar month fol-
lowing the beginning of the term hereof and subsequent installments
thereof being due and payable on or before the first day of each succed-
ing month until the due date of the greater rental herein provided for
such property.

All rentals provided for in this numbered paragraph shall
be made payable to the Treasurer of the United States and forwarded by
Lessee to the Division Engineer, South Atlantic Division, Atlanta 2,
Georgia, or to his successor in authority.

6.  No structures, additions or betterments, except conduits,
conveyors, pipe lines, and telephone and electric lines, temporary or
permanent, shall be placed upon the Leased Property without the prior
written approval of the Division Engineer.  All structures, additions
and betterments to the Leased Property shall become the Property of the
Government when annexed unless otherwise provided by separate agreement
between the Division Engineer and the Lessee.  The Lessee shall make no

– 8 –

alterations of or additions to the Leased Property or rights of way ap-
purtenant thereto which will render the Leased Property or property
adjacent thereto unsuitable for the purpose for which originally de-
signed.  Installed and other equipment may be altered, replaced or
improved without the prior written approval of the Division Engineer,
provided that such alterations, replacements or improvements will not
prevent the return of the Leased Property to the condition existing
at the time of entry by the Lessee under the lease within a period of
120 days, and provided, further, that all such alterations, replacements
or improvements shall become the property of the Government when made.
The Lessee shall prepare and maintain adequate drawings showing the
location and connections and other installation data of each item, or
part thereof, reconnected or removed from its installed location, and
the Lessee shall tag, for identification purposes, and prepare for
long term storage if so directed by the Commanding Officer of the
Alabama Ordnance Works, each item, or part thereof, so removed, to in-
sure the minimum of time and expense in restoration.  The foregoing
provisions of this paragraph 6 shall not apply to that portion of the leased
property subject to the option to purchase described in paragraph 14,
provided, however, that in the event said option is not exercised by
the Lessee, the Lessee shall upon expiration of the option period provi-
ded return the property included under said option to the condition of
said property when received by the Lessee or in a condition satisfactory
to the Division Engineer.  Facilities located on the property subject to
such option to purchase, title to which facilities is retained in the
Government, may be relocated by lessee with the prior written approval
of the Division Engineer, and, unless otherwise provided by the Division
Engineer in such approval, lessee shall not be required to relocate such
facilities upon termination of this lease.

7.  Lessee shall from the beginning of its operation for Com-
mercial production of any of the leased property of which it has

exclusive possession maintain the facilities thereof and the facilities described in sub-paragraph B of paragraph 4 hereof in efficient operating condition to provide at all times the power generating, transmission, water pumping and filtering service for which they were designed to the maximum rated capacity of such facilities, and shall maintain in efficient operating condition to the boundaries of the leased lands, all of the leased facilities designed for the delivery of such services to the plant of the Government adjacent to the leased property. Lessee shall also maintain the existing buildings in as good condition and repair as when received, ordinary wear and tear excepted. The Lessee shall, prior to its productive operation of the facilities in the utility area described in paragraph 4 hereof, maintain the facilities thereon in Standby condition for extended storage in accordance with Standard War Department practice.

8. The Government reserves the right at any time to enter the Leased Property for the purpose of inspection and inventory and when otherwise deemed necessary for the protection of the interests of the Government.

9. Lessee, its invitees and licensees, shall have the right to use, operate, improve and maintain all existing means and facilities of ingress, egress, and communication over lands of the Government to the leased property. Means and facilities of ingress, egress, communication shall include, without limiting the generality thereof, highways, streets, railroads, conduits, conveyors, pipe lines, telephone and electric lines. Lessee shall also have the right, during the term of this lease or any renewals thereof, to construct, use, operate, improve and maintain additional such means and facilities, the location thereof to be subject to the prior approval of the Division Engineer, on, under, over and across the strip of land of the Government not leased hereunder, including "E" Street lying south of Coordinate N18600 and west of the existing railroad lines of the

- 10 -

Government running between Coordinates E4000 and E4400. In the event the lessee shall exercise the option to purchase granted it by paragraph 14 of this lease, the Government agrees to grant to the Lessee a permanent right in common with the Government, its invitees and licensees to use, operate, maintain and improve any railroad tracks and appurtenances thereto constructed by the Lessee upon said strip of land. Any such tracks and appurtenances shall become the property of the Government when annexed. Lessee shall also have the right during the term of this lease or any renewal thereof to construct, operate, improve and maintain additional railroad tracks and appurtenances thereto on, over and across the lands of the Government lying south of Talladega Creek at such location as the Division Engineer may approve. Such tracks and appurtenances shall become the property of the Government when annexed. In the event the Lessee shall exercise the option to purchase granted it by paragraph 14 of this lease, the Government agrees to grant to the lessee a permanent right in common with the Government, its invitees and licensees to use, operate, maintain and improve any railroad tracks and appurtenances thereto constructed by the Lessee upon such lands.

It is understood and agreed that as to means and facilities of ingress, egress and communication to be used jointly and concurrently hereunder by and between the Government and the Lessee, the use thereof by the Lessee shall be subject to such rules, regulations and restrictions as the Commanding Officer of said installation may prescribe for the safety and security of the property of the Government, but that such rules, regulations and restrictions shall not be of such nature as to prevent the continued use thereof by Lessee. It is contemplated that the Government may make available to the Lessee, for a limited period of time. one Diesel locomotive for use in connection with operation of the leased property. Any agreement negotiated for the supply of a Diesel locomotive will be subject to the approval of the Chief of Transportation, and will be incorporated in a separate agreement.

- 11 -

10.  Notwithstanding the execution of this lease, the Government shall have the right until written notice by Lessee as hereinafter provided in this paragraph, to maintain personnel and to operate facilities on the leased property to provide water service to the Government's plant on adjacent property.  Upon written notice by Lessee to the Government that Lessee is ready and willing to furnish such water service as of a specified date and on such date specified by Lessee, the Government will deliver possession of such facilities thereon to Lessee.  Thereafter and without interruption of service, Lessee agrees that it will furnish continuously to the Government, on request, filtered service water to the maximum of 11,000,000 gallons per month at a rate not to exceed 20,000 gallons per hour and drinking water in such amounts as may be required by the Government to the capacity of existing facilities.

From and after the beginning of productive operation by Lessee of the steam electric generating plant on the leased property, Lessee agrees to furnish continuously to the Government on demand electric energy in the maximum amount of 200,000 kwh per month at a maximum demand not to exceed 375 kw.  Lessee will also furnish continuously to the Government on demand for such standby service steam at pressures within the capacity of existing facilities to a maximum amount of 90,000 pounds per month at a rate not to exceed 150 pounds per hour.  Measurement or metering of each service furnished by Lessee under the provisions of this paragraph shall be made from the plant from which such service is rendered and delivery shall be made to the Government at the boundary of the leased lands at the points where existing facilities for rendering such services intersect such boundary.

The Government shall pay Lessee for services rendered hereunder the reasonable cost to Lessee of such services.  The total direct and overhead costs of Lessee of producing such services shall be prorated between the Government and Lessee on the basis of their relative

- 12 -

uses of such services.

Payment by the Government to the Lessee for services rendered under this numbered paragraph shall be made on itemized invoice rendered monthly to the Post Engineer, Alabama Ordnance Works, or his successor in authority.

Lessee agrees that it will maintain in good operating condition the existing fire protection facilities on the leased property and will, in the event of fire, furnish to the Government fire fighting service therefrom to the capacity of such facilities without charge to the Government therefor.  The Government agrees that in the event of fire occurring on the leased property, it will without charge to Lessee assist Lessee to the extent of available facilities of fire fighting apparatus and equipment and furnish the services of its available personnel in extinguishing such fire.  Lessee shall likewise, to the extent of its available fire fighting personnel, equipment and apparatus, furnish assistance to the Government for the extinguishment of fires occurring on the property of the Government.

11.  In the event there is a declaration of national emergency by the President or the Congress of the United States or that the Secretary of War determines that reactivation of the Government's plant adjacent to the leased property is necessary in the interest of national defense, Lessee agrees thirty (30) days after written notice from the Government to furnish continuously during the term of this lease or renewal thereof for reactivation of such plant when and as required, electric power, steam, raw water and filtered water up to the maximum capacity of the leased facilities at the beginning of the term hereof.  Such services shall be delivered at the boundaries of the leased lands through or over existing facilities for delivery at such pressure or voltage as the Government may specify within the capacity of presently existing facilities.  If alteration of such facilities is required to deliver such services to the Government, the Government shall alter the same at its expense.

- 13 -

If Lessee fails to perform under the provisions of this clause the Secretary of War may cancel this lease immediately upon presentation of written cancellation to Lessee.

The Government shall pay to Lessee for services under this paragraph in the same manner as provided in paragraph numbered 10 hereof.

In the event delivery to the Government of steam or water services exceeds the following amounts:

(1) Steam:

Steam at 50 pounds psig to a maximum of 202,000 pounds per hour; plus

Steam at 150 psig to a maximum of 341,300 pounds per hour; plus

Steam at 300 pounds psig to a maximum of 68,000 pounds per hour (or the equivalent of such amounts);

(2) Water - Raw water to a maximum of 21,500 gallons per minute;

Filtered water to a maximum of 7,500 gallons per minute, and delivery to the Government of such services in excess of the foregoing amounts proximately causes the curtailment of operations of Lessee's plant on the site area for the manufacture of newsprint and/or other pulpwood products, the Government will reimburse Lessee during the periods of such curtailment for a portion of the loss as limited and defined hereafter caused Lessee thereby. Such reimbursement for each four week period in which curtailment occurs shall be computed as follows: From the total reasonable cost to Lessee of operating its plant (including overhead costs, raw materials processed and prepaid freight) accruing during the full four calendar week period last preceding the day on which Lessee begins to furnish such excess services, (herein referred to as the base period) deduct the gross revenue of the Lessee accruing from such plant during the four calendar week period in which curtailment occurs

- 14 -

(if the market prices of such products have fallen since the base period, the gross sales shall be computed at prices on the last day of the base period). From the remainder deduct (1) any decrease in operating expense due to lessened production which Lessee is able to effect under accepted managerial, accounting and operational practices (For the purposes of computing the amount of any decrease in operating expense, costs of labor and materials will be figured on the basis of similar costs prevailing on the last day of the base period.) (2) any interest accrued during such period payable by Lessee attributable to funded debt incurred by Lessee subsequent to commencement of operation by Lessee of said plant (3) any increase in taxes or insurance premium expense attributable to property added to the leased property after the commencement of such operations and (4) any deficit between the gross revenues of Lessee during the base period and the total cost to Lessee of operating its plant during such period. The remainder shall be the amount of reimbursement payable by the Government, provided that in no case shall such reimbursement exceed the amount of interest on funded debt, taxes and insurance premium expense accruing and payable by Lessee during the period for which computation is being made less the deductions numbered (2), (3) and (4) above. In the event that Lessee has not operated for a full four calendar week period preceding the day on which Lessee begins to furnish such excess services, the sum payable by the Government to Lessee shall be any deficit between costs to Lessee of operating its plant and gross revenues, provided that in no event shall such sum exceed the maximum stated above.

If, by reason of fire, breakdown of machinery or other cause during such period, it is determined by the Secretary of War that use of base period specified above would be unjust to Lessee, the Secretary of War may, upon application of Lessee, establish some other four calendar week period as a base period.

Such reimbursement by the Government shall be due on or

before ninety (90) days after receipt of itemized statements rendered to the Division Engineer as of the first day of each four week period during the continuance of such curtailment or suspension.

The Government expressly reserves the right, without obligation or liability to the Lessee during a national emergency declared as aforesaid or upon the aforesaid determination of the Secretary of War, to construct and operate on the utility area any additional facilities for the generation of electric power or steam or for obtaining raw or filtered water which the Government may consider desirable, provided that the construction and operation of such additional facilities shall be so conducted as not to disrupt the operations of the Lessee. The Government shall have the further right, during the term of this lease or renewal thereof to construct, operate and maintain on, over and under the site area, facilities necessary for the operation of such additional utility facilities on the utility area, provided that such additional utility facilities shall be so constructed, operated and maintained as not to dislocate Lessee's plant or facilities thereon or to disrupt the operations thereof; provided further that any additional facilities and additional utility facilities constructed by the Government under this paragraph will not be included as a part of this lease.

12. If, during the term of this lease or any renewal thereof, the Government shall lease the remainder of the Alabama Ordnance Works, or any portion thereof, Lessee agrees that it will furnish to the Government's lessee or lessees of such plant or portion thereof, during the term of this lease and any renewal thereof upon written request by such Government's lessee or lessees the following services:

Electric energy to the demand of 8300 kw with a total energy consumption of 3,700 megwhrs a month; Steam at 50 psig to a maximum rate of 70,000 pounds per hour;

- 16 -

Steam at 150 psig to a maximum rate of 115,000 pounds

per hour;

Steam at 300 psig to a maximum rate of 23,000 pounds

per hour;

Water – Raw water to a maximum of 7200 gpm.

Filtered water to a maximum of 2500 gpm.

The obligation of Lessee to furnish the services provided
in this paragraph is conditioned upon the payment by the Government's
lessee or lessees of such plant of the cost of any facilities (other than
production facilities), if any, necessary for delivery of such service
and upon payment to Lessee of the direct cost to Lessee of such services
plus ten per cent (10%).  Lessee shall be obligated to furnish services
under this paragraph only during the time and to the extent that capaci-
ties of the leased properties in excess of the requirements of the Govern-
ment and of Lessee are available, provided, however, that Lessee shall be
obligated to furnish services in the amounts specified above to the Govern-
ment's lessee or lessees unless the Government is requiring services under
the provisions of Paragraph 11 hereof.

Measurement or gauging of service furnished under this
paragraph shall be made at the plant from which such service is rendered
and delivery shall be made at the boundary of the leased property.

13.  In addition to the other rights herein granted, the Lessee
shall have the right to occupy and use for storage and such other purposes
as Lessee may desire the building designated on Exhibit "A" attached hereto
as "G" (TC4).  The Government may terminate Lessee's right of use and
occupancy of such building at any time after ninety (90) days' written
notice to Lessee of its election to terminate such rights.

14.  Upon giving notice as hereinafter provided, Lessee shall
have the right to purchase the site area properties described in paragraph
numbered 2, subject only to the exceptions and reservations set out in
Exhibit "B" attached hereto and made a part hereof, upon payment to the

- 17 -

Government of the sum of $30,750.00. Such option may be exercised by the Lessee giving to the Government written notice at any time within eighteen (18) months after the beginning of the term hereof of Lessee's election to exercise such option, such notice to be addressed to the Division Engineer, Corps of Engineers, South Atlantic Division, and if there be no such officer, to the Chief of Engineers, United States Army, and by tender with such notice of a certified check in the sum of $30,750.00 payable to the Treasurer of the United States, together with an instrument in duplicate for conveyance of such property to Lessee in the form attached hereto marked Exhibit "B" and made a part hereof. Said payment shall be placed in a special deposit account by the Government for refund to the Lessee in event the Lessee exercises its right of termination of this lease as provided for, and on the conditions stated, in numbered paragraph 32 herein. Promptly upon receipt of such notice, check and form of conveyance in duplicate, the Government agrees to execute such form of conveyance by its officer or officers thereunto duly authorized and to deliver a copy of such conveyance to Lessee. Upon tender of such purchase price the rental prescribed herein for the properties to be conveyed shall cease. Conveyance to Lessee under the provisions of this paragraph shall not affect the rights of Lessee under this lease with respect to the water pumping and sewage disposal facilities, telephone line, and railroad tracks located in the conveyed area. If Lessee shall terminate this lease under the provisions of Paragraph 32 hereof, the option granted under this paragraph shall expire upon the date Lessee gives notice of such termination.

15. In the event the Government shall during the term of this lease or any renewal thereof determine that it is willing to sell or dispose of the utility area property described in paragraph numbered 4 hereof, the water pumping and sewage disposal systems designated on Exhibit "A" hereto as "A" (414A) and "B" (617A), (609A), or the machinery,

- 18 -

equipment, pipe lines or other property used and useful in connection with such water pumping and sewage disposal properties which lies within the boundaries of the properties leased hereunder or lies between the two tracts of land leased hereunder, the Government shall before making any sale or agreement to sell the whole or any part of such properties to any other person, give notice to the Lessee of the price and the other terms and conditions under which the Government proposes to sell such properties and thereupon the Lessee shall have the right to buy such properties at the price and upon the terms and conditions proposed. Lessee shall, if it elects to exercise its right to buy, give notice of such election within sixty (60) days from receipt of notice to it by the Government of the proposed sale. If the Lessee shall give such notice, Lessee shall within one hundred eighty (180) days from the date of its notice of election tender to the Division Engineer, Corps of Engineers, South Atlantic Division, or if there be no such officer, to the Chief of Engineers, United States Army, a certified check in the amount of the purchase price of the properties. The Government agrees upon such tender and upon compliance by the Lessee of the other terms and conditions of the sale, to execute and deliver by a duly authorized representative of the Government a deed conveying such properties to Lessee. If Lessee shall not so elect to purchase such properties or shall not comply with the terms and conditions of the sale, the Government shall be free to sell such properties on the terms and conditions specified to any other person or persons. If a sale is not consummated on such terms and conditions within eighteen (18) months after Lessee's right to purchase on such terms and conditions terminates, notice shall be given to Lessee of any subsequently proposed sale or agreement to sell and Lessee shall have the right to purchase the property on the terms and conditions subsequently proposed, to be exercised in the same manner and with the same limitations herein provided.

- 19 -

Failure of the Lessee to exercise any such option provided
for in this paragraph shall not affect its other rights under this lease.

Upon conveyance to the Lessee of the utility area properties
under the provisions of this paragraph, the rental prescribed herein for
the properties conveyed shall cease.

16. Lessee agrees to pay for telephone service and facilities
and for sewage disposal service furnished to Lessee by the Government its
equitable proportionate part of the direct cost of maintenance and opera-
tion of the facilities therefor. Such equitable proportionate part shall
be determined by reference to the relative use by the parties hereto of
such facilities. Payment by Lessee hereunder shall be made promptly upon
receipt of invoice therefor rendered to Lessee by the Commanding Officer
of the Alabama Ordnance Works. The Government assumes no obligation to
maintain such facilities or to furnish such service.

17. The parties hereto agree that the cost of maintenance of
railroad, transmission lines and highway facilities used jointly between
the Government and Lessee shall be borne by the parties hereto in proportion
to their relative use of such facilities. Maintenance and settlement there-
for shall be provided for by agreement between the Lessee and the Commanding
Officer of the Alabama Ordnance Works. The Government assumes no obligation
to maintain either railroad, transmission lines or highway facilities.

18. That upon execution of this lease on behalf of the Govern-
ment and on behalf of the Lessee, a survey and inventory of the Leased
Property, including, but not limited to, all supplies, machinery, equipment
and tools embraced therein, shall be made by a representative of the Govern-
ment and a representative of the Lessee. Said survey and inventory shall
be submitted to the Division Engineer for approval, and upon approval, a
copy thereof shall be attached hereto and become a part hereof, as fully
as if originally incorporated herein. There shall be added to said survey
and inventory from time to time such additional Government property, fixtures
and installations as are furnished by or at the expense of the Government.

- 20 -

At the expiration or termination of this lease, a similar survey and inventory shall be prepared and submitted to the Division Engineer, said survey and inventory to constitute the basis for settlement by the Lessee with the Division Engineer for leased property shown to be lost, damaged or destroyed, any such property to be either replaced or restored or at the election of the Government reimbursement made therefor by the Lessee at the then current market value thereof. Supplies included in the survey and inventory which are used by the Lessee shall be, at the election of the Government, either replaced to stores in kind or reimbursement therefor shall be made by the Lessee at the then current market value thereof upon the expiration or termination of this lease.

19. All portions of the leased property not being used by the Lessee shall be maintained in standby condition for extended storage in accordance with standard War Department practice by and at the expense of the Lessee.

20. That for such period as the Lessee is in possession of the leased property pursuant to the provisions and conditions of this lease the Lessee shall procure and maintain at its cost a standard fire and extended coverage insurance policy or policies on the leased property to the full insurable value thereof. The Lessee shall procure such insurance from any responsible company or companies. The policy or policies evidencing such insurance shall provide that in the event of loss thereunder the proceeds of the policy or policies shall be payable to the Lessee to be used solely for the repair, restoration or replacement of the property damage or destroyed, any balance of the proceeds not required for the repair, restoration or replacement of the property damaged or destroyed to be paid to the Government, provided, however, that the insurer, after payment of any proceeds to the Lessee in accordance with the provisions of the policy or policies shall have no obligation or liability with respect to the use or

- 21 -

disposition of the proceeds by the Lessee. Any proceeds not used within a reasonable time for the repair, restoration or replacement of the property damaged or destroyed will be promptly paid to the Government. Nothing here-in contained shall be construed as an obligation upon the Government to repair, restore or replace the leased property, or any part thereof.

21. Lessee shall assume all responsibility for the Old Reynolds Cemetery located on the property covered by this lease under applicable Alabama laws.

22. That the Government shall not be responsible for damages to the property of the Lessee nor for damages to the property or injuries to the person of the Lessee's officers, agents, servants or employees or other persons on the Leased Property as invitees or licensees of the Lessee arising from the use of the Leased Property by the Lessee, and the Lessee shall indemnify and save the Government harmless from any and all such claim. The Government shall not be responsible for damages to any persons or property off the Leased Property arising from the Lessee's use of the Leased Property and the Lessee shall indemnify and save the Govern-ment harmless from any and all claims for such damages.

23. The Government shall not be liable for any violation or infringement by the Lessee of rights in patented inventions, secret processes and technical information, "know how", or other similar rights, and the Lessee shall indemnify and save the Government harmless from any and all claims arising therefrom or incident thereto.

24. The Lessee has inspected and knows the condition of the leased property and it is understood that the same is hereby leased without any representation or warranty by the Government, whatsoever, and without obligation on the part of the Government to make any alteration, repairs or additions thereto.

25. That, except as otherwise specifically provided in this lease, all disputes concerning questions of fact which may arise under

this lease, and which are not disposed of by mutual agreement, shall be decided by the Division Engineer, who shall reduce his decision to writing and mail a copy thereof to the Lessee at its address shown herein. Within thirty (30) days from said mailing the Lessee may appeal in writing to the Secretary of War, whose written decision or that of his designated representative or representatives thereon shall be final and conclusive upon the parties hereto. The Secretary of War may, in his discretion, designate an individual, or individuals, other than the Division Engineer, or a board as his authorized representative to determine appeals under this condition. The Lessee shall be afforded an opportunity to be heard and offer evidence in support of its appeal. The president of the board, from time to time, may divide the board into divisions of one or more members and assign members thereto. A majority of the members of the board or of a division thereof shall constitute a quorum for the transaction of the business of the board or of a division, respectively and the decision of a majority of the members of the board or of a division shall be deemed to be the decision of the board or of a division as the case may be. If a majority of the member of a division are unable to agree on a decision or if within thirty (30) days after a decision by a division, the board or the president thereof directs that the decision of the division be reviewed by the board, the decision will be so reviewed, otherwise the decision of a majority of the members of a division shall become the decision of the board. If a majority of the members of the board is unable to agree upon a decision the president will promptly submit the appeal to the Under Secretary of War for his decision upon the record. A vacancy in the board or in any division thereof shall not impair the powers, nor affect the duties of the board or division nor of the remaining members of the board or division, respectively. Any member of the board, or any examiner designated by the president of the board for that purpose may hold hearings, examine witnesses, receive evidence and report the evidence to the board or to the appropriate division, if the case is pending before a division. Pending decision of a dispute hereunder the

- 23 -

Lessee shall diligently proceed with the performance of this lease.

26. Lessee and the Government shall be excused from performance of any obligation hereunder during such times as such performance is prevented or delayed by act of God or the public enemy, fire, lightning, explosion, riots, floods or any cause beyond the control of Lessee or the Government.

27. That upon the expiration or other termination of this lease, the Lessee shall, if required by the Government, (a) remove such of its property as has not become the property of the Government under the terms of this lease and within the shortest possible time, but in no case in excess of 120 days from the date written notice of termination is received, or from the date of expiration, restore the Leased Property to as good order and condition as that existing upon the date of commencement of the term of this lease, less ordinary wear and tear, and damage to the Leased Property covered by insurance and for which Government shall receive, or has received, insurance funds in lieu of having the damaged property repaired, replaced, or restored, and place the Leased property in "Standby condition for extended storage", according to established industrial standards, and in accordance with any additional specifications furnished to the Lessee by the Division Engineer, the cost of so restoring the Leased Property and so placing the Leased Property in standby condition for extended storage to be borne by the Lessee, or (b) remove such of its property as has not become the property of the Government under the terms of this lease, and within the shortest possible time place the Leased Property in an operating condition suitable for the Government's production purposes, provided, however, in the event the cost of placing the Leased Property in said operating condition is in excess of the estimated cost of restoring the Leased Property and placing it in "Standby Condition for extended storage", as required by Condition 27 (a) of this lease, the Government shall pay the Lessee the amount of the difference in said costs, or (c) remove such of its property as has not become the

- 24 -

property of the Government under the terms of this lease and return the
Leased Property to the Government in an "as is" condition, the Lessee to
pay the Government the amount of the estimated cost of restoring the
Leased Property and placing it in "Standby Condition for extended storage"
as required by Condition 27 (a) of this lease.  In the event the Government
elects upon expiration or other termination of this lease to have the Leased
Property restored and placed in standby condition for extended storage as
required by Condition 27 (a), or placed in an operating condition as re-
quired by Condition 27 (b), the Lessee shall upon the completion of the
work required thereby, immediately and peaceably yield the same to the
Government in said condition.  If the Lessee shall fail or neglect to remove
its property, or to restore the Leased Property or to place the Leased
Property in standby condition for extended storage, or to yield the Leased
Property, as herein provided, then the Government may cause the property of
the Lessee to be removed, and the Leased Property to be restored and con-
ditioned, and the cost of such removal, restoration and conditioning
shall be paid by the Lessee to the Government upon demand, and no claim
for damages against the Government or its officers or agents shall be
created by or made on account of such removal, restoration and condition-
ing.  In aid of its obligation so to return the Leased Property, the
Lessee shall maintain a program for the proper use, care and maintenance
of the Leased Property, as well as a property control and accounting
system consistent with good business practice.  In the event Lessee shall
exercise the option to purchase described in paragraph 14 hereof, the
provisions of this paragraph 27 shall not apply to the property subject to
such option.

28.  The Government may terminate the lease at any time by
giving thirty (30) days' written notice by the Division Engineer to the
Lessee in the event the Lessee violates any of the terms and conditions
of this lease and continues and persists therein for ten (10) days after

- 25 -

notice thereof in writing by the Division Engineer.

29. That no Member of or delegate to Congress or Resident Commissioner shall be admitted to any share or part of this lease or to any benefit to arise therefrom. Nothing, however, herein contained shall be construed to extend to any incorporated company, if the lease be for the general benefit of such corporation.

30. That the Lessee warrants that it has not employed any person to solicit or secure this lease upon any agreement for commission, percentage, brokerage or contingent fee. Breach of this warranty shall give the Government the right to annul this lease, or, in its option, to collect from the Lessee the amount of such commission, percentage, brokerage, or contingent fee, in addition to the consideration herein set forth. This warranty shall not apply to commission payable by the Lessee upon contracts or leases secured or made through bona fide established commercial or selling agencies maintained by the Lessee for the purpose of securing this lease.

31. All notices to be given pursuant to this lease, except as otherwise expressly provided, shall be addressed, if to the Lessee, to "Coosa River Newsprint Company, 701 Protective Life Building, Birmingham, Alabama"; if to the Government, to the "Division Engineer, Corps of Engineers, South Atlantic Division, P. O. Box 4114, Atlanta, Georgia", or as may from time to time otherwise be directed by the parties. Notice shall be deemed to have been duly given if and when enclosed in a properly sealed envelope or wrapper, addressed as aforesaid, marked as registered mail, with registered mail, with registry fee prepaid and deposited postage prepaid (or, if mailed by the Government, deposited under its franking privilege) in a post office or branch post office regularly maintained by the United States Government.

32. It is understood that this lease is made to provide for keeping the leased property in operating condition to provide services

- 26 -

to the Government's adjacent war production plant in the event it should be reactivated, and to provide facilities to Lessee in the construction, operation and maintenance of a plant for the manufacture of newsprint and/or other pulpwood products on the land described in paragraph numbered 2 hereof, and that the terms and provisions hereof are to be construed to permit such utilization insofar as not inconsistent with the other provisions hereof. In the event the Lessee determines that it is prevented by the necessities of national defense or by any other cause from completing and putting such plant into operation, Lessee shall have the right, at any time within eighteen (18) months from the commencement of the term hereof by thirty (30) days' notice in writing to the Government of Lessee's election to do so, to terminate this lease.

In the event the Lessee determines within the said eighteen (18) month period that it is prevented by the necessities of national defense or by any other cause from completing and putting its proposed plant into operation, Lessee will not transfer or assign this lease or any of its rights or interests hereunder, but will upon such determination promptly terminate this lease, and upon the effective date of termination under this paragraph, the rental payable by Lessee shall cease. If Lessee shall have exercised its option to purchase granted in paragraph fourteen (14) hereof, and shall have received a deed thereunder at the time Lessee terminates this lease within said eighteen (18) month period under the provision of this numbered paragraph, then and in that event Lessee agrees, upon written request by the Government, to reconvey to the Government by statutory warranty deed the property conveyed to Lessee under such option, and any additional trackage rights which may have been conveyed to Lessee by the Government (or if no conveyance has been made to Lessee, to surrender Lessee's right to such conveyance) upon refund to Lessee by the Government of the sum of $30,750.00. Lessee shall have the right, at any time within six months from the date of such termination, to remove any improvements it may have placed upon such property, provided that Lessee

- 27 -

shall, upon such removal restore the property to the condition when received by the Lessee or in a condition satisfactory to the Division Engineer.

33. That except as otherwise specifically provided herein the terms "Government" and "Lessee" shall include their respective successors and assigns and the terms "Division Engineer" and "Commanding Officer" shall include their respective duly appointed successors and authorized representatives.

IN WITNESS WHEREOF I have hereunto set my hand by authority of the Secretary of the Secretary of War, this   12th  day of June, 1947.

                              R. A. Wheeler
                              Lieutenant General
                              Chief of Engineers     R. A. Wheeler
                                                     Chief of Engineers

THIS LEASE is also executed by the Lessee this  18th  day of

June          , 1947.

                              COOSA RIVER NEWSPRINT COMPANY

(CORPORATE)
(  SEAL  )                    By  Edward Lee Norton        (SEAL)
                                       President

                              701 Protective Life Building
                              Birmingham,  Alabama

                    C E R T I F I C A T E

     I,              Charles F. Turner                   ,
certify that I am the      Assistant Secretary            
of the CORPORATION named as Lessee herein; that   Edward Lee         
      Norton                , who signed this lease on behalf of the

- 28 -

Lessee, was then _____President_____of said

CORPORATION; that said lease was duly signed for and in behalf of said

CORPORATION by authority of its governing body, and is within the scope

of its corporate powers.

(CORPORATE)<br>( SEAL )

_____Charles F. Turner____CORPORATE SEAL_____

COUNTY OF ARLINGTON        )
                           )
COMMONWEALTH OF VIRGINIA )

      I,    Freda B. Brill    , a Notary Public in and for

the County aforesaid, hereby certify that    R. A. Wheeler

whose name as Chief of Engineers is signed to the foregoing instrument and

who is known to me, acknowledged before me on this date that, being informed

of the contents of the instrument he, as such officer and with full authority,

executed the same voluntarily for and as the act of the Secretary of War of

the United States of America.

      Given under my hand and notarial seal, this  12th  day of June,

1947.

(SEAL)                              _____Freda B. Brill_____
                                          Notary Public

STATE OF ALABAMA      )
                      )
JEFFERSON COUNTY      )

      I,   Mary V. Bennett     , a Notary Public in and for said County,

in said State, hereby certify that Edward Lee Norton, whose name as President

of Coosa River Newsprint Company, a corporation, is signed to the foregoing

instrument, and who is known to me acknowledged before me on this day that,

being informed of the contents of the instrument, he, as such officer and

with full authority, executed the same voluntarily for and as the act of

said corporation.

- 29 -

Given under my hand and notarial seal, this the 18th day
of June      , 1947.

                                        Mary V. Bennett
(SEAL)                                   Notary Public

**EXBIBIT B**

EXHIBIT "B"

THIS DEED between the UNITED STATES OF AMERICA, hereinafter sometimes called Grantor, and COOSA RIVER NEWSPRINT COMPANY, a corporation organized and existing, under the laws of the State of Alabama, hereinafter sometimes called Grantee;

WITNESSETH:

WHEREAS, The Secretary of War, by virtue of the authority contained in Section 1 of the Act of Congress approved July 2, 1940 (54 Stat. 712), as continued in effect by Section 13 of the Act of Congress approved June 5, 1942 (56 Stat. 317), leased the hereinafter described property to the Grantee for a term beginning the _30th_ day of _June_ 1947; and

WHEREAS, by such lease the Grantee was granted the option to purchase the hereinafter described property and the Grantee has exercised such option in accordance with the terms thereof;

NOW, THEREFORE, KNOW ALL MEN BY THESE PRESENTS, That the United States of America, by

for and in consideration of the sum of Thirty Thousand Seven Hundred Fifty Dollars ($30,750.00) to Grantor in hand paid, the receipt of which is hereby acknowledged, does remise, release, quitclaim and convey to the Coosa River Newsprint Company the following described lands located in Talladega County, Alabama:

(A) All the lands, together with the rights appurtenant thereto lying within the following described boundary lines described by reference to that certain War Department O.C.E. Construction Division drawing numbered 89-11 approved 12-20-46 which is attached hereto, marked Exhibit "A" and made a part hereof: Beginning at the Coosa River at Coordinate N20875, being the south boundary of the existing electric transmission right of way shown as "H" on Exhibit "A" between Coordinates N20800 and N21200, running thence

along the south boundary of said transmission line right of way to the west boundary of the extension of "A" Street, running thence south along the western boundary of said extension of "A" Street and the western boundary of "A" Street to a point midway between Coordinates N18400 and N18000, thence east parallel with Coordinate N18000 to the west boundary of "E" Street, thence south along the west boundary of "E" Street to the intersection of such boundary with Coordinate N16800, thence west along Coordinate N16800 to its intersection with Coordinate E4000, thence south along Coordinate E4000 to the center of Talladega Creek, thence down the center of such creek to the Coosa River, thence up the Coosa River to the point of beginning, together with all the improvements, facilities, buildings, structures, fixtures, tools, supplies and all other properties, real and personal, except as hereinafter specified which as of the date hereof lie within the foregoing described boundary lines.

(B) A perpetual easement and right, in common with the Grantor and other persons invited or licensed by the Grantor or the Grantee, to use that certain street or highway extending from the southern boundary of the above described lands to Alabama Highway No. 91.

(C) A perpetual easement and right, in common with the Grantor and other persons invited or licensed by the Grantor or the Grantee, to use, operate, maintain and improve the existing railroad tracks and appurtenances, furnishing ingress to and egress from the above described lands.

- 2 -

Together with all improvements, rights, hereditaments and appurtenances thereunto appertaining, with the specific exceptions and reservations hereinafter set out.

There is expressly excepted from the property conveyed by this instrument and reserved to the Grantor a perpetual easement and right of way for use, operation, maintenance and improvement of the following Government-owned facilities installed on said property:

(a)  Water Pumping Plant in the location designated as "A" (414 A) on Exhibit "A" hereto and all water pipe lines used or useful in connection therewith, or as may be relocated by Grantee with the approval of Grantor.

(b)  Sewage Disposal Plant in the location designated as "B" (609 A, 617 A) on Exhibit "A" hereto and all sewer pipelines used or useful in connection therewith, or as may be relocated by Grantee with the approval of Grantor.

(c)  Telephone line in the location designated as "C" on Exhibit "A" hereto.

(d)  Railroad spur track in the location designated as "K" on Exhibit "A" hereto.

(e)  Ash Basin in the location designated as "D" on Exhibit "A" hereto and all appurtenances used or useful in connection therewith or as may be relocated by Grantee with the approval of Grantor.

(f)  Drainage Ditches in the location designated as "E" on Exhibit "A" hereto or as may be relocated by Grantee with the approval of Grantor.

Fee simple title to all the buildings, machinery, equipment, pipelines, telephone lines, railroad tracks and other appurtenances installed along, in, over, and upon the above-described easements and right of way is reserved to the Grantor.

Grantor also reserves to itself, its invitees and licensees, in perpetuity the right to use in common with the Grantee, its invitees and licensees, the following streets and highways:

- 3 -

(A)  The street or highway designated as "A" Street on

Exhibit "A" hereto throughout its course over the lands here-

in conveyed.

(B)  The street or highway designated as 3rd Avenue on Ex-

hibit "A" hereto.

Grantee shall have the right to relocate the streets or highways described

in (A) and (B) above, provided that after such relocation said streets or

highways shall be of the same widths and of the same or equivalent construc-

tion as those relocated and shall respectively terminate at the same points

on the boundaries of the above described lands, provided, further, that

Grantor's rights as herein reserved shall apply to the streets as relocated.

Grantor also reserves the permanent right in aid of any Government

project or improvement of navigation on the Coosa River to flood and impound

water upon all of the lands herein conveyed lying below elevation 408 feet

above mean sea level as heretofore established by the United States Geodetic

Survey.

Grantor also reserves the right to regulate the use of highways,

streets, roads and all other means of ingress and egress over and across

the above described lands by such regulations as Grantor may promulgate,

provided that said regulations do not prevent continued use thereof by

Grantee.

Grantor also reserves the right, without obligation or liability

to the Grantee, to construct, operate and maintain on, over and under the

land herein conveyed facilities necessary for the operation of any utility

facilities constructed by the Government on land described and referred to

as the "utility area" in the lease hereinabove referred to, provided that

such facilities shall be so constructed, operated and maintained as not to

dislocate Grantee's plant or facilities or materially to disrupt the opera-

tion thereof on the lands herein conveyed.

TO HAVE AND TO HOLD, the foregoing described property unto the

- 4 -

said Coosa River Newsprint Company, its successors and assigns forever.

IN WITNESS WHEREOF, the United States of America has caused this conveyance to be executed in its name by its officer thereunto duly authorized, and the seal of the War Department to be hereunto affixed this _____ day of _____, 194__.

UNITED STATES OF AMERICA

By_____

COUNTY OF ARLINGTON      )
                         )ss.
COMMONWEALTH OF VIRGINIA )

I, _____, a Notary Public in and for the County of Arlington, hereby certify that _____ whose name as _____ of the United States of America is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, as such officer and with full authority, executed the same voluntarily for and as the act of the United States of America.

Given under my hand and notarial seal, this the _____ day of _____, 194__.

(SEAL)                              _____
                                              Notary Public

- 5 -

**EXBIBIT C**

# WAR DEPARTMENT

## WASHINGTON

JAN 23 1943

Honorable Chauncey Sparks,
        Governor of Alabama,
                Montgomery, Alabama.

Dear Governor Sparks:

The War Department acknowledges receipt of a patent dated December 22, 1942, executed by Governor Dixon on behalf of the State of Alabama, ceding exclusive jurisdiction to the United States of America over 13,163.65 acres of land, more or less, in Talladega County, Alabama. The land is being used for military purposes in connection with Alabama Ordnance Plant.

Notice is hereby given that the United States accepts this cession of jurisdiction, effective as of the 30th day of January, 1943, at 12:00 noon.

Return of the duplicate copy of this letter, with your indorsement thereon designating time of receipt of this acceptance by your office, would be appreciated.

Sincerely yours,

Henry L. Stimson

Secretary of War.

No........................
RECEIVED
JAN 27 1943
Time //://S A.M.
Governor's Office

# WAR DEPARTMENT

## WASHINGTON

JAN - 2 1943

Honorable Frank M. Dixon,
        Governor of Alabama,
                Montgomery, Alabama.

Dear Governor Dixon:

        Pursuant to your letter of December 22, 1942,
inclosing Patent prepared by this Office in connection
with Alabama Ordnance Plant, there are transmitted here-
with for your files two additional copies of this Patent.

        There is also returned to you inclosed, the
original Patent for the purpose of having the seal of the
State of Alabama affixed thereto.

                        Sincerely yours,

                        Henry L. Stimson

                        Secretary of War.

3 Incls.
  Original Patent.
  2-copies of Patent.

December
22nd
1942


Honorable Henry L. Stimson
Secretary of War
Washington, D. C.

My dear Mr. Secretary:

    This acknowledges receipt of
your letter of December 15, enclosing
draft of a patent for the Governor's sig-
nature, ceding jurisdiction over certain
lands situated in Talladega County, Alabama.

    Through some oversight your office
failed to enclose sufficient copies for our
files, and it will be appreciated if you will
let us have the two additional copies which
you stated were being enclosed.

    We are returning herewith your
copy, properly executed.

       Yours very truly,


       J. M. BONNER
      Legal Adviser to the Governor

JMB:A

# WAR DEPARTMENT

## WASHINGTON

DEC 1 - 1942

Honorable Frank M. Dixon,
          Governor of Alabama,
                    Montgomery, Alabama.

Dear Governor Dixon:

Inclosed is a draft of a patent in quadruplicate, prepared for your signature in accordance with the provisions of Sections 18 and 19, Title 59, of the Official Code of Alabama, 1940, ceding to the United States exclusive jurisdiction over certain lands, comprising a total of 13,163.65 acres, more or less, situated in Talladega County, State of Alabama, to be used in connection with the Alabama Ordnance Plant, subject to the rights of the State reserved therein.

These lands were acquired by the United States by:

1. Deed dated December 17, 1941, from Henry Smith and Pauline Smith, his wife, recorded in Deed Record No. 106, page 227, in the land records of Talladega County.

2. Deed dated December 16, 1941, from Julia Vaughn and A. C. Vaughn, her husband, recorded in Deed Record No. 106, page 221, in the land records of Talladega County.

3. Deed dated December 5, 1941, from W. F. Donahoo and Kate Donahoo, his wife, recorded in Deed Record No. 106, page 201, in the land records of Talladega County.

4. Deed dated February 18, 1942, from W. R. Hightower and Onie Hightower, his wife, recorded in Deed Record No. 106, page 359, in the land records of Talladega County.

DEC 17 '42 AM

5. Deed dated May 1, 1942, from Mrs. Nettie Bowen, as Successor Trustee under the Last Will and Testament of Bailey A. Bowen, Deceased, recorded in Deed Record No. 106, page 578, in the land records of Talladega County.

6. Deed dated October 22, 1941, from George W. Jones and Alice D. Jones, his wife, recorded in Deed Record No. 106, page 67, in the land records of Talladega County.

7. Deed dated October 29, 1941, from Alice E. Huey, an unmarried woman, recorded in Deed Record No. 106, page 175, in the land records of Talladega County.

8. Deed dated September 24, 1941, from Mrs. Pauline M. Cliett, a widow, et al., recorded in Deed Record No. 106, page 74, in the land records of Talladega County.

9. Deed dated September 13, 1941, from George W. Jones and Alice D. Jones, his wife, et al., recorded in Deed Record No. 104, page 567, in the land records of Talladega County.

10. Deed dated October 29, 1941, from George R. Spraggins and Lillie P. Spraggins, his wife, recorded in Deed Record No. 106, page 94, in the land records of Talladega County.

11. Deed dated August 25, 1941, from B. F. Nicholls and Victoria Nicholls, his wife, recorded in Deed Record No. 104, page 517, in the land records of Talladega County.

12. Deed dated October 27, 1941, from George W. Jones and Alice D. Jones, his wife, recorded in Deed Record No. 106, page 84, in the land records of Talladega County.

13. Deed dated October 30, 1941, from Robert S. Limbough and Florence Limbough, his wife, recorded in Deed Record No. 106, page 101, in the land records of Talladega County.

14. Deed dated February 20, 1942, from W. F. Donahoo and Kate Donahoo, his wife, recorded in Deed Record No. 106, page 383, in the land records of Talladega County.

15. Decree dated August 8, 1941, on declaration of taking filed on August 8, 1941, in the condemnation proceeding entitled United States of America v. 155.0 acres of land, more or less, situate in Talladega County, State of Alabama, and Annie L. Cook, et al., No. 437 in the District Court of the United States for the Eastern Division of the Northern District of Alabama.

16. Decree dated May 2, 1941, on declaration of taking filed on May 2, 1941, in the condemnation proceeding entitled United States of America v. 163.3 acres of land, more or less, situate in Talladega County, State of Alabama, and Thomas E. Garrett, et al., No. 420 in the District Court of the United States for the Eastern Division of the Northern District of Alabama.

17. Decree dated April 19, 1941, on declaration of taking filed on April 19, 1941, in the condemnation proceeding entitled United States v. 6,623 acres of land, more or less, situate in Talladega County, State of Alabama, and J. J. Hightower, et al., No. 417 in the District Court of the United States for the Eastern Division of the Northern District of Alabama.

- 2 -

18. Decree dated April 16, 1941, on declaration of taking filed on April 16, 1941, in the condemnation proceeding entitled United States of America v. 2134 acres of land, more or less, situate in Talladega County, Alabama, and W. F. Killough, et al., No. 415 in the District Court of the United States for the Eastern Division of the Northern District of Alabama.

19. Decree dated August 11, 1941, on declaration of taking filed on August 11, 1941, in the condemnation proceeding entitled United States of America v. 130.0 acres of land, more or less, situate in Talladega County, State of Alabama, and Bettie J. Morris, et al., No. 438 in the District Court of the United States for the Eastern Division of the Northern District of Alabama.

20. Decree dated February 11, 1942, on declaration of taking filed on February 11, 1942, in the condemnation proceeding entitled United States of America v. 18.1 acres of land, more or less, situate in Talladega County, State of Alabama, and Talladega County, et al., No. 472 in the District Court of the United States for the Eastern Division of the Northern District of Alabama.

21. Decree dated April 19, 1941, on declaration of taking filed on April 19, 1941, and amended by an order dated June 23, 1941, in the condemnation proceeding entitled United States of America v. 2,532.77 acres of land, more or less, situate in Talladega County, State of Alabama, and Willie Sparks, et al., No. 416-E in the District Court of the United States for the Eastern Division of the Northern District of Alabama.

22. Decree dated October 15, 1941, on declaration of taking filed on October 15, 1941, in the condemnation proceeding entitled United States of America v. 40.0 acres of land, more or less, situate in Talladega County, State of Alabama, and Alex Wilkerson, et al., No. 452 in the District Court of the United States for the Eastern Division of the Northern District of Alabama.

It is requested that the patent be executed by you in the statutory manner, recorded in the Office of the Secretary of State, and returned to the War Department.

Sincerely yours,

Henry L. Stimson

Secretary of War.

1 Incl.
Draft of Patent (Quad.)

- 3 -

January
Sixth
1 9 4 2

Honorable Henry L. Stimson
Secretary of War
Washington, D. C.

My dear Mr. Secretary:

With further reference to the
Patent prepared by your office in connection
with Alabama Ordnance Plant, we are return-
ing to rewith your original copy with the
State Seal properly affixed and one carbon
copy.

Yours very truly,

J. M. BONNER
Legal Adviser To The Governor

JMB:A

## PATENT

KNOW ALL MEN BY THESE PRESENTS, THAT WHEREAS, the United States
has purchased and condemned and now holds the hereinafter described land
within the limits of the State of Alabama for the purpose of erecting and
maintaining thereon forts, fortifications, magazines, arsenals, and other
needful buildings; and

WHEREAS, under the provisions of sections 18 and 19, Title 59,
Official Code of Alabama, 1940, the Governor of the State of Alabama, upon
application made to him in writing on behalf of the United States, accom-
panied by proper evidence of title in the United States, describing the
land, is authorized on the part of the State by patent to be recorded in
the office of the Secretary of State to cede to the United States such
jurisdiction as he may deem wise over such land, to hold, to use, and oc-
cupy the same for the purpose of the cession, and none other; and

WHEREAS, application has been made in writing on behalf of the
United States for such cession, accompanied by proper evidence of title in
the United States to the hereinafter described land;

NOW, THEREFORE, I, _____
as Governor of the State of Alabama, in the name and on behalf of the
State of Alabama, and in accordance with the laws of said State, do hereby
cede unto the United States of America exclusive jurisdiction over land
comprising the site of the Alabama Ordnance Plant, situate in Talladega
County, State of Alabama, and more particularly described as follows:

Beginning at a point in the North line of Sec. 20, T 19 S,
R 3 E of the Huntsville Meridian and the intersection with the
East bank of the Cosea River; thence East along the North line
of Secs. 20 and 21, to a point midway between the NW corner of
Sec. 21 and the W 1/16 corner between Secs. 21 and 16; thence
North and parallel to the West line of Sec. 16, 660.0' to a
point; thence East and parallel to the South line of Sec. 16
to a point in the North-South center line of said Sec. 16;
thence North along the North-South center line of said Sec. 16
to the S 1/16 corner of Sec. 16; thence East along the S 1/16
line of said Sec. 16 to its intersection with the West R/W line
of the Childersburg Grassmere Public Road; thence Southeasterly
along the West R/W line of the Childersburg Grasmere public

Road to its intersection with the South line of Sec. 16; thence
East along the South line of Secs. 16 and 15 to the E 1/16 cor-
ner between Secs. 15 and 22; thence North along the E 1/16 line
of Sec. 15 to the E 1/16 corner between Secs. 15 and 10; thence
East along the North line of Secs. 15, 14, and 13 to the NE cor-
ner of Sec. 13; thence South along the East line of Secs. 13 and
24 to the E 1/16 corner between Sec. 24, T 19 S, R 3 E, and Sec.
19, T 19 S, R 4 E; thence East along the E 1/16 line of Sec. 19,
T 19 S, R 4 E, 330' to a point; thence along a line South and
parallel to the West line of Sec. 19 through Secs. 19 and 30 to
its intersection with the North bank of the Talladega Creek;
thence Northwesterly along the North bank of said Talladega
Creek to its intersection with the West line of Sec. 30; thence
South along the West line of Secs. 30 and 31 to its intersection
with the North R/W line of the Southern R. R.; thence South-
westerly along the North R/W line of said Southern R. R. through
Secs. 36 and 35 in T 19 S, R 3 E, and Secs. 2, 3, and 10, in
T 20 S, R 3 E to its intersection with the South line of Sec. 10;
thence West along the South line of Sec. 10, to its SW corner;
thence North along the East line of Sec. 9, 165.0' to a point;
thence West and parallel to the South line of Sec. 9 to a point
in the E 1/16 line of Sec. 9; thence North along the E 1/16 line
of Sec. 9, 165.0' to a point; thence West and parallel to the
South line of Sec. 9 to a point in the North-South center line
of Sec. 9; thence South along the North-South center line of
Sec. 9, 165.0' to a point; thence West and parallel to the South
line of Sec. 9 through Secs. 9 and 8 to its intersection with
the East bank of the Coosa River; thence in a Northerly direc-
tion along the East Bank of the Coosa River, through Secs. 8, 7
and 6, T 20 S, R 3 E and Secs. 31, 30, 29, 28, 21 and 20, T 19 S,
R 3 E, to its intersection with the North line of Sec. 20, the
point of beginning, containing 13,155.65 acres, more or less,
excepting therefrom, however, a certain cemetery referred to in
the decree dated April 19, 1941, in the condemnation proceedings
entitled United States of America v. 3,532.77 acres of land, more
or less, situate in Talladega County, State of Alabama, and
Willie Sparks, et al., No. 416-M, in the District Court of the
United States for the Eastern Division of the Northern District
of Alabama.

A map of said land showing the various tracts comprising the same
is attached hereto and made a part hereof as "Exhibit A."

PROVIDED, That the jurisdiction so ceded shall not prevent the
execution upon such land of any process, civil or criminal, issued under the
authority of this State, except as such process might affect the property of
the United States thereon.

PROVIDED, FURTHER, That the State of Alabama expressly reserves
the right to tax all persons, firms, corporations, or associations now or
hereafter residing or located upon said land; to tax the exercise by any
person, firm, corporation, or association of any and all rights, privileges,

and franchises upon said land; and to tax property of all persons, firms, corporations, or associations situated upon said land. The jurisdiction ceded is for the purposes of the cession, and none other, and shall continue during the time the United States shall be or remain the owner thereof and shall use such land for the purposes of the cession, and the State of Alabama expressly reserves the right to exercise over or upon any such land any and all rights, privileges, powers, or jurisdiction which may now or hereafter be released or receded by the United States to the State.

IN WITNESS WHEREOF, I, _____ as Governor of the State of Alabama, have hereunto set my hand and caused the great seal of the State of Alabama to be affixed hereto this _____ day of _____, A.D., 194_

_____
Governor

ATTEST:

_____
Secretary of State

In compliance with section 18, Title 59, Official Code of Alabama, 1940, this Patent was recorded in the Office of the Secretary of State of the State of Alabama on the _____ day of _____, 1942, in _____.

_____
Secretary of State of the
State of Alabama.

- 3 -













# WAR DEPARTMENT

## WASHINGTON

RECEIVED

APR 13 1944

APR 1 7 1944

Governor's Office

Honorable Chauncey Sparks,
      Governor of Alabama,
            Montgomery, Alabama.

Dear Governor Sparks:

     Inclosed is draft of a patent, in quintuplicate, prepared for your signature in accordance with the provisions of Sections 18 and 19, Title 59, of the Official Code of Alabama, 1940, ceding to the United States exclusive jurisdiction over 5,223.74 acres of land, more or less, used in connection with the Coosa River Ordnance Plant Military Reservation, situate in Talladega County, Alabama, subject to the rights of the state reserved therein.

     The lands described in the draft of patent are those acquired by the United States:

     By decrees entered on certain declarations of taking filed in the District Court of the United States for the Eastern Division of the Northern District of Alabama, said decrees having been entered as of the dates and in those certain condemnation proceedings entitled and numbered as set out immediately below:

| Date Decree Entered | Condemnation Proceeding |
|---|---|
| June 7, 1941 | "United States of America v. 334.25 acres of land, more or less, situate in Talladega County, State of Alabama, and the Heirs of Jordan Barclay, et al," Civil No. 427. |
| November 6, 1941 | "United States of America v. 30 acres of land, more or less, situate in Talladega County, State of Alabama, and Lena B. Castleberry, et al," Civil No. 456. |
| June 14, 1941 | "United States of America v. 790.75 acres of land, more or less, situate in Talladega County, State of Alabama, and J. E. Cater, et al," Civil No. 428. |
| January 10, 1942 | "United States of America v. 47.84 acres of land, more or less, situate in Talladega County, State of Alabama, and Fred D. Cunningham, et al," Civil No. 467. |
| January 21, 1942 | "United States of America v. 24 acres of land, more or less, situate in Talladega County, State of Alabama, and Joe Curry, et al", Civil No. 470. |

| Date Decree Entered | Condemnation Proceeding |
|---|---|
| February 26, 1942 | "United States of America v. 64 acres of land, more or less, situate in Talladega County, State of Alabama, and Joe Curry, et al," Civil No. 476. |
| September 9, 1941 | "United States of America v. 4.8 acres of land, more or less, situate in Talladega County, State of Alabama, and Mary Hicks Dumas, et al," Civil No. 444. |
| August 29, 1941 | "United States of America v. 40 acres of land, more or less, situate in Talladega County, State of Alabama, and H. H. Heinie Estate, et al," Civil No. 441. |
| October 20, 1941 | "United States of America v. 207.50 acres of land, more or less, situate in Talladega County, State of Alabama, and G. C. Smelley, et al," Civil No. 454 |
| December 29, 1941 | "United States of America v. 4 acres of land, more or less, situate in Talladega County, State of Alabama, and Cabot S. Weaver, et al," Civil No. 464. |
| January 5, 1942 | "United States of America v. 10 acres of land, more or less, situate in Talladega County, State of Alabama, and S. O. Wesley, et al," Civil No. 462. |
| May 26, 1941 | "United States of America v. 360.05 acres of land, more or less, situate in Talladega County, State of Alabama, and J. B. White, et al," Civil No. 424. |
| May 20, 1941 | "United States of America v. 602.95 acres of land, more or less, situate in Talladega County, State of Alabama, and Pink Cunningham Estate, et al," Civil No. 423. |

By deeds from the grantors, bearing the dates, and being recorded in the land records of Talladega County, Alabama, as follows:

| Name of Grantor | Date | Deed Book | Page |
|---|---|---|---|
| V. M. Alverson, et ux | October 28, 1941 | 106 | 175 |
| Nat Barclay | October 27, 1941 | 106 | 88 |
| Annie Battle, et al | April 8, 1942 | 106 | 481 |
| R. L. Brown, et al | October 18, 1941 | 106 | 48 |
| John Edwin Cater, Jr., et ux | October 25, 1941 | 106 | 80 |
| J. F. Cater, et ux | October 22, 1941 | 106 | 72 |

|  | | Recordation | |
|---|---|---|---|
| Name of Grantor | Date | Deed Book | Page |
| J. L. Chambers, Executor of Estate of William B. Groce | October 22, 1941 | 106 | 70 |
| Bama Jane Conner, et vir | April 30, 1942 | 106 | 512 |
| Mrs. Willie H. Cowen, et al | October 24, 1941 | 106 | 76 |
| Emma Cunningham | January 26, 1942 | 106 | 320 |
| Jimmie S. Davidson, et al | January 21, 1942 | 106 | 302 |
| Jimmie S. Davidson, et al | January 22, 1942 | 106 | 306 |
| Mrs. Josiephene Fant | November 27, 1941 | 106 | 171 |
| Mrs. Mattie O. Hancook, et vir | September 17, 1941 | 104 | 571 |
| Mattie Harterson, et al | December 4, 1941 | 106 | 186 |
| Alice E. Huey | October 29, 1941 | 106 | 175 |
| Otis Hundley, et ux | October 18, 1941 | 106 | 56 |
| Dalton McGhee, et ux | October 29, 1941 | 106 | 94 |
| Mrs. Maggie Moody, et al | December 20, 1941 | 106 | 237 |
| Clyde Morgan, et ux | June 3, 1942 | 106 | 583 |
| R. L. Newsome, et ux | October 18, 1941 | 106 | 54 |
| Mrs. Fannie Oglesby | January 13, 1942 | 106 | 293 |
| F. J. Owens, et ux | December 4, 1941 | 106 | 188 |
| Robert C. Phillips, et ux | February 14, 1942 | 106 | 460 |
| Lucille Franks Riddle, et vir | January 28, 1942 | 106 | 522 |
| G. C. Smelley, et ux | October 29, 1941 | 106 | 92 |
| Gilbert Storey, et ux | January 23, 1942 | 106 | 309 |
| Elizabeth McConnell Sugg, et vir | February 18, 1942 | 106 | 362 |
| Henry H. Thornton, et ux | November 4, 1941 | 106 | 122 |
| Willie M. Todd, et vir | October 18, 1941 | 106 | 48 |
| Konstanty Waszkiewicz, et ux | December 17, 1941 | 106 | 231 |
| J. B. White, et ux | January 12, 1942 | 106 | 282 |
| E. B. Wren, et al | January 26, 1942 | 109 | 2 & 3 |
| J. V. Wallis, et al | January 15, 1942 | 106 | 288 |

It will be appreciated if you will execute the patent in the statutory manner, have it recorded in the office of the Secretary of State, and return it to the War Department.

The inclosed four carbon copies of the patent are for the use of your office.

Sincerely yours,

*Henry L. Stimson*

Secretary of War.

1 Incl.
   Draft of Patent (in quint.)

- 3 -

April 20, 1944.

Hon. Henry L. Stimson
Secretary of War
Washington, D. C.

Dear Mr. Stimson:

Attached you will find
Patent ceding to the United States
exclusive jurisdiction over 8,223.74
acres of land, more or less, comprising
the site of the Coosa River Ordnance
Plant Military Reservation, situated in
Talladega County, Alabama.

This Patent has been
recorded by the Secretary of State in
Miscellaneous Patent Book, Volume #4.

Yours very truly,

GEO. BLISS JONES
Secretary

GBJ:S
ENCL. (1)

### PATENT

KNOW ALL MEN BY THESE PRESENTS, THAT:

WHEREAS, the United States has purchased or condemned and now owns the hereinafter described land within the limits of the State of Alabama for the purpose of erecting and maintaining thereon forts, fortifications, magazines, arsenals, and other needful buildings; and

WHEREAS, under the provisions of sections 18 and 19, Title 59, Official Code of Alabama, 1940, the Governor of the State of Alabama, upon application made to him in writing on behalf of the United States, accompanied by proper evidence of title in the United States, describing the land, is authorized on the part of the State by patent to be recorded in the office of the Secretary of State of Alabama to cede to the United States such jurisdiction as he may deem wise over such land, to hold, use, and occupy the same for the purpose of the cession, and none other; and

WHEREAS, application has been made in writing on behalf of the United States for such cession, accompanied by proper evidence of title in the United States to the hereinafter described land;

NOW, THEREFORE, I, Chauncy Sparks, as Governor of the State of Alabama, in the name and on behalf of the State of Alabama, and in accordance with the laws of said State, do hereby cede unto the United States of America exclusive jurisdiction over a tract of land comprising the site of Coosa River Ordnance Plant, lying in Township 18 South, Range 5 East, and in Township 18 South, Range 6 East, Huntsville Meridian, Talladega County, Alabama, more particularly described as follows:

All of Sections 11, 12, 13 and 14, Township 18 South, Range 5 East;

Section 1, Township 18 South, Range 5 East, less 10 acres evenly off the North side of the NW¼ thereof;

SE¼; also E½ SW¼; also SW¼ NW¼; also E½ NE¼; also SW¼ NE¼, Section 2, Township 18 South, Range 5 East;

Section 6, Township 18 South, Range 6 East, less the
North 500.7 feet of the East 1972 feet thereof;

W½; also N 3/4 W½ E½; also W½ SW¼ SE¼; also NW diago-
nal half E½ SW¼ NE¼; also NW diagonal half E½ NE¼ Section
7, Township 18 South, Range 6 East;

That part of Section 18, Township 18 South, Range 6
East, lying North and West of a diagonal line extending
North Easterly from the SE corner SW¼ SW¼ SW¼ to the NE
corner NW¼ NW¼ NE¼ of said section 18;

NE¼ SE¼; also E½ NW¼ SE¼; also SE¼ NE¼; also E½ SW¼
NE¼; also NW¼ SW¼ NE¼; also that part of the S½ SE¼ lying East of
Jackson Trace Road, all in Section 15, Township 18 South,
Range 5 East;

A part of the N½ of the N½ of Section 22, Township 18
South, Range 5 East more particularly described as follows:
Beginning at the NE corner of Section 22; thence West along
the North line of Section 22 to the Westerly R/W line of
Jackson Trace Road; thence Southerly 735 feet along said
Westerly R/W line; thence Northeasterly, crossing the West
line of the NE¼ at a point 670 feet South of the NW corner
of the NE¼, to the point of beginning, less and except the
R/W of Jackson Trace Road;

The N½ of the N½ of the NW¼ of the NE¼, the N½ of the
N½ of the NE¼ of the NW¼, and the E 3/4 of the N½ of the N½
of the NE¼ of the NW¼, Section 24, Township 18 South, Range
5 East;

A strip of land 100 feet wide lying between the A. B.
& C. Railroad and Bankhead Boulevard (also known as Jackson
Trace Road) in Sections 21, 22 and 28, Township 18 South,
Range 5 East.  Beginning at a point in the NE¼ NW¼ Section
22 on the West line of Bankhead Boulevard 735.31 feet
Southerly from the intersection of said Bankhead Boulevard
with Piedmont Avenue; thence S 62° 25' 44" W, 1729.36 feet
to the P. C. of a curve concave easterly having a radius of
1860.08 feet; thence Southerly along the arc of said curve
1048.24 feet to the P. T. of said curve; thence S 30° 06'
26" W, 197.43 feet to the East right-of-way line of the
Lincoln - Talladega Highway; thence continuing S 30° 06'
26" W, 111.40 feet to the West right-of-way of said highway;
thence continuing S 30° 06' 26" W, 1031.13 feet to the P. C.
of a curve concave Easterly having a radius of 5679.65 feet;
thence Southerly along the arc of said curve 743.43 feet to
the P. T. of said curve; thence S 22° 36' 26" W 676.43 feet to
the P. C. of a curve concave Easterly having a radius of
566.73 feet; thence Southerly along the arc of said curve
887.54 feet to the P. T. of said curve; thence S 53° 53'
34" E 361.47 feet to a point on the A. B. & C. Railroad
North right-of-way line; thence N 60° 09' 34" W 144.35 feet
along said A. B. & C. Railroad right-of-way to the P. C.
of a curve concave Southerly having a radius of 1960.08
feet; thence along said curve 366.5 feet to the point of
intersection with a curve which is concentric with and 100
feet outside of the above described curve of 566.73 feet
radius; thence Northerly 897.67 feet along said 766.73 feet
radius curve to the P. T. of said curve; thence N 22° 36'
26" E, 676.43 feet to the P. C. of a curve, concave Easterly,
having a radius of 5779.65 feet; thence Northeasterly along
the arc of said curve 756.56 feet to the P. T. of said curve;

- 2 -

thence N 30° 06' 26" E 1090.25 feet to the West right-of-way
line of the Lincoln - Talladega Highway; thence continuing
N 30° 06' 26" E, 111.40 feet to the East right-of-way line of
the Lincoln - Talladega Highway; thence N 30° 06' 26" E,
118.68 feet to the P. C. of a curve, concave Easterly having
a radius of 1980.08 feet; thence along the arc of said curve
1164.60 feet to the P. T. of said curve; thence N 62° 23' 46"
E, 1807.96 feet to the West line of Bankhead Boulevard; thence
N 10° 22' 37" E, 131.35 feet along the West line of Bankhead
Boulevard to the point of beginning; EXCEPTING from said strip
of land that portion thereof crossing the Lincoln - Talladega
Highway, being 111.40 feet in width.

CONTAINING IN ALL FIVE THOUSAND, TWO HUNDRED TWENTY-THREE
AND SEVENTY-FOUR HUNDREDTHS (5,223.74) ACRES OF LAND, MORE OR
LESS.

PROVIDED, That the jurisdiction so ceded shall not prevent the
execution upon such lands of any process, civil or criminal, issued
under the authority of this State, except as such process might affect
the property of the United States thereon.

PROVIDED, FURTHER, That the State of Alabama expressly
reserves the right to tax all persons, firms, corporations, or associa-
tions now or hereafter residing or located upon said land; to tax the
exercise by any person, firm, corporation, or association of any and all
rights, privileges, and franchises upon said land; and to tax property
of all persons, firms, corporations, or associations situated upon said
land. The jurisdiction ceded is for the purposes of the cession, and
none other, and shall continue during the time the United States shall
be or remain the owner thereof and shall use such land for the purposes
of the cession, and the State of Alabama expressly reserves the right
to exercise over or upon any such land any and all rights, privileges,
powers, or jurisdiction which may now or hereafter be released or receded
by the United States to the State.

IN WITNESS WHEREOF, I, Chauncey Sparks, as Governor of the
State of Alabama, have hereunto set my hand and caused the great seal
of the State of Alabama to be affixed hereto, attested by the Secretary
of State, this 19th day of April, A. D., 1944.

(SEAL)
ATTEST: _____
Secretary of State     - 3 -

In compliance with section 18, Title 59, Official Code of
Alabama, 1940, this Patent was recorded in the Office of the Secretary
of State of the State of Alabama on the ___ day of _April_
_____, 1944, in _Misc. Patents Vol # 4_.


_[signature]_
_____
Secretary of State of the State of
Alabama.

- 4 -

# WAR DEPARTMENT

## WASHINGTON

MAY 22 1944

RECEIVED

MAY 24 1944

~~Governor's~~ Office

Honorable Chauncey Sparks,
    Governor of Alabama,
        Montgomery, Alabama.

Dear Governor Sparks:

    The War Department acknowledges receipt of a patent dated April 19, 1944, executed by you on behalf of the State of Alabama, ceding exclusive jurisdiction to the United States over 5,223.74 acres of land, more or less, in Talladega County, State of Alabama, used in connection with a military reservation designated Coosa River Ordnance Plant.

    Pursuant to the provisions of section 355, Revised Statutes, as amended by the act of February 1, 1940 (54 Stat. 19), and by the act of October 9, 1940 (54 Stat. 1083; 40 U.S.C. 255), notice is hereby given that the United States accepts exclusive jurisdiction over the land described in the deed of cession.

    Return of the duplicate copy of this letter, with your indorsement thereon designating time of receipt of this acceptance by your office, would be appreciated.

                Sincerely yours,

Duplicate returned
May 24, 1944.
        K.T.S.

                Henry L Stimson

                Secretary of War.



FOR DEFENSE
BUY
UNITED
STATES
SAVINGS
BONDS
AND STAMPS

INSERT MAP

(SEE INSERT)

STATE INDEX

ALABAMA

VICINITY MAP

R 5 E | R 6 E

HUNTSVILLE MERIDIAN

INSERT MAP

| TRACT NO. | VENDOR | ACREAGE FEE SIMPLE |
|---|---|---|
| 300 | J.B. WHITE | 38. |
| 301 | MATTIE HANCOCK ET VIR | 43. |
| 302 | MATTIE MARTERSON ET AL | 21. |
| 303 | JOE CURRY ET AL | 24 |
| 304 | JOE CURRY ET AL | 24. |
| 305 | MRS MAGGIE MOODY ET AL | 43. |
| 306 | JAMIE McCLELLAN | 15.95 |
| 307 | E.B. WREN ET AL | 360 |
| 308 | CRAIG | 200 |
| 309 | EMMA CUNNIGHAM | 10 |
| 310 | WILLIAM CUNNINGHAM EST | 20.95 |
| 310-A | WILLIAM CUNNINGHAM EST | 54 |
| 311 | ANNE B MORGAN ET AL | 122.5 |
| 312 | EMMA CUNNINGHAM ET AL | 47 |
| 313 | ALICE E HUEY | 40 |
| 314 | BEN CUNNINGHAM EST | 3925 |
| 315 | E H JONES | 122.5 |
| 316 | TURNER BATTLE ET AL | 42 |
| 318 | J E CATER ET UX | 105 |
| 319 | HENRY MCGHEE EST | 10. |
| 323 | MRS FANNIE OGLESBY | 17 |
| 329 | H H HEINIE EST | 40 |
| 335 | J B WHITE ET UX | 78 |
| 336 | S O WESLEY ET AL | 10 |
| 337 | G C SMELLEY ET UX | 25 |
| 338 | WILLIAM ALVERSON ET UX | 50 |
| 339 | MRS WILLIE N COKER ET AL | 198 |
| 340 | STATE OF ALABAMA | 8 |
| 341 | G C SMELLEY ET AL | 10 |
| 342 | ELIZABETH M SUGG ET VIR | 70 |
| 343 | DALTON McGEE ET UX | 40 |
| 344 | JOHN MARK BARCLAY ET AL | 50 |
| 345 | EMMA WELCH EST | 25 |
| 346 | NAT BARCLAY | 38 |
| 347 | H H THORNTON ET UX | 10 |
| 348 | M H THORNTON ET UX | 256.75 |
| 349 | LUCILLE RIDDLE ET AL | 56.75 |
| 350 | MRS JOSEPHENE FANT | 163 |
| 351 | ARMISTEAD BARCLAY EST | 26 |
| 352 | JORDAN BARCLAY EST | 55 |
| 355 | E H JONES ET UX | 10 |
| 356 | CABOT S WEAVER ET AL | 4 |
| 357 | J F CATER & WIFE | 157 |
| 358 | R C PHILLIPS ET UX | 24 |
| 360 | R L NEWSOME ET UX | 11 |
| 361 | R HEINIE ET UX | 219.25 |
| 362 | R L BROWN ET AL | 4025 |
| 363 | JIMMIE B PEARLA DAVIDSON | 385 |
| 364 | OTIS HUNDLEY ET UX | 80 |
| 366 | T L COOK ET AL | 120 |
| 367 | HENRY BARR ET AL | 40 |
| 368 | PINK CUNNINGHAM EST | 10 |
| 369 | JOE ORR EST | 30 |
| 370 | MRS WILLIS M TODD ET VIR | 80 |
| 372 | LENA B CASTLEBERRY ET AL | 30 |
| 373 | SAM ORR EST | 40 |
| 374 | J L CORDON | 324.90 |
| 375 | E H JONES | 40 |
| 376 | PROVIDENCE BAPTIST CHURCH | 1.85 |
| 378 | GILBERT STOREY ET UX | 40 |
| 379 | HANNA CORNELIUS McCAIN | 40 |
| 380 | ALABAMA MINERAL LAND CO | 80. |
| 382 | J E CATER ET AL | 80. |
| 383 | JIMMIE & PEARLE DAVI.SON | 80. |
| 386 | L A CATER | 40 |
| 389 | CHARLES McCLELLAN EST | 70 |
| 392 | W B GROCE EST | 337 |
| 413 | R HEINIE ET UX | 50 |
| 414 | L A CATER | 40 |
| 425 | L A CATER | 40 |
| 426 | ARMISTEAD BARCLAY EST | 5 |
| 427 | GILBERT STOREY ET UX | 111.75 |
| 428 | J L CORDON | 30 |
| 429 | JOHN MARK BARCLAY ET AL | 25. |
| 430 | EMMA CUNNINGHAM | 17 |
| 431 | EMMA CUNNINGHAM | 30 |
| 432 | JIMMIE & PEARL.L DAVIDSON | 40 |
| 433 | R L BROWN ET AL | 10 |
| 434 | R L BROWN ET AL | 20 |
| 435 | HENRY McGHEE EST | 125 |
| 436 | E H JONES | 5 |
| 440 | KONSTANTY WASZKIEWGZ ET UX | 82 |
| 445 | MARY HICKS DUMAS | 0.46 |
| 446 | J V & R R WALLIS ET AL | 5.48 |
| 447 | J M CONKER ET UX | 0.75 |
| 448 | CLYCE MORGAN ET UX | 2.03 |
| 449 | F J OWENS ET UX | 1.73 |
| 450 | DICK MAXWELL ET AL | 0.65 |
| 341 | LELIA SICLAMARET AL | 0.19 |
| 315-A | MRS THELIA WALKER | 1 |
| 315-B | IDA RADNEY ET AL | 2 |
| 315-C | IDA RADNEY | 0.75 |
| 315-D | BETTIE MORRIS ELSTON | 5 |
| 315-E | BETTIE MORRIS ELSTON | 5 |
| 315-F | BETTIE MORRIS ELSTON | 12. |
| 315-G | BEN DAVIS | 14 |
| 315-H | BEN DAVIS | 8 |
| 315-I | HENRY & LILLIE MORRIS | 5 |
| 315-J | JOHN KELLY EST | 35 |
| 315-K | AMOS PATE | 35 |
| 315-L | S P & ALIA STARR | 8 |
| 319-M | JOHN HARRIS | 2 |
| 319-N | HENRY CLAY JONES EST | 4 |
| 315-O | WILLIE B LAWSON | 2.75 |
| 315-P | LAURA MORRIS CAMERON | 1. |
| 460 | MARY HICKS DUMAS | 3.91 |

## PROJECT OWNERSHIP
(TYPE OF MAP)

STATE   ALABAMA

COUNTY   TALLADEGA

DIVISION   SOUTH ATLANTIC

SERVICE COMMAND   FOURTH

USING AGENCY

0.5   MILES N   OF TALLADEGA

25   MILES S.W. OF ANNISTON

### — TRANSPORTATION FACILITIES —

SOU. L. & N. A.B.&C.   RAILROAD

48, 11, 102.   STATE ROAD

241   FEDERAL ROAD

_____   AIRLINE

### — LAND AREA —

ACRES OWNED BY W.D.   5,223.74

ACRES LEASED BY W.D.

ACRES LEASED FROM W.D.

ACRES TRANSFERRED TO W.D.

ACRES DONATED TO W.D.

ACRES AVIGATION EASEMENTS TO W.D.

### — DISPOSALS —

ACRES SOLD

ACRES TRANSFERRED

ACRES EXCHANGED

ACRES OTHERWISE

### — LEGEND —

RESERVATION LINE

STATE OR PROVINCE LINE

COUNTY LINE

CIVIL DISTRICT PRECINCT

LAND-GRANT LINE

CITY, VILLAGE, OR BOROUGH

CEMETERY, SMALL PARK, ETC.

TOWNSHIP LINE

SECTION LINE

AVIGATION EASEMENT

FEE SIMPLE

SCALE IN FEET
1500   0   1500   3000   4500   6000

WAR DEPARTMENT, O.C.E.
CONSTRUCTION DIVISION

REAL ESTATE

COOSA RIVER ORDNANCE PLANT

MILITARY RESERVATION

RECOMMENDED _____ DATE  10-4-43
(ASSOCIATE ENGINEER, (C&R)(STRAL))

APPROVED _____ DATE 10-9-43
MAJOR, CORPS OF ENGINEERS

COMPILED CPG  TRACED CPG  CHECKED EL

| DATE | BY | REVISIONS | APPROVED |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

SHEETS:   OF   DRAWING NO.

CE-Form 1775

**EXHIBIT D**

## CECIL JACKSON    [8-22-96]

### Pages 1 to 123

### TRAVEL TRANSCRIPT

NOTE:   This Travel Transcript Program is a copyrighted software development product of Foshee & Turner Court
Reporters, 1-800-888-DEPO, an Alabama statewide court reporting agency.  However, the transcript contained
herein may or may not have been prepared by Foshee & Turner Court Reporters.



### TRAVEL TRANSCRIPT
### PREPARED WITH SOFTWARE
### COURTESY OF:

*FOSHEE & TURNER COURT REPORTERS*
*220 PARK PLACE TOWER*
*BIRMINGHAM, AL  35203*
*Phone:  (205)251-4200*

*1-800-888-DEPO*

## CECIL JACKSON   [8-22-96]

### Page 0001

```
[01]        IN THE DISTRICT COURT OF
[02]        JEFFERSON COUNTY, TEXAS
[03]           60TH JUDICIAL DISTRICT
[04]
[05]  CASE NUMBER: B-150,896
[06]
[07]  INEZ MARTIN, et al.,
[08]          Plaintiffs,
[09]        vs.
[10]  ACandS, INC., et al.,
[11]          Defendants.
[12]
[13]
[14]        S T I P U L A T I O N
[15]      IT IS STIPULATED AND AGREED
[16]  by and between the parties through
[17]  their respective counsel, that the
[18]  deposition of CECIL JACKSON may be
[19]  taken before CHARLES FOSHEE,
[20]  Commissioner, at the Crown Sterling
[21]
[22]        DEPOSITION OF:
[23]  CECIL JACKSON (SS NO. 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)
```

### Page 0002

```
[01]  Suites Hotel, Birmingham, Alabama, on
[02]  the 22nd day of August, 1996.
[03]      IT IS FURTHER STIPULATED AND
[04]  AGREED that it shall not be necessary
[05]  for any objections to be made by
[06]  counsel to any questions except as to
[07]  form or leading questions, and that
[08]  counsel for the parties may make
[09]  objections and assign grounds at the
[10]  time of the trial, or at the time said
[11]  deposition is offered in evidence, or
[12]  prior thereto.
[13]      IT IS FURTHER STIPULATED AND
[14]  AGREED that the notice of filing of the
[15]  deposition by the Commissioner is
[16]  waived.
[17]
[18]
[19]
[20]
[21]
[22]
[23]
```

### Page 0003

```
[01]          INDEX
[02]  EXAMINATION BY:        PAGE NUMBER:
[03]  MR. KEAHEY              19
[04]  MR. BRIDGER             58
[05]  MR. STEPHEN SMITH        91
[06]  MR. HODGSON             95
[07]  MR. THACKSTON          110
[08]  MR. RICHARDSON         118
[09]  MR. WEWERS             119
[10]
[11]  EXHIBITS:
[12]  PLAINTIFF'S EXHIBIT 1     35
[13]  (PRODUCT IDENTIFICATION LIST)
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
```

### Page 0004

```
[01]        IN THE DISTRICT COURT
[02]        JEFFERSON COUNTY, TEXAS
[03]           60TH JUDICIAL DISTRICT
[04]
[05]  CASE NUMBER: B-150,896
[06]
[07]  INEZ MARTIN, et al.,
[08]          Plaintiffs,
[09]        vs.
[10]  ACandS, INC., et al.,
[11]          Defendants.
[12]
[13]  BEFORE:
[14]      CHARLES FOSHEE, Commissioner
[15]  APPEARANCES:
[16]      ENVIRONMENTAL LITIGATION
[17]  GROUP, P.C., by Mr. Pat Keahey, 3529
[18]  Seventh Avenue South, Birmingham,
[19]  Alabama 35222, appearing on behalf of
[20]  the Plaintiffs.
[21]      RENNEKER/ASSOCIATES, P.L.C.,
[22]  by Ms. Kathryn Brown Ward, 1640 Mellie
[23]  Esperson Building, 815 Walker, Houston,
```

### Page 0005

```
[01]  Texas 77002, appearing on behalf of the
[02]  Defendant, Thermo Electric Company.
[03]      DeHAY & ELLISTON, L.L.P., by
[04]  Mr. Eric D. Wewers, 1500 Mexus Energy
[05]  Tower, 717 North Harwood Street,
[06]  Dallas, Texas 75201-6508, appearing on
[07]  behalf of the Defendant, Riley Stoker
[08]  Corporation and CCR.
[09]      THOMPSON & KNIGHT, P.C., by
[10]  Ms. Shelly L. Cook, 1700 Pacific Avenue
[11]  - Suite 3300, Dallas, Texas 75201-4693,
[12]  appearing on behalf of the Defendant,
[13]  Allied-Signal, Inc.
[14]      STRONG, PIPKIN, NELSON &
[15]  BISSELL, L.L.P., by Mr. John W.
[16]  Bridger, 1400 San Jacinto Building,
[17]  Beaumont, Texas 77701-3255, appearing
[18]  on behalf of the Defendants, Beazer
[19]  East, Inc., BOC Group, Inc., Lincoln
[20]  Electric Company, Hobart Brothers
[21]  Company, appearing subject to and
[22]  without waiving special appearance.
[23]      MATTINGLY & MARSH, by Mr.
```

### Page 0006

```
[01]  Stephen L. Hodgson, 1900 West Loop
[02]  South, Suite 1300, Houston, Texas
[03]  77027, appearing on behalf of the
[04]  Defendants, Carborundum Company and
[05]  Harneshuegger Corporation.
[06]      LANGE, SIMPSON, ROBINSON &
[07]  SOMERVILLE, by Mr. David J. Duke, 1700
[08]  First Alabama Bank Building, 417
[09]  Twentieth Street North, Birmingham,
[10]  Alabama 35203-3272, appearing on behalf
[11]  of the Defendants, Reichhold Chemical
[12]  Company, USX Corporation and Union Camp
[13]  Corporation.
[14]      LAW OFFICE OF WILLIAM M.
[15]  KOZIOL, by Ms. Ann L. Burkey Brezinski,
[16]  1 Kemper Drive, Long Grove, Illinois
[17]  60049-0001, appearing on behalf of the
[18]  Defendant, John Crane, Inc.
[19]      SADLER, SULLIVAN, SHARP,
[20]  FISHBURNE & VAN TASSEL, P.C., by Mr. J.
[21]  Clinton Pittman, 2500 SouthTrust Tower,
[22]  420 North 21st Street, Birmingham,
[23]  Alabama 35203-3204, appearing on behalf
```

CECIL JACKSON    [8-22-96]

## Page 0007

of the Defendant, Flintkote Company.

BLASINGAME, BURCH, GARRARD, BRYANT & ASHLEY, P.C., by Mr. Stephen E.B. Smith, 440 College Avenue North, Athens, Georgia 30603, appearing on behalf of the Defendant, Pittsburgh Corning Corporation.

MEHAFFY & WEBER, P.C., by Mr. Paul R. Heyburn, One Allen Center, 500 Dallas, Suite 1200, Houston, Texas 77002-4804, appearing on behalf of the Defendant, W.R. Grace Company.

MILLS, SHIRLEY, ECKEL & BASSETT, L.L.P., by Mr. Taylor T. Schwab, 400 Washington Building, 2228 Mechanic, Galveston, Texas 77550, appearing on behalf of the Defendant, Oglebay Norton.

JENKENS & GILCHRIST, P.C., by Mr. Robert E. Thackston, 1445 Ross Avenue, Suite 3200, Dallas, Texas, 75202-2799, appearing on behalf of the Defendant, Westinghouse Electric

## Page 0008

Corporation.

DeHAY & ELLISTON, by Ms. Ellin Wellford Grant, 1500 Maxus Harwood Street, Dallas, Texas 75201-6508, appearing on behalf of the Defendant, Zurn Industries.

DUNN, KACAL, ADAMS, PAPPAS & LAW, P.C., by Mr. James D. Smith, 2600 America Tower, 292 Allen Parkway at Waugh, Houston, Texas 77019-2151, appearing on behalf of the Defendant, PPG Industries, Inc.

BOHN & DUCLOUX, by Mr. Jon Bohn, 705 Marshall, Houston, Texas 77006, appearing on behalf of the Defendant, The Hartford Steam Boiler Inspection & Insurance Company.

ANDREWS & KURTH, L.L.P., by Mr. Lance M. Harvey, 4200 Texas Commerce Tower, Houston, Texas 77002, appearing on behalf of the Defendant, Rapid-American Corporation, subject to and without waiving its special

## Page 0009

appearance.

CROUCH & HALLETT, by Mr. Michael Ellis, 717 North Harwood, Suite 1400, Dallas, Texas 75201, appearing on behalf of the Defendant, NARCO.

GOODING & DODSON, by Mr. John L. Tidwell, 300 Texarkana National Bank Building, Texarkana, Texas 75504, appearing on behalf of the Defendant, General Refractories Company, subject to and without waiving its special appearance in the Martin case.

ROBERTS, MARKEL & FOLGER, L.L.P., by Mr. Theodore L. Guerry, 24 Greenway Plaza, Suite 2000, Houston, Texas 77046, appearing on behalf of the Defendant, American Standard, Inc.

MR. VIC FIELDS, Attorney at Law, 3600 W. Bee Caves Road, Suite 212, Austin, Texas 78746, appearing on behalf of the Defendant, Baltimore Insulation Company.

HAWKINS & PARNELL, by Mr.

## Page 0010

[01] Allen L. Broughton, 4000 Suntrust
[02] Plaza, 303 Peachtree Street NE,
[03] Atlanta, Georgia 30308-3243, appearing
[04] on behalf of the Defendant, Ericsson,
[05] Inc.
[06]     ADAMS & REESE, by Mr. E.L.
[07] (Mack) McCafferty, III, 4500 One St.
[08] Louis Center, Mobile, Alabama 36602,
[09] appearing on behalf of the Defendant,
[10] Foster-Wheeler, subject to and without
[11] waiving special its appearance.
[12]     HUIE, FERNAMBUCQ & STEWART,
[13] by Mr. Frank E. Lankford, Jr., Eighth
[14] Floor - First Alabama Bank Building,
[15] 417 Twentieth Street North, Birmingham,
[16] Alabama 35203, appearing on behalf of
[17] the Defendant, Sepco Corporation.
[18]     GODWIN & CARLTON, P.C., by
[19] Ms. Laura Frase, 2500 NationsBank
[20] Plaza, 901 Main Street, LB 171, Dallas,
[21] Texas 75202-3714, appearing on behalf
[22] of the Defendant, Cooper Industries.
[23]     JOHNSON & ASSOCIATES, by Mr.

## Page 0011

[01] Richard Ferguson, 4900 Woodway, Suite
[02] 1100, Houston, Texas 77056, appearing
[03] on behalf of the Defendant,
[04] Ingersoll-Rand Company.
[05]     MR. PAUL B. SHAW, JR.,
[06] Attorney at Law, 810 Park Place Tower,
[07] 2001 Park Place North, Birmingham,
[08] Alabama 35203, appearing on behalf of
[09] Owens-Corning Fiberglas.
[10]     EDWARD B. McDONOUGH, JR.,
[11] P.C., by Mr. Kevin D. Graham, P.O. Box
[12] 194, Mobile, Alabama 36633, appearing
[13] on behalf of the Defendant, A.W.
[14] Chesteron Company, Coltec Industries,
[15] Inc., Garlock, Inc., The Anchor Packing
[16] Company.
[17]     KIRKLAND & BARFIELD, by Mr.
[18] David A. Barfield, 1000 Plaza Building,
[19] Jackson, Mississippi, appearing on
[20] behalf of the Defendants, ACandS, Inc.
[21] and Harbison-Walker.
[22]     REINSTRA, DOWELL & FLATTEN,
[23] by Mr. David D. Reynard, 470 Orleans

## Page 0012

[01] Building, Suite 1010, Beaumont, Texas
[02] 77701-3074, appearing on behalf of the
[03] Defendants, American Optical
[04] Corporation and Liberty Mutual
[05] Insurance Company.
[06]     JENKINS, GROVE & MARTIN,
[07] L.L.P., by Mr. H. Tracy Richardson,
[08] III, 2615 Calder, Suite 500, Beaumont,
[09] Texas 77702, appearing on behalf of the
[10] Defendants, Kaiser Aluminum
[11] Corporation, Mobil Oil Corporation,
[12] Okonite Company, Pneumo Abex.
[13]     PORTERFIELD, HARPER & MILLS,
[14] P.A., by Mr. Timothy W. Knight, 22
[15] Inverness Center Parkway, Suite 600,
[16] Birmingham, Alabama 35242-4821,
[17] appearing on behalf of the Defendant,
[18] Traveler's Insurance Company.
[19]
[20] ALSO PRESENT:
[21]     Videographer, Mr. Don Evans
[22]     Family of Deponent.
[23]

CECIL JACKSON   [8-22-96]

## Page 0013

[01]        I, CHARLES FOSHEE, a Court
[02] Reporter of Birmingham, Alabama, acting
[03] as Commissioner, certify that on this
[04] date, as provided by the Texas Rules of
[05] Civil Procedure and the foregoing
[06] stipulation of counsel, there came
[07] before me at the Crown Sterling Suites
[08] Hotel, Birmingham, Alabama, beginning
[09] at 10:32 a.m., CECIL JACKSON, in the
[10] above cause, for oral examination,
[11] whereupon the following proceedings
[12] were had:
[13]
[14]        CECIL JACKSON,
[15] having been duly sworn, was examined
[16] and testified as follows:
[17]
[18]        THE VIDEOGRAPHER: This is
[19] the deposition of Cecil Jackson, taken
[20] on the 22nd day of August, 1996. The
[21] witness shall be sworn, the attorneys
[22] will introduce themselves for the
[23] record.

## Page 0014

[01]        The time is 10:32 a.m. We're
[02] on the record.
[03]        MR. KEAHEY: All right. I'm
[04] Pat Keahey. I'm one of the attorneys
[05] for the Plaintiff, Mr. Cecil Jackson,
[06] along with Mr. Glen Morgan and Wayne
[07] Reaud and Bill Lewis.
[08]        MR. BRIDGER: My name is John
[09] Bridger. I represent the Lincoln
[10] Electric Company, Hobart Brothers
[11] Company, the BOC Group, Inc., and
[12] Beazer East, all of which are appearing
[13] here today subject to their special
[14] appearances.
[15]        MR. PITTMAN: I'm Clinton
[16] Pittman. I'm here for Flintkote.
[17]        MR. DUKE: I'm David Duke,
[18] here for USX, Union Camp and Reichhold
[19] Chemical.
[20]        MR. SHAW: I'm Paul Shaw here
[21] on behalf of Owens-Corning.
[22]        MS. WARD: I'm Kathryn Ward,
[23] here on behalf of Thermo Electric

## Page 0015

[01] Company, Inc.
[02]        MR. GUERRY: Ted Guerry on
[03] behalf of American Standard.
[04]        MR. FIELDS: Vic Fields,
[05] Baltimore Insulation Company.
[06]        MR. KNIGHT: Tim Knight for
[07] Travelers Insurance Company. .
[08]        MS. GRANT: Ellin Wellford
[09] Grant for Zurn Industries.
[10]        MR. ELLIS: Michael Ellis on
[11] behalf of North American Refractories.
[12]        MR. BROUGHTON: Allan
[13] Broughton here for Ericsson.
[14]        MR. HEYBURN: Paul Heyburn
[15] here for W.R. Grace.
[16]        MR. HARVEY: Lance Harvey for
[17] Rapid-American Corporation, subject to
[18] and without waiving special appearance.
[19]        MR. HODGSON: Steve Hodgson
[20] for Harneshuegger and Carborundum.
[21]        MR. BARFIELD: David Barfield
[22] for Harbison-Walker.
[23]        MR. SMITH: Stephen Smith for

## Page 0016

[01] Pittsburgh Corning.
[02]        MR. SCHWAB: Taylor Schwab
[03] for Oglebay Norton.
[04]        MR. BOHN: Jon Bohn for
[05] Hartford Steam Boiler.
[06]        MR. WEWERS:  Eric Wewers on
[07] behalf of Riley Stoker Corporation, and
[08] those center Defendants who have been
[09] properly served.
[10]        MR. FERGUSON: Richard
[11] Ferguson for Ingersoll-Rand.
[12]        MS. FRASE: Laura Frase,
[13] Cooper Industries.
[14]        MS. COOK: Shelly Cook,
[15] Allied-Signal, Inc.
[16]        MR. SMITH: Jim Smith, PPG.
[17]        MR. GRAHAM: Kevin Graham,
[18] A.W. Chesterton Company, Coltec
[19] Industries, Inc., Garlock, Inc., and
[20] The Anchor Packing Company.
[21]        MR. TIDWELL: John Tidwell,
[22] appearing on behalf of General
[23] Refractories Company, subject to our

## Page 0017

[01] special appearance policy.
[02]        MR. LANKFORD: Frank Lankford
[03] on behalf of Sepco and John Crane.
[04]        MR. McCAFFERTY: Mack
[05] McCafferty on behalf of Foster-Wheeler,
[06] subject to special appearance.
[07]        Before we get started, I need
[08] to make a statement for the record.
[09] I'm E.L. (Mack) McCafferty. I'm here
[10] on behalf of Foster-Wheeler
[11] Corporation. By appearing today, I am
[12] appearing in a special appearance
[13] capacity only and am appearing only to
[14] protect the interest of Foster-Wheeler
[15] at this deposition. But by so
[16] appearing, I'm not waiving any
[17] jurisdictional objections
[18] Foster-Wheeler may have in this
[19] proceeding and any process or service
[20] of process objections.
[21]        And we would further object
[22] to the use of this deposition at trial
[23] or in any capacity in this proceeding

## Page 0018

[01] based upon the fact that Plaintiffs'
[02] counsel has not agreed to provide
[03] discovery depositions either before or
[04] after this deposition to the
[05] Defendants.
[06]        MS. GRANT: Could we go off
[07] the record for a second?
[08]        THE VIDEOGRAPHER: Time is
[09] 10:35 a.m. We're off the record.
[10]
[11]        (Whereupon, a discussion was
[12]        held off the record.)
[13]
[14]        THE VIDEOGRAPHER: Time is
[15] 10:35 a.m. We're on the record.
[16]        MR. KEAHEY: Again, I'm Pat
[17] Keahey, the attorney for Mr. Cecil
[18] Jackson, the Plaintiff. And we also
[19] have three of his family members here
[20] this morning. We have his wife, Nina
[21] Jackson, and his daughter, Carol, and
[22] his son —
[23]        MR. MIKE JACKSON:  Mike.

## CECIL JACKSON   [8-22-96]

### Page 0019

MR. KEAHEY: — who is Mike here with us.

We are going to take this with the usual stipulations. We're taking this deposition according to Texas Rules of Civil Procedure, and Alabama Substantive Law. And one objection by one Defendant for the sake of expediency is good for all Defendants. And that goes for the Plaintiff's, as well.

So —

MS. GRANT:  Are we reserving objections until time of trial except for responsiveness?

MR. KEAHEY:  Yeah, yeah.

EXAMINATION BY MR. KEAHEY:

Q.  Mr. Jackson, let me ask you to introduce yourself to the jury. Just look there at that — that's the camera right there in front of you, and just — if you can, just introduce

### Page 0020

yourself to the jury. Just tell them who you are and where you live.

A.  I'm Cecil Jackson from Clanton, Alabama.

Q.  All right. How old are you, Mr. Jackson?

A.  Seventy-five.

Q.  All right. How are you doing today?

A.  Fairly good.

Q.  Okay. I just want to let the jury know a little bit about you. Can you describe what kind of family you came from down in Chilton County?

A.  I have two sisters, a father and mother.

Q.  All right, sir. Where are you in line in your family?

A.  Second.

Q.  Okay. How far did you go in school?

A.  About five months in the eleventh grade.

### Page 0021

Q.  And you were — you married, and how many children do you have and grandchildren?

A.  Two children.

Q.  Two children?

A.  Uh-huh (indicating yes).

Q.  How many grandchildren do you have?

A.  I believe it's five.

Q.  Okay. In your adult work life, what was the trade or craft that you followed?

A.  Door-hanging.

Q.  Okay.

MR. HODGSON:  Excuse me, what was that?

MR. KEAHEY:  He said door-hanging.

Q.  (BY MR. KEAHEY)  What — were you a member of a union?

A.  Uh-huh (indicating yes).

Q.  What union is that?

A.  Birmingham, 103.

### Page 0022

Q.  All right, sir.  Is that a carpenter's Local?

A.  Uh-huh (indicating yes).

Q.  Okay. Can you also describe yourself as a carpenter, more generally as a carpenter?

A.  Well, I was both, a door-hanger and a carpenter.

Q.  Okay. All right. As I understand it, most of your work was at various heavy industrial and commercial sites in Alabama; is that correct?

A.  Uh-huh (indicating yes.)

Q.  Okay.

A.  Schools.

Q.  Okay. The Social Security records, Mr. Jackson, show that you worked mainly in Alabama for about forty-five years, from 1939 to 1986; is that correct?

A.  Uh-huh (indicating yes).

Q.  Were you in the service?

A.  Uh-huh (indicating yes).

### Page 0023

Q.  What branch of service were you in?

A.  Air Force.

Q.  All right, sir.  When approximately were you in the Air Force?

A.  Well, I was sworn in the 3rd day of September of '42.

Q.  All right. Did you serve in World War II?

A.  Uh-huh (indicating yes).

Q.  Where did you serve?

A.  India.

Q.  In India?

A.  Yes.

Q.  Were you ever in combat over there?

A.  No. Under bombing, but no combat — ground combat.

Q.  All right. Did you receive an honorable discharge from the Air Force?

A.  Uh-huh (indicating yes).

### Page 0024

Q.  All right, sir.  And then you came back to Alabama.  What did you do then?

A.  Started farming on that GI Bill of Rights.

Q.  All right. What did you do from there?

A.  Come off of it and went to work.

Q.  All right. Well, when you say "went to work," tell the jury what you started off doing.

A.  Well, I started off with a friend hanging doors, and then I went into business for myself.

Q.  All right. Well, when you're hanging doors and working as a carpenter, can you just tell the jury — tell us what you did, what a guy that hangs doors and does carpentry work, what did you do in those lines of work?

A.  Hanging doors?

## Page 0025

[01]  Q.  Yes, sir.

[02]  A.  Well, you had to lock them

[03] and put the closures on them.  Some

[04] would be "Morris" (phonetic) locks and

[05] some would be cylindrical locks.

[06]  Q.  All right.  During your time

[07] working at various job sites that I'm

[08] getting ready to ask you about in

[09] Alabama, do you — can you testify that

[10] you were exposed to asbestos and

[11] breathed asbestos dust?

[12]  A.  Uh-huh (indicating yes).

[13]  THE REPORTER:  I'm sorry?

[14]  MR. JAMES SMITH:  Objection,

[15] leading.

[16]  THE REPORTER:  I still didn't

[17] get who objected.

[18]  MR. JAMES SMITH:  Jim Smith.

[19] Objection, leading.

[20]  THE REPORTER:  Thank you,

[21] Jim.

[22]  MR. GRAHAM:  And lack of

[23] foundation.

## Page 0026

[01]  Q.  (BY MR. KEAHEY)  As a

[02] carpenter and a door-hanger, did you

[03] basically work all over the State of

[04] Alabama?

[05]  A.  Uh-huh (indicating yes).

[06]  Q.  Okay.  And this would have

[07] been during the time frame of 1939 to

[08] 1986, with the exception of the service

[09] in World War II; is that correct?

[10]  A.  Uh-huh.  Uh-huh (indicating

[11] yes).

[12]  Q.  Okay.  What type of work did

[13] you yourself do with any asbestos

[14] products that you can remember?

[15]  A.  Installing it.

[16]  Q.  Okay.  And how would you do

[17] that?

[18]  A.  Well, you would have a

[19] Carborundum blade on your skill saw,

[20] and you would — you would saw it with

[21] a skill saw.

[22]  Q.  All right.  Did you also

[23] perform jobs that didn't personally

## Page 0027

[01] involve you handling asbestos directly,

[02] but exposed you to asbestos being

[03] handled by other people?

[04]  MR. GRAHAM:  Object to the

[05] form.

[06]  THE WITNESS:  Uh-huh

[07] (indicating yes).

[08]  Q.  (BY MR. KEAHEY)  Okay.

[09] Throughout your work career at these —

[10] at the Alabama sites, what types of

[11] asbestos do you remember being used by

[12] you or around you?

[13]  A.  I can't remember the names of

[14] the company that built —

[15]  Q.  Just the types, just —

[16] generically, just the types.

[17]  MR. JAMES SMITH:  Pat, are

[18] you talking about anywhere that he

[19] worked?  Are you being specific to

[20] location?

[21]  MR. KEAHEY:  I'm talking

[22] about anywhere in Alabama.

[23]  MR. JAMES SMITH:  I object to

## Page 0028

[01] it.

[02]  Q.  (BY MR. KEAHEY)  You can go

[03] ahead and answer.  Just — just in

[04] general, what do you remember about the

[05] types and kinds of asbestos that you

[06] worked around in Alabama?

[07]  A.  Well, some of it was flat

[08] material and some of it was corrugated.

[09]  Q.  Let me just run down a list

[10] here of your major job sites.  Did you

[11] work at the University of Alabama,

[12] Tuscaloosa, in the early 1960's?

[13]  A.  Uh-huh (indicating yes).

[14]  Q.  All right.  Did you work on

[15] the dorms and various office buildings

[16] at that — at that facility?

[17]  A.  Uh-huh (indicating yes).

[18]  Q.  Did you work at the

[19] University of Montevallo in the early

[20] to late 1960's?

[21]  A.  Uh-huh (indicating yes).

[22]  Q.  Okay.  Do you recall working

[23] on dorms and office buildings at the

## Page 0029

[01] University of Montevallo?

[02]  A.  Uh-huh (indicating yes).

[03]  Q.  Okay.  Did you work at the

[04] Shelby County Hospital here in Alabama

[05] in the early 1960's?

[06]  A.  Uh-huh (indicating yes).

[07]  Q.  Did you work at the Kimberly

[08] Clark Paper Mill, or some people know

[09] it as the Coosa River Mill, and from

[10] the mid-sixties until the mid-1970's?

[11]  A.  Uh-huh (indicating yes).

[12]  Q.  All right.  Did you work at

[13] Redstone Arsenal up in North Alabama in

[14] the early sixties to the mid-1970's?

[15]  A.  Yeah.  I worked up there

[16] some.

[17]  Q.  All right.  Do you remember

[18] working on office buildings up there?

[19]  A.  Uh-huh (indicating yes).

[20]  Q.  Okay.  Did you work at the

[21] Bonette Mills here in Alabama in the

[22] 1960's?

[23]  A.  I — I hung some doors up

## Page 0030

[01] there at the office building, yeah.

[02]  Q.  Okay.  Do you recall working

[03] at the University of Alabama here in

[04] Birmingham in the 1970's?

[05]  A.  Uh-huh (indicating yes).

[06]  Q.  All right.  Do you recall

[07] working on dorms and office buildings

[08] and other buildings at that time?

[09]  A.  Uh-huh (indicating yes).

[10]  Q.  Okay.  Do you recall working

[11] at the Avondale Mill plant in Alex

[12] City, Alabama in the late 1970's?

[13]  A.  Uh-huh (indicating yes).

[14]  Q.  Okay.  Do you recall working

[15] at U.S. Pipe, Bessemer, here in

[16] Birmingham —

[17]  A.  Uh-huh (indicating yes).

[18]  Q.  — at some point in time?

[19]  Did you work at the VA

[20] Hospital in Birmingham in the 1970's?

[21]  A.  Uh-huh (indicating yes).

[22]  Q.  On that job?

[23]  Did you work at the — on the

CECIL JACKSON   [8-22-96]

Page 0031

*St. Vincent's job — St. Vincent's Hospital job in Birmingham in the late 1970's?*

A. Uh-huh (indicating yes).

Q. Did you work at Auburn University here at — in Auburn, Alabama in the 1960's and the 1970's?

A. Yeah.

Q. Okay. What kind of buildings, facilities, do you remember working on down at Auburn?

A. It was mostly dormitories.

Q. Okay. Do you recall working in Montgomery on jobs down there, as well?

A. Uh-huh (indicating yes).

Q. Did you work on the Civic — did you help build the Birmingham-Jefferson County Civic Center here in Birmingham?

A. I hung the doors there.

Q. And would that have been in the early 1970's?

Page 0032

A. Uh-huh (indicating yes).

Q. And did you also work on the Liberty National Life Insurance Building here in Birmingham?

A. Uh-huh (indicating yes).

Q. Okay. Just explain to the jury what — what these worksites were like that you —

A. What?

Q. Just explain to the jury what the conditions were like at these work sites.

MS. GRANT: Object to that question. It's vague, it's over-broad.

THE WITNESS: Well, the conditions, the way you had to do your job, was very dusty. And you could have your mask and you would still get some of it. And everything you cut was — had asbestos in it.

MR. ELLIS: Objection, non-responsive.

THE WITNESS: Or

Page 0033

fireproofing.

Q. (BY MR. KEAHEY) In your opinion, Mr. Jackson, from 1939 to 1986, could you work at any major industrial or commercial job here in Alabama and not be exposed to asbestos?

MR. GRAHAM: Object to the form. There's no foundation.

THE WITNESS: Yeah. I worked on some that I wasn't exposed.

Q. (BY MR. KEAHEY) But do you feel like you were exposed at most of them?

MR. SCHWAB: Objection, leading.

MR. JAMES SMITH: Objection, leading.

THE WITNESS: Yeah. Where they had the fire doors, yeah.

Q. (BY MR. KEAHEY) On these — let me ask you this: Do you remember the names of some of the asbestos products that you saw on these job

Page 0034

[01] sites I just asked you about?

[02]   A. I cannot remember the

[03] manufacturers' names at all.

[04]   Q. Okay. Let me put in front of

[05] you here your asbestos product

[06] identification list, which you have

[07] developed prior to this deposition and

[08] it has been published to the

[09] Defendants. And I just want to ask you

[10] is that your asbestos product

[11] identification list?

[12]   MR. GRAHAM: Object to the

[13] form, leading.

[14]   THE WITNESS: Yeah.

[15]   Q. (BY MR. KEAHEY) Does that

[16] refresh your memory as to the names and

[17] brands of the asbestos products — some

[18] of the asbestos products you were

[19] exposed to here in Alabama?

[20]   MR. GRAHAM: Object to the

[21] form, leading, improper foundation.

[22]   THE WITNESS: (Witness nods

[23] head.)

Page 0035

[01]   Q. (BY MR. KEAHEY) Is that a

[02] yes? You need — Mr. Jackson?

[03]   A. Yeah.

[04]   Q. You need to say "yes."

[05]   A. Yes.

[06]   MR. KEAHEY: Okay. I want to

[07] enter this as Plaintiff's Exhibit

[08] Number 1.

[09]

[10]     (Whereupon, Plaintiff's

[11]     Exhibit #1 was marked for

[12]     identification and same is

[13]     attached hereto.)

[14]

[15]   Q. (BY MR. KEAHEY) Mr. Jackson,

[16] I just want to ask you about some of

[17] those products.

[18]   MR. STEPHEN SMITH: Let me

[19] have my objection to the use of the

[20] exhibit, and also any questions based

[21] on the exhibit as being leading in

[22] nature.

[23]   Q. (BY MR. KEAHEY) Mr. Jackson,

Page 0036

[01] I just want to ask you about some of

[02] these products that are on Plaintiff's

[03] Exhibit Number 1.

[04]   Do you remember the name

[05] "Kaylo"?

[06]   A. Yeah.

[07]   MR. SHAW: Object to the

[08] form, leading.

[09]   Q. (BY MR. KEAHEY) Do you

[10] remember the name "Airco"?

[11]   A. Yeah.

[12]   MR. BRIDGER: Object,

[13] leading.

[14]   Q. (BY MR. KEAHEY) Do you

[15] remember the name "Abex"?

[16]   A. Yeah.

[17]   Q. How about the name "Sepco"?

[18]   A. That one I can't recall,

[19] Zepco.

[20]   Q. Okay. Let me spell it for

[21] you, it's S-e-p-c-o, Sepco. Not Zepco,

[22] but Sepco. Do you recall that name?

[23]   A. Yeah. I've seen it on jobs,

## Page 0037

[01] yes.
[02]     Q.   Okay.  Do you remember the
[03] name "Thermo Electric"?
[04]     A.   Yeah.
[05]         MS. WARD:  Object to the form
[06] of the question, leading.
[07]     Q.   (BY MR. KEAHEY)  Do you
[08] remember the – and you've spoken about
[09] this product earlier, but do you recall
[10] the name, "Carborundum"?
[11]     A.   Uh-huh (indicating yes).
[12]     Q.   Do you remember the name
[13] "Westinghouse"?
[14]     A.   Yeah.
[15]     Q.   Do you remember the name
[16] "Ingersoll-Rand"?
[17]     A.   Uh-huh (indicating yes).
[18]     Q.   Do you remember the name
[19] "General Electric"?
[20]     A.   Yeah.
[21]     Q.   Do you remember the name
[22] "Babcock & Wilcox"?
[23]     A.   Uh-huh (indicating yes).

## Page 0038

[01]     Q.   Do you remember the name
[02] "Combustion Engineering"?
[03]     A.   Yes.
[04]     Q.   And how about the name "U.S.
[05] Gypsum," do you recall that name?
[06]         MR. WEWERS:  Objection,
[07] leading.
[08]         THE WITNESS:  Yeah.
[09]     Q.   (BY MR. KEAHEY)  How about
[10] the name "National Gypsum," do you
[11] recall that name?
[12]         MR. WEWERS:  Objection,
[13] leading.
[14]         THE WITNESS:  I don't recall
[15] National, no.
[16]     Q.   (BY MR. KEAHEY)  Okay.  Mr.
[17] Jackson, did you work with or around
[18] these products that I've just ask you
[19] about at the various industrial and
[20] commercial sites at some point in time
[21] during your career here in Alabama?
[22]         MR. BRIDGER:  Objection,
[23] vague and leading.

## Page 0039

[01]         DEFENSE COUNSEL:  You didn't
[02] ask about any products.  I object to
[03] that as leading and mischaracterizing
[04] his prior testimony.
[05]         THE REPORTER:  And your name,
[06] please?
[07]         MR. THACKSTON:  My name is
[08] Robert Thackston.  I represent
[09] Westinghouse.
[10]         THE REPORTER:  Thank you.
[11]     Q.   (BY MR. KEAHEY)  Mr. Jackson,
[12] can you – just on these companies –
[13] these names I've asked you about here,
[14] can you tell me whether or not the name
[15] of these products were – that these
[16] products were used on a fairly routine
[17] basis around you at the job sites I've
[18] asked you about?
[19]     A.   Uh-huh (indicating yes).
[20]         MR. BRIDGER:  Objection,
[21] over-broad, leading and vague.
[22]         MR. WEWERS:  And misstates
[23] prior testimony.

## Page 0040

[01]         MS. FRASE:  Speculative.
[02]     Q.   (BY MR. KEAHEY)  What do you
[03] recall about the dust conditions when -
[04] you saw these products?
[05]         MR. BRIDGER:  Same objection.
[06]         THE WITNESS:  Well, it was
[07] just, all I can say, bad.  And you –
[08] you had a mask, you're supposed to wear
[09] the mask when you're handling or
[10] working with it, or cutting it or
[11] anything like that.
[12]     Q.   (BY MR. KEAHEY)  What effect
[13] did the mask have, if any, on the dust?
[14]     A.   It would – you had a
[15] strainer in it.  It would collect dust.
[16] You wouldn't put it right down your
[17] throat.
[18]     Q.   Did you still breathe the
[19] dust, even with the mask?
[20]     A.   Well, you would get a certain
[21] – a little amount, but not a great
[22] amount.
[23]     Q.   Okay.  If you would, and I

## Page 0041

[01] know you touched on it before, but just
[02] explain how in your job as a
[03] door-hanger, how would that job bring
[04] you into contact with asbestos
[05] products?
[06]     A.   Well, it's on to your city
[07] code, and just about all business
[08] places now has to have that.  And it's
[09] a – it's city ordinance.
[10]     Q.   All right.  What other crafts
[11] worked around you at these various job
[12] sites that I've asked you about here in
[13] Alabama?  What crafts do you remember
[14] working around you?
[15]         MR. GRAHAM:  Object, vague
[16] and over-broad.
[17]         THE WITNESS:  Steam fitters
[18] – steam fitters, electricians,
[19] plumbers.  And that's about it.
[20]     Q.   (BY MR. KEAHEY)  All right.
[21] Do you recall working around a craft
[22] called asbestos workers?
[23]         MR. WEWERS:  Objection,

## Page 0042

[01] leading.
[02]     Q.   (BY MR. KEAHEY)  Or
[03] insulators?
[04]     A.   Yeah.
[05]     Q.   Okay.  How often did you work
[06] around insulators?
[07]     A.   Well, it was just only what
[08] job required it, you know, what area
[09] you were in.
[10]     Q.   Okay.  Do you know a man by
[11] the name of Larry Dowda?
[12]     A.   Yeah.
[13]     Q.   Is he an insulator?
[14]     A.   Uh-huh (indicating yes).
[15]     Q.   Did you work with him on most
[16] of these jobs I just asked you about?
[17]         MR. STEPHEN SMITH:  Object to
[18] the form, leading.
[19]         MR. GRAHAM:  Leading.
[20]         THE WITNESS:  We worked on --
[21] run together on different jobs,
[22] yeah.
[23]     Q.   (BY MR. KEAHEY)  All right,

CECIL JACKSON   [8-22-96]

### Page 0043

sir. Do you recall working with a man
named Leo Porter?

A.   Yeah.

Q.   All right, sir. Did he work
with you on — on several of your jobs?

A.   We were on the same job,
yeah.

Q.   How often would y'all be on
the same job?

A.   Well, it would just depend.
You never — you never knew when it was
coming up.

Q.   Okay. How about Leonard
Porter, did you work with him?

A.   Yeah. He was in a different
craft from what I was in, but I've
worked on jobs with him, yeah.

Q.   All right, sir. How about
Larry Gore, did you work with Larry?

A.   Larry helped me some. I
hired him to help me.

Q.   All right, sir. Did you see
these — these other crafts like —

### Page 0044

workers like Mr. Dowda using asbestos
on the job sites where you worked?

MS. FRASE:  Objection, calls
for speculation.

MR. GRAHAM:  Lack of
foundation.

THE WITNESS:  Uh-huh
(indicating yes).

Q.   (BY MR. KEAHEY)  How did —
how did you see him using asbestos
around you —

MS. FRASE:  Same objection.

MR. GRAHAM:  Same objection.

Q.   (BY MR. KEAHEY)  — on your
job sites here in Alabama?  Just
describe what you saw him doing.

A.   Well, he would be insulating
the — the pipes. I don't know if it
was hot, cold, or what pipes he was
insulating, but he was — he was
insulating them.

Q.   All right, sir. Did you —
how did you — when you saw him

### Page 0045

insulating, how was he going about
applying that insulation?

A.   Well, they had some kind of
wrapping, looked like cheesecloth,
they'd wrap around the pipe. Then
they'd come back and put fireproofing
on that.

Q.   Okay. All right. Did you
see him cut and saw that — any of that
asbestos?

MR. WEWERS:  Objection,
leading.

MR. SHAW:  Objection to the
form. It's leading, misstates prior
testimony.

MR. BARFIELD:  Objection.

THE WITNESS:  Yeah.

Q.   (BY MR. KEAHEY)  What would
he cut it with?

A.   A Carborundum blade, skill
saw.

Q.   What would happen when he
would cut it?

### Page 0046

[01]   A.   It would just be dust.

[02]   Q.   All right. How close were

[03] you to this dust?

[04]   A.   Well, it would get all over

[05] the building, unless you had fans to

[06] blow it out.

[07]   Q.   Okay. What did your clothing

[08] look like at the end of a workday when

[09] you had been working around Mr. Dowda?

[10]   A.   Well, just be like a white

[11] frost on your clothing.

[12]   Q.   All right. Where did you see

[13] the greatest level of dust on any of

[14] the job sites I asked you about?

[15]      MR. STEPHEN SMITH:  Object to

[16] form, leading.

[17]      THE WITNESS:  The greatest

[18] site was Coosa River Newsprint.

[19]   Q.   (BY MR. KEAHEY)  All right,

[20] sir. And why was that?

[21]   A.   Well, it was just a — a big

[22] open building on — where the paper

[23] machines run and it — it was a big

### Page 0047

[01] area.

[02]   Q.   All right. Did you ever see

[03] crews come in there and use air hoses

[04] or fans?

[05]   A.   I don't recall it.

[06]   Q.   Did you ever see men in there

[07] cleaning up at the end of a workday?

[08]   A.   Oh, yeah.

[09]   Q.   Okay. How would they be

[10] cleaning up?

[11]   A.   Well, some would be using

[12] vacuum-cleaners and — some kind of,

[13] you know, commercial type. And they

[14] would broom it, too.

[15]   Q.   All right, sir. Did that

[16] stir — what did that do to the dust?

[17]   A.   Well, the dust — it wasn't

[18] that bad, only when they was cutting,

[19] you know.

[20]   Q.   All right, sir. And was this

[21] — what you just described at Coosa

[22] River, was that a regular occurrence

[23] down there?

### Page 0048

[01]   A.   No.

[02]   Q.   Were you ever around welders?

[03]   A.   Yes.

[04]   Q.   All right. Who would be

[05] doing this welding?

[06]   A.   I can't remember the name of

[07] the company. They done all of the

[08] welding down at the paper mill.

[09]   Q.   All right. Did you see any

[10] dust created when this welding was

[11] going on?

[12]   A.   No.

[13]   Q.   Okay. Did you see any smoke

[14] created?

[15]   A.   Yes. You could see smoke

[16] coming from the rods.

[17]   Q.   Okay. How close would you be

[18] to these welding — to this welding

[19] operation?

[20]   A.   As close as from here to you.

[21]   Q.   Okay.

[22]   A.   Burnt blisters on my

[23] eyeballs.

## Page 0049

[01]  Q.  Okay.  Mr. Jackson, I'm going
[02]  to shift over here just a little bit
[03]  and ask you some personal questions.
[04]  Do you -- can you -- do you have an
[05]  asbestos-related disease?
[06]  A.  That I don't know.
[07]  Q.  Well, do you have a disease,
[08]  has your doctor told you you have a
[09]  disease called mesothelioma?
[10]  A.  I guess.
[11]  Q.  Okay.  All right.  It's a
[12]  hard name to pronounce, isn't it?
[13]  A.  Yeah.
[14]  Q.  Okay.  Is that -- is that
[15]  what you have?  Is that what you have
[16]  been diagnosed with?
[17]  A.  I can't -- I believe that's
[18]  right.
[19]  Q.  Okay.  All right.  When were
[20]  you diagnosed with mesothelioma?
[21]  A.  In June, I believe it was.
[22]  Q.  Okay.  Had you been
[23]  developing -- had any problems prior to

## Page 0050

[01]  that time?
[02]  A.  No.
[03]  Q.  Did you suffer a stroke back
[04]  in February?
[05]  A.  Uh-huh (indicating yes).
[06]  Q.  Do you know why -- do you
[07]  know the cause of that stroke?
[08]  A.  Well, I think they laid it --
[09]  I can't remember on that part.
[10]  Q.  Okay.  Have you been in the
[11]  hospital since February?
[12]  A.  I think I was.
[13]  Q.  Okay.  Were you in the
[14]  hospital in February after your stroke?
[15]  A.  I was, I think, yes.
[16]  Q.  Okay.  Okay.  As far as this
[17]  disease that you've got now called
[18]  mesothelioma, what effect has it had on
[19]  you since -- since you knew you had it?
[20]  A.  Well, sometimes I have -- I
[21]  have pain in there (indicating).
[22]  Q.  In where, now?
[23]  A.  In my stomach.

## Page 0051

[01]  Q.  Okay.
[02]  A.  And sometimes it will start
[03]  off over here and go across, just like
[04]  a freight train switch yard, it'll turn
[05]  around and come back (indicating).
[06]  Q.  How often does it do that?
[07]  A.  You never know.  It could be
[08]  happening today, or it could be -- be
[09]  two days later and do that.
[10]  Q.  Well, what happens to you
[11]  when -- what do you do when that
[12]  happens?
[13]  A.  Nothing.
[14]  Q.  Are you taking any kind of
[15]  medication?
[16]  A.  I have pain pills.
[17]  Q.  All right, sir.  Do they help
[18]  you any?
[19]  A.  Yeah.
[20]  Q.  How about your sleeping, how
[21]  do you sleep at night?
[22]  A.  I sleep good, as far as I
[23]  know.

## Page 0052

[01]  Q.  Okay.  Are you taking any
[02]  medication for sleeping?
[03]  A.  Uh-uh (indicating no).
[04]  Q.  Okay.  What do you do during
[05]  an average day at home?
[06]  A.  Lay on the couch, watch
[07]  television.
[08]  Q.  All right.  Are you able to
[09]  do anything else?
[10]  A.  Not much.
[11]  Q.  All right.
[12]  A.  Walking gives me out.
[13]  Q.  Have you -- do you ever get
[14]  out of the house?
[15]  A.  Hardly ever, unless I'm going
[16]  somewhere.
[17]  Q.  Okay.  Do you do things that
[18]  you used to do six or eight months ago?
[19]  A.  Well, I ain't done nothing in
[20]  that length of time.  I ain't done
[21]  nothing.
[22]  Q.  Okay.  Are there things that
[23]  you would like to do that you can't do?

## Page 0053

[01]  A.  Not really.  I was ready to
[02]  retire when I retired.  I was tired of
[03]  running the roads.
[04]  Q.  Well, did you have some
[05]  retirement plans?  Did you want to
[06]  travel or do things with your wife?
[07]  A.  Uh-huh (indicating no).
[08]  Q.  Okay.  Did anybody tell you
[09]  in the 1950's or the 1960's or the
[10]  1970's that asbestos was dangerous and
[11]  could cause an irreversible lung
[12]  disorder?
[13]  A.  No.  I wasn't told that, no.
[14]  Q.  Did you ever see a
[15]  warning on a container of asbestos on
[16]  any of these jobs that you worked at in
[17]  Alabama?
[18]  A.  I've seen -- I've seen
[19]  them, yes.
[20]  Q.  Okay.  Did anybody ever tell
[21]  you that as far as -- well, you've
[22]  talked about wearing a dust mask.  Who
[23]  told you to wear a dust mask?

## Page 0054

[01]  A.  That was the -- the company's
[02]  laws.
[03]  Q.  Okay.  Okay.  Was it a
[04]  mandatory policy?
[05]  A.  Uh-huh (indicating yes).
[06]  Q.  Okay.  Let me ask you this:
[07]  Is -- to your knowledge, is your
[08]  disease, mesothelioma, a progressive
[09]  disease?
[10]  A.  They say it's the fast kind,
[11]  yeah.
[12]  Q.  Okay.  What do you know about
[13]  -- what do you know about the future --
[14]  your future with this -- in having this
[15]  disease?  What do you know about it?
[16]  A.  I don't know.
[17]  Q.  Are you concerned or worried
[18]  about the future?
[19]  A.  Well, I just hate to leave
[20]  the loved one behind.  That's all I can
[21]  say.  Other than that, that's the
[22]  greatest.
[23]  Q.  And does that worry you?

CECIL JACKSON [8-22-96]

Page 0055

A. Well, I do a little thinking,
yeah.
Q. Does that worry your family?
A. I'm sure it does.
Q. Have you and your family
talked about this disease --
A. Uh-huh (indicating yes).
Q. -- and what it has done to
you?
All right. Would you have
liked to have known in the 1950's or
the 1960's or the 1970's that asbestos
could cause this kind of disease?
A. I would have liked to have
known it, yeah.
MR. SHAW: Leading, calls for
speculation.
Q. (BY MR. KEAHEY) All right,
sir. When you were wearing a mask, did
anybody tell you that asbestos could
cause what you've got now?
MR. SHAW: Same objection.
THE WITNESS: Well, the

Page 0056

company put warnings on it -- on their
boxes, even.
Q. (BY MR. KEAHEY) Did you see
the word "mesothelioma" on the warning
or on the mask?
A. No. No.
Q. Okay. Had you ever heard of
mesothelioma until June?
A. Uh-uh (indicating no).
Q. Did you know that asbestos
had been harmful to you prior to --
when did you first know asbestos had
been harmful to you?
MR. SHAW: Objection to the
form, leading.
THE WITNESS: It ain't been
too long ago.
Q. (BY MR. KEAHEY) And would it
have been in June?
A. Probably so, yeah.
Q. Okay. Mr. Jackson, if you
could talk to the CEO's and the
chairman of the Board of Directors of

Page 0057

the corporations who made money selling
the very asbestos products that have
caused this mesothelioma, this disease
that you have today, what would you say
to these asbestos companies?
DEFENSE ATTORNEYS: Object to
the form.
THE WITNESS: Blow up the
factories that produces it.
MR. KEAHEY: That's all I
have. I'm going to turn it over now
for cross-examination by attorneys from
the Defendant manufacturers.
Well, let's take a short
break.
THE VIDEOGRAPHER: The time
is 11:02 a.m. We're off the record.

(Whereupon, a brief recess
was taken.)

THE VIDEOGRAPHER: The time
is 11:16 a.m. We're on the record.

Page 0058

[01]
[02] EXAMINATION BY MR. BRIDGER:
[03] Q. Mr. Jackson, my name is John
[04] Bridger. I introduced myself a little
[05] while ago. Can you hear me all right?
[06] A. Uh-huh (indicating yes).
[07] Q. Okay. For the purposes of
[08] the record, if I could get you to
[09] answer yes or no out loud, instead of
[10] uh-huh or uh-uh, because that doesn't
[11] get typed up as well. Okay?
[12] A. Okay.
[13] Q. I'm not meaning to be rude or
[14] anything, but if you say "uh-huh," I'm
[15] going to say, "Is that a yes." Okay?
[16] A. (Witness nods head.)
[17] Q. Is that okay?
[18] A. Good.
[19] Q. Good deal.
[20] MR. KEAHEY: John, I'm going
[21] to ask you and the rest of them, what
[22] we've been doing, is that you could again
[23] just tell him who you represent.

Page 0059

[01] Q. (BY MR. BRIDGER) I represent
[02] four companies who are appearing here
[03] today pursuant to their special
[04] appearances. Their names are the
[05] Lincoln Electric Company, the BOC
[06] Group, Inc., Hobart Brothers Company
[07] and Beazer East. All right?
[08] A. Right.
[09] Q. Good.
[10] I have a list that was
[11] provided to me by your attorneys of
[12] co-workers. I want to read the names
[13] and see if you remember any of these
[14] fellows. Okay?
[15] A. (Witness nods head.)
[16] Q. The first fellow is Robert L.
[17] Childers. Do you remember him?
[18] A. Yes.
[19] Q. And how did you work with Mr.
[20] Childers?
[21] A. We just happened on the same
[22] jobs.
[23] Q. Was he the same craft as you

Page 0060

[01] were?
[02] A. Uh-uh (indicating no).
[03] Q. What was his craft?
[04] A. The way I remember it, he was
[05] an insulator.
[06] Q. Can you tell me at which work
[07] sites you worked with Mr. Childers?
[08] A. No, I can't.
[09] Q. You gave us the names of --
[10] and I wrote them down. I'm not sure I
[11] wrote them down correctly, but I
[12] believe you said Larry Dowder? Am I
[13] pronouncing that correctly?
[14] A. No, it's not Gallagher. It's
[15] Larry --
[16] Q. Oh, I'm sorry.
[17] MR. KEAHEY: You said Dowder.
[18] It's Dowda.
[19] THE WITNESS: Dowda.
[20] Q. (BY MR. BRIDGER) Dowdy?
[21] A. Dowdy.
[22] Q. D-o-w-d-y?
[23] A. Yeah.

## Page 0061

[01]    Q.   Okay.
[02]         MR. KEAHEY:   D-o-w-d-a.
[03]         MR. BRIDGER:   D-a?   Okay.
[04]    Q.   (BY MR. BRIDGER)   And what
[05] trade did Mr. Dowda follow?
[06]    A.   Insulator.
[07]    Q.   You also mentioned, I
[08] believe, a Leo Porter?
[09]    A.   Yeah.
[10]    Q.   What trade did he follow?
[11]    A.   He's a drywall man.
[12]    Q.   Do you remember any jobs in
[13] particular where you can give me a job
[14] site where you worked with Mr. Dowda?
[15]    A.   I believe it was Coosa River
[16] Newsprint.
[17]    Q.   And can you give me your best
[18] recollection of when you worked at
[19] Coosa River Newsprint?
[20]    A.   Well, I went there in '57 and
[21] I stayed there — I went with Daniel to
[22] start with.   Then when I got through
[23] there, I transferred over to Rust

## Page 0062

[01] Engineer.
[02]    Q.   Did you go to Coosa River off
[03] and on for a number of years?
[04]    A.   Well, for about three year,
[05] yeah.
[06]    Q.   For about three years, you
[07] were there.   Do you remember if it was
[08] '57 to about '60?
[09]    A.   Uh-huh (indicating yes).
[10]    Q.   Is that a "yes," sir?
[11]    A.   That's about right.
[12]    Q.   Okay.   Did you ever go back
[13] to Coosa River after about 1960?
[14]    A.   I don't recall going back.
[15]    Q.   Okay.   Do you remember
[16] working with Mr. Dowda at any other
[17] work sites?
[18]    A.   No.   I can't pinpoint one.
[19]    Q.   Okay.   With Mr. Porter, the
[20] man that you called a drywaller?
[21]    A.   Uh-huh (indicating yes).
[22]    Q.   Do you remember any specific
[23] work sites where you worked with Mr.

## Page 0063

[01] Porter?
[02]    A.   I can't remember the sites,
[03] but I remember on the job — being on
[04] the job with him.
[05]    Q.   You remember him being
[06] around, you just don't remember where?
[07]    A.   That's right.
[08]    Q.   And I apologize, but the next
[09] name I have written down is Leonard
[10] Porter, and I don't know if I got that
[11] name down correctly.
[12]    A.   Yeah it's Leonard.   There's a
[13] Leonard Porter.
[14]    Q.   That's a different fellow?
[15]    A.   From which one?
[16]    Q.   From Leo Porter.
[17]    A.   They are brothers.
[18]    Q.   Okay.   What trade did Leonard
[19] Porter follow?
[20]    A.   He was a drywall man.
[21]    Q.   Do you remember any specific
[22] jobs where you and Leonard Porter
[23] worked together, a specific site?

## Page 0064

[01]    A.   I cannot remember, no.
[02]    Q.   Okay.   Then I believe the
[03] next name I had down was Larry Gore?
[04]    A.   Yeah.
[05]    Q.   And what trade did Mr. Gore
[06] follow?
[07]    A.   He was helping me hang doors.
[08]    Q.   Do you remember any specific
[09] jobs where you can say, "Mr. Gore and I
[10] worked together at this job site"?
[11]    A.   No, I can't remember no
[12] specific job.
[13]    Q.   Okay.   With Mr. Childers, do
[14] you remember any specific jobs that you
[15] worked with Mr. Childers at?
[16]    A.   Uh-uh (indicating no).
[17]    Q.   That's a "no"?
[18]    A.   No.
[19]    Q.   Okay.   I have down the next
[20] one, a Willie C. Littleton.   Do you
[21] remember a Willie C. Littleton?
[22]    A.   Yes.
[23]    Q.   What trade did Mr. Littleton

## Page 0065

[01] follow?
[02]    A.   Painting.
[03]    Q.   Do you remember any specific
[04] jobs that you worked with Mr. Littleton
[05] at?
[06]    A.   Montevalio is the only one I
[07] can remember.
[08]    Q.   Then we have down a Grady
[09] Maulding.   Do you remember a Mr. Grady
[10] Maulding?
[11]    A.   Yeah.
[12]    Q.   And what trade did he follow?
[13]    A.   He was carpentry.
[14]    Q.   Do you remember any specific
[15] jobs that you worked with Mr. Grady
[16] Maulding at?
[17]    A.   I can't remember no specific
[18] job, no.
[19]    Q.   The next one I have down is a
[20] William Arthur Smith.
[21]    A.   Yeah.
[22]    Q.   Do you remember him?
[23]    A.   Yes.

## Page 0066

[01]    Q.   What trade did he follow?
[02]    A.   Carpentry.
[03]    Q.   Do you remember any specific
[04] jobs where you and Mr. Smith worked
[05] together?
[06]    A.   No, but he had — I had him
[07] to help me on two or three different
[08] jobs.
[09]    Q.   Okay.   You remember him being
[10] around you on two or three different
[11] jobs, you just don't remember which
[12] ones?
[13]    A.   That's right.
[14]    Q.   All right.   Then I have a
[15] fellow by the name of Henry Strickland?
[16]    A.   Yeah.
[17]    Q.   Do you remember Mr.
[18] Strickland?
[19]    A.   Yeah.
[20]    Q.   Do you remember which trade
[21] he followed?
[22]    A.   Carpentry.
[23]    Q.   Do you remember any specific

## CECIL JACKSON   [8-22-96]

### Page 0067

jobs where you and Mr. Strickland
worked?

A.   Not right off, I can't.

Q.   Would it be fair to say that,
because you were basically in the
construction trade, that you might see
these fellows on one or two different
jobs, but they wouldn't work with you
on every job?  Is that fair?

A.   Uh-huh (indicating yes).

Q.   Is that a "yes"?

A.   Yes.

Q.   Okay.  Do you remember the
names of any welders?

A.   I use to know a bunch of
them, but I can't remember their names.

Q.   Can you tell me which
specific jobs you worked on where you
would have been working, like you said,
next to welders?

A.   Any specific jobs I worked on
where there was welders?

Q.   Yeah.  Where they were

### Page 0068

actually working right side-by-side
with you?

A.   Yeah.

Q.   Not working somewhere on the
plant?

A.   Right by my side.

Q.   Yeah, that type of job.

A.   Close enough to put blisters
on my eyeballs.

Q.   I understand.
Object, non-responsive.
Do you remember those jobs?

A.   Yeah.

Q.   Can you list them for me?

A.   Coosa River Newsprint was the
main one.

Q.   Okay.  Any place other than
Coosa River where you remember that
happening?

A.   No.

Q.   Okay.  Have you ever done any
welding yourself?

A.   Uh-uh (indicating no).

### Page 0069

Q.   That's a "no"?

A.   No.

Q.   Every time you "uh-huh" or
"uh-uh," I'm going to ask "yes or no,"
because it just doesn't get typed up
real well.  Okay?

A.   Uh-huh (indicating yes).

Q.   Have you ever assisted a
welder?

A.   Yes.

Q.   Where you have actually done
any welding for him?

A.   No.

Q.   Just moved the lead wires and
that type of thing?

A.   I hold for him — hold for
him.

Q.   What would you hold for him?

A.   A rod or — reinforcing rod
or something.

Q.   Was that at Coosa River?

A.   Uh-huh, yes.

Q.   Do you remember any place

### Page 0070

[01]   else where you did that?

[02]      A.   No.

[03]      Q.   Okay.  Can you tell me the
[04]   names of any of the rods that were
[05]   used?

[06]      A.   No.

[07]      Q.   Can you tell me anything —
[08]   and this may not mean anything to you,
[09]   but can you tell me the AWS
[10]   classification of any rods?

[11]      A.   I can't.

[12]      Q.   Okay.  We would have to ask
[13]   the welders for that?

[14]      A.   I imagine.

[15]      Q.   Okay.

[16]      A.   It's pretty hard to know the
[17]   other fellow's craft.

[18]      Q.   I understand.
[19]         If I recall correctly —
[20]   well, do you remember getting some
[21]   written questions and maybe going to
[22]   your attorney's office and being asked
[23]   to help fill out some answers to some

### Page 0071

[01]   written questions?

[02]      A.   I can't remember it, no.

[03]      Q.   Okay.  We sent in some —
[04]   some written questions to your attorney
[05]   and the Court allows us to get answers
[06]   to those written questions.  They're
[07]   called Interrogatories.

[08]         It says that, in the past,
[09]   you had prostate cancer.  Did you have
[10]   prostate cancer, sir?

[11]      A.   (Witness nods head.)

[12]      Q.   Is that a "yes"?

[13]      A.   Yes.

[14]      Q.   About when did that come up?

[15]      A.   Three or four year ago.

[16]      Q.   We have a list of five
[17]   doctors.  Let me read all of them and
[18]   then tell me if any of them were for
[19]   your prostate cancer.  Okay?

[20]         Dr. Ken Berry, Dr. Griff
[21]   Harsh, Dr. Finley McRae, Dr. Duane — I
[22]   believe it's pronounced Shroyer, and
[23]   Dr. Patrick Mills.  Did any of those

### Page 0072

[01]   fellows treat you for your prostate
[02]   cancer?

[03]      A.   I believe it was Patrick
[04]   Mills.  Am I right?

[05]      Q.   Okay.  Do you recall any
[06]   other doctors that would have treated
[07]   you for your prostate cancer?

[08]      A.   No.

[09]      Q.   Okay.  Did you receive
[10]   surgery for the prostate cancer?

[11]      A.   They went up there and burnt
[12]   it off, yes.

[13]      Q.   Where did they do that —
[14]   which hospital?

[15]      A.   Alabaster, I believe —
[16]   Shelby Memorial.

[17]      Q.   Shelby Memorial at Alabaster,
[18]   Alabama?

[19]      A.   Yes.

[20]      Q.   Okay.  Do you recall the
[21]   names of any other doctors that would
[22]   have treated you for the prostate
[23]   cancer?

## CECIL JACKSON   [8-22-96]

### Page 0073

[01]    A.  No.
[02]    Q.  Okay.  Did you receive any --
[03] what they call chemotherapy for your
[04] prostate cancer?
[05]    A.  No.
[06]    Q.  Are you on any type of
[07] medication now for your -- as a result
[08] of your prostate cancer?
[09]    A.  No.
[10]    Q.  When was the last time you
[11] saw Dr. Mills, or any other doctor, as
[12] a follow-up for your prostate cancer?
[13]    A.  Well, it ain't been too long
[14] ago, and it was -- everything was all
[15] good.
[16]    Q.  Everything was good?
[17]    A.  Uh-huh (indicating yes).
[18]    Q.  All right.  I see then that
[19] you also have written down that you've
[20] been treated by a neurosurgeon and a
[21] neurologist.  Do you recall what that
[22] was for?
[23]    A.  Well, the clamp came loose on

### Page 0074

[01] the neurosurgeon.  And they went back
[02] in there and clamped it and put a
[03] back-up clamp on it.
[04]    Q.  Okay.  And where was that
[05] clamp?
[06]    A.  In my head.
[07]    Q.  And what -- I see that you've
[08] got a scar.
[09]    A.  Yeah.
[10]    Q.  Did you have surgery on your
[11] head?
[12]    A.  Yeah.  They had to go in,
[13] yeah.
[14]    Q.  Okay.  Do you remember which
[15] of these five doctors would have
[16] treated you for that surgery?  If you
[17] need -- let me read them again: Dr.
[18] Berry, Dr. Harsh, Dr. McRae, and Dr.
[19] Shroyer.  Did any of those fellows do
[20] the surgery on your head?
[21]    A.  McRae, I believe, did.
[22]    Q.  What was the problem they
[23] were doing the surgery for?

### Page 0075

[01]    A.  The vein -- the artery
[02] bursted out.
[03]    Q.  Was that what you referred to
[04] as your stroke?
[05]    A.  No.
[06]    Q.  That's different?
[07]    A.  Aneurysm.
[08]    Q.  That was an aneurysm?
[09]        When did you suffer the
[10] aneurysm?
[11]    A.  That has been three or four
[12] years ago, I guess, wasn't it -- I
[13] don't know.
[14]    Q.  Have you been followed up for
[15] that by any of these doctors?
[16]    A.  Yeah.  I've been examined
[17] since then, yeah.
[18]    Q.  Would it have been by Dr.
[19] McRae, or would it have been by
[20] somebody else?
[21]    A.  I believe it was McRae.
[22]    Q.  You also mentioned your
[23] stroke.  Who would have treated you for

### Page 0076

[01] your stroke?
[02]    A.  Dr. Berry, I guess.
[03]    Q.  Were you hospitalized for the
[04] stroke when you had it?
[05]    A.  Uh-uh (indicating no).
[06]    Q.  Who is the doctor that's
[07] treating you for your mesothelioma?
[08]    A.  McRae, I guess.
[09]    Q.  What did Dr. -- I think we've
[10] mentioned Dr. Berry.  What did Dr.
[11] Harsh do for you?  What was he treating
[12] you for?
[13]    A.  He's the one that did my
[14] first aneurysm.
[15]    Q.  Okay.  How about Dr. Shroyer,
[16] what did Dr. Shroyer do for you?
[17]    A.  I cannot remember.
[18]    Q.  Has either your aneurysm or
[19] your stroke affected your memory in any
[20] way, sir?
[21]    A.  Yes.
[22]    Q.  You have more difficulty
[23] remembering since those?

### Page 0077

[01]    A.  (Witness nods head.)
[02]    Q.  Did your stroke affect you
[03] physically?  Did it leave you either
[04] paralyzed or weaker after the stroke?
[05]    A.  No.  It affected my shoulder
[06] here, and arm up in here (indicating).
[07]    Q.  Did it make it more difficult
[08] to move the shoulder and the arm?
[09]    A.  Yeah.  It's hard to raise the
[10] arm, even.
[11]    Q.  Did you get over that or do
[12] you still have that difficulty?
[13]    A.  I still have it.
[14]    Q.  Have -- you have mentioned
[15] for us an aneurysm, prostate cancer and
[16] your stroke.  Have you had any other
[17] serious illnesses in your life?
[18]    A.  No.
[19]    Q.  Had you ever had any
[20] on-the-job injuries?
[21]    A.  Broke bone here (indicating)
[22] one time.
[23]    Q.  Okay.  Anything other than

### Page 0078

[01] that broken bone in your hand?
[02]    A.  Uh-uh (indicating no).
[03]    Q.  One of the things that we
[04] have down is your lawyer furnished us
[05] with a list of dates of treatment, and
[06] they have some dates of treatment going
[07] back to 1971, and then 1970 to '71.  Do
[08] you remember what type of medical
[09] treatment you would have been receiving
[10] back then, about twenty-five years ago?
[11]    A.  No.
[12]    Q.  Do you have any type of
[13] ongoing problems, like high blood
[14] pressure?  Have you been seeing a
[15] doctor for awhile for high blood
[16] pressure?
[17]    A.  I was on medication for high
[18] blood pressure, but seem like they
[19] pulled me off of that.
[20]    Q.  Who would you have been
[21] seeing for your high blood pressure?
[22]    A.  Dr. Ken Berry.
[23]    Q.  How long have you been seeing

CECIL JACKSON   [8-22-96]

## Page 0079

Dr. Berry?
   A.  Pardon?
   Q.  How long have you been seeing
Dr. Berry?
   A.  Well, he's retired now.
   Q.  Okay. Do you think you might
have been seeing him back in the
seventies?
   A.  Yeah.
   Q.  Was he your family doctor?
   A.  Not really, no.
   Q.  Did you have a family doctor?
   A.  At home.
   Q.  And I'm sorry, but I couldn't
hear you when I was sitting over there.
Where is home?
   A.  Clanton.
   Q.  Who was your family doctor in
Clanton?
   A.  Well, I mostly used Joe Hall
Johnson.
   Q.  And he's there in Clanton?
   A.  Uh-huh, yes.

## Page 0080

   Q.  How long have you been seeing
Dr. Johnson?
   A.  Well, he has been retired now
for sometime.
   Q.  You saw him before he
retired?
   A.  Yeah.
   Q.  Did anyone take over his
practice?
   A.  Yes.
   Q.  Do you know that fellow's
name?
   A.  No, I don't.
   Q.  But does he still practice in
the same —
   A.  Building.
   Q.  Same building that Dr.
Johnson did?
   A.  Uh-huh (indicating yes).
   Q.  Do you know the name of that
building?
   A.  No, I don't.
   Q.  Do you know what street it's

## Page 0081

on there in Clanton?
   A.  It's just called on the Lay
Dam Highway.
   Q.  Okay. Do you know if anybody
took over Dr. Berry's practice?
   A.  Yes, there's someone, but I
can't remember who he is.
   Q.  Took over from — in the same
offices Dr. Berry used to have?
   A.  I believe that's right.
   Q.  Do you know where Dr. Berry's
office was here in Birmingham, which
street?
   A.  No, I don't.
   Q.  You retired in 1986?
   A.  Yes.
   Q.  Did you just decide that was
time to quit working, or was there some
physical reason why you decided you had
to quit?
   A.  Physical, physical reason.
   Q.  What was the physical reason
that you decided you had to stop

## Page 0082

[01]  working?
[02]    A.  From this aneurysm.
[03]    Q.  So, that's when you had the
[04]  aneurysm?
[05]    A.  (Witness nods head.)
[06]    Q.  Up until that time, had you
[07]  noticed any problems with your health?
[08]    A.  No.
[09]    Q.  You were in good shape until
[10]  the aneurysm occurred?
[11]    A.  (Witness nods head.)
[12]    Q.  Is that a "yes"?
[13]    A.  Yes.
[14]    Q.  Okay. In the written
[15]  questions that your lawyers gave us, it
[16]  says that you suffer shortness of
[17]  breath, coughing and congestion. Have
[18]  you been suffering from shortness of
[19]  breath, coughing and congestion?
[20]    A.  It's been sometime back, if I
[21]  was.
[22]    Q.  Okay. That's not a problem
[23]  that you had noticed recently?

## Page 0083

[01]    A.  Uh-uh (indicating no).
[02]    Q.  I guess, from time to time,
[03]  have you had a cold or something like
[04]  that?
[05]    A.  Yeah.
[06]    Q.  Other than just the
[07]  occasional cold, do you remember having
[08]  a long-time problem with shortness of
[09]  breath?
[10]    A.  (Witness shakes head.)
[11]    Q.  That's a "no"?
[12]    A.  No.
[13]    Q.  Did you ever smoke
[14]  cigarettes?
[15]    A.  Yes.
[16]    Q.  How long did you smoke
[17]  cigarettes?
[18]    A.  About thirty-five year.
[19]    Q.  When you were smoking, how
[20]  many cigarettes or how many packs of
[21]  cigarettes would you smoke a day?
[22]    A.  One.
[23]    Q.  One pack?

## Page 0084

[01]    A.  (Witness nods head.)
[02]    Q.  That's a "yes"?
[03]    A.  Yes.
[04]    Q.  Okay. When did you stop
[05]  smoking?
[06]    A.  I haven't stopped.
[07]    Q.  You're still smoking today?
[08]    A.  (Witness nods head.)
[09]    Q.  When did you start smoking?
[10]    A.  About fifty-five years ago.
[11]    Q.  About fifty-five years ago?
[12]    A.  I started smoking when I was
[13]  about twelve or fourteen.
[14]    Q.  Okay. You — do you remember
[15]  when there started being little warning
[16]  labels on the packets of cigarettes?
[17]  Remember that?
[18]    A.  Yeah.
[19]    Q.  And they said --
[20]    A.  "Smoking can be hazardous to
[21]  your health."
[22]    Q.  That's right.
[23]       Even after you saw those

CECIL JACKSON    [8-22-96]

### Page 0085

[01] warning labels on the cigarettes, you
[02] continued to smoke, though, didn't you?
[03]    A.  Uh-huh (indicating yes).  I
[04] don't believe them.
[05]    Q.  Okay.  Have doctors told you
[06] you ought to give up smoking?
[07]    A.  Pardon me?
[08]    Q.  Have any of your doctors told
[09] you you ought to give up smoking?
[10]    A.  Well, one doctor told me,
[11] says, "If you continue smoking, you are
[12] going to have emphysema."
[13]    Q.  Which doctor was that?
[14]    A.  McRae, I believe.
[15]    Q.  And you know that emphysema
[16] is a problem with your lungs; right?
[17]    A.  Right.
[18]    Q.  But you kept on smoking even
[19] after he told you that?
[20]    A.  But they had X-rays and said
[21] my lung looked good.
[22]    Q.  You say you had X-rays.
[23] Would you have — did you ever have

### Page 0086

[01] anything like an annual physical
[02] examination?  Would you go to a doctor
[03] for an annual physical examination?
[04]    A.  No.  I didn't go for regular
[05] check-ups.
[06]    Q.  Would you just get X-rays
[07] when you would be seeing these other
[08] doctors, like Dr. Berry, Dr. McRae, Dr.
[09] Shroyer?  They — that would be one of
[10] the things they might do, is give you a
[11] chest X-ray?
[12]    A.  Yeah.
[13]    Q.  Did you ever have a chest
[14] X-ray because you were having problems
[15] with your chest?
[16]    A.  No.
[17]    Q.  Have they ever given you
[18] what's called either a CAT scan or an
[19] MRI?  That's where they lay you down on
[20] a tube —
[21]    A.  Yeah.
[22]    Q.  — and they send you in
[23] there?

### Page 0087

[01]    A.  (Witness nods head.)
[02]    Q.  What were they looking for
[03] when they gave you a CAT scan or the
[04] MRI?
[05]    A.  I really don't remember, but
[06] I remember the CAT scan all right.
[07]    Q.  Do you remember how long ago
[08] that was?
[09]    A.  No, I can't.
[10]    Q.  Do you remember whether they
[11] were looking at your head or your chest
[12] or your back or your legs or —
[13]    A.  I can remember what they was
[14] looking for.
[15]    Q.  Mr. Jackson, I appreciate
[16] your time.  I'm going to let some of
[17] these other lawyers ask questions.
[18]    A.  Okay.
[19]    Q.  Actually, I have one other
[20] question — one other series of
[21] questions.  Never believe a lawyer when
[22] he says he's just got one more
[23] question.

### Page 0088

[01]    Your lawyer put in front of
[02] you what has now been marked as Exhibit
[03] Number 1, which is entitled "Cecil
[04] Jackson Asbestos Product Identification
[05] List."  Do you see that there in your
[06] hand?
[07]    A.  Yeah.
[08]    Q.  Do you remember making that
[09] up?  Did you help make that list?
[10]    A.  Me?
[11]    Q.  Yes, sir.
[12]    A.  I don't recall it.
[13]    Q.  Okay.  You don't know how
[14] that list came into being?
[15]    A.  No, I don't.
[16]    Q.  So, you can't say whether or
[17] not any of the specific products on
[18] this or any of the specific
[19] manufacturers on this list, you can't
[20] actually say that they were at any of
[21] the work sites that you were at, could
[22] you?
[23]    MR. KEAHEY:  Well, let me

### Page 0089

[01] object.  I don't think he understands
[02] your question.  He has previously
[03] identified that list as being his
[04] asbestos product identification list.
[05] I think when you asked him did he help
[06] make it out, he didn't help type it up.
[07]    MR. BRIDGER:  I asked him if
[08] he helped make it in any way.
[09]    MR. KEAHEY:  I think, Mr.
[10] Jackson, do you remember you and I
[11] sitting down one afternoon?
[12]    THE WITNESS:  Uh-huh
[13] (indicating yes).
[14]    MR. KEAHEY:  And coming up
[15] with this list?
[16]    THE WITNESS:  (Witness nods
[17] head.)
[18]    MR. KEAHEY:  Okay.
[19]    Q.  (BY MR. BRIDGER)  How did you
[20] and your lawyer go about coming up with
[21] this list?
[22]    A.  Me?  Are you speaking to me?
[23]    Q.  Yes, sir.  Yes, sir.

### Page 0090

[01]    A.  I don't know.
[02]    Q.  You don't recall sitting down
[03] and making up that list?
[04]    A.  (Witness shakes head.)
[05]    Q.  Did you look through any
[06] books or anything?
[07]    A.  I can't recall on that.
[08]    Q.  There are a couple of names
[09] on that list.  You told me a little
[10] earlier that you couldn't remember the
[11] names of any of the welding rods — the
[12] manufacturers of welding rods?
[13]    A.  One named, "Babco," I
[14] believe.
[15]    Q.  "Babco"?
[16]    A.  "Babco," yeah.
[17]    Q.  Okay.  Do you remember any
[18] other welding manufacturers' names?
[19]    A.  (Witness shakes head.)
[20]    MR. BRIDGER:  Thank
[21] you, sir.  I appreciate your time.
[22] Some of these other fellows may have
[23] some questions.

CECIL JACKSON   [8-22-96]

Page 0091

EXAMINATION BY MR. STEPHEN SMITH:
Q. Mr. Jackson, how are you doing?
A. Fine, thank you. How are you?
Q. Good, thank you. Good. I'm Stephen Smith, I'm here for Pittsburgh Corning Corporation. I just want to ask you a few follow-up questions.
Concerning your job duties when you were working as a carpenter, what percentage of your time would you spend hanging doors?
A. Well, I started in '57 and hung up til I retired.
Q. I take it, then, your primary job was to hang doors; is that right?
A. Right. Right.
Q. Is there anything else that you would do in addition to hang doors?
A. Oh, if I caught up with my door-hanging, I would do a little odd

Page 0092

and end job, yeah.
Q. But primarily, though, your main job was to hang doors; right?
A. Right.
Q. Earlier you had mentioned Local 103. Is that a carpenter's union?
A. Yeah.
Q. Did you always work out of Local 103?
A. Yeah.
Q. Did you ever work out of any other Locals?
A. Well, when I would go out of state, I did, yeah.
Q. But in the State of Alabama, you always worked out of Local 103; right?
A. Yeah. Right.
Q. And Local 103 is here in Birmingham?
A. Uh-huh (indicating yes).
Q. You had mentioned earlier Mr.

Page 0093

Dowda in your -- in your testimony here today. Do you recall any of the employers that Mr. Dowda worked for?
A. No, I didn't know any of those insulation companies.
Q. Did Mr. Dowda belong to a union?
A. Yes.
Q. Do you know what Local he belonged to?
A. I don't -- I don't ever recall knowing their Local number.
Q. And Mr. Childers, do you know what company he worked for, or companies he worked for?
A. No.
Q. Do you know what union -- or excuse me -- do you know what Local number Mr. Childers belonged to?
A. I'm sure it was Birmingham.
Q. Do you know the number, though?
A. Local 103.

Page 0094

[01]   Q. And what union was that that
[02] Mr. Childers belonged to?
[03]   A. It would have had to have
[04] been carpenter's.
[05]   Q. Oh, I'm sorry. All right.
[06] Mr. Childers belonged to the same union
[07] as you did; is that -- is that what
[08] you're saying?
[09]   A. Yeah.
[10]   Q. Okay. Have you ever heard of
[11] Pittsburgh Corning Corporation, sir?
[12]   A. Yes, I've heard of it.
[13]   Q. And how is it that you've
[14] heard of that company?
[15]   A. On job sites.
[16]   Q. And what do you recall seeing
[17] from Pittsburgh Corning?
[18]   A. I don't recall.
[19]   Q. Can you recall any particular
[20] job site where you saw the name
[21] "Pittsburgh Corning"?
[22]   A. I can't remember any one
[23] particular job, no.

Page 0095

[01]   Q. Have you ever heard of a
[02] product called Thermobestos?
[03]   A. I don't recall it.
[04]   Q. Have you ever heard of a
[05] product called Unibestos?
[06]   A. Uni -- what?
[07]   Q. Unibestos, have you ever
[08] heard of that product?
[09]   A. I don't recall that one.
[10]       MR. STEPHEN SMITH: All
[11] right, sir. That's all I have. Thank
[12] you, sir.
[13]       THE WITNESS: Yes.
[14]
[15] EXAMINATION BY MR. HODGSON:
[16]   Q. Hi, Mr. Jackson. How are you
[17] doing?
[18]   A. Fine, thank you.
[19]   Q. My name is Steve
[20] Hodgson.
[21]   A. Glad to know you, Steve.
[22]   Q. Nice to meet you, sir.
[23]   Are you able to continue

Page 0096

[01] right now? Did you need to take a
[02] break?
[03]   A. Yes. I can go on. We can
[04] get it over with, maybe.
[05]   Q. Okay. I'm going to try to
[06] make it real brief for you, sir.
[07]   I represent Carborundum.
[08]   A. Uh-huh (indicating yes)
[09]   Q. And you mentioned earlier in
[10] your deposition that you had used a
[11] Carborundum blade on your skill saw.
[12] Do you remember that testimony?
[13]   A. Yeah.
[14]   Q. Can you describe the blade
[15] that you're talking about using?
[16]   A. Well, it's a thin blade,
[17] about a quarter of an inch thick, and
[18] it's very porous, like their emery.
[19]   Q. So, it's not a metal blade
[20] like another --
[21]   A. Uh-uh (indicating no)
[22]   Q. -- skill saw blade?
[23]   A. No.

CECIL JACKSON   [8-22-96]

Page 0097

[01]   Q.   Okay.  And what would you use
[02] this Carborundum blade to do?
[03]   A.   Cut fire doors.
[04]   Q.   Fire doors?  And what were
[05] these fire doors made of?
[06]   A.   They were made of asbestos
[07] and — it's solid white stuff just like
[08] snow.
[09]   Q.   Okay.  How much of your job
[10] as a carpenter on these various job
[11] sites was spent working on wood or
[12] working with wood?
[13]   A.   Well, when I was hanging
[14] doors, I didn't mess with woodwork.
[15]   Q.   Okay.  Well — and because
[16] I'm not a carpentry, but any time I
[17] hear the term "carpentry," I think of
[18] someone framing a house or using wood.
[19]   A.   Uh-huh (indicating yes).
[20]   Q.   So, when you're talking
[21] carpentry work, you're not talking
[22] about using any wood products, you're
[23] talking about using some other types of

Page 0098

[01] materials; is that right?
[02]   A.   Right.
[03]   Q.   Okay.  Did anyone ever tell
[04] you that the Carborundum blades that
[05] you've referred to, that the blade
[06] itself contained asbestos?
[07]   A.   (Witness shakes head.)
[08]   Q.   Is that a "no"?
[09]   A.   That's a no, yeah.
[10]   Q.   Okay.  What I'm getting at is
[11] when you're talking about this asbestos
[12] being created or the asbestos that
[13] you're — you're exposed to while
[14] hanging doors, it's actually coming
[15] from the doors that you're cutting;
[16] isn't that correct?
[17]   A.   Right.
[18]   Q.   Okay.  So, you're not here
[19] today to tell this jury that — that
[20] there's asbestos in the Carborundum
[21] blades that you were using?
[22]   A.   It's not caused from the
[23] blade, no.

Page 0099

[01]   Q.   Okay.  Let me ask you, sir,
[02] did you ever use any other type of
[03] cutting blade other a Carborundum-type
[04] blade?
[05]   A.   For what type door are you
[06] speaking of?
[07]   Q.   Well, let me rephrase the
[08] question.  What I'm getting at is, did
[09] you see other brand name blades that
[10] you may have used on your job sites
[11] other than a Carborundum-type blade?
[12]   A.   I don't recall it.
[13]   Q.   Do you understand that
[14] Carborundum is the name of the
[15] manufacturer of the blade?
[16]   A.   Yeah.  Right.  Right.
[17]   Q.   And that it's not actually
[18] called a Carborundum blade, it's
[19] actually — Carborundum is the name of
[20] the company.  You understand that?
[21]   A.   It's just like a grind rock,
[22] only it's about a quarter of an inch
[23] thick.

Page 0100

[01]   Q.   Right.  Right.
[02]           Did you ever use any other
[03] type of blades like that supplied by
[04] some other manufacturer other than
[05] Carborundum?
[06]   A.   Yeah, metal blades, yeah, a
[07] carbon tip.
[08]   Q.   Okay.  Do you know who — who
[09] made those blades?
[10]   A.   No.  No.
[11]   Q.   Okay.  So, as you sit here
[12] today, the only manufacturer that you
[13] can recall is Carborundum blades?
[14]   A.   (Witness shakes head.)
[15]   Q.   Is that "yes"?
[16]   A.   There's several different
[17] just regular saw blade factories.
[18]   Q.   They were still of
[19] that composite-type material?
[20]   A.   Yes.
[21]   Q.   Okay.  Why is it that you can
[22] recall Carborundum so well?
[23]   A.   Because I had to use it so

Page 0101

[01] much.
[02]   Q.   Okay.  So, that was the blade
[03] you used the most?
[04]   A.   Yeah.
[05]   Q.   Okay.  Did you — can you
[06] recall any — seeing any labels or
[07] anything on these blades?
[08]   A.   No.
[09]   Q.   Did — anywhere on the blade,
[10] did it say "Carborundum" on it?
[11]   A.   Well, I just don't recall,
[12] but I'm sure it does say "Carborundum"
[13] on it, yeah.
[14]   Q.   Okay.  That's what I'm
[15] getting at.  Did you yourself ever have
[16] to go to like the tool room or the
[17] supply room to get one of these blades?
[18]   A.   Supply room, yeah.
[19]   Q.   Okay.  When you went to the
[20] supply room, would you ask for a
[21] Carborundum wheel, or would you just
[22] ask for a blade?
[23]   A.   Well, it was only what I was

Page 0102

[01] cutting off, if it was metal or wood or
[02] fire.
[03]   Q.   Okay.  And the vast majority
[04] of your carpentry work was spent
[05] installing fireproof doors; is that
[06] correct?
[07]   A.   No, just regular doors.
[08]   Q.   Regular wood doors?
[09]   A.   Most doors — most jobs you
[10] go on got regular doors.  And the
[11] mechanical room, and such as that,
[12] would have a fire-rated door.  That's a
[13] law.
[14]   Q.   Okay.  Would you use a
[15] Carborundum wheel or blade to cut a
[16] regular door?
[17]   A.   No.
[18]   Q.   Okay.  So, you would only use
[19] a Carborundum blade to cut a fireproof
[20] door?
[21]   A.   Or a metal door.
[22]   Q.   Or a metal door?
[23]   A.   Right.

CECIL JACKSON   [8-22-96]

### Page 0103

Q.   Okay.  Do you know if the metal doors contained any asbestos in them?

A.   No, they didn't have any asbestos in them.  They just had a wool packing, like wool in them.

Q.   Okay.  Do you know if that wool material was an asbestos material?

A.   No, it wasn't asbestos material.

Q.   Okay.  Sometimes during your work career, did you also install just regular wooden doors?

A.   Yes.

Q.   Okay.  And you're not here today to say that these wooden doors had asbestos in them, are you?

A.   No.  They didn't have no asbestos in them.

Q.   As you sit here today, would you be able to give me a percentage of how much of your work was actually spent installing fireproof doors as

### Page 0104

opposed to all the other types of doors that you've installed?

A.   Well, it would be a low percentage.

Q.   Lower than ten percent?

A.   No.  I'd say maybe ten percent.

Q.   Okay.  Do you recall the manufacturer of the skill saw that you may have used when using the Carborundum blade?

A.   There are so many of them, I can't remember on that.

Q.   Okay.  And you're not here to say it that was a Carborundum skill saw, are you?

A.   It wasn't a Carborundum skill saw, no.

Q.   Okay.  Okay.  Is the only Carborundum blade that you've ever used in your career the one that you've discussed as being a quarter inch thick blade; is that right?

### Page 0105

A.   Right.

Q.   Can you give me an estimate as to the diameter of this blade?

A.   Eight inches.  That's what I used, eight-inch.

Q.   Did you ever use any other blades that were larger than the one that you've just described?

A.   Not on a skill saw, no.

Q.   Okay.  Have you used other Carborundum blades on any other tool other than a skill saw?

A.   A table saw.

Q.   Okay.  And so when you would use a table saw, there would be — on occasion there would be a Carborundum blade on the table saw?

A.   (Witness nods head.)

Q.   Is that a "yes"?

A.   Yes.  I put one on, yeah.

Q.   Thank you, sir.
     What was the size of the Carborundum blade on the table saw?

### Page 0106

[01]   A.   I believe it was ten inches.
[02]   Q.   Okay.  What was the
[03]   thickness?
[04]   A.   About five/sixteenths.
[05]   Q.   Other then the small
[06]   eight-inch blade and the larger
[07]   ten-inch blade, can you recall using
[08]   any other Carborundum blades?
[09]   A.   No.
[10]   Q.   No?
[11]        Okay.  When you were using
[12]   the Carborundum blades on either the
[13]   hand-held skill saw or the table saw,
[14]   would you always wear a mask when you
[15]   were doing that?
[16]   A.   Yes.
[17]   Q.   Would you ever use the
[18]   table saw to cut fireproof doors?
[19]   A.   Uh-uh, no.
[20]   Q.   Okay.  So, you would only use
[21]   the hand-held skill saw to cut
[22]   fireproof doors?
[23]   A.   Right.

### Page 0107

[01]   Q.   Okay.  Was the majority of
[02]   your work done using the hand-held saw?
[03]   A.   (Witness nods head.)
[04]   Q.   Is that a "yes"?
[05]   A.   Yes.
[06]   Q.   By any chance, would you be
[07]   able to give me any model numbers of
[08]   the Carborundum blades that you've
[09]   used?
[10]   A.   No idea.
[11]   Q.   Okay.  Can you describe for
[12]   me what the wheels looked like, other
[13]   than just the size?  Was there any
[14]   distinctive color, markings or labeling
[15]   on the wheels?
[16]   A.   Well, it had kind of a brick
[17]   color to the blade, and you could see
[18]   the — what looked like mesh in the
[19]   blade.
[20]   Q.   Okay.
[21]   A.   Built into the blade.
[22]   Q.   Okay.  Any type of label on
[23]   the wheels that you can recall?

### Page 0108

[01]   A.   No.  I can't recall.
[02]   Q.   Would there be writing on the
[03]   wheel itself?
[04]   A.   There would be a tag on the
[05]   wheel, yeah, sticker.
[06]   Q.   Okay.  How about any
[07]   stenciling on the wheel?
[08]   A.   No.
[09]   Q.   Okay.  This tag that you've
[10]   referred to, is it like a sticker-type
[11]   tag?
[12]   A.   Uh-huh (indicating yes).
[13]   Q.   Okay.  Was there any color to
[14]   that tag that you can recall?
[15]   A.   I can't recall on that color.
[16]   Q.   Okay.  But the tag had some
[17]   writing on it?
[18]   A.   Yeah.
[19]   Q.   You recall what it would say?
[20]   A.   No.
[21]   Q.   Do you know if it would give
[22]   you the — the dimensions of the wheel
[23]   or not?

## Page 0109

[01]  A.  I don't recall that, no.

[02]  Q.  Okay.  Did you ever see any

[03] warnings on these wheels?

[04]  A.  I don't recall it.

[05]  Q.  Okay.  So, you don't know if

[06] the tags that you're referring to had a

[07] warning —

[08]  A.  Well, some of the blades

[09] would say the rpm, not to succeed a

[10] certain amount of rpm.

[11]  Q.  Okay.  That's what I'm

[12] getting at.  So, that kind of

[13] information would be stenciled on that

[14] tag on the wheel?

[15]  A.  Uh-huh (indicating yes).

[16]  Q.  Okay.  Can you recall any

[17] other type of information that may have

[18] been on the Carborundum blades?

[19]  A.  No.

[20]      MR. HODGSON:  Okay.  Mr.

[21] Jackson, that's it.  Thank you very

[22] much.

[23]      THE WITNESS:  Thank you.

## Page 0110

[01]

[02] EXAMINATION BY MR. THACKSTON:

[03]  Q.  Afternoon, Mr. Jackson.  My

[04] name is —

[05]  A.  How do you do?

[06]  Q.  I'm Robert Thackston.  I'm

[07] doing fine.  You doing okay to press on

[08] for a few minutes?

[09]  A.  Yeah.

[10]  Q.  Okay.  Your lawyer asked you

[11] a little earlier if you knew the name

[12] "Westinghouse."  I expect you've known

[13] the name "Westinghouse" all your life,

[14] haven't you?

[15]  A.  Yes.

[16]  Q.  You probably knew the name

[17] "Westinghouse" when you were still

[18] living at home as a kid, didn't you?

[19]  A.  Right.

[20]  Q.  Okay.  And then he jumped

[21] into something and said, "Were

[22] Westinghouse products dusty," but you

[23] never did say anything about any

## Page 0111

[01] Westinghouse products.  You just said

[02] you knew the name "Westinghouse."

[03] Right?

[04]  A.  Yeah.

[05]  Q.  And I take it in your job as

[06] a door-hanger, there weren't any

[07] Westinghouse products that you worked

[08] with directly, were there?

[09]  A.  Uh-uh (indicating no).

[10]  Q.  Is that a "no"?

[11]  A.  That's right, I didn't.  No.

[12]  Q.  And he's got a couple of

[13] things listed on that list that you

[14] don't remember helping with called

[15] "Motors & Generators."  You never did

[16] any work with any motors or generators,

[17] did you, sir?

[18]  A.  (Witness shakes head.)

[19]  Q.  I'm sorry.  You have to

[20] answer out loud, please.

[21]  A.  No.

[22]      MR. KEAHEY:  You asked him if

[23] he worked directly with a motor or

## Page 0112

[01] generator; right?

[02]      MR. THACKSTON:  Right.

[03]  Q.  (BY MR. THACKSTON)  You never

[04] did any work with any motors or

[05] generators, did you, sir?

[06]  A.  Well, I've run generators,

[07] yeah.

[08]  Q.  And when you say you've run

[09] generators, those are the types of

[10] generators that make back-up

[11] electricity or something?

[12]  A.  Right.

[13]  Q.  Little small generators that

[14] run on a diesel —

[15]  A.  On the job where the power

[16] wasn't connected in, that's what they

[17] use, portable generators.

[18]  Q.  You're talking about little

[19] portable generators; right?

[20]  A.  Yeah.

[21]  Q.  Do you know who made those

[22] portable generators?

[23]  A.  I've forgotten.

## Page 0113

[01]  Q.  Okay.  In any event, the

[02] question that the lawyer asked was

[03] something about products being dusty.

[04] Do you know anything about motors or

[05] generators being dusty kinds of

[06] products like those fire doors you cut?

[07]  A.  No.

[08]  Q.  Do you know anything about

[09] anybody working with any Westinghouse

[10] products that were around you any time

[11] during your career that were dusty

[12] products?

[13]  A.  (Witness shakes head.)

[14]  Q.  You don't, do you?

[15]  A.  No, I don't recall them.

[16]  Q.  Okay.

[17]  A.  Been too much water under the

[18] dam since then.

[19]  Q.  Well —

[20]  A.  You know it?

[21]  Q.  — as a carpenter, electrical

[22] products aren't the kinds of products

[23] you work with, anyway, are they, other

## Page 0114

[01] than maybe a skill saw or a drill?

[02]  A.  Right.

[03]  Q.  The fire doors that you

[04] talked about, you mentioned a couple of

[05] times that code or law required that —

[06] that you use those; is that right?

[07]  A.  (Witness nods head.)

[08]  Q.  I'm sorry, you have to answer

[09] out loud again.

[10]  A.  Yes.

[11]  Q.  Okay.  Was that the city or

[12] the state telling you you had to use

[13] fire doors?

[14]  A.  Well, fire doors are — are

[15] chosen by the city, if it's in city

[16] limits.  They — certain buildings, the

[17] code calls for fire doors.

[18]  Q.  And did the code call for

[19] using asbestos in those doors, as far

[20] as you know?

[21]  A.  No.  It — It didn't specify

[22] that.

[23]  Q.  It wasn't that specific about

CECIL JACKSON   [8-22-96]

## Page 0115

what kind of fire doors?

A.   You can either get a fire door — you can get them up to — from one hour to five hours.

Q.   And that means that's how many hours they will resist to keep a fire from spreading?

A.   Right.  Right.

Q.   Do you know why the city required that they use those kinds of fire doors in some places?

A.   Yes, sir.

Q.   Why is that?

A.   It's just the city ordinance.

Q.   Do you know why the city has an ordinance requiring the use of fire doors?

A.   Well, I guess it would be to block off other — other areas.

Q.   Would it be to stop the spread of fire?

A.   Yeah.

Q.   When you were a carpenter

## Page 0116

hanging doors back in the beginning, were there fire doors back then, too, or — or did that come in later?

A.   It came in later.

Q.   Okay.  Do you remember what happened when there were doors that weren't fire doors that were hung and a fire came along?

A.   Well, I never run into that, no.

Q.   Okay.  To your knowledge, were there any fire doors back — when was the first time you recall putting in fire doors?

A.   Lord, that has been so long ago, that has been forty year ago.

Q.   So, was it in the early 1950's or late 1940's?

A.   I imagine it was in the fifties.

Q.   Do you know whether there were any fire doors available back then that didn't have asbestos cores inside

## Page 0117

of them?

A.   Only metal fire doors.

Q.   Do you know who made the cores that were inside of those fire doors?

A.   No.

Q.   Did you ever see one of those fire doors after it had stopped a fire?

A.   Uh-uh (indicating no).

Q.   Is that a "no"?

A.   No.

Q.   To your knowledge, did they work?

A.   Pardon me?

Q.   To your knowledge, did they work?

A.   I'm sure they did.  They had to meet the specifications.

Q.   And those, again, were the government specifications; right?

A.   Uh-huh (indicating yes).

MR. THACKSTON:  Thank you, sir.  That's all I have.

## Page 0118

[01]        THE WITNESS:  Thank you.

[02]

[03]   EXAMINATION BY MR. RICHARDSON:

[04]        Q.   Mr. Jackson, my name is Tracy

[05]   Richardson.  I think I'll have just a

[06]   couple of questions for you.

[07]        Earlier this morning, you

[08]   identified a company known as Abex.  Do

[09]   you associate any products with the

[10]   name "Abex"?

[11]        A.   It's — the way I recall it,

[12]   Abex was a insulating.

[13]        Q.   Okay.  Can you tell me what

[14]   type of insulation was manufactured by

[15]   Abex?

[16]        A.   Well, it was a mixture of

[17]   water and some type material, is all I

[18]   recall, because I don't know nothing

[19]   about that kind of stuff.

[20]        Q.   Do you know what it was used

[21]   for?

[22]        A.   To insulate a pipe or — hot

[23]   pipe or something like that.

## Page 0119

[01]        Q.   Can you tell me, how do you

[02]   recall seeing the name "Abex"?  Was it

[03]   on bags or on a box, or how do you

[04]   recall that?

[05]        A.   It would be in boxes.

[06]        Q.   In boxes?

[07]        A.   Uh-huh (indicating yes).

[08]        Q.   Do you know who would have

[09]   used the product that was manufactured

[10]   by Abex?

[11]        A.   Insulators, I guess.

[12]        Q.   Is that the only product you

[13]   can associate with the name "Abex"?

[14]        A.   Uh-huh (indicating yes).

[15]        MR. RICHARDSON:  Okay.

[16]   That's all the questions I have.  Thank

[17]   you, Mr. Jackson.

[18]        THE WITNESS:  Thank you.

[19]

[20]   EXAMINATION BY MR. WEWERS:

[21]        Q.   Mr. Jackson, my name is Eric

[22]   Wewers.

[23]        You mentioned one company

## Page 0120

[01]   that you named earlier that you — that

[02]   you knew the name.  That was U.S.

[03]   Gypsum.  What product do you associate

[04]   with U.S. Gypsum, if any?

[05]        A.   What project, did you say?

[06]        Q.   Product.

[07]        A.   No, I can't.

[08]        Q.   So, as you sit here today,

[09]   you don't recall any specific products

[10]   associated with the name of U.S.

[11]   Gypsum; is that correct?

[12]        A.   I have seen it on many jobs,

[13]   but I can't recall where.

[14]        Q.   You don't recall any specific

[15]   products that the name was on?

[16]        A.   (Witness shakes head.)

[17]        Q.   Is that right?

[18]        A.   Right.

[19]        Q.   Can you recall some specific

[20]   jobs where you remember the name "U.S.

[21]   Gypsum"?

[22]        A.   No, I can't.

[23]        Q.   Can you recall any specific

CECIL JACKSON   [8-22-96]

### Page 0121

[01] time period, say the forties, fifties,
[02] sixties, anything like that?
[03]     A.    No.
[04]         MR. WEWERS:  That's all I
[05] have.  Thank you, sir.
[06]         THE WITNESS:  Thank you.
[07]         MR. KEAHEY:  Let's take a
[08] short break, please.
[09]         THE VIDEOGRAPHER:  The time
[10] is 12:05 p.m.  We're off the record.
[11]
[12]         (Whereupon, a brief recess
[13]         was taken.)
[14]
[15]         THE VIDEOGRAPHER:  The time
[16] is 2:19 p.m.  We're on the record.
[17]         MR. KEAHEY:  All right.  I'm
[18] Pat Keahey, attorney for Mr. Cecil
[19] Jackson.  And he's done about all he
[20] can do for the day.  His wife came to
[21] me after we took the last break, and
[22] she knows him better than I do, and she
[23] says he's had enough for today and

### Page 0122

[01] that's what he's saying.
[02]         So, subject to the -- well,
[03] what his doctor says and the Court
[04] says, I'll try to make him available
[05] for a wrap-up of this.  So, that's it.
[06]         THE VIDEOGRAPHER:  The time
[07] is 2:19 p.m.  We're off the record.
[08]         DEFENSE COUNSEL:  Is that
[09] 2:19 or 12:19?
[10]         THE VIDEOGRAPHER:  12:19.
[11]
[12]     FURTHER DEPONENT SAITH NOT
[13]
[14]
[15]
[16]
[17] CECIL JACKSON          DATE
[18]
[19]
[20]
[21]
[22]
[23]

### Page 0123

[01]         CERTIFICATE
[02]
[03] STATE OF ALABAMA
[04] JEFFERSON COUNTY
[05]
[06]         I hereby certify that the
[07] above and foregoing deposition was
[08] taken down by me in stenotype and the
[09] questions and answers thereto were
[10] transcribed by means of computer-aided
[11] transcription, and that the foregoing
[12] represents a true and correct
[13] transcript of the testimony given by
[14] said witness upon said hearing.
[15]         I further certify that I am
[16] neither of counsel, nor of kin to the
[17] parties to the action, nor am I in
[18] anywise interested in the result of
[19] said cause.
[20]
[21]
[22]         CHARLES FOSHEE
[23]

CECIL JACKSON [8-22-96]

CONCORDANCE:

'42 23:8
'57 61:20 62:8 91:15
'60 62:8
'71 78:7
2500 6:21 10:19
2600 8:8
2615 12:8
292 8:9
2:19 121:16 122:7 122:9
300 9:7
303 10:2
30308-3243 10:3
30603 7:5
3200 7:21
3300 5:11
35 3:12
35203 10:16 11:8
35203-3204 6:23
35203-3272 6:10
35222 4:19
35242-4821 12:16
3529 4:17
3600 9:19
36602 10:8
36633 11:12
3RD 23:7
400 7:15
4000 10:1
417 6:8 10:15
420 6:22
4200 8:19
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 1:23
440 7:4
4500 10:7
470 11:23
4900 11:1
500 7:9 12:8
58 3:4
600 12:15
60049-0001 6:17
60TH 1:3 4:3
705 8:14
717 5:5 9:3
75201 9:4
75201-4693 5:11
75201-6508 5:6 8:5
75202-2799 7:22
75202-3714 10:21
75504 9:8
77002 5:1 8:20
77002-4804 7:11
77006 8:15
77019-2151 8:10
77027 6:3
77046 9:16
77056 11:2
77550 7:16
77701-3074 12:2
77701-3255 5:17
77702 12:9
78746 9:20
810 11:6
815 4:23
896 1:5 4:5
901 10:20
91 3:5
95 3:6

- A -

A.M. 13:9 14:1 18:9 18:15
  57:17 57:23
A.W 11:13 16:18
ABEX 12:12 36:15 118:8
  118:10 118:12 118:15
  119:2 119:10 119:13
ABLE 5:22 95:23 103:21
  107:7
ABOVE 13:10 123:7

ACANDS 1:10 4:10 11:20
ACCORDING 19:5
ACROSS 51:3
ACTING 13:2
ACTION 123:17
ACTUALLY 68:1 69:11 87:19
  88:20 99:14 99:17 99:19
  103:22
ADAMS 8:7 10:6
ADDITION 91:21
ADULT 21:10
AFFECT 77:2
AFFECTED 76:19 77:5
AFTERNOON 89:11 110:3
AGO 52:18 56:17 58:5
  71:15 73:14 75:12 78:10
  84:10 84:11 87:7 116:16
AGREED 1:15 2:4 2:14 18:2
AHEAD 26:3
AIR 23:3 23:5 23:21 47:3
AIRCO 36:10
AL 1:7 1:10 4:7 4:10
ALABAMA 2:1 4:19 6:8 6:10
  6:23 10:8 10:14 10:16
  11:8 11:12 12:16 13:2
  13:8 19:7 20:4 22:12
  22:18 24:2 25:9 26:4
  27:10 27:22 28:6 28:11
  29:4 29:13 29:21 30:3
  30:12 31:7 33:6 34:19
  38:21 41:13 44:15 53:17
  72:18 92:16 123:3
ALABASTER 72:15 72:17
ALEX 30:11
ALLEN 7:9 8:9 10:1 15:12
ALLIED-SIGNAL 5:13 16:15
ALLOWS 71:5
ALUMINUM 12:10
ALWAYS 92:9 92:17 106:14
AMERICA 8:9
AMERICAN 9:17 12:3 15:3
  15:11
AMOUNT 40:21 40:22 109:10
ANCHOR 11:15 16:20
ANDREWS 8:18
ANEURYSM 75:7 75:8 75:10
  76:14 76:18 77:15 82:2
  82:4 82:10
ANN 6:15
ANNUAL 86:1 86:3
ANSWER 28:3 58:9 111:20
  114:8
ANSWERS 70:23 71:5 123:9
APOLOGIZE 63:8
APPEARANCE 5:22 9:1 9:12
  10:11 15:18 17:1 17:6
  17:12
APPEARANCES 4:15 14:14
  59:4
APPEARING 4:19 5:1 5:6
  5:12 5:17 5:21 6:3 6:10
  6:17 6:23 7:5 7:11 7:17
  7:22 8:5 8:11 8:15 8:21
  9:4 9:9 9:16 9:20 10:3
  10:9 10:16 10:21 11:2
  11:8 11:12 11:19 12:2
  12:9 12:17 14:12 16:22
  17:11 17:12 17:13 17:16
  59:2
APPLYING 45:2
APPRECIATE 87:15 90:21
APPROXIMATELY 23:5
AREA 42:8 47:1
AREAS 115:19
ARM 77:6 77:8 77:10
ARSENAL 29:13
ARTERY 75:1
ARTHUR 65:20
ASBESTOS 25:10 25:11
  26:13 27:1 27:2 27:11

28:5 32:20 33:6 33:22
  34:5 34:10 34:17 34:18
  41:4 41:22 44:1 44:10
  45:10 53:10 53:15 55:12
  55:20 56:10 56:12 57:2
  57:5 88:4 89:4 97:6 98:6
  98:11 98:12 98:20 103:2
  103:5 103:8 103:9 103:17
  103:19 114:19 116:23
ASBESTOS-RELATED 49:5
ASHLEY 7:3
ASK 19:19 25:8 33:21 34:9
  35:16 36:1 38:18 39:2
  49:3 54:6 58:21 69:4
  70:12 87:17 91:10 99:1
  101:20 101:22
ASKED 34:1 39:13 39:18
  41:12 42:16 46:14 70:22
  89:5 89:7 110:10 111:22
  113:2
ASSIGN 2:9
ASSISTED 69:8
ASSOCIATE 118:9 119:13
  120:3
ASSOCIATED 120:10
ASSOCIATES 4:21 10:23
ATHENS 7:5
ATLANTA 10:3
ATTACHED 35:13
ATTORNEY 9:18 11:6 18:17
  71:4 121:18
ATTORNEY'S 70:22
ATTORNEYS 13:21 14:4 57:6
  57:12 59:11
AUBURN 31:15 31:6 31:11
AUGUST 2:2 13:20
AUSTIN 9:20
AVAILABLE 116:22 122:4
AVENUE 4:18 5:10 7:4 7:21
AVERAGE 52:5
AVONDALE 30:11
AWS 70:9

- B -

B 11:5 11:10
B-150 1:5 4:5
BABCO 90:13 90:15 90:16
BABCOCK 37:22
BACK 24:2 45:6 50:3 51:5
  62:12 62:14 74:1 78:7
  78:10 79:7 82:20 87:12
  116:1 116:2 116:12
  116:22
BACK-UP 74:3 112:10
BAD 40:7 47:18
BAGS 119:3
BALTIMORE 9:21 15:5
BANK 6:8 9:7 10:14
BARFIELD 11:17 11:18
  15:21 45:16
BASED 18:1 35:20
BASIS 39:17
BASSETT 7:14
BEAUMONT 5:17 12:1 12:8
BEAZER 5:18 14:12 59:7
BEE 9:19
BEGINNING 13:8 116:1
BEHIND 54:20
BELIEVE 21:9 49:17 49:21
  60:12 61:8 61:15 64:2
  71:22 72:3 72:15 74:21
  75:21 81:10 85:4 85:14
  87:21 90:14 106:1
BELONG 93:6
BELONGED 93:10 93:19 94:2
  94:6
BERRY 71:20 74:18 76:2
  76:10 78:22 79:1 79:4
  81:9 86:8
BERRY'S 81:5 81:11

BESSEMER 30:15
BEST 61:17
BETTER 121:22
BETWEEN 1:16
BIG 46:21 46:23
BILL 14:7 24:5
BIRMINGHAM 2:1 4:18 6:9
  6:22 10:15 11:7 12:16
  13:2 13:8 21:23 30:4
  30:16 30:20 31:2 31:18
  31:20 32:4 81:12 92:21
  93:20
BISSELL 5:15
BIT 20:12 49:2
BLADE 26:19 45:20 96:11
  96:14 96:16 96:19 96:22
  97:2 98:5 98:23 99:3
  99:4 99:11 99:15 99:18
  100:17 101:2 101:9
  101:22 102:15 102:19
  104:11 104:20 104:23
  105:3 105:17 105:23
  106:6 106:7 107:17
  107:19 107:21
BLADES 98:4 98:21 99:9
  100:3 100:6 100:9 100:13
  101:7 101:17 105:7
  105:11 106:8 106:12
  107:8 109:3 109:18
BLASINGAME 7:2
BLISTERS 48:22 68:8
BLOCK 115:19
BLOOD 78:13 78:15 78:18
  78:21
BLOW 46:6 57:8
BOARD 56:23
BOC 5:19 14:11 59:5
BOHN 8:13 8:14 16:4
BOILER 8:16 16:5
BOMBING 23:18
BONE 77:21 78:1
BONETTE 29:21
BOOKS 90:6
BOTH 22:7
BOX 11:11 119:3
BOXES 56:2 119:5 119:6
BRANCH 23:1
BRAND 99:9
BRANDS 34:17
BREAK 57:15 96:2 121:8
  121:21
BREATH 82:17 82:19 83:9
BREATHE 40:18
BREATHED 25:11
BREZINSKI 6:15
BRICK 107:16
BRIDGER 3:4 5:16 14:8
  14:9 36:12 38:22 39:20
  40:5 58:2 58:4 59:1
  60:20 61:3 61:4 89:7
  89:19 90:20
BRIEF 57:19 96:6 121:12
BRING 41:3
BROKE 77:21
BROKEN 78:1
BROOM 47:14
BROTHERS 5:20 14:10 59:6
  63:17
BROUGHTON 10:1 15:12
  15:13
BROWN 4:22
BRYANT 7:3
BUILD 31:18
BUILDING 4:23 5:16 6:8
  7:15 9:8 10:14 11:18
  12:1 30:1 32:4 46:5
  46:22 80:16 80:17 80:21
BUILDINGS 28:15 28:23
  29:18 30:7 30:8 31:10
  114:16

CECIL JACKSON     [8-22-96]

T 27:14 107:21
CH 67:15
CH 7:2
KEY 6:15
NT 48:22 72:11
STED 75:2
NESS 24:15 41:7

- C -
:20 64:21
DER 12:8
. 73:3 114:18
ED 41:22 49:9 50:17
:20 71:7 81:2 86:18
:2 95:5 99:18 111:14
.S 44:3 55:16 114:17
ERA 19:22
IP 6:12 14:18
  19:23 20:12 22:4
:18 25:9 26:14 28:2
:12 39:14 40:7 49:4
:20 58:5 60:6 61:13
:17 64:9 65:7 67:17
:14 70:3 70:7 70:9
:20 87:13 94:19 96:3
:14 100:13 100:21
:1:5 105:2 106:7 107:11
:7:23 108:14 109:16
:5:2 115:3 118:13 119:1
:9:13 120:19 120:23
:1:20
CER 71:9 71:10 71:19
:2 72:7 72:10 72:23
:4 73:8 73:12 77:15
ACITY 17:13 17:23
BON 100:7
BORUNDUM 6:4 15:20
:19 37:10 45:20 96:7
:11 97:2 98:4 98:20
:14 99:18 99:19 100:5
:0:13 100:22 101:10
:1:12 101:21 102:15
:2:19 104:11 104:15
:4:17 104:20 105:11
:5:16 105:23 106:8
:6:12 107:8 109:18
BORUNDUM-TYPE 99:3
:11
EER 27:9 38:21 103:12
:4:21 113:11
LTON 10:18
OL 18:21
PENTER 22:5 22:6 22:8
:18 26:2 91:12 97:10
:3:21 115:23
PENTER'S 22:2 92:6
:4
PENTRY 24:20 65:13
:2 66:22 97:16 97:17
:21 102:4
E 1:5 4:5 9:12
  86:18 87:3 87:6
IGHT 91:22
SE 13:10 50:7 53:11
:13 55:21 123:19
SED 57:3 98:22
ES 9:19
:18
5:8
:14 13:19 14:5 18:17
:3 88:3 121:18 122:17
TER 7:9 10:8 12:15
:8 31:19
'S 56:22
TAIN 40:20 109:10
:4:16
TIFICATE 123:1
TIFY 13:3 123:6 123:15
IRMEN 56:23
NCE 107:6

CHARLES 1:19 4:14 13:1
  123:22
CHECK-UPS 86:5
CHEESECLOTH 45:4
CHEMICAL 6:11 14:19
CHEMOTHERAPY 73:3
CHEST 86:11 86:13 86:15
  87:11
CHESTERON 11:14
CHESTERTON 16:18
CHILDERS 59:17 59:20 60:7
  64:13 64:15 93:13 93:19
  94:2 94:6
CHILDREN 21:2 21:4 21:5
CHILTON 20:14
CHOSEN 114:15
CIGARETTES 83:14 83:17
  83:20 83:21 84:16 85:1
CITY 30:12 41:6 41:9
  114:11 114:15 115:9
  115:14 115:15
CIVIC 31:17 31:19
CIVIL 13:5 19:6
CLAMP 73:23 74:3 74:5
CLAMPED 74:2
CLANTON 20:4 79:17 79:19
  79:22 81:1
CLARK 29:8
CLASSIFICATION 70:10
CLEANING 47:7 47:10
CLINTON 6:21 14:15
CLOSE 46:2 48:17 48:20
  68:8
CLOSURES 25:3
CLOTHING 46:7 46:11
CO-WORKERS 59:12
CODE 41:7 114:5 114:17
  114:18
COLD 44:19 83:3 83:7
COLLECT 40:15
COLLEGE 7:4
COLOR 107:14 107:17
  108:13 108:15
COLTEC 11:14 16:18
COMBAT 23:16 23:19
COMBUSTION 38:2
COMMERCE 8:20
COMMERCIAL 22:11 33:5
  38:20 47:13
COMMISSIONER 1:20 2:15
  4:14 13:3
COMPANIES 39:12 57:5 59:2
  93:5 93:15
COMPANY 5:2 5:20 5:21 6:4
  6:12 7:1 7:12 8:17 9:10
  9:22 11:4 11:14 11:16
  12:5 12:12 12:18 14:10
  14:11 15:1 15:5 15:7
  16:18 16:20 16:23 27:14
  48:7 56:1 59:5 59:6
  93:14 94:14 99:20 118:8
  119:23
COMPANY'S 54:1
COMPOSITE-TYPE 100:19
COMPUTER-AIDED 123:10
CONCERNED 54:17
CONCERNING 91:11
CONDITIONS 32:11 32:16
  40:3
CONGESTION 82:17 82:19
CONNECTED 112:16
CONSTRUCTION 67:6
CONTACT 41:4
CONTAINED 98:6 103:2
CONTAINER 53:15
CONTINUE 85:11 95:23
CONTINUED 85:2
COOK 5:10 16:14
COOPER 10:22 16:13
COOSA 29:9 46:18 47:21

61:15 61:19 62:2 62:13
  68:15 68:18 69:21
CORES 116:23 117:4
CORNING 7:7 16:1 91:9
  94:11 94:17 94:21
CORPORATION 5:8 6:5 6:12
  6:13 7:7 8:1 8:22 10:17
  12:4 12:11 15:17 16:7
  17:11 91:9 94:11
CORPORATIONS 57:1
CORRECT 22:12 22:20 26:9
  98:16 102:6 120:11
  123:12
CORRECTLY 60:11 60:13
  63:11 70:19
CORRUGATED 28:8
COUCH 52:6
COUGHING 82:17 82:19
COUNSEL 1:17 2:6 2:8 13:6
  18:2 39:1 122:8 123:16
COUNTY 1:2 4:2 20:14 29:4
  31:19 123:4
COUPLE 90:8 111:12 114:4
  118:6
COURT 1:1 4:1 13:1 71:5
  122:3
CRAFT 21:11 41:21 43:16
  59:23 60:3 70:17
CRAFTS 41:10 41:13 43:23
CRANE 6:18 17:3
CREATED 48:10 48:14 98:12
CREWS 47:3
CROSS-EXAMINATION 57:12
CROUCH 9:2
CROWN 1:20 13:7
CUT 32:19 45:9 45:19
  45:23 97:3 102:15 102:19
  106:18 106:21 113:6
CUTTING 40:10 47:18 98:15
  99:3 102:1
CYLINDRICAL 25:5

- D -
D 5:4 8:8 11:11 11:23
D-A 61:3
D-O-W-D-A 61:2
D-O-W-D-Y 60:22
DALLAS 5:6 5:11 7:10 7:21
  8:4 9:4 10:20
DAM 81:3 113:18
DANGEROUS 53:10
DANIEL 61:21
DATE 13:4 122:17
DATES 78:5 78:6
DAUGHTER 18:21
DAVID 6:7 11:18 11:23
  14:17 15:21
DAY 2:2 13:20 23:8 52:5
  83:21 121:20
DAYS 51:9
DEAL 58:19
DECIDE 81:17
DECIDED 81:19 81:23
DEFENDANT 5:2 5:7 5:12
  6:18 7:1 7:6 7:12 7:17
  7:23 8:6 8:11 8:16 8:21
  9:5 9:9 9:17 9:21 10:4
  10:9 10:17 10:22 11:3
  11:13 12:17 19:8 57:13
DEFENDANTS 1:11 4:11 5:18
  6:4 6:11 11:20 12:3
  12:10 16:8 18:5 19:10
  34:9
DEFENSE 39:1 57:6 122:8
DEHAY 5:3 8:2
DEPEND 43:10
DEPONENT 12:22 122:12
DEPOSITION 1:18 1:22 2:11
  2:15 13:19 17:15 17:22
  18:4 19:5 34:7 96:10

123:7
DEPOSITIONS 18:3
DESCRIBE 20:13 22:4 44:16
  96:14 107:11
DESCRIBED 47:21 105:8
DEVELOPED 34:7
DEVELOPING 49:23
DIAGNOSED 49:16 49:20
DIAMETER 105:3
DIESEL 112:14
DIFFERENT 42:12 43:15
  63:14 66:7 66:10 67:7
  75:6 100:16
DIFFICULT 77:7
DIFFICULTY 76:22 77:12
DIMENSIONS 108:22
DIRECTLY 27:1 111:8
  111:23
DIRECTORS 56:23
DISCHARGE 23:21
DISCOVERY 18:3
DISCUSSED 104:22
DISCUSSION 18:11
DISEASE 49:5 49:7 49:9
  50:17 54:8 54:9 54:15
  55:6 55:13 57:3
DISORDER 53:12
DISTINCTIVE 107:14
DISTRICT 1:1 1:3 4:1 4:3
DOCTOR 49:8 73:11 76:6
  78:15 79:10 79:12 79:18
  ; 85:10 85:13 86:2 122:3
DOCTORS 71:17 72:6 72:21
  74:15 75:15 85:5 85:8
  86:8
DODSON 9:6
DON 12:21
DOOR 99:5 102:12 102:16
  102:20 102:21 102:22
  115:3
DOOR-HANGER 22:8 26:2
  41:3 111:6
DOOR-HANGING 21:13 21:18
  91:23
DOORS 24:14 24:17 24:20
  24:23 29:23 31:21 33:19
  64:7 91:14 91:18 91:21
  92:3 97:3 97:4 97:5
  97:14 98:14 98:15 102:5
  102:7 102:8 102:9 102:10
  103:2 103:13 103:16
  103:23 104:1 106:18
  106:22 113:6 114:3
  114:13 114:14 114:17
  114:19 115:1 115:11
  115:17 116:1 116:2 116:6
  116:7 116:12 116:14
  116:22 117:2 117:5 117:8
DORMITORIES 31:12
DORMS 28:15 28:23 30:7
DOWDA 42:11 44:1 46:9
  60:18 60:19 61:5 61:14
  62:16 93:1 93:3 93:6
DOWDER 60:12 60:17
DOWDY 60:20 60:21
DOWELL 11:22
DOWN 20:14 28:9 31:11
  31:14 40:16 47:23 48:8
  60:10 60:11 63:9 63:11
  64:3 64:19 65:8 65:19
  73:19 79:4 86:19 89:11
  90:2 123:8
DR 71:20 71:21 71:23
  73:11 74:17 74:18 75:18
  76:2 76:9 76:10 76:15
  76:16 78:22 79:1 79:4
  80:2 80:17 81:5 81:9
  81:11 86:8
DRILL 114:1
DRIVE 6:16

DRYWALL 61:11 63:20
DRYWALLER 62:20
DUANE 71:21
DUCLOUX 8:13
DUKE 6:7 14:17
DULY 13:15
DUNN 8:7
DURING 25:6 26:7 38:21
    52:4 103:11 113:11
DUST 25:11 40:3 40:13
    40:15 40:19 46:1 46:3
    46:13 47:16 47:17 48:10
    53:22 52:23
DUSTY 32:17 110:22 113:3
    113:5 113:11
DUTIES 91:11

- E -
E 7:20 10:13
E.B 7:4
E.L 10:6 17:9
EARLIER 37:9 90:10 92:5
    92:23 96:9 110:11 118:7
    120:1
EARLY 28:12 28:19 29:5
    29:14 31:23 116:17
EAST 5:19 14:12 59:7
ECKEL 7:13
EDWARD 11:10
EFFECT 40:12 50:18
EIGHT 52:18 105:4
EIGHT-INCH 105:5 106:6
EIGHTH 10:13
ELECTRIC 5:2 5:20 7:23
    14:10 14:23 37:3 37:19
    59:5
ELECTRICAL 113:21
ELECTRICIANS 41:18
ELECTRICITY 112:11
ELEVENTH 20:23
ELLIN 8:3 15:8
ELLIS 9:3 15:10 32:21
ELLISTON 5:3 8:2
EMERY 96:18
EMPHYSEMA 85:12 85:15
EMPLOYERS 93:3
END 46:8 47:7 92:1
ENERGY 5:4
ENGINEER 62:1
ENGINEERING 38:2
ENOUGH 68:8 121:23
ENTER 35:7
ENTITLED 88:3
ENVIRONMENTAL 4:16
ERIC 5:4 16:6 119:21
ERICSSON 10:4 15:13
ESPERSON 4:23
ESTIMATE 105:2
ET 1:7 1:10 4:7 4:10
EVANS 12:21
EVEN 40:19 56:2 77:10
    84:23 85:18
EVENT 113:1
EVIDENCE 2:11
EXAMINATION 3:2 13:10
    19:18 58:2 86:2 86:3
    91:2 95:15 110:2 118:3
    119:20
EXAMINED 13:15 75:16
EXCEPT 2:6 19:14
EXCEPTION 26:6
EXCUSE 21:15 93:18
EXHIBIT 3:12 35:7 35:11
    35:20 35:21 36:3 88:2
EXHIBITS 3:11
EXPECT 110:12
EXPEDIENCY 19:9
EXPLAIN 32:6 32:10 41:2
EXPOSED 25:10 27:2 33:6
    33:10 33:12 34:19 98:13

EYEBALLS 48:23 68:9

- F -
FACILITIES 31:10
FACILITY 28:16
FACT 18:1
FACTORIES 57:9 100:17
FAIR 67:4 67:9
FAIRLY 20:10 39:16
FAMILY 12:22 18:19 20:13
    20:18 55:3 55:5 79:10
    79:12 79:18
FANS 46:5 47:4
FAR 20:20 50:16 51:22
    53:21 114:19
FARMING 24:4
FAST 54:10
FATHER 20:15
FEBRUARY 50:4 50:11 50:14
FEEL 33:12
FELLOW 59:16 63:14 66:15
FELLOW'S 70:17 80:11
FELLOWS 55:21 67:7 72:1
    74:19 90:22
FERGUSON 11:1 16:10 16:11
FERNAMBUCQ 10:12
FEW 91:10 110:8
FIBERGLAS 11:9
FIELDS 9:18 15:4
FIFTIES 116:20 121:1
FIFTY-FIVE 84:10 84:11
FILING 2:14
FILL 70:23
FINE 91:5 95:18 110:7
FINLEY 71:21
FIRE 33:19 97:3 97:4 97:5
    102:2 113:6 114:3 114:13
    114:14 114:17 115:1
    115:2 115:7 115:11
    115:16 115:21 116:2
    116:7 116:8 116:12
    116:14 116:22 117:2
    117:4 117:8
FIRE-RATED 102:12
FIREPROOF 102:5 102:19
    103:23 106:18 106:22
FIREPROOFING 33:1 45:6
FIRST 6:8 10:14 56:12
    59:16 76:14 116:13
FISHBURNE 6:20
FITTER6 41:17 41:18
FIVE 20:22 21:9 71:16
    74:15 106:4 115:4
FLAT 28:7
FLATTEN 11:22
FLINTKOTE 7:1 14:16
FLOOR 10:14
FOLGER 9:13
FOLLOW 61:5 61:10 63:19
    64:6 65:1 65:12 66:1
FOLLOW-UP 73:12 91:10
FOLLOWED 21:12 66:21
    75:14
FOLLOWING 13:11
FOLLOWS 13:16
FORCE 23:3 23:6 23:22
FORGOTTEN 112:23
FORM 2:7 27:5 33:8 34:11
    34:21 36:8 37:5 42:18
    45:14 46:16 56:15 57:7
FORTIES 121:1
FORTY 116:16
FORTY-FIVE 22:19
FOSHEE 1:19 4:14 13:1
    123:22
FOSTER-WHEELER 10:10 17:5
    17:10 17:14 17:18
FOUNDATION 25:23 33:8
    34:21 44:6
FOUR 59:2 71:15 75:11

FOURTEEN 84:13
FRAME 26:7
FRAMING 97:18
FRANK 10:13 17:2
FRASE 10:19 16:12 40:1
    44:3 44:12
FREIGHT 51:4
FRIEND 24:14
FRONT 19:22 34:4 88:1
FROST 46:11
FURNISHED 78:4
FUTURE 54:13 54:14 54:18

- G -
GALLAGHER 60:14
GALVESTON 7:16
GARLOCK 11:15 16:19
GARRARD 7:2
GAVE 60:9 82:15 87:3
GENERAL 9:10 16:22 28:4
    37:19
GENERALLY 22:5
GENERATOR 112:1
GENERATORS 111:15 111:16
    112:5 112:6 112:9 112:10
    112:13 112:17 112:19
    112:22 113:5
GENERICALLY 27:16
GEORGIA 7:5 10:3
GETTING 25:8 70:20 98:10
    99:8 101:15 109:12
GI 24:4
GILCHRIST 7:19
GIVES 52:12
GLAD 95:21
GLEN 14:6
GODWIN 10:18
GOOD 19:8 20:10 51:22
    58:18 58:19 59:9 73:15
    73:16 82:9 85:21 91:7
GOODING 9:6
GORE 43:19 64:3 64:5 64:9
GOVERNMENT 117:20
GRACE 7:12 15:15
GRADE 20:23
GRADY 65:8 65:9 65:15
GRAHAM 11:11 16:17 25:22
    27:4 33:7 34:12 34:20
    41:15 42:19 44:5 44:13
GRANDCHILDREN 21:3 21:7
GRANT 8:3 15:8 15:9 18:6
    19:13 32:13
GREAT 40:21
GREATEST 46:13 46:17
    54:22
GREENWAY 9:15
GRIFF 71:20
GRIND 99:21
GROUND 23:19
GROUND6 2:9
GROUP 4:17 5:19 14:11
    59:6
GROVE 6:16 12:6
GUERRY 9:14 15:2
GUESS 49:10 75:12 76:2
    76:8 83:2 115:18 119:11
GUY 24:19
GYPSUM 38:5 38:10 120:3
    120:4 120:11 120:21

- H -
H 12:7
HALL 79:20
HALLETT 9:2
HAND 78:1 88:6
HAND-HELD 106:13 106:21
    107:2
HANDLED 27:3
HANDLING 27:1 40:9
HANG 64:7 91:18 91:21

92:3
HANGING 24:14 24:17 24:23
    91:14 97:13 98:14 116:1
HANGS 24:20
HAPPEN 45:22
HAPPENED 59:21 116:6
HAPPENING 51:8 68:19
HAPPENS 51:10 51:12
HARBISON-WALKER 11:21
    15:22
HARD 49:12 70:16 77:9
HARDLY 52:15
HARMFUL 56:11 56:13
HARNESHUEGGER 6:5 15:20
HARPER 12:13
HARSH 71:21 74:18 76:11
HARTFORD 8:16 16:5
HARVEY 8:19 15:16
HARWOOD 5:5 8:4 9:3
HATE 54:19
HAWKINS 9:23
HAZARDOUS 84:20
HEAD 34:23 58:16 59:15
    71:11 74:6 74:11 74:20
    77:1 82:5 82:11 83:10
    84:1 84:8 87:1 87:11
    89:17 90:4 90:19 98:7
    100:14 105:18 107:3
    111:18 113:13 114:7
    120:16
HEALTH 82:7 84:21
HEAR 58:5 79:15 97:17
HEARD 56:7 94:10 94:12
    94:14 95:1 95:4 95:8
HEARING 123:14
HEAVY 22:11
HELD 18:12
HELP 31:18 43:21 51:17
    66:7 70:23 88:9 89:5
    89:6
HELPED 43:20 89:8
HELPING 64:7 111:14
HENRY 66:15
HEYBURN 7:9 15:14
HI 95:16
HIGH 78:13 78:15 78:17
    78:21
HIGHWAY 81:3
HIRED 43:21
HOBART 5:20 14:10 59:6
HODGSON 3:6 6:1 15:19
    21:15 95:15 95:20 109:20
HOLD 69:16 69:18
HOME 52:5 79:13 79:16
    110:18
HONORABLE 23:21
HOSES 47:3
HOSPITAL 29:4 30:20 31:2
    50:11 50:14 72:14
HOSPITALIZED 76:3
HOT 44:19 118:22
HOTEL 2:1 13:8
HOUR 115:4
HOUR6 115:4 115:6
HOUSE 52:14 97:18
HOUSTON 4:23 6:2 7:10
    8:10 8:14 8:20 9:15 11:2
HUIE 10:12
HUNG 29:23 31:21 91:16
    116:7

- I -
IDEA 107:10
IDENTIFICATION 3:13 34:6
    34:11 35:12 88:4 89:4
IDENTIFIED 89:3 118:8
II 23:10 26:9
III 10:7 12:8
ILLINOIS 6:16
ILLNESSES 77:17

## CECIL JACKSON   [8-22-96]

GINE 70:14 116:19
ROPER 34:21
  1:10 4:10 5:13 5:19
  18 8:12 9:17 10:5
  :15 11:20 14:17 15:1
  :15 16:19 59:6
  4 96:17 99:22 104:22
  ES 105:4 106:1
  IX 3:1
  A 23:13 23:14
CATING 21:6 21:21
  :3 22:13 22:21 22:23
  :11 23:23 25:12 26:5
  :10 27:7 28:13 28:17
  :21 29:2 29:6 29:11
  :19 30:5 30:9 30:13
  :17 30:21 31:4 31:16
  :1 32:5 37:11 37:17
  7:23 39:19 42:14 44:8
  :5 50:21 51:5 52:3
  :57 54:5 55:7 56:9 58:6
  :2 62:9 62:21 64:16
  7:10 68:23 69:7 73:17
  :5 77:6 77:21 78:2
  :19 83:1 85:3 89:13
  2:22 96:8 96:21 97:19
  08:12 109:15 111:9
  17:9 117:21 119:7
  19:14
USTRIAL 22:11 33:5
  9:19
USTRIES 8:6 8:12 10:22
  1:14 15:9 16:13 16:19
  L 1:7 4:7
  ORMATION 109:13 109:17
  ERSOLL-RAND 11:4 16:11
  7:16
  JRIES 77:20
  IDE 116:23 117:4
  PECTION 8:17
  TALL 103:12
  TALLED 104:2
  TALLING 26:15 102:5
  03:23
  TEAD 58:9
  ULATE 118:22
  ULATING 44:17 44:20
  4:21 45:1 118:12
  ULATION 9:22 15:5 45:2
  3:5 118:14
  ULATOR 42:13 60:5 61:6
  ULATORS 42:3 42:6
  19:11
  URANCE 8:17 12:5 12:18
  5:7 32:3
  EREST 17:14
  ERESTED 123:18
  ERROGATORIES 71:7
  RODUCE 13:22 19:20
  9:23
  RODUCED 58:4
  ERNESS 12:15
  OLVE 27:1
  EVERSIBLE 53:11

  - J -
  :7 6:20
  INTO 5:16
  CKSON 1:18 1:23 11:19
  3:9 13:14 13:19 14:5
  8:18 18:21 18:23 19:19
  0:3 20:6 22:17 33:3
  5:2 35:15 35:23 38:17
  9:11 49:1 56:21 58:3
  5:16 109:21 110:3 118:4
  19:17 119:21 121:19
  22:17
  MES 8:8 25:14 25:18
  7:17 27:23 33:16

JEFFERSON 1:2 4:2 31:19
  123:4
JENKENS 7:19
JENKINS 12:6
JIM 16:16 25:18 25:21
JOB 25:7 28:10 30:22 31:1
  31:2 32:17 33:5 33:23
  39:17 41:2 41:3 41:11
  42:8 43:6 43:9 44:2
  44:15 46:14 61:13 63:3
  63:4 64:10 64:12 65:18
  67:9 68:7 91:11 91:18
  92:1 92:3 94:15 94:20
  94:23 97:9 97:10 99:10
  111:5 112:15
JOBS 26:23 31:14 36:23
  42:16 42:21 43:5 43:17
  53:16 59:22 61:12 63:22
  64:9 64:14 65:4 65:15
  66:4 66:8 66:11 67:1
  67:8 67:18 67:21 68:12
  102:9 120:12 120:20
JOE 79:20
JOHN 5:15 6:18 9:6 14:8
  16:21 17:3 58:3 58:20
JOHNSON 10:23 79:21 80:2
  80:18
JON 8:13 16:4
JR 10:13 11:5 11:10
JUDICIAL 1:3 4:3
JUMPED 110:20
JUNE 49:21 56:8 56:19
JURISDICTIONAL 17:17
JURY 19:20 20:1 20:12
  24:11 24:18 32:7 32:10
  98:19

  - K -
KACAL 8:7
KAISER 12:10
KATHRYN 4:22 14:22
KAYLO 36:5
KEAHEY 3:3 4:17 14:3 14:4
  18:16 18:17 19:1 19:16
  19:18 21:17 21:19 26:1
  27:8 27:21 28:2 33:2
  33:11 33:20 34:15 35:1
  35:6 35:15 35:23 36:9
  36:14 37:7 38:9 38:16
  39:11 40:2 40:12 41:20
  42:2 42:23 44:9 44:14
  45:18 46:19 55:18 56:3
  56:18 57:10 58:20 60:17
  61:2 88:23 89:9 89:14
  89:18 111:22 121:7
  121:17 121:18
KEEP 115:6
KEMPER 6:16
KEN 71:20 78:22
KEPT 85:18
KEVIN 11:11 16:17
KID 110:18
KIMBERLY 29:7
KIN 123:16
KIND 20:13 31:9 45:3
  47:12 51:14 54:10 55:13
  107:16 109:12 115:1
  118:19
KINDS 28:5 113:5 113:22
  115:10
KIRKLAND 11:17
KNEW 43:11 50:19 110:11
  110:16 111:2 120:2
KNIGHT 5:9 12:14 15:6
KNOWING 9:3:12
KNOWLEDGE 54:7 116:11
  117:12 117:15
KNOWN 55:11 55:15 110:12
  118:8
KNOWS 121:22

KOZIOL 6:15
KURTH 8:18

  - L -
L 1:14 5:10 6:1 6:15 9:7
  9:14 10:1 59:16
L.L.P 5:3 5:15 7:14 8:18
  9:14 12:7
LABEL 107:22
LABELING 107:14
LABELS 84:16 85:1 101:6
LACK 25:22 44:5
LAID 50:8
LANCE 8:19 15:16
LANGE 6:6
LANKFORD 10:13 17:2
LARGER 105:7 106:6
LARRY 42:1 43:19 43:20
  60:12 60:15 64:3
LAST 73:10 121:21
LATE 28:20 30:12 31:2
  116:18
LATER 51:9 116:3 116:4
LAURA 10:19 16:12
LAW 6:14 8:8 9:19 11:6
  19:7 102:13 114:5
LAWS 54:2
LAWYER 78:4 87:21 88:1
  89:20 110:10 113:2
LAWYERS 82:15 87:17
LAY 52:6 81:2 86:19
LB 10:20
LEAD 69:14
LEADING 2:7 25:15 25:19
  33:15 33:17 34:13 34:21
  35:21 36:8 36:13 37:6
  38:7 38:13 38:23 39:3
  39:21 42:1 42:18 42:19
  45:12 45:14 46:16 55:16
  56:15
LEAVE 54:19 77:3
LEGS 87:12
LENGTH 52:20
LEO 43:2 61:8 63:16
LEONARD 43:13 63:9 63:12
  63:13 63:18 63:22
LET 19:19 20:11 28:9
  33:21 34:4 35:18 36:20
  54:6 71:17 74:17 87:16
  88:23 99:1 99:7
LEVEL 46:13
LEWIS 14:7
LIBERTY 12:4 32:3
LIFE 21:11 32:3 77:17
  110:13
LIKE 32:8 32:11 33:12
  40:11 43:23 44:1 45:4
  46:8 46:10 51:3 52:23
  67:19 78:13 78:19 83:3
  86:1 86:8 96:18 96:20
  97:7 99:21 100:3 101:16
  103:6 107:12 107:18
  108:10 113:6 118:23
  121:2
LIKED 55:11 55:14
LIMITS 114:16
LINCOLN 5:19 14:9 59:5
LINE 20:18
LINES 24:21
LIST 3:13 28:9 34:6 34:11
  59:10 68:14 71:16 78:5
  88:5 88:9 88:14 88:19
  89:3 89:4 89:15 89:21
  90:3 90:9 111:13
LISTED 111:13
LITIGATION 4:16
LITTLE 20:12 40:21 49:2
  55:1 58:4 84:15 90:9
  91:23 110:11 112:13
  112:18

LITTLETON 64:20 64:21
  64:23 65:4
LIVE 20:2
LIVING 110:18
LOCAL 22:2 92:6 92:10
  92:17 92:20 93:9 93:12
  93:18 93:23
LOCALS 92:13
LOCATION 27:4
LOCK 25:2
LOCKS 25:4 25:5
LONG 6:16 56:17 73:13
  78:23 79:3 80:1 83:16
  87:7 116:15
LONG-TIME 83:8
LOOK 19:21 46:8 90:5
LOOKED 45:4 85:21 107:12
  107:18
LOOKING 87:2 87:11 87:14
LOOP 6:1
LOOSE 73:23
LORD 116:15
LOUD 58:9 111:20 114:9
LOUIS 10:9
LOVED 54:20
LOW 104:3
LOWER 104:5
LUNG 53:11 85:21
LUNGS 85:16

  - M -
M 6:14 8:19
MACHINES 46:23
MACK 10:7 17:4 17:9
MADE 2:5 57:1 97:5 97:6
  100:9 112:21 117:3
MAIN 10:20 68:16 92:3
MAINLY 22:18
MAJOR 28:10 33:4
MAJORITY 102:3 107:1
MAKE 2:8 17:8 77:7 88:9
  89:6 89:8 96:6 112:10
  122:4
MAKING 88:6 90:3
MAN 42:10 43:1 61:11
  62:20 63:20
MANDATORY 54:4
MANUFACTURED 118:14 119:9
MANUFACTURER 99:15 100:4
  100:12 104:9
MANUFACTURERS 57:13 88:19
  90:12
MANUFACTURERS' 34:3 90:18
MANY 21:2 21:7 83:20
  104:12 115:6 120:12
MARKED 35:11 88:2
MARKEL 9:13
MARKINGS 107:14
MARRIED 21:1
MARSH 5:23
MARSHALL 8:14
MARTIN 1:7 4:7 9:12 12:6
MASK 32:18 40:8 40:9
  40:13 40:19 53:22 53:23
  55:19 56:5 106:14
MATERIAL 28:8 100:19
  103:8 103:10 118:17
MATERIALS 98:1
MATTINGLY 5:23
MAULDING 65:9 65:10 65:16
MAXUS 5:4 8:3
MAY 1:18 2:8 17:18 70:8
  90:22 99:10 104:10
  109:17
MCCAFFERTY 10:7 17:4 17:5
  17:9
MCDONOUGH 11:10
MCRAE 71:21 74:18 74:21
  75:19 75:21 76:8 85:14
  86:8

MEAN 70:8
MEANING 58:13
MEANS 115:5 123:10
MECHANIC 7:16
MECHANICAL 102:11
MEDICAL 78:8
MEDICATION 51:15 52:2
 73:7 78:17
MEET 95:22 117:18
MEHAFFY 7:8
MELLIE 4:22
MEMBER 21:20
MEMBERS 18:19
MEMORIAL 72:16 72:17
MEMORY 34:16 76:19
MEN 47:6
MENTIONED 61:7 75:22
 76:10 77:14 92:5 92:23
 96:9 114:4 119:23
MESH 107:18
MESOTHELIOMA 49:9 49:20
 50:18 54:8 56:4 56:8
 57:3 76:7
MESS 97:14
METAL 96:19 100:6 102:1
 102:21 102:22 103:2
 117:2
MICHAEL 9:3 15:10
MID-1970'S 29:10 29:14
MID-SIXTIES 29:10
MIGHT 67:16 79:6 86:10
MIKE 18:23 19:1
MILL 29:8 29:9 30:11 48:8
MILLS 7:13 12:13 29:21
 71:23 72:4 73:11
MINUTES 110:8
MISCHARACTERIZING 39:3
MISSISSIPPI 11:19
MISSTATES 39:22 45:14
MIXTURE 118:16
MOBIL 12:11
MOBILE 10:8 11:12
MODEL 107:7
MONEY 57:1
MONTEVALLO 28:19 29:1
 65:6
MONTGOMERY 31:14
MONTHS 20:22 52:18
MORE 22:5 76:22 77:7
 87:22
MORGAN 14:6
MORNING 18:20 118:7
MORRIS 25:4
MOST 22:10 33:12 42:15
 101:3 102:9
MOSTLY 31:12 79:20
MOTHER 20:16
MOTOR 111:23
MOTORS 111:15 111:16
 112:4 113:4
MOVE 77:8
MOVED 69:14
MRI 86:19 87:4
MS 4:22 5:10 6:15 8:2
 10:19 14:22 15:8 16:12
 16:14 18:6 19:13 32:13
 37:5 40:1 44:3 44:12
MUCH 52:10 97:9 101:1
 103:22 109:22 113:17
MUTUAL 12:4

- N -

N 1:14
NAME 14:8 36:4 36:10
 36:15 36:17 36:22 37:3
 37:10 37:12 37:15 37:18
 37:21 38:1 38:4 38:5
 38:10 38:11 39:5 39:7
 39:14 42:11 48:6 49:12
 58:3 63:9 63:11 64:3

66:15 80:12 80:20 94:20
95:19 99:9 99:14 99:19
110:4 110:11 110:13
110:16 111:2 118:4
118:10 119:2 119:13
119:21 120:2 120:10
120:15 120:20
NAMED 43:2 90:13 120:1
NAMES 27:13 33:22 34:3
 34:16 39:13 59:4 59:12
 60:9 67:14 67:16 70:4
 72:21 90:8 90:11 90:18
NARCO 9:5
NATIONAL 9:7 32:3 38:10
 38:15
NATIONSBANK 10:19
NATURE 35:22
NE 10:2
NECESSARY 2:4
NEED 17:7 35:2 35:4 74:17
 96:1
NELSON 5:14
NEUROLOGIST 73:21
NEUROSURGEON 73:20 74:1
NEVER 43:11 51:7 87:21
 110:23 111:15 112:3
 116:9
NEWSPRINT 46:18 61:16
 61:19 68:15
NEXT 63:8 64:3 64:19
 65:19 67:20
NICE 55:22
NIGHT 51:21
NINA 18:20
NODS 34:22 58:16 59:15
 71:11 77:1 82:5 82:11
 84:1 84:8 87:1 89:16
 105:18 107:3 114:7
NON-RESPONSIVE 32:22
 68:11
NORTH 5:6 5:9 6:22 7:4
 9:3 10:15 11:7 15:11
 29:13
NORTON 7:18 16:3
NOTHING 51:13 52:19 52:21
 118:18
NOTICE 2:14
NOTICED 82:7 82:23
NUMBER 1:5 3:2 4:5 35:8
 36:3 62:3 88:3 93:12
 93:19 93:21
NUMBERS 107:7

- O -

O 1:14
OBJECT 17:21 27:4 27:23
 32:13 33:7 34:12 34:20
 36:7 36:12 37:5 39:2
 41:15 42:17 46:15 57:6
 68:11 89:1
OBJECTED 25:17
OBJECTION 19:8 25:14
 25:19 32:21 33:14 33:16
 35:19 38:6 38:12 38:22
 39:20 40:5 41:23 44:3
 44:12 44:13 45:11 45:13
 45:16 55:22 56:14
OBJECTIONS 2:5 2:9 17:17
 17:20 19:14
OCCASION 105:16
OCCASIONAL 83:7
OCCURRED 82:10
OCCURRENCE 47:22
ODD 91:23
OFF 18:6 18:9 18:12 24:8
 24:12 24:13 51:3 57:17
 62:2 67:3 72:12 78:19
 102:1 115:19 121:10
 122:7
OFFERED 2:11

OFFICE 6:14 28:15 28:23
 29:18 30:1 30:7 70:22
 81:12
OFFICES 81:9
OFTEN 42:5 43:8 51:6
OGLEBAY 7:18 16:3
OIL 12:11
OKONITE 12:12
OLD 20:5
ON-THE-JOB 77:20
ONE 7:9 10:7 14:4 19:7
 19:8 36:18 54:20 62:18
 63:15 64:20 65:6 65:19
 67:7 68:16 76:13 77:22
 78:3 83:22 83:23 85:10
 86:9 87:19 87:20 87:22
 89:11 90:13 94:22 95:9
 101:17 104:21 105:8
 105:20 115:4 117:7
 119:23
ONES 66:12
ONGOING 78:13
ONLY 17:13 42:7 47:18
 65:6 99:22 100:12 101:23
 102:18 104:19 106:20
 117:2 119:12
OPEN 46:22
OPERATION 48:19
OPINION 33:3
OPPOSED 104:1
OPTICAL 12:3
ORAL 73:10
ORDINANCE 41:9 115:14
 115:16
ORLEANS 11:23
OTHER 27:3 30:8 41:10
 43:23 54:21 62:16 68:17
 70:17 72:6 72:21 73:11
 77:16 77:23 83:6 86:7
 87:17 87:19 87:20 90:18
 90:22 92:13 97:23 99:2
 99:3 99:9 99:11 100:2
 100:4 104:1 105:7 105:10
 105:11 105:12 106:5
 106:8 107:12 109:17
 113:23 115:19
OVER 23:16 26:3 46:4 49:2
 51:3 57:11 61:23 77:11
 79:15 80:8 81:5 81:8
 96:4
OVER-BROAD 32:14 39:21
 41:16
OWENS-CORNING 11:9 14:21

- P -

P 1:14
P.A. 12:14
P.C. 4:17 5:9 6:20 7:3
 7:8 7:19 8:8 10:18 11:11
P.L.C 4:21
P.M. 121:10 121:16 122:7
P.O. 11:11
PACIFIC 5:10
PACK 83:23
PACKETS 84:16
PACKING 11:15 16:20 103:6
PACKS 83:20
PAGE 3:2
PAIN 50:21 51:16
PAINTING 65:2
PAPER 29:8 46:22 48:8
PAPPAS 8:7
PARALYZED 77:4
PARDON 79:2 85:7 117:14
PARK 11:6 11:7
PARKWAY 8:9 12:15
PARNELL 9:23
PART 50:9
PARTICULAR 61:13 94:19
 94:23

PARTIES 1:16 2:8 123:17
PAST 71:8
PAT 4:17 14:4 18:16 27:17
 121:18 -
PATRICK 71:23 72:3
PAUL 7:9 11:5 14:20 15:14
PEACHTREE 10:2
PEOPLE 27:3 29:8
PERCENT 104:5 104:7
PERCENTAGE 91:13 103:21
 104:4
PERFORM 26:23
PERIOD 121:1
PERSONAL 49:3
PERSONALLY 26:23
PHONETIC 25:4
PHYSICAL 81:19 81:21
 81:22 86:1 86:3
PHYSICALLY 77:3
PILLS 51:16
PINPOINT 62:18
PIPE 30:15 45:5 118:22
 118:23
PIPES 44:18 44:19
PIPKIN 5:14
PITTMAN 6:21 14:15 14:16
PITTSBURGH 7:6 16:1 91:8
 94:11 94:17 94:21
PLACE 11:6 11:7 68:17
 69:23
PLACES 41:8 115:11
PLAINTIFF 14:5 18:18
PLAINTIFF'S 3:12 19:11
 35:7 35:10 36:2
PLAINTIFFS 1:8 4:8 4:20
PLAINTIFFS' 18:1
PLANS 53:5
PLANT 30:11 68:5
PLAZA 9:15 10:2 10:20
 11:18
PLEASE 39:6 111:20 121:8
PLUMBERS 41:19
PNEUMO 12:12
POINT 30:18 38:20
POLICY 17:1 54:4
POROUS 96:18
PORTABLE 112:17 112:19
 112:22
PORTER 43:2 43:14 61:8
 62:19 63:1 63:10 63:13
 63:16 63:19 63:22
PORTERFIELD 12:13
POWER 112:15
PPG 8:12 16:16
PRACTICE 80:9 80:14 81:5
PRESENT 12:20
PRESS 110:7
PRESSURE 78:14 78:16
 78:18 78:21
PRETTY 70:16
PREVIOUSLY 89:2
PRIMARILY 42:2
PRIMARY 91:17
PRIOR 2:12 34:7 39:4
 39:23 45:14 49:23 56:11
PROBLEM 74:22 82:22 83:8
 85:16
PROBLEMS 49:23 78:13 82:7
 86:14
PROCEDURE 13:5 19:6
PROCEEDING 17:19 17:23
PROCEEDINGS 13:11
PROCESS 17:19 17:20
PRODUCES 57:9
PRODUCT 3:13 34:5 34:10
 37:9 88:4 89:4 95:2 95:5
 95:8 119:9 119:12 120:3
 120:6
PRODUCTS 26:14 33:23
 34:17 34:18 35:17 36:2

## CECIL JACKSON   [8-22-96]

16:23
REFRESH 34:16
REGULAR 47:22 86:4 100:17
  102:7 102:8 102:10
  102:16 103:13
REICHHOLD 6:11 14:18
REINFORCING 69:19
REINSTRA 11:22
REMEMBER 26:14 27:11
  27:13 28:4 29:17 31:10
  33:21 34:2 36:4 36:10
  36:15 37:2 37:8 37:12
  37:15 37:18 37:21 38:1
  41:13 48:6 50:9 59:13
  59:17 60:4 61:12 62:7
  62:15 62:22 63:2 63:3
  63:5 63:6 63:21 64:1
  64:8 64:11 64:14 64:21
  65:3 65:7 65:9 65:14
  65:17 65:22 66:3 66:9
  66:11 66:17 66:20 66:23
  67:13 67:16 68:12 68:18
  69:23 70:20 71:2 74:14
  76:17 78:8 81:7 83:7
  84:14 84:17 87:5 87:6
  87:7 87:10 87:13 88:8
  89:10 90:10 90:17 94:22
  96:12 104:13 111:14
  116:5 120:20
REMEMBERING 76:23
RENNEKER 4:21
REPHRASE 19:6
REPORTER 13:2 25:13 25:16
  25:20 39:5 39:10
REPRESENT 14:9 39:8 58:23
  59:1 96:7
REPRESENTS 123:12
REQUIRED 42:8 114:5
  115:10
REQUIRING 115:16
RESERVING 19:13
RESIST 115:6
RESPECTIVE 1:17
RESPONSIVENESS 19:15
REST 58:21
RESULT 73:7 123:18
RETIRE 53:2
RETIRED 53:2 79:5 80:3
  80:6 81:15 91:16
RETIREMENT 53:5
REYNARD 11:23
RICHARD 11:1 16:10
RICHARDSON 3:8 12:7 118:3
  118:5 119:15
RIGHT 14:3 19:22 20:5
  20:8 20:17 22:1 22:9
  23:4 23:9 23:20 24:1
  24:6 24:10 24:16 25:6
  26:22 28:14 29:12 29:17
  30:6 40:16 41:10 41:20
  42:23 43:4 43:18 43:22
  44:22 45:8 46:2 46:12
  46:19 47:2 47:15 47:20
  48:4 48:9 49:11 49:18
  49:19 51:17 52:8 52:11
  55:10 55:18 58:5 59:7
  59:8 62:11 63:7 66:13
  66:14 67:3 68:1 68:6
  72:4 73:18 81:10 84:22
  85:16 85:17 87:6 91:18
  91:19 92:3 92:4 92:18
  92:19 94:5 95:11 96:1
  98:1 98:2 98:17 99:16
  100:1 102:23 104:23
  105:1 106:23 110:19
  111:3 111:11 112:1 112:2
  112:12 112:19 114:2
  114:6 115:8 117:20
  120:17 120:18 121:17
RIGHTS 24:5

RILEY 5:7 16:7
RIVER 29:9 46:18 47:22
  61:15 61:19 62:2 62:13
  68:15 68:18 69:21
ROAD 9:19
ROADS 53:3
ROBERT 7:20 39:8 59:16
  110:6
ROBERTS 9:13
ROBINSON 6:6
ROCK 99:21
ROD 69:19
RODS 48:16 70:4 70:10
  90:11 90:12
ROOM 101:16 101:17 101:18
  101:20 102:11
ROSS 7:20
ROUTINE 39:16
RPM 109:9 109:10
RUDE 58:13
RULES 13:4 19:6
RUN 28:9 42:21 46:23
  112:6 112:8 112:14 116:9
RUNNING 53:3
RUST 61:23

- S -

S 1:14
S-E-P-C-O 36:21
SADLER 6:19
SAITH 122:12
SAKE 19:8
SAME 35:12 40:5 43:6 43:9
  44:12 44:13 55:22 59:21
  59:23 80:15 80:17 81:8
  94:6
SAN 5:16
SAW 26:19 26:20 26:21
  33:23 40:4 44:16 44:23
  45:9 45:21 73:11 80:5
  84:23 94:20 96:11 96:22
  100:17 104:9 104:16
  104:18 105:9 105:12
  105:13 105:15 105:17
  105:23 106:13 106:18
  106:21 107:2 114:1
SCAN 86:18 87:3 87:6
SCAR 74:8
SCHOOL 20:21
SCHOOLS 22:15
SCHWAB 7:15 16:2 33:14
SECOND 18:7 20:19
SECURITY 22:16
SEE 43:22 44:10 45:9
  46:12 47:2 47:6 48:9
  48:13 48:15 53:14 56:3
  59:13 67:6 73:18 74:7
  88:5 99:9 107:17 109:2
  117:7
SEEING 78:14 78:21 78:23
  79:3 79:7 80:1 86:7
  94:16 101:6 119:2
SEEM 78:18
SEEN 36:23 53:18 120:12
SELLING 57:1
SEND 86:22
SENT 71:3
SEPCO 10:17 17:3 36:17
  36:21 36:22
SEPTEMBER 23:8
SERIES 87:20
SERIOUS 77:17
SERVE 23:9 23:12
SERVED 16:9
SERVICE 17:19 22:22 23:1
  26:8
SEVENTH 4:18
SEVENTIES 79:8
SEVENTY-FIVE 20:7
SEVERAL 43:5 100:16

SHAKES 83:10 90:4 90:19
  98:7 100:14 111:18
  113:13 120:16
SHAPE 82:9
SHARP 6:19
SHAW 11:5 14:20 36:7
  45:13 55:16 55:22 56:14
SHELBY 29:4 72:16 72:17
SHELLY 5:10 16:14
SHIFT 49:2
SHIRLEY 7:13
SHORT 57:14 121:8
SHORTNESS 82:16 82:18
  83:8
SHOULDER 77:5 77:8
SHOW 22:17
SHROYER 71:22 74:19 76:15
  76:16 86:8
SIDE 68:6
SIDE-BY-SIDE 68:1
SIMPSON 6:6
SINCE 50:11 50:19 55:17
  76:23 113:18
SISTERS 20:15
SIT 100:11 103:20 120:8
SITE 46:18 61:14 63:23
  64:10 94:20
SITES 22:12 25:7 27:10
  28:10 32:12 34:1 38:20
  39:17 41:12 44:2 44:15
  46:14 60:7 62:17 62:23
  63:2 68:21 94:15 97:11
  99:10
SITTING 79:15 89:11 90:2
SIX 52:18
SIXTEENTHS 106:4
SIXTIES 29:14 121:2
SIZE 105:22 107:13
SKILL 26:19 26:21 45:20
  96:11 96:22 104:9 104:15
  104:17 105:9 105:12
  106:13 106:21 114:1
SLEEP 51:21 51:22
SLEEPING 51:20 52:2
SMALL 106:5 112:13
SMITH 3:5 7:4 8:8 15:23
  16:16 25:14 25:18 27:17
  27:23 33:16 35:18 42:17
  46:15 65:20 66:4 91:2
  91:8 95:10
SMOKE 48:13 48:15 83:13
  83:16 83:21 85:2
SMOKING 83:19 84:5 84:7
  84:9 84:12 84:20 85:6
  85:9 85:11 85:18
SNOW 97:8
SOCIAL 22:16
SOLID 9:17
SOMERVILLE 6:7
SON 18:22
SORRY 25:13 60:16 79:14
  94:5 111:19 114:8
SOUTH 4:18 6:2
SOUTHTRUST 6:21
SPEAKING 89:22 99:6
SPECIAL 5:22 8:23 9:11
  10:11 14:13 15:18 17:1
  17:6 17:12 59:3
SPECIFIC 27:19 62:22
  63:21 63:23 64:8 64:12
  64:14 65:3 65:14 65:17
  66:3 66:23 67:18 67:21
  88:17 88:18 114:23 120:9
  120:14 120:19 120:23
SPECIFICATIONS 117:18
  117:20
SPECIFY 114:21
SPECULATION 4:14 55:17
SPECULATIVE 40:1
SPELL 36:20

- Q -

ARTER 96:17 99:22
04:22
ESTION 32:14 37:6 87:20
7:23 89:2 99:8 113:2
ESTIONS 2:6 2:7 35:20
9:3 70:21 71:1 71:4
1:6 82:15 87:17 87:21
0:23 91:10 118:6 119:16
23:9
IT 81:18 81:20

- R -

:9
ISE 77:9
PID-AMERICAN 8:22 15:17
AD 59:12 71:17 74:17
ADY 25:8 53:1
AL 69:6 96:6
ALLY 53:1 79:11 87:5
ASON 81:19 81:21 81:22
AUD 14:7
CALL 28:22 30:2 30:6
0:10 30:14 31:13 36:18
6:22 37:9 38:5 38:11
4:14 40:3 41:21 43:1
7:5 62:14 70:19 72:5
2:20 73:21 88:12 90:2
0:7 93:2 93:12 94:16
4:18 94:19 95:3 95:9
9:12 100:13 100:22
01:6 101:11 104:8 106:7
07:23 108:1 108:14
08:15 108:19 109:1
09:4 109:16 113:15
16:13 118:11 118:18
19:2 119:4 120:9 120:13
20:14 120:19 120:23
CEIVE 23:20 72:9 73:2
CEIVING 78:9
CENTLY 82:23
CESS 57:19 121:12
COLLECTION 61:18
CORD 13:23 14:2 17:8
8:7 18:9 18:12 18:15
57:17 57:23 58:8 121:10
21:16 122:7
CORDS 22:17
STONE 29:13
ESE 10:6
FERRED 75:3 98:5 108:10
FERRING 109:6
FRACTORIES 9:10 15:11

FOSHEE & TURNER TRAVEL TRANSCRIPT PROGRAM

SPEND 91:14
SPENT 97:11 102:4 103:23
SPOKEN 37:8
SPREAD 115:21
SPREADING 115:7
SS 1:23
ST 10:7 31:1
STANDARD 9:17 15:3
START 51:2 61:22 84:9
STARTED 17:7 24:4 24:12
    24:13 84:12 84:15 91:15
STATE 26:3 92:15 92:16
    114:12 123:3
STATEMENT 17:8
STAYED 61:21
STEAM 8:16 16:5 41:17
    41:18
STENCILED 109:13
STENCILING 108:7
STENOTYPE 123:8
STEPHEN 3:5 6:1 7:3 15:23
    35:18 42:17 46:15 91:2
    91:8 95:10
STERLING 1:20 13:7
STEVE 15:19 95:19 95:21
STEWART 10:12
STICKER 108:5
STICKER-TYPE 108:10
STILL 25:16 32:18 40:18
    77:12 77:13 80:14 84:7
    100:18 110:17
STIPULATED 1:15 2:3 2:13
STIPULATION 13:6
STIPULATIONS 19:4
STIR 47:16
STOKER 5:7 16:7
STOMACH 50:23
STOP 81:23 84:4 115:20
STOPPED 84:6 117:8
STRAINER 40:15
STREET 5:5 6:9 6:22 8:4
    10:2 10:15 10:20 80:23
    81:13
STRICKLAND 66:15 66:18
    67:1
STROKE 50:3 50:7 50:14
    75:4 75:23 76:1 76:4
    76:19 77:2 77:4 77:16
STRONG 5:14
STUFF 97:7 118:19
SUBJECT 5:21 8:22 9:10
    10:10 14:13 15:17 16:23
    17:6 122:2
SUBSTANTIVE 19:7
SUCCEED 109:9
SUFFER 50:3 75:9 82:16
SUFFERING 82:18
SUITE 5:11 6:2 7:10 7:21
    9:3 9:15 9:19 11:1 12:1
    12:8 12:15
SUITES 2:1 13:7
SULLIVAN 6:19
SUNTRUST 10:1
SUPPLIED 100:3
SUPPLY 101:17 101:18
    101:20
SUPPOSED 40:8
SURE 55:4 60:10 93:20
    101:12 117:17
SURGERY 72:10 74:10 74:16
    74:20 74:23
SWITCH 51:4
SWORN 13:15 13:21 23:7

- T -

T 1:14 7:14
TABLE 105:13 105:15
    105:17 105:23 106:13
    106:18
TAG 108:4 108:9 108:11

108:14 108:16 109:14
TAGS 109:6
TAKE 19:3 57:14 80:8
    91:17 96:1 111:5 121:7
TAKEN 1:19 13:19 57:20
    121:13 123:8
TALK 56:22
TALKED 53:22 55:6 114:4
TALKING 27:18 27:21 96:15
    97:20 97:21 97:23 98:11
    112:18
TASSEL 6:20
TAYLOR 7:14 16:2
TED 15:2
TELEVISION 52:7
TELL 20:1 24:11 24:18
    24:19 39:14 53:8 53:20
    55:20 58:23 60:6 67:17
    70:3 70:7 70:9 71:18
    98:3 98:19 118:13 119:1
TELLING 114:12
TEN 104:5 104:6 106:1
TEN-INCH 106:7
TERM 37:17
TESTIFIED 13:16
TESTIFY 25:9
TESTIMONY 39:4 39:23
    45:15 93:1 96:12 123:13
TEXARKANA 9:7 9:8
TEXAS 1:2 4:2 5:1 5:6
    5:11 5:17 6:2 7:10 7:16
    7:21 8:4 8:10 8:14 8:19
    8:20 9:4 9:8 9:16 9:20
    10:21 11:2 12:1 12:9
    13:4 19:6
THACKSTON 3:7 7:20 39:7
    39:8 110:2 110:6 112:2
    112:3 117:22
THEODORE 9:14
THERMO 6:2 14:23 37:3
THERMOBESTOS 95:2
THICK 96:17 99:23 104:22
THICKNESS 106:3
THIN 96:16
THING 69:15
THINGS 52:17 52:22 53:6
    78:3 86:10 111:13
THINK 50:8 50:12 50:15
    76:9 79:6 89:1 89:5 89:9
    97:17 118:5
THINKING 55:1
THIRTY-FIVE 83:18
THOMPSON 5:9
THREE 18:19 62:4 62:6
    66:7 66:10 71:15 75:11
THROAT 40:17
THROUGH 11:6 61:22 90:5
THROUGHOUT 27:9
TIDWELL 9:7 16:21
TIL 91:16
TIM 15:6
TIME 2:10 14:1 18:8 18:14
    19:14 25:6 26:7 30:8
    30:18 38:20 50:1 52:20
    57:16 57:22 69:3 73:10
    77:22 81:18 82:6 83:2
    87:16 90:21 91:13 97:16
    113:10 116:13 121:1
    121:9 121:15 122:6
TIMES 114:5
TIMOTHY 12:14
TIP 100:7
TIRED 53:2
TODAY 14:13 17:11 20:9
    51:8 57:4 59:3 84:7 93:2
    98:19 100:12 103:16
    103:20 120:8 121:23
TOGETHER 42:21 63:23
    64:10 66:5

TOLD 49:8 53:13 53:23
    85:5 85:8 85:10 85:19
    90:9
TOOK 81:5 81:8 121:21
TOOL 101:16 105:11
TOUCHED 41:1
TOWER 5:5 6:21 8:9 8:20
    11:6
TRACEY 12:7 118:4
TRADE 21:11 61:5 61:10
    63:18 64:5 64:23 65:12
    66:1 66:20 67:6
TRAIN 51:4
TRANSCRIBED 123:10
TRANSCRIPT 123:13
TRANSCRIPTION 123:11
TRANSFERRED 61:23
TRAVEL 123:11
TRAVELER'S 12:18
TRAVELERS 15:7
TREAT 72:1
TREATED 72:6 72:22 73:20
    74:16 75:23
TREATING 76:7 76:11
TREATMENT 78:5 78:6 78:9
TRIAL 2:10 17:22 19:14
TRUE 123:12
TRY 96:5 122:4
TUBE 86:20
TURN 51:4 57:11
TUSCALOOSA 28:12
TWELVE 84:13
TWENTIETH 6:9 10:15
TWENTY-FIVE 78:10
TWO 20:15 21:4 21:5 51:9
    66:7 66:10 67:7
TYPE 26:12 47:13 68:7
    69:15 73:6 78:8 78:12
    89:6 99:2 99:5 100:3
    107:22 109:17 118:14
    118:17
TYPED 58:11 69:5
TYPES 27:10 27:15 27:16
    28:5 97:23 104:1 112:9

- U -

U 1:14
U.S. 30:15 38:4 120:2
    120:4 120:10 120:20
UH-UH 52:3 53:7 56:9
    58:10 60:2 64:16 68:23
    69:4 76:5 78:2 83:1
    96:21 106:19 111:9 117:9
UNDER 23:18 113:17
UNDERSTAND 22:10 68:10
    70:18 99:13 99:20
UNDERSTANDS 89:1
UNI 95:6
UNIBESTOS 95:5 95:7
UNION 6:12 14:18 21:20
    21:22 92:7 93:7 93:17
    94:1 94:6
UNIVERSITY 28:11 28:19
    29:1 30:3 31:6
UNLESS 46:5 52:15
UNTIL 19:14 29:10 56:8
    82:6 82:9
UP 29:13 29:15 29:18
    29:23 43:12 47:7 47:10
    57:8 58:11 69:5 71:14
    72:11 75:14 77:8 82:6
    85:6 85:9 88:9 89:6
    89:14 89:20 90:3 91:16
    91:22 115:3
USE 17:22 35:19 47:3
    67:15 97:1 99:2 100:2
    100:23 102:14 102:18
    105:6 105:15 106:17
    106:20 112:17 114:6
    114:12 115:10 115:16

USED 27:11 39:16 52:18
    70:5 79:20 81:9 96:10
    99:10 101:3 104:10
    104:20 105:5 105:10
    107:9 118:20 119:9
USING 44:1 44:10 47:11
    96:15 97:18 97:22 97:23
    98:21 104:10 106:7
    106:11 107:2 114:19
USUAL 19:4
USX 6:12 14:18

- V -

VA 30:19
VACUUM-CLEANERS 47:12
VAGUE 32:14 38:23 39:21
    41:15
VAN 6:20
VARIOUS 22:11 25:7 28:15
    38:19 41:17 97:10
VAST 102:3
VEIN 75:1
VIC 9:18 15:4
VIDEOGRAPHER 12:21 13:18
    18:8 18:14 57:16 57:22
    121:9 121:15 122:6
    122:10
VINCENT'S 31:1
VS 1:9 4:9

- W -

W 5:15 9:19 12:14
W.R. 7:12 15:15
WAIVED 2:16
WAIVING 5:22 8:23 9:11
    10:11 15:18 17:16
WALKER 4:23
WALKING 52:12
WANT 20:11 34:9 35:6
    35:16 36:1 53:5 59:12
    91:9
WAR 23:10 26:9
WARD 4:22 14:22 37:5
WARNING 53:15 56:4 84:15
    85:1 109:7
WARNINGS 56:1 109:3
WASHINGTON 7:15
WATCH 52:6
WATER 113:17 118:17
WAUGH 8:10
WAY 32:16 60:4 76:20 89:8
    118:11
WAYNE 14:6
WEAKER 77:4
WEAR 40:8 53:23 106:14
WEARING 53:22 55:19
WEBER 7:8
WELDER 69:9
WELDERS 48:2 67:14 67:20
    67:22 70:13
WELDING 48:5 48:8 48:10
    48:18 68:22 69:12 90:11
    90:12 90:18
WELL 19:11 22:7 23:7
    24:10 24:13 24:16 25:2
    26:18 28:7 31:15 32:15
    40:6 40:20 41:6 42:7
    43:10 44:17 45:3 46:4
    46:10 46:21 47:11 47:17
    49:7 50:8 50:20 51:10
    52:19 53:4 53:21 54:19
    55:1 55:23 57:14 58:11
    61:20 62:4 69:6 70:20
    73:13 73:23 79:5 79:20
    80:3 85:10 88:23 91:15
    92:14 96:10 97:13 97:15
    99:7 100:22 101:11
    101:23 104:3 107:16
    109:8 112:6 113:19
    114:14 115:18 116:9

## CECIL JACKSON   [8-22-96]

8:16 122:2
LFORD 8:3 15:8
T 6:1
TINGHOUSE 7:23 37:13
:9 110:12 110:13
0:17 110:22 111:1
1:2 111:7 113:9
YERS 3:9 5:4 16:6 38:6
:12 39:22 41:23 45:11
9:20 119:22 121:4
EL 101:21 102:15 108:3
8:5 108:7 108:22
9:14
ELS 107:12 107:15
7:23 109:3
TE 46:10 97:7
E 18:20 53:6 121:20
COX 37:22
L 13:22 51:2 115:6
LIAM 6:14 65:20
LIE 64:20 64:21
ES 69:14
HOUT 5:22 8:23 9:11
:10 15:18
NESS 13:21 27:6 32:15
2:23 33:9 33:18 34:14
4:22 38:8 38:14 40:6
1:17 42:20 44:7 45:17
6:17 55:23 56:16 57:8
9:16 59:15 60:19 71:11
7:1 82:5 82:11 83:10
4:1 84:8 87:1 89:12
9:16 90:4 90:19 95:13
9:7 100:14 105:18 107:3
09:23 111:18 113:13
14:7 118:1 119:18
20:16 121:6 123:14
OD 97:11 97:12 97:18
7:22 102:1 102:8
ODEN 103:13 103:16
ODWAY 11:1
ODWORK 97:14
OL 103:5 103:6 103:8
RD 56:4
RK 21:10 22:10 24:9
4:11 24:21 24:22 26:3
6:12 27:9 28:11 28:14
8:18 29:3 29:7 29:12
9:20 30:19 30:23 31:5
1:17 32:2 32:11 33:4
8:17 42:5 42:15 43:4
3:14 43:19 59:19 60:6
2:17 62:23 67:8 88:21
2:9 92:12 97:21 102:4
03:12 103:22 107:2
11:16 112:4 113:23
17:13 117:16
RKDAY 46:8 47:7
RKED 22:18 27:19 28:6
9:15 33:9 41:11 42:20
3:17 44:2 53:16 60:7
1:14 61:18 62:23 63:23
4:10 64:15 65:4 65:15
6:4 67:2 67:18 67:21
2:17 93:3 93:14 93:15
11:7 111:23
RKERS 41:22 44:1
RKING 24:17 25:7 28:22
9:18 30:2 30:7 30:10
0:14 31:11 31:13 40:10
1:14 41:21 43:1 46:9
2:16 67:19 68:1 68:4
1:18 82:1 91:12 97:11
7:12 113:9
RKSITES 32:7
RLD 23:10 26:9
RRIED 54:17
RRY 54:23 55:3
AP 45:5
AP-UP 122:5

WRAPPING 45:4
WRITING 108:2 108:17
WRITTEN 63:9 70:21 71:1
   71:4 71:6 73:19 82:14
WROTE 60:10 60:11

- X -
X-RAY 86:11 86:14
X-RAYS 85:20 85:22 86:6

- Y -
YARD 51:4
YEAR 62:4 71:15 83:18
   116:16
YEARS 22:19 62:3 62:6
   75:12 78:10 84:10 84:11

- Z -
ZEPCO 36:19 36:21
ZURN 8:6 15:9

**EXHIBIT E**

1

1                        NO. B-150,896

2

    INEZ MARTIN, ET AL           )   IN THE DISTRICT COURT OF
3                                 )
              Plaintiffs,         )
4                                 )
    VS.                           )   JEFFERSON COUNTY, TEXAS
5                                 )
    ACandS, INC., ET AL           )
6                                 )
              Defendants.         )   60TH JUDICIAL DISTRICT
7

8

9        *********************************************

10            ORAL AND VIDEOTAPED DEPOSITION OF

11                    S. B. PINKERTON

12                    April 16, 2004

13                    Volume 1 of 1

14       *********************************************

15

         ORAL AND VIDEOTAPED DEPOSITION of S. B. PINKERTON,
16  produced as a witness at the instance of the Plaintiffs, and

17  duly sworn, was taken in the above-styled and numbered cause

18  on April 16, 2004, from 9:10 a.m. to 11:32 a.m., before Starla

19  Foust, CSR, in and for the State of Texas, reported by machine

20  shorthand at the offices of Adams & Coffey, 550 Fannin, Suite

21  800, Beaumont, Texas, pursuant to the Texas Rules of Civil

22  Procedure and the provisions stated on the record or attached

23  hereto.

24

25

2

```
 1                    A P P E A R A N C E S

 2
     FOR THE PLAINTIFFS:
 3        MR. GLEN MORGAN
          MR. DAVID FERRELL
 4        MR. CHRIS PORTNER
          Reaud, Morgan & Quinn
 5        801 Laurel Street
          Beaumont, Texas 77701
 6
     FOR THE DEFENDANT:  Kimberly-Clark Corporation
 7        MR. KENT ADAMS
          Adams & Coffey
 8        550 Fannin, Suite 800
          Beaumont, Texas 77701
 9
     FOR THE DEFENDANT:  Kimberly-Clark Corporation
10        MR. LANE YOUNG
          Hawkins Parnell & Thackston
11        303 Peachtree Street, NE, Suite 4000
          Atlanta, Georgia 30308
12
     FOR THE DEFENDANT:  Kimberly-Clark Corporation
13        MS. SARAH TURNIPSEED
          Nelson Mullins
14        999 Peachtree Street, Suite 1400
          Atlanta, Georgia 30309
15
     FOR THE DEFENDANTS:  Lincoln Electric, Hobart Brothers
16   Company, The BOC Group, and Cooper Industries
          MS. DONNA POLIDORO
17        Strong Pipkin Bissell & Ledyard
          1111 Bagby, Suite 2300
18        Houston, Texas 77002

19   VIDEOGRAPHER:
          Mr. Ryan Lewis
20        Complete Litigation Support
          185 North 11th Street
21        Beaumont, Texas 77702

22

23

24

25
```

3

1                      I N D E X

2    Appearances................................... Page 2

3    Stipulations stated in text................... Page 4

4    S. B. PINKERTON

5         Examination by MR. GLEN MORGAN........... Page 4

6         Examination by MR. KENT ADAMS............ Page 66

7         Re-Examination by MR. GLEN MORGAN........ Page 72

8         Re-Examination by MR. KENT ADAMS......... Page 77

9    Signature and Changes......................... Page 82

10   Reporter's Certificate........................ Page 79

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    P R O C E E D I N G S

2                    THE REPORTER:  Please state the stipulations.

3                    MR. MORGAN:  Pursuant to the Texas Rules.

4                    THE REPORTER:  Will the witness read and sign

5      his deposition?

6                    MR. ADAMS:  Yes.  You can send it to me.

7                    THE VIDEOGRAPHER:  We are on the record at

8      9:10.

9                            S. B. PINKERTON,

10     having been first duly sworn, testified as follows:

11                            EXAMINATION

12     BY MR. MORGAN:

13         Q.    Could you please state your full name for the

14     record?

15         A.    Sanford Brown Pinkerton.

16         Q.    Mr. Pinkerton, what is your address?

17         A.    1415 Springhill -- one word -- Road, Sylacauga --

18     that's S-y-l-a-c-a-u-g-a, Alabama, 35150.

19         Q.    How old of a man are you?

20         A.    78.9.  I'll be 79 on May 29.

21         Q.    Are you a married man?

22         A.    Yes.

23         Q.    Children?

24         A.    One surviving child.

25         Q.    What about your educational background after high

5

1    school?

2        A.    I graduated from Georgia Tech in Naval Science and

3    Tactics in 1946 and in Chemical Engineering in 1948.

4        Q.    What did you do after 1948 from a work standpoint?

5        A.    I, after a brief honeymoon, went to work with

6    Kimberly-Clark immediately on June 29, 1948.

7        Q.    And how long did you work for Kimberly-Clark?

8        A.    Almost 40 years.

9        Q.    What positions did you hold while you were at

10   Kimberly-Clark during those almost 40 years?

11       A.    It's rather -- 40 years covers a lot of jobs.  I

12   first was called -- hired for our Alabama Papermill to be

13   built, which did not then exist, as a service engineer in the

14   marketing and sales section.  And over the years there I was

15   sales coordinator, marketing administrator, district sales

16   manager.

17            Then after a -- from 1956 to '59, I was

18   transferred to our -- Nino, Wisconsin, in the technical

19   department -- technical sales division of Kimberly-Clark,

20   returning to Alabama in September of 1959 back into the

21   marketing end, and ultimately then moved -- ended up being

22   general sales manager, vice-president of sales.  And on May 1

23   of 1981, I was named president of the operation.

24       Q.    President of what operation?

25       A.    Of the U.S. Newsprint and Forest Products Division

1    of Kimberly-Clark.

2        Q.    If you were president of the U.S. Newsprint Forest

3    Products Division of Kimberly-Clark, that made you one of the

4    presidents of how many divisions?

5        A.    There were several.  I really don't recall, maybe

6    six or eight.

7        Q.    And when you became president of this division in

8    1981, where were you geographically located?

9        A.    In Alabama there at the Coosa Pines mill.

10       Q.    And how long did you remain at the Coosa Pines

11   mill?

12       A.    To retirement.  I became -- on May 1 of 1987, I

13   became a senior executive consultant for a period of one year;

14   and on May 1 of 1988 became fully retired.

15       Q.    Throughout your tenure with Kimberly-Clark, were

16   you ever stationed at the Coosa Pines mill before May of '81?

17       A.    Oh, yes.  That's where I spent most of my time was

18   at the Coosa Pines mill.

19       Q.    Okay.  So, when you were --

20       A.    In these various sales capacities, my office was at

21   the mill.

22       Q.    Okay.  And in your sales capacity and in your

23   marketing capacity, did it call on you to go out in the field

24   and call on customers --

25       A.    Yes.

1    Q.    -- or were you a home-based type of sales?

2    A.    No, no.  I --

3          MR. ADAMS:  Let Mr. Morgan finish his question

4    before you start to answer.

5          THE WITNESS:  All right.

6    A.    Pardon me.

7    Q.    I'm through.  Go ahead.

8    A.    The answer is, yes.  I traveled extensively.

9    Q.    How much time, if you had to give us an estimate of

10   travel time versus office time?  Would you break that down?

11   A.    It varied, of course, by these different

12   assignments that I had over the years.  There were times that

13   I would spend at least half of the time on the road traveling.

14   And during periods when I was, like, marketing administrator,

15   I would spend no more than 15 to 20 percent of the time in

16   travel.

17   Q.    All right.  At any point in time up until May 1st,

18   '81, did you have any responsibility for the running of the

19   mill?

20   A.    No.

21   Q.    On May 1st, 1981, until May 1st, 1987, did you have

22   responsibility for the daily running of the mill?

23   A.    Yes.

24   Q.    Okay.  When were you first contacted about giving

25   this deposition?

8

1    A.    Last week, I guess.

2    Q.    What -- Do you still receive a retirement --

3    A.    Yes.

4    Q.    -- from Kimberly-Clark?

5    A.    Yes.

6    Q.    And does it come from Kimberly-Clark?

7    A.    Yes.

8    Q.    And do they mail that to you?

9    A.    Yes.

10   Q.    Have you had any interaction with Kimberly-Clark,

11   the company, since your retirement other than receiving your

12   retirement check?

13   A.    No.

14   Q.    Are there any reunions, benefits, any -- I don't

15   mean anything by this -- but old-timers days out there that

16   would cause you to go back out there?

17   A.    Shortly after retirement some of my pals in the

18   maintenance groups -- the carpenters, the painters, the

19   millwrights -- would have me out for their Christmas

20   luncheons; and I would go back into the mill.  Two or three

21   times associates would be retiring and they would have a

22   coffee and I went out.  I have not been in the mill, though,

23   for a number of years now.

24   Q.    Now, of course, the mill sold in, what, 1997?

25   A.    I wouldn't want -- I wouldn't want to say.  I

9

1    wasn't there.

2         Q.    You do understand that --

3         A.    I understand it was sold to Alliance, and Alliance

4    subsequently sold it.  But I wasn't party to that, and I --

5         Q.    I understand.  You were gone by then?

6         A.    Yeah.

7         Q.    Who took your spot when you left?

8         A.    A man named Bob Vandenheuvel succeeded me as

9    president of the unit.

10        Q.    And do you know how long he remained president?

11        A.    Not really, two or three years, I think, was the

12   length of his term.  I'm not positive.

13        Q.    Do you know the successors until the plant was

14   sold?

15        A.    Yes, I guess.

16        Q.    And if you don't mind, could you at least take a

17   stab at spelling your replacement?

18        A.    Bob.  His name is R. C. V-a-n-d-e-n-h-e-u-v-e-l,

19   Vandenheuvel.

20        Q.    All right.  And who replaced him, if you know?

21        A.    Things were sort of strange.  At that point I'm not

22   sure for a while he was replaced at all, and there was a

23   hiatus.  And then he ultimately was replaced by a man named

24   Ben Knight.

25        Q.    And then anyone after Mr. Knight?

1    A.    I believe that he was the president when the mill

2   was sold to Alliance.

3    Q.    Did you know Mr. Knight?

4    A.    Sure.

5    Q.    How did you know him?

6    A.    He worked for me when I was president.  He was in

7   the forest products end of the business, and he worked for me

8   in land disposition.

9    Q.    Is he currently in the -- in Alabama?  Do you know?

10    A.    He is retired living in Alabama, yes.

11    Q.    Whereabouts, if you know?

12    A.    Some small town between the mill and Birmingham.  I

13   have forgotten.

14    Q.    How far is the mill from Birmingham?

15    A.    About 45 miles there, 40 miles.

16    Q.    Okay.  And how far do you live from Birmingham?

17    A.    I live in Sylacauga, 15 miles farther away from

18   Birmingham.  Just over 50 miles from Birmingham.

19    Q.    Do you see Mr. Knight at all?

20    A.    No.

21    Q.    How about Mr. Vandenheuvel?

22    A.    I haven't seen him for years now.

23    Q.    Do you know if he is still in the Birmingham area?

24    A.    No.  He is retired and living in the Atlanta --

25   greater Atlanta area.

1   Q.   How do you know that?

2   A.   We exchange Christmas cards.

3   Q.   Are you listed in the Sylacauga phone book?

4   A.   Yes.  Sylacauga.

5   Q.   Sorry.

6   A.   It's an Indian word which means buzzard's roost.

7   Q.   Don't get me started.  I have got some Indian words

8   for you.

9        Who was the president immediately before you?

10  A.   A man named Randy Salter.

11  Q.   S-a-l-t-e-r?

12  A.   Yes.

13  Q.   And is he alive?

14  A.   I think he just passed away.

15  Q.   And had he been there for some time in that

16  position before you or just shortly?

17  A.   Randy would have been president probably in the

18  three to five-year range.

19  Q.   What about the man that was before him?

20  A.   Time has a funny way of eroding memory.  To my

21  recollection prior to Randy's being president, the title for

22  that job was general manager; and it was occupied by a man

23  named Clark Hook.

24  Q.   And is Mr. Hook still with us?

25  A.   No.  He is deceased.

1          Q.    Now, I understand you had a meeting with some of

2     the lawyers from Kimberly-Clark on -- was it Wednesday or

3     Thursday or both days?

4                    MR. ADAMS:  You don't need to answer when you

5     met with us or where you met with us or anything like that.

6     You are instructed not to answer that.

7                    MR. MORGAN:  Let's just break and call the

8     judge.

9                    MR. ADAMS:  There is a phone right over there,

10    Glen.

11                   MR. MORGAN:  I know.  I was just going to

12    say -- I'm looking at -- Well, it's Friday.  So, we can do

13    that.  Let's break and do that.

14                   MR. ADAMS:  Okay.

15                   THE VIDEOGRAPHER:  Off the record at 9:24.

16                   (A BRIEF RECESS WAS TAKEN.)

17                   THE VIDEOGRAPHER:  We are on the record at

18    9:26.

19                   MR. MORGAN:  While we are on the record, I

20    want to object so as I don't waive anything that --

21    Rule 199.2b1 requires Kimberly-Clark when presenting a

22    corporate representative to notify us within -- quote -- a

23    reasonable time before the deposition -- end quote -- the name

24    of the individual that will be presented to testify on

25    Kimberly-Clark's behalf; and for each individual they are to

13

1    set forth or designate the matters upon which the individual

2    will testify.

3                    That has not been done in this case, although

4    we sent you a letter April the 7th requesting that

5    information.  And so, since I have not had the gentleman's

6    name or the areas that he will be testifying about, I will ask

7    him the questions that I have.  But when I find out the scope,

8    et cetera, then I may ask you to bring him back at another

9    time so I have had time to prepare for the deposition in the

10   areas where he can testify about.

11                   MR. ADAMS:  And just so you will know,

12   Mr. Pinkerton is offered in response to your deposition notice

13   of April 13th as the person that Kimberly-Clark has located to

14   date who is most responsive to your notice.

15                   MR. MORGAN:  Well, I mean, telling me after

16   the deposition started, that general statement I don't think

17   complies with the rules.  For instance --

18        Q.    (By Mr. Morgan)  Mr. Pinkerton, are you the highest

19   ranking safety individual with knowledge of safety policies

20   and practices at the Kimberly-Clark facility regarding

21   asbestos?  Were you ever a safety individual?

22        A.    No.

23        Q.    Okay.  And are you the most knowledgeable person

24   about the installation and removal of asbestos-containing

25   products on the Kimberly-Clark premises?

1      A.     No.

2      Q.     And are you the highest ranking safety individual

3   or have you ever been the highest ranking safety individual

4   with knowledge of contractor safety policies and practices at

5   the Kimberly-Clark facility?

6              MR. ADAMS:  I object to your line of

7   questioning.  Because as I stated, Mr. Pinkerton is the person

8   that Kimberly-Clark has identified to us as the one most

9   responsive to the areas of inquiry in your notice.

10             MR. MORGAN:  I'm just trying to show that no

11   matter what you call him, he is not responsive at all to my

12   notice.

13             MR. ADAMS:  I -- You know --

14             MR. MORGAN:  Let me go ahead and do this, if

15   you don't mind.

16             MR. ADAMS:  Yeah.

17      Q.     (By Mr. Morgan) Are you or have you ever been the

18   highest ranking safety individual with knowledge of contractor

19   safety policies and practices at the Kimberly-Clark facility?

20      A.     If I understand your question, as president I was

21   responsible for all activities of the operation.

22      Q.     Did you have a safety department when you were

23   president?

24      A.     Yes.

25      Q.     Was there a safety individual --

1    A.    Yes.

2    Q.    -- that was in charge of the safety department?

3    A.    Yes.

4    Q.    Okay.  What was his name?

5    A.    Will Morris.

6    Q.    Is Mr. Morris still alive?

7    A.    I believe so.

8    Q.    Where does he live, if you know?

9    A.    I have no idea.

10    Q.    Do you recall where he did live?

11    A.    No.

12    Q.    And was he a long tenured Kimberly-Clark employee?

13    A.    I think so.  It depends on the term.  But he was

14    not a new hire in-and-out person.

15    Q.    And did he stay after you left?

16    A.    I think so, yes.

17    Q.    Okay.  Have you ever been told that we are looking

18    for someone who is the most knowledgeable person about the

19    installation and removal of asbestos-containing products on

20    Kimberly-Clark's premises?

21    A.    Say that again.

22    Q.    Yes, sir.  Mr. Adams just showed you the notice.

23    That's not the first time you have seen that, I take it?

24    A.    No.

25    Q.    Okay.  When was the first time you saw that?

16

1    A.    I suppose Wednesday of this week.

2    Q.    Okay.  In looking at who we wanted according to

3    that notice, did you ever tell anybody that you really -- you

4    didn't fit any of these categories?

5              MR. ADAMS:  No.  I instruct you not to answer

6    that question.  That invades the attorney-client privilege.

7              MR. MORGAN:  Is he your client?

8              MR. ADAMS:  I am representing this gentleman

9    for the purpose of this deposition, yes.

10   Q.    (By Mr. Morgan) If I were to ask you who would be

11   the most knowledgeable person that you know of regarding the

12   installation and removal of asbestos-containing products on

13   Kimberly-Clark's premises, who would you tell me?

14             MR. ADAMS:  Objection, form.

15   A.    I couldn't tell you.  Excuse me.

16   Q.    All right.  And what about if I asked you for the

17   highest ranking safety individual with knowledge of safety

18   policies and practices at the Kimberly-Clark facility

19   regarding asbestos, who would you tell me would be that

20   person?

21   A.    You mean now or when I worked?

22   Q.    You can tell me the two different people if you

23   would like.  There is not one now.

24   A.    During my employment, I assumed the responsibility

25   ultimately for mill safety.  I established our policies and

17

1    our procedures.

2         Q.    Yes, sir.  But if I asked you who was the highest

3    ranking safety individual with knowledge of safety practices

4    and policies at the Kimberly-Clark facility regarding

5    asbestos, who would you tell me that would be?

6                   MR. ADAMS:  Objection, form.

7         Q.    Go ahead.

8         A.    Probably Will Morris.  I don't know.

9         Q.    Okay.  And if I asked you who would be the highest

10   ranking safety individual with knowledge of contractor safety

11   policies and practices at the Kimberly-Clark facility, would

12   that be the same person, Mr. Morris?

13        A.    Probably, yes.

14        Q.    All right.  And then if I asked you to tell me who

15   you felt like was the most knowledgeable person concerning

16   asbestos-containing products that were manufactured at the

17   Kimberly-Clark facility, who do you think that would be?

18        A.    I wouldn't know.

19        Q.    Okay.  Would you consider yourself to be the most

20   knowledgeable person about any asbestos-containing products

21   that Kimberly-Clark manufactured?

22        A.    No.

23        Q.    And would you be -- would you consider yourself to

24   be the most knowledgeable person about the installation and

25   removal of asbestos-containing products on Kimberly-Clark's

1   premises?

2                      MR. ADAMS:   Objection, form.

3        Q.   You can answer.

4        A.   I'm not -- I don't consider myself qualified in

5   that area because I never was called upon to be qualified in

6   that area.

7        Q.   Okay.

8        A.   We had people who were.  I was not one of them.

9        Q.   Do you know what the -- For instance, do you know

10   what the threshold limit values were for asbestos?

11       A.   No.

12       Q.   Do you know what the PELs were?

13       A.   No.

14       Q.   Do you know what a PEL is?

15       A.   No.

16       Q.   Do you know what the OSHA rules and regulations

17   were concerning exposure to asbestos?

18       A.   No.

19       Q.   Do you know any of the safety rules or regulations

20   concerning procedures to be used while working with

21   asbestos-containing products?

22       A.   No.

23       Q.   Do you know prior to 1981 what the policy or

24   practice was by Kimberly-Clark in terms of handling

25   asbestos-containing products?

19

```
1       A.      No.

2       Q.      Do you know prior to 1981 if there was a policy in

3   place for handling asbestos-containing products?

4       A.      No.

5       Q.      Do you know if there was any policy or practice in

6   place prior to 1981 concerning contractor safety regarding

7   working with asbestos-containing products on the

8   Kimberly-Clark facilities?

9       A.      No.

10      Q.      Do you know if there were any safety guidelines set

11  up to determine if there were asbestos-containing airborne

12  fibers at the Kimberly-Clark facility?

13      A.      No.

14      Q.      Do you know prior to 1981 anything about proper

15  removal of asbestos-containing products on the Kimberly-Clark

16  premises?

17      A.      No.

18      Q.      Prior to 1981 do you know how many insulators were

19  on the payroll?

20      A.      No.

21      Q.      Do you know how many contractors were utilized in

22  either the application or removal of asbestos-containing

23  products?

24      A.      No.

25      Q.      Prior to 1981 did you have any education or
```

1    training --

2                    MR. ADAMS:  Objection, form, of the last

3    question.  I'm sorry.

4                    MR. MORGAN:  Pardon me?

5                    MR. ADAMS:  I object to the form of the last

6    question.  I'm sorry for the interruption.

7         Q.   (By Mr. Morgan) Prior to 1981 did you have any

8    education or training in the hazards of asbestos?

9         A.   No.

10        Q.   Prior to 1981 did you have responsibility for

11   safety of either Kimberly-Clark employees or contractor

12   employees on the Kimberly-Clark premises regarding exposure to

13   asbestos-containing products?

14        A.   No.

15        Q.   Did you ever prior to 1981 oversee any

16   construction, be it new or a modification to the facility,

17   when it was necessary to use asbestos-containing products or

18   remove asbestos-containing products?

19                    MR. ADAMS:  Objection, form.

20        A.   I'm not sure I followed that.

21        Q.   Okay.  I'm sorry.  It was two questions in one.

22                    Did you ever have a responsibility to oversee

23   the safety during construction of a new portion of the

24   facility?

25        A.   No.

21

1      Q.    And my next question is sort of the same thing.

2    Prior to 1981 did you have any responsibility for overseeing

3    safety for contractors or employees if the facility was making

4    a modification that involved asbestos-containing products?

5                    MR. ADAMS:   Objection, form.

6      A.    No.

7      Q.    Can you tell us how many feet of piping was

8    insulated at Kimberly-Clark's facility with

9    asbestos-containing products prior to 1981?

10     A.    No.

11     Q.    Do you know if any air monitoring was conducted

12    prior to 1981 to determine the presence of asbestos fibers in

13    the air?

14     A.    No.

15     Q.    Do you know if midget impingers -- Do you know what

16    a midget impinger is?

17     A.    No.

18     Q.    Do you know the brands of any asbestos-containing

19    products that were utilized on the Kimberly-Clark facility?

20     A.    No.

21     Q.    Do you know that asbestos-containing products were

22    in fact on the Coosa Pines facility prior to 1981?

23     A.    No.

24     Q.    When did you learn of the hazards of asbestos?

25     A.    I don't know that I know of the hazards of

1    asbestos.

2        Q.    Do you know if Kimberly-Clark sold any

3    asbestos-containing products?

4        A.    No.

5        Q.    They might have.  You just don't know?

6        A.    They might have.  I don't believe we did from the

7    Coosa Pines facility.

8        Q.    All right.  Do you know if Kimberly-Clark purchased

9    asbestos fibers?

10       A.    I don't know that.

11       Q.    They could have.  Again, you just don't know?

12       A.    That's correct.

13       Q.    Have you ever heard of Calidria?

14       A.    No.

15       Q.    After 1981 -- During your tenure as president, I

16   guess is the best way.  I want to go from '81 to the time you

17   left, was there a contractor safety policy or procedure put in

18   place?

19       A.    I would assume there was.

20       Q.    Well, don't do that.

21       A.    All right.

22       Q.    If you know, tell me.  If you don't know, tell me

23   you don't know.

24       A.    I don't know.

25       Q.    Okay.  Were there any rules and regulations set

1   forth for the employees of Kimberly-Clark in ways to handle

2   asbestos-containing products?

3        A.    I don't know.

4        Q.    If I went back through the questions I asked you

5   prior to 1981 in terms of policies and procedures and

6   asbestos-containing products and the brands, et cetera, and

7   asked those same questions for your tenure as president until

8   you left from '81 forward, would the answer be the same thing,

9   you don't know?

10       A.    I'm afraid I would have to go down those item by

11  item --

12       Q.    Okay.

13       A.    -- to give you a meaningful answer to that.

14       Q.    All right.  Was there any asbestos abatement done

15  at any point from '81 forward to determine the type of product

16  that was in place?

17              MR. ADAMS:  Objection, form.

18       A.    Not that I was involved in.  I can't say that it

19  didn't happen.  As chief executive officer of the facility,

20  any serious hazard, injury, customer problem, whatever, would

21  be brought to my attention.  Otherwise, we had responsible

22  people managing these operating areas; and I didn't involve

23  myself in the micro-management of their responsibility.

24       Q.    All right.  And that's my question.  If I needed to

25  find out the specifics about contractor safety policies and

1     any steps that Kimberly-Clark may have taken to ensure their

2     safety or the Kimberly-Clark employees' safety, then you told

3     me earlier Mr. Morris would be the guy to ask about that,

4     right?

5          A.    In all probability, yes.

6          Q.    And if -- You said his name was Will Morris?

7          A.    Will, yes.

8          Q.    Was it formally William?  Do you know?

9          A.    I don't know.

10         Q.    Okay.  And who would I ask -- if I wanted to ask

11    questions about the type of products that were purchased to be

12    installed, who would I ask, in your opinion -- the type of

13    asbestos-containing products?

14                    MR. ADAMS:  Objection, form.

15         A.    During my tenure?

16         Q.    Just period.  If I asked you today who you would go

17    ask to determine that, who would that be?

18                    MR. ADAMS:  Same objection.

19         A.    Should I answer it?

20                    MR. ADAMS:  Go ahead, if you have an answer.

21         A.    Probably I would say the purchasing department.

22         Q.    And who would be the head guy there?

23         A.    Now?

24         Q.    No.  Just who would you go ask in your mind?

25         A.    I don't even remember for sure who was in charge of

25

1    purchasing.  That's another one of those rolling jobs.  I

2    can't give you a name.

3        Q.    All right.

4        A.    I'm not being evasive.  I just don't remember.

5        Q.    Okay.  Did Kimberly-Clark have a document retention

6    policy?

7        A.    Yes, we did.

8        Q.    Do you recall what it was?

9        A.    No.

10       Q.    But it was a habit, a practice, if you will, maybe

11   even perhaps a rule --

12       A.    It's a corporate policy as opposed to a divisional

13   policy.

14       Q.    All right.  So, the documents that were generated

15   in the daily running of the premise were maintained?

16       A.    Yes.

17       Q.    Were there any other plants in Alabama besides the

18   Coosa Pines facility?

19             MR. ADAMS:  Objection, form.  You mean any

20   other Kimberly-Clark plants?

21             MR. MORGAN:  Yes.

22       A.    In Alabama?

23       Q.    Yes, sir.

24       A.    We had chipping mills, outside saw mills associated

25   with my division; but we had no other corporate operating

1    divisions in Alabama that I know of.

2         Q.    All right.  And the products made by the Coosa

3    Pines facility, what were they?

4         A.    Newsprint and groundwood printing papers and market

5    pulp.

6         Q.    Newsprint and --

7         A.    Groundwood, this is paperback books, magazines,

8    uncoated.

9         Q.    Kimberly-Clark the company made several products;

10   is that right?

11        A.    A number of products, yes.

12        Q.    What type of products did they make?

13        A.    Well, we are most famous for Kleenex, Kotex,

14   Delsey --

15        Q.    What was the third one?

16        A.    Delsey, the toilet tissue -- Huggies diapers.

17   Those are the most well-known products that we made.  We made

18   all kind of other things like stationary bond papers.  In my

19   case it was lumber.  I mentioned lumber.

20        Q.    No, like, paper towels?

21        A.    Paper towels, yes.

22        Q.    Paper plates?

23        A.    No, not to my knowledge.

24        Q.    Boxes?

25        A.    No.

1      Q.    Coated paper?

2      A.    No.  We did at one point in time, but no more, not

3   for quite a while.

4      Q.    Well, give me an example of coated paper.

5      A.    Coated paper is your slick magazine stock for

6   McCall's, Better Homes and Gardens, Playboy magazine.

7                 MR. ADAMS:   I never read any of those.

8                 MR. MORGAN:   No.  You just looked at all the

9   pictures.

10                MR. ADAMS:   In McCall's, that's right.

11     A.    Those mills, those papermills were sold back in the

12   Seventies.  Did you ever read a book called Good to Great?

13                MR. ADAMS:   Let's just answer Mr. Morgan's

14   questions.

15                THE WITNESS:   All right.

16                MR. ADAMS:   He's got --

17                THE WITNESS:   Not time for coffee?

18                MR. ADAMS:   Yes, sir.

19     Q.    (By Mr. Morgan) Here's my next question:   What is

20   the book Good to Great?

21     A.    This is a book about corporate management.  And it

22   features Darwin Smith and his disposition of our

23   Kimberly-Clark coated mills and concentration on consumer

24   products and competition with Procter and Gamble.  It's

25   becoming quite a classic.  He was one of my --

1           MR. ADAMS:  Just answer his question.

2           MR. MORGAN:  He is.  Just leave him alone.

3      Q.    (By Mr. Morgan) He was one of your --

4      A.    My good friends and mentors.

5           THE VIDEOGRAPHER:  Off the record at 9:50.

6           (A BRIEF RECESS WAS TAKEN.)

7           THE VIDEOGRAPHER:  On the record at 10:10.

8      Q.    (By Mr. Morgan) Mr. Pinkerton, did you say earlier

9  that you instituted some safety policies when you were

10  president?

11     A.    Yes.

12     Q.    Did you give an order that they be done, or how did

13  that come about?

14     A.    Well, when I became president, I re-established a

15  labor management safety committee and put it in place to --

16  The week I got my job, I sent a directive to all of my

17  operating supervisors that I wanted a list of the three most

18  hazardous items in their area of responsibility, and

19  personally went out and viewed these things with them and

20  effected some immediate corrections to safety hazards which

21  existed in the mill.

22           We had regular monthly meetings of that labor

23  management group on safety.  We were told that the hourly paid

24  people were attending those meetings and the salaried people

25  were not that dedicated.  I called a management meeting with

1    the labor union officers and my salaried supervisors and told

2    them of this information I had received.  And I said,

3    "Effective immediately, any salaried person who does not

4    attend the regular safety meetings without doctor's written

5    permission will be fired."

6              We had reasonably good attendance after that.

7    Q.    Or a lot of sick people.

8    A.    That's right.  And we from a -- we also at that

9    same time constructed a health and safety and physical fitness

10   facility.  We brought two doctors on stream.  We proposed

11   annual physical exams for all of our employees at no cost.

12   And that was well received.  So, what else did we do in

13   safety?

14             We were totally dedicated to the safety of our

15   employees.  And they knew that, and our safety record improved

16   to where we were one of the tops in the nation in man hours

17   without a lost time accident.

18             We put in place safety dinners.  When I was

19   there, my predecessors had recognized ten years without a lost

20   time accident.  I moved it up to one year, and changed the

21   recognition from an after work steak for the employee to a

22   formal dinner for the employee and his or her spouse.  That

23   was well received.

24             And the people recognized our commitment to

25   safety.  So, all in all, we had a million man hours -- safe

1    man hours.  And we had bands and families and tours, and

2    people took their spouse to show them where they worked and

3    the like.  So, it was -- there was no question in the minds of

4    anyone of our positive commitment to the safety of our

5    employees.

6         Q.    All right.  Let's go back sort of through things.

7    You asked them to identify the three worst hazards in the

8    plant?

9         A.    That's correct.

10        Q.    Normally those are falling objects, slip and falls,

11   housekeeping?

12        A.    That's right.

13        Q.    And I don't know.  I forget the third one.  But in

14   your case when you had this meeting and they identified for

15   you the three worst hazards, what were they?

16        A.    Slipping and falling was one of them in areas.  We

17   had some areas that didn't have adequate lighting for people

18   to move.  We corrected that.

19             One of the things that's most meaningful to

20   me, I was shown a chlorine unloading dock.  It was -- tank

21   cars were spotted and the material was unloaded oftentimes at

22   night and there was no light.  I called our maintenance

23   manager; and he said, "Yes.  We have been trying to get around

24   to it."

25             And I told him, "We will inspect that in the

1   morning at 9:00 o'clock, the finished job."

2           And we were rather Draconian in some of our

3   approaches, but we got there.  And we were doing it for two

4   reasons.  One to be -- to show these people we were safe, and

5   one to be damn sure that it was in fact a safe practice.

6       Q.   Okay.  So, the three things -- housekeeping was

7   one.  Lighting was another.  And what was the third?

8       A.   Well, it varied.  But whether it was the powerhouse

9   or the papermill or the pulpmill or the wood yard -- We had

10  equipment in the wood yard which was not what I considered

11  appropriate.  And it was completely replaced.

12      Q.   Okay.  So --

13      A.   There was really a variety of things.  It varied

14  depending on the area.

15      Q.   All right.  They identified for you what was

16  causing people to be injured at work through some type of

17  unsafe practice that they found in different parts of the

18  plant, right?

19      A.   That's correct.

20      Q.   And the injuries we are talking about are, again,

21  things that require -- might require surgery, like a back

22  surgery or you cut your finger or something drops on your head

23  or you trip and hurt yourself, right?

24      A.   Correct.

25      Q.   Now, did y'all use chemicals in the facility?

1    A.    Yes.

2    Q.    Were there any tests done to -- or I'm sorry.  Any

3    policies put into place when you became president to change

4    how the chemicals were handled on the premises by the

5    employees?

6              MR. ADAMS:   Objection, form.

7              Go ahead.

8    A.    I never changed any -- I did not change any of the

9    standard operating procedures for materials handling,

10   unloading storage, and the like.  That never occurred.

11   Q.    All right.  Now, you are here as Kimberly-Clark.

12   That's -- I know you are Mr. Pinkerton, but I have asked them

13   to please present Kimberly-Clark to me for me to ask

14   Kimberly-Clark some questions.  And I have told them the areas

15   that I want to ask about.  And Mr. Adams made a comment to the

16   judge that you are very knowledgeable.

17              And so -- and if I'm just asking you

18   questions, I would find out how knowledgeable you are.  And I

19   need you to tell me -- You know, based on that notice in front

20   of you, what matters listed there do you think you can testify

21   about?

22   A.    (Reading) Really, I'm not qualified to testify on

23   behalf of any of these four items in this document.

24   Q.    Okay.  And as Kimberly-Clark sitting here at the

25   table under oath, can you tell me when Kimberly-Clark first

1    learned that exposures to asbestos could cause severe

2    disability or even death?

3        A.    I can't tell you by my knowledge when that

4    occurred.  I can't -- the fact is, anything of major

5    consequence I assumed -- and they were, in many cases --

6    brought to my attention.  During my presidency no one ever

7    brought to my attention any risk or occurrence involving

8    asbestos.  So, therefore, it's a non-issue in my memory.

9        Q.    Okay.  And since no one brought anything to you

10   about any risk of injury or damage occurring or potential

11   damage even, you never did anything then to change anything

12   that was being done on the premises?

13       A.    That's correct.

14       Q.    And from 1948 to 1981, up through those years

15   before you became president, you basically were in the

16   marketing, slash, sales portion of the company?

17       A.    That's correct.

18       Q.    During that time, did they give you any safety

19   training or education involving asbestos or the exposure to

20   asbestos to where you could learn it was harmful?

21       A.    No.

22       Q.    Was there any kind of new president class, for lack

23   of a better term, where before you became president they said,

24   "Okay.  Look, we need you to -- there is a few things we want

25   you to learn about this" and sort of gave you some courses or

34

1   some education about safety?

2       A.    No.

3       Q.    All right.  You went from a salesperson, even

4   though you may have been general manager, the head guy, the

5   big hauncho, et cetera -- you went from there to president of

6   the company having brought with you whatever experience or

7   training you had to that position?

8       A.    That's correct.

9       Q.    And from 1981 to 1988 when you left, did you attend

10  and did Kimberly-Clark either provide or make available to you

11  any type of safety training where you would learn about the

12  hazards of different particular products or substances?

13      A.    No.

14      Q.    Okay.  And in terms of what Kimberly-Clark does

15  know -- and again, you are here as Kimberly-Clark.  What does

16  Kimberly-Clark in the person of Mr. Pinkerton know about the

17  hazards of asbestos and when did you learn that?

18              MR. ADAMS:  Objection, form.

19      A.    I honestly do not know of the hazards of asbestos.

20      Q.    Okay.  Well, again, I know you met with some

21  lawyers.  We have been told that.  Do you know if everybody in

22  the room was a lawyer or not?

23      A.    Well, they didn't have badges on.

24      Q.    They did or did not?

25      A.    Did not.  You know, "I am a lawyer."  I don't know.

35

1    Q.   Well, they are not sheriffs.

2    A.   I didn't ask for diplomas.

3    Q.   Okay.  So then, that leads to my next question.  I

4    assume you met with Mr. Adams and Mr. Young and

5    Ms. Turnipseed; is that right?

6              MR. ADAMS:  Glen, he met with lawyers only.

7    And I will be happy to tell you who all the lawyers were if

8    that makes you happy.

9              MR. MORGAN:  Okay.

10             MR. ADAMS:  There was myself; Ms. Turnipseed;

11   at different times Ms. Himple; Mr. Young; Ms. Davis, a lawyer

12   from my firm.  That was it.  That's all the people he met

13   with.

14             MR. MORGAN:  All right.

15   Q.   (By Mr. Morgan) Okay.  And so, if you will, because

16   after that meeting -- and the contact occurred about a week

17   ago you say.  You had a meeting Wednesday, I believe you said.

18   I assume you met yesterday, as well?

19             MR. ADAMS:  Now, Glen, you are violating Judge

20   Sanderson's ruling that he just gave us.

21             MR. MORGAN:  Okay.  Well, let me ask this

22   then.  I'm trying to establish -- because you are going to

23   object to form here in a minute.

24   Q.   (By Mr. Morgan) If you will, tell me what matters

25   you have been asked to testify about.

1       A.    I'm not sure I can answer that.  I don't know that

2    I've been asked to testify -- to testify about anything.  I'm

3    here to provide what information I can relevant to the

4    subject, and I certainly have nothing to hide.  I just -- I

5    simply -- I don't know how to answer your question.

6       Q.    Well, I mean, we looked at the notice --

7       A.    Yes.

8       Q.    -- of what I wanted to talk about.  You said you

9    are not really qualified or knowledgeable to talk about any of

10   those subjects.

11      A.    Right.

12      Q.    So --

13      A.    If this had ever risen during my tenure anywhere

14   that I could -- to which I could make reference or testify, I

15   would be delighted.  But it never -- it never reached that

16   kind of a level that it came to my office.

17      Q.    No.  I understand that.  And I appreciate your

18   honesty about that.  It's just that I'm trying to get some

19   information about that facility.

20            Do you know that asbestos-containing products

21   were utilized at that facility?

22      A.    Yes.

23      Q.    And how do you know that?

24      A.    Documents that I have seen.

25      Q.    What documents have you seen?

1      A.    I can't identify them all.

2            MR. ADAMS:  We showed Mr. Pinkerton the

3   documents yesterday that we produced to you.

4      Q.    Okay.  What does that tell you after looking at

5   those documents about the presence of asbestos-containing

6   products on the Coosa Pines facility in Alabama?

7      A.    Well, you are asking for an opinion, I suppose.

8      Q.    Sure.

9      A.    One, it tends to confirm that's -- that in fact it

10  was there.  Generally the implication was that it was not

11  in -- ever exposed in any hazardous condition.

12     Q.    Did you see any comment about, perhaps, violating

13  OSHA in those documents?

14     A.    I really don't remember.

15     Q.    Well, when did you see them?

16     A.    I saw them -- a lot of documents yesterday.

17     Q.    Okay.

18     A.    If you could put one in front of me, I'll tell you

19  whether I saw it or not.  But, you know, it's like your

20  questions, there are a lot of them.

21     Q.    I would like to do it this way.  If I could see the

22  documents you looked at, then maybe I can pick them out and

23  hand them to you.

24            MR. ADAMS:  You got them.  We produced them to

25  you.

1                    MR. MORGAN:  I'd like to see what the witness

2    reviewed.

3                    MR. ADAMS:  And I just told you.  What he

4    reviewed were the documents we produced in response to request

5    for production.  Do you have them with you?

6                    MR. MORGAN:  No.

7                    MR. ADAMS:  Would you like to borrow my copy?

8                    MR. MORGAN:  I would like to see the ones he

9    saw.

10                   MR. ADAMS:  Well, he saw --

11                   MR. MORGAN:  I think under the Rules I have a

12   right to see what the witness --

13                   MR. ADAMS:  I agree.  I'm just trying to

14   establish -- I'm telling you what he saw.  And I assume --

15                   MR. MORGAN:  Don't tell me, show me.  That's

16   what the Rules say that --

17                   MR. ADAMS:  You have got to say, "Please."

18                   MR. MORGAN:  Please.

19                   MR. ADAMS:  All right.  Hang on.  I will be

20   right back.

21                   THE VIDEOGRAPHER:  Off the record at 10:27.

22                   (A BRIEF RECESS WAS TAKEN.)

23                   THE VIDEOGRAPHER:  On the record at 10:32.

24        Q.   (By Mr. Morgan) Mr. Pinkerton, we have been handed

25   the other documents that you looked at.  When you went through

1    the documents yesterday, were any portions of those documents

2    highlighted or in any way enhanced?

3         A.    Some of them might have been, yeah.

4         Q.    And by highlighted, I mean something where there is

5    a marker --

6         A.    Yeah, like that.

7         Q.    Okay.

8              MR. ADAMS:   I don't -- I think -- just to save

9    you some time, I think Mr. Pinkerton is mistaken; and I don't

10   think that's the case.  And I don't think you will find any

11   that are highlighted, because I don't recall showing him any

12   highlighted documents.

13             MR. MORGAN:   Well, the witness --

14             MR. ADAMS:   I understand.  I just wanted to

15   save you some time.  Because you can look through those, and I

16   don't think you will see any.  And those are the documents I

17   showed him.

18        A.    A lot of paper passed.

19        Q.    (By Mr. Morgan) Yes, sir.

20             MR. ADAMS:   Maybe I'm wrong.  Go ahead.

21        A.    You have paper you have never seen before.

22        Q.    I understand.  But this -- you know, this kind of

23   thing, you know, kind of stands out a little bit when it's

24   that kind of stuff.  And you say you recall seeing some of

25   that?

1    A.    I think I did, yeah.

2    Q.    Okay.

3    A.    I don't know if it's related to these documents or

4    others.  I don't know.

5    Q.    What other documents did you see yesterday?

6    A.    I don't know.  That's my problem.

7    Q.    Let me do this.  It's been represented to us that

8    this stack of documents that we are now going through were the

9    ones that you looked at yesterday --

10    A.    Yes.

11    Q.    -- so, assuming that's the case, then we should

12    find some documents that have some highlighted on them, based

13    on your recollection of yesterday?

14    A.    Well, I can't speak to that, maybe, whatever.

15    Q.    I thought you just told me that there were.

16    A.    Well, I said -- I thought I recalled seeing some,

17    yes.

18    Q.    Okay.  All right.  Did you notice in there that

19    there were comments about perhaps the condition of some the

20    Kimberly-Clark premises -- or areas of the Kimberly-Clark

21    premise at the Coosa Pines facility were such that it would

22    violate OSHA policies concerning asbestos-containing products?

23    A.    I could well have seen something that referred to

24    that, yes.

25    Q.    And did --

41

1      A.    See, one of the things people do is --

2            MR. ADAMS:  Just answer the question.

3      A.    I got you.

4      Q.    Well, if you don't mind, tell me what you were

5  going to say so that maybe that will help us.

6      A.    I was asked -- I wanted to be informed any time we

7  were out of compliance of anything.  The first statement that

8  was made to me when I assumed my job -- we will not operate

9  this mill one day out of environmental compliance.  That was

10  my marching orders on day one.

11     Q.    Okay.

12     A.    That's really what I'm talking about.

13     Q.    All right.  And again, just so we will make sure,

14  while you were the president of the U.S. Newsprint Forest

15  Product Division, is that the same thing as like the plant

16  manager?

17     A.    No.  Not in this case because it involved

18  marketing, and it involved woodlands, the sales function, the

19  financial function.  It was the equivalent of a corporate

20  entity reporting to the parent -- within the company to the

21  corporate entity.

22     Q.    Okay.  So, you were the plant manager of the Coosa

23  Pines facility?

24     A.    The vice-president of operations reported to me.

25     Q.    Okay.  Well, then let me ask you this, maybe this

1   will explain it:  Was there somebody that had the day-to-day

2   responsibility for running the facility at Coosa Pines --

3        A.   Yes.

4        Q.   -- that would be considered to be the plant

5   manager?

6        A.   Yes.

7        Q.   Who was that?

8        A.   A man named Sam Rollinson, now deceased.

9        Q.   R-a-w-l-i-n-s-o-n?

10       A.   R-o-l-l-i-n-s-o-n, Rollinson.

11       Q.   And who preceded him in that position?

12       A.   That position when I assumed the presidency was not

13  filled, and I don't remember who assumed that before that

14  time.

15       Q.   During your tenure as president, this '81 to '87

16  time period -- '88, Mr. Rollinson was the plant manager?

17       A.   Yes.

18       Q.   Did he remain in that position when you retired?

19       A.   I think so.  Yes, I think so.

20       Q.   And he was there when you took that position?

21       A.   He was not there when I took that position.  I was

22  without middle manager for a period of maybe one year.  And he

23  came in and then assumed the job as vice-president of

24  operations.

25       Q.   Who had that position during that year?  Who

43

1    assumed that?

2        A.    That was -- I assumed that position operating --

3    working with the different operating department heads during

4    that year.

5        Q.    Okay.  So, technically then I guess you are saying

6    '87 to -- I'm sorry.  '81 to '82 you were the plant manager?

7        A.    More or less, yes.

8        Q.    But still with all these other responsibilities as

9    well?

10       A.    Yes.

11       Q.    Who would have been, if you will, the vice plant

12   manager, the assistant plant manager back then?

13       A.    There really wouldn't have been because these

14   different operating areas like the papermill, groundwood,

15   pulpmill, utilities, reported directly to me -- maintenance.

16       Q.    Okay.  Well -- so, the -- was -- the vice-president

17   of operations, is that what you called him, the plant manager?

18       A.    Yes.

19       Q.    So, he was -- in terms of who reported to him, help

20   me there.  Who reported to the plant manager?

21       A.    During Mr. Rollinson's term?

22       Q.    Yes, sir.

23       A.    Then these -- the pulpmill, papermill, utilities,

24   maintenance, personnel -- would all have reported to him --

25   purchasing.

1      Q.     Okay.  And then he reports to you?

2      A.     That's correct.

3      Q.     And then once he assumed that position and all

4    these people reporting to him -- and he was reporting to you.

5    Who else was reporting to you directly?

6      A.     The vice-president of sales, the vice-president of

7    forest products, the controller.  I guess that's it.

8      Q.     Okay.  And did we -- did I ask you if you can

9    remember any plant manager before Mr. Rollinson?

10     A.     I mentioned that we had a -- Clark Hook was a

11   general manager of the mill and had been the mill manager or

12   equivalent of the operations -- vice-president of operations

13   prior to that.  I don't think we had the title vice-president

14   of operations prior to Sam Rollinson.

15     Q.     And Clark Hook?

16     A.     Yes.

17     Q.     H-o-o-k?

18     A.     Yes.

19     Q.     Is he still around?

20     A.     He is deceased.

21     Q.     All right.  If I wanted to know about the

22   relationship between a contractor on the Kimberly-Clark

23   premises and Kimberly-Clark in terms of responsibility of work

24   and all that, who should I ask?  Who would be the person most

25   knowledgeable about that in your opinion?

45

1      A.     You mean in the management of a contracted job on a

2    day-to-day basis?  Is that what you are asking?

3      Q.     Yes, sir.

4      A.     See, usually you would have a project engineer who

5    worked for the chief of engineering assigned to that -- a

6    task.  And depending upon the scope of that task, you would

7    have a project engineer, the head of engineering, maybe the

8    vice-president of operations interested in that kind of a

9    project.

10               And if it was of an even larger scale -- like

11   one of the things we had was a 35 million-dollar rebuild of

12   the wood yard and pulpmill.  I assumed the involvement in

13   regular review meetings of that kind of a project.

14     Q.     Did Kimberly-Clark retain the right to halt work if

15   they felt like that was necessary of a subcontractor or of a

16   contractor?

17               MR. ADAMS:  Objection, form.

18     A.     I really don't know.  That's never occurred that I

19   know about.

20     Q.     Again, you are not saying that it hasn't occurred.

21   You are just saying, not that anyone has brought it to your

22   attention?

23     A.     Being called upon to terminate a contract in

24   process?

25     Q.     No.  I'm sorry.  To halt work.  Let's say that you

1    are -- whoever this liaison is between Kimberly-Clark and the

2    contractor goes out one day and sees something being done that

3    either is not pursuant to the contract or is in violation of

4    some safety policy or procedures.  Did the Kimberly-Clark

5    representative have the ability to stop that work?

6         A.    They had the authority to do it.

7         Q.    Yes, sir.  And did they also have the authority to

8    if they felt like that one particular aspect of a job was not

9    moving fast enough to direct the contractor to adjust his man

10   power to help make this other part come up to speed with the

11   rest of it?

12             MR. ADAMS:  Objection, form.

13        Q.    Go ahead.

14             THE WITNESS:  That means I answer?

15             MR. ADAMS:  If you have an answer.

16        A.    That type of thing happened in all your review

17   meetings.  We had weekly review meetings; and if you were

18   behind in your schedule, I would say, "What are your plans to

19   bring yourself up to speed?"  Or an engineer would ask that

20   question.  Our Kimberly-Clark people would ride herd on the

21   per chart of the project.

22        Q.    All right.  And could they -- could

23   Kimberly-Clark -- did they have the authority to tell the

24   contractor, "We don't want you doing this one thing today.

25   Instead we would like you to work on this today."  Is that

47

1    what we just said we were talking about?

2          A.    We could do that, sure.

3          Q.    And did Kimberly-Clark have a right to expel --

4    whether it did or not is not important right now.  But did it

5    have the right to expel a contractor if it felt it needed to

6    do so?

7          A.    I would assume so with cause.

8          Q.    Okay.

9          A.    Those are -- usually things like that are written

10   into the contract.

11         Q.    All right.

12         A.    Termination.

13         Q.    And I guess, subcontractor or contractor employees

14   could not just -- did not just have free run of the facility;

15   is that right?

16         A.    That's correct.

17         Q.    They were limited to certain areas, couldn't go to

18   work unless -- in a portion of the facility unless

19   Kimberly-Clark directed them to?

20         A.    That's correct.

21         Q.    We have gone through most of the records; and as

22   you can see, we have just been sort of thumbing through them.

23   And we found a document that was highlighted out of there; so,

24   apparently there was some highlighted document in there.

25                          MR. ADAMS:  Objection.

48

1      Q.    Good memory.

2                MR. ADAMS:  Objection.  What happened, Glen,

3      was I accidentally gave you some of my highlighted documents

4      which I did not show to the witness.  But go ahead and ask him

5      about it.

6                MR. MORGAN:  Well, they are in the stack of

7      what he saw.

8                MR. ADAMS:  I understand.  But I mixed my

9      stacks up.  But that's fine.  You can go ahead and ask him

10     about them, if you want to ask him about them.

11               MR. MORGAN:  Well, I don't believe that.

12     Q.    (By Mr. Morgan) But anyway, that aside --

13               MR. ADAMS:  Well, I object to your side-bar

14     comment.

15               MR. MORGAN:  That's okay.  I object to a lot

16     of things you do.

17               MR. ADAMS:  Well, we will both object.

18     Q.    (By Mr. Morgan) This one here, this document here

19     is a document KM67.  It's dated 1986 -- September the 9th,

20     1986.  And it's sent to unit managers in the United States and

21     Canada.  Now, tell me -- on a corporate set-up who are the

22     unit managers?

23     A.    I would -- that's a pretty general term, as you can

24     see.  I could assume that it would mean that whoever the chief

25     executive officer of each operating facility is.  I don't

49

1   know.

2        Q.    Well, did you ever receive things from

3   Kimberly-Clark that was only addressed to unit managers?

4        A.    I don't recall so.  Most of the things are

5   pointedly directed.

6        Q.    Okay.  Well, so, I'm looking at a document that is

7   addressed to unit managers in the U.S. and Canada, and having

8   been with the company all of those years, who was the unit

9   manager either above you, below you, or was it you --

10       A.    Well, the --

11       Q.    -- in 1986?

12       A.    In 1986 the manager above me was at the corporate

13  level, not the local level.

14       Q.    Okay.

15       A.    That would have been Marv Gade of the executive

16  committee of Kimberly-Clark.

17       Q.    Okay.  What was his last name?

18       A.    G-a-d-e, Gade.

19       Q.    Is Mr. Gade still alive?

20       A.    He is still alive.

21       Q.    Do you know where he lives?

22       A.    He lives in either Naples, Florida, or Linville

23  Highlands, North Carolina, depending upon the season.

24       Q.    And Linville Highlands, do you know how to spell

25  Linville?

1              MR. YOUNG:  It's two different towns.

2        A.    No.  I'm not talking about Highlands and Linville.

3              MR. YOUNG:  Oh, you're not?

4        A.    There's a golf club, a private club right above

5    Linville called Linville Highlands.

6        Q.    And is it L-y-n --

7        A.    L-i-n-v-i-l-l-e.

8        Q.    L-i-n-v-i-l-l-e.  Okay.

9              MR. YOUNG:  It's one of the nicest places

10   around.

11             MR. MORGAN:  I'm not surprised you know about

12   that.

13       A.    It's where I had my honeymoon, off the record.

14       Q.    (By Mr. Morgan) Okay.  So, he would have been the

15   unit manager above you.  Did you ever learn --

16       A.    He was not a unit manager.

17       Q.    What was he?

18       A.    He was a member of -- the corporate executive

19   vice-president is responsible for many units.

20       Q.    Well, in 1986 were you a unit manager?

21       A.    I would presume so.

22       Q.    Well, and I don't know.

23       A.    And neither do I.

24       Q.    Well, yesterday you were shown a document, among

25   others as we discussed, that was addressed to unit managers,

1    dated September 19th, 1986, that discussed asbestos.  That was

2    the actual subject discussed.  Do you recall reviewing this

3    document?

4                 MR. ADAMS:  Why don't you show it to him,

5    Glen, so he can see.

6         A.    Let me see it.

7         Q.    (Tendering)

8         A.    (Reviewing) I might have seen this, but I saw a lot

9    of things.  That's as definitive as I can be.

10        Q.    Okay.  Do you recall seeing that document back in

11   1986?

12        A.    No.

13        Q.    Is Mr. Gasper -- was he still there when you left

14   in 1986, or do you know him?

15        A.    I don't know him.

16        Q.    Do you know if he was still with the company when

17   you left?

18        A.    Until that document, I don't remember ever hearing

19   his name before.

20        Q.    Did you even know that Kimberly-Clark had a

21   corporate industrial hygienist?

22        A.    Not really, no.

23        Q.    Okay.  Before reading this document, did you know

24   that you had employees that had died from exposure to asbestos

25   while working for Kimberly-Clark?

52

1       A.      I don't know that --

2                       MR. ADAMS:  Objection, form.  Go ahead.

3       A.      I don't know that any of our employees ever died as

4       a result of asbestos.

5       Q.      Okay.  Well, I guess that answered my question,

6       which was:  Before this, did you know?  And the answer is, no?

7       A.      Uh-huh.

8       Q.      Also, did you know before reading this that two

9       employees in 1986 were diagnosed with having asbestos-related

10      diseases?

11      A.      I did not know.

12                      MR. ADAMS:  Objection, form.

13      Q.      Did you know or -- Do you know about latency when

14      it comes to asbestos?

15      A.      No.

16      Q.      Did you know in 1986 as the president of this

17      entity called the U. S. Newsprint and Forest Products Division

18      that -- let me change that.

19                      If the corporation knew in 1981 that asbestos

20      was harmful to employees and people if they are exposed to

21      sufficient quantities of it, would you have liked to have

22      known that?

23                      MR. ADAMS:  Objection, form.

24      A.      That is sort of suppositional, isn't it?

25      Q.      I'm not real sure.

1      A.     Anytime our corporate people knew of anything I

2    needed to know about, when they came to Coosa Pines, would

3    make it a point to come to my office and review with me what

4    they were covering with the various involved and responsible

5    people within the operation.

6                  And during my time, never did anybody come to

7    my office and say, "We have an asbestos problem or otherwise."

8    It was simply something which never surfaced to the level that

9    people apparently thought that I should know about it.

10   Therefore, I don't recall seeing any document yesterday which

11   was pointedly directed toward me.

12     Q.     And yet you were their boss, right?

13     A.     That's correct.

14     Q.     And my point is:  If you had the knowledge that

15   asbestos was harmful, then wouldn't you have taken steps to

16   see to it that the employees were not exposed to it?

17                  MR. ADAMS:  Objection, form.

18     A.     If I had knowledge of any -- you have already heard

19   me say -- any high-risk or hazardous circumstance or material,

20   I would have responded to it to the fullest extent of my

21   ability.

22     Q.     And if there was a problem -- and by that I mean,

23   if employees were being exposed to asbestos and perhaps

24   violations of OSHA were occurring, is that the kind of thing

25   that should have been reported to you?

1                    MR. ADAMS:  Objection, form.

2          A.    I suppose so.  I would think so.

3          Q.    Well, is that the kind of thing you wanted reported

4     to you?

5          A.    Certainly.  Any hazard I wanted to know about.

6          Q.    And did you tell them that?

7          A.    I think it was patently clear, at least on our

8     plant-site.  I can't speak for the corporation in total.

9          Q.    No, sir.  I'm just talking about you.  You had your

10    monthly meetings.  And you told me earlier that you wanted to

11    know about the hazards, and you did things to correct them.

12                So, I'm asking you:  Do you think that the

13    people understood your commitment to safety and that any

14    hazards or things like that should be brought to your

15    attention?

16         A.    Yes.

17         Q.    And for instance, if there were violations

18    occurring of OSHA, that's something that they should have

19    reported to you; but they never did?

20         A.    Because I'm the guy that goes to jail.

21         Q.    Who is Mr. McDonnell, M-c-D-o-n-n-e-l-l?

22         A.    I'm not familiar with him.

23         Q.    All right.  Yesterday you would have been shown

24    Coosa River Newsprint Pulp and Forest Products Company

25    Base-line Industrial Hygiene Survey that was done from August

1    the 30th to November 12th, 1982.  The report itself is dated

2    February 11th, 1983, from Mr. Gasper.  Do you recall seeing

3    that?

4               MR. ADAMS:  Why don't you show him the

5    document, Glen, so he can look at it.

6        A.    I don't know Gasper.

7               MR. MORGAN:  I don't know where it is in your

8    stack.

9               MR. ADAMS:  Well, show him the one you have,

10   the one you are asking him about.

11              MR. MORGAN:  Well, again, it's just -- it's

12   not the one you looked at.

13       Q.    (Tendering)

14       A.    (Reviewing)

15       Q.    (By Mr. Morgan) Do you recall seeing that?

16       A.    I think so.

17       Q.    Is that the kind of report that would have been

18   sent to you?

19       A.    If in fact it was considered of a level that I

20   should know.  And that's just always a judgment on the part of

21   my deputies and whether we need to take this to the -- to

22   whomever.  See, I don't know this guy Gasper.

23       Q.    Yes, sir.  Can you pass that back to me and let me

24   ask you a question or two about it?

25       A.    Sure.

1    Q.   But this came from the corporate industrial

2  hygienist.  Do you know where he was located?

3    A.   I didn't even know we had one.

4    Q.   Okay.  And so, in the Kimberly-Clark Corporation

5  was it their practice or policy for something like this to be

6  generated and to bypass the president of this division and

7  give it to the facility?

8             MR. ADAMS:  Objection, form.

9    A.   Well, I think you know the answer to that.

10  Bypassing is not -- on responsible items is certainly not

11  appropriate.

12    Q.   Well, I know it wouldn't be appropriate.  But you

13  don't recall ever getting this survey, do you?

14    A.   No.  No.

15    Q.   And yet, just in glancing over it, did you see some

16  items that indicate that there is a problem with some of the

17  asbestos that was on the premises?

18    A.   Well, the comment in that report that said asbestos

19  is present but not considered to such a level as to be a

20  problem; and quite often that would cause this thing to be

21  intercepted at a lower level.

22    Q.   Shouldn't it come down?

23    A.   Not necessarily.

24    Q.   So, it's okay to bypass --

25    A.   No.  I'm talking about -- you mean down corporately

1   to division or from a line organization within the mill?

2        Q.    No.  I'm talking about this is the corporate

3   industrial hygienist that to me is at home office, whether he

4   is or not --

5        A.    Yes, somewhere.

6        Q.    -- but he is the corporate one for everybody.  And

7   it seems like if this is a Coosa River survey of industrial

8   hygiene that it wouldn't be sent maybe over here to somebody

9   else, some other division or some other facility in some other

10   state.  But it would at least make it down -- it would come to

11   you, and from you it would go down to Mr. Rollinson or some

12   other people.

13        A.    Quite often --

14             MR. ADAMS:  Let Mr. Morgan finish.

15        A.    That's not necessarily true, is all I can say.

16        Q.    Okay.  So, it wasn't in your opinion and based on

17   your recollection the policy of Kimberly-Clark to notify the

18   higher-ups, like yourself.  It might bypass them and go down

19   to the facility itself?

20        A.    That's correct.

21        Q.    Okay.  Well, these cases involve people being

22   exposed to asbestos-containing products at the Coosa Pines

23   facility in sufficient quantities to cause an asbestos-related

24   disease, and death in some cases.  And we filed suit on that

25   ground and that premise and we have asked to depose somebody

1    about that and we even set forth the areas.

2              And we have asked to be told in advance what

3    areas you are going to be testifying about.  We have not

4    received any information from the attorneys about that.  And

5    you have told us that as regarding those subjects, you are not

6    really qualified; and you also said you don't really know

7    exactly why you are here in terms of what areas you have been

8    asked to testify about.

9              So, I think based upon that -- and have I

10   stated all that correctly?

11             MR. ADAMS:  Objection, form.  And I instruct

12   you not to answer that question.

13             MR. MORGAN:  I don't think we can do that

14   anymore.

15             MR. ADAMS:  Oh, sure we can.  Pursuant to the

16   Rules, I can instruct a witness not to answer a question that

17   because of the way it's asked could not possibly elicit a fair

18   answer.  And you have asked multiple questions.  You have made

19   jury arguments.  You have made allegations in it.  So, there

20   is no way he could possibly answer that question the way you

21   asked it.

22             MR. MORGAN:  Form over substance, I think.

23        Q.   (By Mr. Morgan) But you told me -- just to make

24   sure I'm right.  You told me that you are not really qualified

25   to testify about any of those matters laid out in the notice;

1    is that correct?

2                    MR. ADAMS:  Objection, form.

3         A.    That's correct.

4         Q.    And you told me that you don't really know what --

5    you really weren't asked to testify about any particular

6    matter today, correct?

7                    MR. ADAMS:  Objection, form.

8         A.    That's correct.

9                    MR. MORGAN:  What were the other ones I said

10   awhile ago?

11                   MR. ADAMS:  You said --

12                   MR. MORGAN:  There's no matter that he was set

13   forth to testify about, nor does he know one.  He is not -- he

14   doesn't know about those.

15                   MR. ADAMS:  Most of that was that speech that

16   you gave at the beginning of it.  So, that's why.

17        Q.    (By Mr. Morgan) Okay.  So, in light of that -- no.

18   There was one.

19                   And Mr. Adams said that you had a lot of

20   knowledge if I would just ask you.  So, assuming that the

21   purpose of this deposition is to determine the amount of

22   asbestos-containing products at the Coosa Pines facility, you

23   can't help us there?

24        A.    That's correct.

25        Q.    And assuming that we want to know the types of

60

1    asbestos-containing products at the Coosa Pines facility, you

2    can't help me there?

3         A.    That's correct.

4         Q.    And in terms of the brand of asbestos-containing

5    products at the Coosa Pines facility, you can't help me there?

6         A.    That's correct.

7         Q.    And in terms of exposure to asbestos-containing

8    products by employees or contractors, you can't help me there?

9         A.    That's correct.

10        Q.    In terms of any policies or practices concerning

11   the monitoring of asbestos-containing products, you can't help

12   me there?

13        A.    That's true.

14        Q.    In terms of warnings to contractors concerning

15   working around asbestos-containing products, you can't help me

16   there?

17        A.    That's correct.

18        Q.    We talked about Kimberly-Clark retaining the right

19   to control the work, not only the scope of work, meaning what

20   they are doing, but the order in which they do it and

21   approving the plans for the contractors work, correct?

22             MR. ADAMS:   Objection, form.

23        A.    If I understand you, that's correct.

24        Q.    Okay.   In other words, so -- I will go through it a

25   again, to sort of clean it up.

61

1              Kimberly-Clark had the right to determine and

2    direct what work was being done by the contractor on what

3    day --

4              MR. ADAMS:  Objection, form.

5      Q.    -- is that right?

6              MR. ADAMS:  Same objection.

7      A.    Yes.

8      Q.    And Kimberly-Clark approved the plans for the work

9    that was going to be done by the contractor before it was

10   done, correct?

11     A.    That's correct.

12     Q.    And then they also would approve and in many cases

13   specify the materials that were being used on the premises by

14   the contractors; is that fair?

15             MR. ADAMS:  Objection, form.

16     A.    That's not quite that black and white.  But that's

17   not necessarily true.

18     Q.    Well, engineering-wise if you had a job to be done

19   by a contractor, wouldn't you specify the products that were

20   necessary?  And the contractor might be able to choose within

21   brands that would qualify for that application, but none the

22   less, Kimberly-Clark told them what the work was and what

23   technical specifications would be necessary?

24             MR. ADAMS:  Objection, form.

25     A.    Much of that was done with subcontracting work that

1    we didn't involve ourselves in.  That's -- the big reason is

2    that we didn't retain the right to specify who they would buy

3    a quarter-horse motor from.

4         Q.    That's right.  What you said was:  You need to use

5    a quarter-horse power motor on this thing.  You didn't really

6    care what kind they got.  But you wanted a quarter-horse power

7    motor.  That's my point.  You may have specified the size of

8    the motor, the horse power of the motor.  But you didn't tell

9    them what brand to go buy; is that right?

10        A.    That's true.

11        Q.    Okay.  And before a contractor could go to work,

12   they had to have special hazard permits issued if any of the

13   work might be hazardous to a Kimberly-Clark employee; is that

14   right?

15        A.    That's true.

16        Q.    And again, the contractor or subcontractor had to

17   comply with Kimberly-Clark's safety policies or procedures,

18   didn't they?

19        A.    That's correct.

20        Q.    Do you know of any employee of Kimberly-Clark that

21   was diagnosed with an asbestos-related disease?

22        A.    Well, one of my old golf buddies had; but it was

23   purportedly related to his tenure at Pascagoula or some place

24   prior to coming to Kimberly-Clark.

25        Q.    Okay.  What type of disease did he have?

63

1     A.    I really don't know, accepting he told me -- it was

2   on the golf course that he was -- this is sort of hazy.  But I

3   recall him telling me that he was drawing some kind of moneys

4   from an asbestos settlement related to a place where he had

5   worked.

6     Q.    Okay.  And did that not involve a cancer?

7     A.    He ultimately died of lung cancer.

8     Q.    Okay.  When was this that you learned of that?

9     A.    This would have been sometime after my retirement.

10     Q.    Okay.  Any other employee that you know of that was

11   diagnosed with an asbestos-related disease?

12     A.    No.  I'm not sure he had a disease relevant.  I

13   just know that he was being compensated.  Or I don't know

14   that.  He told me that he was being compensated.

15     Q.    Just to complete everything.  He told you that he

16   was diagnosed or had some asbestos problem?

17     A.    No.  No.

18     Q.    Just one day he told you I'm getting some money

19   because of an asbestos problem?

20     A.    Correct.

21     Q.    Which made you think he must have had one or he

22   wouldn't get compensated, right?

23                    MR. ADAMS:  Objection, form.

24     A.    I wouldn't want to extrapolate the logic into that.

25     Q.    Are you even able to tell us today in 2004 what

1    steps should have been taken back -- by Kimberly-Clark back in

2    the years at least when you were the president?

3                    MR. ADAMS:  Objection, form.

4        A.    No.  I can't tell you that.

5        Q.    And I guess let me -- I didn't ask the question

6    right.

7                    Can you tell us today in 2004 what steps

8    should have been taken that weren't taken to ensure that the

9    employees and the contractors on the premises of the Coosa

10   Pines facility in Alabama weren't exposed to asbestos in

11   quantities sufficient to cause them to contract an

12   asbestos-related disease?

13                   MR. ADAMS:  Objection, form.

14       A.    That's sort of convoluted, isn't it?

15       Q.    No, sir, not really.  And I usually ask those kinds

16   of questions, but that was not one of them.  I am just being

17   very technical in my question.  I wanted to get the facility

18   in there.  I wanted to get, you know, those kinds of things.

19   So, stay with me.

20                   Can you tell us today what steps should have

21   been taken back when you were president to ensure that the

22   employees or contractors at the Coosa Pines facility weren't

23   exposed to asbestos in quantities sufficient to cause disease?

24                   MR. ADAMS:  Objection, form.

25       A.    You still left me somewhere around second base.

1        Q.     All right.  I will talk slower and maybe louder.

2        A.     I am not prepared today to tell you what I should

3    have done 10, 15, or 20 years ago.

4        Q.     Well, I think that's the answer.  Sitting here

5    today, you don't know if anything different should have been

6    done at all?

7        A.     I really don't.

8        Q.     You really don't know even what was done back then,

9    do you?

10       A.     Related to --

11              MR. ADAMS:   Objection, form.  Go ahead.

12       A.     Related to asbestos?

13       Q.     Yes, sir.

14       A.     The answer to that is:  Yes.  I don't know what

15   should have been done then.  As I said earlier, the subject

16   never was raised.  I had all kind of other subjects related to

17   operations, sales, productivity, the market.  No one ever put

18   on my table anything that said, "You have got an asbestos

19   problem, or might have one," or "Is asbestos in the mill and

20   you should" -- It never arose.

21       Q.     Well, in looking at these documents, having seen

22   what was written while you were there, you are still not in a

23   position today to say, "Gosh, in looking at that, we should

24   have done something different than we did"?

25       A.     Not really, no.

66

```
 1      Q.    Okay.

 2            MR. MORGAN:  You know, I'd like to know some

 3   information about some of the things we had asked about; but

 4   this gentleman doesn't appear to have that.

 5            So, at this time I don't have any further

 6   questions.

 7            MR. ADAMS:  Do you have any questions?

 8            MS. POLIDORO:  No.

 9            MR. ADAMS:  Just a couple.

10                            EXAMINATION

11   BY MR. ADAMS:

12      Q.    Mr. Pinkerton, first tell me again, when were you

13   born?

14      A.    May 29, 1925.

15      Q.    And so, this -- in a couple of weeks, you will turn

16   79 years old; is that correct, sir?

17      A.    That's correct.

18      Q.    And you retired from KCC how many years ago?

19      A.    May 1, 1988.

20      Q.    So, that's 16 years ago?

21      A.    16 years ago almost next week.

22      Q.    Okay.  The Coosa Pines mill that you were president

23   of from '81 to '87, how many acres of ground did that mill

24   itself cover?

25      A.    The mill ground proper was, I think, 640 acres,
```

67

1      there about.

2          Q.     And during the time that you were president,

3      approximately how many employees were there?

4          A.     About 1200.

5          Q.     Oh, by the way, the gentleman you were talking

6      about a little while ago who said he was receiving some

7      compensation who ultimately died of lung cancer as you

8      appreciate it, what was his name?

9          A.     His name was J. W. Smith.

10         Q.     Did he have a nickname?

11         A.     Bugle.

12         Q.     What did he do?

13         A.     He was -- had a number of jobs.  He was a

14     pipefitter.  He was a foreman of a sheet metal shop.  He was a

15     project foreman, small projects around the mill.

16         Q.     Was he one of your golfing buddies?

17         A.     He was.

18         Q.     And he was a craft worker at the mill?

19         A.     Yes.

20         Q.     I just wanted to ask you a couple of questions

21     about paper-making.  What type of paper did this mill make?

22         A.     Primarily newsprint paper with some groundwood

23     specialities for conversion into paperback books, magazines,

24     and the like.

25         Q.     Is that paper-making process a wet process or a dry

68

1    process?

2        A.    Very wet.

3        Q.    Can you explain that?

4        A.    Well, we were making in those days as I recall

5    about 1,500 tons of paper a day; and we were using 40 million

6    gallons of water a day in the process.

7        Q.    And Mr. Morgan asked you whether or not you

8    manufactured any asbestos-containing products at the Coosa --

9    at the Kimberly-Clark facility in question.   To your

10   knowledge -- and by the way, were you ever involved in product

11   formulation?

12       A.    Yes.

13       Q.    Did any of the products that were ever made by the

14   Coosa Pines mill to your knowledge ever contain asbestos?

15       A.    No.

16       Q.    Now, did -- speaking about asbestos, did any

17   asbestos product manufacturers ever furnish to you any

18   warnings about the hazards of asbestos while you were employed

19   at Kimberly-Clark?

20       A.    No.

21       Q.    At any other time?

22       A.    No.

23       Q.    During the time you were president of

24   Kimberly-Clark, were any parts of the mill out of service --

25   in other words, shut down or closed?

1      A.    We were in a growth process; and, yes, we shut down

2   what we called the No. 1 craft pulpmill and replaced it with a

3   larger system.  We -- one of the boilers in our power system

4   was down and had been down.  We didn't shut it down during my

5   tenure.

6      Q.    Which boiler was that?

7      A.    This was in our power generating -- which we

8   acquired from the government.

9      Q.    Did that boiler have a name?

10     A.    We called it the AOW boiler or powerhouse because

11  that's Alabama Ordnance Works was the name of the munitions

12  facility where we built our mill.

13     Q.    I should have asked you that.  There was a power

14  plant at this mill; is that correct?

15     A.    That's correct.

16     Q.    Who built that power plant?

17     A.    That was built by the government for power during

18  the era when they were making tetrol and TNT and

19  nitrocellulose at Childersburg, Alabama.

20     Q.    Was that built by the United States Government or

21  the Alabama government?

22     A.    Built by the United States Government.

23     Q.    Okay.  Did -- when contractors were at the mill,

24  did Kimberly-Clark's employees control the actual work being

25  done by individual craft workers?  And let me break that down

1    a little bit.  Would Kimberly-Clark employees tell the craft

2    workers when to report to work and when to go home?

3        A.   Yes.

4        Q.   And do you know if there was a person in charge of

5    administering contractors, or would it vary from project to

6    project?

7        A.   It would vary.

8        Q.   You were shown some documents yesterday with

9    respect to things that happened after you retired or during --

10   I'm sorry -- during the time you were president that had to do

11   with asbestos; is that correct?

12       A.   That's correct.

13       Q.   Do you recall seeing any documents with respect to

14   air sampling or monitoring that was done in the plant?  Do you

15   recall anything like that right now?

16       A.   I'm not sure.

17       Q.   All right.  Let me ask you a quick question or two.

18   Just a second, sir, I'm going to find what I'm looking for in

19   one second, I think.

20            MR. MORGAN:  Are you looking for the

21   highlighted documents?

22            MR. ADAMS:  Yes.  Did y'all pull those out?

23            MR. MORGAN:  Just that one, but we put it

24   back.  If you will bring the other ones out, we will look at

25   them.

71

1              MR. ADAMS:  I'm getting close, but that's not

2    the one I'm looking for.

3              MR. MORGAN:  Do you want our copy?

4              MR. ADAMS:  Do you have the one that you

5    showed him that was highlighted at the top?  Hang on a second.

6              MR. MORGAN:  That's the one you are looking

7    for?

8              MR. ADAMS:  I think that's the one I'm looking

9    for.  I will know it when I find it.

10             MR. MORGAN:  Do you have them in numerical

11   order?

12             MR. ADAMS:  I have them in whatever order we

13   sent them to you.

14             MR. MORGAN:  It was page 67.

15             MR. ADAMS:  Page 67.

16   Q.    (By Mr. Adams) I think this is what I want right

17   here.  This is it.  The -- Mr. Morgan showed you a document

18   entitled Base-line Industrial Hygiene Survey.  And there was

19   one question I wanted to ask you about.  And that was this

20   paragraph right here that begins with -- "Only one sample for

21   asbestos was collected."  Would you read the first two

22   sentences of that, please?

23   A.    (Reading) Only one sample for asbestos was

24   collected.  This sample indicated that ambient asbestos

25   concentrations in the powerhouse were below existing and

1    pending standards.

2         Q.    Now, is that the powerhouse that you just told us

3    about a moment ago that was built by the United States

4    Government?

5         A.    Yes.  Yes.

6         Q.    Thank you.

7               MR. ADAMS:  Mr. Pinkerton, that's all I have.

8    Thank you very much, sir.

9                         RE-EXAMINATION

10   BY MR. MORGAN:

11        Q.    Mr. Pinkerton, can you tell me where else asbestos

12   was found on the Kimberly-Clark facility?

13        A.    I think -- I'm not sure.  I would say asbestos is

14   not that uncommon in most operating areas of the mill where

15   insulation is required.

16        Q.    Okay.  And I take it that at some point in time the

17   mill work was done -- power-wise was done by steam?

18        A.    Much of it, yes.

19        Q.    And so, when we were talking about a powerhouse,

20   what was that?  Was it a steam powerhouse?

21        A.    It was a 25,000 KVA electro-generating plant,

22   coal-fired, 250,000 tons a year coal.

23        Q.    All right.  And was it used to produce the steam?

24        A.    It was our process steam generator and auxiliary

25   electricity generator.

1      Q.    All right.  And was there another steam generating

2    facility besides that?

3      A.    Well, there was steam that was generated by

4    recovery boilers in the craft pulpmill, as well.

5      Q.    All right.  Now, did you say the U.S. Government

6    built this power plant what year?

7      A.    About 1944 or '45.

8      Q.    All right.

9      A.    Right at the end of the second World War.

10     Q.    And did they also provide all the steam lines that

11    ran throughout the facility?

12     A.    Not to our plant because it didn't exist at that

13    point in time.  Our plant was built in '48, '49.

14     Q.    Okay.  So, when the government built that

15    powerhouse, what was it for?

16     A.    For the generation I mentioned earlier of the

17    smokeless powder, tetrol, TNT.  It was one of the largest --

18    the Kingsport Ordnance is one -- and all over the country.

19     Q.    Well, who was making that product or those

20    products?

21     A.    One of the contractors there was Du Pont.  I don't

22    know who the others are or had -- operating those plants for

23    the government.

24     Q.    I'm sorry.  I got confused.  I thought that

25    Mr. Adams was asking you questions about a power plant that

1    was built for Kimberly-Clark.

2         A.    No.  It was bought by us as a part of the property

3    that we bought to build our mill.  The power plant and the

4    water filtration plant were government constructions which

5    came with our purchase of the plant -- of the plant site for

6    the building of our papermill.

7         Q.    I got you.  Okay.  So, the government originally

8    built it but then abandoned it if by no other means than

9    selling it?

10        A.    That's right.

11        Q.    Okay.  And then, y'all built the facility --

12   Kimberly-Clark built the facility --

13        A.    The papermill, uh-huh.

14        Q.    -- and ran all the steam lines and everything that

15   connected back to that power plant?

16        A.    That's correct.

17        Q.    And in addition to that power plant, there were

18   other areas to help generate steam for the power that the

19   facility might need?

20        A.    And for the recovery of chemicals in our craft

21   pulpmill.

22        Q.    Okay.  And so -- and when we were talking about

23   other facilities for the generation of steam, we are talking

24   about boilers?

25        A.    That's true.

1      Q.      How many boilers were on the Kimberly-Clark

2    facility?

3      A.      Well, it varies according to the date.  But we

4    originally only had one recovery boiler.  Then we expanded the

5    mill and had a second recovery boiler.  Then we expanded the

6    mill again and had a third recovery boiler.

7      Q.      Okay.  What year did you go to two recovery

8    boilers?

9      A.      I believe that was in -- when we put in our third

10   paper machine, which would have been 1956 or '57, thereabouts.

11     Q.      All right.  And what about the third one?

12     A.      It was concurrent with the installation of craft

13   pulp -- our rolled fluff pulpmill in about 1967.

14     Q.      Okay.  And size-wise were they all about the same

15   size?

16     A.      No.  No.  They were sequentially larger based on

17   the expanded operation.

18     Q.      Okay.  Can you give us some idea of the largest

19   boiler that we are talking about, not the original power

20   plant, but the largest -- the third boiler, recovery boiler?

21     A.      I'm afraid my memory bank goes out.  They are

22   discussed in terms of tonnage or tons, and I really don't --

23   can't answer that question.

24     Q.      Okay.

25             THE VIDEOGRAPHER:  About six minutes of the

1    tape left.

2         Q.    At any -- let me back up.  Was the power plant

3    purchased from the government before 1948?

4         A.    It would have been in that area.  And I wouldn't

5    want to say before '48 or right after '48, because I was hired

6    to go to work for that facility at that time.  And that's when

7    the whole thing was unfolding, and I wasn't involved in that

8    process then.

9         Q.    Okay.  So, the facility itself was built --

10        A.    The original facility was built in 1948 and '49.

11        Q.    Okay.  And of course they had to buy the powerhouse

12   from the government before that?

13        A.    That's correct.

14        Q.    And who was responsible for making repairs or

15   modifications to that powerhouse, the original powerhouse?

16                   MR. ADAMS:  Objection, form.

17        A.    We didn't modify that powerhouse until -- of

18   substance until 19 -- some of my part in 1983, '84, when we

19   put in scrubbers and precipitators.

20        Q.    All right.  Well, at that time did you call out the

21   government to come do that?

22        A.    No.  No.  We acquired the whole property in 1948

23   from the government or thereabouts.

24        Q.    All right.  And so, if there had been repairs or

25   maintenance, it was performed by Kimberly-Clark or a

77

1    subcontractor or a contractor; but you didn't call the

2    government out to come take care of that power plant?

3        A.    That's correct.

4        Q.    And that power plant operated for Kimberly-Clark at

5    the Coosa Pines facility from 1948 when it began to be your

6    baby until 1983 when y'all made some modifications?

7        A.    That's correct.

8        Q.    And I assume it's still there today?

9        A.    It's still operating.

10       Q.    Okay.  Do you know if there is any air monitoring

11   responsibility on the part of corporations for things like

12   asbestos?

13       A.    I don't know about asbestos.  Air monitoring of

14   stack gases, yes.  But the asbestos I have no idea about.

15       Q.    Okay.

16            MR. MORGAN:  Let me go off the record.  He

17   needs to change the tape anyway.

18            Have you got some questions?

19            MR. ADAMS:  I have got two real quick.  Do you

20   want me to ask them real quick?

21            MR. MORGAN:  Go ahead.

22                      RE-EXAMINATION

23   BY MR. ADAMS:

24       Q.    Did Kimberly-Clark sell this mill, to the best you

25   know?

```
 1      A.    Yes.  They sold it.

 2      Q.    When was that; and to whom was it sold, as far as

 3 you know?

 4      A.    Well, it was sold to Alliance.  I really don't know

 5 the year that it was sold.

 6      Q.    After --

 7      A.    After I retired.

 8            MR. ADAMS:  Thank you, sir.

 9            Thank you, Glen.

10            THE VIDEOGRAPHER:  Off the record at 11:32.

11            (PROCEEDINGS CONCLUDED)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        NO. B-150,896

 2   INEZ MARTIN, ET AL        ) IN THE DISTRICT COURT OF
                               )
 3             Plaintiffs,     )
                               )
 4   VS.                       ) JEFFERSON COUNTY, TEXAS
                               )
 5   ACandS, INC., ET AL       )
                               )
 6             Defendants.     ) 60TH JUDICIAL DISTRICT

 7                    REPORTER'S CERTIFICATION
                   DEPOSITION OF S. B. PINKERTON
 8                        April 16, 2004

 9        I, STARLA L. FOUST, a Certified Shorthand Reporter in and

10   for the State of Texas, hereby certify to the following:

11        That the witness, S. B. PINKERTON, was duly sworn by the

12   Officer and that the transcript of the oral deposition is a

13   true record of the testimony given by the witness;

14        That the deposition transcript was submitted on

15   _____, to the witness or to the attorney for the

16   witness for examination, signature and returned to me by

17   _____;

18        That the amount of time used by each party at the

19   deposition is as follows:

20        MR. GLEN MORGAN - 1:44

21        MR. KENT ADAMS - 0:10

22        That pursuant to information given to the deposition

23   officer at the time said testimony was taken, the following

24   includes counsel for all parties of record:

25        MR. GLEN MORGAN, Attorney for Plaintiffs
```

1          MR. DAVID FERRELL, Attorney for Plaintiffs

2          MR. CHRIS PORTNER, Attorney for Plaintiffs

3          MR. KENT ADAMS, Attorney for Defendant

4          MR. LANE YOUNG, Attorney for Defendant

5          MS. SARAH TURNIPSEED, Attorney for Defendant

6          MS. DONNA POLIDORO, Attorney for Defendants

7          I further certify that I am neither counsel for, related

8     to, nor employed by any of the parties or attorneys in the

9     action in which this proceeding was taken, and further that I

10    am not financially or otherwise interested in the outcome of

11    the action.

12         Further certification requirements pursuant to Rule 203

13    of TRCP will be certified to after they have occurred.

14         Certified to by me this _____ of _____, ____.

15

16

17                          STARLA L. FOUST, Texas CSR 5946
                            Expiration Date:    12-31-05
18                          Charlotte Smith Reporting, Inc.
                            Firm Registration No. 273
19                          235 Orleans Street
                            P. O. Box 4049
20                          Beaumont, Texas   77704-4049
                            (409) 839-4407
21

22

23

24

25

81

1           FURTHER CERTIFICATION UNDER RULE 203 TRCP

2      The original deposition was/was not returned to the

3  deposition officer on _____;

4      If returned, the attached Changes and Signature pages

5  contains any changes and the reasons therefor;

6      If returned, the original deposition was delivered to

7  _____, Custodial Attorney;

8     That $_____ is the deposition officer's charges

9  to the Plaintiff for preparing the original deposition

10  transcript and any copies of exhibits;

11     That the deposition was delivered in accordance with Rule

12  203.3, and that a copy of this certificate was served on all

13  parties shown herein and filed with the Clerk.

14     Certified to by me this _____ day of _____, _____.

15

16

17                      _____
                        STARLA L. FOUST, Texas CSR 5946
                        Expiration Date:    12-31-05

18                      Charlotte Smith Reporting, Inc.
                        Firm Registration No. 273

19                      235 Orleans Street
                        P. O. Box 4049

20                      Beaumont, Texas  77704-4049
                        (409) 839-4407

21

22

23

24

25

82

```
1                        CHANGES AND SIGNATURE

2    PAGE    LINE      CHANGE                    REASON

3    _____

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

83

```
1        I, S. B. PINKERTON, have read the foregoing deposition

2   and hereby affix my signature that same is true and correct,

3   except as noted above.

4

5                                    _____

                                     S. B. PINKERTON
6

7   THE STATE OF _____)

8   COUNTY OF _____)

9        Before me, _____, on this day

10  personally appeared S. B. PINKERTON, known to me (or proved to

11  me under oath or through _____) (description of

12  identity card or other document) to be the person whose name

13  is subscribed to the foregoing instrument and acknowledged to

14  me that they executed the same for the purposes and

15  consideration therein expressed.

16       Given under my hand and seal of office this _____ day of

17  _____, _____.

18

19                                   _____

                                     NOTARY PUBLIC IN AND FOR
20                                   THE STATE OF _____

21

22

23

24

25
```