

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

APR 2 0 2006

FILED
CLERK'S OFFICE

# BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

## MDL DOCKET NO. 875 - ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)

| | |
|---|---|
| MICHAEL CATANIA, ET AL | C.A. NO. 3:05-1418 |
| VERSUS | UNITED STATES DISTRICT COURT |
| ANCO INSULATIONS, INC., ET AL | MIDDLE DISTRICT OF LOUISIANA |

## OPPOSITION TO PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER

NOW INTO COURT, through undersigned counsel, comes defendant, DSM Copolymer, Inc., and files this Opposition to the Motion by Plaintiffs to vacate the conditional transfer order transferring this case to Multidistrict Litigation No. 875 (asbestos). For the reasons set forth below, Plaintiffs' motion should be denied.

## SUMMARY OF ARGUMENT

Plaintiffs suggest that their Motion to Vacate should be granted because DSM should not have removed this action from state court under 28 U.S.C. 1442. As the panel has made plain, time and again, that argument is irrelevant to the issues before the Panel. *In re Asbestos Prods. Liab. Litig.*, 771 F.Supp. 415 (J.P.M.L.1991). Plaintiffs' regurgitation of their motion to remand in this context is inappropriate and inconsiderate of the time and resources of the Panel and the other parties.

OFFICIAL FILE COPY

IMAGED APR 2 1 2006

The simple matter is that this is a 'tag-along' action appropriate for transfer by the panel under 28 U.S.C. § 1407.  Plaintiffs' argument that the remand of a prior related action for trial preempts transfer of this new action, involving different parties, different claims, and different alleged damages, illustrates their misunderstanding of the relevant law, procedure, and facts.  A remand of a transferred case to the transferor court for trial cannot legally preempt the transfer of another action, involving a different cause of action[1] and different parties, and which will not even be filed for another thirty-one months.  Plaintiffs' contention that the prior suggestion of remand intended to remand this action defies logic.  Review of that order shows that plaintiffs either grossly misinterpret or misapprehend the standard "form" language referenced therein.

Additionally, collateral estoppel does not apply because the remand of the prior action to the transferor court for trial did not make a final adjudication of any merits issue essential to the case.

## SPECIFIC RESPONSES

In response to the specific numbered paragraphs in plaintiffs' motion, DSM responds as follows:

1.

Plaintiffs' argument that this action was improperly removed (stretching from pages 2 to 22 of Plaintiffs' Memorandum in Support of Motion to Vacate Conditional Transfer

---

[1]  In fact, a cause of action had not even arisen at the time of the prior order, i.e., wrongful death.

Order) is irrelevant to the issue before the Panel - whether this case is an asbestos personal injury case within the scope of the Panel's 1991 decision. *In re Asbestos Prods. Liab. Litig.*, 771 F.Supp. 415 (J.P.M.L.1991).   Plaintiffs' arguments against transfer have been consistently and regularly rejected by the Panel.   In its initial opinion creating this MDL docket, the Panel made clear that "distinctions based on such matters as pendency of motions or *other* matters before the transferor court" do not present a basis "for carving out exceptions to transfer in this extraordinary docket." *Id.*

Additionally, Plaintiffs' argument that this action was improperly removed is legally and factually incorrect. Attached hereto as Exhibit "A," and incorporated herein by reference as if repeated *in extenso*, is DSM's Opposition to the Motion to Remand,[2] explaining why removal was proper.

2. through 9.

In response to plaintiffs' assertions contained in numbered paragraphs 2 through 9 of plaintiffs' Motion to Vacate, reiterating various contentions raised in plaintiffs' motion to remand this action to state court, please see DSM's response to numbered paragraph 1, regarding the relevance of such arguments to this proceeding, and please also see the arguments presented in DSM's Opposition to Plaintiffs' Motion to Remand, attached hereto as Exhibit "A."

---

[2] Because of their volume, DSM has not included with Exhibit "A" the Exhibits attached to and filed with the Opposition to Plaintiffs' motion to remand.  DSM will gladly provide a copy of the exhibits to the Panel or any party upon request.

10.

In response to plaintiffs' assertions contained in numbered paragraph 10 of the Motion to Vacate, on information and belief, the prior suit was only remanded to the Middle District of Louisiana because the parties had certified – before the suit was ever removed from state court to federal court – that discovery was complete.[3]  Where all discovery is complete, the appropriateness of M.D.L.-consolidated discovery and pre-trial proceedings is appreciably less.  Therefore, insofar as discovery is not complete in the instant action (there has been no Rule 26 conference, no initial disclosures, and absolutely no discovery or other activity of any kind involving DSM), what happened regarding the M.D.L. in the prior action is irrelevant.

Plaintiff's statement that "[t]he only additional event since the settlement of the survival action was the death of Barbara Catania" is legally and factually erroneous.  At a minimum, plaintiffs have filed this new wrongful death action, allegedly based on their own personal damages, raising issues temporally and categorically distinct from what was at issue in the prior action.

11.

In response to plaintiffs' assertions contained in numbered paragraph 11 of the Motion to Vacate, plaintiffs' argument that this "... case is ready for trial" is simply wrong.  There has been no Rule 26 conference.  There have been no initial disclosures.  There has been no

---

[3] Subsequent events showed that discovery was not, in fact, complete, but that is a separate issue.

discovery involving DSM.  DSM, which was not a direct defendant in the prior action is entitled to an appropriate opportunity to develop, challenge, and engage in appropriate discovery relevant to plaintiffs' claims brought against DSM for the first time.

12.

In response to plaintiffs' assertions contained in numbered paragraph 12 of the Motion to Vacate, plaintiffs' contention that this action,[4] filed 31 months <u>after</u> the referenced suggestion of remand,[5] was remanded from the Eastern District of Pennsylvania to the Middle District of Louisiana (two and-a-half years before it was filed), defies logic and standard precepts of law.  Plaintiffs refer to the uniform notation, likely present in each and every remand to the transferor court, that "[I]n the event the above-listed case is a multiple plaintiff (victim) action, this transfer is for the above-named party only, or said parties representative, and any spousal or dependent actions."  By use of this notation, Judge Weiner did not reach through time and make a binding ruling in a case that did not yet exist.

12. (second)

In response to plaintiffs' assertions contained in the second numbered paragraph 12 of the Motion to Vacate, collateral estoppel will not apply to prior remand determinations of the transferee court because such issues involved were not merit-based, high profile issues,

---

[4] Plaintiffs' petition was filed in state court on November 23, 2005.

