

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

UNITED STATES OF AMERICA
JUDICIAL PANEL ON MULTILDISTRICT LITIGATION

JUL - 3 2006

FILED
CLERK'S OFFICE

DONALD MCCARTY and BETTY
MCCARTY, his wife,

                Plaintiffs,

vs.

ALLIED GLOVE CORPORATION;
AMERICAN OPTICAL CORPORATION;
ARGO PACKING COMPANY;
ATLAS INDUSTRIES, INC.;
A.W. CHESTERTON COMPANY;
BEAZER EAST, INC., in its own right and as
successor to Koppers Company, Inc., and
other related companies including Thiem
Corporation, Beazer USA, Inc., and Beazer,
PLC;
B.M. KRAMER & COMPANY, INC. and
B.M. Kramer Associates;
CASHCO, INC.;
CERTAINTEED CORPORATION;
CHAMPLAIN CABLE CORPORATION, as
successor-in-interest to Hercules Inc.;
COPES-VULCAN, INC.;
COPPUS TURBINES (Tuthill Energy
Systems);
CRANE VALVE GROUP;
DEZURIK, INC.;
DRAVO CORPORATION;
DURABLA MANUFACTURING
COMPANY, in its own right and as successor
to Durabla Canada, Ltd.;

W.D. PA CIVIL ACTION NO. 2:06-cv-625

MDL-875

**MOTION TO VACATE CONDITIONAL
TRANSFER ORDER TO MDL-875**

# OFFICIAL FILE COPY

IMAGED JUL - 3 2006

DURAMETALLIC CORPORATION;
EATON CORPORATION, as successor-in-interest to Cutler-Hammer, Inc.;
E.E. ZIMMERMAN COMPANY;
EICHLEAY CORPORATION;
ELECTROLUX HOME PRODUCTS;
ELLIOTT TURBOMACHINERY COMPANY, INC.;
ELSA BENSON, INC.;
FABRI-VALVE, Division of ITT Grinnell Valve Company, Inc.;
FAIRMONT SUPPLY;
F.B. WRIGHT COMPANY;
FISHER SCIENTIFIC COMPANY;
FOSECO, INC.;
FOSTER WHEELER CORPORATION;
GARLOCK, INC.;
GATEWAY INDUSTRIAL SUPPLY COMPANY;
GENERAL ELECTRIC COMPANY;
GEORGE V. HAMILTON, INC.;
GOULD PUMPS, INC.;
GREENE TWEED & COMPANY;
GRINNELL CORPORATION;
HEDMAN MINES, LTD.;
HONEYWELL, INC;
HUNTER SALES CORPORATION;
IMO INDUSTRIES, INC., f/k/a IMO Delaval, Inc., f/k/a Transamerican DeLaval, Inc., f/k/a DeLaval Turbine, Inc., DeLaval Turbine, Inc., DeValco Corporation;
INDUSTRIAL HOLDINGS CORPORATION f/k/a Carborundum Company;
INGERSOLL-RAND;
I.U. NORTH AMERICAN, INC., as successor by merger to the Garp Company, formerly known as The Gage Company, formerly known as Pittsburgh Gage and Supply Company;
J.M. FOSTER, INC.;
KAISER GYPSUM COMPANY, INC.;
MARLEY COOLING TOWER;
MCCARLS, INC.;

MELRATH SUPPLY AND GASKET
COMPANY;
MINE SAFETY APPLIANCE COMPANY;
MINNOTTE CONTRACTING
CORPORATION;
M.S. JACOBS & ASSOCIATES, INC.;
NAGLE PUMPS, INC.;
OGLEBAY NORTON COMPANY, and its
division Ferro Engineering;
OHIO LIME CORPORATION;
OWENS-ILLINOIS, INC.;
PITTSBURGH METALS PURIFYING
COMPANY;
PLOTKIN BROTHERS SUPPLY, LLP;
POWER PIPING;
PREMIER REFRACTORIES, INC., f/k/a
Adience, Inc., successor-in-interest to Adience
Company, LP, as successor to BMI, Inc.;
SAFETY FIRST INDUSTRIES, INC.,
in its own right and as successor-
in-interest to Safety-First Supply, Inc.;
SEALITE, INC.;
STOCKHAM VALVES & FITTINGS, f/k/a
Marlin Valve, Inc.;
SWINDELL-DRESSLER
INTERNATIONAL COMPANY;
TAYLORED INDUSTRIES, INC.;
THE SAGER CORPORATION, successor-
in-interest to the Sager Glove Corporation;
TOWNSEND & BOTTUM, INC.;
TRECO CONSTRUCTION SERVICES,
INC., f/k/a The Rust Engineering Company;
THIEM CORPORATION, and its division,
Universal Refractories;
UNIFRAX CORPORATION f/k/a
Carborundum;
UNION CARBIDE CORPORATION,
its Linde Division;
UNITED CONVEYOR CORPORATION;
USX CORPORATION, f/k/a United States
Steel Corporation;
VIACOM, INC., successor by merger to
CBS Corporation, f/k/a Westinghouse
Electric Corporation; and
WASHINGTON GROUP

INTERNATIONAL, f/k/a Raytheon
Engineers Constructors, Inc., and all its
domestic subsidiaries, including the Badger
Company, Inc.;

        Defendants,

v.

KENTILE FLOORS, INC.;
BONDEX INTERNATIONAL, INC.;
GEORGIA PACIFIC CORPORATION; and
SEARS ROEBUCK & COMPANY,

        Additional Defendants,

vs.

INSUL COMPANY, INC.,

        Party Defendant,

vs.

GOODYEAR TIRE & RUBBER
COMPANY,

        Additional Defendant.

**<u>MOTION TO VACATE CONDITIONAL TRANSFER ORDER TO MDL-875</u>**

AND NOW COME the above named Plaintiffs, by and through their counsel, Janice M. Savinis, Esquire, John R. Kane, Esquire, Michael J. Gallucci, Esquire, and Savinis, D'Amico, & Kane, L.L.C. and hereby move this Honorable Court to vacate the Conditional Transfer Order to MDL-875.  A Memorandum of Law in Support of Plaintiffs' Motion to Vacate is attached hereto and incorporated herein.

Respectfully Submitted:

SAVINIS, D'AMICO, & KANE, L.L.C.

Michael J. Gallucci, Esquire – Pa. I.D. No. 92859
Attorney for Plaintiffs
707 Grant Street, Suite 3626 Gulf Tower
Pittsburgh, Pa 15219
(412) 227-6556

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

UNITED STATES OF AMERICA
JUDICIAL PANEL ON MULTILDISTRICT LITIGATION   JUL - 3 2006

FILED
CLERK'S OFFICE

|  |  |
|---|---|
| DONALD MCCARTY and BETTY MCCARTY, his wife, | |
| Plaintiffs, | W.D. PA CIVIL ACTION NO. 2:06-cv-625 |
| | MDL-875 |
| vs. | |
| | **PLAINTIFFS' BRIEF IN SUPPORT OF PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER TO MDL-875** |

ALLIED GLOVE CORPORATION;
AMERICAN OPTICAL CORPORATION;
ARGO PACKING COMPANY;
ATLAS INDUSTRIES, INC.;
A.W. CHESTERTON COMPANY;
BEAZER EAST, INC., in its own right and as
successor to Koppers Company, Inc., and
other related companies including Thiem
Corporation, Beazer USA, Inc., and Beazer,
PLC;
B.M. KRAMER & COMPANY, INC. and
B.M. Kramer Associates;
CASHCO, INC.;
CERTAINTEED CORPORATION;
CHAMPLAIN CABLE CORPORATION, as
successor-in-interest to Hercules Inc.;
COPES-VULCAN, INC.;
COPPUS TURBINES (Tuthill Energy
Systems);
CRANE VALVE GROUP;
DEZURIK, INC.;
DRAVO CORPORATION;
DURABLA MANUFACTURING
COMPANY, in its own right and as successor
to Durabla Canada, Ltd.;



DURAMETALLIC CORPORATION;
EATON CORPORATION, as successor-in-
interest to Cutler-Hammer, Inc.;
E.E. ZIMMERMAN COMPANY;
EICHLEAY CORPORATION;
ELECTROLUX HOME PRODUCTS;
ELLIOTT TURBOMACHINERY
COMPANY, INC.;
ELSA BENSON, INC.;
FABRI-VALVE, Division of ITT Grinnell
Valve Company, Inc.;
FAIRMONT SUPPLY;
F.B. WRIGHT COMPANY;
FISHER SCIENTIFIC COMPANY;
FOSECO, INC.;
FOSTER WHEELER CORPORATION;
GARLOCK, INC.;
GATEWAY INDUSTRIAL SUPPLY
COMPANY;
GENERAL ELECTRIC COMPANY;
GEORGE V. HAMILTON, INC.;
GOULD PUMPS, INC.;
GREENE TWEED & COMPANY;
GRINNELL CORPORATION;
HEDMAN MINES, LTD.;
HONEYWELL, INC;
HUNTER SALES CORPORATION;
IMO INDUSTRIES, INC., f/k/a IMO
Delaval, Inc., f/k/a Transamerican DeLaval,
Inc., f/k/a DeLaval Turbine, Inc., DeLaval
Turbine, Inc., DeValco Corporation;
INDUSTRIAL HOLDINGS
CORPORATION f/k/a Carborundum
Company;
INGERSOLL-RAND;
I.U. NORTH AMERICAN, INC., as
successor by merger to the Garp Company,
formerly known as The Gage Company,
formerly known as Pittsburgh Gage and
Supply Company;
J.M. FOSTER, INC.;
KAISER GYPSUM COMPANY, INC.;
MARLEY COOLING TOWER;
MCCARLS, INC.;

MELRATH SUPPLY AND GASKET
COMPANY;
MINE SAFETY APPLIANCE COMPANY;
MINNOTTE CONTRACTING
CORPORATION;
M.S. JACOBS & ASSOCIATES, INC.;
NAGLE PUMPS, INC.;
OGLEBAY NORTON COMPANY, and its
division Ferro Engineering;
OHIO LIME CORPORATION;
OWENS-ILLINOIS, INC.;
PITTSBURGH METALS PURIFYING
COMPANY;
PLOTKIN BROTHERS SUPPLY, LLP;
POWER PIPING;
PREMIER REFRACTORIES, INC., f/k/a
Adience, Inc., successor-in-interest to Adience
Company, LP, as successor to BMI, Inc.;
SAFETY FIRST INDUSTRIES, INC.,
in its own right and as successor-
in-interest to Safety-First Supply, Inc.;
SEALITE, INC.;
STOCKHAM VALVES & FITTINGS, f/k/a
Marlin Valve, Inc.;
SWINDELL-DRESSLER
INTERNATIONAL COMPANY;
TAYLORED INDUSTRIES, INC.;
THE SAGER CORPORATION, successor-
in-interest to the Sager Glove Corporation;
TOWNSEND & BOTTUM, INC.;
TRECO CONSTRUCTION SERVICES,
INC., f/k/a The Rust Engineering Company;
THIEM CORPORATION, and its division,
Universal Refractories;
UNIFRAX CORPORATION f/k/a
Carborundum;
UNION CARBIDE CORPORATION,
its Linde Division;
UNITED CONVEYOR CORPORATION;
USX CORPORATION, f/k/a United States
Steel Corporation;
VIACOM, INC., successor by merger to
CBS Corporation, f/k/a Westinghouse
Electric Corporation; and
WASHINGTON GROUP

INTERNATIONAL, f/k/a Raytheon
Engineers Constructors, Inc., and all its
domestic subsidiaries, including the Badger
Company, Inc.;

     Defendants,

v.

KENTILE FLOORS, INC.;
BONDEX INTERNATIONAL, INC.;
GEORGIA PACIFIC CORPORATION; and
SEARS ROEBUCK & COMPANY,

     Additional Defendants,

vs.

INSUL COMPANY, INC.,

     Party Defendant,

vs.

GOODYEAR TIRE & RUBBER
COMPANY,

     Additional Defendant.

## PLAINTIFFS' BRIEF IN SUPPORT OF PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER TO MDL-875

AND NOW COME the above named Plaintiffs, by and through their counsel, Janice M. Savinis, Esquire, John R. Kane, Esquire, Michael J. Gallucci, Esquire, and Savinis, D'Amico, & Kane, L.L.C. and hereby file the following Brief in Support or Plaintiffs' Motion to Vacate Conditional Transfer Order to MDL-875:

### I. INTRODUCTION

Plaintiffs Donald and Betty McCarty filed a complaint in Lawrence County on November 29, 2005 alleging that Mr. McCarty's mesothelioma was caused by his exposure to and inhalation of asbestos fibers from products manufactured, sold, supplied and distributed by the defendants. Since its inception, this case has been governed by a Case Management Order (CMO) signed by the Honorable Dominick Motto of The Lawrence County Court of Common Pleas. In compliance with the CMO, Plaintiffs have already provided all Defendants with a fact witness list and have already responded to all Defendants' Motions for Summary Judgment. This case was scheduled to go to trial in October of 2006. On May 11, 2006, Defendant General Electric (hereinafter GE) filed a Notice of Removal asserting the existence of federal jurisdiction under 28 U.S.C. §1442(a)(1), the "federal officer" statute.

### II. Argument

On June 15, 2006, Plaintiffs filed a Motion to Remand this case to Lawrence County arguing that Defendant GE's attempted removal was improper. (A copy of said Motion is attached hereto and incorporated herein by reference). In said Motion, Plaintiffs argue that GE failed to meet all the necessary requirements to remove this case

under 28 U.S.C. §1442(a)(1) and, as such, the Western District of Pennsylvania lacks subject matter jurisdiction over this case. The Western District of Pennsylvania has not ruled on Plaintiffs Motion to Remand as of the date of this filing. As Plaintiffs' believe the initial removal of this case to Federal Court was improper, any transfer of this case to the MDL-875, Eastern District of Pennsylvania would create yet another roadblock that plaintiffs would be forced to negotiate in order to get this case back to its proper jurisdiction in state court. In addition, Plaintiffs' trial date was set for October 2006, and the Case Management Order set forth specific pre-trial deadlines which have come and gone due to GE's improper removal. Transferring this case the MDL would create additional delays and further frustrate Plaintiffs in their attempt to get this case back on an expedited state court docket.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter an Order Vacating the Conditional Transfer of this case to MDL-875.

Respectfully Submitted:

SAVINIS, D'AMICO, & KANE, L.L.C.

Michael J. Gallucci, Esquire – Pa. I.D. No. 92859
Attorney for Plaintiffs
707 Grant Street, Suite 3626 Gulf Tower
Pittsburgh, Pa 15219
(412) 227-6556

**PANEL SERVICE LIST (Excerpted from CTO-265)**   JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION
**DOCKET NO. 875**
**IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)** JUL - 3 2006

*Donald McCarty, et al. v. Allied Glove Corp., et al.*, W.D. Pennsylvania, C.A. No. 2:06 CLERK'S OFFICE

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114

Edward J. Cass
Gallagher, Sharp, Fulton & Norman
Bulkley Building, 7th Floor
1501 Euclid Avenue
Cleveland, OH 44115

Adam M. Chud
Goodwin Procter, LLP
901 New York Avenue, N.W.
Washington, DC 20001

David A. Damico
Burns, White & Hickton, LLC
Four Northshore Center
106 Isabella St.
Pittsburgh, PA 15212

Eric K. Falk
Davies, McFarland & Carroll
One Gateway Center
Tenth Floor
Pittsburgh, PA 15222

Nora B. Fischer
Pietragallo, Bosick & Gordon
One Oxford Center
38th Floor
Pittsburgh, PA 15219

Raymond P. Forceno
Forceno & Hannon
111 S. Independence Mall East
The Bourse, Suite 1000
Philadelphia, PA 19106-2574

Ellen B. Furman
Goldfein & Hosmer
1600 Market Street
33rd Floor
Philadelphia, PA 19103

Michael J. Gallucci
Savinis, D'Amico & Kane
707 Grant Street
Gulf Tower, Suite 3626
Pittsburgh, PA 15219

Susan M. Hansen
Brownson & Ballou
225 South Sixth Street
Suite 4800
Minneapolis, MN 55402

Reginald S. Kramer
Oldham & Dowling
195 South Main Street
Suite 300
Akron, OH 44308-1314

David C. Landin
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Gene Locks
Greitzer & Locks
1500 Walnut Street
Philadelphia, PA 19102

Stephen R. Mlinac
Swartz Campbell, LLC
4750 USX Tower
600 Grant Street
Pittsburgh, PA 15219

Ronald L. Motley
Motley Rice, LLC
P.O. Box 1792
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464

John J. Repcheck
Marks, O'Neill, O'Brien & Courtney
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219

John D. Roven
Roven, Kaplan & Wells, L.L.P.
2190 North Loop West
Suite 410
Houston, TX 77018

Richard D. Schuster
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216

Neil Selman
Selman, Breitman & Burgess
11766 Wilshire Boulevard
Sixth Floor
Los Angeles, CA 90025

Robert N. Spinelli
Kelley, Jasons, McGuire & Spinelli
Centre Square West
15th Floor
Philadelphia, PA 19102

Robert E. Swickle
Jaques Admiralty Law Firm, P.C.
1570 Penobscot Building
The Maritime Asbestosis Legal Clinic
Detroit, MI 48226

Andrew J. Trevelise
Reed Smith, LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

James K. Weston II
Tom Riley Law Firm
4040 First Avenue, N.E.
P.O. Box 998
Cedar Rapids, IA 52406



IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF PENNSYLVANIA

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUL - 3 2006

FILED
CLERK'S OFFICE

DONALD MCCARTY and BETTY
MCCARTY, his wife,

          Plaintiffs,

vs.

ALLIED GLOVE CORPORATION;
AMERICAN OPTICAL CORPORATION;
ARGO PACKING COMPANY;
ATLAS INDUSTRIES, INC.;
A.W. CHESTERTON COMPANY;
BEAZER EAST, INC., in its own right and as
successor to Koppers Company, Inc., and
other related companies including Thiem
Corporation, Beazer USA, Inc., and Beazer,
PLC;
B.M. KRAMER & COMPANY, INC. and
B.M. Kramer Associates;
CASHCO, INC.;
CERTAINTEED CORPORATION;
CHAMPLAIN CABLE CORPORATION, as
successor-in-interest to Hercules Inc.;
COPES-VULCAN, INC.;
COPPUS TURBINES (Tuthill Energy
Systems);
CRANE VALVE GROUP;
DEZURIK, INC.;
DRAVO CORPORATION;
DURABLA MANUFACTURING
COMPANY, in its own right and as successor
to Durabla Canada, Ltd.;

CIVIL ACTION NO. 2:06-cv-625

**PLAINTIFFS' MOTION FOR REMAND**





EXHIBIT

A

DURAMETALLIC CORPORATION;
EATON CORPORATION, as successor-in-
interest to Cutler-Hammer, Inc.;
E.E. ZIMMERMAN COMPANY;
EICHLEAY CORPORATION;
ELECTROLUX HOME PRODUCTS;
ELLIOTT TURBOMACHINERY
COMPANY, INC.;
ELSA BENSON, INC.;
FABRI-VALVE, Division of ITT Grinnell
Valve Company, Inc.;
FAIRMONT SUPPLY;
F.B. WRIGHT COMPANY;
FISHER SCIENTIFIC COMPANY;
FOSECO, INC.;
FOSTER WHEELER CORPORATION;
GARLOCK, INC.;
GATEWAY INDUSTRIAL SUPPLY
COMPANY;
GENERAL ELECTRIC COMPANY;
GEORGE V. HAMILTON, INC.;
GOULD PUMPS, INC.;
GREENE TWEED & COMPANY;
GRINNELL CORPORATION;
HEDMAN MINES, LTD.;
HONEYWELL, INC;
HUNTER SALES CORPORATION;
IMO INDUSTRIES, INC., f/k/a IMO
Delaval, Inc., f/k/a Transamerican DeLaval,
Inc., f/k/a DeLaval Turbine, Inc., DeLaval
Turbine, Inc., DeValco Corporation;
INDUSTRIAL HOLDINGS
CORPORATION f/k/a Carborundum
Company;
INGERSOLL-RAND;
I.U. NORTH AMERICAN, INC., as
successor by merger to the Garp Company,
formerly known as The Gage Company,
formerly known as Pittsburgh Gage and
Supply Company;
J.M. FOSTER, INC.;
KAISER GYPSUM COMPANY, INC.;
MARLEY COOLING TOWER;
MCCARLS, INC.;

2

MELRATH SUPPLY AND GASKET
COMPANY;
MINE SAFETY APPLIANCE COMPANY;
MINNOTTE CONTRACTING
CORPORATION;
M.S. JACOBS & ASSOCIATES, INC.;
NAGLE PUMPS, INC.;
OGLEBAY NORTON COMPANY, and its
division Ferro Engineering;
OHIO LIME CORPORATION;
OWENS-ILLINOIS, INC.;
PITTSBURGH METALS PURIFYING
COMPANY;
PLOTKIN BROTHERS SUPPLY, LLP;
POWER PIPING;
PREMIER REFRACTORIES, INC., f/k/a
Adience, Inc., successor-in-interest to Adience
Company, LP, as successor to BMI, Inc.;
SAFETY FIRST INDUSTRIES, INC.,
in its own right and as successor-
in-interest to Safety-First Supply, Inc.;
SEALITE, INC.;
STOCKHAM VALVES & FITTINGS, f/k/a
Marlin Valve, Inc.;
SWINDELL-DRESSLER
INTERNATIONAL COMPANY;
TAYLORED INDUSTRIES, INC.;
THE SAGER CORPORATION, successor-
in-interest to the Sager Glove Corporation;
TOWNSEND & BOTTUM, INC.;
TRECO CONSTRUCTION SERVICES,
INC., f/k/a The Rust Engineering Company;
THIEM CORPORATION, and its division,
Universal Refractories;
UNIFRAX CORPORATION f/k/a
Carborundum;
UNION CARBIDE CORPORATION,
its Linde Division;
UNITED CONVEYOR CORPORATION;
USX CORPORATION, f/k/a United States
Steel Corporation;
VIACOM, INC., successor by merger to
CBS Corporation, f/k/a Westinghouse
Electric Corporation; and
WASHINGTON GROUP

I NTERNATIONAL, f/k/a Raytheon
Engineers Constructors, Inc., and all its
domestic subsidiaries, including the Badger
Company, Inc.;

          Defendants,

v.

KENTILE FLOORS, INC.;
BONDEX INTERNATIONAL, INC.;
GEORGIA PACIFIC CORPORATION; and
SEARS ROEBUCK & COMPANY,

          Additional Defendants,

vs.

INSUL COMPANY, INC.,

          Part y Defendant,

vs.

GOODYEAR TIRE & RUBBER
COMPANY,

          Additional Defendant.

4

## PLAINTIFFS' MOTION FOR REMAND

AND NOW COME the above named Plaintiffs, by and through their counsel,

Janice M. Savinis, Esquire, Anthony J. D'Amico, Esquire, John R. Kane, Esquire,

Michael J. Gallucci, Esquire, and Savinis, D'Amico, & Kane, L.L.C. and hereby move

this Honorable Court to Remand this case to Lawrence County.  A Memorandum of Law

in Support of Plaintiffs' Motion to Remand is attached hereto and incorporated herein.


Respectfully Submitted:

SAVINIS, D'AMICO, & KANE, L.L.C.


Anthony J. D'Amico, Esquire – Pa. I.D. No. 36501
Attorney for Plaintiffs
707 Grant Street, Suite 3626 Gulf Tower
Pittsburgh, Pa 15219
(412) 227-6556

IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF PENNSYLVANIA

DONALD MCCARTY and BETTY
MCCARTY, his wife,

                Plaintiffs,

vs.

ALLIED GLOVE CORPORATION;
AMERICAN OPTICAL CORPORATION;
ARGO PACKING COMPANY;
ATLAS INDUSTRIES, INC.;
A.W. CHESTERTON COMPANY;
BEAZER EAST, INC., in its own right and as
successor to Koppers Company, Inc., and
other related companies including Thiem
Corporation, Beazer USA, Inc., and Beazer,
PLC;
B.M. KRAMER & COMPANY, INC. and
B.M. Kramer Associates;
CASHCO, INC.;
CERTAINTEED CORPORATION;
CHAMPLAIN CABLE CORPORATION, as
successor-in-interest to Hercules Inc.;
COPES-VULCAN, INC.;
COPPUS TURBINES (Tuthill Energy
Systems);
CRANE VALVE GROUP;
DEZURIK, INC.;
DRAVO CORPORATION;
DURABLA MANUFACTURING
COMPANY, in its own right and as successor
to Durabla Canada, Ltd.;

CIVIL ACTION NO. 2:06-cv-625

**PLAINTIFFS' MEMORANDUM IN
SUPPORT OF THEIR MOTION FOR
REMAND**

6

DURAMETALLIC CORPORATION;
EATON CORPORATION, as successor-in-
interest to Cutler-Hammer, Inc.;
E.E. ZIMMERMAN COMPANY;
EICHLEAY CORPORATION;
ELECTROLUX HOME PRODUCTS;
ELLIOTT TURBOMACHINERY
COMPANY, INC.;
ELSA BENSON, INC.;
FABRI-VALVE, Division of ITT Grinnell
Valve Company, Inc.;
FAIRMONT SUPPLY;
F.B. WRIGHT COMPANY;
FISHER SCIENTIFIC COMPANY;
FOSECO, INC.;
FOSTER WHEELER CORPORATION;
GARLOCK, INC.;
GATEWAY INDUSTRIAL SUPPLY
COMPANY;
GENERAL ELECTRIC COMPANY;
GEORGE V. HAMILTON, INC.;
GOULD PUMPS, INC.;
GREENE TWEED & COMPANY;
GRINNELL CORPORATION;
HEDMAN MINES, LTD.;
HONEYWELL, INC;
HUNTER SALES CORPORATION;
IMO INDUSTRIES, INC., f/k/a IMO
Delaval, Inc., f/k/a Transamerican DeLaval,
Inc., f/k/a DeLaval Turbine, Inc., DeLaval
Turbine, Inc., DeValco Corporation;
INDUSTRIAL HOLDINGS
CORPORATION f/k/a Carborundum
Company;
INGERSOLL-RAND;
I.U. NORTH AMERICAN, INC., as
successor by merger to the Garp Company,
formerly known as The Gage Company,
formerly known as Pittsburgh Gage and
Supply Company;
J.M. FOSTER, INC.;
KAISER GYPSUM COMPANY, INC.;
MARLEY COOLING TOWER;
MCCARLS, INC.;

MELRATH SUPPLY AND GASKET
COMPANY;
MINE SAFETY APPLIANCE COMPANY;
MINNOTTE CONTRACTING
CORPORATION;
M.S. JACOBS & ASSOCIATES, INC.;
NAGLE PUMPS, INC.;
OGLEBAY NORTON COMPANY, and its
division Ferro Engineering;
OHIO LIME CORPORATION;
OWENS-ILLINOIS, INC.;
PITTSBURGH METALS PURIFYING
COMPANY;
PLOTKIN BROTHERS SUPPLY, LLP;
POWER PIPING;
PREMIER REFRACTORIES, INC., f/k/a
Adience, Inc., successor-in-interest to Adience
Company, LP, as successor to BMI, Inc.;
SAFETY FIRST INDUSTRIES, INC.,
in its own right and as successor-
in-interest to Safety-First Supply, Inc.;
SEALITE, INC.;
STOCKHAM VALVES & FITTINGS, f/k/a
Marlin Valve, Inc.;
SWINDELL-DRESSLER
INTERNATIONAL COMPANY;
TAYLORED INDUSTRIES, INC.;
THE SAGER CORPORATION, successor-
in-interest to the Sager Glove Corporation;
TOWNSEND & BOTTUM, INC.;
TRECO CONSTRUCTION SERVICES,
INC., f/k/a The Rust Engineering Company;
THIEM CORPORATION, and its division,
Universal Refractories;
UNIFRAX CORPORATION f/k/a
Carborundum;
UNION CARBIDE CORPORATION,
its Linde Division;
UNITED CONVEYOR CORPORATION;
USX CORPORATION, f/k/a United States
Steel Corporation;
VIACOM, INC., successor by merger to
CBS Corporation, f/k/a Westinghouse
Electric Corporation; and
WASHINGTON GROUP

I NTERNATIONAL, f/k/a Raytheon
Engineers Constructors, Inc., and all its
domestic subsidiaries, including the Badger
Company, Inc.;

        Defendants,

 v.

KENTILE FLOORS, INC.;
BONDEX INTERNATIONAL, INC.;
GEORGIA PACIFIC CORPORATION; and
SEARS ROEBUCK & COMPANY,

        Additional Defendants,

vs.

INSUL COMPANY, INC.,

        Part y Defendant,

vs.

GOODYEAR TIRE & RUBBER
COMPANY,

        Additional Defendant.

**PLAINTIFFS' MEMORANDUM IN SUPPORT
OF THEIR MOTION FOR REMAND**

AND NOW COME the above named Plaintiffs, by and through their counsel,

Janice M. Savinis, Esquire, Anthony J. D'Amico, Esquire, John R. Kane, Esquire,

Michael J. Gallucci, Esquire, and Savinis, D'Amico, & Kane, L.L.C. and hereby file the

following Memorandum In Support of Plaintiffs' Motion For Remand:

## I. INTRODUCTION

Plaintiffs Donald and Betty McCarty filed a complaint in Lawrence County on

November 29, 2005 alleging that Mr. McCarty's mesothelioma was caused by his

exposure to and inhalation of asbestos fibers from products manufactured, sold, supplied

and distributed by the defendants. Mesothelioma is an "invariably fatal cancer...for

which asbestos exposure is the only known cause..." In re Patenaude, 210 F.3d 135, 138

(3d Cir.), cert. denied, 531 U.S. 1011 (2000). It kills its victims "generally within two

years of diagnosis[,]" during which "[m]esothelioma victims invariably suffer great pain

and disability." Georgine v. Amchem Prods., Inc., 83 F.3d 610, 633 (3d Cir.), aff'd, 521

U.S. 591 (1997). Mr. McCarty was diagnosed with mesothelioma on July 14, 2005. He

was deposed in connection with this action on January 18, 2006 and January 19, 2006.

Mr. McCarty died from his mesothelioma on March 28, 2006.[1]

Since its inception, this case has been governed by a Case Management Order

(CMO) signed by the Honorable Dominick Motto of The Lawrence County Court of

Common Pleas. In compliance with the CMO, Plaintiffs have already provided all

Defendants with a fact witness list and have already responded to all Defendants'

---

[1] An Estate for Mr. McCarty has been opened, but the complaint has yet to be amended to reflect his death
due to the instant attempt at removal filed by Defendant General Electric.

Motions for Summary Judgment.  This case was scheduled to go to trial in October of 2006.

## II. FACTUAL BACKGROUND

Plaintiff served in the U.S. Navy from 1944 to 1946.  He was employed as a union carpenter from 1950 to 1962 and again from 1967 to 1989.  From 1962 to 1967, Plaintiff was employed as a steel worker at the Babcox and Wilcox plant in Beaver Falls, Pennsylvania.  As a union carpenter, Plaintiff performed work at numerous steel mills, power stations and commercial buildings in Western Pennsylvania, Ohio and West Virginia.  These work sites include, but are not limited to, Jones & Laughlin Steel, Aliquippa Plant, U.S. Steel Clairton, U.S. Steel Neville Island, Crucible Steel, Shippingport Atomic Plant, Bruce Mansfield Power Station, and Babcox & Wilcox.

