

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION JUL 2 7 2006

FILED
CLERK'S OFFICE

IN RE: ASBESTOS PRODUCTS
LIABILITY LITIGATION (No. IV)

DOCKET NO. 875

THIS DOCUMENT RELATES TO:                    (CTO-266)

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA

*Ellis Hales v. Garlock Sealing Techs. LLC, et al.* Newport News
Civil Action No.  VAE 4  06-3203

### MOTION TO VACATE
### THE CONDITIONAL TRANSFER ORDER



Plaintiff, pursuant to Rule 12(c) of the Rules of Procedure of the Judicial Panel on

Multidistrict Litigation, moves the Panel to vacate its Order, CTO-266, of July 3, 2006,

conditionally transferring the above-captioned cases to the United States District Court

for the Eastern District of Pennsylvania.  This motion is based on the attached Brief in

Support of Motion to Vacate Conditional Transfer Order, the Plaintiff's Motion for

Remand, filed in the United States District Court for the Eastern District of Virginia, and

attached as Exhibit A to Plaintiff's Brief in Support of Motion to Vacate Conditional

Transfer Order, and such other material as may be presented to the Panel at the time of

the hearing on the motion.

Respectfully submitted,

ELLIS HALES

By Counsel

2006 JUL 26  P 4: 19

RECEIVED
CLERK OF ...

**OFFICIAL FILE COPY**

IMAGED JUL 2 7 2006

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUL 27 2006

FILED
CLERK'S OFFICE

Robert R. Hatten, Esq. (VSB # 12854)
Donald N. Patten, Esq. (VSB # 06869)
Hugh B. McCormick, III, Esq. (VSB # 37513)
William W.C. Harty, Esq. (VSB # 45447)
PATTEN, WORNOM, HATTEN & DIAMONSTEIN, L.C.
12350 Jefferson Avenue, Suite 300
Newport News, VA  23602
757.223.4500  Telephone
757.249.3242  Facsimile

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this Motion to Vacate the

Conditional Transfer Order and the Brief in Support of Motion to Vacate Conditional

Transfer Order has been served via first class mail to all counsel of record in this Action,

and all counsel contained on the Attached Panel service List (Excerpted from CTO-266) on

this _26ᵗʰ_ day of July, 2006.

_____
William W.C. Harty

| | |
|---|---|
| Robert M. Tata, Esq.<br>Wendy C. McGraw, Esq.<br>HUNTON & WILLLIAM, LLP<br>500 East Main Street, Suite 1000<br>Norfolk, VA 23510 | Carl Schwertz, Esq.<br>DUANE HAUCK & GNAPP<br>10 E. Franklin St., 4th Floor<br>Richmond, VA  23219-2106 |
| George Dancigers, Esq.<br>MCKENRY, DANCIGERS,<br>DAWSON & LAKE<br>192 Ballard Court, Suite 400<br>Virginia Beach, VA 23462-6538 | Eric G. Reeves, Esq.<br>Martin Conn, Esq.<br>MORAN KIKER, BROWN, P.C.<br>4110 E. Parham Road, Suite A<br>Richmond, VA  23228 |

RECEIVED
CLERK'S OFFICE
2006 JUL 26  P 4: 20
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

| | |
|---|---|
| John P. Fishwick, Esq.<br>LICHTENSTEIN & FISHWICK, P.C.<br>101 South Jefferson St., Suite 505<br>Roanoke, VA 24011 | Stephen R. Jackson, Esq.<br>WILLCOX & SAVAGE, P.C.<br>1800 Bank of America Center<br>One Commercial Place<br>Norfolk, VA 23510-2197 |
| R. Thomas Radcliffe, Jr., Esq.<br>Steven J. Parrot, Esq.<br>DEHAY & ELLISTON<br>36 S. Charles St., 13th Floor<br>Baltimore, MD 21201 | |

**PANEL SERVICE LIST (Excerpted from CTO-266)**
**DOCKET NO: 875**
**IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)**

*Ellis Edward Hales, Jr. v. Garlock Sealing Technologies, LLC, et al.,* E.D. Virginia,
C.A. No. 4:06-3203

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114

Edward J. Cass
Gallagher, Sharp, Fulton & Norman
Bulkley Building, 7th Floor
1501 Euclid Avenue
Cleveland, OH 44115

Adam M. Chud
Goodwin Procter, LLP
901 New York Avenue, N.W.
Washington, DC 20001

David A. Damico
Burns, White & Hickton, LLC
Four Northshore Center
106 Isabella St.
Pittsburgh, PA 15212

Raymond P. Forceno
Forceno & Hannon
111 S. Independence Mall East
The Bourse, Suite 1000
Philadelphia, PA 19106-2574

Ellen B. Furman
Goldfein & Hosmer
1600 Market Street
33rd Floor
Philadelphia, PA 19103

Richard S. Glasser
Glasser & Glasser, P.L.C.
Crown Center Building
Suite 600
580 East Main Street
Norfolk, VA 23510

Susan M. Hansen
Brownson & Ballou
225 South Sixth Street
Suite 4800
Minneapolis, MN 55402

William W.C. Harty
Patten, Wornom, Hatten & Diamonstein
12350 Jefferson
Suite 360
Newport News, VA 23602

Reginald S. Kramer
Oldham & Dowling
195 South Main Street
Suite 300
Akron, OH 44308-1314

David C. Landin
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Gene Locks
Greitzer & Locks
1500 Walnut Street
Philadelphia, PA 19102

Wendy C. Mcgraw
Hunton & Williams, LLP
500 E Main St
Suite 1000
Norfolk, VA 23510

Ronald L. Motley
Motley Rice, LLC
P.O. Box 1792
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464

John J. Repcheck
Marks, O'Neill, O'Brien & Courtney
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219

John D. Roven
Roven, Kaplan & Wells, L.L.P.
2190 North Loop West
Suite 410
Houston, TX 77018

Richard D. Schuster
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216

Neil Selman
Selman, Breitman & Burgess
11766 Wilshire Boulevard
Sixth Floor
Los Angeles, CA 90025

Robert N. Spinelli
Kelley, Jasons, McGuire & Spinelli
Centre Square West
15th Floor
Philadelphia, PA 19102

Robert E. Swickle
Jaques Admiralty Law Firm, P.C.
1570 Penobscot Building
The Maritime Asbestosis Legal Clinic
Detroit, MI 48226

Robert Martin Tata
Hunton & Williams
500 East Main Street
Suite 1000
Norfolk, VA 23510

Andrew J. Trevelise
Reed Smith, LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

James K. Weston II
Tom Riley Law Firm
4040 First Avenue, N.E.
P.O. Box 998
Cedar Rapids, IA 52406

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

BEFORE  THE  JUDICIAL  PANEL  ON  MULTI DISTRICT  LITIGATION  JUL 2 7 2006

FILED
CLERK'S OFFICE

IN RE: ASBESTOS PRODUCTS                             DOCKET NO. 875
LIABILITY LITIGATION (No. IV)

THIS DOCUMENT RELATES TO:                           (CTO-266)

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA

*Ellis Hales v. Garlock Sealing Techs., LLC*, et al., Newport News
Civil Action No.  VAE 4  06-3203

## BRIEF IN SUPPORT OF MOTION TO VACATE
## CONDITIONAL TRANSFER ORDER

Plaintiff respectfully files this Brief in Support of his Motion to Vacate the Conditional

Transfer Order (CTO-266) filed by the Judicial Panel on Multidistrict Litigation on July 3, 2006 to

the extent  that it conditionally transfers the above-styled action from the United States District

Court for the Eastern District of Virginia.  Pursuant to Panel Rules 5.12(a), 5.13 and 7.4(d), this

Brief in Support of the Motion to Vacate the Conditional Transfer Order is being filed  in support

to the Plaintiff's Notice of Opposition that was filed on July 13, 2006.

## INTRODUCTION AND FACTUAL BACKGROUND

Plaintiff seeks compensation for injuries caused by exposure to asbestos. Plaintiff  was

exposed to asbestos on multiple occasions at American Tobacco company while working with and

around asbestos products manufactured by the defendants.

On March 13, 2006, the Plaintiff  filed a Complaint in the Circuit Court  for the City of

Newport News, alleging that the Defendants were negligent under Virginia law for failing to warn

the Plaintiff of the latent dangers associated with and around asbestos-containing products.

manufactured or supplied by the Defendants. Due to Hales' terminal diagnosis and failing

condition, the Plaintiff scheduled an early video *de bene esse* deposition to preserve his testimony.

The defendants asked for a discovery deposition preceding the *de bene esse* deposition. The

discovery deposition occurred on May 2, 2006 and the *de bene esse* deposition occurred on May 5,

2006.

On May 26, 2006, one Defendant, Warren Pumps, filed a notice of removal to the United

States District Court for the Eastern District of Virginia. In its notice of removal, Warren Pumps

claimed that the Plaintiff fraudulently joined another defendant, Waco, Inc., to defeat diversity

jurisdiction and that, without the presence of Waco, diversity existed under 28 U.S.C. §1332(a)(1).

The Plaintiff timely filed a motion for remand asserting the lack of subject matter jurisdiction, and

arguing that Plaintiff had identified Waco, Inc. as a company that installed and replaced asbestos-

containing pipecovering at American Tobacco, that Plaintiff reasonably believed that Waco also

supplied asbestos-containing products to American Tobacco, and that Plaintiff's attorneys had

recovered substantial damages from Waco during more than 20 years of litigation in cases that

were substantially similar to this action. The Plaintiff's Motion for Remand and Brief in Support

Thereof are attached hereto as Exhibit A. The remand motion is currently pending before Judge

Jerome Friedman, has been fully briefed by both sides and should be decided shortly by the Court.

## **ARGUMENT**

The issue of federal jurisdiction should be decided by the District Court in Newport News.

Despite the fact that the Panel entered its Conditional Transfer Order *before* the District Court

Judge was able to rule on the motion, that judge has not lost jurisdiction over this case and,

therefore, *can* make a determination as to the Plaintiff's Motion for Remand. *Faulk v. Owens-*

*Corning Fiberglas Corp.*, 48 F.Supp.2d 653, 657 (E.D. Tex. 1999); *See* Panel Rule 1.5, 181 FRD

1, 3 (1998); *see also Bartley v. Borden, Inc.*, 1996 WL 68482 (E.D. La. 1996)(citing Panel Rule 18

which states that the pendency of a conditional transfer order "does not affect or suspend orders

and pretrial proceedings in the district court in which the action is pending and does not in any way

limit the pretrial jurisdiction of that court" within the prescribed 15 day period).  MCL 4[th]

§ 20.131, at 220 (2004)

      In the case at bar, Plaintiff filed his Notice of Opposition within the prescribed fifteen-day

period.  Therefore, transmittal of the CTO was stayed until further action by the Panel.  Since the

case has not been finally transferred, but only "provisionally" transferred, pending a final decision

on transfer, it is still technically pending in the original district court to which it was removed.

Since the issue regarding the remand of this case has been fully briefed and submitted to Judge

Friedman, judicial economy would dictate that he be allowed to rule on the motion before these

matters are transferred to a different district court.

      Plaintiff opposes the conditional transfer because he firmly believes that there is no federal

jurisdiction over this case.  As the case currently stands, complete diversity does not exist due to

the presence of a Virginia defendant — Waco, Inc.  Contrary to Warren Pumps' allegations, the

Plaintiff did not fraudulently join Waco.  The Plaintiff positively identified Waco as one of the

contractors that installed asbestos thermal insulation at American Tobacco, where the Plaintiff

worked for over ten years.  He reasonably believes that Waco also supplied other asbestos-

containing products to American Tobacco that the Plaintiff used in the normal course of his

employment.  Though the other defendants (other than Waco) have consented to removal, not a

single defendant has joined or adopted Warren Pumps' removal notice.

Plaintiff attaches hereto as Exhibit A, a copy of his Motion for Remand and Brief in Support Thereof that was filed in the Eastern District of Virginia.  The Court in Newport News has received briefs from all of the parties to this issue and the matter is ripe for decision by that Court.

## CONCLUSION

Subject matter jurisdiction is lacking because of Warren Pumps' failure to prove that the Plaintiff fraudulently joined Waco, Inc.  This issue has been fully briefed and ripe for resolution by Judge Friedman.  Accordingly, the Panel should vacate the Conditional Transfer Order entered in this case.

WHEREFORE, Plaintiff respectfully request that the Conditional Transfer Order be vacated.

Respectfully submitted,

ELLIS HALES

By Counsel

Robert R. Hatten, Esq. (VSB # 12854)
Donald N. Patten, Esq. (VSB # 06869)
Hugh B. McCormick, III, Esq. (VSB # 37513)
William W.C. Harty, Esq. (VSB # 45447)
PATTEN, WORNOM, HATTEN & DIAMONSTEIN, L.C.
12350 Jefferson Avenue, Suite 300
Newport News, VA 23602
757.223.4500 Telephone
757.249.3242 Facsimile

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

## CERTIFICATE OF SERVICE

JUL 27 2006

FILED
CLERK'S OFFICE

I hereby certify that a true and correct copy of this Motion to Vacate the Conditional

Transfer Order and the Brief in Support of Motion to Vacate Conditional Transfer Order has been

served via first class mail to all counsel of record in this Action, and all counsel contained on the

Attached Panel service List (Excerpted from CTO-266) on this 26th day of July, 2006.

_____
William W.C. Harty

| | |
|---|---|
| Robert M. Tata, Esq.<br>Wendy C. McGraw, Esq.<br>HUNTON & WILLLIAM, LLP<br>500 East Main Street, Suite 1000<br>Norfolk, VA 23510 | Carl Schwertz, Esq.<br>DUANE HAUCK & GNAPP<br>10 E. Franklin St., 4th Floor<br>Richmond, VA 23219-2106 |
| George Dancigers, Esq.<br>MCKENRY, DANCIGERS,<br>DAWSON & LAKE<br>192 Ballard Court, Suite 400<br>Virginia Beach, VA 23462-6538 | Eric G. Reeves, Esq.<br>Martin Conn, Esq.<br>MORAN KIKER, BROWN, P.C.<br>4110 E. Parham Road, Suite A<br>Richmond, VA 23228 |
| John P. Fishwick, Esq.<br>LICHTENSTEIN & FISHWICK, P.C.<br>101 South Jefferson St., Suite 505<br>Roanoke, VA 24011 | Stephen R. Jackson, Esq.<br>WILLCOX & SAVAGE, P.C.<br>1800 Bank of America Center<br>One Commercial Place<br>Norfolk, VA 23510-2197 |
| R. Thomas Radcliffe, Jr., Esq.<br>Steven J. Parrot, Esq.<br>DEHAY & ELLISTON<br>36 S. Charles St., 13th Floor<br>Baltimore, MD 21201 | |

2006 JUL 26 P 4: 20
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION
FILED
CLERK'S OFFICE

**PANEL SERVICE LIST (Excerpted from CTO-266)**
**DOCKET NO: 875**
**IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)**

*Ellis Edward Hales, Jr. v. Garlock Sealing Technologies, LLC, et al.,* E.D. Virginia,
C.A. No. 4:06-3203

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114

Edward J. Cass
Gallagher, Sharp, Fulton & Norman
Bulkley Building, 7th Floor
1501 Euclid Avenue
Cleveland, OH 44115

Adam M. Chud
Goodwin Procter, LLP
901 New York Avenue, N.W.
Washington, DC 20001

David A. Damico
Burns, White & Hickton, LLC
Four Northshore Center
106 Isabella St.
Pittsburgh, PA 15212

Raymond P. Forceno
Forceno & Hannon
111 S. Independence Mall East
The Bourse, Suite 1000
Philadelphia, PA 19106-2574

Ellen B. Furman
Goldfein & Hosmer
1600 Market Street
33rd Floor
Philadelphia, PA 19103

Richard S. Glasser
Glasser & Glasser, P.L.C.
Crown Center Building
Suite 600
580 East Main Street
Norfolk, VA 23510

Susan M. Hansen
Brownson & Ballou
225 South Sixth Street
Suite 4800
Minneapolis, MN 55402

William W.C. Harty
Patten, Wornom, Hatten & Diamonstein
12350 Jefferson
Suite 360
Newport News, VA 23602

Reginald S. Kramer
Oldham & Dowling
195 South Main Street
Suite 300
Akron, OH 44308-1314

David C. Landin
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Gene Locks
Greitzer & Locks
1500 Walnut Street
Philadelphia, PA 19102

Wendy C. Mcgraw
Hunton & Williams, LLP
500 E Main St
Suite 1000
Norfolk, VA 23510

Ronald L. Motley
Motley Rice, LLC
P.O. Box 1792
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464

John J. Repcheck
Marks, O'Neill, O'Brien & Courtney
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219

John D. Roven
Roven, Kaplan & Wells, L.L.P.
2190 North Loop West
Suite 410
Houston, TX 77018

Richard D. Schuster
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216

Neil Selman
Selman, Breitman & Burgess
11766 Wilshire Boulevard
Sixth Floor
Los Angeles, CA 90025

Robert N. Spinelli
Kelley, Jasons, McGuire & Spinelli
Centre Square West
15th Floor
Philadelphia, PA 19102

Robert E. Swickle
Jaques Admiralty Law Firm, P.C.
1570 Penobscot Building
The Maritime Asbestosis Legal Clinic
Detroit, MI 48226

Robert Martin Tata
Hunton & Williams
500 East Main Street
Suite 1000
Norfolk, VA 23510

Andrew J. Trevelise
Reed Smith, LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

James K. Weston II
Tom Riley Law Firm
4040 First Avenue, N.E.
P.O. Box 998
Cedar Rapids, IA 52406

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

ELLIS E. HALES, JR.,                              )
                                                  )
         Plaintiff,                               )
                                                  )
v.                                                )     Civil Action No.: 4:06CV3203
                                                  )
GARLOCK SEALING TECHNOLOGIES                      )
LLC, et al.,                                      )
                                                  )
         Defendants.                              )
                                                  )

## MOTION FOR REMAND AND MEMORANDUM IN SUPPORT THEREOF

NOW COMES the Plaintiff, Ellis E. Hales, Jr., by counsel, and moves this Honorable

Court pursuant to 28 U.S.C. §§ 1441 and 1447 to remand this case to the Circuit Court for the

City of Newport News, Virginia, where it rightly belongs and to award the Plaintiff his

reasonable costs and attorneys fees incurred in bringing this remand motion.  In support of this

motion for remand, the Plaintiff would show this Court as follows:

### SUMMARY

This case was filed in Newport News Circuit Court three months ago.  It arises under

Virginia common and statutory law and states claims for negligence, breach of implied warranty,

and common law conspiracy.  No substantial discovery has occurred.  The Plaintiff was deposed

early to preserve his testimony because he is terminally ill with mesothelioma.

Based on this sparse record, Warren Pumps removed the case to this Court on May

26, 2006 and accused the Plaintiff of fraudulently joining Waco, Inc., a Virginia defendant, solely

for the purpose of destroying diversity.  Warren Pumps bases this allegation on two

unsubstantiated assumptions: (1) Warren Pumps speculates, without any supporting evidence,


PLAINTIFF'S
EXHIBIT
A

that the Plaintiff's attorneys have "named Waco in other lawsuits, and has frequently dismissed them a little over a year after filing," *Notice of Removal*, at 6 n. 3, and (2) Warren Pumps contends that the Plaintiff has no claim against Waco in this case or, even if he does, Plaintiff does not intend to pursue damages against Waco.  Warren Pumps is wrong on both counts.

First, plaintiffs represented by Patten, Wornom, Hatten & Diamonstein (PWHD) have been naming Waco as a defendant in suits in state and federal court for almost 30 years and they have recovered substantial sums from Waco during this time.  A review of the 619 cases brought against Waco since 2000 reveals that only twenty (3.23 %) were nonsuited.  Of those nonsuited, eight (40 %) were nonsuited less than a year after the suit was filed.  Another eight (40%) were nonsuited well over a year and a half after the suit was filed.  *See Case Information Sheet Relating to Waco, Inc.*, and *List of Nonsuits and Dates* (attached as Exhibit A).  In short, Warren Pumps' unfounded allegation that PWHD "has frequently dismissed [Waco] a little over a year after filing" the lawsuit is gravely inaccurate.

Second, the Plaintiff's claims against Waco in this case were brought in good faith and with the full expectation of recovering damages from Waco.  Though this case was only initiated three months ago and the bulk of discovery remains to be conducted, the Plaintiff has substantial evidence that the Plaintiff's employer, American Tobacco, contracted with Waco from the mid-1960s to at least the end of the 1970s to install, replace or repair asbestos pipe insulation on high temperature steam pipes in the Plaintiff's work areas.  The Plaintiff also has substantial scientific and medical evidence that it was probable for fibers released from Waco's contracting activities to make their way into Hales' breathing zone and then be inhaled by him.  Additionally, the Plaintiff reasonably believes that, as a distributor, Waco supplied asbestos products to American Tobacco that the Plaintiff subsequently used in the course of his normal job duties as a

2

millwright.  Throughout this time, Waco knew or had reason to know that the asbestos products it supplied and used at American Tobacco were unreasonably dangerous.  Waco, however, never warned Hales of this danger.

Finally, as the removing party, Warren Pumps, LLC bears the burden of proving that removal is proper.  Yet Warren Pumps admits it "lacks sufficient information" to support its allegations that the Plaintiff's claim constitutes fraudulent joinder and it states that it "may seek leave of Court to take discovery" on these issues.  *Id.*  Warren Pumps cannot remove this case on base conjecture.  And it has failed to prove that the Plaintiff has fraudulently joined Waco in this suit.

## CONCISE STATEMENT OF THE FACTS

The Plaintiff, Ellis Hales, was employed by American Tobacco Company at its "Bermuda Hundred" plant from 1966 to 1982.  He started as a loading dock worker in 1966.  From late 1966 to 1976, Hales worked as a machine operator helper in the processing plant.  In this role, Hales was daily working in close proximity to a paper machine that was powered by high pressure steam pipes — insulated with asbestos — that fed into, and powered, the machines Hales was operating.  From 1976 to 1982, Hales worked in the maintenance department as a millwright where, he testified, 50% of his work involved packing valves and pumps with asbestos packing material, or replacing asbestos gaskets on flanges.

The American Tobacco Company Bermuda Hundred plant routinely shutdown twice a year for approximately ten days in July and December to perform major maintenance and overhauls on the plant's machinery and systems.  *See May 2 Deposition*, at 47-48 (excerpt attached as Exhibit B); *Affidavit of Co-Worker Herman Smith, Jr.*, at ¶ 5 (attached as Exhibit C).  During these shutdowns, the machine operators took vacation time.  *May 2 Deposition*, at 48

3

(excerpt attached as Exhibit B).  The maintenance workers and new hires, however, worked 12 hour shifts during these periods repairing or overhauling pumps, machines and other equipment. Hales worked two shutdowns in 1966 as a new hire, and he worked every shutdown from 1976 to 1982 as a millwright.  *May 2 Deposition*, at 47-48 (excerpt attached as Exhibit B).

During these shutdowns the plant routinely brought in outside contractors to install, repair or replace asbestos thermal insulation on high temperature, high pressure steam pipes located throughout the plant.  Waco is an insulation contractor and a product distributor. *See Sept. 28, 1977 Deposition of David W. Helfrich, Vice President of Waco*, at 9 (excerpts attached as Exhibit D).  Throughout the 1960s and 1970s, industrial plants, including American Tobacco's Bermuda Hundred plant, routinely hired Waco to install or repair, and later to abate, asbestos containing insulation in industrial plants and large commercial buildings.  *Id.*; *May 2 Deposition*, at 211 (excerpt attached as Exhibit B); *Affidavit of Co-Worker Herman Smith, Jr.*, at ¶¶ 5, 6 (attached as Exhibit C).   Hales and his coworkers identify Waco as one of the primary insulation contractors brought in during the Bermuda Hundred plant shutdowns.  *May 2 Deposition*, at 211 (excerpt attached as Exhibit B); *May 5 Deposition*, at 55 (excerpt attached as Exhibit K); *Affidavit of Co-Worker Herman Smith, Jr.*, at ¶¶ 5, 6 (attached as Exhibit C).

Though the maintenance workers and new hires did not work directly with the asbestos thermal pipe insulation or the Waco crews, they were in the general vicinity working on other projects. *See May 2 Deposition*, at 48-49(excerpt attached as Exhibit B); *Affidavit of Co-Worker Herman Smith, Jr.*, at ¶ 6 (attached as Exhibit C).  It was very dusty work and the American Tobacco workers "were all unprotected and exposed to the dust until the 1980s when the outside contractors, including Waco, began to drape off areas where they were working with sheets of poly to separate the [American Tobacco] workers from the work they were doing." *Affidavit of*

4

*Co-Worker Herman Smith, Jr.*, at ¶ 6 (attached as Exhibit C); *see also May 2 Deposition*, at 113-114 (excerpt attached as Exhibit B).  As soon as the Waco crew finished their insulation work, the maintenance workers entered the Waco work areas to perform maintenance tasks in those areas.  *Affidavit of Co-Worker Herman Smith, Jr.*, at ¶ 6 (attached as Exhibit C); *see also May 2 Deposition*, at 212 (excerpt attached as Exhibit B).  After the maintenance shutdown ended, the machine operators returned to work and operated machines powered by steam lines whose insulation had just been repaired or replaced by the Waco crews.  When the machines were started, they often shook and vibrated "violently" due to "hot steam flowing into the cold pipes." *Affidavit of Co-Worker Herman Smith, Jr.*, at ¶ 6 (attached as Exhibit C); *see also May 2 Deposition*, at  86 (excerpt attached as Exhibit B).

Hales worked during two plant maintenance shutdowns as a new hire in 1966.  *May 2 Deposition*, at 47 (excerpt attached as Exhibit B).  He did not work during shutdowns from 1967 to 1976 but, between shutdowns, worked in close proximity to pipes on which asbestos insulation had been repaired or replaced.  *May 5 Deposition*, at 53 (excerpt attached as Exhibit K).  Then, after becoming a millwright in the maintenance department, Hales worked during every plant shutdown from 1976 until he left in 1982.  *May 2 Deposition*, at 48 (excerpt attached as Exhibit B).

As a millwright, Hales performed mechanical repairs to the plant's machinery systems.  *May 2 Deposition*, at 52 (excerpt attached as Exhibit B).  He testified that he regularly used asbestos containing gaskets and packing materials to seal flanges, valves, and pumps on these machinery systems.  *May 2 Deposition*, at 164-165.  He also testified that he worked throughout the plant, including in the boiler room.  *May 5 Deposition*, at 78 (excerpt attached as Exhibit K); *May 2 Deposition*, at 110.

In July 2005, Hales was diagnosed with mesothelioma. "Mesothelioma is 'a signal tumor' for asbestos exposure, and there is 'virtually no other cause of mesothelioma.'" *Garlock Sealing Techs., LLC v. Little*, 620 S.E.2d 773, 775 (Va. 2005). His doctor predicted that he had two to nine months to live. *May 5 Deposition*, at 64 (excerpt attached as Exhibit K). He filed suit in Newport News Circuit Court in March 2006 against a number of manufacturers and suppliers of asbestos containing products, including Warren Pumps and Waco. *See Complaint Attached as Exhibit 1 to Warren Pumps' Notice of Removal*. Due to Hales' terminal diagnosis and failing condition, the Plaintiff pushed for an early video *de bene esse* deposition to preserve his testimony. The defendants asked for a discovery deposition preceding the *de bene esse* deposition. The discovery deposition occurred on May 2, 2006 and the *de bene esse* deposition occurred on May 5, 2006. On May 26, 2006, Warren Pumps removed Hales' case to this Court alleging that the Plaintiff fraudulently joined Waco as a defendant solely to defeat diversity jurisdiction. Because Waco was not fraudulently joined and this Court, therefore, lacks subject matter jurisdiction, the Plaintiff now moves this Court to remand the case to Newport News Circuit Court where it rightly belongs.

## ANALYSIS

"The burden of establishing federal jurisdiction is placed upon the party seeking removal." *Mulcahey v. Columbia Organic Chems. Co.*, Inc., 29 F.3d 148, 151 (4th Cir. 1994). This Court is "obliged to construe removal jurisdiction strictly because of the 'significant federalism concerns' implicated," *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 816 (4th Cir. 2004), and "if federal jurisdiction is doubtful, a remand is necessary," *Mulcahey*, 29 F.3d at 151.

Title 28 U.S.C. § 1332 grants federal courts jurisdiction over matters involving parties that are of completely diverse citizenship. This means that "none of the plaintiffs may share

6

citizenship with any of the defendants." *Owens-Illinois, Inc. v. Meade*, 186 F.3d 435, 440 (4th Cir. 1999). "The presence of the nondiverse party automatically destroys original jurisdiction: No party need assert the defect. No party can waive the defect, or consent to jurisdiction." *Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381, 389 (1998). In addition to the complete diversity requirement, when a case was originally brought in state court, the removal statute imposes the additional requirement that "none of the parties in interest properly joined and served as defendants" may be "a citizen of the State in which such action is brought." 28 U.S.C. § 1441 (b). This case fails both requirements: (1) The Plaintiff and one defendant, Waco, are both citizens of the Commonwealth of Virginia and, thus, are nondiverse; and (2) Waco is a resident of Virginia, the State in which the action was brought.

To circumvent this jurisdictional wall, Warren Pumps alleges that the Plaintiff has fraudulently joined Waco. "The party alleging fraudulent joinder bears a heavy burden — it must show that the plaintiff cannot establish a claim even after resolving all issues of law and fact in the plaintiff's favor." *Marshall v. Manville Sales Corp.*, 6 F.3d 229, 232-33 (4th Cir. 1993). When determining "whether an attempted joinder is fraudulent, the Court is not bound by the allegations of the pleadings, but may instead 'consider the entire record, and determine the basis of joinder by any means available.'" *AIDS Counseling & Testing Centers v. Group W Television, Inc.*, 903 F.2d 1000, 1004 (4th Cir. 1990) (quoting *Dodd v. Fawcett Publications, Inc.*, 329 F.2d 82, 85 (10th Cir. 1964)). Partly because of this expansive review, the standard for reviewing an allegation of fraudulent joinder "is even more favorable to the plaintiff than the standard for ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6)." *Hartley v. CSX Transp., Inc.*, 187 F.3d 422, 424 (4th Cir. 1999).

