**MDL 875**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT 1 1 2006

FILED
CLERK'S OFFICE

PLEADING NO. 4896

MDL  DOCKET NO. 875

BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)

**(In Re: Condition Transfer Order (CTO-268))**

CASE ORIGINATES FROM
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

BYRON GRANIER, ET AL.                          CIVIL ACTION

VERSUS

NORTHROP GRUMMAN SHIP SYSTEMS, INC., ET AL     NO.: **LAE 2 06-3738**

**MOTION TO VACATE CONDITIONAL TRANSFER ORDER**

NOW INTO COURT, through undersigned counsel, come plaintiffs, Josie Legendre Granier,

widow of Byron Granier, individually and on behalf of the minor child of Byron Granier, Benjamin

Granier, and Jared Granier, Clint Granier, and Desiree Granier Dufrene, major children of Byron

Granier who file this Motion to Vacate Conditional Transfer Order (CTO-268) on the basis that the

Conditional Transfer Order entered on or about September 15, 2006, was invalid as there is no

federal jurisdiction for the rendering of this transfer order, for the reasons set forth in the

memorandum attached hereto, at well as for the reasons set forth below:

(1)    This action was originally filed in state court, was improperly removed by
       defendants, Northrop Grumman Ship Systems, Inc. (formerly known as

**OFFICIAL FILE COPY**
**IMAGED OCT 1 2 2006**

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

OCT 10

A 10: 49

RECEIVED
CLERK'S OFFICE

Avondale Shipyards, Inc.), and its executive officers, Peter Territo and Albert Bossier, Jr. (herein all known as "Avondale" or the "Avondale Interests"), without a basis for federal jurisdiction, improperly asserting the Longshore and Harbor Workers' Compensation Act ("LHWCA") and the "Federal Contractors Defense" as a basis for federal jurisdiction;

(2)     The plaintiffs filed a Motion To Remand on July 24, 2006, in the United States District Court for the Eastern District of Louisiana. As of this date, Judge Eldon E. Fallon, the federal judge to whom the case was assigned after removal, has not taken any action on plaintiffs' Motion to Remand, and plaintiffs' Motion To Remand is presently awaiting Judge Fallon's determination on the jurisdictional issue;

(3)     On September 27, 2006, Judge Fallon stayed the determination on plaintiffs' Motion To Remand pending resolution of the Conditional Transfer Order. However, plaintiffs assert that the Condition Transfer Order must be stayed and a determination on the Motion To Remand must be made by the district court prior to any action being taken on the Conditional Transfer Order;

(4)     As shown in plaintiffs' Motion To Remand that has been filed in the Eastern District of Louisiana (See Appendix A & B), the federal court has no jurisdiction over this matter, and cases involving Northrop Grumman Ship Systems, Inc., and its executive officers, including, Peter Territo and Albert Bossier, Jr., have been routinely remanded by the federal courts to the state court from which they originated for lack of federal jurisdiction;

(5)     Vacation of the Conditional Transfer Order/Remand is warranted because the Avondale Interests do not meet the requirements for removal under 28 U.S.C. §1442;

(6)     Vacation of the Conditional Transfer Order is warranted because the Avondale Interests failed to satisfy the first prong of the *Mesa* test for federal officer removal. The defendants cannot show that the government authority under which they allegedly worked interfered with their ability to fulfill their state law obligations to Byron Granier. In addition, Byron Granier was exposed to asbestos at Avondale on commercial vessels which had nothing to do with the government;

(7)     Vacation of the Conditional Transfer Order is warranted because the Avondale Interests failed to satisfy the second prong of the *Mesa* test for federal officer removal. The defendants cannot show that it has a colorable federal defense to the plaintiffs' claims. In addition, Byron Granier was exposed to asbestos at Avondale on commercial vessels which had nothing to do with the government;

(8)     Vacation of the Conditional Transfer Order is warranted because the Avondale Interests failed to satisfy the third prong of the *Mesa* test for federal officer

removal. The defendants cannot show that a nexus exists between actions for which it is being sued and the alleged directives of the federal government. In addition, Byron Granier was exposed to asbestos at Avondale on commercial vessels which had nothing to do with the government; and

(9) Vacation of the Conditional Transfer Order/Remand is warranted under the numerous cases cited in plaintiffs' memorandum in support, including the cases of *Good v. Armstrong World Indus., Inc.*, 914 F. Supp. 1125 (E.D. Pa. 1996); *Bourgeois v. A.P. Green*, No. 96-3764 (E.D. La. 1997); *Gauthe, et al v. Asbestos Corporation, et al*, 1997 WL 3255 (E.D. La. 1997); *Bartley v. Borden, Inc.*, No. 96-145 c/w 96-157 through 96-205 (E.D. La. 1996); *Mouton v. Flexitallic, Inc., et al.*, 1999 WL 225438 (E.D. La. 1999); *Savoie v. Northrop Grumman Ship Systems*, No. 05-2086 (E.D. La. 2005); *Porche v. Flexitallic, Inc., et al.*, 1996 WL 603919 (E.D. La. 1996); *Anderson v. Avondale Industries, Inc.*, 1994 WL 679827 (E.D. La.); *Overly v. Raybestos-Manhattan*, No. C-96-2853 SI., 1996 WL 532150 (N.D. Cal. Sept. 9, 1996); *Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 947 (E.D. N.Y. 1992); and *Freiberg v. Swinerton & Walberg Property Services, Inc.*, 245 F.Supp. 2d 1144 (D. Colo. 2002), among many other cases.

**WHEREFORE**, plaintiffs respectfully submit that the conditional transfer order should be vacated and the case should be remanded to state court for lack of federal jurisdiction, or, in the alternative, the conditional transfer order should be stayed pending a decision on plaintiffs' motion to remand.

Respectfully submitted,

**ROUSSEL AND ROUSSEL**

GEROLYN P. ROUSSEL, TA–4134
PERRY J. ROUSSEL, JR. – 20351
1710 Cannes Drive
LaPlace, LA 70068
Telephone: (985)651-6591
ATTORNEYS FOR PLAINTIFFS,
JOSIE GRANIER, JARED GRANIER, CLINT
GRANIER, AND DESIREE GRANIER DUFRENE

-3-

## CERTIFICATE OF SERVICE

     I hereby certify that a copy of plaintiffs' Motion to Vacate Conditional Transfer Order has been served upon the parties listed on the attached Panel Service List by mailing same to each, properly addressed and postage prepaid, on this _6_ day of October, 2006.

PERRY J. ROUSSEL, JR.

RECEIVED
CLERK'S OFFICE

2006 OCT 10  A 10: 50

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT 1 1 2006

FILED
CLERK'S OFFICE

MDL  DOCKET NO. 875
BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION
IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)
**(In Re: Condition Transfer Order (CTO-268))**

CASE ORIGINATES FROM
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

BYRON GRANIER, ET AL.                                        CIVIL ACTION

VERSUS

NORTHROP GRUMMAN SHIP SYSTEMS, INC., ET AL        NO.: **LAE 2 06-3738**

<u>**MEMORANDUM IN SUPPORT OF MOTION TO VACATE**
**CONDITIONAL TRANSFER ORDER**</u>

**MAY IT PLEASE THE COURT:**

  Plaintiffs, Josie Legendre Granier, widow of Byron Granier, individually and on behalf of the minor

child of Byron Granier, Benjamin Granier, and Jared Granier, Clint Granier, and Desiree Granier Dufrene,

major children of Byron Granier , have filed a Motion to Vacate the Conditional Transfer Order (CTO-268)

entered on September 15, 2006.  The Conditional Transfer Order is invalid as there is no federal jurisdiction

for the rendering of this order.  This action was originally filed in state court, was improperly removed by

defendants, Northrop Grumman Ship Systems, Inc. (formerly known as Avondale Shipyards, Inc.), and its

executive officers, Peter Territo and Albert Bossier, Jr. (herein all known as "Avondale" or the "Avondale

Interests"), without a basis for federal jurisdiction.  Plaintiffs filed a Motion To Remand on July 24, 2006

(See Appendix A & B), in the United States District Court for the Eastern District of Louisiana.  As of this

date, Judge Eldon E. Fallon has not taken any action on plaintiffs' Motion to Remand. On September 27, 2006, Judge Fallon stayed the determination on plaintiffs' Motion To Remand pending resolution of the Conditional Transfer Order. Plaintiffs assert, however, that the Condition Transfer Order must be stayed and a determination on the Motion To Remand must be made by the district court prior to any action being taken on the Conditional Transfer Order. Accordingly, for all of the reasons cited above as well as set forth below, plaintiffs' motion to vacate conditional transfer order should be granted.

## BACKGROUND

Original plaintiff, Byron Granier, contracted mesothelioma, a cancer of the lining of the lung, from his employment at Avondale from approximately 1970 to 1975. This civil action was originally filed by Byron Granier and his wife, Josie Legendre Granier, in the Civil District Court for the Parish of Orleans, State of Louisiana, in proceeding number 2006-4993, Division "A".[1] Plaintiffs' petition asserts state law claims against the Avondale Interests. It is respectfully submitted that this action was improperly removed by the Avondale Interests and should be remanded to state court because the federal courts are without jurisdiction to hear this case.

In the case at bar, the Avondale Interests argue as a basis for removal a defense pursuant to the Longshore and Harbor Workers' Compensation Act ("LHWCA") and the "Federal Contractors Defense." Additionally, the Avondale Interests argue as a basis for removal "federal officer immunity" pursuant to 28 U.S.C. § 1442. As shown herein, none of these are defenses under the law but, even if they were, a defense is not a basis for removal. Accordingly, it is respectfully submitted that the conditional transfer order should be vacated and this action should be remanded to the state court from which it was removed because there is no federal jurisdiction in this case as highlighted by the numerous cases cited herein dealing with the Avondale Interests. As shown herein and in plaintiffs' Motion To Remand (Appendix A & B), the federal court has no jurisdiction over this matter, and cases involving the Avondale Interests have been routinely

---

[1]Since the filing of this action, Byron Granier died from mesothelioma, and the petition/complaint was amended; current plaintiffs are his wife and children.

remanded by the United States Eastern District of Louisiana for lack of federal jurisdiction. Since the federal courts have no jurisdiction over this matter, remand is mandatory. *Insinga v. LaBella*, 845 F.2d 249 (11th Cir. 1988); *Bobby Jones Garden Apartment v. Suleski*, 391 F.2d 172 (5th Cir. 1968); *Covington v. Indemnity Ins. Co.*, 251 F.2d 930 (5th Cir. 1958).

## I.   THERE IS NO FEDERAL JURISDICTION

On the face of the plaintiffs' petition (Exhibit 1), the federal courts lack subject matter jurisdiction. Most of the named defendants are domiciled in Louisiana, so there is no complete diversity. Plaintiffs' petition is grounded solely on state law, so there is no federal question. *Ducre v. Executive Officers of Halter Marine, Inc.*, 752 F.2d 976 (5th Cir. 1985); *Cole v. Celotex Corporation.*, 599 So.2d 1058, 1068 (La. 1992). The Avondale Interests allege federal jurisdiction based upon a defense pursuant to the LHWCA or federal contractor defense or as a "federal officer".[2] These are not tort defenses under Louisiana law, but in any event, an alleged defense is insufficient to allow removal. It is well-settled law that "a defense that raises a federal question is inadequate to confer federal jurisdiction." *Merrell Dow Pharmaceuticals Inc. v. Thompson,* 478 U.S. 804, 808, 106 S.Ct. 3229, 3232, 92 L.Ed. 2d 650 (1986) (citing *Louisville & Nashville R. Co. v. Mottley,* 211 U.. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908). The federal question in removal cases must be disclosed on the face of the plaintiffs' complaint and must be essential to the plaintiffs' cause of action; it is not enough that the federal question arises by way of a defense to that action. *Oliver v. Trunkline Gas Co.*, 789 F.2d 341, 343 (5th Cir. 1986); *PAAC v. Rizzo*, 502 F.2d 306, 313 (3d Cir. 1974); *Border City S. & L. Ass'n v. Kennecorp Mtg.*, 523 F. Supp. 190, 192 (S.D. Ohio 1981); *Bruan, Gordon & Co. v. Hellmers*, 502 F. Supp. 897, 900 (S.D. N.Y. 1980); 1A Moore's Federal practice, Sec. 0.160 (1974); C. Wright, Law of Federal Courts, Sec. 38 at 179 (1976). A case may not be removed to federal court on the basis of a federal defense, even if the defense is anticipated in plaintiffs' complaint and even if the parties concede that the

---

[2]The attorneys for the Avondale Interests have attempted to remove several cases on the same allegations asserted herein, and every case has been remanded back to state court for lack of jurisdiction.

federal defense is the only question truly at issue. *Franchise Tax Bd. of California v. Constr. Laborers Trust for Southern California*, 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983); *Thomas v. Burlington Industries, Inc.*, 763 F. Supp. 1570, 1575 (S.D. Fla. 1991). Moreover, there are no federal defenses in the instant case. A district court may and should always determine <u>sua sponte</u> whether its subject matter jurisdiction has been properly invoked." *Thomas v. Burlington Industries, Inc.*, 763 F.Supp. 1570, 1575 (S.D. Fla. 1991) (citing 14A C. Wright, A. Miller & E. Cooper, <u>Federal Practice and Procedure</u> Sec. 3721). In this case, federal subject matter jurisdiction has not been invoked; plaintiffs' motion to vacate conditional transfer order should be granted; and the case should be remanded to the state court from which it was removed.

## II.    "LHWCA" IS NOT A BASIS FOR FEDERAL JURISDICTION

Defendants argue that they are entitled to federal jurisdiction because Avondale can asserting a defense based upon the LHWCA. This exact issue was addressed in *Aaron v. National Union Fire Insurance Co.*, 876 F.2d 1157 (5th Cir. 1989), *cert. denied sub nom., American Home Insurance Group v. Aaron*, 493 U.S. 1074, 110 S.Ct. 1121, 107 L.Ed.2d 1028 (1990), wherein the Fifth Circuit held that the LHWCA is not a basis for removal. The *Aaron* court reiterated well-established law that a case cannot be removed to federal court on the basis of a federal defense, even if the defense is anticipated in plaintiffs' complaint and even if the parties concede that the federal defense is the only question truly at issue. *Aaron, supra* at 1161; *Franchise Tax Bd. of California v. Constr. Laborers Trust for Southern California*, 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983); *Powers v. South Central United Food & Commercial Workers Unions*, 719 F.2d 760, 764 (5th Cir. 1983). The *Aaron* court stated that the LHWCA statutes are devoid of any indication of specific jurisdictional grants to federal courts as are found in ERISA and LMRA. Thus, "[t]he LHWCA is... nothing more than a statutory defense to a state-court cause of action - the classic circumstance of **non-removability.**" *Aaron, supra* at 1166 (emphasis added); *see also Lowe v. Ingalls Shipbuilding*, 723 F.2d 1173, 1183 (5th Cir. 1984); see also *Masters v. Swiftships Freeport, Inc.*, 867 F.Supp. 555 (S.D. Tex. 1994).

In *Gauthe, et al v. Asbestos Corporation, et al*, 1997 WL 3255 (E.D. La. 1997), Judge Stanwood Duval, Jr. addressed these same LHWCA arguments with regard to the Avondale Interests in an asbestos

exposure case exactly the same as the case at bar. In rejecting Avondale's arguments, Judge Duval relied on both Louisiana law as well as the U.S. Supreme Court decision in *Sun Ship, Inc. v. Pennsylvania*, 100 S. Ct. 2432 (180) to hold that the LHWCA does not preempt, but supplements, state remedies available to an injured worker. *Gauthe, supra* at pages 4-5 (Exhibit "3"); *See also Bartley v. Borden, Inc.*, No. 96-145 c/w 96-157 through 96-205 (E.D. La. 1996) (Exhibit "2"); and *Bourgeois v. A.P. Green*, No. 96-3764 (E.D. La. 1997)(Exhibit "8" at pages 33-34). In the instant case, Byron Granier has not filed a claim for LHWCA benefits, nor has Mr. Granier received any LHWCA benefits. Mr. Granier has elected Louisiana State remedies, and the LHWCA is not a colorable federal defense to Mr. Granier's state law claims. *Porche v. Avondale Shipyards*, consolidated with *Adams v. Hartzman*, 339 So.2d 1212 (La. 1976), *appeal dismissed*, *Territo v. Porche*, 434 U.S. 803, 98 S.Ct. 31, 54 L.Ed.2d 60 (1976); *Gauthe, supra* at pages 4-5; and *Mouton v. Flexitallic, Inc., et al.*, 1999 WL 225438 (E.D. La. 1999) at page 4. (Exhibit "4").

In yet another case of *Bartley v. Borden, Inc.*, No. 96-145 c/w 96-157 through 96-205 (E.D. La. 1996) (Exhibit "2"), Judge Marcel Livaudais, Jr. covered the same issues as those being presented by the Avondale Interests in the instant case. Judge Livaudais clearly explained in his decision that the LHWCA cannot form the basis of federal subject matter jurisdiction. *Bartley, supra* at page 8 (*citing Aaron, supra;* and *Lowe, supra*); see also *Bourgeois v. A.P. Green*, No. 96-3764 (E.D. La. 1997)(Exhibit "8" at pages 33-34).

## III.   THE AVONDALE INTERESTS ARE NOT "FEDERAL OFFICERS" AND THE GOVERNMENT CONTRACTOR DEFENSE DOES NOT APPLY

Plaintiffs' petition is grounded solely on state law. The claim against the Avondale Interests are based on Louisiana law including, among others, theories of failure to warn and failure to provide a safe working environment. As stated by the U.S. Supreme Court in *Mesa v. California*, 489 U.S. 121, 131-132, 109 S.Ct. 959, 966, 103 L.Ed.2d 99 (1989), in order to qualify as a federal officer, or "person" acting under him, the removing party must "(1) demonstrate that it acted under the direction of a federal officer, (2) raise a federal defense to the plaintiffs' claims <u>and</u> (3) demonstrate a causal nexus between plaintiff's claims and acts it performed under color of federal office." (See also *Pack v. AC and S., Inc.*, 838 F.Supp. 1099, 1101 (D. Md.

1993)). The Avondale Interests cannot meet any of these requirements, and the defendants are required to meet all three requirements.

Avondale was and is a privately owned shipyard which constructed both military and commercial vessels. Even with regard to government vessels, however, Avondale employees did not work under the direct orders or direction of a U.S. Navy inspector. The United States government inspectors neither monitored nor enforced safety regulations at Avondale. In addition, safety, even during the construction of government vessels, was the responsibility of Avondale, not the U.S. government. See Exhibit "9", Affidavit of Felix Albert; see also Exhibit "10", Deposition of Rudy Walker, Sr.[3], dated May 8 2003, at pages 342-43; Exhibit "16". It has been held that removal by a "person acting under" a federal officer must be predicated upon a showing that the acts that formed the basis for the state civil suit were performed pursuant to an officer's direct orders or to comprehensive and detailed regulations. *Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 947 (E.D. N.Y. 1992). That did not happen at Avondale.

In the case at bar, Mr. Granier worked directly for Avondale, and Avondale controlled all of the activities in regard to the construction of commercial and Navy vessels. Mr. Granier's employment records show that he did work on commercial LNGs which were vessels being built for El Paso Natural Gas Company, a private corporation. Exhibits "14" & "15". The Navy was a customer just like any other customer of Avondale. Exhibit "10" at p. 341. The Navy did not have to look at the work being done by Avondale, but were called out by Avondale to review the finished sections of the ship just like any other customer. Exhibit "10", p. 342-43; Exhibit "16". Also, the Navy did not have a separate office on Avondale's premises, but used the same facilities as all other customers. Exhibit "10" pages 166-67.

Felix Albert was a ship inspector with the United States Navy at Avondale Shipyards from 1965 to 1976. Inspector Albert states that **"Avondale was a privately owned shipyard that constructed both military and commercial vessels. In connection with the construction of the government vessels,**

---

[3] Rudy Walker, Sr. was a navy inspector covering Avondale Shipyards starting in 1969, and throughout Byron Granier's employment. Exhibit "10", pages 159, 168 & 209.

**Avondale employees did not work under the direct orders of a ship inspector and Avondale employees did not act under the direction of a ship inspector. The United States government inspectors neither monitored nor enforced safety regulations. On the job safety during the construction of vessels for the United States government was the responsibility of Avondale Shipyards' safety department."** See Exhibit "9", Affidavit of Felix Albert; see Exhibit "10" at pp. 342-43; Exhibit "16". Thus, the instant case is distinguishable from the case of *Lalonde v. Delta Field Erection* cited by the Avondale Interests in their removal motion where the injury occurred on a federally owned and operated facility. Most of the work at Avondale was private, commercial work, not work for the U.S. government. Exhibit "10" at pp. 342-344. Moreover, the Navy did not supervise Avondale's work or oversee it while it was being performed. Exhibit "10" at p. 342-343.

Also of note is that the products used on commercial vessels by Avondale were the same products used on the Navy vessels. Exhibit "10" at p. 343. As recognized by the court in *Morales v. Owens-Corning Fiberglass Corp.*, 1994 WL 564744 (N.D. Cal.),

> The "government contractor" defense is not colorable. No defendant has produced evidence that it presented specially designed products to the government under federal orders or specifications that directly conflicted with the state law duty upon which the defendants are now being sued. Most notably, no defendant produces any evidence whatsoever that the products it designed pursuant to government orders were different from those designed for civilian use in any manner pertinent to state law liability.

Exhibit "11"–*Morales* at p. 3 (citations omitted).

Here, Avondale is not a federal owned facility, but a private shipyard. Avondale's operations were under Avondale's control and not the government. Thus, the *Lalonde* case provides absolutely no support for Avondale's assertion of jurisdiction in the case at bar and, moreover, has been rejected by the federal courts. See Exhibit "13", *Savoie v. Northrop Grumman Ship Systems*, No. 05-2086, pp. 4-5 (E.D. La. 2005).

In the case at bar, the Avondale Interests cannot show "that the government provided reasonably precise specifications affecting [Avondale's] provision" for not warning Byron Granier of the dangers of asbestos or for Avondale's failure to furnish adequate ventilation or respiratory equipment to Mr. Granier or

for Avondale's failure to provide Mr. Granier with personal protective equipment to protect Mr. Granier from workplace hazards, as alleged in Mr. Granier's state law petition. Absent a showing by the Avondale Interests that the federal government gave specific instructions to it not to warn or not to provide safeguards to Byron Granier, the Avondale Interests cannot meet even one of the three *Mesa* requirements. *See Overly v. Raybestos-Manhattan*, 1996 U.S. Dist LEXIS 13535, No. 96-2853 (N.D. Cal. 1996) (Exhibit "6"), and *Porche v. Flexitallic*, 1996 U.S. Dist LEXIS 15877, No. 96-2827 c/w 96-2828 (E.D. La. 1996) (Exhibit "5"). Furthermore, the federal government in no way restricted the Avondale Interests' ability to warn employees of work place dangers or to provide employees with workplace safeguards. Thus, there is no causal connection between any control exercised by the United States over the Avondale Interests, if any, and the legal theory under which plaintiffs seek to hold the Avondale Interests liable. Thus, the Avondale Interests have no basis on which to assert an application of the Federal Officer Removal Statute, and there is no federal jurisdiction in this case. *Overly v. Raybestos-Manhattan*, No. 96-2853 (N.D. Cal. 1996) and *Porche v. Flexitallic*, No. 96-2827 c/w 96-2828 (E.D. La. 1996).

In the case of *Gauthe, et al v. Asbestos Corporation, et al*, 1997 WL 3255 (E.D. La. 1997), the Avondale Interests attempted to remove an asbestos case to federal court alleging removal was proper under 23 U.S.C. 1442(a)(1), the Federal Officer Removal Statute. Avondale claimed that removal was proper because they could allegedly raise federal defenses of immunity under the "government contractor immunity" defense and under the LHWCA, as in the instant case.

The *Gauthe* court stated that **"there is no evidence that the Government restricted or prohibited Avondale's ability to notify individuals of the presence of asbestos in the work environment. Assuming that Avondale built ships under the direct supervision of the federal government, nothing about that supervision prevented Avondale from warning Mr. Gauthe about the dangers. Thus, there is no causal connection between the injury alleged by Mr. Gauthe with respect to Avondale's failure to warn and Avondale working on behalf of the federal government."** *Gauthe, supra*, at pages 3-4. Thus, the Avondale Interests have no basis for removal under the government contractor defense. *Id.* Furthermore,

the Avondale Interests do not have statutory immunity under the LWHCA, and this is not grounds for removal of a case to federal court. *Gauthe*, supra at page 4; see also *Aaron v. National Union Fire Insurance Co.*, 876 F.2d 1157 (5th Cir. 1989), *cert. denied sub nom.*, *American Home Insurance Group v. Aaron*, 493 U.S. 1074, 110 S.Ct. 1121, 107 L.Ed.2d 1028 (1990).

In the case of *Mouton v. Flexitallic, Inc., et al.*, 1999 WL 225438 (E.D. La. 1999), the Avondale Interests attempted to remove an asbestos case to federal court alleging removal was proper under 23 U.S.C. 1442(a)(1), the Federal Officer Removal Statute. Again, Avondale claimed that removal was proper because they could allegedly raise federal defenses of immunity under the "government contractor immunity" defense and under the LHWCA.

The *Mouton* court stated that "**the federal government provided no direction on warning when using asbestos, and further did not prevent Avondale from taking its own safety precautions above the minimum standards incorporated in the federal contracts.... Thus, Avondale has failed to establish a causal connection between the Navy's direction pursuant to the design contracts and plaintiff's failure to warn claims.**" *Mouton, supra* at pages 4. Thus, the Avondale Interests have no basis for removal under the government contractor defense, nor does Avondale have any basis for removal under the LHWCA. *Id.*

In yet another case, *Porche v. Flexitallic, Inc., et al.*, 1996 WL 603919 (E.D. La. 1996)(Exhibit "5"), the Avondale Interests again attempted to remove an asbestos case to federal court alleging removal was proper under 23 U.S.C. 1442(a)(1), the Federal Officer Removal Statute. Again, Avondale claimed that removal was proper because they could allegedly raise federal defenses of immunity under the "government contractor immunity" defense. The *Porche* court stated that "**in a similar case removed from state court to federal court in California by Avondale, the district court remanded the case and imposed sanctions. *Overly v. Raybestos-Manhattan*, 96-2853 (N.D. Cal. Sept. 12, 1996). The court need not address these arguments the substance of removal jurisdiction and therefor will not. However, the rationale underlying *Overly* is well-reasoned.**" *Porche, supra* at p. 3. Again, the *Porche* court remanded the case back to the Civil District Court for the Parish of Orleans. *Porche, supra* p. 4.

In yet another case of *Bourgeois v. A.P. Green*, No. 96-3764 (E.D. La. 1997)(Exhibit "8"), the Avondale Interests attempted to remove an asbestos case to federal court alleging removal was proper under 23 U.S.C. 1442(a)(1), the Federal Officer Removal Statute.  Again, Avondale claimed that removal was proper because they could allegedly raise federal defenses of immunity under the "government contractor immunity" defense, and under the LHWCA.  In *Bourgeois*, Judge Fallon starts his ruling at page 29 of the attached transcript (Exhibit "8"), and states that **"the action is not removable under 1442(a)(1) because the Avondale interest did not act, as I read the pleadings and the affidavits and the information, under the control or direction of a federal officer...."** *Id.* at page 31.  **"The removal must be predicated upon a showing that the acts forming the basis of the state court suit were performed pursuant to the officers' direct and detailed control, a general auspices, a general control does not satisfy the riggers of 1442 (a)(1)."** *Id.* at page 32.  In *Bourgeois*, Judge Fallon stated:

> The issue in this case is not the products liability or some cases you will see in the literature occasionally where vessels were built too long and they are subject to wave action and they break in half, we see this in some cases where the argument is that its built improperly and the defense is on the basis that the defense in made in this particular case.  The courts in those cases, although they are seldom in the common days, touch on them a bit more perhaps in the courts but the argument is that they fail not because of any defect in the equipment, not because of the improper work performed on the vessel, but simply because of the design defect, they were as to long and should not have been that long and therefore they we acting under the control and supervision of the government and therefore you are entitled to that particular defense.  I don't see this particular case in that ball park even, I think the issue here is whether there was safety rules, regulations, equipment, atmosphere, information imparted to the people, warnings, things of that sort which are completely under the supervision and control of Avondale.  They would not expose some people to some hazards and other people to other hazards, they have to have a uniform safety program regardless of who they do work for.
>
> So I think the issue in this case is that the government may have had some general control, the inspectors may have come aboard the vessels... And they are often given the safety equipment to go board the vessel by Avondale, they get their visitors equipment and their visitors hat, whether its blue or white or red, they use it and go aboard unless they specifically brought there their own.  So Avondale even suits them out... Avondale, in that instance, is really telling them what to wear and what to do and where to go and whose working on the vessel rather than the other way around....
>
> And finally, the defendants urge that the longshoreman act is a basis for removal.  That *Aaron* case which we discussed, 876 F.2d 1157, indicates that that is not a basis for a removal....  The motion to remand is granted.

*Bourgeois*, supra at pages 32-32 (Exhibit "8"). The above is clearly supported by the Affidavit of Felix Albert who states that Avondale employees did not work under the direct orders of a ship inspector nor did they act under the direction of a ship inspector. The United States government inspectors neither monitored nor enforced safety regulations. On the job safety during the construction of vessels for the United States government was the responsibility of Avondale's safety department, not the government. See Exhibits "9", "10" & "16".

In the recent decision of *Alvin Savoie v. Northrop Grumman Ship Systems, Inc. et al.*, 2:05-CV-02086, the Avondale Interests again unsuccessfully attempted to remove an asbestos exposure case to federal court. In remanding the case to state court, Judge Stanwood Duval states that the Avondale Interests':

> **removal fails on the first [Mesa] prong, as defendant cannot demonstrate that he was acting under the direction of a federal officer specific to the claims alleged in plaintiff's petition, namely, those dealing with safety procedures and plans of Avondale. Claims against Territo include failure to provide petitioner with a safe work place and safety equipment; failure to disclose, warn, or reveal medical and safety information regarding asbestos hazards and safety and health risks associated with asbestos; failure to properly supervise; failure to remove asbestos hazards from the work place; failure to provide a safe and suitable means of asbestos.... Without going into an in depth analysis, the Court view this particular case as analogous to the long line of precedent cases addressing the very issues herein which held that removal was improper.** *See Gauthe v. Asbestos Corp. et al*, 1997 WL 3255 (E.D. La. 1997); *Quebedeaux v. Union Pacific Railroad*, No. 6:04-02232 (W.D. La. 2004); *Bourgeois v. A.P. Green Industries, Inc.*, No. 96-3764 (E.D. La. 1996); *Guidroz v. The Anchor Packing Co.*, No. 98-3709 (E.D. La. 1998); *Overly v. Raybestos-Manhattan*, No. C-96-2553 CI (N.D. Cal. 1996); *Westbrook v. Asbestos Defendants*, 2001 WL 902642 (N.D. Cal. 2001); *Mouton v. Flexitallic, Inc.*, 1999 WL 2254438 (E.D. La. 1999); *Porche v. Flexitallic, Inc.*, 1996 WL 603919 (E.D. La. 1996); *Mabile v. Hidalgo*, No. 95-2200.9 (W.D. La. 1995).... **[Also], Territo's sworn testimony shows that the safety department at Avondale was not under the control of federal officers....** The cases defendant cites, *Lalonde*,... *Fink*,... and *Delancey*,... **are not persuasive.... The plaintiff, in the instant case, does not make any design or manufacturing defect claims against defendants. Plaintiff['s]... claims in this case are based solely upon Territo's and Avondale's failure to use asbestos safely and not based simply upon their use of asbestos. Their claims are based on negligence; any claims brought under La.Civ.Code Art. 2317 "have never been construed to impose a mode of strict liability which, upon the showing of causation, is absolute and unconditional."** *Smith v. Reliance Ins. Co.*, 431 So.2d 907 (La.App. 2 Cir. 1983).

Exhibit "13", *Savoie, supra* at pp. 4-5; See Exhibit "16", the sworn testimony of Peter Territo, defendant herein, identified as exhibit 11 in the *Savoie* case where Mr. Territo states that the safety department at Avondale was not under the control of federal officers.

In the case of *Overly v. Raybestos-Manhattan*, No. C-96-2853 SI., 1996 WL 532150 (N.D. Cal. Sept. 9, 1996)(Exhibit "6"), a federal district court in California found that the attempted federal officer removal of Avondale Shipyard, the defendant, failed the federal-officer removal test because there was no evidence that a federal officer was involved in shipyard safety. In *Overly*, the plaintiff was exposed to asbestos while working at Avondale Shipyards. *Id.* at page 1. After the plaintiff contracted an asbestos-related disease, he sued the defendant, alleging that the defendant's failure to warn about the hazards of asbestos caused his injury. *Id.* The defendant removed, alleging federal officer jurisdiction because it was allegedly under "rigid guidelines" imposed by the federal government for the "design of ships." *Id.* The court rejected the defendant's attempted federal officer removal because it provided no evidence showing that the government controlled asbestos-related warnings or safety. *Id.* "**Absent a showing by defendant that the federal government gave specific instructions to Avondale not to warn employees of the existence of asbestos, Avondale is offered no protection by government contractor immunities.**" *Overly, supra* at page 5 (*citing In re Hawaii Federal Asbestos Cases*, 960 F.2d 806, 813 (9th Cir. 1992)). "**The government in no way restricted Avondale's ability to notify individuals of the presence of asbestos in the work environment. Thus, there is no causal connection between the control exercised by the United States over Avondale and the legal theory under which plaintiffs seek to hold Avondale liable. Consequently, Avondale has no basis on which to assert application of the Federal Officer Removal Statute, and the case must be remanded to state court.**" *Overly, supra*, p.5.

In addition to the cases cited above, other similar cases where the Eastern District of Louisiana has rejected similar arguments by defendants are *Guidroz v. The Anchor packing Company*, C.A. No. 98-3709, Sec. "B" (Exhibit "7") and *Anderson v. Avondale Industries, Inc.*, 1994 WL 679827 (E.D. La.) (Exhibit "12"). In each of these cases, the court found that the government contractor defense was not available. Most

notably is the fact that the *Overly, Porche, Gauthe, Guidroz, Anderson, Bourgeois, Savoie* and *Mouton* decisions all involved workers at the Avondale facility. The court should also be aware that in both the *Overly* and *Porche* decisions, the removing party was sanctioned for the improper removal of those claims.

In the case of *In re Hawaii Federal Asbestos Cases*, 960 F.2d 806 (9th Cir. 1992), U.S. sailors who were exposed to asbestos dust while serving for the U.S. Navy sued various manufacturers of asbestos insulation products which had been used aboard the Navy vessels. In rejecting the defendant's argument that they were shielded from liability under the government contractor defense, the Court held that asbestos insulation is not military equipment. *Id*. at 812. The Court went on to state that even if asbestos insulation were military equipment, which it is not, a manufacturer still has an obligation to warn of dangers inherent in its products. *Id*. Accordingly, the asbestos defendants could not avail themselves to the government contractor defense. Likewise, the U.S. 5th Circuit Court of Appeals rejected Johns-Manville's argument that it was entitled to the government contractor defense in a suit by the widow of a former shipyard worker who died from an asbestos-related disease. *Hansen v. Johns-Manville Products Corporation*, 734 F.2d 1036 (5th Cir. 1984), *cert denied*, 105 S.Ct. 1749, 84 L.Ed. 2d 814 (1985).

It has been held that removal by a "person acting under" a federal officer must be predicated upon a showing that the acts that formed the basis for the state civil suit were performed pursuant to an officer's direct orders or to comprehensive and detailed regulations. *Good v. Armstrong World Industries, Inc., et al*, 914 F.Supp. 1125 (E.D. P.A. 1996); *Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 947 (E.D. N.Y. 1992); *Freiberg v. Swinerton & Walberg Property Services, Inc.*, 245 F.Supp. 2d 1144 (D. Colo. 2002). Regulation of a corporation by the government is insufficient to meet this test, and the "rule that appears to emerge from the case law is one of 'regulation plus...'." *Id.*; *Ryan v. Dow Chemical Co.*, 781 F. Supp. 934 (E.D. N.Y. 1992); *Bahrs v. Hughes Aircraft Co.*, 795 F. Supp. 965 (D. Ariz. 1992). Moreover, the Avondale Interests must exclude the possibility that plaintiffs' state action is based on acts or conduct not justified by their alleged officer's federal duty. *Freiberg v. Swinerton & Walberg Property Services, Inc.*, 245 F.Supp. 2d 1144, 1155 (D. Colo. 2002)(*citing Mesa v. California*, 489 U.S. 121, 132, 109 S. Ct. 959, 103 L. Ed. 2d 99 (1989)).

In the case of *Good v. Armstrong World Industries, Inc., et al*, 914 F.Supp. 1125 (E.D. P.A. 1996), Charles Good ("Good") worked as a boilermaker and boiler tender for the United States Navy for more than 20 years. During his Navy service, Good worked on several vessels containing turbine generators manufactured by Westinghouse, which allegedly emitted asbestos and caused his asbestos personal injuries. Westinghouse removed the case arguing that it designed and manufactured the turbine generators in accordance with specifications and regulations mandated by the Navy and was, thereby, entitled to remove the case to federal court pursuant to the federal officers removal statute, 28 U.S.C. 1442(a)(1). Plaintiffs sought remand arguing, *inter alia*, that Westinghouse did not meet the statutory requirements for removal. In remanding the case, the court stated that Westinghouse did not meet its burden of showing that removal was appropriate pursuant to 28 U.S.C. 1442(a)(1).

The *Good* court stated that "removal must be predicated upon a showing that the acts forming the basis of the state suit were performed pursuant to an officer's direct orders or comprehensive and detailed regulations." *Id*. at p. 1128. "By contrast, if the corporation establishes only that the relevant acts occurred under the general auspices of federal direction then it is not entitled to 28 U.S.C. 1442(a)(1) removal." *Id*. at p. 1128; see also *Mouton v. Flexitallic, Inc.*, 1999 WL 225438 (E.D. La. 1999), p. 2; *Ryan v. Dow Chemical Co.*, 781 F.Supp. 934, 947 (E.D. N.Y. 1992); *Fung v. Abex Corp.*, 816 F.Supp. 569 (N.D. Cal. 1992); *Freiberg v. Swinerton & Walberg Property Services, Inc.*, 245 F.Supp. 2d 1144 (D. Colo. 2002).

In the instant case, remand is even more compelling. Plaintiff herein, Byron Granier, was exposed to asbestos while working for Avondale, a private shipyard. Certainly if the government contractor defense does not apply to a U.S. sailor exposed exclusively aboard a U.S. Navy vessel as in *In re Hawaii Federal Asbestos Cases, supra*, or to a boiler maker/boiler tenderer aboard Navy vessels of 20 years as in *Good, supra*, or to Avondale employees constructing U.S. government vessels as in the numerous cases cited herein, then it does not apply in the case at bar, and the federal courts lack subject matter jurisdiction in this case.

Private corporations may remove a case under the Federal Officer Removal Statute **only** when the corporation is "so intimately involved with government functions as to occupy essentially the position of an

-14-

employee of the government." *Bakalis v. Crosslands Savings Bank,* 781 F. Supp. 140, 145 (E.D. N.Y. 1991). Regulation of a corporation by the government is insufficient to meet this test, and the "rule that appears to emerge from the case law is one of 'regulation plus...'." *Id.; Ryan v. Dow Chemical Co.,* 781 F. Supp. 934 (E.D. N.Y. 1992); *Bahrs v. Hughes Aircraft Co.,* 795 F. Supp. 965 (D. Ariz. 1992).   Avondale is unable to meet this requirement and, more importantly, the Avondale Interests made no showing in this regard in their removal pleadings.  Clearly, the Avondale Interests cannot meet the three requirements of the Mesa test, and the conditional transfer order should be vacated for lack of federal jurisdiction.

## IV.    THE AVONDALE INTERESTS HAVE NO FEDERAL JURISDICTION

In the case of *Freiberg v. Swinerton & Walberg Property Services, Inc.,* 245 F.Supp. 2d 1144 (D. Colo. 2002), plaintiffs which were directly exposed to asbestos-containing products during construction of a government nuclear weapons production facility brought personal injury actions against government contractors and product manufacturers and distributors.  Defendant and government contractor, Swinerton Walberg Property Services, Corp. ("Swinerton"), removed the case to federal court based on alleged federal officer entitlement under 1442(a)(1).  The plaintiffs moved for remand arguing that the acts giving rise to their claims were construction activities independent of the U.S. government's Rocky Flats nuclear weapons production facilities' federal purpose and that Swinerton was not entitled to special federal officer protection. The *Freiberg* court agreed and granted the plaintiffs' Motions For Remand. *Id.* at page 1155; *see also Gauthe, supra; Mouton, supra; Porche, supra;* and *Overly, supra.*  Neither Swinerton nor any of the other defendants demonstrated the requisite causal connection between the government control under which it purported to have acted and plaintiffs' alleged injuries.  Thus, these was no basis on which to find the existence of federal jurisdiction under 28 U.S.C. 1442(a)(1), and no basis for removing these cases from state to federal court. *Freiberg, supra* at page 1156.

In the case at bar, the Avondale Interests cannot present evidence showing that the **"government authority under which [Avondale] worked required them to act"** negligently with regard to Byron Granier nor can they **"establish the [federal officer's] direction and control of their activities directly interfered**

-15-

with their ability to fulfill their state law obligation to warn employees of safety hazards." *Freiberg*, *supra* at 1155; see also *Ruffin*, *supra* at 776. In <u>*Ruffin*</u>, the court concluded that "the mere fact that the government possessed the power to control or regulate employee safety neither establishes that the power was ever used nor that operational mandates of this type were ever issued. Without such proof, [the defendant] cannot satisfy the statutory requirements for removal under §1442 (a) (1)." *Id.* Clearly, this federal court has no jurisdiction over this case and it should be remanded to state court.

## V.   THE AVONDALE INTERESTS HAVE NO EVIDENCE

The Avondale Interests have no evidence that the federal government maintained any control over safety or the activities of Avondale. The Avondale Interests has not shown that "strong government intervention and the threat that a defendant will be sued in state court based on actions which follow federal direction." *Mouton, supra* at p. 2; *Freiberg, supra.* Without this showing, the Avondale Interests have not carried their burden of establishing federal jurisdiction over this state tort action, and the suit should be remanded to state court. *Ryan, surpa* at 939; *Good, supra* at_1127; *Freiberg v. Swinerton & Walberg Property Servs.*, 245 F.Supp. 2d 1144 (D. Colo. 2002).

To establish that the defendants acted under the control of a federal officer, for purposes of §1442(a)(1), the defendants must show that the government authority under which they worked directly interfered with their ability to fulfill their state law obligations to Byron Granier. *Ruffin, 959 F.Supp.* at 776; *Freiberg, supra* at 1155. In the instant case, the Avondale Interests have neither established that they acted pursuant to direct and detailed orders by the federal government regarding its operations and safety activities nor that any federal duty under which they may have been required to act in any way interfered with their state imposed duty of safety towards shipyard employees. Thus, the Avondale Interests have not established the first prong of the <u>*Mesa*</u> test and, therefore, there is no federal jurisdiction. *Savoie, supra*, p. 3.

## VI.   THE AVONDALE INTERESTS HAVE NO COLORABLE FEDERAL DEFENSE

Also, the Avondale Interests cannot satisfy the second prong of the federal officer removal test. To qualify for federal-officer jurisdiction under § 1442(a)(1), the Avondale Interests must establish that they

-16-

have a colorable federal defense to the plaintiffs' claims. *See Mesa*, 109 S. Ct. at 968. For the additional reasons set forth herein, the government contractor defense does not provide the Avondale Interests with a colorable federal defense to plaintiffs' claims. Therefore, the Avondale Interests have failed to establish the second prong of the *Mesa* test and plaintiffs' motion to remand should be granted.

> a. **Application of the Government Contractor Defense Must Be Predicated Upon Both a Federal Interest and a Conflict Between Duties Imposed by State Law and Duties Imposed by Federal Authority.**

The Avondale Interests suggest that they can rely upon the government contractor defense articulated in *Boyle v. United Technologies Corp.*, 487 U. S. 500, 108 S. Ct. 2510, 101 L Ed. 2d 442 (1988). But before the Court can consider whether this serves as a colorable federal defense in this case, the Avondale Interests bear the burden of establishing that two requisite conditions are met: whether the case concerns a unique federal issue and whether there was a significant conflict between federal policy and state law. *Boyle*, 108 S. Ct. at 2515. If either of these conditions are not met, the defendants cannot rely upon the federal contractor defense. *Dorse v. Eagle-Picher Industries, Inc.*, 898 F. 2d 1487, 1490 (11th Cir. 1990) (state law not displaced where no conflict existed between federal contractual duties and state duty of care — contractor could comply with both obligations).

> 1. **No Unique Federal Interest.**

Since asbestos products have been banned for a long time and are no longer used in most equipment, any federal interest in this case is meager at best. Using precisely this reasoning, the Eastern District of Pennsylvania rejected an asbestos manufacturer's claim that it was entitled to the federal-contractor defense to support its attempted federal-officer removal:

> The impact of this personal injury action on the federal interest in protecting future defense procurement — the fundamental point of the government contract defense — is speculative. It is common knowledge that asbestos is no longer used in the design and manufacture of equipment, so that this lawsuit cannot interfere with a federal program involving products that contain asbestos. Therefore, the adjudication of this personal injury action in state court does not threaten the enforcement of a federal policy sufficient to warrant removal.

-17-

*Good v. Armstrong World Indus., Inc.,* 914 F. Supp. 1125, 1131 (E.D. Pa. 1996). Here, the Avondale

Interests present no evidence that a unique federal interest is at issue in this case.

### 2.    No Conflict Exists Between State Law and Federal Mandate.

Assuming for purposes of argument that a federal interest does exist in this case, which is denied, that

federal interest would "merely established a necessary, not a sufficient, condition for the displacement of state

law." *Boyle,* 108 S. Ct at 507.  The court must then determine whether a conflict exists between state law and

federal mandate.  Displacement of state law "will occur only where. . . a 'significant conflict' exists between

an identifiable 'federal policy or interest and the [operation] of state law or the application of state law would

'frustrate specific objectives' of federal legislation." *Id.*  The *Boyle* court offered an example of a situation

in which federal mandate does not conflict with state imposed duty:

> If, for example, the United States contracts for the purchase and installation of an air
> conditioning-unit, specifying the cooling capacity but not the precise manner of construction,
> a state law imposing upon the manufacturer of such units a duty of care to include a certain
> safety feature would not be a duty identical to anything promised the Government, but neither
> would it be contrary.  The contractor could comply with both its contractual obligations and
> the state-prescribed duty of care.  No one suggests that state law would generally be pre-
> empted in this context.

*Id.*[4]  This example clearly highlights the facts applicable to the case at bar are clearly outside the removal

statutes.  Nothing presented by the defendants suggest that there were federal mandates that pre-empted the

Avondale Interests' state prescribed duty of care to Byron Granier.  *Gauthe, supra; Mouton, supra;* and

*Porch; supra;* among many others.

Therefore, even if the Court determined that there is a federal interest in this case, which is denied,

the Avondale Interests would still have to establish a conflict exists between its duties imposed by state law

and its duties imposed by alleged federal authority.  Indeed, in a similar situation, the Eleventh Circuit

determined that the evidence did not support the requirements for the government contractor defense where

---

[4]In *Boyle,* the state-imposed duty of care was directly contrary to the duty imposed by contract
with the federal government. *Boyle,* 108 S. Ct. at 2517.  However, the Avondale Interests
present no evidence that their federal duty, if any, limited their ability to fulfill their state law
duty of care to Byron Granier.

"the contractor could comply with both its contractual obligations and the state-prescribed duty of care." *Dorse v. Eagle-Picher*, 898 F.2d 1487, 1490 (11th 1990)(*citing Boyle*, 108 S.Ct. at 2517). The Ninth Circuit clearly articulated this requirement in the failure to warn context:

> *Boyle* displaces state law only when the Government, making a discretionary, safety-related military procurement decision contrary to the requirements of state law, incorporates this decision into a military contractor's contractual obligations, thereby limiting the contractor's ability to accommodate safety in a different fashion.

*See In re Hawaii Asbestos Cases*, 960 F. 2d 806, 813 (9th Cir. 1992). Here, the Avondale Interests have not established that Avondale's duties imposed by alleged federal authority in any way conflicted with its duties of care imposed by state law. Specifically, under Louisiana law, the Avondale Interests had a duty to warn and to provide safe condition for employees or persons working on or near its facilities. *See, e.g., Jones v. Trailer*, 636 So.2d 1112, 1122 (La.App. 4th Cir.) , *writ denied sub nom., Rome v. Traylor*, 642 So.2d 193 (La. 1994) (referring to La. R. S. § 23.13) ; *Canzoneri v. Smith*, 381 So. 2d 973, 975-76 (La.App. 4th Cir 1980). This duty includes a duty to warn of work-related dangers and how to avoid them. *Canzoneri*, 381 So.2d at 976; *Miller v. Lambert*, 380 So.2d 695, 700 (La.App. 4th Cir. 1980). Accordingly, the Avondale Interests had a duty, imposed by state law, to warn of the dangers of asbestos on the job site. Its failure to do so was in direct violation of state law, and nothing in the Avondale Interests' notice of removal, or otherwise, in any way suggests that its alleged federal authority conflicted with this state imposed duty of care. Where no conflict with state law exists, the defendant is not entitled to rely upon the government contractor defense.

### b.   The Avondale Interests' Fails the Third Prong of the Federal Officer Removal Statute Because it Has Not Shown a Nexus Between Government Control and Plaintiffs' Case.

Under the third prong for federal-officer jurisdiction, the Avondale Interests must show that a nexus exists between actions for which it is being sued and the directives of the federal government. *Ryan*, 781 F. Supp. at 945; *Ruffin*, 959 F. Supp. at 775; *Freiberg, supra* at 1152-6; *Gauthe, supra; Mouton, supra*; and *Porch; supra*. To determine whether a causal nexus exists, "[t]he critical analysis is to what extent defendants acted under the federal direction at the time they were engaged in conduct now being sued upon." *Bahrs v. Hughes Aircraft Co.*, 795 F. Supp. 965, 969 (D. Ariz. 1992); *Freiberg, supra* at 1152-6. To meet this burden,

-19-

a defendant must "by direct averment exclude the possibility that [the state action] was based on acts or conduct of his not justified by his federal duty." *Mesa*, 109 S. Ct. at 966; *Freiberg, supra* at 1152-6. Simply put, the Avondale Interests must show that the federal authority under which it operated "directly interfered with its ability to fulfill its state law obligation" of care. *See Ruffin*, 959 F. Supp. at 776 *(citing Ryan*, 781 F. Supp. at 950); *Freiberg, supra* at 1152-6; *Bahrs*, 795 F. Supp. at 969; *Gauthe, supra; Mouton, supra.*

In this case, the Avondale Interests have provided no evidence showing that a federal officer exercised any control over its operations, or over its safety activities, or over their handling of asbestos. In fact, the evidence shows that asbestos-related safety was not under any federal direction and control. Exhibits "9", "10" & "16". This evidentiary foundation requires that this case be remanded to state court for lack of subject matter jurisdiction. *Freiberg, supra* at pages 1152-6; *Gauthe, supra; Mouton, supra;* and *Porch, supra.*

## VII.   CONCLUSION

There is no evidence showing that asbestos-related safety measures used by Avondale or anything else was ever under federal direction and control. Exhibits "9", "10" & "16". For all of reasons cited, the conditional transfer order should be vacated for lack of jurisdiction, and the case remanded to state court.

**WHEREFORE,** it is respectfully submitted that plaintiffs' Motion to Vacate Conditional Transfer Order should be granted and this action remanded to the state court from which it was improperly removed.

Respectfully submitted,
**ROUSSEL AND ROUSSEL**

GEROLYN P. ROUSSEL, LA – 1134
PERRY J. ROUSSEL, JR. – 20351
1710 Cannes Drive
LaPlace, LA 70068
Telephone: (985)651-6591
ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that a copy of plaintiffs' Motion to Vacate Conditional Transfer Order has been served upon the parties listed on the attached Panel Service List by mailing same to each, properly addressed and postage prepaid, on this 6th day of October, 2006.

PERRY J. ROUSSEL, JR.

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT 11 2006

FILED
CLERK'S OFFICE

**PANEL SERVICE LIST (Excerpted from CTO-268)**
**DOCKET NO. 268**
**IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)**

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114

Brian C. Bossier
Blue Williams, LLP
3421 N. Causeway Boulevard
9th Floor
Metairie, LA 70002

Daniel J. Caruso
Simon, Peragine, Smith & Redfearn
Energy Centre
30th Floor
1100 Poydras Street
New Orleans, LA 70163

Edward J. Cass
Gallagher, Sharp, Fulton & Norman
Bulkley Building, 7th Floor
1501 Euclid Avenue
Cleveland, OH 44115

Adam M. Chud
Goodwin Procter, LLP
901 New York Avenue, N.W.
Washington, DC 20001

David A. Damico
Burns, White & Hickton, LLC
Four Northshore Center
106 Isabella St.
Pittsburgh, PA 15212

Lawrence J. Duplass
Duplass, Witman & Zwain
Three Lakeway Center
Suite 2900
3838 N. Causeway Boulevard
Metairie, LA 70002

Raymond P. Forceno
Forceno & Hannon
111 S. Independence Mall East
The Bourse, Suite 1000
Philadelphia, PA 19106-2574

Ellen B. Furman
Goldfein & Hosmer
1600 Market Street
33rd Floor
Philadelphia, PA 19103

Susan M. Hansen
Brownson & Ballou
225 South Sixth Street
Suite 4800
Minneapolis, MN 55402

Reginald S. Kramer
Oldham & Dowling
195 South Main Street
Suite 300
Akron, OH 44308-1314

David C. Landin
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Gary Allen Lee
Lee, Futrell & Perles, LLP
201 St. Charles Avenue
Suite 4120
New Orleans, LA 70170-4120

Gene Locks
Locks Law Firm, LLC
1500 Walnut Street
Philadelphia, PA 19102

Ronald L. Motley
Motley Rice, LLC
P.O. Box 1792
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464

John J. Repcheck
Marks, O'Neill, O'Brien & Courtney
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219

Samuel M. Rosamond, III
Crawford Lewis, PLLC
400 Poydras Street
Suite 2100
New Orleans, LA 70130

Perry J. Roussel, Jr.
Roussel & Roussel
1710 Cannes Drive
Laplace, LA 70068

John D. Roven
Roven, Kaplan & Wells, L.L.P.
2190 North Loop West
Suite 410
Houston, TX 77018

Richard D. Schuster
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216

Neil Selman
Selman, Breitman & Burgess
11766 Wilshire Boulevard
Sixth Floor
Los Angeles, CA 90025

Robert N. Spinelli
Kelley, Jasons, McGuire & Spinelli
Centre Square West
15th Floor
Philadelphia, PA 19102

Robert E. Swickle
Jaques Admiralty Law Firm, P.C.
1570 Penobscot Building
The Maritime Asbestosis Legal Clinic
Detroit, MI 48226

Andrew J. Trevelise
Reed Smith, LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

James K. Weston II
Tom Riley Law Firm
4040 First Avenue, N.E.
P.O. Box 998
Cedar Rapids, IA 52406

Gordon P. Wilson
Lugenbuhl, Wheaton, et al.
601 Poydras Street
Suite 2775
New Orleans, LA 70130

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT 11 2006

CLERK'S OFFICE

## SCHEDULE PURSUANT TO RULE 7.2

BYRON GRANIER and JOSIE LEGENDRE GRANIER VS. NORTHROP GRUMMAN SHIP SYSTEMS, INC., (formerly AVONDALE INDUSTRIES, INC. and formerly AVONDALE SHIPYARDS, INC.) and its executive officers, ALBERT BOSSIER, JR., and PETER TERRITO; AMERICAN MOTORISTS INSURANCE COMPANY; AMERICAN EMPLOYER'S INSURANCE COMPANY; ONEBEACON AMERICA INSURANCE COMPANY (as successor to COMMERCIAL UNION INSURANCE COMPANY and EMPLOYERS COMMERCIAL UNION INSURANCE COMPANY); THE HOME INSURANCE COMPANY; and THE TRAVELERS CASUALTY & SURETY COMPANY (f/k/a: THE AETNA CASUALTY & SURETY COMPANY); BAYER CROPSCIENCE, INC. (successor TO RHONE POULENC AG COMPANY, formerly AMCHEM PRODUCTS, INC., formerly BENJAMIN FOSTER COMPANY); EAGLE, INC. (FORMERLY EAGLE ASBESTOS & PACKING COMPANY, INC.); FOSTER-WHEELER LLC (formerly FOSTER-WHEELER CORPORATION); GARLOCK SEALING TECHNOLOGIES, LLC (formerly GARLOCK, INC.); GENERAL ELECTRIC COMPANY; HOPEMAN BROTHERS, INC.; LIBERTY MUTUAL INSURANCE COMPANY; THE MCCARTY CORPORATION (SUCCESSOR TO MCCARTY BRANTON, INC., AND PREDECESSOR AND SUCCESSOR TO MCCARTY INSULATION SALES, INC.); MINNESOTA MINING AND MANUFACTURING COMPANY (3M), OWENS-ILLINOIS, INC.; REILLY-BENTON COMPANY, INC.; TAYLOR-SEINDENBACH, INC.; and VIACOM INC. (f/k/a CBS CORPORATION f/k/a WESTINGHOUSE ELECTRIC CORPORATION), NO. 2006-4993, DIVISION "A", CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS, STATE OF LOUISIANA; (ASSIGNED TO JUDGE CAROLYN W. GILL-JEFFERSON OF THE CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS, STATE OF LOUISIANA).


BYRON GRANIER, ET AL. VS. NORTHROP GRUMMAN SHIP SYSTEMS, INC.("AVONDALE"), ET AL, CIVIL ACTION, NO. 06-3738, SECTION "L", MAG. DIV. (3), UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF LOUISIANA; (JUDGE ELDON E. FALLON, UNITED STATES DISTRICT COURT JUDGE FOR THE EASTERN DISTRICT OF LOUISIANA, IS ASSIGNED THIS ACTION).

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT 11 2006   RECEIVED
DISTRICT COURT
ST DISTRICT OF LA

FILED
CLERK'S OFFICE   2006 JUL 24 PM 4: 40

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| BYRON GRANIER, ET AL. | * | CIVIL ACTION NO. 06-3738 |
| VS. | * | DIVISION "L" |
| NORTHROP GRUMMAN SHIP SYSTEMS, INC.("AVONDALE"), ET AL* | | MAG. "3" |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MOTION TO REMAND

**NOW INTO COURT**, through undersigned counsel, come plaintiffs, Byron Granier and

Josie Granier, who seek to have this Honorable Court remand this case to the state court from

which it was removed on the grounds that it was improperly removed by defendants, Northrop

Grumman Ship Systems, Inc., Peter Territo, and Albert Bossier, Jr. (the "Avondale Interests"), all

as is more fully set forth in the Memorandum in Support of Motion To Remand attached hereto.

**WHEREFORE**, it is respectfully submitted that this federal court lacks federal

jurisdiction over this action and plaintiffs pray that this action be remanded to the state court

from which it was removed.

Respectfully submitted,

**ROUSSEL & ROUSSEL**

GEROLYN P. ROUSSEL - 1134
PERRY J. ROUSSEL, JR. - 20351
1710 Cannes Drive
LaPlace, LA 70068
Telephone:  (985) 651-6591
Facsimile:  (985) 651-6592
ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the **Motion To Remand** has been served on counsel of
record for all parties by FAX and by placing same in the United States mail, postage prepaid and
properly addressed on this 24th day of July, 2006.

GEROLYN P. ROUSSEL

-1-

APPENDIX "A"

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

BYRON GRANIER, ET AL.　　　　*　　CIVIL ACTION NO.  06-3738

VS.　　　　　　　　　　　　　*　　DIVISION "L"

NORTHROP GRUMMAN SHIP
SYSTEMS, INC.("AVONDALE"), ET AL*　MAG. "3"

*************************************************************************

## NOTICE OF HEARING

TO: ALL COUNSEL OF RECORD:

Plaintiffs, Byron Granier and Josie Granier, will bring for hearing a Motion To Remand this case back to state court before Judge Eldon Fallon on the _16th_ day of _August_, 2006, at _9:00_ A.m. or as soon thereafter as counsel may be heard.

Respectfully submitted,

**ROUSSEL & ROUSSEL**

GEROLYN P. ROUSSEL - 1134
PERRY J. ROUSSEL, JR. - 20351
1710 Cannes Drive
LaPlace, LA  70068
Telephone:  (985) 651-6591
Facsimile:  (985) 651-6592
ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the **Notice of Hearing** has been served on all counsel of record for all parties by FAX and by placing same in the United States mail, postage prepaid and properly addressed on this 24th day of July, 2006.

GEROLYN P. ROUSSEL

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| BYRON GRANIER, ET AL. | * | CIVIL ACTION NO.  06-3738 |
| VS. | * | DIVISION "L" |
| NORTHROP GRUMMAN SHIP SYSTEMS, INC.("AVONDALE"), ET AL* | | MAG. "3" |

************************************************************************

## MEMORANDUM IN SUPPORT OF MOTION TO REMAND

**MAY IT PLEASE THE COURT**:

Plaintiff, Byron Granier, contracted mesothelioma, a cancer of the lining of the lung, from his employment at Avondale from approximately 1970 to 1975.  This civil action was originally filed in the Civil District Court for the Parish of Orleans, State of Louisiana, in proceeding number 2006-4993, Division "A".  Plaintiffs' petition asserts state law claims against Northrop Grumman Ship Systems, Inc. ("Avondale") and its executive officers, including Peter Territo and Albert Bossier, Jr. (herein Avondale, Territo and Bossier are referred to as the "Avondale Interests."  It is respectfully submitted that this action was improperly removed by the Avondale Interests and should be remanded to state court because this Honorable Court is without jurisdiction to hear this case.

In the case at bar, the Avondale Interests argue as a basis for removal a defense pursuant to the Longshore and Harbor Workers' Compensation Act ("LHWCA") and the "Federal Contractors Defense."  Additionally, the Avondale Interests argue as a basis for removal "federal officer immunity" pursuant to 28 U.S.C. § 1442.  None of these are defenses under Louisiana law but, even if they were, a defense is not a basis for removal.  Accordingly, it is respectfully submitted that this action should be remanded to the state court from which it was removed because this Honorable Court is without jurisdiction to hear this case.

## I.   THIS ACTION SHOULD BE REMANDED SUA SPONTE

It is respectfully requested that this court determine sua sponte that it does not have subject matter jurisdiction in this case.  A review of plaintiffs' petition reveals that there is no

federal jurisdiction in this matter. (Exhibit "1"). On the face of the plaintiffs' petition, this court lacks subject matter jurisdiction and should remand this case. Here, the Avondale Interests make unfounded allegations concerning federal jurisdiction, but the only evidence attached to defendants' Notice of Removal is the plaintiffs' petition which is based solely on state law. Clearly, the Notice of Removal filed by the defendants contain absolutely no evidence in support of defendants' baseless arguments. Moreover, lawyer argument is not a basis for removal, and lawyer argument is not evidence showing that a case is removable to federal court.

A district court may and should always determine <u>sua sponte</u> whether its subject matter jurisdiction has been properly invoked." *Thomas v. Burlington Industries, Inc.*, 763 F.Supp. 1570, 1575 (S.D. Fla. 1991) (citing 14A C. Wright, A. Miller & E. Cooper, <u>Federal Practice and Procedure</u> Sec. 3721). In this case, subject matter jurisdiction has not been invoked, and the case should be remanded to the state court from which it was removed.

## II.   <u>THERE IS NO FEDERAL JURISDICTION</u>

On the face of the plaintiffs' petition, this Court lacks subject matter jurisdiction. Most of the named defendants are domiciled in Louisiana, so there is no complete diversity. Plaintiffs' petition is grounded solely on state law, so there is no federal question. *Ducre v. Executive Officers of Halter Marine, Inc.*, 752 F.2d 976 (5th Cir. 1985); *Cole v. Celotex Corporation.*, 599 So.2d 1058, 1068 (La. 1992). The Avondale Interests allege federal jurisdiction based upon a defense pursuant to the LHWCA or federal contractor defense or as a "federal officer".[1] These are not tort defenses under Louisiana law, but in any event, an alleged defense is insufficient to allow removal. It is well-settled law that "a defense that raises a federal question is inadequate to confer federal jurisdiction." *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 808, 106 S.Ct. 3229, 3232, 92 L.Ed. 2d 650 (1986) (citing *Louisville & Nashville R. Co. v. Mottley*, 211 U.. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908). The federal question in removal cases must be disclosed on the face of the plaintiffs' complaint and must be essential to the plaintiffs' cause of

---

[1]The attorneys for the Avondale Interests have attempted to remove several cases on the same allegations asserted herein, and every case has been remanded back to state court for lack of jurisdiction.

action; it is not enough that the federal question arises by way of a defense to that action. *Oliver v. Trunkline Gas Co.*, 789 F.2d 341, 343 (5th Cir. 1986); *PAAC v. Rizzo*, 502 F.2d 306, 313 (3d Cir. 1974); *Border City S. & L. Ass'n v. Kennecorp Mtg.*, 523 F. Supp. 190, 192 (S.D. Ohio 1981); *Braun, Gordon & Co. v. Hellmers*, 502 F. Supp. 897, 900 (S.D. N.Y. 1980); 1A Moore's Federal practice, Sec. 0.160 (1974); C. Wright, Law of Federal Courts, Sec. 38 at 179 (1976). A case may not be removed to federal court on the basis of a federal defense, even if the defense is anticipated in plaintiffs' complaint and even if the parties concede that the federal defense is the only question truly at issue. *Franchise Tax Bd. of California v. Constr. Laborers Trust for Southern California*, 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983); *Thomas v. Burlington Industries, Inc.*, 763 F. Supp. 1570, 1575 (S.D. Fla. 1991). Moreover, there are no federal defenses in the instant case.

## III.   "LHWCA" IS NOT A BASIS FOR REMOVAL

Defendants argue that they are entitled to removal because Avondale can asserting a defense based upon the ("LHWCA"). This exact issue was addressed in *Aaron v. National Union Fire Insurance Co.*, 876 F.2d 1157 (5th Cir. 1989), *cert. denied sub nom., American Home Insurance Group v. Aaron*, 493 U.S. 1074, 110 S.Ct. 1121, 107 L.Ed.2d 1028 (1990), wherein the Fifth Circuit held that the LHWCA is not a basis for removal. The *Aaron* court reiterated well-established law that a case cannot be removed to federal court on the basis of a federal defense, even if the defense is anticipated in plaintiffs' complaint and even if the parties concede that the federal defense is the only question truly at issue. *Aaron, supra* at 1161; *Franchise Tax Bd. of California v. Constr. Laborers Trust for Southern California*, 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983); *Powers v. South Central United Food & Commercial Workers Unions*, 719 F.2d 760, 764 (5th Cir. 1983). The *Aaron* court stated that the LHWCA statutes are devoid of any indication of specific jurisdictional grants to federal courts as are found in ERISA and LMRA. Thus, "[t]he LHWCA is... nothing more than a statutory defense to a state-court cause of action - the classic circumstance of **non-removability**." *Aaron, supra* at 1166 (emphasis added); *see also Lowe v. Ingalls Shipbuilding*, 723 F.2d 1173, 1183 (5th Cir. 1984).

- 3 -

In *Masters v. Swiftships Freeport, Inc.*, 867 F.Supp. 555 (S.D. Tex. 1994), the defendant argued that its case was properly removed to federal court because the LHWCA preempted plaintiff's state law claims. The *Swiftships* Court stated that the defendant's argument was **"absurd on its face, and the Court is genuinely troubled as to how any such claim could be made in good faith."** *Swiftships, supra* at 557 (emphasis added). The *Swiftships* Court pointed out that "the Fifth Circuit concluded that the LHWCA failed each part of [the preemption] test and that removal... on LHWCA grounds was improper." *Swiftships, supra* at 557 (*citing Brown v. Crop Hail Management, Inc.*, 813 F.Supp. 519, 523-4 (S.D. Tex. 1993)). Therefore, the *Swiftships* Court found that defendant's removal and opposition to plaintiff's Motion To Remand was "frivolous", "utterly groundless", and "prosecuted in bad faith." Thereupon, the *Swiftships* Court sanctioned the defendant and remanded the case to state court. *Swiftships, supra* at 558-59. Plaintiffs ask this Honorable Court to take similar actions in the case at bar.

In *Gauthe, et al v. Asbestos Corporation, et al*, 1997 WL 3255 (E.D. La. 1997),[2] Judge Stanwood Duval, Jr. addressed these same LHWCA arguments with regard to the Avondale Interests in an asbestos exposure case exactly the same as the case at bar. In rejecting Avondale's arguments, Judge Duval relied on both Louisiana law as well as the U.S. Supreme Court decision in *Sun Ship, Inc. v. Pennsylvania*, 100 S. Ct. 2432 (180) to hold that the LHWCA does not preempt, but supplements, state remedies available to an injured worker. In this regard, Judge Duval stated:

> [Defendants] ask this Court to ignore ... long standing state law based on the Alabama Supreme Court's interpretation of the United States Supreme Court's decision in *Sun Ship, Inc. v. Pennsylvania*, 100 S.Ct. 2432 (1980) in *Fillinger v. Foster*, 448 So.2d 321 (Ala. 1984).

> The Supreme Court in *Sun Ship* held that the 1972 extension of federal jurisdiction in this arena **supplements**, rather than supplants state compensation law. *Sun Ship*, 100 S.Ct. 2436. The Supreme Court did not address § 933 (i)'s co-employee immunity under the LHWCA and whether that bar should pre-empt state law to the contrary. This Court is unpersuaded by the Alabama court's reasoning.

---

[2] Exhibit "3".

In addition, contrary to the Avondale Interests' contention, unlike *Grantham v. Avondale Industries, Inc.*, 964 F.2d 471 (5th Cir. 1992), there is no Fifth Circuit case law that conflicts with *Porche* which this Court might be required to follow given the edict in *Grantham*. In *Grantham*, an injured subcontractor worker who had received benefits under the LHWCA brought a negligence and strict liability action against the contractor which was constructing the ship. The district court held that the contractor was immune as the statutory employer of the plaintiff applying Louisiana state decisional law on this issue. The district court did so based on its belief that as the sole basis of jurisdiction was diversity, the court should apply state decisional law, not federal decisional law with respect to whether the statutory employer bar applied.

The Fifth Circuit reversed the district court because the question of immunity was one governed by federal law. Because the Fifth Circuit had not recognized statutory immunity under the LHWCA in previous decisions, *Martin v. Ingalls Shipbuilding*, 746 F.2d 231 (5th Cir. 1984), the court found that the district court erred in finding that statutory immunity applied in that case. However, in so doing, the *Grantham* court recognized that the Fifth Circuit decisional rule with respect to statutory immunity might be erroneous. It stated:

> We recognize that our decisions in *Jenkins* and *Martin* did not address the Supreme Court's holding in *Sun Ship Inc. v. Pennsylvania*, 447 U.S. 715, 100 S.Ct. 2432, 65 L.Ed.2d 458 (1980), where the court held that the LHWCA supplements rather that supplants state workers' compensation schemes. We do not purport to address *Sun Ship* here; nor do we consider whether our decision in *Martin* or those of the Fourth Circuit and the courts of Louisiana reach the better result. There is a powerful argument that we have taken a wrong turn. A conflict between the Fourth and Fifth Circuits over a significant maritime issue should not be left unresolved by our court en banc. This panel can only say that it is bound by the prior decisions of this court as was the district court.

*Grantham*, 964 F.2d at 474.

Thus, even that panel of the Fifth Circuit recognized that *Sun Ship* very well may require a recognition of state decisional law in such a context. Indeed, the Supreme Court in *Sun Ship* stated:

> Thus, even were the LHWCA exclusive within its filed, many employers would be compelled to abide by state-imposed responsibilities lest a claim fall beyond the scope of the LHWCA....
>
> Of one thing we may be certain. The exclusivity rule which appellant urges upon us would thrust employees into the same jurisdictional peril form which they were rescued by *Davis* and *Calbeck v. Travelers Insurance Co.* See Gilmore & Black 425. The legislative policy animating the LHWCA's landward shift was remedial; the amendments' framers acted out of solicitude for the workers....To adopt appellant's position, then would blunt the thrust of the 1972 amendments, and frustrate Congress' intent to aid injured maritime laborers. We decline to do so in the name of "uniformity."

*Id.* at 2439.

Furthermore, in *Grantham*, Grantham had received federal benefits. There is no evidence in this record that Mr. Gauthe has ever accepted LHWCA benefits and thus is distinguishable on that basis.

*Gauthe, supra* at pages 4-5; *See also Bartley v. Borden, Inc.*, No. 96-145 c/w 96-157 through 96-205 (E.D. La. 1996) (Exhibit "2"); and *Bourgeois v. A.P. Green*, No. 96-3764 (E.D. La. 1997)(Exhibit "8" at pages 33-34). In the instant case, Byron Granier has not filed a claim for LHWCA benefits, nor has Mr. Granier received any LHWCA benefits. Mr. Granier has elected Louisiana State remedies, and the LHWCA is not a colorable federal defense to Mr. Granier's state law claims. *Porche v. Avondale Shipyards*, consolidated with *Adams v. Hartzman*, 339 So.2d 1212 (La. 1976), *appeal dismissed, Territo v. Porche*, 434 U.S. 803, 98 S.Ct. 31, 54 L.Ed.2d 60 (1976); *Gauthe, supra* at pages 4-5; and *Mouton v. Flexitallic, Inc., et al.*, 1999 WL 225438 (E.D. La. 1999) at page 4. (Exhibit "4").

In yet another case of *Bartley v. Borden, Inc.*, No. 96-145 c/w 96-157 through 96-205 (E.D. La. 1996) (Exhibit "2"), Judge Marcel Livaudais, Jr. covered the same issues as those being presented by the Avondale Interests in the instant case. Judge Livaudais clearly explained in his decision that the LHWCA cannot form the basis of federal subject matter jurisdiction for removal. *Bartley, supra* at page 8 (*citing Aaron, supra; and Lowe, supra*); see also *Bourgeois v. A.P. Green*, No. 96-3764 (E.D. La. 1997)(Exhibit "8" at pages 33-34). Therefore, the case was remanded to state court. *Bartley, supra* at page 9. The plaintiffs ask this Honorable to take similar actions in the case at bar.

## IV. THE AVONDALE INTERESTS ARE NOT "FEDERAL OFFICERS" AND THE GOVERNMENT CONTRACTOR DEFENSE DOES NOT APPLY

Plaintiffs' petition is grounded solely on state law. The claim against the Avondale Interests are based on Louisiana law including, among others, theories of failure to warn and failure to provide a safe working environment. As stated by the U.S. Supreme Court in *Mesa v. California*, 489 U.S. 121, 131-132, 109 S.Ct. 959, 966, 103 L.Ed.2d 99 (1989), in order to qualify as a federal officer, or "person" acting under him, the removing party must " (1) demonstrate that it acted under the direction of a federal officer, (2) raise a federal defense to the

plaintiffs' claims <u>and</u> (3) demonstrate a causal nexus between plaintiff's claims and acts it performed under color of federal office." (See also *Pack v. AC and S., Inc.*, 838 F.Supp. 1099, 1101 (D. Md. 1993)). The Avondale Interests cannot meet any of these requirements, and the defendants are required to meet all three requirements.

Avondale was and is a privately owned shipyard which constructed both military and commercial vessels. Even with regard to government vessels, however, Avondale employees did not work under the direct orders or direction of a U.S. Navy inspector. Moreover, the United States government inspectors neither monitored nor enforced safety regulations. In addition, safety, even during the construction of government vessels, was the responsibility of Avondale, not the U.S. government. See Exhibit "9", Affidavit of Felix Albert; see also Exhibit "10", Deposition of Rudy Walker, Sr.[3], dated May 8 2003, at pages 342-43; Exhibit "16". It has been held that removal by a "person acting under" a federal officer must be predicated upon a showing that the acts that formed the basis for the state civil suit were performed pursuant to an officer's direct orders or to comprehensive and detailed regulations. *Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 947 (E.D. N.Y. 1992). That did not happen at Avondale.

In the case at bar, Mr. Granier worked directly for Avondale, and Avondale controlled all of the activities in regard to the construction of commercial and Navy vessels. Mr. Granier's Avondale employment records show that he did work on commercial LNGs which were vessels being built for El Paso Natural Gas Company, a private corporation. Exhibits "14" & "15". Nonetheless, the Navy was also a customer just like any other customer of Avondale. Exhibit "10" at p. 341. The Navy did not have to look at the work being done by Avondale, but were called out by Avondale to review the finished sections of the ship just like any other customer. Exhibit "10", p. 342-43; Exh. "16". Also, the Navy did not have a separate office on Avondale's premises, but used the same facilities as all other customers. Exhibit "10" pages 166-67.

Felix Albert was a ship inspector with the United States Navy at Avondale Shipyards from 1965 to 1976. In his sworn affidavit, Mr. Albert states that **"Avondale was a privately**

---

[3] Rudy Walker, Sr. was a navy inspector covering Avondale Shipyards starting in 1969, and throughout Byron Granier's employment. Exhibit "10", pages 159, 168 & 209.

owned shipyard that constructed both military and commercial vessels. In connection with the construction of the government vessels, Avondale employees did not work under the direct orders of a ship inspector and Avondale employees did not act under the direction of a ship inspector. The United States government inspectors neither monitored nor enforced safety regulations. On the job safety during the construction of vessels for the United States government was the responsibility of Avondale Shipyards' safety department." See Exhibit "9", Affidavit of Felix Albert; see Exhibit "10" at pages 342-43; Exhibit "16". Thus, the instant case is clearly distinguishable from the case of *Lalonde v. Delta Field Erection* cited by the Avondale Interests where the injury occurred on a federally owned and operated facility. However, most of the work at Avondale was private, commercial work, not work for the U.S. government. Exhibit "10" at pp. 342-344. Products used on commercial vessels were the same products used on the Navy vessels. Exhibit "10" at p. 343. Moreover, in the instant case, the Navy did not supervise Avondale's work or oversee it while it was being performed. Exhibit "10" at p. 342-343.

Also of note is that in the instant case, the products used on commercial vessels were the same products used on the Navy vessels. Exhibit "10" at p. 343. As recognized by the court in *Morales v. Owens-Corning Fiberglass Corp.*, 1994 WL 564744 (N.D. Cal.),

> The "government contractor" defense is not colorable. No defendant has produced evidence that it presented specially designed products to the government under federal orders or specifications that directly conflicted with the state law duty upon which the defendants are now being sued. Most notably, no defendant produces any evidence whatsoever that the products it designed pursuant to government orders were different from those designed for civilian use in any manner pertinent to state law liability.

Exhibit "11"–*Morales* at p. 3 (citations omitted).

Here, Avondale is not a federal owned facility, but a private shipyard. Avondale's operations were under Avondale's control and were not controlled by government inspectors. Thus, the *Lalonde* case provides absolutely no support for Avondale's assertion of jurisdiction in the case at bar and, moreover, has been rejected by this federal court. See recent Exhibit "13", *Savoie v. Northrop Grumman Ship Systems*, No. 05-2086, pp. 4-5 (E.D. La. 2005).

In the case at bar, the Avondale Interests cannot show "that the government provided reasonably precise specifications affecting [Avondale's] provision" for not warning Byron Granier of the dangers of asbestos or for Avondale's failure to furnish adequate ventilation or respiratory equipment to Mr. Granier or for Avondale's failure to provide Mr. Granier with personal protective equipment to protect Mr. Granier from workplace hazards, as alleged in Mr. Granier's state law petition.  Absent a showing by the Avondale Interests that the federal government gave specific instructions to it not to warn or not to provide safeguards to Byron Granier, the Avondale Interests cannot meet even one of the three *Mesa* requirements.  *See Overly v. Raybestos-Manhattan*, 1996 U.S. Dist LEXIS 13535, No. 96-2853 (N.D. Cal. 1996) (Exhibit "6"), and *Porche v. Flexitallic*, 1996 U.S. Dist LEXIS 15877, No. 96-2827 c/w 96-2828 (E.D. La. 1996) (Exhibit "5").  Furthermore, the federal government in no way restricted the Avondale Interests' ability to warn employees of work place dangers or to provide employees with workplace safeguards.  Thus, there is no causal connection between any control exercised by the United States over the Avondale Interests, if any, and the legal theory under which plaintiffs seek to hold the Avondale Interests liable.  Thus, the Avondale Interests have no basis on which to assert an application of the Federal Officer Removal Statute, and the case should be remanded to the state court from which it was removed.  *Overly v. Raybestos-Manhattan*, No. 96-2853 (N.D. Cal. 1996) and *Porche v. Flexitallic*, No. 96-2827 c/w 96-2828 (E.D. La. 1996).

In the case of *Gauthe, et al v. Asbestos Corporation, et al*, 1997 WL 3255 (E.D. La. 1997), the Avondale Interests attempted to remove an asbestos case to federal court alleging removal was proper under 23 U.S.C. 1442(a)(1), the Federal Officer Removal Statute.  Avondale claimed that removal was proper because they could allegedly raise federal defenses of immunity under the "government contractor immunity" defense and under the LHWCA.

The *Gauthe* court stated that "**there is no evidence that the Government restricted or prohibited Avondale's ability to notify individuals of the presence of asbestos in the work environment.  Assuming that Avondale built ships under the direct supervision of the federal government, nothing about that supervision prevented Avondale from warning Mr. Gauthe about the dangers.  Thus, there is no causal connection between the injury alleged**

by Mr. Gauthe with respect to Avondale's failure to warn and Avondale working on behalf of the federal government." *Gauthe, supra,* at pages 3-4. Thus, the Avondale Interests have no basis for removal under the government contractor defense. *Id.* Furthermore, the Avondale Interests do not have statutory immunity under the LWHCA, and this is not grounds for removal of a case to federal court. *Gauthe,* supra at page 4; see also *Aaron v. National Union Fire Insurance Co.,* 876 F.2d 1157 (5th Cir. 1989), *cert. denied sub nom., American Home Insurance Group v. Aaron,* 493 U.S. 1074, 110 S.Ct. 1121, 107 L.Ed.2d 1028 (1990).

In the case of *Mouton v. Flexitallic, Inc., et al.,* 1999 WL 225438 (E.D. La. 1999), the Avondale Interests attempted to remove an asbestos case to federal court alleging removal was proper under 23 U.S.C. 1442(a)(1), the Federal Officer Removal Statute. Again, Avondale claimed that removal was proper because they could allegedly raise federal defenses of immunity under the "government contractor immunity" defense and under the LHWCA.

The *Mouton* court stated that **"the federal government provided no direction on warning when using asbestos, and further did not prevent Avondale from taking its own safety precautions above the minimum standards incorporated in the federal contracts.... Thus, Avondale has failed to establish a causal connection between the Navy's direction pursuant to the design contracts and plaintiff's failure to warn claims."** *Mouton, supra* at pages 4. Thus, the Avondale Interests have no basis for removal under the government contractor defense, nor does Avondale have any basis for removal under the LHWCA. *Id.* Thus, plaintiffs' motion to remand was granted. *Id.* at page 5.

In yet another case, *Porche v. Flexitallic, Inc., et al.,* 1996 WL 603919 (E.D. La. 1996),[4] the Avondale Interests again attempted to remove an asbestos case to federal court alleging removal was proper under 23 U.S.C. 1442(a)(1), the Federal Officer Removal Statute. Again, Avondale claimed that removal was proper because they could allegedly raise federal defenses of immunity under the "government contractor immunity" defense. The *Porche* court stated that **"in a similar case removed from state court to federal court in California by Avondale, the**

---

[4] Exhibit "5".

district court remanded the case and imposed sanctions. *Overly v. Raybestos-Manhattan*, 96-2853 (N.D. Cal. Sept. 12, 1996). The court need not address these arguments the substance of removal jurisdiction and therefor will not. However, the rationale underlying *Overly* is well-reasoned." *Porche, supra* at p. 3. Again, the *Porche* court remanded the case back to the Civil District Court for the Parish of Orleans. *Porche, supra* p. 4.

In yet another case of *Bourgeois v. A.P. Green*, No. 96-3764 (E.D. La. 1997),[5] the Avondale Interests attempted to remove an asbestos case to federal court alleging removal was proper under 23 U.S.C. 1442(a)(1), the Federal Officer Removal Statute. Again, Avondale claimed that removal was proper because they could allegedly raise federal defenses of immunity under the "government contractor immunity" defense, and under the LHWCA. In *Bourgeois*, Judge Fallon starts his ruling at page 29 of the attached transcript (Exhibit "8"), and states that "the action is not removable under 1442(a)(1) because the Avondale interest did not act, as I read the pleadings and the affidavits and the information, under the control or direction of a federal officer...." *Id.* at page 31. "The removal must be predicated upon a showing that the acts forming the basis of the state court suit were performed pursuant to the officers' direct and detailed control, a general auspices, a general control does not satisfy the riggers of 1442 (a)(1)." *Id.* at page 32. Judge Fallon explains that

> The issue in this case is not the products liability or some cases you will see in the literature occasionally where vessels were built too long and they are subject to wave action and they break in half, we see this in some cases where the argument is that its built improperly and the defense is on the basis that the defense in made in this particular case. The courts in those cases, although they are seldom in the common days, touch on them a bit more perhaps in the courts but the argument is that they fail not because of any defect in the equipment, not because of the improper work performed on the vessel, but simply because of the design defect, they were as to long and should not have been that long and therefore they we acting under the control and supervision of the government and therefore you are entitled to that particular defense. I don't see this particular case in that ball park even, I think the issue here is whether there was safety rules, regulations, equipment, atmosphere, information imparted to the people, warnings, things of that sort which are completely under the supervision and control of Avondale. They would not expose some people to some hazards and other people to other hazards, they have to have a uniform safety program regardless of who they do work for.

---

[5] Exhibit "8".

> So I think the issue in this case is that the government may have had some general control, the inspectors may have come aboard the vessels... And they are often given the safety equipment to go board the vessel by Avondale, they get their visitors equipment and their visitors hat, whether its blue or white or red, they use it and go aboard unless they specifically brought their own. So Avondale even suits them out... Avondale, in that instance, is really telling them what to wear and what to do and where to go and whose working on the vessel rather than the other way around....
> And finally, the defendants urge that the <u>longshoreman act</u> is a basis for removal. That <u>Aaron</u> case which we discussed, 876 F.2d 1157, indicates that that <u>is not a basis for a removal</u>.... The motion to remand is granted.

*Bourgeois*, supra at pages 32-32 (Exhibit "8"). The above is clearly supported by the Affidavit of Felix Albert who states that Avondale employees did not work under the direct orders of a ship inspector nor did they act under the direction of a ship inspector. The United States government inspectors neither monitored nor enforced safety regulations. On the job safety during the construction of vessels for the United States government was the responsibility of Avondale Shipyards' safety department, not the government. See Exhibits "9", "10" & "16".

In the recent decision of this court in the case of *Alvin Savoie v. Northrop Grumman Ship Systems, Inc. et al.*, 2:05-CV-02086, the Avondale Interests again unsuccessfully attempted to remove an asbestos exposure case to this federal court. In remanding the case to state court, Judge Stanwood Duval states that the Avondale Interests':

> removal fails on the first [Mesa] prong, as defendant cannot demonstrate that he was acting under the direction of a federal officer specific to the claims alleged in plaintiff's petition, namely, those dealing with safety procedures and plans of Avondale. Claims against Territo include failure to provide petitioner with a safe work place and safety equipment; failure to disclose, warn, or reveal medical and safety information regarding asbestos hazards and safety and health risks associated with asbestos; failure to properly supervise; failure to remove asbestos hazards from the work place; failure to provide a safe and suitable means of asbestos.... Without going into an in depth analysis, the Court view this particular case as analogous to the long line of precedent cases addressing the very issues herein which held that removal was improper. *See Gauthe v. Asbestos Corp. et al*, 1997 WL 3255 (E.D. La. 1997); *Quebedeaux v. Union Pacific Railroad*, No. 6:04-02232 (W.D. La. 2004); *Bourgeois v. A.P. Green Industries, Inc.*, No. 96-3764 (E.D. La. 1996); *Guidroz v. The Anchor Packing Co.*, No. 98-3709 (E.D. La. 1998); *Overly v. Raybestos-Manhattan*, No. C-96-2553 CI (N.D. Cal. 1996); *Westbrook v. Asbestos Defendants*, 2001 WL 902642 (N.D. Cal. 2001); *Mouton v. Flexitallic, Inc.*, 1999 WL 2254438 (E.D. La. 1999); *Porche v. Flexitallic, Inc.*, 1996 WL 603919 (E.D. La. 1996); *Mabile v. Hidalgo*, No. 95-2200.9 (W.D. La. 1995).... [Also], Territo's sworn testimony shows that the safety department at Avondale was not under the control of federal officers.... The cases defendant cites, *Lalone,... Fink,...* and *Delancey,...* are not persuasive.

Exhibit "13", *Savoie, supra* at pp. 4-5; See Exhibit "16", the sworn testimony of Peter Territo, defendant herein, identified as exhibit 11 in the *Savoie* case where Mr. Territo states that the safety department at Avondale was not under the control of federal officers.

In the case of *Overly v. Raybestos-Manhattan*, No. C-96-2853 SI., 1996 WL 532150 (N.D. Cal. Sept. 9, 1996),[6] a federal district court in California found that the attempted federal officer removal of Avondale Shipyard, the defendant, failed the federal-officer removal test because there was no evidence that a federal officer was involved in shipyard safety. In *Overly*, the plaintiff was exposed to asbestos while working at the Avondale Shipyards. *Id.* at page 1. After the plaintiff contracted an asbestos-related disease, he sued the defendant, alleging that the defendant's failure to warn about the hazards of asbestos caused his injury. *Id.* The defendant removed, alleging federal officer jurisdiction because it was under "rigid guidelines" imposed by the federal government for the "design of ships." *Id.* The court rejected the defendant's attempted federal officer removal because it provided no evidence showing that the government controlled asbestos-related warnings or safety. "Although Avondale has established that it was under substantial control by the government regarding the installation of certain products containing asbestos, it has not done so with regard to the warning of individuals of the presence of asbestos on the job site." *Id.* at page 3. **"Absent a showing by defendant that the federal government gave specific instructions to Avondale not to warn employees of the existence of asbestos, Avondale is offered no protection by government contractor immunities."** *Overly, supra* at page 5 (*citing In re Hawaii Federal Asbestos Cases*, 960 F.2d 806, 813 (9th Cir. 1992)). **"The government in no way restricted Avondale's ability to notify individuals of the presence of asbestos in the work environment. Thus, there is no causal connection between the control exercised by the United States over Avondale and the legal theory under which plaintiffs seek to hold Avondale liable. Consequently, Avondale has no basis on which to assert application of the Federal Officer Removal Statute, and the case must be remanded to state court."** *Overly, supra* at page 5.

---

[6]Exhibit "6".

In addition to the cases cited above, other similar cases where the Eastern District has rejected similar arguments by defendants herein are *Guidroz v. The Anchor packing Company*, C.A. No. 98-3709, Sec. "B" (Exhibit "7") and *Anderson v. Avondale Industries, Inc.*, 1994 WL 679827 (E.D. La.) (Exhibit "12"). In each of these cases, the court found that the government contractor defense was not available. Most notably is the fact that the *Overly, Porche, Gauthe, Guidroz, Anderson, Bourgeois, Savoie* and *Mouton* decisions all involved workers at the Avondale facility. The court should also be aware that in both the *Overly* and *Porche* decisions, the removing party was sanctioned for the improper removal of those claims.

In the case of *In re Hawaii Federal Asbestos Cases*, 960 F.2d 806 (9th Cir. 1992), U.S. sailors who were exposed to asbestos dust while serving for the U.S. Navy sued various manufacturers of asbestos insulation products which had been used aboard the Navy vessels. In rejecting the defendant's argument that they were shielded from liability under the government contractor defense, the Court held that asbestos insulation is not military equipment. *Id.* at 812. The Court went on to state that even if asbestos insulation were military equipment, which it is not, a manufacturer still has an obligation to warn of dangers inherent in its products. *Id.* Accordingly, the asbestos defendants could not avail themselves to the government contractor defense. Likewise, the U.S. 5th Circuit Court of Appeals rejected Johns-Manville's argument that it was entitled to the government contractor defense in a suit by the widow of a former shipyard worker who died from an asbestos-related disease. *Hansen v. Johns-Manville Products Corporation*, 734 F.2d 1036 (5th Cir. 1984), *cert denied*, 105 S.Ct. 1749, 84 L.Ed. 2d 814 (1985).

It has been held that removal by a "person acting under" a federal officer must be predicated upon a showing that the acts that formed the basis for the state civil suit were performed pursuant to an officer's direct orders or to comprehensive and detailed regulations. *Good v. Armstrong World Industries, Inc., et al*, 914 F.Supp. 1125 (E.D. P.A. 1996); *Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 947 (E.D. N.Y. 1992); *Freiberg v. Swinerton & Walberg Property Services, Inc.*, 245 F.Supp. 2d 1144 (D. Colo. 2002). Regulation of a corporation by the government is insufficient to meet this test, and the "rule that appears to emerge from the case

law is one of 'regulation plus...'." *Id.*; *Ryan v. Dow Chemical Co.*, 781 F. Supp. 934 (E.D. N.Y. 1992); *Bahrs v. Hughes Aircraft Co.*, 795 F. Supp. 965 (D. Ariz. 1992). Moreover, the Avondale Interests must exclude the possibility that plaintiffs' state action is based on acts or conduct not justified by their alleged officer's federal duty. *Freiberg v. Swinerton & Walberg Property Services, Inc.*, 245 F.Supp. 2d 1144, 1155 (D. Colo. 2002)(*citing Mesa v. California*, 489 U.S. 121, 132, 109 S. Ct. 959, 103 L. Ed. 2d 99 (1989)).

In the case of *Good v. Armstrong World Industries, Inc., et al*, 914 F.Supp. 1125 (E.D. P.A. 1996), Charles Good ("Good") worked as a boilermaker and boiler tender for the United States Navy for more than 20 years. During his Navy service, Good worked on several vessels containing turbine generators manufactured by Westinghouse, which allegedly emitted asbestos and caused his asbestos personal injuries. Westinghouse removed the case arguing that it designed and manufactured the turbine generators in accordance with specifications and regulations mandated by the Navy and was, thereby, entitled to remove the case to federal court pursuant to the federal officers removal statute, 28 U.S.C. 1442(a)(1). Plaintiffs sought remand arguing, *inter alia*, that Westinghouse did not meet the statutory requirements for removal. In remanding the case, the court stated that Westinghouse did not meet its burden of showing that removal was appropriate pursuant to 28 U.S.C. 1442(a)(1).

The *Good* court stated that "removal must be predicated upon a showing that the acts forming the basis of the state suit were performed pursuant to an officer's direct orders or comprehensive and detailed regulations." *Id.* at p. 1128. "By contrast, if the corporation establishes only that the relevant acts occurred under the general auspices of federal direction then it is not entitled to 28 U.S.C. 1442(a)(1) removal." *Id.* at p. 1128; see also *Mouton v. Flexitallic, Inc.*, 1999 WL 225438 (E.D. La. 1999), p. 2; *Ryan v. Dow Chemical Co.*, 781 F.Supp. 934, 947 (E.D. N.Y. 1992); *Fung v. Abex Corp.*, 816 F.Supp. 569 (N.D. Cal. 1992); *Freiberg v. Swinerton & Walberg Property Services, Inc.*, 245 F.Supp. 2d 1144 (D. Colo. 2002).

In the instant case, remand is even more compelling. Plaintiff herein, Byron Granier, was exposed to asbestos while working for Avondale, a private shipyard. Certainly if the government contractor defense does not apply to a U.S. sailor exposed exclusively aboard a U.S. Navy vessel

as in *In re Hawaii Federal Asbestos Cases, supra,* or to a boiler maker/boiler tenderer aboard Navy vessels of 20 years as in *Good, supra,* or to Avondale employees constructing U.S. government vessels as in the numerous cases cited herein, then it does not apply to preclude recovery by Byron Granier.

Private corporations may remove a case under the Federal Officer Removal Statute **only** when the corporation is "so intimately involved with government functions as to occupy essentially the position of an employee of the government." *Bakalis v. Crosslands Savings Bank,* 781 F. Supp. 140, 145 (E.D. N.Y. 1991). Regulation of a corporation by the government is insufficient to meet this test, and the "rule that appears to emerge from the case law is one of 'regulation plus...'." *Id.; Ryan v. Dow Chemical Co.,* 781 F. Supp. 934 (E.D. N.Y. 1992); *Bahrs v. Hughes Aircraft Co.,* 795 F. Supp. 965 (D. Ariz. 1992). Avondale is unable to meet this requirement and, more importantly, the Avondale Interests made no showing in this regard in their removal pleadings. Clearly, the Avondale Interests cannot meet the three requirements of the Mesa test.

In the case at bar, plaintiff's claims against the Avondale Interests deal with asbestos related warnings and asbestos safety, and the associated allegations to establish these claims under state law. Clearly, there is no basis for removal in the case at bar and the case should be remanded to the state court from which it was removed.

## V.    THE AVONDALE INTERESTS HAVE NO LEGAL BASES FOR REMOVAL

A party seeking removal bears the burden of establishing federal jurisdiction. *Wilson v. Republic Iron & Steel Co.,* 257 U. S. 92, 97, 42 S. Ct. 35, 37, 66 L. Ed 144 (1921). "If the right to removal is doubtful, the case should be remanded [to state court]." *See Gauthe v. Asbestos Corp.,* 1997 WL 3255  (E. D. La. 1997); *Ryan v. Dow Chemical Co.,* 781 F. Supp. 934, 947 (E. D. N. Y. 1992); *Ruffin v. Armco Steel Corp.,* 959 F. Supp. 770 (S. D. Tex. 1997), *order vacated on other grounds,* 1999 WL 318023 (S. D. Tex. 1999); *Bahrs v. Hughes Aircraft Co.,* 795 F. Supp. 965, 969 (D. Ariz. 1992). It has been held that removal by a "person acting under" a federal officer must be predicated upon a showing that the acts that formed the basis for the state civil suit were performed pursuant to a federal officer's direct orders or to comprehensive and

- 16 -

detailed regulations. *Good v. Armstrong World Industries, Inc., et al,* 914 F.Supp. 1125 (E.D.

P.A. 1996); *Ryan, supra* at 947; *Freiberg v. Swinerton & Walberg Property Services, Inc.,* 245

F.Supp. 2d 1144 (D. Colo. 2002). Regulation of a corporation by the government is insufficient

to meet this test, and the "rule that appears to emerge from the case law is one of 'regulation

plus...'." *Id.*; *Ryan v. Dow Chemical Co.,* 781 F. Supp. 934 (E.D. N.Y. 1992); *Bahrs v. Hughes

Aircraft Co.,* 795 F. Supp. 965 (D. Ariz. 1992). Moreover, the Avondale Interests must exclude

the possibility that Byron Granier's state law action is based on acts or conduct of it not justified

by its alleged officer's federal duty. *Freiberg, supra* at 1155(*citing Mesa v. California,* 489 U.S.

121, 132, 109 S. Ct. 959, 103 L. Ed. 2d 99 (1989)).

A case lending support to the case at bar is the case of *Freiberg v. Swinerton & Walberg

Property Services, Inc.,* 245 F.Supp. 2d 1144 (D. Colo. 2002). In *Freiberg,* plaintiffs which were

directly exposed to asbestos-containing products during construction of a government nuclear

weapons production facility brought personal injury actions against government contractors and

product manufacturers and distributors. Defendant and government contractor, Swinerton

Walberg Property Services, Corp. ("Swinerton"), removed the case to federal court based on

alleged federal officer entitlement under 1442(a)(1). The plaintiffs moved for remand arguing

that the acts giving rise to their claims were construction <u>activities independent of the U.S.</u>

<u>government's</u> Rocky Flats nuclear weapons production facilities' <u>federal purpose</u> and that

Swinerton was not entitled to special federal officer protection. The *Freiberg* court agreed and

granted the plaintiffs' Motions For Remand. *Id.*

The *Freiberg* court stated:

> the established rule is that removal by a person "acting under" a federal
> officer must be predicated on a showing that the acts forming the basis of the
> state suit were performed pursuant to an officer's "direct orders or
> comprehensive and detailed regulations. Ryan, 781 F.Supp. at 947. It is not
> enough to prove only that "the relevant acts occurred under the general
> auspices of a federal office or officer" or that "a corporation participates in a
> regulated industry." Id. The official must have direct and detailed control
> over the defendant. Good, 914 F.Supp. at 1128.
>   Direct and detailed control is established by showing strong
> government involvement and the possibility that a <u>defendant could be sued in
> state court as a result of the federal control.</u> Pack, 838 F.Supp. at 1103,
> Ryan, 781 F.Supp. at 948-9 (setting forth detailed analysis of cases). "<u>The
> issue is not simply whether the defendant acted under federal officials but</u>

whether they are in danger of being sued in state court 'based on action taken pursuant to federal direction.'" Id.

(Emphasis Added); *Freiberg*, *supra* at page 1152-53. The *Freiberg* court further states that

unless an officer of the United States (or one acting under him) can justify what he did by reason of some official connection between the acts complained of and his official duties, the purpose of the statute to protect federal interests and immunities is not implicated and the proceeding is not removable. See *Brenner v. Kelly*, 201 F.Supp. 871 (D. Minn. 1962). The nexus requirement is established by showing that the state action "has arisen out of the acts done by the defendant under color of federal authority and in enforcement of federal law." *Mesa*, 489 U.S. at 131-32.... To sustain this burden, the defendant must also "by direct averment exclude the possibility that [the state action] was based on acts or conduct of his not justified by his federal duty." *Mesa*, 489 U.S. at 132.

(Emphasis Added). *Id.* at page 1155. In defining the "under color" causal connection

requirement in an asbestos case, the *Freiberg* court states that

they are being sued for unnecessarily and negligently causing their employees and other workers to be exposed to asbestos dust on the job and for failing to warn these employees and workers of the associated dangers. What they must establish for purpose of the 1442(a)(1) is that the government authority under which they worked required them to act as they did. For purposes of Plaintiffs' failure to warn claims, for example, they must establish the DOE's [Department of Defense] direction and control of their activities directly interfered with their ability to fulfill their state law obligation to warn employees of safety hazards.

(Emphasis Added). *Id.* at page 1155; *see also Gauthe, supra; Mouton, supra; Porche, supra;* and

*Overly, supra.* Neither Swinerton nor any of the other defendants demonstrated the requisite

causal connection between the government control under which it purported to have acted and

plaintiffs' alleged injuries. Thus, these was no basis on which to find the existence of federal

jurisdiction under 28 U.S.C. 1442(a)(1), and no basis for removing these cases from state to

federal court. *Freiberg, supra* at page 1156.

In the case at bar, the Avondale Interests cannot present evidence showing that the

"government authority under which [Avondale] worked required them to act" negligently

with regard to Byron Granier nor can they "establish the [federal officer's] direction and

control of their activities directly interfered with their ability to fulfill their state law

obligation to warn employees of safety hazards." *Freiberg, supra* at 1155; see also *Ruffin,*

*supra* at 776. In *Ruffin*, the court concluded that "the mere fact that the government possessed

the power to control or regulate employee safety neither establishes that the power was ever used nor that operational mandates of this type were ever issued. Without such proof, [the defendant] cannot satisfy the statutory requirements for removal under §1442 (a) (1)." *Id.* Clearly, this federal court has no jurisdiction over this case and it should be remanded to state court.

## VI.   THE AVONDALE INTERESTS PRESENT NO EVIDENCE

The Avondale Interests bear the burden of establishing that it actually did act under the specific authority of the federal government in causing Byron Granier's asbestos related disease. The Avondale Interests present no evidence that the federal government maintained any control over safety or the activities of Avondale. The Avondale Interests has not shown that "strong government intervention and the threat that a defendant will be sued in state court based on actions which follow federal direction." *Mouton, supra* at p. 2; *Freiberg, supra.* Without this showing, the Avondale Interests have not carried their burden of establishing federal jurisdiction over this state tort action, and the suit should be remanded to state court. *Ryan, surpa* at 939; *Good, supra* at 1127; *Freiberg v. Swinerton & Walberg Property Servs.*, 245 F.Supp. 2d 1144 (D. Colo. 2002).

Also, the Avondale Interests have provided absolutely no evidence showing that the government had direct control over Avondale's safety policies and procedures or over the procedures used for cleaning up after the workers completed their tasks. Thus, the Avondale Interests cannot meet its burden of making a causal connection between the state claim being asserted in this matter and the conduct undertaken pursuant to the direct orders (or comprehensive and detailed regulation) given by an officer of the federal government.

To establish that the defendants acted under the control of a federal officer, for purposes of § 1442(a)(1), the defendants must show that the government authority under which they worked directly interfered with their ability to fulfill their state law obligations to Byron Granier. *Ruffin, 959 F.Supp.* at 776; *Freiberg, supra* at 1155. In the instant case, the Avondale Interests have neither established that they acted pursuant to direct and detailed orders by the federal government regarding its operations and safety activities nor that any federal duty under which they may have been required to act in any way interfered with their state imposed duty of safety

- 19 -

towards shipyard employees. Thus, the Avondale Interests have not established the first prong of the *Mesa* test and, therefore, this case should be remanded to state court. See *Savoie, supra* at 3.

## VII.   THE AVONDALE INTERESTS HAVE NO COLORABLE FEDERAL DEFENSE

Also, the Avondale Interests cannot satisfy the second prong of the federal officer removal test. To qualify for federal-officer jurisdiction under § 1442(a)(1), the Avondale Interests must establish that they have a colorable federal defense to the plaintiffs' claims. *See Mesa*, 109 S. Ct. at 968. The Avondale Interests assert that they may rely on the government contractor defense. *See Boyle v. United Technologies Corp.*, 487 U. S. 500, 108 S. Ct. 2510, 101 L. Ed. 2d 442 (1988). For the additional reasons set forth herein, the government contractor defense does not provide the Avondale Interests with a colorable federal defense to plaintiffs' claims. Therefore, the Avondale Interests have failed to establish this second prong of the *Mesa* test and plaintiffs' motion to remand should be granted.

> **a.    Application of the Government Contractor Defense Must Be Predicated Upon Both a Federal Interest and a Conflict Between Duties Imposed by State Law and Duties Imposed by Federal Authority.**

The Avondale Interests suggest that they can rely upon the government contractor defense articulated in *Boyle v. United Technologies Corp.*, 487 U. S. 500, 108 S. Ct. 2510, 101 L. Ed. 2d 442 (1988). But before the Court can consider whether this serves as a colorable federal defense in this case, the Avondale Interests bear the burden of establishing that two requisite conditions are met: whether the case concerns a unique federal issue and whether there was a significant conflict between federal policy and state law. *Boyle*, 108 S. Ct. at 2515. If either of these conditions are not met, the defendants cannot rely upon the federal contractor defense. *Dorse v. Eagle-Picher Industries, Inc.*, 898 F. 2d 1487, 1490 (11th Cir. 1990) (state law not displaced where no conflict existed between federal contractual duties and state duty of care — contractor could comply with both obligations). In this case, the Avondale Interests have presented absolutely no evidence which would establish these two requisite conditions. Thus, the Avondale Interests cannot rely on the government contractor defense.

### 1.   No Unique Federal Interest Justifies Removal.

Since asbestos products have been banned for a long time and are no longer used in most equipment, any federal interest in this case is meager at best. Using precisely this reasoning, the Eastern District of Pennsylvania rejected an asbestos manufacturer's claim that it was entitled to the federal-contractor defense to support its attempted federal-officer removal:

> The impact of this personal injury action on the federal interest in protecting future defense procurement — the fundamental point of the government contract defense — is speculative. It is common knowledge that asbestos is no longer used in the design and manufacture of equipment, so that this lawsuit cannot interfere with a federal program involving products that contain asbestos. Therefore, the adjudication of this personal injury action in state court does not threaten the enforcement of a federal policy sufficient to warrant removal.

*Good v. Armstrong World Indus., Inc.*, 914 F. Supp. 1125, 1131 (E.D. Pa. 1996). Here, the Avondale Interests present no evidence that a unique federal interest is at issue in this case.

### 2.   No Conflict Exists Between State Law and Federal Mandate.

Assuming for purposes of argument that a federal interest does exist in this case, which is denied, that federal interest would "merely established a necessary, not a sufficient, condition for the displacement of state law." *Boyle*, 108 S. Ct at 507. The court must then determine whether a conflict exists between state law and federal mandate. Displacement of state law "will occur only where. . . a 'significant conflict' exists between an identifiable 'federal policy or interest and the [operation] of state law or the application of state law would 'frustrate specific objectives' of federal legislation." *Id.* The *Boyle* court offered an example of a situation in which federal mandate does not conflict with state imposed duty:

> If, for example, the United States contracts for the purchase and installation of an air conditioning-unit, specifying the cooling capacity but not the precise manner of construction, a state law imposing upon the manufacturer of such units a duty of care to include a certain safety feature would not be a duty identical to anything promised the Government, but neither would it be contrary. The contractor could comply with both its contractual obligations and the state-prescribed duty of care. No one suggests that state law would generally be pre-empted in this context.

*Id.*[7]  This example clearly highlights the facts applicable to the case at bar are clearly outside the removal statutes.  Nothing presented by the defendants suggest that there were federal mandates that pre-empted the Avondale Interests' state prescribed duty of care to Byron Granier.  (*Gauthe, supra; Mouton, supra;* and *Porch; supra*; among many others.

Therefore, even if the Court determined that there is a federal interest in this case, which is denied, the Avondale Interests would still have to establish a conflict exists between its duties imposed by state law and its duties imposed by federal authority.  Indeed, in a similar situation, the Eleventh Circuit determined that the evidence did not support the requirements for the government contractor defense where "the contractor could comply with both its contractual obligations and the state-prescribed duty of care."  *Dorse v. Eagle-Picher*, 898 F.2d 1487, 1490 (11th 1990)(*citing Boyle*, 108 S.Ct. at 2517).  The Ninth Circuit clearly articulated this requirement in the failure to warn context:

> *Boyle* displaces state law only when the Government, making a discretionary, safety-related military procurement decision contrary to the requirements of state law, incorporates this decision into a military contractor's contractual obligations, thereby limiting the contractor's ability to accommodate safety in a different fashion.

*See In re Hawaii Asbestos Cases*, 960 F. 2d 806, 813 (9th Cir. 1992).

In the instant case, the Avondale Interests have not established that Avondale's duties imposed by federal authority in any way conflicted with its duties of care imposed by state law.  Specifically, under Louisiana law, the Avondale Interests had a duty to warn and to provide safe condition for employees or persons working on or near its facilities.  *See, e.g., Jones v. Trailer*, 636 So.2d 1112, 1122 (La.App. 4th Cir.) , *writ denied sub nom., Rome v. Traylor*, 642 So.2d 193 (La. 1994)  (referring to La. R. S. § 23.13) ; *Canzoneri v. Smith*, 381 So. 2d 973, 975-76 (La.App. 4th Cir 1980).  This duty includes a duty to warn of work-related dangers and how to avoid them. *Canzoneri*, 381 So.2d at 976; *Miller v. Lambert*, 380 So.2d 695, 700 (La.App. 4th Cir. 1980).  Accordingly, the Avondale Interests had a duty, imposed by state law, to warn of the dangers of

---

[7]In *Boyle*, the state-imposed duty of care was directly contrary to the duty imposed by contract with the federal government. *Boyle*, 108 S. Ct. at 2517.  However, the Avondale Interests present no evidence that their federal duty, if any, limited their ability to fulfill their state law duty of care to Byron Granier.

asbestos on the job site. Its failure to do so was in direct violation of state law, and nothing in the Avondale Interests' notice of removal, or otherwise, in any way suggests that its alleged federal authority conflicted with this state imposed duty of care. Where no conflict with state law exists, the defendant is not entitled to rely upon the government contractor defense. Assuming the Avondale Interests did work under the direct and detailed supervision of the federal government, which is denied, the Avondale Interests provide no evidence that anything about that supervision touched upon or prevented them from warning persons working on or near asbestos products about the dangers associated with asbestos. Thus, the government contractor defense is not available to the Avondale Interests in this case.

### b. The Avondale Interests' Attempted Removal Fails the Third Prong of the Federal Officer Removal Statute Because it Has Not Shown a Nexus Between the Government's Control and Plaintiffs' Legal Theories.

Under the third prong for federal-officer jurisdiction, the Avondale Interests must show that a nexus exists between actions for which it is being sued and the directives of the federal government. *Ryan*, 781 F. Supp. at 945; *Ruffin*, 959 F. Supp. at 775; *Freiberg, supra* at 1152-6; *Gauthe, supra; Mouton, supra*; and *Porch; supra*. To determine whether a causal nexus exists, "[t]he critical analysis is to what extent defendants acted under the federal direction at the time they were engaged in conduct now being sued upon." *Bahrs v. Hughes Aircraft Co.*, 795 F. Supp. 965, 969 (D. Ariz. 1992) (internal quotes omitted); *Freiberg, supra* at 1152-6. To meet this burden, a defendant must "by direct averment exclude the possibility that [the state action] was based on acts or conduct of his not justified by his federal duty." *Mesa*, 109 S. Ct. at 966; *Freiberg, supra* at 1152-6. Simply put, the Avondale Interests must show that the federal authority under which it operated "directly interfered with its ability to fulfill its state law obligation" of care. *See Ruffin*, 959 F. Supp. at 776, *(citing Ryan*, 781 F. Supp. at 950); *Freiberg, supra* at pages 1152-6. This factor is similar to the determination of whether the Avondale Interests acted under federal authority.[8] When making this determination, most courts

---

[8]The causal nexus requirement is necessarily predicated upon the existence of federal authority. In some cases, the two requirements are combined into one test. *See Arness v. Boeing North American, Inc.*, 997 F. Supp. 1268, 1273 (C. D. Cal. 1998).

require "direct and detailed control" by the federal officer over the specific conduct of the defendant that forms the basis for the plaintiff's tort claims. *Bahrs*, 795 F. Supp. at 969; *Freiberg, supra* at pages 1152-6; *Gauthe, supra; Mouton, supra*; and *Porch: supra.*

In this case, the Avondale Interests have provided no evidence showing that a federal officer exercised "direct and detailed" control over its operations, or over its safety activities or over their handling of asbestos. In fact, there is no evidence showing that asbestos-related safety measures used by Avondale or anything else was ever under federal direction and control. Exhibits "9", "10" & "16". In fact, the evidence shows that asbestos-related safety was not under federal direction and control. This lack of an evidentiary foundation, once again, requires that this case be remanded to state court. *Freiberg, supra* at pages 1152-6; *Gauthe, supra; Mouton, supra;* and *Porch, supra.*

Another case on point in this regard is the case of *Bahrs v. Hughes Aircraft Co.*, 795 F. Supp. 965, 969 (D. Ariz. 1992). In *Bahrs*, General Dynamics was sued for dumping toxic waste, including TCE, into the ground, which eventually seeped into the ground and injured the plaintiffs. *Id.* at 967. General Dynamics sought to remove, alleging that federal-officer jurisdiction was appropriate because, when performing the work that created the toxic waste, they were fulfilling a government contract. The court rejected the defendant's attempt to invoke federal officer jurisdiction because, while the federal government may have exercised control over the procedures that created the toxic TCE waste, there was no evidence that it exercised "direct and detailed" control over the conduct that caused the plaintiffs' injuries, the waste-disposal procedures. "While the government officials were undoubtedly most interested in the production of war materials, the record before this Court does not demonstrate the government's necessary control over the method of waste disposal. The mere fact that the government possessed the power to exercise control over the project does not establish that the power was in fact ever exercised." *Id.* at 970. Thus, the court found no nexus existed between the control exercised by the federal government and the tortious conduct that formed the basis of the plaintiff's lawsuit against General Dynamics. *Id.* In the case at bar, the Avondale Interests cannot establish this required nexus.

## VIII.  CONCLUSION

The Avondale Interests bear the burden of satisfying the requirements of the federal officer removal statute so that this court has federal subject matter jurisdiction.  The Avondale Interests have not tendered any evidence to support its allegations of federal authority over its safety, procedures, or activities during the years of Byron Granier's exposure to asbestos nor do they show that a federal officer even required the use of asbestos.  In fact, there is no evidence showing that asbestos-related safety measures used by Avondale or anything else was ever under federal direction and control.  Exhibits "9", "10" & "16".  But even if the Avondale Interests had tendered such evidence, its allegations do not satisfy the requirements of the federal officer removal statute.  For these reasons, removal of this action to federal court is improper.

**WHEREFORE**, for all of the above reasons, it is respectfully submitted that this federal court lacks federal jurisdiction over this action and plaintiffs pray that this action be remanded to the state court from which it was removed.

Respectfully submitted,

**ROUSSEL & ROUSSEL**

GEROLYN P. ROUSSEL - 1134
PERRY J. ROUSSEL, JR. - 20351
1710 Cannes Drive
LaPlace, LA  70068
Telephone:  (985) 651-6591
Facsimile:  (985) 651-6592
ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing pleading has been served upon counsel for all parties by FAX, hand delivery, and/or mailing same to each, properly addressed and postage prepaid, on this 24th day of July, 2006.

GEROLYN P. ROUSSEL

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NUMBER: 2006-4993        DIVISION " A "                SEC " 05 "

BYRON GRANIER and JOSIE LEGENDRE GRANIER

versus

NORTHROP GRUMMAN SHIP SYSTEMS, INC., (formerly AVONDALE INDUSTRIES, INC. and formerly AVONDALE SHIPYARDS, INC.) and its executive officers, ALBERT BOSSIER, JR., and PETER TERRITO; AMERICAN MOTORISTS INSURANCE COMPANY; AMERICAN EMPLOYER'S INSURANCE COMPANY; ONEBEACON AMERICA INSURANCE COMPANY (as successor to COMMERCIAL UNION INSURANCE COMPANY and EMPLOYERS COMMERCIAL UNION INSURANCE COMPANY); THE HOME INSURANCE COMPANY; and THE TRAVELERS CASUALTY & SURETY COMPANY (f/k/a: THE AETNA CASUALTY & SURETY COMPANY); BAYER CROPSCIENCE, INC. (successor TO RHONE POULENC AG COMPANY, formerly AMCHEM PRODUCTS, INC., formerly BENJAMIN FOSTER COMPANY); EAGLE, INC. (FORMERLY EAGLE ASBESTOS & PACKING COMPANY, INC.); FOSTER-WHEELER LLC (formerly FOSTER-WHEELER CORPORATION); GARLOCK SEALING TECHNOLOGIES, LLC (formerly GARLOCK, INC.); GENERAL ELECTRIC COMPANY; HOPEMAN BROTHERS, INC.; LIBERTY MUTUAL INSURANCE COMPANY; THE MCCARTY CORPORATION (SUCCESSOR TO MCCARTY BRANTON, INC., AND PREDECESSOR AND SUCCESSOR TO MCCARTY INSULATION SALES, INC.); MINNESOTA MINING AND MANUFACTURING COMPANY (3M), OWENS-ILLINOIS, INC.; REILLY-BENTON COMPANY, INC.; TAYLOR-SEINDENBACH, INC.; and VIACOM INC. (f/k/a CBS CORPORATION f/k/a WESTINGHOUSE ELECTRIC CORPORATION).

FILED:_____        _____
                                        DEPUTY CLERK

## PETITION FOR DAMAGES

The Petition of Byron Granier and Josie Legendre Granier, persons of the full age of majority and residents of the State of Louisiana, with respect represent:

1.

Defendants, Eagle, Inc. (formerly known as Eagle Asbestos & Packing Company, Inc.), and Taylor-Seidenbach, Incorporated, are domestic corporations with their registered offices in the Parish of Orleans, State of Louisiana. In addition, tortious conduct of Eagle, Inc., Taylor-Seidenbach, Incorporated, Reilly-Benton Company, Inc., and The McCarty Corporation occurred in the Parish of Orleans. Moreover, C. Edwin Hartzman and Henry "Zac" Carter were domiciled in Orleans Parish at the time of their deaths. Additionally, Mr. Granier was exposed to asbestos in the Parish of Orleans and received injury in the Parish of Orleans. Accordingly, venue is proper in Orleans Parish against all defendants pursuant to Louisiana Code of Civil Procedure Articles 42 and 73.

2.

Defendants, EAGLE, INC. (formerly EAGLE ASBESTOS & PACKING COMPANY, INC.), FOSTER-WHEELER LLC (formerly FOSTER-WHEELER CORPORATION), GARLOCK SEALING TECHNOLOGIES, LLC (formerly GARLOCK, INC.), GENERAL ELECTRIC COMPANY, HOPEMAN BROTHERS, INC., THE MCCARTY CORPORATION (successor to

**EXHIBIT**

1

MCCARTY BRANTON, INC., and predecessor and successor TO MCCARTY INSULATION SALES, INC.), MINNESOTA MINING AND MANUFACTURING COMPANY (3M), OWENS-ILLINOIS, INC., REILLY-BENTON COMPANY, INC., BAYER CROPSCIENCE, INC. (successor TO RHONE POULENC AG COMPANY, formerly AMCHEM PRODUCTS, INC., formerly BENJAMIN FOSTER COMPANY), TAYLOR-SEINDENBACH, INC., VIACOM INC. (f/k/a CBS CORPORATION f/k/a WESTINGHOUSE ELECTRIC CORPORATION) (hereinafter collectively referred to as "asbestos defendants"), are all corporations incorporated under the laws of the various states of the United States, as well as Canada and England.  Asbestos defendants all have their principal place of business in various states of the United States, as well as some foreign countries. All of them may be served under and by virtue of the Long Arm Statute of the State of Louisiana, either through their authorized agents, servants, and/or employees, or through the Secretary of State, State of Louisiana.

3.

At all material times herein, Henry "Zac" Carter, James O'Donnell, C. Edwin Hartzman, George Kelmell, John Chantrey, Ollie Gatlin, Earl Spooner, James T. Cole, Hettie "Dawes" Eaves, Burnette "Frenchy" Bordelon, Steven Kennedy, Edward Blanchard,  Peter Territo, and Albert Bossier, Jr. were executive officers of Northrop Grumman Ship Systems, Inc., (formerly Avondale Industries, Inc. and formerly Avondale Shipyards, Inc.) (hereinafter sometimes "Avondale" or "Avondale Industries, Inc.") with the specific responsibility for the health and safety of Mr. Granier and his fellow employees during the time Mr. Granier was exposed to substances which resulted in his mesothelioma and other ill effects related thereto. Henry "Zac" Carter, James O'Donnell, C. Edwin Hartzman, George Kelmell, John Chantrey, Ollie Gatlin, Earl Spooner, James T. Cole, Hettie "Dawes" Eaves, Burnette "Frenchy" Bordelon, Steven Kennedy, and Edward Blanchard have since died, and pursuant to Louisiana Revised Statute 22:655, plaintiffs herein assert a direct action against American Motorists Insurance Company; American Employer's Insurance Company; Onebeacon America Insurance Company (as successor to Commercial Union Insurance Company and Employers Commercial Union Insurance Company); The Home Insurance Company; and The Travelers Casualty & Surety Company (f/k/a: the Aetna Casualty & Surety Company), who, at all times material herein, were the insurance carriers covering all of the foregoing individuals as well as Avondale Industries, Inc. for the liability asserted herein. These executive officers and Avondale were also insured by Highlands Insurance Company for the liability asserted herein, and plaintiffs assert a claim against Avondale for this liability pursuant to a buy-back contract and agreement.  As

stated above, Peter Territo and Albert Bossier, Jr. were also the executive officers of Avondale with specific responsibilities for the health and safety of Mr. Granier and his fellow employees. They, too, were covered for the liability asserted herein by Highlands Insurance Company, American Motorists Insurance Company; American Employer's Insurance Company, Onebeacon America Insurance Company (as successor to Commercial Union Insurance Company and Employers Commercial Union Insurance Company), The Home Insurance Company, and The Travelers Casualty & Surety Company (f/k/a: the Aetna Casualty & Surety Company). Plaintiffs assert a direct action against American Motorists Insurance Company, American Employer's Insurance Company, Onebeacon America Insurance Company (as successor to Commercial Union Insurance Company and Employers Commercial Union Insurance Company), The Home Insurance Company and The Travelers Casualty & Surety Company (f/k/a: the Aetna Casualty & Surety Company) for the liability of these individuals pursuant to the Louisiana Direct Action Statute. Likewise, these executive officers were also insured by Highlands Insurance Company for the liability asserted herein, and plaintiffs assert a claim against Avondale for this liability pursuant to a buy-back contract and agreement.

4.

Under a buy-back contract and agreement between Northrop Grumman Ship Systems, Inc. (formerly Avondale Industries, Inc., formerly Avondale Shipyards, Inc.) (hereinafter "Avondale") and Highlands Insurance Company (currently in receivership), Avondale is an additional insurer under the Highlands Insurance Company policies providing coverage to Avondale and its executive officers and employees for the liability asserted in plaintiff's petitions. The plaintiff asserts a direct action against Avondale pursuant to this contract and agreement pursuant to La. Civil Code articles 1821-1823.

5.

Under a buy-back contract and agreement between Avondale and American Motorists Insurance Company, Avondale is an additional insurer under the American Motorists Insurance Company policies providing coverage to Avondale and its executive officers and employees for the liability asserted in plaintiff's petitions. The plaintiff asserts a direct action against Avondale pursuant to this contract and agreement pursuant to La. Civil Code articles 1821-1823.

6.

American Employer's Insurance Company and Onebeacon America Insurance Company (as successor to Commercial Union Insurance Company and Employers Commercial Union Insurance

Company) provided coverage to Eagle, Inc. for the liability asserted herein, and plaintiffs assert a direct action pursuant to Louisiana Revised Statute 22:655 against these insurance companies for the liability of this defendant.

7.

Liberty Mutual Insurance Company is a foreign corporation licensed to do business in the State of Louisiana, who, at all times material herein, was the insurance carrier covering Reilly-Benton Company, Inc. (hereinafter "Reilly-Benton") for the liability asserted herein.

8.

Byron Granier was employed in various positions by or on the premises of Avondale Industries, Inc. (formerly Avondale Shipyards, Inc.) from approximately 1970 to 1975. Mr. Granier was employed by and on the premises of Avondale at its yards in Algiers, Louisiana, and in its Main Yard from approximately 1970 to 1975. Throughout this time period, Mr. Granier was exposed to asbestos. Mr. Granier's mesothelioma, cancer, and asbestos-related injuries were caused by injuries and damages to his person that he received from his substantial occupational exposure to asbestos during the years 1970 to 1975. The internal injuries Mr. Granier received from his exposure to asbestos dust caused injuries and damages to his person from 1970 to 1975. Mr. Granier's mesothelioma, cancer, and asbestos-related injuries were caused and/or significantly contributed to by injurious exposure to asbestos dust and damages he received from that exposure (1970 to 1975). Mr. Granier's diagnosis of mesothelioma, cancer, and asbestos-related injuries were directly attributable to his exposure to asbestos fibers from 1970 to 1975, and those initial injuries and damages caused by that exposure from 1970 to 1975. The medical evidence shows that Mr. Granier began to sustain tissue damage shortly after the inhalation of asbestos fibers, and that he sustained distinct bodily injury in each year of his occupational exposure to asbestos dust. On a daily basis during Mr. Granier's employment by or on the premises of Avondale from 1970 to 1975, he was exposed to dangerously high levels of toxic substances, including asbestos, in the normal routine course of his work. At all times during Mr. Granier's foregoing employment, he was exposed to asbestos and asbestos-containing products manufactured, distributed, and sold by "asbestos defendants".

9.

Byron Granier was employed in various positions by or on the premises Avondale Industries, Inc. (formerly Avondale Shipyards, Inc.) from approximately 1970 to 1975. In addition to the acts of negligence, strict liability, and fault identified throughout this petition,

- 4 -

Avondale Industries, Inc. (formerly Avondale Shipyards, Inc.) is strictly liable under a theory of premises liability. Avondale Industries, Inc. (formerly Avondale Shipyards, Inc.) was aware or should have been aware of the dangerous condition presented by exposure to asbestos, and that Mr. Granier would suffer from asbestos-related diseases and other ill health effects associated therewith as a result of this exposure, but they failed and/or willfully withheld from Mr. Granier knowledge of the dangers to their health from exposure to asbestos fiber.

10.

In addition to the foregoing acts of negligence and intentional concealment, Avondale and its executive officers are guilty of the following:

a)   Failing to reveal and knowingly concealing critical medical information to Mr. Granier;

b)   Failing to reveal and knowingly concealing the inherent dangers in the use of asbestos, and other harmful substances in their manufacturing process and/or in connection with the work which exposed Mr. Granier;

c)   Failing to provide necessary protection to Mr. Granier;

d)   Failing to provide clean, respirable air and proper ventilation;

e)   Failing to provide necessary showers and special clothing;

f)   Failing to segregate work areas so that workers would not be exposed to deadly asbestos fiber;

g)   Failing to provide necessary and adequate respiratory protection;

h)   Failing to warn employees of the dangers associated with exposure to asbestos;

I)   Failing to use non-asbestos containing products including on jobs where non-asbestos containing products were specified.

j)   Wanton and reckless disregard in the storage, handling, and transportation of asbestos;

k)   Requiring employees to dispose of asbestos in dumpsters, into the river, and onto the land instead of properly disposing of asbestos and asbestos fiber, thereby further exposing employees (and subsequently their family members) to asbestos;

l)   Requiring employees to dispose of asbestos under buildings instead of properly disposing of asbestos and asbestos fiber, thereby further exposing employees (and subsequently their family members) to asbestos;

m)   Failing to warn of the dangers of exposure to asbestos;

n)   Requiring employees to dispose of asbestos without precautions to prevent exposure;

o)   Failing to post warnings regarding asbestos and the hazards of same;

p)   Failing to warn employees that exposure to asbestos could cause deadly diseases including mesothelioma, cancer, asbestosis, pleural thickening, and pleural plaques; and

q)   Failing to warn employees of the invisible nature of harmful asbestos, that it could be carried home on clothing and other objects by a worker, and that it could cause diseases such as asbestosis, pleural plaques, pleural thickening, cancer, and mesothelioma.

These defendants and individuals committed these intentional acts knowing full well that Mr. Granier's injuries would follow or were substantially certain to follow.

11.

As a result of these exposures to toxic substances, including asbestos, Mr. Granier contracted mesothelioma, cancer, which was first diagnosed on approximately March 29, 2006.

12.

Avondale Industries, Inc. (formerly Avondale Shipyards, Inc.) and its executive officers were aware or should have been aware of the dangerous condition presented by exposure to asbestos and other toxic substances, and that Mr. Granier would suffer from asbestos-related disease, including mesothelioma, cancer, and other related ill health effects, as a result of this exposure, but they failed and/or willfully withheld from Mr. Granier knowledge of the dangers to his health from exposure to asbestos fiber and other toxic substances.

13.

Avondale Industries, Inc. (formerly Avondale Shipyards, Inc.) and its executive officers had the responsibility of providing Mr. Granier with a safe place to work and safety equipment with which to conduct his work; however, they negligently and/or intentionally failed to carry out these duties and failed to protect Mr. Granier from the dangers of toxic fiber and dust exposure knowing full well or being substantially certain that certain workers, including Mr. Granier, would develop disease as a result thereof.

14.

Defendants, Avondale Industries, Inc. (formerly Avondale Shipyards, Inc.) and its executive officers, Hopeman Brothers, Inc., Eagle, Inc., Foster-Wheeler LLC (formerly Foster-Wheeler Corporation), The McCarty Corporation, Reilly-Benton Company, Inc., and Taylor-Seidenbach, Inc., had care, custody, and control of the asbestos, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in the injury of Mr. Granier and for which these defendants are strictly liable under Louisiana law.

15.

Defendants, Avondale Industries, Inc. (formerly Avondale Shipyards, Inc.) and its executive officers were the owners of the asbestos, which asbestos was defective and which presented an

unreasonable risk of harm, which asbestos resulted in the injury of Mr. Granier, and for which defendants are strictly liable under Louisiana law.

16.

Defendants, Avondale Industries, Inc. (formerly Avondale Shipyards, Inc.) and its executive officers are answerable for the conduct of those handling asbestos products on their premises, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in the injury to Mr. Granier, and for which defendants are strictly liable under Louisiana law.

17.

Defendants, Avondale Industries, Inc. (formerly Avondale Shipyards, Inc.) and its executive officers are responsible for the conduct of those individuals and companies working on their premises with asbestos products which resulted in exposure to asbestos to Mr. Granier, which asbestos was defective and which presented an unreasonable risk of harm, and which asbestos resulted in the injury to Mr. Granier, and for which defendants are strictly liable under Louisiana law.

18.

Defendants, Avondale Industries, Inc. (formerly Avondale Shipyards, Inc.) and its executive officers, Hopeman Brothers, Inc., Eagle, Inc., Foster-Wheeler LLC (formerly Foster-Wheeler Corporation), The McCarty Corporation, Reilly-Benton Company, Inc., and Taylor-Seidenbach, Inc. were involved in an ultra-hazardous activity in the handling of asbestos, which asbestos resulted in the injury to Mr. Granier, and for which defendants are absolutely liable under Louisiana law.

19.

During Byron Granier's employment, he was provided with masks manufactured by defendant, Minnesota Mining and Manufacturing Company ("3M"). Although these masks were marketed, advertised, and sold by Minnesota Mining and Manufacturing Company as providing necessary and adequate respiratory protection against the ill effects of asbestos and other exposures, in fact, said masks provided little or no protection against toxic exposures. Contrary to representations made by Minnesota Mining and Manufacturing Company, the masks allowed excessive amounts of asbestos fiber and other harmful substances through the filters and around the face piece exposing Byron Granier to the inherent dangers involved in the inhalation of these substances. In addition to the foregoing, Minnesota Manufacturing and Mining Company is guilty of the following:

a)  Manufacturing an unreasonably dangerous per se product;
b)  Breach of warranty;
c)  Manufacturing a product defective in design;
d)  Intentional misrepresentation of its product;

- 7 -

e)     Failing to properly warn against the dangers inherent in the use of its product;
f)     Failing to provide proper instructions in the use of its product;
g)     Failure to properly warn and instruct regarding the limitations of its product;
h)     Any other acts which may be revealed at the trial of this matter.

20.

Minnesota Mining and Manufacturing Company ("3M") was the manufacturer of the 8500 and 8710 respirators, which were utilized by workers (including Byron Granier). DOP and NaCl testing make clear that the filter media found in the 8500 and 8710 permit substantial leakage of small respirable particles, particularly those submicron in size. 3M was well aware of these facts and fraudulently and/or intentionally withheld such information from the consumer end user and consuming public, in an effort to gain an unjust advantage over said individuals and to continue to reap profits from the sales of said respiratory products.

21.

3M has long been aware of the importance of guarding against the inhalation of submicron size particles in preventing lung disease. Further, 3M recognized that workers generally wore their respirator upon seeing visible dust. 3M was also aware that the typical particle in industry was .5 micron in size. 3M has also been aware of limitations and criticisms of the silica dust test. Despite all of this knowledge, 3M fraudulently misrepresented and/or suppressed this information from the users and/or consumers of its products in an effort to gain an unjust advantage over unsuspecting victims, and to continue making profits from the sales of said respiratory products.

22.

In its advertising materials and catalogues, 3M made various misrepresentations of fact, which were not scientifically valid, such as: From 1972 until 1983, 3M promoted the 8710 (and earlier the 8500) for all concentration levels. 3M did not include in any of its marketing literature or use instructions during this time a maximum concentration over the TLV or PEL in which the 8500 or 8710 could not be used. This fostered the belief in users of the products that the respirators could be safely used under most (if not all) conditions.

23.

Furthermore, 3M misrepresented the safety features offered by its products and expressly or impliedly represented that the respirators specifically prevented submicron size contaminants from reaching the lung. 3M represented that the 8710 "protects nose, mouth and lungs from lung damaging dusts", that "The 8710 stops pneumoconiosis and fibrosis producing dusts from ever reaching the lungs", that "The nose needs help. It's not efficient enough to filter out everything harmful to a worker's lungs. ...The 3M Brand Respirator 8710 is efficient enough", that "The

- 8 -

3M Respirator is so effective, it's 99% efficient against dusts with a mean particle diameter of 0.4 to 0.6 microns", and that the 8710 "stops sand and silica and certain other matter that is suspected of producing pneumoconiosis and fibrosis." These fraudulent misrepresentations and/or suppressions of the truth were employed by 3M with the intent to gain an unjust advantage over unsuspecting users and/or consumers of its products, and to continue the profits of 3M from the sales of said respiratory products.

24.

3M's use and fitting instructions were also inadequate. At all relevant times herein, there was no practical and reliable test atmosphere to fit test the 8500 or 8710. Prior to the early 1980's, 3M only provided its own unique positive pressure fit check procedure. A positive pressure test is not appropriate for use in the selection and assignment of a respirator to a particular individual. Moreover, this fit check only identifies, at best, gross or large face-seal leaks.

In addition, 3M's fitting instructions were incomplete and inadequate in other respects. For example, for years 3M instructed the user to pinch the metal clip on the 8710 with one hand to ensure a good fit. Later, however, 3M changed its use instructions and indicated that using one hand to fit the metal clip was inappropriate.

3M erroneously instructed its users to exhale vigorously and to cup their hands over the respirator, both of which are flaws in 3M's positive pressure test.

The saccharin test, as developed by 3M, was a poor fit check procedure because it utilized large size particulates.

3M was also aware that the coal dust and talc powder fit tests were inadequate, and that multiple sizes of the respirators were recommended to ensure fitting the general population. Despite the foregoing, 3M fraudulently withheld this information from the users and/or consumers of its products in an effort to gain an unjust advantage over said users and/or consumers and to continue generating profits from the sale of its respiratory products.

25.

Internal quality control testing performed by 3M establishes that the 8710 routinely failed NIOSH breathing resistance requirements. The scientific literature explains that increased resistance through the filter media causes increased leakage through the face seal.

26.

3M was aware that its 8500 mask was being used by individuals working with and/or around asbestos. 3M was also aware that the mask leaked significant amounts of respirable sized particles.

- 9 -

It was well known that shipyard facilities contained significant amounts of respirable asbestos, and that asbestosis, cancer, and mesothelioma were well recognized hazards associated with work involving asbestos. Yet 3M failed to take appropriate remedial measures. 3M Documents reflect their knowledge of the defects in their product and their suppressions of this information, which include, inter alia, the following: (8500 banned at a location because "of the extreme difficulty in controlling its use"), (in paint spray industry, "some of our published information may have been a little misleading"), ("another problem area is when the mask is accepted it rapidly spreads where it shouldn't be used"), ("The 8500 filter mask can only be used in atmospheres that are non-toxic in nature. Silica dust is classified as a toxic dust."–and so is asbestos dust). Nevertheless, this information was fraudulently suppressed by 3M from users and/or consumers of its respiratory products so as to continue the profits of 3M from the numerous sales of these products to the public.

27.

The 3M respirator's defects, including excessive filter penetration, inadequate fit, inadequate and improper instructions regarding use limitations, inadequate and improper instructions regarding the face fit or face seal check procedures, and misleading marketing literature were substantial contributing factors in causing asbestosis, silicosis, cancer, mesothelioma and other pneumoconiosis due to excessive exposures to harmful asbestos and/or silica particles by workers who used the 3M respirators in visible dust conditions and/or in areas or jobs that involve exposure to excessive respirable asbestos dust and/or silica dust. 3M was long aware of the defects in its products, but continued to fraudulently misrepresent its products and/or continued to fraudulently suppress this information from the users of its products, all in an effort to continue reaping profits from the sales of its respiratory products and to gain an unjust advantage over the unsuspecting users and/or purchasers of its products.

28.

As a result of the aforementioned acts of negligence, intentional tort, fraud, strict liability, and absolute liability of all of the hereinabove named defendants, Mr. Granier contracted asbestos-related mesothelioma, cancer, and other related ill health effects as a result thereof, for which all defendants are jointly, severally, and in solido liable.

29.

At all times material herein, Byron Granier was exposed to asbestos manufactured, distributed, and sold by Hopeman Brothers, Inc. and Wayne Manufacturing Company. The asbestos-containing products manufactured, distributed and/or sold by Hopeman Brothers, Inc. and Wayne

Manufacturing Company were unreasonably dangerous per se, were defective in design, and constituted a breach of warranty from said manufacturers. Further, these defendants failed and refused to warn Mr. Granier of the danger of exposure to such products. They also failed to warn them of the invisible nature of the asbestos and that is could cause deadly diseases such as mesothelioma and cancer. As a result of the defective and unreasonably dangerous condition and composition of the asbestos-containing products manufactured, distributed, and/or sold by these "asbestos defendants," Mr. Granier was exposed to asbestos fibers proximately causing his mesothelioma, cancer, and other related ill health effects. Plaintiffs further contend that said defendants are liable as a result of manufacturing, distributing, or selling an unreasonably dangerous per se product, a product defective in design, for breach of warranty, and for failing to provide adequate warnings and instructions. Further, defendants are liable for failing to substitute available alternative products and for fraudulently concealing the dangers of their products and the health hazards associated with the use and exposure to said products.

30.

During Mr. Granier's employment with and/or on the premises of Avondale, Hopeman Brothers, Inc. also performed contracting work wherein asbestos-containing products were used. During this contracting work, Hopeman Brothers, Inc. exposed Mr. Granier to asbestos-containing products, which caused and/or contributed to his asbestos-related diseases and other related ill health effects. Defendant, Hopeman Brothers, Inc. had care, custody, and control of the asbestos, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in injury to Mr. Granier and for which Hopeman Brothers, Inc. is strictly liable under Louisiana law. Moreover, defendant, Hopeman Brothers, Inc., is answerable for the conduct of those handling asbestos products over which it had control, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in injury to Mr. Granier and for which defendant is strictly liable under Louisiana law. Additionally, defendant, Hopeman Brothers, Inc., was involved in an ultra-hazardous activity in the handling of asbestos, which asbestos resulted in the injury of Mr. Granier, and for which defendant is absolutely liable under Louisiana law.

31.

In addition to the aforementioned acts of negligence, intentional tort, fraud, and strict liability, and absolute liability of Hopeman Brothers, Inc. and Wayne Manufacturing Co., Hopeman Brothers, Inc. is also liable because Wayne Manufacturing Corporation was the alter ego of Hopeman Brothers, Inc. at all time material herein.

32.

Plaintiffs also make additional allegations against Hopeman Brothers, Inc. who was aware of the risk of harm presented by its asbestos products. Hopeman Brothers, Inc. either through exchange of information and/or industry sponsored studies was notified, either directly by its parent companies or by its manufacturing associations, that their products presented an unreasonable risk of harm. However, Hopeman Brothers, Inc. disregarded these notices, elected to conceal these hazards from the plaintiff and continued to use and hold out these products as save and non-toxic.

33.

Hopeman Brothers, Inc. was informed that asbestos dust presented health risks by the U.S. Government or agencies acting on behalf of the U.S. Government no later than 1945. The U.S. Government issued advisories, through the U.S. Maritime Commission, to all government contractors regarding their findings of enumerated health risks in the work place. During the 1950s, the Department of Defense adopted and distributed to all government contractors, safety standards that pertained to the use of these defendants' products in various work places. In 1958, Louisiana adopted a workers compensation remedy for asbestosis. In the 1960s, the U.S. Government promulgated and published the Walsh-Healy Act which adopted safety standards and regulations regarding asbestos dust. Based on information and belief, each of these companies, their predecessor, and corporation officers were made aware of these findings at the time they were issued. Despite this knowledge these companies continued to manufacture, distribute, relabel, fabricate, sell and install these products at plaintiff's worksites. This was done without warning to plaintiff and without the knowledge on the part of the plaintiffs that they were in danger. Additionally, these defendants continued to market their products without disclosing the dangers and simultaneously affirming that their products were safe and non-toxic.

34.

Plaintiffs further allege that Viacom, Inc. (f/k/a CBS Corporation f/k/a Westinghouse Electric Corporation) has through its actions sought to fraudulently conceal and suppress the truth about the dangerous nature of its asbestos containing products that it manufactured, sold and distributed.

35.

By the early 1940s, Westinghouse knew that exposure to asbestos could cause lung disease, asbestosis, lung cancer, and mesothelioma. Throughout the 1930s, 1940s, and 1950s, Westinghouse was a member of the IHF, American Ceramic Society and National Safety Council. Beginning in

the 1930's, Westinghouse received asbestos scientific and medical information through these organizations.

<center>36.</center>

The "Air Hygiene Foundation", was established in 1935 as a fellowship within the Mellon Institute (then a part of the University of Pittsburgh). The organizations' name was changed to "Industrial Hygiene Foundation" and, in 1968, it was again changed to the "Industrial Health Foundation." J-M joined in 1936. IHF members included, among others, Garlock, General Electric Company, and Westinghouse Electric Corporation or their predecessors in interest. All of these companies are defendants in this case. The IHF was founded to conduct occupational health research, particularly with respect to the health effects of dust in the work place. One of the functions of the IHF was to gather and disseminate information regarding occupational health to its members. Since its inception, it has published special bulletins on items of general interest under the headings of legal bulletins, medical bulletins, management bulletins and engineering bulletins. Since 1937, member companies have been kept informed on occupational health issues by the Industrial Hygiene Digest, a monthly publication which is sent to all members in return for their annual membership fee. The Digest is a compilation of abstracts, grouped by topic, of the published domestic and foreign scientific and medical literature pertaining to industrial health and hygiene. In addition to scientific abstracts, the Digest included a section on legal developments, and also provide notice of any proposed changes in threshold limit values for various substances. Correspondence between members and the IHF established that members either participated in or knew of a number of studies and surveys dating as far back as the 1930's which had linked asbestos with various lung diseases. As part of its consultative services for its members, the IHF undertook a number of studies involving evaluations of asbestos dust conditions and asbestos-related disease. In 1947, the fruits of an industry survey conducted by the IHF for the ATI and its members were published in a "Report of Preliminary Dust Survey for Asbestos Textile Institute." The report is dated June 1947. The object of the investigation was stated as: "defining the specific nature and the magnitude of the (asbestosis) problem in all its phases....An original objective of most immediate importance was to facilitate the exchange of information between member companies on successful methods of dust control and otherwise to promote a general improvement in that field." The preliminary survey to be divided into three parts designated as "Engineering, Medical and Physical Testing" was based on visits made to member companies' plants over a three month period." While the actual report does not reveal the identity of the plants which were visited, deposition testimony

<center>- 13 -</center>

of Dr. Braum indicates that other companies evaluated in the report included, among others, Garlock, defendant in this case. Minutes of the Air Hygiene Committee meetings throughout the 1940's and 1950's reflect frequent discussions and presentations pertaining to appropriate medical practices and industrial hygiene approaches to the problem of asbestos dust in the work place. It was continually stressed that both pre-employment and periodic follow-up medical examinations were essential to monitor the health of employees, the necessity of x-rays and lung function studies, and the proper requisites for a diagnosis of asbestos-related disease. Some annual meetings apparently were held by the IHF. The minutes for the Fifth Annual Meeting of the Air Hygiene Foundation of America, Inc., which was held on November 12 and 13 in 1940, revealed asbestos to be one of its two main topics of interest. An Interim Report of the Preventive Engineering Committee, written by Philip Drinker, discussed inter alia dust particle size and dust control. A second report by Foundation Research at the Saranac Laboratory entitled "Individual Susceptibility to Toxic Dusts", authored by Dr. Leroy Gardner, dealt primarily with the problems of silica dust. Also discussed were court decisions on Workers' Compensation cases. A case involving the death of a North Carolina man was discussed, the minutes indicating that the claimant sought compensation on grounds that the defendant's pneumonia was due to asbestosis. The Supreme Court of North Carolina upheld the award finding that asbestosis was a contributing cause of death. The Air Hygiene committee also recommended that pre-employment and periodic chest x-rays be conducted by a reputable radiologist, that the use of the Greenberg-Smith Midget Impinger be adopted for testing the levels of dust in the air, and that various procedures be implemented to reduce the dust in manufacturing facilities. In December of 1946, Mr. Hemeon of the Industrial Hygiene Foundation was invited to attend a meeting of the American Textile Institute (discussed infra) to respond to inquiries regarding IHF's proposed Industrial Hygiene Survey of the member companies. It was agreed at the February 5, 1947, meeting of the American Textile Institute (ATI) that the IHF be permitted to conduct its proposed survey. A June 18, 1947 report by W. C. L. Hemeon, Head Engineer for IHF, stated that the medical review reflected an incidence of asbestosis ranging between 3% and 20%. In one presentation at a regular meeting (prior to 1950) of the IHF, the suggested threshold limit value was criticized as being unsafe for persons exposed to asbestos fiber. Defendants thus had direct and actual knowledge that the suggested threshold limit value for asbestos was not safe. In addition, this criticism was published in the scientific literature and all defendants were put on notice of the hazards of the suggested threshold limit value.

37.

Furthermore, as scientists became more concerned with the connection between asbestos and occupational exposure, General Electric, along with others in the asbestos industry, sponsored both animal and human research on the biological effects of asbestos at the Saranac Laboratory of the Trudeau Foundation. General Electric's association with the Saranac Laboratory extends at least to the 1940s, where Saranac Laboratory correspondence documents the contractual relationship between the Laboratory and General Electric. This research performed by the Saranac Laboratory revealed that exposure to asbestos produced harmful effects to those individuals who inhaled asbestos dust. More specifically, the Saranac Laboratory held the Seventh Saranac Symposium in 1952, whereupon General Electric representatives attended. The presentations by various doctors indicated that a link existed between asbestos and several lung diseases, including asbestosis and lung cancer.

In his presentation at the Seventh Saranac Laboratory in 1952, Dr. Kenneth M. Lynch indicated that he tested the effects of asbestos from a period of twenty five years (1926-1950). The testing resulted in the knowledge of a causal relationship between asbestos and cancer in 1934. This discovery was formally set in a published record. Additionally, in 1947, Dr. Lynch discovered that 13.2% of persons suffering from asbestosis also developed cancer. Furthermore, Dr. Lynch spoke of several reports, dated from 1918 to 1952, discussing the association of cancer with asbestos.

Also, Dr. Merewether began noting the deaths from asbestos exposure in the United Kingdom during the years of 1924 to 1947, including asbestos with tuberculosis and asbestos with lung cancer. Dr. Merewether discovered that 16.2% of persons suffering from asbestosis also developed cancer, as aposed to the 13.2% found earlier, thus further indicating a causal relationship between exposure to asbestos dust and lung cancer. In addition, Dr. Merewether discussed the original cases of asbestosis discovered around 1902. Another doctor, Dr. Arthur J. Vorwald, discussed the discovery of asbestosis in the early 1900s and the availability of information concerning the disease through several reports, ever since. Dr. Vorwald also admitted that individuals exposed to asbestos fibers develop asbestosis. Thus, General Electric's attendance at the Seventh Saranac Symposium in 1952 indicates that it knew, or at least should have known, of the hazardous nature of asbestos in causing asbestosis and lung cancer. Despite this knowledge, General Electric failed to warn its workers and customers of the harmful effects that result from the inhalation of asbestos fibers.

38.

General Electric contracted Harvard University to conduct research regarding the various hazards existing in their plants. Dr. Alice Hamilton, along with other Harvard medical doctors, conducted the research for General Electric. She recommended that chest x-rays be taken of all employees working with asbestos. She additionally recommended an overhaul in the ventilation system on certain apparatus at their plants due to the hazardous nature of asbestos fibers and the fact that moving belts blew the asbestos dust about the room so that it accumulates in the room. Also, in the 1930s, asbestos victims began to sue Johns-Manville and Multibestos because of their asbestos-related illnesses. As a result, Dr. Hamilton wrote to Gerald Swope, President of General Electric, informing him that these suits were justified. She further recommended that General Electric take safety precautions, including an evaluation of the situation and dust counts, to avoid this litigation.

Furthermore, Carl Obermaier, a GE plant manager, wrote to Hamilton acknowledging/admitting that he knew that inhalation of asbestos dust caused health problems, mainly asbestosis. Furthermore, Obermaier spoke of reports and pamphlets discussing the connection between asbestos exposure and lung cancer. Several letters, dated years 1928 - 1934, between Hamilton and GE indicate that GE was well aware of the excessive asbestos dust contained inside their various plants. Thus, GE had knowledge that asbestos dust was harmful, but still refused to warn its employees and its customers to whom it sold its asbestos-containing products.

39.

Throughout the relevant time periods, GE conducted various asbestos tests in their different plants, further indicating that they knew that asbestos was hazardous since they tested for levels of asbestos dust. Also, when tested, several times GE ran well above the maximum allowable level. For example, a survey done in 1973 of several GE plant buildings found an asbestos dust concentration count of 1540 fibers greater than five microns per milliliter of air, when the threshold limit value for asbestos at that time was five fibers greater than five microns per milliliter of air. GE was also aware that large quantities of asbestos fiber would blow into the exhaust system. Many times GE chose to use the cheaper asbestos fiber in the plants, even though the cheaper fiber produced more dust into the exhaust system. However, GE, knowing of the harmful effects of asbestos, still refused to warn those individuals/workers who would come

into contact with their products. Instead, they used these cheaper asbestos fibers attempting to profit at the expense of those individuals who would inhale these fibers from their products.

As a result of the tests conducted at General Electric's plants, various recommendations were given to GE during the 1950s to 1970s, including the improvement of ventilation (including exhaust systems), periodic chest X-rays, pulmonary function tests, medical surveillance programs, wearing of an approved respirator, gloves, and protective clothing, increasing air flow, better maintenance of dust filters, use of industrial vacuum to clean site, complete enclosure of saw and apparatus, checking filters at regular intervals to insure working properly, and the cutting of cloth where asbestos dust should be minimized. More specifically, in letters dated 1956 and 1959, Dr. Elkins informed the GE Lowell Plant that those employees working around asbestos should receive periodic chest x-rays due to the hazardous nature of asbestos. Also, he informed that the workers who sweep the area should wear respiratory equipment. Therefore, General Electric knew or should have known that asbestos could be harmful to those individuals exposed to this dust.

40.

Moreover, various published reports and articles available to GE, prove that GE was empowered with the knowledge that asbestos caused several diseases. Some of the reports and articles include:

(1)    Safety Management: Accident Cost and Control, a published article written in 1956 by Dr. R. Simonds and Dr. J. Grimaldi, which discusses the fact that asbestos produces asbestosis, the symptoms of asbestos, and how asbestos dust can be found in all stages of asbestos handling;

(2)    Asbestos-Dust Exposures at Various Levels and Mortality, a published article written in 1967 by Dr. P. Enterline and Dr. A. Kendrick discussing the first reports of asbestosis in the early 1900s, the first reports of mesothelioma were published in 1955, and the acceptance of a causal relationship between asbestos dust and asbestosis and mesothelioma;

(3)    Asbestos Exposure Smoking, and Neoplasia, a published article written in 1968 by Dr. I. Selikoff, Dr. E. C. Hammond, and Dr. Jacob Churg, discussing that asbestos workers have a high risk of dying of bronchogenic carcinoma.

(4)    Industrial Pneumoconiosis Prevention and Control, an published article written in 1969 by Edmund M. Fenner, director of environmental control at J-M, talks about how

- 17 -

scientists became concerned about the connection between the exposure to asbestos fibers and asbestosis in the 1920s. Furthermore, the article speaks of the Saranac Laboratory's discovery, through animal and human research in the 1930s, that asbestos exposure did "produce a unique and identifiable pulmonary fibrosis." Additionally, the article also talks about how Britain had become concerned about the link between asbestos dust exposure and lung cancer in the 1950s.

(5)    Asbestos And Health In 1969, a published article written in 1969 by George W. Wright, discusses the progression of knowledge about asbestos' relationship with different diseases. Wright begins by talking about the discovery of diseases associated with asbestos exposure in the early 1900s. Then, Wright mentions that in the 1930s, it was pointed out that asbestos poised a problem to the health of workers and that the health problem could be minimized by instituting protective measures to reduce the amount of asbestos airborne dust. Wright also speaks about the various tests conducted to determine the exact relationship between asbestos and diseases. Additionally, Wright indicates that an 80% incidence of asbestosis to workers exposed to asbestos 20 or more years was found, and also that the more asbestos dust concentration in the air the larger % of workers developing cancer. Furthermore, Wright explains that there is a strong relationship between the development of mesothelioma and the exposure to asbestos fibers.

(6)    The Health of Chrysotile Asbestos Mine and Mill Workers of Quebec, a published article written in 1972 by Dr. C. McDonald, Dr. M. Becklake, G. Gibbs, Dr. A. McDonald, and C. Rossiter, talks about how asbestos has been known to cause three identifiable diseases, including asbestosis, lung cancer, and mesothelioma. The article also discusses the fact the percent of people who develop lung cancer rises with the increase in asbestos dust exposure.

(7)    Recommended Safety Practices for Handling Asbestos Fiber, an article written by Johns-Manville indicating that asbestos should be handled in a way as to prevent asbestos dust and that approved asbestos respirators should be worn by when handling asbestos fibers.

(8)    Encyclopedia Of Occupational Health And Safety, written in 1971 by J.C. Gilson, talks about the health hazards, including several diseases, associated with the inhalation of asbestos fibers and asbestos dust. The Encyclopedia also speaks of the first incidence

of asbestosis discovered in 1899 in London and the fact that in the 1930s asbestos was seen as a major cause of health hazards in the asbestos textile industry in the U.S. and other countries.

41.

In addition, Westinghouse and/or its medical director and industrial hygienist became members of the Konicide Club from 1932 through 1940. The Konicide Club was created to understand and control the dust related diseases in the industry, and the members would meet to discuss the methods of accomplishing these goals. On January 22, 1939, The Konicide Club even conducted a meeting which focused on the health problems of the asbestos industry in particular.

42.

Also, Westinghouse's industrial hygienist, E.C. Barnes, wrote to Westinghouse's medical department in the 1940s regarding the high dust levels associated with asbestos cloth and the mixing of asbestos cement. Barnes further explained that the inhalation of asbestos dust could cause asbestosis, and he recommended that this hazard be minimized. Westinghouse was also aware of the dust problems associated with the use of the asbestos cloth on turbines. However, from 1946 through the late 1970s, Westinghouse failed to control or reduce the dust created from the asbestos cloth, cement, and other asbestos-components of its products at the various jobsites, and failed to warn with regard to these hazards.

43.

In 1953, Westinghouse produced its Asbestos Safe Practice Data Sheet, thus further evidencing Westinghouse's knowledge of the hazards associated with asbestos exposure. Also in 1953, Westinghouse acknowledged that it had a duty to warn contractors, who lacked the knowledge of potential hazards. However, Westinghouse still never warned the contractors nor the various jobsites of the hazards associated with exposure to asbestos.

44.

Westinghouse was also aware of the excessive dust produced from its Micarta product during the 1950s, as indicated in a letter from H.W. Speicher to James McClimans, a safety supervisor. In 1973, Westinghouse conducted dust studies at the Micarta facility and recorded high levels of airborne and settle asbestos-containing dust from the circular saw trimming of Micarta. Nevertheless, Westinghouse failed and refused to warn of health hazards of its asbestos-containing Micarta, and suppressed this information.

- 19 -

45.

Additionally, even when OSHA cited Westinghouse with willful, asbestos-related violations during 1970s at its Hampton Micarta plant and in the 1980s at the Lester turbine and blanket plant. Regarding these incidents, Westinghouse's attorneys maintained that Westinghouse would not comply with either the EPA or OSHA and would take an attitude of "respectful noncompliance".

46.

Westinghouse has engaged in a pattern of suppressing information with regard to its asbestos-containing products and the health hazards associated with same. Jeffrey J. Bair of Westinghouse states in what is known as "The Smoking Gun" documents that the Industrial Hygiene Department files, dating back to 1930, have been reviewed. After a general description of the categories of documents reviewed, Mr. Bair provides a discussion of the nature of these documents. The following are quotes from that discussion:

> The majority of the documents in Industrial Hygiene's files are potential "smoking gun" documents. This is so because of the nature, duties, obligations and responsibilities of the Industrial Hygiene Department. The approximately 57 years of Industrial Hygiene files which are in existence today are filled with technical information, procedural information, safe-handling information, hazard information, recommendations and tests results. The files are filled with documentation which critiques and criticizes, from an industrial hygiene perspective, Westinghouse manufacturing and non-manufacturing operations. This documentation often times points out deficiencies in Westinghouse operations and suggests recommendations to correct these deficiencies. Industrial Hygiene's files contain information which details the various chemical substances used at Westinghouse sites over the years, and often times the inadequacies in Westinghouse's use and handling of the substances. The files contain many years of employee test results, some of them unfavorable. Industrial Hygiene, by performing its job, creates, daily, potential smoking gun documents (emphasis added).

> Plant Correspondence and Files

> Please see, for example, Wilber Speicher's letter...correspondence of this type was and continues to be, frequently generated by Industrial Hygiene. Dr. Speicher's correspondence might show early knowledge of the Corporation to certain health hazards associated with epoxy resin dissolving agents. What use did the Corporation make of this knowledge to protect employees and the public? If none or very little, then this document might become a "smoking gun" (emphasis added).

> Industrial Hygiene audit and trip reports certainly qualify as potential smoking guns (emphasis added). Industrial Hygiene, in each plant audit, critiques and criticizes the facility from an industrial hygiene perspective. Industrial Hygiene also makes recommendations to improve the hygiene of the plant. The smoking gun possibilities of such documentation are readily apparent (emphasis added). Material Cards, Materials Safety Data Sheets, Purchasing [sic] Department Specification Cards, Safe Practice Data Sheets and Historical Safe Practice Data Sheet Files

> Again, the smoking gun possibilities of these documents are clear. If, for example, the safe practices detailed in safe practice data sheets are not made a part

- 20 -

of a site's industrial hygiene program and communicated to employees, the potential future problems are readily apparent.  In addition, <u>if the information is not or was not conveyed to customers, the public, etc., again the potential future problems are readily apparent</u> (emphasis added).

<u>Recommendations</u>

<u>Plant Correspondence Files</u> (excluding air sampling data and employee test results such as bio-assay, radiation, etc.)

These records are not required pursuant to any federal, state or local laws and/or regulations.  The Westinghouse domestic records retention guidelines do not specifically address these records.  We recommend that all such files generated prior to 1974 should be discarded.  As stated before, these records are filled with documentation dating back to the 1930's which critiques and criticizes Westinghouse operations, and points out deficiencies in such operations.  The files are filled with technical product and chemical information, hazard information and safe-handling information, <u>most of it generated by the industrial Hygiene Department in a "editorializing" and opinionated manner</u>.  The files are not used in the daily operation of the Department.  In our opinion, the risks of keeping these files on the whole substantially exceed the advantages of maintaining the records for the following reasons:

The substantial bulk of the correspondence was written by the Department in an editorializing, opinionated and verbose manner, instead of strictly factual.  In addition, the Industrial Hygiene Department, prior to 1974, was involved in testing and evaluating the safety of everything from water coolers to gloves.  From a review of the files, it appears that the Department commented and editorialized on just about everything which might have been found in the workplace.  This "self-analysis" and "editorializing" type of information can be dangerous.  This is just the type of documentation which should be discarded from the files.  Correspondence generated subsequent to 1974, generally speaking, does not suffer from these drawbacks.

"<u>Historical Files or Industrial Hygiene Department</u>"

These records are not required pursuant to any federal, state or local laws and/or regulations.  The Westinghouse domestic Records Retention Guidelines do not specifically address these records.  We recommend that, with the exception of the 1974 noise survey and the testing date which is contained in these files, these files be discarded.

<u>Bair's Conclusions</u>

<u>Toxic tort litigation, including toxic tort-related workmen's compensation litigation, show no signs of abating in the near future</u>.  In fact, legislation such as the risk notification legislation currently being considered by Congress, will, according to many "experts", result in an increase in such litigation.  Consequently, well reasoned and conceived document retention and destruction programs for departments such as Industrial Hygiene, and in fact the entire Corporation, are imperative.

Bair's conclusion clearly shows that Westinghouse fraudulently destroyed relevant

documents all in furtherance of its fraudulent activities whereby it misrepresented the dangers of

its asbestos-containing products in order to gain a commercial advantage, *i.e.* sell more of its

dangerous products.  More importantly, his conclusion shows that Westinghouse had motive for

destroying the documents, which was ***avoiding litigation*** and having to answer fraud allegations therein.

47.

It is well-settled that parties have a duty to preserve discoverable evidence, both during and prior to litigation, if it is reasonably foreseen that litigation will occur. Westinghouse knew litigation was likely to occur and destroyed their documents in anticipation therof. This activity amounts to fraud and spoliation. In fact, at least one court has already found that the activities set out in the Jeffrey Bair memo demonstrate a "plan to commit a fraud on the Courts of the United States."

48.

The document destruction program set out in Bair's memo was actually implemented by Westinghouse, as is evidenced by a memorandum entitled "Document Retention" that was written by Wayne C. Bickerstaff on January 29, 1988, directed to J.W. Fisch and copied to S.R. Pitts and Jeffrey Bair. On March 3, 1988, Jeffrey Bair wrote another memo, indicating that he had "informed Wayne to begin discarding [certain documents]." These acts of intentional destruction of records by Westinghouse in order to avoid public knowledge that it had knowledge of health hazards associated with its products constitute fraud under the laws of the state of Louisiana.

49.

Plaintiffs further allege that Viacom, Inc. (f/k/a CBS Corporation f/k/a Westinghouse Electric Corporation) has through its actions sought to fraudulently conceal and suppress the truth about the dangerous nature of its asbestos containing products that it manufactured, sold and distributed.

50.

Eagle, Inc., The McCarty Corporation (successor to McCarty Branton, Inc. and predecessor and successor to McCarty Insulation Sales, Inc.), Reilly-Benton Company, Inc. and Taylor-Seidenbach, Inc., manufactured asbestos-containing pipe covering, blankets, special fittings, gaskets, blocks, valves, cements, mastics, and jackets. They sold these products throughout the time that Mr. Granier was exposed to asbestos to the various sites at which Mr. Granier worked and was exposed. In addition, Eagle, Inc. and Taylor-Seidenbach, Inc. distributed asbestos-containing products manufactured, distributed, and sold by Borden, Inc. (formerly The Borden Company)--(adhesives), Bayer Cropscience, Inc. (Successor to Rhone

Poulenc AG Company, formerly Amchem Products, Inc., formerly Benjamin Foster Company); coatings, sealants, and mastics), H. K. Porter Company, Inc.--(cloth, felt, cord, tubing, rope, wicking, tape, yarn, and thread), Southern Textile Corp.--(pipe covering, cloth, felt, cord, tubing, rope, wicking, tape, yarn, and thread), Owens-Illinois, Inc.--(block, cloth, blankets, yarn, cement, and pipe covering), Armstrong World Industries, Inc.--(gaskets, pipe covering, paper, tile, cement, and felt), Fibreboard Corp.--(pipe covering, cloth, cement, felts, caulking compounds, board, gaskets, packings, blocks, taping and finishing compounds), Keene Corporation--(pipe insulation, cloth, cement, board, spray on insulation, blanket, and block), Pittsburg-Corning Corporation--(pipe covering and block), T & N, PLC (formerly Turner & Newall, PLC--(asbestos fiber), Owens-Corning Fiberglas Corporation--(block, cloth, blankets, yarn, cement, and pipe covering), Foster-Wheeler LLC--(block and boiler insulation), General Electric Company--(electric wire and cable, block and turbine insulation including, but not limited to sprayed asbestos insulation); Viacom Inc. (formerly CBS Corporation formerly Westinghouse Electric Corporation)--(block, boiler and turbine insulation as well as Micarta), Raymark Industries, Inc. (formerly Raybestos Manhattan, Inc.)--(felt, tape, gaskets, yarn, lagging, paper, packing, cloth, and thread), The Babcock & Wilcox Company--(block and boiler insulation), Eagle-Picher Industries, Inc.--(cement), Uniroyal, Inc.--(cloth, tape, yarn, and adhesives), La-Mo Refractory Supply Co. Inc. (all of the above-described silica and asbestos-containing products), Shook & Fletcher Insulation Company--(all of the above-described silica and asbestos-containing products) and .  During various periods of time from 1946 throughout the 1970s, Eagle, Inc., The McCarty Corporation, Reilly-Benton Company, Inc., and Taylor-Seidenbach, Inc. would package the above-described products from other distributors and manufacturers' products in their own boxes and packaging, and hold out the products as their own, thus making them liable as the manufacturer under Louisiana law.  In addition, Eagle, Inc., The McCarty Corporation, Reilly-Benton Company, Inc., and Taylor-Seidenbach, Inc. also did contracting work at locations at which Mr. Granier was working thereby exposing Mr. Granier during their handling of these products.

<center>51.</center>

The asbestos-containing products manufactured, distributed and/or sold by all "asbestos defendants" were unreasonably dangerous per se, were defective in design, and constituted a breach of warranty from said manufacturers. Further, defendants failed and refused to warn Mr. Granier of the danger of exposure to such products. They also failed to warn of the invisible

nature of the asbestos and that it could cause diseases such as mesothelioma, cancer, asbestosis, pleural diseases, and other ill health effects.

52.

As a result of the defective and unreasonably dangerous condition and composition of the asbestos-containing products manufactured, distributed, and/or sold by the "asbestos defendants," Mr. Granier inhaled asbestos fibers and other harmful substances emitted by the normal use of said products, proximately causing the mesothelioma, cancer, and other related ill health effects from which he suffers.  Plaintiffs further contend that said "asbestos defendants" are liable as a result of manufacturing, distributing, or selling an unreasonably dangerous per se product, a product defective in design, for breach of warranty, and for failing to provide adequate warnings and instructions.  Further, "asbestos defendants" are liable for failing to substitute available alternative products and for fraudulently concealing the dangers of their products and the health hazards associated with the use and exposure to said products.

53.

Prior to the time Mr. Granier was exposed to asbestos, all defendants were aware or should have been aware of the health hazards associated with exposure to asbestos, including but not limited to pleural plaques, fibrosis, asbestosis, cancer, and mesothelioma.  Further, all defendants were aware or should have been aware that invisible asbestos particles could remain airborne for many hours and that exposure could occur even after actual use of the products ceased; nevertheless, defendants remained silent as to the unreasonably dangerous nature of the products which suppression of the truth was made with the intention of obtaining an unjust advantage over unsuspecting victims.  Such conduct constitutes fraud under Louisiana law.

54.

All defendants made the misrepresentations cited in the foregoing paragraph despite their knowledge of the falsity, and defendants fraudulently concealed and suppressed the truth about the dangerous nature of the products with the intent to induce purchasers to buy the products and innocent users and employees to continue to be exposed to same without concern for their health.

55.

As a result of the misrepresentations of the defendants that asbestos-containing products were safe, nontoxic, fully tested, desirable, and suitable for use, and as a result of the defendants suppression of the truth about the health hazards associated with exposure to said products, Mr. Granier was exposed to products manufactured, distributed, and sold by "asbestos defendants,"

- 24 -

and he contracted mesothelioma, cancer, and other related ill health effects, which was first diagnosed on approximately March 29, 2006.

56.

The misrepresentations and suppression of the truth of occupational health hazards were made by all defendants with the intent of obtaining an unjust advantage over Mr. Granier, and other employees who remained uninformed and ignorant of the risks of contracting occupational lung diseases from their work environment. These misrepresentations and suppressions were calculated to produce the effect of misleading the employees so that they would not associate any lung disease with occupational exposures on the job. As a result of these misrepresentations and suppressions, all defendants sought to prevent or limit occupational disease claims by injured employees and claims from family members who also contracted disease. These actions constitute fraud under Louisiana law.

57.

The health hazards of asbestos have been recognized by those in the business for two thousand years. The Greek geographer Strabo and the Roman historian Pliny the Elder both recognized asbestosis in slaves whose task was to weave asbestos into cloth. There is conclusive evidence (more specifically outlined below) that by the end of 1930, it was widely known in the United States by those in the industry and their insurers that exposure to asbestos could cause asbestosis and cancer, that asbestosis was a fatal disease, and that the latency period of asbestosis and other asbestos-related disease was of many years duration subsequent to initial exposure, yet this knowledge was suppressed from workers like Mr. Granier.

58.

By the time Mr. Granier began working with and around asbestos products, virtually every state in the Unites States recognized asbestosis and silicosis as compensable claims under workers' compensation laws. In fact, the Louisiana legislature in 1952, when it enacted its first Workers' Compensation Occupational Disease Act, listed asbestosis and silicosis as a compensable occupational disease. Moreover, all suppliers (as well as independent contractors) to any company with government contracts were bound to comply with health and safety requirements of the Walsh Healey Public Contract Act first promulgated in 1936, as well as the regulations of the U.S. Navy and U.S. Maritime Commission in 1943. These mandatory regulations addressed asbestos hazards and asbestosis as a resultant disease of exposure to asbestos. They also required isolation of dusty work, ventilation, use of respirators, and medical

- 25 -

examinations by doctors.  Despite this, Mr. Granier was never warned of any hazard associated

with asbestos or silica, was never protected by use of adequate ventilation, was required to work

next to insulators using asbestos products and with and around silica, and was required to pick up

asbestos containing debris and silica.  He never saw a warning on any asbestos or silica product

nor was he warned by any contractor using asbestos or silica products.  Despite the fact that all

defendants were aware of the hazards of asbestos and silica and other toxic substances to which

Mr. Granier was exposed, they failed and refused to warn of these dangers and, furthermore,

concealed these hazards.  Moreover, defendants suppressed and prevented the dissemination of

information relating to the hazards of asbestos and silica exposure, thus constituting fraud under

Louisiana law.  Even after OSHA became the law in 1971, Mr. Granier was not warned of the

health hazards associated with exposure to asbestos and silica.

<div align="center">59.</div>

The acts of the defendants, as described above, constitute a fraudulent misrepresentation

and/or concealment which proximately caused the injuries to the Petitioners in the following

manner:

1)   The material published or caused to be published was false and incomplete and that the defendants knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-related products.

2)   The defendants intended the publication of false and misleading reports and/or the non-disclosure of documented reports of the health hazards of asbestos:
   a)   To maintain a favorable atmosphere for the continued sale and distribution and use of asbestos and asbestos-related products;
   b)   To assist in the continued pecuniary gain of the defendants through the sale of asbestos products to an ignorant public;
   c)   To influence in the defendant's favor, legislation to regulate asbestos exposures and unlimited medical and disability claims for compensation;
   d)   To provide a defense against lawsuits brought for injury resulting from asbestos disease;
   e)   To prevent relevant medical inquiry about asbestos disease;
   f)   To mislead the general public, and the Petitioner herein, about the hazards associated with asbestos products; and
   g)   To induce the Petitioner to use and continue to use asbestos products.

3)   The Petitioner reasonably relied upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-related products, and the absence of published medical and scientific reports on the hazards of asbestos and asbestos-related products because Petitioner believed it to be safe.

<div align="center">- 26 -</div>

4)    Defendants, intended the Petitioner to rely upon the published reports regarding the safety of asbestos and asbestos-related products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products, and therefore to continue their exposure to those products.

5)    Defendants are in a position of superior knowledge regarding the health hazards of asbestos and therefore the Petitioner and others deciding to use the said asbestos-containing products to which Petitioner was exposed, had a right to rely on the published reports commissioned by the defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products.

60.

Insurance premiums were set based on the risks posed by the insured.  Insurance companies discussed the hazards of asbestos with insured who manufactured, used, or distributed asbestos products.  Insurance field inspectors would survey the premises or operations of the insured, advise the insured of the hazard, and set the premium accordingly.  This was true prior to the time that Mr. Granier was first exposed to asbestos and continued throughout his employment. The fact that workers' compensation insurance carriers were concerned about asbestos is evidenced by the 1932 occupational disease report in "The National Underwriter" where asbestos was listed as a serious hazard receiving special attention "for some time" in insurance underwriting.  When the Supreme Court of North Carolina (*McNeely v. Carolina Asbestos Co.*, May 23, 1934) determined that asbestosis was compensable under its workers' compensation law, insurance executive F. R. Jones wrote that the McNeely case and others like it injected elements of uncertainty that rendered the hazards of asbestosis "often uninsurable at practicable rates."; he wrote that even though rates for those in the asbestos business were high, "their adequacy ... is generally doubted."  To avoid losing money, insurance companies instituted a practice of servicing claims as well as providing the insurance--"sort of a right pocket to left pocket...in other words there wasn't any way (insurance companies) could lose money on it."  (See deposition of Harry J. Flynn in Bradley v. Todd Shipyards, Inc., C.A. No. 85 - 05657, Div. "D", Civil District Court for the Parish of Orleans.)

61.

That all defendants and the companies that insured them knew of the health hazards associated with exposure to asbestos since the 1930s (and suppressed this information) is shown by numerous documents and testimony.  In fact, the knowledge was so well recognized in the asbestos industry that the insurance industry considered confessing liability; instead, they decided to make it "economically impossible" for plaintiffs to pursue their claims.  The minutes of

meetings in 1976 and 1977 of American Mutual Insurance Alliance (an insurance industry association) confirm that the hazards of asbestos exposure have been known for many years. These minutes specifically state that medical research in 1900 linked asbestos with asbestosis and by 1935 it was recognized that asbestos caused cancer. In a memorandum of a meeting of a discussion group dated April 21, 1977, it was stated: The meeting closed with a unanimous rejection of a suggestion that liability in asbestos cases be admitted and the carriers agreed between themselves as to their respective losses and expenses. That insurance companies and their insureds were working together to discourage plaintiffs from pursuing valid claims is also demonstrated in earlier memos. In minutes dated May 22, 1974, discussing *Borel v. Fibreboard Paper Products Corporation*, 493 F.2d 1076, (5th Cir. 1973), cert. denied, 419 U.S. 869 (1974), it is stated: "The appeals court decision in the Borel case of course sets a very bad precedence for our other pending asbestosis cases and (sic) this jurisdiction we will soon have to formulate a 'game plan' for the continued defense of these asbestosis cases **with the other defendants.**"  In a memo dated October 22, 1974, it was decided that the asbestos defendants and their insurance companies would resist pending cases "and attempt to make this economoically (sic) impossible for the plaintiffs to pursue the other cases." These attempts to prevent and stifle valid claims by plaintiffs such as Mr. Granier and plaintiffs herein show that the defendants, to this day, are committing fraud.

<div align="center">62.</div>

Documents and testimony of defendants herein as well as associated asbestos companies is replete with the fact of knowledge and fraud. Although Johns-Manville (hereinafter sometimes referred to as "J-M" and Raybestos-Manhattan, Inc. (hereinafter sometimes referred to as "R-M") are not defendants herein, a discussion of their knowledge is necessary to show knowledge within asbestos industry associations, within the insurance industry, and among other defendants. In 1929, Johns-Manville Corporation and Raybestos-Manhattan, Inc. agreed to permit the Metropolitan Life Insurance Company to conduct a complete Industrial Hygiene survey of some of their facilities, including J-M's asbestos mines and mills in the Province of Quebec. The initial investigation began in October of 1929 and was completed in January of 1931. The study included the following: a survey of the dust conditions in the asbestos mines, mills and fabricating plants; physical examinations of asbestos workers, including X-ray films; and a study of the dust exhaust systems designed to eliminate asbestos dust. This survey was supervised by Dr. Anthony J. Lanza, Assistant Medical Director of Metropolitan; Dr. William J. McConnell,

Assistant Medical Director of Metropolitan; and J. William Fehnel, a chemist with Metropolitan.
Subsequent to this initial study, meetings were held among Dr. Anthony J. Lanza, W. R. Seigle
(Vice President of J-M), Vandiver Brown (General Counsel for J-M), S. A. Williams (President of
Johns-Manville Products Corporation), and Sumner Simpson (President of Raybestos-Manhattan,
Inc.). The minutes of these meetings which occurred in November, 1933, through January, 1934,
reflect that Metropolitan Life was desirous of conducting a follow-up study of the J-M and R-M
facilities, as well as expanding the scope of the study to include additional J-M facilities and
facilities of other members of the asbestos industry. Dr. Lanza felt that the Metropolitan Life
Insurance Company should advise the companies of the types of respirators which should be
provided to the employees engaged in making a study of this problem. On December 7, 1934, Dr.
Lanza forwarded to Vandiver Brown, counsel for J-M, the "galley proof" of the results of the 1929
through 1931 survey of the R-M and J-M plants, entitled "Effects of Inhalation of Asbestos Dust
on the Lungs of Asbestos Workers." This "draft" was also circulated to representatives of
Raybestos-Manhattan, who prepared editorial comments and recommendations for Dr. Lanza
concerning the final publication of the report. Johns-Manville prepared similar comments. The
Metropolitan report informed Raybestos-Manhattan and Johns-Manville of the following: that
prolonged exposure to asbestos dust caused pulmonary fibrosis; that asbestosis could cause
cardiac enlargement; that it was possible for uncomplicated asbestosis to have fatal results; and
that the amount of dust in the air in the asbestos plants surveyed could be substantially reduced.
After incorporating some of J-M's and R-M's editorial suggestions, Dr. Lanza published "Effects
of the Inhalation of Asbestos Dust on the Lungs of Asbestos Workers" in the Public Health
Reports, Volume 50, No. 1, January 4, 1935.

<div align="center">63.</div>

In November 1936, Vandiver Brown of Johns-Manville, together with Sumner Simpson,
President of Raybestos-Manhattan, solicited other members of the Asbestos Products Industry to
participate in "asbestos dust experiments" by the Saranac Laboratory of the Trudeau Institute. Dr.
Leroy U. Gardner was the director of the Trudeau Foundation at the time. A report of these works
was prepared by Dr. Gardner on April 18, 1938. The report was sent to Vandiver Brown, who in
turn sent it to Dr. Lanza for his comments.

<div align="center">64.</div>

In 1942, Charles Roemer, a New Jersey attorney, was advised by his cousin, Dr. Jacob
Roemer, that in the course of reviewing chest x-rays of employees at the Union Asbestos and

Rubber Company's Paterson, New Jersey plant, he had observed a significant number with lung changes which he believed were due to asbestos exposure. Dr. Roemer advised that the men be informed of his findings and that they be instructed to secure outdoor employment which did not involve any exposure to asbestos dust. Dr. Roemer said that unless this was done immediately, the men would suffer and die from asbestos-related lung disease. Vandiver Brown acknowledged that J-M's physical examination program had produced similar findings of x-ray evidence of asbestos disease among workers, but told Mr. Roemer and the UNARCO representatives that it was foolish to be concerned. Mr. Brown explained that it was J-M's policy to let its employees die of asbestos poisoning rather than inform them of health consequences which would undoubtedly lead to costly lawsuits against the company. As testified to by Mr. Roemer, "I'll never forget, I turned to Mr. Brown... and I said, 'Mr. Brown, do you mean to tell me you would let them work until they dropped dead?' He said, "Yes. We save a lot of money that way.'" (Deposition Charles H. Roemer taken April 25, 1984, Johns-Manville Corp. et al. v. the United States of American, U.S. Claims Court Civ. No. 465-83C).

65.

As a result of the aforesaid Metropolitan Life study, additional health research on the effects of prolonged and excessive inhalation of asbestos fiber on human beings was undertaken at the Saranac Laboratory. A report on this research was delivered at the Seventh Saranac Lake Symposium in 1952 and was entitled "Pulmonary Function Studies in Men Exposed for Ten or More Years to Inhalation of Asbestos Fibers" by Fernand Gregorie and George W. Wright.

66.

In addition to the IHF, there were other trade associations which were formed to aid and service companies in the asbestos industry. Members of the Asbestos Textile Institute (ATI), founded on November 16, 1944, included companies which produced asbestos containing cloth and other products. Members included, among others, Garlock, Inc., which is a defendant in this action. At the June 13, 1946, meeting of the Asbestos Textile Institute, a question was posed as to whether or not a committee should be formed to deal with the question of dust control. Beginning on June 13, 1946, a subcommittee of the dust control committee of the Asbestos Textile Institute recommended that the committee contact the United States government, the state governments in which member plants were located, the Mellon Institute, and Metropolitan Life for the purpose of preparing a tentative program aimed at bringing to member companies the assistance of qualified technical and medical people. In 1946, the ATI was presented with a plan for a central medical

- 30 -

committee which would call for individual medical programs at all facilities using asbestos as
well as a central medical department which would be responsible to the association.
Recommendations for initial medical examinations and periodic follow-up examinations were
also made. The recommendation for periodic medical examinations was characterized by the
presenting doctor as "fundamental in an industry where there was a 'known occupational health
hazard'". While the ATI considered this proposal, it nonetheless elected to defer the plan. During
the late 1940's and early 1950's, the ATI was presented with a number of other plans for wide
ranging research on various issues dealing with asbestos-related disease in the asbestos industry.
However, in some instances, the research projects and proposals were discarded.

<center>67.</center>

Another trade organization was the National Insulation Manufacturers Association
("NIMA"), which formed in December of 1958 as a joint venture trade association to serve as a
voice for the mineral insulation industry. After 1958, personnel of Ruberoid/GAF (defendant
herein) attended most, if not all, NIMA meetings at which health hazards were frequently the
topic of formal discussions. NIMA members had unequivocal knowledge of the potential health
hazards posed by unprotected and prolonged exposure to excessive quantities of airborne asbestos
fiber. The testimony of Harry Kaufman, who came to Ruberoid in 1958 as Assistant Director of
Quality Control, admit knowledge of the potential health hazards to an unprotected worker from
exposure to asbestos fiber as far back as 1943 when he attended a five month course at the
University of Maryland on Industrial Safety. Charles Limerick, former manager of the Ruberoid
Vermont Mines, has admitted that he was aware of dangers of asbestos as far back as the 1930's
and 1940's. GAF/Ruberoid was put on notice of dangers in 1935 or 1936 through correspondence
with "Asbestos" magazine. Ruberoid subscribed and advertised in "Asbestos". Moreover,
Ruberoid was prodded by lawsuits brought by its employees alleging that they had developed
asbestosis as early as 1934.

<center>68.</center>

Sumner Simpson, the first Raybestos-Manhattan Incorporated President, maintained a file
or collection of documents, correspondence, and memoranda pertaining to the subjects of the
health effects of asbestos, dust control, and dust levels. These documents clearly evidence
knowledge, beginning in at least the 1930's, of dangers posed by exposure to asbestos and steps
which could and should be taken to minimize the risk of asbestos-caused diseases. The "Sumner
Simpson" documents, as a group, demonstrate the high level of awareness and early sophistication

<center>- 31 -</center>

of the asbestos industry of knowledge that excessive exposure to asbestos over a prolonged period

of time could and would produce asbestos-related diseases.  Numerous letters in the "Sumner

Simpson" document collection refer to the fact that many states were adding asbestos as a

compensable disease and that Raybestos-Manhattan Incorporated was going to have to deal with

that reality.

69.

Defendant, Owens-Illinois, Inc., (O-I) began the manufacture and sale of the asbestos

containing insulation product "Kaylo" in the 1940's.  Defendant's knowledge of the hazards posed

by the inhalation of asbestos fiber released from Kaylo can be documented as far back as the early

1940's.  Much of the evidence arises out of testing done of Kaylo at the Saranac Laboratory at

Saranac Lake New York.  The following is a brief description of some of the evidence pertaining

to O-I's knowledge of the health hazards posed by inhalation of asbestos dust released from its

Kaylo product.  On February 12, 1943, O-I's director of research, U. E. Bows, sent a letter to L. U.

Gardner of the Saranac Laboratory stating:  "(The health hazard) should be considered from the

standpoint of employees working in the plant where the material is made or where it may be

sawed to the desired dimensions and also considered from the standpoint of applicators or erectors

at the point of use."  On November 16, 1948, A. J. Vorwald of the Saranac Laboratory sent a letter

to U. E. Bows regarding the effects of inhalation of Kaylo dust in animal studies.  This letter

provides in pertinent part:

> In all animals sacrificed after more than 30 months of exposure to
> Kaylo dust unmistakable evidence of asbestosis has developed,
> showing that Kaylo on inhalation is capable of producing asbestos
> and must be regarded as a potentially hazardous material.

* * *

> I realize that our findings regarding Kaylo are less favorable than
> anticipated.  However, since Kaylo is capable of producing
> asbestosis, it is better to discover it now in animals rather then later
> in industrial workers.  Thus, the company, being forewarned, would
> be in a better position to institute adequate control measures for
> safeguarding exposed employees and protecting its own interest.

Along with the November 16 letter of Vorwald was an interim report to the Owens-Illinois

Glass Company regarding the ability of dust generated by Kaylo to cause lung disease.  Pertinent

portions of that report provide:

> Kaylo is capable, on prolonged inhalation of producing asbestosis in
> the lungs of guinea pigs and it should be handled industrially as a
> hazardous dust.

* * *

- 32 -

The animals were exposed to atmospheric suspensions of Kaylo dust for 8 hours daily, 5 and ½ days a week throughout the experiment. The dust concentration which varied somewhat from time to time has averaged 116 particles per cubic foot of air over the entire course of the experiment to date.

* * *

All nine animals sacrificed subsequent to 30 months in the present experiment...have developed true fibrosis of a type characteristic of the response of guinea pigs to asbestos.

While the lesions up to 30 months showed no fibrosis, certain aspects of them were compatible with a preliminary stage in the development of asbestosis. These aspects were masked by the inert type of reaction to the materials other than asbestos in the dust.

* * *

Kaylo, because of its content of an appreciable amount of fibrous chrysotile, is capable of producing asbestosis and should be handled as a hazardous industrial dust.

The Saranac Laboratory report clearly informed O-I that the asbestos content in the air in certain parts of its plant were potentially hazardous to human health. The report further recommended that respirators be used by workers loading Kaylo material into box cars. In the same report O-I was also warned against reliance on compliance with government and industry standards in order to completely protect against the possibility of occupational disease. On February 7, 1952, Vorwald sent a letter to W. G. Hazard enclosing the final report on "The Capacity of Inhaled Kaylo Dust to Injure the Lung." A copy of the report was sent to O-I corporate medical director, Shook. The report states in pertinent part:

> Kaylo dust is capable of producing peribronchiolar fibrosis typical of asbestosis. The dust also has a slightly unfavorable influence upon a tuberculosis infection. Although extrapolation from animal to human experience is difficult, nevertheless, the results of the study indicate that every precaution should be taken to protect workers against inhaling the dust.

Despite the information made know to O-I concerning the ability of dust generated form its Kaylo product to cause asbestosis and other ailments, O-I actually drafted a pamphlet stating that Kaylo could be used without the danger of developing asbestosis. See December 12, 1950, letter from Willis G. Hazard to A. G. Vorwald; December 9, 1952, correspondence from C. W. Howard to George White. O-I continued to promote Kaylo as safe and "non-toxic". See advertisement in Petroleum Engineer C-55 to C-62 April, 1952, Hydros Calcium Silicate Heat Insulation.

- 33 -

70.

Other evidence of knowledge include the fact that in May 1952, Willis Hazard of O-I attended the Seventh Saranac Symposium where considerable discussion of asbestosis and cancer took place.

On October 5, 1955, Hazard of O-I concerning a report of Saranac Lake contained in <u>Arch. Indust. Health</u>, 12:348-360, (1955) entitled "Effect of Inhaled Commercial Hydrous Calcium Silicate Dust on Animal Tissues." The report was published by Dr. Scheepers of the Saranac Laboratory and contained some of the Saranac Laboratory's findings pertaining to Kaylo. The report was not shown to O-I officials prior to publication. In his October 5, 1955, Hazard stated:

> We had felt (publication of the research) would be the
> proper procedure for the long run, even though the experiments did
> not show Kaylo to be lily-white. They showed to be specific, the
> Kaylo dust could cause asbestosis, an incurable lung condition; and
> they showed the dust could reactivate tuberculosis....

* * *

The name "Kaylo" and O-I appear no where in the article. Its completely anonymous.

The above aptly demonstrates that O-I possessed the requisite knowledge of the hazards posed by inhalation of asbestos fiber as far back as the 1940's. Despite that knowledge, defendant chose not to warn the plaintiff or others similarly situated of the hazards posed to their health by working with or near defendant's products. Further, defendant's suppression of known health hazards associated with exposure to their products constitute fraud under Louisiana law. Moreover, O-I sold its design and trademark for Kaylo to Owens-Corning Fiberglas Corporation knowing that it was a defective product capable of causing disease and death. O-I is liable for the defective Kaylo product which continued to be sold throughout the 1970s. O-I is liable to plaintiffs both for designing a defective product as well as for plaintiff, Byron Granier, being exposed to this product as manufactured by O-I and later by Owens-Corning Fiberglas Corp. O-I is liable for designing a defective product and for selling the design of this defective product to Owens Corning Fiberglass Corporation. OI is also liable for fraud as its suppressed knowledge of the defectiveness in its product. In addition, O-I breached its continuing duty to warn under Louisiana law. Additionally, O-I suppressed its knowledge of the health effects associated with Kaylo and, thus, committed fraud under Louisiana law.

71.

Defendants, Eagle, Inc. and Taylor-Seidenbach, Inc., did contracting work as early as the 1940s. Likewise, The McCarty Corporation (formerly McCarty Branton, Inc.), and Reilly-Benton

Company, Inc., have done contracting work since their initial existence.   Accordingly, Eagle, Inc., The McCarty Corporation (formerly McCarty Branton, Inc.), Reilly-Benton Company, Inc., and Taylor-Seidenbach were aware of the health and safety requirements of the Walsh Healey Public Contract Act, first promulgated in 1936, as well as the regulations of the U.S. Navy and U.S. Maritime Commission in 1943 (discussed *infra*).   These mandatory regulations addressed asbestos hazards and asbestosis as a resultant disease of exposure to asbestos.   Moreover, these defendants, being asbestos insulation contractors, had to pay higher insurance premiums as a consequence thereof.   Mr. Granier was exposed to asbestos both through their contracting work and through products manufactured, distributed, and sold by them.   Yet at no time was Mr. Granier protected from these hazards nor warned of these hazards.   Even after OSHA became the law in 1971, Mr. Granier was not advised of the hazards associated with exposure to asbestos.   These defendants were aware of the hazards of asbestos but failed and refused to warn Mr. Granier of the dangers and, furthermore, concealed and suppressed its knowledge of these hazards, thus constituting fraud under Louisiana law.   See deposition of Fred J. Schuber, Jr., 05/31/90, pages 149-155, 176-179 and exhibits attached to the deposition of Schuber taken 5/09/90; and deposition of Thomas R. Dimm, 02/03/86, pages 65-66; and Eagle, Inc.'s response #4 to plaintiffs' interrogatories in the case of <u>Atzenhoffer, et al v. National Gypsum, Co., et al</u>, C. A. #89-894, which responses are dated March 27, 1990; and Act No. 532  (1952) amendments to the Louisiana Workers' Compensation Act.

<div align="center">72.</div>

Since the early 1940s, defendant, Foster-Wheeler LLC (formerly Foster-Wheeler Corporation),  was a major manufacturer of boilers used in the construction of both commercial and U.S. Navy vessels.   Since that time through and including the time when Mr. Granier was last exposed, they supplied boilers to virtually every shipyard constructing and repairing vessels in the country.   Accordingly, since the early 1940s, they were aware of the health and safety requirements of the Walsh Healey Public Contract Act, first promulgated in 1936, as well as the regulations of the U.S. Navy and U.S. Maritime Commission in 1943 (discussed <u>infra</u>).   These mandatory regulations addressed asbestos hazards and asbestosis as a resultant disease of exposure to asbestos.   Despite this knowledge, at no time was Mr. Granier advised of these hazards as defendants failed and refused to warn Mr. Granier of the dangers and, furthermore, concealed and suppressed their knowledge of these hazards, thus constituting fraud under Louisiana law.   In addition to manufacturing and selling boilers, (and providing the asbestos

<div align="center">- 35 -</div>

insulation products for insulation of their boilers and the piping connecting their boilers), they constructed their boilers on-site and provided an on-site representative during the construction of their boilers, thus exposing Mr. Granier to asbestos during their operations.

73.

All defendants made the misrepresentations cited in the foregoing paragraphs despite their knowledge of the falsity, and defendants fraudulently concealed and suppressed the truth about the dangerous nature of the products with the intent to induce purchasers to buy the products and innocent users and employees to continue to be exposed to same without concern for their health.

74.

As a result of the misrepresentations of the defendants that silica and asbestos-containing products were safe, nontoxic, fully tested, desirable, and suitable for use, and as a result of the defendants suppression of the truth about the health hazards associated with exposure to said products, Mr. Granier was exposed to products manufactured, distributed, and sold by "asbestos defendants," and he contracted mesothelioma, cancer, and other related ill health effects.

75.

The misrepresentations and suppression of the truth of occupational health hazards were made by all defendants with the intent of obtaining an unjust advantage over Mr. Granier and other employees who remained uninformed and ignorant of the risks of contracting occupational lung diseases from their work environment.  These misrepresentations and suppressions were calculated to produce the effect of misleading the employees so that they would not associate any lung disease with occupational exposures on the job.  As a result of these misrepresentations and suppressions, all defendants sought to prevent or limit occupational disease claims by injured employees and claims from family members who also contracted disease.  These actions constitute fraud under Louisiana law.

76.

All defendants made the misrepresentations cited in the foregoing paragraph despite their knowledge of the falsity, and defendants fraudulently concealed and suppressed the truth about the dangerous nature of the products with the intent to induce purchasers to buy the products and innocent users and employees to continue to be exposed to same without concern for their health.

77.

As a result of the misrepresentations of the defendants that asbestos-containing products were safe, nontoxic, fully tested, desirable, and suitable for use, and as a result of the defendants

- 36 -

suppression of the truth about the health hazards associated with exposure to said products, Mr. Granier was exposed to products manufactured, distributed, and sold by "asbestos defendants," and he contracted mesothelioma, cancer, and other related ill health effects.

78.

The misrepresentations and suppression of the truth of occupational health hazards were made by all defendants with the intent of obtaining an unjust advantage over Mr. Granier, and other employees who remained uninformed and ignorant of the risks of contracting occupational lung diseases from their work environment.  These misrepresentations and suppressions were calculated to produce the effect of misleading the employees so that they would not associate any lung disease with occupational exposures on the job.  As a result of these misrepresentations and suppressions, all defendants sought to prevent or limit occupational disease claims by injured employees and claims from family members who also contracted disease.  These actions constitute fraud under Louisiana law.

79.

As a result of the aforementioned acts of negligence, intentional tort, fraud, and strict liability of all of the hereinabove named defendants, Mr. Granier contracted mesothelioma, cancer, and other related ill health effects.

80.

All of the hereinabove named defendants are jointly, severally, and *in solido* liable to petitioners for the damages sustained as a result of Mr. Granier's contraction of mesothelioma, cancer, and other related ill health effects.  Petitioner, Byron Granier is entitled to damages for the following:  past, present, and future physical pain and suffering; past, present, and future mental pain and suffering; physical disability; fear of death and complications; loss of enjoyment of life and lifestyle; reduction in life expectancy; past, present, and future loss of income and loss of earning capacity; past, present, and future medical expenses; loss of personal services, costs of care and assistance, costs of custodial care; humiliation, frustration and inconvenience caused by the defendants; increased costs of insurance and other expenses incurred as a result of his disease; and all other damages arising out of this action which may be shown at the trial of this matter. Petitioner, Josie Legendre Granier, is entitled to damages for loss of support; costs of services and assistance provided to her husband; loss of enjoyment of life and lifestyle; and the mental pain and anguish which she has endured from watching her husband suffer.

81.

A trial by jury is demanded on all issues.

**WHEREFORE**, petitioners, Byron Granier and Josie Legendre Granier, pray that the defendants named herein be duly cited to appear and answer, and that after all due proceedings are had, that there be judgment rendered herein in favor of petitioners and against defendants for all damages suffered by petitioners together with legal interest and all costs associated with the prosecution of this claim.  Petitioners further pray for all general and equitable relief.

Respectfully submitted,

**ROUSSEL & ROUSSEL**

GEROLYN P. ROUSSEL - 1134
PERRY J. ROUSSEL, JR. - 20351
ANGELIQUE R. DUHON – 28561
1710 Cannes Drive
LaPlace, LA  70068
Telephone:  (985) 651-6591
Facsimile: (985) 651-6592
ATTORNEYS FOR PETITIONERS
BYRON GRANIER
and JOSIE LEGENDRE GRANIER

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

FEB 13  3 01 PM '96

LORETTA G. WHYTE
CLERK

UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ERNEST BARTLEY, et al

versus

BORDEN, INC., et al

CIVIL ACTION

NO.   96-145
c/w  96-157
through 96-205

SECTION: E/5

## O R D E R

Considering the record, the motion to remand, all memoranda submitted by the parties, and for the reasons this date assigned,

IT IS ORDERED that these consolidated Civil Actions be REMANDED to the Civil District Court for the Parish of Orleans, State of Louisiana.

New Orleans, Louisiana, February 13, 1996.

MARCEL LIVAUDAIS, JR.
United States District Judge

FEB 14 1996

DATE OF ENTRY

___ FEE _____
___ PROCESS _____
_x_ CHARGE _____
___ INDEX _____
___ ORDER _____
___ HEARING _____
DOCUMENT No. _____

**EXHIBIT**

tabbies

**2**

UNITED STATES   DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ERNEST BARTLEY, et al

versus

BORDEN, INC., et al

FILED
U.S. DISTRICT CO.
EASTERN

FEB 13   3 00 PM '96

LORETTA G. WHYTE
CLERK

CIVIL ACTION

NO.   96-145
c/w   96-157
through 96-205

SECTION: E/5

## RULING ON MOTION TO REMAND

Plaintiffs[1] in the above actions, which have been consolidated, filed petitions in Civil District Court for the Parish of Orleans, seeking to recover for asbestos-related diseases they allegedly developed while exposed during their employment at Avondale Shipyards.  Approximately 3000 individual plaintiffs initially filed suit in 1991 and these actions have been grouped into flights for trial.  Fifty of these plaintiffs have been selected for trial and an amending petition was filed on December 20, 1995 on behalf of these 50 plaintiffs.  Defendants Travelers Insurance Company, Highlands Insurance Company, American Motorists Insurance Company, Commercial Union Insurance Company, Certain Underwriters at Lloyd's London, Steve Kennedy, Albert Bossier, Peter Territo, and John Chantrey, hereinafter referred to

_____

[1]The individual plaintiffs whose suits were removed and whose civil actions are numbered 96-145, 96-157 through 96-205, are Ernest Bartley, Jr., Nicholas Bieber, Aristide Becnel, Jr., Kernan Brown, Rosemary Cannon and Zelma C. Ellsworth, as spouse, heirs and survivors of the deceased, John Cannon, Jr., James V. Carroll, Amos K. Collins, Anthony Contavaspire, Floyd Costley, Delmo Crow, Mary Decota, Glenn Howard Decota, Delores Threeton and William Decota, as spouse, heirs and survivors of the deceased, Willie Decota, Joseph Dicket, Houston B. Dominique, Garland A. Dufrene, Marion Dufrene, Ronald Dumas, Nolan Dyer, Stanley Eusea, Perry J. Gautier, Oscar B. Goff, Sr., Joseph Granier, Oscar J. Granier, John P. Guillot, Jack Joseph Habert, Melvin Habert, Joseph E. Higdon, Ralph J. Hymel, Irvin Jackson, Edgar Johnson, Sr., Oliver J. Kraemer, Charles T. Kuhn, James S. Landeche, Jr., Melvin J. Lassere, Robert J. Letulle, Sr., Anne Powers, Toni Ann Moragas and Patricia Grishaw, as spouse, heirs and survivors of the deceased, John J. Livaccari, Lester A. Mahler, Tex J. Martinez, Alfred Maten, Jr., Wallace Earl McGill, Horace J. Porche, Charles "Jessie" Rodrigue, Leroy Joseph Rome, Ozie J. Rome, Royan Jeffery, Doris St. Juniors, Audrey Schlaudecker, Darlene A. Schlaudecker, Cora I. Schlaudecker, Donna L. Schlaudecker, Kay A. Schlaudecker, and Randy T. Schlaudecker, as spouse, heirs and survivors of the deceased, Roy L. Schlaudecker, Monroe Schlaudecker, Kenneth J. Stiefel and Claude Walls.

FEB 14 1996

DATE OF ENTRY

INDEX
ORDER
HEARING
DOCUMENT No.

collectively as "Avondale interests", filed a notice of removal and removed these actions to this court.  Plaintiffs now seek remand. Also joining in the motion to remand is defendant Owens-Corning Fiberglas Corporation ("Owens-Corning").

The first issue to be addressed is whether the court has jurisdiction to consider the motions to remand, filed respectively by the plaintiffs on January 24, 1996 and by defendant Owens-Corning on January 26, 1996.  On February 2, 1996, the Judicial Panel on Multidistrict Litigation issued a conditional transfer order in Re Asbestos Products Liability Litigation, Docket No. 875, transferring these actions to the Eastern District of Pennsylvania because they involve questions of fact which are common to the actions previously transferred.  Approximately 56,000 civil actions have thus far been transferred to the Eastern District of Pennsylvania.  The conditional transfer order states that the order does not become effective until filed with the Clerk of the Eastern District of Pennsylvania, and that the transmittal of the order shall be stayed fifteen days from its entry, with the stay being continued if a party files an opposition to the transfer within the fifteen day period until further order of the MDL Panel.

Rule 18 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation provides that:

> The pendency of a motion, order to show cause, conditional transfer order or conditional remand order before the Panel concerning transfer of an action pursuant to 28 U.S.C. § 1407 does not affect or suspend orders and pretrial proceedings in the district court in which the action is pending and does not in any way limit the pretrial jurisdiction of

2

> that court.  A transfer or remand pursuant to
> 28 U.S.C. § 1407 shall be effective when the
> transfer or remand order is filed in the
> office of the clerk of the district court of
> the transferee court.

Thus, this Court has jurisdiction of these actions to consider the motions to remand during the fifteen day period.

The notice of removal recites that the basis of federal removal jurisdiction is that the injured workers were all covered by the federal Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 901, et seq., and that "[t]he pervasive and all-encompassing nature of the LHWCA, when viewed in relation to the instant dispute, gives rise to the doctrine of federal pre-emption and accordingly vests this Court with federal question jurisdiction under 28 U.S.C. § 1331." Diversity of citizenship is not available as a basis of subject matter jurisdiction.

The plaintiffs' petitions do not state a claim for relief under the LHWCA.  They seek damages in tort under Louisiana law from various manufacturers of asbestos-containing products, from co-employees who were safety personnel or supervisors at Avondale, and from their insurers.  The Louisiana Workers Compensation Act allows ordinary tort claims against co-employees for negligent acts committed before October 1, 1976.  The LHWCA immunizes co-employees from tort claims.

Plaintiffs' and manufacturer Owens-Corning seek remand primarily because there is no federal question jurisdiction.[2]

---

[2]Non-removing defendant Owens-Corning Fiberglas Corp. also seeks remand because it did not join in the notice of removal  and because removal was untimely.  The Court's discussion of removal jurisdiction in this action pretermits further consideration of these issues.

3

Since the petitions do not state a claim for relief under any federal laws, the only possible basis for federal question jurisdiction is Avondale's assertion of a defense available to it under the LHWCA.   A federal defense generally does not provide a basis for removal of an action under the "well-pleaded complaint" rule, which is summarized in <u>Aaron v. National Union Fire Ins. Co. of Pittsburgh</u>, 876 F.2d 1157 (5th Cir. 1989), as follows:

> A defendant may remove a state court action to federal court only if the action could have originally been filed in the federal court. <u>Caterpillar v. Williams</u>, 482 U.S. 386, 391-92, 107 S.Ct. 2425, 2429 (1987); 28 U.S.C. § 1441(a).   Thus, where there is no diversity jurisdiction, a federal question must be present in order for removal to be proper. <u>Caterpillar</u>, 107 S.Ct. at 2429.   The well-pleaded complaint rule places even further restrictions on a defendant's ability to remove a case from state court.   The rule provides that the plaintiff's properly pleaded complaint governs the jurisdictional determination, and if, on its face, such a complaint contains no issue of federal law, then there is no federal question jurisdiction.   <u>Id.</u>; <u>Franchise Tax Board v. Laborers Vacation Trust</u>, 463 U.S. 1, 10, 103 S.Ct. 2841, 2846 (1983).   The fact that a federal defense may be raised to the plaintiff's action--even if both sides concede that the only real question at issue is created by a federal defense--will not suffice to create federal question jurisdiction.   <u>Id.</u> at 12, 103 S.Ct. at 2847; <u>Power v. South Central United Food & Commercial Workers Unions</u>, 719 F.2d 760, 764 (5th Cir. 1983). Thus, the general rule provides that a federal defense to a state law claim does not create removal jurisdiction.

There are exceptions to the well-pleaded complaint rule and the one at issue here is the complete preemption doctrine.   First enunciated in <u>Avco Corp. v. Aero Lodge No. 735</u>, 290 U.S. 557, 88 S.

Ct. 1235 (1968), this doctrine provides that if federal law so completely preempts state law, the plaintiff's complaint is recharacterized as stating a federal cause of action. In Avco, the Supreme Court examined the jurisdictional statement in the Labor Management Relations Act ("LMRA") and determined that an action under § 301 of the LMRA for violation of a collective bargaining agreement is controlled by federal substantive law even if filed in state court. 390 U.S. at 560, 88 S.Ct. at 1237.

The question whether this doctrine of complete federal pre-emption applies to other federal statutes was addressed in Metropolitan Life Ins. Co. v. Taylor, 418 U.S. 58, 107 S.Ct. 1542 (1987). The Taylor Court indicated reluctance to afford other federal statutes with the "extraordinary pre-emptive power" found in § 301 of the LMRA, but compared the federal law at issue before it, the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq, with the LMRA. In reaching the conclusion that the complaint, which purported to only raise state law claims, was necessarily federal, the Taylor Court specifically noted that ERISA's civil enforcement provisions closely paralleled that of the LMRA, that the legislative history of the Act indicated Congressional intent to consider all ERISA actions, whether brought in state or federal courts, as arising under federal law, specifically comparing it to the LMRA, and that the civil enforcement scheme created a federal cause of action, similar to that of the LMRA. 481 U.S. 65-66, 107 S.Ct. at 1547-1548. Thus, under Taylor, all complaints seeking redress for violation of

5

employee welfare benefit plans state federal causes of action and are pre-empted by ERISA.[3]

In a concurrence, Justice Brennan warned that the <u>Taylor</u> holding is narrow, and specifically does not adopt a broad rule that "*any* defense premised on congressional intent to pre-empt state law is sufficient to establish removal jurisdiction", but that removal jurisdiction is present only when "Congress has *clearly* manifested an intent to make causes of action . . . *removable to federal court*." He suggested that in the absence of such a **clear** intent in other statutes, the wise course is remand. 481 U.S. 67-68, 107 S.Ct. at 1548.

The Fifth Circuit addressed precisely the question before this Court in <u>Aaron v. National Union Fire Ins. Co. of Pittsburg</u>, 876 F.2d 1157 (5th Cir. 1989). The <u>Aaron</u> court considered whether the LHWCA falls under the <u>Avco</u> exception to the well-pleaded complaint rule such that federal law completely pre-empts all claims filed by workers covered under the LHWCA for employment-related injuries. Aaron's survivors filed a wrongful death action in Louisiana state court against the manufacturer of equipment which fatally injured him, the stevedoring company which employed Aaron, and the harbor and terminal where he was employed for intentional and negligent

---

[3]The Avondale interests contend that the <u>Aaron</u> case improperly failed to follow <u>Taylor</u>, but <u>Taylor</u> plainly analyzes the ERISA statute, comparing it to LMRA, using the three factors recognized by <u>Aaron</u> as indications of manifest congressional intent to pre-empt. See, <u>Taylor</u>, 481 U.S. at 64-66, 107 S.Ct. at 1547 ("In the absence of explicit direction from Congress, this question would be a close one. . . . Even with a provision . . . that lies at the heart of a statute with the unique pre-emptive force of ERISA . . . , however, we would be reluctant to find that extraordinary pre-emptive power, such as has been found with respect to § 301 of the LMRA, that converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule. But the language of the jurisdictional subsection of ERISA's civil enforcement provisions closely parallels that of § 301 of the LMRA . . . . The presumption that similar language in two labor law statutes has a similar meaning is fully confirmed by the legislative history of ERISA's civil enforcement provisions.")

6

actions they allege were the cause of his death occurring at work after being struck by a front-end loader.   Aaron, as are the plaintiffs in these consolidated actions, was covered by the LHWCA, but the Aaron plaintiffs (as do the present plaintiffs) alleged that he had a right to elect a remedy in an area of concurrent state and federal jurisdiction.   The removing defendants there (and here) argued that the LHWCA was the plaintiffs' exclusive remedy, and the district court agreed, denying remand.

The Fifth Circuit carefully studied the question whether the LHWCA was a federal statute to which the Avco complete pre-emption applied.   The Aaron court examined the three factors relied upon by the Supreme Court in Taylor in reaching the decision that ERISA completely pre-empted all state law claims and afforded the right of removal.   Those factors are:

>    1.    The statute must contain a civil enforcement provision that creates a federal cause of action;
>
>    2.    The statute must contain a specific jurisdictional grant; and
>
>    3.    The legislative history of the statute must indicate clear congressional intent to make the cause of action removable.

Applying these factors to the LHWCA, the Aaron court concluded that it did not completely pre-empt state law and does not provide removability when asserted as a defense.   The decision observed that the LHWCA has no civil enforcement provision similar to § 301 of the LMRA, as it does not create a cause of action in either federal or state court, it contains no specific jurisdictional grant as is found in LMRA and ERISA, and the legislative history

7

contains no clear indication of congressional intent to create removal jurisdiction. Thus, in accordance with its previous precedent in <u>Lowe v. Ingalls Shipbuilding</u>, 723 F.2d 1173, 1183 (5th Cir. 1984), which held that an LHWCA defense could not form the basis of federal subject matter jurisdiction for removal, <u>Aaron</u> applied the well-pleaded complaint rule, found removal improper, and remanded the action. <u>Aaron</u> has never been overruled.

The Avondale interests acknowledge that the LHWCA does not meet the three factor <u>Aaron</u> test and that it has never been expressly overruled, but argues instead that <u>Aaron</u> was improperly decided and that it has been "abandoned" in favor of a single factor "manifest Congressional intent to pre-empt" test in the Fifth Circuit and that decisions from the United States Supreme Court have effectively eradicated it. After a careful and detailed consideration of the arguments espoused by the Avondale interests, the Court concludes that they are flawed and that <u>Aaron</u> is still binding precedent which compels the conclusion that the well-pleaded complaint rule applies, the LHWCA does not provide removability as "complete pre-emption" of state law, and that the actions must be remanded.

Several cases are cited by the Avondale interests as illustrative of the fact that the <u>Aaron</u> three factor test has been abandoned. None of the cases cited concern the LHWCA. Further, the short-hand used by the various courts in examining whether a federal statute affords "complete pre-emption" of state law such that the claim is removable despite a well-pleaded complaint which

8

alleges only state law causes of action may well be "manifest Congressional intent to pre-empt state law." This does not lead to the conclusion asserted by the Avondale interests that the three factors discussed in Taylor and Aaron are no longer valid considerations to determine whether there is a clearly manifested congressional intent to create such complete pre-emption. It can hardly be disputed that the inclusion of a civil enforcement provision creating a federal cause of action, a specific jurisdictional grant, and legislative history indicating unambiguous congressional intent to make the action removable reflect this phrase intoned by the removing defendants, i.e., "manifest Congressional intent to pre-empt." Unfortunately for the removing defendants, the LHWCA does not fit in the box they are trying to place it in, as determined by Aaron over six years ago. Recent decisions do not shy away from this result. See, e.g., Masters v. Swiftships Freeport, Inc., 867 F. Supp. 555, 557 (S.D. Tex. 1994).

Accordingly, for the above and foregoing reasons,

IT IS ORDERED that the motions of plaintiffs and defendant Owens-Corning Fiberglas Corp. to remand be and are hereby GRANTED.

New Orleans, Louisiana, February 13, 1996.

MARCEL LIVAUDAIS, JR.
United States District Judge

9

1997 WL 3255
**(Cite as: 1997 WL 3255 (E.D.La.))**

**C**

Only the Westlaw citation is currently available.

United States District Court, E.D. Louisiana.

Dorothy Reed GAUTHE, et al.,
v.
ASBESTOS CORP., et al.

**No. Civ. A. 96-2454.**

Jan. 2, 1997.

*ORDER AND REASONS*

DUVAL, District Judge.

**\*1** A Motion to Remand and a Motion for Sanctions pursuant to 28 U.S.C. § 1447(c) were brought by plaintiffs, Dorothy Reed Gauthe, Paul Gauthe, Helen Cantrelle, Marion Fleming and Anne Richwine ("plaintiffs") and came for argument before the Court. Having listened to argument of counsel and having reviewed the pleadings, memoranda, deposition testimony, affidavits and the relevant law, the Court finds that this matter must be remanded to the 24th Judicial District Court for the Parish of Jefferson, State of Louisiana for the reasons that follow.

Background

The surviving spouse and major children of Earlven Gauthe filed the instant petition for damages in the 24th Judicial District Court for the Parish of Jefferson on July 2, 1996. The gravamen of this survival action centers on damages flowing from Mr. Gauthe's death which allegedly was caused by his exposure to asbestos. Plaintiffs contend that this exposure occurred while he was employed at Avondale Industries, Inc. Included as defendants are the Avondale Insurers [FN1], Avondale Industries, Inc., and the Avondale Supervisors [FN2] (collectively, the "Avondale Interests"). [FN3] As to the Avondale Interests, suit is limited to (1) a failure to apprise Mr. Gauthe of the fact that he was working with and/or around hazardous asbestos containing dust, (2) failure to warn him of the dangers/hazards of asbestos dust and (3) failure to provide him a safe place to work by

not warning him of the fact that he was working with asbestos and that asbestos dust was dangerous. Thus, no "design defect" allegations are made with respect to the Avondale Interests, and the failure to provide a safe work environment is limited specifically to the failure to warn. [FN4]

FN1. The Avondale Insurers are Travelers Insurance Company, Highlands Insurance Company, American Motorists Insurance Company and Commercial Union Insurance Company.

FN2. The Avondale Supervisors are John Chantrey, Peter Territo and J.D. Roberts. Each of these men is accused of being responsible for damages sustained by Earlven Gauthe and his surviving family arising from Mr. Gauthe's employment by Avondale Shipyards, Inc. (n/k/a/ Avondale Industries, Inc.).

FN3. It is interesting to note that Mr. Gauthe's tort suit was heard in state court and resulted in an award there.

FN4. This fact was raised during oral argument and later verified by plaintiffs' counsel.

The Avondale Interests removed this matter 21 days later pursuant to 28 U.S.C. § 1442(a)(1), the Federal Officer Removal Statute. They claim that this action involves persons--namely the Avondale Supervisors and Avondale itself-- acting under the authority of an officer of the United States because of the alleged supervision of the United States government with respect to the actual construction of naval ships at the Avondale facility. Thus, they claim removal is proper under § 1442(a)(1) because:
(a) they can raise, as federal defenses, immunity under the "government contractor immunity" defense and under the LHWCA, and (b) because they can demonstrate a causal nexus between the injuries claimed by Gauthe's successors and the acts

**EXHIBIT**

**3**

they performed under the strict supervision of and compliance with the United States government. *Boyle v. United States Technologies, Inc.*, 487 U.S. 500, 108 S. Ct. 2510, (1988)....
(Doc. 1, Notice of Removal, ¶ 14).

## Is Removal Proper?

The burden of proof for establishing federal jurisdiction is placed upon the party seeking removal. *Willy v. Coastal Corp.*, 855 F.2d 1160, 1164 (5th Cir. 1988) (citing *Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 42 S. Ct. 35 (1921)). "'If the right to remove is doubtful, the case should be remanded.'" *Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 939 (E.D.N.Y. 1992) (citations omitted); *see Butler v. Polk*, 592 F.2d 1293, 1296 (5th Cir. 1979).

**\*2** The United States Court of Appeals for the Fifth Circuit recognizes that §1442(a)(1) provides the only exception to the well-pleaded complaint rule found in *Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 29 S. Ct. 42 (1908). *Aquafaith Shipping, Ltd. v. Jarillas*, 963 F.2d 806 (5th Cir.) *cert. denied*, 113 S. Ct. 413 (1992) (citing *Mesa v. California*, 489 U.S. 121, 136-37, 109 S. Ct. 959, 968 (1989)). Thus, by virtue of this federal statute, where "a person" "acting under" federal officers can present a colorable "government contractor defense" or other federal law defense, the case is removable by such a "person." *Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 939 (E.D.N.Y. 1992) (emphasis added). The power to remove is absolute, provided the proper procedures are followed. *Id.* (citing *Willingham v. Morgan*, 395 U.S. 402, 406, 89 S. Ct. 1813 (1969). *See* Wright & Miller, *Federal Practice and Procedure*, § 3727 at 459 n.35; *Doe v. Kerwood*, 969 F.2d 165, 168 n. 12 and accompanying text (5th Cir. 1992). There is no need to obtain other defendants' consent.

In *Mesa v. California*, 489 U.S. 121, 109 S. Ct. 959 (1989), the Supreme Court set forth the criteria necessary to support removal under this statute and reiterated that in order to invoke the removal power of § 1442(a)(1), a "person" seeking removal must allege a federal law defense. *Crocker v. Borden*, 852 F. Supp. 1322 (E.D.La. 1994) (Livaudais, J.); *Akin v. Big Three Indus., Inc.*, 851 F. Supp. 819 (E.D. Tex. 1994); *Ryan*, 781 F. Supp. at 943. Thus, *Mesa* provides a three pronged inquiry which requires the moving "person" acting "under a federal officer" to:

(1) demonstrate that it acted under the direction of a federal officer;

(2) raise a colorable federal defense to the plaintiffs' claims; and

(3) demonstrate a causal nexus between plaintiffs' claims and acts it performed under color of federal office.

*Crocker*, 852 F. Supp. at 1325. There is no dispute that the removing defendants are "persons" for purposes of the statute. However, all three *Mesa* factors must be met for removal to be proper, and the failure to find a causal nexus between plaintiffs' claims and acts defendants performed under color of federal office would render the **removal** of this matter improper. Thus, pretermitting whether the **Avondale** Interests were acting under the direction of a federal officer and whether government contractor immunity or the LHWCA provide a "colorable" federal defense to this matter, the Court will analyze the third prong.

## Causal Nexus

As framed by the court in *Overly v. Raybestos-Manhattan*, 1996 WL 532150 (N.D. Cal. Sept. 9, 1996:

> The final requirement under the *Mesa* test is that there be a causal nexus between the rules imposed by the United States on the defendant contractor by the federal government and the liability asserted by plaintiff. "There must be a causal connection between what the officer has done under asserted official authority and the state prosecution. It must appear that the [state] prosecution has arisen out of the acts done by the officer under color of federal authority and in enforcement of federal law." *Maryland v. Soper*, 270 U.S. 9, 22 (1926).

**\*3** The *Overly* case is strikingly similar to the case at bar, and the Court finds its reasoning compelling.

This case against the Avondale Interests centers on their failure to warn; plaintiffs' allegations even with respect to a failure to provide a workplace free from the hazards of asbestos is based upon the failure to warn, not the presence of the asbestos itself or the ways and manner in which it was handled. There is no evidence that the Government restricted or prohibited Avondale's ability to notify individuals of the presence of asbestos in the work environment. Assuming that Avondale built ships under the direct supervision of the federal government, nothing about that supervision prevented Avondale from warning Mr. Gauthe about the dangers. Thus, there is no causal connection between the injury alleged by Mr. Gauthe with respect to Avondale's failure to warn and

Avondale working on behalf of the federal government.

The Avondale Interests opine in a Supplemental Memorandum that somehow the causal nexus issue is met solely by virtue of the requirements of the contract under which Avondale labored. In essence they argue that to the extent they complied with the contract, any derogation Avondale may have committed with respect to its state law responsibilities to its employees should be excused, and therefore, the nexus is met. However, to the extent that argument apparently hinges on the government contractor defense, it is inapplicable.

Furthermore, the examples given ring hollow as well. For instance, the Avondale Interests state:

> Another aspect of the defense is and will be that federal asbestos requirements not only did not require all employees who might be exposed to asbestos to wear respirators, but prohibited the use of respirators except where acceptable "control measures" were impractical to create safe asbestos dust levels."

In reality the provision upon which this affirmation was based is found in the Walsh-Healey Act, (Exhibit "B", Memorandum in Opposition to Remand, p. 22) states:

> (c) *Personal protective equipment.*--Where the above methods are impractical, personal protective equipment suited to the hazards and conditions involved should be provided. However, such equipment should not be used in lieu of suitable control measures.

This argument is simply meritless.

### Colorable Defense

Furthermore, even if there were a causal connection, as emphasized in the *Mesa* decision, federal officer removal must be predicated on the allegation of a colorable federal defense. The **Avondale** interests contend that they have presented the Court with two colorable federal defenses--the Longshore Harbor Workers Compensation Act's co-employee immunity under 33 U.S.C. § 933(i) and albeit not briefed, but discussed during oral argument, "government contractor immunity" as delineated in *Boyle v. United Technologies Corp.*, 108 S. Ct. 2510 (1987).

Plaintiffs seek recovery based on Louisiana state law causes of action. The Louisiana Supreme Court has specifically recognized that persons who were injured while engaged in shipbuilding can maintain actions under Louisiana compensation statutes or under the LHWCA; thus, such persons can avail themselves of the Louisiana law which allowed suits against executive offices and fellow servants until 1976 provided that such persons have not elected to accept LHWCA benefits. *Poche v. Avondale Shipyards, Inc.*, 339 So. 2d 1212 (La. 1976). The instant plaintiffs rely on these dictates for recovery. However, the Avondale Interests ask this Court to ignore this long standing state law based on the Alabama Supreme Court's interpretation of the United States Supreme Court's decision in *Sun Ship, Inc. v. Pennsylvania*, 100 S. Ct. 2432 (1980) in *Fillinger v. Foster*, 448 So. 2d 321 (Ala. 1984).

*4 The Supreme Court in *Sun Ship* held that the 1972 extension of federal jurisdiction in this arena supplements, rather than supplants state compensation law. *Sun Ship*, 100 S. Ct. 2436. The Supreme Court did not address § 933(i)'s co-employee immunity under the LHWCA and whether that bar should pre-empt state law to the contrary. This Court is unpersuaded by the Alabama court's reasoning.

In addition, contrary to the Avondale Interests' contention, unlike *Grantham v. Avondale Industries, Inc.*, 964 F.2d 471 (5th Cir. 1992), there is no Fifth Circuit case law that conflicts with *Poche* which this Court might be required to follow given the edict in *Grantham*. In *Grantham*, an injured subcontractor worker who had received benefits under the LHWCA brought a negligence and strict liability action against the contractor which was constructing the ship. The district court held that the contractor was immune as the statutory employer of the plaintiff applying Louisiana state decisional law on this issue. The district court did so based on its belief that as the sole basis for jurisdiction was diversity, the court should apply state decisional law, not federal decisional law with respect to whether the statutory employer bar applied.

The Fifth Circuit reversed the district court because the question of immunity was one governed by federal law. Because the Fifth Circuit had not recognized statutory immunity under the LHWCA in previous decisions, *Martin v. Ingalls Shipbuilding*, 746 F.2d 231 (5th Cir. 1984), the court found that the district court erred in finding that statutory immunity applied in that case. However, in so doing, the *Grantham* court recognized that the Fifth Circuit decisional rule with respect to statutory immunity

Page 5

might be erroneous. It stated:

> We recognize that our decisions in *Jenkins* and *Martin* did not address the Supreme Court's holding in *Sun Ship Inc. v. Pennsylvania*, 447 U.S. 715, 100 S. Ct. 2432, 65 L.Ed.2d 458 (1980), where the court held that the LHWCA supplements rather than supplants state workers' compensation schemes. We do not purport to address *Sun Ship* here; nor do we consider whether our decision in *Martin* or those of the Fourth Circuit and the courts of Louisiana reach the better result. There is a powerful argument that we have taken a wrong turn. A conflict between the Fourth and Fifth Circuits over a significant maritime issue should not be left unresolved by our court en banc. This panel can only say that it is bound by the prior decisions of this court as was the district court. *Grantham*, 964 F.2d at 474.

Thus, even that panel of the Fifth Circuit recognized that *Sun Ship* very well may require a recognition of state decisional law in such a context. Indeed, the Supreme Court in *Sun Ship* stated:

> Thus, even were the LHWCA exclusive within its field, many employers would be compelled to abide by state-imposed responsibilities lest a claim fall beyond the scope of the LHWCA....
>
> *5 Of one thing we may be certain. The exclusivity rule which appellant urges upon us would thrust employees into the same jurisdictional peril form which they were rescued by *Davis* and *Calbeck v. Travelers Insurance Co.* See Gilmore & Black 425. The legislative policy animating the LHWCA's landward shift was remedial; the amendments' framers acted out of solicitude for the workers.... To adopt appellant's position, then would blunt the thrust of the 1972 amendments, and frustrate Congress' intent to aid injured maritime laborers. We decline to do so in the name of "uniformity." *Id.* at 2439.

Furthermore, in *Grantham*, Grantham had received federal benefits. There is no evidence in this record that Mr. Gauthe has ever accepted LHWCA benefits and thus is distinguishable on that basis.

Finally, what is most disturbing to this Court with relation to this case is that there was a full adjudication with respect to Mr. Gauthe and his injury at Avondale in state court. This "defense" was never raised in the state proceeding; issues of estoppel and res judicata might be at play here.

With respect to the second "colorable" federal defense, that being the government contractor defense as delineated in *Boyle*, 108 S. Ct. 2518, it is inapplicable in this instance. [FN5] This is not a design defect case as this defense is framed in *Boyle*, it is a failure to warn case. Avondale did not manufacture the asbestos in question. Nor has Mr. Gauthe sued Avondale because the asbestos was of faulty design or improperly manufactured. He has sued Avondale solely for its failure to warn. To stretch the government contractor defense to encompass something other that a design defect or manufacturing defect is not indicated here.

> FN5.   In *Boyle v. United Technologies Corp.*, 108 S. Ct. 2510 (1988), the Supreme Court held that: liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the Untied States. *Smith v. Xerox Corp.*, 866 F.2d 135, 136-67 (5th Cir. 1989).

Mindful that ambiguities are generally construed against removal, *Butler v. Polk*, 592 F.2d 1293, 1296 (5th Cir. 1979), and finding that there is no the causal nexus required or a colorable defense available to the Avondale Interests, this Court has no jurisdiction over this matter, and it must be remanded to state court pursuant to 28 U.S.C. § 1447(c).

Motion for Sanctions

Section 1447(c) provides for an award of costs and expenses including attorney fees on a motion for remand on the basis of lack of federal subject matter jurisdiction. It is entirely within the discretion of the Court to award such fees. However, considering the complexity of the issue presented, the Court finds that such an award is not warranted. Accordingly,

IT IS ORDERED that pursuant to 28 U.S.C. § 1447(c), as this Court has no jurisdiction over this matter, the Motion to Remand is GRANTED, and the case is REMANDED to the 24th Judicial District Court for the Parish of Jefferson.

IT IS FURTHER ORDERED that the Motion for Sanctions is DENIED.

1997 WL 3255, 1997 WL 3255 (E.D.La.)

END OF DOCUMENT

1999 WL 225438
(Cite as: 1999 WL 225438 (E.D.La.))

C
Only the Westlaw citation is currently available.

United States District Court, E.D. Louisiana.

Wilton David MOUTON
v.
FLEXITALLIC, INC., et al.

No. CIV. A. 99-0162.

April 14, 1999.

ORDER AND REASONS

PORTEOUS, District J.

*1 This cause came for hearing on March 16, 1999 upon a Motion for Remand filed by plaintiff Wilton David Mouton (Mouton). Upon agreement of the parties, this ruling applies to Civil Action Numbers 99-162; 99-159; 99-160; 99-405; and 99-482. For the reasons outlined below, the Court GRANTS the plaintiffs motion and REMANDS the following cases to Civil District Court for the Parish of New Orleans, State of Louisiana, for further proceedings:

| | |
|---|---|
| Mouton v. Flexitallic, Inc. et al. | No. 99-0162 |
| Hebert v. Flexitallic, Inc. et al. | No. 99-0159 |
| Richard v. Flexitallic, Inc. et al. | No. 99-0160 |
| Bircher v. Flexitallic, Inc. et al. | No. 99-0405 |
| Dempster v. Flexitallic, Inc. et al. | No. 99-0482 |

I. BACKGROUND

This case involves multiple plaintiffs alleging numerous theories of liability under state law against multiple defendants for damages based on asbestos exposure. The petition was originally filed in state court in 1995. On December 22, 1998, an amended petition was filed adding **Avondale** and its executive officers for failure to warn about the dangers of asbestos, and failure to provide a safe place to work. The defendant Kennedy, as an **Avondale** executive officer in charge of safety, filed a motion to remove the case to this Court.

EXHIBIT
4

The defendants seek removal based on 28 U.S.C. § 1442(a)(1), the Federal Officer Removal Statute. The defendants claim that they were acting under the authority of various branches of the United States (the Navy, the Federal Maritime Commission) when building the ships during the relevant time frame. The defendants raise the Longshore and Harbor Workers' Act (LHWCA) as their federal defense. The defendants also mention the "government contractor immunity" defense in their Motion to Remove (p.8), but deny they are asserting that defense in their Motion in Opposition to Remand (p. 41).

Plaintiff Wilton David Mouton's case was chosen for oral argument, but the parties have agreed that the court's ruling will apply to all the petitions to remand filed by the plaintiffs listed above.

## II. LEGAL ANALYSIS

### A. Legal Standard for Remand

A case may be removed to federal court under 28 U.S.C. § 1442(a)(1) when "any officer (or any person acting under that officer) of the United States... [is] sued in an official capacity for any act under color of such office...." 28 U.S.C. § 1442(a)(1) (Supp. II 1996). The defendants bear the burden of establishing removal jurisdiction. Winters v. Diamond Shamrock Chemical Co., 149 F.3d 387, 397 (5th Cir.1998).

Supreme Court cases interpreting § 1442(a)(1) have held that the right of removal "ensure[s] a federal forum in any case where a federal officer is entitled to raise a defense arising out of his official duties." Arizona v. Manypenny, 451 U.S. 232, 241 (1981). The importance of the right requires liberal interpretation of the removal statute. Winters, 149 F.3d at 398 (citing Willingham v. Morgan, 395 U.S. 402, 407 (1969)).

### B. Jurisdiction under the "Federal Officer" Statute

*2 In general, an alleged defense to a state law issue, even if it raises a federal question, is insufficient to confer subject matter jurisdiction to satisfy removal. Merrill Dow Pharmaceuticals Inc. v. Thompson, 478 U.S. 804 (1986). However, 28 U.S.C. § 1442(a)(1) provides an exception when the defendant can meet a three-prong test developed from Mesa v. California, 489 U.S. 121 (1989):

1) the defendant is "a person;"

2) the defendant acted under the direction of a federal officer  [FN1]; and

3) the defendant raises a colorable federal defense.

For the first prong, both an individual and a corporation qualify as a "person" under § 1442(a)(1). Winters, 149 F.3d at 398. The parties do not dispute that Avondale satisfies the first prong of the Mesa test.

### 1. Causal Nexus Pursuant to Federal Direction

Under the second prong, § 1442(a)(1) applies to governmental contractors when they can demonstrate a "causal nexus" between the plaintiffs' claims and the acts performed under the "color of federal office." Mesa, 489 U.S. at 131-32. The "color of federal office" prong should not be construed narrowly, but does require "a federal interest in the matter." Winters, 149 F.3d at 398 (quoting Mesa, 489 U.S. at 139).

Prior decisions analyzing what constitutes federal direction have required more than "general auspices" of a federal officer, or participation in a regulated industry. Ryan v. Dow Chemical Co., 781 F.Supp. 934, 946 (E.D.N.Y.1992). Instead, the defendant must show "strong government intervention and the threat that a defendant will be sued in state court" based on actions which follow federal direction. Fung v. Abex Corp., 816 F.Supp. 569, 572 (N.D.Ca.1992).

Defendants argue that sufficient federal control was exhibited to satisfy the second prong of the Mesa test. The defendants offer numerous exhibits consisting of contract specifications, material specifications, and inspection procedures. The defendants point out that the Navy required the use of asbestos, and performed safety inspections for compliance with the Walsh-Healey Act, the LHCWA, and Department of Labor regulations, all incorporated by reference in the military contracts. The defendant also offers affidavits of Avondale employees testifying that regulations regarding the handling of asbestos were enforced by safety inspections from the Navy and the Department of Labor. The defendants assert that the "causal nexus" requirement under Mesa does not require that the act complained of, i.e., failure to provide warnings, was federally authorized or mandated, but only that the act occurred within the course of Avondale's duties to the Navy.

On the other hand, plaintiffs argue that they are alleging strict premises liability and negligence, not product liability or defective design. Thus, Avondale can only satisfy the causal nexus prong if the government directed Avondale's activities regarding warnings and safety procedures to follow when working with asbestos. The plaintiff argues that the contract specifications of the naval vessels do not provide specific information regarding warnings for exposure to asbestos, and Avondale had the ability to provide safe working conditions beyond the minimum requirements that were federally mandated under the contract. Further, the plaintiff points out that exposure to asbestos occurred while building both government and commercial vessels. *See* Plaintiff's Reply Memorandum in Support of Motion to Remand, at p. 7-8.

**\*3** The Court finds the plaintiff's line of reasoning persuasive. Admittedly, several cases have found the federal government's numerous technical specifications for design materials, working condition standards incorporated by reference in the contract, and inspections for compliance were sufficient to establish the causal link required under § 1442(a)(1). *See Lalonde v. Delta Field Erection, et. al*, No. 96-3244-B-M3 (M.D.La.1998) (silica exposure at U.S. rubber facility operated by a government contractor); *Blackmun v. Asbestos Defendants (BHC),* No. C-97-3066, 1997 WL 703773 (N.D.Cal.) (Asbestos exposure while government contractor manufactured rocket motors for the USAF); *Fung,* 816 F.Supp. at 572-73 (asbestos exposure while government contractor manufactured submarines at U.S. naval facility). The Court notes that two of these cases involved operation of federally-owned facilities, and are thus distinguishable under the "causal nexus" analysis.

However, other cases have rejected the theory that the federal government's contractual design specifications satisfy the causal link required absent express contractual government specifications regarding warnings. *See, e.g., Gauthe,* 1997 WL 3255, at \*2; *Overly,* 1996 WL 532150, at \*4. This Court concludes that recent Fifth Circuit precedent supports this analysis. *See Winters,* 149 F.3d at 397 (finding removal proper in a failure to warn case when government's contract specifications for the manufacture of Agent Orange included provisions for packaging and transport, and specific prohibitions against warnings on the barrels).

Although *Avondale* arguably "acted under" the Navy's direction when working by detailed instructions to build the destroyers, the specifications under the contract specified technical parameters, and only had more general references to safety regulations. The federal government provided no direction on warnings when using asbestos, and further did not prevent *Avondale* from taking its own safety precautions above the minimum standards incorporated in the federal contracts. Thus, the Court finds that *Avondale* has failed to establish a causal connection between the Navy's direction pursuant to the design contracts and plaintiff's failure to warn claims.

*2. Federal defense*

Under the third prong [FN2], the federal defense must only be alleged, not proven, because "the validity of the defense ... is a distinct subject" separate from the jurisdictional question. *Mesa,* 109 S.Ct. at 964. In general, satisfaction of the "acting under" prong for § 1442(a)(1) removal has provided sufficient evidence to establish a "colorable" government contract immunity defense. *See, e.g., Winters,* 149 F.3d at 400; *Blackmun,* 1997 WL 703773, at \*3. However, the defendants claim a defense under the LHWCA, not government contractor immunity.

Section 933(i) of the LHWCA provides the exclusive remedy when an employee is injured by a co-employee's negligence. 33 U.S.C. 933(i). However, concurrent "twilight zone" jurisdiction exists between the LHWCA and state compensation statutes. *Sun Ship, Inc. v. Pennsylvania,* 447 U.S. 715 (1980). The question of 933(i)'s pre-emptive effect on Louisiana compensation law in the "twilight zone" of concurrent jurisdiction remains unanswered by the Fifth Circuit. *See, e.g., Gauthe,* 1997 WL 3255, at \*3. The defendants argue that the pre-emptive issues created by the case law satisfy the burden of raising the defense for purposes of removal.

**\*4** The defendants have not put forth any evidence that the plaintiffs have received LHWCA benefits. The Court rejects the proposition that the presence of an unresolved legal issue alone creates a colorable federal defense.

*C. Attorneys' Fees*

A court, in its discretion, may award a plaintiff's "just

costs and any actual expenses, including attorney fees, incurred as a result of the removal" when granting a motion for remand for lack of subject matter jurisdiction. 28 U.S.C. § 1447(c). However, the case law presented by both parties in the context of these facts raises issues of sufficient complexity that such an award would be unwarranted at this point. *See, e.g., Gauthe v. Asbestos Corp.,* No. Civ. A. 96-2454, 1997 WL 3255 (E.D.La.).

Accordingly,

IT IS ORDERED THAT the plaintiff Wilton David Mouton's motion for remand be, and is hereby, GRANTED.

IT IS FURTHER ORDERED that Civil Action No. 99-0162, Mouton v. Flexitallic, Inc. et al.; Civil Action No. 99-0159, Hebert v. Flexitallic, Inc. et al.; Civil Action No. 99-0160, Richard v. Flexitallic, Inc. et al.; Civil Action No. 99-0405, Bircher v. Flexitallic, Inc. et al.; and Civil Action No. 99-0482, Dempster v. Flexitallic, Inc. et al., be, and is hereby, REMANDED to Civil District Court, Parish of New Orleans, State of Louisiana.

> FN1. Some courts define the *Mesa* test as a four-prong approach that has an "acting under" prong and a "causal nexus" prong. *See, e.g., Gauthe v. Asbestos Corp.,* No. Civ. A. 96-2454, 1997 WL 3255 (E.D.La.); *Overly v. Raybestos-Manhattan,* No. C-96-2853, 1996 WL 532150 (N.D.Cal.). However, the Fifth Circuit recently defined the second prong as both "that the defendants acted pursuant to a federal officer's directions and that a causal nexus exists between the defendants' actions under color of federal office and the plaintiff's claims." *Winters,* 149 F.3d at 398.

> FN2. Although the defendants' failure to establish the second prong doom their removal attempt under § 1442(a)(1), the Court briefly adds its reasoning under the third prong to the myriad of district court opinions on the subject.

1999 WL 225438, 1999 WL 225438 (E.D.La.)

END OF DOCUMENT

1996 WL 603919
(Cite as: 1996 WL 603919 (E.D.La.))

Only the Westlaw citation is currently available.


United States District Court, E.D. Louisiana.

Horace PORCHE
v.
FLEXITALLIC, INC., et al.

Civ. A. Nos. 96-2827, 96-2828.

Oct. 13, 1996.

SECTION: "E" This ruling applies only to C.A. No.
96-2880 Plaintiff Nicholas
Bieber

*ORDER AND REASONS*

**\*1** Various plaintiffs, including Nicholas Bieber,
filed suit in state court against various insurers and
Avondale executive officers, for damages they allege
they sustained as a result of exposure to asbestos
while employed for a number of years at Avondale
Shipyards. These plaintiffs are some of a total of
approximately 3,000 plaintiffs who sued these same
defendants in state court in 1991. These 3,000
plaintiffs have been grouped in individual flights of
between 10 and 50 plaintiffs. The cases of 5 flights of
plaintiffs have either been tried or settled. The present
plaintiffs are part of Flight 6.

On December 20, 1995, the plaintiffs filed an
amended petition commencing discovery of Flight 6.
In the amended petition, plaintiffs alleged that their
asbestos-related injuries were caused in part by the
negligence of Avondale executive officers. On
January 16, 1996, the Avondale Interests removed
these same cases in flight 6 which are at issue here,
contending that the LHWCA created federal question
jurisdiction. On February 13, 1996, these case were
remanded because plaintiffs did not seek relief on the
basis of the LHWCA or any other federal statute in
their complaint.

Discovery proceeded on the cases in Flight 6 and
Avondale interests propounded interrogatories to
Nicholas Bieber. The answers to interrogatories were
given to defendants on July 31, 1996, the date of
Nicholas Bieber's deposition. This case was removed
on August 30, 1996 on the ground that there is
removal jurisdiction in the federal officer removal
statute, 28 U.S.C. § 1442(a)(1).

Plaintiffs filed a joint motion to remand all removed
cases. By agreement of the parties, the defendants are
at this time opposing the motion to remand that case
of a single plaintiff, Nicholas Bieber. The motion to
remand as to the other removed cases will be
considered on a later date. The basis for the motion to
remand are that (1) the removal was not timely; (2)
there is no subject matter jurisdiction on which to
base removal of this case.

The procedure for removal is set forth in 28 U.S.C. §
1446. Subsection (b) states:
> The notice of removal of a civil action or
> proceeding shall be filed within thirty days after the
> receipt by the defendant, through service or
> otherwise, of a copy of the initial pleading setting
> forth the claim for relief upon which such action or
> proceeding is based, or within thirty days after the
> service of summons upon the defendant if such
> initial pleading has then been filed in court and is
> not required to be served on the defendant,
> whichever period is shorter.
> If the case stated by the initial pleading is not
> removable, a notice of removal may be filed within
> thirty days after receipt by the defendant, through
> service or otherwise, of a copy of an amended
> pleading, motion, order or other paper from which
> it may first be ascertained that the case is one which
> is or has become removable, except that a case may
> not be removed on the basis of jurisdiction
> conferred by section 1332 of this title more than 1
> year after commencement of this action.

**\*2** Defendants claim that the first time they knew that
Bieber had worked aboard Naval vessels was on the
date the answers to interrogatories were delivered by
him. Counsel for plaintiffs, Stephen B. Murray, has
submitted an affidavit detailing the previous history
of these asbestos cases. Specifically, Murray states
that four flights of cases have gone to trial, one flight
has settled, and one flight is in the discovery phase,
and that the Avondale insurer and executive officers
have been named as direct or third party defendants
in each flight. He states that Avondale Interests have

EXHIBIT
5

conducted extensive discovery and that they have participated in two of the four trials to date. He states that the issue of military inspectors has been raised at each trial, that voluminous testimony concerning Avondale's employees work aboard military vessels was adduced at the trials, military specifications were introduced, and that the work records of Avondale indicates that Bieber and the other plaintiffs worked aboard military ships. Removing defendants do not dispute these statements.

Certainly, the Avondale executive officers were aware that many of their employees worked aboard military ships. In fact, the basis of the removal is that the military exercised such control over them, they became "federal officers" for the purpose of establishing subject matter jurisdiction, an issue which will be considered if the defendants can establish that the removal was timely. Avondale had numerous contracts with the United States Navy in the previous two decades. The knowledge of Avondale's executive officers is imputed to Travelers, their insurer.

The Ninth Circuit in *Eyak Native Village v. Exxon Corp.*, 23 F.3d 773 (9th Cir. 1994), in a case involving hundreds of claims arising out of the *Exxon Valdez* oil spill, held that the removal by Exxon and pipeline defendants of 160 cases after the cases had been pending for several months was untimely. The basis for the removal is the allegation by the defendants that plaintiffs' claims were actually a collateral attack on a federal decision issued 15 years earlier concerning the Alaska Tanker Law. While the defendants argued that their removal of the actions within 30 days of the plaintiff's preliminary designation of issues was timely, the Ninth Circuit found that the claims were not new and that the pipeline company was aware of the nature of the plaintiff's claims, and their relation to the prior federal case, long before the removal notice was filed. 25 F.3d at 782-783.

Removing defendants in this case contend that while they may have had Avondale records indicating that these plaintiffs worked on military vessels during their tenure at Avondale, they did not know that the plaintiffs were claiming damages as a result of exposure to asbestos while in the workplace. The plaintiffs seek damages in their amended complaint for injuries they received as a result of exposure to asbestos, and predicate the liability of Avondale's executive officers on negligence for failing to provide

a safe place to work. Avondale interests, and their insurers, have known since the date the suit was filed that these individuals were claiming damages as a result of exposure to asbestos in the workplace, and that liability is premised on the allegation that Avondale's executive officers did not provide them with a safe place to work. Just as the court in *Eyak* found, these claims are not new and were within the knowledge of the Avondale officers long before the removal of the complaints.

*3 Pretermitting the question of whether timely removal required that it occur within 30 days of the original complaint, certainly timely removal requires that the cases of this flight be removed within 30 days of the amended petition. On the date the amended petition was filed, the defendants knew which particular plaintiffs were involved in this flight and Avondale interests were in possession of their employment records. Those records, as least as to Nicholas Bieber, indicate that he worked aboard military vessels. To argue that plaintiffs complaint may not have arisen out of his exposure while working aboard ships, but may have occurred when he climbed into a destroyer to look for a lunch partner, borders on the absurd. At least by the time the amended petition was filed in 1995, the Avondale interests were in possession of sufficient information that this individual plaintiff worked on a Navy vessel to put it on notice of the facts necessary to remove it on the basis of federal officer jurisdiction. The removal of these cases at this time is patently untimely.

The second, more complex issue to consider is whether the removal on the basis of federal officer removal statute is proper. Specifically, the defendants argue that Avondale was under such military control regarding the promulgation, implementation, and enforcement of its safety programs at the time these plaintiffs were working on military vessels, they became officers of the United States. In a similar case removed from state court to federal court in California by Avondale, the district court remanded the case and imposed sanctions. *Overly v. Raybestos-Manhattan*, 96-2853 (N.D. Cal. Sept. 12, 1996). The Court need not address these arguments regarding the substance of removal jurisdiction and therefore will not. However, the rationale underlying *Overly* is well-reasoned.

Plaintiff Bieber seeks attorneys fees and costs for having to proceed with the remand of a case which

should not have been removed. The Court is ordinarily very reluctant to assess attorneys fees and costs in any circumstance, including the present. This is, however, the second time this action has been removed improvidently, and the removal is patently untimely. The court in *Overly* awarded costs of $ 2,000. Plaintiff Bieber seeks a total of $ 13,170.00 in removal costs, seeking 19 hours for one attorney, 49 1/2 hours for another attorney, 16 hours for another attorney, law clerk or paralegal, deposition costs of over $ 1,000, plus copying and travel expenses. The depositions would have been required, in any circumstance. Almost 70 hours in attorney time to file a motion to remand is excessive. The Court will award 20 hours at $ 150 per hour, which amounts to $ 3,000, plus copying charges of $ 618.75, in removal costs.

If the defendants agree to the remand of the other complaints which were not timely removed, the Court will not award additional costs to plaintiffs for having to respond to the removal of the other complaints in this flight.

*4 Accordingly, for the above and foregoing reasons,

IT IS ORDERED that the motion of plaintiff Nicholas Bieber in Civil Action 96- 2880 to remand to Civil District Court be and is hereby GRANTED and that costs and attorneys fees be awarded to the plaintiff in the amount of $ 3,618.75.

IT IS FURTHER ORDERED that Civil Action No. 96-2880, *Nicholas Bieber v. Flexitallic, Inc.,* be and is hereby REMANDED to Civil District Court, Parish of Orleans, State of Louisiana.

1996 WL 603919, 1996 WL 603919 (E.D.La.)

END OF DOCUMENT

Not Reported in F.Supp.
(Cite as: 1996 WL 532150 (N.D.Cal.))

**C**
Only the Westlaw citation is currently available.

United States District Court, N.D. California.

Robert S. OVERLY and Louise S. Overly Plaintiffs,
v.
RAYBESTOS-MANHATTAN, et al. Defendants.

No. C-96-2853 SI.

Sept. 9, 1996.

ORDER REMANDING CASE TO SUPERIOR
COURT

ILLSTON, District Judge.

*1 On September 6, 1996, the Court heard argument on plaintiffs' motion to remand. Having considered the arguments of counsel and the papers submitted, the Court hereby GRANTS plaintiffs' motion to remand this case to San Francisco County Superior Court. The Court also GRANTS plaintiffs' motion for attorney fees and costs under 28 U.S.C. § 1447(c).

BACKGROUND

On April 30, 1996, plaintiffs filed the complaint in this action in San Francisco County Superior Court. The Superior Court granted trial preference to the case pursuant to California Code of Civil Procedure § 36(d), because Mr. Overly is dying and is expected to survive only a few months; trial was set for October 7, 1996.

On August 9, 1996, after the trial date had been set, defendant Avondale Industries, Inc. removed the case to federal court pursuant to 28 U.S.C §§ 1441, 1442, and 1446. On August 20, 1996, plaintiffs filed a motion to remand and requested that it be heard on an expedited basis.

According to the allegations of the complaint, plaintiff Robert Overly was exposed to asbestos while working in a shipyard in the 1960's. Defendant

Avondale controlled part of the premises of Mr. Overly's employment during this period of time. Plaintiffs' complaint alleges that Avondale knew or should have known that the premises it controlled contained hazardous conditions, namely products containing asbestos. Plaintiffs further allege that defendant hired contractors and subcontractors who used products containing asbestos, but failed to warn individuals in the surrounding area of the existence of asbestos or to take precautions against human exposure to the chemical.

Plaintiffs allege that, as a result of exposure to asbestos while working in the shipyard, Mr. Overly acquired mesothelioma, a cancer usually resulting from asbestos exposure. In May of this year, Mr. Overly was diagnosed with six months remaining to live. Plaintiffs have proceeded against Avondale on the "failure to warn theory" of products liability.

Avondale does not contest Mr. Overly's assertion that he was exposed to asbestos during his work on the Avondale shipyard. Instead, it claims that the work done by Mr. Overly consisted primarily of work on naval ships, and that Avondale is therefore protected by government contractor immunity. Avondale asserts that it was under rigid guidelines by the federal government concerning the design of naval ships. Thus, Avondale asserts that it is entitled to the protection of the Federal Officer Removal Statute, thereby providing grounds for federal jurisdiction.

LEGAL STANDARD

A suit filed in state court may be removed to federal court if the federal court would have had original subject matter jurisdiction over that suit. 28 U.S.C. § 1441(a); Snow v. Ford Motor Co., 561 F.2d 787, 789 (9th Cir.1977). Three potential bases for federal subject-matter jurisdiction are relevant to this suit: (1) federal question jurisdiction under 28 U.S.C. § 1331, [FN1] (2) admiralty jurisdiction under 28 U.S.C. § 1333, [FN2] and (3) supplemental jurisdiction under 28 U.S.C. § 1367. [FN3]

FN1. 28 U.S.C. § 1331 states that "[t]he district courts shall have original jurisdiction of all civil actions arising under the



EXHIBIT
6

Constitution, laws, or treaties of the United States."

FN2. Under 28 U.S.C. § 1333, "[t]he district courts shall have original jurisdiction, exclusive of the courts of the States, of ... [a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled."

FN3. Supplemental or pendent party jurisdiction exists where claims "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a).
The Court may decline to exercise supplemental jurisdiction if: (1) the claim raises a novel or complex issue of state law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. § 1367(c).

*2 A motion to remand is the proper procedure for challenging removal. Remand to state court may be ordered either for lack of subject matter jurisdiction or for any defect in removal procedure. See 28 U.S.C. § 1447(c). The court may remand sua sponte or on motion of a party, and the parties who invoked the federal court's removal jurisdiction have the burden of establishing federal jurisdiction. See Emrich v. Touche Ross & Co., 846 F.2d 1190, 1195 (9th Cir.1988) (citing Wilson v. Republic Iron & Steel Co., 257 U.S. 92, 97 (1921)).

The removal statute is strictly construed against removal jurisdiction and doubt is resolved in favor of remand. Libhart v. Santa Monica Dairy Co., 592 F.2d 1062, 1064 (9th Cir.1979).

The existence of federal jurisdiction on removal must normally be determined on the face of the plaintiff's complaint. See Louisville & Nashville R.R. v. Mottley, 211 U.S. 149 (1908). A "cause of action

arises under federal law only when the plaintiff's well pleaded complaint raises issues of federal law." Metropolitan Life Ins. Co v. Taylor, 481 U.S. 58, 63 (1987).

However, the Court may examine the entire record to determine if the real nature of the claim is federal, notwithstanding plaintiff's characterization to the contrary, when the plaintiff has, by "artful pleading," attempted to defeat defendant's right to a federal forum. See Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 397 n. 2 (1981); Salveson, 525 F.Supp. at 572. A complainant cannot "avoid federal jurisdiction simply by omitting from the complaint federal law essential to his claim, or by casting in state law terms a claim that can be made only under federal law." Harper v. San Diego Transit Corp., 764 F.2d 663, 666 (9th Cir.1985).

The Federal Employee Removal Statute was enacted as a means for federal employees to bypass the well-pleaded complaint rule and raise immunity-related defenses as a basis for removal.

DISCUSSION

I. *Jurisdiction Under the Federal Officer Removal Statute*

The Federal Officer Removal Statute provides that an action may be removed by "[a]ny officer of the United States or any agency thereof, or person acting under him, for any act under color of such office." Title 28 U.S.C. § 1442(a)(1). In Mesa v. California, 489 U.S. 121 (1989), the Supreme Court held that § 1442(a)(1) requires the moving party to: (1) demonstrate that it acted under the direction of a federal officer; (2) raise a colorable federal defense to plaintiff's claims; and (3) demonstrate a causal nexus between plaintiff's claims and the acts defendants performed under color of federal office. Id. at 124-25, 134-35. Before applying the test outlined in Mesa, however, a defendant must qualify as a "person" for the purposes of 28 U.S.C. § 1441(a)(1). As a corporation, defendant Avondale meets this preliminary requirement. Fung v. Abex Corp., 816 F.Supp. 569, 572 (N.D.Cal.1992).

A. *Acts Under the Direction of A Federal Officer*

*3 Under the first prong of the Mesa test, defendant must show that it was acting under the direction of a federal officer. It is not enough to prove only that "the relevant acts occurred under the general auspices

of" a federal officer, *Ryan v. Dow Chemical Co.*, 781 F.Supp. 934, 946 (E.D.N.Y.1992), or that the defendant was a member of a regulated industry. *Id.; Bakalis v. Crossland Sav. Bank*, 781 F.Supp. 140, 144-45 (E.D.N.Y.1991). In the area of product liability, government contract immunity has been limited to cases where defendant companies can show "strong government intervention and the threat that a defendant will be sued in state court 'based upon actions taken pursuant to federal direction.' " *Fung v. Abex Corp.*, 816 F.Supp. at 573 (quoting *Gulati v. Zuckerman*, 723 F.Supp. 353 (E.D.Pa.1989)).

In this case, the liability asserted by the plaintiffs is limited to the failure to warn theory of products liability. Plaintiffs allege that because Avondale failed to warn Mr. Overly of the existence of asbestos in his work environment, Avondale should be held liable for his resulting illness. Plaintiffs are not pursuing a design defect claim of products liability and have offered in writing to waive all potential claims related to design defects.

Although Avondale has established that it was under substantial control by the government regarding the installation of certain products containing asbestos, it has not done so with regard to the warning of individuals of the presence of asbestos on the job site.

B. Colorable Federal Defense

The second prong of the *Mesa* test is that defendant must possess a colorable federal defense. Defendant Avondale presents two potential federal defenses.

1. Longshore and Harbor Workers Compensation Act

One defense asserted by Avondale is that plaintiffs' recovery is limited to relief under the Longshore and Harbor Workers Compensation Act (LHWCA) § 1 et seq., 33 U.S.C.A. § 901 et seq. The LHWCA provides a basis for compensation from employers to certain employees injured in the course of employment while working upon navigable waters or the harbors and shipyards adjoining such waters. 33 U.S.C.A. § 903.

As an initial matter, defendant is barred from asserting a defense on this basis because the LHWCA was not mentioned in defendant's petition for removal as required under 28 U.S.C. § 1446(a).

Furthermore, even if applied to this case, the

LWHCA does not constitute a colorable federal defense for Avondale. Mr. Overly was not an employee of Avondale, he was an employee of Westinghouse. The "borrowed employee" concept asserted by defendant has not been adopted by the Ninth Circuit. Furthermore, even under the Third Circuit guidelines cited by the defendant, Mr. Overly would not qualify as a "borrowed employee" for the purposes of the LWHCA because there has been absolutely no showing that he explicitly agreed to work under conditions controlled solely by Avondale. *Peter v. Hess Oil Virgin Islands Corp.*, 903 F.2d 935, 942 (1990). Thus, the LWHCA does not constitute a colorable defense to plaintiffs' common law causes of action.

2. Government Contractor Immunity

*4 The second ground on which defendant asserts it possesses a colorable federal defense is the government contractor defense. Under this theory, contractors who supply military equipment to the government are immunized from liability under state tort law providing that they can meet the test outlined in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988). In *Boyle*, the Court set the standard for finding state law liability for design defects in military equipment. *Id.* at 511. Military contractor immunity for design defects applies when: "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id.* at 512.

The Ninth Circuit has ruled that in failure to warn product liability cases involving asbestos allegedly used in the construction of naval ships, a defendant must specifically show that "in making [its] decisions regarding warnings [it was] acting in compliance with 'reasonably precise specifications' imposed on [it] by the United States." *In re Hawaii Federal Asbestos Cases*, 960 F.2d 806, 813 (9th Cir.1992). Thus, in order to meet the *Boyle* test in a failure to warn case, the defendant must show that the government affirmatively instructed it regarding the provision of warnings.

Defendant's only showing on this motion relates to the government's manufacturing and engineering specifications. Defendant has not demonstrated that the government provided "reasonably precise

specifications" affecting Avondale's provision of warnings. *Boyle*, 487 U.S. at 512. Absent a showing by defendant that the federal government gave specific instructions to Avondale not to warn employees of the existence of asbestos, Avondale is offered no protection by government contractor immunity. *See In re Hawaii Federal Asbestos Cases*, 960 F.2d at 813. Therefore, defendant fails to meet the second prong of the *Mesa* standard because Avondale has no colorable federal defense to the charges in this case.

C. Causal Nexus

The final requirement under the *Mesa* test is that there be a causal nexus between the rules imposed by the United States on the defendant contractor by the federal government and the liability asserted by plaintiff. "[T]here must be a causal connection between what the officer has done under asserted official authority and the state prosecution. It must appear that the [state] prosecution has arisen out of the acts done by the officer under color of federal authority and in enforcement of federal law." *Maryland v. Soper*, 270 U.S. 9, 22 (1926).

Defendant has produced abundant evidence attesting to the regulations imposed by the federal government on the manufacture and design of ships built by Avondale for the U.S. Navy. However, *none* of these guidelines addresses Avondale's responsibility to warn its employees of their exposure to products containing asbestos. The government in no way restricted Avondale's ability to notify individuals of the presence of asbestos in the work environment. Thus, there is no causal connection between the control exercised by the United States over Avondale and the legal theory under which plaintiffs seek to hold **Avondale** liable. Consequently, **Avondale** has no basis on which to assert application of the Federal Officer **Removal** Statute, and the case must be remanded to state court.

II. *Attorney Fees & Costs*

**\*5** Title 28 U.S.C. § 1447(c) provides that when granting a motion for remand on the basis of a lack of federal subject matter jurisdiction, a court may order the defendant to pay plaintiff "its just costs and any actual expenses, including attorney fees, incurred as a result of the removal." An award under § 1447(c) is entirely within the Court's discretion.

Under its discretion, the Court finds that the case was removed "improvidently and without jurisdiction." *Id.* The Court hereby awards plaintiffs their reasonable costs and attorney fees associated with **removal**, as requested, in the amount of $2,000, to be paid by defendant **Avondale** within ten days of the date of this order.

CONCLUSION

For the foregoing reasons and for good cause shown, plaintiffs' motion to remand is GRANTED. Plaintiffs' motion for reasonable costs and attorney fees incurred as a direct consequence of removal is GRANTED in the amount of $2,000.

IT IS SO ORDERED.

1996 WL 532150 (N.D.Cal.)

END OF DOCUMENT

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

1999 FEB 18  P 12: 16

LORETTA G. WHYTE

# UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

LOUIS J. GUIDROZ                                    CIVIL ACTION

VERSUS                          —                   NO. 98-3709

THE ANCHOR PACKING CO., ET AL                       SECTION "B"(5)

## ORDER AND REASONS

This   matter   is   before   the   Court   for   consideration   of
plaintiff's motion to remand.  Plaintiff filed this action in the
Civil District Court for Orleans Parish, Louisiana, seeking damages
for personal injury resulting from his exposure to asbestos while
working as a shipyard worker.  On December 17, 1998, third party
defendant Alabama Dry Dock and Shipbuilding Corporation ("ADDSCO")
filed a notice of removal on the basis that ADDSCO was acting as a
"federal officer" with respect to the vessels on which plaintiff
worked and was therefore entitled to remove this action under 28
U.S.C. § 1442(a)(1).   The basis for ADDSCO's position is that



DATE OF ENTRY  FEB 18 1999

**EXHIBIT**

**7**

plaintiff's asbestos exposure occurred while on vessels built for the United States Navy.

Plaintiff contends in his motion that ADDSCO has alleged only the availability of a federal defense but has failed to allege or present a basis for federal jurisdiction to support the notice of removal.  Plaintiff argues that the "government contractor defense" as applied to shipyard defendants has been rejected on three separate occasions in the Eastern District of Louisiana, as well as once in the Northern District of California.  Plaintiff contends that no court has extended the government contractor defense beyond that of a design or manufacturing defect.  This, plaintiff contends, is a failure to warn case and there is no connexity between the government contract and ADDSCO's failure to warn worker's about asbestos exposure.  Plaintiff seeks remand of this matter and also seeks attorneys' fees and costs.  Alternatively, plaintiff requests that the Court sever the third party claims against ADDSCO and remand the main demand to the state court.

As noted by plaintiff, it is the removing defendant's burden to establish the existence of federal jurisdiction over the controversy.  Winters v. Diamond Shamrock Chemical Co., 149 F. 3d 387, 397 (5th Cir. 1998) (citations omitted).  The burden therefore

2

is on ADDSCO to prove that the removal was proper and that this

Court has jurisdiction.

Title 28, U.S.C. § 1442(a)(1) provides in pertinent part as

follows:

> (a)  A Civil Action . . . commenced in a state court against
> any of the following persons may be removed by them to a
> district court of the United States for the district and
> division embracing the place wherein it is pending:
>     (1)  Any officer of the United States or any agency
>     thereof, for any act under color of such office . . .

In general, in considering whether removal is proper under

this section, the Court must determine whether the defendants 1)

were persons, 2) acting under federal authority when committing the

acts alleged, and 3) have asserted a colorable federal defense.

Mesa v. California, 489 U.S. 121, 124 - 35, 109 S. Ct. 959, 103 L.

Ed. 2d 99 (1989).  Section 1442(a)(1) may be applied to a non-

governmental individuals who can establish all of the following

similar factors:  1) they are a "person;" 2) they have acted under

the direction of a federal officer; 3) they can demonstrate a

causal nexus between plaintiff's claims and the acts performed

under the color of federal office; and 4) they can raise a federal

defense to plaintiff's claim.  Mesa, 489 U.S. at 131 - 32, 109 S.

Ct. at 966;  Willingham v. Morgan, 395 U.S. 402, 409, 89 S. Ct.

1813, 1817, 23 L. Ed. 2d 396 (1969) (the "color of office" test

3

requires a showing of a causal connection between the charged
conduct and asserted official authority).

### ADDSCO as a "Person":

Under § 1442, the Court must determine whether the removing
defendant is a person within the meaning of the statute. The Fifth
Circuit Court of Appeals has consistently found that corporate
entities qualify as "persons." See, Winters v. Diamond Shamrock
Chemical Co., 149 F. 3d 387, 398 (5th Cir. 1998). Plaintiff does
not contest this. ADDSCO therefore qualifies as a person for
purposes of this removal.

### Acting Under Federal Authority:

In order for a court to find that a non-government defendant
like ADDSCO was acting at the direction of a federal agent, the
defendant must establish that it was under direct control of a
federal officer, that is "the acts that form the basis for the
state civil or criminal suit were performed pursuant to an
officer's direct order or to comprehensive and detailed
regulations." Ryan v. Dow Chemical Co., 781 F. Supp. 934, 939
(E.D.N.Y. 1992). In addition, ADDSCO must establish that the acts
taken at the direction of the federal officer were a cause for the

4

harm alleged by the plaintiff.  The "'color of federal office' requirement is neither 'limited' nor 'narrow,' but should be afforded a broad reading so as not to frustrate the statute's underlying rationale.  <u>Winters</u>, 149 F. 3d at 398 (<u>citing</u> <u>Murray v. Murray</u>, 621 F. 2d 103, 107 (5th Cir. 1980)).[1]

A review of the record reflects that plaintiff has filed an original complaint and a supplemental and amending complaint.  In the original complaint, plaintiff included a list of "defects" contained in certain products arising out of the inherent and known dangers of the asbestos products and the failure of certain named manufacturer/seller/supplier defendants on Exhibit A of the complaint to provide adequate warnings, packaging, or safety equipment at certain exposure sites listed on Exhibit B to the complaint, which included Equitable Shipyards, L.L.C., ("Equitable"). (Complaint, ¶ 13).  With respect to the assertions against the manufacturer/supplier/seller defendants, plaintiff included the following specific claims:

"14.   . . .
      h.   failure to properly *design* these products where the
           nature of the product did not require use of

---

[1]Removal under § 1442(a)(1) "is thus meant to 'ensure a federal forum in any case where a federal official is entitled to raise a defense arising out of his official duties.'" <u>Diamond</u>, 149 F. 3d at 398 (<u>quoting</u> <u>Arizona v. Manypenny</u>, 451 U.S. 232, 241, 101 S. Ct. 1657, 68 L. Ed. 2d 58 (1981)).

5

asbestos  mineral  or  where  alternate,  equally
suitable substances were readily available;
i.    defects  in  the  *composition and construction* of
these products; . . .

Only two of the exposure sites, Avondale Industries and Halter
Marine Group were named as defendants in paragraph 18.  the claims
against those entities at paragraphs 18 - 21 relate to a failure to
warn theory.

In  the  supplemental  complaint,  plaintiff  added  Equitable,
inter alia, to Exhibit A of the original complaint, for injuries
received  at  that  company's  shipyard  located  in  New  Orleans,
Louisiana.  By reference in the amended complaint, this would also
include Equitable as a manufacturer/supplier/seller defendant and
liable  to  plaintiff  under  paragraphs  13  and  14  of  the  original
complaint.

Equitable  later  filed  a  third  party  complaint  in  which  it
added  several  new  parties,  including  ADDSCO  as  an  exposure  site
only.  In that complaint, Equitable alleged that ADDSCO, as well as
other exposure sites, owed it indemnification or some contribution,
for any asbestos exposure plaintiff may have had at its shipyard.
As to certain manufacturer/supplier/seller defendants in its third
party complaint, Equitable reiterated the claims alleged by the
plaintiff  in  the  original  and  supplemental  complaints  and  in

6

addition added claims of failure to warn Equitable about certain dangers for it to pass on to its employees and workers.

Unlike the cases cited by the parties, the Court is not faced with any direct claims by plaintiff against ADDSCO.  ADDSCO was brought into this suit by Equitable as another situs at which plaintiff may have been exposed to asbestos.

ADDSCO nevertheless alleges that plaintiff's suit is one for defective design and construction.  Defendant contends that its exposure herein is a result of the alleged defective design of the two Navy vessels, which included asbestos, as well as the failure to warn about the effects of asbestos.  Defendant contends that the plans and specifications for the two submarine rescue vessels were supervised and approved by the U.S. Navy and that the Navy sent on-site inspectors to supervise and control the construction of the two vessels on which plaintiff worked as an employee of George Engine Company.  In support thereof, ADDSCO references three affidavits attached to the removal notice and the affidavit of a retired naval officer attached to the opposition.  Each affidavit represents that the Navy provided speculations and certain instructions on the vessel design and manufacture and required that ADDSCO comply with those specifications.  There is unrefuted support for ADDSCO's contention that the Navy supplied full-time

7

on-site supervision and instruction on the construction of the vessels and that the vessels were built to Navy specifications.

The plaintiff contends that this is strictly a failure to warn case against the exposure sites and not a design or manufacture case. There is no question that plaintiff's complaints and the third party complaint focus on the failure to warn of the hazards of asbestos and exposure thereto. The claims against the exposure sites relate only to the failure to warn and otherwise to provide a safe work place. There is no claims against ADDSCO under any other theory.

Nevertheless, but for the construction of the Navy vessels plaintiff would not have been present at the ADDSCO shipyard. Pursuant to plaintiff's deposition, attached in part to the notice of removal, plaintiff placed himself at the ADDSCO yard during the construction of two "Navy salvage ships." (Dep., p.108). He was assigned by his employer, George Engine Co., Inc., on several occasions to work on "the ship power and emergency power plant. (Dep., p.109). While there, other workers were installing insulation which caused dust, which allegedly included asbestos particles, and no safety equipment or procedures were provided. (Dep., p.109 - 110). This is the basis for ADDSCO contingent liability for plaintiff's claims. The Court finds that these

8

claims fall within the category of a "failure to warn" case and not a "defective design" case.

Recognizing this, there is nothing before the Court that would reflect that the safety procedures at issue were in any way controlled by the Navy or related to the Navy specifications used to build the two vessels.

To prove a causal connection, the defendant must demonstrate that it was on duty at its place of employment at all times relevant to the alleged incident. <u>Willingham v. Morgan</u>, 395 U.S. 402, 409, 89 S. Ct. 1813, 1817, 23 L. Ed. 2d 396 (1969). The basis for ADDSCO's alleged liability arises out of the manufacture of the vessels plaintiff worked on at that shipyard. More specifically, it arises out of the use of asbestos materials in the manufacture, i.e. the insulation, and the failure to warn other workers or to provide for their safety from exposure to asbestos.

The affidavits provided by ADDSCO are non-specific[1] and otherwise curiously fail to address the use of asbestos materials and any notification or safety procedures related thereto in this project, the very essence of the claims before the Court. The Court has no evidence or argument before it that the Government

---

[1]By non-specific, the Court means that the affiants in some respects detail the Navy's supervisory scheme over building projects but fail to discuss in any detail the particular specifications of this project or the asbestos materials at issue.

9

specified the use of the asbestos products or was involved in the notification or safety procedures related specifically to asbestos. For these reasons, the Court can not find an actual connection between a specific directive by a federal officer and the injuries alleged by the plaintiff. See Anderson v. Avondale Industries, Inc., 1994 W.L. 679827, slip op. at *3 - *4 (E.D. La. Dec. 5, 1994) (affiant's failure to address specifications of the asbestos product defeated causal connection). The Court is not convinced that the second prong of the Mesa test has been met.

Colorable Federal Defense:

Even if a causal connection had been met, the Court does not find a colorable federal defense. ADDSCO presents the Court with two defenses which it categorizes as federal defenses. One is the government contract defense and the other is based in Alabama law which would limit plaintiff's remedies to the Longshoreman and Harbor Worker's Compensation Act ("LHWCA"), 33 U.S.C. § 901, et seq.

The government contract defense is available when a person whose contract providing military equipment to the federal government could be held liable under state tort law for injury resulting from a design defect in that equipment. Boyle v. United

10

Technologies Corp., 487 U.S. 500, 108 S. Ct. 2510 (1988).   Under

Boyle, the government contract defense is available if three

factors are met:

> Liability and design defects in military equipment cannot be
> imposed, pursuant to state law, when 1) the United States
> approved reasonably precise specifications; 2) the equipment
> conformed to those specifications; and 3) the supplier warned
> the United States about the dangers in the use of the
> equipment that were known to the supplier but not to the
> United States.

Boyle, 487 U.S. at 512, 108 S. Ct. at 2518.

The government contract defense is applicable to design and

manufacture defect cases.   Boyle, 108 S. Ct. 2518.   In this

district, removal under this statute has not been expanded to cases

involving only a failure to warn of a particular hazard.   Gauthe v.

Asbestos Corp., 1997 W.L. 3255 (E.D. La. Jan. 2, 1997)

(unpublished).[3]   Since the Court has already found that this action

---

[3]   The Court places little emphasis on the Magistrate Judge's "Ruling" in
Lalonde v. Delta Field Erection, No. 96-3244-B-M3 (M.D. La. Aug. 5, 1998) from the
Middle District of Louisiana cited by ADDSCO.   First, the Court is unclear as to the
jurisdictional authority under which the Magistrate Judge, rather than a District
Judge, entered this jurisdictional "Ruling."   Second and most relevant, the Magistrate
Judge chose to ignore Overly v. Raybestos-Manhatton, 1996 W.L. 532150 (N.D. Ca. Sept.
9, 1996) (unpublished) and other unidentified "similar cases" (presumably those raised
by plaintiff herein) on the basis that these lower court cases "do not involve a
government contractor acting exclusively as an agent for the federal government in
operating a government-owned facility," as she was faced with in Lalonde.   Lalonde,
slip op. at 7 n.13.   The Magistrate Judge found it all but frivolous to consider that
an agent operating such a plant would have to prove that each act it performed had
been under Government supervision.   That is not the case here.   For this reason, the
Lalonde case and its protracted reasoning are distinguishable.

11

is not one for design defect, this defense is not available to ADDSCO.

Even if an element of design defect case existed, the applicability of the government contract defense is a consideration. As previously found, the documents provided to the Court do not reflect whether the Navy specified the use of asbestos insulation in the vessels. In fact, the attachments to the affidavit of Rear Admiral Roger B. Horne, Jr. (retired), reflect that materials and plans were contractor supplied, though Navy approval was required. While the evidence is clear that the Navy had great input into the design and construction of these vessels, there is no indication that the Navy specifically authorized the use of asbestos materials or controlled the warnings vel non regarding its hazards. Without any indication that the United States Navy specified the use of asbestos materials or insulation or that the Navy was notified of the hazards and directed ADDSCO on notification or safety procedures, vel non, the Court can not find that ADDSCO is entitled to a government contract defense. See Smith v. Xerox Corp., 866 F. 2d 135, 138 (5th Cir. 1989)(for government contract defense to apply, the Government must have provided the relevant specifications); compare Winters, 149 F. 3d at 400 -01 (affidavit and other evidence was ample to support that

12

Government had provided specifications for asbestos product) with
Anderson, 1994 W.L. 679827, slip op. at *3 - *4 (affiant's failure
to address specifications of the asbestos product defeated causal
connection prong).

With respect to the applicability of the Longshoreman and
Harbor Workers Act under Alabama law, the Court must also find that
ADDSCO has not proven that a federal defense is available.⁴ ADDSCO
has presented no evidence or argument that would indicate that
plaintiff qualifies as a longshoreman/employee under 33 U.S.C. §
902 et seq., that ADDSCO would be liable to him, the employee of
another company, under 33 U.S.C. § 905, or that he is entitled to
benefits under the LHWCA.  See Alday v. Patterson truck Line, Inc.,
750 F. 2d 375, 376 (5th Cir. 1985) (discussing elements of
liability under LHWCA); Efferson v. Kaiser Aluminum & Chemical
Corp., 816 F. Supp. 1103, 1108 (E.D. La. 1993) (contractor is
"employer" of a subcontractor's employee only if subcontractor
fails to secure the payment of compensation as required by LHWCA);
Overly v. Raybestos-Manhattan, 1996 W.L. 532150, slip op. at *3

---

⁴Defendant's sole support for this defense is an Alabama state court decision
in which the court found that a suit by one worker, covered by the LHWCA, against
another co-employee presented an exclusively federal claim under the LHWCA, thereby
preempting state suit. Fillinger v. Foster, 448 So. 2d 321 (Al. 1984). The Fillinger
case is factually distinct from this case and is contrary to the binding federal
precedent in this Circuit. Aaron v. Nat'l Union Fire Ins. Co. of Pittsburg, Pa., 876
F. 2d 1157 (5th Cir. 1989).

13

(N.D. Ca. 1996)(unpublished) (<u>citing</u> <u>Peter v. Hess Oil Virgin</u>
<u>Islands Corp.</u>, 903 F. 2d 935, 942 (3d Cir. 1990)); <u>Gauthe v.</u>
<u>Asbestos Corp.</u>, 1997 W.L. 3255, slip op. at 3 - 5 (E.D. La. Jan. 2,
1997) (unpublished).

Having found that defendant has failed to establish a causal
connection or action under official authority, and having found
that no federal defense is available to defendants, the Court finds
that this matter was improvidently removed and should be remanded.'
Accordingly,

IT IS ORDERED that plaintiff's motion to remand be and hereby
is GRANTED and this matter be remanded to the Orleans Parish Civil
District Court.

IVAN L.R. LEMELLE
UNITED STATES DISTRICT JUDGE

February 17, 1999

---

'The plaintiff's alternative request to sever the third party claim against
ADDSCO is moot.

14

```
 1                    UNITED STATES DISTRICT COURT

 2                  EASTERN DISTRICT OF LOUISIANA

 3                           NEW ORLEANS

 4
      ROBERT ANDREW BOURGEOIS            DOCKET NO: 96-3764
 5                                       NEW ORLEANS, LOUISIANA
      VERSUS                             SECTION: "L"
 6                                       JANUARY 15, 1996
      A. P. GREEN INDUSTRIES, INC.,
 7    ET AL
                                            PETITION FOR REMOVAL
 8

 9    *********************************************************

10                      TRANSCRIPT OF HEARING
11            BEFORE THE HONORABLE ELDON E. FALLON
                      U.S. DISTRICT JUDGE
12    *********************************************************
13    APPEARANCES:

14
      FOR PLAINTIFF:                MICKEY P. LANDRY, ESQ.
15                                  LEBLANC, MAPLES & WADDELL,
                                    PLACE ST. CHARLES
16                                  201 ST. CHARLES AVENUE - 3204
                                    NEW ORLEANS, LOUISIANA  70170
17                                  (504) 524-3223

18    FOR AMERICAN MOTORISTS:       ROBERT E. CARAWAY, III, ESQ.
                                    PLAUCHE, MASELLI & LANDRY,
19                                  201 ST. CHARLES AVENUE - 4240
                                    NEW ORLEANS, LOUISIANA  70170
20                                  (504) 582-1142

21
      COURT REPORTER:              PATRICIA F. DURONCELET
22                                 501 MAGAZINE STREET
                                   NEW ORLEANS, LOUISIANA  70130
23                                 (504) 589-7781

24
      RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIBED BY CAT
25
```



EXHIBIT

8

1          THE CLERK:  Civil action number 96-3764, Robert

2    Andrew versus A. P. Green, et al.

3          THE COURT:  Counsel make appearances for the

4    record.

5          MR. LANDRY:  Mickey Landry for the plaintiff?

6          MR. CARRAWAY:  Robert Caraway for American

7    Motorists Insurance Company.

8          THE COURT:  Gentlemen, I have read in detail all of

9    your briefs, they considerably deal with the issue in depth.

10   I have read the cases that you cited to me, some of them were

11   reported, some of them were not, but I will listen to any

12   oral argument that you feel I can profit from.

13         MR. LANDRY:  Thank you, Your Honor, Mickey Landry

14   for the plaintiffs.  Your Honor, the Court having indicated

15   that you are familiar with the briefs and the case law, I

16   will attempt to be brief and jsut reserve a little time if I

17   could to reply to Mr. Caraway's comments.

18         Your Honor, the first issue that I think the Court,

19   I respectfuly submit, that the Court should address is the

20   issue of timeliness.  And, Your Honor, just as a little bit

21   of background, this is a class action lawsuit on behalf of a

22   gentleman exposed but not yet diagnosed with asbestos related

23   illness in the workplace employment.  We filed this

24   encompassing class action for all areas.  The vessels that

25   they worked on in the '60s and early '70s encompassed a large

1  amount of Navy vessels, more than what their brief indicates,

2  I believe its at page 22, that even the private vessels were

3  under extensive government control, not that I agree with

4  that, but that's their contention.  If that is true, Your

5  Honor, they knew when this case was filed that they had an

6  opportunity, if there was a possibility to remove it, that

7  they had thirty days to do that.  And, Yuor Honor, they say

8  that they didn't know until some discovery was done, that's

9  what they say, but, Your Honor, Judge Livadais, when

10 presented with the same question, thought that foolishness,

11 there are three thousand cases pending against these

12 gentlemen -- and Mr. Merick's case is in CDC and they know

13 what the basis of that liability is.  They had thirty days,

14 they missed the thirty days.

15            THE COURT:  That's the Porche' case?

16            MR. LANDRY:  Yes, sir.

17            THE COURT:  The motion for remand -- the motion to

18 remove was November the 19th, 1996?

19            MR. LANDRY:  Yes, sir.  Your Honor, I am going to

20 address, quickly, a couple of ponts and be brief.  There's

21 two important cases that you really need to understand and

22 that's the Mesa case and the Bold case.  Mesa involved a male

23 postal employee on his route who got into a traffic accident

24 and was cited for a traffic citation and tried to get into

25 federal court, and they said no you can't do that.  Bold

1    involved a successful plaintiff whose son was killed in a

2    helicopter.  The helicopter door opened in or out and didn't

3    allow the gentlemen to get in or out and he sufficated, he

4    drowned.  They sued the contractor for products liability.

5    The court said no, the Navy specifically told you to make

6    that door out, he got stuck, that's the example of when we

7    should allow a defendant to be relieved of liability in that

8    case.  And, Your Honor, this case is not like that case.

9    This case involves a claim against executive officers.

10          I received a brief from Mr. Caraway Monday night or

11    Tuesday morning and I have not had a chance to file a

12    response.  There's a new case in the federal courts out in

13    California and what they say is that the defense arises from

14    a significant conflict between state law that would hold

15    government contractors liable for design defective military

16    equipment and federal districts in realizing the trade offs

17    between greater state and greater combat effectiveness.

18          But, Your Honor, there is no conflict here, the

19    Avondale executive officers could have built the vessels and

20    not exposed my men to this dangerous chemical, they could

21    have warned them and by warning them could have provided them

22    with a safe place to work.  That's really in essence the Bold

23    discussion, and its really interesting to me, lagally, as far

24    as when you get into the analysis of the Bold, you have to

25    say is this military equipment.  Now, Your Honor if it's

Patricia F Duroncelet, CCR

1   military equipment then it would have certain possibilities

2   of product liability for design defect attaching, but if its

3   not, then it wouldn't.

4           As a threshold matter I am not bringing, nor have I

5   brought, a cause of action against Mr. Caraway's clients for

6   product liability.

7           They make much of whether its a failure to warn,

8   Your Honor, I have attempted to make a comprehensive, state

9   based Louisiana state tort neglegence claim, but what you

10  have to remember is that in this military contract defense,

11  one of the cases say that there's a difference between a can

12  of beans and a super duper aircraft carrier R67.  In this

13  California case, they brought the example of the IN RE:

14  HAWAII case, and in the IN RE: HAWAII case it said the

15  manufacturer conceded that the asbestos at issue was exactly

16  the same products sold in significant quantities to private

17  industry.  I  have a letter from Mr. Cali, who represents

18  Owens-Corning Fiberglas, one of the defendants, which I will

19  file, offer and introduce into evidence and put into the

20  record, its going to be in my supplemental brief that I

21  didn't get their's until Tuesday morning, and Your Honor, I

22  provided a copy to the Court, it will be in my response.  And

23  Mr. Cali indicates that nothing is different about the K19s

24  and the military  vessels or private vessels, its identically

25  the same.  So as to that, Your Honor, I don't think their

1  argument as to that issue carries much weight.

2          THE COURT:  They take the position that the specs

3  called for asbestos and they put asbestos in, in the way the

4  specs called for it, and the specs were pretty specific in

5  deciding the type, or indicating the type and quantity and

6  quality and so forth.  And they did what they were told to do

7  and therefore they were acting under the specific direction

8  of the government, therefore they had a right.  What say you

9  on that?

10         MR. LANDRY:  Well, Your Honor, that is belied by

11 the representations in sworn testimony given by Pete Territo

12 at page 135 of his deposition.  He said that they were in

13 charge of safety.  You know what that would be like, Your

14 Honor, that would be like a Navy vessel that needs a door, a

15 heavy steel door on it and when they lifted it up, it dropped

16 on some men and killed them, we'd say well we used a rope

17 instead of a chain, but we were supposed to put it on the

18 ship, so we are governed by the government contractor

19 defense.  I'm not suing them because they used the spectus,

20 I'm suing because they didn't warn my clients.  First of all,

21 they didn't tell them that asbestos was dangerous, they

22 didn't tell because they didn't know it was dangerous, they

23 couldn't protect themselves and because they couldn't protect

24 themselves they didn't provide them a safe place to work.

25 But that is the question, Your Honor, that the Court needs to

1  address is how much control did they have.

2       And that leads me right into what the Overlay court

3  was presented with and what this Court is going to be

4  presented with and what Judge Duval was recently presented

5  with and that is the only way that they can seek the comfort

6  of this government contractor defense is if they can tell you

7  that the government told them to put this product on the

8  vessel and not warn the employees.  They could have

9  segregated the work force, they could have provided them with

10  respirators.  Mr. Blanchard, this is how bazaar it gets, Your

11  Honor, their vice-president of production didn't even know

12  asbestos was dangerous until 1979.  He is a vice-president of

13  safety and that's at page 99 of his deposition.

14       THE COURT:  Before you sit down, on the

15  longshoreman harbor workers compensation act, what's the

16  significance of that?

17       MR. LANDRY:  Your Honor, we are pursuing claims

18  under the Louisiana state based laws.  The law was in flux

19  for a number of years and in 1992 the Cole versus Celotex

20  decision basically put to rest the argument of a cool

21  contraction; and what the Cole decision says was to decide

22  whether someone contracts a cause of action, -- and its a

23  Herculean task, I take it back, we can't do that.  So what we

24  are going to do, we are going to say a plaintiff in

25  Louisiana, when he receives the injury, the injury is event,

8

1  we are going to apply a key significant events test as

2  opposed to an accrual or contractor theory test.   In that

3  vain, they looked at events and accidents and they said

4  events and accidents is the immediate time after the

5  exposure, an asbestos injury is a continual exposure and the

6  injuries happen as you breath the dust.   What happened, then,

7  Your Honor, was they said, we will apply the law at the time

8  of the exposure.   If you look at 1061 footnote 17, they talk

9  about a companion case where its not only a pre-exposure and

10  post-exposure to the comparative fault act and said we are

11  reminding you that we are not getting into this task of

12  deciding when a cause of action accrues, they use that

13  herculean business again, and we will apply the law at the

14  time of the exposure.

15          Now, there is an interesting case before Judge

16  Schwartz in a case called BERGERON, which they cited in their

17  opinion but they neglected to cite the subsequent case.   In

18  the Bergeron case, Your Honor, its a little bit digressive,

19  but that case involved a wrongful death case and the Court

20  said no, a wrongful death doesn't come about until the person

21  dies, so we will apply the law at his death.   Judge Schwartz

22  then had the benefit of the Cole opinion, and in 1994 he

23  reversed his previous opinion and said even for wrongful

24  death claims, the cause of action and the accrual is not the

25  issue, the issue is what law was in effect at the time of his

1   exposure.

2           And the interesting argument, at least from a legal

3   standpoint, I believe, is that they used the contribution

4   claim which is if a gentleman is exposed by a bunch of

5   defendants, their contribution claim is vested at the time of

6   exposure.  So that what the Court said, Your Honor, is that

7   the event, the preliminary injury, the fault, the damages

8   took place at that time and the wrongful death was just

9   another component.  I think if the Court would look at the

10  first decision, the analysis shows that the law is without

11  doubt at the time of exposure, at least in the federal

12  system.  We have not had, to this date, have a supreme court

13  in a Louisana case say that that is the law.  Although I will

14  tell you, recently, Your Honor, there is a case called Thomas

15  versus Amco that said for people exposed between 1952 and

16  1975, before they listed lung cancer a disease, you could sue

17  the company directly.

18          In any event, Your Honor, if we go back to '72,

19  Kent State, bell bottoms, Richard Nixon, that's the law we

20  are applying here and at that time the Supreme Court of the

21  United States issued a case called Sunship, and I'm sure the

22  Court is familiar with Sunship, but basically what Sunship

23  said was, we are not going to put these maritime workers at

24  the disadvantage of not knowing where they will full, we will

25  allow the longshore worker compensation act to supplement

1  rather than supplant, Your Honor.

2         After that case, the Louisiana Supreme Court in

3  Porche' versus Avaondale Shipyard, reviewed the jurisprudence

4  and accepted the Sunship rational.  Subsequently, Your Honor,

5  Logan versus Louisiana Dry Dock in '89.

6         Now, they raise an interesting argument and that

7  argument is this, the workman's compensation law was changed

8  in 1989 to restrict a plaintiff who potentially could receive

9  benefits from the longshore workers compensation act and the

10 Louisiana workman's compensation act which says if you got a

11 chance for both, Louisiana law will direct you to federal, in

12 1990.  Your Honor, my men were exposed in the '60s and '70s,

13 there's a Louisiana Supreme Court case directly on point

14 called Stelly and in that that was the issue, a man was

15 injured in '89, he files his cause of action in '90, after

16 the amendment, does he have a cause of action under Louisiana

17 workers comp, or is he relegated to what that says.  And what

18 the Court says is no, they said that would be

19 unconstitutional. Your Honor, if in 1992 they couldn't use

20 the Louisiana comparative fault law to divest a plaintiff of

21 his vested substantive tort right under Louisiana law, which

22 was called a vested property right, if you couldn't do that

23 in '92, the Court made sure in '94 or '95, when the Stelly

24 case came out and said we are still not going to allow you to

25 do that, but if we did allow you to do that, it would be

1 unconstitutional, not only the Louisiana State Constitution
2 but the United States Constitution.

3 　　　　And I think the analogy is two guys working
4 together in '74, they get severely injured, one gentleman
5 dies, all of his rights are accrued then.  One poor man holds
6 on until '78, you can't pass a law in '77 to take away his
7 cause of action, what laws you couldn't pass away in '90 to
8 take away his cause of action, which the Supreme Court has
9 told us vested at the time of exposure.

10 　　　　THE COURT:  The same way with the plaintiff against
11 the executive officers, don't have the claim anymore, but you
12 still have it.

13 　　　　MR. LANDRY:  That's correct, we still have that and
14 that's what we have.  Now, I want to say one other thing and
15 if you have any more questions I will answer, but I will be
16 glad to sit down and allow. Mr. Caraway to respond.

17 　　　　There's a three part Mesa test and in that Mesa
18 test, the second part involves the state based defenses or
19 the federal contractor or the government defenses that they
20 have to the plaintiffs' claim.  Now, there is a case, Your
21 Honor, on the longshore harbor worker that says this, the
22 longshore harbor workers act is nothing more than a statutory
23 defense to a state court cause of action.  And then they said
24 this.  The classic circumstance of non-removability.  Now,
25 Your Honor, when they first filed their petition in the case

1   I identify with Judge Duval, I thought they were moving on

2   the longshore harbor worker, I wasn't aware of this federal

3   government defense and I researched that and there's a case

4   called Swift Ships and in that case they said that removal on

5   that basis of the longshore worker compensation was, "absurb

6   on its face and the court is generally troubled as to how any

7   claim can be made in good faith."   And Your Honor asked me,

8   if I had to be honest with Your Honor, Mr. Caraway didn't do

9   that, he went under the government contractor defense and

10  then kind of backdoored in under preemption.  He never said

11  preemption.   I think the supplemental momo is treading very

12  close now to the area that he can't be in, because if he's

13  just in the area of preemption, and that's the basis for

14  removal, that's a classic circumstance of non-removability.

15          One final comment, Your Honor.  The third part of

16  the Mesa requirements, requirements that you draw a causal

17  nexus between the conduct of the defendant and his imposed

18  duty by the government.  And I don't normally like to read,

19  but this is a premises liability case.  I will tell you what

20  they said.  And they said, "In that both the causal nexus and

21  causal federal defense are necessary requirements under 28

22  USC 1442, that is lacking, in essence, plaintiff's claims are

23  for negligence not for manufacturer of goods or equipment

24  that's directed to the federal government, therefore,

25  plaintiff's claims are clearly more analygous to the

1  prosecution by the State of California against postal

2  employees' negligent operation of postal vehicles while on

3  duty, where the Supreme Court found no federal jurisdiction

4  under federal law to removal."

5          And that's basically my argument, Your Honor.

6          THE COURT:  Thank you, Counsel.  Let me hear from

7  your opponent.

8          MR. CARAWAY:  Thank you, Judge.  Thank you,

9  Counsel.  Judge, I will try to stay away as much as I can

10 from the things that we have tried to set forth as clearly as

11 I'm capable of, as much as I can, in my briefs and address

12 some of the things that Mr. Landry has brought up in oral

13 argument.  I want to correct a few things, some of which I

14 think were inadvertant on the part of Mr. Landry.   Mr.

15 Landry has reference to the vice-president, he was not the

16 vice-president of safety at Avondale, but the vice-president

17 of production.  Mr. Landry on the notice issue said that,

18 gee, some of these vessels that the plaintiffs worked on were

19 private vessels and that Avondale takes the position that

20 even when individuals are working on private vessels that

21 they are subjected to this substantial government direction

22 and supervision and therefore we should have known on the

23 basis of our own position that within thirty days of the

24 filing of this suit we should have removed the case.  If Your

25 Honor, and I know Your Honor has said that he has read the

1   briefs carefully, our position is not as Mr. Landry has
2   characterized it, and I regret to say, as Judge Livadais
3   characterized it in the Porche' case.  Our position is that
4   there were some private vessels built at Avondale that were
5   built pursuant to government subsidy and that includes maybe
6   a dozen or so steam powered, subsidized cargo projects,
7   including some that we know or believe that at least three of
8   these four plaintiffs worked on, but that the overwhelming
9   majority of what can be termed private vessels at Avondale,
10  has nothing to do with the government, in the sense of doing
11  projects directly for the government or under government
12  subsidy.  When we say under government subsidy, those
13  contracts are literally signed -- they are three way
14  contracts, the United States government, for example, some
15  ships that were built for Lykes back in the '60s, the United
16  States government, Department of Commerce, Maritime
17  Administration is a signatory on the contract as well as
18  Lykes Brothers, for example, and Avondale.
19          We have provided Your Honor with the Avondale ship
20  list, you can readily see that hundreds if not thousands of
21  vessels have been built by Avondale since it's beginning in
22  1938.  The great majority of those vessels have nothing
23  whatsoever to do with any government requirements or
24  specification or government supervision of the ship building
25  project.  And I feel like we have been put into a dilemma, of

course, we tried to address as much as we can and still be in
good faith in removing cases.  Judge Livaudais' opinion but
he apparently misunderstood the facts that we asserted in
those briefs, I hope Your Honor appreciates them a little bit
better without going into detail.

There are many, many men who work at Avondale who
may or may not have been exposed to asbestos or have been
exposed to asbestos in the past, who have done no work at all
on ships built for the United States Navy or no work at all
on ships built under government subsidy for private
companies, and which therefore their claims would not be
removable.  I do not have the means to tell whether or not
those claims are removable unless it says something in the
petition itself or until I obtain some document during the
course of the litigation that tells me based upon my
experience, on its face that the claims involve an issue of
federal jurisdiction under the federal office removal
statute.

THE COURT:  Don't you find yourself in a difficult
situation along several lines with that argument?  One, if
this were the first asbestos case filed in the country, I
could understand it a little more clearly that maybe you
didn't know, but all of us have lived long enough and been
around the block enough times to know that everything now in
this whole asbestos arena is on computer and you just plug in

1  a name and you get not only every dock the person worked on,

2  but every vessel a person worked on, and another button and

3  you get every asbestos product that he was exposed to and so

4  forth and so on.   Its not like fishing in unchartered waters

5  in this one.

6          Secondly, as I read the petition, or the pleading,

7  you are also in a difficult situation in that it seems to me

8  that at Avondale you are not going to have a separate rule,

9  safety provision requirements for people who work aboard

10 government vessels and those who don't.   You are not going to

11 have the A. team and B. team in so as far as the A. team you

12 are warned and the B. team you are not warned and then

13 asbestos is throughout, but simply because -- and so their

14 position throughout the country has been, in the cases that I

15 have been reading, have been that we are not complaining

16 about the selection of asbestos, we are complaining about the

17 fact that they were not warned of the hazards and/or supplied

18 with some safety provisions to guard against the hazards.

19 Because the fact that it's a hazard may be so, but you can do

20 something about it, otherwise we wouldn't be removing

21 asbestos from the buildings now.   You can work around it if

22 you are provided with the proper gear or if you are warned of

23 the problem. And that's their position.

24          MR. CARAWAY:  Judge, I will try to respond in brief

25 to really the three points that I think you've made.  And I

1  think the first point is that - and I can understand Your

2  Honor's presuming that somehow if you hang around the stuff

3  long enough that we have to punch some buttons and we know

4  everything there is to know about any of these claims once

5  they are filed or within a short period thereafter.  Maybe it

6  should be that way, but it isn't that way.  And the reality

7  is that I don't even know, of course, I don't represent

8  Avondale, but I don't know and I can tell you from

9  discussions with the various lawyers for Avondale and with

10  people at Avondale, they cannot even tell me, they could not

11  give me a list if I asked for it tomorrow of every person who

12  ever worked at Avondale.  And that may be surprising to you,

13  but its true.  What happens is that the employment records of

14  these individuals are located -- in most cases they are

15  actually on micro film and located in four different offices

16  in four different places at Avondale shipyards.  There are

17  personnel records, medical records, workman's compensation

18  records, four bureauracies, when I request employment records

19  for any given plaintiff, basically kick into motion.

20          And just so that you can see the context that we

21  have been operating under for the last two years, and Mr.

22  Landry knows this as well as anybody because most of the

23  claims that we have defended have come out of his office to

24  the tune of hundreds, over the last couple of years.  We are

25  literally getting employment records for plaintiffs the day

1  or two days, at most, in advance of their scheduled

2  depositions, just because of the time it takes for Avondale

3  people to go through the motions on request for dozens and

4  dozens of these records.

5          So, no, I don't have a button to push I wish I had.

6  I have got hundreds of claims that I'm defending, this

7  lawsuit both from the plaintiffs prospective and our

8  prospective essentially relative to most law suits have sat

9  dormant with almost no activity since the day it was filed.

10 We still don't have a Judge for this case.

11         THE COURT:  Is Judge Carmel still working?

12         MR. CARAWAY:  He apparently retired at the end of

13 the year and we have not been advised in any official way

14 that there's going to be a particular judge.  Rumor has it

15 that perhaps Judge Ward may take over this, but I don't have

16 any confirmation of that.  So I hope that you can appreciate

17 that I don't have this big, you know, super computerized data

18 bank in my little law firm, nor does Avondale or counsel for

19 Avondale have some resource where we can punch in a guy's

20 name and know within date of service of a petition or

21 everything that we need to know about him.  I have defended

22 claims brought by security guards alleging asbestos exposure.

23 And when I find that out, the last thing that I want to do is

24 remove that case to federal court.  That guy may have been

25 exposed to asbestos but he was was exposed to asbestos

1  because he was a ship craftsman, working on a ship for the

2  United States government under heavy, daily supervision of

3  those government inspectors.

4       The second point that you raised has to do with,

5  well, you don't have a team A or B, and there's no question

6  about that, we don't have a team A or B at the Avondale

7  safety department, and it would be absurb to suggest, really,

8  that some standards that the Avondale safety department

9  operated under at any given historical time that somehow a

10  difference was made in the way in which the Avondale safety

11  department viewed these issues depending on whether or not it

12  involved a government project or not.  That's not the issue

13  though.  The issue, which is the threshold issue, as to

14  whether or not I have knowledge, I, as a defendant in this

15  case or my client, really, has knowledge sufficient to

16  warrant a good faith removal of a claim filed in state court

17  is whether or not the particular individual involved or who

18  has alleged the jury is an individual whose work was

19  performed substantially on projects that were, number one,

20  subject to the specifications and requirements that we have

21  provided Your Honor, probably more than you wanted to see;

22  and number two, which were subject to that intense government

23  supervision and inspection.  I mean I just simply don't have

24  a warrant to come into court.  Sure I have been around the

25  block now in this stuff and if I have a guy who worked at the

1  Avondale repair yard and he was exposed to asbestos.  I know

2  enough to think that the chances are pretty high that he was

3  exposed to asbestos on a boat or some kind of boat that was

4  being repaired over there.  What I don't know and I wouldn't

5  argue with is that the safety precautions that Avondale

6  undertook, were different in any manner.  What I don't know,

7  which is critical from the standpoint of federal

8  jurisdiction, is whether or not there was some kind of heavy

9  Navy involvement at the Harvey yard, and in most most cases

10  it would be no, and I would have to defend the suit, even in

11  federal and state court.

12        Mr. Landry mentions Aaron as if it somehow has some

13  relevance in what we have attempted to do here.  It stands

14  for the proposition that the longshore act within its own

15  terms does not advance a congressional intent to preempt the

16  entire litigation field with regard to issues that would give

17  rise to benefits under the longshore act, and that's all it

18  stands for.  Those were defendants who removed a case, not on

19  the basis of federal officer removal, but on the basis they

20  have preempted the whole field.  And our position here is

21  much more narrow than that; and it is that, as Your Honor

22  knows, that there is a preemption within the conflict between

23  the Louisiana law which allows co-employees to be sued and

24  the exclusive remedy provision seen back in 1959 in the

25  longshore act.

1           Now, the Porche' court wrote a very long opinion,

2      not without a descent, coming down on one side of this issue.

3      It is a complicated issue and presumably, as well qualified

4      and austere a group as the Alabama Supreme Court, looked at

5      the identical same issue and came down, I believe unanimously

6      on the other side of the issue.  There is no federal decision

7      that I can look to interpreting federal law as to this

8      specific question of whether or not there is preemption by

9      the federal act or the state act as to whether or not the men

10     that I insure can be sued.  Mr. Landry has not pointed to

11     one, if the Court is aware of one, or believes that somehow

12     Sunship decided the question --

13              THE COURT:  You feel that Sunship did not?

14              MR. CARAWAY:  Sunship did not and we specifically

15     refer to the footnote in our supplemental brief.

16              THE COURT:  I saw it.

17              MR. CARAWAY:  Which I think not only standing by

18     itself, but the Sunship court referred to that, there have

19     been at least two federal decisions that we also quoted in

20     our brief which have specifically interpreted various

21     aspects, although admittedly, not this exact issue, as

22     raising legitimate issues of preemption, selective

23     preemption, and what's involved here is really, its an

24     analysis under general federal preemption law, and that is

25     there's simply a conflict that's unvoidable.


Patricia F Duroncelet, CCR

1          THE COURT:  What's your argument, because from the

2     standpoint of the conflict, the conflict really comes about

3     primarily post '72 with the longshoreman act, prior to that

4     we got a little inkling of it, maritime logo cases, but by

5     and large there wasn't any conflict Jenson drew it at the

6     water's edge.  And his position is that his claim predates

7     all of this and therefore he is not concerned about that

8     situation because its not an issue here.

9          MR. CARAWAY:  I have really a two prong response to

10    that.  One of them has to do with the particularities of this

11    particular lawsuit that we are dealing with here today.  The

12    petition alleges in this case is brought by four individuals

13    on behalf of themselves and seeking to became representives

14    of a class of people and that class is defined as those

15    persons who have been injured by exposure to asbestos and

16    were employees of Avondale and who have not an identical, to

17    date or prior to filing of this suit, a named claim.  And

18    that class or subclass of individuals who though exposed as

19    employees of Avondale Industries through the years, have

20    suffered to date no physical injury; and you might say this

21    is an action for monitoring so that the damages, so to speak,

22    are the failure to give medical monitoring in the past.  And,

23    of course, the relief sought is the creation of some kind of

24    medical monitoring system.

25          With regard to that second subclass, these are

1  individuals who, under Cole, under any conceiveable argument,

2  have not yet -- never suffered a physical injury as a result

3  of their employment at Avondale.  Any injury that they may

4  suffer in the future, any injury that they claim to have

5  suffered now arises after, certainly after 1959 when the

6  longshore act, specifically with regard to onboard ship

7  repair people, rather than people on the shore, gave rights

8  to my insureds immunizing them from these suits by

9  co-employees.  And also would arise after the 1989 amendment

10  to the Louisiana workman's compensation act, which

11  specifically said we no longer cover these individuals.

12  That's part of my answer, is that within the petition for

13  damages of the plaintiffs themselves, they assert that they

14  are themselves and seek to represent a class of people that

15  includes people who never suffered microscopic injury and are

16  not alleging any injury that has been suffered as a result of

17  this work at Avondale.

18       My second response to you is that the one thing

19  that I find that Porche' fails to acknowledge, and this is

20  why I think there's an irreconcilable conflict between the

21  two statutory schemes, Porche' -- this is not simply a

22  conflict under vested rights under state law to receive

23  compensation under some tort scheme established under

24  Louisiana law versus some archaic lets protect the employer

25  scheme, under federal law that is enacted later.  It is a

1   conflict between rights and immunities that are given under

2   Louisiana law versus rights and immunities that Mr. Peter

3   Torio, one of the men that I insured and who I represent at

4   trial, who is the only one of these individuals still at

5   Avondale, or Mr. John Chantrey or any of the other people who

6   dutifully perform their jobs as employees at Avondale and

7   here find twenty or thirty years later that they are

8   personally being subjected to suits for asbestos injuries.

9          Now, I don't see any way to look at this that

10  except that as a matter of rights and immunities are in

11  direct conflict.  On the one hand, those that go back all the

12  way to 1959 established that profound law that these men not

13  be subject to the unfairness of suit by co-employees.  And on

14  the other hand, Louisiana law, that at least as substantially

15  put together by the Louisiana Supreme Court in Canner versus

16  Cornick, which I'm sure Your Honor is familiar with, which

17  was sort of generated out of an unfortunate situation in

18  Louisiana at that time in which state compensation benefits

19  under their own workman's compensation scheme were generally

20  and widely recognized not to be very accurate.  And those are

21  two bodies of law, and I believe that the Fininger court has

22  acknowledged are in direct conflict.  How do you see your way

23  out of that, it is not as simple as Porche' says, vested

24  rights occuring jurisdiction, it is not that simple.

25          Judge, just to address a few more points, if I may.

1  I feel like, and I told Mr. Landry this when I walked in, I
2  feel a little bit like Florida State in the forth quarter and
3  I'm behind by 21 points.  It's a tough thing Judge, Judge
4  Duval has rendered an opinion, I do want to correct something
5  that Mr. Landry said to you in a letter yesterday, this is
6  not the third court that has addressed exactly the same
7  issues by exactly the same parties, in exactly the same way.
8  The Overlay case, which, of course, was brought by Avondale
9  itself in removal in California Supreme Court, I didn't have
10  anything to do with that.  But the factual situation there is
11  an individual who is an employee of Westinghouse Corporation,
12  who basically brought a premises liability action against
13  Avondale. The Overlay Court said, with regard to the federal
14  defense, it's not arguable that you have this federal defense
15  because number one, we are under an injunction from the Ninth
16  Circuit saying the failure to warn claim basically is not
17  covered under one of the defenses that you are raising, the
18  government contractor defense.  And number two, you are
19  raising some type of statutory employment argument that is
20  not in the longshore act and therefore you really have not
21  asserted any kind of federal defense.  And there is no causal
22  nexus because of the failure to warn.  In Porche', its really
23  a notice decision, admittedly, Judge Livadais wanted to send
24  a message, I think, to Travelers Insurance Company to remove
25  those cases,  more or less along the lines of get out of here

1   and don't come back.  And he said that he thought it was

2   really persuasive.  But when he decide on those cases, it was

3   decided on the basis of notice.

4   Judge Duval is really the first Judge who has

5   addressed these issues that we have raised on the merits,

6   within the context in which they should be raised.  We

7   disagree, we provided you with a supplemental brief, I just

8   want to end on two notes, one is on the issue of a colorable

9   defense.  I shouldn't have to persuade you, Judge, and under

10  Willingham from the United States Supreme Court, in fact, a

11  long line of Supreme Court, United States Supreme Court cases

12  and other cases, I shouldn't have to bear the burden in order

13  to avail myself of federal court in this case to persuade you

14  that Filinger is correct and Porche' is wrong.  My burden is

15  to show that I have a colorable federal defense.  The fact

16  that it has been accepted by the highest court of one of

17  these states to me is more or less ipso facto persuasive and

18  when the opinion from Judge Duval gets published I will have

19  to make a note to send it to the Supreme Court of Alabama.

20  Its a complicated issue, admittedly.  I'm not sure whose

21  right but I do know this, one of the highest courts in one of

22  the states in this country has been persuaded, and at least

23  two federal courts have carved out certain parts of the

24  longshore act, in Steven v Premium, state law, its a tough

25  case, but it's a colorable argument.

1       The other thing that I would like to say with
2   regard to this failure to warn thing.  You know, Judge, I was
3   looking at the pleadings again before I came over here and
4   I'm not privy to what the pleadings said in Overlay, but I am
5   privy to what the pleadings say here.  What they say here can
6   be found essenially in the plaintiffs' petition in paragraph
7   15.  Mr. Landry can say what he will about this is a failure
8   to warn claim in order to avail themselves of the
9   persuasiveness of the Overlay opinion in order to avail
10  themselves of the persuasiveness and to whatever degree its
11  there in the Geauthier (spelled phonectically) opinion, but
12  the pleadings speak for themselves.  And the pleadings
13  allege, yes, some factual assertions having to do with the
14  warnings issue, in fact, there are two specific allegations
15  having to do with that.  But they also allege that the
16  Avondale supervises, and I'm quoting, "fail to provide a safe
17  work place."  Kind of a general allegation but it keys right
18  in to the statutory deed under Louisiana law which says that
19  Avondale had a duty to provide its employees with a safe
20  place to work.  They allege that the Avondale supervisors
21  failed to provide safety equipment.  That is not a failure to
22  warn issue, Judge, but that is an issue in which we are
23  either right or wrong.  We have provided an affidavit from
24  Mr. Danny Joyce and we have provided other affidavits that
25  will show you that using the S---- contract as an example,

1   that federal, that the Department of Labor regulations were
2   incorporated into these contracts, we have provided you with
3   those regulations that specifically talk about what duties
4   shipyards like Avondale were under with regard to protecting
5   their workers during that era, what safety equipment is
6   specifically addressed.  And we have maintained and given you
7   affidavits to support these, including sworn testimony from a
8   plaintiff in some unrelated lawsuits, that there were Navy
9   safety people on hand doing daily walk through inspections.
10  These issues plaintiffs allege that we failed to provide them
11  with correct safety equipment, that's directly addressed in
12  those safety regulations that were made part of the contracts
13  and inspected on these Navy projects on a daily basis by the
14  United States Department of Navy safety inspectors.  They
15  allege that the United States failed to remove asbestos
16  hazards from the work place and it's contradicted.  Mr.
17  Landry has not argued the case despite this allegation that
18  the asbestos, which we believe these individuals were exposed
19  to in the crafts that they were in, and incidently, there are
20  only three of these men who we think their claims are
21  removable.  The lawsuit was filed on behalf of three guys,
22  the guy in the warehouse, I have no -- I will concede right
23  now, the one guy who's a warehouseman, whose name I believe
24  is Robicheaux, his claim by consent should be sent back to
25  state court.  I have no idea where that man was operating and

1    I think environment is subject to federal inspection

2    regulation specifications.  These other men are different,

3    they were riggers, ship fitters, they operated under the

4    supervision of Mr. S----- and Mr. Blanchard whose job it was

5    to build those ships for the United States government.

6              THE COURT:  I understand your position.

7              MR. CARAWAY:  We were told to put that on the ship,

8    the allegation says that we timely failed to remove asbestos,

9    I'm here to say, and we provided proof for it, that we did

10   not and were not at liberty.  Sir, the case law of the Fifth

11   Circuit is no different from any other circuit.  The

12   allegations of the plaintiffs' petition at the time of

13   removal are what controlled the issue of federal

14   jurisdiction, it does not matter that there may be issues

15   that are also state law issues, the Supreme Court has

16   specifically said in the Willingham case, quoting one of

17   their own decisions, going back to the last century.  And

18   I'll leave on this note.  "Nor is it any objection that

19   questions are involved which are not all the federal

20   character, if one of the latter exists, if there be a single

21   such ingredient in the balance, it is sufficient."  That

22   element is decided upon the subject of jurisdiction.

23             THE COURT:  Gentlemen, you all have briefed it for

24   me, I have looked over the material in some detail, I'm ready

25   to move on it.

1    The lawsuit before me is an action which seeks

2    medical monitoring for people who have been occupationally

3    exposed to asbestos products during the construction and/or

4    work on the various vessels around Avondale shipyards.  Cause

5    of action for medical monitoring has been recognized in this

6    circuit by the Hagee case, Fifth Circuit a 1986 case.

7        The plaintiffs in this case, several of them seek

8    to remand the proceedings to the state court, the case has

9    been removed to this court.  A civil action was originally

10   filed in this case on January the 23rd of 1996 in the Twenty-

11   fourth Judicial District of Jefferson.  Among other people

12   who were named as a defendant, American Motorists Insurance

13   Company, was one of them.  In addition to Travelers Insurance

14   Company, in addition to the various and sundry executive

15   officers of Avondale, American Motorists, as well as several

16   of the other defendants were served with the plaintiff's

17   original petition on February the 8th of 1996. American

18   Motorists was removed on November 19, 1996 on the basis of

19   the information contained in other documents revealed for the

20   first time that the action was removable under 28 USC

21   1446(b).

22        The present motion before the Court is to remand

23   the case.  The pleadings were initially filed, as I said, on

24   January the 23rd, 1996, they were received on February the

25   8th of 1996, and the removal was filed on November 19, 1996.

Patricia F Duroncelet, CCR

The matter may be remanded either because of a defect in procedure or a lack of subject matter jurisdiction. Under 28 USC 1446(b), the defendant must remove within thirty days after receipt of the initial pleading.

American Motorists notice of removal, the Court feels was not timely because American motorists had access to knowledge since at least early February of the facts of the case that formed the basis of the removal. They should have removed the action within thirty days on or before March the 11th of 1996. I find Porche' versus Flexitallic, civil action number 96-27 persuasive and helpful in that particular matter. But even if it were not timely, I also think that the action is not removable under 1442(a)(1) because the Avondale interest did not act, as I read the pleadings and the affidavits and the information, under the control or direction of a federal officer with respect to the plaintiffs' asserted in the action.

In order to qualify as a federal officer or a person acting under him, the removing party must, one, demonstrate that it acted under the direction of a federal officer. Two, must raise a federal defense to the plaintiff's claim. And three, demonstrate a causal nexus between the plaintiff's claim and the acts it performed under the color of federal officers. This is what counsel has called to the Court's attention in the Mesa versus California

Patricia F Duroncelet, CCR

1   case, 49 US 121 et seq.   The removal must be predicated upon

2   a showing that the acts forming the basis of the state court

3   suit were performed pursuant to the officers' direct and

4   detailed control, a general auspices, a general control does

5   not satisfy the riggers of 1442 (a)(1).

6           The issue in this case is not the products

7   liability or some cases you will see in the literature

8   occasionally where vessels were built too long and they are

9   subject to wave action and they break in half, we see this in

10  some cases where the argument is that its built improperly

11  and the defense is on the basis that the defense is made in

12  this particular case.   The courts in those cases, although

13  they are seldom in the common days, touch on them a bit more

14  perhaps in the courts but the argument is that they fail not

15  because of any defect in the equipment, not because of the

16  improper work performed on the vessel but simply because of

17  the design defect, they were as to long and should not have

18  been that long and therefore they were acting under the

19  control and supervision of the government and therefore you

20  are entitled to that particular defense.   I don't see this

21  particular case in that ball park even, I think the issue

22  here is whether there was safety rules, regulations,

23  equipment, atmosphere, information imparted to the people,

24  warnings, things of that sort which are completely under the

25  supervision and control of Avondale.   They would not expose

Patricia F Duroncelet, CCR

1    some people to some hazards and other people to other
2    hazards, they have to have a uniform safety program
3    regardless of who they do work for.
4           So I think the issue in this case is that the
5    government may have had some general control, the inspectors
6    may have come aboard the vessels but we all know when the
7    inspectors come aboard the vessels they are going to make
8    sure that the work is going on and the work is being done
9    properly in the sense of the proper gauge steel and the
10   proper placement of the ribs and so forth and so on.  And
11   they are often given the safety equipment to go board the
12   vessel by Avondale, they get their visitors equipment and
13   their visitors hat, whether its blue or white or red, they
14   use it and go aboard unless they specifically brought there
15   their own.  So Avondale even suits them out.  So they are not
16   -- Avondale, in that instance, is really telling them what to
17   wear and what to do and where to go and whose working on the
18   vessel rather than the other way around.
19          Moreover, the plaintiffs' claims in this case are
20   based on Louisiana state law and do not rise to the level of
21   Constitutional law treaties of the United States.  Therefore,
22   the Court feels that federal jurisdiction does not exist
23   under 28 USC 1441(b).
24          And finally, the defendants urge that the
25   longshoreman act is a basis for removal.  The Aaron case

1  which we discussed, 876 fed 2nd 1157, indicates that that is

2  not a basis for a removal.  But the argument made that there

3  are some specific federal rights, I don't read Sunship or

4  Porche' in that rigorous manner.  I do think there is some --

5  until the state statute said, if federal act is applicable

6  then the state is not applicable, there would be no reason to

7  pass the state statute if Sunship settled that issue or said

8  that the federal preempts the state, it would have been a

9  vain and useless thing and cases citing that particular state

10  statute would be citing a vain and useless thing.

11       So I do feel that that reliance on the longshoreman

12  harbor workers act is not sufficient to make it a federal

13  question or to raise it to federal jurisdiction.

14       The motion to remand is granted.  I have reviewed

15  the material, the plaintiff asks for costs and attorneys

16  fees, there are cases which have granted it, I'm familiar

17  with the case in San Francisco and others, but I think this

18  issue is not uncomplicated, the briefs raise intriguing

19  issues and I think that counsel is certainly in his right in

20  responding to the duty to seek removal in this particular

21  case and did do so and did it professionally and well, so I

22  will deny that motion to award attorneys fees and court

23  costs.

24       Thank you, gentlemen.

25       MR. LANDRY:  Thank you, Judge.

35

MR. CARAWAY:   Thank you, Judge.

\*       \*       \*

Patricia F Duroncelet, CCR

STATE OF LOUISIANA

PARISH OF ORLEANS

## AFFIDAVIT

**BEFORE ME**, the undersigned authority, duly commissioned, qualified and sworn in

and for the state and parish aforesaid, **PERSONALLY CAME AND APPEARED**:

### FELIX ALBERT

who, after being by me first duly sworn, did depose and say that:

1. He worked as a ship inspector for the United States Navy at Avondale Shipyards from 1965 to 1976.

2. Avondale was a privately owned shipyard that constructed both military and commercial vessels.

3. In connection with the construction of the government vessels, Avondale employees did not work under the direct orders of a ship inspector and Avondale employees did not act under the direction of a ship inspector.

4. The United States government inspectors neither monitored nor enforced safety regulations.

5. On the job safety during the construction of vessels for the United States government was the responsibility of Avondale Shipyards' safety department.

_Felix R. Albert_
**AFFIANT**

Sworn to and subscribed before me this the _24th_ day of July, 1996, at New Orleans,

Louisiana.

_____
NOTARY PUBLIC

S:\GAUTHE\AFFIDAVT.EXP

**EXHIBIT**
**9**

**Page 1**

COPY

```
                  CIVIL DISTRICT COURT
                    PARISH OF ORLEANS
                   STATE OF LOUISIANA

RUDY WALKER, SR. and          *    NO. 2003-3384
JOAN WALKER                   *
                              *    DIVISION "H"
VERSUS                        *
                              *    SECTION 12
AVONDALE INDUSTRIES, INC.,    *
et al.                        *
*  *  *  *  *  *  *  *  *     *    *   *   *   *

RALEIGH LANDRY and            *    NO. 02-5103
CLAILEE AUCOIN LANDRY         *
                              *    DIVISION "H"
VERSUS                        *
                              *
AVONDALE INDUSTRIES, INC.,    *
et al.                        *
*  *  *  *  *  *  *  *  *     *    *   *   *   *

LINDWARD FREMIN and his       *    NO. 2001-06848
wife, GAIL ROLLAND FREMIN     *
                              *    DIVISION "E"
VERSUS                        *
                              *    SECTION 9
ENTERGY NEW ORLEANS, INC.,    *
ET AL.                        *
*  *  *  *  *  *  *  *  *     *
```

Videotaped deposition of RUDY JAMES
WALKER, SR., 605 Oak Avenue, Bridge City,
Louisiana 70094, taken in the home of Rudy
Walker, Sr., 605 Oak Avenue, Bridge City,
Louisiana 70094, on Thursday, the 8th day of
May, 2003.

ONE SHELL SQUARE, SUITE 250 ANNEX   **HUFFMAN & ROBINSON, INC.**   (504) 525-1753
NEW ORLEANS, LOUISIANA 70139    CERTIFIED COURT REPORTERS   (800) 749-1753

**Page 2**

APPEARANCES:

    ROUSSEL & ROUSSEL
      (By:  Gerolyn P. Roussel, Esquire)
    1710 Cannes Drive
    LaPlace, Louisiana  70068
          (Attorneys for the Plaintiffs)

    LEE, FUTRELL & PERLES, L.L.P.
    Attorneys at Law
      (By:  Gary A. Lee, Esquire)
    Suite 2409, BankOne Center
    201 St. Charles Avenue
    New Orleans, Louisiana  70170
          (Attorneys for the Avondale
          Employees, Rudy Walker, Sr.
          and Raleigh Landry)

    BLUE WILLIAMS, L.L.P.
    Attorneys at Law
      (By:  Edwin A. Ellinghausen III, Esquire)
    9th Floor
    3421 North Causeway Boulevard
    Metairie, Louisiana  70002
          (Attorneys for the Defendant,
          Northrop Grumman Ship Systems,
          Inc., formerly known as
          Avondale Industries, Inc.

    SIMON, PERAGINE, SMITH & REDFEARN, L.L.P.
    Attorneys at Law
      (By:  James R. Guidry, Esquire)
    30th Floor, Energy Centre
    1100 Poydras Street
    New Orleans, Louisiana  70163-3000
          (Attorneys for the Defendant,
          McCarty Corporation in the
          Landry and Walker Cases)

ONE SHELL SQUARE, SUITE 250 ANNEX   **HUFFMAN & ROBINSON, INC.**   (504) 525-1753
NEW ORLEANS, LOUISIANA 70139    CERTIFIED COURT REPORTERS   (800) 749-1753

**Page 3**

    DOGAN, WILKINSON, KINARD,
       SMITH & EDWARDS
    Attorneys at Law
      (By:  John B. Edwards, II, Esquire)
    734 Delmas Avenue
    Post Office Box 1618
    Pascagoula, Mississippi 39568-1618
          (Attorneys for the Defendant,
          Guard-Line, Inc. in the
          Landry Case)

    BERNARD, CASSISA, ELLIOT & DAVIS
    Attorneys at Law
      (By:  Francine M. Giugno, Esquire)
    1615 Metairie Road  (70005)
    Post Office Box 55490
    Metairie, Louisiana 70055-5490
          (Attorneys for the Defendant,
          Reilly-Benton Company, Inc.
          in the Landry and Walker cases)

    HAILEY, MCNAMARA, HALL, LARMANN
       & PAPALE, L.L.P.
    Attorneys at Law
      (By:  Valerie T. Schexnayder, Esquire)
    Suite 1400
    One Galleria Boulevard  (70001)
    Post Office Box 8288
    Metairie, Louisiana 70011-8288
          (Attorneys for the Defendant,
          The Flintkote Company)

    HAILEY, MCNAMARA, HALL, LARMANN
       & PAPALE, L.L.P.
    Attorneys at Law
      (By:  Amy V. Seemann, Esquire)
    Suite 1400
    One Galleria Boulevard  (70001)
    Post Office Box 8288
    Metairie, Louisiana 70011-8288
          (Attorneys for the Defendant,
          Taylor-Seidenbach, Inc.)

ONE SHELL SQUARE, SUITE 250 ANNEX   **HUFFMAN & ROBINSON, INC.**   (504) 525-1753

**Page 4**

    KING, LeBLANC & BLAND, L.L.P.
    Attorneys at Law
      (By:  Scott T. Winstead, Esquire)
    Suite 3800, BankOne Center
    201 St. Charles Avenue
    New Orleans, Louisiana  70170
          (Attorneys for the Defendant,
          McDermott, Inc.)

    PLAUCHÉ MASELLI LANDRY & PARKERSON, L.L.C.
    Attorneys at Law
      (By:  Stephanie E. Rennell, Esquire)
    Suite 4240, BankOne Center
    201 St. Charles Avenue
    New Orleans, Louisiana  70170
          (Attorneys for the Defendant,
          John Crane, Inc.)

    AULTMAN, TYNER, RUFFIN & YARBOROUGH, LTD.
    Attorneys at Law
      (By:  Troy N. Bell, Esquire)
    Suite 1900
    400 Poydras Street
    New Orleans, Louisiana  70130
          (Attorneys for the Defendant,
          Garlock Sealing Technologies,
          L.L.C. in the Walker and
          Landry Cases)

    DEUTSCH, KERRIGAN AND STILES, L.L.P.
    Attorneys at Law
      (By:  Kevin J. Webb, Esquire)
    755 Magazine Street
    New Orleans, Louisiana  70130-3672
          (Attorneys for the Defendant,
          Rhone-Poulenc Ag Company, in the
          Walker and Landry Cases)
```

**EXHIBIT**

tabbies

10

ONE SHELL SQUARE, SUITE 250 ANNEX   **HUFFMAN & ROBINSON, INC.**   (504) 525-1753

5

```
 1     DUPLASS, ZWAIN, BOURGEOIS & MORTON
       Attorneys at Law
 2     (By:  Magali Puente-Martin, Esquire)
       Suite 2900, Three Lakeway Center
 3     3838 North Causeway Boulevard
       Metairie, Louisiana  70002
 4            (Attorneys for the Defendants,
               Olympic Glove and Steel Grip,
 5             in the Landry Case)

 6
 7     EVERT & WEATHERSBY, L.L.C.
       Attorneys at Law
 8     (By:  Christopher G. Conley, Esquire)
       Post Office Box 1787
 9     Athens, Georgia  30603

            - AND -
10
11     LYNN LUKER & ASSOCIATES
       Attorneys at Law
12     (By:  Lynn M. Luker, Esquire)
       Suite 200
13     616 Girod Street
       New Orleans, Louisiana  70130
14            (Attorneys for the Defendant,
               Foster-Wheeler, L.L.C.)
15
16     FORMAN, PERRY, WATKINS, KRUTZ
            & TARDY, P.L.L.C.
17     Attorneys at Law
       (By:  W. Scott Brown, Esquire)
18     Suite 1420
       1515 Poydras Street
19     New Orleans, Louisiana  70112
              (Attorneys for the Defendant,
20             Owens-Illinois, Inc.)

21     LEMLE & KELLEHER, L.L.P.
       Attorneys at Law
22     (By:  Cory R. Cahn, Esquire)
       21st Floor, Pan-American Life Center
23     601 Poydras Street
       New Orleans, Louisiana  70130-6097
24            (Attorneys for the Defendant,
               General Electric Corporation,
25             in the Walker Case)
```

6

```
 1     BARFIELD & ASSOCIATES
       Attorneys at Law
 2     (By:  Kay Barnes Baxter, Esquire)
       Suite 1460
 3     400 Poydras Street
       New Orleans, Louisiana  70130
 4            (Attorneys for the Defendants,
               Rockbestos in the Fremin and
 5             Walker Cases, and Entergy
               Corporation in the Fremin Case)

 6
 7     GALLOWAY, JOHNSON, TOMPKINS, BURR
            & SMITH, P.L.C.
 8     Attorneys at Law
       (By:  Kimberly G. Anderson, Esquire)
 9     Suite 4040, One Shell Square
       701 Poydras Street
10     New Orleans, Louisiana  70139
              (Attorneys for the Defendant,
11             Walter J. Barnes Electric
               Company, Inc. in the Fremin Case)
12
13     SHER, GARNER, CAHILL, RICHTER, KLEIN,
            McALISTER & HILBERT, L.L.C.
14     Attorneys at Law
       (By:  John T. Balhoff, II, Esquire)
15     28th Floor
       909 Poydras Street
16     New Orleans, Louisiana  70112
              (Attorneys for the Defendant,
17             The Okonite Company)

18
19     MONTGOMERY, BARNETT, BROWN, READ,
            HAMMOND & MINTZ, L.L.P.
20     Attorneys at Law
       (By:  Edward R. McGowan, Esquire)
21     Suite 3200, Energy Centre
       1100 Poydras Street
22     New Orleans, Louisiana  70163-3200
              (Attorneys for the Defendant,
23             Eagle, Inc.)

24
25
```

7

```
 1     McGLINCHEY STAFFORD, P.L.L.C.
       Attorneys at Law
 2     (By:  Heather A. Waterman, Esquire)
       643 Magazine Street
 3     New Orleans, Louisiana  70130
              (Attorneys for the Defendant,
 4             American Cyanamid in the
               Fremin Case)
 5
 6     DUNCAN, COURINGTON & RYDBERG, L.L.C.
       Attorneys at Law
 7     (By:  Blaine A. Moore, Esquire)
       Suite 1200
 8     400 Poydras Street
       New Orleans, Louisiana  70130
 9            (Attorneys for the Defendant,
               Hopeman Brothers, Inc. in
10             the Walker Case)

11
12     LUGENBUHL, WHEATON, PECK, RANKIN
            & HUBBARD
13     Attorneys at Law
       (By:  Gordon P. Wilson, Esquire)
14     Suite 2775, Pan-American Life Center
       601 Poydras Street
15     New Orleans, Louisiana  70130-6027
              (Attorneys for the Defendant,
16             The Travelers Indemnity Company)

17     JONES, WALKER, WAECHTER, POITEVENT,
            CARRERE & DENEGRE, L.L.P.
18     Attorneys at Law
       (By:  William L. Schuette, Esquire)
19     8555 United Plaza Boulevard
       Baton Rouge, Louisiana  70809-7000
20            (Attorneys for the Defendant,
               Viacom, Inc.)
21
22     VIDEOGRAPHER:

23     Georgette Rinkus, CLVS
       Hart Video of Louisiana, L.L.C.
24     Suite C
       1921 Corporate Square Boulevard
25     Slidell, Louisiana  70458
```

8

```
 1     REPORTED BY:

 2     VITA T. ELMER, CCR
       Certified Court Reporter
 3     Huffman & Robinson, Inc.
       One Shell Square, Suite 250 Annex
 4     New Orleans, Louisiana  70139
       (504) 525-1753     (800) 749-1753
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

9

I N D E X

PAGE

In the *Fremin* Case:

EXAMINATION BY MR. BALHOFF    :    16
        RE-EXAMINATION        :    81

EXAMINATION BY MS. BAXTER     :    50
        RE-EXAMINATION        :    84

EXAMINATION BY MS. SCHEXNAYDER:    87
        RE-EXAMINATION        :    91

EXAMINATION BY MS. ROUSSEL    :    89
        RE-EXAMINATION        :    91

In the *Landry* Case:

EXAMINATION BY MR. LEE        :    94
        RE-EXAMINATION        :   106

EXAMINATION BY MR. BROWN      :   102

EXAMINATION BY MS. RENNELL    :   103

In the *Walker* Case:

EXAMINATION BY MR. LEE        :   112

EXAMINATION BY MR. WILSON     :   203

EXAMINATION BY MR. BELL       :   204
        RE-EXAMINATION        :   376

EXAMINATION BY MR. BROWN      :   218
        RE-EXAMINATION        :   381

EXAMINATION BY MS. SEEMANN    :   226

EXAMINATION BY MR. WEBB       :   227

EXAMINATION BY MR. SCHUETTE   :   242

EXAMINATION BY MS. MOORE      :   256

ONE SHELL SQUARE, SUITE 250 ANNEX    **HUFFMAN & ROBINSON, INC.**    (504) 525-1753
NEW ORLEANS, LOUISIANA 70138    CERTIFIED COURT REPORTERS    (800) 749-1753

---

10

PAGE

EXAMINATION BY MR. BALHOFF    :    271

EXAMINATION BY MR. CAHN       :    313
        RE-EXAMINATION        :    338

EXAMINATION BY MS. ROUSSEL    :    337
        RE-EXAMINATION        :    339
        RE-EXAMINATION        :    376

EXAMINATION BY MR. CONLEY     :    344

EXAMINATION BY MS. BAXTER     :    364

EXAMINATION BY MS. SCHEXNAYDER:    386

MARKED TESTIMONY

Request Number 1.......................... 93

EXHIBITS

Exhibit Number 1:                          12
        (Letter to All Parties from
        Gerolyn P. Roussel, dated
        May 2, 2003, with attachments)

Exhibit Number 2:                          92
        (Document entitled "NOTICE OF
        DEPOSITION")

Exhibit Number 3:                          --
        (Document entitled "NOTICE OF
        DEPOSITION," with attachment)

        *      *      *      *      *

ONE SHELL SQUARE, SUITE 250 ANNEX    **HUFFMAN & ROBINSON, INC.**    (504) 525-1753
NEW ORLEANS, LOUISIANA 70138    CERTIFIED COURT REPORTERS    (800) 749-1753

---

11

S T I P U L A T I O N

It is stipulated and agreed by and among
counsel for the parties hereto that the
deposition of the aforementioned witness is
hereby being taken under the Louisiana Code of
Civil Procedure, Article 1421, et seq., for all
purposes, in accordance with law;

That the formalities of filing, reading,
signing, sealing, and certification are
specifically waived;

That all objections, save those as to the
form of the question and the responsiveness of
the answer, are hereby reserved until such time
as this deposition, or any part thereof, may be
used or sought to be used in evidence.

        *      *      *      *      *

VITA T. ELMER, Certified Court Reporter,
in and for the Parish of Orleans, State of
Louisiana, officiated in administering the oath
to the witness.

ONE SHELL SQUARE, SUITE 250 ANNEX    **HUFFMAN & ROBINSON, INC.**    (504) 525-1753

---

12

P R O C E E D I N G S

MS. ROUSSEL:

With regard to the *Walker* case, Sam
Rosamond who represents Commercial Union
Insurance Company has been called. He
admits that he did get notice for today
and is waiving his appearance at the
deposition today.

Highlands Insurance Company,
J. Warren Gardner was called. I talked
with his secretary, she then went and
talked with him and said he was aware of
the deposition today. He did get notice
and he is waiving his appearance. The
secretary's name is Shelly Boudreaux.

We can go ahead and get started.

We're going to attach as Exhibit 1
to the deposition the Notice of
Deposition, since an issue has been
raised. It has the fax confirmation
showing that everyone did get served with
it.

THE VIDEOGRAPHER:

This is the videotaped deposition of
Rudy Walker, Sr., taken for the Civil

ONE SHELL SQUARE, SUITE 250 ANNEX    **HUFFMAN & ROBINSON, INC.**    (504) 525-1753

13

1   District Court for the Parish of Orleans,
2   State of Louisiana, Case Number 02-5103,
3   Case Number 03-3384, and Case Number
4   2001-06848, Division "H."  This deposition
5   is being held at 605 Oak Avenue in Bridge
6   City, Louisiana on May 8, 2003.
7          My name is Georgette Rinkus.  I'm a
8   certified legal video specialist with Hart
9   Video.  The court reporter is Vita Elmer
10  with Huffman & Robinson.
11         Would counsel please introduce
12  themselves.
13  MS. ROUSSEL:
14         Gerolyn Roussel for the plaintiffs.
15  MR. BALHOFF:
16         John Balhoff for The Okonite Company
17  in the *Walker* and *Freeman* cases.
18  MR. BROWN:
19         Scott Brown on behalf of
20  Owens-Illinois, Incorporated in the *Landry*
21  and *Walker* cases.
22  MR. BELL:
23         Troy Bell in the *Landry* and *Walker*
24  cases only.
25  MS. BAXTER:

14

1          Kay Baxter in the *Walker* and *Freeman*
2   cases only.
3   MS. MOORE:
4          Blaine Moore in the *Walker* case
5   only.
6   MR. WILSON:
7          Gordon Wilson for Travelers
8   Indemnity in the *Walker* case.
9   MS. RENNELL:
10         Stephanie Rennell on behalf of John
11  Crane, Inc. in the *Landry* case only.
12  MR. LEE:
13         Gary Lee on behalf of Avondale
14  employees in the *Walker* and *Landry* case.
15  MR. WEBB:
16         Kevin Webb on behalf of
17  Rhone-Poulenc Ag Company in the *Landry* and
18  *Walker* case.
19  MS. PUENTE-MARTIN:
20         Magali Puente on behalf of Olympic
21  Glove and Steel Grip in the *Landry* case.
22  MS. SEEMANN:
23         Amy Seemann in the *Walker*, *Landry*
24  and *Fremin* cases.
25  MR. ELLINGHAUSEN:

15

1          Ed Ellinghausen for Northrop Grumman
2   Ship Systems, formerly known as Avondale
3   Industries, Incorporated in the *Landry* and
4   *Walker* cases.
5   MR. CONLEY:
6          Mr. Walker, I'm Chris Conley and I'm
7   with Foster-Wheeler.
8   THE WITNESS:
9          Foster-Wheeler.
10  MS. SCHEXNAYDER:
11         Valerie Schexnayder in all three
12  cases.
13  MR. MCGOWAN:
14         Edward McGowan for Eagle, Inc. in
15  all three cases.
16  MR. CAHN:
17         Cory Cahn in the *Walker* case.
18  MS. WATERMAN:
19         Heather Waterman for American
20  Cyanamid in the *Fremin* case.
21  MR. GUIDRY:
22         James Guidry for the McCarty
23  Corporation in the *Rudy Walker* and *Raleigh
24  Landry* cases only.
25  MS. ANDERSON:

16

1          Kim Anderson for Walter J. Barnes
2   Electric Company, Inc. in the *Fremin* case
3   only.
4   MS. GIUGNO:
5          Francine Giugno on behalf of
6   Reilly-Benton Company, Inc. in the *Landry*
7   and *Walker* cases only.
8   MR. EDWARDS:
9          John Edwards, *Raleigh Landry* case.
10  THE VIDEOGRAPHER:
11         Is that all, Counsel?
12         Would the court reporter please
13  swear in the witness.
14         RUDY WALKER, SR.,
15  after having been first duly sworn by the
16  above-mentioned Registered Merit Reporter, did
17  testify as follows:
18  EXAMINATION BY MR. BALHOFF:
19  Q.    Good morning.  Mr. Walker, my name
20  is John Balhoff.
21        Did you work with a fellow by the
22  name of Linward Fremin in your work history?
23  A.    Yes.  In my early '60s at Avondale.
24  They used to call him Preacher.  I know him by
25  Preacher.  He worked as an electrician -- the

17

```
1    same work I done at Avondale.  He installed
2    electrical equipment, pulled cable and hooked
3    it up, skin it out and all.
4         Q.    Okay.
5         A.    We done thousands and thousands of
6    connections on junction boxes and light
7    fixtures and panels and switchboards and
8    distributions.
9         Q.    Are you saying that you did this
10   work or you know that Mr. Fremin did this work?
11        A.    He did this work, too.  He did work
12   side by side.  We worked, you know, on the same
13   stuff, same equipment and all.
14        Q.    How often did you work side by side
15   with Mr. Fremin?
16        A.    Oh, I guess on a frequent basis on
17   a daily sometimes or weekly basis.
18        Q.    Did you ever see Mr. Fremin work
19   with Okonite wire and cable?
20        A.    Okonite wire and cable.  We worked
21   with Okonite and Rockbestos and General
22   Electric cables.
23        Q.    So you actually saw Mr. Fremin
24   working with the Rockbestos, Okonite and
25   General Electric cable?
```

18

```
1         A.    Yes.  It was the same wires I was
2    working on.
3         Q.    Did you work with Mr. Fremin at any
4    other worksite other than at Avondale?
5         A.    No, just at Avondale.
6         Q.    Can you be any more specific than
7    the early 1960s?
8         A.    I guess from '61, '62 to '65, '64,
9    '65, in that area, I guess.
10        Q.    Okay, You talked about some of the
11   tasks that you did when you were at Avondale.
12        A.    Yes.
13        Q.    What were some of the tasks that
14   you saw Mr. Fremin performing with Okonite wire
15   and cable?
16        A.    Well, he would do the same.  He'd
17   take the braids off to serve it.  Then he would
18   take that sheet, the rubber sheets and cut it
19   with the knife to fit it in the connectors or
20   if it was a watertight connector or just a
21   clamp connector or whatever and then he would
22   take that sheet off, then he would clean all of
23   the strings and associated loose particles and
24   insulation that wasn't necessary for the
25   installation of the conductors.  And then he
```

19

```
1    would serve that into the panels in the boxes
2    and the switches and the receptacles of the
3    lights and switchboards and all.  That all had
4    this fibrous dust that would come out of it
5    when you would cut it.  You had to cut it or
6    hacksaw it and use the dikes, these stick-on
7    pliers to cut the braids and all, and sharp
8    knives to -- hook knives to cut the rubber off
9    of the insulators.  And it -- you had to serve
10   that into the panels, the electrical panels.
11        Q.    How often did you see -- I'm sorry,
12   Mr. Walker.  How often did you see Mr. Fremin
13   use a hacksaw on electrical wire and cable?
14        A.    Well, every time he cut it, I guess
15   he had to use a hacksaw to cut the bigger
16   cables.  You couldn't cut them with a pliers or
17   anything.  You needed a hacksaw to cut them or
18   one of those big, big old cutters, prong
19   cutters, to cut it.  Smaller cables you could
20   use a regular pliers to chop them, you know,
21   like a size three cable, four, but when they
22   would get to like a eight or ten or bigger, you
23   couldn't -- you needed hacksaws and big cutters
24   to cut them.
25        Q.    What was -- well, first of all, do
```

20

```
1    you know whether the Okonite wire and cable
2    contained asbestos?
3         A.    Well, at that time we knew they had
4    fibrous asbestos in the cable but we didn't
5    know it would cause any problems to our lungs.
6    They didn't have no warning signs or nothing
7    like that that would say.  You know, they
8    had -- you had to use a respirator or something
9    like that.  We didn't have no protection or
10   nothing like that on the -- on the safety end
11   of it.  And that stuff used to fly in your face
12   when you cut it.
13        Q.    How did you know Okonite wire and
14   cable had asbestos in it?
15        A.    They had the rock asbestos was part
16   of the name.
17        Q.    I'm talking about Okonite, not
18   Rockbestos.
19        A.    Okonite, they had particles like
20   asbestos particles in the -- in the wire.
21        Q.    How did you know that insulation in
22   the wire was asbestos?
23        A.    Well, really didn't know it was
24   asbestos but it was a fibrous stuff, I guess.
25        Q.    So no one told you it was asbestos,
```

21

1  correct?

2      A.    No one told me it was asbestos.

3      Q.    Ever?

4      A.    Ever.

5      Q.    What was the outside diameter of

6  the wiring -- let's start with cable.  The

7  Okonite cable that you used, about how large

8  was it in diameter?

9      A.    Some of it was as big as your

10 finger, some was as big as your arm.  It all

11 depends on which size.  As the circular mils

12 would get bigger, the cable would get bigger.

13 And the conductors, maybe say three and four

14 conductors, but the size of the circular mil of

15 the copper would get bigger as the load of the

16 wire would increase, it depends on the load.

17 So we used both small and large wires.

18     Q.    Mr. Walker, I'm sorry I wasn't

19 specific before.  But in this first part of the

20 deposition, all of my questions are just going

21 to be directed as to your knowledge of what Mr.

22 Fremin worked with.

23     A.    Yes.

24     Q.    Later on today we're going to talk

25 about what you worked with.

22

1      A.    Yes.

2      Q.    So am I correct in understanding

3  that Mr. Fremin worked with wire or cable that

4  was as big as your finger up to as big as your

5  arm?

6      A.    That's correct.

7      Q.    Okay.  You actually saw him work

8  with this cable?

9      A.    That's correct.

10     Q.    Do you know what the manufacturer

11 of the cable was?

12     A.    Yeah.

13 MS. ROUSSEL:

14     He already named them.

15 THE WITNESS:

16     It was Okonite, Rockbestos and

17     General Electric.

18 EXAMINATION BY MR. BALHOFF:

19     Q.    Okay.  That's for those various

20 sizes, all three of them?

21     A.    That's for various sizes, yeah.

22     Q.    How about the wire, what was the

23 diameter of the wire?

24     A.    The diameter of the wire was, I

25 guess, maybe a half an inch all the way to

23

1  three inches and four inches.  They had

2  TT-500ths was three conductor circuit mil

3  cables this big (indicating).  And they had

4  TT-1-1/2, twisted half for phones.  And they

5  had for the lights and receptacles, they used

6  Number 3 and Number 4 that was circular mil

7  small, circular mil cable.  And they would use

8  most commonly the three conductor wire for the

9  light fixtures.  And then if you had a switch

10 that you needed an extra wire was four

11 conductor for your travelers.  That's what it

12 was.

13     Q.    What was -- again, what Mr. Fremin

14 worked with, what was the voltage of the

15 Okonite wire -- wire that he worked with?

16     A.    Well, it was 115.  You can get it

17 115 all the way to 500 volts, I guess.

18     Q.    Did you see Mr. Fremin working with

19 115 to 500 volts?

20     A.    Yes, he worked with the voltage.

21 We all worked with the voltage.  We cut in on

22 the -- hooked up the lights and tested the

23 panel, the distribution panels and tested

24 circuits.  You needed power to energize all

25 these circuits.

24

1      Q.    Okay.  What was the voltage rating

2  for the cable of the Okonite cable that Mr.

3  Fremin used that you saw him use?

4      A.    Oh, I guess, I guess it was about a

5  400, 500 volts.  We used to use 440, 460 on the

6  ships and 110 to 115 to 450 voltage.  And I

7  guess that was the same capacity at the -- had

8  to meet the capacity of the cable.

9      Q.    What was the usual length of the

10 run of Okonite cable?

11     A.    Oh, some of them was long -- we run

12 sometimes hundreds of feet or sometimes it was

13 just ten feet or five foot.  It could be any

14 length.  You cut it to length.  You went to the

15 cable reels and you pulled it off and you

16 measured it.  You don't want to cut it too

17 short and so you just pull it, you measure the

18 wire first and then you go measure your cable

19 and pull the cable and tie it down so it

20 wouldn't slip with tie wire on the cable racks.

21 And then after that you generally hook them up

22 at that time after.

23     Q.    In what instances would you only

24 use ten feet and run a cable?

25     A.    Oh, like a short piece for a

**25**

1  junction box to a light fixture or a receptacle
2  or to something close by, you know, like wiring
3  this room here (indicating) or, you know, short
4  runs.
5       Q.   How about the long runs?  What was
6  that used for?
7       A.   Oh, for running lights to
8  switchboards, feeders, main feeders,
9  degaussers, and things of that nature, main
10  feeders, main power feeders to the generators
11  and switchboards to the distribution, from the
12  distribution to the switchboards.
13       Q.   Could you tell the difference
14  between Okonite wire and cable versus
15  Rockbestos wire and cable?
16       A.   well, they were close.  It was
17  hard to do.  You had the armor, the aluminum
18  armored cable and it was all silver, painted
19  silver, unless they used bronze armored.  But
20  they used that only on some commercial ships.
21  But the aluminum casings was about the same,
22  the same braid.  And it was hard to distinguish
23  between one and the other.  It was almost a
24  close match.  Some of them didn't have no -- no
25  braid on them.  Some of them just had the

**26**

1  rubber -- nylon impervious sheet on the
2  outside.
3       Q.   You said it was -- let's go to the
4  aluminum armor.  You said it was hard to
5  distinguish but could you distinguish between
6  Okonite and Rockbestos wire and cable?
7       A.   well, there are a little variation.
8       Q.   what was the difference between
9  them?
10       A.   I guess the pattern.  The color was
11  the same.  It was aluminum colored.  When you
12  would open up the cable, they had some -- some
13  of them had different little particles in it
14  that -- little cords was different and then
15  some of them had like a little streamer that
16  would tell you what type of cables it was in
17  there.  It was like a little plastic thing with
18  a name on it that you cut that out, too.
19       Q.   So if you saw Mr. Fremin working
20  with any wire cable at any given instant, could
21  you tell which kind it was?
22       A.   Yeah.  It was -- you know, there
23  was two -- it was on the reels.  You go pull
24  them off the reels.  You pull them just like I
25  was, pull them off of different reels so you

**27**

1  use a variation of the different cables.
2       Q.   were the reels labeled?
3       A.   Yes, sir.  They had -- they had
4  tags on the -- on the spools.  It was like a
5  big wooden spool that would come on the cables
6  and it was on pipe racks and they would pull it
7  off of that.  And they had tags on the cables
8  and all.  And when you would order them from
9  the expeditor, they would drop it off and they
10  had little pieces of paper that would say what
11  kind of cables it was, you know.
12       Q.   Did you ever re-spool wire and
13  cable back onto an old spool?
14       A.   No.
15       Q.   You never --
16       A.   we generally used it all.
17       Q.   Did you ever see Mr. Fremin
18  re-spool old wire and cable back onto to a
19  spool?
20       A.   Not that I know of, no.  Not to my
21  knowledge.
22       Q.   For the bronze armored cable, could
23  you tell the difference -- back to the aluminum
24  armored cable, could you tell the difference
25  between Okonite and General Electric wire and

**28**

1  cable?
2       A.   On the -- on the braid?
3       Q.   For the aluminum cable?
4       A.   They had a little variation there,
5  too.
6       Q.   Could you tell the difference
7  between them, though?
8       A.   well, I can't recollect but they
9  had a various difference in the various ones.
10  I don't know if it was out of two or three or
11  both of them or what.  I can't recall.  That's
12  a while back.
13       Q.   Okay.  How about the bronze armored
14  cable?
15       A.   The bronze armored cable was --
16       Q.   Could you tell the difference
17  between Okonite bronze armored cable and
18  Rockbestos bronze armored cable?
19       A.   I could tell the difference in the
20  cable because it was harder.  You couldn't cut
21  it easy.
22       Q.   which was harder?
23       A.   The bronze.  And they had barbs,
24  they would get real hard barbs that stick in
25  your hands like fishhooks.

29

1      Q.   Right. Well, could you tell the
2  difference between Okonite bronze armored cable
3  and distinguish that from Rockbestos bronze
4  armored cable?
5      A.   Well, the bronze armored was, I
6  think, the same. It might have been a little
7  different in color. But it was a copper, a
8  copper-looking color.
9      Q.   So you're telling me you could tell
10 the difference between the two just by looking
11 at them?
12     A.   Well, there was the difference in
13 the color and sometimes we'd paint it, but the
14 majority of them would come on a clear copper
15 spool, the armor was on the copper.
16     Q.   For which brand?
17     A.   That's for the General Electric.
18     Q.   Okay. What kind of spool did the
19 Okonite come on?
20     A.   The Okonite came on a big wooden
21 spool.
22     Q.   Okay. And what kind of spool did
23 the Rockbestos come on?
24     A.   A wooden spool, big wooden spool,
25 with metal hubs on the edges so you wouldn't

30

1  chip the wood.
2      Q.   Okay. And this goes to any wire
3  and cable, I'm going to ask this question to
4  all these in general. Did you ever see Mr.
5  Fremin re-spooling any wire or cable back onto
6  an old spool?
7      A.   Not that I know of, no, sir.
8      Q.   Okay. You said that Okonite and
9  Rockbestos were slightly different in color for
10 the bronze armored cable. Was one -- was
11 Okonite darker than Rockbestos or vice versa?
12     A.   I don't remember which one was the
13 darkest one. I guess it could have been either
14 one of them.
15     Q.   Okay.
16     A.   I don't know.
17     Q.   Could you tell -- distinguish
18 Okonite bronze armored cable from General
19 Electric bronze armored cable?
20     A.   I'm not sure.
21     Q.   Okay. That's fine.
22          How about the nylon sheet cable?
23     A.   It was black. It was rugged, hard
24 to cut. In the winter sometimes you'd have to
25 warm it up with a heat striker so you could get

31

1  your knife in it. It was really hard to cut.
2      Q.   Are we talking about wire or cable?
3      A.   The cable. The black impervious
4  sheet, the hard rubber casing on the outside.
5      Q.   Okay. Could you tell the
6  difference between Okonite nylon sheet cable
7  and Rockbestos nylon sheet cable?
8      A.   Yes. One of them had a harder
9  sheet. One of them was like a softer rubber
10 and the other one is a little harder rubber.
11     Q.   Do you know which one had the
12 harder one?
13     A.   I can't remember which one now.
14     Q.   When Mr. Fremin was working with
15 nylon sheet cable, could you tell which brand
16 he was working with?
17     A.   No. He could be using either
18 brand. We can go on a reel and pull it off of
19 another reel. It would be whatever. It
20 wouldn't make a difference as long as you had
21 the correct size for the application that you
22 was doing, installation.
23     Q.   Okay. Would you be able to tell --
24 could you tell the difference between General
25 Electric nylon sheet cable and Okonite nylon

32

1  sheet cable?
2      A.   Yes. Slightly, yes.
3      Q.   Okay. What was the difference
4  between those two?
5      A.   A little harder rubber.
6      Q.   Which had harder rubber?
7      A.   I think the Okonite.
8      Q.   Okay. And when Mr. Fremin was
9  working with -- if he was working with nylon
10 black-sheet cable, could you tell if he was
11 working with Okonite or G.E.?
12     A.   No, I couldn't tell. It was hard.
13 I mean -- I don't know what you want me to
14 answer.
15     Q.   That's fine if you don't know, sir.
16          Where did you generally -- did you
17 exclusively run this cable aboard ships?
18     A.   Yes, sir.
19     Q.   Okay. Nowhere else in Avondale?
20     A.   I pulled it on the ships.
21     Q.   So were you typically in enclosed
22 spaces?
23     A.   Yes.
24     Q.   Was Mr. Fremin typically in exposed
25 spaces when you saw him working?

33

1          A.     In closed spaces, yes, he was.  He
2    worked in places where it was inside the ships,
3    different compartments, fire rooms and engine
4    rooms and living compartments.
5          Q.     Okay.  Were they ever being used
6    near a high heat source?
7          A.     Near a high heat source?
8          Q.     Yes, sir.
9          A.     No.  They would try to keep them
10   away from the high heat sources, the cables.
11         MS. ROUSSEL:
12             Your question goes to when they were
13         actually using them to apply them and
14         remove them.  I'm objecting to the form of
15         your question as opposed to was it being
16         installed in areas that would be high heat
17         sources.
18         MR. BALHOFF:
19             I understand.
20         THE WITNESS:
21             Well, in the fire rooms, it's high
22         heat source.  It was in close proximity to
23         something that was hot enough to melt the
24         cable.  Because you could melt the cable,
25         the rubber on a cable if you put heat on

34

1         them.  Sometimes the pipefitters or
2         something would get too close to your
3         cables with their torches and they would
4         melt it.
5    EXAMINATION BY MR. BALHOFF:
6          Q.     Let me jump back on one other
7    topic.  We've already talked about the cable.
8          A.     Yes.
9          Q.     The three types of cable.  Were the
10   same three brands the manufacturers of the wire
11   that Mr. Fremin worked with?
12         A.     The same manufacturer, the same --
13         Q.     Okonite, Rockbestos and General
14   Electric?
15         A.     Rockbestos, yes.
16         Q.     Could you tell the difference
17   between Okonite wire and Rockbestos wire?
18         A.     They was really similar.  It's hard
19   to say how close in similar it was.  It's just
20   like seeing a variation of this tile right here
21   against that other tile in the other room.
22   One's got a little different pattern on that.
23   But it's the same material, the same thing,
24   same size, same thickness.
25         Q.     But could you tell the difference

35

1    between them?
2          A.     Yeah.  In you look close enough.
3          Q.     When you saw Mr. Fremin working
4    with wire, could you tell which brand he was
5    working with just by looking at him?
6          A.     No.  It's hard to say on a glance
7    to see.  You couldn't see that quick.
8          Q.     Do you believe that all three of
9    those manufacturers, Okonite, Rockbestos and
10   General Electric, that their cable contained
11   asbestos?
12         A.     Yes.
13         Q.     And, again, did anyone tell you
14   that all three of those contained asbestos?
15         A.     Well, on one, Rockbestos, the name
16   was suggesting that it was of asbestos.  And
17   then the other cables were similar so they had
18   asbestos also in them.
19         Q.     Okay.  So you just assume that?
20         MS. ROUSSEL:
21             I'm going to object.  He's already
22         indicated he was an electrician and he was
23         familiar with the kind of product he was
24         working with within that time.
25         MS. BAXTER:

36

1             I'm going to object to the speaking
2         objections.
3         MS. ROUSSEL:
4             Well, this witness has already
5         answered that he knew as an electrician
6         that those products had asbestos in them.
7         MR. CAHN:
8             I'm going to object.  What he
9         testified to is he couldn't differentiate
10        whether or not they contained asbestos.
11        MS. ROUSSEL:
12            Oh, that's not -- he specifically
13        said they did contain asbestos in them.
14        THE WITNESS:
15            They did have asbestos in it.
16   EXAMINATION BY MR. BALHOFF:
17         Q.     Mr. Walker, earlier I believe you
18   said as to the Okonite wire and cable, you
19   didn't know if it had asbestos?
20        MS. ROUSSEL:
21            I'm going to object.  That's not
22        what he said.  He said it did have
23        asbestos in it.
24   EXAMINATION BY MR. BALHOFF:
25         Q.     You at least said, am I correct,

37

1  you didn't know how you knew it had asbestos in
2  it?
3       MS. ROUSSEL:
4            I'm going to object.  He already
5       described the insulation on the inside of
6       it and the fibers that he saw.  So I'm
7       objecting to your mischaracterization and
8       trying to put words in this witness'
9       mouth.
10      MS. BAXTER:
11           Ditto for Gerolyn.
12  EXAMINATION BY MR. BALHOFF:
13      Q.   My question, sir, is going as to
14  all three of the wire and cable.  Who told you,
15  if anyone, that General Electric wire and cable
16  had asbestos in it?
17      A.   No one said.
18      Q.   So how did you know it had asbestos
19  in it?
20      A.   The name implied that.
21      Q.   General Electric's name?
22      A.   No, not General Electric,
23  associated cable.
24      Q.   Okay.  So because Rockbestos had
25  the words "-bestos" in it, did you then assume

38

1  on your own that all wire and cable had
2  asbestos in it?
3       A.   I didn't assume nothing.  I just
4  thought that it was asbestos.  It's hard to
5  look at asbestos and tell if it's asbestos, I
6  know.  But even in the Rockbestos cable, it's
7  hard to know that it's asbestos but it's a
8  fibrous powder that suggested it's asbestos.
9  So I don't know what else to tell you.
10      Q.   Could it have been some other
11  insulation in those three wire and cables?
12      MS. ROUSSEL:
13           I'm going to object.
14      MR. BALHOFF:
15           On what basis?
16      MS. ROUSSEL:
17           He's already indicated it was
18      asbestos insulation.
19      THE WITNESS:
20           Asbestos insulation.
21      MR. BALHOFF:
22           That's not my question.
23      MS. ROUSSEL:
24           That was your question.
25      MR. BALHOFF:

39

1            My question is --
2       THE WITNESS:
3            I want to be as truthful as I
4       possibly can.
5  EXAMINATION BY MR. BALHOFF:
6       Q.   That's all I'm asking you to do,
7  sir.
8       A.   And I'm saying, yes, it was
9  asbestos.  If that's what you want me to tell
10 you.  Because I knew it was asbestos and it was
11 the knowledge that that was an insulator that
12 would be common in electrical cables.
13      Q.   My question then, sir, is how did
14 you know it was asbestos?
15      A.   Well, I can't tell you how did I
16 know.
17      Q.   Could it possibly have been some
18 other insulation in those three brands of wire
19 and cable?
20      MS. ROUSSEL:
21           Objection.
22  EXAMINATION BY MR. BALHOFF:
23      Q.   Other than asbestos?
24      MS. ROUSSEL:
25           He's already answered that question.

40

1       MR. BALHOFF:
2            No, he hasn't.
3  EXAMINATION BY MR. BALHOFF:
4       Q.   Sir, could it have been some other
5  type of insulation?
6       A.   Well, it could have but it's not
7  necessarily it was.  I think it was asbestos.
8  That's what I think it was.
9       Q.   Was there any lettering or any
10 other marks underneath the jackets of the
11 various brands of wire and cable that Mr.
12 Fremin used?
13      A.   Well, the same lettering that I was
14 familiar with was the same while he was
15 getting.  It would have to be the same thing.
16      Q.   What sort of lettering?
17      A.   Well, generally, they had a little
18 streamer on it, a little plastic streamer with
19 a number and a name on it.  And I can't
20 remember what they called it or what was the
21 association, the numbers with it.  But they had
22 some numbers and letters on it.  As far as what
23 the numbers was and all, I can't remember.  It
24 was one or two or ten or GOF.  I don't know.  I
25 can't remember.

41

1    Q.   Okay.  I'm just going to ask you
2  questions about your knowledge with some
3  Okonite wire and cable now.  Was the conductor
4  of the Okonite wire and cable aluminum or
5  copper?
6    A.   Aluminum.
7    Q.   All the wire and cable you used?
8    A.   The ones I used, yes.  We used very
9  little bronze.
10   Q.   Was the conductor solid or
11 stranded?
12   A.   The conductor was stranded.  The
13 copper wire conductor that you're talking about
14 was a stranded wire.
15   Q.   Okay.  Do you know per cable what
16 the size of the -- sizes of conductor you used?
17   A.   Yes.  From Number 3 all the way to
18 T-500, T-550, the big generator cables,
19 switchboard cables.
20   Q.   Do you know whether Mr. Fremin used
21 those same sizes of conductors?
22   A.   Yes.  He used the various sizes.
23 It could have been from three conductor to
24 size -- or three circular mils to ten to
25 hundreds circular mils.

42

1    Q.   It could have been or you did use
2  that?
3    A.   He did use, he did use the various
4  cables.
5    Q.   Okay.  Do you know the size as in
6  ten or twelve or -- it's just -- you're saying
7  it was everything from three to T-550?
8    A.   Three was smallest and then you get
9  to ten and it gets larger.  You get to 30
10 circular mils, it gets larger.  And as you go
11 on, hundred circular mils gets bigger.  The
12 wire size might be as big as your -- your
13 finger.  It's stranded wires.
14   Q.   What was -- I'm going to go to the
15 next layer of the Okonite wire and cable that's
16 outside the conductor.  What color was that
17 material?
18   A.   The braids?
19   Q.   That you know that Mr. Fremin
20 worked with?
21   A.   The braid?  The braid was aluminum
22 colored, painted aluminum colored.
23   Q.   How thick was it?
24   A.   The braids?
25   Q.   Yes, sir.

43

1    A.   It was a thin braid.  It looked
2  like one of those little slinky things that you
3  put on the Japanese finger.  And when you push
4  it, it relieved the pressure.  You can cut it
5  off and slide it off the rubber.  And you can
6  take any portion or piece off it that you
7  wanted.
8    Q.   Did that layer have any kind of
9  texture?
10   A.   Yes.  It was a weave-type texture.
11   Q.   Okay.  And was there any pattern or
12 design of that layer?
13   A.   Yes.  It was a crisscross pattern
14 like you would weave a basket or something.
15   Q.   What was the next layer outside of
16 that?
17   A.   Inside of that?
18   Q.   Outside of that.  On top of that.
19   A.   That was the outer.
20   Q.   The outer layer?
21   A.   Outer case, yes.
22   Q.   So you just had the conductor and
23 then this layer was the only layer over it?
24   A.   They had the braid we're talking
25 about.  Then they had the rubber sheet

44

1  underneath that.  And then they had -- they had
2  string and core underneath that.  And then they
3  had an insulator around the conductors itself,
4  the wires, circular mil copper wire was covered
5  with insulation, too.
6    Q.   Okay.  And as for the colors of the
7  jackets, you already testified to a black nylon
8  jacket.  Were there any other colors that you
9  used -- that Mr. Fremin used?  Excuse me.
10   A.   They had some that was like a --
11 like a grayish color, grayish-black, and the
12 majority of them was black, though.  Now, when
13 you would take off the -- skin the wire, skin
14 the braid, a lot of aluminum would stay on the
15 black wire so you still had aluminum paint that
16 they would -- I guess they'd spray the cables,
17 too, with that.  It would stick to the rubber.
18   Q.   What color was that?
19   A.   Silver.
20   Q.   Did you see Mr. Fremin cut wire and
21 cable with anything else other than a hacksaw?
22   A.   Well, with a hacksaw.  And then
23 they used to have a big cutter by the cable
24 reels.  It had big handles on it with a big
25 cutter on the end and you'd chop it with that,

45

1   too.

2        Q.    How long would it take to chop

3   cable when you used that instrument?

4        A.    It would cut it faster than the

5   hacksaw.  The hacksaw was hard.  You had to

6   push through it.  It depends how sharp it was.

7        Q.    So how often do you think Mr.

8   Fremin used that instrument with the handles

9   versus the hacksaw?

10       A.    Well, if he had the opportunity,

11  he'd use that.  It was easier.

12       Q.    Did you ever see him use that tool?

13       A.    Yes.  Everybody used it.

14       Q.    Did any dust -- did you ever see

15  any dust --

16       A.    Cut it.

17       Q.    -- when you used that tool with the

18  handles?

19       A.    When you cut it with this saw --

20  when you cut it, you'd get some powder and dust

21  because it would snap.

22       Q.    Okay.  Did you ever see Mr. Fremin

23  when he used that tool have dust snap out when

24  he used it?

25       A.    Well, no.  I'm just going to say

46

1   that it happened just like it happened for me.

2        Q.    Are you just assuming it happened

3   for him?

4        A.    Well, I think it happened to him

5   because if he cut it like I did, it did.

6        Q.    If any dust particles were created

7   from cutting the wire cable, would they just

8   fall to the floor?

9        A.    Well, sometimes it was close to

10  your face and the wind would blow it or catch

11  it and you would see the particles.  You could

12  see it on the light.

13       Q.    Would you cut the wire and cable

14  inside the ship or outside?

15       A.    Well, when the cables was -- reels

16  was outside, we'd cut it on the outside.  And

17  on the inside, we'd cut them with the same

18  hacksaws and cutters and pliers.  But inside

19  you had to bring them -- some of them you'd

20  roll up in big lengths and you'd cut it in

21  pieces so you can pull cable and hook it into

22  your wireways and make your connections.

23       Q.    Would you typically cut wire and

24  cable more inside the ship or more outside the

25  ship?

47

1        A.    More inside the ship.

2        Q.    Inside the ship, was there any wind

3   that blew dust particles?

4        A.    Yes.  They had blowers and things

5   like that they would turn on and all the dust

6   that was associated with the installation of

7   shipbuilding was blowing all over the place.

8        Q.    When Mr. Fremin was working with

9   this wire and cable in the ship, were there

10  ever any other crafts working around him?

11       A.    Yes.

12       Q.    What sorts of crafts were working

13  around Mr. Fremin?

14       A.    They had insulators, pipefitters,

15  welders, sheet metal people.  All the crafts,

16  all the crafts worked together on the ship.

17       Q.    Do you know whether those crafts

18  were using asbestos-containing products?

19       A.    At the time, yes.  The pipefitters

20  was using it on that -- on their Garlock

21  gaskets and the insulators would put that on a

22  pipe.  They had the pipe that would -- the

23  insulation would fit on the pipe.  It was a

24  half-round block and they would tie that to the

25  pipe and fit the joints.  And there was dust

48

1   all over that when they would cut them with the

2   little saws, handsaws.  And they had a compound

3   that was -- the Foster compound, they used to

4   come in those clear buckets.  It was Flintkote

5   and it would get hard after they painted it on

6   there.  It would seal that powder dust off

7   after a while.  It would get hard, real hard.

8        Q.    When Mr. Fremin worked around these

9   other crafts, was he exposed to any dust --

10       A.    The same as I was.

11       MR. BELL:

12            Objection to the form of the

13       question.

14       THE WITNESS:

15            with the dust that were coming off

16       the pipe where the insulators would cut

17       it, it was flying all over.  It would fall

18       off as they work.  Sometimes your wire

19       would be buried.  The insulators would

20       bury the wire and you had to pull that

21       out, too.  And you would get it all over

22       your clothes, bring it in your car, you

23       bring it home.  You couldn't get away from

24       that stuff.  It was all over.

25  EXAMINATION BY MR. BALHOFF:

49

```
1        Q.    Did Mr. Fremin have the same
2  experience, the dust was flying all over him?
3        A.    Everybody had it, you had it on
4  your clothes.  You didn't have to be an
5  electrician.  You could be a pipefitter and
6  they had it on there.  You couldn't get away
7  from it because Hopeman Brothers was installing
8  that big -- it's like a board with that
9  asbestos in it.
10       Q.    Do you know if Mr. Fremin ever
11 stripped wire and cable?
12       A.    Yes.
13       Q.    You actually saw him do that?
14       A.    Yes.
15       Q.    Did that process create any dust
16 particles?
17       A.    Yes.
18       Q.    Did those dust particles fall to
19 the floor?
20       A.    It fell to the floor eventually, I
21 guess, in the air.  They got airborne.
22 Sometimes you was underneath it skinning the
23 wires and the stuff was all over falling down
24 on you.  You were underneath like light
25 fixtures, junction boxes and all.
```

50

```
1        Q.    I'm talking about Mr. Fremin right
2  now.
3        A.    Yes.
4        Q.    He had the same experience?
5        A.    He had the same experience.
6  MR. BALHOFF:
7              Those are all the questions I have
8  regarding Mr. Fremin's exposure.  Probably
9  some other attorneys have some on Mr.
10 Fremin.
11 MS. BAXTER:
12             I have some if no one else does in
13 the Fremin case.
14 EXAMINATION BY MS. BAXTER:
15       Q.    Mr. Walker, hi, I'm Kay Baxter.
16             Can you tell me how you first met
17 Mr. Fremin?
18       A.    Like everybody else at Avondale,
19 you just come on the job and then just got
20 associated with them.  People that you don't
21 know you get acquainted with them.  Some of
22 them you make friends with.  I seen a guy just
23 died two weeks ago he worked at Avondale.  His
24 name was Sylvestis Gros (spelled phonetically).
25 All I know him was Corn.  And I couldn't even
```

51

```
1  work with the man.  He worked with me all the
2  time.  I couldn't even -- I seen him out there
3  at the clinic where we was getting radiation.
4        Q.    Mr. Walker, I don't want to cut you
5  off but there is a lot of people here and I
6  just want to try to hold you to the question
7  because we don't want to take any more of your
8  time than we have to.
9        A.    Yes.
10       Q.    Can you tell me -- I think you just
11 told me you met Mr. Fremin through work;
12 correct?
13       A.    Yes.
14       Q.    Can you tell me about what year
15 that was?
16       A.    Around about '61 or '62.  In the
17 early '60s like '64, '65, somewhere around that
18 area.
19       Q.    Okay.  Do you remember the first
20 job you worked with Mr. Fremin?
21       A.    It was on, I guess -- it was like
22 the DDG or DEs.  They had two classes of ships
23 then.  We used to go on various ships.  They'd
24 send us from ship to ship.  We'd go on trial
25 runs and everything else.  So I could have been
```

52

```
1  on whatever ship.  I can't specifically recall
2  the name or the number of the ship.
3        Q.    But do you recall it was a Navy
4  vessel, the very first job you worked with Mr.
5  Fremin?
6        A.    It was a Navy job.
7        Q.    Did you ever work with Mr. Fremin
8  on any ship that wasn't a Navy vessel?
9        A.    Well, the Lykes ships, that might
10 have been in the same time period, too.
11       Q.    Do you recall working with Mr.
12 Fremin on a Lykes ship?
13       A.    We might work on different ships
14 but, yeah, it might have been -- I'm not sure.
15       Q.    Okay.  That's fair.
16             Is there any ship that you
17 specifically recall working with Mr. Fremin on
18 that you can tell us the name or the number of
19 that ship?
20       A.    Oh, Lord.  I'm not sure if I can
21 recall the particular name or the number.
22       Q.    I'm just asking just in case.
23       A.    Because Avondale used to give them
24 numbers.
25       Q.    Okay.
```

**53**

```
 1        A.    The Navy gave them numbers and they
 2   gave them names and I can't recall one from the
 3   other.
 4        Q.    Okay.
 5        A.    We used to call them one, two and
 6   three, four and five or whatever number they
 7   was.  They came in order.
 8        Q.    Okay.  I think what I hear you
 9   telling me -- correct me if I'm wrong -- is
10   that you cannot give me a specific name of a
11   Navy ship or any other vessel that you worked
12   on with Mr. Fremin, am I right?  Is that what
13   you're saying?
14        MS. ROUSSEL:
15             Let me object to the form.  He's
16        already indicated DEs and DDGs.
17        THE WITNESS:
18             DDGs and DEs.
19   EXAMINATION BY MS. BAXTER:
20        Q.    Those are types.  I was asking a
21   specific name or number.
22        A.    Oh.  The number.  I don't know.  The
23   USS --
24        MS. ROUSSEL:
25             Mr. Walker, if you don't recall,
```

**54**

```
 1        that's fine.  Just tell her you don't
 2        recall the specific numbers.
 3        THE WITNESS:
 4             We had the old ones, the *Tweedy*, the
 5        *wheeling*.  I'm not sure, ma'am.  I'm
 6        guessing.  You got me guessing.
 7   EXAMINATION BY MS. BAXTER:
 8        Q.    Can you tell me the names of all
 9   the manufacturers of wire and cable that you
10   worked with at Avondale with Mr. Fremin other
11   than the ones you've already named?
12        A.    That's only ones I remember.
13        Q.    What about Anaconda?
14        A.    I'm not sure.  I don't recall that
15   one.
16        Q.    I'm sorry?
17        A.    I can't recall that one.
18        Q.    What about Phelps Dodge?
19        A.    I don't recall that, either.
20        Q.    Is there a reason you remember -- I
21   know why you remember Rockbestos because the
22   "-bestos" was in the name.  But can you tell me
23   why you remember these particular three
24   manufacturers of wire and cable?
25        A.    Well, they had on the reels.  When
```

**55**

```
 1   we received the paper from the expeditor, it
 2   was on there, too.
 3        Q.    Okay.  Do you know Mr. Lester
 4   Adams?
 5        A.    The name sounds familiar.
 6        Q.    Okay.  Did you know anybody who
 7   worked in the warehouse at Avondale?
 8        A.    Yes.
 9        Q.    Okay.  Who was it?
10        A.    Rock Lowe.
11        Q.    I'm sorry?
12        A.    Rock Lowe, I think.
13        Q.    Okay.
14        A.    Jimmy Boudreaux, Danny Roulet used
15   to be our expeditor.
16        Q.    What was his last name?
17        A.    Roulet, Danny Roulet.
18        Q.    Okay.
19        A.    And Hoff and Goff.
20        Q.    Hoff and Goff?
21        A.    Yes.  Sounds foolish but that's --
22   Goff was, he was one of the expeditors for the
23   material department, too.
24        Q.    Okay.
25        A.    I might have said Goff.  It might
```

**56**

```
 1   have been another.  I can't remember now.  He
 2   used to ride a little blue truck in the yard.
 3   I can't recall his name.
 4        Q.    Okay.  When you say I am -- let me
 5   just clear this up for you.  I'm talking about
 6   when you worked with Mr. Fremin?
 7        A.    Uh-huh (indicating affirmatively).
 8        Q.    What would an expeditor do for you?
 9        A.    Bring our material in, we order it.
10   If you was running out by the shop, you'd tell
11   him what you needed and he would bring it to
12   you.
13        Q.    Okay.  And when you told the
14   expeditor what you needed, would you tell him a
15   name brand or would you just tell him the type
16   of material you needed?
17        A.    We'd call it a name brand like the
18   stick-ons or they had certain types of wire
19   nuts that we'd ask for because they -- that's
20   what we used.  It was on the boxes, the name
21   boxes and we'd ask them for that.  We got
22   familiar with the brands.
23        Q.    Okay.  And where did you see these
24   boxes?
25        A.    Well, we would receive them from
```

57

1  the warehouses and the equipment would come in
2  through it.  It was Russell Stover boxes and
3  Lovell and Drexel and various Westinghouse
4  boxes, light fixtures.  They had all kinds of
5  names for light fixtures.
6      Q.    Okay.
7      A.    That's all I can tell you on that.
8      Q.    Okay.  Can you tell me the first
9  time you remember seeing a Rockbestos wire or
10 cable?
11     A.    Oh, I guess in the '50s, '55, '56,
12 '56.
13     Q.    Okay.
14     A.    Started pulling cable.
15     Q.    And do you recall seeing Rockbestos
16 wire and cable when you were working with Mr.
17 Fremin?
18     A.    Yes.
19     Q.    All right.  Do you recall the
20 specific type of Rockbestos wire or cable that
21 you saw working with Mr. Fremin?
22     A.    Yes.  The different sizes?
23     Q.    Yes, sir.  Can you recall?
24     A.    Sizes from a Number 3 to a large,
25 super large of a hundred, 75,000 circular mils,

58

1  a hundred circular mils, 300 -- they had 300,
2  T-500.  They had big wires.
3      Q.    Okay.
4      A.    Small wires all the way up to the
5  big sizes.
6      Q.    And can you recall any specific job
7  where you used a Rockbestos wire when you were
8  working with Mr. Fremin?
9      MS. ROUSSEL:
10         Other than the ones he's already
11     mentioned?
12     MS. BAXTER:
13         Yes.
14     MS. ROUSSEL:
15         In addition to the ones he's already
16     mentioned?
17     MS. BAXTER:
18         Yes.
19     THE WITNESS:
20         None other than the three that I
21     know.
22 EXAMINATION BY MS. BAXTER:
23     Q.    Okay.  Can you tell me any job that
24 you recall seeing Mr. Fremin specifically use a
25 Rockbestos wire?

59

1      A.    Yes.  Hooking up a light fixture, a
2  switch, receptacles, junction boxes.
3      Q.    What size wire would you use to
4  hook up a switch?
5      A.    A switch, a Number 3 to a Number 4.
6  A Number 4 on the receptacles.
7      Q.    And a Number 4 on the receptacles?
8      A.    Yes.  Three and fours.
9      Q.    All right.  And what kind of wire
10 would you be using for -- would you or Mr.
11 Fremin be using on light fixtures?
12     A.    The light fixtures, three.  Some of
13 them four.
14     Q.    How big around is a Number 3 wire?
15     A.    Number 3 is about big like a --
16 about like a, like a pencil --
17     Q.    Okay.
18     A.    -- pencil lead like, about that big
19 (indicating).  I guess about that thick
20 (indicating).
21     Q.    All right.  Any estimate of what
22 that is?
23     A.    It's --
24     Q.    Quarter inch?
25     A.    Three circular mils.  About an

60

1  eighth or a quarter inch, somewhere in that
2  neighborhood.
3      Q.    How big was a Number 4?
4      A.    The Number 4, a little larger,
5  about a quarter of an inch maybe.
6      Q.    And because Rockbestos has
7  "-bestos" in it, do you think that every wire
8  and cable manufactured by Rockbestos contained
9  asbestos?
10     MS. ROUSSEL:
11         I'm going to object.  He can only
12     talk about those that he used at Avondale
13     Shipyard.  He has no knowledge of
14     everything that Okobestos -- Rockbestos
15     made.
16 EXAMINATION BY MS. BAXTER:
17     Q.    You can answer, Mr. Walker.
18     MS. ROUSSEL:
19         No, you can't answer, Mr. Walker.
20     You can only talk about what you used at
21     Avondale Shipyard.
22 EXAMINATION BY MS. BAXTER:
23     Q.    I'll rephrase my question.
24         Mr. Walker, do you believe that
25 every Rockbestos wire and cable that you used

61

1  at Avondale contained asbestos?
2      A.    I'm not certain, ma'am.
3      Q.    Okay.  Do you recall Mr. Fremin
4  being there the entire time you were there?
5      A.    No.  I worked longer than him.
6      Q.    Do you recall a time when he wasn't
7  there?
8      A.    Yes.
9      Q.    When was that?
10     A.    Well, in the late '60s when I quit.
11     Q.    Was Mr. Fremin there when you quit?
12     A.    No.  He was still there.
13     Q.    Mr. Fremin was still at Avondale
14  when you left?
15     A.    When I left he was deceased, I
16  think.  I don't know when he died.  It might
17  have been '64, '65, somewhere around in that
18  area.  I can't remember the day or the dates
19  that he died.
20     Q.    I'm looking at my questions.
21     A.    Yes.
22     Q.    Have you talked to Mrs. Fremin?
23     A.    No.
24     Q.    Okay.  Have you talked to any of
25  Mr. Fremin's family?

62

1      A.    I haven't, no.
2      Q.    Okay.  Do you remember the
3  designation of any Rockbestos wire or cable
4  that you ever saw Mr. Fremin work with?
5      A.    I don't know the question.
6  Designation?
7      Q.    Yes, sir.  Any letters or numbers,
8  any printing?
9      A.    Of the type of -- no.
10     Q.    Okay.  Can you tell me any specific
11  area of any ship that you recall seeing Mr.
12  Fremin work with a Rockbestos wire or cable?
13     A.    I guess it was in the engine room,
14  in the fire rooms, in the compartments.  They
15  worked all through the ships.
16     Q.    Can you tell me what he was doing
17  with Rockbestos cable in the engine room?
18     A.    Installing it, pulling it and tying
19  it down, packing the glands and cutting it in.
20     Q.    Packing glands?
21     A.    Yes.
22     MS. ROUSSEL:
23          Packing glands.
24     THE WITNESS:
25          Packing glands where you water serve

63

1          it or waterproof where you go through a
2          penetration.
3  EXAMINATION BY MS. BAXTER:
4      Q.    He was doing that with Rockbestos
5  wire or cable?
6      A.    Oh, no.  You do it with just about
7  all the wire.  They got to serve into a
8  terminal, to a box and through a bulkhead.
9      Q.    Okay.  I'm confused.  Packing
10  glands with --
11     A.    Yes.  It's a packing gland.  Some
12  of them are made out of brass.  It's got a nut
13  on it and all and it's got a gland in it that's
14  made out of -- made out of a material, a
15  string-type material coated with some kind of
16  resin and your cable slides in.  And you
17  tighten it down and it seals the cable from the
18  water entering the box or the bulkheads or
19  whatever.
20     Q.    Okay.  Did Rockbestos make that
21  packing glands?
22     A.    No, not at my knowledge.
23     Q.    Okay.  That's where I was confused.
24          When you worked in an engine room
25  with Mr. Fremin, how long would the job take?

64

1      A.    Oh, sometimes a month, some days.
2  It all depends what you had to do.
3      Q.    Well, can you tell me what an
4  electrician would do in the engine room when
5  you were there with Mr. Fremin, let's say, in
6  the '60s?
7      A.    Well, you'd pull your wires, tie it
8  down, and then you start connecting them.  You
9  hook them up, you skin the wires and then serve
10  them into boxes, receptacles, switches, light
11  fixtures, electrical distribution panels,
12  various electrical equipment.
13     Q.    Okay.  When you and Mr. Fremin
14  pulled wires, can you explain that process to
15  me?
16     MS. ROUSSEL:
17          When he pulled them in the engine
18     room?
19     MS. BAXTER:
20          Yes.  We're talking about the engine
21     room now.
22     THE WITNESS:
23          You pull them through a wireway and
24     a larger wire was overhead.  You'd pull
25     them through and you tie the cable

65

```
1        separate from the other ones and then
2        brought it down to where you were going to
3        make your cable entry to the box.  And
4        then once it's secured, then you start
5        hooking it up.
6   EXAMINATION BY MS. BAXTER:
7        Q.    when you were pulling the cable or
8   the wire in the engine room, did Mr. Fremin --
9   did you have to cut it to pull it?
10       A.    Yes, you'd cut it.
11       Q.    when did you cut it?
12       A.    You would cut it after you pulled
13  it.
14       Q.    Okay.  You cut it -- I'm sorry.
15       A.    You pulled the lengths.  Then when
16  you got the right length, you went back and you
17  cut it to make sure that both ends was the
18  right length.
19       Q.    So that's two cuts, one at the
20  beginning and one at the end?
21       A.    Yes.  You cut it in.  You know,
22  when you cut to serve it, you'd cut the other
23  end, too.  And you'd cut both ends so you could
24  pull another piece of cable.  It was one cable
25  after another.
```

66

```
1        Q.    Okay.  On one piece of cable you'd
2   make two cuts, am I right?
3        A.    Yes.  Sometimes one piece of cable
4   was a hundred foot long, you might make ten
5   cuts off of it.
6        Q.    I think you and I are not on the
7   same page here.
8             what I'm talking about is when you
9   were actually pulling the cable through the
10  engine room, one piece of cable?
11       A.    One cable -- it was a big -- on a
12  roll, you'd pull it through the wireway.
13       Q.    Right.
14       A.    You'd tie it off to where enough
15  was hanging out to go in the box.  You come
16  back and you tie it through the wireways.  Then
17  after that you go cut it on the other end.  And
18  then you had two ends hanging.  One would go in
19  the other box.  One would go in this box.
20       Q.    Okay.  What size cable was this?
21       A.    Some of them was Size 3.  That was
22  like a quarter-inch cable and circular mil in
23  the size.
24       Q.    I'm sorry.  what was the circular
25  mil?
```

67

```
1        A.    About three.
2        Q.    Okay.
3        A.    Size 4.
4        Q.    when you were cutting the cable in
5   the engine room, were you cutting it off the
6   spool the original lengths or was that already
7   cut for you?
8        A.    No, cut it off ourselves of the
9   measurement we wanted.
10       Q.    Okay.  And it was on a big spool in
11  the ship?
12       A.    well, on the wet dock.
13       Q.    Okay.  So the spool was on the wet
14  dock?
15       A.    And you carry whatever you can
16  carry on your shoulder on the ship in lengths
17  that you can manage.  Then you cut pieces off
18  of that length so you can pull it and hook it
19  up.
20       Q.    would you have to come off and on
21  the ship to go cut the cable off the spool on
22  the wet dock and go back on the ship?
23       A.    Yes.
24       Q.    Okay.  And about how many trips
25  would you make a day coming off the ship to cut
```

68

```
1   your cable on the wet dock to take it back into
2   the ship?
3        A.    Oh, sometimes five, six times a day
4   or more, sometimes it was numerous.  It all
5   depends how much cable you had to pull and what
6   you had to hook up.
7        Q.    Okay.
8        A.    You had to stop sometimes and make
9   your connections and hook up your boxes and
10  all.
11       Q.    Okay.  I think you told me that you
12  pull the cable in the engine room and then when
13  you got ready to -- what would you be hooking
14  up to in the engine room?
15       A.    Light fixtures and receptacles,
16  switches and distribution boxes.
17       Q.    when you hooked up to a light
18  fixture --
19  MS. ROUSSEL:
20            He's still answering.
21  EXAMINATION BY MS. BAXTER:
22       Q.    I'm sorry.
23       A.    Electrical panels and switchboards,
24  that's it.  That's fundamentally -- yes.
25       Q.    Mr. Walker, do you need a break?
```

1     A.    No, go ahead.

2     Q.    When you were hooking up to light

3 fixtures in the engine room --

4     A.    Yes.

5     Q.    -- would you have to cut the cable?

6     A.    Yes.

7     Q.    Let me rephrase that.  Did you have

8 to hook up a wire or a cable to a light fixture

9 in the engine room?

10    A.    well, the cable -- the electrical

11 cable was the whole thing and then you'd have

12 to bring the cable into the box through a

13 connector and then after the wire was being

14 skinned, then you would connect that to the

15 light fixture.  The wire, the copper wire.

16    Q.    All right.  How many cables would

17 you have to hook up to one light fixture?

18    A.    Oh, sometimes one and sometimes it

19 was a half a dozen.

20    Q.    What kind of light fixture would

21 you be hooking up a half dozen cables to?

22    A.    well, one that would feed one and

23 they made it like a distribution box.  You'd go

24 into the light fixture and feed another one.

25 Sometimes you would have two, three, four.

1     Q.    When you were hooking up a cable to

2 a light fixture, how many times would you have

3 to cut that?

4     A.    One time.  When you'd bring it in,

5 you'd skin it, clean it and skin it and all and

6 bring it into the box and then you'd make your

7 connections.

8     Q.    And what would you be cutting a

9 cable that you were taking into a light fixture

10 with?  Would that be a big one that you'd have

11 to have the cutters for?

12    A.    No, you'd use a stick-on pliers.

13    Q.    I'm sorry.  Use a what?

14    A.    The little wires you'd use like --

15 it was like a dike or a side cutter or a

16 stick-on pliers.

17    Q.    I'm not familiar with that term.

18 Could you describe that for me, please?

19    A.    The stick-on pliers?

20    Q.    Yes.

21    A.    It was like a pincher, like a dike

22 pliers with the points on it and then they had

23 little grooves on it.  You would put some

24 stick-on lugs and you could crimp them on the

25 end of the wires.  That's the pliers.

1     Q.    Okay.  Now, when you would be

2 cutting this kind of cable, did that create any

3 dust?

4     A.    Yes, you could see the dust when

5 you would cut it.

6     Q.    Would there be any other crafts

7 working in the engine room when you guys, you

8 and Mr. Fremin were in there hooking up light

9 fixtures?

10    A.    Yes.

11    Q.    Okay.  What were those crafts?

12    A.    Insulators, pipefitters, welders,

13 shipfitters, duct people, people that would put

14 the vents in.

15    Q.    What were welders doing in the

16 engine room when you were in there hooking up

17 light fixtures?

18    A.    They were welding everything;

19 brackets, handrails and pipe and various

20 metals.

21    Q.    Okay.  What were the insulators

22 doing?

23    A.    They were covering the pipes,

24 insulating the bulkheads and all.

25    Q.    And were the insulators cutting

1 pipe insulation in the engine room when you and

2 Mr. Fremin were in there?

3     A.    They were what?  Insulators cutting

4 pipe?

5     Q.    Were they cutting pipe insulation

6 when you and Mr. Fremin --

7     A.    Oh, yes.  They would cut it all the

8 time.  They were right adjacent to you, next to

9 you.  You were working elbow to elbow.  I'm

10 sure they still do that.

11    Q.    Did you ever see the name of any of

12 those insulation products that the pipefitters

13 were using?

14    A.    The pipefitters?

15    Q.    Yes, sir.

16    A.    It was Garlock.

17    Q.    Mr. walker, I'm sorry --

18    MS. ROUSSEL:

19        He's still answering.

20    THE WITNESS:

21        Are you talking about the gaskets?

22 EXAMINATION BY MS. BAXTER:

23    Q.    I meant to ask you about the

24 insulators.

25    A.    The insulators?

73

1    Q.    Yes, sir.

2    A.    They were putting the -- it's a

3   rock, it's a rolling block. And it's half,

4   it's half piece of insulation that fits on the

5   pipe and they got another cover and you tie it

6   with a tie wrap, tie wire.

7    Q.    Uh-huh.

8    A.    And then they got a compound that

9   they use. It was that gray compound.

10    Q.    Mr. Walker, I'm sorry to cut you

11   off again. I want to focus you on the

12   question. Do you remember the names of any of

13   the pipe covering that the insulators were

14   using?

15    A.    The Foster.

16   MR. BROWN:

17        When he was with Mr. Fremin.

18   MS. ROUSSEL:

19        Is your question limited?

20   MR. BALHOFF:

21        I'm limiting it to when he was in

22   the engine room with Mr. Fremin.

23   THE WITNESS:

24        It's K-A-Y-L-O, Kaylo. It's a

25   insulation material that the insulators

74

1   used to use.

2   EXAMINATION BY MS. BAXTER:

3    Q.    Okay. Do you remember any other

4   pipe covering that the insulators used?

5    A.    We had that Flintkote. It was from

6   Foster. It would get hard. It would seal the

7   pipe after. It would seal that -- it was a

8   mastic like.

9    Q.    Did you ever see the insulators use

10   anything called Unibestos?

11    A.    Unibestos, not that I know of.

12    Q.    What about Pabco pipe covering?

13   Did you ever see that?

14    A.    Pabco. No, not really. I'm not

15   sure. I don't know.

16    Q.    What about Careytemp, did you ever

17   see Careytemp being used when you were with Mr.

18   Fremin?

19    A.    No, not that I know of.

20    Q.    Do you recall seeing the name

21   Johns-Manville on any of the boxes in the

22   engine room when you were down there with Mr.

23   Fremin?

24    A.    No. I'm not certain. I don't

25   know.

75

1    Q.    Can you describe for me any

2   Rockbestos wire that you ever saw Mr. Fremin

3   use?

4   MS. ROUSSEL:

5        Other than what he's been describing

6        all day since Mr. Balhoff started asking

7        questions?

8   MS. BAXTER:

9        I don't think Mr. Balhoff asked

10        about Rockbestos. That's what I'm asking

11        him.

12   THE WITNESS:

13        Yes. The Rockbestos.

14   EXAMINATION BY MS. BAXTER:

15    Q.    That you saw Mr. Fremin use. I

16   know it's kind of a narrow question, Mr.

17   Walker, and it might be kind of difficult but

18   I'd appreciate if you could tell me what you

19   remember.

20    A.    I can remember him using that same

21   material that I used.

22    Q.    Do you remember the -- I'm sorry.

23    A.    Go ahead.

24    Q.    I was going to ask if you remember

25   the color of any Rockbestos wire that you ever

76

1   saw Mr. Fremin using?

2    A.    It was the same color, the aluminum

3   braid and they had the black one.

4    Q.    Did you ever see the name

5   Rockbestos printed on any wire or cable that

6   Mr. Fremin used?

7    A.    On the reels, on the cable reels.

8    Q.    Okay. And was that -- you saw

9   those reels out on the wet dock?

10    A.    On the wet dock.

11   MR. LEE:

12        Anytime you need to take a break,

13        just let us know and we'll take a break.

14   THE WITNESS:

15        Just go on and finish. I'll be glad

16        if y'all finish. Let's see how far they

17        can go.

18   MR. LEE:

19        Tell us when you're ready to take a

20        break and we'll take a break.

21   MS. BAXTER:

22        Mr. Walker, I think this is going to

23        be a rather long procedure. If you want

24        to take a break, you can take a break and

25        then we can come back in.

MS. ROUSSEL:

Kay, why don't you finish your questions. Do you think you're going to be more than an hour?

MS. BAXTER:

Not on Mr. Fremin.

MS. ROUSSEL:

How much longer do you think you're going to be on Fremin?

MS. BAXTER:

I don't know.

MS. ROUSSEL:

It's quarter to 12:00. Let's continue on and see where we are at 12:00 o'clock.

THE WITNESS:

You can't just do Rudy Walker? I know a little bit more about him.

THE VIDEOGRAPHER:

This is the end of Tape 1.

(whereupon a discussion was held off the record.)

MR. BROWN:

I believe I speak on behalf of all the *Raleigh Landry* defendants. We will

object to any use of any video deposition taken today in the *Raleigh Landry* case or the fact it has not been noticed in the *Raleigh Landry* case for video.

MS. ROUSSEL:

Your objection is noted. It will be videoed.

Can we just ask our questions? If you have an objection to a question, let's note that objection.

MS. RENNELL:

This is the entire procedure of this deposition, Gerolyn, in terms of the videotape.

MS. ROUSSEL:

Are you making an objection rather than commentary?

MS. RENNELL:

I'm amending or adding to the objection of Mr. Brown. I believe this has not been noticed for perpetuation purposes. I don't know if you're intending to use this video in *Raleigh Landry* for perpetuation purposes. I have not seen any *Raleigh Landry* notice for

that purpose.

MS. ROUSSEL:

You ready to go?

(whereupon a discussion was held off the record.)

THE VIDEOGRAPHER:

We're back on the record. This is the beginning of Tape 2 of Rudy Walker, videotaped deposition on May 8, 2003.

EXAMINATION BY MS. BAXTER:

Q. Mr. Walker, did you and Mr. Fremin ever do any electrical work on the outside of a ship?

A. No. It's always in the inside.

Q. Okay. I think you told me that you and Mr. Fremin worked in fire rooms of the ship?

A. Engine rooms and the fire rooms.

Q. Is the fire room and the engine room the same thing or is it different --

A. They have two different compartments.

Q. Can you tell me where the fire room is?

A. Where the boiler is at and the

turbines are. And the engine rooms is where the generators and all are. And that's where the boiler is at in the fire rooms.

Q. Okay. You said you worked in the engine room, boiler room and you told me one other place?

MS. ROUSSEL:

I'm going to object to your characterization.

THE WITNESS:

Through the ships in the compartments, throughout the living compartments. The laundries and the mess halls and whatever. Worked everywhere.

MS. BAXTER:

That's all my questions for right now. Thank you, Mr. Walker.

THE WITNESS:

Thank you very much.

MR. BALHOFF:

Does anyone else have *Fremin* questions?

MS. ROUSSEL:

Let's continue on.

MR. BALHOFF:

1    I just have one more.
2  RE-EXAMINATION BY MR. BALHOFF:
3    Q.   Mr. Walker, do you know whether any
4  Okonite wire and cable used by Mr. Fremin
5  contained asbestos?
6    MS. ROUSSEL:
7       Used by Mr. Fremin when he was
8    working with Mr. Walker?
9    MR. BALHOFF:
10       That he knows of.
11    THE WITNESS:
12       I worked with the asbestos cable.
13    He used the same cable I used so it was
14    asbestos cable.
15  EXAMINATION BY MR. BALHOFF:
16    Q.   Do you know whether any --
17    A.   I believe it was asbestos cable.
18    Q.   So in your opinion, all the Okonite
19  wire and cable had --
20    MS. ROUSSEL:
21       While you're putting that on, let me
22    state my objection.
23       Objection.  Are you asking him if
24    all the cable that he worked with while he
25    was working with Fremin aboard ship at

1    Avondale Shipyards had asbestos?
2    MR. BALHOFF:
3       I think that's the only --
4    MS. ROUSSEL:
5       That's why I'm objecting to the form
6    of your question.  It was not clear.
7  EXAMINATION BY MR. BALHOFF:
8    Q.   Is it your opinion that all the
9  Okonite wire and cable that Mr. Fremin worked
10  with contained asbestos?
11    A.   Yes.
12    Q.   So in your -- do you think that
13  there was any Okonite wire and cable that
14  Mr. Fremin used that did not contain asbestos?
15    A.   I think all the cable we used had
16  asbestos in it.
17    Q.   All right.  And, Mr. Walker, before
18  we forget, I was eager to finish up the
19  questions --
20    A.   Yes.
21    Q.   -- about Mr. Fremin so we jumped in
22  without talking about just the framework of the
23  deposition but you have been doing pretty well
24  so far.  I just want to make sure if you do not
25  understand any questions that any of us ask

1  you, please stop us and we'll rephrase the
2  question.
3    A.   Okay.
4    Q.   If you answer the question as we
5  asked it, we'll assume that you understood the
6  question as we asked it.  Is that all right?
7    A.   Okay.
8    Q.   Have you been basically operating
9  under this framework of questioning as I just
10  set forth, all your past questions?
11    A.   Yes, I think so.
12    Q.   And are you -- I see a lot of
13  medication on your nightstand.  Do you feel
14  that any of the medication that you're taking
15  right now is affecting your memory in any way?
16    A.   Absolutely.  I can't think at all.
17  I used to be able to think good.  I can't even
18  think.  I can't concentrate on nothing.  I'm
19  taking pain medicine.  I'm taking steroids.
20  I'm taking this.  And everything is -- my sugar
21  goes up, my sugar goes down.  My blood pressure
22  and heart rate goes up and down.  Sometimes it
23  might be a hundred and forty right now, my
24  heart rate.  It used to be 60.  Now all this is
25  affecting me.  My throat hurts, my esophagus,

1  my side from coughing, my bladder hurts.
2    Q.   I assume that you're attempting to
3  testify accurately to the best of your
4  knowledge?
5    A.   As much as I can, as accurate as I
6  can.  I don't want to be -- I was never
7  untruthful in my life.
8    Q.   Okay.  We're going to take a break
9  now.  As Mr. Lee said earlier, any time you
10  need a break, we'll take a break.
11    MS. BAXTER:
12       I have another question in the
13    *Fremin* case.
14  RE-EXAMINATION BY MS. BAXTER:
15    Q.   Mr. Walker, can you tell me how
16  many electricians were in the crew with you and
17  Mr. Fremin?
18    A.   In the crew?
19    Q.   The electricians, the electricians
20  crew that you and Mr. Fremin were --
21    A.   Sometime the crew was a hundred
22  people.  It all depends how many ships they
23  had, what type of electricians.  They had power
24  lighting and I.C. and various electricians.
25  And I guess they had a hundred, maybe we might

85

1    have had in my crew maybe four, five, six
2    people that were working together in an area,
3    particular area. Sometimes you would work on
4    your own or just with another guy and a helper.
5         MS. ROUSSEL:
6             Is that it?
7         MS. BAXTER:
8             No. That raises some more
9         questions. I'm sorry.
10   EXAMINATION BY MS. BAXTER:
11        Q.   Mr. Walker, you said there were
12   different types of electricians. What type of
13   electrician were you and Mr. Fremin?
14        A.   Well, I was a power/lighting in
15   I.C. and he was the same, also, I think.
16        Q.   Did I understand you that there
17   were maybe four to six power and lighting
18   electricians on that crew?
19        A.   Yes. You'd have about maybe 10 or
20   20 sometimes.
21        Q.   Okay.
22        A.   Sometimes it was a big crew and
23   sometimes you'd pull bigger cable so you had
24   even a bigger crew. The bigger the cables, the
25   more people you needed to pull them.

86

1         Q.   Okay. Did you and Mr. Fremin ever
2    work just the two of you?
3         A.   Together?
4         Q.   Yes, sir.
5         A.   Yes, in the same compartments and
6    all.
7         Q.   I think you told me --
8         A.   we never hooked up the same boxes
9    and everything else but worked together as --
10   together as you work together, you know.
11        Q.   I thought you told me that
12   sometimes you'd work alone or sometimes maybe
13   just the two of you?
14        A.   Sometimes you'd work alone by
15   yourself, sometimes you'd work with a few men,
16   sometimes you'd work with an individual person.
17        Q.   That was my question. Did you ever
18   work with just Mr. Fremin, just the two of you
19   as an individual?
20        A.   No.
21        Q.   Okay. What kind of job would you
22   be doing if you were working alone?
23        A.   well, hooking up a box or a switch
24   or receptacle.
25        Q.   Okay. Did you most often work

87

1    alone or did you most often work with someone
2    else?
3         A.   well, I generally worked in an
4    area. If I hooked up a switch, I worked alone
5    and generally would take about an hour, an hour
6    and a half to hook up a light like a light
7    fixture. It all depends how big and what type.
8         Q.   Would that be true of Mr. Fremin as
9    well, he'd generally work alone?
10        A.   He'd work alone like that, too.
11        MS. BAXTER:
12            All right. That's all my questions.
13   EXAMINATION BY MS. SCHEXNAYDER:
14        Q.   I have a few questions just in
15   Fremin, just a few follow-up questions.
16            My name is Valerie Schexnayder,
17   sir.
18        A.   Yes.
19        Q.   Earlier you testified that you
20   worked around the insulators who had used a
21   Flintkote compound to go over the pipe
22   covering. Do you remember that, sir?
23        A.   Yes.
24        Q.   Did you ever personally see
25   Mr. Fremin work in the vicinity when these

88

1    insulators used this Flintkote compound?
2         A.   Yes.
3         Q.   Do you recall seeing Mr. Fremin
4    work with the -- personally use the Flintkote
5    adhesive -- I mean, the Flintkote compound?
6         A.   Yes.
7         Q.   When did Mr. Fremin use the
8    Flintkote compound?
9         A.   Well, he didn't use it. The
10   insulators used it.
11        Q.   Okay. What color was this
12   Flintkote compound?
13        A.   It was a grayish color.
14        Q.   How was it packaged?
15        A.   It was packaged in a five-gallon
16   container. It would come in five-gallon
17   containers.
18        Q.   Do you recall the Flintkote
19   compound being any other color besides grayish?
20        A.   It would turn a whitish, a lighter
21   gray or a whiter color, a lighter color.
22        Q.   what year do you recall seeing this
23   compound?
24        A.   Oh, they used it, I guess, as long
25   as I was working there.

89

1   Q.   okay.

2   A.   Over the pipes.

3   Q.   Do you recall a specific name to

4   this Flintkote compound?

5   A.   Yeah.

6   Q.   what was the name?

7   A.   It was Foster products or Foster --

8   Foster, I guess.

9   Q.   It was called Foster products?

10   A.   Foster.

11   Q.   Do you know if this compound

12   contained asbestos?

13   A.   Oh, no, I don't know.  It was a

14   liquid type stuff.

15   Q.   This was a liquid type stuff.  So

16   when the insulators applied it or spread it

17   over the pipe, did this liquid type compound

18   create any dust?

19   A.   No.

20        Thank you, sir.  That's all the

21   questions I have.

22        THE WITNESS:

23        Thank you.

24   EXAMINATION BY MS. ROUSSEL:

25   Q.   Mr. walker, as an electrician would

90

1   you sometimes have to remove some of the

2   material to which the Flintkote product was

3   applied?

4   A.   Yes.

5   Q.   And how would you do that?

6   A.   Sometimes you use a knife to cut it

7   and then you take it off as best you can

8   without damaging it so much.

9   Q.   when you would take off the

10   Flintkote product, would that create dust?

11   A.   Yes.

12   Q.   Thank you, sir.  And was that

13   something you did on a regular and frequent

14   basis when you were at Avondale?

15   A.   Yes.  You had to get to different

16   pipes or through pipes, you'd take and -- your

17   wire sometimes was stuck in it.  You had to

18   pull it out, you had to cut it out.  And you do

19   it pretty often.

20   Q.   Now, when Mr. Fremin was there and

21   you said that you believed it was about '61

22   sometime to maybe about '64, '65, during that

23   time period, was Mr. Fremin also exposed to

24   Flintkote in the way you've just described?

25   A.   Oh, yes.  You couldn't help from

91

1   being exposed if you were there.

2        MS. ROUSSEL:

3        That's all I have.  Thank you,

4   Mr. walker.

5        THE WITNESS:

6        Okay.  Thank you.

7   RE-EXAMINATION BY MS. SCHEXNAYDER:

8   Q.   How many times did you see

9   Mr. Fremin remove this Flintkote product?

10   A.   I don't know how many times.  I

11   never kept count

12   Q.   we indicated that dust was created

13   when it was removed.

14   A.   Yes.

15   Q.   Did the dust come from the

16   Flintkote sealer product, did it come from the

17   pipe covering underneath it?

18   A.   The pipe covering underneath.

19        MS. ROUSSEL:

20        Let me object to your saying it was

21   a sealer, but in any event.

22        MS. SCHEXNAYDER:

23        Thank you, sir.  That's all I have.

24   RE-EXAMINATION BY MS. ROUSSEL:

25   Q.   Sir, did they also use the

92

1   Flintkote on joints and elbows and T's?

2   A.   Yes.

3   Q.   And the Flintkote product when it

4   would dry, it would dry hard?

5   A.   Hard.  It would seal everything.

6   Q.   when that would be removed, would

7   the Flintkote product create dust?

8        MS. SCHEXNAYDER:

9        Objection.  Asked and answered.

10        THE WITNESS:

11        You'd have a dust that would come

12   from when you would remove it.

13   EXAMINATION BY MS. ROUSSEL:

14   Q.   From the Flintkote product?

15   A.   From the Flintkote product.

16        MS. SCHEXNAYDER:

17        Same objection.

18        MS. ROUSSEL:

19        Thank you.  Let's take a break until

20   1:00.

21        MR. BROWN:

22        This is Scott Brown on behalf of the

23   *Landry* defendants again.  I would like to

24   attach as Exhibit 2 the *Raleigh Landry*

25   Notice of Deposition of Mr. walker.

93

```
 1              (Whereupon a lunch recess was taken
 2       at this time.)
 3       MS. LUKER:
 4              What I want to do is have this place
 5       in the transcript marked.  I think we have
 6       a natural stopping point on the video so
 7       it's not necessary that we mark it as
 8       video.  We've now concluded that portion
 9       of the testimony that was noticed and
10       taken in the Fremin case, F-R-E-M-I-N, is
11       that how it's spelled?
12       MS. ROUSSEL:
13              Correct.
14       MS. LUKER:
15              There is some discussion about how
16       this transcript is going to be formulated.
17       I don't think that has been resolved.  It
18       certainly hasn't been something that all
19       the parties have agreed to.  So for
20       purposes of the record, I want this place
21       marked so that we'll know the point at
22       which we moved into the remainder of the
23       testimony.
24       MR. BALHOFF:
25              Okonite objects to Mr. Walker's
```

94

```
 1       testimony in the Fremin case being
 2       videographed for discovery purposes
 3       because the Fremin deposition notice does
 4       not indicate it will be taken by a video.
 5       MS. ROUSSEL:
 6              The deposition of Mr. Walker which
 7       we're still currently in at the moment was
 8       noticed for 10:00 this morning as a video
 9       deposition.
10       MR. BROWN:
11              In the Walker case.
12       MS. ROUSSEL:
13              And the video will continue to run.
14       MR. BALHOFF:
15              We'll attach that as the next
16       exhibit, please.
17       MS. BAXTER:
18              We would also like to move to strike
19       the video deposition since it wasn't
20       properly noticed.
21              (Whereupon a discussion was held off
22       the record.)
23  EXAMINATION BY MR. LEE:
24       Q.    Mr. Walker, my name is Gary Lee.
25  I'll have some questions for you today.
```

95

```
 1       A.    Yes, sir.
 2       Q.    Any time you need a break, let us
 3  know and we'll be happy to take a break.
 4       A.    Okay.
 5       Q.    Also, if we ask you any questions
 6  that aren't clear, just let us know and we'll
 7  be happy to clarify it for you.
 8       A.    Okay.
 9              (Whereupon a discussion was held off
10       the record.)
11  EXAMINATION BY MR. LEE:
12       Q.    To start, I want to ask you some
13  questions in another case.  You've been listed
14  as a witness in the Raleigh Landry case.  And I
15  don't think this will take very long.
16              Did you know Raleigh Landry at
17  Avondale?
18       A.    I heard of the name.
19       Q.    Do you know where you heard the
20  name?
21       A.    I guess one of the workers at
22  Avondale or working at Avondale.
23       Q.    Okay.
24       A.    Because they had so many people we
25  knew.  They had thousands of people at
```

96

```
 1  Avondale, 5,000 sometimes.
 2       Q.    Exactly.
 3       A.    A lot of people knew your name,
 4  they call the name, but you just didn't know
 5  everybody who was associated with some of them.
 6  It was just a lot of people that worked there.
 7       Q.    Right.  And there were a lot of
 8  Landrys at Avondale.
 9       A.    A lot of Landrys, lot of Landrys.
10       Q.    This particular gentleman, this
11  particular Landry, you might have known him,
12  you might not; is that fair enough?
13       A.    Yes, that's fair.
14       Q.    Okay.  Did you ever go at any time
15  to the Bayou Black yard?
16       A.    No, sir.  I went to Morgan City
17  yard but not the Bayou Black yard.
18       Q.    What yard is the Morgan City yard?
19       A.    Morgan City yard, that was the
20  McDermott yard.
21       Q.    Okay.  You did go to McDermott?
22       A.    Yeah.
23       Q.    When did you go there?
24       A.    That was -- I guess in the '80s or
25  something like that, '90s or whatever.
```

MS. ROUSSEL:

Gary, this may shorten your testimony but my location and purpose for listing Mr. Walker in *Raleigh Landry* was solely with regard to the Algiers yard so if that will shorten your questions somewhat.

THE WITNESS:

We had Oscar Landry. We used to call him Oscar. They had a few other Landrys, a lot of Landrys.

EXAMINATION BY MR. LEE:

Q.    I understand.

A.    Yes.

Q.    Was there a time that you worked at any yard in Algiers?

A.    Yes.

Q.    What time was that?

A.    I worked at the Todd Shipyard. For Avondale, though.

Q.    Okay.

A.    Avondale would send us over there when they had bottom work or work that needed to be done out there at the Todd yard.

Q.    Okay. What years do you recall

going to the Todd yard?

A.    It was in the '60s. Until Avondale got their own dry dock to lift the ships. They had to bring the ships to Todd's and get some of the valves and things like that. All of the stuff that they couldn't do when it was a waterborne. They would bring it over there and put it on their dry dock and do their work. A lot of times the crafts used to follow and work on some of the stuff they was working on and some of the stuff that they needed to be worked on at the yard, too, at the time.

Q.    Okay. Would it be correct that all the vessels you are familiar with that were worked on at the Todd yard were new ships?

A.    Yes.

Q.    Okay. And they were in the end stage of construction?

A.    Yes. They were doing the bottom work or the final works that they would need to be able to launch the ship that could go to sea without having to be lifted up again.

Q.    Okay. Just to be clear. These ships had been launched quite a long time ago back at the main yard; right?

A.    That's correct.

Q.    And they were nearing delivery?

A.    Nearing delivery.

Q.    And one of the reasons they went there was to put a final coat of paint on them?

A.    To take whatever growth it might have had on and they would -- sometimes they would skin coat it or take sandblasters and blast the paint off and they would come back with the new coats.

Q.    You could only do that in the dry dock?

A.    The dry docks, yes.

Q.    Now, do you remember any specific ships that you went aboard at Algiers?

A.    Yes. Like all the Lykes ships. The first ship and then all the rest of them. I think they done all the Lykes ships that way because they had no other way of lifting them.

Q.    Right.

A.    I think they done them at Todd's.

Q.    To your knowledge, was all the work that Avondale did at Todd on new oceangoing ships just prior to delivery?

MS. ROUSSEL:

Object to the form of the question. He's already indicated various crafts would go there.

THE WITNESS:

They had -- the craft you are referring to --

EXAMINATION BY MR. LEE:

Q.    No, sir. First of all, would I be correct that Avondale did not do repair works at Algiers?

MS. ROUSSEL:

Object to the form.

THE WITNESS:

Avondale done some work. Whatever I think Todd and them agreed to, done some work on the vessels. That's about all I can tell you.

EXAMINATION BY MR. LEE:

Q.    Okay.

A.    They send us to do some work. We did the work.

Q.    Let me make sure we're clear. I thought earlier we agreed that the vessels you were familiar with at Todd were all new ships that were just getting ready to be delivered?

—

101

```
 1        A.    Yes.  But they still had a little
 2   work to be done.
 3        Q.    They were finishing up a new ship?
 4        A.    Finishing up to where we could
 5   paint them up and all that and get them off to
 6   delivery.
 7        Q.    Okay.  You're not familiar with any
 8   work at Todd during the '60s done on barges,
 9   are you?
10        A.    No, sir.
11        Q.    You're not familiar with any work
12   done at Todd in the '60s on tugboats, are you?
13        A.    No, sir.
14        Q.    So all the work you know of at Todd
15   in the '60s was oceangoing ships like the Lykes
16   ships?
17        A.    Yes.
18        Q.    And as far as you know, all the
19   work at Todd in the '60s was on new ships that
20   were just about to be delivered?
21        A.    That's correct.  Yes, sir.
22        Q.    Did you also go to the Todd
23   facilities when you were employed by the Navy?
24        A.    Yes.  I went over there just to
25   look and see, to see what was going on.  We
```

102

```
 1   didn't work.
 2        Q.    I'm sorry?
 3        A.    We didn't work out there.  We just
 4   went to look at, you know, if there was like
 5   painting or something and that's about the
 6   extent of it.
 7        Q.    In the 1960s, do you have any
 8   information regarding any Bayou Black workers
 9   coming from Bayou Black to the New Orleans
10   area?
11        A.    No, sir.
12        MR. LEE:
13            Before I move on to something else,
14        does anybody have any questions about the
15        Landry case?
16        MR. BROWN:
17            Mr. Walker, can you hear me okay?
18        THE WITNESS:
19            Yes.
20   EXAMINATION BY MR. BROWN:
21        Q.    Did you ever work at the McDermott
22   Morgan City yard prior to 1960?
23        A.    No.
24        Q.    That's my only question.  Thank
25   you, sir.
```

103

```
 1   EXAMINATION BY MS. RENNELL:
 2        Q.    Mr. Walker, this is Stephanie
 3   Rennell.  I'm on the floor.  Can you hear me
 4   okay?
 5        A.    Yes.
 6        Q.    Okay.  Do you recall the first time
 7   you would have ever gone to the Algiers Todd
 8   yard?
 9        A.    I guess it was in the early '60s.
10   What particular date, I'm not sure.
11        Q.    When you refer to the early '60s,
12   are you referring to some date before, say,
13   1965?
14        A.    Yes, 1965, because Hurricane Betsy
15   hit then and that's what damaged some ships.
16   The LUTETIA and GENEVIEVE were sent to the
17   bottom at Williams Boulevard from Avondale.
18   And they had some other ships that got damaged,
19   too.  So that was around in 1965, I guess.  So
20   it was before '65, '63, '62, around that area,
21   '61.
22        Q.    Okay.  You mentioned that other
23   crafts went over to the Algiers facility.  Do
24   you recall which crafts those would have been?
25        A.    Well, they had the pipefitters and
```

104

```
 1   some painters went and some electricians went,
 2   I know, for the cathodic protection on the
 3   sides of the ship and different people that put
 4   the mastic on so there would have been some
 5   people in the mastic division at Avondale.  I
 6   don't know if they were called insulators or
 7   whatever.  So I'm not sure what their names
 8   was.
 9        Q.    Okay.  Since you're not able to
10   specifically recall who Mr. Raleigh Landry is,
11   is it fair to say that you are not able to
12   testify as to any particular products that
13   Mr. Landry would have worked with or around
14   while employed by Avondale?
15        A.    If I'm not familiar with what he
16   done, I'd have a hard time saying that.  You
17   know, I'm not too sure if I'm talking about the
18   same man or not.
19        Q.    Do you have a particular person in
20   mind?  When you say you're not sure if you're
21   talking about the same man or not, do you have
22   someone in mind?
23        A.    No.  He would be a little smaller
24   than me, a little guy, about 5 foot 8, 5 foot
25   9, something like that.  He was --
```

**105**

```
1        Q.   Go ahead.  I didn't mean to
2   interrupt you.
3        A.   He was just a regular person, you
4   know, and all.  I can't distinguish one
5   thing -- one trait about him that would bring
6   it out.
7        Q.   This gentleman that you are
8   describing, do you recall what his craft was?
9        A.   No.
10       Q.   Okay.  This gentleman that you're
11  describing, do you recall where he lived?
12       A.   No, I don't know where he lived.
13       Q.   When would have been the last time
14  that you worked at the Algiers yard?
15       A.   The Algiers yard?
16       Q.   Yes, sir.
17       MS. ROUSSEL:
18            While he was employed at Avondale?
19       MS. RENNELL:
20            Yes.  Thank you.
21       THE WITNESS:
22            Oh, I guess about '67 or somewhere
23       around the '60s.  And then the Navy
24       contract came.  I think they done some
25       work on the bow on -- where the dome was.
```

**106**

```
1            And that was on -- that was in the '60s,
2            late '60s, too.
3   EXAMINATION BY MS. RENNELL:
4        Q.   Okay.
5        A.   I'm not sure what year,
6   specifically what year.
7        Q.   Okay.
8        A.   Until we got the dry dock at
9   Avondale, they had no alternative but to take
10  the boat to Todd Shipyard.
11       Q.   Did you go over to the Algiers
12  facility when you were employed by the Navy?
13       A.   Yes, I did.
14       MS. RENNELL:
15            Okay.  All right.  Thank you, sir.
16       I believe that's all I have at this time.
17  RE-EXAMINATION BY MR. LEE:
18       Q.   The Mr. Landry that you are
19  referring to that you recall, did he work at
20  the main yard?
21       A.   They had Oscar Landry.  I'm not
22  sure if that's the same one.  We called him
23  Oscar, Oscar Landry.
24       Q.   That's the fellow you referred to
25  earlier on?
```

**107**

```
1        A.   Yes.
2        Q.   And he worked at the main yard?
3        A.   He worked at the main yard.
4        Q.   Okay.  I'm going to move on now to
5   your case.  One of the other attorneys here may
6   have a time issue.  Mr. Chris Conley asked if
7   he could ask you a few questions so I'm going
8   to let him go and then I'm going to come back
9   and ask some questions.
10       A.   Okay.
11  EXAMINATION BY MR. CONLEY:
12       Q.   Mr. Walker, like I told you way
13  back at the beginning of this, my name is Chris
14  Conley.
15       MS. ROUSSEL:
16            Chris, are you ad hoc'd into the
17       walker case?
18       MR. CONLEY:
19            We are planned for the pro hac.
20       MS. ROUSSEL:
21            Are you not yet?
22       MR. CONLEY:
23            Not yet but we will be by the time
24       we --
25       MS. ROUSSEL:
```

**108**

```
1            Ms. Luker is going to have to ask
2       questions.  You're not in the walker case.
3       MR. CONLEY:
4            Has this been noticed in the federal
5       case?
6       MS. ROUSSEL:
7            This has been noticed in the walker
8       case.  But you're not in the walker case.
9       You're not an attorney in the walker case.
10      MR. CONLEY:
11           All right.  I certainly won't ask
12      questions if she tells me that I can't.
13      MS. ROUSSEL:
14           But, certainly, Foster-wheeler, Ms.
15      Luker can ask any questions that she
16      wants.
17      MR. CONLEY:
18           Let me go ahead and finish my
19      objection.  I am in the middle of trying
20      to get pro hac vice under the Eastern
21      District of Louisiana Rules.  It's
22      Proforma 8.62 and I have contacted the
23      Georgia Supreme Court to get my
24      certificate of good faith which I have now
25      obtained, and we are in the process of
```

109

1  getting that filed today, I hope.  And so
2  I want -- certainly, Mr. walker, in your
3  condition, I certainly won't push this
4  issue.  If Ms. Roussel says I can't talk,
5  I won't talk.  But I am going to preserve
6  my objection and that would be that I will
7  move to strike this deposition in the
8  event that the Court determines that I
9  should have been allowed to ask my
10  questions.
11  MS. ROUSSEL:
12      And you're here asking questions for
13  Foster-Wheeler?
14  MR. CONLEY:
15      That's correct.  Only in the *Rudy*
16  *walker* case.
17  MS. ROUSSEL:
18      Mrs. Luker is here and she is an
19  attorney in the Foster-Wheeler case.  And
20  I certainly have no objection to Ms. Luker
21  asking any questions.
22  MR. CONLEY:
23      All right.
24  MS. ROUSSEL:
25      My only concern is with the number

ONE SHELL SQUARE, SUITE 250 ANNEX   **HUFFMAN & ROBINSON, INC.**   (504) 525-1753
NEW ORLEANS, LOUISIANA 70130   CERTIFIED COURT REPORTERS   (800) 749-1753

110

1  of attorneys here and with the condition
2  of Mr. walker, if attorneys who are not
3  even, number one, licensed in Louisiana
4  and, number two, not even a party or not
5  even an attorney in the case, I can't
6  allow to ask any questions.
7  MR. CONLEY:
8      All right.  And let me just finish
9  my objection, Ms. Roussel.
10  MS. ROUSSEL:
11      Sure.
12  MR. CONLEY:
13      I believe that this is improper.  I
14  think that my client should be allowed to
15  have the attorney of its choosing here.
16  Especially given the unusual circumstances
17  in this case that it's now been removed to
18  federal court.  I am the attorney that
19  handles the federal court removals for
20  them.  And while Ms. Luker is a fine
21  attorney, a competent attorney, I am the
22  one that is qualified to ask those
23  questions.  And I think this prejudices my
24  client, whereas, it would not prejudice at
25  all the proceedings here and, in fact,

ONE SHELL SQUARE, SUITE 250 ANNEX   **HUFFMAN & ROBINSON, INC.**   (504) 525-1753
NEW ORLEANS, LOUISIANA 70130   CERTIFIED COURT REPORTERS   (800) 749-1753

111

1  would speed them up.
2      So with all respect to Mr. walker,
3  and this certainly doesn't involve you,
4  this is just between me and your attorney,
5  is that I will reserve my right to move to
6  strike this deposition unless I have a
7  chance to cross-examine the witness.
8      (whereupon a discussion was held off
9  the record.)
10  MS. LUKER:
11      At this point, I'm going to ask that
12  the deposition be halted and --
13  MS. ROUSSEL:
14      The deposition is not being
15  halted --
16  MS. LUKER:
17      -- we're going to call the judge and
18  have the judge rule on your objection,
19  Mrs. Roussel, because, as you know, it is
20  an invalid objection that you are making.
21  And I want the judge to solve the problem
22  for us once and for all.
23  MS. ROUSSEL:
24      I have no problem calling the judge
25  right now.  I do have a problem with you

ONE SHELL SQUARE, SUITE 250 ANNEX   **HUFFMAN & ROBINSON, INC.**   (504) 525-1753

112

1  stating my objection is invalid.  In any
2  event, let's call the judge and see if the
3  judge is of the opinion that an attorney
4  not licensed in Louisiana who comes
5  *pro hac* into the courtroom has the right
6  to ask questions at a deposition.  when
7  their local counsel is present and asking
8  questions.
9  MS. LUKER:
10      And for the record, please note that
11  the local counsel is not asking questions.
12  MS. ROUSSEL:
13      We're going to move on into the
14  dining room so we don't have to
15  inconvenience this witness while we --
16  THE VIDEOGRAPHER:
17      we're off the record.
18      (whereupon a brief recess was taken
19  at this time.)
20  EXAMINATION BY MR. LEE:
21      Q.   Mr. walker, a preliminary question
22  I have for you, how long have you been living
23  in this house?
24      A.   About 40-something years, about 45
25  years maybe.

ONE SHELL SQUARE, SUITE 250 ANNEX   **HUFFMAN & ROBINSON, INC.**   (504) 525-1753

113

1     Q.    All right. And before that, where
2  did you live?
3     A.    I lived in westwego, 647 Avenue F
4  in westwego.
5     Q.    which?
6     A.    647 Avenue F in westwego.
7     Q.    All right. And before that, do you
8  remember?
9     A.    That's the only place I lived.
10    Q.    The only two places.
11    A.    Yes, sir.
12    Q.    Are you familiar with the fact that
13 some homes at some times on the west bank had
14 scrap material from Johns-Manville delivered to
15 their house for driveways or that kind of --
16    A.    Not that I know of.
17    Q.    You're not familiar with that?
18    A.    No, sir.
19    Q.    So I take it then you're not
20 familiar with whether or not anyplace you ever
21 lived had that kind of material?
22    A.    I don't remember. I don't have
23 no -- no.
24    Q.    I know you worked for Avondale or
25 the Navy most of your life.

114

1     A.    Uh-huh (indicating affirmatively).
2     Q.    Before you were -- what was your
3  first job, do you remember?
4     A.    My first job I worked as a
5  carpenter helper digging forms and putting
6  forms down, helping the carpenters get things
7  prepared like to pour cement or something.
8     Q.    who were you working for then?
9     A.    Different -- Guidros. I worked for
10 Power & Light. I cleaned the fence cutting
11 grass and all, you know. I was a young man,
12 young boy just making a few dollars and getting
13 little odds and end jobs.
14    Q.    Okay.
15    A.    Not no big jobs.
16 MS. ROUSSEL:
17       That's when you were in high school,
18 Mr. walker?
19 THE WITNESS:
20       Yes, I was in high school.
21 EXAMINATION BY MR. LEE:
22    Q.    Do you remember working for a
23 company called westbank Construction Company?
24    A.    westbank Construction.
25    Q.    For a brief period of time.

115

1     A.    Yes. I was a carpenter, I think,
2  carpenter helper.
3     Q.    Do you remember -- well, let me
4  just tell you. Your Avondale records show that
5  you were first employed at Avondale 7-31-56.
6  Sounds right?
7     A.    Yes. I was still in high school.
8  I was in the eleventh grade going in the
9  twelfth and then I worked in the summer months
10 for them. It was like a little summer job.
11    Q.    what did you do that summer?
12    A.    I worked at the Avoncraft.
13    Q.    Avoncraft?
14    A.    Avoncraft, yeah.
15    Q.    what --
16    A.    worked on like a furnace line.
17    Q.    I'm sorry. what line?
18    A.    The furnace line.
19    Q.    were you at Avoncraft the whole
20 summer?
21    A.    Just about, yes.
22    Q.    was that located somewhere on or
23 near the main yard?
24    A.    Yes, in the main yard by the main
25 gate, I guess.

116

1     Q.    was that the company --
2          (whereupon a discussion was held off
3     the record.)
4  THE VIDEOGRAPHER:
5       we're back on the record.
6  EXAMINATION BY MR. LEE:
7     Q.    Mr. walker, what did you do at
8  Avoncraft that first summer?
9     A.    I took panels off of the furnace
10 line and stacked them.
11    Q.    Is that a company that was making
12 panels for --
13    A.    Panels for like builders and all.
14    Q.    For gas stations?
15    A.    Yes.
16    Q.    That's enamel panels?
17    A.    Enamel panels, yes.
18    Q.    So was there a building dedicated
19 for that purpose?
20    A.    Yes. It was where the sheet metal
21 shop is right now, I think.
22    Q.    Okay.
23    A.    Somewhere in that area, yeah.
24    Q.    All right. During that first
25 summer, do you have any reason to believe you

117

1 were exposed to asbestos?
2     A.    No. Unless the -- some of the
3 gloves that we used to take off the hot line
4 had, I guess, an asbestos coating or something
5 on it like.
6     Q.    Do you know that for sure --
7     A.    I'm not sure. I don't know.
8     Q.    what did the gloves look --
9     A.    It was soft gloves, smooth soft
10 gloves and it would keep your hand from getting
11 burnt on the hot panels. The panels was hot.
12 It would come off like on a Christmas tree on a
13 furnace line and we would take those panels off
14 the line and stack them while it was still hot.
15     Q.    Okay.
16     A.    So you had to wear gloves to
17 protect your hands.
18     Q.    Can you recall what the gloves
19 looked like?
20     A.    It was like a little gray glove,
21 like a cotton with a fill material inside like
22 an insulator-type material inside. I'm not
23 sure if it was asbestos.
24     Q.    Yes.
25     A.    I don't think it said asbestos or

118

1 whatever or I can't remember it saying that,
2 but we had to wear gloves because of the heat.
3     Q.    Okay. would you remember any name
4 on the glove at all?
5     A.    No, sir.
6     Q.    what about the next summer, 195 --
7 well, when was the next time you worked at
8 Avondale?
9     A.    I went to work with the electrical
10 department in 1956, I guess, '57.
11     Q.    '57.
12     A.    I worked then through '68. I got
13 laid off. And then they rehired me.
14     MRS. WALKER:
15         '58.
16     THE WITNESS:
17         '58. And then they rehired me
18     shortly after. It wasn't long I was laid
19     off. And then I start working and I
20     worked continuously there until, I think,
21     until '69.
22 EXAMINATION BY MR. LEE:
23     Q.    Okay. If the Avondale records
24 reflect that between May -- you were employed
25 May '57 to May '58, would that sound right?

119

1     A.    Yes.
2     Q.    And they have you as an
3 electrician's helper during that time?
4     A.    Yes, that's correct.
5     Q.    Do you remember what electrician
6 you worked with at that time?
7     A.    Lloyd Frischhertz was the
8 superintendent. And they had George Healy and
9 Salman Coussou. That was all supervisors,
10 Louie Duplantis, Guy J. Riggs, Pat -- they had
11 a lot of people, a lot of electricians that we
12 worked with.
13     Q.    Okay. During that time period
14 we're talking now before you got laid off, did
15 you work on any vessels or did you work
16 shoreside? what did you do?
17     A.    I worked on the ships.
18     Q.    Okay.
19     A.    worked on a lot of commercial
20 ships.
21     Q.    During that '57, '58 time period?
22     A.    That was the Navy ships, I think,
23 on that.
24     Q.    Okay.
25     A.    That was the Navy.

120

1     Q.    Do you remember what kind of ships?
2     A.    The LSDs and cargo ships.
3     Q.    Do you remember whether or not you
4 worked on any DEs during that time period?
5     A.    The DEs was a little later, I
6 think. They had some DEs in the '60s, early
7 '60s like '60 or '61. And they had two DDGs
8 and that was in about the same time span. I
9 don't know which came first or second but it
10 was in that same time frame.
11     Q.    Okay.
12     A.    And then the Lykes ships came in.
13     Q.    Just so we're clear, I'm just
14 trying for the moment to talk about that
15 period --
16     A.    Yeah.
17     Q.    -- '57, '58 before you got laid
18 off.
19     A.    Yes.
20     Q.    I'm just trying to remember -- if
21 you remember vessels in that particular time
22 frame.
23     A.    Yeah, I worked on one vessel. One
24 particular one was the *Tappahannock*.
25     Q.    I'm sorry?

121

```
1        A.    Tappahannock.
2        Q.    What kind of vessel was it?
3        A.    I think it was a Navy boat, too.
4        Q.    A Navy --
5        A.    Yeah, a Navy ship.  Yeah.  I'm not
6   sure.  I think it was.
7        Q.    During that time period, were you
8   around insulators on the boat?
9        A.    Yes.  They had insulators.  They
10  did the same type of work as they did on the
11  other ships, yes.
12       Q.    Did that include installing pipe
13  insulation?
14       MR. BROWN:
15            Object to form.
16       THE WITNESS:
17            And insulation on the bulkheads and
18       things like that.
19  EXAMINATION BY MR. LEE:
20       Q.    Do you remember what kind of
21  materials went on the pipes at that time?
22       A.    They had asbestos type, the same
23  stuff they used to put on the pipes.  They used
24  to wrap the pipes the same way with the -- with
25  that half block.
```

122

```
1        Q.    Half-round material?
2        A.    Half-round material and they
3   sandwich it and tie it and then they coat it
4   with that compound.
5        Q.    Do you remember if they put
6   anything else around it, any cloth material?
7        A.    They had some they used to bathe in
8   a cloth and it was -- the cloth would get
9   soaking wet and then they open it up and smooth
10  it out over it and it would dry hard, also.
11  They made like a protective shield on the pipe
12  insulation itself.
13       Q.    During that time, did you get
14  involved at all in repairing welding machines?
15       A.    No.  That was mostly in the
16  maintenance department on the outside.
17       Q.    In the shop?
18       A.    In the shops and all.
19       Q.    Did you ever see welding machines
20  repaired on the ship?
21       A.    They had some machines on the ship,
22  and they had what they call cracker boxes that
23  was just grids like and they would weld off of
24  those things, too.  I'm sure they repaired them
25  on ships.  The maintenance people would come
```

123

```
1   and work on things and some of it was welding
2   machines.
3        Q.    Okay.  Now, let's move on to '58,
4   when you come back after you were laid off,
5   right?
6        A.    Yes.
7        Q.    Did you do different work when you
8   came back after you were laid off?
9        A.    Electrical, same kind of work,
10  electrical work.
11       Q.    Okay.  There was a time when you
12  became an electrician?
13       A.    Yes.
14       Q.    Do you know about when that was?
15       A.    I guess in '61, something like
16  that, '62.  I started getting raises.  It was
17  like -- you were a helper and then you got a
18  little bit more pay but you were still a
19  helper.  Then at which time where the salary
20  become a certain level, then they would call
21  you a mechanic.  Some people would get paid
22  different than others, you know.  So you don't
23  really know what status of an electrician you
24  really was.  It was just you done the same work
25  as if you were one guy or the other and you
```

124

```
1   were on a different level pay scale.
2        Q.    And you stayed at Avondale until
3   '697
4        A.    '69, yes.
5        Q.    And you worked as an electrician
6   throughout that time?
7        A.    All throughout that area, doing the
8   same thing.
9        Q.    Let me go down the names of some
10  vessels and see if you remember whether or not
11  you worked on them.  Okay?
12       A.    Yes.
13       Q.    There was some destroyer escorts
14  built between '57 and '60.  Do you know if you
15  worked on them?
16       A.    I am not sure.
17       Q.    They were called the 1033 class
18  destroyer escorts?
19       A.    Yes, I might have worked on those.
20  There's a possibility.  They shifted us back
21  and forth on different type ships and in
22  different commercial ships and the Navy ships.
23  So we worked on both kinds.
24       Q.    I understand.  There was some
25  Mississippi Shipping Company cargo vessels
```

125

```
1   built late '59, '61, Del Rio, Del Sol?
2       A.    Yeah, I worked on those, too.
3       Q.    All Right.
4       A.    Del Oro.  I think they had three or
5   something like that.
6       Q.    That's right.  Do you know whether
7   or not you worked on the U.S. Navy guided
8   missile destroyers?
9       A.    That's Apollo they call it?
10      Q.    No, I don't believe.  One was
11  called the Sims and the other the Tattnall?
12      A.    I'm not sure.
13      Q.    Okay.  Do you recall later on there
14  were additional DEs built at Avondale?
15      A.    Yes.  The DEs, that was, I guess
16  they started those in '67 or something like
17  that.  It was the first one, I can't remember
18  the name it was but it was -- they started the
19  big D contract.  That was after the Lykes
20  ships.  That was after '65.  I'm saying '65
21  because I'm marking it that's when the
22  hurricane hit.
23      Q.    Right.
24      A.    And we were working on the Lykes
25  ships then.
```

ONE SHELL SQUARE, SUITE 250 ANNEX   **HUFFMAN & ROBINSON, INC.**   (504) 525-1753
NEW ORLEANS, LOUISIANA 70139   CERTIFIED COURT REPORTERS   (800) 749-1753

126

```
1       Q.    There were a group of Lykes ships
2   built between '62 and '68?
3       A.    Right, I worked on all of those.
4       Q.    Okay.  And then you remember a
5   group of DEs being built after that time that
6   you worked on?
7       A.    Yes.
8       Q.    What kind of work did you do on
9   those?
10      A.    Well, I inspected when I went with
11  the Navy in '69.  I went to work at Avondale
12  working for the Navy on callouts when the --
13  Avondale would call out for particular tests
14  and we'd go witness it to see if it was in
15  accordance with Avondale's test memorandums and
16  drawings.
17      Q.    Okay.  We're going to get to what
18  you did after you worked for the Navy in a
19  little while.  Right now I just want to stick
20  to when you were a direct employee of Avondale.
21  Okay?
22      A.    Yes.
23      Q.    When you were a direct employee of
24  Avondale, you worked as an electrician on DEs,
25  also?
```

ONE SHELL SQUARE, SUITE 250 ANNEX   **HUFFMAN & ROBINSON, INC.**   (504) 525-1753
NEW ORLEANS, LOUISIANA 70139   CERTIFIED COURT REPORTERS   (800) 749-1753

127

```
1       A.    Yes, I done some work on DEs.
2       Q.    Do you remember what kind of work
3   you did as an electrician on the DEs?
4       A.    Yes.  Electrical, power, lighting
5   in I.C., hooked up light switches, the same
6   work, same kind of work using the same -- well,
7   it's different equipment because of commercial
8   and Navy's got a little different equipment.
9   But it's basically the same stuff.
10      Q.    How was it different?
11      A.    Well, it was different because some
12  of them was just regular like steel city boxes
13  and the other one was brass boxes.  The Navy
14  had the brass.  The others had punch-outs and
15  it was a different box.
16      Q.    Do you remember whether or not you
17  worked on the U.S. Navy hospital ship, the
18  Sanctuary?
19      A.    Yes, I did.
20      Q.    That was being refurbished for use
21  in Vietnam?
22      A.    That's correct.
23      Q.    What kind of work did you do on
24  that vessel?
25      A.    Electrical work, the same thing.
```

ONE SHELL SQUARE, SUITE 250 ANNEX   **HUFFMAN & ROBINSON, INC.**   (504) 525-1753

128

```
1       Q.    Do you know if you worked on any of
2   the U.S. Coast Guard cutters that were built in
3   the '60s -- the -- well, the late '60s?
4       A.    I went on it a few times.  I didn't
5   work on a long period of time on that.  Just
6   might have done a little bit work.
7       Q.    Do you remember if you worked --
8   I'm sorry?
9       A.    Not a long period of time.
10      Q.    Do you recall whether or not you
11  worked on any of the Gulf cargo ships?
12      A.    Yeah, Gulf South American, yes.
13      Q.    It was Gulf Farmer, Gulf Banker,
14  Gulf Trader, those ships?
15      A.    Yes, sir, I did.
16      Q.    Do you remember whether you worked
17  on the States lines?
18      A.    The States lines I did.
19      Q.    The Colorado, Montana, Idaho, that
20  group of ships?
21      A.    I think so, yes.
22      Q.    Do you know whether you worked on
23  any of the Esso tankers?
24      A.    Not on those, no, sir.
25      Q.    Do you know if you worked on any of
```

ONE SHELL SQUARE, SUITE 250 ANNEX   **HUFFMAN & ROBINSON, INC.**   (504) 525-1753

129

1    the Prudential LASH cargo ships?

2        A.    No, none of the LASH ships.

3        Q.    None of the LASH at all?

4        A.    No, sir.

5        Q.    During the time that you were

6    employed by Avondale and you worked on the Navy

7    vessels, were Navy inspectors on those vessels?

8        A.    At the time, yes.

9        Q.    Okay.  And they inspected the work

10   that was done --

11       A.    By us, yes.

12       MS. ROUSSEL:

13           And let me object to the form of the

14   question.

15   EXAMINATION BY MR. LEE:

16       Q.    Throughout the time you were

17   employed by Avondale --

18       A.    Yes.

19       Q.    -- any time you worked on a Navy

20   ship, would it be correct that Navy inspectors

21   would inspect the work?

22       MS. ROUSSEL:

23           Object to the form of the question.

24   What do you mean by inspection?

25   EXAMINATION BY MR. LEE:

130

1        Q.    Do you know what I mean by inspect

2    the work?

3        A.    Inspect the work?  The Navy would

4    go out with the Avondale employees and they

5    would look at the work to see if it complied to

6    the drawings and specifications at Avondale.

7        Q.    Okay.

8        A.    Avondale's drawings.

9        Q.    Do you know that the Navy was the

10   source of the specifications?  In other words,

11   the ships were being built to the Navy's

12   specifications?

13       A.    No, sir.  It was by the Avondale

14   drawings.  I know that.

15       Q.    But do you know how the drawings

16   were created?  In other words, do you know that

17   those drawings were created to comply with the

18   Navy's specifications?

19       A.    No.  We only went by what the

20   Avondale ASI drawings showed.

21       Q.    Right.  My question --

22       A.    We didn't question whether it was

23   by a Navy design because Avondale had its own

24   design engineering department.  They done all

25   their designing and just went by the

131

1    instructions that was given in accordance with

2    the drawings.

3        Q.    Okay.  Did you have any familiarity

4    with the contracts between Avondale and the

5    Navy?

6        A.    No, not really.

7        Q.    Okay.  So you don't really know

8    what the Navy required of Avondale insofar as

9    the details of the construction of the ship?

10       A.    All they required is that it was on

11   the drawings and that everything was installed

12   in accordance with the Avondale drawings.

13       Q.    Right.  My question to you is,

14   though, you have no knowledge as to whether or

15   not those drawings were drawn to comply exactly

16   with specifications the Navy had already given

17   Avondale?

18       MS. ROUSSEL:

19           Let me object to the form of the

20       question.  He's already indicated that

21       Avondale had design engineers and it

22       complied with Avondale's drawings as per

23       their engineers.

24       A.    And their specifications.  That's

25   all I can tell you.

132

1    EXAMINATION BY MR. LEE:

2        Q.    That's what I want to make sure.  I

3    want to make sure the extent of the information

4    you have.

5        A.    That's all.

6        Q.    Would it be fair to say that all

7    you really know is you followed a drawing that

8    had Avondale's name on it?

9        A.    They had a list of material which

10   had to be installed and how it had to be

11   installed.

12       Q.    Right.  But beyond that you don't

13   really know one way or the other whether the

14   Navy told Avondale exactly what to put on the

15   drawings?

16       A.    I couldn't say, no.

17       Q.    So you wouldn't know one way or the

18   other, would you?

19       MS. ROUSSEL:

20           Let me object to the form of the

21       question.  You're talking about during the

22       time he was employed at Avondale or during

23       the time that later he became personnel of

24       the Navy?

25       MR. LEE:

133

1       we're talking now only during the
2  time he was employed directly by Avondale.
3       A.    Well, I was going in accordance
4  with the drawing.  I didn't go by no
5  specifications other than what was given to me
6  to install or whatever.
7  EXAMINATION BY MR. LEE:
8       Q.    I appreciate that.  I am just
9  trying to make sure that I understand where
10  your information stops, if you know what I
11  mean.
12       A.    Yes, sir.
13       Q.    I know you were going off drawings.
14       A.    Yes.
15       Q.    I understand the drawings said
16  Avondale?
17       A.    My knowledge didn't go beyond what
18  I knew.  It was the drawings and what was
19  required of me.
20       Q.    I understand.
21       A.    To look at the drawings and don't
22  add to it, and see that everything was
23  installed in accordance with what was in
24  Avondale drawings.
25       Q.    Right.  Now, my question and I

134

1  don't expect you to know this, what I'm asking
2  so I'm sure if you do or don't.
3       A.    Yes.
4       Q.    Do you have any idea one way or the
5  other whether the contract between the Navy and
6  Avondale required the details that were
7  illustrated in those drawings?
8       A.    No.  I don't know that.
9       Q.    Okay.  Fair enough.
10       And you don't know one way or
11  another -- you said they had a list of
12  materials.  You don't know one way or the other
13  whether the contract with the Navy required the
14  exact materials set out in the drawings?
15       A.    That's correct.  That was on the
16  drawings and Avondale incorporated their own
17  drawings.  And that was what we had to install.
18       Q.    Okay.  And once that was installed
19  as per those drawings, the Navy had to inspect
20  it?
21       A.    They came and look at it to see on
22  a callout to see if it was in accordance with
23  Avondale's drawings.
24       Q.    If it wasn't in accordance with the
25  drawings, what would happen?

135

1       A.    Well, they would write a deficiency
2  on a 2247.
3       Q.    Okay.
4       A.    And if it was a correct deficiency,
5  Avondale would fix it.  If it wasn't in
6  accordance with their drawings, Avondale would
7  fix it and they would call it out again and it
8  was fixed.  And then they would sign off on it.
9  You know, if it was in accordance with what it
10  was like it should have been.
11       Q.    If it wasn't in accordance they
12  would -- Avondale would have to fix it or
13  modify it?
14       A.    They'd have to do it in accordance
15  with the drawings.
16       Q.    Okay.  On Navy vessels, did the
17  Navy basically have to review and approve all
18  of the work that was done on the vessel?
19       A.    No.
20       MS. ROUSSEL:
21       Object to the form of the question.
22  EXAMINATION BY MR. LEE:
23       Q.    What work did they not approve?
24       A.    They just went over there and
25  verified that things was installed in

136

1  accordance with whatever you were looking at,
2  the criteria.  And then it was accepted in
3  accordance with if it was correctly installed.
4       Q.    I guess what I'm asking you is was
5  there anything they didn't inspect?
6       A.    I'm sure that whatever Avondale
7  called out, they inspected.  If they call it
8  out, Avondale wanted it inspected, they call it
9  out on a daily basis.  And if it wasn't called
10  out on the callout sheet, they didn't inspect
11  it.  Everything was required to be inspected
12  and verified, I guess, sooner or later.
13       Q.    Right.  At some point --
14       A.    At some point in time when the
15  contractor said it was okay, then they called
16  it out officially and then you either had a
17  choice to go and look at it or accept -- you
18  can accept it too, you know, without looking at
19  it if the quality was good in some cases.
20       Q.    Now, let's make sure we're sticking
21  to the time when you were employed by Avondale,
22  right?
23       A.    Yes.
24       Q.    We're talking just about that time.
25       A.    Yes.

137

Q.   Okay.  During that period of time when you were working as an electrician, did Navy inspectors inspect the electrical work that you did on Navy vessels?

A.   Yes, they did.

Q.   When you worked on commercial vessels during that time, were there any kind of governmental inspectors that inspected your work?

A.   Yes, we came out and looked at it the same way the Navy came out.

Q.   Do you remember what kind of inspectors those were?

A.   Oh, BSA, GSA-type inspectors, they were -- they had different groups that would come out and do an inspection.  Now, they were working for, I guess, the ship industry that the ship belonged to, that it was going to belong to.

Q.   Do you recall the Coast Guard inspecting work on commercial ships?

A.   Oh, very little, if any.

Q.   Do you recall the Coast Guard inspecting work on Coast Guard vessels?

A.   I'm sure they did, yes.  I don't

138

know if they did or not.

Q.   Okay.

A.   I am sure they did.

Q.   On all the vessels that you worked on throughout the time you were directly employed by Avondale, would it be generally true that you worked in all parts of those vessels?

A.   Yes.

Q.   Earlier today you made mention of Hopeman Brothers?

A.   Yes.

Q.   Do you recall working around them on any particular vessel?

A.   Yes, on the Lykes ships.  We worked on the Lykes ships.

Q.   Can you remember any specific occasions when you worked around them?  Do you remember what you were doing, what they were doing?

A.   Yes.  They would put those inch posts and corner posts and they would put that Mica board, they'd cut that big Mica board.  It was like a Sheetrock or Formica or something surface, different color surfaces and they had

139

like a chalky substance in between them and they were about that thick, about three-quarters or one inch thick.  And they would cut them with saws.  That stuff was all over.  That was part of the dust that was in the quarters and they would stand all these boards up and a lot of those -- our switches and cables would go in and the desk lights and mirror lights and all would be connected.  And we work side by side because the panels had to be snapped in, too, by them, and we'd help do it and install the electrical components.

MS. MOORE:

I'm going to object to the responsiveness of the answer.

EXAMINATION BY MR. LEE:

Q.   Do I understand that you from time to time would be working in the same room that these panels were being installed?

A.   Yes, sir.

Q.   Were the panels being cut at that time?

A.   Yes.  They would cut them in on the decks in the same areas on them horses.

Q.   How were they cut?

140

A.   With a saw, one of those big Skilsaws.

Q.   Do you remember whether or not Hopeman Brothers worked on any of the vessels other than Lykes vessels?

A.   That was the Lykes ships.

Q.   How do you know they were Hopeman Brothers employees?

A.   Well, they had their names and all on them, their hats and on the equipment.

Q.   When you were an employee for Avondale, did you know the names of any of the Navy inspectors?

A.   Yes, they would come around.  I'm not sure of all the names right now.  I know maybe one or two.

Q.   Who would they have been?

A.   I think Sal Garacci.  He worked for the Navy.  He worked for Avondale, too, before he worked for the Navy.  And I think Gordon Murray.  I think that's all I can remember.

Q.   In the '60s when you were employed by Avondale, did the Navy maintain an office, if you know, on the Avondale premises?

MS. ROUSSEL:

141

1          Object to the form of the question.
2      Did the Navy maintain an office?
3  EXAMINATION BY MR. LEE:
4      Q.    Yes, on the Avondale premises.
5      A.    No.  It was Avondale -- office
6  at -- I guess Avondale provided that so they
7  have a place for them to go during the day with
8  the callouts and all.  I don't know if they
9  maintained it and all.  I think Avondale
10 maintained all of that.
11     Q.    To your knowledge in the '60s, was
12 there an office area regardless of who provided
13 it that the Navy inspectors used on a daily
14 basis that was sort of their office?
15     MS. ROUSSEL:
16         Object to the form of the question.
17 EXAMINATION BY MR. LEE:
18     Q.    They had use of that office?
19     A.    They had use of an office because
20 they would go in an office.  Now, I'm sure that
21 Avondale allowed them to do that, but I'm not
22 sure what was the circumstances.
23     Q.    Okay.  Do you have any knowledge
24 how many Navy inspectors used that office at
25 Avondale in the '60s?

142

1      A.    Oh, I guess about six or five or
2  something like that.
3      Q.    Do you remember where that office
4  was located?
5      A.    No, sir.
6      Q.    Did you ever visit it yourself in
7  the '60s?
8      A.    No.
9      Q.    How do you know there was such an
10 office?
11     A.    Well, they had the Navy people
12 would go in and out and stay around in that
13 area so they, you know, the people would say
14 that would be the Navy office.  But as far as
15 me going and having to go in there, I didn't go
16 so I didn't know if they were in there.
17     Q.    Do you remember what building it
18 was in?
19     A.    I'm not certain.
20     Q.    Do you know if it was near the
21 river?
22     A.    They moved those office buildings
23 all the time.
24     Q.    Okay.
25     A.    It was -- I think they were on

143

1  wheels or something.  I don't know.  It might
2  have been -- they could have been trailers.
3  I'm not sure.
4      Q.    Okay.  Do I understand, though, the
5  people refer to it as the Navy office?
6      MS. ROUSSEL:
7          Object to the form of the question.
8      A.    I can't answer that.
9  EXAMINATION BY MR. LEE:
10     Q.    Well, you just used the term a
11 minute ago.  I understand you said Navy
12 office so I'm just wondering --
13     A.    Just terminology.  You asked me.
14 I'm assuming that the Navy personnel was in
15 there, it was a little office.  It could have
16 not been an office.
17     Q.    You don't know?
18     A.    I don't know.
19     Q.    That's fair.  I'm just trying to
20 understand what you knew and didn't know.
21     A.    Yeah, I don't know that.
22     Q.    It's fair not to know.
23          Now, at some point you left
24 Avondale, correct?
25     A.    Yes, sir.

144

1      Q.    Why did you leave Avondale?
2      A.    Well, to get in a little bit
3  cleaner environment so I wouldn't be so dirty
4  all the time and maybe get a little raise.  And
5  that's about it.
6      Q.    So what did you do when you left
7  Avondale?
8      A.    I went and worked for the Navy.
9      Q.    Now, did they offer you that work
10 before you left Avondale?
11     A.    No, I had to apply.  I got a 171 at
12 the post office and submitted a resume.
13     Q.    What's a 171?
14     A.    It's a form that you apply for a
15 job with the government.
16     Q.    Did you know you had that job when
17 you quit Avondale?
18     A.    Well, I give them a notice, I
19 Avondale a notice that I was going to quit.
20     Q.    Right.
21     A.    And then they didn't really want me
22 to leave.  They wanted me to go in the Q.C.
23 Department.
24     Q.    What department?
25     A.    Q.C. Department

145

1    Q.    Quality control?

2    A.    Yes.  But I had already made a

3  commitment so I figured that if I had to come

4  back, I'd go back but I would go through the

5  commitment.

6    Q.    And what was the commitment?

7    A.    Well, I had already applied for the

8  job and told the lady I would take it.

9    Q.    That's with the Navy?

10    A.    Yes.

11    Q.    Okay.  That's what I was trying to

12  understand, whether you had applied and knew

13  you had the Navy job before you quit?

14    A.    Yes.  And they told me that I had

15  the job.

16    Q.    Did you have to interview or take

17  any tests to get the Navy job?

18    A.    Yes.  I had to interview and take a

19  test.

20    Q.    Do you remember where you

21  interviewed?

22    A.    I interviewed with Commander

23  Harwitt.

24    Q.    Harwitt?

25    A.    Yes.

146

1    Q.    Where was that?

2    A.    That was at the Navy Department.

3    Q.    Where was that located?

4    A.    At the Port of Embarkation, I

5  guess.

6    Q.    Okay.  Was that the only interview

7  you had to have?

8    A.    I had to get a physical and then a

9  little test.  And that was it.

10    Q.    What kind of test?

11    A.    It was like a little psychological

12  test you fill out that asks you a few questions

13  that you have to answer.

14    Q.    When you were hired by the Navy,

15  was it understood that you were being hired to

16  inspect vessels built at Avondale or were you

17  going to be inspecting elsewhere?

18    A.    Well, at that time, I guess it was

19  elsewhere.  And then when I got hired on, they

20  said I'm going to work at Avondale.

21    Q.    So you didn't know that at first?

22    A.    I didn't know that at first.

23    Q.    Okay.  Did you know that you were

24  going to be hired to inspect electrical

25  installation?

147

1    A.    Yes.  Because that's what I applied

2  for.

3    Q.    At any time in your career did you

4  inspect anything in addition to electrical or

5  was it always electrical?

6    A.    It was basically electrical.  They

7  had some inspections like maybe a paint or

8  something basic.

9    Q.    A what?  I'm sorry?

10    A.    Paint or something like that,

11  nothing elaborate that I would have to have too

12  much expertise in other than electrical.

13    Q.    Did you have any additional

14  training while you were employed by the Navy in

15  inspecting electrical equipment?

16    A.    Yes.

17    Q.    Tell me about the training.

18    A.    They sent me to training school on

19  various things, on installations and all just

20  to get me familiar with what they were doing

21  and so that we would recognize a good product,

22  you know.

23    Q.    When in your career with the Navy

24  did you go to these training schools?

25    A.    During the year they'd send you

148

1  sometimes a couple of times a year.

2    Q.    And where were those schools held?

3    A.    Some of them in Algiers.

4    Q.    Were they always there or were they

5  somewhere else?

6    A.    They had different locations.  In

7  Algiers, they might send you out of town,

8  across the river and then -- or they'd send you

9  to like Norfolk Naval Shipyard.

10    MR. LEE:

11      All right.  We're going to take a

12  break and we'll continue after this

13  conference.

14      (Whereupon the following telephone

15  conference was held with the Judge:)

16    MS. ROUSSEL:

17      Ms. Court Reporter, would you take

18  all this down?

19      Rudy Walker is dying from

20  mesothelioma.  We are at his home at a

21  deposition which has been noticed that

22  started at 10:00 this morning.  There are

23  approximately 24, 25 lawyers in

24  attendance.  Only two attorneys have asked

25  questions so far.  Currently Mr. Gary Lee

**149**

1  is in the process of asking his questions.
2      The person that I had not seen
3  before indicated that he wanted to ask
4  some questions. And I said, first of all,
5  who do you claim you represent? He said
6  Foster-Wheeler, for which I said Lynn
7  Luker is counsel for Foster-Wheeler.
8  There has not been any pro hac admission.
9  He has not participated in this case at
10  all.
11  THE COURT:
12      Mrs. Roussel, I'm trying to get us
13  to the point where we can talk to each
14  other and let the deposition go forward.
15  MS. ROUSSEL:
16      I understand. We are in the
17  deposition and going forward. If I
18  allowed attorneys to ask questions that
19  are not participating in the case, this
20  deposition will never finish. Mr. Walker
21  is on oxygen. He's in his bed giving his
22  deposition. He has tubes going in and out
23  of his body. It should be limited to the
24  attorneys that are actively participating
25  in this case.

**150**

1  THE COURT:
2      There is a seven-hour limit in the
3  rules.
4  MS. ROUSSEL:
5      Okay.
6  THE COURT:
7      Anything else?
8  MS. ROUSSEL:
9      No. That's all I have to say.
10  THE COURT:
11      Mrs. Roussel, these are perfectly
12  fine questions. I think the deposition
13  ought to proceed and it can proceed if Mr.
14  Conley can answer these questions I have
15  to ask him.
16  MR. CONLEY:
17      Yes, sir.
18  THE COURT:
19      Raise your right hand.
20  MR. CONLEY:
21      (Complies.)
22  THE COURT:
23      Do you swear the testimony you are
24  about to give is the truth, the whole
25  truth and nothing but the truth, so help

**151**

1  you God?
2  MR. CONLEY:
3      Yes.
4  THE COURT:
5      Mr. Conley, are you a member of the
6  court?
7  MR. CONLEY:
8      Yes, sir.
9  THE COURT:
10      In which one?
11  MR. CONLEY:
12      The State of Georgia, the Middle
13  District of Georgia Federal Court and the
14  Eleventh Circuit Court of Appeals.
15  THE COURT:
16      Have you attained a certificate from
17  the presiding judge of the highest State
18  of Georgia showing that you had been
19  admitted to the court and you are in good
20  standing in that court?
21  MR. CONLEY:
22      Yes, sir.
23  THE COURT:
24      Is it true, Mr. Conley, you are a
25  member in good standing in the State of

**152**

1  Georgia?
2  MR. CONLEY:
3      That is correct.
4  THE COURT:
5      Is there any disciplinary
6  proceedings or criminal proceedings
7  against you?
8  MR. CONLEY:
9      No, Your Honor.
10  THE COURT:
11      There are none that are pending or
12  have been filed in the past?
13  MR. CONLEY:
14      That's correct.
15  THE COURT:
16      Put Ms. Luker on the phone.
17      You are local counsel for the
18  defendant Foster-Wheeler in this case?
19  MS. LUKER:
20      Yes, Your Honor.
21  THE COURT:
22      Mr. Conley is going to be associated
23  with you?
24  MS. LUKER:
25      Yes, Your Honor.

153

1    THE COURT:
2        You're going to continue as local
3    counsel?
4    MS. LUKER:
5        Yes, Your Honor.
6    THE COURT:
7        Is it your intent to file a motion
8    of Mr. Conley as a visiting counsel?
9    MS. LUKER:
10       Yes.
11   THE COURT:
12       You have until today to file it.
13   MS. LUKER:
14       Thank you, Your Honor.
15   THE COURT:
16       I'm going to let Mr. Conley ask
17   questions. He's already satisfied me that
18   he qualifies under local rule.
19       If you fail to file a motion, you're
20   going to be precluded by using any portion
21   of this deposition in the future.
22   MS. LUKER:
23       Yes, Your Honor. I understand.
24   MS. ROUSSEL:
25       One additional thing. Since it is

154

1        our contention that federal court does not
2        have jurisdiction and we may be moving to
3        strike his testimony, I merely ask that he
4        ask his questions last. Since this is a
5        videotaped deposition, if his testimony is
6        struck, it will not interfere with any
7        other portion of the transcript. That's
8        my only request.
9    THE COURT:
10       I can't say that I understood you.
11   What is the question?
12   MS. ROUSSEL:
13       My question is, we still are in the
14   middle of Gary Lee currently asking
15   questions. There are several other
16   attorneys that need to ask questions.
17   Because it is a videotaped deposition, I
18   ask that he be -- since you ruled that he
19   can ask questions, that he ask them after
20   the other attorneys complete their
21   questions.
22   THE COURT:
23       All right. Any problems with asking
24   questions last?
25   MR. CONLEY:

155

1        I don't object to that. If we reach
2    the seven-hour limit and I haven't had a
3    chance to ask my questions, I'm concerned
4    that my questions may be the most relevant
5    to the issue of removal which is the prior
6    issue before the Court, 28 USC Section
7    1442(a).
8    THE COURT:
9        Defense counsel, you have to figure
10   out how you're going to limit your time.
11       You understand, Mr. Conley, if I
12   don't get this motion by tomorrow, you're
13   going to be precluded by using this
14   deposition for any future purpose?
15   MR. CONLEY:
16       Yes, Your Honor.
17   THE COURT:
18       Go forth and depose. One
19   questioning lawyer per party. Okay?
20   MS. LUKER:
21       Okay.
22   THE COURT:
23       It doesn't mean you or Ms. Luker can
24   ask questions.
25   MS. LUKER:

156

1        That's understood, Your Honor.
2        (Whereupon the conference with the
3    Judge was concluded at this time.)
4    THE VIDEOGRAPHER:
5        I'm going to start the beginning of
6    Tape 3 of the videotaped deposition of
7    Rudy Walker, Sr.
8        Back on the record, May 8, 2003.
9    EXAMINATION BY MR. LEE:
10       Q.   Mr. Walker, we were last talking
11   about training that you had received in the
12   Navy to do your electrical inspections.
13       A.   Yes.
14       Q.   And you were going down some of the
15   different locations where you were given
16   training.
17       A.   Yes.
18       Q.   In your career as a direct Navy
19   employee, how many times do you think you went
20   to training classes?
21       A.   Oh, maybe eight, ten times.
22       Q.   Over all the years?
23       A.   Yes.
24       Q.   Okay. Now, you mentioned a
25   Commander Harwitt who you had interviewed with?

157

```
1        A.    Yes, sir.
2        Q.    Okay.  Did you -- and you mentioned
3   that you took a test when you --
4        A.    Yes.
5        Q.    Was that a test for competency to
6   inspect electrical equipment?
7        A.    No.  It was more or less like a --
8   just to see what you knew basically.
9        Q.    Okay.
10        A.    To make sure you can read and write
11   and things like that.
12        Q.    How did the Navy satisfy itself
13   that you were qualified to inspect electrical
14   equipment?
15        A.    Well, I talked to the commander,
16   too, and he asked specific questions of what I
17   had done and what I knew and equipment I had
18   installed and all that.  And by answering those
19   particular questions, he seemed to be satisfied
20   that I was knowledgeable enough to do the work
21   that he wanted me to do.
22        Q.    Okay.  If we wanted to get a copy
23   of your Navy records, how would we go about
24   that?
25        A.    I don't know.
```

158

```
1        Q.    Okay.
2        A.    I don't know about that.
3   MR. LEE:
4             All right.  Gerolyn, have you asked
5   for those or sent in any --
6   MS. ROUSSEL:
7             I have not requested them as of this
8   time.
9   MR. LEE:
10             I guess you'll provide us with the
11   authorization to secure those records?
12   MS. ROUSSEL:
13             Any properly executed authorization
14   I will be happy to have signed and sent
15   back to you.
16   EXAMINATION BY MR. LEE:
17        Q.    What information might we need to
18   know to put on a form to get your records?  Did
19   you have any numbers of designation?
20        A.    I never took my records.  I don't
21   know exactly who to contact.  I guess the naval
22   base, huh?
23        Q.    Does the Navy give you any kind of
24   identifying number?  In other words, something
25   other than a Social Security number, any kind
```

159

```
1   of a --
2        A.    No, only the Social Security
3   number.
4        Q.    Which is what?  What's your Social
5   Security number?
6        A.    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.
7        Q.    I'm correct when you first started
8   working as an inspector for the Navy, you went
9   back to Avondale?
10        A.    Yes.
11        Q.    Did you ever inspect ships for the
12   Navy anywhere other than Avondale?
13        A.    Anywhere other than Avondale?
14        Q.    Yes, sir.
15        A.    Yes.
16        Q.    Where?
17        A.    At Boland and at Todd's.  I think
18   that's all.
19        Q.    Okay.  Do you remember
20   approximately what years you did inspections at
21   Boland?
22        A.    At Boland, I guess it was in the
23   '80s, I'd say.
24        Q.    And when you did inspections at
25   Todd, were these vessels that Todd was working
```

160

```
1   on?
2        A.    No.  The ones I worked with Todd
3   was Avondale's ships that I worked on.
4        Q.    These are ships that we talked
5   about earlier that were in dry dock that were
6   getting ready to be delivered?
7        A.    That's correct.
8        Q.    When you first started working for
9   the Navy at Avondale, what other Navy
10   inspectors were working there that were in
11   charge of inspecting electrical equipment?
12        A.    Columbus Brown, I think.
13        Q.    Columbus?
14        A.    Columbus Brown, yes.
15        Q.    Anyone else?
16        A.    No.
17        Q.    So you and Mr. Brown were the only
18   Navy --
19   MS. ROUSSEL:
20             Gary, he's in the middle of
21   answering.
22   EXAMINATION BY MR. LEE:
23        Q.    I'm sorry.
24        A.    They had Gordon Murray and Sal
25   Garacci and then Johnny Roberts.  They had
```

161

plenty -- Johnny Roberts.

Q.    Johnny Roberts.  All right.

A.    I guess that's about all of them.

Q.    Now, were these all electrical inspectors?

A.    No.  Some were machinists.  The other ones were electrical, the ones with Johnny Roberts was machinists.

Q.    Do you know where Mr. Roberts is today?

A.    No, sir.

Q.    Do you know what area he was from?

A.    What area?

Q.    Yes.

A.    I think he came from Algiers or he was living in Algiers at the time.  I don't know if he still lives there.  He was living in Algiers.

Q.    What about Columbus Brown, do you know where he is today?

A.    I think these people are not living.

Q.    Okay.  Would that be true for Mr. Murray?

A.    Yes.  I didn't hear from them in a

162

long time.  I heard some of them are deceased.

Q.    And Sal you mentioned?

A.    He's dead.  That's Sal Garacci.

Q.    What's your best estimate -- well, let me start over.

When you first started working in 1970 at Avondale, did you know all of the Navy inspectors at Avondale?

A.    Not all of them, no.  I just knew a few.

Q.    Okay.  Were they all -- did they all share the same general office space?

A.    Yes.  Some of them went in different office spaces.  They had different groups in different office spaces.

Q.    Okay.

A.    Some of them shared.  The electrical, they tried to put the electrical together and then the fitters -- I mean the machinists together.  They put those people in different office together.

Q.    About how many different groups were there, do you know?

A.    About three, I guess.

Q.    Can you name them for me?

163

A.    I guess the hull, the machinists and the electrical.

Q.    Do you have any idea how many inspectors they had in 1970 in the hull group?

A.    I guess about eight, six or eight.  I'm not sure.

Q.    Okay.  Did you know any of them?

A.    Yes.  They had a McCluskey and there was Clark, I'm not sure of his full name, but that's the ones I can remember.

Q.    And about how many were in the machinist group?

A.    About the same amount, about five, six.

Q.    Was there an overall Navy supervisor that was over all three groups?

A.    Well, they had -- when I was there, there was Commander Harwitt.  He was the commander in charge.  He was the overall supervisor.

Q.    I don't want to interrupt you.

A.    He was our supervisor.

Q.    Okay.  Where was he located most of the time?

A.    In another office down the hall

164

from where we were at.

Q.    Do you know where he is today?

A.    No, sir.

Q.    Do you remember his first name?

A.    We just called him Commander Harwitt.

Q.    About how old a fellow was he?

A.    I guess at that time he was in his fifties, I guess, in his fifties.  He was older than me, I know.

Q.    Did there come a time when he was replaced by someone else?

A.    Yeah, somebody else.

Q.    Who was that?

A.    They had a guy Dick Drascavich (spelled phonetically), I think.  He was a civilian, though.

Q.    Drascavich?

A.    Drascavich, I think.

Q.    He replaced Commander Harwitt?

A.    Yes.

Q.    About what year was that?

A.    I guess '7 -- in the '70s.

Q.    Was he still there when you left the Navy?

165

1    A.    No.  He had retired, I think.

2    Q.    And who replaced him?

3    A.    Oh, Lord.  Bob Collier.

4    Q.    Collier?

5    A.    Collier, Bob Collier.  I think

6  that's the name.

7    Q.    Did he stay there until the time

8  you retired or was there somebody else that

9  came in?

10   A.    No.  Then I worked for -- then I

11 started working for Joe Roman, and then I

12 worked -- my last supervisor was Glen

13 Barksdale.

14   Q.    I'm sorry?

15   A.    Glen Barksdale.

16   Q.    Barksdale?

17   A.    Barksdale.

18   Q.    Do you have any idea whether he's

19 still working as an inspector at Avondale?

20   A.    I don't think.

21   Q.    Do you know where he was from?

22   A.    I'm not sure what part of the

23 country he was from.

24   Q.    When did you stop working for the

25 Navy?

166

1    A.    In '97, '98.

2    Q.    Did you retire?

3    A.    Yes, sir.

4    Q.    Do you have any contact today with

5  anyone at the Navy for any purposes?

6    A.    No.  I don't talk to anybody.  We

7  don't see anyone no more over there.

8    Q.    No contact with anyone from

9  benefits or retirement or anything of that

10 nature?

11   A.    Well, my benefits, I'm getting my

12 Social Security right now.  I got that in the

13 mail.  I had to call Social Security for that.

14 But nobody at the base, you know, provides you

15 with that information or nothing like that.

16   Q.    Okay.

17   A.    You have to call on your own to get

18 it.

19   Q.    Did it remain the same throughout

20 the entire time you worked for the Navy that

21 the Navy had personnel who used offices at

22 Avondale?

23   MS. ROUSSEL:

24       Object to the form of the question.

25   A.    I'm not certain.  They had office

167

1  spaces that were used by all the customers and

2  then it could be the Navy or a barge company

3  that might have a contract with Avondale, use

4  the same office space.  A lot of people used

5  the same office space.

6  EXAMINATION BY MR. LEE:

7    Q.    Okay.

8    A.    And they referred to a

9  particular -- it was an inspector's office

10 like, you know.

11   Q.    Okay.  Did you always have an

12 office space you could use at Avondale when you

13 were working for the Navy?

14   A.    Well, they would provide us a desk

15 where we could write periodically, where we

16 have a place to go and pick up our calls.

17   MS. ROUSSEL:

18       When you say "they," you mean

19   Avondale would provide that?

20   THE WITNESS:

21       Yes.  Avondale would provide that

22   for us.

23 EXAMINATION BY MR. LEE:

24   Q.    When you first started working for

25 the Navy at Avondale in the 1970s, where was

168

1  your office space?

2    A.    At Avondale right out the fence,

3  right out the gate.  I guess it would be right

4  now where the -- like in the back of the main

5  buildings at Avondale, you drive to the back.

6  They had a wooden building back there and they

7  had some trailers that sometimes we'd be

8  assigned to go and do some of the paperwork.

9    Q.    Okay.  For the moment just talking

10 about your work as a Navy inspector at Avondale

11 and let's just start in the early 1970s, how

12 much of your time did you spend actually

13 conducting inspections on ships versus doing

14 work somewhere else?

15   A.    Well, about half the time I would

16 do -- I would be doing inspections on the ships

17 in accordance with the callouts.  And the rest

18 of the time, I would be doing other work, you

19 know.

20   Q.    Okay.  What other work would you

21 have to do?

22   A.    Well, make sure that we was

23 familiar with the drawings and procedures and

24 the statuses of everything and the progress of

25 things, getting familiar with the drawings or

169

1   what might be coming up for callouts and
2   getting prepared for it so we might have some
3   idea of what we might be looking at the time of
4   the callout.
5         Q.   Okay.  All right.  Did you inspect
6   vessels before launching?
7         A.   To make sure that they were -- they
8   were watertight or something like that?
9         Q.   No.  What I mean is were any of
10  your inspection duties performed on the vessels
11  before launch?
12        A.   Oh, yes.  In other words, the ship
13  was on launch you're talking about?
14        Q.   Right.
15        A.   Yeah, we worked on that.
16        Q.   Okay.
17        A.   We had some callouts that had to be
18  done prior to launch.
19        Q.   Would it be fair to say most of it
20  was done after the vessels were launched?
21        A.   Yes.  The majority of it was after
22  launch.
23        Q.   Now, you mentioned the names of
24  some people you worked with that also inspected
25  electrical equipment in 1970.  Can you remember

170

1   the names of some of the other people who were
2   electrical inspectors as time went on, later
3   '70s, '80s, even into the '90s?
4         A.   John Murla.
5         Q.   I'm sorry?
6         A.   John Murla and Carl Jeansonne, Joe
7   Malandich (spelled phonetically).  I guess that
8   would be it.  That would be it.  All I can
9   recall so far.
10        Q.   Can you give me an example of the
11  type of things that you would inspect for as a
12  naval inspector?
13        A.   Well, if they would call out like
14  on a particular test model or installation,
15  they would call it out.  It would be in
16  accordance with whatever they were calling out,
17  if it was a drawing or if it was a test memo.
18  If it was a test memo, they would call out
19  certain portions of it or maybe all of it.  And
20  if it was a certain portion, you would go out
21  there and just see that those portions was
22  accomplished in accordance with the test memo.
23  And if everything was all right, it was
24  accepted without it being tested, the
25  installation, say, like the motor was secured

171

1   properly with the right bolts and nuts and that
2   the right switches and all, foundation was all
3   right and things like that.  That's what you
4   inspected for in accordance with whatever the
5   requirements was.
6         Q.   Can you give me some examples of
7   testing that would be done pursuant to test
8   memos?
9         A.   Testing like you do the
10  installation first.  If it was installed
11  correctly, then it would go through the
12  operations procedures, check to make sure the
13  motor was good enough to put power on.  We
14  would have to take a meggar reading to see if
15  it was ready for service and then they would
16  apply the voltage and start up the motor and do
17  a little heat run.  If it meets those
18  requirements, that was acceptable.
19        Q.   Okay.  You've given an example of
20  an electric motor.  Were there any other tests
21  that other inspectors would perform on electric
22  motors to see if they performed within specs?
23        A.   They would make sure like a pump
24  would put out the right volume of water, water
25  pump, and that the voltage was all right, the

172

1   amperage was all right and all of the readings
2   was in accordance with the requirements of the
3   manufacturer's memo.
4         Q.   Which type of inspector would
5   determine whether a volume of, say, liquid
6   would be pumped by an electric pump?
7         A.   That would be the machinist but it
8   was already written down and they had some kind
9   of a reading device they would do to see how
10  much it was putting out.
11        Q.   Okay.  Did you have to, for
12  example, inspect electrical panels to see if
13  the wiring was in the right position?
14        A.   That's correct.  They had to be in
15  the right circuits, right position and right
16  circuits.
17        Q.   Okay.  Did you ever have an
18  opportunity to reject work that had been done?
19        A.   Yes, sir.
20        Q.   Was that uncommon or common?
21        A.   Well, it was -- sometimes it was
22  common.  It all depends -- sometimes you
23  wouldn't run into it for awhile and then you
24  run into a couple of problems that they can
25  fix, you know.  Some of it they fix it on the

173

1  spot and other times they'd have to wait
2  because it took a little bit more work and
3  you'd have to move on to something else.
4  People who was responsible to fix it would fix
5  it and then recall it.
6       Q.   I notice in the hall you have a
7  plaque in there from the crew --
8       A.   Yes.
9       Q.   -- of the *William C. Law*?
10      A.   Yes.
11      Q.   What vessel was that?
12      A.   The *Law* was -- I think that was in
13 the '70s, in the '60s. I'm not sure. I don't
14 remember when I got that plaque.
15      Q.   Was that a vessel at Avondale?
16      A.   It was an Avondale vessel, yes.
17      Q.   Do you remember what kind of vessel
18 it was?
19      A.   I think it was a D -- a repair DE,
20 they overhauled or worked on, yes.
21      Q.   Do you know whether any Navy
22 inspector or which type of Navy inspectors were
23 responsible for inspecting insulation that had
24 been installed on the vessels?
25      A.   I think the hull inspectors.

174

1       Q.   Okay.
2       A.   And the machinists used to go and
3  inspect the pipe inspections, the pipe
4  coverings and things like that.
5       Q.   You didn't personally get involved
6  in that?
7       A.   No.
8       Q.   Do you know whether or not there
9  were any times that insulation had to be taken
10 out and replaced that was found for whatever
11 reason --
12      A.   Yes. Some of it was cut too bad
13 and had too many patches or something like
14 that. You would have to remove it and put some
15 new one in, I guess. There was -- I guess it
16 was like a judgment type thing, how good it
17 looked.
18      Q.   During the time that you were
19 employed as a Navy inspector at Avondale, do
20 you recall any instances in which you think you
21 were exposed to asbestos?
22      A.   When I was working at Avondale?
23      Q.   While you were working for the Navy
24 at Avondale?
25      A.   No. I don't think they allowed

175

1  asbestos on the ships at that time. I think
2  after I went with the Navy, they quit using it.
3  I think so. That's when they had said that
4  they wasn't going to use it on none of the
5  vessels anymore. So whether they were still
6  using it, I wasn't certain then. They said
7  they were going to quit using it.
8       Q.   Would it be fair to say at some
9  point after you started working for the Navy,
10 it's your understanding they stopped using
11 asbestos on ships?
12      A.   Yes, that's correct.
13      Q.   Would that have been sometime in
14 the early '70s or do you know?
15      A.   The end of the '70s, on into '70s.
16      Q.   Do you have any reason to believe
17 even in the early -- well, can you think of any
18 instance on any project you went on at Avondale
19 as a Navy inspector that you think you were
20 exposed to asbestos?
21      A.   At Avondale?
22      Q.   As a Navy inspector.
23      A.   No. Because they wasn't using it
24 then. They had quit using it.
25      Q.   Do you remember any instance when

176

1  you were a Navy inspector at Avondale that you
2  were exposed to pipe insulation whether or not
3  it had asbestos in it?
4       A.   When I was working at Avondale?
5       Q.   As a Navy inspector, employed by
6  the Navy.
7       A.   They didn't have no asbestos. They
8  had taken all of the asbestos. They had pipe
9  insulation and all. I don't know what they
10 replaced that stuff with. It could have been
11 another type of material other than asbestos
12 but they had said they weren't going to use it
13 anymore so we wouldn't be contaminated.
14      Q.   When do you remember hearing that?
15      A.   I guess after I quit the Navy.
16      Q.   After you quit the Navy?
17      A.   No. I mean quit Avondale in '69.
18 I guess it was '70 that we start hearing rumors
19 that they wasn't going to use asbestos because
20 asbestos was causing us problems, that they are
21 going to quit using it on all the ships. In
22 that time frame, it was a little short time
23 frame.
24      Q.   All right. Have you ever reviewed
25 or read the lawsuit that's been filed on your

177

behalf in this case?

A.    No, sir.

Q.    Do you know who you've sued?

MS. ROUSSEL:

Do you understand what he means by
the lawsuit?  That's the paper that's been
filed on your behalf.  He's asking you if
you've looked at the paper that I've filed
to institute your lawsuit?

THE WITNESS:

I reviewed an affidavit like.
That's the affidavit that I witnessed and
made a statement on it and all.

EXAMINATION BY MR. LEE:

Q.    I'm sorry?

A.    And signed, yes.

Q.    Well, there was an affidavit, I
think, of yours that was used in another case.
But I'm talking about something different.  I'm
talking about the --

A.    I'm not sure.

Q.    I'm talking about the papers that
have been filed in court to start your lawsuit?

A.    I never seen no lawyer other than
what the paper she gave me, no judge give me

178

anything other than what y'all are telling me
right now.

Q.    Okay.  Do you know who you filed
suit against?

A.    I'm thinking it's going to be the
asbestos people, Avondale Shipyard Industries
or whatever they call them.

Q.    Do you know whether you've sued any
individuals who worked for Avondale?

A.    No, I didn't sue anybody that's an
individual.

Q.    For example, do you know whether or
not you've sued Peter Territo?

A.    No.  No, I didn't.

Q.    As far as you know, you have not
sued Mr. Territo?

A.    No, sir.

Q.    Do you know who Pete Territo is?

A.    He was an inspector.

Q.    What kind of inspector?

A.    Safety inspector.

Q.    Okay.  You knew Mr. Territo when
you were at Avondale?

A.    Yes.

Q.    Did you have any dealings with him

179

that related to safety?

A.    Yes.  He was the safety man at
Avondale.

Q.    Can you give me some examples what
kind of dealings you had with him that
concerned safety?

A.    He made sure you had your safety
tools on, your safety hat on.

Q.    What years do you remember having
these dealings with Mr. Territo?

A.    Oh, I guess in the '60s and I think
he was still there in the '70s.  I don't know
when he retired or if he's still there.

Q.    Okay.

A.    I don't remember the last time I
seen him.

Q.    But you remember having dealings
with him when you were employed by Avondale?

A.    Yes.  Because he used to come
around and check to make sure we were doing
things safely.

Q.    Okay.  He would come on the ships?

A.    Yes, he would come on the ships
sometimes.

Q.    So you recall him inspecting --

180

doing safety inspections on ships when you were
employed there in the '60s?

A.    Yes.

Q.    Do you recall him doing safety
inspections on ships when you were employed by
the Navy?

A.    I don't recall that.  He might
have.  More than likely he did.  But I'm not
sure.

Q.    Okay.  Do you have any impressions
one way or the other whether he was a good
safety man?

MS. ROUSSEL:

I'm going to object to your
characterization.  What do you mean by
good safety man?  Why don't you ask him
did he ever tell him to wear respiratory
equipment or --

MR. LEE:

Gerolyn, I will ask the questions I
want to ask.

MS. ROUSSEL:

Well, then I'm objecting to the form
of your question.

MR. LEE:

181

1      well, fine, that's all you have to
2  do.
3      A.    well, he never told us how serious
4  asbestos was and he never gave us no equipment
5  or required to wear any kind of equipment to
6  protect our lungs and all.
7  EXAMINATION BY MR. LEE:
8      Q.    Did you ever see him wearing that
9  kind of equipment?
10     A.    Not to my knowledge, no.
11     Q.    So he would come in the same places
12 you worked wearing whatever you were wearing,
13 right?
14     A.    Yeah.  But, you know, I didn't see
15 him all the time.  He wasn't on the vessel all
16 the time.  He would come periodically.
17 Sometimes he would come and inspect areas and
18 he might have the full gear because some
19 people, like the painters, they wore sometimes
20 respirators or suits.  I don't know if that was
21 just a requirement or for their protection or
22 what.
23     Q.    The painters you mean?
24     A.    Yes, the painters.
25     Q.    Right.

182

1      A.    So I'm not sure.
2      Q.    So you don't have an opinion about
3  that?
4      MS. ROUSSEL:
5          An opinion about what?
6  EXAMINATION BY MR. LEE:
7      Q.    whether or not Mr. Territo was a
8  good safety man.
9      MS. ROUSSEL:
10         He's already given his answer.
11     A.    He was a nice man like you.
12 EXAMINATION BY MR. LEE:
13     Q.    Thank you.  Did you know Eddie
14 Blanchard?
15     A.    Yes, sir.
16     Q.    Did you have any dealings with
17 Eddie Blanchard?
18     A.    Yes.  He was the dock
19 superintendent.  Everybody knew him.
20     Q.    what kind of dealings did you have
21 with Mr. Blanchard?
22     A.    Sometimes he'd tell you hello.
23     Q.    He wasn't your direct supervisor?
24     A.    No.
25     Q.    To your knowledge, he was not in

183

1  the safety department?
2      A.    Not to my knowledge, no.  He might
3  have but not to my knowledge.
4      Q.    Okay.  Did you know Steven Kennedy?
5      A.    That name sounds familiar.
6      Q.    Do you remember if you had any
7  direct dealings with Mr. Kennedy?
8      A.    I'm not sure.
9      Q.    would it be correct that you don't
10 know what his position or responsibilities
11 were?
12     A.    That's right.
13     Q.    Did you know J. Melton Garrett?
14     A.    I heard that name, too.  He was in
15 the maintenance department or -- I'm not sure.
16     Q.    what about Al Bossier?
17     A.    Yeah, he was in the electrical
18 department.
19     Q.    when did you first know
20 Mr. Bossier?
21     A.    oh, I guess in the '60s when I
22 first was an electrician.
23     Q.    what was he at that time?
24     A.    He was an engineer, I think.
25     Q.    Electrical --

184

1      A.    Electrical engineer working for
2  Lloyd Frischhertz doing test work.
3      Q.    Did you have any direct dealings
4  with Mr. Bossier?
5      A.    Yes, sir.
6      Q.    what kind of dealings did y'all
7  have?
8      A.    well, he worked on the ships with
9  us.  He was in a different capacity and all
10 that.  We knew him, who he was and all.
11     Q.    Did he supervise your work?
12     A.    No, he didn't supervise my work.
13 He was our supervisor when Lloyd left.  He
14 became a superintendent, I think.
15     Q.    In the electrical department?
16     A.    In the electrical department.
17     Q.    Do I understand it though he
18 didn't -- at no time did he directly supervise
19 you personally?
20     A.    Oh, no.
21     Q.    To your knowledge, was he ever in
22 the safety department?
23     A.    No.
24     Q.    Did you know Jack Carter?
25     A.    well, I knew him because he was

185

1   with Avondale.  I never spoke to him.
2       Q.   You never spoke to him?
3       A.   I heard the man speak but I never
4   spoke to him.
5       Q.   He gave speeches to the employees?
6       A.   Yes, sir.
7       Q.   He didn't directly supervise you?
8       A.   No.
9       Q.   What about Jim O'Donnell, did you
10  know him?
11      A.   I heard that name, too.  But I'm
12  not sure what department he was in.
13      Q.   He wasn't a direct supervisor of
14  you?
15      A.   No, sir.
16      Q.   What about John McQue?
17      A.   John McQue, I heard that name.
18  He -- I think he worked with the inspection
19  department.
20      Q.   Okay.  Did you have any direct
21  dealings with Mr. McQue?
22      A.   Not really.
23      Q.   Mr. Hartzman?
24      A.   No.  I know the name.  He worked at
25  Avondale.  He was some kind of a supervisor at

186

1   Avondale.
2       Q.   Did you ever have any direct
3   dealings with him?
4       A.   No, sir.
5       Q.   What about George Kelmell?
6       A.   No, sir.
7       Q.   Not familiar?
8       A.   I don't remember.  I can't recall
9   the name even.
10      Q.   I'm sorry?
11      A.   I don't recall the name.
12      Q.   What about John Chantry?
13      A.   I heard of that name, yes.
14      Q.   Do you know if you had any direct
15  dealings with Mr. Chantry?
16      A.   No, sir.
17      Q.   Ollie Gatlin?
18      A.   I know that name, too.
19      Q.   Did you have any direct --
20      A.   No direct relationship.
21      Q.   Do you know what his position was
22  at Avondale?
23      A.   I think he worked in the outside --
24  in maintenance or something, the yard
25  maintenance, something like that.  That's where

187

1   I think I heard from him.
2       Q.   What about Frenchie Bordelon?
3       A.   Yes.
4       Q.   Did you know him?
5       A.   Yes, I did.
6       Q.   How did you know him?
7       A.   He was an insulator, I think.
8       Q.   Did you have any direct dealings
9   with Mr. Bordelon?
10      A.   Well, not personally.  But he was
11  the, he was the supervisor, I think, for the
12  insulators.
13      Q.   Right.
14      A.   They are the ones that had the
15  people, the insulators that insulated on the
16  ships.
17      Q.   Right.
18      A.   He was the supervisor, I think.
19      Q.   For insulators.
20      A.   Right.
21      Q.   He was never your supervisor?
22      A.   No, sir.
23      Q.   What about Ewing Moore?
24      A.   I know a Moore.  Ewing?
25      Q.   I believe that was his first name.

188

1       MS. ROUSSEL:
2            Ewing Moore?
3   EXAMINATION BY MR. LEE:
4       Q.   Sorry.
5       A.   I know a Ewing.  I know both names
6   but they're not connected.
7       Q.   And Mr. Frischhertz?
8       A.   Yes, sir.
9       Q.   He was your supervisor?
10      A.   He was my supervisor.
11      Q.   What years was Mr. Frischhertz your
12  supervisor?
13      A.   I guess from '60 -- '56 -- I think
14  he might have died in '70.  I'm not sure, '68,
15  '70.  I'm not sure what year he died.  He died
16  and then Bossier become the supervisor.
17      Q.   So when he died, Mr. Bossier took
18  his position?
19      A.   That's correct.
20      Q.   That was within the electrical
21  department?
22      A.   That's -- yes.
23      Q.   And I take it you had direct
24  dealings with him?
25      A.   Well, not direct dealings.  I knew

189

1   him and sometimes, you know, we talked if we
2   met in the shop and things like that, you know.
3       Q.   Okay.
4       A.   He didn't give me no directions.  I
5   guess he gave my supervisor directions and they
6   gave me directions.
7       Q.   All right.  Do you have any reason
8   to believe that Mr. Frischhertz was at fault or
9   had anything to do with your asbestos exposure
10  at Avondale?
11      A.   No, sir, because he didn't have no
12  more knowledge, I guess, than I did or if he
13  did, he didn't say nothing.
14      Q.   Okay.
15      A.   He didn't let me know.
16      Q.   Do you have any reason to believe
17  he knew any more than you knew?
18      A.   No, sir.
19      Q.   Would the same be true of
20  Mr. Bossier?
21      A.   Same would be true of Bossier, yes.
22      Q.   Earlier you said as far as you were
23  aware once you started working for the Navy,
24  you weren't exposed to asbestos?
25      A.   As far as I know, yes.

190

1       Q.   So by 1984 would you say you're
2   pretty certain there was no more asbestos
3   exposure that you had?
4       A.   For sure, yes.  They wasn't using
5   it.  I don't know what year they cut it off,
6   but they said they wasn't going to use it
7   anymore.
8       Q.   Okay.  Do you have any information
9   that anybody at Avondale at any time intended
10  to hurt you or intended that you would become
11  sick?
12      A.   Not really.
13      Q.   Do you have any reason to believe
14  that anybody at Avondale believed that you
15  would get sick?
16      MS. ROUSSEL:
17          I'm going to object.  He's already
18      indicated they didn't tell him anything.
19      A.   I don't know if they really knew
20  but they didn't give me no equipment and all of
21  that.  Yeah, I got hurt because of not having
22  the proper equipment.
23  EXAMINATION BY MR. LEE:
24      Q.   But as far you know, information
25  that you have, you don't have any information

191

1   that anyone at Avondale believed that you would
2   get sick?
3       A.   I don't think that.
4       Q.   Anytime you were at Avondale, were
5   you familiar with any Walsh-Healy inspectors?
6       A.   Walsh-Healy?  I heard of them.
7   They had a lot of people that came in and out.
8   Walsh-Healy, they were associated with what,
9   I'm not sure.
10      Q.   If you don't know, that's okay.  I
11  just want to see if you know.
12      A.   I don't know.
13      MS. ROUSSEL:
14          If you don't know something, just
15      tell him you don't know.  He doesn't want
16      you to guess.
17      THE WITNESS:
18          Okay.  I didn't know.
19  EXAMINATION BY MR. LEE:
20      Q.   That always applies to all of our
21  questions.
22      A.   Okay.  No, I don't know.
23      Q.   Did you have any familiarity with
24  any Department of Labor inspectors?
25      A.   No, uh-uh.

192

1       Q.   Did you have any familiarity with
2   any OSHA inspectors?
3       A.   No.
4       Q.   Do you have any familiarity with
5   any NIOSH inspectors?
6       A.   No.
7       Q.   Did you ever hear about any of
8   those kind of inspectors?
9       A.   OSHA inspectors.  They would say
10  every now and then that the OSHA inspector was
11  coming around.
12      Q.   After you started working for the
13  Navy at Avondale, were you ever again around
14  Hopeman Brothers workers?
15      A.   No.  It was mostly on the
16  commercial work in the '60s.  We done Hopeman
17  Brothers' work.
18      Q.   There is some indication in your
19  medical records that you had some kind of
20  radiation treatment years ago?
21      A.   Yes.
22      Q.   What was that for?
23      A.   I had one of my testicles had a
24  bruise on it and it become a seminoma.  What
25  they done is they cut it out and they give me

193

```
1    some radiation in that spot to make sure that I
2    didn't have nothing that would spread and
3    nothing spread.
4         Q.    Where was that treatment given to
5    you?
6         A.    At West Jefferson.
7         Q.    Do you remember what year that was?
8         A.    Oh, in the '60s, too, I guess, 1962
9    or something like that, in that area.
10        Q.    Were you ever a smoker?
11        A.    Yes.  For a short period of time.
12        Q.    When was that?
13        A.    When I was in my twenties I
14   periodically smoked a few cigarettes during the
15   day.  It wasn't -- only for a few years, six,
16   eight years.  I didn't count.  I just decided
17   to quit.  I always had in my mind I wasn't
18   going to smoke and then I would smoke every now
19   and then when I'd get together with my friends
20   and all and then I quit.
21        Q.    When you were employed directly by
22   Avondale, did you ever work on boilers?
23        A.    Well, we worked on boilers, per se,
24   as in like the water, the water indicators and
25   the fire eyes on the boilers.  They -- water
```

194

```
1    level indicators and then a couple of little
2    sensors that we work on but I never done no
3    work, per se, on the boiler.
4         Q.    Just work around it?
5         A.    Around it.
6         Q.    This was after the boiler was put
7    in the ship?
8         A.    Well, some of it was being
9    manufactured in the lower yard.  They used to
10   build them in the lower yard by the site and
11   they would put pieces and stack it on the ship.
12        Q.    Okay.  Did you ever work in that
13   boiler site?
14        A.    Worked around by the boiler site,
15   yes.
16        Q.    When you say around it, what do you
17   mean?
18        A.    They had a big shed and all that.
19   But we were in the back by the shed.  And then
20   sometimes we would be on the ship, they would
21   put the boilers on those flats where they put
22   the -- they'd lay the keel, we was working
23   around in that area where they were installing
24   the boilers at.
25        Q.    That's installing them inside the
```

195

```
1    hull?
2         A.    Yes, sir.
3         Q.    Do you remember were you ever
4    around boilers when refractory -- do you know
5    what refractory materials are?
6         A.    It's insulation material.
7         Q.    Brickwork and cement, that sort of
8    thing, that goes inside a boiler.
9         A.    Yes, sir.
10        Q.    Were you ever around boilers when
11   that was being done?
12        A.    Well, in some cases they used to
13   cut the bricks, the yellow bricks with the saws
14   and all that.  The machinist used to do that.
15   The outside machinist used to do that.  And
16   they used to cut the bricks and all and put the
17   layers of those bricks in there.  I wasn't
18   familiar with all of that.
19        Q.    Was this on board ships or on land?
20        A.    They done that on land.  They
21   assembled the boilers on land, too.
22        Q.    My question was, the activity
23   you're describing about cutting the bricks, did
24   that happen?
25        A.    On the wet dock, too, they used to
```

196

```
1    build boilers on the wet dock, too, and they
2    used to cut that on land with the big circular
3    saws, the bricks.  And I remember one guy got
4    his hand cut with the saw.  His name was
5    Buffalo.  He was a boiler man.  I wasn't a
6    boiler man but I worked around that area where
7    they done some of that work.
8         Q.    Do you know what ships those
9    boilers were going onto?
10        A.    No, I'm not sure.  They had the
11   Foster-Wheelers in the back and then they had
12   the General Electric, I think, or Westinghouse
13   but -- Westinghouse boilers was on other ships.
14   I'm not certain what kind of ships they was.
15        Q.    When you made reference to
16   Foster-Wheeler, what were you referring to?
17        A.    Well, they were the ones that
18   worked in the lower yard and brought the
19   boilers in the yard and they done some
20   assembling and put it on the ships, on the
21   Lykes ships.
22        Q.    How did you know it was
23   Foster-Wheeler?
24        A.    Well, they had the big sign on
25   them.  It was Foster-Wheeler boilers.
```

197

```
1        Q.    A sign on the boiler or sign on the
2   building?
3        A.    On the boilers, too, on the people
4   that worked out there, it was Foster-Wheeler
5   people.
6        Q.    Okay. Were you around that work?
7        A.    Sometimes.
8        Q.    Okay. Were you around that -- any
9   of that work that included putting in the
10  bricks or cutting the bricks?
11       A.    No. I wasn't fooling with that.
12       Q.    I know you didn't do it.
13       A.    Yes.
14       Q.    Were you around it?
15       A.    Some cases you had to pass by it
16  because they were cutting it.
17       Q.    Did you have to work around people
18  installing gaskets?
19       A.    Yes, sir.
20       Q.    Who would be installing gaskets?
21       A.    The pipefitters. They would put
22  that Garlock gasket in the flanges and they had
23  that in their buckets and things like that.
24       Q.    How did you know that name?
25       A.    They had it on the material. It
```

198

```
1   was marked on -- written on the material. It
2   was like a grayish-type gasket.
3        Q.    Did you ever work with or around
4   packing materials?
5        A.    Packing glands, yes. The packing
6   glands we worked with was with cable
7   penetrations.
8        Q.    Do you know what was in the packing
9   gland?
10       A.    I guess -- no, I'm not familiar
11  with all the components. They had that
12  graphite and they had a plastic wax on it and
13  the cording -- I'm not sure what the cording
14  was made out of.
15       Q.    Over the course of time that you
16  were working for Avondale with the Navy, did
17  the number of inspectors, Navy inspectors, at
18  the yard fluctuate up and down?
19       A.    Yes, it did.
20       Q.    Did it depend on how many Navy
21  ships were being built?
22       A.    That's correct, yes.
23       Q.    Were you ever reassigned to other
24  yards when Navy work might have been slow?
25       A.    Well, when they didn't have no work
```

199

```
1   and we had to go somewhere else, then yes, we
2   would go to other yards.
3        Q.    You mentioned two other yards
4   earlier. Were there any other yards you'd be
5   reassigned to?
6        A.    Yes. I went to the Michoud
7   facility in New Orleans East.
8        Q.    What would you do there?
9        A.    We were doing work on the LCAC,
10  L-C-A-C.
11       Q.    What was that?
12       A.    It was one of them landing crafts.
13  And we worked there in like a big hangar.
14       Q.    Okay. Anywhere else that you can
15  recall going?
16       A.    That's it.
17       Q.    Who was building the landing craft?
18       A.    The Bell Halter. I think it was
19  Bell Halter.
20       Q.    That was the landing craft being
21  built for the Navy?
22       A.    That's correct.
23       Q.    And you did similar electrical
24  inspection work on that craft?
25       A.    Similar work, yeah.
```

200

```
1        Q.    Did you ever work at the Harvey
2   yard?
3        A.    Yes, I did.
4        Q.    When did you work there?
5        A.    I guess it must have been in the
6   '50s -- '60s, in the '60s. I worked for Hal
7   Bordelon. It was just a short job going,
8   working a couple of weeks at a time to do a
9   rush job and that was it.
10       Q.    Were you working on a vessel?
11       A.    Yes.
12       Q.    Do you remember what kind of
13  vessel?
14       A.    It was like a tugboat or something,
15  you know, workboat.
16       Q.    We've mentioned main yard, Algiers
17  and Harvey. Have you ever worked in any other
18  yards while employed by Avondale?
19       A.    While I was working at Avondale?
20       Q.    Yes, sir.
21       A.    No, no.
22       Q.    Earlier we were talking about the
23  work that Avondale would do on new ships that
24  were about to be delivered.
25       A.    Yes.
```

**201**

```
 1      Q.    That was work done in Algiers.
 2      A.    That's correct.
 3      Q.    Do you know who owned the dry dock
 4  that that work was done in?
 5      A.    Todd.
 6      Q.    As far as you know, it was Todd?
 7      A.    Todd Shipyard or Todd's.
 8      Q.    The yard that that work was done in
 9  was the Todd yard?
10      A.    The Todd yard.  The called it the
11  Todd yard.
12      Q.    Was that the only facility in
13  Algiers that you ever visited while you were
14  working as an employee of Avondale?
15      A.    Yes.  Yes.
16      Q.    To your knowledge, Avondale didn't
17  have its own yard at Algiers?
18  MS. ROUSSEL:
19           I'm going to object.  How do you
20      expect this witness to know who owned that
21      yard?  I'm objecting to your question.
22  MR. LEE:
23           We're not talking about that yard
24      anyway.
25  MS. ROUSSEL:
```

ONE SHELL SQUARE, SUITE 290 ANNEX   **HUFFMAN & ROBINSON, INC.**   (504) 525-1753
NEW ORLEANS, LOUISIANA 70130          CERTIFIED COURT REPORTERS          (800) 749-1753

**202**

```
 1           You're talking about the Algiers
 2      yard that he worked in at Avondale?
 3  MR. LEE:
 4           No, he's already called it the Todd
 5      yard, Gerolyn.
 6  MS. ROUSSEL:
 7           But you asked him who owned that
 8      yard.
 9  MR. LEE:
10           No, I didn't ask him that.
11  MS. ROUSSEL:
12           Okay.  Then I'm objecting to the
13      form of your question.  I didn't
14      understand it.  Let me hear it again.
15           And, Mr. Walker, listen very
16      carefully to what he's asking you.
17  THE WITNESS:
18           Okay.
19  EXAMINATION BY MR. LEE:
20      Q.    I'm just asking you, we talked
21  about the Todd yard, right, in Algiers?
22      A.    Yes.
23      Q.    My only question to you is do you
24  know if Avondale had any yard in Algiers?
25      A.    Not to my knowledge.
```

ONE SHELL SQUARE, SUITE 290 ANNEX   **HUFFMAN & ROBINSON, INC.**   (504) 525-1753
NEW ORLEANS, LOUISIANA 70130          CERTIFIED COURT REPORTERS          (800) 749-1753

**203**

```
 1      Q.    Okay.  I'm going to pass you right
 2  now to some of these other attorneys.  There
 3  are a lot of folks here who have questions and
 4  I may have some other questions later.
 5      A.    Okay.
 6  MR. LEE:
 7           Thank you very much.  I appreciate
 8      it.
 9  THE WITNESS:
10           Yes, sir.  Thank you.
11  EXAMINATION BY MR. WILSON:
12      Q.    Was there a particular department
13  in the Navy that you were employed by?
14      A.    It was the electrical department.
15      Q.    Okay.  The inspectors, did they
16  come under some particular branch?
17      A.    Q.A., quality assurance.
18      Q.    Do you know what SUPSHIPS is?
19  MS. ROUSSEL:
20           You're going to have to wait -- are
21      you waiting your turn?
22      A.    Supervisor of Shipbuilding,
23      Conversion and Repair.
24  EXAMINATION BY MR. WILSON:
25      Q.    Did you work for that department?
```

ONE SHELL SQUARE, SUITE 290 ANNEX   **HUFFMAN & ROBINSON, INC.**   (504) 525-1753

**204**

```
 1      A.    Yeah, that was SUPSHIPS, yes.
 2      Q.    That was the overall department you
 3  were employed by?
 4      A.    Yes.
 5      Q.    Who worked as supervisor of
 6  shipbuilding when you were an inspector?
 7      A.    The overall?
 8      Q.    The local.
 9      A.    We had several of them and several
10  of them was quit or retired.  Other people
11  inherited it.
12      Q.    Do you remember their names?
13      A.    Like I told him the list of them.
14      Q.    Those commanders?
15      A.    Commander Harwitt.  Yes.
16      Q.    Do you know what a mil spec is?
17      A.    No.  I heard what a mil spec was
18  but I'm not certain what it is.
19      Q.    You have never seen a mil spec?
20      A.    No.
21  MR. WILSON:
22           Okay.  Thank you.
23           (whereupon a discussion was held off
24      the record.)
25  EXAMINATION BY MR. BELL:
```

ONE SHELL SQUARE, SUITE 290 ANNEX   **HUFFMAN & ROBINSON, INC.**   (504) 525-1753

205

```
1         Q.    Mr. Walker, you doing okay?
2         A.    I'm hanging in there, yeah.
3         Q.    All right.  Good.  My name is Troy
4    Bell and I'm going to skip around a bit.
5         A.    All right, sir.
6         Q.    All right.  During your testimony
7    you mentioned Garlock gaskets.
8         A.    Yes.
9         Q.    Do you associate any other products
10   other than gaskets with Garlock?
11        A.    Not that I know of.
12        Q.    Okay.  Can you describe what you
13   have told us was Garlock gaskets?
14        A.    Well, it's a gasket that you put on
15   the flanges of those pipes to secure them so
16   they don't leak.
17        Q.    You said it was a gray gasket.  Do
18   you associate any other colors other than gray
19   gaskets with Garlock?
20        A.    They had the reddish rings on them,
21   I think.
22        Q.    Reddish green?
23        A.    Reddish rings.
24   MS. ROUSSEL:
25              Rings, R-I-N-G-S.
```

206

```
1    EXAMINATION BY MR. BELL:
2         Q.    Other than the reddish rings, what
3    else was on the Garlock gasket?
4         A.    They had the name on it.  I guess
5    that was in white.
6         Q.    You guess it was in white?
7         A.    Yes, because you could read it off
8    the gray.
9         Q.    Your association of Garlock
10   gaskets, is that with new construction?
11        A.    Well, they use it on both
12   constructions, new and old.  It all depends on
13   the fittings they would do but it was more
14   likely new construction because I seen both.
15   I'm not sure.
16        Q.    Was is it ever your job to install
17   or remove gasket material?
18        A.    No.
19        Q.    Do you know whether or not the
20   Garlock gasket material contained asbestos?
21        A.    Well, being on them hot steampipes
22   and all of that, yes, I thought they had
23   asbestos on it.  That's all I can tell you.
24        Q.    Now, earlier, and I think it's
25   dealing with the packing gland, you said that
```

207

```
1    the gland was made out of string material.  Do
2    you know whether or not this string material
3    contained asbestos?
4         A.    I'm not certain.
5         Q.    Now, when you started working at
6    Avondale, it was the summer, I believe you said
7    you were still in school, you were in eleventh
8    grade.
9         A.    Yes.
10        Q.    Okay.  And you told us you worked
11   at Avoncraft; is that correct?
12        A.    That's correct.
13        Q.    Was that new construction?
14        A.    Yes.  That would be new
15   construction.
16        Q.    Okay.  When you returned back at
17   Avondale, I believe in 1957 to 1958 when you
18   started working in the electrical department as
19   a helper --
20        A.    Yes.
21        Q.    -- was that new construction?
22        A.    Yes.
23        Q.    Now, what were your duties as a
24   helper?
25        A.    Well, to cut wire and string it out
```

208

```
1    and then serve it and hook it up in boxes,
2    electrical boxes, switches, lights, panels of
3    steam, that was done when I was an electrician.
4         Q.    I've heard when other people have
5    described their duties as a helper, some people
6    say they're gofers.  Did you do gofer work?
7         A.    Yes, you done a lot of gofer work.
8         Q.    A lot of gofer work?
9         A.    Going back and forth bringing
10   things.
11        Q.    Did that gofer work require you to
12   go off the ship?
13        A.    Yes.
14        Q.    How much time when you were a
15   helper between 1957 and 1958 did you do gofer
16   work?
17        A.    Well, a good portion of that time I
18   stayed on the job because, you know, your
19   mechanic you were working with wanted you there
20   and he'd send you off for certain things.  A
21   lot of times you didn't know what to go get, he
22   would go get it and bring it until you realized
23   what he wanted you to do.  But you didn't spend
24   much time off the ship.  He wanted you working.
25        Q.    Okay.  You got laid off because of
```

```
 1    lack at work, then you returned back to
 2    Avondale --
 3         A.    Yes.
 4         Q.    -- in, I believe in -- was it 1958?
 5         A.    '58, yes.
 6         Q.    And you quit Avondale in 1969?
 7         A.    Yes.
 8         Q.    Was all of your work during this
 9    time period from 1958 to 1969 new construction?
10         A.    The majority of it, yes.
11         Q.    When you say "majority," are you
12    saying like 99 percent or --
13         A.    Ninety-something percent. It was a
14    high percent of new construction.
15         Q.    You told us you left Avondale to
16    get in a little cleaner environment and to get
17    a little raise.
18         A.    Uh-huh (indicating affirmatively).
19         Q.    And that's when you went to the
20    Navy, right?
21         A.    Yes.
22         Q.    Once you started working for the
23    Navy, did you start working in a cleaner
24    environment?
25         A.    I certainly did because I didn't
```

```
 1    have to go install in those engine rooms and
 2    fire rooms where they was doing the
 3    installations, you know, of the various raw
 4    work. I was out of that. When they called,
 5    the majority of this work was all done. The
 6    compartments was more or less clean so you was
 7    in a little better environment. You didn't
 8    have to handle that equipment.
 9         Q.    Now, you told us when you worked
10    with the Navy as an inspector, you worked at
11    Todd, you worked at Avondale, and you worked at
12    Boland.
13         A.    Yes.
14         Q.    My question to you is where was
15    Boland located?
16         A.    Boland was on the Industrial Canal
17    by the Ninth Ward off of Florida Avenue, I
18    think, somewhere around that area.
19         Q.    Did the Navy ever require you to
20    take any physicals?
21         A.    When I first worked with them, yes.
22         Q.    They didn't require any annual
23    physicals?
24         A.    Annual physicals?
25         Q.    Yes.
```

```
 1         A.    Yes.
 2         Q.    And could you tell us what the
 3    annual physicals consisted of?
 4         A.    Well, they checked your blood
 5    pressure and your hearing and your lungs to see
 6    if everything was clear.
 7         Q.    Okay. Now, with respect to your
 8    lungs, what did they do?
 9         A.    They would take an x-ray on a
10    yearly basis.
11         Q.    Did they ever inform you that you
12    had what some people call spots on your lungs?
13         A.    They said you had like a pleural
14    thickening.
15         Q.    Do you recall when they told you
16    you had pleural thickening on your lungs?
17         A.    I guess it was in -- in the '70s,
18    about '73, '74.
19         Q.    Did they tell you what caused the
20    pleural thickening?
21         A.    That it might be associated with
22    asbestos or something like that.
23         Q.    Do you remember the doctor who told
24    you this?
25         A.    No. It was a doctor but I don't
```

```
 1    know his name.
 2         Q.    Was he a doctor affiliated with the
 3    Navy?
 4         A.    With the Navy, yes.
 5         Q.    Did the Navy ever inform you about
 6    the potential hazards of asbestos?
 7         A.    Well, they said they have to
 8    monitor it, that, you know, it's in my lungs.
 9    That -- so I wouldn't -- I have to stay in a
10    clean area.
11         Q.    When they told you you had to
12    monitor it, did you, in fact, monitor it by
13    going to see your doctor on an annual basis?
14         A.    I would go to them. They would do
15    the work.
16         Q.    I had asked a question and I'm not
17    sure if you answered the question. I'll ask it
18    again. Did they ever tell you, did the Navy
19    ever tell you about the potential hazards of
20    asbestos?
21         A.    Yes. After I went and worked for
22    them after a while.
23         Q.    Do you know when they told you
24    this?
25         A.    I guess in the '70s.
```

213

1    Q.    Did they tell you, for example --
2    A.    Yes.  Okay.
3    Q.    I want to wait until you finish.
4    A.    Okay.
5    Q.    Did they tell you, for example, if
6    you worked in dusty conditions that you should
7    wear a respirator?
8    A.    Yes, we did.  After that we had to
9    wear something if we was in a bad environment.
10    Q.    Do you ever recall when you believe
11    other workers were working with products you
12    believe contained asbestos, that the areas were
13    roped off?
14    MS. ROUSSEL:
15        Let me object because he's already
16        indicated by that time there had been --
17    MR. BELL:
18        We don't know what time.  He started
19        as an inspector in 1969.
20    MS. ROUSSEL:
21        Let me finish my objection.
22    MR. BELL:
23        Okay.
24    MS. ROUSSEL:
25        He has already indicated by that

214

1    time they were no longer -- he had been
2    told they were no longer using asbestos.
3    So that's my objection.
4    MR. BELL:
5        We know that at trial you're going
6    to say something different.
7    MS. ROUSSEL:
8        Move to strike that comment and also
9        I understand it is 4:30.  I am -- and I
10        have absolutely no health problems --
11        exhausted and I'm sure this witness is,
12        too.  So maybe when you compete your
13        questioning, we'll take a toll as to how
14        much more time we have to go and decide if
15        we need to shut it down for the day.
16    MR. BELL:
17        Okay.  That's fine.
18    EXAMINATION BY MR. BELL:
19    Q.    Mr. Walker, I sort of forgot my
20    question.  Let me see if I can get back on
21    track.
22        Do you recall a time when you
23    believe others may have been working with what
24    you believe was asbestos when the areas were
25    roped off?

215

1    A.    I don't remember them ever being
2    roped off.
3    Q.    Do you remember them segregating
4    the workers?
5    A.    Not that I -- not to my knowledge,
6    no.
7    Q.    I think I know the answer but I'm
8    going to ask it anyway.  Were you ever involved
9    in repair or refurbishing work when you were an
10    electrician?
11    A.    Repair and refurbishing work?
12    Q.    Yes, sir.
13    A.    Or any kind of work?  I done
14    repairs on the ships.
15    Q.    Okay.  You were asked whether or
16    not you worked around pipefitters and you told
17    us that you worked around pipefitters who were
18    installing gaskets.
19    A.    Uh-huh (indicating affirmatively).
20    Q.    And I'm not sure if my notes are
21    correct but you said they had them in their
22    buckets.  Are you talking about the gaskets?
23    A.    The gaskets.  They'd carry them.
24    They carry their tools and their equipment in
25    the buckets and then a lot of times they had

216

1    the gasket material with them.  And a lot of
2    them worked out of five-gallon buckets and
3    toolboxes but they carried the gallon buckets.
4    Q.    Did the pipefitters have preformed
5    gaskets in the buckets that they just pulled
6    out whenever they needed them?
7    A.    Yes.  They had gaskets and they had
8    to fit them to the flanges.
9    Q.    What, if anything, could you tell
10    me about the H. K. Porter Company?
11    A.    H. T. Porter?
12    Q.    H. K. Porter.
13    A.    I never -- I'm not familiar with
14    that.
15    Q.    What, if anything, can you tell me
16    about Southern Textile Corporation?
17    A.    I'm not familiar with that, either.
18    Q.    Are you familiar with a company
19    called Armstrong World Industries?
20    A.    No, I can't remember.
21    Q.    Are you familiar with a company
22    called Fibreboard Corporation?
23    A.    Fibreboard, not really.
24    Q.    Are you familiar with a company
25    called Keene Corporation?

217

1   A.   King.

2   Q.   Keene, K-E-E-N-E?

3   A.   No.

4   Q.   Are you familiar with a company
5   called Pittsburgh-Corning Corporation?

6   A.   Not that I can recall.

7   Q.   Are you familiar with a company
8   called Owens-Corning Fiberglas?

9   A.   I heard of that one, yes,
10  Owens-Corning.

11  Q.   what do you associate with
12  Owens-Corning Fiberglas?

13  A.   I don't recall.

14  Q.   Are you familiar with a company
15  called Raybestos-Manhattan?

16  A.   No.

17  Q.   what about a company called Babcock
18  & Wilcox?

19  A.   I heard of that company. That's
20  some kind of a steamship company or something?

21  Q.   Do you associate the name Babcock &
22  Wilcox with your work at Avondale?

23  A.   Not really. They were at Avondale.
24  They had something to do but I'm not sure what
25  it was.

218

1   Q.   what, if anything, could you tell
2   me about a company called Eagle-Picher?

3   A.   Eagle insulation asbestos but --
4   no.

5   Q.   what about a company called Shook &
6   Fletcher?

7   A.   Shook & Fletcher. No.

8   Q.   what, if anything, could you tell
9   me about a company called Charter?

10  A.   Charter Company. Yes, I heard of
11  Charter Company. That used to be floor work, I
12  think.

13  MR. BELL:

14       Mr. walker, thank you.

15  THE VIDEOGRAPHER:

16       Off the record. End of Tape 3.

17       (whereupon a brief recess was taken
18  at this time.)

19  THE VIDEOGRAPHER:

20       This is the beginning of Tape 4 of
21  the videotaped deposition of Rudy Walker,
22  Sr. We are back on record.

23  EXAMINATION BY MR. BROWN:

24  Q.   Mr. walker, my name is Scott Brown.
25  Can you hear me okay?

219

1   A.   Yes, sir.

2   Q.   Okay. The questions I am going to
3   ask you will be pertaining to the time period
4   from May of 1957 to May of 1958 when you were
5   an electrician's helper at Avondale, okay?

6   A.   Yes.

7   Q.   You mentioned working on one vessel
8   during that time period called the Napahaddock
9   [sic]?

10  A.   *Tappahannock*. I'm not sure if
11  that's how it's pronounced.

12  Q.   You also mentioned working on some
13  LSDs?

14  A.   LSDs, yes. That's when I got laid
15  off, before I got laid off.

16  Q.   Okay. Do you remember the names of
17  any of the other ships besides the *Tappahannock*
18  that you worked on during that time period?

19  A.   I think they had the *Mission*
20  *Capistrano*. That was it, I think, and I got
21  laid off.

22  Q.   I'm sorry. One more time, the
23  *Mission*?

24  A.   *Capistrano*.

25  Q.   *Capistrano*. Okay. were the

220

1   *Tappahannock* and *Mission*, were those commercial
2   vessels?

3   A.   Yes, I think so.

4   Q.   Those are the only vessel names you
5   remember working on during the '58 time period?

6   A.   That's correct, yes.

7   Q.   I'm going to ask you the names of
8   some products and tell me if you remember those
9   products from the 1957, 1958 time period.
10  Okay?

11  A.   Okay.

12  Q.   Thermobestos?

13  A.   Not that I know of.

14  Q.   Careytemp?

15  A.   No.

16  Q.   Pabco?

17  A.   No.

18  MS. ROUSSEL:

19       That was already asked this morning.
20  I would appreciate not going over material
21  that's been asked about already.

22  MR. BROWN:

23       That was a different time period.

24  EXAMINATION BY MR. BROWN:

25  Q.   I'm going to ask you some questions

221

1   now about the pipe insulation that you said you
2   saw insulators working with from '57 to '58.
3   Okay?  What color was that product?
4       A.    It was a whitish-gray material that
5   was the pipe cover.
6       Q.    Okay.
7       A.    It's the half-rounds in blocks.
8       Q.    How thick was that?
9       A.    Well, it was approximately an inch
10  and a half thick with a hole in it and it
11  attached to pipe.  And it got bigger as the
12  pipes got bigger.
13      Q.    Did you ever see any of the
14  packaging that that came in?
15      A.    It was a box, a carton like and it
16  came in Kaylo boxes, K-A-Y-L-O.
17      Q.    What color was the box?
18      A.    It was a regular brown-type box.
19      Q.    Did you see the word "Kaylo" on the
20  box?
21      A.    Yes.  They came with the red
22  letters.
23      Q.    What were the size of the letters?
24      A.    Oh, I don't know what the
25  dimensions was.

222

1       Q.    How about the box?  What was the
2   size of the box?
3       A.    They had the length of boxes, I
4   guess it might have been a few feet long.
5       Q.    You said that you had left Avondale
6   because you wanted to work in a cleaner
7   environment; is that correct?
8       A.    Yes.
9       Q.    Did you ever say anything to
10  Avondale people about cleaning up the
11  environment?
12      A.    No.  We would try to keep the areas
13  clean, but -- and then I guess they do their
14  best but the areas that they were working in
15  was constantly being -- you know, the materials
16  was left in there and the wind would catch it
17  and blow it around and everything else.  It
18  would stay in there for some periods of time.
19  So when you can get out of an area like that,
20  then you try.
21      Q.    Do you know who manufactured the
22  Kaylo product you're talking about?
23      A.    It was just an insulation company.
24  I guess the Kaylo people.
25      Q.    I'm just going to ask you some

223

1   background questions real quick.
2       A.    Yes.
3       Q.    What's your full name, sir?
4       A.    Rudy James Walker.
5       Q.    What's your date of birth?
6       A.    May 19, 1938.
7       Q.    What's the highest level of
8   education you completed?
9       A.    High school education.
10      Q.    Where did you graduate from high
11  school.
12      A.    Westwego High School -- West
13  Jefferson High.  West Jefferson.
14      Q.    What year was that?
15      A.    That was in '57.
16      Q.    You testified earlier today that
17  during the early 1970s the Navy quit using
18  asbestos products; is that correct?
19      MS. ROUSSEL:
20          I'm going to object.  That's not
21      what he indicated.  He never said the Navy
22      used asbestos products.
23      A.    They quit using asbestos -- using
24  asbestos products on ships that I worked with
25  after I retired -- quit Avondale.

224

1   EXAMINATION BY MR. BROWN:
2       Q.    Okay.  Now my question is was the
3   entity that quit using asbestos products
4   Avondale or the Navy?
5       A.    Well, the Navy required that they
6   don't use nothing like that on the ships and
7   Avondale, you know, didn't use it.
8       Q.    Do you have any knowledge regarding
9   whether Avondale continued to use asbestos
10  products on non-Navy ships?
11      A.    Not to my knowledge.  After I quit
12  Avondale, it was not supposed to use it at all.
13      Q.    Okay.  As an electrician's helper,
14  did you ever install the pipe insulation you
15  talked about?
16      A.    No.
17      Q.    Did you ever remove that
18  insulation?
19      A.    Yes, I removed some.
20      Q.    As an electrician's helper?
21      A.    Yes.
22      Q.    And how often did you remove it?
23      A.    Well, when it interfered with our
24  wires or our equipment, we had to remove it.
25      Q.    Was that a daily thing, weekly?

225

1    A.    It wasn't a real frequent thing but
2    occasionally we had to do that.
3    Q.    You're going to have to educate me
4    a little bit here.  Would you have to remove a
5    length of the pipe covering or just a piece to
6    get into where --
7    A.    Some pieces -- it wouldn't be a
8    length in some cases but it would be a piece.
9    We would have to cut a piece out.
10    Q.    As an electrician's helper, did you
11    ever have to go to the warehouse to get
12    products for the electrician you were working
13    for?
14    A.    Sometimes, yes.
15    Q.    How often would you have to do
16    that?
17    A.    Well, not too often because we had
18    people that used to bring the equipment in.
19    Occasionally, we'd have to go get it ourselves.
20    Q.    Earlier you testified to being
21    familiar with a company named Owens-Corning
22    Fiberglas.  Do you know if they made the Kaylo
23    product that you talked about?
24    A.    I'm not certain.
25    Q.    And also you testified earlier to

226

1    having knowledge of Frenchie Bordelon?
2    A.    Yes.
3    Q.    Do you think that he would have
4    better knowledge of the insulation products
5    used at Avondale than you would?
6    A.    I'm certain he did.
7    MR. BROWN:
8         That's all my questions, sir.  Thank
9    you.
10    EXAMINATION BY MS. SEEMANN:
11    Q.    Mr. Walker, my name is Amy Seemann.
12    Can you hear me?
13    A.    Yes, ma'am.
14    Q.    Do you know the name -- other than
15    the companies you've already named, do you know
16    the names of any companies who may have
17    manufactured any asbestos-containing product or
18    any insulation that was at Avondale?
19    A.    No.  That's the only ones.
20    Q.    Other than companies you've already
21    named, do you know the names of any companies
22    who may have supplied insulation or
23    asbestos-containing products to Avondale?
24    A.    Not that I know of, no.
25    Q.    Thank you, sir.  That's all I have.

227

1         (whereupon a discussion was held off
2         the record.)
3    EXAMINATION BY MR. WEBB:
4    Q.    Hi, Mr. Walker, my name is Kevin
5    Webb.
6    A.    Kevin, pleased to meet you.
7    Q.    When you worked as an electrician
8    at Avondale, did you work on vessels all of the
9    time or part of the time?
10    A.    Just about all of the time.
11    Q.    Where else did you work other than
12    on vessels?
13    A.    When I was working at Avondale?
14    Q.    Yes.
15    A.    For Avondale.  Sometimes I'd do a
16    little shop work if they had shop work for us
17    to do.
18    Q.    Was there an electrician's shop at
19    Avondale?
20    A.    Yes.
21    Q.    What type of work did you do in the
22    shop?
23    A.    Well, sometimes we'd drill boxes or
24    break boxes down and get them prepared for them
25    to drill holes in the boxes.

228

1    Q.    Did you do anything else in the
2    shop?
3    A.    That was the extent of it.
4    Q.    Did other electricians work in the
5    shop at the same time that you worked there?
6    A.    Yes.  It was electricians, yes.
7    Q.    What type of work were they doing?
8    A.    They would do similar work.  I'm
9    saying they'd drill holes in boxes and
10    disassemble boxes and reassemble them when it
11    was needed.
12    Q.    Mr. Walker, are you able to give me
13    an estimate of how much time on average you
14    spent working in the electrical shop?
15    A.    In the electrical shop maybe an
16    hour every day or so when we brought our stuff
17    in.
18    Q.    When you reported to work in the
19    morning, where did you report?
20    A.    I reported on the wet dock by the
21    workshop or on the ship.  Our supervisor knew I
22    was there after I punched in and give me my
23    time card and went aboard ship to work.
24    Q.    Where did you go to elementary
25    school?

229

1    A.    Westwego.

2    Q.    It's called Westwego Elementary?

3    A.    Westwego Elementary.

4    Q.    You mentioned early on, I think, in

5  the *Fremin* deposition that you saw employees of

6  Avondale work with Foster compounds.  Do you

7  recall that?

8    A.    Foster compounds, yes.  That was

9  that Foster compound that came in -- that they

10  used to spread on the insulation, the pipe

11  insulation.

12    Q.    Okay.  Was that the insulators that

13  did that?

14    A.    The insulators did that.

15    Q.    And did they spread it over the top

16  of the insulation?

17    A.    Yes.  It was a compound and they

18  take -- one of them used a cloth.  They wet the

19  cloth and put it on top of the pipe material

20  that was fibrous, it would get hard to seal off

21  the pipe material and the joints.

22    Q.    What did the compound look like

23  that was put on the cloth?

24    A.    It was like a gray compound.  It

25  would dry and get hard.  It would get hard

ONE SHELL SQUARE, SUITE 250 ANNEX    HUFFMAN & ROBINSON, INC.    (504) 525-1753
NEW ORLEANS, LOUISIANA 70138    CERTIFIED COURT REPORTERS    (800) 749-1753

230

1  enough to coat it to make a coating on the pipe

2  covering.

3    Q.    Let me try to ask it this way.  Was

4  the Foster compound used for more than one

5  purpose?

6    MS. ROUSSEL:

7        He's already given more than one

8        purpose so I'm objecting to the form of

9        the question.

10    A.    The joints and the cementing of the

11  pipe.  I can't recall.

12  EXAMINATION BY MR. WEBB:

13    Q.    On what type of ships did you see

14  the Foster compound used?

15    A.    On the commercial ships.

16    Q.    Any other type?

17    A.    In the Navy, both the Navy and the

18  commercial.

19    Q.    And where in the ship did you see

20  the Foster compounds used?

21    A.    On the steampiping, piping like

22  that kind.

23    Q.    What part of the ship?

24    A.    In the fire rooms, engine rooms and

25  in some cases where they had steampipes that

ONE SHELL SQUARE, SUITE 250 ANNEX    HUFFMAN & ROBINSON, INC.    (504) 525-1753
NEW ORLEANS, LOUISIANA 70138    CERTIFIED COURT REPORTERS    (800) 749-1753

231

1  run in the quarters.

2    Q.    And all of this work where you saw

3  the Foster compound used was new construction?

4    A.    No.  Both.  New construction.

5    Q.    How do you know that this product

6  was made by Foster?

7    A.    They had the name on the container.

8    Q.    Okay.  What type of container?

9    A.    Five-gallon containers.

10    Q.    Do you recall anything else on the

11  container other than the name?

12    A.    Just the name.

13    Q.    Do you recall a number or anything

14  else like that?

15    A.    Not that I am familiar with.

16    Q.    Did you personally ever use that

17  product?

18    A.    No, sir.

19    Q.    Did you have a chance to see what

20  the product looked like inside the container?

21    A.    Inside the box when you opened it

22  up?  No.  When they opened it up, it was just

23  stacked on one another in the box.

24    Q.    What about in the five-gallon can,

25  did you ever see what the product looked like

ONE SHELL SQUARE, SUITE 250 ANNEX    HUFFMAN & ROBINSON, INC.    (504) 525-1753
NEW ORLEANS, LOUISIANA 70138

232

1  inside those cans?

2    A.    Just like a paint.

3    Q.    What color was it?

4    MS. ROUSSEL:

5        That's been asked and answered at

6        least five or six times now.

7    A.    It was like a grayish-white.

8  EXAMINATION BY MR. WEBB:

9    Q.    And what did the insulators use to

10  apply this product?

11    A.    Sometimes they used their hands.

12    Q.    Did they use anything else other

13  than their hand?

14    A.    Sometimes they used a little brush,

15  their hands.  They'd rinse their hands with

16  water.  That's all I can remember.  I think

17  that's --

18    Q.    Can you tell me when the product

19  was in the can, was it a light gray or a dark

20  gray?

21    A.    It was darkish.  As it dried it got

22  a little lighter.

23    Q.    Are you able to tell me how thick

24  this product was?

25    A.    It was like a heavy paint.

ONE SHELL SQUARE, SUITE 250 ANNEX    HUFFMAN & ROBINSON, INC.

233

1    Q.   Heavy paint?
2    A.   Paint.
3    Q.   Did you see this product in
4    anything other than a five-gallon can?
5    A.   No, sir.  That's it.  That's all I
6    remember is it being a can.
7    Q.   Did you see this product applied in
8    anything other than pipes?
9    A.   No, that was it.
10   Q.   And when it was applied, was it
11   wet?
12   A.   Yes.
13   Q.   Did you see any dust produced when
14   it was applied?
15   A.   No dust.
16   Q.   What is your understanding of why
17   this product was used?
18   A.   The mastic.
19   Q.   Is that what you call it, a mastic?
20   A.   It was like a mastic, I guess, to
21   seal the pipe off, the fibrous ends off of the
22   pipe to give it a coating, mask it.
23   Q.   Was the entire pipe coated or just
24   parts of the pipe?
25   A.   The whole pipe was coated.

ONE SHELL SQUARE, SUITE 250 ANNEX    **HUFFMAN & ROBINSON, INC.**    (504) 525-1753
NEW ORLEANS, LOUISIANA 70139              CERTIFIED COURT REPORTERS              (800) 749-1753

234

1    Q.   Did you ever see this product
2    applied to cloth?
3    A.   Yes.  It was the same stuff.  They
4    used to douse it on the cloth and they would
5    take and spread the cloth on the insulator,
6    insulation material itself and it would get
7    hard.
8    Q.   Where were you when this product
9    was being used?
10   A.   I could be as close as you as I am
11   to the insulator.  He was working in the same
12   proximity.
13   Q.   Okay.  And if someone is just
14   looking at the record, about how far would you
15   say that is?
16   MS. ROUSSEL:
17         Let me ask.  Are you asking him
18         what's the closest he was or generally how
19         close he was?
20   MR. WEBB:
21         I understand that his answer was he
22         was where I am to where you are.
23   A.   Sometimes closer.
24   EXAMINATION BY MR. WEBB:
25   Q.   Sometimes closer?

ONE SHELL SQUARE, SUITE 250 ANNEX    **HUFFMAN & ROBINSON, INC.**    (504) 525-1753
NEW ORLEANS, LOUISIANA 70139              CERTIFIED COURT REPORTERS              (800) 749-1753

235

1    A.   Sometimes closer quarters.
2    Q.   When this product dried, was it
3    hard to the touch or was it kind of soft to the
4    touch?
5    A.   One of them was a hard one and the
6    other one they had a little tacky feel to it.
7    Q.   Now, you're talking about two.
8    What did the substance look like that was hard
9    to the touch?
10   A.   Like it was hard to the touch.  I'm
11   not certain.  It could have been either one of
12   them on that.  But they had a different texture
13   to each one of them.  I'm not certain which one
14   was the hard one or the soft one.
15   Q.   Okay.  Let me see if I understand
16   your testimony.  There were coatings on the
17   pipe and some of it was hard and some of it was
18   soft to the touch?
19   A.   Not real soft, but they were
20   coated, rubberized.
21   Q.   And you don't know --
22   A.   Rubberized.
23   Q.   I'm sorry.  Rubberized?
24   A.   Yeah.
25   Q.   And you don't know who made --

ONE SHELL SQUARE, SUITE 250 ANNEX    **HUFFMAN & ROBINSON, INC.**    (504) 525-1753

236

1    which manufacturer made the substance that was
2    rubberized to the touch?
3    A.   Yes, that's the Foster.
4    Q.   That's the Foster?
5    A.   Foster.  I think so.
6    Q.   Did you ever have to remove this
7    Foster product?
8    A.   In some cases I did.
9    Q.   Under what situations did you do
10   that?
11   A.   If the wires were embedded in it or
12   something like that, we'd have to take it out.
13   Q.   How did the wire get embedded in
14   it?
15   A.   Well, sometimes the insulator --
16   the insulation man would come and install it
17   and the wire would be close by and it would
18   just get wrapped up into the insulation.  He'd
19   insulate with the pipe, insulate the pipe
20   around the cable.  It was embedded in the
21   cable.  It was so close to the wireways that
22   was against it.
23   Q.   Okay.  And the wire that got stuck
24   in this substance, where was it supposed to be
25   installed?

ONE SHELL SQUARE, SUITE 250 ANNEX    **HUFFMAN & ROBINSON, INC.**    (504) 525-1753

237

1      A.    On the wire adjacent to it, close
2  by.
3      Q.    What would you call the area where
4  you installed that type of wire?
5      A.    A wireway.
6      Q.    A wireway?
7      A.    Yes.
8      Q.    And how did you remove the wire
9  when it got caught in the substance?
10     A.    We would cut around the insulation
11 around the wire.
12     Q.    You would cut the insulation around
13 the wire?
14     A.    So we can take the wire out and
15 remove the wire and then they would come back
16 and patch the area up.
17     Q.    How deep would that cut be?
18     A.    Well, it wasn't real deep.  It was
19 maybe an inch or so.
20     Q.    Do you know if you could remove
21 this substance with water?
22     A.    No.  Wash it off?
23     Q.    Do you know what water-soluble
24 means?
25     A.    Yes.  I know, yes.

238

1      Q.    Do you know if this product was
2  water-soluble?
3      A.    I'm not sure.
4      Q.    What type of tool did you use to
5  cut the wire out?
6      A.    A knife.
7      Q.    And how far was your nose and mouth
8  away from the tool when you did this?
9      A.    I guess arm length.
10     Q.    How many times did you have to do
11 something like that, removing the wire?
12     A.    Periodically you had to remove it.
13     Q.    When you did that, did you try not
14 to disturb the insulation?
15     A.    Try not to but sometimes you did.
16     Q.    Do you know if this Foster product
17 contained asbestos?
18     A.    Well, it was on steampiping and
19 just the insulation on the steampiping was
20 asbestos.
21     Q.    Do you know if --
22     A.    It didn't say, I don't think, on
23 the container that it had asbestos in it.  I
24 don't remember that.
25     Q.    Other than what you have testified

239

1  to so far, do you know the names of any other
2  mastics or adhesives that were used out at
3  Avondale?
4      A.    No.
5      Q.    Does the name Arabol ring a bell?
6      A.    Not that I know of, no.
7      Q.    What about Insulcote?
8      A.    I don't remember that, either.
9      Q.    What about Johns-Manville?
10     A.    No.  I heard of Johns-Manville
11 because it was in Marrero.
12     Q.    The plant?
13     A.    The company, yes, the company.
14     Q.    What about Childers?
15     A.    I heard the name but I'm not sure,
16 no.
17     Q.    Do you remember the color of the
18 label on the five-gallon can?
19     A.    I guess it was a little darker than
20 the can.  It was a -- it was a round label.
21 That's all I can remember.
22     Q.    Do you remember the names of any
23 insulators that may have worked with this
24 product?
25     A.    Paul Bordelon, Frenchie Bordelon,

240

1  Luther, John Bowman.
2      Q.    Fremin?
3      A.    Fremin, no.  Bowman.  Yes.  And
4  they had a lot of insulators that we knew.  I
5  just can't remember a whole lot of them, their
6  names.
7      Q.    On what repair projects do you
8  recall seeing the Foster product used?
9      A.    On the repairs?  I guess all the
10 repairs we worked on, they had them on.  I
11 don't recall what particular one but they
12 worked on all the vessels with the same
13 products.  The basic product they was
14 installing that kind of material.
15     Q.    We may be through but just one
16 minute.
17         Do you know the brand name or
18 manufacturer of any asbestos -- of any product
19 that you think contained asbestos that you
20 removed?
21     MS. ROUSSEL:
22         Other than the ones he's been
23     talking about all day?  I'm going to
24     object to the form of your question.  He's
25     been discussing products all day.

241

1    MS. BAXTER:
2         I'm going to object to Gerolyn's
3    commentary.
4  EXAMINATION BY MR. WEBB:
5    Q.   Do you understand the question?
6    A.   Yes.  About what insulation,
7  asbestos insulation I'm familiar with that I
8  told you about, did the --
9    MS. ROUSSEL:
10        Wait, wait.  Let's hear his
11   question.
12 EXAMINATION BY MR. WEBB:
13   Q.   Let me try it again.
14        Do you know who manufactured any
15 product that you think contained asbestos that
16 you removed?
17   A.   No, I don't know.  I can't recall
18 the manufacturer other than the names I had
19 mentioned.  The Eagle asbestos and McCarty and
20 Reilly-Benton and that gasket material.
21   MR. WEBB:
22        All right, sir.  That's all I have.
23   Thank you.
24   THE WITNESS:
25        All right, sir.

242

1    MS. ROUSSEL:
2         Anybody else have some questions?
3    I'm talking about any individual who has
4    not yet asked any questions.  Does anybody
5    have any questions?  Valerie, you're up
6    next.  Wait.  Val, didn't you ask
7    questions before lunch?
8    MS. SCHEXNAYDER:
9         In a different case.
10   MS. ROUSSEL:
11        We've got a triple caption.  Anybody
12   else?
13        (whereupon a discussion was held off
14   the record.)
15   MS. SCHEXNAYDER:
16        Valerie Schexnayder.  I reserve my
17   rights to ask questions once everyone is
18   finished.
19 EXAMINATION BY MR. SCHUETTE:
20   Q.   Mr. Walker, how are you doing?
21   A.   Fine.
22   Q.   Do you still feel like you're
23 capable of answering questions?
24   A.   I'll try, yes.
25   Q.   If you get to the point you don't

243

1  think you can, let me know.  My name is Bill
2  Schuette.  I'd like to take a few minutes to
3  talk to you about the work you did on the Lykes
4  ships.
5    A.   Yes, sir.
6    Q.   Can you tell me which of the Lykes
7  ships you worked on where you worked around
8  Hopeman Brothers employees?
9    A.   Well, on the Amy Lykes, and I guess
10 the Genevieve and the Latitia.  I don't
11 remember all the names of them.  But there was
12 a lot of ships, lot of Lykes ships that I
13 worked on.  I don't know how many it was, like
14 17 --
15   Q.   Excuse me.  I didn't mean to
16 interrupt you.
17   A.   That's okay.
18   Q.   Did you work on any Lykes ships
19 where you didn't work around Hopeman Brothers
20 at some point in time?
21   A.   Not really.  We worked on the ship.
22   Q.   Okay.
23   A.   Because they worked all over the
24 ships just like we did.
25   Q.   Okay.  And Hopeman Brothers did

244

1  work all over the ship just like the Avondale
2  employees did?
3    A.   That's correct, yes.
4    Q.   Were there any of the Lykes ships
5  where you did not work in the crew quarters?
6    A.   No.  I worked in the crew quarters,
7  too.
8    Q.   Okay.  On the Lykes ship besides
9  the crew quarters, you worked in all the other
10 areas of the ship as well?
11   A.   That's correct.
12   Q.   You worked in the -- you mentioned
13 engine room work with regard to some of your
14 other work.  Did you work in the engine rooms
15 and the fire rooms of the Lykes ships?
16   A.   That's correct.
17   Q.   On a typical Lykes ship, can you
18 tell me how long you would spend in the engine
19 room or the fire room?
20   A.   Sometimes hours.  It all depends on
21 what we was doing.  Doing wiring it and
22 connecting it, we'd stay there for long periods
23 of time.
24   Q.   I guess what I'm talking about --
25 maybe it would be easier this way.  Is there

245

1  any way you can estimate for me on a Lykes ship
2  if you took all the time you would spend
3  working on a particular Lykes ship, what
4  percentage of that time would you spend in the
5  engine rooms?
6        A.    Oh, maybe around about 20 percent
7  of the time, 15, 20 percent of the time.
8        Q.    Okay.  Besides the crew quarters,
9  what other areas of the ship would you spend
10  any other substantial amount of time in?
11        A.    Well, they had the mess areas, the
12  mess decks and the quarters and the pilothouse
13  and the steering gear rooms, just about all
14  over the ships.
15        Q.    And I understand you worked
16  throughout the ship.  I guess I was trying to
17  get the areas where you would spend most of
18  your time.  And what you've mentioned are the
19  engine rooms, the crew quarters, the galley,
20  the pilothouse and the steering gear room?
21        A.    Yes.
22        Q.    So that would be most of your time
23  on the ship?
24        A.    Most or your time, yes.
25        Q.    Okay.  Now, you already mentioned

246

1  you would spend about 15 to 20 percent of your
2  time in the engine room.
3        A.    Uh-huh (indicating affirmatively).
4        Q.    How much time would you spend, say,
5  in the pilothouse?
6        A.    Maybe about 10 percent of the time.
7        Q.    Okay.  What about the steering gear
8  room?
9        A.    Maybe about five.
10        Q.    What about the galley?
11        A.    Galley about maybe 10 percent.
12        MS. BAXTER:
13        I'm sorry.  What was that?
14        THE WITNESS:
15        Ten percent.
16  EXAMINATION BY MR. SCHUETTE:
17        Q.    Okay.  And what about the crew
18  quarters?
19        A.    I'm not sure.  I guess half the
20  time or a little less than half the time.
21        Q.    Now, you mentioned these boards
22  that Hopeman Brothers was installing in the
23  crew quarters.
24        A.    Yes.
25        Q.    And you called them a Mica board.

247

1        A.    Mica board.
2        Q.    Where did you get that name?
3        A.    Well, that's what they call the
4  board.  I guess it was a trade name or
5  whatever.  And they had other boards but this
6  one had the Micarta on the outer casing and
7  then the inside was sandwiched with like a
8  Sheetrock-type material.
9        Q.    Okay.  So that's what you're
10  referring to as the Mica board was what you
11  described as it looked like Sheetrock with Mica
12  or Formica on the outside?
13        A.    Outside.
14        Q.    Okay.
15        A.    And the people at Hopeman called it
16  that kind of board, you know.
17        Q.    Okay.  Can you tell me what you
18  recall as far as how thick the Sheetrock
19  portion of it was?
20        A.    Maybe about three-quarters of an
21  inch or three -- seven-eighths of an inch or
22  something like that.
23        Q.    So almost an inch?
24        A.    Almost an inch, yes.  It was pretty
25  close to it.

248

1        Q.    Can you tell me how thick the
2  Formica surface on the outside was?
3        A.    Maybe like your fingernail.  It was
4  just an outer casing like.  It would get hard,
5  I guess.
6        Q.    Okay.
7        A.    Smooth and tough.
8        Q.    Can you tell me what color the
9  Sheetrock portion was?
10        A.    It was a whitish-gray like.
11        Q.    And what color was the Formica
12  portion?
13        A.    It could be any color.  It could be
14  green.  They had a lot of greens and grays and
15  whites and some of them had like a little
16  multiple color on it.
17        Q.    Now, you said you saw dust produced
18  when Hopeman Brothers employees would cut this
19  board with the saw?
20        A.    That's correct.
21        Q.    What color was the dust?
22        A.    It was a light powder dust like, it
23  might have been a grayish powder, white powder.
24        Q.    Would you agree it was the color of
25  the Sheetrock portion?

249

```
1        MS. ROUSSEL:
2             I'm going to object to the form of
3        the question.
4        A.    It could be --
5   EXAMINATION BY MR. SCHUETTE:
6        Q.    You can still answer.
7        A.    It was a powder but the particular
8   color, I am not certain.
9        Q.    Okay.
10       A.    It was a powder.  A particular
11  color I'm not certain.
12       Q.    Okay.
13       A.    It could have been gray, it could
14  have been light white or whatever but sometimes
15  it mixed with the plastic, too.  It was like
16  the Mica and it could have been, you know --
17  but that's all I know.  It was like a powder.
18       Q.    Did you or anyone that you know
19  ever look at the dust to see whether there were
20  really any parts of the Formica in the dust?
21       A.    Not really.
22       Q.    Did you ever see a situation where
23  Hopeman Brothers was cutting just the Sheetrock
24  portion alone without the Formica?
25       A.    No.  It always had a Mica on it.
```

250

```
1        Q.    Okay.
2        A.    The ones I know of.
3        Q.    Okay.  Excuse me.  Conversely, did
4   you ever see a time when Hopeman Brothers was
5   just cutting the Formica portion without it
6   being attached to the Sheetrock?
7        MS. ROUSSEL:
8             Let me object to the form of your
9        question.  You keep saying Formica.  He
10       referred to it as Mica.
11  EXAMINATION BY MR. SCHUETTE:
12       Q.    I'm not trying to mislead you, Mr.
13  Walker.
14       A.    It's a hard substance.
15       Q.    It's a Formica-like substance?  I
16  just thought the jury would understand Formica
17  more than Mica.
18       A.    It's Mica.
19       Q.    Did you ever see that product being
20  sawed alone?
21       A.    No, not that I witnessed.
22       Q.    Do you personally know whether the
23  Sheetrock portion contained any asbestos?
24       A.    Well, we were told that it had some
25  powder dust in it.  It was an insulator that
```

251

```
1   wouldn't -- wouldn't cause a fire.
2        Q.    So your understanding was that the
3   boards contained asbestos to protect people
4   from fire?
5        A.    I guess, yes.
6        Q.    I'm going to switch to something
7   else that you mentioned.  You were talking
8   about boilers.
9        A.    Yes.
10       Q.    And one of the boilers you
11  mentioned, you said, was a Westinghouse boiler.
12       A.    Yes.
13       Q.    Now, I represent Westinghouse and I
14  have for a number of years and I've never heard
15  of a Westinghouse boiler.
16       A.    It might have been General
17  Electric.
18       Q.    Okay.  So you're not sure that you
19  ever saw a Westinghouse boiler?
20       A.    No.
21       Q.    One thing so that we don't mislead
22  you --
23       A.    Yes.
24       Q.    -- is Westinghouse did build
25  turbines.
```

252

```
1        A.    Uh-huh (indicating affirmatively).
2        Q.    Now, did you ever have an
3   opportunity as an Avondale electrician -- this
4   is just when you were working for Avondale
5   directly -- to work around a turbine on a ship?
6        A.    Yes.
7        Q.    Did you ever work on the turbines
8   directly or just around them?
9        A.    Around them.
10       Q.    What kind of things were you doing
11  around the turbines?
12       A.    Doing electrical work.
13       Q.    At any of the times you worked
14  around the turbines -- and I'm just going to
15  limit this again to while you were a direct
16  Avondale employee -- were the turbines being
17  insulated?
18       A.    No -- the turbines?
19       Q.    Right.
20       A.    Sometimes they would, they would
21  insulate the turbines, the Avondale workers
22  would insulate them.  I am sure that was the
23  turbines they would put.  They'd make blankets
24  like or something.  We called it -- we thought
25  it was asbestos.  They make blankets and it
```

253

1  would cover up the hot metal that would be
2  exposed with these blankets.
3       Q.   Other than these blankets, did you
4  ever see an Avondale insulator use any other
5  type of insulation on the turbine itself?
6       A.   Other than that, no.
7       Q.   Okay.  Can you tell me what ships
8  or what types of ships that you worked around
9  the turbine while it was being insulated with
10  the blankets?
11       A.   Well, it was commercial ships and I
12  think the Navy ships had turbines, too.  I'm
13  not certain which ones had the turbines but
14  they had commercial and the Navy had both types
15  of drives.
16       Q.   Did you work around turbines on
17  Navy ships?
18       A.   Yes, sir.  I never worked on them
19  but I worked around them.
20       Q.   Do you recall who built the
21  turbines on the Navy ships?
22       A.   I'm not certain if it was G.E. or
23  whatever.
24       Q.   Let's skip forward now to when you
25  were with the Navy and you were doing

254

1  inspection work.  Did you have any
2  responsibility for inspecting the turbines?
3       A.   No, sir.
4       Q.   Okay.  At any time that you were at
5  the Navy, did you have to work around a turbine
6  while it was being insulated?
7       A.   Yes.
8       Q.   And I take it since you were a Navy
9  inspector, that would have been on a Navy
10  vessel?
11       A.   Yes.
12       Q.   Do you recall which vessel or types
13  of vessel that was?
14       A.   No, sir.
15       Q.   Was it a vessel that was being --
16  that was at Avondale or was it at Boland or
17  Todd?
18       A.   That would be at Avondale.
19       Q.   Do you recall what the turbine was
20  being insulated with?
21       A.   It was a sort of an insulator
22  material.  I don't think it was asbestos.  It
23  wasn't supposed to be using asbestos at that
24  particular time.
25       Q.   Was this a blanket-like material?

255

1       A.   Blanket-like material.
2       Q.   When you say there wasn't supposed
3  to be asbestos at that particular time, about
4  what time frame are you talking about?
5       MS. ROUSSEL:
6            He already answered that.
7       A.   In the '80s.
8  EXAMINATION BY MR. SCHUETTE:
9       Q.   Let me clarify my question because
10  I didn't mean to repeat a question that had
11  been asked before.
12            When I said what time frame did you
13  mean, I was referring to what time frame while
14  you were working for the Navy were you around
15  the turbine while it was being insulated?
16       A.   When I was working at Avondale?
17       Q.   No.  When you were with the Navy.
18       A.   They didn't have any asbestos then.
19       Q.   I didn't ask about whether the
20  insulation contained asbestos or not.  We were
21  talking about that you -- while you were with
22  the Navy, while you were a Navy inspector, you
23  were around a turbine on a ship at Avondale
24  while it was being insulated.
25       A.   Yes.

256

1       Q.   About what year did this happen?
2       A.   That was, I guess, in '69 and '70.
3  It could have been around '71.
4       Q.   All right.  Do you recall the names
5  of any co-workers that you worked with while
6  you worked on a Lykes ship in the crew
7  quarters?
8       A.   Yes.  Louis Duplantis and Bobby
9  Robichaux.
10       Q.   And were both of those gentlemen
11  electricians?
12       A.   Yes.
13       Q.   Do you know if both of those
14  gentlemen are still living and around in this
15  area?
16       A.   I think they both died.
17       MR. SCHUETTE:
18            Mr. Walker, I thank you for your
19       time.
20  EXAMINATION BY MS. MOORE:
21       Q.   Mr. Walker, my name is Blaine
22  Moore.  I have few questions for you.  I'm
23  going to break them up into two different
24  areas.
25       A.   Okay.

257

1      Q.     The first group I want to talk
2 about when you were employed by Avondale and
3 then talk a little bit about when you were
4 employed by the Navy.
5      A.     Okay.
6      Q.     For the first part, I'm going to
7 talk about when you were employed by Avondale.
8 Okay?
9      A.     Okay.
10     Q.     You talked some about Hopeman
11 Brothers and Mr. Schuette was just talking to
12 you about Hopeman Brothers.  What kind of a
13 company was that?
14     A.     Hopeman Brothers?
15     Q.     Uh-huh.  Hopeman Brothers.
16     A.     Hopeman Brothers, they was joiners.
17 They done joiner work.
18     Q.     What all does that entail?
19     A.     They install furniture, desks and
20 Pullman bunks and ceilings and walls, doors,
21 and various things like that.
22     Q.     Okay.  And do you know what years
23 Hopeman Brothers was at Avondale?
24     A.     Oh, through, I guess, from '62, '63
25 to '68, '67.

258

1      Q.     Okay.
2      A.     In that area.
3      Q.     All right.  Do you know if they
4 were there when you started at Avondale in '57
5 or '58?
6      A.     I was there before them and then
7 they came and they done the Lykes works.
8      Q.     Okay.
9      A.     On the Lykes ship, I think they
10 came.
11     Q.     When do you first remember working
12 around Hopeman?
13     A.     Around that time when I was
14 assigned to work on the Lykes ships.
15     Q.     About what year was that?
16     A.     I guess in '63 or '64, something
17 like that.
18     Q.     Okay.  And do you remember which
19 was the first Lykes vessel that you were on
20 with them?
21     A.     Yes.  That was the *Amy Lykes*.
22     Q.     Okay.
23     A.     And I'm not sure what the year was
24 but that was the first ship, I'm pretty sure.
25     Q.     Okay.  Now, I might have

259

1 misunderstood something you said to
2 Mr. Schuette.  Can you tell me what parts of
3 the vessels Hopeman employees worked on mostly?
4      A.     The employees worked on mostly?
5      Q.     The Hopeman employees.
6      A.     They worked in the quarters.
7      Q.     Okay.
8      A.     And but they did do some work in
9 the various other portions because they had
10 furniture or equipment or desks they had to
11 install and they done all the installation of
12 those products.
13     Q.     Okay.  So you said that they
14 installed furniture and doors and --
15     A.     Yes.
16     Q.     -- things like that as well as
17 doing installation of this wallboard that
18 you've been talking about?
19     A.     Yes, ma'am.
20     Q.     Do you have an opinion as to what
21 percentage of the time the Hopeman employees
22 that you worked around were installing
23 furniture and doors and things like that as
24 opposed to doing the wallboard?
25     A.     I guess -- I don't know.  I guess

260

1 50 percent of the time to install the furniture
2 and doors and all.  And, of course, they had
3 the ceilings and that's hard to guess what
4 their percentages were.
5      Q.     Okay.  And the wallboard that you
6 were talking about earlier, is there a specific
7 part of the ships that you saw them install
8 that on?
9      A.     Yes.  In the quarters.
10     Q.     And only in the quarters?
11     A.     Yes.  Mostly in the quarters.
12     Q.     Am I correct in understanding your
13 testimony that you only remember Hopeman from
14 the Lykes vessels?
15     A.     Yes, ma'am.
16     Q.     Okay.  Did you know any Hopeman
17 employees?
18     A.     I knew them but I didn't -- that's
19 a long time ago and I didn't know them that
20 well.  We worked together but it's like when
21 y'all going to leave, I'm not going to know
22 y'all names or I'm not going to know my name,
23 either.  It's going to be hard to call.
24     Q.     And what about the supervisors?
25 Did you know any of them at Hopeman?

261

1     A.    I did know -- I think one could
2  have been Frank Hamilton.
3     Q.    What?
4     A.    Hamilton.  I might be mixed up with
5  another group.  I just can't remember their
6  names.
7     Q.    Do you know if there is anybody
8  else out at Avondale, any other kind of joiner
9  contractor that worked during those same years?
10    A.    Not that I know of.
11    Q.    What about Avondale itself?  Did
12 you have any joiners that did that kind of
13 work?
14    A.    Well, Avondale had -- they had the
15 shipfitters that installed some of the ones
16 that they did.
17    Q.    Did you ever know a man named
18 Norman Lindley?
19    A.    Norman Lindley.  Not that I know
20 of.
21    Q.    Okay.  You had said that you
22 thought that the Mica board or Formica board or
23 whatever we're going to call it contained
24 asbestos.  What makes you think that?
25    A.    Well, they said it was fireproof or

262

1  fire-retardant board and thinking that, that it
2  had some kind of asbestos material in it.  It
3  was just --
4     Q.    So it's the fact that you know it
5  was fire-retardant.
6     A.    Yes, fire-retardant.
7     Q.    Other than that particular board,
8  is there any other product that Hopeman used
9  that you think contained asbestos?
10    A.    Not that I know of.
11    Q.    Do you believe that you were
12 exposed to asbestos around Hopeman employees?
13    A.    With that dust, yes.
14    Q.    Okay.  And I know that you said you
15 saw them cutting it with saws.
16    A.    Yes.
17    Q.    Do you recall them using vacuum
18 attachments on the saws?
19    A.    No.
20    Q.    Do you recall them having special
21 tables that they sawed it on?
22    A.    They had like little trestles they
23 cut it on but it would seal the dust when it
24 wasn't collected.
25    Q.    And was the cutting done -- where

263

1  was the cutting done?
2     A.    On the decks of the ships where
3  they were doing the majority of the work at.
4     Q.    Outside on the decks or inside?
5     A.    Inside and out.
6     Q.    Okay.
7     A.    Sometimes on the outer decks but
8  sometimes if the doors was open and all.
9     Q.    How often would you say that you
10 were around Hopeman employees while the cutting
11 activity was going on?
12    A.    We'd stay away from it as much as
13 possible.  But sometimes you couldn't prevent
14 it so I don't know what percent of the time.
15 We was exposed to it sometimes.
16    Q.    Okay.  What reason would you have
17 had to be in the areas where Hopeman was doing
18 the cutting while they were cutting?  What
19 would you have been doing?
20    A.    We were working on different
21 electrical equipment in the general proximity.
22 You can be in this room and they cut it in the
23 other room and it spilled over into this room.
24 The wind might have blew it or whatever.
25    Q.    Okay.

264

1     A.    You stayed as far away as you
2  could.
3     Q.    Was Hopeman's work done -- at what
4  stage of completion of the vessel?  Was it on
5  the land still or was it already in the water?
6     A.    They done some of their work on the
7  launching ways.  They put their -- all their
8  attachments and where the boards was going to
9  go and foundation some of them, and then they
10 did start some of the work.  But when they
11 launch it, the majority of the work was done
12 waterborne.
13    Q.    Okay.  Do you know who manufactured
14 that board that you're talking about that
15 Hopeman used?
16    A.    No.
17    Q.    Do you know who did inspections of
18 Hopeman's work while you were working at
19 Avondale?
20    A.    I guess the Lykes people.
21    Q.    Okay.  What about after you were
22 employed by the Navy?  Did you ever have an
23 opportunity to inspect anything that Hopeman
24 had done?
25    A.    No.

265

1    Q.    And something that I'm confused on,
2  when you were employed by the Navy, you were a
3  civilian employee, right?
4    A.    When I was working for the Navy?
5    Q.    Uh-huh
6    A.    Yes, I was civilian.
7    Q.    Okay.  But you were paid by the
8  United States Navy?  What did your paycheck say
9  on it, if you remember?
10   A.    United States Government.
11   Q.    Okay.  Do you recall while you were
12 employed by Avondale and working on those
13 ships, the Lykes ships and really any ships you
14 worked on while you were employed by Avondale,
15 any inspectors from the Maritime
16 Administration?
17   A.    ABS or Maritime?
18   Q.    Uh-huh.
19   A.    Yes, they would come in.
20   Q.    What would they do when they would
21 come in?
22   A.    I guess they would see that the
23 product was installed in accordance with
24 ASI-built drawings.  I'm not certain.
25   Q.    Did you ever have any personal

266

1  interaction with any of those people?
2    A.    No.  Occasionally, we might have
3  spoke to them but it was nothing formal.
4    Q.    When you were employed by the Navy,
5  you inspected only Navy vessels; is that
6  correct?
7    A.    That's correct.
8    Q.    Okay.  And do you know if there
9  were any government inspectors that inspected
10 the commercial vessels?
11   MS. ROUSSEL:
12       Already asked and answered at least
13   five times now.  He's not going to answer
14   it again.  Do you have any other
15   questions?
16   MS. MOORE:
17       I don't think that particular
18   question has been answered.
19   MS. ROUSSEL:
20       That question has been answered and
21   he's not going to answer it again.
22 EXAMINATION BY MS. MOORE:
23   Q.    I'm going to do it this way and all
24 it takes is a "yes" or "no."
25       Do you know whether there was any

267

1  government entity that inspected commercial
2  ships?
3    A.    Not that I know of.
4    Q.    Okay.  Do you remember the names of
5  any of the specific vessels that you inspected?
6    A.    When I was working for the Navy?
7    Q.    Uh-huh.
8    A.    The Navy ships.  I'm not certain
9  now of the names when I worked with the -- when
10 I worked for the government.
11   Q.    Or even the types of vessels, if
12 you can tell me.
13   A.    It was some DEs.  We had DEs in the
14 '80s.  We inspected cargo vessels, the oilers,
15 tankers.
16   Q.    I don't want to interrupt you.  Are
17 you still thinking?
18   A.    No.  That's it.
19   Q.    As a naval inspector, were there
20 inspectors from other governmental agencies
21 like the Maritime Commission or the Coast Guard
22 that you worked with or coordinated with when
23 doing your inspections?
24   A.    No, they didn't have them.  They
25 had Avondale inspectors but they didn't have

268

1  other inspectors from other companies and all
2  that inspected on the Navy ships.
3    Q.    When you were performing your
4  inspections when you were employed by the Navy,
5  other than the ship drawings that you were
6  talking about before that you had, were there
7  any other kind of code articles or regulations
8  or anything like that that you used or did you
9  just use the drawings?
10   A.    Drawings and test memos.
11   Q.    That was my other question.  What
12 is a test memo?  I don't know what that is.
13   A.    A test memo is when they write
14 up -- it's like a procedure to follow to do a
15 particular test on a particular piece of
16 equipment.  And it tells you step by step from
17 the beginning to the end how you are supposed
18 to proceed successfully to complete the test.
19   Q.    And who did the test memo come
20 from?
21   A.    It come from Avondale.
22   Q.    And that was like for a specific
23 piece of machinery?
24   A.    Equipment, yeah, or machinery.
25   Q.    And do you know how Avondale came

269

1   to generate the test memo?  Do you know what
2   that procedure was?
3        A.   Well, I guess they had a procedure
4   or drawing that told them that what type of
5   equipment and what the specification of that
6   equipment was, what was the voltage and
7   amperage.  And all of that was incorporated in
8   this memo so it would be easy for somebody to
9   follow step by step and to keep track of what
10  was accomplished on that particular test and
11  when it was a hundred percent complete.
12       Q.   Okay.  And so when you finished
13  doing an inspection that was either -- that
14  came to you either by way of a test memo or
15  just because you were called up to do that --
16       A.   Yes.
17       Q.   -- particular job at that time?
18       A.   Yes.
19       Q.   Who then did you report to?
20       A.   Report to Avondale personnel.
21       Q.   Okay.
22       A.   That was the Q.C. Department and
23  they presented the test memo and then the
24  equipment to look at.
25       Q.   And then after you looked at the

270

1   equipment, you reported back to them?
2        A.   Well, I was with them all the time.
3        Q.   Okay.  Did you report as well to
4   the Navy, to your commander?
5        A.   Yes.  If we had anything to report.
6   If it was satisfactory, and everything was done
7   in accordance with the test memo, then we
8   accepted it and we kept a record that that was
9   complete and then Avondale had that same
10  record.  If we had deficiencies, then we had to
11  have a follow-up inspection.
12       Q.   Okay.  And if there was a
13  deficiency, what was the procedure?  I mean,
14  would the work be halted until the time that
15  the problem was taken care of?
16       A.   They would -- sometimes the work
17  would be done if it wouldn't interfere with the
18  steps and then whatever was -- if it was a
19  deficiency, they can catch it at a later date
20  and just go look at the deficiency.  They
21  wouldn't have to go through the operational
22  portion of it if it didn't interfere with it.
23       Q.   Okay.
24       MS. ROUSSEL:
25       Does that conclude the deposition?

271

1        MS. MOORE:
2             Let me just finish looking over my
3        notes.  I think I'm done.  Thank you, sir.
4             (Whereupon a brief recess was taken
5        at this time.)
6        THE VIDEOGRAPHER:
7             This is the beginning of Tape 5 of
8        the videotaped deposition of Rudy Walker,
9        Sr.
10            Back on record on May 8, 2003.
11  EXAMINATION BY MR. BALHOFF:
12       Q.   Hi, Mr. Walker.  This is John
13  Balhoff again and I have some more questions
14  for you.  These questions are going to pertain
15  to your case.
16            Are you currently a member of any
17  clubs or organization?
18       A.   No, sir.
19       Q.   Were you -- first of all, I
20  understand -- did you have a heart attack in
21  1986?
22       A.   '86, yes.  It wasn't a heart
23  attack.  I was having a closure of my main
24  artery.  And while I was undergoing that
25  problem, I was on the operating table when they

272

1   ballooned it and they relieved the -- they
2   ballooned it and opened up the artery and that
3   lasted to '94.  Then it started to close again
4   so they reballooned it and put a stent in it.
5        Q.   Was that first operation in '91?
6        A.   No.  The first operation was in
7   '86.
8        Q.   Okay.  Well --
9        A.   In '94 I got the second one.
10       Q.   Okay.  Before you were diagnosed
11  with mesothelioma, were you a member of any
12  organizations or groups?
13       A.   Well, a health group.
14       Q.   What kind of health group?
15       A.   West Jefferson Medical Health,
16  health clinic.
17       Q.   What did you do there?
18       A.   Exercised on the tread machine and
19  some of the equipment, the weights and pulleys
20  and things like that.
21       Q.   How often did you go?
22       A.   At least three times a week.
23       Q.   Did you still exercise before 1986?
24       A.   Yes.  I exercised all my life
25  before '86.

273

1    Q.    Did you exercise less after 1986?
2    A.    No.  I exercised more after '86.  I
3    started doing more exercise.
4    Q.    When did you stop exercising?
5    A.    Well, in September of last year
6    when I got sick.
7    Q.    Did a doctor tell you not to
8    exercise or could you no longer exercise?
9    A.    I could no longer exercise.
10   Q.    Were there any other clubs or
11   organizations that you belonged to besides the
12   health clinic?
13   A.    That was it.
14   Q.    Did you have any hobbies that you
15   liked to do?
16   A.    I fished and I hunted.
17   Q.    How often did you fish?
18   A.    I fished just about all summer.
19   Q.    How often did you hunt?
20   A.    In the winter.
21   Q.    What did you hunt?
22   A.    Deer.
23   Q.    Anything else?
24   A.    Well, no.  I hunted before other
25   game but I basically settled just doing deer,

274

1    hunting deer.
2    Q.    Have you hunted and fished all your
3    life?
4    A.    Yes, sir.
5    Q.    And when did you stop hunting and
6    fishing?
7    A.    This September.
8    Q.    Did you -- when was the first time
9    you saw a doctor after you had to stop these
10   activities?
11   A.    When I had what, sir?  When I
12   started having a problem with my lungs?
13   Q.    Is that when you went to a doctor?
14   A.    Yes, I went and I went to my
15   general practitioner and was telling him that I
16   was having trouble with fluid and I was having
17   a little trouble breathing.  And he just wanted
18   to make sure I didn't have pneumonia.  So
19   that's when he gave me an x-ray and he said
20   that they had fluid in the lung but they had
21   something else he could see behind the fluid.
22   He wasn't sure.  Then he got me to do a CAT
23   scan.  In the CAT scan they found out it was
24   not only fluid, it was a mass that was growing
25   in my right lung.

275

1    Q.    When did all this testing occur?
2    A.    I guess -- I started in September.
3    Q.    Of 2002?
4    A.    Yes.
5    Q.    What doctor?
6    A.    Dr. Marina, Joseph Marina.  Jose
7    Marina.  After he done it and they diagnosed me
8    as having the cancer in my right lung, then he
9    send me to Dr. Kessler.  Then Dr. Kessler
10   started my treatments.
11   Q.    What sort of doctor is Dr. Kessler?
12   A.    He was the chemical doctor, chemo
13   doctor, he was the oncology, oncologist.
14   Q.    Before we get back into the meds,
15   did you have any other hobbies that you did
16   before September 2002 other than hunting and
17   fishing?
18   A.    Hunting and fishing were my biggest
19   hobbies.
20   Q.    Were there any other hobbies?
21   A.    Working at my places in the yard,
22   the garden, planting and doing regular work.
23   Q.    Okay.
24   A.    My hobbies, I guess, was with my
25   children, too, my grandchildren.  And I lost

276

1    all of that.  I have nothing left but only my
2    wife to take care of me.  She's got to even
3    bathe me and feed me, too.  I'm almost like an
4    invalid and that only happened in a short
5    period of time.
6    Q.    Can you still walk?
7    A.    I walk occasionally.  I walk with
8    my walker.  I need it.  Then she puts me in a
9    wheelchair.  If I got to go to the hospital and
10   all, I need my oxygen and my wheelchair.  If I
11   go from one end of the house to the other, she
12   has to transfer me.  She helps me to make sure
13   I don't fall with that walker because I fell
14   when I was in the hospital.
15   Q.    So you can't walk without your
16   walker?
17   A.    I'm not stable.  Sometimes my feet
18   leaves me for whatever reason.  I get off
19   balance.
20   Q.    When did you start chemotherapy?
21   A.    I guess in October sometime and in
22   the summer was like a six-hour chemo.  They
23   would put in this catheter here and it was a
24   drip that they stick in here and it comes off
25   of a pole and it drips in there.  They said it

277

1    took six hours for one of the treatments
2    (indicating).
3         Q.    How often do you do those
4    treatments?
5         A.    That was twice a week, every
6    Monday. And then when I had to go back and get
7    fluids because I couldn't eat nothing so I
8    wouldn't dehydrate. I would have to go back
9    the next day, sometimes two and three days
10   after the treatments to get the fluid, the
11   saline solution to keep me from dehydrating.
12        Q.    Have you been doing the
13   chemotherapy treatments continuously since
14   October two times a week?
15        A.    No. They stopped it and then they
16   started it again along with the radiation. The
17   radiation lasts for, I think, almost six weeks,
18   every day with the radiation.
19        Q.    Okay. When did the chemotherapy
20   stop?
21        A.    Sometime in January. It was around
22   in January -- December, around Christmas in
23   January, I guess. And then after that, I had a
24   little break for a little period of time and
25   then he started me off on the chemo and then

278

1    the radiation lasted longer than chemo. They
2    was doing that together and then the chemo
3    stopped and then they continued on the
4    radiation. It burns -- that radiation -- the
5    chemo at first made my stomach so nauseated and
6    on fire that I couldn't eat nothing. I have to
7    heave. After I finish that, the radiation --
8    what -- they did the whole lung back and front
9    and it burned the throat and esophagus all the
10   way to the stomach. I still couldn't eat
11   because I couldn't swallow. In fact, my throat
12   is still hurting right now from the same stuff.
13   That was three weeks ago, four weeks ago, last
14   treatment. They burn it, blister the back and
15   the front.
16        Q.    Mr. Walker, have you ever been
17   vaccinated against polio?
18        A.    Yes. I took an oral vaccine with
19   the sugar cube.
20        Q.    When was that?
21        A.    Oh, I guess in -- when they was
22   going around with this polio thing. I went to
23   the little school, I think, in Bridge City or
24   whatever and they put it in your mouth.
25        Q.    So it was by a sugar cube?

279

1         A.    Sort of like a sugar, a dose.
2         Q.    Okay. Are there any other doctors
3    who have treated you besides Dr. Kessler and
4    Marina?
5         A.    And Dr. Kraus.
6         Q.    Kraus. What sort of doctor is he?
7         A.    He's the one that done the
8    radiation.
9         Q.    Are you still seeing Dr. Marina?
10        A.    Yes.
11        Q.    Are you still seeing Dr. Kraus?
12        A.    Yes.
13        Q.    Are you still seeing Dr. Kessler?
14        A.    Yes. I got to see a urologist next
15   week. They have to do a procedure on my
16   prostate to relieve some pressure on that
17   because I been having spasms.
18        Q.    Back -- okay. Back in 1973 or '74
19   is when you said some of the Navy doctors told
20   you you had some pleural thickening; is that
21   right?
22        A.    Yes. I think, yes, sir.
23        Q.    Did you have any sort of
24   symptoms --
25        A.    No symptoms at all. I didn't feel

280

1    nothing. I didn't have no feeling until
2    September.
3         Q.    So that's the first time you had
4    any symptoms association with pain in your
5    lung?
6         A.    I used to jog and everything else.
7    Sometimes I jog for an hour. On the tread
8    machines. I got weight equipment in my room
9    over there, tread machine, the bicycle and all.
10   I'd run on the street, never had no association
11   at all. My lungs are strong. I thought my
12   lungs would be good. I never had a problem
13   with my lungs.
14        Q.    Had you ever had bronchitis?
15        A.    No.
16        Q.    Never had any other kind of cough?
17        A.    No coughs at all. I started
18   coughing in September. It was like it was all
19   of a sudden. Last week they took two big
20   things of fluid out of my right lung. They
21   were supposed to have sealed it with some kind
22   of green or blue stuff that they pumped in
23   there and they slushed me around for about four
24   hours to get it to work in there.
25        Q.    When did you stop working,

281

1   Mr. Walker?
2       A.      In '97, '98.
3       Q.      You just -- did you just decide to
4   retire?
5       A.      To retire.  I wanted to retire.
6       Q.      And were you working for the Navy
7   up until then?
8       A.      That's correct.
9       Q.      Do you receive benefits from the
10  Navy?
11      A.      Yes.
12      Q.      How much do you get, let's say,
13  like per month?
14      A.      My pension I get, I guess, about
15  almost $3,000 a month on that -- 2,000 a month.
16  She knows more about it than that.  She does my
17  bills.
18      Q.      It's nice to have an accountant.
19      A.      She's my accountant.  I don't know
20  what I'd do without her.  I'm on Social
21  Security, too.
22      Q.      Let me go to -- first of all, I
23  assume as a Navy inspector, I think you said
24  that you never handled wire and cable as a Navy
25  inspector; is that correct?

282

1       A.      We didn't pull cable, no.
2       Q.      Did you handle it in any other way?
3       A.      No kind of way.  Just to look at
4   it, that's all, you know.
5       Q.      Since you usually inspected it
6   after the ship was complete, you weren't around
7   workers working with -- other workers working
8   with wire and cable, were you?
9       A.      No, sir.  They was all complete
10  then and we would go look at a completed work.
11      Q.      I think you -- well, we were
12  focused on Mr. Fremin before.  I assume as an
13  electrician during your years while you were
14  employed at Avondale, you cut wire and cable,
15  too; is that correct?
16      A.      Yes.
17      Q.      Did you also -- did you ever cut it
18  with a hacksaw?
19      A.      Yes, I did.
20      Q.      Did you also use a big tool with
21  the handles?
22      A.      Yes.
23      Q.      Did you use any other tools?
24      A.      And the pliers, side cutters and
25  those dikes and stick-on pliers to cut them.

283

1       Q.      Those were used to cut wire or
2   cable?
3       A.      Well --
4       Q.      Or both?
5       A.      Both.  You can use both, I guess.
6       Q.      Okay.
7       A.      We used them on both.
8       Q.      About how many seconds could you
9   cut through a piece of wire with some cutters?
10      A.      It depends on how strong you are.
11      Q.      I'm talking wire, not cable.
12      A.      The little wire?
13      Q.      Yes, sir.
14      A.      Just like a snap on, you know.
15      Q.      How long did it take to cut through
16  some cable with the bigger cutters?
17      A.      Oh, maybe a minute or so to get
18  everything lined up and all and sized and
19  get -- you had to pull it down because
20  sometimes it was hard to get it through.
21      Q.      But again, was that just cut with a
22  snap?
23      A.      Yes, it was cut on a snap just like
24  you cut it.  It gives you more leverage on the
25  bigger wire.

284

1       Q.      And about how long would it --
2   well, did you ever use a hacksaw on wire?
3       A.      On the bigger wire, big cable,
4   yeah.
5       Q.      Not the cable, the wire?
6       A.      The wire, yeah.
7       Q.      You used a hacksaw to cut wire?
8       A.      Yes.  It all depends what size it
9   was because you couldn't cut the bigger wire
10  like a Number 10 with those pliers because it
11  wouldn't fit around the cable.  You would have
12  to get something that was easier, you can cut
13  through it or, you know, large enough to cut
14  the wire.
15      Q.      That --
16      A.      Or you wasn't strong enough to cut
17  the larger wire.
18      Q.      For that larger wire, would you say
19  you more often used a hacksaw or more often
20  used the big cutters?
21      A.      The larger wire?
22      Q.      Yes, sir.
23      A.      I would use the wire cutters if
24  they were available.  If nobody took them off
25  the rack, you'd use that or you had to bring

285

1  your hacksaw.  Generally, they had one that was
2  available you could cut.
3      Q.    What percentage of the wire that
4  you cut do you think you ever had to use a
5  hacksaw?
6      A.    Hacksaw, not that big of a percent.
7      Q.    Less than 5 percent?
8      A.    Yes, about 5 percent, maybe 10.
9  The majority of them was with the cutters.
10     Q.    For the cable, would you usually
11 use the cutters over the hacksaw?
12     A.    Yes.  It would be easier.  The
13 cutters would be easier for my choice anyway.
14     Q.    What percentage of the times do you
15 think you used the hacksaw for wire?  Would it
16 be less than 5 percent again for that?
17     A.    Yeah.  I wouldn't use it unless I
18 really had to.
19     Q.    So less than 5 percent?
20     A.    As less as I could.
21     Q.    Okay.  As less as you could.
22           Did you personally every strip wire
23 and cable?
24     A.    Yes, I did.
25     Q.    What did you use to strip it with?

286

1      A.    With the pliers to cut the sheeting
2  and the knife to ring it and cut it down, a
3  sharp knife.
4      Q.    How often would you have to strip
5  cable or wire?
6      A.    As often as you made a connection.
7  If you had so many wires in a box, they had to
8  be cleaned and served before you could connect
9  them.  So if you had four wires in a box or
10 five wires in a box or if it was a big panel,
11 it might have ten, fifteen circuits in it.  All
12 those have to be stripped and cleaned to a
13 certain length in a box and then you had to --
14 each one had to be served like that, cut and
15 served with the knife and the pliers.
16     Q.    Okay.  Whenever you were --
17 whenever cable had to be stripped, would you
18 ever just get an electrician's helper to do
19 that for you?
20     A.    Oh, no.  You done that yourself,
21 too.  The electrician's helper did that, also.
22 You both done it.  He did the work, too.  It
23 was basically the same thing.  One works on the
24 piece of equipment and he just didn't do a
25 certain thing and stop and let somebody

287

1  continue on.  You worked on a particular box
2  and you completed the work.
3      Q.    While you were an electrician or an
4  electrician's helper at your time at Avondale,
5  while you were employed at Avondale, did you
6  perform tasks with wire and cable other than
7  stripping and cutting?
8      A.    Yes.  Pulling and strapping.
9      Q.    Okay.  Did you lay conduit?
10     A.    Condo?
11     Q.    Conduit.
12     A.    No, no conduit.  They didn't
13 have -- very little conduit in the ship if they
14 had any.
15     Q.    As part of your job, did you have
16 to read blueprints?
17     A.    Yes.
18     Q.    Okay.  Did you read a blueprint
19 every day?
20     A.    Yes.  Sometimes you refer to the
21 print on a regular basis, on an hourly basis as
22 much as you can remember a circuit to pull
23 where you were going to pull it from and what
24 circuit you were on and you kept track of what
25 circuit you finished when you pulled it and

288

1  tagged the wire.  And they come back to the
2  next one and did the same thing until you did
3  whatever, you know, you was working on.  That
4  was done in accordance with the drawing.
5      Q.    Did you look at the blueprints on
6  board ship or off ship?
7      A.    On board.  You took them on board
8  ship or off board, too, if you had a need to
9  but you brought them with you on a ship.
10     Q.    How much time during a typical
11 workday do you think you spent looking at
12 blueprints or schematics?
13     A.    Oh, I guess at least 10 percent of
14 the time or sometime more frequently if you
15 have to refer to it to make sure that you was
16 doing the correct installation.
17     Q.    Can you put a time evaluation on
18 it?
19     A.    To put a time it's maybe 10 to 15
20 percent of the time during the day you looking
21 at the drawing and then you have to keep
22 referring a lot of time to it to find out what
23 circuits you have completed and what you was
24 going to do next.
25     Q.    Okay.  So while you were looking at

289

```
1    these blueprints and schematics, you weren't
2    being exposed to cut wire and cable, were you?
3         A.    No, sir.
4         Q.    Okay.  Could you have been being
5    exposed to other asbestos-containing products
6    when you were looking at the blueprints?
7         A.    Working in on an area, that's
8    correct.
9         Q.    Did you ever install cable tray?
10        A.    It was wireways.  It wasn't trays.
11        Q.    What did you call them?
12        A.    Cableways or wireways.
13        Q.    Cableways?
14        A.    Yes.  It wasn't a tray like you
15   would think.  It was hangers, cable hangers.
16        Q.    Okay.  Well, how frequently did you
17   -- did you perform that daily?
18        A.    Pulling the cable, right.
19        Q.    I'm talking about installing the
20   ways, cable or wireways.
21        A.    No.  They were installed by the
22   layout people.
23        Q.    So you did not install --
24        A.    The wireways.
25        Q.    -- wireways?
```

ONE SHELL SQUARE, SUITE 250 ANNEX     **HUFFMAN & ROBINSON, INC.**     (504) 525-1753
NEW ORLEANS, LOUISIANA 70139              CERTIFIED COURT REPORTERS          (800) 749-1753

290

```
1         A.    Just the wires in the wireways.
2         Q.    Okay.  Well, did you ever pull the
3    wire or cable through the ways or the conduit?
4         A.    Yes, through the wireways.  I
5    pulled it through the wireways.
6         Q.    How much of your day do you think
7    you spent pulling cable?
8         A.    Oh, it's hard to say.
9         Q.    Or wire?
10        A.    Sometimes you have all the wires
11   pulled and all you done is done the connectors,
12   connection that afternoon or the next day.  And
13   it all depends on how much wire you pull and
14   what you was going to do.  You plan your work
15   on how much wire you was going to pull and then
16   finish up the circuits and start cutting in,
17   hooking up.  So it was -- it could have been
18   any kind of percent on a daily basis.
19        Q.    Do you have an average percentage?
20        A.    The cable, I guess, didn't take as
21   long to do if you didn't have to strap it and
22   all to hook it up.  Sometimes, a lot of times a
23   lot of your work was tedious hooking it up.
24        Q.    Okay.  But can you estimate what a
25   typical day of pulling cable would last?
```

ONE SHELL SQUARE, SUITE 250 ANNEX     **HUFFMAN & ROBINSON, INC.**     (504) 525-1753
NEW ORLEANS, LOUISIANA 70139              CERTIFIED COURT REPORTERS          (800) 749-1753

291

```
1         A.    Maybe 50 percent or 40 percent of
2    the day.
3         Q.    Fifty percent or 40 percent would
4    be pulling cable?
5         A.    Yes.
6         Q.    And you weren't being exposed to
7    cut wire and cable when you were pulling it,
8    were you?
9         A.    No.  It was just when you was
10   cutting it.
11        Q.    Okay.  You said but when you were
12   pulling it, you could have been exposed to
13   other asbestos-containing products or asbestos
14   dust; is that right?
15        MR. BROWN:
16             Object to form.
17        MS. SCHEXNAYDER:
18             I join in.
19        MS. LUKER:
20             Please make the record that all
21        objections, whether made by one or more
22        attorneys apply to all parties.
23        MS. ROUSSEL:
24             How does that work when a defendant
25        is actually asking the question?
```

ONE SHELL SQUARE, SUITE 250 ANNEX     **HUFFMAN & ROBINSON, INC.**     (504) 525-1753

292

```
1         MS. LUKER:
2              Okay.  I amend it to say any
3         defendant who makes a objection makes it
4         for all so we don't have to repeat and
5         have this echo effect.  Thank you for
6         correcting my mistake, Ms. Roussel.
7         MS. ROUSSEL:
8              I was just trying to determine how
9         that would work when a defendant's
10        attorney was asking a question to which
11        you were objecting.
12        MR. BALHOFF:
13             During my line of questioning, I'll
14        bow to objections other people are making
15        to my questions.
16   EXAMINATION BY MR. BALHOFF:
17        Q.    To your knowledge, were you exposed
18   to any asbestos-containing products or asbestos
19   dust while you were pulling wire or cable?
20        A.    I'm sure I was because it was in
21   the area.  The pipefitters was there.  I mean
22   the insulators was there insulating.  We had
23   insulating material that was in the area.
24        Q.    Okay.  I assume another part of
25   your job would be connecting wire or cable to
```

ONE SHELL SQUARE, SUITE 250 ANNEX     **HUFFMAN & ROBINSON, INC.**     (504) 525-1753
NEW ORLEANS, LOUISIANA 70139              CERTIFIED COURT REPORTERS

293

1    terminals; is that right?

2        A.    Yes.

3        Q.    About how much of your workday do

4    you think you spent doing that?

5        A.    It's hard to say.  It was all part

6    of a day's work.  We never kept track of a

7    particular percent of what you done and what

8    you accomplished.  It was all part of the work.

9        Q.    Okay.  Let me go through these

10   tasks and see if you've done them.  Have you

11   ever sealed connections between wire and cable

12   to prevent air or water from getting in?

13       A.    Yes.  The terminals, yes.

14       Q.    Have you ever tested the electrical

15   connections -- and this is all again during

16   your Avondale employment as an electrician --

17   have you ever tested electrical connections to

18   see whether the current was flowing?

19       A.    Yes.  With the amp meter, yes.

20       Q.    Okay.  Have you ever -- I assume

21   you installed lights, fixtures, receptacles and

22   switches?

23       A.    Yes.

24       Q.    All those?

25       A.    Yes.

294

1        Q.    Okay.  As part of your job, would

2    you hook up motors?

3        A.    I would hook up motors.

4        Q.    Would you hook up machines and

5    other equipment?

6        A.    Mostly motors, no machinery.

7        Q.    Okay.  Any other equipment besides

8    motors would you hook up?

9        A.    They were all motor controllers but

10   no -- nothing mechanical.

11       Q.    Okay.  Did you ever rewind motors?

12       A.    No.

13       Q.    We talked about testing some of

14   your wiring.  But did you ever inspect and test

15   other machinery?

16       A.    Other than electrical, no.

17       Q.    Did you install floor boxes?

18       A.    Floor box?

19       Q.    Floor boxes.

20       A.    I'm not certain what that is.

21       Q.    Okay.  Did you ever cut holes

22   through the walls or ceilings to put wire or

23   cable through?

24       A.    No.  The layout people used to do

25   it for me.

295

1        Q.    Okay.  Did you ever erect

2    scaffolding while you were working?

3        A.    No.

4        Q.    Were you carrying -- did you spend

5    part of your day carrying supplies to and from

6    the job?

7        A.    Yes.  We would have to go get some

8    of our equipment.

9        Q.    Like what?

10       A.    Electrical boxes, lugs and bolts

11   and nuts and tape, the things that we used

12   during the process of installing electrical

13   equipment.

14       Q.    Where was all that equipment kept?

15       A.    On the dock.

16       Q.    On the wet docks?

17       A.    The shops on the wet dock.

18       Q.    And in the shops?

19       A.    In the shops, yes.

20       Q.    How far away was the shop?

21       A.    Well, sometime it was the width

22   that was on by the -- on the side by the

23   wharfs, maybe a hundred foot from where the

24   ship's gangway.

25       Q.    Did you ever unload trucks?

296

1        A.    No.  Unless we had a lot of

2    equipment that we received and they would call

3    us off to give the other people a hand on it

4    but it wasn't a general duty of ours to unload

5    the trucks.

6        Q.    Okay.  Did you clean your tools at

7    the end of the day?

8        A.    Yes.  Wiped them off.

9        Q.    By the way, what was the length of

10   the average workday for you?  When did you

11   start?

12       A.    I worked sometimes it was eight,

13   twelve and sixteen hours, sometimes seven days

14   a week we worked.  It all depends on the amount

15   of work and what kind of job they want us doing

16   and if they would let us go home.

17       Q.    Was your normal workweek five days,

18   though?

19       A.    Well, at first the normal work was

20   a five-and-a-half-day week but the average, it

21   was not a norm.  It was -- they would tell you

22   that you had to work on Saturdays and Sundays

23   so they worked seven days a week.  It all

24   depends.  The majority of the times when I

25   worked there, I worked a lot of overtime.  I

297

1  worked a lot of overtime on various ships.
2      Q.    Was that required overtime?
3      A.    Well, it was overtime that they
4  would ask you to work.  And you worked for the
5  extra money.  But they didn't like for you to
6  take off.
7      Q.    Okay.  Would taking off a weekend
8  be considered taking off?
9      A.    Yes.  They wouldn't like that if
10 they needed you.  And they're the ones that
11 said if they needed you or not or knew that
12 they needed you.
13     Q.    Was part of your job ever doing any
14 paperwork?
15     A.    Just keeping track of what you
16 accomplished.
17     Q.    You had to keep your own log?
18     A.    A little paper log, yes.  I
19 remember doing one when I was an electrician.
20     Q.    Did you just keep your own time or
21 were you responsible for others?
22     A.    I kept my -- well, I didn't keep my
23 time.  I give my time to my supervisor and he
24 kept logging my time.
25     Q.    So what exactly were you logging?

298

1      A.    I would clock in the morning and
2  give him my cards and then that was it.  That
3  was my time card
4      Q.    Okay.  So is that -- when I asked
5  if you ever did paperwork, are you just
6  considering the paperwork giving your time card
7  to your supervisor or did you have other
8  paperwork?
9      A.    I had other paperwork that I kept
10 for my own record.
11     Q.    What sort of things did you record
12 in your records?
13     A.    Oh, what I had done and what jobs I
14 had to do.
15     Q.    Did you do that every day?
16     A.    I wrote it in a little notebook,
17 yes, and kept it in my record.
18     Q.    Were you ever responsible for
19 ordering materials?
20     A.    Yes, I had materials I had to
21 order.  I'd write it down and what I had to go
22 get and make a list and then either got it by
23 the workshop or told the expeditor that we
24 didn't have it and he would keep a record what
25 we needed, what was on order.

299

1      Q.    Did you ever have meetings during
2  the workday?
3      A.    Periodically when the supervisor
4  wanted to tell us something important or tell
5  us something that was going on.
6      Q.    Did you have them more often than
7  once a week?
8      A.    Just about once a week.
9      Q.    How long did these meetings usually
10 last?
11     A.    Not too often -- not too long.
12 Maybe fifteen minutes at the most.
13     Q.    How long did it take you to drive
14 to and from work every day?
15     A.    About a half an hour.
16     Q.    Both?  Is it half an hour just to
17 get there or fifteen minutes to get there?
18     A.    About, I guess fifteen minutes to
19 half an hour like from driving here to
20 Avondale.
21     Q.    Yes.
22     A.    It all depends on the traffic.
23 Sometimes you get to the corner and it was
24 blocked and you stay there for an hour or so or
25 it might be clear way and you can drive

300

1  straight through.  Same thing with the
2  knock-off time.  Sometimes if you get ahead of
3  time when everybody was knocking off, you would
4  be caught in their traffic jam or sometimes
5  they would leave, a lot of people would leave
6  before you and it wouldn't be so bad.  It can
7  be a half an hour to hour or hour and a half
8  just from this road from Avondale.
9      Q.    Okay.  Did you ever have any
10 on-site training at Avondale?
11     A.    No.  Just basic.  That's all.  Like
12 in the drawings, they showed us how to read the
13 drawings, our supervisors and mechanics who
14 were working for them.  They showed us
15 basically and from there, we learned but they
16 didn't have no schools at that time at
17 Avondale.
18     Q.    Okay.  We've just gone through
19 about 25 different job activities most of which
20 you did on the job.  I would guess, is it true
21 that all of these other things took up the bulk
22 of your day rather than cutting wire?
23     MS. ROUSSEL:
24        I'm going to object to the form of
25     your question.  Driving to and from work

---

**301**

was not even part of his workday.  What
are you asking him?  I'm objecting to the
form of your question.
     MR. BALHOFF:
          Thank for talking.
     MS. ROUSSEL:
          You're welcome.
EXAMINATION BY MR. BALHOFF:
     Q.   I've gone through all these
activities and the ones you said that were part
of your job, about how much of your workday
compared to just cutting wire and do you think
that took up?
     A.   Just cutting wire and cable?
     Q.   Yes.
     A.   I guess about 30 percent,
35 percent.  I'm not sure exactly what percent.
I never kept track of how much time it took to
do anything.
     Q.   So even though cutting wire and
cable with those cutters would only take a few
seconds to about a minute, that would take up
30 percent of a twelve-hour workday?
     MS. ROUSSEL:
          Let me object to the form of the

**302**

question.  When you say "cutting," are you
including skinning, are you including
cutting with the hacksaw?  I'm objecting
to the form of your question.  That needs
to be clarified.
     A.   The skinning took a lot longer.
EXAMINATION BY MR. BALHOFF:
     Q.   I'm not talking about stripping.
I'm talking about --
     A.   Just cutting the wire?
     Q.   Yes.
     A.   That didn't take long at all.  That
wasn't a big task to do.  It was a task that
you had to go through the process of doing,
accomplishing, but it wasn't something that it
took a long time to do.  But it had to be done.
     Q.   Did you ever -- do you still think
it took 30 percent of your time --
     A.   To cut the wire?
     Q.   -- to cut the wire?
     A.   Maybe not, maybe not that much.
I'm not sure, like I'm saying right now.  I'm
not sure it was that big of a percentage.
Because I was thinking about you was talking
about cutting and skinning and serving the

**303**

wires and all.  Just cutting the wire, no, it
wasn't that long a period of time.
     Q.   Okay.  Whenever you pulled wire,
did you ever kind of grease it or lubricate it
up with soap of any other grease?
     A.   No.  It was just an opening.  We
never used that.
     Q.   Did you ever have any cable or wire
pulls as long as a hundred feet?
     A.   Yes.
     Q.   Or longer?
     A.   Or longer.
     Q.   And about how long would it take to
pull a hundred feet of cable?
     A.   Well, if we had to open a wireway,
it wasn't -- maybe a hour or so if it was tied
down and all.  It all depends how many wires
they had in a wireway.  If they had plenty in a
wireway, you had a lot of interference and how
high it was is to get around through it, to
pull it through it.  It took a lot longer
sometimes for a hundred foot than it did when
you had a clear wireway.  It all depends on the
circumstances of what you was doing.  If the
wireway was an empty one, it went a lot faster

**304**

than if it was half full or completely full.
     Q.   About what's the longest pull,
about how many feet of wire or cable do you
think you ever did?
     A.   I guess a hundred, hundred-
something foot.
     Q.   You don't think you ever got much
longer than a hundred feet?
     A.   Not too much longer.  It's harder
to handle after.  The smaller wires you can
pull but the bigger wires you can't.  When you
get a longer piece, they always had somebody to
help you pull the wire.
     Q.   Were you ever given respirators at
Avondale?
     A.   No, sir.
     Q.   Do you know whether you were ever
exposed to any other chemicals at Avondale?
     A.   I guess paint fumes.
     Q.   Paint fumes?
     A.   And welding fumes.  That's
chemicals.
     Q.   How about silica?
     A.   Not that I know of.
     Q.   Was there ever aluminum dust there?

305

1     A.    I guess they had aluminum on the
2  wire because you get aluminum particles on your
3  skin but I don't know what the silica is.  It's
4  aluminum paint.  I'm not sure.
5     Q.    Okay.  Do you know whether you have
6  submitted a claim to the Johns-Manville
7  Personal Injury Settlement Trust?
8     A.    No, I never filed nothing.
9     Q.    Just so I can make sure, when you
10 were testifying as to some of the Okonite wire
11 and cable, earlier you testified as to what Mr.
12 Fremin was working with; is that right?
13    A.    Yes.
14    Q.    Did you generally work with the
15 same types of Okonite wire and cable that
16 Mr. Fremin worked with?
17    A.    Yes, I'm certain I did.
18    Q.    Are there any instances that you
19 would have worked with other Okonite wire and
20 cable that he did not work with?
21    A.    That was the only cable, the
22 Okonite that I was familiar with that was at
23 the shipyard.
24    Q.    When you would -- whenever you cut
25 wire and cable, I'm talking about with the

ONE SHELL SQUARE, SUITE 250 ANNEX    HUFFMAN & ROBINSON, INC.    (504) 525-1753
NEW ORLEANS, LOUISIANA 70139    CERTIFIED COURT REPORTERS    (800) 749-1753

306

1  clippers, did you hold onto the cable or wire?
2     A.    Well, the bigger ones, no.  You
3  grabbed it and you put the jaws on it and you
4  had to sometimes put it on your chest and pull
5  it down with both arms to cut it.  You needed
6  the leverage.  It was hard to hold the cable
7  and the cutters, too, so sometimes you had to
8  turn loose one of them and it was the cable and
9  you chopped it off.
10    Q.    When you cut smaller wire with the
11 clippers, would that be anywhere near your
12 face?
13    A.    In some cases, yes, it would be
14 right close to your face.  You were under the
15 box and you would cut it.
16    Q.    Why would you need to hold it up
17 close if you were under the box?
18    A.    Well, if you were up -- if the wire
19 was there and you pulled it and you wanted to
20 cut the end off, you was on the ladder to reach
21 it, then you cut -- you was underneath and you
22 would clip it.  You would cut the wire.
23    Q.    Okay.  Were there any other
24 instances other than when you had to get up on
25 a ladder when you would have been cutting it

ONE SHELL SQUARE, SUITE 250 ANNEX    HUFFMAN & ROBINSON, INC.    (504) 525-1753
NEW ORLEANS, LOUISIANA 70139    CERTIFIED COURT REPORTERS    (800) 749-1753

307

1  with the wire close to your face?
2     A.    That would be one.  If you would be
3  in a terminal box or junction box.  But on a
4  distribution box when you was cutting it, you
5  were close as your arm's length, I guess, in
6  cutting it and you would be close to the wire.
7     Q.    Okay.
8     A.    Sometimes it is a pretty good size
9  piece you would have to strip.
10    Q.    Do you think generally you had,
11 whenever you cut wire, that it was close to
12 your face or not close to your face more often
13 than not?
14    A.    It was more often it was close to
15 it.  You didn't reach for.  You was always
16 close.  That's where you had the strength, I
17 guess.  And it was in the general proximity of
18 that area.
19    Q.    When you were working with wire and
20 cable, were you conscious of whether you were
21 working with Okonite cable or Rockbestos cable
22 or General Electric cable?
23    A.    It's -- particularly on the reel,
24 it was hard to tell one from the other.  They
25 looked alike.  If you just skinned them, the

ONE SHELL SQUARE, SUITE 250 ANNEX    HUFFMAN & ROBINSON, INC.    (504) 525-1753

308

1  materials in it all looked the same, you know,
2  the braids.  Some of them had a little variance
3  in the color but it was not a really -- it
4  wasn't a distinct thing that you can really
5  tell one from the other.
6     Q.    So you weren't trying to --
7     A.    I wasn't trying to identify which
8  one.  You either pull one or the other.  If you
9  went to reel it, it was one type or another,
10 you didn't say I'm just going to use this kind
11 of wire rather than that kind of wire.
12    Q.    Do you know whether Okonite or
13 Rockbestos or General Electric wire and cable
14 were used more than the others?
15    A.    No.  Whatever they bought, I guess,
16 for the job.
17    MS. ROUSSEL:
18        Let me object to the form of the
19        question.  Mr. Walker, listen to what he's
20        asking you.  You have only identified
21        those three types of products.
22    MR. BALHOFF:
23        That's all I asked about.
24    MS. ROUSSEL:
25        Okay.  Well, then I misunderstood

ONE SHELL SQUARE, SUITE 250 ANNEX    HUFFMAN & ROBINSON, INC.    (504) 525-1753

309

```
1         your question.
2         THE WITNESS:
3              That's the only ones we were
4         familiar with.
5    EXAMINATION BY MR. BALHOFF:
6         Q.   Right.
7         A.   Yes.
8         Q.   Okay.  So do you have any idea what
9    percentages of those three cables were used at
10   Avondale?
11        A.   No.
12        Q.   Or wires?
13        A.   Or wires.  Percentages, I don't
14   know if they bought them in bulk or if they
15   bought them in whatever.  I'm not -- I don't
16   know.  I didn't purchase it.
17        Q.   You said that you removed Eagle
18   products sometimes; is that correct?
19        A.   Eagle asbestos?
20        Q.   Yes.
21        A.   Yes.
22        Q.   When you removed Eagle products,
23   did it --
24        MS. ROUSSEL:
25              Eagle asbestos products.
```

310

```
1         A.   Yes.
2         MR. BALHOFF:
3              Okay.
4         MS. ROUSSEL:
5              Let's go off the record a minute.
6              (whereupon a discussion was held off
7         the record.)
8         THE VIDEOGRAPHER:
9              We're back on record.
10   EXAMINATION BY MR. BALHOFF:
11        Q.   Did the McCarty products that you
12   removed --
13        MR. GUIDRY:
14              Objection to form.
15        A.   The Marinite board, the board
16        that --
17   EXAMINATION BY MR. BALHOFF:
18        Q.   You had identified that you removed
19   McCarty products?
20        MR. GUIDRY:
21              Objection to form.  He never said
22        that.
23        A.   That I removed some of the stuff?
24        MS. ROUSSEL:
25              McCarty.  That's what he said.
```

311

```
1         MR. GUIDRY:
2              Objection to speaking objection.
3         MS. ROUSSEL:
4              He's asking the question to be
5         reasked again.
6    EXAMINATION BY MR. BALHOFF:
7         Q.   Was there dust released when you
8    removed McCarty products?
9         MR. GUIDRY:
10              Objection to form.
11        A.   The McCarty products, that was
12        the -- that was the board, the Micarta board
13        you're talking about?
14   EXAMINATION BY MR. BALHOFF:
15        Q.   Well, I don't know.  We might be
16   mixing up products now.  All I know is that you
17   had said the word "McCarty" before.  Are you
18   now unfamiliar with the McCarty product?
19        A.   No.  I'm not unfamiliar with the
20   insulation material, but I don't know what
21   you're referring to now.
22        Q.   Okay.  Did you ever remove McCarty
23   insulation material?
24        A.   McCarty?
25        Q.   Yes, sir.
```

312

```
1         A.   No, sir.
2         Q.   Okay.  Did you ever remove any
3    Reilly-Benton product?
4         MS. GIUGNO:
5              Object to form.  I am going to also
6         at this point, I'm going to reserve all of
7         my defenses as to Reilly-Benton.  And I'll
8         object to form.
9         MS. ROUSSEL:
10              What does that mean?
11        MS. GIUGNO:
12              That means I reserve my objections
13        and my defenses and reservations.  That's
14        it.
15   EXAMINATION BY MR. BALHOFF:
16        Q.   Did you remove Reilly-Benton
17   products?
18        MS. GIUGNO:
19              Object to form.
20        A.   To remove it?
21   EXAMINATION BY MR. BALHOFF:
22        Q.   Yes.
23        A.   I might not have removed that.
24        Q.   Okay.
25        A.   Micarta, that was that insulation,
```

313

1  the Eagle asbestos and McCarty and
2  Reilly-Benton was the material that you were
3  referring to.  But I don't know what you were
4  saying.  Sorry about that.
5       MR. GUIDRY:
6            Objection, nonresponsive.
7       MS. GIUGNO:
8            Objection.
9       MR. BALHOFF:
10           Those are all the questions I have
11      for you.
12  EXAMINATION BY MR. CAHN:
13       Q.    Mr. Walker, my name is Cory Cahn.
14  I represent General Electric Company.  I assure
15  you I don't want to be here one minute more
16  than you want me to.
17           Earlier you mentioned G.E. boilers.
18  I have represented G.E. for some time.  To my
19  knowledge, they never manufactured boilers.  Is
20  it possible you were mistaken?
21       A.    I think I was probably mistaken.
22       Q.    You also mentioned having worked
23  around G.E. wire and cable while you were an
24  electrician at Avondale; is that correct?
25       A.    Yes.

314

1       Q.    When is the earliest you recall
2  working around G.E. wire or cable?
3       A.    I guess when I became an
4  electrician.
5       Q.    And when was that?
6       A.    In '56, '57.  When I got the job as
7  an electrician in '57.
8       Q.    Now, you worked with G.E. wire and
9  cable, Rockbestos and Okonite wire and cable;
10  is that correct?
11       A.    That's correct.
12       Q.    How could you tell one from the
13  other?
14       MS. ROUSSEL:
15           He's already answered that.
16       A.    The only way was on the cable
17  reels.
18  EXAMINATION BY MR. CAHN:
19       Q.    What was on the reels that told you
20  it was one or the other?
21       A.    The tags.  Some of them were
22  written on the reels in big writing.
23       Q.    Was there G.E., the name G.E. on
24  any of the reels?
25       A.    I think so.

315

1       Q.    You say you think so?
2       A.    I can't recall if the name was G.E.
3  but it was General Electric cable.
4       Q.    Let me ask you with respect to the
5  reel or the spool, was it G.E.?  Did it say
6  General Electric Company or did it say
7  something else?
8       A.    One of them had like a lightning
9  bolt on it, a red lightning bolt, and I can't
10  recall exactly the name, if they called it G.E.
11  or General Electric but I think that's the one
12  that was General Electric.
13       Q.    So you don't recall seeing the name
14  General Electric or G.E. on the spool but you
15  recall a red lightning bolt?
16       MS. ROUSSEL:
17           I'm going to object to the form of
18      the question.
19       A.    I recall seeing G.E. on the cable
20  reel.
21  EXAMINATION BY MR. CAHN:
22       Q.    Okay.  My question is did you see
23  the letters G.E. or did you see the words
24  General Electric?
25       A.    I'm not sure if it was that.

316

1       Q.    Do you know if they were in any
2  specific color on the reel or spool?
3       A.    Not really.
4       Q.    This red lightning bolt, did that
5  correspond to a particular type of cable?
6       A.    I seen that on a cable.  I'm not
7  sure what it was now.
8       Q.    What made you think that the spool
9  with the red lightning bolt was G.E. cable?
10       MS. ROUSSEL:
11           I'm going to object.  He indicated
12      one of them had a red lightning bolt.  He
13      was not sure if it was G.E.
14       MR. CAHN:
15           He can tell me that.
16       MS. ROUSSEL:
17           He's told you that.
18       THE WITNESS:
19           I'm not sure.  I'm not sure.
20  EXAMINATION BY MR. CAHN:
21       Q.    Other than seeing the name on the
22  spool, was there any other indication that
23  that particular cable was manufactured by G.E.?
24       A.    On the bill of lading when we would
25  receive it, when we would order it.

317

```
1        Q.    How often would you see a bill of
2   lading?
3        A.    When they had a little shipment of
4   cable that would come in, when you requested a
5   call, the expeditor would send it out.
6   Sometimes it would come with the materials, the
7   spool.
8        Q.    Do you specifically recall seeing a
9   bill of lading on a spool that you knew to be
10  manufactured by G.E.?
11       A.    I can't remember that, no.
12       Q.    What information was contained on
13  the bills of lading that you recall seeing?
14       A.    Well, the size, I think the size of
15  the wire and the type, the manufacturer.
16       Q.    Do you specifically recall seeing a
17  bill of lading that identified G.E. as the
18  manufacturer?
19       A.    I can't say that.  I can't remember
20  that far back.
21       Q.    Can you specifically -- let me ask
22  you this:  How was wire delivered to Avondale?
23       A.    I guess on big trucks.
24       Q.    Did it come on spools?
25       A.    On spools on the trucks.
```

318

```
1        Q.    Do you specifically recall seeing
2   spools of wire manufactured by G.E.?
3        A.    Yes.
4        Q.    What led you to believe that that
5   wire was manufactured by G.E.?
6        A.    Well, they had identifying mark.
7   It was either marked G.E. or General Electric
8   or -- but they had something that I remember in
9   my mind that I could identify it.  Now, if it
10  was a particular thing, I can't recall a
11  specific detail of it.
12       Q.    And that was on the spool?
13       A.    Yes.
14       Q.    Do you ever recall seeing a bill of
15  lading which identified G.E. as the
16  manufacturer of any wire that you worked with?
17       A.    Well, I'm not sure if it was on the
18  bill of lading.  It could have been part of it.
19       Q.    But today you don't recall that?
20       A.    I don't recall that, no.
21       Q.    What types of G.E. cables do you
22  recall working with?  And I guess -- let me
23  back up.  As you mentioned, the only way you
24  could identify cable was seeing the name on the
25  spool, correct?
```

319

```
1        A.    Uh-huh (indicating affirmatively).
2        Q.    Were there times when you worked
3   with cable that did not come from a spool?
4        A.    No.  They all came from a spool.
5        Q.    Whatever cable you were working
6   with, you would always go to a spool and take
7   it?
8        A.    A spool is the way they brought it
9   in.
10       Q.    For those cables that you identify
11  as coming off a G.E. spool, were there
12  different sizes, voltages that you worked with?
13       A.    Yes.
14       Q.    Okay.  What were the sizes?
15       A.    They had various sizes from three
16  circular mils all the way to, I guess, four and
17  500 circular mils.  Big cables.
18       MS. ROUSSEL:
19            And that was all covered this
20       morning.  That was the first thing covered
21       this morning.
22       MR. CAHN:
23            I represent G.E.  I don't represent
24  Okonite.  I don't represent Rockbestos.
25  I haven't asked any questions today.  And
```

320

```
1            I'm not here to --
2       MS. ROUSSEL:
3            You're asking the same questions
4       that he's already answered first thing
5       this morning.
6       MR. CAHN:
7            I'm asking specifically to G.E. and
8       those questions were with Fremin so I'm
9       going to ask my questions.
10      MS. ROUSSEL:
11           They were not -- this deposition
12      started this morning at 10:00 in three
13      cases including Walker.
14  EXAMINATION BY MR. CAHN:
15       Q.    With respect to the G.E. cable, did
16  it vary -- when you looked at it, was it
17  different, you know, the color all the way down
18  to the very middle of it depending on the size
19  or was it similar, just larger on the larger --
20       A.    It was similar.
21       Q.    Describe for me what the G.E. cable
22  looked like, starting with the outermost sheet
23  working back to the center.
24       A.    Well, they had the outermost sheet
25  was the armor, then they had the impervious
```

321

```
1    sheet --
2         Q.   I didn't hear you.
3         A.   They had the impervious sheet, the
4    rubber sheet casing, and then they had the
5    strings inside of it and then each layer might
6    have had, they might have had six layers of
7    different insulation-type material all the way
8    to the conductor. It was like layers of it.
9    It was hard to count exactly how many layers
10   but they did have multiple layers of insulation
11   and those layers was material of asbestos
12   nature.
13        Q.   Okay. Let me start with the sheet.
14   What color was the sheet on the G.E. cable?
15        A.   It was blackish.
16        Q.   Was there any writing anywhere on
17   the sheet?
18        A.   They had some markings. Like I
19   said, they had some numbers or stencils and
20   strips but I wasn't -- I'm not sure what it
21   said.
22        Q.   So you don't recall what those
23   markings were?
24        A.   No, sir.
25        Q.   You don't recall what the stencils
```

322

```
1    were?
2         A.   No, sir.
3         Q.   You don't recall if there was any
4    lettering on the sheet?
5         A.   No, sir.
6         Q.   Now, there was an impervious sheet
7    beneath the armor or outermost sheet, right?
8         A.   Yes.
9         Q.   What color was that?
10        A.   Sometimes it was black and
11   sometimes it was gray.
12        Q.   Sometimes black, sometimes gray?
13        A.   It was like -- the black one and
14   they had -- sometimes it was painted so you
15   couldn't tell if it was black or it was coming
16   off of the outer coating that they sprayed
17   something on the armor. So it changed the
18   color.
19        Q.   Did the color of the impervious
20   sheet change depending on what size cable you
21   were using or just on --
22        A.   No. It stayed the same just about.
23        Q.   Describe for me the strings.
24        A.   The strings in there?
25        Q.   Yes.
```

323

```
1         A.   It's like a coating, a coating
2    material and they had a light, like a tar base
3    on it or something on it.
4         Q.   Do you remember the color?
5         A.   It was like a -- the coating was
6    like a blackish. It covered a whitish-type
7    string so it was, I guess, a varnish-looking
8    color or something.
9         Q.   The next thing you said was there
10   were six layers of different insulation
11   material all the way to the conductor, correct?
12        A.   Not six. I didn't count them. But
13   they had multiple layers.
14        Q.   And you mentioned that you thought
15   those were asbestos, correct?
16        A.   Yes, sir.
17        Q.   Do you know for a fact that that
18   was asbestos?
19        A.   Well, I was told some kind of way
20   that all those cables had asbestos insulation
21   in them. And that -- well, I'm going back to
22   the other cable --
23        Q.   I'm asking specifically --
24        A.   -- asbestos, and all of them was
25   the same quality or the same type of cables.
```

324

```
1         Q.   Sitting here today, can you testify
2    to a fact that the G.E. cable you worked with
3    contained asbestos?
4         A.   Well, I couldn't swear on the Bible
5    that it was but I think in my mind, I think it
6    was asbestos.
7         Q.   And you think it was asbestos
8    because another cable manufacturer had the word
9    or the phrase "-bestos" in its name?
10        MS. ROUSSEL:
11             I'm going to object. That is an
12        incorrect statement of this man's prior
13        testimony. He said that it was known to
14        be asbestos.
15        MR. CAHN:
16             That's not what he said.
17   EXAMINATION BY MR. CAHN:
18        Q.   Let me ask you this, Mr. Walker.
19   Did someone tell you that the G.E. cable you
20   were using contained asbestos?
21        A.   Well, I either read it somewhere or
22   I seen it somewhere.
23        Q.   Where would you have read it?
24        A.   We had some books, electrical
25   books. And I could have been thumbing through
```

325

1    that.  I don't know.
2         Q.    You would agree with me, would you
3    not, that not all cable contained asbestos?
4         MS. ROUSSEL:
5              I'm going to object.  He answered
6         that question earlier today.  Are you
7         talking about the cable that he used
8         aboard ship?
9         MR. CAHN:
10             I'm asking him generally.
11        MS. ROUSSEL:
12             Generally in the universe?
13        MR. CAHN:
14             Yeah.
15        MS. ROUSSEL:
16             He can't answer that question.
17        MR. CAHN:
18             He's an electrician.
19   EXAMINATION BY MR. CAHN:
20        Q.    Would you agree with me,
21   Mr. Walker, that not all cable contains
22   asbestos?
23        A.    I'm sure that all of them didn't
24   contain asbestos.
25        Q.    What does asbestos look like?

326

1         A.    They come in different colors.
2         Q.    What colors do you recall it coming
3    in?
4         A.    I remember it coming in a
5    grayish-looking color, mostly grays.
6         Q.    Do you specifically recall seeing
7    this grayish-looking color in the G.E. cable?
8         A.    No, because they were black, also.
9    They had black coloring or black insulation.
10   They also had white insulation in it, too.
11        Q.    Well, was the insulation different
12   depending on which cable you were using, which
13   G.E. cable you were using?
14        A.    No.  They basically the same
15   colors.
16        Q.    Did you ever order cable?
17        A.    No.  Particularly, no.  Just
18   requested that we were running out of cable.
19        Q.    Did you ever request asbestos-
20   containing cable?
21        A.    No, I didn't.
22        Q.    Did you ever request nonasbestos-
23   containing cable?
24        A.    No, I didn't.
25        Q.    Do you recall who told you some

327

1    kind of way that cable contained asbestos
2    insulation?
3         A.    Well, I assume but being it was
4    part of a brand name like that, I associated it
5    with asbestos.
6         Q.    You would agree with me that G.E.'s
7    name doesn't include the word "-bestos" in it?
8         A.    Well, I'm going to assume because
9    I'm not sure right now.
10        Q.    Okay.  But you would also agree
11   with me that just because another
12   manufacturer's cable may have contained
13   asbestos --
14        A.    It's not necessarily so but I think
15   that they all had the asbestos in it.
16        Q.    Okay.  But you --
17        A.    The same, I guess, the same
18   requirement as the other one.  You would
19   have -- one would have to make the same
20   standards, they couldn't just buy one type and
21   install one type and then install another type.
22   It would have to be the same, at least the same
23   types of cable.
24        Q.    Do you recall working with any
25   specifications that specifically called for

328

1    asbestos-containing cable when you were working
2    with a G.E. product?
3         A.    Not that I know of, no.
4         Q.    And you would agree with me that
5    just because one manufacturer's cable may have
6    contained asbestos doesn't mean that another
7    manufacturer's cable --
8         MS. ROUSSEL:
9              He just answered that same question.
10        Mr. Walker, don't answer that question
11        again.  You've already answered it.  Do
12        not answer it again.
13   EXAMINATION BY MR. CAHN:
14        Q.    Not all cable contained asbestos,
15   to your knowledge?
16        MS. ROUSSEL:
17             He's already answered that question
18        as well.  Don't answer that question.
19   EXAMINATION BY MR. CAHN:
20        Q.    You recall seeing books, don't you?
21   Didn't you testify to that?
22        A.    Yeah, a book.
23        Q.    And in that book, I assume there
24   was asbestos and nonasbestos cable; was there
25   not?

329

1    A.    That one had asbestos.

2    Q.    Did they have nonasbestos cable?

3    A.    Not that I recall.

4    Q.    What was that book?

5    A.    It was just a little general book.

6    Q.    Where did you get it from?

7    A.    I guess one of the electricians

8 might have had it or whatever.

9    Q.    Did you ever participate in

10 ordering cable for Avondale?

11    A.    No.

12    Q.    With respect to G.E. wire, how do

13 you know that the wire you worked with was

14 manufactured by G.E.?

15    A.    Because it was on the spools.  They

16 identified them.  They had identifying marks.

17    Q.    What were those identifying marks?

18    A.    I guess G.E. or General Electric.

19 I can't recall exactly what it was, if it was

20 specifically that.

21    Q.    So it could have been something

22 else?

23    A.    It could have been the other one.

24 It all depends.

25    Q.    What size wire did you work with

330

1 that came from a G.E. spool?

2    A.    The size of the wire?

3    Q.    Yes.

4    A.    It was various sizes, various

5 circular mils.

6    Q.    What did it run from?  What was the

7 bottom and the top?

8    A.    The bottom and top?

9    Q.    What was the smallest wire to the

10 largest wire?

11    A.    I guess it was the three, it was, I

12 guess, three circular mils to 500 circular

13 mils, 550 circular mils.  I don't know what the

14 biggest sizes are.

15    Q.    With respect to the wire that you

16 recall specifically taking from the G.E. spool,

17 did its appearance from the outermost sheet to

18 the conductor change depending on whether it

19 was three circular mils or 500 circular mils?

20    A.    The sizes?

21    Q.    Looking at it, did the appearance

22 change?

23    A.    Oh, yeah, the sizes changed.

24    Q.    Other than the size -- you can have

25 something that is this big and black or

331

1 something this big and black?

2    A.    The appearance was about the same,

3 yes.

4    Q.    Take me from the outermost sheet to

5 the conductor and tell me how it appeared and

6 whether there was any writing on any part of

7 it.

8    A.    Well, the outer sheet was a braid

9 and then sometime there was a painted braid and

10 then when you would strip the braid off, they

11 had a rubber casing on it and sometimes that

12 was black and it had a spillover of paint on

13 it.  From underneath there, you took that off

14 and they had a coating, a string coating and

15 then they had insulation over the copper

16 conductors.

17    Q.    Did you ever order wire from G.E.

18 for use at Avondale?

19    A.    Not particularly, no.  I didn't

20 order that.

21    Q.    Do you ever recall working on a

22 project that was spec'd out for asbestos-

23 containing wire?

24    A.    Not that I know of.

25    Q.    If I didn't ask you this, do you

332

1 ever recall working on a project that was

2 spec'd out for asbestos-containing cable?

3    A.    Not that I know of, no, sir.

4    Q.    Was there any writing at all that

5 you recall of any type on the wire that you got

6 from the G.E. spool?

7    A.    They had some strips.  I don't

8 recall what was the names or the numbers or

9 what on the strips.  It was a little

10 identifying thing that you could identify the

11 cable, the type of cable.  But I'm not sure

12 what the identifying mark was, if it was one of

13 the three or just one.

14    Q.    And that --

15    A.    Some of them had it, some of them

16 didn't.

17    Q.    That identification on the type of

18 cable, did that appear on the outer sheet?

19    A.    It was on the inside.

20    Q.    Did that appear on the rubber

21 casing?

22    A.    Some of them had a little stencil

23 on it.  But you had to look good on the casing

24 but they didn't have any particular marks that

25 I can think of that identified it right now.

333

1      Q.   Do you know for a fact that the
2   G.E. wire you worked with contained asbestos?
3        MS. ROUSSEL:
4             Already asked and answered.
5        A.   Well, I just -- I'm saying it did
6   have asbestos in it.
7   EXAMINATION BY MR. CAHN:
8        Q.   And how do you know that?
9        MS. ROUSSEL:
10            He's already answered that.
11       A.   Well, I guess all of them has the
12   same quality requirements.
13   EXAMINATION BY MR. CAHN:
14       Q.   Do you know for a fact whether or
15   not all of the Okonite cable and wire you
16   worked with contained asbestos?
17       MS. ROUSSEL:
18            Already asked and answered.  He's
19       not going to answer that again.  That's
20       been asked.
21       MR. CAHN:
22            That's a yes-or-no question.
23       MS. ROUSSEL:
24            He's not answering that again.  Do
25       you have another question?

334

1   EXAMINATION BY MR. CAHN:
2        Q.   Do you know whether or not all the
3   Okonite and Rockbestos --
4        THE WITNESS:
5             I'm not sure what I'm supposed to
6        answer right now.
7        MR. CAHN:
8             You can answer my question.  She's
9        making her objection for the record.
10       MS. ROUSSEL:
11            No.  I'm objecting on the basis that
12       it's already asked and answered.
13       MR. CAHN:
14            I'm asking for G.E. and I'm
15       having I'm
16       THE WITNESS:
17            Didn't I answer that question
18       several times before?
19       MS. ROUSSEL:
20            Yes, you did and you answered it
21       this morning as well.
22   EXAMINATION BY MR. CAHN:
23       Q.   Do you know for a fact that all of
24   the Okonite and Rockbestos cable or wire that
25   you used contained asbestos?

335

1        A.   Not for a particular fact because I
2   didn't do any kind of chemical analysis on
3   them.
4        Q.   And you don't know for a fact
5   whether or not all the G.E. wire and cable you
6   used contained asbestos?
7        MS. ROUSSEL:
8             He's not answering that again.
9             Mr. Walker, don't answer that
10       question again.
11            Do you have another question?
12       MR. CAHN:
13            I'm ready to move on.  I can finish
14       this in five minutes or --
15       MS. ROUSSEL:
16            No, because you've been asking the
17       same questions over and over again and
18       we're now approaching the hour of seven
19       hours.
20       THE WITNESS:
21            What is it you want me to say?
22       MS. ROUSSEL:
23            Mr. Walker, wait a minute.
24            And I can tell you the federal judge
25       said we would be limited to seven hours

336

1        today.
2        MR. CAHN:
3             That's fine.  Your speaking
4        objections are wasting your time and Mr.
5        Walker's.
6        MS. ROUSSEL:
7             Your same questions over and over
8        again --
9        MR. CAHN:
10            Can you read back my question?
11       MS. ROUSSEL:
12            He's not answering that question.
13       MR. CAHN:
14            Then I'll put it on the record and
15       I'll go to the judge.
16            Can you just read back my question?
17       He can answer it "yes" or "no."
18            (whereupon the preceding question
19       was read back by the court reporter.)
20       THE WITNESS:
21            No, I don't know that for a fact.
22   EXAMINATION BY MR. CAHN:
23       Q.   Do you know whether the G.E. cable
24   contained asbestos for a fact?
25       A.   Not for a fact.

337

1      Q.    Okay.

2      MS. ROUSSEL:

3          I have a question.  When you say,

4      "not for a fact," do you mean -- let me

5      reask it.  I haven't had a time to ask

6      questions yet.

7  EXAMINATION BY MS. ROUSSEL:

8      Q.    In the industry as an electrician

9  for shipboard cable, it was your understanding

10 that those electrical wire and cables contained

11 asbestos; is that right?

12     MR. CAHN:

13         Objection to form because you

14     stopped him from answering questions --

15     A.    That's what I told him before.

16 That was general knowledge that they all were

17 similar.

18     MR. CAHN:

19         And then my question to you was

20     whether or not --

21     MS. ROUSSEL:

22         Wait.  It is my turn to ask

23     questions.  Excuse me.  I'm in your

24     portion of the deposition.

25     MR. CAHN:

ONE SHELL SQUARE, SUITE 250 ANNEX    **HUFFMAN & ROBINSON, INC.**        (504) 525-1753
NEW ORLEANS, LOUISIANA 70139              CERTIFIED COURT REPORTERS                (800) 749-1753

---

338

1          You can't stop him from answering

2      questions that I pose and then ask the

3      same question.

4      THE WITNESS:

5          I thought that's what you were

6      saying.  You asked me in general and I

7      told you that several times.

8      MR. CAHN:

9          I understand in general.  I'm

10     talking about --

11     THE WITNESS:

12         And then you come back and ask me

13     the same thing and I'm saying I'm not

14     understanding what he's saying because

15     he's repeating it and I'm telling him the

16     same thing.  Basically, all the wires was

17     the same, the three was the same because

18     the requirements was the same.

19 RE-EXAMINATION BY MR. CAHN:

20     Q.    What requirements?

21     A.    Well, if you're going to have one

22 particular type cable, they all going to have

23 to be the same because you're not going to pull

24 one type and a different type, three different

25 types of cable.  They all going to be the same

ONE SHELL SQUARE, SUITE 250 ANNEX    **HUFFMAN & ROBINSON, INC.**        (504) 525-1753
NEW ORLEANS, LOUISIANA 70139              CERTIFIED COURT REPORTERS                (800) 749-1753

---

339

1  type materials that's going to be manufactured

2  with.

3      Q.    My question is do you have any

4  evidence that any of the three cables

5  definitively contained asbestos?

6      A.    Oh, I don't have evidence with me,

7  no, sir.

8      MR. CAHN:

9          That's my question.  Thank you.

10     MS. ROUSSEL:

11         Are you finished your questions

12     because I do want to ask some questions

13     and I don't want you to jump in in the

14     middle of my questions.

15     MR. CAHN:

16         I'm happy to let you question but I

17     reserve my right to ask follow-up

18     questions.

19         (whereupon a discussion was held off

20     the record.)

21 RE-EXAMINATION BY MS. ROUSSEL:

22     Q.    With regard to the shipboard

23 electrical wire and cable that you've been

24 discussing all day --

25     A.    Yes.

ONE SHELL SQUARE, SUITE 250 ANNEX    **HUFFMAN & ROBINSON, INC.**        (504) 525-1753

---

340

1      Q.    -- You've talked about the various

2  levels of insulation in those products.

3      A.    Yes.

4      Q.    It was general knowledge to the

5  electrician -- to you as an electrician that

6  that insulation in those Okonite, General

7  Electric and Rockbestos wire and cables

8  contained asbestos?

9      MR. CAHN:

10         Objection as to form.  Leading.

11     A.    I agree but it was what I was

12 telling you and that's what you were asking me.

13 I understand that.

14     MR. CAHN:

15         Your testimony speaks for itself.

16 EXAMINATION BY MS. ROUSSEL:

17     Q.    Now, you talked about when somebody

18 was asking you questions, you mentioned one of

19 the insulators and you said Luther.  Is that

20 Luther Dempster?

21     A.    Luther, yes.

22     Q.    When Mr. Lee was asking you

23 questions earlier today, you said that -- and

24 this is specifically when you were working for

25 the Navy.

ONE SHELL SQUARE, SUITE 250 ANNEX    **HUFFMAN & ROBINSON, INC.**

341

1    A.    Uh-huh (indicating affirmatively).

2    Q.    Now, Avondale at that time also had

3  commercial contracts as well as Navy contracts;

4  is that correct?

5    A.    That's correct.

6    Q.    And you said that when Avondale

7  would call you out, you would come and do an

8  inspection?

9    A.    That's correct.

10    Q.    And the purpose of the callout was

11  to determine whether or not that particular job

12  was completed?

13    A.    It was completed and Avondale had

14  done all the work.

15    Q.    And it was completed according to

16  drawings done by Avondale engineers?

17    A.    Avondale engineers, yes.

18    Q.    And the Navy was just a customer

19  like Exxon?

20    A.    Just like anybody else.

21    MR. CONLEY:

22        Objection.  Leading.

23    THE WITNESS:

24        It was customers.  Avondale was our

25    contractor.  It was a customer, we was

342

1    buying a product from them.

2  EXAMINATION BY MS. ROUSSEL:

3    Q.    And the Form 2247 that you said

4  would be used when Avondale had a callout, that

5  was an Avondale form?

6    A.    That was Avondale form, yes.

7    Q.    And you were checking -- that form

8  you were merely checking against?

9    A.    Well, in case you had -- that was a

10  form that they used for listing the

11  deficiencies.

12    Q.    The deficiencies you were checking

13  against Avondale's --

14    MR. CONLEY:

15        Objection.

16        (Whereupon a discussion was held off

17    the record.)

18  EXAMINATION BY MS. ROUSSEL:

19    Q.    As an inspector, you did not

20  supervise Avondale's work, did you?

21    A.    No, ma'am.

22    MR. LEE:

23        Objection.  Leading.

24  EXAMINATION BY MS. ROUSSEL:

25    Q.    And you did not control Avondale's

343

1  work, did you?

2    A.    No, ma'am.

3    MR. LEE:

4        Objection.  Leading.

5  EXAMINATION BY MS. ROUSSEL:

6    Q.    When Avondale was doing its work,

7  you did not oversee the work they were doing,

8  did you?

9    MR. LEE:

10        Objection.  Leading.

11    A.    No.  They just called us when it

12  was completed.

13  EXAMINATION BY MS. ROUSSEL:

14    Q.    And this goes back to when you were

15  a direct employee of Avondale Shipyards.  The

16  products that Avondale Shipyard was using on

17  commercial vessels was the same kinds of

18  products it was using on the Navy vessels?

19    A.    That's correct.

20    MR. CONLEY:

21        Objection.  Leading and vague.

22  EXAMINATION BY MS. ROUSSEL:

23    Q.    And the way you handled the

24  products on a commercial vessel as an

25  electrician was the same way you handled them

344

1  when you worked on a Navy vessel?

2    A.    That's correct.

3    MR. CONLEY:

4        Objection.  Leading.

5        (Whereupon a discussion was held off

6    the record.)

7    MS. ROUSSEL:

8        That's all I have actually.

9    THE VIDEOGRAPHER:

10        Off the record.  End of Tape 5.

11        (Whereupon a brief recess was taken

12    at this time.)

13    THE VIDEOGRAPHER:

14        This is the beginning of Tape 6 of

15    Rudy Walker, Sr. on May 8, 2003.  We're

16    back on record.

17  EXAMINATION BY MR. CONLEY:

18    Q.    Mr. Walker, just because it's been

19  a long day, let me remind you my name is Chris

20  Conley.  My company is Foster-Wheeler.  Just so

21  we're on the same page just like we're on

22  opposite sides of this room, we're on opposite

23  sides of this case.  I'm representing one of

24  the companies.

25        Before we just started talking, Mr.

345

1   walker, do you think that you've ever talked
2   with somebody from Foster-Wheeler before?
3       A.   No, I don't think so.
4       Q.   The good news that I have for you
5   is I don't anticipate asking you a single
6   question about wire or cable or spools. What I
7   want to do is talk to you a little bit about
8   boilers. Now, you were never a boilermaker,
9   were you?
10      A.   No, sir.
11      Q.   And you were never a pipefitter?
12      A.   No, sir.
13      Q.   All right. You were an
14   electrician?
15      A.   Yes, sir.
16      Q.   And that's what we have talked
17   about the bulk of today.
18      A.   Yes, sir.
19      Q.   All right. But I want to just talk
20   to you a little bit about boilers. To the
21   extent that some of the boiler work happened
22   away from Avondale at my client's plant, for
23   example, where they made the parts and they
24   fabricated the metal --
25      A.   Yes.

346

1       Q.   -- would you have had any
2   involvement with that?
3       A.   No. I didn't go to no plants.
4       Q.   Would you be able to tell us
5   anything about any dealings between the Navy
6   and my client at that time?
7       A.   No, sir.
8       Q.   That's something we'd have to talk
9   to somebody else about?
10      A.   Yes, sir.
11      Q.   When the pieces to the boiler would
12   come to the shipyard, you've talked about the
13   fact that they would first kind of put them
14   together next to the ship if I understood
15   right.
16      A.   Yeah, they'd put some parts and
17   components.
18      Q.   And I think you had mentioned --
19   and you correct me if I'm wrong because I don't
20   want to put the wrong words in your mouth --
21   that there was some kind of shed that they did
22   that in?
23      A.   They had a big cover, big metal
24   building. It was a big portable building and
25   then they covered it up.

347

1       Q.   All right. Was that one for every
2   ship under construction or just one that they
3   could move wherever they needed it?
4       A.   There was one, I think.
5       Q.   Did you ever work yourself as an
6   electrician work inside that shed?
7       A.   No. Close to it but never in it.
8       Q.   Am I right that from time to time
9   when you were going to get on a ship to do your
10   work, you might have to walk by the shed?
11      A.   Yes. In some cases the ship was in
12   a close proximity to that.
13      Q.   Were you walking around that, I'll
14   call it the boiler-making shed, as often as you
15   were doing electrical work?
16      A.   Oh, no. Occasionally, we'd pass by
17   it.
18      Q.   When you would walk past that,
19   would you stop and help or would you just kind
20   of see what was going on and keep going?
21      A.   I wouldn't help. I had nothing to
22   do.
23      Q.   And if I were to start asking you a
24   whole heap of details about what went on under
25   that shed, is there any way you would know?

348

1       A.   I couldn't tell you the details.
2       Q.   All right. Did you see anything
3   going on with your own eyes other than somebody
4   cutting brick with a saw?
5       A.   Yes. And it might have been at
6   another boiler site because they had several
7   boiler sites there, I think. It might not have
8   been Foster-Wheeler. It could have been the
9   other ones. But they did have boiler sites
10   that I was associated with where they did cut
11   bricks and things like that. And then they had
12   some of the pipes, they called it downcomers
13   and the generating pipes and all.
14      Q.   Right.
15      A.   And they took the Cosmolene off it.
16   I don't know if that was Foster-Wheeler or the
17   other kind of boiler.
18      Q.   Were you kept pretty busy as an
19   electrician?
20      A.   Yes, sir.
21      Q.   Did you have a lot of time to worry
22   about boilers?
23      A.   No, sir.
24      Q.   All right. Are you able to tell us
25   one way or the other today if you were ever

### Page 349

nearby when somebody was working on a
Foster-Wheeler boiler in one of those sheds?

A.   Not in one of the sheds.

Q.   And unlike the time on the ship
that we talked about where you might be in
closed quarters or in a cramped space and
you're surrounded by walls and aluminum, would
this be when you're walking by just out in the
open in the yard?

A.   In some cases it was close
proximity in the yard.

Q.   But what I mean by that is there's
open sky above and the breeze is blowing?

A.   Yes.

Q.   I want to move the boiler onto the
ship now, it's on the ship.

A.   Okay.

Q.   Did you ever work inside of a
boiler itself?

A.   Not these boilers, no.

Q.   Not the ones on the ship?

A.   That's correct.

Q.   As I understood it -- and you
correct me if I'm wrong, Mr. Walker -- the
extent of your work that had anything to do

### Page 350

directly with the boiler is there might be a
sensor or a dial or something that you would
need to run control wire to?

A.   Electrical wire to oil indicator
light, water column lights, and that was around
the front of the boilers.  It wasn't inside.
we didn't go inside the boilers at all.

Q.   would you agree with me that that
one job of hooking up control wire to a boiler
was an extremely small part of your job?

A.   Small job, very, very small, yes.

Q.   Because there is a lot of things
for an electrician to do on a ship?

A.   Yes.

Q.   All right.  You've talked about the
brick that you saw being cut that would go
inside of the boilers?

A.   Yes.

Q.   Did it look -- well, let me ask
this question first.  Don't let me assume
things.  Did you ever touch any of that brick
yourself?

A.   No.

Q.   Did it look like the insulation,
you talked about the half-rounds, or did it

### Page 351

look more like the stuff house brick is made
out of?

A.   well, it was more flat and
rectangular.

Q.   All right.  Was it much bigger than
a house brick?

A.   Not too much bigger.  But it was
along in that size or a little thicker.

Q.   All right.  During the time you
might be in the fire room hanging lights,
pulling cable, is it true that somebody else
might have been doing stuff to the boilers?

A.   They had people working on the
boilers, yes.

Q.   Once again, were you near a boiler
every day?

A.   No, no.

Q.   Or every week even?

A.   Occasionally, we'd go down to the
engine room to work and we was close by it.

Q.   On those occasions --

MS. ROUSSEL:

He's still --

MR. CONLEY:

I'm sorry.  I didn't mean to cut you

### Page 352

off.

THE WITNESS:

Yes.

EXAMINATION BY MR. CONLEY:

Q.   On those occasions that you were
near a boiler, was somebody working on it on a
ship, did you ever see them doing anything to a
boiler that looked like it was causing dust
during the time you were there?

A.   No, sir.

Q.   Other than the brick that went on
the inside of the boiler, did you ever see them
sawing or cutting or doing anything to any
material used with the boilers?

A.   No, sir.

Q.   when you would be dealing with the
boiler, it's just a great big old piece of
metal they cook water in?

A.   That's correct.

Q.   So as I understood earlier -- and
you correct me again if I'm wrong -- sometimes
you think there may have been Foster-wheeler
boilers on commercial ships?  By that I mean
non-Navy ships.

A.   Yes.

1    Q.   Do you have any reason to think
2  there were also Foster-wheeler boilers on the
3  Navy ships?
4    A.   I never seen them.
5    Q.   Let me ask it this way.  In your
6  petition that was filed to start the suit, my
7  client, Foster-wheeler, was described as a
8  major manufacturer of boilers used in the
9  construction of United States Navy vessels.  Do
10  you disagree with that?
11    MS. ROUSSEL:
12         I'm going to object.  He can only
13      testify as to what he saw and did not see
14      at Avondale.
15    A.   They had boilers on the Navy ships.
16  And I can't recall what type of boilers the
17  name was.
18  EXAMINATION BY MR. CONLEY:
19    Q.   All right.  Once the boiler was on
20  the ship, do you remember knowing what the name
21  of any of them was?
22    MS. ROUSSEL:
23         I'm going to object.  He's already
24      given testimony with regard to boilers
25      today and the specific names of those

1    boilers.
2  EXAMINATION BY MR. CONLEY:
3    Q.   And let me back up because I wanted
4  to ask you that.  To the extent you think that
5  the Lykes ships had Foster-wheeler boilers on
6  them instead of Babcock & Wilcox boilers or any
7  of the other companies, why is it that you
8  think it was Foster-wheeler on that particular
9  ship of all the ships you've worked on?
10    MS. ROUSSEL:
11         He didn't say that one ship.  He
12      said that series of ships.
13    A.   The Lykes ships.  They all had the
14  same type of boilers and that was the
15  Foster-wheeler boilers.  And I think I can
16  remember that that was the boilers that they
17  installed.
18  EXAMINATION BY MR. CONLEY:
19    Q.   Just because I don't want to
20  overlook something, you said you think you can
21  remember that.  Earlier you said I think
22  something but I wouldn't be willing to swear
23  with my hand on the Bible.  Is this something
24  you could swear with your hand on the Bible
25  about, that those were Foster-wheeler boilers?

1    A.   Well, if push comes to shove, I'm
2  not sure.  It's so hard to remember that long
3  ago.
4    Q.   And I think that's --
5    MS. ROUSSEL:
6         He's still answering, Chris.
7    MR. CONLEY:
8         That's fine.
9  EXAMINATION BY MR. CONLEY:
10    Q.   I am sorry.  I did not mean to cut
11  you off.
12    A.   But in my mind, that's the type of
13  boilers that was installed on the ships.  For
14  whatever reason, Foster-wheeler was the boilers
15  on the commercial ships.
16    Q.   Do you remember what makes you
17  think that?
18    A.   Because that might have been the
19  first boilers that I remember.
20    Q.   When you were new to the business?
21    A.   Yes.
22    Q.   Were there any Navy ships built out
23  there at Avondale during your time that you
24  didn't get on and do some electrical work on?
25    A.   When I was working for Avondale?

1    Q.   Avondale.
2    A.   Avondale.  Yes, I done some
3  electrical work on the Navy work.
4    Q.   Can you think of a Navy ship that
5  came through the yard from 1957 to 1969 that
6  you didn't do some electrical work on?
7    A.   Yes.
8    Q.   How often?
9    A.   Well, as long as I was working
10  there, every day I done electrical work on
11  them.
12    Q.   Let me back up because I think I
13  asked a question that stumped you.  I think I
14  asked a bad question.
15         Do you think there is a Navy ship
16  that was built out there that you didn't do any
17  work on at all?
18    A.   I didn't work on a hundred percent
19  of them, no.
20    Q.   Do you know of any way for us to
21  remember today or to find out today the names
22  of the Navy ships that you did work around
23  boilers on?
24    A.   No, not that I know of unless
25  Avondale kept records of it, and they would

357

1  have kept records of my time and work I worked
2  while I was working for them.
3       Q.    I realize that you are tired and I
4  realize it's been a long day.  It's been a long
5  day for me and I'm a much younger man than you
6  are.
7            To the extent that you have
8  previously indicated in this case that you
9  thought you had worked around Foster-Wheeler
10  products both on Navy ships and commercial
11  ships, is there a reason that you believe
12  differently today?
13       MS. ROUSSEL:
14            Don't answer that question because
15            that mischaracterizes your testimony.  He
16            did not testify to that.  For you to
17            indicate on the record that he did is
18            improper.
19       MR. CONLEY:
20            And I didn't mean to say "testimony"
21            if I did.  I was referring to your
22            complaint.
23       MS. ROUSSEL:
24            I didn't say that on the complaint,
25            either.

358

1  EXAMINATION BY MR. CONLEY:
2       Q.    Sir, did you happen to look at the
3  documents that were filed in response to the
4  removal in this case?  Do you know one way or
5  the other if you looked at those papers?
6       A.    The removal of the lawsuit?
7       Q.    To the federal court instead of the
8  state court?
9       A.    I read a document that said I was
10  suing -- going to federal court in New Orleans.
11       Q.    Did you --
12       A.    I'm recalling that.  Now I'm not
13  sure of that because -- I don't know.  I seen
14  the document that I testified to.
15       MS. ROUSSEL:
16            Let me just indicate you're talking
17            about what initiated your lawsuit when
18            your lawsuit was started?
19       THE WITNESS:
20            Yes.  When I got sick.
21  EXAMINATION BY MR. CONLEY:
22       Q.    Do you remember reading in a brief
23  that was filed on your behalf the statement
24  that, quote, "Mr. Walker was exposed to the
25  asbestos-containing products manufactured by

359

1  Foster-Wheeler while working for Avondale on
2  private works as well as during the
3  construction of military vessels"?
4       MS. ROUSSEL:
5            I'm going to object to that,
6            characterization of that in my pleading
7            and also he's not indicated that he saw
8            removal pleadings.  what he's indicating
9            is he saw the original petition.
10       THE WITNESS:
11            I never brought it to court, that it
12            was a petition that I read and that was
13            supposed to be filed in court, whatever
14            court it was.
15  EXAMINATION BY MR. CONLEY:
16       Q.    Do you remember seeing anything
17  filed in this case that you looked at and
18  reviewed that didn't seem true at the time you
19  read it?
20       A.    No.  It sounded true to me.
21       Q.    All right.  I want to move on and
22  talk to you about something else right quick.
23  You talked about one of your major jobs as a
24  Navy inspector was you learned the drawings, if
25  I understood right?

360

1       A.    Yeah.
2       Q.    You'd have these detailed drawings
3  of the electrical system on the ship and you
4  needed to be familiar with it so you would know
5  if the work was up to those drawings or not?
6       A.    Yes.
7       Q.    And did it cover the type of wire
8  or cable as far as size that would be used for
9  a specific application?
10       A.    That would be correct.
11       Q.    And did it even cover stuff like
12  how much slack there could be in a wire or how
13  much the wire could be skinned back from --
14       A.    They didn't give you particulars on
15  that.  That was a judgment call on how much you
16  cut.
17       Q.    If you were wiring a Navy ship, for
18  example, and you knew that you needed to use
19  wire, could you just swing by the Home Depot on
20  your way in and grab something off the shelves
21  or did you have to use material that Avondale
22  had on hand?
23       A.    Avondale had on hand.
24       Q.    Were you allowed to just use
25  whatever you wanted on the ship?

361

1    A.   No, sir.

2    Q.   All right. Sir, I'm going to talk

3  to you about one last thing and then I think

4  I'm done.

5       You had the radiation therapy that

6  we've already talked about.

7    A.   Yes, sir.

8    Q.   Not with regard to your

9  mesothelioma?

10   A.   Yes.

11   Q.   Earlier when you had your

12 testicular problem?

13   A.   Yes.

14   Q.   And you mentioned that in your

15 private area they gave you radiation?

16   A.   Yes, sir.

17   Q.   Do you remember if they also gave

18 you radiation in the chest area to make sure it

19 didn't spread to your chest?

20   MS. ROUSSEL:

21       I'm going to object.  There is no

22   indication of that.

23 EXAMINATION BY MR. CONLEY:

24   Q.   Do you know a Dr. Terry Kraus?

25   A.   Kraus, Dr. Kraus.

362

1    Q.   I have a report that was put on

2  file by your lawyer from Dr. Kraus dated

3  February 6, 2003.  And it says, "Of interest

4  the patient had cobalt radiation in 1961.  He

5  had treatment to pelvis and chest.  There were

6  five different areas that were treated

7  utilizing Cobalt 60 irradiation."  Do you

8  remember them radiating your chest as well?

9    A.   In this area in the stomach and

10 this whole area here (indicating).

11   Q.   Do you know where Dr. Kraus might

12 have gotten that information?

13   A.   I don't know.

14   Q.   Has anybody told you that several

15 leading doctors in the field of mesothelioma

16 believe that mesothelioma can be caused by

17 something other than asbestos; namely,

18 therapeutic radiation?

19   A.   No.  Nobody told me that.

20   Q.   Has anybody told you that your

21 cancer that you have now was caused by

22 asbestos?

23   A.   Not by asbestos -- the

24 asbestos-related problems that I can have the

25 mesothelioma without the asbestos but the

363

1  asbestos wouldn't cause it but it would develop

2  in the lung if -- it would contribute to it.  I

3  think that's how they explained it to me.

4    Q.   Do you believe that you've worked

5  around asbestos both on Navy ships and non-Navy

6  ships?

7    A.   They didn't have asbestos on the

8  Navy ships after a certain period of time.

9    Q.   Right.  I'm talking about in that

10 pre-1969 time when you were an Avondale

11 employee, do you think you worked around it on

12 both?

13   A.   Yes.  I think they had asbestos on

14 it at the time I worked for Avondale.

15   Q.   Has any doctor been able to tell

16 you which of those two asbestoses might have

17 caused your cancer, the one from the Navy ships

18 or the Avondale?

19   A.   I don't think it's --

20 MR. CONLEY:

21       Sir, those are all the questions I

22   have and I appreciate your patience and

23   your time.

24 THE WITNESS:

25       All right.  Thank you very much.

364

1  EXAMINATION BY MS. BAXTER:

2    Q.   Mr. Walker, I have paid attention

3  today and I wrote down some things that I am

4  not going to be asking you the same questions

5  that you've been asked before.

6       Can you tell me when you were an

7  electrician at Avondale who furnished the cable

8  cutters you used?

9    A.   No, ma'am.

10   Q.   Same question for the hacksaws, do

11 you know who furnished those?

12   A.   I guess it was called a bolt

13 cutter.  I'm not sure if that was the trade

14 name or that's what we give it or whatever.

15   Q.   Do you know who furnished that?

16 where did you get them?

17   A.   Got them from Avondale.  Avondale

18 bought them, I guess.

19   Q.   How about the hacksaws?

20   A.   The hacksaws, some cases we bought

21 our hacksaws.

22   Q.   You bought your own?

23   A.   Brought our own tools.

24   Q.   And did anyone ever tell you to use

25 a hacksaw to cut wire and cable?

365

1      A.      No, but that's what we used to
2   begin with and then they got a little better
3   thing to cut it with.
4      Q.      When you became an electrician,
5   what kind of training did you get to become an
6   electrician?
7      A.      Well, blueprint reading.
8      Q.      I'm sorry?
9      A.      Blueprint reading.
10     Q.      Mr. Walker, let me back up because
11  I don't want to waste your time having you
12  answer a question that I didn't intend to ask.
13  If I ask a bad question, I want to make sure
14  you understand my question and I want to hurry
15  along here.
16          When you became an electrician at
17  Avondale, did someone train you to become an
18  electrician?
19     A.      I went to ICS electrical training
20  school prior to, you know, getting the job.
21  And while I was at Avondale, I took a course,
22  electrical course, and then I went to Jefferson
23  Trade School for electrical and air condition
24  and refrigeration.
25     Q.      When did you go to that trade

366

1   school?
2      A.      Trade school, I guess in the '60s
3   when I went to ICS, and the '70s or around the
4   '60s and '70s I went to the trade school.
5      Q.      Okay.  At any of those places where
6   you had training to become an electrician, did
7   any of them ever tell you or teach you to use a
8   hacksaw to cut wire or cable?
9      A.      Not really.
10     Q.      Did you ever see any empty spools
11  at Avondale?
12     A.      Empty spools?
13     Q.      Yes, sir.
14     A.      Yes.
15     Q.      Did you ever see anyone re-spool
16  the wire or cable?  I know you didn't do it but
17  did you see someone else do it?
18     A.      No, ma'am.
19     Q.      Do you know what happened to the
20  empty reels or spools at Avondale?
21     A.      I guess they brought them back to
22  the manufacturer, they reclaimed them.
23     Q.      Did you ever see Lindward Fremin
24  work around Hopeman Brothers employees when
25  they were cutting those boards?

367

1      A.      I'm not certain, ma'am.  He worked
2   in those compartments but I might not have been
3   with him when he was doing that.  I'm sure he
4   did the same type of work I did and he must
5   have been exposed to the same stuff.  I wasn't
6   with him eight hours a day.
7      Q.      Do you remember how many of those
8   bolt cutters or cable cutters that Avondale had
9   for your electrical crew when you were an
10  electrician with Avondale?
11     A.      I guess they had one or two by the
12  cable reel.  That's about all.  Everybody
13  didn't have one.
14     Q.      You told Mr. Bell that you had
15  heard of the Charters Company and that they did
16  floors on the ships.
17     A.      Yes.
18     Q.      Were you ever around any of the
19  Charters employees when they were installing
20  the floors on the ships?
21     A.      Yes.
22     Q.      Can you tell me what the floors
23  were made of that they installed?
24     A.      Well, they had regular floor tiling
25  installed and some of it looked like it was a

368

1   cement.
2      Q.      Were you ever around them when they
3   were cutting any of that tile?
4      A.      I guess in different compartments
5   but close to it in some cases.
6      Q.      Okay.
7      A.      Only when they was installing it,
8   the ship was almost completing.
9      Q.      And you told us that you learned to
10  read blueprints and you looked at drawings and
11  test memos.  My question to you is did you ever
12  see the letters ASME on any of those
13  blueprints, drawings or test memos?
14     A.      A-S-M-E?  No, not that I recall.
15     Q.      I'm sorry?
16     A.      Not that I recall.
17     Q.      How about the letters A-N-S-I?
18     A.      No, ma'am.
19     Q.      How about A-S-T-M?
20     A.      No.  ASI or I can't remember that
21  name, neither.
22     Q.      What about A-I-E-E?
23     A.      No, I can't recall that.
24     Q.      Did you ever work around Arnott
25  Marine Joiners?

369

```
1        A.    Arnott Marine?
2        Q.    Arnott Marine?
3        A.    Yes.
4        Q.    Was that in the '50s when you first
5   got there?
6        A.    I'm not sure now if it was before
7   the hurricane or after.
8        Q.    Okay.
9        A.    But I can remember Arnott Marines.
10  They did the same work.
11       Q.    That was my next question. Did
12  they create dust when they were working?
13       A.    Well, they had similar products. I
14  think their products was similar.
15       Q.    Okay.
16       A.    And they done similar work and they
17  cut it with the saws. So they had the same
18  association for "-bestos."
19       Q.    Okay. Did you ever wear a rag over
20  your face because of the dust when you were
21  working at Avondale as an electrician?
22       A.    No, no protective gear.
23       Q.    You told us this morning and I want
24  to make sure I heard you right. I think you
25  said that sometimes when the insulators were
```

370

```
1   cutting and the people were working, it would
2   create a lot of dust and you would have to dig
3   your wire out of the dust? Did I hear you
4   correct on that?
5        MR. BROWN:
6             Hold on, Mr. Walker. I will object
7        to the form and on the basis of
8        mischaracterization of prior testimony.
9        A.    It was just buried in the
10  insulation.
11  EXAMINATION BY MS. BAXTER:
12       Q.    Okay.
13       A.    We had to take it out.
14       Q.    I'm not trying to belabor this but
15  when you say buried in the insulation, do you
16  mean dust of the insulation or the insulation
17  products?
18       A.    The insulation product.
19       Q.    Thank you.
20             Is there anyone that you can think
21  of that you can tell us that we can go talk to
22  about your work as an electrician at Avondale?
23       A.    Now, I'm not certain who would be
24  there. I think a lot of them are retired or
25  quit or whatever but people that like maybe
```

371

```
1   Luther still works there. I'm not sure.
2        Q.    They don't have to still work
3   there. They can be retired.
4        A.    I guess him or Berthelot.
5        Q.    I'm sorry. What was that?
6        A.    Berthelot, Ray Berthelot and
7   Luther.
8        Q.    Can you think of anyone who is
9   retired that we could go talk to that you
10  worked with as an electrician?
11       A.    Oh, that's going to be hard to say.
12  I guess Red Sullivan or John Sullivan. He
13  don't work there no more, though.
14       Q.    That's okay. What about Philip
15  LeBlanc?
16       A.    Philip LeBlanc, yes. I know
17  Philip. He's still alive.
18       Q.    Anyone else that you can think of?
19       A.    Not too many people.
20       Q.    Albert Dieudonne? Am I saying that
21  right?
22       A.    Albert. I heard of the name Albert
23  Dieudonne but that wasn't at Avondale, though.
24  I don't know. Albert, I know the name but I'm
25  not sure he was associated with Avondale.
```

372

```
1        Q.    Okay.
2        A.    He might have been with another
3   company, another shipyard.
4        Q.    Did you ever work with any family
5   members at Avondale?
6        A.    My family members?
7        Q.    Yes, sir.
8        A.    Yes.
9        Q.    Who was that?
10       A.    Well, I had Donald LeBoeuf. He
11  worked there but he was an electrician.
12       Q.    And how is he related to you?
13       A.    That was my cousin.
14       Q.    Okay.
15       A.    And my Uncle Ronald Walker. He
16  used to work at the shop and the electrical.
17  And he retired but since then he's deceased.
18       Q.    Okay. But Donald LeBoeuf, your
19  cousin, he's still around?
20       A.    Yes. He's still around.
21       Q.    Where is he?
22       A.    He lives in Westwego. I'm not sure
23  which street.
24       Q.    All right.
25       A.    I had other relatives, too.
```

373

1    Gilbert Boudreaux, he worked in the warehouse.
2    And Larry, Larry worked there.
3         Q.    Who's Larry?
4         A.    Larry Walker.
5         Q.    Larry Walker?
6         A.    Yes.
7         Q.    How is he related to you?
8         A.    He's my cousin, too.
9         Q.    Have we exhausted it?
10        A.    That's about all.
11        Q.    Did you ever belong to a union?
12        A.    Yes, ma'am.
13        Q.    You told us that you kept a
14   notebook where you kept track of everything you
15   did during the day when you were working.
16        A.    Not everything but things that I
17   needed not to forgot. I kept a little log.
18        Q.    Do you know where any of those
19   notebooks are today?
20        A.    No, ma'am.
21        Q.    Did you clean up your work area at
22   the end of the day?
23        A.    Yes. We were told to do so.
24        Q.    How did you do that?
25        A.    We pick up our trash and debris

374

1    that we had caused during the day. Sometimes
2    it was during the day and put it in the
3    container, but not everybody did that.
4         Q.    I think I read that some
5    electricians would keep like a bucket beside
6    them so when they would make --
7         A.    Trash, they'd put in there so you'd
8    have it. They wouldn't scatter it all over the
9    decks.
10        Q.    Did you do that?
11        A.    I did that.
12        Q.    Did Mr. Fremin do that?
13        A.    I'm sure he did. The electricians
14   tried to keep their areas clean, basically.
15   Not all of them did.
16        Q.    Okay. Were you ever around anyone
17   who was sweeping up after the insulators?
18        A.    Sweeping after insulators? Well,
19   they had sweepers all the time. They were all
20   in the areas cleaning up but they had a lot of
21   debris that would stay there. They wouldn't do
22   it on a daily basis and some of it would
23   accumulate.
24        Q.    So is the answer yes, you'd be
25   around when they were sweeping up?

375

1         A.    Yes. Yes.
2         Q.    Have you ever done any remodeling
3    here at your house?
4         A.    Yes.
5         Q.    What type?
6         A.    Carpenter work. I done the
7    carpenter work in here.
8         Q.    Did any of that carpenter work
9    involve any asbestos-containing products, floor
10   tiles, ceiling tiles, roofing?
11        A.    Never no asbestos.
12        Q.    Okay. Do you belong to a church?
13        A.    Yes.
14        Q.    Which one?
15        A.    Holy Guardian Angels Church in
16   Bridge City.
17        Q.    I'm sorry?
18        A.    Holy Guardian Angels Church in
19   Bridge City.
20        Q.    I think I'm done.
21        A.    He just gave me absolution and gave
22   me my scapular. He told me just to take all my
23   sins and throw them in the ocean and don't fish
24   no more. I told him that's what I'm going to
25   do.

376

1         MS. BAXTER:
2              That's all of my questions.
3         Mr. Walker, thank you very much.
4    RE-EXAMINATION BY MS. ROUSSEL:
5         Q.    You talked about working in the
6    boiler room or the fire room. When you were
7    working in the boiler room, did they have
8    boilermakers going in and outside of the boiler
9    room?
10        A.    That's correct. Doing the work.
11        MS. ROUSSEL:
12             That's all I have.
13   RE-EXAMINATION BY MR. BELL:
14        Q.    Okay, Mr. Walker, I'm back again,
15   Troy Bell.
16             As an electrician's helper -- I'm
17   just giving you an example -- you were learning
18   your trade; is that correct?
19        A.    Yes, sir.
20        Q.    And you've already told one of the
21   attorneys that you did not do the job as a
22   boilermaker or pipefitter, correct?
23        A.    That is correct.
24        Q.    You didn't do the job of any other
25   crafts?

377

1       A.      That's correct.  I just witnessed
2  that they done it and how they done it.
3       Q.      If a gasket was being removed by a
4  pipefitter or any other craft, you couldn't
5  tell us the brand name or manufacturer of that
6  gasket being removed, could you?
7       MS. ROUSSEL:
8            He's already answered that.
9       MR. BELL:
10           No, he hasn't.
11      A.      They had a name on the gasket.
12 They had a name on it.
13 EXAMINATION BY MR. BELL:
14      Q.      Okay.  Let me see if we're on the
15 same page.  You were performing your job.
16      A.      Yes.
17      Q.      If a pipefitter, for example, was
18 removing a gasket from a flange, could you tell
19 us the brand name or manufacturer of that
20 gasket that the pipefitter was removing?
21      A.      Not unless I looked at it
22 specifically.  Not from a distance I couldn't
23 tell.
24      Q.      Could you tell us the names of any
25 pipefitters you worked with or around at

ONE SHELL SQUARE, SUITE 250 ANNEX    **HUFFMAN & ROBINSON, INC.**    (504) 525-1753
NEW ORLEANS, LOUISIANA 70130         CERTIFIED COURT REPORTERS           (800) 749-1753

378

1  Avondale?
2       A.      They had a lot of them.  But their
3  names, I can't remember anymore what
4  specifically their names are.
5       Q.      Now, you have told us that
6  pipefitters had tools and they had the gaskets
7  and their bucket.
8       A.      Yes.
9       Q.      Could you tell me what tools the
10 pipefitters work with that they put in their
11 bucket?
12      A.      They had big wrenches, big open
13 ends and regular wrenches like a pipefitter's
14 wrench.  And there was a lot of big tools
15 because they had a lot of tightening up to do
16 and they would give a lot of leverage.
17      Q.      Do you know specifically what those
18 big tools were?
19      A.      Yes.  It was like automobile
20 wrenches with the -- not the socket but the
21 closed wrench fittings that wouldn't slip on
22 the nuts to be tightened down, nuts and bolts.
23 They was all hex heads, I guess, and they use a
24 hex wrench to tighten them down.
25      Q.      Other than the wrenches, could you

ONE SHELL SQUARE, SUITE 250 ANNEX    **HUFFMAN & ROBINSON, INC.**    (504) 525-1753
NEW ORLEANS, LOUISIANA 70130         CERTIFIED COURT REPORTERS           (800) 749-1753

379

1  tell us any other tools that pipefitters may
2  have used?
3       A.      They used torches.
4       Q.      Anything else?
5       A.      Some pipefitters done some welding.
6       Q.      These are the things that you
7  actually saw pipefitters use?
8       A.      Right.
9       Q.      The torch and the welding?
10      A.      They done some welding, yes.
11      Q.      Could you tell us what shift you
12 worked, day or night?
13      A.      I worked sometimes it was at early
14 in the morning until late at night.  It was --
15 I worked the day shift and sometimes it was day
16 and night we was working.
17           The pipefitters used to use some
18 copper pipe, too, and they used to use torches
19 to heat the joints with and they used the joint
20 material in the flux, too.
21      Q.      And you never removed any gasket
22 material, correct?
23      A.      No, sir.
24      Q.      Have you ever seen any documents
25 directed to Avondale to stop using

ONE SHELL SQUARE, SUITE 250 ANNEX    **HUFFMAN & ROBINSON, INC.**    (504) 525-1753
NEW ORLEANS, LOUISIANA 70130         CERTIFIED COURT REPORTERS

380

1  asbestos-containing products in the
2  construction of vessels?
3       A.      Not that I know of, no.
4       Q.      When you worked as a carpenter's
5  helper and I believe it was -- correct me if
6  I'm wrong -- Guidros; is that correct?
7       A.      Yes.
8       Q.      Did you ever work at any schools on
9  the west bank?
10      A.      No.
11      Q.      Was it primarily residential
12 construction?
13      A.      Yes.
14      Q.      Did you ever work at any
15 commercial --
16      A.      No.  It was residential, new
17 construction.  More or less putting forms down
18 and all.
19      Q.      Did you ever complain about the
20 dusty conditions when you worked at Avondale?
21      A.      Not really complained but the
22 conditions sometimes was bad and nobody liked
23 to work in that kind of condition.
24      Q.      I may understand but when you talk
25 about not really complain, what do you mean?

ONE SHELL SQUARE, SUITE 250 ANNEX    **HUFFMAN & ROBINSON, INC.**

381

1    A.    We didn't put no formal complaints
2  about nothing.  It was just worked around it
3  the best you could.  We didn't go and clean up
4  other people's mess.  They did have people to
5  clean it up.  And occasionally they come by and
6  they would pick it up.
7        MR. BELL:
8            Thank you, Mr. Walker.
9  RE-EXAMINATION BY MR. BROWN:
10       Q.    Mr. Walker, I just have a few more
11 questions.
12          When you first started at Avondale
13 as an electrician's helper, did you ever have
14 any classroom training?
15       A.    We had classrooms, yes.
16       Q.    How long did that last?
17       A.    Well, it wasn't for Avondale but I
18 went to maybe an hour, half an hour classes
19 every now and then.
20       Q.    Was it a daily thing or was it --
21       A.    It wasn't a daily thing.  It was
22 maybe a monthly thing we would go through.
23       Q.    Earlier you testified to insulators
24 basically insulating over wire, is that
25 correct, on occasion?

382

1        A.    Insulating over wires, yes.
2        Q.    And you would have to dig the wire
3  out?
4        A.    Take the wire out.
5        Q.    How deep would you have to go into
6  the insulation to get the wire out?
7        A.    Sometimes about a half an inch,
8  quarter inch.  It all depends how deep it was
9  buried in there.
10       Q.    When you did that, did it create
11 dust?
12       A.    Yes.  When you fooled with it, it
13 moved and created dust when you cut into the
14 insulation.
15       Q.    Okay.  You've basically today
16 described three types of products that went on
17 a pipe.  Correct me if I'm wrong here, the pipe
18 covering?
19       A.    Yes.
20       Q.    A cloth product?
21       A.    Yes.
22       Q.    And then some type of sealer?
23       A.    Sealer compound.
24       Q.    Can you tell me which of those
25 products created that dust as you were cutting

383

1  through all of them?
2        A.    I'm thinking it was the rock, the
3  roll block stuff that they put on the pipe
4  itself that created the dust.
5        Q.    Why do you think that, sir?
6        A.    Because it was when they installed
7  it and cut it, it was -- a dust material would
8  fall off.  It would come out and it looked like
9  the same stuff that when you would cut, it
10 could have been a mixture of both but I wasn't
11 certain.  I'm not certain of that.
12       Q.    So it could have been any of the
13 three or all of the three?
14       MS. SCHEXNAYDER:
15           Objection to the form.
16       A.    It could have been part of the
17 three or all of the three.
18 EXAMINATION BY MR. BROWN:
19       Q.    Okay.  Thank you, sir.
20          When you were working as an
21 electrician's helper, did you ever spend any
22 time working in the shop, in the electrician's
23 shop?
24       A.    Yeah.  In some cases we had to go
25 and disassemble something and bring it in and

384

1  pick it up.
2        Q.    How frequent did that happen?
3        A.    That might have been once a day or
4  sometimes once a week.  It all depends what
5  material you need to be worked on in the shop
6  or how much you had.
7        Q.    But at the very least, it was once
8  a week; is that correct?
9        A.    Yes.  We brought something to the
10 shop.
11       Q.    Can you describe for me what was
12 going on in the pilothouse when you would be
13 working in there?
14       A.    Everybody, all the crafts, the same
15 crafting would be working, the joiner work
16 would be working, the electronics people would
17 be working, the electrical people and sometimes
18 they had painters painting, painting by hand
19 and they could be installing anything.
20       Q.    Okay.  So would that hold true what
21 you just told me for the pilothouse, would that
22 hold true for the steering room, also?
23       A.    The steering room, yes.  Not
24 everybody went in the steering room, only the
25 people that had to go in there.

385

1    Q.    What crafts would that be?

2    A.    Mostly the machinists.

3    Q.    How about the galley? What crafts

4    would be working with you in the galley?

5    A.    Well, the joiner works, they done

6    that and Avondale done a lot of their work,

7    too. And they had various crafts the

8    shipfitters would do, installing some of the

9    ovens and the cookwares and all.

10    Q.    How about the quarters, what

11    crafts --

12    A.    That was the electricians, the

13    pipefitters, the insulators, and the joiner

14    workers.

15    Q.    What would the insulators be

16    working on in the quarters?

17    A.    Well, some of the bulkheads would

18    have to be insulated and some of the pipes

19    would be insulated, also.

20    Q.    If you know, how long would it take

21    them to insulate the bulkheads and the pipes?

22    A.    Oh. I'm not sure. They had

23    bulkheads for the insulation that they had to

24    install so I don't know, it all depends how

25    many and how fast the individuals was. I'm not

386

1    certain.

2    Q.    Again, sir, you're going to have to

3    educate me a little bit real quick. Can you

4    explain to me how a bulkhead is insulated?

5    A.    Well, you got studs on them, or

6    wire and studs and then they take and slide the

7    insulation on those things. And they got clips

8    that hold the insulation on.

9    Q.    What does the insulation look like?

10    A.    It's different colors. Some of

11    them is yellow, some of it is white.

12    Q.    Is it a sheet material?

13    A.    Some of it is sheet and some of it

14    has got a coating on it and some of it is just

15    like a rock insulation. Fiberglass or

16    whatever. And I don't know why I say it's

17    fiberglass. It looked like a fibrous material

18    to me.

19    MR. BROWN:

20    That's all my questions, sir.

21    EXAMINATION BY MS. SCHEXNAYDER:

22    Q.    Good evening, sir. My name is

23    Valerie Schexnayder. I represent Flintkote. I

24    only have a couple of questions.

25    You identified Flintkote earlier as

387

1    the compound or mastic?

2    A.    Yes.

3    Q.    You did not permanently use that

4    product, did you?

5    MS. ROUSSEL:

6    That's been asked and answered, Val.

7    At this point I'm not going to let you ask

8    any questions that's been asked and

9    answered.

10    EXAMINATION BY MS. SCHEXNAYDER:

11    Q.    The questions Mr. Webb asked you

12    earlier about the removal of wire from the

13    Foster mastic, would your testimony be the same

14    if I asked you the same questions about removal

15    of wires from Flintkote mastics?

16    MR. WEBB:

17    Objection to the form of the

18    question.

19    A.    It would be the same because it

20    would just, you know, the same -- appeared to

21    be the same stuff.

22    EXAMINATION BY MS. SCHEXNAYDER:

23    Q.    Okay. So if I ask you the same

24    questions he did, your answers would be the

25    same?

388

1    A.    Yes.

2    Q.    Okay. When you did remove the wire

3    from the pipe, from the mastic, how long would

4    it take you to remove the piece of wire?

5    A.    It all depends how long it was

6    buried or how much. In maybe a few minutes.

7    Q.    Okay.

8    A.    It wasn't a long period of time.

9    Q.    And how thick was the wire that

10    you'd have to remove?

11    A.    Some of it was big like your

12    finger.

13    (Whereupon a brief recess was taken

14    at this time.)

15    EXAMINATION BY MS. SCHEXNAYDER:

16    Q.    You were saying it was as big as

17    your finger?

18    A.    Yes.

19    Q.    Now, sir, is it fair to say that

20    once the insulators spread the compound or the

21    mastic on the pipe, once it was spread on,

22    there was no way of knowing whose mastic was on

23    that pipe; is that correct?

24    A.    No, unless you touched it. And

25    that's only in my mind and I'm not certain but

389

1    maybe it might have been not fully dried but
2    one felt like it was a little tacky, the other
3    was a little stiffer but it would dry hard.
4    Which one was the hardest, I'm not certain.
5        Q.    Okay.  But once the mastic or
6    compound were applied to the pipe, they would
7    not write the name of the manufacturer or any
8    of that nature on the mastic itself?
9        A.    I never seen that.
10   MS. SCHEXNAYDER:
11       That's all I have, sir.
12   THE WITNESS:
13       Thank you.
14   MS. ROUSSEL:
15       Is that everybody?
16   MR. LEE:
17       This is Gary Lee.  I just want to
18   reserve my objections to any questions
19   that may have been leading questions asked
20   by Ms. Roussel at the beginning of her
21   questioning a little while ago.  I was out
22   of the room, I was in the bathroom.  I was
23   not here to make objections so to the
24   extent any of those questions may have
25   been leading, I reserve my right.

390

1    MS. ROUSSEL:
2        I object to an untimely objection.
3        Anybody else have anything to say
4    before we go off the record?
5    THE VIDEOGRAPHER:
6        This is the end of the videotaped
7    deposition.  We're off the record.
8        (whereupon the deposition was
9    concluded at this time.)
10       *    *    *    *    *

391

1            REPORTER'S CERTIFICATE
2
3        I, VITA T. ELMER, Certified Court
4    Reporter, in and for the State of Louisiana, as
5    the officer before whom this testimony was
6    taken, do hereby certify that RUDY JAMES
7    WALKER, SR., after having been duly sworn by me
8    upon authority of R.S. 37:2554, did testify as
9    hereinbefore set forth in the foregoing 390
10   pages; that this testimony was reported by me
11   in the stenotype reporting method, was prepared
12   and transcribed by me or under my personal
13   direction and supervision, and is a true and
14   correct transcript to the best of my ability
15   and understanding; that I am not related to
16   counsel or to the parties herein, nor am I
17   otherwise interested in the outcome of this
18   matter.
19
20
21   _Vita J. Elmer_
22   VITA T. ELMER
     Certified Court Reporter
23   Huffman & Robinson, Inc.
     One Shell Square, Suite 250 Annex
24   New Orleans, Louisiana  70139
     (504) 525-1753    (800) 749-1753
25

# Westlaw.

Not Reported in F.Supp.

Not Reported in F.Supp., 1994 WL 564744 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

Page 1

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, N.D. California.
Pacifico B. MORALES, Plaintiff,
v.
OWENS-CORNING FIBERGLAS CORP., et al.,
Defendants.
**No. C 94-2580 EFL.**

Oct. 6, 1994.

*ORDER OF REMAND*

LYNCH, District Judge.

## I. INTRODUCTION

**\*1** Plaintiff filed this suit in San Francisco Superior Court claiming injuries arising out of exposure to asbestos while working at the Subic Bay military base in the Philippines. Several but not all defendants have timely joined in the removal of this case to this Court. Plaintiff has brought a motion to remand the case to state court.

Several defendants oppose this motion to remand on various grounds. Defendant Owens-Illinois argues that plaintiff has failed to comply with Fed.R.Civ.P. 5(d), and has thereby waived his right to challenge procedural defects in the removal procedure. Several defendants also argue that removal was proper under each of two independent grounds: (1) that a federal question is present under 28 U.S.C. § 1331 and Article I, section 8, clause 17 of the U.S. Constitution and that removal is therefore proper under 28 U.S.C. § 1441 because this Court would have had original (either concurrent or exclusive) jurisdiction over the case under the doctrine of federal enclave jurisdiction, and (2) that removal is proper under 28 U.S.C. § 1442 because some defendants are being sued for injuries arising out of conduct they were directed to undertake by a

federal officer. The Court rejects all these arguments and for that reason will remand to state court.

Defendants have the burden of establishing that removal was proper. *Gaus v. Miles, Inc.,* 980 F.2d 564, 566-67 (9th Cir.1992).

## II. REMOVAL UNDER 28 U.S.C. § 1441

### A. *Jurisdiction*

The parties argue at great length over the continuing vitality of federal enclave jurisdiction and whether it is implicated in this case. For purposes of defendants' § 1441 removal, this issue is irrelevant, since the defendants have not unanimously consented to removal of this case from state court to federal court. Such unanimous consent is a procedural requirement under 28 U.S.C. § 1446 for federal question removal under § 1441. *See Emrich v. Touche Ross & Co.,* 846 F.2d 1190, 1193 (9th Cir.1988); *Hewitt v. City of Stanton,* 798 F.2d 1230, 1232-33 (9th Cir.1986). It is absolutely irrelevant to defendants' removal efforts whether the purported ground for removal is a federal question over which federal courts have exclusive [FN1] or merely concurrent jurisdiction. 28 U.S.C. § 1446 mentions nothing of waiving this procedural requirement in cases of purported "exclusive jurisdiction." Case law interpreting the removal procedure statutes have likewise failed to acknowledge defendants' proposed distinction. *See, e.g., Bradwell v. Silk Greenhouse,* 828 F.Supp. 940, 943-44 (M.D.Fla.1993) (remanding for lack of unanimous consent to removal, even though the ERISA claims invoked exclusive federal jurisdiction); *Samuel v. Langham,* 780 F.Supp. 424, 427 (N.D.Tex.1992) (remanding a case to state court even accepting ERISA preemption); *see also McCain v. Cahoj,* 794 F.Supp. 1061 (D.Kan.1992) (remanding a case because of a procedural defect in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



EXHIBIT

11

Not Reported in F.Supp.

Not Reported in F.Supp., 1994 WL 564744 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

the removal despite protestations of exclusive federal jurisdiction). Defendant Flintkote has cited *Santa Rosa Med. Center v. Converse of Puerto Rico, Inc.,* 706 F.Supp. 111, 113 n. 3 (D.P.R.1988) in which the court noted in dicta that "if federal jurisdiction were exclusive, the consent of all defendants would not be required to remove." Flintkote also cited *Ackerman v. National Prop. Analysts,* Fed.Sec.L.Rep.P. 96,604 (S.D.N.Y.1992), in which the court held, without citation, that remand was not appropriate when the federal court has exclusive jurisdiction. The Court is not persuaded by either of these cases. Further, while Owens-Illinois argues that the Court should analogize to the derivative jurisdiction doctrine in this context, the Court sees no justification for that argument.

### B. *Timeliness*

**\*2** Owens-Illinois argues that plaintiff's motion to remand should be stricken or deemed untimely because plaintiff failed to serve defendants until approximately one week after the motion to remand was filed with the Court.

The notice of removal in this case was filed on July 19, 1994. Plaintiff filed with the Court his motion to remand on August 19, 1994, but did not serve defendants until August 26, 1994. Owens-Illinois argues that Fed.R.Civ.P. 5(d) requires that service precede or be contemporaneous with filing with the Court, and that the motion should either be stricken or considered filed on the date of service.

Because 28 U.S.C. § 1447(c) provides for a thirty-day time period in which a motion for remand must be made, and because the time limit for making the motion is strictly enforced, *see, e.g., Barris v. Sulpico Lines, Inc.,* 932 F.2d 1540, 1544-45 (5th Cir.1991), defendant argues that the late service makes plaintiff's motion untimely.

Federal Rule of Civil Procedure 5(d) provides in relevant part:
All papers after the complaint required to be served upon a party, together with a certificate of service, shall be filed with the court within a reasonable time

after service....

While this Rule implies that service on opposing parties should precede filing with the Court, it does not mandate that service precede filing, nor does it require the Court to disregard papers which are served late. Moreover, the Rule does not require the Court to consider papers filed on the date which they are served. While § 1447(c) requires the motion to remand to be made within thirty days, there is no requirement that the motion be served within the thirty day period. Owens-Illinois has not cited any authority which would compel the Court to disregard a motion that was timely filed with the Court because it was served one week after it was filed, and the Court has been unable to locate any authority, either in the case law or in the learned treatises, that would mandate such action. Though it does not condone late service, the Court will not read Fed.R.Civ.P. 5(d) so strictly and will not find that the motion to remand was untimely.[FN2]

Several defendants have clearly not timely consented to this removal. Therefore, since defendants' defect in removing under § 1441 is of a procedural nature under § 1446, plaintiff's timely remand motion is granted.

### III. REMOVAL UNDER 28 U.S.C. § 1442

The requirements for removal under 28 U.S.C. § 1442 are set out in detail in this Court's Order in *Viala v. Owens-Corning Fiberglas Corp,* No. C-94-0399 EFL, dated April 13, 1994.

Several defendants, including Pittsburgh Corning and Foster Wheeler have argued in opposition to the motion for remand that they are entitled to removal under § 1442. Defendant Owens-Illinois joins in that opposition. As defendants note, the availability of § 1442 removal for even one defendant would result in the proper removal of the entire case to this Court.

**\*3** These defendants do not satisfy any of the three elements that are all required to support § 1442 removal. No defendant can raise a colorable federal defense, nor can any defendant establish that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                        Page 3

Not Reported in F.Supp., 1994 WL 564744 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

it was acting under a federal officer. Likewise, no defendant can establish a causal connection between the conduct undertaken at the direction of the federal officer and the basis for that defendant's state law liability. *See Mesa v. California,* 489 U.S. 121 (1989); *Fung v. Abex Co.,* 816 F.Supp. 569 (N.D.Cal.1992), *Ryan v. Dow Chemical,* 781 F.Supp. 934 (E.D.N.Y.1992).

The "government contractor" defense is not colorable. No defendant has produced evidence that it presented specially designed products to the government under federal orders or specifications that directly conflicted with the state law duty upon which the defendants are now being sued. *See In Re Hawaii Federal Asbestos Cases,* 960 F.2d 806 (9th Cir.1992). Most notably, no defendant produces any evidence whatsoever that the products it designed pursuant to government orders were different from those designed for civilian use in any manner pertinent to state law liability.

Pittsburgh Corning does not provide evidence that its products were uniquely designed for government use. There is simply no indication and no evidence that these products were made more dangerous than those on the open market simply because the government ordered them to be designed in a particular way. *See Boyle v. United Technologies, Inc.,* 487 U.S. 500 (1988) (defendant entitled to defense where it altered its design and manufactured outward opening hatches pursuant to government orders and where it was subsequently sued directly on the basis of its outward-opening hatches). The government did not order any defendant, including Pittsburgh Corning, to utilize asbestos in its products nor did it order them to use the asbestos in such a way that people would be dangerously exposed to asbestos fibers. Rather, the government specifications at issue relate to performance requirements and not design or manufacturing requirements.

Defendant Foster Wheeler argues that it is not an asbestos manufacturer or distributor, and that the Court should consider the fact that the government approved its specifications for the boilers as a whole. It argues that the Court should consider its products to be the boilers and the ships on which

the boilers were placed, alleging that they were built to federal specifications. However, the relevant question is whether the government had specifications which required the use of asbestos (as opposed to some other insulation), and not whether the government had other specifications relating to the boilers. *See Lewis v. Babcock Indus., Inc.,* 985 F.2d 83, 86-87 (2d Cir.1993). Foster Wheeler has not come forward with any evidence that the government required it to use asbestos in its boilers. Accordingly, it has not made a colorable claim for the government contractor defense.

**\*4** Because no defendant has made a colorable claim for the government contractor defense, removal under 28 U.S.C. § 1442 is improper.

### IV. CONCLUSION

Because the removal procedure was defective, *see* 28 U.S.C. § 1441, and because no defendant has raised a colorable government contractor defense, *see* 28 U.S.C. § 1442, plaintiff's motion to remand is GRANTED. This case shall be REMANDED to San Francisco Superior Court and all pending dates in this Court shall be vacated.

IT IS SO ORDERED.

> FN1. Whether or not the state court has jurisdiction and whether or not it might be an inconvenient forum are issues for the state court, should defendants wish to bring motions there raising such issues. This Court is simply holding that defendants' removal based on § 1441 is procedurally defective under § 1446 and that therefore the removal must be rejected and plaintiff's motion to remand must be granted. Plaintiff has chosen the forum, state court, for this case. Defendants cannot remove this case to federal court. This does not mean that they cannot raise whatever issues they deem appropriate, including jurisdiction and venue, in state court. This Court of course expresses no opinion on the merits of any such state

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                     Page 4

Not Reported in F.Supp., 1994 WL 564744 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

court motion.

FN2. The Court notes that defendants were
not prejudiced by the late service, since the
motion was not heard until more than 28
days after it was filed, and defendants had
adequate opportunity to oppose the
motion. *See* Local Rule 220-2, 220-3.
The Court further notes that plaintiff did
file a certificate of service on or about
August 26, 1994.

N.D.Cal.,1994.
Morales v. Owens-Corning Fiberglas Corp.
Not Reported in F.Supp., 1994 WL 564744
(N.D.Cal.)

Briefs and Other Related Documents (Back to top)

• 3:94cv02580 (Docket) (Jul. 20, 1994)

**END OF DOCUMENT**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JOHN ANDERSON, ET AL.

VERSUS

AVONDALE INDUSTRIES, INC., ET AL.

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA.

DEC 5  11 14 AM '94

LORETTA ...

CIVIL ACTION

NO. 94-3021

SECTION "K" (4)

## ORDER AND REASONS

A Motion to Remand filed by plaintiffs John Anderson and Eva Washington Anderson came for hearing on November 30, 1994[1]. Having entertained oral argument and reviewing the pleadings, memoranda and the relevant law, the Court finds the motion to be meritorious.

## RELEVANT FACTS AND PROCEDURAL HISTORY

Mr. Anderson worked at Avondale from 1967 to 1980. In March of 1994, he was diagnosed with cancer that he contends was caused by his being exposed to asbestos at Avondale. On August 29, 1994, plaintiffs filed a petition for damages against Avondale, its directors, and those entities that supplied Avondale with asbestos products. Those defendants include Borden, Inc.[2]

Only one Borden-produced asbestos product has been positively identified as being at issue in the instant litigation. That product is a bonding adhesive referred to as "M-6-B." In 1952, a government specification was issued that encompassed this product.

---

[1] In conjunction with the original motion, plaintiffs sought sanctions under Fed. R. Civ. P. 11; however, at oral argument, that motion was withdrawn.

[2] The subject products were apparently manufactured by the Arabol Manufacturing Company which was purchased by Borden in 1963. The two parties will be collectively referred to as "Borden."
     At Paragraph XIII, Borden, Inc. is named as having manufactured, distributed, and sold silica and asbestos-containing adhesive products.

EXHIBIT

12

DATE OF ENTRY   DEC 5 1994
(28)

PROCESS
X CHARGE
DKTD
CtRmDep
Doc. No.

This specification was MIL-A-15199A.  In 1959, the specification was superseded by MIL-A-15199B.  While it is unclear as to when Borden began manufacturing M-6-B, it is clear that the United States government, through the Navy or otherwise, was never involved the development process or production of M-6-B at Borden.

On September 16, 1994, Borden removed plaintiffs' action to federal court based on 28 U.S.C. § 1442(a)(1) which reads in relevant part:

> (a) A civil action . . . commenced in a state court against any of the following persons may be removed by them to a district court of the United States for the district and division embracing the place wherein it is pending:
>
> > (1) Any officer of the United States or any agency thereof, or person acting under him, for any act under color of such office. . . .

(emphasis added).  During the mid-1940's, Borden acted in conjunction with the Navy in developing certain non-asbestos lagging products.  Even though these products are not at issue in this litigation, Borden contends that under the above-quoted statute, it is entitled to remove this case because of that prior government supervision.

The issue presented distills into whether a company's "acting under" an officer of the United States or agency thereof with respect to products that are not the alleged basis for liability in litigation supports the removal of a case dealing with another,

2

unrelated and allegedly harmful, injurious product over which there was no such governmental supervision.[3]

## WAS REMOVAL PROPER?

The burden of proof for establishing federal jurisdiction is placed upon the party seeking removal. Willy v. Coastal Corp., 855 F.2d 1160, 1164 (5th Cir. 1988) (citing Wilson v. Republic Iron & Steel Co., 257 U.S. 92, 42 S. Ct. 35 (1921). "'If the right to remove is doubtful, the case should be remanded.'" Ryan v. Dow Chemical Co., 781 F. Supp. 934, 939 (citation omitted); Butler v. Polk, 592 F.2d 1293, 1296 (5th Cir. 1979) (axiomatic that ambiguities are generally construed against removal).

The United States Court of Appeals for the Fifth Circuit recognizes that § 1442(a)(1) provides the only exception to the well-pleaded complaint rule found in Louisville & Nashville R.R. Co. v. Mottley, 211 U.S. 149, 29 S. Ct. 42 (1908). Aquafaith Shipping, Ltd. v. Jarillas, 963 F.2d 806 (5th Cir.) cert. denied, 113 S. Ct. 413 (1992) (citing Mesa v. California, 489 U.S. 121, 136-37, 109 S. Ct. 959, 968 (1989). Thus, by virtue of this federal statute, where "a person" "acting under" federal officers can present a colorable "government contractor defense," the case

_____

[3]It must be noted that in oral argument, representation was made that Borden had been successful in a motion for summary judgment in state court in a similar asbestos suit because it proved that the only material manufactured by Borden that was used at Avondale was certain non-asbestos products. It is on these products which Borden relies to support the § 1442(a)(1) removal because there is proof that the United States government helped develop them.

Thus, Borden indicated that once it removed the case based on products that plaintiffs do not contend caused harm, it would seek dismissal based on the fact that there were no Borden products containing asbestos at Avondale. This approach appears to the Court to be a classic example of placing the cart before the horse.

3

is removable by such a "person." <u>Ryan v. Dow Chemical Co.</u>, 781 F. Supp. 934, 939 (E.D.N.Y. 1992) (emphasis added). The power to remove is absolute, provided the proper procedures are followed. <u>Id</u>. (citing <u>Willingham v. Morgan</u>, 395 U.S. 402, 406, 89 S. Ct. 1813 (1969). <u>See</u> Wright & Miller, <u>Federal Practice and Procedure</u>, § 3727 at 459 n.35; <u>Doe v. Kerwood</u>, 969 F.2d 165, 168 n. 12 and accompanying text (5th Cir. 1992). There is no need to obtain other defendants' consent.[4]

In <u>Ryan</u>, the district court provides a succinct history of the statute that mirrors the Supreme Court's analysis. As stated by the court:

> [I]ts earlier incantations were drafted to protect officials who faced state government resistance to specific federal laws. The concern underlying each however, has been the same: that state governments hostile to duly enacted federal laws would be able to frustrate the implementation of those laws by bringing or allowing to be brought civil or criminal actions in state court against the federal officials responsible for their implementation.

<u>Id</u>., 781 F.Supp. at 941-42. The court in that decision noted that of late the United States Supreme Court has become more circumspect in its application of the statute culminating in <u>Mesa v. California</u>, 489 U.S. 121, 109 S. Ct. 959 (1989). In <u>Mesa</u>, the Supreme Court set forth the criteria necessary to support removal under the statute and made it clear that in order to invoke the removal power of § 1442(a)(1), a "person" seeking removal must

---

[4]Plaintiffs contended in their motion that procedurally Borden had improperly removed this action because it had not obtained the consent of all the served defendants. While apparently this may be irrelevant under § 1442(a)(1), the issue is rendered moot by the Court's findings herein.

4

allege a federal law defense. <u>Crocker v. Borden</u>, 852 F. Supp. 1322 (E.D.La. 1994) (Livaudais, J.); <u>Akin v. Big Three Indus., Inc.</u>, 851 F. Supp. 819 (E.D. Tex. 1994); <u>Ryan</u>, 781 F. Supp. at 943.

## A.   IS BORDEN A "PERSON?"

Thus, the threshold inquiry is whether Borden is a "person." While there is evidently some case law to the contrary, this Court concurs with the majority of courts that has found that a corporation can be considered a "person" for purposes of the subject removal statute. <u>Akin</u>, 851 F.Supp. at 822. This finding is supported by 1 U.S.C. § 1 which instructs that when construing Congressional acts, unless context indicates otherwise, a "person" includes corporations. <u>Id</u>. n. 2.  <u>See</u> <u>Crocker</u>, 852 F. Supp. at 1325; <u>Pack v. AC and S. Inc.</u>, 838 F.Supp. 1099, 1192-03 (D.Md. 1993); <u>Ryan</u>, 781 F. Supp. at 943; and <u>Bakalis v. Crossland Savings Bank</u>, 781 F. Supp. 140, 143-44 (E.D.N.Y. 1991).  Thus, Borden is considered a "person" for purposes of removal.

## B. DOES BORDEN FULFILL THE MESA REQUIREMENTS?

As previously noted, the next inquiry is whether the mandate of <u>Mesa</u> is fulfilled.  The three pronged inquiry requires the moving "person" acting "under a federal officer" to:

   (1)  demonstrate that it acted under the direction of a federal officer;

   (2)  raise a federal defense to the plaintiffs' claims; and

   (3)  demonstrate a causal nexus between plaintiffs' claims and acts it performed under color of federal office.

5

Crocker, 852 F. Supp. at 1325.  The Court finds that Borden has

failed in its burden of proof with respect to this first element.

As stated in Ryan:

> The rule established is that removal by a "person acting
> under" a federal officer must be predicated upon a
> showing that the acts that form the basis for the state,
> civil or criminal suit were performed pursuant to an
> officer's direct order or to comprehensive and detailed
> regulations.

Ryan v. Dow Chemical Co., 781 F. Supp. at 947 (emphasis added).  In

Ryan, the court found that where the persons being sued for

formulating and producing Agent Orange, all of which its components

were developed without direct government control and all of which

methods of manufacture were determined by the defendants, not the

government, the removing party did not meet its burden of proof.

> Although the defendants later produced and delivered
> Agent Orange under the control of federal officers, these
> subsequent acts are distinct from the earlier acts of
> product and manufacturing design being sued upon.  The
> government sought only to buy ready-to-order herbicides,
> not to cause, control or prevent the production of the
> unwanted by-product, dioxin, which is the alleged cause
> of plaintiffs' injuries.  The necessary direct and
> detailed official control over the acts for which the
> defendants are now being sued is therefore lacking.

Id. at 950 (emphasis added).

As noted, there was only one substance, M-B-6, which contained

asbestos that Borden made that plaintiffs contend subject Borden to

liability.  To demonstrate the "control" required under the first

Mesa element, Borden produced the affidavit of Carl Erikson.  He

was the chief chemist at Arabol Manufacturing Co. until it was

bought out by Borden, where he continued to work.  He attested at

great length with regard to other non-asbestos lagging devices and

6

the intimate involvement that a Walter P. Sinclair with the United States Navy's Naval Engineering and Experimental Station at Annapolis had in drafting other non-asbestos product specifications. However, the affidavit is glaringly silent in regard to Mr. Sinclair's or any other government agent's involvement with M-B-6. Mr. Erikson's only attestations with regard to M-B-6 are:

> 14. Arabol also produced a product referred to as M-6-B to meet government specification MIL-A-15199B.
>
> 15. This government specification required that the product contain asbestos.
>
> 16. Arabol did not produce M-6-B before the government specification regarding the required components was issued.
>
> 17. Arabol manufactured limited quantities of M-6-B for the United States Navy to meet this government specification.

(Memorandum in Opposition, Exhibit 1).

There is absolutely no evidence presented of intimate government oversight or involvement in the design or production of M-6-B. As noted in Pack v. AC and S. Inc., 838 F. Supp. 1099, 1103 (D.Md. 1993), "'[d]irect control' is established by showing strong government intervention and the possibility that a defendant will be sued in state court as a result of the federal control." Id. (citation omitted). Another court describing the necessary connexity stated as follows:

> [The case law] allows private corporations to remove only when the corporation is so intimately involved with government functions as to occupy essentially the position of an employee of the government. Government employees are the primary protected class of §

7

1442(a)(1).   Willingham v. Morgan, 395 U.S. 402, 89 S.
Ct. 1813 (1969).

Bakalis v. Crossland Sav. Bank, 781 F. Supp. 140, 145 (E.D.N.Y.
1991).

Plaintiffs have produced deposition testimony of Mr. Erikson
that indicates that Mr. Erikson has absolutely no recollection of
the government's involvement in the development of M-6-B.
Plaintiffs have presented deposition testimony that demonstrates
that this substance was manufactured before a 1952 Military
specification issued concerning the substance.   (Memorandum in
Support of Motion to Remand, Exhibit 1, Dep. of Carl Erikson,
pp.69-70).   Mr. Erikson specifically testified that he has no
knowledge where the specifications for M-B-6 came from.   He also
does not remember whether government inspectors were at Arabol at
the time, contrary to his very specific memories with respect to
the other substances.   Furthermore, evidence indicates that this
asbestos-containing material may have been used in ships
manufactured at Avondale for private industry in 1967. (Memorandum
in Support of Motion to Remand, Exhibit 5).

For purposes of removal, Borden relied heavily on Crocker v.
Borden, 852 F. Supp. 1322 (E.D.La. 1994) (Livaudais, J.); however,
that case is readily distinguishable from the case at bar.   In
Crocker, a party-manufacturer presented an unrebutted affidavit
outlining in detail the intimate control and supervision by the
Department of the Navy with respect to turbine motors that was the
basis for a third-party demand.   Here, the affiant, who has such
specific memories in relation to the non-asbestos substances, has

8

no particular memory in regard to M-B-6 and its development. Furthermore, there is overwhelming evidence to rebut Borden's contentions.

Considering the history of § 1442(a)(1), and the dearth of evidence presented by the party removing and the plethora of evidence presented by the party seeking remand, the Court finds that Borden failed in proving the first Mesa requirement. Borden has failed to show that it "was acting under" a federal officer with respect to the allegedly injurious product, and that failure in and of itself defeats the removal, mooting any inquiry with respect to other two prongs of Mesa. Therefore, the Court finds that it has no jurisdiction over this matter, and it must remand this suit pursuant to 28 U.S.C. § 1447(c).

Accordingly, the Motion to Remand filed by plaintiffs John Anderson and Eva Washington Anderson is GRANTED, and this case shall be REMANDED to the Civil District Court for the Parish of Orleans.

IT IS SO ORDERED.

New Orleans, Louisiana, this ___5th___ day of December, 1994.

_____
STANWOOD R. DUVAL, JR.
UNITED STATES DISTRICT COURT JUDGE

9

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**ALVIN SAVOIE**                                                    **CIVIL ACTION**

**VERSUS**                                                              **NO.05-2086**

**NORTHROP GRUMMAN SHIP SYSTEMS, INC., ET AL.**          **SECTION "K" (5)**

### ORDER AND REASONS

Before the Court is plaintiff's Motion To Remand and Impose Rule 11 Sanctions (Rec.Doc. 14); Defendant's Motion to Compel Plaintiff to Provide a Verified Response to Remand-Related Interrogatories Pursuant to Rule 33, or Alternatively to Continue the Hearing of Plaintiff's Motion to Remand (Rec.Doc.41); Defendant's Motion to Include Statement Prescribed by 28 U.S.C.A. § 1292 (B) and to Stay Order of Remand (Rec.Doc. 38).  Oral argument was held on July 6, 2005 regarding these motions, with exception to Defendant's Motion to Include Statement Prescribed by 28 U.S.C.A. § 1292(B) which the Court has taken on the briefs.

### BACKGROUND

Plaintiff filed his Petition for Damages in Civil District Court for the Parish of Orleans, alleging he was occupationlly exposed to injurious levels of asbestos from working at Avondale

1

EXHIBIT
13

Shipyards in 1996 and 1967 and American Cyanamid in 1968. Plaintiff names a number of

defendants, among them Northrup Grumman Ship Systems, Inc. f/k/a Avondale Industries, Inc.

and Peter Territo, an Executive Officer of Avondale. Peter Territo removed the case on May 31,

2005, pursuant to 28 U.S.C. § 1331 in that the action arises "under the Constitution, laws or

treaties of the United States" and involves persons acting under authority of the officer of the

United States within the meaning of 28 U.S.C. § 1442.

## LEGAL STANDARD

The burden of proof for establishing federal jurisdiction is placed upon the party seeking

removal. *Willy v. Coastal Corp.*, 855 F.2d 1160, 1164 (5th Cir. 1988) (citing *Wilson v. Republic

Iron & Steel Co.,* 257 U.S. 92, 42 S. Ct. 35 (1921). "'If the right to remove is doubtful, the case

should be remanded.'" *Ryan v. Dow Chemical Co.,* 781 F. Supp. 934, 939 (E.D.N.Y. 1992)

(citations omitted); *see Butler v. Polk,* 592 F.2d 1293, 1296 (5th Cir. 1979). The United States

Court of Appeals for the Fifth Circuit recognizes that § 1442(a)(1)[1] provides the only exception

to the well-pleaded complaint rule found in *Louisville & Nashville R.R. Co. v. Mottley,* 211 U.S.

149, 29 S. Ct. 42 (1908). *Aquafaith Shipping, Ltd. v. Jarillas,* 963 F.2d 806 (5th Cir.) *cert.*

*denied*, 113 S. Ct. 413 (1992) (citing *Mesa v. California,* 489 U.S. 121, 136-37, 109 S. Ct. 959,

968 (1989)). Thus, by virtue of this federal statute, where "a person" "acting under" federal

---

[1](a) A civil action or criminal prosecution commenced in a State court against any of the
following may be removed by them to the district court of the United States for the district and
division embracing the place wherein it is pending:
(1) The United States or any agency thereof or any officer (or any person acting under that
officer) of the United States or of any agency thereof, sued in an official or individual capacity
for any act under color of such office or on account of any right, title or authority claimed under
any Act of Congress for the apprehension or punishment of criminals or the collection of the
revenue.

2

officers can present a colorable "government contractor defense" or other federal law defense, the case is removable by such a "person." *Ryan v. Dow Chemical Co.,* 781 F. Supp. 934, 939 (E.D.N.Y. 1992) (emphasis added). The power to remove is absolute, provided the proper procedures are followed. *Id.* (citing *Willingham v. Morgan,* 395 U.S. 402, 406, 89 S. Ct. 1813 (1969). *See* Wright & Miller, *Federal Practice and Procedure,* § 3727 at 459 n.35. There is no need to obtain other defendants' consent.

In *Mesa v. California,* 489 U.S. 121, 109 S. Ct. 959 (1989), the Supreme Court set forth the criteria necessary to support removal under this statute and reiterated that in order to invoke the removal power of § 1442(a)(1), a "person" seeking removal must allege a federal law defense. *Crocker v. Borden,* 852 F. Supp. 1322 (E.D.La. 1994) (Livaudais, J.); *Akin v. Big Three Indus., Inc.,* 851 F. Supp. 819 (E.D. Tex. 1994); *Ryan,* 781 F. Supp. at 943. Thus, *Mesa* provides a three pronged inquiry which requires the moving "person" acting "under a federal officer" to: (1) demonstrate that it acted under the direction of a federal officer;

(2) raise a colorable federal defense to the plaintiffs' claims; and

(3) demonstrate a causal nexus between plaintiffs' claims and acts it performed under color of federal office. *Crocker,* 852 F. Supp. at 1325. There is no dispute that the removing defendants are "persons" for purposes of the statute. However, all three *Mesa* factors must be met for removal to be proper.

## ANALYSIS

The Court finds that defendant's removal fails on the first prong, as defendant cannot demonstrate that he was acting under the direction of a federal officer specific to the claims alleged in plaintiff's petition, namely, those dealing with the safety procedures and plans of

Avondale. Claims against Territo include failure to provide petitioner with a safe work place and safety equipment; failure to disclose, warn, or reveal medical and safety information regarding asbestos hazards and safety and health risks associated with asbestos; failure to properly supervise; failure to remove asbestos hazards from the work place; failure to provide a safe and suitable means of asbestos. *See* Petition, ¶ 31. Without going into an in depth analysis, the Court views this particular case as analogous to the long line of precedent cases addressing the very issues herein which held that removal was improper. *See Gauthe v. Asbestos Corp., Et AL*, 1997 WL 3255 (E.D.La.1997); *Quebedeaux v. Union Pacific Railroad*, No. 6:04-02232 (W.D.La. 2004); *Bourgeois v. A.P. Green Industries, Inc.*, No. 96-3764 (E.D.La.1996); *Guidroz v. The Anchor Packing Co.*, No. 98-3764 (E.D.La.1996); *Overly v. Raybestos-Manhattan*, No. C-96-2853 CI (N.D.Cal.1996); *Westbrook v. Asbestos Defendants*, 2001 WL 902642 (N.D.Cal.2001); *Mouton v. Flexitallic, Inc.*, 1999 WL 2254438 (E.D.La.1999); *Porche v. Flexitallic, Inc.*, 1996 WL 603919 (E.D.La.1996); *Mabile v. Hidalgo*, No.95-2200.9 (W.D.La.1995).

Furthermore, "[p]rior decisions analyzing what constitutes federal direction have required more than 'general auspices' of a federal officer, or participation in a regulated industry.'" *Mouton, supra*, at *2(citing *Ryan v. Dow Chemical Co.*, 781 F.Supp.934, 946 (E.D.N.Y.1992). "Instead the defendant must show 'strong government intervention and the threat that a defendant will be sued in state court' based on actions which follow federal direction." *Mouton, supra*, at *2(citing *Fung v. Abex Corp.*, 816 F.Supp. 569, 572 (N.D.Ca.1992). Territo's sworn testimony shows that the safety department at Avondale was not under the control of federal officers. *See* Plaintiff's Exhibit 11. The cases defendant cites,

4

*Lalonde v. Delta Field Erection*, Civ. Act. 1997 WL 3255 (E.D.La.01/02/97), *Fink v. Todd Shipyards, Et al.*, No.04-430 (E.D.La. 04/20/04)(Porteous, J.), and *Delancey, Et al. v. General Electric, Et. al*, No.04-341 (E.D.La. 03/31/04)(Feldman, J.) are not persuasive.  Furthermore, *Fink* and *Delancey* involve the design, construction, and manufacturing of turbines and do not refer to any claims regarding safety programs or equipment and are distinguishable from the matter before this Court.  The plaintiff, in the instant matter, does not make any design or manufacturing defect claims against defendants.  Plaintiff made clear at oral argument that the claims in this case are based solely upon Territo's and Avondale's failure to use asbestos safely and not based simply upon their use of asbestos.  Their claims are based on negligence; any claim brought under La. Civ. Code Art. 2317 "has never been construed to impose a mode of strict liability which, upon the showing of causation, is absolute and unconditional." *Smith v. Reliance Ins. Co.*, 431 So.2d 907 (La.App.2nd Cir.1983).

Accordingly, for the reasons stated herein,

**IT IS ORDERED** that plaintiff's Motion for Remand (Rec.Doc.14) is **GRANTED**;

**IT IS FURTHER ORDERED** that plaintiff's Motion for Rule 11 Sanctions (Rec.Doc.14) is **DENIED**;

**IT IS FURTHER ORDERED** that Defendant's Motion to Compel Plaintiff to Provide a Verified Response to Remand-Related Interrogatories Pursuant to Rule 33, and Alternatively to Continue the Hearing of Plaintiff's Motion to Remand (Rec.Doc.41) is **DENIED** as **MOOT**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Include Statement Prescribed by 28 U.S.C.A. § 1292 (B) and to Stay Order of Remand (Rec.Doc. 38) is **DENIED**.

New Orleans, Louisiana, this ___13th___ day of July, 2005.

STANWOOD R. DUVAL, JR.
**UNITED STATES DISTRICT COURT JUDGE**

6

REPORT OF ACCIDENT

AVONDALE SHIPYARDS, INC.

Byron Granier

| Clock No. | Age | Occupation |
|---|---|---|
| 11562 | 23 | Electrician |

Date of Accident: 3/16/76
Date Reported: 3/16/76

Time: 10:40am    Shift: day

Stegal          Electric          LNG#2 -main deck

States" Carrying torch hose, it got hooked and I fell on strongback."

Abrasion lt lower buttock area. Ice. Sulfamylon drs. States"TT last mongh
APCs. RC in AM.

EXHIBIT
14

L. Golden, RN

**REPORT OF ACCIDENT**

Sta #1                    201                              AVONDALE SHIPYARDS, INC.

Byron Granier

| Badge/Clock No. | Age | Occupation |
|---|---|---|
| 11562 | 23 | Layout elect |

| Date of accident | Time | Shift |
|---|---|---|
| 2/13/76 | 9:45 | day |

Date reported: same

| Mancuso | Elect | LNG 2 |
|---|---|---|

Walking with a piece of angle iron, turned around angle hit bridge of noss. rep lac bridge of nose. S To see Dr  States tetanus  about a yr ago!

*Lac bridge nose*
*cut heel – Dennis*

2-16-76   to nose.

2-17-76   to nose ...

... had removed bridge of nose, healed clean.

*[signature] RN*

REPORT OF ACCIDENT

AVONDALE SHIPYARDS, INC.

Byron Granier

| Badge-Check No. | Age | Occupation |
|---|---|---|
| 11562 | 23 | backer |

| Date of Accident | Time | Shift |
|---|---|---|
| 12/5/75 | 3;15PM | day |

Date Reported

City

Phone No.

| | Department | Where Accident Occurred |
|---|---|---|
| Steegal | elect | #2LNG |

wrapping up some junction boxes-pipe bolt fell from above  hitting rt cheek

rt cheek- contusion and sm lac- merth Ice cap

# RECORD

# OF

# VESSELS CONSTRUCTED

# AT

# AVONDALE'S SHIPYARDS DIVISION



**Avondale**
Shipyards Division

**December 13, 1996**

EXHIBIT

15

## VESSELS CONSTRUCTED AT AVONDALE SINCE FOUNDING OF COMPANY - 1938   (Page 60)

| Hull No. | Job No. | Order Date | Keel Date | Launch Date | Delivery Date | Customer | Type of Vessel | Size: Length x Beam x Depth (ft.) / Tonnage | Identification/Remarks |
|---|---|---|---|---|---|---|---|---|---|
| 2260 | C1-1085 | 04/25/72 | 03/05/72 | 05/11/72 | 06/30/72 | Holland - America Line | LASH Lighter Barge | 61.5 x 31 x 13 / 450 DWT | CELLO 1125 |
| 2261 | C2-800 | 06/06/72 | 03/05/73 | 04/15/73 | 02/28/74 | SEDCO, Inc. | Semi-Sub Drilling Rig | 235 x 195 x 124 / 7735 Gross | SEDCO 703 |
| 2262 | C3-308 | 02/14/73 | 10/08/73 | 04/23/74 | 09/26/74 | The Western Co. of North America | Semi-Sub Drilling Rig | 260 x 200 x 111 / 9825 Gross | PACESETTER III |
| 2263 | B3-106 | 04/19/73 | 07/15/73 | 02/07/74 | 03/13/74 | J. Ray McDermott | Deck Cargo Barge | 240 x 72 x 17.25 / 2571 Gross | McDERMOTT TIDELANDS BARGE 012 |
| 2264 | B3-107 | 04/19/73 | 07/15/73 | 03/25/74 | 04/08/74 | J. Ray McDermott | Deck Cargo Barge | 240 x 72 x 17.25 / 2571 Gross | McDERMOTT TIDELANDS BARGE 014 |
| 2265 | C3-517 | 04/24/73 | 10/04/73 | 03/02/74 | 05/15/74 | Interstate Oil Transport Co. | Oil Barge | 450 x 90 x 32.5 / 9482 Gross | OCEAN 155 |
| 2266 | C3-700 | 03/29/73 | 10/15/74 | 12/20/75 | -- | El Paso Natural Gas Company | LNG Carrier | 931.5 x 140.5 x 94 / 63,170 DWT / 95,059 Total Disp. | EL PASO COLOMBIA 125,000 CM Steam Turbine |
| 2267 | C3-700 | 03/29/73 | 04/28/75 | 06/21/76 | -- | El Paso Natural Gas Company | LNG Carrier | 931.5 x 140.5 x 94 / 63,170 DWT / 95,059 Total Disp. | EL PASO SAVANNAH 125,000 CM Steam Turbine |
| 2268 | C3-700 | 03/29/73 | 01/29/76 | 11/06/76 | -- | El Paso Natural Gas Company | LNG Carrier | 931.5 x 140.5 x 94 / 63,170 DWT / 95,059 Total Disp. | EL PASO COVE POINT 125,000 CM Steam Turbine |
| 2269 | C3-683 | 06/04/73 | 08/01/73 | 11/26/73 | 11/26/73 | Great Lakes Dredge & Dock | Clamshell Dredge Hull | 185 x 60 x 11 / 1120 Gross | GL-54 |
| 2270 | H3-330 | 03/14/73 | 04/03/73 | 06/02/73 | 12/05/73 | Electro-Coal Transfer Corp. | Twin Screw Tug | 64 x 24 x 9 / 97.9 Gross | GINNY HOWELL |

1

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF LOUISIANA

3
DOROTHY REED GAUTHE, ET AL          CIVIL ACTION
4                                    NO. 96-2454

5    VERSUS                          SECTION "F"

     ASBESTOS CORPORATION LTD.,
6 ·  ET AL                           MAGISTRATE 3
     ----------------------------------------------------
7    UNITED STATES DISTRICT COURT

8    EASTERN DISTRICT OF LOUISIANA

9
HORACE PORCHE                       CIVIL ACTION
10                                   NO. 96-2827

11   VERSUS
                                     CONSOLIDATED WITH
                                     96-2879; 96-2882;
     FLEXITALLIC INC., ET AL         96-2880; 96-2877;
12                                   96-2878; 96-2881;
13                                   96-2828

14                                   SECTION "E"

15

16

17

18   Deposition of PETER R. TERRITO, taken at Avondale

19   Industries, Inc., 5100 River Road, Avondale,

20   Louisiana, on Thursday, September 26, 1996.

21

22

23

24   EXHIBIT
       16
25

129

1  Q.   They had to wear steel-toed boots if they
2       were in that situation, because that was
3       Avondale's rules?
4  A.   Yes.
5  Q.   Same thing for safety belts?  If an
6       Avondale employee had to wear that or a
7       hard hat, the Navy had to wear it, right?
8  A.   Yes.
9  Q.   That was because that was you-all's
10      rules?
11 A.   Yes.
12 Q.   Now, the Navy, they never came to you and
13      wrote your rules, did they?
14 A.   No.
15 Q.   So the safety department was independent
16      from these Federal officers that were on
17      board these vessels?
18 A.   Yes.
19 Q.   All safety rules were written or
20      promulgated by the safety department at
21      Avondale; is that correct?
22 A.   Yes.
23 Q.   And no Navy inspector at any time ever
24      told you what rules you had to
25      promulgate; is that correct?

1  A.    For as long as we complied with the

2        Longshoremen and Harbor Workers' or OSHA.

3  Q.    The Federal laws that were on the books,

4        that applied to all shipbuilding, and you

5        had to comply with those, also?

6  A.    Yes.

7  Q.    Were there any, to your knowledge,

8        special rules that Avondale had to follow

9        that weren't general rules for all

10       shipbuilding?

11       MR. CARAWAY:

12             Do you mean safety rules?

13       MS. ARDOIN:

14             Safety rules.

15       THE WITNESS:

16             Not that I know of.

17  EXAMINATION BY MS. ARDOIN:

18  Q.    Not that you're aware of?

19  A.    No.

20  Q.    Did any person that you might have

21        identified as a Federal officer or

22        Government inspector -- again, when I say

23        "Federal officer," I'm talking about the

24        Navy inspectors and people who have some

25        Federal authority, did at any time they

135

1  Q.   Is this the same type of authority that

2       -- or this authority that they exercised,

3       was it similar to the instances cited in

4       your affidavit?

5  A.   Yes.

6  Q.   The work that they stopped was the same

7       type of work you would have stopped, had

8       you observed it before the naval officer?

9  A.   Yes.

10 Q.   That aside, what I'm asking you is

11      whether or not the Federal officers that

12      were on board the vessel, the naval

13      inspectors, did they control the safety

14      department of Avondale?

15 A.   No.

16 Q.   Did they control any of your policies or

17      procedures or the promulgation of

18      enforcement policies and procedures?

19 A.   Well, they had the authority to stop

20      anything that they saw that was immediate

21      danger.  So that would give them some

22      control over that, yes.

23 Q.   The same authority that OSHA now has

24      today to stop work if they see immediate

25      danger?

1   A.   Yes.

2   Q.   Did any of these Federal officers direct

3        the promulgation of safety programs at

4        Avondale?

5   A.   No.

6   Q.   Did they direct the enforcement of safety

7        programs at Avondale?

8   A.   Well, they would oversee it, yes.  They

9        would oversee it and make sure that we

10       were doing what we were supposed to do as

11       far as the law was concerned.

12  Q.   But they didn't direct how you were to go

13       about enforcing it, did they?

14  A.   No.

15  Q.   So is it a fair statement that those

16       naval officers were overseeing all

17       operations?

18  A.   Yes.

19  Q.   Did you ever read the Walsh-Healy

20       requirements prior to 1980?

21  A.   No, I don't remember.  I don't think so.

22  Q.   Can you think of any instance wherein you

23       -- and when I use the term "you," I mean

24       you individually or you as the Avondale

25       safety department both here attempted to

137

1        implement a plan that was halted because

2        the Navy didn't want you to do this, or

3        that Inspectors didn't want you to do

4        this?

5  A.    I don't remember anything like that, no.

6  Q.    As a matter of fact, Jim O'Donnell had

7        Instituted the Competent Man Program,

8        right?

9  A.    Yes.

10  Q.    He presented this safety program to the

11        Navy; is that correct?

12  A.    He presented it to the U.S. Department of

13        Labor, yes.

14  Q.    They liked it so much, they adopted it,

15        didn't they?

16  A.    Yes.

17  Q.    As a matter of fact, the Government

18        agencies, Including the Navy, they didn't

19        prohibit you from presenting them with

20        any safety proposals, did they?

21  A.    No.

22  Q.    They didn't tell you what your safety

23        proposals had to be, did they?

24  A.    No.  Just the rules and regulations that

25        governed us, we had to follow, that was

1       In the contract.

2  Q.   So you have OSHA regulations after '72,

3       and you have Walsh-Healy regulations and

4       other Federal regulations that applied to

5       all shipyards that Avondale was also

6       bound it; is that correct?

7  A.   Yes.

8  Q.   And there were no special regulations for

9       Avondale, were there, as far as safety is

10      concerned?  I'm not talking about the

11      other stuff.

12 A.   No.

13 Q.   So when you say the Navy had oversight

14      authority, you're talking about these

15      standards promulgated by these different

16      agencies.  If you weren't following the

17      law, they could shut you down?

18 A.   Yes.

19 Q.   Did any Federal officer ever direct the

20      day-to-day activities of the safety

21      department at Avondale?

22 A.   Not the day-to-day.  We had inspections

23      with the Navy on board vessels.  I guess

24      the Navy came with us to inspect the

25      vessels once a week, but we had three and

139

1      four vessels, so every day there would be

2      an inspector there that came from central

3      management or supervisor of shipbuilding,

4      which the Navy inspectors worked for that

5      was part of the program.

6  Q.   But did those Federal officers direct the

7       safety program, or was it just an

8       inspector?

9  A.   No.  They just followed the rules with us

10      that we made inspections with them.

11 Q.   Did any Federal officer -- and again when

12      I use the term "Federal officer," I mean

13      the Federal inspectors or the ones coming

14      down -- did they exercise control over

15      the safety department at Avondale?

16 MR. CARAWAY:

17           Object to the form.  I think the

18       word "control" could be open to

19       interpretation.  But, subject to

20       that, you can answer the question.

21 THE WITNESS:

22           What was the question?

23 EXAMINATION BY MS. ARDOIN:

24 Q.   I'm asking whether Federal officers

25      controlled the safety department at

140

1          Avondale.

2   A.     No.

3   Q.     Let's see if I have much left.  Paragraph

4          6 of your affidavit, if we could look at

5          that real quick, on the line where it

6          says, "During the construction of naval

7          vessels the Navy personnel would

8          continuously inspect the vessel to ensure

9          that applicable safety standards were

10         met."  Do you see that right here?

11  A.     Yes, I see it.

12  Q.     I don't mean to sound ignorant, but what

13         were the applicable safety standards?

14  A.     The Longshoremen and Harbor Workers' Act,

15         OSHA standards, Walsh-Healy standards.

16  Q.     But these are standards you didn't read,

17         right?

18  A.     Yes.

19  Q.     Did any naval inspector come to you and

20         say, "Mr. Territo, we are going out to

21         inspect to make sure, to ensure that the

22         applicable safety standards were met"?

23  A.     Made inspections with him, yes.

24  Q.     So you assumed the inspections would

25         include compliance with the general

142

1       vessels prior to 1980, in regard to

2       asbestos being used in an area?

3  A.   Prior to 1980?

4       MR. CARAWAY:

5            Wait a second.  I'm going to

6            object to the form.  Did you say

7            "warning signs"?

8       MS. ARDOIN:

9            Yes.

10      MR. CARAWAY:

11           Are you talking about caution

12           labels on products or warning signs

13           put up by the shipyard?

14      MS. ARDOIN:

15           I'm sorry.

16  EXAMINATION BY MS. ARDOIN:

17  Q.   Did you ever see warning signs put up by

18       the shipyard or any subcontractor like

19       Hopeman Brothers, for example, that

20       asbestos was being used in the area, or

21       with reference whatsoever about asbestos?

22  A.   I don't remember.  Before 1980?

23  Q.   Yes.

24  A.   I don't remember.

25  Q.   To your knowledge, is there any Federal

143

1          regulation or specification in the
2          contracts with the Navy that would
3          prevent you from putting up a sign in a
4          naval vessel?
5     A.   If it was under construction?
6     Q.   Yes.
7     A.   No.
8     Q.   So if you wanted to put up a warning sign
9          because lead paint is being used or lead
10         paint is being ripped out, you could do
11         that?
12    A.   Yes.
13    Q.   And you could do that back in the '50s,
14         if you wanted, or the '60s, if you
15         wanted?
16    A.   If it was something unsafe to employees,
17         yes.
18    Q.   The regulations that are promulgated by
19         the Federal Government, would you agree
20         with me that those regulations are the
21         minimal standards for safety?
22    A.   Minimal standards?
23    Q.   In other words, is there anything
24         preventing Avondale from doing more than
25         what those regulations called for?

144

1  A.     No.

2  Q.     So if you don't comply with at least the

3         minimal standards, what happens?

4       MR. CARAWAY:

5               Now?

6       MS. ARDOIN:

7               I'm sorry.  Well, we'll do it

8         both ways.

9 EXAMINATION BY MS. ARDOIN:

10 Q.     If you didn't comply with standards that

11         the Government thought you should have --

12         and I'm sorry, maybe I shouldn't ask

13         this, because you didn't know what the

14         standards were, did you?

15       MR. CARAWAY:

16               Asbestos standards in the '60s,

17           is that what you're referring to?

18       MS. ARDOIN:

19               Right.

20 EXAMINATION BY MS. ARDOIN:

21 Q.     You didn't know what those standards

22         were?

23 A.     No.

24 Q.     Did you know what the standards were for

25         closed containers?

U.S. FILED
EASTERN DISTRICT COURT
DISTRICT OF LA
2006 AUG 22 AM 10: 42
LORETTA
CLERK WHYTE

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| BYRON GRANIER, ET AL. | * | CIVIL ACTION NO. 06-3738 |
| VS. | * | DIVISION "L" |
| NORTHROP GRUMMAN SHIP SYSTEMS, INC.("AVONDALE"), ET AL* | | MAG. "3" |

*******************************************************************

### REPLY MEMORANDUM IN SUPPORT OF MOTION TO REMAND

**MAY IT PLEASE THE COURT**:

Plaintiffs reply to Northrop Grumman Ship Systems, Inc.'s ("Avondale") and its executive officers', Peter Territo and Albert Bossier, Jr. (hereinafter the "Avondale Interests") Opposition to Motion to Remand, as follows:

I.   **AVONDALE CONTROLLED THE ACTIVITIES AT ITS FACILITIES, NOT THE GOVERNMENT; AVONDALE IS NOT A GOVERNMENT OWNED FACILITY**

In the case at bar, Mr. Granier worked directly for Avondale, and Avondale, not the government, controlled all of the activities in regard to the construction of commercial and Navy vessels. Mr. Granier's Avondale employment records show that he did work on commercial LNGs which were vessels being built for El Paso Natural Gas Company, a private corporation. Exhibits attached to Memorandum in Support of Motion To Remand ("Orig.") Exhibits "14" & "15". Rudy Walker, Sr. was a navy inspector covering Avondale Shipyards starting in 1969, and throughout Byron Granier's employment. Orig. Exhibit "10", pages 159, 168 & 209. Mr. Walker states that the Navy was a customer just like any other customer of Avondale. Orig. Exhibit "10" at p. 341. The Navy did not have to look at the work being done by Avondale, but was called out by Avondale to review the finished sections of the ship just like any other customer. Orig. Exhibit "10", p. 342-43; Orig. Exhibit "16". Also, the Navy did not have a separate office on Avondale's premises, but used the same facilities as all other customers. Orig. Exhibit "10" pages 166-67.

Fee
Process
X Dktd
CtRmDep
Doc. No.

APPENDIX "B"

Felix Albert was also a ship inspector with the United States Navy at Avondale Shipyards from 1965 to 1976. In his sworn affidavit, Mr. Albert states that **"Avondale was a privately owned shipyard that constructed both military and commercial vessels. In connection with the construction of the government vessels, Avondale employees did not work under the direct orders of a ship inspector and Avondale employees did not act under the direction of a ship inspector. The United States government inspectors neither monitored nor enforced safety regulations. On the job safety during the construction of vessels for the United States government was the responsibility of Avondale Shipyards' safety department."** See Orig. Exhibit "9", Affidavit of Felix Albert; see Orig. Exhibit "10" at pages 342-43; Orig. Exhibit "16". Thus, the instant case is clearly distinguishable from the case of *Lalonde v. Delta Field Erection* cited by the Avondale Interests where the injury occurred on a federally owned and operated facility. Moreover, most of the work at Avondale was private, commercial work, not work for the U.S. government. Orig. Exhibit "10" at pp. 342-344. Products used on commercial vessels were the same products used on the Navy vessels. Orig. Exhibit "10" at p. 343.[1] Also, in the instant case, the Navy did not supervise Avondale's work or oversee it while it was being performed. Orig. Exhibit "10" at p. 342-343.

In this regard, the case at bar also is clearly distinguishable from the case of *Fung v. Abex*, 816 F.Supp. 569 (N.D. Cal. 1992), cited by the defendants. In *Fung*, the plaintiffs filed suit for asbestos exposure that took place on a federally procured submarine being worked on at a facility owned and operated by the federal government. The *Fung* court stated that personal injury actions arising from incidents occurring on federally owned facilities support jurisdiction under

---

[1]As recognized by the court in *Morales v. Owens-Corning Fiberglass Corp.*, 1994 WL 564744 (N.D. Cal.),

> The "government contractor" defense is not colorable. No defendant has produced evidence that it presented specially designed products to the government under federal orders or specifications that directly conflicted with the state law duty upon which the defendants are now being sued. Most notably, no defendant produces any evidence whatsoever that the products it designed pursuant to government orders were different from those designed for civilian use in any manner pertinent to state law liability.

Orig. Exhibit "11"–*Morales* at p. 3 (citations omitted).

Sec. 28 U.S.C.A. 1331, and arise under the Constitution. *Fung, supra* at 571; see also the distinction in *Lalonde v. Delta Field Erection* cited by the Avondale Interests (where the injury occurred on a federally owned and operated facility).

Here, Avondale is not a federal owned facility, but a private shipyard. Avondale's operations were under Avondale's control and were not controlled by government inspectors. Thus, the *Fung* case provides absolutely no support for Avondale's assertion of jurisdiction in the case at bar, nor does it support the unfounded assertions of jurisdiction by the Avondale Interests which have been rejected on numerous occasions by this federal court.

Also, the Middle District cases cited by the defendants of *Melford v. Territo* and *McFarlain v. Northrop* are clearly distinguishable from the instant case in the above regards. In neither *Melford* nor *McFarlain* was there any evidence or testimony by Navy inspectors showing that Avondale controlled its own operations and not the government. Orig. Exhibits "9" & "10." Here, **"Territo's sworn testimony shows that the safety department at Avondale was not under the control of federal officers."** Orig. Exhibit "13" at p. 4; see Orig. Exhibit "16", the sworn testimony of Peter Territo, defendant herein, identified as exhibit 11 in the *Savoie v. Northrop Grumman Ship Systems*, No. 05-2086 (E.D. La. 2005) case; see also Exhibit "17", Deposition of Eddie Blanchard of September 25, 1996, at pp. 99, 101, 120.

Also, the Avondale Interests discuss Article 8 of a DE contract concerning a 54 person crew at or towards the end of a ship's construction. This crew is for sea trials prior to ship delivery, and sea trials are performed on ships prior to accepting delivery of the completed vessel by both commercial and government customers of Avondale. Thus, the Navy was a customer just like any other customer of Avondale. Orig. Exhibit "10" at p. 341; Orig. Exhibit "9."

## II.    WALSH HEALEY ACT AND THE MINIMUM REQUIREMENTS

Contrary to the assertions of the defendant, the Walsh Healey Act was applicable to every private contractor in the United States which contracted with the government for over $10,000.00 per year for any goods and services. See Exhibit No. "18", Sec. 1. Under Walsh Healey, it was the contractors' duty to follow state safety laws, govern themselves, and make sure that certain safety practices were in place to assure the safety of employees. See Exhibit No. "18", Sec. 1(e).

Furthermore, the 1943 "Minimum Requirements for Safety and Industrial Health in Contract Shipyards" were minimum safety requirements applicable to every private shipyard contractor in the United States which contracted with the government, including Avondale Shipyards, Inc. and all other shipyard contractors dealing with the government. See Exhibit No. "19", page (I). These standards were "only minimum requirements" and expressly did not supersede the state laws governing safety and duty to warn. See Exhibit No. "19", Sec.s 1.1 & 1.2. Also, this standard did not supersede the Walsh Healey Act. Moreover, these standards do not supersede Avondale's state law duty to provide Mr. Granier with a safe workplace.

Nothing in the Minimum Standards or the Walsh Healey Act prohibited government contractors from warning employees concerning the dangers of asbestos. Nothing in the Minimum Standards or the Walsh Healey Act prohibited Avondale from furnishing adequate ventilation or respiratory equipment to Mr. Granier to protect him for asbestos fibers. Nothing in the Minimum Standards or the Walsh Healey Act prohibited Avondale from providing Mr. Granier with personal protective equipment to protect Mr. Granier from workplace hazards. Nothing in the Minimum Standards or the Walsh Healey Act prohibited Avondale from properly handling asbestos in order to eliminate workplace hazards. Nothing in the Minimum Standards or the Walsh Healey Act prohibited Avondale from providing Mr. Granier with a safe workplace, as alleged in Mr. Granier's state law petition. Nothing in the Minimum Standards or the Walsh Healey Act shows federal officer "direction" or "control" prohibiting a government contractor from performing their state required safety duties with regard to asbestos. Moreover, nothing in the Minimum Standards or the Walsh Healey Act established government control over the safety activities or shipbuilding operations of a shipyard contractor.

Here, no conflict existed between the Avondale Interests' alleged federal contractual duties and the Avondale Interests' state duty of care as Avondale could comply with both obligations. Thus, the Avondale Interests cannot rely upon the federal contractor defense. *Dorse v. Eagle-Picher Industries, Inc.*, 898 F. 2d 1487, 1490 (11th Cir. 1990).

Also, contrary to the assertions of the defendants, the Walsh Healey Act and the Minimum Standards do not show that the government had control over the safety and health of employees at Avondale, it only states that the government could monitor a government contractor

-4-

as it felt necessary to determine if the minimum safety standards are being met, just as OSHA, EPA, and other governmental agencies who currently monitor chemical, manufacturing, shipbuilding, and other facilities to assure minimum safety compliance and issue fines to violators.   See also Exhibit "17", p. 100.  The Avondale Interests' broad assertion concerning the government's alleged control over Avondale's operations or safety programs are unfounded and are not supported by the 1943 "Minimum Requirements," the Walsh Healey Act, the sworn statements by Avondale's own safety director, Peter Territo, or the sworn statements by Avondale's Vice President, Edward Blanchard, and have been rejected in this federal court as shown in the cases cited in plaintiffs' original briefs of *Savoie, Overly, Porche, Gauthe, Guidroz, Bourgeois, Bartley, Anderson* and *Mouton,* among others; and in both the *Overly* and *Porche* decisions, the removing party was sanctioned for the improper removal of those claims.

## III.    LALONDE v. DELTA FIELD ERECTION

Plaintiff addressed the obvious distinction between the instant case and that of *Lalonde v. Delta Field Erection*[2] above and in his memorandum in support of his Motion to Remand. However, Territo's desperate attempt in his opposition memorandum to realign the facts of this case to those in *Lalonde* merit the Court's review and scepticism.  For example, at page 14 of the Avondale Interests' memorandum, Territo and/or his counsel assert that **"the work performed [by the Avondale Interests]... was performed exclusively for the government under the direct oversight and control of officers of the federal government.  This control was both overwhelming and pervasive...."**  Contrast that bold assertion with Territo's own sworn testimony which asserted that "the safety department was independent from the Federal officers that were aboard these vessels," that there were no "special [safety] rules that Avondale had to follow that weren't general rules for all ship building," that the "Federal officers that were on board the vessels, the Naval inspectors, did [not] control the safety department at Avondale," and that there was nothing "in the contracts with the Navy that would prevent [the Avondale Interests] from putting up a [warning] sign in a naval vessel."  Orig. Exhibit "16", Deposition of Peter Territo of September 26, 1996, at 129-130, 135, 142-143.

--------

[2]1998 WL 34301466 (M.D. La.).

That testimony is corroborated by the sworn testimony of former Avondale Vice President, Edward Blanchard, in which he testified that no "Federal officer directed or controlled the safety department," that there "were [no] specific regulations that a Federal officer was in there to direct and control," that "Mr. Bloom [federal officer] [did not] have the authority. . .over Mr. Territo," and that "Naval or Government inspectors were there for the purpose of seeing that the general regulations were followed, and not to control the employees of Avondale." Exhibit "17", at pp. 99, 101, 120.

That testimony is corroborated by the Affidavit of Felix Albert, in which he attests that "Avondale employees did not work under the direct orders ... or direction" of an officer of the United States, that "[t]he United States government inspectors neither monitored nor enforced safety regulations," and that even during the construction of government vessels, safety was the responsibility of Avondale, not of the U.S. government. See Orig. Exhibit "9."

In contrast to all of that sworn testimony, the *Lalonde* decision is based on the factual finding that the government, not defendant DSM, specifically controlled safety matters. The situation in *Lalonde* is completely inapposite to the situation at Avondale.

## IV.    PLAINTIFFS' ALLEGATIONS DO NOT SUPPORT AVONDALE'S MISLEADING ASSERTIONS

In its opposition to motion to remand, the Avondale Interests wrongly assert that it has a basis to remove the present case to federal court because it was allegedly following government contract requirements in building government ships containing asbestos. Nonetheless, the Avondale Interests then argue that the plaintiffs allege a design defect in government ships because the petition asserts that Avondale failed to used non-asbestos products when non-asbestos containing product were specified in the contract. Clearly, if the government contract called for non-asbestos products and Avondale used asbestos products, then the Avondale Interests would have been in violation of its government contract, and would not have been following a federal officer's alleged orders. Thus, the Avondale Interests would have no basis to remove this case to federal court under these allegations.

In the case of *Bourgeois v. A.P. Green*, No. 96-3764 (E.D. La. 1997),[3] the Avondale Interests attempted to remove an asbestos case to federal court alleging removal was proper under 23 U.S.C. 1442(a)(1), the Federal Officer Removal Statute. Again, Avondale claimed that removal was proper because they could allegedly raise federal defenses of immunity under the "government contractor immunity" defense, and under the LHWCA. In *Bourgeois*, Judge Fallon starts his ruling at page 29 of the transcript (Orig. Exhibit "8"), and states that **"the action is not removable under 1442(a)(1) because the Avondale interest did not act, as I read the pleadings and the affidavits and the information, under the control or direction of a federal officer...."** *Id.* at page 31. **"The removal must be predicated upon a showing that the acts forming the basis of the state court suit were performed pursuant to the officers' direct and detailed control, a general auspices, a general control does not satisfy the riggers of 1442 (a)(1)."** *Id.* at page 32. Judge Fallon explains:

> The issue in this case is not the products liability or some cases you will see in the literature occasionally where vessels were built too long and they are subject to wave action and they break in half, we see this in some cases where the argument is that its built improperly and the defense is on the basis that the defense in made in this particular case. The courts in those cases, although they are seldom in the common days, touch on them a bit more perhaps in the courts but the argument is that they fail not because of any defect in the equipment, not because of the improper work performed on the vessel, but simply because of the design defect, they were as to long and should not have been that long and therefore they we acting under the control and supervision of the government and therefore you are entitled to that particular defense. I don't see this particular case in that ball park even, I think <u>the issue here is whether there was safety rules, regulations, equipment, atmosphere, information imparted to the people, warnings, things of that sort which are completely under the supervision and control of Avondale.</u> They would not expose some people to some hazards and other people to other hazards, they have to have a uniform safety program regardless of who they do work for.
>
> So I think the issue in this case is that the government may have had some general control, the inspectors may have come aboard the vessels... And they are often given the safety equipment to go board the vessel by Avondale, they get their visitors equipment and their visitors hat, whether its blue or white or red, they use it and go aboard unless they specifically brought there their own. So Avondale even suits them out... Avondale, in that instance, is really telling them what to wear and what to do and where to go and whose working on the vessel rather than the other way around....
>
> And finally, the defendants urge that the <u>longshoreman act</u> is a basis for removal. That <u>Aaron</u> case which we discussed, 876 F.2d 1157, indicates that that <u>is not a basis for a removal</u>.... The motion to remand is granted.

(Emphasis Added.) *Bourgeois, supra* at pp. 32-34.

---

[3] Orig. Exhibit "8".

-7-

In the recent decision of this court in the case of *Alvin Savoie v. Northrop Grumman Ship Systems, Inc. et al.*, 2:05-CV-02086, the Avondale Interests again unsuccessfully attempted to remove an asbestos exposure case to this federal court. In remanding the case to state court, Judge Stanwood Duval states that the Avondale Interests':

> removal fails on the first [Mesa] prong, as defendant cannot demonstrate that he was acting under the direction of a federal officer specific to the claims alleged in plaintiff's petition, namely, those dealing with safety procedures and plans of Avondale. Claims against Territo include failure to provide petitioner with a safe work place and safety equipment; failure to disclose, warn, or reveal medical and safety information regarding asbestos hazards and safety and health risks associated with asbestos; failure to properly supervise; failure to remove asbestos hazards from the work place; failure to provide a safe and suitable means of asbestos.... Without going into an in depth analysis, the Court view this particular case as analogous to the long line of precedent cases addressing the very issues herein which held that removal was improper. *See Gauthe v. Asbestos Corp. et al,* 1997 WL 3255 (E.D. La. 1997); *Quebedeaux v. Union Pacific Railroad,* No. 6:04-02232 (W.D. La. 2004); *Bourgeois v. A.P. Green Industries, Inc.,* No. 96-3764 (E.D. La. 1996); *Guidroz v. The Anchor Packing Co.,* No. 98-3709 (E.D. La. 1998); *Overly v. Raybestos-Manhattan,* No. C-96-2553 CI (N.D. Cal. 1996); *Westbrook v. Asbestos Defendants,* 2001 WL 902642 (N.D. Cal. 2001); *Mouton v. Flexitallic, Inc.,* 1999 WL 2254438 (E.D. La. 1999); *Porche v. Flexitallic, Inc.,* 1996 WL 603919 (E.D. La. 1996); *Mabile v. Hidalgo,* No. 95-2200.9 (W.D. La. 1995).
>
> Furthermore, 'prior decisions analyzing what constitutes federal direction have required more than "general auspices" of a federal officer, or participation in a regulated industry.' *Mouton, supra,* at *2 (*citing Ryan v. Dow Chemical Co.,* 781 F.Supp. 934, 946 (E.D. N.Y. 1992). 'Instead the defendant must show "strong government intervention and the threat that a defendant will be sued in state court" based on actions which follow federal direction.' *Mouton, supra,* at *2 (*citing Fung v. Abex Corp.,* 816 F.Supp. 569, 572 (N.D. Ca. 1992). Territo's sworn testimony shows that the safety department at Avondale was not under the control of federal officers. *See* Plaintiff's Exhibit 11. The cases defendant cites, *Lalonde,... Fink,...* and *Delancey,...* are not persuasive.... The plaintiff, in the instant case, does not make any design or manufacturing defect claims against defendants. **Plaintiff['s]... claims in this case are based solely upon Territo's and Avondale's failure to use asbestos safely and not based simply upon their use of asbestos. Their claims are based on negligence; any claims brought under La.Civ.Code Art. 2317 "have never been construed to impose a mode of strict liability which, upon the showing of causation, is absolute and unconditional."** Smith v. Reliance Ins. Co., 431 So.2d 907 (La.App. 2 Cir. 1983).

Orig. Exhibit "13", *Savoie, supra* at pp. 4-5; See Orig. Exhibit "16", the sworn testimony of Peter Territo, defendant herein, identified as exhibit 11 in the *Savoie* case, above.

As stated above, there is no conflict between the Avondale Interests' alleged federal contractual duties and the Avondale Interests' state duty of care and to provide a safe workplace as Avondale could comply with both obligations. Thus, the Avondale Interests cannot rely upon

the federal contractor defense. *Dorse v. Eagle-Picher Industries, Inc.*, 898 F. 2d 1487, 1490 (11th Cir. 1990). Clearly, this court is without jurisdiction and the case should be remanded to state court.

## V.    AVONDALE HAS NO FEDERAL DEFENSES

In the case at bar, Byron Granier worked for Avondale between May 25, 1970, and September 30, 1976.  Beginning 10/27/72, 33 U.S.C. Sec. 901, et. seq. extended Longshore & Harbor Workers' Compensation Act ("LHWCA") coverage to inland maritime workers, such as Byron Granier. *Adams v Owens-Corning Fiberglas Corp.*, 2004-1296 (La.App. 1 Cir. 9/23/05), 921 So.2d 972, 977-978, *writ denied*, 2005-2501 (La. 4/17/06), 926 So.2d 514; *Abadie v. Metropolitan Life Ins. Co.*, 00-344 (La.App. 5 Cir. 3/28/01), 784 So.2d 46, 65-66, *writ denied*, 2001-1533 (La. 12/14/01), 804 So.2d 642-44.  Thus, for approximately one and one-half years, Mr. Granier was only covered by the Louisiana State Workers' Compensation Act.  The LHWCA provided concurrent coverage with the Louisiana State Workers' Compensation Act after 10/27/72. *Adams*, 921 So.2d at 977-978; *Abadie*, 784 So.2d at 65-67.

Nonetheless, "the LHWCA is... nothing more than a statutory defense to a state-court cause of action - the classic circumstance of non-removability." *Aaron v. National Union Fire Insurance Co.*, 876 F.2d 1157, 1166 (5th Cir. 1989), *cert. denied sub nom., American Home Insurance Group v. Aaron*, 493 U.S. 1074, 110 S.Ct. 1121, 107 L.Ed.2d 1028 (1990) (emphasis added); *see also Lowe v. Ingalls Shipbuilding*, 723 F.2d 1173, 1183 (5th Cir. 1984). In *Gauthe, et al v. Asbestos Corporation, et al*, 1997 WL 3255 (E.D. La. 1997),[4] Judge Stanwood Duval, Jr. addressed these same LHWCA arguments with regard to the Avondale Interests in an asbestos exposure case exactly the same as the case at bar.  In rejecting Avondale's arguments, Judge Duval relied on both Louisiana law as well as the U.S. Supreme Court decision in *Sun Ship, Inc. v. Pennsylvania*, 100 S. Ct. 2432 (180) to hold that the LHWCA does not preempt, but supplements, state remedies available to an injured worker. *Gauthe, supra* at pages 4-5; *See also Bartley v. Borden, Inc.*, No. 96-145 c/w 96-157 through 96-205 (E.D. La. 1996) (Orig. Exhibit "2"); and *Bourgeois, supra* (Orig. Exhibit "8" at pages 33-34).

---

[4] Orig. Exhibit "3".

In the instant case, Byron Granier has not filed a claim for LHWCA benefits, nor has Mr. Granier received any LHWCA benefits. Mr. Granier has elected Louisiana State remedies, and the LHWCA is not a colorable federal defense to Mr. Granier's state law claims. *Porche v. Avondale Shipyards*, consolidated with *Adams v. Hartzman*, 339 So.2d 1212 (La. 1976), *appeal dismissed, Territo v. Porche*, 434 U.S. 803, 98 S.Ct. 31, 54 L.Ed.2d 60 (1976); *Gauthe, supra* at pages 4-5; and *Mouton v. Flexitallic, Inc., et al.*, 1999 WL 225438 (E.D. La. 1999) at page 4. (Orig. Exhibit "4"); *Adams v Owens-Corning Fiberglas Corp.*, 2004-1296 (La.App. 1 Cir. 9/23/05), 921 So.2d 972, 977-978, *writ denied*, 2005-2501 (La. 4/17/06), 926 So.2d 514; *Abadie v. Metropolitan Life Ins. Co.*, 00-344 (La.App. 5 Cir. 3/28/01), 784 So.2d 46, 65-67, *writ denied*, 2001-1533 (La. 12/14/01), 804 So.2d 642-44. Also, as shown above in Section 4, the "government contractor immunity" defense is not a colorable federal defense.

**WHEREFORE,** for all of the above additional reasons, it is respectfully submitted that this federal court lacks federal jurisdiction over this action and plaintiffs pray that this action is remanded to the state court from which it was removed.

Respectfully submitted,

ROUSSEL & ROUSSEL

GEROLYN P. ROUSSEL - 1134
PERRY J. ROUSSEL, JR. - 20351
1710 Cannes Drive
LaPlace, LA 70068
Telephone: (985) 651-6591
Facsimile: (985) 651-6592
ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing pleading has been served upon counsel for all parties by FAX, hand delivery, and/or mailing same to each, properly addressed and postage prepaid, on this 11th day of August, 2006.

GEROLYN P. ROUSSEL

PAGE 2

2

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3    DOROTHY REED GAUTHE, ET AL          CIVIL ACTION

4    VERSUS                    NO. 96-2454

5    ASBESTOS CORPORATION LTD., ET AL    SECTION "F"
                    MAGISTRATE 3
6

7    Deposition of EDWARD BLANCHARD, taken in the
     Administrative Offices of Avondale Shipyards,
8    5100 River Road, Avondale, Louisiana 70094,
     taken on Wednesday, September 25, 1996.
9

10                    APPEARANCES
11
     FOR HORACE PORCHE:
12
     MURRAY LAW FIRM
13    909 POYDRAS STREET, SUITE 2550
     NEW ORLEANS, LOUISIANA 70112
14    BY: JULIE A. ARDOIN, ESQ.

15    FOR DOROTHY REED GAUTHE, ET AL:

16    LEBLANC, MAPLES AND WADDELL
     201 ST. CHARLES AVENUE
17    PLACE ST. CHARLES, SUITE 3204
     NEW ORLEANS, LOUISIANA 70170
18    BY: MICKEY P. LANDRY, ESQ.

19    FOR FLEXITALLIC, INC.:
     (PORCHE CASE ONLY)
20
     DEUTSCH, KERRIGAN AND STILES
21    755 MAGAZINE STREET
     NEW ORLEANS, LOUISIANA 70130
22    BY: WILLIAM C. HARRISON, JR., ESQ.

23    FOR HOPEMAN BROTHERS, INC.:

24    DUNCAN AND COURINGTON
     322 LAFAYETTE STREET
25    NEW ORLEANS, LOUISIANA 70130
     BY: BLAINE A. MOORE, ESQ.

EXHIBIT
17

PAGE 8

8

1       Let me comment, that it is beyond

2    even a cavil that a party has the right to

3    be at a deposition, and you are always

4    free, Mickey, and I can't even imagine

5    objecting to one of your plaintiffs being

6    present in one of these depositions.

7    MR. LANDRY:

8        Okay.  Thank you, Mr. Caraway.

9    EXAMINATION BY MR. LANDRY:

10    Q.   Good morning, Mr. Blanchard, my name

11    is Mickey Landry, and I represent the plaintiffs

12    in this case.  Did you know Mr. Earl Gauthe?

13    A.   Yes, very well.

14    Q.   What I'd like to do is first, Mr.

15    Blanchard, I have read all of your previous

16    depositions.  Let me correct that.  I read three

17    of your previous depositions, and you indicated

18    in there that you may have given a fourth

19    deposition sometime earlier.

20    Do you know how many depositions you've

21    given regarding employment at Avondale, as a

22    witness at Avondale?

23    A.   I think it's three.

24    Q.   Mr. Blanchard, did you ever have an

25    opportunity to read those depositions?

5 Ave. H., MARRERO, La. 70072

PAGE 99

99

1    Q.    Am I going outside the realm of your

2    knowledge --

3    A.    Negative.

4    MR. CARAWAY:

5        She hasn't asked the question yet.

6    EXAMINATION BY MS. ARDOIN:

7    Q.    Am I going outside the realm of

8    knowledge to ask you whether or not any Federal

9    officer directed or controlled the Safety

10   Department; can you tell me whether or not a

11   Federal officer directed or controlled the

12   Safety Department?

13   A.    No, it did not.

14   Q.    They did not do it?

15   A.    Certainly not.

16   Q.    Now, in Paragraph 16 on Page 4, when

17   it says, "As with the construction process, the

18   Navy inspectors had total control of the safety

19   issues on Navy projects at Avondale, and could

20   shut down the work if they felt it was not being

21   conducted safely."

22       So if the Navy saw something that they

23   thought was going to injure people, they could

24   go in and shut down the job, or they would come

25   to you because that affected production, and

100

1   they say, "look, this is not safe or this is

2   going to stop the job?"

3       A.   Yes.  One of the major reasons is

4   that Navy inspectors were everywhere.  They

5   would be in the area also.  If you hurt the

6   people that were out there and he was there, he

7   would get injured.  So, they are looking out for

8   themselves as well as safety of the job.  You

9   know, the Navy being the insurers of the job,

10  they were out looking for that also.

11      Q.   Is that the same like OSHA could come

12  out today, or before you left, and shut down a

13  job because they felt it was unsafe?

14      A.   Certainly could.

15      Q.   Was there any difference between what

16  the Navy could do then and what OSHA could do?

17      A.   Well, OSHA didn't usually get on the

18  Navy jobs as closely as the Navy was.  They

19  looked at the overall shipyard's activity,

20  because we're doing not only Navy work but also

21  commercial work at the same time, and the

22  maritime, of course, would do the same thing

23  that the Navy did on the maritime construction.

24  So, they did their separate jobs, so, they had

25  individual authority for them.

EDWARD BLANCHARD, 515

PAGE 101  SHEET 26

## 101

1    Q.    So on commercial vessels like the

2  Lykes Line, the construction of the Lykes Line

3  was done under general Federal regulations that

4  had to be complied with?

5    A.    That is true.

6    Q.    Were there specific regulations that

7  a Federal officer was in there to direct and

8  control, that you are aware of?

9    A.    No.

10    Q.    Did Mr. Bloom have the authority, did

11  he have authority over Mr. Territo, that you are

12  aware of?

13    A.    No.

14    Q.    Did Mr. Bloom have authority over

15  you, that you are aware of?

16    A.    No.

17    Q.    So that Naval or Government

18  inspectors were there for the purpose of seeing

19  that the general regulations were followed, and

20  not to control the employees of Avondale?

21    A.    Individually, that's correct.

22    MS. ARDOIN:

23        I may not have any other questions.

24    Let me check.  That's it; no further

25    questions.

120

1   you have any involvement with the Lykes cargo

2   vessel project at Avondale?

3       A.   Definitely; one hundred percent, in

4   fact.

5       Q.   What was your job on the Lykes

6   project?

7       A.   I was in charge of production for a

8   long list of ships built here for Avondale for

9   Lykes. In the beginning I was outfitting, and

10   later on as the man in charge of all the

11   production, so, yes.

12       Q.   When you say the man in charge of all

13   production, is it fair to say, Mr. Blanchard,

14   that you were ultimately the man whom all

15   departments reported to in the construction of

16   those vessels?

17   MR. LANDRY:

18       Just give me the year, if you don't

19   mind, because I know it expands.

20   THE WITNESS:

21       '72 on. Vice-president, I was

22   production; that meant I could demand what

23   I wanted and get it done exactly the way I

24   wanted.

25   MR. LANDRY:

2036          74th CONGRESS.  SESS. II.  CHS. 865, 861.  JUNE 29, 30, 19

Civil and criminal jurisdiction of States, etc.; civil rights of inhabitants under local law.

any other law, shall not be held to deprive any State or politic subdivision thereof of its civil and criminal jurisdiction in and o such property, or to impair the civil rights under the local law of t tenants or inhabitants on such property; and insofar as any ju jurisdiction has been taken away from any such State or subdivisio or any such rights have been impaired, jurisdiction over any su property is hereby ceded back to such State or subdivision.

Federal payments in lieu of taxes.

SEC. 2. Upon the request of any State or political subdivisi thereof, or any other local public taxing unit, in which any su project, described in section 1, has been or will be constructed, t Resettlement Administration is authorized to enter into an agre ment, and to consent to the renewal or alteration thereof, with su State or political subdivision thereof, or other local taxing unit, f the payment by the United States of sums in lieu of taxes. Su sums shall be fixed in such agreement and shall be based upon t cost of the public or municipal services to be supplied for the bene of such project or the persons residing on or occupying such premise but taking into consideration the benefits to be derived by such Sta or subdivision or other taxing unit from such project.

Proceeds from operation of projects available for payments and other expenses.

SEC. 3. The receipts derived from the operation of such project described in section 1, in addition to the moneys appropriated allocated for such projects shall be available for such payments lieu of taxes and for any other expenditures for operation and mai tenance (including insurance) of such projects. To provide for su payments and expenditures, the Resettlement Administration authorized from time to time to retain out of such receipts such su as it may estimate to be necessary for such purposes.

Dedication of streets, etc.

SEC. 4. In connection with any such project, described in sectio the Resettlement Administration, with the approval of the Preside is authorized to dedicate land for streets, alleys, and parks, and f any other public use or purpose, and to grant easements.

Approved, June 29, 1936.

[CHAPTER 861]

June 30, 1936.
[S. 3055.]
[Public, No. 846.]

AN ACT

To provide conditions for the purchase of supplies and the making of contra by the United States and for other purposes.

Government contracts.
Contracts for materials, supplies, and equipment exceeding $10,000: representations to be included.

Be it enacted by the Senate and House of Representatives of t United States of America in Congress assembled, That in any co tract made and entered into by any executive department, indepen ent establishment, or other agency or instrumentality of the Unit States, or by the District of Columbia, or by any corporation the stock of which is beneficially owned by the United States (a the foregoing being hereinafter designated as agencies of the Unit States), for the manufacture or furnishing of materials, suppli articles, and equipment in any amount exceeding $10,000, th shall be included the following representations and stipulations:

Contractor is the manufacturer, etc.

(a) That the contractor is the manufacturer of or a regular dea in the materials, supplies, articles, or equipment to be manufactur or used in the performance of the contract;

Payment of prevailing minimum wages.

(b) That all persons employed by the contractor in the manufa ture or furnishing of the materials, supplies, articles, or equipme used in the performance of this contract will be paid, without su quent deduction or rebate on any account, not less than the minimu wages as determined by the Secretary of Labor to be the prevaili minimum wages for persons employed on similar work or in

EXHIBIT
18

74TH CONGRESS.  SESS. II.  CH. 881.  JUNE 30, 1936.

2037

particular or similar industries or groups of industries currently operating in the locality in which the materials, supplies, articles, or equipment are to be manufactured or furnished under said contract;

(c) That no person employed by the contractor in the manufacture or furnishing of the materials, supplies, articles, or equipment used in the performance of the contract shall be permitted to work in excess of eight hours in any one day or in excess of forty hours in any one week; *Maximum hours of labor.*

(d) That no male person under sixteen years of age and no female person under eighteen years of age and no convict labor will be employed by the contractor in the manufacture or production or furnishing of any of the materials, supplies, articles, or equipment included in such contract; and *Child and convict labor.*

(e) That no part of such contract will be performed nor will any of the materials, supplies, articles, or equipment to be manufactured or furnished under said contract be manufactured or fabricated in any plants, factories, buildings, or surroundings or under working conditions which are unsanitary or hazardous or dangerous to the health and safety of employees engaged in the performance of said contract. Compliance with the safety, sanitary, and factory inspection laws of the State in which the work or part thereof is to be performed shall be prima-facie evidence of compliance with this subsection. *Working conditions in factories, etc.* *Compliance with State safety, sanitary, etc., laws.*

SEC. 2. That any breach or violation of any of the representations and stipulations in any contract for the purposes set forth in section 1 hereof shall render the party responsible therefor liable to the United States of America for liquidated damages, in addition to damages for any other breach of such contract, the sum of $10 per day for each male person under sixteen years of age or each female person under eighteen years of age, or each convict laborer knowingly employed in the performance of such contract, and a sum equal to the amount of any deductions, rebates, refunds, or underpayment of wages due to any employee engaged in the performance of such contract; and, in addition, the agency of the United States entering into such contract shall have the right to cancel same and to make open-market purchases or enter into other contracts for the completion of the original contract, charging any additional cost to the original contractor. Any sums of money due to the United States of America by reason of any violation of any of the representations and stipulations of said contract set forth in section 1 hereof may be withheld from any amounts due on any such contracts or may be recovered in suits brought in the name of the United States of America by the Attorney General thereof. All sums withheld or recovered as deductions, rebates, refunds, or underpayments of wages shall be held in a special deposit account and shall be paid, on order of the Secretary of Labor, directly to the employees who have been paid less than minimum rates of pay as set forth in such contracts and on whose account such sums were withheld or recovered: *Provided,* That no claims by employees for such payments shall be entertained unless made within one year from the date of actual notice to the contractor of the withholding or recovery of such sums by the United States of America. *Damages for breach of contract.* *Additional penalties.* *Cancelation of contracts.* *Open-market purchases; charging of additional cost to contractor.* *Use of sums withheld.* *Proviso. Filing of claims.*

SEC. 3. The Comptroller General is authorized and directed to distribute a list to all agencies of the United States containing the names of persons or firms found by the Secretary of Labor to have breached any of the agreements or representations required by this *Distribution to Federal agencies of list of persons, etc., who have breached contracts.*

**2038**    74TH CONGRESS.  SESS. II.  CH. 881.  JUNE 30, 1936.

*Exclusion from future awards; duration.* Act. Unless the Secretary of Labor otherwise recommends no contracts shall be awarded to such persons or firms or to any firm, corporation, partnership, or association in which such persons or firms have a controlling interest until three years have elapsed from the date the Secretary of Labor determines such breach to have occurred.

*Administration by Department of Labor.* SEC. 4. The Secretary of Labor is hereby authorized and directed to administer the provisions of this Act and to utilize such Federal

*State, etc., assistance.* officers and employees and, with the consent of the State, such State and local officers and employees as he may find necessary to assist in the administration of this Act and to prescribe rules and

*Appointment of administrative officer, attorneys, experts, and other personnel.* regulations with respect thereto. The Secretary shall appoint, without regard to the provisions of the civil-service laws but subject to the Classification Act of 1923, an administrative officer, and such attorneys and experts, and shall appoint such other employees with regard to existing laws applicable to the employment and compensation of officers and employees of the United States, as he may from time to time find necessary for the administration of this Act.

*Investigations authorized.* The Secretary of Labor or his authorized representatives shall have power to make investigations and findings as herein provided, and

*Rules, etc.* prosecute any inquiry necessary to his functions in any part of the United States. The Secretary of Labor shall have authority from time to time to make, amend, and rescind such rules and regulations as may be necessary to carry out the provisions of this Act.

*Public hearings.* SEC. 5. Upon his own motion or on application of any person affected by any ruling of any agency of the United States in relation to any proposal or contract involving any of the provisions of this Act, and on complaint of a breach or violation of any representation or stipulation as herein provided, the Secretary of Labor, or an impartial representative designated by him, shall have the power to hold hearings and to issue orders requiring the attendance and testi-

*Witnesses; fees and mileage allowances.* mony of witnesses and the production of evidence under oath. Witnesses shall be paid the same fees and mileage that are paid witnesses

*Compulsory attendance.* in the courts of the United States. In case of contumacy, failure, or refusal of any person to obey such an order, any District Court of the United States or of any Territory or possession, or the Supreme Court of the District of Columbia, within the jurisdiction of which the inquiry is carried on, or within the jurisdiction of which said person who is guilty of contumacy, failure, or refusal is found, or resides or transacts business, upon the application by the Secretary of Labor or representative designated by him, shall have jurisdiction to issue to such person an order requiring such person to appear

*Testimony.* before him or representative designated by him, to produce evidence if, as, and when so ordered, and to give testimony relating to the matter under investigation or in question; and any failure to obey such order of the court may be punished by said court as a contempt

*Findings of fact; effect of.* thereof; and shall make findings of fact after notice and hearing, which findings shall be conclusive upon all agencies of the United States, and if supported by the preponderance of the evidence, shall be conclusive in any court of the United States; and the Secretary of Labor or authorized representative shall have the power, and is hereby authorized, to make such decisions, based upon findings of fact, as are deemed to be necessary to enforce the provisions of this Act.

*Exemptions in specific cases.* SEC. 6. Upon a written finding by the head of the contracting agency or department that the inclusion in the proposal or contract of the representations or stipulations set forth in section 1 will seriously impair the conduct of Government business, the Secretary of

74th CONGRESS.   SESS. II.   CH. 881.   JUNE 30, 1936.   2039

Labor shall make exceptions in specific cases or otherwise when justice or public interest will be served thereby. Upon the joint recommendation of the contracting agency and the contractor, the Secretary of Labor may modify the terms of an existing contract respecting minimum rates of pay and maximum hours of labor as he may find necessary and proper in the public interest or to prevent injustice and undue hardship.  The Secretary of Labor may provide reasonable limitations and may make rules and regulations allowing reasonable variations, tolerances, and exemptions to and from any or all provisions of this Act respecting minimum rates of pay and maximum hours of labor or the extent of the application of this Act to contractors, as hereinbefore described.  Whenever the Secretary of Labor shall permit an increase in the maximum hours of labor stipulated in the contract, he shall set a rate of pay for any overtime, which rate shall be not less than one and one-half times the basic hourly rate received by any employee affected.

SEC. 7. Whenever used in this Act, the word "person" includes one or more individuals, partnerships, associations, corporations, legal representatives, trustees, trustees in bankruptcy, or receivers.

SEC. 8. The provisions of this Act shall not be construed to modify or amend title III of the Act entitled "An Act making appropriations for the Treasury and Post Office Departments for the fiscal year ending June 30, 1934, and for other purposes", approved May 3, 1933 (commonly known as the Buy American Act), nor shall the provisions of this Act be construed to modify or amend the Act entitled "An Act relating to the rate of wages for laborers and mechanics employed on public buildings of the United States and the District of Columbia by contractors and subcontractors, and for other purposes", approved March 3, 1931 (commonly known as the Bacon-Davis Act), as amended from time to time, nor the labor provisions of title II of the National Industrial Recovery Act, approved June 16, 1933, as extended, or of section 7 of the Emergency Relief Appropriation Act, approved April 8, 1935; nor shall the provisions of this Act be construed to modify or amend the Act entitled "An Act to provide for the diversification of employment of Federal prisoners, for their training and schooling in trades and occupations, and for other purposes", approved May 27, 1930, as amended and supplemented by the Act approved June 23, 1934.

SEC. 9. This Act shall not apply to purchases of such materials, supplies, articles, or equipment as may usually be bought in the open market; nor shall this Act apply to perishables, including dairy, livestock and nursery products, or to agricultural or farm products processed for first sale by the original producers; nor to any contracts made by the Secretary of Agriculture for the purchase of agricultural commodities or the products thereof. Nothing in this Act shall be construed to apply to carriage of freight or personnel by vessel, airplane, bus, truck, express, or railway line where published tariff rates are in effect or to common carriers subject to the Communications Act of 1934.

SEPARABILITY CLAUSE

SEC. 10. If any provision of this Act, or the application thereof to any persons or circumstances, is held invalid, the remainder of the Act, and the application of such provisions to other persons or circumstances, shall not be affected thereby.

SEC. 11. This Act shall apply to all contracts entered into pursuant to invitations for bids issued on or after ninety days from

*So in original.*

**2040**   74TH CONGRESS.   SESS. II.   CHS. 881, 882. JUNE 30, 1936.

the effective date of this Act: *Provided, however,* That provisions requiring the inclusion of representations with respect to minimum wages shall apply only to purchases and contracts in such industries as have been the subject matter of a determination by the Secretary of Labor.

Approved, June 30, 1936.

[CHAPTER 882.]

AN ACT

To amend section 5 of the Act of March 2, 1919, generally known as the Minerals Relief Act.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That no one who filed a claim in accordance with the provisions of section 5 of the Act entitled, "An Act to provide relief in cases of contracts connected with prosecution of the war, and for other purposes," approved March 2, 1919, shall be deprived of any of the benefits of said Act as amended by the Act of February 13, 1929, by his failure to file suit under said Act and as provided in the Supreme Court of the District of Columbia or through abatement of any suit so filed.

Upon petition by the claimant of the Interior in such claims and in claims wherein no suit has filed under the said amendment, the Secretary is hereby authorized and directed to review such claims upon ...

Sec. 3. This Act shall not apply to any claim to be made or any claim not presented to the Secretary of the Interior within six months after its approval.

Approved, June 30, 1936.

# NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

## To all to whom these presents shall come. Greeting:

y virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf,

e seal of the National Archives and Records Administration, that the attached reproduction(s) is

correct copy of documents in his custody.



| SIGNATURE | |
|---|---|
| *Diane L. Dimkoff* | |
| NAME | DATE |
| DIANE L. DIMKOFF | 5/11/95 |
| TITLE   ASSISTANT DIRECTOR | |
| CENTER FOR LEGISLATIVE ARCHIVES | |
| NAME AND ADDRESS OF DEPOSITORY | |
| National Archives and Records Administration | |
| Washington, DC 20408 | |

NA FORM 13040D (11-88)

EXHIBIT
19

MC 1. 6.
Sa l

**U. S. Navy Department • U. S. Maritime Commission**

\- \- \- \- \- \- \- \- \-

*Minimum Requirements*

### FOR

# SAFETY AND INDUSTRIAL HEALTH

### IN

# CONTRACT SHIPYARDS

———— ⚓ ————



Approved
U. S. Navy
Jan. 28, 1943



Approved
U. S. Maritime Commission
Feb. 9, 1943

United States Government Printing Office • Washington • 1943

U.S. NAVY DEPARTMENT
WASHINGTON, D. C.

U.S. MARITIME COMMISSION
WASHINGTON, D. C.

*To All Contractors Constructing Ships for United States Navy—United States Maritime Commission:*

As a result of the national conference on safety and health in ship-yards holding contracts with the United States Navy and Maritime Commission, conducted under the auspices of these agencies in Chicago December 7 and 8, 1942, a unanimous agreement was reached upon the minimum standards which have now been approved by the Navy Department and United States Maritime Commission and which should be put into effect in shipyards holding contracts with the two agencies.

These standards represent a specialized study based upon a fact-finding survey on all coasts by experts in that field. They have received the unanimous concurrence of the representatives of the medical and safety departments and of labor-management committees from ship-yards on all coasts.

The necessity for conserving manpower and promoting the physical welfare, health, and safety of what shortly will amount to one million workers in shipyards requires that careful observance of standards for the prevention of accidents and protection of health be accorded. Aside from the weight which must be given humanitarian considerations, it is simply good common sense that as much care and attention be given to protecting the human factors in the war production program as is given machines.

Under the administrative direction of the Maritime Commission, safety and industrial health consultants will be made available in all regions wherein shipyards holding contracts with the Navy and the Commission are located.

Each contractor is hereby given notice that the Navy Department and the Maritime Commission will expect full and complete compliance with the minimum standards which bear the approval of the Navy Department and the Maritime Commission, and each is requested to give full cooperation to the consultants on health and safety who will be charged with the coordination and supervision of the safety and health programs of the two agencies.

The cumulative restriction of manpower makes speedy attention and comprehensive action in respect to the subject matter hereof of vital importance.

FRANK KNOX, *Secretary of the Navy.*

E. S. LAND, *Chairman,*
*U. S. Maritime Commission.*

511211—43——1

(11)

UNITED STATES NAVY—MARITIME COMMISSION

# MINIMUM REQUIREMENTS

for

## SAFETY AND INDUSTRIAL HEALTH IN CONTRACT SHIPYARDS

### B and H–1. Introduction.

1.1   The standards for industrial health and safety as presented in this manual cover only minimum requirements. It is not to be assumed that compliance with these minimum standards is insurance of the development of good health and safety records.

1.2   It is recognized that in many shipyards, standards for health and safety are already in effect which go beyond the requirements of those listed here. The Maritime Commission and Navy urge that any standards of higher level be continued and that where substandard conditions of health and safety exist, they immediately be brought to the required standard or better.

1.3   In all cases the use of the words *shall* or *must* indicates that compliance with that section of the minimum requirements is mandatory. Where the words *should* or *may* are used the section may be considered desirable but not necessarily mandatory under certain circumstances which the contractor in his discretion may determine.

### MINIMUM REQUIREMENTS FOR INDUSTRIAL HEALTH

#### H–2. Medical Facilities.

2.1   *Personnel.*—Yards employing up to 5,000 men should have two full-time physicians, and one additional physician for each additional 5,000 men. Yards with less than 2,000 to 3,000 men will not need full-time physicians.

2.2   Specialists in the various branches of the medical profession available in the area should be consulted as indicated.

2.3   Yards employing up to 5,000 men should have in the main dispensary six full-time nurses and three additional nurses for each additional 5,000. Additional nurses will be required for first aid stations.

2.4   There should be at least three clerks employed in the medical department for each 5,000 employees.

2.5   One ambulance driver should be available per ambulance per shift.

2

B-4. Physical Facilities.

3.1 The medical department should be provided with:

a. A waiting room with suitable registration facilities.

b. A general treatment room.

c. An eye treatment room.

d. A minor surgery room.

e. A ward with three beds for the first 5,000 employees, and one bed for each additional 10,000.

f. Doctors' offices and private examining rooms.

g. A nurses' office and dressing room.

h. X-ray room for yards employing 5,000 men and above.

i. A physiotherapy room.

j. Toilet facilities for doctors, nurses, and patients.

k. A storeroom for general medical stores.

l. X-ray files and viewing room.

3.2 First-aid treatment rooms, manned by nurses, should be provided wherever there is overcrowding at the main dispensary and shops. These sub-stations may be located under building ways or near locations where the number of men working is large so that the distance a man need travel to a sub-station will not exceed approximately 400 yards.

B-5. Equipment.

4.1 The following equipment should be provided:

a. One ambulance for each 10,000 employees, or reasonable fraction thereof, with an ordinary passenger car always in reserve.

b. In some yards a station wagon is used satisfactorily inside the yard and an ambulance used only for trips outside.

c. An X-ray unit for yards employing about 5,000 men and above.

d. Medical and surgical stores required for minor surgery, eye injuries and physiotherapy.

B-6. Records and Forms.

5.1 The following records and forms are recommended:

NOTE—In an emergency no form need be filled out.

a. A form authorizing the workman to report to the medical department for examination or treatment issued by a foreman or leading man or other supervisor. This shall show time of issue, arrival at dispensary, discharge from dispensary and return to work.

b. Appointment form for revisits and retreatments issued by the physicians and nurses.

c. A disposition form issued by physicians and nurses indicating return to work, hospitalization, to home, or other disposition.

A complete and accurate permanent filing system recording permanent nature and cause of injury, diagnosis, treatment, disposition, etc.

3

e. The necessary state and insurance company forms.

f. Daily report to the safety department showing all new cases for the day, together with the nature and cause of injury, and the *diagnosis.*

g. The adoption of the standard nomenclature when made available by the Council on Industrial Health of the American Medical Association, Chicago, Illinois.

B-6. Examinations.

6.1 Physical examinations to insure proper placement of employees shall be given.

6.2 Periodic check examinations shall be given men working in occupations potentially hazardous to themselves or others, as for example to crane operators, locomotive and hoisting and portable engineers. Periodic check examinations should be given men in jobs in which there may be health hazard, as for example to sand blasters, radium and X-ray workers, and paint sprayers.

6.3 Special examinations such as X-ray, serologic and urinalyses shall be given in the individual case as indicated and in accordance with local needs.

B-7. Air Raid Precautions.

7.1 The medical department shall locate, equip, and maintain such emergency first aid dressing stations as may be deemed necessary to handle air raid casualties.

7.2 A certain number of yard employees shall be trained in first aid procedures to render assistance to the medical department in handling air raid victims.

7.3 Close cooperation should be maintained with the local civilian defense officials in order that evacuation and care of air raid victims may be carried out to the best advantage.

7.4 In keeping with local army and navy regulations, steps should be taken to provide protection of dispensaries by sandbags, or otherwise, from fragments and concussion of bombs.

B-8. Responsibilities of the Medical Service.

8.1 Frequent inspection of the yard by the medical staff shall be required in order that physicians may become familiar with shipyard jobs and that help intelligently in preventing accidents and occupational disease.

8.2 Close collaboration shall be maintained with the safety department especially in regard to records of accidents and absenteeism.

8.3 It shall be the joint responsibility of the medical and safety departments through the supplies department to know the composition of paints, thinners, paint removers, and other chemicals used in the yard, and to see that the workers exposed are protected by the best safety practices.

8.4 As in the general practice of medicine the confidential relations of doctor and patient shall be maintained.

8.5 It is certain that in the near future women in large numbers are to be employed in the mechanical trades. It is necessary in shipyards to make special provisions for this class of patients. This will necessitate the establishment of separate waiting, treatment, and examining rooms. In yards where the number of employees is large, it may be logical to establish a separate dispensary for the handling of women patients.

## H-9. Sanitary Inspection.

9.1 *Cafeterias and canteens.*—It shall be the duty of the medical department to adapt from Army and Navy standard, in reasonable conformity with the local health department rules, and inspection scheme to include preemployment examination of food handlers, quality and quantity of food, general cleanliness and comfort, screening, dishwashing, garbage and waste disposal. These inspections shall be made at unscheduled times and never less than once each week.

9.2 *Water supply, sewerage, and waste disposal.*—In cooperation with Maritime and Navy engineers the medical department shall inspect and report upon the above as often as seems advisable, but not less than twice yearly.

9.3 *Salt tablets.*—Salt tablets shall be made available to all employees and shall be kept in covered dispensers appropriately located.

## H-18. Respiratory Protective Equipment for Shipyards.

The U. S. Bureau of Mines, 4800 Forbes Street, Pittsburgh, Penna., maintains a laboratory which *tests* and *approves* for use in industry respiratory protective equipment of all kinds. The Maritime Commission and Navy will require the use of *approved* equipment throughout all yards. The safety department shall be responsible for instructing men in the proper use of such equipment and for the maintenance of ample supplies.

10.1 Details of Bureau of Mines respirators with names of manufacturers, prices, and descriptions can be obtained from the Bureau or from the Maritime Commission.

10.2 The safety department shall be responsible to the management for cleaning and sterilizing all such equipment as often as may be agreed upon with the medical department. (A method for such sterilization is included in these standards; see section H-12.0)

10.3 *General requirements for respirators.*—

Adequate protection as defined by American Standard Safety *for the Protection of Heads, Eyes, and Respiratory Organs.* * H-24, Nov. 1, 1938  Superintendent of Documents, Washington, D. C.; price 10¢.

† (light weight and not obstructive to vision).

---

## H-11. Jobs Requiring Respiratory Protective Equipment.

**5**

11.1 *Dust.*—

| JOBS | PROTECTIVE DEVICES |
|---|---|
| Silica or Sand Dusts (as in sand blasting) | (1) Abrasive blasting helmets.<br>(2) Dust respirator.<br>(3) Air line respirator. |
| Lead Dust (as in mixing paint) | (2) Lead dust respirator.<br>(1) Air line respirator.<br>(3) Dust respirator. |
| Asbestos (as in covering pipes) | |

11.2 *Metal fumes and smokes.*—

| JOBS | PROTECTIVE DEVICES |
|---|---|
| Lead and zinc oxide from welding and burning. | (1) Air line respirator.<br>(2) Fume respirator for lead.<br>(3) Dust respirator for zinc oxide. |

11.3 *Solvent vapors.*—

| JOBS | PROTECTIVE DEVICES |
|---|---|
| Spray painting, both indoors and outdoors.<br>Paint removing, usually indoors.<br>Cementing, usually indoors.<br>Cleaning, usually indoors.<br>Degreasing, usually indoors. | (1) Air line respirator.<br>(2) Chemical cartridge respirator. |

11.4 *Acid gases and mists.*—

| JOBS | PROTECTIVE DEVICES |
|---|---|
| Pickling (indoors).<br>Cleaning (indoors).<br>Degreasing (indoors). | (1) Mist respirator.<br>(2) Chemical cartridge respirator. |

11.5 *Alkali mists.*—

| JOBS | PROTECTIVE DEVICES |
|---|---|
| Cleaning (indoors).<br>Degreasing (indoors). | (1) Mist respirator.<br>(2) Chemical cartridge respirator. |

11.6 *Asphyxiating atmospheres.*—

| JOBS | PROTECTIVE DEVICES |
|---|---|
| | (1) Nose mask.<br>(2) Oxygen-breathing mask.<br>(3) Air-service mask. |

11.7 *air supply for air-line masks of all kinds.*—Air at a comfortable temperature and free from odors and excessive moisture sometimes is difficult to furnish, especially for outdoor jobs in winter. Air quality and temperature shall be tested by the Safety Department and shall meet the suggestions of the American Standard Safety Code for air-supplied respirators (sec. 10.3a).

## H-12. Sterilization of Respirator.

12.1 Each worker who needs a respirator should be assigned his own respirator. Where this is not done, it is important that the respirator be sterilized in addition to being cleaned. Adequate sterilization may be accomplished by—

6

a. Washing the rubber and metal parts with soap, a brush and warm water, after which the respirator is sterilized by immersion for 10 minutes in a solution of formalin made by placing one part of 40 percent formaldehyde solution into nine parts of water.

b. Washing the rubber and metal parts with soap and warm water, after which the respirator is sterilized by dipping in a 3 percent solution of carbolic acid, a 2 percent solution of lysol, or a 70 percent solution of denatured alcohol.

c. Subjecting the respirator to sterilization by a moist atmosphere of antiseptic gas, preferably formaldehyde, for a period of ten minutes at room temperature.

d. After following any one of the outlined procedures, the respirator should be rinsed with water and hung up to dry. The respirator should not be used until it has been dried thoroughly.

e. The filters, felt screens, and elastic headbands should be removed, if detachable, before washing or sterilization of the respirator, unless it is evident that washing and sterilization will not harm these parts.

13.2 The National Safety Council has issued an Industrial Data Sheet No. D-Gen. 10, "Cleaning and Sterilizing Goggles and Respiratory Equipment."

H-13. A Guide for Prevention of Industrial Diseases in Subparts.

13.1 Eight common types of disease and methods for their prevention are given in the following sections. Help in applying these methods will be given by the local Safety Department and by safety and medical consultants of the Navy Department and the Maritime Commission.

13.2 Flashburns and foreign bodies in the eye.—

a. Effects on workers: "Flash" is a surface eye burn resulting from even momentary unprotected exposure to the welding arc. In this condition the eye is painful and sensitive, especially to light. An eye flash shall be treated only by the doctor or by methods he has prescribed.

b. Foreign bodies in the eye shall be removed only under the doctor's orders or by methods he has prescribed. Like flashburns, they are preventable.

c. For safe practice:

All workers:

1. Whenever near welding areas wear antiflash goggles which have been approved by the Safety Department.

2. Wear safety goggles when grinding, chipping, buffing, scratch-brushing, or forging.

7

Welders:

3. Wear approved antiflash goggles even when helmet is being worn.

4. Use portable screens to protect the eyes of fellow workers.

13.3 Lead poisoning.—

a. Sources: In general, any job in which dust, fume, or smoke from any substance containing lead is breathed daily.

b. For example:

| JOB: | WHEN MATERIAL IS: |
|---|---|
| Welding | Metal, coated with paint containing lead. |
| Cutting | Lead. |
| Burning | Lead pigments. |
| Shrinking | |
| Grinding | |
| Buffing | |
| Spray painting | |
| Mixing paint pigments | |

c. Job can be done safely with:

1. (a) Special ventilation: Use a local exhaust hood approximately 8 inches from the job and drawing at least 200 c. f. m. into the hood with filtration of the discharge, or discharge, to a place where the contaminated air will not be breathed, or

(b) Wearing of fume respirator, or

(c) Wearing of supplied air respirator.

2. Periodic medical examination which includes blood and urinalyses.

13.4 Solvent vapors.—

a. Sources: In general, any job in which solvent vapors are breathed. For example:

Spray painting.
Painting.
Using paint remover.
Applying cements.
Paint brush and spray gun cleaning.

b. Job can be safely done with:

1. Segregation of such work, and

2. (a) Special ventilation as may be required.

(b) Provision of spray booths with exhaust system.

8

(c) Wearing of special respirator:

(1) For spray painting: Supplied air respirators or air line hoods.

(2) For other jobs: Chemical cartridge respirators.

(See H-10 on respiratory protective equipment.)

13.5 *Zinc fume fever (zinc chills or shakes).*—

a. Sources: In general, any job in which the fumes from heated zinc are breathed. For example:

| JOB: | WHEN MATERIAL IS: |
|---|---|
| Welding | Galvanized metal |
| Cutting | Zinc |
| Shrinking | Zinc alloy |
| Pouring zinc alloys | Brass |

b. Job can be safely done with:

1. Special ventilation: Local exhaust hoses or hoods located close enough to operation at all times to remove smoke completely.

2. Wearing of special respirators.

NOTE.—There are no known cumulative effects from zinc chills.

13.6 *Fibreglas.*—

a. Effects on workers: Man working with Fiberglas may develop dermatitis or conjunctivitis which are skin and eye conditions. It is best to transfer to another job those who continue to be sensitive.

1. Both experimental and practical evidence show conclusively that the inhalation of Fibreglas causes no lung damage.

2. The cement used with Fibreglas may contain a toxic solvent such as carbon tetrachloride ($CCl_4$) which can cause severe illness or even death if the cement is used indoors with inadequate ventilation.

b. For safe practice:

1. Clothing: Supply loose coveralls with collar and sleeves buttoned over cheesecloth.

2. Goggles: Should be worn.

3. Shower: Should be taken rather than bath, at end of shift.

Respirators are usually not necessary, but if a cement containing a toxic solvent is used, proper protection either by ventilation or by a respirator must be supplied and used.

9

13.7 *Asbestosis.*—

a. Sources: In general, any job in which asbestos dust is breathed. For example:

| JOB: | WHEN MATERIAL IS: |
|---|---|
| Handling. | Asbestos |
| Sawing. | Asbestos mixtures. |
| Cutting. | |
| Molding. | |
| Welding rod salvage. | |

b. Job can be done safely with:

1. Segregation of dusty work and,

2. (a) Special ventilation: Hoods enclosing the working processes and having linear air velocities at all openings of 100 feet per minute, or

(b) Wearing of special respirators.

3. Periodic medical examination.

13.8 *Silicosis.*—

a. Sources: In general, any job in which the dust of free silica (sand) is breathed daily. For example:

JOB

Sand-blasting

Sand packing of pipes

Shot blasting of castings

b. Job can be done safely with:

1. Isolation of dusty process and, in addition,

2. Special ventilation: In the case of sand-blasting, the work should be done in the standard type of sand blast room, cabinet, or machine.

3. Special respirator for dust-containing free silica.

4. Periodic examination by doctor.

13.9 *Dermatitis.*—

a. Sources: Excessive or improper use of cleaning agents such as gasoline. It is not at all uncommon to find dermatitis caused by excessive use of common soaps such as those used in laundering. Cutting oils, certain greases, certain insulating materials used on electric cables and conduits can cause dermatitis.

b. Job can be done safely with:

1. Precautions against excessive use of the causative agent.

2. Advice of the medical department in the use of protective salves and creams.

10

H-14. **Ventilation Standards.**

14.1  Ventilation is required to control temperature and to remove air impurities, as from welding and paint spraying.

14.2  The maintenance of proper working conditions shall be the responsibility of the safety department, whose staff shall work in close cooperation with the welding, paint, and electrical departments. Air analyses and tests shall be made by the safety and medical consultants of the Navy Department and the Maritime Commission as may be needed.

14.3  Personnel of Department.—

a. Number:

1. The size of the ventilation crew will vary with the type of ship, equipment available, etc. The head of the safety department will be responsible for the organization of the safety department or division.

2. There shall be a ventilation supervisor on each shift responsible to the head of the safety department. Under the supervisor there shall be a sufficient crew to inspect and maintain good working conditions.

3. An EC-2 ship shall have at least one ventilation man aboard. Larger ships, or ships like carriers with considerable galvanized welding, shall have at least two ventilation men.

4. The number of ventilation men on the night shifts shall be in proportion to the construction crews.

5. The ventilation crew must have available a maintenance and repair crew of sufficient size to keep equipment on the job and operating efficiently. Long waits during which equipment is idle must be avoided.

b. Training:

1. The ventilation supervisor (that is, the safety engineer) shall be trained to handle the entire ventilation program in the yard. Local educational institutions, State Industrial Hygiene Units, Maritime Commission engineers, and other sources are available to give this training.

2. The ventilation supervisor shall organize classes, demonstrations, and short talks on standard procedures for ventilating specific spaces on the ships.

14.4  *Type of equipment needed.*—In ship construction, two types ventilation are used—local exhaust as for removal of welding at the point of origin, and general ventilation to supply fresh mined working spaces.

11

a. Local exhaust:

1. A common length for a local exhaust hose is forty feet.  In ordering exhaust fans for use with local exhaust hoses, the following specifications should be met: Capable of drawing a minimum of 900 c. f. m. through each of 3-inch (or 4-inch) diameter flexible hose. Fans should have provisions for attaching three or more local exhaust hoses per unit.

2. In the interests of power economy, it is undesirable to move much more than 900 c. f. m. through each local exhaust hose.

b. General ventilation:

1. It is frequently desirable to introduce air into large working spaces such as deep tanks, fore- or after-peaks. This is done in many yards by using a flexible fabric duct, with metal elbow, and a fan of about 8,000 c. f. m. capacity.

2. It is desirable sometimes to supply a quantity of fresh air into the double bottom.  Here a 3,000 c. f. m. unit may be used.

3. These two examples represent the two extremes of this type of work, and therefore are the two extremes in fan sizes. Fan static pressures in each case should exceed four inches of water.

4. For general ventilation of a ship engineroom during construction, a 10,000 c. f. m. blower is recommended.  On the other hand, operations in confined quarters where hunt is generated (plate shrinking, for example) may use a small portable fan to circulate the air.  For this purpose, small blowers of from 800 to 1,500 c. f. m. shall be provided.

c. Ventilating procedures:

1. Local exhaust shall be used whenever a welding operation is being conducted in a confined space, or whenever galvanized metal is being welded. Local exhaust is always a suction process.  Never blow a stream of air upon a welding arc.

2. Many welders think that it is enough to hold the end of the suction hose in the same compartment with the welding operation.  This is not so.  In order to capture the welding fumes, the end of the hose must be within six or eight inches of the arc, assuming a 200 c. f. m. volume per hose.  Beyond this distance, the suction hose is ineffective.

3. The air supply to a general ventilation fan must be fresh outside air.  Recirculation of air already contaminated shall not be permitted.  A minimum of 400 c. f. m. per welder shall be supplied to a given working space such as a deep tank when general ventilation is used alone.

## 12

4. In warm weather, air movements or drafts are helpful, while in cold weather a minimum of air movement is desired and local exhaust will serve best. In temperate weather, it is most satisfactory to use a combination of local exhaust and general ventilation.

14.8 *Coordination of department with construction program.—*
*a.* The ventilation supervisor shall keep abreast of construction, and thus anticipate the ventilation needs.
*b.* The construction foremen shall inform the ventilation department of ventilation needs before the needs occur.
*c.* Blackboards, boxes, signal lights, or similar devices shall be installed on board and used to inform the ventilation department of immediate needs.

14.6 *Supplementary ventilating procedures.—*
*a.* Ventilating confined spaces, such as the fore- or after-peaks and deep tanks, is greatly simplified by the temporary removal or cutting through of certain plates.
*b.* For example, the fore-peak of a Liberty ship can best be ventilated by cutting a combination access and ventilation hole through the watertight bulkhead near the ship's bottom.
*c.* The tank top can be left off of the midship deep tanks until all welding has been completed in this space.
*d.* A side plate can be left or cut out of the engineroom at the bottom deck level.

## MINIMUM REQUIREMENTS FOR SAFETY

**S-1. Management Part.**
2.1 It is absolutely essential, if a successful accident-prevention program is to be installed and operated, that top plant management take an active and interested part in the work. The same supervision given any other important activity in the shipyard shall be given the safety program.
2.2 The responsibility of management insofar as industrial safety is concerned shall be considered to include—
2.21 The provision of a safe working environment.
2.22 Training of employees for safety.
2.23 Establishment of an accident record and reporting system which will definitely tie into nationally uniform reporting, record, and statistical requirements.
2.24 The appointment, where necessary, of a safety engineer (or a safety director) and staff to install, maintain, and properly supervise an accident-prevention program.

## 13

2.25 The issuance of instructions to all division or department heads, foremen, leaders, leadingmen and to any persons in supervisory capacity, that they are considered responsible for preventing accidents which involve employees working under their direction and requiring them to comply with all of the provisions of the accident prevention program in effect in the shipyard.
2.26 An active and interested participation in safety through—
(a) Review of, and executive action on, safety records.
(b) Regular attendance at safety meetings.
(c) Action upon good or bad departmental safety records through personal interviews with department heads.
(d) General letters, for bulletin board posting, addressed to employees and discussions of good or bad yard accident record.
(e) By setting a good example. (Goggles, safety shoes, hard hats and other necessary protective equipment shall be used by any executive who exposes himself to yard operations.)

**S-2. Safety Director and Staff.**
2.1 A full-time safety director (title may be safety engineer or safety inspector, etc.) and staff shall be appointed for all shipyards. (See Section 2.25 for duties and responsibilities.) The safety director shall report to, and be responsible to, the highest ranking managerial executive or his designated representative.
2.2 The staff in the safety department in addition to the safety director, shall consist of:
2.21 An assistant safety director in yards having 3,000 employees or more except that there shall always be at least one safety engineer per shift.
2.22 One safety engineer (safety inspector) for each additional 1,500 employees. Example: If a yard has 35,000 employees there would be required a safety director and an assistant plus 21 safety inspectors.
2.23 The staff of engineers shall be distributed over the three shifts in proportion to the number of employees on each shift.
2.24 One clerk and/or stenographer for the first 5,000 employees and one clerk for each additional 7,500 employees. (It is not to be assumed that the time of safety inspectors or the safety director can be spent on clerical detail. All office functions, while adequately supervised by the safety

14

director, should be carried on by clerks so the greatest possible amount of time of the safety director and his staff may be spent in the shipyard.)

3.20  The duties and responsibilities of the safety director shall include:

(a)  Complete responsibility for formulating, administering and making necessary changes in the shipyard accident prevention programs within the limits of authority granted by the shipyard management.  The safety director shall also be required to correlate the shipyard accident program with the minimum safety and health standards of the United States Navy Department and Maritime Commission.

(b)  Submission of regular monthly, weekly or daily reports on the status of safety directly to the general manager or his designated representative.

(c)  Acting in an advisory capacity on all matters pertaining to safety to the management, general manager, superintendents, foremen, quartermen, leadermen, purchasing department, engineering department, commissary department, or contractors.

(d)  Maintenance of the accident record system, making all necessary reports, personal investigation of all fatal or serious accidents, investigation through his staff of all accidents, securing supervisor's accident reports, checking corrective action taken by supervisors to eliminate accident causes.

(e)  Supervising, or closely cooperating with the training supervisor in the safety training of all employees.  (See Section 6.26.)

(f)  Correlating safety work with medical department to insure proper selection and placement of employees.

(g)  Making personal inspections and supervising inspections by staff and by special employee committees, for the purpose of discovering and correcting unsafe conditions or unsafe work practices *BEFORE THEY CAUSE ACCIDENTS*.

(h)  Exchanging information with other shipyards on best safety methods and consulting with United

15

States Navy Department and Maritime Commission Regional Safety Consultants on safety problems which cannot be solved with methods or information at hand.

(i)  Making certain that all federal, state or local laws, ordinances or orders bearing on industrial safety are complied with.

(j)  Securing any necessary help or advice from the state labor departments on matters pertaining to safety and health.

(k)  Initiating activities that will stimulate and maintain the interest of employees in safety.

(l)  Acting as secretary of all safety committees and in such capacity he shall prepare an agenda for each such meeting covering the business to be discussed and, he shall prepare for the record, minutes of each such meeting.

(m)  Directing the activities of his staff including the assistant safety director, so that the shipyard accident prevention program will be efficiently operated.  It is expected that the safety director may delegate certain responsibilities to his staff engineers, such as that of acting as secretary of safety committees.  Permission or certain of the safety director's authority is expressly for such delegation of authority is given in the interest of efficiency and for training the safety staff.

(n)  Submission of the required reports on the status of safety in the shipyard to the interested government agencies at the time and intervals hereinafter requested.

3.4  Accident Prevention Forms and Reports.

4.1  The safety director shall cause to be designed and put into use at least the following forms and records:—

4.11  *Supervisor's report of accidents.*—

(a)  Giving all vital data on case plus statements as to unsafe act and/or unsafe condition, reason unsafe act or condition was permitted to exist or occur, and the immediate corrective action taken or recommended.  (See Form L.)

4.12  *Safety engineer's recommendation form.*—

(a)  Form used by safety staff to record recommendations made during inspection.  Used for follow-up.  Made in triplicate; one to leader-

Budget Bureau No. 02-R035-42
Approval expires January 31, 1944

# U. S. MARITIME COMMISSION — U. S. NAVY
## PRIVATE SHIPYARDS
## SUPERVISOR'S REPORT OF ACCIDENT OR OCCUPATIONAL DISEASE

Fill out for every disabling injury (or case of occupational disease) whether or not compensable. Answer every question fully. Use other side if necessary. To be mailed with the Monthly Injury Summary (for the month covered in that report) by the 15th of the following month to the Division of Industrial Injury Statistics, Bureau of Labor Statistics, Washington, D. C.

(1) Name of yard ______ ______ (City) (State)
(2) Name of injured employee ______ Badge No. ______
(3) Occupation ______ Department ______
(4) Date of accident ______ Hour of day ______ a.m. p.m.
(5) Witnesses: Name ______ Badge No. ______
" ______ " " ______
(6) Describe accident or case fully (what injured was doing, what happened, etc.) ______
(7) What unsafe condition caused accident or occupational disease? (Specify: broken ladder, defective staging, lack of ventilating equipment, etc.) ______
(8) What was done wrong (unsafely) that caused accident or occupational disease? (Specify: failure to wear provided goggles, overloading crane, using mushroomed chisel, failure to use respiratory protective equipment, etc.) ______
(9) Describe resulting injury or occupational disease. (Specify: lacerated hand, broken left leg, right thumb amputated, lead poisoning, etc.) ______
(10) What have you done to prevent similar occurrences? ______
(11) What do you recommend to prevent similar occurrences? ______
(12) Signed by: ______ Title: ______ Date: ______
Checked by: ______

DO NOT USE

Serial No. ______
Code date ______
Region ______
Location ______
Occupation ______
Dept. ______
Injury date ______
Time of day ______
Agency ______
Agency part ______
Uns. mech. cond. ______
______
Acc. type ______
Uns. act ______
Uns. pers. fact ______
______
Injury ______
Body part ______

FORM 1. (See paragraph S. 4.11-a.)

## SAFETY ENGINEER RECOMMENDATION FORM

BLANK SHIPBUILDING COMPANY

To: ______ Location ______

Date ______ Time ______

An inspection of operations under your supervision revealed the following unsafe practices and/or conditions:

NOTE: (Unsafe acts or conditions to be described here and numbered. Badge numbers or names of men involved may be listed.)

Above conditions or practices last observed (1) ______ (2) ______ (3) ______

Corrected at once? ______ If not, when will corrective action be taken? ______

Signed ______ Safety Department

Date checked ______ Signed ______ Safety Department

(Used only if condition is not corrected at once.)

No. 000

NOTES: (1) Size, approximately 3" x 5"
(2) To be made out in triplicate (See 4.12)
(3) Form need not be filled out if condition is corrected at once unless unsafe act or condition is a repetition or a flagrant violation of safety rules is involved.
(4) If check shows existence of some unsafe act or condition the matter should be referred in writing, to the proper executive for action.

FORM 2. (See paragraph S. 4.12-a.)

18

man or quarterman on job, one to general manager, or other designated executive, one to safety department files after use to check performance. (See Form 2.)

4.13 *United States Navy Department and Maritime Commission monthly injury summary.—*

(a) To be submitted monthly to United States Navy-Maritime Commission. (See Form 3 attached.) To include over-all breakdown of predominant accidents, types and causes, accident frequency, total number of fatal cases, total of lost-time cases and the time lost, etc. *This form to be used also for report to management of shipyard.* To be submitted in triplicate as required on form. (See Form 3.)

(b) The following formula shall be used in determining accident frequency rates for shipyards:

    1. Accident Frequency.—

$$\text{Number Disabling Injuries} \times 1{,}000{,}000$$
$$\overline{\text{Total Man-Hours Worked for Period Covered}}$$

    2. A disabling injury shall be considered to be any injury which results in a man being unable to report for work on the next regular day or shift after the accident, or one which calls for a standard time charge being made regardless of whether time is actually lost. If time is lost due to the injury, subsequent to the initial return to work, than the injury shall be accounted as disabling.

4.14 *Minutes of safety committee meetings.—*

(a) Minutes of meetings should show date and time of meeting, names of those present, action on unfinished business, brief description of new business discussed and action taken or ordered by the committee on each item. The discussion should always include the predominating accident hazards of the yard and the means suggested to control them.

(b) Various committee forms will be made available to shipyards on request.

These forms and any others pertaining to industrial safety or health shall be filed and made available to authorized

19



U. S. MARITIME COMMISSION — U. S. NAVY
PRIVATE SHIPYARDS

INJURY SUMMARY FOR MONTH OF _____ 19___.

INSTRUCTIONS

Form 3—Front    (See paragraph 3. 4.13-a.)

21

representatives of the United States Navy-Maritime Commission upon request.

S-4. Safety Committees.

6.1 The safety director, in cooperation with the shipyard general manager, shall cause to be formed and put into effective operation at least the following safety committees.

6.11 *Central safety committee.*—

(a) Membership: management representative (chairman), safety director (secretary), all superintendents, foremen, medical department representative, quarterman or leaderman, and one employee.

(b) Membership of all but management representative, medical department representative and safety director may be rotated—terms of 2 months each but rotation to be arranged so only ½ of committee changes each month.

(c) Meetings: Shall be monthly or more often as necessary.

(d) Duties: This is the policy forming committee for safety work. They review the monthly report as submitted to the United States Navy-Maritime Commission and other records to determine the course of safety work for coming period. They decide such matters as type of safety equipment to be used and how it shall be made available to men, types of safety training to be used, whether accident prevention plan is being adhered to, interplant contest awards, etc. Such committees shall review the investigation on fatal or serious accidents and make recommendations. All Committee members are expected to make practical suggestions to improve shipyard safety. They also review reports of other committees to make certain suggestions and recommendations are properly followed through.

(e) Secretary: The safety director shall act as secretary, prepare an agenda, take minutes, prepare a report of committee meeting, and distribute copies of reports to members. He shall follow through with other committees, the suggestions and recommendations of the central safety committee.

20

ACCIDENT CAUSE ANALYSIS FOR THE MONTH

22

5.12 *Supervisors' safety committee.—*

(a) Membership: Management representative, safety director, medical department representative, superintendents, foremen, quartermen, and leadermen. This is a rotating committee; rotation should be arranged so all of the supervisory staff serve in their respective periods, i. e., superintendents change each four months, foremen such two months, quartermen and leadermen such month. In no case should an entire group change at one time. Where a department or unit of a department has an unusually poor record than the responsible supervisory staff—superintendent, foreman, quarterman or leaderman should be retained on the committee until their record is at least equal to the shipyard average.

(b) Meetings: Shall be monthly or semimonthly or more frequently, as necessary.

(c) Duties: The primary purpose of this committee is the stimulation and maintenance of interest and the education of its members in accident prevention. The shipyard accident record shall be reviewed, the predominant types of accidents and the predominant causes of these accidents shall be discussed. Suggestions and recommendations to improve the records are solicited from each member. At least one timely subject must be discussed at each meeting; i. e., such as eye injuries and their prevention, electric shocks, hand tool accidents, etc. Methods of avoiding accidents due to these operations should be presented by the committee members.

(d) The committee shall review reports of all fatal and serious accidents and suggest preventive action. It shall review reports of inspection committees and check on the quality of the suggested corrective action for unsafe conditions or practices reported.

(e) The committee shall carry out the suggestions and recommendations of the central committee.

(f) Outside speakers such as safety engineers, insurance men, State Department of Labor men or men from other shipyards, may be used from

23

time to time to stimulate interest of committee members in accident-prevention work. Sound film strips, motion pictures or other similar media on safety subjects can and should be used if available and practicable.

(g) Secretary: Same as for central safety committee.

5.13 *Regular inspection committees.—*

(a) Number: One committee for each department and each hull.

(b) Inspection: Weekly or more often as necessary.

(c) Membership: At least two employees and a supervisory employee of each job being inspected. The safety director or staff safety engineer should accompany the committee.

(d) Duties: To inspect their department or hull for the purpose of discovering and having corrected unsafe acts and unsafe conditions likely to cause accidents. On each section of a job they should be accompanied by a responsible supervisory employee. They are observers only—the foreman, quarterman or leadermen shall do all corrective work. Where a condition is discovered on which there is disagreement the superintendent shall make the necessary decision. *Hazards immediately dangerous to health, life or limb shall be corrected by the accompanying supervisor at once.*

(e) The committee shall submit written reports to the safety director and indicate whether accident-producing conditions or practices have been corrected. These reports shall be referred to the supervisory safety committee by the safety director. If necessary because of dangerous conditions, he may refer them at once to the general manager.

5.14 *Special inspection committees.—*

(a) Staging inspectors, electrical inspectors, crane inspectors, boiler inspectors, and others.

(b) Membership: Specially qualified individuals or teams permanently assigned to work. (See paragraph 5.15c.)

(c) Duties:

1. Staging inspectors: Daily or continuous inspections of all stages shall be made on each

hull—or other locations where stages are used. Report shall be made of all defects to the responsible supervisor for immediate correction. Copy of the daily report shall be submitted to the safety director.

2. Crane inspectors: Weekly inspections shall be made of all cranes and rigging. Reports shall be submitted to proper department heads for correction of unsafe conditions or practices. Copies of reports on defects shall be made to the safety director.

3. Other inspectors: As above and at indicated frequency.

5.15 *Safety committees—General.—*

(a) Committees in addition to those specified in these standards, may be formed and operated if desired.

(b) Representatives on all committees, when of a supervisory status, should be appointed by the shipyard general manager and held responsible by him for active and interested participation in the work of the committee. Employee representation may be secured in the same manner, or by appointment of employee committees, union shop stewards or by election of union members or by any other feasible means.

(c) The services of production employees having related duties may be taken advantage of on inspection committees. Stage erectors or repair men may serve as permanent and continuous staging inspectors; a man or men from the ventilation crew may be utilized for checking on ventilation practices. The reports of state or insurance inspectors will be considered adequate on boilers, air compressors and receivers or on other pressure vessels.

S-4. Employee Safety Training.

6.1 The time for the safety training of an employee to start is at the inception of his employment. After a physical examination, which should be made to make certain that the employee is physically capable of performing safely the work he is requesting, the man have explained to him the safety policy of the company by a representative of the safety department. This may be done individually, in general groups or in craft groups and the instruction may

24

be supplemented by printed instructions in the form of rule books or instruction cards.

6.2 Employees shall have in their possession, and be instructed in the proper use of, all necessary personal protective equipment before being started on any job.

6.3 General safety rule books, craft safety rule books or safety instruction cards should be supplied employees. Such books should be concise but complete enough to furnish written record of all important safety rules. *No rule shall be included which will not be strictly enforced.* The assistance of United States Navy-Maritime Commission safety engineers will be given in the preparation of such rule books if desired.

6.4 All employees shall be instructed in their specific duties by their immediate supervisor and they shall be made familiar with the hazards of the job and instructed carefully in how to avoid them. It shall further be the duty of the supervisor to constantly check all employees so unsafe working practices may be corrected before accidents occur.

6.5 Safety instruction shall be correlated with all apprentice and craft training schools. Safety instruction in such schools or training courses shall include an explanation and demonstration of the need for the safety equipment or safe practices specified and the strict enforcement of all safety requirements in the classes. The instructors shall, by their own example, impress upon the learners the importance of the safety requirements.

6.6 Safety bulletin boards shall be located at each hull and shop, and at such other locations where they may be desirable, on which safety posters, letters or bulletins from the shipyard management or safety department and other safety material may be posted.

6.01 The bulletin boards shall be located where the majority of the employees at a particular location will see them.

6.02 The bulletin boards shall be well constructed, have a locked glass cover and shall be lighted at night.

6.03 Safety posters and other material on bulletin boards shall be changed at least semimonthly or more often. (Posters will be made available by the United States Navy-Maritime Commission for the use of shipyards. However, posters may be selected by the shipyard safety department from any source.)

6.7 Where shipyard house organs (magazines or newspapers) are established, the safety director should arrange to have a reasonable proportion of the space devoted to safety (articles, items and cartoon cuts relating to safety will be made available by United States Navy-Maritime Commission safety consultants.)

25

26

and film strips and motion pictures on safety subjects should here be practicable. Public address systems, where installed, used for safety messages to shipyard employees especially rush hours or at shift changes.

· Supply Store.

safety supply store shall be established in each shipyard fety shoes, safety hats, protective impact goggles and filter-ling goggles shall be made available to shipyard workers. y be sold at or near cost to employees, but safety hats and nd filter-lens goggles shall be issued to each employee but nin the property of the company to be returned when the em-uds his employment. Equipment such as work clothes, gloves, helmets, may also be stocked and sold to employees if desired.

Goggles may be stocked in the central tool room or first-aid department but should be fitted as described in para-graph 7.2 following.

The attendant of the safety store should be skilled in fitting hose, and if goggles are also issued, he should be trained in fitting and servicing of goggles.

gles.

Impact-resisting goggles of a type suitable for the particular I also of a type meeting the requirements of the United States of Standards, shall be worn by every employee exposed to the of eye injuries. Practically every employee in the shipyard, is exception of those working inside offices at all times are either y exposed to eye injury from the work they do, or indirectly h working near operations which are likely to produce flying . (See paragraph H-10.2a, page 4.)

Except where *temporary* lack of goggles make it impossible, employee shall have his own pair of goggles. If it is necessary us goggles to different employees, *the goggles must be sterilized each use.*

Goggles supplied employees should be carefully fitted to their to prevent irritation and to prevent the entrance of foreign s around the edges. (See paragraph 7.2.)

All employees working in proximity to arc-welding operations be required to wear anti "flash" goggles, of at least No. 2-3 (or equivalent), of a type meeting the requirements of the ed States Bureau of Standards. (See section 9.1 on welding for tional eye protection for welders.)

Welding screens constructed of wood, metal or other suitable 'ial shall be used to protect the eyes of workers in proximity ... operations whenever their use is practicable.

27

## 5-4. Welding—Arc.

9.1 All welders shall be made familiar with the hazards of their work and instructed in safe methods of performing the various types of jobs to which they are assigned.

9.2 Personal protection equipment used by welders shall include:

9.21 Welders' protective hood provided with the proper shade of filter type lens for protection against the harmful rays of the arc and a clear cover glass to protect the filter lens.

(a) The shades or their equivalent recommended are:

Up to 30 amperes—No. 6-7 Shade.
30 to 75 amperes—No. 8 Shade.
75 to 200 amperes—No. 10 Shade.
200 to 400 amperes—No. 12 Shade.
Over 400 amperes—No. 14 Shade.

(b) Shades may also be selected from the following table:

| Rod diameter | Welding glass shade No. |
|---|---|
| 1/16 | 10 |
| 3/32 | 10 |
| 1/8 | 10 |
| 5/32 | 12 |
| 3/16 | 12 |
| 7/32 | 12 |
| 1/4 | 14 |
| 5/16 | 14 |
| 3/8 | 14 |

(c) The welder's hood should be inspected at least weekly to detect possible light leaks, cracked protective glass, or badly fouled or missing cover glasses. Any defects discovered shall be corrected at once.

9.22 Protective leather welders' jacket, long-sleeved wool shirt with buttoned collar and leather welders' gloves and safety hat.

(a) It has been found satisfactory in the hot summer months to substitute flameproofed cotton shirts. If this is done, the flameproofing, which must be reapplied after each washing, should be done under the direction of the shipyard. This entails that laundering also be done by the company. Commercial laundries are rapidly undertaking this type of work.

9.23 Hardened and filter lens protective goggles with sideshields to be worn under the hood for protection against burn-

28

ful rays where the hood is raised and for protection against flying scale and chips. The goggles should be of a type meeting the requirements of the United States Bureau of Standards and of at least No. 2-4 shade or equivalent.

9.24 Safety shoes or pull-on boots with cord or leather soles and heels.

9.3 Welding screens (constructed of flameproofed fabric on wood or metal frames, metal on metal frames, or plywood sheets joined by rings) of a size sufficient to protect men working nearby from the harmful effects of the electric arc rays shall be used on all electric welding operations when practicable.

9.31 A type found very successful by one large company can be economically constructed of ¼'' to ⅜'' plywood. Two pieces about 18'' x 30'' are joined at two points along one edge with 2'' x ⅜'' rings. The large size of the rings allows the two pieces to lap sufficiently to make a lightproof joint, while the light weight of the assembled screen makes men more prone to use them.

9.4 Welding leads shall be inspected at least once each shift, and those found defective shall be repaired or replaced.

9.5 All welding leads should be coiled back to centrally located stations after the completion of each shift or job.

9.6 Welding rod tips should not be thrown on decks or stages but should be retained by the welder and turned in at the end of the day for salvage.

9.7 Each electric welder shall make an inspection of the area below him, and of the opposite sides of bulkheads on which he is working, to make certain that there is no danger of falling or penetrating sparks causing a fire. He and his helper must know the location of fire extinguishing equipment and how to use it. It is recommended that a fire extinguisher be available in the immediate area.

9.8 The safety of women welders presents several special problems which should be carefully considered while women are being trained and during their first several weeks on the job.

9.81 Women will at first be subject to excessive fatigue because they are unaccustomed to shipyard work. In their enthusiasm they are likely to overdo and will, under such conditions, be more prone to accidents and at the least, absences may follow. They should, until they become accustomed to the work, be carefully watched by supervisors and if signs of fatigue are evident they should temporarily be given lighter work.

29

9.82 Work clothing for women is still in the development stage. In general, however, the following should be observed:

(a) Safety shoes or pull-on boots with cord or leather soles and heels.

(b) Long underwear; union suit type (wool for winter) khaki trousers and shirt, or coverall type of overall with a drop seat and welders' leather uniform.

(c) It is desirable that the outer clothing, unless of wool, be flameproofed.

(d) Leather gloves.

9.83 Whenever possible, mechanical means of handling material should be utilized in preference to manual handling.

S-10. Burners.

10.1 Equipment for burners shall be the same as that for welders except that the leather clothing and welders' helmets need not be worn. Filter type lens protective glasses with side shields. No. 3-8 shades or their equivalent should be worn. Flameproofed clothing is desirable.

10.2 All individual oxygen and acetylene and other gas lines shall be turned off at the manifold at lunch hour and at quitting time or if the burner must leave the immediate vicinity of his work during the regular shift.

10.3 All hoses should be coiled up to the manifold when shifts are changed or when jobs are completed.

10.4 The practice of dusting the clothes by blowing oxygen on them or using oxygen for ventilating or cooling purposes has resulted in several fatalities and *shall be absolutely forbidden.* Oxygen shall be used only in connection with burning or welding operations.

10.5 Each burner shall make an inspection of the area below him, and of the opposite sides of bulkheads on which he is working, to make certain that there is no danger of falling sparks causing a fire. He and his helper should know the location of fire-extinguishing equipment and how to use it. It is recommended that a fire extinguisher be available in the immediate area.

10.6 Burners' uniforms (overalls) shall be laundered at least weekly except that if oil or grease is spilled on the clothing, it shall be changed at once. It is desirable that arrangements be made by the company to have uniforms (overalls) laundered and flameproofed.

10.7 Defective burning equipment such as torch, hose or cylinder pressure regulators (where cylinders are used), shall be repaired immediately.

10.8 All oxygen and acetylene (gas) lines shall be inspected at least once each shift and those found defective shall be repaired or replaced.

10.9 Standard color coding for oxygen and acetylene pipe lines shall be observed for oxygen and acetylene. (Since it may be impos-

31

sible to secure colored hose during the war, identification may be made by any practicable means so long as every burner and burner's helper or any other person who has occasion to use oxygen-acetylene (gas) equipment is thoroughly familiar with it.)

S-11. Cranes (Whirleys, Hammerheads, Bridge, etc.)

11.1 The safe loads as specified for cranes on single lift shall not be exceeded.

a. For the guidance of crane operators, weights of all sections over 5 tons shall be plainly marked on the section in figures at least 10 inches high.

11.2 On double lifts, cranes shall not be loaded to more than 75% of their combined rated capacities.

11.3 All crane operators shall be given a thorough physical examination upon employment and at at least yearly intervals thereafter. Particular attention should be given to the eye examination.

11.4 Crane Inspectors. (See section S.6.14.)

11.5 All whirley and hammerhead cranes shall be provided with bumper guards of ¾" wire rope or equivalent set from 32 to 36 inches from the ground, and fastened in the form of a half loop to all four wheel covers at the leading and trailing ends of the crane.

11.6 All traveling cranes regardless of the type shall be equipped with a clearly audible automatically operated signal which will indicate that the crane is in motion. A siren or electric horn pitched to a tone above or below the general noise level of operations is preferable to a gong or bell.

11.7 The crane operator shall take signals only from the designated hook tenders or riggers and no others. Hook tenders shall be identified by special hats or arm bands.

11.8 All loads shall be lifted or lowered under power.

11.9 Employees shall not be permitted to pass between the leading and trailing trucks of whirley cranes at any time.

a. Wheel covers shall be provided which will protect all wheels of whirley, gantry, hammerhead and bridge cranes to a distance of ⅔ inch from the crane tracks.

11.10 Employees shall not remain under, or pass under crane loads.

11.11 Trolley lines for cranes shall be protected against accidental contact by men or material, by wood or other suitable sheathing, or if the trolley lines are elevated they shall have a vertical clearance of at least 12 feet above the ground.

a. Bumper guards for trolley ends of bridge cranes should be provided to prevent the hoisting cables from swinging into the trolley

11.12 The crane operator shall be required to immediately notify a designated department head of any defects he notices in the crane or its equipment.

11.13 No person other than the crane operator, a trainee, the supervisor in charge of cranes, the crane inspector, repairman on crane repair jobs or safety department men shall be permitted in crane cabs. No more than three persons shall be in the cab at any time.

a. Whenever possible, crane operators should be relieved on the ground and not in the crane cab.

11.14 Except under emergency conditions and then only with the approval of the safety department, men shall not ride loads. Men shall never be permitted to ride empty hooks or slings.

11.15 A clearance of at least 2 feet and preferably more shall be maintained between the crane and any stationary object or materials. Where existing structures make this clearance impossible, an exception to this rule may be granted by the United States Navy Maritime Commission Safety Consultant after an inspection.

11.16 Strong-backs or spreaders should be used on all lifts where there is danger of the load buckling or where the spread is so wide slings or clamps may slip. Steel strong-backs are preferable to wood.

11.17 The hook tenders shall familiarize themselves with the weights of the various plates, shapes and sections handled, so chain or cable slings of the proper size will be used on lifts.

11.18 All chain and cable slings and strongbacks should be clearly marked, by color coding, to indicate the maximum safe load for which they are to be used.

11.19 All electric cranes should be equipped with limit switches to prevent double blocking.

11.20 Storage racks shall be provided for all chain and cable slings at points convenient to the operations so they may be safely stored when not in use. All chain and cable slings shall be inspected before each use by the hook tender and if found defective, shall be sent to the proper department for repair. Such inspections shall be in addition to, not substitutes for, the regular inspections by the safety department.

S-12. Plant Housekeeping.

12.1 Housekeeping shall be maintained at a high standard in all parts of the shipyard at all times. The following rules shall (or should, as indicated) be put into effect:

a. Wide, well-defined roads, aisles, and passages shall be laid out in the yard and shops and they shall be kept clear of obstructions and shall be kept clean and free from debris. The width of aisles and passages in some of the older yards may be limited because of exist-

30

## 33

in accordance with the requirements of the National Fire Protection Association standards.

12.19 All staging lumber, or other lumber, when dismantled shall have all nails or spikes removed or bent over.

12.20 Plates and shapes shall be stored either in a substantial metal or heavy timber racks or stored flat on a substantial timber or concrete foundation that will prevent shifting.

(a) Plates and shapes shall be stored so there is at least an 8-foot clearance from the center line of railroad tracks.

12.21 Angle brackets and similar small pieces shall be stored in racks.

S-13. Lighting.

13.1 A level of illumination should be maintained for the various type of jobs in all shops, at least as high as that recommended by the standards of the Illuminating Engineering Society.

Minimum Standards of illumination for certain industrial interiors as recommended by the Illuminating Engineering Society are as follows:

| Type of Work | Minimum operating foot-candles measured on the work |
| --- | --- |
| Assembly: | |
| Rough | 10 |
| Medium | 20 |
| Construction—Indoor: | |
| General | 10 |
| Forge shops and welding | 10 |
| Foundries: | |
| Charging floor, tumbling, cleaning, pouring and shaking out | 5 |
| Rough molding and core making | 10 |
| Fine molding and core making | 10 |
| Machine shops: | |
| Rough bench and machine work | 10 |
| Medium bench and machine work, ordinary automatic machines, rough grinding, medium buffing and polishing | 50 |
| Paint shops: | |
| Dipping, simple spraying, firing | 10 |
| Rubbing, ordinary hand painting and finishing; art, stencil and special spraying | 20 |
| Power plants, engine rooms, boilers: | |
| Boilers, coal and ash handling, storage battery rooms | 5 |
| Auxiliary equipment, oil switches and transformers | 10 |
| Engines, generators, blowers, compressors | 15 |
| Receiving and shipping | 10 |
| Sheet metal works: | |
| Miscellaneous machines, ordinary bench work | 15 |
| Punches, presses, shears, stamps, welders, spinning, medium bench work | 20 |

## 32

ing structures, but an effort should be made to maintain a width of twice that of the widest hand or power truck, plus two feet.

12.12 Aisles and passages should be defined by white or yellow lines painted on the floors. Materials or machines should not be permitted to encroach on these lines into the aisle.

12.13 All staging platforms, ramps, stairways, walkways, or other walkway surfaces on shipways shall be kept clean of all debris such as welding rod tips, bolts, nuts, and similar material. Welding leads, burner hose and air hose should be elevated over or placed under the walkway surfaces or protected by cross-over planks. They should be neatly arranged and not left in coils or loops where they may cause men to trip and fall.

12.14 All deck areas on hulls shall be kept free of debris and construction material shall be neatly piled so as not to present a hazard to employees. (See par. S. 12.13 on hose, etc.)

12.15 All dock openings shall, as soon as practicable, be protected with guardrails at least 42 inches in height set 12" back from the edge of the opening. Manholes may be guarded by tacking three uprights to the deck and then tacking a ring of the proper diameter to the top of the uprights. Hatches, without coamings, may be guarded by tacking uprights to the deck at intervals of not more than 10 feet and fastening 2" x 6" or 2" x 8" timber rails in place at 42" from the deck. Midrails set 21" from the deck may be used also, and are especially recommended where women are employed.

(a) Where they are projecting stud bolts around the manholes or tank tops, they should be protected with either metal strips or wood covering to prevent slips and falls or snagging of clothing of workers.

12.16 All snow and ice shall be cleaned from stagings and platforms (by turning the planks), and from decks, before men on regular production are permitted to work on them.

12.17 Free access shall be maintained at all times to all exists and to all fire-alarm boxes or fire-extinguishing equipment.

12.18 All oils, paints, thinners, solvents, waste, rags, or other flammable substances shall be stored and used strictly

## 34

| Type of work | Minimum operating foot-candles recommended work |
|---|---|
| **Steel and iron manufacturing:** | |
| Billets, blooming, sheet bar, skelp and slabbing mills | 5 |
| Boiler room, powerhouse, foundry and furnace rooms | 5 |
| Cold strip, pipe, rail, rod, tube, universal plate and wire drawing | 10 |
| **Repair shops:** | |
| Rough bench and machine work | 10 |
| Medium bench and machine work | 30 |
| Blacksmith shop | 10 |
| Carpenter and pattern shop | 30 |
| Storage | 2 |
| **Store and stock rooms:** | |
| Rough bulky material | 5 |
| Medium or fine material requiring care | 10 |
| Structural steel fabrication | 10 |
| **Woodworking:** | |
| Rough sawing and bench work | 10 |
| Sizing, planing, rough sanding, medium machine and bench work, gluing, veneering, cooperage | 20 |

13.9 All lights should be provided with reflectors suitable for the type of work being done and meeting the requirements of wartime dim-out regulations. A regular schedule of cleaning and maintenance should be instituted that will keep the lighting units at their original efficiency.

**8-14. Hand Tools.**

14.1 All tool rooms issuing hand tools such as hammers, sledges, chisels, spud wrenches, center punches, portable air-driven tools, portable electric tools and other tools should be inspected daily by a safety engineer to make certain that only tools in good condition are being issued. Tools in poor condition shall not be issued.

14.2 Workers' personal tool kits should be inspected at monthly intervals so defective tools may be discovered and repaired.

**8-15. Handling Material (Manual).**

15.1 All employees should be instructed in the proper method of lifting. No limit can be set as to the maximum weight to be lifted by one man, but it should be made clear to all employees that they should secure help if the load is too heavy or too bulky for one man to handle easily. Mechanical equipment should always be used when it is available and its use is practicable.

15.11 Posters illustrating the proper method of lifting should be displayed frequently and men observed lifting incorrectly should be reinstructed by their supervisor.

**Machine Guarding.**

All belts, pulleys, gears, chains, sprockets or other dangerous rts of machines shall be completely enclosed with guards

## 35

constructed of angle-iron brackets covered with heavy sheet metal or ½-inch wire mesh. Vertical or inclined belts shall be guarded to a height of 6 feet above the floor. Horizontal belts over 8 feet above the floor may be guarded only on the under side. Gears, chains and sprockets should be guarded no matter where located.

16.11 Since metal may not be available for guards at present, substantially constructed wood guards will be acceptable.

16.12 In all cases where state requirements are more stringent than those given above, the state rulings must be followed.

16.2 All machines shall be guarded at the point of operation so employees will not be injured while operating the machine.

16.21 The standards of guarding for the various machines as recommended by the Insurance Rating Bureau should be followed except where state requirements are more stringent when the latter will take precedence.

**8-17. Staging and Ladders.**

17.1 United States Navy—Maritime Standards of Construction for shipyard staging is in the process of development and will replace the present recommended practice when published.

17.2 All staging, scaffolding, platforms and walkways shall be constructed in accordance with the requirements of the California State Industrial Commission except where existing state codes are more stringent in which case the latter shall take precedence.

17.3 All ladders should conform to the American Standard Safety Code on ladders.

O



