**MDL 875**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

NOV - 3 2006

FILED
CLERK'S OFFICE

# THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: ASBESTOS PRODUCTS | * | |
| LIABILITY LITIGATION (No. VI) | * | |
| | * | **CIVIL ACTION NO.** |
| ------------------------------------------------- | * | |
| In Re:  Conditional Transfer Order | * | **MDL 875** |
| (CTO-268) | * | |
| ------------------------------------------------- | * | |

### Case Originates from

### UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| BYRON GRANIER, *et al.*, | * | |
| Plaintiffs, | * | |
| | * | Civil Action No.  06-3738 |
| VERSUS | * | |
| | * | Section: L |
| NORTHROP GRUMMAN SHIP | * | |
| SYSTEMS, INC., *et al.*, | * | Magistrate: 1 |
| Defendants. | * | |

* * * * * * * * * * * * * * * *

## MEMORANDUM IN OPPOSITION TO
## MOTION TO VACATE CONDITIONAL TRANSFER ORDER

Northrop Grumman Ship Systems, Inc. f/k/a Avondale Industries, Inc.("Avondale") and

its alleged executive officers, Peter Territo ("Territo") and Albert Bossier ("Bossier")

**OFFICIAL FILE COPY**

(collectively, the "Avondale Interests") submit this Memorandum in Opposition to the Motion to Vacate Conditional Transfer Order by plaintiff and respectfully show as follows:

The question of whether this case was properly removed under the Federal Officer Removal Statute (28 U.S.C. § 1442) is hotly contested as demonstrated in the attached memorandum in Opposition to Motion to Remand.  The Avondale Interests presented to the transferee court prior to the entry of the Conditional Transfer Order the history of similar removals effected in Louisiana in recent months.  Most importantly, the Avondale Interests cited to two recent cases they removed under the Federal Officer Removal Statute that withstood identical Motions to Remand in the Middle District of Louisiana.

As explained in the attached memorandum, there appears to be an irreconcilable split between the Eastern District of Louisiana and the Middle District of Louisiana concerning the propriety of federal officer removals.  The Avondale Interests contend that the test applied in the Middle District (in cases removed by them) and the same test applied in the Eastern District (in cases removed by others[1]) is the proper test.  Moreover, the Avondale Interests contend that even if the test urged by the plaintiff in this case is applied, the nature of the allegations made in his original petition lead to the conclusion that even the plaintiff's more onerous test if satisfied.

At any rate, this Court should not vacate the Conditional Transfer Order until it has first made a determination on the pending motion to remand, where a full-fledged analysis of the federal officer removal statute in the context of this case can be made.  The Avondale Interests stand by the reasoning in the attached memorandum and urge the Court to deny Plaintiffs' Motion to Vacate as premature.

---

[1] *See Delancey, et al. v. General Electric, et al.,* U.S.D.C., E.D. La. No. 04-431, 48 F. Supp. 2d 653 664 (E.D. Tex. 1999); *Fink v. Todd Shipyards, et al.,* E.D. No. 04-430.

Respectfully Submitted,

Gary A. Lee, La. Bar No. 8265
Richard M. Perles, La. Bar No. 01534
A. Ann Cates, La. Bar No. 24769
**Lee, Futrell & Perles, L.L.P.**
201 St. Charles Avenue, Suite 4120
New Orleans, LA 70170
Telephone:      (504) 569-1725
Facsimile:      (504) 569-1726

*and*

Gordon P. Wilson, La. Bar No. 20426
Kristopher T. Wilson, La. Bar No. 23978
R. Lewis Parks, Jr., La. Bar No. 29646
**Lugenbuhl, Wheaton, Peck, Rankin & Hubbard**
601 Poydras Street, Suite 2775
New Orleans, LA 70130
Telephone:      (504) 568-1990
Facsimile:      (504) 310-9195
**Attorneys for Peter Territo and
Albert Bossier, Jr.**

*and*

Brian C. Bossier, La. Bar No. 16818
Edwin A. Ellinghausen, La. Bar No. 1347
Richard L. Olivier, La. Bar No. 19974
Tara Nunez-Smith, La. Bar No. 28403
**Blue Williams, L.L.P.**
3421 North Causeway Boulevard, 9th Floor
Metairie, LA 70002
Telephone:      (504) 831-4090
Facsimile:      (504) 849-4091
**Attorneys for Northrop Grumman Ship Systems,
Inc. (f/k/a Avondale Industries, Inc.)**

3

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

NOV - 3 2006

**CERTIFICATE OF SERVICE**

FILED
CLERK'S OFFICE

I hereby certify that a copy of the foregoing MEMORANDUM IN OPPOSITION TO

MOTION TO VACATE CONDITIONAL TRANSFER ORDER has been served upon the

parties listed on the attached Panel Service List by mailing same to each, postage pre-paid and

properly addressed, this 2nd day of November , 2006.

| | | |
|---|---|---|
| Robert C. Binzley<br>Thompson Hine, LLP<br>127 Public Square<br>3900 Key Center<br>Cleveland, OH  44144 | Susan M. Hansen<br>Brownson & Ballou<br>225 South Sixth Street<br>Suite 4800<br>Minneapolis, MN  55402 | John D. Roven<br>Roven, Kaplan & Wells, LLP<br>2190 North Loop West<br>Suite 410<br>Houston, TX  77018 |
| Brian C. Bossier<br>Blue Williams, LLP<br>3421 N. Causeway Boulevard<br>9th Floor<br>Metairie, LA  70002 | Reginald S. Kramer<br>Oldham & Dowling<br>195 South Main Street<br>Suite 300<br>Akron, OH  44308-1314 | Richard D. Schuster<br>Vorys, Sater, Seymour & Pease, LLP<br>52 East Gray Street<br>P.O. Box 1008<br>Columbus, OH  43216 |
| Daniel J. Caruso<br>Simon, Peragine, Smith & Redfearn<br>1100 Poydras Street<br>30th Floor<br>New Orleans, LA  70163 | David C. Landin<br>Hunton & Williams<br>951 East Bryd Street<br>Riverfront Plaza, East Tower<br>Richmond, VA  23219 | Neil Selman<br>Selman, Breitman & Burgess<br>11766 Wilshire Boulevard<br>Sixth Floor<br>Los Angeles, CA  90025 |
| Edward J. Cass<br>Gallagher, Sharp, Fulton & Norman<br>1501 Euclid Avenue<br>Bulkley Building, 7th Floor<br>Cleveland, OH  44115 | Gary Allen Lee<br>Lee, Futrell & Perles, LLP<br>201 St. Charles Avenue<br>Suite 4120<br>New Orleans, LA  70170-4120 | Robert N. Spinelli<br>Kelley, Jasons, McGuire & Spinelli<br>Center Square West<br>15th Floor<br>Philadelphia, PA  19102 |
| Adam M. Chun<br>Goodwin Procter, LLP<br>901 New York Avenue, NW<br>Washington, DC  20001 | Gene Locks<br>Locks Law Firm, LLP<br>1500 Walnut Street<br>Philadelphia, PA  19102 | Robert E. Swickle<br>Jaques Admiralty Law Firm, PC<br>1570 The Penobscot Building<br>The Maritime Asbestos Legal Clinic<br>Detroit, MI  48226 |
| David A. Damico<br>Burns, White & Hickton, LLC<br>106 Isabella Street<br>Four Northshore Center<br>Pittsburgh, PA  15212 | Ronald L. Motley<br>Motely Rice, LLC<br>28 Bridgeside Boulevard<br>P.O. Box 1792<br>Mt. Pleasant, SC  29464 | Angrew J. Trevelise<br>Reed Smith, LLP<br>1650 Market Street<br>2500 One Liberty Place<br>Philadelphia, PA  19103 |
| Lawrence J. Duplass<br>Duplass, Witman & Zwain<br>3838 N. Causeway Boulevard<br>Suite 2900<br>Metairie, LA  70002 | John J. Repcheck<br>Marks, O'Neill, O'Brien & Courtney<br>707 Grant Street<br>3200 Gulf Tower<br>Pittsburgh, PA  15219 | James K. Weston<br>Tom Riley Law Firm<br>4040 First Avenue, N.E.<br>P.O. Box 998<br>Cedar Rapids, IA  52406 |

RECEIVED
CLERK'S OFFICE

Raymond P. Forceno
Forceno & Hannon
111 S. Independence Mall East
The Bourse, Suite 1100
Philadelphia, PA  19106-2574

Samuel M. Rosamond, III
Crawford, Lewis, PLLC
400 Poydras Street
Suite 2100
New Orleans, LA  70130

Gordon P. Wilson
Lugenbuhl, Wheaton, et al.
601 Poydras Street
Suite 2775
New Orleans, LA  70130

Ellen B. Furman
Goldfein & Hosmer
1600 Market Street
33rd Floor
Philadelphia, PA  19103

Perry J. Roussel, Jr.
Roussel & Roussel
1710 Cannes Drive
LaPlace, LA  70068



RECEIVED
ST DISTRICT COURT
DISTRICT OF LA
2006 AUG -8 PM 3: 51
LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **BYRON GRANIER**, *et al.*, | * | |
| **Plaintiffs,** | * | |
| | * | **Civil Action No.  06-3738** |
| **VERSUS** | * | |
| | * | **Section:  L** |
| **NORTHROP GRUMMAN SHIP** | * | |
| **SYSTEMS, INC.,** *et al.*, | * | **Magistrate:  1** |
| **Defendants.** | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EX PARTE MOTION AND ORDER FOR LEAVE TO
## EXCEED PAGE LIMITATION AND INCORPORATED
## MEMORANDUM IN SUPPORT THEREOF

Northrop Grumman Ship Systems, Inc., f/k/a Avondale Industries, Inc. (hereinafter, "Avondale") and its alleged executive officers, Peter Territo ("Territo") and Albert Bossier ("Bossier") (collectively, the "Avondale Interests") submit this Ex Parte Motion to Exceed Page Limitation established in Local Rule 7.8.1E upon showing that the issues presented in plaintiffs' Motion to Remand involve extremely complex federal procurement contract matters and voluminous documentation that cannot be fairly dealt with under the 25 page limitation established under the Local Rules.  In order for the Avondale Interests to adequately demonstrate that the Motion to Remand should be denied, it is necessary to reconstruct the conditions that prevailed at Avondale

Shipyards from the late 1960's to the mid 1970's relating to United States government contracts for the construction of numerous United States government vessels. Relating the extent of the documentation (and factual references to that documentation) concerning those government contracts is impossible under the 25 page limitation applicable herein.

Accordingly, the Avondale Interests request that they be given leave to exceed the 25 page limitation in their Memorandum in Opposition to Motion to Remand.

Respectfully Submitted,

Gary A. Lee, La. Bar No. 8265
Richard M. Perles, La. Bar No. 01534
A. Ann Cates, La. Bar No. 24769
Lee, Futrell & Perles, L.L.P.
201 St. Charles Avenue, Suite 4120
New Orleans, LA 70170
Telephone:     (504) 569-1725
Facsimile:     (504) 569-1726

*and*

Gordon P. Wilson, La. Bar No. 20426
Kristopher T. Wilson, La. Bar No. 23978
F. Lewis Parks, Jr., La. Bar No. 29646
Lugenbuhl, Wheaton, Peck, Rankin & Hubbard
601 Poydras Street, Suite 2775
New Orleans, LA 70130
Telephone:     (504) 568-1990
Facsimile:     (504) 310-9195
Attorneys for Peter Territo and
Albert Bossier, Jr.

*and*

Brian C. Bossier, La. Bar No. 16818
Edwin A. Ellinghausen, La. Bar No. 1347
Richard L. Olivier, La. Bar No. 19974
Tara Nunez-Smith, La. Bar No. 28403
**Blue Williams, L.L.P.**
3421 North Causeway Boulevard, 9th Floor
Metairie, LA  70002
Telephone:    (504) 831-4090
Facsimile:    (504) 849-4091
**Attorneys for Northrop Grumman Ship Systems,
Inc. (f/k/a Avondale Industries, Inc.)**

## CERTIFICATE OF SERVICE

I hereby certify that on this ___ day of August, 2006, a copy of this pleading has been served upon all counsel of record in this action by depositing same in the United States Mail, properly addressed, first class postage prepaid.

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **BYRON GRANIER**, *et al.*, | * | |
| Plaintiffs, | * | |
| | * | **Civil Action No.  06-3738** |
| **VERSUS** | * | |
| | * | **Section:  L** |
| **NORTHROP GRUMMAN SHIP** | * | |
| **SYSTEMS, INC.**, *et al.*, | * | **Magistrate:  1** |
| Defendants. | * | |

* * * * * * * * * * * * * *

## ORDER

Upon considering the above and foregoing Ex Parte Motion for Leave to Exceed Page Limitation and Incorporated Memorandum in Support Thereof, it is hereby

**ORDERED**, that Northrop Grumman Ship Systems, Inc., f/k/a Avondale Industries, Inc. and its alleged executive officers, Peter Territo and Albert Bossier are hereby granted leave to exceed the 25 page limitation, as established in Local Rule 7.8.1E, in their Memorandum in Opposition to Motion to Remand.

**New Orleans, Louisiana**, this ___ day of August, 2006.

_____

**UNITED STATES DISTRICT COURT JUDGE**

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **BYRON GRANIER,** *et al.,* | * | |
| **Plaintiffs,** | * | |
| | * | **Civil Action No.  06-3738** |
| **VERSUS** | * | |
| | * | **Section:  L** |
| **NORTHROP GRUMMAN SHIP** | * | |
| **SYSTEMS, INC.,** *et al.,* | * | **Magistrate:  1** |
| **Defendants.** | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN OPPOSITION TO MOTION TO REMAND

**MAY IT PLEASE THE COURT:**

**PREAMBLE**

Plaintiff, Byron Granier, filed suit against various parties, including Northrop Grumman Ship Systems, Inc., f/k/a Avondale Industries, Inc. (hereinafter, "Avondale") and its alleged executive officers, Peter Territo ("Territo") and Albert Bossier ("Bossier") (collectively, the "Avondale Interests").  Territo, Bossier and Avondale submit this Memorandum in Opposition to the Motion to Remand filed by plaintiff to show that they qualify as individuals acting under the direct supervision and control of certain federal officers and that the claims made against them are based on acts performed under the direction of those federal officers, which in turn qualifies them for the procedural protections provided by the United States Congress in the Federal Rules of Civil

Procedure.

## I.     INTRODUCTION

This removal is not the first of its kind brought before this Court. Indeed, plaintiff is correct that, to date, this very Division has rejected a removal by the Avondale Interests based on the Federal Officer Removal Statute.[1] Since that time, there have been several significant developments. Most notably, in *Melford v. Territo*,[2] the Middle District of Louisiana performed a thorough analysis of the tests employed by courts within the Fifth Circuit when determining a valid removal under the Federal Officer Removal Statute. In *Lalonde v. Delta Field Erection*,[3] the Court rejected the test espoused by plaintiff in this case -- a test which first saw life in *Overly v. Raybestos-Manhattan*[4] in the Northern District of California. The *Overly* test was relied upon to defeat all of the previous removals by the Avondale Interests to the Eastern District of Louisiana.

Earlier this year, the Avondale Interests undertook to attempt Federal Officer removals of two cases to the Middle District of Louisiana: *Melford* and *McFarlain v. Northrop Grumman Systems Corp.*[5] In *Melford*, the Court utterly rejected the *Overly* test and denied remand. In *McFarlain*, the Court employed the *Overly* test but found that the Avondale Interests had satisfied it and denied remand. Although the Court in *Melford* certified its decision for appellate review, the plaintiff chose not to pursue an immediate appeal and the case was transferred to the MDL in Philadelphia,

---

[1] 28 U.S.C. §1442(a)(1).

[2] No. 05-1405 (M.D. La. Jan. 31, 2006), attached Exhibit B.

[3] No. 96-3244-B-M3 (M.D. La. August 5,1 998); attached as Exhibit A.

[4] 1996 WL 532150 (N.D. Cal. 1996).

[5] Attached as Exhibit C.

Pennsylvania.

Under these evolving circumstances, the Avondale Interests have received conflicting treatment in different courts. Until these conflicts are resolved, the Avondale Interests will be left without clear guidance on this issue, and will be forced to remove all future cases against them.

## II.    PROCEDURAL AND FACTUAL HISTORY

June 8, 2006, Byron Granier filed a Petition for Damages in Civil District Court asserting claims against various defendants. He alleges that he was exposed to asbestos at Avondale from 1970 to 1975.[6] Thereafter, Territo, Bossier and Avondale removed this case under the Federal Officer Removal Statue.

With respect to Territo, Bossier and Avondale, plaintiff asserts claims in negligence and five separate claims of strict liability.[7] Specifically, plaintiff asserts that Territo (and other alleged Avondale executive officers) committed the following tortious acts or omissions, among others:

- Failing to reveal and knowingly concealing critical medical information to Mr. Granier;

- Failing to reveal and knowingly concealing the inherent dangers in the use of asbestos, and other harmful substances in their manufacturing process and/or in connection with the work which exposed Mr. Granier;

- Failing to provide necessary protection to Mr. Granier;

- Failing to provide clean, respirable air and proper ventilation;

- Failing to provide necessary showers and special clothing;

- Failing to segregate work areas so that workers would not be

---

[6] Petition, ¶ 8.

[7] Petition, ¶¶¶¶¶ 14, 15, 16, 17 and 18.

exposed to deadly asbestos fiber;

- Failing to provide necessary and adequate respiratory protection;

- Failing to use non-asbestos containing products including on jobs where non-asbestos containing products were specified.

- Wanton and reckless disregard in the storage, handling, and transportation of asbestos;

- Requiring employees to dispose of asbestos in dumpsters, into the river, and onto the land instead of properly disposing of asbestos and asbestos fiber, thereby further exposing employees (and subsequently their family members) to asbestos;

- Requiring employees to dispose of asbestos under buildings instead of properly disposing of asbestos and asbestos fiber, thereby further exposing employees (and subsequently their family members) to asbestos;

- Requiring employees to dispose of asbestos without precautions to prevent exposure;[8]

In sum, despite plaintiff's convenient assertion that he is asserting only a failure to warn claim, the allegations against the Avondale Interests are more than that.  In fact, as shown above, in addition to allegations of strict liability, plaintiff specifically alleges that Territo, Bossier and Avondale failed to use non-asbestos substitutes.  Plaintiff makes this allegation despite the fact that, as will be seen below, Avondale was *required* by the terms of its contracts with the federal government to utilize asbestos-containing products on the very ships Mr. Granier worked on.

Because the Plaintiff's Petition asserts more than a failure to warn claim against Territo, several prior decisions of the U.S. District Court for the Eastern District of Louisiana, all of which

---

[8] Petition, ¶ 10.

were decided on the basis that Plaintiff asserted *only* a failure to warn claim, are distinguishable --

*Gauthe v. Asbestos Corp.*, 1997 U.S. Dist. Lexis 112, p. 17 (E.D. La. Jan. 2, 1997), and *Mouton v.*

*Flexitallic, Inc.*, 1999 U.S. Dist. LEXIS 5632 (E.D. La. Apr. 14, 1999) -- as well as   *Overly*, the

foundation for *Gauthe* and *Mouton,* and *Westbrook v. Asbestos Defendants*, 2001 WL 902642 (N.D.

Cal.).

## III.    ARGUMENT

### A.    The Federal Officer Removal Statute

The Avondale Interests are entitled to remove this case based on 28 U.S.C. §1442(a)(1),

which reads in relevant part:

> (A)    A Civil Action . . . commenced in a state court against any of
> the following persons may be removed by them to a district
> court of the United States for the district and division
> embracing the place wherein it is pending:

> (1)    Any officer of the United States or any agency thereof, or
> person **acting under him**, for any act under color of such
> office . . . . (*Emphasis added.*)

The intense United States government presence at Avondale during the construction of vessels on

which the plaintiff worked was of such a direct and detailed nature that the Avondale Interests are

entitled to defend this claim in federal court.

It is true that ordinarily a cause of action does not arise under federal law unless the plaintiff's

well-pleaded complaint raises issues of federal law.[9]  Nevertheless, a plaintiff cannot avoid federal

jurisdiction simply by omitting from his petition federal law essential to his claim or by casting in

---

[9] *Franchise Tax Bd. v. Constructional Laborers' Vacation Trust,* 463 U.S. 1, 9-10, 103 S.Ct.
2841, 2846, 77 L.Ed.2d (1983).

state law terms a claim that can be made only under federal law.[10]  Thus, although the well-pleaded complaint rule is well established, equally well established is the exception to that rule by which a person acting under the direction of federal officers can remove a case to federal court.[11]

It should be noted at the outset that the Federal Officer Removal Statute is not being asserted as a *defense* to the claims made against the Avondale Interests.  Rather, it is a procedural device available to certain federal officers of the United States government -- and to individuals acting under those federal officers -- to have claims made against them heard in federal court.  According to the United States Supreme Court, the Federal Officer Removal Statute:

> . . . merely serves to overcome the "well-pleaded complaint" rule which would otherwise preclude removal even if a federal defense were alleged.[12]

Accordingly, the Avondale Interests are not attempting to avail themselves of federal jurisdiction based solely on defenses arising under federal substantive law.  Rather, the Avondale Interests, persons "acting under" an officer of the United States government, are merely seeking to have the claims made against them adjudicated in federal court.

## B.    The Three Prong Test

The United States Supreme Court has set forth the criteria which must be met in order for a defendant to remove a case under 28 U.S.C. §1442(a)(1).  In *Mesa v. California, supra*, the Court set forth a three prong test which requires the "person" acting "under a federal officer" to:

---

[10]  *Harper v. San Diego Transit Corp.*, 764 F.2d 663 (9th Cir. 1985).

[11]  *Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 939 (E.D.N.Y. 1992).

[12]  *Mesa v. California*, 489 U.S. 121, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989), *citing, inter alia, Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 491, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983).

(1)     Demonstrate that he acted under the direction of a federal officer;

(2)     Raise a colorable federal defense to the plaintiff's claim; and

(3)     Demonstrate a causal nexus between plaintiff's claims and acts he performed under color of federal office.[13]

In order to satisfy the "acting under" requirement of the test, the Avondale Interests must first establish that they qualify as "persons."[14] That Territo and Bossier are persons cannot be the subject of serious dispute. Avondale, the corporation, also qualifies as a "person" for the purposes of the federal officer removal statute.[15]

The Avondale Interests must next demonstrate that they acted under the direction of a federal officer. In determining whether a person "acted under" the direction of a federal officer to the extent required, the courts have found several categories of governmental oversight persuasive. The Avondale Interests have collected several of those categories below:

◆     A federal official must have "direct and detailed" control.[16]

◆     A defendant must demonstrate he is governed by "exceedingly complex regulations, guidelines and

---

[13] *Mesa, supra.  See also Fung v. Abex Corp.,* 816 F. Supp. 569 (N.D. Cal. 1992); *Crocker v. Borden, Inc.,* 852 F. Supp. 1322 (E.D. La. 1994); *Lalonde v. Delta Field Erection, supra,* (attached as Exhibit A).

[14]     *Fung,* 816 F. Supp. at 572, *citing International Primate Protection League v. Administration of Tulane Educ. Fund,* 500 U.S. 72, 111 S.Ct. 1700, 114 L.Ed.2d 134 (1991).

[15] *Peterson v. Blue Cross/Blue Shield of Texas,* 508 F.2d 55 (5th Cir. 1975); *Fung,* 816 F. Supp. at 572.

[16] 816 F. Supp. at 572, *citing Ryan v. Dow Chem. Corp.,* 781 F. Supp. 934, 947 (E.D.N.Y. 1992).

evaluation schemes."[17]

♦    A defendant must show that he is "so intimately involved with government functions as to occupy essentially the position of an employee of the government."[18]

♦    A defendant must demonstrate that he was subject to "regulation plus. . . ."[19]

♦    A defendant must show strong government intervention and the threat that a defendant will be sued in state court "based on actions taken pursuant to federal direction."[20]

Considering the "acting under" analysis, courts often look to these factors to determine whether the "causal nexus" requirement has been met. In fact, in *Winters v. Diamond Shamrock*,[21] the United States Fifth Circuit Court of Appeals thoroughly analyzed the federal officer removal statute, holding that it is to be liberally construed, and clarified the test for removal such that the "acting under" and "causal nexus" factors are truly one intertwined factor and not two separate factors.[22] Accordingly, the Avondale Interests will present details concerning "strong government involvement" as proof of satisfaction of both factors. Following these details is a brief survey of some recent decisions that

---

[17] 816 F. Supp. at 572,*citing Gurda Farms, Inc. v. Monroe County Legal Assis. Corp.*, 358 F. Supp. 841 (S.D.N.Y. 1973).

[18] *Willingham v. Morgan*, 395 U.S. 402, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969); *and Bakalis v. Crossland Sav. Bank*, 781 F. Supp. 140, 145 (S.D.N.Y. 1991).

[19] *Ryan, supra, and Bahrs v. Hughes Aircraft*, 795 F. Supp. 965 (D. Ariz. 1992).

[20] *Gulti v. Zuckerman*, 723 F. Supp. 353 (E.D. Pa. 1989).

[21] 149 F.3d 387, 398-400 (5th Cir. 1998).

[22] *See also Lalonde, supra*, Exhibit A.

provide an overview and analysis of the issue at hand.

### C.    *Fung v. Abex Corporation*

One federal court has considered the *Mesa* factors in the context of the removal of an asbestos personal injury claim.  Review of the rationale of that case is helpful in determining the merits of this removal.  In *Fung v. Abex Corp., supra,* the plaintiffs filed suit in California state court alleging injuries caused by exposure to asbestos while working on United States Naval vessels under construction.  The plaintiffs sued General Dynamics and 277 other defendants[23].  General Dynamics removed the case to federal court under 28 U.S.C. §1442(a)(1), the Federal Officer Removal Statute.

The *Fung* court acknowledged that a defendant is not entitled to federal officer removal simply because he is a participant in a regulated industry.  But, the *Fung* court stated that the "control requirement can be satisfied by strong government intervention and the threat that a defendant will be sued in state court based upon actions taken pursuant to federal direction."[24]

Looking at the particular facts established by General Dynamics, the *Fung* court recognized that General Dynamics was under the direct control of the Secretary of the Navy and was authorized to build submarines under federal contracts.  Most importantly, the *Fung* court considered important various other aspects of the relationship between the government and General Dynamics in denying plaintiff's motion for remand:

> While the government contracted defendant to build submarines in the instant case, it monitored General Dynamic's performance at all times and required the defendant to construct and repair the vessels in accordance with the applicable and approved specifications incorporated into the contracts.  In addition, all contract supplies were

---

[23]  816 F. Supp. at 570-71.

[24]  816 F.Supp. at 572.

> subject to inspection, test, and approval by the government. The
> government also performed extensive dock and sea trials on the
> submarines prior to commission, to insure complete conformity with
> design specifications. Given the fact that defendant has established
> that the government, under the direction of the Secretary of Navy,
> exercised "direct and detailed" control over the construction of the
> vessels, the acting under requirement of §1442(a)(1) has been
> satisfied.[25]

As will be demonstrated below, the vessels on which Granier worked were built under

government contracts. Avondale was required to construct these vessels in accordance with

applicable and approved specifications incorporated into their contracts. Moreover, all of the

contract supplies, as in *Fung,* were subject to inspection, tests, and approval by the government. As

in *Fung*, the government also performed extensive dock and sea trials on the ships prior to

commission to insure complete conformity with design specifications.

Finally, Avondale was subject to rigorous safety standards incorporated into the contracts

themselves and monitored on a regular and, in some cases, daily basis. In short, the Avondale

Interests can demonstrate that the government, acting under the direction of the Secretary of Navy

and numerous other federal officers, exercised direct and detailed control over the construction of

the vessels on which it is alleged that the plaintiff sustained injury.

### D.    Contract Specifications

The DE 1078 Class Ocean Escort Vessel project, on which plaintiff worked, according to his

employment records,[26] was the largest construction contract in the history of Avondale. A total of

20 Destroyer Escorts were built stem-to-stern at Avondale pursuant to the contractual provisions

---

[25]  816 F.Supp. at 572-73.

[26]  Granier's employment records are attached hereto as Exhibit D.

between Avondale and the United States Navy.[27]   Attached hereto is Exhibit F is the affidavit of Thomas F. McCaffery which explains succinctly how and in which instances the U.S. Navy *required* the use of asbestos-containing materials.  It cannot be disputed.

### E.    Inspections of Materials and Workmanship

The "direct and detailed" control exercised by the United States Navy over the construction of the DE 1078's was not limited to the mandatory use of asbestos-containing materials.  In fact, Article 6 of the General Provisions authorized material inspection:

> All supplies (which term throughout this clause includes without limitation raw materials, components, intermediate assemblies, and end products) shall be subject to inspection and tests by the Government, to the extent practicable and *at all times and places including the period of manufacture or construction,* and in any event prior to final acceptance of the vessels[28] [emphasis supplied].

In addition to material inspection, the Navy was authorized to and did inspect all aspects of the ship construction process, and even had the authority to suspend construction under Article 15 of the General Provisions:

> The Contracting Officer may, at any time, and from time to time, by written notice to the Contractor, *suspend* in whole or in part the construction of the vessels[29] [emphasis supplied].

In order to accommodate the large number of inspectors called for under the contract, Avondale was required to provide office space for Navy personnel under Article 8 of the Special Provisions:

---

[27] A copy of the contract is attached to the Affidavit of R.D. Church, Exhibit E.

[28] Exhibit E.

[29] *See also* the Affidavit of Peter Territo, attached as Exhibit G.

ARTICLE 8.

NUCLEUS CREW – A crew furnished by the Government of not to exceed fifty-four (54) persons referred hereinafter in this Article as the "Nucleus Crew" shall be present at contractor plant for a period of approximately six months for each vessel.  The facilities shall be available to the nucleus crew beginning six months prior to the contract delivery date or ship delivery date, whichever is earlier, and shall continue until the ship is delivered.  The nucleus crew shall have access to Contractor's plant and to the vessels at all reasonable times during such periods.  The Contractor agrees to furnish office facilities for ten (10) persons and conference room, suitably furnished, for daily meetings of the nucleus crew.[30]

Access to the vessels while under construction by the Navy Inspectors was unlimited.[31]  Estimates as to the number of Navy Inspectors at the Avondale Shipbuilding facility during the construction of the DE 1078's at any given time ranged from between 50 to 100.[32]  This DE1078 "nucleus crew" was in addition to the U.S. Navy and U.S. Maritime Commission inspection teams that were based at the Avondale premises year round.[33]

Further specifics of the inspection regime of government officials at Avondale can be found in the affidavits of Edward Blanchard, John Brinser and Peter Territo.  Mr. Blanchard finished his long career as the vice-president of production at Avondale in 1988.  John Brinser, who was  head of the Quality Assurance Department at Avondale, was previously employed by Combustion Engineering and has very detailed knowledge of the contract specifications and methods of insuring

———————————————

[30] *See* Affidavit of R.D. Church, Exhibit E; and the Affidavit of Eddie Blanchard, Exhibit H.

[31] *See* Article 9 of the Special Provisions, Exhibit E.

[32] *See* Exhibits G and H as well as the Affidavit of John Brinser, attached as Exhibit I.

[33] *See* Exhibits G and H.

compliance of those contract specifications.[34]

In sum, the inspection system -- designed and implemented by the United States Navy to ensure that the proper materials were used or installed and to ensure that these materials were incorporated in the proper manner -- was thorough, all-encompassing, and included the authority for United States Navy inspectors to order that any non-compliance found be corrected by Avondale at any stage of the construction.

**F.     Safety Inspections**

Given the significant presence of Navy Inspectors at Avondale during the construction of the DE 1078's, it is not surprising that Navy personnel also undertook safety inspections.  In fact, the entirety of the Walsh-Healey Act was incorporated into the contract by reference. [35]  In addition, safety regulations promulgated under the Longshoremen and Harbor Workers' Compensation Act, as well as by the Department of Labor, -- including specific provisions for safe levels of asbestos -- were incorporated into the contract for the Destroyer Escorts by reference.[36]  Similarly, shipbuilding safety requirements appearing in the Code of Federal Regulations were incorporated by Clause 60 of the General Provisions, including regulations for respiratory equipment and ventilation.

Peter Territo, a retired member of the Safety Department at Avondale who worked there during the construction of the Destroyer Escorts, spells out, in his affidavit, the pervasive exercise of supervision and control over all aspects of safety by the United States Navy and by other agencies

---

[34] *See* Affidavit of John Brinser, Exhibit I.

[35] *See* Article 44 of the General Provisions, attached to Exhibit E and the text of that law attached as an Exhibit to the Affidavit of Danny Joyce, Exhibit J.

[36] *See* Article 60 of the General Provisions, attached to Exhibit E.

of the United States Government.[37] Mr. Territo's sworn statement, which is also supported by the sworn statements of John Brinser and Eddie Blanchard, relates his personal knowledge of the continuous exercise of safety supervision by government officials, including safety inspectors from the United States Navy during the Destroyer Escort 1078 project.

### G.   *Lalonde v. Delta Field Erection*

In *Lalonde v. Delta Field Erection, supra*[38], the court held that the federal government contractor, DSM, "was 'acting under an officer of the United States or of an agency thereof' for purposes of removal under §1442(a)(1)" because DSM "operated a federal government-owned facility, exclusively for the government, under the oversight and ultimate control of officers of the federal government." While Avondale may not have been a government-owned facility, the work performed under the DE 1078 contract was performed exclusively for the government under the direct oversight and control of officers of the federal government. This control was both overwhelming and pervasive and most decidedly meets the requirement that Avondale "acted under" the federal government.

In a detailed analysis, the *Lalonde* court concluded:

> Plaintiffs cite a number of district court decisions, such as *Overly v. Raybestos-Manhattan*, 1996 WL 532150 (N.D. Cal. 1996), which they contend requires the government contractor to show that the specific alleged acts giving rise to the underlying claims were also specifically directed by a federal officer. That is, plaintiffs argue that *Overly* and similar cases require a showing of a federal directive ordering DSM *not* to warn Lalonde of the hazards of silica dust or *not* to provide him with adequate protective equipment. The Court specifically rejects and declines to follow these lower court cases to

---

[37]   *See* Affidavit of Peter Territo, Exhibit G.

[38]   *See* Exhibit A.

the extent plaintiff urges their applicability to the context presented here.[39]

After specifically rejecting *Overly*[40] and other cases the plaintiff herein relies so heavily on in his Motion to Remand, the court went on to state:

> The Court instead looks to Supreme Court precedent regarding application of §1442(a)(1) which reveals that, unlike the case with other removal statutes, there is no rule of interpretation disfavoring removal under §1442(a)(1). On the contrary, the statute is not "narrow" or "limited" and is not to be given a "narrow, grudging interpretation", the test for removal under §1442(a)(1) "should be broader, not narrower, than the test for official immunity."  [41]  Any requirement that a contractor who is running a federal production facility exclusively for the government has to show that the specified details of the negligent act were done only at the instance of precise and detailed instructions from a federal officer in order for the contractor to be "acting under" a federal officer is an "unduly grudging" requirement.
>
> Every act taken in running the plant was taken under delegated federal authority. DSM **did not cease to be running the plant for and under federal authority when it made operational decisions (such as specific decisions regarding worker safety) within the ambit of its duties without a specific express federal directive as to the particulars, for DSM acted exclusively for and under the**

---

[39]  *Lalonde*, at p. 7.

[40]  *Overly* is specifically founded on plaintiff's theory of products liability being limited, unlike here, to a failure to warn theory: "In this case, the liability asserted by the plaintiffs is limited to the failure to warn theory of products liability." *Overly*, p. 8. Accordingly, Overly's progeny are likewise inapplicable, *e.g.*, *Gauthe v. Asbestos Corp.*, 1997 U.S. Dist. Lexis 112, p. 17 (E.D. La. Jan. 2, 1997)("Thus, no "design defect" allegations are made with respect to the Avondale Interests, and the failure to provide a safe work environment is limited specifically to the failure to warn."). Note, in this case, plaintiff does present a claim for errors in the design and construction/manufacturing process: "failing to use non-asbestos containing products including on jobs where non-asbestos containing products were specified."

[41]  *Lalonde*, at p. 8 (*citing Willingham*, 395 U.S. at 405 & 406-07, 89 S.Ct. At 1815 & 1816, *accord Peterson v. Blue Shield of Texas*, 508 F.2d 55, 58 (5th Cir. 1975).

**federal government in its operation of this facility.**[42]

Like DSM, Avondale acted exclusively for and under the federal government in its operation under the DE 1078 shipbuilding contract.   Although plaintiff urges this Court to find   *Lalonde* inapplicable simply because the Avondale facility was not owned and operated by the United States Navy, this suggestion is erroneous because the basis for the federal officer defense is to:

> [protect] against possible state interference with federal functions – regardless of whether the plant is being run directly by the United States or by a contractor retained and controlled by the federal government. Whether a federal officer directly mandated the specific alleged act of omission in question has little, if anything, to do with the core policy questions of whether federal interests potentially are impacted by the state court suit.[43]

As demonstrated in previous sections,  (1) Navy officers and other government inspectors closely monitored compliance, on a daily basis, by Avondale with safety regulations made part of the contracts; (2) the use of asbestos insulation was *required* by the Navy and its officers; (3) federal asbestos safety regulations, which set standards for safe daily exposures to asbestos, were specifically incorporated into the Navy contracts;   and (4) Navy inspectors constantly monitored the ship construction process for compliance with all terms of the contract.   Taken together, these facts establish that the Avondale Interests were "acting under" the direction of the federal government and that the causal connection is met because the acts complained of were "under color" of federal office.

If it were otherwise, officers charged with the duty to implement federal policies could almost never carry out their duties.   Under such a regime, federal law would be cold comfort because federal employees, state and local officials, and private persons would rarely agree to act under federal

---

[42] *Lalonde,* at p. 8 (emphasis added).

[43] *Id.* at 9.

direction for fear of facing state and local civil or criminal penalties. Furthermore, if plaintiff's

interpretations of the degree and nature of federal direction are correct, many courts, including the

Supreme Court, have misread the statute.[44]

In *Lalonde* the court correctly noted that:

> the "causal connection" required in civil cases under Supreme Court
> precedent is of a different nature from that required in cases such as
> *Overly*. In particular, the governing precedents from the Supreme
> Court do not require a showing in a civil case that the alleged
> wrongful act or omission itself was specifically directed or compelled
> by federal duty or law. Rather, the controlling decisions require only
> a showing that the defendant committed the alleged act or omission
> while performing its federal duties.[45]

Accordingly, the "causal connection" inquiry is not whether the federal agent's alleged wrong

was federally authorized, but rather whether the alleged wrong occurred within the course of the

agent's performance of the agent's federal duties:[46]

> Mr. Lalonde was sandblasting in order to maintain and refurbish plant
> equipment for continued use. The question is not whether a specific
> federal law or order directed DSM not to warn Lalonde about the
> hazards of silica exposure (or even to maintain the plant equipment),
> but rather the question is whether that alleged failure to warn
> occurred while DSM was in the performance of its federal duties, *i.e.*,
> in the course of its operation of the plant as an agent for the federal
> government. The Court therefore holds that the requisite causal
> connection is satisfied here. To the extent that some lower district

---

[44]   *See Willingham v. Morgan*, 395 U.S. 402 (1969);   *Cleveland, C., C. & I. R. Co. v.
McClung*, 119 U.S. 454 (1886); *Tennessee v. Davis*, 100 U.S. 257 (1880); *Allman v. Henley*, 302
F.2d 559 (5th Cir. 1962); *Gurda Farms, Inc. v. Monroe County Legal Assis. Corp.*, 358 F. Supp. 841
(S.D. N.Y. 1973); *Dixon v. Georgia Indigent Legal Serv., Inc.*, 388 F. Supp. 1156 (S.D. Ga. 1974),
*aff'd without opinion*, 532 F.2d 1371 (5th Cir. 1976); *State of Oregon v. Cameron*, 290 F. Supp. 36
(D.Or 1968).

[45]   *Lalonde*, at 10.

[46]   *Id.* at 11.

-17-

court cases would hold to the contrary, the Court specifically rejects
the analytical underpinnings of those cases.[47]

Plaintiff has alleged that the Avondale Interests failed to provide plaintiff with any warnings

about the potential hazards of asbestos.   Plaintiff argues that the Avondale Interests alleged failure

to warn is unrelated to any contract requirements for the use of asbestos.

First, this argument ignores that particular asbestos products and federal asbestos safety

standards (such as the Walsh-Healey Act) were specifically incorporated by reference into the

contracts.   Second, any allegation that plaintiff's claims are limited to a failure to warn are belied

by his own petition.   Besides the allegations that are *not* based on failure to warn excerpted above,

Plaintiff makes five separate claims for strict liability:

14.

Defendants, Avondale Industries, Inc. (formerly Avondale
Shipyards, Inc.) and its executive officers, Hopeman Brothers, Inc.,
Eagle, Inc., Foster-Wheeler LLC (formerly Foster-Wheeler
Corporation), The McCarty Corporation, Reilly-Benton Company,
Inc., and Taylor-Seidenbach, Inc., had care, custody, and control of
the asbestos, which asbestos was defective and which presented an
unreasonable risk of harm, which asbestos resulted in the injury of
Mr. Granier and for which these defendants are strictly liable under
Louisiana law.

15.

Defendants, Avondale Industries, Inc. (formerly Avondale
Shipyards, Inc.) and its executive officers were the owners of the
asbestos, which asbestos was defective and which presented an
unreasonable risk of harm, which asbestos resulted in the injury of
Mr. Granier, and for which defendants are strictly liable under
Louisiana law.

16.

---

[47] *Id.* at 12; See also, *Miller*, 275 F.3d at 418.

Defendants, Avondale Industries, Inc. (formerly Avondale Shipyards, Inc.) and its executive officers are answerable for the conduct of those handling asbestos products on their premises, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in the injury to Mr. Granier, and for which defendants are strictly liable under Louisiana law.

17.

Defendants, Avondale Industries, Inc. (formerly Avondale Shipyards, Inc.) and its executive officers are responsible for the conduct of those individuals and companies working on their premises with asbestos products which resulted in exposure to asbestos to Mr. Granier, which asbestos was defective and which presented an unreasonable risk of harm, and which asbestos resulted in the injury to Mr. Granier, and for which defendants are strictly liable under Louisiana law.

18.

Defendants, Avondale Industries, Inc. (formerly Avondale Shipyards, Inc.) and its executive officers, Hopeman Brothers, Inc., Eagle, Inc., Foster-Wheeler LLC (formerly Foster-Wheeler Corporation), The McCarty Corporation, Reilly-Benton Company, Inc., and Taylor-Seidenbach, Inc. were involved in an ultra-hazardous activity in the handling of asbestos, which asbestos resulted in the injury to Mr. Granier, and for which defendants are absolutely liable under Louisiana law.

These contentions indisputably allege more than a mere failure to warn and also certainly invoke the statutory duty found in Louisiana Revised Statute 23:13, which provides, in pertinent part as follows:

Every employer shall furnish employment which shall be reasonably safe for the employees therein. They shall furnish and use safety devices and safeguards, shall adopt and use methods and processes reasonably adequate to render such employment and the place of employment safe in accordance with the accepted and approved practice in such or similar industry or places of employment considering the normal hazard of such employment, and shall do every other thing reasonably necessary to protect the life, health,

-19-

safety, and welfare of such employees.

This statutory duty provides the basis for all so-called "executive officer" liability in Louisiana.[48] It is extremely doubtful that a plaintiff would limit his claim strictly to a failure to warn, Avondale and its supervisors had a duty under Louisiana Revised Statute 23:13 and under federal regulations to provide a safe workplace, not to simply warn its employees if the workplace was unsafe. The negligence alleged in this lawsuit cannot be disentangled from Revised Statute 23:13 because any state law duty owed by Avondale and its employees to other employees is derived from that statute.

In short, considering the allegations, affidavits, and testimony before the Court, the Avondale Interests have met the "causal nexus" test - *i.e.*, they have shown that they have been sued in state court for actions taken pursuant to federal direction, *i.e.*, compliance with military specifications promulgated and enforced by the U.S. Navy.[49]

### H.    The Avondale Interests Assert Colorable Federal Defenses

The third prong of the test for removal requires that a removing party demonstrate it can

---

[48] *See e.g., Pisciotta v. Allstate Ins. Co.*, 385 So. 2d 1176, 1185 (La. 1980) (see n.1, p.1185, and accompanying text).

[49] See, *e.g., Akin v. Big Three Indus., Inc.*, 851 F. Supp. 819, 823-24 (E.D. Tex. 1994) (stating, "plainly, when a government contractor builds a product pursuant to Air Force specifications and is later sued because compliance with those specifications allegedly causes personal injuries, the nexus requirement is satisfied"); *Teague v. Bell Helicopter Servs.*, 2003 U.S. Dist. Lexis 2088 (N. D. Tex. 02/12/2003)(asbestos plaintiff's motion to remand denied where helicopter manufacturer acted pursuant to the directions of the federal government in contracting to design and manufacture military helicopters). (A copy of *Teague* is attached as Exhibit K); *Williams v. Todd Shipyards Corp.*, 1996 U.S. Dist. LEXIS 22676 (S.D. Tex. Mar. 29, 1996)(asbestos plaintiff's motion to remand denied where shipyard that produced military vessels "demonstrated a causal nexus between the claims against and the acts it performed under color of federal office."). (A copy of *Williams* is attached as Exhibit L).

assert a *colorable* federal defense to the claims made against it.  As explained in detail in *Mesa*:

> For purposes of removal, we only require [the removing party] to allege a colorable federal defense under federal law; "[t]he validity of the defense authorized to be made is a distinct subject.  It involves wholly different inquiries ....  It has no connection whatever with the question of jurisdiction."[50]

The Avondale Interests' federal defense is the immunity provision contained in the Longshore and Harbor Workers' Compensation Act ("LHWCA") at 33 U.S.C. §933(i).  Under the third prong of the federal officer removal statute test, this defense need only be *colorable* to be sufficient.  33 U.S.C. §933(i) sets forth, in pertinent part, as follows:

> The right to compensation or benefits under this Act shall be the exclusive remedy to an employee when he is injured, or to his eligible survivors or legal representatives if he is killed, by the negligence or wrong of any other person or persons in the same employ: Provided, that this provision shall not affect the liability of a person other than an officer or employee of the employer.

Territo and Bossier are persons who, at the time of the alleged delicts, were persons in the same employ as plaintiff.  Avondale qualifies as an "employer" under the LHWCA because it at all relevant times was in the business of building and repairing ships at a facility situated adjacent to the navigable waters of the Mississippi River.[51]  Accordingly, under the immunity provisions of the LHWCA [33 U.S.C. §933(i)] plaintiff cannot make valid claims against the Avondale Interests.  Simply put, the Avondale Interests are asserting a colorable defense under the LHWCA that has not been rejected by any binding federal authority.

---

[50]  109 S.Ct. at 964, *quoting The Mayor v. Cooper*, 6 Wall 247, 254, 18 L.Ed. 851 (1868).

[51]  *See* Affidavit of Territo, Exhibit G.

That such a defense is at least colorable is demonstrated in the case of *Fillinger v. Foster.*[52]

In *Fillinger*, the Alabama Supreme Court was faced with a factual and legal scenario directly on

point with the instant action. In *Fillinger*, a "shipfitter"[53] was injured within the concurrent

jurisdiction of the LHWCA and the Alabama State Workers' Compensation Act. After applying for

his state compensation benefits, the plaintiff instituted suit against one of his co-employees who was

alleged to have had the specific responsibility for his safety. The parties did not dispute that the case

fell within a zone of concurrent federal and state jurisdiction. Neither did they dispute that the

Alabama Workers' Compensation Act did *not*, at that time, provide for co-employee negligence

immunity, while the LHWCA did. The co-employee tort-feasor resisted the application of state law

arguing LHWCA pre-emption.

The *Fillinger* court discussed the Louisiana Supreme Court's decision in *Poche v. Avondale*

*Industries, Inc,* 339 So.2d 1212 (La. 1976):

> The Louisiana Supreme Court held that a land-based maritime
> employee covered by the LHWCA could sue a co-employee under
> that state's workmen's compensation law. Earlier, Louisiana had
> merely recognized the overlap in compensation benefit levels only.
> The rationale of the *Poche* court was based on the election of
> remedies doctrine which has been severely criticized by the
> authorities and which has been held to be inapplicable in a case
> involving the LHWCA. The *Poche* court's decision was also based
> upon an interpretation of Louisiana's Workmen's Compensation law
> and upon prior Louisiana court decisions. ***The Poche decision was***
> ***rendered before the Supreme Court's decision in Sun Ship, supra,***
> ***wherein the court indicated that in a case involving the LHWCA***

---

[52] 448 So.2d 321 (Ala. 1984), *cert denied*, 469 U.S. 872, 105 S.Ct. 223, 83 L.Ed.2d 153 (1984), attached hereto as Exhibit M.

[53] The plaintiff, classified by his employer as "shipfitter," was engaged at the time of his injury in operating a hand held grinder to smooth out welds on storage tanks that were being installed on ocean-going vessels at his employers' dockside facility. *Fillinger*, 448 So. 2d at 322.

> *and a state workmen's compensation scheme in which there was an*
> *indisputable preclusion of LHWCA remedies, the federal law would*
> *"pre-empt the state compensation exclusivity clause."* We consider
> the *Poche* and *Umbehagen* decisions in view of these statements of
> the law in *Sun Ship, supra*. [ *citations omitted and emphasis*
> *supplied.*]

*Fillinger, supra*, at 325.  After drawing from supporting jurisprudence, the court reminded the

litigants of the purpose of 33 U.S.C. §933(i) of the LHWCA which provides for co-employee

immunity:

> The 1959 amendment to §[9]33 simply recognizes the problem [of
> co-employee suits] and solved it by forbidding such an action.  In
> other words, the 1959 amendment to §[9]33 of the Act not only does
> not limit the provisions of §[90]5, but broadens them by insulating
> not only the employer, but also the fellow employees of the injured
> party from any liability and damages to the injured party.  This is
> made clear by the legislative history of the amendment.  *U.S. Code*
> *and Congressional and Administrative News*, 86th Cong., First
> Session 1959, Vol. 2, pages 2134-2136.

*Fillinger, supra*, at 326, quoting *Barnum v. SS MORMACTEAL*, 188 F.Supp 763 (E.D. Pa. 1960).

The court quoted directly from the Senate Report, referenced above, that explained how important

it was for disputes within the "employee family" to be resolved within the framework of the

LHWCA.  Armed with that understanding of the precise holding in *Sun Ship*, the Alabama Supreme

Court had no alternative:

> We are of the opinion that the LHWCA and the law of Alabama are
> in serious conflict as to the maintenance of co-employee suits, and
> because that is the case, we hold that federal law will preempt state
> law. [*citations omitted.*]

*Fillinger, supra*, at 326.

   Finally, it is without serious dispute that federal law governs the question of whether the

LHWCA preempts state law.[54] In *Peter v. Hess Oil Virgin Islands Corp.*[55] and *Cobb v. Sipco Serv. & Marine, Inc.*[56] both courts held that where immunities available under state law and under the LHWCA are deemed to be conflicting, the LHWCA preempts strictly for that contradiction only. These decisions, along with the United States Supreme Court in *Sun Ship*, make clear that the United States Congress intended that disputes between longshore workers be resolved within the exclusive framework of the LHWCA.

## I.    Federal Contractor Immunity

In addition to the defenses available to the Avondale Interests under the LHWCA, the Avondale Interests also assert federal contractor immunities as a defense. The standard for that defense was set out by the United States Supreme Court in *Boyle v. United Tech. Corp.*[57] There, the Court held that the federal contractor defense is derived from the government's own immunity when performing discretionary functions, such as design selection for military equipment.[58] To prevail under the federal contractor defense, the Avondale Interests have the burden of proving that: (1) reasonably precise specifications were approved by the United States; (2) the DE 1078's on which plaintiff worked conformed with those specifications, and (3) the Avondale Interests warned the United States of all dangers then known to Avondale in using the asbestos-containing components the United States required be installed on those vessels that were unknown to the United States

---

[54] *Hetzel v. Bethlehem Steel Corp.*, 50 F.3d 360, 363 (5th Cir. 1995).

[55] 903 F.2d 935 (3rd Cir. 1990).

[56] No. 95-2131, 1997 WL 159491 (E.D. La. March 27, 1997); Attached as Exhibit N.

[57] 487 U.S. 500, 512, 108 S. Ct. 2510, 101 L.Ed. 2d. 442 (1988).

[58] *Boyle,* 487 U.S. at 511.

itself.[59]

Due to the similarity of the requirements between the test for federal officer removal and the first and second prongs of the test for the federal contractor defense, for the same reasons set out above that establish that the Avondale Interests satisfy the jurisdictional analysis, they also satisfy the first prongs of the federal contractor defense. The Avondale Interests always conformed to the exceptionally precise specifications for the construction of the DE 1078s that were drafted and approved by the United States Navy. Further, the vessels constructed at Avondale were ultimately accepted for delivery by the United States Navy following extensive inspections during construction and dock and sea trials thereafter. Thus, the vessels constructed at Avondale conformed with the specifications drafted and enforced by the United States Navy.

As to the last prong of the federal contractor defense, given the extensive presence and control of the construction of the DE 1078s by the United States Navy, the incorporation into the contracts of the Walsh-Healey Act and federal asbestos safety regulations promulgated by the Longshoremen and Harbor Workers Compensation Act, as well as of the Department of Labor, it is also clear that Avondale had no knowledge of any dangers associated with the use of asbestos about which the United States government was not aware.

While there is *no* evidence that the Avondale Interests knew of any dangers in using asbestos about which the United States was not already aware, the Avondale Interests need not establish their ability to satisfy this third prong of the government contractor defense at this stage of the proceedings. Rather, they need only provide a "colorable" defense to justify the removal of this case

---

[59] *Id.* at 512, and *Winters v. Diamond Shamrock Chemical Co.*, 148 F. 3d 7, 400 (5th Cir. 1998).

under the federal officer removal provisions.  Accordingly, as with the LHWCA defense, to determine whether a federal defense is "colorable" for jurisdictional purposes, a court should not delve into "the validity of the defense", which is "a distinct subject" and "involves wholly different inquiries apart from jurisdictional determination." *Faulk v. Owens-Corning Fiberglass Corp.*[60] Therefore, the ultimate merits of the federal contractor defense asserted by the Avondale Interests should not be resolved here, while the "colorable" nature of the defense establishes that this removal was proper.

### J.    The *Melford* and *McFarlain* Breakthrough

Earlier, this year, Territo removed the *Melford* case to the Middle District of Louisiana on precisely the same grounds asserted here: pervasive government regulation of federal ship construction contracts entitled him to federal court jurisdiction under the Federal Officer Removal Statute.  In his motion to remand, the plaintiff in *Melford* made precisely the same argument Granier makes here: the government never forced Territo "not to warn," the *Overly* test applies, and neither longshore immunity nor the Federal Contractor Defense was colorable.  The Court denied remand.

In so doing, the court rejected the *Overly* test and the line of cases that followed it, determined that the Federal Officer Removal Statute should not be afforded a "limited" or "narrow interpretation" and found that, under identical circumstances, the Federal Contractor Defense was colorable.  The ruling in *Melford* is exactly contrary to every Eastern District ruling delivered against the Avondale Interests to date.

In *McFarlain*, Avondale Shipyards removed a case nearly identical to the one brought here under the Federal Officer Removal Statute.  Once again, on the pending remand question, the

---

[60]  48 F. Supp. 2d 653 664 (E.D. Tex. 1999).

plaintiff and Avondale made identical arguments for and against.  The court denied remand.

In so doing, the court began by (apparently) following the *Overly* test, especially the "causal nexus" aspect that establishes that the government must have direction and control over the nature and pervasiveness of warnings.  In fact, the court stated that had the inquiry ended there, the case would have been remanded.

But, the court quickly noted that the plaintiff had urged much more than "failure-to-warn" claims, observing that he had included specific "strict liability" claims based on the presence of asbestos at Avondale's premises.  Under those circumstances, the court concluded the "causal nexus" prong of the removal test had been met.  In this case, plaintiff Granier makes identical "strict liability" claims based on the mere presence of asbestos on the premises.

The court finally concluded that Avondale's federal contractor defense is colorable and that all three prongs of the removal test are met, at least as far as the "non-failure to warn" claims were concerned.  The court then exercised its supplemental jurisdiction over the remaining claims and denied remand.

It is against this historical backdrop that the Avondale Interests removed this case.  Identical cases are removable in some courts, but not in others.  Denying remand here would allow for an expedient and robust inquiry by the United States Fifth Circuit to resolve the conflicting treatment received by the Avondale Interests over the years.

## IV.    POTENTIAL AMENDMENT TO PETITION

It is possible that Granier will attempt to amend his petition so that only "failure to warn" claims remain. The Court should brook no such interference. The U.S. Fifth Circuit succinctly declares:

-27-

> When a defendant seeks to remove a case, the question of whether jurisdiction exists is resolved by looking at the complaint at the time the petition for removal is filed.[61]

Any amendments to Granier's original claims are not to be considered when, as Judge McNamara declares, removal is under examination:

> Plaintiff's Second Amended Complaint is not considered in determining whether this case was properly removed. Jurisdiction is determined based upon the complaint at the time the petition for removal is filed.[62]

Should Granier disavow his strict liability claims and his claims that the Avondale Interests failed to use non-asbestos containing products, it would be a procedural irrelevance, not to say a transparent manipulation of a legitimate jurisdictional inquiry.

## V.   CONCLUSION

Plaintiff alleges that he sustained asbestos-related injuries while performing work at Avondale due to the fault of the Avondale Interests. The United States Navy strictly supervised all facets of the Navy DE 1078's ship construction project, the largest in Avondale's fifty year history. Inspection of the asbestos-containing materials required by the DE 1078 contract specifications were regularly performed, and United States Navy inspectors closely monitored the safe application of those materials during all phases of construction.

The claims made against the Avondale Interests are based on the alleged negligent failure to provide plaintiff with a reasonably safe working environment, as well as no fault, strict liability

---

[61] *Brown v. Southwestern Bell Telephone Company,* 9901 F.2d 1250 (5ʰCir. 1990), citing *Pullman Co. v. Jenkins,* 305 U.S. 534, 537-38, 59 S.Ct. 347, 348-49, 83 L.Ed. 378 (1981).

[62] *Moham v. Jones, Walker, Waechter, Poitevant, Carrere & Denegre,* 2000 WL 335841 (E.D. La. Mar 29, 2000).

claims based on the mere presence of asbestos on the premises.  But, the contract specifications required that asbestos-containing materials be used and the federal government promulgated safety standards for the use of asbestos.  The United States Navy inspected those materials and the application of those materials.  Moreover, the United States Navy, armed with the authority to suspend any part of the construction process, supervised the safe handling of materials and all other work place conditions as part of a safety regimen established under contract.

Furthermore, there is no distinction between the recent cases of  *Melford* and *McFarlain, supra*, where the Court denied motions to remand, and the instant case.  The claim is the same - the use of asbestos at the instruction of the government caused injury to the plaintiff.  Plaintiff cannot distinguish the case at hand from *Melford* and *McFarlain* by lobbying for the application of the *Overly* test.

Finally, the Avondale Interests have asserted two colorable federal defenses to these state law claims, immunity from negligence and strict liability actions for damages arising from plaintiff's work at Avondale under 33 U.S.C. §933(i), Avondale itself is immune under 33 U.S.C. §905(a), and federal contractor immunities.  Accordingly, all three parts of the three prong test under 28 U.S.C. §1442(a) have been met.  Therefore, plaintiff's Motion to Remand must be denied.

Respectfully Submitted,

Gary A. Lee, La. Bar No. 8265
Richard M. Perles, La. Bar No. 01534
A. Ann Cates, La. Bar No. 24769
Lee, Futrell & Perles, L.L.P.
201 St. Charles Avenue, Suite 4120
New Orleans, LA  70170
Telephone:    (504) 569-1725
Facsimile:    (504) 569-1726

*and*

_____

Gordon P. Wilson, La. Bar No. 20426
Kristopher T. Wilson, La. Bar No. 23978
F. Lewis Parks, Jr., La. Bar No. 29646
Lugenbuhl, Wheaton, Peck, Rankin & Hubbard
601 Poydras Street, Suite 2775
New Orleans, LA 70130
Telephone:    (504) 568-1990
Facsimile:    (504) 310-9195
**Attorneys for Peter Territo and
Albert Bossier, Jr.**

*and*

_____

Brian C. Bossier, La. Bar No. 16818
Edwin A. Ellinghausen, La. Bar No. 1347
Richard L. Olivier, La. Bar No. 19974
Tara Nunez-Smith, La. Bar No. 28403
Blue Williams, L.L.P.
3421 North Causeway Boulevard, 9th Floor
Metairie, LA 70002
Telephone:    (504) 831-4090
Facsimile:    (504) 849-4091
**Attorneys for Northrop Grumman Ship Systems,
Inc. (f/k/a Avondale Industries, Inc.)**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served on all counsel of record by

placing copy of the same in the United States mail, postage pre-paid and properly addressed, this

8th day of *August*, 2006.

_____

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

VERA G. LALONDE, ET AL.

VERSUS

DELTA FIELD ERECTION, ET AL.

CIVIL ACTION

NO. 96-3244-B-M3

## RULING

This removed silicosis wrongful death action comes before the Court on plaintiff's

motion to remand (rec.doc.no. 43), which has been referred to the undersigned for decision

(rec.doc.no. 124).  The sole issue remaining before the Court on the motion to remand is

whether removal of the case by defendant DSM Copolymer ("DSM") was proper as a

"federal officer removal" under 28 U.S.C. § 1442(a)(1).[1]

Section 1442(a)(1) provides in pertinent part for the removal of any action against

the "United States or any agency thereof or any officer (or any person acting under that

officer) of the United States or of any agency thereof, sued in an official or individual

capacity for any act under color of such office." 28 U.S.C. § 1442(a)(1).  In their state court

petition, plaintiffs allege that between 1947 and 1976, the decedent John D. Lalonde

performed sandblasting work for various employers at various locations owned or operated

by various premises owners, including DSM.  Plaintiffs allege that DSM and the other

---

[1] Although fraudulent joinder initially was urged as an alternative basis for removal by other removing
defendants, it since has been established beyond question that diversity jurisdiction is not present in this case
because DSM, which is an indisputably non-fraudulently joined defendant, has its principal place of business
in Baton Rouge, Louisiana.  See rec.doc.nos. 95 & 96. Defendant DSM also initially relied, in addition, upon
28 U.S.C. § 1442(a)(2). DSM apparently has abandoned any such reliance, however, as DSM has not raised
any argument in opposition to plaintiff's motion to remand under subparagraph (a)(2), instead arguing
exclusively under subparagraph (a)(1).  In that the removing party bears the burden of establishing the
propriety of removal, the Court will treat DSM's lack of briefing and proof with regard to subparagraph (a)(2)
as an abandonment of that claimed basis for removal.

DKT. &

DATE
NOTICE MAILED TO:
DATE

PRINTED

Counsel (2c)
DLD
JS

EXHIBIT
A



premises owner defendants failed to provide Mr. Lalonde with proper supervision, instruction, and warnings concerning hazards associated with sandblasting, and failed to provide adequate equipment and take other adequate safeguards to guard against the risks associated with inhalation of silica dust. In its notice of removal, DSM alleged, *inter alia*, that DSM properly removed the action under Section 1442(a)(1) as a person acting under the authority of a federal officer because part of the alleged silica exposure occurred at a government-owned synthetic rubber plant operated by DSM for and under the direction and control of an instrumentality of the federal government from 1943 through 1955. DSM further alleged that by virtue of the terms of the agreement whereby DSM purchased the plant from the federal government in 1955, federal authority and control continued for an additional ten years, that is, until 1965.

The Court will begin the jurisdictional analysis in this case at the point where all questions of federal lower court jurisdiction necessarily begin – with the language used by Congress in the statutory jurisdictional grant. *Cf. Marathon Oil Co. v. Ruhrgas*, ___ F.3d ___, 1998 WL 329842, slip op. at *2 (June 22, 1998)( federal courts other than the Supreme Court derive their jurisdiction wholly from the authority of Congress).[2] On its face, Section 1442(a)(1) requires two showings for removal in the context presented here. First, the removing defendant must be a "person acting under [any] officer ... of the United States or of any agency thereof." And, second, the removing defendant must be "sued ... for [an] act under color of such office."

---

[2]The Court begins with the statutory language of Section 1442(a)(1) in large part because of the many varied jurisprudential statements of the elements required for removal and of the showing required to satisfy each element. Rather than extensively contrasting and harmonizing other lower federal court cases, the court's approach in this ruling is to draw the required elements, and their meaning, directly from the relevant statutory language and Supreme Court precedent.

The Supreme Court, in turn, has construed the second, "color of office" statutory element as requiring two showings. First, the high court has "interpreted the 'color of office' test to require a showing of a 'causal connection' between the charged conduct and asserted official authority." *Willingham v. Morgan*, 395 U.S. 402, 409, 89 S.Ct. 1813, 1817, 23 L.Ed.2d 396 (1969). And second, the Supreme Court has interpreted the "color of office" element as requiring that the removing defendant, in addition, raise a colorable federal defense. *E.g., Mesa v. California*, 489 U.S. 121, 125-34, 109 S.Ct. 959, 962-67, 103 L.Ed.2d 99 (1989).[3]

Accordingly, under the statutory language and the controlling Supreme Court precedents, a government contractor seeking to remove a civil action under Section 1442(a)(1) must show:

1) that the removing defendant was acting under an officer of the United States or of an agency thereof;

2) that there was a causal connection between the charged conduct and the asserted official authority; and

3) that the removing defendant has a colorable defense under federal law.

28 U.S.C. § 1442(a)(1); *Willingham, supra; Mesa, supra.*

---

[3]If Section 1442(a)(1) were interpreted to permit removal of any suit arising from the performance of federal duties (*e.g.,* a simple vehicular accident) without the requirement of a colorable federal defense, then a question would arise as to whether Congress had exceeded the maximum possible grant of federal question jurisdiction permitted by the constitution. *See Mesa*, 489 U.S. at 134-39, 109 S.Ct. at 967-70.

Federal officer removal under Section 1442(a)(1) is to be distinguished from removal of federal question cases under 28 U.S.C. 1441, where removal generally cannot be predicated on the presence of a federal defense.

*"Acting Under"*

Neither the Supreme Court nor the Fifth Circuit have established what is required to show that a government contractor is "acting under" an officer of the United States or of an agency thereof. Cases from other federal district courts, which of course are not binding on this court, vary in their approach to what is required under this element.

The following specific facts bear on DSM's claim that it was acting under an officer of the United States or an agency thereof. Under an Operating Agreement in force from 1942 through 1955,[4] DSM[5] operated a government-owned synthetic rubber plant as "agent for ... and for the account and at the expense and risk of" the Rubber Reserve Corporation. The Rubber Reserve Corporation was a subsidiary of the Reconstruction Finance Corporation, which was created as an instrumentality of the United States government.[6] The Operating Agreement reflects that the Reconstruction Finance Corporation was authorized under federal law to create a corporation to produce, *inter alia*, strategic and critical materials as defined by the President, that the President had designated synthetic rubber as a strategic and critical material under the law, that the production of this material and expansion of capacity was important to the interests of the federal government and its national defense program, and that the Reconstruction Finance Corporation had created

---

[4]The period in question raised by the plaintiffs' petition spans from 1947 through 1976. If a particular claim is removable under Section 1442(a)(1), then the entire action becomes removable. *See Spencer v. New Orleans Levee Board*, 737 F.2d 435, 438 (5th Cir. 1984); *Arango v. Guzman Travel Advisors Corp.*, 621 F.2d 1371, 1376 (5th Cir. 1980); *Fowler v. Southern Bell Telephone & Telegraph Co.*, 343 F.2d 150, 152 (5th Cir. 1965). If the federal issues later drop from the case, the district court has the discretion to decline to exercise continued discretion over the nonfederal elements of the case. *Spencer*, 737 F.2d 438; *Ewell v. Petro Processors of Louisiana, Inc.*, 655 F.Supp. 933, 936-37 (M.D. La. 1987)..

[5]Or, actually, its predecessor-in-interest, which will be referred to as "DSM" for ease of reference.

[6]*Operating Agreement*, Section 1 (rec.doc.no. 119, exhibit "A"); *Baker Affidavit*, para. 2 (rec.doc.no. 65, exhibit "C").

-4-

and empowered the Rubber Reserve Corporation to produce synthetic rubber and related materials.[7]

Under Section 27 of the agreement, DSM specifically agreed that it would not engage in any business other than the manufacture of synthetic rubber for the Rubber Reserve Corporation under the Operating Agreement. Under Section 21 of the agreement, DSM could not assign its obligations under the contract; but the Rubber Reserve Corporation could assign its interests "to any other branch of the Government," which then would acquire all of the Rubber Reserve Corporation's rights under the agreement. Under Section 7 of the agreement, the Rubber Reserve Corporation supplied DSM with all of the butadiene and styrene needed for producing the synthetic rubber, and the title to any additional raw materials purchased by DSM vested directly in the Rubber Reserve

---

[7] *Operating Agreement*, preamble (rec.doc.no. 113, exhibit "A").  As a side note, the Court would observe that prior reported decisions reflect that the background for this case comes directly from the pages of history.  As World War II approached, it became evident that the United States would be cut off from 90% of its natural rubber supply.  The development of a synthetic rubber industry became a national military goal of top priority, especially after Pearl Harbor, after which access to the bulk of the country's natural rubber sources in fact were cutoff.  The situation was rather pressing because prior peacetime commercial attempts to develop a viable synthetic rubber process had failed.  The issue was of such import that President Roosevelt took the rather unusual step of asking the Chief Justice of the Supreme Court to lead a wartime commission to investigate rubber production.  (The Chief Justice declined because the project would be inconsistent with his function as a judicial officer.)  Ultimately, Congress gave the Reconstruction Finance Corporation authority to take the steps necessary to organize a synthetic rubber industry in the shortest possible time, which it accomplished through the Rubber Reserve Company, by pooling patent and research information, building plants, and signing agreements with contractors to operate those plants under federal supervision.  To say that the success of this effort was crucial to Allied victory in World War II hardly is an exaggeration.  The federal government's active participation in the production of synthetic rubber continued through the Korean War.  See generally  *General Tire & Rubber Co. v. Firestone Tire & Rubber Co.*, 489 F.2d 1105, 1107-08 (6th Cir. 1973); *Reed v. Fina Oil & Chemical Company*, 995 F.Supp. 705, 708-09 (E.D. Tex. 1998); *In re President's Commission on Organized Crime Subpoena of Scarfo*, 783 F.2d 370, 377 (3rd Cir. 1986).  The Court points to this historical information merely by way of background, as the operating agreement contains the essential legal details (bare and unadorned as they may be) that are necessary for decision here and neither counsel supplied the historic backdrop from which these issues arise.

Corporation.[8] Title to the production as well as the raw materials rested in the government, which paid an operating fee to DSM for its services.[9]

During the term of the agreement, a field representative from the Rubber Reserve Corporation regularly visited the facility. The field representative's responsibilities included overseeing DSM's operations and ensuring that DSM was following government imposed production specifications, government imposed operating procedures, and government imposed laboratory product testing procedures and operations in the manufacturing of synthetic rubber. The United States, through the Rubber Reserve Corporation, controlled what type of rubber was produced at the facility, how much of it was produced, and when each type of rubber was produced. DSM could alter these requirements only with permission from the federal government. If government requirements were not followed, the field representative would bring the matter to the attention of the manager of the section where the problem was observed. If no results were obtained, the field representative would raise the matter with the plant manager, and as a last resort, would go to the federal government in Washington, which had authority to enforce compliance.[10]

The federal government imposed numerous safety requirements at the facility, such as the wearing of protective equipment. The United States required that safety meetings be held in each department on a monthly basis, and, in addition, required plant-wide safety

---

[8]*Operating Agreement*, (rec.doc.no. 113, exhibit "A").

[9]*Baker Affidavit*, para. 6 (rec.doc.no. 65, exhibit "C").

[10]*Baker Affidavit*, paras. 3-7 (rec.doc.no. 65, exhibit "C").

meetings be held on a monthly basis. The government dictated the topics of these meetings.[11]

In summary, DSM operated a federal government-owned facility, exclusively for the government, under the oversight and ultimate control of officers of the federal government. The Court therefore concludes that the foregoing facts are sufficient to establish that DSM was "acting under an officer of the United States or of an agency thereof" for purposes of removal under Section 1442(a)(1).

Plaintiffs cite a number of district court decisions, such as *Overly v. Raybestos-Manhattan*, 1996 WL 532150 (N.D. Cal. 1996), which they contend requires the government contractor to show that the specific alleged acts giving rise to the underlying claims were also specifically directed by a federal officer. That is, plaintiffs argue that *Overly* and similar cases require a showing of a federal directive ordering DSM *not* to warn Lalonde of the hazards of silica dust or *not* to provide him with adequate protective equipment.[12] The Court specifically rejects and declines to follow these lower court cases to the extent plaintiff urges their applicability to the context presented here.[13] The Court

---

[11]*Samuels Affidavit*, paras. 4-5 (rec.doc.no. 65, exhibit "D"). Although Samuels was in charge of laboratory testing for developmental products, his affidavit speaks to the government's imposition of safety requirements for the entire facility and its practices regarding safety meetings for the entire facility. It would not be unreasonable for a supervisor of a single department to have knowledge of the level of control exercised generally by the government over the entire facility.

[12]In *Overly*, for example, the element of "federal direction" applied by the *Overly* court was not satisfied because, while the federal government directed Avondale to install asbestos products, it gave no direction to Avondale regarding workplace warnings pertaining to asbestos exposure.

[13]*Overly* and similar cases pertain to government contractors acting as independent contractors in filling government procurement contracts at their own plants. The cases do not involve a government contractor acting exclusively as an agent for the federal government in operating a government-owned facility.

Many of these same cases apply a similarly chary approach to the "causal connection" element. As will be outlined in the following section of this ruling, the chary approach to the causal connection element applied
(continued...)

instead looks to Supreme Court precedent regarding application of Section 1442(a)(1), which reveals that, unlike the case with other removal statutes, there is no rule of interpretation disfavoring removal under Section 1442(a)(1). On the contrary, the statute is not "narrow" or "limited" and is not to be given a "narrow, grudging interpretation"; the test for removal under Section 1442(a)(1) "should be broader, not narrower, than the test for official immunity." *Willingham*, 395 U.S. at 405 & 406-07, 89 S.Ct. at 1815 & 1816; *accord Peterson v. Blue Cross/Blue Shield of Texas*, 508 F.2d 55, 58 (5th Cir. 1975). Any requirement that a contractor who is running a federal production facility exclusively for the government has to show that the specific details of the negligent act were done only at the instance of precise and detailed instructions from a federal officer in order for the contractor to be "acting under" a federal officer is an "unduly grudging" requirement.

Here, DSM was no less acting under federal authority when it followed the general directives of federal authority in running the government-owned plant than it was when it was following a specific order from a federal officer regarding a particular aspect of plant operations. Every act taken in running the plant was taken under delegated federal authority. DSM did not cease to be running the plant for and under federal authority when it made operational decisions (such as specific decisions regarding worker safety) within the ambit of its duties without a specific express federal directive as to the particulars, for DSM acted exclusively for and under the federal government in its operation of this facility.

---

[13](...continued)
in these cases is not supported by relevant Supreme Court precedent concerning removal of civil, as opposed to criminal, actions.

Any state court suit which concerns the operations of a government-owned defense production facility triggers the strong federal policy interests protecting against possible state interference with federal functions[14] -- regardless of whether the plant is being run directly by the United States or by a contractor retained and controlled by the federal government.   Whether a federal officer directly mandated the specific alleged act or omission in question has little, if anything, to do with the core policy question of whether federal interests potentially are impacted by the state court suit.   The Court accordingly finds this requirement to be an unduly grudging one that is neither compelled by the text of Section 1442(a)(1) nor supported by the policies underlying under that section.

*"Causal Connection"*

District court cases such as *Overly* apply the "causal connection" element, much like the "acting under" element, in a manner that would require the removing party to demonstrate that the federal government specifically directed, *i.e.* "caused," the removing party to commit the precise act or omission which forms the basis of the state law claim.[15] As noted previously, Supreme Court decisions do interpret "the 'color of office' test to require a showing of a 'causal connection' between the charged conduct and asserted official authority." *Willingham*, 395 U.S. at 409, 89 S.Ct. at 1817.   But, as will be shown below, the "causal connection" required in civil cases under Supreme Court precedent is of a different nature from that required in cases such as *Overly*. In particular, the governing

---

[14]These policy interests are discussed in more depth in the final section of this ruling.

[15]In *Overly*, the element of "causal nexus" was not satisfied because the federal government exercised no control over Avondale with regard to warning of workplace hazards from asbestos.  Thus, in this case, *Overly* would require DSM to establish that the federal government specifically directed DSM to not warn contractor's employees about the dangers of inhaling silica dust during sandblasting maintenance operations.

precedents from the Supreme Court do not require a showing in a civil case that the alleged wrongful act or omission itself was specifically directed or compelled by federal duty or law. Rather, the controlling decisions require only a showing that the defendant committed the alleged act or omission while performing its federal duties.

In *Willingham*, a federal prisoner alleged that the penitentiary warden, chief medical officer and others had inoculated him with "a deleterious foreign substance" and had assaulted, beaten, and tortured him in various ways. In connection with what the Supreme Court described as "a 'scattergun' complaint, charging numerous wrongs on numerous different (and unspecified) dates," the prisoner alleged in seeking remand that the penitentiary officials "had been acting 'on a frolic of their own which had no relevancy [to] their official duties as employees or officers of the United States." 395 U.S. at 407 & 408-09, 89 S.Ct. at 1816 & 1817. The prisoner urged that his suit therefore was not removable because the wrongs alleged did not grow out of defendants' conduct under color of office. *See* 395 U.S. at 407, 89 S.Ct. at 1816.

The *Willingham* Court rejected this invitation to focus the inquiry on whether the wrongs alleged were authorized. Instead, the high court framed the question as "whether [the officials] adequately demonstrated a basis for removal by showing that their only contact with respondent occurred while they were executing their federal duties inside the penitentiary." 395 U.S. at 408, 89 S.Ct. at 1816. The Supreme Court answered this question in the affirmative, in the following passage:

> In a civil suit of this nature, we think it was sufficient for petitioners to have shown that their relationship to respondent derived solely from their official duties. Past cases have interpreted the "color of office" test to require a showing of a "causal connection" between the charged conduct and

> asserted official authority. .... "It is enough that (petitioners') acts or (their) presence at the place in performance of (their) official duty constitute the basis, though mistaken or false, of the state prosecution." .... *In this case, once petitioners had shown that their only contact with respondent occurred inside the penitentiary, while they were performing their duties, we believe that they had demonstrated the required "causal connection." The connection consists, simply enough, of the undisputed fact that petitioners were on duty, at their place of federal employment, at all the relevant times.* If the question raised is whether they were engaged in some kind of "frolic of their own" in relation to respondent, then they should have the opportunity to present their version of the facts to a federal, not a state, court. This is exactly what the removal statute was designed to accomplish.

395 U.S. at 409, 89 S.Ct. at 1817 (emphasis added; citations and footnote omitted).

Explaining its reference to "a civil suit of this nature," the high court noted that in a criminal case, a more detailed showing of causal connection "might be necessary because of the more compelling state interest in conducting criminal trials in the state courts." 395 U.S. at 409 n.4, 89 S.Ct. at 1817 n.4. *Willingham* supports the conclusion that the "causal connection" inquiry is not one of whether the federal agent's alleged wrong was federally authorized, but rather is one of whether the alleged wrong occurred within the course of the agent's performance of the agent's federal duties. *Accord Magnin v. Teledyne Continental Motors*, 91 F.3d 1424, 1427-28 (11th Cir. 1996)(similar reading of *Willingham*).

In the instant case, from 1943 through 1955, DSM operated the government-owned synthetic rubber plant for the federal government, pursuant to the Operating Agreement entered into between DSM and the federal instrumentality involved. The statement that DSM's federal duty *was* the operation of the synthetic rubber plant – in all of its facets and with all that that undertaking necessarily entailed -- is not at all an oversimplification or overgeneralization. Rather, it is an entirely accurate statement of an essential material

fact.  It is what DSM contractually bound itself to do, as an agent of the federal government.

Against this backdrop, it is clear that the requisite "causal connection" exists between the state court suit and DSM's discharge of its federal duties.  Mr. Lalonde was sandblasting in order to maintain and refurbish plant equipment for continued use.  The question is not whether a specific federal law or order directed DSM not to warn Lalonde about the hazards of silica exposure (or even to maintain the plant equipment), but rather the question is whether that alleged failure to warn occurred while DSM was in the performance of its federal duties, *i.e.*, in the course of its operation of the plant as an agent for the federal government.  The Court therefore holds that the requisite causal connection is satisfied here.  To the extent that some lower district court cases would hold to the contrary, the Court specifically rejects the analytical underpinnings of those cases.[4]

*Colorable Federal Defense*

As noted, the existence of a "causal connection" alone is not sufficient to satisfy the "color of office" requirement under the statute.  The federal officer or agent, in addition, must raise a colorable defense under federal law.  *Mesa*, 489 U.S. at 125-34, 109 S.Ct. at 962-67.  It is equally well-established, however, that the validity of the federal defense is

---

[4]In passing, the Court would note that cases such as *Overly* are distinguishable from this case on their facts because the government contractors in those cases were performing work under a government contract as independent contractors at a contractor-owned facility that also was used for other, non-government contract work.  In such a context, under this Court's reading of the law, the causal connection requirement arguably would distinguish tort claims arising in the course of non-government contract work from claims arising in the course of government contract work.  No such distinction is needed in this case because all work being done at the government-owned facility in question here, up through 1955, was federal government work done for the government as an agent of the government.  In any event, this Court eschews reliance upon cases such as *Overly* not because of their distinguishing facts but instead because of their legal analysis.  To the extent *Overly* implies that in all situations  the causal connection requirement should be applied in a manner that requires the removing defendant to prove that the actual act or omission was itself specifically federally mandated, this Court expressly rejects such a reading of the federal officer removal statute.



a "distinct subject" that involves "wholly different inquiries" that have "no connection whatever with the question of jurisdiction." *Mesa*, 489 U.S. at 129, 109 S.Ct. at 964, quoting *The Mayor v. Cooper*, 6 Wall. 247, 254, 19 L.Ed. 851 (1868).[5] The federal defense need only be a "colorable" one, not necessarily one that ultimately will prove meritorious.

In the instant case, DSM seeks to assert two federal defenses. First, DSM relies upon the government contractor defense. Second, DSM asserts immunity pursuant to the Defense Production Act, 50 U.S.C. § 2157.

Plaintiffs contend that DSM may not rely on the government contractor defense because DSM has not shown that the federal government prohibited DSM from warning Lalonde about the dangers of silica dust or from providing him with additional protective equipment. Plaintiffs rely in this regard upon the Ninth Circuit decision in *In re Hawaii Federal Asbestos Cases*, 960 F.2d 806 (9th Cir. 1992), in which Navy sailors brought products liability actions against asbestos manufacturers who supplied asbestos insulation used in navy vessels. The Ninth Circuit, in an alternative holding, applied the standards established in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), for determining when a products liability claim against a supplier of military equipment is barred by the government contractor defense.[6] Under *Boyle*, "liability

_____

[5] *See also Willingham*, 395 U.S. at 405, 89 S.Ct. at 1815 ("the test for removal should be broader, not narrower, than the test for official immunity"); *id.*, 395 U.S. at 407, 89 S.Ct. at 1815 ("one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court"). *Accord Magnin*, 91 F.3d at 1429 ("The scope of our inquiry here is only whether [the removing defendant] has advanced a colorable federal defense (including an assertion that he complied with all his federal law obligations), not whether his defense will be successful.")

[6] The Ninth Circuit's primary holding was that the asbestos insulation did not constitute military equipment and that the government contractor defense did not apply to suppliers of nonmilitary equipment. 960 F.2d at 810-12. This proposition itself hardly is a foregone conclusion, as there currently is a split of circuit authority on this issue. *See, e.g., Carley v. Wheeled Coach*, 991 F.2d 1117 (3d Cir.), *cert. denied*, 510

(continued...)

for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not the United States." 487 U.S. at 512, 108 S.Ct. at 2518. In *In re Hawaii Federal Asbestos Cases*, the Ninth Circuit rejected the government contractor defense *on the merits* because the asbestos manufacturers conceded that the Navy had not prohibited them from placing warnings on their insulation products. The Ninth Circuit held that the manufacturers therefore had failed to establish that they had acted in compliance with reasonably precise specifications as required under *Boyle*. 960 F.2d at 812-13.

That the specifics of the *Boyle* test (and, by extension, the Ninth Circuit's *In re Hawaii Federal Asbestos Cases* decision) apply to a government contractor hired under a performance contract to operate a federally-owned production facility exclusively for and as an agent of the federal government, under federal oversight and control, is subject to some question. Indeed, the Supreme Court established the existence and contours of a federal defense for contractors hired by the federal government under a performance contract long before *Boyle*. In *Yearsley v. W.A. Ross Construction Co.* 309 U.S. 19, 60 S.Ct. 413, 84 L.Ed. 554 (1940), in an action removed to federal court, a landowner sought to recover damages from a contractor retained by the federal government to build dikes in the Missouri River for the purpose of improving navigation. The work done had been

---

[6](...continued)
U.S. 868, 114 S.Ct. 191, 126 L.Ed.2d 150 (1993). Moreover, the Ninth Circuit's holding on this issue appears to be flatly contradicted by the Supreme Court's *Yearsley* decision discussed in the text, *infra*.

authorized and directed by the government. The *Yearsley* Court concluded that there could be no liability on the part of the contractor, who had acted as an agent of the federal government, unless the contractor either had exceeded its authority or the authority was not validly conferred. 309 U.S. at 20-21, 60 S.Ct. at 414. Significantly, one of the principal questions in *Boyle* was whether, and, under what circumstances, the Supreme Court should extend its prior holding in *Yearsley* concerning the performance contract context to a manufacturer supplying military equipment as an independent contractor under a procurement contract. *See Boyle*, 487 U.S. at 505-06, 108 S.Ct. at 2515.

The specific elements that would apply to under *Yearsley* and *Boyle* for a contractor-agent in the context presented here are far from clear. One federal court of appeals has suggested that *Yearsley* establishes a separate and "analytically distinct" "government agency defense" that turns upon (1) whether the government itself would be subject to liability on account of sovereign immunity; (2) whether the contractor actually acted as an agent of the government rather than simply as an independent contractor; and (3) whether the agent was acting within the course and scope of its duties. *See Shaw v. Grumman Aerospace Corp.*, 778 F.2d 736, 739-40 (11th Cir. 1985), *cert. denied*, 487 U.S. 1233, 108 S.Ct. 2896, 101 L.Ed.2d 930 (1988). Although another portion of the *Shaw* decision was expressly rejected by the Supreme Court in *Boyle*, *Shaw's* reading of *Yearsley* was not addressed in *Boyle*. *See* 487 U.S. at 513, 108 S.Ct. at 2519. Subsequent to *Boyle*, at least one district court has followed *Shaw's* reading of *Yearsley*. *See Amtreco, Inc. v. O.H. Materials, Inc.*, 802 F.Supp. 443 (M.D. Ga. 1992).

Fifth Circuit *dicta* suggests a possibly more limited reading of *Yearsley* than that advanced in *Shaw*. In *Bynum v. FMC Corp.*, 770 F.2d 556 (5th Cir. 1985), the court

suggested that the *Yearsley* defense required a showing of an actual agency relationship with the government but that the defense may not be available to contractors who fail to follow government specifications or mismanufacture a product. 770 F.2d at 564.[7] But this standard would not necessarily require rejection of DSM's defense here, because the failure to provide warnings or protective equipment that perhaps were not required by government specifications would not constitute a failure to follow government specifications. Moreover, the *Bynum* dicta predates *Boyle's* reading of *Yearsley*. In this rapidly changing area of the law — where even seemingly established circuit precedent is subject to reinterpretation[8] — it would be quite difficult to conclude that a removing defendant could not, as a matter of law, raise a colorable federal defense based merely on *dicta* that now is nearly fifteen years old.

It further has been suggested that the restriction of sovereign immunity in the Federal Torts Claim Act, adopted in 1948, perhaps may lead to a similar curtailing of the reach of the defense available to performance contractor-agents under *Yearsley*. *See Valori v. Johns-Manville Sales Corp.*, 1985 WL 6074, slip op. at 8* (D.N.J. 1985).[9]

---

[7] *See also Ward v. Humble Oil & Refining Co.*, 321 F.2d 775, 780 (5th Cir. 1963)(applying *Yearsley* in context of mineral rights suit to quiet title).

[8] *Compare McGonigal v. Gearhart Industries, Inc.*, 851 F.2d 774, 778 (5th Cir. 1988)(government contractor defense not available to contractor that negligently manufactured, rather than defectively designed, grenade that exploded prematurely), *and Mitchell v. Lone Star Ammunition, Inc.*, 913 F.2d 242, 246-47 (5th Cir. 1990)(government contractor defense not available to contractor where claim was based on manufacturing defect rather than design defect), *with Bailey v. McDonnell Douglas Corp.*, 989 F.2d 794 (5th Cir. 1993)(reinterpreting *McGonigal* and *Mitchell* and concluding that the defense is not limited to design defects as opposed to manufacturing defects).

[9] Of course, a portion of the time span potentially involved in this case predates 1948 to a limited extent, as plaintiff claims that he worked at various defendant facilities from 1947 through 1976. In a related vein, the Fifth Circuit made an alternative holding in *Hansen v. Johns-Manville Products Corp.*, 734 F.2d 1036 (5th Cir. 1984), to the effect that even if there were a "government specifications" defense under Texas law (for which there was no supporting caselaw), any such defense would not apply where work under the
(continued...)

The foregoing establishes that questions remain as to the continuing reach of *Yearsley* in this particular context. However, even if *Boyle* has completely supplanted any vestige of *Yearsley*, and even if *Boyle* states the test that is applicable to the factual setting presented here,[10] the Court does not find at this stage of the proceedings that either *Boyle* or the Ninth Circuit's decision in *In re Hawaii Federal Asbestos Cases* necessarily compel a ruling in plaintiffs' favor on the government contractor defense. The Ninth Circuit's decision, which is not binding authority in this Court, concluded that the asbestos manufacturers there could not establish that were acting in compliance with "reasonably precise specifications" because they had conceded that the Navy did not prohibit them from placing warnings on their insulation products. 960 F.2d at 812. However, arguably, if the Navy approved specifications for the product that did not call for the warnings and the manufactured product conformed to those specifications, then the first two elements of *Boyle would* be satisfied.[11] The only question remaining would be whether the asbestos manufacturers failed to warned the United States about dangers associated with the use

---

[9](...continued)
government contract occurred during only five of the plaintiff's twenty-six years of employment at the single facility involved there. The Court does not find—to the extent, if any, that a similar factual situation is presented here—that *Hansen* is controlling on the question of whether a colorable *federal* defense has been asserted, because *Hansen* concerned Texas law, not the federal common law that was applied under *Boyle* (which was decided four years after *Hansen*) and *Yearsley*. Any extension of *Hansen* to the federal contractor defense would be a matter to be considered on the merits.

[10]The *Boyle* test was stated in the context of a defective design products liability suit brought against a manufacturer of military equipment by a person injured by the military equipment. The instant case presents a suit against a plant operator for injuries allegedly caused to a worker by unsafe working conditions. The different context arguably might require some reformulation of the *Boyle* test to better fit the context presented.

[11]To recap, under *Boyle*, "liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not the United States." 487 U.S. at 512, 108 S.Ct. at 2518.

-17-

of asbestos that were known to the asbestos manufacturers but not to the United States.[12] On that issue, Fifth Circuit authority suggests that the decision to forego safety precautions for wartime sailors might have been a knowing and conscious one by the federal government. *Cf. Gordon v. Lykes Brothers Steamship Co., Inc.*, 835 F.2d 96, 100 (5th Cir. 1988)(government decision not to establish a safety program for World War II merchant seamen working with asbestos was immunized by the discretionary function exception). Thus, this Court cannot predict with any degree of certainty that the Fifth Circuit either would follow the same analysis or reach the same result as that of the Ninth Circuit.

Furthermore, in the context of this case, it is not entirely clear that a *Boyle*-like analysis leads to a conclusion that the government contractor defense is not available here. If, for example, the federal government specified safety requirements for the facility and DSM complied with those requirements, it is arguable that the first two elements of a *Boyle* analysis would be satisfied. If the government-specified requirements did not include the giving of warnings to workers or the taking of further precautions regarding silica exposure, and the government was unaware that such warnings and/or precautions were necessary, then, arguably, the question becomes whether DSM knew of the necessity for the warning yet failed to warn the government of silica hazards resulting from the absence of such warnings and precautions. Such an inquiry is not one to be resolved at this stage, but rather is one for the merits. The mere fact that DSM may not have warned the

---

[12]The Ninth Circuit apparently reads *Boyle's* first element to require the contractor to show that something omitted (such as a warning) was explicitly required to be omitted under the specifications. This reading of *Boyle* is subject to question. Arguably, if the product conforms to the approved specifications, *i.e.*, everything that is called for is present, then the *absence* of an allegedly required feature (such as a warning or a safety shield) would be a matter addressed by the question of whether the contractor then warned the United States about the hazards of this omission in a circumstance where the United States already was not aware of the hazards.

government, by itself, is not dispositive of the issue – the relative knowledge of DSM and the government also is a factor in applying *Boyle's* third element.[13]

The Court notes these many questions and uncertainties in the application of a government contractor defense to the facts of this case simply to illustrate that it cannot be stated categorically at this time that the federal contractor defense is unavailable to DSM.[14]   Nuances such as whether, or to what extent, certain judicial decisions survive other decisions plainly are matters for resolution on the merits of the defense, not for resolution at the jurisdictional stage.  That DSM raises a colorable federal defense that can be conclusively resolved only at a later stage in these proceedings suffices to sustain jurisdiction.

The Court accordingly need not reach the question of whether DSM has raised a colorable federal defense under the Defense Production Act.

*Interference with Federal Function*

The Court therefore concludes that DSM has established the prerequisites for removal under Section 1442(a)(1)(action under a federal officer, the causal connection required for action under color of office, and the presence of a colorable federal defense). Plaintiffs appear to suggest, however, that DSM further must affirmatively demonstrate that

---

[13]*Cf. Garner v. Santoro*, 865 F.2d 629, 638 (5th Cir. 1989)(mere failure to warn government of toxicity of paint used by shipyard worker did not support district court's refusal to allow government contractor defense to go to the jury because the third *Boyle* element further required consideration of whether the United States was aware of the danger presented by the paint's toxicity).

[14]Indeed, the situation here would appear to present a paradigm case for removal under Section 1442(a)(1), at least in the sense that the application of federal law here is subject to much uncertainty. *Cf. Willingham*, 395 U.S. at 407, 89 S.Ct. at 1816 ("one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court"); *id.* at 409, 89 S.Ct. at 1817 ("[T]hey should have the opportunity to present their version of the facts to a federal, not a state, court.  This is exactly what the removal statute was designed to accomplish.  Petitioners sufficiently put in issue the questions of official justification and immunity; the validity of their defenses should be determined in the federal courts.").

the current action "could arrest, restrict, impair, or interfere with either the actions of a federal official or the operations of the federal government," relying on the Fifth Circuit's decision in *Murray v. Murray*. *See* 621 F.2d at 107. Plaintiffs suggest that this action cannot impair federal interests because the death and suit arise almost 40 years after all operations have ceased under the contract between DSM and the federal corporate intermediaries.

The Court does not read the *Murray* decision as establishing a requirement that the removing party show, in addition to the three elements discussed above, a specific impairment of federal interests in the given case. *Murray* does stand as authority regarding the policy and rationale underlying federal officer removal: "that federal officers are entitled to, and the interest of national supremacy requires, the protection of a federal forum in those actions commenced in state court that could arrest, restrict, impair, or interfere with the exercise of federal authority by federal officials." 621 F.2d at 106. The *Murray* court referred back to this underlying rationale in holding that a garnishment action – which does not affect the United States' substantive obligation – is not removable under Section 1442(a)(1). *Id.*, at 107. In so doing, the *Murray* panel specifically reaffirmed that the statute "permits the removal of those actions commenced in state court that expose a federal official [or person acting under him] to potential civil liability ... for an act *performed in the past* under color of office." *Id.*, at 107 (emphasis added).

Insofar as frustration of federal interests is an independent concern here, the Court would note that, quite clearly, the imposition of a future liability against a government contractor for past work can as much impair federal interests as would a current liability during the term of an ongoing agreement:

> [T]he extent of a contractor's liability may, undoubtedly will, affect future dealings between the contractor and the government. .... Speculative federal interests in the obligations of war contractors are numerous. War contractors might be expected to increase the price of war materials to correspond to any extension in their potential liability. Such adjustments might have a significant effect on the federal treasury. If potential liability increased dramatically, future war contractors might attach conditions to the use of their products, or balk at supplying the military with any products whatsoever. Thus, the government's military capacities might be affected.

*In re "Agent Orange" Product Liability Litigation*, 506 F.Supp. 737, 746-47 & n.5 (E.D.N.Y.), *rev'd on other grounds* 635 F.2d 987 (2nd Cir. 1980), *quoted in Bynum v. FMC Corp.*, 770 F.2d 556, 570 n.18 (5th Cir. 1985).

That the synthetic rubber produced at DSM Copolymer in the late 1940's and early 1950's has long since made its way to its appointed tasks on distant shores, for wars that now recede into the history of a waning century, is of no moment here. What matters here is the continuing ability of the federal government to be able to respond in times of national need, and to be able to bring the resources of private industry to bear in such times. Removal by this wartime supplier of this strategic and critical material, on the basis of a federal contractor defense, therefore is clearly consonant with the policies underlying the federal officer removal statute.

<u>CONCLUSION</u>

Accordingly, for the foregoing reasons, plaintiff's motion to remand (rec.doc.no. 43) is DENIED.

Baton Rouge, Louisiana, this _5th_ day of _August_ 1998.

_____
UNITED STATES MAGISTRATE JUDGE

-21-

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

FILED
U.S. DIST COURT
M...... .... LA

2006 JAN 31  P 4: 06

BY...... ........

DANIEL W. MELFORD, SR.

VERSUS

CIVIL ACTION

PETER TERRITO, ET AL

NO. 05-1405

# RULING ON MOTION TO REMAND

This matter is before the court on a motion to remand (doc. 3) by the plaintiff, Daniel W. Melford, Sr.  Defendant Peter Territo opposes the motion (doc. 27).[1] Jurisdiction is at issue.  Plaintiff has moved for expedited hearing (doc. 5) on the motion to remand which is granted.  There is no need for oral argument.

## FACTS AND PROCEDURAL HISTORY

Melford filed this action on November 9, 2005, in the Nineteenth Judicial District Court, Parish of East Baton Rouge, State of Louisiana, seeking to recover from a number of defendants for injuries allegedly caused by exposure to asbestos—Melford alleges that he is dying from malignant mesothelioma.  Plaintiff alleges that Territo was an officer in charge of health and safety at Avondale Industries, Inc.,[2] when Melford worked there as a mechanic from 1968 to 1970.

---

[1]While Territo did not initially respond to Melford's motion to remand within the time limits provided in LR 7.5M, the court granted a motion by Territo to extend his deadline (doc. 25) to allow Territo to respond to an affidavit (doc. 23, Exhibit A) filed by Melford after the motion to remand.

[2]Avondale is now known as Northrop Grumman Ship Systems, Inc.

1

**EXHIBIT**

B

tabbies®

Although he alleges that he never worked on any vessels, Melford claims he was exposed to asbestos while working around vessels undergoing construction and repair at Avondale's shipyard (doc. 1, Exhibit A, ¶ 41). Melford's petition contains the following allegations regarding Territo:

42.

[Territo] was aware or should have been aware of the dangerous condition presented by exposure to asbestos and that Petitioner Daniel W. Melford, Sr. would suffer from an injury as a result of this exposure, but he failed to provide to Mr. Melford knowledge of the dangers to his health from exposure to asbestos fiber.

43.

[Territo] had the responsibility of providing Mr. Melford with a safe place to work, and safety equipment with which to conduct his work. However, he negligently failed to carry out these duties, and failed to protect Mr. Melford from the dangers of asbestos dust exposure.

44.

In addition to the foregoing acts of negligence, Territo made the following acts and/or omissions:

a)   Failing to reveal and knowingly concealing critical medical information to Daniel W. Melford, Sr.;

b)   Failing to reveal and knowingly concealing the inherent dangers in the use of asbestos, and other harmful substances in their manufacturing process;

c)   Failing to provide necessary protection to Mr. Melford;

2

d)  Failing to provide clean, respirable air and proper ventilation;

e)  Failing to provide necessary showers and special clothing;

f)  Failing to warn employees and their family members of the risks associated with direct and bystander exposure to asbestos.

(doc. 1, Exhibit A, ¶¶ 42-44).

Territo removed the action to this court on December 15, 2006.  He alleges jurisdiction under 28 U.S.C. § 1442, the federal officer removal statute.

## LAW AND DISCUSSION

"[T]he burden of establishing jurisdiction rests upon the party seeking to invoke it . . . ."  *Gaitor v. Peninsular & Occidental S. S. Co.*, 287 F.2d 252, 253 (5th Cir. 1961).

Section 1442 provides in part:

(a) A civil action or criminal prosecution commenced in a State court against any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

(1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

3

28 U.S.C.A. § 1442 (a)(1).  This provision was enacted to protect the exercise of federal authority against interference by states through their courts.[3] Wright, Miller, & Cooper, Federal Practice and Procedure:  Jurisdiction 3d § 3727 at 136.  It has been invoked by a wide variety of federal officers and persons acting at the direction of federal officers in many different types of cases, both civil and criminal.  Id. at 125.

The Supreme Court has held that to remove a case under Section 1442, the defendant must (1) show that he acted at the direction of a federal officer; (2) establish a causal connection between the charged conduct and the asserted authority; and (3) raise a colorable federal defense.[4] Willingham, 395 U.S. 406-09; Mesa v. California, 489 U.S. 121,129-38 (1989); Winters v. Diamond Shamrock Chemical Co., 149 F.3d 387, 397-401 (5th Cir. 1998); Miller v. Diamond Shamrock Co., 275 F.3d 414, 418 (5th Cir. 2001).

Territo alleges that during the time that Melford worked at Avondale, the company primarily constructed destroyer escorts for the U.S. Navy and lighter-aboard-ship ("LASH") commercial cargo vessels for the U.S. Department of Commerce, Maritime Administration.[5] Melford contends that he never worked on or

---

[3]For a discussion of the history of the statute, see Willingham v. Morgan, 395 U.S. 402, 405 (1969).

[4]The defendant must also show, as a preliminary matter, that it is a "person" within the meaning of the statute.  Winters, 149 F.3d at 398.  This requirement is not at issue here.

[5]The construction of the LASH vessels was subsidized by the government through the U.S. Maritime Administration's Maritime Subsidy Board.  The government controlled the design and construction of the vessels to ensure that they were suitable for national defense or military purposes in time of war or national emergency (doc. 27, Exhibit C).

4

around any military vessels or equipment (doc. 23, Exhibit A), so Territo contends that Melford's alleged exposure must have come from working around the LASH vessels (doc. 27, Exhibit B).  This allegation is supported by the affidavit of Danny Joyce, an environmental, health, and safety management consultant (doc. 27, Exhibit B).

According to Territo, the asbestos used in constructing the LASH vessels was required by plans and specifications controlled by the United States through the Secretary of Commerce Maritime Subsidy Board (doc. 27 at pp. 6-9, Exhibit C), and Avondale was obligated to use the asbestos-containing materials by its contract with the United States.  Territo provides the affidavit of Thomas McCaffery (doc. 27, Exhibit C), a research consultant in the area of government ship design, development, construction, maintenance, and repair records.  McCaffery avers that the specifications for the LASH vessels required the use of asbestos-containing products in the joiner work and pipe insulation (doc. 27, Exhibit C).

Territo alleges that "Avondale and its personnel were subject to rigorous safety and construction standards that were monitored on a regular basis by federal inspectors." (doc. 27 at p. 5).  Territo provides the affidavit of Edward Blanchard, a former Avondale supervisor who claims to have worked closely with various agencies, including the Maritime Commission, in constructing vessels for the U.S. government (doc. 27, Exhibit E).  Blanchard avers that all aspects of the work on the federal vessels were performed

5

> under close, constant, and detailed surveillance by the
> United States Navy, United States Coast Guard, and the
> Maritime Commission and other federal agencies . . . .
> This surveillance was exercised by written specifications
> and personal oversight and inspection of all Avondale
> work by Federal Inspectors. Virtually no aspect of the
> construction of Federal Vessels escaped this close
> monitoring.

(doc. 27, Exhibit E at ¶ 3). According to Blanchard, "[t]he Federal Inspectors

monitored every aspect of the construction of the vessels at Avondale from the

moment the materials to be used in the construction first arrived at Avondale until the

ship was fully outfitted and delivered." (doc. 27, Exhibit E at ¶ 10). Blanchard avers

that during construction, federal inspectors continuously inspected the vessels to

ensure that the work met the government's regulatory and contractual specifications

(doc. 27, Exhibit E at ¶ 5). Blanchard recalled that the head of Avondale's safety

department "frequently met with the Federal Inspectors to discuss safety issues

regarding the construction of Federal Vessels." (doc. 27, Exhibit E at ¶ 15).

Blanchard avers that safety inspectors from the Maritime Commission had the

authority to terminate a project if they believed the work was not being performed

safely (doc. 27, Exhibit E at ¶ 16).

Territo also submits his own affidavit in which he avers that during the

construction of the LASH vessels, daily inspections were conducted by inspectors

from the Maritime Administration and Coast Guard (doc. 27, Exhibit F). Territo

declares that safety inspectors from the Labor Management Standards

Administration routinely carried out inspections at Avondale to ensure compliance

with federal safety standards, including standards set out in the Walsh-Healy Public

Contracts Act (doc. 27, Exhibit F).

Finally, Territo asserts that the federal contractor defense and the Longshore

and Harbor Workers' Compensation Act ("LHWCA") shield him from Melford's claims

(doc. 1 at ¶ 5).

Under these facts and in light of his defenses, Territo contends that he is

entitled to removal under Section 1442.

Melford contends that Territo is not entitled to removal under Section 1442

because he cannot show that the federal government limited his ability to provide

safety warnings to Avondale employees concerning the dangers of asbestos. This

argument is based on a line of federal district court cases involving similar facts that

were remanded to state court because the removing defendant could not prove that

the federal government restricted the defendant's ability to warn the plaintiffs of the

dangers of asbestos. *See Savoie v. Northrop Grumman*, No. 05-2086 (E.D. La.

2005); *Mouton v. Flexitallic, Inc.*, 1999 WL 225438 (E.D. La.); *Guidroz v. Anchor

Packing*, No. 98-3709 (E.D. La. 1999); *Gauthe v. Asbestos Corp.*, 1997 WL 3255

(E.D. La.); *Overly v. Raybestos-Manhattan*, 1996 WL 532150 (N.D. Cal.); *Porche v.

Flexitallic, Inc.*, 1996 WL 603919 (E.D. La.).

The *Mouton* case is representative of this line of cases.  In *Mouton*, the

plaintiff sued Avondale and its executive officers for failing to warn him about the

7

dangers of asbestos and failing to provide a safe place to work. The defendants removed under Section 1442, claiming that they had acted under the authority of various branches of the government (the Navy, the Federal Maritime Commission) in building ships during the relevant time frame. The defendants asserted government contractor immunity and a defense under the LHWCA. The court granted a motion to remand by the plaintiff.

The court determined that the defendants had failed to establish a causal connection between the plaintiff's claims and the government's direction. While the defendants had presented evidence that the government controlled the specifications of the ships and performed safety inspections, the court found that the government had provided no direction concerning warnings and had not prevented Avondale from taking its own safety precautions. *Mouton*, 1999 WL 225438 at *2-*3. In reaching this conclusion, the court noted that the claims at issue were premises liability and negligence claims based on a failure to warn, not product liability or defective design claims. While the defendants' design contracts might have been evidence of a causal connection if products liability or defective design claims had been at issue, the court concluded that there was no causal connection between the government design contracts and the defendants' alleged negligence in failing to warn the plaintiff of the dangers of asbestos. *Id.* at *3.

This court finds that line of reasoning unpersuasive. We see no basis in the language of Section 1442 or in controlling authority for the requirement that a

8

defendant in a civil case show that the alleged wrongful act or omission was specifically directed or compelled by federal duty or law. To the contrary, controlling cases interpreting the statute have recognized that it is "neither 'limited' nor 'narrow,' but should be afforded a broad reading so as not to frustrate the statute's underlying rationale." *Winters*, 149 F.3d at 398 (quoting *Murray v. Murray*, 621 F.2d 103, 107 (5th Cir. 1980)); *see also State of Texas v. National Bank of Commerce of San Antonio*, 290 F.2d 229, 231, *cert. denied Falkner v. National Bank of Commerce of San Antonio, Texas*, 368 U.S. 832 (1961) (requiring only a "colorable claim that the appellees were acting under an officer of the United States and that the appellees were acting under color of law, as agents of the United States within the meaning of § 1442(a)(1)"). The requirement that the government has controlled the specific act at issue may have a place in determining the merits of the question of immunity, but the "test for removal should be broader, not narrower, than the test for official immunity." *Willingham*, 395 U.S. at 405. Therefore, this factor should not applied to limit removal under Section 1442, at least not without specific guidance from the Supreme Court or the Fifth Circuit.

This case involves the same federal interest that was at stake in *Winters*, namely, the ability of the federal government to order and obtain military equipment at a reasonable cost. *Winters*, 149 F.3d at 399-400. Melford's claims against Territo are based on exposure to asbestos at Avondale's shipyard. Territo alleges that the asbestos was present because it was required in construction contracts controlled

9

by the government.  Territo also alleges that the government was heavily involved
in all aspects of the construction of federal vessels, including safety.   If the
government representatives believed that work on a project at Avondale was being
done in an unsafe manner, it had the authority to shut down the project. The court
finds that the facts of this case are sufficient to demonstrate that Territo acted
pursuant to federal direction and that a causal connection exists between Territo's
alleged actions and Melford's claims.

The final requirement for removal under Section 1442 is the assertion of a
colorable federal defense.  As noted, Territo asserts the government contractor
defense under *Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988), and a defense
under the LHWCA.  Melford argues that neither defense has merit.  However, it is
not necessary for Territo to prove that his federal defense is meritorious, he need
only "articulate its 'colorable' applicability to the plaintiff's claims." *Winters*, 149 F.3d
at 400.  "[O]ne of the most important reasons for removal is to have the validity of the
defense of official immunity tried in federal court." *Willingham*, 395 U.S. at 407.
Under *Boyle*, a defendant is required to show the following:

> (1) the United States approved reasonably precise
> specifications; (2) the equipment conformed to those
> specifications; and (3) the supplier warned the United
> States about the dangers in the use of the equipment that
> were known to the supplier but not to the United States.

*Winters*, 149 F.3d at 400 (quoting *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512
(1988)).  In light of the facts discussed above, the court finds that Territo's assertion

10

of the government contractor defense is sufficiently colorable for removal under Section 1442.  The court need not address Territo's arguments under the LHWCA.

Accordingly, Territo has met the requirements established by controlling authority for removal under 28 U.S.C. § 1442(a)(1).

## CONCLUSION

For the foregoing reasons, the motion to remand (doc. 3) filed by the plaintiff, Daniel W. Melford, Sr., is hereby **DENIED**.

Baton Rouge, Louisiana, January 31, 2006.

JOHN V. PARKER
UNITED STATES DISTRICT JUDGE
MIDDLE DISTRICT OF LOUISIANA

11

**NORTHROP GRUMMAN**

Northrop Grumman Corporation
Ship Systems

P.O. Box 50280
New Orleans, LA 70150-0280
504-654-2121

### Certificate of Records

I, Stephen M. Robinson, Custodian of Records of Northrop Grumman Ship Systems, Inc.,

Avondale Operations, certify that the attached employment records of  __Byron Granier__

Are true and correct copies of all records kept by this office and that such records were kept

in the course and scope of business of this office.

_____
Custodian of Records


_____June 26, 2006_____
Date

**EXHIBIT**

D

| | | | | | | | 9/6/52 |
|---|---|---|---|---|---|---|---|
| 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 | | Granier, Byron John | | | F131562 | | BIRTHDATE |
| CREDIT | ADDRESS | | | | | | SPOUSE |
| 5/25/70 | 113 Martinez St. Thibodaux, La. 70303 | | | | 632-7381 | | Juliet |

| Date | Occupation | Rate | Supervisor | | Date | Occupation | Rate | Supervisor |
|---|---|---|---|---|---|---|---|---|
| 11/9/70 | Ins. Hlp. | 2.49 | Bordelon | | | PULMONARY FUNCTION TEST | | |
| 1/18/71 | GEN. INC. 4½% | 2.60 | | | | | | |
| 2/22/71 | Merit | 2.79 | | | | 6/25/75 Corrected Copy: Layoff lack of work | | |
| 5/24/71 | Merit | 2.95 | | | 8/27/75 | Reh. Ins. | 5.30 | Bordelon |
| 12/6/71 | 5th Clas Ins. | 3.38 | | | 9/1/75 | Gen'l Inc. | 6.00 | |
| 1/31/72 | 4th Class Ins. | 3.52 | | | 7-19-76 | Insulator Spec. | 6.16 | |
| 4/10/72 | 3rd Class Ins. | 3.72 | | | 9/20/76 | Gen'l Inc. | 6.59 | |
| 5/22/72 | Gen'l Raise | 3.92 | | | 10-7-76 | Assumed quit (1003 hrs.) port. 2 wks. | | |
| 8/7/72 | 2nd Class Ins. | 4.11 | | | | vac. due   ldw. 9-30-76 | | |
| 4-30-73 | GENERAL RAISE | 4.54 | | | | | | |
| 7/16/73 | 1st Cl. Ins. | 4.70 | | | | | | |
| 4/29/74 | General Raise | 4.98 | | | | | | |
| 11/4/74 | Gen'l Raise | 5.30 | | | | | | |
| 6-23-75 | Quit another job ldw 6-12-75 | | | | | | | |
| | (438 hrs) Portion 2 Weeks Vact. | | | | | | | |

| DATE | OCCUPATION | RATE | SUPERVISOR+SHIFT | DATE | OCCUPATION | RATE | SUPERVISOR+SHIFT |
|---|---|---|---|---|---|---|---|
| 899 | | | | | | | |

| DATE | TERMINATION INFORMATION | DATE | TERMINATION INFORMATION |
|---|---|---|---|
| 8-11-72 | c/o Bordelon | | |

| CLOCK NUMBER | NAME | | PR 2 | PR 4 |
|---|---|---|---|---|
| 11562 | Byron John Granier | | | |

WARNING NOTICE    ASH-126                                          AVONDALE SHIPYARDS, INC.

Name: _Byron Gramin_                                              Clock No. _11562_

Department: _Insulation_          Supt. or Dept. Head: _B. J. Bordelon, Jr._     Date: _4/13/71_

THIS WILL CONFIRM OUR CONVERSATION OF TODAY, IN WHICH YOU
WERE INFORMED OF THE FOLLOWING:

Please Check Infraction Number Below:

| GENERAL OFFENSE NO. | 1 | ✗ | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| 14 | 15 | Other | MAJOR OFFENSE NO. | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Date and Time of Issuance of Notice                 Date and Time of Offense  _4/12/71_

REASON FOR WARNING
(Explain Fully)   _Absenteeism_

_Was not feeling to Good
After the Big Big Party
at (Nicks)_

_B. J. Bordelon Jr._                        _Byron J Gramin_
Supv. or Department Head                    Employee Acknowledgment

WITNESS _____

EMPLOYEE COMMENT: _None_

WHITE-ORIGINAL TO EMPLOYEE / PINK COPY FOR SUPV. FILE / GREEN COPY TO PERSONNEL

EMPLOYMENT SINCE TERMINATION—Rehire

| | | | | JOB & STATE | SUPERVISORS & POSITION |
|---|---|---|---|---|---|

| 11562 | Byron John Granier | | | | 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 |

Kraemer, La.                                              633-2196

born: 9—6-52                single

| DATE | | | | OPERATION | | | | |
|---|---|---|---|---|---|---|---|---|
| 5-2-70 | Yard Clerk | 1.85 | Bordelon 1-E | | | | | |
| 9/4/70 | Merit | 2.20 | | | | | | |
| 12/9/70 | Merit | 2.49 | | | | | | |
| 11/16/70 | Recl. Ins. Hlp. | 2.49 | | | | | | |



AVONDALE SHIPYARDS INC

UNITED STATES

Donald Bone

Carine Bone

DO NOT WRITE BELOW THIS SPACE

10-4-76                              TERMINATION

GRANIER, BYRON J.
11562
INSULATION DEPT.


Continued . . . .

    If this man should return to work at Avondale, with his
experience, he should return to the Insulation Dept. of which
he is qualified.

    He is not to be re-hired without the consent of Vice President
Duane Clark, who is familiar with this case.

PERSONNEL CHANGE OF INFORMATION

PRESENT STATUS

FLSA Status:  ☐ Exempt   ☐ Non Exempt

PROPOSED SETUP

NEXT TO LAST SALARY CHANGE

Would you recommend this person for Rehire?   YES

☐ General Offense   ☐ Major Offense   ☐ Immediate Discharge Offense   ☐ Quit   ☐ Layoff

I understand and agree that failure to report for work at the conclusion of the Leave of Absence on the date specified above, I will be subject to termination. The purpose of a Leave of Absence is to grant an employee time away from the job for reasons over which he has little or no control which include personal problems. It is not acceptable to grant a Leave of Absence for employment outside the company.

_____   _____   _____
Employee Signature            Date                        Witness

THIS EMPLOYEE IS QUITTING BECAUSE
HE HAS ANOTHER JOB.

APPROVALS

PERSONNEL CONTROL COPY

EMPLOYMENT APPLICATION

AVONDALE SHIPYARDS, Inc. ☐  HAVE BOAT DIV. ☐  STANDARD PAINT & VARNISH ☐  INDUSTRIAL DIV. ☐  STEEL SALES DIV. ☐
SERVICE FOUNDRY DIV. ☐  AVONCRAFT DIV. ☐  BAYOU BLACK DIV. ☐

☐ Married  ☐ Single  ☐ Divorced  ☐ Widowed

SCHOOLS

PRESENT MILITARY STATUS
☐ Reserves   ☐ National Guard

☐ No Affiliation

GRADUATED
☐ Yes  ☐ No
☐ Yes  ☐ No
☐ Yes  ☐ No
☐ Yes  ☐ No

AVONDALE SHIPYARDS, INC.

AVONDALE SHIPYARDS, INC.

PERSONNEL/PAYROLL CHANGE AUTHORIZATION

CODE FOR TYPE
1. Promotion   4. Decrease
2. Merit       5. General
3. In Grade Increase

CODE FOR GRADES
1. Pool        4. Skilled
2. Tech        5. Semi-skilled
3. Unskilled   7. Supervisory

Employee No. **770562**

Date Prepared **6/25/73**   Effective Date **6/25/73**

Explanation to AEIO: *Counted copy - layoff - reduction in force*

PERSONNEL CONTROL COPY

AVONDALE SHIPYARDS, INC.

**PERSONNEL/PAYROLL CHANGE AUTHORIZATION**

| CODE FOR TYPE* | CODE FOR GRADES* |
|---|---|
| 1. Promotion    6. Demotion | 1. Prof.    4. Skilled |
| 2. Merit    5. General | 2. Tech.    5. Semiskilled |
| 3. In Grade Increase | 3. Clerical    9. Unskilled |
|  | 7. Supervisory |

Name: Last — GRANIER    First — BYRON    Middle — J.

Employee No. — 11562    Division — MFD

Date Prepared — 10/9/72    Effective Date — 10/1/72

Home Address

City    State

**Type of Change:**
☐ Salary Change   ☐ Transfer   ☐ Re-classification   ☐ Leave of Absence   ☒ Termination   ☐ Other (explain)

PRESENT STATUS (Fill in for all changes)    PROPOSED STATUS

Hourly, Weekly, or Monthly Rate    Annual

$6.52    $16,337.56*    % increase $    Salary Grade

Job Title

INSULATOR   PREMIUM    (FILLER)

Division    Sufor. Code

MAIN PLANT

Dept.

INSULATION

Work Location

WET DOCK #1

FLSA Status    FLSA Status
☐ Exempt   ☒ Non Exempt    ☐ Exempt   ☐ Non Exempt

LAST SALARY CHANGE    NEXT TO LAST SALARY CHANGE

| Amount | Hrly./Wkly./Mo. | Type* | Amount | Hrly./Wkly./Mo. | Eff. Date | Type* |
|---|---|---|---|---|---|---|
| $ |  |  | $ |  |  |  |

Is Replacement Necessary?

**TERMINATION**

Would You Re-Employ on His Job

Vacation Status — NO    ☐ Voluntary ☐ Quit ☐ Layoff    ☐ Involuntary ☐ Discharge ☐ Other

☐ Bonus Due

**LEAVE OF ABSENCE**

From

☐ Inclusive   ☐ With Pay   ☐ Without Pay

I understand and agree that failure to report for work at the expiration of the Leave of Absence on the date specified above, I will be subject to Termination. The purpose of a Leave of Absence is to grant an employee time away from the job for reasons of which he has little or no control, which includes personal problems. It is not acceptable to grant a Leave of Absence for employment outside the company.

Employee Signature    Date    Witness

**Explanation for Action:**    This employee has quit Avondale for the second time because he saw fit that he should be transferred to the Electrical Dept. Previously, he had been loaned out to the Electrical Dept. for two 30 day periods for emergency reasons as a helper. He has been working for the Insulation Dept. for 6½ years. With the work load we have in the Insulation Dept. we cannot afford to transfer this employee.   (SEE ATTACHED)

**APPROVALS**

Immediate Supv.    Date    Next in Line (optional)    Date    Approved

Personnel Approval

**PERSONNEL USE ONLY**

Date of Birth    Employment Date    Social Security No.

☐ Male ☒ Female   ☐ Single ☐ Married   ☐ U.S. Citizen ☐ Other

PERSONNEL CONTROL COPY

| DATE | DIAGNOSIS | TREATMENT |
|---|---|---|
| | | |

**MEDICAL RECORD** — AGI DATE R 19 RAA

CLK. NO. 1862   NAME Byron O. Gremie   9-6-52   DATE 5-18-70

CHECK ANSWERS TO QUESTIONS BELOW. WITHHOLDING INFORMATION MAY DISQUALIFY YOU FOR EMPLOYM

| | | | | | |
|---|---|---|---|---|---|
| 1. HAVE YOU EVER BEEN TREATED FOR: | Tuberculosis ☐ Yes ☑ No | High Blood Pressure ☐ Yes ☑ No | Diabetes ☐ Yes ☑ No | Asthma ☐ Ye |
| 2. HAVE YOU EVER HAD ANY OPERATIONS? | ☑ Yes ☐ No | | | |
| 3. HAVE YOU EVER HAD TROUBLE WITH: | Your Eyes ☐ Yes ☑ No | Your Legs ☐ Yes ☑ No | Your Back ☐ Yes ☑ No | |
| 4. HAVE YOU EVER HAD A RUPTURE? | ☐ Yes ☑ No | | | |
| 5. HAVE YOU EVER HAD ANY BAD: | Cuts ☐ Yes ☑ No | Bruises ☐ Yes ☑ No | Bone Breaks ☐ Yes ☑ No | Rashes ☐ Ye |
| 6. GIVE DATE OF THE LAST TIME YOU SAW A DOCTOR FOR PERSONAL REASONS: | | | Reason | |
| 7. GIVE DATE OF LAST PHYSICAL EXAMINATION FOR EMPLOYMENT: | | | Company | |
| 8. HAVE YOU EVER RECEIVED WORKMANS COMPENSATION FOR ACCIDENT OR ILLNESS? | ☐ Yes ☐ No | | | |
| 9. HAVE YOU EVER RECEIVED ANY PAYMENT FOR PERSONAL INJURIES OF ANY NATURE? | ☐ Yes ☑ No | | | |
| 10. HAVE YOU EVER HAD ANY MEDICAL OR PHYSICAL TROUBLE NOT MENTIONED ABOVE? | ☐ Yes ☑ No | | | |

DATE 5-18-70   SIGNED Byron Gremie

| PLACE | EXAM | EXAM | EXAM | EXAM | EXAM |
|---|---|---|---|---|---|
| 1. a. Pulse | 76 | | | | |
| b. Appearance | ✓ | | | | |
| c. Intelligence | ✓ | | | | |
| 2. VISION Without glasses | R.20/20 L.20/20 | R.20/ L.20/ | R.20/ L.20/ | R.20/ L.20/ | R.20/ L.20/ |
| With glasses | R.20/ L.20/ | R.20/ L.20/ | R.20/ L.20/ | R.20/ L.20/ | R.20/ L.20/ |
| 3. HEARING | ✓ | | | | |
| 4. NOSE | ✓ | | | | |
| 5. THROAT | ✓ | | | | |
| 6. TEETH | ✓ | | | | |
| 7. GUMS | ✓ | | | | |
| 8. HEART a. Size | ✓ | | | | |
| b. Rhythm | ✓ | | | | |
| c. Murmurs | ✓ | | | | |
| d. Blood press. | S. 130 D. 70 | S. D. | S. D. | S. D. | S. D. |
| 9. LUNGS | ✓ | | | | |
| 10. ABDOMEN | ✓ | | | | |
| 11. INGUINAL REGION | ✓ | | | | |
| 12. GENITALS | ✓ | | | | |
| 13. GLANDS | ✓ | | | | |
| 14. EXTREMITIES | ✓ | | | | |
| 15. SKIN | ✓ | | | | |
| 16. NERVOUS SYSTEM | ✓ | | | | |
| 17. IMPAIRMENTS | ✓ | | | | |
| 18. ACTION | ACCEPT ✓ | | | | |
| | PROV. | | | | |
| | | | | | |

REPORT FOR PHYSICAL EXAMINATION     No. #11582

To: PLANT PHYSICIAN                     Date 6/18/70

| EMPLOYEE | DATE HIRED | DEPARTMENT |
|----------|------------|------------|
| Byron J. GRANIER | 5/23/70 | yard clk. |

| THIS EMPLOYEE WILL REPORT FOR PHYSICAL EXAMINATION ON | DATE TO REPORT | TIME |
|---|---|---|
| | 6/18/70 | ☒ A.M. ☐ P.M. |

| LAST DATE EXAMINED | ☒ O.K. | ☐ REJ. | SUPERINTENDENT Bordelon |
|---|---|---|---|

RULES FOR EMPLOYMENT: No one will be employed who has not been examined and approved as acceptable for employment by the Plant Physician.

All employees must perform their work carefully and avoid any cause of injury to themselves or others by strict compliance with the "Safety" rules and regulations of the Company.

All Employees are required by Company Policy to wear regulation safety hat & safety toe shoes.

Smoking is positively forbidden at all times in restricted areas of the plant.

Employees must pay the cost of any tools which they may lose or which have been loaned to them for use and which are not returned upon demand or when leaving the employ of Avondale Shipyards, Inc.

Boisterous conduct, running, horseplay, drunkenness, sleeping, and similar misconduct while at work will subject an employee to immediate and final discharge.

All injuries occurring to an employee, including the slightest scratches or bruises, must be reported immediately by him to his foreman for treatment at the "First Aid" Station.

Any injuries to employees will be treated by physicians selected by Avondale Shipyards, Inc. which disclaims any responsibility if the employee refuses to accept treatment by such physicians.

All of the above policies will be strictly enforced by imposing penalties on violators.

In accepting employment with Avondale Shipyards, Inc. I understand that I must conform to the rules printed upon the face of this form as a condition of my employment and that any disobedience by me of these rules will be sufficient cause for my discharge.

No guarantee or agreement has been made as to length of service and Avondale Shipyards, Inc. is permitted to pay me daily, weekly, or semi-monthly and to change its method of payment at its option without incurring any obligation to pay me for any period beyond that for which service shall have been actually rendered. 1677 Westbank Exp. - Marrero, La.

Dr. Gidman

SIGNED 

MEDICAL RECORD — SF 18 (10-0-71)                              9/6/52

Position Applying For
Insolator

Check No.
1562

Name
Byron Granier

Reemp.    ☒ Yes   ☐ No

Diabetes  ☐ Yes   ☒ No

1. Have You Ever Been Treated for Asthma?  ☐ Yes  ☒ No          High Blood Pressure  ☐ Yes  ☒ No

2. Have You Ever Had a Settlement for Injuries On or Off the Job?   Explain:
   ☐ Yes  ☒ No

3. Have You Ever Had Any Operations?        Explain: Tonsils
   ☐ Yes  ☒ No

4. Have You Ever Had Eye Trouble?    If Yes, When:              Was it Job Connected
   ☐ Yes  ☒ No                                                 ☐ Yes  ☐ No

5. Have You Ever Had Medical Problems With:
   Eyes ☐ Yes  ☒ No    Ears ☐ Yes  ☒ No    Nose/Throat ☐ Yes ☒ No    Have You Ever Had a Bone Break?  ☐ Yes  ☒ No    If Yes, When

6. When Did You Last See a Doctor?   check-up

7. Where Did You Have Your Last Physical?   Company Name:

8. Have You Ever Had Back Trouble?    Date                                D/A
   ☐ Yes  ☒ No

9. Was This Condition Job Related?    If Yes, Name of Company?
   ☐ Yes  ☒ No

10. Have You Ever Collected Disability Benefits Under a Group Insurance Plan?  ☐ Yes  ☒ No    If Yes, For What Condition (Include Date)

11. Have You Ever Had a Job Connected Injury?   If Yes, Did You Draw Workmen's Compensation & Medical Benefits?
    ☐ Yes  ☒ No                                                ☐ Yes  ☐ No

12. List the Job Connected Injuries, Including the Date, Nature of Injury and Company.

    N/A

13. Do You Have a Pending Law Suit?    If Yes, Explain:
    ☐ Yes  ☒ No

14. Have You Ever Had Any Mental or Physical Trouble Not Mentioned Above?  ☐ Yes  ☒ No    If Yes, Explain:

Date  8/26/75          Signed  X Byron J. Granier

| | EXAM | | | EXAM | | | EXAM |
|---|---|---|---|---|---|---|---|
| Pulse | 72 | 8 Teeth | | 15 Abdomen | | | |
| 2 Vision Without Glasses R20 L20 | | 9 Gums | | 16 Extremities | | | |
| 3 Hearing | | 10 Lungs | | 17 Skin | | | |
| 4 Nose | | 11 Heart a Size | | 18 Nervous System | | | |
| 5 Throat | | b Rhythm | Reg | 19 Blood Pressure | 112/78 | | |
| 6 Genitals | | 13 | | 20 | | | |
| 7 Glands | | 14 | | 21 | | | |

Accept

Risk _____ Reason

Reject _____ Reason

Comments

Examining Physician

REPORT FOR PHYSICAL EXAMINATION

Rehire /# 1562

AGI 29 (R 11/71)

To: PLANT PHYSICIAN

Today's Date 8/26/75

Employee

Byron Granier

Date Hired 8/27/75

Department Insulator

THIS EMPLOYEE WILL REPORT FOR PHYSICAL EXAMINATION ON

Date to Report 8/26/75    Time    ☒ A.M. ☐ P.M.

Last Date Examined    ☒ O.K.    ☐ N.O.

Superintendent Bordelon

In accepting employment with Avondale Shipyards, Inc. I understand that I must conform to company policy and all other company rules and regulations, as a condition of my employment and that any disobedience by me of these rules will be sufficient cause for my discharge.

No guarantee or agreement has been made as to length of service and Avondale Shipyards, Inc. is permitted to pay me daily, weekly, or semi-monthly and to change its method of payment at its option without incurring any obligation to pay me for any period beyond that for which service shall have been actually rendered.

Signed X Byron J. Granier



WEST JEFFERSON X-RAY
*A Medical Corporation*
ALBERT I. HENDLER, M.D.
Radiologist
920 AVENUE C
MARRERO, LOUISIANA 70072
340.2151

AVONDALE MAINYARD
BADGE # 11562

PATIENT'S NAME ___BYRON GRANIER___ DATE ___6/6/75___

REFERRING PHYSICIAN ___DR. GIDMAN___ X-RAY NUMBER ___1542___

EXAMINATION: CHEST: Cardiac, hilar and mediastinal shadows do not
appear unusual. Both lung fields and angles appe
clear. Sixth anterior rib on the right is bifid.

Thank you for referring this patient.

Yours truly,

Albert I. Hendler, M.D.

Case MDL No. 875   Document 4911   Filed 11/03/06   Page 91 of 404

PATIENT RECORD FORM FOR DETECTION OF LUNG DISEASE

DATE

NAME _Bryan   Grover   #1560_

| HEIGHT | AGE | WEIGHT |
|--------|-----|--------|

FOR FILE, STAPLE SPIROGRAM HERE

## GRATICULE

FEV(1.0)

LITERS

1 2 3 4 5 6 7 8 9 10

FEV (1.0)

SECONDS

## DYNAMIC FLOW RATE PROTRACTOR
LITERS/SEC

0

0.25

0.5

1.0

1.5

MMV TIME SCALE-SECONDS

— FOLD HERE —

## PREDICTED VALUES

FORCED VITAL CAPACITY _____

FORCED EXPIRATORY
VOLUME IN ONE SECOND _____

FORCED EXPIRATORY FLOW
FEF (200-1200) _____ L/SEC

FORCED EXPIRATORY FLOW
FEF (25% - 75%) _____ L/SEC

MAXIMUM VOLUNTARY VENTILATION
MVV _____ L/MIN

VITAL CAPACITY _____

REMARKS _____

## OBSERVED VALUES

FVC _4.6_

FEV (1.0) _4.2_

FEF (200 - 1200) _____ L/SEC

FEF (25% - 75%) _____ L/SEC

MVV (EST) _____ L/MIN

VC _____

## IMPORTANT RATIOS

$\frac{FVC\ (OBS)}{FVC\ (PRE)} \times 100 =$ _____ %

$\frac{FEV\ (1.0)(OBS)}{FEV\ (1.0)(PRE)} \times 100 =$ _____ %

$\frac{FEV\ (1.0)(OBS)}{FVC\ (OBS)} \times 100 =$ _92_ %

PATIENT COOPERATION

GOOD   FAIR   POOR

☐       ☐      ☐

PREPARED BY _____

EVALUATION

NORMAL        REQUIRED COMPLETE
                  WORK UP

☐                    ☐

EVALUATED BY _____

PHYSICIAN

spirostat   PHOTOMETRIC RECORDING SPIROMETER

PHARMACEUTICAL DIVISION
MARION
LABORATORIES, INC.

PROGRESS REPORT                                                    AVONDALE SHIPYARDS, IN(

Minor Industrial Injuries

No. 11562

Byron Granier

| DATE | PROGRESS |
|------|----------|
| 9-20-71 | 2- Burned lt upper arm on hot plate, sm burn, Butesin TT mos. ago |
| 4-12-72 | 2- b sion t mid fg , me th had toxoid 3motnths ago |
| 4-13-72 | 2- rt mid fg , fu-acin eck am |
| 10-11-72 | 1- sm lac rt ind fgr furacin recent tt |
| 11-16-72 | 2- Flash both eyes, Pont. Zinc |
| 12-12-72 | 2- minor burn rt lower arm, furacin tet tox ½cc reck am |
| 4-7-73 | 1- Abr. minor of rt thumb, and rt dorsum. |
| 7-2 -73 | 1- rt thumb lac dietal tip at nail merth /tettox ½ cc/ given |
| 9-4-73 | 2- sm piece fiberglass glue went in rt eye, BAW Neosporin reck in 2 hrs. not wearl safety glasses |
| 8-19-74 | 1- abras rt wrist / merth T, 2 mos . ago |
| 9-24-75 | 2- lac. lt ind. fgr, merth. |
| 11/17/75 | 1/ Abr. lt arm, merth. |
| 5-18-76. | 1/ sup.burn rt thumb, silvadene |
| 8/26/76 | 1/ flash ou opthanie zinc |



WEST JEFFERSON X-RAY
*A Medical Corporation*
ALBERT I. HENDLER, M.D.
Radiologist
920 AVENUE C
MARRERO, LOUISIANA 70072
340-2151

MAINYARD BADGE 11562

PATIENT'S NAME ___BYRON GRANIER___ DATE __8/4/76__

REFERRING PHYSICIAN ___DR. GIDMAN___ X-RAY NUMBER __1586__

EXAMINATION:

CHEST: Comparison with previous study of 6-6-75
reveals no significant change.
IMPRESSION: NO EVIDENCE OF ACTIVE PULMONARY OR CARDIAC
PATHOLOGY.
BIFID 6TH RIGHT ANTERIOR RIB

Thank you for referring this patient.

Yours truly,

Albert I. Hendler, M.D.

11562

CERTIFICATE
FOR RETURN TO SCHOOL OR WORK

_____ Byron J. Granier _____ has been under

my care from __7/5/71__ to __7/12/71__

and is able to return to ~~school~~ work on: __7/13/71__

Limitations/Remarks: _____

_____

Dr. _____

Address __209 East 3rd St., Thibodaux, La__

Phone __44-7-2021__ Date __7/17/71__


CERTIFICATE
FOR RETURN TO SCHOOL OR WORK

11562

_Byron Granier_ has been under

my care from __7/2/76__ to __7/9/76__

and is able to return to school/work on: __7/12/76__

Remarks: _Was seen in
Dr. Calecas office this
morning_

Dr. _Raymond Calecas_

Address _____

Phone _____

PROGRESS REPORT

AVONDALE SHIPYARDS, INC.

Reg. No. 11562

Personal

Name: Byron Granier

Foreman

| DATE | PROGRESS |
|------|----------|
| 9-10-70 | Sta #1- Rt eye, B&W |
| 7-19-71 | 1- Off 2 weeks with cut foot, sutures removed, well healed, RTW -personal. |
| 9-21-71 | 2- Pass out vomiting 8:55 |
| 9-23-71 | 2- RTW, out since Tues- Virus |
| 3-1-73 | 2- complains of discomfort of chest, req passout to see FMD, given 7:40am. BP 120/80 pulse 80 |
| 3-2-73 | 2- RTW has slip, BP 120/70 states not getting enough rest and nervous about getting married |
| 3-5-75 | 2- pass out chils, fever, given 8:30am |
| 3-7-75 | 2- RTW out 2 days with cold no slip |
| 6-9-75 | 3- RTW out ½ day with h/a no slip |
| 7/12/76 | Well Eval. |
| | [signature] |
| | [signature] |
| 7/13/76 | 2 left little finger DD to cut sutured per FMD sutures removed per FMD |

REPORT OF ACCIDENT

AVONDALE SHIPYARDS, INC.

202A

| Byron Granier | | Badge/Clock No. 11562 | Age 23 | Occupation Electrician |
| | | Date Accident 3/16/76 | Time 10:40am | Shift day |
| | Where Rec'd | Date Reported 3/16/76 | | |
| Siegal | Electric | | Where Accident Occurred LNG#2 -main deck | |

States" Carrying torch hose,it got hooked and I fell on strongback."

Abrasion lt lower buttock area.Ice.Sulfamylon drs. States"TT last monght APCs. RC in AM.

| | | Approx. Visits |
| | PROGRESS | |
| 3/17/76 | lt buttocks healing well.prn | |

L. Golde , P.A.

REPORT OF ACCIDENT

Str #1                    2 rl              AVONDALE SHIPYARDS, INC.
    Byron Granier                          11562        23    Layout elect
                                           Date of Accident           Time      Shift
                                              2/13/76           9:45      day
                                              same

Mancuso                    Elect                    LNG 2

Walking with a piece of angle iron, turned around angle hit bridge of nose.
Deep lac bridge of nose.  S To see Dr  States tetanus  about a yr ago!

_Lac bridge nose_
_neat Local — Dressed_

2-15-76   1/ nose, JD
2-17-76   1/ nose J D
2-24-     1/ sutures removed bridge of nose, healed clean.

REPORT OF ACCIDENT

AVONDALE SHIPYARDS, INC.

| Name | Byron Granier | Badge Check No. 11562 | Age 23 | Occupation tacker |
| | | Date of Accident 12/5/75 | | Time 3:15PM | Shift day |
| Address | | | |
| City, State, Zip Code | | Phone No. | Date Reported |
| Foreman | Steegal | Department elect | Where Accident Occurred #2LNG |

wrapping up some junction boxes-pipe bolt fell from above hitting rt cheek
rt cheek- contusion and sm lac- merth Ice cap

Explanation:

Diagnosis:

Treatment:

Aprox. Disability

Aprox. Visits

PROGRESS

REPORT OF ACCIDENT

AVONDALE SHIPYARDS, INC.

| Name | Badge No. | Age | Occupation |
|------|-----------|-----|------------|
| Byron Grunler | 11562 | 21 | insulator |

| Date of Accident | Time | Shift |
|------|------|-------|
| 8/19/74 | 2:40 | day |

Date Reported
8/20/74

| Foreman | Department | Where Accident Occurred |
|---------|-----------|------------------------|
| Pownel | Insulating | DR 1097 |

History

Taping overhead with fiberglass tape, y brought rt. arm down hitting it against cooling coil of air conditioner. Sm. lac. L. elbow. Tetanus ace Tet. box Ice given. Recheck in AM.

Examination

Diagnosis

Treatment

Approx. Visits

Medical Disability

| DATE | PROGRESS |
|------|----------|

*Worley* R.N.

REPORT OF ACCIDENT

AVONDALE SHIPYARDS, INC.

Insulation man

States while working smashed finger with pliers......contusion of rt. index finger.

......refr........ld......soaks at home...Rck to wk.

PROGRESS

AVONDALE SHIPYARDS, INC.
P. O. BOX 50280
NEW ORLEANS, LOUISIANA 70150

REQUEST FOR MEDICAL INFORMATION

Attention: Medical Department

Re: _____ Date: 3-1-73

For intelligent assignment of work on your release of the above named employee, the Company Physician requests the following data:

Date of Origin of Medical Condition: 3-1-73

Diagnosis: _____

Treatment — Period of: 3-1-73

Treatment — Nature of: _____

Drugs Which May Impair Efficiency or Constitute Hazard:

Pertinent Lab. — EKG, X-ray, Etc., Reports:

Prognosis: _____

Date Patient Released For Work: 3-2-73

_____ M.D.

Work Limitations: (Specify Extent of Capability and Time Limitations)

Lifting:

Climbing:

Walking:

Other:

Work Surroundings: (Dust, Fumes, Heat, Etc.)

General Comments:

PATIENT RECORD FORM FOR DETECTION OF LUNG DISEASE

DATE _____

| HEIGHT | AGE | WEIGHT | FOR FILE, STAPLE SPIROGRAM HERE |
|--------|-----|--------|--------------------------------|

### GRATICULE

FEV (1.0)

LITERS

1 2 3 4 5 6 7 8 9 10
FEV (1.0)

SECONDS

### DYNAMIC FLOW RATE PROTRACTOR
LITERS/SEC.

0
0.25
0.5
1.0
1.5

MMV TIME SCALE SECONDS

---

FOLD HERE

---

| PREDICTED VALUES | OBSERVED VALUES | IMPORTANT RATIOS |
|------------------|-----------------|------------------|

PREDICTED VALUES

FORCED VITAL CAPACITY _____

FORCED EXPIRATORY
VOLUME IN ONE SECOND _____

FORCED EXPIRATORY FLOW
FEF (200-1200) _____ L/SEC.

FORCED EXPIRATORY FLOW
FEF (25%-75%) _____ L/SEC.

MAXIMUM VOLUNTARY VENTILATION _____ L/MIN.

VITAL CAPACITY _____

REMARKS _____

OBSERVED VALUES

FVC _____

FEV (1.0) _____

FEF (200-1200) _____ L/SEC.

FEF (25%-75%) _____ L/SEC.

MMV (EST.) _____ L/MIN.

VC _____

IMPORTANT RATIOS

$\frac{FVC (OBS)}{FVC (PRE)}$ X 100 = _____ %

$\frac{FEV (1.0)(OBS)}{FEV (1.0)(PRE)}$ X 100 = _____ %

$\frac{FEV (1.0)(OBS)}{FVC (OBS)}$ X 100 = __96__ %

PATIENT COOPERATION

GOOD ☐   FAIR ☐   POOR ☐

PREPARED BY _____

EVALUATION

NORMAL ☐   REQUIRED COMPLETE WORK UP ☐

EVALUATED BY _____ PHYSICIAN

spirostat ® PHOTOMETRIC RECORDING SPIROMETER

PHARMACEUTICAL DIVISION
MARION LABORATORIES, INC.
KANSAS CITY, MISSOURI 64137

REPORT OF ACCIDENT

AVONDALE SHIPYARDS, INC.

| Name | Station/Clock No. | Age | Occupation |
|---|---|---|---|
| BYRON GRANIER | 11562 | 20 | INSULATOR |
| | Date of Accident | | Time / Shift |
| | 9/22/72 | | BEFORE LUNCH DAY |
| | Date Reported | | |
| | 12:40 PM | | |

| Foreman | Occupation | Where Accident Occurred |
|---|---|---|
| J BOWMAN | INSULATOR | DE # 1090 FED |

**History**

AFTERSTEERING, UNHOOKING FIBERGLASS, STATES TWISTED BACK

PAIN RT POST THORACIC REGION REFER MAIN FOR HEAT

**Examination**

**Diagnosis**

**Treatment**

**Approx. Disability**

**Approx. Visits**

| DATE | PROGRESS |
|---|---|
| 9-26-72 | 2- c/o stiffness of back ref to main for heat |
| 9-26-72 | 1- heat to back |

REPORT OF ACCIDENT

AVONDALE SHIPYARDS, INC.

| | | Badge/Clock No. | Age | Occupation |
|---|---|---|---|---|
| BYRON GRAVITTS | | | 19 | INSULATOR |

| | Date of Accident | Time | Shift |
|---|---|---|---|
| | 5-19-72 | 9:25 A.M. | DAY |

**Location**

BOURGEOIS | INSULATION | Where Accident Occurred D.E. 1000 FED.

**History**

STATES THAT WHILE CLEANING A KNIFE IT SLIPPED AND CUT FINGER.....
LEFT LEFT MIDDLE FINGER....LAST TET. IN AUG. 1971....D.D. TO FINGER
REF. TO MAIN FIRST AID.

**Examination**

**Diagnosis**

**Treatment**

**Approx. Disability** | **Approx. Visits**

| DATE | PROGRESS |
|---|---|
| 5-20-72 | 2- DD to lt mid fgr. |
| 5-21-72 | 2- DD to lt mid fgr. |
| 5-22-72 | 2- DD |
| 5-23-72 | 2- reck lt mid fgr----DD |
| 5-24-72 | 2- merth.DD hot soaks |

E. Mata, R.N.

REPORT OF ACCIDENT
AS-347 (R 5/61)

AVONDALE SHIPYARDS, INC.

| Name | | | Badge/Clock No. | | Age | Occupation |
|---|---|---|---|---|---|---|
| DAVID CRAMER | | | | | 19 | INSULATOR |
| Address | | | Date of Accident | | Time | Shift |
| | | Phone No. | Date Reported 1/11/77 | 8:30AM | ? | DAY |

| Foreman | Department | Where Accident Occurred |
|---|---|---|
| PENDELON | INSULATION | FED |

History: WALKING BACK AND FORTH FROM SHOP TO BOAT ALL DAY LONG, HAULING MATERIAL, STATES

HAS PULLED MUSCLE RT ANTICUBITAL SPACE COMPLAINS OF PULLING AT TIMES. APC X 2

REFER DR AT 11

Examination

Diagnosis

Treatment

Approx. Disability

Approx. Visits

| DATE | PROGRESS |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Case MDL No. 875   Document 4911   Filed 11/03/06   Page 106 of 404

REPORT OF ACCIDENT

AVONDALE SHIPYARDS, INC.

| Name | Badge/Clock No. | Age | Occupation |
|------|------|------|------|
| BYRON GRANIER | 11562 | 19 | INSULATOR |

| Address | Date of Accident | Time | Shift |
|------|------|------|------|
| | 1/10/72  4/11/71 | 6:40 AM  ? | DAY |

| Foreman | | Where Accident Occurred | |
|------|------|------|------|
| BORDELON | INSULATION | DE # 1586   FED |

**History**
WALKING BACK AND FORTH FROM SHOP TO BOAT ALL DAY LONG, HAULING MATERIAL,   STATE
HAS PULLED MUSCLE RT ANTICUBITAL SPACE COMPLAINS OF PULLING AT TIMES.   APC X 2

REFER DR AT 11

**Examination:**

**Diagnosis:**

**Treatment:**

| Approx. Disability | O | Approx. Visits | O — 1 |
|------|------|------|------|

| DATE | | PROGRESS | |
|------|------|------|------|
| | | | |

REPORT OF ACCIDENT

AVONDALE SHIPYARDS, INC.

202A

| Name | Badge/Clock No. | Age | Occupation |
|------|------|------|------|
| Myron Granier | 11562 | 18 | Insulation |

| Date of Accident | Time | Shift |
|------|------|------|
| 8-2-71 | 3:20 | day |

Date Reported: same

| Foreman | Department | Where Accident Occurred |
|------|------|------|
| Bordelon | Insulation | DE#1883    FED |

**History:**

ECm 3, tearing cloth and it gave hand hit stud.

Puncture right hand top of little finger. Merth. TT given Rech in am.

**Examination:**

**Diagnosis:**

**Treatment:**

**Approx. Disability:**

**Approx. Visits:**

| DATE | PROGRESS |
|------|------|
| | |

11562

HOLIDAY PAY

July 7, 1971

Shirley:

This man is not able to see you personally.  Please file this slip in his folder.

Thank you,

Elsa

REPORT OF ACCIDENT

337

AVONDALE SHIPYARDS, INC.

| Name | | Badge/Clock No. | | Age | Occupation |
|------|---|------|---|-----|-----|
| Byron Granier | | 11562 | | 18 | Insulator |

| | Date of Accident | Time | Shift |
|---|---|---|---|
| | xxx 5/18/71 | 11:25 | A.M. |

Date Reported

5/18/71

| Foreman | Department | Where Accident Occurred |
|---------|-----------|------------------------|
| Bordelon | Insulator | DE 1081 |

**History**

Putting in Insulation When a Grinding gun fell on Lt. arm. causing

a Hematoma of Lt arm. Ice Cap to See doctor

**Examination**

**Diagnosis**

Minor abrasion ℓ lat. elbow

**Treatment**

Dress

**Approx. Disability** ◯    **Approx. Visit** ◯

| DATE | PROGRESS |
|------|----------|
| 5-18-71 | 1- reck lt arm, ok released |

REPORT OF ACCIDENT

AVONDALE SHIPYARDS, INC.

| | | Badge/Clock No | Age | Occupation |
| --- | --- | --- | --- | --- |
| Name | | | 48 | Installator |
| Address | | Date of Accident | | Time | Shift |
| | | Date Reported | | 12:35 | |
| Foreman | Department: | | Where Accident Occurred |
| | | | |

Injury

Examination

Diagnosis

Treatment

| Approx. Disability | | Approx. Visits |
| --- | --- | --- |

| DATE | PROGRESS |
| --- | --- |
| 4-27-71 | Sta#1- reck nose, Merth. reck arm |

REPORT OF ACCIDENT

AVONDALE SHIPYARDS, INC.

| Name | | Badge/Clock No. | Age | Occupation |
|---|---|---|---|---|
| ____ Tron Spanier | | 1162 | 18 | Isulator |
| Address | | Date of Accident | Time | Shift |
| | | 4/22/71 | 8;30 am |
| | Date Reported | | | |
| | | Dept. | | |
| | | | Where Accident Occurred | |
| Skelton | Insulation | | Dk#1082 Paul FWD | |

**History**

R,U.

Insulating has developed soreness of right anticubital area, states has been pulling and
lifting material. Has noted some soreness in area over past wk.

**Examination**

Has full ROM of joint, no swelling, no tenderness on palaption.

Rt, ACE, APP Hoch am.

**Diagnosis**

**Treatment**

| Addn'l Disability | | | | Approx. Visits |
|---|---|---|---|---|
| DATE | | PROGRESS | | |
| 4-22-71 | Sta#1- reck rt elbow, disch. | | | |

PROGRESS REPORT

AVONDALE SHIPYARDS, INC.

11562                              Minor Industrial Injuries

Byron Granier                          Foreman

| DATE | PROGRESS |
|------|----------|
| 2-1-71 | Sta A- Putting a pad on pipe, touched hot area, burn lt mid fgr, Butesin reck prn |

REPORT OF ACCIDENT
ASR 2422 (Rev 82)

AVONDALE SHIPYARDS, INC.

| Name | Badge/Clock No. | Age | Occupation |
|---|---|---|---|
| | | | Insulator |

| Address | Date of Accident | Time | Shift |
|---|---|---|---|
| | 12-4-7 | 7:15 pm | |

| | Where Accident Occurred |
|---|---|
| Location | Installation | DS Bowen FWD |

**History**

Engine room setting tools on for tool box cut fgr on knife. Superficial laceration

left index finger at right of DS Bowen recent let. arch FWD

**Examination**

**Diagnosis**

**Treatment**

| Approx. Disability | | Approx. Visits |
|---|---|---|

| Date | PROGRESS | |
|---|---|---|

REPORT OF ACCIDENT

AVONDALE SHIPYARDS, INC. 202A

| Name | Badge/Clock No. | Age | Occupation |
| --- | --- | --- | --- |
| Address | Date of Accident | Time | Shift |
| | Date Reported | | |
| | | Where Accident Occurred | |
| Location | | | |

History

Examination

Diagnosis

Treatment

Approx. Disability | Approx. Visits

| DATE | PROGRESS |
| --- | --- |
| 10-23-70 | Sta #1- reck lt foot, DD disch. |

REPORT OF ACCIDENT

AVONDALE SHIPYARDS, INC.

| Name | Badge Clock No. | Age | Occupation |
|------|------|------|------|
| Bryon Granier | 11562 | 17 | Yard Clerk |

| Address | Date of Accident | Time | Shift |
|------|------|------|------|
| | 7-27-70 | 7.10am | D |

Days Employed: same

| Bordelon | Insulation | Where Accident Occurred | | ST |
|------|------|------|------|------|
| Colony | | Field Levee. | | |

Getting ice, ~~####/####/####~~ was using ice pick & stuck it in hand.  Superficial  puncture wound over 1st metacap. dorsal area. msrth TT½cc(H) rech am

Examination

Diagnosis

Treatment

Approx. Disability                                                                 Approx. Visits

| DATE | PROGRESS |
|------|------|
| 7-28-70 | Sta # 1- Reck lt thumb- okay disch. |

115

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| DOROTHY REED GAUTHE, PAUL GAUTHE, HELEN CANTRELLE, MARION FLEMING and ANNE RICHWINE | * CIVIL ACTION |
| | * |
| | * NO. 96-2454 |
| versus | * |
| | * SECTION "K" |
| ASBESTOS CORPORATION, LTD., ET AL. | * |
| | * MAG. 4 |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## AFFIDAVIT

STATE OF LOUISIANA

PARISH OF JEFFERSON

BEFORE ME, Notary Public in and for the Parish of Jefferson, personally came and appeared:

### R.D. CHURCH

who, after being duly sworn, deposed and stated that:

1.     He is the Vice President of Avondale Industries, Inc. ("Avondale").

2.     In said capacity, he is the custodian of certain contracts entered into between Avondale (f/k/a "Avondale Shipyards, Inc.") and various departments of the United States Government, including the United States Military.

3.     One such contract over which he is the custodian is a contract between Avondale and the United States Navy for the Construction of the DE1078 Class Ocean Escort Vessels, also known as Destroyer Escorts.

4.     Attached hereto as "Church A" is a true and correct copy of that contract.



EXHIBIT
E

5.    That he has read this affidavit, and that all statements contained herein are true and correct to the best of his knowledge, information and belief.

_____

**R.D. CHURCH, Affiant**

Sworn to and subscribed before me this 27th day of August, 1996.

_____

NOTARY PUBLIC

VESSEL FORM
(September 1953)
DEPARTMENT OF DEFENSE
NEGOTIATED CONTRACT

NObs— *1506*

DEPARTMENT OF THE NAVY
BUREAU OF SHIPS
Washington 25, D. C.

# GENERAL PROVISIONS

### INDEX

| | | Page |
|---|---|---|
| ARTICLE 1 | *Purpose* | 3 |
| ARTICLE 2 | *Definitions* | 3 |
| ARTICLE 3 | *Order of Precedence* | 3 |
| ARTICLE 4 | *Changes* | 3 |
| ARTICLE 5 | *Preliminary Acceptance* | 3 |
| ARTICLE 6 | *Guaranty Period* | 3 |
| ARTICLE 7 | *Inspection* | 3 |
| ARTICLE 8 | *Final Acceptance* | 4 |
| ARTICLE 9 | *Insurance—Property Loss or Damage—Liability To Third Persons* | 4 |
| ARTICLE 10 | *Delays* | 5 |
| ARTICLE 11 | *Plans and Other Data* | 5 |
| ARTICLE 12 | *Liens and Title* | 5 |
| ARTICLE 13 | *Additional Bond Security* | 6 |
| ARTICLE 14 | *Assignment of Claims* | 6 |
| ARTICLE 15 | *Records* | 6 |
| ARTICLE 16 | *Suspension* | 6 |
| ARTICLE 17 | *Default* | 7 |
| ARTICLE 18 | *Termination for Convenience of the Government* | 7 |
| ARTICLE 19 | *Final Settlement* | 9 |
| ARTICLE 20 | *Military Security Requirements* | 10 |
| ARTICLE 21 | *Plant Protection* | 10 |
| ARTICLE 22 | *Notice and Assistance Regarding Patent Infringement* | 10 |
| ARTICLE 23 | *Reporting of Royalties* | 10 |
| ARTICLE 24 | *Copyrights* | 11 |
| ARTICLE 25 | *Buy American Act* | 11 |
| ARTICLE 26 | *Walsh-Healey Public Contracts Act* | 11 |
| ARTICLE 27 | *Nondiscrimination in Employment* | 11 |
| ARTICLE 28 | *Officials Not To Benefit* | 11 |
| ARTICLE 29 | *Covenant Against Contingent Fees* | 11 |
| ARTICLE 30 | *Federal, State and Local Taxes* | 11 |
| ARTICLE 31 | *Government-Furnished Property* | 12 |
| ARTICLE 32 | *Notice to the Government of Labor Disputes* | 13 |
| ARTICLE 33 | *Disputes* | 13 |
| ARTICLE 34 | *Neutrality Act of 1939* | 13 |
| ARTICLE 35 | *Renegotiation* | 13 |
| ARTICLE 36 | *Small Business* | 13 |
| ARTICLE 37 | *Report of Subcontracting* | 13 |
| ARTICLE 38 | *Examination of Records* | 13 |
| ARTICLE 39 | *Gratuities* | 14 |
| ARTICLE 40 | *General Specifications for the Inspection of Material* | 14 |

3

ARTICLE 1. PURPOSE.—These General Provisions form a part of the contract bearing the number designated above.

ARTICLE 2. DEFINITIONS.—As used throughout this contract the following terms shall have the meanings set forth below:

(a) The term "Secretary" means the Secretary, the Under Secretary, or any Assistant Secretary of the Department and the head or any assistant head of the executive agency; and the term "his duly authorized representative" means any person or persons or board (other than the Contracting Officer) authorized to act for the Secretary.

(b) The term "Chief of the Bureau of Ships" means the Chief or the Acting Chief of the Bureau of Ships of the Department of the Navy.

(c) The term "Contracting Officer" means the person executing this contract on behalf of the Government, and any other officer or civilian employee who is a properly designated Contracting Officer; and the term includes, except as otherwise provided in this contract, the authorized representative of a Contracting Officer acting within the limits of his authority.

(d) The term "Department" means the Department of the Navy.

(e) The term "Bureau of Supplies and Accounts" means the Bureau of Supplies and Accounts of the Department of the Navy.

(f) Except as otherwise provided in this contract, the term "subcontracts" includes purchase orders under this contract.

ARTICLE 3. ORDER OF PRECEDENCE.—The rights and obligations of the parties to this contract shall be subject to and governed by the Special Provisions, the General Provisions, and the approved plans and specifications. No charges shall be allowed or paid except in accordance with the express terms of this contract or a written amendment hereof. To the extent of any inconsistency between such plans and specifications on the one hand and the Special Provisions or the General Provisions on the other, the Special Provisions or the General Provisions shall control. To the extent of any inconsistency between the Special Provisions and the General Provisions, the Special Provisions shall control.

ARTICLE 4. CHANGES.—The Chief of the Bureau of Ships or his duly authorized representative may at any time, by a written order, and without notice to the sureties, make changes, within the general scope of this contract, in any one or more of the following: (i) plans, drawings, designs, or specifications; (ii) method of shipment or packing; and (iii) place of delivery. If any such change causes an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. Any claim by the Contractor for adjustment under this Article must be asserted within thirty (30) days from the date of receipt by the Contractor of the notification of change: Provided, however, that the Contracting Officer, if he decides that the facts justify such action, may receive and act upon any such claim asserted at any time prior to final payment under this contract. In the event of failure mutually to agree to any adjustment, such adjustment shall be determined by a Board of Naval Officers appointed by the Chief of the Bureau of Ships. However, nothing in this Article shall excuse the Contractor from proceeding with the contract as changed.

ARTICLE 5. PRELIMINARY ACCEPTANCE.—Upon satisfactory completion of the applicable trial requirements and upon delivery as provided in the Article of this contract entitled "Completion and Delivery", each vessel shall be preliminarily accepted.

ARTICLE 6. GUARANTY PERIOD.—As used in this contract, the term "defects" includes any and all defects, deficiencies, deteriorations, and failures in the vessels. There shall be a guaranty period for each vessel consisting of the six (6) months immediately following the date of its preliminary acceptance, extended by the time during which such vessel is not available for unrestricted service by reason of any defects for which the Chief of the Bureau of Ships shall determine the Contractor to be responsible. During said period such vessel, after being fully equipped and armed and in all respects complete and ready for service, shall be finally tried by and at the expense of the Government under conditions prescribed by the Secretary. The Contractor may, with the approval of the Secretary, have an engineer on board such vessel during said period. Such engineer shall have every reasonable opportunity to inspect the working of such vessel in all its parts but shall have no power to direct or control its operation.

ARTICLE 7. INSPECTION.—(a) All supplies (which term throughout this Article includes without limitation raw materials, components, intermediate assemblies, and end products) shall be subject to inspection and test by the Government, to the extent practicable at all times and places including the period of manufacture or construction, and in any event prior to final acceptance of the vessels.

(b) Supplies rejected prior to preliminary acceptance as not conforming to this contract and any defects which develop during the guaranty period shall, at the election of the Department, be replaced or corrected either by the Department or by the Contractor. The Department will, whenever practicable, afford the Contractor an opportunity to examine the defective supplies before they are replaced or corrected. Supplies or lots of supplies which have been rejected or required to be corrected in place, as requested by the Contracting Officer, by the Contractor promptly after notice, and shall not again be tendered for acceptance unless the former tender and either the rejection or requirement of correction is disclosed. If the Contractor fails promptly to remove such supplies or lots of supplies, when requested by the Contracting

5

pensated for by insurance or otherwise, provided such liabilities are represented by final judgments or by settlements approved in writing by the Department. The Contractor shall not, however, be so indemnified against liabilities with respect to which the Contractor has failed to procure or maintain insurance, if available, as required or approved by the Department. The Contractor shall promptly notify the Department of each suit or action filed and each claim made against which the Contractor may be entitled to indemnification under this paragraph. The Contractor shall furnish the Department with copies of all papers received with respect to each such suit, action or claim and, if requested by the Department, shall authorize representatives of the Government to settle, or direct or take charge of the defense of, such suit, action or claim. In the absence of such request, the Contractor shall diligently proceed with such defense.

(c) The cost of the insurance required by paragraph (b) of this Article is included in the contract price and the cost of all other insurance which may be required or approved pursuant to this Article will be reimbursed to the Contractor. If the Department should require or approve the cancellation of any such insurance, the Contractor will promptly pay to the Government the amount of all unearned premiums refunded to the Contractor, but only to the extent that such premiums shall have been reimbursed to the Contractor by the Government or included in the contract price.

(d) All insurance which is or may be required or approved pursuant to this Article shall be in such form, in such amounts, for such periods of time, and with such insurers as the Department may from time to time require or approve, provided the Contractor shall be named as an assured and shall be entitled to payment of any loss or damage as its interests may appear. The policies or certificates of insurance shall be deposited with the Office of Naval Material (Insurance Branch) of the Department, or as the Department may otherwise direct.

(e) In the event of loss of or damage to any of the vessels or any of the materials or equipment therefor, the Contracting Officer may, without prejudice to any other right of the Government, either:

(i) Order the Contractor to proceed with repair or replacement, in which event the Contractor shall effect such repair or replacement and, if the risk of the loss or damage shall have been assumed by the Government, any increase in the cost of performing the contract resulting therefrom shall be determined under the Article of this contract entitled "Changes"; or

(ii) Terminate the construction of any or all of the vessels under the Article of this contract entitled "Termination for the Convenience of the Government".

ARTICLE 10. DELAYS.—In the event of any delay in the construction of any of the vessels the Contractor shall give the Department prompt notice thereof in sufficient detail to permit the Department to take appropriate action to minimize the effect of such delay.

ARTICLE 11. PLANS AND OTHER DATA.—(a) The Contractor shall, when requested by the Department, furnish promptly to the Supervisor a schedule of hull plans, armor and other ordnance plans, and engineering plans proposed for the construction of the vessels. Such schedule shall state the number and title of each plan and the prospective date of its submission to the Supervisor, and shall be modified from time to time as may be necessary and resubmitted to the Supervisor.

(b) If changes in approved plans are proposed by the Contractor or are required due to the use of machinery or equipment differing from that described in such plans, the Contractor shall, prior to the manufacture or construction of the part of the vessels affected by any such change, submit for the approval of the Supervisor blueprints of each working drawing, together with statements itemizing the drawing by number and title and any departures from the contract requirements with the reasons therefor. Work done under the drawing concerned prior to its approval will be at the risk of the Contractor. The Contractor shall forward blueprints of each drawing, as finally approved, to the Supervisor for the use of inspectors. The cost of preparing drawings and furnishing blueprints as provided herein shall be borne by the Contractor without additional reimbursement. Blueprints furnished hereunder shall become the property of the Government.

(c) If the Department shall so require, the Contractor will, at the cost of reproduction, furnish to other contractors constructing similar types of vessels copies of working and finished plans, booklets, material schedules, material orders, lists and other data relating to the construction of the vessel.

(d) The Department may require the Contractor to furnish to the Department plans or engineering or statistical information relating to the construction of the vessels in addition to the plans and information required to be furnished by the specifications or other provisions of this contract. The Contractor will be compensated for such additional plans or information by an appropriate increase in the contract price, such increase to be determined as provided in the Article of this contract entitled "Changes".

(e) The furnishing or delivery of any of the copies of plans, booklets, material schedules, material orders, lists or other data required by the provisions of this Article shall not, either expressly or impliedly, constitute (i) any guaranty or warranty by the Contractor other than that they are correct copies of such data or (ii) any license for the use of any patented article or invention shown or listed. The Government shall have the right to use such data for the construction of other vessels or for any other purpose.

ARTICLE 12. LIENS AND TITLE.—(a) Any and all partial payments made hereunder on account of the vessels and the materials and equipment therefor shall be secured, when made, by a lien in favor of the Government upon such material and equipment on account of all payments so made, except to the extent that the Government, by virtue of any other provision of this contract, or otherwise, shall have valid title to such material and equipment as against other creditors of the Contractor. If such property is not identified by marking or segregating, the Government shall be deemed to have a lien upon a proportionate part of any mass of property with which such property is commingled. Any lien provided for by virtue of this Article is paramount to all other liens under the provisions of an Act approved 22 August 1911 (Pub. No. 41, 62d Cong.; 37 Stat. 32; 34 U. S. C. sec. 582). Upon completion and delivery of the vessels, said lien shall be discharged as to any materials and equipment which have not been included in the vessels and which are no longer required therefor.

7

pension, including a reasonable allowance for profit on such increased costs. Any disagreement between the Contractor and the Contracting Officer with respect to the amount of any adjustment to be made under this Article shall constitute a dispute concerning a question of fact within the meaning of the Article of this contract entitled "Disputes".

Article 17. DEFAULT.—(a) The Government may, subject to the provisions of paragraph (b) below, by written Notice of Default to the Contractor, terminate the whole or any part of this contract in any one of the following circumstances:

(i) If the Contractor fails to make delivery of the vessels or supplies or to perform the services within the time specified herein or any extension thereof; or

(ii) If the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and in either of these two circumstances does not cure such failure within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure.

(b) Notwithstanding the provisions of subparagraph (f) below, the Contractor shall not be liable for any excess costs or other damages, if any failure to perform the contract or meet the delivery schedule arises out of causes beyond the control and without the fault or negligence of the Contractor. Such causes include, but are not restricted to, acts of God or of the public enemy, acts of the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, unusually severe weather, and defaults of subcontractors due to any of such causes unless the Contracting Officer shall determine that the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit the Contractor to meet the required delivery schedule.

(c) In the event the Government terminates this contract in whole or in part as provided in paragraph (a) of this Article the Government may procure, upon such terms and in such manner as the Contracting Officer may deem appropriate, vessels, supplies or services similar to those so terminated and the Contractor shall be liable to the Government for any excess costs for such similar vessels, supplies or services: Provided, that the Contractor shall continue the performance of this contract to the extent not terminated under the provisions of this clause. In addition to its other remedies, the Government may, with respect to work terminated as permitted in this Article, proceed with the completion of the vessels and supplies at such plant or plants, including that of the Contractor, as may be designated by the Contracting Officer. If the vessels and supplies are to be completed at the Contractor's plant the Government may use all tools, machinery, facilities and equipment of the Contractor determined by the Contracting Officer to be necessary for that purpose. If the cost to the Government of the vessels and supplies therefor so procured or completed (after adjusting such cost to exclude the effect of changes in the plans and specifications made subsequent to the date of termination) exceeds the price fixed for such vessel and supplies under this contract (after adjusting such price on account of changes in the plans and specifications made prior to the date of termination), the Contractor, or its surety, if any, shall be liable for such excess.

(d) If this contract is terminated as provided in paragraph (a) of this Article the Government, in addition to any other rights provided in this Article, may require the Contractor to transfer title (insofar as not previously transferred) and deliver to the Government, in the manner and to the extent directed by the Contracting Officer, (i) any completed vessels and supplies, and (ii) such partially completed vessels and supplies and materials, parts, tools, dies, jigs, fixtures, plans, drawings, information and contract rights (hereinafter called "manufacturing materials") as the Contractor has specifically constructed, produced or specifically acquired for the performance of such part of this contract as has been terminated; and the Contractor shall, upon direction of the Contracting Officer, protect and preserve property in possession of the Contractor in which the Government has an interest. The Government shall pay to the Contractor the contract price for completed vessels and supplies delivered to and accepted by the Government, and the amount agreed upon by the Contractor and the Contracting Officer for manufacturing materials delivered to and accepted by the Government and for the protection and preservation of property. Failure to agree shall be a dispute concerning a question of fact within the meaning of the Article of this contract entitled "Disputes".

(e) If, after notice of termination of this contract under the provisions of paragraph (a) of this Article, it is determined that the failure to perform this contract is due to causes beyond the control and without the fault or negligence of the Contractor pursuant to the provisions of paragraph (b) of this Article, such Notice of Default shall be deemed to have been issued pursuant to the Article of this contract entitled "Termination for Convenience of the Government", and the rights and obligations of the parties hereto shall in such event be governed by such Article. Except as otherwise provided in this contract, this paragraph (e) applies only if this contract is with a military department.

(f) The rights and remedies of the Government provided in this Article shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract.

Article 18. TERMINATION FOR CONVENIENCE OF THE GOVERNMENT.—(a) The performance of work under this contract may be terminated by the Government in accordance with this Article in whole or, from time to time in part, whenever the Contracting Officer shall determine that such termination is in the best interests of the Government. Any such termination shall be effected by delivery to the Contractor of a Notice of Termination specifying the extent to which performance of work under the contract is terminated, and the date upon which such termination becomes effective.

(b) After receipt of a Notice of Termination, and except as otherwise directed by the Contracting Officer, the Contractor shall (1) stop work under the contract on the date and to the extent specified in the Notice of Termination; (2) place no further orders or subcontracts for materials, services or facilities except as may be

9

(iii) A sum equal to 2% of that part of the amount determined under (i) which represents the cost of articles and materials not processed by the Contractor, plus a sum equal to 8% of the remainder of such amount, but the aggregate of such sums shall not exceed 6% of the whole of the amount determined under subdivision (i) above, which amount for the purpose of this subdivision (iii) shall exclude any charges for interest on borrowings; *Provided, however*, that if it appears that the Contractor would have sustained a loss on the entire contract had it been completed, no profit shall be included or allowed under this subdivision (iii) and an appropriate adjustment shall be made reducing the amount of the settlement to reflect the indicated rate of loss.

(3) The reasonable costs of settlement, including accounting, legal, clerical, and other expenses reasonably necessary for the preparation of settlement claims and supporting data with respect to the terminated portion of the contract and for the termination and settlement of subcontracts thereunder, together with reasonable storage, transportation, and other costs incurred in connection with the protection or disposition of property allocable to this contract. The total sum to be paid to the Contractor under (1) and (2) of this paragraph (*e*) shall not exceed the total contract price as reduced by the amount of payments otherwise made and as further reduced by the contract price of work not terminated. Except for normal spoilage, and except to the extent that the Government shall have otherwise expressly assumed the risk of loss, there shall be excluded from the amounts payable to the Contractor as provided in paragraph (*e*) (1) and paragraph (*e*) (2) (i), the fair value, as determined by the Contracting Officer, of property which is destroyed, lost, ███, or damaged so as to become undeliverable to the Government, or to a buyer pursuant to paragraph ███).

(*f*) Any determination of costs under paragraph (*c*) or (*e*) hereof shall be governed by the Statement of Principles for Consideration of Costs set forth in Part 4 of Section VIII of the Armed Services Procurement Regulation, as in effect on the date of this contract.

(*g*) The Contractor shall have the right of appeal, under the Article of this contract entitled "Disputes", from any determination made by the Contracting Officer under paragraph (*c*) or (*e*) above, except that if the Contractor has failed to submit its claim within the time provided in paragraph (*c*) above and has failed to request extension of such time, he shall have no such right of appeal. In any case where the Contracting Officer has made a determination of the amount due under paragraph (*c*) or (*e*) above, the Government shall pay to the Contractor the following: (i) if there is no right of appeal hereunder or if no timely appeal has been taken, the amount so determined by the Contracting Officer, or (ii) if an appeal has been taken, the amount finally determined on such appeal.

(*h*) In arriving at the amount due the Contractor under this Article there shall be deducted (1) all unliquidated advance or other unliquidated payments on account theretofore made to the Contractor, (2) any claim which the Government may have against the Contractor in connection with this contract, and (3) the agreed price for, or the proceeds of sale of, any materials, supplies, or other things acquired by the Contractor or sold, pursuant to the provisions of this Article, and not otherwise recovered by or credited to the Government.

(*i*) If the termination hereunder be partial, prior to the settlement of the terminated portion of this contract, the Contractor may file with the Contracting Officer a request in writing for an equitable adjustment of the price or prices specified in the contract relating to the continued portion of the contract (the portion not terminated by the Notice of Termination), and such equitable adjustment as may be agreed upon shall be made in such price or prices.

(*j*) The Government may from time to time, under such terms and conditions as it may prescribe, make partial payments and payments on account against costs incurred by the Contractor in connection with the terminated portion of this contract whenever in the opinion of the Contracting Officer the aggregate of such payments shall be within the amount to which the Contractor will be entitled hereunder. If the total of such payments is in excess of the amount finally agreed or determined to be due under this Article, such excess shall be payable by the Contractor to the Government upon demand, together with interest computed at the rate of 6% per annum, for the period from the date such excess payment is received by the Contractor to the date on which such excess is repaid to the Government: *Provided, however*, that no interest shall be charged with respect to any such excess payment attributable to a reduction in the Contractor's claim by reason of retention or other disposition of termination inventory until ten days after the date of such retention or disposition.

(*k*) Unless otherwise provided for in this contract, or by applicable statute, the Contractor, from the effective date of termination and for a period of six years after final settlement under this contract, shall preserve and make available to the Government at all reasonable times at the office of the Contractor but without direct charge to the Government, all its books, records, documents, and other evidence bearing on the costs and expenses of the Contractor under this contract and relating to the work terminated hereunder, or, to the extent approved by the Contracting Officer, photographs, micro-photographs, or other authentic reproductions thereof.

Article 19. FINAL SETTLEMENT.—Upon final acceptance of the vessels, or in the event of the termination of this contract on such terms that none of the vessels is to be completed, then upon such termination, the Contractor shall be entitled to receive the balance owing to it under this contract, such payment to be made promptly after the amount of such balance shall have been determined. The Contractor and each assignee under an assignment in effect at the time of final settlement shall execute and deliver at the time of and as a condition precedent to final payment, a release in form and substance satisfactory to and containing such exceptions as may be found appropriate by the Contracting Officer, discharging the Government, its officers, agents and employees of and from liabilities, obligations and claims arising under this contract. The Contracting Officer may authorize partial payments on account of any such balance to be made in advance of final settlement. If this contract shall have been terminated in whole or in part, any such release shall also contain a release of all claims against the Government arising out of or by virtue of such termination.

11

Article 24. COPYRIGHTS.—(a) The Contractor agrees to and does hereby grant to the Government and to its officers, agents and employees acting within the scope of their official duties, (i) a royalty-free, nonexclusive and irrevocable license to reproduce, translate, publish, use, and dispose of, and to authorize others so to do, all copyrightable material first produced or composed and delivered to the Government under this contract by the Contractor, its employees or any individual or concern specifically employed or assigned to originate and prepare such material; and (ii) a license as aforesaid under any and all copyrighted or copyrightable work not first produced or composed by the Contractor in the performance of this contract but which is incorporated in the material furnished under the contract, provided that such license shall be only to the extent the Contractor now has, or prior to completion or final settlement of the contract may acquire, the right to grant such license without becoming liable to pay compensation to others solely because of such grant.

(b) The Contractor agrees that it will exert all reasonable effort to advise the Contracting Officer, at the time of delivering any copyrightable or copyrighted work furnished under this contract, of any adversely held copyrighted or copyrightable material incorporated in any such work and of any invasion of the right of privacy therein contained.

(c) The Contractor agrees to report to the Contracting Officer, promptly and in reasonable written detail, any notice or claim of copyright infringement received by the Contractor with respect to any material delivered under this contract.

Article 25. BUY AMERICAN ACT.—The Contractor agrees that there will be delivered under this contract only such unmanufactured articles, materials, and supplies (which term "articles, materials, and supplies" is hereinafter referred to in this Article as "supplies") as have been mined or produced in the United States, and only such manufactured supplies as have been manufactured in the United States substantially all from supplies mined, produced, or manufactured, as the case may be, in the United States.   Pursuant to the Buy American Act (41 U. S. Code 10a–d), the foregoing provision shall not apply (i) with respect to supplies excepted by the Secretary from the application of the Act, (ii) with respect to supplies for use outside the United States, (iii) with respect to the supplies to be delivered under this contract which are of a class or kind determined by the Secretary or his duly authorized representative not to be mined, produced, or manufactured, as the case may be, in the United States in sufficient and reasonably available commercial quantities and of a satisfactory quality, or (iv) with respect to such supplies, from which the supplies to be delivered under this contract are manufactured, as are of a class or kind determined by the Secretary or his duly authorized representative not to be mined, produced, or manufactured, as the case may be, in the United States in sufficient and reasonably available commercial quantities and of a satisfactory quality: Provided, that this exception (iv) shall not permit delivery of supplies manufactured outside the United States if such supplies are manufactured in the United States in sufficient and reasonably available commercial quantities and of a satisfactory quality.

Article 26. WALSH-HEALEY PUBLIC CONTRACTS ACT.—If this contract is for the manufacture or furnishing of materials, supplies, articles, or equipment in an amount which exceeds or may exceed $10,000 and is otherwise subject to the Walsh-Healey Public Contracts Act as amended (41 U. S. Code 35–45), there are hereby incorporated by reference all representations and stipulations required by said Act and regulations issued thereunder by the Secretary of Labor, such representations and stipulations being subject to all applicable rulings and interpretations of the Secretary of Labor which are now or may hereafter be in effect.

Article 27. NONDISCRIMINATION IN EMPLOYMENT.—In connection with the performance of work under this contract, the Contractor agrees not to discriminate against any employee or applicant for employment because of race, creed, color, or national origin; and further agrees to insert the foregoing provision in all subcontracts hereunder except subcontracts for standard commercial supplies or for raw materials.

Article 28. OFFICIALS NOT TO BENEFIT.—No member of or delegate to Congress, or resident commissioner, shall be admitted to any share or part of this contract, or to any benefit that may arise therefrom; but this provision shall not be construed to extend to this contract if made with a corporation for its general benefit.

Article 29. COVENANT AGAINST CONTINGENT FEES.—The Contractor warrants that no person or selling agency has been employed or retained to solicit or secure this contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Contractor for the purpose of securing business.   For breach or violation of this warranty the Government shall have the right to annul this contract without liability or in its discretion to deduct from the contract price or consideration the full amount of such commission, percentage, brokerage, or contingent fee.

Article 30. FEDERAL, STATE AND LOCAL TAXES.—(a) Definitions.—As used throughout this article, the following terms shall have the meanings set forth below:

(i) The term "direct tax" means any tax or duty directly applicable to the completed supplies or services (as distinguished from taxes directly applicable to materials and components used in the manufacture or furnishing of the completed supplies or services) covered by this contract, or any other tax or duty from which the Contractor or this transaction is exempt.   It includes any tax or duty directly applicable to the importation, production, processing, manufacture, construction, sale, or use of such supplies or services; it also includes any tax levied on, with respect to, or measured by sales, receipts from sales, or use of the supplies or services covered by this contract.   The term does not include transportation taxes, unemployment compensation taxes, social security taxes, income taxes, excess-profits taxes, capital stock taxes, property taxes, and such other taxes as are not within the definition of the term "direct tax" as set forth above in this paragraph.

13

(*d*) The Government-furnished property shall, unless otherwise provided herein, be used only for the performance of this contract.

(*e*) The Contractor shall maintain and administer, in accordance with sound industrial practice, a program for the maintenance, repair, protection and preservation of Government-furnished property, until disposed of by the Contractor in accordance with this Article.

(*f*) The Government shall at all reasonable times have access to the premises wherein any Government-furnished property is located.

(*g*) Upon the completion of this contract, or at such earlier date as may be fixed by the Contracting Officer, the Contractor shall submit, in a form acceptable to the Contracting Officer, inventory schedules covering all items of Government-furnished property not consumed in the performance of this contract (including any resulting scrap), or not theretofore delivered to the Government, and shall deliver or make such other disposal of such Government-furnished property, as may be directed or authorized by the Contracting Officer. Recoverable scrap from Government-furnished property shall be reported in accordance with a procedure and in such form as the Contracting Officer may direct. The net proceeds of any such disposal shall be credited to the contract price or shall be paid in such other manner as the Contracting Officer may direct.

(*h*) Directions of the Contracting Officer and communications of the Contractor issued pursuant to this Article shall be in writing.

ARTICLE 32. NOTICE TO THE GOVERNMENT OF LABOR DISPUTES.—Whenever the Contractor has knowledge that any actual or potential labor dispute is delaying or threatens to delay the timely performance of this contract, the Contractor shall immediately give notice thereof, including all relevant information with respect thereto, to the Contracting Officer.

ARTICLE 33. DISPUTES.—Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within thirty (30) days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall, unless determined by a court of competent jurisdiction to have been fraudulent, arbitrary, capricious, or so grossly erroneous as necessarily to imply bad faith, be final and conclusive; *provided* that, if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this Article, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision.

ARTICLE 34. NEUTRALITY ACT OF 1939.—If any of the supplies to be delivered under this contract are arms, ammunition, or implements of war, as listed in the current proclamation issued by the President pursuant to the Neutrality Act of 1939 (22 U. S. Code 452), the Contractor either (i) represents that it is properly registered under said Act and agrees to furnish satisfactory evidence thereof upon request, or (ii) represents that it is not subject to said Act and agrees to furnish satisfactory evidence thereof upon request.

ARTICLE 35. RENEGOTIATION.—(*a*) This contract is subject to the Renegotiation Act of 1951 (P. L. 9, 82d Congress) and shall be deemed to contain all the provisions required by Section 104 of said Act.

(*b*) The Contractor (which term as used in this Article means the party contracting to furnish the materials or perform the work required by this contract) agrees to insert the provisions of this Article, including this paragraph (*b*), in all subcontracts as required by Section 104 of the Renegotiation Act of 1951: *Provided*, that the Contractor shall not be required to insert the provisions of this Article in any subcontract of a class or type described in Section 106 (*a*) of the Renegotiation Act of 1951.

ARTICLE 36. SMALL BUSINESS.—It is the policy of the Government, as declared by the Congress to bring about the greatest utilization of small-business concerns which is consistent with efficient production. The Contractor agrees to accomplish the maximum amount of subcontracting to small-business concerns that the Contractor finds to be consistent with the efficient performance of this contract.

ARTICLE 37. REPORT OF SUBCONTRACTING.—The Contractor agrees, upon delivery of the last vessel and performance of all services under this contract, to submit in writing to the Contracting Officer an estimate of the total dollar amount of all subcontracts and purchase orders placed by it under this contract with organizations not affiliated with it, and the percentage of such dollar amount placed with small-business concerns (herein considered to be any concern which including its affiliates, employs in the aggregate fewer than 500 persons).

ARTICLE 38. EXAMINATION OF RECORDS.—(*a*) The Contractor agrees that the Comptroller General of the United States or any of his duly authorized representatives shall, until the expiration of three years after final payment under this contract, have access to and the right to examine any directly pertinent books, documents, papers, and records of the Contractor involving transactions related to this contract.

(*b*) The Contractor further agrees to include in all his subcontracts hereunder a provision to the effect that the subcontractor agrees that the Comptroller General of the United States or any of his duly authorized representatives shall, until the expiration of three years after final payment under the subcontract, have access to and the right to examine any directly pertinent books, documents, papers, and records of such subcontractor involving transactions related to the subcontract. The term "subcontract" as used in this Article excludes (i) purchase orders not exceeding $1,000 and (ii) subcontracts or purchase orders for public utility services at rates established for uniform applicability to the general public.

15

[This page intentionally left blank.]

SPECIAL PROVISIONS
VESSEL FORM
Bureau of Ships
IFB 600-1008-66-S
P.R. 523-61280

DEPARTMENT OF DEFENSE
ADVERTISED CONTRACT
(Fixed Price Type)

APPROPRIATION:
(See Article 19)

All public vouchers for payment
under this contract shall in-
clude a reference to Contract
N00024-67-C-0220.

Payment under this contract
will be made at the Navy
Regional Finance Center, Great
Lakes, Illinois.

CERTIFICATION:
Certified for National Defense
use under DMS Regulation No. 1,
DO-A3.

SECURITY REQUIREMENTS:
DD Form 254, attached hereto,
is applicable to this contract.

DEPARTMENT OF THE NAVY
BUREAU OF SHIPS
WASHINGTON, D.C.  20360

CONTRACT FOR THE CONSTRUCTION OF TWENTY (20) OCEAN ESCORT VESSELS
DE 1078 CLASS, (DE 1078 - 1097), AND PREPARATION OF WORKING PLANS THEREFOR

THIS CONTRACT entered into as of 25 August 1966 by and between the UNITED
STATES OF AMERICA (hereinafter called the "Government"), represented for this
purpose by the Contracting Officer executing this contract, and AVONDALE SHIPYARDS,
INC., a corporation organized and existing under the laws of the State of Louisiana,
(hereinafter called the "Contractor"), and having a principal place of business
at P.O. Box 50280, New Orleans, Louisiana, 70150.

WITNESSETH:

WHEREAS, the Contractor has represented to the Bureau of Ships that it has
an organization, plant and facilities of sufficient capacity without any additional
Government-furnished facilities to perform all the work hereunder in accordance
with the terms of the contract;

NOW THEREFORE, in consideration of the premises, the parties hereto do
mutually agree as follows:

N00024-67-C-0220

## SPECIAL PROVISIONS

ARTICLE 1.  GENERAL SCOPE OF WORK -- (a) (i) The Contractor, subject to the Special Provisions and General Provisions of this contract, shall construct at its yard at Avondale, Louisiana, Twenty (20) Escort Vessels, DE 1078 Class, DE 1078-1087, in the FY 66 Program and DE 1088 - 1097 in the FY 67 Program, (hereinafter called the "vessels"), and will deliver the vessels, complete in all respects, including the installation of materials to be furnished by the Government and the preparation and furnishing of the plans and other data, all in conformity with the specifications set forth in Article 2 hereof, including changes therein which may be made as hereinafter provided.

(ii)  The General Provisions of this contract consist of the General Provisions, BUSHIPS VESSEL FORM (March 1965), as modified in these Special Provisions.

(iii)  The work under this contract shall be under the cognizance of the Supervisor of Shipbuilding, U. S. Navy, New Orleans, Louisiana, (hereinafter called the "Supervisor").

(b)  On Board Repair Parts, Stock Components and Stock Repair Parts;

(1)  Mechanical and Electrical Equipment:

(i)  The Contractor shall furnish the on-board repair parts required by the specifications set forth in Article 2 hereof.

(ii)(A)  The Contractor shall not furnish any parts or components identified in the specifications as stock repair parts or stock components.  The Contractor, however, shall furnish to the Department the information and data relating to stock repair parts and stock components for the Contractor-furnished basic equipment, as required by the specifications set forth in Article 2 hereof.

(B)a.  The Contractor agrees to enter into a standard Government contract or accept a standard Government purchase order from the Bureau of Ships or the Department of the Navy supply demand control points for such stock repair parts and stock components as the Government desires to purchase, provided that such contract or order is received by the Contractor within one hundred twenty (120) days after he has fully complied with paragraph 6.3.1.3 of Specification MIL-P-15137C(SHIPS), and the parties reach agreement with respect to prices therefor and delivery dates thereof.

b.  The Contractor agrees to insert, in all subcontracts hereunder for articles which may require stock repair parts or stock components, a provision which shall conform substantially to paragraph (ii) of this paragraph.

N00024-67-C-0220

(iii)  The Contractor agrees that, upon notice from the Government of errors in any plans or other information furnished by it under this contract which is required by the Government for identification of on-board or stock repair parts, it will make prompt correction thereof.

- (iv)  The Contractor agrees to attend a Pre-Provisioning Conference to be held in the Supervisor's office on a mutually agreed to date, as early as possible after award of the contract and to submit at the meeting an estimate of the total number of Contractor-furnished provisionable items to be placed aboard or installed on the vessel /The Contractor further agrees to adhere to a schedule for submission of Provisioning Technical Documentation which will be developed at the Pre-Provisioning Conference and to submit reports on NAVSHIPS Form 5020 and 5020-1 for Contractor-furnished equipment on a monthly basis until 21 months prior to the end of construction of the vessel and biweekly thereafter./ In the event that the Contractor desires to utilize his EAM capabilities in lieu of the NAVSHIPS Forms, the format of the EAM report must be acceptable to the Supervisor.

(2)  Electronic Equipments:  The Contractor shall furnish on-board repair parts and provisioning technical documentation in accordance with Section 9310-1 of the Specification.

(c)  The Contractor shall comply with the requirements of weight control and reporting in accordance with the Specifications and Article 11.

(d)  The Contractor agrees to attend quarterly progress meetings to be held at the Bureau of Ships, Washington, D.C., for the purpose of reporting progress, anticipated delays, bottlenecks, production problems and other related matters.

(e)(1)  The Contracting Officer, in addition to issuing changes under Clause 3 of the General Provisions, may propose changes within the general scope of this contract as set forth below.  Within 45 days from the date of receipt of any such proposed change, or within such further time as the Contracting Officer may allow, the Contractor shall submit the proposed scope of work, plans and sketches, and his estimate of: (i) the cost, (ii) the weight and moment effect, (iii) effect on delivery date of the vessels, and (iv) status of work on the ship affected by the proposed change.  The proposed scope of work and estimate of cost shall be in such form and supported by such reasonable detail information as the Contracting Officer may require.  This estimate shall be prepared for each vessel covered by this contract.  Within 30 days from the date of receipt of the Contractor's estimate, the Contractor agrees to either (1) enter into a supplemental agreement covering the estimate as submitted or, (ii) if the estimate as submitted is not satisfactory to the Contracting Officer, begin negotiations, at the request of the Contracting Officer, in good faith leading to the execution of a bilateral supplemental agreement.  In either case the supplemental agreement shall cover price, including an equitable adjustment for the preparatory work set forth above, scope and all other necessary equitable adjustments.

N00024-67-C-0220

(2)  In the event that a change under paragraph (e)(1) herein proposed by the Contracting Officer is not incorporated in the contract, the work done by the Contractor in preparing the estimate in accordance with paragraph (e)(1) above shall be treated as if ordered by the Contracting Officer under the "Changes" clause.  The Contractor shall be entitled to an equitable adjustment in contract price for the effort required under paragraph (e)(1), but the Contractor shall not be entitled to any adjustment in delivery dates.  Failure to agree to such equitable adjustment in contract price shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled "Disputes".

ARTICLE 2.  SPECIFICATIONS -- (a)  The applicable specifications shall be Bureau of Ships "Specifications for Building Ocean Escort DE 1078 Class", dated 14 January 1966, Modification No. 1 thereto, dated 20 May 1966, CONFIDENTIAL Addendum thereto, dated 14 January 1966 and Modification No. 1 thereto, dated 20 May 1966.

(b)  Any reference in the specifications to requirements applicable to the "First ships of the class" or "leading ship" shall be construed as referring to the first vessel constructed under this contract.

ARTICLE 3.  WORKING PLANS AND OTHER DATA -- (a)  The Contractor may, at its own expense and election, obtain from any or all of the following:

(1)  Todd Shipyards Corporation, Seattle Division, Seattle, Washington,

(2)  Todd Shipyards Corporation, Los Angeles Division, Los Angeles, California,

(3)  Avondale Shipyards, Inc., New Orleans, Louisiana,

(4)  Lockheed Shipbuilding and Construction Company, Seattle, Washington, and

(5)  Avondale Shipyards, Inc., New Orleans, Louisiana.

at the cost of reproduction, for use hereunder to the extent applicable copies of working plans, selected record plans, booklets, indices, material schedules, plan schedules, purchase specifications, and other data as have been or will be prepared by that shipyard for the construction of the DE 1052 Class or the DE 1078, respectively.  The Government does not guarantee, nor does the Government make any representations with respect to, the timeliness of the preparation and availability of such plans and other data, the correctness and accuracy of any details, dimensions or any other information appearing therein, nor does the Government guarantee that such plans and other data include all data necessary for the construction of the vessels under this contract.  Nothing in this paragraph (a) is intended to limit, or shall it be construed as limiting, the Contractor or the Government in the selection of components, equipment, and other material for the vessels to be constructed under this contract.

-4-

N00024-67-C-0220

    (b) The working plans and other data for the performance of this contract shall be subject to the approval of the Supervisor; provided, however, that the plans and other data previously approved by a Supervisor of Shipbuilding, U.S. Navy, for the construction of the DE 1052 Class vessel, or the DE 1078, or plans and other data duly certified as not requiring Navy approval, if used without deviation in the performance of this contract do not require further approval. A list of plans to be so used shall be provided to the Supervisor prior to such use. Should such plans contain requirements beyond those set out in the specifications listed in Article 2 hereof, the Government will not be responsible for the cost of meeting such additional requirements. Except as above stated, approval of any of the plans and other data for use in connection with vessels other than those being constructed under this contract shall not constitute approval as required under this contract. The approval of plans and other data under this contract is an aspect of inspection and shall not relieve the Contractor of its responsibility for meeting the requirements of the contract.

    (c) The working plans, selected record plans, booklets, indices, material schedules, plans schedules, purchase specifications and other data relating to the construction of the vessels are normally furnished without restriction and the aforesaid data relating to the construction of the vessels hereunder falls within the purview of paragraph (b)(1)(vi) of the "RIGHTS IN TECHNICAL DATA" Clause. Accordingly, the working plans, selected record plans, booklets, indices, material schedules, plan schedules, purchase specifications and other data relating to the construction of the vessels hereunder, furnished by the Contractor under or pursuant to this contract, shall be furnished with unlimited rights. This includes the duty to furnish such data to other builders of 1078 Class DEs, the Contractor being entitled to be reimbursed for the cost of reproduction.

    ARTICLE 4.  COMPENSATION -- The contract price for the work under this contract including the furnishing of all on-board repair parts required by the plans and specifications and the preparation of detail working plans is Ten Million, Eight Hundred Eighty-seven Thousand Dollars ($10,887,000.00) per vessel, making a total contract price for the performance of this contract of Two Hundred Seventeen Million, Seven Hundred Forty Thousand Dollars ($217,740,000.00], subject to adjustment as provided in this contract. The foregoing total contract price is the "total contract price" for purposes of Clause 8 of the General Provisions, entitled "Payments."

    ARTICLE 5.  DELIVERY -- (a) The Contractor shall deliver the vessels to the Government at Charleston Naval Shipyard, Charleston, South Carolina.

| Designation of Vessel | Number of months after date of contract |
|---|---|
| DE  1078 | 47 Months After Award |
| DE  1079 | 49 Months After Award |
| DE  1080 | 51 Months After Award |
| DE  1081 | 53 Months After Award |

-5-

N00024-67-C-0220

| DE | 1082 | 54 Months After Award |
| DE | 1083 | 55 Months After Award |
| DE | 1084 | 56 Months After Award |
| DE | 1085 | 57 Months After Award |
| DE | 1086 | 58 Months After Award |
| DE | 1087 | 59 Months After Award |
| DE | 1088 | 60 Months After Award |
| DE | 1089 | 61 Months After Award |
| DE | 1090 | 62 Months After Award |
| DE | 1091 | 63 Months After Award |
| DE | 1092 | 64 Months After Award |
| DE | 1093 | 65 Months After Award |
| DE | 1094 | 66 Months After Award |
| DE | 1095 | 67 Months After Award |
| DE | 1096 | 68 Months After Award |
| DE | 1097 | 69 Months After Award |

(b)  The vessels shall be delivered in accordance with good commercial practices including the following specific requirements:

(1)  **If a vessel is delivered under its own power**, the vessel shall be manned by an adequate crew, a licensed engineer, and a licensed master, all subject to the approval of the Supervisor; continuous radio contact shall be maintained between the vessel and a designated United States Government activity; oil filters shall be replaced after delivery; lubricating oil shall be replaced or purified after delivery; and the vessel shall not be operated in foul weather sufficient to cause damage to the vessel.

(2)  **If a vessel is delivered by towing**, the vessel shall be manned by an adequate crew approved by the Supervisor; continuous radio contact shall be maintained between the vessel and a designated United States Government activity; shafts shall be locked; and the vessel shall not be towed in foul weather sufficient to cause damage to the vessel.

(3)  No vessel to be delivered under this contract shall be used for towing purposes , whether for delivery or for other reasons, nor is such vessel to be part of a multiple ship tow in the event that delivery is made by towing.

ARTICLE 6.  GOVERNMENT FURNISHED PROPERTY --(a)  The Government shall furnish for use under this contract in accordance with Clause 11 of the General Provisions entitled "Government-Furnished Property" only the property listed in Schedule "A" of the contract ("List of Government Furnished Material DE 1078 Class New Construction Program DE 1078 to DE 1097 Inclusive", dated 15 March 1966, Modification No. 1 thereto, dated 20 May 1966 and Modification No. 2 dated 2 June 1966), notwithstanding any requirements to the contrary for the furnishing of material by the Government which may appear in the plans, specifications or other data.  Any such requirements for the furnishing of material by the Government appearing in

-6-

N00024-67-C-0220

the plans, specifications or other data shall be of no force and effect and are hereby superseded by the list set forth in Schedule "A". Any and all materials required for the performance of this contract which do not appear in Schedule "A" shall be furnished and installed by the Contractor.

(b) The property furnished under this clause is for installation or stowage aboard the vessels being constructed under this contract. None of this property shall be used by the Contractor or a subcontractor for any purpose other than that for which such property has been furnished, unless specifically authorized in writing by the Contracting Officer. Specifically, test equipment intended to be provided to the ship, furnished to the Contractor for stowage aboard the ship, shall not be used by the Contractor for any purpose except for those tests required by Section 9670-0-1 of the specifications.

ARTICLE 7. ENGINEERING SERVICES -- The "Schedule of Engineering Services for DE 1078 Class Vessels (1078 - 1097)," dated 15 March 1966, lists engineering services which will be made available to the Contractor at the expense of the Government in connection with specified items of Government-Furnished Material. These services are advisory, providing only guidance to the Contractor in connection with the proper installation of such material, but not providing a general course of training for Contractor personnel. The Contractor shall have a force of engineers familiar with the fundamentals of the required equipments and systems and possessing knowledge commensurate with the complexity of these equipments and systems. The engineering services listed in the Schedule are intended to provide, to such competent, trained personnel of the Contractor, only specialized information regarding particular equipments and systems that will facilitate proper installation, checkout and testing by such personnel. The service engineers are not agents or representatives of the Government or the Contractor but remain employees or agents of their own employer or principal. However, the time or times when these services will be available to the Contractor and the extent of these services will be determined by the Supervisor. Arrangements for services desired or required by the Contractor in excess of those determined by the Supervisor, or for functions other than those indicated in the Schedule, shall be made by the Contractor, and all such additional services shall be at the Contractor's expense. The Contractor shall be responsible for the proper installation, checkout and testing of all equipments and systems, and making necessary adjustments or alignments in the performance or any other operation involving such equipments and systems, as required by the specifications. Substitution, elimination or addition of services in the Schedule may be made in accordance with the clause of this contract entitled "Changes."

ARTICLE 8. NUCLEUS CREW -- A crew furnished by the Government of not to exceed fifty-four (54) persons referred to hereinafter in this Article as the "nucleus crew" shall be present at Contractor's plant for a period of approximately six months for each vessel. The facilities shall be available to the nucleus crew beginning six months prior to contract delivery date or ship delivery date whichever is earlier, and shall continue until the ship is delivered. The nucleus crew shall have access to Contractor's plant and to the vessels at all reasonable times during such periods. The Contractor agrees to furnish office facilities for

N00024-67-C-0220

ten (10) persons and conference room, suitably furnished, for daily meetings of the nucleus crew. The Contractor further agrees that the nucleus crew shall be permitted to use the equipment, facilities and services furnished by the Contractor to the Supervisor.

ARTICLE 9.  ACCESS TO THE VESSELS -- Officers, employees and associates of other prime contractors with the Government, and their subcontractors, shall, as authorized by the Supervisor, have, at all reasonable times, admission to the Plant, access to the vessel, and be permitted, within the Plant and on the vessel, to perform and fulfill their respective obligations to the Government.  The Contractor shall make reasonable arrangements with the Government or Contractors of the Government, as shall have been identified and authorized by the Supervisor to be given admission to the Plant and access to the vessel, for office space, workshops, storage or shop areas, or other facilities and services, necessary for the performance of the respective responsibilities involved, and reasonable totheir performance.

ARTICLE 10. SONAR (AN/SQS-26) SUBCONTRACT -- The Contractor agrees to enter into a subcontract with the vendor of the SQS-26 ( ) sonar, if so directed by the Government, to perform the following services:

(a)  To review the installation planning and the actual sonar installation and to certify the full compatibility between the sonar and each mechanical and electrical interface.

(b)  To conduct and perform the complete AN/SQS-26 ( ) sonar checkout, testing and demonstration of satisfactory installation and performance forthe Contractor.

(c)  To conduct and perform the Contractor's part of the certification testing of the installed sonar, and assist the Contractor in demonstration of sonar during trials.

The checkout, testing and demonstration of the installed AN/SQS-26 ( ) sonar shall be in accordance with Government approved and furnished checkout, countdown and certification test procedures.  Vendor engineering services provided under this article shall not be used by the Contractor for the purpose specified in Article 7.

Such direction by the Government to enter into such subcontract may be by a change issued under the "Changes" clause; or by a Supplemental Agreement.

ARTICLE 11. WEIGHT CONTROL -- (a) In accordance with the procedures set forth in Section 9290-1 of the Specifications, the Contractor shall enter into an agreement with the Government as to the Accepted Weight Estimate for the vessels under this contract, and such agreement shall be set forth in a Supplemental Agreement.  In the event an agreement as to the Accepted Weight Estimate cannot be reached within nine months after award of this contract, or such further period as may be guaranteed in writing by the Contracting Officer, then the Contracting Officer shall unilaterally determine the Accepted Weight Estimate, provided that the bounds of such unilateral determination shall be the values of the Contractor's Design Weight Estimate and the values of the Contract Design Weight Estimate.

N00024-67-C-0220

(b)  The net weight and moment effect of any changes incorporated into this contract shall be agreed upon and set forth in the supplemental agreement implementing or adjudicating such changes.

(c)  Prior to the date of performance of the inclining experiment, the weight and moment of the Government Furnished Material shall be agreed upon and incorporated into the contract by Supplemental Agreement.

(d)  If, after the Accepted Weight Estimate has been established, the Contractor proposes changes in the Contract Plans or Specifications solely for the purpose of meeting the values of displacement, height of ship's center of gravity (KG), trim or list set forth in or established pursuant to this contract, and if the Bureau approves, the parties shall enter into a Supplemental Agreement implementing such changes and such Supplemental Agreement shall adjust the contract price and delivery schedule pursuant to the "CHANGES" Clause except that no increase in the cost of or time for performance of the contract shall be considered in arriving at the adjustment for such changes.  Any Supplemental Agreements issued pursuant to this paragraph shall reflect the weight and moment effect of the changes and shall be reported as required for other Contract Modifications.  However, the net weight and moment effect of any changes made under this paragraph shall not be considered in calculating the Contractor responsible values under paragraph (e) below.

(e)  The Contractor shall be responsible for the delivery of the vessels with a displacement and KG of nor more than the values specified in the Accepted Weight Estimate for the full load condition plus the values agreed upon for the Contract Modifications and weight growth of Government Furnished Material.  In addition, after the Accepted Weight Estimate has been established, the Contractor shall be responsible for the delivery of the vessels with a trim and list for the full load condition, as specified in Section 9020 of the Specifications.  The Contractor, however, will not be responsible for the net total adverse effect on such trim or list caused by Contract Modifications and weight growth of Government Furnished Material.

ARTICLE 12.  PRICE ESCALATION (LABOR AND MATERIAL) -- (a)  Regardless of the actual change in the cost of labor or materials during the performance of this contract, the price adjustment provided in paragraphs (b) and (c) of this Article shall be the sole adjustment in the contract price on account of such changes.  For the purposes of this Article 31% of the contract price shall be deemed to constitute the labor cost subject to price adjustment and shall be apportioned as shown in the second column of table 1 of paragraph (b) hereof.  Similarly, 56% of the contract price shall be deemed to constitute the material cost subject to price adjustment, and shall be apportioned as shown in the second column of table 2 of paragraph (c) hereof.  No part of said Tables 1 and 2 shall be revised unless this contract is partially terminated and then only to the extent provided in paragraph (f) (2) of this Article provided, however, in the event the construction of the FY 67 vessels stated in Article 1(a)(1) is cancelled pursuant to Article 16, CANCELLATION OF ITEMS, said Tables 1 and 2 shall be

-9-

N00024-67-C-0220

deleted and the appropriate Tables 1 and 2 applicable to the FY 66 vessels stated in Article 1(a)(i), as provided for in IFB-600-1008-66-S, shall be substituted therefor.  In event of such substitution, said Tables 1 and 2 shall, for purposes of this Article 12, be considered to have been in effect as of the effective date of this contract.

(b)  Adjustments in the contract price on account of labor cost shall be made as follows for each Time Interval Period shown in the second column of Table 1, below, based on the changes in the nationwide "Index of Changes in Straight Time Average Hourly Earnings for Selected Shipyards" (June 1962 equals 100) for steel ship construction, herein sometimes called the "Labor Index", furnished to the Bureau of Ships by the Bureau of Labor Statistics of the United States Department of Labor:

(1)  The Labor Index for the base month of February 1966 shall be subtracted from the Labor Index for the Time Interval Period involved, determined in accordance with paragraph (d), below, and the difference computed as a plus or minus figure as the case may be.

(2)  The aforesaid difference, whether plus or minus, shall be divided by the Labor Index for the Base Month and the resulting quotient carried to four decimal places.

(3)  The aforesaid quotient shall be multiplied by the percentage of contract price set forth in the fourth column of Table 1, below, opposite the Time Interval Period involved, and the resulting product carried to six decimal places.

(4)  The aforesaid product shall be multiplied by the contract price of "Two Hundred Seventeen Million, Seven Hundred Forty Thousand Dollars ($217,740,000.00)" the resulting amount shall constitute the adjustment in the contract price for the Time Interval Period involved.

(5)  The adjustment in the contract price shall be upwards or downwards depending upon whether the difference in the labor indices calculated in subparagraph (1) above is a plus or minus figure, as the case may be, and shall be set forth in a Supplemental Agreement.

## Table 1

| Time Interval Period No. | Time Interval Period | Percent of Labor cost apportioned to Time Interval Period | Percent of contract price subject to adjustment for changes in labor cost apportioned to the Time Interval Period |
|---|---|---|---|
| 1. | September, October and November 1966 | 0 | 0 |
| 2. | December 1966, January, February and March 1967 | 0 | 0 |

N00024-67-C-0220

| Time Interval Period No. | Time Interval Period | Percent of Labor cost apportioned to Time Interval Period | Percent of contract price subject to adjustment for changes in labor cost apportioned to the Time Interval Period |
|---|---|---|---|
| 3. | April, May and June 1967 | 0 | 0 |
| 4. | July, August, September and October 1967 | 0 | 0 |
| 5. | November and December 1967, and January 1968 | 0.5 | 0.2 |
| 6. | February, March, April and May 1968 | 1.9 | 0.6 |
| 7. | June, July and August 1968 | 3 | 0.9 |
| 8. | September, October and November 1968 | 4.5 | 1.4 |
| 9. | December 1968, January, February and March 1969 | 5.5 | 1.7 |
| 10. | April, May, June and July 1969 | 9 | 2.8 |
| 11. | August, September and October 1969 | 10 | 3.1 |
| 12. | November, December 1969, and January 1970 | 10 | 3.1 |
| 13. | February, March, April and May 1970 | 10 | 3.1 |
| 14. | June, July and August 1970 | 10 | 3.1 |
| 15. | September, October, November and December 1970 | 9.5 | 2.9 |
| 16. | January, February and March 1971 | 8 | 2.5 |
| 17. | April, May, June and July 1971 | 7.5 | 2.3 |
| 18. | August, September, and October 1971 | 5.5 | 1.7 |
| 19. | November, December 1971, January and February 1972 | 3.1 | 1.0 |
| 20. | March, April and May 1972 | 2 | 0.6 |
|  |  | 100% | 31% |

(c)  Adjustments in the contract price on account of changes in material cost shall be made as follows for the Time Interval Period shown in the second column of Table 2, below, based on the changes in "Material Index for Bureau of Ships Steel Vessel Contracts", herein sometimes called the "Material Index" furnished to the Bureau of Ships by the Bureau of Labor Statistics of the United States Department of Labor:

(1)  The Material Index for the base month of February 1966 shall be subtracted from the Material Index for the Time Interval Period involved, determined in accordance with paragraph (d) below, and the difference computed as a plus or minus figure as the case may be.

(2)  The aforesaid difference, whether plus or minus, shall be divided by the Material Index for the base month and the resulting quotient carried to four decimal places.

-11-

N00024-67-C-0220

(3)   The aforesaid quotient shall be multiplied by the percentage of the contract price set forth in the fourth column of Table 2, below, opposite the Time Interval Period involved, and the resulting product carried to six decimal places.

(4)   The aforesaid product shall be multiplied by the contract price of Two Hundred Seventeen Million, Seven Hundred Forty Thousand Dollars ($217,740,000.00). The resulting amount shall constitute the adjustment in the contract price for the Time Interval Period involved.

(5)   The adjustment in the contract price shall be upwards or downwards depending upon whether the difference in the material indices calculated in subparagraph (1) above, is a plus or minus figure, as the case may be, and shall be set forth in a Supplemental Agreement.

### Table 2

| Time Interval Period No. | Time Interval Period | Percent of material cost apportioned to Time Interval Period | Percent of contract price subject to adjustment for changes in material cost apportioned to the Time Interval Period. |
|---|---|---|---|
| 1. | September, October and November 1966 | 0 | 0 |
| 2. | December 1966, January, February and March 1967 | 0 | 0 |
| 3. | April, May and June 1967 | 0 | 0 |
| 4. | July, August, September and October 1967 | 0.5 | 0.3 |
| 5. | November and December 1967, and January 1968 | 0.5 | 0.3 |
| 6. | February, March, April and May 1968 | 2.5 | 1.4 |
| 7. | June, July and August 1968 | 6 | 3.4 |
| 8. | September, October and November 1968 | 9 | 5.0 |
| 9. | December 1968, January, February, and March 1969 | 11.5 | 6.4 |
| 10. | April, May, June and July 1969 | 12 | 6.7 |
| 11. | August, September and October 1969 | 12 | 6.7 |
| 12. | November, December 1969, and January 1970 | 12 | 6.7 |
| 13. | February, March, April and May 1970 | 12 | 6.7 |

N00024-67-C-0220

| Time Interval Period No. | Time Interval Period | Percent of material cost apportioned to Time Interval Period | Percent of contract price subject to adjustment for changes in material cost apportioned to the Time Interval Period |
|---|---|---|---|
| 14. | June, July and August 1970 | 8.5 | 4.8 |
| 15. | September, October, November and December 1970 | 6 | 3.4 |
| 16. | January, February and March 1971 | 3.5 | 2.0 |
| 17. | April, May, June and July 1971 | 1.5 | 0.8 |
| 18. | August, September, and October 1971 | 1 | 0.6 |
| 19. | November, December 1971, January and February 1972 | 1 | 0.6 |
| 20. | March, April and May 1972 | 0.5 | 0.2 |
| | | 100% | 56% |

(d)  For the purpose of this Article:

(1)  For the purpose of computing the amount of adjustment in the contract price, the amount of contract price set forth in paragraphs (b)(4) and (c)(4) shall not be revised /unless this contract is partially terminated and then only to the extent provided in paragraph (f)(2) of this Article/; provided, however, in the event the construction of the FY 67 vessels stated in Article 1(a)(1) is canceled pursuant to Article 16, CANCELLATION OF ITEMS, said contract prices shall be deleted and the contract price applicable to the FY 66 vessels stated in Article 1(a)(1), as submitted in response to IFB-600-1008-66-S, shall be substituted therefor.  In the event of such substitution, the contract price shall be, for the purposes of this Article 12, considered to have been in effect as of the effective date of this contract.

(2)  The Labor Index and the Material Index for each Time Interval Period shall be the arithmetical average carried to one decimal point of the Labor Index, or the Material Index, as the case may be for each of the months comprising the Time Interval Period as set forth in column two of Tables 1 and 2.

(e)  Nothing contained in this Article shall be construed as prohibiting the inclusion in any adjustment in the contract price provided for under any other provisions of this contract, of changes in the cost of labor or materials.

(f)(1)  If this contract is terminated in whole, for any reason, no price adjustment shall be made under this Article for any Time Interval Period subsequent to the time this contract is terminated.

(2)  In the event that this contract is terminated in part for any reason including cancellation pursuant to Article 16 of these Special Provisions and such partial termination terminates the completion of one or more vessels,

-13-

N00024-67-C-0220

then notwithstanding any other provision of this Article, the contract price set forth in paragraphs (b)(4) and (c) (4), and column two of Tables 1 and 2 shall be adjusted for the reduction in the number of vessels to be completed under this contract.

(g) Any dispute arising under this Article shall be determined in accordance with and subject to the provisions of the "Disputes" Clause of the contract.

ARTICLE 13. EQUIPMENT STANDARDIZATION INCENTIVE -- (a) The objective of this Article is to increase maintainability of shipboard equipment and reduce cost of logistic support by encouraging installation in the vessel of equipments identical to those already installed in U.S. Navy ships and for which Allowance Parts Lists (APL) have already been prepared or are pending (such items already being in the U.S. Navy Supply System). An APL is a standardized list of parts developed by the Department of the Navy for specific components which are installed aboard naval ships as discussed in Section 9310-1 of the Ship Specification.

(b) To encourage meeting the objectives of paragraph (a) above, the contract price shall be increased, as provided in paragraph (c), if at least 90% of the Contractor-furnished equipments comprising each of the following categories are supported by APLs in effect or pending on 1 January 1966.

| Category | First 2 Digits of APL Number |
|---|---|
| Pumps | 01 |
| Boilers | 02 |
| Heat Exchangers | 03 |
| Condensers | 04 |
| Turbines* | 05 |
| Compressors | 06 |
| Distilling Plants | 08 |
| Circuit breakers (over 100 amp trip) | 14 |
| Controllers and starters, motor (for 1/2 H.P. motors and larger | 15 & 34 |
| Generators | 16 |
| Motors (1/2 H.P. & Larger) | 17 |
| Motor-generators | 18 |
| Refrigeration equipment & air conditioning equipment | 32 & 33 |
| Fans (except bracket fans) | 40 |
| Galley and Commissary, Laundry Equipment | 43 & 91 |
| Capstans, Cranes, Winches, Windlasses | 53, 57, 62, 63 |
| Steering gears | 60 |
| Engines, Diesel | 66 |
| Gear assemblies & shaft couplings (10 H.P. & Larger) | 69 & 78 |
| Valves (ferrous - 2" and over) (Nonferrous - 4" and over) | 88 |

* In the turbine category, if 90% of the total quantity (item count) of shipboard repair parts are identical with shipboard repair parts for turbine supported by an APL in effect or pending on 1 January 1966, the Contractor-furnished turbine shall be deemed to be supported by an APL in effect or pending on 1 January 1966 for all purposes of this Article.

-14-

N00024-67-C-0220

The percentage for each equipment category listed above shall be computed by using only those equipments in the category that have been assigned an APL number, the first two digits of which are shown above adjacent to such category. To arrive at such percentage, the number of Contractor-furnished equipments of such category, supported by an APL in effect or pending on 1 January 1966, plus any items of such category covered by paragraph (d), below, shall be divided by the total number of Contractor-furnished equipments in the same category without regard to the date of issuance or pendency of the related AFL, and the quotient multiplied by 100 and rounded off to the nearest full percent (a percentage so arrived at that ends in .50 shall be considered as the next higher full percent).

    (c)  Subsequent to receiving the Coordinated Shipboard Allowance List (COSAL) for the vessel, and prior to final settlement, the Contractor shall submit to the Contracting Officer, a list of all items comprising each equipment category set forth in paragraph (b), above, indicating the items the Contractor considers had APLs in effect or pending on 1 January 1966, and the percent relation arrived at as provided in paragraph (b) above. The Contracting Officer shall determine the percentage for each equipment category. The contract price shall be adjusted, by the amount, set forth below, corresponding to the highest percentage, set forth below, that equals the lowest percentage achieved by any equipment category of the vessel, as determined by the Supervisor of Shipbuilding:

| Lowest % of Contractor-Furnished APL Supported Equipments in Any Category | Vessel Contract Price Increase |
|---|---|
| 90% | $100,000 |
| 91 | 105,000 |
| 92 | 111,000 |
| 93 | 118,000 |
| 94 | 126,000 |
| 95 | 135,000 |
| 96 | 145,000 |
| 97 | 157,000 |
| 98 | 170,000 |
| 99 | 184,000 |
| 100 | 200,000 |

The decision of the Contracting Officer as to computation and amount of contract price adjustment under this Article shall be final and shall not be subject to the "Disputes" Clause of the contract.

    (d)  If the Contractor considers that an item of equipment offers an order of magnitude technical advantage over an item supported by an APL in effect or pending on 1 January 1966, the Contractor should submit a value engineering proposal under the value engineering incentive clause of this contract. A non-APL supported equipment will be deemed to be supported by an APL in effect or pending 1 January 1966 if the use of such non-APL supported equipment is necessitated by approval and application of the value engineering proposal.

-15-

N00024-67-C-0220

(e) Nothing in this Article in any way relieves the Contractor from fully complying with the requirements of the specifications.

ARTICLE 14.   LIMITATION ON CONTRACTOR'S LIABILITY FOR CORRECTION OF DEFECTS -- The liability of the Contractor for the correction of defects, as determined pursuant to the clause of this contract entitled "Inspection," arising during the guaranty period (other than defects resulting from fraud or such gross mistakes as amount to fraud) shall be limited to Four Million, Three Hundred Fifty-four Thousand, Eight Hundred Dollars ($4,354,800.00)

ARTICLE 15.   LIMITATION OF PRICE AND CONTRACTOR OBLIGATIONS --

(a)  Funds are available for the construction of the FY 66 vessels stated in Article 1(a)(1) and are set forth under the heading APPROPRIATION appearing on the first page of this contract.  Funds are not available for the construction of the FY 67 vessels stated in Article 1(a)(1); nor has the determination been made under Section 320 of Public Law 89-37 that all such vessels may be constructed in private shipyards.  Upon availability to the Contracting Officer of funds for construction of the FY 67 vessels stated in Article 1(a)(1), including the afore-mentioned determination under Section 302 of Public Law 89-37, the Contracting Officer shall, not later than 1 November 1966 unless a later date is agreed to by the parties, so notify the Contractor in writing and the Appropriation data shall be revised to reflect the amount of funds available for construction of the vessels.

(b)  The Government is not obligated to the Contractor for contract per-formance in any monetary amount in excess of the amount set forth under the heading APPROPRIATION plus the cancellation ceiling stated in Article 16(c) below.

(c)  The Contractor is not obligated to incur costs for the construction of the FY 67 vessels stated in Article 1(a)(1) unless and until he has been noti-fied in writing by the Contracting Officer of an increase in availability of funds in accordance with paragraph (a) of this Article.  If so notified, the Contractor's obligation shall be increased only to the extent contract performance is required for the construction of the FY 66 vessels for which funds have been made available.

(d)  In the event of termination pursuant to the "Termination for Con-venience of the Government" clause of this contract, the terms "total contract price" and "work under the contract" as used in that clause refer to the amount available for performance of this contract as provided for in this Article and to the work under program year requirements for which funds have been made available.  In event of termination for default, the Government's rights under this contract shall apply to the entire multi-year requirements.

(e)  Notification to the Contractor of an increase or decrease in the funds available for performance of this contract as a result of a clause other than this Article (e.g., exercise of an option for increased quantities or the "Changes" clause) shall not constitute the notification contemplated by para-graph (a) of this Article.

-16-

N00024-67-C-0220

ARTICLE 16.  CANCELLATION OF ITEMS --

(a)  As used herein, the term "cancellation" meansthat the Government is cancelling, pursuant to this Article, the construction of the FY67 vessels stated in Article 1(a)(1).  Such cancellation shall occur only if, within the time period specified in Article 15 of these Special Provisions or such further time as may be agreed to, the Contracting Officer (1) notifies the Contractor that funds will not be available for the construction of the FY67 vessels stated in Article 1(a)(1); or (ii) fails to notify the Contractor that funds have been made available for the construction of the FY67 vessels stated in Article 1(a)(1).

(b)  Except for cancellation pursuant to this Article or for termination pursuant to the "Default" clause, any reduction by the Contracting Officer in the number of vessels called for under this contract shall be considered a termination in accordance with the "Termination  for Convenience of the Government" clause of this contract.

(c)  In the event of cancellation pursuant to this Article, the Contractor will be paid, as consideration therefor, a cancellation charge not to exceed Five Million, Seven Hundred Twenty-six Thousand, Five Hundred Sixty-Two Dollars. ($5,726,562.).

(d)  The cancellation charge is intended to cover only expenses reasonably necessary for production which would have been equitably amortized in the unit prices for the entire quantity of the Multi-Year Procurement, but which, because of the cancellation, are therefore not so amortized.  The cancellation charge shall be computed and claim therefor made as would be applicable under the "Termination for Convenience of the Government" clause of this contract, except that the cancellation charge shall not include any amount for:

(1)  labor, materials or other expenses incurred for production of the cancelled items; provided, that initial costs, preparatory expenses and other nonrecurring costs reasonably and necessarily incurred by the Contractor and its subcontractors, butexclusive of any costs allocable to the completed supplies paid or to be paid for at the unit price, may be included in such charge; and

(ii)  which payment has already been made to the Contractor; or

(iii)  anticipated profit on the cancelled items, or on the costs included in the cancellation charge.

ARTICLE 17.  QUALIFIED PRODUCTS-COMPONENTS -- When any of the end items which are to be supplied to the Government by the Contractor will contain one or more components which are required to be Qualified Products, such components shall have been tested and have qualified for inclusion in a Qualified Products List before the award of any subcontract by the Contractor for such components, or, in the event the Contractor plans to manufacture such components himself, shall have been so tested and have so qualified before the Contractor begins to manufacture such components for performance of this Contract (not before manufacture of the prototype, preproduction model, or first article, for qualification testing).  Unless required for interchangeability or compatibility, the Contractor shall not cite brand names from any Qualified Products List in any subcontract solicitation, but shall refer to the pertinent military specification so that

-17-

N00024-67-C-0220

optimum competition may be obtained.  Delay resulting from the Contractor awaiting
qualification approval by the Government of a component shall not constitute
excusable delay when a previously qualified component could have been procured
in time to meet the end item delivery schedule.

ARTICLE 18.  NEW MATERIAL -- Except as to any supplies and components which
the Specification or Schedule specifically provides need not be new, the
Contractor represents that the supplies and components to be provided under this
contract are new (not used or reconditioned, and not of such age or so deteriorated
as to impair their usefulness or safety).  If at any time during the performance
of this contract, the Contractor believes that the furnishing of supplies or com-
ponents which are not new is necessary or desirable, he shall notify the Contract-
ing Officer immediately, in writing, including the reasons therefor and proposing
any consideration which will flow to the Government if authorization to use such
supplies is granted.

ARTICLE 19.  APPROPRIATION DATA

A11 10 DE 1078-1087  17X1611.8446 31 36995 24 2B 2004911211 - - - 108,435,000.00
                                                  2005011211
                                                  2005111211
                                                  2005211211
                                                  2005311211
                                                  2005411211
                                                  2005511211
                                                  2005611211
                                                  2005711211
                                                  2005811211

 1 DE 1078       17X1611.8446 25 36995 24 2B 2004911111 - - -      435,000.00

                                              Total      108,870,000.00

ARTICLE 20.  FOREIGN SHIPYARD CONSTRUCTION PROHIBITION -- In furtherance of
the Shipbuilding and Conversion Navy appropriation requirement of the Department
of Defense Appropriation Act, 1966, the hull, midbody or other fixed major structural
component of the vessel shall not be constructed in a foreign shipyard.

ARTICLE 21.  REQUIRED SOURCE FOR ALUMINUM INGOT --

(a)  As used in this clause (i) the term aluminum means aluminum forgings
and castings, and all aluminum controlled materials subject to the requirements
of Defense Materials System Regulation 1, including rolled bar, rod, structural
shapes, and bare wire; aluminum conductor steel, reinforced and bare aluminum
cable; insulated or covered wire or cable; extruded bar, rod, shapes and tube
(extruded, drawn and welded tube); sheet and plate; pig or ingot, granular or
shot; foil; and powder, flake, or paste; (ii) the term non-commercial item means
an item other than those listed in (i), but which contains aluminum in any form
and which is specially manufactured to meet Government specifications.

-18-

N00024-67-C-0220

(b)  Except as provided in (c) below, the contractor (or subcontractor or supplier, where applicable) shall purchase aluminum pig or ingot from the General Services Administration (GSA) in a quantity equivalent to that quantity of aluminum consumed in the manufacture of the items to be delivered under this contract and in accordance with the terms and conditions of sale prescribed therefor by GSA.  Aluminum purchased pursuant to this Clause may be used in any manner the contractor desires and need not be earmarked in any way after delivery to the contractor, nor physically incorporated in the items to be delivered.

(c)  To the extent the contractor places subcontracts or purchase orders for aluminum or for items containing aluminum, he is not required with respect to such subcontracts or purchase orders to purchase aluminum from the GSA. However, he agrees to incorporate similar provisions reflecting the requirements of this clause in its entirety in any such subcontract or purchase order for (i) aluminum in the total value of $500.00 or more or (ii) any non-commercial items (containing aluminum) in the total value of $2500.00 or more.  Each subcontractor or supplier hereunder agrees to incorporate the same or a similar clause, having the same effect, in his subcontracts or purchase orders for (i) aluminum in the total value of $500.00 or more and for (ii) any non-commercial items (containing aluminum) in the total value of $2500.00 or more.

(d)  Required purchases of aluminum from GSA by prime contractors, subcontractors, or suppliers, may be deferred for the purpose of consolidating purchases to meet the requirement of two or more contracts, subcontracts, or purchase orders containing this clause but not to exceed a period of 90 days from the date of the earliest clause requirement, or from the date that minimum order quantities are accumulated, whichever is later.  Successive consolidated purchases thereafter may be made at any time within 90 day intervals.  The 90 day limitation may be extended upon approval in writing by the GSA.  Each order placed with GSA pursuant to this clause shall state that it is placed in accordance therewith.  Such orders, and any inquiries with respect to GSA sales of aluminum pig or ingot, shall be sent to:

> Director, Materials Division
> Defense Materials Service
> General Services Administration
> 18th and F Streets, N.W.
> Washington, D. C.  20025

Certain producers of aluminum have entered into a Memorandum of Understanding dated 23 November 1965 with GSA under which they have made long term commitments to purchase certain minimum and maximum quantities of aluminum from that Agency. The obligations of such producers under this clause shall be governed by the provisions of that Memorandum of Understanding and to the extent of any inconsistency."

-19-

N00024-67-C-0220

ARTICLE 22.  APPROVAL BY THE GOVERNMENT -- Approval by the Government as required under this Contract and the applicable specifications shall not relieve the Contractor of its obligation to comply with the specifications and with all other requirements of the contract, nor shall it impose upon the Government any liability it would not have had in the absence of such approval.

ARTICLE 23.  SUCCESSOR IN INTEREST -- Pursuant to a reorganization within the Department of the Navy, effective 1 May 1966, the Naval Ship Systems Command has become the successor to the Bureau of Ships with respect to this contract. Accordingly, each reference in this contract to the Bureau of Ships shall be deemed to refer to the Naval Ship Systems Command and any reference to the Chief, Bureau of Ships, shall be deemed to refer to the Commander, Naval Ship Systems Command.

ARTICLE 24.  MODIFICATIONS -- The General Provisions are hereby modified as follows:

(a)  Clause 3, "CHANGES".  Delete the phrase "(iii) place or delivery" and Substitute therefor "(iii) place of delivery."

(b)  Clause 5, "GUARANTY PERIOD".  Delete the present clause in its entirety and substitute the following therefor:

"5.  GUARANTY PERIOD -- As used in this contract, the term "defects" includes any and all defects, deficiencies, deteriorations, and failure in the vessels.  There shall be a guaranty period for each vessel consisting of six (6) months immediately following the date of completion of the fitting out period of the vessel but in any event not to exceed eight (8) months immediately following the date of preliminary acceptance of the vessel.  Prior to completion of the fitting out period the cognizant Supervisor shall notify the Contractor, in writing, as to the date of completion of the fitting out period. The guaranty period shall be extended by the time during which such vessel is not available for unrestricted service by reason of any defects for which the Chief, Bureau of Ships shall determine the Contractor to be responsible.  During said period the vessel, after being fully equipped and armed and in all respects complete and ready for service, shall be finally tried by and at the expense of the Government under conditions to be prescribed by the Secretary.  The Contractor may, with approval of the Secretary, have an engineer on board such vessel during said period.  Such engineer shall have every reasonable opportunity to inspect the working of such vessel in all its parts but shall have no power to direct or control its operation."

(c)  Clause 25, "NOTICE AND ASSISTANCE REGARDING PATENT AND COPYRIGHT INFRINGEMENT".  Add the following paragraph (a):

"(a)  This clause shall be included in all subcontracts."

-20-

N00024-67-C-0220

(d) Clause 35, "SMALL BUSINESS SUBCONTRACTING PROGRAM". In the first line of paragraph (a)(8), delete the word "month" and insert "quarter". Delete the last sentence of paragraph (a)(8), and insert the following therefor: "The reporting requirements of this subparagraph (8) do not apply to Small Business Contractors, Small Business Subcontractors, or educational and nonprofit institutions".

(e) Clause 38, "DUTY-FREE ENTRY - CANADIAN SUPPLIES". In paragraph (g), on line two (2), delete the figure "$5,000" and substitute therefor the figure "$2,500".

(f) Clause 45, "EQUAL OPPORTUNITY."

Clause 45 entitled "EQUAL OPPORTUNITY" of General Provisions, Vessel Form (March 1965) is amended by deleting references to the President's Committee on Equal Employment Opportunity, Executive Order 10925 of March 6, 1961, as amended, and Section 303 of Executive Order No. 10925 of March 6, 1961, as amended, and substituting therefor the Secretary of Labor, Executive Order No. 11246 of September 24, 1965, and Section 204 of Executive Order 11246 of September 24, 1965, respectively.

In accordance with regulations of the Secretary of Labor, the rules, regulations, orders, instructions, designations, and other directives issued by the President's Committee on Equal Employment Opportunity and those issued by the heads of the various departments or agencies under or pursuant to any of the Executive Orders superseded by Executive Order 11246, shall, to the extent that they are not inconsistent with Executive Order 11246, remain in full force and effect unless and until revoked or superseded by appropriate authority. References in such directives to provisions of the superseded orders shall be deemed to be references to the comparable provisions of Executive Order 11246."

(g) Delete Clause 52, "DATA - WITHHOLDING OF PAYMENT" in its entirety and substitute the following therefor:

"52.   DATA - WITHHOLDING OF PAYMENT --

If 'Technical Data' (as defined in the clause of this contract entitled 'Rights in Technical Data'), or any part thereof, is not delivered within the time specified by this contract or is deficient upon delivery (including having restrictive markings not specifically authorized by this contract), the Contracting Officer may, until such data is delivered or deficiencies are corrected, withhold payment to the Contractor of one percent (1%) of the contract price unless a lesser withholding is specified in the schedule. Such withholding is in addition to and separate from the one percent (1%) withholding under Clause 8 'PAYMENTS' of the General Provisions.

-21-

N00024-67-C-0220

Payments shall not be withheld nor any other action taken pursuant to this clause where the Contractors failure to make timely delivery or to deliver data without deficiencies arises out of causes beyond the control and without the fault or negligence of the Contractor within the meaning of the clause hereof entitled 'Default'. The withholding of any amount or subsequent payment thereof to the Contractor shall not be construed as a waiver of any rights accruing to the Government under this contract."

(h) Clause 53, "AUDIT-PRICE ADJUSTMENTS". In paragraph (b) in the third line after the words "Contracting Officer", add "the Comptroller General of the United States".

(i) Delete Clause 56, "VALUE ENGINEERING" in its entirety and substitute the following therefor:

"56. VALUE ENGINEERING INCENTIVE (OCTOBER 1964) --

(a) This clause applies to cost reduction proposals initiated and developed by the Contractor for changing the drawings, designs, specifications, or other requirements of this contract. This clause does not, however, apply to any such proposal unless it is identified by the Contractor, at the time of its submission to the Contracting Officer, as a proposal submitted pursuant to this clause. The cost reduction proposals contemplated are those that:

(i)  would require, in order to be applied to this contract, a change order to this contract; and

(ii) would result in savings to the Government by providing

(A) less costly items than those specified herein without impairing any of their essential functions and characteristics such as service life, reliability, economy of operation, ease of maintenance, and necessary standardized features, or

(B) items, regardless of the acquisition cost, which produce collateral savings in Government-furnished property, operations, maintenance, or other areas which exceed any increased acquisition cost, without impairing any of the items' essential functions and characteristics.

(b) Cost reduction proposals, as defined herein, shall be processed expeditiously and in the same manner as prescribed for any proposal which would necessitate issuance of a contract change order. As a minimum, the following information shall be submitted by the Contractor with each proposal utilizing Value Engineering Report Form NAVSHIPS 4629:

-22-

N00024-67-C-0220

(i)   a description of the difference between the existing
contract requirement and the proposed change, and the
comparative advantages and disadvantages of each;

(ii)   an itemization of the requirements of the contract which
must be changed if the proposal is adopted and a recom-
mendation as how to make each such change (e.g., suggested
revision);

(iii)   an estimate of the reduction in performance costs, if
any, that will result from adoption of the proposal
taking into account the costs of implementation by the
Contractor (including any amount attributable to sub-
contracts in accordance with paragraph (e) below) and
the basis for the estimate;

(iv)   a prediction of any effects the proposed change would
have on other costs to the Government, such as Govern-
ment-furnished property costs, costs of related items,
and costs of maintenance and operation;

(v)   a statement of the time by which a change order adopting
the proposal must be issued so as to obtain the maximum
cost reduction during the remainder of this contract,
noting any effect on the contract delivery schedule; and

(vi)   the dates of any previously submissions of the proposals,
the numbers of any Government contracts under which sub-
mitted, and the previous actions by the Government, if
known.

Each cost reduction proposal shall be submitted to the cognizant
Supervisor with an advance complete copy to Code 609.4B, Bureau of
Ships, Navy Department, Washington, D.C.  20360

(c)  The Government shall not be liable for any delay in acting
upon any proposal submitted pursuant to this clause. The decision of
the Contracting Officer as to the acceptance of any such proposal under
this contract shall be final and shall not be subject to the 'Disputes'
clause of this contract. The Contracting Officer may accept, in
whole or in part, any cost reduction proposal submitted pursuant to
this clause either by issuing a change order to this contract, or, if
performance has been completed under this contract, by giving written
notice of acceptance within a reasonable time thereafter to the Con-
tractor. Unless and until a change order applies a proposal to this
contract, the Contractor shall remain obligated to perform in
accordance with the terms of the existing contract. If a proposal
is accepted after performance under this contract has been completed,
the adjustment required shall be effected by contract modification
in accordance with this clause. The adjustment made pursuant to
this clause shall be the cumulative total of each adjustment authorized
in this clause, rather than a selection of alternatives.

N00024-67-C-0220

(d)  If a cost reduction proposal submitted pursuant to this
clause is accepted and applied to this contract, an equitable adjust-
ment in the contract price shall be made in accordance with this
clause and the 'Changes' clause of this contract.  The equitable
adjustment shall be established by determining the effect on the
Contractor's cost of performance, taking into account the Con-
tractor's cost of implementing the change (including any amount
attributable to subcontracts in accordance with paragraph (e) below).
When the cost of performance of this contract is reduced as a result
of the change, the contract price shall be reduced by fifty percent
(50%) of the total estimated decrease in the Contractor's cost of
performance.  When the cost of implementing the change precludes
a reduction in the cost of performing this contract, the equitable
adjustment increasing the contract price shall be in accordance with
the 'Changes' clause rather than under this clause.

(e)  The Contractor will use his best efforts to include
appropriate value engineering arrangements in any subcontract which,
in the judgement of the Contractor, is of such a size and nature as
to offer reasonable likelihood of value engineering cost reductions.
For the purpose of computing any equitable adjustment in the contract
price under paragraph (d) above, the Contractor's cost of implementa-
tion of a cost reduction proposal which is accepted under this contract
shall be deemed to include any implementation costs of a subcontractor
and any value engineering incentive payments to a subcontractor, or
cost reduction shares accruing to a subcontractor, which clearly
pertain to such proposal and which are incurred, paid or accrued in
the performance of a subcontract under this contract.  However, no
such payment or accrual to a subcontractor will be permitted, either
as a part of the Contractor's implementation costs or otherwise,
to reduce the Government's share on additional purchases as contem-
plated by paragraph (j) of this clause.

(f)  In the event that an accepted cost reduction proposal
results in projected collateral savings in Government-furnished
property, operations, logistic support, or other areas which exceed
any increase in acquisition cost, the contract price shall be
increased by ten percent (10%) of the projected collateral savings
estimated to accrue to the Government during one (1) year of operational
use of the item incorporating the change.  The determination of the
amount of collateral savings, if any, will be made solely by the
Government and shall not be subject to the 'Disputes' clause of this
contract.

(g)  Cost reduction proposals submitted under the provisions
of any other contract also may be submitted for consideration under
this contract.  Notwithstanding any other provision of this clause,

-24-

N00024-67-C-0220

where a cost reduction proposal has been accepted by the Government, prior to its acceptance under this contract, under any other contract with the Contractor for substantially the same items as called for by this contract, the total amount of the equitable adjustment under this contract shall be limited to that provided for in paragraph (d) of this clause.

(h)  The Contractor may restrict the Government's right to use any sheet of a value engineering proposal or of the supporting data, submitted pursuant to this clause in accordance with the terms of the following legend if it is marked on such sheet.

> This data furnished pursuant to the Value Engineering Incentive clause of contract N00024-67-C-0220 shall not be disclosed outside the Government, or be duplicated, used, or disclosed, in whole or in part, for any purpose other than to evaluate a value engineering proposal submitted under said clause.  This restriction does not limit the Government's right to use information contained in this data if it is or has been obtained from another source, or is otherwise available, without limitations. If such a proposal is accepted by the Government under said contract after the use of this data in such an evaluation, the Government shall have the right to duplicate, use, and disclose any data reasonable necessary to the full utilization of such proposal as accepted, in any manner and for any purpose whatsoever, and have others so do.

In the event of acceptance of a value engineering proposal, the Contractor hereby grants to the Government all rights to use, duplicate or disclose, in whole or in part, in any manner and for any purpose whatsoever, and to have or permit others to do so, any data reasonably necessary to fully utilize such proposal.

(i)  Contract modifications made as a result of this clause will state that they are made pursuant to it.

(j) (1)  If a cost reduction proposal is accepted under this contract, in addition to any adjustment under paragraph (d) above, the Contractor will be paid a royalty share of savings realized by the Government on additional purchases, if any, of items utilizing the cost reduction proposal.  The royalty share will be forty percent (40%) of the unit cost reduction under this contract (without deducting any cost of implementation) multiplied by the quantity of each end item which (i) is substantially the same as an end item called for by this contract, (ii) is accepted by the Government, under any other contract of the Department of the Navy, not later than one (1) year after either the last scheduled delivery of such

-25-

N00024-67-C-0220

item under this contract or the date of the cost reduction proposal, whichever is later, and (iii) utilizes the cost reduction proposal pursuant to the specifications or other provisions of such other contracts. But if application of the cost reduction proposal reasonably requires the incurrence of any ascertainable collateral costs to the Government in connection with this or other contracts or any predictable implementation cost or other contracts with the Contractor or other contractors, or if application of the cost reduction proposal of this contract results in an increase in the contract price under paragraph (d) above, then the sum of such collateral costs, implementation costs, and price increase will be determined, promptly after acceptance of the cost reduction proposal, and any amounts on account of the royalty share which would otherwise be payable under the provisions of this paragraph (j) shall be successively credited against such sum, so that no amount shall be payable under this paragraph (j) unless and until the amounts so credited equal such sum. Except to the extent of such collateral costs and implementation costs, if any, the Government will pay the royalty share to the Contractor from time to time and in reasonable increments as it accumulates and no payable amount will remain unpaid for more than six (6) months.

(2) For the purposes of this paragraph the unit cost reduction under this contract will be what it would have been had the cost reduction proposal been utilized on all units under this contract.

(3) The amount of the unit cost reduction will be determined promptly after acceptance of each cost reduction proposal. If the contractor and the Contracting Officer fail to agree upon the amount of the unit cost reduction or collateral costs or implementation costs, such failure shall be deemed to be a dispute concerning a question of fact within the meaning of the 'Disputes' clause of this contract."

/REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK/

-26-

N00024-67-C-0220

This contract entered into after formal advertising pursuant to 10 U.S. Code 2305.

IN WITNESS WHEREOF, the parties hereto have executed this contract as of the day and year first above written.

THE UNITED STATES OF AMERICA

Date ___ 2 5 AUG 1966 _____

By _____
Contracting Officer
Bureau of Ships
Department of the Navy

AVONDALE SHIPYARDS, INC.
(Type Name of Company)

Date ___ 2 5 AUG 1966 _____

By _____
(Type Name and Title)
Henry Z. Carter, President
P. O. Box 50280
New Orleans, Louisiana
70150
(Type Address)

CERTIFICATE

I, _____, certify that I am _____ _____ of the corporation named as Contractor herein; that _____ _____ who signed said contract on behalf of the Contractor was then _____ of said corporation, and that said contract was duly signed for and in behalf of said corporation by authority of its governing body and is within the scope of its corporate powers.

[ CORPORATE SEAL ]

-27-

## AFFIDAVIT OF THOMAS McCAFFERY

STATE OF VIRGINIA
ALEXANDRIA CITY

BEFORE ME, the undersigned authority, personally came and appeared:

## THOMAS F. McCAFFERY

who, after being duly sworn, did dispose and state as follows:

1.  He is a technical consultant, researcher and the head of a company whose focus is on the location and analysis of United States Navy and merchant ship design, development, construction, maintenance and repair records. He also specializes in research of personnel records, military specifications, qualified product lists and related records.

2.  He is an officer in the United States Naval Reserve and has been since 1976. His current rank is Commander. He has been assigned on active duty to a variety of cruiser and destroyer type ships assigned to the U.S. Atlantic and Pacific Fleets.

3.  He is a Merchant Marine Officer licensed by the United States Coast Guard as Chief Mate of Steam or Motor Vessels of Any Gross Tons Upon Oceans.

4.  He has examined the specifications, design and construction of the Ocean Escort DE 1078 Class (hereinafter "DE 1078 Class").

5.  The DE 1078 Class vessels were built by Avondale Shipyards, Inc. (hereinafter "Avondale") and delivered to the United States Navy between April 6, 1971 and October 17, 1974. On June 30, 1975 all of the ships of this class were re-designated as Frigates (FF) with the same hull number. All of these ships were decommissioned between 1991 and 1994. All of these ships have been either leased or sold to foreign navies. Most are still in active service for their new owners. The ships of this class, their launching and delivery dates are:

| Ship Name / Number | Launched | Delivered |
|---|---|---|
| Joseph Hewes (DE 1078) | March 7,1970 | April 6, 1971 |
| Bowen (DE 1079) | May 2, 1970 | May 17, 1971 |
| Paul (DE 1080) | June 20, 1970 | July 23, 1971 |
| Alywin (DE 1081) | August 29, 1970 | March 3, 1971 |
| Elmer Montgomery (DE 1082) | November 21, 1970 | October 14, 1971 |
| Cook (DE 1083) | January 23, 1971 | December 9, 1971 |
| McCandless (DE 1084) | March 20, 1971 | March 3, 1972 |
| Donald B. Beary (DE 1085) | May 22, 1971 | June 25, 1972 |
| Brewton (DE 1086) | July 24, 1971 | June 18, 1972 |



EXHIBIT

F

| Ship Name / Number | Launched | Delivered |
|---|---|---|
| Kirk (DE 1087) | September 25, 1971 | August 27, 1972 |
| Barbey (DE 1088) | December 4, 1971 | October 15 ,1972 |
| Jesse L. Brown (DE 1089) | March 18, 1972 | December 8, 1972 |
| Ainsworth (DE 1090) | April 15, 1972 | February 1, 1973 |
| Miller (DE 1091) | June 3, 1972 | April 13, 1973 |
| Thomas C. Hart (DE 1092) | August 12, 1972 | June 8, 1973 |
| Capodanno (DE 1093) | October 21, 1972 | October 18, 1973 |
| Pharris (DE 1094) | December 16, 1972 | December 14, 1973 |
| Truett (DE 1095) | February 3, 1973 | May 24, 1974 |
| Valdez (1096) | March 24, 1973 | July 12, 1974 |
| Moinester (DD 1097) | May 12, 1973 | October 17, 1974 |

6.    The basis for the contract between Avondale and the U.S. Navy to build these ships was the "Specifications for Building Ocean Escort DE 1078 Class". This document was approved by the U.S. Navy on January 14, 1966. These specifications cover every aspect of constructing the DE 1078 Class.

7.    Section 9390 of this specification (attached as Exhibit A), deals with thermal insulation requirements of the DE 1078 Class. This section has two specific requirements regarding thermal insulation.

  a.    The decks of air conditioned spaces over the main machinery space, forced draft blowers and boiler uptakes shall be insulated with one (1") inch thick insulating block. The specification for this product is shown as Mil-I-2819. This is "Insulation Block, Thermal".

  b.    The materials and minimum acceptable thicknesses for all other thermal insulation products are specified in Military Standard 769, "Thermal Insulation Requirements for Machinery and Piping".

8.    The version of Mil-I-2819 that was in effect during the time that the DE 1078 Class was under construction at Avondale was Mil-I-2819E , issued on November 9, 1967 (attached as Exhibit B). The specification provides for four different classes of product, identified by temperature range. The maximum temperatures are, by class, 600°, 1200°, 1500° and 2000° F, respectively. Based on these temperature ranges, Class 1 or 2 Insulating Block would be used for deck insulation. Class 2 - 4 Insulating Block could be used for higher temperature applications, such as turbines and boilers. On January 9, 1973 this specification was amended to require that the products under this specification be asbestos and silica free.

9.    Paragraph 3 of this specification requires that any product furnished under this specification can only be those listed on the Qualified Products List for this specification.  Qualified Products Lists for this specification that were in effect from May 27, 1969 to August 7, 1973 (attached as Exhibit C) identify the following products, and their manufacturers, approved for Classes 1 and 2 through September 24, 1972.

      Fiberboard Corporation; Super Caltemp, Caltemp, Pabco, Prasco
      Johns-Manville Sales Corporation; JM, Thermobestos, Superex M
      Keene Corporation; Thermasil
      Owens Corning Fiberglas Corporation; Kaylo, Kaylo 20
      Philip Carey Corporation; New Careytemp 1500 Block Insulation
      GAF Corporation; Calsilite

10.   All of the products listed above contained asbestos.  According to the Qualified Product Lists, a limited number of non-asbestos containing products were available under this specification starting on September 25, 1972.  The first Qualified Product List with no asbestos containing products was issued on May 3, 1973.  Accordingly, the only products that Avondale could have used to meet this specification requirement for DE 1078 through DE 1087 contained asbestos.

11.   Several versions of Military Standard 769 (attached as Exhibit D) were in effect between1970 and1974.  Version "C" was in effect from November 15, 1967 to March 31, 1971.  The "D" version was in effect from April 1, 1971 to June 14, 1974.  The requirements of these standards are applicable to every ship of the U.S. Navy whether the ship is under construction or in operation with the fleet. Table 1 of each document identifies the product specifications which may be used on piping, valves, fittings, flange joints and machinery at indicated temperature ranges.  Versions "C" and "D" identify only two products which may be used for temperatures in excess of 370° F.  These are Mil-I-2781, "Insulation, Pipe, Thermal" and Mil-T-15349, "Insulation Tape, Thermal".  The latter product was only approved for temperatures up to 750° F on piping up to 3/4" in diameter.

12.   The version of Mil-I-2781 that was in effect during the time that the DE 1078 Class was under construction at Avondale was Mil-I-2819D , issued on December 10, 1964 (attached as Exhibit E).  The specification provides for three different grades of product, identified by temperature range.  The maximum temperatures are, by class, 600°, 750° and 1200° F, respectively.  Grades II and III each had two classes of product identified as "Fibrous" and "Compounded". All three grades would have been used in the construction of the DE 1078 Class. The specification was amended on March 1, 1971 to delete the "Fibrous" classes of Grade II (class c) and Grade III (class f).  On January 9, 1973 this specification was further amended to require that the products under this specification be asbestos and silica free.

13. Paragraph 3 of this specification requires that any product furnished under this specification can only be those listed on the Qualified Products List for this specification.  Qualified Products Lists for this specification that were in effect from May 27, 1969 to August 7, 1973 (attached as Exhibit F) identify the following products, and their manufacturers, approved for Grades I, II and III through July 31, 1972.

> Grade I
> Fiberboard Corporation; Pabco, Caltemp
> GAF Corporation; Calsilite
> Johns Manville Sales Corporation; JM 85% Magnesia, Thermobestos
> Keene Corporation; Thermasil
> Nicolet Industries; KaytherM-1700
> Owens-Corning Fiberglas Corporation; Kaylo
> Philip Carey Corporation; New Careytemp 1500

> Grade II, Class c
> Pittsburgh Corning Corporation; Unibestos #750

> Grade II, Class d
> Fiberboard Corporation; Caltemp
> GAF Corporation; Calsilite
> Johns Manville Sales Corporation; Thermobestos
> Keene Corporation; Thermasil
> Nicolet Industries; KaytherM-1700
> Owens-Corning Fiberglas Corporation; Kaylo
> Philip Carey Corporation; New Careytemp 1500

> Grade III, Class e
> Fiberboard Corporation; Caltemp, Prasco
> GAF Corporation; Calsilite
> Johns Manville Sales Corporation; Thermobestos, Superex M
> Keene Corporation; Thermasil
> Nicolet Industries; KaytherM-1700, Hy-Temp
> Owens-Corning Fiberglas Corporation; Kaylo
> Philip Carey Corporation; New Careytemp 1500

> Grade II, Class f
> Pittsburgh Corning Corporation; Unibestos #1200

14. All of the products listed above contained asbestos.  According to the Qualified Product Lists, a few non-asbestos containing products were available under this specification starting on August 1, 1972.   The first Qualified Product List with no asbestos containing products was issued on May 3, 1973.  Accordingly, the only products that Avondale could have used to insulate pipes larger than 3/4" at temperatures above 370° F on DE 1078 through 1087 contained asbestos.

15. From the above he concludes that:

   a. Avondale had a contractual agreement to build DE 1078 Class Ocean Escorts for the U. S. Navy.

   b. A detailed construction specification was part of this contractual agreement.

   c. The construction specification required the use of certain materials as thermal insulation in the construction of the DE 1078 Class ships.

   d. Two of these products, Mil-I-2819 and Mil-I-2781, only permitted the use of products which were approved by the U.S. Navy.

   e. Through September and July 1972, respectively, the only approved products under each specification contained asbestos.

   f. Avondale was contractually obligated to use asbestos containing materials to insulate the USS Joseph Hewes (DE 1078), USS Bowen (DE 1079), USS Paul (DE 1080), USS Aylwin (DE 1081), USS Elmer Montgomery (DE 1082), USS Cook (DE 1083), USS McCandless (DE 1084), USS Donald B. Beary (DE 1085), USS Brewton (DE 1086) and USS Kirk (DE 1087).

16. He has read the foregoing and all of the information contained therein is true and accurate to the best of his personal knowledge.

Executed this 4th day of August, 2006 at Alexandria City, Virginia.


Thomas McCaffery


Sworn and subscribed before me
on this 4th day of August, 2006



Notary Public

REPRODUCED AT THE NATIONAL ARCHIVES

N.S. 0902-008-4010

SPECIFICATIONS

FOR BUILDING

OCEAN ESCORT

DE 1078

CLASS

| Approved |
| --- |
| _signature_ |
| For Chief of Bureau |
| 14 January 1966 |

DEPARTMENT OF THE NAVY
BUREAU OF SHIPS
WASHINGTON, D. C.   20360

## INITIAL DISTRIBUTION

1 copy (designated "Library Copy") to each
Naval Shipyard (SNDL L1)

1 copy, except as noted, (designated "For in-
formation and retention") to each of the following
activities:

Chief Field Branch, BUMED, 3500 Broad St.,
Philadelphia, Pa.
BUWEPS (RSWI) (3 copies)
BUSANDA (W1)
DATMOBAS
MEL (Code 820)
NAVSHIPSO
NAVBOTLAB
NAVSUPRANDFAC
NAVWPNSERVO (Code SST)
NSMSES
NOL
SPCC MECH
U.S. Naval Engineering Laboratory (Code
NE-42)

i

REPRODUCED AT THE NATIONAL ARCHIVES

## TABLE OF CONTENTS

| Section | Title | Page |
|---|---|---|
| 5000-0 | General Administrative Requirements | 1 |
| 9010-0 | Characteristics ........ In Addendum | |
| 9020-0 | General Requirements for Design and Construction | 7 |
| 9020-1 | Plans | 16 |
| 9020-2 | Models and Mockups | 29 |
| 9020-3 | Photographs | 30 |
| 9020-5 | Instruction Books | 32 |
| 9020-6 | Government Furnished Material | 35 |
| 9020-11 | Shipboard Tests | 36 |
| 9080-1 | Ship Trials | 38 |
| 9090-1 | Welding, Riveting, and Allied Processes | 43 |
| 9090-3 | Screw Threads | 44 |
| 9110-0 | General Requirements for Hull Structure | 48 |
| 9110-1 | Shell Plating | 55 |
| 9110-3 | Framing for Shell Plating | 57 |
| 9110-4 | Skeg and Bilge Keels | 58 |
| 9110-5 | Bulkheads and Partitions | 59 |
| 9110-6 | Decks and Platforms | 63 |
| 9110-9 | Structural Stanchions | 64 |
| 9110-12 | Foundations | 65 |
| 9110-16 | Superstructure | 68 |
| 9120-1 | Mooring and Towing Fittings | 69 |
| 9120-2 | Rails, Stanchions, and Life Lines | 70 |
| 9120-3 | Fixed Port Lights and Windows | 72 |
| 9120-4 | Locks, Keys, and Tags | 74 |
| 9120-5 | Hull Fittings | 77 |
| 9140-1 | Deck Covering | 79 |
| 9150-1 | JP-5 Systems | 83 |
| 9160-1 | Access | 86 |
| 9160-2 | Doors, Hatches, Scuttles, and Manhole Covers | 88 |
| 9160-4 | Ladders, Handrails, Floorplates, and Gratings | 95 |
| 9170-1 | Masts and Spars | 99 |
| 9170-3 | Variable Depth Sonar (VDS) Modified AN/SQA-13 System | 101 |
| 9180-1 | Rigging | 102 |
| 9180-2 | Awnings, Weather Screens, Covers and Vinyl Film Curtains | 104 |
| 9190-1 | Painting | 105 |
| 9190-3 | Zinc Coating | 120 |
| 9190-6 | Cathodic Protection | 121 |
| 9200-1 | Capstans | 122 |
| 9200-3 | Replenishment-at-sea and Stores Handling | 123 |
| 9210-1 | Hydraulic Power Transmission System | 126 |
| 9220-1 | Rudder | 130 |
| 9220-2 | Steering Gear | 133 |
| 9240-1 | Command, Combat Control, Communications, and Electronics Stations and Spaces | 138 |
| 9240-2 | Machinery Control Station | 141 |
| 9260-1 | Anchor Stowage and Handling | 142 |
| 9280-1 | Machinery and Piping Designating and Marking | 147 |
| 9280-2 | Electrical Designating and Marking | 154 |
| 9280-3 | Hull Designating and Marking | 170 |
| 9280-6 | Draft Marks | 180 |
| 9290-1 | Weights | 182 |
| 9290-3 | Inclining Experiment | 188 |
| 9290-4 | Activated Fin Stabilizer | 189 |
| 9290-8 | Compartment Testing | 193 |
| 9300-1 | Storerooms and Issue Rooms | 197 |
| 9300-3 | Special Stowage Arrangements | 201 |
| 9310-1 | Repair Parts | 205 |
| 9320-1 | Offices | 208 |
| 9330-0 | General Requirements for Living, Messing, and Recreation Spaces | 211 |
| 9330-2 | Officer Living, Messing, and Recreation Spaces | 213 |
| 9330-3 | Chief Petty Officer Living, Messing, and Recreation Spaces | 215 |
| 9330-4 | Crew Living, Messing, and Recreation Spaces | 216 |
| 9330-5 | Utility Spaces | 218 |
| 9340-1 | Commissary Spaces | 219 |
| 9350-1 | Laundry | 223 |
| 9360-1 | Plumbing | 225 |
| 9360-4 | Garbage Disposal | 228 |
| 9360-6 | Ratproofing | 229 |
| 9370-1 | Medical Spaces | 230 |
| 9380-1 | Ventilation, Heating, and Air Conditioning | 232 |
| 9390-1 | Thermal Insulation and Acoustic Absorptive Treatment of Compartments | 248 |
| 9390-2 | Thermal Insulation for Machinery, Equipment and Piping | 252 |
| 9390-3 | Hull Damping, Sonar Dome Baffles, and Dome Isolation | 255 |
| 9390-4 | Thermal Insulation, Refrigerated Spaces | 257 |

iii

REPRODUCED AT THE NATIONAL ARCHIVES

| Section | Title | Page |
|---|---|---|
| 9390-5 | Thermal Insulation and Acoustic Absorptive Treatment for Ducts and Trunks | 258 |
| 9390-6 | Sheathing | 260 |
| 9400-0 | General Requirements for Machinery Plant | 261 |
| 9400-1 | Noise, Shock and Vibration | 265 |
| 9400-3 | Noise and Shock—Additional Requirements | In Addendum |
| 9410-1 | Propulsion Steam Turbines | 275 |
| 9420-1 | Propulsion Reduction Gears | 284 |
| 9420-2 | Propulsion Couplings | 289 |
| 9430-1 | Propulsion Shafting | 290 |
| 9430-2 | Propulsion Shaft Bearings | 295 |
| 9440-1 | Propeller | 296 |
| 9450-1 | Lubrication Systems | 301 |
| 9460-1 | Steam Condensers and Air Ejectors | 309 |
| 9470-1 | Pumps | 312 |
| 9480-0 | General Requirements for Piping Systems | 319 |
| 9480-1 | Drainage Ballasting Systems | 358 |
| 9480-2 | Machinery and Piping System Drainage | 361 |
| 9480-3 | Sea Water Service Systems | 367 |
| 9480-4 | Fresh Water Service Systems | 371 |
| 9480-5 | Machinery Circulating Water and Cooling Water Systems | 382 |
| 9480-8 | Plumbing and Deck Drains | 385 |
| 9480-9 | Overflows, Air Escapes, Plumbing Vents, and Sounding Arrangements | 390 |
| 9480-10 | Steam and Exhaust Systems | 395 |
| 9490-1 | Compressed Air Systems | 400 |
| 9500-1 | Auxiliary Machinery | 411 |
| 9510-1 | Boilers | 423 |
| 9510-2 | Boiler Controls | 435 |
| 9520-1 | Combustion Exhaust Gas Systems | 443 |
| 9520-2 | Diesel Engine Combustion Air and Exhaust Systems | 445 |
| 9530-1 | Forced Draft Systems | 446 |
| 9550-1 | Fuel Systems | 450 |
| 9560-1 | Condensate and Feed Water Systems | 454 |
| 9580-1 | Distilling Plants | 460 |
| 9590-1 | Refrigeration and Air Conditioning Plants | 462 |
| 9600-0 | General Requirements for Electric Plant | 473 |
| 9610-1 | Ship Service Generator Sets | 484 |
| 9610-4 | Electric Power Supply Conversion Equipment | 492 |
| 9620-0 | General Requirements for Electric Power Distribution Systems | 497 |
| 9620-1 | Switchboards and Panels for Electric Power and Lighting | 504 |
| 9620-2 | Electric Cable | 511 |
| 9620-3 | Electric Distribution and Wiring Equipment | 535 |
| 9620-4 | Storage Batteries | 540 |
| 9620-5 | Protective Devices for Electric Circuits | 541 |
| 9630-1 | Electric Motors, Controllers, and Brakes | 546 |
| 9640-1 | Lighting Systems | 550 |
| 9650-0 | General Requirements for Interior Communication Systems | 567 |
| 9650-1 | Sound Powered Telephone Systems | 573 |
| 9650-2 | Announcing, Recording, and Entertainment Systems and Portable Equipment | 579 |
| 9650-3 | Voice Tubes and Message Passing Facilities | 586 |
| 9650-4 | Electrical Alarm, Safety and Warning Systems | 588 |
| 9650-5 | Electrical Indicating, Order, and Metering Systems | 595 |
| 9650-8 | Switchboards for Interior Communication and Weapons Control Systems | 603 |
| 9670-0 | Requirements for Electronic Systems | 607 |
| 9670-1 | Radio Frequency Transmission Lines | 621 |
| 9670-2 | Requirements for Secure Processing Equipments and Secure Processing Centers | In Addendum |
| 9700-1 | Whistles | 625 |
| 9710-1 | Weapons Control Systems | 626 |
| 9730-1 | Armament Installations | 631 |
| 9750-1 | Torpedo Stowage and Handling | 635 |
| 9750-2 | ASROC Loading, Stowage and Handling | 637 |
| 9780-2 | Ammunition Handling | 640 |
| 9780-3 | Ammunition Stowage | 641 |
| 9810-3 | Torpedo Countermeasure Systems | 643 |
| 9810-4 | Bathythermograph Handling | 644 |
| 9810-6 | Degaussing System | 645 |
| 9820-1 | Boats, Stowing and Handling | 654 |

REPRODUCED AT THE NATIONAL ARCHIVES

| Section | Title | Page |
|---------|-------|------|
| 9830-1 | Helicopter Stowage, Handling, Landing, and Launching Facilities | 658 |
| 9870-1 | Instruments and Instrument Boards | 661 |
| 9880-1 | Damage Control Books | 668 |
| 9880-2 | Damage Control Facilities | 669 |
| 9880-3 | Compartment Checkoff Lists | 670 |
| 9910-1 | Workshops | 672 |
| 9920-1 | Portable Tools and Equipment | 677 |
| 9930-1 | Fire Extinguishing Systems | 678 |

v

REPRODUCED AT THE NATIONAL ARCHIVES

## SECTION 9390-1
### THERMAL INSULATION AND ACOUSTIC ABSORPTIVE TREATMENT OF COMPARTMENTS

5

#### 9390-1-a.  Thermal insulation

Thermal insulating material shall be unfaced or faced fibrous glass board conforming to Mil. Spec. MIL-I-742.  Installation of board shall be in ac-

10  cordance with plan, BUSHIPS No. 805-1749057. Area of application, extent of coverage, and thickness of insulation shall be in accordance with the thermal insulation requirements table and the following additions and exceptions thereto:

15  Insulation on vertical surfaces shall extend from 6 inches above the deck to the overhead except for warm side of refrigerated stores spaces, uptake spaces, magazines, and ammunition handling and ready service spaces,

20  where insulation shall extend from deck to overhead.

Where only a partial area of a boundary requires insulation (i.e., where the overhead of a category "F" space is partially protected

25  from the weather by a category "D" space), insulation shall extend 12 inches beyond the area requiring insulation.

Boundaries abutting insulated boundaries where insulation is not otherwise required

30  shall be insulated for a distance of 12 inches from such insulated boundaries.  Such insulation is not required on bulkheads of category "A" spaces if such bulkheads are terminated by a deck exposed to the weather.

35  Escape trunks within category "A" spaces shall be insulated with two-inch board on the hot side of the surfaces forming the escape trunks.

Insulation will not be required in way of

40  shower stalls, or built-in furniture except in way of berths.  Insulation shall be provided behind built-in berths, and shall extend down to the deck and out 9 inches from the weather boundary or to the back of subbase, whichever is less.  Shelf

45  plates and end filler plates shall terminate at the inboard surface of the insulation and shall be fastened to clips welded to the structure and extending through the insulation.  Openings shall be provided at each end of shelf plates

50  and in filler plates between ends of berths and the insulated boundary.  Each opening shall have a minimum gross area of 36 square inches and shall be fitted with 1/4-inch wire mesh screen.  Filler plate openings shall be

55  located near the deck.

Insulation behind lavatories, service sinks, water closets, and food preparation tables shall be sheathed from the deck to at least two feet above the working surface of the fixtures.

60  Insulation on bulkheads of commissary spaces in way of heat producing commissary equipment and vegetable peeling machines shall be sheathed in accordance with the requirements of 9340-1. Insulation on other areas adjacent to these

65  fixtures which may become wet or coated with grease or in any area where insulation is subject to damage or exposed to heavy traffic shall also be sheathed.  Where insulation installed on vertical stiffeners may be subject to damage

70  by removable chairs, it shall also be sheathed from six inches above the deck to a height of at least three feet.  Sheathing shall be polished corrosion-resisting steel .030 inches (min.) thick, AISI type 304, finish four.

75  Boundaries of fan rooms used as plenums for supply systems shall be considered weather boundaries to spaces adjacent to such fan rooms.

Doors shall not be insulated except for doors to ammunition and missile stowage spaces which

80  shall be insulated with one-inch board.

Types of compartments included under categories listed in thermal insulation requirements table are as follows:

  **Category "A"**

85  All spaces, 120 degrees F. and over.
  **Category "B"**
    All spaces, 106 degrees F. to 119 degrees F.
  **Category "C"**
    All spaces, 101 degrees F. to 105 degrees F.

90  Stowage space containing precision instruments.
    Stowage spaces containing flammable liquids or bottled gasses.
  **Category "D"**

95  All spaces (non-air conditioned), 100 degrees F. and less.
  **Category "E"**
    Drying rooms
  **Category "F"**

100  All (air conditioned) spaces 85 degrees F. or over.
    Passages used as air conditioned air returns.
    Fan rooms used as return air plenums for air conditioning systems.

105  WR, WC and shower spaces fitted with mechanical exhaust ventilation and natural supply ventilation from air conditioned areas.
  **Category "G"**
    All air conditioned spaces, 84 degrees F.

110  or less.

9390-1
DE 1078

248

REPRODUCED AT THE NATIONAL ARCHIVES

**Category "H"**

Ammunition and missile stowage spaces, ready service rooms and handling rooms.

All spaces containing ammunition, missiles, fuses, pyrotechnics smokeless, flashless and black powder, H.E. and components classified as fire, missile or explosion hazards.

**Category "I"**

Dry provisions storeroom

**Category "J"**

Stowage spaces not otherwise specified herein.

Each box of the table gives, by symbol, the insulation requirements (both room side and adjoining side) for any boundary of a compartment listed in column "O". The upper right hand side of each box gives the insulation requirement for the adjacent side of the boundary of the compartment listed in column "O". The lower left hand side of the box gives the room side insulation requirement for that boundary. When either hand of the box indicates insulation on the deck, insulation indicated would be installed on the underside of the deck, unless the other hand of the box already indicates an insulation requirement for that overhead, in which case only the greater of the two thicknesses or extents will be required. If the underside of a deck is a shower, void, or tank, insulation will not be installed on either side of the deck. When the insulation requirement is shown in the center of the box, the insulation shall be installed on the plane surface side of the bulkhead only.

Insulation thickness and extent of coverage shall be as follows wherever indicated on the thermal insulation requirements table by the following symbols:

0 — No insulation required

8 — Deck covered with wood (normally 2 inches thick)

12 — One inch thick insulation required on plane surfaces, and full depth of webs on beams and stiffeners, except if beams and stiffeners are over 12 inches deep cover webs for a distance of only 12 inches from boundary.

14 — One inch thick insulation required on plane surfaces, and on webs and flanges of beams and stiffeners.

14p — Same as "14", except if beams and stiffeners are over 12 inches deep, the flanges are not covered and the webs are covered for a distance of only 12 inches from boundary.

18 — Two-inch thick insulation required on plane surfaces, and one-inch thick on webs and flanges of beams and stiffeners, except if beams and stiffeners are over 12 inches deep, the flanges are not covered and the webs are covered for a distance of only 12 inches from boundary.

In addition to the requirements listed in the table, the following insulation shall be applied on the deck of all main and second deck air conditioned spaces over the main machinery space, and the 01 level over the forced draft blower rooms Nos. 1 and 2 and the uptakes:

(a) Main and second decks.—Insulation shall consist of one inch thick insulating blocks, Mil. Spec. MIL-I-2819, covered with one inch insulation underlayment MIL-D-23134.

(b) 01 level.—Insulation shall consist of one inch thick insulating blocks, Mil. Spec. MIL-I-2819, covered with a minimum 3/8 inch thick latex underlay, Mil. Spec. MIL-D-3135, to make a level, well adhered base for applying deck covering as specified in 9140-1.

The insulating block, sides and bottom, shall be cemented with Minnesota Mining and Mfg. Co. adhesive 1357, or equivalent. Joints of the insulating block shall be tightly fitted.

**9390-1-b. Acoustic absorptive treatment**

Spaces shall be acoustically treated as required to meet noise levels in 9400-1.

Acoustic treatment shall be applied to plane surfaces only and shall consist of; 2-inch thick sound absorbing fibrous glass felt, Mil. Spec. MIL-I-22023, Type II, Class 2 or 3 sheathed with aluminum alloy sheet, Fed. Spec. QQ-A-250/8, 0.04 inch (minimum) thick, perforated with 3/16-inch diameter holes on 3/8-inch or 1/2 inch center; or 2-inch thick perforated hard surfaced fibrous glass acoustical absorptive board Mil. Spec. MIL-A-23054.

Areas requiring overhead sheathing by 9390-6 and also requiring overhead acoustical treatment, shall have perforated aluminum ceilings.

The acoustic absorptive treatments shall be installed in compliance with plan, BUSHIPS No. S3901-921905, except that the acoustical absorptive board shall be secured by studs and fasteners, and its joints taped in accordance with the details for faced thermal insulation board shown on plan, BUSHIPS No. 805-1749057.

Wherever acoustical absorptive treatment is required for noise reduction in rooms, doors to these spaces shall be covered only if the additional area is necessary to obtain the desired reduction.

The surface of the acoustical absorptive treatments shall be painted as specified in 9190-1.

Where acoustic absorptive treatment is required for an overhead and a dropped ceiling is required by another section of this specification, one of the

9390-1
DE 1078

249

REPRODUCED AT THE NATIONAL ARCHIVES

following methods shall be followed:

Perforated aluminum sheathing shall be installed at the desired height and sound absorbing fibrous glass felt shall be installed directly upon it.

Perforated hard surfaced fibrous glass acoustical absorptive board shall be installed at the desired height, with no sheathing required. Neither of the above methods negate any thermal insulation requirements for the overhead.

Where acoustical absorptive treatment is required on vertical surfaces treatment shall be eliminated behind status boards or large equipment which hides the bulkheads. The aluminum sheathing, if used, may be formed into pans and secured to the structure with through connections.

If acoustical treatment is required for any area for which thermal insulation is specified herein, only the acoustic treatment shall be applied to the plane surfaces, and thermal insulation if required shall be applied to beams and stiffeners.

Acoustical absorptive treatment shall be installed on the overhead and boundary bulkheads within the forced draft blower rooms. The minimum treatment shall consist of a 2 inch thickness of fibrous glass blanket Mil. Spec. MIL-I-22023, type II, faced on the room side with a 0.0025 inch aluminum foil septum. A second 2 inch thickness of fibrous glass blanket unfaced shall be installed and sheathed with perforated aluminum alloy sheathing.

As a minimum, acoustical absorptive treatment shall be installed, except as noted above, on boundary bulkheads, both sides of divisional bulkheads, and on the overhead of the following spaces:

C.I.C.
Radio central
Chart room
Crypto room
Sonar control room
ECM control room
Secure teletype
Transmitter room
Electrical central
Switchboard space in auxiliary machinery room #2
Fire room and engine room control stations

### 9390-1-c.  Antisweat treatment

For vermiculite paint materials and method of application, see 9190-1.

Vermiculite paint shall be applied on the warm side of uninsulated boundaries, including webs and flanges of beams and stiffeners in the following locations:

Interior surfaces, including uninsulated flanges, of all spaces, except tanks, voids, and heat producing spaces, exposed to the sea or weather, or where sweating will occur because of opposite extremes in temperature.

Deck under, and all vertical boundaries of air conditioned spaces common to spaces that are not air conditioned.

Exterior surfaces of water tanks in way of all spaces except voids.

Vermiculite paint shall be applied to hangers, brackets, clips, and other members secured to or penetrating boundaries exposed to the sea and where dripping will affect electric installations.

### 9390-1-d.  Vapor barrier

A vapor barrier shall be applied to all insulation within drying rooms, and to the insulation on the warm side of refrigerated stores spaces.

Vapor barrier shall consist of one of the following:

Three coats of vinylidene resin, BUSHIPS formula 113, alternate coats of white and orange, applied to the face, four edges, and two inches of the periphery of the soft surface of each separate section of board before installation. After installation, all seams shall be coated and punctures in the vapor barriers, such as in way of studs, shall be touched up with three coats of vinylidene resin.

Three brush coatings of vapor barrier coating compound, Mil. Spec. MIL-C-19993, alternate coats of white, orange, and white, applied over the exposed surfaces of the installed hard faced fibrous glass board.

No holidays shall exist in any single coat of vapor barrier coating.

### 9390-1-e.  Plans

Plans shall be prepared indicating:

Kind, extent, and thickness of thermal insulation, and acoustic absorptive treatment.

Details showing method of fitting around structural members.

Finishing details in way of fixed port lights and other bulkhead openings.

Details showing method of securing thermal insulation and acoustic absorptive treatment.

Sheathing.

Finish for exterior surface of insulation.

9390-1
DE 1078

250

REPRODUCED AT THE NATIONAL ARCHIVES

# THERMAL INSULATION REQUIREMENTS

|  | ADJOINING SIDE BOUNDARIES | | | | | | | | | | | REFRIGERATED STORES SPACE | VOIDS AT SHELL ABOVE L.L.W.L. | WEATHER BOUNDARIES | | SEA | | BALLAST TANKS |
| ROOM SIDE BOUNDARIES | | | | | | | | | | | | | | Horizontal (Bare Metal) | Horizontal (Wood Deck) | Vertical Above L.L.W.L. | Vertical Below L.L.W.L. |  |
| COLUMN | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| TYPE OF COMPARTMENT — CATEGORY | "A" | "B" | "C" | "D" | "E" | "F" | "G" | "H" | "I" | "J" | "K" | | | | | | | |
| LINE | | | | | | | | | | | | | | | | | | |
| 1 — CATEGORY "A" | 0/18 | 0/18 | 0/18 | 0/18 | 0/18 | 0/18 | 0/18 | 0/14 | 0/18 | 0/0 | | 18 | 0/0 | 0/14 | 8/0 | 0/0 | 0/0 | 0/0 |
| 2 — "B" | 18 | 0/0 | 0/0 | 0/0 | 0/0 | 0/0 | 0/0 | 14/0 | 18/0 | 0/0 | | 18 | 0/0 | 14/0 | 8/0 | 0/12 | 0/0 | 0/0 |
| 3 — "C" | 18 | 0/0 | 0/0 | 0/0 | 0/0 | 0/0 | 0/0 | 14/0 | 18/0 | 0/0 | | 14 | 0/0 | 14/0 | 8/0 | 12/0 | 0/12 | 0/12 |
| 4 — "D" | 18 | 14p/0 | 0/0 | 0/0 | 14p/0 | 14p/0 | 14p/0 | 14/0 | 14p/0 | 0/0 | | 14 | 0/0 | 14p/0 | 8/0 | 12/0 | 0/0 | 0/0 |
| 5 — "E" | 14 | 14/0 | 14/0 | 14/0 | 0/0 | 12/0 | 12/0 | 14/0 | 0/0 | 12/0 | | 14 | 12/0 | 14/0 | 8/0 | 14/0 | 0/12 | 0/0 |
| 6 — "F" | 18 | 14/0 | 14/0 | 0/0 | 12/0 | 0/0 | 0/0 | 14/0 | 0/0 | 0/0 | | 14 | 14/0 | 14/0 | 8/0 | 14/0 | 0/0 | 0/0 |
| 7 — "G" | 18 | 14p/0 | 12/0 | 14/0 | 12/0 | 0/0 | 0/0 | 0/0 | 0/0 | 0/0 | | 14 | 12/0 | 18/0 | 8/0 | 14p/0 | 0/12 | 0/12 |
| 8 — "H" | 18 | 14p/0 | 12/0 | 14/0 | 14/0 | 14/0 | 0/0 | 0/0 | 0/0 | 12/0 | | 14 | 12/0 | 18/0 | 8/0 | 14p/0 | 0/0 | 0/0 |
| 9 — "I" | 18 | 14p/0 | 14/0 | 14/0 | 0/0 | 0/0 | 0/0 | 0*/0 | 12/0 | 14/0 | | 14 | 12/0 | 18/0 | 8/0 | 14/0 | 0/12 | 0/0 |
| 10 — "J" | 0 | 0/0 | 0/0 | 0/0 | 14/0 | 14/0 | 12/0 | 14/0 | 14/0 | 0/0 | | 14 | 0/0 | 18/0 | 8/0 | 12/0 | 0/0 | 0/0 |
| 11 — "K" | 0 | 0/0 | 0/0 | 0/0 | 0/0 | 0/0 | 0/0 | 14/0 | 0/0 | 0/0 | | 14 | 0/0 | 0/0 | 8/0 | 0/0 | 0/0 | |

*No. 14 insulation shall be applied on the projectile side of the common bulkhead between 5"/54 magazine and projectile stowage.

9390-1
DE1078

REPRODUCED AT THE NATIONAL ARCHIVES

**SECTION 9390-2**
**THERMAL INSULATION FOR MACHINERY,**
**EQUIPMENT, AND PIPING**

**9390-2-a.  Definitions**

**Hot surface insulation.**—A type of thermal insulation applied on external surfaces of components which are 125 degrees F. or higher to protect personnel and limit undesirable heat transfer.

**Antisweat insulation.**—A type of thermal insulation applied on components to either prevent formation of condensation on their external surfaces or to limit absorption of external heat which would be detrimental to the system operation.

**Refrigerant insulation.**—A type of thermal insulation applied on external surfaces of components conveying cold fluids, such as Refrigerant 12, to limit absorption of heat by the refrigerant and to prevent ice formation on the surfaces.

**Lagging.**—A protective and confining covering or jacket such as cloth, tape or sheet metal, applied over insulating materials.

**Fastenings.**- Items such as hooks, wire, and adhesive used to secure insulation materials and lagging.

**Machinery covering or pipe covering.**—A composite covering including a thermal insulation, its fastenings, its lagging and its vapor barrier (when specified).

**Re-usable covers.**—Machinery covering or pipe covering which can be removed without being damaged and easily replaced for continued use.

**9390-2-b.  Applications**

**Hot surface insulation.**—All components having hot external surfaces shall be insulated in accordance with the following criteria:

Surfaces which can attain a temperature of 125 degrees F. or higher during any service condition shall be insulated wherever necessary to protect personnel, prevent undesirable transfer of heat to the surroundings, or prevent transfer of heat from the component wherever such transfer would be detrimental to operation of the component or system.

For the following applications, strict adherence to the foregoing would not be practicable or desirable and insulation shall not be installed for:

Any hot surface for which freedom of insulation is essential for its proper operation, such as a boiler gage glass.

Mechanical joints exposed to sub-atmospheric pressures.

Fuel piping between headers and burners.

Thermostatic and bimetallic steam traps and and their inlet piping within 24 inches of the traps.

Piping in bilges.

Pressure gage piping.

For maximum fire prevention, surfaces which could attain a temperature of 450 degrees F. or higher, and where impingement of a flammable fluid on these surfaces is a distinct possibility, shall always be insulated or shielded unless this would prevent proper functioning of the system or component.  See 9480-0 for additional fire safety requirements to prevent impingement of flammable fluids on surfaces 450 degrees F. and higher which cannot be insulated.

**Antisweat insulation.**—All components, except those in refrigerant applications, handling fluids in the temperature range of 28 degrees F. to 95 degrees F. shall be insulated in accordance with the following criteria:

To limit absorption of heat from an external source which would be detrimental to the system, such as a chilled water system.

To prevent formation of condensation on surfaces of components which would be objectionable from:

A habitability standpoint, such as condensation dripping on personnel.

A danger standpoint, such as condensation dripping on electrical and electronic equipment.

A damage standpoint, such as condensation dripping on stores or supplies.

A maintenance standpoint, such as condensation dripping on machinery, equipment, or painted surfaces of bulkheads or decks which are normally kept in ship shape condition.

For the following applications, strict adherence to the foregoing would not be practicable or desirable and insulation need not be installed for:

Any cold surface for which freedom of insulation is essential for its proper operation, such as the pipe coils in a refrigerated space.

When only in an emergency condition does fluid flow in the system which could cause sweating, such as dry pipe systems, and parts of wet systems such as the piping between sprinkling control valves and their root cutout valves.

Where sweating would not be objectionable, such as in voids, shaft alleys, and bilges, and on plumbing fixtures and the supply and drain piping immediately adjacent to and serving these fixtures.

**Refrigerant insulation.**—External surfaces of components handling a refrigerant such as refrigerant

9390-2
DE 1078

252

REPRODUCED AT THE NATIONAL ARCHIVES

12 at a temperature of 40 degrees F. or lower shall have this type of insulation.

**Insulation to prevent freezing.**—When components conveying fresh water are located where they are exposed to freezing temperatures, they shall be insulated. Where not exposed to the weather, anti-sweat type insulation shall be applied; where exposed to the weather, the type used for hot piping in exposed weather locations shall be installed. Sea water and other fluids which freeze below 32 degrees F. shall not be insulated unless the rate of flow in the system is such that the fluid could freeze and application of insulation would prevent freeze-up during system operation.

**Bulkhead connections and penetrations.**—Supplementing requirements in 9480-0 pertaining to insulated bulkhead piping connections, the following applies:

Where refrigerant pipes pass through a non-watertight insulated bulkhead into a refrigerated space, the insulation shall extend at least one inch inside the refrigerated space.

Wherever piping passes through joiner bulkheads or hull structure without the use of a bulkhead fitting, the pipe covering shall also run through intact, except in those cases where the larger hole required for complete covering would affect the structural integrity of the ship.  In those cases, butting the covering to either side of the structure is permitted.

Where antisweat insulation is butted against bulkhead or deck fittings, the ends shall be sealed to the structure with end sealing compound (MIL-C-22395).

**Vapor barriers and pipe hangers.**—For antisweat and refrigerant pipe covering, the vapor barrier specified in Mil. Std. MIL-STD 769* shall be installed so that it completely seals all joints and will remain intact under all service operating conditions.

Pipe clamps shall fit over pipe covering for insulated refrigerant piping.  For antisweat insulated piping, clamps shall be isolated from the pipe by rubber channels at least 1/8 inch thick.  Hangers shall be sealed to vapor barrier with end sealing compound (MIL-C-22395).  Rubber block hangers may be installed directly on piping.  Where clamps fit over covering, a galvanized sheet steel or copper shield at least twice the width of the pipe clamp shall be installed directly under the pipe clamp; also, cork or other rigid insulation having the same thickness as adjacent insulation, shall be used under these shields.

For requirements pertaining to limitation of heat transmission from hot piping to adjacent structure,

such as through pipe clamps, hangers, braces and anchors, see 9480-0.

**Lagging.**—Lagging shall be applied as specified in Mil. Std. MIL-STD 769.*  Metal lagging shall be installed wherever necessary for protecting insulation from damage such as in areas of heavy traffic, and where insulation can become oil or water soaked, such as fuel oil burner headers.  A surface treatment or covering shall be installed on metal lagging where necessary for protection of personnel.

**9390-2-c.  Materials and thickness**

Materials and minimum acceptable thickness shall comply with Mil. Std. MIL-STD-769.*  Where a choice of two or more kinds of covering is specified for one temperature range, the Contractor may install any specified kind provided it is installed on an entire system and compatible components are used throughout, with the exception that rigid and non-rigid insulation may be used on the same system to facilitate the installation of pipe hangers. However, the Contractor shall choose one of the lighter weight (lower density) materials specified.

Materials, such as adhesives, which are in contact with piping, shall not have any adverse effect on the piping material; for example, insulating materials which can give off halides harmful to corrosion resisting steel shall not be used.

Fibrous glass lagging shall not be used where it is subject to abrasion or mechanical injury.

**9390-2-d.  Re-usable covers**

Fabrication and installation of re-usable covers shall comply with Mil. Std. MIL-STD-769.*

For hot surface applications requiring insulation, re-usable covers shall be installed to permit servicing of machinery, equipment, pipe, and valve take-down joints.  Re-usable covers shall not be installed where a vapor barrier is used in conjunction with a thermal insulation.

For units of machinery or equipment such as a small auxiliary turbine or for some piping components. where it would be impractical to install both permanent insulation and resuable covers,  the entire insulation may be made re-usable.

**9390-2-e.  Installation**

Machinery and pipe covering shall be installed in accordance with requirements herein and those specified in Mil. Std. MIL-STD-769.*  Surfaces to which insulation will be applied shall be cleaned and prepared as specified in 9190-1.

Pipe covering shall not be installed over mechanical joints in piping until specified pressure tests have been completed.  Covering shall not be in-

9390-2
DE 1078

REPRODUCED AT THE NATIONAL ARCHIVES

stalled over steam turbine joints until tests have proved the casing joints tight under operating conditions at the dock trial. Covering shall be in place for all sea trials and upon delivery of the ship.

5  Machinery and pipe covering shall be installed so that movements of the components, due to thermal or other forces, will not damage the covering in any way. Fastenings shall not crush or otherwise reduce the insulating value of insulation.

10  It shall be the Contractor's responsibility to ascertain that fastenings provided on components by manufacturers are adequate for installation of the specified insulation.

Where re-usable covers are used at takedown
15  joints, the covering shall be installed in such a manner so as not to interfere with servicing of the joint.

All lagging shall be fitted securely, neatly and smoothly; ragged edges of sheet metal lagging are not permitted.

20

**9390-2-f. Plans**

The Contractor's insulation schedule shall indicate sufficient details to identify materials, specifications, i.p.s. sizes, thickness, and approximate
25  quantities used in the applications. The most severe service temperature on which the insulation is applied shall also be indicated for each application. If the Contractor has a standard practice for covering which is being used in the installation, it shall
30  be referenced on this plan.

*MIL-STD-769A with change notice #1 dated 21 Oct 1963 is applicable and shall be modified as follows:
35  Page 6, Table IV, under 'Temperature Range (°F)' add '251 to 388', under 'Pipe Size' add: '1/2, 3/4' under 'thickness' add:  '1 inch.

9390-2
DE1078

REPRODUCED AT THE NATIONAL ARCHIVES

**SECTION 9390-3**
**HULL DAMPING, SONAR DOME BAFFLES, AND**
**DOME ISOLATION**

**9390-3-a.  Hull damping**

Hull damping treatment shall be installed in the
following areas:  From base line to first platform
and from bow to frame 29 except in chain locker;
nonacoustic area within the dome support structure
immediately below the transducer, and nonacoustic
area of the dome and dome structure aft of the diago-
nal bulkhead located at approximately Frame 16.

Hull damping material for the areas specified
above shall be applied on the shell plating, the
underside of decks and platforms, and one side of
the keel, webs of frames, and bulkheads.

The damping material shall be closely fitted so
that metal surfaces are not exposed. Where it is
not possible to closely fit the tile, the voids and
seams shall be filled flush with a polyamide-epoxy
filler or grouting compound as recommended by the
tile manufacturer. When interference such as pip-
ing and wireways are encountered, at least 80 per-
cent of the panel area shall be damped. Damping
need not be applied to plate panels less than four
inches wide, or to panels whose total area is less
than 144 square inches. Damping shall be applied
to only one side of the structure.

**9390-3-b.  Hull damping application**

Hull damping shall be accomplished either by
use of ML-D3 Tile Damping material or Sprayable
Vibration Damping material.

Except as specified herein, damping material
shall be applied in accordance with BUSHIPS
Instruction 9390.14; Ser 634A-689 of 30 March
1964.

ML-D3 tile damping material, Mil. Spec.
MIL-P-22581, shall be applied in the following
thicknesses:

Plating up to ½ inch thick, 4.5 pounds per
square foot.

Plating above ½ inch thick, 9.0 pounds per
square foot (double tiles).

The damping material shall be secured with one
of the following adhesives:

ML-D2 Adhesive, Philadelphia Resins
Company

Epoxy LMX 551, Co-Polymer Chemicals, Inc.

**Sprayable Vibration Damping Material.**—Spray-on
type hull damping material shall comply with Mil.
Spec. MIL-S-24062 of 11 May 1964, be applied by
an applicator approved by listing on QPL-24062
and shall be applied in accordance with the con-
ditions herein:

(a) May be used to dampen steel plate up to
and including 7/8 inch thickness.  The damping
material thickness and weight for a 3/8 inch
thick steel plate shall be 5/8 inches and 4.5
(± 0.2) pounds per square foot of area to be
damped, respectively.  The thickness and
weight of damping material for other steel plate
thickness shall be proportional to the above.

(b) In addition to the procurement testing,
the required material density and thickness
shall be checked by testing three sample plates
(sprayed with the material) prior to application
to each compartment.  Each sample shall be
suitably labeled to indicate:  date taken, com-
partment and density test results.  Material
thickness in each compartment shall be tested
to ensure that the required thickness is obtained;
a pin type depth guage may be used.

(c) The spray-on damping material shall be
applied before launching and under controlled
conditions of temperature and humidity as re-
quired by the material supplier.

(d) The steel surfaces to be damped shall
be prepared by abrasive blasting to accomplish
complete removal of rust, paint, mill scale and
other surface contaminants to obtain clean, bare
steel. Where abrasive blasting cannot be ac-
complished in the judgement of the Supervisor,
other mechanical means may be used to obtain
clean bare steel to the satisfaction of the
Supervisor.

(e) The cleaned metal surfaces shall be
pretreated as soon as practicable after surface
preparation in order to prevent corrosion in the
interim between cleaning and application of the
damping material.  In areas where the damping
material will be subject to contact with water,
oil, fuel or preservative such as in tanks, voids
and bilges, a coating system conforming to MIL-
P-23236, Class I shall be applied as soon as
practicable after surface preparation.  In other
areas, the cleaned surfaces shall be preserved
in accordance with 9190-1.

(f) The damping material shall be applied
after the coating system has been adequately
cured.  The curing time between coats shall be
in accordance with the manufacturer's instruc-
tions.  The final coat shall be smoothed by hand,
troweling, rolling or other means to produce a
surface as smooth as that of the ML-D3 tiled
surface as determined by the Supervisor.

(g) The surface of the spray-on damping
material shall be sealed the same as for ML-D3
tile—in accordance with the requirements of
BUSHIPS INST. 9390-14 Ser 634A-689 of 30

9390-3
DE 1078

255

REPRODUCED AT THE NATIONAL ARCHIVES

March 1964, with changes 1 and 2 thereto.

**9390-3-c. Sonar dome baffles**

5   Twelve feet aft of the center of the transducer, a baffle shall be installed consisting of a ¼-inch steel plate of single curvature, convex side forward, to which shall be bonded 9/32-inch thick "Saper D3", B.F. Goodrich, or equal, on the forward side and ½ inch "Isoper", B. F. Goodrich, or equal, on back side.

10   The radius of curvature shall be 10 feet. The baffle shall cover as much of the cross sectional area within the dome as possible. Access to the forward portion of the dome through the baffle shall be provided.

15   Rubber tile, Mil. Spec. MIL-R-23074, shall be applied in accordance with BUSHIPS INSTRUCTION 10323.4 Ser 634C1-13 of 13 February 1962 to the exterior face of the cylindrical bulkhead, located within the transducer framework, on top of the cir-

20   cular plate beneath transducer (the outer boundary shall not extend beyond the plane of the radiating face of the transducer).

Baffles shall be installed on the aft vertical plates of the dome and within the dome on the water

25   side of the base line flat from bow aft to diagonal bulkhead. The baffles shall consist of "RAL Soundamp" material, or equal. Access to the inside of the dome through the aft vertical plates shall be provided.

---

9390-3
DE 1078

**SECTION 9390-4**
**THERMAL INSULATION, REFRIGERATED SPACES**

**9390-4-a. Refrigerated stores spaces**

a. **Materials:**

(1) **Insulation.**—For bulkheads, decks and overheads, the insulating material shall be polyurethane foam, National Gypsum Company's Type NB-200, Hooker Chemical Company's Hetrofoam, or equal. The cured foam shall be a non-burning type in accordance with ASTM D-1692, shall have a nominal uniform density of 2 lbs./cu.ft., a maximum thermal conductivity of 0.16 BTU/(Hr) (sq. ft.) (degrees F/in.) at 75 degrees F mean temperature and a minimum compressive strength of 20 PSI. If necessary or desirable from a strength standpoint, the density of the foam in the deck construction may be increased to 4 lbs./cu.ft.

(2) **Sheathing.**—The sheathing shall be reinforced fibrous glass laminate in accordance with MIL-P-17549, Grade W, 3/16 inch thick, with a smooth and glossy gel coat finish, with fire resistant resin in accordance with Mil. Spec. MIL-R-21607. One or more layers of veil mat (surfacing mat) or fine weave cloth may be used directly under the gel coat to insure a smooth surface. Other sheathing materials will be acceptable subject to Bureau approval.

b. **Temperatures and thicknesses.**—The insulation thicknesses shall be sufficient to maintain easily and without sweating, the temperatures specified in 9590-1 with the ambient temperature in surrounding spaces of 100 degrees F; horizontal boundaries, sun exposed 120 degrees F, and 80 percent relative humidity. The normal stiffeners shall be covered with at least 1-1/2 inches of insulation and insulation shall be flush between stiffeners. Web stiffeners which project beyond the normal stiffeners and deep longitudinal or transverse deck beams shall be boxed or otherwise covered with a minimum of 1-1/2 inches of insulation.

c. **Installation.**—Preformed block, pour or froth foamed-in-place insulation may be used. Care must be taken during the application of foamed-in-place material to insure that voids or air pockets that would impair the insulation effectiveness are not produced. Plan, BUSHIPS No. DLG30-503-2021260, may be used as a guide for determining acceptable insulation thicknesses and installation procedures. If performed block is used in the deck, each block must be secured to the deck and to the adjacent blocks with a suitable adhesive. Similarly, sheathing shall be secured to the insulation. All sheathing shall be made watertight. Deck sheathing shall be laid in two layers, completely bonded to each other with staggered joints flush with the deck. Where necessary for effective air circulation, wall battens shall be installed. Sheathing shall be reinforced as necessary to insure adequate strength in securing coils.

d. **Deck grating.**—Each space shall be fitted with aluminum deck gratings per 9160-4. The gratings shall be arranged in panels for convenient removal and they shall be marked for location and identification.

---

9390-4
DE 1078

REPRODUCED AT THE NATIONAL ARCHIVES

**SECTION 9390-5**
**THERMAL INSULATION AND ACOUSTIC ABSORP-
TIVE TREATMENT FOR DUCTS AND TRUNKS**

**9390-5-a.  Definitions**

**Thermal insulation**—An insulation applied to ducts
and equipment to limit heat losses or gains and to
prevent condensation.

**Acoustic insulation**—a noise absorbing material
installed in ductwork to attenuate excessive noise.

**Sheathing** - a protective and confining covering
or jacket of sheet metal applied over thermal insula-
tion.

**Perforated sheathing**—a lining or jacket of perfo-
rated sheet metal applied as the inner casing in an
acoustically lined duct section.

**Vapor barrier**—a covering applied outside of
lagging to prevent the penetration of water vapor.

**Lagging**—a protective and confining covering or
jacket such as cloth or tape applied over insulating
materials.

**Fastenings**—components such as hooks, wire,
straps and adhesives used to secure insulating ma-
terials and lagging.

**9390-5-b.  General requirements**

Surfaces shall be cleaned and prepared as speci-
fied in 9190-1 before they are insulated.

Insulation shall not be installed over watertight
ductwork until specified compartment pressure tests
have been completed.

Fastenings such as hooks, wire, or straps used
to secure the insulation to the ductwork shall not
crush or otherwise reduce the insulation value of
the insulation.

Sheathing shall be installed wherever necessary
to protect insulation from damage and always on in-
sulated ducts that are adjacent to lavatories, serv-
ice sinks, waterclosets, ovens, ranges, dishwashing
machines, and food preparation tables.  Where such
ducts extend vertically through the deck, the sheath-
ing shall be provided from the deck to at least two
feet above the working surface of the fixture.

Wherever condensation is likely to occur on the
duct, a vapor barrier shall be applied on the in-
sulation, or the insulation shall be installed inside
of the duct.

**9390-5-c.  Thermal insulation**

Thermal insulation shall be applied to ventila-
tion and air conditioning systems to reduce heat
losses or gains and to prevent condensation.  The
following specific requirements apply:

On parts of trunks or ducts (including their
flanges) of ventilation supply systems carrying
unheated air that pass through normally heated
spaces, and on parts of trunks or ducts of all
supply systems that pass through or terminate
in heat-producing spaces.

On parts of exhaust trunks or ducts from
heat producing spaces that pass through other
spaces.

On ducts (including their flanges) of air
conditioning systems, on the discharge side of
cooling coils, if the space dewpoint is more than
seven degrees F. higher than the duct air dry
bulb temperature.  Where air from the space
served is bypassed or introduced downstream
from the cooling coil, the duct need not be in-
sulated, except that portion between the cooling
coil, and the point where the cooled and bypass
air are thoroughly mixed.

On distribution ducts in way of berths, if
the temperature in the duct is higher than 95
degrees F.

On all trunks and ducts that pass through
refrigerated spaces.

On all ventilation heaters wherever protection
of personnel is involved.

**9390-5-d.  Removable and replaceable thermal in-
sulated covers**

Removable and replaceable insulated covers
shall be installed on access covers for insulated
portions of air conditioning systems where the ac-
cess cover itself does not incorporate thermal in-
sulation.  Wherever necessary, covers shall be
quilted to maintain uniform thickness, strength and
rigidity.  Covers shall be secured in place by
lacing or similar means.

**9390-5-e.  Acoustic absorptive treatment**

Acoustic absorptive treatment for ventilation,
and air conditioning systems may be necessary to
meet the space noise criteria of 9400-1.  Attenuation
shall be determined using the noise levels in
octave bands listed in Tables 1 and 2 specified in
9400-1 as being the allowable noise level at
terminals.

Where both thermal insulation and acoustic
absorptive treatment are necessary, acoustic ab-
sorptive treatment only shall be installed.

**9390-5-f.  Materials**

The following materials shall be used for
thermal insulation and acoustic absorptive treat-
ment of ventilation and air conditioning systems:

**Thermal insulation for ducts.**—Round ducts,
1-inch fibrous glass blanket Mil. Spec MIL-I-
22023 or one-inch fibrous glass covering Mil.

9390-5
DE 1078

258

REPRODUCED AT THE NATIONAL ARCHIVES

Spec. MIL-I-22344. For rectangular and flat oval ducts one-inch fibrous glass blanket, Mil. Spec. MIL-I-22023, or one-inch fibrous glass hard surface board, Mil. Spec. MIL-I-742, type I, or one-inch fibrous glass unfaced board, Mil. Spec. MIL-I-742, type II; except that board type shall be used on ducts with a flat bottom surface 9 inches or more in width.

**Thermal insulation for trunks and ventilation heaters.** —One-inch fibrous glass board Mil. Spec. MIL-I-742, Type I.

**Insulated covers.** —One-inch fibrous glass board Mil. Spec. MIL-I-742 type I or type II.

**Sheathing for thermal insulation.** —Corrosion resisting steel No. 22USSGA Fed. Spec. QQ-S-766 class 430 2B finish.

**Vapor barrier.** —On brattice cloth or asbestos cloth, one heavy coat of vapor barrier Mil. Spec. MIL-P-875. On faced board and on fibrous glass cloth, three alternate coats, white, orange, and white, in that order, of coating compound Mil. Spec. MIL-C-19993.

**Thermal insulation for flanges.** —Fibrous glass blanket Mil. Spec. MIL-I-22023, type I.

**Lagging.** —Fibrous glass cloth, tape, and thread Mil. Spec. MIL-C-20079, fire resistant brattice cloth Mil. Spec. MIL-C-788, or special weight asbestos Fed. Spec. SS-C-466, Grade U.G., Style 3.

**Adhesive.** —Adhesive shall be in accordance with Mil. Spec. MIL-A-3316. The entire duct surface, insulation outer surfaces and outer surface of lagging shall be coated with adhesive.

**Acoustic absorptive material.** —Acoustic absorptive material shall comply with Mil. Spec. MIL-I-22023, Type II. However, in view of importance of noise attenuation the Bureau will consider for approval, on a case basis, any other material that can be shown to have acoustic and thermal properties, surface finish and installation requirements that will give the maximum reduction in airborne noise.

**Perforated sheathing for acoustic insulation.** —Aluminum alloy Fed. Spec. QQ-A-250/8-0.04-inch thick with holes 1/8-inch dia. on 3/16-inch centers, staggered shall be used.

**9390-5-g. Installation**

Thermal insulation, lagging, and acoustic absorptive treatment for trunks or ducts shall be installed in accordance with plans, BUSHIPS Nos. 805-1749058 and S3901-921905.

Where pre-formed insulation is used on round ducts the butted joints shall be staggered. The longitudinal joint shall be supported at approximately

18-inch intervals by a two-inch wide strip of lagging.

Where banded duct connectors are used in lieu of flanges, the duct insulation and lagging shall terminate one inch from each side of the connector. A strip of insulation and lagging shall then be fitted around the connector, between the terminations of the duct insulation, and held in place by two sheet metal straps, one inch wide. A vapor barrier, if required, and paint shall then be applied.

**9390-5-h. Plans**

The Contractor's plans for ventilation, air conditioning and forced draft ductwork shall indicate the type, quantity, and thickness of material required for thermal insulation and acoustic absorptive treatment.

---

9390-5
DE1078

259

REPRODUCED AT THE NATIONAL ARCHIVES

## SECTION 9390-6
## SHEATHING

### 9390-6-a. Scope

This section contains material and installation requirements for the sheathing of living, messing, and recreation spaces. Sheathing associated with insulation is covered in other sections as follows:

9390-1  Thermal insulation and acoustic absorptive treatment of compartments.

9390-2  Thermal insulation for machinery, equipment, and piping.

9390-4  Thermal insulation, refrigerated spaces.

9390-5  Thermal insulation and acoustic absorptive treatment for ducts and trunks.

### 9390-6-b. Installation

Vertical sheathing shall be attached to the face of structural members projecting six inches or less from the compartment boundary. Vertical structural members projecting more than six inches from the boundary and fixed portlights shall be boxed. Sheathing between boxed members shall be attached to metal furring strips fastened to the compartment boundary.

Overhead sheathing shall be attached to the face of beams.

The sheathing shall be in the form of removable panels. Panels and sections of sheathing in way of equipment which require frequent access for inspection, operation or maintenance shall be provided with hinges and quick acting catches.

Articles such as catches, hinges, lighting fixtures, lighting switches, and ventilation ducts shall be fitted flush with the sheathing.

The installation shall be free of rattles and provision shall be made for dampening possible vibration.

### 9390-6-c. Applications and Materials

Sheathing shall be installed on the overhead and vertical boundaries that have stiffeners, wiring, piping, or insulation on the boundary inside the space. The following spaces shall be sheathed as indicated:

| Space | Material | |
|---|---|---|
| | Overhead | Vertical Boundaries |
| Captain and unit commanders staterooms | aluminum (1) | aluminum (2) (3) |
| CPO lounge area only | | aluminum (2) (3) |
| Wardroom messroom and lounge | aluminum (1) | aluminum (2) (3) |

Note 1.  Aluminum alloy, approximately 0.04 inch thick, Fed. Spec. QQ-A-250/8, temper H22 or H32.

Note 2.  Aluminum alloy, approximately 0.06 inch thick, Fed. Spec. QQ-A-250/8, temper H32.

Note 3.  Wood veneer.  See 9190-1.

9390-6
DE1078

MIL-I-2819E
INTERIM AMENDMENT-1(SHIPS)
9 January 1973

INTERIM AMENDMENT

TO

MILITARY SPECIFICATION

INSULATION BLOCK, THERMAL

This Interim Amendment is issued for use by the Naval Ship Engineering Center with Military Specification MIL-I-2819E dated 9 November 1967.

Page 1

2.2: Delete all reference to the "UNIFORM CLASSIFICATION COMMITTEE" and substitute the following:

"UNIFORM CLASSIFICATION COMMITTEE
    Uniform Freight Classification Rules.

(Application for copies should be addressed to the Uniform Classification Committee, Room 1106, 222 South Riverside Plaza, Chicago, Illinois 60606.)"

Page 2

3.2: Delete and substitute:

"3.2  Material.  The insulation block shall be composed of asbestos-free and silica free heat-resisting compounds suitable for the temperature conditions and the purpose intended."

Table I:  Delete "Loss in weight, percent, maximum | 18.0 | 12.0 | 16.0 | 10.0".

Page 3

4.1: Delete and substitute:

"4.1  Responsibility for inspection.  Unless otherwise specified in the contract or purchase order, the supplier is responsible for the performance of all inspection requirements as specified herein.  Except as otherwise specified in the contract or order, the supplier may use his own or any other facilities suitable for the performance of the inspection requirements specified herein, unless disapproved by the Government.  The Government reserves the right to perform any of the inspections set forth in the specification where such inspections are deemed necessary to assure supplies and services conform to prescribed requirements."

FSC 5640

0066

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC. 01505695
2005/5/5 19:16:12 GMT

MIL-I-2819E

| Examination | Defects |
|---|---|
| Count | No. of blocks per container less than specified or indicated quantity. |
| Weight | Gross or net weight exceeds specified requirements. |
| Markings | Omitted, illegible, incorrect, incomplete, or not as specified (see 5.3). |

4.3.2 <u>Sampling for tests</u>. The lot size shall be the number of half sections or segments in the lot. The sample size shall be the number of sets of tests, that is, the number of specimens subjected to each test (see table II).

Table II – Sampling for tests

| Lot size in half section or segments | Sample size = Number of test specimens for each test (4.4.4 through 4.4.8) | Number of test failures allowed (each test) |
|---|---|---|
| Up to 63 | None | - |
| 64 to 160 | 2 | 0 |
| 161 to 400 | 3 | 0 |
| 401 to 1,000 | 5 | 0 |
| 1,001 to 2,500 | 8 | 0 |
| 2,501 to 6,300 | 13 | 1 |
| 6,301 to 16,000 | 20 | 2 |
| 16,001 to 40,000 | 32 | 3 |

4.3.2.1 <u>Testing of end item</u>. The end item shall be tested for the applicable characteristic as specified in table III from each lot presented for examination for each class of insulation. The sample unit shall be one block. Samples shall be selected throughout the lot (see table II). If any specimen fails any test, this shall be cause for rejection of the lot.

Table III – Instruction for testing

| Characteristic | Specification reference | | Number determinations per unit | Results reported as |
|---|---|---|---|---|
| | Requirement | Test method | | Numerically to nearest 1/ |
| Density | 3.4 | 4.4.2 | 1 | 0.1 lb/cu. ft. |
| Compressive strength | 3.4 | 4.4.3 | 1 | p.s.i. |
| Weight loss by tumbling | 3.4 | 4.4.4 | 1 | 1 percent |
| Flexural strength | 3.4 | 4.4.5 | 1 | p.s.i. |
| Changes under soaking heat | | | | |
| Loss in weight | 3.4 | 4.4.6 | 1 | 0.1 percent |
| Linear shrinkage | 3.4 | 4.4.6 | 1 | 0.1 percent |

1/ Test reports shall include all values on which results are based.

4.4 <u>Test procedures</u>.

4.4.1 <u>Conditioning samples</u>. Test specimens shall be conditioned by drying to constant weight in an oven at a temperature of 215 to 250°F. preceding a test.

4.4.2 <u>Density</u>. The density shall be determined in accordance with the method specified in ASTM C303.

4.4.3 <u>Compressive strength</u>. The compressive strength shall be determined in accordance with the method specified in ASTM C165.

4.4.4 <u>Weight loss by tumbling</u>. Weight loss by tumbling shall be determined in accordance with the method specified in ASTM C421.

4.4.5 <u>Flexural strength</u>. The flexural strength shall be determined in accordance with ASTM C203.

4

0071

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01505695
2005/5/5 19:16:12 GMT

*09-29-01*

MIL-I-2819E
9 November 1967
SUPERSEDING
MIL-I-2819D
9 August 1963
(See 6.5)

MILITARY SPECIFICATION

INSULATION BLOCK, THERMAL

This specification is mandatory for use
by all Departments and Agencies of the
Department of Defense.

1. SCOPE

1.1 Scope. This specification covers thermal insulation block for use on machinery and equipment at surface temperatures up to the approximate limits for the classes specified.

1.2 Classification. Thermal block insulation shall be of the following classes as specified (see 6.1):

Class 1 - Temperatures up to $600^\circ$ Fahrenheit (F).
Class 2 - Temperatures up to $1,200^\circ$F.
Class 3 - Temperatures up to $1,500^\circ$F.
Class 4 - Temperatures up to $2,000^\circ$F.

2. APPLICABLE DOCUMENTS

2.1 The following documents, of the issue in effect on date of invitation for bids or request for proposal, form a part of the specification to the extent specified herein:

SPECIFICATION

FEDERAL
PPP-B-636 - Box, Fiberboard.

STANDARDS

MILITARY
MIL-STD-105 - Sampling Procedures and Tables for Inspection by Attributes.
MIL-STD-129 - Marking for Shipment and Storage.

(Copies of specifications, standards, drawings, and publications required by suppliers in connection with specific procurement functions should be obtained from the procuring activity or as directed by the contracting officer.)

2.2 Other publications. The following documents form a part of this specification to the extent specified herein. Unless otherwise indicated, the issue in effect on date of invitation for bids or request for proposal shall apply.

UNIFORM CLASSIFICATION COMMITTEE
Uniform Freight Classification Rules.

(Application for copies should be addressed to the Official Classification Committee, 202 Union Station, 516 West Jackson Boulevard, Chicago, Illinois 60606.)

AMERICAN SOCIETY FOR TESTING AND MATERIALS
C165 - Compressive Strength of Preformed Block-Type Thermal Insulating, Standard Method of Test for.
C177 - Thermal Conductivity of Materials by Means of the Guarded Hot Plate, Standard Method of Test for.
C203 - Breaking Strength and Calculated Flexural Strength of Preformed Block Type Insulation, Standard Method of Test for.
C303 - Density of Preformed Block-Type Thermal Insulation, Standard Method of Test for.

FSC 5640

*0/0*

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01605695
2005/5/5 19:16:12 GMT

MIL-I-2819E

3.6 Workmanship. The block insulation shall not have visual defects that will adversely affect its serviceability.

4. QUALITY ASSURANCE PROVISIONS

4.1 Responsibility for inspection. Unless otherwise specified in the contract or purchase order, the supplier is responsible for the performance of all inspection requirements as specified herein. Except as otherwise specified, the supplier may utilize his own facilities or any commercial laboratory acceptable to the Government. The Government reserves the right to perform any of the inspections set forth in the specification where such inspections are deemed necessary to assure supplies and services conform to prescribed requirements.

4.2 Qualification tests. Qualification tests shall be conducted at a laboratory satisfactory to the Naval Ship Engineering Center. Qualification tests shall consist of the tests specified in 4.4. Application for Qualification tests shall be made in accordance with "Provisions Governing Qualification SD6" (see 6.3 and 6.4).

4.2.1 Sampling for qualification tests. Three samples shall be tested for each test specified in 4.4.2, 4.4.3, 4.4.4, 4.4.5, and 4.4.6; two samples shall be tested for the test specified in 4.4.7 and one sample shall be tested for the test specified in 4.4.8. The average test results shall be within the limits specified in table I and the individual test results shall not exceed these limits by more than 10 percent.

4.3 Sampling for quality conformance inspection. For purposes of sampling, an inspection lot shall consist of all block insulation of the same class, size and thickness offered for delivery at one time.

4.3.1 Inspection of end item.

4.3.1.1 Examination of the end item. Examination of the end item shall be made in accordance with 4.3.1.1.1 through 4.3.1.1.3. The lot size, for determining the sample size in accordance with MIL-STD-105, shall be in units of insulation block (see 4.3.1.1.1 and 4.3.1.1.2) and units of shipping containers (see 4.3.1.1.3).

4.3.1.1.1 Examination of the end item for defects in appearance and workmanship. The sample unit for the following examination shall be one insulation block. The inspection level for determining the sample size shall be level II, with an acceptable quality level (AQL) of 2.5 percent defective.

| Examination | Defect |
|---|---|
| Appearance and workmanship | Cracked, broken or damaged. Bad edges. Excessive voids. Warped. |
| Classification | Class not as specified. |

4.3.1.1.2 Examination of the end item for defects in dimensions. The sample unit for the following examination shall be one block. The inspection level for determining the sample size, shall be inspection level II, with an acceptable quality level (AQL) of 2.5 percent defective.

| Examination | Defect |
|---|---|
| Length, width and thickness | Not within limits or tolerance specified, or by contract requirement. |

4.3.1.1.3 Examination for preparation for delivery. An examination shall be made to determine that the packing and markings comply with the requirements of section 5 of this specification. The sample unit for the following examination shall be one shipping container, selected just prior to closing operation. The inspection level for determining the sample size shall be level I, with an acceptable quality level (AQL) of 2.5 percent defective. Shipping containers, fully prepared for delivery, shall be examined for closure defects.

| Examination | Defects |
|---|---|
| Packing | Not as specified. Container not as specified, closures not accomplished by specified or required methods of material. Any nonconforming component, component missing, damaged or otherwise defective. |

3

0070

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01505695
2005/5/5 19:16:12 GMT

MIL-I-2819E

4.4.6 **Physical changes under soaking heat**. Specimens shall be weighed and measured. Then the specimens shall be placed in an electrically heated oven and subjected to the maximum temperature for the respective class for 6 hours for loss of weight and linear shrinkage. The specimens shall be removed from the oven and tested to determine loss of weight and linear shrinkage in accordance with the method specified in ASTM C356 (see table I).

4.4.7 **Thermal conductivity**. Conductivity shall be determined in accordance with the method specified in ASTM C177.

4.4.8 **Simulative performance**. Simulative service shall be determined in accordance with the method specified in ASTM C411. The plate shall be maintained at the maximum temperature for the respective class for 30 days.

5. PREPARATION FOR DELIVERY

5.1 **Packing**. Packing shall be level A, B, or C as specified (see 6.1).

5.1.1 **Level A**. Insulation block, packaged as specified (see 6.1), shall be packed in containers conforming to class 2 of PPP-B-636. All corners and edge seams, and manufacturer's joint shall be waterproofed in accordance with the appendix to PPP-B-636.

5.1.2 **Level B**. Insulation block, packaged as specified (see 6.1), shall be packed in containers conforming to class 1 of PPP-B-636, and closed in accordance with the appendix to PPP-B-636.

5.1.3 **Level C**. Block insulation, packed as specified, (see 6.1) shall be packed in containers of the type, size and kind commonly used for the purpose in a manner which will insure acceptance and safe delivery at destination. Shipping containers shall comply with the Uniform Freight Classification Rules or other regulations as applicable to the mode of transportation.

5.2 **Marking**. In addition to any special marking required, shipping containers shall be marked in accordance with MIL-STD-129.

6. NOTES

6.1 **Ordering data**. Procurement documents should specify the following:

    (a) Title, number, and date of this specification.
    (b) Class required (see 1.2).
    (c) Thickness, width and length required (see 3.3).
    (d) Level of packing (see 5.1).

6.2 **Commercial sizes**. Commercial sizes and thicknesses of block insulation covered by this specification are industry standards. Other sizes and thicknesses may be obtained upon request.

6.3 With respect to products requiring qualification, awards will be made only for products which are at the time set for opening of bids, qualified for inclusion in applicable Qualified Products List QPL-2819 whether or not such products have actually been so listed by that date. The attention of the suppliers is called to this requirement, and manufacturers are urged to arrange to have the products that they propose to offer to the Federal Government tested for qualification, in order that they may be eligible to be awarded contracts or orders for the products covered by this specification. The activity responsible for the Qualified Products List is the Naval Ship Engineering Center, Department of the Navy, Washington, D. C. 20360, and information pertaining to qualification of products may be obtained from that activity. Application for Qualification tests shall be made in accordance with "Provisions Governing Qualification SD-6" (see 6.4).

6.4 Copies of "Provisions Governing Qualification SD-6" may be obtained upon application to Commanding Officer, Naval Supply Depot, 5801 Tabor Avenue, Philadelphia, Pennsylvania 19120.

6.5 **CHANGES FROM PREVIOUS ISSUE**. THE EXTENT OF CHANGES (DELETIONS, ADDITIONS, ETC.) PRECLUDE THE ANNOTATION OF THE INDIVIDUAL CHANGES FROM THE PREVIOUS ISSUE OF THIS DOCUMENT.

Custodians:
  Army - ME
  Navy - SH
  Air Force - 84

Review activities:
  Army - ME
  Navy - SH
  Air Force - 84, 85

Preparing activity:
  Navy - SH
  (Project 5640-0157)

Code "C"

*U.S. GOVERNMENT PRINTING OFFICE: 1967-301-513/2451

5

0072

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01505695
2005/5/5 19:16:12 GMT

MIL-I-2819E

   C356 – Linear Shrinkage of Preformed High-Temperature Thermal Insulation Subjected to Soaking Heat, Method of Test for.
   C411 – Hot Surface Performance of High Temperature Thermal Insulation, Method of Test of.
   C421 – Weight Loss by Tumbling of Preformed Insulation, Method of Test for.

 (Application for copies should be addressed to the American Society for Testing and Materials, 1916 Race Street, Philadelphia, Pennsylvania 19103.)

 (Technical society and technical association specifications and standards are generally available for reference from libraries.  They are also distributed among technical groups and using Federal agencies.)

 3.  REQUIREMENTS

 3.1  Qualification.  The insulation block furnished under this specification shall be products which are qualified for listing on the applicable qualified products list at the time set for opening of bids (see 4.2 and 6.3).

 3.2  Material.  The insulation block shall be composed of heat-resisting compounds suitable for the temperature conditions and the purpose intended.

 3.3  Dimensions and tolerances.

 3.3.1  Dimensions.  Insulation shall be furnished in block form in 18-inch length by 3-inch width or 36-inch length by 6- or 12-inch width (see 6.1).  Blocks shall be furnished in thicknesses of 1, 1-1/2, 2, 2-1/2, 3, 3-1/2, or 4 inches (see 6.1).

 3.3.2  Tolerances.  A tolerance of plus or minus 1/8 inch in length, plus or minus 1/16 inch in width and thicknesses will be permitted.

 3.4  Physical requirements.  The insulation block shall conform to the physical requirements shown in table I.

Table I – Physical requirements

| Averages | Class 1 | Class 2 | Class 3 | Class 4 |
|---|---|---|---|---|
| Density, pounds per cubic foot, maximum | 14.0 | 14.0 | 22.0 | 26.0 |
| Compressive strength, at not more than 5 percent deformation min. p.s.i. | 50.0 | 50.0 | 50.0 | 50.0 |
| Weight loss by tumbling, loss in weight, maximum | | | | |
|  After first 10 minutes | 50.0 | 50.0 | 55.0 | 55.0 |
|  After second 10 minutes | 80.0 | 80.0 | 80.0 | 80.0 |
| Modulus of rupture, pounds per square inch, minimum | 1/ | 1/ | 1/ | 2/ |
| Change under soaking heat, 6 hours at °F. | 600 | 1,200 | 1,500 | 2,000 |
|  Loss in weight, percent, maximum | 18.0 | 12.0 | 16.0 | 10.0 |
|  Linear shrinkage, percent, maximum | 2.0 | 2.0 | 2.0 | 3.0 |
| Thermal conductivity, B.t.u. in. per hr. sq. ft. °F. maximum, at a mean temperature of | | | | |
|   200°F. | 0.40 | --- | --- | --- |
|   300°F. | 0.45 | --- | --- | --- |
|   400°F. | 0.50 | --- | --- | --- |
|   500°F. | --- | 0.60 | 0.66 | 0.72 |
|   600°F. | --- | 0.65 | 0.71 | --- |
|   700°F. | --- | 0.70 | 0.76 | --- |
|   750°F. | --- | --- | --- | 0.79 |
|   1000°F. | --- | --- | --- | 0.86 |

1/  Three times density (pounds per cubic foot) of the sample tested.

2/  Two and one-half times density (pounds per cubic foot) of sample tested.

 3.5  Simulative performance.  Insulation block shall be in satisfactory condition upon completion of the test specified in ASTM C411.

0069

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01505695
2005/5/5 19:16:12 GMT

MIL-I-2819E
INTERIM AMENDMENT-1 (SHIPS)

Page 4

Table III:  Delete "Loss in weight | 3.4 | 4.4.6 | 1 | 0.1 percent".

Page 5

4.4.6:  Delete and substitute:

"4.4.6  Physical changes under soaking heat.  Specimens shall be measured.
Then the specimens shall be placed in an electrically heated oven and subjected
to the maximum temperature for the respective class for 6 hours for linear
shrinkage.  The specimens shall be removed from the oven and tested to determine
linear shrinkage in accordance with the method specified in ASTM C35 (see table I)."

Preparing activity:
Navy - SH
(Project 5640-N021)

Page 2 of 2

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01505695
2005/5/5 19:16:12 GMT

QUALIFICATIONS VALIDATED
SEPTEMBER 1972

QPL-2819-40
7 August 1973
SUPERSEDING
QPL-2819-39
3 May 1973

QUALIFIED PRODUCTS LIST

OF

FSC 5640

PRODUCTS QUALIFIED UNDER MILITARY SPECIFICATION

MIL-I-2819

INSULATION BLOCK, THERMAL

This list has been prepared for use by or for the Government in the procurement of products covered by the subject specification and such listing of a product is not intended to and does not connote indorsement of the product by the Department of Defense. All products listed herein have been qualified under the requirements for the product as specified in the latest effective issue of the applicable specification. This list is subject to change without notice; revision or amendment of this list will be issued as necessary. The listing of a product does not release the supplier from compliance with the specification requirements.

THE ACTIVITY RESPONSIBLE FOR THIS QUALIFIED PRODUCTS LIST IS THE NAVAL SHIP ENGINEERING CENTER.

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST OR QUALIFICATION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| Class 1 | New Careytemp 1500 Block Insulation | Philip Carey Co. Rpts. #CRL-2 & #CRL-2A | Celotex Corporation Div. of Jim Walter Corp. 1500 N. Dale Mabry Hwy. Tampa, FL 33622 Plant: 320 W. Wayne Ave. Cincinnati, OH |
| Class 1 | Pabco Super Caltemp Type 1200 NA | EES 610551, EES C-3636 & Fibreboard Corp. Rpt. dtd. 5/23/72 | Fibreboard Corp. Pabco Industrial Products Div. 55 Francisco St. San Francisco, CA 94106 Plant: Emeryville, CA |
| Class 1 | Thermasil | EES 610245 | Keene Corp. Ceiling and Insulation Div. U. S. Route 1 Princeton, NJ 08540 Plant: Valley Forge, PA |
| Class 1 | Kaylo 10AF | Owens-Corning Rpt. 39948-2 | Owens-Corning Fiberglas Corp. Fiberglas Tower Toledo, OH 43601 Plant: Berlin, NJ |
| Class 2 | New Careytemp 1500 Block Insulation | Philip Carey Co. Rpts. #CRL-2 & #CRL-2a | Celotex Corporation Div. of Jim Walter Corp. 1500 N. Dale Mabry Corp. Tampa, FL 33622 Plant: 320 S. Wayne Ave. Cincinnati, OH |
| Class 2 | Pabco Super Caltemp Type 1200 NA | EES 610551, EES C-3636 & Fibreboard Corp. Rpt. dtd 5/23/72 | Fibreboard Corp. Pabco Industrial Products Div. 55 Francisco St. San Francisco, CA 94106 Plant: Emeryville, CA |

1 of 2

0321

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01512782
2005/6/8 21:3:52 GMT

QPL-2819

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST OR QUALIFICATION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| Class 2 | Thermo-12 | Colorado School of Mines Research Institute Rpt. A21201 & Dynatech Corp. Rpt. JNM-11(a) | Johns-Manville Corp. Government Dept. P.O. Box 5108 Greenwood Plaza Denver CO 80217 Plant:  North Main St. Manville, NJ |
| Class 2 | Thermasil | EES 610245 | Keene Corp. Ceiling and Insulation Div. U. S. Route 1 Princeton, NJ 08540 Plant:  Valley Forge, PA |
| Class 2 | Kaylo 10AF | Owens-Corning Rpt. 39948-2 | Owens-Corning Fiberglas Corp. Fiberglas Tower Toledo, OH 43601 Plant:  Berlin, NJ |
| Class 3 | New Careytemp 1500 Block Insulation | Philip Carey Co. Rpts. #CRL-2 & # CRL-2a | Celotex Corporation Div. of Jim Walter Corp. 1500 N. Dale Mabry Hwy. Tampa, FL 33622 Plant:  320 S. Wayne Ave. Cincinnati, OH |
| Class 3 | Thermo-12 | Colorado School of Mines Research Institute Rpt. A21201 & Dynatech Corp. Rpt. JNM-11(a) | Johns-Manville Corp. Government Dept. P.O. Box 5108 Greenwood Plaza Denver, CO 80217 Plant:  North Main St. Manville, NJ |

NOTE:  As of 7 August 1973, no Class 4 Thermal Insulation Block has been tested and qualified under Military Specification MIL-I-2819E. Pending inclusion of this class on the Qualified Products List, the qualification requirements (paragraphs 3.1 and 6.3) of MIL-I-2819E shall be waived for procurement of Class 4 thermal insulation block.  However, procuring agencies should require first article inspection invoking tests of paragraph 4.4 of MIL-I-2819E.  A copy of the first article test data, as certified by the responsible government inspector, shall be forwarded to the applicable qualifying activity.

2 of 2

0322

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to MCCAFFERY & ASSOCIATES INC. 01512782
2005/6/8 21:3:52 GMT

*ㅠ - 29-01*

QPL-2819-38
25 September 1972
SUPERSEDING
QPL-2819-37
6 March 1971

```
┌──────────────────────────┐
│ QUALIFICATIONS VALIDATED  │
│     SEPTEMBER 1972        │
└──────────────────────────┘
```

QUALIFIED PRODUCTS LIST

OF

```
┌─────────────┐
│  FSC 5640   │
└─────────────┘
```

PRODUCTS QUALIFIED UNDER MILITARY SPECIFICATION

MIL-I-2819

INSULATION BLOCK, THERMAL

This list has been prepared for use by or for the Government in the procurement of products covered by the subject specification and such listing of a product is not intended to and does not connote indorsement of the product by the Department of Defense. All products listed herein have been qualified under the requirements for the product as specified in the latest effective issue of the applicable specification. This list is subject to change without notice; revision or amendment of this list will be issued as necessary. The listing of a product does not release the supplier from compliance with the specification requirements.

THE ACTIVITY RESPONSIBLE FOR THIS QUALIFIED PRODUCTS LIST IS THE NAVAL SHIP ENGINEERING CENTER.

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST OR QUALIFICATION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| Class 1 | Pabco Super Caltemp Type 1200 NA | EES 610551, EES C-3636 & Fibreboard Corp. Rpt. dtd. 5/23/72 | Fibreboard Corp. Pabco Industrial Products Div. 55 Francisco St. San Francisco, CA 94106 Plant: Emeryville, CA |
| Class 1 | | | Johns-Manville Sales Corp. Greenwood Plaza Denver, CO 80217 Plants: Manville, NJ Long Beach, CA |
| | Thermobestos Thermobestos | EES 1ADT417 EES 010303 | |
| Class 1 | Thermasil | EES 610245 | Keene Corp. Ceiling and Insulation Div. U. S. Route 1 Princeton, NJ 08540 Plant: Valley Forge, PA |
| Class 1 | Kaylo | EES C-383 | Owens-Corning Fiberglas Corp. Fiberglas Tower Toledo, OH 43659 Plant: Berlin, NJ |
| Class 1 | Kaylo 20 | EES 010346 | Owens-Corning Fiberglas Corp. Fiberglas Tower Toledo, OH 43659 Plant: Berlin, NJ |
| Class 1 | New Careytemp 1500 Block Insulation | Philip Carey Co. Rpts. #CRL-2 & #CRL-2A | Philip Carey Co. Div. Panacon Copr. 320 S. Wayne Ave. Cincinnati, OH 45215 Plant: Same address |
| Class 2 | Pabco Super Caltemp Type 1200 NA | EES 610551, EES C-3636 & Fibreboard Corp. Rpt. dtd 5/23/72 | Fibreboard Corp. Pabco Industrial Products Div. 55 Francisco St. San Francisco, CA 94106 Plant: Emeryville, CA |

1 of 2

573

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC. 01512782
2005/6/8 21:3:52 GMT

QPL-2819

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST OR QUALIFICATION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| Class 2 | | | Johns-Manville Sales Corp. Greenwood Plaza Denver, CO 80217 Plants:  Manville, NJ |
| | Thermobestos Thermobestos | EES 1ADT417 EES 010303 | Long Beach, CA |
| Class 2 | Thermasil | EES 610245 | Keene Corp. Ceiling and Insulation Div. U. S. Route 1 Princeton, NJ 08540 Plant:  Valley Forge, PA |
| Class 2 | Kaylo | EES C-383 | Owens-Corning Fiberglas Corp. Fiberglas Tower Toledo, OH 43659 Plant:  Berlin, NJ |
| Class 2 | Kaylo 20 | EES 010346 | Owens-Corning Fiberglas Corp. Fiberglas Tower Toledo, OH 43659 Plant:  Berlin, NJ |
| Class 2 | New Careytemp 1500 Block Insulation | Philip Carey Co. Rpts. #CRL-2 & #CRL-2a | Philip Carey Co. Div. Panacon Corp. 320 S. Wayne Ave. Cincinnati, OH 45215 Plant:  Same address |
| Class 3 | Kaylo 20 | Mfr's Test Rpt., dtd. 8/3/59 & & EES 610574A | Owens-Corning Fiberglas Corp. Fiberglas Tower Toledo, OH 43659 Plant:  Berlin, NJ |
| Class 3 | New Careytemp 1500 Block Insulation | Philip Carey Co. Rpts. #CRL-2 & # CRL-2a | Philip Carey Co. Div. Panacon Corp. 320 S. Wayne Ave. Cincinnati, OH 45215 Plant:  Same address |
| Class 4 | Superex | EES 610530A | Johns-Manville Sales Corp. Greenwood Plaza Denver, CO 80217 Plant:  Waukegan, IL |

2 of 2

Provided by IHS
No reproduction or networking permitted without license from IHS.

Sold to:MCCAFFERY & ASSOCIATES INC, 01512782
2005/6/8 21:3:52 GMT

Error.

QPL-2819

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST OR QUALIFICATION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| Class 1 | New Careytemp 1500 Block Insulation | The Philip Carey Mfg. Co. Rpt. #CRL-2 | Philip Carey Corp. 320 S. Wayne Ave. Cincinnati, Ohio 45215 Plant: Same address |
| Class 1 | Calsilite | EES B8971 | GAF Corp. 140 West 51 St. New York, N. Y. 10020 Plant: Gloucester City, N. J. |
| Class 2 | Super Caltemp | EES 610551 | Fibreboard Corp. Pabco Industrial Products Div. 475 Brannan St. San Francisco, Calif. 94119 Plant: Emeryville, Calif. |
| Class 2 | Prasco | EES B-6886 | Fibreboard Corp. Pabco Industrial Products Div. 475 Brannan St. San Francisco, Calif. 94119 Plant: Emeryville, Calif. |
| Class 2 | Caltemp | EES C-3636 | Fibreboard Corp. Pabco Industrial Products Div. 475 Brannan St. San Francisco, Calif. 94119 Plant: Emeryville, Calif. |
| Class 2 | ThermoBestos | EES 1ADT417 | Johns-Manville Sales Corp. 22 E. 40th St. New York, N. Y. 10016 Plant: Manville, N.J. Watson, Calif. |
| Class 2 | Thermobestos | EES 010303 | |
| Class 2 | Superex M | EES 010326 | Johns-Manville Sales Corp. 22 E. 40th Street New York, N. Y. 10016 Plant: Waukegan, Ill. |
| Class 2 | Thermasil | EES 610245 | Keene Corp. Industrial Insulation Div. 500 Breunig Ave. Trenton, N. J. 08602 Plant: Valley Forge, Pa. |
| Class 2 | Kaylo | EES C-383 | Owens-Corning Fiberglas Corp. Toledo, Ohio 43601 Plant: Berlin, N. J. |
| Class 2 | Kaylo 20 | EES 010346 | Owens-Corning Fiberglas Corp. Toledo, Ohio 43601 Plant: Berlin, N. J. |
| Class 2 | New Careytemp 1500 Block Insulation | The Philip Carey Mfg. Co. Rpt. #CRL-2 | Philip Carey Corp. 320 S. Wayne Ave. Cincinnati, Ohio 45215 Plant: Same address |
| Class 2 | Calsilite | EES B-8971 | GAF Corp. 140 West 51 St. New York, N. Y. 10020 Plant: Gloucester City, N. J. |

2 of 3

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC. 01511998
2005/6/6 21:19:44 GMT

QPL-2819

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST OR QUALIFICATION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| Class 3 | Superex | EES C-3581 | Johns-Manville Sales Corp. 22 E. 40th Street New York, N. Y. 10016 Plant: Waukegan, Ill. |
| Class 3 | Superex M | EES 010326 | Johns-Manville Sales Corp. 22 E. 40th Street New York, N. Y. 10016 Plant: Waukegan, Ill. |
| Class 3 | HY-Temp | EES C-2815 | Nicolet Industries, Inc. Nicolet Avenue Florham Park, New Jersey Plant: Ambler, Pennsylvania |
| Class 3 | KAYTHERM-1700 | Mfg. Test Rpt. No. KM-63- KAYTHERM-1700-1 | Nicolet Industries, Inc. Nicolet Avenue Florham Park, New Jersey Plant: Ambler, Pennsylvania |
| Class 3 | Kaylo 20 | Mfr's Test Rpt., dtd. 3 Aug. 1959 & EES 610574A | Owens-Corning Fiberglas Corp. Toledo, Ohio 43601 Plant: Berlin, N.J. |
| Class 3 | New Careytemp 1500 Block Insulation | The Philip Carey Mfg. Co. Rpt. #CRL-2 | Philip Carey Corp. 320 S. Wayne Ave. Cincinnati, Ohio 45215 Plant: Same address |
| Class 4 | Hy-Temp | Keasbey & Mattison Test Rpt. KM-62- Hy-Temp-1 | Nicolet Industries, Inc. Nicolet Avenue Florham Park, New Jersey Plant: Ambler, Pennsylvania |
| Class 4 | Superex | EES 610530A | Johns-Manville Corp. 22 E. 40th Street New York, N. Y. 10016 Plant: Waukegan, Ill. |
| Class 4 | Careytemp 2000 | The Philip Carey Mfg. Co. Rpt. #CRL-3 | Philip Carey Corp. 320 S. Wayne Ave. Cincinnati, Ohio 45215 Plant: Same address |

3 of 3

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC. 01511998
2005/6/6 21:19:44 GMT

QPL-2819-36
27 May 1969
SUPERSEDING
QPL-2819-35
25 September 1968

## QUALIFIED PRODUCTS LIST
## OF
## PRODUCTS QUALIFIED UNDER MILITARY SPECIFICATION

FSC 5640

MIL-I-2819

INSULATION BLOCK, THERMAL

This list has been prepared for use by or for the Government in the procurement of products covered by the subject specification and such listing of a product is not intended to and does not connote indorsement of the product by the Department of Defense. All products listed herein have been qualified under the requirements for the product as specified in the latest effective issue of the applicable specification. This list is subject to change without notice; revision or amendment of this list will be issued as necessary. The listing of a product does not release the supplier from compliance with the specification requirements. Use of the information shown hereon for advertising or publicity purposes is expressly forbidden.

The activity responsible for this Qualified Products List is  Naval Ship Engineering Center

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST OR QUALIFICATION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| Class 1 | Super Caltemp | EES 610551 | Fibreboard Corp. Pabco Industrial Products Div. 475 Brannan St. San Francisco, Calif. 94119 Plant: Emeryville, Calif. |
| Class 1 | Caltemp | EES C-3636 | Fibreboard Corp. Pabco Industrial Products Div. 475 Brannan St. San Francisco, Calif. 94119 Plant: Emeryville, Calif. |
| Class 1 | Pabco | EES B-32 | Fibreboard Corp. Pabco Industrial Products Div. 475 Brannan St. San Francisco, Calif. 94119 Plant: Emeryville, Calif. |
| Class 1 | JM | EES C-3581 | Johns-Manville Sales Corp. 22 East 40th Street New York, N. Y. 10016 Plants: Waukegan, Ill.           Manville, N.J.           Watson, Calif. |
| | Thermobestos Thermobestos | EES 1ADT417 EES 010303 | |
| Class 1 | Thermasil | EES 610245 | Keene Corp. Industrial Insulation Div. 500 Breunig Ave. Trenton, N. J. 08602 Plant: Valley Forge, Pa. |
| Class 1 | Kaylo | EES C-383 | Owens-Corning Fiberglas Corp. Toledo, Ohio 43601 Plant: Berlin, N.J. |
| Class 1 | Kaylo 20 | EES 010346 | Owens-Corning Fiberglas Corp. Toledo, Ohio 43601 Plant: Berlin, N. J. |

1 of 3

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC. 01511998
2005/6/6 21:19:44 GMT

QPL-2819

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST OR QUALIFICATION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| Class 1 | New Careytemp 1500 Block Insulation | The Philip Carey Mfg. Co. Rpt. #CRL-2 | Philip Carey Corp. 320 S. Wayne Ave. Cincinnati, Ohio 45215 Plant: Same address |
| Class 1 | Calsilite | EES B8971 | GAF Corp. 140 West 51 St. New York, N. Y. 10020 Plant: Gloucester City, N. J. |
| Class 2 | Super Caltemp | EES 610551 | Fibreboard Corp. Pabco Industrial Products Div. 475 Brannan St. San Francisco, Calif. 94119 Plant: Emeryville, Calif. |
| Class 2 | Prasco | EES B-6886 | Fibreboard Corp. Pabco Industrial Products Div. 475 Brannan St. San Francisco, Calif. 94119 Plant: Emeryville, Calif. |
| Class 2 | Caltemp | EES C-3636 | Fibreboard Corp. Pabco Industrial Products Div. 475 Brannan St. San Francisco, Calif. 94119 Plant: Emeryville, Calif. |
| Class 2 | Thermobestos | EES 1ADT417 | Johns-Manville Sales Corp. 22 E. 40th St. New York, N. Y. 10016 Plant: Manville, N.J. Watson, Calif. |
| Class 2 | Thermobestos | EES 010303 | |
| Class 2 | Superex M | EES 010326 | Johns-Manville Sales Corp. 22 E. 40th Street New York, N. Y. 10016 Plant: Waukegan, Ill. |
| Class 2 | Thermasil | EES 610245 | Keene Corp. Industrial Insulation Div. 500 Breunig Ave. Trenton, N. J. 08602 Plant: Valley Forge, Pa. |
| Class 2 | Kaylo | EES C-383 | Owens-Corning Fiberglas Corp. Toledo, Ohio 43601 Plant: Berlin, N. J. |
| Class 2 | Kaylo 20 | EES 010346 | Owens-Corning Fiberglas Corp. Toledo, Ohio 43601 Plant: Berlin, N. J. |
| Class 2 | New Careytemp 1500 Block Insulation | The Philip Carey Mfg. Co. Rpt. #CRL-2 | Philip Carey Corp. 320 S. Wayne Ave. Cincinnati, Ohio 45215 Plant: Same address |
| Class 2 | Calsilite | EES B-8971 | GAF Corp. 140 West 51 St. New York, N. Y. 10020 Plant: Gloucester City, N. J. |

2 of 3

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC. 01511998
2005/6/6 21:19:44 GMT

QPL-2819

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST OR QUALIFICATION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| Class 3 | Super Caltemp | EES 610551 | Fibreboard Corp. Pabco Industrial Products Div. 475 Brannan St. San Francisco, Calif. 94119 Plant: Emeryville, Calif. |
| Class 3 | Prasco | EES B-6886 | Fibreboard Corp. Pabco Industrial Products Div. 475 Brannan St. San Francisco, Calif. 94119 Plant: Emeryville, Calif. |
| Class 3 | Superex | EES C-3581 | Johns-Manville Sales Corp. 22 E. 40th Street New York, N. Y. 10016 Plant: Waukegan, Ill. |
| Class 3 | Superex M | EES 010326 | Johns-Manville Sales Corp. 22 E. 40th Street New York, N. Y. 10016 Plant: Waukegan, Ill. |
| Class 3 | HY-Temp | EES C-2815 | Nicolet Industries, Inc. Nicolet Avenue Florham Park, New Jersey Plant: Ambler, Pennsylvania |
| Class 3 | KAYTHERM-1700 | Mfg. Test Rpt. No. KM-63- KAYTHERM-1700-1 | Nicolet Industries, Inc. Nicolet Avenue Florham Park, New Jersey Plant: Ambler, Pennsylvania |
| Class 3 | Kaylo 20 | Mfr's Test Rpt., dtd. 3 Aug. 1959 & EES 610574A | Owens-Corning Fiberglas Corp. Toledo, Ohio 43601 Plant: Berlin, N.J. |
| Class 3 | New Careytemp 1500 Block Insulation | The Philip Carey Mfg. Co. Rpt. #CRL-2 | Philip Carey Corp. 320 S. Wayne Ave. Cincinnati, Ohio 45215 Plant: Same address |
| Class 4 | Hy-Temp | Keasbey & Mattison Test Rpt. KM-62- Hy-Temp-1 | Nicolet Industries, Inc. Nicolet Avenue Florham Park, New Jersey Plant: Ambler, Pennsylvania |
| Class 4 | Superex | EES 610530A | Johns-Manville Corp. 22 E. 40th Street New York, N. Y. 10016 Plant: Waukegan, Ill. |
| Class 4 | Careytemp 2000 | The Philip Carey Mfg. Co. Rpt. #CRL-3 | Philip Carey Corp. 320 S. Wayne Ave. Cincinnati, Ohio 45215 Plant: Same address |

3 of 3

☆ U. S. GOVERNMENT PRINTING OFFICE: 1969-341-520/A-7487

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC. 01511998
2005/6/6 21:19:44 GMT

H·29-02]

**MIL-STD-769E(SHIPS)**
**15 July 1974**
**SUPERSEDING**
**MIL-STD-769D(SHIPS)**
**1 April 1971**
**(See 6.7)**

# MILITARY STANDARD

# THERMAL INSULATION REQUIREMENTS

# FOR

# MACHINERY AND PIPING



THIS DOCUMENT CONTAINS //6 PAGES          FSC 5640

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01542032
2005/11/4 23:20:44 GMT

MIL-STD-769E(SHIPS)
15 April 1974

DEPARTMENT OF THE NAVY

NAVAL SEA SYSTEMS COMMAND

WASHINGTON, D.C. 20362

Thermal Insulation Requirements for Machinery and Piping
MIL-STD-769E(SHIPS)

1.  This Military Standard is approved for use by the Naval Sea Systems Command and is available for use by all Departments and Agencies of the Department of Defense.

2.  Recommended corrections, additions, or deletions should be addressed to Commander, Naval Ship Engineering Center, Department of the Navy, Center Building, Prince George's Center, Hyattsville, Maryland 20782.

ii

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01542032
2005/11/4 23:20:44 GMT

MIL—STD—769E(SHIPS)
15 July 1974

FOREWORD

    This standard covers basic thermal insulation requirements.  The information contained
in this standard amplifies the generalized requirements for insulation of piping, machinery
uptakes, and mechanical equipment covered in the General Specifications for Ships of the
U.S. Navy or in detail Ships Specifications.

iii

1851

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01542032
2005/11/4 23:20:44 GMT

MIL-STD-769E(SHIPS)
15 July 1974

## CONTENTS

| | | | Page |
|---|---|---|---|
| Paragraph | 1. | SCOPE | 1 |
| | 2. | REFERENCED DOCUMENTS | 1 |
| | 3. | GENERAL REQUIREMENTS | 2 |
| | 4. | MATERIALS AND THICKNESSES | 2 |
| | 4.1 | Minimum thicknesses | 2 |
| | 4.2 | Special conditions | 6 and 7 |
| | 4.3 | Adhesives | 7 |
| | 4.4 | Finishing cements | 7 |
| | 4.5 | Metal lagging | 7 |
| | 4.6 | Fasteners | 7 |
| | 5. | RE-USABLE COVERS | 7 |
| | 5.1 | Hot-surface insulation covers | 7 |
| | 5.2 | Construction | 8 |
| | 5.3 | Fabrication, piping components | 8 |
| | 5.4 | Fabrication, machinery and equipment | 8 |
| | 6. | INSTALLATION | 9 |
| | 6.1 | Hot-surface insulation | 9 |
| | 6.1.1 | Pipe and tubing | 9 |
| | 6.1.2 | Piping components | 9 |
| | 6.1.3 | Machinery and equipment | 9 |
| | 6.1.4 | Boiler uptakes | 9 |
| | 6.1.5 | Unfired pressure vessels | 10 |
| | 6.1.6 | Outer boiler casing | 10 |
| | 6.2 | Antisweat insulation (cold and chilled water service) | 10 |
| | 6.3 | Refrigerant insulation | 10 |
| | 6.4 | Weather deck hot piping insulation | 10 thru 12 |
| | 6.5 | Metal lagging | 12 |
| | 6.6 | Painting | 12 |

### TABLES

| Table | | | |
|---|---|---|---|
| | I. | Schedule of approved insulation and lagging materials | 3 |
| | II. | Insulation thickness for hot piping, compounded, conforming to MIL-I-2781 | 4 |
| | III. | Thickness of insulation conforming to MIL-P-15280 and MIL-I-22344 for hot piping | 4 |
| | IV. | Thickness of insulating tape conforming to MIL-C-20079 and MIL-I-16411 for 1/4 to 3/4 inch size hot piping | 5 |
| | V. | Thickness of insulating materials for hot surfaces of machinery and equipment up to 850°F | 5 |
| | VI. | Thickness of insulating materials for hot surfaces of machinery and equipment over 850°F | 5 |
| | VII. | Thickness of refrigerant insulation for piping | 5 |
| | VIII. | Thickness of refrigerant insulation for machinery and equipment (exclusive of vapor barrier) | 6 |
| | IX. | Thickness of antisweat insulation (exclusive of vapor barrier) | 6 |
| | X. | Nominal thicknesses of insulation for weather deck hot piping | 6 |

iv

1852

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01542032
2005/11/4 23:20:44 GMT

MIL-STD-769E(SHIPS)
15 July 1974

1.  SCOPE

1.1  The purpose of this standard is to prescribe the requirements for thermal insulation of piping, machinery, uptakes, and mechanical equipment for ships of the U. S. Navy.

2.  REFERENCED DOCUMENTS

2.1  The issues of the following documents in effect on the date of invitation for bids form a part of this standard to the extent specified herein.

GOVERNMENTAL

SPECIFICATIONS

FEDERAL

T-T-931 - Twine, Cotton, Mattress.
HH-C-466 - Cloth, Glass, Coated, (For Membrane Waterproofing and Built-Up Roofing).
HH-I-551 - Insulation Block, Pipe Covering and Boards, Thermal (Cellular Glass).
QQ-N-281 - Nickel-Copper-Alloy Bar, Plate, Rod, Sheet, Strip, Wire, Forgings, and Structural and Special Shaped Sections.
QQ-S-775 - Steel Sheets, Carbon, Zinc-Coated.
QQ-W-343 - Wire, Electrical (Uninsulated).
SS-C-160 - Cements, Insulation, Thermal.
SS-C-192 - Cement, Portland.
TT-P-320 - Pigment, Aluminum; Powder and Paste, for Paint.
UU-B-790 - Building Paper, Vegetable Fiber:  (Kraft, Waterproofed, Water Repellent and Fire Resistant).
UU-T-106 - Tape, Pressure-Sensitive Adhesive, Masking, Paper.

MILITARY

MIL-I-2781 - Insulation, Pipe, Thermal.
MIL-I-2818 - Insulation Blanket, Thermal, Fibrous Mineral.
MIL-I-2819 - Insulation Block, Thermal.
MIL-C-2861 - Cement, Insulation, High-Temperature.
MIL-A-3316 - Adhesives, Fire-Resistant, Thermal Insulation.
MIL-P-15280 - Plastic Material, Unicellular (Sheets and Tubes).
MIL-P-15328 - Primer, (Wash), Pretreatment, Blue (Formula No. 117-B for Metals).
MIL-I-15475 - Insulation Felt, Thermal, Fibrous Glass, Semirigid.
MIL-I-16411 - Insulation Felt, Thermal, Glass Fiber.
MIL-E-17970 - Enamel, Nonflaming (Dry), Chlorinated Alkyd Resin, Soft White, Semigloss, Formula No. 124/58.
MIL-A-18065 - Adhesives, High Initial Bond.
MIL-B-19564 - Bedding Compound, Thermal Insulation Pipe Covering.
MIL-C-19565 - Coating Compounds, Thermal Insulation Pipe Covering - Fire-, and Water-Resistant, Vapor-Barrier and Weather-Resistant.
MIL-C-20079 - Cloth, Glass; Tape, Textile, Glass;  and Thread, Glass.
MIL-I-22023 - Insulation Felt, Thermal and Sound Absorbing Felt, Fibrous Glass, Flexible.
MIL-I-22344 - Insulation, Pipe, Thermal, Fibrous Glass.
MIL-C-22395 - Compound, End Sealing, Thermal Insulation Pipe Covering - Fire-, Water-, and Weather-Resistant.
MIL-I-23128 - Insulation Blanket, Thermal, Refractory Fiber, Flexible.
MIL-I-24244 - Insulation Materials, Thermal, With Special Corrosion and Chloride Requirements.

DRAWING

MILITARY

NAVSEA

5000-S5103-841336 - Piping, Boiler Soot Blower, Typical Installation.

1

1853

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01542002
2005/11/4 23:20:44 GMT

MIL-STD-769E(SHIPS)
15 July 1974

(Copies of specifications, standards, drawings, and publications required by suppliers in connection with specific procurement functions should be obtained from the procuring activity or as directed by the contracting officer.)

NONGOVERNMENTAL

SPECIFICATIONS

AMERICAN SOCIETY FOR TESTING AND MATERIALS (ASTM)
A167-70 - Specification for Stainless and Heat-Resisting Plate,
Sheet, and Strip.
B209-73 - Specification for Aluminum-Alloy Sheet and Plate.

(Application for copies should be addressed to the American Society for Testing and Materials, 1916 Race Street, Philadelphia, Pennsylvania 19103.)

(Technical society and technical association specifications and standards are generally available for reference from libraries. They are also distributed among technical groups and using Federal agencies.)

3.   GENERAL REQUIREMENTS

3.1  Application of the requirements listed herein is limited only to the equipment specified in 1.1.

3.2  Minor deviations in installation which meet the intent of the requirements specified herein may be approved by the cognizant Supervisor of Shipbuilding, U. S. Naval Shipyards, or the Commander, Naval Ship Engineering Center.  (Copies of all such changes shall be forwarded to the Commander, Naval Ship Engineering Center, SEC 6153, Prince George's Center, Center Building, Hyattsville, Maryland 20782.)

3.3  The installation of asbestos or asbestos containing insulation and lagging materials is not permitted.  Where previously installed asbestos containing materials are removed, restoration shall be with asbestos free materials as specified herein.

4.   MATERIAL AND THICKNESSES

4.1  Minimum thicknesses.  Tables I to X, inclusive, specify materials for insulation and lagging and the minimum acceptable thicknesses for the temperature ranges listed.

2

1854

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01542032
2005/11/4 23:20:44 GMT

MIL-STD-769E(SHIPS)
15 July 1974

Table I – Schedule of approved insulation and lagging materials. 1/

| Service | Temperature Range (°F) | Pipe and Tubing Insulation | Pipe and Tubing Lagging | Valve and Fittings Insulation | Valve and Fittings Lagging | Flange Joints Insulation | Flange Joints Lagging 2/ | Machinery Insulation | Machinery Lagging |
|---|---|---|---|---|---|---|---|---|---|
| Gases Steam hot water oil | 125 to 1200 | MIL-I-2781, (MIL-C-20079 2/ (750°F Max) MIL-I-16411 (750°F Max) MIL-I-22344 (370°F Max) MIL-P-15280 (180°F Max) | MIL-C-20079 | MIL-I-2781 MIL-I-2819 MIL-I-16411 MIL-C-2861 SS-C-160 MIL-I-22344 (370°F Max) MIL-P-15280 (180°F max) MIL-I-23128 | MIL-C-20079 | MIL-I-2781 MIL-I-2819 MIL-I-16411 MIL-C-2861 SS-C-160 MIL-I-22344 (370°F Max) MIL-P-15280 (180°F max) MIL-I-23128 | MIL-C-20079 | MIL-I-2819 MIL-I-16411 MIL-I-2819 MIL-C-2861 SS-C-160 MIL-I-22023 (370°F Max) MIL-I-23128 (180°F max) MIL-P-15280 (180°F Max) | MIL-C-20079 |
| Cold water Chilled water | 28 to 70 | MIL-I-16411 MIL-I-2781 MIL-I-22344 MIL-P-15280 MIL-I-551 | MIL-C-20079 UU-B-790, type III, grade F, style 10 | MIL-I-16411 MIL-I-2781 MIL-I-22344 MIL-I-2819 MIL-P-15280 MIL-I-551 | MIL-C-20079 UU-B-790, type III, grade F, style 10 | MIL-I-16411 MIL-I-2781 MIL-I-22344 MIL-I-2819 MIL-P-15280 MIL-I-551 | MIL-C-20079 UU-B-790, type III, grade F, style 10 | MIL-I-16411 MIL-I-22023 MIL-I-2819 MIL-P-15280 MIL-I-551 | MIL-C-20079 UU-B-790, type III, grade F, style 10 |
| Refrigerant | -20 to 60 | MIL-I-551 MIL-P-15280 | MIL-C-20079 | MIL-I-551 MIL-P-15280 | MIL-C-20079 | MIL-I-551 MIL-P-15280 | MIL-C-20079 | MIL-I-551 MIL-P-15280 | MIL-C-20079 |

1/ Additional materials are covered in 4.5 (metal lagging); 6.1.4 (boiler uptakes); 6.2 (securing antisweat insulation); 6.4.1 (weather deck hot piping).

2/ Flammable liquid flanges shall not be lagged.

3/ Used only in a laminate construction consisting of a glass fabric jacket with a fibrous glass felt insert.

3

1855

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01542032
2005/11/4 23:20:44 GMT

MIL-STD-769E(SHIPS)
15 July 1974

Table II - Insulation thicknesses for hot piping, compounded,
conforming to MIL-I-2781.

| Pipe size (inches) | Temperature range (°F) | Class[1] | | Nominal thickness (inches) | | |
|---|---|---|---|---|---|---|
| | | Inner layer | Outer layer | Inner layer | Outer layer | Total |
| 1/2, 1-1/2 | 125 - 388 | b | --- | 1 | --- | 1 |
| | 389 - 500 | b | --- | 2 | --- | 2 |
| | 501 - 750 | d | --- | 2 | --- | 2 |
| | 751 - 950 | e | --- | 2 | --- | 2 |
| | 951 - 1050 | e | b | 2 | 1-1/2 | 3-1/2 |
| 2, 2-1/2 | 125 - 338 | b | --- | 1-1/2 | --- | 1-1/2 |
| | 339 - 388 | b | --- | 2 | --- | 2 |
| | 389 - 500 | b | --- | 3 | --- | 3 |
| | 501 - 750 | d | --- | 3 | --- | 3 |
| | | d | b | 1-1/2 | 1-1/2 | 3 |
| | 751 - 900 | e | b | 1-1/2 | 1-1/2 | 3 |
| | 901 - 1050 | e | b | 2 | 1-1/2 | 3-1/2 |
| 3 through 4-1/2 | 125 - 338 | b | --- | 1-1/2 | --- | 1-1/2 |
| | 339 - 388 | b | --- | 2 | --- | 2 |
| | 389 - 500 | b | --- | 3 | --- | 3 |
| | 501 - 750 | d | --- | 3 | --- | 3 |
| | | d | b | 1-1/2 | 2 | 3-1/2 |
| | 751 - 900 | e | b | 1-1/2 | 2 | 3-1/2 |
| | 901 - 950 | e | b | 2 | 1-1/2 | 3-1/2 |
| | 951 - 1050 | e | b | 2-1/2 | 1-1/2 | 4 |
| 5, 6 | 125 - 338 | b | --- | 1-1/2 | --- | 1-1/2 |
| | 339 - 388 | b | --- | 2 | --- | 2 |
| | 389 - 500 | b | --- | 3 | --- | 3 |
| | 501 - 750 | d | --- | 3 | --- | 3 |
| | | d | b | 1-1/2 | 2 | 3-1/2 |
| | 751 - 900 | e | b | 1-1/2 | 2 | 3-1/2 |
| | 901 - 950 | e | b | 2 | 1-1/2 | 3-1/2 |
| | 951 - 1050 | e | b | 3 | 2 | 5 |
| 7 | 125 - 338 | b | --- | 1-1/2 | --- | 1-1/2 |
| | 339 - 388 | b | --- | 2-1/2 | --- | 2-1/2 |
| | 389 - 500 | b | --- | 3 | --- | 3 |
| | 501 - 750 | d | --- | 4 | --- | 4 |
| | | d | b | 1-1/2 | 2 | 3-1/2 |
| | 751 - 900 | e | b | 1-1/2 | 2 | 3-1/2 |
| | 901 - 950 | e | b | 2 | 2 | 4 |
| | 951 - 1050 | e | b | 3 | 2 | 5 |
| 8 and larger | 125 - 338 | b | --- | 1-1/2 | --- | 1-1/2 |
| | 339 - 388 | b | --- | 2-1/2 | --- | 2-1/2 |
| | 389 - 500 | b | --- | 3 | --- | 3 |
| | 501 - 750 | d | --- | 4 | --- | 4 |
| | | d | b | 2 | 2 | 4 |
| | 751 - 900 | e | b | 2 | 2 | 4 |
| | 901 - 950 | e | b | 2-1/2 | 2 | 4-1/2 |
| | 951 - 1050 | e | b | 3 | 2 | 5 |

[1] Does not include finishing cement.

Table III - Thickness of insulation conforming to MIL-P-15280[1]
and MIL-I-22344, for hot piping.

| Temperature range (°F) | Specification | Thickness |
|---|---|---|
| | | Inch |
| 125 to 180 | MIL-P-15280[1] or MIL-I-22344 | 1/2 |
| 181 to 250 | MIL-I-22344 | 1/2 |
| 251 to 300 | MIL-I-22344 | 3/4 |
| 301 to 370 | MIL-I-22344 | 1 |

[1] Approved for submarines only in this temperature range.

4

1856

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC. 01542032
2005/11/4 23:20:44 GMT

MIL-STD-769E(SHIPS)
15 July 1974

Table IV - Thickness of insulating tape conforming to {MIL-C-20079[1]/ (MIL-I-16411) for 1/4 to 3/4 inch size hot piping.

| Temperature range (°F) | Pipe size | Nominal thickness |
|---|---|---|
| | | Inch |
| 125 to 250 | 1/4, 3/8 | 3/8 |
| 251 to 750 | 1/4, 3/8 | 7/8 |
| 125 to 250 | 1/2, 3/4 | 3/4 |
| 251 to 388 | 1/2, 3/4 | 1 |
| 389 to 500 | 1/2, 3/4 | 1-1/2 |
| 501 to 750 | 1/2, 3/4 | 2 |

[1]/Used only in a laminate construction consisting of a glass fabric jacket with a fibrous glass felt insert.

Table V - Thickness[1]/ of insulating materials for hot surfaces of machinery and equipment up to 850°F.

| Temperature range (°F) | Nominal thickness (inches) | | |
|---|---|---|---|
| | Fibrous glass felt, MIL-I-16411, type II; refractory fiber blanket, MIL-I-23128, grade A | Insulation, block, MIL-I-2819; mineral fiber blanket, MIL-I-2818; fibrous glass felt, MIL-I-16411, type I | Insulating cement, SS-C-160 |
| 125 - 338 | 1 | 1-1/2 | 1-1/2 |
| 339 - 388 | 1-1/2 | 2-1/2 | 2-1/2 |
| 389 - 500 | 2 | 3 | 3 |
| 501 - 750 | 2-1/2 | 3-1/2 | 4 |
| 751 - 850 | 3 | 4-1/2 | 5 |

[1]/ Does not include finishing cement.

Table VI - Thickness[1]/ of insulating materials for hot surfaces of machinery and equipment over 850°F.

| Temperature range (°F) | Thickness (inches) | |
|---|---|---|
| | Single felt material | Block |
| | MIL-I-16411, type II MIL-I-23128, grade A | MIL-I-2819 |
| 851 - 950 | 4 | 4-1/2 |
| 951 - 1050 | 4 | 5 |

[1]/ Does not include finishing cement.

Table VII - Thickness of refrigerant insulation for piping.

| Pipe size (inches) | Temperature range (°F) | Cellular glass HH-I-551 Nominal[1]/ thickness (inches) | | Plastic foam, MIL-P-15280 thickness (inches) | |
|---|---|---|---|---|---|
| Up to 1-1/4 | -20 to -1 | 2-1/4 | 1-1/2* | 1-1/2 | 1* |
| | 0 to 40 | 2 | 1-1/4* | 1 | 3/4* |
| 1-1/2 to 2-1/2 | -20 to -1 | 2-1/2 | 1-3/4* | 1-1/2 | 1 |
| | 0 to 40 | 2-1/4 | 1-1/2* | 1 | 3/4* |
| 3 to 5 | -20 to -1 | 3 | 2* | 1-1/2 | 1* |
| | 0 to 40 | 2-3/4 | 1-3/4* | 1 | 3/4* |

[1]/Nominal thickness is approximate and should only be used as a guide in determining actual thickness requirements.
* Thickness for application in air-conditioned spaces only.

5

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01542032
2005/11/4 23:20:44 GMT

MIL-STD-769E(SHIPS)
15 July 1974

Table VIII - Thickness of refrigerant insulation for machinery
and equipment (exclusive of vapor barrier).

| Temperature range (°F) | Thickness (inches) | | | |
|---|---|---|---|---|
| | Foam plastic, MIL-P-15280 | | Cellular glass, HH-I-551 | |
| 0 to 35 | 3 | 1* | 5 | 1-1/2* |

* Thickness for application in air conditioned spaces only.

Table IX - Thickness of antisweat insulation (exclusive of vapor barrier).

| Temperature range (°F) | Machinery and equipment | | | Piping | | |
|---|---|---|---|---|---|---|
| | Material specification | Thickness (inches) | | Material specification | Thickness (inches) | |
| 28 to 99 | MIL-I-2819 HH-I-551 | 1-1/2 | 3/4* | MIL-I-2781 MIL-I-2819 HH-I-551 | 1 | 1/2* |
| | MIL-I-22023 MIL-P-15280 | 1 3/4 | 1/2* 1/2* | MIL-P-15280 MIL-I-22344 | 3/4 | 1/2* |

* Thickness for application in air-conditioned spaces only.

Table X - Nominal thicknesses of insulation for weather deck hot piping.

| Pipe size (inches) | Calcium silicate, MIL-I-2781 Cellular glass, HH-I-551 |
|---|---|
| | Inches |
| 1/4 to 3 | 1-1/2 |
| 3-1/2 to 6 | 2 |
| Over 6 | 2-1/2 |

4.2 <u>Special conditions</u>. The following special conditions supplement or modify the selection of materials or thicknesses specified, when applicable:

(a)   The insulation thickness on soot blower piping between the root valve and the soot blower heads shall be reduced from that indicated for a system normally operating at the same temperature as follows:
(1)   Where double layer insulation is used, only the inner (high tempera- ture) insulation thickness layer need be installed.
(2)   Where the insulation consists of a single uniform thickness layer, only one-half the total specified thickness need be installed.

(b)   Where double layer construction consisting of two classes of insulation is specified in table II, the higher temperature class insulation may be furnished in a uniform single thickness equal to the total thickness speci- fied, if single layer construction is considered desirable.  Where single layer construction is used in lieu of double layer construction, suitable expansion joints to permit thermal movement of the piping, without opening of insulation joints, must be provided.

(c)   Where considered desirable, higher temperature classes of insulation may be used where lower temperature classes are specified provided they are satis- factory in all other respects (e.g. where class b of MIL-I-2781 is specified, class d or e may be used).

(d)   Insulation conforming to MIL-I-2781 or cellular glass insulation conforming to HH-I-551 shall be used on hot piping requiring insulation that will be exposed to the weather, and shall conform to the thicknesses specified in table X.

(e)   Elastomeric foamed plastic insulation, MIL-P-15280, may be used for machinery and equipment applications up to 180°F; 1/2-inch minimum thickness.

6

1858

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC. 01542032
2005/11/4 23:20:44 GMT

MIL-STD-769E(SHIPS)
15 July 1974

(f)  Where HOT SURFACE insulation thicknesses are not specified, such as for re-
     fractory fiber insulation felt, MIL-I-23128, and special applications, the
     following shall be used as a guide in determining acceptable thicknesses.
     Insulation thickness shall be sufficient to:
     (1)  Reduce the insulation surface temperature to 125°F or below, where
          personnel can normally contact these surfaces.
     (2)  Prevent the transfer of heat to surrounding areas which would be
          objectionable to personnel or adversely affect other components.
     (3)  Prevent transfer of heat which would otherwise reduce the efficiency
          or effectiveness of the system or component.

(g)  Insulation on austenitic stainless steel components and piping except for
     antisweat and refrigeration types shall meet the requirements of MIL-I-247

(h)  Adhesives containing halogenated solvents shall not be used for submarine
     applications.

(i)  Two feet of pipe immediately upstream of thermostatic steam traps shall be
     insulated with 1/4 inch of insulation cement, SS-C-160, type III, grade F,
     and covered with lagging cloth.  A removable cover made of two
     thicknesses of cloth (see 5.3) shall be installed over the trap.

(j)  Two feet of pipe immediately upstream of service steam thermostatic steam
     traps shall be covered with 1/4 inch of insulation cement, SS-C-160, type
     III, grade F, and covered with lagging cloth.  A removable cover made of
     two thicknesses of cloth shall be installed over the trap.

4.3  <u>Adhesives</u>.  The following adhesives shall be used for fastening cloth and tape
lagging.  Lagging pretreated with compatible adhesive is acceptable providing the end resu
is equal to the following:

| Type of lagging | Specification |
|---|---|
| Fibrous glass | MIL-A-3316, class 1 |

4.4  <u>Finishing cements</u>.  Where finishing cement is specified, any of the following
materials are acceptable subject to any material limitations for the proposed application:

(a)  Finishing cement, SS-C-160, type III, grade F.
(b)  High-temperature insulating cement, MIL-C-2861, when used under
     fibrous glass cloth.
(c)  A mixture of 80 percent high-temperature insulating cement, MIL-C-2861,
     and 20 percent Portland cement, SS-C-192.

4.5  <u>Metal lagging</u>.  Where metal lagging is required, any of the following materials
are acceptable, except for uptake applications (see 6.1.4):

| Sheet material | Specification | Nominal thickness Inch |
|---|---|---|
| Hot-dipped galvanized steel | QQ-S-775 | 0.014 |
| Aluminum | ASTM B209, 6061 | .030 |
| Corrosion-resistant steel (CRES) | ASTM A167, AISI type 304 | .014 |

4.6  <u>Fasteners</u>.  Insulation shall be held in place by suitable wire or flat metal ban
The welding of fasteners to machinery, piping, pressure vessels, or other related equipmen
is prohibited.  Where fasteners are necessary they shall be attached during manufacture
(prior to heat treatment, stress relief, and testing) by a Naval Ship Engineering Center
approved procedure.

5.  RE-USABLE COVERS

5.1  <u>Hot-surface insulation covers</u>.  In order to insure that the pipe covering will
not interfere with the servicing of a takedown joint where a re-usable cover is installed,
the permanent insulation shall stop short of the takedown joint and a short removable and
re-usable section of insulation shall be installed between the permanent insulation and th
takedown joint.  The insulation joint formed by the permanent and re-usable sections may b
square, or at an angle of 45 degrees; the joint, however, shall be tight, without any gaps
between the two sections and shall incorporate means to prevent dislodging the insulation
sections.  Re-usable covers are not required on systems insulated with elastomeric foamed
plastic insulation (MIL-P-15280).

7

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01542002
2005/11/4 23:20:44 GMT

MIL-STD-769E(SHIPS)
15 July 1974

5.2  Construction.  For sizes larger than 2-inch iron pipe size (ips), valve bonnets and valves having takedown joints at the ends shall be fitted with re-usable covers such that the bonnet joint may be removed independently of the valve covering.  Valves, 2-inch ips and under, shall be fitted with separate covers as indicated above, or covers of a one-piece design such that they may be wrapped around the entire valve body and clipped or otherwise secured just below the handwheel.

5.3  Fabrication, piping components.  For piping components except as otherwise speci-fied, any one of the following methods of fabrication is acceptable:

5.3.1  Covers may be made in two halves of thermal insulating felt enclosed in a 0.008-inch diameter knitted wire mesh.  Each half cover shall be sewn and quilted with wire-inserted fibrous glass yarn conforming to MIL-C-20079, (for machine sewing, if desired, this yarn may be constructed with three nickel-copper-alloy wires conforming to QQ-N-281 twisted together first, and the three fibrous glass threads twisted around the outside of the wire) or fastened with mechanical stapling with stainless staples in a manner to pro-vide a uniform thickness, strength and rigidity.

5.3.1.1  For all covers over 450°F, a 0.008-inch diameter knitted wire mesh shall be used on the inside surface and on the ends.  Fibrous glass cloth conforming to MIL-C-20079 shall be used on all outside surfaces.  Covers for use at temperatures of 850°F and below shall be filled with fibrous glass felt, MIL-I-16411 (see table I).  Covers for use at temperatures above 850°F shall have a filling consisting of fibrous glass felt, MIL-I-16411, or refractory fiber felt, MIL-I-23128.

5.3.1.1.1  Knitted wire mesh shall be of 304 annealed stainless steel.  The wire shall be 0.008-inch diameter.  The mesh shall consist of 7-1/2 ± 1/2 courses per inch equal spacing and 10 ± 1 wales per inch equal spacing.  The mesh shall be furnished in 30 ± 1/2 inch flattened tubular form and shall be crimped 0.125 to 0.150 inch deep by 5/16 inch crimp to crimp.

5.3.1.2  Preformed fibrous glass valve or fitting covers may be used when temperatures are in the 125° - 370°F range.  These shall be of the same thickness as the adjacent pipe covering.  Such covers, when used, shall be lagged independently of the pipe covering and in a manner which will facilitate removal and replacement.

5.3.2  Covers may be made of segments of block insulation or preformed pipe insulation, having the same thickness as that on the adjacent piping.  Blocks shall be securely wired to frames of 1/2-inch square mesh, number 18 gage (0.049-inch diameter) galvanized steel wire.  Wire mesh frames inside and outside of blocks shall have ends bent over and joints secured with number 18 gage black annealed iron wire woven through the mesh.  Insulating cement compatible with the material of the blocks shall be troweled smoothly over all sur-faces of the wire mesh.  Mineral wool roll felt may be used to build up covers when the flange diameter is larger than the outside diameter of the adjacent pipe covering.  Cover shall be tightly and smoothly lagged to envelop the outside and ends.  Lagging shall be fibrous glass cloth conforming to MIL-C-20079 as described in 5.3.1.1.  Lagging may be cemented or sewn on, except ends of covers shall always be sewn.  Where double layer insulation is used, the two sections of the cover shall be fitted together with scarfed joint.  Such joints shall be straight and true to reduce heat loss.  Bands, eyelets, or locks of galvanized steel, or lacing with hooks, rings, washers, and wire shall be used to secure the covers.

5.3.3  When installing the above covers, spaces between inner surfaces of covers for flanges and other irregular surfaces shall be filled with pieces of insulation felt.  Felt shall be packed loosely enough to preserve air cell structure and tightly enough to prevent air circulation.

5.4  Fabrication, machinery and equipment.  For re-usable covers for machinery and equipment, either of the following methods of fabrication is acceptable.

5.4.1  Covers may be similar to the flexible refractory felt or fibrous glass felt type described for piping components.

5.4.2  Covers may be made in sections formed of insulating block held together with wire and adhesive cement, covered with 1/2-inch thickness of finishing cement, and lagged. Lacing with hooks, rings, washers, and wire, or brass snap fasteners shall be used to secure the covers.

8

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01542032
2005/11/4 23:20:44 GMT

MIL-STD-769E(SHIPS)
15 July 1974

5.4.3 Semi-removable turbine casing flange covers may be installed as an alternate for removable covers specified above. The permanent insulation shall be run to the casing flange allowing bolt removal space. The flange and bolts are then covered with mineral wool, wire inserted fibrous glass cloth, or wire mesh, as required by operating temperature, which shall be secured to the bolts with wire. The flange may then be insulated with fibrous glass felt, MIL-I-16411, mineral wool felt, MIL-I-2818, or insulation block, MIL-I-2819 to the required thickness and shape; the insulation is then lagged with fibrous glass cloth. This cloth shall be carried over the outer edge of the permanent insulation and secured with adhesive. The semi-removable cover shall then be sealed and painted.

6.   INSTALLATION

6.1  Hot surface insulation.

6.1.1  Pipe and tubing. Each layer of molded insulation shall be installed with joints butted together. Where two layers are used, joints shall be staggered. Not less than three fastenings shall be used for securing each 3-foot section of insulation. Fastening shall be number 18 gage minimum (0.049-inch diameter) annealed black or hot-dipped galvanized iron wire or flat steel bands. Except as otherwise specified, lagging shall be installed over the insulation.

6.1.1.1  The installation of soot blower piping insulation shall be in accordance with drawing 5000-S5103-841336.

6.1.2  Piping components. For valves, fittings, and accessories, welded and brazed fittings, including unions, may be insulated and lagged similarly to adjacent piping.

6.1.2.1  Block, felt, blanket insulating materials, or molded pipe insulation secured with hot-dipped galvanized iron wire, may be used. When insulating felts are used above 850°F, the inner layer shall be fibrous glass felt conforming to MIL-I-16411 or refractory fiber felt, MIL-I-23128. Galvanized iron wire netting, number 18 gage minimum (0.049-inch diameter), shall be spread over the insulating material and secured with wire. Insulating cement shall be used to fill crevices, smooth surfaces, and completely cover the wire netting. A 1/2-inch thickness of finishing cement shall then be applied. Insulating material shall be the same thickness as that on adjacent piping.

6.1.2.2  For components 3-1/2 inch ips and smaller, insulating cement only conforming to MIL-C-2861 may be applied to a thickness 1/2-inch less than the adjacent pipe insulation. A 1/2-inch thickness of finishing cement shall be applied over the insulating cement.

6.1.2.3  Re-usable covers shall be fitted where required.

6.1.3  Machinery and equipment. For machinery and equipment, block, felt, or blanket insulating materials of the required thickness shall be secured with hot-dipped galvanized iron wire. Galvanized iron wire netting, 1-inch mesh and number 18 gage minimum (0.049-inch diameter) shall be spread over the surface and secured by wire. Insulating cement shall be used to fill crevices, smooth surfaces, and completely cover the wire netting.

6.1.3.1  When no insulating cement has been specified, a 1/2-inch thickness of finishing cement shall be applied.

6.1.3.2  When an insulating cement has been specified it shall be applied in successive layers, 1/2-inch to 1-inch in thickness, until the total thickness specified has been reached. Wire netting, similar to that used for covering the insulating materials shall be installed between layers. A 1/2-inch thickness of finishing cement shall be applied over the last layer of insulating cement.

6.1.3.3  Lagging shall be installed over finishing cement. Re-usable covers shall be installed where required.

6.1.3.4  Clips, hooks, or other fastenings for securing insulation or lagging shall not be brazed or welded to nonferrous parts of distilling plants or deaerating feed tanks.

6.1.4  Boiler uptakes. Boiler uptake thermal insulation shall be 2-inches thick. Either mineral wool felt, MIL-I-2818, or fibrous glass sheet, MIL-I-15475, may be used. If acoustic absorptive treatment is found to be necessary to decrease the noise level, the insulation thickness shall be increased accordingly.

9

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01542032
2005/11/4 23:20:44 GMT

MIL-STD-769E(SHIPS)
15 July 1974

6.1.4.1  Metal lagging for uptakes shall be galvanized sheet steel conforming to QQ-S-775, not less than 1/32-inch thick.

6.1.4.2  Insulation and lagging is not required on uptakes above the weather deck, except where the transfer of heat to spaces adjacent to the uptake area would be objectionable.

6.1.5  Unfired pressure vessels.  Unfired pressure vessels, including catapult wet accumulators, shall be covered with block insulation MIL-I-2819 in accordance with table V.  Block insulation shall be covered with 1/2-inch cement, MIL-C-2861, lagged with fibrous glass cloth, MIL-C-20079, and painted in accordance with 6.6.  Insulation in the way of vessel supports shall be metal faced to prevent insulation from wedging between the vessel and its support.

6.1.5.1  Removable and re-usable covers shall be installed over butt welded shell inserts for which periodic radiographic inspection of the joint is required.  These covers shall extend 4 inches beyond the welded joint.

6.1.6  Outer boiler casing.  Insulation shall be secured to casing by wire netting (number 18 gage) laced to welded notched studs on boiler casing.  Insulating cement, SS-C-160, shall be used to fill crevices, smooth surfaces and completely cover the netting to 1/2-inch thickness.  Glass cloth conforming to MIL-C-20079 shall be used to lag the insulation and shall be painted in accordance with 6.6.

6.2  Antisweat insulation (cold and chilled water service).

6.2.1  Preformed pipe covering shall be secured to the pipe in the manner prescribed in 6.1.1.  Fibrous glass felt insulation shall be secured with number 18 gage minimum (0.049-inch diameter) hot-dipped galvanized iron wire, soft annealed copper wire, QQ-W-343, wire inserted fibrous glass yarn, or glass thread, MIL-C-20079, spirally wound on 1-inch centers.  One layer of water repellent and fire resistant paper, UU-B-790, shall be wrapped tightly around the insulation and secured with cotton twine, TT-T-931, glass thread, MIL-C-20079, or 1-inch wide tape, UU-T-106.  All joints of the paper shall be lapped and sealed with adhesive cement, MIL-A-3316, class 1.  The compatible lagging shall then be installed and completely covered with vapor barrier compound, MIL-C-19565, type II.  The water repellent paper may be omitted on cellular glass where the insulation surface is suitable for the effective application of vapor barrier compound MIL-C-19565.

6.2.2  Application of a vapor barrier is not required on elastomeric foamed plastic insulation, MIL-P-15280.  Lagging shall be applied to protect insulation from damage, and to delay smoke generation in the event of fire.

6.3  Refrigerant insulation.

6.3.1  Cellular glass insulation shall be coated on all surfaces with vapor barrier compound, MIL-C-19565, type II at the time of installation.  Insulation shall be installed with staggered end joints.  On horizontal pipes the longitudinal joints shall be at the top and bottom.  Insulation shall be secured with number 18 gage minimum (0.049-inch diameter) copper-covered steel wire or 1-inch wide tape, UU-T-106, on 9-inch centers.  The compatible lagging shall then be installed and completely covered with vapor barrier compound, MIL-C-19565, type II.

6.3.2  Elastomeric foamed plastic, MIL-P-15280, may be applied in 1/4-inch minimum thickness layers as necessary to build up the required thickness (Form T or S, as applicable).  All longitudinal and butt joints shall be staggered.  All joints and lagging, if required (see 6.2.2), shall be secured in accordance with adhesive cement requirements of MIL-P-15280.

6.4  Weather deck hot piping insulation.

6.4.1  Calcium silicate or cellular glass insulation for piping exposed to the weather shall be installed as follows:

(a)  Preliminary preparation of piping.
    (1)  All surfaces to be clean, dry, and free of scale and grease.
    (2)  Fittings, valves, flanges, pipe supporting clamp, and at least 3-inches of adjacent pipe shall be painted as follows:  Apply one coat pretreatment formula 117, MIL-C-15328.  After this coat dries, apply two coats of aluminum paint made by mixing 2 pounds of aluminum paste, TT-P-320, type II, class B, with each gallon of phenolic varnish.

10

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01542032
2005/11/4 23:20:44 GMT

MIL-STD-769E(SHIPS)
15 July 1974

(b) Installation on pipes.

   (1) The bore, butt ends, and longitudinal joint surfaces of cellular glass insulating material shall be coated not more than 1/16-inch thick with commercial bedding compound, in accordance with MIL-I-19564, at time of installation. Bedding compound is not required with calcium silicate pipe covering.

   (2) Longitudinal joints on horizontal piping shall be on top and bottom of pipe.

   (3) Insulation shall be secured tightly to pipe with 1/2-inch wide 22 gage galvanized steel bands on 9-inch centers. Steel bands shall be placed over a layer of fibrous glass tape, MIL-C-20079, class C, which has been dipped in the commercial finishing compound in accordance with MIL-C-19565, type I. Steel bands shall be wrapped with a layer of masking tape, UU-T-106, type II.

   (4) Completely coat insulation with commercial finishing compound, in accordance with MIL-C-19565, using about 2 gallons per 100 square feet. Wrap tightly with one layer of open weave fibrous glass cloth, HH-C-466, or knitted fibrous glass tape, MIL-C-20079, and then apply another coating of above-specified finishing compound, using about 4 gallons per 100 square feet. After this coat has set, apply a second coat of finishing compound using the same quantities.

   (5) Where insulation is stopped off on the piping, sufficient mineral wool, MIL-I-2818, shall be tightly tied in place with galvanized iron wire over a heavy coating of the above-specified commercial bedding compound, to provide a tapered portion from insulation surface to pipe surface. The ends of the insulation shall be tapered at a 30-degree angle with the pipe. The tapered ends of the insulation shall be smoothed with insulation cement in accordance with MIL-C-2861. The cement covered tapered ends, after drying thoroughly, shall be coated with approximately an 1/8-inch thick tack coat of end sealing compound in accordance with MIL-C-22395. The sealer compound shall extend onto the pipe for at least 3 inches. A single layer of fibrous glass cloth lagging, in accordance with MIL-C-20079, shall be applied over the insulation and secured at longitudinal lap joint with class 1 adhesive cement in accordance with MIL-C-3316. The fibrous glass lagging cloth shall be tailored to fit the contour of the ends of the insulation by cutting and removing wedge-shaped sections of the cloth. The remaining ends of the cloth shall be embedded in the tack coating of sealer compound and shall be attached to the pipe with a single 1/2-inch wide galvanized steel band. A 3/16-inch layer (approximately) of sealer compound shall be troweled to a smooth finish over the cloth covered ends of the assembly. A smooth finish may be obtained by brush coating or hand rubbing the sealer compound with a suitable solvent. After 72 hours of drying at ambient temperature, the fibrous glass cloth of the assembly shall be given two brush coats of water- and weather-resistant coating compound in accordance with MIL-C-19565. The water-proofing compound shall extend halfway down the tapered ends of the assembly. The waterproofing compound shall be air dried 24 hours between applications. As an alternate method, the preformed pipe insulation may be tapered, the exposed surface coated with insulation cement, SS-C-160, type III, grade F, and lagging and sealant applied as described above.

(c) Installation on fittings, flanges, and valves.

   (1) Before applying flange insulation, weather deck piping shall be tested and secured in the following manner: After specified tests are completed, weather deck piping shall be subjected to alternate periods of full operating pressure, allowing pipe to come to maximum temperature; and then to zero gage pressure allowing pipe to come to ambient temperature. These cycles shall be repeated a sufficient number of times tightening and adjusting flanges where necessary until no leaks can be detected.

   (2) Fittings, flanges, and valve covers shall be ship-fabricated from sections of molded pipe covering or cellular glass block cemented with adhesive cement, MIL-A-18065, class 1.

   (3) Permanent covers for fittings and valves shall be fitted snugly to fittings and adjacent pipe covering using the same material and methods as outlined for pipe covering. Voids between insulation and fitting shall be filled with tightly packed mineral wool, MIL-I-2818.

11

1863

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01542032
2005/11/4 23:20:44 GMT

MIL-STD-769E(SHIPS)
15 July 1974

      (4)  Where specified, rigid-type portable flange covers shall extend over
the adjacent pipe covering 1-1/2 times the thickness of the
insulation.  The two halves of the cover should be coated and
lagged separately, using the same materials and procedure as
outlined for pipe covering.  The galvanized steel bands used to
secure the two halves together and to the adjacent pipe covering
shall be applied over the lagging and then coated with the above-
specified finishing compound.

   (d)  Installation around supports and hangers.

     (1)  Remove only enough insulation from butt edges to provide a snug fit
around support brackets or hanger rods.  Fill voids between in-
sulation and support with tightly packed mineral wool, MIL-I-2818, to
within 1/4-inch from insulation surface.  Fill remainder of space
with end sealing compound in accordance with MIL-C-22395 overlapping
generously both the support member and the adjacent insulation.  Lag
and coat with the same method and materials as adjacent piping.

6.5  Metal lagging.  Metal lagging shall be installed with lap joints, secured with
hardened self-tapping screws or metal bands.  Joints shall be arranged in a manner which will
facilitate run-off of impinging liquids.

6.6  Painting.  Cloth and tape laggings shall be painted after installation with
one coat of nonflaming paint conforming to MIL-E-17970, if necessary for appearance.
Elastomeric foamed plastic insulation, MIL-P-15280, shall not be painted except where
necessary for appearance.  Where painting is necessary, use Devoe and Raynolds "Devflex",
Ocean Chemical's "Ocean Emulsion Fire Retardant Coating No. 634", Ameron Corporation's
"Amercoat 1768", or other Naval Sea Systems Command (NAVSEA) approved equivalent.

6.7  THE MARGINS OF THIS STANDARD ARE MARKED "‡" TO INDICATE WHERE CHANGES (ADDITIONS,
MODIFICATIONS, CORRECTIONS, DELETIONS) FROM THE PREVIOUS ISSUE HAVE BEEN MADE.  THIS WAS
DONE AS A CONVENIENCE ONLY AND THE GOVERNMENT ASSUMES NO LIABILITY WHATSOEVER FOR ANY
INACCURACIES IN THESE NOTATIONS.  BIDDERS AND CONTRACTORS ARE CAUTIONED TO EVALUATE THE
REQUIREMENTS OF THIS DOCUMENT BASED ON THE ENTIRE CONTENT IRRESPECTIVE OF THE MARGINAL
NOTATIONS AND RELATIONSHIP TO THE LAST PREVIOUS ISSUE.

                                   Preparing activity:
                                   Navy - SH
                                   (Project 5640-N036)

☆ U. S. GOVERNMENT PRINTING OFFICE: 1974-603-121/221

12

1864

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC. 01542032
2005/11/4 23:20:44 GMT

This document has been approved
for public release and sale; its
distribution is unlimited.

MIL-STD-769D(SHIPS)
1 APRIL 1971
SUPERSEDING
MIL-STD-769C(SHIPS)
15 NOVEMBER 1967

## MILITARY STANDARD

# THERMAL INSULATION REQUIREMENTS
# FOR
# MACHINERY AND PIPING



FSC 5640 

BEST COPY AVAILABLE



183   -195  8

*H-29-01*

MIL-STD-769D(SHIPS)
NOTICE-1
27 October 1972

MILITARY STANDARD

THERMAL INSULATION REQUIREMENTS

FOR

MACHINERY AND PIPING

TO ALL HOLDERS OF MIL-STD-769D(SHIPS).

1. THE FOLLOWING PAGES OF MIL-STD-769D(SHIPS) HAVE BEEN REVISED AND SUPERSEDE THE PAGES LISTED:

| NEW PAGE | DATE | SUPERSEDED PAGE | DATE |
|---|---|---|---|
| 3 | 27 October 1972 | 3 | 1 April 1971 |
| 4 | 27 October 1972 | 4 | 1 April 1971 |
| 9 | 27 October 1972 | 9 | 1 April 1971 |
| 10 | 1 April 1971 | | Reprinted without change |

2. RETAIN THIS NOTICE PAGE AND INSERT BEFORE THE TABLE OF CONTENTS.

3. Holders of MIL-STD-769D(SHIPS) will verify that page changes indicated above have been entered. The notice page will be retained as a check sheet. This insurance, together with appended pages, is a separate publication. Each notice is to be retained by stocking points until the Military standard is completely revised or canceled.

Preparing activity:
    Navy – SH
    (Project 5640-N019)

FSC 5640



THIS DOCUMENT CONTAINS *5* PAGES

MIL-STD-769D(SHIPS)
1 April 1971

DEPARTMENT OF THE NAVY

NAVAL SHIP SYSTEMS COMMAND

WASHINGTON, D.C. 20360

Thermal Insulation Requirements for Machinery and Piping
MIL-STD-769D(SHIPS)

    1.  This Military Standard was approved 5 March 1971, and is mandatory for use by the Naval Ship Systems Command.

    2.  Recommended corrections, additions, or deletions should be addressed to Commander, Naval Ship Engineering Center, Department of the Navy, Center Building, Prince George's Center, Hyattsville, Maryland 20782.

MIL-STD-769D(SHIPS)
1 APR 1971

CONTENTS

|  |  |  | Page |
|---|---|---|---|
| Paragraph | 1. | SCOPE . . . . . . . . . . . . . . . . . . . . . . . | 1 |
|  | 2. | REFERENCED DOCUMENTS. . . . . . . . . . . . . . . . | 1 |
|  | 3. | GENERAL REQUIREMENTS. . . . . . . . . . . . . . . . | 2 |
|  | 4. | MATERIALS AND THICKNESSES . . . . . . . . . . . . . | 2 |
|  | 4.1 | Minimum thicknesses . . . . . . . . . . . . . . . . | 2 |
|  | 4.2 | Special conditions . . . . . . . . . . . . . . . . | 2 and 3 |
|  | 4.3 | Adhesives . . . . . . . . . . . . . . . . . . . . . | 3 |
|  | 4.4 | Finishing cements . . . . . . . . . . . . . . . . . | 3 |
|  | 4.5 | Metal lagging . . . . . . . . . . . . . . . . . . . | 3 |
|  | 4.6 | Fasteners . . . . . . . . . . . . . . . . . . . . . | 3 |
|  | 5. | RE-USABLE COVERS. . . . . . . . . . . . . . . . . . | 3 |
|  | 5.1 | Hot-surface insulation covers . . . . . . . . . . . | 3 |
|  | 5.2 | Construction. . . . . . . . . . . . . . . . . . . . | 3 |
|  | 5.3 | Fabrication, piping components. . . . . . . . . . . | 4 |
|  | 5.4 | Fabrication, machinery and equipment. . . . . . . . | 8 |
|  | 6. | INSTALLATION. . . . . . . . . . . . . . . . . . . . | 9 |
|  | 6.1 | Hot-surface insulation. . . . . . . . . . . . . . . | 9 |
|  | 6.1.1 | Pipe and tubing . . . . . . . . . . . . . . . . . . | 9 |
|  | 6.1.2 | Piping components . . . . . . . . . . . . . . . . . | 9 |
|  | 6.1.3 | Machinery and equipment . . . . . . . . . . . . . . | 9 |
|  | 6.1.4 | Boiler uptakes . . . . . . . . . . . . . . . . . . | 10 |
|  | 6.1.5 | Unfired pressure vessels . . . . . . . . . . . . . | 10 |
|  | 6.2 | Antisweat insulation. . . . . . . . . . . . . . . . | 10 |
|  | 6.3 | Refrigerant insulation. . . . . . . . . . . . . . . | 10 |
|  | 6.4 | Weather deck hot piping insulation. . . . . . . . . | 10 |
|  | 6.5 | Metal lagging . . . . . . . . . . . . . . . . . . . | 12 |
|  | 6.6 | Painting . . . . . . . . . . . . . . . . . . . . . | 12 |
|  | 7. | NOTES . . . . . . . . . . . . . . . . . . . . . . . | 12 |

TABLES

| Table | I. | Schedule of approved insulation and lagging materials . | 5 |
|---|---|---|---|
|  | II. | Insulation thickness for hot piping, compounded, conforming to MIL-I-2781 . . . . . . . . . . . . . . | 6 |
|  | III. | Thickness of insulation conforming to MIL-P-15280 and MIL-I-22344 for hot piping . . . . . . . . . . . . . | 6 |
|  | IV. | Thickness of insulating tape conforming to MIL-P-15349, for 1/4 to 3/4 inch size hot piping . . . | 7 |
|  | V. | Thickness of insulating materials for hot surfaces of machinery and equipment up to 850°F. . . . . . . . . . | 7 |
|  | VI. | Thickness of insulating materials for hot surfaces of machinery and equipment over 850°F. . . . . . . . . . | 7 |
|  | VII. | Thickness of refrigerant insulation for piping. . . . | 7 |
|  | VIII. | Thickness of refrigerant insulation for machinery and equipment (exclusive of vapor barrier) . . . . . . | 8 |
|  | IX. | Thickness of antisweat insulation (exclusive of vapor barrier) . . . . . . . . . . . . . . . . . . . . | 8 |
|  | X. | Nominal thicknesses of insulation for weather deck hot piping . . . . . . . . . . . . . . . . . . . . . | 8 |

April 1971

1. SCOPE

1.1 The purpose of this standard is to prescribe the requirements for thermal insulation of piping, machinery, uptakes, and mechanical equipment for ships of the U. S. Navy.

2. REFERENCED DOCUMENTS

2.1 The issues of the following documents in effect on the date of invitation for bids or request for proposal, form a part of this standard to the extent specified herein.

GOVERNMENTAL

SPECIFICATIONS

FEDERAL

T-T-931 - Twine, Cotton, Mattress.
HH-C-466 - Cloth, Glass, Coated (for Membrane Waterproofing and Built-Up Roofing).
HH-I-551 - Insulation Block, Pipe Covering and Boards, Thermal (Cellular Glass).
QQ-S-775 - Steel Sheets, Carbon, Zinc-Coated.
QQ-W-343 - Wires Electrical (Uninsulated).
QQ-W-390 - Wire, Nickel-Chromium-Iron Alloy.
SS-C-160 - Cements, Insulation, Thermal.
SS-C-192 - Cement, Portland.
SS-C-466 - Cloth, Thread, and Tape, Asbestos.
TT-P-26 - Paint, Interior, White and Tints, Fire-Retardant.
TT-P-320 - Pigment, Aluminum; Powder and Paste, for Paint.
UU-B-790 - Building Paper, Vegetable Fiber: (Kraft, Waterproofed, Water Repellent and Fire Resistant).
UU-T-106 - Tape, Pressure-Sensitive Adhesive, Masking, Paper.

MILITARY

MIL-I-2781 - Inuslation, Pipe, Thermal.
MIL-I-2818 - Insulation Blanket, Thermal, Fibrous Mineral.
MIL-I-2819 - Insulation Block, Thermal.
MIL-C-2861 - Cement, Insulation, High-Temperature.
MIL-A-3316 - Adhesives, Fire-Resistant, Thermal Insulation.
MIL-P-15280 - Plastic Material, Unicellular (Sheets and Tubes).
MIL-P-15328 - Primer, (Wash) Pretreatment, Blue (Formula No. 117-B for Metals).
MIL-I-15349 - Insulation Tape, Thermal.
MIL-I-15475 - Insulation Felt, Thermal, Fibrous Glass, Semirigid.
MIL-I-16411 - Insulation Felt, Thermal, Glass Fiber.
MIL-A-18065 - Adhesives, High Initial Bond.
MIL-B-19564 - Bedding Compound, Thermal Insulation Pipe Covering.
MIL-C-19565 - Coating Compounds, Thermal Insulation Pipe Covering - Fire-, and Water-Resistant, Vapor-Barrier and Weather-Resistant.
MIL-C-20079 - Cloth, Glass, Tape, Textile, Glass: and Thread, Glass.
MIL-I-22023 - Insulation Felt, Thermal and Sound Absorbing Felt, Fibrous Glass, Flexible.
MIL-I-22344 - Insulation, Pipe, Thermal, Fibrous Glass.
MIL-C-22395 - Compound, End Sealing, Thermal Insulation Pipe Covering - Fire-, Water-, and Weather-Resistant.
MIL-I-23128 - Insulation Blanket, Thermal, Refractory Fiber, Flexible.
MIL-I-24244 - Insulation Materials, Thermal, With Special Corrosion and Chloride Requirements.
MIL-P-52350 - Paper, Asbestos.

DRAWING

MILITARY

NAVSHIPS

5000-S5103-841336 - Piping, Boiler Soot Blower, Typical Installation.

(Copies of specifications, standards, drawings, and publications required by suppliers in connection with specific procurement functions should be obtained from the procuring activity or as directed by the contracting officer.)

NONGOVERNMENTAL

SPECIFICATIONS

AMERICAN SOCIETY FOR TESTING AND MATERIALS (ASTM)
A167 - Specification for Corrosion-Resisting Chromium-Nickel Steel Plate, Sheet and Strip.
A209 - Specification for Seamless Carbon-Molybdenum Alloy-Steel Boiler and Superheater Tubes.

(Application for copies should be addressed to the American Society for Testing and Materials, 1916 Race Street, Philadelphia, Pennsylvania 19103.)

(Technical society and technical association specifications and standards are generally available for reference from libraries.  They are also distributed among technical groups and using Federal agencies.)

3.  GENERAL REQUIREMENTS

3.1  Application of the requirements listed herein is limited only to the equipment specified in 1.1.

3.2  Minor deviations in installation which meet the intent of the requirements specified herein may be approved by the cognizant Supervisor of Shipbuilding, U. S. Naval Shipyards, or the Commander, Naval Ship Engineering Center.  (Copies of all such changes shall be forwarded to the Commander, Naval Ship Engineering Center, SEC 6153.)

4.  MATERIAL AND THICKNESSES

4.1  <u>Minimum thicknesses</u>.  Tables I to X, inclusive, specify materials for insulation and lagging and the minimum acceptable thicknesses for the temperature ranges listed.

4.2  <u>Special conditions</u>.  The following special conditions supplement or modify the selection of materials or thicknesses specified, when applicable:

(a)  The insulation thickness on soot blower piping between the root valve and the soot blower heads shall be reduced from that indicated for a system normally operating at the same temperature as follows:
(1)  Where double layer insulation is used, only the inner (high temperature) insulation thickness layer need be installed.
(2)  Where the insulation consists of a single uniform thickness layer, only one-half the total specified thickness need be installed.
(b)  Where double layer construction consisting of two classes of insulation is specified in table II, the higher temperature class insulation may be furnished in a uniform single thickness equal to the total thickness specified, if single layer construction is considered desirable.  Where single layer construction is used in lieu of double layer construction, suitable expansion joints to permit thermal movement of the piping, without opening of insulation joints, must be provided.
(c)  Where considered desirable, higher temperature classes of insulation may be used where lower temperature classes are specified provided they are satisfactory in all other respects (e.g. where class b of MIL-I-2781 is specified, class d or e may be used.
(d)  Compounded type insulation conforming to MIL-I-2781, grade I, (Calcium silicate only) or cellular glass insulation conforming to HH-I-551 shall be used on hot piping requiring insulation that will be exposed to the weather, and shall conform to the thicknesses specified in table X.
(e)  Elastomeric foamed plastic insulation, MIL-P-15280, may be used for machinery and equipment applications up to 180°F; 1/2 inch minimum thickness.
(f)  Where HOT SURFACE insulation thicknesses are not specified, such as for refractory fiber insulation felt, MIL-I-23128, and special applications, the following shall be used as a guide in determining acceptable thicknesses.  Insulation thickness shall be sufficient to:
(1)  Reduce the insulation surface temperature to 150°F. or below, where personnel can normally contact these surfaces.

2

MIL-STD-769D(SHIPS)
27 October 1972

    (2)  Prevent the transfer of heat to surrounding areas which would be objectionable to personnel or adversely affect other components.

    (3)  Prevent transfer of heat which would otherwise reduce the efficiency or effectiveness of the system or component.

  (g)  Where operating temperatures are normally between 135°F. and 150°F. and the omission of insulation will not adversely affect operating efficiency, non-metallic lagging only may be applied where necessary, to protect personnel from contact with hot metal surfaces.

  (h)  Insulation on austenitic stainless steel components and piping except for antisweat and refrigeration types shall meet the requirements of MIL-I-24244.

  (i)  Adhesives containing halogenated solvents shall not be used for submarine applications.

  (j)  Two feet of pipe immediately upstream of thermostatic steam traps shall be insulated with 1/4 inch of insulation cement, SS-C-160, type III, grade F, and covered with approved lagging cloth.  A removable cover made of two thicknesses of cloth (see 5.3) shall be installed over the trap.

    4.3  Adhesives.  The following adhesives shall be used for fastening cloth and tape lagging.  Lagging pretreated with compatible adhesive is acceptable providing the end result is equal to one of these combinations:

| Type of lagging | Specification |
|---|---|
| Asbestos | MIL-A-3316, class 1 |
| Fibrous glass | |

    4.4  Finishing cements.  Where finishing cement is specified, any of the following materials are acceptable subject to any material limitations for the proposed application:

    (a)  Finishing cement, SS-C-160, type III, grade F.

    (b)  High-temperature insulating cement, MIL-C-2861, when used under asbestos cloth.

    (c)  A mixture of 80 percent high-temperature insulating cement, MIL-C-2861, and 20 percent Portland cement, SS-C-192.

    4.5  Metal lagging.  Where metal lagging is required, any of the following materials are acceptable, except for uptake applications (see 6.1.4):

| Sheet material | Specification | Nominal thickness |
|---|---|---|
| | | Inch |
| Hot-dipped galvanized steel | QQ-S-775 | 0.014 |
| Aluminum | ASTM A209, 6061 | .030 |
| Corrosion-resistant steel (CRES) | ASTM A167, AISI type 304 | .014 |

    4.6  Fasteners.  Insulation shall be held in place by suitable wire or flat metal bands. The welding of fasteners to machinery, piping, pressure vessels or other related equipment is prohibited.  Where fasteners are necessary they shall be attached during manufacture (prior to heat treatment, stress relief and testing) by a Naval Ship Engineering Center approved procedure.

    5.  RE-USABLE COVERS

    5.1  Hot-surface insulation covers.  In order to insure that the pipe covering will not interfere with the servicing of a takedown joint where a re-usable cover is installed, the permanent insulation shall stop short of the takedown joint and a short removable and re-usable section of insulation shall be installed between the permanent insulation and the takedown joint.  The insulation joint formed by the permanent and re-usable sections may be square, or at an angle of 45 degrees; the joint, however, shall be tight, without any gaps between the two sections and shall incorporate means to prevent dislodging the insulation sections.  Re-usable covers are not required on systems insulated with elastomeric foamed plastic insulation (MIL-P-15280).

Supersedes page 3 of 1 April 1971

MIL-STD-769D(SHIPS)
October 1972

5.2 <u>Construction</u>. For sizes larger than 2 inches i.p.s., valve bonnets and valves having takedown joints at the ends shall be fitted with re-usable covers such that the bonnet joint may be removed independently of the valve covering. Valves 2 inches i.p.s. and under shall be fitted with separate covers as indicated above, or covers of a one-piece design such that they may be wrapped around the entire valve body and clipped or otherwise secured just below the handwheel.

5.3 <u>Fabrication, piping components</u>. For piping components except as otherwise specified, any one of the following methods of fabrication is acceptable:

5.3.1 Covers may be made in two halves of thermal insulating felt enclosed in asbestos cloth. Each half cover shall be sewn and quilted with wire-inserted asbestos yarn conforming to SS-C-466, form II, (for machine sewing, if desired, this yarn may be constructed with the three monel wires twisted together first, and the three asbestos threads twisted around the outside of the wire) or fastened with mechanical stapling in a manner to provide a uniform thickness, strength and rigidity.

5.3.1.1 Covers for use at temperatures of 850°F. and below shall be filled with insulation felt (see table I). Wire-inserted asbestos cloth, SS-C-466, grade AAA-M, shall be used on the inside surface of covers for valves larger than 2 inches i.p.s. For valves 2 inches i.p.s. and smaller, grade AAA shall be used on inside surface of covers. For all covers, asbestos cloth, SS-C-466, grade U.G., having a minimum average breaking strength of 90 pounds in warp and 40 pounds in fill shall be used on outside surfaces.

5.3.1.2 Covers for use at temperatures above 850°F. shall have filling consisting of layers of fibrous glass felt, MIL-I-16411, or refractory fiber felt, MIL-I-23128, and shall be covered on the inside surface and on the ends with nickel-chromium alloy wire mesh, QQ-W-390 (or wire-inserted asbestos cloth, SS-C-466, grade AAA-M, for services up to 950°F.) and on the outside surface with grade U.G. asbestos cloth (as described in 5.3.1.1). Asbestos paper MIL-P-52350, class 2, thickness 1/8 inch may be inserted between the insulation felt and the asbestos cloth if considered necessary to retain the cylindrical shape of the cover.

5.3.1.3 Hard asbestos millboard, 1/4 inch thick, enclosed in asbestos cloth of the type used on the outside cover, shall be sewn on ends of covers for strength and rigidity. When a more flexible cover is desired, such as when space limitation would not permit installation of the more rigid type, the millboard will not be required. When the flange diameter is larger than the outside diameter of the adjacent pipe covering, build-up pieces made of insulation felt encased in asbestos cloth, SS-C-466, grade AAA shall be stitched to inside of cover. Halves of covers shall be fastened together by 1/16-inch diameter galvanized, or other corrosion resistant wire rope laced through brass or galvanized steel hooks or rings, or fastened by brass snap fasteners. Fastenings shall be securely attached to cloth lagging.

5.3.1.4 Preformed fibrous glass valve or fitting covers may be used when temperatures are in the 125°-370°F. range. These shall be of the same thickness as the adjacent pipe covering. Such covers, when used, shall be lagged independently of the pipe covering and in a manner which will facilitate removal and replacement.

Supersedes page 4 of 1 April 1971

4

MIL-STD-769D(SHIPS)

Table I - Schedule of approved insulation and lagging materials.1/

| Service | Temperature Range (°F.) | Pipe and Tubing | | Valve and Fittings | | Flange Joints | | Machinery | |
|---|---|---|---|---|---|---|---|---|---|
| | | Insulation | Lagging | Insulation | Lagging | Insulation | Lagging | Insulation | Lagging |
| Gases Steam Hot Water Oil | 125 to 1200 | MIL-I-2781<br>MIL-I-15349<br>(750°F.Max.)<br>MIL-I-22344<br>(370°F.Max.)<br>MIL-P-15280<br>(180°F.Max.) | SS-C-466<br>MIL-C-20079 | MIL-I-2781<br>MIL-I-2819<br>MIL-I-16411<br>MIL-C-2861<br>MIL-I-22344<br>(370°F.Max.)<br>MIL-P-15280<br>(180°F.Max.)<br>MIL-I-23128 | SS-C-466<br>MIL-C-20079 | MIL-I-2781<br>MIL-I-2819<br>MIL-I-16411<br>MIL-C-2861<br>MIL-I-22344<br>(370°F.Max.)<br>MIL-P-15280<br>(180°F.Max.)<br>MIL-I-23128 | SS-C-466<br>MIL-C-20079 | MIL-I-2819<br>MIL-I-16411<br>MIL-I-2818<br>MIL-C-2861<br>MIL-I-22023<br>(370°F.Max.)<br>MIL-I-23128<br>MIL-P-15280<br>(180°F.Max.) | SS-C-466<br>MIL-C-20079<br>UU-B-790,<br>type III,<br>grade F,<br>style 10 |
| Cold water Chilled Water | 28 to 70 | MIL-I-16411<br>MIL-I-2781<br>MIL-I-22344<br><br>MIL-P-15280<br>HH-I-551 | SS-C-466<br>MIL-C-20079<br>UU-B-790,<br>type III,<br>grade F,<br>style 10 | MIL-I-16411<br>MIL-I-2781<br>MIL-I-22344<br><br>MIL-I-2819<br>MIL-P-15280<br>HH-I-551 | SS-C-466<br>MIL-C-20079<br>UU-B-790,<br>type III,<br>grade F,<br>style 10 | MIL-I-16411<br>MIL-I-2781<br>MIL-I-22344<br><br>MIL-I-2819<br>MIL-P-15280<br>HH-I-551 | SS-C-466<br>MIL-C-20079<br>UU-B-790,<br>type III,<br>grade F,<br>style 10 | MIL-I-16411<br>MIL-I-22023<br>MIL-I-2819<br><br>MIL-P-15280<br>HH-I-551 | SS-C-466<br>MIL-C-20079<br>UU-B-790,<br>type III,<br>grade F,<br>style 10 |
| Refrigerant | -20 to 60 | HH-I-551<br>MIL-P-15280 | SS-C-466<br>MIL-C-20079 | HH-I-551<br>MIL-P-15280 | SS-C-466<br>MIL-C-20079 | HH-I-551<br>MIL-P-15280 | SS-C-466<br>MIL-C-20079 | HH-I-551<br>MIL-P-15280 | SS-C-466<br>MIL-C-20079 |

1/ Additional materials are covered in 4.5 (metal lagging); 6.1.4 (boiler uptakes); 6.2 (securing antisweat insulation); 6.4.1 (weather deck hot piping).

2029

MIL-STD-769D(SHIPS)
1 April 1971

### Table II - Insulation thicknesses for hot piping, compounded, conforming to MIL-I-2781.

| Pipe size (inches i.p.s.) | Temperature range (degrees F.) | Class [1] | | Nominal thickness (inches) | | |
|---|---|---|---|---|---|---|
| | | Inner layer | Outer layer | Inner layer | Outer layer | Total |
| 1/2, 1-1/2 | 125 – 388 | b | --- | 1 | --- | 1 |
| | 389 – 500 | b | --- | 2 | --- | 2 |
| | 501 – 750 | d | --- | 2 | --- | 2 |
| | 751 – 950 | e | --- | 2 | --- | 2 |
| | 951 – 1050 | e | b | 2 | 1-1/2 | 3-1/2 |
| 2, 2-1/2 | 125 – 338 | b | --- | 1-1/2 | --- | 1-1/2 |
| | 339 – 388 | b | --- | 2 | --- | 2 |
| | 389 – 500 | b | --- | 3 | --- | 3 |
| | 501 – 750 | d | --- | 3 | --- | 3 |
| | | d | b | 1-1/2 | 1-1/2 | 3 |
| | 751 – 900 | e | b | 1-1/2 | 1-1/2 | 3 |
| | 901 – 1050 | e | b | 2 | 1-1/2 | 3-1/2 |
| 3 through 4-1/2 | 125 – 338 | b | --- | 1-1/2 | --- | 1-1/2 |
| | 339 – 388 | b | --- | 2 | --- | 2 |
| | 389 – 500 | b | --- | 3 | --- | 3 |
| | 501 – 750 | d | --- | 3 | --- | 3 |
| | | d | b | 1-1/2 | 2 | 3-1/2 |
| | 751 – 900 | e | b | 1-1/2 | 2 | 3-1/2 |
| | 901 – 950 | e | b | 2 | 1-1/2 | 3-1/2 |
| | 951 – 1050 | e | b | 2-1/2 | 1-1/2 | 4 |
| 5, 6 | 125 – 338 | b | --- | 1-1/2 | --- | 1-1/2 |
| | 339 – 388 | b | --- | 2 | --- | 2 |
| | 389 – 500 | b | --- | 3 | --- | 3 |
| | 501 – 750 | d | --- | 3 | --- | 3 |
| | | d | b | 1-1/2 | 2 | 3-1/2 |
| | 751 – 900 | e | b | 1-1/2 | 2 | 3-1/2 |
| | 901 – 950 | e | b | 2 | 1-1/2 | 3-1/2 |
| | 951 – 1050 | e | b | 2 | | 2 |
| | 125 – 338 | b | --- | 1-1/2 | --- | 1-1/2 |
| | 339 – 388 | b | --- | 2-1/2 | --- | 2-1/2 |
| | 389 – 500 | b | --- | 3 | --- | 3 |
| | 501 – 750 | d | --- | 4 | --- | 4 |
| | | d | b | 1-1/2 | 2 | 3-1/2 |
| | 751 – 900 | e | b | 1-1/2 | 2 | 3-1/2 |
| | 901 – 950 | e | b | 2 | 2 | 4 |
| | 951 – 1050 | e | b | 3 | 2 | 5 |
| 8 and larger | 125 – 338 | b | --- | 1-1/2 | --- | 1-1/2 |
| | 339 – 388 | b | --- | 2-1/2 | --- | 2-1/2 |
| | 389 – 500 | b | --- | 3 | --- | 3 |
| | 501 – 750 | d | --- | 4 | --- | 4 |
| | | d | b | 2 | 2 | 4 |
| | 751 – 900 | e | b | 2 | 2 | 4 |
| | 901 – 950 | e | b | 2-1/2 | 2 | 4-1/2 |
| | 951 – 1050 | e | b | 3 | 2 | 5 |

[1] Does not include finishing cement.

### Table III - Thickness of insulation conforming to MIL-P-15280[1] and MIL-I-22344, for hot piping.

| Temperature range (°F.) | Specification | Thickness |
|---|---|---|
| | | Inch |
| 125 to 180 | MIL-P-15280[1] or MIL-I-22344 | 1/2 |
| 181 to 250 | MIL-I-22344 | 1/2 |
| 251 to 300 | MIL-I-22344 | 3/4 |
| 301 to 370 | MIL-I-22344 | 1 |

[1] Approved for submarines only in this temperature range.

MIL-STD-769B(SHIPS)
x April 1970

Table IV - Thickness of insulating tape conforming to MIL-I-15349,
for 1/4 to 3/4 inch size hot piping.

| Temperature range (°F.) | Pipe size | Nominal thickness |
|---|---|---|
| | | Inch |
| 125 to 250 | 1/4, 3/8 | 3/8 |
| 251 to 750 | 1/4, 3/8 | 7/8 |
| 125 to 250 | 1/2, 3/4 | 3/4 |
| 251 to 388 | 1/2, 3/4 | 1 |
| 389 to 500 | 1/2, 3/4 | 1-1/2 |
| 501 to 750 | 1/2, 3/4 | 2 |

Table V - Thickness[1]/ of insulating materials for hot surfaces of
machinery and equipment up to 850°F.

| Temperature range (°F.) | Nominal thickness (inches) | | |
|---|---|---|---|
| | Glass fiber felt, MIL-I-16411; type II refractory fiber blanket, MIL-I-23128, grade A | Insulation, block, MIL-I-2819; mineral fiber blanket, MIL-I-2818; glass fiber felt, MIL-I-16411 type I | Insulating cement, MIL-C-2861 |
| 125 - 338 | 1 | | |
| 339 - 388 | 1-1/2 | 1-1/2 | 1-1/2 |
| 389 - 500 | 2 | 2-1/2 | 2-1/2 |
| 501 - 750 | 2-1/2 | 3 | 3 |
| 751 - 850 | 3 | 3-1/2 | 4 |
| | | 4-1/2 | 5 |

[1]/ Does not include finishing cement.

Table VI - Thickness[1]/ of insulating materials for hot
surfaces of machinery and equipment over 850°F.

| Temperature range (°F.) | Thickness (inches) | |
|---|---|---|
| | Single felt material | Block |
| | MIL-I-16411, type II MIL-I-23128, grade A | MIL-I-2819 |
| 851 - 900 | 4 | 4-1/2 |
| 951 - 1050 | 4 | 5 |
| 1051 - 1200 | | |

[1]/ Does not include finishing cement.

Table VII - Thickness of refrigerant insulation for piping.

| Pipe size (inches) | Temperature range (°F.) | Cellular glass HH-I-551 Nominal[1]/ thickness (inches) | | Plastic foam, MIL-P-15280 thickness, (inches) | |
|---|---|---|---|---|---|
| Up to 1-1/4 | -20 to -1 | 2-1/4 | 1-1/2* | 1-1/2 | 1* |
| | 0 to 40 | 2 | 1-1/4* | 1 | 3/4* |
| 1-1/2 to 2-1/2 | -20 to -1 | 2-1/2 | 1-3/4* | 1-1/2 | 1 |
| | 0 to 40 | 2-1/4 | 1-1/2* | 1 | 3/4* |
| 3 to 5 | -20 to -1 | 3 | 2* | 1-1/2 | 1* |
| | 0 to 40 | 2-3/4 | 1-3/4* | 1 | 3/4* |

[1]/ By nominal thickness is meant a thickness which is approximate and should only
be used as a guide in determining actual thickness requirements.
* Thickness for application in air-conditioned spaces only.

7

MIL-STD-769D(SHIPS)
1 April 1971

Table VIII - Thickness of refrigerant insulation for machinery
and equipment (exclusive of vapor barrier).

| Temperature range (°F.) | Thickness (inches) | | | |
|---|---|---|---|---|
| | Foam plastic, MIL-P-15280 | | Cellular glass, HH-I-551 | |
| 0 to 35 | 3 | 1* | 5 | 1-1/2* |

* Thickness for application in air conditioned spaces only.

Table IX - Thickness of antisweat insulation (exclusive of vapor barrier).

| Temperature range (°F.) | Machinery and equipment | | Piping | |
|---|---|---|---|---|
| | Material specification | Thickness (inches) | Material specification | Thickness (inches) |
| 28 to 99 | MIL-I-2819<br>HH-I-551<br>MIL-I-22023<br>MIL-P-15280 | 1-1/2   3/4*<br><br>1      1/2*<br>3/4    1/2* | MIL-I-2781<br>MIL-I-2819<br>HH-I-551<br>MIL-P-15280<br>MIL-I-22344 | 1      1/2*<br><br>3/4    1/2* |

* Thickness for application in air-conditioned spaces only.

Table X - Nominal thicknesses of insulation for weather deck hot piping.

| Pipe size (inches i.p.s.) | Calcium silicate, MIL-I-2781<br>Cellular glass, HH-I-551 |
|---|---|
| | Inches |
| 1/4 to 3 | 1-1/2 |
| 3-1/2 to 6 | 2 |
| Over 6 | 2-1/2 |

5.3.2  Covers may be made of segments of block insulation or preformed pipe insulation, having the same thickness as that on the adjacent piping.  Blocks shall be securely wired to frames of 1/2 inch square mesh, number 18 gage (0.049-inch diameter) galvanized steel wire.  Wire mesh frames inside and outside of blocks shall have ends bent over and joints secured with number 18 gage black annealed iron wire woven through the mesh.  Insulating cement compatible with the material of the blocks shall be troweled smoothly over all surfaces of the wire mesh.  Asbestos roll felt may be used to build up covers when the flange diameter is larger than the outside diameter of the adjacent pipe covering.  Cover shall be tightly and smoothly lagged to envelop the outside and ends.  Lagging shall be canvas or cloth conforming to SS-C-466, grade U.S. as described in 5.3.1.1.  Lagging may be cemented or sewn on, except ends of covers shall always be sewn.  Where double layer insulation is used, the two sections of the cover shall be fitted together with scarfed joint.  Such joints shall be straight and true to reduce heat loss.  Bands, eyelets, or locks of galvanized steel, or lacing with hooks, rings, washers, and wire shall be used to secure the covers.

5.3.3  When installing the above covers, spaces between inner surfaces of covers for flanges and other irregular surfaces shall be filled with pieces of insulation felt.  Felt shall be packed loosely enough to preserve air cell structure and tightly enough to prevent air circulation.

5.4  Fabrication, machinery and equipment.  For re-usable covers for machinery and equipment, either of the following methods of fabrication is acceptable.

5.4.1  Covers may be similar to the flexible refractory felt or fibrous glass felt type described for piping components.

5.4.2  Covers may be made in sections formed of insulating block held together with wire and adhesive cement, covered with 1/2-inch thickness of finishing cement, and lagged. Lacing with hooks, rings, washers, and wire, or brass snap fasteners shall be used to secure the covers.

5.4.3  Semi-removable turbine casing flange covers may be installed as an alternate for movable covers specified above.  The permanent insulation shall be run to the casing flange allowing bolt removal space.  The flange and bolts are then covered with asbestos cloth, wire inserted asbestos cloth or inconel wire mesh, as required by operating temperature, which shall be secured to the bolts with wire.  The flange may now be insulated with fibrous

8

MIL-STD-769D(SHIPS)
27 October 1972

glass felt, MIL-I-16411, mineral wool felt, MIL-I-2818, or insulation block, MIL-I-2819 to the required thickness and shape; the insulation is then lagged with asbestos cloth. This cloth shall be carried over the outer edge of the permanent insulation and secured with adhesive. The semi-removable cover shall then be sealed and pointed.

6.  INSTALLATION

6.1  Hot surface insulation.

6.1.1  Pipe and tubing.  Each layer of molded insulation shall be installed with joints butted together.  Where two layers are used, all joints shall be staggered.  Not less than three fastenings shall be used for securing each 3-foot section of insulation.  Fastening shall be number 18 gage minimum (0.049-inch diameter) annealed black or hot-dipped galvanized iron wire or flat steel bands.  Except as otherwise specified, lagging shall be installed over the insulation.

6.1.1.1  The installation of soot blower piping insulation shall be in accordance with drawing 5000-S5103-841336.

6.1.2  Piping components.  For valves, fittings, and accessories, welded and brazed fittings including unions may be insulated and lagged similarly to adjacent piping.

6.1.2.1  Block, felt, blanket insulating materials, or molded pipe insulation secured with hot-dipped galvanized iron wire, may be used. When insulating felts are used above 850°F., the inner layer shall be fibrous glass felt conforming to MIL-I-16411 or refractory fiber felt, MIL-I-23128.  Galvanized iron wire netting, number 18 gage minimum (0.049-inch diameter), shall be spread over the insulating material and secured with wire.  Insulating cement shall be used to fill all crevices, smooth all surfaces, and completely cover the wire netting.  A 1/2-inch thickness of finishing cement shall then be applied.  Insulating material shall be the same thickness as that on adjacent piping.

6.1.2.2  For components 3-1/2 inch i.p.s. and smaller, insulating cement only conforming to MIL-C-2861, may be applied to a thickness 1/2-inch less than the adjacent pipe insulation.  A 1/2-inch thickness of finishing cement shall be applied over the insulating cement.

6.1.2.3  Re-usable covers shall be fitted where required.

6.1.3  Machinery and equipment.  For machinery and equipment, block, felt, or blanket insulating materials of the required thickness shall be secured with hot-dipped galvanized iron wire.  Galvanized iron wire netting 1-inch mesh and number 18 gage minimum (0.049-inch diameter) shall be spread over the surface and secured by wire.  Insulating cement shall be used to fill all crevices, smooth all surfaces, and completely cover the wire netting.

6.1.3.1  When no insulating cement has been specified, a 1/2-inch thickness of finishing cement shall be applied.

6.1.3.2  When an insulating cement has been specified it shall be applied in successive layers, 1/2-inch to 1-inch in thickness, until the total thickness specified has been reached.  Wire netting, similar to that used for covering the insulating materials shall be installed between layers.  A 1/2-inch thickness of finishing cement shall be applied over the last layer of insulating cement.

6.1.3.3  Lagging shall be installed over finishing cement.  Re-usable covers shall be installed where required.

6.1.3.4  Clips, hooks, or other fastenings for securing insulation or lagging shall not be brazed or welded to nonferrous parts of distilling plants or deaerating feed tanks.

-STD-7690(SHIPS)
ril 1971

6.1.4  Boiler uptakes.  For boiler uptakes, the thermal insulation shall be 2-inches thick.  Either mineral wool felt, MIL-I-2818, or fibrous glass sheet, MIL-I-15475, may be used.  If acoustic absorptive treatment is found to be necessary to decrease the noise level the insulation thickness shall be increased accordingly.

6.1.4.1  Metal lagging for uptakes shall be galvanized sheet steel conforming to QQ-S-775, not less than 1/32-inch thick.

6.1.4.2  Insulation and lagging is not required on uptakes above the weather deck, except where the transfer of heat, to spaces adjacent to the uptake area, would be objectionable.

6.1.5  Unfired pressure vessels.  Unfired pressure vessels including catapult wet accumulators shall be covered with block insulation MIL-I-2819 in accordance with table V.  Block insulation shall be covered with 1/2-inch cement, MIL-C-2861, lagged with asbestos cloth, grade U.G. of SS-C-466, and painted in accordance with 6.6.  Insulation in the way of vessel supports shall be metal faced to prevent insulation from wedging between the vessel and its support.

6.1.5.1  Removable and re-usable covers shall be installed over butt welded shell inserts for which periodic radiographic inspection of the joint is required.  These covers shall extend 4 inches beyond the welded joint.

6.2  Antisweat insulation (cold and chilled water service).

6.2.1  Preformed pipe covering shall be secured to the pipe in the manner prescribed in 6.1.1.  Fibrous glass felt insulation shall be secured with number 18 gage minimum (0.049-inch diameter) hot-dipped galvanized iron wire, soft annealed copper wire, QQ-W-343, wire inserted asbestos yarn, or glass thread, MIL-C-20079, spirally wound on 1-inch centers.  One layer of water repellent and fire resistant paper, UU-B-790, shall be wrapped tightly around the insulation and secured with cotton twine, T-T-931, glass thread, MIL-C-20079, or 1-inch wide tape, UU-T-106.  All joints of the paper shall be lapped and sealed with adhesive cement, MIL-A-3316, class 1.  The compatible lagging shall then be installed and completely covered with vapor barrier compound, MIL-C-19565, type II.  The water repellent er may be omitted on cellular glass where the insulation surface is suitable for the active application of vapor barrier compound MIL-C-19565.

6.2.2  Application of a vapor barrier is not required on elastomeric foamed plastic insulation, MIL-P-15280.  Lagging shall be applied to protect insulation from damage, and to delay smoke generation in the event of fire.

6.3  Refrigerant insulation.

6.3.1  Cellular glass insulation shall be coated on all surfaces with vapor barrier compound, MIL-C-19565, type II at the time of installation.  Insulation shall be installed with staggered end joints.  On horizontal pipes the longitudinal joints shall be at the top and bottom.  Insulation shall be secured with number 18 gage minimum (0.049-inch diameter) copper-covered steel wire or 1-inch wide tape, UU-T-106, on 9-inch centers.  The compatible lagging shall then be installed and completely covered with vapor barrier compound, MIL-C-19565, type II.

6.3.2  Elastomeric foamed plastic, MIL-P-15280, may be applied in 1/4-inch minimum thickness layers as necessary to build up the required thickness (type II, form 1 or 2).  All longitudinal and butt joints shall be staggered.  All joints and lagging, if required (see 6.2.2), shall be secured with adhesive cement in accordance with paragraph 3.7 of MIL-P-15280.

6.4  Weather deck hot piping insulation.

6.4.1  Calcium silicate or cellular glass insulation for piping exposed to the weather shall be installed as follows:

    (a)  Preliminary preparation of piping.
        (1)  All surfaces to be clean, dry, and free of scale and grease.
        (2)  Fittings, valves, flanges, pipe supporting clamp, and at least 3
             inches of adjacent pipe shall be painted as follows:  Apply one
             coat pretreatment formula 117, MIL-C-15328.  After this coat dries,
             apply two coats of aluminum paint made by mixing two pounds of
             aluminum paste, TT-P-320, type II, class B, with each gallon of
             phenolic varnish.

(b)  Installation on pipes.
    (1)  The bore, butt ends, and longitudinal joint surfaces of cellular glass
         insulating material shall be coated not more than 1/16 inch thick with
         commercial bedding compound, in accordance with MIL-I-19564, at time
         of installation.  Bedding compound is not required with calcium sili-
         cate pipe covering.
    (2)  Longitudinal joints on horizontal piping shall be on top and bottom
         of pipe.
    (3)  Insulation shall be secured tightly to pipe with 1/2-inch wide U.S.
         Standard 22 gage galvanized steel bands on 9-inch centers.  Steel
         bands shall be placed over a layer of fibrous glass tape, MIL-C-
         20079, class C, which has been dipped in the commercial finishing
         compound in accordance with MIL-C-19565, type I.  Steel bands shall
         be wrapped with a layer of masking tape, UU-T-106, type II.
    (4)  Completely coat insulation with commercial finishing compound, in
         accordance with MIL-C-19565, using about 2 gallons per 100 square
         feet.  Wrap on tightly one layer of open weave fibrous glass cloth,
         HH-C-466, or knitted fibrous glass tape, MIL-C-20079, and then apply
         another coating of above-specified finishing compound, using about 4
         gallons per 100 square feet.  After this coat has set apply a second
         coat of finishing compound using the same quantities.
    (5)  Where insulation is stopped off on the piping, sufficient mineral wool,
         MIL-I-2818, shall be tightly tied in place with galvanized iron wire
         over a heavy coating of the above-specified commercial bedding com-
         pound, to provide a portion from insulation surface to pipe
         surface.  The ends of the insulation shall be tapered at a 30-degree
         angle with the pipe.  The tapered ends of the insulation shall be
         smoothed with insulation cement in accordance with MIL-C-2861.  The
         cement covered tapered ends, after drying thoroughly, shall be coated
         with approximately a 1/8-inch thick tack coat of end sealing com-
         pound in accordance with MIL-C-22395.  The sealer compound shall ex-
         tend onto the pipe for at least 3 inches.  A single layer of grade D,
         class 2, asbestos cloth lagging, in accordance with SS-C-466, shall be
         applied over the insulation and secured at longitudinal lap joint with
         class 1 adhesive cement in accordance with MIL-C-3316.  The asbestos
         lagging cloth shall be tailored to fit the contour of the ends of the
         insulation by cutting and removing wedge-shaped sections of the cloth.
         The remaining ends of the cloth shall be embedded in the tack coating
         of sealer compound and shall be attached to the pipe with a single
         1/2-inch wide galvanized steel band.  A 3/16-inch layer (approximately)
         of sealer compound shall be troweled to a smooth finish over the cloth
         covered ends of the assembly.  A smooth finish may be obtained by
         brush coating or hand rubbing the sealer compound with a suitable
         solvent.  After 72 hours of drying at ambient temperature, the asbestos
         cloth of the assembly shall be given two brush coats of water- and
         weather-resistant coating compound in accordance with MIL-C-19565.  The
         water-proofing compound shall extend halfway down the tapered ends of
         the assembly.  The waterproofing compound shall be air dried 24 hours
         between applications.  As an alternate method, the preformed pipe
         insulation may be tapered, the exposed surface coated with insulation
         cement, SS-C-160, type III, grade F, and lagging and sealant applied
         as described above.
(c)  Installation on fittings, flanges, and valves.
    (1)  Before applying flange insulation weather deck piping shall be
         tested and secured in the following manner:  After specified
         tests are completed, weather deck piping shall be subjected to
         alternate periods of full operating pressure, allowing pipe to
         come to maximum temperature; and then to zero gage pressure allow-
         ing pipe to come to ambient temperature.  These cycles shall be
         repeated a sufficient number of times tightening and adjusting
         flanges where necessary until no leaks can be detected.
    (2)  Fittings, flanges, and valve covers shall be ship-fabricated from
         sections of molded pipe covering or cellular glass block cemented
         together with adhesive cement, MIL-A-18066, class 1.
    (3)  Permanent covers for fittings and valves shall be fitted snugly to
         fittings and adjacent pipe covering using the same material and
         methods as outlined for pipe covering.  Voids between insulation
         and fitting shall be filled with tightly packed mineral wool,
         MIL-I-2818.

11

MIL-STD-769D(SHIPS)
21 April 1971

    (4)  Where specified, rigid-type portable flange covers shall extend over the adjacent pipe covering 1-1/2 times the thickness of the insulation. The two halves of the cover should be coated and lagged separately, using the same materials and procedure as outlined for pipe covering. The galvanized steel bands used to secure the two halves together and to the adjacent pipe covering shall be applied over the lagging and then coated with the above-specified finishing compound.

  (d)  Installation around supports and hangers.

    (1)  Remove only enough insulation from butt edges to provide a snug fit around support brackets or hanger rods. Fill all voids between insulation and support with tightly packed mineral wool, MIL-I-2819, to within 1/4 inch from insulation surface. Fill remainder of space with end sealing compound in accordance with MIL-C-22395 overlapping generously both the support member and the adjacent insulation. Lag and coat with the same method and materials as adjacent piping.

6.5 <u>Metal lagging</u>. Metal lagging shall be installed with lap joints, secured with hardened self-tapping screws or metal bands. Joints shall be arranged in a manner which will facilitate run-off of impinging liquids.

6.6 <u>Painting</u>. All cloth and tape laggings shall be painted after installation with one coat of fire-retardant white paint, TT-P-26, if necessary for appearance. Elastomeric foamed plastic insulation MIL-P-15280 shall not be painted except where necessary for appearance.

7. NOTES

(Copies of this standard for military use may be obtained as indicated in the foreword to, or the general provisions of, the Index of Military Specifications and Standards.)

Both the title and the identifying number should be stipulated when requesting copies of Military Standards.

                                          Preparing activity:
                                          Navy - SH
                                          (Project 5640-N008)

REPRODUCED AT THE NATIONAL ARCHIVES

DECLASSIFIED
Authority: NND 875 1 NE
By VAN NARA Date 11-8



MIL-STD-769C (SHIPS)
15 NOVEMBER 1967

SUPERSEDING
MIL-STD-769B (SHIPS)
3 JANUARY 1966

MILITARY STANDARD

# THERMAL INSULATION REQUIREMENTS

## FOR

## MACHINERY AND PIPING



FSC 5640

REPRODUCED AT THE NATIONAL ARCHIVES

DECLASSIFIED
Authority
By VAN  Naka Date  11·8

MIL-STD-769C(SHIPS)
15 November 1967

DEPARTMENT OF THE NAVY

NAVAL SHIP ENGINEERING CENTER

WASHINGTON, D.C.  20360

Thermal Insulation Requirements for Machinery and Piping
MIL-STD-769B(SHIPS)

1.  This standard has been approved by the Naval Ship Engineering Center, and is published to establish the requirements for thermal insulation for machinery and piping on Naval ships.

2.  Use of this standard by activities under the cognizance of the Naval Ship Engineering Center shall be mandatory effective on the date of issue.

3.  Recommended corrections, additions, or deletions including improvements in the procedures described herein, and changes in this standard which can result in less costly installations without sacrificing the level of quality desired should be addressed to the Commander, Naval Ship Engineering Center, Department of the Navy, Washington, D. C. 20360.

REPRODUCED AT THE NATIONAL ARCHIVES



MIL-STD-769C(SHIPS)
15 November 1967

## CONTENTS

|  |  |  | Page |
|---|---|---|---|
| Paragraph | 1. | SCOPE........................................................ | 1 |
|  | 2. | REFERENCED DOCUMENTS......................................... | 1 |
|  | 3. | GENERAL REQUIREMENTS......................................... | 2 |
|  | 4. | MATERIALS AND THICKNESSES.................................... | 2 |
|  | 4.1 | Minimum thicknesses......................................... | 2 |
|  | 4.2 | Special conditions.......................................... | 2 |
|  | 4.3 | Adhesives................................................... | 3 |
|  | 4.4 | Finishing cements........................................... | 3 |
|  | 4.5 | Metal lagging............................................... | 3 |
|  | 4.6 | Fasteners................................................... | 3 |
|  | 5. | RE-USABLE COVERS............................................ | 4 |
|  | 5.1 | Hot-surface insulation covers............................... | 4 |
|  | 5.2 | Construction................................................ | 4 |
|  | 5.3 | Fabrication, piping components.............................. | 4 |
|  | 5.4 | Fabrication, machinery and equipment........................ | 9 |
|  | 6. | INSTALLATION................................................ | 10 |
|  | 6.1 | Hot-surface insulation...................................... | 10 |
|  | 6.1.1 | Pipe and tubing............................................. | 10 |
|  | 6.1.2 | Piping components........................................... | 10 |
|  | 6.1.3 | Machinery and equipment..................................... | 10 |
|  | 6.1.4 | Boiler uptakes.............................................. | 10 |
|  | 6.1.5 | Unfired pressure vessels.................................... | 10 |
|  | 6.2 | Antisweat insulation........................................ | 11 |
|  | 6.3 | Refrigerant insulation...................................... | 11 |
|  | 6.4 | Weather deck hot piping insulation.......................... | 11 |
|  | 6.5 | Metal lagging............................................... | 13 |
|  | 6.6 | Painting.................................................... | 13 |
|  | 7. | NOTES....................................................... | 13 |

## TABLES

| Table | I. | Schedule of approved insulation and lagging materials............ | 5 |
|---|---|---|---|
|  | II. | Insulation thickness for hot piping, compounded or fibrous, conforming to MIL-I-2781................................. | 6 |
|  | III. | Thickness of insulation conforming to MIL-P-15280 and MIL-I-22344 for hot piping................................. | 7 |
|  | IV. | Thickness of insulating tape conforming to MIL-P-15349, for 1/4 to 3/4 inch size hot piping.............................. | 7 |
|  | V. | Thickness of insulating materials for hot surfaces of machinery and equipment up to 850°F................................. | 7 |
|  | VI. | Thickness of insulating materials for hot surfaces of machinery and equipment over 850°F................................. | 8 |
|  | VII. | Thickness of refrigerant insulation for piping.................. | 8 |
|  | VIII. | Thickness of refrigerant insulation for machinery and equipment (exclusive of vapor barrier)............................ | 8 |
|  | IX. | Thickness of antisweat insulation (exclusive of vapor barrier)... | 9 |
|  | X. | Nominal thicknesses of insulation for weather deck hot piping.... | 9 |

REPRODUCED AT THE NATIONAL ARCHIVES

DECLASSIFIED
Authority
By VAN Nara Date 11-8

MIL-STD-769C(SHIPS)
15 November 1967

1.  SCOPE

1.1  The purpose of this standard is to amplify the general requirements for insulation of piping, machinery, uptakes, and mechanical equipment covered in the General Specifications for Ships of the U. S. Navy or in ships specifications.

2.  REFERENCED DOCUMENTS

2.1  The issues of the following documents in effect on the date of invitation for bids or request for proposal, form a part of this standard to the extent specified herein.

GOVERNMENTAL

SPECIFICATIONS

| | | |
|---|---|---|
| T-T-931 | - | Twine, Cotton, Mattress. |
| HH-C-466 | - | Cloth, Glass, Coated (for Membrane Waterproofing and Built-Up Roofing). |
| HH-I-551 | - | Insulation Block, Pipe Covering and Boards, Thermal (Cellular Glass). |
| QQ-S-775 | - | Steel Sheets, Carbon, Zinc-Coated. |
| QQ-W-343 | - | Wire-Electrical And Non-Electrical, Copper (Uninsulated). |
| QQ-W-390 | - | Wire, Nickel-Chromium-Iron Alloy. |
| SS-C-192 | - | Cement, Portland. |
| SS-C-466 | - | Cloth, Thread, and Tape, Asbestos. |
| TT-P-26 | - | Paint, Interior, White and Tints, Fire-Retardant. |
| TT-P-320 | - | Pigment, Aluminum; Powder and Paste, for Paint. |
| UU-B-790 | - | Building Paper, Vegetable Fiber:  (Kraft, Waterproofed, Water Repellent and Fire Resistant). |
| UU-T-106 | - | Tape, Pressure-Sensitive Adhesive, Masking, Paper. |
| MIL-C-788 | - | Cloth, Brattice, Cotton, Fire-Resistant. |
| MIL-I-2781 | - | Insulation, Pipe, Thermal. |
| MIL-I-2818 | - | Insulation Blanket, Thermal, Fibrous Mineral. |
| MIL-I-2819 | - | Insulation Block, Thermal. |
| MIL-C-2861 | - | Cement, Insulation, High-Temperature. |
| MIL-C-2908 | - | Cements, Finishing, Insulation. |
| MIL-A-3316 | - | Adhesives, Fire-Resistant, Thermal Insulation. |
| MIL-I-15091 | - | Insulation Felt, Thermal, Asbestos Fiber. |
| MIL-A-15199 | - | Adhesive, Asbestos Cloth to Pipe, Insulation. |
| MIL-P-15280 | - | Plastic Foam, Unicellular, Sheet and Tubular Form, Elastomeric. |
| MIL-P-15328 | - | Primer, Pretreatment (Formula No. 117 for Metals). |
| MIL-I-15349 | - | Insulation Tape, Thermal. |
| MIL-I-15475 | - | Insulation Felt, Thermal, Fibrous Glass, Semirigid. |
| MIL-I-16411 | - | Insulation Felt, Thermal, Glass Fiber. |
| MIL-A-18065 | - | Adhesives, High Initial Bond. |
| MIL-B-19564 | - | Bedding Compound, Thermal Insulation Pipe Covering. |
| MIL-C-19565 | - | Coating Compounds, Thermal Insulation Pipe Covering - Fire-, and Water-Resistant, Vapor-Barrier and Weather-Resistant. |
| MIL-C-20079 | - | Cloth, Glass, Tape, Textile, Glass:  and Thread, Glass. |
| MIL-I-22023 | - | Insulation Felt, Thermal and Sound Absorbing Felt, Fibrous Glass, Flexible. |
| MIL-I-22344 | - | Insulation, Pipe, Thermal, Fibrous Glass. |
| MIL-C-22395 | - | Compound, End Sealing, Thermal Insulation Pipe Covering - Fire-, Water-, and Weather-Resistant. |
| MIL-I-24244 | - | Insulation Materials, Thermal, With Special Corrosion and Chloride Requirements. |
| MIL-P-52350 | - | Paper, Asbestos. |
| General Specifications For Ship of the U.S. Navy. | | |

DRAWING
S000-SS103-841336 - Piping, Boiler Soot Blower, Typical Installation.

(Copies of specifications, standards, drawings, and publications required by suppliers in connection with specific procurement functions should be obtained from the procuring activity or as directed by the contracting officer.)

1

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-STD-769C(SHIPS)
15 November 1967

NONGOVERNMENTAL

SPECIFICATIONS
AMERICAN SOCIETY FOR TESTING AND MATERIALS
ASTM - A167 - Specification for Corrosion-Resisting Chromium-Nickel
Steel Plate, Sheet and Strip.
ASTM - 209 - Specification for Seamless Carbon-Molybdenum Alloy-Steel
Boiler and Superheater tubes.

(Application for copies should be addressed to the American Society for Testing and
Materials, 1916 Race Street, Philadelphia, Pennsylvania 19103)

(Technical society and technical association specifications and standards are generally
available for reference from libraries.  They are also distributed among technical groups
and using Federal agencies.)

3.  GENERAL REQUIREMENTS

3.1  General requirements such as definitions, basic applications, and reasons for
insulating are covered in the General Specifications for Ships of the U. S. Navy or in ships
specifications, Section 9390-2.  Thermal insulation and acoustic absorptive treatment of
compartments, ventilating ducts and trunks are covered in the appropriate sections of the
above specifications.

3.2  Minor deviations in installation which meet the intent of the requirements speci-
fied herein may be approved by the cognizant Supervisor of Shipbuilding, U. S. Naval ship-
yard, or the Commander, Naval Ship Engineering Center.  (Copy of all such changes shall be
forwarded to the Commander, Naval Ship Engineering Center, SEC 6153.)

4.  MATERIALS AND THICKNESSES

4.1  Minimum thicknesses.  Tables I to X, inclusive specify materials for insulation
and lagging and the minimum acceptable thicknesses for the temperature ranges listed.

4.2  Special conditions.  The following special conditions supplement or modify the
selection of materials or thicknesses specified, when applicable:

(a)  The insulation thickness on soot blower piping between the root valve and the
soot blower heads shall be reduced from that indicated for a system normally
operating at the same temperature as follows:
(1)  Where double layer insulation is used, only the inner (high temperature)
insulation thickness layer need be installed.
(2)  Where the insulation consists of a single uniform thickness layer, only
one-half the total specified thickness need be installed.
(b)  The insulation thickness for hot water systems operating at a normal maximum
temperature of 150°F. may be 1/2 inch thick for pipe sizes up to 3/4 inch
i.p.s., in accordance with MIL-I-2781.
(c)  Where double layer construction consisting of two classes of insulation is
specified in table II, the higher temperature class insulation may be
furnished in a uniform single thickness equal to the total thickness
specified, if single layer construction is considered desirable.  Where
single layer construction is used in lieu of double layer construction,
suitable expansion joints to permit thermal movement of the piping, without
opening of insulation joints, must be provided.
(d)  Where considered desirable, higher temperature classes of insulation may be
used where lower temperature classes are specified provided they are
satisfactory in all other respects (e.g. where class b of MIL-I-2781 is
specified, class d or e may be used or where class c is specified, class
f may be used).
(e)  Compounded type insulation conforming to MIL-I-2781, grade I, (calcium
silicate only) or cellular glass insulation conforming to HH-I-551 shall
be used on hot piping requiring insulation that will be exposed to the
weather, and shall conform to the thicknesses specified in table X.

(f)  Elastomeric foamed plastic insulation, MIL-P-15280, may be used for machinery
and equipment applications up to 180°F; 1/2 inch minimum thickness.

2

REPRODUCED AT THE NATIONAL ARCHIVES

(g) Where HOT SURFACE insulation thicknesses are not specified, such as for re-
fractory fiber insulation felt, MIL-I-23128, and special applications, the
following shall be used as a guide in determining acceptable thicknesses.

Insulation thickness shall be sufficient to:

(1) Reduce the insulation surface temperature to 150°F. or below, where
personnel can normally contact these surfaces.
(2) Prevent the transfer of heat to surrounding areas which would be
objectionable to personnel or adversely affect other components.
(3) Prevent transfer of heat which would otherwise reduce the efficiency or
effectiveness of the system or component.

(h) Where operating temperatures are normally between 125°F. and 150°F. and the
ommission of insulation will not adversely affect operating efficiency, non-
metallic lagging only may be applied where necessary, to protect personnel
from contact with hot metal surfaces.

(i) Insulation on austenitic stainless steel piping and machinery shall meet the
corrosion and chloride requirements of MIL-I-24244.

(j) Adhesives containing halogenated solvents shall not be used on foam plastic
conforming to MIL-P-15280 for submarine application.

4.3  Adhesives.  The following adhesives shall be used for fastening cloth and tape
lagging:

| Type of lagging | Specification |
|---|---|
| Asbestos | MIL-A-15199[1]/ or MIL-A-3316, class 1 |
| Fibrous glass | MIL-A-3316, class 1 |

[1]/Not applicable for cementing to fibrous glass in-
sulation or for use with asbestos lagging containing
glass yarn.  Lagging pretreated with compatible ad-
hesive is acceptable providing the end result is
equal to one of the above combinations.

4.4  Finishing cements.  Where finishing cement is specified any of the following
materials are acceptable subject to any material limitations for the proposed application:

(a) Finishing cement, MIL-C-2908, type II.
(b) High-temperature insulating cement, MIL-C-2861, when used under asbestos
cloth.
(c) A mixture of 80 percent high-temperature insulating cement, MIL-C-2861, and
20 percent portland cement, SS-C-192.

4.5  Metal lagging.  Where metal lagging is required, any of the following materials
are acceptable, except for uptake applications (see 6.1.4):

| Sheet material | Specification | Nominal thickness |
|---|---|---|
| | | Inch |
| Hot-dipped galvanized Steel | QQ-S-775 | 0.014 |
| Aluminum | ASTM 209, alloy 6061 | .030 |
| Corrosion-resistant steel (CRES) | ASTM A167, AISI type 304 | .014 |

4.6  Fasteners.  Insulation shall be held in place by suitable wire or flat metal
bands.  The welding of fasteners to machinery, piping, pressure vessels or other related
equipment is prohibited.  Where fasteners are necessary they shall be attached during
manufacture (prior to heat treatment, stress relief and testing) by a Naval Ship
Engineering Center approved procedure.

3

REPRODUCED AT THE NATIONAL ARCHIVES

Authority 977 579
By VAN NARA Date 11-8

MIL-STD-769C(SHIPS)
15 November 1967

5.  RE-USABLE COVERS

5.1  Hot-surface insulation covers.  In order to insure that the pipe covering will
not interfere with the servicing of a takedown joint where a re-usable cover is installed,
the permanent insulation shall stop short of the takedown joint and a short removable and
re-usable section of insulation shall be installed between the permanent insulation and the
takedown joint.  The insulation joint formed by the permanent and re-usable sections may be
square, or at an angle of 45 degrees; the joint, however, shall be tight, without any gaps
between the two sections and shall incorporate means to prevent dislodging the insulation
sections.  Re-usable covers are not required on systems insulated with elastomeric foamed
plastic insulation (MIL-P-15280).

5.2  Construction.  For sizes larger then 2 inches i.p.s., valve bonnets and valves
having takedown joints at the ends shall be fitted with re-usable covers such that the
bonnet joint may be removed independently of the valve covering.  Valves 2 inches i.p.s.
and under shall be fitted with separate covers as indicated above, or covers of a one-piece
design such that they may be wrapped around the entire valve body and clipped or otherwise
secured just below the handwheel.

5.3  Fabrication, piping components.  For piping components except as otherwise specified,
any one of the following methods of fabrication is acceptable:

5.3.1  Covers may be made in two halves of thermal insulating felt enclosed in asbestos
cloth.  Each half cover shall be sewn and quilted with wire-inserted asbestos yarn conforming
to SS-C-466, form II, (for machine sewing, if desired, this yarn may be constructed with
the three monel wires twisted together first, and the three asbestos threads twisted around
the outside of the wire) or fastened with mechanical stapling in a manner to provide a uniform
thickness, strength and rigidity.

5.3.1.1  Covers for use at temperatures of 850°F. and below shall be filled with in-
sulation felt (see table I).  Wire-inserted asbestos cloth, SS-C-466, grade AAA-M, shall be
used on the inside surface of covers for valves larger 2 inches i.p.s.  For valves 2 inches
i.p.s. and smaller, grade AAA shall be used on inside surface of covers.  For 500°F. and
below, asbestos cloth, SS-C-466, grade AA, shall be used on outside surface of covers; grade
AAA cloth shall be used 500°F.

5.3.1.2  Covers for use at temperatures above 850°F. shall have filling consisting of
inner layers of fiber-glass felt, MIL-I-16411, or refractory fiber felt, MIL-I-23128, and
outer layers of asbestos felt, and shall be covered on the inside surface and on the ends
with nickel-chromium alloy wire mesh, QQ-N-390 (or wire-inserted asbestos cloth, SS-C-466,
grade AAA-M, for services up to 950°F.) and on the outside surface with grade AAA asbestos
cloth.  Asbestos paper MIL-P-52350, class 2, thickness 1/8 inch may be inserted between the
asbestos felt and the asbestos cloth if considered necessary to retain the cylindrical
shape of the cover.

5.3.1.3  Hard asbestos millboard, 1/4 inch thick, enclosed in asbestos cloth of the
type used on the outside cover, shall be sewn on ends of covers for strength and rigidity.
When a more flexible cover is desired, uch as when space limitation would not permit
installation of the more rigid type, the millboard will not be required.  When the flange
diameter is larger than the outside diameter of the adjacent pipe covering, build-up
pieces made of asbestos felt encased in asbestos cloth, SS-C-466, grade AAA shall be
stitched to inside of cover.  Halves of covers shall be fastened together by 1/16-inch
diameter galvanized, or other corrosion resistant wire rope laced through brass or galvanized
steel hooks or rings, or fastened by brass snap fasteners.  Fastenings shall be securely
attached to cloth lagging.

5.3.1.4  Preformed fibrous glass valve or fitting covers may be used when temperatures
are in the 125-370°F. range.  These shall be of the same thickness as the adjacent pipe
covering.  Such covers, when used, shall be lagged independently of the pipe covering and
in a manner which will facilitate removal and replacement.

4

REPRODUCED AT THE NATIONAL ARCHIVES
Authority 977 5 79
By VAN NARA Date 11-8

MIL-STD-769C(SHIPS).
15 November 1967

Table I - Schedule of approved insulation and lagging materials 1/

| Service | Temperature Range (°F.) | Pipe and Tubing | | Valves and Fittings | | Flange Joints | | Machinery | |
|---|---|---|---|---|---|---|---|---|---|
| | | Insulation | Lagging | Insulation | Lagging | Insulation | Lagging | Insulation | Lagging |
| Gases<br>Steam<br>Hot Water<br>Oil | 125 to 1200 | MIL-I-2781<br>MIL-I-15349<br>(750°F.Max.)<br>MIL-I-22344<br>(370°F.Max.)<br>MIL-P-15280<br>(180°F.Max.) | SS-C-466<br>MIL-C-20079 | MIL-I-2781<br>MIL-I-2819<br>MIL-I-16411<br>MIL-I-15091,<br>type A<br>MIL-C-2801,<br>MIL-C-22344<br>(370°F.Max.)<br>MIL-P-15280<br>(180°F.Max.)<br>MIL-I-23128 | SS-C-466<br>MIL-C-20079 | MIL-I-2781<br>MIL-I-2819<br>MIL-I-16411<br>MIL-I-15091,<br>type A<br>MIL-C-2801,<br>MIL-C-22344<br>(370°F.Max.)<br>MIL-P-15280<br>(180°F.Max.)<br>MIL-I-23128 | SS-C-466<br>MIL-C-20079 | MIL-I-2819<br>MIL-I-16411<br>MIL-I-15091,<br>type A<br>MIL-I-2818<br>MIL-C-2801<br>MIL-C-22023<br>(370°F.Max.)<br>MIL-I-23128<br>MIL-P-15280<br>(180°F.Max.) | SS-C-466<br>MIL-C-20079 |
| Cold water<br>Chilled<br>Water | 28 to 99 | MIL-I-15091<br>MIL-I-2781<br>MIL-I-22344<br><br>MIL-P-15280<br>HH-I-551 | SS-C-466<br>MIL-C-20079<br>UU-B-790,<br>type III,<br>grade F,<br>style 10<br>MIL-C-788 | MIL-I-15091<br>MIL-I-2781<br>MIL-I-22344<br><br>MIL-I-2819<br>MIL-P-15280<br>HH-I-551 | SS-C-466<br>MIL-C-20079<br>UU-B-790,<br>type III,<br>grade F,<br>style 10<br>MIL-C-788 | MIL-I-15091<br>MIL-I-2781<br>MIL-I-22344<br><br>MIL-I-2819<br>MIL-P-15280<br>HH-I-551 | SS-C-466<br>MIL-C-20079<br>UU-B-790,<br>type III,<br>grade F,<br>style 10<br>MIL-C-788 | MIL-I-15091<br>MIL-I-22023<br>MIL-I-2819<br><br>MIL-P-15280<br>HH-I-551 | SS-C-466<br>MIL-C-20079<br>UU-B-790,<br>type III,<br>style 10<br>MIL-C-788 |
| Refrigerant | -20 to 60 | HH-I-551<br>MIL-P-15280 | SS-C-466<br>MIL-C-20079<br>MIL-C-788 | HH-I-551<br>MIL-P-15280 | SS-C-466<br>MIL-C-20079<br>MIL-C-788 | HH-I-551<br>MIL-P-15280 | SS-C-466<br>MIL-C-20079<br>MIL-C-788 | HH-I-551<br>MIL-P-15280 | SS-C-466<br>MIL-C-20079<br>MIL-C-788 |

1/ Additional materials are covered in 4.5 (metal lagging); 6.1.4 (boiler uptakes); 6.2 (securing antisweat insulation); 6.4.1 (weather deck hot piping).

5

REPRODUCED AT THE NATIONAL ARCHIVES

DECLASSIFIED
Authority NND 11514
By VAN NARA Date 11-8

MIL-STD-769C(SHIPS)
15 November 1967

Table II - Insulation thicknesses for hot piping, compounded and
fibrous conforming to MIL-I-2781

| Pipe size (inches i.p.s.) | Temperature range (degrees F.) | Class[1] | | Nominal thickness (inches) | | |
|---|---|---|---|---|---|---|
| | | Inner layer | Outer layer | Inner layer | Outer layer | Total |
| 1/2, 1-1/2 | 125 - 388 | b,c | --- | 1 | --- | 1 |
| | 389 - 500 | b,c | --- | 2 | --- | 2 |
| | 501 - 750 | c,d | --- | 2 | --- | 2 |
| | 751 - 950 | e,f | --- | 2 | --- | 2 |
| | 951 - 1050 | e,f | b,c | 2 | 1-1/2 | 3-1/2 |
| 2, 2-1/2 | 125 - 338 | b,c | --- | 1-1/2 | --- | 1-1/2 |
| | 339 - 388 | b,c | --- | 2 | --- | 2 |
| | 389 - 500 | b,c | --- | 3 | --- | 3 |
| | 501 - 750 | c,d | --- | 3 | --- | 3 |
| | | c,d | b,c | 1-1/2 | 1-1/2 | 3 |
| | 751 - 900 | e,f | b,c | 1-1/2 | 1-1/2 | 3 |
| | 901 - 1050 | e,f | b,c | 2 | 1-1/2 | 3-1/2 |
| 3 through 4-1/2 | 125 - 338 | b,c | --- | 1-1/2 | --- | 1-1/2 |
| | 339 - 388 | b,c | --- | 2 | --- | 2 |
| | 389 - 500 | b,c | --- | 3 | --- | 3 |
| | 501 - 750 | c,d | --- | 3 | --- | 3 |
| | | c,d | b,c | 1-1/2 | 2 | 3-1/2 |
| | 751 - 900 | e,f | b,c | 1-1/2 | 2 | 3-1/2 |
| | 901 - 950 | e,f | b,c | 2 | 1-1/2 | 3-1/2 |
| | 951 - 1050 | e,f | b,c | 2-1/2 | 1-1/2 | 4 |
| 5, 6 | 125 - 338 | b,c | --- | 1-1/2 | --- | 1-1/2 |
| | 339 - 388 | b,c | --- | 2 | --- | 2 |
| | 389 - 500 | b,c | --- | 3 | --- | 3 |
| | 501 - 750 | c,d | --- | 3 | --- | 3 |
| | | c,d | b,c | 1-1/2 | 2 | 3-1/2 |
| | 751 - 900 | e,f | b,c | 1-1/2 | 2 | 3-1/2 |
| | 901 - 950 | e,f | b,c | 2 | 1-1/2 | 3-1/2 |
| | 951 - 1050 | e,f | b,c | 3 | 2 | 5 |
| 7 | 125 - 338 | b,c | --- | 1-1/2 | --- | 1-1/2 |
| | 339 - 388 | b,c | --- | 2-1/2 | --- | 2-1/2 |
| | 389 - 500 | b,c | --- | 3 | --- | 3 |
| | 501 - 750 | c,d | --- | 4 | --- | 4 |
| | | c,d | b,c | 1-1/2 | 2 | 3-1/2 |
| | 751 - 900 | e,f | b,c | 1-1/2 | 2 | 3-1/2 |
| | 901 - 950 | e,f | b,c | 2 | 2 | 4 |
| | 951 - 1050 | e,f | b,c | 3 | 2 | 5 |
| 8 and larger | 125 - 338 | b,c | --- | 1-1/2 | --- | 1-1/2 |
| | 339 - 388 | b,c | --- | 2-1/2 | --- | 2-1/2 |
| | 389 - 500 | b,c | --- | 3 | --- | 3 |
| | 501 - 750 | c,d | --- | 4 | --- | 4 |
| | | c,d | b,c | 2 | 2 | 4 |
| | 751 - 900 | e,f | b,c | 2 | 2 | 4 |
| | 901 - 950 | e,f | b,c | 2-1/2 | 2 | 4-1/2 |
| | 951 - 1050 | e,f | b,c | 3 | 2 | 5 |

[1] Does not include finishing cement.

6

REPRODUCED AT THE NATIONAL ARCHIVES

DECLASSIFIED
Authority NND 911711
By VAN NARA Date 11-8

MIL-STD-769C(SHIPS)
15 November 1967

Table III - Thickness of insulation conforming to
MIL-P-15280 and MIL-I-22344, for hot piping.

| Temperature range (°F.) | Specification | Thickness |
|---|---|---|
| | | Inch |
| 125 to 180 | MIL-P-15280 or MIL-I-22344 | 1/2 |
| 181 to 250 | MIL-I-22344 | 1/2 |
| 251 to 300 | MIL-I-22344 | 3/4 |
| 301 to 370 | MIL-I-22344 | 1 |

Table IV - Thickness of insulating tape conforming to
MIL-I-15349, for 1/4 to 3/4 inch size
hot piping.

| Temperature range (°F.) | Pipe size | Nominal thickness |
|---|---|---|
| | | Inch |
| 125 to 250 | 1/4, 3/8 | 3/8 |
| 251 to 750 | 1/4, 3/8 | 7/8 |
| 125 to 250 | 1/2, 3/4 | 3/4 |
| 251 to 388 | 1/2, 3/4 | 1 |

Table V - Thickness[1]/ of insulating materials for hot surfaces of machinery and
equipment up to 850°F.

| Temperature range (°F.) | Nominal thickness (inches) | | |
|---|---|---|---|
| | Glass fiber felt MIL-I-16411, type II refractory fiber blanket MIL-I-23128 grade A | Asbestos felt MIL-I-15091 insulation block MIL-I-2819 mineral fiber blanket MIL-I-2818 glass fiber felt MIL-I-16411 type I | Insulating cement MIL-C-2861 |
| 125 - 338 | 1 | 1-1/2 | 1-1/2 |
| 339 - 388 | 1-1/2 | 2-1/2 | 2-1/2 |
| 389 - 500 | 2 | 3 | 3 |
| 501 - 750 | 2-1/2 | 3-1/2 | 4 |
| 751 - 850 | 3 | 4-1/2 | 5 |

1/ Does not include finishing cement.

7

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-STD-769C(SHIPS)
15 November 1967

Table VI - Thickness[1] of insulating materials for hot surfaces of machinery
and equipment over 850°F.

| Temperature range (°F.) | Thickness (inches) | | | | |
|---|---|---|---|---|---|
| | Single felt material | Combination of two felt materials | | | Block |
| | MIL-I-16411 Type II MIL-I-23128 Grade A | Inner layer MIL-I-16411 Type I or II | Outer layer MIL-I-15091 Type A | Total | MIL-I-2819 |
| 851 - 900 951 - 1050 1051 - 1200 | 4 4 | 2 2 | 3 3 | 5 5 | 4-1/2 5 |

[1] Does not include finishing cement.

Table VII - Thickness of refrigerant insulation for piping.

| Pipe size (inches) | Temperature range (°F.) | Cellular glass HH-I-551 Nominal[1] thickness (inches) | | Plastic foam, MIL-P-15280 thickness, (inches) | |
|---|---|---|---|---|---|
| Up to 1-1/4 | -20 to -1 | 2-1/4 | 1-1/2* | 1-1/2 | 1* |
| | 0 to 40 | 2 | 1-1/4* | 1 | 3/4* |
| 1-1/2 to 2-1/2 | -20 to -1 | 2-1/2 | 1-3/4* | 1-1/2 | 1 |
| | 0 to 40 | 2-1/4 | 1-1/2* | 1 | 3/4* |
| 3 to 5 | -20 to -1 | 3 | 2* | 1-1/2 | 1* |
| | 0 to 40 | 2-3/4 | 1-3/4* | 1 | 3/4* |

[1] By nominal thickness is meant a thickness which is approximate and should
only be used as a guide in determining actual thickness requirements.
* Thickness for application in air-conditioned spaces only.

Table VIII - Thickness of refrigerant insulation for machinery and equipment
(exclusive of vapor barrier).

| Temperature range (°F.) | Thickness (inches) | | | |
|---|---|---|---|---|
| | Foam plastic MIL-P-15280 | | Cellular glass, HH-I-551 | |
| 0 to 35 | 3 | 1 | 5 | 1-1/2* |

* Thickness for application in air conditioned spaces only.

8

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-STD-769C(SHIPS)
15 November 1967

Table IX - Thickness of antisweat insulation (exclusive of vapor barrier).

| Temperature range (°F.) | Machinery and equipment | | Piping | |
|---|---|---|---|---|
| | Material specification | Thickness (inches) | Material specification | Thickness (inches) |
| 28 to 99 | MIL-I-15091 MIL-I-2819 HH-I-551 MIL-I-22023 MIL-P-15280 | 1-1/2   3/4*. 1   1/2* 3/4   1/2* | MIL-I-15091 MIL-I-2781 MIL-I-2819 HH-I-551 MIL-I-15280 MIL-I-22344 | 1   1/2* 3/4   1/2* |

* Thickness for application in air-conditioned spaces only.

Table X - Nominal thicknesses of insulation for weather deck hot piping.

| Pipe size (inches i.p.s.) | Calcium silicate, MIL-I-2781 Cellular glass, HH-I-551 |
|---|---|
| | Inches |
| 1/4 to 3 3-1/2 to 6 Over 6 | 1-1/2 2 2-1/2 |

5.3.2  Covers may be made of segments of block insulation or preformed pipe insulation, having the same thickness as that on the adjacent piping.  Blocks shall be securely wired to frames of 1/2 inch square mesh, number 18 gage (0.049-inch diameter) galvanized steel wire.  Wire mesh frames inside and outside of blocks shall have ends bent over and joints secured with number 18 gage black annealed iron wire woven through the mesh.  Insulating cement compatible with the material of the blocks shall be troweled smoothly over all surfaces of the wire mesh.  Asbestos roll felt may be used to build up covers when the flange diameter is larger than the outside diameter of the adjacent pipe covering.  Cover shall be tightly and smoothly lagged to envelop the outside and ends.  For temperatures of 500°F. and below asbestos cloth lagging conforming to SS-C-466, grade AA, shall be used; grade AAA cloth shall be used above 500°F.  Lagging may be cemented or sewn on, except ends of covers shall always be sewn.  Where double layer insulation is used the two sections of the cover shall be fitted together with scarfed joint.  Such joints shall be straight and true to reduce heat loss.  Bands, eyelets, or locks of galvanized steel, or lacing with hooks, rings, washers, and wire shall be used to secure the covers.

5.3.3  When installing the above covers, spaces between inner surfaces of covers for flanges and other irregular surfaces shall be filled with pieces of insulation felt.  Asbestos felt may be used when temperatures are 850°F. or less.  Fibrous glass felt in accordance with MIL-I-16411 or MIL-I-23128, grade A may be used when temperatures are 1200°F. or less.  Felt shall be packed loosely enough to preserve air cell structure and tightly enough to prevent air circulation.

5.4  Fabrication, machinery and equipment.  For re-usable covers for machinery and equipment, either of the following methods of fabrication is acceptable.

5.4.1  Covers may be similar to the flexible asbestos felt or fiber-glass felt type described for piping components.

5.4.2  Covers may be made in sections formed of insulating block held together with wire and adhesive cement, covered with 1/2-inch thickness of finishing cement, and lagged. Lacing with hooks, rings, washers, and wire, or brass snap fasteners shall be used to secure the covers.

9

REPRODUCED AT THE NATIONAL ARCHIVES

DECLASSIFIED
Authority NND 811
By VAN NARA Date 11-8

MIL-STD-769C(SHIPS)
15 November 1967

5.4.3  Semi-removable turbine casing flange covers may be installed as an alternate for removable covers specified above.  The permanent insulation shall be run to the casing flange allowing bolt removal space.  The flange and bolts are then covered with asbestos cloth, wire inserted asbestos cloth or incolen wire mesh, as required by operating temperature, which shall be secured to the bolts with wire.  The flange may now be insulated with fibrous glass felt MIL-I-16411, asbestos felt MIL-I-15091, mineral wool felt MIL-I-2818 or insulation block MIL-I-2819 to the required thickness and shape; the insulation is then lagged with asbestos cloth.  This cloth shall be carried over the outer edge of the permanent insulation and secured with adhesive.  The semi-removable cover shall then be sealed and painted.

6.  INSTALLATION

6.1  Hot surface insulation.

6.1.1  Pipe and tubing.  Each layer of molded insulation shall be installed with joints butted together.  Where two layers are used all joints shall be staggered.  Not less than three fastenings shall be used for securing each 3-foot section of insulation.  Fastening shall be number 18 gage minimum (0.049-inch diameter) annealed black or hot-dipped galvanized iron wire or flat steel bands.  Except as otherwise specified, lagging shall be installed over the insulation.

6.1.1.1  The installation of soot blower piping insulation shall be in accordance with drawing 5000-SS103-841336.

6.1.2  Piping components.  For valves, fittings, and accessories, welded and brazed fittings including unions may be insulated and lagged similarly to adjacent piping.

6.1.2.1  Block, felt, blanket insulating materials, or molded pipe insulation secured with hot-dipped galvanized iron wire, may be used.  When insulating felts are used above 850°F. the inner layer shall be fiber-glass felt conforming to MIL-I-16411 or refractory fiber felt, MIL-I-23128.  Galvanized iron wire netting, number 18 gage minimum (0.049-inch diameter), shall be spread over the insulating material and secured with wire.  Insulating cement shall be used to fill all crevices, smooth all surfaces, and completely cover the wire netting.  A 1/2-inch thickness of finishing cement shall then be applied.  Insulating material shall be the same thickness as that on adjacent piping.

6.1.2.2  For components 3-1/2 inch i.p.s. and smaller, insulating cement only conforming to MIL-C-2861, may be applied to a thickness 1/2-inch less than the adjacent pipe insulation.  A 1/2-inch thickness of finishing cement shall be applied over the insulating cement.

6.1.2.3  Re-usable covers shall be fitted where required.

6.1.3  Machinery and equipment.  For machinery and equipment, block, felt, or blanket insulating materials of the required thickness shall be secured with hot-dipped galvanized iron wire.  Galvanized iron wire netting 1-inch mesh and number 18 gage minimum (0.049-inch diameter) shall be spread over the surface and secured by wire.  Insulating cement shall be used to fill all crevices, smooth all surfaces, and completely cover the wire netting.

6.1.3.1  When no insulating cement has been specified, a 1/2-inch thickness of finishing cement shall be applied.

6.1.3.2  When an insulating cement has been specified it shall be applied in successive layers, 1/2-inch to 1-inch in thickness, until the total thickness specified has been reached.  Wire netting, similar to that used for covering the insulating materials shall be installed between layers.  A 1/2-inch thickness of finishing cement shall be applied over the last layer of insulating cement.

6.1.3.3  Lagging shall be installed over finishing cement.  Re-usable covers shall be installed where required.

6.1.3.4  Clips, hooks, or other fastenings for securing insulation or lagging shall not be brazed or welded to nonferrous parts of distilling plants or deaerating feed tanks.

6.1.4  Boiler uptakes.  For boiler uptakes the thermal insulation shall be 2-inches thick.  Either mineral wool felt, MIL-I-2818, or fibrous glass sheet, MIL-I-15475, may be used.  If acoustic absorptive treatment is found to be necessary to decrease the noise level the insulation thickness shall be increased accordingly.

10

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-STD-769C(SHIPS)
15 November 1967

6.1.4.1  Metal lagging for uptakes shall be galvanized sheet steel conforming to QQ-S-775, not less than 1/32-inch thick.

6.1.4.2  Insulation and lagging is not require on uptakes above the weather deck, except where the transfer of heat, to spaces adjacent to the uptake area, would be objectional.

6.1.5  Unfired pressure vessels.  Unfired pressure vessels including catapult wet accumulators shall be covered with block insulation MIL-I-2319 in accordance with table V. Block insulation shall be covered with 1/2-inch cement, MIL-C-2861, lagged with asbestos cloth, grade U.G. or SS-C-466, and painted in accordance with 6.6.  Insulation in the way of vessel supports shall be metal faced to prevent insulation from wedging between the vessel and its support.

6.1.5.1  Removable and re-usable covers shall be installed over butt welded shell inserts for which periodic radiographic inspection of the joint is required.  These covers shall extend 4 inches beyond the welded joint.

6.2  Antisweat insulation (cold and chilled water service).

6.2.1  Molded pipe covering, cellular glass, water repellent asbestos felt, or fibrous glass insulation shall be secured with number 18 gage minimum (0.049-inch diameter) hot-dipped galvanized iron wire, soft annealed copper wire, QQ-W-343, wire inserted asbestos yarn, or glass thread, MIL-C-20079, spirally wound on 1-inch centers.  One layer of water repellent and fire resistant paper, UU-B-790, shall be wrapped tightly around the insulation and secured with cotton twine, T-T-931, glass thread, MIL-C-20079, or 1-inch wide tape, UU-T-106.  All joints of the paper shall be lapped and sealed with adhesive cement, MIL-A-3316, class 1.  The compatible lagging shall then be installed and completely covered with vapor barrier compound, MIL-C-19565, type II.  The water repellent paper may be eliminated on cellular glass where the insulation surface is suitable for the effective application of vapor barrier compound MIL-C-19565.

6.2.2  Application of a vapor barrier is not required on elastomeric foamed plastic insulation, MIL-P-15280, nor is lagging required except in areas where such insulation would be subject to damage.

6.3  Refrigerant insulation.

6.3.1  Cellular glass insulation shall be coated on all surfaces with vapor barrier compound, MIL-C-19565, type II at the time of installation.  Insulation shall be installed with staggered end joints.  On horizontal pipes the longitudinal joints shall be at the top and bottom.  Insulation shall be secured with number 18 gage minimum (0.049-inch diameter) copper-covered steel wire or 1-inch wide tape, UU-T-106, on 9-inch centers.  The compatible lagging shall then be installed and completely covered with vapor barrier compound, MIL-C-19565, type II.

6.3.2  Elastomeric foamed plastic, MIL-P-15280 may be applied in 1/4-inch minimum thickness layers as necessary to build up the required thickness (type II, form 1 or 2).  All longitudinal and butt joints shall be staggered.  All joints and lagging, if required (see 6.2.2), shall be secured with adhesive cement in accordance with paragraph 3.7 of MIL-P-15280.

6.4  Weather deck hot piping insulation.

6.4.1  Calcium silicate or cellular glass insulation for piping exposed to the weather shall be installed as follows:

    (a)  Preliminary preparation of piping.

        (1)  All surfaces to be clean, dry, and free of scale and grease.
        (2)  Fittings, valves, flanges, pipe supporting clamp, and at least 3 inches of adjacent pipe shall be painted as follows:  Apply one coat pretreatment formula 117, MIL-C-15328.  After this coat dries, apply two coats of aluminum paint made by mixing two pounds of aluminum paste, TT-P-320, type II, class B, with each gallon of phenolic varnish.

    (b)  Installation on pipes.
        (1)  The bore, butt ends, and longitudinal joint surfaces of cellular glass insulating material shall be coated not more than 1/16 inch thick with commercial bedding compound, in accordance with MIL-I-19564, at time of

11

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-STD-769C(SHIPS)
15 November 1967

       installation.  Bedding compound is not required with calcium silicate
       pipe covering.
(2) Longitudinal joints on horizontal piping shall be on top and bottom of
     pipe.
(3) Insulation shall be secured tightly to pipe with 1/2-inch wide U.S.
     Standard 22 gage galvanized steel bands on 9-inch centers.  Steel
     bands shall be placed over a layer of fibrous glass tape, MIL-C-20079,
     class c, which has been dipped in the commercial finishing compound in
     accordance with MIL-C-19565 type I.  Steel bands shall be wrapped with
     a layer of masking tape, UU-T-106, type II.
(4) Completely coat insulation with commercial finishing compound, in
     accordance with MIL-C-19565, using about 2 gallons per 100 square feet.
     Wrap on tightly one layer of open weave fibrous glass cloth, HH-C-466,
     or knitted fibrous glass tape, MIL-C-20079, and then apply another
     coating of above-specified finishing compound, using about 4 gallons
     per 100 square feet.  After this coat has set apply a second coat of
     finishing compound using the same quantities.
(5) Where insulation is stopped off on the piping, sufficient mineral wool,
     MIL-I-2818, shall be tightly tied in place with galvanized iron wire
     over a heavy coating of the above-specified commercial bedding com-
     pound, to provide a tapered portion from insulation surface to pipe
     surface.  The ends of the insulation shall be tapered at a 30-degree
     angle with the pipe.  The tapered ends of the insulation shall be
     smoothed with insulation cement in accordance with MIL-C-2861.  The
     cement covered tapered ends, after drying thoroughly, shall be coated
     with approximately a 1/8-inch thick tack coat of end sealing compound
     in accordance with MIL-C-22395.  The sealer compound shall extend onto
     the pipe for at least 3 inches.  A single layer of grade D, class 2,
     asbestos cloth lagging, in accordance with SS-C-466, shall be applied
     over the insulation and secured at longitudinal lap joint with class
     1 adhesive cement in accordance with MIL-C-3316.  The asbestos lagging
     cloth shall be tailored to fit the contour of the ends of the insula-
     tion by cutting and removing wedge-shaped sections of the cloth.  The
     remaining ends of the cloth shall be embedded in the tack coating of
     sealer compound and shall be attached to the pipe with a single 1/2-
     inch wide galvanized steel band.  A 3/16-inch layer (approximately) of
     sealer compound shall be troweled to a smooth finish over the cloth
     covered ends of the assembly.  A smooth finish may be obtained by brush
     coating or hand rubbing the sealer compound with a suitable solvent.
     After 72 hours of drying at ambient temperature, the asbestos cloth of
     the assembly shall be given two brush coats of water- and weather-
     resistant coating compound in accordance with MIL-C-19565.  The water-
     proofing compound shall extend halfway down the tapered ends of the
     assembly.  The waterproofing compound shall be air dried 24 hours be-
     tween applications.
(c) Installation on fittings, flanges, and valves.
  (1) Before applying flange insulation weather deck piping shall be tested
     and secured in the following manner:  After specified tests are
     completed, weather deck piping shall be subjected to alternate
     periods of full operating pressure, allowing pipe to come to maximum
     temperature; and then to zero gage pressure allowing pipe to come to
     ambient temperature.  These cycles shall be repeated a sufficient
     number of times tightening and adjusting flanges where necessary until
     no leaks can be detected.
  (2) Fittings, flanges, and valve covers shall be ship-fabricated from
     sections of molded pipe covering or cellular glass block cemented to-
     gether with adhesive cement, MIL-A-18065, class 1.
  (3) Permanent covers for fittings and valves shall be fitted snugly to
     fittings and adjacent pipe covering using the same materials and methods
     as outlined for pipe covering.  Voids between insulation and fitting
     shall be filled with tightly packed mineral wool, MIL-I-2818.
  (4) Where specified, rigid-type portable flange covers shall extend over the
     adjacent pipe covering 1-1/2 times the thickness of the insulation.
     The two halves of the cover should be coated and lagged separately,
     using the same materials and procedure as outlined for pipe covering.
     The galvanized steel bands used to secure the two halves together and
     to the adjacent pipe covering shall be applied over the lagging and
     then coated with the above-specified finishing compound.

REPRODUCED AT THE NATIONAL ARCHIVES

MIL-STD-769C(SHIPS)
15 November 1967

(d)  Installation around supports and hangers.
   (1)  Remove only enough installation from butt edges to provide a snug fit
        around support brackets or hanger rods.  Fill all voids between in-
        sulation and support with tightly packed mineral wool, MIL-I-2818, to
        within 1/4 inch from insulation surface.  Fill remainder of space
        with end sealing compound in accordance with MIL-C-22395 overlapping
        generously both the support member and the adjacent insulation.  Lag
        and coat with the same method and materials as adjacent piping.

6.5  Metal lagging.  Metal lagging shall be installed with lap joints, secured with
hardened self-tapping screws or metal bands.  Joints shall be arranged in a manner which
will facilitate run-off of impinging liquids.

6.6  Painting.  All cloth and tape laggings shall be painted after installation with
one coat of fire-retardant white paint, TT-P-26, if necessary for appearance.  Elastomeric
foamed plastic insulation MIL-P-15280 shall not be painted except where necessary for
appearance.  (For material and application requirements, see Section 9190-1 of the General
Specifications for Ships of the U.S. Navy or ships specifications.)

7.  NOTES

(Copies of this standard for military use may be obtained as indicated in the foreword
to, or the general provisions of, the Index of Military Specifications and Standards.)

Both the title and the identifying number should be stipulated when requesting copies
of Military Standards.

Preparing activity:
Navy - SH
(Project 5640-N0211)

13

MIL-I-2781E
7 October 1975
SUPERSEDING
MIL-I-2781D
13 June 1963
(See 6.6)

MILITARY SPECIFICATION

INSULATION, PIPE, THERMAL

This specification is approved for use by all Departments and Agencies of the Department of Defense.

1.  SCOPE

1.1  Scope.  This specification covers preformed thermal insulation for use on pipes at surface temperatures up to 1200° Fahrenheit (°F).

2.  APPLICABLE DOCUMENTS

2.1  The following documents, of the issue in effect on date of invitation for bids or request for proposal, form a part of the specification to the extent specified herein.

SPECIFICATIONS

    FEDERAL
        SS-C-160 - Cements, Insulation, Thermal.
        PPP-B-636 - Boxes, Shipping, Fiberboard.

    MILITARY
        MIL-C-2861 - Cement, Insulation, High Temperature.

STANDARDS

    MILITARY
        MIL-STD-105 - Sampling Procedures and Tables for Inspection by Attributes.
        MIL-STD-129 - Marking for Shipment and Storage.
        MIL-STD-769 - Thermal Insulation Requirements for Machinery and Piping.
        MIL-STD-1623 - Fire Performance Requirements and Approved Specifications for
                       Interior Finish Materials and Furnishings (Naval Shipboard
                       Use).

(Copies of specifications, standards, drawings, and publications required by suppliers in connection with specific procurement functions should be obtained from the procuring activity or as directed by the contracting officer.)

2.2  Other publications.  The following documents form a part of this specification to the extent specified herein.  Unless otherwise indicated, the issue in effect on date of invitation for bids or request for proposal shall apply.

    UNIFORM CLASSIFICATION COMMITTEE
        Uniform Freight Classification Rules.

(Application for copies should be addressed to the Uniform Classification Committee, Room 1106, 222 South Riverside Plaza, Chicago, Illinois 60606.)

    NATIONAL MOTOR FREIGHT TRAFFIC ASSOCIATION INCORPORATED, AGENT
        National Motor Freight Classification Rules.

(Application for copies should be addressed to the National Motor Freight Traffic Association, Inc., 1616 P Street, N.W., Washington, D.C. 20036.)

    AMERICAN SOCIETY FOR TESTING AND MATERIALS (ASTM)
        C 302 - Density of Preformed Pipe-Covering-Type Thermal Insulation, Test for.
        C 335 - Thermal Conductivity of Pipe Insulation, Test for.
        C 356 - Linear Shrinkage of Preformed High-Temperature Thermal Insulation
                Subject to Soaking Heat, Test for.
        C 411 - Hot-Surface Performance of High-Temperature Thermal Insulation, Test
                for.
        C 421 - Mechanical Stability of Preformed Thermal Insulation by Tumbling,
                Test for.
        C 446 - Breaking Load and Calculated Modulus of Rupture of Preformed Insula-
                tion for Pipes, Test for.

FSC 5640

MIL-I-2781E

(Application for copies should be addressed to the American Society for Testing and Materials, 1916 Race Street, Philadelphia, Pennsylvania 19103.)

(Technical society and technical association specifications and standards are generally available for reference from libraries. They are also distributed among technical groups and using Federal agencies.)

3.  REQUIREMENTS

3.1  Qualification.  The thermal pipe insulation furnished under this specification shall be products which are qualified for listing on the applicable qualified products list at the time set for opening of bids (see 4.3 and 6.3).

3.2  Material.  The thermal pipe insulation shall be composed of asbestos-free, heat-resisting compounds suitable for the temperature conditions and the purpose intended.  A certification of compliance shall be required (see 6.2.2).

3.3  Form and dimensions.

3.3.1  Form and length.  Thermal pipe insulation in nominal pipe sizes up to and including 10 inches shall be furnished in sections 3 feet long, split in half lengthwise. Pipe insulation for nominal pipe sizes larger than 10 inches may be furnished in semi-cylindrical sections or as curved segments, 3 feet in length.  Each section or segment shall be generally true to shape and roundness and capable of fitting standard iron pipe sizes.  A tolerance of plus or minus 1/4 inch in length will be permitted.

3.3.2  Inner diameter.  The inner diameter of the pipe insulation shall be as specified table I.

Table I - Inner diameter of pipe insulation.

| Pipe size | | Inner diameter[1] | Tolerance | |
|---|---|---|---|---|
| Nominal | Outer diameter | Nominal | Minus | Plus |
| Inches | Inches | Inches | Inch | Inch |
| 1/2 | 0.840 | 0.856 | 0 | |
| 3/4 | 1.050 | 1.066 | 0 | |
| 1 | 1.315 | 1.331 | 0 | 1/16 |
| 1-1/4 | 1.660 | 1.676 | 0 | |
| 1-1/2 | 1.900 | 1.916 | 0 | |
| 2 | 2.375 | 2.406 | 1/64 | |
| 2-1/2 | 2.875 | 2.906 | 1/64 | |
| 3 | 3.500 | 3.531 | 1/64 | |
| 3-1/2 | 4.000 | 4.031 | 1/64 | 3/32 |
| 4 | 4.500 | 4.531 | 1/64 | |
| 4-1/2 | 5.000 | 5.031 | 1/64 | |
| 5 | 5.563 | 5.641 | 1/32 | |
| 6 | 6.625 | 6.703 | 1/32 | |
| 7 | 7.625 | 7.703 | 1/32 | |
| 8 | 8.625 | 8.703 | 1/32 | 3/32 |
| 9 | 9.625 | 9.703 | 1/32 | |
| 10 | 10.750 | 10.828 | 1/32 | |
| 11 | 11.750 | 11.828 | 1/32 | |
| 12 | 12.750 | 12.844 | 3/64 | |
| 14 | 14.000 | 14.094 | 3/64 | 5/32 |
| 15 thru 32 | 0.000 | 0.094 | 3/64 | |
| 33 | 33.000 | 33.094 | 3/64 | |

[1]/Inner diameter measurement shall consist of the average of six readings on each section; three readings of diameter near the ends and at the center of each section in a horizontal direction, and three vertical measurements of leg height multiplied by two.

3.3.3  Thickness.  Pipe insulation shall be furnished in the thickness specified in table II, as specified (see 6.2).  A tolerance of plus 1/8-inch or minus 1/16-inch in actual thickness specified in table II will be permitted.

2

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01505695
2005/5/5 22:10:16 GMT

MIL-I-2781E

Table II - Thickness.

| Pipe size Nominal | Outer diameter | Nominal thickness | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 inch | 1-1/2 inches | 2 inches | 2-1/2 inches [1] | 3 inches [1] | 3-1/2 inches [1] | 4 inches [1] | 4-1/2 inches [1] | 5 inches [1] |
| Inches | Inches | Actual thickness Inches | Actual thickness Inches | Actual thickness Inches | Actual thickness Inches | Actual thickness Inches | Actual thickness Inches | Actual thickness Inches | Actual thickness Inches | Actual thickness Inches |
| 1/2 | 0.840 | 1 | 1- 9/16 | 2- 1/16 | 2- 7/8 | 3- 3/8 | 3- 7/8 | 4- 3/8 | 4-15/16 | 5- 7/16 |
| 3/4 | 1.050 | 7/8 | 1- 7/16 | 1-15/16 | 2- 3/4 | 3- 1/4 | 3- 3/4 | 4- 1/4 | 4-13/16 | 5- 5/16 |
| 1 | 1.315 | 1- 1/16 | 1- 9/16 | 2- 3/32 | 2- 3/8 | 3- 1/8 | 3- 5/8 | 4- 1/8 | 4-11/16 | 5- 3/16 |
| 1-1/4 | 1.660 | 7/8 | 1- 5/8 | 1-29/32 | 2- 7/16 | 2-15/16 | 3- 7/16 | 3-15/16 | 4-17/32 | 5- 1/32 |
| 1-1/2 | 1.900 | 1- 1/2 | 1- 1/2 | 2- 5/16 | 2-13/16 | 3- 5/16 | 3-13/16 | 4- 3/8 | 4-29/32 | 5-13/32 |
| 2 | 2.375 | 1- 1/32 | 1- 9/16 | 2- 3/32 | 2-19/32 | 3- 3/32 | 3-19/32 | 4- 5/32 | 4-21/32 | 5- 5/32 |
| 2-1/2 | 2.875 | 1- 1/32 | 1-27/32 | 2-11/32 | 2-27/32 | 3-11/16 | 3-29/32 | 4-13/32 | 4-29/32 | 5-17/32 |
| 3 | 3.500 | 1 | 1-17/32 | 2- 3/32 | 2-17/32 | 3- 1/32 | 3-19/32 | 4- 3/8 | 4- 3/8 | 5- 7/32 |
| 3-1/2 | 4.000 | 1- 9/32 | 1-17/32 | 2- 1/32 | 2-25/32 | 3-11/32 | 3-19/32 | 4-13/32 | 4-13/32 | 4-31/32 |
| 4 | 4.500 | 1- 1/32 | 1-25/32 | 2- 1/32 | 2-17/32 | 3-11/32 | 3-27/32 | 4- 3/32 | 4- 3/32 | 4-31/32 |
| 4-1/2 | 5.000 | 1- 9/32 | 1- 1/2 | 2- 1/32 | 2-17/32 | 3-11/32 | 3-27/32 | 4- 3/32 | 4- 3/32 | 4-15/32 |
| 5 | 5.563 | 31/32 | 1-15/32 | 2- 9/32 | 2- 9/16 | 3- 1/16 | 3- 9/16 | 4- 3/32 | 4-23/32 | 5- 3/32 |
| 6 | 6.625 | ----- | 1-17/32 | 2- 1/32 | 2-17/32 | 3- 5/32 | 3-21/32 | 4- 3/16 | 4-15/32 | 5- 7/32 |
| 7 | 7.625 | ----- | 1-17/32 | 2- 1/32 | 2-21/32 | 3- 5/32 | 3-21/32 | 4- 5/32 | 4-21/32 | 5- 5/32 |
| 8 | 8.625 | ----- | 1-17/32 | 2- 5/32 | 2-21/32 | 3- 5/32 | 3-21/32 | 4- 5/32 | 4-21/32 | 5- 5/32 |
| 9 | 9.625 | ----- | 1-19/32 | 2- 5/32 | 2-19/32 | 3- 5/32 | 3-21/32 | 4- 5/32 | 4-21/32 | 5- 5/32 |
| 10 | 10.750 | ----- | 1-19/32 | 2- 3/32 | 2-19/32 | 3- 3/16 | 3-19/32 | 4- 3/32 | 4-19/32 | 5- 3/32 |
| 11 | 11.750 | ----- | 1- 9/16 | 2- 3/32 | 2- 9/16 | 3- 1/16 | 3-19/32 | 4- 3/32 | 4-19/32 | 5- 3/32 |
| 12 | 12.750 | ----- | 1- 7/16 | 2- 1/16 | 2- 7/16 | 3- 1/16 | 3-19/32 | 4- 1/16 | 4-19/32 | 5- 3/32 |
| 14 | 14.000 | ----- | 1- 7/16 | 1-15/16 | 2- 7/16 | 2-15/16 | 3- 7/16 | 3-15/16 | 4- 7/16 | 4-15/16 |
| Over 14 up to and including 33 | ---- | ------ | 1- 7/16 | 1-15/16 | 2- 7/16 | 2-15/16 | 3- 7/16 | 3-15/16 | 4- 7/16 | 4-15/16 |

Note: The inner diameter of pipe insulation listed in table I approximates the outer diameter of iron pipe sizes.
The insulation can be applied either to a pipe or as a second layer to a smaller size of pipe insulation.

[1]/ Pipe insulation may be furnished in two layers to form total required thickness in conformance with MIL-STD-769.

MIL-I-2781E

3.4 <u>Physical requirements</u>. Pipe insulation shall conform to the requirements speci-
fied in table III.

Table III - Physical requirements.

| Characteristic | Test paragraph | Physical requirements |
|---|---|---|
| Density average, lb/ft$^3$ maximum | 4.5.2 | 14.0 |
| Thermal conductivity (average) Btu/hr. ft. deg F at mean temperature of: | 4.5.3 | |
| 200°F | | .42 |
| 300°F | | .45 |
| 400°F | | .50 |
| 500°F | | .60 |
| 600°F | | .65 |
| 700°F | | .70 |
| Weight loss by tumbling Loss in weight (average), percent max. | 4.5.4 | |
| After first 10 minutes | | 20 |
| After second 10 minutes | | 40 |
| Modulus of rupture (average), lb/in$^2$ minimum | 4.5.5 | 1/ |
| Changes under soaking heat for 6 hours at 1200°F Linear shrinkage (average) percent, max. | 4.5.6 | 2.0 |

1/ Three times density (lbs/ft$^3$) of the sample tested.

3.5 <u>Simulative service</u>. Thermal pipe insulation shall not warp, crack, or show other
visible changes upon completion of the test specified in 4.5.7. Minor surface cracks on
the hot face surface of the pipe insulation shall be disregarded. Test duration at speci-
fied temperature shall be 30 days.

3.6 <u>Fire resistance and smoke density</u>. The finished material shall conform to the
fire resistance and smoke density requirements set forth in MIL-STD-1623 (see 4.5.8).

3.7 <u>Compatibility</u>. The piping insulation shall be compatible with thermal insulation
cement of SS-C-160 type III, grade F and high temperature thermal cement of MIL-C-2861.
Without the application of a primer, the cements must readily adhere to the insulation
segments and form a smooth, protective surface which will not separate under force of
gravity, vibration, or accidental mechanical force, such as bumping or jarring.

4. QUALITY ASSURANCE PROVISIONS

4.1 <u>Responsibility for inspection</u>. Unless otherwise specified in the contract or
purchase order, the supplier is responsible for the performance of all inspection require-
ments as specified herein. Except as otherwise specified in the contract or order, the
supplier may use his own or any other facilities suitable for the performance of the
inspection requirements specified herein, unless disapproved by the Government. The Govern-
ment reserves the right to perform any of the inspections set forth in the specification
where such inspections are deemed necessary to assure supplies and services conform to
prescribed requirements.

4.2 <u>Classification of inspections</u>. The inspection requirements specified herein are
classified as follows:

(a) Qualification inspection (see 4.3).
(b) Quality conformance inspection (see 4.4).

4.3 <u>Qualification tests</u>. Qualification tests shall be conducted at a laboratory
satisfactory to the Naval Ship Engineering Center. Qualification tests shall consist of
all the tests specified in 4.5.

4.3.1 <u>Sampling for qualification tests</u>. Three samples shall be selected and subjected
to the tests of 4.5.2, 4.5.4, 4.5.5, and 4.5.6; two samples for the tests of 4.5.3 and

4

MIL-I-2781E

4.5.8 and one sample for the test of 4.5.7. The average test results shall be within the limits prescribed in table III and the individual test results shall not exceed these limits by more than 10 percent.

4.4 Quality conformance inspection.

4.4.1 Sampling for quality conformance inspection. For purposes of sampling, an inspection lot shall consist of all pipe insulation of the same form, size, and thickness produced under similar conditions and procured at one time.

4.4.1.1 Examination of the end item. Examination of the end item shall be made in accordance with 4.4.1.1.1 through 4.4.1.1.3. The lot size, for purpose of determining the sample size in accordance with MIL-STD-105, shall be in units of pipe insulation sections or segments (see 4.4.1.1.1 and 4.4.1.1.2) and units of shipping containers (see 4.4.1.1.3).

4.4.1.1.1 Examination of the end item for defects in appearance and workmanship. The sample unit for the following examination shall be one section or segment. The inspection level for determining the sample size shall be level I with an Acceptable Quality Level (AQL) of 2.5 percent defective.

| Category | Defects |
|---|---|
| Critical | None defined |
| Major | |
| 101 | Appearance and workmanship<br>Cracked, broken or damaged. |
| 102 | Crumbly, surface not smooth. |
| 103 | Not true to form or roundness. |
| 104 | Bad edges. |
| 105 | Longitudinal cut surfaces not plane. |
| 106 | Excessive voids. |
| 107 | Warped. |
| 108 | Form<br>Form not as required; not furnished in sections or segments as specified, fail to properly encase pipe of the required diameter. |
| Minor | None defined |

4.4.1.1.2 Examination of the end item for defects in dimensions. The sample unit for the following examination shall be one section or segment. The inspection level for determining the sample size, shall be level I with an AQL of 2.5 percent defective.

| Categories | Defects |
|---|---|
| Critical | None defined |
| Major | |
| 101 | Length<br>Not within limits or tolerance specified or by contract requirement. |
| 102 | Inner diameter<br>Clearance not within specified limits (see footnote under table I). |
| 103 | Size<br>Not within conformance with the simplified dimensional or nesting system. |
| 104 | Thickness<br>Not within specified limits and tolerances. |
| Minor | None defined |

5

MIL-I-2781E

4.4.1.1.3 <u>Examination of preparation for delivery</u>. An examination shall be made to determine that the packing and markings comply with the requirements of section 5 of this specification. The sample unit for the following examination shall be one shipping container, selected just prior to the closing operation. The inspection level for determining the sample size, shall be level I, with an AQL of 2.5 percent defective. Shipping containers, fully prepared for delivery, shall be examined for closure defects.

| Categories | Defects |
|---|---|
| Critical | None defined |
| Major | Packing |
| 101 | Not as specified. |
| 102 | Container not as specified, closures not accomplished by specified or required methods of material. |
| 103 | Any nonconforming component, component missing, damaged or otherwise defective, affecting serviceability. |
| 104 | Inadequate application of components; such as, incomplete closures, inadequate taping of joints, bulged or distorted containers. |
| | Count |
| 105 | Number of sections or segments per container less than specified or indicated quantity. |
| | Weight |
| 106 | Gross or net weight exceeds specified requirements. |
| | Marking |
| 107 | Omitted, illegible, incorrect, incomplete, or not as specified (see 5.2). |
| Minor | None defined |

4.4.2 <u>Sampling for tests</u>. The lot size shall be the number of half sections or segments in the lot. A separate sample size of specimens shall be drawn for each test as specified in table IV. For tests of 4.5.2 and 4.5.5, the size shall be as specified by table IV. For tests of 4.5.4 and 4.5.6, the sample size shall consist of three specimens per lot for lots over 160 and the number of allowable test failures shall be zero. Lot sizes 160 or under shall be as specified in table IV.

Table IV - Sampling for tests.

| Lot size in half section or segments | Sample size = Number of test-specimens for each test (4.5.2 and 4.5.5) | Number of specimen fialures allowed for each test |
|---|---|---|
| Up to 63 | None | -- |
| 64 to 160 | 2 | 0 |
| 161 to 400 | 3 | 0 |
| 401 to 1,000 | 5 | 0 |
| 1,001 to 2,500 | 8 | 0 |
| 2,501 to 6,300 | 13 | 1 |
| 6,301 to 16,000 | 20 | 2 |
| 16,001 to 40,000 | 32 | 3 |

4.4.2.1 <u>Testing of end item</u>. The end item shall be tested for applicable characteristics as specified in table V from each lot presented.

6

Sold to:MCCAFFERY & ASSOCIATES INC. 01505695

MIL-I-2781E

Table V - Instruction for testing.

| Characteristic | Specification reference | | Number determinations per unit | Results reported as |
|---|---|---|---|---|
| | Requirement | Test method | | Numerically to nearest[1] |
| Density | 3.4 | 4.5.2 | 1 | 0.1 lb/ft$^3$ |
| Weight loss by tumbling | 3.4 | 4.5.4 | 1 | 1 percent |
| Modulus or rupture | 3.4 | 4.5.5 | 1 | lb/in$^2$ |
| Changes under soaking heat Linear shrinkage | 3.4 | 4.5.6 | 1 | 0.1 percent |

[1] Test reports shall include all values on which results are based.

4.5  Test procedures.

4.5.1  Conditioning samples.  Test specimens shall be conditioned by drying to constant weight in an oven at a temperature of 215°F to 250°F preceding a test.

4.5.2  Density.  The density shall be determined in accordance with the method specified in ASTM C 302.

4.5.3  Thermal conductivity.  Thermal conductivity shall be determined in accordance with the method specified in ASTM C 335.

4.5.4  Weight loss by tumbling.  Weight loss by tumbling shall be determined in accordance with the method specified in ASTM C 421.

4.5.5  Modulus of rupture.  Modulus of rupture shall be determined in accordance with the method specified in ASTM C 446.

4.5.6  Physical changes after heat soaking.  Specimens shall be weighed and measured. The specimens shall then be placed in an electrically heated oven and subjected to 1200°F for 6 hours for linear shrinkage.  The specimens shall then be removed from the oven, cooled to room temperature, and tested to determine linear shrinkage in accordance with method specified in ASTM C 356.

4.5.7  Simulative preformance.  Simulative preformance shall be determined in accordance with the method specified in ASTM C 411 except the pipe shall be maintained at the specified temperature for 30 days.

4.5.8  Fire resistance and smoke density.  Specimens shall be tested in accordance with test procedures and requirements set forth in MIL-STD-1623.

4.5.9  Compatibility.  A six inch section of pipe insulation, 1-1/2 inches thick, shall be uniformly surface coated while at room temperature, with approximately a 1/4 inch layer of finishing cement in accordance with type III, grade F of SS-C-160.  Drying time under ambient air temperature conditions shall be determined.  This test shall be repeated with a second pipe section using a cement in accordance with MIL-C-2861.  The drying time for this cement shall also be determined.

5.  PREPARATION FOR DELIVERY

(The preparation for delivery requirements specified herein apply only for direct Government procurements.)

5.1  Packing.  Packing shall be level A, B, or C as specified (see 6.2).

5.1.1  Level A.  Pipe insulation shall be packed in containers conforming to class weather-resistant of PPP-B-636, except that limitations on inside dimensions of box shall not apply.  Boxes shall be closed, waterproofed, and reinforced in accordance with method V of the appendix to the box specification.

5.1.2  Level B.  Pipe insulation shall be packed in containers conforming to class domestic of PPP-B-636, except that limitations on inside dimensions of box shall not apply. Box closure shall be in accordance with the appendix to the box specification.

7

MIL-I-2781E

5.1.3  Level C.  Pipe insulation shall be packed in containers, at the lowest rates, in a manner which will insure acceptance by common carrier and will afford protection against physical damage during direct shipment from the supply source to the first receiving activity for immediate use.  This level in general shall conform to the Uniform Freight or National Motor Freight Classification Rules and Regulations or other carrier regulations as applicable to the mode of transportation.

5.2  Marking.  In addition to any special marking required, shipping containers shall be marked in accordance with MIL-STD-129.

5.2.1  Special marking.  Packages and shipping containers shall be marked "ASBESTOS-FREE", (see 6.2.1).

6.  NOTES

6.1  Intended use.  The thermal insulation is to provide for piping operating at surface temperatures up to 1200°F.

6.2  Ordering data.  Procurement documents should specify:

6.2.1  Procurement requirements:

(a)  Title, number, and date of this specification.
(b)  Nominal iron pipe size, and nominal thickness (see 3.3.3).
(c)  Levels of packing required (see 5.1).
(d)  Special marking (see 5.2.1).

6.2.2  Contract data requirements.  When this specification is used in a procurement /voking the data requirement clause of the Armed Services Procurement Regulations (ASPR) ¦ :agraph 7-104.9(n) and which incorporates a DD Form 1423 Contract Data Requirements List (CDRL), the data requirements identified below will be developed as specified in the cited Data Item Description (DID) and delivered in accordance with such CDRL.  When the ASPR provisions are not invoked, the data specified below shall be delivered in accordance with the contract requirements.

| Specification paragraph | Data requirements | Service | Applicable DID | Options |
|---|---|---|---|---|
| 3.2 | Certificate of compliance | SH | DI-E-2121 | --- |

(Copies of DID's required by the supplier in connection with specific procurement functions should be obtained from the procuring activity or as directed by the contracting officer.  Unless otherwise indicated, the issue in effect on date of invitation for bids or request for proposal shall apply.)

6.3  With respect to products requiring qualification, awards will be made only for products which are at the time set for opening of bids, qualified for the inclusion in applicable Qualified Products List QPL-2781 whether or not such products have actually been listed by that date.  The attention of the suppliers is called to this requirement, and manufacturers are urged to arrange to have the products that they propose to offer to the Federal Government tested for qualification in order that they may be eligible to be awarded contracts or orders for the products covered by this specification.  The activity responsible for the Qualified Products List is the Naval Ship Engineering Center, Prince George's Center, Center Building, Hyattsville, Maryland 20782, and information pertaining to qualification of products may be obtained from that activity.  Application for qualification tests shall be made in accordance with "Provisions Governing Qualification SD-6" (see 6.4).

6.4  Copies of "Provisons Governing Qualification SD-6" may be obtained upon application to Commanding Officer, Naval Publications and Forms Center, 5801 Tabor Avenue, Philadelphia, Pennsylvania 19120.

6.5  Grades, classes, and types of MIL-I-2781D were consolidated as end items were identical.

8

Sold to:MCCAFFERY & ASSOCIATES INC. 01505695

MIL-I-2781E

6.6  THE MARGINS OF THIS SPECIFICATION ARE MARKED "‡" TO INDICATE WHERE CHANGES (ADDI-TIONS, MODIFICATIONS, CORRECTIONS, DELETIONS) FROM THE PREVIOUS ISSUE HAVE BEEN MADE.  THIS WAS DONE AS A CONVENIENCE ONLY AND THE GOVERNMENT ASSUMES NO LIABILITY WHATSOEVER FOR ANY INACCURACIES IN THESE NOTATIONS.  BIDDERS AND CONTRACTORS ARE CAUTIONED TO EVALUATE THE REQUIREMENTS OF THIS DOCUMENT BASED ON THE ENTIRE CONTENT IRRESPECTIVE OF THE MARGINAL NOTA-TIONS AND RELATIONSHIP TO THE LAST PREVIOUS ISSUE.

Custodians:
    Army - ME
    Navy - SH
    Air Force - 84

Preparing activity:
    Navy - SH
    (Project 5640-0284)

☆ U. S. GOVERNMENT PRINTING OFFICE, 1975 -603-744/1364

9

MIL-I-2781E
INTERIM AMENDMENT-1(SH)
4 November 1977

## MILITARY SPECIFICATION

### INSULATION, PIPE, THERMAL

This Interim Amendment is issued for use by the Department of the Navy, Naval Ship Engineering Center, with Military Specification MIL-I-2781E, dated 7 October 1975.

### PAGE 4

3.7, add as last sentence:  "Drying time for each cement after application shall not exceed two hours."

### PAGE 7

4.5.9, line 2:  Delete "1/4-inch layer" and substitute:  "1/8-inch layer".

Preparing activity:
Navy - SH
(Project 5640-N048)

☆U.S. GOVERNMENT PRINTING OFFICE: 1977—703-122/6782

FSC 5640

THIS DOCUMENT CONTAINS ___/___ PAGES.

Sold to MCCAFFERY & ASSOCIATES INC, 01505695

MIL-I-2781D
INTERIM AMENDMENT-4(SHIPS)
9 January 1973
SUPERSEDING[1]
INTERIM AMENDMENT-3(SHIPS)
1 March 1971

MILITARY SPECIFICATION

INSULATION, PIPE, THERMAL

This Interim Amendment is issued for use by the Naval Ship Engineering Center with Military Specification MIL-I-2781D dated 13 June 1963.

Page 1

1.2: Under Grade II, delete "Class c - Fibrous"; and Grade III, delete "Class f - Fibrous."

2.2: Delete all reference to "OFFICIAL CLASSIFICATION COMMITTEE" and substitute the following:

"UNIFORM CLASSIFICATION COMMITTEE
    Uniform Freight Classification Rules.

(Application for copies should be addressed to the Uniform Classification Committee, Room 1106, 222 South Riverside Plaza, Chicago, Illinois 60606.)"

Page 2

3.1, Delete and substitute:

"3.1  Qualification.  The thermal pipe insulation furnished under this specification shall be products which are qualified for listing on the applicable qualified products list at the time set for opening of bids (see 4.2 and 6.2)."

3.2, delete and substitute:

"3.2  Material.  The thermal pipe insulation shall be composed of asbestos-free and silica-free heat-resisting compounds suitable for the temperature conditions and the purpose intended."

Page 3

4.1,  Delete and substitute:

"4.1  Responsibility for inspection.  Unless otherwise specified in the contract or purchase order, the supplier is responsible for the performance of all inspection requirements as specified herein.  Except as otherwise specified in the contract or order, the supplier may use his own or any other facilities suitable for the performance of the inspection requirements specified herein, unless disapproved by the Government.  The Government reserves the right to perform any of the inspections set forth in the specification where such inspections are deemed necessary to assure supplies and services conform to prescribed requirements."

4.2, line 2:  Delete "Bureau of Ships" and substitute "Naval Ship Engineering Center".

Footnote 1:  After "Provisions Governing Qualification" add "SD-6".

[1] THE MARGINS OF THIS SPECIFICATION ARE MARKED "#" TO INDICATE WHERE CHANGES (ADDITIONS, MODIFICATIONS, CORRECTIONS, DELETIONS) FROM THE PREVIOUS ISSUE HAVE BEEN MADE.  THIS WAS DONE AS A CONVENIENCE ONLY AND THE GOVERNMENT ASSUMES NO LIABILITY WHATSOEVER FOR ANY INACCURACIES IN THESE NOTATIONS.  BIDDERS AND CONTRACTORS ARE CAUTIONED TO EVALUATE THE REQUIREMENTS OF THIS DOCUMENT BASED ON THE ENTIRE CONTENT IRRESPECTIVE OF THE MARGINAL NOTATIONS AND RELATIONSHIP TO THE LAST PREVIOUS ISSUE.

THIS DOCUMENT CONTAINS 3 PAGES

FSC 5640

MIL-I-2781D
INTERIM AMENDMENT-4(SHIPS)

Page 5

Table III, delete and substitute:

"Table III - Physical requirements.

| Characteristic | Test paragraph | Grade I Class b | Grade II Class d | Grade III Class e Type I | Grade III Class e Type II |
|---|---|---|---|---|---|
| Density average, lbs/cu.ft. maximum | 4.4.2 | 14.0 | 14.0 | 14.0 | 22.0 |
| Thermal conductivity (average) B.t.u. in. hr sq ft °Fahr. at mean temperature of: | 4.4.3 | | | | |
| 200°F. | | .40 | .40 | | |
| 300°F. | | .45 | .45 | | |
| 400°F. | | .50 | .50 | | |
| 500°F. | | --- | --- | .60 | .66 |
| 600°F. | | --- | --- | .65 | .71 |
| 700°F. | | --- | --- | .70 | .76 |
| Weight loss by tumbling | 4.4.4 | | | | |
| Loss in weight (average), percent max. | | | | | |
| After first 10 minutes | | 40 | 40 | 40 | 55 |
| After second 10 minutes | | 70 | 70 | 70 | 80 |
| Modulus of rupture (average), lbs./sq.in., minimum | 4.4.5 | 1/ | 1/ | 1/ | 2/ |
| Changes under soaking heat for 6 hours at °F. | --- | --- | 600 | 750 | 1,200 | 1,200 |
| Linear shrinkage (average) percent, max. | 4.4.6 | 2.0 | 2.0 | 2.0 | 2.0 |

1/ Three times density (lbs. per cu. ft.) of the sample tested.

2/ Two and one-half times density (lbs. per cu. ft.) of the sample tested."

4.3.1.1.1, line 3:  Delete "I" and substitute "II", and delete "4.0 percent" and substitute "2.5 percent".

4.3.1.1.2, line 3:  Delete "L-6" and substitute "II".

Page 6

Table IV, delete and substitute:

"Table IV - Sampling for tests.

| Lot size in half section or segments | Sample size = Number of test specimens for each test (4.4.2, 4.4.4, 4.4.5, 4.4.6) | Number of test failures allowed (each test) |
|---|---|---|
| Up to       63 | None | - |
| 64 to     160 | 2 | 0 |
| 161 to     400 | 3 | 0 |
| 401 to   1,000 | 5 | 0 |
| 1,001 to   2,500 | 8 | 0 |
| 2,501 to   6,300 | 13 | 1 |
| 6,301 to 16,000 | 20 | 2 |
| 16,001 to 40,000 | 32 | 3 |

Page 2 of 3

1870

Provided by IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01505695

MIL-I-2781D
INTERIM AMENDMENT-4 (SHIPS)

Page 7

Table V, delete and substitute:

"Table V - Instruction for testing.

| Characteristic | Specification reference | | Number determinations per unit | Results reported as |
|---|---|---|---|---|
| | Requirement | Test method | | Numerically to nearest[1] |
| Density | 3.4 | 4.4.2 | 1 | 0.1 lb/cu.ft. |
| Weight loss by tumbling | 3.4 | 4.4.4 | 1 | 1 percent |
| Modulus of rupture | 3.4 | 4.4.5 | 1 | p.s.i. |
| Changes under soaking heat | | | | |
| Linear shrinkage | 3.4 | 4.4.6 | 1 | 0.1 percent |

[1] Test reports shall include all values on which results are based."

4.4.6, delete and substitute:

"4.4.6  Physical changes after heat soaking.  Specimens shall be measured.  The speci-
mens shall then be placed in an electrically heated oven and subjected to the maximum speci-
fied temperature, for the respective grade, for 6 hours for linear shrinkage.  The speci-
mens shall then be removed from the oven, cooled to room temperature, and tested to
determine linear shrinkage in accordance with method specified in ASTM C356."

Page 8

6.2 and 6.3:  Delete and substitute:

"6.2  With respect to products requiring qualification, awards will be made only for
products which are at the time set for opening of bids, qualified for inclusion in appli-
cable Qualified Products List QPL 2781 whether or not such products have actually been
listed that date.  The attention of the suppliers is called to this requirement, and
manufacturers are urged to arrange to have the products that they propose to offer to the
Federal Government tested for qualification in order that they may be eligible to be awarded
contracts or orders for the products covered by this specification.  The activity respon-
sible for the Qualified Products List is the Naval Ship Engineering Center, Prince George's
Center, Center Building, Hyattsville, Maryland 20782, and information pertaining to quali-
fication of products may be obtained from that activity.  Application for Qualification
tests shall be made in accordance with "Provisions Governing Qualification SD-6" (see 6.3).

"6.3  Copies of "Provisions Governing Qualification SD-6" may be obtained upon appli-
cation to Commanding Officer, Naval Publications and Forms Center, 5801 Tabor Avenue,
Philadelphia, Pennsylvania 19120."

Add new paragraph 6.4 as follows:

"6.4  Class c and class f have been eliminated from this specification because of
their high asbestos content.  The remaining classes are considered equivalent in per-
formance."

Preparing activity:
Navy - SH
(Project 5640-N029)

☆ U. S. GOVERNMENT PRINTING OFFICE:  1973 -714.541 1528

Page 3 of 3

1871

This document has been approved
for public release and sale; its
distribution is unlimited.

[COPY AVAILABLE]          **BEST COPY AVAILABLE**

MIL-I-2781D
INTERIM AMENDMENT-3 (SHIPS)
1 March 1971

SUPERSEDING[1]/
INTERIM AMENDMENT-2 (SHIPS)
16 July 1965

MILITARY SPECIFICATION

INSULATION, PIPE, THERMAL

This Interim Amendment is issued for use by the Naval Ship Engineering Center with Military Specification MIL-I-2781D dated 13 June 1963.

Page 1

\#   1.2:  Under Grade II, delete "Class c - Fibrous"; and Grade III, delete "Class f - Fibrous."

\#   2.2:  Delete all reference to "OFFICIAL CLASSIFICATION COMMITTEE" and substitute the following:

"UNIFORM CLASSIFICATION COMMITTEE
    Uniform Freight Classification Rules.

(Application for copies should be addressed to the Uniform Classification Committee, 202 Union Station, 516 West Jackson Boulevard, Chicago, Illinois 60606.)"

Page 2

\#   3.1,  Delete and substitute:

"3.1 Qualification.  The thermal pipe insulation furnished under this specification shall be products which are qualified for listing on the applicable qualified products list at the time set for opening of bids (see 4.2 and 6.2)."

Page 3

\#   4.1,  Delete and substitute:

"4.1 Responsibility for inspection.  Unless otherwise specified in the contract or purchase order, the supplier is responsible for the performance of all inspection requirements as specified herein.  Except as otherwise specified in the contract or order, the supplier may use his own or any other facilities suitable for the performance of the inspection requirements specified herein, unless disapproved by the Government.  The Government reserves the right to perform any of the inspections set forth in the specification where such inspections are deemed necessary to assure supplies and services conform to prescribed requirements."

\#   4.2, line 2:  Delete "Bureau of Ships" and substitute "Naval Ship Engineering Center".

\#   Footnote 1:  After "Provisions Governing Qualification" add "SD-6".

[1]/ CHANGES FROM PREVIOUS ISSUE.  THE OUTSIDE MARGINS OF THIS DOCUMENT HAVE BEEN MARKED "=" TO INDICATE WHERE CHANGES (DELETIONS, ADDITIONS, ETC.) FROM THE PREVIOUS ISSUE HAVE BEEN MADE.  THIS HAS BEEN DONE AS A CONVENIENCE ONLY AND THE GOVERNMENT ASSUMES NO LIABILITY WHATSOEVER FOR ANY INACCURACIES IN THESE NOTATIONS.  BIDDERS AND CONTRACTORS ARE CAUTIONED TO EVALUATE THE REQUIREMENTS OF THIS DOCUMENT BASED ON THE ENTIRE CONTENT AS WRITTEN IRRESPECTIVE OF THE MARGINAL NOTATIONS AND RELATIONSHIP TO THE LAST PREVIOUS ISSUE.

**BEST COPY AVAILABLE**          FSC 5640

Provided by IHS
No reproduction or networking permitted without license from IHS   961

Sold to:MCCAFFERY & ASSOCIATES INC, 01505695
2005/5/5 22:45:30 GMT

Table III, delete and substitute:

"Table III - Physical requirements.

| Characteristic | Test paragraph | Grade I Class b | Grade II Class d | Grade III Class e | |
|---|---|---|---|---|---|
| | | | | Type I | Type II |
| Density average, lbs/cu.ft. maximum | 4.4.2 | 14.0 | 14.0 | 14.0 | 22.0 |
| Thermal conductivity (average) B.t.u. in. hr sq ft °Fahr. at mean temperature of: | 4.4.3 | | | | |
| 200°F. | | | | | |
| 300°F. | | .40 | .40 | | |
| 400°F. | | .45 | .45 | | |
| 500°F. | | .50 | .50 | | |
| 600°F. | | --- | --- | .60 | .66 |
| 700°F. | | --- | --- | .65 | .71 |
| | | --- | --- | .70 | .76 |
| Weight loss by tumbling Loss in weight (average), percent max. | 4.4.4 | | | | |
| After first 10 minutes | | 40 | 40 | 40 | 55 |
| After second 10 minutes | | 70 | 70 | 70 | 80 |
| Modulus of rupture (average), lbs./sq.in., minimum | 4.4.5 | 1/ | 1/ | 1/ | 2/ |
| Changes under soaking heat for 6 hours at °F. | --- | 600 | 750 | 1,200 | 1,200 |
| Loss in weight (average), percent max. | 4.4.6 | 18.0 | 12.0 | 12.0 | 4.0 |
| Linear shrinkage (average), percent, max. | 4.4.6 | 2.0 | 2.0 | 2.0 | 2.0 |

1/  Three times density (lbs. per cu. ft.) of the sample tested.
2/  Two and one-half times density (lbs. per cu. ft.) of the sample tested."

4.3.1.1.1, line 3:  Delete "I" and substitute "II", and delete "4.0 percent" and substitute "2.5 percent".

4.3.1.1.2, line 3:  Delete "L-6" and substitute "II".

Page 6

Table IV, delete and substitute:

"Table IV - Sampling for tests.

| Lot size in half section or segments | Sample size = Number of test specimens for each test (4.4.2, 4.4.4, 4.4.5, 4.4.6) | Number of test failures allowed (each test) |
|---|---|---|
| Up to      63 | None | - |
| 64 to     160 | 2 | 0 |
| 161 to     400 | 3 | 0 |
| 401 to   1,000 | 5 | 0 |
| 1,001 to   2,500 | 8 | 0 |
| 2,501 to   6,300 | 13 | 1 |
| 6,301 to  16,000 | 20 | 2 |
| 16,001 to  40,000 | 32 | 3 |"

Page 8

6.2 and 6.3:  Delete and substitute:

"6.2  With respect to products requiring qualification, awards will be made only for products which are at the time set for opening of bids, qualified for inclusion in applicable Qualified Products List QPL 2781 whether or not such products have actually been listed by that date.  The attention of the suppliers is called to this requirement, and

Page 2
of 3 pages

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01505695
2005/5/5 22:45:30 GMT

MIL-I-2781D
INTERIM AMENDMENT-3 (SHIPS)

manufacturers are urged to arrange to have the products that they propose to offer to the Federal Government tested for qualification in order that they may be eligible to be awarded contracts or orders for the products covered by this specification.  The activity responsible for the Qualified Products List is the Naval Ship Engineering Center, Prince George's Center, Center Building, Hyattsville, Maryland 20782, and information pertaining to qualification of products may be obtained from that activity.  Application for Qualification tests shall be made in accordance with "Provisions Governing Qualification SD-6" (see 6.3).

"6.3  Copies of "Provisions Governing Qualification SD-6" may be obtained upon application to Commanding Officer, Naval Publications and Forms Center, 5801 Tabor Avenue, Philadelphia, Pennsylvania 19120."

Add new paragraph 6.4 as follows:

"6.4  Class c and class f have been eliminated from this specification because of their high asbestos content.  The remaining classes are considered equivalent in performance."

Preparing activity:
Navy - SH
(Project 5640-N013)

Provided by IHS
No reproduction or networking permitted without license from IHS

1963

Sold to:MCCAFFERY & ASSOCIATES INC, 01505695
2005/5/5 22:45:30 GMT

9-29-01

MIL-I-2781D
INTERIM AMENDMENT - 2(SHIPS)
16 July 1965
SUPERSEDING
INTERIM AMENDMENT - 1(SHIPS)
10 December 1964

## MILITARY SPECIFICATION

## INSULATION, PIPE, THERMAL

(This interim amendment forms a part of Military Specification
MIL-I-2781D, 13 June 1963.  It was developed by the Department
of the Navy, Bureau of Ships for immediate use pending the
inclusion of its contents in a coordinated document.)

\#      Pages 2 and 3, Table I, last column heading:  Delete "Tolerance"
and substitute "Tolerance 2/"; and add footnote as follows:

"2/ When specified (see 6.1) the allowable tolerance for
grade II, class c and grade III, class f, for pipe
sizes 1/2, 3/4 and 1 inch shall be minus 1/16 inch
plus 0 inch."

Page 5, table III, columns 3 through 8:  Change densities from
"13.0", "15.0", "13.0", "13.0", "20.0" and "20.0" to "14.0", "15.0",
"14.0", "14.0", "22.0" and "20.0", respectively; and column 8,
\#      delete "1/".

Page 5, paragraph 4.3.1.1.1, line 3:  Change "I" to "II" and
"4.0 percent" to "2.5 percent".

Page 5, paragraph 4.3.1.1.2, line 3:  Change "L-6" to "II".

<u>CHANGES FROM PREVIOUS ISSUE</u>.  THE OUTSIDE MARGINS OF THIS DOCUMENT
HAVE BEEN MARKED  "\#"  TO INDICATE WHERE CHANGES (DELETIONS, ADDITIONS, ETC.)
FROM THE PREVIOUS ISSUE HAVE BEEN MADE.  THIS HAS BEEN DONE AS A CONVENIENCE
ONLY AND THE GOVERNMENT ASSUMES NO LIABILITY WHATSOEVER FOR ANY INACCURACIES
IN THESE NOTATIONS.  BIDDERS AND CONTRACTORS ARE CAUTIONED TO EVALUATE THE
REQUIREMENTS OF THIS DOCUMENT BASED ON THE ENTIRE CONTENT AS WRITTEN
IRRESPECTIVE OF THE MARGINAL NOTATIONS AND RELATIONSHIP TO THE LAST PREVIOUS
ISSUE.

FSC 5640

915-)916





Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01505695
2005/5/5 22:45:30 GMT

MIL-I-2781D
INTERIM AMENDMENT - 2(SHIPS)

**Page 6, table IV:  Delete and substitute:**

"Table IV - Sampling for tests.

| Lot size in half section or segments | Sample size = Number of test specimens for each test (4.4.2, 4.4.4, 4.4.5, 4.4.6) | Number of test failures allowed (each test) |
|---|---|---|
| Up to 63 | None | — |
| 64 to 160 | 2 | 0 |
| 161 to 400 | 3 | 0 |
| 401 to 1,000 | 5 | 0 |
| 1,001 to 2,500 | 8 | 0 |
| 2,501 to 6,300 | 13 | 1 |
| 6,301 to 16,000 | 20 | 2 |
| 16,001 to 40,000 | 32 | 3 |

Page 8, paragraph 6.1:  Add:

\#     "(e) Whether modified tolerance is desired (see table I, footnote 2/)."

Preparing activity:
Navy - SH
(Project 5640-N036Sh)

Page 2 of
2 pages

916

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC. 01505695
2005/5/5 22:45:30 GMT

OBSOLETE

MIL-I-2781D
INTERIM AMENDMENT – 1(SHIPS)
10 December 1964

FEB 8 1965

# MILITARY SPECIFICATION

## INSULATION, PIPE, THERMAL

(This interim amendment forms a part of Military Specification MIL-I-2781D, 13 June 1963.  It was developed by the Department of the Navy, Bureau of Ships for immediate use pending the inclusion of its contents in a coordinated document.)

Page 5, table III, columns 3 through 8:  Change densities from "13.0", "15.0", "13.0", "13.0", "20.0" and "20.0" to "14.0", "15.0", "14.0", "14.0", "22.0" and "20.0", respectively.

Page 5, paragraph 4.3.1.1.1, line 3:  Change "I" to "II" and "4.0 percent" to "2.5 percent".

Page 5, paragraph 4.3.1.1.2, line 3:  Change "L-6" to "II".

Page 6, table IV:  Delete and substitute:

"Table IV – Sampling for tests.

| Lot size in half section or segments | Sample size = Number of test specimens for each test (4.4.2, 4.4.4, 4.4.5, 4.4.6) | Number of test failures allowed (each test) |
|---|---|---|
| Up to 63 | None | — |
| 64 to 160 | 2 | 0 |
| 161 to 400 | 3 | 0 |
| 401 to 1,000 | 5 | 0 |
| 1,001 to 2,500 | 8 | 0 |
| 2,501 to 6,300 | 13 | 1 |
| 6,301 to 16,000 | 20 | 2 |
| 16,001 to 40,000 | 32 | 3 |

"

Preparing activity:
  Navy – SH
  (Project 5640-N030Sh)

FSC 5640

MIL-I-2781D
13 June 1963
SUPERSEDING
MIL-I-2781C
15 February 1960

MILITARY SPECIFICATION

INSULATION, PIPE, THERMAL

This specification has been approved by the Department of Defense and is mandatory for use by the Departments of the Army, the Navy, and the Air Force.

1. SCOPE

1.1 Scope.- This specification covers preformed thermal insulation for use on pipes at surface temperatures up to the approximate limits for the grades specified.

1.2 Classification.- Thermal pipe insulation shall be of the following grades, classes and types, as specified (see 6.1):

Grade I - Temperatures up to 600°F.
    Class b - Compounded.
Grade II - Temperatures up to 750°F.
    Class c - Fibrous.
    Class d - Compounded.
Grade III - Temperatures up to 1,200°F.
    Class e - Compounded.
        Type I - Light density.
        Type II - Heavy density.
    Class f - Fibrous.

2. APPLICABLE DOCUMENTS

2.1 The following documents of the issue in effect on date of invitation for bids or request for proposal, form a part of the specification to the extent specified herein.

SPECIFICATIONS

    FEDERAL
        PPP-B-636 - Box, Fiberboard.

STANDARDS

    MILITARY
        MIL-STD-105 - Sampling Procedures and Tables for Inspection by Attributes.
        MIL-STD-129 - Marking for Shipment and Storage.

(Copies of specifications, standards, drawings, and publications required by suppliers in connection with specific procurement functions should be obtained from the procuring activity or as directed by the contracting officer.)

2.2 Other publications.- The following documents form a part of this specification to the extent specified herein. Unless otherwise indicated, the issue in effect on date of invitation for bids or request for proposal shall apply.

    OFFICIAL CLASSIFICATION COMMITTEE
        Uniform Freight Classification Rules.

(Application for copies should be addressed to the Official Classification Committee, 1 Park Avenue at 33rd Street, New York 16, N. Y.)

FSC 5640



Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01505695
2005/5/5 22:45:30 GMT

MIL-I-2781D

AMERICAN SOCIETY FOR TESTING AND MATERIALS

C302 - Density of Preformed Pipe Covering-Type Thermal Insulation, Method of Test for.
C335 - Thermal Conductivity of Pipe Insulation, Tentative Method of Test for.
C446 - Breaking Strength and Calculated Modulus of Rupture of Preformed Insulation for Pipes, Tentative Method of Test for.
C356 - Linear Shrinkage of Preformed High Temperature Thermal Insulation Subject to Soaking Heat, Method of Test for.
C411 - Hot Surface Performance of High Temperature Thermal Insulation, Method of Test for.
C421 - Weight Loss by Tumbling of Preformed Insulation, Method of Test for.

(Application for copies should be addressed to the American Society for Testing and Materials, 1916 Race Street, Philadelphia 3, Pennsylvania.)

(Technical society and technical association specifications and standards are generally available for reference from libraries. They are also distributed among technical groups and using Federal agencies.)

3. REQUIREMENTS

3.1 Qualification.- The thermal pipe insulation furnished under this specification shall be a product which has been tested and has passed the qualification tests specified herein and has been listed on or approved for listing on the applicable qualified products list.

3.2 Material.- The thermal pipe insulation shall be composed of heat-resisting compounds suitable for the temperature conditions and the purpose intended.

3.3 Form and dimensions.-

3.3.1 Form and length.- Thermal pipe insulation in nominal pipe sizes up to and including 10 inches shall be furnished in sections 3 feet long, split in half lengthwise. Pipe insulation for nominal pipe sizes larger than 10 inches may be furnished in semi-cylindrical sections or as curved segments, 3 feet in length. Each section or segment shall be generally true to shape and roundness and capable of fitting standard iron pipe sizes. A tolerance of plus or minus 1/8 inch in length will be permitted.

3.3.2 Inner diameter.- The inner diameter of the pipe insulation shall be as specified in table 1.

Table I - Inner diameter of pipe insulation

| Pipe size | | Inner diameter[1] | Tolerance | |
|---|---|---|---|---|
| Nominal | Outer diameter | Nominal | Minus | Plus |
| Inches | Inches | Inches | Inch | Inch |
| 1/2 | 0.840 | 0.856 | 0 | |
| 3/4 | 1.050 | 1.066 | 0 | |
| 1 | 1.315 | 1.331 | 0 | 1/16 |
| 1-1/4 | 1.660 | 1.676 | 0 | |
| 1-1/2 | 1.900 | 1.916 | 0 | |
| 2 | 2.375 | 2.406 | 1/64 | |
| 2-1/2 | 2.875 | 2.906 | 1/64 | |
| 3 | 3.500 | 3.531 | 1/64 | |
| 3-1/2 | 4.000 | 4.031 | 1/64 | 3/32 |
| 4 | 4.500 | 4.531 | 1/64 | |
| 4-1/2 | 5.000 | 5.031 | 1/64 | |
| 5 | 5.563 | 5.641 | 1/32 | |
| 6 | 6.625 | 6.703 | 1/32 | |
| 7 | 7.625 | 7.703 | 1/32 | |
| 8 | 8.625 | 8.703 | 1/32 | 3/32 |
| 9 | 9.625 | 9.703 | 1/32 | |
| 10 | 10.750 | 10.828 | 1/32 | |
| 11 | 11.750 | 11.828 | 1/32 | |
| 12 | 12.750 | 12.844 | 3/64 | |

2

1873

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01505695
2005/5/5 22:45:30 GMT

MIL-I-2781D

Table I - Inner diameter of pipe insulation (Cont'd.)

| Pipe size | | Inner diameter[1] | Tolerance | |
|---|---|---|---|---|
| Nominal | Outer diameter | Nominal | Minus | Plus |
| Inches | Inches | Inches | Inch | Inch |
| 14 | 14.000 | 14.094 | 3/64 | |
| 15 | 15.000 | 15.094 | 3/64 | |
| 16 | 16.000 | 16.094 | 3/64 | 5/32 |
| 17 | 17.000 | 17.094 | 3/64 | |
| 18 | 18.000 | 18.094 | 3/64 | |
| 19 thru 32 | .000 | .094 | 3/64 | |
| 33 | 33.000 | 33.094 | 3/64 | |

1/ Inner diameter measurement shall consist of the average of six readings on each section; three readings of diameter near the ends and at the center of each section in a horizontal direction, and three vertical measurements of leg height multiplied by two.

3.3.3  Thickness.- Pipe insulation shall be furnished in the thickness specified in table II, as specified (see 6.1). A tolerance of plus 1/8-inch or minus 1/16-inch in actual thicknesses specified in table II will be permitted.

3.4  Physical requirements.- Pipe insulation shall conform to the requirements specified in table III.

3.5  Simulative service.- Thermal pipe insulation shall not warp, crack, or show other visible changes upon completion of the test specified in 4.4.7. Minor surface cracks on the hot face surface of the pipe insulation shall be disregarded.

3.6  Workmanship.- The thermal pipe insulation shall not have visual defects that will adversely affect its serviceability.

4. QUALITY ASSURANCE PROVISIONS

4.1  Responsibility for inspection.- Unless otherwise specified in the contract or purchase order, the supplier is responsible for the performance of all inspection requirements as specified herein. Except as otherwise specified, the supplier may utilize his own facilities or any commercial laboratory acceptable to the Government. The Government reserves the right to perform any of the inspections set forth in the specification where such inspections are deemed necessary to assure supplies and services conform to prescribed requirements.

4.2  Qualification tests[1].- Qualification tests shall be conducted at a laboratory satisfactory to the Bureau of Ships. Qualification tests shall consist of the tests specified in 4.4.

4.2.1  Sampling for qualification tests.- Three samples shall be selected and subjected to the test of 4.4.2, 4.4.4, 4.4.5, 4.4.6; two samples for the test of 4.4.3 and one sample for the test of 4.4.7. The average test results shall be within the limits prescribed in table III and the individual test results shall not exceed these limits by more than 10 percent.

4.3  Sampling for quality conformance inspection.- For purposes of sampling, an inspection lot shall consist of all pipe insulation of the same grade, class, type, form, size and thickness offered for delivery at one time.

4.3.1  Inspection of end item.-

4.3.1.1  Examination of the end item.- Examination of the end item shall be made in accordance with 4.3.1.1.1 through 4.3.1.1.3. The lot size, for purpose of determining the sample size in accordance with MIL-STD-105, shall be in units of pipe insulation sections or segments (see 4.3.1.1.1 and 4.3.1.1.2) and units of shipping containers (see 4.3.1.1.3).

Application for Qualification tests shall be made in accordance with "Provisions Governing Qualification" (see 6.2 and 6.3).

3

1874

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01505695
2005/5/5 22:45:30 GMT

MIL-I-2781D

## Table II - Thickness

| Pipe size | | Nominal thickness | | | | | | | | |
| Nominal | Outer diameter | 1 inch | 1-1/2 inches | 2 inches | 2-1/2 inches[1] | 3 inches[1] | 3-1/2 inches[1] | 4 inches[1] | 4-1/2 inches[1] | 5 inches[1] |
| Inches | Inches | Actual thickness Inches | Actual thickness Inches | Actual thickness Inches | Actual thickness Inches | Actual thickness Inches | Actual thickness Inches | Actual thickness Inches | Actual thickness Inches | Actual thickness Inches |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/2 | 0.840 | 1 | 1-9/16 | 2-1/16 | 2-7/8 | 3-3/8 | 3-7/8 | 4-3/8 | 4-15/16 | 5-7/16 |
| 3/4 | 1.050 | 7/8 | 1-7/16 | 1-15/16 | 2-3/4 | 3-1/4 | 3-3/4 | 4-1/4 | 4-13/16 | 5-5/16 |
| 1 | 1.315 | 1-1/16 | 1-1/16 | 2-3/32 | 2-5/8 | 3-1/8 | 3-5/8 | 4-1/8 | 4-11/16 | 5-3/16 |
| 1-1/4 | 1.660 | 7/8 | 1-9/16 | 1-29/32 | 2-7/16 | 2-15/16 | 3-7/16 | 3-15/16 | 4-17/32 | 5-1/32 |
| 1-1/2 | 1.900 | 1 | 1-5/8 | 2-5/16 | 2-13/16 | 3-5/16 | 3-13/16 | 4-3/8 | 4-29/32 | 5-13/32 |
| 2 | 2.375 | 1-1/32 | 1-1/2 | 2-3/32 | 2-19/32 | 3-3/32 | 3-19/32 | 4-5/32 | 4-21/32 | 5-5/32 |
| 2-1/2 | 2.875 | 1-1/32 | 1-9/16 | 2-11/32 | 2-27/32 | 3-11/32 | 3-29/32 | 4-13/32 | 4-29/32 | 5-17/32 |
| 3 | 3.500 | 1 | 1-27/32 | 2-1/32 | 2-17/32 | 3-1/32 | 3-19/32 | 4-3/32 | 4-19/32 | 5-7/32 |
| 3-1/2 | 4.000 | 1-9/32 | 1-1/32 | 2-9/32 | 2-17/32 | 3-11/32 | 3-19/32 | 4-11/32 | 4-11/32 | 5-7/32 |
| 4 | 4.500 | 1-1/32 | 1-17/32 | 2-1/32 | 2-25/32 | 3-3/32 | 3-27/32 | 4-3/32 | 4-23/32 | 4-31/32 |
| 4-1/2 | 5.000 | 1-9/32 | 1-25/32 | 2-9/32 | 2-17/32 | 3-3/32 | 3-19/32 | 4-15/32 | 4-15/32 | 5-7/32 |
| 5 | 5.563 | 1 | 1-17/32 | 2 | 2-27/32 | 3-11/32 | 3-27/32 | 4-3/16 | 4-3/16 | 5-5/32 |
| 6 | 6.625 | 31/32 | 1-17/32 | 2-1/32 | 2-9/16 | 3-1/32 | 3-9/16 | 4-5/32 | 4-21/32 | 5-5/32 |
| 7 | 7.625 | --- | 1-1/2 | 2-1/32 | 2-17/32 | 3-1/32 | 3-21/32 | 4-5/32 | 4-21/32 | 5-5/32 |
| 8 | 8.625 | --- | 1-15/32 | 2-1/32 | 2-17/32 | 3-5/32 | 3-21/32 | 4-5/32 | 4-21/32 | 5-3/32 |
| 9 | 9.625 | --- | 1-17/32 | 2-3/32 | 2-21/32 | 3-5/32 | 3-21/32 | 4-5/32 | 4-21/32 | 5-3/32 |
| 10 | 10.750 | --- | 1-17/32 | 2-3/32 | 2-19/32 | 3-3/32 | 3-19/32 | 4-3/32 | 4-19/32 | 5-3/32 |
| 11 | 11.750 | --- | 1-19/32 | 2-3/32 | 2-9/16 | 3-3/32 | 3-19/32 | 4-3/32 | 4-19/32 | 5-3/32 |
| 12 | 12.750 | --- | 1-19/32 | 2-1/16 | 2-9/16 | 3-1/16 | 3-9/16 | 4-1/16 | 4-19/32 | 5-3/32 |
| 14 | 14.000 | --- | 1-9/16 | 1-15/16 | 2-7/16 | 2-15/16 | 3-7/16 | 3-15/16 | 4-7/16 | 4-15/16 |
| Over 14 up to and including 33 | --- | --- | 1-7/16 | 1-15/16 | 2-7/16 | 2-15/16 | 3-7/16 | 3-15/16 | 4-7/16 | 4-15/16 |

Note.- The inner diameter of pipe insulation listed in table I approximates the outer diameter of iron pipe sizes.  The insulation can be applied either to a pipe or as a second layer to a smaller size of pipe insulation.

1/ Pipe insulation may be furnished in two layers to form total required thickness where the nominal thickness required is in excess of 2 inches.

4

1875

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC. 01505695
2005/5/5 22:45:30 GMT

MIL-I-2781D

Table III - Physical requirements

| Characteristic | Test paragraph | Grade I | Grade II | | Grade III | | |
|---|---|---|---|---|---|---|---|
| | | Class b | Class c | Class d | Class e | | Class f |
| | | | | | Type I | Type II | |
| Density average, lbs/cu. ft. maximum | 4.4.2 | 13.0 | 15.0 | 13.0 | 13.0 | 20.0 | 20.0 |
| Thermal conductivity (average) B.t.u. in. hr sq ft °Fahr. at mean temperature of: | 4.4.3 | | | | | | |
| 200°F. | | .40 | .40 | .40 | | | |
| 300°F. | | .45 | .45 | .45 | | | |
| 400°F. | | .50 | .50 | .50 | | | |
| 500°F. | | --- | --- | --- | .60 | .66 | .60 |
| 600°F. | | --- | --- | --- | .65 | .71 | .65 |
| 700°F. | | --- | --- | --- | .70 | .76 | .70 |
| Weight loss by tumbling Loss in weight (average), percent max. | 4.4.4 | | | | | | |
| After first 10 minutes | | 40 | --- | 40 | 40 | 55 | --- |
| After second 10 minutes | | 70 | --- | 70 | 70 | 80 | --- |
| Modulus of rupture (average), lbs./sq. in., minimum | 4.4.5 | 1/ | --- | 1/ | 1/ | 2/ | 1/ |
| Changes under soaking heat for 6 hours at °F. | --- | 600 | 750 | 750 | 1,200 | 1,200 | 1,200 |
| Loss in weight (average), percent, max. | 4.4.6 | 18.0 | 6.0 | 12.0 | 12.0 | 16.0 | 6.0 |
| Linear shrinkage (average), percent, max. | 4.4.6 | 2.0 | 1.0 | 2.0 | 2.0 | 2.0 | 1.0 |

1/ Three times density (lbs. per cu. ft.) of the sample tested.
2/ Two and one-half times density (lbs. per cu. ft.) of the sample tested.

4.3.1.1.1 Examination of the end item for defects in appearance and workmanship.- The sample unit for the following examination shall be one section or segment. The Inspection Level for determining the sample size shall be I, with an Acceptable Quality Level (AQL) of 4.0 percent defective.

| Examination | Defect |
|---|---|
| Appearance and workmanship | Cracked, broken or damaged |
| | Crumbly, surface not smooth |
| | Not true to form or roundness |
| | Bad edges |
| | Longitudinal cut surfaces not plane |
| | Excessive voids |
| | Warped |
| Classification | Grade, class and type when applicable not as specified |
| Form | Form not as required; not furnished in sections or segments as specified, fail to properly encase pipe of the required diameter. |

4.3.1.1.2 Examination of the end item for defects in dimensions.- The sample unit for the following examination shall be one section of segment. The Inspection Level for determining the sample size, shall be L-6, with an Acceptable Quality Level (AQL) of 2.5 percent defective.

| Examination | Defects |
|---|---|
| Length | Not within limits or tolerance specified, or by contract requirement. |

1876

5

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC. 01505695
2005/5/5 22:45:30 GMT

MIL-I-2781D

| Examination | Defects |
|---|---|
| Inner diameter | Clearance not within specified limits (see foot-note under table I). |
| Size | Not within conformance with the simplified dimensional or nesting system. |
| Thickness | Not within specified limits and tolerances. |

4.3.1.1.3  Examination of preparation for delivery.- An examination shall be made to determine that the packing and markings comply with the requirements of Section 5 of this specification. The sample unit for the following examination shall be one shipping container, selected just prior to the closing operation. The Inspection Level for determining the sample size, shall be Level I, with an Acceptable Quality Level of 2.5 percent defective. Shipping containers, fully prepared for delivery, shall be examined for closure defects.

| Examination | Defects |
|---|---|
| Packing | Not as specified. |
|  | Container not as specified, closures not accomplished by specified or required methods of material. |
|  | Any nonconforming component, component missing, damaged or otherwise defective, affecting serviceability. |
|  | Inadequate application of components; such as, incomplete closures, inadequate taping of joints, bulged or distorted containers. |
| Count | Number of sections or segments per container less than specified or indicated quantity. |
| Weight | Gross or net weight exceeds specified requirements. |
| Markings | Omitted, illegible, incorrect, incomplete, or not as specified (see 5.3). |

4.3.2  Sampling for tests.- The lot size shall be the weight of the lot in pounds. The sample size shall be the number of sets of tests, that is, the number of specimens subjected to each test (see table IV).

Table IV - Sampling for tests

| Lot size pounds | Sample size = Number of test specimens for each test (4.4.2, 4.4.4, 4.4.5 and 4.4.6) |
|---|---|
| Up to 40 | None |
| 41 to 180 | 2 |
| 181 to 500 | 3 |
| 501 to 800 | 5 |
| 801 to 1300 | 7 |
| 1301 to 3200 | 10 |
| 3201 to 8000 | 15 |
| 8001 to 20,000 | 25 |
| 20,001 to 50,000 | 35 |

4.3.2.1  Testing of end item.- The end item shall be tested for applicable characteristics as specified in table V from each lot presented for examination for each grade, class, type, and form of insulation. The sample unit shall be one section or segment. Samples shall be selected throughout the lot (see table IV). If any specimen fails in any test, this shall be cause for rejection of the lot.

6

1877

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC. 01505695
2005/5/5 22:45:30 GMT

MIL-I-2781D

Table V - Instruction for testing

| Characteristic | Specification reference | | Number determinations per unit | Results reported as |
|---|---|---|---|---|
| | Requirement | Test method | | Numerically to nearest[1] |
| Density | 3.4 | 4.4.2 | 1 | 0.1 lb/cu. ft. |
| Weight loss by tumbling | 3.4 | 4.4.4 | 1 | 1 percent |
| Modulus of rupture | 3.4 | 4.4.5 | 1 | p.s.i. |
| Changes under soaking heat | | | 1 | |
| Loss in weight | 3.4 | 4.4.6 | 1 | 0.1 percent |
| Linear shrinkage | 3.4 | 4.4.6 | 1 | 0.1 percent |

[1]/Test reports shall include all values on which results are based.

4.4  Test procedures.-

4.4.1  Conditioning samples.-  Test specimens shall be conditioned by drying to constant weight in an oven at a temperature of 215 to 250°F. preceding a test.

4.4.2  Density.-  The density shall be determined in accordance with the method specified in ASTM C302.

4.4.3  Thermal conductivity.-  Thermal conductivity shall be determined in accordance with the method specified in ASTM C335.

4.4.4  Weight loss by tumbling.-  Weight loss by tumbling shall be determined in accordance with the method specified in ASTM C421.

4.4.5  Modulus of rupture.-  Modulus of rupture shall be determined in accordance with the method specified in ASTM C446.

4.4.6  Physical changes after heat soaking.-  Specimens shall be weighed and measured. The specimens shall then be placed in an electrically heated oven and subjected to the maximum specified temperature, for the respective grade, for 6 hours for loss in weight and linear shrinkage. The specimens shall then be removed from the oven, cooled to room temperature, and tested to determine loss in weight, and linear shrinkage in accordance with method specified in ASTM C356.

4.4.7  Simulative service.-  Simulative service shall be determined in accordance with the method specified in ASTM C411. The pipe shall be maintained at the maximum temperature for the respective grade for 30 days.

5.  PREPARATION FOR DELIVERY

5.1  Packing.-  Packing shall be Level A, B or C as specified (see 6.1).

5.1.1  Level A.-  Pipe insulation, packaged as specified (see 6.1), shall be packed in containers conforming to class 2 of PPP-B-636, except that limitations on inside dimensions of box shall not apply. All corners and edge seams, and manufacturer's joint shall be waterproofed in accordance with the Appendix to PPP-B-636.

5.1.2  Level B.-  Pipe insulation, packaged as specified (see 6.1), shall be packed in containers conforming to class 1 of PPP-B-636, except that limitations on inside dimensions of box shall not apply.

5.1.3  Level C.-  Pipe insulation, packaged as specified (see 6.1), shall be packed in containers, at the lowest rates, in a manner which will insure acceptance by common carrier and will afford protection against physical damage during direct shipment from the supply source to the first receiving activity for immediate use. This level in general shall conform to the Uniform Freight Classification Rules and Regulations or other carrier regulations as applicable to the mode of transportation and may be the supplier's commercial practice when such meets the requirements of this level.

1878       ))

7

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC. 01505695
2005/5/5 22:45:30 GMT

MIL-I-2781D

5.2 <u>Marking</u>.- In addition to any special marking required, shipping containers shall be marked in accordance with MIL-STD-129.

6. NOTES

6.1 <u>Ordering data</u>.- Procurement documents should specify the following:

    (a) Title, number, and date of this specification.
    (b) Grade, and if applicable, class and type required (see 1.2).
    (c) Nominal iron pipe size, and nominal thickness (3.4.3).
    (d) Levels of packing required (see 5.1).

6.2 With respect to products requiring qualification, awards will be made only for such products as have, prior to the time set for opening of bids, been tested and approved for inclusion in Qualified Products List QPL 2781, whether or not such products have actually been so listed by that date. The attention of the suppliers is called to this requirement, and manufacturers are urged to arrange to have the products that they propose to offer to the Federal Government tested for qualification, in order that they may be eligible to be awarded contracts or orders for the products covered by this specification. The activity responsible for the qualified products list is the Bureau of Ships, Department of the Navy, Washington 25, D. C., and information pertaining to qualification of products may be obtained from that activity. Application for Qualification tests shall be made in accordance with "Provisions Governing Qualification" (see 6.3).

6.3 Copies of "Provisions Governing Qualification" may be obtained upon application to Commanding Officer, Naval Supply Depot, 5801 Tabor Avenue, Philadelphia 20, Pennsylvania.

Custodians:
  Army - MO
  Navy - Ships
  Air Force - MOA

Preparing activity:
  Navy - Ships
  (Project 5640-0074)

8

1879

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01505695
2005/5/5 22:45:30 GMT

H 29 01

QPL-2781-39
7 August 1973
SUPERSEDING
QPL-2781-38
3 May 1973

QUALIFICATIONS VALIDATED
AUGUST 1972

## QUALIFIED PRODUCTS LIST

### OF

### PRODUCTS QUALIFIED UNDER MILITARY SPECIFICATION

#### MIL-I-2781

FSC 5640

#### INSULATION, PIPE, THERMAL

This list has been prepared for use by or for the Government in the procurement of products covered by the subject specification and such listing of a product is not intended to and does not connote indorsement of the product by the Department of Defense. All products listed herein have been qualified under the requirements for the product as specified in the latest effective issue of the applicable specification. This list is subject to change without notice; revision or amendment of this list will be issued as necessary. The listing of a product does not release the supplier from compliance with the specification requirements.

THE ACTIVITY RESPONSIBLE FOR THIS QUALIFIED PRODUCTS LIST IS THE NAVAL SHIP ENGINEERING CENTER.

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST OR QUALIFICATION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| Grade I | | | |
| Class b | New Careytemp 1500 Cylindrical & Segmental Pipe Insulation | Philip Carey Test Rpts. #CRL-1 and #CRL-1a | Celotex Corporation Div. of Jim Walter Corp. 1500 N. Dale Mabry Hwy. Tampa, FL 33622 Plant: 320 S. Wayne Ave. Cincinnati, OH |
| Class b | Pabco Super Caltemp Type 1200 NA | EES 010078 & Fibreboard Corp. Rpt. dtd. 5/23/72 | Fibreboard Corp. Pabco Industrial Products Div. 55 Francisco St. San Francisco, CA 94106 Plant: Emeryville, CA |
| Class b | Thermo-12 | Colorado School of Mines Research Institute Rpt. A21201 & Dynatech Corp. Rpt. JNM-11(b) | Johns-Manville Corp. Government Dept. P.O. Box 5108 Greenwood Plaza Denver, CO 80217 Plant: North Main St. Manville, NJ |
| Class b | Thermasil | EES 610245 | Keene Corp. Ceiling & Insulation Div. U.S. Route 1 Princeton, NJ 08540 Plant: Valley Forge, PA |
| Class b | Kaylo 10AF | Owens-Corning Rpt. 39948-2 | Owens-Corning Fiberglas Corp. Fiberglas Tower Toledo, OH 43601 Plant: Berlin, NJ |

1 of 3

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC. 01588272
2006/7/18 22:14:39 GMT

QPL-2781

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST OR QUALIFICATION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| **Grade II** | | | |
| Class d | New Careytemp 1500 Cylindrical & Segmental Pipe Insulation | Philip Carey Test Rpts. #CRL-1 & #CRL-1a | Celotex Corporation Div. of Jim Walter Corp. 1500 N. Dale Mabry Hwy. Tampa, FL 33622 Plant: 320 S. Wayne Ave. Cincinnati, OH |
| Class d | Pabco Super Caltemp Type 1200NA | EES 010078 and Fibreboard Corp. Rpt. dtd. 5/23/72 | Fibreboard Corp. Pabco Industrial Products Div. 55 Francisco St. San Francisco, CA 94106 Plant: Emeryville, CA |
| Class d | Thermo-12 | Colorado School of Mines Research Institute Rpt. A21201 & Dynatech Corp. Rpt. JNM-11(b) | Johns-Manville Corp. Government Dept. P.O. Box 5108 Greenwood Plaza Denver, CO 80217 Plant: North Main St. Manville, NJ |
| Class d | Thermasil | EES 610245 | Keene Corp. Ceiling & Insulation Div. U.S. Route 1 Princeton, NJ 08540 Plant: Valley Forge, PA |
| Class d | Kaylo 10AF | Owens-Corning Rpt. 39948-2 | Owens-Corning Fiberglas Corp. Fiberglas Tower Toledo, OH 43601 Plant: Berlin, NJ |
| **Grade III** | | | |
| Class e Type I | New Careytemp 1500 Cylindrical & Segmental Pipe Insulation | Philip Carey Test Rpts. #CRL-1 & #CRL-1a | Celotex Corporation Div. of Jim Walter Corp. 1500 N. Dale Mabry Hwy. Tampa, FL 33622 Plant: 320 S. Wayne Ave. Cincinnati, OH |
| Type II | New Careytemp 1500 Cylindrical & Segmental Pipe Insulation | Philip Carey Test Rpts. #CRL-1 & #CRL-1a | Celotex Corporation Div. of Jim Walter Corp. 1500 N. Dale Mabry Hwy. Tampa, FL 33622 Plant: 320 S. Wayne Ave. Cincinnati, OH |
| Type I | Pabco Super Caltemp Type 1200NA | EES 010078 and Fibreboard Corp. Rpt. dtd. 5/23/72 | Fibreboard Corp. Pabco Industrial Products Div. 55 Francisco St. San Francisco, CA 94106 Plant: Emeryville, CA |
| Type II | Pabco Super Caltemp Type 1200NA | EES 610551 and Fibreboard Corp. Rpt. dtd. 5/23/72 | Fibreboard Corp. Pabco Industrial Products Div. 55 Francisco St. San Francisco, CA 94106 Plant: Emeryville, CA |

2 of 3

744

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01588272
2006/7/18 22:14:39 GMT

QPL-2781

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST OR QUALIFICATION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| Grade III | | | |
| Class e<br>Type I | Thermo-12 | Colorado School of Mines Research Institute Rpt. A21201 & Dynatech Corp. Rpt. JNM-11(b) | Johns-Manville Corp.<br>Government Dept.<br>P.O. Box 5108<br>Greenwood Plaza<br>Denver, CO 80217<br>Plant:  North Main St.<br>        Manville, NJ |
| Type II | Thermo-12 | Colorado School of Mines Research Institute Rpt. A21201 & Dynatech Corp. Rpt. NJM-11(b) | Johns-Manville Corp.<br>Government Dept.<br>P.O. Box 5108<br>Greenwood Plaza<br>Denver, CO 80217<br>Plant:  North Main St.<br>        Manville, NJ |
| Type I | Thermasil | EES 610245 | Keene Corp.<br>Ceiling & Insulation Div.<br>U.S. Route 1<br>Princeton, NJ 08540<br>Plant:  Valley Forge, PA |
| Type II | Thermasil | EES 610245 | Keene Corp.<br>Ceiling & Insulation Div.<br>U.S. Route 1<br>Princeton, NJ 08540<br>Plant:  Valley Forge, PA |
| Type I | Kaylo 10AF | Owens-Corning Rpt. 39948-2 | Owens-Corning Fiberglas Corp.<br>Fiberglas Tower<br>Toledo, OH 43601<br>Plant:  Berlin, NJ |

**3 of 3**

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01588272
2006/7/18 22:14:39 GMT

QPL-2781-37
1 August 1972
SUPERSEDING
QPL-2781-36
27 May 1969

QUALIFICATIONS VALIDATED
AUGUST 1972

QUALIFIED PRODUCTS LIST

OF

PRODUCTS QUALIFIED UNDER MILITARY SPECIFICATION

MIL-I-2781

FSC 5640

INSULATION, PIPE, THERMAL

This list has been prepared for use by or for the Government in the procurement of products covered by the subject specification and such listing of a product is not intended to and does not connote indorsement of the product by the Department of Defense. All products listed herein have been qualified under the requirements for the product as specified in the latest effective issue of the applicable specification. This list is subject to change without notice; revision or amendment of this list will be issued as necessary. The listing of a product does not release the supplier from compliance with the specification requirements.

THE ACTIVITY RESPONSIBLE FOR THIS QUALIFIED PRODUCTS LIST IS THE NAVAL SHIP ENGINEERING CENTER.

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST OR QUALIFICATION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| Grade I | | | |
| Class b | New Careytemp 1500 Cylindrical & Segmental Pipe Insulation | Philip Carey Test Rpts. #CRL-1 and #CRL-1a | Philip Carey Corp. Div. Panacon Corp. 320 S. Wayne Ave. Cincinnati, OH 45215 Plant: Same address |
| Class b | Pabco Super Caltemp Type 1200 NA | EES 010078 & Fibreboard Corp. Rpt. dtd. 5/23/72 | Fibreboard Corp. Pabco Industrial Products Div. 55 Francisco St. San Francisco, CA 94106 Plant: Emeryville, CA |
| Class b | Thermobestos | EES 010147 | Johns-Manville Sales Corp. Greenwood Plaza Denver, CO 80217 Plant: Manville, NJ |
| Class b | Thermobestos | Rpt. No. E432-T-596 of 12 July 1961 | Johns-Manville Sales Corp. Greenwood Plaza Denver, CO 80217 Plant: Long Beach, CA |
| Class b | Thermasil | EES 610245 | Keene Corp. Ceiling & Insulation Div. U.S. Route 1 Princeton, NJ 08540 Plant: Valley Forge, PA |
| Class b | Kaylo | EES 010222 | Owens-Corning Fiberglas Corp. Fiberglas Tower Toledo, OH 43601 Plant: Berlin, NJ |

1 of 3

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01588275
2006/7/18 22:14:39 GMT

QPL-2781

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST OR QUALIFICATION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| **Grade II** | | | |
| Class d | New Careytemp 1500 Cylindrical & Segmental Pipe Insulation | Philip Carey Test Rpts. #CRL-1 & #CRL-1a | Philip Carey Corp. Div. Panacon Corp. 320 S. Wayne Ave. Cincinnati, OH 45215 Plant: Same address |
| Class d | Pabco Super Caltemp Type 1200NA | EES 010078 and Fibreboard Corp. Rpt. dtd. 5/23/72 | Fibreboard Corp. Pabco Industrial Products Div. 55 Francisco St. San Francisco, CA 94106 Plant: Emeryville, CA |
| Class d | Thermobestos | EES 010147 | Johns-Manville Sales Corp. Greenwood Plaza Denver, CO 80217 Plant: Manville, NJ |
| Class d | Thermobestos | Rpt. No. E432-T-596 of 12 July 1961 | Johns-Manville Sales Corp. Greenwood Plaza Denver, CO 80217 Plant: Long Beach, CA |
| Class d | Thermasil | EES 610245 | Keene Corp. Ceiling & Insulation Div. U.S. Route 1 Princeton, NJ 08540 Plant: Valley Forge, PA |
| Class d | Kaylo | EES 010222 | Owens-Corning Fiberglas Corp. Fiberglas Tower Toledo, OH 43601 Plant: Berlin, NJ |
| **Grade III** | | | |
| Class e Type I | New Careytemp 1500 Cylindrical & Segmental Pipe Insulation | Philip Carey Test Rpts. #CRL-1 & #CRL-1a | Philip Carey Corp. Div. Panacon Corp. 320 S. Wayne Ave. Cincinnati, OH 45215 Plant: Same address |
| Type II | New Careytemp 1500 Cylindrical & Segmental Pipe Insulation | Philip Carey Test Rpts. #CRL-1 & #CRL-1a | Philip Carey Corp. Div. Panacon Corp. 320 S. Wayne Ave. Cincinnati, OH 45215 Plant: Same address |
| Type I | Pabco Super Caltemp Type 1200NA | EES 010078 and Fibreboard Corp. Rpt. dtd. 5/23/72 | Fibreboard Corp. Pabco Industrial Products Div. 55 Francisco St. San Francisco, CA 94106 Plant: Emeryville, CA |
| Type II | Pabco Super Caltemp Type 1200NA | EES 610551 and Fibreboard Corp. Rpt. dtd. 5/23/72 | Fibreboard Corp. Pabco Industrial Products Div. 55 Francisco St. San Francisco, CA 94106 Plant: Emeryville, CA |

2 of 3

518

Provided by IHS
No reproduction or networking permitted without license from IHS
Sold to:MCCAFFERY & ASSOCIATES INC. 01588272
2006/7/18 22:14:39 GMT

QPL-2781

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST OR QUALIFICATION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| **Grade III** | | | |
| Class e | | | |
| Type I | Thermobestos | EES 010147 | Johns-Manville Sales Corp. Greenwood Plaza Denver, CO 80217 Plant: Manville, NJ |
| Type II | Thermobestos | EES 010147 | Johns-Manville Sales Corp. Greenwood Plaza Denver, CO 80217 Plant: Manville, NJ |
| Type I | Thermobestos | Rpt. No. E432-T-596 of 12 July 1961 | Johns-Manville Sales Corp. Greenwood Plaza Denver, CO 80217 Plant: Long Beach, CA |
| Type II | Thermobestos | Rpt. No. E432-T-596 of 12 July 1961 | Johns-Manville Sales Corp. Greenwood Plaza Denver, CO 80217 Plant: Long Beach, CA |
| Type I | Thermasil | EES 610245 | Keene Corp. Ceiling & Insulation Div. U.S. Route 1 Princeton, NJ 08540 Plant: Valley Forge, PA |
| Type II | Thermasil | EES 610245 | Keene Corp. Ceiling & Insulation Div. U.S. Route 1 Princeton, NJ 08540 Plant: Valley Forge, PA |
| Type I | Kaylo | EES 010222 | Owens-Corning Fiberglas Corp. Fiberglas Tower Toledo, OH 43601 Plant: Berlin, NJ |
| Type II | Kaylo | EES 010222 | Owens-Corning Fiberglas Corp. Fiberglas Tower Toledo, OH 43601 Plant: Berlin, NJ |

3 of 3

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01588272
2006/7/18 22:14:39 GMT

519

QPL-2781-36
27 May 1969
SUPERSEDING
QPL-2781-35
25 September 1968

FSC 5640

# QUALIFIED PRODUCTS LIST
## OF
## PRODUCTS QUALIFIED UNDER MILITARY SPECIFICATION

MIL-I-2781

INSULATION, PIPE, THERMAL

This list has been prepared for use by or for the Government in the procurement of products covered by the subject specification and such listing of a product is not intended to and does not connote indorsement of the product by the Department of Defense. All products listed herein have been qualified under the requirements for the product as specified in the latest effective issue of the applicable specification. This list is subject to change without notice; revision or amendment of this list will be issued as necessary. The listing of a product does not release the supplier from compliance with the specification requirements. Use of the information shown hereon for advertising or publicity purposes is expressly forbidden.

The activity responsible for this Qualified Products List is  Naval Ship Engineering Center

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST OR QUALIFICATION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| Grade I | | | |
| Class b | New Careytemp 1500 Cylindrical & Segmental Pipe Insulation | Philip Carey Test Rpt. #CRL-1 | Philip Carey Corp. 320 S. Wayne Ave. Cincinnati, Ohio 45215 Plant: Same address |
| Class b | Pabco | EES B-32 | Fibreboard Corp. Pabco Industrial Products Div. 475 Brannan St. San Francisco, Calif. 94119 Plant: Emeryville, Calif. |
| Class b | Caltemp | EES 010078 | do. |
| Class b | Calsilite | EES 010272 | GAF Corp. 140 West 51 St. New York, N. Y. 10020 Plant: Gloucester City, N. J. |
| Class b | | | Johns-Manville Sales Corp. 22 E. 40th St. New York, N. Y. 10016 Plants: Waukegan, Ill. Manville, N. J. |
| | JM (85% Magnesia) Thermobestos | EES C-3581 EES 010147 | |
| Class b | Thermobestos | Rpt. No. E432-T-596 of 12 July 1961 | Johns-Manville Sales Corp. 22 E. 40th St. New York, N. Y. 10016 Plant: Long Beach, Calif. |
| Class b | Thermasil | EES 610245 | Keene Corp. Industrial Insulation Div. 500 Breunig Ave. Trenton, N. J. 08602 Plant: Valley Forge, Pa. |
| Class b | KaytherM-1700 | EES 610356 | Nicolet Industries, Inc. Nicolet Avenue Florham Park, New Jersey Plant: Ambler, Pa. |
| Class b | | | Owens-Corning Fiberglas Corp. Toledo, Ohio 43601 Plant: Berlin, N.J. |
| | Kaylo | EES010222 | |

1 of 3

Provided by IHS
No reproduction or networking permitted without license from IHS

Sold to:MCCAFFERY & ASSOCIATES INC, 01588272
2006/7/18 22:14:39 GMT

QPL-2781

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST OR QUALIFICATION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| Grade II | | | |
| Class c | Unibestos #750 , | EES 010259, J.L.F. Research, Inc. Rpt. of 10/21/64 and Pittsburgh Corning Corp. Rpt. No. PC-U-1 of 12/9/64 | Pittsburgh Corning Corp. One Gateway Center Pittsburgh 22, Pa. Plants: Tyler, Texas Port Allegany, Pa. |
| Class d | New Careytemp 1500 Cylindrical & Segmental Pipe Insulation | Philip Carey Test Rpt. #CRL-1 | Philip Carey Corp. 320 S. Wayne Ave. Cincinnati, Ohio 45215 Plant: Same address |
| Class d | Caltemp | EES 010078 | Fibreboard Corp. Pabco Industrial Products Div. 475 Brannan St. San Francisco, Calif. 94119 Plant: Emeryville, Calif. |
| Class d | Calsilite | EES 010272 | GAF Corp. 140 West 51 St. New York, N. Y. 10020 Plant: Gloucester City, N. J. |
| Class d | Thermobestos | EES 010147 | Johns-Manville Sales Corp. 22 E. 40th St. New York, N. Y. 10016 Plant: Manville, N. J. |
| Class d | Thermobestos | Rpt. No. E432-T-596 of 12 July 1961 | Johns-Manville Sales Corp. 22 E. 40th St. New York, N. Y. 10016 Plant: Long Beach, Calif. |
| Class d | Thermasil | EES 610245 | Keene Corp. Industrial Insulation Div. 500 Breunig Ave. Trenton, N. J. 08602 Plant: Valley Forge, Pa. |
| Class d | KaytherM-1700 | EES 610356 | Nicolet Industries, Inc. Nicolet Avenue Florham Park, New Jersey Plant: Ambler, Pa. |
| Class d | Kaylo | EES 010222 | Owens-Corning Fiberglas Corp. Toledo, Ohio 43601 Plant: Berlin, N.J. |
| Grade III | | | |
| Class e Type I | New Careytemp 1500 Cylindrical & Segmental Pipe Insulation | Philip Carey Test Rpt. #CRL-1 | Philip Carey Corp. 320 S. Wayne Ave. Cincinnati, Ohio 45215 Plant: Same address |
| Type II | New Careytemp 1500 Cylindrical & Segmental Pipe Insulation | Philip Carey Test Rpt. #CRL-1 | Philip Carey Corp. 320 S. Wayne Ave. Cincinnati, Ohio 45215 Plant: Same address |

2 of 3

Provided by IHS
No reproduction or networking permitted without license from IHS

QPL-27B1

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST OR QUALIFICATION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| Grade III Class e Type I | Caltemp | EES 010078 | Fibreboard Corp. Pabco Industrial Products Div. 475 Brannan St. San Francisco, Calif. 94119 Plant: Emeryville, Calif. |
| Type II | Caltemp | EES 610551 | do. |
| Type II | Prasco | EES B-6886 | do. |
| Type I | Calsilite | EES 010272 | GAF Corp. 140 West 51 St. New York, N. Y. 10020 Plant: Gloucester City, N. J. |
| Type I | Thermobestos | EES 010147 | Johns-Manville Sales Corp. 22 E. 40th St. New York, N. Y. 10016 Plant: Manville, N. J. |
| Type II | Thermobestos | EES 010147 | do. |
| Type I | Thermobestos | Rpt. No. E432-T-596 of 12 July 1961 | Johns-Manville Sales Corp. 22 E. 40th St. New York, N. Y. 10016 Plant: Long Beach, Calif. |
| Type II | Thermobestos | Rpt. No. E432-T-596 of 12 July 1961 | do. |
| Type II | Superex M | EES 010230C | Johns-Manville Sales Corp. 22 E. 40th St. New York, N. Y. 10016 Plant: Waukegan, Ill. |
| Type I | Thermasil | EES 610245 | Keene Corp. Industrial Insulation Div. 500 Breunig Ave. Trenton, N. J. 08602 Plant: Valley Forge, Pa. |
| Type II | Thermasil | EES 610245 | Keene Corp. Industrial Insulation Div. 500 Breunig Ave. Trenton, N. J. 08602 Plant: Valley Forge, Pa. |
| Type I | KaytherM-1700 | EES 610356 | Nicolet Industries, Inc. Nicolet Avenue Florham Park, New Jersey Plant: Ambler, Pa. |
| Type II | Hy-Temp | EES B-9231 | do. |
| Type I | Kaylo | EES 010222 | Owens-Corning Fiberglas Corp. Toledo, Ohio 43601 Plant: Berlin, N.J. |
| Type II | Kaylo | EES 010222 | do. |
| Grade III Class f | Unibestos #1200 | EES 010259, Pittsburgh Corning Corp. Rpt. No. PC-U-1 of 12/9/64 | Pittsburgh Corning Corp. One Gateway Center Pittsburgh 22, Pa. Plants: Tyler, Texas Port Allegany, Pa. |

3 of 3

☆ U. S. GOVERNMENT PRINTING OFFICE: 1969-393-063/S-16

Provided by IHS
No reproduction or networking permitted without license from IHS

381

Sold to:MCCAFFERY & ASSOCIATES INC, 01588272
2006/7/18 22:14:39 GMT

DOCUMENT CERTIFICATION

I, Celia A. Booth, do swear under the penalties of perjury that the documents attached hereto are true and accurate copies of the original documents in the custody of the Archivist of the United States.

Celia A. Booth

I, RALPH HAMMACK, a commissioned Notary Public of the Commonwealth of Virginia, do certify that Celia A. Booth appeared before me on this date in the City of Alexandria in the Commonwealth of Virginia and that I took her oath aforesaid.

SEAL

Date: AUGUST 5, 2006

My Commission Expires On: APR 30, 2010

# THERMAL INSULATION REQUIREMENTS

# FOR

# MACHINERY AND PIPING



FSC 5640

DECLASSIFIED
Authority 917 579
By VAN Naka Date 11-8



MIL-STD-769C(SHIPS)
15 November 1967

DEPARTMENT OF THE NAVY

NAVAL SHIP ENGINEERING CENTER

WASHINGTON, D.C. 20360

Thermal Insulation Requirements for Machinery and Piping
MIL-STD-769B(SHIPS)

1. This standard has been approved by the Naval Ship Engineering Center, and is published to establish the requirements for thermal insulation for machinery and piping on Naval ships.

2. Use of this standard by activities under the cognizance of the Naval Ship Engineering Center shall be mandatory effective on the date of issue.

3. Recommended corrections, additions, or deletions including improvements in the procedures described herein, and changes in this standard which can result in less costly installations without sacrificing the level of quality desired should be addressed to the Commander, Naval Ship Engineering Center, Department of the Navy, Washington, D. C. 20360.

DECLASSIFIED
Authority 917 579
By VAN Nara Date 11-8

MIL-STD-769C(SHIPS)
15 November 1967

CONTENTS

Page

| | | | Page |
|---|---|---|---|
| Paragraph | 1. | SCOPE | 1 |
| | 2. | REFERENCED DOCUMENTS | 1 |
| | 3. | GENERAL REQUIREMENTS | 2 |
| | 4. | MATERIALS AND THICKNESSES | 2 |
| | 4.1 | Minimum thicknesses | 2 |
| | 4.2 | Special conditions | 2 |
| | 4.3 | Adhesives | 3 |
| | 4.4 | Finishing cements | 3 |
| | 4.5 | Metal lagging | 3 |
| | 4.6 | Fasteners | 3 |
| | 5. | RE-USABLE COVERS | 4 |
| | 5.1 | Hot-surface insulation covers | 4 |
| | 5.2 | Construction | 4 |
| | 5.3 | Fabrication, piping components | 4 |
| | 5.4 | Fabrication, machinery and equipment | 9 |
| | 6. | INSTALLATION | 10 |
| | 6.1 | Hot-surface insulation | 10 |
| | 6.1.1 | Pipe and tubing | 10 |
| | 6.1.2 | Piping components | 10 |
| | 6.1.3 | Machinery and equipment | 10 |
| | 6.1.4 | Boiler uptakes | 10 |
| | 6.1.5 | Unfired pressure vessels | 10 |
| | 6.2 | Antisweat insulation | 11 |
| | 6.3 | Refrigerant insulation | 11 |
| | 6.4 | Weather deck hot piping insulation | 11 |
| | 6.5 | Metal lagging | 13 |
| | 6.6 | Painting | 13 |
| | 7. | NOTES | 13 |

TABLES

| Table | | | Page |
|---|---|---|---|
| | I. | Schedule of approved insulation and lagging materials | 5 |
| | II. | Insulation thickness for hot piping, compounded or fibrous, conforming to MIL-I-2781 | 6 |
| | III. | Thickness of insulation conforming to MIL-P-15280 and MIL-I-22344 for hot piping | 7 |
| | IV. | Thickness of insulating tape conforming to MIL-P-15349, for 1/4 to 3/4 inch size hot piping | 7 |
| | V. | Thickness of insulating materials for hot surfaces of machinery and equipment up to 850°F | 7 |
| | VI. | Thickness of insulating materials for hot surfaces of machinery and equipment over 850°F | 8 |
| | VII. | Thickness of refrigerant insulation for piping | 8 |
| | VIII. | Thickness of refrigerant insulation for machinery and equipment (exclusive of vapor barrier) | 8 |
| | IX. | Thickness of antisweat insulation (exclusive of vapor barrier) | 9 |
| | X. | Nominal thicknesses of insulation for weather deck hot piping | 9 |

 
DECLASSIFIED
Authority 917 579
By VAN NARA Date 11-8

MIL-STD-769C(SHIPS)
15 November 1967

1. SCOPE

1.1  The purpose of this standard is to amplify the general requirements for insulation of piping, machinery, uptakes, and mechanical equipment covered in the General Specifications for Ships of the U. S. Navy or in ships specifications.

2. REFERENCED DOCUMENTS

2.1  The issues of the following documents in effect on the date of invitation for bids or request for proposal, form a part of this standard to the extent specified herein.

GOVERNMENTAL

SPECIFICATIONS

T-T-931 - Twine, Cotton, Mattress.
HH-C-466 - Cloth, Glass, Coated (for Membrane Waterproofing and Built-Up Roofing).
HH-I-551 - Insulation Block, Pipe Covering and Boards, Thermal (Cellular Glass).
QQ-S-775 - Steel Sheets, Carbon, Zinc-Coated.
QQ-W-343 - Wire-Electrical And Non-Electrical, Copper (Uninsulated).
QQ-W-390 - Wire, Nickel-Chromium-Iron Alloy.
SS-C-192 - Cement, Portland.
SS-C-466 - Cloth, Thread, and Tape, Asbestos.
TT-P-26 - Paint, Interior, White and Tints, Fire-Retardant.
TT-P-320 - Pigment, Aluminum; Powder and Paste, for Paint.
UU-B-790 - Building Paper, Vegetable Fiber: (Kraft, Waterproofed, Water Repellent and Fire Resistant).
UU-T-106 - Tape, Pressure-Sensitive Adhesive, Masking, Paper.
MIL-C-788 - Cloth, Brattice, Cotton, Fire-Resistent.
MIL-I-2781 - Insulation, Pipe, Thermal.
MIL-I-2818 - Insulation Blanket, Thermal, Fibrous Mineral.
MIL-I-2819 - Insulation Block, Thermal.
MIL-C-2861 - Cement, Insulation, High-Temperature.
MIL-C-2908 - Cements, Finishing, Insulation.
MIL-A-3316 - Adhesives, Fire-Resistant, Thermal Insulation.
MIL-I-15091 - Insulation Felt, Thermal, Asbestos Fiber.
MIL-A-15199 - Adhesive, Asbestos Cloth to Pipe, Insulation.
MIL-P-15280 - Plastic Foam, Unicellular, Sheet and Tubular Form, Elastomeric.
MIL-P-15328 - Primer, Pretreatment (Formula No. 117 for Metals).
MIL-I-15349 - Insulation Tape, Thermal.
MIL-I-15475 - Insulation Felt, Thermal, Fibrous Glass, Semirigid.
MIL-I-16411 - Insulation Felt, Thermal, Glass Fiber.
MIL-A-18065 - Adhesives, High Initial Bond.
MIL-B-19564 - Bedding Compound, Thermal Insulation Pipe Covering.
MIL-C-19565 - Coating Compounds, Thermal Insulation Pipe Covering - Fire-, and Water-Resistant, Vapor-Barrier and Weather-Resistant.
MIL-C-20079 - Cloth, Glass, Tape, Textile, Glass:  and Thread, Glass.
MIL-I-22023 - Insulation Felt, Thermal and Sound Absorbing Felt, Fibrous Glass, Flexible.
MIL-I-22344 - Insulation, Pipe, Thermal, Fibrous Glass.
MIL-C-22395 - Compound, End Sealing, Thermal Insulation Pipe Covering - Fire-, and Weather-Resistant.
MIL-I-24244 - Insulation Materials, Thermal, With Special Corrosion and Chloride Requirements.
MIL-P-52350 - Paper, Asbestos.
General Specifications For Ship of the U.S. Navy.

DRAWING
5000-SS103-841336 - Piping, Boiler Soot Blower, Typical Installation.

(Copies of specifications, standards, drawings, and publications required by suppliers in connection with specific procurement functions should be obtained from the procuring activity or as directed by the contracting officer.)

1


THE NATIONAL ARCHIVES

DECLASSIFIED
Authority 917 579
By VAN NARA Date 11-8

MIL-STD-769C(SHIPS)
15 November 1967

NONGOVERNMENTAL

SPECIFICATIONS
AMERICAN SOCIETY FOR TESTING AND MATERIALS
ASTM - A167 - Specification for Corrosion-Resisting Chromium-Nickel
Steel Plate, Sheet and Strip.
ASTM - 209 - Specification for Seamless Carbon-Molybdenum Alloy-Steel
Boiler and Superheater tubes.

(Application for copies should be addressed to the American Society for Testing and
Materials, 1916 Race Street, Philadelphia, Pennsylvania 19103)

(Technical society and technical association specifications and standards are generally
available for reference from libraries.  They are also distributed among technical groups
and using Federal agencies.)

3.  GENERAL REQUIREMENTS

3.1  General requirements such as definitions, basic applications, and reasons for
insulating are covered in the General Specifications for Ships of the U. S. Navy or in ships
specifications, Section 9390-2.  Thermal insulation and acoustic absorptive treatment of
compartments, ventilating ducts and trunks are covered in the appropriate sections of the
above specifications.

3.2  Minor deviations in installation which meet the intent of the requirements speci-
fied herein may be approved by the cognizant Supervisor of Shipbuilding, U. S. Naval ship-
yard, or the Commander, Naval Ship Engineering Center.  (Copy of all such changes shall be
forwarded to the Commander, Naval Ship Engineering Center, SEC 6153.)

4.  MATERIALS AND THICKNESSES

4.1  Minimum thicknesses.  Tables I to X, inclusive specify materials for insulation
and lagging and the minimum acceptable thicknesses for the temperature ranges listed.

4.2  Special conditions.  The following special conditions supplement or modify the
selection of materials or thicknesses specified, when applicable:

   (a)  The insulation thickness on soot blower piping between the root valve and the
        soot blower heads shall be reduced from that indicated for a system normally
        operating at the same temperature as follows:
        (1)  Where double layer insulation is used, only the inner (high temperature)
             insulation thickness layer need be installed.
        (2)  Where the insulation consists of a single uniform thickness layer, only
             one-half the total specified thickness need be installed.
   (b)  The insulation thickness for hot water systems operating at a normal maximum
        temperature of 150°F. may be 1/2 inch thick for pipe sizes up to 3/4 inch
        i.p.s., in accordance with MIL-I-2781.
   (c)  Where double layer construction consisting of two classes of insulation is
        specified in table II, the higher temperature class insulation may be
        furnished in a uniform single thickness equal to the total thickness
        specified, if single layer construction is considered desirable.  Where
        single layer construction is used in lieu of double layer construction,
        suitable expansion joints to permit thermal movement of the piping, without
        opening of insulation joints, must be provided.
   (d)  Where considered desirable, higher temperature classes of insulation may be
        used where lower temperature classes are specified provided they are
        satisfactory in all other respects (e.g. where class b of MIL-I-2781 is
        specified, class d or e may be used or where class c is specified, class
        f may be used).
   (e)  Compounded type insulation conforming to MIL-I-2781, grade I, (calcium
        silicate only) or cellular glass insulation conforming to MIL-I-551 shall
        be used on hot piping requiring insulation that will be exposed to the
        weather, and shall conform to the thicknesses specified in table X.

   (f)  Elastomeric foamed plastic insulation, MIL-P-15280, may be used for machinery
        and equipment applications up to 180°F; 1/2 inch minimum thickness.

2


DECLASSIFIED
Authority 917 5 79
By VAN NARA Date 11-8

MIL-STD-769C(SHIPS)
15 November 1907

   (g)  Where HOT SURFACE insulation thicknesses are not specified, such as for re-
fractory fiber insulation felt, MIL-I-25128, and special applications, the
following shall be used as a guide in determining acceptable thicknesses.

Insulation thickness shall be sufficient to:

    (1)  Reduce the insulation surface temperature to 150°F. or below, where
personnel can normally contact such surfaces.
    (2)  Prevent the transfer of heat to surrounding areas which would be
objectionable to personnel or adversely affect other components.
    (3)  Prevent transfer of heat which would otherwise reduce the efficiency or
effectiveness of the system or component.
   (h)  Where operating temperatures are normally between 125°F. and 150°F. and the
ommission of insulation will not adversely affect operating efficiency, non-
metallic lagging only may be applied where necessary, to protect personnel
from contact with hot metal surfaces.
   (i)  Insulation on austenitic stainless steel piping and machinery shall meet the
corrosion and chloride requirements of MIL-I-24244.
   (j)  Adhesives containing halogenated solvents shall not be used on foam plastic
conforming to MIL-P-15280 for submarine application.

  4.3  Adhesives.  The following adhesives shall be used for fastening cloth and tape
lagging:

| Type of lagging | Specification |
|---|---|
| Asbestos | MIL-A-15199[1] or MIL-A-3316, class 1 |
| Fibrous glass | MIL-A-3316, class 1 |

[1] Not applicable for cementing to fibrous glass in-
sulation or for use with asbestos lagging containing
glass yarn. Lagging pretreated with compatible ad-
hesive is acceptable providing the end result is
equal to one of the above combinations.

  4.4  Finishing cements.  Where finishing cement is specified any of the following
materials are acceptable subject to any material limitations for the proposed application:

   (a)  Finishing cement, MIL-C-2908, type II.
   (b)  High-temperature insulating cement, MIL-C-2861, when used under asbestos
cloth.
   (c)  A mixture of 80 percent high-temperature insulating cement, MIL-C-2861, and
20 percent portland cement, SS-C-192.

  4.5  Metal lagging.  Where metal lagging is required, any of the following materials
are acceptable, except for uptake applications (see 6.1.4):

| Sheet material | Specification | Nominal thickness |
|---|---|---|
| | | Inch |
| Hot-dipped galvanized Steel | QQ-S-775 | 0.014 |
| Aluminum | ASTM 209, alloy 6061 | .030 |
| Corrosion-resistant steel (CRES) | ASTM A167, AISI type 304 | .014 |

  4.6  Fasteners.  Insulation shall be held in place by suitable wire or flat metal
bands. The welding of fasteners to machinery, piping, pressure vessels or other related
equipment is prohibited. Where fasteners are necessary they shall be attached during
manufacture (prior to heat treatment, stress relief and testing) by a Naval Ship
Engineering Center approved procedure.

3


DECLASSIFIED
Authority 917 579
By VAN NARA Date 11-8

MIL-STD-769C(SHIPS)
15 November 1967

5. RE-USABLE COVERS

5.1 Hot-surface insulation covers. In order to insure that the pipe covering will not interfere with the servicing of a takedown joint where a re-usable cover is installed, the permanent insulation shall stop short of the takedown joint and a short removable and re-usable section of insulation shall be installed between the permanent insulation and the takedown joint. The insulation joint formed by the permanent and re-usable sections may be square, or at an angle of 45 degrees: the joint, however, shall be tight, without any gaps between the two sections and shall incorporate means to prevent dislodging the insulation sections. Re-usable covers are not required on systems insulated with elastomeric foamed plastic insulation (MIL-P-15280).

5.2 Construction. For sizes larger than 2 inches i.p.s., valve bonnets and valves having takedown joints at the ends shall be fitted with re-usable covers such that the bonnet joint may be removed independently of the valve covering. Valves 2 inches i.p.s. and under shall be fitted with separate covers as indicated above, or covers of a one-piece design such that they may be wrapped around the entire valve body and clipped or otherwise secured just below the handwheel.

5.3 Fabrication, piping components. For piping components except as otherwise specified, any one of the following methods of fabrication is acceptable:

5.3.1 Covers may be made in two halves of thermal insulating felt enclosed in asbestos cloth. Each half cover shall be sewn and quilted with wire-inserted asbestos yarn conforming to SS-C-466, form II, (for machine sewing, if desired, this yarn may be constructed with the three monel wires twisted together first, and the three asbestos threads twisted around the outside of the wire) or fastened with mechanical stapling in a manner to provide a uniform thickness, strength and rigidity.

5.3.1.1 Covers for use at temperatures of 850°F. and below shall be filled with in-sulation felt (see table I). Wire-inserted asbestos cloth, SS-C-466, grade AAA-H, shall be used on the inside surface of covers for valves larger 2 inches i.p.s. For valves 2 inches i.p.s. and smaller, grade AAA shall be used on inside surface of covers. For 500°F. and below, asbestos cloth, SS-C-466, grade AA, shall be used on outside surface of covers; grade AAA cloth shall be used 500°F.

5.3.1.2 Covers for use at temperatures above 850°F. shall have filling consisting of inner layers of fiber-glass felt, MIL-I-16411, or refractory fiber felt, MIL-I-23128, and outer layers of asbestos felt, and shall be covered on the inside surface and on the ends with nickel-chromium alloy wire mesh, QQ-W-390 (or wire-inserted asbestos cloth, SS-C-466, grade AAA-N, for services up to 950°F.) and on the outside surface with grade AAA asbestos cloth. Asbestos paper MIL-P-52350, class 2, thickness 1/8 inch may be inserted between the asbestos felt and the asbestos cloth if considered necessary to retain the cylindrical shape of the cover.

5.3.1.3 Hard asbestos millboard, 1/4 inch thick, enclosed in asbestos cloth of the type used on the outside cover, shall be sewn on ends of covers for strength and rigidity. When a more flexible cover is desired, uch as when space limitation would not permit installation of the more rigid type, the millboard will not be required. When the flange diameter is larger than the outside diameter of the adjacent pipe covering, build-up pieces made of asbestos felt encased in asbestos cloth, SS-C-466, grade AAA shall be stitched to inside of cover. Halves of covers shall be fastened together by 1/16-inch diameter galvanized, or other corrosion resistant wire rope laced through brass or galvanized steel hooks or rings, or fastened by brass snap fasteners. Fastenings shall be securely attached to cloth lagging.

5.3.1.4 Preformed fibrous glass valve or fitting covers may be used when temperatures are in the 125-370°F. range. These shall be of the same thickness as the adjacent pipe covering. Such covers, when used, shall be lagged independently of the pipe covering and in a manner which will facilitate removal and replacement.

4



THE NATIONAL ARCHIVES

UNCLASSIFIED
Authority 917 579
By VAN NARA Date 11-8

MIL-STD-769C(SHIPS)
15 November 1967

Table I - Schedule of approved insulation and lagging materials. 1/

| Service | Temperature Range (°F.) | Pipe and Tubing Insulation | Pipe and Tubing Lagging | Valves and Fittings Insulation | Valves and Fittings Lagging | Flange Joints Insulation | Flange Joints Lagging | Machinery Insulation | Machinery Lagging |
|---|---|---|---|---|---|---|---|---|---|
| Gases<br>Steam<br>Hot Water<br>Oil | 125 to 1200 | MIL-I-2781<br>MIL-I-15349<br>(750°F. Max.)<br>MIL-I-22344<br>(370°F. Max.)<br>MIL-P-15280<br>(180°F. Max.) | SS-C-466<br>MIL-C-20079 | MIL-I-2781<br>MIL-I-2819<br>MIL-I-16411<br>MIL-I-15091,<br>type A<br>MIL-C-2861,<br>MIL-I-22344<br>(370°F. Max.)<br>MIL-P-15280<br>(180°F. Max.)<br>MIL-I-23128 | SS-C-466<br>MIL-C-20079 | MIL-I-2781<br>MIL-I-2819<br>MIL-I-16411<br>MIL-I-15091,<br>type A<br>MIL-C-2861,<br>MIL-I-22344<br>(370°F. Max.)<br>MIL-P-15280<br>(180°F. Max.)<br>MIL-I-23128 | SS-C-466<br>MIL-C-20079 | MIL-I-2819<br>MIL-I-16411<br>MIL-I-15091,<br>type A<br>MIL-I-2818<br>MIL-C-2861<br>MIL-I-22023<br>(370°F. Max.)<br>MIL-I-23128<br>MIL-P-15280<br>(180°F. Max.) | SS-C-466<br>MIL-C-20079 |
| Cold water<br>Chilled water | 28 to 99 | MIL-I-15091<br>MIL-I-2781<br>MIL-I-22344<br><br>MIL-P-15280<br>MIL-I-551 | SS-C-466<br>MIL-C-20079<br>UU-B-790,<br>type III,<br>grade F,<br>style 10<br>MIL-C-788 | MIL-I-15091<br>MIL-I-2781<br>MIL-I-22344<br><br>MIL-I-2819<br>MIL-P-15280<br>HH-I-551 | SS-C-466<br>MIL-C-20079<br>UU-B-790,<br>type III,<br>grade F,<br>style 10<br>MIL-C-788 | MIL-I-15091<br>MIL-I-2781<br>MIL-I-22344<br><br>MIL-I-2819<br>MIL-P-15280<br>HH-I-551 | SS-C-466<br>MIL-C-20079<br>UU-B-790,<br>type III,<br>grade F,<br>style 10<br>MIL-C-788 | MIL-I-15091<br>MIL-I-22023<br>MIL-I-2819<br><br>MIL-P-15280<br>HH-I-551 | SS-C-466<br>MIL-C-20079<br>UU-B-790,<br>type III,<br>grade F,<br>style 10<br>MIL-C-788 |
| Refrigerant | -20 to 60 | HH-I-551<br>MIL-P-15280 | SS-C-466<br>MIL-C-20079<br>MIL-C-788 | HH-I-551<br>MIL-P-15280 | SS-C-466<br>MIL-C-20079<br>MIL-C-788 | HH-I-551<br>MIL-P-15280 | SS-C-466<br>MIL-C-20079<br>MIL-C-788 | MIL-I-551<br>MIL-C-20079<br>MIL-P-15280 | SS-C-466<br>MIL-C-20079<br>MIL-C-788 |

1/ Additional materials are covered in 4.5 (metal lagging); 6.1.4 (boiler uptakes); 6.2 (securing antisweat insulation); 6.4.1 (weather deck hot piping).

5


DECLASSIFIED
Authority 917 579
By AN NARA Date 11·8

MIL-STD-769C(SHIPS)
15 November 1967

Table II - Insulation thicknesses for hot piping, compounded and
fibrous conforming to MIL-I-2781

| Pipe size (inches i.p.s.) | Temperature range (degrees F.) | Class [1] | | Nominal thickness (inches) | | |
|---|---|---|---|---|---|---|
| | | Inner layer | Outer layer | Inner layer | Outer layer | Total |
| 1/2, 1-1/2 | 125 - 388 | b,c | --- | 1 | --- | 1 |
| | 389 - 500 | b,c | --- | 2 | --- | 2 |
| | 501 - 750 | c,d | --- | 3 | --- | 3 |
| | 751 - 950 | e,f | --- | 2 | --- | 2 |
| | 951 - 1050 | e,f | b,c | 2 | 1-1/2 | 3-1/2 |
| 2, 2-1/2 | 125 - 338 | b,c | --- | 1-1/2 | --- | 1-1/2 |
| | 339 - 388 | b,c | --- | 2 | --- | 2 |
| | 389 - 500 | b,c | --- | 3 | --- | 3 |
| | 501 - 750 | c,d | b,c | 1-1/2 | 1-1/2 | 3 |
| | 751 - 900 | e,f | b,c | 1-1/2 | 1-1/2 | 3 |
| | 901 - 1050 | e,f | b,c | 2 | 1-1/2 | 3-1/2 |
| 3 through 4-1/2 | 125 - 338 | b,c | --- | 1-1/2 | --- | 1-1/2 |
| | 339 - 388 | b,c | --- | 2 | --- | 2 |
| | 389 - 500 | b,c | --- | 3 | --- | 3 |
| | 501 - 750 | c,d | --- | 3 | --- | 3 |
| | | c,d | b,c | 1-1/2 | 2 | 3-1/2 |
| | 751 - 900 | e,f | b,c | 1-1/2 | 2 | 3-1/2 |
| | 901 - 950 | e,f | b,c | 2 | 1-1/2 | 3-1/2 |
| | 951 - 1050 | e,f | b,c | 2-1/2 | 1-1/2 | 4 |
| 5, 6 | 125 - 338 | b,c | --- | 1-1/2 | --- | 1-1/2 |
| | 339 - 388 | b,c | --- | 2 | --- | 2 |
| | 389 - 500 | b,c | --- | 3 | --- | 3 |
| | 501 - 750 | c,d | --- | 3 | --- | 3 |
| | | c,d | b,c | 1-1/2 | 2 | 3-1/2 |
| | 751 - 900 | e,f | b,c | 1-1/2 | 2 | 3-1/2 |
| | 901 - 950 | e,f | b,c | 2 | 1-1/2 | 3-1/2 |
| | 951 - 1050 | e,f | b,c | 3 | 2 | 5 |
| 7 | 125 - 338 | b,c | --- | 1-1/2 | --- | 1-1/2 |
| | 339 - 388 | b,c | --- | 2-1/2 | --- | 2-1/2 |
| | 389 - 500 | b,c | --- | 3 | --- | 3 |
| | 501 - 750 | c,d | --- | 4 | --- | 4 |
| | | c,d | b,c | 1-1/2 | 2 | 3-1/2 |
| | 751 - 900 | e,f | b,c | 1-1/2 | 2 | 3-1/2 |
| | 901 - 950 | e,f | b,c | 2 | 2 | 4 |
| | 951 - 1050 | e,f | b,c | 3 | 2 | 5 |
| 8 and larger | 125 - 338 | b,c | --- | 1-1/2 | --- | 1-1/2 |
| | 339 - 388 | b,c | --- | 2-1/2 | --- | 2-1/2 |
| | 389 - 500 | b,c | --- | 3 | --- | 3 |
| | 501 - 750 | c,d | --- | 4 | --- | 4 |
| | | c,d | b,c | 2 | 2 | 4 |
| | 751 - 900 | e,f | b,c | 2 | 2 | 4 |
| | 901 - 950 | e,f | b,c | 2-1/2 | 2 | 4-1/2 |
| | 951 - 1050 | e,f | b,c | 3 | 2 | 5 |

[1]/ Does not include finishing cement.

6

DECLASSIFIED
Authority 917 579
By VAN NARA Date 11-8

MIL-STD-769C(SHIPS)
15 November 1967

Table III - Thickness of insulation conforming to
MIL-P-15280 and MIL-I-22344, for hot piping.

| Temperature range (°F.) | Specification | Thickness |
|---|---|---|
| | | Inch |
| 125 to 180 | MIL-P-15280 or MIL-I-22344 | 1/2 |
| 181 to 250 | MIL-I-22344 | 1/2 |
| 251 to 300 | MIL-I-22344 | 3/4 |
| 301 to 370 | MIL-I-22344 | 1 |

Table IV - Thickness of insulating tape conforming to
MIL-I-15349, for 1/4 to 3/4 inch size
hot piping.

| Temperature range (°F.) | Pipe size | Nominal thickness |
|---|---|---|
| | | Inch |
| 125 to 250 | 1/4, 3/8 | 3/8 |
| 251 to 750 | 1/4, 3/8 | 7/8 |
| 125 to 250 | 1/2, 3/4 | 3/4 |
| 251 to 388 | 1/2, 3/4 | 1 |

Table V - Thickness[1]/ of insulating materials for hot surfaces of machinery and
equipment up to 850°F.

| Temperature range (°F.) | Nominal thickness (inches) | | |
|---|---|---|---|
| | Glass fiber felt MIL-I-16411, type II refractory fiber blanket MIL-I-23128 grade A | Asbestos felt MIL-I-15091 insulation block MIL-I-2819 mineral fiber blanket MIL-I-2818 glass fiber felt MIL-I-16411 type I | Insulating cement MIL-C-2861 |
| 125 - 338 | 1 | 1-1/2 | 1-1/2 |
| 339 - 388 | 1-1/2 | 2-1/2 | 2-1/2 |
| 389 - 500 | 2 | 3 | 3 |
| 501 - 750 | 2-1/2 | 3-1/2 | 4 |
| 751 - 850 | 3 | 4-1/2 | 5 |

[1]/Does not include finishing cement.

7

DECLASSIFIED
Authority 917 579
By VAN Nara Date 11-8

MIL-STD-769C(SHIPS)
15 November 1967

Table VI - Thickness[1]/ of insulating materials for hot surfaces of machinery and equipment over 850°F.

| Temperature range (°F.) | Thickness (inches) | | | | |
|---|---|---|---|---|---|
| | Single felt material | Combination of two felt materials | | | Block |
| | MIL-I-16411 Type II MIL-I-23128 Grade A | Inner layer MIL-I-16411 Type I or II | Outer layer MIL-I-15091 Type A | Total | MIL-I-2819 |
| 851 - 900 | 4 | 2 | 3 | 5 | 4-1/2 |
| 951 - 1050 | 4 | 2 | 3 | 5 | 5 |
| 1051 - 1200 | | | | | |

[1]/ Does not include finishing cement.

Table VII - Thickness of refrigerant insulation for piping.

| Pipe size (inches) | Temperature range (°F.) | Cellular glass HH-I-551 Nominal[1]/ thickness (inches) | | Plastic foam, MIL-P-15280 thickness, (inches) | |
|---|---|---|---|---|---|
| Up to 1-1/4 | -20 to -1 | 2-1/4 | 1-1/2* | 1-1/2 | 1* |
| | 0 to 40 | 2 | 1-1/4* | 1 | 3/4* |
| 1-1/2 to 2-1/2 | -20 to -1 | 2-1/2 | 1-3/4* | 1-1/2 | 1 |
| | 0 to 40 | 2-1/4 | 1-1/2* | 1 | 3/4* |
| 3 to 5 | -20 to -1 | 3 | 2* | 1-1/2 | 1* |
| | 0 to 40 | 2-3/4 | 1-3/4* | 1 | 3/4* |

[1]/ By nominal thickness is meant a thickness which is approximate and should only be used as a guide in determining actual thickness requirements.
* Thickness for application in air-conditioned spaces only.

Table VIII - Thickness of refrigerant insulation for machinery and equipment (exclusive of vapor barrier).

| Temperature range (°F.) | Thickness (inches) | | | |
|---|---|---|---|---|
| | Foam plastic MIL-P-15280 | | Cellular glass, HH-I-551 | |
| 0 to 35 | 3 | 1 | 5 | 1-1/2* |

* Thickness for application in air conditioned spaces only.

8

AT THE NATIONAL ARCHIVES

DECLASSIFIED
Authority 917 579
By VAN NARA Date 11-8

Table IX - Thickness of antisweat insulation (exclusive of vapor barrier).

| Temperature range (°F.) | Machinery and equipment | | Piping | |
|---|---|---|---|---|
| | Material specification | Thickness (inches) | Material specification | Thickness (inches) |
| 28 to 99 | MIL-I-15091<br>MIL-I-2819<br>HH-I-551<br>MIL-I-22023<br>MIL-P-15280 | 1-1/2 3/4*.<br><br><br>1 1/2*<br>3/4 1/2* | MIL-I-15091<br>MIL-I-2781<br>MIL-I-2819<br>HH-I-551<br>MIL-I-15280<br>MIL-I-22344 | 1 1/2*<br><br><br><br>3/4 1/2* |

* Thickness for application in air-conditioned spaces only.

Table X - Nominal thicknesses of insulation for weather deck hot piping.

| Pipe size (inches i.p.s.) | Calcium silicate, MIL-I-2781<br>Cellular glass, HH-I-551 |
|---|---|
| | Inches |
| 1/4 to 3 | 1-1/2 |
| 3-1/2 to 6 | 2 |
| Over 6 | 2-1/2 |

5.3.2 Covers may be made of segments of block insulation or preformed pipe insulation, having the same thickness as that on the adjacent piping. Blocks shall be securely wired to frames of 1/2 inch square mesh, number 18 gage (0.049-inch diameter) galvanized steel wire. Wire mesh frames inside and outside of blocks shall have ends bent over and joints secured with number 18 gage black annealed iron wire woven through the mesh. Insulating cement compatible with the material of the blocks shall be troweled smoothly over all surfaces of the wire mesh. Asbestos roll felt may be used to build up covers when the flange diameter is larger than the outside diameter of the adjacent pipe covering. Cover shall be tightly and smoothly lagged to envelop the outside and ends. For temperatures of 500°F. and below asbestos cloth lagging conforming to SS-C-466, grade AA, shall be used; grade AAA cloth shall be used above 500°F. Lagging may be cemented or sewn on, except ends of covers shall always be sewn. Where double layer insulation is used the two sections of the cover shall be fitted together with scarfed joint. Such joints shall be straight and true to reduce heat loss. Bands, eyelets, or locks of galvanized steel, or lacing with hooks, rings, washers, and wire shall be used to secure the covers.

5.3.3 When installing the above covers, spaces between inner surfaces of covers for flanges and other irregular surfaces shall be filled with pieces of insulation felt. Asbestos felt may be used when temperatures are 850°F. or less. Fibrous glass felt in accordance with MIL-I-16411 or MIL-I-23128, grade A may be used when temperatures are 1200°F. or less. Felt shall be packed loosely enought to preserve air cell structure and tightly enough to prevent air circulation.

5.4 Fabrication, machinery and equipment. For re-usable covers for machinery and equipment, either of the following methods of fabrication is acceptable.

5.4.1 Covers may be similar to the flexible asbestos felt or fiber-glass felt type described for piping components.

5.4.2 Covers may be made in sections formed of insulating block held together with wire and adhesive cement, covered with 1/2-inch thickness of finishing cement, and lagged. Lacing with hooks, rings, washers, and wire, or brass snap fasteners shall be used to secure the covers.

THE NATIONAL ARCHIVES

DECLASSIFIED
Authority 917 579
By VAN Nara Date 11-8

MIL-STD-769C(SHIPS)
15 November 1967

5.4.3  Semi-removable turbine casing flange covers may be installed as an alternate for removable covers specified above.  The permanent insulation shall be run to the casing flange allowing bolt removal space.  The flange and bolts are then covered with asbestos cloth, wire inserted asbestos cloth or incolon wire mesh, as required by operating temperature, which shall be secured to the bolts with wire.  The flange may now be insulated with fibrous glass felt MIL-I-16411, asbestos felt MIL-I-15091, mineral wool felt MIL-I-2818 or insulation block MIL-I-2819 to the required thickness and shape; the insulation is then lagged with asbestos cloth.  This cloth shall be carried over the outer edge of the permanent insulation and secured with adhesive.  The semi-removable cover shall then be sealed and painted.

6.  INSTALLATION

6.1  <u>Hot surface insulation</u>.

6.1.1  <u>Pipe and tubing</u>.  Each layer of molded insulation shall be installed with joints butted together.  Where two layers are used all joints shall be staggered.  Not less than three fastenings shall be used for securing each 3-foot section of insulation.  Fastening shall be number 18 gage minimum (0.049-inch diameter) annealed black or hot-dipped galvanized iron wire or flat steel bands.  Except as otherwise specified, lagging shall be installed over the insulation.

6.1.1.1  The installation of soot blower piping insulation shall be in accordance with drawing 5000-S5103-841336.

6.1.2  <u>Piping components</u>.  For valves, fittings, and accessories, welded and brazed fittings including unions may be insulated and lagged similarly to adjacent piping.

6.1.2.1  Block, felt, blanket insulating materials, or molded pipe insulation secured with hot-dipped galvanized iron wire, may be used.  When insulating felts are used above 850°F, the inner layer shall be fiber-glass felt conforming to MIL-I-16411 or refractory fiber felt, MIL-I-23128.  Galvanized iron wire netting, number 18 gage minimum (0.049-inch diameter), shall be spread over the insulating material and secured with wire.  Insulating cement shall be used to fill all crevices, smooth all surfaces, and completely cover the wire netting.  A 1/2-inch thickness of finishing cement shall then be applied.  Insulating material shall be the same thickness as that on adjacent piping.

6.1.2.2  For components 3-1/2 inch i.p.s. and smaller, insulating cement only conforming to MIL-C-2861, may be applied to a thickness 1/2-inch less than the adjacent pipe insulation.  A 1/2-inch thickness of finishing cement shall be applied over the insulating cement.

6.1.2.3  Re-usable covers shall be fitted where required.

6.1.3  <u>Machinery and equipment</u>.  For machinery and equipment, block, felt, or blanket insulating materials of the required thickness shall be secured with hot-dipped galvanized iron wire.  Galvanized iron wire netting 1-inch mesh and number 18 gage minimum (0.049-inch diameter) shall be spread over the surface and secured by wire.  Insulating cement shall be used to fill all crevices, smooth all surfaces, and completely cover the wire netting.

6.1.3.1  When no insulating cement has been specified, a 1/2-inch thickness of finishing cement shall be applied.

6.1.3.2  When an insulating cement has been specified it shall be applied in successive layers, 1/2-inch to 1-inch in thickness, until the total thickness specified has been reached.  Wire netting, similar to that used for covering the insulating materials shall be installed between layers.  A 1/2-inch thickness of finishing cement shall be applied over the last layer of insulating cement.

6.1.3.3  Lagging shall be installed over finishing cement.  Re-usable covers shall be installed where required.

6.1.3.4  Clips, hooks, or other fastenings for securing insulation or lagging shall not be brazed or welded to nonferrous parts of distilling plants or deaerating feed tanks.

6.1.4  <u>Boiler uptakes</u>.  For boiler uptakes the thermal insulation shall be 2-inches thick.  Either mineral wool felt, MIL-I-2818, or fibrous glass sheet, MIL-I-15475, may be used.  If acoustic absorptive treatment is found to be necessary to decrease the noise level the insulation thickness shall be increased accordingly.

10

AT THE NATIONAL ARCHIVES

DECLASSIFIED
Authority 917 579
By VAN Nara Date 11-8

MIL-STD-769C(SHIPS)
15 November 1967

6.1.4.1  Metal lagging for uptakes shall be galvanized sheet steel conforming to QQ-S-775, not less than 1/32-inch thick.

6.1.4.2  Insulation and lagging is not require on uptakes above the weather deck, except where the transfer of heat, to spaces adjacent to the uptake area, would be objectional.

6.1.5  Unfired pressure vessels.  Unfired pressure vessels including catapult wet accumulators shall be covered with block insulation MIL-I-2819 in accordance with table V. Block insulation shall be covered with 1/2-inch cement, MIL-C-2861, lagged with asbestos cloth, grade U.G. or SS-C-466, and painted in accordance with 6.6.  Insulation in the way of vessel supports shall be metal faced to prevent insulation from wedging between the vessel and its support.

6.1.5.1  Removable and re-usable covers shall be installed over butt welded shell inserts for which periodic radiographic inspection of the joint is required.  These covers shall extend 4 inches beyond the welded joint.

6.2  Antisweat insulation (cold and chilled water service).

6.2.1  Molded pipe covering, cellular glass, water repellent asbestos felt, or fibrous glass insulation shall be secured with number 18 gage minimum (0.049-inch diameter) hot-dipped galvanized iron wire, soft annealed copper wire, QQ-W-343, wire inserted asbestos yarn, or glass thread, MIL-C-20079, spirally wound on 1-inch centers.  One layer of water repellent and fire resistant paper, UU-B-790, shall be wrapped tightly around the insulation and secured with cotton twine, T-T-931, glass thread, MIL-C-20079, or 1-inch wide tape, UU-T-106.  All joints of the paper shall be lapped and sealed with adhesive cement, MIL-A-3316, class 1.  The compatible lagging shall then be installed and completely covered with vapor barrier compound, MIL-C-19565, type II.  The water repellent paper may be eliminated on cellular glass where the insulation surface is suitable for the effective application of vapor barrier compound MIL-C-19565.

6.2.2  Application of a vapor barrier is not required on elastomeric foamed plastic insulation, MIL-P-15280, nor is lagging required except in areas where such insulation would be subject to damage.

6.3  Refrigerant insulation.

6.3.1  Cellular glass insulation shall be coated on all surfaces with vapor barrier compound, MIL-C-19565, type II at the time of installation.  Insulation shall be installed with staggered end joints.  On horizontal pipes the longitudinal joints shall be at the top and bottom.  Insulation shall be secured with number 18 gage minimum (0.049-inch diameter) copper-covered steel wire or 1-inch wide tape, UU-T-106, on 9-inch centers.  The compatible lagging shall then be installed and completely covered with vapor barrier compound, MIL-C-19565, type II.

6.3.2  Elastomeric foamed plastic, MIL-P-15280 may be applied in 1/4-inch minimum thickness layers as necessary to build up the required thickness (type II, form 1 or 2).  All longitudinal and butt joints shall be staggered.  All joints and lagging, if required (see 6.2.2), shall be secured with adhesive cement in accordance with paragraph 3.7 of MIL-P-15280.

6.4  Weather deck hot piping insulation.

6.4.1  Calcium silicate or cellular glass insulation for piping exposed to the weather shall be installed as follows:

   (a)  Preliminary preparation of piping.

       (1)  All surfaces to be clean, dry, and free of scale and grease.
       (2)  Fittings, valves, flanges, pipe supporting clamp, and at least 3 inches of adjacent pipe shall be painted as follows:  Apply one coat pretreatment formula 117, MIL-C-15328.  After this coat dries, apply two coats of aluminum paint made by mixing two pounds of aluminum paste, TT-P-320, type II, class B, with each gallon of phenolic varnish.
   (b)  Installation on pipes.
       (1)  The bore, butt ends, and longitudinal joint surfaces of cellular glass insulating material shall be coated not more than 1/16 inch thick with commercial bedding compound, in accordance with MIL-I-19564, at time of

11

DECLASSIFIED

Authority  917 579

By VAN  NARA  Date  11-8

             installation.  Bedding compound is not required with calcium silicate
             pipe covering.

   (2)  Longitudinal joints on horizontal piping shall be on top and bottom of
        pipe.

   (3)  Insulation shall be secured tightly to pipe with 1/2-inch wide U.S.
        Standard 22 gage galvanized steel bands on 9-inch centers.  Steel
        bands shall be placed over a layer of fibrous glass tape, MIL-C-20079,
        class c, which has been dipped in the commercial finishing compound in
        accordance with MIL-C-19565 type I.  Steel bands shall be wrapped with
        a layer of masking tape, UU-T-106, type II.

   (4)  Completely coat insulation with commercial finishing compound, in
        accordance with MIL-C-19565, using about 2 gallons per 100 square feet.
        Wrap on tightly one layer of open weave fibrous glass cloth, MIL-C-466,
        or knitted fibrous glass tape, MIL-C-20079, and then apply another
        coating of above-specified finishing compound, using about 4 gallons
        per 100 square feet.  After this coat has set apply a second coat of
        finishing compound using the same quantities.

   (5)  Where insulation is stopped off on the piping, sufficient mineral wool,
        MIL-I-2818, shall be tightly tied in place with galvanized iron wire
        over a heavy coating of the above-specified commercial bedding com-
        pound, to provide a tapered portion from insulation surface to pipe
        surface.  The ends of the insulation shall be tapered at a 30-degree
        angle with the pipe.  The tapered ends of the insulation shall be
        smoothed with insulation cement in accordance with MIL-C-2861.  The
        cement covered tapered ends, after drying thoroughly, shall be coated
        with approximately a 1/8-inch thick tack coat of end sealing compound
        in accordance with MIL-C-22395.  The sealer compound shall extend onto
        the pipe for at least 3 inches.  A single layer of grade D, class 2,
        asbestos cloth lagging, in accordance with SS-C-466, shall be applied
        over the insulation and secured at longitudinal lap joint with class
        1 adhesive cement in accordance with MIL-C-3316.  The asbestos lagging
        cloth shall be tailored to fit the contour of the ends of the insula-
        tion by cutting and removing wedge-shaped sections of the cloth.  The
        remaining ends of the cloth shall be embedded in the tack coating of
        sealer compound and shall be attached to the pipe with a single 1/2-
        inch wide galvanized steel band.  A 3/16-inch layer (approximately) of
        sealer compound shall be troweled to a smooth finish over the cloth
        covered ends of the assembly.  A smooth finish may be obtained by brush
        coating or hand rubbing the sealer compound with a suitable solvent.
        After 72 hours of drying at ambient temperature, the asbestos cloth of
        the assembly shall be given two brush coats of water- and weather-
        resistant coating compound in accordance with MIL-C-19565.  The water-
        proofing compound shall extend halfway down the tapered ends of the
        assembly.  The waterproofing compound shall be air dried 24 hours be-
        tween applications.

 (c)  Installation on fittings, flanges, and valves.

   (1)  Before applying flange insulation weather deck piping shall be tested
        and secured in the following manner:  After specified tests are
        completed, weather deck piping shall be subjected to alternate
        periods of full operating pressure, allowing pipe to come to maximum
        temperature; and then to zero gage pressure allowing pipe to come to
        ambient temperature.  These cycles shall be repeated a sufficient
        number of times tightening and adjusting flanges where necessary until
        no leaks can be detected.

   (2)  Fittings, flanges, and valve covers shall be ship-fabricated from
        sections of molded pipe covering or cellular glass block cemented to-
        gether with adhesive cement, MIL-A-18065, class 1.

   (3)  Permanent covers for fittings and valves shall be fitted snugly to
        fittings and adjacent pipe covering using the same materials and methods
        as outlined for pipe covering.  Voids between insulation and fitting
        shall be filled with tightly packed mineral wool, MIL-I-2818.

   (4)  Where specified, rigid-type portable flange covers shall extend over the
        adjacent pipe covering 1-1/2 times the thickness of the insulation.
        The two halves of the cover should be coated and lagged separately,
        using the same materials and procedure as outlined for pipe covering.
        The galvanized steel bands used to secure the two halves together and
        to the adjacent pipe covering shall be applied over the lagging and
        then coated with the above-specified finishing compound.

THE NATIONAL ARCHIVES

DECLASSIFIED
Authority 917 579
By VAN NARA Date 11-8

MIL-STD-769C(SHIPS)
15 November 1967

(d) Installation around supports and hangers.
   (1) Remove only enough installation from butt edges to provide a snug fit around support brackets or hanger rods.  Fill all voids between insulation and support with tightly packed mineral wool, MIL-I-2818, to within 1/4 inch from insulation surface.  Fill remainder of space with end sealing compound in accordance with MIL-C-2250S overlapping generously both the support member and the adjacent insulation.  Lag and coat with the same method and materials as adjacent piping.

6.5  Metal lagging.  Metal lagging shall be installed with lap joints, secured with hardened self-tapping screws or metal bands.  Joints shall be arranged in a manner which will facilitate run-off of impinging liquids.

6.6  Painting.  All cloth and tape laggings shall be painted after installation with one coat of fire-retardant white paint, TT-P-26, if necessary for appearance.  Elastomeric foamed plastic insulation MIL-P-15280 shall not be painted except where necessary for appearance.  (For material and application requirements, see Section 9190-1 of the General Specifications for Ships of the U.S. Navy or ships specifications.)

7.  NOTES

(Copies of this standard for military use may be obtained as indicated in the foreword to, or the general provisions of, the Index of Military Specifications and Standards.)

Both the title and the identifying number should be stipulated when requesting copies of Military Standards.

<div align="right">
Preparing activity:
Navy - Sh
(Project 5640-N0211)
</div>

DOCUMENT CERTIFICATION

I, Celia A. Booth, do swear under the penalties of perjury that the documents attached hereto are true and accurate copies of the original documents in the custody of the Archivist of the United States.

_Celia A. Booth_
Celia A. Booth

I, _RALPH HAMMOCK_, a commissioned Notary Public of the Commonwealth of Virginia, do certify that Celia A. Booth appeared before me on this date in the City of Alexandria in the Commonwealth of Virginia and that I took her oath aforesaid.

SEAL

Date: _AUGUST 5, 2006_

My Commission Expires On: _APR 30, 2010_

| Approved |
| --- |
| _JOM. Nicholson_ |
| For Chief of Bureau |
| 14 January 1966 |

DEPARTMENT OF THE NAVY
BUREAU OF SHIPS
WASHINGTON, D. C.   20360

Case MDL No. 875 Document 4911 Filed 11/03/06 Page 295 of 404

REPRODUCED AT THE NATIONAL ARCHIVES

**INITIAL DISTRIBUTION**

1 copy (designated "Library Copy") to each Naval Shipyard (SNDL L1)

1 copy, except as noted, (designated "For information and retention") to each of the following activities:

Chief Field Branch, BUMED, 3500 Broad St., Philadelphia, Pa.
BUWEPS (RSWI) (3 copies)
BUSANDA (W1)
DATMOBAS
MEL (Code 820)
NAVSHIPSO
NAVBOTLAB
NAVSUPRANDFAC
NAVWPNSERVO (Code SST)
NSMSES
NOL
SPCC MECH
U.S. Naval Engineering Laboratory (Code NE-42)

REPRODUCED AT THE NATIONAL ARCHIVES

## TABLE OF CONTENTS

| Section | Title | Page |
|---|---|---|
| 5000-0 | General Administrative Requirements | 1 |
| 9010-0 | Characteristics | In Addendum |
| 9020-0 | General Requirements for Design and Construction | 7 |
| 9020-1 | Plans | 16 |
| 9020-2 | Models and Mockups | 29 |
| 9020-3 | Photographs | 30 |
| 9020-5 | Instruction Books | 32 |
| 9020-6 | Government Furnished Material | 35 |
| 9020-11 | Shipboard Tests | 36 |
| 9080-1 | Ship Trails | 38 |
| 9090-1 | Welding, Riveting, and Allied Processes | 43 |
| 9090-3 | Screw Threads | 44 |
| 9110-0 | General Requirements for Hull Structure | 48 |
| 9110-1 | Shell Plating | 55 |
| 9110-3 | Framing for Shell Plating | 57 |
| 9110-4 | Skeg and Bilge Keels | 58 |
| 9110-5 | Bulkheads and Partitions | 59 |
| 9110-6 | Decks and Platforms | 63 |
| 9110-9 | Structural Stanchions | 64 |
| 9110-12 | Foundations | 65 |
| 9110-16 | Superstructure | 68 |
| 9120-1 | Mooring and Towing Fittings | 69 |
| 9120-2 | Rails, Stanchions, and Life Lines | 70 |
| 9120-3 | Fixed Port Lights and Windows | 72 |
| 9120-4 | Locks, Keys, and Tags | 74 |
| 9120-5 | Hull Fittings | 77 |
| 9140-1 | Deck Covering | 79 |
| 9150-1 | JP-5 Systems | 83 |
| 9160-1 | Access | 86 |
| 9160-2 | Doors, Hatches, Scuttles, and Manhole Covers | 88 |
| 9160-4 | Ladders, Handrails, Floorplates, and Gratings | 95 |
| 9170-1 | Masts and Spars | 99 |
| 9170-3 | Variable Depth Sonar (VDS) Modified AN/SQA-13 System | 101 |
| 9180-1 | Rigging | 102 |
| 9180-2 | Awnings, Weather Screens, Covers and Vinyl Film Curtains | 104 |
| 9190-1 | Painting | 105 |
| 9190-3 | Zinc Coating | 120 |
| 9190-6 | Cathodic Protection | 121 |
| 9200-1 | Capstans | 122 |
| 9200-3 | Replenishment-at-sea and Stores Handling | 123 |
| 9210-1 | Hydraulic Power Transmission System | 126 |
| 9220-1 | Rudder | 130 |
| 9220-2 | Steering Gear | 133 |
| 9240-1 | Command, Combat Control, Communications, and Electronics Stations and Spaces | 138 |
| 9240-2 | Machinery Control Station | 141 |
| 9260-1 | Anchor Stowage and Handling | 142 |
| 9280-1 | Machinery and Piping Designating and Marking | 147 |
| 9280-2 | Electrical Designating and Marking | 154 |
| 9280-3 | Hull Designating and Marking | 170 |
| 9280-6 | Draft Marks | 180 |
| 9290-1 | Weights | 182 |
| 9290-3 | Inclining Experiment | 188 |
| 9290-4 | Activated Fin Stabilizer | 189 |
| 9290-8 | Compartment Testing | 193 |
| 9300-1 | Storerooms and Issue Rooms | 197 |
| 9300-3 | Special Stowage Arrangements | 201 |
| 9310-1 | Repair Parts | 205 |
| 9320-1 | Offices | 208 |
| 9330-0 | General Requirements for Living, Messing, and Recreation Spaces | 211 |
| 9330-2 | Officer Living, Messing, and Recreation Spaces | 213 |
| 9330-3 | Chief Petty Officer Living, Messing, and Recreation Spaces | 215 |
| 9330-4 | Crew Living, Messing, and Recreation Spaces | 216 |
| 9330-5 | Utility Spaces | 218 |
| 9340-1 | Commissary Spaces | 219 |
| 9350-1 | Laundry | 223 |
| 9360-1 | Plumbing | 225 |
| 9360-4 | Garbage Disposal | 228 |
| 9360-6 | Ratproofing | 229 |
| 9370-1 | Medical Spaces | 230 |
| 9380-1 | Ventilation, Heating, and Air Conditioning | 232 |
| 9390-1 | Thermal Insulation and Acoustic Absorptive Treatment of Compartments | 248 |
| 9390-2 | Thermal Insulation for Machinery, Equipment and Piping | 252 |
| 9390-3 | Hull Damping, Sonar Dome Baffles, and Dome Isolation | 255 |
| 9390-4 | Thermal Insulation, Refrigerated Spaces | 257 |

ODUCED AT THE NATIONAL ARCHIVES

| Section | Title | Page |
|---|---|---|
| 9390-5 | Thermal Insulation and Acoustic Absorptive Treatment for Ducts and Trunks | 258 |
| 9390-6 | Sheathing | 260 |
| 9400-0 | General Requirements for Machinery Plant | 261 |
| 9400-1 | Noise, Shock and Vibration | 265 |
| 9400-3 | Noise and Shock—Additional Requirements | In Addendum |
| 9410-1 | Propulsion Steam Turbines | 275 |
| 9420-1 | Propulsion Reduction Gears | 284 |
| 9420-2 | Propulsion Couplings | 289 |
| 9430-1 | Propulsion Shafting | 290 |
| 9430-2 | Propulsion Shaft Bearings | 295 |
| 9440-1 | Propeller | 296 |
| 9450-1 | Lubrication Systems | 301 |
| 9460-1 | Steam Condensers and Air Ejectors | 309 |
| 9470-1 | Pumps | 312 |
| 9480-0 | General Requirements for Piping Systems | 319 |
| 9480-1 | Drainage Ballasting Systems | 358 |
| 9480-2 | Machinery and Piping System Drainage | 361 |
| 9480-3 | Sea Water Service Systems | 367 |
| 9480-4 | Fresh Water Service Systems | 371 |
| 9480-5 | Machinery Circulating Water and Cooling Water Systems | 382 |
| 9480-8 | Plumbing and Deck Drains | 385 |
| 9480-9 | Overflows, Air Escapes, Plumbing Vents, and Sounding Arrangements | 390 |
| 9480-10 | Steam and Exhaust Systems | 395 |
| 9490-1 | Compressed Air Systems | 400 |
| 9500-1 | Auxiliary Machinery | 411 |
| 9510-1 | Boilers | 423 |
| 9510-2 | Boiler Controls | 435 |
| 9520-1 | Combustion Exhaust Gas Systems | 443 |
| 9520-2 | Diesel Engine Combustion Air and Exhaust Systems | 445 |
| 9530-1 | Forced Draft Systems | 446 |
| 9550-1 | Fuel Systems | 450 |
| 9560-1 | Condensate and Feed Water Systems | 454 |
| 9580-1 | Distilling Plants | 450 |
| 9590-1 | Refrigeration and Air Conditioning Plants | 462 |
| 9600-0 | General Requirements for Electric Plant | 473 |
| 9610-1 | Ship Service Generator Sets | 484 |
| 9610-4 | Electric Power Supply Conversion Equipment | 492 |
| 9620-0 | General Requirements for Electric Power Distribution Systems | 497 |
| 9620-1 | Switchboards and Panels for Electric Power and Lighting | 504 |
| 9620-2 | Electric Cable | 511 |
| 9620-3 | Electric Distribution and Wiring Equipment | 535 |
| 9620-4 | Storage Batteries | 540 |
| 9620-5 | Protective Devices for Electric Circuits | 541 |
| 9630-1 | Electric Motors, Controllers, and Brakes | 546 |
| 9640-1 | Lighting Systems | 550 |
| 9650-0 | General Requirements for Interior Communication Systems | 567 |
| 9650-1 | Sound Powered Telephone Systems | 573 |
| 9650-2 | Announcing, Recording, and Entertainment Systems and Portable Equipment | 579 |
| 9650-3 | Voice Tubes and Message Passing Facilities | 586 |
| 9650-4 | Electrical Alarm, Safety and Warning Systems | 588 |
| 9650-5 | Electrical Indicating, Order, and Metering Systems | 595 |
| 9650-8 | Switchboards for Interior Communication and Weapons Control Systems | 603 |
| 9670-0 | Requirements for Electronic Systems | 607 |
| 9670-1 | Radio Frequency Transmission Lines | 621 |
| 9670-2 | Requirements for Secure Processing Equipments and Secure Processing Centers | In Addendum |
| 9700-1 | Whistles | 625 |
| 9710-1 | Weapons Control Systems | 626 |
| 9730-1 | Armament Installations | 631 |
| 9750-1 | Torpedo Stowage and Handling | 635 |
| 9750-2 | ASROC Loading, Stowage and Handling | 637 |
| 9780-1 | Ammunition Handling | 640 |
| 9780-3 | Ammunition Stowage | 641 |
| 9810-3 | Torpedo Countermeasure Systems | 643 |
| 9810-4 | Bathythermograph Handling | 644 |
| 9810-6 | Degaussing System | 645 |
| 9820-1 | Boats, Stowing and Handling | 654 |

DUCED AT THE NATIONAL ARCHIVES

| Section | Title | Page |
|---------|-------|------|
| 9830-1 | Helicopter Stowage, Handling, Landing, and Launching Facilities .................. | 658 |
| 9870-1 | Instruments and Instrument Boards ................... | 661 |
| 9880-1 | Damage Control Books ......... | 668 |
| 9880-2 | Damage Control Facilities ..... | 669 |
| 9880-3 | Compartment Checkoff Lists .... | 670 |
| 9910-1 | Workshops ................... | 672 |
| 9920-1 | Portable Tools and Equipment .. | 677 |
| 9930-1 | Fire Extinguishing Systems .... | 678 |

.ODUCED AT THE NATIONAL ARCHIVES

SECTION 9390-1
## THERMAL INSULATION AND ACOUSTIC ABSORPTIVE TREATMENT OF COMPARTMENTS

### 9390-1-a.  Thermal insulation

Thermal insulating material shall be unfaced or faced fibrous glass board conforming to Mil. Spec. MIL-I-742.  Installation of board shall be in accordance with plan, BUSHIPS No. 805-1749057.  Area of application, extent of coverage, and thickness of insulation shall be in accordance with the thermal insulation requirements table and the following additions and exceptions thereto:

Insulation on vertical surfaces shall extend from 6 inches above the deck to the overhead except for warm side of refrigerated stores spaces, uptake spaces, magazines, and ammunition handling and ready service spaces, where insulation shall extend from deck to overhead.

Where only a partial area of a boundary requires insulation (i.e., where the overhead of a category "F" space is partially protected from the weather by a category "D" space), insulation shall extend 12 inches beyond the area requiring insulation.

Boundaries abutting insulated boundaries where insulation is not otherwise required shall be insulated for a distance of 12 inches from such insulated boundaries.  Such insulation is not required on bulkheads of category "A" spaces if such bulkheads are terminated by a deck exposed to the weather.

Escape trunks within category "A" spaces shall be insulated with two-inch board on the hot side of the surfaces forming the escape trunks.

Insulation will not be required in way of shower stalls, or built-in furniture except in way of berths.  Insulation shall be provided behind built-in berths, and shall extend down to the deck and out 9 inches from the weather boundary or to the back of subbase, whichever is less.  Shelf plates and end filler plates shall terminate at the inboard surface of the insulation and shall be fastened to clips welded to the structure and extending through the insulation.  Openings shall be provided at each end of shelf plates and in filler plates between ends of berths and the insulated boundary.  Each opening shall have a minimum gross area of 36 square inches and shall be fitted with 1/4-inch wire mesh screen.  Filler plate openings shall be located near the deck.

Insulation behind lavatories, service sinks, water closets, and food preparation tables shall be sheathed from the deck to at least two feet above the working surface of the fixtures.

Insulation on bulkheads of commissary spaces in way of heat producing commissary equipment and vegetable peeling machines shall be sheathed in accordance with the requirements of 9340-1.  Insulation on other areas adjacent to these fixtures which may become wet or coated with grease or in any area where insulation is subject to damage or exposed to heavy traffic shall also be sheathed.  Where insulation installed on vertical stiffeners may be subject to damage by removable chairs, it shall also be sheathed from six inches above the deck to a height of at least three feet.  Sheathing shall be polished corrosion-resisting steel .030 inches (min.) thick, AISI type 304, finish four.

Boundaries of fan rooms used as plenums for supply systems shall be considered weather boundaries to spaces adjacent to such fan rooms.

Doors shall not be insulated except for doors to ammunition and missile stowage spaces which shall be insulated with one-inch board.

Types of compartments included under categories listed in thermal insulation requirements table are as follows:

Category "A"
All spaces, 120 degrees F. and over.

Category "B"
All spaces, 106 degrees F. to 119 degrees F.

Category "C"
All spaces, 101 degrees F. to 105 degrees F.
Stowage space containing precision instruments.
Stowage spaces containing flammable liquids or bottled gasses.

Category "D"
All spaces (non-air conditioned), 100 degrees F. and less.

Category "E"
Drying rooms

Category "F"
All (air conditioned) spaces 85 degrees F. or over.
Passages used as air conditioned air returns.
Fan rooms used as return air plenums for air conditioning systems.
WR, WC and shower spaces fitted with mechanical exhaust ventilation and natural supply ventilation from air conditioned areas.

Category "G"
All air conditioned spaces, 84 degrees F. or less.

9390-1
DE 1078

248

DUCED AT THE NATIONAL ARCHIVES

Category "H"

Ammunition and missile stowage spaces, ready service rooms and handling rooms.

5  |  All spaces containing ammunition, missiles, fuses, pyrotechnics smokeless, flashless and black powder, H.E. and components classified as fire, missile or explosion hazards.

Category "I"

Dry provisions storeroom

10  Category "J"

Stowage spaces not otherwise specified herein.

Each box of the table gives, by symbol, the insulation requirements (both room side and ad-
15  joining side) for any boundary of a compartment listed in column "O". The upper right hand side of each box gives the insulation requirement for the adjacent side of the boundary of the compartment listed in column "O". The lower left hand side
20  of the box gives the room side insulation requirement for that boundary. When either hand of the box indicates insulation on the deck, insulation indicated would be installed on the underside of the deck, unless the other hand of the box already in
25  dicates an insulation requirement for that overhead, in which case only the greater of the two thicknesses or extents will be required. If the underside of a deck is a shower, void, or tank, insulation will not be installed on either side of the deck. When the
30  insulation requirement is shown in the center of the box, the insulation shall be installed on the plane surface side of the bulkhead only.

Insulation thickness and extent of coverage shall be as follows wherever indicated on the thermal
35  insulation requirements table by the following symbols:

0 — No insulation required

8 — Deck covered with wood (normally 2 inches thick)

40  12 — One inch thick insulation required on plane surfaces, and full depth of webs on beams and stiffeners, except if beams and stiffeners are over 12 inches deep cover webs for a distance of only 12 inches from boundary.

45  14 — One inch thick insulation required on plane surfaces, and on webs and flanges of beams and stiffeners.

14p — Same as "14", except if beams and stiffeners are over 12 inches deep, the flanges
50  are not covered and the webs are covered for a distance of only 12 inches from boundary.

18 — Two-inch thick insulation required on plane surfaces, and one-inch thick on webs and flanges of beams and stiffeners, except if beams
55  and stiffeners are over 12 inches deep, the

flanges are not covered and the webs are covered for a distance of only 12 inches from boundary.

In addition to the requirements listed in the table, the following insulation shall be applied on
60  the deck of all main and second deck air conditioned spaces over the main machinery space, and the 01 level over the forced draft blower rooms Nos. 1 and 2 and the uptakes:

65  (a) Main and second decks.—Insulation shall consist of one inch thick insulating blocks, Mil. Spec. MIL-I-2819, covered with one inch insulation underlayment MIL-D-23134.

70  (b) 01 level.—Insulation shall consist of one inch thick insulating blocks, Mil. Spec. MIL-I-2819, covered with a minimum 3/8 inch thick latex underlay, Mil. Spec. MIL-D-3135, to make a level, well adhered base for applying deck covering as specified in 9140-1.
75  The insulating block, sides and bottom, shall be cemented with Minnesota Mining and Mfg. Co. adhesive 1357, or equivalent. Joints of the insulating block shall be tightly fitted.

80  **9390-1-b.  Acoustic absorptive treatment**

Spaces shall be acoustically treated as required to meet noise levels in 9400-1.

Acoustic treatment shall be applied to plane surfaces only and shall consist of; 2-inch thick
85  sound absorbing fibrous glass felt, Mil. Spec. MIL-I-22023, Type II, Class 2 or 3 sheathed with aluminum alloy sheet, Fed. Spec. QQ-A-250/8, 0.04 inch (minimum) thick, perforated with 3/16-inch diameter holes on 3/8-inch or 1/2 inch center; or
90  2-inch thick perforated hard surfaced fibrous glass acoustical absorptive board Mil. Spec. MIL-A-23054.

Areas requiring overhead sheathing by 9390-6 and also requiring overhead acoustical treatment, shall have perforated aluminum ceilings.
95  The acoustic absorptive treatments shall be installed in compliance with plan, BUSHIPS No. S3901-921905, except that the acoustical absorptive board shall be secured by studs and fasteners, and its joints taped in accordance with the details for
100  faced thermal insulation board shown on plan, BUSHIPS No. 805-1749057.

Wherever acoustical absorptive treatment is required for noise reduction in rooms, doors to these spaces shall be covered only if the additional area
105  is necessary to obtain the desired reduction.

The surface of the acoustical absorptive treatments shall be painted as specified in 9190-1.

Where acoustic absorptive treatment is required for an overhead and a dropped ceiling is required by
110  another section of this specification, one of the

9390-1
DE 1078

249

following methods shall be followed:

Perforated aluminum sheathing shall be installed at the desired height and sound absorbing fibrous glass felt shall be installed directly upon it.

Perforated hard surfaced fibrous glass acoustical absorptive board shall be installed at the desired height, with no sheathing required. Neither of the above methods negate any thermal insulation requirements for the overhead.

Where acoustical absorptive treatment is required on vertical surfaces treatment shall be eliminated behind status boards or large equipment which hides the bulkheads. The aluminum sheathing, if used, may be formed into pans and secured to the structure with through connections.

If acoustical treatment is required for any area for which thermal insulation is specified herein, only the acoustic treatment shall be applied to the plane surfaces, and thermal insulation if required shall be applied to beams and stiffeners.

Acoustical absorptive treatment shall be installed on the overhead and boundary bulkheads within the forced draft blower rooms. The minimum treatment shall consist of a 2 inch thickness of fibrous glass blanket Mil. Spec. MIL-I-22023, type II, faced on the room side with a 0.0025 inch aluminum foil septum. A second 2 inch thickness of fibrous glass blanket unfaced shall be installed and sheathed with perforated aluminum alloy sheathing.

As a minimum, acoustical absorptive treatment shall be installed, except as noted above, on boundary bulkheads, both sides of divisional bulkheads, and on the overhead of the following spaces:

C.I.C.
Radio central
Chart room
Crypto room
Sonar control room
ECM control room
Secure teletype
Transmitter room
Electrical central
Switchboard space in auxiliary machinery room #2
Fire room and engine room control stations

### 9390-1-c.  Antisweat treatment

For vermiculite paint materials and method of application, see 9190-1.

Vermiculite paint shall be applied on the warm side of uninsulated boundaries, including webs and flanges of beams and stiffeners in the following locations:

Interior surfaces, including uninsulated flanges, of all spaces, except tanks, voids, and heat producing spaces, exposed to the sea or weather, or where sweating will occur because of opposite extremes in temperature.

Deck under, and all vertical boundaries of air conditioned spaces common to spaces that are not air conditioned.

Exterior surfaces of water tanks in way of all spaces except voids.

Vermiculite paint shall be applied to hangers, brackets, clips, and other members secured to or penetrating boundaries exposed to the sea and where dripping will affect electric installations.

### 9390-1-d.  Vapor barrier

A vapor barrier shall be applied to all insulation within drying rooms, and to the insulation on the warm side of refrigerated stores spaces.

Vapor barrier shall consist of one of the following:

Three coats of vinylidene resin, BUSHIPS formula 113, alternate coats of white and orange, applied to the face, four edges, and two inches of the periphery of the soft surface of each separate section of board before installation. After installation, all seams shall be coated and punctures in the vapor barriers, such as in way of studs, shall be touched up with three coats of vinylidene resin.

Three brush coatings of vapor barrier coating compound, Mil. Spec. MIL-C-19993, alternate coats of white, orange, and white, applied over the exposed surfaces of the installed hard faced fibrous glass board.

No holidays shall exist in any single coat of vapor barrier coating.

### 9390-1-e.  Plans

Plans shall be prepared indicating:

Kind, extent, and thickness of thermal insulation, and acoustic absorptive treatment.

Details showing method of fitting around structural members.

Finishing details in way of fixed port lights and other bulkhead openings.

Details showing method of securing thermal insulation and acoustic absorptive treatment.

Sheathing.

Finish for exterior surface of insulation.

9390-1
DE 1078

250

# THERMAL INSULATION REQUIREMENTS

| ROOM SIDE BOUNDARIES | ADJOINING SIDE BOUNDARIES | | | | | | | | | | | VOIDS AT SHELL | | WEATHER BOUNDARIES | | | SEA | BALLAST TANKS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| COLUMN | "A" | "B" | "C" | "D" | "E" | "F" | "G" | "H" | "I" | "J" | "K" | REFRIGERATED STORES SPACE | ABOVE L.L.W.L. | Horizontal (Bare Metal) | Horizontal (Wood Deck) | Vertical Above L.W.L. | Vertical Below L.W.L. | |
| TYPE OF COMPARTMENT | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| LINE / 0 | | | | | | | | | | | | | | | | | | |
| CATEGORY "A" / 1 | 0/18 | 0/18 | 0/18 | 0/18 | 0/14 | 0/18 | 0/18 | 14/18 | 0/18 | 0/0 | | –/18 | 0/0 | 0/14 | 8 | 0/0 | 0/0 | 0/0 |
| "B" / 2 | 18/0 | | 0/0 | 0/0 | 14/0 | 0/0 | 0/0 | 14/0 | 18/0 | 0/0 | | –/14 | 0/0 | 0/0 | 8 | 0/12 | 0/12 | 0/12 |
| "C" / 3 | 18/0 | 0/0 | | 14p/0 | 14/0 | 14p/0 | 14p/0 | 14p/0 | 14p/0 | 0/0 | | –/14 | 14/0 | 0/0 | 8 | 0/12 | 0/12 | 0/0 |
| "D" / 4 | 18/0 | 14p/0 | 14p/0 | | 14/0 | 14p/0 | 14p/0 | 14/0 | 14p/0 | 0/0 | | –/14 | 14/0 | 14p/0 | 8 | 0/12 | 0/12 | 0/0 |
| "E" / 5 | 14/0 | 14/0 | 14/0 | 14/0 | | 14/0 | 0/0 | 14/0 | 0/0 | 0/0 | | –/14 | 0/0 | 14p/0 | 8 | 0/12 | 0/12 | 0/0 |
| "F" / 6 | 18/0 | 14p/0 | 12/0 | 14p/0 | 14/0 | | 0/12 | 14/0 | 0/0 | 0/12 | | –/14 | 12/0 | 14p/0 | 8 | 14p/0 | 0/12 | 0/0 |
| "G" / 7 | 18/0 | 14p/0 | 12/0 | 14p/0 | 14/0 | 0/12 | | 14/0 | 0/12 | 0/0 | | –/14 | 14/0 | 14/0 | 8 | 0/0 | 0/14 | 0/0 |
| "H" / 8 | 18/14 | 14p/0 | 14/0 | 14/0 | 14/0 | 14/0 | 14/0 | | 14/0 | 0/14 | | –/14 | 12/0 | 18/0 | 8 | 14p/0 | 0/12 | 0/0 |
| "I" / 9 | 18/0 | 14p/0 | 14/0 | 14/0 | 14/0 | 0/0 | 12/0 | 0*/0 | | 0/14 | | –/14 | 12/0 | 18/0 | 8 | 14p/0 | 0/12 | 0/0 |
| "J" / 10 | 0/0 | 14p/0 | 0/0 | 12/0 | 14/0 | 0/12 | 12/0 | 14/0 | 14/0 | | | –/14 | 0/0 | 18/0 | 8 | 0/14 | 0/0 | 0/0 |
| "K" / 11 | | | | | | | | | | | | | | | | | | |

*No. 14 insulation shall be applied on the projectile side of the common bulkhead between 5"/54 magazine and projectile stowage.

REPRODUCED AT THE NATIONAL ARCHIVES

## SECTION 9390-2
## THERMAL INSULATION FOR MACHINERY, EQUIPMENT, AND PIPING

### 9390-2-a.  Definitions

**Hot surface insulation.**—A type of thermal insulation applied on external surfaces of components which are 125 degrees F. or higher to protect personnel and limit undesirable heat transfer.

**Antisweat insulation.**—A type of thermal insulation applied on components to either prevent formation of condensation on their external surfaces or to limit absorption of external heat which would be detrimental to the system operation.

**Refrigerant insulation.**—A type of thermal insulation applied on external surfaces of components conveying cold fluids, such as Refrigerant 12, to limit absorption of heat by the refrigerant and to prevent ice formation on the surfaces.

**Lagging.**—A protective and confining covering or jacket such as cloth, tape or sheet metal, applied over insulating materials.

**Fastenings.**- Items such as hooks, wire, and adhesive used to secure insulation materials and lagging.

**Machinery covering or pipe covering.**—A composite covering including a thermal insulation, its fastenings, its lagging and its vapor barrier (when specified).

**Re-usable covers.**—Machinery covering or pipe covering which can be removed without being damaged and easily replaced for continued use.

### 9390-2-b.  Applications

**Hot surface insulation.**—All components having hot external surfaces shall be insulated in accordance with the following criteria:

Surfaces which can attain a temperature of 125 degrees F. or higher during any service condition shall be insulated wherever necessary to protect personnel, prevent undesirable transfer of heat to the surroundings, or prevent transfer of heat from the component wherever such transfer would be detrimental to operation of the component or system.

For the following applications, strict adherence to the foregoing would not be practicable or desirable and insulation shall not be installed for:

Any hot surface for which freedom of insulation is essential for its proper operation, such as a boiler gage glass.

Mechanical joints exposed to sub-atmospheric pressures.

Fuel piping between headers and burners.

Thermostatic and bimetallic steam traps and and their inlet piping within 24 inches of the traps.

Piping in bilges.

Pressure gage piping.

For maximum fire prevention, surfaces which could attain a temperature of 450 degrees F. or higher, and where impingement of a flammable fluid on these surfaces is a distinct possibility, shall always be insulated or shielded unless this would prevent proper functioning of the system or component.  See 9480-0 for additional fire safety requirements to prevent impingement of flammable fluids on surfaces 450 degrees F. and higher which cannot be insulated.

**Antisweat insulation.**—All components, except those in refrigerant applications, handling fluids in the temperature range of 28 degrees F. to 95 degrees. F. shall be insulated in accordance with the following criteria:

To limit absorption of heat from an external source which would be detrimental to the system, such as a chilled water system.

To prevent formation of condensation on surfaces of components which would be objectionable from:

A habitability standpoint, such as condensation dripping on personnel.

A danger standpoint, such as condensation dripping on electrical and electronic equipment.

A damage standpoint, such as condensation dripping on stores or supplies.

A maintenance standpoint, such as condensation dripping on machinery, equipment, or painted surfaces of bulkheads or decks which are normally kept in ship shape condition.

For the following applications, strict adherence to the foregoing would not be practicable or desirable and insulation need not be installed for:

Any cold surface for which freedom of insulation is essential for its proper operation, such as the pipe coils in a refrigerated space.

When only in an emergency condition does fluid flow in the system which could cause sweating, such as dry pipe systems, and parts of wet systems such as the piping between sprinkling control valves and their root cutout valves.

Where sweating would not be objectionable, such as in voids, shaft alleys, and bilges, and on plumbing fixtures and the supply and drain piping immediately adjacent to and serving these fixtures.

**Refrigerant insulation.**—External surfaces of components handling a refrigerant such as refrigerant

9390-2
DE 1078

252



12 at a temperature of 40 degrees F. or lower shall have this type of insulation.

   **Insulation to prevent freezing.**—When components conveying fresh water are located where they are exposed to freezing temperatures, they shall be insulated. Where not exposed to the weather, anti-sweat type insulation shall be applied; where exposed to the weather, the type used for hot piping in exposed weather locations shall be installed.

   Sea water and other fluids which freeze below 32 degrees F. shall not be insulated unless the rate of flow in the system is such that the fluid could freeze and application of insulation would prevent freeze-up during system operation.

   **Bulkhead connections and penetrations.**—Supplementing requirements in 9480-0 pertaining to insulated bulkhead piping connections, the following applies:

   Where refrigerant pipes pass through a non-watertight insulated bulkhead into a refrigerated space, the insulation shall extend at least one inch inside the refrigerated space.

   Wherever piping passes through joiner bulkheads or hull structure without the use of a bulkhead fitting, the pipe covering shall also run through intact, except in those cases where the larger hole required for complete covering would affect the structural integrity of the ship. In those cases, butting the covering to either side of the structure is permitted.

   Where antisweat insulation is butted against bulkhead or deck fittings, the ends shall be sealed to the structure with end sealing compound (MIL-C-22395).

   **Vapor barriers and pipe hangers.**—For antisweat and refrigerant pipe covering, the vapor barrier specified in Mil. Std. MIL-STD 769* shall be installed so that it completely seals all joints and will remain intact under all service operating conditions.

   Pipe clamps shall fit over pipe covering for insulated refrigerant piping. For antisweat insulated piping, clamps shall be isolated from the pipe by rubber channels at least 1/8 inch thick. Hangers shall be sealed to vapor barrier with end sealing compound (MIL-C-22395). Rubber block hangers may be installed directly on piping. Where clamps fit over covering, a galvanized sheet steel or copper shield at least twice the width of the pipe clamp shall be installed directly under the pipe clamp; also, cork or other rigid insulation having the same thickness as adjacent insulation, shall be used under these shields.

   For requirements pertaining to limitation of heat transmission from hot piping to adjacent structure, such as through pipe clamps, hangers, braces and anchors, see 9480-0.

   **Lagging.**—Lagging shall be applied as specified in Mil. Std. MIL-STD 769.* Metal lagging shall be installed wherever necessary for protecting insulation from damage such as in areas of heavy traffic, and where insulation can become oil or water soaked, such as fuel oil burner headers. A surface treatment or covering installed on metal lagging where necessary for protection of personnel.

### 9390-2-c. Materials and thickness

   Materials and minimum acceptable thickness shall comply with Mil. Std. MIL-STD-769.* Where a choice of two or more kinds of covering is specified for one temperature range, the Contractor may install any specified kind provided it is installed on an entire system and compatible components are used throughout, with the exception that rigid and non-rigid insulation may be used on the same system to facilitate the installation of pipe hangers. However, the Contractor shall choose one of the lighter weight (lower density) materials specified.

   Materials, such as adhesives, which are in contact with piping, shall not have any adverse effect on the piping material; for example, insulating materials which can give off halides harmful to corrosion resisting steel shall not be used.

   Fibrous glass lagging shall not be used where it is subject to abrasion or mechanical injury.

### 9390-2-d. Re-usable covers

   Fabrication and installation of re-usable covers shall comply with Mil. Std. MIL-STD-769.*

   For hot surface applications requiring insulation, re-usable covers shall be installed to permit servicing of machinery, equipment, pipe, and valve take-down joints. Re-usable covers shall not be installed where a vapor barrier is used in conjunction with a thermal insulation.

   For units of machinery or equipment such as a small auxiliary turbine or for some piping components, where it would be impractical to install both permanent insulation and resuable covers, the entire insulation may be made re-usable.

### 9390-2-e. Installation

   Machinery and pipe covering shall be installed in accordance with requirements herein and those specified in Mil. Std. MIL-STD-769.* Surfaces to which insulation will be applied shall be cleaned and prepared as specified in 9190-1.

   Pipe covering shall not be installed over mechanical joints in piping until specified pressure tests have been completed. Covering shall not be in-

9390-2
DE 1078

253

ODUCED AT THE NATIONAL ARCHIVES

stalled over steam turbine joints until tests have
proved the casing joints tight under operating condi-
tions at the dock trial. Covering shall be in place
for all sea trials and upon delivery of the ship.

5      Machinery and pipe covering shall be install-d
so that movements of the components, due to thermal
or other forces, will not damage the covering in any
way. Fastenings shall not crush or otherwise re-
duce the insulating value of insulation.

10      It shall be the Contractor's responsibility to
ascertain that fastenings provided on components
by manufacturers are adequate for installation of the
specified insulation.

      Where re-usable covers are used at takedown
15  joints, the covering shall be installed in such a man-
ner so as not to interfere with servicing of the joint.

      All lagging shall be fitted securely, neatly and
smoothly; ragged edges of sheet metal lagging are
not permitted.

20

**9390-2-f.  Plans**

      The Contractor's insulation schedule shall in-
dicate sufficient details to identify materials, speci-
fications, i.p.s. sizes, thickness, and approximate
25  quantities used in the applications. The most se-
vere service temperature on which the insulation is
applied shall also be indicated for each application.
If the Contractor has a standard practice for cover-
ing which is being used in the installation, it shall
30  be referenced on this plan.

      *MIL-STD-769A with change notice #1 dated 21
      Oct 1963 is applicable and shall be modified as
      follows:
35      Page 6, Table IV, under 'Temperature Range (°F)'
      add '251 to 388', under 'Pipe Size' add: '1/2, 3/4'
      under 'thickness' add:  '1 inch.

9390-2
DE1078

254



SECTION 9390-3
HULL DAMPING, SONAR DOME BAFFLES, AND
DOME ISOLATION

**9390-3-a.  Hull damping**

Hull damping treatment shall be installed in the following areas:  From base line to first platform and from bow to frame 29 except in chain locker; nonacoustic area within the dome support structure immediately below the transducer, and nonacoustic area of the dome and dome structure aft of the diagonal bulkhead located at approximately Frame 16.

Hull damping material for the areas specified above shall be applied on the shell plating, the underside of decks and platforms, and one side of the keel, webs of frames, and bulkheads.

The damping material shall be closely fitted so that metal surfaces are not exposed.  Where it is not possible to closely fit the tile, the voids and seams shall be filled flush with a polyamide-epoxy filler or grouting compound as recommended by the tile manufacturer.  When interference such as piping and wireways are encountered, at least 80 per-cent of the panel area shall be damped.  Damping need not be applied to plate panels less than four inches wide, or to panels whose total area is less than 144 square inches.  Damping shall be applied to only one side of the structure.

**9390-3-b.  Hull damping application**

Hull damping shall be accomplished either by use of ML-D3 Tile Damping material or Sprayable Vibration Damping material.

Except as specified herein, damping material shall be applied in accordance with BUSHIPS Instruction 9390.14; Ser 634A-689 of 30 March 1964.

ML-D3 tile damping material, Mil. Spec. MIL-P-22581, shall be applied in the following thicknesses:

Plating up to ½ inch thick, 4.5 pounds per square foot.

Plating above ½ inch thick, 9.0 pounds per square foot (double tiles).

The damping material shall be secured with one of the following adhesives:

ML-D2 Adhesive, Philadelphia Resins Company

Epoxy LMX 551, Co-Polymer Chemicals, Inc.

**Sprayable Vibration Damping Material.**—Spray-on type hull damping material shall comply with Mil. Spec. MIL-S-24062 of 11 May 1964, be applied by an applicator approved by listing on QPL-24062 and shall be applied in accordance with the conditions herein:

(a) May be used to dampen steel plate up to and including 7/8 inch thickness.  The damping material thickness and weight for a 3/8 inch thick steel plate shall be 5/8 inches and 4.5 (± 0.2) pounds per square foot of area to be damped, respectively.  The thickness and weight of damping material for other steel plate thickness shall be proportional to the above.

(b) In addition to the procurement testing, the required material density and thickness shall be checked by testing three sample plates (sprayed with the material) prior to application to each compartment.  Each sample shall be suitably labeled to indicate:  date taken, com-partment and density test results.  Material thickness in each compartment shall be tested to ensure that the required thickness is obtained; a pin type depth guage may be used.

(c) The spray-on damping material shall be applied before launching and under controlled conditions of temperature and humidity as required by the material supplier.

(d) The steel surfaces to be damped shall be prepared by abrasive blasting to accomplish complete removal of rust, paint, mill scale and other surface contaminants to obtain clean, bare steel.  Where abrasive blasting cannot be ac-complished in the judgement of the Supervisor, other mechanical means may be used to obtain clean bare steel to the satisfaction of the Supervisor.

(e) The cleaned metal surfaces shall be pretreated as soon as practicable after surface preparation in order to prevent corrosion in the interim between cleaning and application of the damping material.  In areas where the damping material will be subject to contact with water, oil, fuel or preservative such as in tanks, voids and bilges, a coating system conforming to MIL-P-23236, Class I shall be applied as soon as practicable after surface preparation.  In other areas, the cleaned surfaces shall be preserved in accordance with 9190-1.

(f) The damping material shall be applied after the coating system has been adequately cured.  The curing time between coats shall be in accordance with the manufacturer's instruc-tions.  The final coat shall be smoothed by hand, troweling, rolling or other means to produce a surface as smooth as that of the ML-D3 tiled surface as determined by the Supervisor.

(g) The surface of the spray-on damping material shall be sealed the same as for ML-D3 tile—in accordance with the requirements of BUSHIPS INST. 9390-14 Ser 634A-689 of 30

9390-3
DE1078

255

REPRODUCED AT THE NATIONAL ARCHIVES

March 1964, with changes 1 and 2 thereto.

**9390-3-c. Sonar dome baffles**

Twelve feet aft of the center of the transducer, a
baffle shall be installed consisting of a ¼-inch steel
plate of single curvature, convex side forward, to
which shall be bonded 9/32-inch thick "Saper D3",
B.F. Goodrich, or equal, on the forward side and ½
inch "Isoper", B. F. Goodrich, or equal, on back side.
The radius of curvature shall be 10 feet.  The baffle
shall cover as much of the cross sectional area
within the dome as possible.  Access to the forward
portion of the dome through the baffle shall be pro-
vided.

Rubber tile, Mil. Spec. MIL-R-23074, shall be
applied in accordance with BUSHIPS INSTRUCTION
10323.4 Ser 634C1-13 of 13 February 1962 to the
exterior face of the cylindrical bulkhead, located
within the transducer framework, on top of the cir-
cular plate beneath transducer (the outer boundary
shall not extend beyond the plane of the radiating
face of the transducer).

Baffles shall be installed on the aft vertical
plates of the dome and within the dome on the water
side of the base line flat from bow aft to diagonal
bulkhead.  The baffles shall consist of "PAL
Soundamp" material, or equal.  Access to the inside
of the dome through the aft vertical plates shall be
provided.

9390-3
DE1078

256


REPRODUCED AT THE NATIONAL ARCHIVES

SECTION 9390-4
THERMAL INSULATION, REFRIGERATED
SPACES

9390-4-a.  Refrigerated stores spaces
    a.  Materials:
        (1) Insulation.—For bulkheads, decks and
overheads, the insulating material shall be polyure-
thane foam, National Gypsum Company's Type
NB-200, Hooker Chemical Company's Hetrofoam,
or equal.  The cured foam shall be a non-burning
type in accordance with ASTM D-1692, shall have
a nominal uniform density of 2 lbs./cu.ft., a
maximum thermal conductivity of 0.16 BTU/(Hr)
(sq. ft.) (degrees F/in.) at 75 degrees F mean
temperature and a minimum compressive strength of
20 PSI.  If necessary or desirable from a strength
standpoint, the density of the foam in the deck con-
struction may be increased to 4 lbs./cu.ft.
        (2) Sheathing.—The sheathing shall be
reinforced fibrous glass laminate in accordance with
MIL-P-17549, Grade W, 3/16 inch thick, with a
smooth and glossy gel coat finish, with fire resistant
resin in accordance with Mil. Spec. MIL-R-21607.
One or more layers of veil mat (surfacing mat) or
fine weave cloth may be used directly under the gel
coat to insure a smooth surface.  Other sheathing
materials will be acceptable subject to Bureau
approval.
    b.  Temperatures and thicknesses.—The in-
sulation thicknesses shall be sufficient to main-
tain easily and without sweating, the temperatures
specified in 9390-1 with the ambient temperature
in surrounding spaces of 100 degrees F;  horizontal
boundaries, sun exposed 120 degrees F, and 80
percent relative humidity.  The normal stiffeners
shall be covered with at least 1-1/2 inches of insu-
lation and insulation shall be flush between stif-
feners.  Web stiffeners which project beyond the
normal stiffeners and deep longitudinal or transverse
deck beams shall be boxed or otherwise covered with
a minimum of 1-1/2 inches of insulation.
    c.  Installation.—Preformed block, pour or
froth foamed-in-place insulation may be used.  Care
must be taken during the application of foamed-in-
place material to insure that voids or air pockets
that would impair the insulation effectiveness are
not produced.  Plan, BUSHIPS No. DLG30-503-
2021260, may be used as a guide for determining
acceptable insulation thicknesses and installation
procedures.  If performed block is used in the deck,
each block must be secured to the deck and to the
adjacent blocks with a suitable adhesive.  Similarly,
sheathing shall be secured to the insulation.  All
sheathing shall be made watertight. Deck sheathing

shall be laid in two layers, completely bonded to
each other with staggered joints flush with the deck.
Where necessary for effective air circulation, wall
battens shall be installed.  Sheathing shall be rein-
forced as necessary to insure adequate strength in
securing coils.
    d.  Deck grating.—Each space shall be fitted
with aluminum deck gratings per 9160-4.  The
gratings shall be arranged in panels for convenient
removal and they shall be marked for location and
identification.

9390-4
DE 1078

RODUCED AT THE NATIONAL ARCHIVES

**SECTION 9390-5**
**THERMAL INSULATION AND ACOUSTIC ABSORP-**
**TIVE TREATMENT FOR DUCTS AND TRUNKS**

5  **9390-5-a.  Definitions**
   **Thermal insulation**—An insulation applied to ducts
and equipment to limit heat losses or gains and to
prevent condensation.
10    **Acoustic insulation**—a noise absorbing material
installed in ductwork to attenuate excessive noise.
      **Sheathing** - a protective and confining covering
or jacket of sheet metal applied over thermal insula-
tion.
15    **Perforated sheathing**—a lining or jacket of perfo-
rated sheet metal applied as the inner casing in an
acoustically lined duct section.
      **Vapor barrier**—a covering applied outside of
lagging to prevent the penetration of water vapor.
20    **Lagging**—a protective and confining covering or
jacket such as cloth or tape applied over insulating
materials.
      **Fastenings**—components such as hooks, wire,
straps and adhesives used to secure insulating ma-
terials and lagging.
25

   **9390-5-b.  General requirements**
      Surfaces shall be cleaned and prepared as speci-
fied in 9190-1 before they are insulated.
      Insulation shall not be installed over watertight
30 ductwork until specified compartment pressure tests
have been completed.
      Fastenings such as hooks, wire, or straps used
to secure the insulation to the ductwork shall not
crush or otherwise reduce the insulation value of
35 the insulation.
      Sheathing shall be installed wherever necessary
to protect insulation from damage and always on in-
sulated ducts that are adjacent to lavatories, serv-
ice sinks, waterclosets, ovens, ranges, dishwashing
40 machines, and food preparation tables. Where such
ducts extend vertically through the deck, the sheath-
ing shall be provided from the deck to at least two
feet above the working surface of the fixture.
      Wherever condensation is likely to occur on the
45 duct, a vapor barrier shall be applied on the in-
sulation, or the insulation shall be installed inside
of the duct.

   **9390-5-c.  Thermal insulation**
50    Thermal insulation shall be applied to ventila-
tion and air conditioning systems to reduce heat
losses or gains and to prevent condensation. The
following specific requirements apply:
      On parts of trunks or ducts (including their
55 flanges) of ventilation supply systems carrying

unheated air that pass through normally heated
spaces, and on parts of trunks or ducts of all
supply systems that pass through or terminate
in heat-producing spaces.
      On parts of exhaust trunks or ducts from       60
heat producing spaces that pass through other
spaces.
      On ducts (including their flanges) of air
conditioning systems, on the discharge side of
cooling coils, if the space dewpoint is more than   65
seven degrees F. higher than the duct air dry
bulb temperature. Where air from the space
served is bypassed or introduced downstream
from the cooling coil, the duct need not be in-
sulated, except that portion between the cooling   70
coil, and the point where the cooled and bypass
air are thoroughly mixed.
      On distribution ducts in way of berths, if
the temperature in the duct is higher than 95
degrees F.                                         75
      On all trunks and ducts that pass through
refrigerated spaces.
      On all ventilation heaters wherever protection
of personnel is involved.
                                                   80
   **9390-5-d.  Removable and replaceable thermal in-**
              **sulated covers**
      Removable and replaceable insulated covers
shall be installed on access covers for insulated
portions of air conditioning systems where the ac-  85
cess cover itself does not incorporate thermal in-
sulation.  Wherever necessary, covers shall be
quilted to maintain uniform thickness, strength and
rigidity.  Covers shall be secured in place by
lacing or similar means.                           90

   **9390-5-e.  Acoustic absorptive treatment**
      Acoustic absorptive treatment for ventilation,
and air conditioning systems may be necessary to
meet the space noise criteria of 9400-1.  Attenuation  95
shall be determined using the noise levels in
octave bands listed in Tables 1 and 2 specified in
9400-1 as being the allowable noise level at
terminals.
      Where both thermal insulation and acoustic    100
absorptive treatment are necessary, acoustic ab-
sorptive treatment only shall be installed.

   **9390-5-f.  Materials**
      The following materials shall be used for      105
thermal insulation and acoustic absorptive treat-
ment of ventilation and air conditioning systems:
      **Thermal insulation for ducts.**—Round ducts,
1-inch fibrous glass blanket Mil. Spec MIL-I-
22023 or one-inch fibrous glass covering Mil.      110

                                    9390-5
                                    DE 1078
       258

REPRODUCED AT THE NATIONAL ARCHIVES

Spec. MIL-I-22344. For rectangular and flat oval ducts one-inch fibrous glass blanket, Mil. Spec. MIL-I-22023, or one-inch fibrous glass hard surface board, Mil. Spec. MIL-I-742, type I, or one-inch fibrous glass unfaced board, Mil. Spec. MIL-I-742, type II; except that board type shall be used on ducts with a flat bottom surface 9 inches or more in width.

Thermal insulation for trunks and ventilation heaters.—One-inch fibrous glass board Mil. Spec. MIL-I-742, Type I.

Insulated covers.—One-inch fibrous glass board Mil. Spec. MIL-I-742 type I or type II.

Sheathing for thermal insulation.—Corrosion resisting steel No. 22USSGA Fed. Spec. QQ-S-766 class 430 2B finish.

Vapor barrier.—On brattice cloth or asbestos cloth, one heavy coat of vapor barrier Mil. Spec. MIL-P-876. On faced board and on fibrous glass cloth, three alternate coats, white, orange, and white, in that order, of coating compound Mil. Spec. MIL-C-19993.

Thermal insulation for flanges.—Fibrous glass blanket Mil. Spec. MIL-I-22023, type I.

Lagging.—Fibrous glass cloth, tape, and thread Mil. Spec. MIL-C-20079, fire resistant brattice cloth Mil. Spec. MIL-C-788, or special weight asbestos Fed. Spec. SS-C-466, Grade U.G., Style 3.

Adhesive.—Adhesive shall be in accordance with Mil. Spec. MIL-A-3316. The entire duct surface, insulation outer surfaces and outer surface of lagging shall be coated with adhesive.

Acoustic absorptive material.—Acoustic absorptive material shall comply with Mil. Spec. MIL-I-22023, Type II. However, in view of importance of noise attenuation the Bureau will consider for approval, on a case basis, any other material that can be shown to have acoustic and thermal properties, surface finish and installation requirements that will give the maximum reduction in airborne noise.

Perforated sheathing for acoustic insulation.—Aluminum alloy Fed. Spec. QQ-A-250/8-0.04-inch thick with holes 1/8-inch dia. on 3/16-inch centers, staggered shall be used.

9390-5-g. Installation

Thermal insulation, lagging, and acoustic absorptive treatment for trunks or ducts shall be installed in accordance with plans, BUSHIPS Nos. 805-1749058 and S3901-921905.

Where pre-formed insulation is used on round ducts the butted joints shall be staggered. The longitudinal joint shall be supported at approximately 18-inch intervals by a two-inch wide strip of lagging.

Where banded duct connectors are used in lieu of flanges, the duct insulation and lagging shall terminate one inch from each side of the connector. A strip of insulation and lagging shall than be fitted around the connector, between the terminations of the duct insulation, and held in place by two sheet metal straps, one inch wide. A vapor barrier, if required, and paint shall then be applied.

9390-5-h. Plans

The Contractor's plans for ventilation, air conditioning and forced draft ductwork shall indicate the type, quantity, and thickness of material required for thermal insulation and acoustic absorptive treatment.

———————

9390-5
DE1078

REPRODUCED AT THE NATIONAL ARCHIVES

## SECTION 9390-6
## SHEATHING

### 9390-6-a. Scope

This section contains material and installation requirements for the sheathing of living, messing, and recreation spaces. Sheathing associated with insulation is covered in other sections as follows:

9390-1  Thermal insulation and acoustic absorptive treatment of compartments.

9390-2  Thermal insulation for machinery, equipment, and piping.

9390-4  Thermal insulation, refrigerated spaces.

9390-5  Thermal insulation and acoustic absorptive treatment for ducts and trunks.

### 9390-6-b. Installation

Vertical sheathing shall be attached to the face of structural members projecting six inches or less from the compartment boundary. Vertical structural members projecting more than six inches from the boundary and fixed portlights shall be boxed. Sheathing between boxed members shall be attached to metal furring strips fastened to the compartment boundary.

Overhead sheathing shall be attached to the face of beams.

The sheathing shall be in the form of removable panels. Panels and sections of sheathing in way of equipment which require frequent access for inspection, operation or maintenance shall be provided with hinges and quick acting catches.

Articles such as catches, hinges, lighting fixtures, lighting switches, and ventilation ducts shall be fitted flush with the sheathing.

The installation shall be free of rattles and provision shall be made for dampening possible vibration.

### 9390-6-c. Applications and Materials

Sheathing shall be installed on the overhead and vertical boundaries that have stiffeners, wiring, piping, or insulation on the boundary inside the space. The following spaces shall be sheathed as indicated:

| Space | Material | |
| --- | --- | --- |
| | Overhead | Vertical Boundaries |
| Captain and unit commanders staterooms | aluminum (1) | aluminum (2) (3) |
| CPO lounge area only | | aluminum (2) (3) |
| Wardroom messroom and lounge | aluminum (1) | aluminum (2) (3) |

Note 1. Aluminum alloy, approximately 0.04 inch thick, Fed. Spec. QQ-A-250/8, temper H22 or H32.

Note 2. Aluminum alloy, approximately 0.06 inch thick, Fed. Spec. QQ-A-250/8, temper H32.

Note 3. Wood veneer. See 9190-1.

9390-6
DE1078

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| WILTON DAVID MOUTON | * | CIVIL ACTION |
| | * | NO. 99-0162 |
| | * | |
| VERSUS | * | SECTION "T" |
| | * | |
| | * | MAG. 1 |
| FLEXITALLIC, INC., ET AL. | * | |

* * * * * * * * * * * * * * * **

## AFFIDAVIT OF PETER TERRITO

STATE OF LOUISIANA

PARISH OF JEFFERSON

BEFORE ME, the undersigned authority, personally came and appeared:

### PETER TERRITO

who, after being duly sworn, did dispose and state as follows:

1.    He was previously employed by Avondale Industries, Inc. (formerly "Avondale Shipyards, Inc.) (hereinafter "Avondale") as Director of Safety.



2.     He began working at Avondale on May 20, 1952, following his honorable discharge from the United States Marine Corps, and since 1960, he was intimately involved in every aspect of the construction of all types of vessels, boats and ships as a supervisor at Avondale, including numerous projects for the United States Navy, United States Coast Guard and vessels constructed under the auspices of the United State Maritime Commission.

3.     At all times, Avondale is and was in the business of building and repairing ships at a facility situated adjacent to the navigable waters of the Mississippi River.

4.     Since approximately 1960, he was personally involved in all areas of safety management and control related to the construction, outfitting, testing, sea trial, and delivery of the various classes of Navy vessels built at Avondale, including twenty (20) Destroyer Escort 1078 Class Ocean Escort Vessels.

5.     During all aspects of the work on Navy vessels, *e.g.* land-side construction, launching, outfitting, testing, and sea trials, Avondale

performed its work under close, constant and detailed control and supervision of the Department of the Navy. This supervision and control was exercised by written specifications and personal oversight and inspection of all Avondale work by Navy officers and by civilian employees of the United States Navy. Virtually no aspect of the construction of the navy vessels escaped this close control.

6.    During all aspects of the construction of the Navy vessels, the Navy retained the ultimate decision-making authority over all safety issues. If a disagreement regarding safety issue arose, the Navy's decision controlled.

7.    During the construction of a Navy vessel, Navy personnel would continuously inspect the vessel to ensure that the applicable safety standards were met, including requirements for air qualification and ventilation. These inspections would take place daily, and he and other Avondale safety personnel would accompany the Navy personnel on these inspections to catalogue any deficiencies noted by the Navy inspectors. Avondale would then be required to remedy each of the hazards noted before work in the affected area could continue.

8.   Similarly, if Navy inspectors independently witnessed unsafe working conditions, the Navy inspector would issue a formal complaint to personnel at Avondale.  If the unsafe condition was not remedied to the Navy inspector's satisfaction, the Navy inspector had the authority to shut-down the work on the ship.

9.   The Navy inspectors and representatives had "free-reign" of the Avondale shipyard facility.  Navy inspectors were allowed to go anywhere in the Avondale shipyard facility at any time and were not required to be with personnel of Avondale.

10.   There were many types of Navy inspectors at the Avondale shipyard facility.  These inspectors included boiler inspectors, hull inspectors, and safety inspectors.  The United States Navy, as well as the Department of Labor and the United States Coast Guard, currently have safety and occupational health and safety inspectors at Avondale that conduct frequent safety "walk-throughs" throughout the shipyard facility.  The Navy had similar safety inspectors throughout the 1960's and 1970's who conducted safety "walk-throughs" during the construction of the Destroyer Escorts and other Navy vessels being constructed at Avondale.

11.     These Navy inspectors maintained a constant presence at Avondale and oversaw virtually every aspect of the shipbuilding process. These inspectors were provided offices at the Avondale shipyard facility pursuant to the Navy contracts and were present at the Avondale facility at all times.

12.     There were specific occasions where a Navy inspector felt that painting and insulating work on a vessel was not adequately ventilated, and the Navy inspector shut-down those operations until the problems were corrected.

13.     On one occasion, a Navy inspector shut-down all work in an engine room on a Destroyer Escort because the air hoses being used in the engine room were not being properly maintained, and on that occasion all Avondale employees had to be removed from the engine room, and no work could be performed in the engine room until the situation was corrected.

14.     On another occasion, the Navy inspectors shut-down painting operations because the fans providing ventilation for the area did not meet Navy specification because the motor running the fan was located too close

to the flammable fumes which were being vented.  That operation could not continue until Avondale personnel modified the spray booth so that the motor running the fan was located outside of the booth and turned the fan inside of the booth with a long belt.

15.    On anther occasion, a Navy inspector shut-down welding operations in the Combat Information Center ("CIC") of a Destroyer Escort due to the concentration of fumes in the compartment.  The Navy inspector refused to allow any work to be performed in the CIC until he was satisfied that adequate ventilation was in place.

16.    All land-side construction on Navy vessels proceeded under that same level of Navy supervision.  The on-site Navy inspectors would oversee and approve virtually every aspect of the construction, including adherence to the safety regulations.  All aspects of safety during construction remained under the ultimate authority of the Navy, from welding to scaffolding and from drinking water containers to personal floatation devices.  All unsafe conditions noted by the Navy inspectors had to be corrected by Avondale.  Avondale was subject to this same scrutiny for safety concerns throughout the launching and outfitting of the Navy

vessels.

17.    Once a Navy ship was launched and outfitted, various sea trials followed.  The first sea trial was called the "Builder's Trial" and was conducted by the shipyard using its personnel with senior Navy personnel on board for inspections, observation and approval.  During the Builder's Trial, Navy inspectors would inspect the ship and would issue deficiency reports if they found any problems on the ship, including safety violations. The ship would then return to the shipyard facility, and shipyard workers would correct all of the deficiencies found by the Navy inspectors.  He had personally participated in these sea trials on Navy vessels, including the Destroyer Escorts.

18.    Following completion of the Builder's Trial and after Avondale made the necessary repairs to the ship, the Navy would conduct its own sea trial called an "Acceptance Trial."  Acceptance Trials were fully conducted and staffed by United States Navy officers, civilian employees and crew, with shipyard and manufacturers' representatives along to observe.  As before, any deficiencies or safety hazards discovered by Navy inspectors during the Acceptance Trials were Avondale's

responsibility to correct.

19.     Following one such sea trial on a Destroyer Escort, he recalls that the insulation on a boiler was saturated with diesel fuel.  The Navy inspector shut-down all work around the site until the affected insulation was removed and replaced, an operation that took approximately one week to correct.

20.     During the construction of steam-powered commercial cargo vessels in the 1960's and 1970's, the same regular and detailed safety inspections of the work on those vessels were conducted by inspectors working under the authority of the Department of Labor, the Coast Guard, MARAD, the Walsh-Healey Act and, later, the Occupational Safety and Health Administration ("OSHA").

21.     He and other Avondale safety personnel were personally involved in the inspections conducted by Walsh-Healey inspectors, who were employed by the federal government, on both governmental and civilian projects and personally assisted those inspectors in the monitoring of air quality during the construction and outfitting of those vessels.

22.     The inspectors working for the Department of Labor, the

Coast Guard, MARAD, and the Walsh-Healey and OSHA inspectors all had the final word regarding safety issues and had the authority to shut-down operations on any vessel if they felt that the work was not being performed safely. Once halted, the operation could not be resumed until the perceived problem had been corrected to the satisfaction of the inspector.

23. He has read the foregoing and all of the information contained therein is true and accurate to the best of his personal knowledge

Executed this ___8___ day of March, 1999 at *New Orleans La.* Louisiana.

_____
PETER TERRITO

Sworn to and subscribed before me this 8th day of March, 1999.

_____
NOTARY PUBLIC

## AFFIDAVIT OF EDWARD BLANCHARD

STATE OF LOUISIANA

PARISH OF JEFFERSON

BEFORE ME, the undersigned authority, personally came and appeared:

### EDWARD BLANCHARD

who, after being duly sworn, did dispose and state as follows:

1.      With the exception of approximately two years of service in the United States Navy between 1944 and 1946, he was employed at Avondale Shipyards and Avondale Industries, Inc. from 1942 until 1988, when he retired.  From 1950, on he was a supervisor and, later, General Superintendent of Outfitting, Assistant Vice-President of Production Operations, Vice-President of Production Operations, and Group Vice-President of Production Operations at Avondale.  At Avondale he oversaw the construction of all vessels.

2.      Since 1950, he and the Avondale Production Department have worked intimately with personnel and inspectors from the United States Navy, the United States Coast Guard, and the United States Maritime Administration in the construction of military vessels built pursuant to contracts with the United States


EXHIBIT
H

Navy, the United States Coast Guard and the Maritime Commission (hereinafter sometimes referred to as "Federal Vessels").

3.    During all aspects of work on the Federal Vessels, *e.g.* landside construction, launching, outfitting, testing and sea trials, Avondale performed its work under close, constant, and detailed surveillance by the United States Navy, United States Coast Guard and the Maritime Commission and other federal agencies (hereinafter sometimes referred to as "Federal Inspectors").  This surveillance was exercised by written specifications and personal oversight and inspection of all Avondale work by Federal Inspectors.  Virtually no aspect of the construction of Federal Vessels escaped this close monitoring.

4.    During all aspects of the construction of Federal Vessels, Federal Inspectors retained the ultimate decision making authority over all construction.  If a disagreement regarding any issue arose, the Federal Inspectors' decision controlled.

5.    During the construction of the Federal Vessels, the Federal Inspectors would continuously inspect the vessel to ensure that the work on the vessel met the federal government's regulatory and contractual criteria.  These inspections would take place daily, and he interacted with the Federal Inspectors daily to ensure that

2

production was proceeding on schedule and meeting all government specifications.

6.     In the 1950's, the Navy established a quality control system where all work performed on Navy vessels was approved by a Navy inspector. Later, the Navy established a Quality Assurance Office at Avondale. The Navy Quality Assurance group operated out of a two-story building constructed at Avondale pursuant to the Navy contracts which housed over sixty (60) Navy inspectors. Since he first became involved with navy inspectors at Avondale, the Navy inspectors had the authority to stop production on a project if any aspect of the work was being performed improperly or in an unsafe manner. Any problems noted by a Navy inspector had to be corrected before work on a project could proceed.

7.     The Federal Inspectors and their representatives had unlimited access to all areas of the Avondale shipyard. Federal Inspectors were allowed to go anywhere in the shipyard at any time and were not required to be escorted by Avondale personnel.

8.     There were different types of Federal Inspectors at Avondale, including boiler inspectors, hull inspectors, and safety inspectors. Further, the United States Navy and the United States Coast Guard had safety and occupational health

3

inspectors at Avondale that conducted frequent "walk-throughs" throughout the shipyard facility. The Navy also had inspectors who conducted similar "walk-throughs" during the construction of the Destroyer Escort Vessels and all other Navy vessels built at Avondale.

9.     The Federal Inspectors maintained a constant presence at Avondale and oversaw every aspect of the shipbuilding process. Further, the Navy inspectors were provided offices at Avondale pursuant to the Navy contracts and were present at Avondale at all times.

10.    The Federal Inspectors monitored every aspect of the construction of the vessels at Avondale from the moment the materials to be used in the construction first arrived at Avondale until the ship was fully outfitted and delivered.

11.    As soon as products to be used in the construction of a Navy vessel arrived at Avondale, they became the property of the United States Navy. The Navy inspectors oversaw the unloading, handling and storage of all construction materials, from steel plates to insulation products, and monitored the care and "housekeeping" of those products at Avondale until they were installed on the vessels.

12.    He recalls that the Navy required compliance with the smallest details

4

and, for example, would even check the temperature and humidity at which welding rods were stored.

13.   Similarly, the Navy monitored the handling and storage of insulation materials to be installed on vessels. The inspectors would reject materials which were broken or which had been stored improperly and were, for instance, too damp, and oversaw the installation of the products and tested the products once the installation was complete.

14.   Since the 1950's, the Navy had also worked closely with the safety directors at Avondale to ensure that Avondale maintained a safe working environment for its employees during he construction of Navy vessels.

15.   He recalls that Jim O'Donnell, the first head of the Avondale Safety Department frequently met with the Federal Inspectors to discuss safety issues regarding the construction of Federal Vessels.

16.   Navy inspectors had ultimate control over safety issues on Navy projects at Avondale and could shut down work on a project if they felt that the work was not being performed safely. Maritime Commission and Coast Guard inspectors had this same authority on Maritime Commission subsidized vessels and Coast Guard vessels.

5

17.   The Federal Vessels constructed at Avondale were built in stages, and every stage of the ship construction was inspected and approved by Federal Inspectors.   Work on a Federal Vessel could not progress until the work was inspected and approved by the Federal Inspectors and work that did not meet their specifications had to be corrected.

18.   He had to prepare 30-day production reports regarding the progress on the construction of every vessel built for the Navy, the Coast Guard, or the Maritime Commission at Avondale.   In those reports, he would have to certify that Avondale had complied with the contract requirements for a particular vessel before the installment payments would be released.

19.   He specifically recalls the Navy inspectors requiring adequate ventilation in vessels while insulation was being installed and specifically recalls discussing ventilation to be provided on the Destroyer Escorts with the Navy inspectors supervising that project and working with the Navy personnel to ensure that adequate ventilation was provided to the employees working on those vessels.

20.   He was personally involved in pre-bid inspections at Avondale where Navy personnel would review the working and safety conditions at the shipyard prior

to the awarding of a Navy contract.

21.    As soon as any ship built for the Navy, the Coast Guard or the Maritime Commission was launched and outfitted, various trials followed. A "Dock-Side" trial would first be conducted to assure a successful "Builder's Trial." Federal Inspectors would be present to monitor those tests.

22.    The first sea trial was called the "Builder's Trial" and was conducted by the shipyard using its personnel and senior Navy and government personnel on board for inspections, observation and approval. During the Builder's Trial, Navy and government inspectors would inspect the ship and would issue deficiency reports if they found any problems on the ship. The ship would then return to the shipyard facility, and shipyard workers would correct any deficiencies found by the inspectors. He has personally participated in these sea trials on Navy vessels, including the Destroyer Escorts. Similar, if not identical, procedures governed the Builder's Trials of Coast Guard and Maritime Commission vessels.

23.    Following the completion of the Builder's Trial and after Avondale made the necessary corrections to the ship, a second sea trial called an "Acceptance Trial" was conducted. Acceptance Trials were fully staffed by United States Navy officers,

civilian employees and crew, with shipyard and manufacturers' representatives along to observe.  As before, any deficiencies discovered by any inspectors during the Acceptance Trial were Avondale's responsibility to correct.  Similar, if not identical, procedures governed the Coast Guard and Maritime Commission vessels.

24.    He recalls that the Navy had lists of qualified products which could be used in the construction of their vessels and that every single component installed on a vessel constructed at Avondale had to be on the Navy's qualified list.  Any substitutions or changes in items to be installed on a vessel had to be approved by the Navy.  Similar, if not identical, procedures governed the Coast Guard and Maritime Commission vessels.

25.    During the construction of steam-powered commercial cargo vessels in the 1906's and 1970's, the same regular and detailed inspections of the work on those vessels were conducted by inspectors working under the authority of the U.S. Coast Guard and the Maritime Commission.  For example, for Lykes Lines vessels constructed at Avondale, he recalls that there were ten inspectors monitoring the construction.

26.    He has read the foregoing and all of the information contained herein is true and accurate to the best of his knowledge, information and belief.

8

Executed this ___30th___ day of June, 2005 at ___Avondale___,

Louisiana.


_Edward Blanchard_
EDWARD BLANCHARD


Sworn to and subscribed before me
this 30th day of June, 2005.

_____
NOTARY PUBLIC


KRISTOPHER T. WILSON
NOTARY PUBLIC
LA BAR No. 23978
Parish of Orleans, State of Louisiana
My Commission is issued for Life

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DOROTHY REED GAUTHE, ET AL.  \*  CIVIL ACTION
             \*
versus          \*  NO. 96-2454
             \*
ASBESTOS CORPORATION LTD., ET AL. \*  SECTION F, MAGISTRATE 3
             \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### AFFIDAVIT OF JOHN BRINSER

STATE OF LOUISIANA

PARISH OF JEFFERSON

   BEFORE ME, the undersigned authority, personally came and appeared:

### JOHN BRINSER

who, after being duly sworn, did depose and state as follows:

   1.   He is currently employed by Avondale Industries, Inc. ("Avondale") as Vice President of Quality Assurance.  He had been employed by Avondale since 1978 and has worked in the Quality Assurance Department for the last twelve years.  As Vice President of Quality Assurance, he interacts with personnel of the United States Navy on a daily basis, and he is the Avondale employee primarily responsible for working with the United States Navy to ensure that all Navy ships constructed at Avondale comply with the specifications and standards which are set forth by the United States Navy in Navy contracts with Avondale.

   2.   Prior to 1970, he was an active duty naval officer with the United States Navy.  In 1970, he went to work for Combustion Engineering, Inc. ("C.E."), the company that supplied the steam propulsion boilers for the Destroyer Escorts constructed at Avondale throughout the 1970's.  These boilers were provided to Avondale and the United States Navy in accordance with C.E.

EXHIBIT
I

contract No. 667.

3.      When he first went to work for C.E., he did not work on the destroyer escort project at Avondale.  At some point during the construction of the destroyer escorts at Avondale, he did spend some time at the Avondale shipyard facility trouble-shooting screen tube vibration problems on C.E. boilers.

4.      When the C.E. boilers were being constructed for the Destroyer Escorts at Avondale, the boilers would be constructed at the boiler shop at Avondale and then would be placed onto the ship by a large crane.  The steam piping would then be connected to the boiler and then the steam drum and piping would then be insulated with asbestos-containing insulation or lagging materials. The boiler construction, hook-up and insulation process would be performed by employees of Avondale under the direct supervision by representatives of C.E. and surveillance by the Department of the Navy.

5.      Prior to the development of any particular class of Navy vessel, including the Destroyer Escorts, there was an extensive set of U.S. Navy specifications already in place which governed all aspects of ship construction.  The Navy specifications which were applicable to a new ship would total tens of thousands of pages.  The specifications governed all aspects of design and construction including the materials used, safety factors, repairability and maintenance.  A specification at one level, for example for a steam boiler, incorporated numerous other lower-level specifications, including those governing every material used in the boiler, such as piping, lagging materials, insulation materials, packing and gaskets.  For example, if the specification for a steam boiler required insulation materials at a particular location, the materials required to be used in the insulation materials and their performance criteria would be set forth in a separate specification for

2

insulating materials. By reason of this incorporation of specifications, a given piece of engineering equipment such as a steam boiler would be governed by hundreds of specifications, all promulgated by the United States Navy.

6.     A sub-contractor, such as C.E., would first become involved in the construction process of a U.S. Navy ship when C.E. would receive from a contractor, such as Avondale, a boiler purchase order. Attached to the boiler purchase order would be the terms and conditions drafted by Avondale based on the contract and contract specifications prepared by the Department of the Navy, and sections from the shipbuilding specification itself would be attached to the boiler purchase order. The specification sections from the contract specification for the ship would reference military specifications for the building of particular products such as boilers. The Military Specifications would establish the actual materials that were to be used in the construction of the boiler, and the Military Specifications often made reference to a Qualified Products List which set forth various products which were approved for use on military vessels. This Qualified Products List would set forth the type of product and manufacturer of the product. Neither C.E. nor Avondale was permitted under this contract to deviate from the Military Specifications without prior approval from the Navy.

7.     The military specifications are very specific with regard to the materials to be used in the construction of boilers. These specifications encompassed everything to be used in the construction of a boiler, including the piping, tubing, brick work, insulation and refractory materials. The specifications also established the testing procedures for the insulation and steam piping which were required to be followed by both Avondale and C.E.

8.     During all aspects of boiler work at Avondale, Avondale and C.E. performed their work under close surveillance by the Department of the Navy. This surveillance was exercised by

3

contract documents, design and construction drawings, written specifications and personal oversight of Avondale and C.E. work by representatives of the United States Navy. Virtually no aspect of the development, manufacture and testing of naval boilers escaped this close control.

9.     Representatives of the United States Navy oversaw virtually all aspects of the construction process of the boilers on the Destroyer Escort vessels. Navy inspectors were present when the boiler was being constructed in the Avondale boiler shop, when the boilers were actually placed on the Destroyer Escort vessels, when Avondale workers hooked up the boilers to the vessel and when the boilers were insulated with asbestos-containing materials.

10.     The United States Navy required detailed testing during various aspects of boiler construction. For example, Navy personnel would be present for all weld inspections, radiography inspections and hydrostatic testing. All test results were submitted to representatives of the United States Navy who had to approve the results of every test.

11.     United States Navy representatives were also present during the application and installation of asbestos-containing insulation. These Navy personnel provided surveillance and inspected the insulation process to ensure that the boilers were properly insulated in accordance with military specifications.

12.     When a Navy inspector had a complaint about quality and construction, the inspector would issue a Quality Deficiency Report and provide it to the Quality Assurance representative of Avondale. Avondale was then required to correct the deficiency so the work complied with Navy specifications.

13.     Similarly, if Navy inspectors witnessed unsafe working conditions, the Navy inspector would issue a formal complaint to personnel at Avondale. If the unsafe condition was not

4

remedied to the Navy inspector's satisfaction, the Navy inspector had the authority to shut-down the work on the ship.

14.     The Navy inspectors and representatives had "free-reign" of the Avondale shipyard facility. Navy inspectors were allowed to go anywhere in the Avondale shipyard facility at any time and were not required to be with personnel of Avondale.

15.     There were many types of Navy inspectors at the Avondale shipyard facility. These inspectors included boiler inspectors, hull inspectors and safety inspectors. The United States Navy currently has safety and occupational health inspectors at Avondale that conduct frequent safety "walk-throughs" throughout the shipyard facility. To the best of his knowledge, the Navy had similar safety inspectors throughout the 1970's who conducted safety "walk-throughs" during the construction of the Destroyer Escorts and other Navy vessels being constructed at Avondale.

16.     These Navy inspectors maintained a constant presence at Avondale and oversaw virtually every aspect of the shipbuilding process. These inspectors were provided offices at the Avondale shipyard facility as required by the contracts with the Navy and were present at the Avondale facility at all times.

17.     Once a Navy ship was launched  and outfitted, various sea trials followed. The first sea trial was called the "Builder's Trial" and was conducted by the shipyard using its personnel with senior Navy personnel on board for inspections, observation and approval. Representatives from the major component vendors, including boiler personnel, would attend such trials. During the Builder's Trial, Navy inspectors would inspect the ship and would issue deficiency reports if they found any problems on the ship. The ship would then return to the shipyard facility, and shipyard workers would correct all of the deficiencies found by Navy inspectors.

5

18.    Following the completion of the Builder's Trial and the Preliminary Acceptance Trial and after the shipyard had made the necessary repairs to the ship, the Navy would conduct its own sea trial called an Final Acceptance Trial at the conclusion of the guarantee period.  Acceptance Trials were fully conducted and staffed by United States Navy officers, civilian employees and crew, with shipyard and manufacturers' representatives along to observe.  As before, any deficiencies discovered by Navy inspectors during the Acceptance Trials was the responsibility of Avondale and the manufacturers to correct.

19.    The document attached to this Affidavit as "Brinser 1" is a true copy of the specifications used to design and build a C.E. boiler for the Destroyer Escort vessels constructed at Avondale throughout the 1970's.


JOHN BRINSER


Sworn to and subscribed before me
this 27th day of August , 1996.


Notary Public

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JOHN ANDERSON AND EVA WASHINGTON ANDERSON | * | CIVIL ACTION |
| | * | |
| versus | * | NO. 96-2395 |
| | * | |
| AVONDALE INDUSTRIES, INC., ET AL. | * | SECTION "K" |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * | * | MAG. 4 |

AFFIDAVIT

STATE OF LOUISIANA

PARISH OF *JEFFERSON*

BEFORE ME, Notary Public in and for the Parish of *JEFFERSON*, personally came and appeared:

DANNY JOYCE

who, after being duly sworn, deposed and stated that:

1.     He is President and Owner of Technical Environmental Services and has been in that position since 1991.  Technical Environmental Services is an environmental engineering, industrial hygiene, and safety consulting firm.

2.     He has a Bachelor of Sciences degree in Environmental Health from Old Dominion University in Norfolk, Virginia and a Masters in Sciences degree in Industrial Hygiene from Central Missouri State University, Missouri.

3.     From 1980 until 1991, he was employed first as an industrial hygienist and then as Director of Safety and Health by Avondale Industries, Inc.

EXHIBIT

J

4.      He served as an industrial hygienist for approximately two years at Newport News Shipbuilding and Drydock Company prior to his employment at Avondale.

5.      That as an industrial hygienist with longtime experience in the shipbuilding and ship-repairing industry, he is familiar with the development of safety standards pertaining to asbestos use and control.

6.      That as the former Director of Safety and Health at Avondale Industries, Inc., he also was charged with the duty of running the Workers' Compensation Department.

7.      That he has conducted research into the corporate history of Avondale Industries, Inc. insofar as it relates to the use and control of asbestos hazards through the years.

8.      That he has reviewed records which indicate that the 20 Destroyer Escorts, Class 1078, that were constructed at Avondale between May, 1969 and October, 1974 for the United States Navy were part of the largest single contract project in the history of Avondale Industries, Inc.

9.      That, beginning in 1951, the Walsh-Healey Act contained standards for the safe handling of asbestos insulation. (See copy of 1951 Safety And Health Standards for contractors Performing Federal Supply Contracts Under the Walsh-Healey Public Contracts Act, United States Department of Labor, 1951). The Walsh-Healey standards continued to contain safety regulations for the safe use and handling of asbestos insulation products until the Walsh-Healey provisions were superseded by Emergency Asbestos Standards under OSHA in 1971.

10.     That, under the Walsh-Healey standards, protective equipment such as respirators were used only as the last resort to protect employees from overexposure to asbestos dust. Over-exposure were defined as exposures exceeding 5 million particles per cubic foot on a time-weighed average, 8 hours a day, 40 hours per week (See attached 1951 Walsh-Healey Standards,

Section H).  This standard reflected the best scientific evidence available to the government at the time.

11.    That the Walsh-Healey regulations pertaining to asbestos dust control, from their inception in 1951 through the last standard of 1969, mandated the use of engineering control measures to ensure that the asbestos dust level did not exceed the maximum which was considered safe.  These measures included enclosure of processes or operations, isolation of processes or operations, substitution of non-toxic materials, wet methods, dilution by general ventilation, local exhaust ventilation, and temperature control as well as any other effective engineering controls.  (See 1951 Walsh-Healey Standards, Section H(1)(b)).

12.    That the government's recommended safe exposure level was lowered to two million particles per cubic feet under the Walsh-Healey standards in 1969 and remained at that level until Walsh-Healey standards were superseded by OHSA in 1971 (See attached 1969 Walsh-Healey Standards).

13.    That, under the Walsh-Healey regulatory scheme, the United States Government was authorized to cancel a contract if violations were found.  In addition, the government was authorized not to award another contract for three years to any person or firm responsible for violations unless the Secretary of Labor recommended otherwise.  (See attached 1968 Handy Guide to the Walsh-Healey Public Contracts Act).

14.   That the Walsh-Healey regulations applied to any employees working on government contracts which exceeded $10,000 in value.

_____
Danny Joyce, Affiant

Sworn to and subscribed before me
this _27_ day of August, 1996,
at ___HARVEY___, Louisiana.

_____
NOTARY PUBLIC

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

## To all to whom these presents shall come, Greeting:

By virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf,
the seal of the National Archives of the United States, that the attached reproduction(s) is a true and
copy of documents in his custody.

| SIGNATURE | |
|---|---|
| *Diane L. Dimkoff* | |
| NAME | DATE |
| DIANE L. DIMKOFF | 5/11/95 |
| TITLE  ASSISTANT DIRECTOR | |
| CENTER FOR LEGISLATIVE ARCHIVES | |
| NAME AND ADDRESS OF DEPOSITORY | |
| The National Archives | |
| Washington, D.C. 20408 | |

NA FORM 14007A (10-86)



UNITED STATES DEPARTMENT OF LABOR
MAURICE J. TOBIN, *Secretary*

*Wage and Hour and Public Contracts Divisions*
WM. R. McCOMB, *Administrator*

WASHINGTON, D.C.

UNITED STATES GOVERNMENT PRINTING OFFICE    WASHINGTON 19



# SAFETY AND HEALTH
## STANDARDS

For Contractors
performing Federal Supply
Contracts under the
Walsh-Healey Public Contracts Act

---

UNITED STATES DEPARTMENT OF LABOR
MAURICE J. TOBIN, Secretary

Wage and Hour and Public Contracts Divisions
WM. R. McCOMB, Administrator
WASHINGTON, D. C.



1 9 1951

Item 777

L 22 2:
Sa 1

# FOREWORD

The Walsh-Healey Public Contracts Act requires that contracts entered into by any agency of the United States Government for the manufacture or furnishing of materials, supplies, articles, and equipment in any amount exceeding $10,000 must contain, among other provisions, a stipulation that "No part of such contract will be performed nor will any of the materials, supplies, articles, or equipment to be manufactured or furnished under said contract be manufactured or fabricated in any plants, factories, buildings, or surroundings or under working conditions which are insanitary or hazardous or dangerous to the health and safety of employees engaged in the performance of the contract . . ."

This booklet contains the safety and health standards which will guide the Secretary of Labor and the Administrator of the Wage and Hour and Public Contracts Division in the administration of the Act, and which will be applied in determining whether, in specific cases, Government contracts are being performed under safe and sanitary conditions. These standards are based to a large extent on codes approved by the American Standards Association and safety and health codes adopted by a number of States, and generally represent what have been shown by industrial experience to be reasonable minimum standards for safety and health.

Space limitations of this bulletin permit compilation only of those standards relating to safety and sanitation problems which are commonly met by employers, and preclude inclusion of materials relating to uncommon hazards or situations. The measures to be taken to meet uncommon hazards should be reasonable in the light of the circumstances. Further, these standards are not in any way intended to limit or supersede State or local safety and sanitation codes, and where such codes provide stricter or more exact standards, compliance with such higher standards will be deemed compliance with the Public Contracts Act.

The failure to maintain proper safety and health standards in the performance of contracts subject to the Public Contracts Act constitutes a breach of contract which may provide the basis for cancellation of the contract, and makes the party responsible for such breaches subject to the ineligible list sanctions provided in the Act.

These standards were prepared by the Bureau of Labor Standards in cooperation with the Wage and Hour and Public Contracts Division, and checked for adequacy and suitability for use in the States with representatives of typical State labor departments. We wish to take this opportunity to thank these officials for their assistance in making this publication possible.

i

# TABLE OF CONTENTS

## PART I—SAFETY PROGRAMS PAY DIVIDENDS

Page

A. Accident Costs ........................................................ 1

B. Management's Part in Safety .................................. 1

C. Worker's Part in Safety ........................................... 2

D. Accident Investigation ............................................ 2

E. Accidents are Preventable ...................................... 2

## PART II—REQUIREMENTS

A. Injury Rates ............................................................. 2

B. Buildings and Equipment ....................................... 4
    1. Buildings ............................................................ 4
    2. Floors ................................................................. 4
    3. Floor openings, wall openings and elevated platforms ..... 4
    4. Stairways or steps ............................................ 4
    5. Elevators ........................................................... 4
    6. Illumination ....................................................... 4
    7. Aisles and passageways .................................. 5
    8. Ladders .............................................................. 5
    9. Overhead work ................................................. 6
    10. Housekeeping and order ................................. 6
    11. Yards and grounds ......................................... 6
    12. Materials .......................................................... 6
    13. Compressed gases .......................................... 6
    14. Special precautions for oxygen cylinders ...... 7
    15. Flammable Liquids .......................................... 7
    16. Explosives ....................................................... 7
    17. Spontaneous ignition ...................................... 7
    18. Electrical equipment ....................................... 8
    19. Tools ................................................................. 8

C. Fire Prevention and Protection ............................... 8
    1. Building egress .................................................. 8
    2. Fire extinguishing equipment .......................... 9

D. Pressure Vessels ...................................................... 9
    1. Fired pressure vessels ...................................... 9
      (a) Steam Boilers ............................................ 9
      (b) Heating boilers and miscellaneous small boilers ..... 9
      (c) Steam cookers, digesters, glue pots, etc. ..... 9
    2. Compressed Air Machinery and Equipment ... 9
      (a) Compressors ............................................. 9
      (b) Switches and other electrical apparatus .... 10
      (c) Belt, pulley, gear and shaft guards ........ 10
      (d) Lubrication ............................................... 10
      (e) Cooling ..................................................... 10
      (f) Operation and maintenance ..................... 10
      (g) Aftercoolers ............................................. 10
      (h) Piping ....................................................... 10
      (i) Valves ....................................................... 11
      (j) Receivers .................................................. 11
      (k) Working space ......................................... 11
      (l) Aisles ........................................................ 11
      (m) Safety valves .......................................... 11

iii

Page

E.  Machinery Guarding ................................................................................ 11
  1.  Railings and toeboards ...................................................................... 11
  2.  Guards ................................................................................................ 12
  3.  Belts, pulleys, etc. ............................................................................. 13
  4.  Vertical and inclined belts ................................................................ 13
  5.  Horizontal belts ................................................................................. 13
  6.  Cone pulleys and belts ...................................................................... 13
  7.  Machine control ................................................................................. 13
  8.  Belt shifters ........................................................................................ 14
  9.  Pulleys—Location on shafting .......................................................... 14
  10.  Gears ................................................................................................. 14
  11.  Keys and keyseats ........................................................................... 14
  12.  Flywheels and shafting .................................................................... 14
  13.  Presses ............................................................................................. 14
  14.  Abrasive wheels ............................................................................... 15
      (a)  Handling ..................................................................................... 15
      (b)  Storage ....................................................................................... 16
      (c)  Inspection .................................................................................. 16
      (d)  Rigidity, supports ..................................................................... 16
      (e)  Guards ........................................................................................ 16
      (f)  Spindle ....................................................................................... 16
      (g)  Mountings and fastenings ......................................................... 16
      (h)  Dust exhaust provisions ............................................................ 16
      (i)  Exposures permitted .................................................................. 16
      (j)  Exposure adjustment ................................................................. 16
      (k)  Work rests .................................................................................. 16
  15.  Miscellaneous Machine Guarding ................................................... 16
      (a)  Revolving, oscillating or reciprocating parts of engines and other
           machines ................................................................................... 16
      (b)  Oiling devices ............................................................................ 17
      (c)  Projecting parts on shafts ......................................................... 17
      (d)  Revolving stock .......................................................................... 17
      (e)  Noise reduction .......................................................................... 17
  16.  Fans .................................................................................................. 17
  17.  Revolving drums and cylinders ....................................................... 17
  18.  Counterweights, tension weights and springs ................................ 17
  19.  Lathes and automatic screw machines ............................................ 17
      (a)  Drill presses .............................................................................. 17
      (b)  Drop Hammers ........................................................................... 17
      (c)  Planers and shapers ................................................................... 17
      (d)  Metal shears ............................................................................... 17

F.  Woodworking Machines .......................................................................... 18
  1.  Band saw or band knife ..................................................................... 18
  2.  Band resaw .......................................................................................... 18
  3.  Cork cutter .......................................................................................... 18
      (a)  Circular knife type ..................................................................... 18
      (b)  Band knife type .......................................................................... 18
  4.  Circular rip saws ................................................................................. 18
  5.  Self-feed circular rip saws .................................................................. 18
  6.  Self-feed band rip saws ...................................................................... 18
  7.  Circular cross cut saws ....................................................................... 19
  8.  Swing cut off saws .............................................................................. 19
  9.  Circular resaws ................................................................................... 19
  10.  Portable circular saws ...................................................................... 19
  11.  Jointer or buzz planers ..................................................................... 19
  12.  Combination woodworking machines .............................................. 19
  13.  Automatic lathes ............................................................................... 19
  14.  Mortising machines ........................................................................... 19
  15.  Chain mortisers ................................................................................ 19
  16.  Moulders, matchers, and stickers .................................................... 19
  17.  Panel raisers ...................................................................................... 19
  18.  Planers ............................................................................................... 19

iv

Page

19. Disc sanders .................................................. 19
20. Drum sanders ................................................ 19
21. Shapers .................................................... 19
22. Tenoners ................................................... 20
23. Wood heel turning machines ................................. 20
24. Stave jointers ............................................. 20
25. Veneer clipper or slicers .................................. 20

G. Cranes and Hoists .............................................. 20
   1. Overhead trolleys and monorails ........................... 20
   2. Cranes .................................................... 20
      (a) Bumpers ............................................. 20
      (b) Buffers ............................................. 20
      (c) Fenders ............................................. 20
      (d) Brakes ............................................. 20
      (e) Lubrication ........................................ 20
      (f) Collector wires .................................... 20
   3. Crane footwalks ........................................... 20
   4. Cranes—Stairways ......................................... 20
   5. Crane cages—enclosures ................................... 21
      (a) Indoor cranes ...................................... 21
      (b) Outdoor cranes ..................................... 21
      (c) Trolley conductors ................................. 21
   6. Hoists .................................................... 21
      (a) Limit switches ..................................... 21
      (b) Brakes ............................................. 21
      (c) Capacity marking ................................... 21
      (d) Control equipment .................................. 21
   7. Cables, ropes and chains .................................. 21

H. Environmental Conditions and Personal Services ................. 21
   1. Gases, vapors, dusts, fumes and mists ..................... 21
      (a) Guide for allowable concentrations ................. 21
      (b) Control measures ................................... 22
      (c) Personal protective equipment ...................... 22
      (d) Respiratory protective devices ..................... 22
      (e) Air cleaning equipment ............................. 22
   2. Eye protection ............................................ 22
   3. Sanitation and personal service conveniences ............. 22
      (a) Lunch rooms ........................................ 22
      (b) Dressing rooms ..................................... 23
      (c) Emergency treatment of eye burns ................... 23
      (d) Drinking water ..................................... 23
      (e) Toilet facilities .................................. 23
      (f) Washroom facilities ................................ 23
   4. First-aid facilities ...................................... 23

v

# PART I—SAFETY PROGRAMS PAY DIVIDENDS

Hard, cold statistics on industrial accidents in the United States tell a tragic and revealing story. These figures deal with the number of people killed and injured in industrial accidents. Sometimes figures are used to estimate the billions of dollars that are lost by management and by workers and their families as a result of accidents.

But there are no statistics on the human suffering, sorrow, and misery which follow deaths and injuries into the homes of American workers, even though the human tragedy which stalks after industrial accidents affords the most impelling reason for intelligent safety programs.

Although the most important consideration in any safety program is the safety and well-being of the worker and the protection of his family from want, another driving force behind industrial safety programs is the cost of accidents in terms of money and human resources—a tragic economic waste.

A third reason for undertaking good safety programs applies primarily to contractors performing on certain Government supply contracts of $10,000 or more subject to the safety requirements of the Walsh-Healey Public Contracts Act. For the guidance of such contractors, Part II of this booklet presents the rules which should be observed in compliance with the Act.

Part I presents in brief useable form the most important basic principles of accident prevention taken from day-by-day practices of managements whose safety performances have been the best—

    Accident Costs.
    Management's Part in Safety.
    Worker's Part in Safety.
    Accident Investigation.
    Accidents are Preventable.

## A. ACCIDENT COSTS

Accidents are expensive. They constitute a serious wastage of our human and material resources. Substantial savings of both can be made by preventing accidents. They can be prevented by appeals to the emotions and by persistent day-by-day effort to enlist on the side of safety the ever-present desire and necessity that every management has for reducing waste.

Everyone can easily see that accident costs are wholly waste. It is not so easy to see how large are these wastes. Compensation and medical costs (spoken of as direct costs) are obvious. It has, however, taken careful studies by experienced cost accountants and industrial executives to show how large are the other costs (spoken of as indirect costs). It is now clear that on the average the indirect costs of

accidents in industry are not less than four times the direct costs. The items of cost that are likely to be present in each case of accidental injury are:

1. Compensation.
2. Medical expense.
3. Lost time of injured employee.
4. Lost time of fellow employees who stop work:
    (a) To aid injured worker.
    (b) Out of sympathy or curiosity.
    (c) For other incidental reasons.
5. Time of foreman, executives, or other staff personnel:
    (a) Assisting injured employee.
    (b) Investigating cause of accident.
    (c) Arranging for continuance of injured employee's work.
    (d) Selecting, training, or breaking in new employee.
    (e) Preparing accident report.
    (f) Attending hearings on injury (serious or contested cases).
6. Lost production due to upset, shock, or diverted interest of workers.
7. Lost production due to stoppage of machine or process in charge of injured person.
8. Damage to machine, equipment, or material directly occasioned by the accident.
9. Spoiled product or material due to emotional upset of fellow workers.
10. Lessened effectiveness of injured employee for a period after his return to work.
11. Business or good will lost through failure to fill order on time, lost bonuses, payment of forfeits for nondelivery, etc.
12. Legal expense, court fees, expense of preparation of case, settlements, judgements, etc., in cases contested at law.
13. The employer's share of the loss and expense to society in each case of death or continued loss in earning power.

## B. MANAGEMENT'S PART IN SAFETY

Safety work in industry must begin at the top. Since every kind of work that men do involves some degree of hazard, each produces its share of injuries. But by the proper attention to safety almost all injuries can be prevented in any kind of work and in any occupation. Management's desire to eliminate injuries should be strong enough to make their prevention a vital part of all activities. Prevention must receive continuous attention along with such matters as cost, quality, and production.

Very briefly, the more important definite things that the management should do to prevent accidents may be set down as follows:

1. Provide safe plant and equipment.
2. Safeguard all machinery.

1

3.  Place no new machinery or equipment in operation unless full attention has been paid to its safety.

4.  Plan and arrange all processes and operations with careful attention to safety.

5.  Maintain a system of inspection to discover correctible hazards.

6.  Maintain safety minded supervision.

7.  Train, educate, and stimulate its employees to follow safe methods of work and take a sincere interest in the safety of themselves and their fellow workers.

8.  Investigate all accidents to determine how best to prevent a recurrence.

9.  Make a full report to the proper authorities of all cases of injury.

## C.  THE WORKER'S PART IN SAFETY

Safety is everybody's business. Every employee should, of course, be always alert to the possibilities of injury. Management can do only part of the job. Each worker should faithfully cooperate with his management in all safety programs. Some of the ways in which his help is most necessary are:

1.  Faithfully using all safeguards provided.

2.  Studying and carefully following safety rules and safety instructions.

3.  Working earnestly on safety committees or other safety activities to which he may be assigned.

4.  Seeking always for the safe way of working on each job or activity.

5.  Watching out always for the safety of his fellow men.

6.  Reporting all hazardous conditions of which he learns.

## D.  ACCIDENT INVESTIGATION

It is obvious that every case of disabling injury should be carefully investigated to find out how to prevent a recurrence. In theory every accident, whether it yields an injury or not,

should be investigated also, but this would involve such a heavy volume of work that few managements would find it practical. Good practice is to investigate all cases of disablement, all other happenings involving the probability of serious injury, and cases of repeated injury to an individual.

The investigations must be made by persons who are intelligent, painstaking, and keenly safety-minded. Usually an accident has more than a single cause. A combination of circumstances was necessary to bring it about. The employer should try to correct every condition or circumstance that might lead to injury. He should particularly not be content to stop with finding the human fault or failure that was involved, for in almost every case, both a material and a human fault will be found. If the material fault or lack is corrected, the human fault or lack usually fails to produce injury. Of course, effort should be made to correct the human fault also. Usually correction of the material or mechanical fault involves expense so that the constant temptation is to blame the individual at fault and let the matter end there. That is not in the best interests of safety, and the tendency to take that course must continuously be resisted.

## E.  ACCIDENTS ARE PREVENTABLE

An excellent definition of "accident" is that it is an "unexpected occurance," that is, unplanned for or unforeseen. Occasionally, human injury is involved and we have an accidental injury which is what we really mean when we say "accident." If each bit of work done in industry could be properly planned and then carried out exactly as planned, there would be no unexpected occurrences and therefore no human injuries. Numerous establishments, large and small, in each branch of industry have by planning, foresight, and care eliminated at least 9 out of every 10 injuries that otherwise would have been suffered by their workers and have profited by so doing.

# PART II—REQUIREMENTS

## Frequency Rate

Injury-frequency rates are the primary measures of the incidence of work injuries. The lack of comparability inherent in simple injury totals, arising from variations in employment and operating time, is overcome by expressing the injuries in terms of a standard unit of exposure. By definition, the standard comparison injury-frequency rate is the average number of disabling work injuries per million employee-hours worked. Expressed as a formula it is:

$$\text{Frequency Rate} = \frac{\text{Number of disabling injuries multiplied by 1,000,000}}{\text{Total number of employee-hours worked}}$$

## What injuries to count

A disabling work injury is defined as any injury incurred in the course of and arising out of employment, which:

(1)  Results in death, or

(2)  Results in any degree of permanent physical impairment, regardless of whether or not any time is lost from work, or

2

(3)   Renders the injured person unable to work at any regularly established job, which is open and available to him, throughout the hours of his regular shift on any day after the day of injury, including Sundays, holidays, and days on which the plant is shut down.

The injuries described in items 1 and 2 of this definition are commonly spoken of as "death cases" and "permanent disability" cases. Death cases usually are readily identified. Permanent disabilities likewise are usually easy to identify. It is necessary, however, to remember that permanent disabilities include not only all injuries involving the amputation of any part of the body, but also all injuries which result in the complete or partial loss of use of any body part or function of the body. For example, the partial loss of vision or a permanently stiff arm resulting from a poorly healed fracture would be counted as permanent impairments just as you would count an injury involving the amputation of a finger or a foot. Most permanent disability cases involve the loss of considerable time. Occasionally, however, there are hardy individuals who experience a minor permanent disability, such as the amputation of the end of a finger, and return to work on the same day or the following day. Regardless of the fact that no recorded time was lost, these cases should be counted if there actually is any residual permanent impairment of any body part or body function.

The third category of disabling injuries is referred to as "temporary-total disabilities." They are "temporary" disabilities because they do not result in death or any form of permanent impairment. In other words, they are injuries from which the injured person eventually recovers with no lasting ill effects. At the same time, they are "total" disabilities because they render the injured person totally unable to work at any regular job for a period of time equivalent to at least one full shift on any day after the day of injury. The important things to remember in connection with these injuries are: (1) Time lost on the day of injury is not considered in determining whether or not an injury is disabling; (2) the inability to work must continue throughout the hours of the worker's regular shift on at least one day; but, (3) this inability to work may occur on any day after the injury, not necessarily on the next day, and not necessarily on a day on which he would normally be expected to work.

The reference in the definition to a regularly established job means that you are not permitted to exclude an injury from the count of disabling injuries if the injured person returns to a specially created easy job which was designed simply to get him back to work without loss of time.

It should also be noted that under the definition of a disabling injury the reportability of an injury for injury-statistics purposes is in no way related to the eligibility of the injured person for workmen's compensation payments. In case of doubt as to whether or not an injured person is able to work, the attending physician's decision is final.

Establishments participating in the Bureau of Labor Statistics' quarterly work-injury survey and retaining on file copies of each completed report on Form BLS 1417 or 1417-A will be considered as complying with the requirement regarding the maintenance of injury-frequency rates.

For every-day use, the frequency rate affords the best measure of performance because each accident might easily, "but for the grace of God," have been very serious or fatal, and therefore the constant effort must be to prevent every injury, not just the more serious ones. The following example shows how to figure the frequency rate.

During 1949 eighteen lost-time injuries occurred in a certain machine shop. The number of man-hours worked during the year totaled 216,000. What was the frequency rate? Substituting these numbers in the frequency rate formula we get:

$$F = \frac{18 \times 1,000,000}{216,000}$$

which gives a frequency rate of 83 plus. That is, the men in the shop suffered 83 lost-time injuries for every million man-hours they worked.

If the figure for man-hours is not available, a close enough estimate can usually be made by multiplying the average number of workers by the hours worked per week and the number of weeks worked for the period for which the frequency rate is being calculated.

Some people prefer to think of the frequency rate in terms of how long a person may expect to work on the average without getting hurt. If, in the above example, the shop worked a 40-hour week 50 weeks during the year, each man worked 2,000 hours in the year, and therefore in order to put in 216,000 hours there must have been an average of 108 men working. The 18 injuries averaged among these 108 men means that every sixth man was disabled during the year. Another way of putting it is that, on the average, each man could expect to be disabled once in 6 years. That is a very high injury rate for even the most hazardous work. Numerous plants in all branches of industry maintain frequency rates below 10 and often times below 5. A worker in a plant having a frequency rate of 5 is fortunate indeed for on the average he can expect to work three lifetimes—a whole century—for each disabling injury he suffers. He is undoubtedly much safer when at work than when not at work.

(For full detailed information on determining frequency rates see "American Stan-

3

dard", *Method of Compiling Industrial Injury Rates*, Z16.1.[1])

## B. BUILDINGS AND EQUIPMENT

1. Buildings.—Buildings and all appurtenances thereto, including bridges, towers, balconies, runways, and platforms, should be structurally safe to prevent collapse.

2. Floors.—(a) No floor or platform should be so loaded as to have a factor of safety of less than four. That is, the weight placed upon a floor or platform should not exceed one-fourth of the breaking strength of the platform or floor.

(b) Floors, other than those resting directly on solid ground, when used for storage or for operations that might lead to overloading should be clearly posted to show maximum safe floor loads.

(c) All floor surfaces should be kept clean and dry and maintained in a smooth and reasonably nonslippery condition free from holes or projections that might cause tripping.

(d) Where the type of operation necessitates working on wet or slippery floor areas, such areas should be protected against slipping by the use of mats, grates, cleats, or other high friction floor coverings.

(e) Safe means of access, suited to conditions, should be provided to every overhead point to which employees are called upon to go in connection with their employment. Materials or objects should not remain unnecessarily on the floor surface in such places as will subject employees to the hazard of falls.

3. Floor openings, wall openings, and elevated platforms.—Floor openings, wall openings, and elevated platforms where there is a possibility of persons or material falling through should be provided with standard railing and toe boards, or with wood or metal covers. Where guard rails are advisable refer to Standards for *Railings, Toeboards, and Guards* as specified under Part II E, Machine Guarding.

4. Stairways or Steps.—(a) Riser height and tread width should be uniform in any given flight of stairs. Variations in riser height should not exceed 1/8 inch in the stair as constructed. Variation due to wear should not be allowed to exceed 1/4 inch. Riser height should not be over 8 inches and tread width exclusive of nosing not less than 9 inches. Preferred dimensions are: riser 7 inches, tread 11 inches plus 1 inch nosing, and width not less than 36 inches.

(b) Every stairway or steps of four or more risers should be equipped with a substantial smooth handrail from 30 inches to 36 inches high, measured vertically from the nose of the tread and placed on the left-hand side as one mounts the stair and on the open side, if any. If 5 feet or more in width, or open on both sides, the stairs should have a handrail on each side.

(c) Interior stairways or steps which are more than 8 feet wide should be divided by center rails into widths of not more than 8 feet nor less than 3 feet 8 inches.

(d) Exterior stairways or steps should have a handrail at each side, and if the stairway or steps are more than 88 inches wide, one or more intermediate handrails should be provided.

(e) Railings on open sides of stairways or steps should be provided with an intermediate rail at midheight, or with vertical members having a maximum spacing of 11 inches.

(f) Every stairway or steps should be maintained in good repair, free from protruding bolts, screws, and nails, and unnecessary material, dirt, and slippery conditions. Treads should be renewed when the surface, including the nosing, shows wear to the extent of 1/4 inch or more.

(g) Stairways should not be used for storage purposes, and any equipment should be so located that its presence or use will not unnecessarily obstruct or interfere with free passage.

(h) All metal treads should have a surface which will reasonably prevent slipping.

5. Elevators.—(a) Elevator inspection by a recognized elevator inspection service will be acceptable as evidence of satisfactory installation and maintenance. Hoistways, hatchways, elevator wells and wheel holes should be securely fenced, inclosed, or otherwise protected. (For details, see American Standard Safety Code for Elevators, Dumbwaiters, and Escalators.)

(b) Elevator machinery, electrical apparatus, or system wiring should be properly installed, guarded, and inspected.

6. Illumination.—Illumination adequate to permit all work activities to be carried on safely should be provided and maintained during all work periods. Minimum standards for illumination should be in conformance with the "American Standard," Recommended Practice of Industrial Lighting.

7. Aisles and passageways.—(a) Permanent aisles and passageways should be kept clear and in good repair. Where, due to lack of proper definition, such aisles and passageways become hazardous, they should be clearly defined by painted lines, curbings, or other methods of marking.

(b) Where industrial trucks are in customary use, one-way traffic aisles should be at least 2 feet wider than the widest vehicle. Two-way traffic aisles should be at least 3 feet wider than twice the width of the widest vehicle.

(c) There should be no obstructions across or in aisles that might cause tripping.

[1] Published by American Standards Association, 70 E. 45th St., New York City.

8. Ladders.—*(a)* Full compliance with the applicable provisions of the "American Standard", Safety Code for Wood Ladders, A14.1, is recommended.

*(b)* Rung spacing on each fixed ladder should be uniform. This includes the space between the top rung and the landing measured vertically from the top rung. Rungs of all ladders should be uniformly spaced, firmly secured and maintained in a sufficiently tight condition to prevent turning or other motion. Bent rungs of metal fixed ladders should be promptly replaced or repaired. Clearance at the back of rungs of fixed ladders should not be less than 6½ inches measured horizontally from any object.

*(c)* Fixed ladders should be secured with sufficient firmness and in such manner that they will be free from visible motion under normal conditions of use. Hand holds should be provided at the top of each fixed ladder so arranged that a person using them can conveniently retain a secure hold with either hand when stepping from the top rung of the ladder to the landing point or the reverse. Side rails should extend above landings at least 3 feet. No fixed ladder should have a slope outward, that is, from the vertical toward the climber, unless such sloping ladder or sloping part thereof is properly caged. Ladders in disrepair should be promptly repaired or removed from use.

*(d)* In the use of portable straight ladders, practicable precautions should be used. Every step ladder should be equipped with a spreader of a type that locks when the ladder is opened to hold it securely in the open position. Portable steps and saw horses should be of substantial construction with parts firmly secured and maintained in a safe state of repair.

9. Overhead work.—*(a)* Every overhead job that may have to be done in an establishment should be carefully considered and a safe means of doing it provided.

*(b)* Some of the more common "overhead" jobs with means of safeguarding are given below:

(1) *Nature of job.*—Devices that require only infrequent attention normally consisting of only simple servicing or adjustments. Examples: Valves in steam, air, or other supply lines; pressure reducers; overflow or other high level storage tanks; liquid level indicators; gauges; natural draft ventilators.

*Suggested safeguards.* — Portable ladders: Feet suited to floor surface; ladder of correct length, strength, and condition conveniently available, firm support (at top), security (of position), safety in placing ladder, safety of man on ladder (position, clearance from moving parts, electrical conductors, steam pipes, etc.).

Good practice provides fixed ladders or stairs to such equipment wherever reasonably possible.

Good design eliminates overhead locations to the maximum practicable extent.

(2) *Nature of job.*—Devices that require rather frequent (as weekly) servicing usually involving only minor attention or adjustment. Examples: Ring oiler (or equivalent) bearings, induction motors, storage tanks, exhaust fans.

*Suggested safeguards.*—Railed and toeboarded platforms reached by stairs should be provided wherever space and location permits. Fixed ladders are preferable to stairs steeper than will give a 10 inch rise and 8 inch tread (pitch about 51°). Where location prevents stair or fixed ladder, provide portable railed step or portable ladder suited to the purpose with hooks fixed to the rails to engage suitable supports at the platform.

(3) *Nature of job.*—Apparatus that requires daily or more frequent servicing. Examples: Control devices as governors, regulators, recorders, sight glasses, etc.

*Suggested safeguards.*—Every such point should be accessible by a platform and stair. In some cases they can be serviced from the floor. Example: Use of telescope to read thermometers on tall apparatus.

(4) *Nature of job.*—Equipment that requires relatively infrequent attention but which involves major cleaning or maintenance and repair work. Examples: Electric overhead traveling cranes (overhauling), steam boilers (retubing, cleaning tubes), stills, fractionating columns, digesters, etc.

*Suggested safeguards.* — Railed and toeboarded platforms reached by stairs wherever possible. Particularly in crane overhauls such platforms cut the cost of the work, result in better maintenance, and reduce the hazard, thus justifying very substantial expenditures for the platform. If fixed platforms are not practicable, provide substantial "knock-down" scaffolding (railed and toeboarded) kept for the purpose. In some cases wheeled platforms (wheels arranged to lock) are convenient.

(5) *Nature of job.*—Apparatus out of doors. (Assignable to above classes but listed here because of the special hazards due to wind, ice, cold, etc.) Example: Sprinkler tanks, oil storage tanks, derricks, coal unloaders, dust collectors, advertising signs, flood lights.

*Suggested safeguards.*—All outdoor tanks should be equipped with fixed ladders and self-draining platforms (if needed) to give safe access to manholes, etc. Means of access to bearings, etc., on derricks and coal unloaders must be suited to conditions. Never omit ladder rails or allow ladder to have reverse slope; provide adequate hand holds and foot supports.

(6) *Nature of job.*—Maintenance activities, as window cleaning and reglazing, paint-

ing, replacing lights, painting masonry, oiling, and other work on overhead shafting.

*Suggested safeguards.* — Window cleaning equipment should conform to the "American Standard," Safety Code for Window Cleaning.

Long spout oil cans can be used instead of ladders. The practice of oiling running overhead machinery is rarely carefully planned. When done from a crane, a railed platform should be provided and careful precautions taken to guard against insufficient clearance. Extension fittings should be used to give adequate clearance from moving parts.

10. **Housekeeping and order.**—*(a)* Satisfactory control requires careful consideration of such factors as tonnage and volume of materials to be handled, the amounts required at the successive steps of the process, allowance of the spaces necessary, and the methods to be used in handling and transporting the materials and articles.

*(b)* Methods of piling should be worked out for each class of materials or articles. Points commonly of importance are:

*(1)* *Height of pile.*—This is dependent upon the character of the material and the consequent danger of toppling, the means used in piling and removal, the traffic nearby, and interference with sprinkler operation. When the nature of the material is suitable, it should be so piled as to be interlocking.

*(2)* *Strength of support.*—Allowable floor loads should be posted.

*(3)* *Evenness of support and its continued stability.*—This condition often exists in yard piling where uneven ground or moisture may cause toppling, and on first floors or in basements where floors may slope or flooring sag.

*(4)* *Location.*—Aisle traffic or the presence of work benches or machines may make it necessary to limit the height of material to be piled in a safe manner.

*(5)* *Piling small articles.*—Containers suited to the nature of the articles are commonly used. These usually take the form of wheeled or truck pick-up containers that receive the articles from work bench or machine. A useful modification for such articles are small cans or trays that themselves may be stacked.

*(6)* *Pipe or other long stock.*—Suitable racks aid handling. Projecting ends should be protected by location, railings, or barriers.

*(c)* Remove, or bend over in such a manner as to make them harmless, all projecting nails in kegs, barrels, boards, or boxes allowed to remain about the work place.

*(d)* Waste disposal provisions should be made for the orderly collection and disposal of all scrap debris, empty bottles, etc.; special provisions suited to the nature of the substance in question should be made for the disposal of poisonous and obnoxious substances.

11. **Yards and grounds.**—In plant yards and grounds, safety measures include:

(1) Proper drainage.

(2) Clearance signs to warn of limit clearances.

(3) Derails and bumper blocks.

(4) Traffic control signs to warn pedestrian, vehicular, and railroad traffic.

(5) Proper coverings or rails for open pits, tanks, vats, ditches, etc.

12. **Materials.**— *(a)* Materials, wherever stored, should be piled, stacked, or racked in a manner designed to prevent tipping, falling, collapsing, rolling, or spreading. Racks, bins, planks, sleepers, bars, strips, blocks, and sheets should be used where necessary to make the piles stable. Materials and objects that are stored in overhead places should be secured so that they will not fall and cause injury to persons below.

*(b)* All hazardous chemicals should be distinctively marked to indicate their nature.

13. **Compressed Gases.**—*(a)* Cylinders containing compressed gases should not be unduly exposed to the heat of stoves, radiators, or furnaces. Where cylinders are stored in the open, they should be protected from accumulations of snow and ice and from the sun where high temperatures occur.

*(b)* Heat increases the pressure within the cylinder, or it may melt the fusible safety plugs, which in acetylene cylinders melt at a temperature of approximately 210° to 220°F. Should a valve become frozen, it should be thawed out with warm (not scalding) water. Open flames should not be used for this purpose under any circumstances.

*(c)* Cylinders should preferably be stored in an upright position. In many plants, cylinders are held upright by straps or chains to prevent their falling over. This is particularly important with acetylene cylinders.

*(d)* Empty cylinders should be plainly marked EMPTY, and the valves should be closed. The empty cylinders should be segregated from full cylinders and returned to the manufacturer as soon as practicable.

*(e)* The recommendations of the National Fire Protection Association and State and municipal laws and regulations should be closely observed in regard to the storage of compressed gas cylinders. Cylinders should never be allowed to fall or otherwise receive shock.

14. **Special precautions for oxygen cylinders.**—*(a)* Great care must be exercised in handling oxygen to prevent contact of oxygen under pressure with oils, greases, organic lubricants, rubber, or other materials of an organic nature in order to prevent explosion. The following recommendations of the Compressed Gas Association should be observed:

(1) Never permit oil, grease, or readily combustible materials to come in contact with oxygen cylinders, valves, regulators, gauges, or fittings.

(2) Never lubricate regulators, fittings, or gauges with oil or any other combustible substance.

(3) Never handle oxygen cylinders or apparatus with oily hands or greasy gloves or rags.

(4) Always clear the particles of dust and dirt from the opening to each cylinder by slightly opening and closing the valve before applying any fitting to the cylinder.

(5) Never permit oxygen to enter the regulator suddenly. Open the valve slowly. When opening the valve, point the face of the gauge on regulator away from the operator.

(6) Never drape an oxygen cylinder with any material such as wearing apparel, rags, etc.

(7) Never use oxygen fittings, valves, regulators, or gauges for any other service except oxygen.

(8) Users should never mix gases of any type in an oxygen or any other cylinder.

(9) Never use oxygen from a cylinder except through a pressure reducing regulator.

(10) Never attempt to use regulators which are in need of repair or cylinders having valves which do not operate properly.

(11) Never attempt to repair defective oxygen equipment unless properly qualified by knowledge and experience.

15. Flammable liquids.—Materials such as paints, lacquers, thinners, gasoline, and naptha should be stored and handled with provisions for safety suited to the material and the conditions of its use. They should also be covered or stored in an approved type of safety container suitable to the nature of the material.

16. Explosives. — Explosives should be stored in approved type explosive magazines which are bulletproof, ventilated, and located at distances from other buildings as required under the American Table of Quantity and Distance. For details, refer to U. S. Bureau of Mines Information Circular 7307 on "Surface Storage of Explosives" and Information Circular 7380 on "Safe Storage, Handling, and Use of Commercial Explosives."

17. Spontaneous ignition.—Proper precautions should be taken in connection with storage of materials which may cause spontaneous ignition. Rooms in which there may be explosive concentrations of dust, gases, or vapors should have explosion-proof electrical fixtures and equipment in accordance with the provisions of the National Electrical Code relating to hazardous locations.

18. Electrical equipment.—The following general information should be used in conjunction with the National Electrical Safety Code, National Bureau of Standards Handbook H30:

(a) General protection.—Where practicable, transformers, control boards, and other accessories should be placed in special rooms to which only authorized persons have access. If the use of a separate room is not feasible, enclosures should be built around those parts of electrical equipment having exposed conductors. Enclosures made of metal should be effectively grounded.

Warning signs should be displayed near exposed current-carrying parts and in specially hazardous areas, such as high voltage installations. Signs should be large enough to be read easily and they should be so placed as to be visible from all approaches to the danger zones. They should be displayed in as many languages as needed.

Suitable insulating mats or platforms of substantial construction and providing good footing shall be placed on floors and, if necessary, on the frames of the machines having exposed live parts of more than 150 volts to ground, so that the operator or persons in the vicinity cannot readily touch such parts unless standing on the mats, platforms, or insulating floors.

(b) Grounding.—Fixed equipment or appliances having exposed metal frames should be grounded under any of the following conditions:

(1) If operated at more than 150 volts to ground, regardless of location.

(2) If located where exposed grounded surfaces, as plumbing fixtures or conductive floor and wall can be reached by a person while touching the metal parts of equipment.

(3) If located in hazardous areas.

The grounding of portable equipment should follow that of fixed equipment except (1) electrically heated appliances exempted by administrative authority, and (2) motors if positively guarded under all conditions. It is recommended, however, that motors always be grounded.

(c) Ground connections.—Ground connections should be of copper, and the combined resistance of the grounded wire and the connection with the ground should not exceed 3 ohms for waterpipe connections nor 25 ohms for artificial grounds. The actual ground circuit resistance should be kept as far as possible below the maximum permissible limits.

Where a grounding wire is exposed to mechanical injury, it should be protected by conduit connected at both ends to the grounding wire or by other substantial enclosure. If the enclosure is of metal, it also should be grounded.

(d) Transformers.—These should preferably be located outside of buildings, and surrounded by an enclosure of grounded metal at least 8 feet high. If a building wall forms a

7

(2) If the air compressor is engine or turbine driven, an auxiliary control to the governor should be installed to prevent racing when the unloader operates.

(3) Every air compressor should be equipped with an automatic mechanism so arranged that the compressor will automatically stop its air-compressing operation before the discharge pressure exceeds the maximum working pressure allowable under this code on the weakest portion of the system to which the compressor is connected.

(4) If this automatic mechanism is electrically operated, the actuating device should be so designed and constructed that the electrical contact or contacts cannot lock or fuse in a position that will cause the compressor to continue its air-compressing operation.

*(b) Switches, and other electrical apparatus.*—If the compressor is driven by an electric motor, all electrical switches and other electrical apparatus should be guarded as required by the National Electrical Safety Code and the National Electrical (Fire) Code.

*(c) Belt, pulley, gear, and shaft guards.*—All belts, pulleys, gears, flywheels, and shafts should be guarded as outlined in Part II E of these standards.

*(d) Lubrication.*—Specific requirements for lubricating oils are intentionally omitted from these standards. In the operation of air compressors, many of the troubles experienced can be traced to the use of a poor or unsuitable grade of oil in the air cylinders. The importance of good air cylinder oil is generally recognized by the leading manufacturers of equipment and of lubricants and it is therefore suggested that their recommendations be followed.

Air compressor cylinders should be lubricated by means of visible-flow forced-feed lubricators.

Only enough oil should be used to furnish satisfactory lubrication in order to avoid carryover to intercoolers, aftercoolers, receivers, and other parts of the system.

*(e) Cooling.*—Where water cooling is used, a visible indication of water flow should be provided.

*(f) Operation and maintenance.*—(1) Compressor valves should be inspected, checked for broken springs, and tested for tightness frequently and at regular intervals. Leaky valves should be made tight by repair or replacement. Accumulations of carbon or other foreign matter should be removed.

(2) Unloaders and governor controls on air compressors should be inspected at frequent and regular intervals and should be maintained in good working condition. Where emergency (overspeed) stops are installed, such devices should be tested at regular intervals to insure their operation within safe limits of overspeed.

(3) If the compressor is steam driven, the throttle valve should be closed and tagged, and the cylinder drain cocks should be opened, before starting repairs or other work on the compressor.

(4) If the compressor is motor driven, the line switch supplying the motor should be opened and tagged or locked before starting repairs or other work on the compressor.

(5) Under no circumstances should kerosene, gasoline, or other flammable solvents be introduced into the compressor cylinders, the piping, or the receiver. Soapy water or any suitable non-toxic, nonflammable solution may be used for cleaning such portions of the system.

*(g) Aftercoolers.*—(1) Aftercoolers should be designed to withstand safely the maximum pressure in the air discharge piping.

(2) The advantages to be gained by using aftercoolers are of sufficient importance to warrant consideration of such equipment on at least new installations. Aftercoolers reduce the temperature of the air discharged by the compressor to a point at which most of the moisture and oil vapor condenses and can be removed.

(3) The removal of the moisture tends to prevent water hammer in the air lines. The condensation of oil vapors tends to prevent their being carried over to pipe lines, receivers, and other parts of the systems.

(4) Where pipelines and receivers have become coated with oil because of improper lubrication of the compressor, explosive mixtures of air and oil vapor may be formed at high temperatures. Consequently overheating should be avoided and oil accumulation should be immediately removed.

(5) The use of aftercoolers tends to maintain more nearly uniform air temperatures on the discharge side of the system, thereby minimizing the strains resulting from alternate expansion and contraction of pipelines.

*(h) Piping.* — (1) *Installation.* — Piping should meet the requirements of the American Standard Code for Pressure Piping. In its installation, adequate provision should be made for expansion and contraction, and to counteract pulsation and vibration. Steam and air piping should be equipped with adequate traps or other means for removing liquid from the lines. Air discharge piping should be so installed that pockets where oil may accumulate are avoided.

(2) *Insulation.*—Steam piping should be adequately insulated where it is exposed to contact.

(3) *Compressor air intake.*—Provision should be made to prevent drawing air containing flammable or toxic gases, vapors, or dusts into the compressor, and to prevent steam, water, or waste of any sort from being blown

10

or drawn into the compressor intake. No valve should be installed in the air intake pipe to an air compressor.

(4) *Air-discharge piping.*—The air-discharge piping from the compressor to the air receiver should be at least as large as the discharge opening on the air compressor. Because the air-discharge pipe becomes hot, no wood or other flammable material should be permitted to remain in contact with it.

(*i*) *Valves.*—(1) Stop valves in the air line between the compressor and the air receiver are not recommended. In every case where a stop valve is so installed, one or more spring-loaded safety valves should be installed between the compressor and the stop valve. The total capacity of such safety valves should be sufficient to limit the pressure in the air discharge piping to 10 per cent above the relieving pressure of the safety valves on the air receiver.

(2) Any stop valve which may be installed in the air discharge piping should be so located that it can be inspected and cleaned at definite regular intervals. Stop valves should preferably be of the gate type and not of the globe type. If a globe valve is used it shall be so installed that the pressure is under the seat and that the valve will not trap condensation.

(3) Every steam-driven air-compressor should be provided with a manually operable throttle valve in the steam supply line, in a readily accessible location.

(4) A stop valve should be installed between the air-receiver and each piece of stationary utilization equipment at a point convenient to the operator thereof.

(5) A stop valve should be installed at each outlet to which an air hose may be attached.

(*j*) *Receivers.*—(1) *Construction.* Air receivers should be constructed in accordance with the 1937 Edition of the A.S.M.E. Code for Unfired Pressure Vessels.[2] The operating pressure should be based on a factor of safety of not less than 5. Inspection openings should be provided in all air receivers 18 inches or more in diameter.

(2) *Installation.*—Air receivers should be so installed that all drains, handholes, and manholes therein are easily accessible. Air receivers should be supported with sufficient clearance to premit a complete external inspection and to avoid corrosion of external surfaces. Under no circumstances should an air receiver be buried underground or located in an inaccessible place. The receiver should be located as close to the compressor or aftercooler as is possible in order to keep the discharge pipe short. The receiver should be located in a cool place to facilitate the condensation of moisture and oil vapors.

[2] Published by the American Society of Mechanical Engineers, 29 W. 39th St., New York City.

(3) *Drains and traps.*—A drain pipe and valve should be installed at the lowest point of every air receiver to provide for the removal of accumulated oil and water. Adequate automatic traps may be installed in addition to drain valves. The drain valve on the air receiver should be opened and the receiver completely drained frequently and at such intervals as to prevent the accumulation of excess amounts of liquid in the receiver.

(4) *Gages and valves.*—Every air receiver should be equipped with an indicating pressure gage (so located as to be readily visible) and with one or more spring-loaded safety valves. The total relieving capacity of such safety valves should be such as to prevent pressure in the receiver from exceeding the maximum allowable working pressure of the receiver by more than 10 percent. No valve of any type should be placed between the air receiver and its safety valve or valves.

(*k*) *Working space.*—In the location of compressors and related equipment, provision should be made for safe access to all parts of the equipment for operation, maintenance, and repairs.

(1) *Aisles.*—Aisle space should be adequate, should be independent of work and storage areas, and should be defined by floor markings.

(*m*) *Safety valves.*—(1) All safety valves used should be constructed, installed, and maintained in accordance with the A.S.M.E. Code for Unfired Pressure Vessels.

(2) Safety appliances, such as safety valves, indicating devices, and controlling devices, should be constructed, located, and installed so that they cannot be readily rendered inoperative by any means, including the elements.

(3) All safety valves should be tested frequently and at regular intervals to determine whether they are in good operating condition.

## E. MACHINERY GUARDING

1. Railings and toeboards.—Where standard railings and toeboards are specified in this manual they should conform to the following specifications:

(*a*) Railings should be 42 inches in height except where otherwise specified and should be equipped with toeboards unless the space between the lower rail and floor is filled with material as specified in "b".

(*b*) They should be of substantial construction, should be permanently fastened in place, and should be smooth and free from protruding nails, bolts, and splinters. An intermediate rail should be provided between the top rail and the floor, unless this space is filled with substantial wire mesh, expanded metal, or other suitable material.

(*c*) If constructed of pipe, the inside diame-

ter of the pipe should not be less than 1-1/4 inch.

*(d)* If constructed of metal shapes or bars, each part should have a cross section at least equal in strength to that of a 1-1/2- by 3/16-inch angle iron.

*(e)* If constructed of wood, the posts should not be smaller than the sizes commercially known as 2- by 4-inch or 3- by 3-inch. The top rail should be at least as large as the size known as 2- by 4-inch. The intermediate rail should not be smaller than the size commercially known as 1- by 4-inch.

*(f)* Posts and uprights should be spaced not more than 8 feet apart.

*(g)* Toeboards should be at least 5-1/2 inches in height and be constructed of wood, metal, metal grill with openings not exceeding 1 inch or other suitable material.

*(h)* Intermediate rails and toeboards, and top rails which are attached to the side of the posts, should be placed on the side of the posts away from the engine, belt, floor opening, etc., to be guarded, so that any blow or pressure against them will be taken up by the posts instead of tending to push the rails away from the posts.

2. Guards. *(a)* If guards are made of wire mesh, perforated or expanded metal, crossed strips or bars of wood or metal, etc., the width or diameter of the holes should not exceed 2 inches. If parallel strips or bars of wood or metal are used, the space between them

should not exceed 1 inch. There should be no openings more than 1/2 inch in width or diameter within 4 inches of any part, belt, pulley or flywheel, or other dangerous moving part. Wood slats should be smooth and free from splinters, and the holes in perforated or expanded metal should be free from sharp cutting edges.

*(b)* The supporting frames should be of substantial construction, such as angle iron, varying from 1 by 1 by 1/8 inch to 1-1/2 by 3/16 inch, or iron pipe with inside diameter varying from 3/4 inch to 1-1/2 inch, according to the weight of the filling material, the size of the panels, and the exposure of the guard to collision with trucks, etc. Any panel which measures more than 42 inches in both width and length should be substantially supported across its narrowest dimension at intervals of not more than 42 inches.

*(c)* The filling material should be bolted, riveted, or otherwise securely attached to the frame in such a manner that no sharp points or edges will be exposed. Bolts should be at least 3/16 inch in diameter and should be spaced not more than 10 inches apart. Flat bars or strips used for clamps should not be smaller than 3/4 by 1/8 inch if of iron, or 1 by 1 inch if of wood. Perforated or sheet metal may be spotwelded to angle iron frames.

*(d)* The thickness of material used for guards should not be less than is specified in the following table:

| Material | A Clearance from moving part at all points | B Largest mesh Opening allowable | C Minimum gauge (U. S. Standard) or thickness |
|---|---|---|---|
| Woven wire | Under 4 inches | 1/2 inch | –#16. |
| | 4–15 inches | 2 inches | –#12. |
| Expanded metal | Under 4 inches | 1/2 inch | –#18. |
| | 4–15 inches | 2 inches | –#13. |
| Perforated metal | Under 4 inches | 1/2 inch | –#20. |
| | 4–15 inches | 2 inches | –#14. |
| Sheet metal | Under 4 inches | | #22. |
| | 4–15 inches | | #22. |
| Wood or metal strip crossed | Under 4 inches | 1/2 inch | Wood 3/4 inch, metal #16. |
| | 4–15 inches | 2 inches | Wood 3/4 inch, metal #16. |
| Wood or metal strip not crossed | Under 4 inches | 1/2 inch width | Wood 3/4 inch, metal #16. |
| | 4–15 inches | 1 inch width | Wood 3/4 inch, metal #16. |
| Solid wood¹ | | | |

¹ If plywood is used it should be not less than 3/4 inch thick and not less than 3 ply.

12

(e) Guards should be securely and permanently fastened in place, except as otherwise specifically provided.

3. Belts, pulleys, etc.—(a) All vertical and inclined belts should be completely enclosed or effectively guarded. However, belts that are 1 inch or less in width need be guarded only to 6 inches from the nip point.

(b) All V-belts regardless of shape, size, position, or running speed should be completely enclosed or effectively guarded.

4. Vertical and inclined belts.—(a) If the guard is within 4 inches of a belt or pulley, it should extend from the floor or platform level to a height of at least 6 feet. If the guard is within 15 inches but not within 4 inches of the belt or pulley it should extend from the floor or platform level to a height of at least 5 feet except in each case as follows:

(1) If any part of a pulley is more than 5 feet but less than 7 feet above the floor or platform level the guard should extend to the top of the pulley but need not exceed a height of 7 feet above the floor or platform level. This also applies to clutches.

(2) If the top of any pulley is not more than 5 feet above the floor, the guard need not extend above a point midway between the top of the pulley and a height of 5 feet, provided that in no case should it extend less than 42 inches above the floor unless it covers the top as well as all sides of the belt and pulley, in which case there should be no requirement as to height.

(3) If it is an overhead belt, the guard may be a basket or box, suspended from above and extending across the bottom of the pulley and all around the pulley to a height of 6 feet except where the top of the pulley exceeds such height when the guard should extend to the top of the pulley but need not exceed 7 feet.

(b) Where no pulley hazard is involved, a standard railing placed not less than 15 inches or more than 20 inches from the belt, measured horizontally from the top of the railing, will be considered a sufficient guard.

(c) If the belt is inclined, the height of the guard or distance of the guard or railing from the belt should be such that the vertical clearance between the floor and the lower run of the belt at any point outside of the guard or railing, should not be less than 6 feet 6 inches.

5. Horizontal belts.—(a) Where both runs of the belt are within 7 feet of the floor or platform level, the guard should extend at least 15 inches above the upper run or to a height of 7 feet above the floor. In no case should the guard extend less than 42 inches above the floor, except that if it covers the top as well as all sides of the belt and pulley, there should be no requirement as to height.

(b) Where the upper run of the belt is more than 7 feet above the floor or platform level and the lower run is within 7 feet of the floor, the pulleys should be guarded on sides and outer face to a height of 7 feet above the floor or platform level, and the belt guard between the two pulleys should extend at least 15 inches above the lower run, but need not exceed a maximum of 7 feet and should be a minimum of 42 inches above the floor or platform level unless completely enclosed. Unless the guards extend across the inner face of each pulley to a height of seven feet, the guard for the lower run of the belt should be carried to the same height as the pulley guards at all points within 15 inches horizontally from the inner face of either pulley.

(c) Where pulleys are so located and of such dimensions as to permit passage between the upper and lower runs of the belt, the space between the pulleys should be completely barred or should be provided with a passageway substantially guarded on sides and top and bottom.

6. Cone pulleys and belts.—(a) Cone pulley belts more than 2-1/2 inches in width should be equipped with mechanical belt shifters and all cone pulley belts should be guarded to a point 3 inches above the nipping point of the belt and pulley and not less than 3 feet 6 inches from the floor or platform where any part of the lower cone is less than 3 feet above the floor or platform level.

(b) Where both upper and lower cones are within 7 feet of the floor or platform level, as for example on some vertical drill presses and other machines and for which conditions are such that mechanical belt shifters are not required and none are furnished, the belt and cone pulleys should be guarded as specified in Part II E 2 above with a hinged self closing section to permit shifting.

(c) All belts regardless of width should be provided with belt shifters when joined together with a metallic or other form of fastener which by construction or wear will constitute a hazard.

7. Machine control.—(a) Every machine should be equipped with a loose pulley, clutch switch, or other adequate means readily accessible for the purpose of stopping the machine quickly.

(b) Machines on which two or more persons work should be equipped with one or more controls so located that more than one of these persons can quickly disconnect the machine from the source of power.

(c) Machines operated from a number of different places should be provided with readily accessible means for shutting off the power and means of locking controls to protect men working on the machines against unexpected starting.

13

8. **Belt shifters.**—(a) Every set of tight and loose pulleys should be equipped with a permanent belt shifter so located as to be within easy reach of the operator. The belt shifter should be so constructed as to make it impossible for the belt to creep from the loose pulley to the tight pulley.

(b) Every belt shifter should be equipped with an interlocking device which will prevent accidental shifting.

(c) Where overhead belt shifters are not located directly over a machine or bench, the shifting lever should be cut off 6 feet 6 inches above floor level.

9. **Pulley—Location on shafting.**—(a) Every pulley near a shaft hanger, shaft bearing, or other fixed object should be placed so as to allow a side clearance at least 1/2 inch greater than the width of the belt between the pulley and the nearest part of such shaft hanger, shaft bearing, or other fixed object or a guard should be placed adjacent to the pulley to prevent the belt from running off on the side next to the shaft hanger, shaft bearing, or other fixed object.

(b) Where pulleys must be closer together on the shaft than the width of the wider belt plus 1/2 inch, the pulleys should be guarded so that the belt on either pulley cannot run off between the pulleys.

10. **Gears.**—All gears should be solidly enclosed, except that gears without spokes or holes in the web may be guarded by a band guard with flanges extending beyond the root of the teeth.

11. **Keys and keyseats.**—(a) Every projecting key in revolving shafting where exposed to contact, should be cut off or enclosed.

(b) Every keyseat in revolving shafting, where exposed to contact, should be filled or enclosed.

12. **Flywheels and shafting.**—(a) *Flywheel guards.*—Flywheels located so that any part is six (6) feet or less above the floor or platform should be guarded in one of the following ways:

(1) *With a standard railing.*—The railing must be placed not less than six (6) inches nor more than twenty (20) inches from the wheel, provided that it should be not less than fifteen (15) inches from the spokes of wheel or projections. If wheel extends into pit or within two (2) inches of the floor, a standard toe-board should be installed. If passage over journal or bearing is necessary, the passageway should be provided with a standard railing and toeboard.

(2) *With an enclosure of sheet, perforated, or expanded metal or woven wire.*—When such guard is placed less than six (6) inches from wheel, it should be not less than six (6) feet high, except if flywheel is less than six (6) feet high, the guard should be not less than the height of the wheel from the floor. In no case should guard be less than three (3) feet six (6) inches high unless wheel is completely enclosed, including the top. Where clearance of guard from flywheel at any point is under four (4) inches, the largest mesh or opening allowable should not be more than one-half (1/2) inch. Where such clearance is from four (4) to fifteen (15) inches, largest mesh or opening allowable should not be greater than two (2) inches.

(3) Flywheels, with smooth rims, five (5) feet or less in diameter, other than wheels having solid web centers, where the preceding methods cannot be applied, should be provided with a disc having a smooth surface and edge attached to the flywheel in such a manner as to cover the spokes of the wheel on the exposed side. The disc may be four (4) inches smaller in radius than the radius of the inner surface of the wheel if it is desired to provide space for bar in turning over the wheel. Keys and other dangerous projections not covered by disc should be cut off or covered.

(4) An adjustable guard may be used where it is necessary to start engine or for making adjustments.

(5) A slot opening for jack bar will be permitted.

(6) Spokes of pulleys, balance wheels, or flywheels other than on a prime mover, the bottom of which is six (6) feet or less above the floor or other working level should be protected by filling in the spokes or by guarding as required for belts.

(b) *Shafting.*—All exposed parts of transmission shafting six (6) feet or less from floor or working platform should be protected by a stationary casing enclosing shafting completely. Horizontal shafting may be guarded by a trough enclosing sides and top or sides and bottom of shafting as location requires.

Shafting under bench machines should be enclosed by a stationary casing or by a trough at sides and top, or sides and bottom, as location requires. The sides of the trough should come within at least 6 inches of the underside of the table, or if shafting is located near floor, within 6 inches of floor. In every case the sides of trough should extend at least 2 inches below or above the shafting as the case may be.

Revolving shafting and spindles forming part of and integral with individual machines where such part creates a hazard should be enclosed or covered.

13. **Presses.**—(a) *Preferred guarding methods.*—Protection from the dies of every press, except hot-metal presses, should be provided by means of the following:

(1) Complete enclosure, or

(2) Full automatic feed, or

14

(3) Semiautomatic feed with ram enclosure, or

(4) Limited opening (3/8 inches) between dies.

The maximum width of opening in the enclosure or between the enclosure and working surface shall be not greater than shown in the following table:

| Distance of opening from nip point (inches) | Maximum width of opening (inches) |
|---|---|
| 0     to 2½ | ⅜ |
| 2½ to 3½ | ½ |
| 3½ to 5½ | ⅝ |
| 5½ to 6½ | ¾ |
| 6½ to 7½ | ⅞ |
| 7½ to 8½ | 1¼ |

*(b) Alternative guarding methods.*—Only in case none of the methods in *(a)* above can be applied, then a device which will reasonably prevent injury by contact with dies should be installed as follows:

(1) A two-hand tripping device for each person engaged in the operation of a single press, so designed and arranged as to prevent tying, wedging, or otherwise securing one handle or button and operating the press with one hand only, or

(2) An interlocking gate guard operated by the tripping device of the press, which interposes a barrier on the front and sides of the ram before the plunger descends and will not permit the press to operate until the hand or hands of the operator have been removed from the danger zone, or

(3) A sweep or gate guard with the sweep arm, or gate interconnected to the ram and so designed and constructed as to sweep the hands of the operator from the die zone as the ram descends; and each single sweep arm provided with a flag or barrier attached thereto so that the operator cannot reach behind the sweep, or

(4) A pull-out protective device attached to the operator's hands or arms and connected to the ram, or outer slide of the press in such a way that the operator's hands or fingers will be withdrawn from the danger zone as the ram or outer slide descends; and designed so that where the open distance between the top of the work and the lower extremity of the punch is less than 2 inches that the multiplying action of this guard should be such that the hands will be withdrawn a safe distance from the nip point during the first quarter of the stroke.

*(c)* Special hand tools should be accepted only as an accessory to the guards listed herein and not as a substitute for any guard.

*(d)* Guards which are attached to the ram and which move downward so that the operator's hand or fingers may be caught between the gate and lower die should not be used.

*(e)* Where the speed of the ram is so slow that the operator might beat the ram on the down stroke after the press has been tripped, no device should be used which permits the insertion of the hands until the completion of the downward stroke without stopping the ram.

*(f)* Every hand-fed power press should be equipped with: (1) An arrangement which disconnects the treadle or hand-operated lever from the clutch mechanism after each stroke, or (2) A device that will, within its own action, automatically lock the clutch mechanism into place so that the press cannot make a second stroke until the treadle or hand lever is again pressed to its lowest position, or (3) By some other method which will accomplish the result outlined above; unless the danger zone protection is such that the guard remains in its protective position during the second stroke of the press.

*(g) Platen presses.*—Platen presses with or without mechanical power should be provided with one of the following: (1) An automatic feed which does not require the operator's hand to be placed between the platen and bed, or an automatic stop which will prevent the platen from closing if the hand or hands of the operator are caught between the platen and the bed, or (2) A guard, gate or sweep motion, which will throw the operator's hands out of the way as the press closes. If, of the type which lifts the hands out of the danger zone, the guard should rise at least 4 inches above the platen as the press closes and should descend by gravity or by mechanical means. The guard should be arranged so that it will prevent a shear between the guard and the top of the platen, or (3) Any other device that will prevent the platen from fully closing before the operator's hands are removed from between the platen and the bed.

14. Abrasive wheels.—The following standards for the operation of abrasive wheels should be supplemented by the "American Standard," Safety Code for the Use, Care, and Protection of Abrasive Wheels, to insure that full safety measures are taken in their operation:

*(a) Handling.*—All grinding wheels are breakable and some are very fragile. Great care should be exercised in handling and storage to prevent damage which might cause a wheel to fly apart when brought up to speed. The following rules which are based on experience, should always be observed:

(1) Handle wheels carefully to prevent dropping or bumping.

(2) Do not roll wheels (hoop fashion).[3]

(3) Use trucks or suitable conveyors which will provide proper support for all transporta-

---

[3] Exemption to (2) and (3): Where it is impractical to comply with (2) and (3) because of large size of wheel, danger of damage when rolling the wheel will be minimized if floor is smooth, clean and free from obstructions. The use of a strip of rubber or cork matting will further reduce the danger.

15

tion of wheels which cannot be carried by hand.[3]

(4) Stack wheels carefully on trucks. Do not pile heavy castings or tools on top of them, nor permit wheels to topple over.

(b) *Storage.*—Suitable racks, bins or drawers should be provided to accommodate the various types of wheels used. Wheel storage rooms should not be subject to extreme temperatures, and should always be kept dry.

(c) *Inspection.*—Immediately after unpacking, all wheels should be closely inspected to make sure that they have not been injured in transit or otherwise. As an added precaution, wheels should be tapped gently (while suspended) with a light implement, such as the handle of a screw driver for light wheels, or a wooden mallet for heavier wheels. If they sound cracked, they should not be used. Wheels must be dry and free from sawdust when applying the test, otherwise the sound will be deadened. It should also be noted that organic bonded wheels do not emit the same clear metallic ring as do vitrified and silicate wheels.

(d) *Rigidity, supports.*—Grinding machines should be sufficiently heavy and rigid as to minimize vibration.

Where practical, the machines should be securely mounted on substantial floors, benches, foundations or other adequate structures.

(e) *Guards.* — Every stationary abrasive wheel and portable wheels used in stationary position should be equipped with guards of the hood type strong enough to withstand the shock of a bursting wheel. A hood type or band guard strong enough to withstand the shock of a bursting wheel should be used on every portable wheel where the operation and the nature of the work will permit.

(f) *Spindle.* — The spindle and nut and flange projection, if any, should be guarded.

(g) *Mountings and fastenings.*—Hoods should be so mounted as to maintain proper alignment with the wheels, and the strength of the fastenings should exceed the strength of the hood.

(h) *Dust exhaust provisions.*—Hoods on machines used for dry grinding and other operations where dust is produced should have provisions made for connection to an exhaust system. For detailed recommendations reference is made to "American Standard" for Grinding, Polishing and Buffing Equipment Sanitation (Z43).

(i) *Exposures permitted.*—(1) *Bench and floor stands.*—The maximum angular exposure of the grinding wheel periphery and sides for hoods used on machines known as bench and floor stands should not exceed 90° or one-fourth of the periphery. This exposure should begin at a point not more than 65° above the horizontal plane of the wheel spindle.

Wherever the nature of the work requires contact with the wheel below the horizontal plane of the spindle, the exposure should not exceed 125°. This exposure should begin at a point not more than 65° above and extend to a point not more than 60° below the horizontal plane of the wheel spindle.

(2) *Cylindrical grinders.*—The maximum angular exposure of the grinding wheel periphery and sides for hoods used on cylindrical grinding machines should not exceed 180°. This exposure should begin at a point not more than 65° above the horizontal plane of the wheel spindle.

(3) *Surface grinders and cutting machines.*—The maximum angular exposure of the grinding wheel periphery and sides for hoods used on cutting machines and on surface grinding machines which employ the wheel periphery should not exceed 150°. This exposure should begin at a point not less than 15° below the horizontal plane of the wheel spindle.

(4) *Swing frame and portable grinders.*—The maximum angular exposure of the grinding wheel periphery and sides for hoods used on machines known as swing frame and portable grinding machines should not exceed 180°, and the top half of the wheel should be protected at all times.

(5) *Top grinding.*—In operations where the work is ground on the top of the wheel, the exposure of the grinding wheel periphery should be as small as practicable, with a maximum exposure of 60°.

(j) *Exposure adjustment.*—Hoods of the type described in (1) and (2) under "Exposure Permitted," where the operator stands in front of the opening, should be constructed so that the peripheral protecting member can be adjusted to the constantly decreasing diameter of the wheel. The maximum angular exposure above the horizontal plane of the wheel spindle as specified in (1) and (2) should never be exceeded, and the distance between the wheel periphery and the adjustable tongue or the end of the peripheral member at the top should never exceed 1/4 inch.

(k) *Work rests.*—Work rests should be kept adjusted close to the wheel with a maximum distance of 1/8 inch to prevent the work from being caught between the wheel and the rest. The work rest should be securely clamped after each adjustment. The adjustment should not be made while the wheel is in motion.

15. Miscellaneous machine guarding.—*(a) Revolving, oscillating or reciprocating parts of engines and other machines:*

(1) Every projecting set screw in moving parts, where exposed to contact, should be guarded.

(2) Cranks or crank discs, crank shafts connecting rods, where exposed to contact, should be guarded.

16

(3) Eccentrics and cams, where exposed to contact, should be guarded.

(4) Machine parts having a reciprocating or oscillating motion such that a shearing or crushing hazard is created should be guarded.

(5) Any moving part of a machine which at any time leaves a space of less than 18 inches between it and any fixed object not a part of the machine, or between it and a moving or stationary part of any other machine should be guarded.

(b) *Oiling devices.*—All machines lubricated while in motion and having lubricating devices so located as to make it hazardous to reach them should be equipped with an automatic oiling device or some equally efficient means to protect the oiler.

Machines shut down for oiling or maintenance should be marked, locked or otherwise protected so as to prevent starting the machine while such work is in progress.

(c) · *Projecting parts on shafts.*—Every projecting part on a revolving shaft such as a collar, clamp, pin, coupling, oiling device, etc., where exposed to contact (which should include exposure while oiling machinery in motion) should be guarded.

(d) *Revolving stock.*—All revolving stock projecting from machines should be guarded by pipe enclosure or other means to prevent contact with the stock.

(e) *Noise reduction.*—It is desirable to reduce to the minimum the noise incident to the operation of machines especially where there are a number placed close to each other.

16. Fans.—The blades of every fan open to contact should be guarded in accordance with Part II E of these standards except that fans more than seven feet above the floor or working level need not be guarded providing the blades cease to revolve before any work of a character which would expose any person to contact with such fan is permitted. This standard also applies to the ordinary office fan.

17. Revolving drums and cylinders.—(a) Revolving barrels, drum or other containers, where exposed to contact should be guarded by an enclosure or standard guard rail in accordance with Part II E of these standards.

(b) Tanning drums, where exposed to contact, should be guarded by an enclosure built in accordance with guarding as specified under Part II E, to a height of 6 feet.

(c) Every drum or other revolving container, which must be loaded or unloaded should be equipped with a brake or lock which will enable the operator to lock the drum while loading or unloding it.

18. Counterweights, tension weights and springs.—(a) Every counterweight, where exposed to contact, should be enclosed or equipped with a safety chain that will prevent the weight

from falling to a distance of less than 7 feet from the floor or working level.

(b) Every tension weight exposed to contact should be enclosed or securely fastened to the tension bar.

(c) All springs should be guarded or otherwise equipped to eliminate any hazard due to breakage of spring or failure of the mounting.

19. Lathes and automatic screw machines.—Chucks and face plates should be free from projections, and dogs, if used, should be of the safety type only—circular in shape with no projections beyond the periphery.

Chip guards to catch flying chips, particularly in the case of high speeds used in the softer metals should be provided.

Rotating stock in turret lathes and automatic screw machines should be completely enclosed in pipe long enough to contain the longest stock used.

Suitable shields and oil catchers should be provided to prevent slipperiness from the oil thrown from automatic screw machines.

(a) *Drill presses.*—All projections on the rotating spindle, and as much of the spindle itself as possible should be guarded.

Spindle drive belts when in range of the operator's head or body, should be guarded against both contact and breakage.

(b) *Drop hammers.*—Every drop hammer, the operation of which requires the hands to be placed between the dies, should be provided with a positive stop that will prevent the descent of the hammer until the operator's hands are withdrawn.

A shield or screen should be provided for every drop hammer except where guarded by location when the operation is such that sparks or scales are liable to be thrown off.

On every board drop hammer a substantial guard should be provided around the board above the roll to prevent the board falling in case the board breaks or comes loose from the ram.

(c) *Planers and shapers (metal).* — The spaces between the ways of planer frames should be filled in smoothly with heavy sheet metal to eliminate the shear hazard.

Where clearance from fixed objects is inadequate, men may be caught by the stroke of planer or shaper; in such cases space to allow for the maximum possible stroke should be railed off in such manner as to give protection without creating a shear hazard between the railing and the planer table or the work carried on it.

(d) *Metal shears.*—There are two main types of metal shears—alligator and squaring. The latter may be either power or foot-operated. All should be guarded.

(1) *Alligator shears.*—These shears are used to cut rods, bars, strap, etc. They are

17

arranged to run continuously, the material being inserted as the jaw opens. In cutting short pieces the operator is likely to get his fingers under the knife. Also, he may stumble or trip in handling the stock and get caught. Many injuries occur through lack of care in sorting out hard metal which might fly when cut or throw chips from itself or from the knife. If fairly uniform material is handled, mechanical feed can readily be devised. In junk yards, however, this is not feasible. Even in such cases it is usually feasible to guard this machine by running a heavy U-shaped metal strap horizontally around the moving (upper) jaw with the lower edge of the strap just far enough above the cutting edge of the fixed jaw to allow the material to be inserted under it.

(2) *Squaring shears.*—Injuries usually result from the fact that where the operator's foot is on the treadle he is in poor balance, with the added fact that the necessary angle set of the knife is likely, with thick material or a dull knife, to draw the material under it and the operator's hand with it.

Squaring shears either mechanical, foot or hand power, and fed by hand, shall have the knives substantially guarded. This guard may be a fixed barrier, set not more than three-eighths (3/8) inch above the table or the material being sheared. Automatic clamps shall be acceptable as guards when cut-outs are filled in so that the fingers of the operator cannot enter the danger zone.

## F. WOODWORKING MACHINES

1. **Band saw or band knife.**—Band wheels of band saws or band knives and all parts of the blade should be enclosed or guarded except the part between the guide and table that is necessary for the thickness of the material being cut. If a metal guard is used it should be of not less than 20 U. S. Standard Gauge. If other material is used, the guard should be of equal strength and firmness.

2. **Band resaw.**—Band wheels of band resaws and all portions of the blade should be enclosed or guarded except the portion between the guide and table that is necessary for the thickness of the material being cut. If a metal guard is used it should be of not less than No. 20 U. S. Standard Gauge. If other material is used, the guard should be of equal strength and firmness. The feed rolls should be enclosed, except such part as may be necessary to feed stock.

3. **Cork cutter.**—(a) *Circular knife type.*—A hood should be provided that will cover the knife at all times to at least the depth of the cutting edge. The hood should automatically adjust itself to the thickness of and remain in contact with the material being cut at the point where the stock encounters the knife, or it may be

be a fixed or manually adjusted hood or guard, provided the space between the bottom of the guard and the material being machined does not exceed 3/8 inch at any time.

The exposed parts of the cutter blade under the table should be guarded.

(b) *Band knife type.*—Band wheels of band knives and all parts of the blade should be enclosed except that part between the guide and the table that is necessary for the thickness of the material being cut. If a metal guard is used, it should be not less than No. 20 U. S. Standard Gauge. If other metal is used, it should be of equal strength and firmness.

4. **Circular rip saws.**—A hood should be provided that will cover the saw at all times to at least the depth of the teeth.

The hood should automatically adjust itself to the thickness of and remain in contact with the material being cut at the point where the stock encounters the saw, or it may be a fixed or manually adjusted hood or guard, provided the space between the bottom of the guard and the material being cut does not exceed 3/8 inch at any time.

The hood or other guard should be so designed as to prevent a "kick-back" or a separate attachment that will prevent a "kick-back" should be provided. Non-kickback devices should be effective for all thicknesses of materials that are cut.

Except when grooving, dadoing or rabbeting, a spreader should be provided and fastened securely at the rear of saw in alignment with saw blade. It should be slightly thinner than the saw kerf and slightly thicker than the saw disc.

The exposed part of the saw blade under the table should be guarded.

5. **Self-feed circular rip saws.**—A hood or guard should be provided that will cover the saw at all times at least to the depth of the teeth. The hood or guard need not rest upon the table nor upon the material being cut, but should extend to a line not more than 3/8 inch above the plane formed by the bottom of the feed rolls.

The feed rolls should be enclosed, except such part as may be necessary to feed stock.

A spreader should also be provided and fastened securely at the rear of saw in alignment with saw blade, except where a roller wheel is provided back of the saw. The spreader should be slightly thinner than the saw kerf and slightly thicker than the saw disc. Non-kickback dogs shall be provided in front of the saws.

The exposed part of the saw blade under the table should be guarded.

6. **Self-feed band rip saws.**—Band wheels of self-feed band rip saws and all portions of the blade should be enclosed or guarded except the portion between the guide and table that is

18

necessary for the thickness of the material being cut. If a metal guard is used it should be of not less than No. 20 U. S. Standard Gauge. If other material is used, the guard should be of equal strength and firmness.

The feed rolls should be enclosed, except such part as may be necessary to feed stock.

7.   Circular cross cut saws.—A hood should be provided that will cover the saw at all times at least to the depth of the teeth.

The hood should automatically adjust itself to the thickness of and remain in contact with the material being cut at the point where the stock encounters the saw, or it may be a fixed or manually adjusted hood or guard provided the space between the bottom of the guard and the material being cut does not exceed 3/8 inch at any time. This rule should not be applied to circular cross cut saws with stationary tables where the saw moves forward when cutting.

Circular cross cut saws with stationary tables where the saw moves forward when cutting should have a hood or guard securely fastened to the table that will cover the saw in all positions. The hood or guard should extend at least two inches in front of the saw teeth, when the saw is in its back position.

The exposed part of the saw blade under the table should be guarded over its entire travel.

8.   Swing cut-off saws.—A guard should be provided that will cover the saw, and such guard should adjust itself to the thickness of the stock being cut.

There should be an effective device to return the saw automatically to the back of the table when released at any point of its travel.

If a counterweight is used, all bolts supporting the bar and weight should be provided with cotter pins. A bolt should be put through the extreme end of the counterweight bar to prevent dropping of weight, or where the weight does not enclose the rod, a safety chain should be attached to it to prevent dropping.

Limit chains or other positive stops should be provided to prevent the saw from swinging beyond the front edge of the table.

9.   Circular resaws.—A hood should be provided that will cover the saw at all times, except where the material is being cut.

A spreader should also be provided and fastened securely at the rear of saw in alignment with the saw blade, except where a roller wheel is provided back of saw. The spreader should be slightly thinner than the saw kerf and slightly thicker than the saw disc.

Feed rolls should be enclosed except such part as may be necessary to feed stock.

Non-kickback dogs across the full width of the table should be provided.

10.   Portable circular saws.—Portable circular saws should be provided with a hood that

will cover the saw teeth at all times except where the material is being cut.

11.   Jointer or buzz planers.—A cylindrical cutting head should be provided.

A guard which adjusts automatically over the cutting head should be provided. All exposed parts of cutting head should be guarded.

Where equipped with automatic feed, the feeding mechanism should be guarded.

Where knives are exposed beneath the table, they should be guarded.

12.   Combination woodworking machines.—Each point of operation of any tool should be guarded as required for such tool in a separate machine. The drive should be so arranged that only the tool in use would be operating.

13.   Automatic lathes.—A hood or cover should be provided enclosing the cutter blades, except at the contact points, while the stock is being cut.

14.   Mortising machines. — Mortising machines, except hollow chisel mortisers, should be provided with thumb stops at each side of the chisel.

15.   Chain Mortisers.—These should be guarded by enclosure on top.

16.   Moulders, matchers, and stickers.—These should be guarded with hoods or other enclosures that should be so arranged and maintained as to guard effectively all cutting heads and knives.

Feed rolls should be enclosed, except such part as may be necessary to feed stock.

17.   Panel raisers.—Panel raisers should be guarded with hoods or other enclosures so arranged and maintained as to guard effectively all cutting heads and knives.

Feed rolls should be enclosed, except such part as may be necessary to feed stock.

18.   Planers.—Planers should be guarded with hoods or other enclosures so arranged and maintained as to guard effectively all cutting heads and knives.

Feed rolls should be enclosed, except such part as may be necessary to feed stock.

19.   Disc sanders. — Disc Sanders should have the periphery and back of revolving head guarded, and the space between revolving disc and edge of table should not be greater than 1/4 inch.

20.   Drum sanders.—The exposed parts of the drum, except that portion where the material comes in contact with the abrasive surfaces, should be guarded.

Feed rolls should be enclosed except such part as may be necessary to feed stock.

21.   Shapers.—The cutting heads of wood shapers should be provided with a guard that will prevent the hands of the operator from coming in contact with the knives. This rule need not apply when templates are used, which will effectively keep the operator's hands away

from the knives or when shaping stock large enough to accomplish the same purpose.

22. **Tenoners.**—Tenoners should be provided with hoods or other enclosures so arranged and maintained as to guard effectively all cutting parts and saws.

23. **Wood heel turning machines.**—Wood heel turning machines should be provided with a guard or shield in front of the cutters except while it is necessary to expose a part of the cutter while turning stock.

24. **Stave jointers.**—The upper half of the rotating head or disc carrying the knives of stave jointers should be provided with a cover over the sides and front.

25. **Veneer clipper or slicers.**—Veneer clippers or slicers should be provided with prong guards or shields, both in front and back of the knife, so arranged that the hands of the operator and the man taking away, cannot be caught.

## G. CRANES AND HOISTS

1. **Overhead trolleys and monorails.**—Every overhead trolley and every monorail crane should be constructed so as to prevent it leaving the track at any point except that where, because of necessity for removal, trolleys cannot be so constructed, an additional guard rail should be installed which will prevent the trolley from falling if it leaves the tracks. If removable sections are provided in the guard rail, they should be so arranged that they will drop into place by gravity immediately upon release after removal of trolley.

2. **Cranes.** — The recommendations contained herein should apply to power-driven overhead traveling cranes, storage bridges, gantry cranes and portal cranes, and modifications of these types which retain their fundamental features.

(a) *Bumpers.*—A bumper should be provided at each end of the trolley. It should be fastened to the bridge girder, or, if the rail is prevented from sliding lengthwise, it may be fastened to the rail. A bumper engaging the tread of the wheel should be of a height at least equal to the radius of the wheel. Bumpers engaging other parts of the crane are acceptable.

(b) *Buffers.*—If there is more than one trolley on the same bridge girders, buffers or cushioning devices should be provided. If there is more than one crane on the same runway, buffers or cushioning devices should be provided at both ends of the bridges.

(c) *Fenders.*—Bridge trucks and trolley trucks should be equipped with fenders which extend below the top of the rail and project in front of the truck wheels.

(d) *Brakes.* — Each independent hoisting unit of a crane should be equipped with two braking means except worm-geared hoists, the angle of whose worm is such as to prevent the

load from accelerating in the lowering direction.

One brake should be applied directly to the motor shaft or some part of the reducing gear, and may be either electrically operated, or mechanical. The other brake may be either mechanical or electrical. If mechanical it should lock the load when hoisting is stopped, and should also control the speed during lowering so as to prevent undue acceleration. Electric dynamic braking for direct-current and electric braking for alternating-current hoists may be used to control the lowering speed.

Each brake should be capable of sustaining one and one-half times the rated load.

Worm-geared hoists referred to in these standards should have at least one electrically operated or mechanical brake.

On cage-operated cranes with the cage mounted on the bridge girders, a foot brake to properly retard and stop the motion of the bridge should be capable of retarding at the rate of 1 foot per second while full load is being carried.

(e) *Lubrication.* — Lubricating devices should be arranged so that they can be reached without danger to the oiler. They should also be arranged so that it is not necessary to remove any guards or other parts for lubrication purposes.

(f) *Collector wires.*—Collector wires should be guarded when they can be readily contacted.

3. **Crane footwalks.**—If sufficient headroom is available on cage-operated cranes, a footwalk should be provided on the drive side along the entire length of the bridge of all cranes having the trolley running on the tops of the girders. To give sufficient access to the opposite side of the trolley, there should be provided either a footwalk mounted on the trolley, a footwalk or platform in the building, or a footwalk on the opposite side of the crane at least twice the length of the trolley.

If possible, footwalks should be located so as to give a headroom of not less than 78 inches. Otherwise a headroom of not less than 48 inches may be used.

If it is not possible to provide a headroom of 48 inches or more, footwalks should be omitted from the crane, and a stationary platform built at the edge of the runway to be used by workmen when making repairs, or else a landing stage built alongside the crane when repair work is done.

4. **Cranes — Stairways.** — Every overhead traveling crane operated from a cage should be provided with a stairway or fixed ladder between the cage and the crane footwalk, and between the cage and the floor.

Stairways should be equipped with rigid and substantial metal handrails as described in Part II B and should be at at an angle of not more than 50° with the horizontal.

20

5. Crane cages — Enclosures — *(a) Indoor cranes.*—The cage floor of every indoor overhead traveling crane should be solid except that grating with openings not exceeding 1/2 inch in width may be provided where necessary for vision.

The sides of the cage of every indoor overhead traveling crane should be enclosed as follows:

(1) Solid to a height of 42 inches, or

(2) With not less than No. 10 wire screen with mesh openings not greater than 3 inches, to a height of 42 inches, with toeboard, or

(3) With a standard guard rail and toeboard.

*(b) Outdoor cranes.* — The cage of every outdoor traveling crane should be fully enclosed with windows on three sides of the cage. The windows should give ample vision for operators and may be fixed at the front and back but should have the side windows arranged to open. The door should swing inward or should slide, and should be arranged to close automatically. A temperature reasonably comfortable for the operator should be maintained in cold weather.

*(c) Trolley conductors.*—Trolley conductors should be so located or so guarded that persons entering or leaving the cage are not likely to come into contact with them.

6. Hoists.—*(a) Limit switches.*—Each overhead electric or air operated hoist motor should be equipped with an effective limit switch so placed and arranged as to disconnect the motor and apply the brake in time to stop the motor before the hook passes the highest point of safe travel.

*(b) Brakes.*—Each electric or air-operated hoist motor should be provided with an electrically or mechanically operated brake so arranged that the brake will be applied when the power is cut off from the hoist. This brake should have sufficient holding power to sustain not less than one and one-half times the rated load.

The hoisting drum of all hand power hoists should be equipped with an effective brake, and should be provided with a ratchet and pawl of sufficient strength to hold the load in any position.

*(c) Capacity marking.*—The rated load of each hoist, in pounds or tons, should be legibly marked on the hoist or load block.

*(d) Control equipment.*—Operating controls should be marked to indicate the resultant direction of travel.

7. Cables, ropes and chains.—Chains, ropes, cables, hooks, rings, slings, and other devices and accessories used for hoisting and lifting should not be subjected to greater working loads than recommended by their manufacturers. They should be frequently inspected and should be renewed when inspection reveals unsafe conditions.

Bolts or nails should not be used to connect, splice or shorten chains. Knots should not be tied in the chain.

A hoist cable should be considered unsafe and should be renewed when because of broken wires, wear, rust, undue strain, or other cause the strength of the cable becomes reduced 25 percent. Hoist cables will be considered unsafe when upon inspection 10 percent or more of the total number of wires are broken in a length equal to eight diameters of the cable.

Crane hoist cable should be lubricated and inspected at frequent intervals. Proper lubrication adds much to their durability.

## H. ENVIRONMENTAL CONDITIONS AND PERSONAL SERVICES

1. Gases, vapors, dusts, fumes and mists.—All dust, mists, fumes, gases or other atmospheric impurities generated in connection with an operation or process, emitted into or disseminated throughout areas where persons are employed, in quantities as are determined to be harmful to the health of such employees should be controlled by the methods set forth under "Control Measures" below.

Where there is any doubt concerning the presence of a harmful condition, the contractor should have determinations made of the kind and amount of atmospheric impurities from samples taken at a point or points in the breathing zone of workers during normal operations. These determinations should be made by a properly qualified analyst.

*(a) Guide for allowable concentrations.*—For the following substances, the values recommended by the American Conference of Governmental Industrial Hygienists should be used as a guide for allowable concentrations:

*Gases and Vapors*

| Substance: | P.p.m.¹ |
|---|---|
| Ammonia | 100.00 |
| Arsine | 0.05 |
| Benzene (benzol) | 35.00 |
| Carbon monoxide | 100.00 |
| Carbon tetrachloride | 50.00 |
| Chlorine | 1.00 |
| Formaldehyde | 5.00 |
| Gasoline | 500.00 |
| Hydrogen chloride | 5.00 |
| Hydrogen cyanide | 10.00 |
| Hydrogen sulphide | 20.00 |
| Hydrogen fluoride | 3.00 |
| Methyl chloride | 100.00 |
| Phosgene | 1.00 |
| Sulfur dioxide | 10.00 |
| Toluene | 200.00 |
| Turpentine | 100.00 |
| Xylene | 200.00 |

*Toxic Dusts, Fumes and Mists*

| Substance: | mg. per cu. m. [2] |
|---|---|
| Cadmium | 0.1 |
| Lead | .15 |
| Mercury | .1 |

*Mineral Dusts*

| Substance: | M.p.p.c.f. [3] |
|---|---|
| Asbestos | 5 |
| Carborundum | 50 |
| Dust (nuisance, no free silica) | 50 |
| Portland cement | 50 |
| Silica: | |
| High (above 50 percent free $SiO_2$) | 5 |
| Medium (5 percent to 50 percent free $SiO_2$) | 20 |
| Low (below 5 percent free $SiO_2$) | 50 |
| Slate (below 5 percent free $SiO_2$) | 50 |

Additional sampling and analysis may be required to check the design and efficiency of the control equipment, devices or methods.

(b) *Control measures.*—One or more of the following methods should be used to control harmful dusts, mists, fumes, gases and other atmospheric impurities:

(1) Inclosure of such process or operation.

(2) Isolation or rearrangement of such process or operation.

(3) Substitution of non-toxic material.

(4) Wet methods.

(5) Dilution by general ventilation.

(6) Local exhaust ventilation.

(7) Temperature control.

(c) *Personal protective equipment.*—Where the above methods are impractical, personal protective equipment suited to the hazards and conditions involved should be provided. However, such equipment should not be used in lieu of suitable control measures.

Where irritant or toxic substances may come in contact with the skin or clothing, the employees should be adequately protected by one or more of the following:

(1) Necessary protective clothing, gloves, helmets, goggles, and footwear.

(2) A suitable protective ointment for exposed skin areas.

(3) Necessary facilities and suitable solvents, such as soap and hot water, for the removal of accumulated material and protective ointments.

All persons required to use protective equipment should be properly instructed in the use of such equipment.

(d) *Respiratory protective devices.* — All respiratory protective devices should bear the approval of the U. S. Bureau of Mines for the exposures involved.

[1] Parts per million.
[2] Milligrams per cubic meter.
[3] Million parts per cubic foot.

Where persons may be exposed to harmful materials while fumigating, repairing or servicing equipment, or due to leaks or other similar conditions, approved type respirators should be provided, properly maintained and used.

Air supplied to air-line respirators should be free from harmful dusts, fumes, vapors, or gases to the extent that inhalation of such air should not constitute harmful exposure.

Whenever compressed air is used to supply respirators, an approved type regulator and filter should be inserted in the supply line and the compressor should be so located as to prevent contamination of the intake air. Air provided should be of an equable temperature.

(e) *Air-cleaning equipment.* — Air-cleaning equipment should be located so as to permit the removal of dust or other collected material without creating a hazard and to allow for cleaning and repairing the apparatus without recontaminating the general atmosphere.

Operations or processes generating different kinds of dust, fumes, or vapors, should not be connected to the same exhaust system when the mixture may result in the formation of toxic, flammable or explosive compounds.

Contaminated materials removed by exhaust systems should be disposed of in such manner that they do not reenter the breathing zone of the worker or create a hazard to other employees or to the public.

2. *Eye protection.*—Eye protection should be provided where persons are exposed to any hazard which may reasonably be expected to cause injury to the eyes.

Such hazards are:

(a) *Relatively large flying particles.*—There are many operations and processes where this hazard occurs. Some of these are chipping, calking, coarse grinding, some riveting operations and sledging in quarries.

(b) *Dust and small flying particles.*—There are many operations and processes where this hazard occurs. Some of these are scaling, light grinding, stone dressing, spot welding and some woodworking and metal working operations.

(c) *Splashing metal.* — There are many operations and processes where this hazard occurs. Some of these are babbiting, casting of hot metal and dipping in hot metal baths.

(d) *Injurious gases, fumes and liquids.*—There are many operations and processes where this hazard occurs. Some of these are encountered in the handling of acids and caustics.

(e) *Injurious radiant energy.*—There are many operations and processes where this hazard occurs. Some of these are electric arc welding, oxyacetylene and oxyhydrogen welding and cutting, furnace tending and irradiation with ultra violet light.

3. *Sanitation and personal service conveniences.*—(a) *Lunchrooms.*—Seperate rooms in which employees may eat their lunches should

be provided in plants where employees are exposed to harmful materials in the work rooms. Such rooms should be maintained in a clean and sanitary condition at all times and they should be ventilated, illuminated, and heated properly and adequately.

(b) *Dressing rooms.*—Workers who handle or are exposed to harmful materials in such a manner that contact of work clothes with street clothes will communicate to the latter the harmful substances accumulated during working hours should be provided with facilities which will prevent this contact and also permit the free ventilation or drying of the work clothes while they are not in use. In any plant where it is necessary for both male and female employees to change clothes, separate dressing rooms should be provided.

(c) *Emergency treatment of eye burns.*—Where the workmen's eyes are exposed to injurious chemical materials, such as acids, caustics, etc., suitable facilities for quick drenching or flushing of the eyes, such as fountain-type wash bowl, should be provided within the workroom for immediate emergency use.

(d) *Drinking water.*—There should be provided in all places of employment a supply of clean, cool, safe drinking water, approved by the local authority having jurisdiction.

The common drinking cup should not be used. When individual drinking cups (to be used only once) are supplied, a suitable container should be provided for the disposal of used cups. Containers for drinking water from which the water must be dipped or poured should not be allowed.

(e) *Toilet facilities.*—Every place of employment should be provided with adequate closets, chemical closets, or privies (separate for each sex), in accordance with the following table in which the number of persons is the maximum number of each sex employed at any one time on the premises for which facilities are furnished:

| Number of persons: | Minimum number of facilities |
|---|---|
| 1 to 9 | 1 |
| 10 to 24 | 2 |
| 25 to 49 | 3 |
| 50 to 74 | 4 |
| 75 to 100 | 5 |
| Over 100 | 1 for each additional 30 persons |

Where chemical closets are used, they shall of a type approved by local health authori-

ties and should be maintained in a clean and sanitary condition at all times. Privies should not be permitted where more than 25 people are employed, and no privy should be permitted within 100 feet of any room where foodstuffs are stored or handled. No privy should be used unless it can be located, constructed, and maintained without danger of contamination of any source of drinking water.

Waste receptacles with covers should be kept in all toilet rooms used by females. These should be emptied at regular and frequent intervals.

An adequate supply of toilet paper in proper holders should be provided in each toilet room.

All toilets should have solid partitions separating them from work rooms. They should be effectively separated and designated as to sex and should be lighted and ventilated adequately. Toilet-room windows may be translucent but not transparent.

(f) *Washroom facilities.*—Adequate facilities for maintaining personal cleanliness should be provided in every place of employment and these should be maintained in a sanitary condition throughout.

The common towel should not be used.

4. *First-aid facilities.*—Adequate facilities for the administration of first aid to injured employees should be provided and maintained in a clean and sanitary condition at all times. Facilities should include the materials, antiseptics, bandages, etc., necessary for emergency first aid, considering local conditions, the number of employees, etc.

It is the duty of the employer to see that some individual is available, during all periods and shifts of plant operation who has been trained in, or is capable of administering first aid and handling the emergencies that may arise in connection with accidents and injuries to workers.

First aid facilities and services should be used only for the intended purpose of first aid and should not in any way take the place of necessary experienced care and treatment by a physician.

The address and phone number of physicians, hospitals, and ambulance services and other facilities which might be needed in cases of emergency should be posted in a conspicuous location and manner.

When females are employed, cots in adequate number should be provided and so located, placed or screened as to provide necessary privacy for those using same.

U. S. GOVERNMENT PRINTING OFFICE: 1951—921345

23

*Adm. Dist.*

Sh. 167
2500 - 10PP
5/4/70

# FEDERAL REGISTER

## VOLUME 34 • NUMBER 96

Tuesday, May 20, 1969 • Washington, D.C.

### PART II

## DEPARTMENT OF LABOR

Safety and Health
Standards





7946

RULES AND REGULATIONS

# Title 41—PUBLIC CONTRACTS AND PROPERTY MANAGEMENT

## Chapter 50—Public Contracts, Department of Labor

### PART 50-201—GENERAL REGULATIONS

### PART 50-204—SAFETY AND HEALTH STANDARDS FOR FEDERAL SUPPLY CONTRACTS

#### Safety and Health Standards

Following notice and opportunity for public participation, on January 17, 1969, a revision of Part 50-204 of Title 41, Code of Federal Regulations, and an amendment of § 50-201.502 of the same title were published in the FEDERAL REGISTER at 34 F.R. 788-796. On February 14, 1969, a document was published in the FEDERAL REGISTER at 34 F.R. 2207 postponing the effective date of the rules until May 17, 1969. The purpose of the postponement was to permit a careful review of the rules by the present Secretary of Labor. Further notice and general public participation were found unnecessary in view of the previous opportunities afforded, although an advisory committee with a broad representation of labor, management, and public groups interested in occupational safety and health was appointed to assist in the review and to make recommendations concerning the rules.

Consideration has now been given to the rules and to the data, views, and argument which had been submitted orally and in writing in response to the proposals published in the FEDERAL REGISTER on September 20, 1968 (33 F.R. 14258) and also to the recommendations of the advisory committee and the revision and amendment published in the FEDERAL REGISTER at 34 F.R. 788-796 are hereby adopted, subject to the changes indicated below. The listed changes in Part 50-204 include for easy reference the minor amendments to § 50-204.36 published on April 23, 1969 (34 F.R. 6779).

The changes are as follows:

1. In paragraph (a) of § 50-204.1, the first sentence is changed by adding the following sentence to the quotation from section 1(e) of the Walsh-Healey Public Contracts Act: "Compliance with the safety, sanitary, and factory inspection laws of the State in which the work or part thereof is to be performed shall be prima-facie evidence of compliance with this subsection."

2. In paragraph (b) of § 50-204.2, the address of the office in the Middle Atlantic Region listed in Item No. 2 of the paragraph is changed to Room 410, Penn Square Building, Juniper and Filbert Streets, Philadelphia, Pa. 19107.

3. Section 50-204.4 is changed.

4. In subparagraph (4) of paragraph (a) of § 50-204.5 the word "gullotine" is changed to read "guillotine".

5. Section 50-204.10 is amended.

6. Section 50-204.50 is amended.

7. Section 50-204.36 as changed at 34 F.R. 6779 is amended.

8. Section 50-204.80 is deleted.

9. A new § 50-204.1a is added.

*Effective date.* The revision of Part 50-204 and amendment of § 50-201.502 shall be effective May 17, 1969, or the date of their publication in the FEDERAL REGISTER, whichever is later. To the extent that any substantive rules may be considered involved, no further delay is provided, because the rules either remain unchanged from those published on January 17, 1969, for which a 90-day delay in effective date has been provided, or to the extent that they are changed, the rules are less restrictive than those previously published. In the event this document is published in the FEDERAL REGISTER subsequent to May 16, 1969, the rules, revising Part 50-204 of Title 41, Code of Federal Regulations and amending § 50-201.502 of the same title referred to at 34 F.R. 2207 (Feb. 14, 1968) shall not be effective between May 17 and the date of the publication of this document.

Signed at Washington, D.C., this 14th day of May 1969.

GEORGE P. SHULTZ,
*Secretary of Labor.*

Subpart A—Scope and Application

Sec.
50-204.1   Scope and application.
50-204.1a  Variations.

Subpart B—General Safety and Health Standards

50-204.2   General safety and health standards; incorporation by reference.
50-204.3   Material handling and storage.
50-204.4   Tools and equipment.
50-204.5   Machine guarding.
50-204.6   Medical services and first aid.
50-204.7   Personal protective equipment.
50-204.8   Use of compressed air.
50-204.10  Occupational noise exposure.

Subpart C—Radiation Standards

50-204.20  Radiation—Definitions.
50-204.21  Exposure of individuals to radiation in restricted areas.
50-204.22  Exposure to airborne radioactive material.
50-204.23  Precautionary procedures and personnel monitoring.
50-204.24  Caution signs, labels and signals.
50-204.25  Exemptions from posting requirements.
50-204.26  Exemptions for radioactive materials packaged for shipment.
50-204.27  Instruction of personnel posting.
50-204.28  Storage of radioactive materials.
50-204.29  Waste disposal.
50-204.30  Notification of incidents.
50-204.31  Reports of overexposure and excessive levels and concentrations.
50-204.32  Records.
50-204.33  Disclosure to former employee of individual employee's record.
50-204.34  AEC licensees—AEC contractors operating AEC plants and facilities—AEC-agreement State licensees or registrants.
50-204.35  Application for variation from radiation levels.
50-204.36  Radiation standards for mining.

Subpart D—Gases, Vapors, Fumes, Dusts, and Mists

Sec.
50-204.50  Gases, vapors, fumes, dusts, and mists.
50-204.66  Inspection of compressed gas cylinders.
50-204.66  Acetylene.
50-204.67  Oxygen.
50-204.68  Hydrogen.
50-204.69  Nitrous oxide.
50-204.70  Compressed gases.
50-204.71  Safety relief devices for compressed gas containers.
50-204.72  Safe practices for welding and cutting on containers which have held combustibles.

Subpart E—Transportation Safety

50-204.75  Transportation safety.

AUTHORITY: The provisions of this Part 50-204 issued under secs. 1, 4, 49 Stat. 2036, 2038, as amended; 41 U.S.C. 35, 38; 5 U.S.C. 556.

## Subpart A—Scope and Application

### § 50-204.1   Scope and Application.

(a) The Walsh-Healey Public Contracts Act requires that contracts entered into by any agency of the United States for the manufacture or furnishing of materials, supplies, articles, and equipment in any amount exceeding $10,000 must contain, among other provisions, a stipulation that "no part of such contract will be performed nor will any of the materials, supplies, articles, or equipment to be manufactured or furnished under said contract be manufactured or fabricated in any plants, factories, buildings, or surroundings or under working conditions which are unsanitary or hazardous or dangerous to the health and safety of employees engaged in the performance of said contract. Compliance with the safety, sanitary, and factory inspection laws of the State in which the work or part thereof is to be performed shall be prima-facie evidence of compliance with this subsection." (sec. 1(e), 49 Stat. 2036, 41 U.S.C. 35(e)). This Part 50-204 expresses the Secretary of Labor's interpretation and application of this provision with regard to certain particular working conditions. In addition, §§ 50-204.27, 50-204.30, 50-204.31, 50-204.32, 50-204.33, and 50-204.36 contain requirements concerning the instruction of personnel, notification of incidents, reports of exposures, and maintenance and disclosure of records.

(b) Except in the conduct of formal enforcement proceedings provided for in Part 50-203 of this chapter and as otherwise provided in this part, every investigator conducting investigations and every officer of the Department of Labor determining whether there are or have been violations of the safety and health requirements of the Walsh-Healey Public Contracts Act and of any contract subject thereto, and whether a settlement of the resulting issues should be made without resort to administrative or court litigation, shall treat a failure to comply with, or violation of, any of the safety and health measures contained in this

Part 50-204 as resulting in working conditions which are "unsanitary or hazardous or dangerous to the health and safety of employees" within the meaning of section 1(e) of the Act and the contract stipulation it requires. Every such investigator or every such officer shall have technical competence in safety, industrial hygiene, or both as may be appropriate, in the matters under investigation or consideration.

(e) Whenever any applicable standard in this Part 50-204 is relied upon by the Department of Labor in a formal enforcement proceeding under section 5 of the Walsh-Healey Public Contracts Act to support a finding of violation of the safety and health provisions of the Act and of a contract subject thereto, any respondent in the proceeding shall have the right and shall be afforded the opportunity to challenge the legality, fairness or propriety of any such reliance.

(d) The standards expressed in this Part 50-204 are for application to ordinary employment situations; compliance with them shall not relieve anyone from the obligation to provide protection for the health and safety of his employees in unusual employment situations. Neither do such standards purport to describe all of the working conditions which are unsanitary or hazardous or dangerous to the health and safety of employees. Where such other working conditions may be found to be unsanitary or hazardous or dangerous to the health and safety of employees, professionally accepted safety and health practices will be used.

(e) Compliance with the standards expressed in this Part 50-204 is not intended, and shall not be deemed, to relieve anyone from any other obligation he may have to protect the health and safety of his employees, arising from sources other than the Walsh-Healey Public Contracts Act, such as State, local law or collective bargaining agreement.

(f) Whenever this part adopts by reference standards, specifications and codes published and available elsewhere, it only serves to adopt the substantive, technical portions of such standards, specifications and codes.

§ 50-204.1a  Variations.

(a) The safety and health standards expressed in this part are intended for the application of section 1(e) of the Walsh-Healey Public Contracts Act to ordinary employment situations. The Director of the Bureau of Labor Standards may apply variations from the provisions of this part in enforcing the Act whenever he finds that, under the particular facts and circumstances involved, the plants, factories, buildings, surroundings, or working conditions are not unsanitary or hazardous or dangerous to the health and safety of the employees involved. Interested persons may request such a variation by making application therefor to the Director, Bureau of Labor Standards, U.S. Department of Labor, Washington, D.C. 20210.

(b) The provisions of paragraph (a) of this section shall not apply to §§ 50-204.35 and 204.36 which contain separate and specific variations procedures.

(c) Requests for exceptions or exemptions from the safety and health standards required by the Walsh-Healey Public Contracts Act, as permitted under section 6 of the Act, are processed under § 50-201.601 of this chapter.

## Subpart B—General Safety and Health Standards

§ 50-204.2  General safety and health standards; incorporation by reference.

(a) Every contractor shall protect the safety and health of his employees by complying with the applicable standards, specifications, and codes developed and published by the following organizations:

United States of America Standards Institute (American Standards Association).
National Fire Protection Association.
American Society of Mechanical Engineers.
American Society for Testing and Materials.
United States Governmental Agencies, including by way of illustration the following publications of the indicated agencies:

(1) U.S. Department of Labor

Title 29 (CFR):
Part 1501—Safety and Health Regulations for Ship Repairing.
Part 1502—Safety and Health Regulations for Shipbuilding.
Part 1503—Safety and Health Regulations for Shipbreaking.
Part 1504—Safety and Health Regulations for Longshoring.

(2) U.S. Department of Interior, Bureau of Mines

(i) Safety Code for Bituminous Coal and Lignite Mines of the United States, Part I—Underground Mines, and Part II—Strip Mines.
(ii) Safety Code for Anthracite Mines of the United States, Part I—Underground Mines, and Part II—Strip Mines.
(iii) Safety Standards for Surface Auger Mining.
(iv) Respiratory Protective Devices Approved by the Bureau of Mines, Information Circular 8281.

(3) U.S. Department of Transportation.

49 CFR 171-179 and 14 CFR 103 Hazardous materials regulation—Transportation of compressed gases.

(4) U.S. Department of Health, Education, and Welfare, Public Health Service.

(i) Publication No. 24—Manual of Individual Water Supply Systems.
(ii) Publication No. 526—Manual of Septic-Tank Practices.
(iii) Publication No. 546—The Vending of Food and Beverages.
(iv) Publication No. 934—Food Service Sanitation Manual.
(v) Publication No. 956—Drinking Water Standards.
(vi) Publication No. 1152—A Sanitary Standard for Manufactured Ice.
(vii) Publication No. 1516—Working with Silver Solder.

(5) U.S. Department of Defense.

(i) AFM 127-100—Air Force—Explosives Safety Manual.
(ii) AMCR 385-224—Army Material Command—AMC Safety Manual.

(iii) NAVORD OPS—Navy—Ammunition Ashore, Handling, Stowing, and Shipping.

(6) U.S. Department of Agriculture.

Respiratory Devices for Protection against Certain Pesticides—ARS 33-76-2.

(b) Information as to the standards, specifications, and codes applicable to a particular contract or invitation for bids and as to the places where such documents and those incorporated by reference in other sections of this part may be obtained and is available at the Office of the Director of the Bureau of Labor Standards, U.S. Department of Labor, Railway Labor Building, Washington, D.C. 20210, and at any of the following regional offices of the Bureau:

1. North Atlantic Region, 341 Ninth Avenue, Room 920, New York, N.Y. 10001 (Connecticut, Maine, Massachusetts, New Hampshire, New York, Rhode Island, Vermont, New Jersey and Puerto Rico).

2. Middle Atlantic Region, Room 410, Penn Square Building, Juniper and Filbert Streets, Philadelphia, Pa. 19107 (Delaware, District of Columbia, Maryland, North Carolina, Pennsylvania, Virginia, and West Virginia).

3. South Atlantic Region, 1371 Peachtree Street NE., Suite 723, Atlanta, Ga. 30309 (Alabama, Florida, Georgia, Mississippi, South Carolina and Tennessee).

4. Great Lakes Region, 848 Federal Office Building, 219 South Dearborn Street, Chicago, Ill. 60604 (Illinois, Indiana, Kentucky, Michigan, Minnesota, Ohio and Wisconsin).

5. Mid-Western Region, 1906 Federal Office Building, 911 Walnut Street, Kansas City, Mo. 64106 (Colorado, Iowa, Kansas, Missouri, Montana, Nebraska, North Dakota, South Dakota, Utah, and Wyoming).

6. West Gulf Region, Room 601, Mayflower Building, 411 North Akard Street, Dallas, Tex. 75201 (Arkansas, Louisiana, New Mexico, Oklahoma, and Texas).

7. Pacific Region, 10353 Federal Building, 450 Golden Gate Avenue, Box 36017, San Francisco, Calif. 94102 (Alaska, Arizona, California, Hawaii, Idaho, Nevada, Oregon, Washington and Guam).

(c) In applying the safety and health standards referred to in paragraph (a) of this section the Secretary may add to, strengthen or otherwise modify any standards whenever he considers that the standards do not adequately protect the safety and health of employees as required by the Walsh-Healey Public Contracts Act.

§ 50-204.3  Material handling and storage.

(a) Where mechanical handling equipment is used, sufficient safe clearances shall be allowed for aisles, at loading docks, through doorways and wherever turns or passage must be made. Aisles and passageways shall be kept clear and in good repair, with no obstruction across or in aisles that could create a hazard. Permanent aisles and passageways shall be appropriately marked.

(b) Storage of material shall not create a hazard. Bags, containers, bundles, etc. stored in tiers shall be stacked, blocked, interlocked and limited in height so that they are stable and secure against sliding or collapse.

(c) Storage areas shall be kept free from accumulation of materials that constitute hazards from tripping, fire, explosion, or pest harborage. Vegetation

7918

## RULES AND REGULATIONS

*used*

control will be exercised when necessary.

(d) Proper drainage shall be provided.

(e) Clearance signs to warn of clearance limits shall be provided.

(f) Derail and/or bumper blocks shall be provided on spur railroad tracks where a rolling car could contact other cars being worked, enter a building, work or traffic area.

(g) Covers and/or guard rails shall be provided to protect personnel from the hazards of open pits, tanks, vats, ditches, etc.

### § 50–204.4  Tools and equipment.

Each employer shall be responsible for the safe condition of tools and equipment used by employees, including tools and equipment which may be furnished by employees.

### § 50–204.5  Machine guarding.

(a) One or more methods of machine guarding shall be provided to protect the operator and other employees in the machine area from hazards such as those created by point of operation, in going nip points, rotating parts, flying chips and sparks. Examples of guarding methods are—Barrier guards, two hand tripping devices, electronic safety devices, etc.

(b) General requirements for machine guards. Guards shall be affixed to the machine where possible and secured elsewhere if for any reason attachment to the machine is not possible. The guard shall be such that it does not offer an accident hazard in itself.

(c) Point of Operation Guarding.

(1) Point of operation is the area on a machine where work is actually performed upon the material being processed.

(2) Where existing standards prepared by organizations listed in § 50–204.2 provide for point of operation guarding such standards shall prevail. Other types of machines for which there are no specific standards, and the operation exposes an employee to injury, the point of operation shall be guarded. The guarding device shall be so designed and constructed so as to prevent the operator from having any part of his body in the danger zone during the operating cycle.

(3) Special hand tools for placing and removing material shall be such as to permit easy handling of material without the operator placing a hand in the danger zone. Such tools shall not be in lieu of other guarding required by this section, but can only be used to supplement protection provided.

(4) The following are some of the machines which usually require point of operation guarding:

Guillotine cutters.
Shears.
Alligator shears.
Power presses.
Milling machines.
Power saws.
Jointers.
Portable power tools.
Forming rolls and calenders.

(d) Revolving drums, barrels and containers shall be guarded by an enclosure which is interlocked with the drive

mechanism, so that the barrel, drum or container cannot revolve unless the guard enclosure is in place.

(e) When the periphery of the blades of a fan is less than seven (7) feet above the floor or working level, the blades shall be guarded. The guard shall have openings no larger than one half (½) inch.

(f) Machines designed for a fixed location shall be securely anchored to prevent walking or moving.

### § 50–204.6  Medical services and first aid.

(a) The employer shall ensure the ready availability of medical personnel for advice and consultation on matters of plant health.

(b) In the absence of an infirmary, clinic or hospital in near proximity to the work place which is used for the treatment of all injured employees, a person or persons shall be adequately trained to render first aid. First aid supplies approved by the consulting physician shall be readily available.

(c) Where the eyes or body of any person may be exposed to injurious corrosive materials, suitable facilities for quick drenching or flushing of the eyes and body shall be provided within the work area for immediate emergency use.

### § 50–204.7  Personal protective equipment.

Protective equipment, including personal protective equipment for eyes, face, head, and extremities, protective cloth-

ing, respiratory devices, and protective shields and barriers, shall be provided and maintained in a sanitary and reliable condition wherever it is necessary by reason of hazards of processes or environment, chemical hazards, radiological hazards, or mechanical irritants encountered in a manner capable of causing injury or impairment in function of any part of the body through absorption, inhalation or physical contact. Where employees provide their own protective equipment, the employer shall be responsible to assure its adequacy, including proper maintenance and sanitation of such equipment. All personal protective equipment shall be of safe design and construction for the work to be performed.

### § 50–204.8  Use of compressed air.

Compressed air shall not be used for cleaning purposes except where reduced to less than 30 p.s.i. and then only with effective chip guarding and personal protective equipment.

### § 50–204.10  Occupational noise exposure.

(a) Protection against the effects of noise exposure shall be provided when the sound levels exceed those shown in Table I of this section when measured on the A scale of a standard sound level meter at slow response. When noise levels are determined by octave band analysis, the equivalent A-weighted sound level may be determined as follows:



BAND CENTER FREQUENCY IN CYCLES PER SECOND

Equivalent sound level contours. Octave band sound pressure levels may be converted to the equivalent A-weighted sound level by plotting them on this graph and noting the A-weighted sound level corresponding to the point of highest penetration into the sound level contours. This equivalent A-weighted sound level, which may differ from the actual A-weighted sound level of the noise, is used to determine exposure limits from Table I.

(b) When employees are subjected to sound exceeding those listed in Table I of this section, feasible administrative or engineering controls shall be utilized. If such controls fail to reduce sound levels within the levels of the table, personal protective equipment shall be provided and used to reduce sound levels within the levels of the table. ~*Conformance*.

(c) If the variations in noise level involve maxima at intervals of 1 second or less, it is to be considered ~Intermittent. In such cases where the duration of the maxima are less than 1 second, they shall be treated as of 1 second duration.

(d) In all cases where the sound levels exceed the values shown herein, a continuing, effective hearing conservation program shall be administered.

TABLE I

PERMISSIBLE NOISE EXPOSURES [1]

| Duration per day, hours | Sound level dBA Slow response |
|---|---|
| 8 | 90 |
| 6 | 92 |
| 4 | 95 |
| 3 | 97 |
| 2 | 100 |
| 1½ | 102 |
| 1 | 105 |
| ½ | 110 |
| ¼ or less | 115 |

[1] When the daily noise exposure is composed of two or more periods of noise exposure of different levels, their combined effect should be considered, rather than the individual effect of each. If the sum of the following fractions: $C1/T1 + C2/T2$, ... $Cn/Tn$ exceeds unity, then, the mixed exposure should be considered to exceed the limit value. Cn indicates the total time of exposure at a specified noise level, and Tn indicates the total time of exposure permitted at that level.

Exposure to impulsive or impact noise should not exceed 140 dBA peak sound pressure level.

## Subpart C—Radiation Standards

§ 50–204.20  Radiation  definitions.

As used in this subpart:

(a) "Radiation" includes alpha rays, beta rays, gamma rays, X-rays, neutrons, high-speed electrons, high-speed protons, and other atomic particles; but such term does not include sound or radio waves, or visible light, or infrared or ultraviolet light.

(b) "Radioactive material" means any material which emits, by spontaneous nuclear disintegration, corpuscular or electromagnetic emanations.

(c) "Restricted area" means any area access to which is controlled by the employer for purposes of protection of individuals from exposure to radiation or radioactive materials.

(d) "Unrestricted area" means any area access to which is not controlled by the employer for purposes of protection of individuals from exposure to radiation or radioactive materials.

(e) "Dose" means the quantity of ionizing radiation absorbed, per unit of mass, by the body or by any portion of

the body. When the provisions in this subpart specify a dose during a period of time, the dose is the total quantity of radiation absorbed, per unit of mass, by the body or by any portion of the body during such period of time. Several different units of dose are in current use. Definitions of units used in this subpart are set forth in paragraphs (f) and (g) of this section.

(f) "Rad" means a measure of the dose of any ionizing radiation to body tissues in terms of the energy absorbed per unit of mass of the tissue. One rad is the dose corresponding to the absorption of 100 ergs per gram of tissue (1 millirad (mrad) = 0.001 rad).

(g) "Rem" means a measure of the dose of any ionizing radiation to body tissue in terms of its estimated biological effect relative to a dose of 1 roentgen (r) of X-rays (1 millirem (mrem) = 0.001 rem). The relation of the rem to other dose units depends upon the biological effect under consideration and upon the conditions for irradiation. Each of the following is considered to be equivalent to a dose of 1 rem:

(1) A dose of 1 rad due to X- or gamma radiation;

(2) A dose of 1 rad due to X-, gamma, or beta radiation;

(3) A dose of 0.1 rad due to neutrons or high energy protons;

(4) A dose of 0.05 rad due to particles heavier than protons and with sufficient energy to reach the lens of the eye;

(5) If it is more convenient to measure the neutron flux, or equivalent, than to determine the neutron dose in rads, as provided in subparagraph (3) of this paragraph, 1 rem of neutron radiation may, for purposes of the provisions in this subpart be assumed to be equivalent to 14 million neutrons per square centimeter incident upon the body; or, if there is sufficient information to estimate with reasonable accuracy the approximate distribution in energy of the neutrons, the incident number of neutrons per square centimeter equivalent to 1 rem may be estimated from the following table:

NEUTRON FLUX DOSE EQUIVALENTS

| Neutron energy (million electron volts (Mev)) | Number of neutrons per square centimeter equivalent to a dose of 1 rem (neutrons/cm²) | Average flux to deliver 100 millirem in 40 hours (neutrons/cm² per sec.) |
|---|---|---|
| Thermal | 970×10⁶ | 670 |
| 0.0001 | 720×10⁶ | 500 |
| 0.005 | 820×10⁶ | 570 |
| 0.02 | 400×10⁶ | 280 |
| 0.1 | 120×10⁶ | 80 |
| 0.5 | 43×10⁶ | 30 |
| 1.0 | 26×10⁶ | 18 |
| 2.5 | 29×10⁶ | 20 |
| 5.0 | 26×10⁶ | 18 |
| 7.5 | 24×10⁶ | 17 |
| 10 | 24×10⁶ | 17 |
| 10 to 30 | 14×10⁶ | 10 |

(h) For determining exposures to X-or gamma rays up to 3 Mev, the dose limits specified in this part may be assumed to be equivalent to the "air dose". For the purpose of this subpart

"air dose" means that the dose is measured by a properly calibrated appropriate instrument in air at or near the body surface in the region of the highest dosage rate.

§ 50–204.21  Exposure of individuals to radiation in restricted areas.

(a) Except as provided in paragraph (b) of this section, no employer shall possess, use, or transfer sources of ionizing radiation in such a manner as to cause any individual in a restricted area to receive in any period of one calendar quarter from sources in the employer's possession or control a dose in excess of the limits specified in the following table:

| | Rems per calendar quarter |
|---|---|
| 1. Whole body: Head and trunk; active blood-forming organs; lens of eyes; or gonads | 1¼ |
| 2. Hands and forearms; feet and ankles | 18¾ |
| 3. Skin of whole body | 7½ |

(b) An employer may permit an individual in a restricted area to receive doses to the whole body greater than those permitted under paragraph (a) of this section, so long as:

(1) During any calendar quarter the dose to the whole body shall not exceed 3 rems; and

(2) The dose to the whole body, when added to the accumulated occupational dose to the whole body, shall not exceed 5 (N–18) rems, where "N" equals the individual's age in years at his last birthday; and

(3) The employer maintains adequate past and current exposure records which show that the addition of such a dose will not cause the individual to exceed the amount authorized in this paragraph. As used in this paragraph "Dose to the whole body" shall be deemed to include any dose to the whole body, gonad, active bloodforming organs, head and trunk, or lens of the eye.

(c) No employer shall permit any employee who is under 18 years of age to receive in any period of one calendar quarter a dose in excess of 10 percent of the limits specified in the table in paragraph (a) of this section.

(d) "Calendar quarter" means any 3-month period determined as follows:

(1) The first period of any year may begin on any date in January: *Provided,* That the second, third, and fourth periods accordingly begin on the same date in April, July, and October, respectively, and that the fourth period extends into January of the succeeding year, if necessary to complete a 3-month quarter. During the first year of use of this method of determination, the first period for that year shall also include any additional days in January preceding the starting date for the first period; or

(2) The first period in a calendar year of 13 complete, consecutive calendar weeks; the second period in a calendar year of 13 complete, consecutive calendar weeks; the third period in a calendar

year of 13 complete, consecutive calendar weeks; the fourth period in a calendar year of 13 complete, consecutive calendar weeks. If at the end of a calendar year there are any days not falling within a complete calendar week of that year, such days shall be included within the last complete calendar week of that year. If at the beginning of any calendar year there are days not falling within a complete calendar week of that year, such days shall be included within the last complete calendar week of the previous year; or

(3) The four periods in a calendar year may consist of the first 14 complete, consecutive calendar weeks; the next 12 complete, consecutive calendar weeks, the next 14 complete, consecutive calendar weeks, and the last 12 complete, consecutive calendar weeks. If at the end of a calendar year there are any days not falling within a complete calendar week of that year, such days shall be included (for purposes of this part) within the last complete calendar week of that year. If at the beginning of any calendar year there are days not falling within a complete calendar week of that year, such days shall be included (for purposes of this part) within the last complete week of the previous year.

(e) No employer shall change the method used by him to determine calendar quarters except at the beginning of a calendar year.

§ 50–204.22   Exposure to airborne radioactive material.

(a) No employer shall possess, use or transport radioactive material in such manner as to cause any employee, within a restricted area, to be exposed to airborne radioactive material in an average concentration in excess of the limits specified in Table I of Appendix B to 10 CFR Part 20. The limits given in Table I are for exposure to the concentrations specified for 40 hours in any workweek of 7 consecutive days. In any such period where the number of hours of exposure is less than 40, the limits specified in the table may be increased proportionately. In any such period where the number of hours of exposure is greater than 40, the limits specified in the table shall be decreased proportionately.

(b) No employer shall possess, use, or transfer radioactive material in such a manner as to cause any individual within a restricted area, who is under 18 years of age to be exposed to airborne radioactive material in an average concentration in excess of the limits specified in Table II of Appendix B to 10 CFR Part 20. For purposes of this paragraph, concentrations may be averaged over periods not greater than 1 week.

(c) "Exposed" as used in this section means that the individual is present in an airborne concentration. No allowance shall be made for the use of protective clothing or equipment, or particle size,

except as authorized by the Director, Bureau of Labor Standards.

§ 50–204.23   Precautionary procedures and personnel monitoring.

(a) Every employer shall make such surveys as may be necessary for him to comply with the provisions in this subpart. "Survey" means an evaluation of the radiation hazards incident to the production, use, release, disposal, or presence of radioactive materials or other sources of radiation under a specific set of conditions. When appropriate, such evaluation includes a physical survey of the location of materials and equipment, and measurements of levels of radiation or concentrations of radioactive material present.

(b) Every employer shall supply appropriate personnel monitoring equipment, such as film badges, pocket chambers, pocket dosimeters, or film rings, to, and shall require the use of such equipment by:

(1) Each employee who enters a restricted area under such circumstances that he receives, or is likely to receive, a dose in any calendar quarter in excess of 25 percent of the applicable value specified in paragraph (a) of § 50–204.21; and

(2) Each employee under 18 years of age who enters a restricted area under such circumstances that he receives, or is likely to receive, a dose in any calendar quarter in excess of 5 percent of the applicable value specified in paragraph (a) of § 50–204.21; and

(3) Each employee who enters a high radiation area.

(c) As used in this subpart:

(1) "Personnel monitoring equipment" means devices designed to be worn or carried by an individual for the purpose of measuring the dose received (e.g., film badges, pocket chambers, pocket dosimeters, film rings, etc.);

(2) "Radiation area" means any area, accessible to personnel, in which there exists radiation at such levels that a major portion of the body could receive in any one hour a dose in excess of 5 millirem, or in any 5 consecutive days a dose in excess of 100 millirem; and

(3) "High radiation area" means any area, accessible to personnel, in which there exists radiation at such levels that a major portion of the body could receive in any one hour a dose in excess of 100 millirem.

§ 50–204.24   Caution signs, labels, and signals.

(a) General. (1) Symbols prescribed by this section shall use the conventional radiation caution colors (magenta or purple on yellow background). The symbol prescribed by this section is the conventional three-bladed design:

RADIATION SYMBOL

1. Cross-hatched area is to be magenta or purple.

2. Background is to be yellow.



(2) In addition to the contents of this section, and labels prescribed in this section, employers may provide on or near such signs and labels any additional information which may be appropriate in aiding individuals to minimize exposure to radiation or to radioactive material.

(b) Radiation areas. Each radiation area shall be conspicuously posted with a sign or signs bearing the radiation caution symbol and the words:

CAUTION*
RADIATION AREA

(c) High radiation area. (1) Each high radiation area shall be conspicuously posted with a sign or signs bearing the radiation caution symbol and the words:

CAUTION*
HIGH RADIATION AREA

(2) Each high radiation area shall be equipped with a control device which shall either cause the level of radiation to be reduced below that at which an individual might receive a dose of 100 millirems in 1 hour upon entry into the area or shall energize a conspicuous visible or audible alarm signal in such a manner that the individual entering and the employer or a supervisor of the activity are made aware of the entry. In the case of a high radiation area established for a period of 30 days or less, such control device is not required.

(d) Airborne radioactivity area. (1) As used in the provisions of this subpart, "airborne radioactivity area" means (i) any room, enclosure, or operating area in which airborne radioactive materials, composed wholly or partly of radioactive material, exist in concentrations in excess of the amounts specified in column 1 of Table I of Appendix B to 10 CFR Part 20 or (ii) any room, enclosure, or operating area in which airborne radioactive materials exist in concentrations

---

* Or "Danger".

RULES AND REGULATIONS                    7951

which, averaged over the number of hours in any week during which individuals are in the area, exceed 25 percent of the amounts specified in column 1 of the described Table 1.

(2) Each airborne radioactivity area shall be conspicuously posted with a sign or signs bearing the radiation caution symbol and the words:

CAUTION [1]
AIRBORNE RADIOACTIVITY AREA

(c) *Additional requirements.* (1) Each area or room in which radioactive material is used or stored and which contains any radioactive material (other than natural uranium or thorium) in any amount exceeding 10 times the quantity of such material specified in Appendix C to 10 CFR Part 20 shall be conspicuously posted with a sign or signs bearing the radiation caution symbol and the words:

CAUTION [1]
RADIOACTIVE MATERIALS

(2) Each area or room in which natural uranium or thorium is used or stored in an amount exceeding 100 times the quantity specified in Appendix C to 10 CFR Part 20 shall be conspicuously posted with a sign or signs bearing the radiation caution symbol and the words:

CAUTION [1]
RADIOACTIVE MATERIALS

(f) *Containers.* (1) Each container in which is transported, stored, or used a quantity of any radioactive material other than natural uranium or thorium) greater than the quantity of such material specified in Appendix C to 10 CFR Part 20 shall bear a durable, clearly visible label bearing the radiation caution symbol and the words:

CAUTION [1]
RADIOACTIVE MATERIALS

(2) Each container in which natural uranium or thorium is transported, stored, or used in a quantity greater than 10 times the quantity specified in Appendix C to 10 CFR Part 20 shall bear a durable, clearly visible label bearing the radiation caution symbol and the words:

CAUTION [1]
RADIOACTIVE MATERIALS

(3) Notwithstanding the provisions of subparagraphs (1) and (2) of this paragraph a label shall not be required:

(i) If the concentration of the material in the container does not exceed that specified in column 2 of the described Table 1, or

(ii) For laboratory containers, such as beakers, flasks, and tests tubes, used transiently in laboratory procedures, when the user is present.

(4) Where containers are used for storage, the labels required in this paragraph shall state also the quantities and kinds of radioactive materials in the containers and the date of measurement of the quantities.

---
[1] Or "Danger".

§ 50–204.25  Exceptions from posting requirements.

Notwithstanding the provisions of § 50–204.24:

(a) A room or area is not required to be posted with a caution sign because of the presence of a sealed source, provided the radiation level 12 inches from the surface of the source container or housing does not exceed 5 millirem per hour.

(b) Rooms or other areas in on-site medical facilities are not required to be posted with caution signs because of the presence of patients containing radioactive material, provided that there are personnel in attendance who shall take the precautions necessary to prevent the exposure of any individual to radiation or radioactive material in excess of the limits established in the provisions of this subpart.

(c) Caution signs are not required to be posted at areas or rooms containing radioactive materials for periods of less than 8 hours: *Provided,* That (1) the materials are constantly attended during such periods by an individual who shall take the precautions necessary to prevent the exposure of any individual to radiation or radioactive materials in excess of the limits established in the provisions of this subpart; and (2) such area or room is subject to the employer's control.

§ 50–204.26  Exemptions for radioactive materials packaged for shipment.

Radioactive materials packaged and labeled in accordance with regulations of the Department of Transportation shall be exempt from the labeling and posting requirements during shipment, provided that the inside containers are labeled in accordance with the provisions of § 50–204.24.

§ 50–204.27  Instruction of personnel posting.

Employers regulated by the AEC shall be governed by "§ 20.206" (10 CFR Part 20) standards. Employers in a State named in § 50–204.34(c) shall be governed by the requirements of the laws and regulations of that State. All other employers shall be regulated by the following:

(a) All individuals working in or frequenting any portion of a radiation area shall be informed of the occurrence of radioactive materials or of radiation in such portions of the radiation area; shall be instructed in the safety problems associated with exposure to such materials or radiation and in precautions or devices to minimize exposure; shall be instructed in the applicable provisions of this subpart for the protection of employees from exposure to radiation or radioactive materials; and shall be advised of reports of radiation exposure which employees may request pursuant to the regulations in this part.

(d) Each employer to whom this subpart applies shall post a current copy of its provisions and a copy of the operating procedures applicable to the work

under contract conspicuously in such locations as to ensure that employees working in or frequenting radiation areas will observe these documents on the way to and from their place of employment, or shall keep such documents available for examination of employees upon request.

§ 50–204.28  Storage of radioactive materials.

Radioactive materials stored in a nonradiation area shall be secured against unauthorized removal from the place of storage.

§ 50–204.29  Waste disposal.

No employer shall dispose of radioactive material except by transfer to an authorized recipient, or in a manner approved by the Atomic Energy Commission or a State named in § 50–204.34(c).

§ 50–204.30  Notification of incidents.

(a) *Immediate notification.* Each employer shall immediately notify the Regional Director of the appropriate Wage and Labor Standards Administration, Office of Occupational Safety of the Bureau of Labor Standards of the U.S. Department of Labor, for employees not protected by AEC by means of 10 CFR Part 20, § 50–204.34(b) of this part, or the requirements of the laws and regulations of States named in § 50–204.34 (c), by telephone or telegraph of any incident involving radiation which may have caused or threatens to cause:

(1) Exposure of the whole body of any individual to 25 rems or more of radiation; exposure of the skin of the whole body of any individual to 150 rems or more of radiation; or exposure of the feet, ankles, hands, or forearms of any individual to 375 rems or more of radiation; or

(2) The release of radioactive material in concentrations which, if averaged over a period of 24 hours, would exceed 5,000 times the limit specified for such materials in Table II of Appendix B to 10 CFR Part 20.

(3) A loss of 1 working week or more of the operation of any facilities affected; or

(4) Damage to property in excess of $100,000.

(b) *Twenty-four hour notification.* Each employer shall within 24 hours following its occurrence notify the Regional Director of the appropriate Wage and Labor Standards Administration, Office of Occupational Safety of the Bureau of Labor Standards of the U.S. Department of Labor, for employees not protected by AEC by means of 10 CFR Part 20, § 50–204.34(b) of this part, or the requirements of the laws and applicable regulations of States named in § 50–204.34(c), by telephone or telegraph of any incident involving radiation which may have caused or threatens to cause:

(1) Exposure of the whole body of any individual to 5 rems or more of radiation; exposure of the skin of the whole body of any individual to 30 rems or more of radiation; or exposure of the feet,

7952

## RULES AND REGULATIONS

ankles. hands, or forearms to 75 rems or more of radiation; or

(2) A loss of 1 day or more of the operation of any facilities; or

(3) Damage to property in excess of $10,000.

§ 50–204.31  Reports of overexposure and excessive levels and concentrations.

(a) In addition to any notification required by § 50–204.20 each employer shall make a report in writing within 30 days to the Regional Director of the appropriate Wage and Labor Standards Administration, Office of Occupational Safety of the U.S. Department of Labor, for employees not protected by AEC by means of 10 CFR Part 20, or under section 50–204.34(b) of this part, or the requirements of the laws and regulations of States named in § 50–204.34(c), of each exposure of an individual to radiation or concentrations of radioactive material in excess of any applicable limit in this subpart. Each report required under this paragraph shall describe the extent of exposure of persons to radiation or to radioactive material; levels of radiation and concentrations of radioactive material involved, the cause of the exposure, levels of concentrations; and corrective steps taken or planned to assure against a recurrence.

(b) In any case where an employer is required pursuant to the provisions of this section to report to the U.S. Department of Labor any exposure of an individual to radiation or to concentrations of radioactive material, the employer shall also notify such individual of the nature and extent of exposure. Such notice shall be in writing and shall contain the following statement: "You should preserve this report for future reference."

§ 50–204.32  Records.

(a) Every employer shall maintain records of the radiation exposure of all employees for whom personnel monitoring is required under § 50–204.23 and advise each of his employees of his individual exposure on an annual basis.

(b) Every employer shall maintain records in the same units used in tables in § 50–204.21 and Appendix B to 10 CFR Part 20.

§ 50–204.33  Disclosure to former employee of individual employee's record.

(a) At the request of a former employee an employer shall furnish to the employee a report of the employee's exposure to radiation as shown in records maintained by the employer pursuant to § 50–204.32(a). Such report shall be furnished within 30 days from the time the request is made, and shall cover each calendar quarter of the individual's employment involving exposure to radiation or such lesser period as may be requested by the employee. The report shall also include the results of any calculations and analysis of radioactive material deposited in the body of the employee. The report shall be in writing and contain the following statement: "You should preserve this report for future reference."

(b) The former employee's request should include appropriate identifying data, such as social security number and dates and locations of employment.

§ 50–204.34  AEC licensees—AEC contractors operating AEC plants and facilities—AEC agreement State licensees or registrants.

(a) Any employer who possesses or uses source material, byproduct material, or special nuclear material, as defined in the Atomic Energy Act of 1954, as amended, under a license issued by the Atomic Energy Commission and in accordance with the requirements of 10 CFR Part 20 shall be deemed to be in compliance with the requirements of this subpart with respect to such possession and use.

(b) AEC contractors operating AEC plants and facilities: Any employer who possesses or uses source material, byproduct material, special nuclear material, or other radiation source under a contract with the Atomic Energy Commission for the operation of AEC plants and facilities and in accordance with the standards, procedures, and other requirements for radiation protection established by the Commission for such contract pursuant to the Atomic Energy Act of 1954 as amended (42 U.S.C. 2011 et seq.), shall be deemed to be in compliance with the requirements of this subpart with respect to such possession and use.

(c) AEC-agreement State licensees or registrants:

(1) Atomic Energy Act Sources. Any employer who possesses or uses source material, byproduct material, or special nuclear material, as defined in the Atomic Energy Act of 1954, as amended (42 U.S.C. 2011 et seq.), and has either registered such sources with, or is operating under a license issued by, a State which has an agreement in effect with the Atomic Energy Commission pursuant to section 274(b) (42 U.S.C. 2021(b)) of the Atomic Energy Act of 1954, as amended, and in accordance with the requirements of that State's laws and regulations shall be deemed to be in compliance with the radiation requirements of this part, insofar as his possession and use of such material is concerned, unless the Secretary of Labor, after conference with the Atomic Energy Commission, shall determine that the State's program for control of these radiation sources is incompatible with the requirements of this part. Such agreements currently are in effect only in the States of Alabama, Arkansas, California, Kansas, Kentucky, Florida, Mississippi, New Hampshire, New York, North Carolina, Texas, Tennessee, Oregon, Idaho, Arizona, Colorado, Louisiana, Nebraska, and Washington.

(2) Other sources. Any employer who possesses or uses radiation sources other than source material, byproduct material, or special nuclear material, as defined in the Atomic Energy Act of 1954, as amended (42 U.S.C. 2011 et seq.), and has either registered such sources with, or is operating under a license issued by a State which has an agreement in effect with the Atomic Energy Commission pursuant to section 274(b) (42 U.S.C. 2021(b)) of the Atomic Energy Act of 1954, as amended, and in accordance

with the requirements of that State's laws and regulations shall be deemed to be in compliance with the radiation requirements of this part, insofar as his possession and use of such material is concerned, provided the State's program for control of these radiation sources is the subject of a currently effective determination by the Secretary of Labor that such program is compatible with the requirements of this part. Such determinations currently are in effect only in the States of Alabama, Arkansas, California, Kansas, Kentucky, Florida, Mississippi, New Hampshire, New York, North Carolina, Texas, Tennessee, Oregon, Idaho, Arizona, Colorado, Louisiana, Nebraska, and Washington.

§ 50–204.35  Application for variations from radiation levels.

(a) In accordance with policy expressed in the Federal Radiation Council's memorandum concerning radiation protection guidance for Federal agencies (25 F.R. 4402), the Director, Bureau of Labor Standards may from time to time grant permission to employers to vary from the limitations contained in §§ 50–204.21 and 50–204.22 when the extent of variation is clearly specified and it is demonstrated to his satisfaction that (1) such variation is necessary to obtain a beneficial use of radiation or atomic energy, (2) such benefit is of sufficient value to warrant the variation, (3) employees will not be exposed to an undue hazard, and (4) appropriate actions will be taken to protect the health and safety of such employees.

(b) Applications for such variations should be filed with the Director, Bureau of Labor Standards, U.S. Department of Labor, Washington, D.C. 20210.

§ 50–204.36  Radiation standards for mining.

(a) For the purpose of this section, a "working level" is defined as any combination of radon daughters in 1 liter of air which will result in the ultimate emission of $1.3 \times 10^5$ million electron volts of potential alpha energy. The numerical value of the "working level" is derived from the alpha energy released by the total decay of short-lived radon daughter products in equilibrium with 100 pico-curies of radon 222 per liter of air. A working level month is defined as the exposure received by a worker breathing air at one working level concentration for $4\frac{1}{2}$ weeks of 40 hours each.

(b) (1) Occupational exposure to radon daughters in mines shall be controlled so that no individual will receive an exposure of more than 3 working level months in any calendar quarter and no more than 4 working level months in any calendar year. Actual exposures shall be kept as far below these values as practicable.

(2) In enforcing this section, the Director of the Bureau of Labor Standards may at any stage approve variations in individual cases from the limitation set forth in subparagraph (1) of this paragraph to comply with the requirements of the Act upon a showing to the satisfaction of the Director by an employer having a mine with conditions resulting

an exposure of more than 4 working level months but not more than 12 working-level months in any 12 consecutive months that (1) under the particular ts and circumstances involved the rking conditions of the employee so posed are such that their health and ety are protected, and (ii) the employer has a bona fide plan to reduce the els of exposure to those specified in paragraph (1) of this paragraph as in as practicable, but in no event later in January 1, 1971.

3) Whenever a variation under subparagraph (2) of this paragraph is ight, a request therefor should be subited in writing to the Director of the reau of Labor Standards, U.S. Department of Labor, Washington, D.C. :10, within 90 days following the end the calendar quarter or year, as the e may be.

c) (1) For uranium mines, records of vironmental concentrations in the occied parts of the mine, and of the time nt in each area by each person involved in underground work shall be established and maintained. These records ll be in sufficient detail to permit calations of the exposures, in units of rking level months, of the individuals l shall be available for inspection by Secretary of Labor or his authorized nts.

2) For other than uranium mines and surface workers in all mines, subagraph (1) of this paragraph will be plicable: Provided, however, That if environmental sample shows a conitration greater than 0.33 working el in any occupied part of the mine, maintenance of individual occupancy ords and the calculation of individual posures will not be required.

d) (1) At the request of an employee former employee) a report of the employee's exposure to radiation as shown records maintained by the employer suant to paragraph (c) of this seco, shall be furnished to him. The ret shall be in writing and contain the owing statement:

This report is furnished to you under the visions of the U.S. Department of Labor, lation Safety and Health Standards (41 . 50–204.38). You should preserve this ort for future reference.

2) The former employee's request. uld include appropriate identifying a, such as social security number and es and locations of employment.

**port D—Gases, Vapors, Fumes, Dusts, and Mists.**

0–204.50   Gases, vapors, fumes, dusts, and mists.

a) Exposures by inhalation, ingesb, skin absorption, or contact to any terial or substance (1) at a concention above those specified in the reshold Limit Values of Airborne itaminants for 1968" of the American nference of Governmental Industrial yienists, except for the USASI Stands listed in Table I of this section and ept for the values of mineral dusts ed in Table II of this section, and (2) centrations above those specified in ole I and II of this section, shall be

avoided, or protective equipment shall be provided and used.

(b) To achieve compliance with paragraph (a), feasible administrative or engineering controls must first be determined and implemented in all cases. In cases where protective equipment, or protective equipment in addition to other measures is used as the method of protecting the employee, such protection must be approved for each specific application by a competent industrial hygienist or other technically qualified source.

TABLE I

| | 8–hr. time weighted average |
|---|---|
| Toluene (Z37.12–1967) | 200 p.p.m. |
| Formaldehyde (Z37.16–1967) | 3 p.p.m. |
| Carbon tetrachloride (Z37.17–1967) | 10 p.p.m. |
| Trichloroethylene (Z37.19–1967) | 100 p.p.m. |
| Tetrachloroethylene (Z37.22–1967) | 100 p.p.m. |
| Hydrogen fluoride (Z37.28–1966) | 3 p.p.m. |
| Fluoride dust as F (Z37.28–1966) | 2.5mg/M³ |
| Carbon disulfide (Z37.3–1968) | 20 p.p.m. (50 acceptable ceiling concentrate. |
| Hydrogen sulfide (Z37.2–1966) | 20 p.p.m. |

TABLE II

MINERAL DUSTS

| Substance | Mppcf | Mg/M³ |
|---|---|---|
| Silica: | | |
| Crystalline— | | |
| Quartz (Respirable) | 250¹ | $\frac{10mg/M^3}{\%SiO_2+5}$ |
| Quartz (Total Dust) | | $\frac{30mg/M^3}{\%SiO_2+2}$ |
| Cristobalite: Use ½ the value calculated from the count or mass formulae for quartz. | | |
| Tridymite: Use ½ the value calculated from the formulae for quartz. | | |
| Amorphous, including natural Diatomaceous earth | 20 | 80mg/M³ |
| Tremolite | 5 | $\frac{20mg/M^3}{\%SiO_2}$ |
| Silicates (less than 1% crystalline Silica): | | |
| Asbestos—12 fibers per milliliter greater than 5 microns in length or | 5 | |
| Mica | 20 | |
| Soapstone | 20 | |
| Talc | 20 | |
| Portland Cement | 50 | |
| Graphite (natural) | 15 | |
| Coal Dust (Respirable fraction less than 5% SiO₂) | | 2.4mg/M³ |
| For more than 5% SiO₂ | | $\frac{10mg/M^3}{\%SiO_2+2}$ |
| Inert or Nuisance Dust: | | |
| Respirable fraction | 15 | 5mg/M³ |
| Total Dust | 50 | 15mg/M³ |

NOTE: Conversion factors

mppcf×35.3 = million particles per cubic meter = particles per c.c.

* Millions of particles per cubic foot of air, based on impinger samples counted by light-field technics.
¹ The percentage of crystalline silica in the formula is the amount determined from air-borne samples, except in those instances in which other methods have been shown to be applicable.
(As determined by the membrane filter method at 450 X phase contrast magnification.)
– Both concentration and percent quartz for the application of this limit are to be determined from the fraction passing a size-selector with the following characteristics:

The measurements under this note refer to the use of an AEC instrument. If the respirable fraction of coal dust is determined with a MRE the figure corresponding to that of 2.4 Mg/M³ in the table for coal dust is 4.5 Mg/M³.

§ 50–204.65   Inspection of compressed gas cylinders.

Each contractor shall determine that compressed gas cylinders under his control are in a safe condition to the extent that this can be determined by visual inspection. Visual and other inspections shall be conducted as prescribed in the Hazardous Materials Regulations of the Department of Transportation (49 CFR Parts 171–179 and 14 CFR Part 103). Where those regulations are not applicable, visual and other inspections shall be conducted in accordance with Compressed Gas Association Pamphlets C–6–198 and C–8–1962.

§ 50–204.66   Acetylene.

(a) The in-plant transfer, handling, storage, and utilization of acetylene in cylinders shall be in accordance with Compressed Gas Association Pamphlet G–1–1966.

(b) The piped systems for the in-plant transfer and distribution of acetylene shall be designed, installed, maintained, and operated in accordance with Compressed Gas Association Pamphlet G–1.3–1959.

(c) Plants for the generation of acetylene and the charging (filling) of acetylene cylinders shall be designed, constructed, and tested in accordance with the standards prescribed in Compressed Gas Association Pamphlet G–1.4–1966.

§ 50–204.67   Oxygen.

The in-plant transfer, handling, storage, and utilization of oxygen as a liquid or a compressed gas shall be in accordance with Compressed Gas Association Pamphlet G–4–1962.

§ 50–204.68   Hydrogen.

The in-plant transfer, handling, storage, and utilization of hydrogen shall be in accordance with Compressed Gas Association Pamphlets G–5.1–1961 and G–5.2–1966.

§ 50–204.69   Nitrous oxide.

The piped systems for the in-plant transfer and distribution of nitrous oxide shall be designed, installed, maintained, and operated in accordance with Compressed Gas Association Pamphlet G–8.1–1964.

§ 50–204.70   Compressed gases.

The in-plant handling, storage, and utilization of all compressed gases in cylinders, portable tanks, rail tankcars, or motor vehicle cargo tanks shall be in accordance with Compressed Gas Association Pamphlet P–1–1965.

| Aerodynamic diameter (unit density sphere) | % passing selector |
|---|---|
| 2 | 90 |
| 2.5 | 75 |
| 3.5 | 50 |
| 5.0 | 25 |
| 10 | 0 |

7954

## RULES AND REGULATIONS

### Subpart E—Transportation Safety

#### § 50–204.75  Transportation safety.

Transportation in connection with public contracts, as listed in § 50–204.2(a)(3) shall be conducted in accordance with the U.S. Department of Transportation requirements. Where such requirements do not apply, Chapters 10, 11, 12, and 14 of the Uniform Vehicle Code of the National Committee on Uniform Traffic Laws and Ordinances, 1962 Edition, shall be used.

2. Section 50–201.502 is revised to read as follows:

#### § 50–201.502  Record of injuries.

(a) Every person who is or shall become a party to a Government contract which is subject to the provisions of the Walsh-Healey Public Contracts Act and the regulations thereunder, or who is performing or shall perform any part of such contract subject to the provisions of such act or regulations, shall maintain the records specified below which shall be available for inspection by authorized representatives of the Secretary of Labor:

#### § 50–204.71  Safety relief devices for compressed gas containers.

Compressed gas cylinders, portable tanks, and cargo tanks shall have pressure relief devices installed and maintained in accordance with Compressed Gas Association Pamphlets S–1.1–1963 and 1965 addenda and S–1.2–1963.

#### § 50–204.72  Safe practices for welding and cutting on containers which have held combustibles.

Welding or cutting or both on containers which have held flammable or combustible solids, liquids, or gases, or have contained substances which may produce flammable vapors or gases will not be attempted until the containers have been thoroughly cleaned in strict accordance with the rules and procedures embodied in American Welding Society Pamphlet A–6.0–65, edition of 1965.

(1) Records of all injuries to employees, including a brief description of the manner of occurrence and the date and duration of disability.

(2) Records of injury frequency rates, calculated annually on a calendar year basis commencing the first of January of each year, as defined in United States of America Standards Institute, Z16.1–1967 "Method of Recording and Measuring Work Injury Experience."

(3) Records of injury severity rates, calculated annually on a calendar year basis commencing the first of January of each year, as defined in United States of America Standards Institute, Z16.1–1967 "Method of Recording and Measuring Work Injury Experience."

(b) The records required in paragraph (a) of this section shall be kept on file at least 3 years from the date of entry.

(c) Where records are kept on a fiscal or insurance year basis, they shall be accepted as being, in compliance with subparagraphs (2) and (3) of paragraph (a) of this section.

(Sec. 4, 49 Stat. 2036; 41 U.S.C. 2036)

[F.R. Doc. 69–5931; Filed, May 19, 1969; 8:45 a.m.]



NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

To all to whom these presents shall come, Greeting:

By virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf,

the seal of the National Archives of the United States, that the attached reproduction(s) is a true and

copy of documents in his custody.

| SIGNATURE | |
|---|---|
| *[signature]* | |
| NAME | DATE |
| DIANE L. DIMKOFF | 5/11/95 |
| TITLE  ASSISTANT DIRECTOR | |
| CENTER FOR LEGISLATIVE ARCHIVES | |
| NAME AND ADDRESS OF DEPOSITORY | |
| The National Archives Washington, D.C. 20408 | |

NA FORM 14007A (10-86)

L 22.5:W 16/2/968

# A HANDY GUIDE



## TO THE WALSH-HEALEY
# PUBLIC CONTRACTS ACT

¹ Offices of the Bureau of Labor Standards

| REGIONAL OFFICE | AREA COVERED |
|---|---|
| Atlanta, Georgia | Alabama, Florida, Georgia, Mississippi, South Carolina, and Tennessee |
| Baltimore, Maryland | Delaware, District of Columbia, Maryland, North Carolina, Pennsylvania, Virginia, and West Virginia |
| Chicago, Illinois | Illinois, Indiana, Kentucky, Michigan, Minnesota, Ohio, and Wisconsin |
| Dallas, Texas | Arkansas, Louisiana, New Mexico, Oklahoma, and Texas |
| Kansas City, Missouri | Colorado, Idaho, Iowa, Kansas, Missouri, Montana, Nebraska, North Dakota, South Dakota, Utah, and Wyoming |
| New York, New York | Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, New York, Puerto Rico, Rhode Island, Vermont, and Virgin Islands |
| San Francisco, California | Alaska, Arizona, California, Hawaii, Nevada, Oregon, Washington, American Samoa, Guam, Outer Continental Shelf Lands as defined in Outer Continental Shelf Lands Act, Eniwetok Atoll, Johnston Island, Kwajalein Atoll, and Wake Island |

13501





**U.S. DEPARTMENT OF LABOR**

U.S. DEPARTMENT OF LABOR
WAGE AND HOUR AND PUBLIC CONTRACTS DIVISIONS
WHPC Publication 1107
Revised April 1968

This Guide is intended only to give brief information about the principal provisions of the Walsh-Healey Public Contracts Act. It is not to be considered in the same light as official statements of position contained in regulations, rulings, interpretations, and other such documents formally adopted by the Department of Labor and the Wage and Hour and Public Contracts Divisions.

## General Provisions

The Walsh-Healey Public Contracts Act sets basic labor standards for employees working on Government contracts calling for the manufacture or furnishing of materials, supplies, articles or equipment in an amount exceeding $10,000. The law contains minimum wage, maximum hours, and safety and health provisions. It bans the employment of child labor and convict labor on covered contracts.

## Qualified Contractor

The law restricts the award of contracts to manufacturers or regular dealers in the materials, supplies, articles or equipment called for in the contract.

## How the Act Applies to Employers

In addition to its coverage of prime contractors, the Act's requirements apply to secondary contractors:

(1) Where the secondary contractor substitutes for the prime contractor in performing any of the work which the latter has contracted to do for the Government, as by (a) manufacturing or furnishing any of the contract items which the prime contractor has agreed to manufacture or furnish for the Government, or by (b) producing or supplying any parts, materials, or services to be used in manufacturing an end product that the prime contractor has agreed to manufacture for the Government, which parts, materials, or services it is the regular practice in the industry manufacturing such end product for the manufacturers to produce or supply themselves rather than to procure from others; or

(2) Where the secondary contractor is a manufacturer of materials, supplies, articles, or equipment which the Government has contracted with a regular dealer to furnish, and the dealer causes the manufacturer to deliver

1

the items directly to the Government either by a direct shipment to the Government agency as consignee or to the prime contractor's warehouse or other designated place where they will be held for the Government and not placed in regular stock; *or*

(3) Where the secondary contractor, pursuant to a contract in excess of $10,000 in amount with a Government prime contractor, is engaged in manufacture or furnishing of materials, supplies, articles, or equipment which the Government agency has contracted with the prime contractor to procure for and on behalf of the Government from suppliers thereof, the cost of which the Government has agreed to pay or reimburse from Government funds.

Coverage of the prime contractor begins at the time the contract is awarded by the Government and coverage of a secondary contractor at the time the contract is awarded to him by the prime contractor.

### Exemptions

The Act, and regulations issued pursuant to authority in the Act, provide some specific exemptions from provisions of the Act. These exemptions, which are listed and explained in the Rulings and Interpretations issued under the Act, are concerned with such matters as common carrier services under published tariff rates, perishables and items procured in the open market under certain specific exceptions from normal procurement requirements, and limited classes of contracts for farm products entered into with original producers or by the Secretary of Agriculture for price stabilization purposes.

### Employee Coverage

The Act's provisions extend to employees who, after the date of award, manufacture, fabricate, produce, assemble, handle, or ship goods required by the contract, or whose activities are connected with these functions.

The Act's provisions are not applied to bona fide executive, administrative, and professional employees and do not extend to certain office and custodial workers. Office and custodial workers not subject to the provisions of the Public Contracts Act are usually subject to the provisions of the Fair Labor Standards Act.

### Minimum Wages

A covered employer must pay all covered employees at least the minimum wages determined by the Secretary of Labor to be prevailing for similar work or in the pertinent industry or industries. In the absence of a higher minimum wage determination, a minimum rate of $1.60 an hour applies. A contract is subject to more than one minimum wage determination if products subject to different determinations are being furnished. In such cases employees are entitled to the highest rate under any applicable wage determination for all hours worked in the week during any part of which they engaged in the contract work unless the employer kept records segregating the work. Employees of regular dealers are subject to the $1.60 an hour rate. Minimum wage determinations issued under the Act are not enforced in Puerto Rico or the Virgin Islands where compliance with wage orders under the Fair Labor Standards Act, issued pursuant to industry committee hearings and recommendations, is required.

### Special Lower Wage Rates

An employer may pay special lower rates to apprentices, student-learners, or handicapped workers, PROVIDED the Wage and Hour and Public Contracts Divisions have issued certificates authorizing such employment. Special rates lower than the determination rates are authorized for learners, beginners or probationary workers in certain minimum wage determinations.

## Overtime Pay

Covered employees must be paid at least one and one-half times their basic rate for all hours over 8 a day or 40 a week, whichever constitutes the greater number of overtime hours in the particular workweek. The overtime pay requirements must be met for all such overtime hours, on the basis of the total hours worked in the workweek on Government and non-Government work, if a worker spends any part of the workweek performing on a covered contract.

## Safety and Health

No work called for by a covered contract may be performed in places or under working conditions which are unsanitary or hazardous or dangerous to the health and safety of the employees engaged in the performance of the contract.

## Child Labor

Boys under 16 years of age and girls under 18 may not work on covered contracts. Employers can protect themselves from unintentional violations by having on file an unexpired certificate of age showing that a minor is at least 16 years of age, if a male, and at least 18 years of age, if a female. Age or employment certificates accepted as proof of age are issued under State law in 45 States. In Idaho, Mississippi, South Carolina, and Texas, Federal certificates are issued. Special arrangements are made in Alaska.

## Homework

Homeworkers may not work on covered contracts, unless they are handicapped clients of sheltered workshops employed in accordance with Fair Labor Standards Act Regulations, Part 525.

## Convict Labor

Convicts may not work on covered contracts.

## Records

No particular form of record is required. Compliance with the recordkeeping requirements for employees subject to the minimum wage and overtime provisions of the Fair Labor Standards Act satisfies most of the requirements under regulations adopted for the purpose of enforcing the Public Contracts Act. Most of the required information is of the kind that employers usually keep in ordinary business practices and in complying with other laws and regulations. Under the Public Contracts Act an employer is required, for example, to maintain records showing the name, address, sex, and occupation of each employee covered by the contract stipulations, the hours worked each day and each week, the wage rate and wages paid, the date of birth of each employee who is under 19 years of age. In addition, records of injury frequency rates must be kept and, where the hazard of occupational radiation is present, employers are required to keep exposure records for certain employees who enter radiation areas.

## Posters

The official poster outlining the provisions of the Act must be displayed by employers so as to permit employees to see it on their way to or from their place of employment. Posters are available without charge from the Wage and Hour and Public Contracts Divisions.

Where the hazard of occupational radiation is present, employers must post certain additional documents or keep them available for examination of employees upon request. Each area where radiation sources are used or stored shall be posted with radiation caution symbols.

## Damages

Employers are liable to the U.S. Government in the amount of $10 a day for every day a minor below the permitted age or a convict is knowingly employed in the performance of a covered contract, and in the amount of any back pay that should have gone to workers under minimum wage and overtime pay rules. Amounts collected by the Government on account of underpayments of required wages are turned over to employees to whom they are due.

The Attorney General is authorized to sue contractors who owe the United States money as a result of violations, or the money owed may be withheld by the Government from monies due the contractor on any Government contract.

## Penalties

The U.S. Government is authorized to cancel a contract if violations are found. The Government will not award another contract for three years to a person or firm responsible for violations, unless the Secretary of Labor recommends otherwise.

## Enforcement and Assistance

Authorized representatives of the Wage and Hour and Public Contracts Divisions investigate for compliance with all provisions of the Public Contracts Act, except for safety and health requirements which are administered by the Bureau of Labor Standards. Anyone can request assistance if he thinks a firm is violating the Act. Complaints, records, and other information from employers and employees are treated confidentially.

## Special Note

Whether contracts and particular employees are covered by the Public Contracts Act de-pends on the facts in each case. If you want to know about the application of the law in a particular case, contact the nearest office of the Wage and Hour and Public Contracts Divisions or the Bureau of Labor Standards. Give information on the name of the prime contractor, the name of the Government agency that issued the contract, the contract number, the amount of the contract, what the firm produces for the contract, the method and rate of pay, the hours of work, and any other details you think will be needed for an adequate reply.

## Additional Information

Inquiries about the Walsh-Healey Public Contracts Act will be answered by mail, telephone, or personal interview at any office of the Wage and Hour and Public Contracts Divisions of the U.S. Department of Labor. Offices are listed in the telephone directory under the U.S. Department of Labor in the U.S. Government listing. These offices also supply publications free of charge.

Offices listed in *Italics* are staffed by investigation personnel whose duties frequently require them to be away from the office. Telephone messages and requests for information may be left at these offices when regular personnel are not on duty. Personal appointments may be arranged by either telephone or mail.

Alabama: *Anniston*, Birmingham, *Dothan, Florence, Gadsden, Huntsville,* Mobile, Montgomery, *Opelika, Selma, Tuscaloosa*

Alaska: *Anchorage*

Arizona: Phoenix, *Tucson*

Arkansas: *El Dorado, Fayetteville, Fort Smith, Hope, Jonesboro,* Little Rock, *Pine Bluff*

California: *Bakersfield, Fresno,* Hollywood, Long Beach, Los Angeles, *Modesto, Monterey,* Oakland, *Redding, Riverside,* Sacramento, *San Diego,* San Francisco, *San Jose, San Mateo, Santa Ana, Santa Rosa, Stockton, West Covina,* Whittier

Colorado: Denver, *Pueblo*

Connecticut: *Bridgeport,* Hartford, *New Haven, New London*

Delaware: *Wilmington*

District of Columbia: College Park

Florida: *Clearwater, Cocoa, Fort Lauderdale, Fort Myers,* Jacksonville, *Lakeland, Leesburg,* Miami, North Miami, *Orlando, Panama City, Pensacola, St. Petersburg, Tampa, West Palm Beach*

Georgia: *Albany, Athens,* Atlanta, *Augusta,* Columbus, *Gainesville,* Hapeville, *Macon, Rome,* Savannah, *Thomasville, Valdosta*

Hawaii: Honolulu

Idaho: *Boise*

Illinois: Chicago, Springfield

Indiana: *Evansville,* Indianapolis, South Bend

Iowa: *Burlington, Cedar Rapids, Davenport,* Des Moines, *Fort Dodge, Mason City, Sioux City, Waterloo*

Kansas: *Great Bend, Pittsburg, Salina, Topeka,* Wichita

Kentucky: *Ashland,* Lexington, Louisville, *Middlesboro, Pikeville*

Louisiana: *Alexandria,* Baton Rouge, *Hammond, Houma, Lafayette, Lake Charles, Monroe,* New Orleans, Shreveport

Maine: Portland

Maryland: Baltimore, College Park, *Hagerstown, Salisbury*

Massachusetts: Boston, *Lowell,* Springfield, *Worcester*

Michigan: Detroit, Grand Rapids, *Lansing*

Minnesota: Minneapolis

Mississippi: *Biloxi, Columbus, Clarksdale, Greenwood, Hattiesburg,* Jackson, *Tupelo*

Missouri: *Cape Girardeau, Columbia, Joplin,* Kansas City, *St. Joseph,* St. Louis, *Springfield*

Montana: *Great Falls*

Nebraska: *Grand Island, Lincoln,* Omaha

Nevada: *Reno*

New Hampshire: Manchester, *Laconia*

New Jersey: *Camden,* Newark, Paterson, Trenton

New Mexico: Albuquerque, *Las Cruces, Roswell*

New York: *Albany,* Bronx, Brooklyn, Buffalo, Hempstead, New York, *Rochester,* Syracuse

North Carolina: *Asheville,* Charlotte, *Durham, Fayetteville,* Goldsboro. Greensboro, *Hickory, High Point,* Raleigh, *Wilmington, Winston-Salem*

North Dakota: *Bismarck*

Ohio: Cincinnati, Cleveland, Columbus

Oklahoma: *Ardmore, Enid, Lawton, Muskogee,* Oklahoma City, Tulsa

Oregon: *Eugene, Medford,* Portland, *Selma*

Pennsylvania: *Allentown, Altoona, Chester, DuBois, Erie, Greensburg,* Harrisburg, *Hazleton, Indiana, Johnstown, Lancaster, Lewistown,* McKeesport, *New Castle,* Philadelphia, Pittsburgh, *Reading, Scranton, Uniontown, Washington,* Wilkes-Barre

Rhode Island: Providence

South Carolina: *Charleston,* Columbia, *Florence, Greenville, Spartanburg*

South Dakota: *Aberdeen, Rapid City,* Sioux Falls

Tennessee: *Bristol, Chattanooga, Columbia, Jackson, Johnson City,* Knoxville, Memphis, Nashville

Texas: *Abilene, Amarillo, Austin, Beaumont,* Corpus Christi, Dallas, El Paso, Forth Worth, *Galveston, Harlingen,* Houston, *Laredo, Longview, Lubbock, Lufkin, Midland, Odessa, Paris,* San Antonio, *Texarkana, Tyler, Victoria,* Waco, *Wichita Falls*

Utah: *Ogden,* Salt Lake City

Vermont: *Burlington, Montpelier*

Virginia: *Alexandria, Norfolk,* Richmond, Roanoke, *Waynesboro*

Washington: Seattle, *Spokane, Tacoma*

West Virginia: *Bluefield,* Charleston, Clarksburg, *Huntington, Logan*

Wisconsin: Madison, Milwaukee, *Oshkosh*

Wyoming: *Casper, Cheyenne*

Puerto Rico: *Arecibo, Caguas,* Hato Rey, Mayaguez, *Ponce,* Santurce

Canal Zone, Virgin Islands: Santurce, Puerto Rico

American Samoa, Eniwetok Atoll, Guam, Johnston Island, Kwajalein Atoll, Wake Island: Honolulu, Hawaii

1 of 1 DOCUMENT

**RHONDA TEAGUE, ET AL., Plaintiffs, VS. BELL HELICOPTER SERVICES, INC., ET AL., Defendants.**

NO. 4:03-CV-004-A

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION**

*2003 U.S. Dist. LEXIS 2088*

**February 12, 2003, Decided**

**February 12, 2003, Filed; February 13, 2003, Entered**

**DISPOSITION:**
[*1] Plaintiffs' motion to remand denied.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiffs decedents family sued defendant, decedents former employer and related corporate entities, and claimed that decedent was exposed to asbestos during his employment. The employer removed the action to the instant and claimed federal officer removal jurisdiction. The family filed an emergency motion to remand.

**OVERVIEW:** The employer used asbestos in the process of manufacturing military helicopters. The family alleged that decedent's exposure to asbestos caused his injuries that resulted in his death. To claim that removal was proper under *28 U.S.C.S. § 1442,* the employer had the had to meet the elements of a three prong test. Because corporate entities qualified as persons under § 1442(a)(1), the employer met the first prong. The employer acted pursuant to the directions of the federal government in contracting to design and manufacture military helicopters and the federal government exercised strict control over the employer's design and manufacture of the military helicopters, and that. Thus, prong two was met. The employer successfully used a colorable federal defense because liability for design defects in military equipment could be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

**OUTCOME:** The family's motion to remand was denied.

### LexisNexis(TM) HEADNOTES - Core Concepts

*Civil Procedure > Removal > Basis for Removal*
[HN1] *28 U.S.C.S. § 1442*(a)(1) allows removal from state court to federal court by the following parties: The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

*Civil Procedure > Removal > Basis for Removal*
[HN2] To claim that removal is proper pursuant to *28 U.S.C.S. § 1442*(a)(1), a defendant has the burden of showing that it: (1) is a "person" within the meaning of the statute; (2) acts pursuant to a federal officer's directions and that a causal nexus exists between the defendant's actions under color of federal office and the plaintiff's claims; and (3) asserts a colorable federal defense.

*Civil Procedure > Removal > Basis for Removal*
[HN3] When a government contractor builds a product pursuant to Air Force specifications and is later sued because compliance with those specifications allegedly causes personal injuries, the nexus requirement for removal to federal court is satisfied.

*Military & Veterans Law > Tort Liability*
[HN4] Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States has approved reasonably precise specifications; (2) the equipment conforms to those



EXHIBIT

tables'

K

2003 U.S. Dist. LEXIS 2088, *

specifications; and (3) the supplier warns the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Civil Procedure > Removal > Basis for Removal*
[HN5] Regarding a "colorable federal defense" in removal analysis, defendants need not prove the asserted defense, but need only articulate its colorable applicability.

**COUNSEL:**
For RHONDA J TEAGUE, LEATRICE JOY HENDERSON, plaintiffs: Melissa K Hutts, Attorney at Law, Baron & Budd, Dallas, TX USA.

For BELL HELICOPTER SERVICES INC, BELL HELICOPTER TEXTRON INC, TEXTRON INC, defendants: Stephen C Howell, Attorney at Law, Howell Dorman Loyd & Sams, Fort Worth, TX USA.

For GUARD-LINE INC, defendant: Robert Wilkinson, Attorney at Law, Dogan & Wilkinson, Pascagoula, MS USA.

**JUDGES:**
JOHN McBRYDE, United States District Judge.

**OPINIONBY:**
JOHN McBRYDE

**OPINION:**

MEMORANDUM OPINION and ORDER

Came on for consideration plaintiffs' emergency motion to remand. n1 The court, having reviewed the motion, the expedited response of defendant Textron, Inc. ("Textron"), n2 plaintiffs' reply, the record, and applicable authorities, concludes that the motion should be denied.

> n1 The "emergency" label on plaintiffs' motion influenced the court's decision to order defendants to file an expedited response. The court agrees with Textron that there appears to be no justification for the "emergency" label. See Resp. at 13-14.

> n2 One of the exhibits attached to Textron's response is the declaration of Gary D. Kelley ("Kelley"), which the court is not considering because it does not have an original signature.

[*2]

I.

Background

Plaintiffs instituted this suit in the District Court of Tarrant County, Texas, 67th Judicial District, on November 22, 2002, against Textron and related corporate entities, complaining that Robert William Henderson ("Henderson"), now deceased, was exposed to asbestos during his employment by Bell. n3 Bell used asbestos in the process of manufacturing military helicopters. They allege that Henderson's exposure to asbestos caused his injuries that resulted in his death. Pet. P 11. Textron removed the action to this court by notice of removal filed January 3, 2003, claiming federal officer removal jurisdiction under *28 U.S.C. § 1442*(a)(1). All other defendants consented to the removal. See Notice of Removal, Exs. B & C.

> n3 For convenience, defendants are collectively referred to as "Bell."

II.

Federal Officer Removal Jurisdiction

[HN1] Section 1442(a)(1) allows removal from state court to federal court by the following parties:

The United States or any agency [*3] thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

*28 U.S.C. § 1442*(a)(1); *Mesa v. California, 489 U.S. 121, 103 L. Ed. 2d 99, 109 S. Ct. 959 (1989)*. [HN2] To claim that removal was proper pursuant to section 1442(a)(1), Textron has the burden of showing that Bell: (1) is a "person" within the meaning of the statute; (2) "acted pursuant to a federal officer's directions and that a causal nexus exists between the defendant's actions under color of federal office and the plaintiff's claims"; and (3) asserts a "colorable federal defense." *Winters v. Diamond Shamrock Chem. Co., 149 F.3d 387, at 398-401*.

A. "Person" Under Section 1442(a)(1)

Because corporate entities qualify as persons under section 1442(a)(1), *id. at 398*, Textron meets the first prong.

B. Acted Pursuant to Federal Directions & Causal Nexus

Textron provides ample [*4] support for its contention that, at times relevant to this action, Bell acted

pursuant to the directions of the federal government in contracting to design and manufacture military helicopters. Attached to Textron's response is the declaration of William T. Wilson ("Wilson"), who worked for Bell in contract administration for thirty-two years, and served as director of helicopter contracts. Wilson Decl. P 2. Wilson details the extensive interaction between the government and Bell in carrying out the contracts:

....

3. Since 1951, Bell has supplied thousands of helicopters to the U.S. government for military use, including the H-13, UH-1, and AH-1 series aircraft. Throughout this time, Bell has had to follow specific Government-approved procedures, regulations, laws, and standards for the design, materials, marking, production, and delivery of these helicopters.

....

5. In 1955, the USAF awarded Bell a contract for the production of three prototype aircraft, designated XH-40 aircraft. In the contract, the USAF selected precise specifications Bell had proposed in response to government design criteria. The USAF established those specifications as contractual requirements [*5] which Bell had to adhere to in producing the prototypes. One of the specifications mandated by the USAF in the construction of the aircraft was the use of asbestos in certain seals and gaskets on the stainless steel enclosure the government mandated for the engine compartment. This performance requirement was imposed by the government to prevent the spread of fire from the engine compartment to the passenger compartment.

....

10. The U.S. Government actively participated in the development of the UH-1 and AH-1 series helicopters. To facilitate the Government's review and approval of the design and production specifications and engineering drawings, the Government maintained a staff of military and civilian representatives at Bell's plant. From the 1960's to the present, the Government has maintained scores of personnel at Bell's plant to ensure the helicopters were built in accordance with the Detail Specifications. ... They were charged with reviewing and approving engineering drawings, assuring adherence to military specifications and requirements, assisting Bell's employees in achieving full compliance with military contract requirements, approving manufacturing and [*6] assembly processes and products, and accepting helicopters and supplies on behalf of the Government after determining they met every contract requirement.

....

12. Bell delivered any helicopter and part to the U.S. Army pursuant to a Government contract requiring Bell to adhere to detailed Government-approved design, production, marking, and shipping specifications. The contracts incorporate by reference the relevant specifications and mandate that all aircraft or parts be manufactured in accordance with the Detail Specifications and that Bell's quality assurance program conform to military specifications.

13. If Bell failed to manufacture military helicopters in strict compliance with Government specifications, Bell was subject to a variety of penalties under U.S. law, including civil and criminal sanctions. Bell was not permitted to change specifications in any way without the express authorization of the Government.

....

15. Bell performed the helicopter contracts in accordance with the requirements of the Detail Specifications prepared at the direction of the Government, approved by the Government, and incorporated by reference in the contracts. The [*7] Government did not permit to deviate from the Detail Specifications without a contract change authorized by the Government's Contracting Officer. ... The Detail Specifications incorporated a multi-page list of military specifications, known as "mil-specs," which had to be followed. The mil-specs themselves were often lengthy and detailed documents. The mil-specs described the characteristics for helicopter parts containing asbestos as required by the Detail Specification. The seals and gaskets that a production employee at Bell might have come in contact with were such parts.

....

22. In short, in accordance with Government contract requirements, the Government was directly and intimately involved with development and controlled the design of every aspect of the helicopter, including without limitation the types of materials used in the helicopters and their component parts. Government representatives closely monitored Bell's work at every steps in the design process and Government evaluation and approval had to occur at every step. Bell had little or no leeway in determining the required design of the helicopters, including the required materials for the component [*8] parts and their painting and marking.

23. Bell had no actual knowledge of any danger in the use of asbestos in helicopter components that was not known to the US Government.

....

25. In short, at every step in the development and production of UH-1 and AH-1 series helicopters, Bell had to follow Government-evaluated and -approved Detail Specifications concerning the design, materials, painting and markings for those helicopters and their

2003 U.S. Dist. LEXIS 2088, *

component parts. Every helicopter or component part accepted by the Government from Bell was accepted only after the Government confirmed the aircraft or part conformed to the contract specifications. Bell possessed no knowledge of the dangers, if any, concerning the design, materials, painting, and markings for those helicopters and their component parts which Government was not already aware of.

27. [sic] In summary, the government mandated the use of asbestos by Bell in the manufacture of helicopters that were made by Bell during the period of time that the decedent Robert William Henderson was employed by Bell. Bell had no discretion in its use of asbestos in the helicopters. Had Bell refused to follow government mandated [*9] use of asbestos it would have ben [sic] subject to numerous civil and criminal penalties.

Id. PP 3, 5, 10, 12-13, 15, 22-23, 25, 27. The court finds that the federal government exercised strict control over Bell's design and manufacture of the military helicopters, and that Bell acted pursuant to the direction of the federal government at the times relevant to this action.

Plaintiffs deny that a causal nexus exists between their claims and Bell's actions under color of federal office:

In this action, Defendants' conduct at issue is their safety and warning-related activities, and in particular their failure to warn of the hazards associated with asbestos use and exposure. Textron has not established, nor has it alleged, that its safety and warning-related activities were under the direction and control of a federal officer. Although Textron may in fact ultimately prove that it (or its predecessors) built helicopters at the direction of the United States, Plaintiffs are confident that Textron can offer no such proof regarding (non-existent) asbestos warnings.

Mot. at 4 (emphasis in the original); see also id. at 9 (stating, "Textron offers no evidence [*10] that the federal government addressed, in any way, Textron's ability to warn employees of the presence and dangers of asbestos").

While certain portions of plaintiffs' state-court petition allege failure-to-warn theories of liability, the petition also sets forth claims that complain of use of asbestos in the design and manufacturing processes:

14. .... The Defendants were negligent in one, some and/or all of the following respects, among others, same being the proximate cause of Plaintiffs' decedent's illnesses, disabilities and/or death:

....

(e) in failing to develop and utilize a substitute material to eliminate asbestos fibers in the asbestos-containing products, and/or the machinery requiring or calling for the use of asbestos and/or asbestos-containing products;

(f) in failing to properly design and manufacture asbestos, asbestos-containing products, and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products for safe use under conditions of use that were reasonably anticipated;

....

16. Plaintiffs' decedent was exposed to asbestos-containing products and/or machinery requiring or calling [*11] for the use of asbestos and/or asbestos-containing products that were manufactured and distributed by the Defendants and/or their predecessors-in-interest for use as construction materials and/or machinery in industrial operations. Plaintiffs would show that the defective condition of the products rendered such products unreasonably dangerous, and that the asbestos-containing products and/or machinery were in this defective condition at the time they left the hands of Defendants.

Pet. PP 14(e) - (f), 16; see also id. PP 11, 26. Thus, plaintiffs' characterization of this action as simply being about defendants' safety- and warning-related activities is not accurate.

With regard to defendants' design and manufacture of military helicopters, "the government mandated the use of asbestos by Bell during the period of time that the decedent Robert William Henderson was employed by Bell." Wilson Decl. P 27. The court concludes that Textron satisfied its burden that a causal nexus exists between Bell's actions under color of federal office and some of plaintiffs' claims. See, e.g., *Akin v. Big Three Indus., Inc., 851 F. Supp. 819, 823-24 (E.D. Tex. 1994)* (stating, [*12] "plainly, [HN3] when a government contractor builds a product pursuant to Air Force specifications and is later sued because compliance with those specifications allegedly causes personal injuries, the nexus requirement is satisfied").

C. Colorable Federal Defense

Textron asserts as its "colorable federal defense" the government contractor defense, see Resp. at 5, the criteria of which are set out in Boyle v. United Technologies Corp.:

[HN4] Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the

2003 U.S. Dist. LEXIS 2088, *

dangers in the use of the equipment that were known to the supplier but not to the United States.

*487 U.S. 500, 512, 101 L. Ed. 2d 442, 108 S. Ct. 2510 (1988); see also Winters, 149 F.3d at 400.* As the Fifth Circuit noted, [HN5] "defendants need not prove the asserted defense, but need only articulate its 'colorable' applicability." *Winters, 149 F.3d at 400; see also Jefferson County v. Acker, 527 U.S. 423, 431, 144 L. Ed. 2d 408, 119 S. Ct. 2069 (1999)* [*13] (recognizing that "one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court," and not requiring "the officer virtually to win his case before he can have it removed") (internal quotations and citations omitted).

Textron has adduced sufficient evidence through Wilson's declaration -- the particularly pertinent portions of which are recited in Section II.B. above -- to support the colorable applicability of the federal contractor defense.

***The court concludes that Textron has satisfied its burden under *28 U.S.C. § 1442*(a)(1), and that accordingly, plaintiffs' motion to remand should be denied.

III.

ORDER

For the reasons discussed,

The court ORDERS that plaintiffs' motion to remand be, and is hereby, denied.

SIGNED February 12, 2003.

JOHN McBRYDE

United States District Judge

1996 U.S. Dist. LEXIS 22676, *

FOCUS - 5 of 6 DOCUMENTS

**SYLVIA SANTOS WILLIAMS, et al., Plaintiffs, VS. TODD SHIPYARDS CORPORATION, Defendant.**

**CIVIL ACTION NO. H-95-4592**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

*1996 U.S. Dist. LEXIS 22676*

**March 29, 1996, Decided**

**April 2, 1996, Entered**

**DISPOSITION:**
 [*1]  Motion to remand filed by plaintiffs and intervenors. (Docket Entry No. 3) GRANTED in part and DENIED in part.

**COUNSEL:**
For SYLVIA SANTOS WILLIAMS, JOSEPH SANTOS, III, RICHARD SANTOS, plaintiffs: Eric Alan Von Bogdan, Williams Bailey, Houston, TX.

For DORIS GILBREATH, JON L GILBREATH, JEFFREY D GILBREATH, DEBORAH ANDREWS, ELNORA MAE CLEMENTS, SANDRA EARLENE DODSON, intervenor-plaintiffs: Eric Alan Von Bogdan, Williams Bailey, Houston, TX.

For DORIS RICHARDSON RYLEE, DEBRA K RYLEE, VICKI RENEE RYLEE, intervenor-plaintiffs: Eric Bogdan, William Bailey Law Firm, Houston, TX.

For TODD SHIPYARDS CORPORATION, defendant: Ned Edward Wesley Johnson, Johnson and Associates, Elena Faye Diiorio, Vinson and Elkins, Houston, TX.

**JUDGES:**
Lee H. Rosenthal, United States District Judge.

**OPINIONBY:**
Lee H. Rosenthal

**OPINION:**

### MEMORANDUM AND OPINION

Pending before this court is a motion to remand filed by plaintiffs and intervenors. (Docket Entry No. 3). Based on a careful review of the pleadings, motions, submissions, and applicable law, the court GRANTS the motion in part and DENIES it in part, for the reasons set out below.

### I. Background

The original plaintiffs in this case are the representative [*2]  and heirs of Joseph Santos, Jr., ("Santos"). Santos worked for defendant Todd Shipyards Corporation ("Todd Shipyards") from 1953 to 1990 as a machinist. During his employment, Santos was exposed to asbestos. Santos died of lung cancer on May 7, 1992. Plaintiffs sued Todd Shipyards in the 113th Judicial District of Harris County on April 22, 1994, asserting that Todd Shipyards' gross negligence caused Santos's death.

Between August 24, 1995 and August 29, 1995, four sets of intervenors filed similar claims for the deaths of four other former Todd Shipyards employees allegedly caused by asbestos exposure. Each intervention raised causes of action covering different employment and exposure periods, occupations, and diseases. The intervenors are the representatives and heirs of Alonzo R. Bell ("Bell"), Earl W. Clements ("Clements"), Lowry E. Gilbreath ("Gilbreath"), and William K. Rylee ("Rylee").

Todd Shipyards removed this case to federal court on September 22, 1995. Two of the intervenor groups, *Clements* and *Gilbreath*, alleged asbestos exposure occurring between 1939 and 1968. Todd Shipyards asserts that during World War II, it operated the Houston and Galveston shipyards [*3]  under the authority and/or direction of federal officers. Todd Shipyards removed this case pursuant to *28 U.S.C. § 1442*(a)(1).

Plaintiffs/intervenors move for remand, asserting that this court lacks jurisdiction because these cases arise



1996 U.S. Dist. LEXIS 22676, *

under the Texas Workers' Compensation Act and are nonremovable under *28 U.S.C. § 1445*(c); because Todd Shipyards has failed to establish jurisdiction under section 1442(a) as to the *Clements* and *Gilbreath* intervenors; and because Todd Shipyards has failed to state a basis for removal of claims of the remaining intervenors and the original plaintiffs.

## II.   28 U.S.C. §   1445(c) and the *Clements* and *Gilbreath* Intervenors

Plaintiffs/intervenors first argue that this case is not removable because the claims arise under the state workers' compensation statute. *28 U.S.C. §   1445*(c) provides as follows:

A civil action in any State court arising under the workmen's compensation laws of such State may not be removed to any district court of the United States.

The Fifth Circuit has defined the "arising under" standard in section [*4] 1445(c) in a manner consistent with the interpretation of that standard under section 1331. A suit "arises under" the law that creates the cause of action. *Patin v. Allied Signal, Inc., 77 F.3d 782, 1996 WL 93996, *3 (5th Cir. 1996); Jones v. Roadway Express, 931 F.2d 1086, 1092 (5th Cir. 1991).* In *Ehler v. St. Paul Fire and Marine Ins. Co., 66 F.3d 771 (5th Cir. 1995),* the court held that an injured employee's suit to rescind a settlement agreement with a worker's compensation insurer for fraud or misrepresentation was based on a cause of action created by Texas common law, not the Texas Workers' Compensation Act. "That a workers' compensation law is a premise of the tort does not mean that the tort 'arises under' the workers' compensation laws...." *Id. at 773* (citation omitted). Similarly, in *Patin v. Allied Signal, Inc.,* the Fifth Circuit held that claims against a workers' compensation carrier for breach of the duty of good faith and fair dealing do not arise under the workers' compensation statutes and are not within the non-removability provision of section 1445(c).

In the present case, plaintiffs/intervenors seek exemplary [*5] damages for Todd Shipyard's alleged gross negligence relating to decedents' exposure to asbestos. The Texas Worker's Compensation Act states in pertinent part as follows:

This section does not prohibit the recovery of exemplary damages by the surviving spouse or heirs of the body of a deceased employee whose death was caused by an intentional act or omission of the employer's gross negligence.

Texas Labor Code §   408.001(b), formerly Tex. Rev. Civ. Stat. Ann. Art. 8306, §  5. The Fifth Circuit has held

that by exempting exemplary damages for wrongful death due to the employer's gross negligence from the exclusive remedy bar, the Texas Worker's Compensation Act does not create a cause of action for exemplary damages, but merely saves the existing common law cause of action. *Bridges v. Phillips Petroleum, 733 F.2d 1153, 1155; see also Duhart v. State, 610 S.W.2d 740, 743 (Tex. 1980); Terry v. Tyler Pipe Indus., 645 F. Supp. 1194, 1199 (E.D. Tex. 1986).* n1

n1 In *Duhart,* the Texas Supreme Court noted that the purpose of Article 8306 §   5 was "not to create a cause of action for exemplary damages, but rather to leave the law as it was before the passage of the compensation act." *Duhart, 610 S.W.2d at 743.*

[*6]
The plaintiffs/intervenor's causes of action do not "arise under" the Texas worker's compensation statute so as to preclude removal under section 1445(c).

## III. 28 U.S.C. § 1442(a)(1)

Section 1442(a)(1), the federal officer removal statute, provides that an action may be removed to federal court by:

any officer of the United States or any agency thereof, or person acting under him, for any act under color of such office. ...

A removing party that is not itself a federal officer must: 1) be a "person" within the meaning of section 1442(a)(1); 2) assert a colorable claim to a federal defense; and 3) show that it is sued for acts taken "under color of" federal office or at the direction of a federal officer. *Akin v. Big Three Industries, Inc., 851 F. Supp. 819, 822 (E.D. Tex. 1994)*(citations omitted). Each of these elements is addressed below.

### A. A "Person" Under Section 1442(a)(1)

In *Peterson v. Blue Cross/Blue Shield of Texas, 508 F.2d 55, 58 (5th Cir.), cert. denied, 422 U.S. 1043, 45 L. Ed. 2d 694, 95 S. Ct. 2657 (1975),* the Fifth Circuit held that a corporate defendant could [*7] be a "'person' acting under" a federal office for the purpose of section 1442(a)(1). *See also Akin, 851 F. Supp. at 823; Pack v. A.C. and S., Inc., 838 F. Supp. 1099, 1102 (D. Md. 1993); Fung v. Abex Corp., 816 F. Supp. 569, 572 (N.D. Cal. 1992); Ryan v. Dow Chem. Co., 781 F. Supp. 934, 946 (E.D.N.Y. 1992).* For the purpose of section 1442(a)(1), Todd Shipyards is a "person."

### B. The Assertion of a Colorable Federal Defense

A removing party under section 1442(a)(1) must assert a colorable claim to a federal defense, to "ensure that the federal district court is passing on a question of federal law." *Akin, 851 F. Supp. at 823; Mesa v. California, 489 U.S. 121, 103 L. Ed. 2d 99, 109 S. Ct. 959 (1989)*. The removing party is not required to prove the validity of the defense, but must allege a colorable claim to such a defense. *489 U.S. at 129*.

Todd Shipyards asserted that it has a colorable claim to the government contractor defense as set forth in *Boyle v. United Technologies Corp., 487 U.S. 500, 101 L. Ed. 2d 442, 108 S. Ct. 2510 (1988)*. (Docket Entry [*8] No. 1). *Boyle* established a three-part test for the governmental contractor defense to tort liability under state law, as follows:

1) the federal government approved reasonably precise specifications for contract performance;

2) the performance of the contract conformed to those specifications; and

3) the contractor informed the government of any hazards associated with these specifications of which it was aware, and of which the government was not aware.

*Boyle, 487 U.S. at 512.*

Todd Shipyards provides affidavit evidence that it worked almost exclusively on government-owned vessels during World War II. This work was done according to specifications issued and approved by the vessel owners, the Navy, Army, or Maritime Commission. (Docket Entry No. 6, pp. 6-7 and Affidavit of Robert Moore).

Both before and after the United States entered World War II, Todd Shipyards repaired, rebuilt, and retrofitted government-owned vessels. All work performed for the Navy was subject to the Minimum Standards for Contract Navy Shipyards. (Docket Entry No. 6, Exhibit D). The federal government required adherence to these standards for shipyards performing [*9] government contract work. These specifications included requirements for the materials to be used and craft assignments. The Minimum Standards set out specific procedures for the use of required materials, including asbestos. Navy inspectors monitored Todd Shipyards' work and governmental personnel generally controlled production under procedures mandated by the United States Navy. (Docket Entry No. 6, pp. 6-7 and Exhibits A and B).

This court finds that Todd Shipyards has asserted a colorable claim to the federal government contractor defense for the purpose of removal under section 1442(a)(1).

C. *Acts Performed Under the Direction of a Federal*

*Officer*

The final requirement for removal under section 1442(a)(1) is that the lawsuit arise out of actions taken by a government contractor at the direction of a federal officer. *Akin, 851 F. Supp. at 823; Pack, 838 F. Supp. at 1103; Fung, 816 F. Supp. at 572*. When the defendant claims to have been a "person acting under" a federal office, the question is whether the suit is "based upon actions taken pursuant to federal direction." *Ryan, 781 F. Supp. at 949* (citation [*10] omitted). The defendant must prove the existence of a "causal nexus" between the actions for which it is being sued and the directives of federal officers. *See, e.g., Akin, 851 F. Supp. at 823; Pack, 838 F. Supp. at 1103*.

"What [this requirement] comes down to is that the court in each case must ascertain to what extent defendants act under federal direction and to what extent [defendants act] as independent agents." *Gurda Farms, Inc. v. Monroe County Legal Assistance Corp., 358 F. Supp. 841, 844 (S.D.N.Y. 1973); see also Northern Colo. Water Conservancy Dist. v. Board of County Comm'rs, 482 F. Supp. 1115, 1117-19 (D. Colo.1980), cited in Ryan, 781 F. Supp. at 946*.

A "person acting under" a federal officer must show that the acts that form the basis for the state suit were performed pursuant to a federal officer's direct orders or pursuant to comprehensive and detailed regulations. *Ryan, 781 F. Supp. at 947*. At the other end of the "acting under" spectrum, a "person" establishing only that the relevant acts occurred under the general auspices of a federal office or officer is [*11] not entitled to section 1442(a)(1) removal. *Id.* The mere fact that a corporation participates in a regulated industry is insufficient to support removal, absent a showing that the particular conduct is closely linked to detailed and specific regulations. *Bakalis v. Crossland Sav. Bank, 781 F. Supp. 140, 144-45 (E.D.N.Y. 1991)*.

Todd Shipyards cites three cases to support its position that it meets the requirements for removal under section 1442(a)(1). In *Akin*, plaintiffs sued for exposure to toxic chemicals while working on jet engines built for the United States Air Force. The court found the required nexus, stating that "when a government contractor builds a product pursuant to Air Force specifications and is later sued because compliance with those specifications allegedly causes personal injuries, the nexus requirement is satisfied." *851 F. Supp. at 823*. In *Pack*, the defendant corporation contracted with the government to build turbine generators for naval vessels in accordance with government specifications during *World War II. 838 F. Supp. at 1103*. Defendant's employees sued for exposure to asbestos while working on the [*12] generators. *Id. at 1102*. The court found that the defendant satisfied the "acting under" requirement of section 1442(a)(1) as a result of direct control by the Navy and Maritime

1996 U.S. Dist. LEXIS 22676, *

Commission over the construction, design, and testing of the turbines. The government monitored the defendant's performance and reviewed and approved the results of its work. *Id. at 1103.* Finally, in *Fung*, the defendant corporation's employees sued for injuries allegedly resulting from asbestos exposure while working on naval vessels. *816 F. Supp. at 571.* The Navy monitored the defendant's performance and required it to construct and repair vessels in accordance with government specifications. *Id. at 572-73.* The government also performed dock and sea trials to ensure conformity with specifications. *Id. at 573.* The court found that the defendant was acting under the direct control of the Navy.

Todd Shipyards argues that the facts of the present case are "remarkably similar" to those in *Pack* and *Fung*. Todd Shipyards repaired government ships under the direction of and pursuant to specifications issued by the Maritime [*13] Commission prior to 1942. (Docket Entry No. 6, p. 8 and Moore Affidavit, P 3). During World War II, Todd Shipyards repaired and rebuilt vessels owned by the Navy, Maritime Commission, and Army. The government dictated the specifications for material and craft use on their vessels. The Navy inspected the work performed by Todd Shipyards, and military personnel "generally controlled yard production." (*Id.*, p. 9 and Moore Affidavit, PP 4, 5, 7). When vessels were completed, the Navy or Maritime Commission conducted sea trials to ensure that the work met specifications. (*Id.*, Moore Affidavit, P 4). Todd Shipyards asserts that the United States government required the use of asbestos-containing products in the government vessels built and/or repaired by Todd Shipyards. (Docket Entry No. 6, p. 10). The government also set out health, safety, and industrial hygiene procedures for the work, including procedures for jobs involving asbestos. (*Id.*, pp. 9-10).

The affidavit and other materials submitted by Todd Shipyards are very similar to the facts found sufficient for removal in *Pack* and *Fung*, as well as *Akin*.

In one case, *Good v. Armstrong World Industries, Inc., 914 F. Supp. 1125, 1996 WL 21131 (E.D. Pa. 1996),* [*14] an asbestos exposure case similar to the present suit, the court held that although the defendant government contractor manufacturer, Westinghouse, had shown that it was acting under the Navy's control and direction in building turbines, Westinghouse had not shown that a specific federal officer controlled Westinghouse's work. The court held that this prevented removal under section 1442(a)(1). The court relied on the words in section 1442(a)(1) which grant removal authority to "any person acting under *him*," in holding that the removing defendant must show it acted under the direct and detailed control of a specific federal officer to allow removal.

The holding in *Good* is at odds with the consistent findings of proper removal in *Crocker v. Borden, Inc., 852 F. Supp. 1322, 1332,* (E.D. La. 1994), as well as *Pack, 838 F. Supp. at 571; Fung, 816 F. Supp. at 571;* and *Akin, 851 F. Supp. at 823.* In these cases, the courts found that when the defendant manufacturers were government contractors acting under the detailed direction and control of the United States military in the repair and construction of wartime equipment, [*15] this was sufficient for removal under section 1442(a)(1).

The result in *Good* is also inconsistent with the basis of section 1442 removal recognized by the courts. "The rule that appears to emerge from the case law is one of 'regulation plus ....' " Private corporations may remove under section 1442 only when the corporation is "so intimately involved with government functions as to occupy essentially the position of an employee of the government." *Bakalis, 781 F. Supp. at 145; see also, Gurda Farms, Inc. v. Monroe County Legal Assistance Corp., 358 F. Supp. at 844-845* (the removal of assault and trespass actions against attorneys who had committed the alleged torts while acting on behalf of migrant farm workers was proper, based on a showing that the attorneys were governed by "exceedingly complex regulations, guidelines, and evaluation schemes," affecting the attorneys' conduct on a "day to day basis").

In the present case, Todd Shipyards has asserted that during World War II, the Navy, Army, and Maritime Commission specifically directed and controlled its work, including by requiring and regulating the use of asbestos. This court finds that [*16] Todd Shipyards has demonstrated a causal nexus between the claims against it and the acts it performed under color of federal office and has met the requirements of removal under section 1442(a)(1).

## IV. Removal of the *Williams, Bell,* and *Rylee* Causes of Action

Plaintiffs also argue that Todd Shipyards failed to state a basis for the removal of the *Williams, Bell,* and *Rylee* cases. (Docket Entry No. 3, p. 2). Todd Shipyards argues that removal of these cases is proper under *28 U.S.C. § 1441*(c).

*28 U.S.C. § 1441*(c), as amended in 1990, provides as follows:

whenever a separate and independent claim or cause of action within the jurisdiction conferred by section 1331 of this title is joined with one or more otherwise non-removable claims or causes of action, the entire case may be removed and the district court may determine all issues therein, or, in its discretion, may remand all

1996 U.S. Dist. LEXIS 22676, *

matters in which State law predominates.

As amended, section 1441(c) permits a federal court to exercise supplemental jurisdiction only over causes of action joined with a claim within the original jurisdiction of the federal [*17] courts. Before the 1990 amendment, section 1441(c) provided that:

whenever a separate and independent claim or cause of action, which would be removable if sued upon alone, is joined with one or more otherwise nonremovable claims or causes of action, the entire case may be removed and the district court may determine all issues therein, or, in its discretion, may remand all matters not otherwise within its original jurisdiction.

Because the current language of section 1441(c) expressly mandates that the "separate and independent claim or cause of action" must be "within the jurisdiction conferred by section 1331," Todd Shipyards cannot base its removal of the *Williams, Bell,* and *Rylee* claims on section 1441(c). *See, e.g. Baylor v. District of Columbia, 838 F. Supp. 7, 9 (D.D.C. 1993).* Even if there were claims within this court's original jurisdiction under section 1331(c), the court would remand the *Bell, Williams,* and *Rylee* claims as cases in which state law clearly predominates. The *Bell, Williams,* and *Rylee* cases are remanded to the 113th Judicial District of Harris County.

SIGNED on March 29, 1996, at Houston, Texas. [*18]

Lee H. Rosenthal

United States District Judge

448 So.2d 321
1984 A.M.C. 2535
(Cite as: 448 So.2d 321)

Page 5

Kjell FILLINGER

v.

Talmadge Franklin FOSTER.

82-297.

Supreme Court of Alabama.

Jan. 27, 1984.

Rehearing Denied April 6, 1984.

Employee who was covered under Federal Longshoremen's and Harbor Workers' Compensation Act, but worked at land-based operation, brought negligence action against coemployee for damages resulting from injuries he allegedly sustained while working on job. The Circuit Court, Mobile County, Michael E. Zoghby, J., entered judgment for employee on jury verdict in the amount of $75,000, and coemployee appealed. The Supreme Court, Maddox, J., held that Act preempts state law regarding maintenance of coemployee's suit, and thus, exclusivity provisions of Act barred state negligence action brought by employee against coemployee for damages.

Reversed and remanded.

[1] WORKERS' COMPENSATION ⊚⟹2085

413k2085
Although state may apply its workers' compensation scheme to land-based injuries that fall within coverage of Federal Longshoremen's and Harbor Workers' Compensation Act, concurrent jurisdiction for pursuit of benefits under state's workers' compensation scheme does not include common-law suits for damages against coemployees. Longshoremen's and Harbor Workers' Compensation Act, §§ 1-51, as amended, 33 U.S.C.A. §§ 901-950.

[2] STATES ⊚⟹18.57
360k18.57
Formerly 360k4.10
Federal Longshoremen's and Harbor Workers' Compensation Act, which forbids suits by employee against coemployee, preempts state law, which allows such suits, and thus, exclusivity provisions of Act barred negligence action brought by land-based

maritime worker, covered by the Act, against coemployee for damages. Longshoremen's and Harbor Workers' Compensation Act, § 33(i), as amended, 33 U.S.C.A. § 933(i).

[3] STATES ⊚⟹18.5
360k18.5
Formerly 360k4.12
If enforcement of state law presents serious danger of conflict with administration of federal program, federal law must take precedence.

*322 James W. Tarlton, III, and Gregory C. Buffalow of Hamilton, Butler, Riddick, Tarlton & Allen, Mobile, for appellant.

Gregory B. Breedlove of Cunningham, Bounds, Yance, Crowder & Brown, Mobile, for appellee.

MADDOX, Justice.

Plaintiff, Talmadge Franklin Foster, while working as a "shipfitter" at a land-based operation, but who was covered under the provisions of the Federal Longshoremen's and Harbor Worker's Compensation Act (LHWCA), 33 U.S.C. §§ 901-950, sued his co-employee for injuries he allegedly sustained while working on the job. The issue before the Court is whether the exclusivity provisions of the LHWCA bars the suit. We hold that the exclusivity provisions of the federal act are controlling, and we reverse and remand.

The injury which is the basis of this suit occurred at the Kaiser Aluminum and Chemical Sales, Inc. plant on Pinto Island in Mobile. The Pinto Island plant manufactures storage tanks which are placed in ocean-going vessels at the plant site. The plaintiff, who was classified as a "shipfitter," was injured while using a hand-held grinder to smooth out welds on the storage tanks. The grinder, which did not have a safety guard, "kicked back," and struck the plaintiff in the face.

After his injury, plaintiff applied for state workmen's compensation benefits. He never applied for compensation benefits under the LHWCA, although he was eligible for them. See Waller v. Kaiser Aluminum & Chemical Sales, Inc., OWCP No. 6-47643 (March 13, 1981); Clark v. Kaiser Aluminum & Chemical Sales, Inc., OWCP No. 6-47917 (June 9, 1981); Campbell v. Kaiser

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

EXHIBIT

M

tabbies*

448 So.2d 321
(Cite as: 448 So.2d 321, *322)

Aluminum & Chemical Sales, Inc., OWCP No. 6-47914 (June 12, 1981); and Sylvester v. Kaiser Aluminum & Chemical Sales, Inc., OWCP No. 6-45393 (July 7, 1981), holding the Kaiser facility came under the LHWCA.

Plaintiff, in his original complaint, and in all amended complaints, claimed that the defendant co-employee had personal duties and responsibilities in the area of safety at the Kaiser facility, and that these duties *323 included providing him with a reasonably safe place to work and with reasonably safe tools and equipment with which to perform his work. Plaintiff claimed that the co-employee defendant, who was the plant manager, breached this duty by providing him with an unreasonably dangerous tool, and that his injury proximately resulted from the breach of this duty. Plaintiff testified at trial that he was never instructed to use a safety guard nor was he warned by any of his co-employees of the possibility that the grinder would "kick back."

Defendant raised as a defense the exclusivity provisions of the LHWCA by asking the court (1) to dismiss the claim, (2) to direct a verdict in his behalf, and (3) to enter a judgment in his behalf notwithstanding the fact the jury awarded plaintiff $75,000. The court denied each motion.

The defendant appealed and raises two issues on appeal: (1) whether the LHWCA bars the instant suit, (2) and whether the defendant was guilty of any negligence which would subject him to personal liability. Because of our holding on the first issue, we do not reach the second.

Appellant/defendant argues that co-employee suits in state courts for damages are barred in cases falling under the provisions of the LHWCA and that the election of remedies doctrine has no bearing in this case, citing 33 U.S.C. §§ 901-950; Sun Ship, Inc. v. Pennsylvania, 447 U.S. 715, 100 S.Ct. 2432, 65 L.Ed.2d 458 (1980); Ex parte Alabama Oxygen Co., Inc., 433 So.2d 1158, 1159 (Ala.1983); Keller v. Dravo Corp., 441 F.2d 1239 (5th Cir.1971); Nations v. Morris, 483 F.2d 577 (5th Cir.1973); Hughes v. Chitty, 415 F.2d 1150 (5th Cir.1969). The appellee/plaintiff contends that in a case of land-based maritime injury, concurrent jurisdiction exists between federal and state remedies and that the plaintiff is not barred by the

LHWCA unless he elects to pursue remedies under the LHWCA, citing Poche v. Avondale Shipyards, Inc., 339 So.2d 1212 (La.1976); Umbehagen v. Equitable Equipment Co., 329 So.2d 245 (La.App.1976); Sun Ship, Inc. v. Pennsylvania, 447 U.S. 715, 100 S.Ct. 2432, 65 L.Ed.2d 458 (1980); Thomas v. Washington Gas Light Co., 448 U.S. 261, 100 S.Ct. 2647, 65 L.Ed.2d 757 (1980).

Although both parties argue diversely about the intent of Congress in passing the exclusivity provisions of the LHWCA, they agree that the plaintiff was covered by the LHWCA; therefore, whether plaintiff could maintain his state court action requires us to construe the act to determine the intent of Congress in passing the LHWCA and the amendments thereto.

We find it unnecessary to delineate the historical background of the LHWCA, except to point out that since passage of the Act, Congress has progressively extended coverage under the act to maritime workers employed in land-based activities. See G. Gilmore & C. Black, The Law of Admiralty (1975); A. Larson, 2A, 4 Workmen's Compensation Law (1983); Sun Ship, supra; Washington Gas Light Co., supra.

For example, in 1972 Congress amended the LHWCA to cover more maritime employees under more situations, probably because of a statement made by Justice White in Nacirema Operating Co. v. Johnson, 396 U.S. 212, 90 S.Ct. 347, 24 L.Ed.2d 371 (1969). See also Tucker, Coverage and Procedure Under the LHWCA, 55 Tul.L.R. 1056 (1981).

"While we have no doubt that Congress had the power to [extend LHWCA jurisdiction landward] in defining the coverage of its compensation remedy, the plain fact is that it chose instead the line in Southern Pacific Co. v. Jensen, 244 U.S. 205 (1917), separating water from land at the edge of the pier. The invitation to move that line landward must be addressed to Congress, not to this Court."

Nacirema Operating Co., supra, 396 U.S. 223-24, 90 S.Ct. at 353-54.

To "move" that line landward, Congress amended 33 U.S.C. § 902(3) and § 903(a). Now 33 U.S.C. § 902(3) reads, in pertinent part:

"[E]mployee means any person engaged in

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

448 So.2d 321
(Cite as: 448 So.2d 321, *324)

maritime employment, including any *324 longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder...."

Also 33 U.S.C. § 903(a) now reads in pertinent part:

"(a) Compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel ). (Emphasis added.)

Congress did not amend 33 U.S.C. § 933(i), which reads as follows:

"The right to compensation or benefits under this chapter shall be the exclusive remedy to an employee when he is injured, or to his eligible survivors or legal representatives if he is killed, by the negligence or wrong of any other person or persons in the same employ: Provided, That this provision shall not affect the liability of a person other than an officer or employee of the employer. [Emphasis added.]

"Mar. 4, 1927, c. 509, § 33, 44 Stat. 1440; June 25, 1938, c. 685, §§ 12, 13, 52 Stat. 1168; Aug. 18, 1959, Pub.L. 86-171, 73 Stat. 391; Oct. 27, 1972, Pub.L. 92-576, § 15(f)-(h), 86 Stat. 1262."

Appellant strongly argues that, as a matter of federal law, specifically 33 U.S.C. § 933(i), the plaintiff was prevented from maintaining a co-employee damage suit. Appellant's argument is based upon the proposition that to allow a co-employee suit by a covered maritime employee when the federal statute specifically prohibits such suits would be to create the "type of federal-state conflict in which, under long established principles of federal pre-emption, pre-emption of state law is required."

Appellee contends that in a case of a land-based maritime injury, concurrent jurisdiction exists between federal and state remedies. In fact, appellee contends that the U.S. Supreme Court in Sun Ship, supra, has held that the LHWCA does not preclude concurrent state jurisdiction under a state

workmen's compensation act in a case involving a harbor worker injured on land. Appellee states that this was the sole issue in Sun Ship, supra, as is apparent from the opinion, and that the issue was decided in his favor. The Court, in Sun Ship, supra, opined:

"The single question presented by these consolidated cases is whether a State may apply its workers' compensation scheme to land-based injuries that fall within the coverage of the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), as amended in 1972. 33 U.S.C. §§ 901-950. We hold that it may."

Sun Ship, supra, 447 U.S. at 716, 100 S.Ct. at 2434.

Appellant counters that "a distinction should be observed between the pre-emption of co-employee negligence actions for damages and the area in which some degree of overlap between the Longshoremen's and Harbor Workers' Compensation Act and the Alabama Workers' Compensation Act is permitted."

Appellant argues "that "a careful reading of the Sun Ship decision indicates that the only permissible concurrent jurisdiction between federal and state compensation laws is concurrent application of 'compensation benefit' levels." He says "That is, 'workers who commence their actions under state law will generally be able to make up the difference between state and federal benefit levels.' " (Emphasis supplied).

Appellant argues:

"The difference between benefit levels, however, refers to the schedule of compensation benefits, for example, for injuries to limbs, disfigurement and other categories in which weekly or biweekly benefit awards are made. This is something wholly different from the situation presented here, involving an action for damages, in which there is a clear conflict *325 between the federal statute prohibiting co-employee damage suits and the state common law of Alabama which allows it."

In our research, we have found that after it decided Sun Ship, the Supreme Court later decided that the Full Faith and Credit Clause of the U.S. Constitution does not preclude successive workmen's compensation awards, since a state has

no legitimate interest within the context of the federal system in preventing another state from granting a supplemental award when the second state could have applied its workmen's compensation law in the first instance. Thomas v. Washington Gas Light Co., 448 U.S. 261, 100 S.Ct. 2647, 65 L.Ed.2d 757 (1980). Neither Sun Ship, supra, nor Washington Gas Light Co., supra, however, involved the precise question before us today-- whether there can be concurrent jurisdiction to award damages to an injured plaintiff. Other courts have addressed the issue, however. The Louisiana Supreme Court held that a land-based maritime employee covered by the LHWCA could sue a co-employee under that state's workmen's compensation law. Poche v. Avondale Shipyards, Inc., 339 So.2d 1212 (La.1976). Earlier, Louisiana had merely recognized the overlap in compensation benefit levels only. Umbehagen v. Equitable Equipment Co., 329 So.2d 245 (La.Ct.App.1976). The rationale of the Poche court was based on the election of remedies doctrine which has been severely criticized by the authorities and which has been held to be inapplicable in a case involving the LHWCA. See A. Larson, 2A Workmen's Compensation, § 73 (1983); Landry v. Carlson Mooring Service, 643 F.2d 1080 (5th Cir.1981). The Poche court's decision was also based upon an interpretation of Louisiana's workmen's compensation law and upon prior Louisiana court decisions. The Poche decision was rendered before the Supreme Court's decision in Sun Ship, supra, wherein the Court indicated that in a case involving the LHWCA and a state workmen's compensation scheme in which there was an indisputable preclusion of LHWCA remedies, the federal law would "pre-empt the state compensation exclusivity clause." Sun Ship, 447 U.S. at 722, 100 S.Ct. at 2437. We consider the Poche and Umbehagen decisions in view of these statements of the law in Sun Ship, supra.

In the resolution of the question presented we are aided by other state and federal decisions. The Florida District Court of Appeals held the LHWCA took precedence over state law as to whether the employer could be assigned all rights of persons entitled to recover damages from third persons in a wrongful death action. United States Fidelity and Guaranty Co. v. Reed Construction Corp., 132 So.2d 626 (Fla.App.1961). The Supreme Court of South Carolina held the LHWCA was the "sole and

exclusive remedy" of a plaintiff suing a co-employee in a negligence action. Smalls v. Blackmon, 269 S.C. 614, 239 S.E.2d 640, at 640 (1977). That court specifically cited 33 U.S.C. § 933(i). In Smalls the negligence action was clearly a shore-based maritime accident, as the plaintiff and defendant were involved in an automobile accident located at the Parris Island Marine Corps Exchange Service Station.

The Smalls court relied upon Nations v. Morris, 483 F.2d 577 (5th Cir.1973), cert. denied, 414 U.S. 1071, 94 S.Ct. 584, 38 L.Ed.2d 477 (1973), to reach its holding. Nations involved a plaintiff injured on an oil drilling rig located 40 miles off the coast of Louisiana. The plaintiff brought a co-employee action in federal court. Chief Judge Brown, writing for the appeals court, held that the LHWCA prohibited co-employee suits in this situation. In dicta, the Nations court indicated the LHWCA would apply to "twilight" or shore-based injuries, too. "L & H [LHWCA] applies during the dark of night, at the break of dawn and in the twilight too." Nations, supra, at 584. In a case involving an injury on a floating dry dock located in a repair yard in a marine repair facility in Louisiana, the Fifth Circuit had earlier held that the exclusivity provisions of the LHWCA were constitutional and that they barred co-employee suits. Keller v. Dravo Corp., 441 F.2d 1239 (5th Cir.1971). The Keller *326 court cited 33 U.S.C. § 933(i) as the controlling provision. See also Fitzgerald v. Compania Naviera La Molinera, 394 F.Supp. 402 (E.D.La.1974), citing Keller, supra; Bynum v. S.S. Mormacteal, 188 F.Supp. 763 (E.D.Pa.1960), which discusses the purpose of Congress' passage of 33 U.S.C. § 933(i):

"The 1959 amendment to § 33 simply recognized the problem [of co-employee suits] and solved it by forbidding such an action. In other words, the 1959 amendment to § 33 of the Act not only does not limit the provisions of § 5, but broadens them by insulating not only the employer, but also the fellow employees of the injured party from any liability in damages to the injured party. This is made clear by the legislative history of the amendment. U.S.Code Congressional and Administrative News, 86th Congress, First Session 1959, Volume 2, pages 2134-2136. With respect to the amendment now relied on by libellant, the Senate Report, under the heading 'Purpose Of The Bill', states as follows at page 2135:

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

" 'The other major provision of the bill relates to the immunization of fellow employees against damage suits. The rationale of this change in the law is that when an employee goes to work in a hazardous industry he encounters two risks. First, the risks inherent in the hazardous work and second, the risk that he might negligently hurt someone else and thereby incur a large common-law damage liability. While it is true that this provision limits an employee's rights, it would at the same time expand them by immunizing him against suits where he negligently injures a fellow worker. It simply means that rights and liabilities arising within the 'employee family' will be settled within the framework of the Longshoremen's and Harbor Workers' Compensation Act.' "

Bynum, supra at 764-765. Hughes v. Chitty, 415 F.2d 1150 (5th Cir.1969), held that the LHWCA was the exclusive remedy for a longshoreman injured on navigable water.

[1] We are sensitive to the statement made in Sun Ship, supra, that a state may apply its workers' compensation scheme to land-based injuries that fall within the coverage of the LHWCA, but we believe the concurrent jurisdiction for pursuit of benefits under a state's workmen's compensation scheme does not include common law suits for damages against co-employees.

[2][3] We are of the opinion that the LHWCA and the law of Alabama are in serious conflict as to the maintenance of co-employee suits, and because that

is the case, we hold that federal law will pre-empt state law. Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1983); Howard v. Uniroyal, Inc., 543 F.Supp. 490 (M.D.Ala.1981); Ex parte Alabama Oxygen Co., Inc., supra. If the "enforcement of state law 'presents a serious danger of conflict with the administration of the federal program ...' " the federal law must take precedence. Uniroyal, supra at 492. We can perceive no greater conflict than that which would be presented if we allowed this employee to sue his co-employee because he was a land-based maritime worker, and a maritime worker injured on a navigable waterway would be precluded from maintaining such a suit; therefore, we are persuaded to hold that the exclusivity provisions of 33 U.S.C. § 933(i) apply and that the state action was barred.

Because of our holding on the issue of pre-emption, we need not address the second issue raised by the defendant on appeal. For the foregoing reasons, the judgment of the trial court is reversed and the cause remanded in accordance with this opinion.

REVERSED AND REMANDED.

TORBERT, C.J., and FAULKNER, JONES, ALMON, SHORES, EMBRY, BEATTY and ADAMS, JJ., concur.

END OF DOCUMENT

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
1997 A.M.C. 1964
(Cite as: 1997 WL 159491 (E.D.La.))

Rickie A. COBB and Theresa Cobb

v.

SIPCO SERVICES & MARINE, INC., et al.

Civil Action No. 95-2131.

United States District Court,
E.D. Louisiana.

March 27, 1997.

### ORDER AND REASONS ON BENDER SHIPYARD'S MOTION FOR SUMMARY JUDGMENT

VANCE, District Judge.

*1 Before the Court is the motion for summary judgment of defendant Bender Shipyard, Inc. ("Bender"). For the reasons stated below, the motion is GRANTED.

### INTRODUCTION

Plaintiffs Rickie A. Cobb and Theresa Cobb brought this tort action against Bender and several other defendants for negligence and punitive damages for their allegedly reckless conduct in handling and storing toxic or hazardous substances. Specifically, Rickie Cobb contends that he suffered severe respiratory problems and lost a major portion of one of his lungs as a result of exposure to hazardous or toxic paints while working as an electrician on the MV CRESCENT CITY QUEEN at Bender's shipyard. Bender filed this motion for summary judgment contending that Mr. Cobb was its borrowed servant, who is precluded from suing Bender for tort damages under the Longshore and Harbor Workers' Compensation Act ("LHWCA"). Mr. Cobb has opposed Bender's motion, asserting that he was not the borrowed servant of Bender, and in any event, is not foreclosed from suing Bender for punitive damages under Louisiana law.

### FACTS

Bender is in the ship building business and was in the process of constructing the MV CRESCENT CITY QUEEN at its shipyard in Braithwaite, Louisiana in November 1994. On May 19, 1994 Bender entered a contract with Volt Technical

Services ("Volt"), under which Volt was to supply labor to Bender to perform certain work as "borrowed servants." Defendant's Exh. B. In addition, Volt agreed to obtain and maintain workmen's compensation and federal LHWCA insurance coverage on the personnel supplied. Id. Bender's director of human resources testified that Bender had used Volt prior to the time Mr. Cobb was hired and that his understanding was that Volt was to send Bender "qualified personnel, fitters, welders, electricians, whatever we were asking for, and we would put them to work as borrowed servants through Volt." Defendant's Exh. A, Bobby C. Woods Depo. at 32.

Rickie Cobb was a marine electrician hired by Volt in late October 1994, following a telephone interview in Jacksonville, Florida. Defendant's Exh. C, Cobb Depo. at 23-24. Mr. Cobb was assigned to work for Bender in Braithwaite, doing electrical work on board the MV CRESCENT CITY QUEEN. Id. at 23-26 and 30. Mr. Cobb dealt with a Volt representative in New Orleans, Don Ford, who directed him to the Bender location at Braithwaite. Id. at 26-28. Mr. Ford stayed at the same hotel as the plaintiff and served as his contact with Volt during the period that plaintiff worked on Bender's project. Id. at 38. Plaintiff stated that if he needed an advance on a paycheck or to go home for an emergency or anything like that Mr. Ford was his "liaison" with Bender to work things out. Id. Other than these types of activities, however, Mr. Ford was not directing Mr. Cobb's work at Bender. Id. at 38-39. Plaintiff worked on Bender's project from November 1994 until January 1995. Defendant's Exh. D, Cobb's Personnel File.

*2 When Mr. Cobb arrived at Bender's shipyard, he was interviewed by Bender and administered an electrician's exam, as well as a drug test. Id. at 28-29. Although Mr. Cobb testified that he was "under the impression" that he already had a job, he stated that Mack Wigham, Bender's "lead man," hired him after he passed the electrician's exam and the drug test. Id. Bender's human resources director testified that Bender retained the right to reject plaintiff and any other potential worker assigned to Bender by a labor contractor. Defendant's Exh. A, Bobby Woods Depo. at 37-38.

Mr. Cobb testified that Mack Wigham supervised



EXHIBIT
N

Not Reported in F.Supp.
(Cite as: 1997 WL 159491, *2 (E.D.La.))

his work and gave him his work assignments and instructions. Defendant's Exh. C, Cobb Depo. at 31-32. Volt did not maintain a representative on the Bender project to supervise or direct plaintiff's work. Id. at 38-39, 136. Mr. Cobb supplied his own hand tools, and Bender provided him with "troubleshooting equipment and the larger tools he needed on the job." Id. at 35. There is no evidence that Volt supplied plaintiff with any of the tools needed to perform his work.

Bender concedes that it could not have terminated plaintiff's original employment with Volt. However, Bender had the authority to terminate Mr. Cobb's relationship with Bender. Mr. Cobb was not on Bender's payroll, and he did not receive benefits from Bender. Bender paid Volt $16.60 per hour for plaintiff's work, of which plaintiff received $10.75 per hour from Volt. Bender also paid Volt a per diem allowance of $4.25 per hour, which Volt paid directly to plaintiff. Bender paid Volt the sum of $22.29 per hour for plaintiff's overtime work, of which plaintiff received $16.13 per hour. Defendant's Exh. D.

Based on the foregoing facts Bender contends that plaintiff was its borrowed servant and, as such, was barred from maintaining a cause of action against Bender in tort by virtue of the LHWCA.

LEGAL ANALYSIS

Standard for Summary Judgment

Under Fed.R.Civ.P. 56, summary judgment is proper when there is no genuine issue of material fact, and the moving party is entitled to a judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All inferences will be made in favor of the party opposing summary judgment. However, the opposing party may not rely on mere allegations or denials but must set forth specific facts establishing that genuine issues exist for trial. See Fed.R.Civ.P. 56(e). Only factual disputes "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The Borrowed Servant Doctrine

As noted, Bender contends that Cobb was its borrowed servant. In Ruiz v. Shell Oil Co., 413 F.2d 310, 312-13 (5th Cir.1969), the Fifth Circuit outlined nine factors to be evaluated in determining whether the borrowed employee doctrine applies. These factors are as follows:

*3 1. Who has control over the employee and the work he is performing, beyond mere suggestion of details of cooperation?
2. Whose work is being performed?
3. Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?
4. Did the employee acquiesce in the new work situation?
5. Did the original employer terminate his relationship with the employee?
6. Who furnished tools and place for performance?
7. Was the new employment over a considerable length of time?
8. Who had the right to discharge the employee?
9. Who had the obligation to pay the employee?
Id. Although no single factor or a combination of them is determinative, the Fifth Circuit in many cases has considered the factor of control to be central. See Brown v. Union Oil Co. of California, 984 F.2d 674, 676 (5th Cir.1993); Melancon v. Amoco Production Co., 834 F.2d 1238, 1244 (5th Cir.1988); Capps v. N.L. Baroid--NL Indus., Inc., 784 F.2d 615, 616-17 (5th Cir.), cert. denied, 479 U.S. 838, 107 S.Ct. 141, 93 L.Ed.2d 83 (1986).

The issue of borrowed employee status is a matter of law for the district court to determine. Capps, 784 F.2d 615, 616; Melancon, 834 F.2d at 1244. If sufficient basic factual ingredients are undisputed, the Court may grant summary judgment. Capps, 784 F.2d 615, 616. A consideration of the relevant factors and the undisputed facts indicates that Mr. Cobb was Bender's borrowed servant as a matter of law.

1. Control Over the Employee and the Work He Was Performing

There is no dispute that while plaintiff was working at the Bender shipyard in Braithwaite he was supervised by Bender's foreman, Mack Wigham, and that he received all of his work assignments and instructions from Bender personnel. Defendant's Exh. C, Cobb Depo. at 31-32, 34-35

Not Reported in F.Supp.
(Cite as: 1997 WL 159491, *3 (E.D.La.))

and 136. Nor is there any dispute that Volt did not have a representative on the job site to supervise or direct plaintiff's work. Id. at 38-39 and 136. Plaintiff stated that his only contact with Volt during this period was that Volt had a representative in Braithwaite who acted as a liaison when plaintiff needed an advance on paychecks or to go home for emergencies or anything like that. Id. at 38. The facts on the issue of control clearly support a finding of borrowed servant status.

2. Whose Work is Being Performed?

The answer to this question is likewise straightforward. Plaintiff was performing electrician's services for Bender in the process of constructing the MV CRESCENT CITY QUEEN. This factor likewise supports borrowed servant status.

3. Whether an Agreement or Understanding Existed Between the Original and the Borrowing Employer

In this case, unlike the case of West v. Kerr-McGee Corp., 765 F.2d 526, 531 (5th Cir.1985), relied on by plaintiffs, Bender and Volt entered into a temporary labor contract agreement in which the parties expressed an intention for Volt to provide Bender with workers skilled in various trades to work as Bender's "borrowed servants." See Defendant's Exh. B. The evidence also indicates that Bender had used Volt's services before this incident for the same purpose. See Defendant's Exh. A, Bobby Woods Depo. at 31-33. The written evidence of the agreement between Volt and Bender is consistent with an understanding to create a borrowed servant relationship between the employees supplied by Volt and Bender.

4. Whether the Employee Acquiesced in the New Work Situation

*4 Mr. Cobb worked for a company that loaned temporary employees. Although he resided in Florida, plaintiff acquiesced in the fact that he was assigned to work at Bender's shipyard in Louisiana. He worked there over two months before he became ill. He did not ask for a reassignment during this period. These factors indicate that he acquiesced in his new work situation.

5. Did the Original Employer Terminate his Relationship with the Employee?

The Fifth Circuit has held that this factor does not require a lending employer to completely sever his relationship with the employee. Capps, 784 F.2d at 617. It reasoned that such a requirement would in effect eliminate the borrowed servant doctrine, since there could never be two employers. Id. The Court stated that the emphasis should be on the lending employer's relationship with the employee while the borrowing occurs and, when the lending employer exercises no control over the employee while he works for the borrowing employer and places no restrictions on him with respect to that employment, the facts favor borrowed employee status. Id. at 618. The undisputed facts reveal that plaintiff had only limited contacts with Volt after he began working at Bender's shipyard and that those contacts related to picking up his paycheck and arranging for time off due to emergencies. Cobb Depo. at 38. There is no evidence that Volt placed any restrictions on Bender with respect to Mr. Cobb's employment conditions or that it exercised control over Mr. Cobb while he worked for Bender. These facts favor borrowed servant status. See Capps, 784 F.2d at 618.

6. Who Furnished Tools and the Place for Performance?

Bender clearly provided plaintiff the place where he performed his work. In addition, although plaintiff furnished his own set of hand tools, Bender provided "troubleshooting equipment and the larger tools he needed on the job." Defendant's Exh. C, Cobb Depo. at 35. There is no evidence that Volt provided plaintiff with any tools that he needed to perform his work. Factor six thus favors borrowed servant status.

7. Whether the Employment was Over a Considerable Length of Time

Plaintiff worked for Bender for over two months prior to becoming ill. The Fifth Circuit has stated that when the length of time of an employment is considerable, "this factor supports a finding that the employee is a borrowed employee; however, the converse is not true." Capps, 784 F.2d at 615. Further, the Fifth Circuit has affirmed findings of borrowed servant status when an employee's injury

Not Reported in F.Supp.
(Cite as: 1997 WL 159491, *4 (E.D.La.))

Page   4

occurred on the first day of the job. See Capps, 784
F.2d at 618; Champagne v. Penrod Drilling Co.,
341 F.Supp. 1282, 1284 (W.D.La.1971), aff'd per
curiam, 459 F.2d 1042 (5th Cir.1972), cert.
denied, 409 U.S. 1113, 93 S.Ct. 927, 34 L.Ed.2d
696 (1973). With respect to this factor, the Court
finds that the length of employment is neutral on the
issue of borrowed servant status.

### 8. Who Has the Right to Discharge the Employee?

*5 Bender did not have the authority to terminate
Mr. Cobb's relationship with Volt. However,
Bender could have terminated its relationship with
plaintiff at any time. See Defendant's Exh. C, Cobb
Depo. at 100. In Capps the court stated that the
proper focus of this inquiry is whether the
borrowing employer could terminate the employee's
services with itself, even if it could not have
terminated the plaintiff's relationship with the
lending employer. Id. at 618; see also Hebron v.
Union Oil Co. of California, 634 F.2d 245 (5th
Cir.1981) (per curiam). So framed, the facts on this
issue favor borrowed servant status.

### 9. Who Had the Obligation to Pay the Employee?

Mr. Cobb was paid by Volt and was not paid
directly by Bender. Bender, however, paid Volt at
an hourly rate for Cobb's work, which Volt paid to
Cobb at a lower rate. Under these circumstances,
the Fifth Circuit has found that this factor does not
detract from borrowed servant status. Plaintiff
argues that inconsistent treatment of borrowed
employees and regular employees is inconsistent
with a borrowing employee relationship. While it is
certainly true that the Fifth Circuit found this to be
the case in West v. Kerr-McGee Corp., 765 F.2d
526, 531 (5th Cir.1985), there is no evidence in this
record to indicate that Bender's direct employees
received preferential treatment. The only evidence
is that plaintiff received no benefits from Bender.

Accordingly, the Court finds that there is no
genuine factual dispute as to the Ruiz factors and
that, as a matter of law, nearly all of the factors
support a finding of borrowed employee status. The
Court thus finds that Mr. Cobb was, as a matter of
law, a borrowed employee of Bender. As such, a
negligence recovery against Bender is barred by the
LHWCA.

### Plaintiffs' Claim for Punitive Damages

Mr. Cobb argues that even if the Court finds that
his negligence claim against Bender is preempted by
the LHWCA because of his borrowed servant status,
he may nonetheless maintain a tort action against
Bender for punitive damages under Louisiana Civil
Code article 2315.3. [FN1] Plaintiff contends that
his injuries were caused by the defendants' wanton
or reckless disregard for public safety in the storage,
handling or transportation of hazardous or toxic
substances within the meaning of article 2315.3.
Plaintiff further contends that his injury occurred in
the "twilight zone" in which both the LHWCA and
state law may apply. Further, Mr. Cobb argues
that, despite Louisiana's workmen's compensation
scheme, at the time of his injuries, Louisiana law, as
stated in Billiot v. BP Oil, 645 So.2d 604
(La.1994), allowed an employee to sue his employer
in tort for punitive damages under Louisiana Civil
Code article 2315.3. Mr. Cobb notes that although
Billiot was legislatively overruled in 1995, the
statute overruling it became effective on June 17,
1995 and was prospective only. See La. Acts no.
432 (1995). Plaintiff asserts that his remedy under
Louisiana Civil Code article 2315.3 is not a
workmen's compensation remedy.

> FN1. Louisiana Civil Code article 2315.3 provides:
> "[E]xemplary damages may be awarded, if it is
> proved that plaintiff's injuries were caused by the
> defendant's wanton or reckless disregard for public
> safety in the storage, handling, or transportation of
> hazardous or toxic substances."

*6 A number of cases have purported to delineate
the so-called "twilight zone" of concurrent
jurisdiction between the LHWCA and state law
workmen's compensation statutes. See Davis v.
Department of Labor and Indus. of Washington, 317
U.S. 249, 63 S.Ct. 225, 87 L.Ed. 246 (1942)
(establishing regime of concurrent jurisdiction in
"twilight zone"); see also Hetzel v. Bethlehem Steel
Corp., 50 F.3d 360, 363-64 (5th Cir.1995)
(discussing cases). In 1972 Congress amended the
LHWCA to expand its coverage beyond the
traditional navigable waters to specific adjoining
areas, such as piers and other adjoining areas
"customarily used by an employer in loading,
unloading, dismantling or building a vessel." See
33 U.S.C. § 903(a). In Sun Ship, Inc. v.
Pennsylvania, 447 U.S. 715, 100 S.Ct. 2432, 65

Not Reported in F.Supp.                                                Page   5
(Cite as: 1997 WL 159491, *6 (E.D.La.))

L.Ed.2d 458 (1980), the Supreme Court addressed the issue of whether this extension of the LHWCA's coverage displaced states from applying their own workmen's compensation schemes to land-based injuries that fell under expanded federal coverage. The Court unanimously answered the question in the negative.   The Court specifically rejected the argument that concurrent jurisdiction was inappropriate because "concurrent jurisdiction could result in more favorable awards for workers' injuries than under an exclusively federal compensation system." Id. at 724, 100 S.Ct. at 2438.  The Court found that the exclusive remedy provision of section 905(a) of the LHWCA provided no obstacle to the provision of a concurrent state remedy.

This case is a twilight zone case since Mr. Cobb's illness occurred in a shipyard in Braithwaite, Louisiana at which a vessel was being constructed. Based on Sun Ship, it is apparent that Louisiana could provide a workmen's compensation remedy to Mr. Cobb and that the LHWCA would not preempt such a recovery.

However, in this case, plaintiff does not claim an award of compensation benefits but wishes to pursue a state law tort action against Bender for reckless and wanton misconduct.  This raises the issue of the effect of section 905(a) of the LHWCA, the exclusive remedy provision, on the availability of state tort relief for a plaintiff whose injury falls within the twilight zone. [FN2] The Third Circuit in Peter v. Hess Oil Virgin Islands Corp., 903 F.2d 935 (3d Cir.1990), held under almost identical circumstances that this situation raises a question of federal preemption:

> FN2. The LHWCA's exclusive remedy provision ordinarily precludes actions alleging gross negligence or "wanton or reckless" misconduct, as well as simple negligence. Houston v. Bechtel Assoc. Professional Corp., 522 F.Supp. 1094 (D.D.C.1981); Johnson v. Odeco Oil & Gas Co. Inc., 679 F.Supp. 604, 606-07 (E.D.La.1987), aff'd, 864 F.2d 40 (5th Cir.1989).  There is an exception for intentional torts.  Id.

In this case, however, we deal not with an award of compensation benefits but with a common law action for negligence.  The more difficult issue raised by Hess turns on the effect of section 905(a) upon the availability of state tort relief for

a plaintiff whose injury falls within the twilight zone.  This raises a question of federal supremacy that requires us to consider whether LHWCA (1) evidences a congressional intent to preempt the entire area of compensation for this kind of injury, or (2) is inconsistent with the provisions of a state tort remedy so that it would be impossible for the defendant to comply with both federal and state law, or (3) whether the state tort remedy "stands as an obstacle to the accomplishment of the full purposes and objectives of Congress."
*7 Id. at 950.

Federal law governs questions of preemption. See Hetzel v. Bethlehem Steel Corp., 50 F.3d 360, 362 (5th Cir.1995).    It is obvious that Sun Ship precludes any argument that the LHWCA was intended by Congress to preempt all state legislation governing events occurring within the twilight zone. Accord, Peter v. Hess Oil Virgin Islands Corp., 903 F.2d 935, 950.  However, federal preemption can occur when a state law either directly conflicts with federal law or frustrates the purpose behind federal law. Hetzel, 50 F.3d at 363, 366; Hess, 903 F.2d at 930.

Section 905(a) of the LHWCA provides:
> The liability of an employer ... shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death....
33 U.S.C. § 905(a).  As the Third Circuit noted in Hess, the section's plain language evidences an unmistakable intention to embody the quid pro quo that defines most workmen's compensation statutes, that is, the employer provides no fault compensation in return for an immunity from tort liability for damages. Id. at 950. Further, the Fifth Circuit has stated that when liability arises as a result of the employment relationship, Congress explicitly intended for the LHWCA to be the exclusive remedy. Hetzel, at 366.

The Supreme Court has likewise stated that the LHWCA was designed to strike a balance between employers and employees:
> [T]he [LHWCA is] not a simple remedial statute intended for the benefit of the workers. Rather, it was designed to strike a balance between the

Not Reported in F.Supp.
(Cite as: 1997 WL 159491, *7 (E.D.La.))

Page   6

concerns of the longshoremen and harbor workers on the one hand, and their employers on the other. Employers relinquish their defenses to tort actions in exchange for limited and predictable liability. Employees accepted the limited recovery because they receive prompt relief without the expense, uncertainty, and delay that tort actions entail. Morrison-Knudsen Constr. Co. v. Director, OWCP, 461 U.S. 624, 636, 103 S.Ct. 2045, 76 L.Ed.2d 194 (1983). In the context of section 905(a), the Court fails to see any indication that Congress intended to preserve state tort liability for the same injuries as to which it granted immunity from federal tort liability. See Hess, 903 F.2d at 951. A state tort action for punitive damages for wanton and reckless misconduct would be every bit as disruptive of Congress' quid pro quo as would be a federal action for the same relief. Congressional policy would be frustrated if an injured worker were allowed to recover LHWCA benefits and then sue a covered employer under a state tort theory. Here, plaintiff has sought LHWCA benefits from Volt, but not from Bender. That he has not sought this relief from Bender does not alter the result. Bender, as Cobb's "employer" under the borrowed servant doctrine, is liable for LHWCA compensation under section 904(a) of the LHWCA and is entitled to immunity under § 905(a). See Total Marine Services, Inc. v. Director OWCP, 87 F.3d 774 (5th Cir.1996).

*8 It is true that in Hahn v. Ross Island Sand & Gravel Co., 358 U.S. 272, 79 S.Ct. 266, 3 L.Ed.2d 292 (1959), the Supreme Court permitted a state tort recovery for an injury within the scope of the LHWCA. However, as the Third Circuit noted in Hess, when the Supreme Court sustained a damage recovery in Hahn, the Oregon statute involved, like most workmen's compensation statutes, including the LHWCA, provided that if an employer covered by the statute failed to secure workmen's compensation coverage it would be subject to a negligence action in which it would be denied common law defenses. Hess, 903 F.2d at 952; Hahn, 358 U.S. at 273, 79 S.Ct. at 267. The employer in Hahn had not obtained such coverage, and it was under this provision that the damage judgment was allowed. In Hahn, the state negligence liability was a sanction for the employer's failure to secure workmen's compensation coverage. "The existence and function of that liability was entirely consistent with Congress' intent to ensure a seamless intersection between state and federal compensation coverage." Hess, 903 F.2d at 952. In that context, tort liability was consistent with the Congressional scheme. That is not the case here, where application of Louisiana tort law, which plaintiff concedes is not a workmen's compensation remedy, does not further the availability of no fault compensation, and it obstructs the purposes of the LHWCA. Further, the Fifth Circuit has held post-Hahn that section 905(a) bars a state tort recovery from a borrowing LHWCA employer. Rosetti v. Avondale Shipyards, Inc., 821 F.2d 1083 (5th Cir.1987), cert. denied, 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988) (plaintiff engaged in shipyard activities that were apparently in twilight zone). Finally, as the Third Circuit stated in Hess, the boundaries of concurrent jurisdiction in the "twilight zone" should be determined by the problems that gave rise to the doctrine and not extended in application to "undermine the policy reflected in § 905(a)." Hess, 903 F.2d at 952.

For all of the foregoing reasons, Bender's motion for summary judgment is GRANTED.

END OF DOCUMENT

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works