**MDL 875**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

NOV 17 2006

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

**IN RE: ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)**
**CONDITIONAL TRANSFER ORDER (CTO-269)       DOCKET NO. 875**

---

**This Document Pertains To:**

*Joseph Alexander Anderson, Jr., et al v. Ford Motor Co., et al*
Pending: Federal District Court, District of Utah, Central Division
Civil Action No.: 06-741

*Wrongly removed from the Third District Court of Salt Lake County, Utah to the United States District Court, District of Utah, Central Division, and wrongfully conditionally transferred to the United States Panel of Multidistrict Litigation*

---

### PLAINTIFFS' MOTION TO VACATE
### CONDITIONAL TRANSFER ORDER

Plaintiffs in the Utah *Anderson* case, Joseph Alexander Anderson, Jr. and Arva Anderson, respectfully move the Judicial Panel on Multidistrict Litigation to enter an order vacating Conditional Transfer Order (269) as it pertains to them and to remand this action to the United States District Court, District of Utah, Central Division, where the plaintiffs' case is pending. Ultimately, pursuant to plaintiffs' motion to remand on file with the Utah federal court, the plaintiffs seek the return of their suit to the Third Judicial District Court of Salt Lake County, Utah from which it was wrongly removed.

### A. Introduction

1.     On October 20, 2006, the Judicial Panel on Multidistrict Litigation, *In re Asbestos Products Liability Litigation* (No. VI) issued Conditional Transfer Order (CTO-269) (the "CTO") conditionally transferring cases from various federal courts throughout

IMAGED NOV 2 0 2006     OFFICIAL FILE COPY

PLEADING NO. 4914

the country, including the above-captioned case (the "*Anderson* case"), to the Eastern District of Pennsylvania, assigned to the Honorable James T. Giles.

2.     The plaintiffs timely filed a notice of opposition to the conditional transfer and now move the Panel to deny jurisdiction over this matter and vacate its order of October 20, 2006, conditionally transferring the *Anderson* case to the United States District Court for the Eastern District of Pennsylvania. Plaintiffs further request that the Panel remand this action to the Federal District Court, District of Utah, Central Division, where it is pending. Ultimately, the plaintiffs request that this matter be returned to the Third Judicial District Court of Salt Lake County, Utah from which it was omprovidently removed.

3.     Plaintiffs assert that their case was improperly removed from state court to federal court and that the federal court lacks subject-matter jurisdiction over this action. Plaintiffs' motion to vacate is supported by an accompanying Brief to Vacate the CTO (as it applies to the *Anderson* case) which is fully incorporated by reference in this motion.

## B. Conclusion

4.     For the reasons set out in this motion, supported by fact and authorities in the accompanying brief and exhibits, the plaintiffs ask the Panel to enter an order vacating the CTO as it pertains to them and to remand this action to the Federal District Court, District of Utah, Central Division, where it is pending. Ultimately, pursuant to plaintiffs' motion to remand on file with the Utah federal court, the plaintiffs seek the

return of their suit to the Third Judicial District Court of Salt Lake County, Utah.  At a

minimum, this Panel should stay any transfer of the Utah Anderson Case to Multidistrict

Litigation pending a determination by the United States District Court for the District of

Utah with respect to the Andersons' motion to remand their case to state court.

DATED this _16_ day of November, 2006.

HATCH, JAMES & DODGE
Mark F. James

LAW OFFICES OF G. PATTERSON KEAHEY, P.C.
G. Patterson Keahey

By: _____
G. PATTERSON KEAHEY
Attorneys for Plaintiffs in the Utah Asbestos Case

3

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

NOV 1 7 2006

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

**IN RE: ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)**
        **CONDITIONAL TRANSFER ORDER (CTO-269)     DOCKET NO. 875**

---

**This Document Pertains To:**

*Joseph Alexander Anderson, Jr., et al v. Ford Motor Co., et al*
**Pending:  Federal District Court, District of Utah, Central Division**
**Civil Action No.:  06-741**

*Wrongly removed from the Third District Court of Salt Lake County, Utah to the United States District Court, District of Utah, Central Division, and not properly conditionally transferred to the United States Panel of Multidistrict Litigation*

---

## BRIEF IN SUPPORT OF MOTION TO VACATE
## CONDITIONAL TRANSFER ORDER

This memorandum is filed, pursuant to Judicial Panel on Multidistrict Litigation Rule 7.4(c), in support of the Motion to Vacate the Conditional Transfer Order of the Panel, issued on October 20, 2006, ordering transfer of the Utah *Anderson* case.

### A.  History of the Litigation

Mr. Anderson was diagnosed with mesothelioma on October 10, 2005.[1]  Mr. Anderson and his wife, Arva Anderson ("the Andersons"), filed suit against the defendants on August 3, 2006, in Salt Lake County District Court seeking damages for personal injury and loss of consortium arising out of Mr. Anderson's exposure to asbestos and asbestos-containing products.[2]  Defendants Ford Motor Company and General Motors Corporation, with the consent

---

[1] Mesothelioma is an "invariably fatal cancer…for which asbestos exposure is the only known cause…" *In re Patenaude*, 210 F.3d 135, 138 (3d Cir.), *cert. denied*, 531 U.S. 1011 (2000). It kills its victims "generally within two years of diagnosis[,]" during which "[m]esothelioma victims invariably suffer great pain and disability." *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 633 (3d Cir.), *aff'd*, 521 U.S. 591 (1997).

[2] *In re:  Asbestos Cases of Hatch, James & Dodge and G. Patterson Keahey, Joseph Alexander Anderson, Jr. and Arva Anderson v. Asbestos Defendants, Summary Complaint*, Case No. 060912863, Master Case No. 010900863,

of all the defendants, filed a notice of removal on September 1, 2006, asserting the existence of federal jurisdiction under 28 U.S.C. §1441 because the underlying action allegedly arose, in part, out of activities conducted on federal enclaves.   The removal was filed despite clear and unequivocal language in the plaintiffs' master complaint that the plaintiffs had disclaimed any recovery for any injuries arising from activities conducted on federal enclaves.

On September 22, 2006, the plaintiffs filed a motion to remand and memorandum in support asserting that the defendants were on notice that the plaintiffs had disclaimed all federal claims. *See Plaintiffs' Motion to Remand and Memorandum in Support*  (Ex. A hereto).   On October 10, 2006, the defendants filed a motion opposing the plaintiffs' motion to remand.[3]  The Andersons responded to the defendants' motion on October 17, 2006.  *See Plaintiffs' Response to Defendants' Memorandum in Opposition to Plaintiffs' Motion To Remand and for Award of Costs and Attorneys' Fees*, attached to this brief as Exhibit "C " and incorporated fully by reference.

On October 20, 2006, the Judicial Panel on Multidistrict Litigation, *In re Asbestos Products Liability Litigation* (No. VI), issued Conditional Transfer Order (CTO-269) conditionally transferring multiple cases currently pending in various federal district courts throughout the United States to the Eastern District of Pennsylvania, assigned to the Honorable James T. Giles. The *Anderson* case was among those transferred.  Plaintiffs, on  November  3, 2006, timely filed their notice of opposition to the transfer and now move the Panel to deny jurisdiction over this matter and vacate its order of conditional transfer, because the federal

---

August 3, 2006, attached to *Plaintiffs' Motion to Remand and Memorandum in Support* as Exhibit A.  *Plaintiffs' Motion to Remand and Support Memorandum* are attached hereto as Exhibit "A" and incorporated fully by reference.

[3] *See* Defendants' Memorandum in Opposition to Plaintiffs' Motion to Remand and for Attorneys' Fee attached to this brief as Exhibit "B " and incorporated fully by reference.

2

district courts lack subject-matter jurisdiction over the *Anderson* case. The plaintiffs' arguments

and authorities in support of their motion to remand for lack of subject-matter jurisdiction are

fully set out in Exhibits "A" and "C" and, for the convenience of the Panel, are summarized here

as follows.

## B. The Federal Court Lacks Subject Matter Jurisdiction

### 1. Plaintiffs' Disclaimer of Federal Claim Mandates Remand to State Court.

As set out in the plaintiffs' motion to remand, according to the Case Management Order

governing the *Anderson* case, the action entitled *In Re Asbestos Litigation*, Master Case No.

010900863 AS, is "the Master case for all cases involving exposure to asbestos-containing

products."[4]   The Master Complaint governing the cases removed to the Utah federal court

includes the following language:

> **The Federal Courts lack subject matter jurisdiction over this action, as there
> is no federal question and incomplete diversity of citizenship due to the
> presence of a Utah defendant.   Removal is improper.   Every Claim arising
> under the Constitution, treaties, or laws of the United States is *expressly
> disclaimed* (including any claim arising from an act or omission on a federal
> enclave, or of any officer of the U.S. or any agency or person acting under
> him occurring under color of such office).   No claim of admiralty or maritime
> law is raised. Plaintiffs sue no foreign state or agency.[5]** (emphasis added)

The Andersons' complaint was filed under the aegis of the master complaint.[6]

When a plaintiff has a choice between federal law claims and state law claims, he may

elect to proceed in state court on the exclusive basis of state law, thus defeating the defendant's

opportunity to remove, but taking the risk that any federal claims will one day be precluded.

---

[4] *See Second Amended Case Management Order No. 1* attached to Exhibit "A" *Plaintiffs' Motion to Remand and Memorandum in Support* as Exhibit "C" and incorporated fully by reference.

[5] *See In Re Asbestos Litigation*, Master Case No. 010900863 AS, attached to *Plaintiffs' Motion to Remand and Memorandum in Support* this motion as Exhibit "D."

[6]*See, supra,* fn 1.

*Carpenter v. Wichita Falls Independent School Dist.*, 44 F.3d 362, 366 (5th Cir. 1995), citing *Merrell Dow Pharmaceuticals, Inc. v. Thompson,* 478 U.S. 804, 809, 106 S. Ct. 3229, 3233 n.6, 92 L.Ed.2d 650 (1986) ("Jurisdiction may not be sustained on a theory that the plaintiff has not advanced."); *Travelers Indem. Co. v. Sarkisian,* 794 F.2d 754, 758 (2d Cir.), *cert. denied,* 479 U.S. 885, 107 S. Ct. 277, 93 L.Ed.2d 253 (1986); 1A James W. Moore & Brett A. Ringle, *Moore's Federal Practice* ¶ 0.160 (2d ed. 1979) (noting the freedom of the plaintiff to "ignore the federal ground and rely on the state ground").

The United States Supreme Court in *Caterpillar Inc. v. Williams* declared that the presence or absence of federal-question jurisdiction is governed by the "well-pleaded complaint rule." 482 U.S. 386, 392, 107 S. Ct. 2425, 2429 (1987). This rule provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint. *Id.* "The party who brings a suit is master to decide what law he will rely upon." *Willy v. Coastal Corp.,* 855 F.2d 1160, 1167 (5th Cir. 1988); *see also Healy v. Sea Gull Specialty Co.,* 237 U.S. 479, 480, 35 S. Ct. 658, 659, 59 L.Ed. 1056 (1915); *Mountain Fuel Supply Co. v. Johnson*, 586 F.2d 1375, 1380 (10th Cir. 1978)(the determination of whether a "federal question" exists to justify removal jurisdiction requires a court to look solely at the plaintiffs' complaint rather than to any subsequent pleading or the notice for removal).

The master complaint expressed the plaintiffs' intent to rely on Utah state law and to disclaim any causes of action under federal law. Since the plaintiffs are masters of their complaint, the Andersons were entitled to choose a state forum over a federal forum.

2.    **Defendants Have Not Met Their Burden of Establishing That Removal is Proper.**

In their opposition to plaintiffs' motion to remand, defendants alleged that plaintiffs did not dispute that certain locations, i.e., Lackland Air Force Base, were federal enclaves and, therefore, removal was appropriate. Defendants' argument ignores Plaintiffs' express disclaimer of federal causes of action and federal jurisdiction. Moreover, defendants clearly misunderstood that it was their burden *to prove* that removal was proper. *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992)("[t]he 'strong presumption' against removal jurisdiction means that the defendant always has the burden of establishing that removal is proper"); *Celli v. Shoell*, 40 F.3d 324, 327 (10th Cir. 1994)("[i]f jurisdiction is challenged, the burden is on the party claiming jurisdiction to show it by a preponderance of the evidence"). The defendants did not meet this burden.

Determining whether or not federal enclave jurisdiction exists is a "complex question" resting on such factors as whether federal government exercises exclusive, concurrent or proprietorial jurisdiction over property, when that property became a federal enclave and what the state law was at that time, whether that state law is consistent with federal policy, and whether it has been altered by national legislation. *Id.* at 328. The defendants' bare assertion that the plaintiffs did not dispute that facilities such as Lackland Air Force Base, Dugway Proving Grounds, Tooele Army Depot, and Hill Air Force Base were federal enclaves and that others "are *likely* federal enclaves" is insufficient to establish that these facilities are, indeed, federal enclaves. As the Court stated in *Zuniga v. Chugach Maintenance Services*:

> Defendants' notice of removal asserts that the events underlying this action occurred on Edwards Air Force Base, which Defendants claim is a federal enclave. The court finds that this assertion, made without any evidentiary support, is insufficient to establish the events occurred on Edwards Air Force Base. Because they removed this action, the burden is on Defendants to prove the existence of jurisdictional facts. (citations omitted).

5

2006 WL 769317, *6.   In finding that the removing defendants had not met their burden to establish federal enclave jurisdiction, the court said:

> In addition, Defendants are advised that the court is not convinced, based on the briefing currently before the court, that Edwards Air Force Base is a federal enclave. Defendants offer no evidence that the United States formally accepted exclusive federal jurisdiction over Edwards Air Force Base, or its predecessor, Muroc Bombing and Gunnery Range. Defendants offer no evidence that the State of California ever consented to the exclusive federal jurisdiction of the United States. Defendants have cited no evidence or argument that Edwards Air Force Base provided a benefit to the United States. Defendants have cited no case finding that Edwards Air Force Base is a federal enclave over which the United States has exclusive federal jurisdiction. Simply put, Defendants have failed on this motion to dismiss to meet their burden to show Edwards Air Force Base is a federal enclave.

*Zuniga*, WL 769317, *7.   Therefore, even without the existence of the explicit disclaimer of all federal causes of action and the plaintiffs' right to choose to assert only state claims, the defendants' opposition to the plaintiffs' motion for remand fails because they did not, on any level, establish federal enclave jurisdiction.

## C.  Conclusion

Because this case was improperly removed from state court to the United States District Court for the District of Utah, the Panel should vacate its CTO with respect to the Utah *Anderson* Case.  The Panel also should instruct that this case be remanded to state court.  At a minimum, this Panel should stay any transfer of the Utah Anderson Case to Multidistrict Litigation pending a determination by the United States District Court for the District of Utah with respect to the Andersons' motion to remand their case to state court.

DATED this 16 day of November, 2006.

HATCH, JAMES & DODGE
Mark F. James

LAW OFFICES OF G. PATTERSON KEAHEY, P.C.
G. Patterson Keahey

By: _____

Attorneys for Anderson Plaintiffs in Utah Asbestos Case

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

NOV 17 2006

FILED
CLERK'S OFFICE

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this _16_ day of November, 2006, a true
and correct copy of the foregoing was filed with the United States District Court for the
District of Utah and served on the following by U.S. Mail, first-class postage prepaid, as
well as to those individuals identified on the attached list of "Involved Counsel for
Schedule CTO-269, Docket No. 875, In Re Asbestos Products Liability Litigation (No.
VI):

# INVOLVED COUNSEL LIST (Excerpted from CTO-269)
## DOCKET NO. 875
## IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)

Barbara K. Berrett
BERRETT & ASSOCIATES
Ken Garff Building
405 South Main Street
Suite 1050
Salt Lake City, UT 84111

Richard C. Binzley
THOMPSON HINE, LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114

Mary P. Birk
BAKER & HOSTETLER, LLP
303 East 17th Avenue
Suite 1100
Denver, CO 80203

Scot A. Boyd
CHRISTENSEN & JENSEN
50 South Main Street
Suite 1500
Salt Lake City, UT 84144

Kamie F. Brown
SNELL & WILMER, LLP
15 West South Temple
Suite 1200
Gateway Tower West
Salt Lake City, UT 84101

Edward J. Cass
GALLAGHER, SHARP,
FULTON & NORMAN
Bulkley Building, 7th Floor
1501 Euclid Avenue
Cleveland, OH 44115

Patricia w. Christensen
PARR, WADDOUPS, BROWN,
GEE & LOVELESS
185 South State Street
13th Floor
P. O. Box 11019
Salt Lake city, UT 84147

David A. Damico
BURNS, WHITE & HICKTON,
LLC
Four Northshore Center
106 Isabella Street
Pittsburgh, PA 15212

Steven T. Densley
STRONG & HANNI
9 Exchange Place
6th Floor
Salt Lake City, UT 84111

Dennis C. Ferguson
WILLIAMS & HUNT
257 East 200 South
Suite 500
P. O. Box 45678
Salt Lake City, UT 84145-5678

Raymond P. Forceno
FORCENO & HANNON
111 S. Independence Mall East
The Bourse, Suite 1000
Philadelphia, PA 19106-2574

Tracy H. Fowler
SNELL & WILMER, LLP
15 West South Temple
Suite 1200
Gateway Tower West
Salt Lake City, UT 84101

Ellen B. Furman
GOLDFEIN & HOSMER
1600 Market Street
33rd Floor
Philadelphia, PA 19103

Richard K. Glauser
SMITH & GLAUSER, PC
7351 South Union Park Avenue
Suite 200
Midvale, UT 84047

Jonathan L. Hawkins
MORGAN, MINNOCK, RICE &
JAMES
136 S. Main
Suite 800
Salt Lake City, UT 84101

Mark F. James
HATCH, JAMES & DODGE
10 West Broadway
Suite 400
Salt Lake City, UT 84101

G. Patterson Keahey
LAW OFFICES OF G.
PATTERSON KEAHEY, PC
One Independence Plaza
Suite 612
Birmingham, AL 35219

Reginald S. Kramer
OLDHAM & DOWLING
195 South Main Street
Suite 300
Akron, OH 44308-1314

David C. Landin
HUNTON & WILLIAMS
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Dan R. Larsen
SNELL & WILMER, LLP 15
West South Temple
Suite 1200
Gateway Tower West
Salt Lake City, UT 84101

Gene Locks
LOCS LAW FIRM, LLC
1500 Walnut Street
Philadelphia, PA 19102

Adam M. Chud
GOODWIN PROCTER, LLP
901 New York Avenue, NW
Washington, DC 20001

Ronald L. Motley
MOTLEY RICE, LLC
P.O. Box 1792
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464

J. Kevin Murphy
KIPP & CHRISTIAN
10 Exchange Place
Fourth Floor
Salt Lake city, UT 84111-2314

Kenneth Leigh Reich
SNOW CHRISTENSEN &
MARTINEAU
10 Exchange PL
P. O. Box 45000
Salt Lake City, UT 84145-5000

Andrew J. Trevelise
REED SMITH, LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

Ross I. Romero
JONES, WALDO, HOLBROOK
& McDONOUGH
170 South Main Street
Suite 1500
P. O. box 45444
Salt Lake City, UT 841453

Mark J. Williams
JONES, WALDO, HOLBROOK
& MCDONOUGH
170 South Main Street
Suite 1500
P. O. Box 45444
Salt Lake City, Utah 84101

Susan M. Hansen
BROWNSON & BALLOU
225 South Sixth Street
Suite 4800
Minneapolis, MN 55402

Richard D. Schuster
VORYS, SATER, SEYMOUR &
PEASE, LLP
52 East Gay Street
P. O. Box 1008
Columbus, OH 43216

Stewart O. Peay
SNELL & WILMER, LLP
15 West South Temple
Suite 1200
Gateway Tower West
Salt Lake City, UT 84101

Robert E. Swickle
JAQUES ADMIRALITY LAW
FIRM, PC
1570 Penosbscot Building
The Maritime Asbestosis Legal
Clinic
Detroit, MI 48226

Gregory S. Roberts
RAY QUINNEY & NEBEKER
P. O. Box 45385
Salt Lake City, UT 84145-0385

James K. Weston, II
TOM RILEY LAW FIRM
4040 First Avenue, NE
P. O. Box 998
Cedar Rapids, IA 52406

Ryan J. Schriever
J. JOYCE & ASSOCIATES
P. O. Box 329
Sandy , Utah 84091-0329

Melinda A. Morgan
RICHARDS, BRANDT,
MILLER & NELSON
50 S. Main Street, Suite 700
P. O. Box 2465
Salt Lake City, UT 84110

Neil Selman
SELMAN, BREITMAN &
BURGESS
11766 Wilshire Boulevard
Sixth Floor
Los Angeles, CA 90025

Robert N. Spinelli
KELLEY, JASON,S MCGUIRE
& SPINELLI
Centre Square West
15th Floor
Philadelphia, PA 19102

John J. Repcheck
MARKS, O'NEILL, O'BRIEN &
COURTNEY
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219

Katherine E. Venti
PARSONS, BEHLE &
LATIMER201 S Main St. Ste
1800
P. O. Box 45898
Salt Lake City, UT 84145

John D. Roven
ROVEN-KAPLAN, LLP
2190 North Loop West
Suite 410
Houston, TX 77018

A

RECEIVED
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

2006 NOV 17 A 10: 52

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

NOV 17 2006

FILED
CLERK'S OFFICE

# EXHIBIT "A"

Mark F. James (5295)
**HATCH, JAMES & DODGE, P.C.**
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

G. Patterson Keahey (*pro hac vice*)
**LAW OFFICES OF G. PATTERSON KEAHEY, P.C.**
One Independence Plaza, Suite 612
Birmingham, Alabama 35209
Telephone: (800) 291-0050
Facsimile: (205) 871-0801

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **IN RE: ASBESTOS CASES OF HATCH, JAMES & DODGE and G. PATTERSON KEAHEY.** | **PLAINTIFFS' MOTION TO REMAND AND FOR AWARD OF COSTS AND ATTORNEYS' FEES** |
| **JOSEPH ALEXANDER ANDERSON, JR., and ARVA ANDERSON** | **CASE NO.: 2:06-cv-741** |
| **Plaintiffs,** | **Judge Ted Stewart** |
| **vs.** | (State Court Master Case No. 010900863 AS; State Court Case No. 060912863 – Judge Glenn K. Iwasaki) |
| **ASBESTOS DEFENDANTS** | |

Plaintiffs hereby move pursuant to 28 U.S.C. § 1447 that this Court remand this action

to the Third Judicial District Court of Salt Lake County, Utah, the state court from which it was

removed.  This action was improperly removed and should be remanded to state court.  In

addition to remand, Plaintiffs request an award of costs and attorneys' fees incurred by them in

connection with their Motion to Remand.

Plaintiffs' Motion is supported by an accompanying Memorandum of Points and Authorities.

DATED this ____ day of September, 2006.

**HATCH, JAMES & DODGE, P.C.**
Mark F. James

**LAW OFFICES OF G. PATTERSON KEAHEY, P.C.**
G. Patterson Keahey

By:  _____/s/Mark F. James_____
Attorneys for Plaintiff

Mark F. James (5295)
**HATCH, JAMES & DODGE, P.C.**
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

G. Patterson Keahey (*pro hac vice*)
**LAW OFFICES OF G. PATTERSON KEAHEY, P.C.**
One Independence Plaza, Suite 612
Birmingham, Alabama 35209
Telephone: (800) 291-0050
Facsimile: (205) 871-0801

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

|  |  |
|---|---|
| IN RE: ASBESTOS CASES OF HATCH, JAMES & DODGE and G. PATTERSON KEAHEY. | **PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO REMAND AND FOR AWARD OF COSTS AND ATTORNEYS' FEES** |
| JOSEPH ALEXANDER ANDERSON, JR., and ARVA ANDERSON | **CASE NO.: 2:06-cv-741** |
| **Plaintiffs,** | **Judge Ted Stewart** |
| vs. |  |
| **ASBESTOS DEFENDANTS** | (State Court Master Case No. 010900863 AS; State Court Case No. 060912863 – Judge Glenn K. Iwasaki) |

Plaintiffs move pursuant to 28 U.S.C. § 1447 that this Court remand this action to the state court from which it was removed. Plaintiffs also seek an award of costs and attorneys' fees in connection with their motion seeking remand.

## A. Background

The removal of this case, unauthorized under Federal law, is a transparent effort to delay the progress of the case until the plaintiff, Joseph Anderson, Jr., dies. Mr. Anderson was diagnosed with mesothelioma on October 10, 2005. Mesothelioma is an "invariably fatal cancer...for which asbestos exposure is the only known cause..." *In re Patenaude*, 210 F.3d 135, 138 (3d Cir.), *cert. denied*, 531 U.S. 1011 (2000). It kills its victims "generally within two years of diagnosis[,]" during which "[m]esothelioma victims invariably suffer great pain and disability." *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 633 (3d Cir.), *aff'd*, 521 U.S. 591 (1997).

Mr. Anderson and his wife, Arva Anderson, filed suit against the defendants on August 3, 2006, in Salt Lake County Third District Court seeking damages for personal injury and loss of consortium.[1] The plaintiffs sought leave, on that same day, for permission to take an expedited videotape deposition of Joseph Anderson, Jr. because of the deteriorating state of his health.[2] In a declaration attached to the motion for leave, Mr. Anderson's treating physician expressed his concern about Joseph Anderson's ability to survive for any significant length of time.[3]

Defendants Ford Motor Company and General Motors Corporation, with the consent of many defendants, filed a notice of removal on September 1, 2006, asserting the existence of federal jurisdiction under 28 U.S.C. §1441 because the underlying action arose, in part, out of activities conducted on federal enclaves. The removal was filed despite clear and unequivocal

---

[1] In re: Asbestos Cases of Hatch, James & Dodge and G. Patterson Keahey, Joseph Alexander Anderson, Jr. and Arva Anderson v. Asbestos Defendants, *Summary Complaint*, Case No. 060912863, Master Case No. 010900863, August 3, 2006 attached to this motion as Exhibit "A" and incorporated fully by reference.
[2] *Motion for Leave to Take Expedited Videotape Deposition of Plaintiff Joseph Alexander Anderson, Jr.* attached to this motion as Exhibit "B" and incorporated fully by reference.
[3] *Id.*

language in the plaintiffs' master complaint that the plaintiffs had disclaimed any recovery for

any injuries arising from activities conducted on federal enclaves.

### B. Defendants Were On Notice That Plaintiffs Had Disclaimed Federal Claims

According to the Case Management Order governing the *Anderson* case, the action

entitled *In Re Asbestos Litigation*, Master Case No. 010900863 AS, is "the Master case for all

cases involving exposure to asbestos-containing products."[4]   The Master Complaint governing

the cases removed to this Court includes the following language:

> **The Federal Courts lack subject matter jurisdiction over this action, as there is no federal question and incomplete diversity of citizenship due to the presence of a Utah defendant.  Removal is improper.  Every Claim arising under the Constitution, treaties, or laws of the United States is *expressly disclaimed* (including any claim arising from an act or omission on a federal enclave, or of any officer of the U.S. or any agency or person acting under him occurring under color of such office).  No claim of admiralty or maritime law is raised.  Plaintiffs sue no foreign state or agency.**[5]   (emphasis added)

As required by the case management order, a "brief complaint" was filed on behalf of

Joseph and Arva Anderson on August 3, 2006.  The complaint was filed under the aegis of the

Master Complaint.[6]

After receiving the defendants' notice of removal, counsel for the plaintiffs informed all

defense counsel of record that there was a disclaimer in the Master Complaint and that "[c]ase

law supports this disclaimer as a valid method for plaintiffs to avoid removal or to justify a

remand."[7]   Counsel also reminded the defendants that since Mr. Anderson was a living

---

[4] *See Second Amended Case Management Order No. 1* (relevant excerpts attached to this motion as Exhibit "C" and incorporated fully by reference).

[5] *See* Master Complain, *In Re Asbestos Litigation*, Master Case No. 010900863 AS (relevant excerpts attached to this motion as Exhibit "D" and incorporated fully by reference).

[6] *See* Exhibit "A," *Summary Complaint.*

[7] *Letter* from Plaintiffs' Counsel, Gary M. DiMuzio to All Defense Counsel of Record, September 6, 2006, attached to this motion as Exhibit "E" and incorporated fully by reference.

3

mesothelioma case "it is our intention to expedite this matter so that he can not only be deposed but that he can have his day in court while alive."[8] In reply, counsel for the defendants alleged that they had "been unable to locate any such case law. Please provide us with citations for the case law you assert supports your position or, if unpublished, please provide us with copies."[9]

On September 7, 2006, counsel for the plaintiffs sent a letter to all defense counsel reminding them that it was their burden to establish the basis for removal while, at the same time, providing defendants with citations to and quotations from federal case law in which federal courts had remanded cases to state courts when the plaintiffs had specifically disclaimed federal causes of action. Plaintiffs' counsel asked the defendants to agree to a motion to remand the *Anderson* case to state court.[10]

On that same day, plaintiffs' counsel received another letter from another defense counsel stating that they had been unable to find any case law directly on point.[11] That letter also requested case law in support of the plaintiff's request for a voluntary remand.[12] Plaintiffs' counsel response to that letter included additional case law on remand based on disclaimer and asked "[s]hould I file the remand as agreed or opposed?"[13] Defendants declined plaintiffs' request for an agreed motion to remand on September 11, 2006, alleging that "the law is not

---

[8] *Id.*

[9] *See Copy of E-mail Transmission,* September 7, 2006, from Ron Hellbusch with cc to all defense counsel to Gary M. DiMuzio attached to this motion as Exhibit "F" and incorporated for all purposes.

[10] *See Letter* from Plaintiffs' Counsel to Defendants' Counsel, September 7, 2006, attached to this motion as Exhibit "G" and incorporated for all purposes.

[11] *See Letter* from Dan R. Larsen, Snell & Winter,, with cc to all defense counsel, to Gary M. DiMuzio, September 7, 2006 attached to this motion as Exhibit "H" and incorporated for all purposes.

[12] *Id.*

[13] *Id.*

well-settled that a general disclaimer for any asbestos claims arising on a federal enclave is sufficient to effectively avoid federal court jurisdiction."[14]  Hence, this motion to remand.

## C.  Argument & Authorities

### 1.    Plaintiffs Are Masters of Their Complaint.

The United States Supreme Court in *Caterpillar Inc. v. Williams* declared that the presence or absence of federal-question jurisdiction is governed by the "well-pleaded complaint rule."  482 U.S. 386, 392, 107 S. Ct. 2425, 2429 (1987).  This rule provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint.  *Id.*  "The party who brings a suit is master to decide what law he will rely upon."  *Willy v. Coastal Corp.*, 855 F.2d 1160, 1167 (5th Cir. 1988); *see also Healy v. Sea Gull Specialty Co.*, 237 U.S. 479, 480, 35 S. Ct. 658, 659, 59 L.Ed. 1056 (1915); *Mountain Fuel Supply Co. v. Johnson*, 586 F.2d 1375, 1380 (10th Cir. 1978) (the determination of whether a "federal question" exists to justify removal jurisdiction requires a court to look solely at the plaintiffs' complaint rather than to any subsequent pleading or the notice for removal).

The Master Complaint in this case expresses the plaintiffs' intent to rely on Utah state law and to disclaim any causes of action under federal law.  Since the plaintiffs are masters of their complaint, they are entitled to choose a state forum over a federal forum.

### 2.    Plaintiffs' Disclaimer of Federal Claim Mandates Remand to State Court.

Plaintiffs, Joseph and Arva Anderson, have chosen not to assert, and to specifically disclaim, any causes of action arising under federal law.  Plaintiffs' Master Complaint specifically and unequivocally expressed the Anderson's desire to limit their complaint to state

---

[14] See *Letter* from Dan R. Larsen, cc All Defense Counsel, to Plaintiffs' Counsel, September 11, 2006, attached to this motion as Exhibit "I" and incorporated for all purposes.

law claims, including specifically not asserting any claim arising from an act or omission on a federal enclave, or of any officer of the U.S. or any agency or person acting under him occurring under color of such office. *See* Exhibit "D." Federal case law is clear. When a plaintiff has a choice between federal law claims and state law claims, he may elect to proceed in state court on the exclusive basis of state law, thus defeating the defendant's opportunity to remove, but taking the risk that any federal claims will one day be precluded. *Carpenter v. Wichita Falls Independent School Dist.*, 44 F.3d 362, 366 (5th Cir. 1995) citing *Merrell Dow Pharmaceuticals, Inc. v. Thompson,* 478 U.S. 804, 809, 106 S. Ct. 3229, 3233 n. 6, 92 L.Ed.2d 650 (1986) ("Jurisdiction may not be sustained on a theory that the plaintiff has not advanced."); *Travelers Indem. Co. v. Sarkisian,* 794 F.2d 754, 758 (2d Cir.), *cert. denied,* 479 U.S. 885, 107 S. Ct. 277, 93 L.Ed.2d 253 (1986); 1A James W. Moore & Brett A. Ringle, *Moore's Federal Practice* ¶ 0.160 (2d ed. 1979) (noting the freedom of the plaintiff to "ignore the federal ground and rely on the state ground").

      In *Caldwell v. American Home Products Corp.*, the plaintiffs filed their complaint in the Circuit Court of Jones County, Mississippi, setting forth various state law claims and expressly disclaiming any federal rights or causes of action. 210 F.Supp.2d 809 (S.D. Miss. 2002). The court, in remanding the case to state court, said that the fact that plaintiffs could have alleged viable federal claims is of "no moment" because by electing to disclaim all federal claims, plaintiffs will be precluded from trying federal claims in the state court. *Id* at 811. That fact, the court observed, does not prevent the plaintiffs from being entitled to remand. *Id. See also, Lott v. Nationscredit Financial Services Corp.*, 2004 WL 741681, 3 (N.D. Miss. 2004) (defendants' argument for removal are without merit because plaintiff has disclaimed all federal claims of action); *Petty v. Gulf Guar. Ins. Co.*, 303 F.Supp.2d 815, 818 & n.3 (N.D. Miss. 2003) (plaintiffs

6

specifically disclaimed any federal claims in their complaint so that "all of their claims, therefore, arise under and will succeed or fail based solely on state law").

In *Westbrook v. Asbestos Defendants*, 2001 WL 902642, *2 (N.D. Cal. 2001), the plaintiffs disclaimed, in writing, any claims arising out of work done on United States Navy ships. The court, in remanding the case to state court, stated:

> Plaintiff's claims against defendant Todd Shipyards Corp., excludes plaintiff's asbestos exposure at military and federal government jobs sites and the Board US Navy Vessels….the court sees no reason not to hold plaintiffs in this case to their waiver of claims arising out of work done on federal job sites in Vessels. This waiver, therefore, justifies remand. If plaintiffs later attempt to reverse course and are allowed to do so by the state court despite their expressed waiver, Todd can always file for removal once again.

*Id.* *See also Overly v. Raybestos-Manhattan, Inc.,* 1996 WL 532150, *3 (N.D. Cal. 1996) (plaintiffs waived all design defect claims that could have given rise to federal officer exposure); *Schilz v. A.P. Green Ind., Inc.,* 2002 WL 102608, *1 (N.D. Cal. 2002) (citing Plaintiff's Waiver of Claim for Design Defect Product Liability, the court ruled that removal was improper).

In a case in the Northern District of Mississippi, numerous asbestos claims were removed from state court in Mississippi. Federal question jurisdiction was asserted to exist under both "federal enclave" and "federal officer" theories. Plaintiffs moved for remand on the ground that they had expressly disclaimed any claims that could raise a federal question. The court granted plaintiffs' motion in an opinion styled *Mangialardi v. Harold's Auto Parts, Inc, et al.,* No. 2:02CV-121-B-B (N.D. Miss. Nov. 18, 2002).[15] Defendants argued that plaintiffs' failure-to-warn claims could warrant federal court jurisdiction, but the district court ruled that because all federal claims had been waived, there was no federal jurisdiction:

---

[15] *See Mangialardi v. Harold's Auto Parts, Inc, et al.,* No. 2:02CV-121-B-B (N.D. Miss. Nov. 18, 2002 attached to this motion as Exhibit "J" and incorporated for all purposes.

The court finds that the plaintiffs have waived all federal claims; therefore, the case should be remanded. It should be emphasized, however, that remand in this case rests upon the plaintiffs' complete waiver and disavowal of all federal claims, including all failure to warn claims based in whole or in part upon federal asbestos exposure. Any future attempt by plaintiffs to reassert such federal-exposure-based claims would immediately render this case once again subject to removal…

Since the plaintiffs have stipulated that they will not pursue any federal claims, should any of these plaintiffs' alleged injuries be proven at trial to have resulted from federal exposure, the fact-finder is precluded from considering those injuries and the calculation of damages. Just as a plaintiff who stipulates damages in an amount less than $75,000 to avoid diversity jurisdiction cannot later claim greater damages in state court, the plaintiffs in the present case cannot now disclaim their federal causes of action and later argue damages caused by federal exposure…

This court finds that the plaintiffs in the present case have effectively waived their federal claims now and forever and have thereby defeated removal.

Just as in *Mangialardi*, the plaintiffs in this case have explicitly waived and disclaimed any federal causes of action.

In *Hardmon v. City of Clarksdale*, 1998 WL 378380 (N. D. Miss. May 21, 1998), defendant removed a wrongful termination case filed in state court. Although the plaintiff did not seek any relief under federal law, defendants argued that plaintiff was, in effect, making an equal protection claim under the United States Constitution. The district court straightforwardly rejected defendants' contentions, reaffirming the principle that a plaintiff is free to disclaim any federal law claims:

The court begs to differ. Unless plaintiff claims she was treated differently because of her inclusion in a group protected by the Fourteenth Amendment, she cannot possibly be asserting an equal protection claim. She has specifically disavowed any intention to make such an argument, and therefore, defendants cannot invoke this court's subject matter jurisdiction on that basis.

As to plaintiff's claim for negligence per se based on defendants' alleged violation of the FMLA, the court reaches the same conclusion. With plaintiff's specific disclaimer, the court can draw only one conclusion: plaintiff is not

8

seeking any relief under the FMLA. In that situation, no federal question is raised.

Id. at * 1.

Addressing removal, the Tenth Circuit Court of Appeals has stated:

"Defendant's right to remove and plaintiff's right to choose his forum are not on equal footing; for example, unlike the rules applied when a plaintiff has filed suit in federal court with a claim that, on its face, satisfies the jurisdictional amount, removal statutes are construed narrowly; where plaintiff and defendant clash about jurisdiction, uncertainties are resolved in favor of remand."

*Martin v. Franklin Capital Corporation*, 251 F.3d 1284, 1289-90 (10th Cir. 2001) (quoting *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994)). The courts strictly construe the removal statues in favor of remand and against removal. Plaintiffs have shown that the federal court lack subject-matter jurisdiction, this case should be remanded to state court.

### 3.     This Court Should Award Plaintiffs Their Costs and Attorneys' Fees Incurred in Connection With this Matter.

28 U.S.C. § 1447(c) provides that in connection with an order remanding a case from federal court to state court, the federal court "may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal."[16] The district court, in its discretion, may award costs and fees for improper removal. In order to be awarded costs and fees, it is not necessary that the plaintiff show that the removal was in bad faith. *Daleske v. Fairfield Communities, Inc.*, 17 F.3d 321, 324 (10th Cir. 1994). *See Suder v. Blue Circle, Inc.*, 116 F.3d 1351, 1352 (10th Cir. 1997) (the only circumstances in which fees may not be assessed against the removing party is where the removal to federal court was proper in the first place). In *Suder*, the Tenth Circuit addressed an appeal of a district court's assessment of costs and

---

[16] "An award of costs and fees pursuant to section 1447(c) is a 'collateral matter over which a court normally retains jurisdiction even after being divested of jurisdiction on the merits.'" *Dead Kennedys v. Biafra*, 46 F.Supp.2d 1028, 1030 (N.D. Cal. 1999) (quoting *Moore v. Permanente Medical Group, Inc.*, 981 F.2d 443, 445 (9th Cir. 1992)).

attorneys fees against a party, Blue Circle, based on the district court's finding that Blue Circle

improperly had removed a case to federal court. Blue Circle argued that because there was a

"colorable basis" for its removal, it was error for the district court to have assessed fees.

Rejecting this argument, the Tenth Circuit Court of Appeals stated:

> The standard is not whether the basis for the removal was merely "colorable;" the
> central inquiry is the "propriety" of the removal, see *Daleske*, 17 F.3d at 324, a
> standard much different than "colorable." A removal is proper only if it is
> legitimate.

*Suder*, 116 F.3d at 1535.

In *Dead Kennedys v. Biafra*, 46 F. Supp. 2d 1028 (N.D. Cal. 1999), the court, addressing

a request for costs and fees resulting from improper removal, observed that

> [i]n deciding whether or not to award costs and attorney's fees, the Court should
> consider whether removal was proper, looking both at the nature of the removal
> and of the remand. The purpose of an award is not to punish the removing party
> but instead to reimburse the party who sought remand for litigation costs incurred
> as a result of removal. The availability of costs and attorney fees replaces the
> former requirement of posting of a bond; however, it serves the same purpose to
> discourage improper removal. *See* 28 U.S.C. § 1447, commentary.

*Id.* at 1030. The Seventh Circuit Court of Appeals, in *Tenner v. Zurek*, 168 F.3d 328, 330 (7th

Cir. 1999), affirmed the district court's award of fees for improper removal and stated: "[t]he

plain wording of the statute [§ 1447(c)] manifests a Congressional determination that the district

court ought to seek a fair allocation of all the costs of defending against an improper removal."

The district court in *Greenidge v. Mundo Shipping Corp.*, 60 F.Supp.2d 10 (E.D.N.Y.

1999), awarded costs and fees to a plaintiff who had successfully obtained remand of a case to

state court. The district court found that although the case was not removed in bad faith, "the

removal greatly complicated the case [and] it would be unfair to require [plaintiffs] or their

counsel to absorb the cost of litigating the remand motion, which in no way advanced their case."

*Id.* at 12. Finding that removal was improper on three different grounds, the district court in *Eyal Lior v. Sit*, 913 F. Supp. 868, 878 (D.N.J. 1996), held that an award of fees and costs was appropriate.

In this case, removal of the cases was not proper and was designed to seek to delay this case in the hopes that Mr. Anderson will die prior to trial. Plaintiffs, at defendants' request, provided defendants with clear legal authority supporting remand. Defendants refused to agree to voluntarily remand the cases. As a result, plaintiffs has been forced to incur substantial fees and costs in requesting remand. As in *Greenidge*, the defendants' removal in this case has significantly complicated the case, resulted in significant and unwarranted delay, and the considerable time and money Plaintiffs have been forced to expend in seeking remand in no way advanced the case.

Under the circumstances of this case, it is equitable and fair that defendants be required to reimburse plaintiffs for the costs and fees they incurred, to be established by affidavit, in seeking remand of these improperly-removed cases.[17]

### D.  Conclusion

For the foregoing reasons, plaintiffs ask the Court to grant the motion to remand, remand this suit to the state court where it was originally filed and for such further relief to which the plaintiffs may be entitled, including an award to plaintiffs and against defendants for the costs and attorneys' fees plaintiffs incur in connection with their motion seeking remand.

---

[17] Plaintiffs' legal counsel have not submitted herewith an Affidavit of Attorneys' Fees and Costs but intend to submit such an affidavit, and any additional information required by the Court, to establish the amount of attorneys' fees and costs incurred.

11

DATED this _____ day of September, 2006.

        **HATCH, JAMES & DODGE, P.C.**
        Mark F. James

        **LAW OFFICES OF G. PATTERSON**
        **KEAHEY, P.C.**
        G. Patterson Keahey

By:      /s/Mark F. James_____
        Attorneys for Plaintiff

Case MDL No. 875    Document 4914    Filed 11/17/06    Page 30 of 423

# EXHIBIT "A"

Mark F. James (5295)
**HATCH, JAMES & DODGE, P.C.**
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

G. Patterson Keahey (*pro hac vice*)
**LAW OFFICES OF G. PATTERSON KEAHEY, P.C.**
One Independence Plaza, Suite 612
Birmingham, Alabama 35209
Telephone: (800) 291-0050
Facsimile: (205) 871-0801

Gary M. DiMuzio (*pro hac vice*)
**LAW OFFICES OF GARY DIMUZIO**
P.O. Box 272909
Houston, Texas 77277
(713) 417-2197
Fax (713) 583-9299

Attorneys for Plaintiffs

**FILED DISTRICT COURT**
**Third Judicial District**

AUG 03 2006

SALT LAKE COUNTY

By_____
                      Deputy Clerk

|  |  |
|---|---|
| **IN RE: ASBESTOS CASES OF HATCH, JAMES & DODGE and G. PATTERSON KEAHEY.** | **SUMMARY COMPLAINT FOR PERSONAL INJURY AND LOSS CONSORTIUM AND DEMAND FOR JURY TRIAL-ASBESTOS** |
| **JOSEPH ALEXANDER ANDERSON, JR., and ARVA ANDERSON** | CASE NO.: 060912863 |
| Plaintiffs, | JUDGE: _____ |
| vs. | **MASTER CASE NO. 010900863 AS** |
| **ASBESTOS DEFENDANTS** | **JUDGE GLENN K. IWASAKI** |

<u>SUMMARY COMPLAINT</u>

1.    Plaintiff-1, JOSEPH ALEXANDER ANDERSON, JR. was born on October 31,

1933.

2.    Plaintiff's asbestos-related injury, date of diagnosis, employment status, and history of exposure to asbestos are as stated on Exhibit A.

3.    Plaintiff-2, ARVA ANDERSON, is the faithful and dutiful spouse of Plaintiff.

4.    MASTER COMPLAINT OF HATCH, JAMES & DODGE and G. PATTERSON KEAHEY, P.C.'s FOR PERSONAL INJURY, LOSS OF CONSORTIUM, WRONGFUL DEATH AND DEMAND FOR JURY TRIAL ("Master Complaint"), Master Case No. 010900863 AS was filed on December 17, 2003 in the Third Judicial District Court of Salt Lake County, State of Utah. A copy of the Master Complaint and related Amended Case Management Order may be obtained upon request from counsel filing this Summary Pleading, and designated portions of the Master Complaint are incorporated by reference in herein pursuant to the authority conferred by the Master Order.  Plaintiff's claims are as set forth in said Master Complaint against the defendants identified in exhibits B through D hereto for the causes of action marked as follows:

|  | Defendants* on Exhibit: | | |
| Cause of Action | B | C | D |
| --- | --- | --- | --- |
| First (Negligence) | X | | |
| Second (Strict Liability) | X | | X |
| Third (False Representation) | X | | X |
| Fourth (Intentional Tort) | X | | X |
| Fifth (Premises Owner/ Contractor Liability) | | X | |
| Sixth (Respiratory Safety Devices-Negligence) | X | | |

| | | | |
|---|---|---|---|
| Seventh<br>(Respiratory Safety Devices-Strict Liability) | X | | |
| Eighth<br>(Brake Shoe Grinding Machine–Negligence) | X | | |
| Ninth<br>(Fraud and Deceit Concealment) | X | | |

| Cause of Action | B | C | D |
|---|---|---|---|
| Tenth<br>(Fraud and Deceit/Negligent Misrepresentation) | X | | |
| Eleventh<br>(Intentional Tort by Conspiracy/Concert of Action) | X | | |
| Twelfth<br>(Fraud [Lorillard Tobacco Co.]) | | | |
| Thirteenth<br>(Loss of Consortium) | X | X | X |
| Fourteenth<br>(Wrongful Death) | | | |
| Fifteenth<br>(Household/Secondary Exposure) | X | X | X |

5.     Plaintiffs were married on November 25, 1961.

JURY DEMAND

6.     Plaintiffs hereby make a demand for a jury trial of all issues triable of right by a

jury and have paid their statutory fee thereof.


DATED this the _____ day of _____, 2006.

                              HATCH, JAMES & DODGE, P.C.
                              and
                              G. PATTERSON KEAHEY, P.C.

By: _____

Mark James
Attorneys for Plaintiff

<u>EXHIBIT A</u>

Plaintiff's exposure to asbestos and asbestos-containing products occurred at various locations both inside and outside the State of Utah, including, but not limited to:

| **LOCATION** | **JOB TITLE** | **YEARS WORKED** |
|---|---|---|
| U.S. Air Force Base Korea | | |
| Lackland Air Force Base San Antonio, TX | | 1952 |
| Amarillo Air Force Base Amarillo, TX | | 1952-1953 |
| Turner Air Force Base Albany, GA | | 1953 |
| Sequoia Ventures, Inc. Castlegate Powerhouse San Francisco, CA | Helper | 1950-1955-1957 |
| Paul W. Larsen Contractor, Inc. Commercial Site Salt Lake City, UT | Pipefitter | 1951 |
| Unknown Employer Dugway Proving Grounds Dugway, UT | Pipefitter | 1951 |
| Unknown Employer Phillips 66 Oil Refinery Woods Cross, UT | Pipefitter | 1951 |
| Unknown Employer Arco Defense Depot Arco, ID | Pipefitter | 1960's-1970's |
| M.G. Ericson Plumbing & Heating Co. Commercial Site Salt Lake City, UT | Pipefitter | 1951-1952 |

| | | |
|---|---|---|
| Stearns Roger Corp.<br>Kemmerer Power Plant<br>Kemmerer, WY | Pipefitter | 1953 |
| Keystone Fabrication Company (Compton, CA)<br>Kemmerer Power Plant<br>Kemmerer, WY | Pipefitter | 1953-1954 |
| Curtis D. Evans<br>Murray High School<br>Murray, UT | Pipefitter | 1954<br>(approx. 6 months) |
| Evans/Palmer Co.<br>Commercial Site<br>Logan, UT | Pipefitter | 1954-1955 |
| Carlson Plumbing Co.<br>Commercial Site<br>Salt Lake City, UT | Pipefitter | 1955, 1959 |
| Standard Plumbing & Heating Co.<br>Commercial Site<br>Salt Lake City, UT | Pipefitter | 1955-1959 |
| Hansen Niederhauser Co., Inc.<br>Commercial Site<br>Salt Lake City, UT | Pipefitter | 1956 |
| Walters Plumbing & Heating Company<br>Commercial Site<br>Salt Lake City, UT | Pipefitter | 1956 |
| Walsh Plumbing Co.<br>Commercial Site<br>Salt Lake City, UT | Pipefitter | 1957 |
| Fluor Corp. (Irvine, CA)<br>Industrial Site (S)<br>Salt Lake City, UT | Pipefitter | 1958-1959 |
| W.J. Mechanical Contractors<br>Commercial Site<br>Salt Lake City, UT | Pipefitter | 1958-1959 |

| | | |
|---|---|---|
| A&B Plumbing & Heating Company<br>Commercial Site (S)<br>Salt Lake City, UT | Pipefitter | 1959 |
| Jack Burns Plumbing & Heating<br>Commercial Site (S)<br>Salt Lake City, UT | Pipefitter | 1959 |
| W.B. Johnson Co., Inc.<br>Commercial Site (S)<br>Salt Lake City, UT | Pipefitter | 1959-1961 |
| Brimley Plumbing & Heating<br>Commercial Site<br>Salt Lake City, UT | Pipefitter | 1960 |
| Stan Liles Plumbing & Heating Co.<br>Commercial Site (S)<br>Salt Lake City, UT | Pipefitter | 1961 |
| Brown & Tye Plumbing & Heating<br>Cypress High School<br>Magna, UT | Pipefitter | 1961-1970 |
| Brown & Tye Plumbing & Heating<br>Hercules Power Plant<br>Magna, UT | Pipefitter | |
| Brown & Tye Plumbing & Heating<br>Kennecott Copper Smelter<br>Magna, UT | Pipefitter | |
| Brown & Tye Plumbing & Heating<br>Trade Tech Building<br>Salt Lake City, UT | Pipefitter | |
| Brown & Tye Plumbing & Heating<br>Latter Day Saints Church<br>Wood Cross, UT | Pipefitter | Early 1960's |
| J. Allen Company<br>Chemical Plant (S)<br>Moline, IA | Pipefitter | 1968 |

| | | |
|---|---|---|
| Koldaire, Inc., fka Smiths Food King<br>Draper Elementary School    Pipefitter<br>Draper, UT | | 1970-1978; 1980 |
| Koldaire, Inc., fka Smiths Food King<br>Hill Air Force Base    Pipefitter<br>Ogden, UT | | 1970-1978; 1980 |
| Koldaire, Inc., fka Smiths Food King<br>Smith Store (S)    Pipefitter<br>Salt Lake City, UT | | 1970-1978; 1980 |
| Koldaire, Inc., fka Smiths Food King<br>March Air Force Base    Pipefitter<br>Riverside, CA | | 1980 |
| Reber Company    Pipefitter<br>Kennecott Oxygen Plant<br>Magna, UT | | 1976-1977 |
| Jacobs Constructors, Inc.    Pipefitter<br>Commercial Site (S)<br>Salt Lake City, UT | | 1977-1978 |
| Benjamin F. Shaw Co.    Pipefitter<br>Kemmerer Power Plant<br>Kemmerer, WY | | 1978 |
| Higham-Hilton Mechanical Contractors, Inc.<br>Commercial Site (S)    Pipefitter<br>Salt Lake City, UT | | 1978 |

Industrial Commercial Maintenance FKA Commercial & Industrial Maintenance
Geneva Steel                    Pipefitter              1978-1981
Orem, UT

Industrial Commercial Maintenance FKA Commercial & Industrial Maintenance
Nitrogen Plant (S)              Pipefitter
Pocatello, ID

Industrial Commercial Maintenance FKA Commercial & Industrial Maintenance
Uranium Mill                    Pipefitter
Magna, UT

| | | |
|---|---|---|
| Morrison Knudsen<br>Industrial Site (S)<br>Salt Lake City, UT | Pipefitter | 1979 |
| Andy Henderson Plumbing Co.<br>Boston Building<br>Salt Lake City, UT | Pipefitter | 1980-1990 |
| Andy Henderson Plumbing Co.<br>First Security Bank Building<br>Salt Lake City, UT | Pipefitter | 1980-1990 |
| Andy Henderson Plumbing Co.<br>Freeport Center<br>Clearfield, UT | Pipefitter | 1980-1990 |
| Andy Henderson Plumbing Co.<br>Ogden Federal Building<br>Ogden, UT | Pipefitter | 1980-1990 |
| Andy Henderson Plumbing Co.<br>South High School<br>Salt Lake City, UT | Pipefitter | 1980-1990 |
| Andy Henderson Plumbing Co.<br>Tooele Ordinance Depot<br>Tooele, UT | Pipefitter | 1980-1990 |
| Andy Henderson Plumbing Co.<br>Utah State Unemployment Building<br>Salt Lake City, UT | Pipefitter | 1980-1990 |
| Andy Henderson Plumbing Co.<br>Veterans' Administration Hospital<br>Salt Lake City, UT | Pipefitter | 1980-1990 |
| Energy Fuels<br>Uranium Mill<br>Magna, UT | Pipefitter | 1980's |

**Asbestos-Related Injury-**     **Mesothelioma**

**Date of Diagnosis-**     **October 10, 2005**

**Plaintiff's employment status-**     **Retired**

EXHIBIT B

DEFENDANTS WHO WERE:

- Manufacturers
- Distributors
- Suppliers
- Sellers

AMERICAN STANDARD, INC.

A.W. CHESTERTON COMPANY

BONDEX INTERNATIONAL, INC.          RPM INTERNATIONAL, INC.
                                    RPM, INC.

BUFFALO PUMPS, INC.

BULLOUGH ABATEMENT, INC.

CARRIER CORPORATION

CERTAINTEED CORPORATION            CERTAIN-TEED CORPORATION
                                   KEASBEY & MATTISON
                                   GUSTIN BACON MANUFACTURING CO.
                                   PARKSON PIPELINE MATERIALS
                                   PARKSON, INC.
                                   WATER CO.
                                   TELFORD SMITH SUPPLY CO.

CLEAVER-BROOKS                     AQUA-CHEM, INC.

CRANE CO.                          CRANE PLUMBING & HEATING
                                   MIDWEST PIPING CO.
                                   MIDWEST PIPING & SUPPLY CO.
                                   MIDWEST INVESTMENT
                                   BURKS PUMP
                                   CHEMPUMP
                                   CYCLOTHERM
                                   DEMING PUMP
                                   HYDRO-AIRE
                                   LEAR ROMEC
                                   RESISTOFLEX
                                   STOCKHAM VALVE COMPANY
                                   SWARTWOUT CO.
                                   WEINMAN PUMP COMPANY

DURABALA MANUFACTURING
COMPANY

EMERSON ELECTRIC CO.               COPELAND CORPORATION

FLOWSERVE CORP

ACEC CENTRIFUGAL PUMPS
ALDRICH PUMPS
ANCHOR DARLING VALVES
ATOMAC VALVES
BORG WARNER CORPORATION
BORG WARNER ENERGY EQUIPMENT GROUP
BORG-WARNER INDUSTRIAL CORPORATION
BORG-WARNER INDUSTRIAL PRODUCTS
BW/IP, INC.
BYRON JACKSON CO.
BYRON JACKSON PUMPS
CAMERON PUMPS
CLARK BROS.
DRESSER-RAND
DURAMETALLIC
DURCO INTERNATIONAL
DURCO PUMPS
DURCO VALVES
DURIRON COMPANY
EDWARD STEAM SPECIALTY COMPANY
EDWARD VALVES
FIVE STAR SEAL
FLOWSERVE PUMPS
HENRY VOGT MACHINE COMPANY
IDP PUMPS
JEUMONT-SCHNEIDER PUMPS
KAMMER VALVES
MCCANNA
MOORE STEAM TURBINE
NOBLE VALVES
PACIFIC PUMPS
PLEUGER PUMPS
SCIENCO PUMPS
SIER-BATH PUMPS
STORK ENGINEERED PUMPS
TERRY STEAM TURBINE
UNITED CENTRIFUGAL PUMPS
VALTEK CONTROL PRODUCTS
VOGT
VOGT VALVE COMPANY
WESTERN LAND ROLLER IRRIGATION PUMPS
WILSON-SNYDER PUMPS
WORTHINGTON PUMPS
WORTHINGTON SIMPSON PUMPS

FLUOR CORPORATION

FLUOR MAINTENANCE
FLUOR CONSTRUCTION COMPANY
THE FLUOR CORPORATION, LIMITED
THE FLUOR CORPORATION, LTD.

FORD MOTOR COMPANY

FOSTER WHEELER NORTH AMERICA     FOSTER WHEELER ENERGY
CORPORATION

| | |
|---|---|
| GARLOCK SEALING TECHNOLOGIES, LLC | ENPRO CORPORATION |
| GENERAL MOTORS CORPORATION | |
| GEORGIA-PACIFIC CORPORATION | BESTWALL GYPSUM COMPANY |
| THE GOODYEAR TIRE & RUBBER COMPANY | GOODYEAR AEROSPACE CORP. LORAL CORPORATION LOCKHEED MARTIN TACTICAL SYSTEMS, INC. AIRCRAFT BRAKING SYSTEMS CORP. |
| HAMILTON MATERIALS, INC. | |
| HANSON PERMANENTE CEMENT, INC. | KAISER CEMENT CORPORATION GYPSUM CARRIER, INC. |
| HENRY VOGT MACHINE COMPANY | |
| HILL BROTHERS CHEMICAL COMPANY | |
| HONEYWELL, INC. | ALLIEDSIGNAL, INC. |
| INDUSTRIAL SUPPLY COMPANY | |
| ITT INDUSTRIES, INC. | GOULDS PUMPS, INC. |
| OAKFABCO, INC. | |
| OWENS-ILLINOIS, INC. | |
| PHILIPS ELECTRONICS NORTH AMERICA CORPORATION | NORELCO SERVICE, INC. PHILIPS HOME PRODUCTS, INC. NORTH AMERICAN PHILIPS CORPORATION |
| SEPCO CORPORATION | |
| SEQUOIA VENTURES, INC. | |
| SPX COOLING TECHNOLOGIES, INC. | |
| T.H. AGRICULTURE & NUTRITION. COMPANY | SUC THOMPSON HAYWARD CHEMICAL LLC. |
| THERMAL WEST | |
| UNION CARBIDE CORPORATION | UNION CARBIDE CHEMICALS AND PLASTICS COMPANY, INC. UNION CARBIDE AND CARBON PRODUCTS LINDE AIR PRODUCTS COMPANY |
| WARREN PUMPS, INC. | |
| WESTINGHOUSE ELECTRIC CORPORATION | VIACOM, INC. |

YORK INTERNATIONAL
CORPORATION

BORG-WARNER AIR CONDITIONING, INC.

ZURN INDUSTRIES, INC.

ZURN INDUSTRIES, INC., ENERGY DIVISION
ERIE CITY IRON WORKS
ERIE CITY BOILERS

EXHIBIT C

PREMISES OWNER/CONTRACTOR DEFENDANTS, JOBSITES, YEARS

**HERCULES, INC.**                      **HERCULES POWDER COMPANY**

**KENNECOTT UTAH COPPER**               **RIO TINTO**
**CORPORATION**

**UTAH POWER & LIGHT COMPANY**

EXHIBIT D

RESPIRATORY SAFETY DEVICE DEFENDANTS

BRAKE SHOE GRINDING MACHINE DEFENDANTS

DIATOMACEOUS EARTH DEFENDANTS

ALL OTHER DEFENDANTS

**DAIMLERCHRYSLER CORPORATION**

# EXHIBIT "B"

COPY

FILED DISTRICT COURT
Third Judicial District

AUG 03 2006

SALT LAKE COUNTY

By_____
Deputy Clerk

Mark F. James (5295)
**HATCH, JAMES & DODGE, P.C.**
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

G. Patterson Keahey (*pro hac vice*)
**LAW OFFICES OF G. PATTERSON KEAHEY, P.C.**
One Independence Plaza, Suite 612
Birmingham, Alabama 35209
Telephone: (800) 291-0050
Facsimile: (205) 871-0801

Gary M. DiMuzio (*pro hac vice*)
**LAW OFFICES OF GARY DIMUZIO**
P.O. Box 272909
Houston, Texas 77277
(713) 417-2197
Fax (713) 583-9299

Attorneys for Plaintiffs

| | |
|---|---|
| IN RE: ASBESTOS CASES OF<br>HATCH, JAMES & DODGE and G.<br>PATTERSON KEAHEY.<br><br>JOSEPH ALEXANDER ANDERSON,<br>JR., and<br>ARVA ANDERSON<br><br>          **Plaintiffs,**<br><br>vs.<br><br>ASBESTOS DEFENDANTS | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **MOTION FOR LEAVE TO TAKE**<br>**EXPEDITED VIDEOTAPE**<br>**DEPOSITION OF PLAINTIFF JOSEPH**<br>**ALEXANDER ANDERSON, JR.**<br><br>CASE NO.:  _060912663_<br><br>**JUDGE GLENN K. IWASAKI** |

Plaintiffs Joseph Alexander Anderson, Jr. and Arva Anderson through their legal counsel

hereby move the Court for an order authorizing the take of Mr. Anderson's video tape

deposition. The basis for Plaintiffs' request is that Mr. Anderson is extremely ill. His health is

rapidly deteriorating. He has been diagnosed with malignant mesothelioma, which is a terminal

disease. Because delay in taking Mr. Anderson's deposition and preserving his testimony for

trial may result in substantial prejudice to Mr. Anderson should he pass away before the trial of

this matter, Mr. Anderson respectfully requests that the Court enter an order allowing Mr.

Anderson's testimony to be preserved. Plaintiffs intend to diligently and immediately seek

service of process on as many defendants in this lawsuit prior to the taking of the deposition. If

authorized by the Court, Plaintiffs' legal counsel intend to take the video tape deposition of Mr.

Anderson, at Mr. Anderson's home in Nephi, Utah, sometime in September, 2006, a date to be

agreed upon by both parties.

DATED this 3rd day of August, 2006.

HATCH, JAMES & DODGE, P.C.

G. PATTERSON KEAHEY, P.C.

and

LAW OFFICES OF GARY DIMUZIO

By: _____
Mark James
Attorneys for Plaintiffs

# EXHIBIT "C"

IN THE THIRD JUDICIAL DISTRICT COURT

OF SALT LAKE COUNTY, STATE OF UTAH

FILED DISTRICT COURT
Third Judicial District

SEP 3 0 2003

SALT LAKE COUNTY

By _____

Deputy Clerk

| | |
|---|---|
| IN RE ASBESTOS LITIGATION | ) |
| | ) SECOND AMENDED CASE |
| | ) MANAGEMENT ORDER NO. 1 |
| | ) |
| | ) |
| | ) Case No. 010900863 AS |
| | ) |
| _____ | ) Honorable Glenn K. Iwasaki |

Based upon representations by various potential plaintiffs' counsel to the judges of the

Third Judicial District Court of Salt Lake County, Utah, this Order is entered in anticipation of a

substantial increase in asbestos litigation in Utah courts.

This order is intended to facilitate the administration of those cases involving allegations

of asbestos exposure by reducing multiple filings and hearings and by setting out orders for the

orderly disposition of such cases. This order shall apply to all cases filed by Brayton Purcell and

by Ness, Motley, Loadholt, Richardson & Poole in which a claim for money damages is based

upon allegations of exposure to products containing asbestos and/or machinery calling for the use

of asbestos ("asbestos cases").

## I.

### GENERAL PROCEDURES

1. <u>Cover Sheet</u>: A cover sheet shall be filed with each pleading. The cover sheet

shall list the party filing the pleading and its counsel; it shall also list in a vertical column all

other parties.

2. <u>Master Service List</u>: Plaintiffs' counsel shall maintain a master service list of all

counsel representing parties in any asbestos cases governed by this Order. Defense counsel shall

e-mail their addresses to plaintiffs' counsel at the time they enter their appearances. An updated copy of this master service list will also be filed in the offices of Judge Iwasaki. It is the responsibility of all parties to ensure that the current master service list, as updated, is used for the service of all master pleadings.

      3.    <u>Service of Pleadings and Documents</u>: Any party required to serve any notice in an asbestos case shall serve one copy of the document on counsel for each party as they appear on the service list for that individual case, and file it with the Court as appropriate.

      a.    The parties may stipulate to service of any pleading, discovery document, or other written material by e-mail ("e-service") in lieu of standard service by mail or hand delivery, and are encouraged to do so. Such e-service shall be deemed the same as service by hand delivery for computing time to file a response.

      b.    No party will be deemed bound by e-service unless it has affirmatively stated that it will agree to such service in writing, but if such an election is made by a party in one case, it will be deemed effective in all cases until expressly rejected in writing. Also, if an attorney stipulates to e-service on behalf of one client s/he will be expected to accept e-service for all his/her clients. Parties may reject a prior e-service agreement if such an election is not made.

      4.    <u>Status of Service of Process</u>: At the time Initial Disclosures by plaintiff are due, plaintiffs' counsel shall provide a list of all parties who have been served to date and their attorneys. The Certificate of Service on the Initial Disclosures is sufficient to satisfy this requirement. Defendants shall have forty-five (45) days from the date of proper service in which to file an Answer or otherwise plead.

5.    Rules of Civil Procedure: The Utah Rules of Civil Procedure shall govern all asbestos cases except to the extent that those rules are modified by this Second Amended Case Management Order.

6.    Master Pleadings: It is hereby ordered that an action entitled In re: Asbestos Litigation, Master Case No. 010900863 AS, shall become the Master case for all cases involving exposure to asbestos-containing products. This Master Asbestos Case shall serve as a depository for all asbestos liability actions. Pleadings, discovery matters, motions, orders, exhibit and witness lists, pre-trial statements and other documents common to all cases shall be filed only in the Master Asbestos Case and not in any individual case. When counsel enters an appearance for the first time for a particular defendant, s/he should file his/her notice of appearance in the Master Asbestos Case. Counsel are thereafter required to notify the Clerk of Court of all changes in their address, telephone numbers, and fax numbers.

a.    In each case, the parties may, if they wish, incorporate by reference any specifically described master pleading, whether that master pleading is filed by that party or by any other party;

b.    Plaintiff's counsel should file a Master Complaint and then incorporate it by reference in a brief complaint filed on behalf of each individual plaintiff;

c.    Defendants are encouraged to file Master Answers and to incorporate their Master Answers by reference in answering the individual Complaints filed on behalf of each plaintiff.

d.    Any party shall have the right to move against or contest any master pleading as though that master pleading were filed in an individual case.

-3-

b.      Plaintiff's counsel shall file a motion seeking that a case be designated as exigent.  Defendants shall have 14 days thereafter to object on the basis that the scheduled case does not meet the definition of an exigent case.

c.      Each exigent case will have a separate six-month pre-trial scheduling order entered, using the same basic format as the attorneys' planning conference format used in all non-exigent cases.  Plaintiff may request a trial setting upon completion of its obligation to prove complete medical records, pathological materials, autopsy reports (where applicable) and product identification evidence.

d.      The subsequent death of the plaintiff will be considered just cause for returning the case to a non-exigent status unless the court rules otherwise.  Issues resulting from the death of the plaintiff (*e.g.*, failure to comply with formalities in regard to proper substitution of plaintiff, medical and autopsy issues, impact on the jury if one has already been impaneled, etc.) may be considered by the court in regard to a request for maintaining the case on an exigent trial setting.

DATED this _30_ day of _SEPT._ , 2003.

Glenn K. Iwasaki
District Court Judge

# EXHIBIT "D"

Brent O. Hatch (5715)
Mark F. James (5295)
**HATCH, JAMES & DODGE, P.C.**
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

G. Patterson Keahey, Esquire
**LAW OFFICE OF G. PATTERSON KEAHEY, P.C.**
One Independence Plaza, Suite 612
Birmingham, Alabama 35209
Telephone: (800) 291-0050
Facsimile: (205) 871-0801

Attorneys for Plaintiffs

### IN THE THIRD JUDICIAL DISTRICT COURT, SALT LAKE COUNTY,

### STATE OF UTAH

| | |
|---|---|
| IN RE: ASBESTOS CASES OF HATCH, JAMES & DODGE and LAW OFFICE OF G. PATTERSON KEAHEY, P.C.<br><br>   Plaintiffs,<br><br>vs.<br><br>ASBESTOS DEFENDANTS | **MASTER COMPLAINT OF HATCH, JAMES & DODGE AND KEAHEY FOR PERSONAL INJURY, LOSS OF CONSORTIUM, WRONGFUL DEATH AND DEMAND FOR JURY TRIAL**<br><br>Master Case No. 010900863 AS<br><br>Judge Glenn K. Iwasaki |

As used herein, "Plaintiff-1" shall mean the asbestos-injured plaintiff; "Plaintiff-2" shall mean the spouse of Plaintiff-1.

As used herein, the masculine gender shall be deemed to include the feminine gender whenever the asbestos-injured plaintiff is a female.

1.     The true names and capacities, whether individual, corporate, associate, governmental or otherwise, of defendants DOES 1 through 800, are unknown to plaintiff at this time, who therefore sues said defendants by such fictitious names.   When the true names and capacities of said defendants have been ascertained, plaintiff will amend this complaint accordingly.   Plaintiff is informed and believes, and thereon alleges, that each defendant designated herein as a DOE is responsible, negligently or in some other actionable manner, for the events and happenings hereinafter referred to, and caused injuries and damages thereby to the plaintiff, as hereinafter alleged.

2.     At all times herein mentioned, each of the defendants was the agent, servant, employee and/or joint venturer of his co-defendants, and each of them, and at all said times, each defendant was acting in the full course and scope of said agency, service, employment and/or joint venture.

3.     Plaintiff is informed and believes, and thereon alleges that at all times herein mentioned, defendants on Exhibits B through E and DOES 1 through 800, inclusive, were and are corporations, partnerships, unincorporated associations, sole proprietorships and/or other business entities organized and existing under and by virtue of the laws of the State of Utah, or the laws of some other state or foreign jurisdiction, and that said defendants, and each of them, were and are

2

authorized to do and are doing business in the State of Utah, and that said defendants have regularly conducted business in the County of Salt Lake, State of Utah.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction and jurisdiction of the parties pursuant to the Constitution and the Laws of the State of Utah including Utah Code Ann. § 78-3-4.

5.      Venue is proper pursuant to the Laws of the State of Utah including § 78-13-6 Utah Code Ann.

6.      The Federal Courts lack subject matter jurisdiction over this action, as there is no federal question and incomplete diversity of citizenship due to the presence of a Utah defendant. Removal is improper.  Every claim arising under the Constitution, treaties, or laws of the United States is expressly disclaimed (including any claim arising from an act or omission on a federal enclave, or of any officer of the U. S. or any agency or person acting under him occurring under color of such office).  No claim of admiralty or maritime law is raised.  Plaintiffs sue no foreign state or agency.  Venue is proper in Salt Lake County, Utah.

7.      This civil action is brought pursuant to the laws of the State of Utah including, but not limited to Utah Code Ann. § 78-11-7 (Wrongful death).

8.      The plaintiffs all waive, remit, release, discharge, and dismiss any claim or potential claim for responsibility, in whole or in part, for any or all plaintiffs' injuries or damages to the entities Asbestos Corp. Ltd, Atlas Turner, Inc., Lac D'Amiante du Quebec, Les Mines D'Amiante

3

Bell, Ltd., and/or Societe Miniere Mazarin, Inc., or any other entity that may be, or may claim to be, a Foreign Sovereign subject to the Foreign Sovereign Immunity Act.

9.     Plaintiffs in this action do not assert any claims for, do not see any damages for, and disclaim, waive, release and discharge any recovery of damages for any injuries arising out of exposure to asbestos-containing products designed, manufactured, distributed, sold or marketed by, or any actions or inactions of Asbestos Corp. Ltd, Atlas Turner, Inc., Lac D'Amiante du Quebec, Les Mines D'Amiante Bell, Ltd., and/or Societe Miniere Mazarin, Inc. or any other entity that may be or may claim to be a Foreign Sovereign under the Foreign Sovereign Immunity Act. To the extent plaintiffs have been exposed to such asbestos containing products and have sustained any injuries there from plaintiffs hereby waive, release and discharge their right to recover damages for such injuries.

10.     Because each and every plaintiff in this case has been exposed to asbestos containing products manufactured, sold or installed by one or more Defendants who is/are a citizen of Utah, this case may not properly be removed since there is no diversity of citizenship and "local" Defendants are parties.

4

FIRST CAUSE OF ACTION
(Negligence)

PLAINTIFF-1 COMPLAINS OF DEFENDANTS ON EXHIBIT B AND DOES 1-300,

THEIR ALTERNATE ENTITIES, AND EACH OF THEM, AND FOR A CAUSE OF ACTION

FOR NEGLIGENCE ALLEGES:

11.    At all times herein mentioned, each of the named defendants and DOES 1 through

300 was the successor, successor in business, successor in product line or a portion thereof, assign,

predecessor, predecessor in business, predecessor in product line or a portion thereof, parent,

subsidiary, wholly or partially owned by, or the whole or partial owner of, or member in an entity

researching, studying, manufacturing, fabricating, designing, modifying, labeling, assembling,

distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing,

contracting for installation of, repairing, marketing, warranting, rebranding, manufacturing for

others, packaging and advertising a certain product, namely asbestos, and other products containing

asbestos. Said entities shall hereinafter collectively be called "alternate entities." Each of the herein

named defendants is liable for the tortious conduct of each successor, successor in business,

successor in product line or a portion thereof, assign, predecessor in product line or a portion thereof,

parent, subsidiary, whole or partial owner, or wholly or partially owned entity, or entity that it was a

member of, or funded, that researched, studied, manufactured, fabricated, designed, modified,

labeled, assembled, distributed, leased, bought, offered for sale, supplied, sold, inspected, serviced,

installed, contracted for installation of, repaired, marketed, warranted, rebranded, manufactured for

5

WHEREFORE, plaintiff prays for judgment against defendants, their alternate entities, and each of them, in an amount to be proved at trial in each individual case, as follows:

Plaintiff-1:

a.      For plaintiff's general damages according to proof;

b.      For plaintiff's loss of income, wages and earning potential according to proof;

c.      For plaintiff's medical and related expenses according to proof;

Plaintiff-2:

d.      For plaintiff's damages for loss of consortium according to proof;

Plaintiff-1 and Plaintiff-2:

e.      For plaintiffs' cost of suit herein;

f.      For exemplary or punitive damages according to proof;

g.      For damages for fraud according to proof; and

h.      For such other and further relief as the Court may deem just under the circumstances.

Dated: this 17 day of December, 2003.

HATCH, JAMES & DODGE, P.C.
and
LAW OFFICE OF G. PATTERSON KEAHEY, P.C.

By: _____

BRENT O. HATCH
MARK F. JAMES
Attorney for Plaintiffs

# EXHIBIT "E"

(ASBESTOS LITIGATION)
LAW OFFICES OF

# G. PATTERSON KEAHEY, P.C.

ONE INDEPENDENCE PLAZA
SUITE 612
BIRMINGHAM, ALABAMA 35209



TELEPHONE (205) 871-0707
FACSIMILE (205) 871-0801

EMAIL info@mesohelp.com
www.mesohelp.com

September 6, 2006

To All Defense Counsel of Record

Re:    In the Third Judicial District Court, Salt Lake City, Utah
       <u>Joseph Alexander Anderson Jr. and Arva Anderson v.</u>
       <u>Asbestos Defendants, et al.</u>
       Case No. 060912863 AS

       United States District Court, District of Utah, Central Division
       <u>Joseph Alexander Anderson Jr. and Arva Anderson v.</u>
       <u>Asbestos Defendants, et al.</u>
       Case No. 2:06-cv-741

Dear Counsel:

We received the notice of removal in the above referenced cause. As you know, federal enclave was the basis of the removal. However, in the Master Complaint, there is an express disclaimer: "Every claim arising under the Constitution, treaties, or laws of the United States is expressly disclaimed (including any claim arising from an act or omission on a federal enclave, or of any officer of the U. S. or any agency or person acting under him occurring under color of such office)." Case law supports this disclaimer as a valid method for plaintiffs to avoid removal or to justify a remand.

Mr. Anderson is a living mesothelioma case and of course, it is our intention to expedite this matter so that he can not only be deposed but that he can have his day in court while alive. I would ask that you agree to remand this case immediately to the state court. I have already orally communicated this wish to the filing attorney. I would like to have an answer regarding this matter no later than the end of business on Thursday, September 7, 2006.

Thank you for your prompt attention to this matter.

Sincerely,

/s/: Gary M. Dimuzio

Gary M. DiMuzio

GMD/dp

# EXHIBIT "F"

# Diane Partain

**From:** Hellbusch, Ron [RHellbusch@bakerlaw.com]
**Sent:** Thursday, September 07, 2006 9:00 AM
**To:** dimuzio@DiMuziolaw.com.com; asbestos.utah; Diane Partain; HJD Law Asbestos
**Cc:** Melinda_Morgan@rbmn.com; Anna-Collins@rbmn.com; Heidi-Minson@rbmn.com; pwc@pwlaw.com; nancyw@pwlaw.com; kventi@pblutah.com; asbestos@strongandhanni.com; tfowler@swlaw.com; kbrown@swlaw.com; astander@swlaw.com; lromney@swlaw.com; dferguson@wilhunt.com; asbestos@wilhunt.com; jwhipple@wilhunt.com; Smith, Laura Mae; Birk, Mary; Hellbusch, Ron; asbestos@scmlaw.com; lthomas@scmlaw.com; jdunyon@scmlaw.com; bmaw@fre700.com; asbestos.Groups@chrisjen.com; sboyd@chrisjen.com; Julielawson@chrisjen.com; mhomer@suitter.com; Bhayman@suitter.com; jscotter74@yahoo.com; rknebel@smithglauser.com; dmmoscon@stoel.com; ELJENSEN@stoel.com; rromero@joneswaldo.com; gjsanders@kippandchristian.com; mwakeham@kippandchristian.com; hcolledge@kippandchristian.com; jhawkins@mmrj.com; jminnock@mmrj.com; cross@dunndunn.com; rburbidge@burbidgeandmitchell.com; jsears@burbidgeandmitchell.com; Rrose@rqn.com; groberts@rqn.com; bberrett@berrettandassoc.com; Nedra@berrettandassoc.com; 1rgc1@man.com; rsegal@lynberg.com; asbestos@bermansavage.com; asbestos@bermansavage.com; asbestos.Groups@chrisjen.com; asbestos@scmlaw.com; asbestos@wilhunt.com; astander@swlaw.com; asbestos@strongandhanni.com; Anna-Collins@rbmn.com; asbestos@kippandchristian.com; gjsanders@kippandchristian.com; sboyd@chrisjen.com
**Subject:** RE: UT-Anderson, Joseph

In your September 6, 2006 letter, you state that "[c]ase law supports this disclaimer as a valid method for plaintiffs to avoid removal or to justify a remand." We have been unable to locate any such case law. Please provide us with citations for the case law you assert supports your position or, if unpublished, please provide us with copies.

> -----Original Message-----
> **From:** Diane Partain [mailto:dpartain@mesohelp.com]
> **Sent:** Wednesday, September 06, 2006 3:03 PM
> **To:** Melinda_Morgan@rbmn.com; Anna-Collins@rbmn.com; Heidi-Minson@rbmn.com; pwc@pwlaw.com; nancyw@pwlaw.com; kventi@pblutah.com; asbestos@strongandhanni.com; tfowler@swlaw.com; kbrown@swlaw.com; astander@swlaw.com; lromney@swlaw.com; dferguson@wilhunt.com; asbestos@wilhunt.com; jwhipple@wilhunt.com; Smith, Laura Mae; Hellbusch, Ron; Birk, Mary; asbestos@scmlaw.com; lthomas@scmlaw.com; jdunyon@scmlaw.com; bmaw@fre700.com; asbestos.Groups@chrisjen.com; sboyd@chrisjen.com; Julielawson@chrisjen.com; mhomer@suitter.com; Bhayman@suitter.com; jscotter74@yahoo.com; rknebel@smithglauser.com; dmmoscon@stoel.com; ELJENSEN@stoel.com; rromero@joneswaldo.com; gjsanders@kippandchristian.com; mwakeham@kippandchristian.com; hcolledge@kippandchristian.com; jhawkins@mmrj.com; jminnock@mmrj.com; cross@dunndunn.com; rburbidge@burbidgeandmitchell.com; jsears@burbidgeandmitchell.com; Rrose@rqn.com; groberts@rqn.com; bberrett@berrettandassoc.com; Nedra@berrettandassoc.com; 1rgc1@man.com; rsegal@lynberg.com; asbestos@bermansavage.com; HJD Law Asbestos; Hellbusch, Ron; asbestos@bermansavage.com; asbestos.Groups@chrisjen.com; asbestos@scmlaw.com; asbestos@wilhunt.com; astander@swlaw.com; asbestos@strongandhanni.com; Anna-Collins@rbmn.com; asbestos@kippandchristian.com; gjsanders@kippandchristian.com; sboyd@chrisjen.com
> **Cc:** asbestos.utah
> **Subject:** In the Third District District Court, Salt Lake City, Utah, United States District Court, District of Utah, Central Division, Joseph Alexander Anderson, Jr. v. Asbestos Defendants

Enclosed please find correspondence from Mr. DiMuzio.

Diane R. Partain
Paralegal
Law Offices of G. Patterson Keahey
One Independence Plaza
Suite 612
Birmingham, AL 35209
(T) 205-871-0707
(F) 205-871-0801

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS LEGALLY PRIVILEGED AND CONFIDENTIAL INFORMATION
INTENDED FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE.  IF THE READER OF THIS MESSAGE IS NOT THE
INTENDED RECIPIENT, OR HAS RECEIVED THIS TRANSMISSION IN ERROR, YOU ARE HEREBY NOTIFIED THAT THE
DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED.  IF YOU ARE NOT THE
INTENDED RECIPIENT, DO NOT READ THE CONTENTS OF THIS COMMUNICATION OR ANY ATTACHMENT TO THIS MESSAGE.
PLEASE IMMEDIATELY REPLY TO THE SENDER THAT YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR.  THEN DELETE
IT.  THANK YOU.

---

This email is intended only for the use of the party to which it is
addressed and may contain information that is privileged,
confidential, or protected by law.  If you are not the intended
recipient you are hereby notified that any dissemination, copying
or distribution of this email or its contents is strictly prohibited.
If you have received this message in error, please notify us immediately
by replying to the message and deleting it from your computer.

Internet communications are not assured to be secure or clear of
inaccuracies as information could be intercepted, corrupted, lost,
destroyed, arrive late or incomplete, or contain viruses. Therefore,
we do not accept responsibility for any errors or omissions that are
present in this email, or any attachment, that have arisen as a result
of e-mail transmission.

---

# EXHIBIT "G"

LAW OFFICES OF

# G. PATTERSON KEAHEY, P.C.

ONE INDEPENDENCE PLAZA
SUITE 612
BIRMINGHAM, ALABAMA 35209

® ⊜GCU⊜

TELEPHONE (205) 871-0707
FACSIMILE (205) 871-0801

EMAIL info@mesohelp.com
www.mesohelp.com

September 7, 2006

To All Defense Counsel of Record

Re:   In the Third Judicial District Court, Salt Lake City, Utah
      Joseph Alexander Anderson Jr. and Arva Anderson v.
      Asbestos Defendants, et al.
      Case No. 060912863 AS

      United States District Court, District of Utah, Central Division
      Joseph Alexander Anderson Jr. and Arva Anderson v.
      Asbestos Defendants, et al.
      Case No. 2:06-cv-741

Dear Counsel:

        As I am sure you are aware, the burden is on the defendants when removing on
the basis on federal enclave.   I feel this burden and responsibility is particularly
important when dealing with a living mesothelioma plaintiff who deserves his day in
court.

        You state you have been unable to locate case law for the proposition that a
disclaimer can prevent removal or justify a remand. I suggest checking with some of your
national counsel or Westlaw – the case law exists and is available from both sources.
Below are but a few references (there are more):

      "[I]f a plaintiff indeed has a viable state law claim, he may depend on it alone and
      thereby defeat attempts at removal." Carpenter v. Wichita Indep. Sch. Dist., 44 F.3d 363-
      367 (5th Cir. 1995) (citing Caterpillar, Inc., v. Williams, 482 U.S. 386, 391 n. 7, 107 S.
      Ct. 2425, 96 L. Ed. 2d 318 (1987)).  The fact that plaintiff could have alleged viable
      federal claims is of no moment.  By electing to disclaim all federal claims, plaintiffs will
      precluded from trying federal claims in the state court, and will probably be precluded
      from ever presenting these possible federal claims, but that does not prevent plaintiff
      from being entitled to remand.

      Judge Pickering in Caldwell v. American Home Prods. Corp., 210 F.Supp.2d 809, 811
      (S.D. Miss. 2002). See also Walker v. Atwood Chevrolet-Olds, Inc., 189 F.Supp.2d 594,
      598 (S.D. Miss. 2001) ("a plaintiff with a choice between federal and state law claims
      may elect to proceed in state court on the exclusive basis of state law, thus defeating the

September 7, 2006
Page 2 of 2

defendant's opportunity to remove by taking the risk that his federal claims will one day be precluded.") (quoting <u>Carpenter</u>, supra, 44 F.3d at 366).

One federal judge recently commented on the practice of removing asbestos-related cases to federal court:

> [A]sbestos removal litigation ... generally has less to do with effecting valid removals than with attempting to obtain a transfer of the case to a multi-district litigation (MDL) court, where the case generally languishes for a protracted period of time. While the desire of defendants to reach the comparative safety of an MDL court is understandable, their repeated efforts to do so, regardless of the jurisdictional merits, has resulted in an air of skepticism among the federal courts regarding the validity of most asbestos removals.

Rosamond v. Garlock Sealing Technologies, Inc., 2004 WL 943924 at *4 (N.D. Miss, April 5, 2004).

Given that Mr. Anderson is a alive but suffering from an inevitably fatal form of cancer whose only known cause in North America is asbestos exposure, we will do everything in out power to avoid a removal that would result in his case languishing in the MDL.

Can I file an agreed motion to remand?

Sincerely,

/s/:  Gary M. Dimuzio

Gary M. DiMuzio
Of Counsel

GMD/dp

# EXHIBIT "H"

# Snell & Wilmer
L.L.P.
### LAW OFFICES

15 West South Temple
Suite 1200
Gateway Tower West
Salt Lake City, UT 84101
801.257.1900
801.257.1800 (Fax)
www.swlaw.com

Dan R. Larsen
801.257.1949
dlarsen@swlaw.com

DENVER

LAS VEGAS

ORANGE COUNTY

PHOENIX

SALT LAKE CITY

TUCSON

September 7, 2006

**VIA FACSIMILE (205) 871-0801**
**AND E-MAIL (dpartain@mesohelp.com)**

Gary M. DiMuzio
Law Offices of G. Patterson Keahey, P.C.
One Independence Plaza, Suite 612
Birmingham, Alabama  35209

      Re:    Joseph Alexander Anderson v. Asbestos Defendants

Dear Mr. DiMuzio:

      I received a copy of your September 6, 2006 letter to all defense counsel regarding the Notice of Removal.  After our telephone discussion on September 5th, I and others have researched regarding your statement that an express disclaimer in the master complaint effectively eliminates federal enclave jurisdiction as a basis for removal.  We have been unable to find any case law directly on point.  To properly consider your request for a voluntary remand, I am requesting that you provide us with the supporting case law you reference in your letter. Thanks for your professional courtesy in bringing this matter to our attention.

          Very truly yours,

          Snell & Wilmer

          Dan R. Larsen /mkj

          Dan R. Larsen

DRL:mkj
(Dictated but not read)
cc:    All Defense Counsel (via e-mail)

411670.1

# EXHIBIT "I"

# Snell & Wilmer
### L.L.P.
#### LAW OFFICES

15 West South Temple
Suite 1200
Gateway Tower West
Salt Lake City, UT 84101
801.257.1900
801.257.1800 (Fax)
www.swlaw.com

Dan R. Larsen
801.257.1949
dlarsen@swlaw.com

DENVER

LAS VEGAS

ORANGE COUNTY

PHOENIX

SALT LAKE CITY

TUCSON

September 11, 2006

VIA FACSIMILE (205) 871-0801
AND E-MAIL (dpartain@mesohelp.com) ONLY

Gary M. DiMuzio
Law Offices of G. Patterson Keahey, P.C.
One Independence Plaza, Suite 612
Birmingham, Alabama 35209

     Re:    Joseph Alexander Anderson v. Asbestos Defendants

Dear Mr. DiMuzio:

     After careful consideration, I must respectfully decline your request for a stipulated remand to state court. Contrary to your assertions, the law is not well-settled that a general disclaimer for any asbestos claims arising on a federal enclave is sufficient to effectively avoid federal court jurisdiction. This is particularly true in the Anderson case where the summary complaint expressly alleges that "plaintiff's exposure to asbestos and asbestos-containing products occurred at various locations" including federal enclave worksites. Under the Utah Liability Reform Act, Utah Code Ann. § 78-27-38, the parties are entitled to apportion fault attributable to other parties, including plaintiff, for injuries that occurred on federal enclaves. Since Mr. Anderson seeks recovery for cumulative asbestos exposure and injuries, it would be impossible to parse out the asbestos-related injuries which occurred on versus off federal enclave worksites.

     I recognize your desire to expedite this matter. For that reason, I am providing this letter explaining my position so that you may take whatever action you deem appropriate. I expect the court's assistance will be necessary to resolve this issue.

                    Very truly yours,

                    Snell & Wilmer

                    Dan R. Larsen

DRL:mkj
cc:    All Defense Counsel (via e-mail)

412070.1

# EXHIBIT "J"

Serial: 116304

## IN THE SUPREME COURT OF MISSISSIPPI

No. 2004-IA-01308-SCT

**FILED**

AUG 2 6 2004

OFFICE OF THE CLERK
SUPREME COURT
COURT OF APPEALS

*HAROLD'S AUTO PARTS, INC., ET AL.*                    *Petitioners*

*v.*

*FLOWER MANGIALARDI, ET AL.*                          *Respondents*

### ORDER

This matter is before the Court, en banc, on the Petition for Permission to Appeal From an Interlocutory Order and Motion for Stay filed by counsel for Petitioners. Also before the Court is the response and supplemental response filed by counsel for Respondents. Petitioners seek to appeal an interlocutory order of the Circuit Court of Bolivar County, Mississippi, which denied petitioners' motion to sever filed therein.

After due consideration, the Court finds that the petition for interlocutory appeal is well taken and should be granted. The Court further finds that no further briefing is needed, and we shall proceed to a consideration of the merits.

This interlocutory appeal concerns joinder of multiple plaintiffs in an asbestos, mass tort litigation case. This matter is controlled by *Jansen Pharmaceutica, Inc. v. Armond*, 866 So. 2d 1092 (Miss. 2004). Even though asbestos litigation is, indeed, a "mature tort," as discussed in dicta in *Armond*, this Court did not intend in that case, and we shall not proceed

**EXHIBIT**

tabbies"

"A"

here, to exempt asbestos cases from the requirements of Rule 20, of the Mississippi Rules of Civil Procedure.

The case before us has endured seven amended complaints, and now involves the claims of 264 plaintiffs against 137 named defendants who have identified approximately 600 different employers where asbestos exposure might have taken place. Approximately 220 of the plaintiffs are unable to identify any employment within the state of Mississippi. The complaint provides virtually no helpful information with respect to the claims asserted by the individual plaintiffs. We are provided the following allegations and information regarding the plaintiffs:

    1.    names and social security numbers;

    2.    they are "resident citizens of the State of Mississippi, or other states of the United States, or are personal representatives or wrongful death beneficiaries of deceased plaintiffs (we are not told which plaintiffs are citizens and which are representatives or beneficiaries);

    3.    they were exposed to asbestos products which were "mined, designed, specified, evaluated, manufactured, packaged, furnished, supplied and/or sold" by defendants during "all or part of the period 1930 through the present" (we are not told which plaintiffs were exposed to which products manufactured by which defendants; nor are we told when any particular plaintiff was exposed during the seventy-five year period);

In essence, we are told that 264 plaintiffs were exposed over a 75-year period of time to asbestos products associated with 137 manufacturers in approximately 600 workplaces. We are not told which plaintiff was exposed to which product manufactured by which defendant in which workplace at any particular time. We do not suggest that this lack of

basic information is the result of recalcitrance on the part of plaintiffs' counsel; perhaps plaintiffs' counsel has not furnished the information.

Defendants have strenuously objected to the failure and/or refusal of plaintiffs' to provide the information. They point out that it is impossible to argue to the trial court that joinder was improper, because they aren't provided basic information about each of the plaintiffs. Curiously, rather than filing a motion for more definite statement, or to dismiss, defendants' simply seek the information "as soon as practicable." The defendant's further argue that Rule 20 requires the disclosure to be made.

The position stated by plaintiffs is that defendant's do not need the information right now, since there apparently is a plan to try the cases, one at a time.

We find that all have missed the mark. This matter should not be before us because of a failure to comply with Rule 20, but rather because of an abuse of, and failure to comply with, Rules 8, 9, 10 and 11. What is referred to as "core information" and "disclosure" is basic information which should be known to plaintiffs' counsel *prior* to filing the complaint, not information to be developed in discovery or disclosure. The information should have been included in the complaint.

Complaints should not be filed in matters where plaintiffs intend to find out in discovery whether or not, and against whom, they have a cause of action. Absent exigent circumstances, plaintiffs' counsel should not file a complaint until sufficient information is obtained, and plaintiffs' counsel believes in good faith that *each plaintiff* has an appropriate cause of action to assert against a defendant in the jurisdiction where the complaint is to be

3

filed. To do otherwise is an abuse of the system, and is sanctionable. *See* Miss. R. Civ. P., Rule 11.

Rule 20 allows joinder only where the plaintiffs make certain assertions which demonstrate the matters set out in the rule. In this regard, plaintiffs have wholly failed. Indeed, plaintiffs have not even attempted to provide the information. They presume that they are entitled to proceed with their suit, as filed, and they will demonstrate later that joinder is proper. We can only presume from the record before us that plaintiff take this course because they don't know whether or not joinder is appropriate. This is so, apparently, because they don't know the claims of each plaintiff. They don't appear to know when they were exposed, where they were exposed, by whom they were exposed, or even if they were exposed. Presumably, when they learn this information, plaintiffs' counsel intends to dismiss those who should not have been joined. This is a perversion of the judicial system unknown prior to the filing of mass-tort cases.

We must point out that not all cases involving multiple plaintiffs and/or defendants which have come before this Court appear to have been filed in this manner. We note cases where counsel for the plaintiffs appear to have interviewed each plaintiff, investigated their claims, and developed information necessary to file a complaint on their behalf.

But here, not only have plaintiffs failed to furnish their counsel the necessary information to file the complaint, but plaintiff's counsel continues to resist furnishing to defendants and the court.

4

Incredibly, plaintiffs asked the trial court to set aside its order of certification for interlocutory appeal, claiming they got no notice of the motion, and that "[p]laintiffs were never afforded any of their constitutional rights of due process to contest such a motion." This complaint comes to us from plaintiffs who, more than three years ago, filed suit against 137 defendants; who have amended their complaint six times; and who are apparently unable to explain to the trial court, this Court, or to the defendants, exactly who each plaintiff has sued, and why.

We hereby reverse the trial court's June 23, 2004, Order, insofar at it denies the plaintiffs' motion to sever, and we order severance as to each plaintiff. We hold that plaintiffs have wholly failed in their obligation to assert sufficient information to justify joinder and, accordingly, this matter is remanded to the trial court for a transfer of each plaintiff to an appropriate court of venue and jurisdiction, where known. The trial court is hereby directed to dismiss, without prejudice, the complaint of each plaintiff who fails, within forty-five days of the date of this Order, to provide the defendants and trial court with sufficient information for such determination, and transfer if warranted. Such information must include, at a minimum, the name of the defendant or defendants against whom each plaintiff makes a claim, and the time period and location of exposure.

IT IS THEREFORE ORDERED that the Petition for Interlocutory Appeal by Permission filed by counsel for petitioners is hereby granted.

5

IT IS FURTHER ORDERED that this matter is hereby remanded to the Circuit Court of Bolivar County, Mississippi, for entry of an order granting the petitioners' motion to sever in accordance with the provisions of this Order.

IT IS FURTHER ORDERED that the Circuit Court of Bolivar County shall dismiss, without prejudice, each plaintiff who fails to provide the defendants and the court, within forty-five days of the date of this Order, with sufficient information as specified herein which allows the trial court to determine the appropriate court for transfer.

IT IS FURTHER ORDERED that Respondents are taxed with all costs of this appeal.

SO ORDERED, this the 23rd day of August, 2004.

JAMES W. SMITH, JR., CHIEF JUSTICE
FOR THE COURT

TO GRANT: SMITH, C.J., WALLER AND COBB, P.JJ., CARLSON, GRAVES AND DICKINSON, JJ.

TO DENY: EASLEY. J.

NOT PARTICIPATING: DIAZ AND RANDOLPH, JJ.

B

# EXHIBIT "B"

Dan R. Larsen (4865)
Karthik Nadesan (10217)
Snell & Wilmer L.L.P.
15 West South Temple, Suite 1200
Gateway Tower West
Salt Lake City, UT 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800

Attorneys for Defendant Ford Motor Company and
General Motors Corporation

<hr>

## UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| IN RE: ASBESTOS CASES OF HATCH, JAMES & DODGE and G. PATTERSON KEAHEY<br><br>JOSEPH ALEXANDER ANDERSON, JR. and ARVA ANDERSON,<br><br>Plaintiffs,<br><br>v.<br><br>ASBESTOS DEFENDANTS | **MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO REMAND AND FOR AWARD OF COSTS AND ATTORNEYS' FEES**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>Case No. 2:06-cv-741<br><br>Judge Ted Stewart |

Defendants Ford Motor Company ("Ford") and General Motors Corporation ("General Motors"),[1] through counsel, submit this memorandum in opposition to Plaintiffs' Motion for Remand and for Award of Attorneys' Fees.

<hr>

[1] This memorandum in opposition has been joined by defendants Honeywell, Inc., Kennecott Utah Copper Corporation, Rocky Mountain Power aka PacificCorp aka Utah Power & Light Company, Oakfabco, Inc., T.H. Agriculture & Nutrition, CBS Corporation, American Standard, Inc., Kaiser Gypsum Company, Flowserve Corp. d/b/a Wilson-Snyder Pumps, Fluor Corporation, Garlock Sealing Technologies, BW/IP International, Inc. (f/k/a Borg Warner Industrial Products, successor in interest to Byron Jackson Pumps, predecessor to Flowserve, Inc.); Flowserve Corporation (f/k/a Durco International, Inc.); Flowserve Corporation, on behalf of ACEC Centrifugal Pumps, Atomac, Five Star Seal, Kammer and Stork Engineered Pumps; Flowserve Corporation, f/k/a Valtek, Inc., improperly denominated as Valtek Control Products; Hamilton Materials, Inc., SPX Cooling Technologies, Inc., DaimlerChrysler Corporation, Durametallic, Goodyear Tire and Rubber Company, Hill Brothers Chemical Co., Warren Pumps, LLC, Zurn Industries, Inc., Bullough Abatement, Inc., York International Corporation, Thermal West, Bondex International, Inc. aka RPM, Inc., Carrier Corporation, Hercules Incorporated, Georgia-Pacific Corporation, Crane Co., Sequoia (conditionally consented to removal but not served), Buffalo Pumps, Inc., CertainTeed Corporation, Philips Electronics North America Corporation, Sepco Corporation, Union Carbide Corporation, Goulds Pumps, Inc., Foster Wheeler North America Corporation.

414999

# INTRODUCTION

Plaintiffs' sole basis for seeking remand is that language in the separately filed Master Complaint states that "[e]very claim arising under the Constitution, treaties, or laws of the United States is expressly disclaimed," thus preventing federal jurisdiction from attaching to plaintiffs' individual complaint.[2]  (See Plaintiffs' Memorandum in Support of Motion to Remand and for Award of Costs and Attorneys' Fees at 3).  However, a complaint cannot "avoid federal jurisdiction simply by omitting from the complaint federal law essential to his claim, or by casting in state law terms a claim that can only be made under federal law."  Fung v. Abex Corp., 816 F. Supp. 569, 571 (N.D. Cal. 1992) (holding that plaintiffs' action arose under federal question jurisdiction because many of the allegations in their complaint were based upon exposure to asbestos while at a federal enclave).  In this case, plaintiffs' argument is based on a fundamental misunderstanding of federal enclave jurisdiction.  Removal under federal enclave jurisdiction depends not on the pleading of federal claims, but rather on the assertion that the events that form the basis of the claim occurred on a federal enclave.  Accordingly, because plaintiffs have alleged that their injury occurred as a result of exposure to asbestos on a federal enclave, their cause of action arises under federal jurisdiction.  Furthermore, because plaintiffs have alleged that each exposure to asbestos is a concurrent cause of their injury, plaintiffs cannot disclaim causes of action arising under federal law without disclaiming all of their causes of action based on that same injury.  Either plaintiffs must accede to federal enclave jurisdiction and pursue their claims in federal court, or they must dismiss their complaint because they have disclaimed the entirety of their causes of action.

---

[2]Plaintiffs concede that defendants' removal of this case was procedurally correct.  They do not challenge the timeliness of the removal or the sufficiency of the multiple defendants' consent to removal.  Furthermore, plaintiffs concede that plaintiff Joseph Anderson ("Anderson") was exposed to asbestos on federal enclaves as alleged in their Summary Complaint, a copy of which is attached to Plaintiffs' Memorandum in Support of Motion to Remand and for Award of Attorneys' Fees.

# ARGUMENT

## POINT I

## REMOVAL BY DEFENDANTS WAS PROPER

**A.     Plaintiffs Cannot Disclaim Federal Enclave Jurisdiction Without Disclaiming All Their Causes of Action.**

**i.     Federal Enclave Jurisprudence Generally**

It is well settled law that "personal injury actions which arise from incidents occurring in federal enclaves [as designated by Art. I, § 8, cl. 17] may be removed to federal district court as part of federal question jurisdiction." Akin v. Ashland Chem. Co., 156 F.3d 1030, 1034 (10th Cir. 1998). Under the Constitution of the United States, the United States has the authority to "exercise exclusive Legislation in all Cases whatsoever, . . . over all Places purchased by [the United States] . . . for the Erection of Forts, Magazines, Arsenals, dock-Yards, or other needful Buildings." U.S. Const. Art. I, § 8, cl. 17. When the United States purchases such a federal enclave, "the jurisdiction theretofore residing in the state passes, in virtue of the constitutional provision, to the United States, thereby making the jurisdiction of the latter the sole jurisdiction." Mater v. Holley, 200 F.2d 123, 124 (5th Cir. 1952). As a result, "any law existing in territory over which the United States has 'exclusive' sovereignty must derive its authority and force from the United States and is for that reason federal law, even though having its origin in the law of the state within the exterior boundaries of which the federal area is situate." Id. Therefore, "[i]t would be incongruous to hold that although the United States has exclusive sovereignty in the area here involved, its courts are without power to adjudicate controversies arising there, but must relegate the parties to the courts of another sovereign for relief." Id. at 124-25. Moreover, "a federal forum in which to litigate controversies arising on such [federal enclaves] prevents state judicial interference with matters likely to involve substantial federal interests." Akin v. Big Three, 851 F. Supp. 819, 822 (E.D. Tex. 1994).

Consequently, federal courts have consistently held that, in toxic tort cases, federal jurisdiction is invoked if the exposure to the toxic substance occurred on a federal enclave. See,

Case MDL No. 875   Document 4914   Filed 11/17/06   Page 85 of 423

e.g., Durham v. Lockheed Martin Corp., 445 F.3d 1247, 1250 (9th Cir. 2006) (noting that asbestos exposure on federal enclave gave rise to federal enclave jurisdiction); Ashland Chem., 156 F.3d at 1034 (affirming removal of toxic tort case based on fact that personal injury action had arisen from events occurring on a federal enclave); Big Three, 851 F. Supp. at 822 (finding "a compelling argument for a holding that federal enclave jurisdiction exists over the tort claims" when the exposure occurred on a federal enclave). Significantly, courts have noted that jurisdiction arises because, "in enclave jurisdiction, the determinative fact is the precise location of the *events* giving rise to the claims for relief … it is only when geography is mapped a certain way that an otherwise state claim presents a federal question." Big Three, 851 F. Supp. at 825 (emphasis added). Accordingly, federal jurisdiction is invoked even if only some of the events giving rise to the cause of action, i.e., only a portion of the plaintiffs' exposure, occurred on the federal enclave. See, e.g., Bachman v. Fred Meyer Stores, Inc., 402 F. Supp. 2d 1342, 1347 (D. Utah 2005) (finding federal question jurisdiction because plaintiff has alleged that "some of the injuries sustained by her late husband took place on federal enclaves, including particularly Hill Air Force Base"); In Re Welding Rod Prods. Liab. Litig., No. 1:03CV17000, 2005 U.S. Dist LEXIS 1265, at *21 (N.D. Ohio Jan. 13, 2005) (finding federal jurisdiction when "a not-insignificant portion" of plaintiff's exposure occurred on a federal enclave)[3]; Celli v. Shoell, 995 F. Supp. 1337, 1341 (D. Utah 1997) (finding federal enclave jurisdiction where "one or more of the events at issue occurred at Hill Air Force Base, a federal enclave").

It is due to the nature of toxic tort actions that federal jurisdiction is present even when only a portion of the plaintiffs' exposure occurred on the federal enclave. Specifically, courts have held that federal jurisdiction attaches because the plaintiffs' injury was concurrently caused by exposures to the toxic substance inside the federal enclave and by exposures outside the federal enclave. See, e.g., Reed v. Fina Oil & Chem. Co., 995 F. Supp. 705, 709 (E.D. Tex. 1998); Cirilo v. Lincoln Elec. Co., No. SA04CA115RF, 2004 U.S. Dist. LEXIS 28679, at *11

---

[3] A copy of this unpublished decision is attached as Exhibit "A."

(W.D. Tex. May 24, 2004)[4]. In Reed, plaintiff alleged that he developed leukemia as a result of

exposure to chemicals while employed at a synthetic rubber plant between 1944 and 1979. 995

F. Supp. 707. The case was removed on the basis that the synthetic rubber plant had been a

federal enclave from 1944 through 1955. Id. The court reasoned that "[s]ince Plaintiffs have

not claimed the injury specifically occurred after 1955, and since Plaintffs have alleged one

continuous injury from 1944 through 1979, there are at least ten years of exposure for which . . .

the federal enclave elements are at issue in this case." Id. at 709. Accordingly, the court denied

remand, stating that, "very simply, the plaintiffs have alleged a single, indivisible injury that

arises in part under federal law and in part under state law . . . even if the state and federal claims

were divisible, which they are not, this Court would have jurisdiction over both claims." Id. The

court further held that "since Plaintiffs did not and could not separate the periods of exposure

between 1944 through 1955, and 1955 through 1979, jurisdiction in federal court properly exists

for claims arising from the *entire* period." Id. (emphasis added). Similarly, in Cirilo, the

plaintiff brought causes of action for negligence, gross negligence, strict liability, and

conspiracy, alleging that he had been injured as a result of exposure to manganese from welding

fumes. 2004 U.S. Dist. LEXIS 28679 at *4. The court found federal enclave jurisdiction

appropriate because the plaintiff's claims arose "out of exposure to a chemical on a federal

enclave, in not insignificant measure, and in furtherance of employment duties on the federal

enclave." Id. at *11. Therefore, "the fact that some of Plaintiff's injuries occurred outside of the

federal enclaves does not negate that *the cause of action – alleged as long-term and repeated

exposure – arises under federal law.*" Id. (emphasis added).

ii.     **Federal Enclave Jurisdiction in this Case**

Here, the causes of action alleged in plaintiffs' Master and Summary Complaints are

premised on their allegation that Anderson developed mesothelioma as a result of exposure to

---

[4]A copy of this unpublished decision is attached as Exhibit "B."

defendants' asbestos-containing products.[5]  Plaintiffs' Summary Complaint further alleges that

Anderson was exposed to asbestos on Lackland Air Force Base, Dugway Proving Grounds,

Tooele Army Depot, and Hill Air Force Base. (Summary Complaint ¶ 2, Ex. A).  Plaintiffs do

not dispute that the foregoing locations are federal enclaves.  In addition, plaintiffs' Summary

Complaint alleges that Anderson was exposed to asbestos at other military bases that are likely

federal enclaves.[6]  Accordingly, on its face, plaintiffs' Summary Complaint alleges that their

injuries arose from events occurring on a federal enclave.

    Furthermore, not only have plaintiffs conceded that Anderson was exposed to asbestos

while working at federal enclaves, they have alleged that Anderson's injury, mesothelioma, was

caused by long-term cumulative exposure to asbestos.  Specifically, plaintiffs have alleged that

"plaintiff's exposure to asbestos and asbestos-containing products caused severe and permanent

injury to plaintiff" and "progressive lung disease, cancer, and other serious diseases are caused

by inhalation of asbestos fibers without perceptible trauma and that said disease results from

exposure to asbestos and asbestos-containing products . . . over a period of time." (Master

Complaint ¶¶ 23-24).  Plaintiffs have further alleged that Anderson's "injuries are a result of

---

[5]It may be helpful to briefly explain asbestos litigation background and procedure in the Utah State Court system. All asbestos cases filed in the Third District Court in and for Salt Lake County, State of Utah are initially assigned to the Honorable Glenn K. Iwasaki, District Court Judge.  An asbestos master case has been created to facilitate the administration of matters that are common to the asbestos litigation.  On December 17, 2003, the "Master Complaint of Hatch, James & Dodge and Keahey for Personal Injury, Loss of Consortium, Wrongful Death and Demand for Jury Trial" was filed in the Master Case, No. 010900863 ("Master Complaint," attached hereto as Exhibit "C").  The Master Complaint is 166 pages in length and contains 14 separate causes of action.  Under the Second Amended Case Management Order No. 1 ("CMO") entered by Judge Iwasaki on September 30, 2003, a plaintiff's counsel may file a master complaint and then incorporate it by reference in a brief "Summary Complaint" filed on behalf of each individual plaintiff.  In this case, plaintiffs filed their Summary Complaint on August 3, 2006 asserting their individual claims and incorporating certain causes of action more particularly described in the Master Complaint. Among other things, the Master Complaint contains the following language regarding federal jurisdiction:

   The Federal Courts lack subject matter jurisdiction over this action, as there is no federal question
   and incomplete diversity of citizenship due to the presence of a Utah defendant.  Removal is
   improper.  Every claim arising under the Constitution, treaties, or laws of the United States is
   expressly disclaimed (including any claim arising from an act or omission on a federal enclave, or of
   any officer of the U.S. or any agency or person acting under him occurring under color of such
   office).

(Master Complaint ¶ 6).  Plaintiffs contend that this language prevents any asbestos case filed by plaintiffs' counsels' firm from being removed to federal court.
[6]Specifically, Exhibit A of the Summary Complaint lists exposure to asbestos at Amarillo Air Force Base, Turner Air Force Base, Arco Defense Depot, March Air Force Base, and a U.S. Air Force Base in Korea.

cumulative exposure to asbestos." (Master Complaint ¶ 40).  In fact, plaintiffs' counsel have

previously alleged in another asbestos case that:

- "All inhaled asbestos fibers that touch a cell contribute to the development of mesothelioma."[7]

- "[A]ny exposure to asbestos is considered factually and legally sufficient to support causation, especially in a mesothelioma case." (Sortor Memorandum at 22).

- "[E]very [exposure to asbestos] is a substantial factor in bringing about mesothelioma." (Sortor Memorandum at 23).

- "[A]ll asbestos exposures alter the cellular environment in such a way to contribute to the development and progression of mesothelioma." (Sortor Memorandum at 8).

- "[I]t is more accurate to view the process [of developing mesothelioma] as one in which all fibers contribute to the disease through cumulative insults and injury which overcome the body's defense mechanisms." (Sortor Memorandum at 7).

Simply put, plaintiffs and their counsel allege that Anderson's exposure to asbestos on the

federal enclaves was as much the cause of Anderson's injury, mesothelioma, as his exposure to

asbestos outside the federal enclaves.  Just as the courts found in Reed and Cirilo, Anderson's

claims arising under federal law are indivisible from his claims arising under state law.  As a

result, Anderson cannot exclude all claims arising under federal law without also withdrawing all

causes of action premised on Anderson's mesothelioma.

Furthermore, the "disclaimer" cases cited by plaintiffs are unhelpful to their motion.

First, Westbrook v. Asbestos Defendants, No. C011661VRW, 2001 WL 902642 at *2 (N.D. Cal.

July 31 2001), Overly v. Raybestos-Manhattan, Inc., 1996 WL 532150, at *3 (N.D. Cal. 1996),

and Schilz v. A.P. Green Indus., Inc., 2002 WL 102608, at *1 (N.D. Cal. 2002),[8] have no

relevance to a disclaimer of federal enclave jurisdiction because they involved federal defense

removals under 28 U.S.C. § 1442(a).  However, it is notable that in Overly and Schilz, plaintiffs

were held to have disclaimed their entire design defect causes of action in order to avoid federal

---

[7] Plaintiffs' Response and Memorandum in Opposition to Defendants' Motion for Clarification, Sortor v. Asbestos Defendants, Case No. 040909899 at 11, Third District Court, State of Utah, Jan 3, 2006 ("Sortor Memorandum"), attached as Exhibit "D."  It should be noted that Defendants dispute these general allegations by plaintiffs' counsel to the extent that they are unsupported by well-studied epidemiological evidence.

[8] Plaintiffs failed to attach copies of the unpublished opinions as required by local rule DUCivR 7-2(a). Accordingly, defendants attach copies of those cases as Exhibits "E," "F," and "G."

jurisdiction. Similarly, in <u>Westbrook</u>, the court held that the disclaimer only avoided federal

jurisdiction if plaintiff's claims arose *only* from work that was not done under the direction of

any federal officers. 2001 WL 902642 at *2. However, the court never addressed the issue of

the survival of an independent state law claim because it found that, even absent the disclaimer,

federal defense removal was not appropriate. <u>Id.</u> at *3-4. More on point, plaintiffs cite

<u>Mangialardi v. Harold's Auto Parts, Inc.</u>, No. 2:02CV121BB (N.D. Miss. Nov. 18, 2002), which

involved a disclaimer of federal enclave jurisdiction.[9] Significantly, in that case, the court

emphasized "that remand in this case rests upon Plaintiffs' complete waiver and disavowal of *all*

federal claims, including all failure to warn claims *based in whole or in part* upon federal

asbestos exposure." (Plaintiffs' Memorandum in Support at 8) (emphasis added). "Since the

plaintiffs have stipulated that they will not pursue any federal claims, should any of these

plaintiffs' alleged injuries be proven at trial to have resulted from federal exposure, the fact-

finder is precluded from considering those *injuries* and the calculation of damages." <u>Id.</u>

(emphasis added). Similarly, in this case, plaintiffs cannot disclaim federal jurisdiction unless

they disclaim all causes of action premised upon Anderson's mesothelioma, thereby effectively

disclaiming all of the causes of action alleged in their complaint.

## B.    Plaintiffs' Complaint Failed to Effectively Disclaim Those Causes of Action Invoking Federal Jurisdiction

Even if it were possible for plaintiffs to divest the Court of federal enclave jurisdiction by

simply saying so, plaintiffs' general "disclaimer" in the Master Complaint fails to effectively

identify or exclude federal enclave exposure alleged in the Summary Complaint. In other words,

they have failed to specify what has been disclaimed or waived. Neither plaintiff's Summary

Complaint nor their Memorandum in Support identify the causes of action plaintiffs are

disclaiming or the defendants against whom plaintiffs are waiving their claims. Instead,

---

[9]Instead of attaching a copy of the unpublished federal court order to their Memorandum, plaintiffs attached a Mississippi Supreme Court decision in which plaintiffs' counsel was reprimanded for failing to furnish essential information required by Rule 11 in their complaint and for refusing to furnish such information to the defendants and the court. Because the federal court order was never reported on Westlaw or LexisNexis, defendants have been unable to obtain a copy and must rely upon plaintiffs' quotation.

plaintiffs rely, without any clarification, on broad language in the Master Complaint that "[e]very claim arising under the Constitution, treaties, or laws of the United States is expressly disclaimed." However, even as the "master of their complaint," plaintiffs have an obligation to set forth the facts and legal elements giving rise to their cause of action. Plaintiffs, not defendants, have the burden of accurately defining the contours of their claim. See Fed. R. Civ. P. 8(a) (a pleading which sets forth a claim for relief shall contain "a short and plain statement of the claim"); Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002) (Rule 8(a) pleading requirement intended to give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests). That obligation does not shift merely because plaintiffs decide to define the scope of their causes of action by exclusion, rather than by inclusion. In this case, plaintiffs' claim that their Master Complaint, filed almost three years before this case, prevents federal jurisdiction from attaching to this case or to any case filed by plaintiffs in the future. In fact, plaintiffs claim that the boilerplate disclaimer language in their Master Complaint has waived all grounds for federal court jurisdiction – whether based on federal enclave, federal officer defense, preemption of state law by federal law, or even diversity – regardless of the allegations or causes of action in their Summary Complaint. However, Plaintiffs' Summary Complaint – which is the only complaint specific to these plaintiffs – says nothing about waiver of federal claims. This is not a case where an individual plaintiff has filed a specific waiver of his federal claims. Instead, it is a wholesale effort by plaintiffs' counsel to frustrate removal and avoid federal jurisdiction in each and every case filed in the state, regardless of the particular circumstances involved. Allowing plaintiffs to allege a specific federal enclave cause of action in their Summary Complaint while at the same time generally disclaiming any federal cause of action in their Master Complaint eviscerates Rule 8(a) – a defendant would never have fair notice of the claims alleged against it from the face of the complaint. Accordingly, removal in this case was proper because plaintiffs' general "disclaimer" fails to waive the injury causes of action creating federal enclave jurisdiction.[10]

---

[10] To the extent plaintiffs now intend to disclaim the causes of action creating federal jurisdiction, the Court is not

## POINT II

## ALTERNATIVELY, PLAINTIFFS ARE NOT ENTITLED TO ATTORNEYS' FEES

To the extent the Court finds removal is improper, plaintiffs are not entitled to attorneys'

fees. Although plaintiffs cite numerous cases in support of the award of attorneys' fees, these

cases were overruled by the United States Supreme Court in Martin v. Franklin Capital Corp.,

126 S. Ct. 704 (U.S. 2005). Confronted with the question of when attorneys' fees may be

awarded upon remand, the Court held that, "[a]bsent unusual circumstances, courts may award

attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable

basis for seeking removal." Id., 126 S. Ct. at 711. Significantly, guided by Martin, district

courts within the Tenth Circuit have consistently held that attorneys' fees are not warranted when

a defendant improperly removes based upon an absence of dispositive legal authority. See, e.g.,

Wolf Creek Nuclear Operating Corp. v. Framatome ANP, Inc., 416 F. Supp. 2d 1081, 1090 (D.

Kan. 2006) (holding no basis for attorneys' fees when defendant made an objectively reasonable

attempt to extend the law in the jurisdiction); Toutant v. Nationwide Mut. Ins. Co., 2006 U.S.

Dist. LEXIS 49302, Case No. 06CV00530MSKPAC, *14 (D. Colo. July 19, 2006)[11] ("Given the

novelty of the issue presented here and the absence of dispositive legal authority to guide the

parties conduct, the Court cannot say [defendant's] removal was objectively unreasonable");

Vetro, Inc. v. Active Plumbing and Heating, Inc., 403 F. Supp. 2d 1033, 1039 (D. Colo. 2005)

(award of attorneys' fees was not warranted where removal was improper but defendant's

contention that federal question jurisdiction was present was not clearly without merit). See also

In re: Methyl Tertiary Butyl Ether Prods. Liab. Litig., 2006 U.S. Dist. LEXIS 20575, Case No.

1:00-1898, MDL 1358, *37-38 (S.D.N.Y. April 17, 2006) (denying award of attorneys' fees

where defendants raised colorable issues of law in support of removal because "removability is

an evolving and difficult field of law"); Contreras v. Host Am. Corp., 2006 U.S. LEXIS 62794,

---

required to remand this case. See, e.g., Swett v. Schenk, 792 F.2d 1447, 1450 (9th Cir. 1986) (federal court has
power to hear claims that would not be independently removable even after the basis for removal jurisdiction is
dropped from the proceedings); IMFC Prof'l Servs., Inc. v. Latin Am. Home Health, Inc., 676 F.2d 152, 157 (5th
Cir. 1982) (amendment of a complaint to eliminate a federal question does not affect a court's prior-existing
jurisdiction).
[11] A copy of this unpublished decision is attached as Exhibit "H."

Case No. 3:06cv840, *14 (D. Conn. Sept. 5, 2006) (denying attorneys' fees where issue of validity of defendant's removal was complex and answer was not obvious in light of established case law).[12]  As detailed in Point I above, there is no published authority holding that a plaintiff may disclaim federal enclave jurisdiction when the events that caused the injury occurred at least in part on a federal enclave.  Furthermore, defendants had an objectively reasonable basis for removal given the alleged cumulative effect of asbestos exposure in causing plaintiffs' injury and the allegation that Anderson was in fact exposed on federal enclaves.

In addition, "[t]he appropriate test for awarding fees under § 1447 (c) should recognize the desire to deter removals sought for the purpose of prolonging litigation and imposing costs on the opposing party, while not undermining Congress' basic decision to afford defendants a right to remove as a general matter when the statutory criteria are satisfied." Martin, 126 S. Ct. at 711.  In this case, plaintiffs have not shown that Defendants removed this case for any reason other than to exercise their right to a federal forum. See, e.g., Clark v. Ameritas Inv. Corp., 408 F. Supp. 2d 819, 835 (D. Neb. 2005) (denying attorneys' fees where removal was motivated by defendant's objectively reasonable belief that it was entitled to seek a federal forum for resolution of the case).  In fact, plaintiffs are solely responsible for any significant or unwarranted delay in the prosecution of their claim.  Anderson was diagnosed on October 10, 2005 and was reportedly informed he had about six months to live.  However, plaintiffs initially chose to file suit in the State of California, an improper forum. See California Court Notice of Ruling on Motion to Dismiss for *Forum Non Conveniens*, attached as Exhibit "K."  Moreover, although the California court dismissed the case in May 2006, plaintiffs waited until August 2006 before they re-filed their case in Utah.  Therefore, given Defendants' objectively reasonable belief that they are entitled to a federal forum under existing case law, and the lack of any showing that the removal was motivated by improper reasons, an award of attorneys' fees is not appropriate even if this Court grants plaintiffs' motion to remand.

---

[12]Copies of these unpublished decisions are attached as Exhibits "I" and "J."

**CONCLUSION**

For the foregoing reasons, Ford and General Motors respectfully request that the Court deny plaintiffs' Motion to Remand.

DATED this 10th day of October, 2006.

SNELL & WILMER L.L.P.

/s/ Karthik Nadesan
Dan R. Larsen
Karthik Nadesan
*Attorneys for Defendants Ford Motor
Company and General Motors Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of October, 2006, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which sent notification of such filing to the following:

| | |
|---|---|
| Attorneys for Plaintiff | **HATCH JAMES & DODGE, P.C.**<br>Brent O. Hatch, Esq.<br>Mark F. James, Esq.<br>10 West Broadway, Suite 400<br>Salt Lake City, UT 84101<br>mjames@hjdlaw.com |
| | **LAW OFFICE OF G. PATTERSON KEAHEY, P.C.**<br>G. Patterson Keahey<br>One Independence Plaza, Suite 612<br>Birmingham, AL 35209 |
| GARLOCK, INC. | **J. JOYCE & ASSOCIATES LAW FIRM**<br>Joseph J. Joyce<br>Post Office Box 329<br>Sandy, UT 84091-0329<br>jjj@jjoycelawfirm.com |
| A W CHESTERTON<br>FLUOR CORPORATION | **PARR WADDOUPS BROWN GEE & LOVELESS**<br>Patricia Christensen<br>185 South State Street, Suite 1300<br>Salt Lake City, UT 84111<br>pwc@pwlaw.com |
| GOULD PUMPS, INC. | **STRONG & HANNI**<br>Steven T. Densley<br>3 Triad Center, Suite 500<br>Salt Lake City, UT 84180<br>sdensley@strongandhanni.com |
| EMERSON ELECTRIC CO. | **SMITH & GLAUSER**<br>Richard Glauser<br>7351 South Union Park Avenue, #200<br>Salt Lake City, UT 84047<br>rkg@smithglauser.com |

| | |
|---|---|
| BUFFALO PUMPS, INC.<br>CERTAINTEED CORPORATION<br>PHILIPS ELECTRONICS NORTH<br>AMERICAN CORPORATION<br>SEPCO CORPORATION<br>UNION CARBIDE CORPORATION | **BAKER & HOSTETLER LLP**<br>Mary Price Birk<br>Ronald L. Hellbusch<br>303 East 17th Avenue, Suite 1100<br>Denver, CO 80203-1264<br>mbirk@bakerlaw.com<br>rhellbusch@bakerlaw.com |
| CLEAVER BROOKS<br>FLOWSERVE CORP.<br>HAMILTON MATERIALS, INC.<br>OWENS-ILLINOIS, INC.<br>SPX COOLING TECHNOLOGIES, INC. | **RICHARDS, BRANDT, MILLER & NELSON**<br>Melinda A. Morgan<br>50 South Main, Suite 700<br>Salt Lake City, UT 84144<br>melinda-morgan@rbmn.com |
| FOSTER WHEELER ENERGY CORP | **JONES, WALDO, HOLBROOK & McDONOUGH**<br>Mark Williams<br>170 South Main, Suite 1500<br>Salt Lake City, UT 84101<br>mwilliams@joneswaldo.com |
| GEORGIA-PACIFIC CORPORATION<br>ITT INDUSTRIES, INC.<br>CARRIER CORPORATION<br>CRANE CO.<br>HERCULES, INC. | **PARSONS BEHLE & LATIMER**<br>Katherine E. Venti<br>201 South Main, Suite 1800<br>Salt Lake City, UT 84111<br>ecf@parsonsbehle.com |
| WESTINGHOUSE ELECTRIC CORP.<br>HANSON PERMANENTE CEMENT, INC.<br>AMERICAN STANDARD, INC.<br>VIACOM, INC. | **SNELL & WILMER**<br>Tracy H. Fowler<br>Scott A. Dubois<br>Kamie F. Brown<br>15 West South Temple, Suite 1200<br>Salt Lake City, UT 84101<br>tfowler@swlaw.com<br>sdubois@swlaw.com<br>kbrown@swlaw.com |
| DAIMLERCHRYSLER CORPORATION<br>GOODYEAR TIRE & RUBBER CO.<br>HILL BROTHERS CHEMICAL CO.<br>WARREN PUMPS, INC.<br>ZURN INDUSTRIES, INC. | **CHRISTENSEN & JENSEN**<br>Scot A. Boyd<br>Rebecca L. Hill<br>50 South Main, Suite 1500<br>Salt Lake City, UT 84144<br>scot.boyd@chrisjen.com<br>rebecca.hill@chrisjen.com |

414999

BONDEX INTERNATIONAL, INC.

**JONES, WALDO, HOLBROOK & McDONOUGH**
Ross Romero
170 South Main, Suite 1500
Salt Lake City, UT 84101
rromero@joneswaldo.com

**MARKUSSON GREEN & JARVIS**
Dennis Markusson
Bill Stanton
999 18th Street, Suite 3300
Denver, CO 80202

HENRY VOGT MACHINE COMPANY

**BERRETT & ASSOCIATES**
Barbara Berrett
405 South Main Street, Suite 1050
Salt Lake City, UT 84111
bberrett@berrettandassoc.com

BORG WARNER CORP.
YORK INTERNATIONAL
CORPORATION

**WILLIAMS & HUNT**
Dennis Ferguson
Mark R. Anderson
257 East 200 South, Suite 500
Salt Lake City, UT 84111
manderson@wilhunt.com

DURABALA MANUFACTURING CO.
INDUSTRIAL SUPPLY COMPANY, INC.

**MORGAN, MINNOCK, RICE & JAMES, L.C.**
Jonathan L. Hawkins
Joseph E. Minnock
136 South Main, 8th Floor
Salt Lake City, UT 84101
jhawkins@mmrj.com

OAKFABCO
UTAH POWER AND LIGHT CO.
KENNECOTT UTAH COPPER
CORPORATION
T.H. AGRICULTURE & NUTRITION CO.

**RAY, QUINNEY & NEBEKER**
Rick L. Rose
Gregory Roberts
36 South State Street, Suite 1400
Salt Lake City, UT 84145-0385
groberts@rqn.com

SEQUOIA VENTURES INC.
THERMAL WEST INDUSTRIAL, INC.

**SNOW, CHRISTENSEN & MARTINEAU**
Jill L. Dunyon
Joseph Barrett
Kenneth L. Reich
10 Exchange Place, Suite 1100
Salt Lake City, UT 84145
kreich@scmlaw.com

414999

I further certify that on the 10th day of October, 2006, true and correct copies of the
foregoing were sent via first-class mail, postage prepaid, to the following:

BULLOUGH ABATEMENT, INC.                    **KIPP & CHRISTIAN**
                                            J. Kevin Murphy
                                            Michael F. Skolnick
                                            10 Exchange Place, 4th Floor
                                            Salt Lake City, UT 84111

HONEYWELL CORPORATION                       **FABIAN & CLENDENIN**
                                            Douglas Payne
                                            215 South State, Suite 1200
                                            Salt Lake City, UT 84111


                                    /s/ Karthik Nadesan_____

414999                                    16

## INDEX TO EXHIBITS

Exhibit "A":    In Re Welding Rod Products Liability Litigation, No. 1:03CV17000, 2005 U.S. Dist. LEXIS 1265 (N.D. Ohio Jan. 13, 2005)

Exhibit "B":    Cirilo v. Lincoln Electric Co., No. SA04CA115RF, 2004 U.S. Dist. LEXIS 28679 (W.D. Tex. May 24, 2004)

Exhibit "C":    Master Complaint of Hatch, James & Dodge and Keahey for Personal Injury, Loss of Consortium, Wrongful Death and Demand for Jury Trial" filed in Master Case, No. 010900863

Exhibit "D":    Plaintiff's Response and Memorandum in Opposition to Defendants' Motion for Clarification, Sorter v. Asbestos Defendants, Case No. 040909899, Third District Court, State of Utah, Jan. 3, 2006

Exhibit "E":    Westbrook v. Asbestos Defendants, No. C011661VRW, 2001 WL 902642 (N.D. Cal. July 31 2001)

Exhibit "F":    Overly v. Raybestos-Manhattan, Inc., 1996 WL 532150 (N.D. Cal. 1996)

Exhibit "G":    Schilz v. A.P. Green Ind., Inc., 2002 WL 102608 (N.D. Cal. 2002)

Exhibit "H":    Toutant v. Nationwide Mut. Ins. Co., 2006 U.S. Dist. LEXIS 49302, Case No. 06CV00530MSKPAC (D. Colo. July 19, 2006)

Exhibit "I":    In re: Methyl Tertiary Butyl Ether Prods. Liab. Litig., 2006 U.S. Dist. LEXIS 20575, Case No. 1:00-1898, MDL 1358 (S.D.N.Y. April 17, 2006)

Exhibit "J":    Contreras v. Host Am. Corp., 2006 U.S. LEXIS 62794, Case No. 3:06cv840 (D. Conn. Sept. 5, 2006)

Exhibit "K":    California Court Notice of Ruling on Motion to Dismiss for Forum Non Conveniens

414999

# EXHIBIT "A"

to

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO REMAND AND FOR AWARD OF COSTS AND ATTORNEYS' FEES

Unpublished Decision

<u>In Re Welding Rod Products Liability Litigation</u>,
No. 1:03CV17000,
2005 U.S. Dist. LEXIS 1265
(N.D. Ohio Jan. 13, 2005)

Case MDL No. 875 Document 4914 Filed 11/17/06 Page 100 of 423
Case 2:06-cv-00741-TS Document 128 Filed 10/10/2006 Page 2 of 12

Page 1

LEXSEE 2005 U.S. DIST LEXIS 1265

## IN RE: WELDING ROD PRODUCTS LIABILITY LITIGATION

### Case No. 1:03-CV-17000 (MDL Docket No. 1535)

### UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

*2005 U.S. Dist. LEXIS 1265*

**January 13, 2005, Decided**

**SUBSEQUENT HISTORY:** Motion granted by, Motion denied by, Remanded by, in part *In re Welding Rod Prods. Liab. Litig., 2005 U.S. Dist. LEXIS 1266 (N.D. Ohio, Jan. 13, 2005)*

**PRIOR HISTORY:** *In re Welding Rod Prods. Liab. Litig., 2004 U.S. Dist. LEXIS 29351 (N.D. Ohio, Nov. 10, 2004)*

**DISPOSITION:** [*1] Motions to remand in 31 Louisiana cases granted, except as to plaintiff Buteaux, whose motion denied.

**COUNSEL:** For Welding Rod Plaintiff(s), Plaintiff: Andrew S. Goldwasser, Phillip A. Ciano, Ciano & Goldwasser, Cleveland, OH; Christina M. Janice, John R. Climaco, Climaco Lefkowitz Peca Wilcox & Garofoli, Cleveland, OH; D. Grant Kaiser, The Kaiser Firm, Houston, TX; D. John Neese, John Eddie Williams, Jr., Williams Bailey Law Firm, LLP, Houston, TX; Daniel E. Becnel, Jr., Reserve, LA; David C. Landever, Weisman, Kennedy & Berris, Cleveland, OH; Don Barrett, Richard R. Barrett, Barrett Law Office, Lexington, MS; Drew Ranier, Ranier, Gayle & Elliot, Lake Charles, LA; Frederick C. Baker, Motley Rice, LLC, Mt. Pleasant, SC; Gano D. Lemoine, III, Murray Law Firm, New Orleans, LA; James D. Shannon, Kelley M. Berry, Shannon Law Firm, Hazlehurst, MS; John T. Murray, Murray & Murray, Sandusky, OH; Joseph F. Rice, Motley Rice LLC, Mt. Pleasant, SC; Matthew W. Willis, Walter Umphrey, Provost Umphrey Law Firm, Beaumont, TX; Mikal C Watts, Watts & Heard, L.L.P., Corpus Christi, TX; Richard F. Scruggs, Scruggs Law Firm, Pascagoula, MS; Roy F Amedee, Jr., Roy F. Amedee [*2] Attorney at Law, LaPlace, LA; Russell T. Abney, Watts Law Firm,

Corpus Christi, TX; Scott O. Nelson, Maples & Lomax, Pascagoula, MS; Sidney A. Backstrom, Scruggs Law Firm, Oxford, MS; Robert E. Piper, Jr., Piper & Associates, Shreveport, LA; Ftemkos (Tim) J. Yianne, Bell & Bands, Charleston, WV.

**JUDGES:** KATHLEEN McDONALD O'MALLEY, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** KATHLEEN McDONALD O'MALLEY

**OPINION:**

### MEMORANDUM AND ORDER

This Court earlier entered its Second Remand Order (docket no. 224) which addressed, among other things, whether seven cases originally filed in Louisiana state court were properly removed to federal court. The removing defendants in these seven Louisiana cases asserted two bases for federal jurisdiction: "(1) fraudulent joinder and diversity jurisdiction, pursuant to *28 U.S.C. § 1332(a)(1)*; and (2) federal officer jurisdiction, pursuant to *28 U.S.C. § 1442(a)(1)*." Second Remand Order at 12. The Court ultimately concluded that "at least one defendant in each of the seven Louisiana cases has stated a colorable federal defense and carried its burden of showing the propriety of federal officer removal. Accordingly, [*3] the motions to remand in these cases must all be denied." Id. at 23-24. Because the Court found it had federal officer jurisdiction over these Louisiana cases, it "did not examine" the defendants' fraudulent joinder argument. Id. at 13.

The parties agreed, where possible, to apply the Court's reasoning to other Louisiana cases in the MDL

Case MDL No. 875  Document 4914  Filed 11/17/06  Page 101 of 423
Case 2:06-cv-00741-TS  Document 128  Filed 10/10/2006  Page 3 of 12

Page 2

2005 U.S. Dist. LEXIS 1265, *3

and stipulate to removal or remand. The parties also agreed, where stipulation was not possible, to identify those Louisiana cases where jurisdictional issues remained unresolved. Having abided by this agreement, the parties now direct the Court's attention to 31 additional Louisiana cases which, the plaintiffs urge, are factually different from the seven Louisiana cases discussed in the Second Remand Order. See Exhibit A to this Order (listing the 31 Louisiana cases); see docket nos. 379, 606, 675 (parties' briefs discussing "factual challenges" to jurisdiction). Specifically, the plaintiffs in these 31 cases argue: (1) they were not injured while working on federal projects; (2) therefore, the defendants were not acting in their role as a federal military contractor when they provided the allegedly defective welding rods; and (3) [*4] accordingly, the defendants do not have a colorable federal officer defense to their claims. In other words, these 31 plaintiffs assert that the determinative jurisdictional facts present in the seven Louisiana cases discussed in the Second Remand Order are not present in their cases, so federal jurisdiction does not exist.

The defendants respond that: (1) as to each of the 31 plaintiffs, the alternative argument of fraudulent joinder, which the Court did not examine in the Second Remand Order, is meritorious; (2) even if the fraudulent joinder argument is unpersuasive, three of the 31 plaintiffs are simply wrong about the jurisdictional facts, so the federal officer defense is colorable in their case; and (3) for two of the 31 plaintiffs, there is yet a third alternative basis for federal jurisdiction -- "federal enclave" jurisdiction. n1

n1 When the jurisdictional briefing started, there were 60 Louisiana cases at issue. As briefing continued, the parties came to agreement regarding the propriety of federal jurisdiction in 29 cases, leaving the 31 cases addressed by this Order. Before reaching agreement, the parties had addressed a subcategory of federal enclave jurisdiction known as "Outer Continental Shelf" ("OCS") jurisdiction, which was relevant to five cases where plaintiffs had allegedly suffered welding fume exposure while working on offshore oil production platforms. See 43 U.S.C. § 1349(b)(1) (setting out federal jurisdiction flowing from the *Outer Continental Shelf Lands Act*). The parties' mid-briefing agreement resolved all five of these cases, however, so the Court does not touch on OCS jurisdiction in this Order.

[*5]

The Court now issues this Fourth Remand Order to resolve these arguments and, for the reasons stated below, finds as follows: (1) defendants' fraudulent joinder argument is not well-taken; (2) the federal officer defense is well-taken as to plaintiff Buteaux, but not as to any other plaintiff; and (3) the federal enclave argument is well-taken as to plaintiff Buteaux, but not as to any other plaintiff. Thus, the motions to remand in these 31 Louisiana cases are all **GRANTED**, except as to plaintiff Buteaux, where the motion to remand is **DENIED**. The 30 cases where the Court grants the motions to remand are hereby **REMANDED** to the Louisiana state court where they were originally filed. See Exhibit A to this Order (summarizing the Court's rulings).

I.

If the Court concludes that any one of the several jurisdictional bases asserted by the defendants are present as to a given plaintiff, then the motion to remand pending in that plaintiff's case must be denied. The Court examines each of defendants' arguments below.

A. Fraudulent Joinder.

This Court has twice examined arguments made by the parties in this MDL regarding fraudulent joinder: (1) in the [*6] Second Remand Order, where the Court determined the plaintiffs' joinder of several non-diverse "distributor defendants" in a number of Mississippi cases was not fraudulent; and (2) the Third Remand Order (docket no. 807), where the Court determined the plaintiff's joinder of two non-diverse defendants in an Arkansas case was fraudulent. See Second Remand Order at 6-12; Third Remand Order at 6-18.

The primary distinguishing factor between these two Remand Orders was the extent to which the plaintiffs offered individualized allegations and/or evidence supporting the claims against the non-diverse defendants. In the Mississippi cases, for example, the plaintiffs "provided a non-frivolous depiction of evidence and inferences to support their claim that [non-diverse

Case 2:06-cv-00741-TS   Document 128   Filed 10/10/2006   Page 4 of 12
Case MDL No. 875   Document 4914   Filed 11/17/06   Page 102 of 423

Page 3

2005 U.S. Dist. LEXIS 1265, *6

defendant] Nordan Smith did have reason to know" that "welding fumes could cause neurological injury." Second Remand Order at 10 (emphasis in original) In the Arkansas case, in contrast, "the only allegations tying [non-diverse defendants] Welsco and El Dorado to the alleged conspiracy [were] wholly generic," and the plaintiff left "unrebutted" the defendants' proffer of jurisdictional [*7] evidence contravening these generic allegations. Third Remand Order at 17, 11. The Court summed up:

> In cases where the plaintiffs have made either no or only generic allegations against specific defendants, who later adduce unrebutted evidence that they have no connection to the plaintiff nor to other appropriately-named defendants, joinder is "clearly improper." On the other hand, if the plaintiff makes specific allegations tying a specific defendant to a plaintiff or to a conspiracy among co-defendants, or if a plaintiff can adduce evidence giving color to his claims against a particular defendant, then joinder of that defendant is clearly proper.

Third Remand Order at 18-19.

Applying the same analysis to the circumstances presented here in the 31 Louisiana cases, the Court concludes the jurisdictional evidence is more akin to the latter description than the former. Unlike the situation in the Roberts case from Arkansas, where the plaintiff's only specific mention in the complaint of the non-diverse defendants was to allege their citizenship, the 31 Louisiana plaintiffs set out explicit allegations regarding Louisiana defendant Industrial Welding Supply Co. [*8] of Harvey, Inc. ("IWS"). The plaintiffs allege that IWS represents itself as "one of the largest independent welding supply distributors in Louisiana," provides "welding expert[s] to answer metallurgical questions," and is knowledgeable about the need for welding "safety equipment." Complaint ("petition") at P56. It is unclear the degree to which IWS, the non-diverse supplier defendant in these 31 Louisiana cases, is related to "Industrial Welding Supplies of Hattiesburg, Inc. d/b/a Nordan Smith," the in-state defendant in the Mississippi cases. But the Court's earlier analysis of whether Nordan Smith was fraudulently joined applies equally to IWS:

the plaintiffs provide a non-frivolous depiction of evidence and inferences to support their claim that [IWS] did have reason to know [that welding fumes could cause neurological injury] -- there were documents available to industry participants showing the dangers of welding rods, and [IWS] was a large distributor in the business of conveying knowledge about the safety of the welding products it sold. Given the evidence presented so far by both sides, this Court cannot say that no reasonable jury following [Louisiana] [*9] law could possibly conclude one or more of the [Louisiana] distributor defendants ["knew or should have known that the product was defective, and failed to declare it." *Reaux v. Deep S. Equip. Co., 840 So.2d 20, 23 (La. Ct. App. 2003)*, writ denied, *847 So.2d 1237 (La. 2003)*.] In sum, the defendants have not shown that every non-diverse distributor defendant was fraudulently joined.

Second Remand Order at 10. The claims made by the 31 Louisiana plaintiffs against in-state supplier defendant IWS are as colorable as the claims made by the Mississippi plaintiffs against in-state distributor defendant Nordan Smith.

Unlike the Mississippi cases, the removing defendants in the 31 Louisiana cases have asserted an additional argument: IWS and other non-diverse suppliers cannot be liable under Louisiana law, in particular, because Louisiana law holds that, "when a product is in a sealed container or package, a vendor is entitled to reasonably rely on the assumption that the product is not defective." *Barrett v. R.J. Reynolds Tobacco Co., 1999 U.S. Dist. LEXIS 10239, 1999 WL 460778 at *2 (E.D. La. June 29, 1999)*. The supplier defendants insist that any [*10] welding rods they sold to the 31 plaintiffs originally came from the manufacturers in labeled and sealed packages, and were sent on to the plaintiffs in the same condition.

That the suppliers are entitled to rely on an assumption that the product is not defective, however, does not mean a plaintiff cannot overcome this

Case MDL No. 875   Document 4914   Filed 11/17/06   Page 103 of 423
Case 2:06-cv-00741-TS   Document 128   Filed 10/10/2006   Page 5 of 12

Page 4

assumption by "showing [the supplier] knew or should have known that the product was defective." Id. Certainly, a supplier, with knowledge that a product is defective, cannot avoid liability simply by pointing out that he did not modify the manufacturer's packaging before selling the product to the consumer. As noted above, the plaintiffs have supplied allegations and evidence giving at least some color to their claim that, in fact, the suppliers should have known the welding rod products they were selling were defective. Thus, the suppliers' "sealed package" jurisdictional argument is unpersuasive.

It bears repeating that this Court has no idea whether the plaintiffs in these 31 Louisiana cases will ultimately muster enough evidence to convince a jury that, in fact, the welding rods that IWS sold were defective and IWS knew or should have known that. [*11] But "there is arguably a reasonable basis for predicting that [Louisiana] law might impose liability on the facts involved." *Alexander v. Electronic Data Sys. Corp., 13 F.3d 940, 949 (6th Cir. 1994).* Accordingly, defendants' fraudulent joinder argument fails.

B. Federal Officer Defense.

In the Second Remand Order, the Court examined the defendants' argument that this Court had jurisdiction over seven cases removed from Louisiana state court because there was a "colorable federal defense" to the plaintiffs' claims. Specifically, the manufacturing defendants asserted they were "acting in their role as federal military contractors when they provided the allegedly defective welding rods to the plaintiffs," so this Court had jurisdiction over the cases pursuant to the federal officer removal statute, *28 U.S.C. § 1442(a)(1)*. Second Remand Order at 14. The primary point of contention surrounding this issue was whether the United States Navy "demanded or heedfully approved reasonably precise specifications for (or warnings about) the welding rods manufactured by the defendants," or instead "the defendants . . . dictated the contents" [*12] of the specifications and warning labels to the Navy. Id. at 19, 21. The Court ultimately concluded that, "in light of the arguments and evidence adduced by the defendants . . ., the military contractor defense is not so insufficiently grounded as to be devoid of color," id. at 22, and denied the motions to remand.

Notably, one matter upon which the parties in these

seven Louisiana cases agreed was that the plaintiffs were exposed to manganese in welding rod fumes while performing work for the United States Navy. Thus, there was no argument from the plaintiffs that their claims were not tied to defendants' conduct of providing welding rods compliant with federal military specifications. n2 Here, however, the 31 plaintiffs each assert their exposure to manganese in welding rod fumes did not occur in conjunction with construction or repair of Navy ships. The 31 plaintiffs thus conclude this Court does not have federal jurisdiction over their cases, because the manufacturing defendants were not acting in their role as military contractors when they produced the welding rods at issue.

> n2 In other words, there was no argument, in the Second Remand Order, that the defendants could not meet the second prong of federal officer jurisdiction. See *Feidt v. Owens Corning Fiberglas Corp., 153 F.3d 124, 127 (3rd Cir. 1998)* (to establish removal jurisdiction under *section 1442(a)(1)*, a defendant must establish that: "(1) it is a 'person' within the meaning of the statute; (2) the plaintiffs' claims are based upon the defendant's conduct 'acting under' a federal office; (3) it raises a colorable federal defense; and (4) there is a causal nexus between the claims and the conduct performed under color of a federal office).

[*13]

After reviewing the facts pertaining to each case, the defendants conceded this argument as to 28 of the 31 plaintiffs. As to the other three plaintiffs, however, the defendants assert that "jurisdictional discovery [has] revealed that [these plaintiffs] . . . were exposed to welding fumes either as a welder or as a bystander to welding activities performed pursuant to government contract" -- specifically, "vessel construction or repair for the Navy." Opposition br. at 4-5, 5-6. n3 The three plaintiffs respond that the defendants are stretching the concept of "exposure" unreasonably. As to two plaintiffs, the Court agrees.

> n3 The three plaintiffs are: Fredderick Thomas, Curtis Williams, and Harry

2005 U.S. Dist. LEXIS 1265, *13

Buteaux.

The defendants state that plaintiff Curtis Williams "worked as a welder for Southern Shipbuilding and while there, the company constructed the YTB OSHKOSH, a tugboat constructed for the Navy." Id. at 5 (citation omitted, emphasis added). But this statement does not find support in the record. Defendants [*14] do not claim Williams, himself, ever worked on (or even near) the OSHKOSH, and Williams states he never worked on any government project. Moreover, the evidence shows that the only tie between Williams and any government welding project is that, during the late 1960s, Williams worked in a shipyard for about six months where, years earlier, other welders had worked on the OSHKOSH. Williams remembers the vessel name OSHKOSH, but that is it. The Court agrees with Williams that the jurisdictional evidence adduced by defendants provides no color to their federal officer defense to Williams' claims.

Similarly, the defendants state that the deposition of plaintiff Fredderick Thomas revealed he "was employed by Seward Seacraft in Bayou Vista, Louisiana as a welder's apprentice from 1972-73. While there, he assisted welders who were constructing a vessel for the Navy." Id. The same deposition, however, also revealed that Thomas only welded on aluminum vessels, using welding rods that did not contain manganese. The defendants point to no evidence that Williams worked on or near any other government project where he might have been exposed to manganese-containing fumes. As with [*15] Williams, the defendants do not adduce sufficient evidence supporting any nexus between their role as military contractors and Thomas's claims.

In the case of Harry Buteaux, however, the Court reaches the opposite conclusion. The defendants explain that Buteaux, "from 1963 to 1967, served as a Boatswain Mate in the Navy. While serving in the Navy, he was stationed aboard the USS SEMMES, a guided missile destroyer. Buteaux worked in the vicinity of welding aboard the USS SEMMES while the ship was dry-docked at the Charleston Naval Shipyard undergoing repairs." Id. Buteaux responds that: (1) he was not a welder himself until after he left the Navy; and (2) the welding that occurred on the USS SEMMES was on a different deck from where he usually worked. Buteaux concludes he never experienced exposure to welding rod fumes during

his time in the Navy. But Buteaux concedes he "was on [the] ship while . . . welding was taking place," the welding occurred inside the ship at the same time he was present (although on a different deck), and he occasionally saw welding arc-lights and welding fumes. Depo. at 12-19. n4 Buteaux's acknowledgment of at least modest proximity to manganese-containing [*16] welding fumes while on a Navy ship is meaningful, moreover, because the plaintiffs have repeatedly alleged that even relatively minor exposure to such fumes can cause harm. See, e.g., Andre v. A.O. Smith, case no. 03-CV-17269, complaint at PP61, 62 (alleging that "manganese exposure for a period as short as 49 days can cause . . . neurological damage," and that this exposure can be suffered "indirectly . . . as [a] bystander[] while working in the proximity of other persons using welding products"); Ruth v. Lincoln Electric Co., case no. 03-CV-17003, complaint at PP7, 8 (same). Whether plaintiffs can ultimately prove that indirect or minimal exposure to welding fumes caused harm to any particular plaintiff is irrelevant at this stage; the threshold question is whether the Court has jurisdiction over the claims that plaintiffs assert. The jurisdictional facts in Buteaux's case support the defendants' position that a measurable portion of Buteaux's exposure to the manganese fumes that allegedly caused his injuries occurred while he was a bystander to welding activities performed pursuant to government contract. In light of these facts, Buteaux's motion to remand must be denied [*17] on the basis of federal officer removal.

> n4 Having reviewed the deposition excerpts offered by the parties, the Court cannot help but note that Buteaux's counsel's repeated, forceful instructions to his client not to answer questions posed by defense counsel were contrary to Fed. R. Civ. P. 30(d)(1).

C. Federal Enclave Jurisdiction.

In addition to asserting federal jurisdiction based on fraudulent joinder and the military contractor defense, the defendants also assert that federal jurisdiction is proper as to two of the 31 Louisiana cases because these plaintiffs -- Williams and Buteaux -- worked in "federal enclaves." The Court has not addressed this jurisdictional basis in

this MDL in its prior Remand Orders.

The fundamental basis for federal enclave jurisdiction is *Article I, Section 8, Clause 17 of the United States Constitution*, which "grants Congress the power to exercise exclusive jurisdiction over enclaves acquired by the United States with the state's [*18] consent for various military purposes." *Celli v. Shoell, 995 F. Supp. 1337, 1341 (D. Utah 1998)*. "Whether federal enclave jurisdiction, a form of federal question jurisdiction, exists is a complex question, resting on such factors as whether the federal government exercises exclusive, concurrent or proprietarial jurisdiction over the property, when the property became a federal enclave and what the state law was at that time, whether that law is consistent with federal policy, and whether it has been altered by national legislation." *Celli v. Shoell, 40 F.3d 324, 328 (10th Cir. 1994)*. It is generally safe to assume, however, that a United States military base "is a federal enclave subject to the exclusive jurisdiction of the United States." *Celli, 995 F. Supp. at 1341*; see *Cirilo v. Lincoln Elec. Co., 2004 U.S. Dist. LEXIS 28679, *8, case no. SA-04-CA-115-RF (W.D. Tex. May 24, 2004)* ("a state may not exercise jurisdiction over a federal enclave unless specifically reserved by the state at the time of her consent to the federal purchase, or unless permitted by Congress") (citing *Fort Leavenworth Railroad Co. v. Lowe, 114 U.S. 525, 526-28, 29 L. Ed. 264, 5 S. Ct. 995 (1885)*, [*19] and *Paul v. United States, 371 U.S. 245, 268, 9 L. Ed. 2d 292, 83 S. Ct. 426 (1963))*. n5

> n5 The Cirilo case was later transferred to this Court as related to this Welding Rods MDL, and has been assigned case no. 04-CV-18607. Before transfer, the transferor court denied plaintiff's motion for remand, agreeing with defendants that federal enclave jurisdiction existed. *2004 U.S. Dist. LEXIS 28679 at *13*. The transferor court did not examine the defendants' alternative argument that federal officer jurisdiction also existed. Id.

Defendants point out that plaintiff Williams served in the Louisiana National Guard for four years, during which time he was posted at the Fort Polk United States Army Base in Louisiana, as well as Fort Bliss United States Army Base in Texas. Defendants argue that,

because Forts Polk and Bliss are federal enclaves, Williams' claims are subject to the jurisdiction of this Court. Williams responds that the factual support for this argument is anemic, because his exposure to welding rod fumes had no connection to the time [*20] he spent at Fort Polk or Fort Bliss. Williams testified that he attended a total of two weeks of National Guard training per year at the two Army Bases, plus one day per week; his duties during training were as a cook, and never as a welder; and his only exposure to welding during this time was to observe others doing some welding inside a large tent, about 150 feet away. Williams testified he became a welder only years after his National Guard service ended.

The Court agrees with Williams that there is no factual support for a nexus between his welding-fume claims and a federal enclave. Unlike the case with Buteaux, who worked inside an enclosed ship where welding occurred, it is not even arguable that Williams was close enough to suffer exposure to welding rod fumes during his time at the two Army Bases. "When the plaintiffs' claims arise out of exposure to chemicals on [a United States military] base in furtherance of their employment duties, enclave jurisdiction is properly invoked." *Akin v. Big Three Industries, Inc., 851 F. Supp. 819, 822 (E.D. Tex. 1994)*. But that is not the case here. Because Williams' claims simply did not arise out of exposure that occurred [*21] on a federal enclave, this Court will not exercise jurisdiction over Williams' claims.

As to plaintiff Buteaux, the Court has already concluded it has jurisdiction over his claims pursuant to the federal officer removal statute. It is notable, moreover, that a not-insignificant portion of Buteaux's exposure to welding rod fumes occurred on a federal enclave -- the guided missile destroyer on which Buteaux was stationed was dry-docked at the United States Navy's Charleston Naval Shipyard. Accordingly, this Court also has federal enclave jurisdiction over Buteaux's case. n6

> n6 "When exposures allegedly occur partially inside and partially outside the boundaries of an enclave[,] an argument [will] surface that the state's interest increases proportionally, while the federal interest decreases." *Akin, 851 F. Supp. at 825 n.4*. Thus, it is unavoidable that the parties will "engage in some debate about the precise ratio of the location of the plaintiff's injuries sustained on a federal

Case MDL No. 875 Document 4914 Filed 11/17/06 Page 106 of 423
Case 2:06-cv-00741-TS Document 128 Filed 10/10/2006 Page 8 of 12

Page 7

2005 U.S. Dist. LEXIS 1265, *21

enclave as compared to other sites." *Cirilo, 2004 U.S. Dist. LEXIS 28679 at *10-11*. Here, Buteaux worked in propinquity to welders working on a federal military vessel or base, such that it would not be unreasonable to conclude the plaintiff inhaled material amounts of welding fumes containing manganese while on a federal enclave. Thus, there is a colorable federal nexus and federal jurisdiction over the case exists. See id., *2004 U.S. Dist. LEXIS 28679 at *11* (concluding federal enclave jurisdiction was appropriate because the welder-plaintiff's claims arose "out of exposure to a chemical on a federal enclave, in not insignificant measure, and in furtherance of employment duties on the federal enclave") (emphasis added).

[*22]

II.

For the reasons stated above, the motions to remand in the 31 Louisiana cases listed in Exhibit A to this Order are all **GRANTED**, except as to plaintiff Buteaux, whose motion is **DENIED**.

**IT IS SO ORDERED.**

**s/Kathleen M. O'Malley**

**KATHLEEN McDONALD O'MALLEY**

**UNITED STATES DISTRICT JUDGE**

**DATED: January 13, 2005**

Exhibit A page 1

| No. | Plaintiff | Case No. | Diversity Jurisdiction? |
|-----|-----------|----------|-------------------------|
| 1 | Andre | 03-CV-17269 | No |
| 2 | Caminita | 03-CV-17271 | No |
| 3 | Coupel | 03-CV-17272 | No |
| 4 | Davis | 03-CV-17273 | No |
| 5 | DiMarco | 03-CV-17274 | No |
| 6 | Goudeau | 03-CV-17275 | No |
| 7 | Jones | 03-CV-17277 | No |
| 8 | LaBauvre | 03-CV-17278 | No |
| 9 | Lethermon | 03-CV-17279 | No |

Case MDL No. 875 Document 4914 Filed 11/17/06 Page 107 of 423
Case 2:06-cv-00741-TS Document 128 Filed 10/10/2006 Page 9 of 12

Page 8

2005 U.S. Dist. LEXIS 1265, *22

| No. | Plaintiff | Case No. | Diversity Jurisdiction? |
|-----|-----------|----------|-------------------------|
| 10 | Webb | 03-CV-17282 | No |
| 11 | Williams | 03-CV-17283 | No |
| 12 | Arcenaux | 03-CV-17312 | No |
| 13 | Clostio | 03-CV-17313 | No |
| 14 | Ray | 03-CV-17314 | No |
| 15 | Roberts | 03-CV-17315 | No |
| 16 | Royer | 03-CV-17316 | No |
| 17 | Starr | 03-CV-17317 | No |
| 18 | Barras | 04-CV-17352 | No |
| 19 | Champagne | 04-CV-17354 | No |
| 20 | Sanchez | 04-CV-17357 | No |
| 21 | Curole | 03-CV-17303 | No |
| 22 | Hesse | 03-CV-17304 | No |
| 23 | Szubinski | 03-CV-17309 | No |
| 24 | Thomas | 03-CV-17310 | No |
| 25 | Joseph | 04-CV-17055 | No |
| 26 | Leblanc | 04-CV-17056 | No |
| 27 | Lopez | 04-CV-17058 | No |

Case MDL No. 875   Document 4914   Filed 11/17/06   Page 108 of 423
Case 2:06-cv-00741-TS   Document 128   Filed 10/10/2006   Page 10 of 12

Page 9

2005 U.S. Dist. LEXIS 1265, *22

| No. | Plaintiff | Case No. | Diversity Jurisdiction? |
|---|---|---|---|
| 28 | Marcel | 04-CV-17060 | No |
| 29 | Vilardo | 04-CV-17062 | No |
| 30 | Buteaux | 03-CV-17300 | No |
| 31 | Williams | 03-CV-17323 | No |

[*23]

| No. | Federal Officer Jurisdiction? | Federal Enclave Jurisdiction? | Remand Motion Ruling |
|---|---|---|---|
| 1 | n/a | n/a | GRANTED |
| 2 | n/a | n/a | GRANTED |
| 3 | n/a | n/a | GRANTED |
| 4 | n/a | n/a | GRANTED |
| 5 | n/a | n/a | GRANTED |
| 6 | n/a | n/a | GRANTED |
| 7 | n/a | n/a | GRANTED |
| 8 | n/a | n/a | GRANTED |
| 9 | n/a | n/a | GRANTED |
| 10 | n/a | n/a | GRANTED |

Case MDL No. 875   Document 4914   Filed 11/17/06   Page 109 of 423
Case 2:06-cv-00741-TS   Document 128   Filed 10/10/2006   Page 11 of 12

Page 10

2005 U.S. Dist. LEXIS 1265, *23

| No. | Federal Officer Jurisdiction? | Federal Enclave Jurisdiction? | Remand Motion Ruling |
|---|---|---|---|
| 11 | No | No | GRANTED |
| 12 | n/a | n/a | GRANTED |
| 13 | n/a | n/a | GRANTED |
| 14 | n/a | n/a | GRANTED |
| 15 | n/a | n/a | GRANTED |
| 16 | n/a | n/a | GRANTED |
| 17 | n/a | n/a | GRANTED |
| 18 | n/a | n/a | GRANTED |
| 19 | n/a | n/a | GRANTED |
| 20 | n/a | n/a | GRANTED |
| 21 | n/a | n/a | GRANTED |
| 22 | n/a | n/a | GRANTED |
| 23 | n/a | n/a | GRANTED |
| 24 | No | n/a | GRANTED |
| 25 | n/a | n/a | GRANTED |
| 26 | n/a | n/a | GRANTED |
| 27 | n/a | n/a | GRANTED |

Case MDL No. 875   Document 4914   Filed 11/17/06   Page 110 of 423
Case 2:06-cv-00741-TS   Document 128   Filed 10/10/2006   Page 12 of 12

Page 11

2005 U.S. Dist. LEXIS 1265, *23

| No. | Federal Officer Jurisdiction? | Federal Enclave Jurisdiction? | Remand Motion Ruling |
|-----|-------------------------------|-------------------------------|----------------------|
| 28  | n/a                           | n/a                           | GRANTED              |
| 29  | n/a                           | n/a                           | GRANTED              |
| 30  | Yes                           | Yes                           | Denied               |
| 31  | n/a                           | n/a                           | GRANTED              |

# EXHIBIT "B"

to

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO REMAND AND FOR AWARD OF COSTS AND ATTORNEYS' FEES

Unpublished Decision

Cirilo v. Lincoln Electric Co.,
No. SA04CA115RF,
2004 U.S. Dist. LEXIS 28679
(W.D. Tex. May 24, 2004)

Case MDL No. 875 Document 4914 Filed 11/17/06 Page 112 of 423
Case 2:06-cv-00741-TS Document 128 Filed 10/10/2006 Page 2 of 5

Page 1

LEXSEE 2004 U.S. DIST. LEXIS 28679

**DAVID M. CIRILO, JR., Plaintiff, v. THE LINCOLN ELECTRIC COMPANY, et al., Defendants.**

**SA-04-CA-115-RF**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS, SAN ANTONIO DIVISION**

*2004 U.S. Dist. LEXIS 28679*

**May 24, 2004, Decided**
**May 24, 2004, Filed**

**COUNSEL:** [*1] For DAVID M. CIRILO, plaintiff: Grant Kaiser, The Kaiser Firm, LLP, Houston, TX; Russell T. Abney, Watts Law Firm, LLP, Houston, TX; Steven J. Kherkher, Williams & Bailey Law Firm, Houston, TX; Mikal C. Watts, Watts Law Firm, LLP, Corpus Christi, TX; Walter Umphrey, Provost Umphrey Law Firm, Beaumont, TX.

For THE LINCOLN ELECTRIC COMPANY, HOBART BROTHERS COMPANY, THE ESAB GROUP, INC., THE BOC GROUP, INC., fka Airco, Inc., PRAXAIR, INC., TDY INDUSTRIES, INC., VIACOM, INC., Successor by Merger to CBS Corporation, f/k/a Westinghouse Electric Corporation, UNION CARBIDE CORPORATION, in its Capacity as the Successor in Interest to Union Carbide Chemicals and Plastics Company, Inc., UNION CARBIDE CORPORATION, EUTECTIC CORPORATION, A.O. SMITH CORPORATION, Sandvik, INC., AIRGAS-GULF STATES, INC., AIRGAS-SOUTHWEST, INC., defendants: Darrell L. Barger, Hartline, Dacus, Barger, Dreyer & Kern, LLP, Corpus Christi, TX; C. Patrick Waites, Houston, TX; John G. Bissell, Strong Pipkin Bissell & Ledyar, Houston, TX.

For ILLINOIS TOOL WORKS, INC., MILLER ELECTRIC MANUFACTURING CO., INC., defendants: John R. Henderson, Lynn Rene Levitan, Kristin A. Regel, Brown McCarroll, L.L.P., Dallas, TX.

For [*2] SELECT ARC, INC., defendant: Arthur R. Almquist, Mehaffy & Weber, Houston, TX; James G. Martingano, Mehaffy & Weber, Houston, TX.

For AMERICAN WELDING SOCIETY, INC., defendant: Lea F. Courington, GWINN & ROBY, Dallas, TX; Lindsey C. Cummings, Gwinn & Roby, Dallas, TX.

For NATIONAL ELECTRIC MANUFACTURERS ASSOCIATION, defendant: William R. Stoughton, Jenner & Bloc, LLC, Dallas, TX.

For GENERAL ELECTRIC COMPANY, defendant: Rachel Giesber Clingman, Jenifer King Points, Fulbright & Jaworski, Houston, TX.

For AERIFORM CORPORATION, defendant: Lansford O. Ireson, Jr., Mary Alice Parsons, Ireson & Weizel, P.C., Houston, TX.

For DELORO STELLITE COMPANY, INC., A, defendant: Kent M. Adams, Adams & Coffey, Beaumont, TX; Ellen Gayle Reynard, Adams & Coffey, P.C., Beaumont, TX.

For J.W. HARRIS CO., INC., defendant: Joe Michael Russell, Kent, Good & anderson, P.C., Dallas, TX.

For BIG THREE INDUSTRIES, INC., AIR LIQUIDE AMERICA FOUNDATION, INC., defendants: Hubert Oxford, III, Benckenstein & Oxford, Beaumont, TX.

For MATHESON TRI-GAS, INC., defendant: E. Stratton Horres, Jr., Wilson, Elser, Moskowitz, Edelman & Dicker, Dallas, TX; Lisa C. Nolley, Wilson, Elser, [*3]

Case MDL No. 875 Document 4914 Filed 11/17/06 Page 113 of 423
Case 2:06-cv-00741-TS Document 128 Filed 10/10/2006 Page 3 of 5

Page 2

2004 U.S. Dist. LEXIS 28679, *3

Moskowitz, Edelman & Dicker, LLP, Dallas, TX.

**JUDGES:** ROYAL FURGESON, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** ROYAL FURGESON

**OPINION:**

### ORDER DENYING MOTION TO REMAND

BEFORE THE COURT is Plaintiff's Motion to Remand (Docket No. 7), filed on March 5, 2004, as well as Defendants' Response, with attachments and supplement. The application for transfer of this cause to the Northern District of Ohio's multidistrict litigation court is pending before the Multi-District Litigation Panel, but this Court has received confirmation from that body that pending motions, specifically motions to remand, should be ruled on if possible prior to transfer. After careful consideration, the Court finds that Defendants demonstrated the propriety of federal subject matter jurisdiction upon removal and therefore DENIES Plaintiff's Motion.

#### Factual and Procedural Background

In his complaint, Plaintiff alleges that various manufacturers, distributors, and consumers of welding consumables, such as welding rods, conspired to conceal alleged dangers of welding products or manufactured or distributed dangerous products. Manganese is a toxic metal that is contained in welding consumables and released during the welding [*4] process. Plaintiff claims that his exposure to manganese from welding fumes caused him injury and that Defendants are liable for this damage under theories of negligence, gross negligence, strict liability and conspiracy.

Plaintiff filed his complaint in the 407th Judicial District Court of Bexar County, Texas. Some of the Defendants removed to this Court on February 4, 2004 pursuant to 28 U.S.C. §§ 1441, 1442(a)(1) and 1446. Under 28 U.S.C. § 1441, consent of all Defendants is required for removal, and Defendant submit such consent was received and is documented at Exhibit A of the Notice of Removal. Plaintiff has not objected to this representation. Under 28 U.S.C. § 1442(a)(1), consent by non-removing defendants is not required. n1 Defendant moved for a stay of the proceedings pending a determination of their proposed transfer of the cause to

the multi-district litigation court in the Northern District of Ohio.

n1 *Ruffin v. Armco Steel Corp., 959 F.Supp. 770, 773 (S.D. Tex. 1997).* See also *Doe v. Kerwood, 969 F.2d 165, 168 (5th Cir. 1992).*

[*5]

The stay was denied because, in the interests of justice and at the suggestion on multiple occasions of the Multi-District Litigation Panel, this Court has determined that to the extent subject matter jurisdiction can be resolved prior to transfer, the multi-district litigation courts' efforts are aided, and the cases before them more quickly and efficiently postured for disposition. The Court indicated as much in its Order denying the Motion to Stay, however Defendants re-urge their position in the opposition to the currently pending motion to remand. After denying Defendants request for stay, this Court once again received a request from the MDL Panel that pending remand motions be addressed by the Court, rather than stayed pending transfer. The Court declines to reconsider its position on the Defendants' motion to stay and will rule on the dispute as to the propriety of federal subject matter jurisdiction. Furthermore, the Court is not persuaded by the actions of its honored sister district courts in Texas that have stayed matters pending a transfer to the MDL panel when a motion to remand remains pending. This is especially true in light of the MDL Panel's own request that jurisdictional [*6] matters be resolved prior to transfer.

Defendants removed to this Court on the basis of Plaintiff's response to an interrogatory. Plaintiff there averred that at least a portion of his claimed injuries occurred while working at United State Air Force facilities or bases, such as Kelly Air Force Base and Fort Sam Houston. In addition, Plaintiff's complaint states that more than half of his alleged twenty-two years of exposure to welding fumes occurred at one of the two military stations. Defendants claim that this fact gives rise to federal subject matter jurisdiction because the bases are under the exclusive jurisdiction and sovereignty of the United States government. Defendants claim that federal officer removal jurisdiction and federal enclave jurisdiction both provide this court with subject matter jurisdiction over Plaintiff's claims.

Case MDL No. 875 Document 4914 Filed 11/17/06 Page 114 of 423
Case 2:06-cv-00741-TS Document 128 Filed 10/10/2006 Page 4 of 5

Page 3

2004 U.S. Dist. LEXIS 28679, *6

In his Motion to Remand, Plaintiff argues that the federal courts do not enjoy jurisdiction over his claim because the welding chemicals and welding process used that ultimately caused his injuries were identical in the military or civilian context and that his injuries sustained on military bases constitute only a portion of his damages. Plaintiff [*7] claims that Defendants do not meet their burden with respect to either basis for jurisdiction and that therefore the cause must be remanded to the courts of Texas.

**Discussion**

Defendants bear significant burden with respect to their contention that removal was proper. A removing party bears the burden of demonstrating that federal jurisdictional requirements have been satisfied and that removal was procedurally proper. n2 Moreover, any ambiguity or doubt will be construed against removal because the removal statute should be strictly construed in favor of remand. n3 The Court examines Defendants' claims for subject matter jurisdiction with these standards in mind.

> n2 *Manguno v. Prudential Property & Casualty Co., 276 F.3d 720, 723 (5th Cir. 2002).*

> n3 *Id. See also Acuna v. Brown & Root, Inc., 200 F.3d 335, 339 (5th Cir. 2000); Willy v. Coastal Corp., 855 F.2d 1160, 1164 (5th Cir. 1988).*

Based upon the explicit grant provided by the Enclave Clause, [*8] Congress has the power to "exercise exclusive Legislation" over "all Places purchased by the consent of the legislature of the State in which the same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings." n4 "The term exclusive legislation' is the equivalent of exclusive jurisdiction.'" n5 It is a well and long established principle that a state may not exercise jurisdiction over a federal enclave, unless specifically reserved by the state at the time of her consent to the federal purchase or unless permitted by Congress. n6

> n4 *U.S. CONST. Art. I, § 8, cl. 17.*

> N5 *United States v. Gliatta, 580 F.2d*

156, 158 (5th Cir. 1978) (citing *Surplus Trading Co. v. Cook, 281 U.S. 647, 652, 74 L. Ed. 1091, 50 S. Ct. 455 (1930)).*

> n6 *See Fort Leavenworth Railroad Co. v. Lowe, 114 U.S. 525, 526-28, 29 L. Ed. 264, 5 S. Ct. 995 (1885); Paul v. United States, 371 U.S. 245, 268, 9 L. Ed. 2d 292, 83 S. Ct. 426 (1963).*

The Fifth Circuit addressed federal enclave jurisdiction in *Mater v. Holly.* [*9] n7 The *Mater* court held that when negligence claims are based upon an accident that occurred on a federal military base where land had been ceded by the State to the Union then those claims "arise under the laws of the United States." n8 In cases where the United States gains title to state land with the consent of the state, then state power is "terminated and federal sovereignty [becomes] complete and exclusive." n9 "Any law existing in territory over which the United States has exclusive' sovereignty must derive its authority and force from the United States." n10 The result of the holding and analysis of *Mater* is that such a case presenting a question arising under federal law is removable under *28 U.S.C. § 1441(a).* n11

> n7 *200 F.2d 123 (5th Cir. 1952).*

> n8 *Id. at 123, 125. See also Akin v. Big Three Industries Inc., 851 F.Supp. 819, 822 (E.D. Tex. 1994).*

> n9 *Mater, 200 F.2d at 124* (citing *Surplus Trading Co., 281 U.S. at 652).*

> N10 *Id.*

> n11 *Akin, 851 F.Supp. at 822.*

[*10]

Here, it is undisputed that Plaintiff alleges some portion of his injury to have occurred on Kelly Air Force Base and Fort Sam Houston, military bases in the San Antonio area. It is also undisputed that Kelly Air Force Base and Fort Sam Houston are federal enclaves, that is, lands acquired by the federal government with the consent of the State of Texas. n12 Plaintiff objects to the removal of this cause of action on the grounds of federal enclave jurisdiction because he claims that only a portion

Case MDL No. 875 Document 4914-28 Filed 11/17/06 Page 115 of 423
Case 2:06-cv-00741-TS Document 128 Filed 10/10/2006 Page 5 of 5

Page 4

2004 U.S. Dist. LEXIS 28679, *10

of his injuries occurred on the federal enclave. He claims, therefore, that *Mater* is inapposite because, there, the plaintiff's injuries occurred wholly within the enclave.

n12 Although undisputed, Defendants submit authenticated copies of the Texas State Archives relevant to the United States government's purchase and ownership over Kelly Air Force Base and Fort Sam Houston. Def. Oppo. to Pltf's Mot. to Remand, at App. A & B.

The parties engage in some debate about the precise ratio of the location of Plaintiff's [*11] injuries sustained on federal enclave as compared to other sites. Plaintiff admits though in his answers to interrogatories that he worked as a welder for ten years at Kelly Air Force Base and for an additional two years at Fort Sam Houston. The total period of his alleged exposure to manganese fumes on military installations is from 1987-1999. The Court is persuaded that these responses are consistent with the allegations in Plaintiff's Complaint. For example, Plaintiff alleged, "during all or part of the periods from 1980 through 20002, Plaintiff . . . was exposed to toxic fumes resulting from welding." n13 Plaintiff has alleged personal injury on several theories, arising in significant portion from work performed on two federal enclaves. The claims are, as in *Akin*, arising out of exposure to a chemical on a federal enclave, in not insignificant measure and in furtherance of employment duties on the federal enclave. n14 The fact that some of Plaintiff's injuries occurred outside of the federal enclaves does not negate that the cause of action -- alleged as long-term and repeated exposure -- arises under federal law. n15

n13 Pltf's Complaint, at 10.

[*12]

n14 *Akin, 851 F.Supp. at 822.*

n15 *See Reed v. Fina Oil & Chemical Co., 995 F.Supp. 705, 713 (E.D. Tex. 1998).*

In addition, Plaintiff, throughout his motion, improperly focuses the inquiry upon whether or not

federalism principles permit this Court to deprive the State court of "its otherwise proper jurisdiction over Mr. Cirilo's state-tort-law claim." n16 This argument for the propriety of concurrent State court jurisdiction misses the point of whether or not removal was proper. n17 The Court finds that federal enclave jurisdiction is properly invoked by Defendants and that the action is removable under *28 U.S.C. § 1441(a)*. The Court enjoys supplemental jurisdiction over the related claims for Plaintiff's injuries occurring outside a federal enclave.

n16 Pltf's Mot. to Remand, at 2.

n17 *See Akin, 851 F.Supp. at 822, n.1* ("Whether the state court's jurisdiction is concurrent is irrelevant to the issue whether a federal question is presented. Many federal questions may be heard concurrently in a federal system. The removal statutes permit a defendant to exercise the option of having a federal question decided by a United States court.").

[*13]

Having determined that jurisdiction over this entire cause of action is proper in the federal courts based upon federal enclave jurisdiction and supplemental jurisdiction, the Court need not address the supplemental basis for removal, federal officer jurisdiction.

**Conclusion**

Accordingly, it is ORDERED that Plaintiff's Motion to Remand (Docket No. 7) is DENIED. In light of the notice provided to this Court that the MDL Panel still considers the transfer, the Court will at this time order a stay pending transfer.

It is further ORDERED that the above styled and numbered cause is STAYED pending transfer to the Northern District of Ohio or notice that the transfer will not occur. The parties need not submit a scheduling order at this time.

Signed this **24th** day of May 2004.

ROYAL FURGESON

UNITED STATES DISTRICT JUDGE

# EXHIBIT "C"
# PART 2 OF 2

to

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO REMAND AND FOR AWARD OF COSTS AND ATTORNEYS' FEES

"Master Complaint of Hatch, James & Dodge and Keahey for Personal Injury, Loss of Consortium, Wrongful Death and Demand for Jury Trial"

Filed in Master Case, No. 010900863

against each such alternate entity; defendants, and each of them, have acquired the assets, or a portion thereof, of each such alternate entity; defendants, and each of them, have caused the destruction of plaintiff's remedy against each such alternate entity; each such defendant has the ability to assume the risk-spreading role of each such alternate entity, and that each such defendant enjoys the goodwill originally attached to each such alternate entity.

| DEFENDANT | ALTERNATE ENTITY |
|---|---|
| ATLANTIC RICHFIELD COMPANY | ARCO<br>RICHFIELD REFINERY CORP.<br>RICHFIELD TWIN TOWERS |
| AVENTIS CROPSCIENCE USA, INC. | RHONE-POULENC AG COMPANY, INC.<br>RHODIA, INC.<br>RHONE-POULENC, INC.<br>STAUFFER CHEMICALS CO.<br>AMCHEM PRODUCTS, INC., THE BENJAMIN<br>   FOSTER DIVISION |
| BANK OF AMERICA, NT & SA | SECURITY PACIFIC NATIONAL BANK<br>HIBERNIA BANK<br>BANK OF ITALY |
| BAYER CORPORATION | MILES CUTTER BIOLOGICALS, INC.<br>MILES LABORATORY, INC.<br>CUTTER LABORATORIES, INC.<br>CUTTER LABORATORIES INTERNATIONAL, INC.<br>BERKELEY PHARMACALS, INC.<br>BETERINARY INDUSTRIES, INC.<br>CUTTER LABORATORIES OVERSEAS CORP.<br>CUTTER-VITRUM, INC.<br>CUTTER-PUERTO RICO, INC.<br>BAY-O-PHARM, INC. |
| BECHTEL CORPORATION (DE) | BECHTEL POWER CORPORATION<br>BECHTEL CONSTRUCTORS CORP.<br>BECHTEL CIVIL & MINERALS, INC. (NV)<br>SEQUOIA VENTURES INC. (NV)<br>W. A. BECHTEL CO. (CA)<br>W. A. BECHTEL COMPANY (CA) |

| | W. A. BECHTEL CO., INC. (DE) |
| | W. A. BECHTEL CO. (DE) |
| | W. A. BECHTEL CO. (NV) |
| | THE W.A.BECHTEL COMPANY (MD) |
| | BECHTEL-McCONE (INCORPORATED) (DE) |
| | BECHTEL-McCONE CORPORATION (NV) |
| | BECHTEL-McCONE-PARSONS CORPORATION (NV) |
| | BECHTEL BROTHERS McCONE COMPANY (DE) |
| | BECHTEL BROTHERS-McCONE |
| | INTERNATIONAL CORPORATION (DE) |
| | BECHTEL INTERNATIONAL CORPORATION (DE) |
| | INTERNATIONAL BECHTEL, INC. |
| | THE BECHTEL GROUP, INC. |
| | BECHTEL CIVIL, INC. (NV) |
| | BECHTEL CORPORATION (NV) |
| | BECHTEL PETROLEUM INC. |
| | BECHTEL, INC. |
| | MARINSHIP/CALIFORNIA SHIPBUILDING |
| | PEPPERWOOD CORPORATION |
| | JOSHUA HENDY CORPORATION |
| | MacDONALD & KAHN |
| | J.H. POMEROY & COMPANY, INC. |
| | SANTA FE BRAUN, INC. |
| BOHANNON DEVELOPMENT COMPANY | HILLSDALE SHOPPING CENTER |
| BOLTON INDUSTRIES, INC. | H.B. BRANDS |
| | MJB COFFEE |
| | MJB FOODS |
| | RESTAURANT EQUIPMENT |
| | LEASING COMPANY, INC. |
| | UNION CITY FOODS, INC. |
| BONAVENTURE, LTD. | THE BONAVENTURE HOTEL |
| BURNS PHILIP FOOD, INC. | FLEISCHMANN'S YEAST, INC. |
| B.W. HOTEL, LLC | BEVERLY WILSHIRE HOTEL |
| C. F. SERVICES, INC. | CONTADINA FOODS |
| CADBURY BEVERAGES, INC. | CANADA DRY, U.S.A. |
| | PETER PAUL, INC. |
| CALIFORNIA HYATT CORPORATION | HYATT CORPORATION |
| | HYATT REGENCY, INC. |

| CALIFORNIA INSTITUTE OF TECHNOLOGY | JET PROPULSION LABORATORY-CAL. |
|---|---|
| CALIFORNIA PACIFIC MEDICAL CENTER | MEDICAL RESEARCH INSTITUTE<br>CALIFORNIA PACIFIC MEDICAL SERVICES<br>PACIFIC PRESBYTERIAN MEDICAL CENTER<br>HOMEOPATHIC FOUNDATION OF CALIFORNIA<br>CHILDREN'S HOSPITAL OF SAN FRANCISCO |
| CANADAIGUA WINE COMPANY, INC. | ALMADEN WINES |
| CARGILL, INCORPORATED | LESLIE SALT CO. |
| CATELLUS DEVELOPMENT CORPORATION | SANTA FE PACIFIC REALTY CORPORATION<br>SOUTHERN PACIFIC LAND COMPANY<br>GOLDEN GATE FIELDS |
| CHAMPION INTERNATIONAL CORP. | ST. REGIS PAPER<br>U.S. PLYWOOD CORP. |
| CHW WEST BAY | ST. MARY'S HOSPITAL<br>SETON MEDICAL CENTER<br>SETON HEALTH SERVICES CORPORATION<br>ST. CATHERINE HOSPITAL ON HALF MOON BAY<br>SETON MEDICAL OFFICE CENTER<br>WESTERN HANSEN'S DISEASE INSTITUTE<br>SETON INSTITUTE FOR INTERNATIONAL DEVELOPMENT<br>SETON ASSOCIATES<br>NARCISSUS EYE RESEARCH FOUNDATION<br>MERCY SERVICES CORPORATION - S.F.<br>ST. MARY'S FOUNDATION<br>ST. MARY'S HOSPITAL AND MEDICAL CENTER<br>MERCY PROFESSIONAL BUILDING, INC.<br>NOTRE DAME HOSPITAL |
| CLOUGHERTY PACKING COMPANY | FARMER JOHN'S SAUSAGE COMPANY |
| COASTAL WEST VENTURES, INC. | PACIFIC REFINING COMPANY<br>SEQUOIA REFINING CORP. |
| COLBERG, INC. | COLBERG BOATWORKS |
| CONOCO, INC. | DOUGLAS OIL CO. OF CALIFORNIA<br>CONTINENTAL OIL COMPANY |

82

| | |
|---|---|
| CONOPCO, INC. | UNILEVER UNITED STATES INC.<br>LEVER BROTHERS COMPANY<br>UNILEVER RESEARCH, U.S., INC.<br>UNILEVER ACQUISITION CORP. II |
| CONTINENTAL MARITIME<br>OF SAN FRANCISCO | CONTINENTAL MARITIME<br>SERVICE ENGINEERING CO. |
| CPC INTERNATIONAL (BEST FOODS) | BESTFOODS |
| CROCKER PLAZA COMPANY | CROCKER-AETNA COMPANY<br>CROCKER-AETNA SUBSIDIARY, INC. |
| CURTICE-BURNS FOODS, INC. | COMSTOCK FOODS<br>COMSTOCK MICHIGAN FRUIT<br>NALLEY'S FINE FOODS |
| DEL MONTE CORPORATION | CALIFORNIA PACKING CORP.<br>ENCINAL TERMINALS |
| DILLINGHAM CONSTRUCTION<br>N.A., INC. | DILLINGHAM CONSTRUCTION<br>  INTERNATIONAL, INC.<br>DILLINGHAM CONSTRUCTION<br>  CORPORATION<br>DILLINGHAM CONSTRUCTION, INC.<br>DILLINGHAM HEAVY CONSTRUCTION<br>GORDON H. BALL INC.<br>BASALT ROCK<br>BASALT ROCK CO., INC.<br>BASALT SHIPYARD<br>BASALT PRECAST DIVISION<br>DILLINGHAM CONSTRUCTION<br>  PACIFIC LTD.<br>DILLINGHAM CONSTRUCTION GUAM, LTD.<br>HD&C INTERIORS, LTD.<br>HAWAIIAN BITUMULS & PAVING COMPANY<br>HAWAIIAN CONCRETE & ROCK COMPANY<br>HAWAIIAN DREDGING & CONSTRUCTION COMPANY<br>WATKINS ENGINEERS & CONSTRUCTORS, INC.<br>INLAND INDUSTRIAL CONTRACTORS,<br>  INCORPORATED<br>C. NORMAN PETERSON<br>ALBINA ENGINE & MACHINE WORKS<br>ALASKA STEAMSHIP COMPANY<br>BEACON GASOLINE COMPANY<br>BEACON PETROLEUM COMPANY |

|  | FOSS TUG & LAUNCH |
|  | SIMPSON CONSTRUCTION |
|  | WILLAMETTE IRON & STEEL COMPANY |
| EARTHGRAINS BAKING COMPANIES, INC | KILPATRICK'S BAKERIES, INC. |
| EXXON MOBIL CORPORATION | EXXON CORPORATION |
|  | HUMBLE OIL AND REFINING COMPANY |
|  | STANDARD OIL OF NEW JERSEY |
|  | ENCO |
|  | MOBIL OIL CORPORATION |
|  | GENERAL PETROLEUM COMPANY |
| FDCC CALIFORNIA, INC. | DINWIDDIE CONSTRUCTION COMPANY |
|  | FLETCHER CONSTRUCTION NORTH AMERICA |
| FEDERATED DEPARTMENT STORES, INC. | I. MAGNIN, INC. |
|  | BROADWAY STORES, INC. |
|  | MACY'S CALIFORNIA, INC. |
|  | EMPORIUM CAPWELL |
|  | CAPWELLS |
|  | CARTER HAWLEY HALE STORES, INC. |
|  | WEINSTOCKS |
|  | WEINSTOCK-LUBIN & CO. |
|  | HALE BROTHERS STORES, INC. |
|  | BROADWAY-HALE STORES, INC. (DE) |
|  | BROADWAY-HALES STORES, INC. (CA) |
|  | BULLOCKS |
| FELCOR LODGING TRUST, INC. | BRISTOL HOTEL COMPANY |
|  | BRISTOL HOTEL ASSET COMPANY |
|  | HOLIDAY INNS, INC. |
|  | BASS HOTELS & RESORTS, INC. |
| FIRST PALM SPRINGS VILLA | VILLA ALEJO APARTMENTS |
| FMC CORPORATION | FOOD MACHINERY AND CHEMICAL CORPORATION |
|  | BARIUM PRODUCTS, LTD. |
|  | FMC AUTO DIVISION |
|  | LINK-BELT CONSTRUCTION EQUIPMENT COMPANY |
|  | VAN PELT |
|  | CHICAGO PUMPS |
|  | CHIKSAN |
|  | COFFIN TURBO PUMPS |

84

|  |  |
|---|---|
|  | HAMER |
|  | JOHN BEAN PUMP COMPANY |
|  | PEERLESS PUMPS |
|  | WECO |
|  | WELL EQUIPMENT MANUFACTURING |
| FOREMOST McKESSON, INC. | FOREMOST DAIRIES, INC. (1967) |
|  | FWDR ASSOCIATES, INC. |
| FORT JAMES OPERATING COMPANY | JAMES RIVER PAPER COMPANY, INC. |
|  | JAMES RIVER II, INC. |
|  | CROWN-ZELLERBACH |
| G. HEILMAN BREWING COMPANY, INC. | BURGERMEISTER BREWING CORPORATION |
| GAYLORD CONTAINER CORPORATION | CROWN-ZELLERBACH CORPORATION |
|  | JAMES RIVER II, INC. |
| GENERAL BREWING COMPANY | LUCKY LAGER BREWING COMPANY |
| GTE CALIFORNIA INCORPORATED | ASSOCIATED TELEPHONE CO., LTD. |
|  | THE ASSOCIATED TELEPHONE COMPANY |
|  | ASSOCIATED TELEPHONE CORPORATION |
|  | GENERAL TELEPHONE COMPANY OF CALIFORNIA |
|  | SUNLAND-TUJUNGA TELEPHONE COMPANY |
|  | DELTA TELEPHONE AND TELEGRAPH COMPANY |
|  | CALIFORNIA WATER & TELEPHONE COMPANY |
|  | WESTERN CALIFORNIA TELEPHONE |
| THE GILLETTE COMPANY | PAPERMATE |
| GOOD SAMARITAN CHARITABLE TRUST | GOOD SAMARITAN HEALTH SYSTEM, |
|  |  dba SAN JOSE MEDICAL CENTER |
|  | HEALTH DIMENSIONS, INC., |
|  |  dba SAN JOSE MEDICAL CENTER |
|  | SAN JOSE MEDICAL CENTER |
|  | THE SAN JOSE HEALTH CENTER |
|  | SAN JOSE HOSPITAL AND HEALTH CENTER, INC. |
|  | SAN JOSE HOSPITAL CORPORATION |
| HARTFORD FIRE INSURANCE CO. | 650 CALIFORNIA STREET ASSOCIATES |
|  | HARTFORD BUILDING |
|  | HARTFORD ACCIDENT & INDEMNITY CO. |
| HERSHEY FOODS CORPORATION | HERSHEY CHOCOLATE OF CALIFORNIA |
|  | HERSHEY CHOCOLATE CORPORATION |

| | |
|---|---|
| HEUBLEIN, INC. | HEUBLEIN WINES<br>UNITED VINTNERS, INC. |
| HONDO OIL & GAS COMPANY | PAULEY PETROLEUM, INC.<br>FLETCHER OIL AND REFINING COMPANY |
| HUNT-WESSON, INC. | HUNT FOODS, INC. |
| IMPERIAL HOLLY CORP. | HOLLY SUGAR CORP. |
| INTER-CONTINENTAL HOTELS<br>CORPORATION | MARK HOPKINS INTER-CONTINENTAL HOTEL |
| INTERSTATE BRANDS CORPORATION | WONDER BREAD BAKERY |
| ITT SHERATON CORPORATION | THE SHERATON CORPORATION |
| IWCC ACQUISITION CORPORATION | INDIAN WELLS COUNTRY CLUB |
| JOHSUA HENDY CORPORATION | CALIFORNIA SHIPBUILDING CORPORATION<br>JOSHUA HENDY IRON WORKS |
| K MART CORPORATION | KRESGE DEPARTMENT STORE<br>KMART BUILDING SUPPLIES |
| KAISER ALUMINUM AND CHEMICAL CO. | PERMANENTE METALS YARDS 1, 2 |
| KAISER CARGO | KAISER YARDS 3 & 4 |
| KAISER VENTURES, INC. | KAISER STEEL RESOURCES, INC.<br>KAISER CO., INC.<br>KAISER STEEL CORPORATION<br>KAISER RESOURCES, INC.<br>KAISER SHIPYARD - VANCOUVER<br>KSC RECOVERY, INC. (Successor to the Bankruptcy Estate<br>of Kaiser Steel Corporation) |
| KENNECOTT UTAH COPPER<br>CORPORATION | RIO TINTO |
| KIMBERLY-CLARK CORPORATION | ANDERSON PULP MILL |
| KINTETSU ENTERPRISES<br>COMPANY OF AMERICA | MIYAKO HOTEL |

86

KRAFT FOODS, INC.

GENERAL FOODS CORPORATION
MAXWELL HOUSE
DART & KRAFT, INC.
KRAFT, INC.
KRAFT GENERAL FOODS, INC.
KRAFT FOOD INGREDIENTS CORP.

LESLIE CONTROLS, INC.

LESLIE CO.

LOCKHEED MARTIN CORPORATION

LOCKHEED CORPORATION
LOCKHEED MISSILES & SPACE CO., INC.
LOCKHEED AIRCRAFT CORPORATION

LOCKHEED SHIPBUILDING CORPORATION

LOCKHEED SHIPBUILDING AND
CONSTRUCTION COMPANY
PUGET SOUND BRIDGE & DRY DOCK COMPANY
PUGET SOUND BRIDGE & DREDGING COMPANY

MALINDONS LTD.

VAL STROUGH CHEVROLET CO.

MARRIOTT CORPORATION

STANFORD COURT HOTEL

MARTIN MARIETTA CARBON, INC.

MARTIN MARIETTA TECHNOLOGIES, INC.
HARVEY ALUMINUM OF AMERICA
HARVEY ALUMINUM, INC.

MARY E. STEBBINS TRUST

FLOOD BLDG.

MARYMOUNT ACADEMY,
INCORPORATED

MARYMOUNT SCHOOL OF SANTA BARBARA

McCLATCHY NEWSPAPERS, INC.

THE SACRAMENTO BEE

MCPHAIL'S, INC.

MILLERS HOME APPLIANCES
McPHAIL FUEL CO.
EXCEL DISTRIBUTING

McDONNELL DOUGLAS
CORPORATION

DOUGLAS AIRCRAFT COMPANY
BOEING NORTH AMERICAN, INC.

MOORE DRY DOCK CO.

MOORE SECURITIES CO.
MOORE DRY DOCK
SCHNITZER STEEL INDUSTRIES, INC.

87

| | |
|---|---|
| NABISCO, INC. | RJR NABISCO, INC.<br>NABISCO BRANDS, INC.<br>PLANTER'S PEANUTS |
| NARVEN ENTERPRISES, INC. | EL CORTEZ HOTEL |
| NESTLE USA, INC. | NESTLE BEVERAGE COMPANY<br>CHASE & SANBORN,<br>HILLS BROTHERS COFFEE, INC.<br>NESTLE FOOD COMPANY<br>CARNATION COMPANY<br>CONTADINA FOODS<br>C. F. SERVICES, INC. |
| NEW VICI, INC. | VINTNERS INTERNATIONAL COMPANY, INC.<br>PAUL MASSON, INC. |
| OCEAN SHORE IRON WORKS | OCEAN SHORE CONTROL CO., INC. |
| PACIFIC OIL REFINERY | COASTAL WEST VENTURIER, INC.<br>COASTAL CORP.<br>SEQUOIA REFINING<br>PACIFIC REFINING CORP. |
| PACIFIC SHIP REPAIR, INC. | RADAWA MAINTENANCE COMPANY |
| PEPPERWOOD CORPORATION | MARINSHIP CORPORATION |
| PHILLIPS PETROLEUM COMPANY | GETTY OIL<br>TIDEWATER OIL COMPANY<br>TIDEWATER ASSOCIATED OIL COMPANY<br>LYON OIL COMPANY<br>AVON OIL COMPANY<br>DRILLING SPECIALTIES CO. |
| THE PILLSBURY COMPANY | PROGRESSO FOODS COMPANY<br>TILLIE LEWIS FOODS |
| PIONEER CARPET MILLS, INC. | FOX SAN FRANCISCO PLAZA CORPORATION<br>SOUTHWEST AMUSEMENT CORPORATION<br>OXNARD IMPORT CARS, INC.<br>GENERAL RECORDS CORPORATION<br>ONE PLAZA CORPORATION<br>N.T. & T., INC.<br>SOUTHWEST THEATRE CORPORATION<br>SAN JOAQUIN THEATRE CORPORATION |

Case MDL No. 875   Document 4914   Filed 11/17/06   Page 126 of 423

|  |  |
|---|---|
|  | NORTHERN CALIFORNIA PROPERTIES, INC. |
|  | SOCAL PROPERTIES CORPORATION |
|  | CENTRAL CALIFORNIA PROPERTIES, INC. |
|  | EAST BAY PROPERTIES, INC. |
|  | MID-CALIFORNIA PROPERTIES, INC. |
|  | NINE SEVENTY CORPORATION |
| POTLATCH CORPORATION |  |
| THE PROCTER & GAMBLE MANUFACTURING COMPANY | PROCTER & GAMBLE COMPANY |
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA | BUNKER HILL TOWERS |
| REGAL HOTEL MANAGEMENT, INC. | REGAL BILTMORE HOTEL |
| SAN DIEGO GAS & ELECTRIC COMPANY | SAN DIEGO GAS COMPANY<br>SAN DIEGO GAS & ELECTRIC LIGHT COMPANY<br>SAN DIEGO CONSOLIDATED GAS & ELECTRIC COMPANY |
| SAUGUS STATION | THATCHER GLASS CORP. |
| SHELL OIL COMPANY | SHELL UNION OIL CORPORATION<br>SHELL CHEMICAL CO.<br>SHELL DEVELOPMENT CO.<br>SHELL COMPANY OF CALIFORNIA |
| THE SHORENSTEIN CO. | FREMONT CENTER |
| SIMPSON PAPER COMPANY | HUMBOLDT BAY PULP COMPANY<br>SIMPSON LEE PAPER COMPANY<br>CROWN SIMPSON CORP. |
| SMITH INTERNATIONAL SOUTH AMERICA, INC. | SMITH TOOL COMPANY, INC. |
| SMURFIT NEWSPRINT CORPORATION | PUBLISHER'S PAPER CO.<br>PUBLISHER'S FOREST PRODUCTS OF CALIFORNIA<br>SCOTT LUMBER COMPANY |

| | |
|---|---|
| SOUTHERN CALIFORNIA EDISON COMPANY | EDISON INTERNATIONAL |
| SOUTHERN CALIFORNIA WATER COMPANY | ARDEN-CORDOVA WATER COMPANY |
| SOUTHWEST MARINE, INC. | SOUTHWEST MARINE OF SAN FRANCISCO, INC. SOUTH BAY BOAT YARD, INC. NORTHWEST MARINE, INC. (Oregon) |
| SPENGERS FISH GROTTO | SPANGERS-BERKELEY |
| SBC HOLDINGS, INC. | THE STROH BREWERY COMPANY, INC. THE STROH PRODUCTS COMPANY JOSEPH SCHLITZ BREWING COMPANY JOS. SCHLITZ BREWING COMPANY SCHLITZ BREWERY |
| STERLING WINTHROP, INC. | STERLING DRUG, INC. WINTHROP LABORATORIES, INC. |
| SUMMIT MEDICAL CENTER | MERRITT HOSPITAL PROVIDENCE HOSPITAL |
| SUNSET HOMES, INC. | SUNSET DEVELOPMENT |
| SUNVALLEY ASSOCIATES, a California general partnership | SUNVALLEY ASSOCIATES LIMITED PARTNERSHIP SUNVALLEY, a general partnership SUN VALLEY MALL |
| SUN SHIP, INC. | SUN SHIPBUILDING AND DRY DOCK COMPANY SUN SHIPBUILDING COMPANY |
| TENET HEALTHSYSTEM HOSPITALS, INC. | TENET HEALTHCARE CORP. MEDICAL ARTS BUILDING |
| TEXACO REFINING AND MARKETING, INC. | TEXACO, INC. TEXACO USA THE TEXAS COMPANY THE TEXAS CORPORATION TIDEWATER OIL COMPANY ASSOCIATED OIL COMPANY GETTY OIL FOUR STAR OIL AND GAS COMPANY MOHAWK REFINERY |

90

| | |
|---|---|
| THEODORE KOOPMAN, ET AL | LONG BEACH CONVENTION CENTER |
| THRIFT LODGE | INDIO MOTEL, INC.<br>THUNDERBIRD MOTOR LODGE |
| TIG PREMIER INSURANCE COMPANY | TRANSAMERICA PREMIER INSURANCE COMPANY<br>PREMIER INSURANCE COMPANY |
| TITLE INSURANCE AND<br>GUARANTY COMPANY | WESTERN TITLE INSURANCE COMPANY |
| TODD SHIPYARDS CORPORATION | TODD PACIFIC SHIPYARDS CORPORATION |
| TODD PACIFIC SHIPYARDS CORPORATION | TODD SHIPYARDS CORPORATION |
| TOSCO CORPORATION | THE OIL SHALE CORPORATION<br>TOSCO REFINING COMPANY |
| TRW INC. | THOMPSON-RAMO-WOOLRIDGE |
| ULTRAMAR INC. | BEACON OIL COMPANY<br>CAMINOL COMPANY<br>THE CAMINOL COMPANY, LTD. |
| UNION BANK | CALIFORNIA FIRST BANK |
| UNION PACIFIC RESOURCES COMPANY | CHAMPLIN PETROLEUM |
| UNITED INDUSTRIAL MATERIALS, INC. | UNITED REFRACTORY & CORROSION PRODUCTS, INC. |
| UNITED TECHNOLOGIES<br>CORPORATION | UNITED AIRCRAFT CORPORATION<br>UNITED AIRCRAFT & TRANSPORT CORPORATION<br>PRATT & WHITNEY |
| UNIVERSAL STUDIOS, INC. | MCA, INC. |
| UNOCAL CORPORATION | UNION OIL COMPANY OF CALIFORNIA<br>UNION OIL CO.<br>UNION CHEMICAL<br>COLLIER CARBON & CHEMICAL CORPORATION<br>R. T. COLLIER<br>WEST COAST SHIPPING COMPANY |
| USX CORPORATION | CONSOLIDATED WESTERN PIPE & STEEL<br>CONSOLIDATED WESTERN STEEL |

91

|                                | WESTERN PIPE & STEEL |
|                                | CONSOLIDATED SHIPBUILDING CORP. |
|                                | UNITED STATES STEEL CORPORATION |
|                                | U.S. STEEL SUPPLY |
|                                | U.S. STEEL COMPANY |
|                                | COLUMBIA STEEL COMPANY |
|                                | AMERICAN BRIDGE & IRON |
|                                | CARNEGIE-ILLINOIS STEEL CORPORATION |

URBAN PACIFIC PROPERTIES

OPERA PLAZA COMMERCIAL MANAGEMENT
OPERA PLAZA
PACIFIC UNION DEVELOPMENT

UTAH POWER & LIGHT COMPANY

VACCO INDUSTRIES

VACCO VALVE CO.
VACUUM & AIR COMPONENTS COMPANY
  OF AMERICA

VACU*BLAST CORPORATION

VACUBLAST INTERNATIONAL
VACU-BLAST CORPORATION

WELLS FARGO BANK, N.T. & S.A

FIRST INTERSTATE BANK OF CALIFORNIA
ATC COMPANY

WESTLAND BAY FAIR MALL L.P.

BAY FAIR MALL
BAY FAIR SHOPPING CENTER CORP.
VALLEY-FAIR MALL
VALLEY FAIR MALL

WHITEMORE OXYGEN COMPANY

YALE INTERNATIONAL

SPRECKELS SUGAR COMPANY, INC.
SPRECKLES INDUSTRIES
SPRECKLES SUGAR CO.
SPRECKLES DEVELOPMENT CO., INC.
SPRECKLES LAND CO.
MECHANICAL PRODUCTS CO., INC.
DUFF-NORTON CO., INC.
DOMINO SUGAR CORPORATION
AMSTAR CORPORATION
AMSTAR SUGAR CORPORATION
SI ACQUISITION CORP.
TATE AND LYLE PLC

YOLLAND & CO.

YOLLAND MATERIALS COMPANY

YORK INTERNATIONAL CORPORATION

YORK OPERATING COMPANY
YORK HOLDINGS
YORK HOLDING CORPORATION
CENTRAL ENVIRONMENTAL SYSTEMS
BORG-WARNER AIR CONDITIONING, INC.
BORG-WARNER CENTRAL ENVIRONMENTAL
    SYSTEMS
YORK DIVISION, BORG-WARNER
YORK-LUXAIRE, INC.
YORK CORPORATION
YORK ICE MACHINERY
YORK MANUFACTURING

ZURN INDUSTRIES, INC.

BUMSTEAD-WOOLFORD COMPANY

55.     At all times mentioned herein, the Premises Owner/Contractor Liability Defendants,

and each of them, respectively, owned, leased, maintained, managed, and/or controlled the premises

listed on Exhibit C where plaintiff was present.  The information provided on Exhibit C is

preliminary, based on recall of events covering many years, and further investigation and discovery

may produce more reliable information.  Additionally, plaintiff might have been present at these or

other Premises Owner/Contractor Liability Defendants' premises at other locations and on other

occasions.

56.     Prior to and at said times and places, said Premises Owner/Contractor Liability

Defendants, and each of them, respectively, caused certain asbestos- and silica-containing insulation,

other building materials, products, and toxic substances to be constructed, installed, maintained,

used, supplied, replaced, repaired, and/or removed on each of the aforesaid respective premises, by

their own workers and/or by various unqualified or unskilled contractors, and caused the release of

93

dangerous quantities of toxic asbestos fibers and other toxic substances into the ambient air and thereby created a hazardous and unsafe condition to plaintiff and other persons exposed to said asbestos fibers and toxic substances while present at said premises.

57.     At all times mentioned herein, said Premises Owner/Contractor Liability Defendants, and each of them, knew, or in the exercise of ordinary and reasonable care should have known, that the foregoing conditions and activities created a dangerous, hazardous, and unsafe condition and unreasonable risk of harm and personal injury to plaintiff and other workers or persons so exposed while present on each of the aforesaid respective premises.

58.     At all times relevant herein, plaintiff entered said premises and used or occupied each of said respective premises as intended, and for each of the respective Premises Owner/Contractor Liability Defendants' benefit and advantage, and at each of the respective Premises Owner/Contractor Liability Defendants' request and invitation.  In so doing, plaintiff was exposed to dangerous quantities of asbestos fibers and other toxic substances released into the ambient air by the aforesaid hazardous conditions and activities managed, maintained, initiated, and/or otherwise created, controlled, or caused by said Premises Owner/Contractor Liability Defendants, and each of them.

59.     Plaintiff at all times was unaware of the hazardous condition or the risk of personal injury created by the aforesaid presence and use of asbestos products and materials and other toxic substances on said premises.

94

60.     At all times mentioned herein, said Premises Owner/Contractor Liability Defendants, and each of them, remained in control of the premises where plaintiff was performing his work.

61.     At all times mentioned herein, the Premises Owner/Contractor Liability Defendants owed to plaintiffs and others similarly situated a duty to exercise ordinary care in the management of such premises in order to avoid exposing workers such as plaintiff to an unreasonable risk of harm and to avoid causing injury to said person.

62.     At all times mentioned herein, said Premises Owner/Contractor Liability Defendants, and each of them, knew, or in the exercise of ordinary and reasonable care should have known, that the premises that were in their control would be used without knowledge of, or inspection for, defects or dangerous conditions and that the persons present and using said premises would not be aware of the aforesaid hazardous conditions to which they were exposed on the premises.

63.     At all times mentioned herein, said Premises Owner/Contractor Liability Defendants, and each of them, negligently failed to maintain, manage, inspect, survey, or control said premises or to abate or correct, or to warn plaintiff of, the existence of the aforesaid dangerous conditions and hazards on or about said premises.

64.     Prior to and at the times and places aforesaid, said Premises Owner/Contractor Liability Defendants, and each of them, respectively, caused certain asbestos- and silica-containing insulation, other building materials, products, and toxic substances to be constructed, installed, maintained, used, replaced, repaired, and/or removed on each of their aforesaid respective premises

95

by their own workers and/or by employing various contractors, and caused the release of dangerous quantities of toxic asbestos fibers and other toxic substances into the ambient air and thereby injured plaintiff.

65.    At all times mentioned herein, said Premises Owner/Contractor Liability Defendants, and each of them:

a.    Should have recognized that the work of said contractors would create during the progress of the work, dangerous, hazardous, and unsafe conditions which could or would harm plaintiff and others unless special precautions were taken;

b.    Knew or had reason to know, that the contractors it had selected and hired to install, remove, abate, or otherwise handle asbestos-containing materials were unfit, unskilled, or otherwise unqualified to do so; and

c.    Failed to use reasonable care to discover whether the contractors it selected and hired to install, remove, abate or otherwise handle asbestos-containing materials were competent or qualified to do so.

66.    In part, plaintiff was exposed to dangerous quantities of asbestos fibers and other toxic substances by reason of such contractors' failure to take necessary precautions.

67.    The work of contractors on premises controlled by the Premises Owner/Contractor Defendants created an unsafe premise and an unsafe work place by reason of the release of dangerous quantities of toxic substances including but not limited to asbestos.

96

68.     The unsafe premise or work place was created, in part, by the negligent conduct of the contractors employed by the Premises Owner/Contractor Defendants. Said negligent conduct includes but is not limited to:

      a.     Failure to warn of asbestos and other toxic dusts;

      b.     Failure to suppress the asbestos-containing or toxic dusts;

      c.     Failure to remove the asbestos-containing and toxic dusts through use of ventilation or appropriate means;

      d.     Failure to provide adequate breathing protection, *i.e.*, approved respirators or masks;

      e.     Failure to inspect and/or test the air;

      f.     Failure to provide medical monitoring; and

      g.     Failure to select and hire a careful and competent contractor or subcontractor.

69.     The Premises Owner/Contractor Defendants' duty to maintain and provide safe premises, a safe place to work, and to warn of dangerous conditions are non-delegable; said duties arise out of common law, and other aspects of Utah law. Therefore, the Premises Owner/Contractor Defendants are responsible for any breach of said duties whether by themselves or others.

70.     Prior to and at said times and places, said Premises Owner/Contractor Liability Defendants were subject to certain ordinances, statutes, and other government regulations promulgated by the State of Utah, and others, which required said Premises Owner/Contractor

97

Liability Defendants to provide specific safeguards or precautions to prevent or reduce the inhalation of asbestos dust and other toxic fumes or substances; and said Premises Owner/Contractor Liability Defendants failed to provide the required safeguards and precautions, or contractors employed by the Premises Owner/Contractor Liability Defendants failed to provide the required safeguards and precautions. Defendants' violations of said codes include but are not limited to:

      a.      Failing to comply with statutes and allowing ambient levels of airborne asbestos fiber to exceed the permissible/allowable levels with regard to the aforementioned statutes;

      b.      Failing to segregate work areas involving the release of asbestos or other toxic dusts;

      c      Failing to suppress dust using prescribed ventilation techniques;

      d.      Failing to suppress dust using prescribed "wet down" techniques;

      e.      Failing to warn or educate plaintiff or others regarding asbestos or other toxic substances on the premises;

      f.      Failing to provide approved respiratory protection devices;

      g.      Failing to ensure approved respiratory protection devices were used properly;

      h.      Failing to provide for an ongoing health screening program for those exposed to asbestos on the premises;

      i.      Failing to provide adequate housekeeping and clean-up of the work place;

     j.      Failing to properly warn of the hazards associated with asbestos as required by these statutes;

     k.      Failing to properly report renovation and disturbance of asbestos-containing materials, including but not limited to U.C.A. §19-2-108.

     l.      Failing to have an asbestos removal supervisor as required by regulation;

     m.      Failing to get approval for renovation as required by statutes; and

     n.      Failing to maintain records as required by statute.

71.     Plaintiff at all times was unaware of the hazardous condition or the risk of personal injury created by defendants' violation of said regulations, ordinances or statutes.

72.     At all times mentioned herein, plaintiff was a member of the class of persons whose safety was intended to be protected by the regulations, statutes or ordinances described in the foregoing paragraphs.

73.     At all times mentioned herein, said Premises Owner/Contractor Liability Defendants, and each of them, knew, or in the exercise of ordinary and reasonable care should have known, that the premises that were in their control would be used without knowledge of, or inspection for, defects or dangerous conditions, that the persons present and using said premises would not be aware of the aforesaid hazardous conditions to which they were exposed on the premises, and that such persons were unaware of the aforesaid violations of codes, regulations, and statutes.

99

74.    As a legal consequence of the foregoing, plaintiff developed asbestos-related illness, which has caused great injury and disability as previously set forth, and plaintiff has suffered damages as herein alleged.

WHEREFORE, plaintiff prays for judgment against defendants, their alternate entities, and each of them, as hereinafter set forth.

## SIXTH CAUSE OF ACTION
(Respiratory Safety Devices - Negligence)

AS AND FOR A FURTHER, SIXTH, SEPARATE AND DISTINCT CAUSE OF ACTION FOR NEGLIGENCE, PLAINTIFF-1 COMPLAINS OF DEFENDANTS ON EXHIBIT D, DOES 621-650, THEIR ALTERNATE ENTITIES, AND EACH OF THEM, AND FOR A CAUSE OF ACTION FOR NEGLIGENCE ALLEGES:

75.     Plaintiff, by this reference, incorporates the allegations contained in the First Cause of Action.

76.     At all times herein mentioned each of defendants listed on Exhibit D and DOES 621-650 (hereinafter also known as "Respiratory Safety Device Defendants") were and are engaged in the research, study, manufacture, fabrication, design, labeling, assembly, distribution, sale, marketing, inspection, service, repair, warranty, packaging, and advertising of respiratory safety devices, including but not limited to protective masks, respirators and filters.

77.     At all times herein mentioned, the Respiratory Safety Device Defendants, and each of them, singularly and jointly, negligently and carelessly researched, manufactured, fabricated, designed, tested or failed to test, warned or failed to warn, labeled, assembled, distributed, leased, bought, offered for sale, sold, inspected, serviced, repaired, marketed, warranted, rebranded, manufactured for others, packaged and advertised, certain respiratory safety devices, including but not limited to masks, respirators and filters, in that said respiratory safety devices, while being used in a manner that was reasonably foreseeable, failed to protect users, consumers, workers and others,

101

including the plaintiff herein, who were in proximity to and exposed to said asbestos fibers (hereinafter collectively called "exposed persons"), from inhalation of asbestos fibers, thereby rendering said devices unsafe and dangerous for use by exposed persons.

78.     The Respiratory Safety Device Defendants, and each of them, had a duty to exercise due care in the pursuance of the activities mentioned above, and defendants, and each of them, breached said duty of due care.

79.     The Respiratory Safety Device Defendants knew, or should have known, and intended, that the aforesaid respiratory safety devices would be used by consumers, workers, bystanders and others, including the plaintiff herein, to protect them from inhalation of asbestos fibers. Said devices, while being used in a manner that was reasonably foreseeable, failed to protect plaintiff from exposure to asbestos fibers, resulting in severe and permanent injury to plaintiff.

WHEREFORE, plaintiff prays for judgment against defendants, their alternate entities, and each of them, as hereinafter set forth.

102

## SEVENTH CAUSE OF ACTION
### (Respiratory Safety Devices - Strict Liability)

AS AND FORTH A FURTHER, SEVENTH, SEPARATE AND DISTINCT CAUSE OF ACTION FOR NEGLIGENCE, PLAINTIFF-1 COMPLAINS OF DEFENDANTS ON EXHIBIT D AND DOES 621-650, THEIR ALTERNATE ENTITIES AND EACH OF THEM, AND FOR A CAUSE OF ACTION FOR NEGLIGENCE ALLEGES:

80.     Plaintiff, by this reference, incorporates the allegations contained in the First Cause of Action, and paragraph 77 of the Sixth Cause of Action.

81.     Said respiratory safety devices were defective and unsafe for their intended purpose in that said devices did not prevent the inhalation of asbestos fibers by plaintiff. The defect existed in said devices at the time they left the possession of the Respiratory Safety Device Defendants. Said devices did, in fact, allow inhalation of asbestos fibers which causes serious disease and/or death. The defect in said devices did, in fact, cause personal injuries, including asbestosis, other lung damage, and cancer to exposed persons, including plaintiff herein, while being used in a reasonably foreseeable manner thereby rendering the same defective, unsafe and dangerous for use by exposed persons.

WHEREFORE, plaintiff prays for judgment against defendants, their alternate entities, and each of them, as hereinafter set forth.

103

## EIGHTH CAUSE OF ACTION
### (Brake Shoe Grinding Machine - Negligence)

AS AND FOR A FURTHER, EIGHTH, SEPARATE AND DISTINCT CAUSE OF ACTION FOR NEGLIGENCE, PLAINTIFF-1 COMPLAINS OF DEFENDANTS ON EXHIBIT D, DOES 701-715, THEIR ALTERNATE ENTITIES, AND EACH OF THEM, AND FOR A CAUSE OF ACTION FOR NEGLIGENCE ALLEGES:

82.     Plaintiff, by this reference, incorporates the allegations contained in the First Cause of Action.

83.     At all times herein mentioned, each of defendants HENNESSY INDUSTRIES and DOES 651-700 (hereinafter sometimes also known as "Brake Shoe Grinding Machine Defendants") were and are engaged in the research, study, manufacture, fabrication, design, modification, labeling, assembly, distribution, leasing, sale, supply, marketing, inspection, service, repair, warranty, packaging and advertising of brake shoe grinding machines and related products and equipment.

84.     At all times herein mentioned, each of the named Brake Shoe Grinding Machine Defendants and DOES 651-700, and each of them, was the successor, successor in business, successor in product line or a portion thereof, assign, predecessor, predecessor in business, predecessor in product line or a portion thereof, parent, subsidiary, wholly or partially owned by, or the whole or partial owner of or member in an entity researching, studying, manufacturing, fabricating, designing, modifying, labeling, assembling, distributing, leasing, selling, supplying, marketing, inspecting, servicing, repairing, warranting, packaging and advertising brake shoe

104

grinding machines and related products and equipment, for which each of the herein named Brake Shoe Grinding Machine Defendants is liable for the tortious conduct of their alternate entities. The following defendants, and each of them, are liable for the acts of each and every alternate entity, and each of them, in that there has been a virtual destruction of plaintiff's remedy against each such alternate entity; defendants, and each of them, have acquired the assets, product line, or a portion thereof, of each such alternate entity; defendants, and each of them, caused the destruction of plaintiff's remedy against each such alternate entity; each such defendant has the ability to assume the risk-spreading role of each such alternate entity; and that each such defendant enjoys the goodwill originally attached to each such "alternate entity."

DEFENDANT                          ALTERNATE ENTITY

HENNESSY INDUSTRIES                AMMCO TOOLS, INC.

85.     At all times herein mentioned, the Brake Shoe Grinding Machine Defendants, and each of them, singularly and jointly, negligently and carelessly researched, manufactured, fabricated, designed, modified, tested or failed to test, warned or failed to warn, labeled, assembled, distributed, leased, bought, offered for sale, supplied, sold, inspected, serviced, repaired, marketed, warranted, rebranded, manufactured for others, packaged and advertised certain brake shoe grinding machines and related products and equipment, in that said products, while being used in a manner that was reasonable, failed to protect users, consumers, workers and others, including the plaintiff herein, who were in proximity to said brake shoe grinding machines and related products and equipment (hereinafter collectively called "exposed persons"), from exposure to and inhalation of asbestos

105

Case MDL No. 875 Document 4914 Filed 11/17/06 Page 143 of 423

fibers released from asbestos-containing brake linings caused by the use of the brake shoe grinding machines and related products and equipment, thereby rendering said devices unsafe and dangerous for use by exposed persons.

86.     The Brake Shoe Grinding Machine Defendants knew, or should have known, and intended, that the aforesaid brake shoe grinding machines and related products and equipment would be used by consumers, workers, bystanders and others, including the plaintiff herein, in conjunction with asbestos-containing brake linings. Said machines, products, and equipment, while being used in a manner that was reasonably foreseeable, failed to protect plaintiff from exposure to asbestos fibers released from asbestos-containing brake linings caused by use of said brake shoe grinding machines and related products and equipment, resulting in severe and permanent injury to plaintiff.

87.     Said brake shoe grinding machines and related products and equipment were defective and unsafe for their intended purpose in that said products caused, and failed to prevent, the inhalation of asbestos fibers by plaintiff. The defect existed in said products at the time they left the possession of the Brake Shoe Grinding Machine Defendants. Use of said products did, in fact, lead to inhalation of asbestos fibers which causes serious disease and/or death. The defect in said products did, in fact, cause personal injuries, including asbestosis, other lung damage, and cancer to exposed persons, including plaintiff herein, while being used in a reasonably foreseeable manner thereby rendering the same defective, unsafe and dangerous for use.

106

WHEREFORE, plaintiff prays for judgment against defendants, their alternate entities, and each of them, as hereinafter set forth.

## NINTH CAUSE OF ACTION
(Fraud and Deceit/Concealment)

AS AND FOR A FURTHER, NINTH, SEPARATE AND DISTINCT CAUSE OF ACTION FOR FRAUD AND DECEIT/CONCEALMENT, PLAINTIFF COMPLAINS OF DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, GATKE CORPORATION, PNEUMO ABEX CORPORATION (formerly known as ABEX CORPORATION and successor-in-interest to AMERICAN BRAKEBLOK CORPORATION), and T&N PLC (formerly known as TURNER AND NEWALL and alter-ego to KEASBY-MATTISON COMPANY), DOES 716-800, THEIR ALTERNATE ENTITIES, AND EACH OF THEM, AND ALLEGES AS FOLLOWS:

88.     Plaintiff, by this reference, incorporates and makes a part hereof as though fully set forth herein at length each and every allegation of the First through Eighth Causes of Action as though fully set forth herein.

89.     The term "conspirators" as used herein includes but is not limited to: METROPOLITAN LIFE INSURANCE COMPANY, Anthony Lanza, M.D., Johns-Manville, Raybestos-Manhattan (now Raymark Industries, Inc. [Raymark]), American Brakeblok Corporation (now PNEUMO ABEX CORPORATION [PNEUMO ABEX]), Keasbey-Mattison COMPANY (now T&N PLC [T&N]), all members of the Asbestos Textile Institute (ATI), and the other entities and individuals identified in this Eleventh Cause of Action.

107

90.    Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, the conspirator defendants were and are corporations organized and existing under and by virtue of the laws of the State of Utah, or the laws of some other state or foreign jurisdiction, and that defendants were and are authorized to do and/or were and are doing business in the State of Utah, and that said defendants regularly conducted and/or conducts business in the County of Salt Lake, State of Utah.

91.    Plaintiff was exposed to asbestos-containing dust created by the use of the asbestos products manufactured, distributed and/or supplied by one or more of the conspirators named below. The exposure to the asbestos or asbestos-related products supplied by the conspirator(s) caused plaintiff's asbestos-related disease and injuries.

92.    The conspirators, individually and as agents of one another and as co-conspirators, agreed and conspired among themselves, with other asbestos manufacturers and distributors, and with certain individuals including but not limited to Anthony Lanza, M.D. (Lanza), and defendant METROPOLITAN LIFE INSURANCE COMPANY (MET LIFE) to injure the plaintiff in the following fashion (the following is not an exclusive list of the wrongful acts of the conspirators but a representative list):

a.    Beginning in 1929, MET LIFE entered agreements with Manville and others to fund studies of the affects of asbestos exposure on Canadian asbestos miners. When the data from these studies proved that Canadian asbestos miners were developing asbestosis,

108

MET LIFE, Johns-Manville, and others suppressed its publication; further, Anthony Lanza, M.D. (then a MET LIFE employee) actively misrepresented the results of the Canadian study for many years thereafter to meetings of health care professionals seeking information regarding asbestos exposure.

b.      In approximately 1934, conspirators Manville and MET LIFE, through their agents, Vandiver Brown and attorney J.C. Hobart, and conspirator Raybestos-Manhattan (Raybestos), through its agents, Sumner Simpson and J. Rohrbach, suggested to Lanza, MET LIFE (insurers of Manville and Raybestos), that Lanza publish a study on asbestosis in which Lanza would affirmatively misrepresent material facts and conclusions about asbestos exposure; including but not limited to descriptions of the seriousness of the disease process, asbestosis. The misrepresentation was accomplished through intentional deletion of Lanza's description of asbestosis as "fatal" and through other selective editing that affirmatively misrepresented asbestosis as a disease process less serious than it was known to be by the conspirators. As a result, Lanza's study was published in the medical literature containing said misleading statements in 1935. The conspirators were motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent nondisclosure by the desire to influence proposed legislation to regulate asbestos exposure, to provide a defense in lawsuits involving Manville, Raybestos, and MET LIFE, as insurer, and to promote the use of their asbestos products.

c.    The above-described conspiracy continued in 1936, when additional co-conspirators American Brakeblok Corporation (defendant PNEUMO ABEX), Asbestos Manufacturing COMPANY (defendant GATKE CORPORATION), Manville, Keasbey & Mattison COMPANY (then an alter-ego to conspirator Turner & Newall, defendant T&N), Raybestos-Manhattan (Raymark), Russell Manufacturing (whose liabilities have been assumed by H.K. Porter COMPANY), Union Asbestos and Rubber COMPANY and USG, entered into an agreement with a leading medical research facility named Saranac Laboratories (the "Saranac Laboratories Agreement"). Under the agreement, the conspirators acquired the power to decide what information Saranac Laboratories could publish regarding asbestos disease and could also control in what form such publications were to be disseminated. Their agreement provided these conspirators the power and ability to affirmatively misrepresent the results of the work at Saranac, and also gave these conspirators power to suppress material facts included in any study. On numerous occasions thereafter, the conspirators exercised their power to prevent Saranac scientists from disclosing material scientific data, resulting in numerous misstatements of fact regarding the health affects of asbestos exposure being made at scientific meetings.

d.    The conspiracy was furthered when on November 11, 1948, representatives of the following conspirators met at Johns-Manville headquarters: Johns-Manville, American Brakeblok Division of American Brake and Shoe Foundry (defendant PNEUMO ABEX),

110

defendant GATKE CORPORATION, Keasbey & Mattison COMPANY (then an alter-ego to

conspirator Turner & Newall, defendant T&N), Raybestos (Raymark), Thermoid

COMPANY (whose assets and liabilities were later purchased by H.K. Porter COMPANY),

Union Asbestos and Rubber COMPANY, defendant USG, and MET LIFE. Defendant USG

did not send a COMPANY employee to the meeting, but instead authorized Vandiver Brown

of Johns-Manville to represent its interest at the meeting and to take action on its behalf.

   e.  At the November 11, 1948 meeting, these conspirators, and their

representatives, decided to exert their influence to materially alter and misrepresent material

facts about the substance of research conducted by Dr. Leroy Gardner at the Saranac

Laboratories beginning in 1936. Dr. Gardner's research involved the carcinogenicity of

asbestos in mice and also included an evaluation of the health effects of asbestos on humans

with a critical review of the then-existing standards for asbestos dust exposure.

   f.  At this meeting, these conspirators intentionally and affirmatively decided that

Dr. Gardner's work should be edited to delete material facts about the cancer-causing

propensity of asbestos, the health effects of asbestos on humans, and the critique of the dust

standards. The conspirators then published these deceptive and fraudulent statements in the

medical literature as edited by Dr. Arthur Vorwald. These conspirators thereby fraudulently

misrepresented the risks of asbestos exposure to the public in general, and the class of

persons exposed to asbestos, including the plaintiff.

g.      As a direct result of influence exerted by the conspirators, Dr. Vorwald published Dr. Gardner's edited work in the <u>Journal of Industrial Hygiene, AMA Archives of Industrial Hygiene and Occupational Health</u> in 1951 in a form that stressed those portions of Dr. Gardner's work that the conspirators wished stressed, but which omitted reference to human asbestosis and cancer, thereby fraudulently and affirmatively misrepresenting the extent of the risks.   The conspirators affirmatively and deliberately disseminated this deceptive and fraudulent Vorwald publication to university libraries, government officials, agencies, and others.

h.      Such actions constitute a material affirmative misrepresentation of the total context of material facts involved in Dr. Gardner's work and resulted in creating an appearance that inhalation of asbestos was less of a health problem than Dr. Gardner's unedited work indicated.

i.      When Dr. Vorwald subsequently tried to publish more complete information regarding Dr. Gardner's animal studies, the conspirators required his discharge from Saranac Laboratories, denied him permission to publish or complete Gardner's work, and actively discouraged institutions of higher learning from hiring or retaining Dr. Vorwald in any capacity.

j.      The following conspirators were members of the trade association known as Quebec Asbestos Mining Association (Q.A.M.A.):   Johns-Manville Corporation; Carey-

Canada, individually and as successor to Quebec Asbestos corporation; Celotex Corporation,

successor to Quebec Asbestos Corporation; National Gypsum COMPANY; and Turner &

Newall (defendant T&N), individually and successor to Bell Asbestos. These conspirators,

members of Q.A.M.A., participated in the above-described misrepresentation of the work of

Dr. Gardner published by Dr. Vorwald in the <u>AMA Archives of Industrial Health</u> in 1951.

Evidence of the Q.A.M.A's involvement in this misrepresentation arises from co-conspirator

Johns-Manville's membership in the Q.A.M.A., as well as correspondence from co-

conspirators dated 1/29/47, 11/26/47, 3/6/48, 10/15/48, 3/8/49, and 9/6/50, all indicating

close monitoring of the editing process of Q.A.M.A.'s representative, Ivan Sabourin, acting

on behalf of all Q.A.M.A. members.

      k.      As a furtherance of the conspiracy commenced in 1929, conspirators who

were members of the Q.A.M.A. as described above, began on or about 1950 to formulate a

plan to influence public opinion about the relationship between asbestos and cancer by

influencing the medical literature on this subject and then touting and disseminating this

literature to the public. Such literature was also disseminated to organizations and legislative

bodies responsible for regulatory control of asbestos with the specific intent of

misrepresenting the existing scientific information and suppressing contrary scientific data in

their possession and control.

l.      This plan of misrepresentation and influence over medical literature began on

or about 1950 when the aforementioned Q.A.M.A. members selected Saranac Laboratories to

evaluate whether cancer was related to asbestos.  After a preliminary report authored by Dr.

Vorwald in 1952 indicated that a cancer/asbestos relationship might exist in experimental

animals, these Q.A.M.A. members refused to further fund the study, terminated the study,

and prevented any public discussion or dissemination of the results.

m.      As a result of the termination of Q.A.M.A./Saranac study, the conspirators

fraudulently withheld information from the public and affirmatively misrepresented to the

public and responsible legislative and regulatory bodies that asbestos did not cause cancer,

including affirmative misrepresentations by conspirators and conspirators' agents K.W.

Smith, M.D., Paul Cartier, M.D., Vorwald, Lanza, Vandiver Brown, and Ivan Sabourin, said

misrepresentations being directed to, *inter alia*, U.S. Government officials, Canadian

government officials, U.S. National Cancer Institute, medical organizations, health

professionals,  and the general public, including plaintiff.

n.      Subsequently, the Q.A.M.A. conspirators contracted with the Industrial

Hygiene Foundation and Dr. Daniel Braun to further study the relationship between asbestos

exposure, asbestosis, and lung cancer. In 1957, Drs. Braun and Truan (Braun and Truan)

reported to the Q.A.M.A. that asbestosis did increase a worker's risk of incurring lung cancer.

o.      The Q.A.M.A. conspirators as a furtherance of the conspiracy commenced in

1929, thereafter caused, in 1958, a publication of the work by Braun and Truan in which the

findings regarding increased incidence of cancer in persons with asbestosis was edited out

(stricken) by agents of the Q.A.M.A.  The published version of the Braun and Truan study

contained a conclusion that asbestos exposure, alone, did not increase the incidence of lung

cancer, a conclusion known by the conspirators to be false.

p.      By falsifying and causing publication of studies concluding that asbestos

exposure did not cause lung cancer, and simultaneously omitting documented findings that

asbestosis did increase the risk of lung cancer, the conspirators affirmatively misrepresented

to the public and concealed from the public the extent of risks associated with inhalation of

asbestos fibers.

q.      In furtherance of the ongoing 1929 conspiracy, in approximately 1958, these

Q.A.M.A. conspirators publicized the fraudulently edited works of Braun and Truan at a

symposium in an effort to fraudulently misrepresent to the public and persons exposed to

asbestos that the inhalation of asbestos dust would not cause cancer.

r.      The fraudulent misrepresentations beginning in 1929 as elaborated above and

continuing with the publication of the 1958 Braun and Truan study influenced the standards

set for asbestos exposure. The developers of such standards failed to lower the maximum

115

exposure limits because a cancer risk associated with asbestos inhalation had not been proven.

s.    In furtherance of the 1929 conspiracy, in 1967, Q.A.M.A. conspirators decided, at their trade association meeting, that they would intentionally mislead consumers about the extent of risks involved in inhalation of asbestos products.

t.    In furtherance of the 1929 conspiracy, in 1952, a Symposium regarding the health effects of asbestos was held at Saranac Laboratories. The following conspirators were in attendance: MET LIFE, Lanza, Johns-Manville, Turner & Newall (defendant T&N), Ray-bestos (Raymark), and Q.A.M.A. members by way of their agents, Cartier, Sabourin and LaChance.

u.    At the 1952 Saranac Symposium, the occurrence of lung cancer and asbestosis in product users was discussed as was the carcinogenic properties of all fiber types of asbestos. In an affirmative attempt to mislead the public about the extent of health risks associated with asbestos, and in an effort to fraudulently conceal those risks from the pubic, these conspirators conspired to prevent publication of the record of this 1952 Saranac Symposium and it was not published. In addition, the conspirators induced Dr. Vorwald not to announce the results of his and Dr. Gardner's animal studies showing excess cancers in animals which thereby fraudulently misrepresented existing secret data which could not be

116

publicized owing to the secrecy provisions contained in the 1936 Saranac agreement heretofore described.

  v.  The following co-conspirators were members of the trade organization known as the Asbestos Textile Institute (ATI): Raybestos (Raymark), Johns-Manville, H.K. Porter, Keasbey & Mattison, individually and through its alter-ego Turner & Newall (defendant T&N) and National Gypsum (defendant ASBESTOS CLAIMS MANAGEMENT CORPORATION), GATKE CORPORATION, individually and/or through its alter-ego Asbestos Textile COMPANY, Inc., Uniroyal, Inc., individually and through its alter-egos, CDU Holding COMPANY, Uniroyal Holding COMPANY, and Uniroyal Goodrich Tire COMPANY.

  w.  In furtherance of the foregoing conspiracy, in 1947, these conspirators, members of the ATI, received a report from industrial hygienist W.C.L. Hemeon (Hemeon) regarding asbestos, which suggested re-evaluation of the then existing maximum exposure limits for asbestos exposure.  These conspirators caused the Hemeon report not to be published and thereby fraudulently concealed material facts about asbestos exposure from the public and affirmatively misrepresented to the public and class of persons exposed to asbestos that the then existing maximum exposure limit for asbestos was acceptable. Thereafter, these conspirators withheld additional material information on dust standards

117

from the American Conference of Governmental Industrial Hygienists (ACGIH), thereby further influencing evaluations of their Threshold Limit Values for asbestos exposure.

x.      In furtherance of the foregoing conspiracy, in 1953, co-conspirator National Gypsum, through its agents, in response to an inquiry from the Indiana Division of Industrial Hygiene regarding health hazards of asbestos spray products, refused to mail a proposed response to that division indicating that respirators should be worn by applicators of the products. National Gypsum's response distorted and fraudulently misrepresented the need for applicators of asbestos spray products to wear respirators and fraudulently concealed from such applicators the need for respirators and thereby misrepresented the risks associated with asbestos exposure.

y.      In furtherance of the foregoing conspiracy, in 1955, conspirator Manville, through its agent Dr. Kenneth Smith, caused to be published in the AMA Archives of Industrial Health, an article entitled "Pulmonary Disability in Asbestos Workers." This published study materially altered the results of an earlier study in 1949 concerning the same set of workers. This alteration of Dr. Smith's study constituted a fraudulent and material misrepresentation about the extent of the risk associated with asbestos inhalation.

z.      In furtherance of the foregoing conspiracy, in 1955, the National Cancer Institute held a meeting at which conspirator Manville, individually and as an agent for other co-conspirators, and Dr. Vorwald, as agent of co-conspirators, affirmatively misrepresented

118

that there were no existing animal studies concerning the relationship between asbestos exposure and cancer, when, in fact, the conspirators were in secret possession of several suppressed studies which demonstrated that positive evidence did exist.

aa.     In furtherance of the foregoing conspiracy, in 1957, these conspirators and members of the ATI, jointly rejected a proposed research study on cancer and asbestos exposure. This resulted in fraudulently concealing from the public material facts regarding asbestos exposure and also constituted an affirmative misrepresentation of the then-existing knowledge about asbestos exposure and lung cancer.

bb.     In furtherance of the foregoing conspiracy, in 1964, conspirators who were members of the ATI met to formulate a plan for rebutting the association between lung cancer and asbestos exposure that had been recently published by Dr. Irving J. Selikoff of Mount Sinai Research Center.  Thereafter, these members of the ATI embarked upon a campaign to further misrepresent the association between asbestos exposure and lung cancer.

cc.     Conspirators Mellon Institute and Industrial Hygiene Foundation (IHF) were research institutes whose functions included involvement in research regarding the health effects of inhaling asbestos dust.

dd.     Beginning in the early 1940's, the IHF was involved in a study by Hemeon entitled Report of Preliminary Dust Investigation for Asbestos Textile Institute, June 1947. This study was done in connection with members of the ATI. This study found that workers

119

exposed to less than the recommended maximum exposure level for asbestos were nonetheless developing disease. As a part of the conspiracy, the IHF never published this study.

ee.    Beginning in the mid 1950's, the IHF and the Mellon Institute were involved in the publication of works by Braun and Truan entitled An Epidemiological Study of Lung Cancer in Asbestos Miners. In its original, unedited form in September, 1957, this study had concluded that workers with asbestosis had an increased incidence of lung cancer and that the Canadian government had been under-reporting cases of asbestosis. The final, published version of this study in June, 1958, deleted the conclusion that workers with asbestosis suffered an increased incidence of lung cancer and that the Canadian government had been under-reporting asbestosis cases. The IHF and the Mellon Institute conspired with the members of the Q.A.M.A., their legal counsel, Ivan Sabourin, and other conspirators to delete the above-described information regarding asbestos and cancer.

ff.    The above-described actions of the IHF and the Mellon Institute constituted intentional deception and fraud in actively misleading the public about the extent of the hazards connected with breathing asbestos dust.

gg    The above-described conspiratorial and fraudulent actions of the IHF and the Mellon Institute substantially contributed to retarding the development of knowledge about

the hazards of asbestos and thereby substantially contributed to injuries suffered by the plaintiff.

hh.     All conspirators identified above approved, ratified, and furthered the previous conspiratorial acts of conspirators Manville, Raybestos (now Raymark), Lanza, and MET LIFE, and all the alleged co-conspirators during the date and circumstances set forth above, and acted as agents and co-conspirators for the other conspirators.

ii.     As evidence of Raymark's fraud, concealment, suppression, and conspiratorial misconduct and of the referenced conspirators, and each of them, as herein set forth, Raymark's President and/or other senior executives corresponded with other senior executives of Raymark's co-conspirators, which series of correspondence and related documents and papers are commonly referenced as "The Sumner Simpson Papers."

jj.     Further, as evidence of the fraud, concealment, suppression, and conspiratorial misconduct by the members of the ATI, as herein set forth, the ATI and the IHF kept minutes of their regular meetings, discussions, resolutions, and related actions, recorded in "The ATI Minutes."

93.     MET LIFE was an active participant in the foregoing conspiracy and benefited thereby. MET LIFE benefited from its involvement because of the following non-exclusive lists:

a.     by providing workers' compensation insurance to co-conspirators;

b.     by providing life insurance for employees of the co-conspirators;

121

    c.      by providing health insurance or health care for the employees of the co-conspirators;

    d.      by providing health information and resources;

    e.      by purchasing substantial stock in asbestos-related companies including stock of co-conspirators; and

    f.      by developing information by which asbestos-related claims for compensation could be defeated.

94.    The acts of the conspirators as described above constitute fraudulent concealment, which caused injury to the plaintiff in the following manner (the list is not exclusive):

    a.      The material published or caused to be published by the conspirators was false and incomplete in that the conspirators knowingly and deliberately deleted, concealed, and otherwise suppressed references to and material facts regarding the known health hazards of asbestos and asbestos-related products.

    b      The conspirators, with intent to defraud, individually, as members of a conspiracy, and as agents of other conspirators, promoted the publication of false and misleading reports to the general public and individuals therein, and/or the intentional suppression and nondisclosure of documented reports of health hazards of asbestos in order to:

(i)    maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-related products;

(ii)    assist in the continued pecuniary gain of conspirators through the sale of their products;

(iii)    influence in the conspirators' favor proposed legislation to regulate asbestos exposure; and

(iv)    provide a defense in law suits brought for injury resulting from asbestos disease.

c.    The conspirators, individually, as members of a conspiracy, and as agents of other conspirators, had a duty to disclose information regarding the health hazards of asbestos within their knowledge and/or control.   The conspirators knowingly and intentionally breached this duty through their fraudulent concealment as described herein.

d.    Plaintiff and others reasonably relied, both directly and indirectly, upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-related products and in the absence of published medical and scientific reports of the hazards of asbestos and their continued exposure to asbestos. Plaintiff believed asbestos to be safe and was unaware of the hazards due to conspiratorial and fraudulent conduct. Plaintiff was not warned of the hazards of asbestos dust as a direct result of the above-described conspiracy and fraudulent concealment.  If plaintiff had known of the health

hazards of asbestos, of which plaintiff was unaware as a direct result of the conspirators' fraudulent concealment, plaintiff would have acted differently regarding his exposure to asbestos and asbestos-related products.

      e.     Conspirators, individually, as members of a conspiracy, and as agents of other conspirators, intended that plaintiff relied on the deceptive and fraudulent reports that the conspiracy caused to be published throughout the United States regarding the safety of asbestos and asbestos-related products and to rely on the absence of published medical and scientific data (because of the conspiracy's concealment) regarding the hazards of asbestos and asbestos-related products and thereby caused plaintiff and others to continue their exposure to asbestos products.

      f.     Conspirators, individually, as members of a conspiracy, and as agents of other co-conspirators, were and are in a position of superior knowledge regarding the absence of health hazards of asbestos and therefore the plaintiff reasonably relied (both directly and indirectly) on the published reports commissioned by the conspirators regarding the health hazards of asbestos and the absence of published information (because of the suppression by the conspiracy) regarding the hazards of asbestos and asbestos-related products.

      g.     As a direct result of the continuing and ongoing conduct of the conspirators as alleged herein, plaintiff contracted asbestos-related disease and suffered injuries and incurred damages which are described in greater detail in the foregoing paragraphs.

124

95.     MET LIFE acted in concert with the foregoing described parties (the conspirators) and pursuant to a common design, as previously described, to cause injury to plaintiff.

96.     MET LIFE knew that the conduct of Manville, Raybestos (Raymark), USG, American Brakeblok Corporation (now defendant PNEUMO ABEX), Keasbey-Mattison COMPANY (now defendant T&N), and the other conspirators was coercive, fraudulent, and deceitful towards others (including plaintiff) and that conspirators' conduct was a breach of duty/ies owed plaintiff; and MET LIFE gave substantial assistance and encouragement to Manville and the other conspirators in breaching their duties to plaintiff and others.

97.     MET LIFE provided substantial assistance to the foregoing conspirators in accomplishing their tortious result and their breach of duties to plaintiff.

98.     Upon information and belief, plaintiff was insured, directly or indirectly, by MET LIFE and as such was owed a fiduciary duty by MET LIFE, which duty was breached by its foregoing conduct and conspiracy and thereby caused plaintiff's asbestos-related injuries.

99.     The conspirators made representations to plaintiff and others concerning asbestos-containing products including but not limited to:

        a.     the statements set forth and summarized in the foregoing paragraphs;

        b.     that asbestos in commercially used insulation products was not hazardous (this statement was known to be false by the conspirators);

c.      the amount of asbestos in the air necessary to cause disease was five million

particles per cubic foot (this statement was known to be false by the conspirators);

d.      that asbestos does not cause cancer (this statement was known to be false by

the conspirators);

e.      in addition, the conspirators actively and fraudulently concealed facts from the

plaintiff and others including, but not limited to:

(i)      that asbestos-related disease can be a fatal disease;

(ii)     that asbestos causes various forms of lung cancer;

(iii)    that individuals should protect themselves from breathing asbestos

dust;

(iv)     the extent of asbestos disease in exposed populations;

(v)      information regarding the levels of airborne asbestos which can cause

disease;

(vi)     their experience with workers' compensation claims related to asbestos

exposure; and

(vii)    the statements set forth in foregoing paragraphs.

100.    Further, the conspirators knew that the foregoing statements were false and that by

their acts they were actively and fraudulently concealing adverse information regarding the health

effects of asbestos, including the facts set forth above; the conspirators made the false statements and

126

concealed the information with the intent to deceive; plaintiff and others relied both directly and indirectly on the foregoing false statements and their lack of knowledge resulting from their fraudulent concealment, resulting in and causing asbestos-related injuries and damages as more fully set forth herein.

101.    The asbestos-containing products that conspirators manufactured, marketed, distributed, sold, and otherwise supplied were defective; plaintiff was exposed to asbestos from the conspirators' products which caused his asbestos-related injuries as more fully set forth in the foregoing paragraphs.

102.    Additionally and alternatively, as a direct result of MET LIFE's actions and omissions, plaintiff was caused to remain ignorant of all the dangers of asbestos resulting in plaintiff, his agents, employers and the general public being unaware of the true and full dangers of asbestos, deprived plaintiff of the opportunity to decide for himself whether he wanted to take the risk of being exposed to asbestos, denied plaintiff the opportunity to take precautions against the dangers of asbestos and caused plaintiff's damages herein.

WHEREFORE, plaintiff prays for judgment against defendants, their alternate entities, and each of them, as hereinafter set forth.

## TENTH CAUSE OF ACTION
(Fraud and Deceit/Negligent Misrepresentation)

AS AND FOR A FURTHER, TENTH, SEPARATE AND DISTINCT CAUSE OF ACTION

FOR FRAUD AND DECEIT/NEGLIGENT MISREPRESENTATION, PLAINTIFF COMPLAINS

OF DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, PNEUMO ABEX

CORPORATION (formerly known as ABEX CORPORATION and successor-in-interest to

AMERICAN BRAKEBLOCK CORPORATION), GATKE CORPORATION, and T&N PLC

(formerly known as TURNER AND NEWALL and alter-ego to KEASBY-MATTISON

COMPANY), DOES 701-800, THEIR ALTERNATE ENTITIES, AND EACH OF THEM, AND

ALLEGES AS FOLLOWS:

103.    Plaintiff, by this reference, incorporates and makes a part hereof as though fully set

forth herein at length each and every allegation of the First through Ninth Causes of Action as though

fully set forth herein.

104.    The acts of the conspirators, as incorporated herein and described above, constitute

fraudulently negligent misrepresentation which caused injury to the plaintiff in the following

manner:

a.       The material published or caused to be published by the conspirators was

false, untrue, and incomplete in that the conspirators knowingly, deliberately, and with intent

to deceive made representations, product sales, and assertions regarding the safety of

asbestos and asbestos-related products.

128

b.     The conspirators made these false, untrue and incomplete representations without any reasonable grounds for believing and/or relying on their truth and with the intent to induce the general consuming public and individuals therein, including plaintiff, and others, directly and indirectly, to rely on these false, untrue, and incomplete representations.

c.     Plaintiff and others reasonably, justifiably, and without knowledge of the falsity of the conspirators' misrepresentations, relied, both directly and indirectly, upon published data documenting the purported safety of asbestos and asbestos-related products and in the absence of published information of the hazards of asbestos and cautionary warning language on or with said conspirators' products, all resulting in continued injurious exposure to asbestos.  Plaintiff was unaware of the hazards due to the conspirators' conduct.

WHEREFORE, plaintiff prays for judgment against defendants, their alternate entities, and each of them, as hereinafter set forth.

## ELEVENTH CAUSE OF ACTION
### (Intentional Tort by Means of Conspiracy/Concert of Action)

AS AND FOR A FURTHER, ELEVENTH, SEPARATE AND DISTINCT CAUSE OF ACTION FOR INTENTIONAL TORT BY MEANS OF CONSPIRACY/CONCERT OF ACTION, PLAINTIFF COMPLAINS OF DEFENDANTS METROPOLITAN ·LIFE INSURANCE COMPANY, GATKE CORPORATION, HONEYWELL, INC.  (successor-in-interest to ALLIEDSIGNAL, INC., formerly known as the Bendix Aviation Corporation), THE BUDD COMPANY,  CARLISLE   CORPORATION,   CHRYSLER   CORPORATION   (now

129

DAIMLERCHRYSLER CORPORATION), DANA CORPORATION, FORD MOTOR COMPANY, GENERAL MOTORS COMPANY, BRIDGESTONE/FIRESTONE, INC., LEAR-SIEGLER, INC. (now LEAR-SIEGLER DIVERSIFIED HOLDINGS CORPORATION), MAREMONT CORPORATION, ROHM AND HAAS CO. (now MORTON INTERNATIONAL, INC. ), MOOG AUTOMOTIVE (formerly known as WAGNER ELECTRIC CORPORATION), PARKER-HANNIFIN CORPORATION, SCANDURA, INC. (formerly known as Scandinavia Belting COMPANY), STANDARD MOTOR PRODUCTS, INC. (EIS Brand Brakes); BORG-WARNER AUTOMOTIVE, INC., PNEUMO ABEX CORPORATION (formerly known as ABEX CORPORATION and successor-in-interest to AMERICAN BRAKEBLOK CORPORATION and the S. K. WELLMAN COMPANY), and T&N PLC (formerly known as TURNER AND NEWALL, alter-ego to KEASBY-MATTISON COMPANY and alter-ego to S.K. WELLMAN COMPANY), ASBESTOS MANUFACTURING COMPANY, BRASSBESTOS BRAKE LINING COMPANY, FIBRE & METAL PRODUCTS COMPANY, H. KRASNE MANUFACTURING COMPANY, LASCO BRAKE PRODUCTS, L.J. MILEY COMPANY, RITESET MANUFACTURING COMPANY, ROSSENDALE-RUBOIL COMPANY, SOUTHERN FRICTION MATERIALS COMPANY, U.S. SPRING & BUMPER COMPANY, AUTO FRICTION CORPORATION, AUTO SPECIALTIES MANUFACTURING COMPANY, EMSCO ASBESTOS COMPANY, FORCEE MANUFACTURING CORPORATION, MOLDED INDUSTRIAL FRICTION CORPORATION, NATIONAL TRANSPORT SUPPLY, INC., SILVER LINE PRODUCTS, INC., STANDCO, INC.,

UNIVERSAL FRICTION MATERIALS COMPANY, WHEELING BRAKE BLOCK MANUFACTURING COMPANY, ASBESTOS CLAIMS MANAGEMENT CORPORATION (formerly known as National Gypsum COMPANY), BELL ASBESTOS MINES LTD., DOES 651-690, THEIR ALTERNATE ENTITIES, AND EACH OF THEM, AND ALLEGES AS FOLLOWS:

105.    Plaintiff, by this reference, incorporates and makes a part hereof as though fully set forth herein at length each and every allegation of the First through Tenth Causes of Action as though fully set forth herein.

106.    The term "conspirators" as used herein includes but is not limited to:  the above-identified defendants, Anthony Lanza, M.D., Arthur Vorwald, M.D., Leroy Gardner, M.D., Johns-Manville, Raybestos-Manhattan (now Raymark Industries, Inc. [Raymark]), Russell Manufacturing (whose liabilities have been assigned by H.K. Porter COMPANY), Union Asbestos and Rubber COMPANY, Thermoid COMPANY (whose assets and liabilities have been purchased by H.K. Porter COMPANY), Carey-Canada, Quebec Asbestos Corporation, Celotex Corporation, Industrial Hygiene Foundation, Mellon Institute, all members of the Asbestos Textile Institute (ATI), all members of the Friction Materials Standards Institute and its predecessors, and the other entities and individuals identified in this Seventeenth Cause of Action.

107.    Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, the conspirator defendants were and are corporations organized and existing under and by virtue of the laws of the State of Utah, or the laws of some other state or foreign jurisdiction, and

131

that defendants were and are authorized to do and/or were and are doing business in the State of Utah, and that said defendants regularly conducted and/or conducts business in the County of Salt Lake, State of Utah.

108.    Plaintiff was exposed to asbestos-containing dust created by the use of the asbestos products manufactured, distributed, and/or supplied by one or more of the conspirators named herein. The exposure to the asbestos or asbestos-related products supplied by the one or more of the conspirator(s) caused plaintiff's asbestos-related disease and injuries.

109.    The conspirators, individually, as agents of one another, and as co-conspirators, agreed and conspired among themselves, with other asbestos manufacturers and distributors, and with certain individuals including but not limited to Anthony Lanza, M.D. (Dr. Lanza), and defendant METROPOLITAN LIFE INSURANCE COMPANY (MET LIFE) to injure the plaintiff in the following fashion (the following is not an exclusive list of the wrongful acts of the conspirators but a representative list):

a.    Beginning in 1929, MET LIFE entered agreements with Johns-Manville and others to fund studies of the effects of asbestos exposure on Canadian asbestos miners. When the data from these studies proved that Canadian asbestos miners were developing asbestosis, MET LIFE, Johns-Manville, and others suppressed its publication; further, Dr. Lanza. (then a MET LIFE employee) actively misrepresented the results of the Canadian

132

study for many years thereafter to meetings of health care professionals seeking information regarding asbestos exposure.

b.      In approximately 1934, conspirators Johns-Manville and MET LIFE, through their agents, Vandiver Brown and attorney J.C. Hobart, and conspirator Raybestos-Manhattan (Raybestos), through its agents, Sumner Simpson and J. Rohrbach, suggested to Dr. Lanza, Associate Director, MET LIFE (insurers of Johns-Manville and Raybestos), that Dr. Lanza publish a study on asbestosis in which Dr. Lanza would affirmatively misrepresent material facts and conclusions about asbestos exposure, including but not limited to descriptions of the seriousness of the disease process of asbestosis.  The misrepresentation was accomplished through intentional deletion of Dr. Lanza's initial description of asbestosis as "fatal" and through other selective editing that affirmatively misrepresented asbestosis as a disease process less serious than it was known to be by the conspirators.  As a result, Dr. Lanza's study was published in the medical literature containing said misleading statements in 1935.  The conspirators were motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent nondisclosure by the desire to influence proposed legislation to regulate asbestos exposure, to provide a defense in lawsuits involving Johns-Manville, Raybestos, and MET LIFE, as insurer, and to promote the use of their asbestos products.

133

c.     The above-described conspiracy continued in 1936, when additional conspirators American Brakeblok Corporation (defendant PNEUMO ABEX), defendant ASBESTOS MANUFACTURING COMPANY, defendant GATKE CORPORATION, Johns-Manville, Keasbey & Mattison COMPANY (then an alter-ego to conspirator Turner & Newall, defendant T&N), Raybestos-Manhattan (Raymark), Russell Manufacturing (whose liabilities have been assumed by H.K. Porter COMPANY), Union Asbestos and Rubber COMPANY, and defendant USG, entered into an agreement with a leading medical research facility named Saranac Laboratories.  (The following conspirators also joined the FMSI portion of the conspiracy alleged below: American Brake Block Corporation (now defendant PNEUMO ABEX), defendant ASBESTOS MANUFACTURING COMPANY, defendant GATKE CORPORATION, Johns-Manville, Keasbey & Mattison COMPANY (through Turner & Newall (defendant T&N) alter-ego Atlas Asbestos), Raybestos-Manhattan and Russell Manufacturing (whose liabilities have been assumed by H.K. Porter COMPANY).) Under the agreement, the conspirators acquired the power to decide what information Saranac Laboratories could publish regarding asbestos disease and could also control in what form such publications were to occur.  Their agreement provided these conspirators the power and ability affirmatively to misrepresent the results of the work at Saranac, and also gave these conspirators power to suppress material facts included in any study.  On numerous occasions thereafter, the conspirators exercised their power to prevent Saranac scientists

134

from disclosing material scientific data, resulting in numerous misstatements of fact regarding the health effects of asbestos exposure being presented at scientific meetings.

      d.      The conspiracy was furthered when on November 11, 1948, representatives of the following conspirators met at Johns-Manville headquarters: Johns-Manville, American Brakeblok Division of American Brake and Shoe Foundry (defendant PNEUMO ABEX), defendant GATKE CORPORATION, Keasbey & Mattison COMPANY (then an alter-ego to conspirator Turner & Newall (defendant T&N)), Raybestos (now Raymark), Thermoid COMPANY (whose assets and liabilities were later purchased by H.K. Porter COMPANY), Union Asbestos and Rubber COMPANY, defendant USG, and MET LIFE. Defendant USG did not send a COMPANY employee to the meeting, but instead authorized Vandiver Brown of Johns-Manville to represent its interest at the meeting and to take action on its behalf.

      e.      At the November 11, 1948 meeting, these conspirators, and their representatives decided to exert their influence to materially alter and misrepresent material facts about the substance of research conducted by Dr. Leroy Gardner at Saranac Laboratories beginning in 1936. Dr. Gardner's research involved the carcinogenicity of asbestos in mice and also included an evaluation of the health effects of asbestos exposure in humans with a critical review of the then existing standards for asbestos dust exposure.

      f.      At this meeting, these conspirators intentionally and affirmatively decided that Dr. Gardner's work should be edited to delete material facts about the cancer-causing

propensity of asbestos, the health effects of asbestos on humans, and the critique of dust standards. The conspirators then published these deceptive and fraudulent statements in the medical literature, as edited by Dr. Vorwald, also of the Saranac Laboratories. These conspirators thereby fraudulently misrepresented the risks of asbestos exposure to the public in general, and the class of persons exposed to asbestos, including the plaintiff.

g.     As a direct result of influence exerted by the conspirators, Dr. Vorwald published Dr. Gardner's edited work in the <u>Journal of Industrial Hygiene, AMA Archives of Industrial Hygiene and Occupational Health</u> in 1951 in a form that stressed those portions of Dr. Gardner's work that the conspirators wished stressed, but which omitted reference to human asbestosis and cancer, thereby fraudulently and affirmatively misrepresenting the extent of the risks. The conspirators affirmatively and deliberately disseminated this deceptive and fraudulent Vorwald publication to university libraries, government officials, agencies, and others.

h.     Such actions constitute a material affirmative misrepresentation of the total context of material facts involved in Dr. Gardner's work and resulted in creating the appearance that inhalation of asbestos was less of a health problem than Dr. Gardner's original, unedited work indicated.

i.     When Dr. Vorwald subsequently attempted to publish more complete information regarding Dr. Gardner's animal studies, the conspirators required his discharge

136

from Saranac Laboratories, denied him permission to publish or complete Gardner's work, and actively discouraged institutions of higher learning from hiring or retaining Dr. Vorwald in any capacity.

j.      The following conspirators were members of the trade association known as Quebec Asbestos Mining Association (Q.A.M.A.):  Johns-Manville Corporation, Carey-Canada, individually and as successor to Quebec Asbestos Corporation, the Celotex Corporation, successor to Quebec Asbestos Corporation, National Gypsum COMPANY (now known as defendant ASBESTOS CLAIMS MANAGEMENT CORPORATION), and Turner & Newall (defendant T&N), individually and successor to defendant BELL ASBESTOS MINES LTD.  These conspirators, members of Q.A.M.A., participated in the above-described misrepresentation of the work of Dr. Gardner published by Dr. Vorwald in the AMA Archives of Industrial Health in 1951.  Evidence of the Q.A.M.A's involvement in this misrepresentation arises from co-conspirator Johns-Manville's membership of the Q.A.M.A., as well as correspondence from co-conspirators dated 1/29/47, 11/26/47, 3/6/48, 10/15/48, 3/8/49, and 9/6/50, all indicating close monitoring of the editing process of Q.A.M.A.'s representative, Ivan Sabourin, acting on behalf of all Q.A.M.A. members.

k.      As a furtherance of the conspiracy commenced in 1929, conspirators who were members of the Q.A.M.A. as described above, began on or about 1950 to formulate a plan to influence public opinion about the relationship between asbestos and cancer by

137

influencing the medical literature on this subject and then touting and disseminating this literature to the public and to organizations and legislative bodies responsible for regulatory control of asbestos with the specific intent of misrepresenting the existing scientific information and suppressing contrary scientific data in their possession and control.

l.      This plan of misrepresentation and influence over the medical literature began on or about 1950 when the aforementioned Q.A.M.A. members selected Saranac Laboratories to do an evaluation of whether cancer was related to asbestos.   After a preliminary report authored by Dr.  Vorwald in 1952 indicated that a cancer/asbestos relationship might exist in experimental animals, these Q.A.M.A. members refused to further fund the study, terminated the study, and prevented any public discussion or dissemination of the results.

m.      As a result of the termination of Q.A.M.A./Saranac study, the conspirators fraudulently withheld information from the public and affirmatively misrepresented to the public and responsible legislative and regulatory bodies that asbestos did not cause cancer, including affirmative misrepresentations by conspirators and conspirators' agents K.W. Smith, M.D., Paul Cartier, M.D., A.J. Vorwald, M.D., Anthony Lanza, M.D., Vandiver Brown, and Ivan Sabourin, said misrepresentations being directed to inter alia, U.S. Government officials, Canadian government officials, U.S. National Cancer Institute, medical organizations, health professionals,  and the general public, including plaintiff.

138

n.      Subsequently, the Q.A.M.A. conspirators contracted with the IHF and Dr. Daniel Braun to further study the relationship between asbestos exposure, asbestosis and lung cancer. In 1957, Drs. Braun and Truan (Braun and Truan) reported to the Q.A.M.A. that asbestosis did increase a worker's risk of incurring lung cancer.

o.      The Q.A.M.A. conspirators as a furtherance of the conspiracy commenced in 1929, thereafter caused, in 1958, a publication of the work by Braun and Truan in which the findings regarding increased incidence of cancer in persons with asbestosis was edited out (stricken) by agents of the Q.A.M.A. The published version of Braun/Truan study contained a conclusion that asbestos exposure alone did not increase the incidence of lung cancer, a conclusion known by the conspirators to be false.

p.      By falsifying and causing publication of studies concluding that asbestos exposure did not cause lung cancer and simultaneously omitting documented findings that asbestosis did increase the risk of lung cancer, the conspirators affirmatively misrepresented to the public and concealed from the public the extent of risks associated with inhalation of asbestos fibers.

q.      In furtherance of the ongoing 1929 conspiracy, in approximately 1958, these Q.A.M.A. conspirators publicized the fraudulently edited works of Braun and Truan at a symposium in an effort to fraudulently misrepresent to the public and persons exposed to asbestos that the inhalation of asbestos dust would not cause cancer.

139

r.      The fraudulent misrepresentations beginning in 1929 as elaborated above and continuing with the publication of the 1958 Braun and Truan study influenced the standards set for asbestos exposure. The developers of such standards failed to lower the maximum exposure limits because a cancer risk, associated with asbestos inhalation, had not been proven.

s.      In furtherance of the 1929 conspiracy, in 1967, Q.A.M.A. conspirators decided, at their trade association meeting, that they would intentionally mislead consumers about the extent of risks involved in the inhalation of asbestos products.

t.      In furtherance of the 1929 conspiracy, in 1952, a Symposium regarding the health effects of asbestos was held at Saranac Laboratories. The following conspirators were in attendance: MET LIFE, Lanza, Johns-Manville, Turner & Newall (defendant T&N), Raybestos-Manhattan (now Raymark), and Q.A.M.A. members by way of their agents, Cartier, Sabourin, and LaChance.

u.      At the 1952 Saranac Symposium, the occurrence of lung cancer and asbestosis in product users was discussed and the carcinogenic properties of all fiber types of asbestos was also discussed. In an affirmative attempt to mislead the public about the extent of health risks associated with asbestos, and in an effort fraudulently to conceal those risks from the pubic, these conspirators conspired to prevent publication of the record of this 1952 Saranac Symposium, and it was not published. In addition, the conspirators induced Dr. Vorwald not to announce the results of his and Dr. Gardner's animal studies showing excess cancers in

140

animals which thereby fraudulently misrepresented existing secret data which could not be publicized owing to the secrecy provisions contained in the 1936 Saranac Agreement heretofore described.

v.      The following conspirators were members of ATI:   Raybestos (now Raymark), Johns-Manville, H.K. Porter, Keasbey & Mattison, individually and through its alter-ego Turner & Newall (defendant T&N), National Gypsum (defendant ASBESTOS CLAIMS MANAGEMENT CORPORATION), and Uniroyal, Inc., individually and through its alter-egos, CDU Holding COMPANY, Uniroyal Holding COMPANY and Uniroyal Goodrich Tire COMPANY.

w.      In furtherance of the foregoing conspiracy, in 1947, these conspirators, members of the ATI, received a report from industrial hygienist W.C.L. Hemeon (Hemeon) regarding asbestos, which suggested re-evaluation of the then-existing maximum exposure limits for asbestos exposure.  These conspirators caused the Hemeon report to be suppressed and thereby fraudulently concealed material facts about asbestos exposure from the public and affirmatively misrepresented to the public and class of persons exposed to asbestos that the then existing maximum exposure limit for asbestos was acceptable.  Thereafter, these conspirators withheld additional material information on dust standards from the American Conference of Governmental Industrial Hygienists (ACGIH), thereby further influencing evaluations of their Threshold Limit Values for asbestos exposure.

    x.    In furtherance of the foregoing conspiracy, in 1953, conspirator National

Gypsum (defendant ASBESTOS CLAIMS MANAGEMENT CORPORATION), through its

agents, in response to an inquiry from the Indiana Division of Industrial Hygiene regarding

health hazards of asbestos spray products, refused to mail a proposed response to that

division indicating that respirators should be worn by applicators of the products. National

Gypsum's response distorted and fraudulently misrepresented the need for applicators of

asbestos spray products to wear respirators and fraudulently concealed from such applicators

the need for respirators and thereby misrepresented the risks associated with asbestos

exposure.

    y.    In furtherance of the foregoing conspiracy, in 1955, conspirator Johns-

Manville, through its agent Dr. Kenneth Smith, caused to be published in the AMA Archives

of Industrial Health, an article entitled "Pulmonary Disability in Asbestos Workers." This

published study materially altered the results of an earlier study in 1949 concerning the same

set of workers. This alteration of Dr. Smith's study constituted a fraudulent and material

misrepresentation about the extent of the risk associated with asbestos inhalation.

    z.    In furtherance of the foregoing conspiracy, in 1955, the National Cancer

Institute held a meeting at which conspirator Johns-Manville, individually and as an agent for

other co-conspirators and Dr. Vorwald, as an agent of conspirators, affirmatively

misrepresented that there were no existing animal studies concerning the relationship

between asbestos exposure and cancer, when, in fact, the conspirators were in secret possession of several suppressed studies which demonstrated that positive evidence of such relationship did exist.

      aa.     In furtherance of the foregoing conspiracy, in 1957, these conspirators and members of the ATI, jointly rejected a proposed research study on cancer and asbestos and this resulted in fraudulently concealing from the public material facts regarding asbestos exposure and also constituted an affirmative misrepresentation of the then-existing knowledge about asbestos exposure and lung cancer.

      bb.     In furtherance of the foregoing conspiracy, in 1964, conspirators who were members of the ATI met to formulate a plan for rebutting the association between lung cancer and asbestos exposure that had been recently published by Dr. Irving J. Selikoff of the Mount Sinai Research Center.  Thereafter, these members of the ATI embarked upon a campaign to further misrepresent the association between asbestos exposure and lung cancer.

      cc.     Conspirator Mellon Institute and conspirator IHF were research institutes whose functions included involvement in research regarding the health effects of inhaling asbestos dust.

      dd.     Beginning in the early 1940's, the IHF was involved in a study by Hemeon entitled Report of Preliminary Dust Investigation for Asbestos Textile Institute, June 1947. This study was done in conjunction with members of the ATI.  This study found that workers

143

exposed to less than the recommended maximum exposure level for asbestos were nonetheless developing disease. As a part of the conspiracy, the IHF never published this study.

      ee.    Beginning in the mid 1950's, the IHF and the Mellon Institute were involved in the publication of works by Braun and Truan entitled <u>An Epidemiological Study of Lung Cancer in Asbestos Miners</u>. In its original, unedited form in September, 1957, this study had concluded that workers with asbestosis have an increased incidence of lung cancer and that the Canadian government had been under-reporting cases of asbestosis. The final, published version of this study in June 1958, deleted the conclusion that workers with asbestosis suffered an increased incidence of lung cancer and that the Canadian government had been under-reporting asbestosis cases. The IHF and the Mellon Institute conspired with the members of the Quebec Asbestos Mining Association (Q.A.M.A.) their legal counsel, Ivan Sabourin, and other conspirators to delete the above-described information regarding asbestos and cancer.

      ff.    The above-described actions of the IHF and the Mellon Institute constituted intentional deception and fraud in actively misleading the public about the extent of the hazards connected with inhaling asbestos dust.

      gg.    The above-described conspiratorial and fraudulent actions of the IHF and the Mellon Institute substantially contributed to retarding the development of knowledge about

the hazards of asbestos and thereby substantially contributed to injuries suffered by the plaintiff.

hh.    All conspirators identified above approved, ratified, and furthered the previous conspiratorial acts of conspirators Johns-Manville, Raybestos (now Raymark), Lanza, and MET LIFE, and all the alleged co-conspirators during the dates and circumstances set forth above, acted as agents and co-conspirators for the other conspirators.

ii.    As evidence of Raymark's fraud, concealment, suppression, and conspiratorial misconduct and that of the referenced conspirators, and each of them, as herein set forth, Raymark's President and/or other senior executives corresponded with other senior executives of Raymark's co-conspirators, which series of correspondence and related documents and papers are commonly referenced as "The Sumner Simpson Papers."

jj.    As further evidence of the fraud, concealment, suppression, and conspiratorial misconduct of the members of the Asbestos Textile Institute as herein set forth, the ATI and the Industrial Hygiene Foundation kept minutes of their regular meetings, discussions, resolutions, and related actions, recorded in "The ATI Minutes."

kk.    MET LIFE was an active participant in the foregoing conspiracy and benefited thereby. MET LIFE benefited from its involvement because of the following non-exclusive list:

(I)    by providing workers' compensation insurance to the conspirators;

145

(ii)     by providing life insurance for employees of the conspirators;

(iii)    by providing health insurance or health care for the employees of the conspirators;

(iv)    by providing health information and resources;

(v)     by purchasing substantial stock in asbestos-related companies including stock of conspirators; and

(vi)    by developing information by which asbestos-related claims for compensation could be defeated.

110.    The foregoing conspiracy was furthered through the formation of the FMSI and its predecessors, the Brake Lining Manufacturers' Association, and the Clutch Facing and Brake Lining Standards Institute.  The members thereof joined with, ratified and furthered the conspiratorial actions of the above-identified conspirators.

111.    The Friction Materials Standards Institute, and its predecessors, the Brake Lining Manufacturers' Association, and the Clutch Facing & Brake Linings Standards Institute, were formed to be the ears and mouthpiece of the friction materials industry.  The initial members of the Friction Materials Standards Institute, between 1950 and 1953, included defendant ASBESTOS MANUFACTURING COMPANY, defendant T&N, PLC. (through its alter-ego Atlas Asbestos COMPANY), defendant BRASSBESTOS BRAKE LINING COMPANY, defendant FIBRE & METAL PRODUCTS COMPANY, defendant GATKE CORPORATION, defendant MAREMONT

146

(through its predecessor-in-interest, Grizzly Manufacturing), defendant H. KRASNE MANUFACTURING COMPANY, defendant LASCO BRAKE PRODUCTS, defendant HONEYWELL, INC. (successor-in-interest to ALLIEDSIGNAL INC., then known as Bendix Aviation Corporation), defendant L. J. MILEY COMPANY, defendant CARLISLE CORPORATION, Raymark (then known as Raybestos-Manhattan), defendant RITESET MANUFACTURING COMPANY, defendant ROSSENDALE-RUBOIL COMPANY, Russell Manufacturing COMPANY, defendant SCANDURA (then known as Scandinavian Belting COMPANY), defendant SOUTHERN FRICTION MATERIALS COMPANY, defendant U.S. SPRING & BUMPER COMPANY, defendant PNEUMO ABEX (through its predecessor-in-interest, S.K. Wellman COMPANY) and defendants LEAR-SIEGLER, INC. (now LEAR-SIEGLER DIVERSIFIED HOLDINGS CORPORATION) and BRIDGESTONE/FIRESTONE, INC. (through their predecessor-in-interest, World Bestos Corporation). By 1973, the following joined the Friction Materials Standards Institute: defendant AUTO FRICTION CORPORATION, defendant AUTO SPECIALTIES MANUFACTURING COMPANY, defendant DAIMLER CHRYSLER CORPORATION (then known as Chrysler Corporation), defendant EMSCO ASBESTOS COMPANY, defendant FORCEE MANUFACTURING CORPORATION, defendant GENERAL MOTORS CORPORATION, H.K. Porter COMPANY (through its Thermoid division), Johns-Manville Corporation, defendant LEAR-SIEGLER, INC. (now LEAR-SIEGLER DIVERSIFIED HOLDINGS CORPORATION) (through its predecessor-in-interest Royal Industries), defendant

147

MOLDED INDUSTRIAL FRICTION CORPORATION, defendant ROHM AND HAAS CO. (formerly Morton International, Inc.) (through its predecessors-in-interest, Morton-Thiokol and Thiokol Chemical Corporation), defendant NATIONAL TRANSPORT SUPPLY INC., defendant PARKER-HANNIFIN CORPORATION (through its predecessor-in-interest Pick Manufacturing COMPANY), defendant PNEUMO ABEX's American Brakeblok division, defendant SILVER LINE PRODUCTS INC., defendant STANDCO INC., defendant UNIVERSAL FRICTION MATERIALS COMPANY, and defendant WHEELING BRAKE BLOCK MANUFACTURING COMPANY. On information and belief, plaintiff alleges that the following manufacturers and/or distributors of asbestos-containing automotive friction products joined with, ratified, and furthered the conspiratorial actions of the above-identified conspirators, including the conspirators who were members of the FMSI and its predecessors: defendant THE BUDD COMPANY, defendant DANA CORPORATION, defendant FORD MOTOR COMPANY, defendant GENERAL MOTORS CORPORATION, defendant LEAR-SIEGLER, INC. (now LEAR-SIEGLER DIVERSIFIED HOLDINGS CORPORATION), defendant ROHM AND HAAS CO. (now MORTON-INTERNATIONAL, INC.), STANDARD MOTOR PRODUCTS, INC. (EIS Brand Brakes); defendant MOOG AUTOMOTIVE, INC. (formerly known as Wagner Electric) and defendant BORG-WARNER.

112.    The Friction Materials Standards Institute conspirators lobbied the Illinois Pollution Control Board to stop a proposed ban on asbestos in friction materials.

113.     The Friction Materials Standards Institute conspirators actively lobbied and endeavored to thwart proposed OSHA regulations and actual application of the regulations to the end that their asbestos-containing products could and would continue to be manufactured, distributed and sold without interruption or interference.

114.     Even though they disseminated materials and information to the contrary, The Friction Materials Standards Institute conspirators knew, and suppressed, that:

      a.     OSHA regulations, even if enforced and complied with, would not prevent asbestos disease in workers exposed to their products;

      b.     chrysotile asbestos caused mesothelioma and other incurable disease;

      c.     brake workers suffered "considerable exposures" to respirable asbestos fibers during the intended use, installation and expected replacement of friction materials;

      d.     there was no "safe" level of occupational exposure to respirable asbestos; and

      e.     there was a substantial risk and danger suffered by bystanders and family members of brake mechanics because of the release of respirable asbestos in the use of friction materials, as herein described.

115.     The acts and omissions of the conspirators, as described above, and each of them, constitute fraudulent concealment and/or fraudulent misrepresentation which caused injury to the plaintiff, including, but not limited to, the following manner:

149

a.      The material published or caused to be published by the conspirators, was false and incomplete in that the conspirators, knowingly and deliberately, deleted references to the known health hazards of asbestos and asbestos-related products.

b.      The conspirators, with intent to defraud, individually, as members of a conspiracy, and as agents of other conspirators, published false and misleading reports to the general public and individuals thereof, and/or intentionally suppressed and did not disclose documented reports of the health hazards of asbestos in order to:

(i)      maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-related products;

(ii)     assist in the continued pecuniary gain of conspirators, through the sale of their products;

(iii)    influence in the conspirators' favor proposed legislation to regulate asbestos exposure; and

(iv)    provide a defense in law suits brought for injury resulting from asbestos disease.

c.      The conspirators, individually, as members of a conspiracy, and as agents of other conspirators, had a duty to disclose information regarding the health hazards of asbestos within their knowledge and/or control.   The conspirators, knowingly and intentionally breached this duty through their fraudulent concealment as described herein.

150

d.      Plaintiff and others reasonably relied, both directly and indirectly, upon the

published medical and scientific data documenting the purported safety of asbestos and

asbestos-related products, and in the absence of published medical and scientific reports of

the hazards of asbestos and their continued exposure to asbestos.  Plaintiff believed asbestos

to be safe and was unaware of its hazards due to conspiratorial and fraudulent conduct.

Plaintiff was not warned of the hazards of inhaling asbestos dust as a direct result of the

above-described conspiracy and fraudulent concealment.  If plaintiff had known of the health

hazards of asbestos, of which plaintiff was unaware as a direct result of the conspirators'

fraudulent concealment, plaintiff would have acted differently regarding his exposure to

asbestos and asbestos-related products.

e.      Conspirators, individually, as members of a conspiracy, and as agents of other

conspirators, intended that plaintiff rely on the deceptive and fraudulent reports that the

conspiracy caused to be published throughout the United States regarding the safety of

asbestos and asbestos-related products and to rely on the absence of published medical and

scientific data (because of the conspiracy's suppression) regarding the hazards of asbestos

and asbestos-related products and  thereby caused plaintiff and others to continue their

exposure to asbestos products.

f.      Conspirators, individually, as members of a conspiracy, and as agents of other

conspirators, were and are in a position of superior knowledge regarding the health hazards

151

of asbestos and therefore the plaintiff reasonably relied, both directly and indirectly, on the published reports commissioned by the conspirators regarding the health hazards of asbestos exposure and the absence of published information (because of the suppression by the conspiracy) regarding the hazards of asbestos and asbestos-related products.

g.      As a direct result of the continuing and ongoing conduct of the conspirators, as alleged herein, the plaintiff contracted asbestos-related disease and suffered injuries and incurred damages which are described in greater detail in the foregoing paragraphs.

116.    MET LIFE acted in concert with the foregoing described parties (the conspirators) and pursuant to a common design, as previously described, to cause injury to plaintiff.

117.    MET LIFE knew that the conduct of Johns-Manville, Raybestos (now Raymark), defendant USG, American Brakeblok Corporation (now defendant PNEUMO ABEX), Keasbey-Mattison COMPANY (now defendant T&N), and the other conspirators was coercive, fraudulent, and deceitful towards others (including plaintiff) and that conspirators' conduct was a breach of duty/ies owed plaintiff; and MET LIFE gave substantial assistance and encouragement to Johns-Manville and the other conspirators in breaching their duties to plaintiff and others.

118.    MET LIFE provided substantial assistance to the foregoing conspirators in accomplishing their tortious result and their breach of duties to plaintiff.

152

119.    Upon information and belief, plaintiff was insured, directly or indirectly, by MET

LIFE and as such was owed a fiduciary duty by MET LIFE which duty was breached by its foregoing

conduct and conspiracy which thereby caused plaintiff's asbestos-related injuries.

120.    The conspirators made representations to plaintiff and others concerning asbestos-

containing products including but not limited to:

      a.     the statements set forth and summarized in the foregoing paragraphs;

      b.     that asbestos in commercially used insulation products was not hazardous

(this statement was known to be false by the conspirators);

      c.     the amount of asbestos in the air necessary to cause disease was five million

particles per cubic foot (this statement was known to be false by the conspirators);

      d.     that asbestos does not cause cancer (this statement was known to be false by

the conspirators);

      e.     in addition, the conspirators actively and fraudulently concealed facts from the

plaintiff and others including, but not limited to:

          (i)     that asbestos-related disease can be a fatal disease;

          (ii)     that asbestos causes various forms of lung cancer;

          (iii)     that individuals should protect themselves from breathing asbestos

dust;

          (iv)     the extent of asbestos disease in exposed populations;

153

(v)    information regarding the levels of airborne asbestos which can cause

disease;

(vi)    their experience with workers' compensation claims related to asbestos

exposure; and

(vii)    the statements set forth in foregoing paragraphs.

121.    Further, the conspirators knew that their foregoing statements were false and that, by

their acts, they were actively and fraudulently concealing adverse information regarding the health

effects of asbestos, including the facts set forth above; the conspirators made the false statements and

concealed the information with the intent to deceive; plaintiff and others relied both directly and

indirectly on the foregoing false statements and their lack of knowledge resulting from their

fraudulent concealment, resulting in and causing asbestos-related injuries and damages as more fully

set forth herein.

122.    The asbestos-containing products that conspirators manufactured, marketed,

distributed, sold, and otherwise supplied were defective.  Plaintiff was exposed to asbestos from the

conspirators' products which caused his asbestos-related injuries as more fully set forth in the

foregoing paragraphs.

123.    Additionally and alternatively, as a direct result of MET LIFE's actions and

omissions, plaintiff was remained ignorant of all the dangers of asbestos resulting in plaintiff, his

agents, employers and the general public being unaware of the true and full dangers of asbestos.

154

Plaintiff was deprived of the opportunity to decide for himself whether he wanted to take the risk of being exposed to asbestos, denied plaintiff the opportunity to take precautions against the dangers of asbestos, and caused plaintiff's damages herein.

WHEREFORE, plaintiff prays for judgment against defendants, their alternate entities, and each of them, as hereinafter set forth.

TWELFTH CAUSE OF ACTION
(Fraud)

AS AND FOR A FURTHER, TWELFTH, SEPARATE, FURTHER AND DISTINCT CAUSE OF ACTION FOR FRAUD, PLAINTIFF-1 COMPLAINS OF DEFENDANT LORILLARD TOBACCO COMPANY, ITS ALTERNATE ENTITIES (LORILLARD, INC. and HOLLINGSWORTH & VOSE COMPANY), AND EACH OF THEM, AND ALLEGES:

124.    Plaintiff, by this reference, hereby incorporates by reference, as though fully set forth herein, each and every allegation contained in the First Cause of Action herein, excepting there from allegations pertaining to negligence.

125.    At all times pertinent hereto, the defendants LORILLARD TOBACCO COMPANY, its alternate entities (LORILLARD, INC. and HOLLINGSWORTH & VOSE COMPANY), and each of them, owed plaintiff a duty to abstain from injuring the person, property, or rights of the plaintiff. When a duty to act was imposed, as set forth herein, the defendant, its alternate entities, and each of them, did the acts and omissions in violation of that duty, thereby causing injury to the plaintiff as is more fully set forth herein. Such acts and omissions more specifically included

155

suggestions of fact which were not true and which defendant, its alternate entities, and each of them, did not believe to be true; assertions of fact which were not true and which defendant, its alternate entities, and each of them, had no reasonable ground for believing to be true; and the suppression of fact when a duty existed to disclose it, all as are more fully set forth herein; the violation of any one such duty gave rise to a cause of action for violation of the rights of the plaintiff as provided for at common law and under the laws of the State of Utah.

126.   With intent to deceive plaintiff, and others in plaintiff's position, and with intent that plaintiff and such others should be and remain ignorant of the health hazard posed by its asbestos-containing product and with intent to induce plaintiff and such others to alter his and their positions to his and their injury and/or risk and in order to gain advantages, the following acts occurred:

   a.   From approximately March, 1952 to approximately May, 1956, defendant LORILLARD TOBACCO COMPANY, manufactured, marketed, sold and/or distributed filter cigarettes known as "Kent" to the public, including plaintiff.   During the aforementioned period, the filter material in the "Micronite" filter on Kent cigarettes contained crocidolite asbestos as one of its components.   Asbestos was intentionally and knowingly included as an ingredient of the asbestos-containing Micronite filter for "Kent" cigarettes by defendant LORILLARD TOBACCO COMPANY.   During the aforementioned period, defendant LORILLARD TOBACCO COMPANY manufactured, marketed, sold and/or distributed between 10-13 billion asbestos-containing Kent filtered cigarettes.

156

b.    Between March, 1952 and approximately May, 1956, defendant LORILLARD
TOBACCO COMPANY engaged the services of a public relations firm(s) to advertise and
promote the sale of its Kent cigarette brand.   LORILLARD TOBACCO COMPANY
designed, ratified, approved and funded the Kent advertising campaign, which promoted the
alleged "health" benefits of smoking Kent cigarettes in print, radio and television.   The
purpose of said campaign was to convey "facts" which defendant LORILLARD TOBACCO
COMPANY knew to be false or which were intended to mislead the public, including
plaintiff, into believing that Kent cigarettes were a "safer" cigarette than other brands.
Throughout the aforementioned period, defendant LORILLARD TOBACCO COMPANY
advertised Kent brand cigarettes and the Micronite filter in a national campaign claiming that
Kent cigarettes provided "More health protection. . . ." Defendant LORILLARD TOBACCO
COMPANY boasted that "No other cigarette approaches such a degree of health protection"
and "You'll get the health protection you definitely need."   Defendant LORILLARD
TOBACCO COMPANY went so far as to state that "You'll be enjoying the greatest health
protection in cigarette history!"

c.    Defendant LORILLARD TOBACCO COMPANY engaged in the
aforementioned advertising campaign, despite its actual and/or constructive knowledge that
asbestos inhalation was harmful to human health, and in the face of independent testing,
conducted at the request of and funded by defendant LORILLARD TOBACCO COMPANY,

157

which demonstrated that asbestos fibers were released from the Micronite filter when Kent cigarettes were smoked. Defendant willfully withheld such information from its consumers, including plaintiff, and knowingly and intentionally provided information which was misleading as to the potential health hazard posed by smoking its Kent cigarettes with the asbestos Micronite filter. Defendant LORILLARD TOBACCO COMPANY suppressed the fact that the Micronite filter contained asbestos by purposely omitting the word asbestos from any of the aforementioned advertising and from its packaging. Despite being either actually and/or constructively aware that asbestos inhalation could be hazardous to its consumers, including plaintiff, defendant LORILLARD TOBACCO COMPANY failed to place a warning of any kind regarding said health hazards in any of its advertising or on any of its packaging and did not recall a single asbestos-containing Kent filtered cigarette from the market throughout the period of their manufacture.

127.   Defendant LORILLARD TOBACCO COMPANY having such aforementioned knowledge, and the duty to inform plaintiff about the true facts, and knowing the plaintiff did not possess such knowledge and would breathe asbestos from its Kent cigarettes innocently, acted falsely and fraudulently and with full intent to cause plaintiff to remain unaware of the true facts and to induce plaintiff to smoke its asbestos filtered cigarettes, all in violation common law and the laws of the State of Utah.

WHEREFORE, plaintiffs pray judgment as hereinafter set forth.

## THIRTEENTH CAUSE OF ACTION
### (Loss of Consortium)

AS AND FOR A FURTHER, THIRTEENTH, SEPARATE, FURTHER AND DISTINCT CAUSE OF ACTION FOR LOSS OF CONSORTIUM, PLAINTIFF-2 COMPLAINS OF DEFENDANTS, THEIR ALTERNATE ENTITIES, AND EACH OF THEM, AND ALLEGES AS FOLLOWS:

128.    Plaintiff-2 incorporates by reference each and every paragraph of the First through Twelfth Causes of Action herein.

129.    Plaintiff-1 and Plaintiff-2 were married on the date stated in their complaint, and at all times relevant to this action were, and are now, husband and wife.

130.    Prior to Plaintiff-1's injuries as alleged, Plaintiff-1 was able and did perform duties as a spouse. Subsequent to the injuries and as a proximate result thereof, Plaintiff-1 has been unable to perform the necessary duties of a spouse and the work and service usually performed in the care, maintenance and management of the family home, and Plaintiff-1 will be unable to perform such work, service and duties in the future. As a proximate result thereof, Plaintiff-2 has been permanently deprived and will be deprived of the consortium of Plaintiff-2's spouse, including the performance of duties, all to Plaintiff-2's damages, in an amount presently unknown to Plaintiff-2 but which will be proved at the time of trial.

131.    Plaintiff-2's discovery of the cause of Plaintiff-2's loss of consortium, as herein alleged, first occurred within one year of the date this complaint was filed.

132.    As a direct and proximate result of the acts of defendants, their alternate entities, and each of them, and the severe injuries caused thereby to Plaintiff-1 as set forth in this complaint, Plaintiff-2 has suffered, and for a long period of time will continue to suffer, loss of consortium, including but not by way of limitation, loss of services, marital relations, society, comfort, companionship, love and affection of said spouse, and has suffered severe mental and emotional distress and general nervousness as a result thereof.

WHEREFORE, plaintiff prays for judgment against defendants, their alternate entities, and each of them, as hereinafter set forth.

### FOURTEENTH CAUSE OF ACTION
#### (Wrongful Death)

AS AND FOR A FURTHER, FOURTEENTH, SEPARATE, FURTHER AND DISTINCT CAUSE OF ACTION FOR WRONGFUL DEATH, PLAINTIFF-2 COMPLAINS OF DEFENDANTS, THEIR ALTERNATE ENTITIES, AND EACH OF THEM, AND ALLEGES AS FOLLOWS:

133.    As a direct and proximate result of the acts of defendants, their alternate entities, and each of them, Plaintiff-1 is now deceased.

134.    Plaintiff-2 is the acting personal representative of the estate of Plaintiff-1.

135.    Pursuant to U.C.A. Section 78-11-7 Plaintiff-2 brings this action on behalf of all heirs of Plaintiff-1.

160

WHEREFORE, plaintiff prays for judgment against defendants, their alternate entities, and each of them, in an amount to be proved at trial in each individual case, as follows:

Plaintiff-1:

a.     For plaintiff's general damages according to proof;

b.     For plaintiff's loss of income, wages and earning potential according to proof;

c.     For plaintiff's medical and related expenses according to proof;

Plaintiff-2:

d.     For plaintiff's damages for loss of consortium according to proof;

Plaintiff-1 and Plaintiff-2:

e.     For plaintiffs' cost of suit herein;

f.     For exemplary or punitive damages according to proof;

g.     For damages for fraud according to proof; and

h.     For such other and further relief as the Court may deem just under the circumstances.

Dated: this 17 day of December, 2003.

HATCH, JAMES & DODGE, P.C.
and
LAW OFFICE OF G. PATTERSON KEAHEY, P.C.

By:

BRENT O. HATCH
MARK F. JAMES
Attorney for Plaintiffs

161

## EXHIBIT A

Plaintiff's exposure to asbestos and asbestos-containing products occurred at various

locations [inside][both inside and outside] the State of Utah, including but not limited to:

LOCATION                        JOB TITLE                   YEARS WORKED


(Plaintiff's asbestos-related injury)

(Date of diagnosis)

(Plaintiff's employment status)

162

## EXHIBIT B

DEFENDANTS WHO WERE:

- Manufacturers
- Distributors
- Suppliers
- Sellers

Case MDL No. 875   Document 4914   Filed 11/17/06   Page 201 of 423

## EXHIBIT C

PREMISES OWNER/CONTRACTOR DEFENDANTS, JOBSITES, YEARS

## EXHIBIT D

RESPIRATORY SAFETY DEVICE DEFENDANTS

BRAKE SHOE GRINDING MACHINE DEFENDANTS

DIATOMACEOUS EARTH DEFENDANTS

ALL OTHER DEFENDANTS

EXHIBIT E

CONSPIRACY/CONCERT OF ACTION DEFENDANTS

# EXHIBIT "C"
# PART 1 OF 2

to

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO REMAND AND FOR AWARD OF COSTS AND ATTORNEYS' FEES

"Master Complaint of Hatch, James & Dodge and Keahey for Personal Injury, Loss of Consortium, Wrongful Death and Demand for Jury Trial"

Filed in Master Case, No. 010900863

Brent O. Hatch (5715)
Mark F. James (5295)
**HATCH, JAMES & DODGE, P.C.**
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

G. Patterson Keahey, Esquire
**LAW OFFICE OF G. PATTERSON KEAHEY, P.C.**
One Independence Plaza, Suite 612
Birmingham, Alabama 35209
Telephone: (800) 291-0050
Facsimile: (205) 871-0801

Attorneys for Plaintiffs

## IN THE THIRD JUDICIAL DISTRICT COURT, SALT LAKE COUNTY,

## STATE OF UTAH

| | |
|---|---|
| IN RE: ASBESTOS CASES OF HATCH, JAMES & DODGE and LAW OFFICE OF G. PATTERSON KEAHEY, P.C.   Norris Bilanzich | **MASTER COMPLAINT OF HATCH, JAMES & DODGE AND KEAHEY FOR PERSONAL INJURY, LOSS OF CONSORTIUM, WRONGFUL DEATH AND DEMAND FOR JURY TRIAL** |
| Plaintiffs, | Norris Case No. 030928241 |
| vs. | ~~Master Case No. 010900863 AS~~ |
| ASBESTOS DEFENDANTS | Bilanzich Case No. 030928235 |
| | Judge Glenn K. Iwasaki |

As used herein, "Plaintiff-1" shall mean the asbestos-injured plaintiff; "Plaintiff-2" shall

mean the spouse of Plaintiff-1.

As used herein, the masculine gender shall be deemed to include the feminine gender whenever the asbestos-injured plaintiff is a female.

1.      The true names and capacities, whether individual, corporate, associate, governmental or otherwise, of defendants DOES 1 through 800, are unknown to plaintiff at this time, who therefore sues said defendants by such fictitious names.  When the true names and capacities of said defendants have been ascertained, plaintiff will amend this complaint accordingly.  Plaintiff is informed and believes, and thereon alleges, that each defendant designated herein as a DOE is responsible, negligently or in some other actionable manner, for the events and happenings hereinafter referred to, and caused injuries and damages thereby to the plaintiff, as hereinafter alleged.

2.      At all times herein mentioned, each of the defendants was the agent, servant, employee and/or joint venturer of his co-defendants, and each of them, and at all said times, each defendant was acting in the full course and scope of said agency, service, employment and/or joint venture.

3.      Plaintiff is informed and believes, and thereon alleges that at all times herein mentioned, defendants on Exhibits B through E and DOES 1 through 800, inclusive, were and are corporations, partnerships, unincorporated associations, sole proprietorships and/or other business entities organized and existing under and by virtue of the laws of the State of Utah, or the laws of some other state or foreign jurisdiction, and that said defendants, and each of them, were and are

2

authorized to do and are doing business in the State of Utah, and that said defendants have regularly conducted business in the County of Salt Lake, State of Utah.

<u>JURISDICTION AND VENUE</u>

4.     This Court has subject matter jurisdiction and jurisdiction of the parties pursuant to the Constitution and the Laws of the State of Utah including Utah Code Ann. § 78-3-4.

5.     Venue is proper pursuant to the Laws of the State of Utah including § 78-13-6 Utah Code Ann.

6.     The Federal Courts lack subject matter jurisdiction over this action, as there is no federal question and incomplete diversity of citizenship due to the presence of a Utah defendant. Removal is improper.  Every claim arising under the Constitution, treaties, or laws of the United States is expressly disclaimed (including any claim arising from an act or omission on a federal enclave, or of any officer of the U. S. or any agency or person acting under him occurring under color of such office).  No claim of admiralty or maritime law is raised.  Plaintiffs sue no foreign state or agency.  Venue is proper in Salt Lake County, Utah.

7.     This civil action is brought pursuant to the laws of the State of Utah including, but not limited to Utah Code Ann. § 78-11-7 (Wrongful death).

8.     The plaintiffs all waive, remit, release, discharge, and dismiss any claim or potential claim for responsibility, in whole or in part, for any or all plaintiffs' injuries or damages to the entities Asbestos Corp. Ltd, Atlas Turner, Inc., Lac D'Amiante du Quebec, Les Mines D'Amiante

3

Bell, Ltd., and/or Societe Miniere Mazarin, Inc., or any other entity that may be, or may claim to be, a Foreign Sovereign subject to the Foreign Sovereign Immunity Act.

9.  Plaintiffs in this action do not assert any claims for, do not see any damages for, and disclaim, waive, release and discharge any recovery of damages for any injuries arising out of exposure to asbestos-containing products designed, manufactured, distributed, sold or marketed by, or any actions or inactions of Asbestos Corp. Ltd, Atlas Turner, Inc., Lac D'Amiante du Quebec, Les Mines D'Amiante Bell, Ltd., and/or Societe Miniere Mazarin, Inc. or any other entity that may be or may claim to be a Foreign Sovereign under the Foreign Sovereign Immunity Act.  To the extent plaintiffs have been exposed to such asbestos containing products and have sustained any injuries there from plaintiffs hereby waive, release and discharge their right to recover damages for such injuries.

10.  Because each and every plaintiff in this case has been exposed to asbestos containing products manufactured, sold or installed by one or more Defendants who is/are a citizen of Utah, this case may not properly be removed since there is no diversity of citizenship and "local" Defendants are parties.

4

## FIRST CAUSE OF ACTION
### (Negligence)

PLAINTIFF-1 COMPLAINS OF DEFENDANTS ON EXHIBIT B AND DOES 1-300,

THEIR ALTERNATE ENTITIES, AND EACH OF THEM, AND FOR A CAUSE OF ACTION

FOR NEGLIGENCE ALLEGES:

11.    At all times herein mentioned, each of the named defendants and DOES 1 through

300 was the successor, successor in business, successor in product line or a portion thereof, assign,

predecessor, predecessor in business, predecessor in product line or a portion thereof, parent,

subsidiary, wholly or partially owned by, or the whole or partial owner of, or member in an entity

researching, studying, manufacturing, fabricating, designing, modifying, labeling, assembling,

distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing,

contracting for installation of, repairing, marketing, warranting, rebranding, manufacturing for

others, packaging and advertising a certain product, namely asbestos, and other products containing

asbestos. Said entities shall hereinafter collectively be called "alternate entities." Each of the herein

named defendants is liable for the tortious conduct of each successor, successor in business,

successor in product line or a portion thereof, assign, predecessor in product line or a portion thereof,

parent, subsidiary, whole or partial owner, or wholly or partially owned entity, or entity that it was a

member of, or funded, that researched, studied, manufactured, fabricated, designed, modified,

labeled, assembled, distributed, leased, bought, offered for sale, supplied, sold, inspected, serviced,

installed, contracted for installation of, repaired, marketed, warranted, rebranded, manufactured for

5

others and advertised a certain product, namely asbestos, and other products containing asbestos.
The following defendants, and each of them, are liable for the acts of each and every alternate entity,
and each of them, in that there has been a virtual destruction of plaintiff's remedy against each such
alternate entity; defendants, and each of them, have acquired the assets, product line, or a portion
thereof, of each such alternate entity; such alternate entity; defendants, and each of them, caused the
destruction of plaintiff's remedy against each such alternate entity; each such defendant has the
ability to assume the risk-spreading role of each such alternate entity; and that each such defendant
enjoys the goodwill originally attached to each such alternate entity.

| DEFENDANT | ALTERNATE ENTITY |
| --- | --- |
| BULLOUGH ABATEMENT INC. | BULLOUGH ASBESTOS SUPPLY COMPANY<br>BULLOUGH INSULATION & SUPPLY, INC.<br>THERMAL WEST INDUSTRIAL, INC. |
| GARLOCK SEALING TECHNOLOGIES, LLC | ENPRO CORPORATION |
| INDUSTRIAL SUPPLY COMPANY, INC. | |
| MOUNTAIN STATES INSULATION & SUPPLY CO., INC. | MOUNTAIN STATES INSULATION |
| TURPINS INCORPORATED | |
| WESTERN INSULATION & SUPPLY CO, INC. | HUNTER INSULATION, INC. |
| WESTERN INSULATION CONTRACTORS ASSOCIATION | |
| A & A AUTO DISTRIBUTING CO. | EVERYBODY'S AUTO SUPPLY |
| A & A READY MIXED CONCRETE, INC. | A & A CONCRETE SUPPLY, INC. |
| A. TEICHERT & SON, INC. | TEICHERT, INC. |

6

| | |
|---|---|
| A.H. VOSS COMPANY | VOSS INTERNATIONAL<br>PACIFIC-VOSS CORPORATION<br>ALCOBRA COMPANY |
| ABB LUMMUS GLOBAL, INC. | LUMMUS CORPORATION |
| ABCO ENGINEERING CORPORATION | STEARNS-ROGERS MANUFACTURING CO., INC. |
| ABHI-CROCKETT, INC. | CALIFORNIA AND HAWAIIAN SUGAR COMPANY<br>C & H-HAWAII, INC.<br>C & H SUGAR COMPANY |
| ABNEY MILLS CORPORATION | BRASA, INC.<br>BRANDON SALES, INC. |
| ACF INDUSTRIES, INCORPORATED | ACF INDUSTRIES HOLDING CORP.<br>AMERICAN CAR AND FOUNDRY CO. |
| ACP, INC. | ALAMEDA COUNTY PLUMBING, INC. |
| THE ADHESIVE PRODUCTS, INC. | API SEALANTS |
| AGCO CORPORATION | MASSEY-FERGUSON INC. |
| AIRCRAFT BRAKING SYSTEMS CORP. | LOCKHEED MARTIN TACTICAL SYSTEMS, INC.<br>LORAL CORPORATION<br>GOODYEAR AEROSPACE CORP.<br>THE GOODYEAR TIRE & RUBBER COMPANY |
| ALART MECHANICAL CONTRACTORS | ALART AND HATT<br>ALART PLUMBING, INC. |
| ALCOA INC. | ALUMINUM COMPANY OF AMERICA |
| ALHAMBRA BUILDING SUPPLY | ARCADIA BUILDING MATERIALS |
| ALLPAX GASKET CUTTER PRODUCTS, INC. | THE ALLPAX COMPANY, INC.<br>WALKER & FORBES, INC. |
| ALUMA SYSTEMS USA INC. | THE BURKE COMPANY<br>BURKE CONCRETE ACCESSORIES, INC.<br>H & B CONCRETE SPECIALTIES COMPANY |

7

|  |  |
|---|---|
|  | FORM TIES, INC. |
|  | ALUMA SYSTEMS CAL. INC. |
| ALUMAX RECYCLING GROUP, INC. | APEX INTERNATIONAL ALLOYS. INC. |
|  | APEX INTERNATIONAL ALLOYS |
| AMAX INDUSTRIAL PRODUCTS DIV. | INDUSTRIAL PRODUCTS CO. AMAX |
| AMCA-KOEHRING COMPANY | KOEHRING CRANES, INC. |
| AMCORD, INC. | RIVERSIDE CEMENT COMPANY |
|  | AMERICAN CEMENT CORPORATION |
|  | PEERLESS CEMENT |
|  | HERCULES CEMENT |
|  | GIFFORD HILL CO. |
|  | BEAZER WEST, INC. |
|  | CORNERSTONE C&M CO. |
|  | HANSON BUILDING MATERIALS, INC./HANSON PLC |
|  | HANSON PLC |
|  | HANSON AGGREGATES WEST, INC. |
| AMERACE CORPORATION | AMERACE ESNA CORPORATION |
|  | PEQUANOC RUBBER COMPANY |
| AMERICAN BILTRITE, INC. | AMERICAN BILTRITE RUBBER CO., INC. |
|  | PANTHER PANCO RUBBER |
|  | PANTHER RUBBER MANUFACTURING COMPANY |
| AMERICAN BROADCASTING COMPANIES, INC. | KSFO RADIO STATION |
| AMERICAN CRANE & EQUIPMENT CORPORATION | AMERICAN RAIL & CRANE |
| AMERICAN CYANAMID COMPANY | BLOOMINGDALE RUBBER COMPANY |
|  | BLOOMINGDALE RUBBER PRODUCTS |
|  | CYTEC ENGINEERED MATERIALS |
|  | CHEMICALS GROUP |
|  | INDUSTRIAL CHEMICAL PRODUCTS DIVISION |
|  | AMERICAN HOME PRODUCTS CORPORATION |
| AMERICAN ELECTRIC CORPORATION |  |
| AMERICAN HONDA MOTOR CO., INC. | HONDA OF AMERICA MFG., INC. |

| | |
|---|---|
| AMERICAN LAUNDRY MACHINERY, INC. | AMERICAN LAUNDRY EQUIPMENT |
| AMERICAN PACIFIC ROOFING COMPANY | ASBESTOS PRODUCTS COMPANY OF SAN DIEGO |
| AMERICAN STANDARD, INC. | THE TRANE COMPANY<br>TRANE BOILER<br>U.S. RADIATOR<br>AMERICAN RADIATOR & STANDARD SANITARY CORP.<br>THE AMERICAN RADIATOR COMPANY<br>KEWANEE BOILER CO., INC.<br>STANDARD MANUFACTURING CO.<br>WESTINGHOUSE AIR BRAKE CORP<br>WABCO |
| ANCHOR PACKING COMPANY | |
| ANGELO J. DANERI, INC. | DANIERI PLASTERING |
| ANVIL INDUSTRIES, INC. | DURANT INSULATED PIPING CORPORATION |
| ARCOR, INT. | PENNIMAN AND RICHARDS, INC. |
| AMERON INTERNATIONAL CORPORATION | AMERON (HONG KONG) LIMITED<br>AMERON, INC.<br>AMERICAN PIPE AND CONSTRUCTION CO. |
| AMTECH MECHANICAL SERVICES COMPANY | RALPH E. MANNS CO.<br>COMMAIR MECHANICAL SERVICES |
| ANDRECO REFRACTORY SERVICES | A. E. ANDERSON CONSTRUCTION |
| ANCHOR HOCKING CORPORATION | ANCHOR HOCKING GLASS CORPORATION<br>ANCHOR CAP CORPORATION |
| ANHEUSER-BUSCH, INC. | BUDWEISER BREWING COMPANY<br>BUDWEISER COMPANY |
| ALUMAX RECYCLING GROUP, INC. | APEX INTERNATIONAL ALLOYS, INC. |
| A.O SMITH ELECTRICAL PRODUCT COMPANY | |
| AQUA-CHEM, INC. | CLEAVER BROOKS |

9

| | |
|---|---|
| ARB, INC. | ALEX ROBERTSON COMPANY CORPORATION<br>PRATT - ROBERTSON COMPANY<br>ALEC ROBERTSON BAKERSFIELD, INC.<br>DE VOIR ENTERPRISES<br>ARB FABRICATED SYSTEMS, INC. |
| ARC MANAGEMENT COMPANY | ARC ELECTRIC CO. |
| ARROW HART | |
| A.R.T. STUDIO CLAY COMPANY, INC. | ALPINE DIVISION, A.R.T. STUDIO CLAY CO. |
| ASARCO INCORPORATED | AMERICAN SMELTING AND REFINING COMPANY<br>PIPE COMPANY, INC.<br>CAPCO PIPE & SUPPLY<br>CEMENT ASBESTOS PRODUCTS COMPANY |
| ASBESTOSPRAY CORPORATION | PHILIP CAREY<br>SMITH AND KANZLER CO., INC.<br>SMITH AND KANZLER CORPORATION<br>SPRAYED INSULATION, INC.<br>S.K. INSULROCK CORPORATION<br>SPRAYON RESEARCH CORPORATION<br>SPRAYON INSULATION AND ACOUSTICS, INC.<br>SPRAYED INSULATION INC.<br>ASBESTOS PRODUCTS MANUFACTURING CORPORATION<br>ASBESTOSPRAY APPLICATORS, INC.<br>SPRAYCRAFT CORPORATION |
| ASBESTOS PRODUCTS<br>MANUFACTURING CORPORATION | ASBESTOSPRAY CORPORATION<br>ASBESTOSPRAY APPLICATORS, INC.<br>ASBESTOSPRAY CORPORATION OF NEWARK, NJ |
| ASHLAND, INC. | ASHLAND OIL, INC.<br>ASHLAND OIL & REFINING COMPANY<br>VALVOLINE OIL COMPANY<br>ASHLAND CHEMICAL COMPANY OF CALIFORNIA<br>UNITED CARBON COMPANY |
| ASSOCIATED INSULATION<br>OF CALIFORNIA | OSCAR E. ERICKSON, INC. |
| AT&T CORP. | AT&T TECHNOLOGIES, INC. |
| ATLAS HEATING AND<br>VENTILATING CO. LTD. | ATLAS HEATING AND AIR CONDITIONING<br>ATLAS SHEETMETAL |

| | |
|---|---|
| ARB, INC. | ALEX ROBERTSON COMPANY CORPORATION |
| | PRATT - ROBERTSON COMPANY |
| | ALEC ROBERTSON BAKERSFIELD, INC. |
| | DE VOIR ENTERPRISES |
| | ARB FABRICATED SYSTEMS, INC. |
| ARC MANAGEMENT COMPANY | ARC ELECTRIC CO. |
| ARROW HART | |
| A.R.T. STUDIO CLAY COMPANY, INC. | ALPINE DIVISION, A.R.T. STUDIO CLAY CO. |
| ASARCO INCORPORATED | AMERICAN SMELTING AND REFINING COMPANY |
| | PIPE COMPANY, INC. |
| | CAPCO PIPE & SUPPLY |
| | CEMENT ASBESTOS PRODUCTS COMPANY |
| ASBESTOSPRAY CORPORATION | PHILIP CAREY |
| | SMITH AND KANZLER CO., INC. |
| | SMITH AND KANZLER CORPORATION |
| | SPRAYED INSULATION, INC. |
| | S.K. INSULROCK CORPORATION |
| | SPRAYON RESEARCH CORPORATION |
| | SPRAYON INSULATION AND ACOUSTICS, INC. |
| | SPRAYED INSULATION INC. |
| | ASBESTOS PRODUCTS MANUFACTURING CORPORATION |
| | ASBESTOSPRAY APPLICATORS, INC. |
| | SPRAYCRAFT CORPORATION |
| ASBESTOS PRODUCTS MANUFACTURING CORPORATION | ASBESTOSPRAY CORPORATION |
| | ASBESTOSPRAY APPLICATORS, INC. |
| | ASBESTOSPRAY CORPORATION OF NEWARK, NJ |
| ASHLAND, INC. | ASHLAND OIL, INC. |
| | ASHLAND OIL & REFINING COMPANY |
| | VALVOLINE OIL COMPANY |
| | ASHLAND CHEMICAL COMPANY OF CALIFORNIA |
| | UNITED CARBON COMPANY |
| ASSOCIATED INSULATION OF CALIFORNIA | OSCAR E. ERICKSON, INC. |
| AT&T CORP. | AT&T TECHNOLOGIES, INC. |
| ATLAS HEATING AND VENTILATING CO. LTD. | ATLAS HEATING AND AIR CONDITIONING |
| | ATLAS SHEETMETAL |

10

Case MDL No. 875    Document 4914    Filed 11/17/06    Page 216 of 423

AUBURN TECHNOLOGIES, INC.  WHITE MOTOR COMPANY
            BOMBARDIER, INC.
            ALCO PRODUCTS, INC.

AUSTIN-CAMPBELL CORPORATION  AUSTIN-CAMPBELL COMPANY

AUTO PARTS WHOLESALE  SOUTHERN AUTO SUPPLY

A.W. CHESTERTON COMPANY

B&P PROCESS EQUIPMENT & SYSTEMS BAKER PERKINS
            PERKINS MASONRY SUPPLY

B.H.P. MINERAL INTERNATIONAL, INC. UTAH CONSTRUCTION AND MINING CO.

BABCOCK BORSIG POWER, INC.  DB RILEY, INC.
            RILEY STOKER CORPORATION
            BADENHAUSEN

BALDOR ELECTRIC COMPANY

BALL-FOSTER GLASS  MADERA GLASS CO.

BARRINGTON MFG., INC.  BARRINGTON-MOBAR, INC.

BASF CORPORATION  NARMCO, INC.
            NARMCO MATERIALS, INC.
            BASF WYANDOTTE CORPORATION
            BASF SYSTEMS CORPORATION
            BADISCHE CORPORATION
            LIMBACHER PAINT & COLOR WORKS, INC.
            GLASURIT AMERICA, INC.
            INMONT CORPORATION
            QUANTUM, INCORPORATED
            CCF, INC.

BAY CITIES CRANE & RIGGING, INC. BRAGG CRANE & RIGGING NORTHERN OPERATIONS, INC.

BECKMAN COULTER, INC.  SMITH KLINE DIAGNOSTICS
            SMITH KLINE & FRENCH
            BECKMAN INSTRUMENTS, INC.

BELL ASBESTOS MINES, LTD.  ATLAS TURNER, INC.
            TURNER & NEWALL, PLC.

11

| | |
|---|---|
| BELL INDUSTRIES, INC. | BESSONE PLUMBING & HEATING SUPPLY CO., INC<br>DESERT SERVICE CORPORATION |
| BELOIT CORPORATION | BOLOIGHT COMPANY |
| BENSON CHEMICAL CORPORATION | W. RONALD BENSON, INC. |
| BERKELEY READY-MIX COMPANY | BERKELEY OAKLAND READY MIX<br>OAKLAND READY MIX CO.<br>MISSION VALLEY READY MIX CO. |
| BIGGE DEVELOPMENT CO. | BIGGE CRANE AND RIGGING CORPORATION |
| BINNEY & SMITH, INC. | BINSMITH, INC. |
| BLACK & DECKER (U.S.) INC. | BLACK & DECKER CORPORATION<br>EMHART CORPORATION<br>UNITED SHOE MACHINERY CORPORATION<br>USM CORPORATION<br>FARREL-BERMINGHAM<br>FARREL CORP. |
| BLACKWELL HOMES | BLACKWELL BROTHERS<br>SCHULTE-BLACKWELL DEVELOPMENT CORP.<br>KENNETH M. BLACKWELL, INC.<br>JACK R. BLACKWELL INC. |
| BLUES ROOFING | ALTA ROOFING COMPANY OF SAN FRANCISCO |
| THE BOEING COMPANY | BOEING NORTH AMERICAN, INC.<br>McDONNELL DOUGLAS CORPORATION<br>DOUGLAS AIRCRAFT CO.<br>COLLINS RADIO COMPANY<br>ROCKWELL INTERNATIONAL CORPORATION<br>AUTONETICS, INC.<br>ROCKETDYNE<br>ROCKWELL MANUFACTURING COMPANY<br>NORTH AMERICAN ROCKWELL<br>NORTH AMERICAN AVIATION, INC. |
| BOEING NORTH AMERICAN, INC. | THE BOEING COMPANY<br>ROCKWELL INTERNATIONAL CORPORATION<br>COLLINS RADIO COMPANY<br>AUTONETICS, INC.<br>ROCKETDYNE<br>ROCKWELL MANUFACTURING COMPANY |

12

|  |  |
|---|---|
|  | ROCKWELL-STANDARD, INC. |
|  | ROCKWELL SPRING & AXLE CO. |
|  | ROCKWELL SPRING & AXLE CO., |
|  | TIMKEN-DETROIT AXEL DIVISION |
|  | NORTH AMERICAN ROCKWELL |
|  | NORTH AMERICAN AVIATION, INC. |
| BOISE CASCADE CORPORATION | UNION LUMBER |
| BOMBARDIER, INC. | DRESSER INDUSTRIES, INC. |
|  | M. W. KELLOGG |
|  | AMERICAN LOCOMOTIVE COMPANY (ALCO) |
|  | ALCO PRODUCTS, INC. |
|  | WHITE MOTOR COMPANY |
|  | AUBURN TECHNOLOGY, INC. |
|  | U.S. MONTREAL LOCOMOTIVE WORKS |
| BOREL PLACE OFFICE CENTER | BOREL ESTATE COMPANY |
| BORG-WARNER AUTOMOTIVE, INC. | BORG-WARNER CORPORATION |
|  | BORG-WARNER CORPORATION, BORG & BECK DIVISION |
|  | BORG-WARNER CORPORATION, ROCKFORD |
|  | CLUTCH DIVISION |
| BOSTIK INC. | BOSTIK USA |
| BOVEE & CRAIL CONSTRUCTION CO. | BOVEE INCORPORATED |
| BOYD CORPORATION | A.B. BOYD CO. |
| BRAGG INVESTMENT COMPANY, INC. | BRAGG CRANE & RIGGING NORTHERN OPERATIONS, INC. |
|  | BAY WESTERN INDUSTRIAL MAINTENANCE |
| BRIDGESTONE/FIRESTONE, INC. | FIRESTONE TIRE & RUBBER CORP. |
| BROWN OIL TOOLS, INC. | BROWN EQUIPMENT & SERVICE TOOLS, INC. |
| BRUCKNER MANUFACTURING CORP. | FARBERWARE, INC. |
|  | FARBERWARE DIV., LCA CO. |
|  | S.W. FARBER |
| B. T. MANCINI CO., INC. | THE BROOKMAN CO., INC. |
| BUCYRUS INTERNATIONAL, INC. | BUCYRUS-ERIE |
| BUFFALOW'S, INC. | BUFFALOWS INDUSTRIAL REFRIGERATION |

BUNN-O-MATIC CORPORATION                 REGAL COFFEE URNS

BUSS AUTOMOTIVE PARTS                    DE LUXE AUTO SUPPLY INC.

CAHILL CONTRACTORS, INC.                 CAHILL CONSTRUCTION CO., INC.

CALAVERAS CEMENT COMPANY                 CBR CEMENT CORPORATION
                                         FLINTKOTE COMPANY
                                         CALAVERAS PORTLAND CEMENT COMPANY

CALAVERAS ASBESTOS LTD.                  JEFFERSON LAKE ASBESTOS CORP.
                                         JEFFERSON LAKE SULPHUR CORP.
                                         OCCIDENTAL PETROLEUM INVESTMENT COMPANY

CALIFORNIA PORTLAND                      CALMAT COMPANY
   CEMENT COMPANY                        CONSOLIDATED ROCK
                                         PORTLAND CEMENT
                                         RIVERSIDE CEMENT
                                         SOUTHWESTERN CEMENT

CAPITOL BUILDING MATERIALS, INC.         HANSEN LIME & LUMBER COMPANY

CAPCO PIPE COMPANY, INC.

CARBORUNDUM

CARSON INDUSTRIES, INC.                  CARSON-BROOKS PLASTICS, INC.
                                         CARSON POLYPLASTICS, INC.
                                         CARSON-DEXOL INDUSTRIES, INC.
                                         CARSON INDUSTRIES ACQUISITION, INC.

CASSIAR MINING CORPORATION               CASSIAR ASBESTOS COMPANY
                                         CASSIAR ASBESTOS COMPANY, LTD
                                         CASSIAR CORPORATION
                                         CASSIAR COMPANY, LLC
                                         BRINCO MINING LIMITED

CBR CEMENT CORPORATION                   CALAVERAS CEMENT COMPANY
                                         CALAVERAS PORTLAND CEMENT COMPANY
                                         MONOLITH PORTLAND CEMENT COMPANY

C. D. ERICSON COMPANY, INC.              C DUANE ERICSON COMPANY, INC.
                                         CD ERICSON CO., INC.

14

CERTAINTEED CORPORATION

CERTAIN-TEED CORPORATION
KEASBEY & MATTISON
GUSTIN BACON MANUFACTURING CO.
PARKSON PIPELINE MATERIALS
PARKSON, INC.
WATER CO.
TELFORD SMITH SUPPLY CO.

CERTIFIED GROCERS OF
CALIFORNIA, LTD.

CERTIFIED GROCERS OF CALIFORNIA, INC.

CHAMPION INDUSTRIAL
CONTRACTORS, INC.

HANSEN'S, INC.
HANSEN MECHANICAL, INC.

CHAMPLAIN CABLE
CORPORATION

HAVEG INDUSTRIES
REINHOLD INDUSTRIES
HARVEY INDUSTRIES

CHANCELLOR CORPORATION

CHANCELLOR SCIENCES, INC.
HARBOR BOAT BUILDING CO.
HARBOR MARINE INDUSTRIES
HARCO ENGINEERING
FELLOWS & STEWART SHIPYARD
THE FARRIS GROUP
LOUIS FARRIS, JR.

CHARLES AYRES

CHARLES AYRES COMPANY
CHARLES AYRES SUPPLY COMPANY

CHAMBLIN PROPERTIES, INC.

CITY LIGHTS
CALIFORNIA ELECTRIC SERVICE, INC.

CIBA-GEIGY CORPORATION

HEATH TECHNA AEROSPACE COMPANY

CIRCOR INTERNATIONAL, INC.

AERODYNE CONTROLS CORPORATION
ATKOMATIC PRODUCTS
CIRCLE SEAL CONTROLS, INC.
CONTROMATICS SPECIALTY PRODUCTS
CPC-CRYOLAB PRODUCTS
GO REGULATOR
HOKE, INC.
KF INDUSTRIES, INC.
LESLIE CONTROLS, INC.
NICHOLSON STEAM TRAP
ROCKWOOD SWENDEMAN PRODUCTS
SPENCE ENGINEERING COMPANY, INC.

15

|  |  |
|---|---|
|  | SSI EQUIPMENT, INC. |
|  | TELFORD VALVES & SPECIALTIES, INC. |
|  | WATTS INDUSTRIES |
| CLAIROL INCORPORATED | WILLIAM DONALD FRANK INCORPORATED |
| CLARK-RELIANCE CORPORATION |  |
| CLASSIC TIES PERFORMANCE | SHAW AUTO PARTS |
| CLEAVER-BROOKS | AQUA-CHEM, INC. |
| CLINTON MANAGEMENT | CLINTON ENGINE PRODUCTS COMPANY, INC. |
| COLTEC INDUSTRIES, INC. | FAIRBANKS-MORSE LOCOMOTIVES |
|  | COLT INDUSTRIES |
|  | GARLOCK, INC. |
|  | THE ANCHOR PACKING COMPANY |
|  | BELMONT PACKING |
| COLUMBIA I & S, INC. | COLUMBIA ASBESTOS, INC. |
| COMMONWEALTH ALUMINUM CORPORATION | MARTIN MARIETTA ALUMINUM, INC. |
| COMPLETE AUTO PARTS | EAST BAY AUTO SUPPLY |
| CONAIR CORPORATION |  |
| CONGOLEUM CORPORATION | CONGOLEUM NAIRN, INC. |
| CONTROLCO | STOVE PLUMBERS SUPPLIES CO. |
| COOPERHEAT-MQS INC. | COOPERHEAT INDUSTRIES, INC. |
| COOPER INDUSTRIES, INC. | CROUSE-HINDS COMPANY |
|  | ALCO PRODUCTS, INC. |
|  | McGRAW-EDISON COMPANY |
|  | STUDEBAKER-WORTHINGTON CORP. |
| COOPER INDUSTRIES, INC. | McGRAW-EDISON COMPANY |
|  | McGRAW-ELECTRIC COMPANY |
|  | TOASTMASTER, INC. |
|  | TOASTMASTER PRODUCTS DIVISION, |
|  | McGRAW ELECTRIC CO. |

16

COPES VULCAN, INC.

CORNING INCORPORATED                          CORNING GLASS CO.

COROMANDEL CONSTRUCTION                        WATERWORKS PLUMBING CO., INC.  (THE)
COMPANY, INC.

COURTAULDS GRAFIL, INC.                        HYSOL

CRANE CO.                                      CRANE PLUMBING & HEATING
                                               MIDWEST PIPING CO.
                                               MIDWEST PIPING & SUPPLY CO.
                                               MIDWEST INVESTMENT
                                               BURKS PUMP
                                               CHEMPUMP
                                               CYCLOTHERM
                                               DEMING PUMP
                                               HYDRO-AIRE
                                               LEAR ROMEC
                                               RESISTOFLEX
                                               STOCKHAM VALVE COMPANY
                                               SWARTWOUT CO.
                                               WEINMAN PUMP COMPANY

CROWN COACH INCORPORATED                       GENERAL ELECTRIC RAILCAR SERVICES CORPORATION

CROWN, CORK & SEAL COMPANY, INC.    MUNDET CORK CORP.

CROWN EQUIPMENT CORPORATION         CROWN LIFT TRUCKS

CSK AUTO, INC.                                  KRAGEN AUTO SUPPLY CO.
                                               NORTHERN AUTOMOTIVE CORPORATION
                                               CHECKER AUTO PARTS, INC.
                                               TBDPC CORPORATION
                                               PACCAR AUTOMOTIVE, INC.
                                               GRAND AUTO, INC.
                                               AL'S AND GRAND AUTO SUPPLY, INC.
                                               SCHUCK'S AUTO SUPPLY

CUSTODIS-COTTRELL, INC.                        CUSTODIS HAMON CONSTRUCTORS, INC.
                                               RESEARCH COTTRELL, INC.
                                               CUSTODIS CHIMNEY COMPANY
                                               R-C REFUSE PROCESSING, INC.

CUSTOM BUILDING PRODUCTS             B & P CUSTOM BUILDING PRODUCTS

17

| | |
|---|---|
| CUTLER-HAMMER, INC. | EATON CORPORATION |
| | YALE & TOWNE MANUFACTURING CO. |
| CYPRUS AMAX MINERALS COMPANY | CYPRUS MINERAL COMPANY |
| | CYPRUS INDUSTRIAL MINERALS CORPORATION |
| | SIERRA TALC AND CLAY COMPANY |
| | SIERRA TALC COMPANY |
| | PACIFIC COAST TALC COMPANY |
| | INYO TALC COMPANY |
| D. CUMMINS CORPORATION | VALLEY ASBESTOS COMPANY |
| D/C DISTRIBUTION CORPORATION | AMFAC DISTRIBUTION CORPORATION |
| | MORAN SUPPLY |
| | HEIECKE & MORAN |
| | N.V. MORAN PLUMBING SUPPLY, INC. |
| | EDWARDS PLUMBING SUPPLY COMPANY, INC. |
| DAL-TILE CORPORATION | DAL-TILE INTERNATIONAL INC. |
| | AMERICAN OLEAN TILE COMPANY, INC. |
| | AMERICAN ENCAUSTIC TILING CO. |
| | MURRAY TILE CO. |
| | MURRAY QUARRY TILE |
| | POMONA TILE COMPANY |
| | OLEAN CERAMIC MOSAIC TILE |
| | OLEAN TILE CO. |
| DALZIEL SUPPLY COMPANY | THOMAS F. SMITH, INCORPORATED |
| | BARDIN'S YOSEMITE SUPPLIERS, INC. |
| DANA CORPORATION | VICTOR MANUFACTURING AND GASKET COMPANY |
| | SMITH AND KANZLER CO., INC. |
| | SMITH AND KANZLER CORPORATION |
| | SPRAYED INSULATION, INC. |
| | S.K. INSULROCK CORPORATION |
| | SPRAYON RESEARCH CORPORATION |
| | SPRAYON INSULATION & ACOUSTICS, INC. |
| | SPRAYED INSULATION INC. |
| DANIEL SMITH PLASTERING, INC. | DANIEL SMITH PLASTERING |
| DARCOID COMPANY OF CALIFORNIA | DARCOID RUBBER COMPANY |
| DAVIS WATER & WASTE INDUSTRIES, INC. | TAYLOR-JETT, CO. |

| | |
|---|---|
| DAVIS WIRE CORPORATION | DAVIS WALKER CORPORATION |
| DEAN INDUSTRIES, INC. | U.S. RANGE, INC.<br>DEAN/U.S. RANGE, INC. |
| DELPHI E. MANAGEMENT | DELCO BATTERY |
| DEL WEBB CORPORATION | DEL WEBB CALIFORNIA CORPORATION |
| DIAMOND INTERNATIONAL<br>CORPORATION | THE DIAMOND MATCH COMPANY<br>DIAMOND NATIONAL CORPORATION<br>DIAMOND GARDNER COMPANY<br>DIAMOND LUMBER<br>DIAMOND PULP AND PAPER |
| DICALITE HOLDING, INC. | GREFCO, INC.<br>SGL CORPORATION<br>GREAT LAKES CARBON CORPORATION |
| DICK BRUHN, INC. | BUTLER UNIFORMS |
| DOALL INDUSTRIAL SUPPLY<br>CORPORATION | GENERAL MACHINERY SUPPLY COMPANY |
| DOMCO PRODUCTS TEXAS, L.P. | DOMCO U.S. INCORPORATED<br>DOMCO INC. FLOOR PRODUCT (TEXAS)<br>AZROCK INDUSTRIES, INC.<br>UVALDE ROCK ASPHALT COMPANY |
| DOME CONSTRUCTION CORPORATION | DOME DEVELOPMENT CORPORATION |
| DOMTAR, INC. | DOMTAR GYPSUM, INC.<br>DOMTAR GYPSUM AMERICA, INC. |
| DORSETT & JACKSON, INC. | CARMONA CHEMICAL COMPANY<br>C.L. DUNCAN CO. |
| DOVER CORPORATION | A-C COMPRESSOR<br>BLACKMER PUMP<br>GROEN<br>NORRISEAL<br>OPW<br>PEERLESS MANUFACTURING CO.<br>PRECO TURBINE & COMPRESSOR SERVICE |
| DUBL DUCK, INC. | DOUBLE DUCK |

19

DUPONT DE NEMOURS & COMPANY, E.I.

DURABALA MANUFACTURING COMPANY

DURAMETALLIC CORPORATION

DYNA-FLEX CORP.                         DYNA-FLEX INTERNATIONAL CORPORATION

E. F. BRADY COMPANY, INC.               E.F. BRADY COMPANY CENTRAL CALIFORNIA LATHING

E. F. MITCHLER COMPANY                  LODI READY MIX & BUILDING MATERIALS

EATON CORPORATION                       CUTLER-HAMMER, INC.

ECONOTHERM ENERGY                       CHANUTE MANUFACTURING COMPANY, INC.
  SYSTEMS, INC.                         BECCO, INC.

EL PASO PIPELINE COMPANY                TENNECO CORPORATION
                                        PACKAGING COMPANY OF CALIFORNIA
                                        TENNECO OIL CO.
                                        TENNECO RESINS
                                        TENNECO CHEMICAL
                                        DIAMOND PULP AND PAPER

EM SECTOR HOLDINGS INC.                 UNIVERSAL OIL PRODUCTS COMPANY
                                        BOYLSTON CORPORATION
                                        EHRHART & ASSOCIATES, INC.
                                        EHRHART & ARTHUR, INC.

EMERSON ELECTRIC CO.                    ALCO VALVE
                                        AUTOMATIC SWITCH COMPANY
                                        BROOKS INTRUMENT
                                        CHROMOLOX
                                        CONTINNENTAL EQUIPMENT COMPANY
                                        COPELAND
                                        DANIEL INDUSTRIES, INC.
                                        DANIEL ORIFICE FITTING CO.
                                        DOERR ELECTRIC MOTORS
                                        EDWIN L. WIEGAND COMPANY
                                        EMERSON PROCESS MANAGEMENT
                                        FISHER CONTROLS INTERNATIONAL
                                        FISHER GOVERNOR COMPANY
                                        FISHER / ROSEMOUNT
                                        PEERLESS MANUFACTURING COMPANY
                                        U.S. ELECTRIC MOTORS
                                        U.S. SYNCHROGEAR

| | |
|---|---|
| ENVIROTECH PUMPS SYSTEMS | WEIR GROUP<br>WEIR SPECIALTY PUMPS<br>BAKER PROCESS GROUP OF BAKER HUGHES INC. |
| ERIC F. ANDERSON, INC. | ERIC A. ANDERSON |
| ERICSSON, INC. | ERICSSON RADIO SYSTEMS, INC.<br>ANACONDA WIRE & CABLE COMPANY<br>THE ANACONDA COMPANY<br>CONTINENTAL WIRE & CABLE COMPANY<br>L.M. ERICSSON TELEPHONE COMPANY |
| ESCALON PREMIER BRANDS | ESCALON PACKING CO.<br>ESCALON PACKERS, INC. |
| ESICORP, INC. | EBASCO SERVICES INCORPORATED<br>ENSERCH CORPORATION<br>E & L ASSOCIATES<br>EHRHART & LESTER ASSOCIATES<br>RAYTHEON COMPANY<br>KENLES ENGINEERS AND CONSTRUCTORS, INC.<br>WOLDER ENGINEERS AND CONSTRUCTORS, INC.<br>WOLDER ENGINEERING CORPORATION<br>JACOBS ENGINEERING |
| ESSEX GROUP, INC. | ESSEX INTERNATIONAL, INC.<br>ESSEX WIRE AND CABLE GROUP<br>ESSEX WIRE CORPORATION<br>UAE OF MICHIGAN, INC. |
| ETERNIT, INC. | ETERNIT, KAPELLE<br>KAPELLE ETERNIT |
| EZON, INC. | ATLANTIC PACIFIC AUTOMOTIVE<br>ATLANTIC PACIFIC AUTO PARTS |
| FBC INDUSTRIES, INC. | FOOTHILL BEVERAGE CO.<br>ORANGE COAST SNACK FOODS<br>FREEWAY AUTO LEASE, INC.<br>JIM'S TOWING<br>J.N.J. LAND CO.<br>ARMLINE, INC. |
| FAIRBANKS MORSE PUMP CORPORATION | |

FAMILIAN CORPORATION

FAMILIAN PIPE & SUPPLY
INDUSTRIES SUPPLY CO.

FARWEST CORROSION CONTROL CO.

CORROSION CONTROL PRODUCTS CO.

FAURECIA EXHAUST SYSTEMS, INC.

A.P. AUTOMOTIVE SYSTEMS, INC.
GOERLICH'S EXHAUST SYSTEMS
GOERLICH'S, INC.
ASSOCIATED PARTS, INCORPORATED
OLDBERG MANUFACTURING COP.
BASCA MANUFACTURING COMPANY
McKENZIE MUFFLER COMPANY
BELOND CORPORATION
AP PARTS COMPANY
AP NORTH AMERICAN AFTERMARKET DIVISION
PSA/PEUGEOT-CITROEN SA

FEDERAL-MOGUL CORPORATION

FEL-PRO INCORPORATED

FERRO ENGINEERING

OGLEBAY NORTON COMPANY

FIBREX, INC.

FORTY-EIGHT INSULATIONS, INC.

FIESTA FORD LINCOLN MERFURY

BEN COWDEN FORD

FIRE EQUIPMENT DISTRIBUTION
COMPANY, INC.

SOLON FIRE CONTROL

FISHER BERKELEY-EKTACOM

BERKELEY

FKI INDUSTRIES

JOHNSTON BOILER COMPANY
STONE AMERICAN CORP.
HINES CORPORATION II
STONE JOHNSTON CORPORATION

FLAME REFRATORIES, INC.

FLETCHER CONSTRUCTION
NORTH AMERICA

DINWIDDIE CONSTRUCTION COMPANY

FLINT & WALLING INDUSTRIES, INC.

AMERICAN DRYER DIVISION

THE FLINTKOTE COMPANY

FLINTKOTE MINES, LTD. - QUEBEC
CALAVERAS CEMENT COMPANY
BLUE DIAMOND CORPORATION
GENSTAR COMPANY

22

BOTSWANA FIBERS, LTD.
CAPASCO, LTD.
ORANGEBURG MANUFACTURING CO.
PIONEER-FLINTKOTE
PIONEER CORP.
TILE TEX
ATLAS ADHESIVES
PACIFIC ASBESTOS COMPANY
VAN PACKER CHIMNEY CO.

FLOWSERVE CORP

ACEC CENTRIFUGAL PUMPS
ALDRICH PUMPS
ANCHOR DARLING VALVES
ATOMAC VALVES
BORG WARNER CORPORATION
BORG WARNER ENERGY EQUIPMENT GROUP
BORG-WARNER INDUSTRIAL CORPORATION
BORG-WARNER INDUSTRIAL PRODUCTS
BW/IP, INC.
BYRON JACKSON CO.
BYRON JACKSON PUMPS
CAMERON PUMPS
CLARK BROS.
DRESSER-RAND
DURAMETALLIC
DURCO INTERNATIONAL
DURCO PUMPS
DURCO VALVES
DURIRON COMPANY
EDWARD STEAM SPECIALTY COMPANY
EDWARD VALVES
FIVE STAR SEAL
FLOWSERVE PUMPS
HENRY VOGT MACHINE COMPANY
IDP PUMPS
JEUMONT-SCHNEIDER PUMPS
KAMMER VALVES
MCCANNA
MOORE STEAM TURBINE
NOBLE VALVES
PACIFIC PUMPS
PLEUGER PUMPS
SCIENCO PUMPS
SIER-BATH PUMPS
STORK ENGINEERED PUMPS
TERRY STEAM TURBINE

23

Case MDL No. 875 Document 4914 Filed 11/17/06 Page 229 of 423

|  |  |
|---|---|
|  | UNITED CENTRIFUGAL PUMPS |
|  | VALTEK CONTROL PRODUCTS |
|  | VOGT |
|  | VOGT VALVE COMPANY |
|  | WESTERN LAND ROLLER IRRIGATION PUMPS |
|  | WILSON-SNYDER PUMPS |
|  | WORTHINGTON PUMPS |
|  | WORTHINGTON SIMPSON PUMPS |
| FLUOR CORPORATION | FLUOR MAINTENANCE |
|  | FLUOR CONSTRUCTION COMPANY |
|  | THE FLUOR CORPORATION, LIMITED |
|  | THE FLUOR CORPORATION, LTD. |
| FMC CORPORATION-TURBO PUMP OPERATION | COFFIN TURBO PUMP, INC. |
| FMC CORPORATION | FOOD MACHINERY AND CHEMICAL CORPORATION |
|  | BARIUM PRODUCTS, LTD. |
|  | FMC AUTO DIVISION |
|  | LINK-BELT CONSTRUCTION EQUIPMENT COMPANY |
|  | VAN PELT |
|  | CHICAGO PUMPS |
|  | CHIKSAN |
|  | COFFIN TURBO PUMPS |
|  | HAMER |
|  | JOHN BEAN PUMP COMPANY |
|  | PEERLESS PUMPS |
|  | WECO |
|  | WELL EQUIPMENT MANUFACTURING |
| FOLEY-PMI, INC. | P.M.I. CORPORATION |
| FOOTE JONES/ILLINOIS GEAR | PACIFIC MILSTALLATION, INC. |
| FORT KENT HOLDING, INC. | DUNHAM-BUSH, INC. |
| FOSTER-WHEELER, LLC |  |
| FRANK W. DUNNE COMPANY | DUNNE QUALITY PAINTS |
|  | KELLY-MOORE PAINT COMPANY, INC. |
| FRANZIA WINERY, LLC | FRANZIA BROTHERS WINERY |
|  | FRANZIA BROTHERS WINERY LIMITED PARTNERSHIP |
|  | THE WINE GROUP, LTD. |

24

FRASER'S BOILER SERVICE, INC.        FRASER BOILER WORKS

FIBERITE, INC.                       ICI COMPOSITES, INC.
                                     ICI FIBERITE
                                     FIBERITE CORPORATION
                                     UNIVERSAL MANUFACTURING COMPANY

FYREPEL PRODUCTS, INC.               FIRELAND INDUSTRIES, INC.

G-I HOLDINGS, INC.                   GAF CORPORATION
                                     RUBEROID CO.
                                     H.F. WATSON CO.
                                     VERMONT ASBESTOS
                                     AMERICAN I.G. CORPORATION
                                     GENERAL ANILINE & FILM CORPORATION
                                     STANDARD PAINT COMPANY

GARLOCK, INC.                        COLTEC INDUSTRIES, INC.
                                     FAIRBANKS-MORSE
                                     BELMONT PACKING & RUBBER CO.
                                     GARLOCK PACKING CO.
                                     U.S. GASKET CO.

GARDENA HOLDINGS                     B. P. CHEMICALS (HITCO) INC.
                                     HITCO, INC.
                                     HITCO TECHNOLOGIES, INC.
                                     U.S. POLYMERIC, INC.
                                     U.S. POLYMERIC CHEMICALS, INC.
                                     ARMCO COMPOSITES DIVISION OF ARMCO, INC.

GASKET HOLDINGS, INC.                FLEXITALLIC, INC.

GASKET SPECIALTIES, INC.             GEORGE SHORT COMPANY

GATKE CORPORATION                    ASBESTOS TEXTILE COMPANY, INC.

GAYLE DOUGLAS, INC.                  MCWILLIAMS LUMBER COMPANY, INC.

GENCO CORPORATION                    GENCO INDUSTRIAL PRODUCTS
                                     C.D. GENTER COMPANY
                                     PACIFIC GREAT LAKES CORPORATION

GENCORP, INC.                        GENERAL TIRE & RUBBER COMPANY

GENERAL CABLE CORPORATION            CAROL CABLE COMPANY

25

| | |
|---|---|
| GENERAL ELECTRIC CAPITAL TECHNOLOGY MANAGEMENT SERVICES | SAN JOSE WATER POLLUTION CONTROL SEWAGE TREATMENT PLANT |
| GENERAL ELECTRIC COMPANY | GENERAL ELECTRIC COMPANY HOUSEWARES |
| GENERAL SIGNAL PUMP GROUP | |
| THE GENLYTE GROUP INCORPORATED | GENLYTE THOMAS GROUP LLC LIGHTOLIER INCORPORATED |
| GENUINE PARTS COMPANY | NAPA AUTO PARTS GENUINE PARTS COMPANY OF MICHIGAN, INC. AUTHORIZED MOTOR PARTS CORP. GENUINE PARTS COMPANY OF WISCONSIN, INC. AUTOMOTIVE PARTS COMPANY COLYEAR MOTOR SALES COMPANY GENERAL AUTOMOTIVE PARTS CORPORATION STANDARD UNIT PARTS CORPORATION DIGERUD AUTO PARTS |
| GENERAL SIGNAL TECHNOLOGY CORPORATION | GENERAL SIGNAL CORPORATION GENERAL SIGNAL CORPORATION, BLUE M DIVISION G.S. CORPORATION, BLUE M DIVISION SOLA BASIC INDUSTRIES, INC. |
| GEORGIA-PACIFIC CORPORATION | BESTWALL GYPSUM COMPANY |
| GEORGIA KAOLIN COMPANY, INC. | GEORGIA TALC |
| THE GILLETTE COMPANY | |
| GLENDORA BUILDERS SUPPLY, INC. | VICTORY MATERIALS CO. |
| GNWP ACQUISITION COMPANY, INC. | GROSSMAN'S |
| GOODRICH CORPORATION | |
| THE GOODYEAR TIRE & RUBBER COMPANY | GOODYEAR AEROSPACE CORP. LORAL CORPORATION LOCKHEED MARTIN TACTICAL SYSTEMS, INC. AIRCRAFT BRAKING SYSTEMS CORP. |
| GOULD, INC. | CENTURY ELECTRIC EASTMAN CORPORATION GOULD ELECTRONICS, INC. |

26

|  |  |
|---|---|
|  | IMPERIAL CORPORATION |
|  | IMPERIAL EASTMAN CORPORATION |
|  | I-T-E CIRCUIT BREAKER COMPANY |
| GOULD PUMPS, INC. |  |
| GRANITE ROCK COMPANY | CENTRAL SUPPLY COMPANY |
|  | LIMESTONE PRODUCTS, INCORPORATED |
|  | LOS GATOS SAND AND GRAVEL COMPANY, INC. |
|  | BUSHMONT CO. |
| GRANT WILSON, INC. | ACME ASBESTOS FLOORING AND TILE CORPORATION |
| GRAYBAR ELECTRIC COMPANY, INC. |  |
| GREAT WAY TRAILERS, INC. | SALT LAKE GREAT DANE, INC. |
| GROSSMAN'S BARGAIN OUTLET | GROSSMAN'S LUMBER |
| GROSSMAN'S, INC. | EVANS PRODUCTS COMPANY |
|  | HUBBARD & JOHNSON |
| GUARD-LINE, INC. | 20TH CENTURY GLOVE |
| GUHO BUILDING MATERIALS | CUDAHY BUILDING MATERIALS |
| GUY F. ATKINSON | COMMONWEALTH CONSTRUCTION CO. |
|  | WILLAMETTE IRON AND STEEL CO. (WISCO) |
|  | BINGHAM-WILLAMETTE CO. |
|  | WALSH CONSTRUCTION CO. |
|  | GUY F. ATKINSON CONSTRUCTION CO. |
|  | GUY F. ATKINSON CO. |
|  | ATKINSON MARINE |
|  | MONTERY CONSTRUCTION CO. |
| H & A CONSTRUCTION CORP. | SPRAYCRAFT CORPORATION |
|  | ASBESTOS PRODUCT MANUFACTURING CORP. |
|  | ASBESTOSPRAY CORP. |
|  | ASBESTOSPRAY APPLICATORS. INC. |
| HTR ENTERPRISES, INC. | MARELICH MECHANICAL CO., INC. |
|  | L.M.N. ENTERPRISES |
| HOMEBASE, INC. | HOMECLUB, INC. |
| HAJOCA CORPORATION | HEIECK CORPORATION (post-1989) |
|  | HEIECK SUPPLY (SAN FRANCISCO) (post-1989) |

27

|                                          |                                                              |
|------------------------------------------|--------------------------------------------------------------|
|                                          | HEIECK SUPPLY (SACRAMENTO) (post-1989)                       |
|                                          | HEIECK SUPPLY (SAN JOSE) (post-1989)                         |
|                                          | QUAKER SUPPLY                                                |
|                                          | KEENAN SUPPLY, INC.                                          |
|                                          | KEENAN SUPPLY COMPANY                                        |
|                                          | KEENAN PIPE & SUPPLY, a Corporation                          |
|                                          | KEENAN PIPE & SUPPLY, a Partnership                          |
| HALDEN BRAKE PRODUCTS CORPORATION        | HALDEN GROUP                                                 |
|                                          | SAB AUTOMOTIVE                                               |
| HAMON CORPORATION                        | HAMON COOLING TOWERS                                         |
|                                          | HAMON-SOBELCO INTERNATIONAL, INC.                            |
| HAMILTON BEACH/PROCTOR-SILEX             | HAMILTON BEACH DIVISION, SCOVILL MANUFACTURING COMPANY        |
|                                          | PROCTOR ELECTRIC CO.                                         |
|                                          | PROCTOR-SILEX CORPORATION                                    |
| HAMILTON MATERIALS, INC.                 |                                                              |
| HAMILTON SUNDSTRAND                      | FALK CORPORATION                                             |
|                                          | HAMILTON STANDARD                                            |
|                                          | LMI MILTON ROY                                               |
|                                          | MILTON ROY COMPANY                                           |
|                                          | SULLAIR CORPORATION                                          |
|                                          | SUNDSTRAND CORPORATION                                       |
|                                          | SUNDYNE CORPORATION                                          |
| HANFORD-FREUND & CO.                     | HANFRE ASSET CORPORATION                                     |
| HANSON PLC                               | HANSON BUILDING MATERIALS, INC./HANSON PLC                   |
|                                          | HANSON AGGREGATES WEST, INC.                                 |
|                                          | AMCORD, INC.                                                 |
|                                          | RIVERSIDE CEMENT COMPANY                                     |
|                                          | AMERICAN CEMENT CORPORATION                                  |
|                                          | PEERLESS CEMENT                                              |
|                                          | HERCULES CEMENT                                              |
|                                          | GIFFORD HILL CO.                                             |
|                                          | BEAZER WEST, INC.                                            |
|                                          | CORNERSTONE C&M CO.                                          |
| HANSON PERMANENTE CEMENT, INC.           | KAISER CEMENT CORPORATION                                    |
|                                          | GYPSUM CARRIER, INC.                                         |
| HARCROS CHEMICALS, INC.                  | HARRISONS & CROSSFIELD                                       |

| | |
|---|---|
| THE HAROLD E. SHUGART COMPANY, INC. | ACOUSTICS AND SPECIALTIES CONTRACTORS, INC. |
| HARRAH'S OPERATING COMPANY, INC. | HARRAH'S ENTERTAINMENT, INC. |
| HARWICK CHEMICAL CORPORATION | STANDARD CHEMICAL COMPANY<br>HARWICK STANDARD CHEMICAL COMPANY<br>HARWICK, INC.<br>CHEMETRON CORPORATION |
| HAWTHORNE BONDED BRAKE CO. | BONDED BRAKE EQUIPMENT CORPORATION<br>BONDED BRAKE LINING SALE CO. |
| HAYES WHEELS INTERNATIONAL COMPANY | KELSEY HAYES COMPANY |
| HEIECK SUPPLY | HEIECK CORPORATION<br>HEIECK SUPPLY (SAN FRANCISCO)<br>HEIECK SUPPLY (SACRAMENTO)<br>HEIECK SUPPLY (SAN JOSE) |
| HENNESSY INDUSTRIES, INC. | AMMCO TOOLS, INC. |
| HENRY COMPANY | HENRY'S PLASTIC CEMENT |
| HICKMAN BROS., INC. | WESTERN MECHANICAL CO., INC. |
| HIGHLAND STUCCO AND LIME PRODUCTS, INC. | HIGHLAND PRODUCTS, INC.<br>HIGHLAND PLASTER |
| HILL BROTHERS CHEMICAL COMPANY | |
| HOBART BROTHERS COMPANY | |
| HOECHST CELANESE CORPORATION | HOECHST CELANESE CHEMICAL GROUP, INC.<br>CELANESE CHEMICAL CO.<br>CELANESE CORPORATION<br>AMERICAN HOECHST CORPORATION |
| THE HOFMANN COMPANY | HOFMANN CONSTRUCTION CO.<br>HOFMANN BUILDERS, INC.<br>H&C PLASTERING<br>H&Y PLASTICS/PREHUNG DOOR SHOPS<br>COMPU-TECH LUMBER COMPANY<br>DB PETROLEUM |

29

HOLADAY-PARKS-FABRICATORS, INC.    JAMES A. NELSON CO., INC

HONEYWELL, INC.

ALLIEDSIGNAL, INC.
ALLIED-SIGNAL, INC.
THE BENDIX CORPORATION
BENDIX PRODUCTS AUTOMOTIVE DIVISION
BENDIX PRODUCTS DIVISION, BENDIX AVIATION CORP.
BENDIX HOME SYSTEMS
ALLIED CORPORATION
ALLIED CHEMICAL CORPORATION
GENERAL CHEMICAL CORPORATION

HULL CORPORATION    METAPLAST CORPORATION

HUSSMANN CORPORATION    HUSSMAN REFRIGERATION

ICF KAISER ENGINEERS, INC.    KAISER ENGINEERS & CONSTRUCTORS, INC.

IDEAL BASIC INDUSTRIES, INC.    IDEAL CEMENT CO.

IDEX CORPORATION

GAST MANUFACTURING CORPORATION
LIQUID CONTROLS
LUBRI-QUIP
MANZEL
VIKING PUMP, INC.
WARREN-RUPP, INC.

IMO INDUSTRIES, INC.

BERKELEY PUMP COMPANY
TRANSAMERICA DELAVAL, INC.

INDOPCO, INC.    NATIONAL STARCH & CHEMICAL CORP.

INDUSTRIAL HOLDINGS CORPORATION    CARBORUNDUM COMPANY (THE)

INGERSOLL-RAND COMPANY

INTERNATIONAL TRUCK AND
  ENGINE CORPORATION

NAVISTAR INTERNATIONAL TRANSPORTATION
  CORPORATION
NAVISTAR INTERNATIONAL CORPORATION
INTERNATIONAL HARVESTER COMPANY
INTERNATIONAL HARVESTER CORPORATION

INVENSYS PLC

INVENSYS COMPANY
INVENSYS CONTROL SYSTEMS
SIEBE

30

ITT INDUSTRIES, INC.

A-C PUMPS
BELL & GOSSETT
CAM-LINE
CAM-TITE
CONOFLOW
DIA-FLO
ENGINEERED VALVES DIVISION
FABRI-VALVE
FLOJET
FOSTER ENGINEERING
GEM SPRINKLER COMPANY
GENERAL CONTROLS
GOULDS PUMPS, INC.
GRINNELL CO., INC.
GRINNELL CORP.
GRINNELL FIRE PROTECTION SYSTEMS, INC.
GRINNELL FIRE PROTECTION
GRINNELL INDUSTRIAL PIPING, INC.
GRINNELL SUPPLY SALES, INC.
HOFFMAN SPECIALTY
ITT GRINNELL VALVE CO., INC.
ITT INDUSTRIES FLUID
ITT STANDARD
JABSCO
LOWARA
MARLOW
MCDONNELL & MILLER
REZNOR MFG. CO.
RICHTER
SKOTCH

J & H MARINE AND INDUSTRIAL
  ENGINEERING COMPANY

WILLARD MARINE DECKING, INC.
LORELITE

J.C. PENNY, INC.

J. GIBBS SONS, INC.

J. GIBBS SONS

JAMES E. MARSH, INC.

JAMES E. MARSH INSULATION & DRYWALL
  CONTRACTOR, INC.

JEFFERSON SMURFIT
  CORPORATION (U.S.)

CONTAINER CORPORATION OF AMERICA
CONCORA CORPORATION

31

Case MDL No. 875   Document 4914   Filed 11/17/06   Page 237 of 423

| | |
|---|---|
| JIM WALTER CORPORATION | THE CELOTEX CORPORATION<br>PHILIP CAREY COMPANY<br>PANACON CORP. |
| JOE MARSH DISTRIBUTING CORP. | MARSH TILE |
| JOE'S AUTO PARTS | MARTIN AUTO PARTS |
| JOHN CRANE, INC. | CRANE PACKING CO.<br>JOHN CRANE PACKING COMPANY |
| JOHNSON CONTROLS, INC. | JOHNSON SERVICE COMPANY |
| JOHNSTON BOILER COMPANY | HINES CORPORATION II<br>STONE JOHNSTON CORPORATION |
| JOHN WAGNER ASSOCIATES, INC. | GRABBER, INC.<br>GRABBER CALIFORNIA, INC.<br>J. WAGNER ENTERPRISES, INC.<br>AUTOBAHN CLASSIC CARS, LTD. |
| KAISER AEROSPACE &<br>ELECTRONICS CORPORATION | KAISER AEROTECH CORPORATION<br>KAISER AEROSPACE & ELECTRONICS CO. |
| KAISER ALUMINUM &<br>CHEMICAL CORPORATION | MEXICO REFRACTORIES<br>KAISER REFRACTORIES<br>NATIONAL REFRACTORIES & MINERALS CORPORATION<br>HENDY INTERNATIONAL COMPANY<br>MAXXAM, INC. |
| KAISER INDUSTRIES CORPORATION | KAISER MOTORS CORPORATION<br>KAISER-FRAZER CORPORATION |
| KAMAN INDUSTRIAL TECHNOLOGIES<br>CORPORATION | KAMAN BEARING AND SUPPLY CORP. CALIFORNIA<br>KAMAN AIRCRAFT BEARING CORPORATION<br>WINN SUPPLY COMPANY |
| KERR-MCGEE CHEMICAL CORPORATION | AMERICAN POTASH & CHEMICAL CORPORATION |
| KEENAN PIPE & SUPPLY | KEENAN PROPERTIES, INC.<br>KEENAN SUPPLY, INC.<br>KEENAN SUPPLY COMPANY<br>KEENAN PIPE & SUPPLY, a Partnership |
| KEENAN PROPERTIES, INC. | KEENAN SUPPLY, INC.<br>KEENAN SUPPLY COMPANY |

32

| | |
|---|---|
| | KEENAN PIPE & SUPPLY, a Corporation<br>KEENAN PIPE & SUPPLY, a Partnership<br>COAST PIPE & SUPPLY CO |
| KEENE CORPORATION | THE EHRET MAGNESIA MANUFACTURING CO.<br>BALDWIN HILL COMPANY<br>BALDWIN EHRET HILL, INC.<br>KEENE BUILDING PRODUCTS CORPORATION<br>CROWN CORK & SEAL COMPANY, INC.<br>MUNDET CORK COMPANY |
| KELLY-MOORE PAINT<br>COMPANY, INC. | FRANK W. DUNNE COMPANY<br>DUNNE QUALITY PAINTS |
| KENLES ENGINEERS<br>AND CONSTRUCTORS, INC. | WOLDER ENGINEERS AND CONSTRUCTORS, INC.<br>WOLDER ENGINEERING CORPORATION<br>JACOBS ENGINEERING<br>ESICORP, INC.<br>EBASCO SERVICES INCORPORATED<br>ENSERCH CORPORATION<br>E & L ASSOCIATES<br>EHRHART & LESTER ASSOCIATES<br>RAYTHEON COMPANY |
| KICE INDUSTRIES, INC. | KICE METAL PRODUCTS COMPANY, INC. |
| KIDDE INDUSTRIES | GROVE NORTH AMERICA DIVISION<br>GROVE MANUFACTURING COMPANY<br>GROVE MANUFACTURING COMPANY,<br>  A DIVISION OF WALTER KIDDE AND COMPANY, INC.<br>GROVE MANUFACTURING COMPANY,<br>  A DIVISION OF KIDDE, INC.<br>GROVE MANUFACTURING COMPANY,<br>  A DIVISION OF KIDDE INDUSTRIES, INC. |
| KING MAXIT, INC. | KING STUCCO, INC. |
| THE KINGSFORD PRODUCTS<br>COMPANY | C.B. HOBBS CORPORATION |
| KNEZ BUILDING MATERIALS<br>& INSULATION | GRAY BUILDING MATERIALS, INC. |
| KOHLER CO. | KOHLER PLUMBING PRODUCTS |
| KORVETTES, INC. | |

33

KUBOTA CORPORATION

    KUBOTA, LTD.
    KUBOTA IRON & MACHINERY WORKS, LTD.

KVAERNER U.S., INC.

    KVAERNER E&C
    KVAERNER PULPING, INC.
    E. KEELER COMPANY
    TRAFALGAR HOUSE
    DAVY CORPORATION
    DAVY McKEE CORPORATION
    ARTHUR G. McKEE COMPANY
    POWER GAS CORPORATION
    DAVY BROTHERS LIMITED
    CONSTRUCTORS JOHN BROWN
    RICHARD COSTAIN LTD
    JOHN BROWN & COMPANY

L & W SUPPLY CORPORATION

    ROSE CITY BUILDING MATERIALS

L. D. REEDER CO.

    L. D. REEDER CO. OF LOS ANGELES
    L. D. REEDER CO. OF SAN FRANCISCO
    L. D. REEDER CO. OF SACRAMENTO

LEESON ELECTRIC CORPORATION

L.H. BUTCHER COMPANY

    CENTRAL SOLVENTS AND CHEMICAL COMPANY, INC.
    CHEMCENTRAL CORPORATION COMPANY, INC.
    HOOKER CHEMICAL CORPORATION (NY)
    OCCIDENTAL CHEMICAL CORPORATION
    UDYLITE CORPORATION (DE)
    UDYLITE, CALIFORNIA
    WILBEL, INC.
    WILBUR-ELLIS COMPANY

LA HABRA PRODUCTS, INC.

    LA HABRA STUCCO

LAKE ASBESTOS OF QUEBEC, LTD.

    LAC D'AMIANTE DU QUEBEC LTEE

LANTIS WEST CORPORATION

    COCHRAN WESTERN, INC.

LASALLE BRISTOL CORPORATION

    LASALLE-DEITCH CO., INC.

LAW ENGINEERING AND
  ENVIRONMENTAL SERVICES, INC.

    LAW CRANDALL, INC.

LASSLEY DEVELOPMENT COMPANY

    WESTERN HOMES, INC.

| | |
|---|---|
| LEAR-SIEGLER DIVERSIFIED HOLDINGS CORPORATION | LEAR-SIEGLER, INC.<br>WORLD BESTOS CO. |
| LENNOX INDUSTRIES, INC. | LENNOX FURNACE COMPANY |
| L.E.T. ENTERPRISES | NELSON-ADAMS COMPANY |
| LEVEL THREE COMMUNICATIONS, INC. | PETER KIEWIT SONS, INC. |
| LEVIN ENTERPRISES, INC. | LMC CORPORATION<br>LEVIN METALS CORPORATION<br>LEVIN MACHINERY & SALVAGE COMPANY, INC. |
| LIMBACH, INC. | LIMBACH COMPANY<br>WESTERN AIR & REFRIGERATION, INC. |
| THE LINCOLN ELECTRIC COMPANY | |
| LINCOLN MOTORS | |
| LONE STAR INDUSTRIES, INC. | RHODES-JAMIESON<br>LONE STAR CEMENT |
| LOCKHEED MARTIN TACTICAL SYSTEMS, INC. | LORAL CORPORATION<br>SPACE SYSTEMS\LORAL, INC.<br>PHILCO FORD CORPORATION<br>PHILCO<br>GOODYEAR AEROSPACE CORPORATION<br>FORD AEROSPACE CORPORATION<br>THE GOODYEAR TIRE & RUBBER COMPANY<br>AIRCRAFT BRAKING SYSTEMS CORP. |
| LORD CORPORATION | HUGHSON CHEMICALS |
| LOUIS-ALLIS COMPANY | |
| LUMBERJACK BUILDING MATERIALS | PAYLESS CASHWAYS, INC.<br>FURROW BUILDING MATERIALS, INC. |
| M.F. BOLSTER FLOORING COMPANY | THE BOLSTER COMPANY<br>C. F. BOLSTER COMPANY |
| M P S LIQUIDATING COMPANY | MANNING PACKING & SUPPLY CO., INC. |
| M. SLAYEN & ASSOCIATES, INC. | CALIFORNIA FABRICS & UPHOLSTERY |

| | |
|---|---|
| MACAULAY FOUNDRY, INC. | H.C. MACAULAY FOUNDRY COMPANY |
| MAERSK, INC. | MOLLER STEAMSHIP COMPANY |
| MALLINCKRODT GROUP, INC. | INTERNATIONAL MINERAL & CHEMICAL CORPORATION |
| MALOTT & PETERSON-GRUNDY | PETERSON FLOORING |
| MALTBY ELECTRIC SUPPLY COMPANY, INC. | MALTBY ELECTRIC SUPPLY COMPANY |
| MARATHON ELECTRIC MANUFACTURING COMPANY | |
| MAREMONT CORPORATION | |
| MARJAY, INC. | THERMO-PAK BOILERS, INC. |
| MARK PAUL, INCORPORATED | SIMON HOME CENTER |
| MARSHCO, INC. | MARSHCO AUTO PARTS, INC.<br>NATIONAL AUTO PARTS<br>MOTOR PARTS CO. |
| MARTIN BROTHERS/MARCOWALL, INC. | MARTIN BROTHERS PLASTERING |
| MATSUSHITA ELECTRIC CORPORATION OF AMERICA | MATSUSHITA SERVICES COMPANY<br>AMERICAN MATSUSHITA ELECTRONICS CORPORATION<br>MATSUSHITA HOME APPLIANCE CORPORATION<br>OF AMERICA<br>MATSUSHITA ELECTRIC MOTOR CORPORATION<br>OF AMERICA<br>MATSUSHITA ELECTRIC, INC., LTD.<br>MATSUSHITA LOGISTICS COMPANY<br>MATSUSHITA HOME AND COMMERCIAL<br>PRODUCTS COMPANY<br>PANASONIC COMPANY<br>PANASONIC COMMUNICATIONS & SYSTEMS COMPANY<br>PANASONIC COMPANY WEST<br>PANASONIC WEST, INC.<br>PANASONIC CONSUMER ELECTRONICS COMPANY<br>PANASONIC SERVICES COMPANY<br>PANASONIC BROADCAST & DIGITALSYSTEMS COMPANY<br>PANASONIC COPIER COMPANY<br>PANASONIC DOCUMENT SYSTEMS COMPANY<br>PANASONIC BROADCAST & TELEVISION |

SYSTEMS COMPANY
PANASONIC CORPORATION
PANASONIC AUTOMOTIVE ELECTRONICS COMPANY
PANASONIC FACTORY AUTOMATION COMPANY
PANASONIC INDUSTRIAL COMPANY
PANASONIC SERVICES COMPANY
PANASONIC COPIER COMPANY
PANASONIC COMPANY CENTRAL
PANASONIC DOCUMENT SYSTEMS COMPANY
PANASONIC FINANCE, INC.
PANASONIC CAPITAL CORP.
PANASONIC COMPANY CENTRAL
PANASONIC OFFICE PRODUCTS COMPANY
PANASONIC INFORMATION &
   COMMUNICATIONS COMPANY
PANASONIC HOME AND COMMERCIAL
   PRODUCTS COMPANY
PANASONIC TELECOMMUNICATION SYSTEMS COMPANY
PANASONIC VIDEO IMAGING SYSTEMS COMPANY
PANASONIC MEDICAL & INDUSTRIAL VIDEO COMPANY
PANASONIC BROADCAST & DIGITAL
   SYSTEMS COMPANY
PANASONIC PERSONAL AND PROFESSIONAL
   PRODUCTS COMPANY
PANASONIC CUSTOMER CALL CENTER COMPANY
PANASONIC LOGISTICS COMPANY OF AMERICA
MATSUSHITA COOKING APPLIANCE COMPANY
MATSUSHITA TELEVISION COMPANY
MATSUSHITA COMPUTER COMPANY
PANASONIC BROADCAST SYSTEMS COMPANY
QUASAR ELECTRONICS CORPORATION
QUASAR INTERNATIONAL CORPORATION
QUASAR COMPANY
NATIONAL COMPANY, INC.
NEWCRAFT, INC.
PANAFAX CORPORATION

MAYTAG CORPORATION            THE HOOVER COMPANY
                              CHICAGO PACIFIC CORPORATION
                              NORGE CLEANERS

MAZDA NORTH AMERICAN OPERATIONS MAZDA MOTOR OF AMERICA, INC.

M.B.L., INC.                  M.B.L. SUPPLY

McGEE CONSULTING ASSOCIATES, INC.  McGEE CONSTRUCTION

37

| | |
|---|---|
| McGRAW-EDISON COMPANY | McGRAW-ELECTRIC COMPANY<br>COOPER INDUSTRIES, INC.<br>LANDERS, FRARY & CLARK<br>TOASTMASTER, INC.<br>TOASTMASTER PRODUCTS DIVISION,<br> McGRAW ELECTRIC CO.<br>TURBODYNE-EDISON POWER CORP.<br>WORTHINGTON CORPORATION |
| MCNEIL & NRM, INC., CALIFORNIA | MCNEIL & NRM, INC.<br>NRM CORPORATION<br>MCNEIL CORPORATION (OHIO) |
| MERCK & CO., INC. | MERCK CHEMICAL DIVISION |
| MERITOR AUTOMOTIVE, INC. | MERITOR AUTOMOTIVE CORP.<br>MERITOR AUTOMOTIVE GROUP<br>MERITOR SUSPENSION SYSTEMS COMPANY, INC.<br>ROCKWELL-STANDARD CORPORATION<br>ROCKWELL HEAVY VEHICLE SYSTEMS<br>MERITOR HEAVY VEHICLE SYSTEMS, INC.<br>MERITOR SUSPENSION SYSTEMS COMPANY, INC.<br>ARVINMERITOR, INC.<br>ARVIN INDUSTRIES, INC. |
| METALCLAD INSULATION<br>CORPORATION | NORTHERN CALIFORNIA INSULATION, INC.<br>SWEETSER ENTERPRISES |
| METAL WARE CORPORATION | NESCO |
| MEYER CORPORATION | FARBERWARE, INC.<br>FARBERWARE DIV., LCA CO. |
| MEYER PLUMBING SUPPLY<br>COMPANY, INC. | MEYERS SUPPLIES |
| MILLENIUM CHEMICAL, INC. | SCM CORPORATION<br>GLIDDEN-DURKEE, DIVISION OF SCM CORPORATION<br>MACCO ADHESIVES GROUP<br>HSCM-20, INC. |
| MILLER ELECTRIC MANUFACTURING | |
| MILTON ROY COMPANY | HAYS REPUBLIC<br>WILLIAMS INSTRUMENT COMPANY |

| | |
|---|---|
| MIURA BOILER WEST, INC. | MULLER BOILERS |
| MODERN PLASTICS, INC. | CAST INDUSTRIAL PRODUCTS COMPANY<br>INDUSTRIAL AND FOUNDRY SUPPLY<br>WATERTON INDUSTRIAL PRODUCTS<br>PACIFIC GRAPHITE |
| MOHASCO CORPORATION | VOLKER & COMPANY<br>WILLIAM VOLKER & COMPANY |
| MONOLITH PORTLAND<br>CEMENT COMPANY | CBR CEMENT CORPORATION |
| MONTGOMARY WARD & COMPANY | |
| MOOG AUTOMOTIVE, INC. | WAGNER ELECTRIC CORPORATION |
| MORGAN BROTHERS PATIOS | MORGAN BROS. PATIOS |
| MORTON INTERNATIONAL, INC. | MORTON SALT DIVISION, MORTON<br>INTERNATIONAL, INC.<br>MORTON THIOKOL, INC.<br>THIOKOL CHEMICAL CORPORATION |
| MOTOR PARTS DISTRIBUTOR, INC. | MOTOR PARTS DISTRIBUTORS OF MODESTO, INC. |
| MURRAY PLUMBING & HEATING<br>CORPORATION | MURRAY COMPANY |
| N. V. MORAN PLUMBERS<br>SUPPLY, INC. | MORAN SUPPLY<br>PLUMBERS SUPPLY |
| NACCO MATERIALS HANDLING<br>GROUP, INC. | HYSTER COMPANY |
| SSW, INC. | NATIONAL DYNAMICS CORPORATION<br>NEBRASKA BOILER COMPANY |
| NATIONAL SEMICONDUCTOR<br>CORPORATION (MAINE), INC. | FAIRCHILD CAMERA & INSTRUMENT, INC.<br>FAIRCHILD SEMICONDUCTOR CORPORATION |
| NATIONAL REFRACTORIES and<br>MINERAL CORPORATION | KAISER REFRACTORIES<br>MEXICO REFRACTORIES |
| NEBRASKA BOILER COMPANY | NATIONAL DYNAMICS |

39

| | |
|---|---|
| NIBCO, INC | NORTHERN INDIANA BRASS COMPANY |
| NI WEST, INC. | NORRIS-I INDUSTRIES<br>NORRIS INDUSTRIES, INC.<br>NORRIS-NI INDUSTRIES<br>NORRIS-THERMADOR CORPORATION<br>NORRIS STAMPING & MANUFACTURING CO. |
| NISSAN NORTH AMERICA, INC. | NISSAN MOTOR CORPORATION IN U.S.A.<br>INFINITI MOTOR CORPORATION<br>DATSUN |
| NORTH AMERICAN REFRACTORIES<br>COMPANY | INTERNATIONAL PIPE AND CERAMICS CORPORATION |
| NORTH SAFETY EQUIPMENT | WELSH TEXTON<br>MORTON SAFETY |
| NORTHWEST ENGINEERING COMPANY | NORTHWEST CRANE, INC. |
| NRI INDUSTRIES, INC. | NATIONAL RUBBER CO. INC. |
| OAKFABCO, INC. | KEWANEE BOILER CO., INC.<br>AMERICAN STANDARD, INC. |
| O.K.I. SUPPLY CO. | BERING SALES, INC. |
| OGLEBAY NORTON | |
| THE OKONITE COMPANY, INC. | |
| OSCAR E. ERICKSON,<br>INCORPORATED | ASSOCIATED INSULATION OF CALIFORNIA<br>OSCAR E. ERICKSON COMPANY |
| OSRAM SYLVANIA INC. | GTE SYLVANIA INCORPORATED<br>GTE PRODUCTS CORPORATION<br>SPECO, INC.<br>SYLVANIA ELECTRIC PRODUCTS, INC.<br>UNION INSULATING COMPANY<br>WILBUR B. DRIVER COMPANY<br>PATHMAKER COMMUNICATIONS, INC.<br>SYLVANIA COMMERCIAL ELECTRONICS CORPORATION<br>COLUMBIA LIGHTING, INC.<br>CLARK CONTROL, INC.<br>UNISTRUT CORPORATION<br>GIBSON ELECTRIC, INC. |

|  |  |
|---|---|
|  | PHILCO CONSUMER ELECTRONICS CORPORATION |
|  | SYLVANIA SERVICE COMPANY, INC. |
|  | ZINSCO ELECTRICAL PRODUCTS |
|  | AMERICAN MINE TOOL, INC. |
|  | THE WALMET CORPORATION |
|  | ASHEVILLE PLASTIC SERVICES, INC. |
|  | UNISTRUT CORPORATION |
| OWL CONSTRUCTORS | OWL ENGINEERS |
|  | OWL CRANE AND RIGGING CO. |
|  | H.C. SMITH CONSTRUCTION CO. |
|  | HOLMES & NARVER, INC. |
|  | PAOLI CONSTRUCTION, INC. |
| P-G INDUSTRIES, INC. | THE PRYOR-GIGGEY CO. |
| PACIFIC COAST BUILDING PRODUCTS, INC., dba PACIFIC SUPPLY | PACIFIC SUPPLY COMPANY |
|  | PACIFIC COAST BUILDING PRODUCTS, INC. |
|  | PACIFIC COAST |
| PM-AG PRODUCTS INCORPORATED | PACIFIC MOLASSES COMPANY |
| PACCAR, INC. | PETERBILT TRUCK CENTER, INC. |
|  | PETERBILT MOTORS COMPANY |
|  | PETERBILT TRUCK COMPANY |
|  | KENWORTH TRUCK COMPANY |
| PACIFIC INDUSTRIES, INC. | WHEELABRATOR-FRYE, INC. |
| PARKER HANNIFIN CORPORATION | SACOMA-SIERRA, INC. |
|  | SACOMA MANUFACTURING COMPANY |
|  | E.I.S. AUTOMOTIVE CORPORATION |
| PASMINCO INCORPORATED | PACIFIC SMELTING FOUNDATION |
|  | PASCO ZINC CORPORATION |
| PAMECO CORPORATION | PAMECO-AIRE, INC. |
|  | MLX REFRIGERATION AND AIR CONDITIONING GROUP, INC. |
| PARAMOUNT INTERESTS, INC. | WARRIOR CONSTRUCTION, INC. |
|  | PARAMOUNT WARRIOR, INC. |
|  | PARAMOUNT PACIFIC (A DIVISION OF PARAMOUNR WARRIOR) |
|  | ZAPATA CONSTRUCTORS, INC. |

41

| | |
|---|---|
| PARKER-HANNIFIN CORPORATION | SACOMA-SIERRA, INC.<br>SACOMA MANUFACTURING COMPANY<br>E.I.S. AUTOMOTIVE CORPORATION |
| PARKSON PIPELINE MATERIALS | PIPELINE PRODUCTS, INC. |
| PARSONS ENERGY & CHEMICAL GROUP INC. | PARSONS PROCESS GROUP, INC.<br>RALPH M. PARSONS COMPANY<br>PARSONS S.I.P. INC.<br>S.I.P., INC. |
| PASMINCO INCORPORATED | PACIFIC SMELTING FOUNDATION<br>PACIFIC ZINC COMPANY |
| PAUL DEL GRANDE AUTO PARTS, INC. | PAUL DEL GRANDE AUTO PARTS SUPPLY |
| PERINI CORPORATION | PERINI LAND AND DEVELOPMENT COMPANY, INC. |
| PERINI LAND AND DEVELOPMENT COMPANY, INC. | PERINI CORPORATION |
| PETERSON LUMBER COMPANY | PETERSON BROTHERS SAWMILL |
| PETRO-CHEM DEVELOPMENT CO., INC. | AMERICAN PETRO-CHEM CO., INC. |
| PETRO-CHEMICAL INSULATION, INC. | PETROLEUM AND CHEMICAL INSULATION, INC.<br>PETRO-CHEM |
| PFIZER, INC. | SOUTHERN CALIFORNIA MINERALS COMPANY<br>C. K. WILLIAMS COMPANY<br>KENNEDY MINERALS COMPANY<br>DESERT MINERALS, INC.<br>CONTINENTAL MINERALS CORPORATION<br>GRANTHAM MINES<br>BLUE STAR MINES |
| PHELPS-DODGE CORPORATION | PHELPS-DODGE INDUSTRIES<br>PHILPS-DODGE WIRE & CABLE GROUP |
| PHILIPS ELECTRONICS NORTH AMERICA CORPORATION | NORELCO SERVICE, INC.<br>PHILIPS HOME PRODUCTS, INC.<br>NORTH AMERICAN PHILIPS CORPORATION |
| PHILIP CAREY CORPORATION | SMITH & KANZLER COMPANY |

PIERCE ENTERPRISES

FRANK D. SMITH COMPANY
LOS ANGELES LATHING
PIERCE LATHING CO.

PILKINGTON AEROSPACE, INC.

SWEDLOW PLASTICS COMPANY
PILKINGTON HOLDINGS, INC.
SWEDLOW, INC.

PIONEER GASKET

PITA REALTY LIMITED

EASTERN MAGNESIA TALC COMPANY

PITT-DES MOINES, INC.

PITTSBURGH-DES MOINES CORPORATION
PITTSBURGH-DES MOINES STEEL COMPANY
PITTSBURGH-DES MOINES COMPANY

PLANT INSULATION COMPANY

ASBESTOS COMPANY OF CALIFORNIA
PLANT ASBESTOS COMPANY

PNEUMO ABEX CORPORATION

ABEX CORPORATION
AMERICAN BRAKE SHOE COMPANY
EATON BRAKE SHOES
EATON MANUFACTURING CO.
AMERICAN BRAKE SHOE AND FOUNDRY COMPANY
AMERICAN BRAKEBLOK, DIVISION OF AMERICAN
  BRAKE SHOE AND FOUNDRY CO.
AMERICAN BRAKEBLOK CORPORATION
AMERICAN BRAKE MATERIALS CORPORATION
AMERICAN BRAKE SHOE AND FOUNDRY (DE)

PORTER WARNER INDUSTRIES, INC.

INDUSTRIAL AND FOUNDRY SUPPLY
WATERTON INDUSTRIAL PRODUCTS
PACIFIC GRAPHITE

PLUMBING AND INDUSTRIAL
  SUPPLY COMPANY, INC.

WHITTIER PIPE & SUPPLY COMPANY

PPG INDUSTRIES, INC.

PITTSBURGH PLATE GLASS COMPANY

POWERS PROCESS CONTROLS

POWERS REGULATOR COMPANY

PRAXAIR

WHITMORE OXYGEN COMPANY

PRICE PFISTER, INC.

PRICE PFISTER, NI INDUSTRIES, INC.

PROKO INDUSTRIES, INC.

43

| | |
|---|---|
| PULLMAN STANDARD, INC. | PULLMAN, INC.<br>PULLMAN TRANSPORTATION COMPANY<br>DRESSER INDUSTRIES, INC.<br>M. W. KELLOGG<br>STUDEBAKER-WORTHINGTON |
| P.W. STEPHENS ENVIRONMENTAL<br>ASBESTOS ABATEMENT CO. | P.W. STEPHENS, INC. |
| QUAD C CORPORATION | FIREPROOFING, INC.<br>STRUCTURAL FIREPROOFING, INC.<br>YOHANAN CORPORATION |
| QUIGLEY COMPANY, INC. | QUIGLEY, INC.<br>QUIGLEY CORPORATION |
| QUINTEC INDUSTRIES, INC. | WESTERN FIBERGLAS SUPPLY COMPANY<br>MULDOON INSULATION |
| R.F. MACDONALD CO. | CALIFORNIA BOILER |
| R. G. SMITHSON, INC. | WINCHESTER PLUMBING CO. |
| R. T. VANDERBILT COMPANY | WESTERN TALC COMPANY<br>INTERNATIONAL TALC COMPANY |
| RAPID-AMERICAN CORP. | THE PHILIP CAREY MANUFACTURING COMPANY<br>PANACON CORPORATION<br>PHILIP CAREY CORPORATION<br>CAREY CANADA, INC.<br>CELOTEX CORPORATION<br>RAPID AMERICAN CORP. (DE)<br>RAPID AMERICAN CORP. (OH)<br>RAPID ELECTROTYPE CO.<br>FAMILY BARGAIN CENTERS, INC.<br>GLEN ALDEN COAL CO.<br>GLEN ALDEN CORPORATION<br>KENTON CORPORATION<br>McCORY CORPORATION<br>McGREGOR CORPORATION<br>WORLD-WIDE FINANCIAL PARTNERSHIP, L.P.<br>RIKLIS FAMILY CORPORATION<br>EII HOLDINGS, INC. |
| THE RAYMOND CORPORATION | RAYMOND HANDLING CONCEPTS CORP. |

44

| | |
|---|---|
| RAYMOND INTERIOR SYSTEMS - NORTH | JAMES L. WHITTAKER<br>WHITTAKER PLASTERING<br>JAMES WHITTAKER, INC.<br>GEORGE M. RAYMOND CO. - NORTH<br>JAMES L. WHITTAKER ACOUSTICAL |
| RAYTHEON COMPANY | HUGHES AIRCRAFT COMPANY<br>RAYTHEON SYSTEMS - SOUTH CAROLINA<br>HUGHES AIRCRAFT - SOUTH CAROLINA<br>KENLES ENGINEERS AND CONSTRUCTORS, INC.<br>WOLDER ENGINEERS AND CONSTRUCTORS, INC.<br>WOLDER ENGINEERING CORPORATION<br>JACOBS ENGINEERING<br>ESICORP, INC.<br>ENSERCH CORPORATION<br>EBASCO SERVICES INCORPORATED<br>E & L ASSOCIATES<br>EHRHART & LESTER ASSOCIATES |
| RAYTHEON CONSTRUCTORS INC. | CATALYTIC, INC.<br>UE&C -- CATALYTIC, INC.<br>STERNS-ROGER WORLD CORPORATION |
| REDWOOD PLUMBING CO., INC. | REDWOOD GENERAL & MECHANICAL |
| REGAL-BELOIT CORPORATION | |
| RELIANCE ELECTRIC MOTORS | MASTER ELECTRIC |
| RICH PLUMBING SUPPLY | GENERAL PLUMBING SUPPLY COMPANY |
| RIKEN-AMERICA, INC. | J.N. CEAZAN COMPANY |
| THE RIVAL COMPANY | RIVAL MANUFACTURING COMPANY |
| RIVERDALE HOME IMPROVEMENT CENTER | RIVERDALE LUMBER COMPANY |
| ROBERTSON-CECO CORPORATION | H. H. ROBERTSON CO. |
| ROCKWELL AUTOMATION, INC. | |
| ROHR, INC. | ROHR INDUSTRIES, INC. |

45

| | |
|---|---|
| ROLLS-ROYCE MOTOR CARS, INC. | ROLLS-ROYCE MOTORS, INC. |
| ROME SUBSIDIARY, INC. | PIPER AIRCRAFT CORP. |
| ROTHSCHILD & RAFFIN, INC. | ROTHSCHILD, RAFFIN & WEIRICK |
| ROSENDAHL CORPORATION | ROSENDAHL INDUSTRIAL MAINTENANCE CO., INC.<br>HUMISTON-ROSENDAHL, INC. |
| RPM CORPORATION | |
| RUGBY BUILDING PRODUCTS, INC. | RUGBY USA, INC.<br>STANLINE PRODUCTS, INC.<br>STANLINE<br>ARMLINE CO. |
| SABERHAGEN HOLDINGS, INC. | THE BROWER COMPANY |
| SACHSE ENGINEERING ASSOCIATES, INC. | CONTINENTAL MARINE SERVICES, INC. |
| SAGINAW MACHINE SYSTEMS, INC. | ADVANCED TECHNOLOGIES, A UNIT OF SMS GROUP, INC.<br>ATE |
| SALOMON SMITH BARNEY HOLDINGS, INC. | ENGELHARD MINERALS & CHEMICALS CORPORATION<br>PHIBRO CORPORATION<br>PHIBRO-SALOMON, INC.<br>SALOMON, INC. |
| SALTIRE INDUSTRIAL, INC. | SCOVILL, INC.<br>SCOVILL MANUFACTURING CO.<br>DOMINION ELECTRIC |
| SAN FRANCISCO GRAVEL COMPANY, INC. | SAN FRANCISCO SAND & GRAVEL |
| SANTA FE-POMEROY, INC. | J. H. POMEROY & COMPANY, INC.<br>SANTA FE INTERNATIONAL |
| SANTA FE BRAUN, INC. | J. H. POMEROY & COMPANY, INC.<br>SANTA FE DRILLING<br>SANTA FE-POMEROY<br>SANTA FE INTERNATIONAL<br>SFIC HOLDING CORP.<br>KILPATRICK & CO.<br>BRAUN AIR CONDITIONING CORPORATION<br>DEL Q SANTA FE BRAUN, INC. |

| | |
|---|---|
| SARGENT CONTROLS & AEROSPACE | SARGENT INDUSTRIES, INC.<br>KAHR BEARING CORPORATION<br>AETNA STEEL PRODUCTS CORPORATION<br>ARNOT MARINE CORPORATION |
| SCANDURA, INC. | THE SCANDINAVIA BELTING COMPANY<br>SCANDURA, INCORPORATED |
| SCHICK NORTH AMERICA, INC. | SCHICK INCORPORATED<br>SCHICK ELECTRIC, INC.<br>EVERSHARP, INC. |
| SCHICK INCORPORATED | SCHICK NORTH AMERICA, INC.<br>SCHICK ELECTRIC, INC.<br>EVERSHARP, INC. |
| SCHNEIDER ELECTRIC | SQUARE D COMPANY |
| SCHOU-GALLIS, INC. | SCHOU-GALLIS COMPANY, LTD. |
| SCOTT CO. OF CALIFORNIA | SCOTT-BROADWAY CONTRACTORS, INC.<br>BROADWAY PLUMBING CO., INC. |
| SCOTT'S FERTILIZER | |
| SEARS, ROEBUCK & CO. | ORCHARD SUPPLY HARDWARE CORPORATION |
| SGL CARBON CORPORATION | GREAT LAKES CARBON CORPORATION<br>SIGRI GREAT LAKES CARBON CORPORATION<br>DICALITE HOLDING, INC.<br>GREFCO, INC. |
| SHARON LAND COMPANY<br>LIMITED PARTNERSHIP | SAND HILL BUILDING |
| SHASTA AUTOMOTIVE PARTS<br>WAREHOUSE | ROTHER AUTO PARTS, INC. |
| SHAWMUT NATIONAL MORTGAGE<br>FUNDING CORPORATION | UNITED STATES TRUST CO. OF NEW YORK |
| SHERWIN-WILLIAMS COMPANY | SPRAYON PRODUCTS INDUSTRIAL SUPPLY |
| SHORELINE CORPORATION | UNITED BOILER AND ENGINEERING COMPANY |

47

| | |
|---|---|
| SILVER LINE PRODUCTS, INC. | SILVER LINE BRAKE CORP. |
| SIMPSON INDUSTRIES, INC. | ALLIED ENGINEERING & CONSULTING |
| SIMPSON REDWOOD CO. | DOVER LUMBER CO. |
| SINGER SAFETY COMPANY | SINGER SAFETY PRODUCTS, INC. |
| SIX STATES DISTRIBUTORS, INC. | SIX DISTRIBUTORS OF OGDEN, INC. |
| SMARDAN-HATCHER COMPANY | SMARDAN SUPPLY COMPANY<br>SMARDAN PIPE & SUPPLY |
| SMITH PIPE & SUPPLY, INC. | SMITH-BENNETT<br>INDIO PIPE & SUPPLY, INC. |
| SPERRY RAND CORP. | REMINGTON |
| SPX CORPORATION | THE PISTON RING COMPANY<br>SEALED POWER CORPORATION<br>WAUKESHA FOUNDRY<br>WAULESHA PUMPS<br>UDI<br>MARLEY COOLING TOWER<br>MARLEY COOLING TECHNOLOGIES<br>WEIL-MCLAIN<br>LIGHTNIN<br>SPX VALVES & CONTROLS<br>DEZURIK<br>AWWA<br>FEBCO<br>POLYJET<br>COPES-VULCAN<br>RAVEN<br>DANIEL VALVE<br>MUELLER STEAM SPECIALTY<br>ACUTEX FLUID POWER<br>FILTRAN<br>F.P. SMITH CORPORATION<br>GENERAL SIGNAL CORPORATION<br>BEST POWER<br>DEZURIK<br>DIELECTRIC<br>EDWARDS SYSTEMS TECHNOLOGY<br>GFI GENFARE<br>GS ELECTRIC |

GS NETWORKS
KAYEX
REVCO
LINDBERG
WAUKESHA ELECTRIC
UNITED DOMINION INDUSTRIES
MARLEY ENGINEERED PRODUCTS
MARLEY PUMP
DANIEL VALVE COMPANY
AURORA PUMPS
EDWARDS COMPANY
KINNEY VACUUM COMPANY
B-F-I
BUILDERS IRON FOUNDRY
VULCAN SOOT BLOWER COMPANY
PROPORTIONEERS PUMPS
NEW YORK AIR BRAKE COMPANY
MARSH INSTRUMENT
THE COPES COMPANY
LINGBERG BLUE
DEZURIK NOZZLE SHOWER COMPANY
CEILCOTE
BEAR AUTOMOTIVE SERVICE
EQUIPMENT COMPANY
AUTOMOTIVE DIAGNOSTICS
ALAN TEST PRODUCTS

| | |
|---|---|
| SOCO-LYNCH CORPORATION | WESTERN CHEMICAL & MANUFACTURING COMPANY |
| SONY ELECTRONICS, INC. | SONY CORPORATION OF AMERICA |
| SOUTHEASTERN CRANE LIQUIDATION, INC. | MANITOWAC |
| SOUTHWESTERN PORTLAND CEMENT COMPANY | SOUTHWESTERN CEMENT ENT., INC. VICTOR CEMENT |
| SPRAYON RESEARCH CORPORATION | SPRAYED INSULATION INC. SPRAYON INSULATION & ACOUSTICS, INC. |
| S.T.M. AUTOMOTIVE | SAN PABLO AUTOMOTIVE SUPPLY S.P. AUTOMOTIVE APPIAN AUTO SUPPLY S&S DISTRIBUTORS |

49

| | |
|---|---|
| STAN FLOWERS | GATEWAY SHIPWRIGHTS |
| STANDARD MOTOR PRODUCTS, INC. | EIS BRAND BRAKES<br>CALI BLOCK |
| STANDARD PACIFIC CORPORATION | STANDARD PACIFIC, L.P. |
| STANDEX INTERNATIONAL<br>CORPORATION | TOASTWELL COMPANY |
| STANLEY ENTERPRISES, INC. | LEVINE'S AUTO SUPPLY CO. |
| STATE FARM GENERAL<br>INSURANCE COMPANY | STATE FARM MUTUAL AUTOMOBILE<br>INSURANCE COMPANY |
| STEAM SALES & SERVICE CO. | AMERICAN EXPORT ISBRANDTSEN<br>ISBRANDTSEN COMPANY<br>PROSPERITY, INC.<br>PANTEX PRESSING MACHINE, INC. |
| STERIS CORPORATION | AMSCO INTERNATIONAL, INC. |
| STERLING FLUID SYSTEMS (U.S.A.), INC. | LA BOUR PUMPS, A MEMBER OF THE<br>STERLING FLUID SYSTEMS GROUP<br>THE STERLING FLUID SYSTEMS GROUP |
| STEWART-WARNER SOUTH<br>WIND CORPORATION | STEWARD CO. |
| STOCKTON BOX | AMERICAN RIVER PINE |
| STRUCTURAL FIREPROOFING, INC. | FIREPROOFING, INC.<br>QUAD C CORPORATION |
| STRUCTURAL POLYMER, INC. | FERRO CORPORATION<br>WESTERN BACKING CORP. |
| STRUCTURAL COATING, INC. | AMERICAN ENERGY PRODUCTS CORP.<br>SPRAYON RESEARCH CORP.<br>SPRAYED INSULATION, INC.<br>SPRAYON INSULATION AND ACOUSTICS, INC. |
| MODINE MANUFACTURING COMPANY | MODINE WESTERN, INC.<br>STUART RADIATOR CORE  MANUFACTURING CO., INC.<br>STUART-WESTERN, INC.<br>STUART RADIATOR SALES, INC. |

|  |  |
|---|---|
|  | STUART RADIATOR DISTRIBUTORS, INC.<br>WESTERN BRAKE & AUTOMOTIVE SALES, INC.<br>WESTERN BRAKE INCORPORATED<br>WESTERN BRAKE INDUSTRIES, INC. |
| STUART C. IRBY CO. |  |
| STURLA, INC., MEDALLION<br>CARPETS DIVISION | BARWICK-PACIFIC CARPET COMPANY |
| SUNBEAM CORPORATION | NORTHERN ELECTRIC COMPANY<br>SUNBEAM HOLDINGS, INC.<br>SUNBEAM APPLIANCE SERVICE COMPANY<br>OSTER CORPORATION |
| SUNRISE MINIATURE GOLF, INC. | INDIO COOLING & HEATING SUPPLY |
| SUPERIOR AIR PARTS, INC. | SUPERIOR AIR PARTS, INC., DBA SUPERIOR<br>    TURBINE DIVISION<br>OAK VALLEY RANCH<br>SUPERIOR DISTRIBUTION<br>C.B. DEDMON, INC. |
| SWECO, INC. | SOUTHWESTERN ENGINEERING CO. |
| SYAR INDUSTRIES, INC. | VALLEJO BUILDING MATERIALS |
| SYD CARPENTER MARINE<br>CONTRACTOR, INC. | SYD CARPENTER COMPANY |
| SYNERGISM, INC. | CUPERTINO ELECTRIC, INC. |
| SYNTEX (U.S.A.) INC. | SYNTEX CORPORATION |
| T & H BUILDING SUPPLY | PALO ALTO BUILDING SUPPLY, INC.<br>PALO ALTO MATERIALS |
| TAYLOR PLUMBING SUPPLY COMPANY | GLOBE PLUMBING SUPPLY CO. |
| TAYLORED INDUSTRIES, INC. | TAYLORED INSTRUMENTS |
| TARKETT, INC. | GAF CORPORATION - FLOORING DIVISION |
| TELEDYNE, INC. | RYAN AERONAUTICAL CO. |

51

| | |
|---|---|
| TENNECO INC. | TENNECO CORPORATION |
| | TENNESSEE GAS TRANSMISSION CO. |
| | TENNECO OIL CO. |
| | TENNECO RESINS |
| | TENNECO CHEMICAL |
| | DIAMOND PULP AND PAPER |
| | |
| *TENNECO AUTOMOTIVE, INC. | WALKER MANUFACTURING COMPANY |
| | MONROE AUTO EQUIPMENT COMPANY |
| | NORTH AMERICAN ORIGINAL EQUIPMENT OPERATIONS, |
| |   A DIVISION OF TENNECO AUTOMOTIVE, INC. |
| | NORTH AMERICAN AFTERMARKET OPERATIONS, |
| |   A DIVISION OF TENNECO AUTOMOTIVE, INC. |
| | |
| TENNECO PACKAGING INC. | A & E PLASTICS |
| | |
| TEREX CORPORATION | P&H MACHINE |
| | AMCA-KOEHRING COMPANY |
| | KOEHRING CRANES, INC. |
| | KOEHRING CRANES AND EXCAVATORS, INC. |
| | KOEHRING COMPANY |
| | TEREX CRANES - WAVBERLY OPERATIONS |
| | BUCYRUS CONSTRUCTION PRODUCTS, INC. |
| | UNIT RIG CANADA LTD. |
| | M&M ENTERPRISES OF BARAGA, INC. |
| | NEW TEREX HOLDING CORP. |
| | PPM CRANES, INC. |
| | TEREX AERIALS, INC. |
| | TEREX ATLANTICO, INC. |
| | TEREX BARAGA PRODUCTS, INC. |
| | TEREX CRANES, INC. |
| | TEREX CREDIT CORP. |
| | TEREX INTERNATIONAL EXPORTS, INC. |
| | TEREX MATERIAL HANDLING CORP. |
| | TEREX MINING EQUIPMENT, INC. |
| | TEREX-TELELECT, INC. |
| | TEREX WEST COAST, INC. |
| | TEREX OF WESTERN MICHIGAN, INC. |
| | TOWER CRANES, INC. |
| | |
| TFI BUILDING MATERIALS, INC. | SAN DIEGO PIPE & SUPPLY CO., INC. |
| | TFI MATERIALS SUPPLY, INC. |
| | TFI BUILDING MATERIALS, INC. - SOUTH |
| | TFI BUILDING MATERIALS, INC. - NORTH |
| | SUNLIGHT ELECTRIC SUPPLY CO., INC. - SOUTH |
| | IMPERIAL VALLEY BUILDING SUPPLY CO., INC. |

|  | APPLIANCE DISTRIBUTORS INCORPORATED |
|---|---|
|  | TFI BUILDING MATERIALS WATERWORK, INC. |
|  | MORRELL'S CORPORATION |
|  | COAST ELECTRICAL WHOLESALE SUPPLY, INC. |
|  | ALLIED PIPE & SUPPLY, INC. |
|  | PLANTE PIPE & SEAL COMPANY, INC. |
|  | A-C SUPPLY, INC. |
|  | WEST PIPE AND SUPPLY CO., INC. |
|  | GARDEN GROVE PIPE & SUPPLY |
| THERMA CORPORATION | THERMA-TRANE |
|  | THERMA-TRANE AIR CONDITIONING COMPANY OF SAN JOSE, INC. |
| THERMAFIBER, LLC | AMERICAN ROCK WOOL CORP. |
|  | COAST INSULATING CORPORATION |
|  | COAST INSULATING PRODUCTS |
| THERMO BLACK CLAWSON | BLACK CLAUSEN |
| THOMAS DEE ENGINEERING CO., INC. | DEE ENGINEERING COMPANY |
| THURMAN INDUSTRIES, INC. | PAY & PAK |
| TISHMAN REALTY & CONSTRUCTION | STEVELAND, INC. |
| TOASTMASTER, INC. | TOASTMASTER PRODUCTS DIVISION, McGRAW ELECTRIC CO. |
|  | McGRAW-EDISON COMPANY |
|  | McGRAW-ELECTRIC COMPANY |
|  | COOPER INDUSTRIES, INC. |
| TOM RUSSELL PAINTING | ECKELMAN PAINTING & DRYWALL, INC. |
| TURBODYNE ELECTRIC POWER CORPORATION | TURBODYNE-EDISON POWER CORP. |
| U.C. REALTY CORPORATION | MHC HOLDINGS AND LAND CORPORATION |
|  | HOMECRAFTERS CENTERS, INC. |
|  | MOORE-HANDLEY, INC. |
| ULTRASYSTEMS CONSTRUCTION CO., INC. | OFFCO CONSTRUCTION CO., INC. |
|  | WESTERN PETRO-CHEM. SERVICES, INC. |

| | |
|---|---|
| UNION CARBIDE CORPORATION | UNION CARBIDE CHEMICALS AND PLASTICS COMPANY, INC.<br>UNION CARBIDE AND CARBON PRODUCTS<br>LINDE AIR PRODUCTS COMPANY |
| UNIROYAL FIBER & TEXTILE | |
| USX CORPORATION | UNITED STATES STEEL<br>TIGER BRAND WIRE & CABLE<br>AMERICAN STEEL AND WIRE |
| DIVISION OF UNIROYAL INC. | |
| UNITED GRINDING TECHNOLOGIES, INC. | BLOHM & VOSS |
| UNITED DOMINION | WEIL MCCLAIN |
| UNITED REFRIGERATION, INC. | NATIONAL REFRIGERANTS, INC.<br>THERMAL PRODUCTS, INC. |
| U.S. INDUSTRIAL GLOVE COMPANY | ARATEX SERVICES, INC. |
| UNITED TRACTOR, CO. | KALAMAZOO, INC. |
| UNIVERSITY MECHANICAL & ENGINEERING CONTRACTORS, INC. | JWP WEST<br>E.H. MORRIL COMPANY |
| THE UTILITY SUPPLY GROUP, INC. | PARKSON PIPELINE MATERIALS<br>PARKSON, INC. |
| VALLEN SAFETY SUPPLY COMPANY | VALLEN CORPORATION<br>ENCON |
| VAN ARSDALE-HARRIS LUMBER COMPANY | VAN ARSDALE-HARRIS COMPANY<br>VANARCO |
| VANARCO | VAN ARSDALE-HARRIS COMPANY<br>VAN ARSDALE-HARRIS LUMBER COMPANY |
| VENTFABRICS, INC. | VENTFABRICS ACQUISITION, INC. |
| VENTON PLASTERING | VENTON PLASTERING, INC. |

54

| | |
|---|---|
| VIACOM, INC. | CBS CORPORATION<br>WESTINGHOUSE ELECTRIC CORPORATION<br>WESTINGHOUSE ELECTRIC AND<br>MANUFACTURING COMPANY<br>KPIX TELEVISION STATION |
| VIAD CORP. | ARMOUR AND COMPANY<br>ARMOUR & CO.<br>ARMOUR & COMPANY<br>THE GREYHOUND CORPORATION<br>G. ARMOUR ARIZONA COMPANY<br>ARIZONA DIAL<br>III CORPORATION<br>BALDWIN LOCOMOTIVES<br>BALDWIN LOCOMOTIVE WORKS<br>LIMA-HAMILTON CORPORATION<br>LIMA LOCOMOTIVE WORKS<br>BALDWIN-LIMA-HAMILTON CORPORATION<br>BALDWIN-LESSING-HAMILTON<br>THE MIDVALE COMPANY<br>THE DIAL CORPORATION<br>THE NEW DIAL CORP. |
| VISKASE SALES CORPORATION | MOUNTAIN STATES INSULATION CORPORATION |
| VOITH FABRIC CO. | APPLETON MILLS<br>J M VOITH GMBH<br>LINDSAY WIRE, INC. |
| VON HOUSEN AUTO PARTS | VON HOUSEN MOTORS, INC.<br>GRINZEWITSCH ENTERPRIZES, INC.<br>GRINZEWITSCH ENTERPRIZES, INC. |
| THE W. W. HENRY COMPANY | HENRY ADHESIVE |
| WALDRON, DUFFY, INC. | WALDRON, DUFFY & SMITH, INC. |
| WARREN PUMPS, INC. | |
| WAYNE/SCOTT FETZER COMPANY | WAYNE HOME EQUIPMENT, DIVISION<br>WAYNE COMBUSTION SYSTEM |
| WEBCO, INC. | WESTERN BOILER CO. |

| | |
|---|---|
| WESTBURNE SUPPLY, INC. | P. E. O'HAIR & CO.<br>AIR COLD SUPPLY, INC.<br>OAKLAND PLUMBING SUPPLY |
| WARNER-LAMBERT COMPANY | FENCHURCH, INC.<br>SCHICK INCORPORATED<br>SCHICK ELECTRIC, INC. |
| WEAVEXX, INC. | LOCKPORT DRYER FELTS<br>INDUSTRIAL HOLDINGS CORPORATION<br>(CARBORUNDUM INTERESTS) |
| WEAVEXX CORPORATION | HUYCK-FORMEX<br>HUYCK FORMING FABRICS |
| THE WELDING WAREHOUSE | PACIFIC WELDING |
| WESTERN BOILER CO. | WEBCO, INC. |
| WESTERN BUILDING MATERIAL CORPORATION | SCHARPFS<br>TWIN OAKS |
| WESTERN BUILDING PRODUCTS | G. A. R. TANK CO.<br>WESTERN ASBESTOS CO. |
| WESTINGHOUSE ELECTRIC CORPORATION | |
| WEYERHAEUSER COMPANY | WEYERHAEUSER COMPANY OF TACOMA WA |
| WHITE CONSOLIDATED INDUSTRIES, INC. | DITO DEAN FOOD PREP.<br>FRIGIDAIRE<br>KELVINATOR<br>JERGUSON GAGE AND VALVE<br>ECONOMY PUMP<br>STRONG, CARLISLE & HAMMOND<br>SARCO<br>MARSH VALVE<br>BLAW-KNOX<br>COPE-VULCAN<br>THE COPE COMPANY<br>VULCAN SOOT BLOWER COMPANY<br>SCOTT & WILLIAMS<br>SPECIALTY VALVE AND CONTROL DIVISION<br>AMERICOLD COMPRESSOR CORPORATION<br>LOREN DRYER COMPANY |

56

| | |
|---|---|
| WHITE MOTOR COMPANY | ALCO PRODUCTS, INC.<br>STUDEBAKER-WORTHINGTON CORP. |
| WILLARD MARINE DECKING CO. | J & H MARINE & INDUSTRIAL<br>  ENGINEERING COMPANY<br>LORELITE |
| THE WILLIAM LYON COMPANY | PRESLEY OF SOUTHERN CALIFORNIA |
| WISMER & BECKER CONTRACTING<br>  ENGINEERS | WISMER & BECKER, INC.<br>ATK CONSTRUCTION, LTD. |
| WORKSAFE INDUSTRIES, INC. | EASTCO INDUSTRIAL SAFETY CORP<br>CHARKATE WORK SAFE MANUFACTURING CO. |
| YORK HEATING AND AIR<br>  CONDITIONING | LILLARD CO. |
| YORK INTERNATIONAL | BORG-WARNER AIR CONDITIONING, INC. |
| YRUETA DRYWALL &<br>  PAINTING COMPANY | YRUETA-BASCO COMPANY<br>YRUETA COMPANY<br>YRUETA BROS. CO.<br>YRUETA BROS. ACCOUSTICAL<br>CARLOS YRUETA<br>FRED YRUETA<br>HORACIO YRUETA |
| YRUETA-BASCO COMPANY | YRUETA DRYWALL & PAINTING COMPANY<br>YRUETA COMPANY<br>YRUETA BROS. CO.<br>YRUETA BROS. ACCOUSTICAL<br>CARLOS YRUETA<br>FRED YRUETA<br>HORACIO YRUETA |
| ZURN INDUSTRIES, INC. | ZURN INDUSTRIES, INC., ENERGY DIVISION<br>ERIE CITY IRON WORKS<br>ERIE CITY BOILERS |

12.    At all times herein mentioned, defendants, their alternate entities, and each of them, were and are engaged in the business of researching, manufacturing, fabricating, designing, modifying, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling,

inspecting, servicing, installing, contracting for installation of, repairing, marketing, warranting, rebranding, manufacturing for others, packaging and advertising a certain product, namely asbestos and other products containing asbestos.

13.    At all times herein mentioned, defendants, their alternate entities and each of them, singularly and jointly, negligently and carelessly researched, manufactured, fabricated, designed, modified, tested or failed to test, abated or failed to abate, warned or failed to warn of the health hazards, labeled, assembled, distributed, leased, bought, offered for sale, supplied, sold, inspected, serviced, installed, contracted for installation of, repaired, marketed, warranted, rebranded, manufactured for others, packaged and advertised, a certain product, namely asbestos, and other products containing asbestos, in that said products caused personal injuries to users, consumers, workers, bystanders and others, including the plaintiff herein, (hereinafter collectively called "exposed persons"), while being used in a manner that was reasonably foreseeable, thereby rendering said products unsafe and dangerous for use by exposed persons.

14.    Defendants, their alternate entities, and each of them, had a duty to exercise due care in the pursuance of the activities mentioned above and defendants, and each of them, breached said duty of due care.

15.    Defendants PNEUMO ABEX CORPORATION; HONEYWELL, INC. (successor-in-interest to ALLIEDSIGNAL, INC.); AUTO SPECIALTIES MANUFACTURING COMPANY; BRASSBESTOS BRAKE LINING COMPANY; BRIDGESTONE/FIRESTONE, INC.;  BORG

WARNER CORPORATION; THE BUDD COMPANY; CARLISLE CORPORATION;
DAIMLERCHRYSLER CORPORATION; DANA CORPORATION; FORD MOTOR COMPANY;
GATKE CORPORATION; GENERAL MOTORS CORPORATION; H. KRASNE
MANUFACTURING COMPANY; HALDEN BRAKE PRODUCTS CORPORATION (also known
as Halden Group and successor in interest to SAB Automotive; LEAR-SIEGLER DIVERSIFIED
HOLDINGS CORPORATION; MAREMONT CORPORATION; MOOG AUTOMOTIVE, INC.;
ROHM AND HAAS CO.; (formerly Morton International, Inc.; PARKER-HANNIFIN
CORPORATION; RITESET MANUFACTURING COMPANY; SCANDURA, INC.; and
STANDARD MOTOR PRODUCTS, INC. (E.I.S. BRAND BRAKES); produced a substantial share
of the market for asbestos-containing friction brake products, which products were defective as
alleged herein, during the time in question.  Brake products produced by each of said defendants
were fungible, in that they were interchangeable with brake products produced by the other said
defendants.  Plaintiff's primary exposure to asbestos fibers from brake products came during
inspection and replacement of worn brake products, and the producers of the brake products that
caused plaintiff's injuries cannot be identified, through no fault of plaintiff.

16.     The aforementioned asbestos-containing brake products were toxic and carcinogenic
and were used in conjunction with one another, all resulting in cumulative injury and harm to the
plaintiff herein.  Plaintiff therefore alleges it is the burden of the defendants as listed in paragraph 12
above, their alternate entities, and each of them, to prove the asbestos and asbestos-containing

products manufactured, sold, supplied, applied or distributed by them were not the cause of plaintiff's injury in accordance with the holdings of <u>Sindell v. Abbott Laboratories</u> (1980) 26 Cal.3d 588; <u>Wheeler v. Raybestos-Manhattan</u> (1992) 8 Cal. App. 4th 1152 and <u>Pereira v. Dow Chemical Company, Inc.</u> (1982) 129 Cal. App. 3d 865.

17.    Defendants HONEYWELL, INC. (successor-in-interest to ALLIEDSIGNAL, INC.), BORG-WARNER AUTOMOTIVE, INC., DANA CORPORATION, and MOOG AUTOMOTIVE, INC. (formerly known as WAGNER ELECTRIC CORPORATION), produced a substantial share of the market for asbestos-containing friction clutch products, which products were defective as alleged herein, during the time in question.  Clutch products produced by each of said defendants were fungible, in that they were interchangeable with clutch products produced by the other said defendants.  Plaintiff's primary exposure to asbestos fibers from clutch products came during inspection and replacement of worn clutch products, and the producers of the clutch products that caused plaintiff's injuries cannot be identified through no fault of plaintiff.

18.    The aforementioned asbestos-containing clutch products were toxic and carcinogenic and were used in conjunction with one another, all resulting in cumulative injury and harm to the plaintiff herein.  Plaintiff therefore alleges it is the burden of the defendants as listed in paragraph 12 above, their alternate entities, and each of them, to prove the asbestos and asbestos-containing products manufactured, sold, supplied, applied or distributed by them were not the cause of plaintiff's injury in accordance with the holdings of <u>Sindell v. Abbott Laboratories</u> (1980) 26 Cal. 3d 588;

Wheeler v. Raybestos-Manhattan (1992) 8 Cal. App. 4th 1152 and Pereira v. Dow Chemical Company, Inc. (1982) 129 Cal. App. 3d 865.

19.    Defendants PNEUMO ABEX CORPORATION; HONEYWELL, INC. (successor-in-interest to ALLIEDSIGNAL, INC.); BORG-WARNER AUTOMOTIVE, INC.; CARLISLE CORPORATION; FORD MOTOR COMPANY; GENERAL MOTORS CORPORATION; BRIDGESTONE/FIRESTONE, INC.; MOOG AUTOMOTIVE, INC.; INTERNATIONAL TRUCK AND ENGINE CORPORATION (fka NAVISTAR INTERNATIONAL TRANSPORTATION CORPORATION); BOEING NORTH AMERICAN, INC., and MERITOR AUTOMOTIVE GROUP produced a substantial share of the market for asbestos-containing truck brake products, which products were defective as alleged herein, during the time in question. Truck brake products produced by each of said defendants were fungible, in that they were interchangeable with truck brake products produced by the other said defendants. Plaintiff's primary exposure to asbestos fibers from truck brake products came during inspection and replacement of worn truck brake products, and the producers of the truck brake products that caused plaintiff's injuries cannot be identified, through no fault of plaintiff.

20.    The aforementioned asbestos-containing truck brake products were toxic and carcinogenic and were used in conjunction with one another, all resulting in cumulative injury and harm to the plaintiff herein. Plaintiff therefore alleges it is the burden of the defendants listed in paragraph 5 herein, their alternate entities, and each of them, to prove the asbestos and asbestos-

61

containing products manufactured, sold, supplied, applied or distributed by them were not the cause

of plaintiff's injury in accordance with the holdings of <u>Sindell v. Abbott Laboratories</u> (1980) 26

Cal.3d 588; <u>Wheeler v. Raybestos-Manhattan</u> (1992) 8 Cal. App. 4th 1152 and <u>Pereira v. Dow</u>

<u>Chemical Company, Inc.</u> (1982) 129 Cal. App.3d 865.

21.    Defendants, their alternate entities and each of them, knew, or should have known,

and intended that the aforementioned asbestos and products containing asbestos and/or brake shoe

grinding machines and related products and equipment, would be transported by truck, rail, ship and

other common carriers, that in the shipping process the products would break, crumble or be

otherwise damaged; and/or that such products would be used for insulation, construction, plastering,

fireproofing, soundproofing, automotive, aircraft and/or other applications, including, but not limited

to sawing, chipping, hammering, scraping, sanding, breaking, removal, "rip-out", and other

manipulation, resulting in the release of airborne asbestos fibers, and that through such foreseeable

use and/or handling, exposed persons, including plaintiff herein, would use or be in proximity to and

exposed to said asbestos fibers.

22.    Plaintiff has used, handled, or been otherwise exposed to asbestos and asbestos-

containing products referred to herein in a manner that was reasonably foreseeable. Plaintiff's

exposure to asbestos fibers from the use or handling of brake shoe grinding machines and related

products and equipment occurred in a manner that was reasonably foreseeable. Plaintiff's exposure

to asbestos and asbestos-containing products occurred at various locations as set forth in Exhibit A, attached to plaintiff's complaint and incorporated by reference herein.

23.    As a direct and proximate result of the conduct of the defendants, their alternate entities, and each of them, as aforesaid, plaintiff's exposure to asbestos and asbestos-containing products caused severe and permanent injury to the plaintiff, the nature of which, along with the date of plaintiff's diagnosis, are set forth in Exhibit A, attached to plaintiff's complaint and incorporated by reference herein.

24.    Plaintiff is informed and believes, and thereon alleges, that progressive lung disease, cancer, and other serious diseases are caused by inhalation of asbestos fibers without perceptible trauma and that said disease results from exposure to asbestos and asbestos-containing products including brake linings caused by brake shoe grinding machines and related products and equipment over a period of time.

25.    Plaintiff suffers from a condition related to exposure to asbestos and asbestos-containing products.  Plaintiff was not aware at the time of exposure that asbestos or asbestos-containing products presented any risk of injury and/or disease.

26.    As a direct and proximate result of the aforesaid conduct of defendants, their alternate entities, and each of them, plaintiff has suffered, and continues to suffer, permanent injuries and/or future increased risk of injuries to his person, body and health, including, but not limited to, asbestosis, other lung damage, and cancer, and the mental and emotional distress attendant thereto,

63

from the effect of exposure to asbestos fibers, all to his general damage in the sum in excess of the jurisdictional limits of this Court.

27.     As a direct and proximate result of the aforesaid conduct of the defendants, their alternate entities, and each of them, plaintiff has incurred, is presently incurring, and will incur in the future, liability for physicians, surgeons, nurses, hospital care, medicine, hospices, x-rays and other medical treatment, the true and exact amount thereof being unknown to plaintiff at this time, and plaintiff prays leave to amend this complaint accordingly when the true and exact cost thereof is ascertained.

28.     As a further direct and proximate result of the said conduct of the defendants, their alternate entities, and each of them, plaintiff has incurred, and will incur, loss of income, wages, profits and commissions, a diminishment of earning potential, and other pecuniary losses, the full nature and extent of which are not yet known to plaintiff; and leave is requested to amend this complaint to conform to proof at the time of trial.

29.     Defendants, their alternate entities, and each of them, and their officers, directors, and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should have known of, each of the acts set forth herein.

30.     Defendants, their alternate entities, and each of them, are liable for the fraudulent, oppressive, and malicious acts of their alternate entities, and each of them, and each defendant's officers, directors and managing agents participated in, authorized, expressly and impliedly ratified,

64

and had full knowledge of, or should have known of, the acts of each of their alternate entities as set forth herein.

31.    The herein described conduct of said defendants, their alternate entities, and each of them, was and is willful, malicious, fraudulent, outrageous, and in conscious disregard and indifference to the safety and health of exposed persons.  Plaintiff, for the sake of example and by way of punishing said defendants, seeks punitive damages according to proof.

WHEREFORE, plaintiff prays for judgment against defendants, their alternate entities, and each of them, as hereinafter set forth.

SECOND CAUSE OF ACTION
(Strict Liability)

AS AND FOR A SECOND, SEPARATE, FURTHER AND DISTINCT CAUSE OF ACTION FOR STRICT LIABILITY, PLAINTIFF-1 COMPLAINS OF DEFENDANTS ON EXHIBITS B AND D, DOES 1-300, THEIR ALTERNATE ENTITIES, AND EACH OF THEM, AND ALLEGES AS FOLLOWS:

32.    Plaintiff incorporates herein by reference, as though fully set forth herein, the allegations contained in Paragraphs 1-10 and 11-31 of the First Cause of Action herein.

33.    Defendants, their alternate entities, and each of them, knew and intended that the above-referenced asbestos and asbestos-containing products, and/or brake shoe grinding machines and related products and equipment, would be used by the purchaser or user thereof without

65

inspection for defects therein or in any of their component parts and without knowledge of the hazards involved in such use.

34.     Said asbestos and asbestos-containing products were defective and unsafe for their intended purpose in that the inhalation of asbestos fibers causes serious disease and/or death. The defect existed in the said products at the time they left the possession of defendants, their alternate entities, and each of them. Said products did, in fact, cause personal injuries, including asbestosis, other lung damage, and cancer to exposed persons, including plaintiff herein, while being used in a reasonably foreseeable manner, thereby rendering the same defective, unsafe and dangerous for use.

35.     Exposed persons did not know of the substantial danger of using said products. Said dangers were not readily recognizable by exposed persons. Said defendants, their alternate entities, and each of them, further failed to adequately warn of the risks to which plaintiff and others similarly situated were exposed.

36.     In researching, manufacturing, fabricating, designing, modifying, testing or failing to test, warning or failing to warn, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation of, repairing, marketing, warranting, rebranding, manufacturing for others, packaging and advertising asbestos and asbestos-containing products, defendants, their alternate entities, and each of them, did so with conscious disregard for the safety of exposed persons who came in contact with said asbestos and asbestos-containing products, in that said defendants, their alternate entities, and each of them, had

66

prior knowledge that there was a substantial risk of injury or death resulting from exposure to asbestos or asbestos-containing products, including but not limited to asbestosis, other lung damages, and cancer. Said knowledge was obtained, in part, from scientific studies performed by, at the request of, or with the assistance of, said defendants, their alternate entities, and each of them, and which knowledge was obtained by said defendants, their alternate entities, and each of them on or before 1930, and thereafter.

37.    On or before 1930, and thereafter, said defendants, their alternate entities and each of them, were aware that members of the general public and other exposed persons who would come in contact with their asbestos and asbestos-containing products, had no knowledge or information indicating that asbestos or asbestos-containing products could cause injury, and said defendants, their alternate entities, and each of them, knew that members of the general public and other exposed persons who came in contact with asbestos and asbestos-containing products, would assume, and in fact did assume, that exposure to asbestos and asbestos-containing products was safe, when in fact said exposure was extremely hazardous to health and human life.

38.    With said knowledge, said defendants, their alternate entities, and each of them, opted to research, manufacture, fabricate, design, modify, label, assemble, distribute, lease, buy, offer for sale, supply, sell, inspect, service, install, contract for installation of, repair, market, warrant, rebrand, manufacture for others, package and advertise said asbestos and asbestos-containing products without attempting to protect exposed persons from, or warn exposed persons of, the high risk of

67

injury or death resulting from exposure to asbestos and asbestos-containing products.  Rather than attempting to protect exposed persons from, or warn exposed persons of, the high risk of injury or death resulting from exposure to asbestos and asbestos-containing products, defendants, their alternate entities, and each of them, intentionally failed to reveal their knowledge of said risk, and consciously and actively concealed and suppressed said knowledge from exposed persons and members of the general public, thus impliedly representing to exposed persons and members of the general public that asbestos and asbestos-containing products were safe for all reasonably foreseeable uses.  Defendants, their alternate entities, and each of them, engaged in this conduct and made these implied representations with the knowledge of the falsity of said implied representations.

39.    The above-referenced conduct of said defendants, their alternate entities, and each of them, was motivated by the financial interest of said defendants, their alternate entities, and each of them, in the continuing, uninterrupted research, design, modification, manufacture, fabrication, labeling, assembly, distribution, lease, purchase, offer for sale, supply, sale, inspection, installation of, contracting for installation of, repair, marketing, warranting, rebranding, manufacturing for others, packaging and advertising of asbestos and asbestos-containing products.  In pursuance of said financial motivation, said defendants, their alternate entities, and each of them, consciously disregarded the safety of exposed persons and in fact were consciously willing and intended to permit asbestos and asbestos-containing products to cause injury to exposed persons and induced persons to work with and be exposed thereto, including plaintiff.

68

40.     Plaintiff alleges that the aforementioned defendants, their alternate entities, and each of them, impliedly warranted their asbestos and asbestos-containing products and brake shoe grinding machines and related products and equipment to be safe for their intended use; but their asbestos and asbestos-containing products and/or brake shoe grinding machines and related products and equipment created an unreasonable risk of bodily harm to exposed persons.

41.     Plaintiff further alleges his injuries are a result of cumulative exposure to asbestos and various asbestos-containing products manufactured, fabricated, inadequately researched, designed, modified, inadequately tested, labeled, assembled, distributed, leased, bought, offered for sale, supplied, sold, inspected, serviced, installed, contracted for installation of, repaired, marketed, warranted, rebranded, manufactured for others, packaged and advertised by the aforementioned defendants, their alternate entities, and each of them and that plaintiff cannot identify precisely which asbestos or asbestos-containing products caused the injuries complained of herein.

42.     Plaintiff relied upon defendants', their alternate entities', and each of their representations, lack of warnings, and implied warranties of fitness of asbestos and their asbestos-containing products and brake shoe grinding machines and related products and equipment. As a direct, foreseeable and proximate result thereof, plaintiff has been injured permanently as alleged herein.

43.     As a direct and proximate result of the actions and conduct outlined herein, plaintiff has suffered the injuries and damages previously alleged.

69

WHEREFORE, plaintiff prays for judgment against defendants, their alternate entities, and each of them, as hereinafter set forth.

### THIRD CAUSE OF ACTION
(False Representation
Under Restatement of Torts Section 402-B)

AS AND FOR A FURTHER, THIRD, SEPARATE AND DISTINCT CAUSE OF ACTION FOR FALSE REPRESENTATION UNDER RESTATEMENT OF TORTS SECTION 402-B, PLAINTIFF-1 COMPLAINS OF DEFENDANTS ON EXHIBITS B AND D, DOES 1-300, THEIR ALTERNATE ENTITIES, AND EACH OF THEM, AND ALLEGES AS FOLLOWS:

44.     Plaintiff hereby incorporates by reference, as though fully set forth herein, each and every allegation contained in the First and Second Causes of Action.

45.     At the aforementioned time when defendants, their alternate entities, and each of them, researched, manufactured, fabricated, designed, modified, tested or failed to test, inadequately warned or failed to warn, labeled, assembled, distributed, leased, bought, offered for sale, supplied, sold, inspected, serviced, installed, contracted for installation of, repaired, marketed, warranted, rebranded, manufactured for others, packaged and advertised the said asbestos and asbestos-containing products, as hereinabove set forth, the defendants, their alternate entities, and each of them, expressly and impliedly represented to members of the general public, including the purchasers and users of said product, and other exposed persons, including the plaintiff herein and his

70

employers, that asbestos and asbestos-containing products, were of merchantable quality, and safe for the use for which they were intended.

46.    The purchasers and users of said asbestos and asbestos-containing products, and other exposed persons, including the plaintiff and his employers, relied upon said representations of defendants, their alternate entities, and each of them, in the selection, purchase, and use of asbestos and asbestos-containing products.

47.    Said representations by defendants, their alternate entities, and each of them, were false and untrue, and defendants knew at the time they were untrue, in that the asbestos and asbestos-containing products, were not safe for their intended use, nor were they of merchantable quality as represented by defendants, their alternate entities, and each of them, in that asbestos and asbestos-containing products have very dangerous properties and defects whereby said products cause asbestosis, other lung damages and cancer, and have other defects that cause injury and damage to the users of said products and other exposed persons, thereby threatening the health and life of said persons, including plaintiff herein.

48.    As a direct and proximate result of said false representations by defendants, their alternate entities, and each of them, the plaintiff sustained the injuries and damages hereinabove set forth.

WHEREFORE, plaintiff prays for judgment against defendants, their alternate entities, and each of them, as hereinafter set forth.

## FOURTH CAUSE OF ACTION
(Intentional Tort)

AS AND FOR A FURTHER, FOURTH, SEPARATE AND DISTINCT CAUSE OF ACTION FOR AN INTENTIONAL TORT, PLAINTIFF-1 COMPLAINS OF DEFENDANTS ON EXHIBITS B AND D DOES 1-300, THEIR ALTERNATE ENTITIES, AND EACH OF THEM, AND ALLEGES:

49.     Plaintiff, by this reference, hereby incorporates by reference, as though fully set forth herein, each and every allegation contained in the First and Third Causes of Action herein excepting there from allegations pertaining to negligence.

50.     At all times pertinent hereto, the defendants, their alternate entities, and each of them, owed plaintiff a duty, as provided by Utah law, to abstain from injuring the person, property or rights of plaintiff. When a duty to act was imposed, as set forth herein, the defendants, their alternate entities, and each of them, did do the acts and omissions in violation of that duty, thereby causing injury to plaintiff as is more fully set forth herein. Such acts and omissions suggest facts which were not true and which defendants, their alternate entities, and each of them, did not believe to be true; assertions of fact which were not true and which defendants, their alternate entities, and each of them, had no reasonable ground for believing to be true, and the suppression of facts when a duty existed to disclose them, all as are more fully set forth herein; the violation of any one such duty gave rise to a cause of action for violation of the rights of plaintiff.

72

51.     Since on or before 1930, the defendants, their alternate entities, and each of them, have known and have possessed the true facts of medical and scientific data and other knowledge which clearly indicated that the asbestos and asbestos-containing products referred to in plaintiff's First Cause of Action were and are hazardous to the health and safety of plaintiff and others in plaintiff's position working in close proximity with such materials. The defendants, their alternate entities, and each of them, have known of the dangerous propensities of other of the aforementioned materials and products since before that time.  With intent to deceive plaintiff and others in plaintiff's position, and with intent that he and such others should be and remain ignorant of such facts with intent to induce plaintiff and such others to alter his and their positions to his and their injury and/or risk and in order to gain advantages, the following acts occurred:

            a.     Defendants, their alternate entities, and each of them, did not label any of the aforementioned asbestos-containing materials and products regarding the hazards of such materials and products to the health and safety of plaintiffs and others in plaintiffs' position working in close proximity with such materials until 1964, when certain of such materials were labeled by some, but not all, of defendants, their alternate entities, and each of them, when the knowledge of such hazards was existing and known to defendants, their alternate entities, and each of them, since 1924.  By not labeling such materials as to their said hazards, defendants, their alternate entities, and each of them, caused to be suggested as a fact to plaintiff that it was safe for plaintiff to work in close proximity to such materials when

73

in fact it was not true and defendants, their alternate entities, and each of them, did not believe it to be true;

  b. Defendants, their alternate entities, and each of them, suppressed information relating to the danger of the use of the aforementioned materials by requesting the suppression of information to the plaintiff and the general public concerning the dangerous nature of the aforementioned materials to workers, by not allowing such information to be disseminated in a manner which would have given general notice to the public, and knowledge of the hazardous nature thereof when defendants, their alternate entities, and each of them, were bound to disclose such information;

  c Defendants, their alternate entities, and each of them, sold the aforementioned products and materials to plaintiff's employer and others without advising plaintiff and others of the dangers of the use of such materials to persons working in close proximity thereto when defendants, their alternate entities, and each of them, knew of such dangers, and had a duty to disclose such dangers, all as set forth herein. By said conduct, defendants, their alternate entities, and each of them, caused to be positively asserted to plaintiff that which was not true and that which defendants, their alternate entities, and each of them, had no reasonable ground for believing to be true, to-wit: that it was safe for plaintiff to work in close proximity to such materials;

d.      Defendants, their alternate entities, and each of them, suppressed from plaintiff medical and scientific data and knowledge of the results of studies, including but not limited to the information and knowledge of the contents of the Lanza report (as hereinafter defined). Although bound to disclose it, defendants, their alternate entities, and each of them influenced A. J. Lanza to change his report, the altered version of which was published in Public Health Reports, Volume 50 at page 1 in 1935, thereby causing plaintiff and others to be and remain ignorant of the results of such studies. Defendants, their alternate entities, and each of them, caused Asbestos Magazine, a widely disseminated trade journal, to omit mention of danger, thereby lessening the probability of notice of danger to the users thereof;

e.      Defendants, their alternate entities, and each of them, belonged to, participated in, and financially supported the Asbestos Textile Institute and other industry organizations which, for and on behalf of defendants, their alternate entities, and each of them, actively promoted the suppression of information of danger to users of the aforementioned products and materials, thereby misleading plaintiff by the suggestions and deceptions set forth above in this cause of action. The Dust Control Committee (which changed its name to the Air Hygiene Committee) of the Asbestos Textile Institute was specifically enlisted to study the subject of dust control. Discussions among the members of this committee were held many times regarding the dangers inherent in asbestos and the

75

dangers which arise from the lack of control of dust, and such information was suppressed from public dissemination from 1946 to a date unknown to plaintiff at this time;

      f.      Commencing in 1930 with the study of mine and mill workers at Asbestos and Thetford Mines in Quebec, Canada, and the study of workers at Raybestos-Manhattan plants in Manheim and Charleston, South Carolina, defendants, their alternate entities, and each of them, knew and possessed medical and scientific information of the connection between inhalation of asbestos fibers and asbestosis, which information was disseminated through the Asbestos Textile Institute and other industry organizations to all other defendants, their alternate entities, and each of them.  Between 1942 and 1950, the defendants, their alternate entities, and each of them, acquired medical and scientific information as to the connection between inhalation of asbestos fibers and cancer, which information was disseminated through the Asbestos Textile Institute and other industry organizations to defendants.  Thereby, defendants, their alternate entities, and each of them, suggested to the public as a fact that which is not true and disseminated other facts likely to mislead plaintiff.  Such facts misled plaintiff and others by withholding the afore-described medical and scientific data and other knowledge and by not giving plaintiff the true facts concerning such knowledge of danger, which defendants, their alternate entities, and each of them, were bound to disclose;

g.      Defendants, their alternate entities, and each of them, failed to warn plaintiff and others of the nature of said materials which were dangerous when breathed and which could cause pathological effects without noticeable trauma, despite the fact that defendants, their alternate entities, and each of them, possessed knowledge and were under a duty to disclose the knowledge that said materials were dangerous and a threat to the health of persons coming into contact therewith;

h.      Defendants, their alternate entities, and each of them, failed to provide plaintiff with information concerning adequate protective masks and other equipment devised to be used when applying and installing the products of the defendants, and each of them, despite knowing that such protective measures were necessary, and that they were under a duty to disclose that such materials were dangerous and would result in injury to the plaintiff and others applying and installing such material;

i.      Defendants, their alternate entities, and each of them, when under a duty to so disclose, concealed from plaintiff the true nature of the industrial exposure of plaintiff and knew that plaintiff and anyone similarly situated, upon inhalation of asbestos would, in time, develop irreversible conditions of pneumoconiosis, asbestosis and/or cancer. Defendants, their alternate entities, and each of them, also concealed from plaintiff and others the fact that harmful materials to which they were exposed would cause pathological effects without noticeable trauma;

77

j.     Defendants, their alternate entities, and each of them, failed to provide information of the true nature of the hazards of asbestos materials and that exposure to these materials would cause pathological effects without noticeable trauma to the public, including buyers, users, and physicians employed by plaintiff and plaintiff's employers so that said physicians could examine, diagnose, and treat plaintiff and others who were exposed to asbestos, despite the fact that defendants, their alternate entities, and each of them, were under a duty to so inform and said failure was misleading; and

k.     Defendants, their alternate entities, and each of them, failed to provide adequate information to physicians and surgeons retained by plaintiff's employers and their predecessor companies, for purposes of making physical examinations of plaintiff and other employees, as to the true nature of the risk of such materials and exposure thereto when they in fact possessed such information and had a duty to disclose it.

52.     Defendants, their alternate entities, and each of them, having such aforementioned knowledge, and the duty to inform plaintiff about the true facts, and knowing the plaintiff did not possess such knowledge and would breathe such material innocently, acted falsely and fraudulently and with full intent to cause plaintiff to remain unaware of the true facts and to induce plaintiff to work in a dangerous environment.

WHEREFORE, plaintiff prays for judgment as is hereinafter set forth.

## FIFTH CAUSE OF ACTION
(Premises Owner/Contractor Liability)

AS AND FOR A FURTHER AND FIFTH SEPARATE AND DISTINCT CAUSE OF

ACTION, PLAINTIFF-1 COMPLAINS OF DEFENDANTS ON EXHIBIT C, DOES 301-500,

THEIR ALTERNATE ENTITIES (hereinafter "Premises Owner/Contractor Liability Defendants"),

AND EACH OF THEM, AND ALLEGES AS FOLLOWS:

53.     Plaintiff, by this reference, incorporates the allegations contained in the First Cause of

Action.

54.     At all times herein mentioned, each of the Premises Owner/Contractor Liability

Defendants was a successor, successor-in-business, assign, predecessor, predecessor-in-business,

parent, subsidiary, wholly or partially owned by, or the whole or partial owner of an entity causing,

certain asbestos- and silica-containing insulation, other building materials, products, and toxic

substances to be constructed, installed, maintained, used, replaced, repaired and/or removed on the

respective premises owned, leased, maintained, managed, and/or controlled by them.  Said entities

shall hereinafter collectively be called "alternate entities."  Each of the herein-named defendants is

liable for the tortious conduct of each successor, successor-in-business, assign, predecessor-in-

business, parent, subsidiary, whole or partial owner, or wholly or partially owned entity, that caused

the presence as aforesaid of said asbestos- and silica-containing insulation and other toxic

substances.  The following defendants, and each of them, are liable for the acts of each and every

"alternate entity," and each of them, in that there has been a virtual destruction of plaintiff's remedy

79

# EXHIBIT "D"

to

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO
## REMAND AND FOR AWARD OF COSTS AND ATTORNEYS' FEES

Plaintiff's Response and Memorandum in Opposition to
Defendants' Motion for Clarification,
<u>Sorter v. Asbestos Defendants</u>,
Case No. 040909899,
Third District Court, State of Utah, Jan. 3, 2006

# COVER SHEET FOR ASBESTOS LITIGATION

CASE NO.:                        Case No. 040909899
                                 Master Case No. 010900863

PLAINTIFFS:                      Howard Sortor and Nadine Sortor

DATE:                            January 3rd, 2006

**TYPE OF PLEADING:**            **Plaintiffs' Response and Memorandum in
                                 Opposition to Defendants' Motion for
                                 Clarification.**

FILING PARTY'S COUNSEL:          Mark F. James
                                 Mark H. Richards
                                 HATCH, JAMES & DODGE, P.C.
                                 10 WEST BROADWAY, SUITE 400
                                 SALT LAKE CITY, UTAH  84101
                                 Ph:  (801) 363-6363
                                 Fx:  (801) 363-6666


                                 G. Patterson Keahey
                                 John T. Alley, Jr.
                                 LAW OFFICES OF G. PATTERSON
                                 KEAHEY, P.C.
                                 ONE INDEPENDENCE PLAZA, SUITE 612
                                 BIRMINGHAM, ALABAMA 35209
                                 Ph:  (800) 291-0050
                                 Fx:  (205) 871-0801

OTHER PARTIES:                   ASBESTOS DEFENDANTS

Mark F. James (5295)
Mark Richards (9018)
**HATCH, JAMES & DODGE, P.C.**
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666


G. Patterson Keahey (*pro hac vice*)
John T. Alley, Jr. (*pro hac vice*)
**LAW OFFICES OF G. PATTERSON KEAHEY, P.C.**
One Independence Plaza, Suite 612
Birmingham, Alabama 35209
Telephone: (800) 291-0050
Facsimile: (205) 871-0801


Gary M. DiMuzio (*pro hac vice*)
**LAW OFFICES OF GARY DIMUZIO**
4226 Judson
Houston, TEXAS 77005
Phone: (713) 417-2197


Attorneys for Plaintiffs

---

IN THE THIRD JUDICIAL DISTRICT COURT
IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| IN RE: ASBESTOS CASES OF HATCH, JAMES & DODGE and G. PATTERSON KEAHEY. | **PLAINTIFFS' RESPONSE AND MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR CLARIFICATION** |
| HOWARD SORTOR AND NADINE SORTOR | Case No. 040909899 AS |
| Plaintiffs, | Honorable Glenn K. Iwasaki |
| vs. | |
| ASBESTOS DEFENDANTS | |

Plaintiffs Howard Sortor and Nadine Sortor, through their counsel of record, respectfully submit the following Response and Memorandum in Opposition to Defendants' Motion for Clarification.

## INTRODUCTION AND SUMMARY OF ARGUMENTS

Defendants lost a number of motions for summary judgment. Defendants now claim that the orders denying their motions fail to give them adequate guidance regarding product identification, exposure and causation to participate meaningfully in mediation or to prepare their defenses for trial. Defendants allege that Plaintiffs in the instant case need to prove that the Plaintiff Howard Sortor's exposure to any given product was "frequent, regular and in proximity" to be deemed a substantial cause of Sortor's incurable mesothelioma. Defendants further claim this legal requirement was established in the *Lohrmann* case (*Lohrmann vs. Pittsburgh Corning Corp.*, 782 F.2d 1156 (4th Cir. 1986)), which Defendants allege is now the majority rule in the United States.

Plaintiffs show in the following brief the above arguments to be baseless given the available scientific and medical information, the very case they primarily cite in support of their position, and the facts of the instant case. First, the generally accepted science in the relevant area is in contradiction to Defendants' position. Defendants have failed to come forward with science or expert testimony in support of their argument that the exposures to cause mesothelioma need to be "frequent, regular, and in proximity". Plaintiffs' evidence, both in the previously filed responses to Defendants' motions for summary judgment and as affidavits attached to this memo, prove that it is generally accepted that, mesothelioma, the disease from which Mr. Sortor suffers, can be (and often is) caused by very low, infrequent and irregular

2

exposures to asbestos, that there is no safe threshold of exposure to asbestos in regards to mesothelioma, and that all fibers contribute to the cancer developing process.

Second, the *Lohrmann* test, as enunciated in the original case and its well-reasoned progeny, is **not** a legal test for what exposure is adequate to cause mesothelioma. It is quite simply an analytical framework a court may use when, lacking direct evidence of exposure, it must evaluate whether purely circumstantial evidence is adequate to raise a reasonable fact issue of whether exposure did in fact occur to the product in question. When faced with direct evidence of exposure such as plaintiff or coworker testimony that the product was used in such a way around the plaintiff that he would have breathed dust from the product, which is the case here, the "frequency, regularity and proximity" test outlined in *Lohrmann* is inappropriate: If the Fourth Circuit Court of Appeals felt that even in a **high** exposure disease like asbestosis it was necessary to have "frequent, regular and proximate" exposure to satisfy the substantial causation, it would have required the three-prong test to be satisfied in the case of direct evidence of exposure. It has not done so. The *Lohrmann* test simply stands for the proposition that when lacking **direct** evidence of exposure to a given Defendant's specific product, the plaintiff may prove exposure to it **indirectly** through circumstantial evidence to be evaluated as follows: 1) evidence that the **product** was used "frequently" at the jobsite; 2) that the plaintiff worked "regularly" at the jobsite; and 3) that the plaintiff was in "proximity" to the products usage. Even though direct testimony may be missing, the plaintiff can prove product exposure circumstantially by providing adequate "frequency, regularity and proximity" evidence. The *Lohrmann* test is not about not how much asbestos exposure does it take to develop mesothelioma, which is a deadly disease that indisputably requires a low dose of asbestos

3

exposure. It should be noted that this analysis was developed as a *legal* test for determining the sufficiency of circumstantial product exposure evidence in an *asbestosis* case.  In the *Lohrmann* decision, the Fourth Circuit Court of Appeals specifically held that because **asbestosis** requires long periods of exposure in both a scientific and a "substantial" causation analysis, it would not be unfair when proving product exposure circumstantially, to require "frequent" use of the product and that the plaintiff "regular" work in that area.  As the *Lohrmann* test is really about whether there is enough evidence of exposure to a given product to go to the fact finder, and this Court has already ruled there is enough evidence, Defendants' motion is for all intents and purposes moot.

Not only do Defendants attempt to obfuscate the distinction between *circumstantial indirect evidence of exposure to a given product* and *mesothelioma causation*, they also try to blur the bold lines between "substantial cause" and the "frequency, regularity and proximate" test.  Although courts in a long line of cases have interpreted the use of "substantial causation" as actually being helpful to the asbestos plaintiff, the Defendants in this case incorrectly attempt to characterize this relaxed requirement as being "sole proximate" cause or "but for" causation.  Further, the Defendants incorrectly characterize the *Lohrmann* case as holding that the "frequency, regularity and proximity" test is an elaboration and extension of substantial causation.

Finally, the facts of the instant case are not consistent with situations where *Lohrmann* and its well- reasoned progeny would apply the "frequency, regularity and proximity" test.  The briefing and oral arguments Plaintiffs previously presented to this Court made clear that Plaintiffs are primarily relying upon first hand "direct" evidence; typically either Mr. Sortor or

4

one or more coworker(s) could place Mr. Sortor in an area when a specific product was being used in such a way as to produce asbestos dust that Sortor would have breathed. This alone completely distinguishes the instant case from the facts and holding of *Lohrmann*. Additionally, in the *Lohrmann* case the disease in question was the scarring condition asbestosis, which, unlike mesothelioma, is generally accepted as requiring a very high dose of asbestos exposure over a long period of time. The *Lohrmann* court went so far as to discuss the Plaintiff's own expert testimony, which provided evidence in that case that as much as a full month of exposure was "not significant" in the development of the disease asbestosis. This is in stark contrast to the overwhelming, undisputed, and generally accepted evidence put forth by Plaintiffs that mesothelioma is a very low dose disease that can be caused not only by low doses, but also by infrequent, irregular and relatively distant exposures. To require "frequency, regularity and proximity" (in the sense the Defendants hope to have those terms defined) to asbestos exposure *in total* to cause mesothelioma is against the great weight of scientific evidence. Adopting Defendants' position would deny the right of an individual fatally poisoned by knowledgeable companies to claim protection of the laws when he receives an injury.

To go even further, and require in a mesothelioma case that *every single product* meet Defendants' interpretation of the "frequency, regularity and proximity" test, would be to not only deny mesothelioma victims protection under the law, but would actually encourage companies so inclined to place profits over the lives and safety of individuals.

The best test consistent with both the scientific truth regarding mesothelioma and also with strong legal precedent is whether there is evidence presented that the plaintiff was exposed to asbestos dust from a defendant's product. The fact finder can then allocate percentages of

liability based upon the relative levels of exposures among the products involved. As discussed below, this was precisely the test used by the Eleventh Circuit Court of Appeals, a jurisdiction Defendants claim has embraced their interpretation of *Lohrmann*, in a mesothelioma case decided more than four (4) years after the *Lohrmann* decision.

## ADDITIONAL INTRODUCTION

Plaintiffs' response to Defendants' Motion for Clarification and to Defendants' request that this Court adopt the *Lohrmann* test addresses specifically Mr. Sortor's disease – mesothelioma. For the sake of brevity, Plaintiffs hereby adopt by reference as if included wholly in the instant pleading Plaintiffs' Responses to Motions for Summary Judgment and all exhibits attached thereto. Additionally, Plaintiffs have attached four (4) affidavits from leading experts in mesothelioma science and medicine to this response.

## THE SCIENCE AND MEDICINE OF MESOTHELIOMA CAUSATION

Mesothelioma is a "signature" or "signal" disease for asbestos exposure. There is no other generally accepted cause for mesothelioma in North America. Experts agree the great majority of mesothelioma is solely attributable to asbestos exposure. Malignant mesothelioma is a form of cancer that is inevitable fatal. All the cells in a cancerous tumor are generally thought to have originated from one cell that acquired all the necessary mutations to induce the uncontrolled growth that characterizes malignancies.

From the very earliest studies published on mesothelioma, it has been clear that infrequent, irregular and distant low level exposures to asbestos can cause mesothelioma. The first study that established beyond reasonable doubt that asbestos causes mesothelioma included exposure to people not working occupationally with asbestos, but rather people who suffered

from distant environmental exposures. Subsequent published literature has repeatedly shown that such distant low environmental exposure is linked to mesothelioma. Additionally, the scientific literature has published accounts of family members of workers getting mesothelioma from living in the same house where workers brought home their asbestos contaminated clothing. Although there is some indication in the literature that the more exposure a population receives, the more likely mesothelioma will occur, this relationship is not as clear as with other dose relationship diseases. The clearer relationship is between the time of the diagnosis of mesothelioma in relationship to the first known exposure.

Laboratory research has confirmed that very low exposure – perhaps even one fiber of asbestos – can lead to the types of DNA damage linked to mesothelioma. In terms of mesothelioma, there is no known safe level or "threshold" of asbestos exposure. All inhaled asbestos fibers that contact a cell elicit one or more physiological responses, all of which set the stage for the initiation and promotion of a cancerous cell and ultimately the entire malignant tumor. The body has a limited ability to repel these insults and damage. Therefore, from a scientific view not only is it impossible to tease out which fibers caused DNA damage, it is more accurate to view the process as one in which all fibers contribute to the disease through cumulative insults and injury which overcome the body's defense mechanisms. [*See* Exhibits 1, 2, 3 and 4, affidavits, respectively of Alice Boylan, M.D., Samuel Hammar, M.D. Dr. Arthur Frank PhD, M.D., and Jerry Lauderdale, C.I.H.; *see also* the scientific and medical exhibits attached to Plaintiffs' responses to motions for summary judgment filed in this case.]

As more precisely and eloquently described by a mesothelioma treatment specialist who also performs laboratory research in the molecular biology of asbestos-induced mesothelioma:

5.    For asbestos-related cancers, including mesothelioma and lung cancer, there is no known minimum dose, or threshold of exposure, that can lead to the development of malignant cells (1).

6.    Studies in vitro suggest that it may take only one fiber to produce a malignancy in tissue that gets exposed. Indeed, exposure of a cell to one fiber can cause DNA strand breaks, changes in DNA that lead to the development of cancer. Asbestos-induced strand breaks have been seen with cell exposure to both amphibole and serpentine fibers.   Consequently, it is impossible to determine which fiber, of any and which fiber types, from which specific product, caused a cancer to develop (2).

7.    Although one fiber can results in multiple DNA strand brakes leading to malignant transformation of a cell, each asbestos fiber that is ingested or inhaled appears to have an affect which can contribute to the development and propagation of malignant cells. For example, asbestos fibers of all types have been shown to induce the development of pro and anti-inflammatory cytokines by mesothelial cells (1). Inflammation is now recognized as playing an important role in the development and progression of cancers.   In addition, exposure to asbestos fibers appears to impair cellular immunity, the body's only strategy to rid itself of malignant cells (3). Therefore, the current body of research shows that the overall asbestos burden, and all asbestos exposures alter the cellular environment in such a way to contribute to the development and progression of mesothelioma...

[*See* Exh. 1, Affidavit of Alice Boylan, M.D.]

The above generally accepted opinions are in accordance with those expressed by

internationally respected mesothelioma pathologist Samuel Hammar, M.D.:

8.    First of all, mesothelioma is a cancer of the mesothelial lining of the lungs/chest cavity and some other organs. Mesothelioma is a signature disease for asbestos exposure. Exposure to asbestos in the only generally accepted cause for mesothelioma in North America. In my own experience, it is rare to have a case of mesothelioma with no known exposure to asbestos, other than the background levels to which everyone is exposed. Background levels may be a factor in the induction of mesothelioma but current scientific methods are inadequate to answer this question with certainty. It is generally accepted that mesothelioma is a low dose disease, with no known threshold of asbestos exposure below which there is no risk. This low dose aspect of mesothelioma has been borne out in human epidemiological studies, case reports, and laboratory research involving cells and animals. The first major case series of mesothelioma

8

in the peer reviewed literature, the 1960 Wagner study, contained both occupational and environmental cases with the asbestos exposure ranging widely in both proximity and intensity. There have been numerous cases in the literature of low and/or distant exposures causing mesothelioma. These cases include but are not limited to: short, high intensity exposures; secondary exposures such as household members exposed to asbestos contaminated work clothing brought home by another household member; low level environmental cases where the victims lived considerable distances from the source of exposure…

10.    Every asbestos fiber that comes into contact with a cell in the respiratory tract will elicit a physiological response from the body. The body has a limited ability to deal with this exposure burden.  Some of the fibers will stimulate removal mechanisms and eventually be removed from the body. Other fibers will stay in the lungs and/or translocate to the lining of the lungs and other organs where mesothelioma develops. Any fiber contacting a cell may cause genetic damage, induce inflammatory reactions, or cause other biochemical reactions which have been implicated in the development of mesothelioma. Consequently, I believe the only scientifically supportable position is that all inhaled fibers that contact a cell play a role in the devolvement of the subsequent mesothelioma, up until the development of one fully cancerous cell.

[See Exh. 2, Affidavit of Samuel Hammar, M.D.]

Arthur Frank, PhD, M.D., is well-known, highly respected public health professor and researcher who has dedicated nearly his entire career to researching asbestos-related diseases. He earned both his medical degree and his PhD in the carcinogenic mechanisms of asbestos while studying under arguably the preeminent asbestos researcher in history, Irving J. Selikoff.

Dr. Frank states:

…Specifically, there is scientific evidence for asbestos in animals, and in man, that as little as one day of exposure can lead to mesothelioma or lung cancer. There are also cases of "neighborhood" cases of mesothelioma caused by asbestos where the only documented exposure is living near (up to ½ miles away) of an asbestos utilizing facility.

6.    Although each and every fiber that reaches tissues in the human body can lead to changes giving rise to diseases known to occur following exposure to asbestos, it may take only one fiber to produce a malignancy in tissue that gets

exposed. There is no way to sort which fiber, of any and all fiber types, from which specific product, caused any changes seen.

7.    If it was thought necessary to have "frequent, regular, and proximate" exposure to asbestos in cases of mesothelioma that would not comport with scientific knowledge, and it would disqualify some cases known to be caused by asbestos and not allow them to be admitted under such a legal construct.

[*See* Exh. 3, Affidavit of Arthur Frank, PhD., M.D.]

In order to show the Court that the medical and medical research science experts in the appropriate filed are in agreement with scientists in the appropriate engineering and industrial hygiene field who specialize in exposure to asbestos fibers, Plaintiffs have submitted an affidavit from a Certified Industrial Hygienist with extensive governmental and private practice experience:

Asbestos is known to cause a lung disease known as asbestosis. Asbestosis is known to develop after exposures over time to asbestos in air. The exposures are typically repeated frequently over a number of years, resulting in an increased deposition of asbestos fibers in the workers' lungs. Worker groups with higher exposures have generally experienced higher incidences of asbestosis compared to worker groups with lower cumulative exposures. This association of higher asbestosis incidence with higher cumulative exposures over time has been understood as confirming a dose-response relationship between asbestos exposure and development of asbestosis.

The association between asbestos exposure and development of mesothelioma has not been found to follow the same dose-response relationship. Rather than an equal weighting on time and concentration as with asbestosis, the incidence of mesothelioma is much more dependent on time since exposure than on the accumulated dose over time. (Robinson, 2002) Short term, large dose exposures have been found to cause mesothelioma even though the dose over time is not large. (NIOSH 1995) Therefore, risk for developing this asbestos related disease is not dependent on frequently working in close proximity with asbestos containing products.

[*See* Exh. 4, Affidavit of Jerry Lauderdale, C.I.H.]

In summary, the generally accepted and unopposed scientific and medical evidence holds that:

1. Mesothelioma can be caused by infrequent exposure;

2. Mesothelioma can be caused by low levels of exposure;

3. Mesothelioma can be caused by distant exposures;

4. All inhaled asbestos fibers that touch a cell contribute to the development of mesothelioma;

On the other hand *asbestosis*, the disease at issue in *Lohrmann*, *is* a relatively high dose disease, generally requiring years of relatively heavy exposure. It is generally accepted that there are sufficiently low levels of exposure that do not increase the risk of developing asbestosis. Asbestosis is a disease of scarring necessarily involving damage to large amounts of lung tissue. This is in contrast to mesothelioma, which is generally accepted to originate as a single damaged cell. [*See* Exhibits 1, 2, 3 and 4.]

The Defendants urge an incorrect interpretation of *Lohrmann* that would bar deserving mesothelioma victims from receiving compensation while sparing liable companies any penalty for their misbehavior. Allowing defendants to escape legal liability in cases where the scientific evidence overwhelmingly proves they were responsible for causing the disease is contrary to well-reasoned case law and would be a public health and public policy travesty.

## ARGUMENT

Defendants rely primarily on the *Lohrmann* decision (*Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156 (4th Cir. 1986)) for their position that Mr. Sortor must show that he experienced "frequent, regular and proximate" exposure to asbestos before he can link his

incurable and entirely preventable mesothelioma to asbestos exposure.  Even assuming arguendo

that Defendant's interpretation of *Lohrmann* was correct in some instances, the test would not be

appropriate for mesothelioma as the above-cited evidence demonstrates.  The *Lohrmann* court

predicated its ruling upon the evidence in the record showing that ***asbestosis*** is a relatively high

exposure disease and that as much as 30 days exposure would be insignificant in the disease

outcome.  This case does not involve asbestosis.  Moreover, Defendants have misstated the

holdings in *Lohrmann* on several levels.

      A.      **The *Lohrmann* Test is limited to indirectly establishing <u>exposure to a given product</u> through circumstantial evidence in an asbestosis case. Defendants falsely assert that it is also an appropriate causation test for mesothelioma.**

Defendants incorrectly assert that the holding in *Lohrmann* directly concerns substantial

causation and that it applies to mesothelioma cases: it does not.  The *Lohrmann* case was

followed two months later by another Fourth Circuit opinion, *Roehling v. Nat. Gypsum Co. Gold

Bond Bldg*, 786 F.2d. 1225 (4th Cir. 1986), which even further clarified the limited nature of the

*Lohrmann* ruling.

The plaintiff in *Lohrmann* was exposed to asbestos from 1940 to 1979 as a pipefitter at

Bethlehem Steel Corporation's Key Highway Shipyard in Baltimore, Maryland.  He filed suit

against a number of asbestos manufacturers claiming that exposure to asbestos caused him to

develop ***asbestosis***. As noted above, this factual distinction from the instant case is very

important as asbestosis is a high exposure disease, whereas indisputably mesothelioma can be

caused by brief, low-level intermittent exposure.  The case proceeded to trial where the district

court directed a verdict in favor of several defendants on the grounds that there was insufficient

evidence to show causation between use of their products and the plaintiff's claims for asbestosis. The plaintiff appealed and the Fourth Circuit affirmed.

In reviewing the evidence on appeal against the asbestos defendants, the Fourth Circuit noted that the plaintiff could only prove he was at the same very large shipyard where the defendant's asbestos products were being used without ***any evidence of inhalation of asbestos fibers*** (site exposure versus asbestos exposure). The plaintiff could not provide any direct evidence of exposure to specific products, or offer any evidence as to where the products were being used or when they were being used. *Lohrmann*, 782 F.2d at 1163. The very limited circumstantial, indirect evidence presented to the court was analyzed in terms of how much evidence existed with respect to how frequently the product was used at the jobsite, how regularly the plaintiff worked there, and in what proximity. Given the almost complete dearth of indirect circumstantial evidence, the Fourth Circuit concluded that the trial court was correct in ruling that the plaintiff's ***site exposure*** evidence was insufficient to establish any exposure to the products in question. Obviously, substantial causation cannot be satisfied without adequate proof of exposure to the product in question.

A little over two months later, the Fourth Circuit gave further shape to the "frequency, proximity and regularity" test of asbestos-containing product exposure law in *Roehling*. The plaintiff in *Roehling* was a pipefitter who contracted ***mesothelioma*** as a result of exposure to asbestos for over two years at three different jobsites. The plaintiff could not identify the asbestos products he was exposed to at the three jobs, and none of the three co-worker witnesses who testified on the issue of exposure knew Roehling or remembered having had contact with him. The witnesses could not confirm that Roehling was present at any of the three jobsites, and

they did not know when, where or what products he would have been exposed to, if any. *Roehling*, 786 F.2d at 1226.

Reviewing the evidence on appeal, the Fourth Circuit concluded that Roehling, similar to the plaintiff in *Lohrmann*, had offered insufficient evidence of "*asbestos*" exposure as to two of the jobsites. None of the three co-workers worked at the jobsites at the same time as Roehling. Thus, there was *only site exposure* evidence at these job sites.

As to the evidence relating to Roehling's third job site, however, the court found that there was sufficient proof of exposure. The co-workers worked at the jobsite the same time as Roehling and identified products that they and others who were nearby were exposed to at the jobsite. Reversing the trial court's decision that such circumstantial evidence from co-workers was insufficient and that direct evidence by the plaintiff of exposure was required, the Fourth Circuit reasoned as follows:

> Such burden is unreasonable. Roehling cannot be required to remember product names some thirty years later when he had been a pipefitter, breathing the dust, not handling the products. Such requirement would, in essence, destroy an injured bystander's cause of action for asbestos exposure. Rarely would bystander's taken note of the names of materials used by others. Moreover, the witnesses should not be required to know Roehling. They were employees of different companies with different responsibilities in the work area. Bystanders often go unrecognized, but still receive injuries.

*Roehling*, 786 F.2d at 1228. The court went on to squarely hold that in cases alleging exposure to asbestos:

> The evidence, circumstantial as it may be, need only establish that [the Plaintiff] … **was in the same vicinity as witnesses who can identify the products causing the asbestos dust that all people in that area, not just the product handlers, inhaled**.

*Id.* (emphasis added). From a purely scientific or industrial hygienist point of view, the court found that there was evidence of inhalation of asbestos fibers from the products in question. There was no further discussion of a need for "frequent regular and proximate" exposures for a substantial causation analysis – the test was simply used to determine the sufficiency of the indirect, circumstantial nature of product identification/exposure, and if that test is met, then subsequently a substantial causation analysis would take place.

*Lohrmann* does ***not*** stand for the proposition that mesothelioma, or any disease, requires frequent and regular exposure in proximity to be deemed caused by asbestos. Rather, the "frequency, regularity and proximity" test was used in situations where there was no direct evidence of exposure to a given defendant's product – to frame analysis of the question of whether the defendant in question should be in the case at all. Direct evidence in *Lohrmann* and its well-reasoned progeny means either the plaintiff or a coworker can establish through testimony that the plaintiff was working with or around the product in question in a way that would cause the plaintiff to inhale the asbestos dust released from the product. When direct evidence product exposure was in the record, *Lohrmann* did not utilize the frequency, regularity and proximity test because under such circumstances such test has no application: the question of whether there was enough evidence to keep a given defendant in the case had already been answered by the direct evidence testimony. Once exposure is established, either through direct evidence or through the "frequency, regularity and proximity" analysis, the court then engages in a substantial causation analysis. If this were not the case, the Fourth Circuit would have held that exposure must be "frequent, regular and proximate" in cases involving both direct and indirect exposure. It made no such holding.

The plaintiffs in situations lacking direct testimony of exposure could *indirectly* establish exposure to the product in question though circumstantial evidence that would show: (1) how "frequently" the product was used at the job site (by such evidence as invoices or testimony); (2) how "regularly" the plaintiff worked at the job site, and (3) what proximity there was between the plaintiff's work activities and the use of the product. If after analysis of the circumstantial evidence by the above three-factor analysis, it would be not be reasonable to infer that exposure to a particular product had indeed occurred, then the case must fail against that defendant. That was the full extent of the use of the "frequency, regularity and regularity" test in *Lohrmann*, the seminal case for this legal theory. Of course, in the instant case, Mr. Sortor has produced substantial direct evidence (as well as circumstantial evidence) of product exposure, with the circumstantial and indirect evidence such as invoices being provided to further strengthen the direct testamentary evidence.

In summary, there was no "direct" evidence of exposure in *Lohrmann*, and very little in the way of even indirect or circumstantial evidence, to implicate the products of the three defendants named in that case with respect to exposing the plaintiff to asbestos. In essence, the *Lohrmann* test, which Defendants seek to apply far beyond its intent or purpose, is a test to determine whether a product has been credibly identified as giving rise to asbestos exposure, when no direct evidence of such exposure exists.

The facts of *Lohrmann* also point to how absurd it would be to apply this guideline for the sufficiency of circumstantial evidence as a test for *causation* in a *mesothelioma* case. This is the case for several reasons. First, as set forth above, the disease in question in *Lohrmann* was asbestosis. The court emphasized that the plaintiffs' own expert had testified it took a lot of

16

asbestos exposure over a long period of time to cause the disease. The expert had testified that as much as 30 days exposure would be relatively inconsequential in the development of the disease asbestosis. The court specifically mentioned that because of the high dose nature of asbestos, requiring circumstantial evidence to be frequent, regular and proximate would not be in unfair in the subsequent substantial causation analysis. This fact scenario is dramatically different from the no threshold, very low dose realities of mesothelioma induction involved in the instant case.

     **B.**     **Defendants incorrectly assert that the "frequency, regularity and proximity" test is an extension of the "substantial cause" test.**

As noted above, the *Lohrmann* test as articulated in the *Lohrmann* case and its well-reasoned progeny is concerned with what is commonly referred to in asbestos litigation as "Product Identification" when there is no direct evidence of exposure to the product. However, Defendants assert that the *Lohrnmann* test is necessary not only for product identification under all direct and indirect evidence circumstances, but that it is also a test to establish whether the product in question "caused" the illness to a nearly "sole proximate" or "but for" causation standard. There are several layers of confusion and/or obfuscation in Defendants' argument that require discussion in order to make clear the absolutely disingenuous nature of the argument.

     **1.**     **"Frequency, regularity and proximity" does not equate to or refine to "substantial cause"**

Defendants equate "substantial cause" with their version of the "frequency, regularity and proximity test" without clear legal explanation or scientific support. In fact, when purporting to count the numbers of jurisdictions that have adopted some version of the *Lohrmann* test, Defendants include states that have had asbestos litigation and that also use the "substantial factor" test in their causation analysis. Were that the definition of a *Lohrmann* state, then Utah

has already made its decision inasmuch as asbestos litigation is occurring in Utah presently, and Utah historically has used some form of the substantial factor test. Defendants' approach is both bad accounting and over zealous advocacy. Clearly more information is required for a thoughtful, proper analysis.

As discussed above, *Lohrmann* is a test for determining whether exposure to a given product occurred. A fundamental tenant of product liability law in this type circumstance is that for a given defendant to be held liable, there must be exposure to the defendant's product. This is what the *Lohrmann* test addressed where the only available evidence is circumstantial evidence. But this exposure to a given product is merely a subset of the information in any form of causation analysis. Certainly, in any legal or scientific/medical causation analysis, exposure to the poison is a *sine qua non*. But exposure is only one link in the chain of causation. From the scientific viewpoint, the question as to exposure is simply, was there enough exposure to cause the disease.

Defendants take a legal test that was developed to evaluate the sufficiency of indirect, ***circumstantial evidence*** of exposure to a given defendant's product in an ***asbestosis*** case, and without clear legal support or scientific justification, claim that it somehow provides "a more precise definition of 'substantial'" in the context of a causation analysis. *Lohrmann* did not define *substantial causation* with the "frequency, regularity and proximity" test. Rather, the court determined whether the circumstantial evidence was adequate to ***show exposure to a given product***.

Defendants attempt to classify proximate cause as being tantamount to either "sole proximate" or "but for" causation, ignoring the long standing jurisprudence that indicates that the

18

substantial factor test was developed specifically to avoid the unjust rulings that would result from a strict "but for" causation analysis. Furthermore, courts around the country have been using well-reasoned and just interpretations of substantial factor analysis tailored to fit the unique aspects of asbestos litigation.

After science and medicine determined that mesothelioma can be caused by very low, brief exposures to asbestos, theoretically even to one fiber, it became unreasonably difficult to accurately attribute any particular source of exposure for the malignancy. Recognizing this fact and also recognizing the manifest unfairness of depriving mesothelioma victims of a fair right to seek compensation, courts have ruled that all identifiable asbestos exposures are deemed to be substantial contributing causes. This line of well-reasoned and just cases is also consistent with the additional scientific progress having been made in understanding how every asbestos fiber that contacts a cell contributes to the carcinogenic process.

The classic pre-asbestos case in this area is *Landers v. East Texas Salt Water Disposal Co.*, 151 Tex. 251, 248 S.W.2d 731 (1952), in which one defendant's oil pipeline and another defendant's salt water disposal line ruptured at about the same time, releasing oil and salt water into plaintiff's lake. The Texas Supreme Court found the injury an "indivisible" one, and held both defendants jointly and severally liable even though it could not be said that the damage would not have happened "but for" either source of pollution.

The same concept made its asbestos debut in *Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076 (5th Cir. 1973) (applying Texas law and quoting *Landers v. East Texas Salt Water Disposal Co.*, 151 Tex. 251, 248 S.W.2d 731 (1952)), in which the Fifth Circuit rejected a challenge to the jury's causation finding in the following language:

> In the instant case, it is impossible, as a practical matter, to determine with absolute certainty which particular exposure to asbestos dust resulted in injury to Borel. It is undisputed, however, that Borel contracted asbestosis from inhaling asbestos dust and that he was exposed to the products of all the defendants on many occasions. It was also established that the effect of exposure to asbestos dust is cumulative, that is, each exposure may result in an additional and separate injury. We think, therefore, that on the basis of strong circumstantial evidence the jury could find that *each defendant was the cause in fact of some injury to Borel.*

*Id.* at 1095 (emphasis added).[1]

The Fifth Circuit further rejected the notion that in a case involving multiple tort-feasors, some defendants should escape liability simply because the harm could not be scientifically apportioned:

> Where the tortuous acts of two or more wrongdoers join to produce an indivisible injury, that is, an injury which by its nature cannot be apportioned with reasonable certainty to the individual wrongdoers, all of the wrongdoers will be held jointly and severally liable for the entire damages and the injured party may proceed to a judgment against any one separately or against all in one suit.

*Id.*

*Borel* involved asbestosis, but this principle was reaffirmed in a mesothelioma case with the following language based upon the Restatement (Second) of Torts, which Utah has adopted:

> Conversely, in the present case, Tate's mesothelioma was not necessarily caused solely by one defendant's products….*Thus, when a defendant has in fact caused harm to the plaintiff, he may not escape liability merely because the harm he has inflicted has combined with similar harm inflicted by other wrongdoers.* See Restatement (Second) of Torts §433B (2), comment defendant (1963). *If there was sufficient evidence by appellees showing that Carey*

---

[1] Given the context of the instant Response, it should be noted that this reference to "circumstantial" evidence was regarding which fiber or fibers caused the illness, and was decided prior to some of the more recent evidence that indicates that all fibers are implicated to varying degrees.

20

*supplied any of the asbestos to which Tate was exposed, then appellees have adequately met their burden of proof.*

As previously discussed, the medical evidence demonstrates that it is difficult to determine exactly which exposure to asbestos dust is responsible for a resulting asbestos – related disease. It is thus impossible, as a practical matter, to determine with absolute certainty which particular exposure to asbestos dust resulted in mesothelioma.

*Celotex Corp. v. Tate*, 797 S.W.2d 197, 204 (Tex. Ct. App. 1990) (writ dism'd) (emphasis added).

Numerous other cases have held the same way. For example, in the case of *Mavroudis v. Pittsburgh-Corning Corp.*, 935 P.2d 684 (Wash. Ct. App. 1997), involving the same internationally recognized expert pathologist designated by Plaintiff Sortor in the instant case, the court clarified the role of and reasoning behind the "substantial factor" test in an asbestos context:

Dr. Hammar testified that although all of Mr. Mavroudis's exposures to asbestos while working at the Puget Sound Naval Station from 1957 to 1963 probably played a role in causing the mesothelioma, and that as little as 10 percent of the total exposure would have been sufficient to cause the injury, he could not say which exposures were, in fact, the cause of the mesothelioma. *This is exactly the kind of situation that calls for application of the substantial factor test, in order that no supplier enjoy a causation defense solely on the ground that the plaintiff probably would have suffered the same disease from inhaling fibers originating from the products of other suppliers. ...In sum, we conclude that multi-supplier asbestos-injury cases call for the substantial-factor test of causation rather than the but-for test, in cases such as this one, wherein the expert witness testifies, as did Dr. Hammar, that all of the plaintiff's exposure probably played a role in causing the injury* and that it is not possible to determine which exposures were, in fact, the cause of the condition.

*Id.* at 689 (emphasis added); *see also Spaur v. Owens-Corning Fiberglas Corp.*, 510 N.W.2d 854, 861 (Iowa 1994) ("We hold that it is not necessary and indeed may be impossible to establish exactly how much one party's asbestos product contributed to the resulting injury. *From the medical evidence presented, the jury could infer that Kaylo was a contributing cause*

21

of [plaintiff's] disease.") (emphasis added); *Eagle-Picher Ind., Inc. v. Balbos*, 604 A.2d 445, 459 (Md. 1992) ("In products liability involving asbestos, where the plaintiff has sufficiently demonstrated both lung disease resulting from exposure to asbestos and that the exposure was to the asbestos products of many different, but identified, suppliers, *no supplier enjoys a causation defense solely on the ground that the plaintiff would probably have suffered the same disease from inhaling fibers originating from the products of other suppliers.*" (footnote omitted) (emphasis added).

Consistent with this proposition, courts have found that any exposure to asbestos is considered factually and legally sufficient to support causation, especially in a mesothelioma case. *See, e.g., Reserve Mining Co. v. EPA*, 514 F.2d 492, 508-9 and fn. 25 and 26 (8th Cir. 1975) ("It is significant that the witnesses generally agree that no known safe level of exposure exists for mesothelioma."); *Blancha v. Keene Corp.*, 1991 WL 224573 at 3 and 5 (E.D. Pa. 1991) ("Very small amounts of and short periods of exposure to asbestos dust and fibers can cause mesothelioma. . . .Mesothelioma . . . may be caused by a very small amount of exposure both as to time period and concentration. . . . Any exposure to asbestos dust and fibers can cause or lead to mesothelioma."); *Eagle-Pitcher Indus., Inc. v. Balbos*, 578 A.2d 228, 243 (Md. App. 1990), *aff'd in part and rev'd in part on other grounds*, 604 A.2d (Md. 1992) ("...all of Knuckle's exposures to asbestos were 'significantly contributing causal factor[s] to the mesothelioma.'"); *Celotex Corp. v. Tate*, 797 S.W.2d at 203 ("The medical evidence confirmed that inhaling asbestos dust in industrial conditions, even with relatively light exposure, can produce mesothelioma.").

22

Given the overwhelming scientific consensus regarding the relationship between asbestos

and mesothelioma, courts have uniformly adopted the following causation standard in regard to

mesothelioma cases:

> [I]t is not essential to establish with any precision the quantity, duration, or
> percentage of the occupational exposure to asbestos for which any or each
> particular manufacturer or supplier is responsible in order to establish proximate
> cause and, therefore, liability. *Every such exposure is a substantial factor in
> bringing about mesothelioma*, and may be so found when the latency period is
> consistent.

*Blancha v. Keene Corp.*, 1991 WL 224573 at 6, (E.D. Pa. 1991) (emphasis added); *see also*

*Spaur v. Owens-Corning Fiber Glass Corp.*, 510 N.W.2d 854, 861 (Iowa 1994); *Celotex Corp. v.

Tate*, 797 S.W.2d at 204 ("If there was sufficient evidence presented by appellee showing that

Carey supplied *any* of the asbestos to which Tate was exposed, then appellees have adequately

met their burden of proof [regarding causation]").

In the *Lohrmann* case the court showed sensitivity to this issue of necessary dose in

substantial causation analysis, by stating that the "frequency, regularity and proximity" test for

establishing product identification/exposure would not make for an unfair burden in the later

stage of substantial cause analysis because the plaintiffs medical expert testified that even a full

months exposure was inconsequential for an *asbestosis* case:

> To support a reasonable inference of substantial causation from circumstantial
> evidence, there must be evidence of exposure to a specific product on a regular
> basis over some extended period of time in proximity to where the plaintiff
> actually worked.   Such a rule is in keeping with the opinion of the plaintiff's
> medical expert who testified that even thirty days exposure, more or less, was
> insignificant as a causal factor in producing the plaintiff's disease.

*Lohrmann*, 782 F.2d at 1162-63

It is for these reasons that most courts have recognized a distinction between exposure in asbestosis and mesothelioma cases. For example, in *Egan v. Kaiser Aluminum & Chemical Corporation*, 677 So.2d 1027 (La. Ct. App. 1996) the court distinguished between the duration of exposure to a particular asbestos product in connection with an asbestosis case and a mesothelioma case stating:

> In the instant case, the disease we are concerned with is mesothelioma, which, the evidence showed, can develop from relatively short high intensity exposure to asbestos, as opposed to the asbestosis in *Murphy*, [*Quick v. Murphy Oil Co.*, 643 So. 2d 1291, *writ denied* 648 So. 2d 923 (LA App. 4th Cir. 1994)] which develops as a result of relatively high exposure levels over a fairly long period of time. . . . ***Simply because the plaintiff was exposed to OCF's asbestos-containing product over a relatively short period of time, and had considerable long term exposure to other products, it cannot be said that the exposure to Kaylo could not have been a substantial contributing factor*** in the development of mesothelioma.

*Id.* at 1035 (emphasis added). Egan, a 1994 ***mesothelioma causation*** case was decided by the same court that rendered the 1986 *Lohrmann* decision regarding ***indirect, circumstantial evidence of product identification/ exposure***. It would be difficult to find a decision that so clearly and convincingly unveils the multiple layers of obfuscation that Defendants have engaged in this and other jurisdictions. *See also John Crane v. Scribner*, 800 A.2d 727, 734 (MD 2001) (noting, in a different context, Plaintiffs' expert, Dr. Brody's testimony that all of the exposures . . . contribute to the development of the tumor up until when the first cancer cell is formed).

As noted above, one need look no farther than some of the very jurisdictions that Defendants claim have adopted their interpretation of *Lohrmann* for well-reasoned examples of how to analysis exposure and causation in a mesothelioma case. For example, four years after the *Lohrmann* decision, the Eleventh Circuit looked closely at the idea of substantial causation, mesothelioma, and how much exposure was needed for the case to proceed to the fact finder. In

*Hoffman v. Allied Corp.*, 912 F.2d 1379 (11th Cir. 1990), the product in question was not used in close proximity to the plaintiff, thereby violating the Defendant's interpretation of the *Lohrmann* test:

> Milton Hoffman stated in an affidavit that the only method to ventilate the ordnance repair shop was to open its windows. (R 7-178, Hoffman Affidavit). These windows remained open during a substantial portion of the year, and dust could blow into the shop through the windows. (R 7-178, Hoffman Affidavit). The prevailing winds blew from the water's edge across the dry dock into the ordnance repair shop. (R 7-178, Hoffman Affidavit). Mr. Hoffman claimed that the breezes carried asbestos dust from the ships at the dry dock into the shop where he worked. (R 7-178, Hoffman Affidavit). Further, insulators and other shipyard workers, like Mr. Rapacilo, occasionally came into or worked in the ordnance repair shop, and they were sometimes covered with dust. (R 7-178, Hoffman Affidavit).

*Id.* at 1381.

As in the instant case, the plaintiffs in *Hoffman* presented scientific and medical evidence in the form of affidavits. Although the decision over 15 years old, the scientific evidence presented still resonates with today's scientific literature and the affidavits attached to this response:

> ...the Hoffmans offered an affidavit by Dr. Joseph Wagoner. Dr. Wagoner, an epidemiology expert, opined that:
>
> > asbestos was the substantial causal factor in the induction of Milton Hoffman's malignant mesothelioma of the pleura. The *dusts and fibers from defendants' products* which have been identified and shown to have been in general use in the shipyard during the time of Mr. Hoffman's tenure there *are the substantial causal factors of his said disease....* [T]he use of asbestos materials in shipyards releases asbestos dust into the air which typically hangs in the air and permeates the air throughout the work area, including areas removed from its point of release so that persons working in adjacent areas near the point source of asbestos dust could inhale asbestos fibers. Once released into the air, asbestos fibers drift with air currents thus spreading over time throughout a large area. Asbestos dust and fibers remain floating in the air once released and individuals not

working directly with asbestos products are at risk of becoming diseased.
... [N]umerous articles and studies [have shown] the development of pleural mesothelioma among individuals ... living up to *at least a half mile away* from a given point source of asbestos dust and who have no direct contact with asbestos products.

(R 7-168, Wagoner Affidavit (emphasis added)).

*Id.* at 1382.

The final two paragraphs of the *Hoffman* decision are so compelling and applicable to mesothelioma cases that a quotation in full is warranted:

The key issue in this case is *not* whether there should be a presumption of causation if a plaintiff merely shows that asbestos products manufactured by the defendant were in use at a particular job site.   Instead, the issue is whether a reasonable jury could conclude in this case by a preponderance of the evidence presented, that Mr. Hoffman was exposed to Armstrong's asbestos products, and that the exposure was a proximate cause of his injury.

Neither party disputes that Armstrong's products were in use 300 to 400 feet away from Milton Hoffman.   The Hoffmans have offered affidavits to prove, and Armstrong has not contested, that the only known cause of mesothelioma is asbestos exposure.   The Hoffmans have also offered an affidavit from an expert who has made an opinion as to the ultimate issue in the case:  that Armstrong's products were the substantial causal factors of Milton Hoffman's disease. Although we make no opinion as to the weight which should be given to such evidence by the fact finder, we cannot agree with the district court's determination that no genuine issue of material fact exists for trial. Instead, we believe a reasonable jury could conclude that Milton Hoffman was exposed to and injured by Armstrong's products.   The Hoffmans have raised sufficient evidence to show that a genuine issue of material fact exists.

*Id.* at 1383.

## CONCLUSION

For the reasons set forth above, the Court should deny Defendants' Motion for Clarification

26

DATED this 3rd day of January, 2006.

> HATCH, JAMES & DODGE, P.C.,
> LAW OFFICES OF GARY DIMUZIO
>
> and
>
> G. PATTERSON KEAHEY, P.C.
>
> By: _____
> Mark Richards
>
> Attorney for Plaintiffs

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I served a true and correct copy of the *Plaintiffs' Response and Memorandum in Opposition to Defendants' Motion for Clarification* via United States Mail, postage prepaid, and/or by electronic mail on this *3rd* day of *January, 2006* on the counsel of record below:

**Attorneys for A.W. Chesterton**
Patricia Christensen
PARR WADDOUPS BROWN GEE &
LOVELESS
185 South State Street, Suite 1300
Salt Lake City, Utah 84111
pwc@pwlaw.com

**Attorneys for Anchor Darling Valve**
**Company, Cleaver Brooks, Durco**
Melinda A. Morgan
RICHARDS, BRANDT, MILLER &
NELSON
50 South Main Street, 7th Floor
P.O. Box 2465
Salt Lake City, UT 84110-2465
Telephone: (801) 531-2000
Facsimile: (801) 532-5506
Melinda-Morgan@rbmn.com

**Attorneys for Defendant Garlock, Inc.,**
**Crown, Cork & Seal, Fairbank Morse**
**Pump, Gould Pumps**
Joseph J. Joyce
STRONG AND HANNI
3 Triad Center, Suite 500
Salt Lake City, UT 84180
Telephone: (801) 532-7080
Facsimile: (801) 596-1508
asbestos@strongandhanni.com

**Attorneys for Bullough Abatement, Inc.**
Shawn McGarry
David M. Bernstein
KIPP AND CHRISTIAN, P.C.
10 Exchange Place, 4th Floor
Salt Lake City, Utah 84111
asbestos@kippandchristian.com

**Attorneys for Defendants Emerson**
**Electric**
Richard K. Glauser
Justin Scott
SMITH & GLAUSER, P.C.
7351 S. Union Park Ave, #200
Salt Lake City, Utah 84047
Telephone: (801) 562-5555
RKGlauser@aol.com
gdj@smithglauser.com

**Attorneys for Viacom**
Tracy H. Fowler
Todd M. Shaughnessy
Angela Stander
SNELL & WILMER
15 West South Temple, Suite 1200
Salt Lake City, UT 84101
Telephone: (801) 257-1900
Facsimile: (801) 257-1800
swasbestos@swlaw.com

**Attorneys for Thermal West**
John R. Lund
Jill L. Dunyon
SNOW, CHRISTENSEN & MARTINEAU
10 Exchange Place Eleventh Floor
Post Office Box 45000
Salt Lake City, UT 84145
Asbestos@scmlaw.com

**Attorneys for Ingersoll-Rand Company**
E. Scott Savage
Casey K. McGarvey
BERMAN & SAVAGE
50 South Main Street, Suite 1250
Salt Lake City, UT 84144
Telephone: (801) 328-2200

**Attorneys for Crane Company, Georgia Pacific Corporation, Milton Roy Company, Square D Company**

Katherine Venti, Esq.
PARSONS BEHLE & LATIMER
One Utah Center
201 South Main Street, Suite 1800
P.O. Box 45898
Salt Lake City, Utah 84145-0898
(801) 532-1234
kventi@pblutah.com

**Attorneys for General Electric**
Gregory J. Sanders
Margaret R. Wakeham
KIPP & CHRISTIAN, P.C.
10 Exchange Place, 4th Floor
Salt Lake City, UT 84111
(801) 521-3773
jsanders@kippandchristian.com
mwakeham@kippandchristian.com

**Attorneys for Industrial Supply Company**
Joseph E. Minnock
Jonathan L. Hawkins
MORGAN, MINNOCK, RICE & JAMES
Kearns Building, 8th Floor
136 South Main Street
Salt Lake City, UT 84101
Telephone: (801) 531-7888
Facsimile: (801) 531-9732
jhawkins@mmrj.com
jminnock@mmrj.com

asbestos@bermansavage.com
Refused to accept Email service
**Attorneys for Warren Pumps, Zurn Industries**
Phillip S. Ferguson
Rebecca Hill
Scot A. Boyd
CHRISTENSEN & JENSEN, P.C.
Key Bank Tower, Suite 1500
50 South Main Street
Salt Lake City, Utah 84111
Asbestos.Groups@chrisjen.com
sboyd@chrisjen.com
RebeccaHill@chrisjen.com

*Laura Chaves.*

Laura Chaves

# EXHIBIT 1

Affidavit

State of South Carolina
County of Charleston

1.      This is the affidavit of Alice M. Boylan, MD.  I am an adult over the age of 18 and capable of making this affidavit. I have never been convicted of a felony or crime of moral turpitude. The following testimony is based upon my own personal knowledge from professional training and experience.

2.      I am a medical doctor with board certification in internal medicine, pulmonary medicine and critical care.  I have NIH-funded research investigating the molecular biology of asbestos-induced mesothelioma.  My full academic background and experience is delineated in the attached C.V.

I have been asked to provide opinions concerning the relationship between asbestos exposure and the potential to develop mesothelioma, based on scientific principles and knowledge.

4.  The opinions offered herein come from more than fifteen years of study regarding asbestos, and the diseases they can cause in humans and animals.  In addition, these opinions are derived from my original research and my clinical practice as a physician who cares for patients with asbestos-related disease.

5.      For asbestos-related cancers, including mesothelioma and lung cancer, there is no known minimum dose, or threshold of exposure, that can lead to the development of malignant cells (1).

6.      Studies in vitro suggest that it may take only one fiber to produce a malignancy in tissue that gets exposed. Indeed, exposure of a cell to one fiber can cause DNA strand breaks, changes in DNA that lead to the development of cancer.  Asbestos-induced strand breaks have been seen with cell exposure to both amphibole and serpentine fibers. Consequently, it is impossible to determine which fiber, of any and which fiber types, from which specific product, caused a cancer to develop (2).

7.      Although one fiber can results in multiple DNA strand brakes leading to malignant transformation of a cell, each asbestos fiber that is ingested or inhaled appears to have an affect which can contribute to the development and propagation of malignant cells.  For example, asbestos fibers of all types have been shown to induce the development of pro and anti-inflammatory cytokines by mesothelial cells (1). Inflammation is now recognized as playing an important role in the development and progression of cancers.  In addition, exposure to asbestos fibers appears to impair cellular immunity, the body's only strategy to rid itself of malignant cells (3).  Therefore, the current body of research shows that the overall asbestos burden, and all asbestos exposures alter the cellular environment in such a way to contribute to the development and progression of mesothelioma.

8.      The association between asbestos exposure and development of mesothelioma has not been found to follow a clear dose-response relationship.  The incidence of mesothelioma is much more dependent on time since exposure than on the accumulated dose over time. (1) The development of mesothelioma has been described after short-term large exposure in workers, after low dose long term exposure (such as in wives and children of asbestos workers), in people living near asbestos mining and manufacturing operations, and as a result of environmental exposures (such as in persons living near asbestos containing rock formations in California) (4).

9.     Consequently, from a public health perspective it would be inappropriate that a court would adopt as needed a rule requiring "frequency, regularity, and proximity" to relate exposure to asbestos and the development of mesotheliomas since the scientific community and the federal government has not been able to determine a safe level of exposure. For example, the EPA has not been able to develop an inhalation reference concentration (an estimate of a continuous inhalation exposure of a chemical to the human population through inhalation that is likely to be without risk) (5).

10.     Therefore, the concept of "frequent, regular, and proximate" exposure to asbestos in cases of mesothelioma is not consistent with our current understanding of the cellular and molecular biology of asbestos-induced malignancy.   Such a requirement would disqualify some cases clearly caused by asbestos exposure and not allow them to be admitted under such a legal construct.

11.     Based on these and numerous other reports in scientific literature, it is my opinion that mesothelioma can result from infrequent and low exposures to asbestos.  It would therefore, not be appropriate to require demonstration that exposures to asbestos were frequent, regular, and in close proximity to the individual in cases of mesothelioma.  It is also my opinion that it would not be appropriate to require that the individual have demonstrated exposures to each product that were frequent, regular, and in close proximity to the individual.

12.     These views are generally accepted in the scientific /medical community.

13.     Further sayeth the affiant not.


_____
                    Alice M. Boylan, MD,

Signed before me on  21ˢᵗ_____ December, 2005


          Marianne E. Grac
                    Notary


1.     The mesothelial cell and mesothelioma. Jaurand M-C, Bignon J editors. Marcel Dekker, Inc. New York, NY 1994.

2.     Hardy, Jeanne A, Aust Ann E.  Iron in asbestos chemistry and carcinogenicity. Chem Rev 1995;95: 97-118.

3. Kagan E, Solomon A, Cochran JC, et al.  Immunological studies of patiens with asbestosis.  II. Studies of circulating lymphoid cells and humoral immunity.  Clin Exp Immunol 1977; 268-275.

4. Pan XL, Day HW, Wang W, Beckett LA, Schenker MB, Residential proximity to naturally occurring asbestos and mesotheioma risk in California. Am J Respir Crit Care Med 2005; 172:1019-25

5.      U.S. Environmental Protection Agency. *Integrated Risk Information System (IRIS) on Asbestos*. National Center for Environmental Assessment, Office of Research and Development, Washington, DC. 1999

# EXHIBIT 2

Mark F. James (5295)
Mark Richards (9018)
**HATCH, JAMES & DODGE, P.C.**
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

G. Patterson Keahey (*pro hac vice*)
John T. Alley, Jr. (*pro hac vice*)
**LAW OFFICES OF G. PATTERSON KEAHEY, P.C.**
One Independence Plaza, Suite 612
Birmingham, Alabama 35209
Telephone: (800) 291-0050
Facsimile: (205) 871-0801

Gary M. DiMuzio (*pro hac vice*)
**LAW OFFICES OF GARY DIMUZIO**
4226 Judson
Houston, TEXAS 77005
Phone: (713) 417-2197

Attorneys for Plaintiffs

### IN THE THIRD JUDICIAL DISTRICT COURT
### IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| IN RE: ASBESTOS CASES OF HATCH, JAMES & DODGE and G. PATTERSON KEAHEY. | **AFFIDAVIT OF SAMUEL P. HAMMAR** |
| HOWARD SORTOR AND NADINE SORTOR | Case No. 040909899 AS |
| Plaintiffs, | Honorable Glenn K. Iwasaki |
| vs. | |
| ASBESTOS DEFENDANTS | |

### AFFIDAVIT

1.  My name is Dr. Samuel P. Hammar.  I am over the age of 18 years, am of sound mind and body, have never been convicted of a felony and am fully capable of making this declaration.

1

Case MDL No. 875    Document 4914    Filed 11/17/06    Page 322 of 423

2.      I am and have been the director of Diagnostic Specialties Laboratories, Inc., (aka PAKC/DSL) in Bremerton, Washington, since February 1989. Prior to that, I was a pathologist at Virginia Mason Clinic, Seattle, Washington. I have been board-certified in anatomic and clinical pathology since 1975. My area of expertise is pulmonary pathology, which is the study of diseases of the lung. Asbestos-related diseases are a subspecialty of mine. Because of my special interest in this area, I am referred cases of possible asbestos-related disease for my review and analysis by other physicians. I also serve on the Panel for the Reclassification of Lung Tumors for the World Health Organization. I am a reviewing pathologist for the US-Canadian Mesothelioma Panel and am a Clinical Professor of Pathology at the University of Washington School of Medicine. I am licensed to practice medicine in the State of Washington.

3.      I have authored or co-authored over 100 articles, 12 abstracts and 40 chapters in books. I have edited, along with Dr. David Dail, two textbooks titled Pulmonary Pathology, in which I wrote the chapter on pleural disease and co-authored the chapter on asbestos. Attached is a copy of my curriculum vitae.

4.      In addition to my research and writing, I do surgical pathology work and am qualified to examine tissue specimens to determine what disease(s) the patient was suffering from. I also perform autopsies in order to determine what disease processes the patient was suffering from at the time of death.

5.      I have testified as an expert witness in numerous trials involving asbestos-related diseases. I have reviewed the medical records and/or pathology materials as described in this report and my opinions are stated to be within a reasonable degree of medical certainty.

6.      The opinions expressed in this report are based upon my years of study, my review of the peer-reviewed literature, my scientific research and publishing activities, and my work as a diagnosing pathologist for asbestos-related diseases. I hold the below opinions to a reasonable degree of medical certainty. I also believe these opinions to be generally accepted among doctors and scientists with expertise in this area.

7.      I am swearing this affidavit in response to several question posed to me regarding the nature of mesothelioma and how it can be induced by asbestos exposure.

8.      First of all, mesothelioma is a cancer of the mesothelial lining of the lungs/chest cavity and some other organs. Mesothelioma is a signature disease for asbestos exposure. Exposure to asbestos in the only generally accepted cause for mesothelioma in North America. In my own experience, it is rare to have a case of mesothelioma with no known exposure to asbestos, other than the background levels to which everyone is exposed. Background levels may be a factor in the induction of mesothelioma but current scientific methods are inadequate to

answer this question with certainty. It is generally accepted that mesothelioma is a
low dose disease, with no known threshold of asbestos exposure below which
there is no risk. This low dose aspect of mesothelioma has been borne out in
human epidemiological studies, case reports, and laboratory research involving
cells and animals. The first major case series of mesothelioma in the peer
reviewed literature, the 1960 Wagner study, contained both occupational and
environmental cases with the asbestos exposure ranging widely in both proximity
and intensity. There have been numerous cases in the literature of low and/or
distant exposures causing mesothelioma. These cases include but are not limited
to: short, high intensity exposures; secondary exposures such as household
members exposed to asbestos contaminated work clothing brought home by
another household member; low level environmental cases where the victims
lived considerable distances from the source of exposure.

9.   Asbestosis is quite distinct from mesothelioma. Asbestosis is a scarring condition
of the lung itself (parenchema) involving damage to many cells, rather than a
cancerous process that in all likelihood stems from one fully cancerous cell.
Asbestosis is generally regarded as a high dose illness, usually requiring fairly
heavy exposures over an extended period of time. It is generally held that short
duration or low dose exposures cannot cause asbestosis.

10.  Every asbestos fiber that comes into contact with a cell in the respiratory tract will
elicit a physiological response from the body. The body has a limited ability to
deal with this exposure burden. Some of the fibers will stimulate removal
mechanisms and eventually be removed from the body. Other fibers will stay in
the lungs and/or translocate to the lining of the lungs and other organs where
mesothelioma develops. Any fiber contacting a cell may cause genetic damage,
induce inflammatory reactions, or cause other biochemical reactions which have
been implicated in the development of mesothelioma. Consequently, I believe the
only scientifically supportable position is that all inhaled fibers that contact a cell
play a role in the devolvement of the subsequent mesothelioma, up until the
development of one fully cancerous cell.

11.  For asbestos to be determined to be a cause of a mesothelioma there is no
requirement that the source be located any particular distance from the patient.
There are cases in the literature that range from direct hands on use of the
asbestos to cases located a considerable distances from the source of fiber
emissions. The key is whether the fibers are inhaled – not the distance from the
source from the patient.

12.  Regarding the level of exposure needed for the induction of mesothelioma, as
noted before there is no known safe level of exposure to asbestos in term of
inducing mesothelioma. There is no scientific requirement that the exposure last a
certain amount of time, occur with a certain regularity, or be a given intensity. As
a scientists and doctor I look at each case individually to see if there are exposures
consistent with the wide range of exposures reported in the scientific literature.

3

13. If a court were to require frequent, regular exposures in close proximity to the source of fibers, many mesothelioma cases that are in my opinion most certainly linked to asbestos would be barred from pursuing their cases. The court would be requiring more exposure for causation than the science dictates would be necessary.

14. If a court were to go even further, and require that there be frequent, regular exposure in close proximity to the source of fibers for every single product, even more deserving cases would be barred. The law in that case could be requiring more exposure to each product than the science indicates is required for total causation to be established.

Further Affiant saith not,

_Samuel P. Hammar MD_

Signature of Affiant

**SWORN** to and **SUBSCRIBED** in my presence, on this the ___19th___ day of ___December___, 2005.

_Michaele J. Stoll_

Notary Public in and for the state of WA.

My Commission Expires:

_July 9, 2007_

DATED this ___3rd___ day of ___January___, 2006

HATCH, JAMES & DODGE, P.C.
LAW OFFICES OF GARY DIMUZIO

and

G. PATTERSON KEAHEY, P.C.

By: _[signature]_

MARK RICHARDS
Attorney for Plaintiffs

4

# EXHIBIT 3

Case MDL No. 875    Document 4914    Filed 11/17/06    Page 326 of 423

# **Affidavit**

State of Pennsylvania
County of Philadelphia

1. This is the affidavit of Arthur L. Frank, MD, PhD. I am an adult over the age of 18 and capable of making this affidavit. I have never been convicted of a felony or crime of moral turpitude. The following testimony is based upon my own personal knowledge from professional training and experience.

2. I am a medical doctor with board certification in both internal medicine and occupational medicine. I also hold a PhD in biomedical sciences and the original research completed for this degree had to do with the study of the effects of asbestos on respiratory tissue. My full academic background and experience is delineated in his C.V., which is attached. I am a Professor of Public Health and Chair the Department of Environmental and Occupational Health at the Drexel University School of Public Health.

3. The opinions offered herein come from more than thirty-five years of study regarding asbestos, all of the fiber types, the diseases they can cause in humans and animals, and from original research beyond the broader scientific literature. I have examined thousands of individuals for evidence of asbestos-related disease.

4. While it is agreed in the scientific community that there is a threshold, in principle, that must be exceeded to produce the disease asbestosis, there is no consensus on what that level might be. However, asbestosis can result from not only occupational exposures but familial and neighborhood exposures as well. The exposure may be daily or regular at a workplace, but may be much less frequent, regular or at a great distance from the source of exposure, such as simply living near, but not working at a mine or asbestos textile facility.

5. For the disease mesothelioma, or any other asbestos-related cancer, there is no threshold of exposure that can lead to disease. This is not unique to asbestos, but is a characteristic of each and every carcinogen, where any dose carries some carcinogenic risk. Specifically, there is scientific evidence for asbestos in animals, and in man, that as little as one day of exposure can lead to mesothelioma or lung cancer. There are also cases of "neighborhood" cases of mesothelioma caused by asbestos where the only documented exposure is living near (up to ½ mile away) of an asbestos utilizing facility.

6. Although each and every fiber that reaches tissues in the human body can lead to changes giving rise to diseases known to occur following exposure to asbestos, it may take only one fiber to produce a malignancy in tissue that gets exposed. There is no way to sort which fiber, of any and all fiber types, from which specific product, caused any changes seen.

7. If it was thought necessary to have "frequent, regular, and proximate" exposure to asbestos in cases of mesothelioma that would not comport with scientific knowledge, and it would disqualify some cases known to be caused by asbestos and not allow them to be admitted under such a legal construct.

8. It would also not be appropriate to set that standard for any individual product, since it is recognized that even a single fiber could cause disease, and that any single product might have been the original source for such an exposure. Moreover, there is an accumulative risk as each and every fiber gets added to one's body burden, regardless of initial source.

9. From a public health perspective it would be inappropriate that a court would adopt as needed a rule requiring "frequency, regularity, and proximity" to relate exposure to asbestos and the development of mesotheliomas.

10. These views are generally accepted in the scientific /medical community and by various governmental agencies both nationally and internationally.

11. Further sayeth the affiant not.

_____
Arthur L. Frank, MD, PhD

Signed before me on ___9th__ of __ December, 2005

_____
Notary

Sworn to and subscribed before me
this __9__ day of __Dec__ 200_5__.

NOTARIAL SEAL
DYAN'NE J GLASS, Notary Public
City of Philadelphia  Phila County
My Commission Expires May 15, 2006

# EXHIBIT 4

AFFIDAVIT OF JERRY LAUDERDALE, C.I.H.
REGARDING EXPOSURE CONSIDERATIONS RELATING TO MESOTHELIOMA

STATE OF __Texas__                    §
                                      §
                                      §
COUNTY OF __Travis__                  §

     Before me, the undersigned on this day personally appeared JERRY LAUDERDALE, P.E., C.I.H, R.S., known to me or through his driver's license and who, being by me duly sworn upon his oath, deposes and states as follows:

     "My name is JERRY LAUDERDALE. I am over the age of 18 years, have never been convicted of a felony and am fully competent to make this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

     I am a Certified Industrial Hygienist. I am also a Registered Professional Engineer and a Registered Sanitarian in the State of Texas. Industrial hygiene is the science of identifying and preventing workplace hazards. I am now in a private consulting practice. For many previous years, I worked as an industrial hygienist for Texas Department of Health, Occupational Health Division. In my work for the state of Texas I inspected facilities where asbestos products were manufactured and also facilities where asbestos products were used in many different ways, such as in the construction of those facilities and/or in insulation on steam pipes, steam boilers or other vessels or structures. Asbestos-containing gaskets and rope packing were used in connection with pipe flanges and/or various types of equipment. In this service I developed expertise in various areas of occupational health related to asbestos disease including, but not limited to occupational health, epidemiology, historical aspects of the development asbestos-related disease and industrial hygiene. A true and correct copy of curriculum vitae is attached as Exhibit A. My opinions have been generally accepted by the scientific and medical community.

     My personal knowledge of the relevant facts about exposures and development of asbestos diseases has been gained through my educational background and professional training and experience as well as my review of scientific and medical literature.

     I have been asked to provide opinions concerning the relationship between asbestos exposure and the potential to develop mesothelioma, based on industrial hygiene principles and knowledge. At issue is what evidence of exposure is necessary to demonstrate that a person was significantly exposed to an asbestos containing product to demonstrate an increased risk for development of mesothelioma.

     Asbestos is known to cause a lung disease known as asbestosis. Asbestosis is known to develop after exposures over time to asbestos in air. The exposures are

1

typically repeated frequently over a number of years, resulting in an increased deposition of asbestos fibers in the workers' lungs. Worker groups with higher exposures have generally experienced higher incidences of asbestosis compared to worker groups with lower cumulative exposures. This association of higher asbestosis incidence with higher cumulative exposures over time has been understood as confirming a dose-response relationship between asbestos exposure and development of asbestosis.

The association between asbestos exposure and development of mesothelioma has not been found to follow the same dose-response relationship. Rather than an equal weighting on time and concentration as with asbestosis, the incidence of mesothelioma is much more dependent on time since exposure than on the accumulated dose over time. (Robinson, 2002) Short term, large dose exposures have been found to cause mesothelioma even though the dose over time is not large. (NIOSH 1995) Therefore, risk for developing this asbestos related disease is not dependent on frequently working in close proximity with asbestos containing products.

Studies in many populations have shown that persons with occasional or indirect exposure to asbestos have developed mesothelioma. (Newhouse 1965) People living in households of asbestos workers receive indirect exposure to asbestos from asbestos contaminated work clothing worn home from dusty workplaces. The effect was studied by the National Institute for Occupational Safety and Health in a study commissioned by Congress (NIOSH, 1995). They found that there were numerous studies that demonstrate that wives and even children of asbestos workers had enough asbestos exposure to cause mesothelioma. The most frequently cited source for household exposure is to wives from washing their husbands' clothing. Also, people living near asbestos mining and manufacturing operations have developed mesothelioma as a result of environmental exposures. Household contacts and environmental exposed individuals were reposted in one of the best documented early study in South Africa (Wagner, 1960). For the year 1999, the two most frequently cited occupations on death certificates showing mesothelioma as a cause of death were Managers and Administrators, and Housewife/Homemaker. (NIOSH, 2002) These occupations would typically experience only infrequent, indirect asbestos exposures.

Exposures of only a very brief duration have also been shown to result in mesothelioma. The NIOSH congressional study stated that "—Mesothelioma has occurred following short term asbestos exposures of only a few weeks, and can result from very low levels of exposure." (NIOSH 1995) Recent studies have also shown that mesothelioma rates are higher for persons living near asbestos containing rock formations in California (Pan, 2005). This finding supports the hypothesis that there is a link between higher environmental exposures occurring near rock outcroppings containing asbestos and development of mesothelioma.

Based on these and numerous other reports in scientific literature, it is my opinion that mesothelioma can result from infrequent and incidental exposures to asbestos at doses that would be considered to be low using occupational exposure standards. In my opinion, for mesothelioma cases it would not be appropriate to require demonstration that

2

exposures to asbestos were frequent, regular, and in close proximity to the individual. Similarly, for individuals exposed to several asbestos containing products, it would not be appropriate to require that the individual have demonstrated exposures to each product that was frequent, regular, and in close proximity to the individual.  The adoption of a frequent, regular, and close proximity rule for a total dose or for an individual contributing dose would, in my opinion, not be appropriate based on industrial hygiene knowledge about the relationship between exposure to asbestos and development of mesothelioma.

　　　　FURTHER AFFIANT SAYETH NOT."

　　　　　　　　　　　　　　　　JERRY F. LAUDERDALE

　　　　SUBSCRIBED AND SWORN TO ME BEFORE ME on the __13th__ day of __December__, 200**5**, by the said AFFIANT who has stated to me that the foregoing affidavit and statements contained herein are true and correct within his personal knowledge to certify which witness my hand and official seal of office.

　　　　[SEAL]

Notary Public in and for the State of __Texas__

Printed Name of Notary __Kerri Cohen__
My Commission Expires: __August 27, 2008__

> KERRI COHEN
> Notary Public, State of Texas
> My Commission Expires
> August 27, 2008

3

# APPENDIX A

# PERSONAL RESUME
# JERRY F. LAUDERDALE, P.E., M.S., C.I.H.

### Education:

Bachelor of Science in Mechanical Engineering, University of Texas at Austin - 1970

Master of Science in Industrial Hygiene, Texas A&M University, College Station 1976

### Professional Qualifications

Registered Professional Engineer, Texas - 1975 - #38500
Certified Industrial Hygienist - 1976 - #1027
Registered Professional Sanitarian, - 1987 - #2459
Mold Assessment Consultant – 2005 – MAC#0185

### Employment History:

**Lauderdale Environmental Engineering, 1995 - Present.**

Principal. Responsible for all aspects of performance of industrial hygiene services, including recognition, evaluation, and control of occupational health hazards, including indoor air pollution. Control aspects include design of ventilation systems for contaminant control, noise reduction controls, and other aspects of engineering control methods. Provide expert opinion and testimony related to occupational and environmental health concerns. Provide Comprehensive risk assessment and risk control services.

**Environmental Technologies, Incorporated, 1995 - 2000 (Part-time).**

Executive Consultant. Responsible for initiating, bidding, planning, and conducting industrial hygiene, forensics, and environmental health projects for a broad spectrum of clients.

**Texas Department of Health, 1971 - 1995.**

Director of the Division of Occupational Health - 1990-1995. Responsible for implementation of statewide consultation and regulatory programs covering environmental health, occupational health, indoor air pollution, asbestos, polychlorinated biphenyls, lead paint poisoning and hazard communication. Programs include four contracts with the United States Environmental Protection Agency totaling over $800,000. Programs which license asbestos abatement professionals and register hazardous chemical storage facilities collect over $3,000,000 annually. Program staff included 98 professional and support staff, with an operating budget of $4,200,000.

Director of the Division of Occupational Safety and Health - 1987-1990. State Safety Engineer - Directed safety and industrial hygiene programs. Responsible for implementation of a consultation program under a grant from the United States Department of Labor, Occupational Safety and Health Administration, to provide comprehensive safety and health services to Texas industries.

5

Chief Industrial Hygienist - 1976-1987.   Division of Occupational Health and Radiation Control -- Responsible for program development and for coordination of central and regional environmental health and industrial hygiene activities for Texas.

Staff Industrial Hygienist - 1971-1976.   Division of Occupational Health and Radiation Control - Performed comprehensive and complex industrial hygiene and environmental health inspections throughout Texas.   Responsibilities included preparation for and conduct of inspections, hazard recognition, evaluations, and control.

**Texas Water Commission, 1970 - 1971.**
Engineering Assistant - 1970.   Performed tasks relating to development of a program to track releases of chemical pollutants from industrial facilities.

<u>**Professional Activities:**</u>
President, Texas Hill Country Section, American Industrial Hygiene Association, 1981
Adjunct Associate Professor, Environmental Sciences, The University of Texas School of Public Health, Houston  1980 - 1996.
Member, American Industrial Hygiene Association

6

# PUBLICATIONS

1.  Air sampling Instruments (5th Edition), 1978, Part V, Section U; "Direct Reading Instruments for Analyzing Airborne Gases and Vapors (John S. Nader, Jerry F. Lauderdale) pp U-1 - U-164.

2.  "Environmental and Occupational Health in Texas", East Texas Medicine / Vol. 2 No. 1, pg 12-14, by Jerry Lauderdale, P.E. Janet Pichette, BS, Jean Brender, RN, Ph.D., Dennis Perotta, Ph.D., Laurel Schulze, BS

3.  "Formaldehyde: Public and Industrial Exposures" by Jerry F. Lauderdale, American Society of Safety Engineers, Region III, Tenth Annual Professional Development Conference Proceeding, Feb. 1982.

4.  "Measurement of Noise Levels in the Vicinity of Occupationally Exposed Workers", Jerry Lauderdale, M.S., Richard Konzen, Pg.JD., American Industrial Hygiene Conference, May 26, 1977.

5.  "Quantification of Fiber Releases for Various Floor Tile Removal Methods", R. N. Crossman, Jr., M. Williams, Jr., J. Lauderdale, K. Schosek, R. Dodson., Applied Occupational and Environmental Hygiene, Vol. 11, No. 9, September 1996.

JERRY F. LAUDERDALE, P.E., M.S., C.I.H.
3804 CLOUDY RIDGE RD.
AUSTIN, TEXAS 78734
PHONE: 512/266-8933
FAX: 512/266-8933

7

# APPENDIX B

# REFERENCES

Newhouse, M.L., and H. Thompson.  Mesothelioma of Pleura and Peritoneum Following Exposure to Asbestos in the London Area.  British Journal of Industrial Medicine 22:261-269 (1965)

NIOSH (1995).  Report to Congress on Workers' Home Contamination Study Conducted Under The Workers' Family Protection Act (29 U.S.C. 671a)  Cincinnati, OH:  U.S. Department of Health and Human Services, Public Health Service, Center for Disease Control, National Institute for Occupational Safety and Health, DHHS (NIOSH) Publication No. 95-123.  pages 6-11, 35-63.

NIOSH (2002).  Work-Related Lung Disease Surveillance Report, 2002.  Cincinnati, OH: U.S. Department of Health and Human Services, Public Health Service, Center for Disease Control, National Institute for Occupational Safety and Health, DHHS (NIOSH) Publication No. 2003-111.  pages 157-168.

Pan, X., H.W. Day, W. Wang, L.A. Beckett, M.B. Schenker.  Residential Proximity to Naturally Occurring Asbestos and Mesothelioma Risk in California.  American Thoracic Society, June 23, 2005.

Robinson, B.W.S., A.P. Chahinian (2002).  Mesothelioma.  Martin Dunitz Ltd., The Livery House, London.  Pages 339-349.

Wagner, J.C., C.A. Sleggs, and P. Marchand (1960).  Diffuse Pleural Mesothelioma and Asbestos Exposure in the North Western Cape Province>  Brit. J. Industr. Med., 1960, 17, 260.

# EXHIBIT "E"

to

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO REMAND AND FOR AWARD OF COSTS AND ATTORNEYS' FEES

Unpublished Decision

<u>Westbrook v. Asbestos Defendants,</u>
No. C011661VRW,
2001 WL 902642
(N.D. Cal. July 31 2001)

Westlaw.

Case MDL No. 875 Document 4914 Filed 11/17/06 Page 339 of 423
Case 2:08-cv-00741-TS Document 128 Filed 10/16/2008 Page 2 of 4

Not Reported in F.Supp.2d                                                                                                           Page 1
Not Reported in F.Supp.2d, 2001 WL 902642 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

**C**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, N.D. California.
Paul WESTBROOK and Marlene Westbrook,
Plaintiffs,
v.
ASBESTOS DEFENDANTS (BHC), Defendants.
No. C-01-1661 VRW.

July 31, 2001.

ORDER
WALKER, J.
*1 Invoking the federal officer removal statute, 28 USC § 1442(a)(1), and the military contractor defense, defendant Todd Shipyards Corp removed this asbestos related tort action to federal court on April 27, 2001. According to Todd, to the extent asbestos was used on its property, the United States Navy required it, giving rise to the military contractors defense and allowing removal. Presently before the court is plaintiffs' motion to remand. For the reasons that follow, the motion is GRANTED.

I

On March 14, 2001, plaintiffs Paul and Marlene Westbrook filed suit in the San Francisco superior court alleging personal injury and loss of consortium against numerous defendants, among them Todd. Plaintiff Paul Westbrook formerly worked with asbestos as an insulator and now suffers from asbestosis and asbestos-related pleural disease. He has an increased risk of developing further conditions, including cancer.

Plaintiffs' suit against Todd arises out of the operation of a facility at which plaintiff worked for certain subcontractors in the 1960s and 1970s. Plaintiff indicates that he worked as an insulator for both Owens Corning Fiberglass Corp (1960s and 1970s) and Roberts Brothers Construction Company (1974) on Todd's premises. Def Exhibits, Exh B, Complaint at 7 & 8. It is not clear from the complaint how much plaintiff worked on United States Navy ships at Todd's facilities.

Against Todd, plaintiffs allege only loss of consortium and "premises owner/contractor liability." Id at 2. This is in contrast with the numerous causes of action brought against other defendants. Plaintiffs allege that Todd:
1. "Should have recognized that the work of said contractors would create during the progress of the work, dangerous, hazardous, and unsafe conditions which could or would harm plaintiff and others unless special precautions were taken;"
2. "Knew or had reason to know, that the contractors it had selected and hired to install, remove, abate or otherwise handle asbestos-containing materials were unfit or unqualified to do so;" and
3. "Failed to use reasonable care to discover whether the contractors it selected and hired to install, remove, abate or otherwise handle asbestos-containing materials were competent or qualified to do so."

Id at 2-3. The precise nature of plaintiffs' allegations against Todd is murky in two ways.

First, the portions of the complaint cited above focus on the negligent hiring of subcontractors (numbers 2 and 3). But plaintiffs explicitly disclaim any claims based on negligent hiring in their reply brief in connection with this motion. In that brief, plaintiffs assert that their cause of action for premises owner/contractor liability has two components: (1) failure to warn of a dangerous condition on the premises; and (2) negligent exercise of retained control over the premises. Reply Br at 3 (citing Grahn v. Tosco Corporation, 58 Cal App 4th 1373, 68 Cal Rptr 2d 806 (1997)).

*2 The complaint also fails to make clear to what extent the insulating work that caused plaintiff's injuries was done on United States Navy ships. The complaint lists United States Navy ships and no private ships. But plaintiffs have disclaimed, in writing, any claims arising out of work done on United States Navy ships. See Leroy Decl, Exh A.

In any event, on April 27, 2001, Todd removed the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

case to this court. Plaintiffs now move to remand to state court.

## II

Todd bears the burden of establishing that removal is proper. *Gaus v. Miles, Inc,* 980 F.2d 564, 566 (9th Cir1992). To remove a case failing within the federal-question grant of federal jurisdiction, a defendant would have to show that a federal question appears on the face of a well-pleaded complaint. See *Louisville & Nashville R Co v. Motley,* 211 U.S. 149, 152 (1908). An actual or anticipated federal defense would not justify removal. Id. Removal under the federal officer removal statute, however, is different. That statute allows removal on the basis of a federal defense.

Under 28 USC § 1442(a)(1), "[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office" may remove to federal court. Removal is proper if the moving party can (1) demonstrate that it acted under the direction of a federal officer; (2) raise a colorable defense to plaintiffs' claims; and (3) demonstrate a causal nexus between plaintiffs' claims and acts it performed under color of federal office. *Fung v. Abex Corp,* 816 F Supp 569, 571-72 (ND Cal 1992) (citing *Mesa v. California,* 489 U.S. 121, 124-25, 134-35 (1989)); *Jefferson County, Alabama v. Acker,* 527 U.S. 423, 431 (1999) (defense need only be colorable).

In this case, Todd claims that it is shielded from liability by military contractors immunity. This doctrine was set forth in *Boyle v. United Technologies Corp,* 487 U.S. 500 (1988). The *Boyle* Court held that "[l]iability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." Id at 512.

Applying the *Mesa* test to the facts of this case, the court concludes that plaintiffs' motion to remand must be granted for two reasons. First, plaintiffs have asserted, in writing in the state court action, that: "Plaintiffs claims against defendant Todd Shipyards Corporation, exclude plaintiff's asbestos exposure at military and federal government jobsites and aboard U.S. Navy vessels." Leroy Decl, Exh A. To the extent this "stipulation" (as plaintiffs call it) is binding, Todd's ground for removal is eviscerated. If plaintiffs' claims arise only from work done on private ships, not under the direction of any federal officers, Todd's military contractor defense is unavailable.

*3 The question then is whether plaintiffs' written waiver is sufficient. The waiver of claims arising out of work done on federal jobsites and vessels is not a "stipulation" between the parties since Todd has not signed it. But another judge in this district has credited such a written disclaimer in a motion to remand. See *Overly v. Raybestos-Manhattan,* 1996 WL 532150 at *3 (ND Cal 1996). In *Overly,* Judge Illston accepted the plaintiffs' written waiver of claims related to design defects and therefore granted the motion to remand. The court sees no reason not to hold plaintiffs in this case to their waiver of claims arising out of work done on federal jobsites and vessels. This waiver, therefore, justifies remand. If plaintiffs later attempt to reverse course, and are allowed to do so by the state court despite their express waiver, Todd can always file for removal once again.

The motion to remand is also appropriate for a second reason. Even if plaintiffs' claims relate to work done on United States Navy ships, it is not clear that they even implicate the military contractors defense. In terms of the *Mesa* test, prongs (2) or (3) are probably not met. This is because the cause of action plaintiffs bring, based on premises owner/contractor liability, does not turn simply on Todd's use of asbestos. Rather, the claim appears to turn on a failure to warn about the dangers of asbestos and negligent exercise of retained control. The defense: "The Navy made me do it," does not apply to either basis of liability. Todd has shown, through the declaration of Roger B Horne (Exh I), the deposition of Tom Hixson (Exh C) and various military specifications documents (Exh J, K, L & M), that the Navy required

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Todd to use asbestos insulation. But Todd has not shown that the Navy required it to refrain from issuing warnings. Absent such a showing, Todd has no colorable military contractor defense to a failure to warn claim. See *In re Hawaii Federal Asbestos Cases,* 960 F.2d 806, 812-13 (9th Cir1992); *Overly,* 1996 WL 532150 at * 4; see also *Feidt v Owens Corning Fiberglas Corp,* 153 F3d 124, 129 (3d Cir1998) (discussing district court's remand of failure to warn claim in the face of a military contractors' defense, but affirming remand based on 28 USC § 1447(d)).

Todd's military contractors defense would fare no better with respect to the negligent exercise of retained control claim. That claim, as explained in *Grahn v. Tosco,* 58 Cal App 4th 1373, 68 Cal Rptr 2d 806 (1997), is premised on the notion that "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Id at 1393. The degree of control Todd retained in this case is not clear. But accepting Todd's contention that it was required by the Navy to use asbestos, the decision to use asbestos cannot give rise to liability under this theory. Only decisions within Todd's control, whether to have the workers use breathers for example, could give rise to liability. Since Todd alleges that only the use of asbestos was required by the Navy, Todd's military contractor defense cannot shield Todd from liability for negligent exercise of retained control.

**4** As the court understands plaintiffs' claims, Todd lacks a colorable military contractor defense. This means that Todd cannot meet prong two of the *Mesa* test. Another way to describe this situation is to say that Todd does have a colorable military contractor defense, but it is limited to defending against claims arising only out of the choice to use asbestos, because that is the only action that was directed by the government. Under this rubric, it is prong three of the *Mesa* test that is not met as there is no causal connection between the acts performed under the government's orders and the claims brought by plaintiffs. Either way, given the court's understanding of

plaintiffs' claims, Todd would be unable to demonstrate that removal was appropriate even if plaintiffs had not waived their claims arising out of work at government jobsites and on government vessels.

For these reasons, plaintiffs' motion to remand (Doc # 3) is GRANTED. Plaintiffs seek an award of $1563.78, the amount they incurred in attorneys' fees bringing this motion to remand. Under 28 USC § 1447(c), the court may order a removing defendant to pay plaintiffs their "just costs and any actual expenses, including attorney fees, incurred as a result of removal." Whether to grant such an award is within the court's discretion. In this case, the removal was unnecessary. The day before Todd removed this action, plaintiffs waived their claims to damages arising out of work done on federal government jobsites and vessels. As a result, the court concludes that an award of fees is appropriate and awards the requested amount, $1563.78. The amount is supported by the Leroy declaration and appears reasonable.

IT IS SO ORDERED.

N.D.Cal.,2001.
Westbrook v. Asbestos Defendants (BHC)
Not Reported in F.Supp.2d, 2001 WL 902642 (N.D.Cal.)

Briefs and Other Related Documents (Back to top)

• 3:01cv01661 (Docket) (Apr. 27, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT "F"

to

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO REMAND AND FOR AWARD OF COSTS AND ATTORNEYS' FEES

Unpublished Decision

Overly v. Raybestos-Manhattan, Inc.,
1996 WL 532150
(N.D. Cal. 1996)

Westlaw.

Not Reported in F.Supp.                                                                                  Page 1
Not Reported in F.Supp., 1996 WL 532150 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

▷
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, N.D. California.
Robert S. OVERLY and Louise S. Overly Plaintiffs,
v.
RAYBESTOS-MANHATTAN, et al. Defendants.
**No. C-96-2853 SI.**

Sept. 9, 1996.

ORDER REMANDING CASE TO SUPERIOR
COURT

ILLSTON, District Judge.

**\*1** On September 6, 1996, the Court heard argument
on plaintiffs' motion to remand. Having considered
the arguments of counsel and the papers submitted,
the Court hereby GRANTS plaintiffs' motion to re-
mand this case to San Francisco County Superior
Court. The Court also GRANTS plaintiffs' motion for
attorney fees and costs under 28 U.S.C. § 1447(c).

BACKGROUND

On April 30, 1996, plaintiffs filed the complaint in
this action in San Francisco County Superior Court.
The Superior Court granted trial preference to the
case pursuant to California Code of Civil Procedure §
36(d), because Mr. Overly is dying and is expected to
survive only a few months; trial was set for October
7, 1996.

On August 9, 1996, after the trial date had been set,
defendant Avondale Industries, Inc. removed the case
to federal court pursuant to 28 U.S.C §§ 1441, 1442,
and 1446. On August 20, 1996, plaintiffs filed a mo-
tion to remand and requested that it be heard on an
expedited basis.

According to the allegations of the complaint,
plaintiff Robert Overly was exposed to asbestos
while working in a shipyard in the 1960's. Defendant
Avondale controlled part of the premises of Mr.
Overly's employment during this period of time.
Plaintiffs' complaint alleges that Avondale knew or
should have known that the premises it controlled
contained hazardous conditions, namely products

containing asbestos. Plaintiffs further allege that de-
fendant hired contractors and subcontractors who
used products containing asbestos, but failed to warn
individuals in the surrounding area of the existence of
asbestos or to take precautions against human expos-
ure to the chemical.

Plaintiffs allege that, as a result of exposure to asbes-
tos while working in the shipyard, Mr. Overly ac-
quired mesothelioma, a cancer usually resulting from
asbestos exposure. In May of this year, Mr. Overly
was diagnosed with six months remaining to live.
Plaintiffs have proceeded against Avondale on the
"failure to warn theory" of products liability.

Avondale does not contest Mr. Overly's assertion that
he was exposed to asbestos during his work on the
Avondale shipyard. Instead, it claims that the work
done by Mr. Overly consisted primarily of work on
naval ships, and that Avondale is therefore protected
by government contractor immunity. Avondale as-
serts that it was under rigid guidelines by the federal
government concerning the design of naval ships.
Thus, Avondale asserts that it is entitled to the pro-
tection of the Federal Officer Removal Statute,
thereby providing grounds for federal jurisdiction.

LEGAL STANDARD

A suit filed in state court may be removed to federal
court if the federal court would have had original
subject matter jurisdiction over that suit. 28 U.S.C. §
1441(a); Snow v. Ford Motor Co., 561 F.2d 787, 789
(9th Cir.1977). Three potential bases for federal sub-
ject-matter jurisdiction are relevant to this suit: (1)
federal question jurisdiction under 28 U.S.C. § 1331,
FN1 (2) admiralty jurisdiction under 28 U.S.C. §
1333, FN2 and (3) supplemental jurisdiction under 28
U.S.C. § 1367.FN3

>    FN1. 28 U.S.C. § 1331 states that "[t]he dis-
>    trict courts shall have original jurisdiction of
>    all civil actions arising under the Constitu-
>    tion, laws, or treaties of the United States."

>    FN2. Under 28 U.S.C. § 1333, "[t]he district
>    courts shall have original jurisdiction, ex-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 532150 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.)

clusive of the courts of the States, of ... [a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled."

FN3. Supplemental or pendent party jurisdiction exists where claims "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a).
The Court may decline to exercise supplemental jurisdiction if: (1) the claim raises a novel or complex issue of state law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. § 1367(c).

*2 A motion to remand is the proper procedure for challenging removal. Remand to state court may be ordered either for lack of subject matter jurisdiction or for any defect in removal procedure. See 28 U.S.C. § 1447(c). The court may remand sua sponte or on motion of a party, and the parties who invoked the federal court's removal jurisdiction have the burden of establishing federal jurisdiction. See Emrich v. Touche Ross & Co., 846 F.2d 1190, 1195 (9th Cir.1988) (citing Wilson v. Republic Iron & Steel Co., 257 U.S. 92, 97 (1921)).

The removal statute is strictly construed against removal jurisdiction and doubt is resolved in favor of remand. Libhart v. Santa Monica Dairy Co., 592 F.2d 1062, 1064 (9th Cir.1979).

The existence of federal jurisdiction on removal must normally be determined on the face of the plaintiff's complaint. See Louisville & Nashville R.R. v. Mottley, 211 U.S. 149 (1908). A "cause of action arises under federal law only when the plaintiff's well pleaded complaint raises issues of federal law." Metropolitan Life Ins. Co v. Taylor, 481 U.S. 58, 63 (1987).

However, the Court may examine the entire record to determine if the real nature of the claim is federal, notwithstanding plaintiff's characterization to the contrary, when the plaintiff has, by "artful pleading," attempted to defeat defendant's right to a federal forum. See Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 397 n. 2 (1981); Salveson, 525 F.Supp. at 572. A complainant cannot "avoid federal jurisdiction simply by omitting from the complaint federal law essential to his claim, or by casting in state law terms a claim that can be made only under federal law." Harper v. San Diego Transit Corp., 764 F.2d 663, 666 (9th Cir.1985).

The Federal Employee Removal Statute was enacted as a means for federal employees to bypass the well-pleaded complaint rule and raise immunity-related defenses as a basis for removal.

DISCUSSION

I. Jurisdiction Under the Federal Officer Removal Statute

The Federal Officer Removal Statute provides that an action may be removed by "[a]ny officer of the United States or any agency thereof, or person acting under him, for any act under color of such office." Title 28 U.S.C. § 1442(a)(1). In Mesa v. California, 489 U.S. 121 (1989), the Supreme Court held that § 1442(a)(1) requires the moving party to: (1) demonstrate that it acted under the direction of a federal officer; (2) raise a colorable federal defense to plaintiff's claims; and (3) demonstrate a causal nexus between plaintiff's claims and the acts defendants performed under color of federal office. Id. at 124-25, 134-35. Before applying the test outlined in Mesa, however, a defendant must qualify as a "person" for the purposes of 28 U.S.C. § 1441(a)(1). As a corporation, defendant Avondale meets this preliminary requirement. Fung v. Abex Corp., 816 F.Supp. 569, 572 (N.D.Cal.1992).

A. Acts Under the Direction of A Federal Officer

*3 Under the first prong of the Mesa test, defendant must show that it was acting under the direction of a federal officer. It is not enough to prove only that "the relevant acts occurred under the general auspices

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 532150 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.)

of" a federal officer, *Ryan v. Dow Chemical Co.,* 781 F.Supp. 934, 946 (E.D.N.Y.1992), or that the defendant was a member of a regulated industry. *Id.; Bakalis v. Crossland Sav. Bank,* 781 F.Supp. 140, 144-45 (E.D.N.Y.1991). In the area of product liability, government contract immunity has been limited to cases where defendant companies can show "strong government intervention and the threat that a defendant will be sued in state court 'based upon actions taken pursuant to federal direction.' " *Fung v. Abex Corp.,* 816 F.Supp. at 573 (quoting *Gulati v. Zuckerman,* 723 F.Supp. 353 (E.D.Pa.1989)).

In this case, the liability asserted by the plaintiffs is limited to the failure to warn theory of products liability. Plaintiffs allege that because Avondale failed to warn Mr. Overly of the existence of asbestos in his work environment, Avondale should be held liable for his resulting illness. Plaintiffs are not pursuing a design defect claim of products liability and have offered in writing to waive all potential claims related to design defects.

Although Avondale has established that it was under substantial control by the government regarding the installation of certain products containing asbestos, it has not done so with regard to the warning of individuals of the presence of asbestos on the job site.

### B. Colorable Federal Defense

The second prong of the *Mesa* test is that defendant must possess a colorable federal defense. Defendant Avondale presents two potential federal defenses.

### 1. Longshore and Harbor Workers Compensation Act

One defense asserted by Avondale is that plaintiffs' recovery is limited to relief under the Longshore and Harbor Workers Compensation Act (LHWCA) § 1 et seq., 33 U.S.C.A. § 901 et seq. The LHWCA provides a basis for compensation from employers to certain employees injured in the course of employment while working upon navigable waters or the harbors and shipyards adjoining such waters. 33 U.S.C.A. § 903.

As an initial matter, defendant is barred from asserting a defense on this basis because the LHWCA was

not mentioned in defendant's petition for removal as required under 28 U.S.C. § 1446(a).

Furthermore, even if applied to this case, the LWHCA does not constitute a colorable federal defense for Avondale. Mr. Overly was not an employee of Avondale, he was an employee of Westinghouse. The "borrowed employee" concept asserted by defendant has not been adopted by the Ninth Circuit. Furthermore, even under the Third Circuit guidelines cited by the defendant, Mr. Overly would not qualify as a "borrowed employee" for the purposes of the LWHCA because there has been absolutely no showing that he explicitly agreed to work under conditions controlled solely by Avondale. *Peter v. Hess Oil Virgin Islands Corp.,* 903 F.2d 935, 942 (1990). Thus, the LWHCA does not constitute a colorable defense to plaintiffs' common law causes of action.

### 2. Government Contractor Immunity

**\*4** The second ground on which defendant asserts it possesses a colorable federal defense is the government contractor defense. Under this theory, contractors who supply military equipment to the government are immunized from liability under state tort law providing that they can meet the test outlined in *Boyle v. United Technologies Corp.,* 487 U.S. 500 (1988). In *Boyle,* the Court set the standard for finding state law liability for design defects in military equipment. *Id.* at 511. Military contractor immunity for design defects applies when: "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id.* at 512.

The Ninth Circuit has ruled that in failure to warn product liability cases involving asbestos allegedly used in the construction of naval ships, a defendant must specifically show that "in making [its] decisions regarding warnings [it was] acting in compliance with 'reasonably precise specifications' imposed on [it] by the United States." *In re Hawaii Federal Asbestos Cases,* 960 F.2d 806, 813 (9th Cir.1992). Thus, in order to meet the *Boyle* test in a failure to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1996 WL 532150 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

warn case, the defendant must show that the government affirmatively instructed it regarding the provision of warnings.

Defendant's only showing on this motion relates to the government's manufacturing and engineering specifications. Defendant has not demonstrated that the government provided "reasonably precise specifications" affecting Avondale's provision of warnings. *Boyle,* 487 U.S. at 512. Absent a showing by defendant that the federal government gave specific instructions to Avondale not to warn employees of the existence of asbestos, Avondale is offered no protection by government contractor immunity. *See In re Hawaii Federal Asbestos Cases,* 960 F.2d at 813. Therefore, defendant fails to meet the second prong of the *Mesa* standard because Avondale has no colorable federal defense to the charges in this case.

### C. Causal Nexus

The final requirement under the *Mesa* test is that there be a causal nexus between the rules imposed by the United States on the defendant contractor by the federal government and the liability asserted by plaintiff. "[T]here must be a causal connection between what the officer has done under asserted official authority and the state prosecution. It must appear that the [state] prosecution has arisen out of the acts done by the officer under color of federal authority and in enforcement of federal law." *Maryland v. Soper,* 270 U.S. 9, 22 (1926).

Defendant has produced abundant evidence attesting to the regulations imposed by the federal government on the manufacture and design of ships built by Avondale for the U.S. Navy. However, *none* of these guidelines addresses Avondale's responsibility to warn its employees of their exposure to products containing asbestos. The government in no way restricted Avondale's ability to notify individuals of the presence of asbestos in the work environment. Thus, there is no causal connection between the control exercised by the United States over Avondale and the legal theory under which plaintiffs seek to hold Avondale liable. Consequently, Avondale has no basis on which to assert application of the Federal Officer Removal Statute, and the case must be re-

manded to state court.

### II. *Attorney Fees & Costs*

**\*5** Title 28 U.S.C. § 1447(c) provides that when granting a motion for remand on the basis of a lack of federal subject matter jurisdiction, a court may order the defendant to pay plaintiff "its just costs and any actual expenses, including attorney fees, incurred as a result of the removal." An award under § 1447(c) is entirely within the Court's discretion.

Under its discretion, the Court finds that the case was removed "improvidently and without jurisdiction." *Id.* The Court hereby awards plaintiffs their reasonable costs and attorney fees associated with removal, as requested, in the amount of $2,000, to be paid by defendant Avondale within ten days of the date of this order.

### CONCLUSION

For the foregoing reasons and for good cause shown, plaintiffs' motion to remand is GRANTED. Plaintiffs' motion for reasonable costs and attorney fees incurred as a direct consequence of removal is GRANTED in the amount of $2,000.

IT IS SO ORDERED.

N.D.Cal.,1996.
Overly v. Raybestos-Manhattan
Not Reported in F.Supp., 1996 WL 532150 (N.D.Cal.)

Briefs and Other Related Documents (Back to top)

• 3:96cv02853 (Docket) (Aug. 09, 1996)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT "G"

to

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO REMAND AND FOR AWARD OF COSTS AND ATTORNEYS' FEES

Unpublished Decision

Schilz v. A.P. Green Ind., Inc.,
2002 WL 102608
(N.D. Cal. 2002)

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 102608 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

**C**

Briefs and Other Related Documents

Only the Westlaw citation is currently available.
United States District Court, N.D. California.
Barbara SCHILZ, Plaintiff,
v.
A.P. GREEN INDUSTRIES, INC., et. al. Defendants.
No. C01-4299 MMC.

Jan. 15, 2002.

ORDER GRANTING MOTION TO REMAND;
DENYING REQUEST FOR ATTORNEY'S FEES
AND COSTS

CHESNEY, J.
*1 Before the Court is plaintiff's motion to remand,
filed December 17, 2001, pursuant to 28 U.S.C. §
1447(c). Defendant United States Steel (USS) filed
opposition, to which plaintiff replied.[FN1] Having
considered the papers filed in support of and in op-
position to the motion, the Court finds the matter ap-
propriate for decision on the papers, VACATES the
hearing scheduled for January 18, 2002, and rules as
follows.

> FN1. On January 11, 2002, USS moved to
> strike plaintiff's reply as untimely. In con-
> junction with the filing of her reply, plaintiff
> explained that the reply was filed late be-
> cause "[t]he due-date for Plaintiff's Reply
> Brief was mistakenly mis-calendared." (See
> Robert Barrow Decl. ¶ 2.) Under the circum-
> stances, USS's motion to strike is hereby
> DENIED. As an alternative to striking
> plaintiff's reply, USS requests leave to file a
> surreply. Such request is DENIED, as USS
> has failed to demonstrate how a surreply
> would assist the Court in adjudicating the in-
> stant motion.

Plaintiff filed the instant wrongful death action in
state court on June 2, 2000, alleging that her hus-
band's death was caused by his exposure to asbestos
on a Naval ship. On November 16, 2001, defendant

USS, the alleged successor-in-interest to the manu-
facturer of the ship, removed the instant action.

In its removal notice, USS asserts that the Court has
jurisdiction pursuant to 28 U.S.C. § 1442(a)(1),
which provides that an action may be removed by
"[a]ny officer of the United States or any agency
thereof, or person acting under him, for any act under
color of such office." 28 U.S.C. § 1442(a)(1). In or-
der for removal to be proper under § 1442(a)(1), the
removing party must "(1) demonstrate that it acted
under the direction of a federal officer; (2) raise a
colorable federal defense to plaintiff's claims; and (3)
demonstrate a causal nexus between plaintiff's claims
and the acts defendants performed under color of fed-
eral office." Fung v. Abex Corporation, 816 F.Supp.
569, 571 (N.D.Cal.1992) (citing Mesa v. California,
489 U.S. 121 (1989)).

Specifically, USS asserts that plaintiff's claims are re-
movable under the government contractor's defense
defined in Boyle v. United Technologies Corp., 487
U.S. 500 (1988), as the ship in question was con-
structed "pursuant to contract with the Navy and un-
der the authority of officers of the United States or
agencies thereof." (Notice of Removal ¶ 3.) This ar-
gument is not persuasive. In the instant action,
plaintiff has limited her claim against USS to the fail-
ure to warn theory of liability; plaintiff is not pursu-
ing a design defect claim against USS. (See Plaintiff's
Waiver of Claim for Design Defect Product Liability,
filed January 9, 2002.) The government contractor's
defense on which USS relies "is inapplicable to a
failure to warn claim in the absence of evidence that
in making its decision whether to provide a warning
... [USS] was 'acting in compliance with 'reasonably
precise specifications' imposed on [it] by the United
States.' " Butler v. Ingalls Shipbuilding, Inc., 89 F.3d
582, 586 (9 th Cir.1996). Here, USS has failed to
submit evidence demonstrating that it was subject to
any government specifications with respect to the
placement of warnings on its products. Absent such
showing, defendant may not rely on the government
contractor's defense. See id. As defendant has failed
to raise a colorable federal defense to plaintiff's
claims, removal is not proper pursuant to 28 U.S.C. §

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 2

Not Reported in F.Supp.2d, 2002 WL 102608 (N.D.Cal.)

**(Cite as: Not Reported in F.Supp.2d)**

1442(a)(1).<u>FN2</u> *See* <u>Mesa, 489 U.S. at 124-25, 134-35</u>.

> <u>FN2.</u> In light of this finding, the Court need not address whether defendant's removal was timely under <u>28 U.S.C. § 1446(b)</u>. Nor, under the facts presented, would the timing of the removal warrant an award of attorney's fees. *See infra.*

**\*2** Pursuant to <u>28 U.S.C. § 1447(c)</u>, plaintiff seeks to recover her attorney's fees and other expenses resulting from defendant's removal of the action to the district court. Under <u>§ 1447(c)</u>, "[a]n order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." <u>28 U.S.C. § 1447(c)</u>. The district court has "wide discretion" to award attorney's fees and costs under <u>§ 1447(c)</u>, even in the absence of a finding that defendant acted in bad faith. *See <u>Moore v. Permanente Medical Group, Inc., 981 F.2d 443, 446-47 (1992)</u>*. In the instant action, at the time USS filed its notice of removal, plaintiff's claims against USS were not limited to a theory of liability based on failure to warn. Under such circumstances, the Court declines to exercise its discretion to award attorney's fees.

Accordingly, plaintiff's motion to remand is hereby GRANTED, and plaintiff's request for attorney's fees and costs is hereby DENIED.

This order closes Docket No. 5.

IT IS SO ORDERED.

N.D.Cal.,2002.
Schilz v. A.P. Green Industries, Inc.
Not Reported in F.Supp.2d, 2002 WL 102608 (N.D.Cal.)

Briefs and Other Related Documents (Back to top)

• 3:01cv04299 (Docket) (Nov. 16, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT "H"

to

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO REMAND AND FOR AWARD OF COSTS AND ATTORNEYS' FEES

Unpublished Decision

Toutant v. Nationwide Mutual Insurance Co.,
2006 U.S. Dist. LEXIS 49302,
Case No. 06CV00530MSKPAC
(D. Colo. July 19, 2006)

Case MDL No. 875 Document 4914 Filed 11/17/06 Page 351 of 423
Case 2:06-cv-00741-TS Document 128 Filed 10/10/2006 Page 2 of 7

Page 1

LEXSEE 2006 U.S. DIST. LEXIS 49302

## DARRELL TOUTANT, Plaintiff, v. NATIONWIDE MUTUAL INSURANCE COMPANY, Defendant.

### Civil Action No. 06-cv-00530-MSK-PAC

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO

*2006 U.S. Dist. LEXIS 49302*

**July 19, 2006, Decided**
**July 19, 2006, Filed**

**COUNSEL:** [*1] For Darrell Toutant, Plaintiff: Avi Sue Rocklin, Robert F. Hill, Hill & Robbins, P.C., Denver, CO; M. Gabriel McFarland, Evans & McFarland, LLC-Golden, Golden, CO; Thomas Dalton McFarland, Zachary Christian McFarland, McFarland Law Offices, Golden, CO.

For Nationwide Mutual Insurance Company, Defendant: John Mark Vaught, Michael D. Alper, Terence M. Ridley, Wheeler Trigg Kennedy LLP, Denver, CO.

**JUDGES:** Marcia S. Krieger, United States District Judge.

**OPINION BY:** Marcia S. Krieger

**OPINION:**

### MEMORANDUM OPINION AND ORDER REMANDING CASE

Honorable Marcia S. Krieger

THIS MATTER comes before the Court on the Plaintiff's Amended Motion to Remand (# 16). n1 Having considered the motion, the response (# 22), n2 the reply (# 24), the surreply (# 26-2), n3 and the parties' supplemental authority (# 28, # 29), the Court

> n1 The Defendant filed a separate motion (# 27) requesting oral argument on the motion to remand on the basis that the motion presents an issue of first impression. After consideration of the

parties' written positions, the Court determines that oral argument would not assist in the determination of the legal issues presented. Therefore, the motion for oral argument is denied. [*2]

> n2 The Defendant's motion (# 21) for leave to file a 20-page response is granted.

> n3 The Defendant's motion (# 26) seeking leave to file a surreply is granted.

FINDS and CONCLUDES that:

### I. Jurisdiction

The Defendant invokes the Court's subject matter jurisdiction pursuant to *28 U.S.C. §§ 1332* and *1453*.

### II. Background

In 2003, various insureds filed a Class Action Complaint against their respective insurers in the Boulder County District Court (referred to herein as "the Insurance Class Action"). A Second Amended Class Action Complaint was filed in December 2003. The Plaintiff, Darrell Toutant, was one of several named plaintiffs, and the Defendant, Nationwide Mutual Insurance Company ("Nationwide"), was one of several defendants in the Insurance Class Action.

Some defendants in the Insurance Class Action filed

Case MDL No. 875 Document 4914 Filed 11/17/06 Page 352 of 423
Case 2:06-cv-00741-TS Document 128 Filed 10/10/2006 Page 3 of 7

Page 2

2006 U.S. Dist. LEXIS 49302, *2

motions to sever. The plaintiffs stipulated to severance but stated their intention to file a motion to consolidate for certain purposes not identified. The Boulder District Court granted the motions to sever [*3] on February 24, 2006, based upon the plaintiffs' stipulation. It then reconfigured the Insurance Class Action into several separately numbered matters. One of the separately numbered matters is this one, in which Mr. Toutant asserts claims against Nationwide on his own behalf and on behalf of a class.

One month after severance, Nationwide removed this matter. Nationwide asserts that this Court has subject matter jurisdiction on two grounds: (1) that Mr. Toutant asserts claims on behalf of a class, and this matter was properly removed pursuant to the Class Action Fairness Act of 2005 ("the CAFA"); n4 and (2) that the Court exercises diversity jurisdiction pursuant to *28 U.S.C. § 1332*, therefore, removal is proper pursuant to *28 U.S.C. § 1446(b)*. Nationwide contends that removal has been timely because the severance order issued on February 24, 2006 commenced this action.

n4 Section 4 of the CAFA amended *28 U.S.C. § 1332* to create subject-matter jurisdiction in federal courts over class actions in which: (i) more than $ 5 million was in controversy; and (ii) any class member is diverse in citizenship from any defendant. *See 28 U.S.C. § 1332(d)(2)* (as amended). Section 5 of the CAFA created *28 U.S.C. § 1453*, which allows for the removal of applicable class actions to federal court in accordance with the general removal statute, *28 U.S.C. § 1446*, "except that the 1-year limitation under *section 1446(b)* shall not apply."

[*4]

Mr. Toutant moves to remand this matter to state court. He contends that the removal of this matter is untimely under both CAFA and *28 U.S.C. § 1446(b)* n5 because this action commenced in 2003 as the Insurance Class action; no new action was commenced upon issuance of the severance order on February 24, 2006. He also requests an award of costs and attorney fees in accordance with *28 U.S.C. § 1447(c)*.

n5 Mr. Toutant also asserts that the amount-in-controversy requirement of the diversity statute is not met. It is not necessary to address this assertion, which goes to the substantive basis for removal. For the reasons discussed *infra*, there was no procedural opportunity to remove this matter.

### III. Issue Presented

The overarching issue is whether this matter was timely removed pursuant to the CAFA or the general removal statute, *28 U.S.C. § 1446(b)*. However, resolution of such issue turns on whether the severance order issued in [*5] the Insurance Class Action on February 24, 2006, resulted in the commencement of this matter as a new civil action subject to removal.

### IV. Analysis

The Court begins with the axiom that federal courts are courts of limited jurisdiction and must narrowly construe statutes conferring federal jurisdiction. *See U.S. ex rel. Grynberg v. Praxair, Inc., 389 F.3d 1038, 1048 (10th Cir. 2004), cert. denied, 125 S. Ct. 2964, 162 L. Ed. 2d 888 (2005); Pritchett v. Office Depot, Inc., 420 F.3d 1090, 1094-95 (10th Cir. 2005)*. There is a general presumption against federal court jurisdiction, and the party asserting jurisdiction has the burden of establishing its existence. *See Kinross v. Utah Railway Co., 362 F.3d 658, 661 (10th Cir. 2004)*. With regard to removed cases, a court must resolve all doubts as to the applicability of a removal statute against removal. *See Fajen v. Foundation Reserve Ins. Co., Inc., 683 F.2d 331, 333 (10th Cir. 1982)*. When a court determines that it lacks subject matter jurisdiction over a removed case, it must remand the case to state court. *Cf. Penteco Corp. Ltd. Partnership, 929 F.2d at 1521* [*6] (requiring dismissal for lack of jurisdiction).

Determination of this Court's jurisdiction turns on the answer to a single question -- was the removal of this matter timely? Removal pursuant to CAFA would be timely only if this matter is deemed to be an action that commenced after the CAFA's effective date of February 18, 2005. *See Pritchett v. Office Depot, Inc., 420 F.3d 1090 (10th Cir. 2005)*. n6 Removal under the general removal statute, *28 U.S.C. § 1446(b)*, would be timely only if it occured within 1 year following the

Case MDL No. 875 Document 4914 Filed 11/17/06 Page 353 of 423
Case 2:06-cv-00741-TS Document 128 Filed 10/10/2006 Page 4 of 7

Page 3

2006 U.S. Dist. LEXIS 49302, *6

commencement of a civil action. n7

n6 *Section 9 of the CAFA* provides that "The amendments made by this Act shall apply to any civil action commenced on or after the date of enactment of this Act." In *Pritchett*, removal was improper because the action was deemed to have commenced on the date that the initial pleading was filed in state court, which was prior to the CAFA's effective date.

n7 This statute provides:

(b) The notice of removal of a civil action or proceeding shall be filed within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based, or within thirty days after the service of summons upon the defendant if such initial pleading has then been filed in court and is not required to be served on the defendant, whichever period is shorter.

If the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable, except that a case may not be removed on the basis of jurisdiction

conferred by *section 1332* of this title more than 1 year after commencement of the action.

Here, the parties contest whether this matter was removed more than 1 year after the commencement of an action.

[*7]

According to Nationwide, a civil action was commenced at the moment these parties and claims were severed from others in the Insurance Class Action. In contrast, Mr. Toutant contends that commencement of the action involving this matter occurred in 2003, and that, regardless of the assignment of an independent case number by the state court, severance of these claims and parties did not commence a new action.

This presents a question of first impression within the Tenth Circuit. With the exception of three recent Colorado district court decisions involving other matters severed from the Insurance Class Action, n8 and the two district court decisions relied upon by Nationwide, n9 this Court has found no caselaw -- binding or otherwise -- which addresses whether the severance of claims and parties results in commencement of a civil action for purposes of the CAFA or the general removal statute.

n8 Judge Robert E. Blackburn addressed this issue in *Briggs v. Geico General Ins. Co., 2006 U.S. Dist. LEXIS 49014, Civil Case No. 06-cv-00550-REB-MEH, 2006 WL 1897210 (D. Colo. Jul. 10, 2006)*, and reached substantially the same conclusion that this Court reaches here. Similarly, Chief Judge Lewis T. Babcock issued two orders incorporating Judge Blackburn's ruling by reference. *Thacker v. Farmers Insurance Exch., 2006 U.S. Dist. LEXIS 47299, 06-cv-00558-LTB-CBS (D. Colo. Jul. 12, 2006); Medina v. Colonial Penn Franklin Ins. Co., 2006 U.S. Dist. LEXIS 47245, 06-cv-00553-LTB-MEH (D. Colo. Jul. 12, 2006)*.

[*8]

Case MDL No. 875 Document 4914 Filed 11/17/06 Page 354 of 423
Case 2:06-cv-00741-TS Document 128 Filed 10/10/2006 Page 5 of 7

Page 4

2006 U.S. Dist. LEXIS 49302, *8

n9 *Crump v. Wal-Mart Group Health Plan, 925 F. Supp. 1214 (W.D. Ky. 1996); Farmer v. St. Paul Fire & Marine Ins. Co., 2006 U.S. Dist. LEXIS 23966, No. 2:05CV161-D-B, 2006 WL 1134238 (N.D. Miss. Apr. 24, 2006).*

In the absence of binding precedent on the issue and because the matter began in the Colorado courts, the Court turns to Colorado law for guidance in determining when commencement of an action in a Colorado court occurs. n10 A review of the Colorado Rules of Civil Procedure finds no support for the proposition that an order of severance results in the commencement of an action.

n10 In *Schorsch v. Hewlett-Packard Co., 417 F.3d 748, 750 (7th Cir. 2005),* the Seventh Circuit concluded that state law determines when an action is commenced for purposes of the CAFA. The Eighth Circuit followed *Schorsch in Plubell v. Merck & Co., Inc., 434 F.3d 1070, 1071 (8th Cir. 2006).* The Tenth Circuit has declined to opine whether state or federal law governs when an action is commenced. *See Prime Care of Northeast Kansas, LLC v. Humana Ins. Co., 447 F.3d 1284, 1289 n.6 (10th Cir. 2006).* However, it noted that it is the prevailing view to apply the law of the state where the action was commenced to determine whether an amended complaint relates back to the original complaint in the commencement analysis. *See id.*

[*9]

The Rules governing commencement of a civil action and severance appear to be wholly unrelated. Pursuant to C.R.C.P. 3(a) n11, "A civil action is commenced (1) by filing a complaint with the court, or (2) by service of a summons and complaint." n12 This rule makes no reference to severance. In corresponding fashion the rules governing severance make no reference to commencement of a civil action. Severance generally is governed by C.R.C.P. 42(b), which states:

The court in furtherance of convenience,

or to avoid prejudice, or when separate trials will be conducive to expedition or economy may order a separate trial of any separate issue or of any number of claims, cross claims, counterclaims, third-party claims, or issues.

Severance as to party is governed by C.R.C.P. 21, which provides:

Misjoinder of parties is not ground for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately.

n11 Colorado Rules of Civil Procedure.

[*10]

n12 Such rule is similar to its federal counterpart, *Fed. R. Civ. P. 3,* which provides for commencement of a civil action by the filing of a complaint rather than by service of a summons and complaint.

The fact that the Rule specifying the events that result in commencement of a civil action and the Rules applicable to severance do not refer to each other is both logical and practical. The concept of commencement of an action is tied to the assertion of claims by a plaintiff or plaintiffs against a defendant or defendants. n13 Severance of claims or of parties with particular claims does not impact either the substance of the claims; severance pertains simply to the manner in which the claims are determined.

n13 When there is a substantive change in the claims asserted, some courts have considered the change to act as the

Case MDL No. 875 Document 4914 Filed 11/17/06 Page 355 of 423
Case 2:06-cv-00741-TS Document 128 Filed 10/10/2006 Page 6 of 7

Page 5

2006 U.S. Dist. LEXIS 49302, *10

commencement of a new action for calculation of time for removal. For example, the Tenth Circuit ruled in *Prime Care, 447 F.3d at 1286,* that amendments to a complaint which do not relate back to the original complaint affect the "commencement" date for purposes of the CAFA. In other words, there are circumstances in which amended pleadings may restart the removal clock. The Tenth Circuit declined to follow the approach of the Fifth and Seventh Circuits, which automatically treated an action as having been "commenced" upon the filing of an amended complaint which adds a new party. *See Braud v. Transport Service Co. of Illinois, 445 F.3d 801, 804 (5th Cir. 2006); Knudsen v. Liberty Mut. Ins. Co., 435 F.3d 755, 758 (7th Cir. 2006), petition for cert. filed* (May 23, 2006) (No. 05-1496). In the case at bar, however, no amended complaints were filed after severance; therefore, *Prime Care* is not on point.

[*11]

The Court next turns to the two decisions relied upon by Nationwide in support of its contention that severance commences a new action, *Crump v. Wal-Mart Group Health Plan, 925 F. Supp. 1214 (W.D. Ky. 1996),* and *Farmer v. St. Paul Fire & Marine Ins. Co.,* 2006 U.S. Dist. LEXIS 23966, No. 2:05CV161-D-B, 2006 WL 1134238 (N.D. Miss. Apr. 24, 2006). Both are decisions of trial courts.

In *Crump,* Jarriett Paul Moore sued Destiny Crump in 1993 for personal injuries sustained in an automobile accident. Wal-Mart intervened in 1994 but asserted no claims against Ms. Crump. In October 1995, Ms. Crump asserted a cross-claim against Wal-Mart. The state court treated the cross-claim as a separate action. Shortly thereafter, Wal-Mart removed the action to federal court on the basis that the claim was preempted by federal law or that there was diversity jurisdiction. The district court ruled that the removal was timely under the general removal statute because the removed claim did not exist until October 1995 and there was no diversity of jurisdiction until after severance.

In *Farmer,* St. Paul Fire & Marine Insurance ("St. Paul") was added as a defendant on May 3, 2005. The claims [*12] against St. Paul were severed, and St. Paul promptly removed the matter to federal court. Citing *Crump,* the federal district court concluded that the action was properly removed on the basis of diversity jurisdiction because the severance of claims "restarted *Section 1446(b)*'s one-year time limit for removal of diversity based actions[.]"

For a variety of reasons, this Court declines to follow the conclusions of *Crump* and *Farmer.* First, the decisions in *Crump* and *Farmer* conclude, without analysis, that the severance of claims resulted in commencement of a new civil action. It is not clear that the issue presented here was presented to these courts for determination. Neither is it apparent upon what basis or legal authority these courts based their conclusion. Clearly, neither court considered Colorado law. Second, neither opinion addresses whether it is federal law or state law that determines when a state action is commenced, nor articulates any policy that would favor treatment of severance as commencement of a new action. Third, the facts in both cases would suggest that removal would have been timely regardless of the severance. n14

n14 Ms. Crump first asserted claims against Wal-Mart in October 1995, and Wal-Mart removed the action to federal court less than 30 days later. Therefore, Ms. Crump's pleading against Wal-Mart was arguably an "initial pleading" for purposes of *28 U.S.C. § 1446(b),* which would have allowed for removal. In addition, it is also arguable that the action against St. Paul was "commenced" at the time St. Paul was added as a party and, therefore, the removal would have been timely.

[*13]

As discussed *supra,* this Court presumes an absence of federal jurisdiction and narrowly construes removal statutes against the conferral of jurisdiction. Colorado law does not recognize severance as the commencement of a new action. Nationwide has cited no binding federal precedent that would override Colorado law. Furthermore, Nationwide has presented no facts other

Case MDL No. 875 Document 4914 Filed 11/17/06 Page 356 of 423
Case 2:06-cv-00741-TS Document 128 Filed 10/10/2006 Page 7 of 7

Page 6

2006 U.S. Dist. LEXIS 49302, *13

than severance that would make the removal of this action timely.

The Court finds that the action asserting the claims against Nationwide was commenced in 2003, at the very latest when the Second Amended Complaint was filed in December. Severance of the claims or parties from the Insurance Class Action to create this matter did not change the claims asserted. Similarly, the administrative assignment of a new case number did not change the claims asserted. Therefore, severance of the claims that comprise this matter did not result in the commencement of a new action for purposes of calculating the time for removal. Removal of this matter was, therefore, untimely under both the CAFA and *28 U.S.C. § 1446(b)*.

Mr. Toutant requests an award of attorney fees and costs for the wrongful removal of [*14] this matter in accordance with *28 U.S.C. § 1447(c)*. This statute provides that an order to remand "may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." This statute confers discretion upon the remanding court to award fees and costs for an improper removal. *See Martin v. Franklin Capital Corp., 393 F.3d 1143, 1146 (10th Cir. 2004), affirmed, 126 S. Ct. 704, 163 L. Ed. 2d 547 (2005); Suder v. Blue Circle, Inc., 116 F.3d 1351, 1352 (10th Cir. 1997)*. As the Supreme Court clarified, there is no presumption of an award of fees and costs under this statute. *See Martin, 125 S. Ct. at 709*. Absent unusual circumstances, if a defendant's removal position was objectively reasonable at the time of removal, a court should decline to award fees and costs. *See id. at 708*.

Given the novelty of the issue presented here and the absence of dispositive legal authority to guide the parties' conduct, the Court cannot say that Nationwide's removal was objectively unreasonable. Thus, the request for an award of attorney fees and costs is denied.

**IT IS THEREFORE** [*15] **ORDERED** that:

(1) The motion (# 21) for leave to file a 20-page response is **GRANTED**.

(2) The motion for leave to file a surreply (# 26) is **GRANTED**.

(3) The motion requesting oral argument (# 27) is **DENIED**.

(4) The motion to remand (# 16) is **GRANTED**. The Clerk of Court is directed to remand this case to the Boulder County District Court.

(5) The request for attorney fees and costs is **DENIED**.

Dated this 19th day of July, 2006

**BY THE COURT:**

Marcia S. Krieger

United States District Judge

# EXHIBIT "I"

to

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO REMAND AND FOR AWARD OF COSTS AND ATTORNEYS' FEES

Unpublished Decision

<u>In re: Methyl Tertiary Butyl Ether Products Liability Litigation,</u>
2006 U.S. Dist. LEXIS 20575,
Case No. 1:00-1898, MDL 1358
(S.D.N.Y. April 17, 2006)

Case MDL No. 875  Document 4914  Filed 11/17/06  Page 358 of 423
Case 2:06-cv-00741-TS  Document 128  Filed 10/10/2006  Page 2 of 15

Page 1

LEXSEE 2006 U.S. DIST. LEXIS 20575

**IN RE: METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION; This document relates to: HOWARD GRAHAM and RHEA MCMANNIS v. SHELL OIL CO. and EXXON MOBIL CORP., 06 Civ. 1379 (SAS)**

**Master File No. 1:00-1898, MDL 1358 (SAS), M 21-88**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2006 U.S. Dist. LEXIS 20575*

**April 17, 2006, Decided**

**SUBSEQUENT HISTORY:** Later proceeding at *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.,* 2006 U.S. Dist. LEXIS 43329 (S.D.N.Y., June 23, 2006)

**PRIOR HISTORY:** *Koch v. Hicks (In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.),* 2006 U.S. Dist. LEXIS 18035 (S.D.N.Y., Apr. 7, 2006)

**COUNSEL:** [*1]

For Plaintiffs: Aaron M. Zigler, Esq., Stephen M. Tillery, Esq., Christine Moody, Esq., Korein Tillery, Saint Louis, MO. Scott Summy, Esq., Celeste Evangelesti, Esq., Baron & Budd, P.C., Dallas, TX.

Liaison Counsel for Plaintiffs: Robin Greenwald, Esq., Robert Gordon, Esq., C. Sanders McNew, Esq., Weitz & Luxenberg, P.C., New York, NY.

For Shell Oil Company: John Galvin, Esq., Michael Downey, Esq., Fox Galvin, LLC, St. Louis, MO.

For Exxon Mobil Corporation: Edward A. Cohen, Esq., Roman P. Wuller, Esq., Robert J. Wagner, Esq., Thompson Coburn, LLP, St. Louis, MO. Craig H. Zimmerman, Esq., McDermott, Will & Emery, LLP, Chicago, IL.

Liaison Counsel for Defendants: Peter John Sacripanti, Esq., James A. Pardo, Esq., Stephen J. Riccardulli, Esq., McDermott, Will & Emery, LLP, New York, NY.

**JUDGES:** SHIRA A. SCHEINDLIN, U.S.D.J.

**OPINION BY:** SHIRA A. SCHEINDLIN

**OPINION:**

**OPINION AND ORDER**

SHIRA A. SCHEINDLIN, U.S.D.J.:

**I. INTRODUCTION**

This case is one of dozens in a multi-district litigation ("MDL"), in which numerous plaintiffs are seeking relief from contamination, or threatened contamination, of groundwater from various defendants' use of the gasoline [*2] additive methyl tertiary butyl ether ("MTBE"). The parties have already engaged in extensive motion practice, and familiarity with the Court's previous opinions is assumed. n1 This opinion relates only to *Howard Graham and Rhea McMannis v. Shell Oil Co. and Exxon Mobil Corp.,* 06 Civ. 1379 *("Graham v. Shell").*

> n1 *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.,* 415 F. Supp. 2d 261, 2005 WL 3005794 (S.D.N.Y. 2005); *In re MTBE Prods. Liab. Litig.,* 399 F. Supp. 2d 340 (S.D.N.Y. 2005); *In re MTBE Prods. Liab. Litig.,* 399 F. Supp. 2d 325 (S.D.N.Y. 2005); *In re MTBE Prods. Liab. Litig.,* 2005 U.S. Dist.

Case MDL No. 875 Document 4914 Filed 11/17/06 Page 359 of 423
Case 2:06-cv-00741-TS Document 128 Filed 10/10/2006 Page 3 of 15

Page 2

2006 U.S. Dist. LEXIS 20575, *2

LEXIS 12843, No. M21-88, MDL 1358, 2005 WL 1529594 (S.D.N.Y. Jun. 28, 2005); In re MTBE Prods. Liab. Litig., 2005 U.S. Dist. LEXIS 12400, No. M21-88, MDL 1358, 2005 WL 1500893 (S.D.N.Y. Jun. 24, 2005); In re MTBE Prods. Liab. Litig., 402 F. Supp. 2d 434 (S.D.N.Y. 2005); In re MTBE Prods. Liab. Litig., 399 F. Supp. 2d 242 (S.D.N.Y. 2005); In re MTBE Prods. Liab. Litig., 233 F.R.D. 133 (S.D.N.Y. 2005); In re MTBE Prods. Liab. Litig., 379 F. Supp. 2d 348 (S.D.N.Y. 2005); In re MTBE Prods. Liab. Litig., 2005 U.S. Dist. LEXIS 753, No. M21-88, MDL 1358, 2005 WL 106936 (S.D.N.Y. Jan. 18, 2005); In re MTBE Prods. Liab. Litig., 2005 U.S. Dist. LEXIS 225, No. M21-88, MDL 1358, 2005 WL 39918 (S.D.N.Y. Jan. 6, 2005); In re MTBE Prods. Liab. Litig., 364 F. Supp. 2d 329 (S.D.N.Y. 2004); In re MTBE Prods. Liab. Litig., 361 F. Supp. 2d 137 (S.D.N.Y. 2004) ("MTBE VI") In re MTBE Prods. Liab. Litig., 341 F. Supp. 2d 386 (S.D.N.Y. 2004) ("MTBE V"); In re MTBE Prods. Liab. Litig., 341 F. Supp. 2d 351 (S.D.N.Y. 2004) ("MTBE IV"); In re MTBE Prods. Liab. Litig., 342 F. Supp. 2d 147 (S.D.N.Y. 2004) ("MTBE III"); In re MTBE Prods. Liab. Litig., 209 F.R.D. 323 (S.D.N.Y. 2002) ("MTBE II"); In re MTBE Prods. Liab. Litig., 175 F. Supp. 2d 593 (S.D.N.Y. 2001) ("MTBE I").

[*3]

## II. BACKGROUND

In 2000 and 2001, three MTBE lawsuits were filed in Illinois state court: England, et al. v. Atlantic Richfield Co., et al., n2 Village of East Alton v. Premcor Refining Group Inc. et al., n3 and Misukonis, et al. v. Atlantic Richfield Co., et al. n4 Defendants timely removed England and Village of East Alton on the basis of federal question jurisdiction, but they did not remove Misukonis from Illinois state court. n5

n2 No. 00-L-331 (Ill. 3d Cir. Madison Co. Apr. 11, 2000).

n3 No. 01-L-1171 (Ill. 3d Cir. Madison Co. July 20, 2001).

n4 No. 01-L-1472 (Ill. 3d Cir. Madison Co. Sept. 20, 2001).

n5 On October 16, 2000, after removal, the Judicial Panel on Multidistrict Litigation transferred England to this Court for inclusion in In re MTBE Products Liability Litigation, pursuant to Rule 7.4 of the Rules of the Judicial Panel on Multidistrict Litigation and 28 U.S.C. § 1407. See England, No. 00-370 (S.D. Ill.). Village of East Alton was not transferred to this Court and on November 15, 2001, Judge David Herndon, U.S. District Judge for the Southern District of Illinois, remanded Village of East Alton to state court. See Village of East Alton, No. 01-596 (S.D. Ill.).

[*4]

Misukonis became the instant case. On November 17, 2003, the Misukonis plaintiffs filed the Fourth Amended Complaint in Madison County Circuit Court. The Misukonis plaintiffs alleged negligence, strict liability for defective product, and conspiracy, and requested a declaratory judgment ordering the action to be maintained as a class action. n6 On March 30, 2005, Judge Phillip Kardis of the Third Judicial Circuit Court in Madison County, Illinois approved a stipulated settlement among the named plaintiffs, Frances Misukonis and Frank and Dolores Provaznik, and seven of the nine defendants: Atlantic Richfield Company, BP Corporation North America, Inc., BP Products North America, Inc., CITGO Petroleum Corporation, Chevron U.S.A. Inc., Conoco, Inc., and Phillips Petroleum Company (merged into ConocoPhillips Company) ("settling defendants"). Pursuant to the settlement agreement, the Fourth Amended Complaint was dismissed with prejudice as to the settling defendants, but it remained in effect against Shell Oil Company ("Shell") and Exxon Mobil Corporation ("Exxon").

n6 11/17/03 Fourth Amended Complaint, Misukonis, 01-L-1472 (Ill. 3d Cir. Madison Co.) ("Fourth Amended

Case MDL No. 875 Document 4914 Filed 11/17/06 Page 360 of 423
Case 2:06-cv-00741-TS Document 128 Filed 10/10/2006 Page 4 of 15

Page 3

2006 U.S. Dist. LEXIS 20575, *4

Complaint").

[*5]

On September 14, 2005, the court granted plaintiffs' motion to file a Fifth Amended Complaint, dated August 30, 3005, "instanter." n7 The Fifth Amended Complaint substituted the settling plaintiffs with Howard Graham and Rhea McMannis. n8 In the new Complaint, plaintiffs alleged negligence and nuisance and sought a declaratory judgment seeking an order that the action be maintained as a class action. n9 McMannis alleged that she owns a private well located within 3000 feet of a station owned or controlled by Shell. Graham alleged that he owns a private well that relies on groundwater and is within 3000 feet of a well owned or controlled by Exxon. Both plaintiffs alleged that their wells are at risk of contamination from MTBE and/or tert butyl alcohol ("TBA"). n10

> n7 *See* 9/14/05 Order, 01-L-1472 (Ill. 3d Cir. Madison Co.).

> n8 Rhea McMannis was a plaintiff in *England.* In 2001, after *England* was transferred to the MDL, tests on water samples from her well failed to show any MTBE contamination and there were no allegations of any known releases of gasoline containing MTBE occurring near her residence. *See MTBE I, 175 F. Supp. 2d at 608.* This Court dismissed McMannis from *England* finding that "general allegations concerning the chemical characteristics of MTBE and the widespread MTBE contamination of groundwater throughout the country" were insufficient to establish a "present threat of imminent harm" as to her. *Id. at 608-10* (also noting that McMannis had not presented statistics of MTBE detection rates for private wells in the county or even state; that Madison County was not a participant in the reformulated gasoline program (a Congressional program whereby gasoline companies were required to sell oxygenated gasoline); and that ethanol was the "primary oxygenate used in the Midwest").

[*6]

> n9 8/30/05 Fifth Amended Complaint, *Howard Graham and Rhea McMannis v. Shell Oil Co. and Exxon Mobil Corp,* 01-L-1472 (Ill. 3d Cir. Madison Co.) ("Fifth Amended Complaint") PP33-57.

> n10 *See id.* P39. TBA is a product resulting from the degradation of MTBE. *See id.* P11.

Defendants claim that the Fifth Amended Complaint is essentially a new case. They claim that the "new case" is removable on five separate grounds: n11 (1) the Class Action Fairness Act of 2005 ("CAFA") which authorizes removal of certain putative class actions; n12 (2) the Energy Policy Act of 2005 ("Energy Policy Act"), which allows removal of certain claims related to MTBE; n13 (3) diversity jurisdiction; n14 (4) federal agent jurisdiction; n15 and (5) federal question jurisdiction. n16

> n11 *See* 9/28/05 Notice of Removal, *Graham v. Shell Oil Co.,* No. 05-703 (S.D. Ill.) ("Notice of Removal") PP21-86.

> n12 *See* Pub. L. No. 109-2, 119 Stat. 4 (codified in relevant part at *28 U.S.C. § 1332(d)* and *1453(b)*) (2005).

[*7]

> n13 *See* Pub. L. No. 109-58, 119 Stat. 594 (codified in scattered sections of 16 U.S.C. and 42 U.S.C.) (2005).

> n14 *See 28 U.S.C. § 1332(a).*

> n15 *See 28 U.S.C. § 1442(a)(1) (2006).*

> n16 *See 28 U.S.C. § 1331.*

## III. APPLICABLE LAW

### A. Removal and Remand

Case MDL No. 875  Document 4914  Filed 11/17/06  Page 361 of 423
Case 2:06-cv-00741-TS  Document 128  Filed 10/10/2006  Page 5 of 15

Page 4

2006 U.S. Dist. LEXIS 20575, *7

*Section 1447(c)* of Title 28 provides: "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." When a party challenges the removal of an action from state court, the burden falls on the removing party "to establish its right to a federal forum by competent proof.'" n17 "In light of the congressional intent to restrict federal court jurisdiction, as well as the importance of preserving the independence of state governments, federal courts construe the removal statute narrowly, resolving any doubts against removability." n18 If the removing party cannot establish its right to removal by competent proof, the removal is improper, and the district court [*8] must remand the case to the court in which it was filed. n19

n17 *R.G. Barry Corp. v. Mushroom Makers, Inc.*, 612 F.2d 651, 655 (2d Cir. 1979) (quoting *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S. Ct. 780, 80 L. Ed. 1135 (1936)).

n18 *Somlyo v. J. Lu-Rob Enters., Inc.*, 932 F.2d 1043, 1046 (2d Cir. 1991) (citing *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108, 61 S. Ct. 868, 85 L. Ed. 1214 (1941)). Accord *Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28, 31, 123 S. Ct. 366, 154 L. Ed. 2d 368 (2002) (noting that "statutory procedures for removal are to be strictly construed").

n19 See *United Food & Commercial Workers Union, Local 919 v. Centermark Props. Meriden Square*, 30 F.3d 298, 301 (2d Cir. 1994) (citing *R. G. Barry Corp.*, 612 F.2d at 655). See also *Klein v. Vision Lab Telecomms., Inc.*, 399 F. Supp. 2d 528, 531 (S.D.N.Y. 2005); *Kings Choice Neckwear, Inc. v. DHL Airways, Inc.*, 2003 U.S. Dist. LEXIS 17507, No. 02 Civ. 9580, 2003 WL 22283814, at *2 (S.D.N.Y. Oct. 2, 2003).

[*9]

A defendant may remove a civil action filed in state court to federal court if the claims arise under federal law. n20 A case arises under federal law when federal law provides for the cause of action, n21 or where the state-law claim necessarily raises a "stated federal issue" that is substantial and disputed "which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." n22 In determining if this federal claim exists, courts will "examine the well-pleaded' allegations of the complaint and ignore potential defenses." n23 The presence of a federal defense does not raise a federal question, "even if the defense is anticipated in the plaintiffs complaint, and even if...the federal defense is the only question truly at issue." n24

n20 See *28 U.S.C. § 1441(a) (2006)*.

n21 See *Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 808, 106 S. Ct. 3229, 92 L. Ed. 2d 650 (1986); *Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 13, 103 S. Ct. 2841, 77 L. Ed. 2d 420 (1983).

[*10]

n22 *Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.*, 162 L. Ed. 2d 257, 545 U.S. 308, 125 S. Ct. 2363, 2368 (2005). Accord *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187 (2d Cir. 2005).

n23 *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6, 123 S. Ct. 2058, 156 L. Ed. 2d 1 (2003). Two exceptions to the well-pleaded complaint rule permit removal of state law actions: when the claims are completely preempted by federal law and when Congress "expressly [] provides" for removal of those claims. *Id. at 8.*

n24 *Marcus v. AT&T Corp.*, 138 F.3d 46, 53 (2d Cir. 1998) (quoting *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 393, 107 S. Ct. 2425, 96 L. Ed. 2d 318 (1987)). Accord *City of Rome v. Verizon Commc'ns, Inc.*, 362 F.3d 168, 174 (2d Cir. 2004).

"A case is removable when the initial pleading

Case MDL No. 875 Document 4914 Filed 11/17/06 Page 362 of 423
Case 2:06-cv-00741-TS Document 128 Filed 10/10/2006 Page 6 of 15

Page 5

2006 U.S. Dist. LEXIS 20575, *10

enables the defendant to intelligently ascertain' removability from the face of such pleading." n25 This standard "does not require a defendant to look beyond the initial pleading for facts giving rise [*11] to removability." n26 Nor does it require a defendant to "guess" whether the action is removable. n27 There is "a judicial reluctance to make jurisdiction hinge on fortuities or *ex parte* tactical moves." n28

> n25 *Whitaker v. American Telecasting, Inc., 261 F.3d 196, 206 (2d Cir. 2001)* (quotation marks omitted).

> n26 *Id.*

> n27 *Richstone v. Chubb Colonial Life Ins., 988 F. Supp. 401, 403 (S.D.N.Y. 1997)* ("A defendant must be able to ascertain easily the necessary facts to support his removal petition. To allow a document with less information to satisfy the statute would require the movant to guess' as to an actions' removability, thus encouraging premature, and often unwarranted, removal requests.") (citations omitted).

> n28 *Murphy v. Kodz, 351 F.2d 163, 167 (9th Cir. 1965)* (finding that in a case properly brought in federal court, the "plaintiff's subsequent reduction of his claim to less than the jurisdictional amount" did not "disturb the diversity jurisdiction of a federal court"). *Accord New Jersey Dep't of Envtl. Prot. v. Gloucester Envtl. Mgmt. Serv. Inc., 719 F. Supp. 325, 334 (D.N.J. 1989)* ("If a court dismissed the federal defendant from...a case [removed pursuant to *section 1442(a)(1)*], it must use its discretion to decide whether to remand the remaining ancillary claims to state court or to maintain jurisdiction over those claims.").

[*12]

## B. Federal Agent Jurisdiction

The federal officer removal statute can override the well-pleaded complaint rule. n29 "Suits against federal officers may be removed despite the nonfederal cast of the complaint," but the federal officer's defense must raise an issue of federal law. n30 Thus, persons acting under color of any federal office or agency may remove a case to federal court, despite the absence of a federal cause of action, when their removal petition alleges a colorable federal defense and there is a causal nexus between the federal direction and the conduct at issue. n31

> n29 *See Mesa v. California, 489 U.S. 121, 136, 109 S. Ct. 959, 103 L. Ed. 2d 99 (1989).*

> n30 *Jefferson County v. Acker, 527 U.S. 423, 431, 119 S. Ct. 2069, 144 L. Ed. 2d 408 (1999). Accord Mesa, 489 U.S. at 133-35; In re Agent Orange Prod. Liab. Litig., 304 F. Supp. 2d 442, 446 (E.D.N.Y. 2004)*; 16 James Wm. Moore et al., Moore's Federal Practice ("Moore's"), P107.15[1][b][ii].

> n31 The requirement for a federal defense is broadly construed; a defense need only be colorable, not clearly sustainable. *See Jefferson County, 527 U.S. at 431* ("We...do not require the officer virtually to win his case before he can have it removed.'") (citation omitted); *Colorado v. Symes, 286 U.S. 510, 519, 52 S. Ct. 635, 76 L. Ed. 1253 (1932)* (where a defendant seeks removal pursuant to the federal officer removal statute, "no determination of fact is required but it must fairly appear from the showing made that [the defendant's removal] claim is not without foundation and is made in good faith").

[*13]

## C. Procedural Requirements for Removal

In addition to demonstrating the presence of federal jurisdiction, a defendant must comply with the removal procedures in *section 1446* of Title 28. Specifically, *section 1446(b)* requires a defendant to file a notice of removal thirty days after receiving the initial pleading. n32

Case MDL No. 875 Document 4914 Filed 11/17/06 Page 363 of 423
Case 2:06-cv-00741-TS Document 128 Filed 10/10/2006 Page 7 of 15

Page 6

2006 U.S. Dist. LEXIS 20575, *13

n32 The statute provides in pertinent part: "[A] notice of removal of a civil action or proceeding shall be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based." 28 U.S.C. § 1446(b).

The thirty-day period is strictly construed. n33 It is "triggered by formal service" of the summons and complaint. n34 The purpose of the thirty-day rule is:

"to deprive the defendant of the undeserved tactical advantage that [it] would have if [it] could wait and see how [it] was faring in state court before deciding [*14] whether to remove ... and to prevent the delay and waste of resources involved in starting a case over in a second court after significant proceedings...in the first court." n35

However, section 1446(b) also states:

If the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable. n36

Thus, when a case is removable, but the grounds in the initial complaint are "obscured, omitted, or misstated," a defendant "has thirty days from the revelation of grounds for removal to file a notice of removal." n37 This provision preserves the defendant's right to remove a case to federal court upon receiving notice that the case is removable. n38 In order to satisfy section 1446(b), a defendant must show (1) that the original complaint was not removable on its face at the time it was filed n39 and (2) that another paper changed the status of the case, making it clear that the complaint was removable. n40

n33 See Somlyo, 932 F.2d at 1046

[*15]

("federal courts rigorously enforce the statute's thirty-day filing requirement").

n34 Whitaker, 261 F.3d at 202 ("the commencement of the removal period [can] only be triggered by formal service of process, regardless of whether the statutory phrase or otherwise' hints at some other proper means of receipt of the initial pleading") (citing Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc., 526 U.S. 344, 354-55, 119 S. Ct. 1322, 143 L. Ed. 2d 448 (1999)).

n35 Yankee Bank for Fin. & Sav., FSB v. Hanover Square Assocs.-One Ltd. P'ship, 693 F. Supp. 1400, 1411 (N.D.N.Y. 1988) (quoting Wilson v. Intercollegiate (Big Ten) Conference Athletic Assoc., 668 F.2d 962, 965 (7th Cir. 1982)).

n36 28 U.S.C. § 1446(b) (2006) (emphasis added).

n37 Moore's P107.30[3][a][ii]. Accord Lovern v. General Motors Corp., 121 F.3d 160, 162 (4th Cir. 1997) ("The statute does not preclude defendants from removing a case where their discovery of the grounds of federal jurisdiction is belated because facts disclosing those grounds were inadequately or mistakenly stated in the complaint.").

n38 See Powers v. Chesapeake & Ohio Ry. Co., 169 U.S. 92, 100-01, 18 S. Ct. 264, 42 L. Ed. 673 (1898) (noting that the removal statute permits and requires "the defendant to file a petition for removal as soon as the action assumes the shape of a removable case in the court in which it was brought"); H. Rep. 352, 81st Cong. (1st Sess. 1949) reprinted in 1949 U.S. Code & Cong. Serv. at 1254, 1268 (explaining that the addition of the provision allowing removal when the initial pleading does not state a removable case was meant to codify the finding in

Case MDL No. 875 Document 4914 Filed 11/17/06 Page 364 of 423
Case 2:06-cv-00741-TS Document 128 Filed 10/10/2006 Page 8 of 15

Page 7

2006 U.S. Dist. LEXIS 20575, *15

*Powers, 169 U.S. 92, 18 S. Ct. 264, 42 L. Ed. 673*, to allow removal of an action *whenever* removability is disclosed).

[*16]

n39 *See In re Willis, 228 F.3d 896, 897 (5th Cir. 2000)* ("thirty-day period begins running on receipt of complaint only when complaint explicitly discloses [basis for federal jurisdiction]").

n40 *See* 14C Charles Alan Wright, et al., Federal Practice and Procedure § 3733 at 309-10 (1998) (noting that "depositions, answers to interrogatories, and requests for admissions, amendments to ad damnum clauses of the pleadings, and correspondence between the parties and their attorneys or between the attorneys are usually accepted as other paper' sources that initiate a new thirty day period of removability," and collecting cases). The phrase "other paper" generally refers to "documents generated within the state court litigation." *Zbranek v. Hofheinz, 727 F. Supp. 324, 326 (E.D. Tex. 1989)*.

## D. Revival Exception

There is one narrow judicially-created exception to the thirty-day rule, known as the revival exception. n41 This exception allows removal after the thirty day period has run where an amended pleading changes the nature of a case so drastically [*17] that the amendment "in effect begins a new case." n42 A defendant must rely on the revival exception where the complaint was initially removable, making *section 1446(b)* inapplicable. "The right to revive must be determined in each case with reference to its purposes and those of the 30-day limitation on removal to which it is an exception, and against a background of general considerations relating to the proper allocation of decision-making responsibility between state and federal courts. n43 Where the pleading amendments do not change the "target" of a plaintiff's attack, the basic legal theory of the case, or the "nature of the relief sought" there is no revival. n44 Thus, where the addition of new parties, the enactment of a new law, or

the addition of claims does not change the essential nature of the action, revival is not warranted. n45 In contrast, where the newly added claims "bear no resemblance" to the original allegations or the parties are realigned such that, for example, co-defendants become plaintiffs, a district court may apply the revival exception. n46

[*18]

n41 *See Wilson, 668 F.2d at 965.*

n42 *Id: at 966. Accord Johnson v. Heublein Inc., 227 F.3d 236, 242 (5th Cir. 2000)* (upholding district court's decision to deny remand based on the revival doctrine where the allegations contained in the amended complaint bore "no resemblance whatsoever to the allegations of the original complaint [and] the parties to the original action [were] now aligned in a completely different manner").

n43 *Wilson, 668 F.2d at 965.*

n44 *Id. at 966. Accord Casale v. Metro. Transp. Auth., 2005 U.S. Dist. LEXIS 34637, No. 05 Civ. 4232, 2005 WL 3466405, at *4 (S.D.N.Y. Dec. 19, 2005)* (finding that the addition of a claim under *42 U.S.C. § 1983* to a pre-existing claim under Article 78 of New York's Civil Practice Law and Rules did not warrant application of the revival doctrine, where the additional claim rested on the same allegation that defendants had deprived plaintiff of a liberty interest in violation of the *Fourteenth Amendment*).

n45 *See, e.g., Louisiana Farm Bureau Cas. Ins. Co. v. Michelin Tire Corp., 207 F. Supp. 2d 524, 526 (M.D. La. 2002)* (refusing to apply the revival doctrine after addition of a plaintiff, where the lawsuit still arose from the same "alleged explosion of the Michelin tire and the injuries" suffered by plaintiffs); *Tully v. AFGE Local 3148, 2001 U.S. Dist. LEXIS 2550, No. 00-7664, 2001 WL 253034, at*

Case MDL No. 875 Document 4914 Filed 11/17/06 Page 365 of 423
Case 2:06-cv-00741-TS Document 128 Filed 10/10/2006 Page 9 of 15

Page 8

2006 U.S. Dist. LEXIS 20575, *18

*2 (E.D.N.Y. Mar. 9, 2001) (finding that where plaintiffs removed a cause of action from the complaint and the "basic legal theory of plaintiff's action - that the defendants failed to adequately represent him in various grievances with his employer" remained the same, application of the revival exception was not warranted); *Camino Camper of San Jose, Inc. v. Winnebago Indus., Inc., 715 F. Supp. 964, 965-66 (N.D. Cal. 1989)* (finding passage of the Judicial Improvements and Access to Justice Act did not revive defendants time to remove); *Clarson v. Southern Gen. Life Ins. Co., 694 F. Supp. 847 (M.D. Fla. 1987)* (where substitution of a plaintiff, necessitated by the original plaintiff's death and addition of several causes of action did not change the essential nature of the suit, the amended complaint was "not sufficiently different so that continued litigation in state court would be unjust to defendant, given defendant's voluntary submission to state court jurisdiction" on the earlier complaint); *Frye v. General Fin. Corp., 35 B.R. 742 (N.D. Ill. 1983)* (finding that where plaintiffs added thirty-six named plaintiffs, three defendants, and new allegations of misconduct to their complaint, the revival doctrine was not warranted as the "gravamina" or the "vital essences" of the complaint had not been changed).

[*19]

n46 *Heublein Inc., 227 F.3d at 242. But see Rubstello, Inc. v. Transportation Ins. Co.*, No. 05-0688, 2005 WL 1503924, at *4 (E.D. Cal. Jul. 22, 2005) (noting that the "revival exception" has rarely been "used successfully given the stringent qualifications").

**E. CAFA and the Energy Policy Act**

CAFA authorizes removal of certain putative class actions commenced on or after February 18, 2005. n47 A

court must look to state law to determine when a lawsuit was initially commenced for purposes of CAFA. n48 In Illinois, the Seventh Circuit has explained that, typically, "routine changes in class definitions - the sort that relate back to the original pleading for limitations purposes - do not commence new actions." n49

n47 *See* 28 U.S.C. § 1332(d) (note on Effective and Applicability Provisions).

n48 *See Braud v. Transp. Serv. Co., 445 F.3d 801, 2006 U.S. App. LEXIS 8496, 2006 WL 880051 (5th Cir. Apr. 6, 2006)* (noting that the courts of appeals that have examined this issue have unanimously held that state law determines when an action is commenced for purposes of CAFA).

[*20]

n49 *Knudsen v. Liberty Mut. Ins. Co.* ("*Knudsen II*"), 435 F.3d 755, 757 (7th Cir. 2006) (quotations and citations omitted).

As a threshold matter, "substitution of unnamed class members for named plaintiffs who fall out of the case because of settlement or other reasons is a common and normally an unexceptionable (routine) feature of class action litigation both in the federal courts and in the Illinois courts." n50 Prior to class certification, if the named plaintiffs settle, courts will generally allow substitution of new named plaintiffs. n51 Courts "disregard the jurisdictional void that is created when the named plaintiffs' claims are dismissed and, shortly afterwards, surrogates step forward to replace the named plaintiffs." n52

n50 *Phillips v. Ford Motor Co., 435 F.3d 785, 787 (7th Cir. 2006)*.

n51 *See id.*

N52 *Id.*

Thus, the substitution of named plaintiffs only [*21]

Case 2:06-cv-00741-TS    Document 128    Filed 10/10/2006    Page 10 of 15
Case MDL No. 875    Document 4914    Filed 11/17/06    Page 366 of 423

Page 9

recommences a case if the amended pleading does not relate back to the earlier complaint. n53 "[A] new contention relates back to the original complaint (and hence is not a new claim for relief or cause of action) when the original pleading furnishes the defendant with notice of the events that underlie the new contention." n54 "Under Illinois law...an amendment relates back when it arises out of the same transaction or occurrence set up in the original pleading.'" n55

> n53 *See id. See also Plubell v. Merck & Co., 434 F.3d 1070 (8th Cir. 2006)* (holding that amended pleading did not "commence" a new action for the purposes of CAFA because the claims did not change and the replacement representative was a member of the putative class in the original pleading).
>
> n54 *Knudsen II, 435 F.3d at 757.*
>
> n55 *Phillips, 435 F.3d at 787* (citing *735 Ill. Comp. Stat. 5/2-616(b)* (2005)). *See also Chandler v. Illinois Central R.R., 207 Ill. 2d 331, 798 N.E.2d 724, 732-33, 278 Ill. Dec. 340 (Ill. 2003)* (noting that "a liberal construction of the requirements of *section 2-616(b)* is necessary in order to allow the resolution of litigation on the merits and to avoid elevating questions of form over substance") (quotations and citations omitted); *Fed. R. Civ. P. 15(c).*

[*22]

In contrast, where an amendment adds an entirely new defendant, the case may become removable as to that defendant. n56 Or, where "a novel claim" is "tacked on" to an existing action, a court may decide that the action has been recommenced. n57

> n56 *See Knudsen v. Liberty Mut. Ins. Co.* ("Knudsen I"), *411 F.3d 805, 807-08 (7th Cir. 2005).*
>
> n57 *Knudsen II, 435 F.3d at 757. See also Heaphy v. State Farm Mut. Auto. Ins. Co., 2005 U.S. Dist. LEXIS 25651, No. C05-5404, 2005 WL 1950244, at *3-5*

*(W.D. Wash. Aug. 15, 2005)* (removal under CAFA permitted where a new lead plaintiff who was not a member of the prior putative class was added and new causes of action were asserted).

The Energy Policy Act allows removal of "claims and legal actions" filed after August 8, 2005, that allege actual or threatened contamination of MTBE. n58 The applicability of this section to amended complaints is an issue of first impression that has not yet been addressed in any court. Nonetheless, the definitions [*23] of claim or action are well-established. "New legal arguments about the same events do not amount to a new claim. n59 "One set of facts producing one injury creates one claim for relief, no matter how many laws the deeds violate." n60 Thus, the test for whether a new claim or legal action has been filed is similar to the test for whether the case has been re-commenced. Ultimately, the question is whether plaintiffs have pled fundamentally new facts.

> n58 42 U.S.C. § 4575 Note.
>
> n59 *Brannigan v. United States, 249 F.3d 584, 588 (7th Cir. 2001)* ("In both civil and criminal practice it is the underlying events, rather than the legal arguments advanced to obtain relief from those events, that demarcate a 'claim.'").
>
> n60 *N.A.A.C.P. v. American Family Mut. Ins. Co., 978 F.2d 287, 292 (7th Cir. 1992). Accord Original Ballet Russe, Ltd. v. Ballet Theatre, Inc., 133 F.2d 187, 189 (2d Cir. 1943)* (noting that a "claim" is used to denote "the aggregate of operative facts that give right to a right enforceable in the courts" and that it replaces the former notion of "cause of action"). *See also* 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1324 (3d ed. 2004).

[*24]

## IV. DISCUSSION

Plaintiffs claim that the legal theory of the case has

Case MDL No. 875   Document 4914   Filed 11/17/06   Page 367 of 423
Case 2:06-cv-00741-TS   Document 128   Filed 10/10/2006   Page 11 of 15

Page 10

2006 U.S. Dist. LEXIS 20575, *24

remained unchanged and that defendants' removal is untimely. n61 Plaintiffs explain that since it was first filed, this case has been "a suit on behalf of well owners complaining of threatened or actual MTBE contamination, n62 and that the Fifth Amended Complaint merely reduced the scope of the action by (1) dismissing the settling defendants, (2) dropping the count for conspiracy, (3) recasting the strict liability claim as a claim for nuisance, and (4) limiting the class to "well owners who were within 3000 feet of service stations owned or operated by defendants." n63

> n61 *See* Plaintiffs' Memorandum in Support of Remand ("Pl. Mem.") at 6.
>
> n62 *Id.* at 8.
>
> n63 *Id.*

Defendants oppose remand claiming that plaintiffs "effectively filed a new case," n64 because the Fifth Amended Complaint includes new plaintiffs, new claims, new proof, and new relief. n65 They also argue that the Fifth Amended Complaint does not [*25] "relate back" to the original complaint, and for this reason it commenced a " new piece of litigation'" for purposes of CAFA and the Energy Policy Act. n66

> n64 Defendants' Joint Memorandum in Opposition to Plaintiffs' Motion to Remand ("Opp. Mem.") at 2.
>
> n65 *Id.*
>
> n66 *Id.* at 8 (quoting *Knudsen I, 411 F.3d at 807*).

The originally filed class action, in *Misukonis,* contained allegations of negligence, strict liability for placing MTBE and MTBE-containing gasoline, a defective and/or unreasonably dangerous product, into the stream of commerce, and conspiracy. n67 The action was removable when filed. n68 Because it was filed in 2001, defendants' removal in 2005 was untimely unless defendants can demonstrate that the Fifth Amended Complaint was effectively a new case thereby permitting removal under either the revival exception, the Energy Policy Act, or CAFA.

[*26]

> n67 *See* 9/20/01 Class Action Complaint, *Misukonis,* No. 01-L-1472 (Ill. 3d Cir. Madison Co.) PP100-219. *Cf.* Class Action Complaint, *England,* No. 00-L-331 (Ill. 3d Cir. Madison Co.) PP53-75 (also alleging negligence, strict liability for placing MTBE and gasoline containing MTBE into the stream of commerce, and conspiracy).

> n68 *See In re MTBE Prods. Liab. Litig., 399 F. Supp. 2d 340 (S.D.N.Y. 2005); MTBE III, 342 F. Supp. 2d at 150* (finding that federal jurisdiction was appropriate over the MTBE cases because "defendants argued that the federal government required them to add MTBE to gasoline" and the use of MTBE was the "conduct upon which plaintiffs' claims [were] based").

## A. The Revival Exception

Defendants' assertion that the Fifth Amended Complaint involves new proof, new claims, and new relief is unavailing. Merely naming two new plaintiffs does not restart defendants' removal clock because the essential nature of the case has not changed. n69

> n69 See, e.g., *Louisiana Farm Bureau Cas. Ins. Co., 207 F. Supp. 2d at 524; Frye, 35 B.R. at 742*.

In the Fourth Amended Complaint, plaintiffs' putative class was defined as "all persons who own real property in the State [*27] of Illinois that is not used for commercial purposes upon which a private water supply well exists that provides drinking water." n70 The putative class in the Fifth Amended Complaint is defined as "all persons who own real property in the State of Illinois that is not used for commercial purposes upon which a private water supply well exists that provides drinking water, and who are within 3000 feet of services stations that are or were owned or operated by Defendants." n71 The only difference is that the Fifth

Amended Complaint is more specific than the Fourth Amended Complaint.

n70 Fourth Amended Complaint P64.

n71 Fifth Amended Complaint P47.

Defendants concede that Graham and McMannis "were likely members" of the Misukonis-Provaznik class. n72 Thus, defendants had notice of any possible risk of contamination claims which could have been made by Graham and McMannis. The fact that defendants may have to conduct a new investigation into potential sources of contamination or risk of contamination focused [*28] on the Graham and McMannis wells does not prove that this is a new action. n73

n72 Opp. Mem. at 12.

n73 *See Schillinger v. Union Pac. R.R. Co., 425 F.3d 330, 334 (7th Cir. 2005)* ("the potential for a larger amount of legal research and discovery in and of itself is not a significant enough step to create new litigation"). Defendants also noted that Rhea McMannis appeared as a plaintiff in *England,* but was dismissed for lack of standing. *See* 3/8/05 Letter from Peter John Sacripanti, counsel for Exxon, to the Court at 1. This fact is irrelevant to the analysis of whether the addition of McMannis to the Fifth Amended Complaint created a new case.

The class allegations in the new complaint are also not substantially different. In the Fourth Amended Complaint, plaintiffs brought the action on behalf of the class to certify and determine (1) whether defendants were negligent by adding MTBE to gasoline distributed in Illinois, (2) whether defendants were negligent in failing to warn [*29] plaintiffs of the risks posed by MTBE-containing gasoline, (3) whether MTBE was a defective and/or unreasonably dangerous product at the time defendants placed it into the stream of commerce in Illinois, and (4) whether defendants conspired to act in concert when they chose to add MTBE to the gasoline. n74 The alleged common questions of law or fact in

plaintiffs' Fifth Amended Complaint duplicate the first three questions in this list. n75 Plaintiffs merely dropped the conspiracy allegations.

n74 *See* Fourth Amended Complaint P74.

n75 *See* Fifth Amended Complaint P49.

Defendants' argument that the essential focus of the Complaint has changed is also mistaken. Defendants argue that the earlier Complaint focused on product liability and whether gasoline with MTBE was defective, but that the Fifth Amended Complaint focuses only on the localities of the Exxon and Shell service stations. n76 This is not the case. The Fourth Amended Complaint alleged claims against particular defendants with service [*30] stations in Illinois and thus it focused on fact-specific spill information. n77 Moreover, the Fifth Amended Complaint is not focused solely on the localities of the Exxon and Shell service stations. The Fifth Amended Complaint alleges, in language identical to that in the Fourth Amended Complaint, that defendants knew of "MTBE's chemical characteristics that make it virtually certain that if MTBE were released into the environment it would contaminate sources of drinking water to a greater degree than other gasoline constituents" and that "despite this knowledge, defendants misrepresented to the public and the government the true nature of MTBE and negligently elected to promote and market MTBE." n78 Thus, the essential nature of plaintiffs' claims remains the same.

n76 *See* Opp. Mem. at 7.

n77 *See* Fourth Amended Complaint PP4-11.

n78 Fifth Amended Complaint P28. *Cf.* Fourth Amended Complaint P35 (alleging identical claims).

In sum, the Fifth Amended Complaint did not in effect begin a [*31] new case. Plaintiffs' effort to recover for MTBE contamination or risk of contamination remained the same in both the Fourth Amended Complaint and the Fifth Amended Complaint.

Case MDL No. 875   Document 4914   Filed 11/17/06   Page 369 of 423
Case 2:06-cv-00741-TS   Document 128   Filed 10/10/2006   Page 13 of 15

Page 12

2006 U.S. Dist. LEXIS 20575, *31

Defendants acknowledge that both the Fourth and Fifth Amended Complaints sought to "recover for alleged contamination or risk of contamination" to plaintiffs' wells. n79 The Fifth Amended Complaint did not change the object of plaintiffs' attack, the legal theory of the case, or the relief sought. n80

> n79 Opp. Mem. at 4-5. Defendants contend that because the plaintiffs' *wells* are different than the previous plaintiffs' wells, this is an effectively new case. *See* Opp. Mem. at 10. Defendants note that they will have to mount a "new investigation" of McMannis and Graham's wells, each of the gasoline stations and other sites that could have served as potential sources for contamination, and "evaluate the regional hydrogeology," files from the Illinois Environmental Protection Agency, and "Illinois private well records and files." Affidavit of Ed Alizadeh, President of Geotechnology, Inc., in support of Defendants' Joint Memorandum in Opposition to Plaintiffs' Motion to Remand at 1. As noted, even additional claims that do not change the underlying theory of the case will not suffice to revive the right to remove.

[*32]

> n80 *See Wilson,* 668 F.2d at 966.

**B. CAFA and the Energy Policy Act**

For the same reasons, the Fifth Amended Complaint did not commence a new case for purposes of the Energy Policy Act or CAFA. Generally, passage of a new law providing a new basis for removal does not, by itself, revive a defendant's right to remove. n81 Defendants do not claim, however, that their right to remove was revived by these statutes. n82 Defendants argue instead that the Fifth Amended Complaint re-commenced the action for purposes of CAFA and that claims in the action were newly "filed" for purposes of the Energy Policy, Act. n83

> n81 *See, e.g., Camino Camper of San Jose, Inc.,* 715 F. Supp. at 965-66; *Samura v. Kaiser Foundation Health Plan, Inc.,* 715 F. Supp. 970, 972 (N.D. Cal. 1989) (new basis for removal under a federal act did not "undo the original waiver" of removal or warrant application of the revival exception).

> n82 Even if defendants had made the argument that the passage of CAFA or the Energy Policy Act, without an amendment to the complaint, revived their right to remove, a new removal period would have expired thirty days after the effective date of each Act.

[*33]

> n83 Nonetheless, defendants recognize that the tests for revival and for whether a case was re-commenced are "essentially the same." Opp. Mem. at 6.

Defendants cannot show that the amendments re-commenced the case. *First,* plaintiffs did not add a new defendant or a novel claim. *Second,* assuming, arguendo, that the substitution of McMannis and Graham as the named plaintiffs would completely alter the facts and proof at issue in the case, defendants cannot show that they lacked notice of the events at issue. Both the Fourth and Fifth Amended Complaints claim that defendants are liable for negligently breaching their duties to "ensure that MTBE, when used as intended, would not pose an unreasonable risk to groundwater from which plaintiffs and the Class draw their water." n84 Illinois "allows named plaintiffs to be substituted with relation back." n85 The Fourth Amended Complaint's class allegations encompassed Graham and McMannis' claims as they were part of the purported class. The fact the named individual plaintiffs changed did not alter the underlying allegations.

> n84 *Compare* Fourth Amended Complaint P44 *with* Fifth Amended Complaint P37.

[*34]

Case MDL No. 875  Document 4914  Filed 11/17/06  Page 370 of 423
Case 2:06-cv-00741-TS  Document 128  Filed 10/10/2006  Page 14 of 15

Page 13

2006 U.S. Dist. LEXIS 20575, *34

n85 *Phillips, 435 F.3d at 788*. That the individual facts regarding the newly named plaintiffs may cause new discovery obligations is not sufficient to show that this case has been re-commenced.

Similarly, defendants cannot show that these are newly filed claims for purposes of the Energy Policy Act. Plaintiffs' addition of a nuisance claim did not change the essential factual allegations. This new claim is based on the same factual allegations alleged in the earlier complaints. n86

n86 *Compare* Fifth Amended Complaint PP43-44 ("Defendant, by the wide-scale production, distribution, and use of the chemicals they place and distribute in gasoline, including MTBE and/or TBA, performed in a negligent, reckless, and/or abnormally dangerous manner, has caused contamination of the nation's groundwater supply" and "plaintiffs and members of the proposed class have suffered and will suffer damages and injury distinct from these harms to the general public, namely the plaintiffs' water supply wells are at risk for MTBE and/or TBA contamination.") *with* Fourth Amended Complaint P50-51 ("At the time defendants placed MTBE and gasoline containing MTBE into the stream of commerce, it was defective and/or unreasonably dangerous for its intended and foreseeable uses....As a direct and proximate result of the unreasonably dangerous and/or defective condition of MTBE or gasoline containing MTBE and its introduction into the stream of commerce by defendants, the plaintiffs' water supply wells are contaminated or are at risk for MTBE and/or TBA contamination.").

[*35]

As noted, courts must "construe the removal statute narrowly, resolving any doubts against removability."

n87 Here, the purposes of the thirty-day limit on removal are well-served by a remand. All defendants but Exxon and Shell settled with the named plaintiffs. This necessitated the substitution of named plaintiffs. Allowing Exxon and Shell an opportunity to remove now would only give them an "undeserved tactical advantage" and unnecessarily prolong these proceedings. n88 The Fifth Amended Complaint was removed many years after the action was first filed. It must be remanded as the removal was untimely.

n87 *Somlyo, 932 F.2d at 1046* (quotations and citations omitted).

n88 *Wilson, 668 F.2d at 965*.

### C. Plaintiffs' Request for Attorney's Fees

Plaintiffs also seek their costs and attorneys' fees associated with Defendants' removal. n89 Pursuant to *28 U.S.C. § 1447(c)*, "an order remanding the case may require payment of just costs and any actual [*36] expenses, including attorney fees, incurred as a result of the removal." The purpose of the statute is to prevent "abuse, unnecessary expense, and harassment" as a result of improper removal. n90 "Providing for attorneys' fees when granting a motion to remand serves the purpose of deterring improper removal, whereas awarding fees when denying a motion for remand does not." n91

n89 *See* Plaintiffs' Motion to Remand P4.

n90 *Circle Indus. USA, Inc. v. Parke Constr. Group, 183 F.3d 105, 109 (2d Cir. 1999)*.

n91 *Id.*

The Supreme Court recently provided guidance for the standard governing application of *section 1447(c)*. In *Martin v. Franklin Capital Corp.*, the Court held that an award of attorneys' fees is a matter of discretion with neither a presumption in favor of or against such an award. n92 Instead, the district court must determine whether the removing party lacked an "objectively reasonable basis for seeking removal." n93 "The appropriate test for awarding fees under § [*37] *1447(c)*

Case MDL No. 875   Document 4914   Filed 11/17/06   Page 371 of 423
Case 2:06-cv-00741-TS   Document 128   Filed 10/10/2006   Page 15 of 15

Page 14

2006 U.S. Dist. LEXIS 20575, *37

should recognize the desire to deter removals sought for the purpose of prolonging litigation and imposing costs on the opposing party, while not undermining Congress' basic decision to afford defendants a right to remove as a general matter, when the statutory criteria are satisfied." n94 The Court also noted that "district courts retain discretion to consider whether unusual circumstances warrant a departure from the rule in a given case." n95

n92 *Martin v. Franklin Capital Corp., U.S. , 126 S. Ct. 704, 710, 163 L. Ed. 2d 547 (Dec. 7, 2005).*

n93 *Id. at 711.*

n94 *Id.*

n95 *Id.*

Plaintiffs argue that defendants' removal was "improper and vexatious," as it only served to prolong the litigation. n96 Despite the fact that the motion to remand is granted, I find that an award of costs, disbursements, and attorneys' fees would not serve "the purpose of deterring improper removal." n97 Defendants did not lack an objectively reasonable [*38] basis for seeking removal. Defendants raised colorable issues of law regarding revival and two new federal statutes. Removability is an evolving and difficult field of law. n98 Equity does not require an award of costs and expenses under *section 1447(c).*

n96 Plaintiffs' Motion to Remand P5.

n97 *Circle Indus. USA, Inc., 183 F.3d*

*at 109.*

n98 *See Sung ex rel. Lazard Ltd. v. Wasserstein, 415 F. Supp. 2d 393, 398 (S.D.N.Y. 2006)* (noting that a motion to remand required the court to delve into a "thicket of an oft-visited yet unsettled area of the law"). *See also* Edward M. Spiro, *Removal Jurisdiction - A Continuing Conundrum,* New York Law Journal, Apr. 6, 2006, at 3 (explaining that for defendants seeking to remove, "determining removability can be a tricky business, particularly where there is no explicit federal claim on the face of the state court pleading").

## V. CONCLUSION

For the foregoing reasons plaintiffs' motion to remand is granted. The Clerk of [*39] the Court is directed to close this motion (06 Civ. 1379: attachment #29, docket #2) and this case.

SO ORDERED:

Shira A. Scheindlin

U.S.D.J.

Dated: New York, New York

April 17, 2006

# EXHIBIT "J"

to

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO REMAND AND FOR AWARD OF COSTS AND ATTORNEYS' FEES

Unpublished Decision

Contreras v. Host America Corp.,
2006 U.S. LEXIS 62794,
Case No. 3:06cv840
(D. Conn. September 5, 2006)

Case MDL No. 875 Document 4914 Filed 11/17/06 Page 373 of 423
Case 2:06-cv-00741-TS Document 128 Filed 10/10/2006 Page 2 of 6

Page 1

1 of 1 DOCUMENT

**Enrique Jose Contreras, et al., Plaintiffs, v. Host America Corporation, Defendant**

**Case No. 3:06cv840 (JBA)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

*2006 U.S. Dist. LEXIS 62794*

**September 1, 2006, Decided**
**September 5, 2006, Filed**

**PRIOR HISTORY:** *In re Host Am. Corp. Secs. Litig., 236 F.R.D. 102, 2006 U.S. Dist. LEXIS 20791 (D. Conn., 2006)*

**DISPOSITION:** [*1] Plaintiffs' Motion to Remand Granted.

**COUNSEL:** For Enrique Jose Contreras, Jose Suarez, Anil Sawant, Radar Devices Inc, Boune Ome Rahanavnog, Cilantro Fund Partners LP, Joseph Su, Hermant A. Desai, Per F. Fjortoft, Melvin J. Arrandt, Mostafa M. Gamali, James M. Semler, Kouk S. Lee, Haresh S. Shah, Daniel G.R. Caris, Michael Louis Kramer, Laura M. Sodano, Diana L. Nassaney, John J. Zahorchak, Richar M. Ruan, James Russell Yowell, Jason Novonty, Shashank Mathur, Louis Holcomb, Constance T. Mccuune, Jonathan Eggena, Kipp Teamey, Larry D. Gregory, Anita B. Gomberg, Renee L. Brunt, David Taiwo, Kevin D. Nguyen, Aiman Youssif, Michael Schoeman, Lawrence Edward Dombrowski, Brooks L. Hurst, Gezim Zeko, Douglas M. Yelin, Joseph Zu, John N. Tessendorf, Chen-Wai Shin, Thien B. Train, James Strode, William I Fender, David A. Burns, Matthew Samuel, Anastasia Michos, Plaintiffs: Joel Thomas Faxon, Stratton Faxon, New Haven, CT.

For Host Amer Corp, Defendant: Craig A. Raabe, Jason Marc Kuselias, Robinson & Cole LLP, Hartford, CT.

**JUDGES:** Janet Bond Arterton, United States District Judge.

**OPINION BY:** Janet Bond Arterton

**OPINION:**

**RULING ON PLAINTIFFS' MOTION TO REMAND [DOC. # 11]**

Plaintiffs, 45 individuals [*2] and 2 corporate entities who purchased defendant's stock in July 2005, initially filed this action in Connecticut Superior Court asserting claims of common law fraud, fraudulent non-disclosure, fraudulent misrepresentation, and negligent misrepresentation arising out of allegedly materially false statements made by defendant Host America Corporation ("Host America") on July 12, 2005 when it announced that it had received a firm commitment from WalMart to purchase its LightMasterPlus product for installation in WalMart stores. See Compl. [Doc. # 1-2].

Defendant removed the suit to this Court pursuant to *28 U.S.C. §§ 1441* and *1448*, claiming that the Court "has jurisdiction over this matter because the Complaint alleges a claim arising under the laws of the United States, to wit, the Securities Exchange Act of 1934, as amended, within the meaning of *28 U.S.C. § 1331*, and in addition is removable on the ground that the action appears to have been intentionally structured in an attempt to circumvent the provisions of *15 U.S.C. § 78bb(f)(2)*." Notice of Removal [Doc. # 1-1] at P 6. Plaintiffs [*3] now move to remand on the basis that no federal subject matter jurisdiction exists because plaintiffs have asserted only state common law claims [Doc. # 11], and defendant opposes [Doc. # 16]. For the reasons that follow, plaintiffs' Motion to Remand will be granted.

**I. STANDARD**

Removal from state court to federal court is proper

Case MDL No. 875 Document 4914 Filed 11/17/06 Page 374 of 423
Case 2:06-cv-00741-TS Document 128 Filed 10/10/2006 Page 3 of 6

Page 2

2006 U.S. Dist. LEXIS 62794, *3

under *28 U.S.C. § 1441* in "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." *28 U.S.C. § 1441(a)*. In the absence of diversity of citizenship, the district court has original jurisdiction only if the case "arises under" federal law in accordance with *28 U.S.C. § 1331*. See *Caterpillar, Inc. v. Williams, 482 U.S. 386, 392, 107 S. Ct. 2425, 96 L. Ed. 2d 318 (1987)*. The burden of establishing the existence of federal subject matter jurisdiction rests on the removing party, see *United Mutual Houses, L.P. v. Andujar, 230 F. Supp. 2d 349 (S.D.N.Y. 2002)* (citing *Caterpillar, 482 U.S. at 391-92*), and "in light of the congressional intent to restrict federal court jurisdiction, [*4] as well as the importance of preserving the independence of state governments, federal courts construe the removal statute narrowly, resolving any doubts against removability," *Somlyo v. J. Lu-Rob Enter., Inc., 932 F.2d 1043,1045-46 (2d Cir. 1991)*.

As a general matter, "removal based on federal question jurisdiction is improper unless a federal claim appears on the face of a well-pleaded complaint." *Travelers Indem. Co. v. Sarkisian, 794 F.2d 754, 758 (2d Cir. 1986)*. This is because "it has been the law for decades that the party who brings a suit is master to decide what law he will rely on. . . . Where plaintiff's claim involves both a federal ground and a state ground, the plaintiff is free to ignore the federal question and pitch his claim on the state ground." Id.

"However, in certain limited circumstances a plaintiff may not defeat removal by clothing a federal claim in state garb, or, as it is said, by use of 'artful pleading.'" Id. n1 The cases in which federal courts have permitted removal on the basis of the artful pleading doctrine fall into two general categories: (1) "cases in which federal preemption has eliminated the legal [*5] foundation of plaintiff's state law claims" ("complete preemption"), and (2) "cases in which plaintiff's choice of a state forum is motivated by the desire to evade the consequences of [federal] litigation." See *Bowlus v. Alexander & Alexander Servs., Inc., 659 F. Supp. 914, 918-19 (S.D.N.Y. 1987)*. The rationale underlying these exceptions is that "[a] federal court need not blind itself to the real gravamen of a claim because plaintiff tenders a blindfold in the form of artificial characterizations in its complaint." *In re Wiring Device Antitrust Litig., 498 F. Supp. 79, 82 (E.D.N.Y. 1980)* (Weinstein, J.). Thus, the Second Circuit has identified as relevant factors in

determining whether to permit removal based on artful pleading: (1) whether the elements of a plaintiff's claim(s) are virtually identical to those of a claim expressly grounded on federal law, and (2) whether a plaintiff previously elected to proceed in federal court. See *Sarkisian, 794 F.2d at 761*. n2

n1 The artful pleading doctrine evolved primarily from a footnote in *Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 397 n.2, 101 S. Ct. 2424, 69 L. Ed. 2d 103 (1981)*, in which the Supreme Court approved the appellate court's affirmance of removal, stating "we agree that at least some of the claims had a sufficient federal character to support removal. As one treatise puts it, courts 'will not permit plaintiff to use artful pleading to close off defendant's right to a federal forum . . . [and] occasionally the removal court will seek to determine whether the real nature of the claim is federal, regardless of plaintiff's characterization'" (citing Wright & Miller, Federal Practice & Procedure § 3722).

[*6]

n2 Plaintiffs contend that the holding in Sarkisian was substantially limited, if not overruled, by the Supreme Court's opinion in *Rivet v. Regions Bank of Louisiana, 522 U.S. 470, 118 S. Ct. 921, 139 L. Ed. 2d 912 (1998)*. While the Court is mindful of Rivet's rejection of the "claim preclusion" interpretation in Moitie, on which Sarkisian relied, stating "Moitie did not create a preclusion exception to the rule, fundamental under currently governing legislation, that defendant cannot remove on the basis of a federal defense," *522 U.S. at 478*, the Court is not convinced that Rivet overruled application of this two-part test from Sarkisian. See *Bellido Sullivan v. American Int'l Group, 123 F. Supp. 2d 161, 164 (S.D.N.Y. 2000)* ("Some lower courts have suggested that federal preemption is actually the only situation

Case MDL No. 875   Document 4914   Filed 11/17/06   Page 375 of 423
Case 2:06-cv-00741-TS   Document 128   Filed 10/10/2006   Page 4 of 6

Page 3

2006 U.S. Dist. LEXIS 62794, *6

which would justify removal. . . . Furthermore, one leading treatise [Wright & Miller] notes that it is peculiar that the United States Supreme Court's opinion in Rivet - a decision which attempted to clarify the artful pleading doctrine - made no mention of this second type of artful pleading, declaring simply that, 'the artful pleading doctrine allows removal where federal law completely preempts a plaintiff's state law claim.' While this is curious, it is doubtful that the Court would abandon its precedent in this area in such a subtle fashion.") (emphasis added).

[*7]

## II. DISCUSSION

The first category of cases in which removal has been permitted -- where the claims are completely preempted by federal law -- is admittedly not applicable here. The Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), at *15 U.S.C. § 78bb(f)(1)*, provides that "no covered class action, based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging . . . a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security." A "covered class action" includes a lawsuit in which damages are sought on behalf of more than 50 people." *15 U.S.C. § 78bb(f)(5)(B)*. The purpose of SLUSA is "to prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives" of the 1995 Private Securities Litigation Reform Act ("PSLRA"). See SLUSA § 2(5), 112 Stat. 3227. However, "the Act does not does not deny any individual plaintiff, or indeed any group of fewer than 50 plaintiffs, the right to enforce any state-law cause of action [*8] that may exist." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 126 S. Ct. 1503, 1512, 164 L. Ed. 2d 179 (2006)*. Accordingly, plaintiffs may file suits in groups of under 50 individuals alleging state common law violations and "the existence of [such] a calculated strategy to avoid SLUSA preemption [will] not, by itself, permit a finding [of] preemption." *Bell v. Ebbers (In re Worldcom, Inc. Sec. Litig.), 308 F. Supp. 2d 236, 245 (S.D.N.Y. 2004)*. n3

n3 Defendant requests, in the event that the Court is inclined to grant plaintiffs' Motion to Remand, leave to conduct limited discovery to determine whether, "despite plaintiffs' characterization of the number of joined plaintiffs, removal is proper under SLUSA [on the basis that] while the Complaint only names 47 plaintiffs, there is reason to believe that there are necessary plaintiffs and/or plaintiffs who are acting in a representative capacity." Def. Opp. at 27 n.9. However, because the Court determines that it does not have subject matter jurisdiction over plaintiffs' claims, it does not have the jurisdiction to order such discovery.

[*9]

The second rationale for permitting removal based on artful pleading -- where plaintiff's choice of a state forum appears to be motivated by the desire to evade the consequences of prior litigation - also is inapplicable to this action. Turning to the second criterion first, the elements of the federal claim asserted in the now consolidated federal action (Case No. 05cv1250 (JBA)) are not "virtually identical" to the elements of plaintiffs' state common law claims asserted in this action. Compare *Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)* (holding that the elements of a claim under *Section 10(b) of the Securities Exchange Act of 1934* are: (1) a material misrepresentation or omission; (2) scienter; (3) connection with purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation), with *Weisman v. Kaspar, 233 Conn. 531, 539, 661 A.2d 530 (Conn. 1995)* ("The essential elements of an action in common law fraud . . . are that: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act [*10] upon it; and (4) the other party did so act upon that false representation to his injury.").

As was the case in *Sarkisian*, simply because plaintiffs here allege facts which also constitute a federal cause of action under *Section 10(b) of the Securities Exchange Act* and *Rule 10b5*, and plaintiffs' claims arise out of the same factual predicate as that underpinning the

Case MDL No. 875 Document 4914 Filed 11/17/06 Page 376 of 423
Case 2:06-cv-00741-TS Document 128 Filed 10/10/2006 Page 5 of 6

Page 4

2006 U.S. Dist. LEXIS 62794, *10

federal action, the substantive claims are not per se identical. See *Sarkisian, 794 F.2d at 761* (holding that plaintiff's state law claims -- though arising out of the same nucleus of operative facts as the federal claim -- were not virtually identical to those previously pled under RICO because the state law claims did not include "a pattern of racketeering activity" or operation of an "enterprise," as required under RICO); compare *In re NASDAQ Market Makers Antitrust Litig., 929 F. Supp. 174, 178 (S.D.N.Y. 1996)* (finding state law claim to be a "well-disguised federal claim[]" where, inter alia, "the Alabama statute makes illegal essentially the same acts prohibited by the federal antitrust laws"); *In re Wiring Device Antitrust Litig., 498 F. Supp. 79, 82 (E.D.N.Y. 1980)* [*11] (denying motion to remand where "while plaintiff . . . alleged only state law claims in his complaint and argued strenuously that by doing so federal jurisdiction [was] precluded, it was nevertheless evident that a federal antitrust question [was] integral to its claims").

Additionally, although defendant refers to the fact that plaintiffs appear to invoke a fraud-on-the-market reliance presumption, by referring to artificial stock demand and price inflation, a theory which is not available in the state common law fraud claims asserted by plaintiffs, plaintiffs do in fact allege actual justifiable reliance on defendant's July 12, 2005 press release. See Compl. 5-51, 74. Accordingly, notwithstanding defendant's protestations that "none of the plaintiffs allege . . . that they actually read and relied on the July 12, 2005 press release," Def. Opp. at 22, because plaintiffs' state common law claims require proof of actual reliance, and may not rely on a fraud-on-the-market theory instead, plaintiffs will have the burden of demonstrating the sufficiency of these allegations, and of proving them, in state court. n4

> n4 Likewise, defendant's argument concerning the viability of plaintiffs' negligent misrepresentation claim may also be tested upon remand to state court.

[*12]

Thus, even though plaintiffs use in their Complaint some language identical to that of the complaints in the federal action, and the factual predicate of each action is identical, the claims asserted in this case cannot be said to be inherently federal in nature, or dependent on a federal

question or federal claim, such that removal would be justified. See *Bellido-Sullivan, 123 F. Supp. 2d at 165* ("As for the second situation [where artful pleading will permit removal] where federal law is necessary and central to the plaintiff's state law claims, courts will generally only allow removal where a determination of the meaning or application of federal law is required to resolve a claim created by state law."). Indeed, the existence of a "calculated strategy to avoid SLUSA preemption," such as that employed by plaintiffs here, "does not, by itself, permit a finding [of] preemption," see *In re WorldCom, Inc. Sec. Litig., 308 F. Supp. 2d at 245*, because, as the Supreme Court has recognized, SLUSA "does not deny any individual plaintiff, or indeed any group of fewer than 50 plaintiffs, the right to enforce any state-law cause of action that may exist, [*13] " *Dabit, 126 S. Ct. at 1514*. n5

> n5 Because the Court determines that the second prong of the artful pleading removal test -- virtual identity of federal and state claims -- has not been satisfied, it need not reach the question of whether plaintiffs have previously elected to proceed in federal court within the meaning of Sarkisian and its progeny. The Court nevertheless notes that this prong appears applicable to, at most, only the handful of plaintiffs who were involved in the federal action and in the opposition to remand even those plaintiffs expressed their intention to opt out of the proposed federal class in favor of pursuing remedies under state law (as the proposed federal class has not yet been certified, plaintiffs here are not yet parties in that action as class members, nor have they yet had an opportunity to formally opt out of that class).

Accordingly, the doctrine of artful pleading may not be invoked in this case to negate the general rule that the plaintiffs are the master [*14] of their complaint, and to deem plaintiffs' state common law claims to be in essence federal claims thus justifying removal. n6

> n6 Plaintiffs indicate that they intend to move for fees and costs associated with

Case MDL No. 875   Document 4914   Filed 11/17/06   Page 377 of 423
Case 2:06-cv-00741-TS   Document 128   Filed 10/10/2006   Page 6 of 6

Page 5

2006 U.S. Dist. LEXIS 62794, *14

their motion to remand pursuant to *28 U.S.C. § 1447(c)*. "The standard for awarding fees should turn on the reasonableness of the removal. Absent unusual circumstances, courts may award attorney's fees under *§ 1447(c)* only where the removing party lacked an objectively reasonable basis for seeking removal." *Martin v. Franklin Capital Corp., 126 S. Ct. 704, 711, 163 L. Ed. 2d 547 (2005)*. As demonstrated herein, the issue of the validity of defendant's removal in this case is complex and the answer not obvious in light of established case law and thus it cannot be said that defendant lacked an objectively reasonable basis for removal and accordingly any motion for fees and costs would not be well-founded.

### III. CONCLUSION

For the foregoing reasons, plaintiffs' [*15] Motion to Remand [Doc. # 11] is GRANTED and the Clerk is directed to remand this case to the Connecticut Superior Court, Judicial District of New Haven.

IT IS SO ORDERED.

/s/ Janet Bond Arterton

United States District Judge

**Dated: New Haven, Connecticut on this 1st day of September, 2006.**

# EXHIBIT "K"

to

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO REMAND AND FOR AWARD OF COSTS AND ATTORNEYS' FEES**

California Court Notice of
Ruling on Motion to Dismiss for
*Forum Non Conveniens*

1   MARK S. GERAGHTY (CA BAR NO. 79043)
    JEFFREY S. SINEK (CA BAR NO. 135508)
2   LYNN R. LEVITAN (CA BAR NO. 176737)
3   THELEN REID & PRIEST LLP
    333 South Hope Street, Suite 2900
4   Los Angeles, California 90071
    Telephone: (213) 576-8000
5   Facsimile: (213) 576-8080

6   Attorneys for Defendant
    DAIMLERCHRYSLER CORPORATION
7

8   FRANK D. POND (CA BAR NO. 126191)
    MICHAEL A. GRAHAM (CA BAR NO. 179051)
9   KEVIN D. JAMISON (CA BAR NO. 222105)
    POND NORTH LLP
10  350 South Grand Avenue, Suite 2850
    Los Angeles, California 90071
11  Telephone: (213) 617-6170
    Facsimile: (213) 623-3594

12
    Attorneys for Defendants
13  FORD MOTOR COMPANY AND GENERAL MOTORS CORPORATION

14              SUPERIOR COURT OF THE STATE OF CALIFORNIA
15                  FOR THE COUNTY OF LOS ANGELES
16

| | |
|---|---|
| 17  JOSEPH ALEXANDER ANDERSON, JR. and ARVA ANDERSON, et al., | Case No.: BC 347121 |
| 18              Plaintiffs, | Assigned for all purposes to the Honorable Irving S. Feffer |
| 19              v. | **NOTICE OF RULING ON DAIMLERCHRYSLER CORPORATION'S, FORD MOTOR COMPANY'S AND GENERAL MOTORS COPRORATION'S MOTION TO DISMISS FOR *FORUM NON CONVENIENS*** |
| 20  A.W. CHESTERTON, INC., et al., | |
| 21              Defendants. | |
| 22 | |
| 23 | Date: May 10, 2006 |
| 24 | Time: 9:00 a.m. Dept: 51 |
| 25 | First Complaint Filed: February 7, 2006 |
| 26 | Trial Date: None Set. |
| 27 | |
| 28 | |

May-11-06 10:15am From-Thelen Reid & Priest LLP Case MDL No. 875 Document 4914 Filed 11/17/06 Page 380 of 423 213/815 F-007

Case 2:06-cv-00741-TS Document 128 Filed 10/10/2006 Page 3 of 15

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on May 10, 2006, DAIMLERCHRYSLER CORPORATION, FORD MOTOR COMPANY AND GENERAL MOTORS CORPORATION's ("defendants") Motion to Dismiss for *Forum Non Conveniens* was heard before the Honorable Irving Feffer in Department 51 of the above-entitled court. Lynn Levitan of Thelen Reid & Priest LLP appeared on behalf of Chrysler, Timothy Pieper appeared on behalf of Ford Motor Company and General Motors Corporation and Carolin Shining of Baron & Budd appeared on behalf of plaintiffs.

Having read and considered defendant's Motion to Dismiss for *Forum Non Conveniens*, plaintiffs' late-served Opposition and defendants' Reply and Objections to Evidence, as well as all joinders by co-defendants, the Court granted defendant's Motion to Dismiss for *Forum Non Conveniens* and ordered that the case be re-filed in Utah.

Counsel for Chrysler was ordered to give notice.

Dated: May 10, 2006

THELEN REID & PRIEST LLP

By _____
Mark S. Geraghty
Jeffrey S. Sinek
Lynn R. Levitan
Attorneys for Defendant
DAIMLERCHRYSLER CORPORATION

LA #400674 v1

-2-

NOTICE OF RULING ON DAIMLERCHRYSLER CORPORATION'S, FORD MOTOR COMPANY'S AND GENERAL MOTORS CORPORATION'S MOTION TO DISMISS FOR *FORUM NON CONVENIENS*

THELEN REID
& PRIEST LLP
ATTORNEYS AT LAW

*Joseph Alexander Anderson, Jr., et al. v. A.W. Chesterton, Inc., et al.*

## PROOF OF SERVICE BY FACSIMILE

CASE NO. BC 347121

I am over the age of 18 and not a party to the within action. I am employed in the County of Los Angeles, State of California by Thelen Reid & Priest LLP. My business address is 333 South Hope Street, Suite 2900, Los Angeles, California 90071-3048.

On May 11, 2006, at the time and from the telephone facsimile number indicated on the attached transmission report, the following entitled document:

**NOTICE OF RULING ON DAIMLERCHRYSLER CORPORATION'S, FORD MOTOR COMPANY'S AND GENERAL MOTORS COPRORATION'S MOTION TO DISMISS FOR** *FORUM NON CONVENIENS*

was served by transmitting true and correct copies thereof via facsimile to the following:

### SEE ATTACHED SERVICE LIST

I am readily familiar with the practices of Thelen Reid & Priest LLP for sending documents via facsimile. On the above stated date, the above listed document was transmitted via facsimile and said transmission was reported complete and without error. A copy of the transmission report showing the date and time of transmission that was properly issued by the transmitting facsimile machine is attached hereto, and incorporated herein by reference.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on May 11, 2006, at Los Angeles, California.

_____
Deanna M. Cabada

1

**SERVICE LIST**

2 | BARON & BUDD, P.C.                     Attorneys for
3 | Carolin K. Shining, Esq.              PLAINTIFFS
   | John Langdoc, Esq.
4 | 3102 Oak Lawn Ave., Ste. 1100
   | Dallas, TX 75219
5 | Tel.: 214.521.3605
   | Fax: 214.520.1181
6

7 | KIESEL, BOUCHER & LARSON LLP          Attorneys for
   | Patrick DeBlase, Esq.                 PLAINTIFFS
8 | 8648 Wilshire Blvd.
   | Beverly Hills, CA 90211-2910
9 | Tel.: 310.854.4444
   | Fax: 310.854.0812
10

11 | BARONIAN LAW FIRM                     Attorneys for
    | Robert Baronian, Esq.                GARLOCK SEALING TECHNOLOGIES
12 | 301 E. Colorado Blvd., Ste. 618
    | Pasadena, CA 91101
13 | Tel.: 626.568.0834
    | Fax: 626.449.4568
14

15 | BASSI, MARTINI, EDLIN & BLUM, LLP    Attorneys for
    | Robert J. Ryan, Esq.                 FOSTER WHEELER NORTH AMERICA
16 | 351 California Street, Suite 200      CORPORATION
    | San Francisco, CA 94104
17 | Tel.: 415.397-9006
    | Fax: 415.397-1339
18

19 | BISHOP, BARRY, HOWE, HANEY &         Attorneys for
    | RYDER                                CALAVERAS ASBESTOS, LTD.
20 | Douglas G. Wah, Esq.                  THORPE INSULATION COMPANY
    | Watergate Tower III
21 | 2000 Powell Street, Suite 1425
    | Emeryville, CA 94608
22 | Tel.: 510.596.0888
    | Fax: 510.596.0899
23

24 | CARROLL, BURDICK & McDONOUGH LLP     Attorneys for
    | Michael J. Mehall, Esq.              FOSTER WHEELER NORTH AMERICA
25 | 633 West Fifth Street, 51st Floor     CORPORATION
    | Los Angeles, CA 90071
26 | Tel.: 213.833.4500
    | Fax: 213.833.4555
27

28

| | |
|---|---|
| 1 FILICE BROWN EASSA & MCLEOD, LLP | Attorney for |
| EUGENE BROWN, JR., ESQ. | OAKFABCO, INC. |
| 2 AMEE A. MIKACICH, ESQ. | |
| 3 LAKE MERRITT PLAZA | |
| 1999 HARRISON STREET, SUITE 1800 | |
| 4 OAKLAND, CA 96612 | |
| Tel.: (510) 444-3131 | |
| 5 Fax: (510) 839-7940 | |
| 6 | |
| 7 FREEBURG, NETTELS & | Attorneys for |
| SCHALDENBRAND | GOODRICH CORPORATION |
| 8 Cynthia B. Schaldenbrand, Esq. | |
| 440 W. First Street, Suite 102 | |
| 9 Tustin, CA 92780 | |
| Tel.: (714) 508-1800 | |
| 10 Fax: (714) 508-1809 | |
| 11 | |
| 12 HOWARD ROME MARTIN & RIDLEY LLP | Attorneys for |
| Henry D. Rome, Esq. | WARREN PUMPS, L.L.C. |
| 1775 Woodside Road, Suite 200 | |
| 13 Redwood City, CA 94061-3436 | |
| Tel.: 650.365.7715 | |
| 14 Fax: 650.364.5297 | |
| 15 | |
| 16 JACKSON & WALLACE, LLP | Attorneys for |
| John R. Wallace, Esq. | HANSON PERMANENTE CEMENT, INC. |
| 55 Francisco Street, 6th Floor | KAISER GYPSUM COMPANY, INC. |
| 17 San Francisco, CA 94133 | KAISER CEMENT CORPORATION |
| Tel.: 415.982.6300 | ZURN INDUSTRIES, INC. |
| 18 Fax: 415.982.6700 | |
| 19 JACKSON & WALLACE, LLP | Attorneys for |
| Gabriel A. Jackson, Esq. | BUFFALO PUMPS, INC. |
| 20 55 Francisco Street, 6th Floor | |
| San Francisco, CA 94133 | |
| 21 Tel.: 415.982.6300 | |
| Fax: 415.982.6700 | |
| 22 | |
| 23 KNOTT & GLAZIER LLP | Attorneys for |
| Steven E. Knott, Esq. | T.H. AGRICULTURE & NUTRITION, L.L.C. |
| 24 601 South Figueroa Street, Suite 1950 | SUC THOMPSON HAYWARD CHEM. |
| Los Angeles, CA 90017 | CO. |
| 25 Tel.: 213.312.9200 | |
| Fax: 213.312.9201 | |
| 26 | |
| 27 | |
| 28 | |

| | | |
|---|---|---|
| 1 | LEWIS, BRISBOIS, BISGAARD & SMITH LLP<br>John A. Graniez, Esq. | Attorneys for<br>ADVOCATE MINES, LTD. |
| 2 | 221 N. Figueroa Street, Suite 1200<br>Los Angeles, CA 90012 | |
| 3 | Tel.: 213.250.1800 | |
| 4 | Fax: 213.250.7900 | |
| 5 | McKENNA LONG & ALDRIDGE LLP<br>William J. Sayers, Esq. | Attorneys for<br>CERTAINTEED CORPORATION |
| 6 | 444 South Flower Street, Suite 800<br>Los Angeles, CA 90071 | |
| 7 | Tel.: 213.688-1000 | |
| 8 | Fax: 213.243-6330 | |
| 9 | McQUAID, BEDFORD & VAN ZANDT, LLP<br>Noreen Q. Yamonte, Esq. | Attorneys for<br>PEP BOYS MANNY MOE & JACK OF CA |
| 10 | 221 Main Street, 16th Floor<br>San Francisco, CA 94105-1936 | |
| 11 | Tel.: 415.905.0200 | |
| 12 | Fax: 415.905.0202 | |
| 13 | MORGENSTEIN & JUBELIRER, LLP<br>Neil C. Ludman, Esq. | Attorneys for<br>GEORGIA-PACIFIC CORPORATION |
| 14 | One Market Plaza<br>Spear Street Tower, 32nd Floor | OWENS-ILLINOIS, INC. |
| 15 | San Francisco, CA 94105<br>Tel.: 415.901.8700 | |
| 16 | Fax: 415.901.8701 | |
| 17 | PERKINS COIE, LLP<br>David T. Biderman, Esq. | Attorneys for<br>HONEYWELL INTERNATIONAL, INC. |
| 18 | 1620 26th Street, 6th Floor | |
| 19 | Santa Monica, CA 90404<br>Tel.: 310.788.9900 | |
| 20 | Fax: 310.788.3399 | |
| 21 | POND NORTH, LLP<br>Frank D. Pond, Esq. | Attorneys for<br>FORD MOTOR COMPANY |
| 22 | 350 South Grand Ave., Suite 2850<br>Los Angeles, CA 90071 | GENERAL MOTORS CORPORATION<br>VIACOM, INC. |
| 23 | Tel.: 213.617-6170 | |
| 24 | Fax: 213.623-3594 | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

| | | |
|---|---|---|
| 1 | PRINDLE, DECKER & AMARO LLP | Attorneys for |
| 2 | James G. Murray, Esq. | HENRY VOGT MACHINE COMPANY |
| | 310 Golden Shore, 4th Floor | |
| 3 | Long Beach, CA 90801-5511 | |
| | Tel.: 562.436.3946 | |
| 4 | Fax: 562.495.0564 | |
| 5 | PRINDLE, DECKER & AMARO LLP | Attorneys for |
| | Andy J. Goetz, Esq. | AMERICAN STANDARD, INC. |
| 6 | 310 Golden Shore, 4th Floor | |
| 7 | Long Beach, CA 90801-5511 | |
| | Tel.: 562.436.3946 | |
| 8 | Fax: 562.495.0564 | |
| 9 | WALSWORTH, FRANKLIN, BEVINS & McCALL | Attorneys for BONDEX INTERNATIONAL |
| 10 | | HAMILTON MATERIALS, INC. |
| | Michael T. McCall, Esq. | RPM INTERNATIONAL, INC. |
| 11 | 1 City Boulevard, West, 5th Floor | |
| | Orange, CA 92868-3604 | |
| 12 | Tel.: 714.634.2522 | |
| | Fax: 714.634.0686 | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

THELEN REID
& PRIEST LLP
ATTORNEYS AT LAW

LA #394267 v1

PROOF OF SERVICE

05/11/2006 THU 10:13 [TX/RX NO 7384] @008

1   MARK S. GERAGHTY (CA BAR NO. 79043)
2   JEFFREY S. SINEK (CA BAR NO. 135508)
    LYNN R. LEVITAN (CA BAR NO. 176737)
3   THELEN REID & PRIEST LLP
    333 South Hope Street, Suite 2900
4   Los Angeles, California 90071
    Telephone:  (213) 576-8000
5   Facsimile:  (213) 576-8080

6   Attorneys for Defendant
    DAIMLERCHRYSLER CORPORATION
7
8   FRANK D. POND (CA BAR NO. 126191)
    MICHAEL A. GRAHAM (CA BAR NO. 179051)
9   KEVIN D. JAMISON (CA BAR NO. 222105)
    POND NORTH LLP
10  350 South Grand Avenue, Suite 2850
    Los Angeles, California 90071
11  Telephone:  (213) 617-6170
    Facsimile:  (213) 623-3594
12
13  Attorneys for Defendants
    FORD MOTOR COMPANY AND GENERAL MOTORS CORPORATION

14
15          SUPERIOR COURT OF THE STATE OF CALIFORNIA
16               FOR THE COUNTY OF LOS ANGELES

17  JOSEPH ALEXANDER ANDERSON,          Case No.: BC 347121
    JR. and ARVA ANDERSON, et al.,
18                                      Assigned for all purposes to the
            Plaintiffs,                 Honorable Irving S. Feffer
19
            v.                          [PROPOSED] ORDER GRANTING
20                                      DAIMLERCHRYSLER CORPORATION'S,
    A.W. CHESTERTON, INC., et al.,      FORD MOTOR COMPANY'S AND GENERAL
21                                      MOTORS COPRORATION'S MOTION TO
            Defendants.                 DISMISS FOR *FORUM NON CONVENIENS*
22
23                                      Date:  May 10, 2006
                                        Time:  9:00 a.m.
24                                      Dept:  51
25
                                        First Complaint Filed: February 7, 2006
26                                      Trial Date:  None Set.
27
28

THELEN REID
& PRIEST LLP
ATTORNEYS AT LAW

LA #400727 v1                           -1-

[PROPOSED] ORDER GRANTING DAIMLERCHRYSLER CORPORATION'S, FORD MOTOR COMPANY'S
AND GENERAL MOTORS COPRORATION'S MOTION TO DISMISS FOR *FORUM NON CONVENIENS*

1   DAIMLERCHRYSLER CORPORATION, FORD MOTOR COMPANY AND

2   GENERAL MOTORS CORPORATION's ("defendants") Motion to Dismiss for *Forum Non*

3   *Conveniens* was heard before the Honorable Irving Feffer in Department 51 of the above-entitled

4   court. Lynn Levitan of Thelen Reid & Priest LLP appeared on behalf of Chrysler, Timothy

5   Pieper appeared on behalf of Ford Motor Company and General Motors Corporation and Carolin

6   Shining of Baron & Budd appeared on behalf of plaintiffs.

7       Having read and considered defendant's Motion to Dismiss for *Forum Non Conveniens*,

8   plaintiffs' late-served Opposition and defendants' Reply and Objections to Evidence, as well as all

9   joinders by co-defendants, the Court granted defendant's Motion to Dismiss for *Forum Non*

10  *Conveniens* and ordered that the case be re-filed in Utah.

11

12      IT IS SO ORDERED.

13

14  Dated: _____

15

16                              _____
                                HONORABLE IRVING S. FEFFER
                                JUDGE OF THE SUPERIOR COURT

17

18

19

20

21

22

23

24

25

26

27

28

LA #400727 v1                           -2-

THELEN REID
& PRIEST LLP
ATTORNEYS AT LAW

[PROPOSED] ORDER GRANTING DAIMLERCHRYSLER CORPORATION'S, FORD MOTOR COMPANY'S
AND GENERAL MOTORS COPRORATION'S MOTION TO DISMISS FOR *FORUM NON CONVENIENS*

1    *Joseph Alexander Anderson, Jr.,, et al. v. A.W. Chesterton, Inc., et al.*

2    **PROOF OF SERVICE BY FACSIMILE**

3                                                                     CASE NO. BC 347121

4

5       I am over the age of 18 and not a party to the within action. I am employed in the County of Los Angeles, State of California by Thelen Reid & Priest LLP. My business address is

6 333 South Hope Street, Suite 2900, Los Angeles, California 90071-3048.

7       On May 11, 2006, at the time and from the telephone facsimile number indicated on the

8 attached transmission report, the following entitled document:

9

10 **[PROPOSED] ORDER GRANTING DAIMLERCHRYSLER CORPORATION'S, FORD MOTOR COMPANY'S AND GENERAL MOTORS COPRORATION'S MOTION TO DISMISS FOR *FORUM NON CONVENIENS***

11 was served by transmitting true and correct copies thereof via facsimile to the following:

12

13                                 **SEE ATTACHED SERVICE LIST**

14       I am readily familiar with the practices of Thelen Reid & Priest LLP for sending

15 documents via facsimile. On the above stated date, the above listed document was transmitted via

16 facsimile and said transmission was reported complete and without error. A copy of the

17 transmission report showing the date and time of transmission that was properly issued by the

18 transmitting facsimile machine is attached hereto, and incorporated herein by reference.

19       I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

20       Executed on May 11, 2006, at Los Angeles, California.

21

22

23                                      _____

24                                       Deanna M. Cabada

25

26

27

28

1                          <u>SERVICE LIST</u>

2    BARON & BUDD, P.C.                    Attorneys for
3    Carolin K. Shining, Esq.             PLAINTIFFS
     John Langdoc, Esq.
4    3102 Oak Lawn Ave., Ste. 1100
     Dallas, TX 75219
5    Tel.: 214.521.3605
     Fax: 214.520.1181
6

7    KIESEL, BOUCHER & LARSON LLP         Attorneys for
     Patrick DeBlase, Esq.               PLAINTIFFS
8    8648 Wilshire Blvd.
     Beverly Hills, CA 90211-2910
9    Tel.: 310.854.4444
     Fax: 310.854.0812
10

11   BARONIAN LAW FIRM                    Attorneys for
     Robert Baronian, Esq.               GARLOCK SEALING TECHNOLOGIES
12   301 E. Colorado Blvd., Ste. 618
     Pasadena, CA 91101
13   Tel.: 626.568.0834
     Fax: 626.449.4568
14

15   BASSI, MARTINI, EDLIN & BLUM, LLP    Attorneys for
     Robert J. Ryan, Esq.                FOSTER WHEELER NORTH AMERICA
16   351 California Street, Suite 200     CORPORATION
     San Francisco, CA 94104
17   Tel.: 415.397-9006
     Fax: 415.397-1339
18

19   BISHOP, BARRY, HOWE, HANEY &         Attorneys for
     RYDER                               CALAVERAS ASBESTOS, LTD.
20   Douglas G. Wah, Esq.                THORPE INSULATION COMPANY
     Watergate Tower III
21   2000 Powell Street, Suite 1425
     Emeryville, CA 94608
22   Tel.: 510.596.0888
     Fax: 510.596.0899
23

24   CARROLL, BURDICK & McDONOUGH LLP     Attorneys for
     Michael J. Mehall, Esq.             FOSTER WHEELER NORTH AMERICA
25   633 West Fifth Street, 51st Floor    CORPORATION
     Los Angeles, CA 90071
26   Tel.: 213.833.4500
     Fax: 213.833.4555
27

28

THELEN REID      LA #394267 v1              –3–
& PRIEST LLP                          PROOF OF SERVICE
ATTORNEYS AT LAW

| | | |
|---|---|---|
| 1 | FILICE BROWN EASSA & MCLEOD, LLP | Attorney for |
| | EUGENE BROWN, JR., ESQ. | OAKFABCO, INC. |
| 2 | AMEE A. MIKACICH, ESQ. | |
| 3 | LAKE MERRITT PLAZA | |
| | 1999 HARRISON STREET, SUITE 1800 | |
| 4 | OAKLAND, CA 96612 | |
| | Tel.: (510) 444-3131 | |
| 5 | Fax:  (510) 839-7940 | |
| 6 | | |
| 7 | FREEBURG, NETTELS & | Attorneys for |
| | SCHALDENBRAND | GOODRICH CORPORATION |
| 8 | Cynthia B. Schaldenbrand, Esq. | |
| | 440 W. First Street, Suite 102 | |
| 9 | Tustin, CA 92780 | |
| | Tel.: (714) 508-1800 | |
| 10 | Fax: (714) 508-1809 | |
| 11 | | |
| | HOWARD ROME MARTIN & RIDLEY LLP | Attorneys for |
| 12 | Henry D. Rome, Esq. | WARREN PUMPS, L.L.C. |
| | 1775 Woodside Road, Suite 200 | |
| 13 | Redwood City, CA  94061-3436 | |
| | Tel.: 650.365.7715 | |
| 14 | Fax: 650.364.5297 | |
| 15 | | |
| | JACKSON & WALLACE, LLP | Attorneys for |
| 16 | John R. Wallace, Esq. | HANSON PERMANENTE CEMENT, INC. |
| | 55 Francisco Street, 6th Floor | KAISER GYPSUM COMPANY, INC. |
| 17 | San Francisco, CA  94133 | KAISER CEMENT CORPORATION |
| | Tel.: 415.982.6300 | ZURN INDUSTRIES, INC. |
| 18 | Fax: 415.982.6700 | |
| 19 | JACKSON & WALLACE, LLP | Attorneys for |
| | Gabriel A. Jackson, Esq. | BUFFALO PUMPS, INC. |
| 20 | 55 Francisco Street, 6th Floor | |
| | San Francisco, CA  94133 | |
| 21 | Tel.: 415.982.6300 | |
| | Fax: 415.982.6700 | |
| 22 | | |
| 23 | KNOTT & GLAZIER LLP | Attorneys for |
| | Steven E. Knott, Esq. | T.H. AGRICULTURE & NUTRITION, |
| 24 | 601 South Figueroa Street, Suite 1950 | L.L.C. |
| | Los Angeles, CA  90017 | SUC THOMPSON HAYWARD CHEM. |
| 25 | Tel.: 213.312.9200 | CO. |
| | Fax: 213.312.9201 | |
| 26 | | |
| 27 | | |
| 28 | | |

THELEN REID
& PRIEST LLP
ATTORNEYS AT LAW

LA #394267 v1

- 4 -

PROOF OF SERVICE

| | | |
|---|---|---|
| 1 | LEWIS, BRISBOIS, BISGAARD & SMITH LLP<br>John A. Graniez, Esq. | Attorneys for<br>ADVOCATE MINES, LTD. |
| 2 | 221 N. Figueroa Street, Suite 1200<br>Los Angeles, CA 90012 | |
| 3 | Tel.: 213.250.1800<br>Fax: 213.250.7900 | |
| 4 | | |
| 5 | McKENNA LONG & ALDRIDGE LLP<br>William J. Sayers, Esq. | Attorneys for<br>CERTAINTEED CORPORATION |
| 6 | 444 South Flower Street, Suite 800<br>Los Angeles, CA 90071 | |
| 7 | Tel.: 213.688-1000<br>Fax: 213.243-6330 | |
| 8 | | |
| 9 | McQUAID, BEDFORD & VAN ZANDT, LLP<br>Noreen Q. Yamonte, Esq. | Attorneys for<br>PEP BOYS MANNY MOE & JACK OF CA |
| 10 | 221 Main Street, 16th Floor<br>San Francisco, CA 94105-1936 | |
| 11 | Tel.: 415.905.0200<br>Fax: 415.905.0202 | |
| 12 | | |
| 13 | MORGENSTEIN & JUBELIRER, LLP<br>Neil C. Ludman, Esq. | Attorneys for<br>GEORGIA-PACIFIC CORPORATION<br>OWENS-ILLINOIS, INC. |
| 14 | One Market Plaza<br>Spear Street Tower, 32nd Floor | |
| 15 | San Francisco, CA 94105<br>Tel.: 415.901.8700 | |
| 16 | Fax: 415.901.8701 | |
| 17 | PERKINS COIE, LLP | Attorneys for<br>HONEYWELL INTERNATIONAL, INC. |
| 18 | David T. Biderman, Esq.<br>1620 26th Street, 6th Floor | |
| 19 | Santa Monica, CA 90404<br>Tel.: 310.788.9900 | |
| 20 | Fax: 310.788.3399 | |
| 21 | POND NORTH, LLP<br>Frank D. Pond, Esq. | Attorneys for<br>FORD MOTOR COMPANY<br>GENERAL MOTORS CORPORATION<br>VIACOM, INC. |
| 22 | 350 South Grand Ave., Suite 2850<br>Los Angeles, CA 90071 | |
| 23 | Tel.: 213.617-6170<br>Fax: 213.623-3594 | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

| | | |
|---|---|---|
| 1 | PRINDLE, DECKER & AMARO LLP | Attorneys for |
| | James G. Murray, Esq. | HENRY VOGT MACHINE COMPANY |
| 2 | 310 Golden Shore, 4th Floor | |
| 3 | Long Beach, CA 90801-5511 | |
| | Tel.: 562.436.3946 | |
| 4 | Fax: 562.495.0564 | |
| 5 | PRINDLE, DECKER & AMARO LLP | Attorneys for |
| | Andy J. Goetz, Esq. | AMERICAN STANDARD, INC. |
| 6 | 310 Golden Shore, 4th Floor | |
| 7 | Long Beach, CA 90801-5511 | |
| | Tel.: 562.436.3946 | |
| 8 | Fax: 562.495.0564 | |
| 9 | WALSWORTH, FRANKLIN, BEVINS & | Attorneys for |
| | McCALL | BONDEX INTERNATIONAL |
| 10 | Michael T. McCall, Esq. | HAMILTON MATERIALS, INC. |
| 11 | 1 City Boulevard, West, 5th Floor | RPM INTERNATIONAL, INC. |
| | Orange, CA 92868-3604 | |
| 12 | Tel.: 714.634.2522 | |
| 13 | Fax: 714.634.0686 | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

C

# EXHIBIT "C"

Mark F. James (5295)
**HATCH, JAMES & DODGE, P.C.**
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

G. Patterson Keahey (*pro hac vice*)
**LAW OFFICES OF G. PATTERSON KEAHEY, P.C.**
One Independence Plaza, Suite 612
Birmingham, Alabama 35209
Telephone: (800) 291-0050
Facsimile: (205) 871-0801

Attorneys for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| **IN RE: ASBESTOS CASES OF HATCH, JAMES & DODGE and G. PATTERSON KEAHEY.** | **PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO REMAND AND FOR AWARD OF COSTS AND ATTORNEYS' FEES** |
| **JOSEPH ALEXANDER ANDERSON, JR., and ARVA ANDERSON** | **CASE NO.: 2:06-cv-741** |
| **Plaintiffs,** | **Judge Ted Stewart** |
| **vs.** | |
| **ASBESTOS DEFENDANTS** | (State Court Master Case No. 010900863 AS; State Court Case No. 060912863 – Judge Glenn K. Iwasaki) |

Plaintiffs file this Reply Memorandum in response to defendants' memorandum in opposition to plaintiffs' motion to remand and for award of costs and attorneys' fees. This Reply Memorandum reaffirms the propriety of plaintiffs' request that the Court enter an order remanding this action to the state court from which it was removed and for attorneys' fees and costs.

1

**A.    Plaintiffs Properly Chose to Rely Exclusively on State Law and Have Not Disclaimed Their State Law Causes of Action**

Defendants' response to plaintiffs' motion to remand completely disregards the facts and the law that govern remand of this case to state court.[1]  Defendants removed this case to federal court pursuant to article I, section 8, clause 17, of the United States Constitution, which provides for exclusive federal jurisdiction over federal enclaves. Not only have the defendants failed to establish federal enclave jurisdiction by a preponderance of the evidence, they have ignored plaintiffs' well-established right to rely on state law and disclaim federal causes of action, arising from either federal officer or federal enclave jurisdiction, without abandoning state law causes of action.

Defendants' notice of removal, and memorandum in opposition, were filed despite explicit and unambiguous language in the plaintiffs' master complaint, properly incorporated in the summary complaint, that the plaintiffs had disclaimed any recovery for any injuries arising from activities conducted on federal enclaves.  The master complaint included the following language:

> **The Federal Courts lack subject matter jurisdiction over this action, as there is no federal question and incomplete diversity of citizenship due to the presence of a Utah defendant.  Removal is improper.  Every Claim arising under the Constitution, treaties, or laws of the United States is _expressly disclaimed_ (including any claim arising from an act or omission _on a federal enclave_, or of any officer of the U.S. or any agency or person acting under him occurring under color of such office).  No claim of admiralty or maritime law is raised. Plaintiffs sue no foreign state or agency.[2]** (emphasis added).

---

[1] _Plaintiffs' Motion to Remand and Memorandum in Support_ with attached Exhibits is on file with this Court and incorporated in this response fully by reference.

[2] _See In Re Asbestos Litigation_, Master Case No. 010900863 AS, attached to _Plaintiffs' Motion to Remand and Memorandum in Support_ as Exhibit "D" on file with this Court and incorporated in this response fully by reference.

Plaintiffs further pled that, on information and belief, defendants were business entities "organized and existing under and by virtue of the laws of the State of Utah, or the laws of some other state or foreign jurisdiction . . . **and are authorized to do and are doing business in the State of Utah."**[3]

In addition to invoking Utah law, plaintiffs' complaint did not raise any issues of federal law and, in fact, expressly disclaimed *any* such issue. *See Caterpillar, Inc. v. Williams,* 482 U.S. 386, 391 & n. 7 (1987) (noting that, because the plaintiff is the "master of the claim" a plaintiff may avoid federal jurisdiction by exclusive reliance on state law); *see also Petty v. Gulf Guar. Ins. Co.,* 303 F. Supp. 2d 815, 818 & n.3 (N.D. Miss. 2003)(plaintiffs specifically disclaimed any federal claims in their complaint so that "all of their claims, therefore, arise under and will succeed or fail based solely on state law").

Defendants cite no authority for their assertion that "Anderson cannot exclude all claims arising under federal law without also withdrawing all causes of action premised on Anderson's mesothelioma." There is no authority for this proposition. Indeed, the law is well-established that, by eschewing claims based on federal law, the plaintiffs have the right to have their cause resolved in state court. *Holmes Group, Inc. v. Vornado Air Circulation Systems, Inc.,* 535 U.S. 826, 831 (2002).

Defendants wrongly contend that "[r]emoval under federal enclave jurisdiction depends not on the pleading of federal claims, but rather on the assertion that the events that form the basis of the claim occurred on a federal enclave." (Defendants' Memorandum at p. 2). Once again, this statement is not supported by pertinent authority because it is directly contrary to the

---

[3] *See Master Complaint* at pp. 2-3, attached to *Plaintiffs' Motion to Remand and Memorandum in Support* on file with this Court and incorporated in this response fully by reference.

law governing removal and remand. As early as 1914, the United States Supreme Court made clear that whether or not a case is one arising under the Constitution or a law or treaty of the United States "must be determined from what necessarily *appears in the plaintiff's statement of his own claim* in the bill or declaration, unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose." *Taylor v. Anderson*, 234 U.S. 74, 75-76 (1914). Contrary to defendants' assertions that the plaintiffs' pleading have no impact on the question of removal, under ordinary circumstances, the determination of whether a particular case arises under federal law turns on the "well-pleaded complaint" rule. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 207 (2004). Pursuant to the "well-pleaded complaint" rule, federal jurisdiction exists only when the plaintiff's well-pleaded complaint raises issues of federal law. *State of Okl. ex rel. Oklahoma Tax Com'n v. Wyandotte Tribe of Oklahoma*, 919 F.2d 1449, 1450 (10th Cir. 1990) citing *Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. 1, 9-12 (1983)(federal courts have jurisdiction to hear, originally or by removal, only those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law). Given the plaintiffs' unequivocal disclaimer of all federal causes of action under the "well-pleaded complaint" rule in this case, remand is proper.

Defendants wrongly assert that plaintiffs cannot disclaim federal enclave jurisdiction without disclaiming all their causes of action.[4] While Mr. Anderson did work at various Air

---

[4] In case after case cited to this Court in support of the defendants' contention that the plaintiffs are subject to federal enclave jurisdiction, there is one glaring omission: the cases do not involve a disclaimer of federal causes of action. *See, e.g., Akin v. Ashland Chem Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998); *Mater v. Holley*, 200 F.2d 123 (5th Cir. 1952); *Akin v. Big Three*, 851 F. Supp. 819 (E.D. Tex. 1994); *Akin v. Big Three Industries, Inc.* 851 F. Supp. 819 (E. D. Tex. 1994); *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247 (9th Cir. 2006); *Bachman v. Fred Meyer Stores, Inc.*, 402 F.Supp.2d 1342, 1347 (D. Utah 2005); *Celli V. Shoell*, 995 F. Supp. 1337 (D. Utah 1997); *Reed v. Fina Oil & Chem. Co.*, 995 F. Supp. 705 (E.D. Tex. 1998).

4

Force bases, the majority of his exposure to asbestos-containing products occurred in his role as a pipefitter for various commercial operations at various locations both inside and outside the State of Utah,.[5] The court in *Akin v. Big Three Industries, Inc.* observed that when exposures allegedly occurred partially inside and partially outside the boundaries of an enclave, an argument would surface that the state's interest increases proportionally, while the federal interest decreases. 851 F. Supp. 819, 825 at fn4 (E.D. Tex. 1994). More important, where a plaintiff can plead either a state or a federal claim, he "is free to ignore the federal question and pitch his claim on the state ground." *Hunter v. United Van Lines*, 746 F.2d 635, 641 (C.A. Cal. 1984) citing *Salveson v. Western States Bankcard Association*, 731 F.2d 1423, 1427 (9th Cir.1984) (quoting 1 A. Moore's Federal Practice ¶ 0.160, at 1835 (2d ed. 1979)). Defendants erroneously assert that "Anderson's claims arising under federal law are indivisible from his claims arising under state law." Plaintiffs do, and have, pitched their claim on state law grounds.

Defendants reliance on *Reed v. Fina Oil & Chem. Co.*, 995 F. Supp. 705, 709 (E.D. Tex. 1998) and *Cirilo v. Lincoln Electric Co.*, No. SA04CA115RF, 2004 U.S. Dist. LEXIS 28679 (W.D. Tex. May 24, 2004), is misplaced because neither of these cases involved the issue that is at the heart of plaintiffs' motion to remand: the presence of a specific disclaimer of all federal causes of action. Furthermore, each of these cases involved facilities that were proven to be federal enclaves. Defendants in this case have not met their threshold burden by proving to the Court that the facilities they have named are indeed federal enclaves.

---

[5] *See Summary Complaint*, attached to Plaintiffs' Motion to Remand and Memorandum in Support on file with the Court and incorporated fully by reference.

5

**B.     Defendants Have Not Met Their Burden of Establishing
That Removal is Proper**

In their opposition to plaintiffs' motion to remand, defendants allege that the plaintiffs do not dispute that certain locations, i.e., Lackland Air Force Base, are federal enclaves. Clearly, the defendants misunderstand that it is their burden *to prove* that removal is proper. *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992)("[t]he 'strong presumption' against removal jurisdiction means that the defendant always has the burden of establishing that removal is proper"); *Celli v. Shoell*, 40 F.3d 324, 327 (10th Cir. 1994)("[i]f jurisdiction is challenged, the burden is on the party claiming jurisdiction to show it by a preponderance of the evidence"). The defendants did not produce a single piece of evidence that meets that burden.

Determining whether or not federal enclave jurisdiction exists is a "complex question" resting on such factors as whether federal government exercises exclusive, concurrent or proprietorial jurisdiction over property, when that property became a federal enclave and what the state law was at that time, whether that state law is consistent with federal policy, and whether it has been altered by national legislation. *Id.* at 328. The defendants' bare assertion that the plaintiffs do not dispute that facilities such as Lackland Air Force Base, Dugway Proving Grounds, Tooele Army Depot, and Hill Air Force Base are federal enclaves and that others "are *likely* federal enclaves" is insufficient to establish that these facilities are, indeed, federal enclaves. As the Court stated in *Zuniga v. Chugach Maintenance Services*:

> Defendants' notice of removal asserts that the events underlying this action occurred on Edwards Air Force Base, which Defendants claim is a federal enclave. The court finds that this assertion, made without any evidentiary support, is insufficient to establish the events occurred on Edwards Air Force Base. Because they removed this action, the burden is on Defendants to prove the existence of jurisdictional facts. (citations omitted).

No. CVF060048AWILJO, *6.[6]   In finding that the removing defendants had not met their

burden to establish federal enclave jurisdiction, the court said:

> In addition, Defendants are advised that the court is not convinced, based on the
> briefing currently before the court, that Edwards Air Force Base is a federal
> enclave. Defendants offer no evidence that the United States formally accepted
> exclusive federal jurisdiction over Edwards Air Force Base, or its predecessor,
> Muroc Bombing and Gunnery Range. Defendants offer no evidence that the State
> of California ever consented to the exclusive federal jurisdiction of the United
> States. Defendants have cited no evidence or argument that Edwards Air Force
> Base provided a benefit to the United States. Defendants have cited no case
> finding that Edwards Air Force Base is a federal enclave over which the United
> States has exclusive federal jurisdiction. Simply put, Defendants have failed on
> this motion to dismiss to meet their burden to show Edwards Air Force Base is a
> federal enclave.

*Zuniga*, No. CVF060048AWILJO, *7.   Therefore, even without the existence of the explicit

disclaimer of all federal causes of action and plaintiffs' right to choose to assert only state

claims, defendants' opposition to plaintiffs' motion for remand must fail because defendants

have not, on any level, established federal enclave jurisdiction.

### C.   Plaintiffs Are Entitled to Attorney Fees and Costs

Plaintiffs reiterate their request for an award of attorney's fees and costs under 28 U.S.C.

§ 1447(c) for improvidently removing this case to federal court.  Under § 1447 (c), "[a]n order

remanding the case may require payment of just costs and any actual expenses, including

attorney fees, incurred as a result of the removal." The Supreme Court acknowledged that

"assessing costs and fees on remand reduces the attractiveness of removal as a method for

delaying litigation and imposing costs on the plaintiff ..." and that "... the appropriate test for

awarding fees under § 1447 should recognize the desire to deter removals sought for purpose of

prolonging litigation and imposing costs on the opposing party, while not undermining Congress'

---

[6] A copy of *Zuniga v. Chugach Maintenance Services*, No. CVF060048AWILJO is attached to this response.

7

basic decision to afford defendants a right to remove as a general matter, when the statutory criteria are satisfied." *Martin v. Franklin Capital Corp.*, 126 S. Ct. 704, 706 (2005).

The Supreme Court in *Martin* clarified the standard to be applied when considering requests for attorney's fees in connection with an improvident removal. The Court held that "[a]bsent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal. Conversely, when an objectively reasonable basis exists, fees should be denied." *Martin v. Franklin Capital Corp.*, 126 S. Ct. at 706.

As the party invoking the federal court's jurisdiction, defendants carried the burden of demonstrating that the requirements for exercising federal jurisdiction were present in this case. *Wolf Creek Nuclear Operating Corp. v. Framatome ANP, Inc.*, 416 F.Supp.2d 1081, 1084 - 1085 (D. Kan. 2006). There were ample facts to be discovered and abundant law to provide guidance. Defendants ignored the law and facts in their rush to remove this case. Defendants' pronouncement that various Air Force bases and facilities were federal enclaves was made without any examination of the underlying facts and without offering this Court the proof required for such a fundamental premise. Furthermore, despite the plaintiffs' well-pleaded complaint with its explicit disclaimer of all federal causes of action, and authority supporting the plaintiffs' right to elect to proceed on state law claims, defendants proceeded without an objectively reasonable basis for removal in this case. After plaintiffs provided case law to defendants and requested that defendants voluntarily remand this case, defendants still refused. Plaintiffs should be awarded attorney's fees and costs.

8

Case MDL No. 875 Document 4914 Filed 11/17/06 Page 403 of 423

### D.    Conclusion

For the reasons set forth in plaintiffs' motion to remand and memorandum in support, as well as those reasons set forth herein, plaintiffs ask the Court to grant their motion to remand and for attorney's fees and costs.

DATED this 17th day of October, 2006.

**HATCH, JAMES & DODGE, P.C.**
Mark F. James

**LAW OFFICES OF G. PATTERSON KEAHEY, P.C.**
G. Patterson Keahey

By: _____/s/ Mark F. James_____
Attorneys for Plaintiffs

## Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2006 WL 769317 (E.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

c

Briefs and Other Related Documents
Zuniga        v.        Chugach        Maintenance
ServicesE.D.Cal.,2006.Only the Westlaw citation is
currently available.

United States District Court,E.D. California.
Alexi ZUNIGA, Joseph De Felice, Jackie Malcomb,
James Mamula, Plaintiffs,
v.
CHUGACH MAINTENANCE SERVICES, et al.,
Defendants.
**No. CVF060048AWILJO.**

March 24, 2006.

Kenneth A. Satin, The Accident Attorneys A
Professional Corporation, Newport Beach, CA, for
Plaintiffs.
Joseph Charles Faucher, Reish, Luftman, Reicher &
Cohen, Los Angeles, CA, for Defendants.

MEMORANDUM OPINION AND ORDER
GRANTING MOTION TO DISMISS, DENYING
MOTION TO STRIKE, AND DISMISSING
COMPLAINT WITH LEAVE TO AMEND
ISHII, J.

(Documents # 5 & # 6)

*1 This removed action concerns employment
actions taken by Defendants. Plaintiffs allege
violations of state employment laws. Defendants
contend that this court has jurisdiction pursuant to 28
U .S.C. § 1331 because the employment actions took
place on a federal enclave.

BACKGROUND

On April 14, 2005, Plaintiffs filed an action in the
Kern County Superior Court. The first cause of action
alleges tortuous discharge in violation of public
policy. The second cause of action alleges a violation
of California Labor Code § 6310 for retaliating
against an employee who protests unsafe or
unhealthy working conditions. The third cause of
action alleges fraud. The Kern County Superior Court
originally dismissed the action, but on December 14,
2005, the Kern County Superior Court set aside the
dismissal. On January 12, 2006, Defendants removed

the action to this court. Defendants contend that this
court has subject matter jurisdiction because the
events occurred at Edwards Air Force Base, which
Defendants allege is a federal enclave.

On January 19, 2006, Defendants filed a motion to
strike and a motion to dismiss. Defendant contend
that the first cause of action is barred by the federal
enclave doctrine. Defendants contend the third cause
of action should be dismissed because no claim for
fraud exists under California law in the employment
termination context. Defendants contend punitive
damages are not allowed for the second cause of
action under California law. The motions were
scheduled for a court hearing to be held on March 6,
2006.

On February 27, 2006, Defendants filed a reply brief.

Because Plaintiffs did not file a timely opposition, on
February 28, 2006, the court took Defendants'
motions under submission.

The undersigned received a courtesy copy of an
opposition to the motion to strike and an opposition
to the motion to dismiss. After being notified that the
courtesy copies had not been filed, on February 28,
2006, Plaintiffs filed their oppositions. Plaintiffs
contend this action is not governed and controlled by
the federal enclave doctrine and this court lacks
jurisdiction. Plaintiffs seek leave to file an amended
complaint to contain additional facts.

LEGAL STANDARDS

A complaint may be dismissed under Rule 12(b)(6)
of the Federal Rules of Civil Procedure if it appears
beyond doubt that the plaintiff can prove no set of
facts in support of the claim that would entitle him to
relief. Hishon v. King & Spalding, 467 U.S. 69, 73,
104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (citing Conley
v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d
80 (1957)); Balistreri v. Pacifica Police Department,
901 F.2d 696, 699 (9th Cir.1990). A Rule 12(b)(6)
dismissal can be based on the failure to allege a
cognizable legal theory or the failure to allege
sufficient facts under a cognizable legal theory.
Robertson v. Dean Witter Reynolds, Inc., 749 F.2d
530, 533-34 (9th Cir.1984). In considering a motion to
dismiss, the court must accept as true the allegations

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 769317 (E.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

of the complaint in question, *Hospital Bldg. Co. v. Rex Hospital Trustees*, 425 U.S. 738, 740, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976), construe the pleading in the light most favorable to the party opposing the motion, and resolve all doubts in the pleader's favor. *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404, *reh'g denied*, 396 U.S. 869, 90 S.Ct. 35, 24 L.Ed.2d 123 (1969).

*2 Rule 12(f) of the Federal Rules of Civil Procedure allows the court to strike from "any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The purpose of a Rule 12(f) motion is to avoid the costs that arise from litigating spurious issues by dispensing with those issues prior to trial. *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir.1983). Immaterial matter is defined as matter that "has no essential or important relationship to the claim for relief or the defenses being pleaded." *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir1993) (quoting 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1382, at 706-07 (1990)), *rev'd on other grounds*, 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994). Impertinent matter is defined as "statements that do not pertain, and are not necessary, to the issues in question." *Fantasy, Inc.* 984 F.2d at 1527. Granting a motion to strike may be proper if it will make the trial less complicated or if allegations being challenged are so unrelated to plaintiff's claims as to be unworthy of any consideration as a defense and that their presence in the pleading will be prejudicial to the moving party. *Id.*

FACTS

A. Complaint's Allegations

As a general matter, a court may not consider any material outside of the complaint when ruling on a Rule 12(b)(6) motion. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir.2001); *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir.1994). If the parties present the court with evidence outside the pleadings and the court considers the evidence, the court must convert the Rule 12(b)(6) motion into a motion for summary judgment. Fed. R. Civ. Pro. 12(b)(6); *Anderson v. Angelone*, 86 F.3d 932, 934-35 (9th Cir.1996). The following relevant facts are alleged in Plaintiffs' complaint:

The complaint alleges that Plaintiffs were employees of Defendant Chugach Maintenance Services

("Chugach").

The complaint alleges that throughout their scope of employment with Chugach, Plaintiffs were subjected to harassment from Chugach and its employees. The complaint alleges that Defendants would unnecessarily reprimand Plaintiffs when Plaintiffs reported acts of misconduct by their supervisors and Defendants denied Plaintiffs safety equipment when working in hazardous environments.

The complaint alleges that as a result of Plaintiffs' whistle blowing and complaints, Plaintiffs' positions were terminated. Shortly after, Defendants reinstated Plaintiffs' former positions and hired new staff to replace Plaintiffs.

B. Judicial Notice

There are exceptions to Rule 12(b)(6)'s requirement that extrinsic evidence cannot be considered without converting the motion to a summary judgment motion. The court may consider documents over which the court may take judicial notice. *Lee*, 250 F.3d at 689; *Mack v. South Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir.1986).

*3 Defendants ask the court to take judicial notice of the fact that Edwards Air Force Base has been a United States Military Base since the 1930's. Plaintiffs offer no reason for the court to not take judicial notice of this fact. The court may take notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed.R.Evid. 201(b); *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir.1993). The court will take judicial notice of the fact that Edwards Air Force Base has been a United States Military Base since the 1930's.

In addition, Defendants ask the court to take judicial notice of the complaint filed in the Kern County Superior Court, the Kern County Superior Court's dismissal of this action, the Kern County Superior Court's order setting aside the dismissal, and Defendants' notice of removal. Judicial notice may be taken of court records. *See Mullis v. United States Bank. Ct.*, 828 F.2d 1385, 1388 n .9 (9th Cir.1987); *Egan v. Teets*, 251 F.2d 571, 578 (9th Cir.1957); *Valerio v. Boise Cascade Corp.*, 80 F.R.D. 626, 635 n. 1 (N.D.Cal.1978). However, "a court may not take judicial notice of proceedings or records in another cause so as to supply, without formal introduction of evidence, facts essential to support a contention in a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 769317 (E.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

cause then before it." *M/V Am. Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1491 (9th Cir.1983). Thus, while the court will take judicial notice of court records, the court will not consider the records for the truth of the facts asserted within them.

DISCUSSION

A. Jurisdiction

This case was removed from the Kern County Superior Court to this court upon on the ground that this court has subject matter jurisdiction based upon 28 U.S.C. § 1331, the federal question statute, because the events in question occurred on Edwards Air Force Base. In their opposition, Plaintiffs question whether federal jurisdiction is appropriate under the federal enclave doctrine.

Title 28 U.S.C. § 1441(b) reads in relevant part: "Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties." "The burden of establishing federal jurisdiction is on the party seeking removal, and the removal statute is strictly construed against removal jurisdiction." *Prize Frize Inc. v. Matrix Inc.*, 167 F.3d 1261, 1265 (9th Cir.1999); *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1195 (9th Cir.1988). If there is any doubt as to the right of removal in the first instance, "federal jurisdiction must be rejected." *Duncan v. Stuetzle*, 76 F.3d 1480, 1485 (9th Cir.1996); *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir.1992).

"The presence or absence of federal question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *California v. United States*, 215 F.3d 1005, 1014 (9th Cir.2000); *see also California ex. rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 838 (9th Cir.2004); *Duncan, 76 F.3d at 1485*. Under the "well-pleaded complaint" rule, courts look to that "necessarily appears in the plaintiff's statement of his own claim in the bill or declaration, unaided by anything in anticipation of avoidance of defenses which it is thought the defendant may interpose." *California*, 215 U.S. at 1014. Generally, "a case may not be removed on the basis of a federal defense ... even if the defense is anticipated in the plaintiff's

complaint and both parties concede that the federal defense is the only question truly at issue." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987); *Wayne v. DHL Worldwide Express*, 294 F.3d 1179, 1183 (9th Cir.2002). "In addition, the plaintiff is the 'master' of her case, and if she can maintain her claims on both state and federal grounds, she may ignore the federal question, assert only state claims, and defeat removal." *Duncan, 76 F.3d at 1485*. However, the "artful pleading doctrine is a corollary to the well-pleaded complaint rule, and provides that although the plaintiff is the master of his own pleadings, he may not avoid federal jurisdiction by omitting form the complaint allegations of federal law that are essential to the establishment of his claim." *Lippitt v. Raymond James Fin. Serv.*, 340 F.3d 1033, 1041 (9th Cir.2003).

*4 "If at any time prior to judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c). A district court has "a duty to establish subject matter jurisdiction over the removed action *sua sponte,* whether the parties raised the issue or not." *United Investors Life Ins. Co. v. Waddell & Reed, Inc.*, 360 F.3d 960, 967 (9th Cir.2004). "Thus, the court can, in fact must, dismiss a case when it determines that it lacks subject matter jurisdiction, whether or not a party has a filed a motion." *Page v. City of Southfield*, 45 F.3d 128, 133 (6th Cir.1995). In other words, a district court may remand a removed case *sua sponte* if it determines that it lacks subject matter jurisdiction over the case. *See Parker v. Ho Sports Co.*, 2005 U.S. Dist. LEXIS 37289 at *1 (E.D.Cal.2005); *Knutson v. Allis-Chalmers Corp.*, 358 F.Supp.2d 983, 990 (D.Nev.2005); *Tortola Restaurants, L.P. v. Kimberly-Clark Corp.*, 987 F.Supp. 1186, 1188 (N.D.Cal.1997); *cf. Kelton Arms Condo. Homeowners Ass'n v. Homestead Ins. Co.*, 346 F.3d 1190, 1192-93 (9th Cir.2003) (holding that court may not *sua sponte* remand for procedural defects in removal but noting a distinction between procedural and jurisdictional defects and that a "district court must remand if it lacks jurisdiction").

The basis of jurisdiction in this action is Defendants' allegations that the facts underlying this action occurred on a federal enclave. The Ninth Circuit has indicated that personal injury actions arising from incidents occurring on federal enclaves may support the district court's jurisdiction under Section 1331. *Willis v. Craig*, 555 F.2d 724, 726 (9th Cir.1977); *Mater v. Holley*, 200 F.2d 123 (5th Cir.1952); *Fung v. Abex Corp.*, 816 F.Supp. 569, 571 (N.D.Cal.1992). In

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2006 WL 769317 (E.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

this case, there is a question of whether this is subject to federal jurisdiction because the events underlying this action occurred on a federal enclave. Whether federal enclave jurisdiction exists is a complex question, resting on such factors as where the events underlying the action occurred on the property, whether the federal government exercises exclusive or concurrent jurisdiction over the property, when the property became a federal enclave and what the state law was at that time, whether that law is consistent with federal policy, and whether it has been altered by national legislation. *See Celli v. Shoell,* 40 F.3d 324, 328 (10th Cir.1994). In an action, such as this one, where the Defendants maintain the federal enclave doctrine allows for federal jurisdiction, the Ninth Circuit has remanded the action to the district court to make a finding on whether federal enclave jurisdiction exists. *See, e.g., Willis,* 555 F.2d at 726. Thus, to determine if this court has jurisdiction, the court must decide whether the federal enclave doctrine applies to this case.

### B. Federal Enclave

**\*5** Defendant contends that the court has jurisdiction under the federal enclave doctrine. The Federal Enclave Clause provides that:
The Congress shall have power ... To exercise exclusive legislation in all Cases whatsoever, over such District (not exceeding ten miles square) as may, by Cession of particular states, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in Which the Same Shall be, for the Erection of Forts, Magazines, Arsenals, dockYards, and other needful Buildings....

U.S. Const. art. I, § 8, cl. 17. Only federal law applies on a federal enclave under exclusive federal jurisdiction, except to the extent Congress has otherwise provided. *See Pacific Coast Dairy v. Department of Agriculture of California,* 318 U.S. 285, 294, 63 S.Ct. 628, 87 L.Ed. 761 (1943). However, in order to ensure that no such area is left without a developed legal system for private rights, preexisting state law not inconsistent with federal policy becomes federal law and remains in existence until altered by national legislation. *Id.* at 294.

Under Article 1, section 8, clause 17 of the United States Constitution, the United States can obtain exclusive federal jurisdiction over land with the consent of the state. *Paul v. United States,* 371 U.S.

245, 264, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963). This can be accomplished through a consensual acquisition or by a condemnation followed by a cession of jurisdiction. *United States v. Jenkins,* 734 F.2d 1322, 1325 n. 3 (9th Cir. (1983). After the state consents, the United States must formally accept exclusive federal jurisdiction. 40 U.S.C. § 3112; *Paul,* 371 U.S. at 264; *Jenkins,* 734 F.2d at 1325 n. 3. When the Federal Enclave Clause is complied with, the state loses all legislative power over the property in question, except such authority as it explicitly reserves to itself in ceding jurisdiction. *Paul,* 371 U.S. at 263-69; *Fort Leavenworth R. Co. v. Lowe,* 114 U.S. 525, 5 S.Ct. 995, 29 L.Ed. 264 (1885).

Historically, when a cession conferred a benefit to the federal government the courts presumed a formal acceptance of exclusive federal jurisdiction by the United States in absence of any dissent. *S.R. A., Inc. v. State of Minn.,* 327 U.S. 558, 563 & n. 7, 66 S.Ct. 749, 90 L.Ed. 851 (1946). Until 1940 it appears that, although the Courts recognized the United States could decline to accept exclusive jurisdiction over land it acquired, nonetheless, acceptance was presumed in the absence of evidence indicating a rejection. *See Humble Pipe Line Co. v. Waggonner,* 376 U.S. 369, 370-74, 84 S.Ct. 857, 11 L.Ed.2d 782 (1964) (citing cases); *see also Fort Leavenworth R.R. Co. v. Lowe,* 114 U.S. 525, 5 S.Ct. 995, 29 L.Ed. 264 (1884). However, during the 1930's, the Supreme Court decided a series of cases involving whether general state cessions of jurisdiction were valid without federal government acceptance of that jurisdiction. *Collins v. Yosemite Park & Curry Co.,* 304 U.S. 518, 522-24, 58 S.Ct. 1009, 82 L.Ed. 1502 (1938); *James v. Dravo Contracting Co.,* 302 U.S. 134, 141-42, 146-49, 58 S.Ct. 208, 82 L.Ed. 155 (1937); *Silas Mason Co. v. Tax Commission of Washington,* 302 U.S. 186, 197-99, 58 S.Ct. 233, 82 L.Ed. 187 (1937). Each case involved litigants seeking to avoid application of state law, arguing that general automatic state ceding statutes-which ceded jurisdiction upon the mere acquisition of property by the federal government-precluded enforcement of state laws. In all three cases, the Supreme Court noted that the United States could not be forced to accept unwanted legislative jurisdiction, and held that the general ceding statutes were insufficient in themselves to transfer legislative authority. *See Collins,* 304 U.S. at 527-28; *Silas Mason Co. ,* 302 U.S. at 207; *James,* 302 U.S. at 147-48. Congress responded to these decisions by enacting 40 U.S.C. § 255, which set forth how the United States could obtain and accept grants of jurisdiction by the states. Exclusive federal jurisdiction over federal land, once

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 5
Not Reported in F.Supp.2d, 2006 WL 769317 (E.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

covered by 40 U.S.C. § 255, is now covered by 40 U.S.C. § 3112, which provides:

*6 (a) Exclusive jurisdiction not required.-It is not required that the Federal Government obtain exclusive jurisdiction in the United States over land or an interest in land it acquires.

(b) Acquisition and acceptance of jurisdiction.-When the head of a department, agency, or independent establishment of the Government, or other authorized officer of the department, agency, or independent establishment, considers it desirable, that individual may accept or secure, from the State in which land or an interest in land that is under the immediate jurisdiction, custody, or control of the individual is situated, consent to, or cession of, any jurisdiction over the land or interest not previously obtained. The individual shall indicate acceptance of jurisdiction on behalf of the Government by filing a notice of acceptance with the Governor of the State or in another manner prescribed by the laws of the State where the land is situated.

(c) Presumption.-It is conclusively presumed that jurisdiction has not been accepted until the Government accepts jurisdiction over land as provided in this section.

In *Paul,* the Supreme Court considered the enforceability of California's wholesale milk price regulations with respect to milk sold to the United States at three military installations (Travis Air Force Base, Castle Air Force Base, and Oakland Army Terminal). *Paul,* 371 U.S. at 247. Citing 40 U.S.C. § 255, the Supreme Court clearly stated that the United States must assent to jurisdiction for a federal enclave to have exclusive federal jurisdiction. *Id.* at 264-65 & n. 30. The Supreme Court concluded that because the state milk regulations were not in effect at the time much of the land at issue was ceded to the United States and such laws conflicted with federal procurement policy, they could not be enforced if the property was a federal enclave with exclusive federal jurisdiction. *Id.* at 269.

Defendants have provided evidence, over which this court takes judicial notice, that Edwards Air Force Base became a military establishment in 1930. However, neither the complaint nor the facts over which this court takes judicial notice indicate where the events underlying this action occurred. The key factor in determining whether federal enclave jurisdiction exists is the location of the plaintiff's injury. *See, e.g., Akin v. Ashland Chem. Co.,* 156 F.3d 1030, 1035 (10th Cir.1998) (affirming district court's ruling that the notice of removal was timely because

the complaint was ambiguous as to where plaintiffs were exposed to asbestos and only after receipt of answers to interrogatories were defendants provided sufficient notice that conduct took place wholly within federal enclave,); *Roll v. Tracor, Inc.,* 140 F.Supp.2d 1073, 1978 n. 2 (D.Nev.2001) (choice-of-law rule for state applied because location of accident was not a federal enclave); *Hines v. AC & S, Inc.,* 128 F.Supp.2d 1003, 1005 (N.D.Tex.2001) (determining whether the exposure occurred on a federal enclave); *Anderson v. Crown Cork & Seal,* 93 F.Supp.2d 697, 700 (E.D.Va.2000) (finding court must determine whether alleged injuries occurred on a federal enclave); *Fung v. Abex Corp.,* 816 F.Supp. 569, 571 (N.D.Cal.1992) (personal injury actions arising from asbestos exposure were proper subject of federal jurisdiction because asbestos exposure took place on federal enclaves). Because no facts that the court can consider on this motion to dismiss brought under Rule12(b)(6) indicate the events underlying Plaintiffs' causes of action occurred on Edwards Air Force Base,[FN1] it is unnecessary to determine if Edwards Air Force Base is a federal enclave. Defendants have failed to establish that the events underlying this action even occurred at Edwards Air Force Base. Thus, the court cannot find the events at issue occurred on a federal enclave.

FN1. The court has taken judicial notice of Defendants' notice of removal. Defendants notice of removal asserts that the events underlying this action occurred on Edwards Air Force Base, which Defendants claim is a federal enclave. The court finds that this assertion, made without any evidentiary support, is insufficient to establish the events occurred on Edwards Air Force Base. Because they removed this action, the burden is on Defendants to prove the existence of jurisdictional facts. *See Gaus v. Miles, Inc.,* 980 F.2d 564, 566 (9th Cir.1992); *Miller v. Grgurich,* 763 F.2d 372, 373 (9th Cir.1985). The existence of federal jurisdiction on removal is generally determined from the face of the plaintiff's complaint. *See Louisville & Nashville R.R. v. Mottley,* 211 U.S. 149, 153-54, 29 S.Ct. 42, 53 L.Ed. 126 (1908); *Miller v. Grgurich,* 763 F.2d 372, 373 (9th Cir.1985); *Salveson v. Western States Bankcard Ass'n,* 731 F.2d 1423, 1426 (9th Cir.1984).

*7 In addition, Defendants are advised that the court is not convinced, based on the briefing currently

Not Reported in F.Supp.2d                                                                              Page 6
Not Reported in F.Supp.2d, 2006 WL 769317 (E.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

before the court, that Edwards Air Force Base is a federal enclave. Defendants offer no evidence that the United States formally accepted exclusive federal jurisdiction over Edwards Air Force Base, or its predecessor, Muroc Bombing and Gunnery Range. Defendants offer no evidence that the State of California ever consented to the exclusive federal jurisdiction of the United States. Defendants have cited no evidence or argument that Edwards Air Force Base provided a benefit to the United States. Defendants have cited no case finding that Edwards Air Force Base is a federal enclave over which the United States has exclusive federal jurisdiction. Simply put, Defendants have failed on this motion to dismiss to meet their burden to show Edwards Air Force Base is a federal enclave.

Defendants reliance on *Hancock v. Train*, 426 U.S. 167, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976), to establish Edwards Air Force Base as a federal enclave is misplaced. *Hancock v. Train* involved a federal installation that was emitting pollution in a state that had a permitting system to regulate polluters. The question presented was whether the federal installation had to apply for and receive a permit from the state, and had to meet the substantive standards of the state act, or whether it only had to get a permit from the Environmental Protection Agency and meet the federal standards. The Supreme Court held that a federal agency performing a federal function is not required to submit to a state regulatory procedure, absent a "clear and unambiguous" congressional statement to that effect. *Hancock*, 426 U.S. at 179. At issue here is whether private Defendants can be sued for alleged violations of state law that allegedly occurred on federal land, not whether the United States is subject to California's pollution regulations. Thus, *Hancock v. Train* offers little assistance on the federal enclave issue.

Defendant's reliance on *Taylor v. Lockheed Martin Corporation*, 78 Cal.App.4th 472, 92 Cal.Rptr.2d 873 (2000) is also not persuasive. In *Taylor*, the California Court of Appeal stated that a federal enclave "is created when the federal government purchases land within a state with the state's consent, which may be conditioned on the retention of state jurisdiction consistent with the federal use." *Id.* at 478, 92 Cal.Rptr.2d 873. The Court of Appeal stated that "the voluntary cession of land by a state to the federal government is an actual transfer of sovereignty." *Id.* The Court of Appeal found in *Taylor* that the condition of a state's consent was met in that case because Section 34 of the former California Political Code granted a blanket consent to

federal jurisdiction for any tract of land purchased or condemned by the United States for the purpose of erecting forts, magazines, arsenals, dockyards, and other needful buildings. *Id.* at 480, 92 Cal.Rptr.2d 873. Defendants have neither provided authority as to how Edwards Air Force Base was acquired nor whether Section 34 of the former California Political Code was the relevant statute at the time Edwards Air Force Base became a military instillation. In addition, the issue of the United State's acceptance of exclusive jurisdiction was not at issue in *Taylor* because after the land had been purchased by the Army in 1941, the United States Government accepted jurisdiction over the property. *Id.* at 479-80, 92 Cal.Rptr.2d 873. Finally, unlike *Taylor*, it is not clear from the facts presented to this court that the conduct underlying this action occurred on Edwards Air Force Base.

**\*8** The court is hesitant to find as a matter of law that Edwards Air Force Base is not a federal enclave and California law applies on this military instillation. However, for the purposes of the pending motion, the court has no choice but to conclude that Defendants have not met their burden to prove that the events underlying this action occurred on Edwards Air Force Base and Edwards Air Force Base is a federal enclave. Given the fact Edwards Air Force Base may well be a federal enclave, the court will allow Defendant an additional opportunity to raise this issue. In addition, Plaintiffs request the opportunity to file an amended complaint that addresses the enclave issue.

The Supreme Court in *Paul v. United States*, 371 U.S. 245, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963), remanded the case for the lower court to determine if some of the land on which the milk was in fact sold was land over which the United States did not have exclusive jurisdiction. *Id.* at 269-30. Similarly, the Ninth Circuit in *Willis v. Craig*, 555 F.2d 724, 726 (9th Cir.1977), remanded the action to the district court to make a finding on whether federal enclave jurisdiction existed. *Id.* at 726. Thus, the court finds that before concluding Edwards Air Force Base is not a federal enclave, which may well affect this court's jurisdiction, the parties should be given an opportunity to provide further briefing. The court finds the appropriate procedure in light of the parties' requests and burdens on this issue is to allow Plaintiffs to file an amended complaint pursuant to their request and then allow Defendants the opportunity to file another motion that addresses the enclave issue.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 769317 (E.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

C. Wrongful Discharge in Violation of Public Policy

Plaintiffs' first cause of action alleges wrongful discharge in violation of public policy. Relying on *Taylor* and the federal enclave doctrine, Defendants contend that Plaintiffs' first cause of action for wrongful discharge in violation of public policy is barred. Because the court finds that, at this time, there is no evidence the events underlying the first cause of action occurred on Edwards Air Force Base and it is not clear that Edwards Air Force Base is a federal enclave on which California law cannot apply, the court declines to dismiss the first cause of action for wrongful discharge in violation of public policy. However, Plaintiffs have asked for the opportunity to amend the complaint, including the first cause of action. Based on Plaintiffs' request, the court will dismiss the complaint with leave to amend.

D. Punitive Damages for a Violation of California Labor Code § 6310

Plaintiffs' second cause of action alleges a violation of California Labor Code § 6310. Defendants contend that Plaintiffs are not entitled to punitive damages for a cause of action brought under California Labor Code § 6310. As such, Defendants request the court strike Plaintiffs' request for punitive damages.

California Labor Code § 6310(b) allows a cause of action for any employee who is discharged or discriminated against because the employee made a bona fide complaint regarding unsafe working conditions. California Labor Code § 6310(b) states that such an employee is entitled to "reinstatement and reimbursement for lost wages and work benefits." Based on the language of Section 6310(b), Defendants contend punitive damages for this cause of action are not available.

*9 A wrongful termination action under California Labor Code § 6310 is not limited to statutorily-identified remedies. *Freund v. Nycomed Amersham, 347 F.3d 752, 760* (9th Cir.2003); *Hentzel v. Singer Co., 138 Cal.App.3d 290, 301-02 159 (1982)*. Section 6310's remedies are not confined to the statute because if a statute prescribing a remedy does not create a new right or liability, but merely provides a new remedy for an independent and pre-existing right or liability, the new remedy is not exclusive but merely cumulative of other existing remedies, and does not eliminate the old remedy unless expressly stated. *Freund, 347 F.3d at 760*. Based on this

authority, Defendants' motion to strike Plaintiffs' request for punitive damages must be denied. There is a set of "acts that could be proved consistent with the allegations of the complaint" that could entitle Plaintiffs to punitive damages. *See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); Diaz v. Gates, 380 F.3d 480, 482 (9th Cir.2004)*. However, because Plaintiffs have requested the opportunity to file an amended complaint, the complaint will be dismissed with leave to amend to allow Plaintiffs the opportunity to clarify the basis of this cause of action and the damages they request.

D. Fraud

Plaintiffs' third cause of action alleges fraud. Defendants contend Plaintiffs' fraud cause of action should be dismissed because the California Supreme Court has held that no cause of action for fraud lies for facts misrepresented by an employer to effect the termination of employment. Plaintiffs do not offer any reason why their fraud claim is not barred.

In *Hunter v. Up-Right, Inc., 6 Cal.4th 1174, 1185, 26 Cal.Rptr.2d 8, 864 P.2d 88 (1993)*, the plaintiff was falsely told by his supervisor that the corporation had decided to eliminate his position. *Id. at 1179, 26 Cal.Rptr.2d 8, 864 P.2d 88*. On the basis of that representation, the plaintiff signed a document setting forth his resignation. *Id.* At trial, a jury found in favor of the plaintiff on his fraud claim. *Id. at 1180, 26 Cal.Rptr.2d 8, 864 P.2d 88*. The California Supreme Court granted the defendant's petition for review, and found that "wrongful termination of employment ordinarily does not give rise to a cause of action for fraud or deceit, even if some misrepresentation is made in the course of the employee's dismissal." *Id. at 1178, 26 Cal.Rptr.2d 8, 864 P.2d 88*. The California Supreme Court explained that the defendant "simply employed a falsehood to do what it otherwise could have accomplished directly." *Id. at 1184, 26 Cal.Rptr.2d 8, 864 P.2d 88*. The California Supreme Court reasoned that as a result, the plaintiff could not establish all the elements of fraud because the plaintiff did not rely to his detriment on the misrepresentation. *Id. at 1184, 26 Cal.Rptr.2d 8, 864 P.2d 88*. The California Supreme Court court concluded by stating that an employee could maintain an action for fraud "only if the plaintiff can establish all of the elements of fraud with respect to a misrepresentation that is separate from the termination of the employee contract, i.e., when the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 769317 (E.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

plaintiff's fraud damages cannot be said to result from the termination itself." *Id.*

**\*10** The California Supreme Court further defined this exception in *Lazar v. Superior Court,* 12 Cal.4th 631, 49 Cal.Rptr.2d 377, 909 P.2d 981 (1996). In *Lazar,* the defendant asked the plaintiff to leave his employment in New York and to work for the defendant in Los Angeles, falsely telling the plaintiff that his job in Los Angeles would be secure and would involve significant pay increases. *Id. at 635-36, 49 Cal.Rptr.2d 377, 909 P.2d 981.* Shortly after the plaintiff relocated, he was fired, and the plaintiff filed an action alleging fraud *Id. at 636-37, 49 Cal.Rptr.2d 377, 909 P.2d 981.* The California Supreme Court found that this case did not fall under *Hunter.* The California Supreme Court explained that *Hunter* "did not call into question generally the viability of traditional fraud remedies whenever they are sought by a terminated employee," but established that a plaintiff fails to state a claim for fraud if "the element of detrimental reliance [is] absent." *Id. at 641, 643, 49 Cal.Rptr.2d 377, 909 P.2d 981.* In addition, the court stated *Hunter* precludes recovery for fraud "only where the result of the employer's misrepresentation is indistinguishable from an ordinary constructive wrongful termination ." *Id. at 643, 49 Cal.Rptr.2d 377, 909 P.2d 981.* The California Supreme Court found the plaintiff had established the elements of fraud, including detrimental reliance, because unlike *Hunter,* the defendant's misrepresentations were made prior to the formation of the employment relationship, when the plaintiff was free to decline the position. *Id. at 642-43, 49 Cal.Rptr.2d 377, 909 P.2d 981.*

Together, *Hunter* and *Lazar* provide authority for the proposition that employees can maintain a cause of action for fraud against their employer only if they allege all of the elements of such a claim, including detrimental reliance, and if they allege damages distinct from the termination itself. In this action, the basis of Plaintiffs' fraud claim is not entirely clear. It appears that Plaintiffs are alleging that Defendants misrepresented to Plaintiffs that they were being terminated because the company was going "to do away with their positions." *See* Complaint at ¶¶ 7 & 20. After Plaintiffs were terminated, their positions were reinstated and new staff was hired. *See id. at ¶ 7, 26 Cal.Rptr.2d 8, 864 P.2d 88.* The complaint alleges that Defendants made these representations with the expectation that Plaintiffs would believe that their termination was justified rather than based on retaliation. *See id. at ¶ 22.* Plaintiffs seek punitive damages. *See id.*

Plaintiffs' fraud claim appears to be analogous to that of the employee in *Hunter.* Unlike the misrepresentation in *Lazar,* the alleged misrepresentations at issue here appear to have occurred during the employment relationship, when Defendants had "coercive power" over Plaintiffs. Thus, like the employer in *Hunter,* Defendants appear to have simply employed a falsehood to do what they otherwise could have accomplished directly, i.e. fire Plaintiffs. Therefore, based on the allegations in the complaint, Plaintiffs did not rely to their detriment on the alleged misrepresentations because it appears Defendants could have fired Plaintiffs for a reason unrelated to the misrepresentations. Accordingly, Defendants' motion to dismiss Plaintiffs' fraud claim is granted. However, "[i]f a complaint is dismissed for failure to state a claim, leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distributing Co. v. Serv-Well Furniture Co., Inc.,* 806 F.2d 1393, 1401 (9th Cir.1986). Here, because it is not completely clear that Plaintiffs will be unable to allege detrimental reliance, leave to amend will be granted.

### F. Request to Amend

**\*11** In their opposition, Plaintiffs request leave to file an amended complaint. Plaintiffs state that they would like the opportunity to allege facts showing that the federal enclave doctrine does not apply, allege additional facts regarding their causes of action, and allege new causes of action.

Rule 15(a) of the Federal Rules of Civil Procedure provides that a "party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served.... Otherwise a party may amend only by leave of court...." A motion to dismiss for failure to state a claim is not a "responsive pleading" that would terminate a plaintiff's right to amend the complaint. *Doe v. United States,* 58 F.3d 494, 497 (9th Cir.1995); *Schreiber Distrib. v. Serv-Well Furniture Co.,* 806 F.2d 1393, 1401 (9th Cir.1986); *Mayes v. Leipziger,* 729 F.2d 1389 605, 607 (9th Cir.1984); *Breier v. Northern California Bowling Proprietors' Ass'n,* 316 F.2d 787, 789 (9th Cir.1963). Because Defendants did not file a responsive pleading, but only a motion to dismiss, Plaintiffs do not need leave of court to file an amended complaint. *See Allwaste, Inc. v. Hecht,* 65 F.3d 1523, 1530 (9th Cir.1995); *Doe, 58 F.3d at 497.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                           Page 9
Not Reported in F.Supp.2d, 2006 WL 769317 (E.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Plaintiffs are free to file an amended complaint.

In addition, when dismissing a complaint, the Ninth Circuit has stated that "leave to amend should be granted unless the district court determines that the pleading could not possibly be cured by the allegation of other facts." *Bly-Magee v. California,* 236 F.3d 1014, 1019 (9th Cir.2001) (internal quotation marks omitted); *Chang v. Chen,* 80 F.3d 1293, 1296 (9th Cir. (9th Cir.1996). Here, it is not clear that the complaint could not be saved by amendment. Additional allegations could show that the events at issue did not occur on a federal enclave and/or that Edwards Air Force Base is not a federal enclave. Additional allegations could be made that are consistent with a cause of action for fraud. Additional allegations could be made to support related causes of action.

When filing any amended complaint or further motions, the parties are cautioned to review this order, the federal enclave doctrine, and the situations when employees can sue their employers for fraud. The parties are advised that all pleadings must be based upon a well-founded belief that a cognizable or arguable legal theory exists that would support the pleading. *See* Fed.R.Civ.P. 11; *Les Shockley Racing Inc. v. National Hot Rod Ass'n,* 884 F.2d 504, 510 (9th Cir.1989).

The parties are also reminded that pursuant to Title 28 U.S.C. § 1447(c), the court will remand this action if at any time prior to judgment it appears that the court lacks subject matter jurisdiction. The party that seeks to remain in federal court has the burden of proof to avoid remand to state court. *Gaus v. Miles, Inc.,* 980 F.2d 564, 566 (9th Cir.1992); *Miller v. Grgurich,* 763 F.2d 372, 373 (9th Cir.1985); *Conrad Associates v. Hartford Accident & Indemnity Co.,* 994 F.Supp. 1196, 1198 (N.D.Cal.1998). As such, if any amended complaint contains no federal cause of action, Defendants will be required to prove that this court has jurisdiction because Edwards Air Force Base is a federal enclave on which the United States exercises exclusive federal jurisdiction and the events at issue occurred within this federal enclave.

### ORDER

*12 Accordingly, for the reasons stated in the above Memorandum Opinion, IT IS HEREBY ORDERED that:
1. Defendants' motion to DISMISS is GRANTED;
2. Defendants' motion to STRIKE is DENIED;

3. The complaint is DISMISSED WITH LEAVE TO AMEND;
4. Any amended complaint SHALL BE FILED within thirty days of this order's date of service; and
5. Any answer or responsive pleading SHALL BE FILED within twenty days of the date on which Plaintiffs file their amended complaint.

IT IS SO ORDERED.

E.D.Cal.,2006.
Zuniga v. Chugach Maintenance Services
Not Reported in F.Supp.2d, 2006 WL 769317 (E.D.Cal.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1836829 (Trial Pleading) Answer by Defendants to Plaintiffs' First Amended Complaint (May 15, 2006) Original Image of this Document (PDF)
• 2006 WL 1490390 (Trial Motion, Memorandum and Affidavit) First Amended Complaint For: (Apr. 26, 2006) Original Image of this Document (PDF)
• 2006 WL 1183500 (Trial Motion, Memorandum and Affidavit) Opposition to Defendants' Motion to Dismiss First and Third Causes of Action in Plaintiffs' Complaint; Memorandum of Points and Authorities (Feb. 28, 2006) Original Image of this Document (PDF)
• 2006 WL 821905 (Trial Motion, Memorandum and Affidavit) Defendants' Points and Authorities in Reply to Plaintiffs' Opposition to Motion to Dismiss First and Third Causes of Action in Complaint (Feb. 27, 2006) Original Image of this Document (PDF)
• 2006 WL 821908 (Trial Motion, Memorandum and Affidavit) Defendants' Points and Authorities in Reply to Plaintiffs' Opposition to Motion to Strike Punitive Damages (Feb. 27, 2006) Original Image of this Document (PDF)
• 2006 WL 508584 (Trial Motion, Memorandum and Affidavit) Defendants' Motion to Dismiss First and Third Causes of Action in Plaintiffs' Complaint (f. R.Civ. P. 12(b) (6)J; Memorandum of Points and Authorities in Support Thereof (Filed Concurrently Herewith: (1) Motion to Strike Punitive Damages; (2) Request for Judicial Notice; and (3) Notice of Lodging Non-Federal Authorities) (Jan. 19, 2006) Original Image of this Document (PDF)
• 2006 WL 508585 (Trial Motion, Memorandum and Affidavit) Defendants'Motion to Strike Punitive Damages in Plaintiffs' Complaint (F.R.Civ.P.12(f)); Memorandum of Points and Authorities in Support Thereof (Jan. 19, 2006) Original Image of this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 10
Not Reported in F.Supp.2d, 2006 WL 769317 (E.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

Document (PDF)
• 1:06cv00048 (Docket) (Jan. 13, 2006)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 2006 WL 769317 (E.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

C

Briefs and Other Related Documents

Zuniga v. Chugach Maintenance ServicesE.D.Cal.,2006.Only the Westlaw citation is currently available.
United States District Court,E.D. California.
Alexi ZUNIGA, Joseph De Felice, Jackie Malcomb, James Mamula, Plaintiffs,
v.
CHUGACH MAINTENANCE SERVICES, et al., Defendants.
**No. CVF060048AWILJO.**

March 24, 2006.

Kenneth A. Satin, The Accident Attorneys A Professional Corporation, Newport Beach, CA, for Plaintiffs.
Joseph Charles Faucher, Reish, Luftman, Reicher & Cohen, Los Angeles, CA, for Defendants.

MEMORANDUM OPINION AND ORDER GRANTING MOTION TO DISMISS, DENYING MOTION TO STRIKE, AND DISMISSING COMPLAINT WITH LEAVE TO AMEND
ISHII, J.

(Documents # 5 & # 6)

**\*1** This removed action concerns employment actions taken by Defendants. Plaintiffs allege violations of state employment laws. Defendants contend that this court has jurisdiction pursuant to 28 U .S.C. § 1331 because the employment actions took place on a federal enclave.

BACKGROUND

On April 14, 2005, Plaintiffs filed an action in the Kern County Superior Court. The first cause of action alleges tortuous discharge in violation of public policy. The second cause of action alleges a violation of California Labor Code § 6310 for retaliating against an employee who protests unsafe or unhealthy working conditions. The third cause of action alleges fraud. The Kern County Superior Court originally dismissed the action, but on December 14, 2005, the Kern County Superior Court set aside the dismissal. On January 12, 2006, Defendants removed

the action to this court. Defendants contend that this court has subject matter jurisdiction because the events occurred at Edwards Air Force Base, which Defendants allege is a federal enclave.

On January 19, 2006, Defendants filed a motion to strike and a motion to dismiss. Defendant contend that the first cause of action is barred by the federal enclave doctrine. Defendants contend the third cause of action should be dismissed because no claim for fraud exists under California law in the employment termination context. Defendants contend punitive damages are not allowed for the second cause of action under California law. The motions were scheduled for a court hearing to be held on March 6, 2006.

On February 27, 2006, Defendants filed a reply brief.

Because Plaintiffs did not file a timely opposition, on February 28, 2006, the court took Defendants' motions under submission.

The undersigned received a courtesy copy of an opposition to the motion to strike and an opposition to the motion to dismiss. After being notified that the courtesy copies had not been filed, on February 28, 2006, Plaintiffs filed their oppositions. Plaintiffs contend this action is not governed and controlled by the federal enclave doctrine and this court lacks jurisdiction. Plaintiffs seek leave to file an amended complaint to contain additional facts.

LEGAL STANDARDS

A complaint may be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure if it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle him to relief. Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (citing Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); Balistreri v. Pacifica Police Department, 901 F.2d 696, 699 (9th Cir.1990). A Rule 12(b)(6) dismissal can be based on the failure to allege a cognizable legal theory or the failure to allege sufficient facts under a cognizable legal theory. Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 533-34 (9th Cir.1984). In considering a motion to dismiss, the court must accept as true the allegations

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                        Page 2
Not Reported in F.Supp.2d, 2006 WL 769317 (E.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

of the complaint in question, *Hospital Bldg. Co. v. Rex Hospital Trustees*, 425 U.S. 738, 740, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976), construe the pleading in the light most favorable to the party opposing the motion, and resolve all doubts in the pleader's favor. *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404, *reh'g denied*, 396 U.S. 869, 90 S.Ct. 35, 24 L.Ed.2d 123 (1969).

**\*2** Rule 12(f) of the Federal Rules of Civil Procedure allows the court to strike from "any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The purpose of a Rule 12(f) motion is to avoid the costs that arise from litigating spurious issues by dispensing with those issues prior to trial. *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir.1983). Immaterial matter is defined as matter that "has no essential or important relationship to the claim for relief or the defenses being pleaded." *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir1993) (quoting 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1382, at 706-07 (1990)), *rev'd on other grounds*, 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994). Impertinent matter is defined as "statements that do not pertain, and are not necessary, to the issues in question." *Fantasy, Inc.* 984 F.2d at 1527. Granting a motion to strike may be proper if it will make the trial less complicated or if allegations being challenged are so unrelated to plaintiff's claims as to be unworthy of any consideration as a defense and that their presence in the pleading will be prejudicial to the moving party. *Id.*

## FACTS

### A. Complaint's Allegations

As a general matter, a court may not consider any material outside of the complaint when ruling on a Rule 12(b)(6) motion. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir.2001); *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir.1994). If the parties present the court with evidence outside the pleadings and the court considers the evidence, the court must convert the Rule 12(b)(6) motion into a motion for summary judgment. Fed. R. Civ. Pro. 12(b)(6); *Anderson v. Angelone*, 86 F.3d 932, 934-35 (9th Cir.1996). The following relevant facts are alleged in Plaintiffs' complaint:

The complaint alleges that Plaintiffs were employees of Defendant Chugach Maintenance Services

("Chugach").

The complaint alleges that throughout their scope of employment with Chugach, Plaintiffs were subjected to harassment from Chugach and its employees. The complaint alleges that Defendants would unnecessarily reprimand Plaintiffs when Plaintiffs reported acts of misconduct by their supervisors and Defendants denied Plaintiffs safety equipment when working in hazardous environments.

The complaint alleges that as a result of Plaintiffs' whistle blowing and complaints, Plaintiffs' positions were terminated. Shortly after, Defendants reinstated Plaintiffs' former positions and hired new staff to replace Plaintiffs.

### B. Judicial Notice

There are exceptions to Rule 12(b)(6)'s requirement that extrinsic evidence cannot be considered without converting the motion to a summary judgment motion. The court may consider documents over which the court may take judicial notice. *Lee*, 250 F.3d at 689; *Mack v. South Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir.1986).

**\*3** Defendants ask the court to take judicial notice of the fact that Edwards Air Force Base has been a United States Military Base since the 1930's. Plaintiffs offer no reason for the court to not take judicial notice of this fact. The court may take notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed.R.Evid. 201(b); *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir.1993). The court will take judicial notice of the fact that Edwards Air Force Base has been a United States Military Base since the 1930's.

In addition, Defendants ask the court to take judicial notice of the complaint filed in the Kern County Superior Court, the Kern County Superior Court's dismissal of this action, the Kern County Superior Court's order setting aside the dismissal, and Defendants' notice of removal. Judicial notice may be taken of court records. *See Mullis v. United States Bank. Ct.*, 828 F.2d 1385, 1388 n .9 (9th Cir.1987); *Egan v. Teets*, 251 F.2d 571, 578 (9th Cir.1957); *Valerio v. Boise Cascade Corp.*, 80 F.R.D. 626, 635 n. 1 (N.D.Cal.1978). However, "a court may not take judicial notice of proceedings or records in another cause so as to supply, without formal introduction of evidence, facts essential to support a contention in a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cause then before it." *M/V Am. Queen v. San Diego Marine Constr. Corp.,* 708 F.2d 1483, 1491 (9th Cir.1983). Thus, while the court will take judicial notice of court records, the court will not consider the records for the truth of the facts asserted within them.

### DISCUSSION

### A. Jurisdiction

This case was removed from the Kern County Superior Court to this court upon on the ground that this court has subject matter jurisdiction based upon 28 U.S.C. § 1331, the federal question statute, because the events in question occurred on Edwards Air Force Base. In their opposition, Plaintiffs question whether federal jurisdiction is appropriate under the federal enclave doctrine.

Title 28 U.S.C. § 1441(b) reads in relevant part: "Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties." "The burden of establishing federal jurisdiction is on the party seeking removal, and the removal statute is strictly construed against removal jurisdiction." *Prize Frize Inc. v. Matrix Inc.,* 167 F.3d 1261, 1265 (9th Cir.1999); *Emrich v. Touche Ross & Co.,* 846 F.2d 1190, 1195 (9th Cir.1988). If there is any doubt as to the right of removal in the first instance, "federal jurisdiction must be rejected." *Duncan v. Stuetzle,* 76 F.3d 1480, 1485 (9th Cir.1996); *Gaus v. Miles, Inc.,* 980 F.2d 564, 566 (9th Cir.1992).

"The presence or absence of federal question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *California v. United States,* 215 F.3d 1005, 1014 (9th Cir.2000); *see also California ex. rel. Lockyer v. Dynegy, Inc.,* 375 F.3d 831, 838 (9th Cir.2004); *Duncan,* 76 F.3d at 1485. Under the "well-pleaded complaint" rule, courts look to what "necessarily appears in the plaintiff's statement of his own claim in the bill or declaration, unaided by anything in anticipation of avoidance of defenses which it is thought the defendant may interpose." *California,* 215 U.S. at 1014. Generally, "a case may not be removed on the basis of a federal defense ... even if the defense is anticipated in the plaintiff's

complaint and both parties concede that the federal defense is the only question truly at issue." *Caterpillar, Inc. v. Williams,* 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987); *Wayne v. DHL Worldwide Express,* 294 F.3d 1179, 1183 (9th Cir.2002). "In addition, the plaintiff is the 'master' of her case, and if she can maintain her claims on both state and federal grounds, she may ignore the federal question, assert only state claims, and defeat removal." *Duncan,* 76 F.3d at 1485. However, the "artful pleading doctrine is a corollary to the well-pleaded complaint rule, and provides that although the plaintiff is the master of his own pleadings, he may not avoid federal jurisdiction by omitting form the complaint allegations of federal law that are essential to the establishment of his claim." *Lippitt v. Raymond James Fin. Serv.,* 340 F.3d 1033, 1041 (9th Cir.2003).

*4 "If at any time prior to judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c). A district court has "a duty to establish subject matter jurisdiction over the removed action *sua sponte,* whether the parties raised the issue or not." *United Investors Life Ins. Co. v. Waddell & Reed, Inc.,* 360 F.3d 960, 967 (9th Cir.2004). "Thus, the court can, in fact must, dismiss a case when it determines that it lacks subject matter jurisdiction, whether or not a party has a filed a motion." *Page v. City of Southfield,* 45 F.3d 128, 133 (6th Cir.1995). In other words, a district court may remand a removed case *sua sponte* if it determines that it lacks subject matter jurisdiction over the case. *See Parker v. Ho Sports Co.,* 2005 U.S. Dist. LEXIS 37289 at *1 (E.D.Cal.2005); *Knutson v. Allis-Chalmers Corp.,* 358 F.Supp.2d 983, 990 (D.Nev.2005); *Tortola Restaurants, L.P. v. Kimberly-Clark Corp.,* 987 F.Supp. 1186, 1188 (N.D.Cal.1997); *cf. Kelton Arms Condo. Homeowners Ass'n v. Homestead Ins. Co.,* 346 F.3d 1190, 1192-93 (9th Cir.2003) (holding that court may not *sua sponte* remand for procedural defects in removal but noting a distinction between procedural and jurisdictional defects and that a "district court must remand if it lacks jurisdiction").

The basis of jurisdiction in this action is Defendants' allegations that the facts underlying this action occurred on a federal enclave. The Ninth Circuit has indicated that personal injury actions arising from incidents occurring on federal enclaves may support the district court's jurisdiction under Section 1331. *Willis v. Craig,* 555 F.2d 724, 726 (9th Cir.1977); *Mater v. Holley,* 200 F.2d 123 (5th Cir.1952); *Fung v. Abex Corp.,* 816 F.Supp. 569, 571 (N.D.Cal.1992). In

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

this case, there is a question of whether this is subject to federal jurisdiction because the events underlying this action occurred on a federal enclave. Whether federal enclave jurisdiction exists is a complex question, resting on such factors as where the events underlying the action occurred on the property, whether the federal government exercises exclusive or concurrent jurisdiction over the property, when the property became a federal enclave and what the state law was at that time, whether that law is consistent with federal policy, and whether it has been altered by national legislation. *See Celli v. Shoell,* 40 F.3d 324, 328 (10th Cir.1994). In an action, such as this one, where the Defendants maintain the federal enclave doctrine allows for federal jurisdiction, the Ninth Circuit has remanded the action to the district court to make a finding on whether federal enclave jurisdiction exists. *See, e.g., Willis,* 555 F.2d at 726. Thus, to determine if this court has jurisdiction, the court must decide whether the federal enclave doctrine applies to this case.

### B. Federal Enclave

**\*5** Defendant contends that the court has jurisdiction under the federal enclave doctrine. The Federal Enclave Clause provides that:

The Congress shall have power ... To exercise exclusive legislation in all Cases whatsoever, over such District (not exceeding ten miles square) as may, by Cession of particular states, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in Which the Same Shall be, for the Erection of Forts, Magazines, Arsenals, dockYards, and other needful Buildings....

U.S. Const. art. I, § 8, cl. 17. Only federal law applies on a federal enclave under exclusive federal jurisdiction, except to the extent Congress has otherwise provided. *See Pacific Coast Dairy v. Department of Agriculture of California,* 318 F.Supp. 285, 294, 63 S.Ct. 628, 87 L.Ed. 761 (1943). However, in order to ensure that no such area is left without a developed legal system for private rights, preexisting state law not inconsistent with federal policy becomes federal law and remains in existence until altered by national legislation. *Id .* at 294.

Under Article 1, section 8, clause 17 of the United States Constitution, the United States can obtain exclusive federal jurisdiction over land with the consent of the state. *Paul v. United States,* 371 U.S.

245, 264, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963). This can be accomplished through a consensual acquisition or by a condemnation followed by a cession of jurisdiction. *United States v. Jenkins,* 734 F.2d 1322, 1325 n. 3 (9th Cir. 1983). After the state consents, the United States must formally accept exclusive federal jurisdiction. 40 U.S.C. § 3112; *Paul,* 371 U.S. at 264; *Jenkins,* 734 F.2d at 1325 n. 3. When the Federal Enclave Clause is complied with, the state loses all legislative power over the property in question, except such authority as it explicitly reserves to itself in ceding jurisdiction. *Paul,* 371 U.S. at 263-69; *Fort Leavenworth R. Co. v. Lowe,* 114 U.S. 525, 5 S.Ct. 995, 29 L.Ed. 264 (1885).

Historically, when a cession conferred a benefit to the federal government the courts presumed a formal acceptance of exclusive federal jurisdiction by the United States in absence of any dissent. *S.R. A., Inc. v. State of Minn.,* 327 U.S. 558, 563 & n. 7, 66 S.Ct. 749, 90 L.Ed. 851 (1946). Until 1940 it appears that, although the Courts recognized the United States could decline to accept exclusive jurisdiction over land it acquired, nonetheless, acceptance was presumed in the absence of evidence indicating a rejection. *See Humble Pipe Line Co. v. Waggonner,* 376 U.S. 369, 370-74, 84 S.Ct. 857, 11 L.Ed.2d 782 (1964) (citing cases); *see also Fort Leavenworth R.R. Co. v. Lowe,* 114 U.S. 525, 5 S.Ct. 995, 29 L.Ed. 264 (1884). However, during the 1930's, the Supreme Court decided a series of cases involving whether general state cessions of jurisdiction were valid without federal government acceptance of that jurisdiction. *Collins v. Yosemite Park & Curry Co.,* 304 U.S. 518, 522-24, 58 S.Ct. 1009, 82 L.Ed. 1502 (1938); *James v. Dravo Contracting Co.,* 302 U.S. 134, 141-42, 146-49, 58 S.Ct. 208, 82 L.Ed. 155 (1937); *Silas Mason Co. v. Tax Commission of Washington,* 302 U.S. 186, 197-99, 58 S.Ct. 233, 82 L.Ed. 187 (1937). Each case involved litigants seeking to avoid application of state law, arguing that general automatic state ceding statutes-which ceded jurisdiction upon the mere acquisition of property by the federal government-precluded enforcement of state laws. In all three cases, the Supreme Court noted that the United States could not be forced to accept unwanted legislative jurisdiction, and held that the general ceding statutes were insufficient in themselves to transfer legislative authority. *See Collins,* 304 U.S. at 527-28; *Silas Mason Co. .,* 302 U.S. at 207; *James,* 302 U.S. at 147-48. Congress responded to these decisions by enacting 40 U.S.C. § 255, which set forth how the United States could obtain and accept grants of jurisdiction by the states. Exclusive federal jurisdiction over federal land, once

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 769317 (E.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

covered by 40 U.S.C. § 255, is now covered by 40 U.S.C. § 3112, which provides:
*6 (a) Exclusive jurisdiction not required.-It is not required that the Federal Government obtain exclusive jurisdiction in the United States over land or an interest in land it acquires.
(b) Acquisition and acceptance of jurisdiction.-When the head of a department, agency, or independent establishment of the Government, or other authorized officer of the department, agency, or independent establishment, considers it desirable, that individual may accept or secure, from the State in which land or an interest in land that is under the immediate jurisdiction, custody, or control of the individual is situated, consent to, or cession of, any jurisdiction over the land or interest not previously obtained. The individual shall indicate acceptance of jurisdiction on behalf of the Government by filing a notice of acceptance with the Governor of the State or in another manner prescribed by the laws of the State where the land is situated.
(c) Presumption.-It is conclusively presumed that jurisdiction has not been accepted until the Government accepts jurisdiction over land as provided in this section.

In *Paul,* the Supreme Court considered the enforceability of California's wholesale milk price regulations with respect to milk sold to the United States at three military installations (Travis Air Force Base, Castle Air Force Base, and Oakland Army Terminal). *Paul,* 371 U.S. at 247. Citing 40 U.S.C. § 255, the Supreme Court clearly stated that the United States must assent to jurisdiction for a federal enclave to have exclusive federal jurisdiction. *Id.* at 264-65 & n. 30. The Supreme Court concluded that because the state milk regulations were not in effect at the time much of the land at issue was ceded to the United States and such laws conflicted with federal procurement policy, they could not be enforced if the property was a federal enclave with exclusive federal jurisdiction. *Id.* at 269.

Defendants have provided evidence, over which this court takes judicial notice, that Edwards Air Force Base became a military establishment in 1930. However, neither the complaint nor the facts over which this court takes judicial notice indicate where the events underlying this action occurred. The key factor in determining whether federal enclave jurisdiction exists is the location of the plaintiff's injury. *See, e.g., Akin v. Ashland Chem. Co.,* 156 F.3d 1030, 1035 (10th Cir.1998) (affirming district court's ruling that the notice of removal was timely because

the complaint was ambiguous as to where plaintiffs were exposed to asbestos and only after receipt of answers to interrogatories were defendants provided sufficient notice that conduct took place wholly within federal enclave,); *Roll v. Tracor, Inc.,* 140 F.Supp.2d 1073, 1978 n. 2 (D.Nev.2001) (choice-of-law rule for state applied because location of accident was not a federal enclave); *Hines v. AC & S, Inc.,* 128 F.Supp.2d 1003, 1005 (N.D.Tex.2001) (determining whether the exposure occurred on a federal enclave); *Anderson v. Crown Cork & Seal,* 93 F.Supp.2d 697, 700 (E.D.Va.2000) (finding court must determine whether alleged injuries occurred on a federal enclave); *Fung v. Abex Corp.,* 816 F.Supp. 569, 571 (N.D.Cal.1992) (personal injury actions arising from asbestos exposure were proper subject of federal jurisdiction because asbestos exposure took place on federal enclaves). Because no facts that the court can consider on this motion to dismiss brought under Rule12(b)(6) indicate the events underlying Plaintiffs' causes of action occurred on Edwards Air Force Base,[FN1] it is unnecessary to determine if Edwards Air Force Base is a federal enclave. Defendants have failed to establish that the events underlying this action even occurred at Edwards Air Force Base. Thus, the court cannot find the events at issue occurred on a federal enclave.

FN1. The court has taken judicial notice of Defendants' notice of removal. Defendants notice of removal asserts that the events underlying this action occurred on Edwards Air Force Base, which Defendants claim is a federal enclave. The court finds that this assertion, made without any evidentiary support, is insufficient to establish the events occurred on Edwards Air Force Base. Because they removed this action, the burden is on Defendants to prove the existence of jurisdictional facts. *See Gaus v. Miles, Inc.,* 980 F.2d 564, 566 (9th Cir.1992); *Miller v. Grgurich,* 763 F.2d 372, 373 (9th Cir.1985). The existence of federal jurisdiction on removal is generally determined from the face of the plaintiff's complaint. *See Louisville & Nashville R.R. v. Mottley,* 211 U.S. 149, 153-54, 29 S.Ct. 42, 53 L.Ed. 126 (1908); *Miller v. Grgurich,* 763 F.2d 372, 373 (9th Cir.1985); *Salveson v. Western States Bankcard Ass'n,* 731 F.2d 1423, 1426 (9th Cir.1984).

*7 In addition, Defendants are advised that the court is not convinced, based on the briefing currently

Not Reported in F.Supp.2d                                                                                                        Page 6
Not Reported in F.Supp.2d, 2006 WL 769317 (E.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

before the court, that Edwards Air Force Base is a federal enclave. Defendants offer no evidence that the United States formally accepted exclusive federal jurisdiction over Edwards Air Force Base, or its predecessor, Muroc Bombing and Gunnery Range. Defendants offer no evidence that the State of California ever consented to the exclusive federal jurisdiction of the United States. Defendants have cited no evidence or argument that Edwards Air Force Base provided a benefit to the United States. Defendants have cited no case finding that Edwards Air Force Base is a federal enclave over which the United States has exclusive federal jurisdiction. Simply put, Defendants have failed on this motion to dismiss to meet their burden to show Edwards Air Force Base is a federal enclave.

Defendants reliance on *Hancock v. Train,* 426 U.S. 167, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976), to establish Edwards Air Force Base as a federal enclave is misplaced. *Hancock v. Train* involved a federal installation that was emitting pollution in a state that had a permitting system to regulate polluters. The question presented was whether the federal installation had to apply for and receive a permit from the state, and had to meet the substantive standards of the state act, or whether it only had to get a permit from the Environmental Protection Agency and meet the federal standards. The Supreme Court held that a federal agency performing a federal function is not required to submit to a state regulatory procedure, absent a "clear and unambiguous" congressional statement to that effect. *Hancock,* 426 U.S. at 179. At issue here is whether private Defendants can be sued for alleged violations of state law that allegedly occurred on federal land, not whether the United States is subject to California's pollution regulations. Thus, *Hancock v. Train* offers little assistance on the federal enclave issue.

Defendant's reliance on *Taylor v. Lockheed Martin Corporation,* 78 Cal.App.4th 472, 92 Cal.Rptr.2d 873 (2000) is also not persuasive. In *Taylor,* the California Court of Appeal stated that a federal enclave "is created when the federal government purchases land within a state with the state's consent, which may be conditioned on the retention of state jurisdiction consistent with the federal use." *Id.* at 478, 92 Cal.Rptr.2d 873. The Court of Appeal stated that "the voluntary cession of land by a state to the federal government is an actual transfer of sovereignty." *Id.* The Court of Appeal found in *Taylor* that the condition of a state's consent was met in that case because Section 34 of the former California Political Code granted a blanket consent to

federal jurisdiction for any tract of land purchased or condemned by the United States for the purpose of erecting forts, magazines, arsenals, dockyards, and other needful buildings. *Id.* at 480, 92 Cal.Rptr.2d 873. Defendants have neither provided authority as to how Edwards Air Force Base was acquired nor whether Section 34 of the former California Political Code was the relevant statute at the time Edwards Air Force Base became a military instillation. In addition, the issue of the United State's acceptance of exclusive jurisdiction was not at issue in *Taylor* because after the land had been purchased by the Army in 1941, the United States Government accepted jurisdiction over the property. *Id.* at 479-80, 92 Cal.Rptr.2d 873. Finally, unlike *Taylor,* it is not clear from the facts presented to this court that the conduct underlying this action occurred on Edwards Air Force Base.

**\*8** The court is hesitant to find as a matter of law that Edwards Air Force Base is not a federal enclave and California law applies on this military instillation. However, for the purposes of the pending motion, the court has no choice but to conclude that Defendants have not met their burden to prove that the events underlying this action occurred on Edwards Air Force Base and Edwards Air Force Base is a federal enclave. Given the fact Edwards Air Force Base may well be a federal enclave, the court will allow Defendant an additional opportunity to raise this issue. In addition, Plaintiffs request the opportunity to file an amended complaint that addresses the enclave issue.

The Supreme Court in *Paul v. United States,* 371 U.S. 245, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963), remanded the case for the lower court to determine if some of the land on which the milk was in fact sold was land over which the United States did not have exclusive jurisdiction. *Id.* at 269-30. Similarly, the Ninth Circuit in *Willis v. Craig,* 555 F.2d 724, 726 (9th Cir.1977), remanded the action to the district court to make a finding on whether federal enclave jurisdiction existed. *Id.* at 726. Thus, the court finds that before concluding Edwards Air Force Base is not a federal enclave, which may well affect this court's jurisdiction, the parties should be given an opportunity to provide further briefing. The court finds the appropriate procedure in light of the parties' requests and burdens on this issue is to allow Plaintiffs to file an amended complaint pursuant to their request and then allow Defendants the opportunity to file another motion that addresses the enclave issue.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 7
Not Reported in F.Supp.2d, 2006 WL 769317 (E.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

C. Wrongful Discharge in Violation of Public Policy

Plaintiffs' first cause of action alleges wrongful discharge in violation of public policy. Relying on *Taylor* and the federal enclave doctrine, Defendants contend that Plaintiffs' first cause of action for wrongful discharge in violation of public policy is barred. Because the court finds that, at this time, there is no evidence the events underlying the first cause of action occurred on Edwards Air Force Base and it is not clear that Edwards Air Force Base is a federal enclave on which California law cannot apply, the court declines to dismiss the first cause of action for wrongful discharge in violation of public policy. However, Plaintiffs have asked for the opportunity to amend the complaint, including the first cause of action. Based on Plaintiffs' request, the court will dismiss the complaint with leave to amend.

D. Punitive Damages for a Violation of <u>California Labor Code § 6310</u>

Plaintiffs' second cause of action alleges a violation of <u>California Labor Code § 6310</u>. Defendants contend that Plaintiffs are not entitled to punitive damages for a cause of action brought under <u>California Labor Code § 6310</u>. As such, Defendants request the court strike Plaintiffs' request for punitive damages.

<u>California Labor Code § 6310(b)</u> allows a cause of action for any employee who is discharged or discriminated against because the employee made a bona fide complaint regarding unsafe working conditions. <u>California Labor Code § 6310(b)</u> states that such an employee is entitled to "reinstatement and reimbursement for lost wages and work benefits." Based on the language of <u>Section 6310(b)</u>, Defendants contend punitive damages for this cause of action are not available.

**\*9** A wrongful termination action under <u>California Labor Code § 6310</u> is not limited to statutorily-identified remedies. *Freund v. Nycomed Amersham,* 347 F.3d 752, 760 (9th Cir.2003); *Hentzel v. Singer Co.,* 138 Cal.App.3d 290, 301-02 159 (1982). <u>Section 6310</u>'s remedies are not confined to the statute because if a statute prescribing a remedy does not create a new right or liability, but merely provides a new remedy for an independent and pre-existing right or liability, the new remedy is not exclusive but merely cumulative of other existing remedies, and does not eliminate the old remedy unless expressly stated. *Freund,* 347 F.3d at 760. Based on this

authority, Defendants' motion to strike Plaintiffs' request for punitive damages must be denied. There is a set of "acts that could be proved consistent with the allegations of the complaint" that could entitle Plaintiffs to punitive damages. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Diaz v. Gates,* 380 F.3d 480, 482 (9th Cir.2004). However, because Plaintiffs have requested the opportunity to file an amended complaint, the complaint will be dismissed with leave to amend to allow Plaintiffs the opportunity to clarify the basis of this cause of action and the damages they request.

D. Fraud

Plaintiffs' third cause of action alleges fraud. Defendants contend Plaintiffs' fraud cause of action should be dismissed because the California Supreme Court has held that no cause of action for fraud lies for facts misrepresented by an employer to effect the termination of employment. Plaintiffs do not offer any reason why their fraud claim is not barred.

In *Hunter v. Up-Right, Inc.,* 6 Cal.4th 1174, 1185, 26 Cal.Rptr.2d 8, 864 P.2d 88 (1993), the plaintiff was falsely told by his supervisor that the corporation had decided to eliminate his position. *Id.* at 1179, 26 Cal.Rptr.2d 8, 864 P.2d 88. On the basis of that representation, the plaintiff signed a document setting forth his resignation. *Id.* At trial, a jury found in favor of the plaintiff on his fraud claim. *Id.* at 1180, 26 Cal.Rptr.2d 8, 864 P.2d 88. The California Supreme Court granted the defendant's petition for review, and found that "wrongful termination of employment ordinarily does not give rise to a cause of action for fraud or deceit, even if some misrepresentation is made in the course of the employee's dismissal." *Id.* at 1178, 26 Cal.Rptr.2d 8, 864 P.2d 88. The California Supreme Court explained that the defendant "simply employed a falsehood to do what it otherwise could have accomplished directly." *Id.* at 1184, 26 Cal.Rptr.2d 8, 864 P.2d 88. The California Supreme Court reasoned that as a result, the plaintiff could not establish all the elements of fraud because the plaintiff did not rely to his detriment on the misrepresentation. *Id.* at 1184, 26 Cal.Rptr.2d 8, 864 P.2d 88. The California Supreme Court court concluded by stating that an employee could maintain an action for fraud "only if the plaintiff can establish all of the elements of fraud with respect to a misrepresentation that is separate from the termination of the employee contract, i.e., when the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 769317 (E.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

plaintiff's fraud damages cannot be said to result from the termination itself." *Id.*

**\*10** The California Supreme Court further defined this exception in *Lazar v. Superior Court,* 12 Cal.4th 631, 49 Cal.Rptr.2d 377, 909 P.2d 981 (1996). In *Lazar,* the defendant asked the plaintiff to leave his employment in New York and to work for the defendant in Los Angeles, falsely telling the plaintiff that his job in Los Angeles would be secure and would involve significant pay increases. *Id.* at 635-36, 49 Cal.Rptr.2d 377, 909 P.2d 981. Shortly after the plaintiff relocated, he was fired, and the plaintiff filed an action alleging fraud. *Id.* at 636-37, 49 Cal.Rptr.2d 377, 909 P.2d 981. The California Supreme Court found that this case did not fall under *Hunter.* The California Supreme Court explained that *Hunter* "did not call into question generally the viability of traditional fraud remedies whenever they are sought by a terminated employee," but established that a plaintiff fails to state a claim for fraud if "the element of detrimental reliance [is] absent." *Id.* at 641, 643, 49 Cal.Rptr.2d 377, 909 P.2d 981. In addition, the court stated *Hunter* precludes recovery for fraud "only where the result of the employer's misrepresentation is indistinguishable from an ordinary constructive wrongful termination ." *Id.* at 643, 49 Cal.Rptr.2d 377, 909 P.2d 981. The California Supreme Court found the plaintiff had established the elements of fraud, including detrimental reliance, because unlike *Hunter,* the defendant's misrepresentations were made prior the formation of the employment relationship, when the plaintiff was free to decline the position. *Id.* at 642-43, 49 Cal.Rptr.2d 377, 909 P.2d 981.

Together, *Hunter* and *Lazar* provide authority for the proposition that employees can maintain a cause of action for fraud against their employer only if they allege all of the elements of such a claim, including detrimental reliance, and if they allege damages distinct from the termination itself. In this action, the basis of Plaintiffs' fraud claim is not entirely clear. It appears that Plaintiffs are alleging that Defendants misrepresented to Plaintiffs that they were being terminated because the company was going "to do away with their positions." *See* Complaint at ¶¶ 7 & 20. After Plaintiffs were terminated, their positions were reinstated and new staff was hired. *See id.* at ¶ 7, 26 Cal.Rptr.2d 8, 864 P.2d 88. The complaint alleges that Defendants made these representations with the expectation that Plaintiffs would believe that their termination was justified rather than based on retaliation. *See id.* at ¶ 22. Plaintiffs seek punitive damages. *See id.*

Plaintiffs' fraud claim appears to be analogous to that of the employee in *Hunter.* Unlike the misrepresentation in *Lazar,* the alleged misrepresentations at issue here appear to have occurred during the employment relationship, when Defendants had "coercive power" over Plaintiffs. Thus, like the employer in *Hunter,* Defendants appear to have simply employed a falsehood to do what they otherwise could have accomplished directly, i.e. fire Plaintiffs. Therefore, based on the allegations in the complaint, Plaintiffs did not rely to their detriment on the alleged misrepresentations because it appears Defendants could have fired Plaintiffs for a reason unrelated to the misrepresentations. Accordingly, Defendants' motion to dismiss Plaintiffs' fraud claim is granted. However, "[i]f a complaint is dismissed for failure to state a claim, leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distributing Co. v. Serv-Well Furniture Co., Inc.,* 806 F.2d 1393, 1401 (9th Cir.1986). Here, because it is not completely clear that Plaintiffs will be unable to allege detrimental reliance, leave to amend will be granted.

### F. Request to Amend

**\*11** In their opposition, Plaintiffs request leave to file an amended complaint. Plaintiffs state that they would like the opportunity to allege facts showing that the federal enclave doctrine does not apply, allege additional facts regarding their causes of action, and allege new causes of action.

Rule 15(a) of the Federal Rules of Civil Procedure provides that a "party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served.... Otherwise a party may amend only by leave of court...." A "motion to dismiss for failure to state claim is not a "responsive pleading" that would terminate a plaintiff's right to amend the complaint. *Doe v. United States,* 58 F.3d 494, 497 (9th Cir.1995); *Schreiber Distrib. v. Serv-Well Furniture Co.,* 806 F.2d 1393, 1401 (9th Cir.1986); *Mayes v. Leipziger,* 729 F.2d 1389 605, 607 (9th Cir.1984); *Breier v. Northern California Bowling Proprietors' Ass'n,* 316 F.2d 787, 789 (9th Cir.1963). Because Defendants did not file a responsive pleading, but only a motion to dismiss, Plaintiffs do not need leave of court to file an amended complaint. *See Allwaste, Inc. v. Hecht,* 65 F.3d 1523, 1530 (9th Cir.1995); *Doe,* 58 F.3d at 497.

Not Reported in F.Supp.2d                                                                                Page 9
Not Reported in F.Supp.2d, 2006 WL 769317 (E.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

Plaintiffs are free to file an amended complaint.

In addition, when dismissing a complaint, the Ninth Circuit has stated that "leave to amend should be granted unless the district court determines that the pleading could not possibly be cured by the allegation of other facts." *Bly-Magee v. California,* 236 F.3d 1014, 1019 (9th Cir.2001) (internal quotation marks omitted); *Chang v. Chen,* 80 F.3d 1293, 1296 (9th Cir. (9th Cir.1996). Here, it is not clear that the complaint could not be saved by amendment. Additional allegations could show that the events at issue did not occur on a federal enclave and/or that Edwards Air Force Base is not a federal enclave. Additional allegations could be made that are consistent with a cause of action for fraud. Additional allegations could be made to support related causes of action.

When filing any amended complaint or further motions, the parties are cautioned to review this order, the federal enclave doctrine, and the situations when employees can sue their employers for fraud. The parties are advised that all pleadings must be based upon a well-founded belief that a cognizable or arguable legal theory exists that would support the pleading. *See* Fed.R.Civ.P. 11; *Les Shockley Racing Inc. v. National Hot Rod Ass'n,* 884 F.2d 504, 510 (9th Cir.1989).

The parties are also reminded that pursuant to Title 28 U.S.C. § 1447(c), the court will remand this action if at any time prior to judgment it appears that the court lacks subject matter jurisdiction. The party that seeks to remain in federal court has the burden of proof to avoid remand to state court. *Gaus v. Miles, Inc.,* 980 F.2d 564, 566 (9th Cir.1992); *Miller v. Grgurich,* 763 F.2d 372, 373 (9th Cir.1985); *Conrad Associates v. Hartford Accident & Indemnity Co.,* 994 F.Supp. 1196, 1198 (N.D.Cal.1998). As such, if any amended complaint contains no federal cause of action, Defendants will be required to prove that this court has jurisdiction because Edwards Air Force Base is a federal enclave on which the United States exercises exclusive federal jurisdiction and the events at issue occurred within this federal enclave.

ORDER

**\*12** Accordingly, for the reasons stated in the above Memorandum Opinion, IT IS HEREBY ORDERED that:
1. Defendants' motion to DISMISS is GRANTED;
2. Defendants' motion to STRIKE is DENIED;

3. The complaint is DISMISSED WITH LEAVE TO AMEND;
4. Any amended complaint SHALL BE FILED within thirty days of this order's date of service; and
5. Any answer or responsive pleading SHALL BE FILED within twenty days of the date on which Plaintiffs file their amended complaint.

IT IS SO ORDERED.

E.D.Cal.,2006.
Zuniga v. Chugach Maintenance Services
Not Reported in F.Supp.2d, 2006 WL 769317 (E.D.Cal.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1836829 (Trial Pleading) Answer by Defendants to Plaintiffs' First Amended Complaint (May 15, 2006) Original Image of this Document (PDF)
• 2006 WL 1490390 (Trial Motion, Memorandum and Affidavit) First Amended Complaint For: (Apr. 26, 2006) Original Image of this Document (PDF)
• 2006 WL 1183500 (Trial Motion, Memorandum and Affidavit) Opposition to Defendants' Motion to Dismiss First and Third Causes of Action in Plaintiffs' Complaint; Memorandum of Points and Authorities (Feb. 28, 2006) Original Image of this Document (PDF)
• 2006 WL 821905 (Trial Motion, Memorandum and Affidavit) Defendants' Points and Authorities in Reply to Plaintiffs' Opposition to Motion to Dismiss First and Third Causes of Action in Complaint (Feb. 27, 2006) Original Image of this Document (PDF)
• 2006 WL 821908 (Trial Motion, Memorandum and Affidavit) Defendants' Points and Authorities in Reply to Plaintiffs' Opposition to Motion to Strike Punitive Damages (Feb. 27, 2006) Original Image of this Document (PDF)
• 2006 WL 508584 (Trial Motion, Memorandum and Affidavit) Defendants' Motion to Dismiss First and Third Causes of Action in Plaintiffs' Complaint (f. R.Civ. P. 12(b) (6)J; Memorandum of Points and Authorities in Support Thereof (Filed Concurrently Herewith: (1) Motion to Strike Punitive Damages; (2) Request for Judicial Notice; and (3) Notice of Lodging Non-Federal Authorities) (Jan. 19, 2006) Original Image of this Document (PDF)
• 2006 WL 508585 (Trial Motion, Memorandum and Affidavit) Defendants'Motion to Strike Punitive Damages in Plaintiffs' Complaint (F.R.Civ.P.12(f)); Memorandum of Points and Authorities in Support Thereof (Jan. 19, 2006) Original Image of this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 10
Not Reported in F.Supp.2d, 2006 WL 769317 (E.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

Document (PDF)
• 1:06cv00048 (Docket) (Jan. 13, 2006)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.