# MDL 875

**BEFORE THE UNITED STATES OF AMERICA**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**JUDICIAL PANEL FOR MULTIDISTRICT LITIGATION**

APR - 6 2007

FILED
CLERK'S OFFICE

| | | |
|---|---|---|
| IN RE:  ASBESTOS PLAINTIFFS, *et al.* | * | |
| (Plaintiff Melvin Raymond only) | * | |
| Plaintiff, | * | |
| | * | |
| VERSUS | * | **MDL DOCKET NO.  875** |
| | * | |
| OWENS-ILLINOIS, INC., *et al.* | * | |
| Defendants. | * | |

* * * * * * * * * * * * * * *

## MEMORANDUM IN OPPOSITION TO
## MOTION TO VACATE CONDITIONAL TRANSFER ORDER

Northrop Grumman Ship Systems, Inc. f/k/a Avondale Industries, Inc.("Avondale") and its alleged executive officer, Peter Territo ("Territo") (collectively, the "Avondale Interests") submit this Memorandum in Opposition to the Motion to Vacate Conditional Transfer Order by plaintiff and respectfully show as follows:

The question of whether this case was properly removed under the Federal Officer Removal Statute (28 U.S.C. § 1442) is hotly contested as demonstrated in the attached memorandum in Opposition to Motion to Remand. The Avondale Interests presented to the transferee court prior to the entry of the Conditional Transfer Order the history of similar removals effected in Louisiana in recent months. Most importantly, the Avondale Interests cited to two recent cases they removed under the Federal Officer Removal Statute that withstood identical Motions to Remand in the Middle District of Louisiana.

Moreover, the Avondale Interests demonstrated that a vast majority of the asbestos-containing materials found at Avondale during Mr. Raymond's time on the premises originated and were present at the explicit direction of officers of the United States Government during the construction of federal vessels. Mr. Raymond clings to a meaningless distinction between

## OFFICIAL FILE COPY

vessels constructed for the U.S. Navy and certain unspecified "Commercial Vessels" in an attempt to show that perhaps he was only (or primarily) exposed to work performed on "commercial vessels."   In other words, he was not a victim of the federal government's requirement that asbestos-containing materials be used in the construction of United States Navy vessels.  As explained in the attached memorandum, the so-called "Commercial Vessels" were actually vessels constructed for the United States Maritime Commission, another branch of the federal government, for commercial use.   The very same mandatory asbestos-related specifications for the United States Navy vessels were in force for the United States Maritime Commission "Commercial Vessels."

As further explained in the attached memorandum, there appears to be an irreconcilable split between the Eastern District of Louisiana and the Middle District of Louisiana concerning the propriety of federal officer removals.  The Avondale Interests contend that the test applied in the Middle District (in cases removed by them) and the same test applied in the Eastern District (in cases removed by others[1]) is the proper test.  Moreover, the Avondale Interests contend even if the test urged by Mr. Raymond in this case is applied, the nature of the allegations made in his original petition satisfies the more onerous test.

At any rate, this Court should not vacate the Conditional Transfer Order until it has first made a determination on the pending motion to remand, where a full-fledged analysis of the federal officer removal statute in the context of this case can be made.  The Avondale Interests stand by the reasoning in the attached memorandum and urge the Court to deny Plaintiffs' Motion to Vacate as premature.

---

[1] *See Delancey, et al. v. General Electric, et al.*, U.S.D.C., E.D. La. No. 04-431 and *Fink v. Todd Shipyards, et al.*, E.D. No. 04-430, both attached.

Respectfully Submitted:

_____
**Gordon P. Wilson, La. Bar No. 20426**
**F. Lewis. Parks, Jr., La. Bar No. 29646**
**Lugenbuhl, Wheaton, Peck, Rankin & Hubbard**
601 Poydras Street, Suite 2775
New Orleans, LA 70130
Telephone:     (504) 568-1990
Facsimile:     (504) 310-9195

*and*

_____
**Gary A. Lee, La. Bar No. 8265**
**Richard M. Perles, La. Bar No. 1534**
**Lee, Futrell & Perles, L.L.P.**
201 St. Charles Avenue, Suite 4120
New Orleans, LA  70170
Telephone:     (504) 569-1725
Facsimile:     (504) 569-1726
**Attorneys for Peter R. Territo *and* Northrop**
**Grumman Industries, Inc. f/k/a Avondale**
**Industries, Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing MEMORANDUM IN OPPOSITION TO

MOTION TO VACATE CONDITIONAL TRANSFER ORDER has been served upon the

parties listed on the attached Panel Service List by mailing same to each, postage pre-paid and

properly addressed, this 27th day of March , 2007.

_____

RECEIVED CLERK'S OFFICE 2007 MAR 28 A 10: 00

| | | |
|---|---|---|
| Julie Adroin, LLC<br>909 Poydras Street, Suite 2550<br>New Orleans, LA 70112 | Richard C. Binzley, Esq.<br>Thompson Hine, LLP<br>127 Public Square, 3900 Key Center<br>Cleveland, OH 44114 | Edward J. Cass, Esq.<br>Gallagher, Sharp, Fulton & Norman<br>1501 Euclid Avenue, 7th Floor<br>Cleveland, OH 44115 |
| Adam N. Chud, Esq.<br>Shea & Gardner<br>1800 Massachusetts Avenue, N.W.<br>Washington, DC 20036 | David A. Damico, Esq.<br>Burns, White & Hickton, LLC<br>106 Isabella Street, 4th Northshore Center<br>Pittsburgh, PA 15212 | Raymond P. Forceno, Esq.<br>Forceno & Hannon<br>111 S. Independence Mall East<br>The Bourse, Suite 1000<br>Philadelphia, PA 19106-2574 |
| Ellen B. Furman, Esq.<br>Goldfein & Hosmer<br>1600 Market Street, 33rd Floor<br>Philadelphia, PA 19103 | Susan M. Hansen, Esq.<br>Brownson & Baltou<br>601 Second Avenue, South<br>4800 U.S. Bank Place<br>Minneapolis, MN 55402 | Reginald S. Kramer, Esq.<br>Oldham & Dowling<br>195 South Main Street, Suite 300<br>Akron, OH 44308-1314 |
| David C. Landin, Esq.<br>Hunton & Williams<br>951 East Byrd Street<br>Riverfront Plaza, East Tower<br>Richmond, VA 23219 | Gene Locks, Esq.<br>Greitzer & Locks<br>1500 Walnut Street<br>Philadelphia, PA 19102 | Ronald L. Motley, Esq.<br>Motley Rice, LLC<br>28 Bridgeside Boulevard<br>Mt. Pleasant, SC 29264 |
| Frederick Lewis Parks<br>Lugenbuhl, Wheaton, et al.<br>601 Poydras Street, Suite 2775<br>New Orleans, LA 70130 | John J. Repcheck, Esq.<br>Marks, O'Neill, O'Brien & Courtney<br>707 Grant Street, 3200 Gulf Tower<br>Pittsburgh, PA 15219 | John D. Roven, Esq.<br>Roven, Kaplan & Wells<br>2190 North Loop West, Suite 410<br>Houston, TX 77018 |
| Richard D. Schuster, Esq.<br>Vory's Sater, Seymour & Pease<br>52 East Gay Street<br>P.O. Box 1008<br>Columbus, OH 43216 | Neil Selman, Esq.<br>Selman, Breitman & Burgess<br>11766 Wilshire Boulevard, 6th Floor<br>Los Angeles, CA 90025 | Robert N. Spinelli, Esq.<br>Kelley, Jasons, McGuire & Spinelli<br>Centre Square West, 15th Floor<br>Philadelphia, PA 19102 |
| Robert E. Swickle, Esq.<br>Jaques Admiralty Law Firm, P.C.<br>1570 Penobscot Building<br>Maritime Asbestosis Legal Clinic<br>Detroit, MI 48226 | Andrew J. Trevclise, Esq.<br>Reed Smith, LLP<br>2500 One Liberty Place<br>1650 Market Street<br>Philadelphia, PA 19103 | James K. Weston, II, Esq.<br>Tom Riley Law Firm<br>4040 First Avenue, N.E.<br>P.O. Box 998<br>Cedar Rapids, IA 52406 |
| Blaine Moore<br>Duncan & Courington, L.L.C.<br>322 Lafayette Street<br>New Orleans, LA 70130 | Charles Giordano<br>Album, Stovall, Radecker & Giordano<br>3850 N. Causeway Blvd., Suite 1130<br>Metairie, LA 70002 | Jay Jalaek<br>Kean Miller<br>22nd Flood - One American Place<br>Baton Rouge, LA 70825 |
| Benjamin Slater, III<br>Mark E. Van Horn<br>Robert B. Acomb, III<br>650 Poydras Street, Suite 2600<br>New Orleans, LA 70130 | R. Dean Church<br>Forrest Ren Wilkes<br>Forman, Perry, Watkins & Krutz<br>P.O. Box 22608<br>Jackson, MS 39225 | Larry Canada<br>Galloway, Johnson, Tompkins<br>4040 One Shell Square<br>New Orleans, LA 70139 |
| Gary A. Lee<br>Lee Futrell & Perles<br>201 St. Charles Avenue, Suite 4120<br>New Orleans, LA 70170 | Susan Kohn<br>Simon, Peragine, Smith & Redfearn<br>1100 Poydras Street, 30th Floor<br>New Orleans, LA 70163 | Lawrence G. Pugh, III<br>Montgomery, Barnett, Brown<br>1100 Poydras Street, Suite 3200<br>New Orleans, LA 70163 |
| A. Wendell Stout<br>Janet McDonald<br>Deutsch, Kerrigan & Stiles<br>755 Magazine Street<br>New Orleans, LA 70130-3672 | Leon Gary<br>Jones, Walker<br>8555 United Plaza Boulevard<br>5th Floor, Four United Plaza<br>Baton Rouge, LA 70809 | Stephen Elliott<br>Dawn M. Palmisano<br>Bernard, Cassisa, Elliott & Davis<br>1615 Metairie Road<br>P.O. Box 55490<br>Metairie, LA 70005-5490 |

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  ASBESTOS PLAINTIFFS, *et al.* | * | |
| (Plaintiff Melvin Raymond only) | * | CIVIL ACTION NO.  06-11140 |
| | * | |
| VERSUS | * | SECTION  K |
| | * | |
| BORDEN, INC., *et al.* | * | MAGISTRATE  1 |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN OPPOSITION TO MOTION TO REMAND

**MAY IT PLEASE THE COURT:**

**PREAMBLE**

Plaintiff, Melvin Raymond, filed suit against various parties, including Northrop Grumman Ship Systems, Inc., f/k/a Avondale Industries, Inc. (hereinafter, "Avondale") and its alleged executive officer, Peter Territo ("Territo") (collectively, the "Avondale Interests"). The Avondale Interests submit this Memorandum in Opposition to the Motion to Remand filed by plaintiff to show that they qualify as individuals acting under the direct supervision and control of certain federal officers and that the claims made against them are based on acts performed under the direction of those federal officers, which in turn qualifies them for the procedural protections provided by the United States Congress in the Federal Rules of Civil Procedure.

## I.   INTRODUCTION

This removal is not the first of its kind brought before this Court.  Indeed, plaintiff is correct that, to date, several divisions within the Eastern District have rejected removals by the Avondale Interests based on the Federal Officer Removal Statute.[1]  Since that time, there have been several significant developments.  Most notably, in *Lalonde v. Delta Field Erection*,[2] the Middle District of Louisiana performed a thorough analysis of the tests employed by courts within the Fifth Circuit when determining a valid removal under the Federal Officer Removal Statute.  In *Lalonde v. Delta Field Erection,* the Court rejected the test espoused by plaintiff in this case -- a test which first saw life in *Overly v. Raybestos-Manhattan*[3] in the Northern District of California.  The *Overly* test was relied upon to defeat all of the previous removals by the Avondale Interests to the Eastern District of Louisiana.

Recently, the Avondale Interests undertook Federal Officer removals of two cases to the Middle District of Louisiana:  *Melford v. Territo*[4] and *McFarlain v. Northrop Grumman Systems Corp.*[5]  In *Melford*, the Court completely rejected the *Overly* test and denied remand.  In *McFarlain*, the Court employed the *Overly* test but found that the Avondale Interests had satisfied it and denied remand.  Although the Court in *Melford* certified its decision for appellate review, the plaintiff chose not to pursue an immediate appeal and the case was transferred to the MDL in Philadelphia, Pennsylvania.

Under these evolving circumstances, the Avondale Interests have received conflicting treatment in different courts.  Until these conflicts are resolved, the Avondale Interests will be left

---

[1]  28 U.S.C. §1442(a)(1).

[2]  No. 96-3244-B-M3 (M.D. La. August 5, 1998); attached as Exhibit A.

[3]  1996 WL 532150 (N.D. Cal. 1996).

[4]  No. 05-1405 (M.D. La. Jan. 31, 2006), attached Exhibit B.

[5]  No. 05-1506-JJB-SCR (M.D. La. Feb. 7, 2006), attached as Exhibit C.

without clear guidance on this issue, and will be forced to remove all future cases against them which qualify for removal.

## II.     PROCEDURAL AND FACTUAL HISTORY

Melvin Raymond filed a Petition for Damages in Civil District Court asserting claims against various defendants. He alleges that he was exposed to asbestos fibers while employed at Avondale from 1966 through 1977.[6] Thereafter, the Avondale Interests removed this case under the Federal Officer Removal Statue. Plaintiff asserts claims against the Avondale Interests in negligence and intentional tort.[7] Specifically, plaintiff asserts that Territo (and other alleged Avondale executive officers) "negligently and/or intentionally failed to protect plaintiff from the dangers of toxic fiber and dust exposure."[8]

## III.    ARGUMENT

### A.     The Federal Officer Removal Statute

The Avondale Interests are entitled to remove this case based on 28 U.S.C. §1442(a)(1), which reads in relevant part:

> (A)   A Civil Action . . . commenced in a state court against any of the following persons may be removed by them to a district court of the United States for the district and division embracing the place wherein it is pending:

> (1)   Any officer of the United States or any agency thereof, or person **acting under him**, for any act under color of such office . . . .  (*Emphasis added.*)

The intense United States government presence at Avondale and U.S. government control of the construction of vessels at Avondale, which plaintiff alleges resulted in his exposure to asbestos, was

---

[6]  See Petition.
[7]  Petition, ¶¶ 20 through 34.
[8]  First Supplemental Petition ¶ 7

3

of such a direct and detailed nature that the Avondale Interests are entitled to defend this claim in federal court.

## B.     The Three Prong Test

The United States Supreme Court has set forth the criteria which must be met in order for a defendant to remove a case under 28 U.S.C. §1442(a)(1).  In *Mesa v. California, supra,* the Court set forth a three prong test which requires the "person" acting "under a federal officer" to:

(1)     Demonstrate that he acted under the direction of a federal officer;

(2)     Raise a colorable federal defense to the plaintiff's claim; and

(3)     Demonstrate a causal nexus between plaintiff's claims and acts he performed under color of federal office.[9]

In order to satisfy the "acting under" requirement of the test, the Avondale Interests must first establish that they qualify as "persons."[10]  That Territo is a person cannot be the subject of serious dispute.  Avondale, the corporation, also qualifies as a "person" for the purposes of the federal officer removal statute.[11]

The Avondale Interests must next demonstrate that they acted under the direction of a federal officer.  In determining whether a person "acted under" the direction of a federal officer to the extent required, the courts have found several categories of governmental oversight persuasive.  The Avondale Interests have collected several of those categories below:

• A federal official must have "direct and detailed" control.[12]

---

[9]  *Mesa, supra.  See also Fung v. Abex Corp.*, 816 F. Supp. 569 (N.D. Cal. 1992); *Crocker v. Borden, Inc.*, 852 F. Supp. 1322 (E.D. La. 1994); *Lalonde v. Delta Field Erection, supra,* (attached as Exhibit A).

[10]  *Fung,* 816 F. Supp. at 572, *citing International Primate Protection League v. Administration of Tulane Educ. Fund,* 500 U.S. 72, 111 S.Ct. 1700, 114 L.Ed.2d 134 (1991).

[11]  *Peterson v. Blue Cross/Blue Shield of Texas*, 508 F.2d 55 (5th Cir. 1975); *Fung,* 816 F. Supp. at 572.

[12]  816 F. Supp. at 572, *citing Ryan v. Dow Chem. Corp.*, 781 F. Supp. 934, 947 (E.D.N.Y. 1992).

4

- A defendant must demonstrate he is governed by "exceedingly complex regulations, guidelines and evaluation schemes."[13]

- A defendant must show that he is "so intimately involved with government functions as to occupy essentially the position of an employee of the government."[14]

- A defendant must demonstrate that he was subject to "regulation plus. . . ."[15]

- A defendant must show strong government intervention and the threat that a defendant will be sued in state court "based on actions taken pursuant to federal direction."[16]

Considering the "acting under" analysis, courts often look to these factors to determine whether the "causal nexus" requirement has been met. In fact, in *Winters v. Diamond Shamrock,*[17] the United States Fifth Circuit Court of Appeals thoroughly analyzed the federal officer removal statute, holding that it is to be liberally construed, and clarified the test for removal such that the "acting under" and "causal nexus" factors are truly one intertwined factor and not two separate factors.[18] Accordingly, the Avondale Interests will present details concerning "strong government involvement" as proof of satisfaction of both factors. Following these details is a brief survey of some recent decisions that provide an overview and analysis of the issue at hand.

### C.      Contract Specifications and U. S. Government Presence

Attached hereto as Exhibit D is the affidavit of Thomas F. McCaffery that explains how and

---

[13] 816 F. Supp. at 572, *citing Gurda Farms, Inc. v. Monroe County Legal Assis. Corp.*, 358 F. Supp. 841 (S.D.N.Y. 1973).

[14] *Willingham v. Morgan,* 395 U.S. 402, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969); *and Bakalis v. Crossland Sav. Bank,* 781 F. Supp. 140, 145 (S.D.N.Y. 1991).

[15] *Ryan, supra, and Bahrs v. Hughes Aircraft*, 795 F. Supp. 965 (D. Ariz. 1992).

[16] *Gulti v. Zuckerman*, 723 F. Supp. 353 (E.D. Pa. 1989).

[17] 149 F.3d 387, 398-400 (5th Cir. 1998).

[18] *See also Lalonde, supra,* Exhibit A.

in which instances the U.S. government *required* the use of asbestos-containing materials.  It speaks volubly for itself and cannot be disputed.

Further examples of the direct and detailed control of U.S. government officials at Avondale can be found in the affidavit of Edward Blanchard.  Mr. Blanchard finished his long career as the vice-president of production at Avondale in 1988.[19]  The affidavit of Peter Territo provides further evidence of U.S. government control.

In sum, construction and inspection systems -- designed and implemented by the U.S. government to ensure that the proper materials were used or installed and to ensure that these materials were incorporated in the proper manner -- was thorough, all-encompassing, and included the authority for U.S. government inspectors to order that any non-compliance found be corrected by Avondale at any stage of the construction.

### D.    *Lalonde v. Delta Field Erection*

In *Lalonde v. Delta Field Erection, supra*,[20] the court held that the federal government contractor, DSM, "was 'acting under an officer of the United States or of an agency thereof' for purposes of removal under §1442(a)(1)" because DSM "operated a federal government-owned facility, exclusively for the government, under the oversight and ultimate control of officers of the federal government."  While Avondale may not have been a government-owned facility, the work performed under contract with the U.S. government was performed exclusively for the government under the direct oversight and control of officers of the federal government.  This control was both overwhelming and pervasive and most decidedly meets the requirement that Avondale "acted under" the federal government.

---

[19]  *See* Affidavit of Eddie Blanchard, Exhibit E.
[20]  *See* Exhibit A.

In a detailed analysis, the *Lalonde* court concluded:

> Plaintiffs cite a number of district court decisions, such as *Overly v. Raybestos-Manhattan*, 1996 WL 532150 (N.D. Cal. 1996), which they contend requires the government contractor to show that the specific alleged acts giving rise to the underlying claims were also specifically directed by a federal officer. That is, plaintiffs argue that *Overly* and similar cases require a showing of a federal directive ordering DSM *not* to warn Lalonde of the hazards of silica dust or *not* to provide him with adequate protective equipment. The Court specifically rejects and declines to follow these lower court cases to the extent plaintiff urges their applicability to the context presented here.[21]

After specifically rejecting *Overly*[22] and other cases the plaintiff herein relies so heavily on in his

Motion to Remand, the court went on to state:

> The Court instead looks to Supreme Court precedent regarding application of §1442(a)(1) which reveals that, unlike the case with other removal statutes, there is no rule of interpretation disfavoring removal under §1442(a)(1). On the contrary, the statute is not "narrow" or "limited" and is not to be given a "narrow, grudging interpretation," the test for removal under §1442(a)(1) "should be broader, not narrower, than the test for official immunity."[23] Any requirement that a contractor who is running a federal production facility exclusively for the government has to show that the specified details of the negligent act were done only at the instance of precise and detailed instructions from a federal officer in order for the contractor to be "acting under" a federal officer is an "unduly grudging" requirement.
>
> Every act taken in running the plant was taken under delegated federal authority. DSM **did not cease to be running the plant for and under federal authority when it made operational decisions (such as specific decisions regarding worker safety) within the**

---

[21] *Lalonde*, at p. 7.

[22] *Overly* is specifically founded on plaintiff's theory of products liability being limited, unlike here, to a failure to warn theory: "In this case, the liability asserted by the plaintiffs is limited to the failure to warn theory of products liability." *Overly*, p. 8. Accordingly, Overly's progeny are likewise inapplicable, *e.g.*, *Gauthe v. Asbestos Corp.*, 1997 U.S. Dist. Lexis 112, p. 17 (E.D. La. Jan. 2, 1997) ("Thus, no "design defect" allegations are made with respect to the Avondale Interests, and the failure to provide a safe work environment is limited specifically to the failure to warn.").

[23] *Lalonde*, at p. 8 (*citing Willingham*, 395 U.S. at 405 & 406-07, 89 S.Ct. At 1815 & 1816, *accord Peterson v. Blue Shield of Texas*, 508 F.2d 55, 58 (5th Cir. 1975).

7

> **ambit of its duties without a specific express federal directive as
> to the particulars, for DSM acted exclusively for and under the
> federal government in its operation of this facility.**[24]

Like DSM, Avondale acted exclusively for and under the federal government in its operation

under all of the U.S. government contracts.  It might be said that *Lalonde* is inapplicable simply

because the Avondale facility was not owned and operated by the United States Navy, this

suggestion is erroneous because the basis for the federal officer defense is to:

> [protect] against possible state interference with federal functions –
> regardless of whether the plant is being run directly by the United
> States or by a contractor retained and controlled by the federal
> government.  Whether a federal officer directly mandated the specific
> alleged act of omission in question has little, if anything, to do with
> the core policy questions of whether federal interests potentially are
> impacted by the state court suit.[25]

As demonstrated in previous sections,  (1) U.S. government inspectors closely monitored

compliance, on a daily basis, by Avondale with safety regulations made part of the contracts; (2) the

use of asbestos insulation was ***required*** by the U.S. government; (3) federal asbestos safety

regulations, which set standards for safe daily exposures to asbestos, were specifically incorporated

into the contracts;  and (4) U.S. government inspectors constantly monitored the ship construction

process for compliance with all terms of the contract.  Taken together, these facts establish that the

Avondale Interests were "acting under" the direction of the federal government and that the causal

connection is met because the acts complained of were "under color" of federal office.  If it were

otherwise, officers charged with the duty to implement federal policies could almost never carry out

their duties.  Under such a regime, federal law would be cold comfort because federal employees,

state and local officials, and private persons would rarely agree to act under federal direction for fear

---

[24]  *Lalonde*, at p. 8 (emphasis added).
[25]  *Id.* at 9.

of facing state and local civil or criminal penalties.  Furthermore, if plaintiff's interpretations of the

degree and nature of federal direction are correct, many courts, including the Supreme Court, have

misread the statute.[26]

      In *Lalonde* the court correctly noted that:

> the "causal connection" required in civil cases under Supreme Court
> precedent is of a different nature from that required in cases such as
> *Overly*.  In particular, the governing precedents from the Supreme
> Court do not require a showing in a civil case that the alleged
> wrongful act or omission itself was specifically directed or compelled
> by federal duty or law.  Rather, the controlling decisions require only
> a showing that the defendant committed the alleged act or omission
> while performing its federal duties.[27]

      Accordingly, the "causal connection" inquiry is not whether the federal agent's alleged

wrong was federally commanded, but rather whether the alleged wrong occurred within the course

of the agent's performance of the agent's federal duties:[28]

> Mr. Lalonde was sandblasting in order to maintain and refurbish
> plant equipment for continued use.  The question is not whether a
> specific federal law or order directed DSM not to warn Lalonde about
> the hazards of silica exposure (or even to maintain the plant
> equipment), but rather the question is whether that alleged failure to
> warn occurred while DSM was in the performance of its federal
> duties, *i.e.*, in the course of its operation of the plant as an agent for
> the federal government.  The Court therefore holds that the requisite
> causal connection is satisfied here.  To the extent that some lower
> district court cases would hold to the contrary, the Court specifically
> rejects the analytical underpinnings of those cases.[29]

      In short, considering the allegations, affidavits, and testimony before the Court, the Avondale

---

[26] *See Willingham v. Morgan*, 395 U.S. 402 (1969); *Cleveland, C., C. & I. R. Co. v. McClung*, 119
U.S. 454 (1886); *Tennessee v. Davis*, 100 U.S. 257 (1880); *Allman v. Henley*, 302 F.2d 559 (5th Cir.
1962); *Gurda Farms, Inc. v. Monroe County Legal Assis. Corp.*, 358 F. Supp. 841 (S.D. N.Y. 1973);
*Dixon v. Georgia Indigent Legal Serv., Inc.*, 388 F. Supp. 1156 (S.D. Ga. 1974), *aff'd without
opinion*, 532 F.2d 1371 (5th Cir. 1976); *State of Oregon v. Cameron*, 290 F. Supp. 36 (D.Or 1968).
[27] *Lalonde*, at 10.

[28] *Id.* at 11.

9

Interests have met the "causal nexus" test - *i.e.*, they have shown that they have been sued in state court for actions taken pursuant to federal direction, *i.e.*, compliance with military specifications promulgated and enforced by the U.S. Navy.[30]

### E.    The Avondale Interests Can Assert Colorable Federal Defenses

The third prong of the test for removal requires that a removing party demonstrate it can assert a ***colorable*** federal defense to the claims made against it.  As explained in detail in *Mesa*:

> For purposes of removal, we only require [the removing party] to allege a colorable federal defense under federal law; "[t]he validity of the defense authorized to be made is a distinct subject.  It involves wholly different inquiries . . . .  It has no connection whatever with the question of jurisdiction."[31]

The standard for that defense was set out by the United States Supreme Court in *Boyle v. United Tech. Corp.*[32]  There, the Court held that the federal contractor defense is derived from the government's own immunity when performing discretionary functions, such as design selection for military equipment.[33]  To prevail under the federal contractor defense, the Avondale Interests have the burden of proving that: (1) reasonably precise specifications were approved by the United States; (2) the DE 1078's on which plaintiff worked conformed with those specifications, and (3) the

---

[29]   *Id.* at 12; See also, *Miller*, 275 F.3d at 418.

