

MDL 875

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

APR 26 2007

FILED
CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

GERALDINE BURTON, individually and
as personal representative to the estate of
HAROLD BURTON, decedent; BLAINE
BURTON, MARK BURTON,

Plaintiffs,

vs.

A.W. CHESTERTON COMPANY, et al.,

Defendants.

MDL Docket No. 875 – In re Asbestos
Products Liability Litigation (No. VI)

N.D. California Civil Action No. 07-0702 SI

**DEFENDANT McDONNELL DOUGLAS CORPORATION'S
RESPONSE TO PLAINTIFFS' MOTION TO
VACATE CONDITIONAL TRANSFER ORDER**

Comes now defendant McDonnell Douglas Corporation ("MDC") and files

this Response to Plaintiffs' Motion to Vacate Conditional Transfer Order to

transfer this action as a tag-along action to the Multi-District Litigation ("MDL")

No. 875 In Re Asbestos Product Liability Litigation proceedings in the United

States District Court for the Eastern District of Pennsylvania ("MDL 875"), on the

following grounds:

**OFFICIAL FILE COPY**

RECEIVED
CLERK'S OFFICE
APR 26  A 10: 50

1

1.    Plaintiffs fail to articulate, let alone make the requisite strong showing for, any valid basis for this Panel to vacate its March 8, 2007 Conditional Transfer Order ("CTO") to transfer this related tag-along asbestos action from the Northern District of California to MDL 875.

2.    There is nothing unique about this case, including the issues arising from Plaintiffs' Motion for Remand, that warrants vacating the CTO – simply stated, this action is similar to thousands of asbestos injury and wrongful death actions that have been transferred from federal district courts throughout the country to MDL 875 for coordinated proceedings ever since MDL 875 was established in 1991, and similar to thousands more such actions that no doubt will continue to be transferred to MDL 875 in the future.

3.    Vacating the CTO based on the irrelevant and conclusory reasons advanced by Plaintiffs would completely undermine the primary reason for having MDL proceedings in general, and the main purpose of MDL 875 in particular.

Respectfully submitted,
Robert E. Boone III
Amy M. Gantvoort
BRYAN CAVE LLP
120 Broadway, Suite 300
Santa Monica, California 90401
Telephone:  (310) 576-2100
Facsimile:   (310) 576-2200

By: _____
        Amy M. Gantvoort
*Attorneys for Defendant*
*McDonnell Douglas Corporation*

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   SUMMARY

Defendant McDonnell Douglas Corporation ("MDC") respectfully submits that this Panel should deny plaintiffs Geraldine Burton, Blaine Burton and Mark Burton's ("Plaintiffs") request to vacate the Conditional Transfer Order ("CTO") the Panel issued on March 8, 2007, conditionally transferring this related tag-along asbestos action to the Multi-District Litigation ("MDL") No. 875 In Re Asbestos Product Liability Litigation proceedings in the United States District Court for the Eastern District of Pennsylvania ("MDL 875" or "MDL Court"), for the simple reason that Plaintiffs have not articulated, and cannot proffer, any legitimate reason for doing so.

Plaintiffs' arguments in support of vacating the CTO display a fundamental misunderstanding of the law governing transfer of matters to the MDL. As this Panel knows, a party seeking to vacate a CTO must make a strong showing on specific grounds for such relief before it can be granted. Here, Plaintiffs fall far short of meeting that burden. While Plaintiffs claim that the CTO should be vacated simply because they claim that the case is purportedly "unique" and transfer to the MDL proceedings would not promote judicial economy, they altogether fail to substantiate such allegations. Contrary to Plaintiffs' bald assertions, this asbestos action, including Plaintiffs' remand motion and the issues arising therefrom, is not legally and factually unique so as to warrant vacating the CTO, nor will transferring the action to MDL 875 defeat goals of judicial

economy or prejudice Plaintiffs.   Accordingly, Plaintiffs' Motion should be denied.

## II.   **BACKGROUND**

This is a garden variety asbestos wrongful death action.  Plaintiffs allege both product and premises liability claims against MDC and other defendants, claiming that decedent Harold Burton ("Decedent") contracted mesothelioma caused by exposure to asbestos in defendants' respective purported asbestos-containing products and at defendants' respective premises.  Regarding MDC, Plaintiffs contend that Decedent was exposed to asbestos in C-47/C-53/R4D, DB-7 (A-20) and B-17 military aircraft built by MDC while Decedent served in the United States Army Air Force and attended a MDC aircraft mechanical school in Long Beach, California for approximately six months in 1943 and an aircraft engine mechanical school at Sheppard Field in Texas for approximately ten weeks in 1943.

Promptly on first notice of sufficient information regarding Plaintiffs' claims against MDC based on its military aircraft, MDC removed the action to the United States District Court for the Northern District of California ("Northern District Court") on February 2, 2007 on the grounds of "federal officer" removal jurisdiction.  On the same day, defendants The Boeing Company and United Technologies Corporation likewise removed the action on "federal officer" grounds.  On February 2, 2007, MDC also filed a Notice of Potential Tag-Along Action with the Northern District Court.  Pursuant to Rule 7.5(e) of the Rules of

the Judicial Panel on Multidistrict Litigation, on February 6, 2007, MDC requested

that the Panel transfer this action to MDL 875 as a related tag-along action to the

MDL 875 proceedings before the Honorable James Giles to the United States

District Court for the Eastern District of Pennsylvania, where all asbestos product

liability cases pending in the federal courts are to be transferred for coordinated

pre-trial matters.  MDL 875 was established in 1991, and since that time, Judge

Giles and the Honorable Charles Weiner before him have disposed of tens of

thousands of asbestos suits.[1]

On March 2, 2007, Plaintiffs filed their Motion for Remand and Request for

Costs (including Attorneys' Fees) on Improper Removal ("Motion for Remand")

in the Northern District Court.  The Motion for Remand is currently set for hearing

on May 4, 2007.

On March 8, 2007, as it routinely does in response to Rule 7.5(e)

notifications, the JPML filed a Conditional Transfer Order ("CTO") transferring

the case to MDL 875.

On March 23, 2007, MDC filed in the Northern District Court a Motion to

Temporarily Stay the Action ("Motion to Stay") pending transfer of the action to

---

[1]     On July 29, 1991, the MDL Judicial Panel entered an order transferring all
asbestos personal injury cases pending in federal courts to the Eastern District of
Pennsylvania for coordinated pretrial proceedings pursuant to 28 U.S.C. § 1407.
That order also applies to "tag-along actions," or actions involving common
questions of fact filed after January 17, 1991.

MDL 875. The hearing on MDC's Motion to Stay is set for May 4, 2007. Also, on March 23, 2007, Plaintiffs filed their notice of opposition to the CTO.

On April 9, 2007, Plaintiffs filed their Motion to Vacate the CTO, claiming that the CTO should be vacated because (a) this action is purportedly "unique" – based on Plaintiffs' remand motion - such that it should not be part of MDL 875 and (b) transfer to MDL 875 would defeat judicial economy goals and prejudice Plaintiffs. As set forth in MDC's Opposition to Plaintiffs' Motion for Remand, a copy of which (the brief only) is attached to the Declaration of Amy M. Gantvoort as Exhibit A and the Reply to Plaintiffs' Opposition to MDC's Motion to Stay, a copy of which (the brief only) is attached to the Gantvoort Declaration as Exhibit B, MDC properly removed this case to federal court and requested that the action be stayed pending its ultimate transfer to MDL 875.

## III.   ARGUMENT

### A.   Plaintiffs Must Satisfy a Heavy Burden of Proof Before the CTO Can Be Vacated

The hurdle for vacating a conditional transfer order is high. Indeed, the party requesting such relief must make a strong showing on specific grounds demonstrating no "common questions of fact relating to injuries or wrongful death allegedly caused by exposure to asbestos or asbestos containing products" in order to support its motion for vacating the CTO. In re Asbestos Products Liability Litigation (No. VI), 771 F. Supp. 415, 417 (J.P.M.L. 1991) The Panel has previously rejected distinctions based on the pendency of motions or other matters

before the transferor court, the uniqueness of a party's status, the type of

defendant, the docket condition of any specific federal district, the stage of pretrial

proceedings, the presence of unique claims or additional claims not relating to

asbestos injury or death, and/or the unanimity of opposition to transfer by the

parties as grounds for carving out exceptions to transfer to MDL-875's

extraordinary docket. See In re Asbestos Products Liability Litigation (No. VI),

170 F. Supp. 2d 1348, 1349 (J.P.M.L. 2001) (emphasis added).

### B.   Plaintiffs Fail to Satisfy Their Burden for Vacating the CTO

Plaintiffs fall miserably short of satisfying their burden.  In their brief in

support of the Motion to Vacate, they fail to state any valid grounds for vacating

the CTO, nor do they proffer any persuasive supporting facts or evidence.  Instead,

as explained more fully below, Plaintiffs offer a wholly inapposite argument

regarding competing motions for remand and stay and completely fail to address

the issue at hand – whether there is any valid reason why this case should not be

transferred to MDL 875.

### C.   Plaintiffs' Case is Not Unique.

Plaintiffs contend that the Panel should vacate the CTO because their case

is unique.  Aside from the fact that the Panel has declined to vacate CTOs on

uniqueness grounds, Plaintiffs offer no relevant facts or evidence to support their

claim that this case is "unique."  The reason they do not do so is simple:  they

cannot because this action is not unique.  Rather, this case is similar to literally

thousands of asbestos cases which have been previously transferred to MDL 875

from virtually every federal district court in this country. Numerous future cases –
similar to this one – no doubt will likewise be transferred to MDL 875 in the
future. There is nothing special or unique about Plaintiffs' claims. They have
alleged broad traditional products and premises liability theories against numerous
defendants based on Decedent's purported exposure to asbestos in defendants'
respective products and at defendants' respective premises, just like almost every
other asbestos plaintiff has alleged such theories. There is nothing unique about
Decedent's alleged exposure – Plaintiffs claim he was exposed during his working
career, just like thousands of other claimants have alleged occupational exposure.
Decedent's alleged exposure to asbestos in military equipment is remarkably
indistinguishable from numerous other military exposure cases that have been part
of the MDL proceedings for years.

**D.    The Fact That Plaintiffs Filed a Motion for Remand Does Not
Warrant Vacating the CTO**

Nor does the fact that Plaintiffs have requested the transferor court to
remand the case back to state court constitute grounds to vacate the CTO.
Plaintiffs are under the misguided impression that their filing such a motion makes
this action unique so as to warrant vacating the CTO. To the contrary, asbestos
plaintiffs frequently file remand motions after removal before a CTO is issued and
before the district court subsequently stays the action.

Plaintiffs' argument that this Panel should vacate the CTO pending a ruling
by the transferor court on their Motion for Remand is unavailing. A district court

may wait for a transfer order without ruling on a motion to remand.  <u>In re Asbestos Products Liability Litigation</u>, 170 F. Supp.2d 1348, 1349 n.1 (J.P.M.L. 2001) ("[T]hose courts wishing to address [motions to remand] have adequate time in which to do so, those courts concluding that such issues should be addressed by the transferee judge <u>need not rule on them</u>, and the process of 1407 transfer in MDL 875 can continue without any unnecessary interruption or delay.") (emphasis added).[2/]

Further, Plaintiffs' Motion to Vacate the CTO displays a fundamental misunderstanding of the present issue.  Rather than providing the Panel with any showing, let alone a strong showing, of specific grounds demonstrating no "common questions of fact relating to injuries or wrongful death allegedly caused by exposure to asbestos or asbestos containing products" exist in order to support its motion for vacating the CTO, Plaintiffs instead simply re-hash their arguments in opposition to MDC's Motion to Stay.  Here, Plaintiffs' heavy reliance on <u>Conroy v. Fresh Del Monte Produce, Inc.</u>, 325 F. Supp. 2d 1049 (N.D. Cal. 2004) is grossly misplaced.  As recognized in their own Motion to Vacate, <u>Conroy</u> dealt with the issue of competing motions to remand and stay in the district court, not

---

[2/]     The following three factors should be considered in determining whether a stay is appropriate: (1) judicial efficiencies in avoiding duplicative litigation; (2) potential prejudice to the party seeking the stay; and (3) hardship to other party if the action is not stayed.  <u>Rivers v. Walt Disney Co.</u>, 980 F. Supp. 1358, 1360 (C.D. Cal. 1997).  As shown in MDC's Motion to Stay and Reply Brief in Support of Motion to Stay Action, all three factors weigh in favor of a stay in this action pending the Panel's determination on transfer on May 31, 2007.

the propriety of a transfer order to the MDL. As such, Plaintiffs' arguments are not the least persuasive.

Additionally, it is likely that the transferor court will determine that a stay is appropriate pending the determination on the transfer of this action to the MDL. Indeed, a majority of courts have concluded that it is appropriate to stay preliminary proceedings while a motion to transfer and consolidate is pending before the Panel because a stay provides for consistent treatment of similar issues and will reduce the burden on the Court. Rivers, 980 F. Supp. at 1362; see also Moore v. Wyeth-Ayerst Laboratories, 236 F. Supp.2d 509, 511 (D. Md. 2002) (stay of consideration of motion to remand warranted pending transfer to MDL); Knearem v. Bayer Corp, 2002 U.S. Dist. LEXIS 9523 at *3-*4 (D. Kan. May 7, 2002) (staying action pending transfer to MDL because it would allow the transferee judge to deal with the common issues raised by remand motions); Jackson v. Johnson & Johnson, Inc., 2001 U.S. Dist. LEXIS 22329 at *17 (W.D. Tenn. Apr. 2, 2001) ("[t]he general rule is for federal court to defer ruling on pending motions to remand in MDL litigation until after the [MDL Judicial Panel] has transferred the case to the MDL court."). Here, it is likely that the transferor court will decline to rule on Plaintiffs' Motion for Remand and stay the action pending the Panel's decision on transfer. Consequently, there is no reason for the Panel to vacate the CTO.