[5] The suggestion of remand is dated April 7, 2003.

which were actually litigated by the same parties to a final judgment. [*See Rucker v. Shalala*, 894 F. Supp. 1209 (S.D. Ind.1995), enumerating the following as the relevant issues for application of collateral estoppel: (1) the issue was actually litigated in a prior proceeding; (2) there was a full and fair opportunity to litigate the issue at that time; (3) the issue was actually decided in the first action; (4) a valid, final disposition of the issue in question was made on the merits; (5) it was necessary to decide the issue in the first case; (6) the issue occupied a high position in the first case; (7) the later litigation is between the same parties or parties that are bound by the previous litigation; (8) issue was foreseeably important at the time of the first case and necessary to its judgment. *See Laughlin v. United States*, 344 F.2d 187, 191 (D.C.Cir.1965); and *Hyman v. Regenstein*, 258 F.2d 502, 510-11 (5th Cir.1958), cert. denied, 359 U.S. 913, 79 S.Ct. 589, 3 L.Ed.2d 575 (1959); and (9) there are no special considerations, such as fundamental fairness, which deny application of issue preclusion.]

See also *U.S. v. Shanbaum*, 10 F.3d 305 (5th Cir. 1994) ("Issue preclusion is appropriate only if the following four conditions are met.... [T]hird, the issue must have been necessary to support the judgment in the prior case. Fourth, there must be no special circumstance that would render preclusion inappropriate or unfair. *Universal American Barge Corp. v. J-Chem, Inc.*, 946 F.2d 1131, 1136 (5th Cir.1991) *citing Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326-32, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979). Accordingly, plaintiffs' Motion to Vacate Conditional Transfer Order issued in this case should be denied.

WHEREFORE, plaintiffs' motion to vacate the Conditional Transfer Order, transferring this case to Multidistrict Litigation No. 875 (asbestos), should be denied.

Respectfully submitted:

David K. Nelson (#17075)
G. Trippe Hawthorne (#23773)
KEAN, MILLER, HAWTHORNE, D'ARMOND,
McCOWAN & JARMAN, L.L.P.
One American Place, 22nd Floor
Post Office Box 3513 (70821)
Baton Rouge, Louisiana 70825
Telephone: (225) 387-0999
Facsimile: (225) 388-9133

*Attorneys for DSM Copolymer, Inc.*

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

APR 2 0 2006

**CERTIFICATE OF SERVICE**

FILED
CLERK'S OFFICE

I hereby certify that a copy of the foregoing has this day been placed in the U.S. Mail,

postage prepaid, and addressed to all counsel of record listed on the attached Panel Service

List.

Baton Rouge, Louisiana, this 18th day of April, 2006.

**PANEL SERVICE LIST**
**JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

Michael Catania, et al v. Anco Insulations
MDL Docket No. 875

Gary A. Bezet
Kean, Miller, Hawthorne, D'Armond,
McCowan & Jarman, LLP
One American Place
22nd Floor
P.O. Box 3513
Baton Rouge, LA  70821-3513

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH  44114

Edward J. Cass
Gallagher, Sharp, Fulton & Norman
Bulkley Building, 7th Floor
1501 Euclid Avenue
Cleveland, OH  44115

Adam M. Chud
Goodwin Procter, LLP
901 New York Avenue, N.W.
Washington, D.C.  20001

David A. Damico
Burns, White & Hickton, LLC
Four Northshore Center
106 Isabella Street
Pittsburgh, PA  15212

S. Gene Fendler
Liskow & Lewis
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, LA  70139

Raymond P. Forceno
Forceno & Hannon
111 S. Independence Mall East
The Bourse, Suite 1000
Philadelphia, PA  19106-2574

Ellen B. Furman
Goldfein & Hosmer
1600 Market Street
33rd Floor
Philadelphia, PA  19103

Leon Gary, Jr.
Jones, Walker, Waechter, et al
5th Floor
Four United Plaza
8555 United Plaza Boulevard
Baton Rouge, LA 70809

Kathleen A. Gendusa
Taylor, Porter, Brooks & Phillips
P.O. Box 2471
451 Florida Street, 8th Floor
Baton Rouge, LA 70820

Susan M. Hansen
Brownson & Ballou
225 South Sixth Street
Suite 4800
Minneapolis, MN  55402

Ralph S. Hubbard III
Lugenbuhl, Wheaton
601 Poydras Street, Suite 2775
New Orleans, LA  70130

1024940_1

Susan B. Kohn
Simon, Peragaine, Smith & Redfearn
1100 Poydras Street, Suite 300
New Orleans, LA  70163

Reginald S. Kramer
Oldham & Dowling
195 South Main Street, Suite 300
Akron, OH  44308-1314

Deborah K. Kuchler
Abbott, Simses & Kuchler
400 Lafayette Street, Suite 200
New Orleans, LA  70130

David C. Landin
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA  23219

Christopher K. Lightfoot
Hailey, McNamara, Hall, Larmann & Papale
One Galleria Boulevard, Suite 1400
P.O. Box 8288
Metairie, LA  70011-8288

Gene Locks
Greitzer & Locks
1500 Walnut Street
Philadelphia, PA  19102

Lynn M. Luker
Lynn Luker & Associates
3433 Magazine Street
New Orleans, LA  70115

Janet L. MacDonell
Deutsch, Kerrigan & Stiles
755 Magazine Street
New Orleans, LA  70130

Ronald L. Motley
Motley Rice, LLC
28 Bridgeside Boulevard
Mt. Pleasant, SC  29465

Andrew L. Plauche, Jr.
Plauche, Maselli, Landry & Parkerson, LLP
201 St. Charles Avenue, Suite 4240
New Orleans, LA  70170-4240

Lawrence G. Pugh III
Montgomery, Barnett, Brown, Read
3200 Energy Centre
1100 Poydras Street
New Orleans, LA  70163-3200

John J. Repcheck
Marks, O'Neill, O'Brien & Courtney
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA  15219

Gerolyn P. Roussel
Roussel & Roussel
1710 Cannes Drive
LaPlace, LA  70068

John D. Roven
Roven, Kaplan & Wells, LLP
2190 North Loop West, Suite 410
Houston, TX  77018

Richard D. Schuster
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH  43216

Neil Selman
Selman, Breitman & Burgess
11766 Wilshire Bouelvard, Sixth Floor
Los Angeles, CA  90025

Robert N. Spinelli
Kelley, Jasons, McGuire & Spinelli
15th Floor
Centre Square West
Philadelphia, PA  19102

Robert E. Swickle
Jaques Admiralty Law Firm, PC
The Maritime Asbestosis Legal Clinic
1570 Penobscot Building
Detroit, MI  48226

Andrew J. Trevelise
Reed Smith, LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA  19103

Mark E. Van Horn
Taggart, Morton, Ogden, Staub, & O'Brien,
LLC
1100 Poydras Street, Suite 2100
New Orleans, LA  70163-2100

James K. Weston II
Tom Riley Law Firm
4040 First Avenue N.E.
P.O. Box 998
Cedar Rapids, IA  52406

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

UNITED STATES DISTRICT COURT

APR 2 0 2006

MIDDLE DISTRICT OF LOUISIANA

FILED
CLERK'S OFFICE

MICHAEL CATANIA and
KRISTEN CATANIA

C.A. NO. 05-1418-JJB-DLD

VERSUS

JUDGE BRADY

ANCO INSULATIONS, INC.
(SUCCESSOR TO THE ABER
COMPANY, INC.); et al

## OPPOSITION TO MOTION TO REMAND

This memorandum is submitted on behalf of DSM Copolymer, Inc. ("DSM") in opposition

to the plaintiffs' Motion to Remand. DSM submits the following documentary evidence in support

of its position:

1.      Certified Copy of the Opposition to Motion to Remand filed by DSM in *Barbara Catania*

and *Michael Catania v. Acands, Inc., et al*, C.A. No. 02-368-D-M1, United States District

Court, Middle District of Louisiana,[1] with the following Exhibits attached:

    A.      Act of Sale, Vendor's Lien, and Special Mortgage for Plancor 152 (butadiene plant);

    B.      Act of Sale, Vendor's Lien, and Special Mortgage for Plancor 876 (synthetic rubber

        plant);

    C.      Operating Agreement and Agreement of Lease copied from National Archives and

        Records Administration;

    D.      Affidavit (certified copy) of Arley Ray Baker, original of which is in the record of

        the action entitled *Verna G. LaLonde, et al. v. Delta Field Erection, et al*, C.A. No.