Mr. McCarty testified in his two-day deposition regarding his asbestos exposure at J&L Steel Aliquippa in the 10 inch Round Mill, Blast Furnace, By-Products, Coke Battery Department, Soaking Pits, 6 inch Plug Mill, Open Hearth and Junior Beam Mill as follows (See Exhibit A):

A.  Plaintiff was employed by McDowell Corp. in 1951-1952 in the 10 inch Round Mill (pp. 44-45, 48); he completed form and scaffolding work during new construction (p. 46).  He was exposed to asbestos pipecovering, packing and gaskets when constructing and dismantling the scaffolding (pp. 49-50).  He wore asbestos gloves when welding (p. 51).

B.  For six months in the early 1950s, while employed by Koppers, he was present during the construction of a Blast Furnace.  He recalled pouring the footer (pp. 52-55).  He was exposed to asbestos transite that was being installed on an elevator (pp. 55-56).  In addition, he recalled exposure to asbestos pipecovering, gaskets, gloves and valves (pp. 56-57).

C.  From August of 1968 to January of 1969, he returned for Koppers to the Blast Furnace to construct scaffolding at which time he was exposed to asbestos pipecovering, gaskets and valves (pp. 115-117).

D.  In 1969-1970, for three to four months (pp. 146-147), he was employed in the Coke Battery Department, building scaffolding for workers who installed a

portion of a roof on a battery. He recalled exposure to asbestos packing, gaskets, valves, cement and pipecovering (p. 148).

E. He was employed by Eichleay from September of 1972 to April of 1973, in the soaking pits where he had bystander exposure to pipecovering, gaskets and valves (pp. 120-121).

F. He returned for Eichleay from March to December of 1975. He worked in the By-Products Department and had bystander exposure to pipecovering, packing, valves and gaskets (pp. 125-127).

G. In the 1970s, for six months, he worked for Dick Corporation in the 6 inch Plug Mill (pp. 149-150). He completed repairs on rolls and had the same exposure to asbestos products as he recalled during his other employment at J&L (p. 150).

H. He recalled exposure to asbestos-containing hot tops (pp. 167-168) while working in the Open Hearth Department in the 1970s for four to six months (pp. 279-283). He was constructing scaffolding for various trades (p. 280).

I. In the late 1980s, while employed by Estoff for three months, the plaintiff worked in the Junior Beam Mill installing foundations for pumps (pp. 151-152). He described exposure to valves and gaskets (p. 152).

At no point in his deposition did Plaintiff testify that he was exposed to any asbestos from any turbines, General Electric or otherwise. More specifically, Plaintiff did not testify that he was exposed to any asbestos from any of the turbines at the Jones & Laughlin Steel plant in Aliquippa. Furthermore, Plaintiff did not testify that he was exposed to any asbestos from any turbines while serving in the Navy. Plaintiff's only exposure to asbestos from any turbines is at the Bruce Mansfield Power Station.

In Plaintiffs' Response to Defendants' Motions for Summary Judgment, Plaintiffs relied on the affidavit of Ronald Wolfe. Mr. Wolfe worked with Mr. McCarty as a carpenter at Bruce Mansfield Power Station. Mr. Wolfe stated in his affidavit that he and Mr. McCarty were exposed to asbestos dust from pipecovering and other products in and around the turbines at Bruce Mansfield Power Station. There is absolutely no evidence that Plaintiff was exposed to any asbestos from the General Electric (hereinafter GE) turbines present at the Jones & Laughlin Steel plant in Aliquippa. Moreover, there are no specific allegations on the face of Plaintiffs' state court Complaint regarding the presence

12

of GE products at Jones & Laughlin Steel, Aliquippa, nor is there any allegation that Plaintiff was exposed to asbestos from a GE turbine at Jones & Laughlin Steel, Aliquippa.

GE claims that out of the seven turbines at Jones & Laughlin Steel, Aliquippa, one turbine, serial number 62826 (hereinafter referred to as "the GE turbine"), was originally manufactured for and sold to the U.S. Navy in 1943 and was installed on the USS Fowler. (See Banaszewski Affidavit attached to GE's Notice of Removal as Exhibit I). In his affidavit, Mr. Banaszewski states that he started at GE in 1968, 25 years after the GE turbine was allegedly manufactured according to Navy specifications. Mr. Banaszewski has absolutely no first hand personal knowledge regarding the manufacture of the GE turbine. In fact, he admits this fact in paragraph six of his affidavit by stating, "[u]pon my review of those historical GE steam turbine records, I learned that a GE steam turbine bearing serial number 62826 was placed in service at Jones and Laughlin's plant in Aliquippa[.]" He continues, "[w]hen I researched the history of that turbine, I learned that it was one of several steam turbines manufactured for and purchased by the United States Navy in 1943." (See Banaszewski Affidavit at ¶6). His only basis for claiming that the GE turbine was manufactured for and purchased by the Navy is his review of some "historical GE steam turbine records." Surprisingly, however, these "historical GE steam turbine records" are not attached to GE's Notice of Removal.

When the plaintiffs initially scheduled the deposition of Mr. Banaszewski, GE filed a Motion to Strike Plaintiffs' Notice of Deposition and Motion for Protective Order (See Exhibit B). GE contended that the plaintiff was deposed and there was no record evidence that he worked on and/or around a GE land based turbine. The Court denied

GE's motion: the Court finds that it is not conclusive that any testimony that could be

offered by Mr. Banaszewski would be irrelevant to the issues in the case (See Exhibit C

Order of Court dated March 3, 2006).

Prior to Mr. Banaszewski's video conference deposition, GE was to produce the

documents relevant to J&L Aliquippa and Bruce Mansfield Power Station.  When GE

failed to comply, the plaintiffs filed a Motion to Compel GE to Produce Documents Prior

to the Deposition of Paul Banaszewski (See Exhibit D).  The Court entertained Plaintiffs'

Motion and entered the following Order:

**ORDER OF COURT**

> AND NOW, this 21st day of April, 2006, after a hearing on the
> Plaintiffs' Motion to Compel General Electric to Produce Documents
> Prior to the Deposition of Paul Banaszewski, it is ORDERED and
> DECREED that the Defendant, General Electric, shall produce the
> requested documents to Plaintiffs' counsel forty-eight (48) hours before
> the deposition of Paul Banaszewski, and that the deposition of Paul
> Banaszweksi shall take place by video-telephone conference and the
> Plaintiff is granted leave to utilize a court reported in Pennsylvania who
> will be able to see and hear the witness.

(See Exhibit E Order of Court dated April 21, 2006).  On April 26, 2006, the day of Mr.

Banaszewski's deposition, counsel for the plaintiffs stated the following on the record:

> On April 21, 2006, Judge Dominick Motto, who is presiding
> over this case, entered an order in which he compelled defendant
> General Electric to produce all the documents requested within 48
> hours.  In addition, Judge Motto stated in his order that the court
> reporter for this deposition could be at the RoData facility and that the
> parties were free to conduct the deposition by video teleconference.
> When I argued Plaintiff's Motion to Compel Defendant
> General Electric to Produce the Documents, Attorney Bryan Neft was
> present on behalf of General Electric.  He advised the court at that point
> in time that General Electric did, in fact, Fed-Ex the records to me.  He
> did not provide me at that time with the letter of April 20, 2006
> prepared by Mr. Bickers.
> I'm going to have Mr. Bickers April 20, 2006 letter marked as
> Exhibit A.  It is plaintiff's position that Mr. Bickers failed to comply
> with the Judge's Order.  Mr. Bickers in his letter invited me to come to
> Albany or Schenectady to review documents, which is contrary to the
> Judge's Order.
> Mr. Neft never advised the Court that GE was not producing
> all the documents and clearly at the time of oral argument I was led to
> believe that I would have all the documents.  It was not until I returned
> to my office and received a Federal Express package did I realize that

> Mr. Bickers was not producing all the documents but was inviting me
> to come to Schenectady or Albany to review documents.
> With that being said, I'd like the witness to be sworn.

(See deposition testimony of Paul Banaszewski, attached hereto as Exhibit F).

GE failed to provide these "historical GE steam turbine records" that allegedly support

Mr. Banaszewski's affidavit to Plaintiffs or this Honorable Court.

Mr. Banaszewski's lack of personal knowledge regarding the manufacture of the

GE turbine is further evidenced by his own deposition testimony. Mr. Banaszewski's

testimony in his deposition completely contradicts the facts he attempts to set forth in his

affidavit. When he was specifically asked how many GE turbines used in the Navy were

sold to Jones & Laughlin Steel, Aliquippa, he responded "I think I have seen reference to

numbers like five or six, in that range." (See deposition testimony of Paul Banaszewski

at page 126, attached hereto as Exhibit F). Despite this testimony, Mr. Banaszewski

stated in his affidavit, only 2 days after his deposition, that one out of the seven turbines

at Jones & Laughlin Steel, Aliqippa was manufactured for and purchased by the United

States Navy. (See Banaszewski Affidavit at ¶6). Mr. Banaszewski's affidavit contradicts

his own deposition testimony and proves that he has absolutely no personal knowledge

regarding the manufacture of the GE turbine. GE had answered interrogatories on a

number of occasions regarding the J&L site and never alleged one of the turbines was

originally manufactured for the Navy. Mr. Banaszewski testified:

> Q:  General Electric answered interrogatories in numerous
> asbestos cases here in Allegheny County and in regard to J&L
> Steel Aliquippa, I have been given some conflicting
> information (p. 118). In McCarty, the case at issue, General
> Electric indicated that they had steam based turbines at the
> plant in 1916, 1923, 1926, 1929 and 1943, so that would be
> five turbines.
> In another case where the plaintiff only worked at J&L Steel
> Aliquippa, the Pajak case, GE answered (p. 119)
> interrogatories and indicated that they had two turbines at J&L
> Steel Aliquippa, one in 1922, which has not been identified in

15

McCarty, and one in 1926, and so I was somewhat confused by the answer.

Then the story gets even a little better because then I spoke with Mr. Bickers (counsel for GE) and during our telephone conversation he revealed to me that he believes there were seven General Electric turbines at J&L Steel Aliquippa.

So, I'm going to ask you, based on your review of the documents that you had available, do you have any knowledge how many turbines that GE had at the Aliquippa plant?

A:    Based on what we have been able to dissect by going through records as they were found, I think that's the sequence that you are referencing, this is a very , very old site, ala the reference to turbines back at the turn of the century, 1910s, 1915s, there may have even been more than sever. Just as we learned more and more, I think the information was given to you.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Q:    Based on McCarty interrogatories, the last year referenced is 1943, and do you know if that is the appropriate year that the last turbine was sent or sold to them, '43? (p. 120)

A:    As I just said, based on what we have been able to put together to this date, that is the best information we have got. I would not sit here and tell you that that's gospel because we may find that J&L Steel purchased the turbine again through outside sources, or information even from GE could have been lost over the years. We are giving you the best information we got.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Q:    And can you tell us what your knowledge is of what entity got a turbine at J&L Steel Aliquippa, if you know, based on your review of the documents? (p. 126)

A:    Well, it appears that the U.S. Navy post World War II sold some turbines to J&L Steel.

Q:    Do you know how many?

A:    I think I have seen reference to numbers like five or six, in that range.

Q:    Are you telling me five or six to J&L Steel Aliquippa?

A:    To J&L Steel Aliquippa as they are assigned in our – in the field documents there was a folder that indicated they were going to Aliquippa. Did they go there, I can't determine that because I don't know the numbers of them, it was just a documents that said they were going to J&L Steel (p. 127)

Q:    Okay. But where the government, the military, the Navy or some other entity sold it to J&L Steel, how many fall into that category?

A:    Again, as I said, I think there was reference to numbers like six, seven, some number around that, that we could find documents on.

Q:    And what type of documents did you have in your possession that showed that it was not a direct sale from GE to J&L?

A:    It was a document that indicated the purchase was from J&L Steel to the Navy and I don't have that document.

Q:    But you had it available from the field office?

A:    Yes.

Q:    And how, why, how –

16

> MR. BICKERS:  It is here if you want us to pull them out and
> ask questions about them.
>
> Q:     I just would like to ask you if the purchase was not a direct
>         purchase, because you are telling me it was from the Navy to
>         J&L (p. 128)
>
> A:     That's correct.

(See deposition testimony of Paul Banaszewski, attached hereto as Exhibit F).

Despite these facts, on May 11, 2006, Defendant GE filed a Notice of Removal

asserting the existence of federal jurisdiction under 28 U.S.C. §1442(a)(1), the "federal

officer" statute.  GE claims that its Notice of Removal was timely under 28 U.S.C. §

1446(b).

## III. STATEMENT OF QUESTION INVOLVED

Whether GE has established a factual basis for subject matter jurisdiction and

removal based upon 28 U.S.C. § 1442(a)(1)?

**ANSWER: NO**

## IV. LAW AND ARGUMENT

The right to removal is limited, and arises only when a federal interest in the

matter exists.  Winters v. Diamond Shamrock Chemical Co., 149 F.3d 387, 397 (5th Cir.

1998) (quoting Willingham v. Morgan, 395 U.S. 402, 406 (1969)).  The Court must

always bear in mind that:

> Federal courts are courts of limited jurisdiction.  They possess only that
> power authorized by Constitution and statute…which is not to be
> expanded by judicial decree . . . .  **It is to be presumed that a cause lies
> outside this limited jurisdiction . . ., and the burden of establishing the
> contrary rests upon the party asserting jurisdiction [.]"**

Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377 (1994) (internal citations

omitted)(emphasis added).  A defendant seeking removal bears the burden of

demonstrating federal subject matter jurisdiction.  See Boyer v. Snap-On Tools Corp.,

913 F.2d 108 (3d Cir. 1990).  All doubts "must be resolved against removal and in favor

17

of remanding the case to state court." Ta v. Neimes, 927 F.Supp. 977, 985 (W.D. Tex. 1996).

GE claims that it is entitled to remove this case pursuant to 28 U.S.C. §1442(a)(1), the "federal officer" statute. This statute states, in relevant part,

> [a] civil action or criminal prosecution commenced in a State court against any of the following may be removed by them to the district court of the United States for the district and division embracing the pace wherein it is pending: (1) The United States or any agency thereof or any officer (or person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office[.]

28 U.S.C. § 1442(a)(1). This statute creates an exception to the well-pleaded complaint rule, even without the existence of a federal cause of action, so long as the removing party asserts a colorable federal defense to the state claims. See Williams v. General Electric Company, 418 F.Supp. 610 (M.D. Pa. 2005) (citing Mesa v. California, 489 U.S. 121, 136 (1989))("[the federal officer removal statute] is a pure jurisdictional statute, seeking to do nothing more than grant district court jurisdiction over cases in which a federal officer is a defendant."). The federal officer removal statue is designed to "ensure a federal forum in any case where a federal official is entitled to raise a defense arising out of his official duties." Arizona v. Manypenny, 451 U.S. 232, 241-42 (1981); Winters v. Diamond Shamrock Chemical Co., 149 F.3d 387, 397 (5th Cir. 1998).

The Middle District of Pennsylvania recently considered a removal attempt by GE in asbestos litigation on nearly identical facts to the case at bar in Williams v. General Electric Company, 418 F.Supp. 610 (M.D. Pa. 2005). Mr. and Mrs. Williams sued GE and a number of other defendants in Dauphin County alleging that Mr. Williams was exposed to asbestos while serving in the Navy and while employed as a steel worker at

18

Bethlehem Steel. Plaintiffs contended that his exposure to asbestos while so employed caused his asbestosis. The Williams' did not specifically allege in their complaint that Mr. Williams' asbestosis was caused by exposure to GE products that GE claims it supplied to the Navy. GE filed a Notice of Removal under 28 U.S.C. § 1442(a) claiming that the turbines at issue in the Navy were specifically designed for use in accordance with the specifications and control of the Secretary of the United States Navy and its officers. As GE did in the case at bar, GE relied upon the affidavit of David Hobson to support its removal. After considering all the applicable law, which is fully set forth below, the Court remanded the case to Dauphin County Court of Common Pleas noting that "GE has not satisfied its burden of demonstrating that removal is appropriate under 28 U.S.C. § 1442(a)(1)." See Williams, 418 F.Supp. 610

According to the applicable law as set forth in Williams, in order to meet its burden of establishing removal jurisdiction pursuant to 28 U.S.C. § 1442 (a), GE must establish the following: (1) it is a "person" within the meaning of the statute; (2) Plaintiffs' claims are predicated on GE's conduct "acting under" a federal officer; (3) GE has a colorable federal defense to the claims; and (4) there is a causal nexus between the claims and the conduct performed under color of a federal office. See Williams, 418 F.Supp. 610 (citing Feidt v. Owens Corning Fiberglas Corp., 153 F.3d 124, 127 (3d Cir. 1998)) (internal citations omitted). A failure to establish any of the preceding four criteria is a failure to properly remove the case under the Federal Officer Removal Statute, 28 U.S.C. § 1442.

A.    Is GE a Person Within the Meaning of the Statute?

The Court in Williams was not asked to address whether GE was a person within the meaning of the statute, as the Plaintiff in that case did not contest the issue. Here, however, Plaintiff does not believe that GE is a "person" entitled to protection under the Federal Removal Statute.

    1. Corporations

First, the Third Circuit has yet to decide the issue of whether a corporation shall be considered a "person" under the statute and District Courts are divided on this issue. The issue has been addressed in the Eastern District of Pennsylvania, but not within the Western District. The Eastern District stated, "[a]lthough Federal District Courts are divided on the question, I agree with those opinions taking a broad approach when defining "person," and thereby including corporations within the definition." Good v. Armstrong World Industries, 914 F.Supp. 1125, 1127, 1128 (E.D. Pa. 1996).

While it did not deal with the specific issue of a corporation, the Supreme Court in International Primate Protection League and its Members v. Administrators of Tulane Educational Fund, 500 U.S. 72; 111 S. Ct. 1700 (1991), analyzed the language of the 28 U.S.C. § 1442, and determined that "person" does not include Federal agencies. In International Primate, the Supreme Court was asked to determine whether a federal agency, the National Institute of Health (NIH), should be considered a "person" under 28 U.S.C. § 1442.

In ruling that an agency does not have removal power, the Court stated: "[w]e find that, when construed in the relevant context, the first clause of § 1442(a)(1) grants removal power to only one grammatical subject, "any officer," which is then modified by

20

a compound prepositional phrase: "of the United States or [of] any agency thereof." Id.,

500 U.S. at 79, 80. The Court went on to explain why removal does not exist by an

agency of the United States, but only an officer of an agency of the U.S.:

> Finally, the phrase in § 1442(a)(1) that limits exercise of the removal power to
> suits in which the federal defendant is challenged for "any act under color of such
> office" reads very awkwardly if the prior clauses refer not only to persons but to
> agencies. An agency would not normally be described as exercising authority
> "under color" of an "office." In sum, IBR's interpretation of § 1442(a)(1) simply
> does not accord with the statute's language and structure.

Id., 500 U.S. at 80.

The NIH argued that if a Federal agency does not have power in and of itself

under the statute, then it should qualify as a "person working under a Federal Officer." In

rejecting this position, too, the Supreme Court held that typically a sovereign is not

defined as a person, and because of "the awkwardness of referring to an agency as a

'person acting under him.'". Id., 500 U.S. at 84.

Given the U.S. Supreme Court's position that the Federal Officer Removal Statue

does apply to agencies, it seems remote that they would extend the language of the act to

encompass corporations. Further, the Supreme Court's holding in International Primate

turns on the language of the act and that the subject of the act was intended to be an

individual ("the first clause of § 1442(a)(1) grants removal power to only one

grammatical subject"), not an agency. Specifically if the statute reads awkwardly having

an "agency as a 'person acting under him'" it reads just as awkwardly as having a

corporation as a person working under him.

2.    *Federal Defendants v. Private Individuals and Entities*

21

Beyond describing the inherent language and structure difficulties of including an "agency" within the meaning of "person," the Supreme Court reiterates that the defendant is a "federal defendant." Even in its most general terms before addressing whether a federal agency should be considered a person, the Supreme Court describes the statute as applicable to *federal* defendants, and more specifically only to *certain federal* defendants. The United States Supreme Court noted, "[s]hortly after the suit was filed, NIH removed the case to federal court pursuant to 28 U. S. C. § 1442(a)(1), which authorizes removal of state suits by *certain federal defendants*." Id. at 500 U.S. 76. (emphasis added). This description is important as Defendant GE is not a "federal defendant."

Although the Eastern District of Pennsylvania decided the issue of whether a corporation was a person within the meaning of §1442, it never specifically dealt with whether the language of "acting under a federal officer" was meant to include anyone in the world who allegedly took direction from a federal officer or merely those people employed by the federal government taking actual direction from a superior. In International Primate, the party attempting removal was the National Institute of Health, a federal agency, not one of the other defendants, such as the Institute for Behavior Resources. The Supreme Court describes the NIH as a federal defendant and the IBR as a private entity.

The history of the federal officer removal statute gets its origin in the Act of February 4, 1815, § 8, 3 Stat. 198, as a congressional response to New England's opposition to the War of 1812, through its expansion in response to South Carolina's 1833 threats of nullification, and its further expansion in the Civil War era as protection for revenue officers became necessary, to enactment of the Judicial Code of 1948 when

22

the removal statute took its present form encompassing all federal officers. *See* Mesa v. California, 489 U.S. 12, 125-126; 109 S. Ct. 959 (1989) [citations omitted]. The purpose behind the act was "to protect federal officers from interference by hostile state courts". Willingham v. Morgan, 395 U.S. 402, 405, 89 S.Ct. 1813 (1969).

Here, a non-federal defendant, GE, seeks removal by attempting to use a statute designed to protect Federal officers and Federal employees working under the direction of those officers. However, the statute was not designed to protect non-federal employees. *See also*, Lindy v. Lynn, 395 F. Supp. 769, 771 (E.D. Pa. 1974) (citing The People of the State of California v. Bozarth, 356 F. Supp. 667, 668-669 (N.D.Cal.1973)) ("The Congressional intent behind this section was that suits against United States government officers for acts done within the scope of their authority should be tried only in the courts of the United States. Willingham v. Morgan, 395 U.S. 402, 89 S. Ct. 1813, 23 L. Ed. 2d 396 (1969). Thus, Federal officers would not be forced to answer for their conduct within the scope of their duty in any court except a Federal Court. State of North Carolina v. Carr, 386 F.2d 129 (4th Cir. 1967); State of New Jersey v. Moriarity, 268 F. Supp. 546 (D.C.N.J.1967).").

The purpose of the Federal Removal Statute was to protect Federal officers and those federal employees carrying out business on behalf of the Federal Officers. Here, however, there is no Federal defendant seeking protection from state court. Rather, a private company, not even a person, seeks to expand the Federal officer removal statute under the guise that it was alleged instructed by Federal officers. The appellate cases dealing with the statute, Jefferson County v. Acker, 527 U.S. 423 (1999) (two Federal Judges, as Federal Officers of the Court, were able to remove suit against them), Ariz. v.

Manypenny, 451 U.S. 232 (suit against border patrol officer removed to federal court),

Willingham v. Morgan, 395 U.S. 402, 89 S. Ct. 1813, 23 L. Ed. 2d 396 (1969) (Federal

Warden and Chief Medical Officer of Federal prison were entitled to removal to Federal

Court), do not apply to private individuals, let alone private companies.

Given the U.S. Supreme Court's position that the Federal Officer Removal Statute

does not apply to agencies, even Federal agencies, and that the history of the act is to

protect Federal Officers from state courts, Plaintiff avers that the Supreme Court would

not extend the language of the act to encompass private corporations.

B.    Was GE Acting Under a Specific Federal Officer?

Plaintiffs dispute that GE can meet the remaining three prongs of the Feidt test.

First, GE has failed to prove that it was acting "under" a federal officer in supplying the

Navy with the GE turbine as required by Feidt.  In an attempt to prove that it was acting

"under" a federal officer, GE relies on the affidavits of David Hobson.  Mr. Hobson states

in paragraph 3 of his affidavit of October 17, 2003,

> [d]uring my 27 years of employment with GE, I had frequent and
> extensive business dealings on behalf of GE with commissioned officers
> and civilian employees of the United States Navy in connection with their
> purchase and use of marine steam turbines from GE.  Over the same time
> period, I also had extensive business dealings on behalf of GE with
> commercial shipyards and/or ship owners in connection with their
> purchase and use of marine steam turbines from GE.  GE sold its marine
> steam turbines to the Navy and commercial shipyards and/or ship owners
> for installation aboard ships.

(See Affidavit of David Hobson attached to GE's Notice of Removal as Exhibit J).  The

District Court for the Middle District of Pennsylvania, after quoting nearly identical

language from Mr. Hobson's affidavit, stated, "nothing in this testimony provides that the

24

Navy provided precise specifications for any turbines . . . nor that the equipment supplied conformed with such specifications[.]"  See Williams, 418 F.Supp. 610.

In the case *sub judice*, the evidence proffered by GE does not support its position that GE was acting "under" a federal officer.  Neither the affidavit of Mr. Banaszewski nor the affidavits Mr. Hobson prove that the Navy provided precise specifications for the GE turbine, nor do these affidavits prove that the GE turbine complied with such specifications.  Neither of the affidavits establish that GE was acting under the direction of the Secretary of the Navy or any other Naval officer in designing, manufacturing, or supplying the Navy with the GE turbine.  GE has failed to prove that it was acting "under" the direction of a federal officer in the manufacturing and supplying of the turbine at issue.

In Good v. Armstrong World Industries, 914 F.Supp. 1125,(E.D. Pa. 1996), another defendant in asbestos litigation, Westinghouse, attempted to remove a case to Federal Court under the same guise as GE in the instant matter, that it manufactured a turbine under a federal officer.  The court held that removal pursuant to the statute must be "predicated" upon a showing that the acts forming the basis of the state suit were performed pursuant to a specific officer's direct orders or comprehensive and detailed regulations from that officer.  However, if the facts establish

> only that the relevant acts occurred under the general auspices of federal direction then it is not entitled to § 1442(a)(1) removal. Fung, 816 F. Supp. at 569; Ryan, 781 F. Supp. at 947. Thus, Westinghouse must prove that it constructed the turbines according to the direct and detailed control of an officer of the United States, rather than at the general direction of an agency or other governmental department. See Pack, 838 F. Supp. at 1103.

Id., 914 F.Supp. at 1128.

GE's argument fails to identify any such officer, other than the Secretary of the Navy, just as Westinghouse alleged in Good. Furthermore, the court Good, found upon closer scrutiny that the facts do not support the claim that the Secretary of the Navy had any part in the turbine development.

> The suggestion in the notice of removal that the Secretary of the Navy was connected to the design and manufacture of turbines by Westinghouse is not supported by the record and indeed is refuted by the record. At most, the Secretary appears to have been the official outer point of multiple layers of individuals employed by the federal government who worked with Westinghouse during the design and manufacture of the turbines. Although it is true that the United States Navy and many individuals employed by the Navy worked with Westinghouse, Westinghouse does not show that the Secretary of the Navy or any other federal officer directly controlled and supervised the work of Westinghouse.

Id., 914 F.Supp. at 1129.

Like Westinghouse in Good, GE merely puts forth a blanket allegation that it worked under the Secretary of the Navy, but in actuality the affidavits by GE and Westinghouse assert that it worked with many different federal employees. As in Good, working under the general auspices of federal direction does not entitle one to removal under § 1442(a)(1). The Good Court noted, "[a]cting under the direction of the Navy, however, is not the same as acting under the direct and detailed control of a federal officer." Id., 914 F.Supp. at 1129.

Also, GE claims in the affidavit of Mr. Hobson, that the inspector of Naval Machinery (hereinafter INM) worked on site at the GE manufacturing location and "observed the manufacturing process[.]" (See Affidavit of David Hobson attached to GE's Notice of Removal as Exhibit J). Westinghouse, in the Good case, also claimed in an affidavit that the INM and Navy civilians were present at Westinghouse's manufacturing location and provided oversight for virtually every aspect of the

manufacture and testing of the turbines. See Good, 914 F.Supp. at 1129. The Good

Court noted that the people employed by the Navy "who had oversight authority does not

support the blanket assertion by Westinghouse that the Secretary of the Navy provided

*direct and detailed control* over Westinghouse." Id. (emphasis added). Here, like

Westinghouse in Good, GE cannot and does not prove that the Secretary of the Navy or

any other federal officer "directly controlled and supervised" the manufacture and design

of the GE turbine. Thus, GE fails the second prong of the four prong test set forth in

Feidt.

C.      Does GE Have a Colorable Federal Defense to the Claims?

In an attempt to satisfy the "colorable defense" prong of Feidt, GE claims that it is

entitled to the benefit of the federal common law government contractor defense. GE is

incorrect in its assertion. The government contractor defense shields contractors from

liability under state tort law for defects in military equipment supplied to the U.S., if the

contractor can prove the following: "(1) the United States approved reasonable precise

specifications; (2) the equipment conformed to those specifications; and (3) the supplier

warned the United States about the dangers in the use of the equipment that were known

to the supplier, but not to the United States." See Boyle v. United Technologies Corp.,

487 U.S. 500 (1988); see also, Carley v. Wheeled Coach, 991 F.2d 1117 (3d Cir. 1993).

It is important to note that Plaintiffs' complaint in this case does not specifically

allege that Plaintiff's mesothelioma was caused by his exposure to materials GE is

claiming it supplied to the Navy. See Williams, 418 F.Supp. 610 (First, the Court notes

that nothing in the complaint specifically alleges that Plaintiff's asbestosis relates to

materials GE is claimed to have supplied the Navy). Again, GE has failed to provide any

government contracts or any government specifications for the GE turbine. GE has failed to show that the United States approved "reasonably precise" specifications for the GE turbine and that the GE turbine conformed to those specifications. The only evidence offered by GE on this point is the affidavits of Mr. Hobson and Mr. Banaszewski, both of which are insufficient to support GE's claim. In fact, all Mr. Hobson could state was that he had some "business dealings" with the Untied States regarding turbines. Mr. Hobson, never mentions anything at all about the GE turbine at Jones & Laughlin Steel, Aliquippa.

Further, regarding the Hobson affidavit, the <u>Williams</u> court has already emphatically stated, "the Hobson affidavit does not support even a colorable claim to the government contractor defense." See <u>Williams,</u> 418 F.Supp. 610. Likewise, the most that Mr. Banaszewski can say is that the GE turbine was "manufactured for and purchased by the United States Navy in 1943." (See Banaszewski Affidavit attached to GE's Notice of Removal as Exhibit I at ¶6). Mr. Banaszewski makes absolutely no mention that the GE turbine was manufactured in accordance with any government specifications. Further, GE does not attach the historical documents that Banaz reviewed and form the basis of his opinions in his affidavit. GE has failed to support its claim to the government contractor defense and as such, fails the third prong of the <u>Feidt</u> test for removal under 28 U.S.C. § 1442(a).

D.  <u>Is There a Causal Nexus Between the Claims and the Conduct Performed Under
    Color of a Federal Office?</u>

Under the fourth prong of the <u>Feidt</u> test, GE must prove that there is a causal nexus between Plaintiffs' claims and the conduct GE claims it performed under color of a

federal office. See Feidt, 153 F.3d 124. GE has failed to do this. The Williams court noted,

> [b]ecause GE has failed to demonstrate adequately that it has a colorable federal defense to Plaintiffs' claims, and has failed to show it was acting under a federal officer in supplying the Navy with steam turbines, the Court questions whether GE can validly assert 'a causal nexus between the claims and the conduct performed under color of a federal officer.'