7

The fraudulent joinder doctrine applies when either (1) "there is no possibility that the plaintiff would be able to establish a cause of action against the in-state defendant in state court;" or (2) "there has been outright fraud in the plaintiff's pleading of jurisdictional facts." *Id.* at 424 (quoting *Marshall v. Manville Sales Corp.*, 6 F.3d 229, 232-33 (4th Cir. 1993)). Warren Pumps relies primarily on the first "no possibility" prong. In construing this prong, the Fourth Circuit has admonished courts not to delve "too far into the merits in deciding a jurisdictional question." *Id.* at 425. For instance, in *Hartley* the Court noted that it could not say that "Hartley has no chance of establishing the facts necessary to support her tort claims" and that the questions presented were "questions of fact that are ordinarily left to the state court jury." *Id.* "In all events," the Court continued, "a jurisdictional inquiry is not the appropriate stage of litigation to resolve these various uncertain questions of law and fact." *Id.* Rather, courts should "accept the parties joined on the face of the complaint unless joinder is clearly improper. To permit extensive litigation of the merits of a case while determining jurisdiction thwarts the purpose of jurisdictional rules." *Id.* Concluding, the Court reemphasized that a plaintiff's "claims may not succeed ultimately, but ultimate success is not required to defeat removal." *Id.* (citing *Marshall*, 6 F.3d at 233 ("A claim need not ultimately succeed to defeat removal; only a possibility of a right to relief need be asserted.")). Instead, "there need be only a slight possibility of a right to relief" and once "the court identifies this glimmer of hope for the plaintiff, the jurisdictional inquiry ends." *Hartley*, 187 F.3d at 426.[1] Because there is much more than a "slight possibility

---

[1] At least one Judge in this Court has indicated that the standard should not be quite so rigid and that the "no possibility" prong really means that the court must "ascertain 'whether there is a reasonable basis for predicting liability based on the claims alleged.'" *17th St. Assocs., LLP v. Markel Int'l Ins. Co.*, 373 F. Supp. 2d 584, 595 (E.D. Va. 2005) (quoting *Linnin v. Michielsens*, 372 F. Supp. 2d 811, 818 (E.D. Va. 2005)). Even under this broader standard, however, this case should be remanded because there is a reasonable basis to predict liability against Waco, and the plaintiff intends to pursue his claims against Waco to judgment.

of a right to relief" in this case, this Court should find that Waco is not fraudulently joined and remand this action to the Newport News Circuit Court.

### A. THE PLAINTIFF'S ATTORNEYS DID NOT IN THIS CASE, OR ANY OTHER CASE, JOIN WACO AS AN OUTRIGHT FRAUD, AND PLAINTIFF FULLY INTENDS TO OBTAIN A RECOVERY FROM WACO.

The Plaintiff's attorneys have named Waco as a defendant in asbestos cases filed in state and federal courts for almost 30 years. State court cases filed by PWHD in the Circuit Court of Newport News have been consolidated under the caption *In re: All Asbestos Cases*, CL90-10000W-01, CL90-10000C-03 since 1990. *See Master Motion for Judgment* (attached as Exhibit D). Waco has been a named defendant in these consolidated Newport News cases since that time. Waco was an original endorser of the Standing Order Applicable to Asbestos Litigation in these consolidated actions. *See Standing Order* (attached as Exhibit E). This standing order and its supplements govern all aspects of pretrial and trail practice and procedure in these consolidated cases. Waco's master answers to discovery in the *In re: Asbestos Cases* consolidation apply to all individual cases, including Hales' case. And in just the past six years, Waco has paid millions of dollars to victims of asbestos exposure represented by PWHD in these consolidated cases.

Warren Pumps complains that the Plaintiff did not formally serve Waco in this law suit. Interestingly, the Plaintiff did not formally serve Warren Pumps either. To reduce cost and streamline the procedural aspects of this ongoing litigation, a few of the defendants including Waco and Warren Pumps[2] have agreed to allow PWHD to informally serve them with complaints in these consolidated actions rather than requiring formal service of process. That informal service occurred here for both Waco and Warren Pumps. *See e.g., Letter from Counsel*

---

[2] The Plaintiff's counsel also has informal service agreements with other defendants involved in the consolidation but not named as defendants in this particular case.

9

*for Waco dated June 19, 2006* (attached as Exhibit F); *Letter to Robert M. Tata dated March 15, 2006*, in *Hales v. Garlock Sealing Technologies, LLC* (attached as Exhibit G).

Warren Pumps also complains that Waco has not yet filed a responsive pleading in this individual case. Waco, however, has filed a Master Plea of the Statute of Limitations, Demurrer and Motion to Strike, and Grounds of Defense to the Plaintiffs' Master Motion for Judgment in the consolidated action. Supplement Number 1 to the Standing Order Applicable to Asbestos Litigation permits defendants in the consolidated litigation to file a master grounds of defense and then, as individual cases are filed, to file a "Short Form Grounds of Defense which simply states that service has been achieved and that the Defendant adopts the Master Grounds of Defense." *Supplement Number 1 to the Standing Order Applicable to Asbestos Litigation*, at ¶ 3 (attached as Exhibit H).

In view of the ongoing litigation involved in these consolidated cases, the Plaintiff's attorneys have agreed to allow Waco to file late responsive pleadings to individual cases brought under the umbrella of the *In re: All Asbestos Cases* consolidation pending a determination by Waco whether the individual case meets Waco's internal settlement criteria. *See Letter from Waco's Counsel dated June 19, 2006* (attached as Exhibit F). Under the agreement, if Waco determines the case does not meet its settlement criteria, then they file a responsive pleading, which the Plaintiff agrees to receive as timely. *Id.* If the case does meet Waco's settlement criteria, then Waco may choose to make a settlement offer rather than prolonging litigation and incurring additional costs. *Id.* Under the agreement, however, Waco does not guarantee that it will make an offer, and PWHD does not represent that any particular plaintiff will accept Waco's settlement offer, if one is made. *Id.* Timing of settlement offers and/or acceptance is of no concern. *Id.*

Though Waco is not required to file a responsive pleading within the normal 21-day period after service, Waco's Master Grounds of Defense applies to the consolidated cases and Waco is informally served with copies of all pleadings and treated in all other respects as though it had filed a timely responsive pleading. In this case, for example, Waco was served with a copy of this motion and brief, and with copies of all notices of deposition taken to date. Though Warren Pumps complains of Waco's absence at the depositions, Waco's choice whether to attend the depositions was wholly up to its counsel and not a decision solicited or controlled by the Plaintiff or his counsel. *See Letter from Waco's Counsel Dated June 19, 2006* (attached as Exhibit F). Moreover, Waco was not the only party not to attend the depositions. Metropolitan Life Insurance Company, likewise, was noticed for both depositions, but attended neither.

Warren Pumps should not be surprised that the Plaintiff might have an agreement with Waco relating to responsive pleadings. Like Waco, Warren Pumps has agreed with PWHD to extend its normal 21 day Virginia responsive pleading deadline for cases falling under the umbrella of this consolidation. *See Letter from Warren Pumps' Counsel to Plaintiff's Counsel dated April 14, 2005* (attached as Exhibit I). The Plaintiff has similar agreements with other foreign and domestic defendants who have been long term parties to this litigation, as well. Such agreements have never precluded or inhibited the plaintiffs represented by PWHD from seeking a joint judgment against these defendants.

Finally, Warren Pumps accuses the Plaintiff of having "no real intention of obtaining a joint judgment against Waco" and claims that "Plaintiff's Counsel has named Waco in other lawsuits, and has frequently dismissed them a little over a year after filing," insinuating that the Plaintiff simply waits for the jurisdictional time set forth under 28 U.S.C. § 1446 to run. Warren Pumps submits no proof for this allegation and admits that it would have to ask this Court for

11

leave to take discovery on this issue before it could substantiate its spurious accusation. Discovery is not required. Legion evidence refuting this allegation is a matter of public record.

A brief search of PWHD's files reveals that plaintiffs represented by PWHD have named Waco as a defendant in 619 lawsuits just since 2000. *See Affidavit, Case Information Sheet Relating to Waco, Inc., and List of Nonsuits and Dates* (attached as Exhibit A). The plaintiffs in these cases, as in the instant case, fully intended to recover damages against Waco, and, in fact, recovered money in 513, or 83 %, of these claims. *Id.* Moreover, contrary to Warren Pumps' unsubstantiated accusations, Waco has been nonsuited only twenty times in the 619 cases filed against it over the past six years. *Id.* Eight of those nonsuits occurred less than one year after the suit was filed. *Id.* Another eight occurred over eighteen months after suit. In short, plaintiffs represented by PWHD have fully intended to recover damages from Waco for their injuries, and Waco has paid substantial amounts of money for claims that Waco has determined are valid, payable, and which Waco has determined may subject it to considerable exposure. Warren Pumps could have determined most of this information from nonsuit orders and orders approving settlements that are a matter of public record.

In short, the Plaintiff has agreements with a number of in-state and out-of-state defendants, including Warren Pumps and Waco, to streamline this ongoing litigation. Plaintiffs represented by PWHD bring valid, good faith claims against Waco for exposure to products supplied by Waco and/or asbestos work performed by Waco. Waco's settlement history with the hundreds of plaintiffs represented by PWHD attests to the validity of such claims.

### B. HALES HAS STATED VALID, GOOD FAITH CLAIMS AGAINST WACO AND FULLY INTENDS TO PURSUE THEM TO JUDGMENT OR SETTLEMENT.

Hales has brought claims of negligent failure to warn and breach of warranty against

Waco. Both claims have long been recognized in Virginia. *See Featherall v. Firestone Tire &*

*Rubber Co.*, 252 S.E.2d 358, 366 (Va. 1979) (adopting the failure to warn regime set forth in

Restatement (Second) of Torts § 388). The two theories are very similar. Indeed, the Virginia

Supreme Court has noted:

> The standard of safety of goods imposed on the seller or manufacturer of a
> product is essentially the same whether the theory of liability is labeled
> warranty or negligence. The product must be fit for the ordinary purposes
> for which it is to be used. . . . Under either the warranty theory or the
> negligence theory the plaintiff must show, (1) that the goods were
> unreasonably dangerous either for the use to which they would ordinarily
> be put or for some other reasonably foreseeable purpose, and (2) that the
> unreasonably dangerous condition existed when the goods left the
> defendant's hands.

*Slone v. General Motors Corp.*, 457 S.E.2d 51, 54 (Va. 1995) (quoting *Logan v. Montgomery*

*Ward*, 219 S.E.2d 685, 687 (Va. 1975)). Both theories, moreover, contemplate liability to

bystanders; under these theories "[t]he duty to warn . . . extends not only to the immediate

purchaser but to other persons who might in the ordinary and natural course of events be

subjected to danger." *Featherall*, 252 S.E.2d at 366.

Warren Pumps does not appear to quibble over whether Waco owed Hales a duty to warn

under either theory. Nor does Warren Pumps appear to argue over whether the asbestos goods

supplied and/or used by Waco were unreasonably dangerous for their ordinary use; that they

were unreasonably dangerous when they left Waco's hands; or that they were improperly used.

Rather, Warren Pumps' complaint appears to relate solely to causation – *i.e.*, whether Hales was

exposed to asbestos from Waco's products.

In Virginia, "negligence and proximate cause are issues for a jury's resolution. A court

decides these issues only when reasonable minds could not differ." *Hadeed v. Medic-24, Ltd*,

13

377 S.E.2d 589, 593 (Va. 1989).  Reasonable minds could differ over the question whether the

asbestos products supplied and used by Waco were a substantial contributing factor to Hales'

mesothelioma.  Hales was exposed to asbestos released from Waco's products in at least two

different ways:  (1) bystander exposure to asbestos fibers released during Waco's contracting

work during, immediately after, and between plant shutdowns; and (2) direct exposure to

asbestos fibers released from products supplied by Waco and used by Hales during his work as a

millwright.

> **1.     Hales Was Exposed As A Bystander To Asbestos Fibers Released As A Result Of Waco's Contracting Work During, Immediately After, and Between Plant Shutdowns.**

First, Hales worked in close proximity to Waco employees installing, repairing or

replacing asbestos thermal insulation throughout the plant during two shutdowns in 1966 and

during every shutdown from 1976 to 1982.  Hales testified he was not "actually involved in

placing or removing" pipe insulation.  *May 2 Deposition*, at 85-86 (excerpt  attached as Exhibit

B).  But he testified that he was in the general area while Waco was performing this work.  His

co-workers, likewise, state that plant employees performing maintenance during shutdowns

"worked in close proximity to the Waco employees who were cutting and fitting asbestos

sections and blocks to the steam pipes." *Affidavit of Co-Worker Herman Smith, Jr.*, at ¶ 6

(attached as Exhibit C).

The Plaintiff's experts are expected to testify that asbestos fibers are very aerodynamic.

*See Lauderdale Affidavit*, at ¶¶ 3, 4 (attached as Exhibit L).  Once asbestos fibers are airborne,

"they settle very slowly — about one foot per hour or less." *Id.* at ¶ 3.  Additionally, if "any

wind currents are present, asbestos fibers are readily transported over great distances, and remain

airborne indefinitely." *Id.*  If they do finally settle on a surface, "[a]sbestos fibers may . . . be

easily redistributed, or re-entrained, in air if settled dust is disturbed" as "frequently occurs during cleanup after asbestos insulation work, for instance." *Id.* A rational factfinder could determine that asbestos released through Waco's insulation work could have migrated to Hales' breathing zone.

Warren Pumps points out that Hales testified that the area in the paper machine building where Waco worked was draped off with poly drapes. Hales, however, was testifying about limited occasions late in his work career at American Tobacco. He testified earlier during the same deposition as follows:

Q:   Now, you told me that you saw an outside contractor come in and do some insulation work and put up curtains?

A:   They put up curtains where they were working at because it was real dusty where they – they – they were wearing masks and whatever.

Q:   And nobody talked about why it was that they were wearing masks or anything like that?

\*         \*         \*         \*         \*         \*         \*         \*

A:   No.

Q:   Nobody at American Tobacco Company ever explained to you why that was?

A:   *And that was only in the later years, you know, just before I left there, probably early eighties when I saw this.*

Q:   Saw what, sir?

A:   *The curtains.*

Q:   Okay.

15

A:    And by that time, we did have a plastic paper suit that we'd put on when

we were working around things that caused that -- you know, had

asbestos in it, to our knowledge.

*May 2 Deposition*, at 113-14 (excerpt attached as Exhibit B) (emphasis added); *Affidavit of Co-Worker Herman Smith, Jr.*, at ¶ 5 (attached as Exhibit C) (stating that "outside contractors, including Waco, began to drape off areas" in the 1980s).[3]  Hales also worked in the building that housed the three boilers that supplied the steam to the pipes.  *May 2 Deposition*, at 110.  Hales, however, never testified that Waco ever draped off their work area during while working on the boilers in this separate building.

Hales also testified that the work Waco performed was "real dusty." *May 2 Deposition*, at 113 (excerpt attached as Exhibit B).  Hales, however, would not be able to see this dust if it was behind a curtain.  More importantly, Hales would not see these asbestos fibers as even a moderate dust haze unless there were at least 100 million particles per cubic foot of air (100 mppcf).  *See Lauderdale Affidavit*, at ¶ 4 (attached as Exhibit L).

At the time of Hales' initial exposure in 1966, the threshold limit value (TLV) established by the American Conference of Government Industrial Hygienists (ACGIH) for asbestos exposure was 5 million particles per cubic foot of air — twenty times *less* than the 100 mppcf that would have had to be present before Hales could say it was "real dusty."  *See Lauderdale Affidavit*, at ¶ 4.  It was thought from the 1930s through 1972 that exposures above 5 mppcf posed a substantial threat of asbestosis, but even then there was no minimum level of exposure

---

[3] Though Hales' testimony elsewhere may confuse the issue, this Court should construe the facts and the reasonable inferences arising from those facts in the light most favorable to the Plaintiff for purposes of determining whether Hales fraudulently joined Waco. *See Marshall*, 6 F.3d at 232-33 (noting that the court must "resolv[e] all issues of law and fact in the plaintiff's favor.").

16

below which malignancies, such as mesothelioma, would not occur. *See* ACGIH,

*Documentation of Threshold Limit Values* at 11 (1962) ("The present threshold limit [of 5 mppcf

for asbestos] relates to the prevention of *asbestosis*." (emphasis added)) (excerpt attached as

Exhibit N); NIOSH, *Revised Recommended Asbestos Standard*, at 92 (Dec. 1976) (excerpt

attached as Exhibit O). By the time of Hales' last shutdown exposures in the late 1970s, the U.S.

Government had reduced and redefined the 5 mppcf TLV drastically — as of 1976, the

permissible exposure limit (PEL) for asbestos to which Hales could be exposed was 2 fibers per

cubic centimeter of air (2 f/cc). NIOSH, *Revised Recommended Asbestos Standard*, at 1 (excerpt

attached as Exhibit O). Even then, however, NIOSH proposed that the PEL be reduced to the

current standard of 0.1 f/cc. *Id.* at 93. In making this recommendation, NIOSH stated that

"[e]valuation of all available human data provides no evidence for a threshold or for a 'safe'

level of asbestos exposure." *Id.* at 92. NIOSH proposed the 0.1 f/cc not because it was safe, but

because it was the "lowest level detectable by available analytical techniques" existing at the

time. *Id.* at 93. Finally, a "NIOSH congressional study published in 1995" reaffirmed that

"Mesothelioma has occurred following short term asbestos exposures of only a few weeks" and

has resulted "from very low levels of exposure." *Lauderdale Affidavit*, at ¶ 8 (attached as

Exhibit L). In short, it takes very little asbestos exposure to develop mesothelioma. By

testifying that Waco's work was "real dusty," Hales was providing substantial evidence that he

was injuriously exposed as a bystander to Waco's thermal insulation work during shutdowns.

Between shutdowns, moreover, Hales testified that he "probably could be within four or

five feet of" the high pressure steam pipes, *May 5 Deposition*, at 53 (excerpt attached as Exhibit

K), and that he had incidental exposure to the asbestos thermal insulation on those pipes during

his normal work as a machine operator.

17

Q:      So in your mind you have no exposure at all to any of the pipe insulation during

        your six years as a maintenance mechanic?

A:      Not insulation.  I mean incidental, if some were -- steam pipes shake from time to

        time.  If something like that would happen – well, they constantly shake.  if you

        had to walk through there, incidental, but not actually involved in placing or

        removing.

Q:      You're familiar with the phenomena called water hammer?

A:      Water hammer?

Q:      When a pipe causes – the steam causes the pipe to shake?

A:      I said – I said -- that's what I said.  Incidental contact, that's what I said.

Q:      And you said that those pipes would shake constantly.

A:      Yeah.

        . . . .

Q:      What would happen when those pipes shook?

A:      Well, I guess some dust could come in.

*May 2 Deposition*, at 85-86 (excerpt  attached as Exhibit B); *Affidavit of Co-Worker Herman*

*Smith, Jr.*, at ¶ 7 (attached as Exhibit C) (stating that "[o]ftentimes, the steam pipes would shake

and vibrate violently when the machines were restarted" and "[d]ust would fall from the

asbestos-insulated steam pipes whenever this happened").

        Though Hales, himself, could not say whether the insulation material used by Waco

contained asbestos, this was not within his personal knowledge.  The Plaintiff, however, would

show though other evidence that Waco used asbestos containing insulation at American Tobacco.[4]  And such evidence would supplement, not contradict, Hales' testimony.

In short, Hales' testimony that Waco's insulation work was "real dusty" is strong evidence that he was exposed as a bystander to asbestos dust far in excess of any safe level established by medical science — in 1966, 1976, or 2006 — and that this exposure greatly increased his risk of developing mesothelioma.  Reviewing this scientific and coworker testimony in conjunction with Hales' testimony, a rational factfinder could find that Waco's insulation work, standing alone, was a substantial contributing factor to Hales' mesothelioma — but that was not his only potential exposure to Waco products.

> **2.   Hales Suffered Direct Exposure To Asbestos Fibers Released From Products Supplied By Waco And Used By Hales During His Work As A Millwright.**

The second predominant means of exposure was Hales' daily work with asbestos products many of which the Plaintiff reasonably believes were supplied by Waco in its role as a product distributor.  In this role, Waco dealt "with over a hundred manufacturers on a regular basis." *Helfrich Deposition*, at 26 (excerpt attached as Exhibit J).  Included among the asbestos products distributed by Waco are asbestos block and pipe insulation, asbestos cement, asbestos cloth, asbestos tape, asbestos rope, asbestos paper, and asbestos gaskets and packing. *See id.* at 87-96.  A cursory review of the Waco invoices already in Plaintiff's possession, for example, reveals that in October 1975, Waco purchased compressed asbestos gaskets and/or packing from Melrath Gasket Company. *Invoices for Asbestos Products Supplied by Waco, Inc. During the*

------------------------------------------------------------------------

[4] Additionally, thermal system insulation installed prior to 1980 — such as the pipe insulation installed by Waco on the steam pipes connected to the machines Hales used for ten years, and the boiler insulation Hales work around from 1976 to 1980 — is classified by OSHA as "presumed asbestos containing material" (PACM). *See* 29 C.F.R. § 1910.1001 (b); 29 C.F.R. § 1915.1001 (b).

*Same Timeframe as Hales' Exposure*, at pages 1-3 (attached collectively as Exhibit M). In 1975-76 Waco supplied 90,000 pounds of 80% asbestos cloth to another industrial consumer. *Id.* at pages 4-5 (11/7/75 Invoice for Amatex Order No. 1296 and 7/29/75 letter to Amatex referencing the same order and stating the continuing order for an "anticipated 90,000 pounds"). And, on December 17, 1978, Waco purchased Kaylo pipe insulation and "asbestos sewing thread" from C.E. Thurston and Sons, Inc. -- another contractor identified by Hales. *Id.* at page 6.

During Hales' work as a machine operator and helper, he testified he was required to replace asbestos cloth on dryer tubes in the plant. *May 5 Deposition*, at 106-07 (excerpt attached as Exhibit K). He obtained this cloth from the storeroom. *Id.* In 1976, Hales worked for six months in the Bermuda Hundred storeroom where asbestos containing products were routinely stored. *May 2 Deposition*, at 165 (excerpt attached as Exhibit B). Then, from 1976 to 1982, Hales worked as a maintenance worker, or "millwright," during which time, he testified, he daily used asbestos containing gasket and packing products purchased from distributors, like Waco, and stored in American Tobacco's storeroom. *May 2 Deposition*, at 52 (excerpt attached as Exhibit B). On the basis of coworker interviews and other direct and circumstantial evidence, the Plaintiff reasonably believes that Waco was a substantial supplier of the asbestos containing products stored in American Tobacco's storeroom and used by Hales in his day to day employment as a millwright.

In sum, Hales was exposed in at least two different ways to asbestos products supplied and/or used by Waco. These asbestos products were and still are unreasonably dangerous for the use to which they were put and that unreasonably dangerous condition existed when the products left Waco's hands. Particular issues relating to causation and the nature and degree of Hales' exposure are fact intensive and rightly "left to the state court jury." *Hartley*, 187 F.3d at 425.

This jurisdictional inquiry "is not the appropriate stage of litigation to resolve these various uncertain questions of law and fact." *Id.* However, because there is much more than a "slight possibility of a right to relief" in this case, this Court should find that Waco is not fraudulently joined and remand this action to the Newport News Circuit Court. *Id.* at 426.

## CONCLUSION

For the foregoing reasons, this Court should remand this case to the Circuit Court for the City of Newport News where it rightly belongs and award the Plaintiff his reasonable costs and attorney's fees incurred in the presentation of this matter pursuant to 28 U.S.C. § 1447 (c) ("An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal.").

Respectfully Submitted,

By:_____
                Of Counsel

Robert R. Hatten, Esq. (VSB # 12854)
Donald N. Patten, Esq. (VSB # 06869)
Hugh B. McCormick, III, Esq. (VSB # 37513)
William W.C. Harty, Esq. (VSB # 45447)
PATTEN, WORNOM, HATTEN & DIAMONSTEIN, L.C.
12350 Jefferson Avenue, Suite 300
Newport News, VA 23602
757.223.4500  Telephone
757.249.3242  Facsimile

Richard S. Glasser, Esq. (VSB # 04092)
GLASSER & GLASSER, P.L.C.
Crown Center Building, Suite 600
580 E. Main Street, Suite 600
Norfolk, VA 23510-3312

<u>CERTIFICATE OF SERVICE</u>

I certify that on this 23rd day of June, 2006, a true and exact copy of the plaintiffs' MOTION FOR REMAND was mailed via U.S. Mail to the following counsel:

Robert M. Tata, Esq.
Wendy C. McGraw, Esq.
HUNTON & WILLLIAM, LLP
500 East Main Street, Suite 1000
Norfolk, VA 23510

Carl Schwertz, Esq.
DUANE HAUCK & GNAPP
10 E. Franklin St., 4th Floor
Richmond, VA 23219-2106

John P. Fishwick, Esq.
LICHTENSTEIN & FISHWICK, P.C.
101 South Jefferson St., Suite 505
Roanoke, VA 24011

George Dancigers, Esq.
MCKENRY, DANCIGERS,
DAWSON & LAKE
192 Ballard Court, Suite 400
Virginia Beach, VA 23462-6538

Stephen R. Jackson, Esq.
WILLCOX & SAVAGE, P.C.
1800 Bank of America Center
One Commercial Place
Norfolk, VA 23510-2197

Eric G. Reeves, Esq.
Martin Conn, Esq.
MORAN KIKER, BROWN, P.C.
4110 E. Parham Road, Suite A
Richmond, VA 23228

R. Thomas Radcliffe, Jr., Esq.
Steven J. Parrot, Esq.
DEHAY & ELLISTON
36 S. Charles St., 13th Floor
Baltimore, MD 21201

_____
William W.C. Marty

CASE INFORMATION RELATING TO WACO, INC.

|  | CASES WACO NAMED | CASES PAID | CASES PENDING | CASES NON-SUITED | OTHER * |
|---|---|---|---|---|---|
| 2000 | 216 | 182 | 25 | 6 | 4 |
| 2001 | 141 | 127 | 9 | 5 | 0 |
| 2002 | 97 | 90 | 5 | 2 | 0 |
| 2003 | 69 | 60 | 2 | 7 | 0 |
| 2004 | 48 | 32 | 13 | 0 | 3 |
| 2005 | 40 | 22 | 18 | 0 | 0 |
| 2006 | 8 | 0 | 8 | 0 | 0 |
| TOTAL | 619 | 513 | 80 | 20 | 7 |

* Case status incomplete because of case transfer to another law firm, no record of Non-Suit Order and/or other misc. reasons.