[30]   See, *e.g.*, *Akin v. Big Three Indus., Inc.*, 851 F. Supp. 819, 823-24 (E.D. Tex. 1994) (stating, "plainly, when a government contractor builds a product pursuant to Air Force specifications and is later sued because compliance with those specifications allegedly causes personal injuries, the nexus requirement is satisfied"); *Teague v. Bell Helicopter Servs.*, 2003 U.S. Dist. Lexis 2088 (N. D. Tex. 02/12/2003) (asbestos plaintiff's motion to remand denied where helicopter manufacturer acted pursuant to the directions of the federal government in contracting to design and manufacture military helicopters).  A copy of *Teague* is attached as Exhibit F.  *Williams v. Todd Shipyards Corp.*, 1996 U.S. Dist. LEXIS 22676 (S.D. Tex. Mar. 29, 1996) (asbestos plaintiff's motion to remand denied where shipyard that produced military vessels "demonstrated a causal nexus between the claims against and the acts it performed under color of federal office.").  A copy of *Williams* is attached as Exhibit G.

[31]   *Mesa, supra*, at 964, *quoting The Mayor v. Cooper*, 6 Wall 247, 254, 18 L.Ed. 851 (1868).

[32]   487 U.S. 500, 512, 108 S. Ct. 2510, 101 L.Ed. 2d. 442 (1988).

[33]   *Boyle,* 487 U.S. at 511.

Avondale Interests warned the United States of all dangers then known to Avondale in using the asbestos-containing components the United States required be installed on those vessels that were unknown to the United States itself.[34]

Due to the similarity of the requirements between the test for federal officer removal and the first and second prongs of the test for the federal contractor defense, for the same reasons set out above that establish that the Avondale Interests satisfy the jurisdictional analysis, they also satisfy the first prongs of the federal contractor defense. The Avondale Interests always conformed to the exceptionally precise specifications for the construction of the vessels that were drafted and approved by the U.S. government. Further, the vessels constructed at Avondale were ultimately accepted for delivery by the U.S. government following extensive inspections during construction and dock and sea trials thereafter.

As to the last prong of the federal contractor defense, given the extensive presence and control of the construction by the U.S. government, the incorporation into the contracts of the Walsh-Healey Act and federal asbestos safety regulations promulgated by the Longshoremen and Harbor Workers Compensation Act, as well as of the Department of Labor, it is also clear that Avondale had no knowledge of any dangers associated with the use of asbestos about which the United States government was not aware.

While there is *no* evidence that the Avondale Interests knew of any dangers in using asbestos about which the United States was not already aware, the Avondale Interests need not establish their ability to satisfy this third prong of the government contractor defense at this stage of the proceedings. Rather, they need only provide a "colorable" defense to justify the removal of this case under the federal officer removal provisions. Accordingly, as with the LHWCA defense, to

---

[34] *Id.* at 512, and *Winters v. Diamond Shamrock Chemical Co.*, 148 F. 3d 7, 400 (5th Cir. 1998).

determine whether a federal defense is "colorable" for jurisdictional purposes, a court should not delve into "the validity of the defense," which is "a distinct subject" and "involves wholly different inquiries apart from jurisdictional determination."[35]  Therefore, the ultimate merits of the federal contractor defense asserted by the Avondale Interests should not be resolved here, while the "colorable" nature of the defense establishes that this removal was proper.

The second of the Avondale Interest's two available federal defenses is the immunity provision contained in the Longshore and Harbor Workers' Compensation Act ("LHWCA").[36] Under the third prong of the federal officer removal statute test, this defense need only be *colorable* to be sufficient.  33 U.S.C. §933(i) sets forth, in pertinent part, as follows:

> The right to compensation or benefits under this Act shall be the exclusive remedy to an employee when he is injured, or to his eligible survivors or legal representatives if he is killed, by the negligence or wrong of any other person or persons in the same employ:  Provided, that this provision shall not affect the liability of a person other than an officer or employee of the employer.

Jurisdiction under Longshore and Harbor Workers' Compensation Act is established by the satisfaction of the "status" and "situs" tests.  Injuries are compensable under the LHWCA for "employees" including:

> . . . any person engaged in maritime employment including any longshoreman or other person engaged in longshoring operations and any harborworker including a ship repairman, ship-builder. . .[37]

Such a person must also sustain an injury

> . . . upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel).[38]

---

[35]  *Faulk v. Owens-Corning Fiberglass Corp.*, 48 F. Supp. 2d 653 664 (E.D. Tex. 1999).

[36]  33 U.S.C. §933(i), *et seq.*

[37]  33 U.S.C. §902(3).

[38]  33 U.S.C. §903(a).

12

Raymond cannot dispute that he, Territo and Avondale satisfy the "status" and "situs" test and are thus subject to the jurisdiction of the LHWCA.

Avondale is and has always been situated adjacent to the navigable waters of the United States of America, on the banks of the Mississippi River in a community known as Avondale, Louisiana.[39] Avondale is and has always been (as its title suggests) in the business of constructing marine vessels.[40] During the relevant time, Territo was employed at Avondale as a longshore worker.[41] Raymond alleges that Territo was his safety supervisor and Raymond himself was engaged in maritime employment related to shipbuilding at the same facility. Accordingly, Avondale Shipyards, Territo and Raymond all qualify for treatment under the LHWCA.

That such a defense is at least colorable is demonstrated in the case of *Fillinger v. Foster*.[42] In *Fillinger*, the Alabama Supreme Court was faced with a factual and legal scenario directly on point with the instant action. In *Fillinger*, a "shipfitter"[43] was injured within the concurrent jurisdiction of the LHWCA and the Alabama State Workers' Compensation Act. After applying for his state compensation benefits, the plaintiff instituted suit against one of his co-employees who was alleged to have had the specific responsibility for his safety. The parties did not dispute that the case fell within a zone of concurrent federal and state jurisdiction. Neither did they dispute that the Alabama Workers' Compensation Act did ***not***, at that time, provide for co-employee negligence immunity, while the LHWCA did. The co-employee tort-feasor resisted the application of state law

---

[39] *See*, Exhibit H.
[40] *See*, Exhibit H.
[41] *See*, Exhibit H.
[42] 448 So.2d 321 (Ala. 1984), *cert denied*, 469 U.S. 872, 105 S.Ct. 223, 83 L.Ed.2d 153 (1984).
[43] The plaintiff, classified by his employer as "shipfitter," was engaged at the time of his injury in operating a hand held grinder to smooth out welds on storage tanks that were being installed on ocean-going vessels at his employers' dockside facility. *Fillinger*, 448 So. 2d at 322.

arguing LHWCA pre-emption.

The *Fillinger* court discussed the Louisiana Supreme Court's decision in *Poche v. Avondale Industries, Inc*, 339 So.2d 1212 (La. 1976):

> **The Poche decision was rendered before the Supreme Court's
> decision in Sun Ship, supra, wherein the court indicated that in a
> case involving the LHWCA and a state workmen's compensation
> scheme in which there was an indisputable preclusion of LHWCA
> remedies, the federal law would "pre-empt the state compensation
> exclusivity clause."**  We consider the *Poche* and *Umbehagen*
> decisions in view of these statements of the law in *Sun Ship, supra*.[44]

After drawing from supporting jurisprudence, the court reminded the litigants of the purpose of 33 U.S.C. §933(i) of the LHWCA which provides for co-employee immunity:

> The 1959 amendment to §[9]33 simply recognizes the problem [of
> co-employee suits] and solved it by forbidding such an action.  In
> other words, the 1959 amendment to §[9]33 of the Act not only does
> not limit the provisions of §[90]5, but broadens them by insulating
> not only the employer, but also the fellow employees of the injured
> party from any liability and damages to the injured party.  This is
> made clear by the legislative history of the amendment.  *U.S. Code
> and Congressional and Administrative News*, 86th Cong., First
> Session 1959, Vol. 2, pages 2134-2136.[45]

The court quoted directly from the Senate Report, referenced above, that explained how important it was for disputes within the "employee family" to be resolved within the framework of the LHWCA.

Armed with that understanding of the precise holding in *Sun Ship*, the Alabama Supreme Court had no alternative:

> We are of the opinion that the LHWCA and the law of Alabama are
> in serious conflict as to the maintenance of co-employee suits, and
> because that is the case, we hold that federal law will preempt state
> law.[46]

---

[44] *Fillinger, supra*, at 325 (citations omitted and emphasis supplied).

[45] *Fillinger, supra*, at 326, quoting *Barnum v. SS MORMACTEAL*, 188 F.Supp 763 (E.D. Pa. 1960).

[46] *Fillinger, supra*, at 326 (citations omitted).

14

Finally, it is without serious dispute that federal law governs the question of whether the LHWCA preempts state law.[47] In *Peter v. Hess Oil Virgin Islands Corp.*[48] and *Cobb v. Sipco Serv. & Marine, Inc.*[49] both courts held that where immunities available under state law and under the LHWCA are deemed to be conflicting, the LHWCA preempts strictly for that contradiction only. These decisions, along with the United States Supreme Court in *Sun Ship*, make clear that the United States Congress intended that disputes between longshore workers be resolved within the exclusive framework of the LHWCA.

### F.    The Recent *Melford* and *McFarlain* Rulings

Territo removed the *Melford* case to the Middle District of Louisiana on precisely the same grounds asserted here: pervasive government regulation of federal ship construction contracts entitled him to federal court jurisdiction under the Federal Officer Removal Statute. In his motion to remand, the plaintiff in *Melford* made precisely the same argument Raymond makes here: the government never forced Territo "not to warn," the *Overly* test applies, and the Federal Contractor Defense is not colorable. The Court denied remand.

In so doing, the court rejected the *Overly* test and the line of cases that followed it, determined that the Federal Officer Removal Statute should not be afforded a "limited" or "narrow interpretation" and found that, under identical circumstances, the Federal Contractor Defense was colorable. The ruling in *Melford* is contrary to every Eastern District ruling against the Avondale Interests to date.

In *McFarlain*, Avondale Shipyards removed a case nearly identical to the one brought here under the Federal Officer Removal Statute. Once again, on the pending remand question, the

---

[47] *Hetzel v. Bethlehem Steel Corp.*, 50 F.3d 360, 363 (5th Cir. 1995).

[48] 903 F.2d 935 (3rd Cir. 1990).

[49] No. 95-2131, 1997 WL 159491 (E.D. La. March 27, 1997) attached as Exhibit I.

15

plaintiff and Avondale made identical arguments for and against. The court denied remand.

In so doing, the court began by (apparently) following the *Overly* test, especially the "causal nexus" aspect that establishes that the government must have direction and control over the nature and pervasiveness of warnings. In fact, the court stated that had the inquiry ended there, the case would have been remanded.

But, the court quickly noted that the plaintiff had urged much more than "failure-to-warn" claims, observing that he had included specific "strict liability" claims based on asbestos in Avondale's garde, custody, or control. Under those circumstances, the court concluded the "causal nexus" prong of the removal test had been met. In this case, plaintiff makes identical "strict liability" claims based on Avondale's mere custody of asbestos, which was mandated by federal contract requirements and specifications.

The court also concluded that Avondale's federal contractor defense is colorable and that all three prongs of the removal test are met, at least as far as the "non-failure to warn" claims were concerned. The court then exercised its supplemental jurisdiction over the remaining claims and denied remand.

It is against this historical backdrop that the Avondale Interests removed this case. Identical cases are deemed removable in some courts, but not in others. Denying remand here would allow for an expedient and robust inquiry by the United States Fifth Circuit to resolve the conflicting treatment received by the Avondale Interests over the years.

## IV.   CONCLUSION

Melvin Raymond alleges that he sustained asbestos-related injuries while employed by Avondale due to the fault, intentional tort and strict liability of the Avondale Interests. The U.S. government strictly supervised all facets of U.S. government ship construction projects, which

16

constituted an overwhelming majority of all the asbestos used at Avondale from 1966 - 1977. Inspections of the asbestos-containing materials required by the U.S. government contract specifications were regularly performed.

The claims made against Territo and the Avondale Interests are based on the alleged negligent and/or intentional failure to eliminate asbestos use in its shipbuilding.  But, the government contract specifications required that asbestos-containing materials be used.  The U.S. government inspected those materials and the application of those materials.

Furthermore, there is no material distinction between the instant case and the recent *Melford* and *McFarlain* cases, *supra*, where the Court denied motions to remand.  The claim is the same - the use of asbestos at the instruction of the government caused injury to the plaintiff.  Plaintiff cannot distinguish the case at hand from *Melford* and *McFarlain* by lobbying for the application of the *Overly* test.

Finally, Territo and the Avondale Interests have asserted colorable federal defenses to these state law claims, the Government Contractor defense and LHWCA immunity.  Accordingly, all three parts of the three prong test under 28 U.S.C. §1442(a) have been met.  Therefore, plaintiff's Motion to Remand must be denied.

Respectfully Submitted:

_s/Gordon P. Wilson_____
**Gordon P. Wilson, La. Bar No. 20426**
**F. Lewis Parks, Jr., La. Bar No. 29646**
**Lugenbuhl, Wheaton, Peck, Rankin & Hubbard**
601 Poydras Street, Suite 2775
New Orleans, LA 70130
Telephone:    (504) 568-1990
Facsimile:    (504) 310-9195
e-mail:       gwilson@lawla.com
              lparks@lawla.com

*and*

17

**Gary A. Lee, La. Bar No. 8265**
**Richard M. Perles, La. Bar No. 1534**
**Lee, Futrell & Perles, L.L.P.**
201 St. Charles Avenue, Suite 4120
New Orleans, LA  70170
Telephone:    (504) 569-1725
Facsimile:    (504) 569-1726
e-mail:    glee@leefutrell.com
           rperles@leefutrell.com
**Attorneys for Peter R. Territo *and* Northrop**
**Grumman Industries, Inc. f/k/a Avondale**
**Industries, Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that on <u>30 January 2007</u>, a copy of the foregoing MEMORANDUM IN

OPPOSITION TO MOTION TO REMAND was filed electronically with the Clerk of Court using

the CM/ECF system.  Notice of this filing will be sent to:

| | |
|---|---|
| Julie A. Ardoin | Gary Allen Lee |
| Richard Marshall Perles | Gordon Peter Wilson |

by operation of the court's electronic filing system.  I also certify that I have mailed by United States

Postal Service, this filing to the following non-CM/ECF participants:

_s/Gordon P. Wilson_____
**Gordon P. Wilson, La. Bar No. 20426**
**Attorneys for Peter R. Territo *and* Northrop**
**Grumman Industries, Inc. f/k/a Avondale**
**Industries, Inc.**
**Lugenbuhl, Wheaton, Peck, Rankin & Hubbard**
601 Poydras Street, Suite 2775
New Orleans, LA 70130
Telephone:    504-568-1990
Facsimile:    504-310-9195
e-mail:        gwilson@lawla.com

RECEIVED
CLERK'S OFFICE
2007 MAR 27  A 10: 28
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

19

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

VERA G. LALONDE, ET AL.

VERSUS                                        CIVIL ACTION

                                              NO. 96-3244-B-M3
DELTA FIELD ERECTION, ET AL.

<u>RULING</u>

   This removed silicosis wrongful death action comes before the Court on plaintiff's

motion to remand (rec.doc.no. 43), which has been referred to the undersigned for decision

(rec.doc.no. 124).  The sole issue remaining before the Court on the motion to remand is

whether removal of the case by defendant DSM Copolymer ("DSM") was proper as a

"federal officer removal" under 28 U.S.C. § 1442(a)(1).[1]

   Section 1442(a)(1) provides in pertinent part for the removal of any action against

the "United States or any agency thereof or any officer (or any person acting under that

officer) of the United States or of any agency thereof, sued in an official or individual

capacity for any act under color of such office."  28 U.S.C. § 1442(a)(1).  In their state court

petition, plaintiffs allege that between 1947 and 1976, the decedent John D. Lalonde

performed sandblasting work for various employers at various locations owned or operated

by various premises owners, including DSM.  Plaintiffs allege that DSM and the other

---

[1] Although fraudulent joinder initially was urged as an alternative basis for removal by other removing defendants, it since has been established beyond question that diversity jurisdiction is not present in this case because DSM, which is an indisputably non-fraudulently joined defendant, has its principal place of business in Baton Rouge, Louisiana.  *See* rec.doc.nos. 95 & 96.  Defendant DSM also initially relied, in addition, upon 28 U.S.C. § 1442(a)(2).  DSM apparently has abandoned any such reliance, however, as DSM has not raised any argument in opposition to plaintiff's motion to remand under subparagraph (a)(2), instead arguing exclusively under subparagraph (a)(1).  In that the removing party bears the burden of establishing the propriety of removal, the Court will treat DSM's lack of briefing and proof with regard to subparagraph (a)(2) as an abandonment of that claimed basis for removal.

DKT. &

DATE _____
NOTICE MAILED TO:       Counsel (20)
DATE 8/6/95 _____        DLD:
                        JS



premises owner defendants failed to provide Mr. Lalonde with proper supervision, instruction, and warnings concerning hazards associated with sandblasting, and failed to provide adequate equipment and take other adequate safeguards to guard against the risks associated with inhalation of silica dust. In its notice of removal, DSM alleged, *inter alia*, that DSM properly removed the action under Section 1442(a)(1) as a person acting under the authority of a federal officer because part of the alleged silica exposure occurred at a government-owned synthetic rubber plant operated by DSM for and under the direction and control of an instrumentality of the federal government from 1943 through 1955. DSM further alleged that by virtue of the terms of the agreement whereby DSM purchased the plant from the federal government in 1955, federal authority and control continued for an additional ten years, that is, until 1965.

The Court will begin the jurisdictional analysis in this case at the point where all questions of federal lower court jurisdiction necessarily begin – with the language used by Congress in the statutory jurisdictional grant. *Cf. Marathon Oil Co. v. Ruhrgas*, ___ F.3d ___, 1998 WL 329842, slip op. at *2 (June 22, 1998)( federal courts other than the Supreme Court derive their jurisdiction wholly from the authority of Congress).[2] On its face, Section 1442(a)(1) requires two showings for removal in the context presented here. First, the removing defendant must be a "person acting under [any] officer... of the United States or of any agency thereof." And, second, the removing defendant must be "sued ... for [an] act under color of such office."

---

[2]The Court begins with the statutory language of Section 1442(a)(1) in large part because of the many varied jurisprudential statements of the elements required for removal and of the showing required to satisfy each element. Rather than extensively contrasting and harmonizing other lower federal court cases, the court's approach in this ruling is to draw the required elements, and their meaning, directly from the relevant statutory language and Supreme Court precedent.

The Supreme Court, in turn, has construed the second, "color of office" statutory element as requiring two showings. First, the high court has "interpreted the 'color of office' test to require a showing of a 'causal connection' between the charged conduct and asserted official authority." *Willingham v. Morgan*, 395 U.S. 402, 409, 89 S.Ct. 1813, 1817, 23 L.Ed.2d 396 (1969).  And second, the Supreme Court has interpreted the "color of office" element as requiring that the removing defendant, in addition, raise a colorable federal defense. *E.g.*, *Mesa v. California*, 489 U.S. 121, 125-34, 109 S.Ct. 959, 962-67, 103 L.Ed.2d 99 (1989).[3]

Accordingly, under the statutory language and the controlling Supreme Court precedents, a government contractor seeking to remove a civil action under Section 1442(a)(1) must show:

> 1)    that the removing defendant was acting under an officer of the United States or of an agency thereof;
>
> 2)    that there was a causal connection between the charged conduct and the asserted official authority; and
>
> 3)    that the removing defendant has a colorable defense under federal law.

28 U.S.C. § 1442(a)(1); *Willingham, supra*; *Mesa, supra*.

---

[3] If Section 1442(a)(1) were interpreted to permit removal of any suit arising from the performance of federal duties (*e.g.*, a simple vehicular accident) without the requirement of a colorable federal defense, then a question would arise as to whether Congress had exceeded the maximum possible grant of federal question jurisdiction permitted by the constitution. *See Mesa*, 489 U.S. at 134-39, 109 S.Ct. at 967-70.

Federal officer removal under Section 1442(a)(1) is to be distinguished from removal of federal question cases under 28 U.S.C. 1441, where removal generally cannot be predicated on the presence of a federal defense.

*"Acting Under"*

Neither the Supreme Court nor the Fifth Circuit have established what is required to show that a government contractor is "acting under" an officer of the United States or of an agency thereof. Cases from other federal district courts, which of course are not binding on this court, vary in their approach to what is required under this element.

The following specific facts bear on DSM's claim that it was acting under an officer of the United States or an agency thereof. Under an Operating Agreement in force from 1942 through 1955,[4] DSM[5] operated a government-owned synthetic rubber plant as "agent for ... and for the account and at the expense and risk of" the Rubber Reserve Corporation. The Rubber Reserve Corporation was a subsidiary of the Reconstruction Finance Corporation, which was created as an instrumentality of the United States government.[6] The Operating Agreement reflects that the Reconstruction Finance Corporation was authorized under federal law to create a corporation to produce, *inter alia*, strategic and critical materials as defined by the President, that the President had designated synthetic rubber as a strategic and critical material under the law, that the production of this material and expansion of capacity was important to the interests of the federal government and its national defense program, and that the Reconstruction Finance Corporation had created

---

[4] The period in question raised by the plaintiffs' petition spans from 1947 through 1976. If a particular claim is removable under Section 1442(a)(1), then the entire action becomes removable. *See Spencer v. New Orleans Levee Board*, 737 F.2d 435, 438 (5th Cir. 1984); *Arango v. Guzman Travel Advisors Corp.*, 621 F.2d 1371, 1376 (5th Cir. 1980); *Fowler v. Southern Bell Telephone & Telegraph Co.*, 343 F.2d 150, 152 (5th Cir. 1965). If the federal issues later drop from the case, the district court has the discretion to decline to exercise continued discretion over the nonfederal elements of the case. *Spencer*, 737 F.2d 438; *Ewell v. Petro Processors of Louisiana, Inc.*, 655 F.Supp. 933, 936-37 (M.D. La. 1987)..

[5] Or, actually, its predecessor-in-interest, which will be referred to as "DSM" for ease of reference.

[6] *Operating Agreement*, Section 1 (rec.doc.no. 119, exhibit "A"); *Baker Affidavit*, para. 2 (rec.doc.no. 65, exhibit "C").

-4-

and empowered the Rubber Reserve Corporation to produce synthetic rubber and related materials.[7]

Under Section 27 of the agreement, DSM specifically agreed that it would not engage in any business other than the manufacture of synthetic rubber for the Rubber Reserve Corporation under the Operating Agreement. Under Section 21 of the agreement, DSM could not assign its obligations under the contract; but the Rubber Reserve Corporation could assign its interests "to any other branch of the Government," which then would acquire all of the Rubber Reserve Corporation's rights under the agreement. Under Section 7 of the agreement, the Rubber Reserve Corporation supplied DSM with all of the butadiene and styrene needed for producing the synthetic rubber, and the title to any additional raw materials purchased by DSM vested directly in the Rubber Reserve

---

[7]*Operating Agreement*, preamble (rec.doc.no. 113, exhibit "A"). As a side note, the Court would observe that prior reported decisions reflect that the background for this case comes directly from the pages of history. As World War II approached, it became evident that the United States would be cut off from 90% of its natural rubber supply. The development of a synthetic rubber industry became a national military goal of top priority, especially after Pearl Harbor, after which access to the bulk of the country's natural rubber sources in fact were cutoff. The situation was rather pressing because prior peacetime commercial attempts to develop a viable synthetic rubber process had failed. The issue was of such import that President Roosevelt took the rather unusual step of asking the Chief Justice of the Supreme Court to lead a wartime commission to investigate rubber production. (The Chief Justice declined because the project would be inconsistent with his function as a judicial officer.) Ultimately, Congress gave the Reconstruction Finance Corporation authority to take the steps necessary to organize a synthetic rubber industry in the shortest possible time, which it accomplished through the Rubber Reserve Company, by pooling patent and research information, building plants, and signing agreements with contractors to operate those plants under federal supervision. To say that the success of this effort was crucial to Allied victory in World War II hardly is an exaggeration. The federal government's active participation in the production of synthetic rubber continued through the Korean War. *See generally General Tire & Rubber Co. v. Firestone Tire & Rubber Co.*, 489 F.2d 1105, 1107-08 (6th Cir. 1973); *Reed v. Fina Oil & Chemical Company*, 995 F.Supp. 705, 708-09 (E.D. Tex. 1998); *In re President's Commission on Organized Crime Subpoene of Scarfo*, 783 F.2d 370, 377 (3rd Cir. 1986). The Court points to this historical information merely by way of background, as the operating agreement contains the essential legal details (bare and unadorned as they may be) that are necessary for decision here and neither counsel supplied the historic backdrop from which these issues arise.

Corporation.[8] Title to the production as well as the raw materials rested in the government, which paid an operating fee to DSM for its services.[9]

During the term of the agreement, a field representative from the Rubber Reserve Corporation regularly visited the facility. The field representative's responsibilities included overseeing DSM's operations and ensuring that DSM was following government imposed production specifications, government imposed operating procedures, and government imposed laboratory product testing procedures and operations in the manufacturing of synthetic rubber. The United States, through the Rubber Reserve Corporation, controlled what type of rubber was produced at the facility, how much of it was produced, and when each type of rubber was produced. DSM could alter these requirements only with permission from the federal government. If government requirements were not followed, the field representative would bring the matter to the attention of the manager of the section where the problem was observed. If no results were obtained, the field representative would raise the matter with the plant manager, and as a last resort, would go to the federal government in Washington, which had authority to enforce compliance.[10]

The federal government imposed numerous safety requirements at the facility, such as the wearing of protective equipment. The United States required that safety meetings be held in each department on a monthly basis, and, in addition, required plant-wide safety

---

[8] *Operating Agreement*, (rec.doc.no. 113, exhibit "A").

[9] *Baker Affidavit*, para. 6 (rec.doc.no. 65, exhibit "C").

[10] *Baker Affidavit*, paras. 3-7 (rec.doc.no. 65, exhibit "C").

meetings be held on a monthly basis.  The government dictated the topics of these meetings.[11]

In summary, DSM operated a federal government-owned facility, exclusively for the government, under the oversight and ultimate control of officers of the federal government. The Court therefore concludes that the foregoing facts are sufficient to establish that DSM was "acting under an officer of the United States or of an agency thereof" for purposes of removal under Section 1442(a)(1).