Moreover, either the transferor court or the MDL Court is fully capable of deciding Plaintiffs' remand motion. The issues presented are not unique or

isolated.   As an initial matter, the MDL Court is more than qualified to determine

and dispose of Plaintiffs' disingenuous timeliness argument and move on to

evaluating jurisdiction on the merits.   Numerous cases involving the identical issue

here, namely asbestos incorporated into military equipment under the

Government's direction, have been removed pursuant to Section 1442(a) on

"federal officer" grounds.   There are numerous military contractors being sued by

asbestos plaintiffs in a multitude of jurisdictions throughout the country for their

use of Government-approved and mandated asbestos components in military

equipment, against which claims such contractors, like MDC, are immune from

liability pursuant to the "government contractor" defense as stated in Boyle v.

United Technologies, Inc., 487 U.S. 500 (1988) and its progeny, including

Niemann v. McDonnell Douglas Corp., 721 F.Supp. 1019 (S.D. Ill. 1989) (in

which MDC obtained a grant of summary judgment under Boyle against asbestos

claims regarding the manufacture of military aircraft).

Plaintiffs' contend that the threshold jurisdictional issue is whether, under

current California law, MDC, and the other removing defendants, were acting

under the direction of a federal officer.   However, the government contractor

defense is based on federal law and, indeed, was created by federal courts.   By

operation of the defense, federal law, i.e., government contractor immunity,

preempts state law product liability claims.   The United States Supreme Court

explicitly stated in Boyle that "civil liabilit[y] arising out of the performance of

federal procurement contracts" is a "'uniquely federal' interest."   Boyle, 487 U.S.

11

at 505-06. "[I]t is plain that the Federal Government's interest in the procurement of equipment is implicated by [product liability] suits [against the contractor] – even though the dispute is one between private parties." Id. at 506. The rationale for the defense is based upon federal law, i.e., a military contractor should enjoy the same immunity as a federal officer enjoys under the discretionary function exception to the Federal Torts Claims Act ("FTCA"), 28 U.S.C. § 2680(a). Id. at 511. This is precisely the type of issue involving military contractors that is found in numerous cases in the MDL. Thus, Plaintiffs' assertion that this action "bears no similarity to any issue in any other case which has been or may be transferred to the MDL" is just flatly wrong. Further, permitting the MDL Court to address such issues, particularly jurisdictional issues, in numerous cases involving similar claims and common factual circumstances obviously would promote consistent and predictable results. See In re Ivy, 901 F.2d 7, 9 (2d Cir. 1990) (finding that transferor court should not hear motion because the issue was easily capable of arising in cases from other transferor district courts and, "consistency as well as economy is thus served [if the ...objections...[are] heard and resolved by a single court.")

In fact, not only is the MDL Court well-qualified to determine motions for remand on such common issues involving "federal officer" removal, but the MDL Court has shown a desire to actively control the administration and adjudication of such pre-trial proceedings, including the determination of pending motions. (See MDL 875 Administrative Order No. 11, at No. 2, entered on August 15, 2006.)

Clearly, the MDL Court has indicated in interest in ruling on motions pending at the time of the transfer of a case.

Finally, contrary to Plaintiffs' assertions, MDC properly and timely removed this case to federal court based on "federal officer" removal grounds. As detailed in MDC's Opposition to the Motion for Remand and accompanying declarations and exhibits thereto, MDC timely removed the action upon the first notice that "federal officer" removal grounds existed. MDC has provided substantial evidence that it acted under the direction and control of a federal officer when it built the military aircraft at issue here, including the installation of asbestos-containing components in the aircraft. To support its removal, MDC demonstrated the causal connection between Plaintiffs' claims and MDC's alleged conduct under the direction of federal officers. Additionally, MDC has asserted two separate colorable federal defenses, namely the government contractor defense under Boyle v. United Technologies Corp., 487 U.S. 500 (1988), and derivative sovereign immunity under Yearsley v. W.A. Ross Construction Co., 308 U.S. 18 (1940), to Plaintiffs' claims. As such, MDC has set out strong arguments supporting jurisdiction in federal court, and there is absolutely no bar to the transfer of this action to MDL 875 for coordinated pre-trial proceedings.

**E.**     **Transfer of the Case to MDL 875 Will Best Serve Judicial Economy and Efficiency and Will Not Prejudice Plaintiffs**

This case involves numerous questions of fact common with cases already pending in the MDL 875 proceedings. As this Panel well knows, there are

numerous military contractors being sued by asbestos plaintiffs in the MDL

proceedings. Mesothelioma, the particular disease that Decedent allegedly

contracted, is shared by many asbestos plaintiffs in the MDL proceedings; it is not

a new disease. As a result, there are numerous common questions of fact

pertaining to exposure, medical and causation matters, as well as various defenses

raised by MDC and the other defendants, including the "government contractor"

defense under Boyle v. United Technologies, Inc., 487 U.S. 500 (1988) and its

progeny. Judicial resources will certainly be saved by avoiding duplicative

litigation dealing with identical issues in multiple actions and would prevent

inconsistent rulings on common issues from case to case.

Plaintiffs will not be severely prejudiced by transfer of the action to the

MDL proceedings. To support their claim of prejudice, Plaintiffs merely state in a

conclusory manner that the case has been pending for over two years and point to

plaintiff Geraldine Burton's failing health. However, it is clear that the case can

be fairly and efficiently litigated in the MDL proceedings. The hearing on transfer

has already been set as soon as May 31, 2007. Upon the transfer to MDL 875, the

case will immediately proceed. Thus, Plaintiffs are guaranteed to have their day in

court.

Further, Plaintiffs' own gamesmanship - blindsiding defendants with new

claims supported by a new witness at the eleventh hour - are the only cause of any

"unnecessary delay" in this action. Plaintiffs waited over two years since the

inception of this case and until the eve of trial to suddenly reveal a new witness

providing information regarding new claims based on MDC's military aircraft at a new location. As such, Plaintiffs' actions are the sole cause of any delay in moving this case forward to trial.

By contrast, MDC and the other defendants will be substantially prejudiced if the case is not transferred to MDL 875 for coordinated pre-trial proceedings. Defendants would be forced to engage in potentially duplicative pretrial proceedings in the district court and the MDL Court. Indeed, such duplicative pretrial activity is exactly what the MDL docket was designed to prevent. Thus, following transfer, the action may proceed, in the appropriate court, without running afoul of the entire MDL system and causing unnecessary waste of judicial and the parties' resources.

## IV.    **CONCLUSION**

MDC respectfully submits that the Panel should deny Plaintiffs' Motion to Vacate the Conditional Transfer Order, and transfer this action to MDL 875.

Respectfully submitted,
Robert E. Boone III
Amy M. Gantvoort
BRYAN CAVE LLP
120 Broadway, Suite 300
Santa Monica, California 90401
Telephone: (310) 576-2100
Facsimile: (310) 576-2200

By: _____
    Amy M. Gantvoort
*Attorneys for Defendant*
*McDonnell Douglas Corporation*

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

APR 26 2007

FILED
CLERK'S OFFICE

# BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

GERALDINE BURTON, individually and
as personal representative to the estate of
HAROLD BURTON, decedent; BLAINE
BURTON, MARK BURTON,

        Plaintiffs,

        vs.

A.W. CHESTERTON COMPANY, et al.,

        Defendants.

MDL Docket No. 875 – In re Asbestos
Products Liability Litigation (No. VI)

N. D. California Civil Action No. 07-0702SI

### DECLARATION OF AMY M. GANTVOORT IN SUPPORT OF DEFENDANT McDONNELL DOUGLAS CORPORATION'S RESPONSE TO PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER

I, Amy M. Gantvoort, hereby declare as follows:

1.    I am an attorney duly licensed to practice law before the Courts of

the State of California and the United States District Court for the Northern

District of California. I am an associate at Bryan Cave LLP, counsel of record for

defendant McDonnell Douglas Corporation ("MDC"). I have personal knowledge

of the facts set forth in this declaration, and, if called as a witness, I could and

would testify competently to the following facts.

1

2.     MDC removed this action from the Superior Court of California, County of San Francisco, to the United States District Court for the Northern District of California ("Northern District Court") on February 2, 2007 on the grounds of "federal officer" removal jurisdiction.  On the same day, defendants The Boeing Company and United Technologies Corporation likewise removed the action on "federal officer" grounds.  On February 2, 2007, MDC also filed a Notice of Potential Tag-Along Action in the  Northern District Court.

3.     On February 6, 2007, pursuant to Rule 7.5(e) of the Rules of the Judicial Panel on Multidistrict Litigation, MDC requested that the Panel transfer the action to Multidistrict Litigation No. 875 - In re Asbestos Products Liability Litigation (No. VI).

4.     On March 2, 2007, Plaintiffs filed their Motion for Remand and Request for Costs (including Attorneys' Fees) on Improper Removal ("Motion for Remand") in the Northern District Court.  The Motion for Remand is currently set for hearing on May 4, 2007.

5.     On March 8, 2007, the JPML filed a Conditional Transfer Order ("CTO") transferring the case to MDL 875.

6.     On March 23, 2007, MDC filed in the Northern District Court a Motion to Temporarily Stay the Action ("Motion to Stay") pending transfer of the action to MDL 875.  The hearing on MDC's Motion to Stay is set for May 4, 2007.  Also, on March 23, 2007, Plaintiffs filed their notice of opposition to the CTO.

7.     On April 9, 2007, Plaintiffs filed their Motion to Vacate the CTO. The hearing session is set for May 31, 2007.

8.     Attached hereto as Exhibit A is a true and correct copy of MDC's Opposition to Plaintiffs' Motion for Remand (the brief only), filed in the Northern District on April 13, 2007.

9.     Attached hereto as Exhibit B is a true and correct copy of MDC's Reply to Plaintiffs' Opposition to MDC's Motion to Stay (the brief only), filed in the Northern District on April 20, 2007.

I declare under penalty of perjury according to the laws of the United States that the foregoing is true and correct.

Executed this 25th day of April, 2007 at Santa Monica, California.

Amy M. Gantvoort

BRYAN CAVE LLP
120 Broadway, Suite 300
Santa Monica, California 90401
Telephone: (310) 576-2100

3

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

APR 26 2007

FILED
CLERK'S OFFICE

# BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

GERALDINE BURTON, individually and
as personal representative to the estate of
HAROLD BURTON, decedent; BLAINE
BURTON, MARK BURTON,

MDL Docket No. 875 – In re Asbestos
Products Liability Litigation (No. VI)

Plaintiffs,

N.D. California Civil Action No. 07-0702 SI

vs.

A.W. CHESTERTON COMPANY, et al.,

Defendants.

## PROOF OF SERVICE

I hereby certify that copies of **DEFENDANT McDONNELL DOUGLAS CORPORATION'S RESPONSE TO PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER; DECLARATION OF AMY M. GANTVOORT; AND MDC'S CORPORATE DISCLOSURE STATEMENT,** and this Certificate of Service were served by Federal Express Next Day Delivery in a sealed envelope, addressed to the following:

PLEASE SEE ATTACHED PANEL SERVICE LIST

2007 APR 26   A 10: 52

RECEIVED
CLERK'S OFFICE

1

I declare that I am employed in the office of a member of the bar of the United States District Court for the Northern District of California at whose direction the service was made. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on April 25, 2007, at Santa Monica, California.

Frank Kavelin

Geraldine Burton v. A.W. Chesteron, et al.

## SERVICE LIST

| | |
|---|---|
| Jessica N. Biernier<br>Levin Simes & Kaiser LLP<br>44 Montgomery Street, 36th Floor<br>San Francisco, CA 94104 | Reginald S. Kramer<br>Oldham & Dowling<br>195 South Main Street<br>Suite 300<br>Akron, OH 44308-1314 |
| Richard C. Binzley<br>Thompson Hine, LLP<br>127 Public Square<br>3900 Key Center<br>Cleveland, OH 44114 | David C. Landin<br>Hunton & Williams, LLP<br>Riverfront Plaza, East Tower<br>951 East Byrd Street<br>Richmond, VA 23219 |
| Edward J. Cass<br>Gallagher, Sharp, Fulton & Norman<br>Bulkley Building, 7th Floor<br>1501 Euclid Avenue<br>Cleveland, OH 44115 | Gene Locks<br>Locks Law Firm, LLC<br>1500 Walnut Street<br>Philadelphia, PA 19102 |
| Adam M. Chud<br>Goodwin Procter, LLP<br>901 New York Avenue N.W.<br>Washington, D.C. 20001 | Lillian Ma, Esq.<br>Tucker Ellis & West LLP<br>One Market Street<br>Steuart Tower, Suite 1300<br>San Francisco, CA 94105 |
| David A. Damico<br>Burns, White & Hickton, LLC<br>Four Northshore Center<br>106 Isabella Street<br>Pittsburgh, PA 15212 | Ronald L. Motley<br>Motley Rice, LLC<br>P.O. Box 1792<br>28 Bridgeside Boulevard<br>Mt. Pleasant, SC 29464 |
| Raymond P. Forceno<br>Forceno & Hannon<br>111 S. Independence Mall East<br>The Bourse, Suite 1000<br>Philadelphia, PA 19106-2574 | John J. Repcheck<br>Marks, O'Neill, O'Brien & Courtney<br>3200 Gulf Tower<br>707 Grant Street<br>Pittsburgh, PA 15219 |
| Ellen B. Furman<br>Goldfein & Hosmer<br>1600 Market Street<br>33rd Floor<br>Philadelphia, PA 19103 | John D. Roven<br>Roven-Kaplan, L.L.P.<br>2190 North Loop West<br>Suite 410<br>Houston, TX 77018 |
| Susan M. Hansen<br>Brownson & Ballou<br>225 South Sixth Street<br>Suite 4800<br>Minneapolis, MN 55402 | Richard D. Schuster<br>Vorys, Sater, Seymour & Pease, LLP<br>52 East Gay Street<br>P.O. Box 1008<br>Columbus, OH 43216 |
| | |

Geraldine Burton v. A.W. Chesteron, et al.