---

[1]Because the certified copy was bound and sealed by the Clerk, the original will be filed with the clerk and
service copies will be made from file copies of this exhibit, with the first page reflecting the Clerk's certification.

1003836_1

Page 1 of 24



EXHIBIT

A

96-3244-B-M3, United States District Court, Middle District of Louisiana;

E.    Affidavit (certified copy) of Martin E. Samuels, original of which is in the record of
the action entitled *Verna G. LaLonde, et al. v. Delta Field Erection, et al,* C.A. No.
96-3244-B-M3, United States District Court, Middle District of Louisiana;

F.    Affidavit (certified copy) of Robert Dennis, original of which is in the record of the
action entitled *Joseph Keller, Sr., et al. v. Owens-Corning Fiberglass Corporation,
et al.,* C.A. No. 99-546-C-M3, United States District Court, Middle District of
Louisiana;

G.    Executive Order No. 10678, September 20, 1956, President Dwight D. Eisenhower;

H.    Copy of Opinion of Magistrate Judge Docia Dalby, dated August 5, 1998, in *Verna
G. LaLonde, et al. v. Delta Field Erection, et al,* C.A. No. 96-3244-B-M3, United
States District Court, Middle District of Louisiana;

I.    Excerpts from deposition transcript of Victor Reno taken on February 6, 2002, pp.
9-13, 15, 55-62 and 109-110;

J.    Plaintiffs' Master Interrogatories, Requests for Production of Documents and/or
Things, and Requests for Admissions Propounded to All Defendants;

K.    Historical documents from National Archives and Records Administration, in globo,
demonstrating the government's control over DSM until 1965; and

L.    Executive Order No. 10539.

2.    Certified copy of Magistrate Judge's Report of Magistrate Judge Steven Riedlinger dated
June 14, 2002, in *Barbara Catania and Michael Catania v. Acands, Inc., et al,* C.A. No. 02-
368-D-M1, United States District Court, Middle District of Louisiana.

3.    Certified copy of ruling of Judge James J. Brady dated July 18, 2002, in *Barbara Catania and Michael Catania v. Acands, Inc., et al*, C.A. No. 02-368-D-M1, United States District Court, Middle District of Louisiana.

## TABLE OF AUTHORITIES

<u>CASES</u>

*Akin v. Big Three Industries, Inc.*, 851 F. Supp. 819 (E.D. Tx. 1994) . . . . . . . . . . . . . . . . . . . . . 19

*Catania v. Acands, Inc., et al*, C.A. No. 02-368-D-M1 (M.D. La. 2002)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 8, 13, 20, 22

*Bynum v. FMC Corp.*, 770 F.2d 556 (5th Cir. 1985)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Crocker v. Borden, Inc.*, 852 F. Supp. 1322 (E.D. La. 1994)  . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Frieberg v. Swinerton & Walberg Property*, 245 F.Supp. 2d 1114 (D. Colo. 2002) . . . . . . . 22, 23

*General Tire & Rubber Co., v. Firestone Tire & Rubber Co.*, 489 F.2d 1105 (6th Cir. 1973)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Good v. Armstrong World Industries, Inc.*, 914 F. Supp. 1125 (E.D. Pa. 1996) . . . . . . . . . . . . 20

*Gurda Farms, Inc. v. Monroe County Legal Assistance Corp.*, 358 F. Supp. 841 (S.D.N.Y. 1991)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re President's Commission on Organized Crime Subpoena of Scarfo*, 783 F.2d 370 (3rd Cir. 1986)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*In Re "Agent Orange" Product Liability Litigation*, 506 F. Supp. 737 (E.D.N.Y.), *rev'd on other grounds*, 635 F.2d 987 (2nd Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Mesa v. California* , 489 U.S. 121, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989) . . . . . . . . . . . . . 14, 18

*Overly v. Raybestos-Manhattan,* 1996 WL 532150 (N.D. Cal. Sept. 9, 1996)  . . . . . . . . . . 20, 22

*Reed v. Fina Oil & Chemical Company,* 995 F. Supp. 705 (E.D. Tex. 1998) . . . . . . . . . . . . 9, 22

*Torres v. CBS News,* 854 F. Supp. 245 (S.D.N.Y. 1994)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*LaLonde, et al. v. Delta Field Erection*, et al, 96-3244 (M.D. La. 1998)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 8, 9, 10, 11, 12, 14, 15, 17, 18, 19, 20, 21

*Willingham v. Morgan,* 395 U.S. 402, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 18, 19

## STATUTORY AUTHORITY

21 F.R. 7199, as amended by Ex. Ord. No. 10720, July 11, 1957, 22 F.R. 5521 . . . . . . . . . . . . 12

28 U.S.C. § 1442(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 13

28 U.S.C. §1442(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

50 App. U.S.C.A. §1941e(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Louisiana Civil Code article 2317 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Rubber Producing Facilities Disposal Act of 1953 (Public Law 205, 83rd Congress, 67 Stat. 408) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 13, 15

Section 5(d) of the Reconstruction Finance Corporation Act (Public Law 2, 72nd Congress, 47 Stat. 5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## OTHER AUTHORITY

Executive Order No. 10539 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Executive Order No. 10678 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

## I.   BACKGROUND AND PERTINENT FACTS

Precisely the same issues presented in plaintiffs' Motion to Remand were considered by the

Court in the context of a Motion to Remand in *Verna G. LaLonde, et al. v. Delta Field Erection, et*

*al,* C.A. No. 96-3244-B-M3, United States District Court, Middle District of Louisiana ("*LaLonde*").

The same issues were again considered by the Court in *Barbara Catania and Michael Catania v.*

*Acands, Inc., et al,* C.A. No. 02-368-D-M1, United States District Court, Middle District of

Louisiana (*"Barbara Catania"*), the predecessor litigation to this case.

In each of those prior instances, the Court found that exercise of jurisdiction under the

federal officer removal statute was proper.   A copy of the rulings are attached as exhibits to this

Opposition.  (Exhibit "1-H," "2 " and "3 ").   These prior opinions were correct under the law and

facts presented and thoroughly analyzed and addressed the arguments raised by plaintiffs in this

Motion to Remand.  Accordingly, for the reasons set forth below, which are in accord with the prior

rulings of the Court in *LaLonde* and *Barbara Catania*, plaintiffs' Motion to Remand should be

denied.