See Williams, 418 F.Supp. 610 (citing Feidt, 153 F.3d at 127). Just as GE's attempt in Williams failed, GE's attempt to prove a casual nexus in the case at bar also fails.

Continuing, the Williams court, noted, "[e]ven assuming GE could make such a showing, the Court would find that they have failed in this regard, as the Hobson Affidavit does not assert, much less support, a causal nexus between the injuries Plaintiffs allege and the marine steam turbines GE allegedly supplied the Navy." See Williams, 418 F.Supp. 610.

In the case at bar, GE cannot and does not prove that there is a causal nexus between Plaintiff's mesothelioma and the GE turbine. Moreover, Plaintiffs do not claim asbestos exposure to the one turbine at Jones & Laughlin Steel, Aliquippa which GE relies on for its basis for removal. At no point in his deposition did Plaintiff testify that he was exposed to asbestos from any turbines, General Electric or otherwise. More specifically, Plaintiff did not testify that he was exposed to any asbestos from any of the turbines at the Jones & Laughlin Steel plant in Aliquippa. Plaintiff's only exposure to asbestos from turbines is at the Bruce Mansfield Power Station. In Plaintiffs' Response to Defendants' Motions for Summary Judgment, Plaintiffs do not set forth any evidence proving that Plaintiff was exposed to any asbestos from the GE turbine at the Jones & Laughlin Steel plant in Aliquippa. Moreover, GE admits this fact on pages 6 and 7 of its

Notice of Removal: "the [Motion for Summary Judgment] response does not state or refer to any direct evidence that Donald McCarty was exposed to asbestos from any GE turbine at the J&L Aliquippa facility." (See GE's Notice of Removal at pages 6-7)

In Good, the court also found that "Westinghouse's poor showing of the causal connection between the allegations of plaintiffs and its conduct taken under direction of a federal officer is also evidenced by its failure to set forth the substance of the regulations and specifications." Specifically, "neither the notice nor the affidavit establishes that a federal officer required the use of asbestos in the design and manufacture of the turbine generators." Id., 914 F.Supp. at 1130.

Like in Good and Williams, There is absolutely no evidence that Plaintiff was exposed to any asbestos from the GE turbines present at Jones & Laughlin Steel, Aliquippa and GE has failed to point this court to any evidence to the contrary. GE has certainly not come forth alleging that exposure to this specific turbine at J&L caused the plaintiff's mesothelioma. Thus, there can be no logical argument that there is a causal nexus between Plaintiff's mesothelioma and any turbines which GE is claiming it supplied the United States Navy or under color of a federal officer. GE has completely and utterly failed to meet the fourth prong of the Feidt test.

## V. CONCLUSION

GE's attempt to remove this case is clearly in error and nothing more than an attempt to stall the litigation process. To succeed with its removal attempt, GE must meet the four prong test set forth by the Third Circuit in Feidt. GE cannot meet the Feidt test. GE is not considered a "person" under 28 U.S.C. §1442(a)(1). GE has not submitted any evidence to this Court proving that it was acting under a federal officer

when it designed and manufactured the GE turbine.  GE has also failed to prove that it has a colorable defense to Plaintiffs' claims.  GE argues, incorrectly, that it is entitled to the government contractor defense; however, GE failed to submit any evidence to this Court proving that it is entitled to such a defense under the Boyle standard.  Furthermore, GE has failed to submit any evidence to this Court that there is a causal nexus between Plaintiffs' claims and the conduct that GE claims it performed under color of a federal office.  There is absolutely no evidence that Mr. McCarty was exposed to asbestos from the GE turbine at Jones & Laughlin Steel, Aliquippa.  Thus, there can be no causal connection between Plaintiff's mesothelioma and the GE turbine at Jones & Laughlin Steel, Aliquippa.  Just as GE did in the Williams case and Westinghouse in the Good case, GE has failed to meet its heavy burden of proving subject matter jurisdiction of this Court and removal under 28 U.S.C. § 1442(a).  Thus, this case should be remanded to the Lawrence County Court of Common Pleas.

Respectfully Submitted:

SAVINIS, D'AMICO, & KANE, L.L.C.

Anthony J. D'Amico, Esquire – Pa. I.D. No. 36501
Attorney for Plaintiffs
707 Grant Street, Suite 3626 Gulf Tower
Pittsburgh, Pa 15219
(412) 227-6556

31

1              IN THE COURT OF COMMON PLEAS

2           OF LAWRENCE COUNTY, PENNSYLVANIA

3                   CIVIL DIVISION

4

5    DONALD McCARTY and BETTY    )

6    McCARTY, his wife,          )

7              Plaintiffs,       )

8         vs.                    ) G.D. No. 2-05

9    ALLIED GLOVE CORPORATION,   )

10   et al.,                     )

11             Defendants.       )

12

13           VIDEOTAPE DEPOSITION OF DONALD McCARTY,

14   taken pursuant to the Pennsylvania Rules of Civil

15   Procedure, before Jennifer S. Saylor, Court

16   Reporter-Notary Public in and for the Commonwealth

17   of Pennsylvania, on Wednesday, January 18, 2006, at

18   the Holiday Inn, 7195 Eastwood Road, Beaver Falls,

19   Pennsylvania 15010, commencing at 10:00 o'clock a.m.

20

21

22

23

PLAINTIFF'S EXHIBIT

Page 44

1    Q.    Then you went back to the carpenter's union?

2    A.    Right.

3    Q.    You retired from the carpenter's union on

4    December 1, 1989, is that accurate?

5    A.    Right.

6    Q.    Under the first heading listed on Exhibit B,

7    it notes, "Early jobs as a carpenter from 1950 to

8    1962", quote, the first place that's noted there is

9    J & L Aliquippa, and it says in parentheses, the

10   1950s.  Do you recall working at J & L Aliquippa in

11   the 1950s?

12   A.    Yes.

13   Q.    How many times did you work at J & L

14   Aliquippa in the 1950s?

15            MR. KANE:  Just in the '50s now.

16   Q.    Just in the '50s.

17   A.    I can't answer that, I really don't know.

18   Q.    Was it more than one?

19   A.    Oh, yes.

20   Q.    Was it more than 10?

21   A.    That's a good question, in around there

22   somewhere I was there.

23   Q.    So you think you were there, give or

**EXHIBIT**

_____

Page 45

1    ten times?

2        A.    I don't know, I don't really know the answer

3    to that.   That was 50 years ago.

4        Q.    Right.   It notes under the heading of J & L

5    Aliquippa, 1950's, 10-inch round mill, "(continuous

6    welding for McDowell Corp. from Cleveland)".

7        A.    Yes.

8        Q.    Do you recall working in the 10-inch round

9    mill at the Aliquippa Works?

10       A.    Yes.

11       Q.    Is the 10-inch round mill in the north mill

12   at Aliquippa or the south mill, or have you never

13   heard of those terms?

14       A.    Yes, I've heard of the terms, but 10-inch

15   round is right as you go under the underpass in

16   Aliquippa, it's about in the mill someplace I'd

17   say.

18       Q.    When it's noted on Exhibit B, it says

19   "(continuous welding for McDowell Corp.)", was

20   McDowell Corp. your employer?

21       A.    Yes.

22       Q.    And McDowell Corp. is headquartered in

23   Cleveland, Ohio?

1      A.    Yes.

2      Q.    When it says continuous welding, what does

3   that mean?

4      A.    Well, they come in in rolls.  The steel came

5   in in rolls and that started down in -- it was a

6   German design, and they would bring these rolls up,

7   bring them right up to the top and weld them and run

8   them through, cut them to length, oil them and

9   grease them and throw them in the boxcar.

10      Q.    When you were there at the 10-inch round

11   mill, what were you doing?

12      A.    Carpenter.

13      Q.    What specific type of duties did you have as

14   a carpenter in the 10-inch round mill?

15      A.    Form work, scaffolding, put all of the forms

16   in, then you set the anchor bolts and mount the

17   machinery, too.

18      Q.    Do you know the name -- let's do this.

19   Withdraw that, please.

20          When you were in the 10-inch round mill,

21   were you doing new construction work at that time?

22      A.    That was new, yes.

23      Q.    Were you helping them build a building?

Page 47

1    A.    No.

2    Q.    What were you building?

3    A.    Putting in this mill, you had to build all

4 of the forms, set the anchor bolts where they

5 mounted these machine and then this thing would

6 start from a roll, you know, a big roll and it kept

7 bringing it up until it got up to the top and would

8 weld it.  It was all one operation, it was a German

9 design, even some of the drawings was in German.

10    Q.    So you were helping them getting the

11 building ready for this continuous welding machine

12 to be installed?

13    A.    The building was already there.

14    Q.    You were getting the forms ready for the

15 German machine to do the welding?

16    A.    That's true, yes.

17    Q.    How long were you there in the 10-inch round

18 mill doing that work?

19    A.    No idea.

20    Q.    Was it greater than a week?

21    A.    Oh, yeah.

22    Q.    Was it greater than a year?

23    A.    No, I doubt it.

Page 48

1    Q.   Can you think of the specific time in the

2    1950s that you worked in the 10-inch round mill on

3    this continuous welding project?

4    A.   Very early, '51, '52, sometime in there.

5    Q.   And you don't know how long you were

6    actually there on that project?

7    A.   No, not really.

8    Q.   When you were there on that project, did the

9    continuous welding machine ever get into operation?

10   A.   Yes.

11   Q.   How many continuous welding machines did you

12   help install at that time?

13   A.   I didn't install the machine, the millwright

14   done that.  We built the scaffolds and foundations

15   and set the anchor bolts and the millwrights set all

16   the machines.

17   Q.   How many machines did you help get ready to

18   be installed?

19   A.   I have no idea.

20   Q.   Was it more than one?

21   A.   Oh, yeah.

22   Q.   More than 10?

23   A.   Probably, yes.  They brought this thing up

Page 49

1    from a flat slab and they just brought it up,

2    brought it up gradually until it --

3         Q.   Until it made some type of a tube?

4         A.   Then it welded it, yes.  It was quite a few,

5    really.

6         Q.   While you were working for McDowell

7    Corporation in 1951 and 1952 in that 10-inch round

8    mill, do you believe you worked with or around any

9    asbestos products?

10        A.   Yes.

11        Q.   What type of products do you believe you

12   worked with or around just on that job at that time?

13        A.   Pipe covering, you know, we built scaffolds

14   for everybody.  You got a union job, the carpenter's

15   job was to build scaffolding.  We built them for the

16   pipe fitters, for the insulators, for the plumbers,

17   for everybody.  When we went back to tear the

18   scaffolds down, their garbage was left right there,

19   all of the parts, whatever they left, packing or

20   valves or gaskets or whatever, and we dumped the

21   planks, tear it down and move it and go someplace

22   else and built it again.  You used that stuff over

23   and over and over and over.

1    Q.    Do you recall when you were at the 10-inch

2    round mill on that continuous welding project,

3    having to take debris off of the scaffolding that

4    you were taking down?

5    A.    We didn't take it off, we just dumped it.

6    Q.    Do you recall doing that at that particular

7    job?

8    A.    Oh, yes.

9    Q.    Do you believe within that debris there was

10   some asbestos packing?

11   A.    Yes.

12   Q.    Do you believe within that debris there was

13   some asbestos gaskets?

14   A.    Yes, gaskets, valves.

15   Q.    Within the debris, do you believe there were

16   asbestos valves?

17   A.    Yes.

18   Q.    Do you know the names of any of the

19   companies that made the pipe covering, just at that

20   time at that job?

21   A.    I'm not sure on that job.

22   Q.    I don't want you to guess, but if you have a

23   recollection, I would appreciate it.

Page 51

1    A.    I'm not sure at that job.

2    Q.    Would you have any way of knowing who

3    manufactured the debris from gaskets at that job at

4    that time?

5    A.    No.

6    Q.    Would you have any way of knowing the name

7    of the company that made the packing debris at that

8    job at that time?

9    A.    No.

10    Q.    Do you know the name of the company that

11    made the valve debris at that job at that time?

12    A.    No.

13    Q.    Can you think of any other asbestos products

14    that you came in contact with while you were at the

15    10-inch round mill in '51 or '52 at the J & L

16    Aliquippa Works?

17    A.    Gloves.  We used gloves when we were

18    welding, welding the reinforcement rods.

19    Q.    Any other products that you believe

20    contained asbestos, just at that job at that time?

21    A.    No.

22    Q.    Do you know the name of the company that

23    made the gloves?

1    A.    No.

2    Q.    Were these a five-fingered type glove or a

3    mitten type?

4    A.    Five, five finger.

5    Q.    In addition to preparing forms and doing

6    scaffolding, you would have also performed welding

7    work at that time?

8    A.    Yes.  When we set the anchor bolts, before

9    they poured the concrete, we went down in and drove

10    rods into the ground and would weld the rods to the

11    bolts to hold them so they didn't knock them out of

12    line when they poured the concrete.

13    Q.    Did you actually do welding at that job?

14    A.    Yes.

15    Q.    Also noted on Exhibit B under the 10-inch

16    round mill, it notes, quote, "Blast Furnace in the

17    1950s.  During construction of the Blast Furnace, he

18    recalls the pouring of the footer."

19          Was this at the same time you were doing the

20    work at the 10-inch round mill or was this another

21    time at the Aliquippa Works?

22    A.    Another time.

23    Q.    Do you remember when, in the 1950s, you were

1    there for the pouring of the blast furnace footer?

2        A.    No.

3        Q.    Was this still early in the 1950s?

4        A.    I don't know, it's hard to say, I would say

5    probably mid, early to mid, in there somewhere.

6        Q.    Are the blast furnaces in the south mill or

7    the north mill, if you know?

8        A.    I would say north.

9        Q.    Do you remember if there were any other

10   blast furnaces there in operation when you were

11   pouring the footer?

12       A.    Yes.

13       Q.    How many blast furnaces were in operation

14   when you were there?

15       A.    One.

16       Q.    Did that blast furnace have a name or

17   designation?

18       A.    No. 5 they called it.

19       Q.    So the No. 5 blast furnace was in operation?

20       A.    Yes.

21       Q.    What blast furnace were you pouring the

22   footer for?

23       A.    The new one, No. 1, I guess, I don't know

1   what they called it.

2      Q.   How long were you there for the pouring of

3   the footer for that blast furnace?

4      A.   I was there after we poured the footer,

5   that's the only thing I remember, on account that it

6   was big.  It was 80 foot, 7 inches across and 12

7   foot, 3 deep, and 6-inch anchor bolts.  It was a

8   monstrous big job.

9      Q.   You're talking about the dimensions of the

10  footer?

11     A.   Yes.

12     Q.   You don't recall how long it took you to

13  build the form for that footer?

14     A.   No, not really.

15     Q.   But you believe you were there for the

16  construction of the form for the footer and then you

17  were there also after the footer was poured?

18     A.   Oh, yeah.

19     Q.   How long, total, do you think you were there

20  during that particular project?  Was it the case of

21  a couple of months, six months or a year?

22     A.   I'd say probably six months.

23     Q.   During that time that you were there, were

1   you working at any other place within the Aliquippa

2   Works other than on that blast furnace project?

3       A.   I don't know if it was the same contractor

4   or not, we put Transite on the elevator, and that's

5   right next to, alongside of the blast furnace.  I

6   don't even know if that was the same contractor.  We

7   was doing that at the same time, but I know we put

8   it on.

9       Q.   Earlier when you were at the Aliquippa

10  Works, you knew you were doing the continuous

11  welding project for McDowell, do you know who your

12  employer was when you were doing this blast furnace

13  project?

14      A.   I think it was Koppers.

15      Q.   This Transite project that you just talked

16  about, was that part of the work you did after the

17  footer was poured or did that Transite project occur

18  some time later?

19      A.   That was later, after the footer was

20  poured.  I don't even know if that was the same

21  contractor.  I don't remember.

22      Q.   And where exactly was the Transite

23  installed?

Page 56

1    A.    It was on the elevators, it runs clear up, I

2  don't know what they are, 100 or 120 feet high.

3    Q.    This would have been the elevator associated

4  with Blast Furnace No. 5?

5    A.    One, No. 1.

6    Q.    It was the new project?

7    A.    Yes.

8    Q.    Do you know the name of the company that

9  made the Transite?

10    A.    No.

11    Q.    Do you believe the Transite contained

12  asbestos?

13    A.    Yes.

14    Q.    Can you think of any other

15  asbestos-containing products that you came in

16  contact with while you were working on the blast

17  furnace project in the early or mid 1950s?

18    A.    On the blast furnace, yes.

19    Q.    What type of products do you believe

20  contained asbestos that were on that blast furnace

21  project?

22    A.    Pipe covering, gloves, gaskets, valves.

23    Q.    Anything other than the Transite pipe

1    covering, gloves, gaskets or valves?

2        A.    Not that I can think of offhand, no.

3        Q.    If you remember any, just say, Joe, I

4    remember another one, okay, and we'll talk about

5    it.

6              Do you remember the name of the company that

7    made the pipe covering that was present on that

8    blast furnace project?

9        A.    Yes.

10       Q.    Who was that?

11       A.    Oh, my.  Kaylo, that's it, Kaylo and

12   Johns-Manville (indicating).

13       Q.    Do you know if there were any other

14   manufacturers of the pipe covering other than

15   Johns-Manville and Kaylo on that particular blast

16   furnace project at that time?

17       A.    No, that's the only two I remember.

18       Q.    Do you know the name of the company that

19   made the gloves that you recall from that blast

20   furnace project?

21       A.    No.

22       Q.    Do you recall the name of the company that

23   made the gaskets that you recall from that project?

1    A.    I don't know about on that, I don't know.

2    Q.    Do you recall the name of the company that

3    you associate with the valves that may have been

4    present on that project?

5    A.    Not on that project, no.

6    Q.    Can you think of any other

7    asbestos-containing products that you came in

8    contact with when you were working in the early or

9    mid '50s on the blast furnace project at J & L

10   Aliquippa, other than the ones we just talked about?

11   A.    No.

12   Q.    The next notation on Exhibit B notes that

13   you worked at the USX Clairton Works and it says

14   "coke battery (1950s)".

15   A.    Yes.

16   Q.    Do you recall working at the Clairton Works?

17   A.    Yes, definitely.

18   Q.    How many times were you at the Clairton

19   Works --

20   A.    Once.

21   Q.    -- in the 1950s?  One time?

22   A.    And swore I'd never go back.

23   Q.    Do you remember when in the 1950s you were

1   during any other time?

2       A.   Not working, no.

3            (Laughter.)

4       Q.   Do you believe you were exposed to any

5   asbestos products when you were working at

6   Kaufmann's in Rochester?

7       A.   No.

8       Q.   Do you believe you were exposed to any

9   asbestos while you were shopping at Kaufmann's in

10  Rochester?

11           (Laughter.)

12      A.   (No response.)

13      Q.   The next notation takes us back, it says,

14  "J & L Aliquippa, Blast Furnace."  Underneath that

15  notation it says August '68 to January '69 for

16  Koppers.  It says, "during Super Bowl III, Jets

17  versus Baltimore."  Do you remember being at the

18  blast furnaces at Aliquippa Works during that time?

19      A.   Yes.

20      Q.   Which blast furnace were you working on

21  during that time period?

22      A.   No. 1.

23      Q.   What were you doing on the No. 1 blast

1   furnace at that time?

2       A.    Scaffolding.

3       Q.    Was this repair work to the No. 1 blast

4   furnace.

5       A.    Yes.

6       Q.    Was the blast furnace in operation at that

7   time?

8       A.    Yes.

9       Q.    No. 1 was in operation?

10      A.    No.

11      Q.    Or some other blast furnace was in

12  operation.

13      A.    No, No. 1 was, no.

14              MR. KANE:   No. 1 was not?   What was in

15  operation?

16              THE WITNESS:   Now you have me

17  confused.

18  BY MR. SCHAPER:

19      Q.    I venture to guess that if you're working on

20  scaffolding at blast furnace 1, it probably wasn't

21  working, but there may have been another one

22  working?

23      A.    No, I think it was working.   I'm not sure.

1    Q.    Did you do anything else on the blast

2  furnace project at Aliquippa in '68 and early '69,

3  other than the scaffolding work?

4    A.    No.

5    Q.    Your employer at the time was Koppers?

6    A.    Yes.

7    Q.    Do you believe from August of '68 until

8  January of '69 on the blast furnace project at

9  Aliquippa, that you worked with or around any

10  asbestos products?

11    A.    Yes.

12    Q.    What type of products were those?

13    A.    Pipe covering, gaskets, valves, we did

14  scaffold for some of the Aliquippa -- J & L workers,

15  we scaffold for some of them for insulation.

16    Q.    Do you think that insulation contained

17  asbestos?

18    A.    Yeah, pipe insulation -- you know, pipe

19  covering, I'm sorry.

20    Q.    Other than the pipe covering, gaskets and

21  valves, do you believe you worked with or around any

22  asbestos-containing products at the J & L Aliquippa

23  blast furnace project from August of '68 until

1   January of '69?

2        A.    Not with.

3        Q.    Or around?

4        A.    I don't know about around.

5        Q.    Do you know the name of the company who made

6   the pipe covering that you associate with that

7   project at that time?

8        A.    No.

9        Q.    Do you know the name of the company that you

10   associate with the gaskets at that project at that

11   time?

12        A.    No.

13        Q.    Do you know the name of the company that you

14   associate with the valves at that project at that

15   time?

16        A.    No.

17        Q.    Do you remember who won Super Bowl III?

18        A.    Yes, I remember, I was there at that time.

19        Q.    You remember that?

20        A.    Yep.

21        Q.    Whose native son won that game?

22        A.    I'll tell you, a guy I was working with was

23   a good friend of Joe's, and he came out Monday night

Page 120

1      A.    Three, actually.

2      Q.    Who was the other one?

3      A.    Bi-Crime (phonetic), it was a little

4   concrete outfit.  We put the parking lot and the

5   sidewalks and the curbs in.

6      Q.    When you were working on the high-rise

7   project in Ambridge, do you think you came in

8   contact with any asbestos products?

9      A.    No, I don't think so.

10     Q.    Flip to the next page, once again, we return

11  to the J & L Aliquippa Works, and it says underneath

12  there, "soaking pits (once - September '72 until

13  April '73 for Eichleay)", do you recall working for

14  Eichleay during that time period at the soaking pits

15  at the Aliquippa Works?

16     A.    Yes.

17     Q.    Are the soaking pits in the north mill or

18  the south mill, if you know?

19     A.    I don't know, I really don't.

20     Q.    Do you remember working at any other place

21  for Eichleay during that time period, other than the

22  soaking pits?

23     A.    During that time, no.

1    Q.    What were you doing on the soaking pits for

2  Eichleay during that time period?

3    A.    Scaffolding.

4    Q.    Anything else?

5    A.    We had some form work to put down underneath

6  the soaking pits for the bricklayers, firebrick.

7    Q.    Were the soaking pits operating at the time

8  you were there?

9    A.    Yes.

10    Q.    When you were working during that time

11  period for Eichleay on the soaking pit project at

12  the Aliquippa Works, do you believe you worked with

13  or around any asbestos-containing products?

14    A.    Around, yes.

15    Q.    Did you work with any asbestos products?

16    A.    No.

17    Q.    Did you work around any asbestos products?

18    A.    Just around, yes.

19    Q.    What were those products?

20    A.    The same thing, pipe covering, gaskets,

21  valves.

22    Q.    Anything else?

23    A.    I don't think I done any welding on that.

1    Q.    Do you associate any name with the pipe

2    covering at that project at that time?

3    A.    Johns-Manville and Kaylo.

4    Q.    Okay.

5         Do you associate any other names other than

6    Johns-Manville and Kaylo with that pipe covering at

7    that time?

8    A.    No, I don't.

9    Q.    Do you associate any names with the gaskets

10   from the soaking pit work at that time?

11   A.    No.

12   Q.    Do you associate any names with the valves

13   on that project at that time?

14   A.    No.

15   Q.    It notes next, it just says Bruce Mansfield,

16   you're talking about the power plant?

17   A.    Bruce Mansfield, no, it's a coal plant.

18   Q.    Right, it makes electricity?

19   A.    Coal powered, yeah.

20   Q.    Right.  Not the nuke plant.

21   A.    No.

22   Q.    It says you were employed by Foster-Wheeler

23   "(April '73 to October '74)."  Do you remember

1    time when you were there?

2        A.    No.

3        Q.    It notes next that you returned to J & L

4    Aliquippa, it says underneath, "By-products

5    (once) -  March '75 to December '75 for Eichleay)"?

6        A.    Right.

7        Q.    Do you remember being there at that time for

8    Eichleay?

9        A.    Yes.

10       Q.    And you were in the by-products area?

11       A.    Yes.

12       Q.    What were you doing in by-products for

13   Eichleay at that time?

14       A.    We had form work and scaffolding.

15       Q.    Did you work anywhere else at Aliquippa

16   other than the by-products area for Eichleay at that

17   time?

18       A.    Not at that time, no.

19       Q.    When you were doing the form and scaffolding

20   work for Eichleay in the by-products area at

21   Aliquippa during those years, do you believe you

22   worked with any asbestos products?

23       A.    No, I don't think with, no.

1     Q.    Do you believe you worked around any

2  asbestos products for Eichleay at that time?

3     A.    I was only about 15 feet from the coke

4  battery.

5     Q.    What products do you believe you worked

6  around at that time for Eichleay that you believe

7  contained asbestos?

8     A.    Well, I know packing around the doors, you

9  know, probably everything.  I don't know, I would

10  say all of them, really.

11     Q.    What other types of products do you believe

12  contained asbestos that you worked around on that

13  job, other than the packing?

14     A.    Pipe covering, valves, gaskets.

15     Q.    Anything else?

16     A.    No, not that I can think of.

17     Q.    Do you associate any name with the packing

18  that you associate with that project at that time?

19     A.    No.

20     Q.    How about the pipe covering, do you

21  associate any name with that product?

22     A.    No, that was old stuff that was already on

23  there, you know.

Page 127

1    Q.   Do you associate any names with the gaskets

2  from that project at that time?

3    A.   No.

4    Q.   Do you associate any name with the valves

5  from that project at that time?

6    A.   No.

7    Q.   Can you think of any other asbestos products

8  that you worked around while you were working in the

9  by-products area at J & L Aliquippa for Eichleay at

10  that time?

11    A.   No.

12    Q.   It next notes B&W in Ambridge, in

13  parentheses it says January '76 to November '76,

14  employed by D&T Brooks as a carpenter foreman, do

15  you remember that job at that time?

16    A.   Yes.

17    Q.   Where did you work for B&W at its Ambridge

18  plant?  Do you remember a name of a building or an

19  area that you worked in?

20    A.   It was all one building, but they had

21  different areas, they had furnaces.  We had seven

22  carpenter crews, they had 100 carpenters on that

23  job.

Page 146

1    asbestos products on the loading dock project?

2        A.    No.

3        Q.    How about on the foundations project?

4        A.    No.

5        Q.    The next notation has us back to the J & L

6    Aliquippa Works, underneath that it says (Coke

7    Battery) and in parentheses it says once, have we

8    already talked about that job?

9        A.    No, I don't think so.

10       Q.    That's something we haven't discussed yet?

11       A.    No, I don't think so.

12       Q.    Do you have any idea when you were at the

13   coke battery on that one occasion, can you tell me

14   if it was in the '50s, '60s or '70s?

15       A.    No, I'll tell you it was around, right after

16   I left the blast furnace, I would say probably '69,

17   '70, in there somewhere.

18       Q.    And how long were you at the coke battery at

19   that time?

20       A.    Three or four months.

21       Q.    During those three or four months, what were

22   you doing?

23       A.    Scaffolding.

Page 147

1    Q.   Why were you building scaffolding there,

2   what was going on?

3    A.   We was putting some part of the roof on,

4   repacking the doors, just general maintenance,

5   really.

6    Q.   What were they putting a roof on, what

7   building?

8    A.   The blast furnaces, or the coke battery

9   itself.  Some of the brick was sloped down and you

10   would go inside and brace them up and go outside and

11   remud them, and another thing, that cement was used

12   in that, the mud.  I don't know if there was

13   asbestos in that or not.

14   Q.   So this would have been the roofs or the top

15   sides of the coke batteries themselves?

16   A.   Coke battery, yeah.

17   Q.   Did you do anything else other than the

18   scaffolding work for that three or four months you

19   were there?

20   A.   No.

21   Q.   During that time that you were at the J & L

22   Aliquippa coke battery on that one occasion, do you

23   believe you worked with any asbestos products?

Page 148

1    A.    No.

2    Q.    Were you around any asbestos products?

3    A.    Yes.

4    Q.    What type of products were those?

5    A.    Packing, they repacked the doors.

6    Q.    That's the rope stuff again?

7    A.    Yes, the rope, yeah.

8    Q.    Anything else other than the rope?

9    A.    Yeah, pipe covering, gaskets, valves, quite

10   a bit of pipe covering on that job.

11   Q.    Quite a bit of pipe covering you said?

12   A.    On that job, yes.

13   Q.    Anything else besides the packing, pipe

14   covering, gaskets and valves that you can recall

15   working around on that job, on that occasion?

16   A.    No, not that I remember.

17   Q.    You had earlier talked about cement, can you

18   testify that the cement contained asbestos?

19   A.    No.

20   Q.    Do you associate any name with the packing

21   from that one time you were at the coke battery at

22   Aliquippa?

23   A.    No.

Page 149

1    Q.    Do you associate any name of the pipe

2    covering from the coke battery project?

3    A.    Not on that one, no.

4    Q.    Do you associate any name with the gaskets

5    from that time?

6    A.    (Witness shaking head negatively.)  No.

7    Q.    You're shaking your head no?

8    A.    No, I'm sorry.

9    Q.    That's okay.

10         Do you associate any name with the valve

11   from that one project?

12   A.    No.

13   Q.    The next notation here says 6-inch plug

14   mill, and then in parentheses it says once, and it

15   says Dick Corp.  Was your employer Dick Corporation

16   in that time?

17   A.    Dick Corporation, yes.

18   Q.    And you worked on one occasion at the 6-inch

19   plug mill?

20   A.    Yes.

21   Q.    Do you have any idea when that was?  Can you

22   narrow it to a decade, maybe?

23   A.    It had to be in the '70s.

1    Q.    How long did that one occasion last when you

2    were there at the plug mill?

3    A.    Six months.

4    Q.    What specifically were you doing during that

5    six months?

6    A.    I was a night-turn steward.

7    Q.    What type of work was going on in the 6-inch

8    plug mill when you were there at the nighttime --

9    A.    We were doing a lot of repair, a lot of

10   tearing out, putting new rolls in, mostly repair.

11   Q.    When you were at the 6-inch plug mill for

12   Dick Corporation for those six months, do you

13   believe you worked with any asbestos products?

14   A.    Not with, no.

15   Q.    Were you around any asbestos products at

16   that time?

17   A.    Yes.

18   Q.    What types of products were those?

19   A.    Same thing, pipe covering, gaskets, valves.

20   Q.    Anything else?

21   A.    No.

22   Q.    Do you associate a name with the pipe

23   covering from the 6-inch plug mill project?

1    A.    No.

2    Q.    Do you associate a name with the gaskets

3    from the 6-inch plug mill project?

4    A.    No.

5    Q.    Do you associate any name with the valve

6    from the 6-inch mill, plug mill project?

7    A.    No.

8    Q.    The last notation under the Aliquippa

9    heading says, it looks like it says "Jr. Beam Mill",

10   parentheses, it says late '80s?