NONSUITS

Scruggs, T. filed 02/14/00, nonsuited 03/09/00

Marasco, D. filed 04/18/00, nonsuited 10/13/04

Riggs, R. filed 10/03/00, nonsuited 09/16/02

Kaminky, J. filed 10/03/00, nonsuited 03/26/02

Battle, I. filed 10/04/00, nonsuited 05/10/01

Battle, H. filed 10/24/00, nonsuited 01/17/01

Combs, M. filed 03/06/01, nonsuited 08/12/02

Holley, J. filed 05/31/01, nonsuited 08/02/02

Freeman, L. filed 07/30/01, nonsuited 10/13/04

Cupp, R. filed 07/30/01, nonsuited 08/02/02

Boyd, R. filed 12/26/01, nonsuited 10/14/04

Ball, J. filed 03/29/02, nonsuited 10/14/04

Rountree, J. filed 06/06/02, nonsuited 10/18/04

Jones, S. filed 02/04/03, nonsuited 07/24/03

Whitley, C. filed 03/19/03, nonsuited 02/24/05

Van Dyke, B. filed 06/05/03, nonsuited 03/09/04

Stinson, R. filed 10/16/03, nonsuited 10/25/03

Ward, C. filed 12/01/03, nonsuited 10/14/04

Eure, T. filed 12/23/03, nonsuited 01/09/04

Jeffries, R. filed 12/23/03, nonsuited 10/14/04

**AFFIDAVIT**

**COMMONWEALTH OF VIRGINIA**

**CITY OF NEWPORT NEWS, to wit:**

     I, **JOYCE D. BLAYLOCK**, being over twenty-one (21) years of age, declare and say the following:

1.     I am a paralegal employed in the litigation section of the firm of Patten, Wornom, Hatten & Diamonstein, L.C. in Newport News, Virginia;

2.     My routine job duties require me, among other things, to track claims that have been filed against defendants in asbestos litigation brought pursuant to and under the umbrella of the asbestos consolidated cases *In re all Asbestos*, CL90-10000W-01, CL90-10000C-03;

3.     I compiled the attached documents entitled "Case Information Relating to Waco, Inc." and "Nonsuits."

4.     The information on these documents was drawn from documents and files retained in the ordinary course of business at Patten, Wornom, Hatten & Diamonstein, L.C. and most of the information is also a matter of public record;

5.     The information on these documents is correct and accurate to the best of my knowledge and belief.

                                           JOYCE D. BLAYLOCK

   SWORN TO BEFORE ME and subscribed in my presence this 23 day of _____June_____, 2006

                                        Notary Public

My commission expires: ____9/30/09____

```
0001
 1   VIRGINIA:
           IN THE CIRCUIT COURT FOR THE CITY OF NEWPORT NEWS
 2
 3
 4   ELLIS E. HALES, JR.,
 5                Plaintiff,
 6   v.                                  AT LAW NO.
                                         CL06-00526V-04
 7   GARLOCK SEALING
     TECHNOLOGIES, LLC, et al.,
 8
                Defendants.
 9
10
11              DEPOSITION UPON ORAL EXAMINATION
                    OF ELLIS E. HALES, JR.,
12             TAKEN ON BEHALF OF THE DEFENDANTS
13
14                   Richmond, Virginia
15
                       May 2, 2006
16
17   Appearances:
18        PATTEN, WORNOM, HATTEN & DIAMONSTEIN
          By:  DONALD N. PATTEN, ESQUIRE
19             CHRISTIANE G. BURRELL, ESQUIRE
               Counsel for the Plaintiff
20
21        DUANE, HAUCK & GNAPP
          By:  CARL R. SCHWERTZ, ESQUIRE
22             Counsel for the Defendant Garlock Sealing
               Technologies, LLC
23
24        MORAN KIKER BROWN
          By:  ERIC G. REEVES, ESQUIRE
25             Counsel for the Defendant A. W. Chesterton
0002
 1   APPEARANCES:  (Cont'd.)
 2        HUNTON & WILLIAMS
          By:  WENDY C. McGRAW, ESQUIRE
 3             Counsel for the Defendants Warren Pumps, Inc.
 4
          WILLCOX & SAVAGE
 5        By:  STEPHEN R. JACKSON, ESQUIRE
               Counsel for the Defendants The Lincoln
 6             Electric Company and Hobart Brothers Company
 7
          DEHAY & ELLISTON
 8        By:  KAY MILLICENT BROWN, ESQUIRE
               Counsel for the Defendant Goulds Pumps
 9
10
11
12
13
14
```



```
15
16
17
18
19
20
21
22
23
24
25
0003
 1                          I N D E X
 2
      WITNESS                EXAMINATION BY      PAGE
 3
      Ellis E. Hales, Jr.    Mr. Schwertz          5
 4
                             Mr. Reeves          139
 5
                             Ms. McGraw          172
 6
                             Mr. Jackson         196
 7
                             Ms. Brown           247
 8
                             Mr. Patten          263
 9
                             Ms. McGraw          271
10
                             Mr. Reeves          274
11
                             Ms. Brown           277
12
13
14
15
                            EXHIBITS
16
17    NO.  DESCRIPTION                          PAGE
18    1    Photograph                           268
19    2    Photograph                           270
20    3    Photograph                           271
21
22
23
24
25
0004
 1          Deposition upon oral examination of
 2    ELLIS E. HALES, JR., taken on behalf of the
 3    Defendants, before Donna R. Tanner, Court Reporter and
 4    a Notary Public for the Commonwealth of Virginia at
 5    large, taken pursuant to notice, commencing at 10:45
 6    a.m., on May 2, 2006, at the offices of McEachin Law
 7    Firm, 5905 West Broad Street, Richmond, Virginia; and
 8    this in accordance with the Rules of the Supreme Court
```

```
 9   of Virginia, 1950, as amended.
10              - - - - - -
11              THE VIDEOGRAPHER:  This is the case of
12   Hales versus Garlock Sealing Technologies, et al.
13   This will be the deposition of Ellis E. Hales taken at
14   5905 West Broad Street in Richmond, Virginia.  My name
15   is James C. Attaway.  I'm employed by Video Works of
16   Virginia, Incorporated, at 5712 Patterson Avenue in
17   Richmond, and I'll be the video operator for this
18   deposition.  Today's date is May 2nd, 2006.  It's
19   approximately 10:45 a.m.
20              Would counsel please introduce
21   themselves and tell us who they represent?
22              MR. PATTEN:  My name is Donald Patten.
23   I'm with the firm of Patten, Wornom, Hatten &
24   Diamonstein.  That's located in Newport News,
25   Virginia.  It's 12350 Jefferson Avenue, Newport News,
0005
 1   Virginia, and I represent the plaintiff and his name
 2   is Ellis E. Hales, Jr.
 3              MS. BURRELL:  Christiane Burrell.  I'm
 4   also at the law firm of Patten, Wornom, Hatten &
 5   Diamonstein for the plaintiff, Mr. Hales.
 6              MR. SCHWERTZ:  Carl Schwertz on behalf
 7   of the defendant Garlock Sealing Technologies.
 8              MR. REEVES:  Eric Reeves from Moran,
 9   Kiker, Brown on behalf of A. W. Chesterton.
10              MR. JACKSON:  Steve Jackson from Willcox
11   & Savage.  I'm here for Lincoln and Hobart.
12              MS. BROWN:  Kay Brown here for Goulds
13   Pumps.
14              MS. McGRAW:  Wendy McGraw from Hunton &
15   Williams here for Warren Pumps.
16              THE VIDEOGRAPHER:  Okay.  Would you
17   please place Mr. Hales under oath?
18
19              ELLIS HALES, JR., was sworn and deposed
20   on behalf of the Defendants as follows:
21
22                      EXAMINATION
23
24   BY MR. SCHWERTZ:
25         Q.    Good morning, Mr. Hales.  My name is
0006
 1   Carl Schwertz and I'm going to start the questioning
 2   of you here this morning.  Can you hear me okay?
 3         A.    Yes.
 4         Q.    I'm sure that you've met with your
 5   attorneys and they've given you some idea of what
 6   we're going to do, but just for the record, this is a
 7   deposition.  You see we have a court reporter here
 8   taking down what you say, and we also have a
 9   videographer who's going to take your picture or a
10   movie of this whole thing.  You understand that?
11         A.    Yes.
12         Q.    And you understand that you're under
13   oath?
```

0046
1   of the stems, et cetera, that was what was used to
2   create the paper, was the liquid as opposed to the
3   stems and the other by-products, or did they use those
4   by-products to also create the paper?
5        A.     They used those by-products to create
6   the paper.
7        Q.     Okay.  The liquid, where did that -- was
8   it re -- after it was flavored, reput back into the
9   process?
10       A.     That was the size press operation.
11       Q.     I got you.
12       A.     The size press actually pressed the
13   juices into the dry paper and then it went through an
14   oven.
15       Q.     Did the mix of what was added to the
16   liquid that was evaporated, I think you said
17   glycerine, licorice --
18       A.     Licorice and cocoa.
19       Q.     Cocoa.  Did those change at all during
20   your time?
21       A.     No, they -- I say cocoa.  They also used
22   blocks of chocolate.
23       Q.     Right.  Well, on the dock you would take
24   the hogsheads of the by-products off the flatbeds.
25   Where would they go from there?
0047
1        A.     They went into warehouses.
2       Q.     Into warehouses?
3       A.     Yes.
4       Q.     Was it your responsibility to take them
5   from the warehouse to the manufacturing process?
6       A.     No.
7       Q.     And how long were you on the dock?
8       A.     From May through September.
9       Q.     September, I believe?
10       A.     Yes.
11       Q.     And during that entire time, if you
12   could get to inside cleaning, you would take that
13   opportunity?
14       A.     Yes, except for a two-week span.  They
15   called a plant shutdown in July, which I had to work
16   that one because I just started there, where
17   maintenance is actually done on the machines.
18       Q.     Did they have annual two-week shutdowns?
19       A.     They had two per year, one in July and
20   one at Christmas.
21       Q.     Okay.  And were they both two weeks in
22   length?
23       A.     Approximately two weeks.
24       Q.     And you said the one in July of '66, you
25   were required to work?
0048
1        A.     I was required to work.  I actually
2   worked the December one also.
3       Q.     Of '66?
4       A.     Of '66.

```
 5        Q.      Before we get to what you did, did you
 6  ever work any of the other shutdowns?
 7        A.      Yes, once -- after '76, when I became a
 8  maintenance person.
 9        Q.      Okay.  And at that point did you work
10  all the shutdowns?
11        A.      I worked all of them then.
12        Q.      So when the plant shut down, if you
13  didn't -- weren't required to work, that was vacation
14  time for you?
15        A.      No, no, no.  Maintenance was required to
16  work.
17        Q.      I appreciate that, but if you weren't in
18  maintenance --
19        A.      If you weren't in maintenance, except
20  for people just coming in --
21        Q.      Low men on the pole?
22        A.      There you go.
23        Q.      So other than those people --
24        A.      Other than those, they weren't required
25  to work.
0049
 1        Q.      It was four weeks of vacation, roughly?
 2        A.      Well --
 3        Q.      However long the shutdown was?
 4        A.      Yeah.
 5        Q.      And other than your time in '66, and
 6  then the time when you began in '76 in maintenance,
 7  you get that -- you did not have to do any of the
 8  shutdown work?
 9        A.      No, I didn't.
10        Q.      Okay.  Let's talk about your time in '66
11  when you did do the shutdown work.  What did you do?
12        A.      I worked along with -- alongside the
13  maintenance personnel.  I was assigned as a helper to
14  a maintenance person, handed them materials, go and
15  get materials, whatever they needed to complete the
16  job.
17        Q.      Do you remember who the mechanic was you
18  worked with?
19        A.      Well, I wasn't assigned to a particular
20  maintenance person.  I might be working with one guy
21  in the morning and then another guy in the afternoon.
22        Q.      And from day to day it would change, as
23  well?
24        A.      It would change.
25        Q.      Right.
0050
 1        A.      Depending on what they needed somebody
 2  to do.
 3        Q.      I understand when I asked you what --
 4  what you did, you told me that -- whatever the
 5  mechanic asked you to do.  Do you have a specific
 6  recollection of any particular jobs that you did?
 7        A.      Well, I was there when they were packing
 8  pumps or replacing -- I call them seals, but gaskets,
 9  per se, removing pumps.
```

10          Q.      The Bermuda 100 plant, how was it --
11 were the machines powered?
12          A.      Electronics and steam.
13          Q.      And did that stay that way for the
14 entire time you were there?
15          A.      Yes, sir.  The paper machine runs off
16 steam.
17          Q.      Right.  How did they generate the steam?
18          A.      They had a boiler plant.
19          Q.      How many buildings were over at the
20 Bermuda 100 plant?
21          A.      Well, they had a research building out
22 front, they had a main office located behind that,
23 they had a locker room, they had a water treatment
24 plant where they actually processed what comes in, per
25 se.  The boiler room was located on that end next to
0051
1 the water treatment.  Then they had the main plant
2 building, which when I first started there, they had
3 one machine and went to three of them before I left
4 there.
5          Q.      Three?
6          A.      Across the road from that, they had a
7 processed -- a warehouse processing department.  In
8 the main building, the plant building, they had a
9 machine area, had a processing area, they had the
10 maintenance shop there, the storeroom with the
11 warehouse on the back side of that, and down the hill
12 they had a processing plant -- I mean, a water
13 treatment building.  I think that was about all the
14 buildings that they had.
15          Q.      You told me that there was a boiler
16 plant.  Was it attached to the main -- main plant
17 building?
18          A.      No, it was -- when you came in the
19 plant, the office building was here, and the -- to the
20 right of that about a couple hundred yards the water
21 treatment and the boiler building was side by side.
22          Q.      Okay.
23          A.      Steam was transferred from there, three
24 great big pipes that came into the plant building.
25          Q.      Yes, sir.  And these buildings were
0052
1 separate buildings, they didn't share a common wall,
2 they were separated; correct?
3          A.      Which?
4          Q.      The boiler plant building and --
5          A.      Yeah, they were separate buildings.
6          Q.      During your time at American Tobacco
7 between May of '66 and December of '82, were you
8 always in the main plant building?
9          A.      No.  Once I went into maintenance, I
10 went all over the complex.
11          Q.      Okay.  So you would go in each and every
12 building?
13          A.      From time to time.
14          Q.      For maintenance?

15          A.      For maintenance.
16          Q.      From office building to water treatment
17  to --
18          A.      Wherever -- the maintenance department
19  was divided into two sections, electrical and
20  mechanical.  They call it a millwright, and as
21  millwright I was required to do any maintenance that
22  was not considered electrical.
23          Q.      So I shouldn't call you if my fuses
24  blow, but anything else, you get the call?
25          A.      Sir?
0053
1           Q.      I wouldn't call you if any of my fuses
2   blew, but everything else I would call you, is that
3   how it works?
4           A.      There you go.  Yes, sir.
5           Q.      All right.  We were talking, Mr. Hales,
6   a little bit about the first plant shutdown that you
7   had in July of '66, and you told me that you were a
8   helper to various maintenance mechanics?
9           A.      Yes.
10          Q.      And you gave me some jobs that you did?
11          A.      Yes.
12          Q.      How about in December of '66?
13          A.      Same thing.
14          Q.      Same thing.  Okay.  And if I asked you
15  for specific jobs that you did in December that you
16  might recall, you said that you packed pumps, you
17  replaced gaskets?
18          A.      No, I didn't -- I wasn't the one that
19  was packing the pumps.
20          Q.      Thank you.  You were helping the man?
21          A.      I was handing him materials, per se, to
22  do whatever was needed or going and retrieving
23  materials.
24          Q.      Okay.  In September of 1966, you became
25  a machine operator helper?
0054
1           A.      A -- a helper.
2           Q.      A helper?
3           A.      Yeah, the operator --
4           Q.      A machine -- okay.  I'm sorry.
5           A.      There was the operator, there was a
6   first helper, second helper, third helper and a fourth
7   helper assigned to a machine per shift.
8           Q.      Per shift.  You would start as a fourth
9   helper and move to a third, to a second, to a first,
10  is that the order?
11          A.      There you go.
12          Q.      And did you start as a fourth helper?
13          A.      No, I started as third helper.
14          Q.      Okay.  Skipped a level?
15          A.      Yes.  Because they put in a new machine,
16  they had to move people up on that job.
17          Q.      And were you assigned to the paper
18  machine originally?
19          A.      Yes, I was assigned to the paper

```
 7          Q.      Anything but welding?
 8          A.      Anything but welding.
 9          Q.      And is it fair also anything but
10    electric -- electrical work, too?
11          A.      Well, no electrical.  As a maintenance
12    person I didn't work on electrical.
13          Q.      Right.  And I wanted to make sure that
14    we were clear about that, sir.  Anything mechanical,
15    other than welding, you did?
16          A.      Yes, I was involved in.
17          Q.      You were involved in, yes, sir.  And
18    would that be fair about that once you became a C
19    mechanic, a B mechanic, an A mechanic, you were going
20    to do every -- everything mechanical in the
21    maintenance department throughout the complex?
22          A.      Right.
23          Q.      When did you begin to do welding, if at
24    all?
25          A.      After I became a B class mechanic, then
0084
 1    I took some welding training and I had to complete the
 2    welding training before I became an A class.
 3          Q.      And is that the difference between -- is
 4    that what causes a person to be an A class mechanic,
 5    is to be able to weld?
 6          A.      To be able to handle anything that was
 7    mechanical in the plant.
 8          Q.      How long were you a C class mechanic?
 9          A.      Probably about four months.
10          Q.      How long were you a B class mechanic?
11          A.      About six months, I think.
12          Q.      So just under two years of your roughly
13    six year time period you were an apprentice, a C and a
14    B, and then you became an A class for the last roughly
15    four years?
16          A.      Yes, yes.
17          Q.      Tell me what asbestos-containing
18    products you believe that you worked hands-on with
19    during your time that you were a mechanic.
20          A.      The packing, gasket materials, and the
21    welding rods.
22          Q.      Anything other than those three?
23          A.      Not to my knowledge.
24          Q.      What products that you believe contained
25    asbestos did you work around during the time that you
0085
 1    were a maintenance mechanic?
 2          A.      The same.
 3          Q.      Did you ever work around the pipe
 4    insulation as a maintenance mechanic?
 5          A.      Where it was stored at, no.
 6          Q.      Or even in the plant?
 7          A.      Like I said, I was never involved in --
 8          Q.      Mr. Hales, I was asking about what you
 9    worked around, not what you worked hands-on with.  I
10    know you told me that you never put on pipe
11    insulation.
```

```
12          A.      I don't remember our maintenance
13     department as the -- relining pipes or anything.
14          Q.      So in your mind you have no exposure at
15     all to any of the pipe insulation during your six
16     years as a maintenance mechanic?
17          A.      Not insulation.  I mean, incidental, if
18     some were -- steam pipes shake from time to time.  If
19     something like that would happen -- well, they
20     constantly shake.  If you had to walk through there,
21     incidental, but not actually involved in placing or
22     removing.
23          Q.      You're familiar with the phenomena
24     called water hammer?
25          A.      Water hammer?
0086
 1          Q.      When a pipe causes -- the steam causes
 2     the pipe to shake?
 3          A.      I said -- I said -- that's what I said.
 4     Incidental contact, that's what I said.
 5          Q.      And you said that those pipes would
 6     shake constantly?
 7          A.      Yeah.
 8          Q.      And what would --
 9          A.      But they -- you know, they weren't out
10     in the work -- actual work area where we had to be at.
11          Q.      Where were they?
12          A.      They were behind the machine.  On a
13     shutdown, you know, you might have to walk through
14     that area or something, but it wasn't inside that
15     where you were stationed at.
16          Q.      What would happen when those pipes
17     shook?
18          A.      Well, I guess some dust could come in.
19          Q.      The tobacco processing plant --
20          A.      Yes.
21          Q.      -- since the hogsheads came in dry --
22          A.      Yeah.
23          Q.      -- and they were dumped into hoppers,
24     would that create dust in the plant?
25          A.      But I didn't work in that area.
0087
 1          Q.      I appreciate that, Mr. Hales.  But did
 2     you ever see the -- the --
 3          A.      Well, yeah, they dumped them in an
 4     area.  Actually, that area was on the other side of
 5     the -- in a separate building.
 6          Q.      When it was dumped, did it create dust?
 7          A.      Yeah.
 8          Q.      Now, the packing that you worked with
 9     hands-on as a maintenance mechanic, do you know the
10     manufacturers, distributors or suppliers of that?
11          A.      Chesterton and Garlock were the major.
12          Q.      Did that packing look any -- was it any
13     different -- look any different than the packing that
14     you worked around when you were in -- before you
15     became a maintenance mechanic?
16          A.      No, same type material.
```

```
15        A.      Yes.
16        Q.      Did you do anything during our break to
17  prepare for the afternoon's deposition at all?
18        A.      No.
19        Q.      All right.  I told you that I thought
20  we'd finished with American Tobacco, but, of course,
21  at lunchtime I did do some preparation and thought
22  about some other things I need to ask you about.
23                You didn't tell me to turn mine on.
24  When you went into the maintenance department, I think
25  you said that you covered the entire complex of
0110
1   maintenance?
2         A.      Yes.
3         Q.      So that brought you into all the
4   buildings at the complex; correct?
5         A.      Yes.
6         Q.      Was there any specialization amongst the
7   mechanics that you -- a certain segment, other than
8   electrical and mechanical?
9         A.      No.
10        Q.      It didn't matter, you would go anywhere?
11        A.      Go anywhere.
12        Q.      So you could go to the office building;
13  correct?
14        A.      Yes, yes.
15        Q.      You could go to the water treatment
16  plant?
17        A.      Yes.
18        Q.      You could go to the boiler plant?
19        A.      Yes.
20        Q.      And you worked in all of those
21  buildings?
22        A.      I worked in all -- physically worked in
23  all of them.
24        Q.      All right.  Now, establishing that,
25  Mr. Hales, are there any other asbestos-containing
0111
1   products that you believe you may have worked with or
2   around as a mechanic since you went to all those other
3   different plants?
4         A.      To my knowledge, no, nothing that stands
5   out.
6         Q.      When you worked in the boiler plant, did
7   you work on the boilers?
8         A.      I worked on boilers -- not necessarily
9   the boiler itself, but the pumps that were used on the
10  boilers.  I mean, not physically worked on the
11  boilers, per se.
12        Q.      Mr. Hales, you worked on other things
13  other than pumps in your six years as a maintenance
14  mechanic?
15        A.      Yeah, I worked -- I mean, if they had a
16  toilet that was messed up, I worked on the toilet.
17        Q.      Sure.
18        A.      But when you say the boiler house, if
19  they had a bathroom down there, I might have gone down
```

20      there and fixed the bathroom.
21          Q.      Or if there was a gauge that needed to
22      be replaced you might have to replace a gauge or, you
23      know, a light fixture that was broken you might have
24      to fix a light fixture?
25          A.      No, I wouldn't fix the light fixture.
0112
1           Q.      Why?  Oh, that was electrical.  Now, you
2       said that you took some apprentice classes?
3           A.      Yes.
4           Q.      Hands-on and then some college type
5       courses?
6           A.      Yes.
7           Q.      And there was some mechanical training.
8       Tell me about that.
9           A.      That was -- well, when I said mechanical
10      training, which wrench was designed for what, whatever.
11          Q.      Did they have teachers to come in and
12      show you that?
13          A.      No, I learned that from the other
14      mechanics, per se.
15          Q.      All right.  You said you had some math
16      classes?
17          A.      Yes.  That was done by the supervisor in
18      the shop.
19          Q.      Okay.  And then you had some safety
20      classes?
21          A.      Some safety classes, yes, sir.
22          Q.      Tell me about those.
23          A.      Well, no running in the plant, use
24      gloves.  Mostly the safety stuff was posted.  You
25      know, do not -- the dos and don'ts as far as what to
0113
1       -- you could do and what you couldn't or weren't
2       supposed to do.  Never put your hands in moving parts
3       and on hot stuff.
4           Q.      Now, this is 1976 that this began?
5           A.      Yeah.
6           Q.      That's when you took these classes?
7           A.      Yeah.
8           Q.      Any part of those safety classes dealing
9       with hazardous materials?
10          A.      Hot stuff more or less.  When I first
11      went back there we -- the asbestos was not necessarily
12      known that it was harming me.
13          Q.      So nobody ever talked to you --
14          A.      Nobody ever talked to me about don't --
15      don't use asbestos or don't, you know, be around it or
16      whatever.
17          Q.      Now, you told me that you saw an outside
18      contractor come in and do some insulation work and put
19      up curtains?
20          A.      They put up curtains where they were
21      working at because it was real dusty where they --
22      they -- they were wearing masks and whatever.
23          Q.      And nobody talked about why it was that
24      they were wearing masks or anything like that?

25      A.    Like I said, we wore -- the only mask we
0114
1  wore was a dust mask for nuisance type dust in the
2  air, not necessarily to protect me from the asbestos
3  or whatever, no.
4      Q.    But going back to my question regarding
5  that you saw these people putting up the curtains --
6      A.    Nobody.
7      Q.    Nobody said anything about that?
8      A.    No.
9      Q.    Nobody at American Tobacco Company ever
10  explained to you why that was?
11      A.    And that was only in the later years,
12  you know, just before I left there, probably early
13  eighties when I saw this.
14      Q.    Saw what, sir?
15      A.    The curtains.
16      Q.    Okay.
17      A.    And by that time, we did have a plastic
18  paper suit that we'd put on when we were working
19  around things that caused that -- you know, had
20  asbestos in it, to our knowledge.
21      Q.    Okay.  So what was it that you were
22  working around when you put on the paper suit?
23      A.    They had a -- I guess, an air dryer that
24  had asbestos-lined tubes in there.  Then we only --
25  that was about the only thing that I remember wearing
0115
1  that for then, except to keep off nuisance dust if you
2  were in a real dusty area and you didn't want to be
3  sweating and the stuff get saturated in your clothes.
4      Q.    And you said you wore a mask.  Is it one
5  of the paper masks?
6      A.    Yes, sir.
7      Q.    In a real dusty area?
8      A.    Yes, sir.
9      Q.    Where would those areas be?
10      A.    Well, I mean, I actually wore them as a
11  helper on the machine out there sometimes when the
12  material was -- the tobacco material would be drying,
13  it would form a lot of dust, so I had to stand there
14  and compress this material into a barrel, so dust
15  would be flying and I'd put a mask on then.
16      Q.    Mr. Hales, at any point in time, let's
17  say in the first segment of your career at American
18  Tobacco, did you ever see any warnings on any
19  products?
20      A.    I didn't personally read any, no, sir.
21      Q.    You didn't read any or didn't see any?
22      A.    Well, I don't know that -- that they
23  were there.
24      Q.    Okay.  And I'm not talking about just
25  asbestos -- with products you think may have contained
0116
1  asbestos, but any types of products, did you ever see
2  any warnings on them?
3      A.    I mean, you'd see -- you might see

```
 5        A.      Yeah.
 6        Q.      What was his name?
 7        A.      First name was Ken.
 8        Q.      So we've got a Ken and a Glen?
 9        A.      Yeah.  And between the two of them,
10   there was an older gentleman named Nelson.  He was the
11   shop supervisor.
12        Q.      Around about that time, did they start
13   -- did the plant start using different materials?
14        A.      No, they still kept with the same
15   manufacturers, per se.
16        Q.      Do you know or would you know if they
17   switched to a different kind of -- different kind of
18   product, same manufacturer, but different kind of
19   product?
20        A.      No, I wouldn't necessarily know.
21        Q.      And you don't know anything today about
22   product names or numbers, anything like that?
23        A.      No, I don't know anything about product
24   numbers.
25        Q.      I've got a couple more questions about
0163
 1   packing and then I have a few more about gaskets.  But
 2   in terms of the packing, when you would repack a valve
 3   or a shaft of any kind, would you allow there to be
 4   some -- basically allow the packing material to get
 5   wet and there to be some leaking, maybe dripping?
 6        A.      No, we wouldn't allow it to get wet
 7   necessarily because the pump would be down at that
 8   time and it was dry.
 9        Q.      When you'd pull out the packing, usually
10   it would be wet from the process, wouldn't it?  I
11   mean, as Mr. Schwertz talked to you this morning, it
12   would take some time for that material to dry out; is
13   that correct?
14        A.      In some cases, I mean, but in some cases
15   it was -- by being a metal to metal type thing, the
16   packing would dry out.  It would have a leak in it,
17   per se, and it might be damp right there where it was
18   leaking at, but most of it would not be wet, no.
19        Q.      I guess during that time you were in the
20   maintenance department, there were anywhere from
21   twenty-five to upwards of forty maintenance workers.
22   Did I understand you correctly when you said that?
23        A.      Somewhere in there.
24        Q.      How would you-all divide up the
25   responsibilities among yourselves?
0164
 1        A.      We didn't.  We were assigned jobs.
 2        Q.      Okay.  How did that process occur?
 3        A.      Well, if I finished a job and they were
 4   in need of a mechanic on another job, the supervisor
 5   would come and say, Hey, they need you over there, and
 6   he would tell me what he thought the problem might be,
 7   so I could take the proper tools out there to work on
 8   it with.
 9        Q.      Would a class A mechanic typically do
```

10  the more complicated jobs?
11          A.      Well, like I said, the only time that
12  they had that division was when I came through, and
13  everybody else was an A class mechanic anyhow.  There
14  were only four of us that came through that class.
15          Q.      If I could talk for a moment about the
16  gaskets.  You mentioned earlier this morning -- you
17  talked a little bit about sheet gaskets, as well as
18  precut gaskets.  What percentage of time would you use
19  precut gaskets versus the sheet gasket material?
20          A.      Probably five to eight percent of free
21  form.
22          Q.      So you're saying most of the time you'd
23  use sheet gasket?
24          A.      Ninety-five percent of the time we used
25  sheet material.
0165
1           Q.      Would the precut gaskets be for a
2   particular purpose or would you go to the storeroom
3   and they'd say, Well, we've got a precut gasket for
4   that size, here it is?
5           A.      Well, on a particular pump that might be
6   a specified gasket that goes there, but normally we
7   would -- well, we didn't keep a lot of precut gaskets
8   there, and they told us to improvise.  We might have
9   to put in two pieces of gasket material to make up --
10  that seal work rather than one piece.
11          Q.      Yes, sir.  Would that be on the steam
12  pipes mostly?
13          A.      No, it went on pumps also, sir.
14          Q.      Is there any way that you can tell me or
15  estimate for me the number of times that you used
16  packing materials from 1976 to '82?
17          A.      No, sir.  It was a constant thing.
18          Q.      Let me ask it to you this way:  Would
19  it -- would it happen on a weekly basis?
20          A.      At some point, somewhere in the plant on
21  a weekly or daily basis something needed a gasket or
22  seal, yes.
23          Q.      It wouldn't be every day that you were
24  working on a gasket?
25          A.      I would not personally work on a gasket
0166
1   every day, no, sir.
2           Q.      Okay.  How many -- can you give me some
3   sort of estimate about how often you personally would
4   be replacing a gasket?
5           A.      No.
6           Q.      Would once a month be a fair estimate?
7           A.      Oh, no, sir.
8           Q.      What would be fair?
9           A.      Probably at least once or twice a week.
10          Q.      Would that same be true for packing or
11  would it be less?
12          A.      Same thing.
13          Q.      Where did you see the name Chesterton in
14  reference to the gasket material?

14  that asbestos was being removed because before then,
15  it wasn't even required, you know.  It wasn't until
16  OSHA demand -- demanded that it be done that we were
17  told about that.
18          Q.      Okay.  You talked about at some point
19  during your time at American Tobacco that you were
20  told about the hazards of asbestos.  Did they tell you
21  anything about your use of -- of gaskets or packing?
22          A.      They didn't single it out.  They told us
23  to use gloves because it was common knowledge that
24  that type of material did contain asbestos because of
25  the heat application that it was used in.
0178
1           Q.      What about respirators and working with
2   packing and gaskets?
3           A.      They didn't tell us to use respirators.
4   Like I said, we had to use the nuisance mask maybe.
5           Q.      So at some point you started using the
6   nuisance mask for work with gaskets and packing?
7           A.      Yeah.
8           Q.      Okay.  And before American Tobacco
9   suggested that you do that, were you doing it on your
10  own?
11          A.      Sometimes if you were in an area that --
12  like I said, the humidity -- the drier it was, the
13  more dust it was, and if you were working in that type
14  of application, then you would -- I mean, I would use
15  one, yes.
16          Q.      You personally would, if you felt like
17  it was dusty, you would put your mask on?
18          A.      Yes.  I have sinus problems, so the
19  dust, I want to stay the heck away from that.
20          Q.      I know we've talked at length about your
21  time at American Tobacco, so I'm going to try not to
22  belabor it too much, but I'm still trying to get a
23  sense of what a day was like for you there when you
24  were an -- when you were a mechanic.  When you came
25  in, what type of stuff did you work on?  We talked
0179
1   about packing and gaskets, but I got the sense that
2   you didn't spend your whole day packing valves.
3           A.      No.
4           Q.      Okay.  So can you just tell us some of
5   the things that you did, unrelated to asbestos or
6   related, whichever.  Just give us an idea of what you
7   did during the day.
8           A.      Well, when we came in we all assembled
9   in the shop area closer to where the foreman's office
10  was.  And depending upon what had to be done or what
11  had been reported, he would be passing out job
12  assignments.  So going in there, unless it was a job
13  that I had the day before and I had a piece of
14  equipment down and I knew I had to go back and fill
15  that out, other than that, I wouldn't know what I was
16  going to be doing from day to day.
17          Q.      And what's some of the types of
18  equipment that you worked on?