Plaintiffs cite a number of district court decisions, such as *Overly v. Raybestos-Manhattan*, 1996 WL 532150 (N.D. Cal. 1996), which they contend requires the government contractor to show that the specific alleged acts giving rise to the underlying claims were also specifically directed by a federal officer.  That is, plaintiffs argue that *Overly* and similar cases require a showing of a federal directive ordering DSM *not* to warn Lalonde of the hazards of silica dust or *not* to provide him with adequate protective equipment.[12]  The Court specifically rejects and declines to follow these lower court cases to the extent plaintiff urges their applicability to the context presented here.[13]  The Court

---

[11]*Samuels Affidavit*, paras. 4-5 (rec.doc.no. 65, exhibit "D").  Although Samuels was in charge of laboratory testing for developmental products, his affidavit speaks to the government's imposition of safety requirements for the entire facility and its practices regarding safety meetings for the entire facility.  It would not be unreasonable for a supervisor of a single department to have knowledge of the level of control exercised generally by the government over the entire facility.

[12]In *Overly*, for example, the element of "federal direction" applied by the *Overly* court was not satisfied because, while the federal government directed Avondale to install asbestos products, it gave no direction to Avondale regarding workplace warnings pertaining to asbestos exposure.

[13]*Overly* and similar cases pertain to government contractors acting as independent contractors in filling government procurement contracts at their own plants.  The cases do not involve a government contractor acting exclusively as an agent for the federal government in operating a government-owned facility.

Many of these same cases apply a similarly chary approach to the "causal connection" element.  As will be outlined in the following section of this ruling, the chary approach to the causal connection element applied

(continued...)

instead looks to Supreme Court precedent regarding application of Section 1442(a)(1), which reveals that, unlike the case with other removal statutes, there is no rule of interpretation disfavoring removal under Section 1442(a)(1). On the contrary, the statute is not "narrow" or "limited" and is not to be given a "narrow, grudging interpretation"; the test for removal under Section 1442(a)(1) "should be broader, not narrower, than the test for official immunity." *Willingham*, 395 U.S. at 405 & 406-07, 89 S.Ct. at 1815 & 1816; *accord Peterson v. Blue Cross/Blue Shield of Texas*, 508 F.2d 55, 58 (5th Cir. 1975). Any requirement that a contractor who is running a federal production facility exclusively for the government has to show that the specific details of the negligent act were done only at the instance of precise and detailed instructions from a federal officer in order for the contractor to be "acting under" a federal officer is an "unduly grudging" requirement.

Here, DSM was no less acting under federal authority when it followed the general directives of federal authority in running the government-owned plant than it was when it was following a specific order from a federal officer regarding a particular aspect of plant operations. Every act taken in running the plant was taken under delegated federal authority. DSM did not cease to be running the plant for and under federal authority when it made operational decisions (such as specific decisions regarding worker safety) within the ambit of its duties without a specific express federal directive as to the particulars, for DSM acted exclusively for and under the federal government in its operation of this facility.

---

[13](...continued)
in these cases is not supported by relevant Supreme Court precedent concerning removal of civil, as opposed to criminal, actions.

Any state court suit which concerns the operations of a government-owned defense production facility triggers the strong federal policy interests protecting against possible state interference with federal functions[14] – regardless of whether the plant is being run directly by the United States or by a contractor retained and controlled by the federal government.   Whether a federal officer directly mandated the specific alleged act or omission in question has little, if anything, to do with the core policy question of whether federal interests potentially are impacted by the state court suit.  The Court accordingly finds this requirement to be an unduly grudging one that is neither compelled by the text of Section 1442(a)(1) nor supported by the policies underlying under that section.

*"Causal Connection"*

District court cases such as *Overly* apply the "causal connection" element, much like the "acting under" element, in a manner that would require the removing party to demonstrate that the federal government specifically directed, *i.e.* "caused," the removing party to commit the precise act or omission which forms the basis of the state law claim.[15] As noted previously, Supreme Court decisions do interpret "the 'color of office' test to require a showing of a 'causal connection' between the charged conduct and asserted official authority." *Willingham*, 395 U.S. at 409, 89 S.Ct. at 1817.  But, as will be shown below, the "causal connection" required in civil cases under Supreme Court precedent is of a different nature from that required in cases such as *Overly*.  In particular, the governing

---

[14]These policy interests are discussed in more depth in the final section of this ruling.

[15]In *Overly*, the element of "causal nexus" was not satisfied because the federal government exercised no control over Avondale with regard to warning of workplace hazards from asbestos.  Thus, in this case, *Overly* would require DSM to establish that the federal government specifically directed DSM to not warn contractor's employees about the dangers of inhaling silica dust during sandblasting maintenance operations.

precedents from the Supreme Court do not require a showing in a civil case that the alleged wrongful act or omission itself was specifically directed or compelled by federal duty or law. Rather, the controlling decisions require only a showing that the defendant committed the alleged act or omission while performing its federal duties.

In *Willingham*, a federal prisoner alleged that the penitentiary warden, chief medical officer and others had inoculated him with "a deleterious foreign substance" and had assaulted, beaten, and tortured him in various ways. In connection with what the Supreme Court described as "a 'scattergun' complaint, charging numerous wrongs on numerous different (and unspecified) dates," the prisoner alleged in seeking remand that the penitentiary officials "had been acting 'on a frolic of their own which had no relevancy [to] their official duties as employees or officers of the United States." 395 U.S. at 407 & 408-09, 89 S.Ct. at 1816 & 1817. The prisoner urged that his suit therefore was not removable because the wrongs alleged did not grow out of defendants' conduct under color of office. *See* 395 U.S. at 407, 89 S.Ct. at 1816.

The *Willingham* Court rejected this invitation to focus the inquiry on whether the wrongs alleged were authorized. Instead, the high court framed the question as "whether [the officials] adequately demonstrated a basis for removal by showing that their only contact with respondent occurred while they were executing their federal duties inside the penitentiary." 395 U.S. at 408, 89 S.Ct. at 1816. The Supreme Court answered this question in the affirmative, in the following passage:

> In a civil suit of this nature, we think it was sufficient for petitioners to have shown that their relationship to respondent derived solely from their official duties. Past cases have interpreted the "color of office" test to require a showing of a "causal connection" between the charged conduct and

asserted official authority. .... "It is enough that (petitioners') acts or (their) presence at the place in performance of (their) official duty constitute the basis, though mistaken or false, of the state prosecution." .... *In this case, once petitioners had shown that their only contact with respondent occurred inside the penitentiary, while they were performing their duties, we believe that they had demonstrated the required "causal connection." The connection consists, simply enough, of the undisputed fact that petitioners were on duty, at their place of federal employment, at all the relevant times.* If the question raised is whether they were engaged in some kind of "frolic of their own" in relation to respondent, then they should have the opportunity to present their version of the facts to a federal, not a state, court. This is exactly what the removal statute was designed to accomplish.

395 U.S. at 409, 89 S.Ct. at 1817 (emphasis added; citations and footnote omitted).

Explaining its reference to "a civil suit of this nature," the high court noted that in a criminal case, a more detailed showing of causal connection "might be necessary because of the more compelling state interest in conducting criminal trials in the state courts." 395 U.S. at 409 n.4, 89 S.Ct. at 1817 n.4. *Willingham* supports the conclusion that the "causal connection" inquiry is not one of whether the federal agent's alleged wrong was federally authorized, but rather is one of whether the alleged wrong occurred within the course of the agent's performance of the agent's federal duties. *Accord Magnin v. Teledyne Continental Motors*, 91 F.3d 1424, 1427-28 (11th Cir. 1996)(similar reading of *Willingham*).

In the instant case, from 1943 through 1955, DSM operated the government-owned synthetic rubber plant for the federal government, pursuant to the Operating Agreement entered into between DSM and the federal instrumentality involved. The statement that DSM's federal duty *was* the operation of the synthetic rubber plant — in all of its facets and with all that that undertaking necessarily entailed — is not at all an oversimplification or overgeneralization. Rather, it is an entirely accurate statement of an essential material

-11-

fact. It is what DSM contractually bound itself to do, as an agent of the federal government.

Against this backdrop, it is clear that the requisite "causal connection" exists between the state court suit and DSM's discharge of its federal duties. Mr. Lalonde was sandblasting in order to maintain and refurbish plant equipment for continued use. The question is not whether a specific federal law or order directed DSM not to warn Lalonde about the hazards of silica exposure (or even to maintain the plant equipment), but rather the question is whether that alleged failure to warn occurred while DSM was in the performance of its federal duties, *i.e.*, in the course of its operation of the plant as an agent for the federal government. The Court therefore holds that the requisite causal connection is satisfied here. To the extent that some lower district court cases would hold to the contrary, the Court specifically rejects the analytical underpinnings of those cases.[4]

*Colorable Federal Defense*

As noted, the existence of a "causal connection" alone is not sufficient to satisfy the "color of office" requirement under the statute. The federal officer or agent, in addition, must raise a colorable defense under federal law. *Mesa*, 489 U.S. at 125-34, 109 S.Ct. at 962-67. It is equally well-established, however, that the validity of the federal defense is

---

[4]In passing, the Court would note that cases such as *Overly* are distinguishable from this case on their facts because the government contractors in those cases were performing work under a government contract as independent contractors at a contractor-owned facility that also was used for other, non-government contract work. In such a context, under this Court's reading of the law, the causal connection requirement arguably would distinguish tort claims arising in the course of non-government contract work from claims arising in the course of government contract work. No such distinction is needed in this case because all work being done at the government-owned facility in question here, up through 1955, was federal government work done for the government as an agent of the government. In any event, this Court eschews reliance upon cases such as *Overly* not because of their distinguishing facts but instead because of their legal analysis. To the extent *Overly* implies that in all situations the causal connection requirement should be applied in a manner that requires the removing defendant to prove that the actual act or omission was itself specifically federally mandated, this Court expressly rejects such a reading of the federal officer removal statute.

a "distinct subject" that involves "wholly different inquiries" that have "no connection whatever with the question of jurisdiction." *Mesa*, 489 U.S. at 129, 109 S.Ct. at 964, quoting *The Mayor v. Cooper*, 6 Wall. 247, 254, 19 L.Ed. 851 (1868).[5] The federal defense need only be a "colorable" one, not necessarily one that ultimately will prove meritorious.

In the instant case, DSM seeks to assert two federal defenses. First, DSM relies upon the government contractor defense. Second, DSM asserts immunity pursuant to the Defense Production Act, 50 U.S.C. § 2157.

Plaintiffs contend that DSM may not rely on the government contractor defense because DSM has not shown that the federal government prohibited DSM from warning Lalonde about the dangers of silica dust or from providing him with additional protective equipment. Plaintiffs rely in this regard upon the Ninth Circuit decision in *In re Hawaii Federal Asbestos Cases*, 960 F.2d 806 (9th Cir. 1992), in which Navy sailors brought products liability actions against asbestos manufacturers who supplied asbestos insulation used in navy vessels. The Ninth Circuit, in an alternative holding, applied the standards established in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), for determining when a products liability claim against a supplier of military equipment is barred by the government contractor defense.[6] Under *Boyle*, "liability

---

[5] *See also Willingham*, 395 U.S. at 405, 89 S.Ct. at 1815 ("the test for removal should be broader, not narrower, than the test for official immunity"); *id.*, 395 U.S. at 407, 89 S.Ct. at 1815 ("one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court"). *Accord Magnin*, 91 F.3d at 1429 ("The scope of our inquiry here is only whether [the removing defendant] has advanced a colorable federal defense (including an assertion that he complied with all his federal law obligations), not whether his defense will be successful.")

[6] The Ninth Circuit's primary holding was that the asbestos insulation did not constitute military equipment and that the government contractor defense did not apply to suppliers of nonmilitary equipment. 960 F.2d at 810-12. This proposition itself hardly is a foregone conclusion, as there currently is a split of circuit authority on this issue. *See, e.g., Carley v. Wheeled Coach*, 991 F.2d 1117 (3d Cir.), *cert. denied*, 510
(continued...)

for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not the United States." 487 U.S. at 512, 108 S.Ct. at 2518. In *In re Hawaii Federal Asbestos Cases*, the Ninth Circuit rejected the government contractor defense *on the merits* because the asbestos manufacturers conceded that the Navy had not prohibited them from placing warnings on their insulation products. The Ninth Circuit held that the manufacturers therefore had failed to establish that they had acted in compliance with reasonably precise specifications as required under *Boyle*. 960 F.2d at 812-13.

That the specifics of the *Boyle* test (and, by extension, the Ninth Circuit's *In re Hawaii Federal Asbestos Cases* decision) apply to a government contractor hired under a performance contract to operate a federally-owned production facility exclusively for and as an agent of the federal government, under federal oversight and control, is subject to some question. Indeed, the Supreme Court established the existence and contours of a federal defense for contractors hired by the federal government under a performance contract long before *Boyle*. In *Yearsley v. W.A. Ross Construction Co.* 309 U.S. 19, 60 S.Ct. 413, 84 L.Ed. 554 (1940), in an action removed to federal court, a landowner sought to recover damages from a contractor retained by the federal government to build dikes in the Missouri River for the purpose of improving navigation. The work done had been

---

[6](...continued)
U.S. 868, 114 S.Ct. 191, 126 L.Ed.2d 150 (1993). Moreover, the Ninth Circuit's holding on this issue appears to be flatly contradicted by the Supreme Court's *Yearsley* decision discussed in the text, *infra*.

authorized and directed by the government.  The *Yearsley* Court concluded that there could be no liability on the part of the contractor, who had acted as an agent of the federal government, unless the contractor either had exceeded its authority or the authority was not validly conferred.  309 U.S. at 20-21, 60 S.Ct. at 414.  Significantly, one of the principal questions in *Boyle* was whether, and, under what circumstances, the Supreme Court should extend its prior holding in *Yearsley* concerning the performance contract context to a manufacturer supplying military equipment as an independent contractor under a procurement contract.  *See Boyle*, 487 U.S. at 505-06, 108 S.Ct. at 2515.

The specific elements that would apply to under *Yearsley* and *Boyle* for a contractor-agent in the context presented here are far from clear.  One federal court of appeals has suggested that *Yearsley* establishes a separate and "analytically distinct" "government agency defense" that turns upon (1) whether the government itself would be subject to liability on account of sovereign immunity; (2) whether the contractor actually acted as an agent of the government rather than simply as an independent contractor; and (3) whether the agent was acting within the course and scope of its duties.  *See Shaw v. Grumman Aerospace Corp.*, 778 F.2d 736, 739-40 (11ᵗʰ Cir. 1985), *cert. denied*, 487 U.S. 1233, 108 S.Ct. 2896, 101 L.Ed.2d 930 (1988).  Although another portion of the *Shaw* decision was expressly rejected by the Supreme Court in *Boyle*, *Shaw's* reading of *Yearsley* was not addressed in *Boyle*.  *See* 487 U.S. at 513, 108 S.Ct. at 2519.  Subsequent to *Boyle*, at least one district court has followed *Shaw's* reading of *Yearsley*.  *See Amtreco, Inc. v. O.H. Materials, Inc.*, 802 F.Supp. 443 (M.D. Ga. 1992).

Fifth Circuit *dicta* suggests a possibly more limited reading of *Yearsley* than that advanced in *Shaw*.  In *Bynum v. FMC Corp.*, 770 F.2d 556 (5ᵗʰ Cir. 1985), the court

suggested that the *Yearsley* defense required a showing of an actual agency relationship with the government but that the defense may not be available to contractors who fail to follow government specifications or mismanufacture a product. 770 F.2d at 564.[7] But this standard would not necessarily require rejection of DSM's defense here, because the failure to provide warnings or protective equipment that perhaps were not required by government specifications would not constitute a failure to follow government specifications. Moreover, the *Bynum dicta* predates *Boyle*'s reading of *Yearsley*. In this rapidly changing area of the law – where even seemingly established circuit precedent is subject to reinterpretation[8] – it would be quite difficult to conclude that a removing defendant could not, as a matter of law, raise a colorable federal defense based merely on *dicta* that now is nearly fifteen years old.

It further has been suggested that the restriction of sovereign immunity in the Federal Torts Claim Act, adopted in 1948, perhaps may lead to a similar curtailing of the reach of the defense available to performance contractor-agents under *Yearsley*. *See Valori v. Johns-Manville Sales Corp.*, 1985 WL 6074, slip op. at 8* (D.N.J. 1985).[9]

---

[7] *See also Ward v. Humble Oil & Refining Co.*, 321 F.2d 775, 780 (5th Cir. 1963)(applying *Yearsley* in context of mineral rights suit to quiet title).

[8] *Compare McGonigal v. Gearhart Industries, Inc.*, 851 F.2d 774, 778 (5th Cir. 1988)(government contractor defense not available to contractor that negligently manufactured, rather than defectively designed, grenade that exploded prematurely), *and Mitchell v. Lone Star Ammunition, Inc.*, 913 F.2d 242, 246-47 (5th Cir. 1990)(government contractor defense not available to contractor where claim was based on manufacturing defect rather than design defect), *with Bailey v. McDonnell Douglas Corp.*, 989 F.2d 794 (5th Cir. 1993)(reinterpreting *McGonigal* and *Mitchell* and concluding that the defense is not limited to design defects as opposed to manufacturing defects).

[9] Of course, a portion of the time span potentially involved in this case predates 1948 to a limited extent, as plaintiff claims that he worked at various defendant facilities from 1947 through 1976. In a related vein, the Fifth Circuit made an alternative holding in *Hansen v. Johns-Manville Products Corp.*, 734 F.2d 1036 (5th Cir. 1984), to the effect that even if there were a "government specifications" defense under Texas law (for which there was no supporting caselaw), any such defense would not apply where work under the
(continued...)

The foregoing establishes that questions remain as to the continuing reach of *Yearsley* in this particular context. However, even if *Boyle* has completely supplanted any vestige of *Yearsley*, and even if *Boyle* states the test that is applicable to the factual setting presented here,[10] the Court does not find at this stage of the proceedings that either *Boyle* or the Ninth Circuit's decision in *In re Hawaii Federal Asbestos Cases* necessarily compel a ruling in plaintiffs' favor on the government contractor defense. The Ninth Circuit's decision, which is not binding authority in this Court, concluded that the asbestos manufacturers there could not establish that were acting in compliance with "reasonably precise specifications" because they had conceded that the Navy did not prohibit them from placing warnings on their insulation products. 960 F.2d at 812. However, arguably, if the Navy approved specifications for the product that did not call for the warnings and the manufactured product conformed to those specifications, then the first two elements of *Boyle* would be satisfied.[11] The only question remaining would be whether the asbestos manufacturers failed to warned the United States about dangers associated with the use

---

[9](...continued)
government contract occurred during only five of the plaintiff's twenty-six years of employment at the single facility involved there. The Court does not find—to the extent, if any, that a similar factual situation is presented here—that *Hansen* is controlling on the question of whether a colorable *federal* defense has been asserted, because *Hansen* concerned Texas law, not the federal common law that was applied under *Boyle* (which was decided four years after *Hansen*) and *Yearsley*. Any extension of *Hansen* to the federal contractor defense would be a matter to be considered on the merits.

[10]The *Boyle* test was stated in the context of a defective design products liability suit brought against a manufacturer of military equipment by a person injured by the military equipment. The instant case presents a suit against a plant operator for injuries allegedly caused to a worker by unsafe working conditions. The different context arguably might require some reformulation of the *Boyle* test to better fit the context presented.

[11]To recap, under *Boyle*, "liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not the United States." 487 U.S. at 512, 108 S.Ct. at 2518.

of asbestos that were known to the asbestos manufacturers but not to the United States.[12]

On that issue, Fifth Circuit authority suggests that the decision to forego safety precautions for wartime sailors might have been a knowing and conscious one by the federal government. Cf. *Gordon v. Lykes Brothers Steamship Co., Inc.*, 835 F.2d 96, 100 (5th Cir. 1988)(government decision not to establish a safety program for World War II merchant seamen working with asbestos was immunized by the discretionary function exception). Thus, this Court cannot predict with any degree of certainty that the Fifth Circuit either would follow the same analysis or reach the same result as that of the Ninth Circuit.

Furthermore, in the context of this case, it is not entirely clear that a *Boyle*-like analysis leads to a conclusion that the government contractor defense is not available here. If, for example, the federal government specified safety requirements for the facility and DSM complied with those requirements, it is arguable that the first two elements of a *Boyle* analysis would be satisfied. If the government-specified requirements did not include the giving of warnings to workers or the taking of further precautions regarding silica exposure, and the government was unaware that such warnings and/or precautions were necessary, then, arguably, the question becomes whether DSM knew of the necessity for the warning yet failed to warn the government of silica hazards resulting from the absence of such warnings and precautions. Such an inquiry is not one to be resolved at this stage, but rather is one for the merits. The mere fact that DSM may not have warned the

---

[12]The Ninth Circuit apparently reads *Boyle's* first element to require the contractor to show that something omitted (such as a warning) was explicitly required to be omitted under the specifications. This reading of *Boyle* is subject to question. Arguably, if the product conforms to the approved specifications, i.e., everything that is called for is present, then the *absence* of an allegedly required feature (such as a warning or a safety shield) would be a matter addressed by the question of whether the contractor then warned the United States about the hazards of this omission in a circumstance where the United States already was not aware of the hazards.

government, by itself, is not dispositive of the issue — the relative knowledge of DSM and the government also is a factor in applying *Boyle's* third element.[13]

The Court notes these many questions and uncertainties in the application of a government contractor defense to the facts of this case simply to illustrate that it cannot be stated categorically at this time that the federal contractor defense is unavailable to DSM.[14]  Nuances such as whether, or to what extent, certain judicial decisions survive other decisions plainly are matters for resolution on the merits of the defense, not for resolution at the jurisdictional stage.  That DSM raises a colorable federal defense that can be conclusively resolved only at a later stage in these proceedings suffices to sustain jurisdiction.

The Court accordingly need not reach the question of whether DSM has raised a colorable federal defense under the Defense Production Act.

*Interference with Federal Function*

The Court therefore concludes that DSM has established the prerequisites for removal under Section 1442(a)(1)(action under a federal officer, the causal connection required for action under color of office, and the presence of a colorable federal defense).  Plaintiffs appear to suggest, however, that DSM further must affirmatively demonstrate that

---

[13]*Cf. Garner v. Santoro*, 865 F.2d 629, 638 (5th Cir. 1989)(mere failure to warn government of toxicity of paint used by shipyard worker did not support district court's refusal to allow government contractor defense to go to the jury because the third *Boyle* element further required consideration of whether the United States was aware of the danger presented by the paint's toxicity).

[14]Indeed, the situation here would appear to present a paradigm case for removal under Section 1442(a)(1), at least in the sense that the application of federal law here is subject to much uncertainty. *Cf. Willingham*, 395 U.S. at 407, 89 S.Ct. at 1816 ("one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court"); *id.* at 409, 89 S.Ct. at 1817 ("[T]hey should have the opportunity to present their version of the facts to a federal, not a state, court.  This is exactly what the removal statute was designed to accomplish.  Petitioners sufficiently put in issue the questions of official justification and immunity; the validity of their defenses should be determined in the federal courts.").

the current action "could arrest, restrict, impair, or interfere with either the actions of a federal official or the operations of the federal government," relying on the Fifth Circuit's decision in *Murray v. Murray*. *See* 621 F.2d at 107. Plaintiffs suggest that this action cannot impair federal interests because the death and suit arise almost 40 years after all operations have ceased under the contract between DSM and the federal corporate intermediaries.

The Court does not read the *Murray* decision as establishing a requirement that the removing party show, in addition to the three elements discussed above, a specific impairment of federal interests in the given case. *Murray* does stand as authority regarding the policy and rationale underlying federal officer removal: "that federal officers are entitled to, and the interest of national supremacy requires, the protection of a federal forum in those actions commenced in state court that could arrest, restrict, impair, or interfere with the exercise of federal authority by federal officials." 621 F.2d at 106. The *Murray* court referred back to this underlying rationale in holding that a garnishment action – which does not affect the United States' substantive obligation – is not removable under Section 1442(a)(1). *Id.*, at 107. In so doing, the *Murray* panel specifically reaffirmed that the statute "permits the removal of those actions commenced in state court that expose a federal official [or person acting under him] to potential civil liability ... for an act *performed in the past* under color of office." *Id.*, at 107 (emphasis added).

Insofar as frustration of federal interests is an independent concern here, the Court would note that, quite clearly, the imposition of a future liability against a government contractor for past work can as much impair federal interests as would a current liability during the term of an ongoing agreement.

-20-

[T]he extent of a contractor's liability may, undoubtedly will, affect future dealings between the contractor and the government. .... Speculative federal interests in the obligations of war contractors are numerous. War contractors might be expected to increase the price of war materials to correspond to any extension in their potential liability. Such adjustments might have a significant effect on the federal treasury. If potential liability increased dramatically, future war contractors might attach conditions to the use of their products, or balk at supplying the military with any products whatsoever. Thus, the government's military capacities might be affected.

*In re "Agent Orange" Product Liability Litigation*, 506 F.Supp. 737, 746–47 & n.5 (E.D.N.Y.), *rev'd on other grounds* 635 F.2d 987 (2nd Cir. 1980), *quoted in Bynum v. FMC Corp.*, 770 F.2d 556, 570 n.18 (5th Cir. 1985).

That the synthetic rubber produced at DSM Copolymer in the late 1940's and early 1950's has long since made its way to its appointed tasks on distant shores, for wars that now recede into the history of a waning century, is of no moment here. What matters here is the continuing ability of the federal government to be able to respond in times of national need, and to be able to bring the resources of private industry to bear in such times. Removal by this wartime supplier of this strategic and critical material, on the basis of a federal contractor defense, therefore is clearly consonant with the policies underlying the federal officer removal statute.

## CONCLUSION

Accordingly, for the foregoing reasons, plaintiff's motion to remand (rec.doc.no. 43) is DENIED.

Baton Rouge, Louisiana, this 5th day of August, 1998.

_____
UNITED STATES MAGISTRATE JUDGE

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

DANIEL W. MELFORD, SR.

VERSUS

PETER TERRITO, ET AL

FILED
U.S. DIST COURT
LA

2006 JAN 31  P 4: 06

CIVIL ACTION

NO. 05-1405

## RULING ON MOTION TO REMAND

This matter is before the court on a motion to remand (doc. 3) by the plaintiff, Daniel W. Melford, Sr.  Defendant Peter Territo opposes the motion (doc. 27).[1] Jurisdiction is at issue.  Plaintiff has moved for expedited hearing (doc. 5) on the motion to remand which is granted.  There is no need for oral argument.