## SERVICE LIST

| | |
|---|---|
| Neil Selman<br>Selman, Breitman & Burgess<br>11766 Wilshire Boulevard<br>Sixth Floor<br>Los Angeles, CA 90025 | Robert N. Spinelli<br>Kelley, Jasons, McGuire & Spinelli<br>Centre Square West<br>15th Floor<br>Philadelphia, PA 19102 |
| Robert E. Swickle<br>Jacques Admiralty Law Firm, P.C.<br>1570 Penobscot Building<br>The Maritime Asbestosis Legal Clinic<br>Detroit, MI 48226 | Andrew J. Trevelise<br>Reed Smith LLP<br>2500 One Liberty Place<br>1650 Market Street<br>Philadelphia, PA 19103 |
| James K. Weston, II<br>Tome Riley Law Firm<br>4040 First Avenue, N.E.<br>P.O. Box 998<br>Cedar Rapids, IA 52406 | Bo Kim, Esq.<br>Perkins Coie LLP<br>1620 26th Street<br>South Tower, Sixth Floor<br>Santa Monica, CA 90404 |

**EXHIBIT A**

1    **BRYAN CAVE LLP**
Robert E. Boone III (California Bar No. 132780)
2    Amy M. Gantvoort (California Bar No. 227294)
120 Broadway, Suite 300
3    Santa Monica, California 90401-2386
Telephone:    (310) 576-2100
4    Facsimile:    (310) 576-2200
E-mail:    reboone@bryancave.com
5             amy.gantvoort@bryancave.com

6    Attorneys For Defendant
McDONNELL DOUGLAS CORPORATION

7

8              **UNITED STATES DISTRICT COURT**

9              **NORTHERN DISTRICT OF CALIFORNIA**

10

11   GERALDINE BURTON, individually and as          Case No. CV 07-00702 SI
personal representative to the estate of
12   HAROLD BURTON, decedent; BLAINE              **DEFENDANT McDONNELL DOUGLAS**
BURTON, MARK BURTON and DOES ONE          **CORPORATION'S OPPOSITION TO**
13   through TEN, inclusive,                       **PLAINTIFFS' MOTION FOR REMAND**
                                                **AND REQUEST FOR COSTS**
14              Plaintiffs,                       **(INCLUDING ATTORNEYS' FEES) ON**
                                                **IMPROPER REMOVAL**
15              vs.
                                                [Filed concurrently with Declarations of Amy
16   A.W. CHESTERTON COMPANY, et al.,            M. Gantvoort, William F. Losch, Jr., and Larry
                                                F. Fogg; and Appendix of Exhibits]
17              Defendants.
                                                Date:    May 4, 2007
18                                              Time:    9:00 a.m.
                                                Dept.:   Courtroom 10, 19th Floor
19

20

21              Defendant McDonnell Douglas Corporation ("MDC") submits the following

22   Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Remand and

23   Request for Costs (including Attorneys' Fees) on Improper Removal ("Motion for Remand).

24

25

26

27

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

1

TABLE OF CONTENTS

2    I. SUMMARY OF ARGUMENT.................................................................................1

3    II. FACTUAL AND PROCEDURAL BACKGROUND.....................................................4

4        A.    Plaintiffs' Claims.................................................................................4

5        B.    MDC Built Military Aircraft Pursuant to Contracts With and Under the Direction
              and Control of Federal Officers..............................................................8

6    III. MDC'S REMOVAL WAS TIMELY........................................................................11

7    IV. FEDERAL OFFICER REMOVAL JURISDICTION is proper...............................15

         A.    The Test For "Federal Officer" Removal Jurisdiction ..................................15

8        B.    MDC Acted Under The Direction Of Federal Officers When It Built
9              C-47/C-53/R4D and DB-7/A-20 Aircraft...............................................15

10             1.    MDC satisfies the "acting under" requirement based on the Government's
                     extensive involvement in and control over MDC's production of

11                   C-47/C-53/R4D and DB-7/A-20 aircraft..............................................17

12             2.    MDC also satisfies the "acting under" requirement based on the Government's
                     mandate that MDC install GFAE-CI components on C-47/C-53/R4D

13                   and DB-7/A-20 aircraft. ....................................................................19

14             3.    MDC also satisfied the "acting under" requirement based on the Government's
                     mandate that MDC comply with military specifications that required the use of

15                   asbestos..........................................................................................20

16        C.    There Is A Causal Nexus Between MDC's Action Under Color Of Federal Office
              And Plaintiffs' Claims.........................................................................21

17        D.    MDC Has A "Colorable Federal Defense," i.e., Government Contractor Defense
              And Derivative Sovereign Immunity.......................................................22

18

19   V. PLAINTIFFS ARE NOT ENTITLED TO AN AWARD OF FEES AND COSTS...................25

     VI. CONCLUSION .................................................................................................25

20

21

22

23

24

25

26

27

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

# TABLE OF AUTHORITIES

**Cases**

Akin v. Big Three Industries,
   851 F. Supp. 819 (E.D. Tex. 1994) ........................................................................................21

Boyle v. United Technologies Corp.,
   487 U.S. 500 (1988) ...........................................................................................4, 22, 23

Dewey v. Asbestos Defendants,
   No. C 04-4645 (January 3, 2005),
   slip op. at 6 (citations omitted) ...........................................................................................21

Durham v. Lockheed Martin Corp.,
   445 F.3d 1247 (9th Cir. 2006) ...........................................................................11, 13, 25

Fung v. Abex Corp.,
   816 F. Supp. 569 (N.D. Cal. 1992).................................................................15, 16, 21

Good v. Armstrong World Industries, Inc.,
   914 F. Supp. 1125 (E.D. Pa. 1996)..........................................................................17

Gulati v. Zuckerman,
   723 F. Supp 353 (E.D. Pa. 1989)..........................................................................16

Harris v.Bankers Life and Casualty Co.,
   425 F.3d 689 (9th Cir. 2005) ..........................................................................14

In re Aircraft Crash Litigation Frederick, Maryland,
   752 F. Supp. 1326 (S.D. Ohio 1990)...............................................................19, 20

International Primate Protection League v. Administrators of Tulane Educational Fund,
   500 U.S. 72 (1991) ..........................................................................................17

Mesa v. California,
   489 U.S. 121,
   109 S. Ct. 959,
   103 L.Ed.2d 99 (1989) ...............................................................................15, 21, 23

Niemann v. McDonnell Douglas Corporation,
   721 F. Supp. 1019, (S.D. Ill. 1989) ............................................................4, 22, 23

Pack v. AC&S,
   838 F. Supp. 1099(D. Md. 1993) ..................................................16, 17, 19, 23

Ramey v. Martin-Baker Aircraft Co.,
   874 F.2d 946 (4th Cir. 1989)..........................................................................24

State of Nebraska ex rel. Department of Social Services v. Benston,
   146 F.3d 676 (9th Cir. 1998)..........................................................................17

U.S. v. Aerodex,
   469 F.2d 1003 (5th Cir. 1972)..........................................................................18

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

U.S. v. Bornstein,
   423 U.S. 303,
   96 S.Ct. 523,
   46 L.Ed.2d 514 (1976) ................................................................................18

Winters v. Diamond Shamrock Chemical Co.,
   149 F.3d 387 (5th Cir. 1998)......................................................................15

Yearsley v. W.A. Ross Construction Co.,
   309 U.S. 18,
   60 S. Ct. 413,
   84 L.Ed. 554 (1940) ...........................................................2, 4, 22, 24, 25

**Statutes**

28 U.S.C. § 1442.................................................................................................17

28 U.S.C. § 1442(a)(1) .............................................................1, 11, 12, 15, 24

28 U.S.C. § 1446(b)...................................................................................11, 12

28 U.S.C. § 2680(a).............................................................................................22

31 U.S.C. § 3730(a)..............................................................................................18

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

MDC OPPOSITION TO MOTION FOR REMAND
CV 07-0702 SI

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    SUMMARY OF ARGUMENT**

Plaintiffs Geraldine Burton, Mark Burton and Blaine Burton's ("Plaintiffs") Motion for Remand should be denied because this Court has "federal officer" removal jurisdiction over this action pursuant to 28 U.S.C. § 1442(a)(1). Contrary to Plaintiffs' assertions, MDC timely removed the action and has in fact made the requisite showing – in its Notice of Removal and in this Opposition – that it has the right to have this case adjudicated in federal court.

Plaintiffs' accusation that MDC's removal was untimely has no merit and is disingenuous. MDC did not "pull the rug out from under" Plaintiffs on the eve of trial but, instead, timely and immediately removed this action on "federal officer" removal grounds upon the first notice from Plaintiffs that they were alleging claims based on decedent Harold Burton's ("Decedent") exposure to Government-furnished and Government–mandated asbestos-containing components of military aircraft built by MDC, namely the C-47/C-53/R4D and DB-7/A-20 aircraft (collectively the "Aircraft"), which components MDC was <u>required</u> by the Government to install on those planes. It was not until January 2007, over two years since the inception of this litigation and on the eve of the hearing on MDC's summary judgment motion based on Plaintiffs' lack of product identification and evidence of exposure, that Plaintiffs revealed <u>for the first time</u> that they were alleging claims against MDC based on <u>its</u> military aircraft and disclosed sufficient information regarding those claims to put MDC on notice that it had grounds for "federal officer" removal. Prior to such time, Plaintiffs' sole basis for suing MDC was their unsupported contention that Decedent was exposed to asbestos while attending an aircraft training school located at MDC's premises in Long Beach for six months in 1943, while Decedent was serving in the United States Army Air Corps ("AAC").[1] Throughout this litigation, in response to written discovery and oral depositions, Plaintiffs never asserted or provided any evidence that Decedent was exposed to asbestos from any particular military aircraft designed or built by MDC, let alone any specific component of any such aircraft, in connection with the training school. In fact,

---

[1]  The AAC was later known as the United States Army Air Force and is now known as the United States Air Force.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

MDC OPPOSITION TO MOTION FOR REMAND
CV 07-0702 SI

1    Plaintiffs themselves denied knowledge of any witness who could attest to Decedent's purported

2    attendance at the school or provide any details about his training, or the nature and source of his

3    purported exposure at that location.  However, on January 12, 2007, Plaintiffs blindsided MDC

4    with their summary judgment opposition by suddenly claiming that Decedent was exposed to

5    asbestos from MDC-built aircraft.  MDC was shocked to learn that the source of Plaintiffs' last

6    minute "new" product identification information is one of decedent's Army buddies whose

7    identity Plaintiffs knew but failed to disclose in discovery, despite being asked such information in

8    depositions, and whom Plaintiff's counsel first contacted in December 2006.  Plaintiffs' own

9    eleventh hour change of direction in this lawsuit provided MDC with its first opportunity to

10   remove this action.

11        Plaintiffs' contention that MDC was on notice earlier of its ability to remove the case

12   based on Plaintiffs' generic and wholly unsupported claim against co-Defendant Boeing that

13   Decedent was exposed to asbestos in "Boeing" B-17 aircraft is misplaced and cannot justify

14   remand.  Although for a limited time MDC built only two of the many different models of B-17

15   aircraft – specifically, some but not all B-17F and B-17G models assembled by MDC's

16   predecessor, Douglas Aircraft Company ("DAC"),[2] Plaintiffs never before claimed that Decedent

17   worked with or was exposed to asbestos from B-17F or B-17G aircraft, much less such model

18   aircraft actually built by DAC.[3]  Consequently, MDC's removal was timely.

19        More importantly, MDC has demonstrated that "federal officer" removal is proper.  MDC

20   has shown that (1) it acted under the direction of a federal officer when it included allegedly

21   asbestos-containing components in the Aircraft; (2) there is a causal connection between

22   Plaintiffs' claims and MDC's alleged conduct under the direction of federal officers;[4] and (3) it

23   has asserted two colorable federal defenses to Plaintiffs' claims.

24   _____
     [2]  DAC merged with McDonnell Aircraft Company in 1967 to form MDC.  (Douglas Aircraft
25   Company and McDonnell Douglas Corporation will collectively be referred to herein as "MDC".)
     DAC also built (and designed) the C-47/C-53/R4D and DB-7/A-20.
26   [3]  In fact, to this day, Plaintiffs have not provided any evidence that Decedent worked with or was
     exposed to asbestos from any DAC-built B-17F or B-17G aircraft or any components thereof,
27   which would enable MDC to determine that it could remove this action on "federal officer"
     grounds.
28   [4]  Plaintiffs do not contest that MDC is a "person" under Section 1442(a)(1).

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

1    More specifically, MDC has proffered undisputed evidence[5/] that it was acting under the

2   direction and control of federal officers while producing the Aircraft.  The United States

3   Government was intimately involved in and exercised extensive control over the procurement,

4   design, manufacture, assembly, testing and modification of the Aircraft throughout MDC's

5   involvement in those procurement programs.  Military officers actively participated in, supervised

6   and oversaw all of these phases of the procurement program, down to the most minute detail, to

7   ensure that MDC complied with the design requirements for the aircraft and its contractual

8   obligations to the Government.  The designs of the Aircraft were fixed by Detail Specifications,

9   Change Orders and design drawings, all of which were reviewed and approved by federal officers.

10  MDC was not free to make any changes to the Aircraft designs without prior express review and

11  authorization from the Government.  Not only did the Government approve all aspects of the

12  designs, but the Government in fact dictated many of the features of the Aircraft designs.  For

13  instance, the Government required MDC to install certain components which allegedly contained

14  asbestos, such as engines, on the Aircraft.  Such equipment was designated by the AAC as

15  "Government Furnished Aircraft Equipment-Contractor Installed" ("GFAE-CI") in the

16  procurement contracts,[6/] which expressly mandated that MDC install such equipment on the

17  planes.  The Government selected, reviewed and approved the design of, and separately procured,

18  GFAE-CI components from their original equipment manufacturers ("OEMs"), not MDC.  The

19  Government dealt directly with those OEMs during those procurement processes.  MDC had no

20  choice but to install GFAE-CI components on the aircraft.  In addition, the Government also

21  required MDC to comply with numerous military specifications, promulgated by the Government,

22  many of which mandated the use of asbestos in the aircraft.