### A.   PROCEDURAL BACKGROUND

1.   *Verna G. LaLonde, et al. v. Delta Field Erection, et al,* C.A. No. 96-3244.

Plaintiffs Verna Lalonde, Sylvia Kelley, and Mary Brown were the alleged heirs of John

Lalonde, and filed suit in state court against several defendants, including DSM, for injuries

allegedly resulting from John LaLonde's exposure to silica dust while performing sandblasting and

painting at various facilities from 1947 to 1976, including DSM's facility at issue in this case.

Additionally, plaintiffs alleged that DSM and the other alleged "premises owners" were responsible

for providing Mr. LaLonde with "proper supervision, safety instruction, warnings concerning

hazardous conditions in the workplace, and generally with a safe place to work," and that they failed

to institute safety procedures and plans and failed to properly supervise operations. (Exhibit "1-H," pp. 1-2). Furthermore, plaintiffs asserted claims against the "premises owners" pursuant to Civil Code article 2317, which provides strict liability against defendants for defective things in their "custody."

DSM removed the case pursuant to 28 U.S.C. § 1442(a) because plaintiffs' alleged claims against DSM arose out of DSM's activities as the operator of a government-owned facility that was operated under the direct and detailed control of officers of the United States Government from 1942 to 1955.

Plaintiffs filed a motion to remand, and after multiple briefings by each party, the Court denied plaintiffs' motion. Exhibit "1-H."

> 2.  *Barbara Catania and Michael Catania v. Acands, Inc., et al*, C.A. No. 02-368.

*Barbara Catania and Michael Catania v. Acands, Inc.* was the predecessor litigation to this case.[2]  Plaintiffs, Barbara Catania and Michael Catania, filed suit in state court against several defendants for injuries allegedly resulting from Barbara Catania's exposure to asbestos-containing products.  Plaintiffs alleged that Barbara Catania's uncles, Victor Reno, Russell Reno, and Peter Giordano, were exposed to toxic substances, including asbestos, in the normal routine course of their work, that they brought asbestos home on their clothing, and thereby exposed Barbara Catania to asbestos.  (Exhibit "2").

As in *LaLonde*, DSM removed the case to this Court on the basis of the "federal officer removal" statute.

---

[2] For a more detailed procedural history, please see Section IA, pp. 2-3, to DSM's Opposition filed in *Barbara Catania*, attached hereto as Exhibit "1."

Plaintiffs filed a motion to remand, and both Magistrate Judge Riedlinger and Judge Brady found removal well founded.  Exhibits "2" and "3."

3.   *Michael Catania, et al v. Anco Insulations, Inc., et al*, C.A. No. 05-1418.

This case, *Michael Catania, et al v. Anco Insulations, Inc.*, is successor litigation to the *Barbara Catania* case.  In this case, Michael and Kristen Catania, Barbara Catania's husband and daughter, respectively, are suing DSM and others for wrongful death for the death of Barbara Catania. More specifically, plaintiffs' claims against DSM include premises liability, strict liability, absolute liability, negligence, fraud, and failure to warn.  (Petition, paragraphs 3, 9, 10, 12, 20, 67-76, and 68-71).  DSM has again removed the case based on federal officer removal, and plaintiffs have again moved for remand.  Plaintiffs' motion is not based on any intervening change in law, different facts, or any other basis which would allow, much less require, the Court to reverse itself and it's prior consistent rulings, including *LaLonde* and *Barbara Catania*.  Accordingly, plaintiffs' motion must be denied.

**B.   HISTORICAL BACKGROUND**

The Court in *LaLonde* succinctly summarized the historical perspective that is needed to understand precisely why federal officer removal is appropriate in this case:

> As World War II approached, it became evident that the United States would be cut off from 90% of its natural rubber supply. The development of a synthetic rubber industry became a national military goal of top priority, especially after Pearl Harbor, after which access to the bulk of the country's natural rubber sources in fact were cutoff.  The situation was rather pressing because prior peacetime commercial attempts to develop a viable synthetic rubber process had failed.  The issue was of such import that President Roosevelt took the rather unusual step of asking the Chief Justice of the Supreme Court to lead a wartime commission to investigate rubber production.  (The Chief Justice declined because the project would be inconsistent with his function as a judicial officer.)

Ultimately, Congress gave the Reconstruction Finance Corporation[3] authority to take the steps necessary to organize a synthetic rubber industry in the shortest possible time, which it accomplished through the Rubber Reserve Company, by pooling patent and research information, building plants, and signing agreements with contractors to operate those plants under federal supervision.   To say that the success of this effort was crucial to Allied victory in World War II hardly is an exaggeration.   The federal government's active participation in the production of synthetic rubber continued through the Korean War.[4]

The site of what today is DSM's facility was acquired in October and November of 1942 by agents of the United States government as part of the government's efforts described above.  The design and construction of the plant was accomplished under the auspices of the Defense Plant Corporation, an instrumentality of the United States Government created on August 22, 1940 under Section 5(d) of the Reconstruction Finance Corporation Act (Public Law 2, 72nd Congress, 47 Stat. 5) by the Reconstruction Finance Corporation, itself an instrumentality of the United States Government created on January 22, 1932 under the same act.

DSM's facility was originally two distinct plants built by the Defense Plant Corporation:  a butadiene plant known as Plancor 152, and a synthetic rubber plant known as Plancor 876.[5]  Both plants were designed to technical specifications established by the United States Government and were built under the direct supervision of federal officers of the United States.  The original plans and specifications for the plants were prepared by the Government and required the use of asbestos-

---

[3]A Corporation created and owned by the United States government to produce synthetic rubber.  (Footnote not in original text.)

[4]Exhibit "1-H," *LaLonde, supra,* at n. 7, p. 5, *citing, General Tire & Rubber Co., v. Firestone Tire & Rubber Co.,* 489 F.2d 1105, 1107-08 (6th Cir. 1973); *Reed v. Fina Oil & Chemical Company,* 995 F. Supp. 705, 708-09 (E.D. Tex. 1998); and *In re President's Commission on Organized Crime Subpoena of Scarfo,* 783 F.2d 370, 377 (3rd Cir. 1986).