11   A.    That was in Aliquippa J & L.

12   Q.    And the place you were working was called

13   the Junior Beam Mill?

14   A.    Yeah.  That was Estoff (phonetic).

15   Q.    I'm sorry, that was your employer?

16   A.    Yes.

17   Q.    How long were you there?

18   A.    Six months -- well, no, not there, he had

19   two or three other jobs, I was down at Kobuta for

20   awhile and there for a while, probably three months

21   each.

22   Q.    So you think you were at the Junior Beam

23   Mill project for three months?

1    A.    Yes, we put foundations in for pumps, put a

2    big tank in for -- something to do with the water.

3    They didn't have enough water, and they ran new

4    lines and everything in for water.

5    Q.    Do you believe you worked with any asbestos

6    products when you were there on that three-month

7    project at that Junior Beam Mill?

8    A.    I was around the pumps.  They put in new

9    pumps, it would probably be valves and gaskets, I

10   guess.

11   Q.    Do you think the pumps contained asbestos?

12   A.    Pressure pumps?  I don't know, maybe.  No, I

13   couldn't say that, no.

14   Q.    And you think the valves contained asbestos?

15   A.    I don't know.

16   Q.    Did you mention gaskets with this work?

17   A.    Yes, I don't know, I was thinking of pumps.

18   Q.    You don't know if any of those products

19   contained asbestos?

20   A.    No, I really don't.

21   Q.    Can you think of any other asbestos products

22   that you worked around at the three-month Junior

23   Beam Mill project?

Page 167

1    because I think we're going to be going for a while

2    based on all of the information that you've given us

3    today, okay?

4              THE WITNESS:  All right by me.

5              MR. BRUNI:  I want to note an objection

6    to John going first.

7              MR. SCHAPER:  For the sake of that, if

8    we'll just have one objection is an objection to

9    all, unless somebody opts out of it, which I can't

10   imagine, just for the sake of shouting across the

11   room.  We'll give John a microphone and get on with

12   it.

13                    EXAMINATION

14   BY MR. KANE:

15     Q.   Mr. McCarty, I have a few questions for

16   you.  I want to start off with one of the products

17   you just talked about at the end, which you called a

18   hot top.  You mentioned that in relation to B&W,

19   correct?

20     A.   Right.

21     Q.   Did you work around hot tops at any other

22   facilities during your career?

23     A.   Yes, J & L Aliquippa.

1      Q.     Do you know what time frame you worked

2   around the hot tops at J & L Aliquippa?

3      A.     No.

4      Q.     How many times did you work around hot tops

5   at J & L Aliquippa?

6      A.     Just at Aliquippa?

7      Q.     Just at Aliquippa.

8      A.     A lot of times.  You're there every day, a

9   lot of times, really.

10      Q.     How about B&W?

11      A.     Many times at B&W.

12      Q.     You talked about a couple manufacturers of

13   pipe covering, namely Johns-Manville and Kaylo, and

14   you named two facilities where you remembered Kaylo

15   from, is Kaylo only at those two facilities.

16                 (Objection by Defense Counsel.)

17      Q.     You can answer the question.

18      A.     I would say no.

19      Q.     Can you tell me where else you recall Kaylo

20   from?

21                 (Objection by Defense Counsel.)

22      A.     No, not offhand.

23      Q.     Can you give me a time frame of when you

Page 219

1          (Recess taken, 3:49 p.m.).

2          (Reconvened at 3:52 p.m.)

3                   EXAMINATION

4    BY MS. BONENBERGER:

5       Q.    Sir, my name is Hilary Bonenberger, I

6    represent Dravo Corporation, so I have a couple of

7    questions for you in follow-up to Mr. Kane's

8    questions relative to Dravo, okay?

9       A.    (Witness nodding head affirmatively.)

10      Q.    My understanding that you recall seeing

11   Dravo at a facility while you were working for

12   Eichleay, is that correct?

13      A.    Right.

14      Q.    Now, I have you down as working for Eichleay

15   on a couple of occasions, and I'm not sure at what

16   facility you were working.

17      A.    By-products.

18      Q.    That would have been at J & L Aliquippa?

19      A.    J & L, yes.

20      Q.    From my notes, I have that as being that you

21   were there from March of 1975 to December of 1975;

22   is that correct, if my notes are right?

23      A.    You know more than I do.

1    Q.    If I told you that is also what's reflected

2    in the Answers to Interrogatories, would you be okay

3    with that?

4    A.    Yes.

5    Q.    And I think that you said that you were

6    doing scaffolding work at that time?

7    A.    Yes.

8    Q.    Let me make sure of this.  You would not

9    have been doing the scaffolding for Dravo; is that

10   correct?

11   A.    No.  I was doing it for Eichleay, yes.

12   Q.    Do you know whether or not Dravo was working

13   for J & L directly or was working for another

14   contractor?

15   A.    I have no idea.

16   Q.    And you told Mr. Kane that they were

17   working, that Dravo was working in the coke

18   batteries?

19   A.    Yes.

20   Q.    And the coke batteries is the department

21   next that's to the by-products, correct?

22   A.    The by-products comes off of the coke

23   battery, yes.

1    Q.    You were working in an adjacent department

2    but not in the same department, correct?

3    A.    Right.   They were outside.

4    Q.    That was actually my next question, it's my

5    understanding that they're outside?

6    A.    Yes.

7    Q.    You would not have been working side by side

8    with the Dravo employees, correct?

9    A.    There was about a 10-foot space between

10   them.

11   Q.    I understand that, but as far as working

12   side by side and working on the same --

13   A.    No, no.

14   Q.    You said that the coke batteries were about

15   15 feet from the by-products in your earlier

16   testimony.

17   A.    In there somewhere, yeah.

18   Q.    Do you know how long of that nine-month

19   period of time that you were in the by-products

20   department, how long Dravo was there?

21   A.    I couldn't tell you, I don't know.

22   Q.    Were they there for a less period of time

23   than Eichleay was?

1    A.    See, I quit there.  When I quit there, Dravo

2  was still there.

3    Q.    So they came in after Eichleay started and

4  then they stayed on after you left, is that a fair --

5    A.    Well, Eichleay wasn't done when I left.  I

6  quit and went to B&W in Ambridge.  But I couldn't

7  answer that, I really don't know.

8    Q.    How do you know it was Dravo employees

9  working in the coke batteries?

10    A.    All of their equipment, their hard hats,

11  different colors, their equipment was in there.  Run

12  into guys you know once in awhile.  You know they

13  were working for them.  You know, casual

14  conversation, talk to them back and forth.

15    Q.    Do you recall what the hard hats -- you said

16  they were different colors, do you know what the

17  hard hats for Dravo were?

18    A.    No, I don't.

19    Q.    Do you know -- I'm sorry?

20    A.    Eichleay was orange.

21    Q.    Did Dravo have any sort of logo or insignia

22  on the hat?

23    A.    I don't know.

Page 223

1    Q.    So is it fair to say that that hard hat

2  wasn't actually what was indicating it was Dravo?

3    A.    No, I knew some of the guys that was working

4  over there.

5    Q.    Who were the guys working for Dravo that you

6  recall speaking to?

7    A.    I remember one was Herbie Anderson.   I

8  remember Herbie, I used to talk to him about every

9  day.   That's about the only one I remember, really.

10    Q.    So you recall Herbie Anderson actually being

11  on this job, this J & L Aliquippa job for Dravo?

12    A.    Yes.

13    Q.    And he said he was working for Dravo?

14    A.    Yes.

15    Q.    With regard to the equipment, did you

16  actually see their equipment on site?

17    A.    I seen their trucks, yeah.   Yeah, that's

18  probably all, just the trucks.

19    Q.    How did you know it was a Dravo truck versus

20  another contractor's truck?

21    A.    They had signs on the door of their trucks,

22  pickups.

23    Q.    What did the signs say?

1    A.    Dravo.

2    Q.    Was it in a certain color?

3    A.    Yeah, it was, but I couldn't tell you what

4    they were.

5    Q.    Other than Herbie Anderson, do you know how

6    many other employees Dravo had on site?

7    A.    No.

8    Q.    What trade was Mr. Anderson?

9    A.    A carpenter for Moon.

10    Q.    Was he involved with preparing scaffolding

11    for Dravo?

12    A.    Well, he was a foreman, really, he just laid

13    out work for the other guys, so...

14    Q.    What would the carpenter guys be doing for

15    Dravo, do you know?

16    A.    Scaffolding mostly, I guess.

17    Q.    Do you know what other trades Dravo was

18    employing on that job?

19    A.    They had to have insulators; it was pretty

20    near a complete job.  They was there quite a while,

21    I don't know who all would be there, really,

22    insulators, carpenters, ironworkers.

23    Q.    I apologize.  As you sit here today, do you

1    know what trades, in fact, were employed by Dravo,

2    or are you just surmising?

3        A.    Yes, I'm just surmising, really.  I know

4    carpenters were there because Herbie was a boss.

5        Q.    Understood.  Now, I know this is an obvious

6    question, but since you didn't put the scaffolding

7    up for Dravo, you wouldn't have taken it down,

8    correct?

9        A.    No, I had nothing to do with it.  No.

10       Q.    Now, you told Mr. Kane that they were

11   working with packing on the coke battery doors?

12       A.    Yes.

13       Q.    Did you actually see Dravo employees working

14   with that packing?

15       A.    Yes.

16       Q.    And did you see them removing the packing?

17       A.    No.

18       Q.    You just saw them putting new packing in?

19       A.    Yeah.

20       Q.    Did you have occasion to see the packaging

21   that that packing came in?

22       A.    No.

23       Q.    You wouldn't know the manufacturer or

Page 226

1    supplier of that packing?

2        A.    No.

3        Q.    Do you know whether or not Dravo brought the

4    packing on site or whether J & L Aliquippa supplied

5    it to Dravo?

6        A.    No.

7        Q.    You don't know either?

8        A.    I don't know either, right.

9        Q.    I did a nice compound question there.

10            Why do you believe the packing contained

11   asbestos?

12       A.    The rest of it did.  Every time we was

13   around it, it was all asbestos, it would have to be

14   in a blast furnace -- I mean, in a coke battery,

15   because it wouldn't hold up otherwise.

16       Q.    Is that because of the high heat

17   application?

18       A.    Yes.

19       Q.    When you say all of the rest of it, did you

20   mean rope packing in general?

21       A.    Well, other blast furnaces.  I worked on

22   three of them myself.

23                    MR. KANE:   The blast furnace or the

1   coke battery?

2       A.    Jesus Christ -- sorry, the coke battery.

3   Been here too long.

4       Q.    I hear you there.

5            And the reason that you believe the other

6   rope packing contained asbestos was because of the

7   high heat application?

8       A.    Yes.

9       Q.    Now, you told Mr. Bruni that you, during

10  your career, did not wear respiratory protection?

11      A.    No.

12      Q.    So you would not have been wearing

13  respiratory protection when you were working in the

14  by-products department, is that correct?

15      A.    No.

16      Q.    That's correct?

17      A.    Yes.

18      Q.    Did you happen to see what type of tools the

19  Dravo employees were using to put that rope packing

20  in around the doors?

21      A.    No.

22      Q.    In fact, you were doing your own job, right?

23      A.    Right.

Page 228

1    Q.    So you weren't watching them the entire

2    time?

3    A.    Right.

4    Q.    And there might have been times that you

5    were a farther distance away from the coke

6    batteries, depending on what your job duties were

7    that day, correct?

8    A.    Right.

9    Q.    Do you recall whether or not Dravo was

10   working on the very first coke battery, or the very

11   first battery, as it was close to the by-products,

12   or if they were just in the coke batteries

13   themselves?

14   A.    No, that was the closest one to the

15   by-products, yes.

16   Q.    Do you know whether or not they were only

17   working on that one battery?

18   A.    I think so, that was the only one that was

19   down.

20   Q.    Now, with respect to the mud and cement that

21   was used on the roof of the battery, you told

22   Mr. Kane that you can't be sure that that contained

23   asbestos; is that correct?

1    A.   No, I couldn't be positive, no.

2    Q.   Do you know the manufacturer or supplier of

3  that mud or cement used on the roof?

4    A.   No.

5    Q.   And can you tell me whether Dravo brought

6  that on site?

7    A.   No.

8    Q.   And you wouldn't be able to tell me if J & L

9  Aliquippa was the one that supplied it?

10    A.   No.

11    Q.   Correct?

12    A.   Correct, right.

13    Q.   Did you ever see the packaging that that mud

14  or cement came in?

15    A.   No.

16    Q.   Bear with me, I think I might be done.

17        And this is the only occasion that you

18  recall seeing Dravo at a site that you were working

19  for another contractor, correct?

20    A.   As far as I remember, yes.

21    Q.   You told us that you worked for Dravo at one

22  point in time, is that correct?

23    A.   Yes.

1          MS. BONENBERGER:  Okay, sir, that's all

2    of the questions I have.  Thank you very much.

3          THE WITNESS:  Thank you.

4          (Recess taken, 4:05 p.m.)

5          (Reconvened at 4:07 p.m.)

6                    EXAMINATION

7    BY MR. MILANOVICH:

8      Q.   Hello, sir, my name is George Milanovich and

9    I have some questions for you.

10          Isn't it correct that during your career,

11    you never would have ordered any pipe covering; is

12    that correct?

13     A.   No, I never ordered any.  No.

14     Q.   Do you know the names of anybody who would

15    have ever ordered any pipe covering?

16     A.   No.

17     Q.   Did you ever see pipe covering delivered to

18    any site that you would have worked at?

19     A.   Yes.  I know J & L, and I know B&W, Bruce

20    Mansfield.

21     Q.   You actually saw it delivered at J & L?

22          MR. KANE:  Make sure you're finished

23    with your answer.  You said J & L, B&W and Bruce

1    Mansfield, do you recall seeing it delivered to

2    anywhere else?

3              THE WITNESS:   I can't think of any, I

4    can't think of any more.

5    BY MR. MILANOVICH:

6         Q.   When did you see pipe covering delivered to

7    J & L?

8         A.   When?

9         Q.   Yes.

10        A.   You mean the dates?

11        Q.   You worked there many times.

12        A.   Yes.  Oh, I was probably on the coke

13   battery.

14        Q.   Would that have been the '69, '70 period?

15        A.   I don't know.

16        Q.   Where did you see it being delivered to?

17        A.   It was delivered on the job site.

18        Q.   Who delivered it, do you know?

19        A.   The only time I remember of anybody, it was

20   Wright and Gage, but I couldn't tell you which one

21   it was.

22        Q.   Do you have a specific recollection of

23   seeing either of those two deliver pipe covering to

Page 232

1    J & L when you were at the coke batteries?  Do you

2    specifically remember that.

3        A.    I'm pretty sure it did, yes.  I would say

4    yes.  Coke battery, yes.

5        Q.    And that's when you were there '69 to '70?

6        A.    I can't answer that, I was there too many

7    times.  I don't remember when I was on the coke

8    battery.

9        Q.    But you remember seeing it being delivered

10   there?

11       A.    Yes, I think I did, I really did.

12       Q.    But you can't give me a time period?

13       A.    Sir?

14       Q.    You can't give me a time period?

15       A.    No, it says here --

16       Q.    Well, I don't want you to read from your

17   Answers to Interrogatories.

18       A.    No.  No, I couldn't tell you a time, no.

19       Q.    Do you know what job you were doing when you

20   recalled them --

21       A.    Coke battery.

22       Q.    Do you know who you were working for?

23       A.    No, I'm not really sure.  I can't say, no.

1    Q.   Do you know how it was being delivered?

2    A.   Like I said, those were the only two

3    deliveries that I ever -- I mean by truck, is that

4    what you mean?

5    Q.   That's what I'm asking you, how was it being

6    delivered to the coke batteries?

7    A.   That's the only two ways I remember them

8    ever doing it, was by truck.

9    Q.   You said two ways, what's the other way?

10   A.   Well, truck, I mean two different companies.

11   Q.   I'm talking about how it was being

12   delivered, by truck?

13   A.   Yes.

14   Q.   Do you know which company was delivering the

15   pipe covering?

16   A.   I'd say it was either Wright or Gage.

17   Q.   But you don't know, is that correct?

18   A.   No.  I ain't going to take a guess, I'm not

19   really sure.

20   Q.   Did you ever see any sales slips for pipe

21   covering?

22   A.   No.

23   Q.   Invoices?

1      A.    No.

2      Q.    Did you ever see anybody unload a truck that

3   had pipe covering on it?

4      A.    Yes, I seen them deliver it there, yes.

5      Q.    Unload it?

6      A.    No, I can't say I have.

7      Q.    You, yourself, never unloaded a truck with

8   pipe covering?

9      A.    No.

10     Q.    That's correct?

11     A.    Yes.

12     Q.    Did you ever see the pipe covering come

13   packaged at the coke batteries?

14     A.    I worked for Johns-Manville, I seen it.

15     Q.    I mean, when you were at the coke batteries?

16     A.    No, I don't think so.

17     Q.    How do you associate pipe covering with Gage

18   then?  How do you know that Gage had delivered it,

19   did you see their trucks?

20     A.    Well, usually that's what they brought in,

21   pipe covering, cement, gaskets.

22     Q.    How do you know -- for the pipe covering,

23   how do you know that if you've never seen the truck

1  being unloaded, how do you know there was pipe

2  covering?

3      A.   I don't know, it was just there and they

4  were using it; it has to be delivered.  As far as me

5  seeing it, I couldn't say I did, really, no.  I

6  don't remember anyhow.

7      Q.   While you were at B&W, you mentioned that

8  blankets were -- you were using blankets and you

9  mentioned two companies again, and you weren't sure

10  which one delivered the blankets.  Sitting here

11  today after a few hours, do you recall what company

12  would have delivered the blankets at B&W when you

13  were working there between '62 and '67?

14      A.   No, I couldn't say for sure, really, I mean,

15  if I had to -- no, I ain't going to guess.  I'd say

16  Wright, but I'm not sure on that.

17      Q.   Sitting here today, can you describe for me

18  a Gage truck?  Could you tell me what one looks

19  like?

20      A.   All I know is the name on the door.

21      Q.   Was that the only word on the door?

22      A.   I think there was an initial before the

23  name.  I'm not sure, really, I'm not.

Page 236

1    Q.    So you really couldn't describe a truck for

2    me, sitting here today?

3    A.    No, I couldn't.  It was too many -- it was

4    too long ago.

5    Q.    Would you know anybody that would have

6    worked for Gage?

7    A.    No.

8    Q.    Do you know where they're located?

9    A.    Pittsburgh is all I know.

10   Q.    Do you know where in Pittsburgh?

11   A.    No.

12   Q.    Did you ever see a shipping order for Gage?

13   A.    No, not that I recollect, no.

14   Q.    Did you ever see an invoice with the name

15   Gage on it?

16   A.    No.

17   Q.    You mentioned some cement at B&W when you

18   were working on the boilerhouses, do you know who

19   would have supplied that cement?

20   A.    No.

21   Q.    When you were working at J & L Aliquippa in

22   '68 to '69 during the Super Bowl III time, you

23   mentioned gaskets, how would you have been exposed

Page 237

1    to gaskets at that time?

2         A.    On the blast furnace.  I mean, I didn't work

3    with them, I was in the vicinity.

4         Q.    How would you have been exposed to gaskets?

5         A.    Hell, they were all around you.  I mean...

6         Q.    Can you describe for me what they looked

7    like?

8         A.    What do you mean?

9         Q.    The gaskets that you mentioned in the blast

10   furnace, during that late '68, early '69 period.

11        A.    No, I couldn't, a gasket is a gasket.

12        Q.    Why do you believe they contained asbestos?

13        A.    Because of the heat, the blast furnace is

14   hot.

15        Q.    You mentioned gaskets again in the '72, '73

16   period at J & L Aliquippa when you were at the

17   soaking pits, how would you have been exposed to

18   gaskets there?

19        A.    The same way, just in the vicinity, that's

20   all that would be.

21        Q.    How close to the vicinity would you be to a

22   gasket at the soaking pits?

23        A.    I don't know, all around, really.

Page 238

1    Q.    Can you put it in feet or yards or inches?

2    A.    Hell, it was probably within a foot at

3    different times.

4    Q.    Could you describe for me what those gaskets

5    would look like at the soaking pits?

6    A.    No.

7    Q.    You mentioned gaskets again at the

8    by-products area when you were there in '75, how

9    would you have been exposed to gaskets in the

10   by-products area?

11   A.    Next door on the blast furnace, because it

12   was only, I don't know, roughly 15 feet apart.

13            MR. KANE:  Are you saying the blast

14   furnace was only 15 feet from the by-products?

15            THE WITNESS:  Yes.

16   Q.    The blast furnace?

17   A.    No, not the blast furnace, hell, no, the

18   coke batteries again.

19            THE WITNESS:  Good thing you come

20   along, John.

21            (Laughter.)

22   Q.    Can you describe for me what those gaskets

23   that were 15 feet away at the coke batteries looked

Page 279

1   unfortunately your friend DeDe McClure passed away

2   on Tuesday?

3       A.   Yes, his obituary was in the paper last

4   night.

5       Q.   When we were talking about that, you told me

6   that -- when you were starting to think about

7   working with Mr. McClure, you were reminded that you

8   spent some time at the J & L Steel Aliquippa Works

9   in the open hearths.

10      A.   Open hearths, yes.

11      Q.   We didn't talk about that yesterday, so

12  let's chat about that a little bit and then we'll go

13  back to some of these other attorneys that have some

14  questions for you, okay?

15      A.   Yep.

16      Q.   Can you recall when you were working at the

17  J & L Aliquippa Works open hearths?

18      A.   I couldn't tell you the date, but there was

19  an incident that happened when I was down there that

20  a fellow run and jumped into the molten steel and

21  committed suicide.  Whenever that happened, I don't

22  know.  I don't know what...

23      Q.   I think you told me this morning you thought

Page 280

1    that might have happened in the '70s?

2        A.    Yes, I would say it was in the '70s, yes.

3        Q.    How long were you working in the open hearth

4    at that time?

5        A.    Four to six months.

6        Q.    What were you doing during those four to six

7    months?

8        A.    Scaffolding.

9        Q.    Who were you working for at that time?

10       A.    I couldn't answer that, I don't know.

11       Q.    You don't remember your employer?

12       A.    No, I don't.

13       Q.    While you were doing the scaffolding for the

14   four to six months in the open hearth area, what was

15   the project that was going on?  Why were you

16   building the scaffolding?

17       A.    I was building it for other crafts, I'm

18   trying to think of them.  They were setting

19   something up high, millwrights were there, fitters,

20   a pretty big scaffold.  I know it was probably six

21   weeks building a scaffold, three or four different

22   crafts on it, they tore out a lot of stuff.  You

23   know, I know they tore out pipe covering.  I know

1   there was valves, they tore out a section of the

2   walls.  I don't know.

3      Q.   Well, when you were there for this

4   particular project and the other crafts were doing

5   their job, were the open hearths operating at that

6   time?

7      A.   Yes.

8      Q.   How many open hearths were there, to your

9   knowledge, at that time?

10     A.   Just the one where they ladled, where they

11  poured the steel in and then they picked them up in

12  the crane and they filled each, whatever you call

13  them, ingots, like, you know.

14     Q.   Okay.

15          Did you observe that process taking place

16  where they would pour the steel?

17     A.   Yes.  We had to clear the scaffold every

18  time they done that.

19     Q.   How often do you think you observed the

20  pouring of steel when you were in the open hearths

21  for that four to six-month period, was that a weekly

22  occurrence or a daily occurrence?

23     A.   That was daily.

1    Q.    How many times would they pour steel in a

2  day, on average?

3    A.    I'd say once, I'm not really sure.

4    Q.    At least once a day?

5    A.    At least once a day, yes.

6    Q.    You started to tell me about there was some

7  pipe covering there and some valves, do you believe

8  you worked with any asbestos products when you were

9  at the Aliquippa open hearths for that four to

10  six-month period?

11    A.    Not with, no.

12    Q.    Do you believe you were around asbestos

13  products during that period?

14    A.    Yes.

15    Q.    And would that include the pipe covering

16  that you had mentioned?

17    A.    Yes.

18    Q.    And the valves that you had mentioned?

19    A.    Yes.

20    Q.    Can you think of any other

21  asbestos-containing products that you worked around

22  during this time period?

23    A.    No.

1              MR. KANE:  Yesterday he had mentioned

2      hot tops.

3              THE WITNESS:  Hot tops, yeah, open

4      hearth, yes.

5              (Objection by Defense Counsel.)

6              MR. KANE:  He did.

7              DEFENSE COUNSEL:  Do you want to give

8      him a manufacturer name, too, while you're at it,

9      John?

10             MR. KANE:  Sure.

11             THE WITNESS:  Well, open hearth, you

12     had hot tops.

13     BY MR. SCHAPER:

14        Q.   So we'll add hot tops to our list?

15             MR. SCHAPER:  Do we want to add

16     anything else to our list, either of you?

17             DEFENSE COUNSEL:  John, do you have any

18     other names?

19             MR. KANE:  I have quite a few.

20             (Laughter.)

21     BY MR. SCHAPER:

22        Q.   Mr. McCarty, do you associate any names with

23     the hot tops that you came in contact with there at

1   that time?

2       A.   You mean names of what?

3       Q.   Names of companies that might have made the

4   hot tops?

5       A.   Oh, no.

6       Q.   Again, some other people, I'm quite certain

7   will have some questions about each of these

8   things.  Can you think of any other

9   asbestos-containing products that you worked around

10  during that four to six months that you were in the

11  area of the J & L Aliquippa open hearth?

12      A.   No.

13               MR. SCHAPER:  What we would like to do

14  now, Mr. McCarty, is we'll take a very short break,

15  I'll get out of my chair here and give that up to

16  some people that want to ask questions, and we'll

17  continue on similar to what we were doing yesterday

18  afternoon.

19               (Recess taken, 10:08 a.m.)

20               (Reconvened at 10:09 a.m.)

21                    EXAMINATION

22  BY MR. VERDI:

23      Q.   Good morning, sir, my name is Joshua Verdi,

Page 359

1    A.    No, not offhand, I don't remember, no.

2    Q.    So the only time you ever worked with or

3  around Rust Engineering was this one occasion at a

4  Crucible Steel facility prior to 1962?

5    A.    Right.

6    Q.    The notes from yesterday indicate that it

7  was at the Midland facility, is that where it would

8  have been?

9    A.    Yes.

10    Q.    Again, I'm going to switch gears on you,

11  I've got one more defendant to ask you about.  When

12  you were working at J & L Aliquippa -- and I've got

13  that same bug flying around me now -- J & L

14  Aliquippa from August of 1968 to January of 1969,

15  this is the blast furnace job, do you recall that?

16    A.    Yes.

17    Q.    Were you working around the steel pouring

18  process?

19    A.    No.

20    Q.    You were nowhere near where they were

21  pouring steel?

22    A.    No.  But the ladle cars would go by, you

23  know, the ladle cars with all of that stuff.

Page 360

1      Q.    You were at J & L Aliquippa for Eichleay

2   from September of 1972 to April of 1973 working on a

3   soaking pit project, do you recall that?

4      A.    Yes.

5      Q.    Can you tell me, during the period of time

6   that you were at J & L Aliquippa for Eichleay,

7   working on the soaking pits, were you working near

8   the steel pouring process?

9      A.    Yes, they had the soaking pits -- no, not

10   the pouring process, no.

11      Q.    The soaking pits weren't near the pouring

12   process, were they?

13      A.    No.

14      Q.    Were they in the same building or were they

15   in a separate building?

16      A.    Separate building.

17      Q.    Now, when you were questioned by your lawyer

18   yesterday, he asked you if you'd ever worked around

19   hot tops, do you recall those questions?

20      A.    Yes.

21      Q.    And you said that you worked around hot tops

22   at Babcock & Wilcox Koppel facilities?

23      A.    Yes.

1      Q.    Can you tell us when it was that you would

2   have worked around those hot tops?

3      A.    Many times, really.

4      Q.    What time period?

5      A.    I worked for Brooks on and off for 30 years.

6      Q.    Now, would you work around the hot tops when

7   you were employed by B&W at Koppel?

8      A.    No.

9      Q.    Not during the course of your employment?

10      A.    No.

11      Q.    It was on occasions you worked for D&T

12   Brooks at the Koppel facility?

13      A.    Right.

14      Q.    Sir, can you tell me what those hot tops at

15   the Koppel facility looked like?

16      A.    The top they took off of the ingot, just a

17   hunk of whatever you want to call it, steel, they

18   picked them off after they poured them, dropped them

19   on the deck.

20      Q.    They picked them up in one piece and took

21   them off?

22      A.    Yes.

23      Q.    Can you tell us, as we sit here today,

1   whether or not those hot tops contained asbestos?

2       A.   There was boxes up there with signs on them,

3   asbestos, yes.

4       Q.   Those hot tops came in boxes, is that what

5   you're saying?

6       A.   No, the box that had the asbestos came in

7   boxes.

8       Q.   What asbestos?

9       A.   That they put on the hot tops.

10      Q.   They put asbestos on top of hot tops?

11      A.   Don't they line them?

12      Q.   I'm not here to answer the question, sir,

13  I'm sorry.

14           You say that the hot tops that you saw were

15  a piece of metal that were set on top of the ingots?

16      A.   Set on top of the mold where the ingots was,

17  yes.

18      Q.   You're telling us that there was asbestos

19  that was put on top of these hot tops?

20      A.   No, I thought it was put between the mold

21  and the hot top.

22      Q.   What was put between the mold and the hot

23  top?

Page 370

1    monstrous big scaffold in that area.

2        Q.    How do you know they were hot tops?

3        A.    They had the molds, you know, you're in the

4    same area.

5        Q.    So your testimony that you worked around hot

6    tops at J & L Aliquippa, is based on the fact that

7    you worked where the molds were?

8        A.    Where I worked in the open hearth, yes.

9        Q.    Did you see them using the hot tops?

10       A.    Sure.  The hot tops?

11       Q.    Yes.

12       A.    No, I thought you meant the molten steel in

13   the molds and stuff.  Did I actually see the hot

14   tops?  I don't know, I couldn't answer that.

15       Q.    When you told us today that you worked

16   around the hot tops at J & L Aliquippa, you really

17   don't have any knowledge that you did work around

18   the hot tops at J & L Aliquippa, do you?

19       A.    Well, I worked on the open hearth.

20       Q.    But you don't know that you worked around

21   hot tops, do you?

22       A.    They're not there?

23       Q.    Can you tell us they were there?

1    A.    Can you tell me they weren't?

2         (Laughter.)

3    Q.    I also wanted to ask you about -- you didn't

4    tell us yesterday about working at the open hearth

5    at J & L Aliquippa.

6    A.    He asked me about guys that I worked with

7    that are still living, and I told him about a friend

8    of mine, DeDe McClure.

9    Q.    Yes.

10   A.    When I went home last night, his obituary

11   was in the paper.  And I got to thinking about DeDe,

12   and I knew I worked with him down there for like a

13   four to six-month period.  I don't know, more of a

14   guess than anything else on the time when I was

15   there, like late '60s, early '70s, mid '70s.  I

16   don't know the time, but that's what brought me up --

17   it made me think about that on account that DeDe

18   died.

19   Q.    Sir, just one or two more.  When you were

20   working in any of the steel mills, do you recall

21   working around any Koppers' employees?

22   A.    Well, the blast furnace in J & L, yes.

23   Q.    Were you employed by Koppers at that time?

1    A.   Yes.

2    Q.   Do you recall any occasions that you worked

3  around Koppers' employees when you were not employed

4  by Koppers?