19          A.      Well, conveyor belts.  I don't know what
20  you believe but, you know, pumps and valves, because
21  of the type of operation, it was probably fifty
22  percent of the jobs.
23          Q.      Okay.
24          A.      I might have gone out there to start a
25  forklift that wouldn't start, but basically I just
0180
1   have a jump box for a vehicle and some cables to
2   restart it.  I didn't do the actual mechanical work on
3   it because that wasn't my expertise.
4           Q.      When you said from time to time you
5   would do plumbing work, like if something was wrong
6   with a toilet --
7           A.      Well, if a toilet were reported to be
8   out of operation or, you know, needed fixing, new
9   valve on it or whatever, new seals, we did that.
10          Q.      And you mentioned conveyer belts.  What
11  about like if the heating or air conditioning unit in
12  one of the buildings was down.  Was that something you
13  guys would take care of?
14          A.      No, that was basically electrical.
15          Q.      Can you think of any other equipment
16  that you worked on?
17          A.      Like I said, I worked on forklifts, we
18  did welding of pipes.
19          Q.      How often did you do welding?
20          A.      Oh, maybe once, two or three times a
21  week, you know, at some point, but it was not a
22  constant thing.
23          Q.      What were some of the other components
24  of the -- of the machines?  I think you -- globally
25  you called it a paper machine.  What were some of the
0181
1   other component parts of that?
2           A.      Some other what?
3           Q.      Other component parts of it.
4           A.      Well, like I said, they had tile lined
5   chests in the back in the process department where
6   they mixed the wet materials.  It went on through a
7   stainless steel screen to make the paper material.
8           Q.      And did you work on all aspects of that
9   machinery?
10          A.      The rollers, putting new bearings on
11  rolls and all that, yes, I did.
12          Q.      Okay.  You've talked a fair amount about
13  pumps.  Can you give me any sense of how many pumps
14  there were at this facility?
15          A.      There were hundreds of pumps.
16          Q.      Hundreds of them.  Okay.
17          A.      Well, each roller -- not roller, but the
18  big drums that dry material, they -- most of them had
19  two pumps on them, at least two pumps.
20          Q.      And what was the material that was being
21  pumped or the substance that was being pumped with
22  respect to those?
23          A.      Steam.

```
24        Q.      Okay.
25        A.      To dry and heat the materials.
0182
 1        Q.      And I think you'd mentioned pumping
 2 glycerine?
 3        A.      Yeah.
 4        Q.      Was that a hot application or is that --
 5 what temperature would that be?
 6        A.      It was made with hot water, yes, and
 7 then that lining fiber had a steam jacket on it
 8 somewhere because if it didn't, the paper would break
 9 down.  If you put sudden cold on a hot application, it
10 would tear a hole in it.
11        Q.      What about the licorice pumps?
12        A.      Same thing.
13        Q.      What about the cocoa pump?
14        A.      Same thing.  All of them at some point
15 had a heated jacket on them.
16        Q.      And do you remember the manufacturers of
17 any of the pumps that were at the plant?
18        A.      I remember Gould and Warren.
19        Q.      Okay.  What were some of the functions
20 of the Gould pumps?
21        A.      Most of the larger pumps were Gould
22 pumps, and they pumped all types of, you know -- the
23 process of -- the fiber material mixed with water.
24        Q.      And then what --
25        A.      They also generated steam, the
0183
 1 centrifugal for running the -- running the machinery
 2 and all like that.
 3        Q.      What were some of the applications of
 4 the Warren pumps?
 5        A.      They were basically liquid pumps, most
 6 of them.
 7        Q.      You said liquid pumps?
 8        A.      Liquid.  When I say liquid, either the
 9 juice from the tobacco or the -- some type of water
10 application to cool something down or something.
11        Q.      So were those steam driven?
12        A.      You had some of them that were hooked up
13 with steam.
14        Q.      And are all these pumps that you're
15 talking about, these are all in the main facility, the
16 machine facility that you worked in?
17        A.      No, they had pumps in the boiler room,
18 pumps in the water treatment room.
19        Q.      And who -- do you remember the
20 manufacturer of the pumps in the boiler room?
21        A.      Same -- same basic pumps were used
22 throughout the plant.
23        Q.      Do you remember in particular specific
24 to the boiler room who the manufacturer was?
25        A.      The pump used?
0184
 1        Q.      Yes.
 2        A.      It was probably Gould.
```

11      A.     Somewhere in there.

12      Q.     Thereabouts.  And how many folks worked

13  in the storeroom?

14      A.     That were assigned to the storeroom,

15  probably the supervisor and two other people.

16      Q.     So in the case that you were there, you

17  were one of the two other people?

18      A.     There you go.

19      Q.     So a total of three people?

20      A.     Three people.

21      Q.     Okay.  Is that pretty constant while you

22  were there?

23      A.     That was pretty constant.

24      Q.     Okay.  What happened at the end of that

25  six months?  Is that when you --

0211

1      A.     I went back to the machine.

2      Q.     Okay.  Was there -- why was that, just

3  by choice or did they reassign you?

4      A.     No.  Like I said, when I went back

5  there, I knew it was for a specified time that

6  somebody was going to be out.

7      Q.     Got you.

8      A.     That I'd be taking their place.

9      Q.     Okay.  You talked about outside

10  contractors coming in to do insulation work and I

11  think you mentioned Waco and you mentioned C. E.

12  Thurston?

13      A.     C. E. Thurston.

14      Q.     And how is it that you know those names?

15      A.     Saw the name on the truck.

16      Q.     On the truck.  Okay.  Was that during

17  the whole time that you were there, these folks came

18  in and did that?

19      A.     As well as I remember it, yes.

20      Q.     Would they come in at certain periods of

21  time?  For instance, did they come in at shutdowns or

22  were they --

23      A.     They came in basically at shutdowns.

24      Q.     And they would send in a crew or crews

25  to do this work?

0212

1      A.     Yeah.

2      Q.     And that would include reinsulating

3  pipes?

4      A.     Whatever they had to do.

5      Q.     Okay.  Did you ever see any of the

6  material that they brought in to put on pipes?

7      A.     I never really looked at the material

8  they brought in.

9      Q.     Were you ever assigned to work with or

10  around them?

11      A.     Like I said, when they -- they were

12  working on particular areas -- in particular areas,

13  the shutdown was normally more than a week.  And they

14  would be working one week of that shutdown and after

15  they finished and cleaned up, we could go in that area

16    and do whatever we had to do.
17         Q.    Okay.  You testified a little bit
18    earlier that at some point in time you took a welding
19    training course; correct?
20         A.    Yes, I did.
21         Q.    And that was in order to qualify to
22    become a class A mechanic?
23         A.    That was, yes.
24         Q.    Okay.  Who taught the course?
25         A.    Actually, the -- my immediate supervisor
0213
1     was a certified welder.
2          Q.    Who was that?  I'm sorry.
3          A.    That was Glen.
4          Q.    That was Glen.
5          A.    And the mechanic that I actually worked
6     with most of the time, he was also certified, so --
7          Q.    Who was that?
8          A.    I know his face, but right now I can't
9     tell you his name.
10         Q.    Don't have a first name or anything?
11         A.    It was on the tip of my tongue when I
12    told you.
13         Q.    So both of these folks were certified
14    welders?
15         A.    They were certified welders.
16         Q.    And what did it consist of, the course
17    that you took?
18         A.    How to use a welding rod, at what
19    temperature I needed to set the material, what angles
20    to use and all.
21         Q.    Okay.  And about how long did the course
22    last?
23         A.    Well, over a course of about three to
24    four months.
25         Q.    Three to four months.  And how much time
0214
1     a day would you be in this class?
2          A.    Well, there was no particular -- I might
3     not get to it today.
4          Q.    Okay.
5          A.    I might be assigned for four hours
6     Thursday and four hours Friday, depending on the work
7     load.
8
9                MR. JACKSON:  Okay.  I understand we
10    need to change a tape, so we're going to take a quick
11    break.
12               THE VIDEOGRAPHER:  All right.  This will
13    be the end of tape three.  We're going off the record
14    at 4:19.
15               (Off the record.)
16               THE VIDEOGRAPHER:  This is the beginning
17    of tape four.  We are back on the record at 4:20.
18
19    BY MR. JACKSON:
20         Q.    Mr. Hales, I'm going to pick up right

STATE OF VIRGINIA

CITY / COUNTY OF _Chesterfield_ , to wit:

NOW COMES HERMAN SMITH, JR., who after being duly sworn makes oath as follows:

1.     My name is Herman Smith, Jr. and I live at 3540 Louise Drive, Chester, Virginia, 23831.
I am 58 years old and am a retired employee of the ~~R. J. Reynolds Tobacco Company~~. From 1969 to
2003 I worked in the maintenance department at a tobacco manufacturing facility located in Bermuda
Hundred, Chesterfield County, Virginia. When I was hired in 1969 the facility was owned by the
American Tobacco Company. It was later sold to the Brown & Williamson Tobacco Company, and then
again to R. J. Reynolds ~~which was my last employer~~. After my Retirement 7/9/2,

2.     At the Bermuda Hundred facility there was a steam plant, a processing building, a water
treatment plant and a research area. This plant made a tobacco product for cigarettes, from the stems, dust
and left-over debris of the tobacco leaf. Various liquids were added to the tobacco debris and the resulting
slurry was processed through large paper machines and then dried in large dryers. The finished product
resembled a sheet of tobacco. Insulated steam pipes were located overhead throughout the processing
building and were also connected to the paper machines, each of which was at least 100 feet in length.

3.     I began my career working for American Tobacco on the loading dock, where I loaded the
tobacco hogsheads onto trucks. After a few months, I was assigned to the maintenance department and I
became a maintenance apprentice. Eventually I became a mechanic and by the time I retired I held a double
A mechanic rating. Among the people with whom I worked at American Tobacco was Ellis Hales, who was
a helper and machine operator when I arrived in 1969, but who later became a mechanic in the maintenance
department.

4.     The maintenance department at American Tobacco was divided into two trades: electricians
and millwrights. Both Mr. Hales and I were millwrights and were responsible for repairing and maintaining
everything in the plant that was mechanical. This included among other things, the machinery and
equipment, pipes, pumps, tanks, and valves which were located within the plant.

5.     Routine repair and maintenance occurred on a daily basis. However in addition, the
machinery within the plant was completely shut down twice each year for major renewal and overhaul.
These shut-downs occurred in July and at Christmas and lasted several weeks at a time. The maintenance
department worked 12-hour shifts during these shutdown periods but outside contractors were also hired to
carry out major repair projects. From 1969 through at least the end of the 1970's, Waco, Inc. was one of the
primary insulation contractors employed by American Tobacco during the shutdown periods to renew,
repair and reinstall asbestos insulation on the steam pipes which were connected to the paper machines and
which also ran throughout the plant.

6.     During the semi-annual shutdowns, maintenance workers worked in close proximity to the
Waco employees who were cutting and fitting asbestos sections and blocks to the steam pipes. This was a
very dusty process and we were all unprotected and exposed to the dust until the late ~~1970's~~ 1980's when the

Smith, Herman Jr. Waco Aff re Hales



outside contractors, including Waco, began to drape off areas where they were working with sheets of poly to separate the rest of us from the work they were doing. However, as soon as their work was completed, the drapes were removed and the maintenance workers, including myself and Mr. Hales, returned to the areas where the asbestos covered pipes were located. Our duties often required us to come in contact with the asbestos-insulated steam pipes that had been renewed and repaired by the Waco employees.

7.    Following the completion of the shut-downs when the insulation work and other repairs were completed, the paper machines would be restarted and brought back on line. Oftentimes, the steam pipes would shake and vibrate violently when the machines were restarted, due to the hot steam flowing into the cold pipes. Dust would fall from the asbestos-insulated steam pipes whenever this happened. The steam pipes also vibrated during normal plant operations creating dust, especially when a machine had to be brought down for repairs and then was restarted too quickly. Machine operators and their helpers, such as Mr. Hales before he joined the maintenance department, who worked around the steam pipes connected to the tobacco machines, were routinely exposed to this dust.

8.    The plant millwrights routinely made repairs to pumps in the process areas that were located all around the paper machines including behind the machines.  Asbestos-insulated steam pipes were connected to the back of the paper machines near where many of the pumps were located. The millwrights, including Ellis Hales after he went into maintenance, routinely had to work in close proximity to these insulated pipes in order to repair the pumps.

_____
HERMAN SMITH, JR.


SWORN TO BEFORE ME, by HERMAN SMITH, JR. and subscribed in my presence this
_16_ day of _____June_____, 2006.

_____
Notary Public

My commission expires: _September 30, 2006_

Smith, Herman Jr. Waco Aff re Hales

VIRGINIA:  IN THE CIRCUIT COURT FOR THE CITY OF NEWPORT NEWS

IN RE: ALL ASBESTOS CASES                    CL90-10000W-01
                                             CL90-10000C-03

## MASTER MOTION FOR JUDGMENT

1.     For the purposes of this Master Motion for Judgment, the term "Plaintiff" includes both the injured party in personal injury actions and the decedent in wrongful death actions filed pursuant to the provisions of Virginia Code, Section 8.01-50, et seq.     Individual Plaintiffs and their work sites will be identified in subsequent Abbreviated Motions for Judgment which incorporate by reference the allegations of this Master Motion for Judgment.

2.     The Defendants are corporations, companies or other business entities which, during all times material hereto, and for a long time prior thereto, have been, and/or are now engaged, directly or indirectly, in the manufacturing, producing, selling, merchandising, supplying, distributing, and/or otherwise placing in the stream of commerce, asbestos products.

3.     At all times material hereto, Defendants acted through their agents, servants or employees who were acting within the scope of their employment on the business of the Defendants.

4.     At all times material hereto:

(a)    Defendant, OWENS-CORNING FIBERGLAS CORP., a corporation organized and existing under the laws of the State of Delaware and a successor by purchase of Kaylo Division of Owens-Illinois Glass Company, manufactured, produced and/or sold, either directly or indirectly, to the Plaintiff's employer(s)

1



asbestos products including Kaylo Pipecovering and Block.

(b)   Defendant, OWENS-ILLINOIS, INC., a corporation organized and existing under the laws of the State of Ohio and formerly known as OWENS-ILLINOIS GLASS COMPANY, manufactured, produced, sold and supplied, either directly or indirectly, to the Plaintiff's employer(s) asbestos products including Kaylo Pipecovering and Block.

(c)   Defendant, PITTSBURGH CORNING CORPORATION, a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, manufactured, produced and sold, either directly or indirectly, to the Plaintiff's employer(s) asbestos-containing Unibestos Pipecovering.

(d)   Defendant, GARLOCK, INC., PRECISION SEAL DIVISION, a corporation organized and existing under the laws of the State of Ohio, manufactured, produced and sold, either directly or indirectly, to the Plaintiff's employer(s) asbestos-containing sheet packing and gasket material.

(e)   Defendant, PORTER-HAYDEN COMPANY, a corporation organized and existing under the laws of the State of Maryland, distributed and sold, either directly or indirectly, to the Plaintiff's employer(s) asbestos products manufactured by the Johns-Manville Corporation.

(f)   Defendant, KEENE CORPORATION, a corporation organized and existing under the laws of the State of Delaware, a successor by merger to KEENE BUILDING PRODUCTS CORPORATION, and a successor by merger to BALDWIN-EHRET-HILL, INC., which was organized and existing under the laws of the State of Pennsylvania, and was successor by merger to EHRET MAGNESIA MANUFAC-TURING COMPANY, which was formerly a corporation organized and existing under

2

the laws of the Commonwealth of Pennsylvania, manufactured, produced and sold, either directly or indirectly through its predecessor corporation, to the Plaintiff's employer(s) asbestos products including Thermasil Pipecovering and Block, Mono Block Pipecovering and Block, and Powerhouse and Superpowerhouse Cement.

(g)     Defendant, C. E. THURSTON & SONS, INC., a corporation incorporated under the rules of Virginia having its corporate offices at 4850 Brookside Court, Norfolk, Virginia, supplied to Plaintiff's employer(s) a variety of asbestos-containing products manufactured by different companies.

(h)     Defendant, WACO, INC., a corporation incorporated under the rules of Virginia having its corporate offices at 814 Chapman Way, Newport News, Virginia, and a successor to WACO INSULATION, INC, supplied to Plaintiff's employer(s) asbestos-containing products manufactured by different companies.

(i)     Defendant, GAF CORPORATION, a corporation organized and existing under the laws of the State of Delaware and a successor by merger of the RUBEROID COMPANY, mined, manufactured and sold, either directly or indirectly, to Plaintiff's employer(s) asbestos floor tile and asbestos fibers which were incorporated into asbestos insulation products that were sold to Plaintiffs employer(s) by C.E. THURSTON & SONS.

(j)     Defendant, A. P. GREEN REFRACTORIES COMPANY, a corporation incorporated under the laws of the State of Delaware and a successor in interest to A. LYNN THOMAS COMPANY, manufactured and sold, either directly or indirectly, to Plaintiff's employer(s) various asbestos-containing blocks, mortars and refractory products and also sold a variety of asbestos-containing insulation products to Plaintiff's employer(s) through their wholly owned subsidiary, A. LYNN THOMAS

3

COMPANY.

(k)     Defendant, ARMSTRONG WORLD INDUSTRIES, INC., a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and formerly known as ARMSTRONG CORK COMPANY, manufactured and sold, either directly or indirectly, to Plaintiff's employer(s) asbestos floor tile.

(l)     Defendant, NATIONAL GYPSUM, a Delaware corporation, manufactured and sold, either directly or indirectly to Plaintiff's employer(s) asbestos ceiling tiles and Gold Bond cement.

(m)     Defendant, FIBREBOARD CORPORATION, PABCO INDUSTRIAL PRODUCTS DIVISION, a Delaware corporation and a successor by merger of Paraffine Company, Plant Rubber and Supply Company, Plant Rubber and Asbestos Works, and Pabco Insulation Corporation, manufactured and sold, either directly or indirectly, to Plaintiff's employer(s) asbestos-containing Pabco pipecovering and block and Caltemp pipecovering and block.

5.     Throughout Plaintiff's employment as set forth in the Abbreviated Motion for Judgment, Plaintiff was continually exposed to and inhaled asbestos dust and fibers generated from the ordinary and foreseeable use of the Defendants' asbestos products which proximately resulted in the Plaintiff's contracting asbestosis, scarred lungs, respiratory disorders, mesothelioma, cancers, and/or other injuries, some or all of which are permanent and/or fatal.

<u>COUNT I</u>

6.     The Plaintiff hereby incorporates by reference Paragraphs One (1) through Five (5), inclusive, as if the same were hereto set forth at length.

7.     At all times material hereto, the Plaintiff was not aware of the nature

4

and extent of the danger to his/her respiratory system, heart, other bodily parts, and general health that would result from his/her contact with, exposure to and inhalation of the asbestos dust and fibers resulting from the ordinary and foreseeable use of the Defendants' asbestos products; whereas, each of the Defendants knew, should have known, or could have reasonably determined that the Plaintiff would inhale asbestos dust and fibers during or as a consequence of the ordinary and foreseeable use of such asbestos products, and despite such facts, Defendants, individually, jointly, and severally:

(a)    Mined, manufactured, sold, distributed, and/or otherwise placed in the stream of commerce asbestos products which Defendants knew or in the exercise of ordinary care should have known, were imminently and inherently dangerous, defective, and otherwise highly harmful to the Plaintiff;

(b)    Failed to take reasonable precautions or to exercise reasonable care to adequately or sufficiently warn the Plaintiff, of the dangers and harm to which he/she was exposed as a consequence of the inhalation of asbestos dust and fibers resulting from the ordinary and foreseeable use of said asbestos products;

(c)    Failed and omitted to provide the Plaintiff with the knowledge of reasonably safe and sufficient safeguards, wearing apparel, proper safety equipment and appliances needed to protect him/her from being injured, disabled, killed, or otherwise harmed by working with, using, handling, coming into contact with, and inhaling the asbestos dust and fibers resulting from the ordinary and foreseeable use of their products;

(d)    Failed to place any warnings or adequate and sufficient warnings

5

on or inside the containers of their asbestos products to suitably apprise the Plaintiff of the risks and dangers inherent to the ordinary and foreseeable use of said asbestos products and the precautions necessary to make said asbestos products safe for their ordinary and foreseeable uses;

(e)     Failed to package the said asbestos products so that, in the ordinary and foreseeable use and handling thereof, the Plaintiff would not come into contact with and be exposed to the inhalation of asbestos dust and fibers from said asbestos products;

(f)     Failed to take reasonable, sufficient, and proper precautions reasonably calculated to reach the Plaintiff to instruct him/her in the proper and safe use and handling of said asbestos products;

(g)     Failed to adequately test their respective asbestos products before offering them for sale and use so that the Plaintiff would not inhale the asbestos dust and fibers resulting from the ordinary and foreseeable use of said asbestos products;

(h)     Failed to remove and recall such asbestos products from the stream of commerce and marketplace upon ascertaining that such asbestos products could cause asbestosis, scarred lungs, respiratory disorders, mesothelioma, cancers, and other injuries, some or all of which are permanent and may be fatal;

(i)     Failed to advise the Plaintiff, whom the Defendants knew, or should have known, had been exposed to long-term inhalation of asbestos dust and fibers, to cease all future exposure to the inhalation of all types of other fumes, smoke, dust, and fibers, to be examined by a lung specialist to determine the nature and extent of any and all diseases caused by such exposure, and to receive

6

treatment for such diseases.

8.  Such negligent and deliberate acts of the Defendants proximately resulted in the Plaintiff's contracting asbestosis, scarred lungs, respiratory disorders, mesothelioma, cancers, and/or other injuries, some or all of which are permanent and/or fatal.

## COUNT II

9.  Plaintiff hereby incorporates by reference Paragraphs One (1) through Eight (8), inclusive, as if the same were hereto set forth at length.

10.  Defendants impliedly warranted that the asbestos products which they mined, manufactured, sold, distributed, and/or otherwise placed in the stream of commerce were reasonably fit for use and safe for their intended purposes.

(a)  That, at the time of the manufacture and sale of their asbestos products by the Defendants to the Plaintiff's employer(s), Defendants knew, or had reason to know, that the said asbestos products would be used by the Plaintiff as the ultimate user or consumer;

(b)  That, all throughout many years of the Plaintiff's exposure to and use of the said products, the same asbestos products were expected to and/or did reach the user ultimate or consumer without substantial change in the condition in which they were sold; and

(c)  That the said asbestos products were sold in a defective condition in that they are incapable of being made safe for their ordinary and intended use, and said Defendants failed to give adequate or sufficient warnings or instructions about the unreasonable risks and dangers inherent in the products.

11.  Defendants breached said warranties to the Plaintiff in that their said

asbestos products were imminently and inherently dangerous, defective, hazardous, unfit for use, not properly merchantable, and not safe for their intended ordinary and foreseeable uses and purposes and such breaches proximately resulted in the Plaintiff's contracting asbestosis, scarred lungs, respiratory disorders, mesothelioma, cancers, and/or other injuries, some or all of which are permanent and/or fatal.

COUNT III

12.    The Plaintiff hereby incorporates by reference Paragraphs One (1) through Eleven (11), inclusive, as if the same were hereto set forth at length.

13.    Defendants, individually, jointly, in conspiracy with each other, and as an industrial and trade association or group for many decades have been possessed of medical and scientific data which clearly indicated that the inhalation of asbestos dust and fibers resulting from the ordinary and foreseeable use of their asbestos products were imminently, inherently and unreasonably dangerous, carcinogenic, and potentially deadly.

14.    Despite the medical and scientific data possessed by and available to them, the Defendants, prompted by pecuniary motives, individually, jointly, and in conspiracy with each other, fraudulently, willfully, deliberately, maliciously and callously:

(a)    Ignored, withheld, and/or actively concealed said medical and scientific data from the public, and particularly persons like the Plaintiff, who were using and/or being exposed to the Defendants' asbestos products and to the inhalation of the asbestos dust and fibers resulting from the ordinary and foreseeable use of said asbestos products;

(b)    Caused to be released, published, and/or disseminated data and

8

reports containing the dangers of their asbestos products, which data and reports they knew, should have known, or could have reasonably been determined to be incorrect, incomplete, outdated, and misleading;

(c)     Deliberately chose to provide patently inadequate and ambiguous warnings and intentionally failed to warn of the known dangers when finally compelled by the state of medical art to provide notice of the dangers of their asbestos products and the inhalation of asbestos dust and fibers resulting from the ordinary and foreseeable use of said asbestos products;

(d)     Distorted, and/or caused to be misdiagnosed, the results of medical examinations conducted upon persons and workers like the Plaintiff who were using and handling said asbestos products and being exposed to the inhalation of asbestos dust and fibers resulting from the ordinary and foreseeable use of said asbestos products;

(e)     Refused and failed to test their asbestos products, and/or tested their products and willfully concealed or refused to publish adverse test results, or distorted said adverse test results so that the public persons such as the Plaintiff were misled into believing the test results were not adverse; and

15.     Defendants, individually, jointly, and in conspiracy with each other, participated in the fraudulent scheme described in Paragraph Thirteen (13) above to keep the Plaintiff in ignorance of his/her rights by fraudulently concealing the nature and extent of the harm which he/she has suffered as a result of using and being exposed to the Defendants' asbestos products and by fraudulently concealing that this harm was the direct and proximate result of the occupational use and exposure to the Defendants' asbestos products and the inhalation of asbestos dust

9

and fibers resulting from the ordinary and foreseeable use of said asbestos products, and, in fact, said fraudulent scheme did keep the Plaintiff in ignorance of his/her rights.

16.     Defendants, individually, jointly, and in conspiracy with each other intended, by the fraudulent misrepresentations and omissions as set forth in Paragraph Fifteen (15) above, to induce the Plaintiff to rely upon said fraudulent misrepresentations, and omissions and to continue to expose himself/herself to the dangers that the Defendants knew to be inherent in the use of and exposure to their asbestos products and the inhalation of the asbestos dust and fibers resulting from the ordinary and foreseeable use of said asbestos products without warning to the Plaintiff of these dangers, thereby depriving him/her of the opportunity of informed free choice as to whether to continue to use such asbestos products and to expose himself/herself to these dangers.

17.     Defendants, individually, jointly, in conspiracy with each other, and through trade associations in which they were members, maliciously, willfully, callously, and deliberately:

(a)     Exposed and continued to expose the Plaintiff to the risks and dangers of asbestosis, mesothelioma, scarred lungs, cancer, and other illnesses and damage to various organs of the body, including injury to tissue and bone, all of which risks Defendants knew, should have known, or could have reasonably determined;

(b)     Failed to test and continue to test their asbestos products regarding the risks and dangers to persons who use or were exposed to their asbestos products and the inhalation of the asbestos dust and fibers resulting from

10

the ordinary and foreseeable use of said asbestos products;

(c)     Ignored medical and scientific data regarding the risks of asbestosis, scarred lungs, cancer, mesothelioma, and other illnesses to workers like the Plaintiff who used or were exposed to their asbestos products and the inhalation of the asbestos dust and fibers resulting from the ordinary and foreseeable use of said asbestos products;

(d)     Sought methods to ignore or defeat Workmen's Compensation and other claims of workers like the Plaintiff who suffered from illnesses or diseases from use of or exposure to their asbestos products and the inhalation of the asbestos dust and fibers resulting from the ordinary and foreseeable use of said asbestos products;

(e)     Attempted to discredit scientists, doctors, writers, and medical literature who or which indicated, demonstrated, or established a relationship between illness and disease from the use of and exposure to their asbestos products and the inhalation of the asbestos dust and fibers resulting from the ordinary and foreseeable use of said asbestos products;

(f)     Refused to conduct research on the relationship between asbestos exposure and disease because pecuniary motives of profit were followed at the expense of human lives;

(g)     Sought to create favorable publicity about asbestos products for pecuniary motives when they knew of their risks and dangers;

(h)     Failed to seek safe substitute products for asbestos for pecuniary motives of profit at the expense of human lives;

(i)     Misled the public and workers such as the Plaintiff who used or

11

were exposed to their asbestos products and indicated that their asbestos products were safe in their ordinary and foreseeable uses;

    (j)    Concealed the existence of tests, data, literature, and medical reports regarding the causal relationship of asbestos to cancer, mesothelioma, scarred lungs, asbestosis, respiratory disorders and other illnesses;

    (k)    Refused to authorize testing and research involving the relationship of illness and disease to exposure to, use of, and inhalation of the asbestos dust and fibers resulting from the ordinary and foreseeable use of their asbestos products fearing adverse publicity would affect the highly profitable market of asbestos sales;

    (l)    Chose to rely on inaccurate or insufficient medical and scientific research or data regarding the causal relationship between asbestos products and disease in order to avoid any possible adverse publicity that would affect sales of their asbestos products; and

    (m)    Failed to place adequate or proper warnings on their asbestos products fearing that such warnings would adversely affect sales.

    18.    The Plaintiff reasonably and in good faith relied upon the fraudulent misrepresentations, omissions, and concealments, made by the Defendants, individually, jointly, and in conspiracy with each other, regarding the safe nature of their asbestos products, which reliance resulted in illness, injuries and/or deaths to the Plaintiff.

<u>COUNT IV</u>

    19.    The Plaintiff hereby incorporates by reference Paragraphs One (1) through Eighteen (18), inclusive, as if the same were hereto set forth at length.

12

20.   As a direct and proximate result of the negligence, carelessness, gross negligence, willful misconduct, breach of warranty, fraudulent concealment, misrepresentations and willful omissions of the Defendants, the Plaintiff was caused to contract diseases and injuries to his/her body systems, lungs and heart, including, asbestosis, scarred lungs, respiratory disorders, mesothelioma, cancers, and other injuries, some or all of which are permanent and/or fatal that has caused and is continuing to cause the Plaintiff pain, suffering and mental anguish and will inevitably cause his/her death.   Further, aside from the diseases and injuries of which the Plaintiff is presently afflicted, the Plaintiff has become a likely candidate for progressive future disease and for future cancer, some or all which may be permanent and/or fatal.

21.   As a direct and proximate result of the negligence, carelessness, gross negligence, willful misconduct, breach of warranty, fraudulent concealment, misrepresentations, and willful omissions of the Defendants, the Plaintiff:

(a)   Has been obliged to spend various sums of money to treat his/her diseases and injuries, and may be obliged to continue to do so in the future;

(b)   Has and will sustain a loss of earnings and earning capacity;

(c)   Has had his/her enjoyment of life impaired

(d)   Has had his/her life expectancy shortened; and

(d)   Has been caused to suffer great psychic trauma including cancer phobia.

22.   As a direct and proximate result of the negligence, carelessness, gross negligence, willful misconduct, breach of warranty, fraudulent concealment,

13

misrepresentations, and willful omissions of the Defendants resulting in the death of Plaintiff's Decedent, his/her survivors were caused to suffer substantial sorrow, mental anguish, and solace, including loss of society, companionship, comfort, guidance, kindly offices, and advice of the Decedent; his/her survivors lost the benefit of the earnings the Decedent would have earned and the many services, protection, care and assistance that the Decedent would have provided.  In addition, the survivors were caused to incur expenses for their Decedent's care, treatment, and hospitalization incident to the illness resulting in his/her death, and reasonable funeral expenses, all of which are compensable under the Virginia Wrongful Death Statute.   The survivors were also caused to suffer substantial loss of support, services, and society of the Decedent, including loss of the benefit of the earnings the Decedent would have earned, loss of inheritable estate, loss of love and affection, loss of protection, loss of care and assistance, and loss of companionship, comfort, guidance, kindly offices, and advice of the Decedent and the Plaintiff's Decedent was caused to suffer a loss of earnings and a decrease in his/her earning capacity, as well as excruciating and conscious pain and suffering, both mental and physical, all of which are compensable in a maritime wrongful death action.

23.    Any delay in filing the Plaintiff's causes of action is a direct and proximate result of the Defendants' failure to warn the fraudulent concealment hereinafter described.

(a)    For a long time the Defendants have known of the hazards of asbestos inhalation and ingestion and had the duty to warn foreseeable users like the Plaintiff, of the hazards of their asbestos products.  However, the Defendants intentionally and fraudulently concealed said knowledge from the Plaintiff resulting

14

in the failure of the Plaintiff to discover the facts which are the basis of his/her causes of action despite the exercise of due diligence on behalf of the Plaintiff. Accordingly, any attempt on the part of any Defendant to complain about the timeliness of the commencement of Plaintiff's causes of action should be estopped.