### FACTS AND PROCEDURAL HISTORY

Melford filed this action on November 9, 2005, in the Nineteenth Judicial District Court, Parish of East Baton Rouge, State of Louisiana, seeking to recover from a number of defendants for injuries allegedly caused by exposure to asbestos—Melford alleges that he is dying from malignant mesothelioma.  Plaintiff alleges that Territo was an officer in charge of health and safety at Avondale Industries, Inc.,[2] when Melford worked there as a mechanic from 1968 to 1970.

---

[1] While Territo did not initially respond to Melford's motion to remand within the time limits provided in LR 7.5M, the court granted a motion by Territo to extend his deadline (doc. 25) to allow Territo to respond to an affidavit (doc. 23, Exhibit A) filed by Melford after the motion to remand.

[2] Avondale is now known as Northrop Grumman Ship Systems, Inc.

1


EXHIBIT
B

Although he alleges that he never worked on any vessels, Melford claims he was

exposed to asbestos while working around vessels undergoing construction and

repair at Avondale's shipyard (doc. 1, Exhibit A, ¶ 41).  Melford's petition contains

the following allegations regarding Territo:

42.

    [Territo] was aware or should have been aware of
the dangerous condition presented by exposure to
asbestos and that Petitioner Daniel W. Melford, Sr. would
suffer from an injury as a result of this exposure, but he
failed to provide to Mr. Melford knowledge of the dangers
to his health from exposure to asbestos fiber.

43.

    [Territo] had the responsibility of providing Mr.
Melford with a safe place to work, and safety equipment
with which to conduct his work.  However, he negligently
failed to carry out these duties, and failed to protect Mr.
Melford from the dangers of asbestos dust exposure.

44.

    In addition to the foregoing acts of negligence,
Territo made the following acts and/or omissions:

    a)    Failing to reveal and knowingly concealing
critical medical information to Daniel W.
Melford, Sr.;

    b)    Failing to reveal and knowingly concealing
the inherent dangers in the use of asbestos,
and other harmful substances in their
manufacturing process;

    c)    Failing to provide necessary protection to Mr.
Melford;

2

Case 3:05-cv-01405-JVP-DLD       Document 31       Filed 01/31/2006       Page 3 of 11

    d)     Failing to provide clean, respirable air and
proper ventilation;

    e)     Failing to provide necessary showers and
special clothing;

    f)     Failing to warn employees and their family
members of the risks associated with direct
and bystander exposure to asbestos.

(doc. 1, Exhibit A, ¶¶ 42-44).

Territo removed the action to this court on December 15, 2006. He alleges

jurisdiction under 28 U.S.C. § 1442, the federal officer removal statute.

## LAW AND DISCUSSION

"[T]he burden of establishing jurisdiction rests upon the party seeking to

invoke it . . . ." *Gaitor v. Peninsular & Occidental S. S. Co.*, 287 F.2d 252, 253 (5th

Cir. 1961).

Section 1442 provides in part:

(a) A civil action or criminal prosecution commenced in a
State court against any of the following may be removed
by them to the district court of the United States for the
district and division embracing the place wherein it is
pending:

(1) The United States or any agency thereof or any officer
(or any person acting under that officer) of the United
States or of any agency thereof, sued in an official or
individual capacity for any act under color of such office or
on account of any right, title or authority claimed under any
Act of Congress for the apprehension or punishment of
criminals or the collection of the revenue.

3

Case MDL No. 875 Document 5009 Filed 04/06/07 Page 48 of 117
Case 2:06-cv-11140-SRD-SS    Document 8-3    Filed 01/30/2007    Page 4 of 11

Case 3:05-cv-01405-JVP-DLD    Document 31    Filed 01/31/2006    Page 4 of 11

28 U.S.C.A. § 1442 (a)(1). This provision was enacted to protect the exercise of federal authority against interference by states through their courts.[3] Wright, Miller, & Cooper, Federal Practice and Procedure: Jurisdiction 3d § 3727 at 136. It has been invoked by a wide variety of federal officers and persons acting at the direction of federal officers in many different types of cases, both civil and criminal. *Id.* at 125.

The Supreme Court has held that to remove a case under Section 1442, the defendant must (1) show that he acted at the direction of a federal officer; (2) establish a causal connection between the charged conduct and the asserted authority; and (3) raise a colorable federal defense.[4] *Willingham*, 395 U.S. 406-09; *Mesa v. California*, 489 U.S. 121,129-38 (1989); *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387, 397-401 (5th Cir. 1998); *Miller v. Diamond Shamrock Co.*, 275 F.3d 414, 418 (5th Cir. 2001).

Territo alleges that during the time that Melford worked at Avondale, the company primarily constructed destroyer escorts for the U.S. Navy and lighter-aboard-ship ("LASH") commercial cargo vessels for the U.S. Department of Commerce, Maritime Administration.[5] Melford contends that he never worked on or

---

[3]For a discussion of the history of the statute, *see Willingham v. Morgan*, 395 U.S. 402, 405 (1969).

[4]The defendant must also show, as a preliminary matter, that it is a "person" within the meaning of the statute. *Winters*, 149 F.3d at 398. This requirement is not at issue here.

[5]The construction of the LASH vessels was subsidized by the government through the U.S. Maritime Administration's Maritime Subsidy Board. The government controlled the design and construction of the vessels to ensure that they were suitable for national defense or military purposes in time of war or national emergency (doc. 27, Exhibit C).

4

around any military vessels or equipment (doc. 23, Exhibit A), so Territo contends

that Melford's alleged exposure must have come from working around the LASH

vessels (doc. 27, Exhibit B).  This allegation is supported by the affidavit of Danny

Joyce, an environmental, health, and safety management consultant (doc. 27,

Exhibit B).

   According to Territo, the asbestos used in constructing the LASH vessels was

required by plans and specifications controlled by the United States through the

Secretary of Commerce Maritime Subsidy Board (doc. 27 at pp. 6-9, Exhibit C), and

Avondale was obligated to use the asbestos-containing materials by its contract with

the United States.  Territo provides the affidavit of Thomas McCaffery (doc. 27,

Exhibit C), a research consultant in the area of government ship design,

development, construction, maintenance, and repair records.  McCaffery avers that

the specifications for the LASH vessels required the use of asbestos-containing

products in the joiner work and pipe insulation (doc. 27, Exhibit C).

   Territo alleges that "Avondale and its personnel were subject to rigorous

safety and construction standards that were monitored on a regular basis by federal

inspectors." (doc. 27 at p. 5).  Territo provides the affidavit of Edward Blanchard, a

former Avondale supervisor who claims to have worked closely with various

agencies, including the Maritime Commission, in constructing vessels for the U.S.

government (doc. 27, Exhibit E).  Blanchard avers that all aspects of the work on the

federal vessels were performed

> under close, constant, and detailed surveillance by the United States Navy, United States Coast Guard, and the Maritime Commission and other federal agencies . . . . This surveillance was exercised by written specifications and personal oversight and inspection of all Avondale work by Federal Inspectors. Virtually no aspect of the construction of Federal Vessels escaped this close monitoring.

(doc. 27, Exhibit E at ¶ 3). According to Blanchard, "[t]he Federal Inspectors monitored every aspect of the construction of the vessels at Avondale from the moment the materials to be used in the construction first arrived at Avondale until the ship was fully outfitted and delivered." (doc. 27, Exhibit E at ¶ 10). Blanchard avers that during construction, federal inspectors continuously inspected the vessels to ensure that the work met the government's regulatory and contractual specifications (doc. 27, Exhibit E at ¶ 5). Blanchard recalled that the head of Avondale's safety department "frequently met with the Federal Inspectors to discuss safety issues regarding the construction of Federal Vessels." (doc. 27, Exhibit E at ¶ 15). Blanchard avers that safety inspectors from the Maritime Commission had the authority to terminate a project if they believed the work was not being performed safely (doc. 27, Exhibit E at ¶ 16).

Territo also submits his own affidavit in which he avers that during the construction of the LASH vessels, daily inspections were conducted by inspectors from the Maritime Administration and Coast Guard (doc. 27, Exhibit F). Territo declares that safety inspectors from the Labor Management Standards

6

Administration routinely carried out inspections at Avondale to ensure compliance with federal safety standards, including standards set out in the Walsh-Healy Public Contracts Act (doc. 27, Exhibit F).

Finally, Territo asserts that the federal contractor defense and the Longshore and Harbor Workers' Compensation Act ("LHWCA") shield him from Melford's claims (doc. 1 at ¶ 5).

Under these facts and in light of his defenses, Territo contends that he is entitled to removal under Section 1442.

Melford contends that Territo is not entitled to removal under Section 1442 because he cannot show that the federal government limited his ability to provide safety warnings to Avondale employees concerning the dangers of asbestos. This argument is based on a line of federal district court cases involving similar facts that were remanded to state court because the removing defendant could not prove that the federal government restricted the defendant's ability to warn the plaintiffs of the dangers of asbestos. *See Savoie v. Northrop Grumman*, No. 05-2086 (E.D. La. 2005); *Mouton v. Flexitallic, Inc.*, 1999 WL 225438 (E.D. La.); *Guidroz v. Anchor Packing*, No. 98-3709 (E.D. La. 1999); *Gauthe v. Asbestos Corp.*, 1997 WL 3255 (E.D. La.); *Overly v. Raybestos-Manhattan*, 1996 WL 532150 (N.D. Cal.); *Porche v. Flexitallic, Inc.*, 1996 WL 603919 (E.D. La.).

The *Mouton* case is representative of this line of cases. In *Mouton*, the plaintiff sued Avondale and its executive officers for failing to warn him about the

7

Case MDL No. 875   Document 5009   Filed 04/06/07   Page 52 of 117
Case 2:06-cv-11140-SRD-SS      Document 8-3      Filed 01/30/2007      Page 8 of 11

Case 3:05-cv-01405-JVP-DLD      Document 31      Filed 01/31/2006      Page 8 of 11

dangers of asbestos and failing to provide a safe place to work.  The defendants

removed under Section 1442, claiming that they had acted under the authority of

various branches of the government (the Navy, the Federal Maritime Commission)

in building ships during the relevant time frame.   The defendants asserted

government contractor immunity and a defense under the LHWCA.   The court

granted a motion to remand by the plaintiff.

The court determined that the defendants had failed to establish a causal

connection between the plaintiff's claims and the government's direction. While the

defendants had presented evidence that the government controlled the

specifications of the ships and performed safety inspections, the court found that the

government had provided no direction concerning warnings and had not prevented

Avondale from taking its own safety precautions. *Mouton,* 1999 WL 225438 at *2-*3.

In reaching this conclusion, the court noted that the claims at issue were premises

liability and negligence claims based on a failure to warn, not product liability or

defective design claims.  While the defendants' design contracts might have been

evidence of a causal connection if products liability or defective design claims had

been at issue, the court concluded that there was no causal connection between the

government design contracts and the defendants' alleged negligence in failing to

warn the plaintiff of the dangers of asbestos. *Id.* at *3.

This court finds that line of reasoning unpersuasive.  We see no basis in the

language of Section 1442 or in controlling authority for the requirement that a

defendant in a civil case show that the alleged wrongful act or omission was specifically directed or compelled by federal duty or law. To the contrary, controlling cases interpreting the statute have recognized that it is "neither 'limited' nor 'narrow,' but should be afforded a broad reading so as not to frustrate the statute's underlying rationale." *Winters*, 149 F.3d at 398 (quoting *Murray v. Murray*, 621 F.2d 103, 107 (5th Cir. 1980)); *see also State of Texas v. National Bank of Commerce of San Antonio*, 290 F.2d 229, 231, *cert. denied Falkner v. National Bank of Commerce of San Antonio, Texas*, 368 U.S. 832 (1961) (requiring only a "colorable claim that the appellees were acting under an officer of the United States and that the appellees were acting under color of law, as agents of the United States within the meaning of § 1442(a)(1)"). The requirement that the government has controlled the specific act at issue may have a place in determining the merits of the question of immunity, but the "test for removal should be broader, not narrower, than the test for official immunity." *Willingham*, 395 U.S. at 405. Therefore, this factor should not applied to limit removal under Section 1442, at least not without specific guidance from the Supreme Court or the Fifth Circuit.

This case involves the same federal interest that was at stake in *Winters*, namely, the ability of the federal government to order and obtain military equipment at a reasonable cost. *Winters*, 149 F.3d at 399-400. Melford's claims against Territo are based on exposure to asbestos at Avondale's shipyard. Territo alleges that the asbestos was present because it was required in construction contracts controlled

by the government.  Territo also alleges that the government was heavily involved in all aspects of the construction of federal vessels, including safety.   If the government representatives believed that work on a project at Avondale was being done in an unsafe manner, it had the authority to shut down the project.  The court finds that the facts of this case are sufficient to demonstrate that Territo acted pursuant to federal direction and that a causal connection exists between Territo's alleged actions and Melford's claims.

The final requirement for removal under Section 1442 is the assertion of a colorable federal defense.  As noted, Territo asserts the government contractor defense under *Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988), and a defense under the LHWCA.  Melford argues that neither defense has merit.  However, it is not necessary for Territo to prove that his federal defense is meritorious, he need only "articulate its 'colorable' applicability to the plaintiff's claims." *Winters*, 149 F.3d at 400.  "[O]ne of the most important reasons for removal is to have the validity of the defense of official immunity tried in federal court." *Willingham*, 395 U.S. at 407.
Under *Boyle*, a defendant is required to show the following:

> (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Winters*, 149 F.3d at 400 (quoting *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988)).  In light of the facts discussed above, the court finds that Territo's assertion

of the government contractor defense is sufficiently colorable for removal under Section 1442. The court need not address Territo's arguments under the LHWCA.

Accordingly, Territo has met the requirements established by controlling authority for removal under 28 U.S.C. § 1442(a)(1).

## CONCLUSION

For the foregoing reasons, the motion to remand (doc. 3) filed by the plaintiff, Daniel W. Melford, Sr., is hereby DENIED.

Baton Rouge, Louisiana, January 31, 2006.

JOHN V. PARKER
UNITED STATES DISTRICT JUDGE
MIDDLE DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

FILED
U.S. DIST COURT
MIDDLE DIST. OF LA

2006 FEB -7  P 4: 02

SIC'
BY DEPUTY CLERK

MICHAEL J. MCFARLAIN                              CIVIL ACTION

VERSUS                                           NO. 05-1406-JJB-SCR

NORTHROP GRUMMAN SYSTEMS                          JUDGE BRADY
CORP., *ET AL.*

**********************************************************************************

### RULING ON MOTION FOR REMAND

This matter is before the Court on Plaintiff Michael McFarlain's motion to remand. (Doc 6.) Defendant Northrup Grumman Ship Systems, Inc., f/k/a Avondale Industries, Inc. (hereinafter "Avondale") opposes the motion. (Doc. 18.) Jurisdiction is at issue. For the reasons set forth below, the Court denies McFarlain's motion. Specifically, the Court finds that it has original jurisdiction over McFarlain's premises liability claims and supplemental jurisdiction over his failure to warn claims.

Background Facts and Procedural History

McFarlain, who suffers from mesothelioma, an incurable lung cancer caused by asbestos exposure, filed this action in November of 2005 in the Nineteenth Judicial District Court of Louisiana, seeking to recover damages against various manufacturers and distributors of asbestos-containing products, including Avondale. McFarlain alleges that he was exposed to asbestos when he was employed at Avondale's main shipyard in 1963 and in 1967. During the 1963



EXHIBIT
C

employment, McFarlain worked for Arnot Marine, a sub-contractor Avondale hired

to perform work on vessels constructed under a contract with the United States

Government, which directed all facets of the ships' construction including design

and materials.  McFarlain asserts that Avondale is liable to him for injuries caused

by his asbestos exposure under essentially two theories: that Avondale failed to

warn him about the dangers of asbestos exposure and otherwise failed to provide

him a safe workplace, and that Avondale is strictly liable for its *garde* of the

asbestos which caused McFarlain's injuries.  (Compl., pars. 35-44.)

Avondale removed the case to this Court on December 15, 2006, alleging

that jurisdiction exists under 28 U.S.C. § 1442(a)(1), which grants a federal forum

to the United States or its agencies or officers who are sued for acting "under color

of" such office.  McFarlain moves to remand the case back to state court, arguing

that removal under § 1442(a)(1) is not proper in this case.  Also, Avondale moves

that this Court grant certification of an interlocutory appeal of this matter.  (Doc. 21.)

McFarlain opposes this motion.  (Doc. 28.)

<u>Analysis</u>

The parties agree that the basic test governing the application of the federal

removal statute (§ 1442(a)(1)) has been articulated in <u>Mesa v. California</u>, 489 U.S.

121, 124-25, 134-35, 109 S. Ct. 959, 103 L. Ed. 2d 99 (1989), which requires the

party seeking removal to show that (1) it acted under the direction of a federal

officer; (2) it has a colorable federal defense to the plaintiff's claim; and (3) there is

2

Case MDL No. 875   Document 5009   Filed 04/06/07   Page 58 of 117
Case 2:06-cv-11140-SRD-SS      Document 8-4      Filed 01/30/2007      Page 3 of 13

Case 3:05-cv-01406-JJB-SCR      Document 29      Filed 02/07/2006      Page 3 of 13

a causal nexus between the alleged tortious conduct and the actions taken under the federal authority.[1]  The failure to warn claim and the premises liability claim are analyzed under Mesa in turn below.

## I. Failure to Warn

For analytical purposes, the "federal direction" prong of Mesa and the "causal nexus" prong can be considered together. See Arness v. Boeing N. Am., Inc., 997 F.Supp. 1268, 1273 (C.D. Cal. 1998) (holding that for § 1442(a)(1) jurisdiction to exist, a defendant must show a "causal nexus" between the alleged tortious conduct and the acts performed by the defendant "at the direction of official federal authority").  To satisfy this requirement, "[m]ost courts have held that the federal officer must have direct and detailed control over the defendant"; it is not enough for the defendant to show that the relevant acts occurred "under the general auspices of federal direction." Id. (citations and internal quotations omitted).  In the failure to warn context, this standard requires, at a minimum, that the government provide some level of direct control over warnings. See Freiberg v. Swinerton & Walberg Prop. Servs., 245 F. Supp. 2d 1144, 1155 (D. Colo. 2002) (holding that plaintiffs in a failure to warn case can meet the Mesa "causal nexus" requirement only by

---

[1]McFarlain submitted his affidavit in which he maintains that during his employment at the Avondale facilities, he did not work on vessels that Avondale constructed pursuant to military contracts.  Even if this is true, it does not help McFarlain because his claims are for exposure that he suffered while residing near and working at the Avondale facilities, where at least some vessels were constructed pursuant to government contract.  Thus, the federal officer jurisdiction analysis is appropriate in this case.

Case MDL No. 875 Document 5009 Filed 04/06/07 Page 59 of 117
Case 2:06-cv-11140-SRD-SS Document 8-4 Filed 01/30/2007 Page 4 of 13

Case 3:05-cv-01406-JJB-SCR Document 29 Filed 02/07/2006 Page 4 of 13

showing that the government's "direction and control of their activities directly interfered with their ability to fulfill their state law obligation to warn employees of safety hazards") (citations omitted). Under this standard, Avondale clearly does not meet the <u>Mesa</u> "causal nexus" prong because it has presented no evidence that the government exercised any control over activities related to warnings. In fact, deposition testimony of Avondale's safety director, Peter Territo, from a prior case indicates that federal officers exercised no control over Avondale's safety department and that nothing in the federal regulations prevented Avondale from warning its employees of the dangers of asbestos exposure. (Territo dep., Exh. E, at 135, 143.) Thus, under the "causal nexus" prong of <u>Mesa</u>, there is no basis for federal officer jurisdiction for McFarlain's failure to warn claims. <u>See</u> <u>Faulk v. Owens-Corning Fiberglass Corp.</u>, 48 F. Supp. 2d 653, 662-64 (E.D. Tex. 1999) (finding the absence of federal directives regarding warnings sufficient to cause the contractor-defendant to fail <u>Mesa</u>'s "causal nexus" test).

Even if Avondale could satisfy the causal nexus test, there would be no § 1442(a)(1) jurisdiction over the failure to warn claims, because those claims also fail <u>Mesa</u>'s "colorable federal defense" prong. As a matter of law, neither federal defense that Avondale asserts can succeed for the failure to warn claims.

The first defense that Avondale asserts is the government contractor immunity defense. The Supreme Court has articulated the test for immunity under the government contractor defense in <u>Boyle v. United Techs. Corp.</u>, 487 U.S. 500, 512,

108 S. Ct. 2510, 101 L. Ed. 2d 442 (1988). The defense is available when: "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not the United States." Id. Importantly, there must also be a uniquely federal interest involved and a conflict between the federal policy and the state duty of care. Id. at 506-08. Though Boyle was a products liability case, it applies in the failure to warn context as well. See Winters v. Diamond Shamrock Chem. Co., 149 F.3d 387, 400, 401 (5th Cir. 1998) (noting that "the test" for immunity under the government contractor defense is the Boyle test, and applying a Boyle analysis to a situation where the government prohibited the contractor from placing warnings on the product). In fact, all of the federal courts of appeals that have squarely faced the issue of the government contractor defense in the failure to warn context have applied the Boyle test and concluded that the defense does not apply unless the government makes "reasonably precise specifications" concerning the warnings. See Butler v. Ingalls Shipbuilding, Inc., 89 F.3d 582 (9th Cir. 1996) ("'In a failure-to-warn action, where no conflict exists between requirements imposed under a federal contract and a state law duty to warn, regardless of any conflict which may exist between the contract and state law design requirements, Boyle commands that we defer to the operation of state law.'") (quoting In re Joint E. And S. Dist. N. Y., 897 F.2d 626, 631 (2d Cir. 1990)); Oliver v. Oshkosh Truck Corp., 96 F.3d 992, 1003 (7th

Cir. 1996) (applying Boyle and its requirement of "reasonably precise specifications"

in the failure to warn context); Tate v. Boeing Helicopters, 55 F.3d 1150, 1156 (6th

Cir. 1995) (same).[2]  Because the government did not provide any specifications

(leave alone "reasonably precise" ones) to Avondale regarding warnings, Avondale

simply does not have a colorable federal contractor defense under any of the tests

articulated by those circuits.[3]

    Avondale also asserts that is has a colorable defense under the Longshore

and Harbor Worker's Compensation Act ("LHWCA").  This defense, however, has

been consistently rejected in this context by courts.  See, e.g., Mouton v. Flexitallic,

---

[2]There is some indirect Fifth Circuit support for this view.  In Winters v. Diamond Shamrock Chem. Co., 149 F.3d 387, 401 (5th Cir. 1998), the court denied a motion to remand in part because the contractors hired to produce Agent Orange failed to provide warnings only because they "were specifically prohibited from placing any warnings on the finished product itself except as allowed by contract."

[3]The Sixth and Seventh circuits appear to require less government involvement with the warnings than the Second and Ninth circuits require to find a colorable federal contractor defense.  See, e.g., Tate, 55 F.3d at 1157 (finding that unlike in some cases decided in courts within other circuits, the government need only exercise discretion with respect to warnings; it need not dictate or prohibit the warnings).

    Arguably, under the Seventh Circuit's test, Avondale may have a colorable government contractor defense.  In Oliver, 96 F.3d at 1003-04, the court held that a state duty to warn can be "displaced" if the contractor can show that "(1) the government exercised its discretion and approved certain warnings; (2) the contractor provided the warnings required by the government; or (3) the contractor warned the government about dangers in the equipment's use that were known to the contractor but not to the government."  Avondale has presented evidence that even though the government did not require warnings, it knew about the dangers of asbestos (so Avondale had no duty to warn the government).  This appears to meet the requirements of the third prong of Oliver.  On the other hand, the government has used its discretion to approve Avondale's choice not to provide warnings – which falls into the first Oliver prong.  However, when the government approves certain warnings (or, presumably, the absence of warnings), the government contractor defense is viable only if the government goes beyond merely "rubber stamping" the contractor's choice.  Id. at 1004.  Here, it appears that the government essentially "rubber stamped" Avondale's choice not to provide warnings.  Given Boyle's conflict requirement, this latter reading of Oliver is the better one.  Thus, even under the more lax Sixth and Seventh circuit tests, Avondale has no colorable federal contractor defense.

Inc., No. CIV.A.99-0162, 1999 WL 225438 at *3-*4 (E.D. La. Apr. 14, 1999) (noting that concurrent jurisdiction exists between the LHWCA and state compensation statutes and that there is some uncertainty as to whether the LHWCA preempts Louisiana compensation law, and holding that this unresolved legal issue is not sufficient to create a colorable defense); Bartley v. Borden, Inc., Nos. Civ.A. 96-145, Civ.A. 96-157 to Civ.A. 96-205, 1996 WL 68482 at *4 (E.D. La. Feb. 13, 1996) (rejecting a LHWCA defense on the grounds that the LHWCA does not completely preempt state law and does not provide removability when asserted as a defense).

Avondale relies on two unpublished cases from this district for the proposition that in a failure to warn case, when the federal government does not prevent a contractor-defendant from issuing warnings, removal may still be appropriate. In Lalonde v. Delta Field Erection, No. Civ.A.96-3244-B-M3, 1998 WL 34301466 (M.D. La. Aug. 6, 1998), Magistrate Judge Dalby relied heavily on the Supreme Court's opinion in Willingham v. Morgan, 395 U.S. 402, 89 S. Ct. 1813, 23 L. Ed. 2d 396 (1969), where the Court indicated that § 1442(a)(1) should be liberally construed in favor of jurisdiction and that the statute's requirement of the officer acting "under color of" federal authority simply means that the federal officer must be acting pursuant to his official duties. Magistrate Judge Dalby thus found that Mesa's "causal nexus" requirement, as applied in the failure to warn context, does not require that the federal government directly control the contractor's activities with respect to warnings. Lalonde, 1998 WL 34301466 at *5-*6. The court rejected the

"chary" approach of other courts that have held otherwise. Id. at *3, *6.

However, while the Willingham principle, taken at face value, does indeed support the Lalonde court's analysis, the Supreme Court has added something new to the equation with its decision in Boyle v. United Techs. Corp., 487 U.S. 500, 108 S. Ct. 2510, 101 L. Ed. 2d 442 (1988), discussed supra, where the Court set parameters for immunity under the government contractor defense. Of particular importance is Boyle's requirement that for contractor immunity to exist, there must be a conflict between the contractor's federal authority and its duties under state law. Id. at 507-08. The Court illustrated this principle with a hypothetical situation where the United States contracts for an air-conditioning unit, specifying the "cooling capacity but not the precise manner of construction." Id. at 509. The Court explained that if a state law required a certain safety feature to be added, this would not create a conflict; the contractor could comply with the state duty and still follow the terms of the contract. Thus there would be no need for the state law to be preempted, and no need for the contractor to be shielded by immunity. Id. A logical application of this analogy is in the failure to warn context; a "safety feature" can be a warning. See Epperson v. Northrop Grumman Systs. Corp., No. 4:05CV2953, 2006 WL 90070, at *4 (E.D. Va. Jan. 11, 2006) (applying the Boyle analogy to the failure to warn context, and finding no immunity absent a conflict between a state duty to warn and federal directives regarding warnings).