23

24

25

26

27

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

---

[5/]  Even if Plaintiff could proffer admissible controverting evidence, MDC still is entitled to have this matter adjudicated in federal court.  MDC only has to make a plausible showing that "federal officer" jurisdiction exists.  A motion for remand is not an appropriate juncture at which to determine the merits of the case.
[6/]  Government Furnished Aircraft Equipment ("GFAE") component parts can be of two types: (1) GFAE-CI (Contractor installed GFAE) and (2) GFAE-GI (Government installed GFAE).  MDC was required to install GFAE-CI equipment on the aircraft pursuant to its procurement contracts with the Government.  Declaration of Larry L. Fogg ("Fogg Decl.") ¶¶ 11, 22, 41.  GFAE-CI components are specified in the Aircraft Detail Specifications, which are incorporated by reference into each of the production contracts.

MDC OPPOSITION TO MOTION FOR REMAND
CV 07-0702 SI

1    There is no question that a causal nexus exists between Plaintiffs' claims and MDC's

2  conduct under the direction and control of federal officers.  Plaintiffs are suing MDC based on

3  Decedent's purported exposure to Government-mandated and Government-furnished asbestos-

4  containing components that MDC was required to install in the Aircraft.  Since MDC's use of such

5  asbestos-containing components in the Aircraft was specifically compelled by the Government,

6  MDC easily satisfies the causal nexus requirement.

7    MDC asserts two colorable federal defenses to Plaintiffs' claims.  MDC asserts the

8  "government contractor defense," as recognized by the Supreme Court in Boyle v. United

9  Technologies Corp., 487 U.S. 500 (1988).  Plaintiffs cannot credibly contend that this defense is

10  not "colorable" based on the facts in this case, including undisputed evidence proffered by MDC,

11  as well as the plethora of decisions by federal and state courts upholding the defense, including the

12  grant of summary judgment in favor of MDC on identical grounds in Niemann v. McDonnell

13  Douglas Corp., 721 F. Supp. 1019 (S.D. Ill. 1989), which involved alleged asbestos exposure

14  arising from military aircraft built by MDC for the Air Force pursuant to the same procurement

15  scheme as the aircraft involved here.  MDC also has asserted a colorable defense of derivative

16  sovereign immunity against Plaintiffs' claims pursuant to the doctrine set forth in Yearsley v.

17  W.A. Ross Construction Co., 309 U.S. 18 (1940).

18    As "federal officer" jurisdiction is proper, Plaintiff's Motion for Remand should be denied.

19  **II.    FACTUAL AND PROCEDURAL BACKGROUND**

20    **A.    Plaintiffs' Claims**

21    Plaintiffs are the surviving spouse and children of decedent Harold Burton.  Plaintiffs

22  assert premises and product liability claims against MDC.  On January 12, 2007, MDC received

23  its first notice in the case that Plaintiffs allege – as stated for the first time ever in their opposition

24  to MDC's summary judgment motion ("MSJ") – that Decedent died from mesothelioma caused by

25  exposure to asbestos in C-47/C-53/R4D[7] and DB-7/A-20 military aircraft designed and built by

26

27  ───────────────
[7] Plaintiffs allege that Decedent was exposed to asbestos from DC-3 aircraft, but as is explained in
28  the Fogg Declaration the alleged DC-3 aircraft are, in fact, C-47/R4D and/or C-53/R4D military
aircraft.  Fogg Decl. ¶¶ 5, 18-19.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

MDC OPPOSITION TO MOTION FOR REMAND
CV 07-0702 SI

1   MDC for the AAC pursuant to military equipment procurement contracts with the Government.

2          At no time before January 12, 2007 did Plaintiffs identify any MDC aircraft as a source of

3   Decedent's alleged asbestos exposure and a basis for their claims. Before such time, Plaintiffs had

4   always contended – as stated in their written product identification and alleged exposure

5   information discovery responses required by the San Francisco Superior Court General Orders –

6   only that Decedent was exposed to asbestos at an aircraft mechanical school held at MDC's

7   premises in Long Beach, California for approximately six months in 1943. See Declaration of

8   Jeffrey A. Kaiser in Support of Motion for Remand ("Kaiser Decl."), Exhibit E at pp. 3:3-11,

9   8:21-22; Exhibit C at pp. 3:13-14, 3:20-22, 9:23-24; Exhibit D at pp. 2:17, 5:21. Plaintiffs'

10  mandatory discovery responses did not identify any other connection to MDC, including any other

11  MDC premises or any MDC aircraft. Plaintiffs' responses generically identified B-17 aircraft but

12  repeatedly stated that Decedent was a "*Boeing B-17 Mechanic*" while serving in the Army. See

13  Kaiser Decl., Exhibit E at p. 8:20; Exhibit C at p. 9:22; Exhibit D at 5:17. Plaintiffs' responses did

14  not identify any particular model B-17 aircraft or state that Decedent purportedly worked on any

15  B-17 aircraft – or, for that matter – any aircraft, built or supplied by MDC at any time.

16         Also prior to January 12, 2007, during depositions taken in the case, at no time did

17  Plaintiffs identify any MDC aircraft. Upon direct questioning, Plaintiffs testified that they had no

18  knowledge about the alleged training school Decedent attended at MDC's Long Beach premises,

19  or if Decedent ever worked on any MDC aircraft. See Deposition of Geraldine Burton at pp. 49:8-

20  20, 50:3-8; 148:6-15; Deposition of Blaine Burton at pp. 36:10-12, 43:22-45:9, 53:12-55:8;

21  Deposition of Mark Burton at pp. 35:18-22; 57:11-25, 106:21-107:18, attached to MDC's

22  Appendix of Exhibits as Exhibits 48, 49, and 50, respectively. Plaintiffs testified that they could

23  not identify any witnesses who could testify about Decedent's attendance at the school in Long

24  Beach, any work he performed on or around any aircraft; nor did Plaintiffs ever provide any

25  documents demonstrating that Decedent ever worked on any MDC-built aircraft. See Exhibit 48

26  at p. 55:9-19; Exhibit 49 at pp. 36:13-21, 53:12-10; Exhibit 50 at pp. 35:23-25, 57:15-25, 107:1-

27  18. Plaintiffs never identified any MDC-designed and/or manufactured aircraft, or made any

28  claim that Decedent was exposed to asbestos in any MDC-designed and/or manufactured aircraft,

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

MDC OPPOSITION TO MOTION FOR REMAND
CV 07-0702 SI

1    in connection with the training school. See Declaration of Amy M. Gantvoort ("Gantvoort Decl.")

2    ¶ 3. In fact, at any time during the course of discovery, Plaintiffs did not identify that Decedent

3    was exposed to asbestos-containing components from any MDC aircraft at any time at any

4    location. Id.

5            Accordingly, MDC filed its MSJ on November 8, 2006, on the grounds that Plaintiffs had

6    no product identification against MDC and no evidence of any exposure at any MDC premises.

7    Id. ¶ 4.

8            Plaintiffs served their Opposition to MDC's MSJ on January 12, 2007.  Id. ¶ 5.

9    Remarkably, in their Opposition, Plaintiffs identified – for the first time – certain of MDC's

10   military aircraft which purportedly were a source of asbestos exposure to Decedent.  Plaintiffs'

11   sudden, new disclosure of MDC-built military aircraft was based on testimony by a new witness,

12   whom Plaintiffs never disclosed before, related to a different location (a military base in Texas)

13   during a different time period in 1943.  Specifically, Plaintiffs identified James R. Tukesbrey as a

14   new witness to Decedent's military service and filed a declaration by Mr. Tukesbrey in support of

15   their Opposition. See Declaration of James Tukesbrey ("Tukesbrey Decl."), attached to the

16   Appendix of Exhibits as Exhibit 51.  In his declaration, Mr. Tukesbrey declared that, "Harold

17   Burton and I worked in close proximity to others who were performing brake replacement and

18   other work on various airplanes, including but not limited to Douglas DC-3s, Douglas DB-7s (A-

19   20 Havoc), and B-25s." See Exhibit 51 at ¶ 10.  This was MDC's first notice that Plaintiffs were

20   basing their claims on Decedent's alleged exposure to asbestos in MDC military aircraft, and to

21   which aircraft Decedent was purportedly exposed – namely C-47/C-53/R4D and DB-7 (A-20)

22   aircraft.  In fact, Plaintiffs' counsel did not even contact Mr. Tukesbrey until late December 2006,

23   in connection with the Opposition, even though Plaintiffs themselves knew but failed to disclose

24   the identity of Mr. Tukesbrey during discovery.  See Deposition of James Tukesbrey, attached to

25   the Appendix of Exhibits as Exhibit 52, at p. 14:11-15.  Indeed, Mr. Tukesbrey has had regular

26   contact with Plaintiffs ever since World War II!  See Exhibit 52 at pp. 29:21-30:8, 60:10-63:1.

27           Also, in their Opposition, Plaintiffs made clear for the first time that they were basing their

28   claims against MDC on Decedent's alleged exposure to asbestos through his work on or around

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

MDC OPPOSITION TO MOTION FOR REMAND
CV 07-0702 SI

1   others performing work on B-17 aircraft manufactured by DAC.  MDC does not dispute that,

2   during World War II, DAC built certain models of the B-17 as part of a collaborative war effort

3   involving Boeing and Vega (a part of Lockheed).  See Declaration of William Losch, ¶ 4-6;

4   Exhibit 47 to the Appendix of Exhibits.  However, prior to their Opposition, Plaintiffs had never

5   once alleged that Decedent was exposed to a **Douglas-built B-17** nor did they specifically identify

6   either the **B-17F or B-17G** models – the only two models of B-17 that Douglas built.  Id.;

7   Gantvoort Decl. ¶ 7.  Furthermore, Plaintiffs never proffered any actual evidence with their

8   Opposition that Decedent in fact ever worked on a **Douglas-built B-17F or B-17G** aircraft – as

9   opposed to B-17s built by Boeing or Vega – at any time, much less at the training school, in

10  support of this new allegation.

11          Additionally, on January 9, 2007, Plaintiffs served by mail their Amended Responses to

12  Standard Interrogatories Propounded by Defendants (Wrongful Death) (Set Two).  MDC received

13  these amended responses on January 12, 2006.  See Gantvoort Decl. ¶ 6.  In these amended

14  responses, Plaintiffs – for the first time – identified Mr. Tukesbrey as a witness with purported

15  knowledge of Decedent's alleged asbestos exposure.  See Plaintiffs' Amended Answers to

16  Standard Interrogatories, attached to the Appendix of Exhibits as Exhibit 53, at p. 3:26-28, 8:1-2.

17  Moreover, the amended responses, for the first time, identified "DC-3" and DB-7 (A-20 Havoc) as

18  being present at Sheppard Field, Texas, an entirely new location, and alleged that Decedent

19  worked in proximity to others performing brake replacements and other work on these military

20  aircraft.  Id. at p. 3:10-16.

21          On January 26 and 20, 2007, MDC took the deposition of James Tukesbrey, who testified

22  as to Decedent's alleged exposure to other servicemen performing work on the Aircraft.  See

23  Gantvoort Decl. ¶ 8.

24          Based on these new allegations involving MDC's military aircraft, coupled with the

25  deposition testimony of witness James Tukesbrey, MDC promptly and timely removed the action

26  to this Court on February 2, 2007.

27

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

MDC OPPOSITION TO MOTION FOR REMAND
CV 07-0702 SI

**B.    MDC Built Military Aircraft Pursuant to Contracts With and Under the Direction and Control of Federal Officers.**

As detailed in this memorandum, the concurrently-filed Declaration of Larry L. Fogg ("Fogg Decl.") and Declaration of Donald Douglas, Jr. [8/] (deceased) ("Douglas Decl.") (attached as Exhibit 54 to the Appendix of Exhibits), MDC properly removed this action on "federal officer" removal grounds based on Decedent's alleged exposure to C-47/C-53/R4D and A-20 aircraft. It is undisputed that MDC built the Aircraft pursuant to military procurement contracts with the AAC and in compliance with reasonably precise design specifications, as well as detailed design drawings, which were reviewed and approved by the AAC. Fogg Decl. ¶¶ 7-9, 18-21, 24, 28-32, 35; Douglas Decl. ¶ 28. Government personnel were intimately involved in design, development and testing of the aircraft and their components and systems, monitored MDC's performance under the contracts at all times and required MDC to construct the aircraft in accordance with applicable and approved specifications and drawings incorporated into the contracts. Fogg Decl. ¶¶ 7-9, 18-21, 24, 30-32, 34-35; Douglas Decl. ¶ 12. All contracts, and aircraft built pursuant to those contracts, were subject to inspection, testing and approval by the AAC. Fogg Decl. ¶¶ 6, 12, 14-15, 20, 36-37; Douglas Decl. ¶ 12-15. In addition, the AAC performed extensive flight tests of the aircraft and their components and systems prior to commission to ensure complete conformity with design specifications. Fogg Decl. ¶ 12, 14, 36; Douglas Decl. ¶¶ 12, 41.

Federal officers, including officers from the AAC, participated in, supervised and directed virtually all aspects of the design, testing and production phases of the Aircraft. Fogg Decl. ¶¶ 7-8, 12, 15, 16, 21, 25, 26, 27, 31-32, 37-38; Douglas Decl. ¶ 12. The military had stationed at various MDC facilities a resident contracting officer/representative, along with a full staff of scientists, engineers, procurement officers, technicians and security personnel. Douglas Decl. ¶ 12. These federal officers supervised and directed the design, testing and production of aircraft,

---

[8/] Mr. Douglas' declaration was executed on May 4, 2000, in support of MDC's Opposition to Plaintiffs' Motion to Remand in Rellin v. Allied Signal, Inc. (D.C. Hawaii 2000). Mr. Douglas passed away on October 3, 2004.

MDC OPPOSITION TO MOTION FOR REMAND
CV 07-0702 SI

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

1    including without limitation ordering changes in design, testing and/or manufacture of aircraft.