[5]See, Exhibits "1-A" and "1-B," respectively.

containing insulation products.[6]  This type of insulation was essential to the operation of DSM's facilities because of the high operating temperatures that were required in the production processes.[7] After the construction of the facility was completed, the facility was operated by DSM under the supervision of the Government.[8]

During the period of government ownership of the facility, the Government controlled production specifications, manufacturing requirements, operating procedures, testing procedures, safety requirements, and safety meetings at the facility.[9]  DSM was essentially an employee of the Government exclusively producing government-owned rubber under government direction with government-owned equipment on a government-owned facility.  As recognized by the Court in *LaLonde, supra,* "from 1942 through 1955, DSM operated a government-owned synthetic rubber plant as 'agent for ... and for the account and at the expense and risk of' the Rubber Reserve Corporation," which was "a subsidiary of the Reconstruction Finance Corporation."[10]

During the term of the Operating Agreement, a field representative from the Rubber Reserve Corporation regularly visited the facility.   The extent of the Rubber Reserve Corporation's control over the manner in which DSM operated the plant was succinctly described in *LaLonde*:

> The field representative's responsibilities included overseeing DSM's operations and ensuring that DSM was following government imposed production specifications, government imposed operating procedures, and government imposed laboratory product testing

---

[6]Exhibit "1-G."

[7]Exhibit "1-G."

[8]See, the Operating Agreement, Exhibit "1-C."

[9]See, Affidavits of Arley Ray Baker and Martin E. Samuels, attached hereto as Exhibits "1-D" and "1-E" respectively.

[10]Exhibit "1-H," *LaLonde* at p. 4.  *See also,* Exhibits "1-A," "1-B," and "1-C."

procedures and operations in the manufacturing of synthetic rubber.
The United States, through the Rubber Reserve Corporation,
controlled what type of rubber was produced at the facility, how
much of it was produced, and when each type of rubber was
produced. DSM could alter these requirements only with permission
from the federal government....

\* \* \*

The federal government imposed numerous safety
requirements at the facility, such as the wearing of protective
equipment. The United States required that safety meetings be held
in each department on a monthly basis, and, in addition, required
plant-wide safety meetings to be held on a monthly basis. The
government dictated the topics of these meetings.

In summary, DSM operated a federal government-owned
facility, exclusively for the government, under the oversight and
ultimate control of officers of the federal government.[11]

This relationship continued until 1955 when the Government sold the facility to DSM.[12]

However, the sale did not end the period of government control over DSM.

In 1953, the Congress passed the Rubber Producing Facilities Disposal Act of 1953 (Public

Law 205, 83rd Congress, 67 Stat. 408), which authorized the sale of government-owned rubber

producing facilities to private companies.  Because of the importance the production of synthetic

rubber played in the national defense, however, Congress required that all acts of sale contain and

be expressly contingent upon a National Security Clause.  The National Security Clause was

designed to obligate plant owners to maintain their operations in conformity with  pre-sale

operations and specifications and guarantee that they could resume, with only 180 days notice,

production of synthetic rubber in accordance with government specifications and at wartime

---

[11]Exhibit "1-H," *LaLonde* at pp. 6-7; See also, Exhibits "1-C" through "1-F."

[12]See, Exhibits "1-A" and "1-B."

production volumes.[13]

In 1956, President Dwight D. Eisenhower, in Executive Order No. 10678,[14] directed that the Federal Facilities Corporation be the entity charged with the responsibility for administering the contracts of sale executed pursuant to the Rubber Producing Disposal Act. In addition, President Eisenhower gave the Federal Facilities Corporation the authority and duty to oversee and administer the National Security Clauses contained in the acts of sale "in accordance with the needs and requirements of the national defense as determined by the Secretary of Defense."[15]

On April 21, 1955, DSM purchased Plancor 152 and Plancor 876 from the Rubber Producing Facilities Disposal Commission, which was the instrumentality of the United States Government created under the Rubber Producing Facilities Disposal Act of 1953 to sell the government-owned rubber plants. As required by the Act, both acts of sale contained and were expressly conditioned on a "National Security Clause," which, according to the Acts of Sale, "shall be effective for a period of ten years from the date hereof."[16] The National Security Clause obligated DSM to maintain the facility for a ten (10) year period such that it could, with only 180 days notice, resume production for the Government a specified annual capacity of synthetic rubber in accordance with government specifications.[17]   Additionally, the Government, through the Federal Facilities Corporation, was given the right and duty to conduct periodic inspections of the facility for the

---

[13]See, 50 App. U.S.C.A. §
(h).

[14]21 F.R. 7199, as amended by Ex. Ord. No. 10720, July 11, 1957, 22 F.R. 5521 (attached as Exhibit "1-G").

[15]*Id.* at §2.

[16]See, Exhibits "1-A" and "1-B."

[17]See, Exhibit "1-A," pp. 12-15; Exhibit "1-B," pp. 15-19; and Exhibit "1-G."

purpose of determining whether DSM was operating and maintaining the facility in a manner consistent with the National Security Clauses.  Furthermore, in the event that DSM failed to meet its obligations under the National Security Clauses, the Government had "the unconditional right to immediate possession and use of the Facility" for the purpose of restoring it to a condition capable of producing the specified annual capacity of rubber.[18]  These National Security Clauses were conditions of the sale from the government and placed a continuing obligation upon DSM to operate and maintain the plants in their pre-sale conditions.

Thus, by virtue of the Rubber Producing Facilities Disposal Act and the National Security Clauses in the acts of sale conveying the plants to DSM, government oversight and control of DSM did not end until April, 1965.

The plaintiffs allege that Ms. Catania was exposed to asbestos-containing products brought home by her uncles and on her uncles' clothing from various facilities from 1951 to 1969, including DSM's facility.  Plaintiffs also allege that Barbara Catania was exposed to asbestos by living in close proximity to DSM's plant.  Because the plant was constructed, designed and owned by the Federal Government for a substantial part of the applicable time period, and because DSM was under government oversight and control for the majority of the applicable time period, removal of this action is proper under 28 U.S.C. §1442(a).

## II.    LAW AND ARGUMENT

### Federal Officer Removal

Federal officer removal under 28 U.S.C. §1442(a) requires two showings.

> First, the removing defendant must be a 'person acting under [any] officer ... of the United States or any agency thereof.'  And, second,

---

[18]See, Exhibit "1-A," p. 13 and Exhibit "1-B," p. 16.

the removing defendant must be 'sued ... for [an] act under color of such office.[19]

The Supreme Court has construed the "color of office" statutory element as requiring two showings: (1) a 'causal connection' between the charged conduct and asserted official authority, *Willingham v. Morgan,* 395 U.S. 402, 409, 89 S.Ct. 1813, 1817, 23 L.Ed.2d 396 (1969); and (2) a "colorable federal defense" for the defendant. *Mesa v. California,* 489 U.S. 121, 131-32, 109 S. Ct. 959, 966, 103 L.Ed.2d 99 (1989).

Thus, as summarized by the Court in *LaLonde*:

> [U]nder the statutory language and the controlling Supreme Court precedents, a government contractor seeking to remove a civil action under Section 1442(a)(1) must show:
>
> 1. that the removing defendant was acting under an officer of the United States or an agency thereof;
>
> 2. that there was a causal connection between the charged conduct and the asserted official authority; and
>
> 3. that the removing defendant has a colorable defense under federal law.

Furthermore, the federal officer removal statute is not to be construed narrowly. *Willingham, supra,* 395 U.S. at 406. Rather, the statute should be broadly construed to achieve its purpose. *Id.* If the requirements of 1442(a)(1) are met, the right to removal is absolute, not discretionary. *Id.*

In light of the facts set forth above, each of the removal requirements are met in this case, and DSM's right to removal is absolute.