5    A.   No, not that I can recall, no.

6         MR. MAGEE:   Thank you, sir.   That's all

7  I have.

8                    EXAMINATION

9  BY MS. BACSI:

10    Q.   Good morning, my name is Dana Bacsi and I'm

11  going to be asking you a few questions.

12         When you worked at the B&W main plant in

13  Beaver Falls from '62 to '67, did you work a certain

14  shift?

15    A.   Well, the night I first went down there, I

16  was in the labor pool, I worked all three shifts.

17  When I got in the welding department, probably five

18  and a half years when I was there, I worked steady

19  daylight.

20    Q.   What were your hours then?

21    A.   7 to 3.

22    Q.   Did you work any overtime while you were at

23  B&W?

Page 373

1    A.    No.   I don't remember, no.   Oh, yes.   I do

2    remember one instance, I had had a -- when I run the

3    submerged arc welding machine, I had a piece that

4    they were going to ship to their plant in Wisconsin,

5    wherever it was at, and I had to finish it.   And I

6    worked a couple hours over one time that I ever

7    remember, that I remember, yes.

8    Q.    Now, it appears from your work list that you

9    were employed by the union pretty steadily until the

10   1978 time period, correct?

11   A.    Employed by what?

12   Q.    Employed through the union pretty steadily

13   until the 1978 time period, correct?

14              MR. KANE:   Object to vagueness.

15   A.    Yes.

16   Q.    And let me ask you, did you do any

17   remodeling jobs through the union?

18   A.    Not through the union, no.

19   Q.    Did the union, at any time, the carpenter's

20   union that you were involved in from '50 to '62 and

21   '67 to '89, did they ever advise you or warn you

22   about any asbestos exposure at all?

23   A.    No.

Page 374

1    Q.    They didn't have any meetings on the subject

2    or give you flyers?

3    A.    No.

4    Q.    Now, you indicated that you worked with your

5    son Richard moonlighting, correct?

6    A.    Yes.

7    Q.    And Richard was born in 1956?

8    A.    Yes.

9    Q.    How old was Richard when he first started

10   working with you moonlighting?

11   A.    Pretty young when he used to go with me,

12   yes.

13   Q.    Give me an age.

14   A.    I don't know, I couldn't say.  I don't know

15   if he was in his teens or not.  He was pretty young

16   when he used to go out with me.

17   Q.    Is Richard -- Richard's at the current

18   address that you provided us with today?

19   A.    How's that?

20   Q.    Richard's at the address that you provided

21   in your discovery responses to us?

22   A.    He's at 135 County Line Road, New Galilee.

23   Q.    Was he out of high school when he first

Page 375

1    started working with you doing moonlighting?

2    A.    No.

3    Q.    After high school, before high school?

4    A.    Before high school.  He was still in school,

5    he worked with me in the summertime.

6    Q.    Tell me about the type of work that you did

7    when you were moonlighting.

8    A.    Remodeling.  Home remodeling.  Roofs,

9    replaced windows, doors, drywall, floors, anything.

10   Whatever needed done.

11   Q.    And I think you said shingles, too, right?

12   A.    Shingles, yeah, roofs.

13   Q.    Did you ever do any new construction?

14   A.    New?

15   Q.    Right.

16   A.    Home work, yes.

17         MR. KANE:  That means build a house.

18         MS. BACSI:  Right.

19   A.    Yes.

20   Q.    Can you tell me where that was or how often

21   would you do new construction?

22   A.    We probably only had -- I don't know, I'd

23   say six or eight new, that we formed, but I built

## IN THE COURT OF COMMON PLEAS OF LAWRENCE COUNY, PENNSYLVANIA

DONALD McCARTY and
BETTY McCARTY, his wife,

           Plaintiffs,

v.

ALLIED GLOVE CORPORATION, et al.,

           Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL

NO. 00002 of 2005

Code 59

**GENERAL ELECTRIC COMPANY'S
MOTION TO STRIKE NOTICES OF
DEPOSITION AND MOTION FOR A
PROTECTIVE ORDER**

Filed on behalf of Defendant:
General Electric Company

Counsel of Record for these Parties:
Nora Barry Fischer, Esquire
Pa. I.D. No. 25545
Bryan S. Neft, Esquire
Pa. I.D. No. 60007
Brian S. Green, Esquire
Pa. I.D. No. 86888

PIETRAGALLO BOSICK & GORDON
Firm #834
One Oxford Centre, 38th Floor
Pittsburgh, PA 15219
(412) 263-2000



EXHIBIT
B

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNY,
PENNSYLVANIA

| | | |
|---|---|---|
| DONALD McCARTY and | ) | CIVIL |
| BETTY McCARTY, his wife, | ) | |
| | ) | |
| Plaintiffs, | ) | NO. 00002 of 2005 |
| | ) | |
| v. | ) | |
| | ) | Code 59 |
| ALLIED GLOVE CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## GENERAL ELECTRIC COMPANY'S MOTION TO STRIKE PLAINTIFFS' NOTICES OF DEPOSITION AND MOTION FOR A PROTECTIVE ORDER

Defendant, General Electric Company, a corporation (hereinafter "GE"), by and through its attorneys, Pietragallo, Bosick & Gordon LLP and Nora Barry Fischer, Esquire, hereby moves this Honorable Court to strike plaintiffs' Notices of Deposition and issue a Protective Order to prevent the irrelevant, unreasonable and potentially abusive deposition s of Paul Banaszewski and Walter Martiny as requested in "Plaintiffs' Notice of Deposition of Paul Banaszewski" and "Plaintiffs' Notice of Deposition of Walter Martiny", for the reasons that follow:

1.     On November 29, 2005, this matter was initiated by the filing of a Complaint with the Court.  Plaintiff-husband, Donald McCarty, is alleged to have worked as a union carpenter at various worksites between 1950 and 1962 and from 1965 until his retirement in 1989.  Plaintiff-husband is also alleged to have worked from 1962 until 1965 at a Babcock &

1

Wilcox plant in Beaver Falls, PA. Plaintiff-husband is alleged to have worked at the Bruce Mansfield Power Station in Shippingport, PA. Plaintiffs allege that plaintiff-husband developed mesothelioma from his workplace exposure to asbestos. (See, Plaintiff's Answers to Standard Short Form Interrogatories, portions of which are attached and incorporated hereto as "Exhibit A".)

2.     On January 16, 2005, plaintiffs served undersigned counsel for General Electric Company a "Notice of Deposition of Paul Banaszewski". (See "Plaintiff's Notice of Deposition," attached and incorporated hereto as Exhibit "B".) Paul Banaszewski has traditionally been offered as a lay witness concerning GE land-based steam turbines, but as of the date of this filing, GE has not yet filed its Witness List for this matter.

3.     Plaintiffs unilaterally chose February 17, 2006 for the deposition of Paul Banaszewski, without any consultation with undersigned counsel.

4.     While GE records indicate that it shipped large-sized land-based steam turbines to the Bruce Mansfield Power Station in Shippingport, PA in 1973, 1974 and 1978, these records also indicate that GE heat retention material specifications applicable to those three turbines provided that all insulation materials shall be asbestos free. (See, "Affidavit of Paul A. Banaszewski", dated January 30, 2006, attached and incorporated hereto as Exhibit "C".) As such, there can be no claim of asbestos-exposure related to any GE land-based steam turbines located at the Bruce Mansfield Power Station in Shippingport, PA.

2

5.      On January 16, 2005, plaintiffs served undersigned counsel for General Electric Company a "Notice of Deposition of Walter Martiny". (See "Plaintiff's Notice of Deposition," attached and incorporated hereto as Exhibit "D".)   Walter Martiny has traditionally been offered as a lay witness concerning GE electric motors, but as of the date of this filing, GE has not yet filed its Witness List for this matter.

6.      Plaintiffs unilaterally chose February 20, 2006 for the deposition of Walter Martiny, without any consultation with undersigned counsel.

7.      Plaintiff-husband was deposed on January 18 and 19, 2006, during which he offered testimony about the various asbestos-containing products to which he was allegedly exposed at different work locations.   He testified that he spent most of his time erecting scaffolding and building forms.   Throughout two days of testimony, plaintiff-husband did not offer any testimony that he worked on our around any allegedly asbestos-containing GE land-based steam turbines or electric motors.

8.      Moreover, plaintiffs have failed to indicate any allegedly asbestos-containing products produced by General Electric Company that may have exposed plaintiff-husband to asbestos fibers.

9.      To date, no record evidence exists that plaintiff-husband ever worked with any alleged asbestos-containing GE products, much less GE land-based steam turbines or electric motors with any asbestos-containing component part and/or insulation.

10.     Under Pennsylvania Rule of Evidence 401, any testimony regarding GE land-based steam turbines or electric motors is not "relevant evidence" relating to the existence of any facts at issue in the above-captioned matter.

3

11.     General Electric and Paul Banaszewski do not consent to having Mr. Banaszewski's deposition taken in the above-captioned matter.

12.     General Electric and Walter Martiny do not consent to having Mr. Martiny's deposition taken in the above-captioned matter.

13.     Plaintiffs' requests for depositions of Paul Banaszewski and Walter Martiny are hence unreasonable and potentially abusive, as they are not related to any alleged product at issue and such request amounts to a "fishing expedition."  In the case of Carl Hoffman, Jr. v. Gregory H. Knight, 2003 Pa. Super. 159, 823 A.2d 202, 2003 Pa. Super. LEXIS 872 (Pa. Super. 2003), the Superior Court of Pennsylvania discussed when a petition for issuance of a commission or a letter rogatory should be refused for lack of relevance.  The Court held that the petitioner must show that the deposition testimony is relevant and that "'the administration of justice will fail' if the testimony is not compelled."  Id.  See also, Thomas Land v. State Farm Mut. Ins. Co., 410 Pa. Super. 579, 600 A.2d 605, 1991 Pa. Super. LEXIS 3903 (Pa. Super. 1991), where the Court held that it was not error to refuse discovery that amounted to "fishing expeditions," citing to In re Thompson's Estate, 416 Pa. 249, 206 A.2d 21 (Pa. 1965).

14.     On December 12, 2005, GE served plaintiffs with four sets of discovery requests, including Requests for Admissions, Product Identification Interrogatories, Expert Interrogatories and Requests for Production of Documents.  (See, GE's "Notice of Service of Discovery Directed to Plaintiffs," attached and incorporated hereto as Exhibit "E".)

15.     Plaintiffs did not contact counsel for GE requesting an extension of time to serve their responses to GE's four sets of discovery requests.

16.     To date, plaintiffs have not responded to GE's discovery requests that were properly served upon them six weeks ago.

4

17.     Despite the lack of record evidence that plaintiff-husband worked on GE land-based steam turbines or electric motors and plaintiffs' failure to comply with GE's proper discovery requests, plaintiffs have served notices of deposition directed to Paul Banaszewski and Walter Martiny and they are insisting on confirming deposition dates. (See, "Email from Plaintiffs' Counsel Janice Savinis, dated January 27, 2006", a copy of which is attached and incorporated hereto as Exhibit "F".)

18.     Pennsylvania Rule of Civil Procedure 4012 states:

> [u]pon motion by a party . . . and for good cause shown, the court may make any order which justice requires to protect a party or person from unreasonable annoyance, embarrassment, oppression, burden or expense, including one or more of the following:
> (1) that the discovery . . . shall be prohibited;
>
> * * *
>
> (5) that the scope of discovery . . . shall be limited.

19.     Based on the foregoing reasons, GE respectfully requests that this Court grant this Motion to Strike Plaintiffs' Notices of Deposition and Motion for a Protective Order and strike "Plaintiffs' Notice of Deposition of Paul Banaszewski", as attached at Exhibit "A", and "Plaintiffs' Notice of Deposition of Walter Martiny" as attached at Exhibit "D", from the record in this matter.

WHEREFORE, Defendant General Electric Company, by and through its undersigned Counsel, moves this Honorable Court to Strike "Plaintiffs' Notice of Deposition of Paul Banaszewski" and "Plaintiffs' Notice of Deposition of Walter Martiny" and to issue the attached Order.

Respectfully submitted,


By: _____

Nora Barry Fischer, Esquire
Pa. I.D. No. 25455
Bryan S. Neft, Esquire
Pa. I.D. No. 60007
Brian S. Green, Esquire
Pa. I.D. No. 86888


Pietragallo, Bosick & Gordon
One Oxford Center, 38th Floor
Pittsburgh, PA  15219
(412) 263-2000

*Attorneys for General Electric Company*


Doc. 935191

IN THE COURT OF COMMON PLEAS OF LAWRENCE COUNTY,
PENNSYLVANIA

| | |
|---|---|
| DONALD MCCARTY and BETTY MCCARTY, his wife,<br><br>Plaintiffs,<br><br>vs.<br><br>ALLIED GLOVE CORPORATION, et. al.,<br><br>Defendants. | CIVIL DIVISION - ASBESTOS<br><br>NO. G.D. 2-05<br><br>Code: 012<br><br>**ANSWERS TO THE STANDARD SHORT SET OF INTERROGATORIES**<br><br>FILED ON BEHALF OF PLAINTIFF<br><br>Counsel of Record for This Party:<br><br>Janice M. Savinis, Esquire<br>PA. I.D. #51943<br><br>Michael J. Gallucci, Esquire<br>PA. I.D. #92859<br><br>SAVINIS, D'AMICO & KANE, L.L.C.<br>Suite 3626, Gulf Tower<br>707 Grant Street<br>Pittsburgh, PA 15219<br>(412) 227-6556 |

**EXHIBIT**

A

PLAINTIFFS' ANSWERS TO THE
NEW STANDARD SHORT SET OF INTERROGATORIES

1.    Please state plaintiff's:

(a)    full name:    **Donald W. McCarty**

        present address:    **141 County Line Road
        New Galilee, PA 16141**

(o)    address as of date of filing of complaint:        **see 1.(b.)**

(d)    date of birth:    **9/19/27**

(e)    social security number:    **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**

(f)    educational background:    **10th grade, 1947-1949 Terra School for Craftsmen, New
                Castle, PA**

2.    If the plaintiff is presently married, please state:

(a)    the full name of spouse:    **Betty J. McCarty**

(b)    the date of marriage:    **12/3/49**

(c)    the spouse's place of employment for the five (5) years preceding the filing of this action:

        **N/A**

(d)    spouse's educational background:    **High School Graduate**

(e)    spouse's social security number:    **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**

(f)    spouse's date of birth:    **April 8, 1928**

(g)    spouse's date of death:    **N/A**

3.    If plaintiff has been married previously, please complete the following chart with regard to each
of the former marriages:

6.   If plaintiff has ever been a party to any litigation other than this action, please complete the following chart with regard to such litigation:

   (a)   Name and Address of Court in Which Filed
   (b)   Name of Other Party
   (c)   Date Filed

   **Plaintiff has not been a party to any litigation other than this action.**

7.   Has plaintiff ever served in the Armed Forces of the United States?  If so, please state:

   (a)   Branch of service:  **Navy**
   (b)   Serial Number:  **2520292**
   (c)   Inclusive dates of service:  **9/20/44 – July or August 1946**
   (d)   Type of discharge:  **Honorable**

8.   Has plaintiff ever been rejected from service in the Armed Forces of the United States?  If so, please state the date, branch and reason(s) for such a rejection:   **No.**

9.   If plaintiff has ever made a claim for disability benefits from the Veteran's Administration, please complete the following chart with regard to each claim:

   (a)   VA or "C" Number
   (b)   Date Filed
   (c)   Address of Office Where Filed
   (d)   Nature of Disability Claim

   **Plaintiff has not made a claim for disability benefits from the Veteran's Administration.**

10.   If plaintiff has ever been confined to any hospital, please complete the following chart with regard to each hospitalization:

   (a)   Name and Address of Hospital
   (b)   Inclusive Dates of Hospitalization
   (c)   Cause of Hospitalization

   **See Exhibit A**

(e)   Physician Who Supplied Report
(f)   Disposition of Claim

N/A

22.   Has any physician or other medical practitioner listed above ever testified or rendered an expert opinion in any proceeding whatsoever concerning and/or on behalf of plaintiff?  (Y or N)   If so, please complete the following chart:

(a)   Name and Address of Physician or Medical Practitioner
(b)   Date of Testimony or Opinion
(c)   Nature of Testimony or Opinion (Deposition, Report, Etc.)

Plaintiff's physician or medical practitioner listed above has not testified on behalf of the plaintiff or offered an expert opinion in any proceeding on behalf of Plaintiff.

23.   If plaintiff has ever filed a claim for Social Security Disability, please complete the following chart:

(a)   Place Filed
(b)   Date Filed
(c)   Type of Disability
(d)   Physician who Supplied Report
(e)   Disposition of Claim

N/A

24.   With regard to plaintiff's employment history throughout his life, please complete the following chart:

(a)   Jobsite
(b)   Employer Name and Address
(c)   Dates of Employment
(d)   Type of Work Performed

See Exhibit B

25.   Please complete the following chart with regard to plaintiff's personal knowledge (not what someone has told him) of his exposure to dust from asbestos products:

    (a)   Name of Manufacturer and Brand Name and Type of Product
    (b)   Name of Employer and Location of Worksite
    (c)   Dates of Exposure

At various times throughout his career, Plaintiff was exposed to the following asbestos products at B&W (Koppel, Wallace Run, Main Plant), Bruce Mansfield, J&L Aliquippa and others places:

    Pipecovering -- Johns-Manville, Kaylo (1950s, 1960s and 1970s)
    Cloth
    Gaskets
    Packing
    Gloves
    Aprons
    Hot Tops (J&L Aliquippa and B&W Koppel Plant)
    Valves (Honeywell)
    Pumps
    Cement
    Boilers (insulation, gaskets)
    Transite (J&L Aliquippa Blast Furnace, and other places)

Plaintiff recalls that he was exposed to asbestos gaskets, cloth and packing supplied by F.B. Wright and cloth, pipecovering, and cement supplied by Pittsburgh Gage at some of the above jobsites

Plaintiff worked around individuals who were employed by the following outside contractors using asbestos products:

    Eichleay
    Dravo
    Foster Wheeler
    Zurn
    McCarl's



(c)      All Offices or Other Positions held and Dates of Service

(a)      Local 422
(b)      1950-1962, 1967-1989
(c)      None

[illegible redacted text]

[illegible redacted text]

[illegible redacted text]

[illegible redacted text]

[illegible redacted text]

[illegible redacted text]

[illegible redacted text]

39.      When and where was the first time the plaintiff used a respirator, if ever

**N/A**

40.      What was the purpose of using a respirator?   **N/A**

41.      When did plaintiff first learn that exposure to asbestos could be harmful to one's health?

**Plaintiff first learned that exposure to asbestos could be harmful to one's health approximately in 1990's**

[illegible redacted text]

[illegible redacted text]

Interrogatories Answered by:

John R. Kane
Attorneys for the Plaintiff

**EXHIBIT B**

**WORK HISTORY**

Mr. McCarty started in the Carpenters Union in 1950, local 422.  He worked out of that union until 1962.  In 1962, Mr. McCarty worked at B&W (Main Plant on the Annealing Furnace) until September 1967 when he went back to the Carpenters Union, local 422.  Mr. McCarty retired from the Carpenter's Union on December 1, 1989.

Mr. McCarty has a printout of his various employers from 1967 until his retirement (attached hereto).  The records show his employer for various times, but not where he worked.  From his own memory, Plaintiff is able to state that he was exposed to asbestos at the following locations:

**EARLY JOBS AS A CARPENTER FROM 1950 TO 1962:**

**J&L Aliquippa** (1950s)

*10" round mill (continuous welding for mcdowell corp from Cleveland)*

*Blast Furnace in the 1950s during construction of the Blast Furnace, he recalls the pouring of the footer*

**USX Clairton**, Coke Battery (1950s)

**Shippingport Atomic Plant** (Early 1950s)

**Beaver Courthouse**
*Unaware of Asbestos Exposure*

**Church in Freedom**
*Unaware of Asbestos Exposure*

**Termite job in doctor's office in Beaver Falls**
*Unaware of Asbestos Exposure*

**B&W - Wallace Run Steel Plant** (in the 1950s)

*Plaintiff put in two electric furnaces*
*Put in a foundation for an air hammer*
*Built a cooling bed*
*Tore out the bed and air hammer and put in a hydraulic hammer*

**Koppel Steel Mill** for D&T Brooks

*Original Construction (50s)*
*Built an addition (50s)*
*Put in the Continuous Casting for Mellon Stuart in the early 80s*

**Blawnox in Elwood**

*Moved equipment around, put in a floor, tore out the roof and put in a new roof*

**Elwood City Forge**

*Put a foundation in for a lathe for Brooks D&T (once late 50s/Early 60s)*

**Colonial Steel Mill in Monaca for D&T Brooks**

*Plaintiff put a stopper in for railroad cars*

## 1962 TO 1967 MR. MCCARTY WAS EMPLOYED BY:

**B&W at their main plant in Beaver Falls**

## VARIOUS JOBS WHERE EMPLOYER IS INDICATED ON THE UNION PRINTOUT. PLAINTIFF IS CONTINUING TO PUT THIS TOGETHER FROM HIS MEMORY AND MAY RECOLLECT ADDITIONAL SITES AT THE DEPOSITION:

**Kaufmann's in Rochester**

*10/67 through 6/68*

**J&L Aliquippa Blast Furnace**

*8/68 to 1/69 for Koppers during Superbowl III Jets v. Baltimore*

**Gimbels in Beaver Valley Mall**

*1/69 through 3/69*

**High Rise in Ambridge**

*Coco Bros & Pittsburgh Acoustical 5/70 through 11/70*

**J&L Aliquippa**

*Soaking Pits (once – 9/72 until 4/73 for Eichleay)*

**Bruce Mansfield:**

*Employed by Foster Wheeler (4/73-10/74)*

**J&L Aliquippa**

*By Products (once – 3/75 to 12/75 for Eichleay),*

**B &W in Ambridge** (1/76 – 11/76)

*Employed by D&T Brooks as a Carpenter Foreman*

**Bruce Mansfield:**

*Employed by Johns-Manville (1/77 – 6/77) inside plant*
*Employed by Johns-Manville (7/77-8/77) in the Coal Crusher Building*
*Employed by T&B (11/77 until 11/78)*

## PLAINTIFF HAS A SPECIFIC RECOLLECTION OF WORKING  AT THE FOLLOWING SITES, BUT IS UNABLE TO RECALL THE SPECIFIC TIME:

**Levingston Steel in Ambridge** *Worked for a contractor from McDonald, PA*

**Mesta in New Castle** (bought by Elwood City Forge)
*Put in Electric Furnaces*

**USX Nevel Island**

**Westinghouse Plant near Beaver**

*For Brooks D&T several times in the 1960s and 1970s*

**J&L Aliquippa**

*Coke Battery (once)*
*6" plug mill (once – dick corp),*
*Jr. Beam Mill (late 80s)*

**Koppel Steel Mill** for D&T Brooks

*Put in the Continuous Casting for Mellon Stuart in the early 80s*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of Plaintiff's Answers to the Standard Set of Short Form Interrogatories were served upon all known counsel of record this 6th day of January, 2006 via email.

SAVINIS, D'AMICO, & KANE L.L.C.

_____
Attorney for plaintiff

 

IN THE COURT OF COMMON PLEAS OF LAWRENCE COUNTY,
PENNSYLVANIA

| | |
|---|---|
| DONA LD MCCARTY and BETTY MCCARTY, his wife,<br><br>Plaintiffs,<br><br>v.<br><br>SAFETY FIRST INDUSTRIES, INC., et al.,<br><br>Defendants. | CIVIL DIVISION - ASBESTOS<br><br>NO. 2-05<br><br>**PLAINTIFFS' NOTICE OF DEPOSITION OF PAUL BANASZEWSKI**<br><br>FILED ON BEHALF OF PLAINTIFFS<br><br>Counsel of Record for This Party:<br><br>Janice M. Savinis, Esquire<br>Pa. I.D. #51943<br><br>Michael J. Gallucci, Esquire<br>Pa. I.D. #92859<br><br>SAVINIS, D'AMICO & KANE, L.L.C.<br>Suite 3626, Gulf Tower<br>707 Grant Street<br>Pittsburgh, PA 15219<br>(412) 227-6556 |

**EXHIBIT**

**B**

 

IN THE COURT OF COMMON PLEAS OF LAWRENCE COUNTY,
PENNSYLVANIA

| | |
|---|---|
| DONA LD MCCARTY and BETTY<br>MCCARTY, his wife,<br><br>Plaintiffs,<br><br>v.<br><br>SAFETY FIRST INDUSTRIES, INC., et al.,<br><br>Defendants. | CIVIL DIVISION - ASBESTOS<br><br>NO. 2-05 |

### PLAINTIFFS' NOTICE OF DEPOSITION OF PAUL BANASZEWSKI

**PLEASE TAKE NOTICE** that, pursuant to Pennsylvania Rule of Civil Procedure and the Pennsylvania Rules of Evidence, the plaintiffs will conduct a deposition of Paul Banaszewski which will take place on Friday, February 17, 2006 at 9:00 a.m.

The deposition will be held at the offices of Savinis, D'Amico & Kane, L.L.C., 3626 Gulf Tower, 707 Grant Street, Pittsburgh, PA 15219 (412-227-6556).

The Court Reporting service for the deposition will be provided by Urbash Professional Reporting, Inc. (724) 443-5730 or an agent thereof. The deposition will be used at the trial of this matter. All counsel are invited to attend and participate in this deposition.

Respectfully submitted,

By: _____

Michael J. Gallucci, Esquire
Attorney for Plaintiffs

 

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plaintiffs' Notice of Deposition was served on all counsel of record via facsimile transmission and/or email and/or U.S. Mail dated January 14, 2006.

SAVINIS, D'AMICO & KANE, L.L.C.

BY: _____
Michael J. Gallucci, Esquire

## IN THE CIRCUIT COURT OF LAWRENCE COUNTY, PENNSYLVANIA

DONALD McCARTY and                      )      CIVIL DIVISION - ASBESTOS
BETTY McCARTY, his wife,                )
                                        )      No. G.D. 2005-00002
            Plaintiffs,                 )
                                        )
v.                                      )
                                        )      CIVIL DIVISION - ASBESTOS
ALLIED GLOVE CORPORATION, et al.,       )
                                        )      No. G.D. 2005-00002
            Defendants.                 )
                                        )
                                        )
                                        )

### AFFIDAVIT OF PAUL A. BANASZEWSKI

STATE OF NEW YORK

COUNTY OF SCHENECTADY

The undersigned, Paul A. Banaszewski, having been duly sworn, deposes and states under oath as follows:

1.    I am over the age of eighteen years; I am competent to testify to the facts set forth herein.

2.    I am currently retired from General Electric Company ("GE"), but continue to consult for GE. For approximately fifteen years prior to retiring in April 2000, I was GE's Manager for Steam Turbine Product Services and provided technical support for all of GE's local offices. My entire career at GE has involved working with steam turbines and their aftermarket servicing.

3.    I am informed that that Donald McCarty and Betty McCarty have filed a lawsuit against a number of defendants, including GE, in which it is claimed that Donald McCarty, a carpenter, may have worked in proximity to GE steam turbines installed at the Bruce Mansfield Power Station in Shippingport, PA from 1973 to 1978.

4.    Steam turbines are complex mechanical devices made of metal. Those who work on them belong to trades that perform mechanical work, such as machinists. Carpenters would have very limited, if any, contact with steam turbines.



**EXHIBIT**

C

5.    I have determined that GE shipped three steam turbines to the Bruce Mansfield Power Station in 1973, 1974, and 1978, serial numbers 170X479, 170X553, and 170X710, respectively.  The GE heat retention material specifications applicable to those three turbines provided that all insulation materials shall be asbestos free.

FURTHER, AFFIANT SAYETH NAUGHT

_____

Paul A. Banaszewski

Sworn and subscribed to

this 30 day of January, 2006.

_____
Notary Public

My Commission Expires:

GLADYS J. COX
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED IN SCHENECTADY COUNTY
NO. 01CO6025469
COMMISSION EXPIRES 5/24/2007

 

IN THE COURT OF COMMON PLEAS OF LAWRENCE COUNTY, PENNSYLVANIA

| | |
|---|---|
| DONALD MCCARTY and BETTY MCCARTY, his wife, | CIVIL DIVISION - ASBESTOS |
| Plaintiffs, | NO. 2-05 |
| v. | **PLAINTIFFS' NOTICE OF DEPOSITION OF WALTER MARTINY** |
| SAFETY FIRST INDUSTRIES, INC., et al., | FILED ON BEHALF OF PLAINTIFFS |
| Defendants. | Counsel of Record for This Party: |

Janice M. Savinis, Esquire
Pa. I.D. #51943

Michael J. Gallucci, Esquire
Pa. I.D. #92859

SAVINIS, D'AMICO & KANE, L.L.C.
Suite 3626, Gulf Tower
707 Grant Street
Pittsburgh, PA 15219
(412) 227-6556

**EXHIBIT**

**D**

1/16/06

 

IN THE COURT OF COMMON PLEAS OF LAWRENCE COUNTY,
PENNSYLVANIA

| | |
|---|---|
| DONALD MCCARTY and BETTY<br>MCCARTY, his wife, | CIVIL DIVISION - ASBESTOS |
| Plaintiffs, | NO. 2-05 |
| v. | |
| SAFETY FIRST INDUSTRIES, INC., et al., | |
| Defendants. | |

### PLAINTIFFS' NOTICE OF DEPOSITION OF WALTER MARTINY

PLEASE TAKE NOTICE that, pursuant to Pennsylvania Rule of Civil Procedure and
the Pennsylvania Rules of Evidence, the plaintiffs will conduct a deposition of Walter
Martiny which will take place on Monday, February 20, 2006 at 9:00 a.m.

The deposition will be held at the offices of Savinis, D'Amico & Kane, L.L.C., 3626
Gulf Tower, 707 Grant Street, Pittsburgh, PA 15219 (412-227-6556).

The Court Reporting service for the deposition will be provided by Urbash Professional
Reporting, Inc. (724) 443-5730 or an agent thereof. The deposition will be used at the
trial of this matter. All counsel are invited to attend and participate in this deposition.

Respectfully submitted,

By: _____
Michael J. Gallucci, Esquire
Attorney for Plaintiffs

 

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plaintiffs' Notice of

Deposition was served on all counsel of record via facsimile transmission and/or email

and/or U.S. Mail dated January **14**, 2006.

SAVINIS, D'AMICO & KANE, L.L.C.

BY: _____

Michael J. Gallucci, Esquire

 

IN THE COURT OF COMMON PLEAS OF LAWRENCE COUNTY, PENNSYLVANIA

DONALD McCARTY and
BETTY McCARTY, his wife,

         Plaintiffs,

v.

GENERAL ELECTRIC COMPANY, et al.,

         Defendants.

CIVIL DIVISION

No.: G.D. 2-05

Code 012: Asbestos

**GENERAL ELECTRIC COMPANY'S
NOTICE OF SERVICE OF
DISCOVERY DIRECTED TO
PLAINTIFFS**

Filed on behalf of Defendant:
General Electric Company

Counsel of Record for these Parties:

Nora Barry Fischer, Esquire
Pa. I.D. #25455
Bryan S. Neft, Esquire
Pa. I.D. #60007

PIETRAGALLO BOSICK & GORDON
Firm #834
One Oxford Centre, 38th Floor
Pittsburgh, PA 15219
(412) 263-2000

#916831v1
12/14/2005



**EXHIBIT**

E



F I L E D
DEC 19 2005
PRO & CLERK

IN THE COURT OF COMMON PLEAS OF LAWRENCE COUNTY, PENNSYLVANIA

DONALD McCARTY and
BETTY McCARTY, his wife,

              Plaintiffs,

v.