WHEREFORE, Plaintiff prays for judgment against the Defendants, individually and jointly and severally, for compensatory damages in the sum of THREE MILLION DOLLARS ($3,000,000.00), and punitive damages in the amount of TWO MILLION DOLLARS ($2,000,000.00), together with interest from the date of diagnosis of asbestos-induced disease plus costs of this suit and such other and further relief as is just and proper.

Respectfully submitted,

PATTEN, WORNOM & WATKINS

By_____
                              Of Counsel

Robert R. Hatten, Esquire
Donald N. Patten, Esquire
Jonathan A. Smith-George, Esquire
James F. Thornton, Jr., Esquire
PATTEN, WORNOM & WATKINS
12350 Jefferson Avenue
Suite 360
Newport News, VA 23602

Richard S. Glasser, Esquire
GLASSER & GLASSER
Suite 400
125 St. Paul's Boulevard
Norfolk, VA   23510

PLAINTIFFS DEMAND A JURY WITH RESPECT TO ALL ISSUES
TO WHICH THEY ARE ENTITLED BY LAW TO A JURY.

VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF NEWPORT NEWS

IN RE: ALL ASBESTOS CASES                    CL92-10000W-01
                                             CL92-1000OC-03

## STANDING ORDER APPLICABLE TO ASBESTOS LITIGATION

Pursuant to Rule 1:18 of the Rules of the Supreme Court of Virginia and by order of this court, for the purpose of coordinating and managing asbestos litigation now or in the future filed in this Court by Patten, Wornom, Hatten & Diamonstein, L.C.; Glasser and Glasser, P. L. C. and Michie, Hamlet, Lowry, Rasmussen & Tweel, PLLC and responded to by the undersigned it is hereby ORDERED that the following procedures apply:

1.      Trial dates for these cases shall be selected in a manner to be designated by the presiding trial judge of the specific case involved, following the issuance of a praecipe. No case shall be set for trial until Plaintiff has provided responses to discovery as set forth in Paragraph 2 and all authorizations and releases as set forth in Paragraph 8. The trial judge shall advise the attorneys for the plaintiffs and defendants whether he wishes to set these cases at docket call or at some other time convenient to the Court and all parties.

2.      Defendants shall submit and plaintiffs shall respond within forty-five (45) days to a Standard Set of Interrogatories and Request for Production of Documents. The aforesaid 45-day response period shall begin thirty (30) days after the date on which the plaintiff files the Motion for Judgment, but this time limitation shall not apply to cases that have been filed prior to the date of this Order unless plaintiffs counsel files a praecipe requesting a trial date in that case; and, in that event, the forty five day period shall commence to run on the date that the plaintiffs' praecipe is filed. Plaintiffs who filed their Motions for Judgment prior to the date of this order who do not file a praecipe requesting a trial date shall, nevertheless, answer the Standard Set of Interrogatories within a reasonable time and the remaining portions of this Standing Order shall



EXHIBIT
E

apply to those cases. The Standard Set of Interrogatories shall be reasonable in number but may exceed thirty (30) in number. The defendants shall confer and file a copy of the Standard Set of Interrogatories within fourteen (14) days of the entry of this Order. The Standard Set of Interrogatories shall be answered by the Plaintiff in each instance where Answers to Interrogatories have not already been filed by the Plaintiff prior to entry of this Order.

Plaintiff may submit fifty (50) interrogatories (with no more than ten (10) subparts per question) to each defendant who shall respond within forty-five (45) days.

For any case that is set for trial, plaintiff is permitted to file defendant specific interrogatories not exceeding ten (10) in number to be answered by each defendant within twenty one (21) days from the date of service or one hundred thirty-five (135) days prior to trial, whichever date shall occur later. For any case that is set for trial, defendant is permitted to file plaintiff specific interrogatories not exceeding ten (10) in number to be answered by each plaintiff within twenty one (21) days from the date of service or one hundred thirty-five (135) days prior to trial, whichever date shall occur later.

3.    Any party who propounds Request for Admissions may simultaneously propound related Interrogatories not exceeding seven (7) in number seeking the basis of any denials.

4.    Additional Interrogatories may be propounded by any party who obtains leave of Court to do so. Extensions of time to respond to all Interrogatories and Request for Production of Documents may be given by agreement of the parties or upon motion to the Court for good cause.

5.    Any *de bene esse* depositions shall be preceded by a discovery deposition unless waived by the party(ies) against whom it is intended to be offered and at least fifteen (15) business days' notice shall be required prior to the taking of any *de bene esse* deposition with the

exception of any witness or party *in extremis*. Any *de bene esse* deposition of a plaintiff shall be preceded by the timely filing of relevant answers or responses to Interrogatories and Requests for Production of Documents and may not be scheduled less than seven (7) days after the service of answers and responses without agreement of the parties against whom the deposition will be offered or by leave of the court. All exhibits to be used by the *de bene esse* witness will be provided two (2) business days before the date of discovery depositions. These requirements may be waived by the Court for good cause shown or in circumstances where the Plaintiffs' counsel have not had adequate prior notice of the impending incompetency or death of a party to provide such answers or to produce such documents. Such hearing may be conducted telephonically.

6. Depositions and trial testimony taken in the Consolidated Proceeding captioned C/P 77-1 in the Federal District Court for the Eastern District Court of Virginia, Norfolk and Newport News Divisions, shall be available for use in these proceedings as if taken in these cases, subject to the rules of evidence and subject to the provisions of the Pretrial Preparation Schedule as they apply to the specific testimony.

7. The limitation of five (5) depositions per party shall not apply to these cases. The Court admonishes the parties not to abuse this privilege. At least five (5) business days' notice is to be given to all parties prior to the taking of any discovery deposition, with the exception of the taking of all discovery depositions of expert witnesses in which case fifteen (15) business days' notice shall be required.

8. Liaison Counsel - Counsel for the defendants shall designate a Medical Liaison counsel to receive plaintiff's employment records, medical records, radiology, and pathology. Medical Liaison counsel shall also collect all medical records, pathology and radiological materials pertaining to the plaintiff, and plaintiff shall be required to provide HIPPA compliant

3

authorization and release to Medical Liaison counsel for this purpose at such time as plaintiff's counsel files discovery responses as required by paragraph 2 of this Order or, in the case of radiology and pathology, as provided by the Trial Preparation Schedule. Liaison counsel shall promptly copy all such employment and medical records and provide a copy to plaintiffs counsel, and plaintiff's counsel shall reimburse liaison counsel for such copying costs. Further, all counsel for the defendants shall jointly coordinate with liaison counsel with regard to all matters pertaining to independent medical examinations of the plaintiffs and review of plaintiffs' chest x-rays and tissues. Further, a plaintiff shall not be required to submit to more than one independent medical examination-such medical examination to be coordinated by all defendants through liaison counsel. The word of the liaison counsel shall be binding concerning his responsibilities as set forth above. All defendants who have agreed to such cost sharing arrangement shall be required to reimburse Medical Liaison counsel pro-rata for the fees and costs incurred for coordinating the medical defense.

     9.    All orders submitted to the Court for entry must be endorsed by all counsel affected by the said order, or if there has been filed in the suit an order that the parties have agreed that the designated lead counsels may endorse orders, this will suffice. Nonsuit orders shall not require a signature of defense counsel. The Court may enter any order pursuant to Rule 1:13, of the Rules of the Supreme Court of Virginia if within twenty-one (21) days of the submission of a draft order no party objects to said order.

     10.    Part Four of the Rules of the Supreme Court of Virginia shall apply to these cases except as otherwise stated above.

     11.    In previous orders this Court has required that all reports—either oral or written—which are received by defense counsel or their agents as a result of the reading of chest x-rays

4

and review of tissues or pathology obtained from the plaintiff, shall be communicated to opposing counsel regardless of whether counsel intends to use such expert as a witness in the trial of the case.  In response to motions by Plaintiffs and Defendants to enter a Pretrial Order, this Court revisited this issue.  Having considered the memoranda filed by counsel, the case law cited therein, and Rules 4:1 and Rule 4:10 of the Rules of the Supreme Court of Virginia, this Court is of the opinion that pathology materials and x-rays are inanimate and tangible, and as such, subject to discovery under Rule 4:1 and that, absent a showing of exceptional circumstances, the Plaintiffs' counsel are not entitled to the identification of, or opinion of, any non-testifying expert with whom the defendants choose to consult on the subject pathology or x-rays.

12.    A Pretrial Preparation Schedule is attached hereto and incorporated by reference into this Order and except for good cause shown will apply to all current and future cases.  The dates as contained in the Pretrial Preparation Schedule may be varied by written agreement signed by all counsel or by the Court for good cause shown.

13.    The plaintiffs' Master Motion for Judgment as amended which (by prior order of this Court) has been incorporated by reference in previously filed asbestos cases by the filing of an Abbreviated Motion for Judgment shall continue to be incorporated by reference in subsequently filed asbestos cases by the filing of an Abbreviated Motion for Judgment. Defendants' Responsive Pleadings and Answers, as amended, shall continue to be incorporated by reference in response to currently filed and subsequently filed asbestos cases by the filing of responses to Abbreviated Motions for Judgment.

14.    In the discretion of the trial court, pre-trial conferences may be scheduled to determine dispositive motions, demurrers, special pleas, motions for summary judgment,

5

motions in limine, motions to compel discovery, admissibility of evidence, stipulations of fact,

legal issues for trial, amendments to pleadings, and such other matters as the Court in its

discretion' may consider appropriate from time to time. The moving party with respect to these

pretrial matters shall be responsible for scheduling timely hearings and/or conferences with the

Court to resolve these matters in advance of trial.

15.   Each party shall continue to have a duty to supplement or amend prior

interrogatory responses in compliance with Rule 4:1(e), irrespective of the preparation

deadlines as set forth in this Order.

16.   With regard to experts, no party may list more than three (3) experts for non-

medical issues and three (3) experts for medical issues (excluding treating physicians) except

by leave of Court for good cause shown.  For good cause, parties may substitute previously

disclosed experts based upon unanticipated, non-availability for trial testimony, provided that

a reasonable opportunity for a discovery deposition is afforded before trial commences on

such terms and costs as the Court may determine.

17.   This Order shall apply to all parties noticed pursuant to the Plaintiffs' Notice of

Motion for Hearing attached hereto and made a part hereof and shall be circulated to all such

counsel for their endorsements, reserving objections thereto.

ENTERED this _____ day of _____ , 2004.

_____
JUDGE

I certify that the document to which this
authentication is affixed is a true copy of a
record in the Newport News Circuit Court,
that I have custody of the record and I am the
custodian of that record.
Rex A. Davis, Clerk

By _____ D.C.

6

## PRETRIAL PREPARATION SCHEDULE

1.   Plaintiffs provide to Defendants:                          150 days prior to trial

    (a)   Reports by medical experts who
Plaintiffs propose to use at trial;

    (b)   The identity of all witnesses who will or may be
called at trial specifying whether each witness is a factual
witness, medical expert witness, treating physician, or expert
in some other discipline and if so, specifying the discipline;

    (c)   For all experts other than Plaintiff specific medical
experts whom Plaintiffs propose to use at trial, reports or
summaries or depositions representative of testimony,
if not previously provided;

    (d)   All medical materials, x-rays, pathology, etc., collected
by Plaintiffs.

    (e)   The identify of any deposition taken in CP/77-1 which
Plaintiff intends to offer into evidence and the identity of the
Defendants against whom Plaintiffs propose to offer each
deposition.  Plaintiff will provide a copy of such deposition at
defendant's cost, if requested.

2.   Defendants provide objection to the use of CP/77-1          129 days prior to trial
depositions identified pursuant to paragraph 1(e).

3.   Defendants provide to Plaintiffs:                          90 days prior to trial

    (a)   Reports by medical experts who
Defendants propose to use at trial;

    (b)   The identity of all witnesses who will or may
be called at trial specifying whether each witness
is a factual witness, medical expert witness,
treating physician, or expert in some other
discipline and if so, specifying the discipline;

    (c)   For all experts other than Plaintiff specific medical
experts whom Defendants propose to use at trial, reports or

i

summaries or depositions representative of testimony, if not previously provided;

(d)      All medical materials, x-rays, pathology, etc., previously provided by Plaintiffs;

4.      (a)      Deadline for both Plaintiffs and Defendants to identify in writing any factual witness not previously identified, who may or will be called to testify at trial;                    60 days prior to trial

5.      (a)      Plaintiffs' and Defendants' discovery, including depositions, shall be completed.                    45 days prior to trial

"Complete" means that all interrogatories, requests for production, requests for admissions and other discovery must be served sufficiently in advance of trial to allow a timely response at least 45 days before trial.  Depositions may be taken after the specified time period by agreement of counsel of record or for good cause shown, provided, however, that the taking of a deposition after the deadline established herein shall not provide a basis for continuance of the trial date or the scheduling of motions inconsistent with the normal procedures of the court.

(b)      Plaintiffs provide to Defendants final exhibit list and provide copies of any exhibits that have not been previously provided.  As for any documents on this list that were not previously identified, defendants may conduct discovery concerning those documents until 15 days prior to trial.

(c)      Defendants provide to Plaintiffs final exhibit list and provide copies of any exhibits (that have not been previously provided).  As for any documents on this list that were not previously identified, Plaintiffs may conduct discovery concerning those documents until 15 days prior to trial.

6.      Plaintiffs' and Defendants' *de bene esse* cut off:                    35 days prior to trial

7.      Parties exchange:                    30 days prior to trial

(a)      Page/line deposition designations of all unavailable case-specific witnesses provided b both parties;

ii

    (b)    Pretrial motions; and

    (c)    Pursuant to Va. Code § 8.01-401.1, the parties shall exchange any statements from public treatises, periodicals, or pamphlets on a subject of history or medical r other science or art established as a reliable authority, by testimony or stipulation that it intends to introduce through an expert witness upon direct examination.

8.    Parties exchange:                         23 days prior to trial

    (a)    Counter-designations and objections to designation of depositions;

    (b)    Responses to pretrial motions;

    (c)    Objections to the admissibility of exhibits; and

    (d)    Plaintiffs to provide settlement demands.

9.    (a)    Parties exchange objections to counter-designations and/or cross-designations of depositions; and        18 days prior to trial

    (b)    Defendants to provide good-faith response to Plaintiffs' settlement demands.

10.    Subpoenas should be served prior to this date.        10 days prior to trial

11.    Parties reveal final list of all witnesses who will appear in person to testify at trial.        7 days prior to trial

12.    Parties both provide Voir Dire questions and jury instructions to the Court.        5 days prior to trial.

**OBJECTIONS BY OWENS-ILLINOIS, INC. TO
STANDING ORDER APPLICABLE TO ASBESTOS LITIGATION
CL92-10000W01 and CL92-10000C-03**

Owens-Illinois, Inc. objects to paragraph 6 of the Standing Order to the extent that it may be interpreted to authorize the use of depositions taken in the consolidated proceeding captioned C/P77-1 in the Federal District Court for the Eastern District of Virginia, Norfolk and Newport News Divisions, against Owens-Illinois, Inc. under circumstances in which Owens-Illinois, Inc. was not given notice of the taking of the deposition or appeared and cross-examined the witness with a similar motivation to do so as may exist in the case in which said deposition is now being offered.

Owens-Illinois objects to paragraph 16 of the Standing Order as an unreasonable limitation on the number of expert and non-expert witnesses which, under the circumstances of the nationwide scope of this litigation, prejudices or may prejudice Owens-Illinois' ability to present its defense and impairs its right to a fair trial.

Robert L. O'Donnell, Esquire (VSB No. 14832)
VANDEVENTER BLACK LLP
500 World Trade Center
Norfolk, VA 23510
(757) 446-8600 – Telephone
(757) 446-8670 – Telefax
*Counsel for Owens-Illinois, Inc.*

Defendants Dana Corporation and General Electric Company object to the entry of Paragraph 7 of the Standing Order inasmuch as it permits the noticing and taking of discovery depositions without allowing sufficient time for proper service of subpoenas *duces tecum* on fact witnesses prior to the depositions. Defendants object for the reasons stated in their Response To Plaintiff's Objections To Paragraphs 5 and 7 of the Proposed Standing Order Applicable to Asbestos Litigation and on the record during oral argument.

_____

John M. Fitzpatrick, Esquire (VSB No. 29906)
S. Elizabeth Bharr, Esquire (VSB No. 44439)
Matthew D. Joss, Esquire (VSB No. 48434)
Erik D. Nadolink, Esquire (VSB No. 38840)
LeCLAIR RYAN, P.C.
707 East Main Street, 11th Floor
Richmond, Virginia 23219
(804) 783-2003 (Telephone)
(804) 783-2294 (Facsimile)
**Counsel for Dana Corporation and
General Electric Company**

PATTEN, WORNOM, HATTEN & DIAMONSTEIN, L.C.

The Plaintiffs object to the entry of Paragraph 11 of the Standing Order for the reasons previously set forth in Plaintiffs' motion and brief, wherein Plaintiffs argued that the examination of the Plaintiffs' pathology and x-rays by a defense medical expert constituted an independent medical examination pursuant to Rule 4:10 of the Rules of the Supreme Court of Virginia and would thereby require non-testifying experts of the defense to provide copies of such reports to Plaintiffs' counsel.  Plaintiffs' motion was previously overruled by Letter Order of the Court dated March 8, 2004, to which the Plaintiffs specifically except.

_____
Robert R. Hatten, Esq. – VSB # 12854
PATTEN, WORNOM, HATTEN & DIAMONSTEIN, L.C.
12350 Jefferson Avenue, Suite 300
Newport News, VA  23602
757.223.4500  Telephone
757.249.3242  Facsimile
        *Counsel for All Plaintiffs*

SEEN AND OBJECTED IN PART AND AGREED
IN PART.  THESE DEFENDANTS OBJECT TO THE
LIMITATION OF THE NUMBER OF EXPERTS FOR
THE REASONS STATED IN COURT AND BRIEFS
AND MEMORANDA FILED:

_____

Carl R. Schwertz, Esq. (VSB#27399)
Justin S. Gravatt, Esq. (VSB#65506)
Duane, Hauck & Gnapp, P.C.
10 East Franklin Street
Richmond, Virginia  23219
Tel:  (804) 644-7400
Fax: (804) 649-8329
*Counsel for Garlock Sealing Technologies LLC,*
*Anchor Packing Company,*
*Fairbanks-Morse, Engine Division*
*Fairbanks-Morse, Pump Division*
*Belmont Packing Company*

SEEN AND AGREED TO:

Carl E. Pierce, II
PIERCE, HERNS, SLOAN & McLEOD, L.L.C.
321 East Bay Street, The Blake House
Charleston, South Carolina 29401
tel (843) 722-7733
fax (843) 722-7732

**Foster Wheeler LLC's (Survivor to merger with Foster Wheeler Corporation)
objections to Standing Order applicable to asbestos litigation
CL92-10000W-01 and CL92-10000C-03**

Foster Wheeler objects to paragraph 6 of the Standing Order on the grounds that it was not a party to C/P 77-1 and did not have notice of the depositions taken in that litigation and depositions taken there cannot now be used against it in the present litigation.   Foster Wheeler objects to paragraph 15 of the Standing Order to the extent it limits the listing of expert witnesses to 3 non-medical experts and 3 medical experts.   The complexity of this litigation and the medical and non-medical issues involved in many instances necessitate the use of more than 3 medical and 3 non-medical experts and this limitation on the listing of expert witnesses prejudices Foster Wheeler's right to a fair trial.

Robert A. Ziogas, Esq. (VSB #24964)
Glenn, Feldmann, Darby & Goodlatte
210 1st Street, S. W., Suite 200
Post Office Box 2887
Roanoke, Virginia  24001-2887
Telephone:  (540) 224-8000
Facsimile:  (540) 224-8050
Counsel for Foster Wheeler LLC (survivor to
merger with Foster Wheeler Corporation)

SIGNATURE PAGE FOR STANDING ORDER – HATTEN ASBESTOS LITIGATION

SEEN AND AGREED:

Richard K. Bennett (VSB No. 14724)
Julie S. Palmer (VSB No. 65800)
Harman, Claytor, Corrigan & Wellman, P.C.
P.O. Box 70280
Richmond, Virginia 23255
Phone: (804) 747-5200
Fax: (804) 747-6085
*Counsel for The Flintkote Company and
Buffalo Pumps, Inc.*

**Hopeman Brothers, Inc.'s**
**objections to Standing Order applicable to asbestos litigation**
**CL92-10000W-01 and CL92-10000C-03**

Hopeman Brothers, Inc. objects to paragraph 6 of the Standing Order on the grounds that it was not a party to C/P 77-1 and did not have notice of the depositions taken in that litigation and depositions taken there cannot now be used against it in the present litigation. Hopeman Brothers, Inc. objects to paragraph 15 of the Standing Order to the extent it limits the listing of expert witnesses to 3 non-medical experts and 3 medical experts. The complexity of this litigation and the medical and non-medical issues involved in many instances necessitate the use of more than 3 medical and 3 non-medical experts and this limitation on the listing of expert witnesses prejudices Hopeman Brothers, Inc.'s right to a fair trial.

Gerard E. W. Voyer, Esquire
Virginia Bar No. 04372
Christopher J. Wiemken, Esquire
Virginia Bar No. 43299
Taylor & Walker, P.C.
1300 First Virginia Tower
555 Main Street
P.O. Box 3490
Norfolk, Virginia 23514-3490
(757) 625-7300 - Telephone
(757) 625-1504 - Facsimile
*Counsel for Hopeman Brothers, Inc.*

**Burns International Services Corporation's**
**objections to Standing Order applicable to asbestos litigation**
**CL92-10000W-01 and CL92-10000C-03**

Burns International Services Corporation objects to paragraph 6 of the Standing Order on the grounds that it was not a party to C/P 77-1 and did not have notice of the depositions taken in that litigation and depositions taken there cannot now be used against it in the present litigation. Burns International Services Corporation objects to paragraph 15 of the Standing Order to the extent it limits the listing of expert witnesses to 3 non-medical experts and 3 medical experts. The complexity of this litigation and the medical and non-medical issues involved in many instances necessitate the use of more than 3 medical and 3 non-medical experts and this limitation on the listing of expert witnesses prejudices Burns International Services Corporation's right to a fair trial.


Gerard E. W. Voyer, Esquire
Virginia Bar No. 04372
Christopher J. Wiemken, Esquire
Virginia Bar No. 43299
Taylor & Walker, P.C.
1300 First Virginia Tower
555 Main Street
P.O. Box 3490
Norfolk, Virginia 23514-3490
(757) 625-7300 - Telephone
(757) 625-1504 - Facsimile
*Counsel for Burns International Services Corporation*

SEEN AND AGREED:

By _____
                Of Counsel

Henry N. Ware, Jr. Esq. (VSB #22832)
Mary Elizabeth Davis, Esq. (VSB #41908)
M.F. Connell Mullins, Jr., Esq. (VSB #47213)
J. Vaden Hunt, Esq. (VSB # 65574)
Spotts, Fain Chappell & Anderson, P.C.
411 East Franklin Street, Suite 600
P.O. Box 1555
Richmond, Virginia 23219
Tel: (804) 788-1190
Fax: (804) 788-0570
*Counsel for Viacom, Inc.,*
*Ingersoll-Rand Company,*
*Quigley Company, Inc.,*
*and Pfizer, Inc.*

The defendant John Crane, Inc. objects to the entry of Paragraph 6 of the Order inasmuch as it permits the use of depositions and other discovery from a series of cases styled CP 77-1, in the United States District Court for the Eastern District of Virginia, in which this defendant was not at the time of the taking of the discovery a party, was not noticed and did not participate. To the extent this defendant was properly noticed, defendant can not and does not object. It is this defendant's understanding that it was involved in one case in CP 77-1, an action commenced in the federal courts of Texas and transferred to the Virginia federal system, where it was tried in 1988. Because of the transfer under forum non conveniens reasons, this defendant objects to the use of any discovery taken before it became yoked with CP 77-1.


*Archibald Wallace*

Archibald Wallace, III (VSB No. 06005)
WallacePledger PLLC
The Capstone Center
7100 Forest Avenue, Suite 302
Richmond, Virginia 23226
*Counsel for John Crane, Inc.*

SEEN AND AGREED:

Jeffrey S. Poretz, Esquire (VSB# 38529)
Douglas Pfeiffer, Esquire
Miles & Stockbridge, P.C.
10 Light Street
Baltimore, MD 21202
(410) 727-6464
*Counsel for Defendant Air Products and*
*Chemicals, Inc., as a successor in interest to*
*Catalytic, Inc.*

SEEN AND AGREED TO:

Jeffrey S. Poretz, Esquire (VSB# 38529)
Robin Silver, Esquire
Anthony B. Taddeo, Jr., Esquire
Miles & Stockbridge, P.C.
10 Light Street
Baltimore, MD 21202
(410) 727-6464
*Counsel for Georgia-Pacific Corporation*

Seen:

James A. Gorry, III, Esquire
Hofheimer Nusbaum, P.C,
1700 Dominion Tower
999 Waterside Drive
Norfolk, Virginia 23510
(757) 622-3366
(757) 629-0700 (facsimile)
*Counsel for Eaton Electrical, Inc.*

## OBJECTIONS OF CAUDLE-HYATT, INC.,
### ITT INDUSTRIES, INC., AND PATTERSON PUMP COMPANY
### TO STANDING ORDER APPLICABLE TO ASBESTOS LITIGATION
### CL92-10000W-01 AND CL92-10000C-03

ITT Industries, Inc. and Patterson Pump Company object to paragraph 6 of the Standing Order on the grounds that they were not a party to C/P 77-1, they did not have notice of the depositions taken in the C/P 77-1 litigation, and depositions taken there cannot now be used against them in the present litigation. To the extent that Caudle-Hyatt, Inc. was not a party to particular cases or was not noticed for particular depositions in the C/P 77-1 litigation, Caudle-Hyatt, Inc. objects to paragraph 6 of the Standing Order on the grounds that it did not have notice of those depositions taken in that litigation and depositions taken there without notice to Caudle-Hyatt, Inc. cannot now be used against it in the present litigation.

Caudle-Hyatt, Inc., ITT Industries, Inc. and Patterson Pump Company object to paragraph 15 of the Standing Order to the extent it limits the listing of expert witnesses to three non-medical experts and three medical experts. The complexity of this asbestos litigation and the medical and non-medical issues involved in many instances necessitate the use of more than three medical and three non-medical experts, and this limitation on the listing of expert witnesses prejudices the right of Caudle-Hyatt, Inc., ITT Industries, Inc. and Patterson Pump Company to a fair trial.


*Stephanie C. Blythe* (signature)

Albert H. Poole, Esquire
Stephanie C. Blythe, Esquire
HUFF, POOLE & MAHONEY, P.C.
4705 Columbus Street
Virginia Beach, Virginia 23462
Telephone: (757) 499-1841
Facsimile: (757) 552-6016
***Counsel for Caudle-Hyatt, Inc.,***
***ITT Industries, Inc., and***
***Patterson Pump Company***

### WARREN PUMPS, INC.'S OBJECTIONS TO
### THE STANDING ORDER APPLICABLE TO
### THE NEWPORT NEWS ASBESTOS LITIGATION
### CL92-10000W-01 and CL92-10000C-03

Warren Pumps objects to paragraph 6 of the Standing Order to the extent it may be interpreted to permit the use of depositions taken in C/P 77-1 in the present litigation against defendants who: (1) were not party to that litigation; (2) did not receive notice of said depositions; or (3) did not have an opportunity to cross-examine the deponent(s).

Warren Pumps further objects to Paragraph 15 of the Standing Order to the extent it constitutes an unreasonable limitation on the number of medical and non-medical experts Warren Pumps is permitted to designate. This limitation may prejudice Warren Pumps' ability to defend the plaintiffs' claims and may adversely affect its right to a fair trial.

WARREN PUMPS, INC.

David Craig Landin (VSB 12642)
Lori M. Elliott (VSB 36375)
Raymond F. Geoffroy (VSB 42781)
HUNTON & WILLIAMS
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
(804) 788-8200
(804) 788-8218 (facsimile)

59184.000011 RICHMOND 1189874v1

**OBJECTIONS OF CAUDLE-HYATT, INC.,**
**ITT INDUSTRIES, INC., AND PATTERSON PUMP COMPANY**
**TO STANDING ORDER APPLICABLE TO ASBESTOS LITIGATION**
**CL92-10000W-01 AND CL92-10000C-03**

ITT Industries, Inc. and Patterson Pump Company object to paragraph 6 of the Standing Order on the grounds that they were not a party to C/P 77-1, they did not have notice of the depositions taken in the C/P 77-1 litigation, and depositions taken there cannot now be used against them in the present litigation. To the extent that Caudle-Hyatt, Inc. was not a party to particular cases or was not noticed for particular depositions in the C/P 77-1 litigation, Caudle-Hyatt, Inc. objects to paragraph 6 of the Standing Order on the grounds that it did not have notice of those depositions taken in that litigation and depositions taken there without notice to Caudle-Hyatt, Inc. cannot now be used against it in the present litigation.

Caudle-Hyatt, Inc., ITT Industries, Inc. and Patterson Pump Company object to paragraph 15 of the Standing Order to the extent it limits the listing of expert witnesses to three non-medical experts and three medical experts. The complexity of this asbestos litigation and the medical and non-medical issues involved in many instances necessitate the use of more than three medical and three non-medical experts, and this limitation on the listing of expert witnesses prejudices the right of Caudle-Hyatt, Inc., ITT Industries, Inc. and Patterson Pump Company to a fair trial.

Albert H. Poole, Esquire
Stephanie C. Blythe, Esquire
HUFF, POOLE & MAHONEY, P.C.
4705 Columbus Street
Virginia Beach, Virginia 23462
Telephone: (757) 499-1841
Facsimile: (757) 552-6016
*Counsel for Caudle-Hyatt, Inc.,*
*ITT Industries, Inc., and*
*Patterson Pump Company*

**WARREN PUMPS, INC.'S OBJECTIONS TO**
**THE STANDING ORDER APPLICABLE TO**
**THE NEWPORT NEWS ASBESTOS LITIGATION**
**CL92-10000W-01 and CL92-10000C-03**

Warren Pumps objects to paragraph 6 of the Standing Order to the extent it may be

interpreted to permit the use of depositions taken in C/P 77-1 in the present litigation against

defendants who: (1) were not party to that litigation; (2) did not receive notice of said

depositions; or (3) did not have an opportunity to cross-examine the deponent(s).

Warren Pumps further objects to Paragraph 15 of the Standing Order to the extent it

constitutes an unreasonable limitation on the number of medical and non-medical experts Warren

Pumps is permitted to designate.  This limitation may prejudice Warren Pumps' ability to defend

the plaintiffs' claims and may adversely affect its right to a fair trial.