Federal courts that have considered Boyle in the failure to warn context have

overwhelmingly agreed that there is no § 1442(a)(1) jurisdiction unless the federal authority exercises some degree of *direct* influence over the contractor's activities with respect to warnings. As discussed *supra*, the Second, Sixth, Seventh, and Ninth Circuits have all so held, with no court of appeals taking the contrary view. Moreover, a number of district court cases have agreed. See, e.g., Epperson, 2006 WL 90070, at *4 (finding a "well established exception to government contractor immunity" in failure to warn cases and noting that the Eastern District of Virginia has rejected the government contractor defense in failure to warn cases in "the thousands of asbestos cases that have preceded"); Freiberg v. Swinerton & Walberg Prop. Servs., 245 F. Supp. 2d 1144, 1155 (D. Colo. 2002) (allowing contractor immunity only if government directives regarding warnings "directly interfered" with the contractors' state law duty to warn); Faulk v. Owens-Corning Fiberglass Corp., 48 F. Supp. 2d 653, 662-64 (E.D. Tex. 1999) (finding no contractor immunity absent any federal directives concerning warnings); Mouton v. Flexitallic, Inc., No. CIV.A.99-0162, 1999 WL 225438 at *3 (E.D. La. Apr. 14, 1999) (same); Gauthe v. Asbestos Corp., No. Civ. A. 96-2454, 1997 WL 3255, at *3 (E.D. La. Jan. 2, 1997) (same); Overly v. Raybestos-Manhattan, No. C-96-2853 SI, 1996 WL 532150, at *3 (N.D. Ca. Sept. 9, 1996) (finding that even though Avondale was under substantial government control with respect to installation of asbestos-containing products, it was not under such control with respect to providing warnings, and that it thus had

9

Case MDL No. 875 Document 5009 Filed 04/06/07 Page 65 of 117
Case 2:06-cv-11140-SRD-SS    Document 8-4    Filed 01/30/2007    Page 10 of 13

Case 3:05-cv-01406-JJB-SCR    Document 29    Filed 02/07/2006    Page 10 of 13

no immunity).[4] Of the cases that appear in Westlaw, <u>Lalonde</u> appears to be the sole anomaly that holds that a federal contractor may be immune from liability for failing to meet its state law duty to warn, even when the government does not direct the warning activities in any overt way.[5]

Magistrate Judge Dalby found that in light of <u>Boyle</u>, there were "many questions and uncertainties" about the application of the government contractor defense to the <u>Lalonde</u> facts, particularly the fact that the contract in <u>Lalonde</u> was a performance contract to operate a federally-owned production facility exclusively for the federal government. <u>Id.</u> at *7-*9. This factor arguably distinguishes <u>Lalonde</u> from the instant case. In any event, the Court agrees with McFarlain that a <u>Boyle</u> analysis is appropriate in the case at bar, and that under <u>Boyle</u>, Avondale has no colorable federal contractor defense because there was no "conflict" between Avondale's duties to provide warnings under state law and Avondale's duties as a federal contractor. Thus, Avondale has not met the jurisdictional requirements of § 1442(a)(1) with respect to the failure to warn claims. This does not end the inquiry, however, because this case is not solely about failure to warn.

## II. Strict Premises Liability

---

[4] The cases cited are representative, not exhaustive.

[5] There are other cases not published in Westlaw that follow <u>Lalonde</u>. Avondale cites <u>Catania v. AcandS, Inc.</u>, C.A. No. 02-368-D (M.D. La. July 18, 2002), where this Court adopted the report of a magistrate judge who relied on <u>Lalonde</u>. Also, very recently, Judge Parker found <u>Lalonde</u> persuasive in <u>Melford v. Territo</u>, No. 05-1405 (M.D. La. Jan. 31, 2006).

Though McFarlain tries to frame the case as a "failure to warn" case, it is clear that his complaint contains allegations that fall outside the ambit of "failure to warn." For example, in paragraph 43, subsection d of his complaint, McFarlain alleges that Avondale  is strictly liable "for its *garde* of the asbestos which caused Petitioner's injuries." Because McFarlain's complaint contained non-failure to warn claims at the time Avondale removed the case, the court must consider the non-failure to warn claims at this stage, even if McFarlain might now be willing to forsake those claims for purposes of this motion. See Hook v. Morrison Milling Co., 38 F.3d 776, 780 (5th Cir. 1994) ("In a jurisdictional inquiry, we look at the complaint as it existed at the time the petition for removal was filed, regardless of any subsequent amendments to the complaint.").

The analysis of McFarlain's non-failure to warn claims is rather straightforward under Mesa and Boyle.  Avondale has presented considerable evidence, in the form of affidavits and contract specifications, that the government exercised pervasive control over Avondale's performance of the contracts, and imposed rigorous standards on Avondale.  These standards included detailed requirements that Avondale use asbestos-containing materials. There is clearly a causal connection between these government requirements and the activities that form the basis for McFarlain's premises liability claims.  Thus, Mesa's "causal nexus" requirement, though not met with respect to the failure to warn claims, is met with respect to the premises liability claims.

Likewise, Mesa's "colorable federal defense" requirement is met with respect to the premises liability claims. These claims meet the Boyle test for the federal contractor defense because there is clearly a conflict between Avondale's state law duties with respect to its premises and the federal requirements that Avondale use asbestos-containing products. Because the premises liability claims survive the Mesa and Boyle analyses, there is original jurisdiction over these claims under § 1442(a)(1). See Teague v. Bell Helicopter Servs., Inc., No. 4:03-CV-004-A, 2003 WL 21135481, at *4, *5 (N.D. Tex. Feb. 12, 2003) (denying a motion to remand because plaintiff's claims against the government contractor were not limited to failure to warn and the non-failure to warn claims met the jurisdictional tests).

Thus, the Court is faced with premises liability claims for which the § 1442(a)(1) jurisdictional requirements are met, as well as failure to warn claims for which the § 1442(a)(1) requirements are not met. Title 28 U.S.C. § 1367(a) provides that

> in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

The Court has supplemental jurisdiction over the failure to warn claims under § 1367(a), because they are "so related" to the premises liability claims that they form part of the same "case or controversy." See Carter v. Acands, Inc., No. 3:02-CV-00009, 2002 WL 31682352, at *5 (E.D. Tex. June 27, 2002) (finding that

12

Case MDL No. 875   Document 5009   Filed 04/06/07   Page 68 of 117
Case 2:06-cv-11140-SRD-SS     Document 8-4     Filed 01/30/2007     Page 13 of 13

Case 3:05-cv-01406-JJB-SCR     Document 29     Filed 02/07/2006     Page 13 of 13

supplemental jurisdiction existed for failure to warn claims when there was original

jurisdiction over non-failure to warn asbestos claims asserted against a government

contractor).  Courts may decline supplemental jurisdiction over the state law claims

for the following reasons:

> (1) the claim raises a novel or complex issue of state law, (2) the claim
> substantially predominates over the claim or claims over which the district
> court has original jurisdiction, (3) the district court has dismissed all claims
> over which it has original jurisdiction, or (4) in exceptional circumstances,
> there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367.

None of these factors appears to apply in this case.  Therefore, the Court accepts

supplemental jurisdiction over the failure to warn claims.

## Conclusion

For the foregoing reasons, McFarlain's motion to remand is **DENIED**.  As a

result, Avondale's motion to certify an interlocutory appeal of this order is mooted.

Baton Rouge, Louisiana, February 6, 2006.


JAMES J. BRADY, JUDGE
MIDDLE DISTRICT OF LOUISIANA

## AFFIDAVIT OF THOMAS McCAFFERY

STATE OF VIRGINIA
ALEXANDRIA CITY

     BEFORE ME, the undersigned authority, personally came and appeared:

### THOMAS F. McCAFFERY

who, after being duly sworn, did dispose and state as follows:

1.    He is a technical consultant, researcher and the head of McCaffery & Associates, Inc., a company whose focus is on the location and analysis of United States Navy and merchant ship design, development, construction, maintenance and repair records. He also specializes in research of personnel records, military specifications, qualified product lists and related records.

2.    He is an officer in the United States Naval Reserve and has been since 1976. His current rank is Commander. He has been assigned on active duty to a variety of cruiser and destroyer type ships assigned to the U.S. Atlantic and Pacific Fleets.

3.    He is a Merchant Marine Officer licensed by the United States Coast Guard as Chief Mate of Steam or Motor Vessels of Any Gross Tons Upon Oceans.

4.    Between 1965 and 1976 78 of 93 or 84% of all ocean going ships built by Avondale Shipbuilding, Inc., previously known as Avondale Marine Ways, Inc. were constructed for the U.S. Navy, U.S. Maritime Administration and U.S. Coast Guard. The following table summarizes these ship construction projects:

| U.S. Government Agency | Class / Ship Type | Dates | Number |
|---|---|---|---|
| U.S. Maritime Administration | C4-S-66a / Cargo | 1965 - 68 | 14 |
| U.S. Coast Guard | WHEC 715 / Cutter | 1967 - 72 | 12 |
| U.S. Navy | DE -1052 / Ocean Escort | 1969 - 70 | 7 |
| U.S. Maritime Administration | C4-S-69b / Cargo | 1968 - 69 | 5 |
| U.S. Navy | DE-1078 / Ocean Escort | 1971 - 74 | 20 |
| U.S. Maritime Administration | C8-S-81b / Cargo | 1970 - 73 | 11 |
| U.S. Maritime Administration | C8-S-81d / Cargo | 1973 - 75 | 9 |



EXHIBIT
D

5.   Cargo vessels built for the U.S. Maritime Administration were constructed under the provisions of Title V "Construction Differential Subsidy" (hereinafter "CDS"), of the Merchant Marine Act, 1936 (hereinafter referred to as "the Act"). The CDS program permitted the U.S. Maritime Administration to pay for over one-half of the cost of new merchant ships in order to defray the cost to ship owners of building ships in U.S. commercial shipyards. Fifty-one of the ships listed above were built through this program under contracts between the U.S. Maritime Administration, Avondale and the following commercial shipping companies:

| Company | Ship Class |
|---|---|
| Lykes Brothers Steamship Company | C4-S-66a |
| States Lines | C4-S-69b |
| Prudential Line / Pacific Far East Line | C8-S-81b |
| Delta Line / Waterman Steamship / Central Gulf Line | C8-S-81d |

6.   Sections 502 and 504 of the Act required that the CDS payments be made directly to Avondale, rather than to the prospective ship owner. Further, the Act required that the vessels built with CDS be constructed under a contract or contracts which ". . . contain such provisions as are provided in this title to protect the interests of the United States . . . "

7.   Ship plans and specifications for ships to be constructed with CDS were reviewed by both the U.S. Maritime Administration and the U.S. Navy. The Navy required all ships receiving CDS to include specific "National Defense Features." These features were intended to ensure that the ships could be used as Naval Auxiliaries in time of war.

8.   Ship Construction Contracts for ships built with CDS contained the following provisions:

   a.   The contract consisted of Special Provisions, General Provisions and the approved Plans and Specifications.

   b.   The vessels were to be built by Avondale in strict accordance with the approved Plans and Specifications.

   c.   Changes in the Plans and Specifications could not be made without the specific approval of the Maritime Administration.

   d.   The Maritime Administration would pay Avondale a percentage of the vessel's purchase price equal to the cost differential between U.S. and foreign construction, plus 100% of the cost of the National Defense Features.

   f.   The ships and the shipyard were subject at all times for inspection by representatives of the Maritime Administration.

   g.   The contracts were subject to the provisions to the Walsh-Healy Public Contracts Act.

9.    Ship construction specifications for the ships listed above, approved by the Maritime Administration and incorporated into the Ship Construction contracts, all required the use of at least some asbestos containing materials. Some specifications required the use of several asbestos containing materials.

10.   The prospective ship owners were also parties to Operating Differential Subsidy Contracts with the Maritime Administration. These contracts required all vessels receiving Operating Differential Subsidy to be documented under the Marine Inspection and Navigation Laws of the United States.

11.   The Marine Inspection and Navigation laws are codified in Title 46 "Shipping" of the Code of Federal Regulations and enforced by the U.S. Coast Guard. The specific construction requirements applicable to all general cargo-type vessels built by Avondale are contained in Title 46, Code of Federal Regulations, Subchapters F "Machinery" (parts 50 -62), I "Cargo and Miscellaneous Vessels" (parts 90 - 105), J "Electrical" (parts 110 - 113) and Q "Materials" (part 164).

12.   Part 91 of these regulations is titled "Inspection and Certification". Pursuant to this regulation, vessels built by Avondale are subject to U.S. Coast Guard Inspection and Certification. When a ship is inspected by the U.S. Coast Guard and found to be in compliance with the with all of the Marine Inspection and Navigation Laws, a Certificate of Inspection is issued to the ship. In the absence of a valid Certificate of Inspection any Cargo Vessel built by Avondale could not be operated by either Avondale or the ship's owner.

13.   The prerequisite for issuance of an original Certificate of Inspection by the U.S. Coast Guard is the mandatory Initial Inspection.

A.    The first phase of the Initial Inspection is for the ship owner or builder to submit a complete set of plans for the ship to the U.S. Coast Guard for review and approval (46CFR91.20-10). A ship that is subject to U.S. Coast Guard regulation may not be constructed unless its plans and specifications have been reviewed and approved by the U.S. Coast Guard (46CFR91.55). Only after the plans for the vessel are approved, may the builder begin to construct the ship.

B.    Throughout the construction period the U.S. Coast Guard, along with other Governmental agencies and the American Bureau of Shipping, inspect the ship's structure, machinery, material and workmanship (46CFR91.20-15). The Coast Guard inspections are intended to ensure that the ship is built in accordance with the approved plans and applicable U.S. Coast Guard Regulations (46CFR91.20). Any deviation from, or revision to, the previously approved plans by the builder must be approved, in writing, by the Commandant of the U.S. Coast Guard (46CFR90.15).

14.   Part 92 of Title 46 is titled "Construction and Arrangement." This section establishes the minimum acceptable standards for construction and arrangement of the accommodation and service areas aboard an inspected ship. Section 92.07 is titled "Structural Fire Protection" and identifies the specific materials to be used in the construction of decks, bulkheads and other structures (92.07-5(f)).

15.   For example, the portion of this section dealing with the ship's accommodation and service areas (92-07-10(d) (7)) states,

> "Ceilings, linings, and insulation, including pipe and duct laggings, shall be of approved incombustible materials."

16.   Starting in 1948, the U.S. Coast Guard published, bi-annually, Coast Guard Publication CG 190, "Equipment Lists". These contained lists of, "Items approved or accepted under Marine Inspection and Navigation Laws". Of specific interest is section 164.009, "Incombustible Materials". This section identifies several types of asbestos containing products for insulation and lagging purposes. These products include corrugated asbestos sheathing, asbestos cement board, asbestos paper, asbestos cement, block insulation and pipe covering (lagging). The 1966 edition of this publication listed approved pipe covering products. Non-asbestos containing pipe covering products did not appear in this publication until the 1968 edition. The following products were the only pipe covering products approved by the U.S. Coast Guard through 1968:

> Baldwin-Ehret-Hill, Thermasil
> Baldwin-Ehret-Hill, Thermalite 85% Magnesia
> Fiberboard Products Company, PABCO Precision Molded Caltemp
> Fiberboard Products Company, PABCO Precision Molded Super Caltemp
> Johns-Manville, 85% Magnesia
> Johns-Manville Thermobestos
> Owens-Corning Fiberglass, KAYLO Block Insulation
> Owens-Corning Fiberglass, KAYLO 20 Block Insulation
> Pittsburgh-Corning Corp., UNIBESTOS
> The Rubberoid Company, Calsilite

17.   All of the pipe covering products identified above contained asbestos.

18.   Accordingly, the only products that were approved by the U.S. Coast Guard for use as pipe coverings (laggings) in the service and accommodation areas of the general cargo-type ships constructed by Avondale through 1968 contained asbestos.

19.   The basis for the contracts between Avondale and the U.S. Navy and U.S. Coast Guard to build the Navy warships and Coast Guard cutters listed above were the construction specifications prepared by the U.S. Navy or U.S. Coast Guard. Section 9390 / S39 of these specifications deals with the thermal insulation requirements of each class of ships. This section incorporates by reference

either Section 9390 / S39 of the "General Specifications for Ships of the U.S. Navy" (hereinafter "General Specifications"), or Military Standard 769, "Thermal Insulation Requirements for Machinery and Piping". These documents specify the materials and minimum acceptable thicknesses for all thermal insulation products that may be used in the construction of ships for the U.S. Navy and U.S. Coast Guard.

20.    Table 1 of both Military Standard 769 and Section 9390 / S39 of the General Specifications identify the product specifications which may be used on piping, valves, fittings, flange joints and machinery at indicated temperature ranges. Only two products were approved for use on piping whose temperature exceeded 370° F. These are Mil-I-2781, "Insulation, Pipe, Thermal" and Mil-T-15349, "Insulation Tape, Thermal". The latter product was only approved for temperatures up to 750° F on piping up to 3/4" in diameter.

22.    Specification Mil-I-2781 provides for three different grades of product, identified by temperature range. The maximum temperatures are, by class, 600°, 750° and 1200° F, respectively. Grades II and III each had two classes of product identified as "Fibrous" and "Compounded". All three grades would have been used in the construction of the warships and cutters listed above. The specification was amended on March 1, 1971 to delete the "Fibrous" classes of Grade II (class c) and Grade III (class f). On January 9, 1973 this specification was further amended to require that the products manufactured under this specification be asbestos and silica free.

22.    Paragraph 3 of Specification Mil-I-2781 requires that any product furnished under this specification must be one of those which has been tested, approved for use by the U.S. Navy and listed on the Qualified Products List for this specification. Qualified Products Lists for this specification, and its predecessor specification, Navy Department Specification 32-P-8 since 1950. All of the products contained on these lists contained asbestos. The first non-asbestos containing product approved under this specification was not available until May 27, 1969. Another non-asbestos containing product became available under this specification on August 1, 1972. The first Qualified Product List with no asbestos containing products was issued on May 3, 1973. Accordingly, the only products that Avondale could have used to insulate pipes larger than 3/4" at temperatures above 370° F on ships it built for the U.S. Navy or U.S. Coast Guard through mid-1969 contained asbestos.

23.    All contracts between the U.S. Navy, Coast Guard or Army and Avondale incorporated by reference, among others, the provisions of the Walsh-Healy Public Contracts Act.

24.   From the above he concludes that:

   a.   From the 1965 through 1976 Avondale entered into at least seven contracts with various U.S. Government entities to construct 78 ocean going vessels.

   b.   Ocean going vessels built for the U.S. Government represent approximately 84% of the ocean going vessels built by Avondale between 1965 and 1976.

   c.   The contracts to build these ships incorporated, by reference, ship construction specifications, plans, Military Standards, Military Specifications, Federal Regulations and the provisions of the Walsh-Healy Public Contracts Act. These documents also included lists of specific products approved by the U.S. Government for use in building ocean going vessels.

   d.   All of the contracts to build ships for the U.S. Government required that Avondale build the ships in strict accordance with the construction specifications, plans and other documents incorporated into the ship construction contracts.

   e.   On ships built for the U.S. Government, Avondale could only install those products which were approved for use by the U.S. Government.

   f.   Non-asbestos containing thermal insulation products were not approved for use on U.S. Navy or U.S. Coast Guard ships until May 27, 1969.

   g.   At least 83% of the asbestos containing thermal insulation used at Avondale from 1965 - 1976 was purchased by Avondale as a result of U.S. Government requirements.

26.   He has read the foregoing and all of the information contained therein is true and accurate to the best of his personal knowledge.

        Executed this 26th day of January, 2007 at Alexandria City, Virginia.


                              Thomas McCaffery


Sworn and subscribed before me
on this 26th day of January, 2007




Notary Public

## AFFIDAVIT OF EDWARD BLANCHARD

STATE OF LOUISIANA

PARISH OF JEFFERSON

BEFORE ME, the undersigned authority, personally came and appeared:

### EDWARD BLANCHARD

who, after being duly sworn, did dispose and state as follows:

1.　　With the exception of approximately two years of service in the United States Navy between 1944 and 1946, he was employed at Avondale Shipyards and Avondale Industries, Inc. from 1942 until 1988, when he retired. From 1950, on he was a supervisor and, later, General Superintendent of Outfitting, Assistant Vice-President of Production Operations, Vice-President of Production Operations, and Group Vice-President of Production Operations at Avondale. At Avondale he oversaw the construction of all vessels.

2.　　Since 1950, he and the Avondale Production Department have worked intimately with personnel and inspectors from the United States Navy, the United States Coast Guard, and the United States Maritime Administration in the construction of military vessels built pursuant to contracts with the United States



—                                —

Navy, the United States Coast Guard and the Maritime Commission (hereinafter

sometimes referred to as "Federal Vessels").

3.     During all aspects of work on the Federal Vessels, *e.g.* landside

construction, launching, outfitting, testing and sea trials, Avondale performed its

work under close, constant, and detailed surveillance by the United States Navy,

United States Coast Guard and the Maritime Commission and other federal agencies

(hereinafter sometimes referred to as "Federal Inspectors"). This surveillance was

exercised by written specifications and personal oversight and inspection of all

Avondale work by Federal Inspectors. Virtually no aspect of the construction of

Federal Vessels escaped this close monitoring.

4.     During all aspects of the construction of Federal Vessels, Federal

Inspectors retained the ultimate decision making authority over all construction. If

a disagreement regarding any issue arose, the Federal Inspectors' decision controlled.

5.     During the construction of the Federal Vessels, the Federal Inspectors

would continuously inspect the vessel to ensure that the work on the vessel met the

federal government's regulatory and contractual criteria. These inspections would

take place daily, and he interacted with the Federal Inspectors daily to ensure that

production was proceeding on schedule and meeting all government specifications.

6.      In the 1950's, the Navy established a quality control system where all work performed on Navy vessels was approved by a Navy inspector. Later, the Navy established a Quality Assurance Office at Avondale. The Navy Quality Assurance group operated out of a two-story building constructed at Avondale pursuant to the Navy contracts which housed over sixty (60) Navy inspectors. Since he first became involved with navy inspectors at Avondale, the Navy inspectors had the authority to stop production on a project if any aspect of the work was being performed improperly or in an unsafe manner. Any problems noted by a Navy inspector had to be corrected before work on a project could proceed.

7.      The Federal Inspectors and their representatives had unlimited access to all areas of the Avondale shipyard. Federal Inspectors were allowed to go anywhere in the shipyard at any time and were not required to be escorted by Avondale personnel.

8.      There were different types of Federal Inspectors at Avondale, including boiler inspectors, hull inspectors, and safety inspectors. Further, the United States Navy and the United States Coast Guard had safety and occupational health

inspectors at Avondale that conducted frequent "walk-throughs" throughout the shipyard facility. The Navy also had inspectors who conducted similar "walk-throughs" during the construction of the Destroyer Escort Vessels and all other Navy vessels built at Avondale.

9.    The Federal Inspectors maintained a constant presence at Avondale and oversaw every aspect of the shipbuilding process. Further, the Navy inspectors were provided offices at Avondale pursuant to the Navy contracts and were present at Avondale at all times.

10.    The Federal Inspectors monitored every aspect of the construction of the vessels at Avondale from the moment the materials to be used in the construction first arrived at Avondale until the ship was fully outfitted and delivered.

11.    As soon as products to be used in the construction of a Navy vessel arrived at Avondale, they became the property of the United States Navy. The Navy inspectors oversaw the unloading, handling and storage of all construction materials, from steel plates to insulation products, and monitored the care and "housekeeping" of those products at Avondale until they were installed on the vessels.

12.    He recalls that the Navy required compliance with the smallest details

4

and, for example, would even check the temperature and humidity at which welding rods were stored.

13.     Similarly, the Navy monitored the handling and storage of insulation materials to be installed on vessels. The inspectors would reject materials which were broken or which had been stored improperly and were, for instance, too damp, and oversaw the installation of the products and tested the products once the installation was complete.

14.     Since the 1950's, the Navy had also worked closely with the safety directors at Avondale to ensure that Avondale maintained a safe working environment for its employees during he construction of Navy vessels.

15.     He recalls that Jim O'Donnell, the first head of the Avondale Safety Department frequently met with the Federal Inspectors to discuss safety issues regarding the construction of Federal Vessels.

16.     Navy inspectors had ultimate control over safety issues on Navy projects at Avondale and could shut down work on a project if they felt that the work was not being performed safely. Maritime Commission and Coast Guard inspectors had this same authority on Maritime Commission subsidized vessels and Coast Guard vessels.

17.     The Federal Vessels constructed at Avondale were built in stages, and every stage of the ship construction was inspected and approved by Federal Inspectors.   Work on a Federal Vessel could not progress until the work was inspected and approved by the Federal Inspectors and work that did not meet their specifications had to be corrected.

18.     He had to prepare 30-day production reports regarding the progress on the construction of every vessel built for the Navy, the Coast Guard, or the Maritime Commission at Avondale.   In those reports, he would have to certify that Avondale had complied with the contract requirements for a particular vessel before the installment payments would be released.

19.     He specifically recalls the Navy inspectors requiring adequate ventilation in vessels while insulation was being installed and specifically recalls discussing ventilation to be provided on the Destroyer Escorts with the Navy inspectors supervising that project and working with the Navy personnel to ensure that adequate ventilation was provided to the employees working on those vessels.

20.     He was personally involved in pre-bid inspections at Avondale where Navy personnel would review the working and safety conditions at the shipyard prior

to the awarding of a Navy contract.

21.    As soon as any ship built for the Navy, the Coast Guard or the Maritime

Commission was launched and outfitted, various trials followed.  A "Dock-Side" trial

would first be conducted to assure a successful "Builder's Trial."  Federal Inspectors

would be present to monitor those tests.

22.    The first sea trial was called the "Builder's Trial" and was conducted by

the shipyard using its personnel and senior Navy and government personnel on board

for inspections, observation and approval.  During the Builder's Trial, Navy and

government inspectors would inspect the ship and would issue deficiency reports if

they found any problems on the ship.  The ship would then return to the shipyard

facility, and shipyard workers would correct any deficiencies found by the inspectors.

He has personally participated in these sea trials on Navy vessels, including the

Destroyer Escorts.  Similar, if not identical, procedures governed the Builder's Trials

of Coast Guard and Maritime Commission vessels.