2    Fogg Decl. ¶¶ 12, 16, 21, 26, 30-31, 37-38; Douglas Decl. ¶ 12.  Military officers, engineers,

3    contact administrators and technicians had, and exercised, complete access to MDC's facilities to

4    oversee design, development and production of aircraft.  Fogg Decl. ¶ 12; Douglas Decl. ¶ 12.

5    Federal officers were present at MDC's facilities daily during the design and development years of

6    aircraft programs to ensure that designs complied with all applicable government specifications.

7    Douglas Decl. ¶ 12.

8          Federal officers controlled any and all design changes to the aircraft.  That is, MDC could

9    not change the design of the aircraft without prior authorization from Federal officers.  Fogg Decl.

10   ¶¶ 12, 21, 32; Douglas Decl. ¶ 24.  AAC-originated design changes were communicated through

11   Change Orders or Contract Change Notifications, under which AAC officers directed MDC to

12   make specific changes to aircraft design.  Fogg Decl. ¶¶ 16, 27, 38; Douglas Decl. ¶ 23.  Even

13   design modifications proposed by MDC occurred only after a proposed change had been

14   submitted to, and evaluated and approved by, federal officers.  Fogg Decl. ¶ 21, 32; Douglas Decl.

15   ¶ 24.  For example, on the C-47/R4D, federal officer approval for design changes occurred

16   through the ECP ("Engineering Change Proposal") process, which was specified in all aircraft

17   production contracts.  Douglas Decl. ¶ 24.  Through this process MDC, at the request of federal

18   officers, determined the feasibility and cost of the requested change, following which the

19   Government evaluated, reviewed and either approved, approved in part, directed revisions of or

20   rejected the changed design.  Douglas Decl. ¶ 24.  Federal officers retained absolute authority to

21   accept, reject or modify any aspect or portion of an ECP.  Douglas Decl. ¶ 24.  Federal officers

22   monitored all ECP changes to the aircraft at every stage and MDC could not proceed with any

23   design change activity without prior Government review and approval.  Douglas Decl. ¶ 24.

24         More importantly, many of the component parts used in the Aircraft were government-

25   procured and government-furnished aircraft equipment ("GFAE-CI") that MDC installed on the

26   aircraft, during their manufacture and assembly, as required by MDC's procurement contracts with

27   the Government and under the direction and control of federal officers.  Fogg Decl. at ¶¶ 11, 22,

28   33, 39-41.  Federal officers, not MDC, selected and approved the design of, including the use of

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

MDC OPPOSITION TO MOTION FOR REMAND
CV 07-0702 SI

1    any asbestos in, GFAE-CI components used in the aircraft. Id. Further, federal officers

2    independently procured these GFAE-CI component parts from their original equipment

3    manufacturers ("OEMs"), supplied components to MDC, and required MDC to install them on the

4    aircraft. Id. That is, MDC had no choice but to install Government selected and approved

5    component parts, including any asbestos contained in them, on the aircraft. Plaintiffs sue MDC

6    for allegedly using asbestos in those components.

7    　　　　For instance, engines used on C-47 aircraft were GFAE-CI components procured by the

8    Government from the engine manufacturer, Pratt & Whitney. The GFAE-CI Pratt & Whitney R-

9    1830 engines included asbestos-copper gaskets. MDC was required by federal officers to install

10   those engines, with those asbestos components, on C-47 aircraft. Id. at ¶ 42. Engines used on C-

11   53 aircraft were GFAE-CI components procured by the Government from Pratt & Whitney. The

12   GFAE-CI Pratt & Whitney R-1830 engines included asbestos-containing gaskets, which MDC

13   was required by federal officers to install, with those asbestos components, on C-53 aircraft. Id. at

14   ¶ 43. Engines used on A-20 aircraft were GFAE-CI components procured by the Government

15   from Wright Aeronautical. The GFAE-CI Wright Aeronautical GR-2600-23 and R-2600-23

16   engines included asbestos-containing gaskets, which MDC was required by federal officers to

17   install, with those asbestos components, on A-20 aircraft. Id. at ¶¶ 44, 54.

18   　　　　Furthermore, MDC was required to comply with various Government-authored material

19   specifications, including (1) Air Force-Navy Aeronautical Standards, which are prepared jointly

20   by the United States Air Force, Bureau of Aeronautics and Aeronautical Standards Group of the

21   Departments of the Air Force and Navy, and (2) Military Specifications, currently known as MIL

22   specs, which required MDC to use Government-specified and approved materials, components

23   and/or techniques that had been developed by the Government over many years of procuring,

24   designing and manufacturing military equipment for use in the production of aircraft and were

25   prepared "under the cognizance of the Munitions Board Standards Agency, as developed jointly

26   by the technical service of the Army, Navy and the Air Force." Id. at ¶¶ 45-47.

27   　　　　Numerous such material specifications mandated the use of asbestos. For instance,

28   Government officials specifically required MDC to install Air Force-Navy Aeronautical Standard

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

MDC OPPOSITION TO MOTION FOR REMAND
CV 07-0702 SI

1   AN900 and AN4171 components on the Aircraft. Id. at ¶¶ 45-56. Air Force-Navy Aeronautical

2   Standard AN900 specified a gasket design comprised asbestos material encapsulated in copper

3   sheet. Id. at ¶¶ 49, 54. In addition, Air Force-Navy Aeronautical Standard AN4171 specified an

4   engine accessory drive gasket comprised of sheet-form or roll-form asbestos. Id. at ¶ 51. As an

5   example, pursuant to a Change Order issued by AAC Second Sergeant A. S. Wolfert, the

6   Government directed MDC to install GFAE-CI AN4059 gaskets on C-47 aircraft. Id. at ¶ 47.

7   Many of the gaskets used on the GFAE-CI engines built by the engine OEMs, such as Pratt &

8   Whitney, were made in accordance with such material specifications, thus further demonstrating

9   the level of control by federal officers over the Government's procurement of all military

10  equipment. Id. at ¶¶ 52, 56.

11         Plaintiffs sue MDC for allegedly using asbestos on the Aircraft, particularly in those

12  engines and other asbestos-containing components. MDC consequently removed this action to

13  this Court on "federal officer" grounds pursuant to 28 U.S.C. § 1422(a)(1).

14  **III.   MDC'S REMOVAL WAS TIMELY.**

15         Under 28 U.S.C. § 1446(b), the trigger to start the clock running on a defendant's notice of

16  removal is the "receipt by the defendant, through service or otherwise, of a copy of an amended

17  pleading, motion, order, or other paper from which it may first be ascertained that the case is one

18  which is or has become removable…" 28 U.S.C. § 1446(b).

19         In Durham v. Lockheed Martin Corp., 445 F.3d 1247 (9th Cir. 2006), an electronics

20  technician, who suffered from lung cancer allegedly caused by his exposure to asbestos during his

21  service in the Air Force, brought claims in state court against Lockheed and other defendants.

22  Durham, 445 F.3d at 1249. Lockheed did not originally attempt to remove the case based on

23  federal enclave grounds evident from the complaint, but later removed the case when federal

24  officer grounds were revealed through interrogatory responses which detailed, for the first time,

25  plaintiff's specific allegations as to defendant's military aircraft. Id. Plaintiff moved to remand,

26  claiming that Lockheed's removal was untimely as it did not remove the case on federal enclave

27  grounds within thirty days of receipt of the complaint. Id. The district court remanded the case

28  and awarded fees and costs to plaintiff, finding that the thirty-day time period ran from the service

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

1   of the complaint, i.e., the date of notice of the federal enclave removal grounds, and Lockheed

2   filed an appeal as to the award of fees and costs. Id.

3        The Ninth Circuit reasoned that to start the thirty-day clock, plaintiff had to provide

4   defendant with facts to support each of the three requirements to support federal officer removal.

5   The party seeking removal must show that (a) it is a "person" within the meaning of the statute;

6   (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions and

7   plaintiff's claims; and (c) it can assert a "colorable federal defense." Id. at 1251. The court found

8   that, until plaintiff revealed specific facts as to which aircraft he worked on during his military

9   career, Lockheed could not assert that its actions were taken pursuant to a federal officer's

10  direction, or that it had a colorable federal defense. Id. The court went on to reason that Lockheed

11  could not remove the case until it had enough information to discern whether its allegedly

12  wrongful conduct was protected by federal contractor immunity. Id. In fact, the court stated that,

13  had Lockheed removed at an earlier time, it may well have subjected itself to fees and costs, and

14  potentially Rule 11 sanctions for filing a baseless notice of removal. Id. The court reasoned:

15  "[w]e no longer require defendants to take this blind leap – we don't charge defendants' with

16  notice of removability until they've received a paper that gives them enough information to

17  remove." Id. Thus, extending U.S.C § 1442's liberal interpretation of § 1446, the court held that

18  the defendant's thirty days to remove commences when the plaintiff discloses sufficient facts for

19  federal officer removal, even if the defendant was aware of a different basis for removal at an

20  earlier time. Id. at 1253. The court stated: "[o]ur interpretation of section 1446(b) protects the

21  government's right of removal and encourages plaintiffs to disclose the facts underlying their

22  claims early on. We note that an opposite result would encourage gamesmanship and defeat the

23  policies underlying sections 1442 and 1446." Id. As such, the court further held that the

24  Lockheed had an objectively reasonable basis for filing the removal petition, precluding the award

25  of attorneys' fees and costs. Id.

26       Here, MDC promptly removed the action upon first notice that it had valid grounds to do

27  so. Plaintiffs never provided sufficient information based on which MDC could discern that it

28  could assert that its actions were taken pursuant to a federal officer's directions and that colorable

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

1    federal defenses existed to Plaintiffs' claims until (1) Plaintiffs revealed on January 12, 2007, in

2    their MSJ Opposition and amended discovery responses, that their claims were based on

3    Decedent's alleged exposure to asbestos in C-47/C-53/R4D and DB-7/A-20 aircraft (and B-17s

4    allegedly built by MDC) and identified Mr. Tukesbrey as a witness, and (2) MDC thereafter

5    moved swiftly to depose Mr. Tukesbrey on January 26 and 30, 2007, and he testified about the

6    nature of Decedent's work with or around the allegedly asbestos-containing components of such

7    aircraft.  Plaintiffs' argument that MDC knew or should have known of removal grounds before

8    such time is disingenuous because Plaintiffs' counsel did not even contact Plaintiffs' sole critical

9    witness until late December 2006.  Indeed, Plaintiffs concealed Mr. Tukesbrey's identity

10   throughout discovery, even though MDC specifically asked Plaintiffs in deposition to identify

11   persons who might have worked with Decedent, and, most shockingly, despite the fact that

12   Plaintiffs had been in regular contact with Mr. Tukesbrey all along.  Plaintiffs' eleventh hour

13   "revelation" regarding the identities of MDC aircraft and Mr. Tukesbrey, solely for the purpose of

14   derailing MDC's MSJ, is exactly the kind of gamesmanship that defeats the policies underlying 28

15   U.S.C. §§ 1442 and 1446.  See Durham, 445 F.3d at 1253.

16        Contrary to Plaintiffs' claims, grounds for federal officer removal do not lie simply

17   because a plaintiff has vaguely identified an aircraft or that a person served in the military.  In

18   order to determine if grounds for "federal officer" removal exist, a defendant must have sufficient

19   information regarding the specific components that are alleged to be a source of exposure and

20   what work was performed on such components in order to conduct an adequate investigation into

21   whether the subject components were in fact GFAE-CI.  See Durham, 445 F.3d at 1251.  Without

22   such information, MDC could not assert either that its actions were taken pursuant to a federal

23   officer's directions or that it had colorable federal defenses, and is not required to risk an improper

24   or unsubstantiated removal.  See id.

25        Plaintiffs' contentions that MDC was put on notice at an earlier time are without merit.

26   MDC was not put on sufficient notice by the generalized claims of exposure during Decedent's

27   military career found in the Preliminary Fact Sheet attached to the original personal injury and the

28   wrongful death complaints.  See Exhibits A and B to the Kaiser Decl.  In fact, the Preliminary Fact

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

MDC OPPOSITION TO MOTION FOR REMAND
CV 07-0702 SI

1   Sheets does not identify any aircraft at all, let alone any specific aircraft attributable to MDC.

2   Such generalized information of purported exposure during military service does not constitute

3   notice of or provide a valid basis for "federal officer" removal jurisdiction.

4        Additionally, Plaintiffs' argument that MDC was on notice because Plaintiffs' earlier

5   discovery responses alleged that Decedent attended a MDC training facility for approximately six

6   months in 1943 is misguided and nothing more than conjecture. To this day, Plaintiffs have not

7   proffered a shred of evidence, and never before January 12, 2007 did they claim, that Decedent

8   was exposed to asbestos in any MDC aircraft, including any DAC-built B-17F and B-17G aircraft,

9   while he purportedly attended training school in Long Beach in 1943. Mr. Tukesbrey did not even

10  attend that school! Plaintiffs merely suggest that MDC was on notice that "federal officer"

11  removal jurisdiction existed because MDC manufactured B-17 aircraft during the same time

12  period that Decedent allegedly attended a MDC training school and it can be assumed that he

13  worked on or around such military aircraft. Such speculation is insufficient to provide MDC with

14  adequate grounds for "federal officer" removal jurisdiction, particularly when Plaintiffs have

15  never been able to proffer any evidence whatsoever about what Decedent did at the school.

16  Moreover, MDC had no duty to investigate Plaintiffs' vague, unsupported claims regarding

17  "Boeing" B-17 aircraft to determine whether "federal officer" grounds actually existed. See

18  Harris v.Bankers Life and Casualty Co., 425 F.3d 689, 694-95 (9th Cir. 2005) (holding that notice

19  of removability is determined through the four corners of the applicable pleadings, not through

20  subjective knowledge or a duty to make further inquiry.)