---

[19]Exhibit "1-H," *LaLonde, supra,* at p. 2.

### A.   DSM WAS ACTING UNDER AN OFFICER OF THE UNITED STATES OR AN AGENCY THEREOF

It is indisputable that DSM was "acting under an officer of the United States or an agency thereof" for most of the years that Barbara Catania was allegedly exposed to asbestos-containing products from DSM's facility. The plaintiffs allege that Barbara Catania was exposed to asbestos-containing products from various facilities from 1951 through 1969, including DSM's facility.

For five of these years (1951 through 1955), the DSM plant was owned by the United States and operated by DSM under an Operating Agreement. During this period of time, DSM was acting as "an agent for ... and for the account and at the expense and risk of" the Rubber Reserve Corporation, which was an instrumentality of the United States government.[20] All aspects of DSM's operations were under the control and supervision of the Rubber Reserve Corporation, including production specifications, manufacturing schedules, operating procedures, safety procedures, and laboratory product testing.[21] This governmental control through 1955 alone makes the entire action removable.[22]

For the period 1955 through 1965, DSM was acting under the control of the Department of Defense, through the Federal Facilities Corporation, in accordance with the section 7(h) of the Rubber Producing Facilities Disposal Act, Executive order No. 10678, and the National Security Clauses in the acts of sale by which DSM acquired the facility. During this period of time, DSM was statutorily and contractually obligated to conduct its operations in a manner consistent with prior operating procedures and practices so that it could resume, with only 180 days notice, the

---

[20]Operating Agreement, Exhibit "1-C," section 1.

[21]Exhibits "1-C," "1-D," "1-E" and "1-F."

[22]Exhibit "1-H," *LaLonde* at p. 4, fn. 4 (citations omitted).

production of government-specified synthetic rubber in government-specified production amounts. Failure to operate the facilities in accordance with these specifications could result in the immediate seizure of the facilities by the government, at DSM's expense. By inclusion of these clauses, the government assured that it would continue to have control over the plant. The government satisfied itself that it had that control by inspections.[23]

The National Security Clauses contained in the acts of sale transferring Plancors 152 and 876 to DSM allowed the government to inspect the plants to insure that DSM was meeting its obligations. Enforcement of the National Security Clause was the responsibility of the Federal Facilities Corporation from 1955 through September 1961.[24] From September 1961 through 1965 those duties were assigned to the Utilization and Disposal Service division of the General Services Administration.[25] Records obtained from the National Archives and Records Administration show that these agencies carried out their responsibilities via regular inspections of DSM's facilities.[26]

These documents establish that DSM's facilities were inspected at least nine times from February 1956 through June 1964. The inspection reports show that the inspectors were very interested in the production capacities of the two plants and making sure that these capacities met the requirements of the National Security Clause. Several of the inspection reports also reflect that the government inspectors inquired on a regular basis concerning the safety records at the plants. Those reports also show that the inspectors were concerned that the facilities were being properly maintained. The inspections demonstrate that the federal government assured itself on a regular

---

[23]See Exhibit "1-K."

[24]See Exhibit "1-L," Executive Order No. 10539.

[25]See Pub.L. 87-190, Aug 30, 1961, 75 Stat. 418 and GSA Order No. AIM 5430.23.

[26]See Exhibit "1-K."

basis that DSM was complying with the terms of the National Security Clauses.

The affidavit of Robert Dennis explains that keeping the plant ready to produce rubber to governmental standards meant continuing to use the asbestos-containing insulation which the original government plans specified.[27]  According to Mr. Dennis, there was no other insulation available during the 1950's and 60's which could accomplish the task of keeping the steam at the temperatures necessary for the production of synthetic rubber.  Therefore, by requiring DSM to be ready to produce rubber to government standards and retaining the right to take over possession and use of the facilities if it did not, the federal government maintained control over DSM.

The regular inspections of DSM's facilities by the federal government, the consequences set forth in the  National Security Clauses, and the technical requirements for producing synthetic rubber during the 1950's and 60's assured that the federal government had control over DSM through the expiration of the National Security Clause in 1965.

In light of the foregoing, it is simply beyond doubt that DSM was "acting under  an officer of the United States or an agency thereof."  *See, LaLonde, supra; Gurda Farms, Inc. v. Monroe County Legal Assistance Corp.,* 358 F. Supp. 841, 843-45 (S.D.N.Y. 1991) (private attorneys offering assistance to migrant farm workers under a federal program and who were governed by complex regulations, guidelines, and evaluation schemes met the "acting under" prong of federal officer removal").

## B.   THERE IS A CAUSAL CONNECTION BETWEEN THE CHARGED CONDUCT AND THE ASSERTED OFFICIAL AUTHORITY

There is a causal connection between the charged conduct and the asserted official authority. The "causal connection" requirement does NOT require that the alleged wrongful act or omission

---

[27]Exhibit "1-F."

itself was specifically directed or compelled by federal duty or law. "Rather, the controlling decisions require only a showing that the defendant committed the alleged act or omission while performing its federal duties." *LaLonde*,[28] at p. 10; *see also, Willingham, supra.*

It is alleged that DSM was negligent because it failed to provide a safe place in which to work free from the dangers of asbestos and that DSM failed to warn plaintiff's uncle of such danger. The affidavit of Robert Dennis establishes that the use of asbestos-containing insulation products was essential to the operation of DSM's facilities and that the government's original plans and specifications for the design and construction of the facility required the use of asbestos-containing insulation. The affidavits of Arley Baker and Martin Samuels establish that, through 1955, absolutely all aspects of DSM's operations were controlled by the United States government, including safety issues. The affidavit of Robert Dennis and the Acts of Sale containing the "National Security Clauses" establish that from 1956 through 1965, DSM was obligated to continue to operate the plant in a manner consistent with its operation when the government owned the facility. Thus, the claims against DSM arise out of the operation and maintenance of a facility that was owned by the government and operated exclusively on behalf of and under the direction of the government.

## C.   DSM HAS PLED A COLORABLE FEDERAL DEFENSE

The third prong of the analysis is satisfied with the assertion of a **colorable** federal defense. *Mesa.* At this phase in the litigation, and for these purposes, the question is not whether the claimed defense will ultimately prove meritorious, but whether a colorable claim to such a defense has been made. Thus, the removing party need not prove that it will ultimately sustain the defense, nor is it

---

[28]Exhibit "1-H."

required to prove its case prior to removal. *Willingham*, 395 U.S. at 406, 89 S.Ct. at 1816. *See also, LaLonde, supra*, at p. 13 (stating: "[t]he federal defense need only be a 'colorable' one, not necessarily one that ultimately will prove meritorious."). *Akin v. Big Three Industries, Inc.*, 851 F.Supp. 819, 823 (E.D. Tx. 1994). Accordingly, a detailed analysis of whether a removing defendant has or can meet all of the elements of the defense it raises would be inappropriate. For example, in *Crocker v. Borden, Inc.*, 852 F.Supp. 1322 (E.D. La. 1994), the court held that the defendant presented a colorable claim to a federal defense, despite plaintiffs' arguments that the defendant could not establish one of the elements of that defense. Also, in *Torres v. CBS News*, 854 F.Supp. 245, 247 (S.D.N.Y. 1994), the court stated that "while plaintiff is correct that the bulk of authority on the issue of immunity in the circumstances alleged in this case would mitigate against the success of such defense [citations omitted], the defense is a colorable one at this time."