GENERAL ELECTRIC COMPANY, et al.,

           Defendants.

CIVIL DIVISION

No.: G.D. 2-05

### GENERAL ELECTRIC COMPANY'S NOTICE OF
### SERVICE OF DISCOVERY DIRECTED TO PLAINTIFFS

KINDLY take notice that defendant, General Electric Company, by and through its attorneys, Pietragallo, Bosick & Gordon, Nora Barry Fischer, Esquire and Bryan S. Neft, Esquire, has served Request for Admissions, Expert Interrogatories, Product Identification Interrogatories, and Request for Production of Documents on plaintiffs by mailing same to their attorneys, Janis M. Savinis, Esquire and Michael J. Gallucci, Esquire, Savinis of Savinis, D'Amico & Kane, L.L.C., Gulf Tower, Suite 3626, Pittsburgh, PA 15219, via U.S. first-class mail, postage prepaid, this 16th day of December 2005.

Respectfully submitted,

PIETRAGALLO, BOSICK & GORDON

By: _____
     Nora Barry Fischer, Esquire
     Bryan S. Neft, Esquire

     *Attorneys for Defendant,*
     *General Electric Company*

#916831v1
12/14/2005

 

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing **General Electric Company's Notice of Service of Discovery Directed to Plaintiffs** was served upon plaintiffs' counsel, addressed as follows, and all other counsel of record were notified of the filing of same via electronic mail, this 16th day of December 2005:

> Janice M. Savinis, Esquire
> Michael J. Gallucci, Esquire
> Savinis, D'Amico & Kane, L.L.C.
> Gulf Tower, Suite 3626
> Pittsburgh, PA  15219
>
> *Attorneys for Plaintiffs*

Nora Barry Fischer, Esquire
Bryan S. Neft, Esquire

#916831v1
12/14/2005

## Brian Green

**From:** Janice M.. Savinis [jsavinis@sdklaw.com]
**Sent:** Friday, January 27, 2006 3:39 PM
**To:** Nora Fischer
**Cc:** Eric Reif; Brian Green; Jan Bruner; Michael Gallucci; Angela R. Busi
**Subject:** RE: siemon---mcaarty--ge

WELL ON MONDAY I WILL LOOK AT A VIDEO CONFERENCE FACILITY IN CHICAGO AND SCHEDULE 2-28.
I KNOW SHE HAS BEEN DEPOSED BEFORE---ARE YOU GOING TO PRODUCE THE TRANSCRIPTS OR IS
A MOTION NECESSARY?

---

**From:** Nora Fischer [mailto:NBF@pbandg.com]
**Sent:** Friday, January 27, 2006 3:28 PM
**To:** Janice M.. Savinis
**Cc:** Eric Reif; Brian Green
**Subject:** RE: siemon---mcaarty--ge
**Importance:** High

Tim Kapshandy  of Sidley tells me that Marjorie Drucker can tentatively  be available in Chicago on February 28th
and March first depending on two potential trial appearances.    Nora

> -----Original Message-----
> **From:** Janice M.. Savinis [mailto:jsavinis@sdklaw.com]
> **Sent:** Friday, January 27, 2006 1:59 PM
> **To:** Nora Fischer
> **Subject:** siemon---mcaarty--ge
>
> DID GE GIVE YOU DATES FOR THE DEPOSITION?



EXHIBIT

F

1/27/2006

**IN THE COURT OF COMMON PLEAS OF LAWRENCE COUNY, PENNSYLVANIA**

DONALD McCARTY and )   CIVIL
BETTY McCARTY, his wife, )
                                            )
       Plaintiffs, )   NO. 00002 of 2005
                                            )
v. )
                                            )   Code 59
ALLIED GLOVE CORPORATION, et al., )
                                            )
       Defendants. )
                                            )
                                            )
                                            )
                                            )
                                            )
                                            )

## ORDER OF COURT

AND NOW, this ____ day of _____, 2005, upon consideration of the Motion to Strike Plaintiffs' Notices of Deposition and Motion for Protective Order filed on behalf of Defendant General Electric Company, the Motion is **GRANTED**, and it is hereby **ORDERED** that plaintiffs' Notices of Deposition of Paul Banaszewski and Walter Martiny are hereby **STRICKEN** from the record of this matter and Defendant GE, Paul Banaszewski and Walter Martiny are hereby relieved of the obligation to respond to or appear at any deposition in the above-captioned matter.

BY THE COURT:

_____

Judge Dominick Motto

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing **General Electric Company's Motion to Strike Plaintiffs' Notices of Deposition and Motion for a Protective Order** was served upon plaintiffs' counsel by **hand delivery**, addressed as follows, and all other counsel of record were notified of the filing of same, by electronic mail, this _____ day of _____, 2005:

Janice M. Savinis, Esquire
SAVINIS D'AMICO & KANE
Gulf Tower, Suite 3626
Pittsburgh, PA 15219

*Attorney for Plaintiffs*

By:_____
     Nora Barry Fischer, Esquire
     Bryan S. Neft, Esquire
     Brian S. Green, Esquire

*Attorneys for General Electric Company*

#935191

DONALD McCARTY and BETTY McCARTY, his wife,

      Plaintiffs

VS.

ALLIED GLOVE CORPORATION, et al.

      Defendants

IN THE COURT OF COMMON PLEAS

LAWRENCE COUNTY, PENNSYLVANIA

NO. 2 OF 2005, C.A.

### ORDER OF COURT

AND NOW, this 3rd day of March, 2006, after consideration of the Motion of Defendant General Electric to Strike Plaintiffs' Notices of Deposition and Motion for a Protective Order, and after consideration of Plaintiffs' Response to such motion and the Defendant General Electric Company's Reply to Plaintiffs' Response, and after considering the argument of counsel, the Court finds that it is not conclusive that any testimony that could be offered by Paul Banaszewski and Walter Martiny would be irrelevant to the issues in this case. It is therefore ORDERED, ADJUDGED and DECREED that General Electric Company's Motion to Strike Plaintiffs' Notices of Deposition and Motion for a Protective Order is DENIED.

BY THE COURT:

_____
Dominick Motto, P.J.

med

83RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

FILED/ORIGINAL

2006 MAR -6   A 8: 41

HELEN I. MORGAN
PRO AND CLERK

**EXHIBIT**
C

IN THE COURT OF COMMON PLEAS OF LAWRENCE COUNTY,
PENNSYLVANIA

| | |
|---|---|
| DONALD MCCARTY and BETTY MCCARTY, his wife, | CIVIL DIVISION - ASBESTOS |
| Plaintiffs, | NO. 2-05 |
| vs. | **PLAINTIFFS' MOTION TO COMPEL GENERAL ELECTRIC TO PRODUCE DOCUMENTS PRIOR TO THE DEPOSITION OF PAUL BANASZEWSKI** |
| ALLIED GLOVE CORPORATION, et. al., | |
| Defendants. | FILED ON BEHALF OF PLAINTIFFS |

Counsel of Record for This Party:

Janice M. Savinis, Esquire
Pa. I.D. #51943

Michael J. Gallucci. Esquire
Pa. I.D. # 92859

SAVINIS, D'AMICO & KANE, L.L.C.
Suite 3626, Gulf Tower
707 Grant Street
Pittsburgh, PA 15219
(412) 227-6556



EXHIBIT

D

IN THE COURT OF COMMON PLEAS OF LAWRENCE COUNTY,
PENNSYLVANIA

| | |
|---|---|
| DONALD MCCARTY and BETTY MCCARTY, his wife, | CIVIL DIVISION - ASBESTOS |
| Plaintiffs, | NO. 2-05 |
| vs. | |
| ALLIED GLOVE CORPORATION, et. al., | |
| Defendants. | |

## PLAINTIFFS' MOTION TO COMPEL GENERAL ELECTRIC TO PRODUCE DOCUMENTS PRIOR TO THE DEPOSITION OF PAUL BANASZEWSKI

AND NOW come the above named Plaintiffs by and through their attorneys Janice M. Savinis, Esquire and Savinis, D'Amico & Kane, L.L.C. and hereby file the following Motion to Compel General Electric to Produce Documents Prior to the Deposition of Paul Banaszewski:

1. The plaintiffs filed a Complaint on November 29, 2005 contending that plaintiff-husband developed mesothelioma from exposure to the asbestos products manufactured and supplied by the defendants. The plaintiff-husband, Donald McCarty, was deposed and testified to his asbestos exposure at the Bruce Mansfield Power Station in Shippingsport, Pennsylvania.

2. On January 16, 2006, plaintiffs served counsel for General Electric with a Notice of Deposition for Paul Banaszewski. When plaintiffs' counsel requested a General Electric witness regarding turbines, Mr. Banaszewski has always been identified by the defendant as the appropriate witness.

3. On February 3, 2006, General Electric filed a Motion to Strike the Deposition Notice of Paul Banaszewski. Attached to said motion was an affidavit of Mr.

Banaszewski dated January 30, 2006 (See Exhibit A). Mr. Banaszewski's affidavit is based on his review of General Electric documents regarding the Bruce Mansfield Power Station.

4. Plaintiffs filed a Response to said Motion on February 6, 2006. In responding to the Motion, plaintiffs requested that General Electric be compelled to produce all the documents referenced in the affidavit of Mr. Banaszewski (See Exhibit B). Prior to responding to said Motion, the plaintiff made a request for said documents (See Exhibit C).

5. The Court entertained oral argument and on March 3, 2006 entered an Order denying General Electric's Motion to Strike Plaintiffs' Notice of Deposition and compelled the defendant to produce Mr. Banaszewski for a deposition (See Exhibit D).

6. Plaintiffs rescheduled the deposition of Mr. Banaszewski to take place on April 10, 2006; the defendant cancelled the deposition (See Exhibit E). Counsel for General Electric advised plaintiffs' counsel that Mr. Banaszewski would be available for a deposition on April 26, 2006 (See Exhibit F). The defendant was well aware of the plaintiffs' counsel's intention to conduct the deposition of Mr. Banaszewski by videoconference. Plaintiffs' counsel has conducted a deposition of Mr. Banaszewski by videoconference on two other occasions. Counsel for General Electric was with Mr. Banaszewski in Albany, New York and plaintiffs' counsel was in Pittsburgh with the court reporter.

7. General Electric is now not willing to produce Mr. Banaszewski for a deposition unless the court reporter is present with him in Albany, New York, where the witness will attend (See Exhibit G).

8. On April 11, 2006, plaintiffs not only requested the documents that Mr. Banaszewski reviewed in signing his affidavit, but also requested additional documents (See Exhibit H). Plaintiffs' counsel assumed that most of the documents that were requested in the letter had been reviewed by Mr. Banaszewski in preparing his affidavit, based on his prior testimony.

9. Plaintiffs' counsel initially was led to believe that the documents were mailed to her, however, that is not the case. On April 18, 2006, plaintiffs counsel was advised that the requested documents would be made available on the day of Mr. Banaszewski's deposition (See Exhibit I).

WHEREFORE, the Plaintiffs respectfully request that the Court enter an Order compelling General Electric to produce the documents to plaintiff's counsel 48 hours before the deposition of Paul Banaszewski. In addition, plaintiffs request permission to utilize a court reporter in Pennsylvania. At a video-telephone conference, the court reporter will see and hear the witness.

Respectfully Submitted,

Janice M. Savinis, Esquire

**IN THE CIRCUIT COURT OF LAWRENCE COUNTY, PENNSYLVANIA**

| | | |
|---|---|---|
| DONALD McCARTY and | ) | CIVIL DIVISION - ASBESTOS |
| BETTY McCARTY, his wife, | ) | |
| | ) | No. G.D. 2005-00002 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | CIVIL DIVISION - ASBESTOS |
| ALLIED GLOVE CORPORATION, et al., | ) | |
| | ) | No. G.D. 2005-00002 |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

## AFFIDAVIT OF PAUL A. BANASZEWSKI

STATE OF NEW YORK

COUNTY OF SCHENECTADY

      The undersigned, Paul A. Banaszewski, having been duly sworn, deposes and states under oath as follows:

1.    I am over the age of eighteen years; I am competent to testify to the facts set forth herein.

2.    I am currently retired from General Electric Company ("GE"), but continue to consult for GE. For approximately fifteen years prior to retiring in April 2000, I was GE's Manager for Steam Turbine Product Services and provided technical support for all of GE's local offices. My entire career at GE has involved working with steam turbines and their aftermarket servicing.

3.    I am informed that that Donald McCarty and Betty McCarty have filed a lawsuit against a number of defendants, including GE, in which it is claimed that Donald McCarty, a carpenter, may have worked in proximity to GE steam turbines installed at the Bruce Mansfield Power Station in Shippingport, PA from 1973 to 1978.

4.    Steam turbines are complex mechanical devices made of metal. Those who work on them belong to trades that perform mechanical work, such as machinists. Carpenters would have very limited, if any, contact with steam turbines.



5.   I have determined that GE shipped three steam turbines to the Bruce Mansfield Power Station in 1973, 1974, and 1978, serial numbers 170X479, 170X553, and 170X710, respectively.  The GE heat retention material specifications applicable to those three turbines provided that all insulation materials shall be asbestos free.

FURTHER, AFFIANT SAYETH NAUGHT

Paul A. Banaszewski

Sworn and subscribed to

this 30 day of January, 2006.

Notary Public

My Commission Expires:

GLADYS J. COX
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED IN SCHENECTADY COUNTY
NO. 01CO6025489
COMMISSION EXPIRES 5/24/2007

2

## IN THE COURT OF COMMON PLEAS OF LAWRENCE COUNTY, PENNSYLVANIA

DONA LD MCCARTY and BETTY
MCCARTY, his wife,

Plaintiffs,

v.

ALLIED GLOVE CORPORATION, et al.,

Defendants.

CIVIL DIVISION - ASBESTOS

NO. 2-05

**PLAINTIFFS' RESPONSE TO
GENERAL ELECTRIC'S MOTION TO
STRIKE PLAINTIFFS' NOTICES OF
DEPOSITION AND MOTION FOR A
PROTECTIVE ORDER**

FILED ON BEHALF OF PLAINTIFFS

Counsel of Record for This Party:

Janice M. Savinis, Esquire
Pa. I.D. #51943

Michael J. Gallucci, Esquire
Pa. I.D. #92859

SAVINIS, D'AMICO & KANE, L.L.C.
Suite 3626, Gulf Tower
707 Grant Street
Pittsburgh, PA 15219
(412) 227-6556



FILED
FEB - 7 2006
PRO ? CLERK

EXHIBIT
B

IN THE COURT OF COMMON PLEAS OF LAWRENCE COUNTY,
PENNSYLVANIA

DONA LD MCCARTY and BETTY
MCCARTY, his wife,

    Plaintiffs,

    v.

ALLIED GLOVE CORPORATION, et al.,

    Defendants.

CIVIL DIVISION - ASBESTOS

NO. 2-05

**PLAINTIFFS' RESPONSE TO GENERAL ELECTRIC'S MOTION TO
STRIKE PLAINTIFFS' NOTICES OF DEPOSITION AND
MOTION FOR A PROTECTIVE ORDER**

AND NOW comes the above named Plaintiffs by and through their attorneys, Janice M. Savinis, Esquire and Savinis, D'Amico & Kane, L.L.C. The defendant, General Electric Company filed a Motion to Strike Plaintiffs' Notices of Deposition and Motion for a Protective Order. The plaintiffs respond as follows:

1. It is admitted that on November 29, 2005, this matter was initiated by the filing of a Complaint with the Court. It is admitted that Donald McCarty worked as a union carpenter at various worksites between 1950 and 1962 and from 1965 until his retirement in 1989. It is admitted that he worked as a steel worker from 1962 until 1965 at B&W in Beaver Falls, PA. It is admitted that plaintiff worked at the Bruce Mansfield Power Station in Shippingport, PA. Plaintiff worked at Bruce Mansfield as a carpenter from 4/73 to 10/74, 1/77 to 6/77, 7/77 to 8/77 and 11/77 to 11/78 for different employers (See Exhibit #1, Plaintiffs' Answers to Interrogatories). It is admitted that plaintiffs allege that plaintiff-husband developed mesothelioma from his workplace exposure to asbestos.

2. It is admitted that on January 16, 2005, plaintiffs served counsel for General Electric Company (hereinafter "GE") a "Notice of Deposition of Paul Banaszewski." It is admitted that Paul Banaszewski has been offered as a lay witness concerning GE land-based steam turbines. By January 16, 2005, plaintiffs' counsel was well aware of the plaintiff-husband's work history which

included Bruce Mansfield Power Station and J&L Steel Aliquippa, jobsites at which the defendant conceded in the past were GE turbine sites. In Answers to Interrogatories in another asbestos case, the defendant stated that in 1973, 1974 1977, GE sold and/or sent turbines to Bruce Mansfield Power Station, which was owned and/or operated by Penn Power (See Exhibit #2, Interrogatory Answers in Lacki). GE represented that it is possible that the turbines may have been insulated with asbestos (1) thermal insulation, (2) sound deadening materials, (3) gaskets, (4) valve packing and/or (5) seals. GE agreed in said Answers to make records available for inspection if requested. The defendant stated:

> GE's land-based steam turbines are not asbestos or asbestos-containing products as those terms are commonly understood. Rather, they are complex mechanical devices made predominantly of metal. It is possible that portions that portions of some land-based steam turbines may have been insulated with thermal insulation that may have contained some quantity of asbestos during a period of time that may or may not be relevant to this litigation. This thermal insulation material would have been manufactured and installed by others, however, and not by GE. The nature and type of thermal insulation to be applied at any given site typically remained the prerogative of the utility or facility that purchased the turbine(s), and/or its consulting architect-engineers. Some other asbestos-containing material may have been used in connection with certain components of GE's land-based steam turbines during a period of time that may or may not be relevant to this litigation, such as sound deadening materials, gaskets, valve packing, and seals. The sound deadening materials were manufactured and sold by outside vendors, and may or may not have been installed by GE. In some instances, GE land-based steam turbines were shipped with non-friable sound deadening material applied on the inside of the metal lagging. This material may have been contained a small percentage of chrysotile asbestos. This material is referenced in GE's Technical Information Letters TIL 1052-4 and TIL 1052-3 AR1 that were sent to GE Field Offices in 1989 and 1990, for distribution to purchasers of GE's turbines. These material were manufactured by others, and not by GE. Whether asbestos-containing materials were used in such applications, and their type, if any, may, is some instances, be determined from individual records pertaining to a particular site and the steam turbines installed there, to the extent such records are available.
>
> GE's records indicate that it supplied land-based steam turbines to...Pennsylvania Power Company/First Energy Corporation/Pennsylvania Electric's Bruce Mansfield Power Station in Shippingport, PA (1973, 1974 and 1977).
>
> GE states that to the extent that plaintiff claims exposure to asbestos-containing materials in connection with GE land-based steam turbines, GE will make such records available to him at a mutually convenient time and place after collection has been completed, execution of a confidentially agreement and entry of an appropriate protective order, to the extent that such records are

existing, relevant and responsive. Additionally, GE states that there
may be technical records existing, relevant and responsive.
Additionally, GE states that there may be technical drawings and
specifications relating to its land-based steam turbines on
microfiche at GE.

As to J&L Steel Aliquippa, the defendant stated the same in regard to the

introductory paragraph in Answers to Interrogatories (See Exhibit #3,

Interrogatory Answers in Pajak) and conceded that GE had two turbines at said

job site. The defendant stated:

> Further, at some point in time, the manufacturers and installers
> of these other manufacturers' products may have provided warnings or
> other information on or with their insulation products but GE would not
> have been involved in the preparation of such warnings. To the best of
> its knowledge, no warning regarding these other companies' products
> was placed on the metal surfaces of GE's steam turbines. In the 1970s,
> the Turbine Business Operation divisions began recommending to
> its customers that insulation materials applied by others on its land
> turbines be of asbestos-free materials. Answering further, GE is not
> aware of any clinical, epidemiological, toxicological, industrial
> hygiene, medical and/or scientific literature demonstrating that GE's
> land-based steam turbines cause asbestos-related disease.
>
> GE's records indicate that it supplied land-based steam
> turbines to the J&L Steel Plant in Aliquippa, PA in 1922 and 1926.
> However, after reasonable inquiry, GE does not have, and cannot
> readily obtain, existing master turbine files, service records or
> other records, if any, that may contain additional information
> responsive to these discovery requests. Investigation continues.
> GE states that to the extent that plaintiffs claim exposure to asbestos-
> containing materials in connection with GE land-based steam turbines,
> GE will make such records available to her at a mutually convenient
> time and place after collection has been completed, execution of a
> confidentiality agreement and entry of an appropriate protective order
> to the extent that such records are existing, relevant and responsive.
> Additionally, GE states that there may be technical drawings and
> specifications relating to its land-based steam turbines on microfiche at
> GE Power Systems offices in Schenectady and Atlanta, which can be
> made available at these locations upon entry of an appropriate
> protective order.

In the past, when plaintiffs' counsel requested that GE produce the documents

referenced in Answers to Interrogatories for inspection, the defendant cautioned that the

project could take six months to complete and cost up to $64,000. The defendant

responded as follows (See Exhibit #4):

> Any documents relating to this turbine will be organized and
> collected by GE's national counsel, Sidley Austin Brown & Wood, in
> Chicago, IL. Once an appropriate confidentiality agreement has
> been entered, GE will make these file materials available for your
> review in Chicago, IL. Turbine drawings, usually numbering between

thirty thousand (30,000) to fifty thousand (50,000) per unit, are kept at
GE's turbine facility in Schenectady, NY and may be reviewed under
an appropriate confidentiality agreement and with sufficient notice.
You must advise us and Sidley as counsel as to when you would like to
visit the Schenectady, NY facility for such a review. **Drawings must
be handled by a contractor that manages these filed for GE
(Xerox). Xerox will retrieve and duplicate these documents for you
and separately track the charges incurred by you.**

 Please understand the immense number of documents that
may be involved in a single turbine document production. **One unit
may have up to 50,000 drawings, which may take six (6) months
and up to $64,000 in costs to reproduce.** Sufficient scheduling for a
document production is requested, and I ask for your cooperation in
scheduling same.

3. It is denied that plaintiffs unilaterally chose February 17, 2006 for the deposition
of Paul Banaszewski, without any consultation with counsel for GE. Defense
counsel is well aware that plaintiffs' counsel was willing to conduct the
deposition at a convenient time for the witness and lawyers involved.

4. It is neither admitted nor denied that GE records establish that it shipped large-
sized land-based steam turbines to the Bruce Mansfield Power Station in
Shippingport, PA in 1973, 1974 and 1978. It is admitted that in Answers to
Interrogatories GE has stated that it shipped turbines to Bruce Mansfield. It is
neither admitted nor denied that GE heat retention material specifications
applicable to those three turbines provided that "<u>all insulation materials</u>" shall be
asbestos free since said documents have never been produced. As noted above,
when plaintiffs requested turbine documents, the plaintiffs were directed to GE
repositories; documents were never produced unless GE was directed to do so by
the Court (See Exhibit #5). Paul Banaszewski executed an affidavit attached to
GE's motion in which he stated in paragraph #5 the following (See Exhibit #6):

 I have determined that GE shipped three steam turbines to the Bruce
Mansfield Power Station in 1973, 1974 and 1978, serial number
170X479, 170X553 and 170X710, respectively. The GE heat retention
material specifications applicable to those three turbines provided that
all insulation materials shall be asbestos free.

Mr. Banaszewski addressed "insulation" in his affidavit and not sound deadening
material, gaskets, valve packing and seals as outlined by GE in interrogatories.
GE made it a point to distinguish "thermal" insulation for "other types of asbestos
material" that were used on GE turbines. In the past, when a Court compelled GE

to provide "heat retention material" documents (See Exhibit #7) the following statements were set forth in said documents:

> Exceptions to the use of materials other than standard as outlined above must be specifically called for in the turbine contract.  Drawings K9659686 and 687, K-9659689, 90, 91 and 92 show details of application of approved materials.
>
> Use of materials other than those specified in the contract must be approved by the Schenectady turbine marketing section through usual district office channels.
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
> The procurement of insulation for specified turbine components will be the responsibility of the GE District Office, providing that such insulation is called for in the turbine contract.  In the event that the turbine contract specifies materials other than those of our standard drawings, it will be the responsibility of the GE District Office to prepare and submit to the bidder such supplementary specifications as may be required.  Accordingly, any questions pertaining to this insulation should be referred to the responsible GE District Office.

Contrary to GE's representation, GE was responsible for the asbestos insulation installed on the turbines.

5.  It is admitted that on January 16, 2005, plaintiffs served undersigned counsel for GE a "Notice of Deposition of Walter Martiny."  It is neither admitted nor denied that Walter Martiny has been offered as a lay witness concerning GE electric motors (See Exhibit #8).  When plaintiffs requested to depose Mr. Martiny, counsel for GE claimed they were not aware of his whereabouts.  GE was compelled by a Court to produce his last known address and phone number (See Exhibit #9).

6.  It is denied that plaintiffs unilaterally chose February 20, 2006 for the deposition of Walter Martiny, without any consultation with undersigned counsel.  Defense counsel is well aware that plaintiffs' counsel was willing to conduct the deposition at a convenient time for the witness and lawyers involved.

7.  It is admitted that plaintiff-husband was deposed on January 18 and 19, 2006, during which time he offered testimony about the various asbestos-containing products to which he was exposed at different work locations.  It is neither admitted nor denied that he testified that he spent most of his time erecting scaffolding and building forms.  It is denied that throughout two days of testimony, plaintiff-husband did not offer any testimony that he worked on or around any asbestos-containing GE land-based turbines or electric motors.  The

plaintiff testified (See Exhibit #10) that he worked at the Bruce Mansfield Power Station on four occasions and was exposed to asbestos pipecovering, gaskets, blankets and insulated valves and pumps. He testified he was employed:

A. For Foster Wheeler from 4/73 to 10/74 for the construction of Units 1 and 2 (pp. 122-123). During this time period, he built scaffolds and was exposed to asbestos pipecovering, gaskets and valves while laboring near other trades (pp. 123-124). He built scaffolds primarily for boilermakers and had direct exposure to asbestos blankets (vol. 2, pp. 464-465). He was present when Units 1 and 2 went on line (vol 2, p. 463).

B. For Johns-Manville, an insulating contractor, from 1/77 to 6/77 on Unit 1 (p. 130). During this time period, he built scaffolds and was exposed to Johns-Manville pipecovering (pp. 130-131). The tradesmen he worked with insulated a variety of sizes of steam pipes with the Manville asbestos pipecovering (pp. 466-467).

C. For Johns-Manville from 7/77 to 8/77 around the coal crusher building (p. 131). He was exposed to Johns-Manville asbestos pipecovering while building scaffolds for asbestos insulation workers (pp. 131-132). In addition, he labored side by side with other trades including pipefitters and laborers who were "finishing up on Unit 1 and... starting Unit 2... [T]hese units were attached to each other" (p. 468).

D. For Townsend & Bottum (hereinafter T&B), the general contractor, from 11/77 to 11/78 on Unit 1, 2 and 3 performing maintenance (pp. 132-133). During this time period he was exposed to asbestos valves, gaskets and Johns-Manville pipecovering (pp. 133-134).

E. Plaintiff was exposed to asbestos-insulated pumps (pp. 185-186) while laboring near other tradesmen (pp. 416-417).

F. He observed asbestos pipecovering being delivered to Bruce Mansfield (p. 230).

Counsel for General Electric conducted the deposition of Ronald Kennedy in another mesothelioma case. Mr. Kennedy was a life long employee of Pennsylvania Power Company (Penn Power), a wholly owned subsidiary of Ohio Edison Company.

Penn Power operated the Bruce Mansfield Power Station. Mr. Kennedy was present during the construction of Bruce Mansfield as a Penn Power foreman from 1974 to 1978. According to Mr. Kennedy, GE had asbestos blankets on the turbines (See Exhibit #11).

Edward Sweeney testified that he was employed as a steamfitter, beginning his four years apprenticeship in September of 1957 (pp. 9, 16). Mr. Sweeney was employed at the Bruce Mansfield Power Station as a superintendent for T&B on a couple of occasions between 1975 and 1977 (p. 148). He identified T&B as the general contractor during the new construction (p. 149). As the superintendent, he not only supervised the work of steamfitters, he also supervised the work of other trades (p. 149) including boilermakers, ironworkers, carpenters, pipefitters and laborers (pp. 149-150). According to Mr. Sweeney, "there was an extensive amount of piping systems, and most of the systems" were insulated with asbestos pipecovering (p. 149). He also described exposure to asbestos blankets (p. 153) (See Exhibit #12).

Francis J. Sweeney, another lifelong steamfitter, testified (pp. 258-261) he was at Bruce Mansfield for T&B in 1976-1977 during new construction (pp. 314-315); during part of his employment he served as a foreman (p. 316). Mr. Sweeney discussed exposure to asbestos blankets and gaskets (pp. 317-321) (See Exhibit #13)

Lawrence Steigerwald testified on September 29, 1988. Mr. Steigerwald was employed as a local 449 steamfitters and labored at various job sites including Bruce Mansfield. He recalled being at the job site for T&B from:

G. August 3, 1973 to May 27, 1976 (p. 196);

H. June 2, 1976 (p. 201);

I. June 25, 1976 to November 21, 1977 (p. 202); and

J. October 1978 (p. 205).

While Mr. Steigerwald was present, Units 1, 2 and 3 were being constructed. He discussed exposure to asbestos pipecovering, block, blankets, gaskets and valves. He testified (p. 200):

> We did a lot – extreme – a lot of hot welds and stress-relieving on this job. Our main steam pipe had six-and-a-half inch welds. They welded continuously around the clock and they kept heat on it continuously.

And one of my duties, because I was in charge of the hot welding, was to take the heats with a pyrometer. We couldn't go below a certain temperature, we couldn't go above a certain temperature. There were welding inspectors there constantly, quality control people. And after it was all done and it was inspected, we would have to strip it, clean it, and knock the – and grind down the sides, where you kept the piping on, and then you would stress-relieve and depending on the size of the welds, the stress relief might run up to 1,200 degrees and you bring it down 15, 25 degrees an hour. And there were GE turbines and when we tied into the GE equipment, any welding – GE had a person there that would inspect all the welds. He would have to sign off on them besides our quality control and our welding inspectors (See Exhibit #14).

Thomas Conway, a steamfitter since 1954 (pp. 7, 17-18) worked for T&B at Bruce Mansfield in 1975-76 (pp. 160-161) and in 1979 on and around the turbines (p. 196), at which time he was exposed to asbestos pipecovering and gaskets (See Exhibit #15).

David Cole, who was employed as a construction laborer, testified by affidavit that he labored at the Bruce Mansfield Plant on various occasions in the 1970s and was exposed to asbestos insulation including pipecovering, blankets, gaskets, seals and packing (See Exhibit #16, paragraph 3G).

Robert Schaffer, who was employed out of the International Elevator Constructors Union, testified by affidavit that he was present at the Bruce Mansfield Power Station from 1971-73 and was exposed to pipecovering, cement and gaskets (See Exhibit #17, paragraph #12).