WARREN PUMPS, INC.

David Craig Landin (VSB 12642)
Lori M. Elliott (VSB 36375)
Raymond F. Geoffroy (VSB 42781)
HUNTON & WILLIAMS
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
(804) 788-8200
(804) 788-8218 (facsimile)

59184.000011 RICHMOND 1189874v1

*VIRGINIA:*

## IN THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS

IN RE: ALL ASBESTOS CASES      }
      }
OWENS-CORNING CORPORATION, et al.  } LAW NO. CL92-92-10000-01
      }
       *Defendants*  }

### STANDING ORDER APPLICABLE TO ASBESTOS LITIGATION

SEEN AND AGREED TO:        Dated:

*April 15, 2004*

Richard W. Boone, Sr.
BOONE & ASSOCIATES, P.C.
*Counsel for Defendant Crown, Cork & Seal*
10195 Main Street
Suite D
Fairfax, Virginia 22031-3415
703-934-2780 (phone)
703-934-2785 (fax)

READ AND SIGNED:

R. Thomas Radcliffe, Jr., Esquire
VA Bar #34711
DEHAY & ELLISTON, L.L.P.
36 S. Charles Street, Suite 1300
Baltimore, MD  21201
(410) 783-7225

Counsel for Defendants,
The Okonite Company and Goulds Pumps, Inc.


**OBJECTION**
These Defendants maintain their objection to Paragraph 16 of the Standing Order
Applicable to Asbestos Litigation which limits the non-medical and medical experts that
the parties may list to a total of six (6) experts, absent leave of Court.

The defendant SB Decking Inc., f/k/a Selby, Battersby & Co., Inc. objects to the entry of Paragraph 6 of the Order inasmuch as it permits the use of depositions and other discovery from a series of cases styled CP 77-1, in the United States District Court for the Eastern District of Virginia, in which this defendant was not a party, was not noticed, and did not participate.

Respectfully submitted,

GAVETT AND DATT, P.C.

_____

Geoffrey S. Gavett, #33393
Lucas F. Webster, #66056
15850 Crabbs Branch Way, Suite 180
Rockville, MD 20855
(301) 948-1177
**Attorneys for SB Decking Inc., f/k/a Selby, Battersby & Co., Inc.**

The defendant Pneumo Abex Corporation objects to Paragraph 6 of the Order permitting the use of depositions and other discovery from a series of cases styled CP 77-1, in the United States District Court for the Eastern District of Virginia, in which this defendant was not at the time of the taking of the discovery a party, was not noticed and did not participate. Pneumo Abex also objects to Paragraph 15 of the Standing Order to the extent it limits the listing of expert witnesses to 3 non-medical and 3 medical experts. The complexity of this litigation and the medical and non-medical legal issues involved necessitates the use of additional experts and this limitation prejudices Pneumo Abex's right to a fair trial.


_____
R. Barrow Blackwell, Esq. (VSB No. 16741)
Kaufman & Canoles, P.C.
150 West Main Street
Norfolk, VA  23510
757/624-3000
757/624-3169
Counsel for Pneumo Abex Corporation


#911178 v2

The defendant Natkin & Company objects to the entry of Paragraph 6 of the Order inasmuch as it permits the use of depositions and other discovery from a series of cases styled CP 77-1, in the United States District Court for the Eastern District of Virginia, in which this defendant was not at the time of the taking of the discovery a party, was not noticed and did not participate. To the extent this defendant was properly noticed, defendant can not and does not object.


Charles L. Williams (VSB #23587)
James C. Skilling (VSB #27998)
William F. Karn (VSB #36342)
BUTLER WILLIAMS & SKILLING, P.C.
100 Shockoe Slip, Fourth Floor
Richmond, VA 23219
(804) 648-4848 - telephone
(804) 648-6814 - facsimile
*Counsel for Natkin & Company*

The defendant E. I. du Pont de Nemours and Company objects to Paragraph 6 of the Order permitting the use of depositions and other discovery from a series of cases styled CP77-1,in the United States District Court for the Eastern District of Virginia, in which this defendant was not at the time of the taking of the discovery a party, was not noticed and did not participate. E. I. du Pont de Nemours and Company also objects to Paragraph 15 of the standing order to the extent it limits the listing of expert witnesses to 3 non-medical and 3 medical experts. The complexity of this litigation and the medical and non-medical legal issues involved necessitate the use of additional experts and this limitation prejudices E. I. du Pont de Nemours and Company's right to a fair trial.

_Robert W. McFarland_

Robert W. McFarland, VSB #24021
McGuireWoods LLP
9000 World Trade Center
Norfolk, VA 23510
757/640-3700

\\COM\409357.1

SEEN AND OBJECTED TO:

International Paper Company objects to the entry of Paragraph 6 of this Order inasmuch as it permits the use of depositions and other discovery from a series of cases styled CP77-1, in the United States District Court for the Eastern District of Virginia, in which this defendant was not noticed and did not participate.  Consequently, this defendant did not have the opportunity to defend its interests in those proceedings and would be unduly prejudiced by their use in any case by virtue of this Order.

_____
Counsel for International Paper Company

**Virginia:   In The Circuit Court for the City of Newport News**
**In re: All Asbestos Cases**                          CL90-10000W-01
                                                        CL90-10000C-03


**SEEN AND OBJECTED TO:**

  Minnesota Mining Company, Inc. (3M) objects to paragraph 6 of the Standing Order to

the extent that it may be interpreted to authorize the use of depositions taken in the consolidated

proceeding captioned C/P77-1 in the Federal District Court for the Eastern District of Virginia,

Norfolk and Newport News Divisions, against 3M under circumstances in which 3M was not

given notice of the taking of the deposition or appeared and cross-examined the witness with a

similar motivation to do so as may exist in the case in which said deposition is now being

offered.

  3M objects to paragraph 16 of the Standing Order as an unreasonable limitation on the

number of expert and non-expert witnesses which, under the circumstances of the nationwide

scope of this litigation, prejudices or may prejudice 3M's ability to present it defenses and

impairs its defense and impairs it right to a fair trial.

JORDAN COYNE & SAVITS, L.L.P.
10509 Judicial Drive, Suite 200
Fairfax, VA 22030
703-246-0900
703-591-3673 (fax)


By:   _____
   Michael E. Reheuser, VSB #36475
   Counsel for Minnesota Mining Company, Inc.

**OBJECTIONS OF GENERAL REFRACTORIES COMPANY
TO STANDING ORDER APPLICABLE TO ASBESTOS LITIGATION
CL92-10000W-01 AND CL92-10000C-03**

General Refractories Company adopts any and all objections set forth by other

defendants herein, as applicable.

Kenneth J. Ries, Esquire
JOHNSON, AYERS & MATTHEWS, P.L.C.
Post Office Box 2200
Roanoke, Virginia 24009-2200
540/767-2035
       Of Counsel for Defendant
       General Refractories Company

The defendant Mobil Corporation objects to Paragraph 6 of the Standing Order permitting the use of depositions and other discovery from a series of cases styled CP77-1, in the United States District Court for the Eastern District of Virginia, in which this defendant was not at the time of the taking of the discovery a party, was not noticed and did not participate. Mobil Corporation also objects to Paragraph 15 of the Standing Order to the extent it limits the listing of expert witnesses to 3 non-medical and 3 medical experts. The complexity of this litigation and the medical and non-medical legal issues involved necessitate the use of additional experts and this limitation prejudices Mobil Corporation's right to a fair trial.

Bruce T. Bishop, VSB #16029
Joyce Jackson Wood, VSB #19969
Willcox & Savage P.C.
One Commercial Place
1800 Bank of America Center
Norfolk, Virginia 23510
(757) 628-5500

The defendant Rapid American Corporation objects to Paragraph 6 of the Standing Order permitting the use of depositions and other discovery from a series of cases styled CP77-1, in the United States District Court for the Eastern District of Virginia, in which this defendant was not at the time of the taking of the discovery a party, was not noticed and did not participate.  Rapid American Corporation also objects to Paragraph 15 of the Standing Order to the extent it limits the listing of expert witnesses to 3 non-medical and 3 medical experts.  The complexity of this litigation and the medical and non-medical legal issues involved necessitate the use of additional experts and this limitation prejudices Rapid American Corporation's right to a fair trial.

Bruce T. Bishop, VSB #16029
Joyce Jackson Wood, VSB #19969
Willcox & Savage P.C.
One Commercial Place
1800 Bank of America Center
Norfolk, Virginia 23510
(757) 628-5500

1-578391.1
05/05/2004

SEEN AND OBJECT TO:

Metropolitan Life Insurance Company objects to the entry of Paragraph 6 inasmuch as it permits the use of depositions and other discovery from a series of cases styled CP77-1, in the United States District Court for the Eastern District of Virginia, in which this defendant was not noticed and did not participate. Consequently, this defendant did not have the opportunity to defend its interests in those proceedings and would be unduly prejudiced by their use in any case by virtue of this Order. Metropolitan Life Insurance Company also incorporates by reference as its own, the objections made by other Defendants to this Order.

_____
METROPOLITAN LIFE INSURANCE COMPANY
BY COUNSEL

John P. Fishwick, Jr.
VSB# 23285
Lichtenstein Fishwick & Johnson, PLC
101 S. Jefferson Street
Suite 400
Roanoke, Virginia 24011
(540) 345-5890 (Telephone)
(540) 345-5789 (Facsimile)

**HONEYWELL INTERNATIONAL, INC.,
AS SUCCESSOR TO ALLIED CHEMICAL CORPORATION'S
OBJECTIONS TO
THE STANDING ORDER APPLICABLE TO
THE NEWPORT NEWS ASBESTOS LITIGATION
CL92-10000W-01 and CL92-10000C-03**

Honeywell International, Inc., as successor to Allied Chemical Corporation (hereinafter "Allied") objects to paragraph 6 of the Standing Order to the extent it may be interpreted to permit the use of depositions taken in C/P 77-1 in the present litigation against defendants who: (1) were not party to that litigation; (2) did not receive notice of said depositions; or (3) did not have an opportunity to cross-examine the deponent(s).

Allied further objects to Paragraph 16 of the Standing Order to the extent it constitutes an unreasonable limitation on the number of medical and non-medical experts Allied is permitted to designate. This limitation may prejudice Allied's ability to defend the plaintiffs' claims and may adversely affect its right to a fair trial.

                        **HONEYWELL INTERNATIONAL, INC.
                        as Successor to ALLIED CHEMICAL CORP.**


                        _____
                        John D. Epps (VSB 19594)
                        Raymond F. Geoffroy (VSB 42781)
                        HUNTON & WILLIAMS
                        Riverfront Plaza, East Tower
                        951 East Byrd Street
                        Richmond, Virginia 23219
                        (804) 788-8200
                        (804) 788-8218 (facsimile)

**Crane Company's**
**objections to Standing Order applicable to asbestos litigation**
**CL92-10000W-01 and CL92-10000C-03**

Crane Company objects to paragraph 6 of the Standing Order on the grounds that it was not a party to C/P 77-1 and did not have notice of the depositions taken in that litigation and depositions taken there cannot now be used against it in the present litigation. Crane Company objects to paragraph 15 of the Standing Order to the extent it limits the listing of expert witnesses to 3 non-medical experts and 3 medical experts. The complexity of this litigation and the medical and non-medical issues involved in many instances necessitate the use of more than 3 medical and 3 non-medical experts and this limitation on the listing of expert witnesses prejudices Crane Company's right to a fair trial.


_Christopher J. Wiemken_

John Franklin, III, Esquire
Virginia Bar No. 13267
Christopher J. Wiemken, Esquire
Virginia Bar No.  43299
Gerard E. W. Voyer, Esquire
Virginia Bar No.  04372
Taylor & Walker, P.C.
1300 First Virginia Tower
555 Main Street
P.O. Box 3490
Norfolk, Virginia 23514-3490
(757) 625-7300 - Telephone
(757) 625-1504 - Facsimile
*Counsel for Crane Company*

AYLOR & WALKER, P.C.
NORFOLK, VIRGINIA
23514

DAIMLERCHRYSLER CORPORATION'S, FORD MOTOR COMPANY'S, GENERAL
MOTORS CORPORATION'S, OBJECTIONS TO STANDING ORDER APPLICABLE TO
ASBESTOS LITIGATION
CL 92-10000W-01 AND CL 92-10000C-03

DaimlerChrysler, Ford and General Motors object to this standing order, in its entirety, on the
following grounds:

1. No statutory, common law or other legal authority authorizes the Court to impose local
   rules or standing orders consolidating the procedures of multiple cases and impacting the
   rights of the parties in this manner.

2. While Virginia Supreme Court Rule 1:18 grants the Court discretion to control the
   scheduling of individual existing actions, it does not grant the Court the power to impose
   a standing order such as this one.

3. Neither the Multiple Claimant Litigation Act, Virginia Code §8.01-267.1, nor the
   Asbestos Consolidation Statute, Virginia Code §8.01-374.1, grants the Court authority to
   impose this standing order.

4. The Court does not have the requisite subject matter jurisdiction to impose such a
   standing order upon cases in which no case or controversy exists.

5. Enforcement of this standing order violates the due process rights of defendants made
   subject to its provisions after its entry by the Court.

6. The consolidated procedures imposed by this standing order are prejudicial to
   Defendants.

7. The standing order does not differentiate between the various forms of asbestos and
   asbestos containing products used, manufactured and sold by various defendants.

DaimlerChrysler, Ford and General Motors object to specific provisions of the standing order, as
follows:

8. DaimlerChrysler, Ford and General Motors object to paragraph 6 of the standing order,
   because they were not parties to C/P 77-1 and did not receive notice of any depositions in
   that case. Therefore, any depositions from that case cannot be used against
   DaimlerChrysler, Ford or General Motors in any present litigation.

9. DaimlerChrysler, Ford and General Motors object to paragraph 8 of the standing order, because it prejudices defendants by requiring the existence of one "Medical Liaison" to coordinate the employment records, medical records, pathological materials and radiological materials on the behalf of a large group of defendants manufacturing a variety of products containing various amounts and types of asbestos and asbestos containing products.

10. DaimlerChrysler, Ford and General Motors object to paragraph 16 of the standing order, because its limits upon the number of experts to be used by a party is prejudicial and will prevent Defendant's rights to a fair trial.

SEEN AND OBJECTED TO:

DAIMLERCHRYSLER CORPORATION,
FORD MOTOR COMPANY, AND
GENERAL MOTORS CORPORATION

By _____
                     Of Counsel

Steven R. Williams (VSB# 28909)
Samuel L. Tarry, Jr. (VSB# 36850)
Donald W. Martin, Jr. (VSB# 45608)
McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219-4030
Tel: (804) 775-1000
Fax: (804) 775-1061
**Counsel for Defendants DaimlerChrysler
Corporation, Ford Motor Company,
and General Motors Corporation**

HONEYWELL INTERNATIONAL, INC.'S OBJECTIONS TO STANDING ORDER
APPLICABLE TO ASBESTOS LITIGATION
CL 92-10000W-01 AND CL 92-10000C-03

Honeywell International Inc. objects to this Standing Order, in its entirety, because no statutory, common law or other legal authority authorizes the Court to impose local rules or standing orders consolidating the procedures of multiple cases and impacting the rights of the parties in this manner. The Court does not have the requisite subject matter jurisdiction to impose such a standing order upon cases in which no case or controversy exists. The consolidated procedures of the Standing Order are prejudicial to defendants.

Honeywell International, Inc. objects to paragraph 6 of the Standing Order because it was not a party to C/P 77-1 and did not receive notice of any depositions in that case. Therefore, any depositions from that case cannot be used against Honeywell International, Inc. in any present litigation.

Honeywell International, Inc. objects to paragraph 8 of the Standing Order because it prejudices defendants by requiring the existence of one "Medical Liaison" to coordinate the employment records, medical records, pathological materials and radiological materials on the behalf of a large group of defendants manufacturing a variety of products containing various amounts and types of asbestos and asbestos containing products.

Honeywell International, Inc. objects to paragraph 16 of the standing order because its limits upon the number of experts to be used by a party are prejudicial and will prevent defendant's rights to a fair trial.

> HONEYWELL INTERNATIONAL, INC
> FORMERLY ALLIEDSIGNAL, INC. AND
> ALLIED CORPORATION, SUCCESSOR
> IN INTEREST TO BENDIX CORPORATION
>
> By _____
> Of Counsel

William D. Bayliss (VSB #13741)
Calvin W. Fowler (VSB # 27982)
Lynn K. Brugh, IV (VSB # 36778)
Turner A. Broughton (VSB # 42627)
WilliamsMullen, P.C.
Two James Center
1021 East Cary Street
P.O. Box 1320
Richmond, Virginia 23218-1320
(804) 643-1991
(804) 783-6507 (Fax)
*Counsel for Honeywell International, Inc.,
Formerly AllliedSignal, Inc. and Allied
Corporation, successor in interest to
Bendix Corporation*

Waco, Inc.'s
Objections to Standing Order Applicable to Asbestos Litigation
CL92-10000W-01 and CL92-10000C-03

Waco, Inc. objects to paragraph 6 of the Standing Order on the grounds that it was not a party to C/P 77-1 and did not have notice of the depositions taken in that litigation and depositions taken there cannot now be used against it in the present litigation. Waco, Inc. objects to paragraph 16 of the Standing Order to the extent it limits the listing of expert witnesses to 3 non-medical experts and 3 medical experts. The complexity of this litigation and the medical and non-medical issues involved in many instances necessitate the use of more than 3 medical and 3 non-medical experts and this limitation on the listing of expert witnesses prejudices Waco, Inc.'s right to a fair trial.

George J. Dancigers, Esquire
VSB# 16077
Ann J. Premer, Esquire
VSB #65843
MCKENRY, DANCIGERS, WARNER, DAWSON & LAKE, P.C.
The Greenwich Center
192 Ballard Court, Suite 400
Virginia Beach, Virginia  23462
(757) 461-2500
*Counsel for Waco, Inc.*

**Uniroyal, Inc.'s**
**Objections to Standing Order Applicable to Asbestos Litigation**
**CL92-10000W-01 and CL92-10000C-03**

Uniroyal, Inc. objects to paragraph 6 of the Standing Order on the grounds that it was not a party to C/P 77-1 and did not have notice of the depositions taken in that litigation and depositions taken there cannot now be used against it in the present litigation. Uniroyal, Inc. objects to paragraph 16 of the Standing Order to the extent it limits the listing of expert witnesses to 3 non-medical experts and 3 medical experts. The complexity of this litigation and the medical and non-medical issues involved in many instances necessitate the use of more than 3 medical and 3 non-medical experts and this limitation on the listing of expert witnesses prejudices Uniroyal, Inc.'s right to a fair trial.


George J. Dancigers, Esquire
VSB# 16077
Ann J. Premer, Esquire
VSB #65843
MCKENRY, DANCIGERS, WARNER, DAWSON & LAKE, P.C.
The Greenwich Center
192 Ballard Court, Suite 400
Virginia Beach, Virginia 23462
(757) 461-2500
*Counsel for Uniroyal, Inc.*

SIGNED AND AGREED TO:

PIERCE, HERNS, SLOAN & McLEOD, LLC
The Blake House
321 East Bay Street
P.O. Box 22437 (29413)
Charleston, South Carolina (29401)
PH: (843) 722-7733
FAX: (843) 722-7732

BY: _____

James G. Kennedy
James D. Gandy, III
Carl E. Pierce, II
David B. Yarborough, Jr.

Counsel for Union Carbide Corporation and Amchem Products, Inc.

STACKHOUSE, SMITH & NEXSEN
1600 First Virginia Tower
555 Main Street
P.O. Box 3640 (zip: 23514)
Norfolk, VA 23510
PH: (757) 623-3555
FAX: (757) 624-9245

BY: _____

William W. Nexsen     VA Bar #1759
Paul H. Avery         VA Bar #46624
Scott Sina            VA Bar#47890

# McKenry, Dancigers, Dawson & Lake
### A PROFESSIONAL CORPORATION
### ATTORNEYS AND COUNSELORS AT LAW
P. O. BOX 12549
NORFOLK, VA 23541-0549

192 BALLARD COURT
SUITE 400
VIRGINIA BEACH, VIRGINIA 23462-6538

TELEPHONE (757) 461-2500
FACSIMILE (757) 461-2341
www.va-law.org

JAMES R. McKENRY
GEORGE J. DANCIGERS
THOMAS C. DAWSON, JR.
PETER S. LAKE

TED G. YOAKAM
J. BRIAN SLAUGHTER
JASON C. ROPER
DEBORAH B. VAUGHN
ALLISON W. ANDERS
NICOLE S. LANG

MARY J. McCLELLAN
ADMINISTRATOR

June 19, 2006

Donald N. Patten, Esquire
Patten, Wornom, Hatten & Diamonstein, LC
12350 Jefferson Avenue, Suite 300
Newport News, Virginia 23602

     RE:    <u>Ellis E. Hales, Jr. vs. Garlock Sealing Technologies, LLC, et al.</u>

Dear Mr. Patten:

As counsel for Waco, Inc., I have read the Notice of Removal filed by Robert Tata and Wendy McGraw on behalf of Warren Pumps, LLC in this case.

At Page 6 of the Notice of Removal, Note 3 and the second sentence of numbered Paragraph 22 suggests that there may be some sort of an arrangement by and between your office and my office to defeat diversity jurisdiction.

As you know, since 1977, I have had the privilege of representing and defending Defendants in the asbestos litigation, thousands of which cases being with the folks in your office and Richard Glasser's office as Plaintiffs' counsel.

Over the years, with respect to Waco, Inc., our respective firms have battled over many cases and eventually have come to an understanding with respect to resolving these cases. Should your office or indeed Richard Glasser's office present to me sufficient information in any particular case that leads me to believe that settling a case is in Waco, Inc.'s best interest, I will so recommend to Waco, Inc. This decision is mine and mine alone. The factors that go into my recommendation are quintessentially my work product. However, settlement timing is of no concern to me.

As Robert Tata and Wendy McGraw, who are both fine lawyers, can determine by



Page 2
June 19, 2006

reviewing the many public record Orders that have been entered in the thousands of asbestos cases filed by your office and Mr. Glasser's office, Waco, Inc. has indeed settled thousands of cases with your offices.

In most cases, Waco, Inc. is not served by your firm. Service is not necessary for me to make a determination as to whether a case ought to be settled or not. This is with your agreement and mine and at my request. Should Waco, Inc. be served, with your agreement and at my request, it is not necessary for Waco, Inc. to file responsive pleadings. This is with your agreement and mine. Waco, Inc. does not traditionally attend depositions of any kind with respect to cases filed by your office or Richard Glasser's office.

Should the occasion arise that we are unable to resolve a case, we would certainly need to file an Answer at that point. Should I need a deposition transcript to assist me in evaluating any particular case, they have always been provided. Obviously, should I not be able to recommend a settlement and should you continue to believe that there is a potentially meritorious claim against Waco, Inc., Plaintiff is free to try the case. Our office has nothing to do with the timing of any settlement and never has.

Regarding the substance of the Notice of Removal, I am not in a position to comment on it, especially since only the Plaintiff has testified and no one else has. I anticipate that at such point as you believe that there is the type of evidence that you believe is sufficient for me to consider with respect to resolving this case that you will provide it to me, as your office always has.

Over the past thirty years or so, the asbestos litigation has spawned many different approaches by and between the parties with respect to the appropriate handling of these matters from both sides and my sense is that Mr. Tata and Ms. McGraw's comments concerning the timing issue may have been a little hasty. Should Mr. Tata and Ms. McGraw decide to check the local Court's records with respect to asbestos litigation, they will find thousands of Orders reflecting cases that have been settled to the satisfaction of the parties. Again, this is public record.

I am writing because while it is true that "fraudulent joinder" does not reflect on the integrity of the parties, it is nevertheless distressing to have my firm's good name and Waco, Inc.'s reputation linked with such a concept. There is no basis for it.

To the extent that Mr. Tata and Ms. McGraw's Note 3 suggests that Waco, Inc. was named in many suits and then was dismissed implying that there was no actual settlement, this is again apparently somewhat hastily said. While Warren Pumps indicates that it lacks

Page 3
June 19, 2006

sufficient information to determine whether the dismissals in the other cases were timed to defeat diversity jurisdiction, a simple call to counsel could have determined whether or not the dismissals were made with a real settlement or not.

Very truly yours,

George J. Dancigers

GJD/eer

cc:   Richard Glasser, Esquire

11807.13694

# PATTEN, WORNOM, HATTEN & DIAMONSTEIN, L.C.

DONALD N. PATTEN
ROBERT R. HATTEN
ALAN A. DIAMONSTEIN
H. DUNCAN GARNETT, JR.
AVERY T. WATERMAN, JR.*
ELEANOR WESTON BROWN**
ALLAN R. STALEY
SOUTH T. PATTERSON
JAMES H. SHOEMAKER, JR.
WESLEY E. RICE
HUGH B. McCORMICK, III
STEVEN A. MEADE
DOUGLAS E. MILLER
PATRICK R. PETTITT

ATTORNEYS AND COUNSELORS AT LAW
SUITE 300
12350 JEFFERSON AVENUE
NEWPORT NEWS, VIRGINIA 23602

_____

(757) 223-4500

FAX  (757) 249-3242

WRITER'S DIRECT DIAL: (757) 223-4591
WRITER'S E-MAIL: jblaylock@pwhd.com
WEBSITE: http://www.pwhd.com

JORDAN Z. DALY
JENNIFER WEST VINCENT
KEVIN M. DIAMONSTEIN***
JENNIFER J. SHERWOOD
WILLIAM W. C. HARTY
CHRISTIANE G. BURRELL

OF COUNSEL
NEAL J. PATTEN
I. LEAKE WORNOM, JR.
STANLEY W. DRUCKER
WILLIAM M. MARTIN, III

_____

THOMAS R. WATKINS (1925-1995)

* Admitted in VA, DC and LA
** Admitted in VA and NC
*** Admitted in VA, DC, PA and NY

March 15, 2006

Robert M. Tata, Esq.
Hunton & Williams, LLP
500 East Main, Suite 1000
Norfolk, VA  23510-3889

     RE:   Ellis Edward Hales, Jr. v. Garlock Sealing Technologies, LLC, et al.,
            Civil Action No.:  00526VC

Dear Mr. Tata:

     Pursuant to the agreement dated April 14, 2005, enclosed please find the Plaintiff's Complaint filed in the above-referenced matter.

     If you should have any questions, please feel free to contact our office at 757.223.4500.

               Sincerely,

               PATTEN, WORNOM, HATTEN
               & DIAMONSTEIN, L.C.

               Joyce D. Blaylock
               Paralegal

JB\jb

Enclosure



VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF NEWPORT NEWS

IN RE: ALL ASBESTOS CASES                    CL90-10000W-01
                                             CL90-10000C-03


SUPPLEMENT NUMBER 1
TO STANDING ORDER APPLICABLE TO ASBESTOS LITIGATION

For the purpose of conserving judicial resources and streamlining the procedural aspects of the asbestos cases filed and to be filed in this Court, it is hereby ORDERED that the following revised procedures apply:

1.    Twelve trial dates for these cases per year shall be designated and assigned by the Court.  On an alternating basis, the defendants' counsel and the plaintiffs' counsel shall select four cases per trial date.  Selection of the first six trial dates of a given year shall be made by June 30th of the year preceding and selection of the last six trial dates of a given year shall be made by December 31st of the year preceding.  The judge to whom the four cases have been assigned will make the final decision as to the consolidation of those actions for trial.

2.    The plaintiffs' shall file a Master Motion for Judgment which will be incorporated by reference in all subsequently filed asbestos cases by the filing of an Abbreviated Motion for Judgment.

3.    Each defendant shall file a Master Grounds of Defense which will serve as the responsive pleading to the Master Motion for Judgment.  After the filing of the Abbreviated Motion for Judgment, and within the time limits prescribed by the Rules of the Supreme Court of Virginia, each Defendant shall file a Short Form Grounds of

EXHIBIT
H

Defense which simply states that service has been achieved and that the Defendant adopts the Master Grounds of Defense.

4.   The plaintiffs shall file a Master Witness List containing the names and addresses of all of the corporate witnesses, generic product identification witnesses, state-of-the-art experts, and other witnesses who will testify about general issues without reference to a particular plaintiff.   Each defendant shall also file a Master Witness List containing the names and addresses of its corporate witnesses, state-of-the-art experts and other witnesses who will testify about general issues.   Both the plaintiffs' and the defendants' Master Witness Lists shall indicate the scope of the proposed witness' testimony, whether the witness has been previously deposed, and identify a where a sample of such testimony can be located by case citation. Witnesses can be added to the Master Witness Lists only by sequentially numbered supplements.

5.   Both the plaintiffs and each defendant shall file a Master Exhibit List which will apply to all cases.   Exhibits can be added to the Master Exhibit Lists only by sequentially numbered supplements.

6.   Plaintiffs shall file a list of depositions that have been ruled upon by either this Court or the Federal District Court for the Eastern District of Virginia and have been scripted.   The list shall indicate those parties represented or who had an opportunity to be represented at the deposition and will be available for use in all subsequent cases against any party who was present or had the opportunity to be present at the deposition.   Additions or deletions from the scripted depositions are at

the discretion of the trial court predicated upon a showing of good cause by the party requesting the same.

7.  The Court adopts its voir dire conducted in the trial of <u>DeVault v. Owens-Corning Fiberglas Corp</u> as the Master Voir Dire to be used in all subsequent trials. Additions or deletions to this Master Voir Dire are at the discretion of the trial court predicated upon a showing of good cause by the party requesting the same.

8.  A Revised Pre-Trial Scheduling Order reflecting the changes encompassed in this Order is attached hereto and will apply to all current and future cases.

ENTERED this 14th day of January, 1992.

_____
JUDGE

I certify that the document to which this certification is affixed is a true copy of ... Report Hawa Circuit Court ... of the record and ... of that record.

Rex A. Davis, Clerk

by _____ D.C.



**HUNTON&**
**WILLIAMS**

HUNTON & WILLIAMS LLP
RIVERFRONT PLAZA, EAST TOWER
951 EAST BYRD STREET
RICHMOND, VIRGINIA 23219-4074

TEL      804 • 788 • 8200
FAX     804 • 788 • 8218

RAYMOND F. GEOFFROY III
DIRECT DIAL: 804-788-7313
EMAIL: rgeoffroy@hunton.com

FILE NO: 59184.1

April 14, 2005

Hugh B. McCormick, III, Esq.
Patten, Wornom, Hatten & Diamonstein. L.C.
12350 Jefferson Avenue, Suite 300
Newport News, Virginia 23602

Re:   **Warren Pumps Agreement Regarding Service of Process in Newport News and
      Portsmouth Asbestos Cases Filed by Patten, Wornom, Hatten & Diamonstein, L.C.**

Dear Hugh:

This letter confirms our agreement that Hunton & Williams will accept service of process on
behalf of Warren Pumps LLC. This agreement applies only to Motions for Judgment filed by
your firm relating to cases pending in Virginia. We agree that Warren Pumps does not waive
any rights or defenses, specifically including all jurisdictional defenses, by waiving service
through the Secretary of the Commonwealth.