23.    Following the completion of the Builder's Trial and after Avondale made

the necessary corrections to the ship, a second sea trial called an "Acceptance Trial"

was conducted.  Acceptance Trials were fully staffed by United States Navy officers,

—                           —

civilian employees and crew, with shipyard and manufacturers' representatives along

to observe.  As before, any deficiencies discovered by any inspectors during the

Acceptance Trial were Avondale's responsibility to correct.  Similar, if not identical,

procedures governed the Coast Guard and Maritime Commission vessels.

24.    He recalls that the Navy had lists of qualified products which could be

used in the construction of their vessels and that every single component installed on

a vessel constructed at Avondale had to be on the Navy's qualified list.  Any

substitutions or changes in items to be installed on a vessel had to be approved by the

Navy.  Similar, if not identical, procedures governed the Coast Guard and Maritime

Commission vessels.

25.    During the construction of steam-powered commercial cargo vessels in

the 1906's and 1970's, the same regular and detailed inspections of the work on those

vessels were conducted by inspectors working under the authority of the U.S. Coast

Guard and the Maritime Commission.  For example, for Lykes Lines vessels

constructed at Avondale, he recalls that there were ten inspectors monitoring the

construction.

26.    He has read the foregoing and all of the information contained herein is

true and accurate to the best of his knowledge, information and belief.

8

Executed this __30th__ day of June, 2005 at __Avondale__

Louisiana.

__Edward Blanchard__
EDWARD BLANCHARD

Sworn to and subscribed before me
this 30 day of June, 2005.

_____
NOTARY PUBLIC

KRISTOPHER T. WILSON
NOTARY PUBLIC
LA BAR No. 23978
Parish of Orleans, State of Louisiana
My Commission is issued for Life

Page 1

2003 U.S. Dist. LEXIS 2088, *

1 of 1 DOCUMENT

RHONDA TEAGUE, ET AL., Plaintiffs, VS. BELL HELICOPTER SERVICES, INC., ET AL., Defendants.

NO. 4:03-CV-004-A

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION

*2003 U.S. Dist. LEXIS 2088*

February 12, 2003, Decided

February 12, 2003, Filed; February 13, 2003, Entered

DISPOSITION:
[*1] Plaintiffs' motion to remand denied.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiffs decedents family sued defendant, decedents former employer and related corporate entities, and claimed that decedent was exposed to asbestos during his employment. The employer removed the action to the instant and claimed federal officer removal jurisdiction. The family filed an emergency motion to remand.

**OVERVIEW:** The employer used asbestos in the process of manufacturing military helicopters. The family alleged that decedent's exposure to asbestos caused his injuries that resulted in his death. To claim that removal was proper under *28 U.S.C.S. § 1442*, the employer had the had to meet the elements of a three prong test. Because corporate entities qualified as persons under § 1442(a)(1), the employer met the first prong. The employer acted pursuant to the directions of the federal government in contracting to design and manufacture military helicopters and the federal government exercised strict control over the employer's design and manufacture of the military helicopters, and that. Thus, prong two was met. The employer successfully used a colorable federal defense because liability for design defects in military equipment could be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

**OUTCOME:** The family's motion to remand was

denied.

LexisNexis(TM) HEADNOTES – Core Concepts

*Civil Procedure > Removal > Basis for Removal*
[HN1] *28 U.S.C.S. § 1442*(a)(1) allows removal from state court to federal court by the following parties: The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

*Civil Procedure > Removal > Basis for Removal*
[HN2] To claim that removal is proper pursuant to *28 U.S.C.S. § 1442*(a)(1), a defendant has the burden of showing that it: (1) is a "person" within the meaning of the statute; (2) acts pursuant to a federal officer's directions and that a causal nexus exists between the defendant's actions under color of federal office and the plaintiff's claims; and (3) asserts a colorable federal defense.

*Civil Procedure > Removal > Basis for Removal*
[HN3] When a government contractor builds a product pursuant to Air Force specifications and is later sued because compliance with those specifications allegedly causes personal injuries, the nexus requirement for removal to federal court is satisfied.

*Military & Veterans Law > Tort Liability*
[HN4] Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States has approved reasonably precise specifications; (2) the equipment conforms to those


EXHIBIT F

Page 2

2003 U.S. Dist. LEXIS 2088, *

specifications; and (3) the supplier warns the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Civil Procedure > Removal > Basis for Removal*
[HN5] Regarding a "colorable federal defense" in removal analysis, defendants need not prove the asserted defense, but need only articulate its colorable applicability.

COUNSEL:
For RHONDA J TEAGUE, LEATRICE JOY HENDERSON, plaintiffs: Melissa K Hutts, Attorney at Law, Baron & Budd, Dallas, TX USA.

For BELL HELICOPTER SERVICES INC, BELL HELICOPTER TEXTRON INC, TEXTRON INC, defendants: Stephen C Howell, Attorney at Law, Howell Dorman Loyd & Sams, Fort Worth, TX USA.

For GUARD-LINE INC, defendant: Robert Wilkinson, Attorney at Law, Dogan & Wilkinson, Pascagoula, MS USA.

JUDGES:
JOHN McBRYDE, United States District Judge.

OPINIONBY:
JOHN McBRYDE

OPINION:

MEMORANDUM OPINION and ORDER

Came on for consideration plaintiffs' emergency motion to remand. n1 The court, having reviewed the motion, the expedited response of defendant Textron, Inc. ("Textron"), n2 plaintiffs' reply, the record, and applicable authorities, concludes that the motion should be denied.

n1 The "emergency" label on plaintiffs' motion influenced the court's decision to order defendants to file an expedited response. The court agrees with Textron that there appears to be no justification for the "emergency" label. See Resp. at 13-14.

n2 One of the exhibits attached to Textron's response is the declaration of Gary D. Kelley ("Kelley"), which the court is not considering because it does not have an original signature.

[*2]

I.

Background

Plaintiffs instituted this suit in the District Court of Tarrant County, Texas, 67th Judicial District, on November 22, 2002, against Textron and related corporate entities, complaining that Robert William Henderson ("Henderson"), now deceased, was exposed to asbestos during his employment by Bell. n3 Bell used asbestos in the process of manufacturing military helicopters. They allege that Henderson's exposure to asbestos caused his injuries that resulted in his death. Pet. P 11. Textron removed the action to this court by notice of removal filed January 3, 2003, claiming federal officer removal jurisdiction under *28 U.S.C. § 1442(a)(1)*. All other defendants consented to the removal. See Notice of Removal, Exs. B & C.

n3 For convenience, defendants are collectively referred to as "Bell."

II.

Federal Officer Removal Jurisdiction

[HN1] Section 1442(a)(1) allows removal from state court to federal court by the following parties:

The United States or any agency [*3] thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

*28 U.S.C. § 1442(a)(1); Mesa v. California, 489 U.S. 121, 103 L. Ed. 2d 99, 109 S. Ct. 959 (1989).* [HN2] To claim that removal was proper pursuant to section 1442(a)(1), Textron has the burden of showing that Bell: (1) is a "person" within the meaning of the statute; (2) "acted pursuant to a federal officer's directions and that a causal nexus exists between the defendant's actions under color of federal office and the plaintiff's claims"; and (3) asserts a "colorable federal defense." *Winters v. Diamond Shamrock Chem. Co., 149 F.3d 387, at 398-401.*

A. "Person" Under Section 1442(a)(1)

Because corporate entities qualify as persons under section 1442(a)(1), *id. at 398,* Textron meets the first prong.

B. Acted Pursuant to Federal Directions & Causal Nexus

Textron provides ample [*4] support for its contention that, at times relevant to this action, Bell acted

Case MDL No. 875   Document 5009   Filed 04/06/07   Page 86 of 117
Case 2:06-cv-11140-SRD-SS      Document 8-7      Filed 01/30/2007      Page 3 of 5

Page 3

2003 U.S. Dist. LEXIS 2088, *

pursuant to the directions of the federal government in contracting to design and manufacture military helicopters. Attached to Textron's response is the declaration of William T. Wilson ("Wilson"), who worked for Bell in contract administration for thirty-two years, and served as director of helicopter contracts. Wilson Decl. P 2. Wilson details the extensive interaction between the government and Bell in carrying out the contracts:

3. Since 1951, Bell has supplied thousands of helicopters to the U.S. government for military use, including the H-13, UH-1, and AH-1 series aircraft. Throughout this time, Bell has had to follow specific Government-approved procedures, regulations, laws, and standards for the design, materials, marking, production, and delivery of these helicopters.

....

5. In 1955, the USAF awarded Bell a contract for the production of three prototype aircraft, designated XH-40 aircraft. In the contract, the USAF selected precise specifications Bell had proposed in response to government design criteria. The USAF established those specifications as contractual requirements [*5] which Bell had to adhere to in producing the prototypes. One of the specifications mandated by the USAF in the construction of the aircraft was the use of asbestos in certain seals and gaskets on the stainless steel enclosure the government mandated for the engine compartment. This performance requirement was imposed by the government to prevent the spread of fire from the engine compartment to the passenger compartment.

10. The U.S. Government actively participated in the development of the UH-1 and AH-1 series helicopters. To facilitate the Government's review and approval of the design and production specifications and engineering drawings, the Government maintained a staff of military and civilian representatives at Bell's plant. From the 1960's to the present, the Government has maintained scores of personnel at Bell's plant to ensure the helicopters were built in accordance with the Detail Specifications. ... They were charged with reviewing and approving engineering drawings, assuring adherence to military specifications and requirements, assisting Bell's employees in achieving full compliance with military contract requirements, approving manufacturing and [*6] assembly processes and products, and accepting helicopters and supplies on behalf of the Government after determining they met every contract requirement.

....

12. Bell delivered any helicopter and part to the U.S. Army pursuant to a Government contract requiring Bell

to adhere to detailed Government-approved design, production, marking, and shipping specifications. The contracts incorporate by reference the relevant specifications and mandate that all aircraft or parts be manufactured in accordance with the Detail Specifications and that Bell's quality assurance program conform to military specifications.

13. If Bell failed to manufacture military helicopters in strict compliance with Government specifications, Bell was subject to a variety of penalties under U.S. law, including civil and criminal sanctions. Bell was not permitted to change specifications in any way without the express authorization of the Government.

....

15. Bell performed the helicopter contracts in accordance with the requirements of the Detail Specifications prepared at the direction of the Government, approved by the Government, and incorporated by reference in the contracts. The [*7] Government did not permit Bell to deviate from the Detail Specifications without a contract change authorized by the Government's Contracting Officer. ... The Detail Specifications incorporated a multi-page list of military specifications, known as "mil-specs," which had to be followed. The mil-specs themselves were often lengthy and detailed documents. The mil-specs described the characteristics for helicopter parts containing asbestos as required by the Detail Specification. The seals and gaskets that a production employee at Bell might have come in contact with were such parts.

....

22. In short, in accordance with Government contract requirements, the Government was directly and intimately involved with development and controlled the design of every aspect of the helicopter, including without limitation the types of materials used in the helicopters and their component parts. Government representatives closely monitored Bell's work at every steps in the design process and Government evaluation and approval had to occur at every step. Bell had little or no leeway in determining the required design of the helicopters, including the required materials for the component [*8] parts and their painting and marking.

23. Bell had no actual knowledge of any danger in the use of asbestos in helicopter components that was not known to the US Government.

....

25. In short, at every step in the development and production of UH-1 and AH-1 series helicopters, Bell had to follow Government-evaluated and -approved Detail Specifications concerning the design, materials, painting and markings for those helicopters and their

2003 U.S. Dist. LEXIS 2088, *

component parts. Every helicopter or component part accepted by the Government from Bell was accepted only after the Government confirmed the aircraft or part conformed to the contract specifications. Bell possessed no knowledge of the dangers, if any, concerning the design, materials, painting, and markings for those helicopters and their component parts which Government was not already aware of.

27. [sic] In summary, the government mandated the use of asbestos by Bell in the manufacture of helicopters that were made by Bell during the period of time that the decedent Robert William Henderson was employed by Bell. Bell had no discretion in its use of asbestos in the helicopters. Had Bell refused to follow government mandated [*9] use of asbestos it would have ben [sic] subject to numerous civil and criminal penalties.

Id. PP 3, 5, 10, 12-13, 15, 22-23, 25, 27. The court finds that the federal government exercised strict control over Bell's design and manufacture of the military helicopters, and that Bell acted pursuant to the direction of the federal government at the times relevant to this action.

Plaintiffs deny that a causal nexus exists between their claims and Bell's actions under color of federal office:

In this action, Defendants' conduct at issue is their safety and warning-related activities, and in particular their failure to warn of the hazards associated with asbestos use and exposure. Textron has not established, nor has it alleged, that its safety and warning-related activities were under the direction and control of a federal officer. Although Textron may in fact ultimately prove that it (or its predecessors) built helicopters at the direction of the United States, Plaintiffs are confident that Textron can offer no such proof regarding (non-existent) asbestos warnings.

Mot. at 4 (emphasis in the original); see also id. at 9 (stating, "Textron offers no evidence [*10] that the federal government addressed, in any way, Textron's ability to warn employees of the presence and dangers of asbestos").

While certain portions of plaintiffs' state-court petition allege failure-to-warn theories of liability, the petition also sets forth claims that complain of use of asbestos in the design and manufacturing processes:

14. .... The Defendants were negligent in one, some and/or all of the following respects, among others, same being the proximate cause of Plaintiffs' decedent's illnesses, disabilities and/or death:

....

(e) in failing to develop and utilize a substitute material to eliminate asbestos fibers in the asbestos-containing products, and/or the machinery requiring or calling for the use of asbestos and/or asbestos-containing products;

(f) in failing to properly design and manufacture asbestos, asbestos-containing products, and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products for safe use under conditions of use that were reasonably anticipated;

....

16. Plaintiffs' decedent was exposed to asbestos-containing products and/or machinery requiring or calling [*11] for the use of asbestos and/or asbestos-containing products that were manufactured and distributed by the Defendants and/or their predecessors-in-interest for use as construction materials and/or machinery in industrial operations. Plaintiffs would show that the defective condition of the products rendered such products unreasonably dangerous, and that the asbestos-containing products and/or machinery were in this defective condition at the time they left the hands of Defendants.

Pet. PP 14(e) - (f), 16; see also id. PP 11, 26. Thus, plaintiffs' characterization of this action as simply being about defendants' safety- and warning-related activities is not accurate.

With regard to defendants' design and manufacture of military helicopters, "the government mandated the use of asbestos by Bell during the period of time that the decedent Robert William Henderson was employed by Bell." Wilson Decl. P 27. The court concludes that Textron satisfied its burden that a causal nexus exists between Bell's actions under color of federal office and some of plaintiffs' claims. See, e.g., *Akin v. Big Three Indus., Inc., 851 F. Supp. 819, 823-24 (E.D. Tex. 1994)* (stating, [*12] "plainly, [HN3] when a government contractor builds a product pursuant to Air Force specifications and is later sued because compliance with those specifications allegedly causes personal injuries, the nexus requirement is satisfied").

C. Colorable Federal Defense

Textron asserts as its "colorable federal defense" the government contractor defense, see Resp. at 5, the criteria of which are set out in Boyle v. United Technologies Corp.:

[HN4] Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the

2003 U.S. Dist. LEXIS 2088, *

dangers in the use of the equipment that were known to the supplier but not to the United States.

*487 U.S. 500, 512, 101 L. Ed. 2d 442, 108 S. Ct. 2510 (1988)*; see also *Winters, 149 F.3d at 400*. As the Fifth Circuit noted, [HN5] "defendants need not prove the asserted defense, but need only articulate its 'colorable' applicability." *Winters, 149 F.3d at 400*; see also *Jefferson County v. Acker, 527 U.S. 423, 431, 144 L. Ed. 2d 408, 119 S. Ct. 2069 (1999)* [*13] (recognizing that "one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court," and not requiring "the officer virtually to win his case before he can have it removed") (internal quotations and citations omitted).

Textron has adduced sufficient evidence through Wilson's declaration -- the particularly pertinent portions of which are recited in Section II.B. above -- to support the colorable applicability of the federal contractor defense.

***The court concludes that Textron has satisfied its burden under *28 U.S.C. § 1442(a)(1)*, and that accordingly, plaintiffs' motion to remand should be denied.

III.

ORDER

For the reasons discussed,

The court ORDERS that plaintiffs' motion to remand be, and is hereby, denied.

SIGNED February 12, 2003.

JOHN McBRYDE

United States District Judge

Page 1

1996 U.S. Dist. LEXIS 22676, *

FOCUS - 5 of 6 DOCUMENTS

SYLVIA SANTOS WILLIAMS, et al., Plaintiffs, VS. TODD SHIPYARDS
CORPORATION, Defendant.

CIVIL ACTION NO. H-95-4592

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
TEXAS, HOUSTON DIVISION

*1996 U.S. Dist. LEXIS 22676*

March 29, 1996, Decided

April 2, 1996, Entered

**DISPOSITION:**

[*1]    Motion to remand filed by plaintiffs and intervenors. (Docket Entry No. 3) GRANTED in part and DENIED in part.

**COUNSEL:**

For SYLVIA SANTOS WILLIAMS, JOSEPH SANTOS, III, RICHARD SANTOS, plaintiffs: Eric Alan Von Bogdan, Williams Bailey, Houston, TX.

For DORIS GILBREATH, JON L GILBREATH, JEFFREY D GILBREATH, DEBORAH ANDREWS, ELNORA MAE CLEMENTS, SANDRA EARLENE DODSON, intervenor-plaintiffs: Eric Alan Von Bogdan, Williams Bailey, Houston, TX.

For DORIS RICHARDSON RYLEE, DEBRA K RYLEE, VICKI RENEE RYLEE, intervenor-plaintiffs: Eric Bogdan, William Bailey Law Firm, Houston, TX.

For TODD SHIPYARDS CORPORATION, defendant: Ned Edward Wesley Johnson, Johnson and Associates, Elena Faye Diiorio, Vinson and Elkins, Houston, TX.

**JUDGES:**

Lee H. Rosenthal, United States District Judge.

**OPINIONBY:**

Lee H. Rosenthal

**OPINION:**

MEMORANDUM AND OPINION

Pending before this court is a motion to remand filed by plaintiffs and intervenors. (Docket Entry No. 3). Based on a careful review of the pleadings, motions,

submissions, and applicable law, the court GRANTS the motion in part and DENIES it in part, for the reasons set out below.

I. Background

The original plaintiffs in this case are the representative [*2] and heirs of Joseph Santos, Jr., ("Santos"). Santos worked for defendant Todd Shipyards Corporation ("Todd Shipyards") from 1953 to 1990 as a machinist. During his employment, Santos was exposed to asbestos. Santos died of lung cancer on May 7, 1992. Plaintiffs sued Todd Shipyards in the 113th Judicial District of Harris County on April 22, 1994, asserting that Todd Shipyards' gross negligence caused Santos's death.

Between August 24, 1995 and August 29, 1995, four sets of intervenors filed similar claims for the deaths of four other former Todd Shipyards employees allegedly caused by asbestos exposure. Each intervention raised causes of action covering different employment and exposure periods, occupations, and diseases. The intervenors are the representatives and heirs of Alonzo R. Bell ("Bell"), Earl W. Clements ("Clements"), Lowry E. Gilbreath ("Gilbreath"), and William K. Rylee ("Rylee").

Todd Shipyards removed this case to federal court on September 22, 1995. Two of the intervenor groups, *Clements* and *Gilbreath*, alleged asbestos exposure occurring between 1939 and 1968. Todd Shipyards asserts that during World War II, it operated the Houston and Galveston shipyards [*3] under the authority and/or direction of federal officers. Todd Shipyards removed this case pursuant to *28 U.S.C. § 1442*(a)(1).

Plaintiffs/intervenors move for remand, asserting that this court lacks jurisdiction because these cases arise



1996 U.S. Dist. LEXIS 22676, *

under the Texas Workers' Compensation Act and are nonremovable under 28 U.S.C. § 1445(c); because Todd Shipyards has failed to establish jurisdiction under section 1442(a) as to the *Clements* and *Gilbreath* intervenors; and because Todd Shipyards has failed to state a basis for removal of claims of the remaining intervenors and the original plaintiffs.

## II.   28 U.S.C. § 1445(c) and the *Clements* and *Gilbreath* Intervenors

Plaintiffs/intervenors first argue that this case is not removable because the claims arise under the state workers' compensation statute.  28 U.S.C. § 1445(c) provides as follows:

A civil action in any State court arising under the workmen's compensation laws of such State may not be removed to any district court of the United States.

The Fifth Circuit has defined the "arising under" standard in section [*4]  1445(c) in a manner consistent with the interpretation of that standard under section 1331. A suit "arises under" the law that creates the cause of action. *Patin v. Allied Signal, Inc.*, 77 F.3d 782, 1996 WL 93996, *3 (5th Cir. 1996); *Jones v. Roadway Express*, 931 F.2d 1086, 1092 (5th Cir. 1991). In *Ehler v. St. Paul Fire and Marine Ins. Co.*, 66 F.3d 771 (5th Cir. 1995), the court held that an injured employee's suit to rescind a settlement agreement with a worker's compensation insurer for fraud or misrepresentation was based on a cause of action created by Texas common law, not the Texas Workers' Compensation Act. "That a workers' compensation law is a premise of the tort does not mean that the tort 'arises under' the workers' compensation laws...." *Id.* at 773 (citation omitted). Similarly, in *Patin v. Allied Signal, Inc.*, the Fifth Circuit held that claims against a workers' compensation carrier for breach of the duty of good faith and fair dealing do not arise under the workers' compensation statutes and are not within the non-removability provision of section 1445(c).

In the present case, plaintiffs/intervenors seek exemplary [*5]  damages for Todd Shipyard's alleged gross negligence relating to decedents' exposure to asbestos. The Texas Worker's Compensation Act states in pertinent part as follows:

This section does not prohibit the recovery of exemplary damages by the surviving spouse or heirs of the body of a deceased employee whose death was caused by an intentional act or omission of the employer's gross negligence.

Texas Labor Code § 408.001(b), formerly Tex. Rev. Civ. Stat. Ann. Art. 8306, § 5. The Fifth Circuit has held

that by exempting exemplary damages for wrongful death due to the employer's gross negligence from the exclusive remedy bar, the Texas Worker's Compensation Act does not create a cause of action for exemplary damages, but merely saves the existing common law cause of action. *Bridges v. Phillips Petroleum*, 733 F.2d 1153, 1155; see also *Duhart v. State*, 610 S.W.2d 740, 743 (Tex. 1980); *Terry v. Tyler Pipe Indus.*, 645 F. Supp. 1194, 1199 (E.D. Tex. 1986). n1]

> n1  In *Duhart*, the Texas Supreme Court noted that the purpose of Article 8306 § 5 was "not to create a cause of action for exemplary damages, but rather to leave the law as it was before the passage of the compensation act." *Duhart*, 610 S.W.2d at 743.

[*6]

The plaintiffs/intervenor's causes of action do not "arise under" the Texas worker's compensation statute so as to preclude removal under section 1445(c).

## III.   28 U.S.C. § 1442(a)(1)

Section 1442(a)(1), the federal officer removal statute, provides that an action may be removed to federal court by:

any officer of the United States or any agency thereof, or person acting under him, for any act under color of such office. ...

A removing party that is not itself a federal officer must: 1) be a "person" within the meaning of section 1442(a)(1); 2) assert a colorable claim to a federal defense; and 3) show that it is sued for acts taken "under color of" federal office or at the direction of a federal officer. *Akin v. Big Three Industries, Inc.*, 851 F. Supp. 819, 822 (E.D. Tex. 1994)(citations omitted). Each of these elements is addressed below.

### A. A "Person" Under Section 1442(a)(1)

In *Peterson v. Blue Cross/Blue Shield of Texas*, 508 F.2d 55, 58 (5th Cir.), cert. denied, 422 U.S. 1043, 45 L. Ed. 2d 694, 95 S. Ct. 2657 (1975), the Fifth Circuit held that a corporate defendant could [*7]  be a "'person' acting under" a federal office for the purpose of section 1442(a)(1). See also *Akin*, 851 F. Supp. at 823; *Pack v. A.C. and S., Inc.*, 838 F. Supp. 1099, 1102 (D. Md. 1993); *Fung v. Abex Corp.*, 816 F. Supp. 569, 572 (N.D. Cal. 1992); *Ryan v. Dow Chem. Co.*, 781 F. Supp. 934, 946 (E.D.N.Y. 1992). For the purpose of section 1442(a)(1), Todd Shipyards is a "person."

### B. The Assertion of a Colorable Federal Defense

Page 3

1996 U.S. Dist. LEXIS 22676, *

A removing party under section 1442(a)(1) must assert a colorable claim to a federal defense, to "ensure that the federal district court is passing on a question of federal law." *Akin, 851 F. Supp. at 823; Mesa v. California, 489 U.S. 121, 103 L. Ed. 2d 99, 109 S. Ct. 959 (1989)*. The removing party is not required to prove the validity of the defense, but must allege a colorable claim to such a defense. *489 U.S. at 129.*

Todd Shipyards asserted that it has a colorable claim to the government contractor defense as set forth in *Boyle v. United Technologies Corp., 487 U.S. 500, 101 L. Ed. 2d 442, 108 S. Ct. 2510 (1988)*. (Docket Entry [*8] No. 1). *Boyle* established a three-part test for the governmental contractor defense to tort liability under state law, as follows:

1) the federal government approved reasonably precise specifications for contract performance;

2) the performance of the contract conformed to those specifications; and

3) the contractor informed the government of any hazards associated with these specifications of which it was aware, and of which the government was not aware.

*Boyle, 487 U.S. at 512.*

Todd Shipyards provides affidavit evidence that it worked almost exclusively on government-owned vessels during World War II. This work was done according to specifications issued and approved by the vessel owners, the Navy, Army, or Maritime Commission. (Docket Entry No. 6, pp. 6-7 and Affidavit of Robert Moore).

Both before and after the United States entered World War II, Todd Shipyards repaired, rebuilt, and retrofitted government-owned vessels. All work performed for the Navy was subject to the Minimum Standards for Contract Navy Shipyards. (Docket Entry No. 6, Exhibit D). The federal government required adherence to these standards for shipyards performing [*9] government contract work. These specifications included requirements for the materials to be used and craft assignments. The Minimum Standards set out specific procedures for the use of required materials, including asbestos. Navy inspectors monitored Todd Shipyards' work and governmental personnel generally controlled production under procedures mandated by the United States Navy. (Docket Entry No. 6, pp. 6-7 and Exhibits A and B).

This court finds that Todd Shipyards has asserted a colorable claim to the federal government contractor defense for the purpose of removal under section 1442(a)(1).