21        Additionally, Plaintiffs' written discovery responses and deposition testimony never

22  identified DAC-built B-17 aircraft, or even specified B-17F and/or B-17G aircraft (the only

23  models manufactured by DAC) as a source of Decedent's asbestos exposure. Rather, during the

24  course of this litigation, Plaintiffs repeatedly identified the B-17 aircraft as the "Boeing B-17." It

25  was not until Plaintiffs disclosed in their MSJ Opposition that they sought to base their claims on

26  Decedent's alleged exposure to asbestos-containing components of DAC-built B-17s.

27        MDC was not required to make a "blind leap" based on insufficient information and

28  conjecture, and possibly subjected itself to sanctions for an improvident removal based on

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

1 incomplete information. Thus, MDC's Notice of Removal was timely as the triggering events did

2 not occur until Plaintiffs provided sufficient information regarding their claims involving MDC's

3 military aircraft and the specific component parts thereof for MDC to discern that "federal officer"

4 removal jurisdiction existed. Quite simply, Plaintiffs' tactical decision to withhold such critical

5 information regarding the basis for their claims until the eve of trial backfired.

6 IV.    **FEDERAL OFFICER REMOVAL JURISDICTION IS PROPER.**

7        A.    **The Test For "Federal Officer" Removal Jurisdiction**

8              28 U.S.C. § 1442(a)(1) governs federal officer removal jurisdiction, and states, in relevant

9 part:

10               (a) A civil action…commenced in a State court against any of the
                 following may be removed by them to the district court of the
                 United States for the distraction and division embracing the place
11               where it is pending:

12               (1) The United States or any agency thereof or any officer (or any
                 person acting under that officer) or the United States or of any
13               agency thereof, sued in an official or individual capacity for any act
                 under color of such office…

14 28 U.S.C. § 1442(a)(1).

15             To establish federal officer removal jurisdiction, the removing party must (1) must be a

16 "person" within the meaning of the statute; (2) demonstrate that it acted under the direction of a

17 federal officer; (3) demonstrate a causal nexus between the plaintiff's claims and the acts the

18 defendant performed under color of federal office; and (4) raise a colorable federal defense to the

19 plaintiff's claims. Mesa v. California, 489 U.S. 121, 124-35, 109 S. Ct. 959, 103 L.Ed.2d 99

20 (1989). In their Motion, Plaintiffs do not (and cannot) contend that MDC fails to satisfy the first

21 of these requirements – that is, that MDC is a "person" under the statute.[9] As explained below,

22 MDC easily satisfies the remaining three requirements.

23        B.    **MDC Acted Under The Direction Of Federal Officers When It Built C-47/C-**

24              **53/R4D and DB-7/A-20 Aircraft**

25             A corporate defendant is "acting under" the direction of a federal officer when that officer

26 had "direct and detailed control" over the defendant." See Fung v. Abex Corp., 816 F. Supp. 569,

27 ─────────────────
[9]  Corporate entities are considered "persons" for purposes of Section 1442(a)(1). See Winters v.
28 Diamond Shamrock Chemical Co., 149 F.3d 387, 398 (5th Cir. 1998).

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

1    572 (N.D. Cal. 1992). "This control requirement can be satisfied by strong government

2    intervention and the threat that a corporate defendant will be sued in state court 'based upon

3    actions taken pursuant to federal direction." Id. (quoting Gulati v. Zuckerman, 723 F. Supp 353,

4    358 (E.D. Pa. 1989)).

5          Courts in this and other circuits have sustained removal on "federal officer" grounds and,

6    in doing so, found the removing defendant satisfied the "acting under" prong under circumstances

7    similar to, but less compelling than, those presented here.  For example, in Fung, Navy personnel

8    filed personal injury product liability actions against General Dynamics based on their alleged

9    exposure to asbestos used in submarines General Dynamics built for the Navy pursuant to military

10   procurement contracts.  General Dynamics removed the actions to this Court on "federal officer"

11   grounds, and plaintiffs moved for remand.  In upholding "federal officer" removal jurisdiction,

12   this Court held that General Dynamics satisfied the "acting under" prong because it was "under

13   the direct control of the Secretary of the Navy and authorized to build submarines under federal

14   contract," the Government "monitored General Dynamics' performance at all times and required

15   the defendant to construct and repair the [submarines] in accordance with the applicable and

16   approved specifications incorporated into the contracts," "all contract supplies were subject to

17   inspection, test, and approval by the government," and "the government also performed extensive

18   dock and sea trial on the submarines prior to commission, to ensure complete conformity with

19   design specifications." Id. at 572-73.

20         Similarly, in Pack v. AC&S, 838 F. Supp. 1099, 1103 (D. Md. 1993), the court found that

21   Westinghouse, which designed and manufactured turbine generators for the Navy properly

22   removed over 500 product liability actions against it on "federal officer" grounds.  On plaintiffs'

23   motion to remand, which the court denied, the court found that Westinghouse satisfied the "acting

24   under" requirement by demonstrating that the Government (1) exercised "extensive control over

25   the construction, design and testing of the turbines," (2) "monitored Westinghouse's performance

26   and on occasion it returned drawings and specifications for revision," (3) specified and approved

27   asbestos-containing components used, and (4) tested the turbines. Id. at 1103.

28         As explained below, the Government exercised at least the same level of involvement and

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

1   control over MDC's production of C-47/C-53/R4D and A-20 aircraft, as it did with respect to the

2   products at issue in the Fung and Pack cases. In fact, MDC submits that it has demonstrated a

3   greater level of Government intervention than was demonstrated in Fung or Pack because neither

4   of those decisions mentions any evidence that the Government required General Dynamics or

5   Westinghouse to install alleged asbestos-containing GFAE-CI components on that military

6   equipment, like MDC has shown was the case here with respect to the C-47/C-53/R4D and A-20.

7       Plaintiffs' reliance on Good v. Armstrong World Industries, Inc., 914 F. Supp. 1125, 1128

8   (E.D. Pa. 1996) is misplaced. Initially, Good was decided at a time when the Supreme Court held

9   that removal under the federal officer removal statute was not available to the United States

10  Government or federal agencies. See, e.g., Int'l Primate Prot. League v. Adm'r of Tulane Educ.

11  Fund, 500 U.S. 72, 76 (1991). Congress enacted the Federal Courts Improvement Act of 1996,

12  which amended Section 1442 to permit removal by the United States Government and by federal

13  agencies, thereby effectively abrogating Int'l Primate. See State of Nebraska ex rel. Dept. of Soc.

14  Servs. v. Benston, 146 F.3d 676, 678 (9th Cir. 1998) (recognizing change in law). Consequently,

15  there is no longer any reason to preclude removal under Section 1442 by corporate defendants

16  acting under the control of the United States Government or a federal agency. Simply put, the

17  Good standard no longer applies and MDC is entitled to remove under Section 1442 based upon

18  the direct control of the Government and the AAC.

19      MDC has demonstrated that it incorporated asbestos-containing components pursuant to

20  the express direction of specific federal officers through their direct involvement in the design and

21  development of the aircraft, their selection of GFAE-CI and their execution of Change Orders

22  requiring installation of asbestos-containing parts.

23      **1.    MDC satisfies the "acting under" requirement based on the**

24           **Government's extensive involvement in and control over MDC's**

25           **production of C-47/C-53/R4D and DB-7/A-20 aircraft.**

26      MDC has established the "acting under" requirement based on the Government's intimate

27  involvement in and control over MDC's production of the Aircraft. As discussed in detail in the

28  Larry L. Fogg and Donald Douglas declarations, the Government was directly and closely

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

1    involved in all phases of the C-47/C-53/R4D and DB-7/A-20 programs, including the design,

2    manufacture, testing and modification of the Aircraft, for many years. Indeed, the Government

3    was "omnipresent." Federal officers and personnel were stationed and worked at the MDC's

4    facilities where the aircraft were manufactured. Air Force officers, engineers, contract

5    administrators and technicians had, and exercised, complete access to MDC's facilities to review,

6    approve and oversee the design, development, and production of the Aircraft. They were present

7    at MDC's facilities daily to ensure that the design and manufacture of the aircraft complied with

8    all applicable Government specifications and requirements. Such presence, oversight and

9    direction by military officials constitutes detailed and direct Governmental control. See Fung, 816

10   F. Supp. at 572-74 (concluding that control requirement was satisfied when it is shown that

11   Government exercised "direct and detailed" control over defendant manufacturer).

12       Further, the Government had authority to reject any aircraft that failed to conform to these

13   specifications. As a Government contractor, MDC would be subject to liability and penalties

14   under 31 U.S.C. 3729(a) of the False Claims Act ("FCA") for failure to deliver aircraft that

15   conformed with contractual specifications. U.S. v. Aerodex, 469 F.2d 1003 (5th Cir. 1972)

16   (manufacturer of aircraft engine component liable for failure to comply with specifications).[10]

17   The FCA was enacted in 1863 (see Act of Mar. 2, 1863, ch. 67, 12 Stat. 696), and "was originally

18   aimed principally at stopping fraud perpetrated by contractors during the Civil War." U.S. v.

19   Bornstein, 423 U.S. 303, 309, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976).

20       The Government was continuously involved in the revision of the Aircraft designs through

21   Change Orders. Fogg Decl. ¶¶ 16, 27, 38; Douglas Decl. ¶ 24. Government officials transmitted

22   Change Orders directing MDC to accomplish specific design changes, including changes which

23   specifically required use of asbestos components as heat-resistant material. Id. Conversely, MDC

24   could not change the design without prior Government authorization. Fogg Decl. ¶¶ 12, 21, 32;

25   Douglas Decl. ¶ 24. Design modifications occurred only after a proposed change had been

26

27   [10]  Under the FCA, the Attorney General may bring a civil action against the Government
     contractor. 31 U.S.C. § 3730(a). Alternatively, a private party ("relator") may bring a *qui tam*
28   action on behalf of the Government. 31 U.S.C. § 3730(b)(1).

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

1    submitted to, and evaluated and approved by, the Government. Fogg Decl. ¶¶ 12, 21, 32; Douglas

2    Decl. ¶ 24. For example, as to the C-47, Governmental approval for design changes occurred

3    through the ECP process, which was specified in all aircraft production contracts. Douglas Decl. ¶

4    24. Through this process, MDC, at the request of the Government, determined the feasibility and

5    cost of the requested change, following which the AAC evaluated, reviewed and either approved,

6    approved in part, directed revisions of or rejected the changed design. Douglas Decl. ¶ 24. The

7    Government retained absolute authority to accept, reject or modify any aspect or portion of an

8    ECP. Douglas Decl. ¶ 24. The Government monitored all ECP changes to aircraft at every stage.

9    Douglas Decl. ¶ 24. MDC could not proceed with any design change activity without prior

10   Government review and approval. Douglas Decl. ¶ 24.

11          MDC has satisfied the "acting under" requirement by demonstrating that the Government

12   exercised "direct and detailed" control over the production of the aircraft.

13                **2.     MDC also satisfies the "acting under" requirement based on the**

14                **Government's mandate that MDC install GFAE-CI components on C-**

15                **47/C-53/R4D and DB-7/A-20 aircraft.**

16          MDC was also "acting under" a federal officer because the Government required MDC to

17   install certain asbestos-containing GFAE-CI components and gaskets in the aircraft. AAC

18   personnel required, directed and supervised MDC's installation of numerous GFAE-CI

19   components in the aircraft. The Government, not MDC, selected these GFAE-CI components,

20   such as engines for each aircraft. Fogg Decl. at ¶¶ 11, 22, 33, 39-41. As the Government's

21   requirements for the aircraft evolved, so did the design. Concurrent with this design evolution, the

22   Government issued Change Orders directing MDC to install GFAE-CI asbestos-containing parts

23   on later aircraft. Id. The Government selected each of these asbestos-containing components on

24   its own, separately procured them from OEMs, supplied them to MDC as GFAE-CI, and required

25   MDC to install them on the aircraft during assembly. Id.

26          Courts have recognized that the inclusion of GFAE-CI permits greater Government control

27   over an aircraft design. In re Aircraft Crash Litigation Frederick, Maryland, 752 F. Supp. 1326

28   (S.D. Ohio 1990), the Government procured the subject GFAE-CI autopilot directly from

SM01DOCS\633428.6                            19

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

1    component manufacturer, Lear, and supplied it directly to aircraft manufacturer, Boeing, for

2    installation on C-135 aircraft.  The court recognized that the Government procured aircraft

3    subsystems as GFAE-CI directly from the subsystem manufacturer for installation by the airframe

4    manufacturer because the GFAE-CI process allowed the Government to be directly involved in

5    design and development of such subsystems.  Id. at 1345.

> ### 3.    MDC also satisfied the "acting under" requirement based on the Government's mandate that MDC comply with military specifications that required the use of asbestos.

9        The Government's requirement that MDC install certain components which complied with

10    material specifications, such as Air Force-Navy Aeronautical Standards  and MIL specs, also

11    satisfies the "acting under" requirement.  These specifications required use of asbestos in certain

12    parts, such as gaskets, which were incorporated into the aircraft and GFAE-CI subsystems.  These

13    Government-authored material specifications included MIL specs as well as Air Force-Navy

14    Aeronautical Standards prepared jointly by the United States Air Force, the Bureau of Aeronautics

15    and the Aeronautical Standards Group of the Departments of the Air Force and Navy.  By

16    requiring MDC to comply with such specifications, the Government required MDC to use

17    Government-specified and approved materials, such as asbestos, in the aircraft.  Fogg Decl. ¶¶ 45-

18    56.  Air Force-Navy Aeronautical Standard AN900 specified a gasket design comprised asbestos

19    material encapsulated in copper sheet.  Id. at ¶¶ 49, 54.  AN900 asbestos-copper gaskets were

20    installed throughout Pratt & Whitney's R-1830 engines that MDC was required to install on C-47

21    and C-53 aircraft as GFAE-CI.  Id. at ¶¶ 42-43.  AAC Second Sergeant A. S. Wolfert directed

22    MDC to install GFAE-CI AN4059 gaskets on C-47 aircraft.  Id. at ¶¶ 16(d), 47.  Similarly, Air

23    Force-Navy Aeronautical Standard AN900 specifically required the use of asbestos-containing

24    gaskets in the Wright R-2600 engines on A-20 aircraft.  Id. at ¶ 44, 54.  Many of the gaskets used

25    on the GFAE-CI engines built by the engine OEMs, such as Pratt & Whitney, were made in

26    accordance with such material specifications, thus further demonstrating the level of control by

27    federal officers over the Government's procurement of all military equipment.  Id. at ¶¶ 52, 56.