In *LaLonde*, the Court found that DSM presented a "colorable" issue as to the applicability of the government contractor defense or some variation of it. (Exhibit 1-H, pp. 12-19). Although the plaintiffs in their Motion to Remand raise various issues as to whether the defense can prevail, their arguments actually support the exercise of jurisdiction by this Court. As noted by this Court, it is precisely because of the nuances and uncertainties that may arise in the application of the government contractor defense that the exercise of jurisdiction by this Court is warranted. "One of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court." *LaLonde, supra*, at n. 14,[29] *quoting, Willingham, supra*, 395 U.S. at 407, 89 S.Ct. at 1816.

---

[29]Exhibit "1-H."

D.   **PLAINTIFFS' ARGUMENTS MISCONSTRUE THE FEDERAL OFFICER REMOVAL STATUTE AND WERE SPECIFICALLY REJECTED BY THE COURT IN *LALONDE* AND *BARBARA CATANIA***

Plaintiffs raise several arguments in their Motion to Remand, each of which has already been considered and rejected by the Court in *LaLonde* and *Barbara Catania*.

Plaintiffs cite *Good v. Armstrong World Industries, Inc.*, 914 F.Supp. 1125 (E.D. Pa. 1996), *Overly v. Raybestos-Manhattan*, 1996 WL 532150 (N.D. Cal., 9/9/96) and several other cases employing similar reasoning for the proposition that DSM must prove that the specific alleged acts giving rise to the underlying claims were specifically ordered by a federal officer.[30] This argument was thoroughly analyzed by the Court in *LaLonde* and rejected as inconsistent with the Supreme Court precedent and "unduly grudging." (Exhibit "1-H," pp. 7-9). The Court noted that *Overly* and its progeny pertain to government contractors acting as independent contractors, not to entities owned by the government. The Court stated:

> Any state court suit which concerns the operation of a government-owned defense production facility triggers the strong federal policy interests protecting possible state interference with federal functions – regardless of whether the plant is being run directly by the United States or by a contractor retained and controlled by the federal government. Whether a federal officer directly mandated the specific alleged act or omission in question has little, if anything, to do with the core policy question of whether federal interests potentially are impacted by the state court suit.[31]

Plaintiffs also argue that DSM will not prevail on the government contractor's defense, but as noted above at this phase in the proceedings and for these purposes, the standard is whether a colorable defense exists, not whether the defense will prevail on the merits. DSM has presented ample facts which demonstrate that either the government contractor's defense, the Defense

---

[30]In other words, the plaintiffs' argument is that DSM must prove that a federal officer specifically told DSM not to warn employees of the dangers of asbestos.

[31]Exhibit "1-H," *LaLonde, supra,* at p. 9.

Production Act, or some variation of these two defenses may apply in light of the unique relationship that existed between DSM and the government from 1942 through 1965. A federal court, not a state court, should decide the proper application of these defenses to this case.

Plaintiffs next argue that "[s]ince asbestos products have been banned for a long time and are not longer used inn most equipment, any federal interest in this case is meager at best."[32] This argument was soundly rejected by the Court in *LaLonde*:

> Insofar as frustration of federal interests is an independent concern here, the Court would note that, quite clearly, the imposition of a future liability against a government contractor for past work can as much impair federal interests as would a current liability during a term of an ongoing agreement:
>
> [T]he extent of a contractor's liability may, undoubtedly will, affect future dealings between the contractor and the government ... Speculative federal interests in the obligations of war contractors are numerous. War contractors might be expected to increase the price of war materials to correspond to any extension in their potential liability. Such adjustments might have a significant effect on the federal treasury. If potential liability increased dramatically, future war contractors might attach conditions to the use of their products, or balk at supplying the military with any products whatsoever. Thus, the government's military capacities might be affected.
>
> *In Re "Agent Orange" Product Liability Litigation*, 506 F.Supp. 737, 746-47 & n. 5 (E.D.N.Y.), *rev'd on other grounds*, 635 F.2d 987 (2nd Cir. 1980), *quoted* in *Bynum v. FMC Corp.*, 770 F.2d 556, 570 n. 18 (5th Cir. 1985).
>
> That the synthetic rubber produced at the DSM Copolymer in the late 1940s and early 1950s has long since made its way to its appointed tasks on distant shores, for wars that now recede into the history of a waning century, is of no moment here. What matters here is the continuing ability of the federal government to be able to respond in times of national need, and to be able to bring the resources of private industry to bear in such times. Removal by this wartime supplier of this strategic and critical material, on the basis of a federal contractor defense, therefore, is clearly consonant with the policies underlying the federal officer removal statute.[33]

---

[32]Memorandum in Support of Motion to Remand, p. 17.

[33]Exhibit "1-H," *LaLonde, supra*, at pp. 20-21 (citations in original text).

In fact, the only identifiable difference between plaintiffs' basis for remand stated here and in *Barbara Catania* is the citation to a 2002 case from a district court in Colorado, *Frieberg v. Swinerton & Walberg Property*, 245 F.Supp.2d (Colo. 2002). *Frieberg* presents the fact scenario of a plaintiff who was a construction worker allegedly exposed to asbestos while constructing a government facility. The Court in *Frieberg* remanded the case, finding that defendant was not sufficient acting under a federal officer and based on a deficient nexus to support removal.

This case is distinguishable on multiple grounds. First, the plaintiff role in *Frieberg* was limited to participation in construction of the facility. DSM, on the contrary, operated a government-owned facility. Moreover, the facts presented here show that DSM was acting directly under authority of a federal officer. (Exhibit "1-H," pp. 4-12).[34]

Additionally, *Frieberg*, like the *Overly* line of cases, involved <u>only</u> failure to warn claims. Plaintiffs' claims in this case are not so limited. Plaintiff here has asserted other types of claims, including strict liability, absolute liability, negligent handling, and premises liability. (Petition, paras. 3, 9, 10, 12, 20 and 67-71). Last, *Frieberg* adopted the "unduly grudging" legal standards also seen in *Overly*, which this Court has previously rejected. (Exhibit "1-H," p. 7).

---

[34]It is noteworthy that the Court in *Frieberg* expressly distinguished *Reed v. Fina Oil*, 995 F.Supp. 705, 710 (E.D. Tx. 1998), a case factually similar to this case. *Frieberg*, 245 F.Supp. at 1153.

III.   **CONCLUSION**

For the foregoing reasons, DSM Copolymer, Inc. respectfully submits that removal was proper and the plaintiffs' Motion for Remand should be denied.