From 1976 to 1978, Harvey Means was employed by T&B at Bruce Mansfield. He worked on the piping on the General Electric turbines, at which time he was exposed to asbestos pipecovering and Flexitallic and Garlock asbestos gaskets. He used the Flexitallic gaskets on the high pressure lines (See Exhibit #18, paragraph #19) (Caveat: Flexitallic has conceded in Answers to Interrogatories that it manufactured asbestos-containing spiral wound gaskets from 1972 to 1992. During said time frame, there were no asbestos free Flexitallic spiral wound gaskets. See Exhibit #19). Attached are affidavits of pipefitter, Daniel Bravin, and asbestos

worker/insulator, John Connolly, who also testified to asbestos exposure at Bruce Mansfield Power Station during the relevant time period (See Exhibit #20 and #21).

In GE documents entitled "Technical Information Letter" it is noted that the electrical equipment on defendant's turbines, such as motors and general insulation systems contained asbestos until 1983 (See Exhibit #22). The plaintiff worked at J&L Steel's Aliquippa Plant in the 1950s through the 1970s as a carpenter in various departments including 10inch Round Mill, Blast Furnace and Coke Oven Dept. (See Exhibit #1). Paul Kemp was employed by J&L from 1956 to 1989 in the Coke Oven, Blast Furnace and in the Tube Mills as a machinist; he identified GE asbestos motors at the plant (See Exhibit #23). George Joseph identified General Electric asbestos insulated turbines at J&L Steel Aliquippa (See Exhibit #24).

8. It is denied based on the above referenced testimony and document that plaintiffs have failed to identify asbestos-containing products produced by GE that may have exposed plaintiff-husband to asbestos fibers. Despite the fact that counsel for General Electric participated in the two day deposition of the plaintiff-husband, counsel never asked the plaintiff if he worked near turbines or motors. Mr. McCarty is 79 years old and has been out of the work force for 17 years. At that end of October of 2005, the plaintiff had two cycles of chemotherapy which was discontinued due to poor tolerance. He had to construct a work history from memory. When he was a member of the carpenter's union, the union did not maintain information regarding job sites, only employers. He was employed for years at Bruce Mansfield Power Station, and was present during "new construction" which included the construction of turbines. Each unit consisted of a GE turbine and a Foster Wheeler boiler.

9. It is denied that to date, no record evidence exists that plaintiff-husband ever worked with any alleged asbestos-containing GE products, more specifically, GE land-based steam turbines or electric motors with any asbestos-containing component part and/or insulation.

10. It is denied that under Pennsylvania Rule of Evidence 401, any testimony regarding GE land-based steam turbines or electric motors is not "relevant

evidence" relating to the existence of any facts at issue in the above-captioned matter.

11. It is neither admitted nor denied that General Electric and Paul Banaszewski do not consent to having Mr. Banaszewski's deposition taken in the above-captioned matter.

12. It is neither admitted nor denied that General Electric and Walter Martiny do not consent to having Mr. Martiny's deposition taken in the above-captioned matter.

13. It is denied that plaintiffs' requests for depositions of Paul Banaszewski and Walter Martiny are unreasonable and abusive, as they are not related to any alleged product at issue and such request amounts to a "fishing expedition." The "fishing expedition" is when GE sends an asbestos-harmed plaintiff to review thousands of documents when Mr. Banaszewski can pull the documents and answer relevant questions regarding a specific job site.

14. It is admitted that on December 12, 2005, GE served plaintiffs with four sets of discovery requests, including Requests for Admissions, Product Identification Interrogatories, Expert Interrogatories and Request for Production of Documents. On January 6, 2006, plaintiffs served Plaintiffs' Short Form Interrogatories (See Exhibit #1) which are responsive to the defendant's discovery request in that the plaintiffs provided the following information:

    A. work history of plaintiff-husband;

    B. medical history of plaintiff-husband;

    C. union records;

    D. general background information; and

    E. on February 1, 2006, the plaintiffs served executed authorizations.

15. It is denied that to date, plaintiffs have not responded to GE's discovery requests that were properly served upon them six weeks ago.

16. It is admitted that plaintiffs have served notices of deposition directed to Paul Banaszewski and Walter Martiny and they are insisting on confirming deposition dates based on the testimony of the plaintiff-husband regarding the job sites at which he labored.

17. It is neither admitted nor denied that Pennsylvania Rule of Civil Procedure 4012 states:

> [u]pon motion by a party... and for good cause shown, the court may make any order which justice requires to protect a party or person from unreasonable annoyance, embarrassment, oppression, burden or expense, including one or more of the following:
> (1) that the discovery... shall be prohibited;
>
> ***
> (5) that the scope of discovery... shall be limited.

18. It is respectfully requested that the Court deny the defendant's Motion for a Protective Order and strike "Plaintiffs' Notice of Deposition of Paul Banaszewski" and "Plaintiffs' Notice of Deposition of Walter Martiny." It is also requested that the Court compel GE to produce the documents relevant to said job site.

Respectfully Submitted,

SAVINIS, D'AMICO & KANE, L.L.C.

Janice M. Savinis, Esquire
Attorney for Plaintiffs

# Savinis, D'Amico, & Kane, L.L.C.

**Attorneys At Law**

Janice M. Savinis
Anthony J. D'Amico
John R. Kane
Michael J. Gallucci

February 7, 2006

Brian Green, Esquire
Pietragallo, Bosick & Gordon
The Thirty-Eighth Floor
One Oxford Centre
Pittsburgh, PA 15219

RE:   McCarty v. Allied Glove Corp., et. al.
Lawrence County No. 2-05

Dear Brian,

I received the fax you sent to Jan. Please be advised of the following:

A.  Your office conducted the deposition of Mr. Kennedy just a few months ago and therefore you have both transcripts;

B.  I only have the affidavits of Schaffer, Means, Bravin, Connolly and Kemp; and

C.  George Joseph was never deposed.

I will make the transcripts of Francis Sweeney, Ed Sweeney and Mr. Conway available when you produce the documents Mr. Banasweski reviewed in preparing his affidavit and all of his previous transcripts and affidavits. Please supply in electronic form when available. Please contact me regarding when we can exchange documents.

Very truly yours,

*Janice M. Savinis*

Janice M. Savinis, Esquire

JMS/arb

cc:   Jan Bruner

**EXHIBIT**

C

Telephone: (412) 227-6556
Facsimile: (412) 227-6445
Toll Free: (877) 227-6558
Email Address: sdk@sdklaw.com

Suite 3626, Gulf Tower
707 Grant Street
Pittsburgh, Pennsylvania 15219
Web Address: www.sdklaw.com

DONALD MCCARTY and BETTY            :   IN THE COURT OF COMMON PLEAS
MCCARTY, his wife,
                                    :   LAWRENCE COUNTY, PENNSYLVANIA
        Plaintiffs
                                    :   NO. 2 OF 2005, C.A.
VS.
                                    :
ALLIED GLOVE CORPORATION, et al.    :

        Defendants                  :

## ORDER OF COURT

AND NOW, this 3'd day of March, 2006, after consideration of the Motion of Defendant General Electric to Strike Plaintiffs' Notices of Deposition and Motion for a Protective Order, and after consideration of Plaintiffs' Response to such motion and the Defendant General Electric Company's Reply to Plaintiffs' Response, and after considering the argument of counsel, the Court finds that it is not conclusive that any testimony that could be offered by Paul Banaszewski and Walter Martiny would be irrelevant to the issues in this case.  It is therefore ORDERED, ADJUDGED and DECREED that General Electric Company's Motion to Strike Plaintiffs' Notices of Deposition and Motion for a Protective Order is DENIED.

                        BY THE COURT:


                        _____
                        Dominick Motto, P.J.

med

'83RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

FILED/ORIGINAL

2006 MAR -6  A 8: 41

HELEN I. MORGAN
PRO AND CLERK

EXHIBIT
D

# Savinis, D'Amico, & Kane, L.L.C.

**Attorneys At Law**

Janice M. Savinis
Anthony J. D'Amico
John R. Kane
Michael J. Gallucci

March 31, 2006

Nora Barry Fischer, Esquire
Bryan Neft, Esquire
Pietragallo, Bosick & Gordon
Thirty-Eighth Floor
One Oxford Centre
Pittsburgh, PA 15219

RE:  McCarty (Lawrence County No. 2-05)
     Depositions of GE Witnesses – **CANCELLED** for 4/10 & 4/11/06

Dear Nora and Bryan,

I have no problem rescheduling the depositions, however, keep in mind that under the Case Management Order, I have until May 1, 2006 to complete the depositions. I assume it is not necessary to file a Motion to Compel, and you will see to it that the witnesses are produced before May 1, 2006 or request permission from the Court to go beyond the May 1, 2006 deadline. Please advise.

Very truly yours,

Janice M. Savinis, Esquire

JMS/arb

cc:  All Counsel of Record (w/enclosure)
     John Kane, Esq.
     Mike Gallucci, Esq.
     Jan Bruner



EXHIBIT
E

Telephone: (412) 227-6556
Facsimile: (412) 227-6445
Toll Free: (877) 227-6558
Email Address: sdk@sdklaw.com

Suite 3626, Gulf Tower
707 Grant Street
Pittsburgh, Pennsylvania 15219
Web Address: www.sdklaw.com

**PIETRAGALLO BOSICK & GORDON LLP**
**ATTORNEYS AT LAW**

THE THIRTY-EIGHTH FLOOR
ONE OXFORD CENTRE
PITTSBURGH, PENNSYLVANIA 15219

TELEPHONE NO.: 412-263-2000
FACSIMILE NO.: 412-261-5295

Bryan S. Neft, Esquire
BLMUT-80035

Direct Dial No.: 412-263-4385
E-mail: BSN1@PBandG.com

March 27, 2006

Janice Savinis, Esquire
SAVINIS, D'AMICO & KANE, LLC
Suite 3626, Gulf Tower
707 Grant Street
Pittsburgh, PA 15219

RE:    Donald McCarty and Betty McCarty, his wife v. Allied Glove Corporation, et al.
       G.D. No.: 2005-00002; Lawrence County, PA

Dear Ms. Savinis:

We are in receipt of your Notices of Deposition for Paul Banaszewski and Walter Martini for April 10th and 11th starting at 8:00 a.m. Pursuant to your letter, we are attempting to get dates when the witness are available and will respond to you shortly. At that time, we will also let you know where the depositions will take place.

Should you have any questions, please do not hesitate to contact me.

Very truly yours,

Bryan S. Neft

BSN/chl
cc:    Nora B. Fischer, Esquire

# SCANNED

# PIETRAGALLO BOSICK & GORDON LLP
## ATTORNEYS AT LAW

THE THIRTY-EIGHTH FLOOR
ONE OXFORD CENTRE
PITTSBURGH, PENNSYLVANIA 15219

TELEPHONE NO.: 412-263-2000
FACSIMILE NO.: 412-261-5295

Nora Barry Fischer, Esquire
ELMUT-80035

Direct Dial No.: 412-263-1821
E-mail: NBF@PBandG.com

April 3, 2006

**VIA E-MAIL and U.S. FIRST CLASS MAIL**

Janice Savinis, Esquire
SAVINIS, D'AMICO & KANE, LLC
Suite 3626, Gulf Tower
707 Grant Street
Pittsburgh, PA  15219

RE:   Donald McCarty and Betty McCarty, his wife v. Allied Glove Corporation, et al.
G.D. No.: 2005-00002;  Lawrence County, PA
Depositions of Paul Banszewski and Walter Martiny

Dear Janice:

This letter will confirm my telephone discussion with you on March 31.  General Electric Company will produce Walter Martiny on April 19 and Paul Banszewski on April 26 for deposition. As soon as I have details concerning the location, I will advise as I understand that you would like to set up video conferencing for both of these depositions.

Secondly, this letter will confirm that you and John Kane will go over your file as well as your discovery requests and give me a listing of those documents which you would like to review.  I await receipt of same.

Yours truly,

Nora Barry Fischer

NBF/lak

cc:   Thomas Bickers
        John Heller



EXHIBIT
F

Janice Savinis, Esquire
SAVINIS, D'AMICO & KANE, LLC
April 3, 2006
Page 2


bcc:    Roxanne Samii

# PIETRAGALLO BOSICK & GORDON LLP
## ATTORNEYS AT LAW

THE THIRTY-EIGHTH FLOOR
ONE OXFORD CENTRE
PITTSBURGH, PENNSYLVANIA 15219

TELEPHONE NO.: 412-263-2000
FACSIMILE NO.: 412-261-5295

Direct Dial No.: (412) 263-1821
E-mail: nbf@PBandG.com

(Dictated but not read)

April 14, 2006

VIA E-Mail to jsavinis@sdklaw.com
And Hand Delivery
Janice Savinis, Esquire
Savinis D'Amico & Kane
707 Grant Street, 36th Floor
Pittsburgh, PA  15219

RE:   McCarty v. General Electric Co., Court of Common Pleas of Lawrence
County, Pa. No. 2-2005

Dear Ms. Savinis:

I am writing to confirm our discussions earlier today concerning the depositions of Walt
Martiny and Paul Banaszewski. You are continuing to search for a videoconference center in Ft.
Wayne, Indiana for the deposition of Walt Martiny, and a location for the deposition of Paul
Banaszewski in Albany, New York. You indicated that the first priority would be lining up a
center in Ft. Wayne. Because the videoconferencing center that you use in Pittsburgh is closed
for the holiday, you may not have centers lined up before Monday, April 17. You hoped to
provide the location to Bryan Neft or me on Monday.

You also had indicated that your partner, Tony D'Amico, had proposed that there be two
court reporters transcribing Mr. Martiny's deposition on April 19, and that the parties could have
further discussions concerning which of the two transcripts should be the official transcript. I
indicated that I would report your proposal to our lead trial counsel. I also advised that given the
holiday weekend, I was not sure if I would be able to reach him.

With regard to your requests for documents, I indicated to you that Attorney Tom Bickers
would be handling the document production. I personally do not have any documents to tender to
you. I also indicated that in connection with any document production, we would be forwarding
to you a confidentiality agreement concerning the documents produced. You indicated that you

Document #: 976337 Version:v1



EXHIBIT

G

Janice Savinis, Esquire
April 14, 2006
Page 2

were agreeable to signing a confidentiality agreement, as you had done so many times in the past.

If this is not a correct reflection of our conversations, please advise me immediately.

Very truly yours,

Nora Barry Fischer, Esquire

NBF/

## Janice M.. Savinis

**From:** Nora Fischer [NBF@pbandg.com]
**Sent:** Wednesday, April 12, 2006 9:13 AM
**To:** Janice M.. Savinis
**Subject:** RE: Depositions of Martiny & Banaszewski

Ok - thought so - by the way I like that place. Eamiled Tim and John to get me the places of the witnesses. Nora

> -----Original Message-----
> **From:** Janice M.. Savinis [mailto:jsavinis@sdklaw.com]
> **Sent:** Wednesday, April 12, 2006 9:11 AM
> **To:** Nora Fischer; Angela R. Busi
> **Subject:** RE: Depositions of Martiny & Banaszewski
>
> Yes rodata
>
> ---
>
> **From:** Nora Fischer [mailto:NBF@pbandg.com]
> **Sent:** Wednesday, April 12, 2006 8:58 AM
> **To:** Angela R. Busi
> **Cc:** Janice M.. Savinis
> **Subject:** RE: Depositions of Martiny & Banaszewski
>
> I was waiting for Janice to tell us where she was setting up the video conferencing. Rodata on SS ?  Will get land locations. Nora
>
>> -----Original Message-----
>> **From:** Angela R. Busi [mailto:abusi@sdklaw.com]
>> **Sent:** Wednesday, April 12, 2006 7:20 AM
>> **To:** Nora Fischer
>> **Cc:** Janice M.. Savinis
>> **Subject:** Depositions of Martiny & Banaszewski
>>
>> Ms. Fischer:
>>
>> Could you please let us know where these depositions are going to be held so we can send out a Notice?
>>
>> Thank you,
>> Angie Busi

# Savinis, D'Amico, & Kane, L.L.C.

**Attorneys At Law**

April 11, 2006

Janice M. Savinis
Anthony J. D'Amico
John R. Kane
Michael J. Gallucci

Nora Barry Fischer, Esquire
Pietragallo, Bosick & Gordon
Thirty-Eighth Floor
One Oxford Centre
Pittsburgh, PA 15219

   RE:  McCarty – GE Depositions
       Lawrence County No. 2-05

Dear Nora,

   I will be conducting the Paul Banaszewski deposition and John will be conducting the deposition of Walter Martiny. As you know, the turbines at issue are at the Bruce Mansfield Power Station in Shippingsport and J&L Steel Aliquippa. In regard to the Banaszewski deposition, I would like to review in advance of the deposition the following documents regarding said job sites:

    A. Heat Retention documents and/or Heat Retention Material Reference Notes;
    B. Master Parts Lists;
    C. Contract between the customer and GE;
    D. All drawings referenced in the Heat Retention documents;
    E. Documents Mr. Banaszewski refers to in his affidavit of January 30, 2006 in regard to this case;
    F. The GE Technical Information Letters TIL1052-4, TIL1052-3 ARI that were sent to the GE field offices in 1989 and 1990. Reference is always made to these letters by GE in Answers to Interrogatories.

   John will correspond with you in regard to Mr. Martiny. Certainly, if you have questions or concerns, please contact me.

          Very truly yours,

          Janice M. Savinis, Esquire

JMS/arb
cc: John Kane, Esq.
   Mike Gallucci, Esq.
   Jan Bruner

**EXHIBIT**

H

Telephone: (412) 227-6556
Facsimile: (412) 227-6445
Toll Free: (877) 227-6558
Email Address: sdk@sdklaw.com

Suite 3626, Gulf Tower
707 Grant Street
Pittsburgh, Pennsylvania 15219
Web Address: www.sdklaw.com

## Janice M.. Savinis

**From:** Nora Fischer [NBF@pbandg.com]
**Sent:** Tuesday, April 18, 2006 3:36 PM
**To:** Janice M.. Savinis
**Subject:** RE: McCARTY

I have not seen them as well.  I will check with Tom Bickers who is handling. I understand from when I last talked to him that they may be produced at the deposition with a letter supplementing discovery responses. Nora

-----Original Message-----
**From:** Janice M.. Savinis [mailto:jsavinis@sdklaw.com]
**Sent:** Tuesday, April 18, 2006 2:47 PM
**To:** Nora Fischer
**Cc:** Jan Bruner; John R. Kane; Michael Gallucci
**Subject:** McCARTY

I HAVE NOT RECEIVED THE TURBINE DOCUMENTS FOR THE UPCOMING DEPO. CAN YOU FIND OUT WHEN THEY WERE SENT. THANKS



**EXHIBIT**
I

## Janice M.. Savinis

**From:** Nora Fischer [NBF@pbandg.com]
**Sent:** Tuesday, April 18, 2006 4:26 PM
**To:** Janice M.. Savinis
**Cc:** Jan Bruner; John R. Kane; Michael Gallucci; Tom Bickers (E-mail)
**Subject:** RE: McCARTY

I understand that we are still waiting on the duplication of some documents. Nora

-----Original Message-----
**From:** Janice M.. Savinis [mailto:jsavinis@sdklaw.com]
**Sent:** Tuesday, April 18, 2006 4:13 PM
**To:** Nora Fischer
**Cc:** Jan Bruner; John R. Kane; Michael Gallucci
**Subject:** RE: McCARTY

IF THAT IS THE CASE I AM FILING A MOTION. I CAN NOT LOOK AT DOCUMENTS THE DAY OF THE DEPO. THE WITNESS SIGNED AN AFFIDAVIT STATING HE REVIEWED DOCUMENTS. THIS IS THE FIRST TIME YOU MENTIONED PRODUCING DOCUMENTS THE DAY OF THE DEPO.

**From:** Nora Fischer [mailto:NBF@pbandg.com]
**Sent:** Tuesday, April 18, 2006 3:36 PM
**To:** Janice M.. Savinis
**Subject:** RE: McCARTY

I have not seen them as well.  I will check with Tom Bickers who is handling. I understand from when I last talked to him that they may be produced at the deposition with a letter supplementing discovery responses. Nora

-----Original Message-----
**From:** Janice M.. Savinis [mailto:jsavinis@sdklaw.com]
**Sent:** Tuesday, April 18, 2006 2:47 PM
**To:** Nora Fischer
**Cc:** Jan Bruner; John R. Kane; Michael Gallucci
**Subject:** McCARTY

I HAVE NOT RECEIVED THE TURBINE DOCUMENTS FOR THE UPCOMING DEPO. CAN YOU FIND OUT WHEN THEY WERE SENT. THANKS

## Janice M.. Savinis

**From:** Janice M.. Savinis
**Sent:** Tuesday, April 18, 2006 4:30 PM
**To:** 'Nora Fischer'
**Cc:** Jan Bruner; John R. Kane; Michael Gallucci; Tom Bickers (E-mail)
**Subject:** RE: McCARTY

PLEASE FORWARD TO ME THE DOCUMENTS YOU HAVE.

---

**From:** Nora Fischer [mailto:NBF@pbandg.com]
**Sent:** Tuesday, April 18, 2006 4:26 PM
**To:** Janice M.. Savinis
**Cc:** Jan Bruner; John R. Kane; Michael Gallucci; Tom Bickers (E-mail)
**Subject:** RE: McCARTY

I understand that we are still waiting on the duplication of some documents. Nora

-----Original Message-----
**From:** Janice M.. Savinis [mailto:jsavinis@sdklaw.com]
**Sent:** Tuesday, April 18, 2006 4:13 PM
**To:** Nora Fischer
**Cc:** Jan Bruner; John R. Kane; Michael Gallucci
**Subject:** RE: McCARTY

IF THAT IS THE CASE I AM FILING A MOTION. I CAN NOT LOOK AT DOCUMENTS THE DAY OF THE DEPO.THE WITNESS SIGNED AN AFFIDAVIT STATING HE REVIEWED DOCUMENTS.THIS IS THE FIRST TIME YOU MENTIONED PRODUCING DOCUMENTS THE DAY OF THE DEPO.

---

**From:** Nora Fischer [mailto:NBF@pbandg.com]
**Sent:** Tuesday, April 18, 2006 3:36 PM
**To:** Janice M.. Savinis
**Subject:** RE: McCARTY

I have not seen them as well.  I will check with Tom Bickers who is handling. I understand from when I last talked to him that they may be produced at the deposition with a letter supplementing discovery responses. Nora

-----Original Message-----
**From:** Janice M.. Savinis [mailto:jsavinis@sdklaw.com]
**Sent:** Tuesday, April 18, 2006 2:47 PM
**To:** Nora Fischer
**Cc:** Jan Bruner; John R. Kane; Michael Gallucci
**Subject:** McCARTY

I HAVE NOT RECEIVED THE TURBINE DOCUMENTS FOR THE UPCOMING DEPO. CAN YOU FIND OUT WHEN THEY WERE SENT. THANKS

# Janice M.. Savinis

**From:** Janice M.. Savinis

**Sent:** Tuesday, April 18, 2006 4:41 PM

**To:** 'Nora Fischer'

**Cc:** Jan Bruner; John R. Kane; Michael Gallucci; Tom Bickers (E-mail)

**Subject:** RE: McCARTY

HE WORKS AT A BIG LAWFIRM WITH SUPPORT STAFF THAT CAN FED X THE DOCUMENTS THAT HAVE BEEN PRODUCED.

---

**From:** Nora Fischer [mailto:NBF@pbandg.com]
**Sent:** Tuesday, April 18, 2006 4:39 PM
**To:** Janice M.. Savinis
**Cc:** Jan Bruner; John R. Kane; Michael Gallucci; Tom Bickers (E-mail)
**Subject:** RE: McCARTY

As I advised I have no documents responding to your request. Mr Bickers is handling the document production and he is now en route to Ft Wayne. Nora

-----Original Message-----
**From:** Janice M.. Savinis [mailto:jsavinis@sdklaw.com]
**Sent:** Tuesday, April 18, 2006 4:30 PM
**To:** Nora Fischer
**Cc:** Jan Bruner; John R. Kane; Michael Gallucci; Tom Bickers (E-mail)
**Subject:** RE: McCARTY

PLEASE FORWARD TO ME THE DOCUMENTS YOU HAVE.

---

**From:** Nora Fischer [mailto:NBF@pbandg.com]
**Sent:** Tuesday, April 18, 2006 4:26 PM
**To:** Janice M.. Savinis
**Cc:** Jan Bruner; John R. Kane; Michael Gallucci; Tom Bickers (E-mail)
**Subject:** RE: McCARTY

I understand that we are still waiting on the duplication of some documents. Nora

-----Original Message-----
**From:** Janice M.. Savinis [mailto:jsavinis@sdklaw.com]
**Sent:** Tuesday, April 18, 2006 4:13 PM
**To:** Nora Fischer
**Cc:** Jan Bruner; John R. Kane; Michael Gallucci
**Subject:** RE: McCARTY

IF THAT IS THE CASE I AM FILING A MOTION. I CAN NOT LOOK AT DOCUMENTS THE DAY OF THE DEPO.THE WITNESS SIGNED AN AFFIDAVIT STATING HE REVIEWED DOCUMENTS.THIS IS THE FIRST TIME YOU MENTIONED PRODUCING DOCUMENTS THE DAY OF THE DEPO.

---

**From:** Nora Fischer [mailto:NBF@pbandg.com]
**Sent:** Tuesday, April 18, 2006 3:36 PM
**To:** Janice M.. Savinis

4/19/2006

**Subject:** RE: McCARTY

I have not seen them as well.  I will check with Tom Bickers who is handling. I understand from when I last talked to him that they may be produced at the deposition with a letter supplementing discovery responses. Nora

-----Original Message-----
**From:** Janice M.. Savinis [mailto:jsavinis@sdklaw.com]
**Sent:** Tuesday, April 18, 2006 2:47 PM
**To:** Nora Fischer
**Cc:** Jan Bruner; John R. Kane; Michael Gallucci
**Subject:** McCARTY

I HAVE NOT RECEIVED THE TURBINE DOCUMENTS FOR THE UPCOMING DEPO. CAN YOU FIND OUT WHEN THEY WERE SENT. THANKS

IN THE COURT OF COMMON PLEAS OF LAWRENCE COUNTY,
PENNSYLVANIA

| | |
|---|---|
| DONALD MCCARTY and BETTY MCCARTY, his wife, | CIVIL DIVISION - ASBESTOS |
| Plaintiffs, | NO. 2-05 |
| vs. | |
| ALLIED GLOVE CORPORATION, et. al., | |
| Defendants. | |

### ORDER OF COURT

AND NOW to wit, this _____ day of _____2006, after consideration of Plaintiffs' Motion to Compel General Electric to Produce Documents Prior to the Deposition of Paul Banaszewski, it is hereby ORDERED, ADJUDGED, and DECREED that Plaintiffs' Motion is granted.

By the Court:

_____J.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Motion to Compel General Electric to Produce Documents Prior to the Deposition of Paul Banaszewski was served upon on counsel of record this _____ day of April 2006 via first class mail and/or email.

SAVINIS, D'AMICO & KANE

Attorney for Plaintiff

IN THE COURT OF COMMON PLEAS OF LAWRENCE COUNTY,
PENNSYLVANIA

| | |
|---|---|
| DONALD MCCARTY and BETTY MCCARTY, his wife,<br><br>            Plaintiffs,<br><br>vs.<br><br>ALLIED GLOVE CORPORATION, et. al.,<br><br>            Defendants. | CIVIL DIVISION - ASBESTOS<br><br>NO. 2-05<br><br>**NOTICE OF SERVICE OF PLAINTIFFS' MOTION TO COMPEL GENERAL ELECTRIC TO PRODUCE DOCUMENTS PRIOR TO THE DEPOSITION OF PAUL BANASZEWSKI**<br><br>FILED ON BEHALF OF PLAINTIFFS<br><br>Counsel of Record for This Party:<br><br>Janice M. Savinis, Esquire<br>Pa. I.D. #51943<br><br>Michael J. Gallucci, Esquire<br>Pa. I.D. # 92859<br><br>SAVINIS, D'AMICO & KANE, L.L.C.<br>Suite 3626, Gulf Tower<br>707 Grant Street<br>Pittsburgh, PA 15219<br>(412) 227-6556 |

IN THE COURT OF COMMON PLEAS OF LAWRENCE COUNTY,
PENNSYLVANIA

| | |
|---|---|
| DONALD MCCARTY and BETTY MCCARTY, his wife, | CIVIL DIVISION - ASBESTOS |
| Plaintiffs, | NO. 2-05 |
| vs. | |
| ALLIED GLOVE CORPORATION, et. al., | |
| Defendants. | |

## NOTICE OF SERVICE OF PLAINTIFFS' MOTION TO COMPEL GENERAL ELECTRIC TO PRODUCE DOCUMENTS PRIOR TO THE DEPOSITION OF PAUL BANASZEWSKI

Notice is hereby given that the Plaintiffs, by and through their attorneys, Janice

M. Savinis, Esquire and Savinis, D'Amico & Kane, L.L.C., served Plaintiff's Motion to

Compel General Electric to Produce Documents Prior to the Deposition of Paul

Banaszewski upon their counsel by way of U.S. First Class Mail, postage prepaid, this

_____ day of April, 2006.

Respectfully submitted,

SAVINIS, D'AMICO, & KANE, L.L.C.

By _____
Janice M. Savinis, Esquire
Attorney for Plaintiff

DONALD McCARTY and BETTY McCARTY:    IN THE COURT OF COMMON PLEAS
his wife,

       Plaintiffs

VS.

ALLIED GLOVE CORPORATION, et al.:

       Defendants

:   LAWRENCE COUNTY, PENNSYLVANIA

:   NO. 2 OF 2005, C.A.

## ORDER OF COURT

AND NOW, this 21st day of April, 2006, after a hearing on the Plaintiffs' Motion to Compel General Electric to Produce Documents Prior to the Deposition of Paul Banaszewski, it is ORDERED and DECREED that the Defendant, General Electric, shall produce the requested documents to Plaintiffs' counsel forty-eight (48) hours before the deposition of Paul Banaszewski, and that the deposition of Paul Banaszewski shall take place by video-telephone conference and the Plaintiff is granted leave to utilize a court reporter in Pennsylvania who will be able to see and hear the witness. Other parties who wish to participate in this deposition shall do so by being personally present either at the location of the witness being deposed or at the location of Plaintiffs' counsel, and not by telephone.

            BY THE COURT:

            _____
            Dominick Motto, P.J.

med

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

**EXHIBIT**

**E**

FILED/ORIGINAL

2006 APR 21 P 1: 27

HELEN I. MORGAN
PRO AND CLERK

## Transcript of Paul Banaszewski

Page 1

IN THE COURT OF COMMON PLEAS OF LAWRENCE COUNTY,
PENNSYLVANIA
- - -

DONALD McCARTY and BETTY McCARTY,)
his wife,                         )CIVIL DIVISION
                                  )   ASBESTOS
            Plaintiffs,           )
                                  )No. 2-05
        vs.                       )
                                  )
ALLIED GLOVE CORPORATION, et al.,)
                                  )
            Defendants.           )

- - -

Deposition of PAUL BANASZEWSKI

Wednesday, April 26, 2006

- - -

     The deposition of PAUL BANASZEWSKI, called as a
witness by the Plaintiffs, pursuant to notice and the
Pennsylvania Rules of Civil Procedure pertaining to
the taking of depositions, taken before me, the
undersigned, Terri J. Urbash, a Notary Public in and
for the Commonwealth of Pennsylvania, at Rodata, Inc.,
1207 Muriel Street, Pittsburgh, Pennsylvania,
commencing at 10:02 a.m., the day and date above set
forth.