We further agree that Patten, Wornom will identify all cases in which it served Warren Pumps
with process through the Secretary of the Commonwealth and for which it has not received a
Grounds of Defense or other responsive pleading on behalf of Warren Pumps. Patten, Wornom
will provide 30 days, following the identification of such cases, for Warren Pumps to serve any
responsive pleading or motion. Patten, Wornom agrees not to seek a default in such cases.

The Motions for Judgment should be sent a) via first-class mail to Bob Tata of our Norfolk
office and b) sent via email to ljohnson@hunton.com and btata@hunton.com:

Robert M. Tata, Esq.
Hunton & Williams LLP
500 East Main, Suite 1000
Norfolk, Virginia 23510-3889
Email: btata@hunton.com)
Telephone:  (757) 640-5328
Fax: (757) 625-7720



# HUNTON&
# WILLIAMS

Hugh B. McCormick, III, Esq.
April 14, 2005
Page 2

The Rules of the Supreme Court of Virginia determine when service is accomplished. Patten, Wornom agrees that Warren Pumps will have 30 days from the date of service to serve its response. At any time Patten, Wornom believes Warren Pumps is delinquent in filing its response to a Motion for Judgment, Patten, Wornom agrees to notify either Bob Tata or me, and permit Warren Pumps 14 days to cure the issue. If Warren Pumps cures within 14 days, Patten, Wornom agrees not to seek a default.

This agreement is supported by mutual consideration.

If this letter accurately reflects the terms of our agreement, please execute the agreement by signing your name in the space below.

Thank you for your cooperation. Should you have any questions, please do not hesitate to contact me.

Sincerely,

Raymond F. Geoffroy III

cc:   Robert M. Tata

Agreed:

Hugh B. McCormick, III

Date: 4-25-05

1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE EASTERN DISTRICT OF VIRGINIA

3              NEWPORT NEWS DIVISION

4

5   ROSCOE C. McGUIRE, JR.,         )

6           Plaintiff,       )  CIVIL ACTION

7        v.               )  NO. 76-68-NN

8   JOHNS-MANVILLE CORPORATION, et al,)

9          Defendants.     )  C/P 77-1

10   ---

11  IRA H. DISHNER            )

12  HELEN ANN DISHNER,      ) CIVIL ACTION

13          Plaintiffs     ) NO. 77-518-N

14  v.                )

15  JOHNS-MANVILLE COPORATION, et al, ) C/P NO. 77-1

16      Defendants        )

17

18      DEPOSITION UPON ORAL EXAMINATION

19        OF DAVID W. HELFRICH,

20    TAKEN ON BEHALF OF THE PLAINTIFFS

21    ---------------------------------

22       Newports News, Virginia

23        September 28 1977

24

25

EXHIBIT

2

```
 1   Appearances:
 2                GLASSER and GLASSER
 3                By:  RICHARD S. GLASSER, ESQUIRE
 4                     RONALD F. SCHMIDT, ESQUIRE
 5                PATTEN & WORNOM
 6                By:  ROBERT R. HATTEN, ESQUIRE
 7                SEAWELL, McCOY, DALTON, HUGHES, GORE &
 8                TIMMS
 9                By:  GLEN A. HUFF, ESQUIRE
10                     Counsel for Defendants Johns-Manvill
11                     Corporation and Johns-Manville
12                     Sales Corporation
13                HOYLE, CORBETT & HUBBARD
14                By:  WILLIAM V. HOYLE, ESQUIRE
15                     Counsel for Defendant Raybestos
16                     Manhattan, Inc.
17                WILLIAMS, WORRELL, KELLY & GREER
18                By:  JAMES A. STALNAKER, ESQUIRE
19                     Counsel for Defendant
20                     Owens-Corning Fiberlas Corp.
21                TAYLOR, GUSTIN, HARRIS, FEARS & DAVIS
22                By:  S. RANDALL McDANIEL, ESQUIRE
23                     Counsel for Defendant Pittsburgh
24                     Corning Corp.
25
```

3

```
 1            WILLCOX,  SAVAGE,  LAWRENCE,  DICKSON  &

 2            SPINDLE

 3            By:   GUY  R.  FRIDDELL,  III,  ESQUIRE

 4                  Counsel  for  Defendant  The

 5                  Celotex  Corp.

 6            TAYLOR,  WALKER,  BERNARD  &  ADAMS

 7            By:   GERARD  E.  W.  VOYER,  ESQUIRE

 8                  Counsel  for  Defendant  Unarco

 9                  Industries,  Inc.

10            McCAUL,  GRIGSBY  &  PEARSALL

11            By:   JOHN  W.  PEARSALL,  III,  ESQUIRE

12                  Counsel  for  the  Deponent

13

14

15                       -  -  -

16

17                    I  N  D  E  X

18   DEPONENT                                    PAGE

19   David  W.  Helfrich      By  Mr.  Glasser      4

20                           By  Mr.  Hatten      114

21                           By  Mr.  Glasser      118

22

23

24

25
```

4

1          Deposition upon oral examination of

2     DAVID W. HELFRICH, taken on behalf of the Plaintiffs,

3     before Frances P. Zahn, RPR, a Notary Public for the

4     Commonwealth of Virginia at Large, taken pursuant to

5     notice, commencing at  10:00 a.m., on the 28th day

6     of September, 1977, at the offices of Waco

7     Insulation of Tidewater, Inc. Newport News, Virginia;

8     and this in accordance with the Federal Rules of

9     Civil Procedure.

10

11          MR. GLASSER:  For the record, this is

12     being taken, of course, according to C/P 77-1.

13

14          DAVID W. HELFRICH was sworn and

15     deposed on behalf of the Plainiffs, as follows:

16                    EXAMINATION

17     BY MR. GLASSER:

18          Q.     Would you state your full name, please?

19          A.     David W. Helfrich.

20          Q.     And what is your age, Mr. Helfrich?

21          A.     34.

22          Q.     And your home address, sir?

23          A.     Is 209 Palen, P-a-l-e-n, Avenue,

24     Newport News.

25          Q.     And how long have you lived there?

1     A.      Lived there for about four months.

2     Q.      And what is your present position with

3 Waco?

4     A.      Vice president.

5     Q.      And how long have you been with Waco?

6     A.      12 years.

7     Q.      And what has been your functions

8 during that 12-year period with Waco?

9     A.      Well, I started out in our Richmond

10 office as an estimator, proceeded through a chain of

11 jobs and ended up down here as branch manager, vice

12 president.

13     Q.      Now, can you tell us basically what an

14 estimator does?

15     A.      He determines the value of a

16 construction project, and quotes prices.

17     Q.      And when you were promoted from

18 estimator, what additional responsibilities did you

19 take on in the Richmond facility?

20     A.      Being in charge of the contract

21 department, which involved responsibility for sales

22 of contract work and the profits.

23     Q.      Did you perform any other function at

24 Richmond, other than your services in the contract

25 department and as an estimator?

1    questions we'll have this morning, where appropriate,

2    I would invite you if there are names of people who

3    have information that you are not personally

4    familiar with, but there are others in the operation

5    who might be more familiar, if you feel it's

6    appropriate, you might give us that name.

7                    Now, what is the nature of Waco

8    Insulation's business?

9         A.        Primarily, we are contractors.  We are

10   also distributors.  Our prime business is

11   contracting for industrial insulations.

12        Q.        Now, can you tell us what contracting

13   for industrial insulations means?

14        A.        Installation of insulation materials

15   in industrial plants and large commercial buildings.

16        Q.        And what part of your gross revenues

17   are related to contract work as distinguished from

18   your sales as a distributor?

19        A.        75, 80 percent.

20        Q.        Relate to contract work?

21        A.        Yes.

22        Q.        Do you do both refractory work and

23   general insulation work?

24        A.        No.

25        Q.        You do no refractory work whatsoever?

1  with regard to purchases that you make from

2  manufacturers, or other distributors?

3       A.     Copies of the purchase orders.

4       Q.     How is the purchase order originated?

5  What is generally the initial contact?  Are you

6  approached by a manufacturer's representative?  Do

7  they solicit you, or you solicit them?  Can you

8  describe that procedure for us?

9       A.     We are contacted by manufacturers'

10 representatives on a regular basis, soliciting our

11 business.  In general, on the specific basis, when

12 we have a requirement, we go to them.

13      Q.     Okay.  And can you tell us from your

14 personal knowledge, Mr. Helfrich, which

15 manufacturers you are presently dealing with?

16      A.     We deal with over a hundred

17 manufacturers on a regular basis.

18      Q.     Do you have any exclusive distribution

19 franchises with any manufacturers for this, or any

20 other area?

21           MR. VOYER:  Mr. Glasser, just to speed

22 things along, manufacturers of what?  I assume Waco

23 Insulation handles various products.

24 BY MR. GLASSER:

25      Q.     Do you have any exclusive

1    distributorships for any manufacturers in this or

2    any other area?

3         A.      No.

4         Q.      Now, with regard to your present

5    contract work, and to your present distribution

6    sales, can you tell us what part of your present

7    inventory deals with asbestos-containing goods, as

8    distinguished from nonasbestos-containing goods?

9         A.      I would say zero.

10        Q.      You have none?

11        A.      None.

12        Q.      Do you have any asbestos goods in your

13   warehouse now?

14        A.      I would say no.

15        Q.      Can I interpret from your answer that

16   there is a possibility there could be some?

17        A.      There is a possibility there could be

18   a piece of something.  We do not stock anything that

19   contains asbestos.

20        Q.      Are you still making any sales or

21   distributing any items, either through sales through

22   this operation, or direct sales that manufacturers

23   make, using this branch as a conduit --

24        A.      Yes.

25        Q.      -- of asbestos-containing goods?

1    Q.    I would like to put a time frame on

2  this from 1968 up to and including today?

3    A.    Amatex, Southern, Raybestos Manhattan.

4  That's substantially the list.

5    Q.    Is American Asbestos, to your

6  knowledge, a predecessor of Amatex?

7    A.    To my knowledge.

8    MR. HOYLE:   American who?

9    MR. GLASSER:   American Asbestos.

10  BY MR. GLASSER:

11    Q.    And which of the three cloth

12  manufacturers who you have named would you identify

13  as a primary source of supply, a major source of

14  supply?

15    A.    Amatex.

16    Q.    And who would be your second largest

17  manufacturer in terms of the supplies that you

18  distributed?

19    A.    Southern.

20    Q.    And have you dealt with Amatex since

21  1968?

22    A.    Continuously since '68?

23    Q.    More or less continuously?

24    A.    No.  We weren't dealing with them at

25  that time.  This happened more recently.

88

```
 1          Q.        When did you start dealing with Amatex?

 2          A.        I'm going to say '73.

 3          Q.        And are you still dealing with them

 4    today?

 5          A.        Yes.

 6          Q.        And are you still distributing

 7    asbestos cloth manufactured by Amatex?

 8          A.        We still could.  We're still set up.

 9          Q.        Have you done -- have you actually

10    either directly or indirectly purchased or sold any

11    cloth, asbestos-containing cloth, manufactured by

12    Amatex in the year 1977?

13          A.        I do not have specific knowledge.

14          Q.        Is the same true as to Southern?

15          A.        That's -- the same is true, yes.

16          Q.        When did you start dealing with

17    Southern?

18          A.        We've been dealing with Southern

19    probably since 1970, maybe.  I'm guessing.

20          Q.        And are you still dealing with them?

21          A.        Yes.

22          Q.        Do you know whether you have purchased

23    or distributed any asbestos-containing cloth

24    manufactured by Southern Asbestos Company in 1977?

25          A.        Do not have specific knowledge, if
```

89

it's in there, in those records; but I can't really
remember the exact dates.

Q.     But you have dealt with them in the
not too distant past?

A.     Yes.

Q.     1976 for sure?

A.     Yes.

Q.     What about Raybestos Manhattan?

A.     Raybestos Manhattan -- it's been a
while.  '73, '72, probably.

We may have sold something of theirs
more recently, which was relatively minor in volume.

MR. HOYLE:  What was that last
statement?  May have sold --

THE DEPONENT:  We may have handled
some Raybestos products more recently, but it's
relatively minor.

BY MR. GLASSER:

Q.     Who is Melrath Gasket?

A.     Melrath Gasket is a processor, to my
knowledge, who takes a product and makes it into a
finished product.

Q.     Do you know whose product they use?

A.     I do not.

Q.     But you have had asbestos-containing

1    purchases from them; have you not?

2         A.        Yes

3         Q.        Now, concerning the cloth

4    manufacturers that you have named, can you give me

5    an approximate volume as to how much cloth,

6    asbestos-containing cloth you maintain in your

7    inventory?  Is it a large product in terms of your

8    inventory?

9         A.        We do not inventory asbestos cloth.

10        Q.        You only make direct sales on asbestos

11   cloth?

12        A.        Yes.

13        Q.        Why is that?

14        A.        We don't use it and we don't handle it.

15   Don't want to, particularly.

16        Q.        But you have filled orders as large as

17   blanket orders, of 15,000 pounds of cloth?

18        A.        Yes.

19        Q.        Through Amatex Corporation, I believe?

20        A.        Yes.

21        Q.        And at least part of that transaction

22   was in 1976?

23                  You might want to --

24        A.        Yes.  I can look at that and give you

25   the exact dates.

# Transcript of Proceedings

**Date:** May 5, 2006
**Volume:**

**Case:** Ellis E. Hales, Jr. v. Garlock Sealing Technologies, et al

Printed On: 6/22/2006

ADAMS HARRIS REPORTING, INC.
Phone: 757-631-0458
Fax: 757-631-1507
Email: kbeardadams@aol.com
Internet:



VIRGINIA:
　　IN THE CIRCUIT COURT FOR THE CITY OF NEWPORT NEWS


ELLIS E. HALES, JR.,

　　　　　Plaintiff,

v.　　　　　　　　　　　　　　AT LAW NO.
　　　　　　　　　　　　　　　CL06-00526V-04
GARLOCK SEALING
TECHNOLOGIES, LLC, et al.,

　　　　　Defendants.


DE BENE ESSE
DEPOSITION UPON ORAL EXAMINATION
OF ELLIS E. HALES, JR.,
TAKEN ON BEHALF OF THE PLAINTIFF


Richmond, Virginia


May 5, 2006


Appearances:

　　PATTEN, WORNOM, HATTEN & DIAMONSTEIN
　　By:　DONALD N. PATTEN, ESQUIRE.
　　　　CHRISTIANE G. BURRELL, ESQUIRE
　　　　Counsel for the Plaintiff


　　DUANE, HAUCK & GNAPP
　　By:　GAUHAR R. NASEEM, ESQUIRE
　　　　Counsel for the Defendant Garlock Sealing
　　　　Technologies, LLC


　　MORAN KIKER BROWN
　　By:　ERIC G. REEVES, ESQUIRE
　　　　Counsel for the Defendant A. W. Chesterton