C. *Acts Performed Under the Direction of a Federal*

*Officer*

The final requirement for removal under section 1442(a)(1) is that the lawsuit arise out of actions taken by a government contractor at the direction of a federal officer. *Akin, 851 F. Supp. at 823; Pack, 838 F. Supp. at 1103; Fung, 816 F. Supp. at 572*. When the defendant claims to have been a "person acting under" a federal office, the question is whether the suit is "based upon actions taken pursuant to federal direction." *Ryan, 781 F. Supp. at 949* (citation [*10] omitted). The defendant must prove the existence of a "causal nexus" between the actions for which it is being sued and the directives of federal officers. *See, e.g., Akin, 851 F. Supp. at 823; Pack, 838 F. Supp. at 1103.*

"What [this requirement] comes down to is that the court in each case must ascertain to what extent defendants act under federal direction and to what extent [defendants act] as independent agents." *Gurda Farms, Inc. v. Monroe County Legal Assistance Corp., 358 F. Supp. 841, 844 (S.D.N.Y. 1973); see also Northern Colo. Water Conservancy Dist. v. Board of County Comm'rs, 482 F. Supp. 1115, 1117-19 (D. Colo.1980), cited in Ryan, 781 F. Supp. at 946.*

A "person acting under" a federal officer must show that the acts that form the basis for the state suit were performed pursuant to a federal officer's direct orders or pursuant to comprehensive and detailed regulations. *Ryan, 781 F. Supp. at 947.* At the other end of the "acting under" spectrum, a "person" establishing only that the relevant acts occurred under the general auspices of a federal office or officer is [*11] not entitled to section 1442(a)(1) removal. *Id.* The mere fact that a corporation participates in a regulated industry is insufficient to support removal, absent a showing that the particular conduct is closely linked to detailed and specific regulations. *Bakalis v. Crossland Sav. Bank, 781 F. Supp. 140, 144-45 (E.D.N.Y. 1991).*

Todd Shipyards cites three cases to support its position that it meets the requirements for removal under section 1442(a)(1). In *Akin*, plaintiffs sued for exposure to toxic chemicals while working on jet engines built for the United States Air Force. The court found the required nexus, stating that "when a government contractor builds a product pursuant to Air Force specifications and is later sued because compliance with those specifications allegedly causes personal injuries, the nexus requirement is satisfied." *851 F. Supp. at 823.* In *Pack*, the defendant corporation contracted with the government to build turbine generators for naval vessels in accordance with government specifications during *World War II. 838 F. Supp. at 1103.* Defendant's employees sued for exposure to asbestos while working on the [*12] generators. *Id. at 1102.* The court found that the defendant satisfied the "acting under" requirement of section 1442(a)(1) as a result of direct control by the Navy and Maritime

1996 U.S. Dist. LEXIS 22676, *

Commission over the construction, design, and testing of the turbines. The government monitored the defendant's performance and reviewed and approved the results of its work. *Id. at 1103.* Finally, in *Fung,* the defendant corporation's employees sued for injuries allegedly resulting from asbestos exposure while working on naval vessels. *816 F. Supp. at 571.* The Navy monitored the defendant's performance and required it to construct and repair vessels in accordance with government specifications. *Id. at 572-73.* The government also performed dock and sea trials to ensure conformity with specifications. *Id. at 573.* The court found that the defendant was acting under the direct control of the Navy.

Todd Shipyards argues that the facts of the present case are "remarkably similar" to those in *Pack* and *Fung.* Todd Shipyards repaired government ships under the direction of and pursuant to specifications issued by the Maritime [*13] Commission prior to 1942. (Docket Entry No. 6, p. 8 and Moore Affidavit, P 3). During World War II, Todd Shipyards repaired and rebuilt vessels owned by the Navy, Maritime Commission, and Army. The government dictated the specifications for material and craft use on their vessels. The Navy inspected the work performed by Todd Shipyards, and military personnel "generally controlled yard production." (*Id.,* p. 9 and Moore Affidavit, PP 4, 5, 7). When vessels were completed, the Navy or Maritime Commission conducted sea trials to ensure that the work met specifications. (*Id.,* Moore Affidavit, P 4). Todd Shipyards' asserts that the United States 'government required the use of asbestos-containing products in the government vessels built and/or repaired by Todd Shipyards. (Docket Entry No. 6, p. 10). The government also set out health, safety, and industrial hygiene procedures for the work, including procedures for jobs involving asbestos. (*Id.,* pp. 9-10).

The affidavit and other materials submitted by Todd Shipyards are very similar to the facts found sufficient for removal in *Pack* and *Fung,* as well as *Akin.*

In one case, *Good v. Armstrong World Industries, Inc., 914 F. Supp. 1125, 1996 WL 21131 (E.D. Pa. 1996),* [*14] an asbestos exposure case similar to the present suit, the court held that although the defendant government contractor manufacturer, Westinghouse, had shown that it was acting under the Navy's control and direction in building turbines, Westinghouse had not shown that a specific federal officer controlled Westinghouse's work. The court held that this prevented removal under section 1442(a)(1). The court relied on the words in section 1442(a)(1) which grant removal authority to "any person acting under *him*," in holding that the removing defendant must show it acted under the direct and detailed control of a specific federal officer to allow removal.

The holding in *Good* is at odds with the consistent findings of proper removal in *Crocker v. Borden, Inc., 852 F. Supp. 1322, 1332, (E.D. La. 1994),* as well as *Pack, 838 F. Supp. at 1103; Fung, 816 F. Supp. at 571;* and *Akin, 851 F. Supp. at 823.* In these cases, the courts found that when the defendant manufacturers were government contractors acting under the detailed direction and control of the United States military in the repair and construction of wartime equipment, [*15] this was sufficient for removal under section 1442(a)(1).

The result in *Good* is also inconsistent with the basis of section 1442 removal recognized by the courts. "The rule that appears to emerge from the case law is one of 'regulation plus ....' " Private corporations may remove under section 1442 only when the corporation is "so intimately involved with government functions as to occupy essentially the position of an employee of the government." *Bakalis, 781 F. Supp. at 145; see also, Gurda Farms, Inc. v. Monroe County Legal Assistance Corp., 358 F. Supp. at 844-845* (the removal of assault and trespass actions against attorneys who had committed the alleged torts while acting on behalf of migrant farm workers was proper, based on a showing that the attorneys were governed by "exceedingly complex regulations, guidelines, and evaluation schemes," affecting the attorneys' conduct on a "day to day basis").

In the present case, Todd Shipyards has asserted that during World War II, the Navy, Army, and Maritime Commission specifically directed and controlled its work, including by requiring and regulating the use of asbestos. This court finds that [*16] Todd Shipyards has demonstrated a causal nexus between the claims against it and the acts it performed under color of federal office and has met the requirements of removal under section 1442(a)(1).

IV. Removal of the *Williams, Bell,* and *Rylee* Causes of Action

Plaintiffs also argue that Todd Shipyards failed to state a basis for the removal of the *Williams, Bell,* and *Rylee* cases. (Docket Entry No. 3, p. 2). Todd Shipyards argues that removal of these cases is proper under *28 U.S.C. § 1441(c).*

*28 U.S.C. § 1441(c),* as amended in 1990, provides as follows:

whenever a separate and independent claim or cause of action within the jurisdiction conferred by section 1331 of this title is joined with one or more otherwise non-removable claims or causes of action, the entire case may be removed and the district court may determine all issues therein, or, in its discretion, may remand all

1996 U.S. Dist. LEXIS 22676, *

matters in which State law predominates.

As amended, section 1441(c) permits a federal court to exercise supplemental jurisdiction only over causes of action joined with a claim within the original jurisdiction of the federal [*17] courts. Before the 1990 amendment, section 1441(c) provided that:

whenever a separate and independent claim or cause of action, which would be removable if sued upon alone, is joined with one or more otherwise nonremovable claims or causes of action, the entire case may be removed and the district court may determine all issues therein, or, in its discretion, may remand all matters not otherwise within its original jurisdiction.

Because the current language of section 1441(c) expressly mandates that the "separate and independent claim or cause of action" must be "within the jurisdiction conferred by section 1331," Todd Shipyards cannot base its removal of the *Williams, Bell,* and *Rylee* claims on section 1441(c). *See, e.g. Baylor v. District of Columbia, 838 F. Supp. 7, 9 (D.D.C. 1993).* Even if there were claims within this court's original jurisdiction under section 1331(c), the court would remand the *Bell, Williams,* and *Rylee* claims as cases in which state law clearly predominates. The *Bell, Williams,* and *Rylee* cases are remanded to the 113th Judicial District of Harris County.

SIGNED on March 29, 1996, at Houston, Texas. [*18]

Lee H. Rosenthal

United States District Judge

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ALVIN SAVOIE | * | Civil Action No.: 2:05-cv-2086 |
| | * | |
| Plaintiff, | * | |
| | * | Section: D |
| VERSUS | * | |
| | * | |
| NORTHROP GRUMMAN SHIP | * | Judge: Duval |
| SYSTEMS, INC., ET AL. | * | |
| | * | |
| Defendants. | * | |
| | * | Magistrate Judge: Chasez |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

AFFIDAVIT OF PETER TERRITO

STATE OF LOUISIANA

PARISH OF ORLEANS

BEFORE ME, the undersigned authority, personally came and appeared:

PETER TERRITO

who, after being duly sworn, did dispose and state as follows:

1.      He began working at Avondale on May 20, 1952, following his honorable

discharge from the United States Marine Corps.  During Alvin Savoie's employment at



Avondale in the summers of 1965 and 1966, he was involved in daily inspections throughout the shipyard and on every ship under construction at Avondale's Main Yard, including the Lykes Brothers cargo ships, as well as U. S. Navy Destroyer Escorts, U. S. Coast Guard cutters and other ships constructed at Avondale's Main Yard.

2.      At all times during Mr. Savoie's employment at Avondale, Avondale was in the business of building ships at its Main Yard facility situated on and adjacent to the navigable waters of the Mississippi River.

3.      Throughout Mr. Savoie's employment at Avondale, Mr. Territo was an employee of Avondale and conducted safety inspections under direction of Avondale's Director of Safety, Jim O'Donnell, who is deceased. Throughout the 1960s Jim O'Donnell met with federal safety inspectors regarding Avondale's compliance with federal safety regulations.

4.      During the construction of Lykes Brothers ships at Avondale, the construction was inspected by representatives of the United States Maritime Commission and the United States Coast Guard, as well as Walsh-Healy inspectors and Department of Labor inspectors.

5.      During the construction of the Lykes ships and other ships, federal inspectors inspected the ships on a daily basis. On commercial ships including the Lykes Brothers vessels, daily inspections were conducted by Maritime Administration ("MARAD") inspectors, who maintained a constant presence at Avondale through onsite offices. In addition, the vessels were inspected daily by U. S. Coast Guard inspectors, who also

2

maintained a constant presence at Avondale through onsite offices.

6.     U. S. Naval vessels constructed at Avondale were inspected by inspectors employed by the United States Superintendent of Ship Building ("SUPSHIP").   The SUPSHIP inspectors also maintained a continuing presence at Avondale through offices on the Avondale premises.

7.     Throughout the 1960s, federal safety inspectors conducted safety inspections throughout the shipyard and aboard all ships under construction, to ensure compliance with all federal safety rules and regulations.

8.     The federal government propounded safety regulations governing all aspects of safety in the construction of ships at Avondale's Main Yard, including commercial ships such as the Lykes ships. Throughout the 1960s, Avondale was routinely inspected by safety inspectors from the Labor Management Standards Administration to ensure compliance with federal safety standards.  The Labor Management Standards Administration inspectors who inspected Avondale during the 1960s included Chuck Hines, Forrest Luke, Elmer Lee, Joseph McGrath, Burt Lindquist, Jim Rosemerkey, Jack Beard and Curtis Foster.

9.     In addition, separate federal government inspectors conducted safety inspections to ensure compliance with federal safety regulations applicable to Avondale under the Walsh-Healy Public Contracts Act.  These federal safety inspectors included industrial hygienist Mike Padilla and safety inspector Chuck Freeman.

10.     All federal inspectors and representatives had access to all of the Avondale

3

shipyard facility and all ships under construction.  The federal inspectors were authorized to

go anywhere in the Avondale shipyard facility and aboard all ships at any time.

He has read the foregoing and all of the information contained therein is true and

accurate to the best of his personal knowledge.

Executed this _29_ day of June, 2005 at New Orleans, Louisiana.

_Peter Territo_
PETER TERRITO

Sworn to and subscribed before me
this _29_ day of _June_____, 2005.

_____
Notary Public
Name  _G. P. Wilson_____
Bar No. _20246_____
Commission expires _DEATH____

4

Not Reported in F.Supp.
1997 A.M.C. 1964
(Cite as: 1997 WL 159491 (E.D.La.))

Rickie A. COBB and Theresa Cobb
v.
SIPCO SERVICES & MARINE, INC., et al.

Civil Action No. 95-2131.

United States District Court,
E.D. Louisiana.

March 27, 1997.

ORDER AND REASONS ON BENDER
SHIPYARD'S MOTION FOR SUMMARY
JUDGMENT

VANCE, District Judge.

*1 Before the Court is the motion for summary judgment of defendant Bender Shipyard, Inc. ("Bender"). For the reasons stated below, the motion is GRANTED.

INTRODUCTION

Plaintiffs Rickie A. Cobb and Theresa Cobb brought this tort action against Bender and several other defendants for negligence and punitive damages for their allegedly reckless conduct in handling and storing toxic or hazardous substances. Specifically, Rickie Cobb contends that he suffered severe respiratory problems and lost a major portion of one of his lungs as a result of exposure to hazardous or toxic paints while working as an electrician on the MV CRESCENT CITY QUEEN at Bender's shipyard. Bender filed this motion for summary judgment contending that Mr. Cobb was its borrowed servant, who is precluded from suing Bender for tort damages under the Longshore and Harbor Workers' Compensation Act ("LHWCA"). Mr. Cobb has opposed Bender's motion, asserting that he was not the borrowed servant of Bender, and in any event, is not foreclosed from suing Bender for punitive damages under Louisiana law.

FACTS

Bender is in the ship building business and was in the process of constructing the MV CRESCENT CITY QUEEN at its shipyard in Braithwaite, Louisiana in November 1994. On May 19, 1994 Bender entered a contract with Volt Technical

Services ("Volt"), under which Volt was to supply labor to Bender to perform certain work as "borrowed servants." Defendant's Exh. B. In addition, Volt agreed to obtain and maintain workmen's compensation and federal LHWCA insurance coverage on the personnel supplied. Id. Bender's director of human resources testified that Bender had used Volt prior to the time Mr. Cobb was hired and that his understanding was that Volt was to send Bender "qualified personnel, fitters, welders, electricians, whatever we were asking for, and we would put them to work as borrowed servants through Volt." Defendant's Exh. A, Bobby C. Woods Depo. at 32.

Rickie Cobb was a marine electrician hired by Volt in late October 1994, following a telephone interview in Jacksonville, Florida. Defendant's Exh. C, Cobb Depo. at 23-24. Mr. Cobb was assigned to work for Bender in Braithwaite, doing electrical work on board the MV CRESCENT CITY QUEEN. Id. at 23-26 and 30. Mr. Cobb dealt with a Volt representative in New Orleans, Don Ford, who directed him to the Bender location at Braithwaite. Id. at 26-28. Mr. Ford stayed at the same hotel as the plaintiff and served as his contact with Volt during the period that plaintiff worked on Bender's project. Id. at 38. Plaintiff stated that if he needed an advance on a paycheck or to go home for an emergency or anything like that Mr. Ford was his "liaison" with Bender to work things out. Id. Other than these types of activities, however, Mr. Ford was not directing Mr. Cobb's work at Bender. Id. at 38-39. Plaintiff worked on Bender's project from November 1994 until January 1995. Defendant's Exh. D, Cobb's Personnel File.

*2 When Mr. Cobb arrived at Bender's shipyard, he was interviewed by Bender and administered an electrician's exam, as well as a drug test. Id. at 28-29. Although Mr. Cobb testified that he was "under the impression" that he already had a job, he stated that Mack Wigham, Bender's "lead man," hired him after he passed the electrician's exam and the drug test. Id. Bender's human resources director testified that Bender retained the right to reject plaintiff and any other potential worker assigned to Bender by a labor contractor. Defendant's Exh. A, Bobby Woods Depo. at 37-38.

Mr. Cobb testified that Mack Wigham supervised

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.

(Cite as: 1997 WL 159491, *2 (E.D.La.))

his work and gave him his work assignments and instructions. Defendant's Exh. C, Cobb Depo. at 31-32. Volt did not maintain a representative on the Bender project to supervise or direct plaintiff's work. Id. at 38-39, 136. Mr. Cobb supplied his own hand tools, and Bender provided him with "troubleshooting equipment and the larger tools he needed on the job." Id. at 35. There is no evidence that Volt supplied plaintiff with any of the tools needed to perform his work.

Bender concedes that it could not have terminated plaintiff's original employment with Volt. However, Bender had the authority to terminate Mr. Cobb's relationship with Bender. Mr. Cobb was not on Bender's payroll, and he did not receive benefits from Bender. Bender paid Volt $16.60 per hour for plaintiff's work, of which plaintiff received $10.75 per hour from Volt. Bender also paid Volt a per diem allowance of $4.25 per hour, which Volt paid directly to plaintiff. Bender paid Volt the sum of $22.29 per hour for plaintiff's overtime work, of which plaintiff received $16.13 per hour. Defendant's Exh. D.

Based on the foregoing facts Bender contends that plaintiff was its borrowed servant and, as such, was barred from maintaining a cause of action against Bender in tort by virtue of the LHWCA.

LEGAL ANALYSIS

Standard for Summary Judgment

Under Fed.R.Civ.P. 56, summary judgment is proper when there is no genuine issue of material fact, and the moving party is entitled to a judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All inferences will be made in favor of the party opposing summary judgment. However, the opposing party may not rely on mere allegations or denials but must set forth specific facts establishing that genuine issues exist for trial. See Fed.R.Civ.P. 56(e). Only factual disputes "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The Borrowed Servant Doctrine

As noted, Bender contends that Cobb was its borrowed servant. In Ruiz v. Shell Oil Co., 413 F.2d 310, 312-13 (5th Cir.1969), the Fifth Circuit outlined nine factors to be evaluated in determining whether the borrowed employee doctrine applies. These factors are as follows:

*3 1. Who has control over the employee and the work he is performing, beyond mere suggestion of details of cooperation?

2. Whose work is being performed?

3. Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

4. Did the employee acquiesce in the new work situation?

5. Did the original employer terminate his relationship with the employee?

6. Who furnished tools and place for performance?

7. Was the new employment over a considerable length of time?

8. Who had the right to discharge the employee?

9. Who had the obligation to pay the employee? Id. Although no single factor or a combination of them is determinative, the Fifth Circuit in many cases has considered the factor of control to be central. See Brown v. Union Oil Co. of California, 984 F.2d 674, 676 (5th Cir.1993); Melancon v. Amoco Production Co., 834 F.2d 1238, 1244 (5th Cir.1988); Capps v. N.L. Baroid--NL Indus., Inc., 784 F.2d 615, 616-17 (5th Cir.), cert. denied, 479 U.S. 838, 107 S.Ct. 141, 93 L.Ed.2d 83 (1986).

The issue of borrowed employee status is a matter of law for the district court to determine. Capps, 784 F.2d 615, 616; Melancon, 834 F.2d at 1244. If sufficient basic factual ingredients are undisputed, the Court may grant summary judgment. Capps, 784 F.2d 615, 616. A consideration of the relevant factors and the undisputed facts indicates that Mr. Cobb was Bender's borrowed servant as a matter of law.

1. Control Over the Employee and the Work He Was Performing

There is no dispute that while plaintiff was working at the Bender shipyard in Braithwaite he was supervised by Bender's foreman, Mack Wigham, and that he received all of his work assignments and instructions from Bender personnel. Defendant's Exh. C, Cobb Depo. at 31-32, 34-35

Not Reported in F.Supp.
(Cite as: 1997 WL 159491, *3 (E.D.La.))

and 136. Nor is there any dispute that Volt did not have a representative on the job site to supervise or direct plaintiff's work. Id. at 38-39 and 136. Plaintiff stated that his only contact with Volt during this period was that Volt had a representative in Braithwaite who acted as a liaison when plaintiff needed an advance on paychecks or to go home for emergencies or anything like that. Id. at 38. The facts on the issue of control clearly support a finding of borrowed servant status.

### 2. Whose Work is Being Performed?

The answer to this question is likewise straightforward. Plaintiff was performing electrician's services for Bender in the process of constructing the M/V CRESCENT CITY QUEEN. This factor likewise supports borrowed servant status.

### 3. Whether an Agreement or Understanding Existed Between the Original and the Borrowing Employer

In this case, unlike the case of West v. Kerr-McGee Corp., 765 F.2d 526, 531 (5th Cir.1985), relied on by plaintiffs, Bender and Volt entered into a temporary labor contract agreement in which the parties expressed an intention for Volt to provide Bender with workers skilled in various trades to work as Bender's "borrowed servants." See Defendant's Exh. B. The evidence also indicates that Bender had used Volt's services before this incident for the same purpose. See Defendant's Exh. A, Bobby Woods Depo. at 31-33. The written evidence of the agreement between Volt and Bender is consistent with an understanding to create a borrowed servant relationship between the employees supplied by Volt and Bender.

### 4. Whether the Employee Acquiesced in the New Work Situation

*4 Mr. Cobb worked for a company that loaned temporary employees. Although he resided in Florida, plaintiff acquiesced in the fact that he was assigned to work at Bender's shipyard in Louisiana. He worked there over two months before he became ill. He did not ask for a reassignment during this period. These factors indicate that he acquiesced in his new work situation.

### 5. Did the Original Employer Terminate his Relationship with the Employee?

The Fifth Circuit has held that this factor does not require a lending employer to completely sever his relationship with the employee. Capps, 784 F.2d at 617. It reasoned that such a requirement would in effect eliminate the borrowed servant doctrine, since there could never be two employers. Id. The Court stated that the emphasis should be on the lending employer's relationship with the employee while the borrowing occurs and, when the lending employer exercises no control over the employee while he works for the borrowing employer and places no restrictions on him with respect to that employment, the facts favor borrowed employee status. Id. at 618. The undisputed facts reveal that plaintiff had only limited contacts with Volt after he began working at Bender's shipyard and that those contacts related to picking up his paycheck and arranging for time off due to emergencies. Cobb Depo. at 38. There is no evidence that Volt placed any restrictions on Bender with respect to Mr. Cobb's employment conditions or that it exercised control over Mr. Cobb while he worked for Bender. These facts favor borrowed servant status. See Capps, 784 F.2d at 618.

### 6. Who Furnished Tools and the Place for Performance?

Bender clearly provided plaintiff the place where he performed his work. In addition, although plaintiff furnished his own set of hand tools, Bender provided "troubleshooting equipment and the larger tools he needed on the job." Defendant's Exh. C, Cobb Depo. at 35. There is no evidence that Volt provided plaintiff with any tools that he needed to perform his work. Factor six thus favors borrowed servant status.

### 7. Whether the Employment was Over a Considerable Length of Time

Plaintiff worked for Bender for over two months prior to becoming ill. The Fifth Circuit has stated that when the length of time of an employment is considerable, "this factor supports a finding that the employee is a borrowed employee; however, the converse is not true." Capps, 784 F.2d at 615. Further, the Fifth Circuit has affirmed findings of borrowed servant status when an employee's injury

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
(Cite as: 1997 WL 159491, *4 (E.D.La.))

occurred on the first day of the job. See Capps, 784 F.2d at 618; Champagne v. Penrod Drilling Co., 341 F.Supp. 1282, 1284 (W.D.La.1971), aff'd per curiam, 459 F.2d 1042 (5th Cir.1972), cert. denied, 409 U.S. 1113, 93 S.Ct. 927, 34 L.Ed.2d 696 (1973). With respect to this factor, the Court finds that the length of employment is neutral on the issue of borrowed servant status.

### 8. Who Has the Right to Discharge the Employee?

*5 Bender did not have the authority to terminate Mr. Cobb's relationship with Volt. However, Bender could have terminated its relationship with plaintiff at any time. See Defendant's Exh. C, Cobb Depo. at 100. In Capps the court stated that the proper focus of this inquiry is whether the borrowing employer could terminate the employee's services with itself, even if it could not have terminated the plaintiff's relationship with the lending employer. Id. at 618; see also Hebron v. Union Oil Co. of California, 634 F.2d 245 (5th Cir.1981) (per curiam). So framed, the facts on this issue favor borrowed servant status.

### 9. Who Had the Obligation to Pay the Employee?

Mr. Cobb was paid by Volt and was not paid directly by Bender. Bender, however, paid Volt at an hourly rate for Cobb's work, which Volt paid to Cobb at a lower rate. Under these circumstances, the Fifth Circuit has found that this factor does not detract from borrowed servant status. Plaintiff argues that inconsistent treatment of borrowed employees and regular employees is inconsistent with a borrowing employee relationship. While it is certainly true that the Fifth Circuit found this to be the case in West v. Kerr-McGee Corp., 765 F.2d 526, 531 (5th Cir.1985), there is no evidence in this record to indicate that Bender's direct employees received preferential treatment. The only evidence is that plaintiff received no benefits from Bender.

Accordingly, the Court finds that there is no genuine factual dispute as to the Ruiz factors and that, as a matter of law, nearly all of the factors support a finding of borrowed employee status. The Court thus finds that Mr. Cobb was, as a matter of law, a borrowed employee of Bender. As such, a negligence recovery against Bender is barred by the LHWCA.

### Plaintiffs' Claim for Punitive Damages

Mr. Cobb argues that even if the Court finds that his negligence claim against Bender is preempted by the LHWCA because of his borrowed servant status, he may nonetheless maintain a tort action against Bender for punitive damages under Louisiana Civil Code article 2315.3. [FN1] Plaintiff contends that his injuries were caused by the defendants' wanton or reckless disregard for public safety in the storage, handling or transportation of hazardous or toxic substances within the meaning of article 2315.3. Plaintiff further contends that his injury occurred in the "twilight zone" in which both the LHWCA and state law may apply. Further, Mr. Cobb argues that, despite Louisiana's workmen's compensation scheme, at the time of his injuries, Louisiana law, as stated in Billiot v. BP Oil, 645 So.2d 604 (La.1994), allowed an employee to sue his employer in tort for punitive damages under Louisiana Civil Code article 2315.3. Mr. Cobb notes that although Billiot was legislatively overruled in 1995, the statute overruling it became effective on June 17, 1995 and was prospective only. See La. Acts no. 432 (1995). Plaintiff asserts that his remedy under Louisiana Civil Code article 2315.3 is not a workmen's compensation remedy.