28        MDC satisfies the "acting under" requirement based on the federal officers' mandate that

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

1    MDC install asbestos-containing GFAE-CI components on the aircraft.

2    **C.    There Is A Causal Nexus Between MDC's Action Under Color Of Federal**

3    **Office And Plaintiffs' Claims**

4    MDC satisfies the "causal nexus" requirement because Plaintiffs' claims arise directly

5    from MDC's acts under color of federal office, i.e., Decedent's alleged exposure to asbestos in

6    aircraft manufactured by MDC pursuant to Government procurement contracts and under

7    extensive Government control.   In other words, there is a "causal nexus" between Plaintiffs'

8    claims and the acts performed by MDC because Plaintiffs' state court action is based on MDC's

9    conduct, which it was required to perform by federal officers pursuant to its federal duty.  Mesa,

10   489 U.S. at 131-132.

11   In Fung, the Court found the requisite causal nexus because the plaintiffs' alleged exposure

12   occurred while they worked on submarines that were constructed with asbestos at the

13   Government's direction and approval.  Fung, 816 F. Supp. at 572-573.  Similarly, in Akin v. Big

14   Three Industries, 851 F. Supp. 819, 823-824 (E.D. Tex. 1994), the court held that "[p]lainly, when

15   a government contractor builds a product pursuant to Air Force specifications and is later sued

16   because compliance with those specifications allegedly causes personal injuries, the nexus

17   requirement is satisfied" and removal jurisdiction is proper.  In several unpublished slip opinions,

18   this Court has held that the causal nexus requirement is satisfied in an asbestos case when the

19   defendant's use of asbestos in the particular product at issue was compelled by the government

20   rather than being an independent choice of the defendant.  Dewey v. Asbestos Defendants, No. C

21   04-4645 (January 3, 2005), slip op. at 6 (citations omitted).

22   Here, MDC's use of asbestos-containing components in C-47/C-53/R4D and A-20 aircraft

23   was specifically compelled by the Government.  The Government required MDC to use GFAE-CI

24   components that it procured directly from its OEMs and supplied to MDC for installation in the

25   aircraft.   Fogg Decl. ¶¶ 11, 22, 33, 39-41. The Government further required that MDC install

26   components that complied with material specifications that mandated use of asbestos in specific

27   applications.  Id. at 45-56.  MDC had no choice but to install those components on the aircraft in

28   carrying out its obligations under its procurement contracts with the AAC.  Had it not done so, the

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

MDC OPPOSITION TO MOTION FOR REMAND
CV 07-0702 SI

1    aircraft would not have complied with Government-approved design specifications, MDC would

2    have been in breach of those procurement contracts and subject to penalties under the FCA.

3        **D.**    **MDC Has A "Colorable Federal Defense," i.e., Government Contractor**

4            **Defense And Derivative Sovereign Immunity**

5        MDC raised a colorable federal defense to Plaintiffs' claims by asserting the "government

6    contractor" defense as stated in <u>Boyle v. United Technologies, Inc.</u>, 487 U.S. 500 (1988), and its

7    progeny, including <u>Niemann v. McDonnell Douglas Corp.</u>, 721 F. Supp. 1019 (S.D. Ill. 1989) (in

8    which MDC obtained a grant of summary judgment under <u>Boyle</u> against asbestos claims regarding

9    the manufacture of military aircraft).  Further, MDC raised the separate and additional colorable

10    federal defense of "derivative sovereign immunity" as set forth in <u>Yearsley v. W.A. Ross</u>

11    <u>Construction Co.</u>, 309 U.S. 18 (1940).

12        Under <u>Boyle</u>, civil tort liability for design defects in military equipment cannot be imposed

13    against the manufacturer under state law if (1) the United States approved reasonably precise

14    specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned

15    the United States about dangers in use of equipment that was known to the supplier but not to the

16    United States.  <u>Boyle</u>, 487 U.S. at 512.

17        The government contractor defense is based on federal law and, indeed, was created by

18    federal courts.  By operation of the defense, federal law, <u>i.e.</u>, government contractor immunity,

19    preempts state law product liability claims.  Further, the United States Supreme Court explicitly

20    stated in <u>Boyle</u> that "civil liabilit[y] arising out of the performance of federal procurement

21    contracts" is a "'uniquely federal' interest."  <u>Id.</u> at 505-06.  "[I]t is plain that the Federal

22    Government's interest in the procurement of equipment is implicated by [product liability] suits

23    [against the contractor] – even though the dispute is one between private parties."  <u>Id.</u> at 506.  The

24    rationale for the defense is based upon federal law, <u>i.e.</u>, a military contractor should enjoy the

25    same immunity as a federal officer enjoys under the discretionary function exception to the

26    Federal Torts Claims Act ("FTCA"), 28 U.S.C. § 2680(a).  <u>Id.</u> at 511.  As the Supreme Court

27    stated:

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

1
2
3
4
5
6
7
8
9

"We think that the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function within the meaning of [28 U.S.C. § 2680(a)]. It often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness. And we are further of the view that permitting 'second-guessing' of these judgments . . . through state tort suits against contractors would produce the same effect sought to be avoided by the FTCA exemption. The financial burdens of judgments against the contractors would ultimately be passed through, substantially if not totally, to the United States itself, since defense contractors will predictably raise their prices to cover, or to insure against, contingent liability for the Government-ordered designs. To put the point differently: It makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production. **In sum, we are of the view that state law which holds Government contractors liable for design defects in military equipment does in some circumstances present a 'significant conflict' with federal policy and must be displaced.**"

10   Id. at 511-12 (citations omitted; emphasis added).

11       MDC's assertion of the government contractor defense is "colorable" within the meaning

12   of § 1442(a)(1) so as to confer removal jurisdiction. However, the question at this stage is not

13   whether MDC's claimed defense is meritorious or even whether MDC will likely prevail on that

14   defense. Mesa, 489 U.S. at 128-29; see also Pack, 838 F. Supp. at 1103. The appropriate inquiry

15   is whether this Court will be deciding a question of federal law. Akin, 851 F. Supp. at 823 ("The

16   purpose of [the colorable claim to a federal defense] requirement is to ensure that the federal

17   district court is passing on a question of federal law."). There can be no doubt that MDC's

18   "government contractor" defense is colorable, especially in light Niemann, where MDC obtained

19   summary judgment under Boyle against asbestos claims regarding military aircraft. See Fung, 816

20   F. Supp. at 569 (acknowledging Niemann decision). Indeed, the Fogg Declaration and referenced

21   exhibits and the Douglas Declaration establish that (1) the Government approved reasonably

22   precise specifications for the aircraft; (2) the aircraft conformed to those specifications; and (3)

23   MDC warned the Government about the dangers in the use of the equipment that were known to

24   MDC but not to the Government.

25       Plaintiffs' argument that MDC had a duty to warn of the hazards of asbestos is untenable.

26   As determined by Niemann, MDC had no duty to warn the AAC about the alleged hazards of

27   asbestos, and thus satisfies the third prong of the Boyle test, because the AAC already had

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

MDC OPPOSITION TO MOTION FOR REMAND
CV 07-0702 SI

1   superior knowledge about those hazards.  Niemann, 721 F. Supp. at 1027-1028.  MDC

2   demonstrated the AAC's superior knowledge about asbestos through testimony by AAC Colonel

3   Alvin F. Meyer, Jr. (Ret.) and AAC Colonel Walter Melvin, M.D.  Their testimony is attached as

4   Exhibits 55 and 56 to the Appendix of Exhibits.  (Also attached as Exhibit 57 to the Appendix of

5   Exhibits is a separate affidavit by Colonel Meyer on the subject; Fogg Decl. ¶ 57.)  See also

6   Ramey v. Martin-Baker Aircraft Co., 874 F.2d 946, 950-51 (4th Cir. 1989) (holding that because

7   of the government's demonstrated knowledge of the risk of asbestos, the third element of Boyle

8   was satisfied regardless of the level of defendant's knowledge of risks).  Additionally, MDC had

9   no power to place any markings or labels on MDC aircraft or aircraft components, including

10  GFAE-CI components, except as required by Government specifications.  Fogg Decl. ¶ 58.

11          MDC's assertion of the "derivative sovereign immunity" defense under Yearsley 309 U.S.

12  18 (1940), is "colorable" within the meaning of § 1442(a)(1) so as to confer removal jurisdiction.

13  In Yearsley, a government contractor built dikes in the Mississippi River, which disturbed the

14  river's flow and washed away part of plaintiff's land.  Id. at 19.  Plaintiff sued the government

15  contractor and the court found that the contractor was acting under the direction of the

16  Government and, as such, that plaintiff could only proceed against the Government under the

17  takings clause of the Fifth Amendment to the United States Constitution.  Id. at 20-21.  The

18  Supreme Court affirmed the Court of Appeals finding that "the work that the contractor had done

19  in the river bed was all authorized and directed by the Government of the United States for the

20  purpose of improving the navigation of this navigable river."  Id. at 20.  Based on this finding, the

21  court stated, "it is clear that if this authority to carry out the project was validly conferred, that is,

22  if what was done was within the constitutional power of Congress, there is no liability on the part

23  of the contractor for executing its will."  Id. at 21 (citations omitted).

24          Here, Plaintiffs' claims against MDC arise from alleged work on aircraft that were

25  designed, manufactured and delivered by MDC pursuant to military procurement contracts with

26  the AAC.  Under those contracts, MDC was required to comply with extensive specifications to

27  install on the aircraft GFAE-CI that allegedly exposed Mr. Burton to asbestos.  In performance of

28  its obligations under the contracts, MDC complied with all Government design specifications and

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

MDC OPPOSITION TO MOTION FOR REMAND
CV 07-0702 SI

1    installed such components as specifically authorized and required by the Government. Since

2    GFAE-CI components were separately procured by the Government under separate contracts with

3    other manufacturers, MDC had no input into the design or manufacture of those products. MDC

4    merely received the GFAE-CI components from the Government and installed them into the

5    aircraft as it was required to do under the contracts. Accordingly, MDC has clearly asserted a

6    second, separate colorable federal defense to Plaintiffs' claims under the derivate sovereign

7    immunity doctrine set forth in Yearsley.

8    **V.    PLAINTIFFS ARE NOT ENTITLED TO AN AWARD OF FEES AND COSTS.**

9    Plaintiffs are not entitled to an award of fees and costs for improper removal. "Absent

10    unusual circumstances, attorneys' fees should not be awarded when the removing party has an

11    objectively reasonable basis for removal." Durham, 445 F.3d at 1250 (citing Martin v. Franklin

12    Capital Corp., 546 U.S. 132 (2005)). As amply demonstrated above, MDC had an objectively

13    reasonable basis for removing this action. Thus, even if the Court were to determine that the case

14    should be remanded to the Superior Court of California for the County of San Francisco, which it

15    should not, Plaintiffs are not entitled to an award of fees and costs from MDC.

16    **VI.    CONCLUSION**

17    For all of the above reasons, MDC respectfully requests that the Court deny Plaintiffs'

18    Motion for Remand.

19    Dated: April 13, 2007                    **BRYAN CAVE LLP**
                                               Robert E. Boone III
20                                             Amy M. Gantvoort

21

22    By: _____/s/_____
                        Amy M. Gantvoort
23                      Attorneys for Defendant
                        MCDONNELL DOUGLAS CORPORATION

24

25

26

27

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

**EXHIBIT B**

1   **BRYAN CAVE LLP**
Robert E. Boone III (State Bar No. 132780)
2   Amy M. Gantvoort (State Bar No. 227294)
120 Broadway, Suite 300
3   Santa Monica, California 90401-2386
Telephone: (310) 576-2100
4   Facsimile:  (310) 576-2200
E-mail:  reboone@bryancave.com
5           amy.gantvoort@bryancave.com

6   Attorneys For Defendant
McDONNELL DOUGLAS CORPORATION

7

8

9                **UNITED STATES DISTRICT COURT**

10              **NORTHERN DISTRICT OF CALIFORNIA**

11

12   GERALDINE BURTON, individually and     Case No. CV 07-0702 SI
     as personal representative to the estate of
13   HAROLD BURTON, decedent; BLAINE
     BURTON, MARK BURTON and DOES      **DEFENDANT McDONNELL**
14   ONE through TEN, inclusive,           **DOUGLAS CORPORATION'S REPLY**
                                           **BRIEF IN SUPPORT OF ITS MOTION**
15           Plaintiffs,                   **FOR A TEMPORARY STAY OF THE**
                                           **ACTION PENDING ITS TRANSFER**
16       vs.                               **TO MULTI-DISTRICT LITIGATION**
                                           **NO. 875 IN RE ASBESTOS PRODUCT**
17   A.W. CHESTERTON COMPANY, et al.,      **LIABILITY LITIGATION**
18           Defendants.                   [Filed concurrently with Declaration of
                                           Amy M. Gantvoort]
19
                                           Date:    May 4, 2007
20                                         Time:    9:00 a.m.
                                           Dept.:   Courtroom 10, 19th Floor
21

22

23

24

25

26

27

28

SM01DOCS\635150

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

I.    **INTRODUCTION**

Until the issue of transfer of this action to Multidistrict Litigation No. 875 In Re Asbestos Product Liability Litigation ("MDL 875") is resolved by the Judicial Panel on Multidistrict Litigation ("JPML"), MDC submits that a stay of proceedings in this Court, including a stay of the ruling on Plaintiffs' Motion for Remand, is warranted. Such a stay would (a) promote judicial efficiency, (b) allow consistency in pre-trial rulings, including common issues involving "federal officer" removal jurisdiction upon which many asbestos cases pending in the federal courts are based, and (c) be most convenient to the parties. Plaintiffs' argument that the Court should rule on their motion for remand prior to any transfer decision runs afoul of the entire system of multidistrict litigation, which was created and intended to provide the most efficient and consistent means to handle exactly the types of issues presented in this case - such issues identical to those found in numerous cases currently pending in or due to be transferred to the MDL. Moreover, the MDL Court has clearly indicated its interest in the administration and adjudication of all pre-trial proceedings, including the determination of motions pending at the time of transfer.