Respectfully submitted:


/s/ David K. Nelson
David K. Nelson (#17075)
Gregory M. Anding (#23622)
G. Trippe Hawthorne (#23773)
KEAN, MILLER, HAWTHORNE, D'ARMOND,
McCOWAN & JARMAN, L.L.P.
Post Office Box 3513
Baton Rouge, LA 70821
Telephone: 225-387-0999

**Attorneys for DSM Copolymer, Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of January, 2006, a copy of the foregoing Opposition to Remand was filed electronically with the Clerk of Court using the CM/ECF system.  The exhibits to this opposition were filed in person with the Clerk's office separately and will be mailed by United States Postal Service to all counsel.  Notice of this filing will be sent to the following by operation of the court's electronic filing system.

Gerolyn Roussel, Esq.
Perry J. Roussel, Jr., Esq.
Angelique Renee Duhon
Roussel & Roussel
1710 Cannes Drive
LaPlace, LA 70068

David M. Bienvenu, Jr.
Todd S. Manuel
Jennifer M. Sigler
Elisabeth Quinn Zelden
Kathleen A. Gendusa
Taylor Porter Brooks & Phillips
P.O. Box 2471
Baton Rouge, LA 70821

Claude A. Greco
Anne E. Medo
Michael E. Hill
Spiro G. Latsis
Hailey McNamara Hall
    Larmann & Papale, LLP
P.O. Box 8288
Metairie, LA 70001-8288

Lawrence Abbott
Sarah E. Iiams
Deborah Kuchler
Ernest G. Foundas
Michele Dana Allen-Hart
McGready Lewis Richeson
Abbott, Simses & Kuchler
400 Lafayette St., Ste 200
New Orleans, LA 70130

Lawrence G. Pugh, III
Alison S. Borison
Edward R. McGowan
Jonathan P. Hilbun
Montgomery, Barnett, Brown,
    Read Hammond & Mintz
3200 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163

Gary A. Bezet
Barrye Panepinto Miyagi
Gayla M. Moncla
Robert E. Dille
Kean,   Miller,   Hawthorne,
D'Armond
    McCowan & Jarman, LLP
Post Office Box 3513
Baton Rouge, LA  70821

I also certify that I have mailed by United States Postal Service this filing to the following non-CM/ECF participant:

C. Kelly Lightfoot
Hailey McNamara Hall, Larmann & Papale, LLP
P.O. Box 8288
Metairie, LA 70001-8288

Baton Rouge, this 25th day of January, 2006.


_____/s/ David K. Nelson_____
David K. Nelson

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

2006 APR 19  A 11: 30

RECEIVED
CLERK'S OFFICE

**PANEL SERVICE LIST**
**JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

Michael Catania, et al v. Anco Insulations
MDL Docket No. 875

Gary A. Bezet
Kean, Miller, Hawthorne, D'Armond,
McCowan & Jarman, LLP
One American Place
22nd Floor
P.O. Box 3513
Baton Rouge, LA 70821-3513

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114

Edward J. Cass
Gallagher, Sharp, Fulton & Norman
Bulkley Building, 7th Floor
1501 Euclid Avenue
Cleveland, OH 44115

Adam M. Chud
Goodwin Procter, LLP
901 New York Avenue, N.W.
Washington, D.C. 20001

David A. Damico
Burns, White & Hickton, LLC
Four Northshore Center
106 Isabella Street
Pittsburgh, PA 15212

S. Gene Fendler
Liskow & Lewis
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, LA 70139

Raymond P. Forceno
Forceno & Hannon
111 S. Independence Mall East
The Bourse, Suite 1000
Philadelphia, PA 19106-2574

Ellen B. Furman
Goldfein & Hosmer
1600 Market Street
33rd Floor
Philadelphia, PA 19103

Leon Gary, Jr.
Jones, Walker, Waechter, et al
5th Floor
Four United Plaza
8555 United Plaza Boulevard
Baton Rouge, LA 70809

Kathleen A. Gendusa
Taylor, Porter, Brooks & Phillips
P.O. Box 2471
451 Florida Street, 8th Floor
Baton Rouge, LA 70820

Susan M. Hansen
Brownson & Ballou
225 South Sixth Street
Suite 4800
Minneapolis, MN 55402

Ralph S. Hubbard III
Lugenbuhl, Wheaton
601 Poydras Street, Suite 2775
New Orleans, LA 70130

1024940_1

Susan B. Kohn
Simon, Peragaine, Smith & Redfearn
1100 Poydras Street, Suite 300
New Orleans, LA  70163

Reginald S. Kramer
Oldham & Dowling
195 South Main Street, Suite 300
Akron, OH  44308-1314

Deborah K. Kuchler
Abbott, Simses & Kuchler
400 Lafayette Street, Suite 200
New Orleans, LA  70130

David C. Landin
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA  23219

Christopher K. Lightfoot
Hailey, McNamara, Hall, Larmann & Papale
One Galleria Boulevard, Suite 1400
P.O. Box 8288
Metairie, LA  70011-8288

Gene Locks
Greitzer & Locks
1500 Walnut Street
Philadelphia, PA  19102

Lynn M. Luker
Lynn Luker & Associates
3433 Magazine Street
New Orleans, LA  70115

Janet L. MacDonell
Deutsch, Kerrigan & Stiles
755 Magazine Street
New Orleans, LA  70130

Ronald L. Motley
Motley Rice, LLC
28 Bridgeside Boulevard
Mt. Pleasant, SC  29465

Andrew L. Plauche, Jr.
Plauche, Maselli, Landry & Parkerson, LLP
201 St. Charles Avenue, Suite 4240
New Orleans, LA  70170-4240

Lawrence G. Pugh III
Montgomery, Barnett, Brown, Read
3200 Energy Centre
1100 Poydras Street
New Orleans, LA  70163-3200

John J. Repcheck
Marks, O'Neill, O'Brien & Courtney
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA  15219

Gerolyn P. Roussel
Roussel & Roussel
1710 Cannes Drive
LaPlace, LA  70068

John D. Roven
Roven, Kaplan & Wells, LLP
2190 North Loop West, Suite 410
Houston, TX  77018

Richard D. Schuster
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH  43216

Neil Selman
Selman, Breitman & Burgess
11766 Wilshire Bouelvard, Sixth Floor
Los Angeles, CA  90025

Robert N. Spinelli
Kelley, Jasons, McGuire & Spinelli
15th Floor
Centre Square West
Philadelphia, PA  19102

Robert E. Swickle
Jaques Admiralty Law Firm, PC
The Maritime Asbestosis Legal Clinic
1570 Penobscot Building
Detroit, MI  48226

Andrew J. Trevelise
Reed Smith, LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA  19103

Mark E. Van Horn
Taggart, Morton, Ogden, Staub, & O'Brien,
LLC
1100 Poydras Street, Suite 2100
New Orleans, LA  70163-2100

James K. Weston II
Tom Riley Law Firm
4040 First Avenue N.E.
P.O. Box 998
Cedar Rapids, IA  52406

1024940_1