- - -

NETWORK DEPOSITION SERVICES
2936 MCNEAL ROAD
ALLISON PARK, PENNSYLVANIA  15101
724-443-5730

- - -



Transcript of Paul Banaszewski

1          MS. SAVINIS:  This is going to be the

2     deposition of Paul Banaszewski, a General

3     Electric witness.  Before this deposition begins,

4     I just want to place some preliminary statements

5     on the record.

6          On April 21st, 2006 Judge Dominic Motto,

7     who is presiding over this case, entered an order

8     in which he compelled defendant General Electric

9     to produce all the documents requested within 48

10    hours.  In addition, Judge Motto stated in his

11    order that the court reporter for this deposition

12    could be at the Rodata facility and that the

13    parties were free to conduct the deposition by

14    video teleconference.

15         When I argued plaintiff's motion to

16    compel defendant General Electric to produce the

17    documents, Attorney Bryan Neft was present on

18    behalf of General Electric.  He advised the court

19    at that point in time that General Electric did,

20    in fact, Fed-Ex the records to me.  He did not

21    provide me at that time with the letter of April

22    20th, 2006 prepared by Mr. Bickers.

23         I'm going to have Mr. Bickers April 20th,

24    2006 letter marked as Exhibit A.  It is

25    plaintiff's position that Mr. Bickers failed to

Transcript of Paul Banaszewski

Page 8

1    comply with the Judge's order.  Mr. Bickers in

2    his letter invited me to come to Albany or

3    Schenectady to review documents, which is

4    contrary to the judge's order.

5         Mr. Neft never advised the court that GE

6    was not producing all the documents and clearly

7    at the time of oral argument I was led to believe

8    that I would have all the documents.  It was not

9    until I returned to my office and received a

10   Federal Express package did I realize that

11   Mr. Bickers was not producing all the documents

12   but was inviting me to come to Schenectady or

13   Albany to review documents.

14        With that being said, I'd like the

15   witness to be sworn.

16        MR. NEFT:  I'd like to put a statement on

17   the record.

18        MR. BICKERS:  Before we begin, we likewise

19   have some preliminary objections to put on the

20   record.  I would note on the record that, of

21   course, Judge Motto's order speaks for itself as

22   to what the obligations of the parties are.  I

23   don't believe anywhere he indicated that the

24   production of documents was to be inconsistent

25   with the rules in Pennsylvania, and as my letter

Transcript of Paul Banaszewski

1      A      That's correct.

2      Q      And when you say, just so I understand

3  there is no misinterpretation, when you say they were

4  located here in Pittsburgh, then they were sent to

5  you?

6      A      No, they were located in Pittsburgh and

7  sent to a legal duplicating company to make copies.

8      Q      But they were in Pittsburgh in 2006, these

9  documents?

10     A      Many of them, yes.

11     Q      Okay.  I could go through the answers to

12 interrogatories and make this very long, and I don't

13 want to go that road at this time of the day,

14 Mr. Banaszewski, I can see that big smile on your face

15 and I want you to be a happy witness.

16            General Electric answered interrogatories;

17 okay, in numerous asbestos cases here in Allegheny

18 County and in regard to J&L Steel Aliquippa, I have

19 been given some conflicting information.

20            In McCarty, the case at issue, General

21 Electric indicated that they had steam based turbines

22 at the plant in 1916, 1923, 1926, 1929, and 1943, so

23 that would be five turbines.

24            In another case where the plaintiff only

25 worked at J&L Steel Aliquippa the Pajak case, GE

Transcript of Paul Banaszewski

Page 119

1   answered interrogatories and indicated that they had

2   two turbines at J&L Steel Aliquippa, one in 1922,

3   which has not been identified in McCarty, and one in

4   1926, and so I was somewhat confused by the answer.

5          Then the story gets even a little better

6   because then I spoke with Mr. Bickers and during our

7   telephone conversation he revealed to me that he

8   believes there were seven General Electric turbines at

9   J&L Steel Aliquippa.

10          So I'm going to ask you, based on your

11  review of the documents that you had available, do you

12  have any knowledge how many turbines that GE had at

13  the Aliquippa plant?

14     A     Based on what we have been able to dissect

15  by going through records as they were found, I think

16  that's the sequence that you are referencing, this is

17  a very, very old site, ala the reference to turbines

18  back at the turn of the century, 1910s, 1915s, there

19  may have even been more than seven.  Just as we

20  learned more and more, I think the information was

21  given to you.

22     Q     Okay.

23     A     Or provided, I don't know if it was to

24  you, but, and so in a site like this, and I think

25  we've also determined that some of these might have

Transcript of Paul Banaszewski

Page 120

1    been purchased independently of GE through other

2    parties, we are sharing what we know and I think

3    that's -- you have to accept that that's the status of

4    the knowledge at this time.

5        Q    And based on McCarty interrogatories, the

6    last year referenced is 1943, and do you know if that

7    is the appropriate year that the last turbine was sent

8    or sold to them, '43?

9        A    As I just said, based on what we have been

10   able to put together to this date, that is the best

11   information we have got.  I would not sit here and

12   tell you that that's gospel because we may find that

13   J&L Steel purchased the turbine again through outside

14   sources, or information even from GE could have been

15   lost over the years.  We are giving you the best

16   information we got.

17       Q    Sure.

18       A    We can't give you what we don't have.

19       Q    Sure.  Those J&L Steel Aliquippa documents

20   refer to a Curtis, C-U-R-T-I-S, turbine.  Was somehow

21   Mr. Curtis involved in a patent for GE; do you know?

22       A    Yes, yes, he was.

23       Q    Was it the very first GE turbine?

24       A    No.

25       Q    Okay.

Transcript of Paul Banaszewski

Page 126

1    construction department.  I never heard that word used

2    in relation to a GE department so I would interpret

3    this based on what I know as being the person who was

4    putting that material on, which would be a vendor.

5         Q    You had mentioned when you gave your

6    answer about J&L Steel Aliquippa that, you know, more

7    information has become available regarding what's at

8    J&L Steel Aliquippa and you had noted something to the

9    effect that not all the turbines were a direct sale

10   from GE to J&L, that there was, perhaps, some other

11   entity that sold to J&L a GE turbine or by some other

12   mechanism a GE turbine ended up at J&L Steel

13   Aliquippa; do you remember that?

14        A    Yes, I remember that.

15        Q    And can you tell us what your knowledge is

16   of what entity got a turbine at J&L Steel Aliquippa,

17   if you know, based on your review of the documents?

18        A    Well, it appears that the U.S. Navy post

19   World War II sold some turbines to J&L Steel.

20        Q    Do you know how many?

21        A    I think I have seen reference to numbers

22   like five or six, in that range.

23        Q    Are you telling me five or six to J&L

24   Steel Aliquippa?

25        A    To J&L Steel Aliquippa as they are

Transcript of Paul Banaszewski

Page 127

1    assigned in our -- in the field documents there was a

2    folder that indicated they were going to Aliquippa.

3    Did they go there, I can't determine that because I

4    don't know the numbers of them, it was just a document

5    that said they were going to J&L Steel.

6        Q      Okay.  But where the government, the

7    military, the Navy or some other entity sold it to J&L

8    Steel, how many fall into that category?

9        A      Again, as I said, I think there was

10   reference to numbers like six, seven, some number

11   around that, that we could find documents on.

12       Q      And what type of documents did you have in

13   your possession that showed that it was not a direct

14   sale from GE to J&L?

15       A      It was a document that indicated the

16   purchase was from J&L Steel to the Navy and I don't

17   have that document.

18       Q      But you had it available from the field

19   office?

20       A      Yes.

21       Q      And how, why, how --

22              MR. BICKERS:  It is here if you want us to

23       pull them out and ask questions about them.

24       Q      I just would like to ask you if the

25   purchase was not a direct purchase, because you are

Transcript of Paul Banaszewski

Page 128

1    telling me it was from the Navy to J&L?

2          A     That's correct.

3                MR. BICKERS:  Or more correctly, the Navy

4          purchased the turbines from GE and the turbines

5          later appeared at J&L and we only have evidence

6          at this point that one of those naval turbines

7          was a GE turbine.

8          Q     Fair enough.  In regard to both Bruce

9    Mansfield and J&L Steel Aliquippa, do you know if GE

10   ever went back to perform any work on their turbines?

11         A     I'm sure they did.

12         Q     Are there documents in GE's control that

13   would tell us when GE went back to Bruce Mansfield or

14   to J&L Steel Aliquippa?

15         A     Yeah, there is about 20 boxes here that

16   I'm sure would give you that type of information.

17         Q     Did you look at that information in

18   preparing your affidavit?

19         A     No, I did not.

20         Q     These documents that reference when GE

21   would go back to these two specific sites, what type

22   of document should I ask GE for or how can I classify

23   these documents?

24         A     I don't think you can.  They could be just

25   about anything from memos, letters, virtually all

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plaintiffs' Motion for

Remand was served on all counsel listed on the attached counsel list via electronic mail

or U.S. Mail postage pre-paid this 15 day of June, 2006.


SAVINIS, D'AMICO & KANE, L.L.C.


BY: _____
        /Anthony J. D'Amico, Esquire

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plaintiffs' Motion to

Vacate Conditional Transfer Order to MDL-875 was served on all counsel listed on the

attached counsel list via electronic mail or U.S. Mail postage pre-paid this 30ᵗʰ day of

June, 2006.

SAVINIS, D'AMICO & KANE, L.L.C.

BY: _____
        Michael J. Gallucci, Esquire

## COUNSEL LIST

| Defendant | Counsel of Record |
|---|---|
| Allied Glove Corporation | Stephen R. Mlinac, Esquire<br>Anne L. Wilcox, Esquire<br>Swartz Campbell LLC<br>4750 U.S. Steel Tower<br>600 Grant Street<br>Pittsburgh, Pa 15219 |
| American Optical Corporation | Kathy K. Condo, Esquire<br>Joshua D. Verdi, Esquire<br>Reed Smith, LLP<br>435 Sixth Avenue<br>Pittsburgh, PA 15219 |
| Argo Packing Company | Matthew R. Wimer, Esquire<br>Deborah L. Iannamorelli, Esquire<br>Wimer Law Offices, P.C.<br>655 Allegheny Avenue<br>Oakmont, PA 15139 |
| Atlas Industries, Inc. | Edmund L. Olszewski, Jr., Esquire<br>Kelly Smith Dorencamp, Esquire<br>Dickie, McCamey & Chilcote, P.C.<br>Two PPG Place, Suite 400<br>Pittsburgh, PA 15222-5402 |
| A.W. Chesterton Company | Alba A. Romano, Esquire<br>Patrick R. Riley, Esquire<br>Sibyl McNulty, Esquire<br>Riley, Hewitt & Sweitzer, P.C.<br>650 Washington Road<br>Pittsburgh, PA 15228 |
| Beazer East, Inc., in its own right and as successor to Koppers Company, Inc., and other related companies including Thiem Corporation, Beazer U.S.A., Inc., and Beazer, PLC | Michael Magee, Esquire<br>Robert J. Monahan, Esquire<br>Pietragallo, Bosick & Gordon, LLP<br>38th Floor, One Oxford Centre<br>Pittsburgh, PA 15219 |

| Defendant | Counsel of Record |
|---|---|
| B. M. Kramer & Company, Inc. and B. M. Kramer Associates | Alice S. Johnston, Esquire<br>Mark A. Bartholomaei, Esquire<br>Obermayer Rebmann Maxwell & Hippell LLP<br>One Mellon Center, Suite 5240<br>500 Grant Street<br>Pittsburgh, PA 15219-2502 |
| Cashco, Inc. | Michael A. Kurafth, Esquire<br>Edward A. Miller, Esquire<br>Melissa Dovich Cochran, Esquire<br>Marshall, Dennehey, Warner, Coleman & Goggin, P.C.<br>U.S. Steel Tower, Suite 2900<br>600 Grant Street<br>Pittsburgh, PA 15219 |
| Certainteed Corporation | William D. Hague, Esquire<br>George M. Milanovich, Esquire<br>Wilbraham Lawler & Buba<br>Two Gateway Center, Suite 1725<br>603 Stanwix Street<br>Pittsburgh, PA 15222 |
| Champlain Cable Corporation, as successor-in-interest to Hercules Inc. | Paul K. Vey, Esquire<br>Timothy J. Green, Esquire<br>Pietragallo, Bosick & Gordon, LLP<br>38th Floor, One Oxford Centre<br>Pittsburgh, PA 15219 |
| Copes-Vulcan, Inc. | Vincent R. Scaglione, Jr., Esquire<br>Michael S. Kaczmarek, Esquire<br>Dickie, McCamey & Chilcote, P.C.<br>Two PPG Place, Suite 400<br>Pittsburgh, PA 15222-5402 |
| Coppus Turbines (Tuthill Energy Systems) | Kathy K. Condo, Esquire<br>Joshua Verdi, Esquire<br>Reed Smith, LLP<br>435 Sixth Avenue<br>Pittsburgh, PA 15219 |
| Crane Valve Group | Nicholas P. Vari, Esquire<br>Eric R. Cottle, Esquire<br>Kirkpatrick Lockhart Nicholson Graham, LLP<br>1500 Oliver Building<br>535 Smithfield Street<br>Pittsburgh, PA 15222-2312 |

| Defendant | Counsel of Record |
|-----------|-------------------|
| Dezurik, Inc. | John J. Repcheck, Esquire<br>Joseph L. Orszulak, Esquire<br>Marks, O'Neill, O'Brien & Courtney, P.C.<br>2600 Gulf Tower<br>707 Grant Street<br>Pittsburgh, PA 15219 |
| Dravo Corporation | Stephen R. Mlinac, Esquire<br>Hilary C. Bonenberger, Esquire<br>Swartz Campbell LLC<br>4750 U.S. Steel Tower<br>600 Grant Street<br>Pittsburgh, Pa 15219 |
| Durabla Manufacturing Company, in its own right and as successor to Durabla Canada, Ltd. | David J. Rosenberg, Esquire<br>Weber Gallagher Simpson Stapleton Fires & Newby, LLP<br>Two Gateway Center, Suite 1450<br>603 Stanwix Street<br>Pittsburgh, PA 15222 |
| Durametallic Corporation | John J. Repcheck, Esquire<br>John M. Schollaert, Esquire<br>Marks, O'Neill, O'Brien & Courtney, P.C.<br>2600 Gulf Tower<br>707 Grant Street<br>Pittsburgh, PA 15219 |
| Eaton Corporation, as successor-in-interest to Cutler-Hammer, Inc. | Cy Goldberg, Esquire<br>121 S. Broad Street<br>Suite 1500<br>Philadelphia PA 19107 |
| E. B. Zimmerman Company | John J. Repcheck, Esquire<br>John M. Schollaert, Esquire<br>Marks, O'Neill, O'Brien & Courtney, P.C.<br>2600 Gulf Tower<br>707 Grant Street<br>Pittsburgh, PA 15219 |
| Eichleay Corporation | Daniel E. Krauth, Esquire<br>Zimmer Kunz, PLLC<br>U.S. Steel Tower, Suite 3300<br>600 Grant Street<br>Pittsburgh, PA 15219-2702 |
| Electrolux Home Products | Vincent Scaglione, Jr., Esquire<br>Dickie, McCamey & Chilcote, P.C.<br>Two PPG Place, Suite 400<br>Pittsburgh, PA 15222-5402 |

| Defendant | Counsel of Record |
|---|---|
| Elliott Turbomachinery Company, Inc. | James C. Zeszutek, Esquire<br>Thorp Reed & Armstrong LLP<br>One Oxford Centre, 14th Floor<br>301 Grant Street<br>Pittsburgh PA 15219-1425 |
| Elsa Benson, Inc | Leo Gerard Daley, Esquire<br>Grogan Graffam, P.C.<br>Four Gateway Center<br>12th Floor<br>Pittsburgh, PA 15222 |
| Fabri-Valve, Division of ITT Grinnell Valve Company, Inc. | Robert W. Hastings, Esquire<br>James P. Killeen, Esquire<br>Dickie, McCamey & Chilcote, P.C.<br>Two PPG Place, Suite 400<br>Pittsburgh, PA 15222-5402 |
| Fairmont Supply | Edmund L. Olszewski, Jr., Esquire<br>Kelly Smith Dorencamp, Esquire<br>Dickie, McCamey & Chilcote, P.C.<br>Two PPG Place, Suite 400<br>Pittsburgh, PA 15222-5402 |
| F. B. Wright Company | Leo Gerard Daley, Esquire<br>Grogan Graffam, P.C.<br>Four Gateway Center<br>12th Floor<br>Pittsburgh, PA 15222 |
| Fischer Scientific Company | James V. Corabelli, Esquire<br>Melissa L. Evans, Esquire<br>Babst, Calland, Clements & Zomnir, P.C.<br>Two Gateway Center, 8th Floor<br>603 Stanwix Street<br>Pittsburgh, PA 15222 |
| Foseco, Inc. | Terry A. Schrock, Esquire<br>Maron Pierce, LLC<br>Landmark Building, Suite 1945<br>100 West Station Square Drive<br>Pittsburgh, PA 15219 |
| Foster Wheeler Corporation | Dennis F. Wolford, Esquire<br>Reed, Luce, Tosh, Wolford & Douglass, P.C.<br>804 Turnpike Street<br>Beaver, PA 15009 |
| Garlock, Inc. | Gregory L. Fitzpatrick, Esquire<br>Margolis Edelstein<br>1500 Grant Building<br>310 Grant Street<br>Pittsburgh, PA 15219 |

| Defendant | Counsel of Record |
|---|---|
| Gateway Industrial Supply Company | Dale K. Forsythe, Esquire<br>Scott W. Stephen, Esquire<br>Gregory S. Knight, Esquire<br>Wayman, Irvin & McCauley<br>437 Grant Street<br>1624 Frick Building<br>Pittsburgh, PA 15219 |
| General Electric Company | Nora Barry Fischer, Esquire<br>Bryan S. Neft, Esquire<br>Pietragallo, Bosick & Gordon, LLP<br>38th Floor, One Oxford Centre<br>Pittsburgh, PA 15219<br><br>John A. Heller, Esquire<br>Sidley Austin LLP<br>One South Dearborn Street<br>Chicago, IL 60603<br><br>Thomas A. Bickers, Esquire<br>Paine, Tarwater, Bickers & Tillman, L.L.P<br>1100 First Tennessee Plaza<br>800 South Gay Street<br>Knoxville, Tennessee 37929 |
| George V. Hamilton, Inc. | Concetta A. Silvaggio, Esquire<br>Michael A. Katz, Esquire<br>Willman & Arnold, LLP<br>705 McKnight Park Drive<br>Pittsburgh, Pa 15237 |
| Gould Pumps, Inc. | Leo Gerard Daley, Esquire<br>Michael P. Creedon, Esquire<br>Grogan Graffam, P.C.<br>Four Gateway Center<br>12th Floor<br>Pittsburgh, PA 15222 |
| Greene Tweed & Company | Dennis F. Wolford, Esquire<br>Reed, Luce, Tosh, Wolford & Douglass, P.C.<br>804 Turnpike Street<br>Beaver, PA 15009 |
| Grinnell Corporation | Alexander P. Bicket, Esquire<br>Zimmer Kunz, PLLC<br>U.S. Steel Tower, Suite 3300<br>600 Grant Street<br>Pittsburgh, PA 15219-2702 |

| Defendant | Counsel of Record |
|---|---|
| Hedman Mines, Ltd | Robert N. Spinelli, Esquire<br>Richard L. Walker, II, Esquire<br>Kelley Jasons McGuire & Spinelli<br>Centre Square West, Suite 1500<br>1500 Market Street<br>Philadelphia PA 19102 |
| Honeywell, Inc. | Kenneth S. Mroz, Esquire<br>Swartz Campbell LLC<br>4750 U.S. Steel Tower<br>600 Grant Street<br>Pittsburgh, Pa 15219 |
| Hunter Sales Corporation | Andrew F. Adomitis, Esquire<br>Grogan Graffam, P.C.<br>Four Gateway Center<br>12th Floor<br>Pittsburgh, PA 15222 |
| IMO Industries, Inc., f/k/a IMO Delaval, Inc., f/k/a DeLaval Turbine, Inc., DeLaval Turbine, Inc., DeValco Corporation | Eric K. Falk, Esquire<br>Julie L. Nord, Esquire<br>Brandon D. Coneby, Esquire<br>Davies, McFarland & Carroll, P.C.<br>One Gateway Center, 10th Floor<br>Pittsburgh, PA 15222-1416 |
| Industrial Holdings Corporation, f/k/a Carborundum Company | Robert W. Hastings, Esquire<br>James P. Killeen, Esquire<br>Dickie, McCamey & Chilcote, P.C.<br>Two PPG Place, Suite 400<br>Pittsburgh, PA 15222-5402 |
| Ingersoll-Rand | John F. McCabe, Esquire<br>Marks, O'Neill, O'Brien & Courtney, P.C.<br>Gulf Tower, Suite 2600<br>707 Grant Street<br>Pittsburgh, PA 15219-6101 |
| I.U. North American, Inc., as successor by merger to the Garp Company, formerly known as The Gage Company, formerly known as Pittsburgh Gage and Supply Company | Edward J. Wilbraham, Esquire<br>Jennifer E. Watson, Esquire<br>William D. Hague, Esquire<br>George M. Milanovich, Esquire<br>Wilbraham Lawler & Buba<br>Two Gateway Center, Suite 1725<br>603 Stanwix Street<br>Pittsburgh, PA 15222 |
| J. M. Foster, Inc. | Richard C. Polley, Esquire<br>Shannon B. Noe, Esquire<br>Angela R. Winslow, Esquire<br>Dickie, McCamey & Chilcote, P.C.<br>Two PPG Place, Suite 400<br>Pittsburgh, PA 15222-5402 |

| Defendant | Counsel of Record |
|---|---|
| Kaiser Gypsum Company, INc. | Michael A. Karaffa, Esquire<br>Edward A. Miller, Esquire<br>Marshall, Dennehey, Warner, Coleman & Goggin, P.C.<br>U.S. Steel Tower, Suite 2900<br>600 Grant Street<br>Pittsburgh, PA 15219 |
| Marley Cooling Tower | Matthew A. Wimer, Esquire<br>Deborah L. Iannamorelli, Esquire<br>Wimer Law Offices, P.C.<br>655 Allegheny Avenue<br>Oakmont, PA 15139 |
| McCarls, Inc. | John J. Repcheck, Esquire<br>John M. Schollaert, Esquire<br>Marks, O'Neill, O'Brien & Courtney, P.C.<br>2600 Gulf Tower<br>707 Grant Street<br>Pittsburgh, PA 15219 |
| Melrath Supply and Gasket Company | Patrick T. Finnegan, Esquire<br>Elizabeth W. Downey, Esquire<br>Law Offices of Kevin C. Tierney<br>100 South Broad Street, Suite 1125<br>Philadelphia, PA 19110-1029 |
| Mine Safety Appliance Company | Joslin Gleason, Esquire<br>Davies, McFarland & Carroll, P.C.<br>One Gateway Center, 10th Floor<br>Pittsburgh, PA 15222-1416 |
| Minnotte Contracting Corporation | Joni M. Mangino, Esquire<br>Christopher T. Yoskosky, Esquire<br>Zimmer Kunz, PLLC<br>U.S. Steel Tower, Suite 3300<br>600 Grant Street<br>Pittsburgh, PA 15219-2702 |
| M. S. Jacobs & Associates, Inc. | Alexander P. Bicket, Esquire<br>Zimmer Kunz, PLLC<br>U.S. Steel Tower, Suite 3300<br>600 Grant Street<br>Pittsburgh, PA 15219-2702 |
| Nagle Pumps, Inc. | Richard C. Polley, Esquire<br>Adam J. Warhola, Esquire<br>Dickie, McCamey & Chilcote, P.C.<br>Two PPG Place, Suite 400<br>Pittsburgh, PA 15222-5402 |

| Defendant | Counsel of Record |
|---|---|
| Oglebay Norton Company, and its division Ferro Engineering | Jeanne Welch Sopher, Esquire<br>Heintzman, Warren, Wise & Fornella, P.C.<br>The 35th Floor, Gulf Tower<br>707 Grant Street<br>Pittsburgh, PA 15219-1913 |
| Ohio Lime Corporation* (dismissed 3/2/06) | Kenneth S. Robb, Esquire<br>1080 Long run Road<br>McKeesport, PA 15132 |
| Owens-Illinois, Inc. | Kathy K. Condo, Esquire<br>Joshua D. Verdi, Esquire<br>Reed Smith, LLP<br>435 Sixth Avenue<br>Pittsburgh, PA 15219 |
| Pittsburgh Metals Purifying Company | John J. Delany, Esquire<br>Stephanie M. Pompey, Esquire<br>Delany & O'Brien<br>325 Chestnut Street, Suite 1212<br>Philadelphia, PA 19106 |
| Plotkin Brothers Supply , LLP | Richard C. Polley, Esquire<br>Shannon E. Noe, Esquire<br>Dickie, McCamey & Chilcote, P.C.<br>Two PPG Place, Suite 400<br>Pittsburgh, PA 15222-5402 |
| Power Piping | Anne D. Harman, Esquire<br>Bailey Riley Buch & Harman<br>900 Riley Building<br>P.O. Box 631<br>Wheeling WV 26003 |
| Premier Refractories, Inc., f/k/a Adience, Inc., successor-in-interest to Adience Company, LP, as successor to BMI, Inc. | Concetta A. Silvaggio, Esquire<br>Michael A. Katz, Esquire<br>Willman & Arnold, LLP<br>705 McKnight Park Drive<br>Pittsburgh, Pa 15237 |
| Safety First Industries, Inc., in its own right and as successor-in-interest to Safety-First Supply, Inc. | Joseph R. Schaper, Esquire<br>Heintzman, Warren, Wise & Fornella, P.C.<br>The 35th Floor, Gulf Tower<br>707 Grant Street<br>Pittsburgh, PA 15219-1913 |
| Sealite, Inc. | Anne D. Harman, Esquire<br>Bailey Riley Buch & Harman<br>900 Riley Building<br>P.O. Box 631<br>Wheeling WV 26003 |

| Defendant | Counsel of Record |
|---|---|
| Stockham Valves & Fittings, f/k/a Marlin Valve, Inc. | Concetta A. Silvaggio, Esquire<br>Michael A. Katz, Esquire<br>Willman & Arnold, LLP<br>705 McKnight Park Drive<br>Pittsburgh, Pa 15237 |
| Swindell-Dressler International Company | Robert D. Leidigh, Esquire<br>Grogan Graffam, P.C.<br>Four Gateway Center<br>12th Floor<br>Pittsburgh, PA 15222 |
| Taylored Industries, Inc. | Matthew A. Wimer, Esquire<br>Deborah L. Iannamorelli, Esquire<br>Wimer Law Offices, P.C.<br>655 Alleghany Avenue<br>Oakmont, PA 15139 |
| The Sager Corporation, successor-in-interest to the Sager Glove Corporation | Richard C. Polley, Esquire<br>Shannon B. Noe, Esquire<br>Dickie, McCamey & Chilcote, P.C.<br>Two PPG Place, Suite 400<br>Pittsburgh, PA 15222-5402 |
| Townsend & Bottum, Inc. | Hunter A. McGeary, Esquire<br>Dickie, McCamey & Chilcote, P.C.<br>Two PPG Place, Suite 400<br>Pittsburgh, PA 15222-5402 |
| Treco Construction Services, Inc., f/k/a The Rust Engineering Company | Michael Magee, Esquire<br>Robert J. Monahan, Esquire<br>Pietragallo, Bosick & Gordon, LLP<br>38th Floor, One Oxford Centre<br>Pittsburgh, PA 15219 |
| Thiem Corporation, and its division, Universal Refractories | Michael Magee, Esquire<br>Robert J. Monahan, Esquire<br>Pietragallo, Bosick & Gordon, LLP<br>38th Floor, One Oxford Centre<br>Pittsburgh, PA 15219 |
| Unifrax Corporation, f/k/a Carborundum | Robert W. Hastings, Esquire<br>James P. Killeen, Esquire<br>Dickie, McCamey & Chilcote, P.C.<br>Two PPG Place, Suite 400<br>Pittsburgh, PA 15222-5402 |

| Defendant | Counsel of Record |
|---|---|
| Union Carbide Corporation, its Linde Division | William D. Hague, Esquire<br>Jennifer R. Watson, Esquire<br>George M. Milanovich, Esquire<br>Wilbraham Lawler & Buba<br>Two Gateway Center, Suite 1725<br>603 Stanwix Street<br>Pittsburgh, PA 15222 |
| United Conveyor Corporation | Jeanne Welch Sopher, Esquire<br>Michael D. Heintzman, Esquire<br>Charles S. Warren Esquire<br>Marilyn J. Larrimer, Esquire<br>Heintzman, Warren, Wise & Fornella, P.C.<br>The 35th Floor, Gulf Tower<br>707 Grant Street<br>Pittsburgh, PA 15219-1913 |
| USX Corporation, f/k/a United States Steel Corporation | A. Bradley Cramer, Jr., Esquire<br>United States Steel Corporation<br>600 Grant Street, Room 1880<br>Pittsburgh, PA 15219-4776 |
| Viacom, Inc., successor by merger to CBS Corporation, f/k/a Westinghouse Electric Corporation | Eric L. Horne, Esquire<br>Daniel J. Sinclair, Esquire<br>Eckert Seamans Cherin & Mellott, LLC<br>U.S. Steel Tower, 44th Floor<br>600 Grant Street<br>Pittsburgh, PA 15219 |
| Washington Group International, f/k/a Raytheon Engineers Constructors, Inc., and all its domestic subsidiaries, including the Badger Company, Inc. | Gregory L. Fitzpatrick, Esquire<br>Margolis Edelstein<br>1500 Grant Building<br>310 Grant Street<br>Pittsburgh, PA 15219 |
| Kentile Floors, Inc. (Joined by First Amended Complaint) | Lorrie L. Cherillo, Esquire<br>William J. Donovan, Esquire<br>Burns, White & Hickton<br>Four Northshore Center<br>106 Isabella Street<br>Pittsburgh, PA 15212 |
| Bondex International, Inc. (Joined by First Amended Complaint) | Edward A. Miller, Esquire<br>Melissa Dovich Cochran, Esquire<br>Michael A. Karaffa, Esquire<br>Marshall, Dennehey, Warner, Coleman & Goggin, P.C.<br>U.S. Steel Tower, Suite 2900<br>600 Grant Street<br>Pittsburgh, PA 15219 |

| Defendant | Counsel of Record |
|---|---|
| Georgia-Pacific Corporation (Joined by First Amended Complaint) | Stacey F. Vernallis, Esquire<br>Dana L. Bacsi, Esquire<br>Goehring, Rutter & Boehm<br>1424 Frick Building<br>437 Grant Street<br>Pittsburgh, PA 15219 |
| Sears, Roebuck & Company (Joined by First Amended Complaint) | Eric K. Falk, Esquire<br>Julie L. Nord, Esquire<br>Brandon D. Coneby, Esquire<br>Davies, McFarland & Carroll, P.C.<br>One Gateway Center, 10th Floor<br>Pittsburgh, PA 15222-1416 |
| Goodyear Tire & Rubber Company (Additional Defendant) | William David Geiger, Esquire<br>Davies, McFarland & Carroll, P.C.<br>One Gateway Center, 10th Floor<br>Pittsburgh, PA 15222-1416 |