bc96f7ae-3c5b-4508-b26c-ad40a3a2eb87

Page 2

```
 1    APPEARANCES:   (Cont'd.)

 2         HUNTON & WILLIAMS
           By:  WENDY C. McGRAW, ESQUIRE
 3              Counsel for the Defendant Warren Pumps, Inc.

 4

           WILLCOX & SAVAGE
 5         By:  STEPHEN R. JACKSON, ESQUIRE
                Counsel for the Defendants The Lincoln
 6              Electric Company and Hobart Brothers Company

 7

           DEHAY & ELLISTON
 8         By:  KAY MILLICENT BROWN, ESQUIRE
                Counsel for the Defendant Goulds Pumps
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

ADAMS HARRIS REPORTING, INC.
757-631-0458

bc96f7ae-3c5b-4508-b26c-ad40a3a2eb87

Page 53

1          Q.     Were there -- was there insulation on

2     the pipes in the ceiling of the building?

3          A.     On the steam pipes, yes, there was some

4     insulation.

5          Q.     Do you know what kind of insulation it

6     was?

7          A.     To my knowledge, no.

8          Q.     Do you -- how close were you to those

9     pipes that were in the ceilings?

10         A.     Well, I probably could be within four or

11    five feet of them.

12         Q.     Well, I mean, how high were these

13    ceilings?

14         A.     Well, the ceiling actually there was

15    three stories and a basement.

16         Q.     So it would be up in the ceiling then,

17    is that --

18         A.     Well, they had pipes on all levels of

19    that --

20         Q.     Okay.

21         A.     -- of three stories above that machine

22    area.

23         Q.     Well, did you ever work on those pipes?

24         A.     No, I didn't work on those pipes.

25         Q.     Okay.  Do you remember some of your

bc96f7ae-3c5b-4508-b26c-ad40a3a2eb87

1 coworkers?  Can you tell us a few names of people that

2 you worked with?

3     A.    Well, on the machine, Jonah Lawson was

4 one of the fellows I worked with.  Mr. Carroll,

5 Linwood Carroll, he was actually in the process area

6 when I first started there.  Herman Smith and Joseph

7 Seaborne were mechanics that I worked alongside while

8 I was there.  John Wilson worked as a dock supervisor

9 while I was there.  And Jessie Walker, he came in on

10 the dock, but actually right around the same time that

11 I went in the maintenance department, he actually went

12 into the storeroom.

13     Q.    You said that there were shutdowns and

14 they occurred every year?

15     A.    There were two shutdowns, one in July

16 around the 4th, and the other in December at Christmas

17 time.

18     Q.    What did they do when they shut this --

19 these machines down?

20     A.    Well, that's when they did major

21 overhauls on equipment throughout the plant, replacing

22 pumps, if necessary, and working on others to get them

23 into good -- good order.

24     Q.    And did you participate in those

25 overhauls after 1976?

Page 55

1      A.      After -- after '76, yes, I did.  We were

2  scheduled twelve-hour shifts for those shutdown days

3  that we worked on the materials.

4      Q.      And during those periods, was there any

5  repacking of pumps?

6      A.      There was major repacking of pumps.

7      Q.      And did you do that work?

8      A.      Yes, I did.

9      Q.      Was there any outside contractors that

10 ever came in during that period?

11     A.      Yes, they did, working on the pipes.

12 The two that I remember were Waco and C. E. Thurston.

13     Q.      And what were -- they were working on

14 pipes, you say?

15     A.      They worked on pipes and generally when

16 they came in they would drape off an area with poly

17 that we weren't allowed to enter while they were

18 working.  Like the duration of the shutdowns were

19 approximately two weeks, so they might be in there the

20 first week to do that work, and then we'd be able to

21 get in those areas after they finished them during the

22 second week.

23     Q.      All right.  Where were the gaskets and

24 packing material stored at American Tobacco, and the

25 welding rods and all that other?

1          A.          In the storeroom area, which was located

2    behind the mechanical shop.

3          Q.          Is this the place that you worked in for

4    about six months?

5          A.          Yes, it is.

6          Q.          Did you actually hand out gasket

7    material and packing material to people?

8          A.          At that time, yes, I did, to the

9    mechanics or --

10         Q.          And the gasket, that came in sheets, I

11   think you said; right?  Were they in boxes or just the

12   sheets?

13         A.          They came in sheets.

14         Q.          Okay.  Did you hand out boxes of packing

15   or did you take the material out of the box and give

16   it to the person that wanted it?

17         A.          Well, if there were pieces that were

18   left over from another job that were in the area, I

19   handed them those pieces hoping it would be used up

20   before they would use unused material.

21         Q.          You ever see any writing on the boxes,

22   other than the name that you've told us about?

23

24              MR. REEVES:  Objection to form.

25              THE WITNESS:  I didn't necessarily read

1  I mean, I couldn't talk or whatever.  Probably eight

2  to nine hours later, I woke up in a recovery area,

3  actually in an intensive care portion of the hospital

4  with tubes in my nose and down my throat.

5         Q.    So how long were you in the hospital

6  during that stay?

7         A.    From the 22nd of June to the 9th of July.

8         Q.    And did you have any other procedures,

9  other than those that we've just talked about?

10        A.    They were the only procedures that I

11  had.  The rest of it was related -- regulation --

12  trying to make sure all my systems was working.

13        Q.    What doctors helped you or saw you

14  during that hospitalization stay?

15        A.    Dr. Buckman was the surgeon that

16  inserted the tubes.  Dr. Andrea Miksa was my lung

17  consultant.  And at the end of that stay -- well, on

18  the 8th of July, she came in and told me that the test

19  results had come back from UVA and that I did have

20  cancer, and she suggested that I talk with an

21  oncologist, Dr. Lloyd, which I saw on the 3rd of

22  August of last year.  And she told me at that time

23  that I had mesothelioma.

24        Q.    So that's the first time you knew about

25  mesothelioma?

bc96f7ae-3c5b-4508-b26c-ad40a3a2eb87

Page 64

1      A.      That's the first time I was aware of

2   that ailment.

3      Q.      All right.  And did she prescribe

4   treatment, and, if so, what treatment have you had?

5      A.      Well, she -- she told me at that time --

6   she asked me did I want her to tell it to me straight

7   and not hold back anything.  And I said, Yes, but I

8   don't know that I was ready for what she told me,

9   because she said I had terminal cancer.  If I didn't

10  have my stuff in order, I had better do it in a hurry

11  because I could have as little as two months or as

12  long as nine months before termination.

13     Q.      Did she recommend any chemotherapy or

14  radiation or anything?

15     A.      Well, she said that I would be treated

16  with chemo on a twenty-one day cycle for as long my

17  body could hold up to that treatment or until I told

18  her to stop.  But in -- in preparation for the

19  treatment, she wanted me to take three tests to

20  determine what type of chemo that she'd give me, the

21  first being an x-ray, the second being a CAT scan, and

22  the third being what they call a PET scan.

23          I took the x-ray and the CAT scan, but

24  on three different occasions -- occasions the PET scan

25  machine was down, and I had to call to reschedule an

bc96f7ae-3c5b-4508-b26c-ad40a3a2eb87

1          A.       Steam.

2          Q.       Any idea how many boilers were in that?

3          A.       At least three large boilers.

4          Q.       When you say large, can you kind of

5    describe it for me in terms of height and -- you

6    know.

7          A.       Probably about twelve to fifteen feet

8    high.

9          Q.       Okay.  So much taller than you are?

10         A.       Yeah.

11         Q.       Okay.  How about width wise?  Any -- any

12   estimate about --

13         A.       Somewhere around the same size.

14         Q.       Okay.  So roughly a square or a cube

15   type of thing?

16         A.       Well, no, the -- they were basically, I

17   guess, round, oblong.

18         Q.       Okay.  And the boiler facility, did it

19   have more than one level?

20         A.       Yes, there were at least two levels

21   there.

22         Q.       Okay.  And I take it from the -- from

23   the boilers, the three that you've mentioned, you have

24   pipes that go up and those pipes channel steam to

25   various other places in the plant?

Page 78

1    A.    Yes, they did.

2    Q.    Fair statement?

3    A.    Yes.

4    Q.    And I think my -- my understanding --
5    and you correct me if I'm wrong.  My understanding is
6    that the various machinery that you had in that plant
7    for making the paper you've described ran largely on
8    steam?

9    A.    Yes.

10   Q.    Okay.  And I take it because it had to
11   go to different parts in the plant it was, what,
12   high-pressure steam?

13   A.    Yes, it was.

14   Q.    Okay.  Now, did you have occasion during
15   your career -- I know the first part of your career,
16   '66 to '76, you worked with the machinery?

17   A.    Yes.

18   Q.    When you went into maintenance, though,
19   you did have occasion to spend time in the boiler
20   plant?

21   A.    At some point I worked throughout that
22   plant.

23   Q.    Okay.  And I take it that these various
24   boilers and the steam pipes were all insulated?  I
25   think you've said that.

Page 106

1      A.      That is correct.

2      Q.      You also talked a little bit in your

3  deposition the other day about some kind of

4  asbestos-lined tubes in the dryer.  Do you remember

5  talking about that?

6      A.      That was the dryer out there, yes.

7      Q.      What did that look like?

8      A.      Well, it was a rectangular thing that

9  was probably about ten -- ten to eleven feet high.  It

10  had a cone -- it was designed to take dust out of the

11  air and more or less purify it, I guess.

12      Q.      This was -- this is the whole dryer

13  assembly you're talking about?

14      A.      Yeah.

15      Q.      What did the asbestos-lined tubes look

16  like?

17      A.      Well, they were, I guess, a cloth type

18  sleeve on a metal form.

19      Q.      And it would be like an asbestos cloth?

20      A.      Yeah.  Well --

21      Q.      How many tubes were there in this dryer?

22      A.      Approximately forty of them.

23      Q.      How often would you have to repair or --

24  strike that.

25              How often would you have to replace the

bc96f7ae-3c5b-4508-b26c-ad40a3a2eb87

1   asbestos cloth on these tubes?

2        A.      I may have done it personally a couple

3   times the whole time I was there.

4        Q.      Where would you get this asbestos cloth,

5   from the storeroom?

6        A.      They -- they -- yeah, they would provide

7   it for us by the storeroom, yeah.

8        Q.      The -- the storeroom.  And would this

9   asbestos cloth be on a spool?

10       A.      I think they just were laid out in a

11  box.  I can't really tell you right now.

12       Q.      Well, did it look like a white sheet or

13  a canvas sheet, something like that?

14       A.      I don't necessarily -- it was a -- more

15  or less a bag.

16       Q.      A bag -- was it a --

17       A.      A sleeve that you put on.

18       Q.      What color was this?

19       A.      It was an off-white, I guess.

20       Q.      Who was the manufacturer of this

21  material?

22       A.      That I couldn't tell you.

23       Q.      You recall seeing the box that it came

24  in, though?

25       A.      Yeah, but I couldn't tell you who the

bc96f7ae-3c5b-4508-b26c-ad40a3a2eb87

**AFFIDAVIT OF JERRY LAUDERDALE, P.E., C.I.H., R.S.**

STATE OF TEXAS                          §
                                        §
                                        §
COUNTY OF TRAVIS                        §

Before me, the undersigned on this day personally appeared JERRY LAUDERDALE, P.E., C.I.H., R.S., known to me or through his driver's license and who, being by me duly sworn upon his oath, deposes and states as follows:

1.      "My name is JERRY LAUDERDALE. I am over the age of 18 years, have never been convicted of a felony and am fully competent to make this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2.      I am a Certified Industrial Hygienist. Industrial hygiene is the science of identifying and preventing workplace hazards. I am now in a private consulting practice. For many previous years, I worked as an industrial hygienist for Texas State Department of Health, Occupational Health Division. In my work for the state of Texas I inspected facilities where asbestos products were manufactured and facilities where asbestos products were used. In those facilities in which asbestos products were used asbestos products were used in the construction of those facilities and/or in insulation on steam pipes, steam boilers or other vessels or structures for steam and/or heat processes. Asbestos-containing gaskets and rope packing were often used in connection with pipe flanges and/or various types of equipment. In this service I developed expertise in various areas of occupational health related to asbestos disease including, but not limited to occupational health, epidemiology, historical aspects of the development asbestos-related disease and industrial hygiene.

3.      Asbestos particles are very small. Once they are airborne, they settle very slowly – about 1 foot per hour or less. Asbestos fibers would typically remain airborne for very long periods of time. When any wind currents are present, asbestos fibers are readily transported over great distances, and remain airborne indefinitely. Asbestos fibers may also be easily redistributed, or re-entrained, in air if settled dust is disturbed. This frequently occurs during cleanup after asbestos insulation work, for instance. Therefore, asbestos exposure can occur to persons remote from the site of fiber release due to fiber transmission by air currents, or by dispersion of asbestos fibers in settled dust.

4.      A concentration of 5 million particles per cubic foot of air (5 mppcf) of asbestos-containing dust in air is not visible to the naked eye in ordinary light. A much higher concentration is needed before enough dust is present to create a visible haze in

1



air. Wherever a haze is visible in air, the dust concentration is likely to be above 100 million particles per cubic foot. That fact has been documented in the published scientific literature as early as the 1930's.

5. Workers in industrial facilities would not be able to determine if activities in an area have created an asbestos exposure hazard, or if the area has been adequately decontaminated after asbestos work. An industrial hygienist or other competent person would be needed to make those types of decisions based on air sampling evaluations of the environment. A worker would not be able to determine whether a work area was free from asbestos particles using his knowledge or his natural senses.

6. In 1967 the National Safety Council published to its members the paper "Occupational Health in the Construction Industry" by Fred Ottoboni, Senior Industrial Hygiene Engineer at Bureau of Occupational Health, California State Department of Health, Berkeley, California. This paper was important as it detailed the health hazard to bystanders from exposure to asbestos-containing products on construction jobs. The link between asbestos exposure and adverse health effects is so strong that at no time has there ever been a peer reviewed published paper concluding or demonstrating that the use of asbestos-containing thermal insulation such as pipe cover, block insulation or spray-on fireproofing could or would be used safely in the absence of any dust suppression methods or respiratory protection. In other words, there was no dispute in the medical and scientific literature that the use of industrial hygiene controls in the use of asbestos products was appropriate and necessary.

7. Studies in many populations have confirmed that persons with occasional or indirect exposure to asbestos have developed mesothelioma. People living in households of asbestos workers receive indirect exposure to asbestos from asbestos contaminated work clothing worn home from dusty workplaces.

8. Exposures of only a very brief duration have also been shown to result in mesothelioma. The NIOSH congressional study published in 1995 stated that "— Mesothelioma has occurred following short term asbestos exposures of only a few weeks, and can result from very low levels of exposure."

9. Based on the scientific literature and my experience and training as a Certified Industrial Hygienist, it is my opinion that mesothelioma can result from infrequent and incidental exposures to asbestos at doses that would be considered to be low using occupational exposure standards.

FURTHER AFFIANT SAYETH NOT."

_____
JERRY F. LAUDERDALE

2

SUBSCRIBED AND SWORN TO ME BEFORE ME on the _22ND_ day of _JUNE_ ,
2006, by the said AFFIANT who has stated to me that the foregoing affidavit and
statements contained herein are true and correct within his personal knowledge to certify
which witness my hand and official seal of office.

[SEAL]

TERRY L. COCKERHAM
Notary Public, State of Texas
My Commission Expires
December 13, 2009

Notary Public in and for the State of _TEXAS_

_Terry L. Cockerham_
Printed Name of Notary

My Commission Expires: _Dec. 13, 2009_

3

# WACO INSULATION OF TIDEWATER, INC.

Commercial and Industrial Insulation
Contractors and Distributors

23rd. ST. & HUNTINGTON AVE.        P.O. BOX 5227

NEWPORT NEWS, VA. 23605

NEWPORT NEWS  804/247-0128
NORFOLK         804/622-0515

TO

MCGRATH SUPPLY AND GASKET COMPANY, INC.

3503 Memphis Street

Philadelphia, Pennsylvania  19134

SHIP TO

WACO INSULATION OF TIDEWATER, INC

23rd Street & Huntington Avenue

Newport News, Virginia  23607

SAME UNLESS OTHERWISE NOTED HERE

| DATE | DATE REQUIRED | TERMS | SHIP VIA | F.O.B. | CODE |
|------|---------------|-------|----------|--------|------|
| 7-1-75 | Four (4) Weeks Or Sooner | Usual | Best Way | Shipping Point | T 3000 |

| QUANTITY | | DESCRIPTION/STOCK NUMBER | PRICE | AMOUNT |
|----------|---|--------------------------|-------|--------|
| ORDERED | RECEIVED | | | |
| 25 Pieces | | Compressed Asbestos Packing ½" Thick x 1" Wide | | |
| 22 pieces | | x 10' Long | 4.75 Each | 118.75 |
| | | The Above To Meet MIL-A-17472B | | |
| | | CONFIRMING ORDER TO RALPH RUDDINGER | | |
| | | DO NOT DUPLICATE | | |
| | | NNSB&DD Company S6700 | | |
| | | EXHIBIT | | |

TAX STATUS ➤    NOT EXEMPT        EXEMPT NO. 120-046-740-5    [X]

1. Acknowledge receipt of order promptly.
2. Our order number must appear on all packages,
   bill of ladings and correspondence.

By _____
DAVID D. MCINTYRE



**MELRATH GASKET**

MELRATH GASKET CO., A DIVISION OF TANNETICS, INC.

23RD ST. & HUNTINGTON AVE

SOLD TO:
MACO INSULATION OF TIDEWATER, INC.
P.O. BOX 5227
NEWPORT NEWS, VA. 23605

| ORDER NO. | | | SHIP VIA |
|---|---|---|---|
| A-25735 | 2,870 | | PHILA |

QUANTITY ORDERED: 1240 PCS

1/8" MELRATH #750 NEOPRENE & ASBESTOS
MIL-A-7021-B
2" WIDE X 10 FT. LONG

ACKNOWLEDGMENT

MELRATH GASKET

BL 50905-0911

# MELRATH GASKET



SOLD TO:
NACO INSULATION OF TIDEWATER
PHILADELPHIA, SARAMING AVE.
P. O. BOX 5227
NEWPORT NEWS, VA. 23605

23RD ST. & HUNTINGTON AVE.

A COMPANY OF TANNETICS, INC.

| ORDER NO. | CUST. ORDER NO. | REQUISITION NO. | TERMS | | PARTIAL | COMPLETE | | SHIP VIA |
|---|---|---|---|---|---|---|---|---|
| A 03575 | 2526 | | PHILA | | | | | |

| QUANTITY ORDERED | | |
|---|---|---|
| 25 PCS. | 1/4" MELRATH #125 COMPRESSED ASBESTOS. | |
| | MIL-A-17472-D | |
| | 1" WIDE X 120" LONG | |

2CR
50702-0703

ACKNOWLEDGMENT
THIS IS A COPY OF YOUR ORDER AS WE HAVE ENTERED IT. PLEASE CHECK WITH YOUR RECORDS. IF IT DOES NOT AGREE, NOTIFY US IMMEDIATELY. WE THANK YOU FOR THE BUSINESS ENTRUSTED TO US.
MELRATH GASKET

ACKNOWLEDGMENT

**WACO INSULATION OF TIDEWATER, INC.**
23rd. ST. & HUNTINGTON AVE.
P.O. BOX 6227
NEWPORT NEWS, VA. 23605

*Commercial and Industrial Insulation Contractors and Distributors*

**ACCOUNTING COPY**
NEWPORT NEWS 804/247-0128
NORFOLK 804/622-0515

$ 7705

| DESCRIPTION | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|
| | | | |

TERMS: NET 30 DAYS. A SERVICE CHARGE OF 1½% WILL BE CHARGED ON ALL ACCOUNTS THAT ARE 30 DAYS PAST DUE, (AN ANNUAL RATE OF 18%).

TOTAL (BEFORE TAX)

SALES TAX

TOTAL

July 29, 1975

Mr. W. Maaskart
Amatex Corporation
P. O. Box 228
Norristown, Pennsylvania

Re:  Our Purchase Order No. 1296

Dear Bill:

This letter is to confirm Release No. 2 against the above
referenced purchase order of 15,000 pounds required on
September 3, 1975.  Please mark all rolls with NNSB & DD
Company Purchase Order No. 32-1192, Release No. 2.

At this rate, it looks like we will get their anticipated
90,000 pounds  and so far the Ship Yard is pleased with
our service.

Very truly yours,


Wayne P. McIntyre
Sales Department

WPM/pb

FORM GA-4 · 50M · 4-71 · 67

# C. E. THURSTON and SONS, INC.

ACCOUNTS RECEIVABLE, ACCOUNTING

Since 1919

NORFOLK ☐
Phone 627-7321
P. O. Box 2568(11)
550 Tidewater Drive

RICHMOND ☐
Phone 233-6677
P. O. Box 25207
700 Dinwiddie Ave.

ROANOKE ☐
Phone 366-1981
P. O. Box 148 (24007)
33 W. Salem Ave.

**INVOICE N 91994**

| SOLD TO | D. P. 9327 |
|---|---|
| | WACO INSULATION OF TIDEWATER, INC. |
| STREET ADDRESS | WARWICK BLVD. AT 65TH STREET |
| CITY & STATE | P. O. BOX 5227 NEWPORT NEWS, VA. 23605 |

FOR:

SHIP TO: Waco Insulation

ADDRESS: Newport News Va

| ORDER DATE | CUSTOMER'S ORDER NO. | SHIPPED VIA | DATE |
|---|---|---|---|
| | C-1128.2 | | |

| QUANTITY ORDERED | QUANTITY SHIPPED | BACK ORDERED | DESCRIPTION | UNIT | List Price | SALESMAN'S CODE NO. | TYPE OF SALE N R O | EXTENSION | Discount | SHEET NO. | OF SHEETS | TOTAL AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 363C | | | 1T 6x1 Kaylo | ft | 1.4 | 20 44 5 | | | | | | 50 76 |
| 4848 | | | " 1x3¼ Fiberglas ASJ witbest | " | .318 | | | | | | | 15 26 |
| 4242 | | | " 3½x3½ " " | " | .30 | | | | | | | 12 60 |
| 5 5 | | | Rolls #1 Blanket Sealing | lb | 12.30 | | | | | | | 61 50 |
| | | | | | | | | | | | | 140 12 |

RECD BY

ACKWD

DATE SHIPPED 12-17

DELIVERED BY

# DOCUMENTATION OF

# THRESHOLD LIMIT VALUES

## 1962





# AMERICAN CONFERENCE OF
# GOVERNMENTAL INDUSTRIAL HYGIENISTS

## COMMITTEE ON THRESHOLD LIMIT VALUES





42 017 0583

Copies of this publication may be obtained from:

Secretary-Treasurer
American Conference of Governmental Industrial Hygienists
1014 Broadway
Cincinnati 2, Ohio

Price per copy $4.00
Make checks payable to American Conference of Governmental
Industrial Hygienists

Copyright 1962
by
American Conference of Governmental
Industrial Hygienists

ii

42 017 0584

References
1. Sayers, R.R.: Am. Stds. Assn. Z37, No. 9, 1943; Cook, W.A.: Ind. Med. 14, 936, (1945).
2. Pinto, S.S.: Communication to Committee Member (1961).

## ARSINE

### 0.05 ppm (Approximately 0.2 mg/m³)

The extreme, acute toxicity of arsine is well known; 250 ppm for 30 minutes is fatal to man and 3-10 ppm can cause poisoning symptoms in a few hours (1). Nau (2) reported the conditions of an arsine exposure that indicated the previous limit of 1 ppm was too high. Elkins (3) reported a case of severe, but nonfatal, arsine poisoning that resulted from an exposure averaging 0.5 ppm. Elkins has concluded that 0.05 ppm arsine is not an unreasonable low limit on the basis of a study of chronic arsine exposures of Bulmer, et al. (4). Urinary As varied from 0.7 to 4 mg. in men showing toxic signs of exposure of jaundice and anemia. Assuming 75% of the As is excreted in the urine 1 mg. As/l corresponds to 1.33 mg. intake, or 0.133 mg. As/m³ air if 10 m³ air is taken as the average amount of tidal air inhaled during a working day. This corresponds to 0.033 ppm arsine, and suppo the recommended limit of 0.05 ppm arsine.

References
1. Henderson, Y., Haggard, H.W.: Noxious Gases, Reinhold Publishing Co., N.Y. (1943).
2. Nau, C.A.: South. Med. J. 41, 341 (1948).
3. Elkins, H.B.: Chemistry of Industrial Toxicology, Wiley & Sons, N.Y. (1959).
4. Bulmer, F.M.R., et al.: J. Ind. Hyg. & Tox. 22, 111 (1940).



## ASBESTOS

### 5 mppcf

Asbestos is a generic term applying to a number of mineral silicates that are incombustible in air and can be separated into filaments. The most widely used in industry is chrysotile, a magnesium silicate from serpentine. Other types include amosite (an iron magnesium silicate) crocidolite (a sodium iron silicate), tremolite (a calcium magnesium silicate) and anthophyllite (also an iron magnesium silicate).

Miller and Sayers (1) showed that intraperitoneal injection of amosite, chrysotile and crocidolite in guinea pigs produced the reaction of an inert dust. Vorwald et al. (2) confirmed this for short fibers (under 3 μ) but observed that long fibers produced a fibrous reaction. Continuing unpublished work by Gardner, these workers demonstrated that long fibers (20 microns and above) produced peribronchiolar fibrosis in lower animals, and developed evidence that this resulted from mechanical rather than chemical action. Asbestos dust containing 0.6 per cent fibers longer than 10 microns, in concentrations of 138 mppcf (or 0.8 million "long" fibers per c.f.), was capable of producing experimental asbestosis in guinea pigs. When the concentration was 6.7 per cent fibers over 10 microns, 40 mppcf, (equivalent to 2.7 million "long" fibers per c.f.), the reaction developed in approximately half the time.

That exposure to asbestos is associated with development of a potentially disabling pneumoconiosis in man has been amply demonstrated by industrial experience (3,4,5,6,7,8,9,10,11). The present threshold limit relates to the prevention of asbestosis. It was recommended by Dreessen et al. (8), after study of 541 employees in three asbestos textile plants using chrysotile. Only three

42 017 0585

doubtful cases of pneumoconiosis were found in those exposed to dust concentrations under 5 mppcf, whereas numerous well-marked cases were found above 5 mppcf. Counts were from impinger-collected samples in ethyl alcohol and distilled water. Both fibrous and non-fibrous particles were counted, but the latter greatly preponded to those of settled dust samples, it is believed that dust counts of particulates by conventional methods can be expected to give only an indirect measure of the risk of asbestosis because of the great relative importance of long fibers.

References

1.  Miller, J.W., Sayers, R.R.:  Pub. Health Rept. 56, 264 (1941).
2.  Vorwald, A. J., Durkan, T.M., Pratt, P.C.:  Arch. Ind. Hyg. 3, 1 (1951).
3.  Merewether, E.R.A.:  J. Ind. Hyg. 12, 198, 239 (1930).  Pneumoconiosis Abstracts, 1926-1938, Vol. I, p. 128.
4.  Wood, W.B., Gloyne, S.R.:  Lancet, Dec. 22, 1934, pp. 1383-1385.
5.  Fulton, W.B., Dooley, A., Matthews, J. L., Houtz, R.L.:  Penn. Dept. Labor and Ind. Bull. 42 (1935).
6.  Lanza, A.J., McConnell, W.J., Fehnel, J.W.:  Pub. Health Rept. 50, 1 (1935).
7.  Donnelly, J.:  J. Ind. Hyg. & Tox. 18, 222 (1936).
8.  Dreessen, W.C., DallaValle, J.W., Edwards, T.I., Miller, J.W., Sayers, R.R.: Pub. Health Bull. No. 241. Wash., D.C., (1938).
9.  Lynch, M.:  Arch. Ind. Health. 11, 185 (1955).
10. Smith, K.W.:  Arch. Ind. Health 12, 198 (1955).
11. Cartier, P.:  Arch. Ind. Health 11, 204 (1955).

## BARIUM (and Compounds)

### 0.5 mg/m$^3$

The clinical entity "baritosis" has been reported in the industrial hygiene literature sporadically since 1934 when Leschke (1) described a case with almost fatal outcome in a baryta worker who had apparently inhaled ample quantities. Other reports of industrial exposure to barium compounds with or without exposure to lithopone have described pulmonary nodulation with or without decrease in lung function, such as dyspnea on exertion (2,3). More soluble forms of barium, as the carbonate, oxide and nitrate, tend to be more injurious, particularly acutely. Dusts of barium oxide are considered potential agents of dermal and nasal irritation (4).

The pharmacologic action of barium is well known (5); chief among the actions of barium is its effect on muscle, particularly cardiac, increasing its excitability.  Skeletal, arterial, intestinal, and bronchial muscle are all affected by barium.  In addition, effects on the hematopoietic system have been noted, as well as on the cerebral cortex.

Fazekas, et al. (6) have reported that subcutaneous injection of an aqueous solution of barium chloride at a dosage of 5 mg/kg caused acute toxicity with death after 2-2.5 hours.  Chronic poisoning was achieved by the injection of solutions at 10, 5, and 2 mg/kg.  Rabbits in this series were killed at 98 to 193 days. Effects on the central nervous system are described.

The present limit of 0.5 mg Ba/m$^3$ air was suggested by Hyatt (7), who employed this limit for a number of years at the Los Alamos Laboratories with satisfactory results for the control of exposure to barium nitrate.  It is not known what degree of added safety this limit incorporates.

42 017 0586



# REVISED RECOMMENDED
# ASBESTOS STANDARD



**U. S. DEPARTMENT OF HEALTH, EDUCATION, AND
WELFARE
Public Health Service
Center for Disease Control
National Institute for Occupational Safety and Health**



EXHIBIT

# REVISED RECOMMENDED

# ASBESTOS STANDARD



**U. S. DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE**
Public Health Service
Center for Disease Control
National Institute for Occupational Safety and Health

## DECEMBER 1976

For sale by the Superintendent of Documents, U.S. Government
Printing Office, Washington, D.C. 20402

The Division of Surveillance, Hazard Evaluations, and Field Studies, National Institute for Occupational Safety and Health (NIOSH), having primary responsibility for development of a NIOSH position paper on health effects of occupational asbestos exposure, has critiqued all available data and prepared the following document for publication and transmittal to the Occupational Safety and Health Administration (OSHA), as requested by the Assistant Secretary of Labor. Primary responsibility for development of this document was shared by Richard A. Lemen and John M. Dement, with technical consultation provided by Dr. Joseph K. Wagoner. Individuals who served as the NIOSH review committee were:

> Kenneth Bridbord, M.D.
> David H. Groth, M.D.
> Gerald J. Karches
> James B. Lucas, M.D.
> James H. Wills, Ph.D.

DHEW (NIOSH) Publication No. 77-169

REVISED RECOMMENDED
ASBESTOS STANDARD

### Table of Contents

| | Page |
|---|---|
| I. INTRODUCTION | 1 |
| II. BIOLOGIC EFFECTS OF EXPOSURE ON ANIMALS | 3 |
| Carcinogenicity | 3 |
| Mutagenicity | 12 |
| References | 13 |
| Summary Table of Asbestos-induced Carcinogenicity in Animals | 17 |
| Tables and Figure | 21 |
| III. EFFECTS ON HUMANS | 26 |
| Nonmalignant Respiratory Disease | 26 |
| Carcinogenicity | 30 |
| Synergism | 38 |
| Fiber Analysis in Tissue | 39 |
| References | 43 |
| Tables | 53 |
| IV. SAMPLING METHODS AND ENVIRONMENTAL DATA | 58 |
| Review of Sampling and Analysis Techniques for Asbestos | 58 |
| Comparisons of Asbestos Mass Concentrations (mg/m3) and Fiber Number Concentrations (fibers/cc) | 71 |
| Nonoccupational Exposures – Ambient Levels | 73 |
| References | 78 |
| Tables | 82 |
| V. BASIS FOR THE RECOMMENDED STANDARD | 88 |
| VI. THE RECOMMENDED STANDARD | 92 |
| References | 95 |
| Table | 96 |

# I.  INTRODUCTION

When the asbestos criteria document was first published in 1972, the National Institute for Occupational Safety and Health (NIOSH) recommended a standard of 2.0 asbestos fibers/cubic centimeter (cc) of air based on a count of fibers greater than 5 micrometers ($\mu$m) in length.  This standard was recommended with the stated belief that it would "prevent" asbestosis and with the open recognition that it would not "prevent" asbestos-induced neoplasms.  Furthermore, data were presented which supported the fact that technology was available to achieve that standard and that the criteria would be subject to review and revision as necessary.  Since the time that the asbestos criteria were published in 1972, sufficient additional data regarding asbestos-related disease have been developed to warrant reevaluation.

On June 7, 1972, the Occupational Safety and Health Administration (OSHA) promulgated a standard for occupational exposure to asbestos containing an 8-hour time-weighted average (TWA) concentration exposure limit of 5 fibers longer than 5 $\mu$m/cc of air, with a ceiling limitation against any exposure in excess of 10 such fibers/cc. The standard further provided that the 8-hour TWA was to be reduced to 2 fibers/cc on July 1, 1976.

As the result of a court case, OSHA decided that to achieve the most feasible occupational health protection, a reexamination of the standard's general premises and general structure was necessary. To this end, on October 9, 1975, OSHA announced a proposed rule-making to lower the exposure limit to an 8-hour TWA concentration of 0.5 asbestos fibers longer

1

than 5 μm/cc of air with a ceiling concentration of 5 fibers/cc of air determined by a sampling period of up to 15 minutes. On December 2, 1975, OSHA requested NIOSH to reevaluate the information available on the health effects of occupational exposure to asbestos fibers and to advise OSHA on the results of this study.

This document contains an updated review of the available information on the health effects of exposure to asbestos. In addition, NIOSH's proposal for a new numerical exposure limit is included.

*Edward J. Fairchild*

for · John F. Finklea, M.D.
  Director, National Institute for
  Occupational Safety and Health

2

# V.  BASIS FOR THE RECOMMENDED STANDARD

The first modern approach to the setting of an asbestos standard was proposed by the British Occupational Hygiene Society (BOHS 1968) in terms of fiber concentration. In 1968, a subcommittee of the Society evaluated data on 290 men at work in an asbestos factory. These data were provided by company sources. All the men had been employed after January 1933, following implementation of dust control measures mandated by the Factory Inspectorate in 1931. Estimates of the fiber exposure of these workmen were also provided by the company. Of the 290 individuals, 8 were stated to have x-ray evidence of asbestos disease and 16 had rales. Noteworthy in the 1968 data was the preponderance of individuals who had been employed less than 20 years. Only 118 of the 290 persons had worked for longer than 20 years and a scant 13 has been employed for 30 or more years.

After a review of these data, the BOHS proposed a standard which was adopted with minor modifications by the British government in 1969, and implemented in May 1970. All fibers between 5 and 100 microns in length were counted by light microscopy. The standard required no action to be taken below 2 fibers/cc. Between 2 fibers/cc and 12 fibers/cc, control measures commensurate with the exposure circumstances (time and frequency of worker exposure) were prescribed; above 12 fibers/cc, full application of control measures, including respiratory protection, was mandatory. The BOHS predicted that the risk of being affected, to the extent of having the earliest clinical signs of asbestos exposure (rales), would be less than 1% for an accumulated exposure of 100 fiber-years/cc (2 fibers/cc for 50

88

years, 4 fibers/cc for 25, etc). Data (Lewinsohn, 1972) from the same factory which formed the basis for the BOHS standard demonstrate that a greater prevalence of abnormalities now exist (Table V-1). These data, in addition to demonstrating a dose-response relationship for radiographically detected abnormalities consistent with asbestosis, further showed a 17% prevalence of abnormal radiographic findings (6% consistent with asbestosis) in individuals employed since 1950.

Weill et al (1975), when considering lung function and irregular small opacities, reported that there was little evidence of a dose-response relationship below 100 mppcf-years. They further concluded that a concentration of 5 fibers/cc could be cautiously considered as "safe". Ayer and Berg (1976), however, reported data which suggest that the BOHS standard, of an average cumulative exposure of 100 fiber-years/cc, for chrysotile asbestos may prevent significant decreases in pulmonary function only when combined with periodic spirometry and further reduction of exposure for affected workers. Holmes (1973) has since stated that the data upon which the BOHS standard was based were inadequate to set a standard to prevent asbestosis. The BOHS-recommended standard of 2 fibers/cc was based on data related only to asbestosis and the Society clearly cautioned that, since a quantitative relationship between asbestos exposure and cancer risk was not known, it was not possible at that time to specify an air concentration which was known to be free of increased cancer risk. (BOHS 1968)

Howard et al (1976), in a follow-up examination of the textile workers previously studied by Doll (1955) and Knox et al (1965, 1968) for cancer, and by Lewinsohn (1972) for asbestosis, reported a statistically

89

significant increase in the risk of developing lung cancer (1.8 times the expected) among those first entering scheduled areas from 1933 to 1950. In the same study, they also reported an excess of deaths due to lung cancer (1.9 times the expected) after 15 or more years from initial exposure among those who started work subsequent to 1950, a period of improved industrial engineering control technology and regulation.

In a study of miners exposed to amphibole fibers (amosite) in the cummingtonite-grunerite ore series, with airborne concentrations of less than 2.0 fibers/cc (average concentration, 0.25 fibers/cc) and 94% of the fibers shorter than 5 μm in length, Gillam et al (1976) have demonstrated threefold increases in the risks of mortality from both malignant and nonmalignant respiratory diseases.

Newhouse (1969, 1973) and Newhouse et al (1972) have shown that the cancer risk to factory workers following mixed exposure to chrysotile, amosite, and crocidolite is dose-related. The women reported to have heavier exposures (as judged by their occupations) showed a sixfold excess of cancer following only 15 years' latency, whereas those with moderate or low exposures required 25 years' latency to demonstrate an excess. The rate of mesothelioma increased with both the severity and the length of exposure. However, even with as little as two years of asbestos exposure, six mesotheliomas occurred among female employees.

McDonald (1973) stated that the risk of developing lung cancer was essentially confined to persons with a dust index above 200 mppcf-years, and Enterline et al (1973) showed no direct dose-response for respiratory cancer below 125 mppcf-years. In a review of these two papers, Schneiderman (1974) concluded that, instead of being consistent with a

90

threshold level at which no cancer risk exists, these data did not provide evidence for a threshold or for a "safe" level of exposure. He pointed out that in the paper by Enterline et al (1973) there is no dose group for which the Standardized Mortality Ratio (SMR) is below 100 (100 = normal), but that the 95% confidence limits on the SMR's included 100 for two of the three dose groups below 125 mppcf-years. One of the dose groups (25-62.4) had a statistically significant excess mortality from lung cancer, whereas for the other two this mortality rate was insignificantly elevated above the expected values. Regarding McDonald's paper, Schneiderman stated that it is hard to determine what is excess since no expected numbers for each group were given upon which to base this comparison.

Among amosite workers with employment of 3 months or less, Selikoff (1976) reported excess cancer risks of 3.87, 1.68, and 1.65 times those expected for cancer of the lung, colon and rectum, and all sites, respectively.

Anderson et al (1976) have reported a significant excess of radiographic abnormalities of the chest characteristic of asbestos exposure (pleural and/or parenchymal) 25 - 30 years after the onset of household contamination. These abnormalities were observed in 35% of 326 otherwise healthy workers who had household contacts with amosite asbestos. In addition, four pleural mesotheliomas were found in this group.

## VI.   THE RECOMMENDED STANDARD

Available studies provide conclusive evidence that exposure to asbestos fibers causes cancer and asbestosis in man.   Lung cancers and asbestosis have occurred following exposure to chrysotile, crocidolite, amosite, and anthophyllite.   Mesotheliomas, lung and gastrointestinal cancers have been shown to be excessive in occupationally exposed persons, while mesotheliomas have developed also in individuals living in the neighborhood of asbestos factories and near crocidolite deposits, and in persons living with asbestos workers.   Asbestosis has been identified among persons living near anthophyllite deposits.

Likewise,   all commercial forms of asbestos are carcinogenic in rats, producing lung carcinomas and mesotheliomas following their inhalation, and mesotheliomas after intrapleural or ip injection.   Mesotheliomas and lung cancers were induced following even 1 day's exposure by inhalation.

The size and shape of the fibers are important factors; fibers less than 0.5 $\mu$m in diameter are most active in producing tumors.   Other fibers of a similar size, including glass fibers, can also produce mesotheliomas following intrapleural or ip injection.

There are data that show that the lower the exposure, the lower the risk of developing cancer.   Excessive cancer risks have been demonstrated at all fiber concentrations studied to date.   Evaluation of all available human data provides no evidence for a threshold or for a "safe" level of asbestos exposure.

92

In view of the above, the standard should be set at the lowest level detectable by available analytical techniques, an approach consistent with NIOSH's most recent recommendations for other carcinogens (ie, arsenic and vinyl chloride). Such a standard should also prevent the development of asbestosis.

Since phase contrast microscopy is the only generally available and practical analytical technique at the present time, this level is defined as 100,000 fibers >5 $\mu$m in length/m$^3$ (0.1 fibers/cc), on an 8-hour-TWA basis with peak concentrations not exceeding 500,000 fibers >5 $\mu$m in length/m$^3$ (0.5 fibers/cc) based on a 15-minute sample period. Sampling and analytical techniques should be performed as specified by NIOSH publication USPHS/NIOSH Membrane Filter Method for Evaluating Airborne Asbestos Fibers – T.R. 84 (1976).

This recommended standard of 100,000 fibers >5 $\mu$m in length/m$^3$ is intended to (1) protect against the noncarcinogenic effects of asbestos, (2) materially reduce the risk of asbestos-induced cancer (only a ban can assure protection against carcinogenic effects of asbestos) and (3) be measured by techniques that are valid, reproducible, and available to industry and official agencies.

However, some difficulties arise in that specific work practices and innovative engineering control or process changes are needed. But because of the well-documented human carcinogenicity from all forms of asbestos, these difficulties should not be cited as cause for permitting continued exposure to asbestos at concentrations above 100,000 fibers >5 $\mu$m in length/m$^3$.

93

This standard was not designed for the population-at-large, and any extrapolation beyond general occupational exposures is not warranted. The standard was designed only for the processing, manufacturing, and use of asbestos and asbestos-containing products as applicable under the Occupational Safety and Health Act of 1970.

REFERENCES FOR CHAPTERS V AND VI

1.  1969 Standard for asbestos dust concentration for use with the asbestos regulations. Department of Employment and Productivity, Her Majesty's Factory Inspectorate. Technical Note 13, 1970

2.  Lewinsohn HC (1972): The medical surveillance of asbestos workers. Soc Health 92:69

3.  Weill H, Ziskind MM, Waggenspack C, Possiter CE (1975): Lung function consequences of dust exposure in asbestos cement manufacturing plants. Arch Environ Health 30:248-52

4.  Ayer H, Berg J (1976): Cumulative asbestos exposure and forced vital capacity. Submitted for publication to Arch Environ Health

5.  Holmes S (1973): Environmental data in industry, in Bogovski P, Timbrell V. Gilson JC, Wagner JC (eds): Proceedings of the Conference on Biological Effects of Asbestos. Lyon, pp 135

6.  Newhouse ML (1969): A study of the mortality of workers in an asbestos factory. Br J Ind Med 26:294

7.  Newhouse ML (1973): Cancer among workers in the asbestos textile industry, in Bogovski P, Gilson JC, Timbrell V, Wagner JC (eds): Proceedings of the Conference on Biological Effects of Asbestos. Lyon, pp 203

8.  Newhouse ML, Berry G, Wagner JC, Turok ME (1972): A study of the mortality of female asbestos workers. Br J Ind Med 29:134

9.  Howard S, Kimben LJ, Lewinsohn HC, Peto J, Doll R (1976); A Mortality Study among Workers in an Englosh Asbestos Factory. Oxford University, (in press)

10. Doll R (1955): Mortality from lung cancer in asbestos workers. Br J Ind Med 12:81-86

11. Knox JF, Doll RS, Hill ID (1965): Cohort analysis of changes in incidence of bronchial carcinoma in a textile asbestos factory. Am NY Acad Sci 132:526-35

12. Knox JF, Holmes S, Doll R, Hill ID (1968): Mortality from lung cancer and other causes among workers in an asbestos textile factory. Br J Ind Med 25:293-303

13. Gillam JD, Dement JM, Lemen RA, Wagoner JK, Archer VE, Beljer HP (1976): Mortality patterns among hard rock gold miners exposed to an asbestiform mineral. Ann NY Acad Sci 271:336-44

TABLE VI-1

B.O.H.S. ASBESTOS STANDARD
X-RAY FINDINGS IN AN ASBESTOS TEXTILE FACTORY
DECEMBER 1970 (MALES)

| Years of Exposure | No. | X-ray Findings | | | |
|---|---|---|---|---|---|
| | | Normal | Pleural Fibrosis* | Pulmonary Fibrosis | Total Abnormal** |
| 0 – 9 | 613 | 548 | 10 | 0 | 65(11%) |
| 10 – 19 | 189 | 122 | 18 | 20 | 67(36%) |
| 20 – 29 | 114 | 51 | 30 | 21 | 63(55%) |
| 30 – 39 | 42 | 9 | 17 | 17 | 33(78%) |
| 40 – 49 | 12 | 2 | 6 | 3 | 10(83%) |

* Consistent with asbestos exposure
**Including changes not considered due to asbestos exposure
Adapted from reference 2

☆U.S. GOVERNMENT PRINTING OFFICE: 1 9 8 6 – 6 4 6 – 1 1 7 / 4 0 9 0 5

DEPARTMENT OF
HEALTH, EDUCATION, AND WELFARE
PUBLIC HEALTH SERVICE
CENTER FOR DISEASE CONTROL
NATIONAL INSTITUTE FOR OCCUPATIONAL SAFETY AND HEALTH
ROBERT A. TAFT LABORATORIES
4676 COLUMBIA PARKWAY, CINCINNATI, OHIO 45226

OFFICIAL BUSINESS
PENALTY FOR PRIVATE USE, $300



POSTAGE AND FEES PAID
U.S. DEPARTMENT OF H.E.W
HEW 396

THIRD-CLASS MAIL

DHEW (NIOSH) Publication No. 77-169