> FN1. Louisiana Civil Code article 2315.3 provides: "[E]xemplary damages may be awarded, if it is proved that plaintiff's injuries were caused by the defendant's wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic substances."

*6 A number of cases have purported to delineate the so-called "twilight zone" of concurrent jurisdiction between the LHWCA and state law workmen's compensation statutes. See Davis v. Department of Labor and Indus. of Washington, 317 U.S. 249, 63 S.Ct. 225, 87 L.Ed. 246 (1942) (establishing regime of concurrent jurisdiction in "twilight zone"); see also Hetzel v. Bethlehem Steel Corp., 50 F.3d 360, 363-64 (5th Cir.1995) (discussing cases). In 1972 Congress amended the LHWCA to expand its coverage beyond the traditional navigable waters to specific adjoining areas, such as piers and other adjoining areas "customarily used by an employer in loading, unloading, dismantling or building a vessel." See 33 U.S.C. § 903(a). In Sun Ship, Inc. v. Pennsylvania, 447 U.S. 715, 100 S.Ct. 2432, 65

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
(Cite as: 1997 WL 159491, *6 (E.D.La.))

L.Ed.2d 458 (1980), the Supreme Court addressed the issue of whether this extension of the LHWCA's coverage displaced states from applying their own workmen's compensation schemes to land-based injuries that fell under expanded federal coverage. The Court unanimously answered the question in the negative. The Court specifically rejected the argument that concurrent jurisdiction was inappropriate because "concurrent jurisdiction could result in more favorable awards for workers' injuries than under an exclusively federal compensation system." Id. at 724, 100 S.Ct. at 2438. The Court found that the exclusive remedy provision of section 905(a) of the LHWCA provided no obstacle to the provision of a concurrent state remedy.

This case is a twilight zone case since Mr. Cobb's illness occurred in a shipyard in Braithwaite, Louisiana at which a vessel was being constructed. Based on Sun Ship, it is apparent that Louisiana could provide a workmen's compensation remedy to Mr. Cobb and that the LHWCA would not preempt such a recovery.

However, in this case, plaintiff does not claim an award of compensation benefits but wishes to pursue a state law tort action against Bender for reckless and wanton misconduct. This raises the issue of the effect of section 905(a) of the LHWCA, the exclusive remedy provision, on the availability of state tort relief for a plaintiff whose injury falls within the twilight zone. [FN2] The Third Circuit in Peter v. Hess Oil Virgin Islands Corp., 903 F.2d 935 (3d Cir.1990), held under almost identical circumstances that this situation raises a question of federal preemption:

> FN2. The LHWCA's exclusive remedy provision ordinarily precludes actions alleging gross negligence or "wanton or reckless" misconduct, as well as simple negligence. Houston v. Bechtel Assoc. Professional Corp., 522 F.Supp. 1094 (D.D.C.1981); Johnson v. Odeco Oil & Gas Co. Inc., 679 F.Supp. 604, 606-07 (E.D.La.1987), aff'd, 864 F.2d 40 (5th Cir.1989). There is an exception for intentional torts. Id.

In this case, however, we deal not with an award of compensation benefits but with a common law action for negligence. The more difficult issue raised by Hess turns on the effect of section 905(a) upon the availability of state tort relief for

a plaintiff whose injury falls within the twilight zone. This raises a question of federal supremacy that requires us to consider whether LHWCA (1) evidences a congressional intent to preempt the entire area of compensation for this kind of injury, or (2) is inconsistent with the provisions of a state tort remedy so that it would be impossible for the defendant to comply with both federal and state law, or (3) whether the state tort remedy "stands as an obstacle to the accomplishment of the full purposes and objectives of Congress."
*7 Id. at 950.

Federal law governs questions of preemption. See Hetzel v. Bethlehem Steel Corp., 50 F.3d 360, 362 (5th Cir.1995). It is obvious that Sun Ship precludes any argument that the LHWCA was intended by Congress to preempt all state legislation governing events occurring within the twilight zone. Accord, Peter v. Hess Oil Virgin Islands Corp., 903 F.2d 935, 950. However, federal preemption can occur when a state law either directly conflicts with federal law or frustrates the purpose behind federal law. Hetzel, 50 F.3d at 363, 366; Hess, 903 F.2d at 930.

Section 905(a) of the LHWCA provides:
> The liability of an employer ... shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death....

33 U.S.C. § 905(a). As the Third Circuit noted in Hess, the section's plain language evidences an unmistakable intention to embody the quid pro quo that defines most workmen's compensation statutes, that is, the employer provides no fault compensation in return for an immunity from tort liability for damages. Id. at 950. Further, the Fifth Circuit has stated that when liability arises as a result of the employment relationship, Congress explicitly intended for the LHWCA to be the exclusive remedy. Hetzel, at 366.

The Supreme Court has likewise stated that the LHWCA was designed to strike a balance between employers and employees:
> [T]he [LHWCA is] not a simple remedial statute intended for the benefit of the workers. Rather, it was designed to strike a balance between the

Not Reported in F.Supp.
(Cite as: 1997 WL 159491, *7 (E.D.La.))

concerns of the longshoremen and harbor workers on the one hand, and their employers on the other. Employers relinquish their defenses to tort actions in exchange for limited and predicable liability. Employees accepted the limited recovery because they receive prompt relief without the expense, uncertainty, and delay that tort actions entail. Morrison-Knudsen Constr. Co. v. Director, OWCP, 461 U.S. 624, 636, 103 S.Ct. 2045, 76 L.Ed.2d 194 (1983). In the context of section 905(a), the Court fails to see any indication that Congress intended to preserve state tort liability for the same injuries as to which it granted immunity from federal tort liability. See Hess, 903 F.2d at 951. A state tort action for punitive damages for wanton and reckless misconduct would be every bit as disruptive of Congress' quid pro quo as would be a federal action for the same relief. Congressional policy would be frustrated if an injured worker were allowed to recover LHWCA benefits and then sue a covered employer under a state tort theory. Here, plaintiff has sought LHWCA benefits from Volt, but not from Bender. That he has not sought this relief from Bender does not alter the result. Bender, as Cobb's "employer" under the borrowed servant doctrine, is liable for LHWCA compensation under section 904(a) of the LHWCA and is entitled to immunity under § 905(a). See Total Marine Services, Inc. v. Director OWCP, 87 F.3d 774 (5th Cir.1996).

*8 It is true that in Hahn v. Ross Island Sand & Gravel Co., 358 U.S. 272, 79 S.Ct. 266, 3 L.Ed.2d 292 (1959), the Supreme Court permitted a state tort recovery for an injury within the scope of the LHWCA. However, as the Third Circuit noted in Hess, when the Supreme Court sustained a damage recovery in Hahn, the Oregon statute involved, like most workmen's compensation statutes, including the LHWCA, provided that if an employer covered by the statute failed to secure workmen's compensation coverage it would be subject to a negligence action in which it would be denied common law defenses. Hess, 903 F.2d at 952; Hahn, 358 U.S. at 273, 79 S.Ct. at 267. The employer in Hahn had not obtained such coverage, and it was under this provision that the damage judgment was allowed. In Hahn, the state negligence liability was a sanction for the employer's failure to secure workmen's compensation coverage. "The existence and function of that liability was entirely consistent with

Congress' intent to ensure a seamless intersection between state and federal compensation coverage." Hess, 903 F.2d at 952. In that context, tort liability was consistent with the Congressional scheme. That is not the case here, where application of Louisiana tort law, which plaintiff concedes is not a workmen's compensation remedy, does not further the availability of no fault compensation, and it obstructs the purposes of the LHWCA. Further, the Fifth Circuit has held post-Hahn that section 905(a) bars a state tort recovery from a borrowing LHWCA employer. Rosetti v. Avondale Shipyards, Inc., 821 F.2d 1083 (5th Cir.1987), cert. denied, 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988) (plaintiff engaged in shipyard activities that were apparently in twilight zone). Finally, as the Third Circuit stated in Hess, the boundaries of concurrent jurisdiction in the "twilight zone" should be determined by the problems that gave rise to the doctrine and not extended in application to "undermine the policy reflected in § 905(a)." Hess, 903 F.2d at 952.

For all of the foregoing reasons, Bender's motion for summary judgment is GRANTED.

END OF DOCUMENT

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

FILED
U.S. DISTRICT COURT
2004 MAR 31  P 4: 20

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| MARY DELANCEY, ET AL | * | CIVIL ACTION |
| VERSUS | * | NO.  04-431 |
| GENERAL ELECTRIC, ET AL | * | SECTION "F" |

## ORDER AND REASONS

Before the Court is the plaintiffs' motion to remand.  For the
reasons that follow, the motion is DENIED.

### Background

In early 2004, the wife and daughter of Ellis DeLancey, Mary
F. Delancey an Dionne D. Hindman, respectively, sued in state
court, General Electric Company, Foster Wheeler Corp., Garlock,
Inc., Insterstate Fire & Casualty Co., Inc., and Gray & Company.,
Inc., on behalf of and for the wrongful death of Ellis DeLancey.
Ellis Delancey had worked on a Navy vessel, the U.S.S. Herbert J.
Thomas, as a boiler fireman from 1959 to 1963. In the 1960's and
1970's, Delancey was employed by Gurtler, Hevert & Company, Inc.,
a now defunct Louisiana corporation. While working for the U.S.
Navy and Gurtler, the plaintiffs charge Ellis was exposed to
extremely high levels of asbestos fibers and other harmful dusts.
The plaintiffs point to turbines manufactured by General Electric
as the source of exposure to asbestos fibers while in the Navy.

1

DATE OF ENTRY

APR - 1 2004

Fee
Process
X  Dktd
CtRmDep
Doc. No

They further claim that exposure to asbestos fibers caused Ellis DeLancey to contract mesothelioma, from which he died in 2002. On February 13, 2004, General Electric removed the case to federal court under the federal officer removal statute or, in the alternative, under the Court's diversity jurisdiction. The plaintiffs now move to remand the case to state court.

I.

Although the plaintiffs challenge removal in this case, the removing defendants carry the burden of showing the propriety of this Court's removal jurisdiction. See Jernigan v. Ashland Oil, Inc., 989 F.2d 812, 815 (5th Cir.), cert. denied, 510 U.S. 868, 114 S. Ct. 192, 126 L.Ed.2d 150 (1993); Willy v. Coastal Corp., 855 F.2d 1160, 1164 (5th Cir. 1988). In addition, any ambiguities are construed against removal, Butler v. Polk, 592 F.2d 1293, 1296 (5th Cir. 1979), as the removal statute should be strictly construed in favor of remand. York v. Horizon Fed. Sav. and Loan Ass'n, 712 F. Supp. 85, 87 (E.D. La. 1989); see also Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100 (1941).

Even though an anticipated federal defense is ordinarily not enough to raise federal question jurisdiction, removal under the federal officer removal statute is proper if "the defense depends on federal law." Jefferson County, Ala. v. Acker, 527 U.S. 423, 431, 119 S.Ct 2069, 2075, 144 L.Ed.2d 408 (1999); See 28 U.S.C. § 1442(a)(1)(West 2004). The importance of removal under Section 1442

2

is that a federal court be given the opportunity to determine the validity of the federal defense. See <u>Willingham v. Morgan</u>, 395 U.S. 402, 407, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969). In <u>Winters v. Diamond Shamrock Chemical Co.</u>, 148 F.3d 387 (5th Cir. 1998), the Fifth Circuit enumerated a three-part test to determine the applicability of Section 1442(a)(1), the federal officer removal statute. A district court must conclude that the defendant: (1) is a person under the statute; (2) acted under color of federal authority with respect to the plaintiff's injuries; and (3) has asserted a colorable federal defense. <u>Id.</u> at 397.

The plaintiffs assert that remand is proper because General Electric has failed to prove the second and third element of removal under Section 1442(a)(1). General Electric contends that they have met their burden in establishing that Section 1442(a)(1) is the proper vehicle for removal in this case; thus, providing the opportunity to argue the validity of their federal defense in a federal forum. The Court agrees.

To prove the second element, that they acted under the color of federal authority, General Electric must show that they acted "pursuant to a federal officer's directions and that a causal nexus exists between the defendant['s] actions under color of federal office and the plaintiff's claims." <u>Winters</u>, 148 F.3d at 398. The defendant is required to provide evidence that the government had strict control over the development and production of the turbines.

3

See id. at 399. The evidence offered by General Electric to prove the propriety of removal are two affidavits of David Hobson. Hobson is a former employee of General Electric, initially working in marine engineering, who worked at General Electric from 1969 to 1996. The plaintiff was employed on the Navy ship from 1959 to 1963. Although Hobson's employment was after the time of the alleged injury, Hobson's affidavits reveal that he has reviewed the United States Navy's commercial specifications and other documents for marine steam turbines purchased since World War II. He is aware of the history of production of turbines at General Electric.

This research knowledge of Hobson is in addition to his personal knowledge in dealing with Navy specifications on turbines during his tenure at General Electric. He has personally dealt with the U.S. Navy's control over specifications. He has also discussed specifications with those involved in Naval shipbuilding, including Naval officers. Hobson states that the specifications for thermal insulation would be determined by the Navy Sea Systems Command, NAVSEA. Naval Officers supervised and exhibited direct control over production of General Electric turbines. He further states that no specification was outside close control of the government. Each specification had to be expressly authorized by the Navy, through its officers. This uncontradicted affidavit is sufficient to establish that General Electric acted under the color of federal office for the purposes of removal. Because the plaintiffs claim

4

injuries from the type of thermal insulation, asbestos, in the steam turbines upon the vessel he worked on for the Navy, there is a causal connection between General Electric's actions under the color of federal office and the injuries suffered by the plaintiff.

The establish the third element of a colorable federal defense, General Electric is not required to prove the full application of the defense to this case. As the Supreme Court succinctly states in Willingham, "[t]he officer need not win his case before he can have it removed." 395 U.S. at 407, 89 S.Ct. 1813, 23 L.Ed.2d 396. The rationale for the federal officer removal statute is to have the federal courts determine the applicability of a federal defense. See Winters, 148 F.3d at 400 (citing Willingham, 395 U.S. at 407, 89 S.Ct. 1813, 23 L.Ed.2d 396).

General Electric will raise the federal defense that they have acted as a federal contractor for activities for which the government itself is immune from liability. The standard for this defense is set out by the Supreme Court in Boyle v. United Techs. Corp., 487 U.S. 500, 512, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). The federal contractor defense is derived from the government's own immunity when performing discretionary functions, such as the design selection for military equipment. Id. at 511, 108 S.Ct. 2510, 101 L.Ed.2d 442. To prevail under the federal contractor defense General Electric has the burden of proving: (1) reasonably precise specifications were approved by the United States; (2) the

5

turbines reasonably conformed with those specifications; and (3) they warned the United States of all dangers known in using the equipment, but unknown to the United States. Id. at 512, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988); see Winters, 149 F.3d at 400. Evidence proving the causal connection similarly established a colorable federal defense in this case. See Winters, 149 F.3d at 400. General Electric provides sufficient evidence to suggest the specifications were determined by NAVSEA and that the specifications were complied with. There is no evidence that General Electric knew of any dangers in using asbestos that the United States was unaware. Although the ultimate applicability of the government contractor defense is yet to be satisfied, General Electric has provided a colorable defense sufficient to require resolution of the case in a federal forum.[1]

Accordingly, the plaintiff's motion to remand is DENIED.

New Orleans, Louisiana, March 31, 2004.

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

[1] The Court is not required to determine whether complete diversity exists because this case is removable under the federal officer statute.

6

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2004 APR 20  AM 11: 45

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

ANDREW S. FINK                          CIVIL ACTION

VERSUS                                  NO. 04-430

TODD SHIPYARDS, et al                   SECTION "T"(1)


This cause came for hearing on March 31, 2004, upon the motion of plaintiff, Andrew S. Fink ("Fink"), to remand the case to state court pursuant to 28 U.S.C. § 1447 (c). Oral argument was not entertained by the Court; therefore, the matter was taken under submission on the briefs only. The Court, having studied the record, the legal memoranda submitted by the parties, as well as the applicable law and jurisprudence, is now fully advised in the premises and ready to rule.

## ORDER AND REASONS

### I. BACKGROUND

The plaintiff, Andrew S. Fink, filed an action in the Civil District Court for the Parish of New Orleans alleging damages from exposure to asbestos. In the Petition for Damages, plaintiff alleges that he was exposed to asbestos while serving as a maintenance mechanic in the U.S.

DATE OF ENTRY
APR 2 0 2004

Fee_____
Process_____
Dktd_____
CtRmDep_____
Doc. No._____

Navy from 1942 to 1946, while employed at Todd Shipyards as a mechanic's helper in 1947, and while employed at Fulton Bag Co. and West Virginia Pulp & Paper Co. from 1950 to 1985. Specifically, when serving in the U.S. Navy and while employed at Todd Shipyards, plaintiff claims he was exposed to "asbestos-containing components in boilers and turbines which were manufactured, distributed and/or sold by defendants, Foster Wheeler Corporation and General Electric Company."

After being served with the Petition for Damages, defendant General Electric Company (hereinafter "GE") timely removed this action to federal court under the provisions of the federal officer removal statute, 28 U.S.C. § 1442(a)(1). In response thereto, plaintiff filed a Motion to Remand, arguing therein that removal was improper because GE did not satisfy the requirements of the 28 U.S.C. § 1442(a)(1) as interpreted by federal case law.

## II. DISCUSSION

Motions to remand to state court are governed by 28 U.S.C. 1447(c), which provides in relevant part: "[i]f at any time before the final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." See Ford v. Elsbury, 32 F.3d 931, 935 (5th Cir. 1994). "[W]hen faced with a motion to remand, it is the defendant's burden to establish the existence of federal jurisdiction over the controversy." Winters v. Diamond Shamrock Chemical Co., 149 F.3d 387, 397 (5th Cir. 1998).

Plaintiffs premise the removal of his claim against defendant GE, on the federal officer removal statute. "The federal officer removal statute is a pure jurisdictional statute, seeking to do nothing more than grant district court jurisdiction over cases in which a federal officer is a defendant." Mesa v. California, 489 U.S. 121, 109 S. Ct. 959, 968, 103 L.Ed.2d 99 (1989). The

requirements of 28 U.S.C. § 1442(a)(1) provides, in pertinent part:

> (a)  A civil action or criminal prosecution commenced in a State court against any of the following persons may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
> (1)  An officer of the United States or any agency thereof, **or person acting under him,** for any act under color of such office.  (emphasis added).

In order to qualify as a federal officer, or "person" acting under him, the removing party must "(1) demonstrate that it acted under the direction of a federal officer, (2) raise a federal defense to the plaintiff's claims and (3) demonstrate a casual nexus between the plaintiff's claims and acts it performed under color of federal officer."  Mesa, 489 U.S. at 131-32.

The preliminary issue to be resolved is whether GE qualifies as a "person" acting under a federal officer who is entitled to invoke the removal provisions of 28 U.S.C. § 1442(a)(1).  The reasoning of the district court in Ryan v. Dow Chemical Co., 781 F. Supp. 934, 946 (E.D.N.Y. 1992), persuades this Court that a purely legal "person", such as a corporation, "could be engaged in activities that amount to the implementation of a federal policy under the direction of a government officer", that § 1442(a)(1) was enacted to protect.  Thus, GE qualifies as a "person", who may be entitled to remove as a federal officer if it meets the three requirements set forth in Mesa, 489 U.S. at 131-32.

To determine if GE qualifies as a federal officer, the first question to be addressed under Mesa is whether GE has demonstrated that it acted under the direction of a federal officer.  Id. at 131-32.  To satisfy the showing required in Mesa, GE submitted an affidavit of David Hobson, a 27-year employee of GE.  In his affidavit, Mr. Hobson states that he is familiar with the operations of the marine turbine unit and the involvement of the U.S. Navy as far back as 1969. See generally, Exhibits B and C.  According to Mr. Hobson, GE manufactured and supplied

turbines for U.S. Navy ships under contracts between GE and the shipyards and/or the Navy Department. See Exhibit B, ¶ 6. The Navy Department administered the contracts through the Navy Sea Systems Command ("NAVSEA"). Id. Mr. Hobson attested to the fact that "[a]ll aspects of the design, performance requirements and materials used for construction, including thermal insulation for Navy vessels, was specified by NAVSEA." Id. at ¶ 7. During all aspects of its turbine work related to U.S. Navy ships, GE performed its work under the immediate supervision of the Navy through NAVSEA officers. Id. at ¶ 8. Further, "[t]he turbines manufactured and supplied by GE for any U.S. Navy vessel had to meet detailed and precise U.S. Navy specifications." Id. at ¶ 10. In the design phase of a turbine, as in all other phases, the U.S. Navy retained ultimate decision authority. Id. at ¶ 11. If an engineering disagreement arose between the Navy and the outside design consultants, the Navy controlled the design adopted. Id. at ¶ 12.

After the design phase, and during production of turbines for the U.S. Navy, the Inspector of Naval Machinery was on site to ensure compliance with all Navy specifications. Id. at ¶ 13. At this time, all drawings, approvals, and any reports of out-of-tolerance machining were submitted to and approved by the Inspector of Naval Machinery or by the mechanical engineers working under him who also were employed by the U.S. Navy. Id. Thereafter, U.S. Navy personnel supervised the installation of the turbines by shipyard personnel. Id. at ¶ 19. Finally, in addition to controlling the design and manufacture of the turbines for U.S. Naval vessels, the U.S. Navy also controlled the testing of the turbines at all stages, both before and after installation, to ensure compliance with naval specifications and requirements. Id. at ¶ 14, 15, 20, 21.

This court finds that the testimony of Mr. Hobson demonstrates that GE qualifies as a federal officer during the time that he began his employment with the company in 1969. In addition, Mr. Hobson has shown that GE qualifies as a federal officer during the time Mr. Fink was exposed to asbestos, based on Mr. Hobson's personal knowledge of the historical practices of GE with regard to marine steam turbines that were purchased from GE by the Navy and commercial shipyards and/or ship owners for installation aboard ships. Id. at ¶ 5. Mr. Hobson also confirms this court's view that GE was a federal officer during the 1940s through his studies of "military and commercial specifications and other documents dating back to World War II concerning marine steam turbines and have conferred on numerous occasions with Naval officers and others involved in Naval and commercial shipbuilding." Id. at ¶ 4.

The second question to be addressed under Mesa, is whether GE raises a federal defense to the plaintiff's claims. Under Willingham v. Morgan, 395 U.S. 402, 89 S. Ct. 1813, 23 L.Ed.2d. 396 (1969), any party qualifying as a federal officer who can raise a colorable defense arising out of their duty to enforce federal law is entitled to remove. The party need not prove that it can sustain the defense, but only that it presents a colorable claim. 395 U.S. at 406, 89 S. Ct. at 1816. The Willingham Court explained that "one of the most important reasons for removal is to have the validity of the defense of official immunity tried in federal court," **but that the removing party need not prove his case prior to removal, nor should the policy of protecting federal officers be "frustrated by a narrow, grudging interpretation of §1442(a)(1)."** Id. (emphasis added). It is under this context that this Honorable Court must consider the facts surrounding plaintiff's motion to remand.

Plaintiff contends that remand is appropriate because the affidavits submitted by GE are

not prepared for the present case, being dated October 17, 2003.  In addition, the plaintiff's claim

that since GE was unable to offer proof that Mr. Hobson had personal knowledge of the **actual**

ships that Mr. Fink worked on, the company is unable to meet their burden under the federal

officer removal statute.  (emphasis added).  However, removal under 28 U.S.C. 1442(a)(1) is

broadly construed.  See Willingham, 395 U.S. at 406, 89 S. Ct. at 1816.  Such detail in the

removal notice is not required under prevailing federal case law.

     For purposes of 28 U.S.C. § 1442(a)(1), a defendant "need not prove the asserted

defense, but need only articulate its 'colorable' applicability to the plaintiff's claims."  Winters,

149 F.3d at 400.  **A federal officer is not required to win his case before he can have it**

**removed.**  See Willingham, 395 U.S. at 407, 89 S. Ct. 1813 (emphasis added).  GE claims the

military contractor defense espoused in Boyle v. United Technologies Corp., 487 U.S. 500, 108

S. Ct. 2510, 101 L.Ed.2d. 422 (1988).  This defense "generally immunizes government

contractors from civil liability arising out of the performance of federal procurement contracts."

Bailey v. McDonnell Douglass Corp., 989 F. 2d 794, 797 (5th Cir. 1993).  The test for immunity

under the government contractor defense is the following:  "[l]iability for design defects in

military equipment cannot be imposed, pursuant to state law, when (1) the United States

approved reasonably precise specifications; (2) the equipment conformed to those specifications;

and (3) the supplier warned the United States about the dangers in the use of the equipment that

were known to the supplier but not to the United States." 487 U.S. at 512, 108 S. Ct. at 2518.

     In Boyle, the Court explained that the government's immunity inured to the benefit of the

contractor because it was derivative of the government's own immunity from suit "where the

performance of a discretionary function is at issue." Winters, 149 F.3d at 400 (citing Boyle, 487

U.S. at 511, 108 S. Ct. 2510)(citation omitted).  The Court noted that "the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function."  See id. at 400 (citing Boyle, 487 U.S. at 511, 108 S. Ct. 2518).  The first and second prongs of Boyle assure that the this suit is within the area where the policy of the "discretionary function" would be frustrated - i.e., the defendant assures that the design feature in question was considered by a Government officer, and not merely by the contractor itself.  Boyle, 487 U.S. at 511, 108 S. Ct. 2518.  Since, we find that the decisions regarding the design and specifications of the turbines constituted a governmental exercise of a discretionary function, the third prong of Boyle need not be addressed.  Thus, this Court finds that the GE has met the second Mesa requirement.

The third Mesa requirement is that GE must demonstrate a causal nexus between the claims against it and the acts it performed under color of federal office.  See Crocker v. Borden, 852 F. Supp. 1322, 1326 (1994).  We need not again delve into the specifics contained in the record, as we have done supra, to determine whether the defendants' proffer of the government contractor defense satisfies the third requirement for removal under § 1442.  See Winters, 149 F.3d at 400.  We simply note that the evidence we have earlier described amply supports the defendant's assertion that the claims against it arise out of the construction of marine turbines utilizing asbestos containing materials and these turbines were constructed pursuant to Naval specifications for the U.S. Navy.  See Crocker, at 1326.

Accordingly,

GE has carried its burden of establishing that it acted under an officer of the United States; therefore, the court maintains jurisdiction over this matter.  Removal is appropriate

pursuant to § 1447 (c).  Thus, **IT IS ORDERED** that the plaintiff's Motion to Remand is hereby

**DENIED.**

     New Orleans, Louisiana, this _____ day of April, 2004.

                                     **G. THOMAS PORTEOUS, JR.**
                             **UNITED STATES DISTRICT JUDGE**