Further, as supported by its Opposition to Plaintiffs' Motion for Remand, MDC has timely and properly removed this action based on "federal officer" grounds. The jurisdictional issues in the case are largely similar or identical to those issues found in numerous cases pending in or due to be transferred to the MDL. The requested stay presents little to no prejudice to Plaintiffs. Accordingly, it is appropriate that the action be stayed pending the JPML's determination on whether this action will be transferred to the MDL Court and, only after such determination, should the proper court hear Plaintiffs' motion for remand.

II.    **THE ACTION SHOULD BE STAYED UNTIL THE ISSUE OF TRANSFER HAS BEEN DECIDED.**

"The general rule is for federal courts to defer ruling on pending motions to remand in MDL litigation until after the [MDL] panel has transferred the case to the MDL." Jackson v. Johnson & Johnson, Inc., 2001 U.S. Dist. LEXIS 22339, at *17 (W.D. Tenn.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

1   2001). In fact, a majority of courts have concluded that it is often appropriate to stay

2   preliminary proceedings while a motion to transfer and consolidate is pending before the

3   JPML because a stay provides for consistent treatment of similar issues and will reduce the

4   burden on the Court. Rivers v. Walt Disney Co., 980 F. Supp.1360, 1362 (C.D. Cal.

5   1997); see also Moore v. Wyeth-Ayerst Laboratories, 236 F. Supp. 2d 509, 511 (D. Md.

6   2002) (stay of consideration of motion to remand warranted pending transfer to MDL).

7   Accordingly, MDC moves this Court to stay all proceedings in this case, including

8   consideration of Plaintiffs' Motion for Remand, as this case is prepared to soon be

9   transferred to the asbestos MDL docket in Pennsylvania. In fact, the JPML has already set

10  a hearing on the transfer of this action for May 31, 2007. (Declaration of Amy M.

11  Gantvoort in Support of Reply Brief, ¶ 2; Exhibit A). Thus, a determination on the transfer

12  issue is imminent.

13          The facts and well-established case law make clear that a stay is warranted here. As

14  discussed in MDC's Motion for Stay, MDC easily passes the three-pronged test articulated

15  in Meyers v. Bayer AG, 143 F. Supp. 2d 1044, 1048-1049 (E. D. Wis. 2001), for

16  addressing simultaneous motions for remand and stay pending MDL transfer. See also

17  Conroy v. Fresh Del Monte Produce, Inc., 325 F. Supp. 2d 1049, 1053 (N.D. Cal. 2004)

18  (incorporating the Meyers three-step approach in the court's analysis). The Meyers

19  methodology provides that the transferor court should: (1) give preliminary scrutiny to the

20  merits of the motion to remand. If the preliminary assessment suggests that removal was

21  largely improper, the court should consider the motion to remand to the state court; (2) if

22  the jurisdictional issue appears factually or legally difficult, determine if the issues are

23  identical or similar to other cases that have been or may be transferred to the MDL docket;

24  and (3) if the jurisdictional issue is both difficult and similar to those in cases transferred or

25  likely to be transferred, proceed to consider the motion to stay, which requires

26  consideration of the interests of economy, the hardship to the moving party if not stayed

27  and the potential for prejudice to the non-moving party. Meyers, 143 F. Supp. 2d at 1048-

28  49.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

### A.    Preliminary Assessment of the Jurisdictional Issues

The first prong under <u>Meyers</u> requires a "limited review" of the merits of the motion for remand.  Only if such review reveals that the jurisdictional argument is a "sure loser" should the Court not proceed to the second prong under <u>Meyers</u>.  <u>Id</u>. at 1048.  Here, a brief consideration of MDC's Notice of Removal and its Opposition to the Motion for Remand amply demonstrates that MDC properly removed the case – and certainly that MDC's asserted jurisdictional ground ("federal officer") is not a "sure loser."  MDC timely removed the action upon first discovery of Plaintiffs' claims against MDC based on Decedent's purported exposure to asbestos in MDC's military aircraft.  Contrary to Plaintiffs' assertion that MDC wanted to avoid trial, it is Plaintiffs who "pulled the rug out from under" defendants after two years of litigation and on the eve of hearing on MDC's Motion for Summary Judgment by revealing <u>for the first time</u> that they were alleging claims against MDC based on MDC's military aircraft and disclosing sufficient information regarding those claims to put MDC on notice that it had grounds for "federal officer" removal.  Plaintiffs' own failure to reveal critical product information regarding their claims until the last possible moment provided MDC with its first opportunity to remove the action.  Now Plaintiffs seek to escape the consequences of their own actions.

Further, as detailed in MDC's Opposition to the Motion for Remand and the accompanying Declaration of Larry L. Fogg, MDC has provided substantial evidence that it acted under the direction and control of a federal officer when it built the military aircraft at issue here, including the installation of asbestos-containing components in the aircraft.  To support its removal, MDC demonstrated the causal connection between Plaintiffs' claims and MDC's alleged conduct under the direction of federal officers.  Additionally, MDC has asserted two separate colorable federal defenses, namely the government contractor defense under <u>Boyle v. United Technologies Corp.</u>, 487 U.S. 500 (1988), and derivative sovereign immunity under <u>Yearsley v. W.A. Ross Construction Co.</u>, 308 U.S. 18 (1940), to Plaintiffs' claims.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

1    Far from a "sure loser," MDC has set out strong arguments supporting removal in
2  its Notice of Removal and Opposition to the Motion for Remand.

3    **B.    Similar Jurisdictional Issues are Before the MDL**

4    Regarding the second prong under Meyers, the issues presented are not unique or
5  isolated.   As an initial matter, the MDL is more than qualified to determine and dispose of
6  Plaintiffs' disingenuous timeliness argument and move on to evaluating jurisdiction on the
7  merits.   Numerous cases involving the identical issue here, namely asbestos incorporated
8  into military equipment under the Government's direction, have been removed pursuant to
9  Section 1442(a) on "federal officer" grounds.  There are numerous military contractors
10 being sued by asbestos plaintiffs in a multitude of jurisdictions throughout the country for
11 their use of Government-approved and mandated asbestos components in military
12 equipment, against which claims such contractors, like MDC, are immune from liability
13 pursuant to the "government contractor" defense as stated in Boyle v. United
14 Technologies, Inc., 487 U.S. 500 (1988) and its progeny, including Niemann v. McDonnell
15 Douglas Corp., 721 F.Supp. 1019 (S.D. Ill. 1989) (in which MDC obtained a grant of
16 summary judgment under Boyle against asbestos claims regarding the manufacture of
17 military aircraft).

18    As noted in MDC's Motion to Stay, not only is the MDL Court well-qualified to
19 determine motions for remand on such common issues involving "federal officer" removal,
20 but in fact, the MDL Court has shown a clear desire to actively control the administration
21 and adjudication of such pre-trial proceedings, including the determination of pending
22 motions.  (See MDL 875 Administrative Order No. 11, at No. 2, entered on August 15,
23 2006, attached as Exhibit B to the Declaration of Amy M. Gantvoort in Support of Reply
24 Brief.)  Clearly, the MDL Court has indicated in interest in ruling on motions pending at
25 the time of the transfer of a case.

26    Further, permitting the MDL Court to address such issues, particularly jurisdictional
27 issues, in numerous cases involving similar claims and common factual circumstances
28 obviously would promote consistent and predictable results.  Judicial economy concerns

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

1   compel the imposition of a stay where common legal issues are likely to be considered in
2   other actions before the MDL court. See Shields v. Bridgestone/Firestone, Inc., 232 F.
3   Supp. 2d 715, 718 (E.D. Tex. 2002). Under such circumstances, there is an undesirable
4   risk of inconsistent decisions by potential transferor district courts absent a stay of
5   proceedings in those courts. See In re Ivy, 901 F.2d 7, 9 (2d Cir. 1990) (finding that
6   transferor court should not hear motion because the issue was easily capable of arising in
7   cases from other transferor district courts and, "consistency as well as economy is thus
8   served [if] the …objections…[are] heard and resolved by a single court.")

9        Plaintiffs' contend that the threshold jurisdictional issue is whether, under current
10  California law, MDC was acting under the direction of a federal officer. However, the
11  government contractor defense is based on federal law and, indeed, was created by federal
12  courts. By operation of the defense, federal law, i.e., government contractor immunity,
13  preempts state law product liability claims. The United States Supreme Court explicitly
14  stated in Boyle that "civil liabilit[y] arising out of the performance of federal procurement
15  contracts" is a "'uniquely federal' interest." Boyle, 487 U.S. at 505-06. "[I]t is plain that
16  the Federal Government's interest in the procurement of equipment is implicated by
17  [product liability] suits [against the contractor] – even though the dispute is one between
18  private parties." Id. at 506. The rationale for the defense is based upon federal law, i.e., a
19  military contractor should enjoy the same immunity as a federal officer enjoys under the
20  discretionary function exception to the Federal Torts Claims Act ("FTCA"), 28 U.S.C. §
21  2680(a). Id. at 511. Additionally, Plaintiffs raise the issue of MDC's purported duty under
22  California law to warn of the hazards of asbestos. These are precisely the type of issues
23  involving military contractors that are found in numerous cases in the MDL. Thus,
24  Plaintiffs' assertion that this action "bears no similarity to any issue in any other case
25  which has been or may be transferred to the MDL" is just flatly wrong. "Consistency as
26  well as economy are…served" by having these similar and complex issues decided by the
27  MDL Judge assigned to handle just such pretrial proceedings. See In re Ivy, 901 F.2d at 9.
28       Given that MDC has made at least a showing of federal jurisdiction on numerous

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

1  factual grounds in its Notice of Removal and its Opposition to Plaintiffs' Motion for

2  Remand, and because these issues are commonly found in numerous asbestos actions

3  before MDL 875, this Court should grant a temporary stay without committing its limited

4  resources to consideration of the remand motion at this time.

5    **C.**   **The Relevant Considerations Weigh in Favor of A Stay**

6     Having established that complex and similar questions are presented in this and

7  other cases already to be transferred to the MDL docket, and can expect to arise in later-

8  filed cases, consideration of the relevant factors weighs in favor of entering a stay here. A

9  stay of this action pending resolution of the transfer issue by the JPML clearly would

10  promote judicial economy and efficiency. If the case is not stayed pending transfer, which

11  could occur as soon as May 31, 2007, it would continue to proceed with discovery, and

12  this Court would have to devote valuable resources to management of a case which,

13  ultimately, will likely to be transferred to MDL 875 for the very purpose of conducting

14  such pre-trial proceedings on a coordinated basis with other similar actions. Judicial

15  resources will certainly be saved by avoiding duplicative litigation dealing with identical

16  issues in multiple actions and would prevent inconsistent rulings on common issues from

17  case to case.

18     Moreover, Plaintiffs will not be prejudiced by a stay in this case. See American

19  Seafood v. Magnolia Processing, Inc., 1992 U.S. Dist. LEXIS 7374, at *5 (E.D. Pa. May 8,

20  1992) (granting motion to stay pending ruling by JPML and noting that plaintiffs would

21  not be substantially prejudiced by temporary stay). A temporary stay is appropriate as it

22  will allow for the JPML to determine which is the proper court to hear the motion for

23  remand. Upon the JPML's ruling on transfer of this action, the matter will immediately

24  proceed – either in this Court (if there is no transfer) or in the MDL Court (if a transfer is

25  ordered). Thus, Plaintiffs will have their day in court and, at worst, will only be slightly

26  inconvenienced by a temporary stay pending resolution of the transfer issue. In fact, the

27  JPML has already issued a notice of hearing as soon as May 31, 2007, on the issue of

28  transferring the action. Thus, Plaintiffs are guaranteed to have their day in court sooner

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401

CV 07-0702 SI
MDC'S REPLY BRIEF RE: STAY ACTION

1 | rather than later.

2 |     Further, Plaintiffs' own gamesmanship - blindsiding defendants with new claims

3 | supported by a new witness at the eleventh hour - are the only cause of any "unnecessary

4 | delay" in this action.  Plaintiffs waited over two years since the inception of this case and

5 | until the eve of trial to suddenly reveal a new witness providing information regarding new

6 | claims based on MDC's military aircraft at a new location.  As such, Plaintiffs' actions are

7 | the sole cause of any delay in moving this case forward to trial.

8 |     By contrast, MDC and the other defendants will be substantially prejudiced if the

9 | Court does not impose a stay of the action.  A temporary stay will save the parties from

10 | incurring litigation expenses that might be avoided by having to engage in potentially

11 | duplicative pretrial proceedings in this Court and the MDL Court.  Indeed, such

12 | duplicative pretrial activity is exactly what the MDL docket was designed to prevent.

13 |     Thus, the transfer issue should be decided by the JPML prior to any determination

14 | on Plaintiffs' Motion for Remand.  After such decision is made on May 31, 2007, the

15 | action may proceed, including hearing on the motion for remand, in the appropriate court

16 | without running afoul of the entire MDL system and causing unnecessary waste of judicial

17 | and the parties' resources.

18 | **III.     CONCLUSION**

19 |     MDC respectfully submits that the Court should order a temporary stay of this

20 | action pending a ruling from the JPML regarding transfer of this action to MDL 875.

21 |

22 | Dated:  April 20, 2007

Respectfully submitted,

**BRYAN CAVE LLP**
ROBERT E. BOONE III
AMY M. GANTVOORT

By: _____/s/_____
      Amy M. Gantvoort

Attorneys for Defendant
McDONNELL DOUGLAS CORPORATION

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401