MDL 875

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

AUG 2 3 2007

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI) ) ) ) This document relates to: ) ) SALVATORE GITTO ) AND PHYLLIS GITTO, ) ) Plaintiffs, ) ) vs. ) ) A.W. CHESTERTON CO., INC., ) *et al.*, ) ) Defendants. ) | MDL Docket No. 875 <br><br> S.D.N.Y. No. 07 CV 4771 (DC) |

## DEFENDANT EATON HYDRAULICS INC., F/K/A VICKERS, INCORPORATED'S OPPOSITION TO PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER 281 IN MDL DOCKET NO. 875

Defendant Eaton Hydraulics Inc., f/k/a Vickers, Incorporated ("EHI"), by and through

counsel, hereby files its Opposition to Plaintiffs' Motion to Vacate Conditional Transfer Order

("CTO") 281 in Multidistrict Litigation ("MDL") Docket No. 875 (Plaintiffs' Motion and

Memorandum of Law in Support are hereinafter referred to as "Plaintiffs' Motion"). Contrary to

Plaintiffs' assertions, transfer of this tag-along action to MDL Docket No. 875 pursuant to 28

U.S.C. § 1407 is appropriate, as discussed below.

OFFICIAL FILE COPY

IMAGED AUG 2 4 2007

Plaintiffs' Motion ignores the only issue before this Panel: whether transfer of this action is appropriate. Instead, Plaintiffs re-argue their Motion to Remand pending in the United States District Court for the Southern District of New York. As this Panel has expressly stated, 28 U.S.C. § 1407 does not empower the Panel to decide questions going to the jurisdiction or merits of a case, including issues relating to a motion to remand. To the contrary, the sole issue before this Panel involves whether this case should be transferred to MDL Docket No. 875 as a tag-along action pursuant to 28 U.S.C. § 1407.

Rule 1.1 of the Panel Rules of Procedure defines a tag-along action as "a civil action pending in a district court and involving common questions of fact with actions previously transferred under Section 1407." J.P.M.L. Rule 1.1, 199 F.R.D. 425, 427 (2001). All of the prior actions consolidated in, or transferred to, MDL Docket No. 875 concerned allegations of personal injury or wrongful death caused by asbestos or asbestos-containing products. The claims in this case involve the same allegations of personal injury caused by asbestos or asbestos-containing products. Ex. 1 (Pls.' Summons, Second Am. Compl., and NY Asbestos Litigation Standard Compl. No. 1). As such, this case involves common questions of fact with the cases in MDL Docket No. 875 and should be transferred as a tag-along action. Finally, contrary to Plaintiffs' assertions, the pendency of Plaintiffs' Motion to Remand in the Southern District of New York does not constitute grounds to vacate or delay the transfer of this case, as this Panel repeatedly has held that there is no reason to delay or in any way interrupt the MDL transfer process to accommodate a pending motion to remand.[1]

---

[1] As discussed below, while Plaintiffs' Second Amended Complaint, served on EHI on June 13, 2007, is the operative complaint for purposes of transfer, the operative complaint for removal purposes is likely Plaintiffs' original Complaint.

## I.   **EHI'S RESPONSES TO PLAINTIFFS' AVERMENTS**

As Rule 7.1 of the Panel Rules of Procedure requires, EHI responds to Plaintiffs' averments in corresponding numbered paragraphs. In addition, because Plaintiffs' Motion simply re-argues Plaintiffs' Motion to Remand, EHI follows its numbered responses with a discussion of the sole issue before this Panel -- the propriety of transfer in this case.

1.     EHI admits that Salvatore and Phyllis Gitto are plaintiffs in the action entitled, *Gitto vs. A.W. Chesterton Co.*, Civil Action No. 07 CV 4771 (DC) (S.D.N.Y.) ("the Gitto Action").

2.     EHI admits that the Gitto Action was identified as a tag-along action subject to CTO 281 issued by this Panel on June 22, 2007.

3.     EHI admits that Plaintiffs have filed a Motion to Vacate CTO 281 as it applies to the Gitto Action. EHI denies the remaining allegations of paragraph three of Plaintiffs' Motion. By way of further answer, EHI states that as Plaintiffs' allegations of personal injury resulting from exposure to asbestos or asbestos-containing products involve the same common questions of fact with every case in the asbestos MDL, transfer of the Gitto Action as a tag-along action to MDL Docket No. 875 is appropriate. *See In re Seeburg-Commonwealth United Merger*, 331 F. Supp. 552, 554 (J.P.M.L. 1971) (transfer is appropriate when "the pleadings . . . [present] numerous, substantial and complex questions of fact common to most if not all of the actions involved in the coordinated or consolidated pretrial proceedings"); *In re Equity Funding Corp. of Am. Litig.*, 391 F. Supp. 767, 768 (J.P.M.L. 1975) (transferring action because a comparison of the cases already consolidated and the case in question revealed "that both contain similar allegations focusing upon analogous violations of securities laws").

4.     EHI states that the allegations of paragraph four of Plaintiffs' Motion are irrelevant to this Panel's decision regarding whether transfer under 28 U.S.C. § 1407 is

appropriate in this matter.  Nonetheless, EHI admits that Plaintiffs filed a Motion to Remand the Gitto Action to the Supreme Court of the State of New York, County of New York.

5.     EHI states that the allegations of paragraph five of Plaintiffs' Motion are irrelevant to this Panel's decision regarding whether transfer under 28 U.S.C. § 1407 is appropriate in this matter.  Nonetheless, EHI admits that Plaintiffs filed a reply memorandum in support of their Motion to Remand on August 3, 2007, pursuant to an order by the Honorable Denny Chin of the United States District Court for the Southern District of New York.

6.     EHI states that the allegations of paragraph six of Plaintiffs' Motion are irrelevant to this Panel's decision regarding whether transfer under 28 U.S.C. § 1407 is appropriate in this matter.  Nonetheless, EHI denies the allegations of paragraph six of Plaintiffs' Motion.  By way of further answer, EHI states that it filed a Memorandum in Opposition to Plaintiffs' Motion to Remand on July 5, 2007.

7.     EHI states that the allegations of paragraph seven of Plaintiffs' Motion are irrelevant to this Panel's decision regarding whether transfer under 28 U.S.C. § 1407 is appropriate in this matter.  Nonetheless, EHI denies the allegations of paragraph seven of Plaintiffs' Motion.  By way of further answer, EHI states that while Judge Chin established a briefing schedule for defendant Northrop Grumman Systems Corp. ("Northrop") to file a separate opposition to Plaintiffs' Motion to Remand on federal enclave grounds and for Plaintiffs to file a reply brief, he did not rule on EHI's letter request to stay Plaintiffs' Motion to Remand. Ex. 2 (Order of the Honorable Denny Chin establishing a briefing schedule for Northrop's opposition and Plaintiffs' reply).

8.     EHI states that the allegations of paragraph eight of Plaintiffs' Motion are irrelevant to this Panel's decision regarding whether transfer under 28 U.S.C. § 1407 is

appropriate in this matter. Nonetheless, EHI admits that it removed the Gitto Action to the U.S.

District Court for the Southern District of New York on June 5, 2007 pursuant to 28 U.S.C.

§ 1442 (federal officer removal jurisdiction). By way of further answer, EHI states that as a

defendant removing on federal officer removal grounds, EHI was not required to obtain the

consent of any other defendants. *See Torres v. CBS News*, 854 F. Supp. 245, 246 n. 2 (S.D.N.Y.

1994). Moreover, contrary to Plaintiffs' assertion that "Judge Chin established a briefing

schedule on the Motion to Remand whereby *separate defendants* could file papers concerning

the remand issue," (Pls.' Mot. at 3) (emphasis added), Judge Chin expressly allowed only one

defendant, Northrop, to file an Opposition to Plaintiffs' Motion to Remand based on Northrop's

assertion that the claims against it provided for separate and timely federal enclave removal

jurisdiction. Ex. 2 (Order of the Honorable Denny Chin establishing a briefing schedule for

Northrop's opposition and Plaintiffs' reply). Northrop ultimately decided not to file its

opposition brief on federal enclave removal grounds. Finally, contrary to Plaintiffs' contentions,

not only would it have been inappropriate for other defendants to join in or file separate

opposition briefs in support of EHI's Opposition to Plaintiffs' Motion to Remand where such

defendants did not assert their own removal grounds, but the filing of such papers would be

immaterial to any decision regarding the propriety of EHI's removal.

      9.     EHI states that the allegations of paragraph nine of Plaintiffs' Motion are

irrelevant to this Panel's decision regarding whether transfer under 28 U.S.C. § 1407 is

appropriate in this matter. Nonetheless, EHI denies the allegations of paragraph nine of

Plaintiffs' Motion. By way of further answer, EHI states that the Gitto Action was properly

removed on federal officer removal grounds as EHI was acting under the direct and detailed

control of U.S. Navy officers in performing the very conduct at issue in the case, and EHI asserts

several colorable federal defenses to Plaintiffs' claims.[2]

Plaintiffs' only dispute with EHI's removal in their remand briefing and their re-argument before this Panel is that EHI was not acting under the direction of a federal officer in providing warnings regarding EHI pumps or valves to which Plaintiff Salvatore Gitto alleges exposure while working aboard U.S. Navy ships in the 1950s and 1960s. Contrary to Plaintiffs' assertions, EHI demonstrates through extensive testamentary and documentary evidence that the U.S. Navy prescribed and proscribed the warnings affixed to and accompanying any EHI pumps or valves installed on U.S. Navy ships in the 1950s and 1960s, including any warnings regarding asbestos, and EHI could not deviate in any way from these Navy-dictated warnings. This evidence, including the declarations of three retired U.S. Navy officers and detailed military specifications, shows that the U.S. Navy prevented EHI from complying with any state-law imposed warnings, including any warnings regarding asbestos. As such, EHI demonstrates that federal officer removal applies to Plaintiffs' failure to warn claims. *See, e.g., Nesbiet v. General Elec. Co.,* 399 F. Supp. 2d 205 (S.D.N.Y. 2005); *Madden v. Able Supply Co.,* 205 F. Supp. 2d 695, 702 (S.D. Tex. 2002).

---

[2] EHI did not receive Plaintiffs' First or Second Amended Complaints until after EHI filed its Notice of Removal, and as such there is a question regarding the operative complaint for purposes of removal. *See Katz v. Warner-Lambert Co.,* 9 F. Supp. 2d 363, 364 (S.D.N.Y. 1998) (holding that an amended complaint served after the notice of removal is not the operative complaint); *Miami Valley Hosp. v. Cmty. Ins. Co.,* No. 3:05-cv-297, 2006 WL 2252669, at *1 n.1 (S.D. Ohio Aug. 7, 2006) (holding that even though defendants had not received service of plaintiffs' amended complaint prior to their removal, the operative complaint for removal purposes was the amended complaint because it was filed before defendants' removal). Because Plaintiffs' Second Amended Complaint is the first complaint to limit Plaintiffs' claims against EHI to failure to warn claims, the operative claims for purposes of removal in the Southern District of New York should include all claims presented in the original Complaint, *i.e.,* both failure to warn and non-failure to warn claims. Plaintiffs do not dispute and thus implicitly concede in their Motion to Remand and reply brief the propriety of EHI's removal as it relates to Plaintiffs' non-failure to warn claims.

As Plaintiffs' Motion simply re-argues their remand briefing, it contains several legal and factual inaccuracies regarding the application of federal officer removal jurisdiction in this case. First, Plaintiffs assert that courts apply a strict interpretation of federal officer removal in the context of government contractors. (Pls.' Mot. at 4 n.5.) Plaintiffs are wrong. Although federal courts usually construe removal jurisdiction narrowly, the Supreme Court has held that the federal officer removal statute is an exception to this rule. *See Willingham v.* Morgan, 395 U.S. 402, 406-07 (1969) (federal officer removal statute is neither "narrow" nor "limited," and the policy underlying the statute "should not be frustrated by a narrow, grudging interpretation"). Moreover, federal officer removal cases involving government contractors or other private actors who were "acting under" a federal officer have applied the liberal standard associated with Section 1442(a)(1) removal. *See, e.g., Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398 (5th Cir. 1998); *Nesbiet*, 399 F. Supp. 2d at 210.

Similarly, Plaintiffs simply misunderstand the application of federal officer removal as it relates to asbestos failure to warn claims. (Pls.' Mot. at 6-7.) The case law is clear that federal officer removal jurisdiction applies to asbestos failure to warn claims where the federal officer prevented the manufacturer from complying with its state-law duty to warn by controlling all warnings accompanying the product. *See, e.g., Nesbiet*, 399 F. Supp. 2d 205; *Madden*, 205 F. Supp. 2d 695. For example, in *Nesbiet*, the court upheld federal officer removal jurisdiction in a similar failure to warn case against a Navy contractor arising from the plaintiff's exposure to asbestos while working at the Brooklyn Navy Yard during World War II. The court found that the defendant, who was supplying the Navy with marine steam turbines that the United States needed to build Naval ships, satisfied the "acting under" and "causal nexus" requirements of federal officer removal because it was acting under the direct and detailed

control of U.S. Navy officers regarding the provision of all warnings, and that such control directly interfered with the defendant's ability to fulfill its state law obligations to warn about the hazards of asbestos. *Nesbiet*, 399 F. Supp. 2d at 212. This control was evidenced in part by military specifications, MIL-M-15071A-G, that required that safety instructions be provided as "*dictated by the Navy*" and "indicate[d] that the content of instruction manuals [was] subject to the approval of the Navy." *Id.* at 209 (emphasis in original).[3] The court further held that the defendant was not required to provide direct evidence that the U.S. Navy specifically prohibited it from warning about asbestos. *Id.*

In addition to these legal inaccuracies, Plaintiffs' Motion contains factual inaccuracies. Most notably, Plaintiffs assert that the testimony of EHI's three U.S. Navy declarants exhibits a "lack of sufficient personal knowledge." (Pls.' Mot. at 12.) Not only do EHI's Navy declarants have first-hand knowledge of the Navy's direct and detailed control over the very conduct at issue through their contemporaneous Navy service, their sworn testimony discusses in detail such control. In direct contrast, Plaintiffs fail to mention that their only U.S. Navy declarant, Captain Arnold P. Moore, **was not even in** the Navy during the relevant time period and thus he has no personal knowledge of the issues before the Court.

10.    EHI states that the allegations of paragraph ten of Plaintiffs' Motion are irrelevant to this Panel's decision regarding whether transfer under 28 U.S.C. § 1407 is appropriate in this matter. Nonetheless, EHI denies the allegations of paragraph ten of Plaintiffs' Motion. By way

---

[3] Included among the military specifications reviewed by the *Nesbiet* court is MIL-M-15071D, *id.* at 209 n.24, which Plaintiffs refer to in their Motion (Pls.' Mot. at 9). The *Nesbiet* court admonished the plaintiffs in that case for mischaracterizing the specifications in arguing that the specifications "'imposed an affirmative requirement to warn on contractors.'" *Id.* at 208-09 (quoting Nesbiet Mem. at 15). Plaintiffs here present a similarly flawed argument with respect to MIL-M-1507D in their Motion. (Pls.' Mot. at 9.)

of further answer, EHI states that jurisdiction is proper before the Southern District of New York.

10.[sic]   EHI states that the allegations of paragraph ten [sic] of Plaintiffs' Motion are irrelevant to this Panel's decision regarding whether transfer under 28 U.S.C. § 1407 is appropriate in this matter.  Nonetheless, EHI admits that under Panel Rule 1.5, the pendency of a CTO does not affect or suspend orders and pretrial proceedings in the transferor district court. EHI further explains, however, that Panel Rule 1.5 in no way affects this Panel's ability to transfer any action, regardless of whether a motion to remand is pending before the transferor court.  To the contrary, this Panel has repeatedly held that there is no reason to delay transfer in order to accommodate a pending motion to remand.  *See, e.g., In re Asbestos Prods. Liab. Litig. (No. VI)*, 170 F. Supp. 2d 1348, 1349 n.1 (J.P.M.L. 2001); *In re Air Crash Disaster at Fla. Everglades on Dec. 29, 1972*, 368 F. Supp. 812, 813 (J.P.M.L. 1973) ("Plaintiffs . . . have filed motions seeking remand [and] urge the Panel to postpone any decision on the question of transfer until those motions have been determined.  We see no reason for delaying our decision. Because these actions involve questions of fact identical to those raised in the actions previously transferred by the Panel, transfer is necessary in order to eliminate the possibility of duplicative discovery and conflicting pretrial rulings.").

11.   EHI states that the allegations of paragraph eleven of Plaintiffs' Motion are irrelevant to this Panel's decision regarding whether transfer under 28 U.S.C. § 1407 is appropriate in this matter.  Nonetheless, EHI denies the allegations of paragraph eleven of Plaintiffs' Motion.  By way of further answer, EHI states that the briefing on Plaintiffs' Motion to Remand recently concluded and Judge Chin has not yet indicated whether he will grant oral argument.  EHI further states that this Panel has set a hearing on Plaintiffs' Motion for

September 27, 2007.  As such, it is not likely that Judge Chin will rule on Plaintiffs' Motion to Remand before this Panel rules on Plaintiffs' Motion.

11.[sic]  EHI states that the allegations of paragraph eleven [sic] of Plaintiffs' Motion are irrelevant to this Panel's decision regarding whether transfer under 28 U.S.C. § 1407 is appropriate in this matter.  Nonetheless, EHI denies the allegations of paragraph eleven [sic] of Plaintiffs' Motion.  By way of further answer, EHI states that the transfer of this case as a tag-along action to MDL Docket No. 875 is appropriate, as this case involves common questions of fact with the cases in MDL Docket No. 875.  *See In re Seeburg-Commonwealth United Merger*, 331 F. Supp. 552, 554 (J.P.M.L. 1971) (transfer is appropriate when "the pleadings . . . [present] numerous, substantial and complex questions of fact common to most if not all of the actions involved in the coordinated or consolidated pretrial proceedings").

EHI further explains that it is not appropriate for this Panel to vacate or delay transfer in this case based on Plaintiffs' Motion to Remand pending in the transferor court.  In the Panel's original decision centralizing these asbestos actions, *In re Asbestos Prods. Liab. Litig. (No. VI)*, 771 F. Supp. 415 (J.P.M.L. 1991), "distinctions based on such matters as the pendency of motions or other matters before the transferor court . . . were considered and rejected by the Panel as grounds for carving out exceptions to transfer." *In re Asbestos Prods. Liab. Litig. (No. VI)*, 170 F. Supp. 2d at 1349.  Moreover, this Panel has repeatedly held that there is no reason to deny or in any way interrupt the transfer process in order to accommodate a pending motion to remand.  *Id.* at 1349 n.1; *In re Vioxx Prods. Liab. Litig.*, 360 F. Supp. 2d 1352, 1354 (J.P.M.L. 2005) (holding "[t]he pendency of a motion to remand to state court is not a sufficient basis to avoid inclusion in Section 1407 proceedings"); *In re Air Crash Disaster at Fla. Everglades on Dec. 29, 1972*, 368 F. Supp. at 813 ("Plaintiffs . . . have filed motions

seeking remand [and] urge the Panel to postpone any decision on the question of transfer until those motions have been determined. We see no reason for delaying our decision. Because these actions involve questions of fact identical to those raised in the actions previously transferred by the Panel, transfer is necessary in order to eliminate the possibility of duplicative discovery and conflicting pretrial rulings.").

In addition, numerous courts have held that the sole issue before this Panel is "the merits of the transfer viewed against the purposes of the multidistrict statutory scheme, whether or not there is a pending jurisdictional objection." *In re Ivy*, 901 F.2d 7, 9 (2d Cir. 1990); *Med. Soc'y of the State of New York v. Conn. Gen. Corp.*, 187 F. Supp. 2d 89, 91 (S.D. N.Y. 2001); *Johnson v. AMR Corp.*, Nos. 95 C 7659-95 C 7664, 1996 WL 164415, at *3 (N.D. Ill. April 3, 1996). Similarly, courts have found that a jurisdictional challenge should not short-circuit the otherwise advisable transfer. *E.g.*, *Med. Soc'y of the State of New York*, 187 F. Supp. 2d at 91.

Finally, this Panel repeatedly has held that transfer is warranted regardless of a pending motion to remand, as the motion to remand can be presented to and decided by the transferee judge. *In re Vioxx Prods. Liab. Litig.*, 360 F. Supp. 2d at 1354 (holding that pending motions to remand "can be presented to and decided by the transferee judge"); *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 293 F. Supp. 2d 1375, 1377 (J.P.M.L. 2003); *In re Air Crash Disaster at Fla. Everglades on Dec. 29, 1972*, 368 F. Supp. at 813 ("the transferee judge certainly has the power to determine the question of remand.").

12.     EHI states that the allegations of paragraph twelve of Plaintiffs' Motion are conclusions or other non-factual statements and therefore require no response from EHI. Nonetheless, EHI states that Plaintiffs' Motion and accompanying memorandum in support are irrelevant to this Panel's decision regarding whether transfer under 28 U.S.C. § 1407 is

appropriate in this matter.  By way of further answer, EHI incorporates its response to paragraph 11 [sic] of Plaintiffs' Motion.  For all of the reasons discussed in this Opposition, EHI respectfully requests that the Panel transfer this tag-along action under CTO 281 to MDL Docket No. 875.

## II.   TRANSFER OF THIS TAG-ALONG ACTION TO MDL DOCKET NO. 875 IS APPROPRIATE

### A.   Common Questions Of Fact Exist Between This Case And Every Asbestos Case Previously Transferred To MDL Docket No. 875

On June 22, 2007, pursuant to Rule 7.4 of the Panel Rules of Procedure, 199 F.R.D. 425, 435-36 (2001), this Panel ordered that this case be transferred to MDL Docket No. 875 as a tag-along action pursuant to 28 U.S.C. § 1407, because it appeared to involve questions of fact common to the actions previously transferred to the United States District Court for the Eastern District of Pennsylvania and assigned to the Honorable James T. Giles.  Plaintiffs subsequently moved to vacate or delay the Panel's transfer order.

Thus, the sole issue before this Panel involves whether this case should be transferred to MDL Docket No. 875 as a tag-along action pursuant to 28 U.S.C. § 1407.  As discussed above, Rule 1.1 of the Panel Rules of Procedure defines a tag-along action as "a civil action pending in a district court and involving common questions of fact with actions previously transferred under Section 1407."  J.P.M.L. Rule 1.1, 199 F.R.D. 425, 427 (2001).

On July 29, 1991, pursuant to 28 U.S.C. § 1407, this Panel transferred 21,937 actions involving allegations of personal injury or wrongful death caused by asbestos or asbestos-containing products to the Eastern District of Pennsylvania, MDL Docket No. 875, for pretrial proceedings, as the actions involved common questions of fact, and centralization of the actions best served convenience of the parties and witnesses and promoted the just and efficient conduct of litigation.  *In re Asbestos Prods. Liab. Litig. (No. VI)*, 771 F. Supp. at 417.  Since that time,

the Panel has transferred an additional 82,268 actions to the Eastern District of Pennsylvania.

*See* MDL Docket No. 875, (CTO 281), filed June 22, 2007.  All of the actions transferred to

MDL Docket No. 875 have involved allegations of personal injury or wrongful death caused by

asbestos or asbestos-containing products.

The claims in this case involve common questions of fact with every one of the 104,205

cases previously transferred to MDL Docket No. 875.  As with all of the cases in this asbestos

MDL, this case concerns allegations of personal injury caused by asbestos and asbestos-

containing products.  Ex. 1 (Pls.' Summons, Second Am. Compl., and NY Asbestos Litigation

Standard Compl. No. 1).  Significantly, Plaintiffs *only* allege injuries resulting from exposure to

asbestos and asbestos-containing products.  Specifically, Plaintiffs allege that from 1951 to 1952

and 1954 to 1965, Plaintiff Salvatore Gitto was exposed to asbestos and asbestos-containing

products while employed by the U.S. Navy at the Brooklyn Navy Yard aboard several Navy

ships.  Ex. 3 (Pls.' Answers to Defs.' Fourth Am. Standard Set of Interrogs. and Request for

Produc. of Docs., Chart A.)

Furthermore, Plaintiffs allege that Plaintiff Salvatore Gitto was exposed to EHI pumps

and valves aboard several U.S. Navy ships while employed by the U.S. Navy from 1951 to 1952

and 1954 to 1965 at the Brooklyn Navy Yard.  Ex. 3 (Pls.' Answers to Defs.' Fourth Am.

Standard Set of Interrogs. and Request for Produc. of Docs., Chart A.)  Plaintiff Salvatore Gitto

subsequently testified at his deposition that he was exposed to asbestos in EHI pumps and/or

valves at the Brooklyn Navy Yard from 1951 to 1952 and 1954 to 1966 aboard the following

U.S. Navy ships:  USS Hornet, USS Franklin D. Roosevelt, and USS Lexington.  Ex. 4 (Gitto

Dep. May 16, 2007, 170:25-171:3, 189:15-190:2, 192:25-193:7, 270:11-270:14; June 7, 2007, 356:11-13, 364:10-15, 372:10-12, 375:7-12, 17:14-16, 18:23-19:4).[4]

Thus, as Plaintiffs' allegations of personal injury resulting from exposure to asbestos or asbestos-containing products involve the same common questions of fact with every case in the asbestos MDL, this Panel should transfer this case as a tag-along action to MDL Docket No. 875. *See In re Seeburg-Commonwealth United Merger*, 331 F. Supp. at 554 (transfer is appropriate when "the pleadings . . . [present] numerous, substantial and complex questions of fact common to most if not all of the actions involved in the coordinated or consolidated pretrial proceedings"); *In re Equity Funding Corp. of Am. Litig.*, 391 F. Supp. 767, 768 (J.P.M.L. 1975) (transferring action because a comparison of the cases already consolidated and the case in question revealed "that both contain similar allegations focusing upon analogous violations of securities laws.").

In fact, in numerous situations, this Panel has transferred asbestos cases with considerably fewer common questions of fact than this case. *E.g., In re Asbestos Prods. Liab. Litig.*, Nos. 875, 3:01-540, 3:01-1627, 1:00-1454, 2001 WL 1042562, at *1 (J.P.M.L. Aug. 29, 2001) ("Plaintiffs seek to exclude the three actions from transfer on the ground that the actions do not specifically involve claims of asbestos related injuries but rather simply involve efforts to enforce contractual rights acquired in state court settlements of asbestos personal injury claims."). Under such circumstances, this Panel has concluded:

> [T]o any parties that believe the uniqueness of their particular
> situation renders inclusion of their action in MDL-875 unnecessary
> or inadvisable, we note that whenever the transferee judge deems

---

[4] While it is not specifically relevant for this brief, EHI disputes any allegation that its products here contained asbestos.

> remand of any claims or actions appropriate, procedures are
> available whereby this may be accomplished with a minimum of
> delay.

*Id.*

### B.    There Is No Reason For This Panel To Vacate Or Delay Its Transfer Order In This Case Pending Plaintiffs' Motion To Remand

In Plaintiffs' Motion, after re-arguing their Motion to Remand, Plaintiffs request that this Panel vacate or delay the transfer order in this case to allow the Southern District of New York to rule on their Motion to Remand.

Contrary to Plaintiffs' assertions, it is not appropriate for this Panel to vacate or delay transfer in this case based on Plaintiffs' Motion to Remand pending in the transferor court. As noted above, in this Panel's original decision centralizing these asbestos actions, *In re Asbestos Prods. Liab. Litig. (No. VI)*, 771 F. Supp. 415 (J.P.M.L. 1991), "distinctions based on such matters as the pendency of motions or other matters before the transferor court . . . were considered and rejected by the Panel as grounds for carving out exceptions to transfer." *In re Asbestos Prods. Liability Litig. (No. VI)*, 170 F. Supp. 2d at 1349. Moreover, this Panel has held that there is no reason to delay or in any way interrupt transfer in order to accommodate a pending motion to remand. *See, id.* at 1349 n.1; *see also In re Air Crash Disaster at Fla. Everglades on Dec. 29, 1972*, 368 F. Supp. at 813 ("Plaintiffs . . . have filed motions seeking remand [and] urge the Panel to postpone any decision on the question of transfer until those motions have been determined. We see no reason for delaying our decision. Because these actions involve questions of fact identical to those raised in the actions previously transferred by the Panel, transfer is necessary in order to eliminate the possibility of duplicative discovery and conflicting pretrial rulings.").

In addition, numerous courts have held that the sole issue before this Panel is "the merits of the transfer viewed against the purposes of the multidistrict statutory scheme, whether or not there is a pending jurisdictional objection." *Ivy*, 901 F.2d at 9; *see Med. Soc'y of the State of New York*, 187 F. Supp. 2d at 91; *Johnson*, 1996 WL 164415, at *3. Similarly, courts have found that a jurisdictional challenge should not short-circuit the otherwise advisable transfer. *See, e.g.*, *Med. Soc'y of the State of New York*, 187 F. Supp. 2d at 91.

Furthermore, this Panel repeatedly has held that transfer is warranted regardless of a pending motion to remand, as the motion to remand can be presented to and decided by the transferee judge. *See In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 293 F. Supp. 2d at 1377; *see also Ivy*, 901 F.2d at 9; *In re Air Crash Disaster at Fla. Everglades on Dec. 29, 1972*, 368 F. Supp. at 813 ("the transferee judge certainly has the power to determine the question of remand.").

Thus, transfer of this tag-along asbestos case to MDL Docket No. 875 is appropriate under 28 U.S.C. § 1407, as this case involves common questions of fact with the cases in MDL Docket No. 875. Moreover, despite Plaintiffs' assertions, Plaintiffs' Motion to Remand pending in the Southern District of New York is irrelevant to this Panel's decision regarding transfer.

Dated:  August 23, 2007

Respectfully submitted,

*Andrew Sapon* w/ permission LMN

Andrew Sapon
Bivona & Cohen, P.C.
Wall Street Plaza
88 Pine Street
New York, NY  10005-1886
(212) 363-3100 (phone)
(212) 363-9824 (fax)


*Of Counsel:*
Raymond B. Biagini
Lisa M. Norrett
McKenna Long & Aldridge LLP
1900 K Street, NW
Washington, DC  20006
(202) 496-7500 (phone)
(202) 496-7756 (fax)

**Attorneys for Defendant
Eaton Hydraulics Inc., f/k/a
Vickers, Incorporated**

## REASONS WHY ORAL ARGUMENT NEED NOT BE HEARD

Oral argument need not be heard in this case because (1) the dispositive issues have been authoritatively decided and (2) the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument. *See* J.P.M.L. Rule 16.1(c), 199 F.R.D. 425, 438-40 (2001).  The sole issue before this Panel involves whether this case should be transferred to MDL Docket No. 875 as a tag-along action pursuant to 28 U.S.C. § 1407.  As discussed in detail in Defendant Eaton Hydraulics Inc., f/k/a Vickers, Incorporated's Opposition to Plaintiffs' Motion to Vacate Conditional Transfer Order 281 to Docket No. 875, transfer of this case as a tag-along action to MDL Docket No. 875 is appropriate, as this case involves common questions of fact with the cases in MDL Docket No. 875.  *See In re Seeburg-Commonwealth United Merger*, 331 F. Supp. 552, 554 (J.P.M.L. 1971).

Furthermore, it is not appropriate for this Panel to vacate or delay transfer in this case based on Plaintiffs' Motion to Remand pending in the transferor court.  In the Panel's original decision centralizing these asbestos actions, *In re Asbestos Prods. Liab. Litig. (No. VI)*, 771 F. Supp. 415 (J.P.M.L. 1991), "distinctions based on such matters as the pendency of motions or other matters before the transferor court . . . were considered and rejected by the Panel as grounds for carving out exceptions to transfer." *In re Asbestos Prods. Liab. Litig. (No. VI)*, 170 F. Supp. 2d 1348, 1349 (J.P.M.L. 2001).  Moreover, this Panel has repeatedly held that there is no reason to deny or in any way interrupt the transfer process in order to accommodate a pending motion to remand.  *Id.* at 1349 n.1; *In re Vioxx Prods. Liab. Litig.*, 360 F. Supp. 2d 1352, 1354 (J.P.M.L. 2005) (holding "[t]he pendency of a motion to remand to state court is not a sufficient basis to avoid inclusion in Section 1407 proceedings"); *In re Air Crash Disaster at Fla. Everglades on Dec. 29, 1972*, 368 F. Supp. 812, 813 (J.P.M.L. 1973).

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

### CERTIFICATE OF SERVICE

AUG 2 3 2007

FILED
CLERK'S OFFICE

I certify that on August 23, 2007, copies of the foregoing:

1.  Defendant Eaton Hydraulics Inc., f/k/a/ Vickers, Incorporated's Opposition to Plaintiffs' Motion to Vacate Conditional Transfer Order 281 in MDL Docket No. 875

2.  Exhibits to Defendant Eaton Hydraulics Inc., f/k/a/ Vickers, Incorporated's Opposition to Plaintiffs' Motion to Vacate Conditional Transfer Order 281 in MDL Docket No. 875

3.  Reasons Why Oral Argument Need Not Be Heard

were served via first class mail upon:

> The Honorable Denny Chin
> United States District Judge
> Southern District of New York
> 500 Pearl Street, Room 1020
> New York, NY  10007

and via first class mail upon the parties on the attached Panel Service List.

Lisa M. Norrett

**PANEL SERVICE LIST (Excerpted from CTO-281)**
**MDL NO. 875**
**IN RE Asbestos Products Liability Litigation (No. VI)**

*Salvatore Gitto, et al. v. A.W. Chesterton Co., Inc., et al.*, S.D. New York, C.A. No. 1:07-4771

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114

Jerome Block
Levy, Phillips & Konigsberg, LLP
800 Third Avenue
13th Floor
New York, NY 10022

Edward J. Cass
Gallagher, Sharp, Fulton & Norman
Bulkley Building, 7th Floor
1501 Euclid Avenue
Cleveland, OH 44115

Adam M. Chud
Goodwin Procter, LLP
901 New York Avenue, N.W.
Washington, DC 20001

David A. Damico
Burns, White & Hickton, LLC
Four Northshore Center
106 Isabella St.
Pittsburgh, PA 15212

Raymond P. Forceno
Forceno & Hannon
111 S. Independence Mall East
The Bourse, Suite 1000
Philadelphia, PA 19106-2574

Ellen B. Furman
Goldfein & Hosmer
1600 Market Street
33rd Floor
Philadelphia, PA 19103

Susan M. Hansen
Brownson & Ballou
225 South Sixth Street
Suite 4800
Minneapolis, MN 55402

Reginald S. Kramer
Oldham & Dowling
195 South Main Street
Suite 300
Akron, OH 44308-1314

David C. Landin
Hunton & Williams, LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Gene Locks
Locks Law Firm, LLC
1500 Walnut Street
Philadelphia, PA 19102

Ronald L. Motley
Motley Rice, LLC
P.O. Box 1792
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464

John J. Repcheck
Marks, O'Neill, O'Brien & Courtney
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219

John D. Roven
Roven-Kaplan, L.L.P.
2190 North Loop West
Suite 410
Houston, TX 77018

Andrew Sapon
Bivona & Cohen
88 Pine Street
New York, NY 10005

Richard D. Schuster
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216-1008

Neil Selman
Selman, Breitman & Burgess
11766 Wilshire Boulevard
Sixth Floor
Los Angeles, CA 90025

Robert N. Spinelli
Kelley, Jasons, McGuire & Spinelli
Centre Square West
15th Floor
Philadelphia, PA 19102

Robert E. Swickle
Jaques Admiralty Law Firm, P.C.
1370 Penobscot Building
645 Griswold St.
The Maritime Asbestosis Legal Clinic
Detroit, MI 48226-4192

Andrew J. Trevelise
Reed Smith, LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

James K. Weston, II
Tom Riley Law Firm
4040 First Avenue, N.E.
P.O. Box 998
Cedar Rapids, IA 52406

# EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SALVATORE GITTO AND PHYLLIS GITTO,

                           Plaintiffs,

        - against -

A.W. CHESTERTON CO., INC.;
AMERICAN STANDARD, INC.,
      individually and on behalf of
      its division The Trane Company;
AURORA PUMP COMPANY;
BLACKMER PUMP;
BUFFALO PUMPS, INC.,
      individually and as a subsidiary of
      Ampco-Pittsburgh Corp.;
CARRIER CORPORATION
      a/k/a Bryant Manufacturing Corporation;
CRANE CO.;
CRANE PUMPS & SYSTEMS, INC.;
DUNHAM-BUSH, INC. ;
DURABLA MANUFACTURING COMPANY;
ELLIOTT TURBOMACHINERY CO.;
FAIRBANKS-MORSE PUMP CORPORATION,
      individually and as successor-in-interest to
      Henry Vogt Machine Company, Babcock Power
      Inc., Company, and Pacific Pumps, Inc.;
FLOWSERVE CORPORATION;
FMC CORPORATION
      on behalf of its former Northern Pump Business;
FMC CORPORATION,
on behalf of its former Peerless Pumps;
FOSTER WHEELER ENERGY CORP.;
GARDNER DENVER, INC.;
GARLOCK SEALING TECHNOLOGIES, LLC,
      successor by merger to Garlock, Inc.;
GENERAL ELECTRIC COMPANY;
GENERAL REFRACTORIES, CO.;
GOULDS PUMPS INCORPORATED;
GRISHAM RUSSELL;
HERCULES CHEMICAL COMPANY, INC.;
HOPEMAN BROTHERS, INC.;

Index No. D7105033
DOF:  4-13-07

SUMMONS

Plaintiff Designates
NEW YORK COUNTY
as the place for trial

The basis for venue is
defendants' place of business

Plaintiff resides at
324 95th st
Brooklyn, New York  11209

NOT COMPARED
WITH COPY FILE

APR 13 2008

NEW YORK
COUNTY CLERKS OFFICE

LEVY PHILLIPS &
ONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

HOWDEN BUFFALO INC.,
     individually and as successor-interest-to
     BF Sturtevant, Buffalo Forge and The Howden Group;
IMO INDUSTRIES, INC.,
     as successor-in-interest  to and f/k/a Delaval Turbine,
     Transamerica Delaval, IMO Delaval and Enterprise Engine & Foundry Co.;
INGERSOLL-RAND COMPANY;
J.H. FRANCE REFRACTORIES COMPANY;
JOHNSTON BOILER CO.;
LESLIE CONTROLS, INC.;
MURPHY BROTHERS WORKS;
PEERLESS INDUSTRIES, COMPANY, INC.;
QUAKER CHEMICAL CORPORATION;
RAPID-AMERICAN CORPORATION
     as successor-in-interest to Phillip
     Carey Manufacturing Corp.;
SELBY BATTERSBY & COMPANY;
STERLING FLUID SYSTEMS USA, LLC,
     formerly known as Peerless Pump Co.;
TACO, INC.;
THE ANCHOR PACKING CO.;
THE NASH ENGINEERING COMPANY;
THE TRANE COMPANY;
TYCO FLOW CONTROL, INC.,
UNION CARBIDE;
UNIROYAL, INC.;
VIACOM INC.,
     successor by merger to CBS Corporation,
     f/k/a Westinghouse Electric Corporation;
VICKERS INC,
     a/k/a Eaton Hydraulics Inc.;
WALTER H. EAGAN CO., INC.;
WARREN PUMPS, INC.;
WEIL PUMP CO.;
YARWAY CORPORATION;

                     Defendants.

-------------------------------------------X

TO THE ABOVE NAMED DEFENDANTS:

     You are hereby summoned to answer in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete is this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated:    New York, New York
          April 12, 2007

                    LEVY PHILLIPS & KONIGSBERG, L.L.P.
                    Attorneys for Plaintiffs

                    By:    Carmen V. St. George, Esq.
                            800 Third Avenue - 13th Floor
                            New York, New York 10022
                            (212) 605-6200

**Defendants Addresses:**

A.W. CHESTERTON CO., INC.
Middlesex Industrial Park
Rt. 93
Stoneham, MA 02180

AMERICAN STANDARD, INC.,
individually and on behalf of
its division The Trane Company;
One Centennial Avenue
P.O. Box 6820
Piscataway, NJ 08855

AURORA PUMP COMPANY
c/o Karen Carriker
13515 Ballantyne Corporate Place
Charlotte, NC 28277

BUFFALO PUMPS, INC.
c/o CT Corporation System
111 Eighth Avenue
New York, NY 10011

CRANE CO.
c/o CT Corporation System
111 Eighth Avenue
New York, NY 10011

CRANE PUMPS & SYSTEMS, INC.
P.O. Box 603
Piqua, OH 45356

DUNHAM-BUSH, INC. n/k/a/ FORT
KENT HOLDINGS, INC.
179 S. Street
West Hartford, CT 06110

ELLIOTT TURBOMACHINERY CO.
North 4th Street
Jeannette, PA 15644

FMC CORPORATION,
on behalf of its former Northern Pump Business
1735 Market Street
Philadelphia, PA 19103

FMC CORPORATION,
on behalf of its former Peerless Pumps
1735 Market Street
Philadelphia, PA 19103

FLOWSERVE CORPORATION
5215 N. O'Connor Blvd, Suite 2300
Irving, Texas 75039

FOSTER WHEELER ENERGY CORP.
Perryville Corporate Park
P.O. Box 4000
Clinton, NJ 08809

GARLOCK SEALING TECHNOLOGIES, LLC,
successor by merger to Garlock, Inc.
c/o CT Corporation System
111 Eighth Avenue
New York, NY 10011

GENERAL ELECTRIC COMPANY
Henry J. King., Jr., Esq./
Managing Attorney
Electric Insurance Company
152 Conant Street
Beverly, MA 01915

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

GENERAL REFRACTORIES CO.
225 City Avenue
Suite 114
Bala Cynwyd, PA 19004

GRISHAM RUSSELL

HERCULES CHEMICAL CO., INC.
111 South Street
Passaic, NJ 07055

INGERSOLL-RAND COMPANY
200 Chestnut Ridge Road
Woodcliff Lake, New Jersey 07675

J.H. FRANCE REFRACTORIES CO.
P.O. Box 276
895 Clarence Road
Snow Shoe, PA 16874-0276

JOHNSTON BOILERS CO.
300 Pine Street
Ferrysburg, MI 4409

LESLIE CONTROLS, INC.
12501 Telecom Drive
Tampa, Florida 33637

MURPHY BROTHERS WORKS
5311 South 122nd East Avenue
Tulsa, Oklahoma 74146

PEERLESS INDUSTRIES, INC.,
f/d/b/a Peerless Heater Co.
Platinum Corporate Services
c/o Borghese Law Firm
1515 Market Street, 9th Floor
Philadelphia, PA 19102

QUAKER CHEMICAL CORPORATION
c/o CT Corporation
80 State Street
Albany, NY 12207

SELBY BATTERSBY & CO.
c/o Hecker, Brown, Sherry and Johnson
1700 Two Logan Square
18th and Arch Streets
Philadelphia, PA 19103-2769

STERLING FLUID SYSTEMS (USA), LLC
2005 Dr. Martin Luther King Jr. Street
Indianapolis, IN 46202

TACO, INC.
1160 Cranston Street
Cranston, RI 02920

THE ANCHOR PACKING COMPANY
120 East Ave, Suite 101
Rochester, NY 14604-7356

THE NASH ENGINEERING COMPANY
9 Trefoil Drive
Trumbull, CT 06611-1330

THE TRANE COMPANY
One Centennial Avenue
Piscataway, New Jersey 08855

TYCO FLOW CONTROL, INC.,
2405 Maryland Road
Willow Grove, PA 19090

UNION CARBIDE
c/o CT Corporation
111 Eighth Avenue
New York, NY 10011

UNIROYAL, INC.
Attn: Legal Department
70 Great Hill Road
Naugatuck, CT 06770

VIACOM, INC.,
successor by merger to CBS, Corp. f/k/a
Westinghouse Electric Corp.
c/o Asbestos Litigation Support Manager
Eckert Seamans Cherin & Mellott, LLC
Case Management & Technology Center
600 Grant Street, 5th Floor
Pittsburgh, PA 15219

WARREN PUMPS, INC.
82 Bridges Avenue
P.O. Box 969
Warren, MA 01083-0969

YARWAY CORPORATION
2405 Maryland Road
Willow Grove, PA 19090

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
SALVATORE GITTO AND PHYLLIS GITTO,

                              Plaintiffs,

               -against-

A.W. CHESTERTON CO., INC.;
AMERICAN STANDARD, INC.,
       individually and on behalf of
       its division The Trane Company;
AURORA PUMP COMPANY;
BLACKMER PUMP;
BUFFALO PUMPS, INC.,
       individually and as a subsidiary of
       Ampco-Pittsburgh Corp.;
CARRIER CORPORATION
       a/k/a Bryant Manufacturing Corporation;
CRANE CO.;
CRANE PUMPS & SYSTEMS, INC.;
DUNHAM-BUSH, INC. ;
DURABLA MANUFACTURING COMPANY;
ELLIOTT TURBOMACHINERY CO.;
FAIRBANKS-MORSE PUMP CORPORATION,
       individually and as successor-in-interest to
       Henry Vogt Machine Company, Babcock Power
       Inc., Company, and Pacific Pumps, Inc.;
FLOWSERVE CORPORATION;
FMC CORPORATION
       on behalf of its former Northern Pump Business;
FMC CORPORATION,
on behalf of its former Peerless Pumps;
FOSTER WHEELER ENERGY CORP.;
GARDNER DENVER, INC.;
GARLOCK SEALING TECHNOLOGIES, LLC,
       successor by merger to Garlock, Inc.;
GENERAL ELECTRIC COMPANY;
GENERAL REFRACTORIES, CO.;
GOULDS PUMPS INCORPORATED;
GRISHAM RUSSELL;
HERCULES CHEMICAL COMPANY, INC.;
HOPEMAN BROTHERS, INC.;
HOWDEN BUFFALO INC.,
       individually and as successor-interest-to
       BF Sturtevant, Buffalo Forge and The Howden Group;

NYCAL
Index No.: 07/105033

DOF:  5/31/07

**SECOND AMENDED
COMPLAINT**

LEVY PHILLIPS &
KONIGSBERG, L L P
800 THIRD AVENUE
NEW YORK N.Y 10022

IMO INDUSTRIES, INC.,
     as successor-in-interest  to and f/k/a Delaval Turbine,
     Transamerica  Delaval,  IMO  Delaval  and  Enterprise
Engine & Foundry Co.;
INGERSOLL-RAND COMPANY;
J.H. FRANCE REFRACTORIES COMPANY;
JOHNSTON BOILER CO.;
LESLIE CONTROLS, INC.;
MURPHY BROTHERS WORKS;
PEERLESS INDUSTRIES, COMPANY, INC.;
QUAKER CHEMICAL CORPORATION;
RAPID-AMERICAN CORPORATION
     as successor-in-interest to Phillip
     Carey Manufacturing Corp.;
SELBY BATTERSBY & COMPANY;
STERLING FLUID SYSTEMS USA, LLC,
     formerly known as Peerless Pump Co.;
TACO, INC.;
THE ANCHOR PACKING CO.;
THE NASH ENGINEERING COMPANY;
THE TRANE COMPANY;
TYCO FLOW CONTROL, INC.,
UNION CARBIDE;
UNIROYAL, INC.;
VIACOM INC.,
     successor by merger to CBS Corporation,
     f/k/a Westinghouse Electric Corporation;
VICKERS INC,
     a/k/a Eaton Hydraulics Inc.;
WALTER H. EAGAN CO., INC.;
WARREN PUMPS, INC.;
WEIL PUMP CO.;
YARWAY CORPORATION; and
NORTHROP GRUMMAN SYSTEMS, CORP.,

                       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

     Plaintiffs, by their attorneys, LEVY PHILLIPS & KONIGSBERG, LLP, for their Complaint,
respectfully alleges as follows:

1.     Plaintiffs repeat and re-allege New York Asbestos Litigation Standard Complaint No.
     1 as if fully incorporated herein.

2.     Plaintiffs are citizens of the State of New York.

3.  Pursuant to Case Management Order No. 1§VIE, Plaintiffs amend their complaint with respect to claims arising from exposure to asbestos at the Brooklyn Navy Yard as follows: Plaintiffs expressly limit such claims to failure to warn about the hazards of asbestos as alleged in New York Asbestos Litigation Standard Complaint No. 1.

Dated:      New York, New York
            May 30, 2007

                          LEVY PHILLIPS & KONIGSBERG, L.L.P.
                          *Attorneys for Plaintiffs*


                          By:     Jerome H. Block

                          800 Third Avenue
                          New York, New York 10022
                          (212) 605-6200

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK      )
                              ) ss.:

COUNTY OF NEW YORK     )

       Alyza M. Barral, being duly sworn deposes and says that she is an employee of Levy Phillips & Konigsberg, L.L.P., the attorneys for the above named plaintiff herein, that she is over the age of eighteen and is not a party to the within action. That on the 31ST day of May, 2007 a copy of:

### PLAINTIFF'S NOTICE OF AMENDMENT AND SECOND AMENDED COMPLAINT

by depositing a true copy thereof enclosed in a post-paid wrapper, in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State, addressed to each of the following persons at the last known address set forth after each name:

**TO:**

Julie Evans, Esq.
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER, LLP
150 East 42nd Street
New York, New York 10017
*Attorneys for Defendants A.W. Chesterton, Co., Inc.*

Genevieve MacSteel, Esq.
MCGUIREWOODS
1345 Avenue of the Americas, 7thFloor
New York, New York 10105
*Attorneys for American Standard Inc.*

David M. Katzenstein, Esq.
MCGIVNEY & KLUGER, P.C.
80 Broad Street, 23rd Floor
New York, NY 10024
*Attorneys for Aurora Pump Company*

Edward J. Wilbraham Esq./ John S. Howarth, Esq.
WILBRAHAM, LAWLER & BUBA
1818 Market Street
Philadelphia, PA 19103
*Attorneys for Buffalo Pumps, Inc.*

Frank A. Cecere, Esq.
AHMUTY DEMERS & McMANUS
200 I.U. Willets Road
Albertson, New York 11507
*Attorneys for Carrier Corp.*

Michael Waller, Esq
KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP
One Newark Center, Tenth Floor
Newark, NJ 07102
*Attorneys for Crane Co.*

Michael Waller, Esq
KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP
One Newark Center, Tenth Floor
Newark, NJ 07102
*Attorneys for Crane Pumps & Systems, Inc.*

Peter Lagenus, Esq.
SCHNADER, HARRISON, SEGAL & LEWIS
140 Broadway, Suite 3100
New York, New York 10005
*Attorneys for Dunham-Bush, Inc. N/k/a Fort Kent Holdings, Inc.*

William Mueller, Esq.
CLEMENTE MUELLER
& TOBIA, P.A.
P.O. Box 1296
Morristown, New Jersey 07962

CLEMENTE MUELLER
& TOBIA, P.A.
76 Beaver Street, 2nd Floor
New York, NY 10005
*Attorneys for Durabla Manufacturing Co.*

Donald Fay, Esq.
WATERS McPHERSON McNEIL
233 Broadway, Suite 970
New York, NY 10279
*Attorneys for Elliot Turbomachinery Co.*

John A. Turlik, Esq.
SEGAL McCAMBRIDGE SINGER &
MAHONEY, LTD.
830 Third Avenue, Suite 400
New York, New York 10022
*Attorneys for Fairbanks Morse Pumps*

Christopher Hannan, Esq.
KELLEY JASONS MCGOWAN SPINELLI
& HANNA, LLP
120 Wall Street, 30th Floor
New York, NY 10005
*Attorneys for FMC Corporation*

Erich Gleber, Esq.
SEGAL McCAMBRIDGE
SINGER & MAHONEY
830 Third Avenue, Suite 400
New York, NY 10022
*Attorneys for Flowerserve Corporation*

Michael A. Tanenbaum, Esq.
SEDGWICK, DETERT, MORAN &
ARNOLD LLP
Three Gateway Center, 12th Floor
Newark, NJ 07102
*Attorneys for Foster Wheeler Energy Corp.*

Robert J. Kenney, Esq.
SEGAL McCAMBRIDGE
SINGER&MAHONEY, LTD.
830 Third Avenue, Suite 400
New York, New York 10022
*Attorneys for Gardner Denver*

John A. Turlik, Esq.
SEGAL McCAMBRIDGE
SINGER&MAHONEY, LTD.
830 Third Avenue, Suite 400
New York, New York 10022
*Attorneys for Garlock Sealing Technologies*

Diane Pompei, Esq.
SEDGWICK, DETERT, MORAN
& ARNOLD LLP
Three Gateway Center, 12th Floor
Newark, NJ 07102
*Attorneys for General Electric Company*

Suzanne Halbardier, Esq.
BARRY McTIERNAN & MOORE
2 Rector Street, 14th Floor
New York, New York 10006
*Attorneys for General Refractories*

John Fanning, Esq.
CULLEN & DYKMAN LLP
177 Montague Street
Brooklyn, New York 11201
*Attorneys for Goulds Pumps Inc.*

Jeff Kluger, Esq./ Joan Gaisor, Esq.
McGIVNEY & KLUGER , P.C.
80 Broad Street, 23rd Floor
New York, New York 10004
*Attorneys for Hercules Chemical Co., Inc.*

Jennifer Darger, Esq.
DARGER & ERRANTE, LLP
116 E.27th Street, 12th Floor
New York, NY 10016.
*Attorneys for Hopeman*

John Fanning, Esq.
CULLEN & DYKMAN LLP
177 Montague Street
Brooklyn, New York 11201
*Attorneys for Howden Buffalo, Inc.*

Lawrence G. Cetrulo, Esq./
Christopher A. D. Hunt, Esq.
CETRULO & CAPONE LLP
20 Exchange Place
New York, NY 10005
*Attorneys for Howden Buffalo, Inc.*

Joseph Colao, Esq.
LEADER & BERKON
630 Third Avenue, 17th Floor
New York, New York 10017
*Attorneys for IMO*

Lisa M. Pascarella, Esq.
PEHLIVAN, BRAATEN & PASCARELLA,
L.L.C.
Paytner's Ridge Office Park
2430 Route 34
Manasquan, NJ 08736
*Attorneys for Ingersoll-Rand Company*

PEHLIVANIAN, BRAATEN &
PASCARELLA, L.L.P.
115 Broadway, 19th Floor
New York, NY 10006
*Attorneys for Ingersoll-Rand Company*

Robert C. Malaby, Esq.
MALABY, CARLISLE
& BRADLEY, LLC
150 Broadway, Suite 600
New York, New York 10038
*Attorneys for JH France Refractories Co.*

Mark S. Gaffrey, Esq.
HOAGLAND LONGO MORAN
DUNST & DOUKAS
40 Patterson Street
P.O. Box 480
New Brunswick, New Jersey 08903
*Attorneys for Johnston Boilers Co.*

John J. Fanning, Esq.
CULLEN & DYKMAN, LLP
177 Montague Street
Brooklyn, NY 11201
*Attorneys for Leslie Controls, Inc.*

Julie Evans, Esq.
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER, LLP
150 East 42nd Street
New York, New York 10017
*Attorneys for Murphy Brothers Works*

Timothy J. McHugh, Esq.
LAVIN, O'NEIL, RICCI,
CEDRONE & DISIPIO
420 Lexington Ave, Suite 2900
Graybar Building
New York, NY 10170
*Attorneys for Otis Elevator Co,*

Arthur D. Bromberg, Esq.
Weiner Lesniak, LLP
629 Parsippany Road
PO Box 0438
Parsippany, NJ 70754-0438
*Attorneys for Peerles Industrie, Inc.*

Stephen A. Manuele, Esq.
FELDMAN KIEFFER & HERMAN, LLP
The Dun Building
110 Pearl Street, Suite 400
Buffalo, New York 14202
*Attorneys for Quaker Chemical Corporation*

Linda Yassky, Esq.
SONNENSCHEIN NATH
& ROSENTHAL LLP
1221 Avenue of the Americas
23rd Floor
New York, New York 10020
*Attorneys for Rapid-American Corp.*

Stephen A. Manuele, Esq.
FELDMAN KIEFFER
& HERMAN, LLP
The Dun Building
110 Pearl Street, Suite 400
Buffalo, New York 14202
*Attorneys for Selby Battersby & Company*

Christopher Hannan, Esq.
KELLEY JASONS MCGOWAN SPINELLI
& HANNA, LLP
120 Wall Street, 30th Floor
New York, NY 10005
*Attorneys for Sterling Fluid Systems (USA)
LLC*

Joan Gaisor, Esq.
McGIVNEY & KLUGER , P.C.
80 Broad Street, 23rd Floor
New York, New York 10004
*Attorneys for TACO, Inc.*

Philip J. O'Rourke, Esq.
McGIVNEY & KLUGER , P.C.
80 Broad Street, Suite 2300
New York, New York 10004
*Attorneys for Tate Andale, Inc.*

Dave Weinberg, Esq.
SEGAL  McCAMBRIDGE  SINGER  &
MAHONEY, LTD.
830 Third Avenue, Suite 400
New York, New York 10022
*Attorneys for The Anchor Packing Co.*

Chuck McGivney, Esq.
McGIVNEY & KLUGER, P.C.
80 Broad Street, 23rd Floor
New York, New York 10004
*Attorneys for The Nash Engineering Co.*

Genevieve MacSteel, Esq./
Robert Brooks-Rigolosi, Esq.
MCGUIREWOODS
1345 Avenue of the Americas, 7thFloor
New York, New York 10022
*Attorneys for The Trane Co.*

Rob Tonogbanua, Esq.
Dickie, McCamey & Chilcote, P.C.
Public Ledger Building, Suite 901
150 South Independence Mall West
Philadelphia, PA 19106-3409
*Attorneys for Tyco Flow Control Inc.*

Pokorney Counsel:
Stephen S. Davie, Esq.
MACKENZIE HUGHES, LLP
101 South Salina Street
P.O. Box 4967
Syracuse, NY 13221-4967
*Attorneys for Tyco Flow Control Inc.*

Judith Yavitz, Esq.
ANDERSON KILL & OLICK, P.C.
1251 Avenue of the Americas
New York, New York 10020
*Attorneys for Union Carbide*

Norman Senior, Esq.
GREENFIELD STEIN & SENIOR
600 Third Avenue
New York, New York 10016
*Attorneys for Uniroyal, Inc.*

William J. Bradley, III, Esq.
MALABY, CARLISLE & BRADLEY, LLC
150 Broadway, Suite 600
New York, New York 10038
*Attorneys for Viacom, Inc.*

Andrew Sapon, Esq.
BIVONA & COHEN, P.C.
Wall Street Plaza
88 Pine Street
New York, NY 10005-1886
*Attorneys for Vickers Inc.*

Joseph Colao, Esq.
LEADER & BERKON LLP
630 Third Avenue, 17th Floor
New York, New York 10017
*Attorneys for Warren Pumps, Inc.*

Rob Tonogbanua, Esq.
Dickie, McCamey & Chilcote, P.C.
Public Ledger Building, Suite 901
150 South Independence Mall West
Philadelphia, PA 19106-3409
*Attorneys for Yarway Corp.*

**Counsel Unknown for the following**
 **Defendants:**

BLACKMER PUMP
GRISHAM RUSSELL
WALTER H. EAGAN CO., INC.
WEIL PUMP CO.
NORTHROP GRUMMAN SYSTEMS, CORP.


and via Facsimile to:

Diane Pompei, Esq.
SEDGWICK, DETERT, MORAN
& ARNOLD LLP
Three Gateway Center, 12th Floor
Newark, NJ 07102



Sworn to before me this
31ST day of May, 2007

NOTARY PUBLIC

ALYZA M. BARRAL


CARMEN VICTORIA MARKAKIS
NOTARY PUBLIC
#02MA6029086
Qualified in Queens County
Commission Expires 10/9/20 09

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
----------------------------------X

IN RE NEW YORK CITY                    New York Asbestos
    ASBESTOS LITIGATION              Litigation (NYAL)


----------------------------------X    Index No. 4000

   THIS DOCUMENT RELATES TO:              STANDARD
                                       COMPLAINT
     ALL CASES                       NO. 1

----------------------------------X

      Plaintiffs, by their lawyers, for their Complaint
respectfully allege:


## PARTIES PLAINTIFF

     1.   Plaintiff was employed in the construction
trade and/or at shipyards or in other occupations at various
times between approximately the 1930's and the present.
During that employment, and at other times and places,
plaintiff was exposed to asbestos and dust from defendants'
asbestos and asbestos-containing products.  Plaintiff worker
has contracted asbestos-related diseases and injuries as a
result thereof.

      2.   Plaintiff wife is the lawful wife of the
plaintiff worker.

## PARTIES DEFENDANT

3. . The defendants mined, processed, manufactured, designed, developed, tested, fashioned, packaged, inspected, sold, distributed, supplied, delivered, installed, and/or applied the asbestos, asbestos products and materials to which plaintiffs were exposed, and were in the business of doing so and injected those materials into the stream of commerce.

4. The plaintiffs at this time have not named as defendants the Manville Corporation, Johns-Manville Corporation, Johns-Manville Sales Corporation, Unarco Industries, Inc., Amatex, Forty-Eight Insulations, Nicolet or Standard Insulations, although the plaintiffs believe that those entities are also responsible for the damages and injuries involved in this action. The omission of those entities as defendants is due solely to the pendency of bankruptcy proceedings, initiated by those companies, which prohibit their being sued and are a bar to jurisdiction being obtained over them in this action at this time. Should it become permissible at some time to commence action against these entities, plaintiffs will seek to amend this Complaint to designate them as defendants.

5. At all relevant times, the defendants did and do business in this State, transacted business in this State, committed one or more tortious acts within this State, and otherwise did or performed acts within or without the State

which subjects them to the jurisdiction of the Courts of the State.

6.   At all relevant times, the defendants' actions and conduct were performed through their duly authorized agents, servants and employees, who were acting in the course and scope of their employment and authority and in further-ance of the business and profit of defendants.

### BACKGROUND

7.   In the course of employment, and at other times and places, plaintiffs were exposed to asbestos and dust from defendants' asbestos-containing products, includ-ing, but not limited to insulation, cement, acoustic materi-als, plaster, textiles and tape.

8.   The inhalation and ingestion of asbestos causes a variety of diseases, including asbestosis, a chronic lung disease which, inter alia, impairs the ability of the lungs to function, for which there is no cure, and which pro-gressively worsens and in its advanced stages can result in death.   Inhalation and ingestion of asbestos also increases the risk of developing a number of cancers, including lung cancer, and mesothelioma a virulent and almost always fatal cancer of the lining of the lungs or stomach.

9.   Once released into the air, asbestos particles remain airborne, and may travel great distances, or settle down and perhaps again become airborne, until ultimately inhaled or somehow removed, but will not naturally destruct.

10.   At all relevant times, the defendants knew or should have known that asbestos was deleterious, carcinogenic and posed a health hazard to consumers, users and others exposed to it.

11.   At all relevant times, the defendants knew or should have known that their asbestos products and materials would be purchased and used without inspection for defect, and without knowledge of defect by users and others exposed to them.

12.   The asbestos products and materials reached the consumers, users and others exposed to them in a substantially unchanged condition from that in which they left the hands of defendants.

13.   The asbestos products and materials were installed, applied and/or used in a manner intended by or reasonably foreseeable to the defendants.

14.   The asbestos products and materials to which plaintiffs were exposed were defective, unsafe and/or unreasonably dangerous.

15.  At all relevant times, defendants individually and collectively failed and refused to warn or advise plaintiffs and others of the dangerous characteristics of asbestos, and of the health threats or consequences to those coming in contact with, breathing or exposed to asbestos products and materials.

16.  At all relevant times, defendants individually and collectively failed to provide proper and adequate warnings and information of dangers and health hazards to persons foreseeably using or coming into contact with asbestos products and materials.

17.  At all relevant times, defendants individually and collectively failed to study, investigate, determine, impose or comply with reasonable standards and regulations to protect and promote the health and safety of or minimize the dangers to those exposed to or coming into contact with asbestos products and materials.

18.  At all relevant times, defendants individually and collectively failed to fully and properly test and study their asbestos products and materials to fully expose and learn of the hazards associated with those materials.

19.  At all relevant times, defendants individually and collectively failed to develop, make available, provide or promote building and construction products and materials

5.

which were free of asbestos or which contained insignificant
amounts of asbestos, or design products which minimized or
eliminated the release of airborne, inhalable asbestos dust
and/or fibers.

20. The defendants individually and collectively
made express warranties and representations, incorrectly and
untruthfully, that asbestos products were safe and suitable
for use.

21. Motivated by a desire for unwarranted economic
gain and profit, defendants individually and collectively
have willfully and recklessly ignored knowledge, in existence
since at least 1929, of the health hazards of asbestos prod-
ucts and materials and have thereby exhibited reckless disre-
gard for the health and well-being of the plaintiffs, and
numerous others exposed to their products.

22. As a proximate result of their wrongful ex-
posure to asbestos at the hands of defendants, plaintiffs
contracted asbestos related diseases and injuries, including
various forms of cancer and asbestosis, all chronic, progres-
sive and permanent injuries. Plaintiffs also sustained pain
and suffering, were required to undergo medical treatment and
monitoring, suffered severe emotional distress and mental
anguish, have and had a significantly increased risk of can-
cer and other diseases, incurred expenses, and sustained
other injury, damages and losses. In the future, upon infor-

mation and belief, plaintiffs' asbestos-related diseases will progress, plaintiffs will suffer additional and worsening pain and suffering, and plaintiffs will require medical care and treatment and medical monitoring, and will sustain other injury, damages and loss.

## A FIRST CLAIM IN NEGLIGENCE

23.  Plaintiffs repeat and reallege the allegations of paragraphs 1 through 22, as if fully set forth herein.

24.  Acting individually and collectively, defendants willfully, recklessly and negligently failed and refused to warn or advise plaintiffs and others of the dangers and hazards of asbestos products and materials, and the dangers posed to the health and welfare of those coming in contact with, using or exposed to asbestos products and materials.

25.  Acting individually and collectively, defendants willfully, recklessly and negligently failed to provide needed, accurate and adequate warnings and information of the health hazards and dangers of asbestos materials to those who would reasonably and foreseeably come into contact with, use, be exposed to or be harmed by those asbestos products and materials.

26.  Acting individually and collectively, defendants willfully, recklessly and negligently failed to study, investigate, ascertain, impose or comply with reasonable standards and regulations to protect and promote the health and safety of or minimize the dangers to those using exposed to or coming into contact with the asbestos products and materials.

27.  Acting individually and collectively, defendants willfully, recklessly and negligently failed to fully and properly test and study asbestos products and materials to fully expose and learn of the hazards associated with those products and materials.

28.  Acting individually and collectively, defendants willfully, recklessly and negligently failed to develop, make available, provide or promote building and construction products and materials which were free of asbestos or which contained insignificant amounts of asbestos, and/or failed to design asbestos products so as to prohibit or minimize the release of airborne, inhalable asbestos dust and/or fibers.

29.  Acting individually and collectively, defendants willfully, recklessly and negligently failed to provide instructions of potentially safer methods of handling asbestos products and materials to users or others foreseeably

coming into contact with or exposed to those products and materials.

30.   Defendants were otherwise negligent.

31.   As a proximate consequence of the acts, omissions, willfulness, recklessness and negligence of the defendants, plaintiffs sustained the injuries and damages set forth above in paragraph 22 and elsewhere.

32.   As a result of the foregoing, each plaintiff has been injured in the sum of TEN MILLION ($10,000,000) DOLLARS.

## A SECOND CLAIM IN STRICT PRODUCTS LIABILITY

33.   Plaintiffs repeat and reallege the allegations of paragraphs 1 through 22 and 24 through 31, as if fully set forth herein.

34.   As a proximate result of the defective, unsafe and unreasonably dangerous condition of the asbestos products and materials, plaintiffs sustained the injuries detailed above in paragraph 22 and elsewhere.

35.   Accordingly, defendants are strictly liable to plaintiffs.

36.   By reason of the foregoing, each plaintiff was injured in the sum of TEN MILLION ($10,000,000) DOLLARS.

## A THIRD CLAIM FOR RELIEF ON BEHALF OF PLAINTIFF WIVES FOR LOSS OF SERVICES, SOCIETY AND CONSORTIUM

37.  Plaintiffs repeat and reallege the allegations of paragraphs 1 through 22, 24 through 31 and 34-35, as if fully set forth herein.

38.  As a direct and proximate result of the conduct of defendants, the defective, unsafe and unreasonably dangerous condition of the asbestos products and materials, and the injuries to plaintiffs, plaintiff wives were deprived of the services, society and consortium of their husbands.

39.  By reason of the foregoing, each plaintiff spouse has been injured in the sum of FIVE HUNDRED THOUSAND ($500,000) DOLLARS.

## A FOURTH CLAIM FOR PUNITIVE DAMAGES

40.  Plaintiffs repeat and reallege the allegations of paragraphs 1 through 22, 24 through 31 and 34-35, as if fully set forth herein.

41.  Defendants' willful, wanton conduct evinces a total, conscious and/or reckless disregard for the lives and well-being of plaintiffs, as well as for the health, well-being and rights of others who used, were foreseeably exposed to or otherwise came into contact with, asbestos products and materials.

42.  As a consequence, an award of punitive damages is required to uphold and vindicate the public welfare.

WHEREFORE, plaintiffs demand judgments against the defendants as follows:

1.  TEN MILLION ($10,000,000) DOLLARS in actual compensatory damages for each plaintiff worker, and FIVE HUNDRED THOUSAND ($500,000) DOLLARS for each plaintiff wife;

2.  Punitive damages in the sum of TEN MILLION ($10,000,000) DOLLARS for each plaintiff worker;

3.  Interest, costs, disbursements, fees and other costs of suit; and

4.  Such other and further relief as to the Court may seem just and proper.

Dated:  New York, New York
        February 1, 1989

                          LEVY PHILLIPS & KONIGSBERG
                          Attorneys for Plaintiffs

                          By: _____
                                 Stanley J. Levy
                              A Member of the Firm
                              0 Park Avenue
                              New York, New York 10016
                              212) 972-1480

# EXHIBIT 2

# MEMO ENDORSED

**GILBERT & GILBERT, LLC**
ATTORNEYS AT LAW

THE EMPIRE STATE BUILDING
350 FIFTH AVENUE, SUITE 5615
NEW YORK, NY 10118
212-286-8524
(FAX) 212-286-8522

July 5, 2007

Via Facsimile (212)-805-7906
Hon. Denny Chin, United States District Judge
United States District Court
Southern District of New York
500 Pearl Street, Room 1020
New York, NY 10007

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: 7/10/07

RE:   Salvatore Gitto and Phyllis Gitto vs. A.W. Chesterton Co., Inc. et al.
Civil Action No. 07CV4771(DC)

Honorable Sir:

This office represents defendant Northrop Grumman Systems Corp. in the above referenced matter. We write at the advice of the Court's law secretary Josh Hsu, Esq. regarding obtaining an extension of time to address plaintiff's pending Motion for Remand.

Northrop Grumman is a Federal defense contractor who was belatedly served with notice of this action. Plaintiff apparently alleges that he believes he may have been exposed to asbestos while working for the United States Navy in buildings that were owned either by the United States Navy and/or by Northrop Grumman but occupied by the United States Navy during plaintiff's employment.

Defendant Northrop Grumman Systems Corp. on May 25, 2007 first received an Amended Complaint dated May 17, 2007 and was simultaneously noticed for a continued deposition of plaintiff dated June 7, 2007. Northrop Grumman appeared for this examination as well as plaintiff's De Bene Esse deposition held over objection, the same day. During the examination plaintiff produced three original volumes of binders that presumably have bearing on plaintiff's case as to this defendant but, to date have not been produced to this office.

Significantly, plaintiff had not advised either prior to, or at, the June 7, 2007 depositions that the matter had been removed to Federal Court by co-defendant Eaton Hydraulics. Moreover, despite defendant Northrop Grumman's appearance at the June

7th deposition, plaintiff failed to serve defendant Northrop Grumman with either the Removal documentation or its pending application for Remand filed with the Court on or about June 15, 2007 and now returnable on July 6, 2007 (tomorrow).

This office first learned that this matter was removed to Federal Court this afternoon, at which time the undersigned contacted this Court to obtain an extension of time to obtain the removal filings and to have an opportunity to be heard on Defendant Northrop Grumman Systems Corp.'s position with regard to Federal Court of Jurisdiction over this matter.

Accordingly, defendant Northrop Grumman wishes to request an extension of time to respond to the pending remand motion regarding appropriateness of Federal Court Jurisdiction in this matter.

Respectfully submitted,
Gilbert & Gilbert, LLC

_____s/_____

Elisa T. Gilbert
Gilbert & Gilbert, LLC
350 5th Avenue, Suite 5615
New York, NY 10118

ETG/ab

See service list

Northrop may file papers on or before 7/23/07. Plaintiffs so ORDERED. reply shall be filed

WPJ 8/3/07.

7/9/07

# EXHIBIT 3

LEVY, PHILLIPS & KONIGSBERG, LLP
ATTORNEYS AT LAW
800 THIRD AVENUE
NEW YORK, N. Y. 10022

(212) 605-6200
FAX: (212) 605-6290
E-MAIL: lpk@lpklaw.com
Writer's Direct E-Mail cdonaldson@lpklaw.com

NEW JERSEY OFFICE
QUAKERBRIDGE EXECUTIVE CENTER
101 GROVERS MILL ROAD
LAWRENCEVILLE, NJ 08648
TELEPHONE: (609) 720-0400
FAX: (609) 720-0457

GOSHEN OFFICE
42 PARK PLACE
GOSHEN, NEW YORK 10924
TELEPHONE: (845) 294-2002

May 4, 2007

To: All Counsel

Re: Salvatore Gitto
November 2007 Extremis Trial Cluster

Dear Counsel:

Enclosed please find Plaintiff's Answers To Defendants' Fourth Amended Standard Set Of Interrogatories And Request For Production Of Documents for plaintiff, Salvatore Gitto, along with a copy of his pathology report from Mamonides Medical Center dated March 12, 2007 diagnosing his mesothelioma.

Very truly yours,

LEVY PHILLIPS & KONIGSBERG, LLP

By: Corrinne Donaldson
Legal Assistant

:cd
Enclosures

00092692.WPD

SUPREME COURT OF THE STATE OF NEW YORK
ALL COUNTIES WITHIN NEW YORK CITY
-----------------------------------------------------------X

                                NYCAL

In Re:      NEW YORK CITY
            ASBESTOS LITIGATION

-----------------------------------------------------------X    **PLAINTIFF'S ANSWERS TO**
                                              **DEFENDANTS' FOURTH**
This Document Applies to:             **AMENDED STANDARD SET OF**
                                              **INTERROGATORIES AND**
                                            **REQUEST FOR PRODUCTION**
**SALVATORE GITTO**       07/105033         **OF DOCUMENTS**
-----------------------------------------------------------X

00091612.WPD

LEVY, PHILLIPS & KONIGSBERG, LLP
ATTORNEYS AT LAW
800 THIRD AVENUE
NEW YORK, N. Y. 10022

(212) 605-6200
FAX: (212) 605-6290
E-MAIL: lpk@lpklaw.com
Writer's Direct E-Mail cdonaldson@lpklaw.com

NEW JERSEY OFFICE
QUAKERBRIDGE EXECUTIVE CENTER
101 GROVERS MILL ROAD
LAWRENCEVILLE, NJ 08648
TELEPHONE: (609) 720-0400
FAX: (609) 720-0457

GOSHEN OFFICE
42 PARK PLACE
GOSHEN, NEW YORK 10924
TELEPHONE: (845) 294-2002

May 4, 2007

To: All Counsel

**Re: Salvatore Gitto**
**November 2007 Extremis Trial Cluster**

Dear Counsel:

Enclosed please find Plaintiff's Answers To Defendants' Fourth Amended Standard Set Of Interrogatories And Request For Production Of Documents for plaintiff, Salvatore Gitto, along with a copy of his pathology report from Mamonides Medical Center dated March 12, 2007 diagnosing his mesothelioma.

Very truly yours,

LEVY PHILLIPS & KONIGSBERG, LLP

By: Corrinne Donaldson
*Legal Assistant*

:cd
Enclosures

00092692.WPD

## GENERAL OBJECTION

Plaintiff objects to these discovery requests to the extent they seek information protected as attorney-client privilege and/or work product doctrine.  Finally, plaintiff objects to any discovery request that may be construed as requesting production of Proof of Claim Forms (POCs) and/or other documents reflecting communications between plaintiff and any settlement trust or any other entity made solely for purposes of settlement. See CPLR § 4547.

.EVY PHILLIPS &
)NIGSBERG, L.L.P.
900 THIRD AVENUE
EW YORK, N.Y. 10022

## INTERROGATORIES

1.      State the following:

      (a)      your full name, and all other names by which you have been known;

      (b)      age, and date and place of birth;

      (c)      whether you were an adopted child;

      (d)      present marital status, date of current marriage, spouse's maiden name, dates of any prior marriages and the names of any prior spouses, if applicable;

      (e)      present home address; and

      (f)      social security number.


A.1.    (a)      Salvatore Gitto.

      (b)      74; November 5, 1932, Brooklyn, New York.

      (c)      No.

      (d)      Married; January 30, 1954, Phyllis Volz.

      (e)      324 95th Street, Brooklyn, NY 11209.

      (f)      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.


2.      State the following with regard to your father and mother:

      (a)      names;

      (b)      current address (if deceased, state last known address);

      (c)      the current condition of each one's health, including any specific medical problems.  If either of your parents are deceased, please state for each deceased parent:

    i.      specific physical problems;

    ii.     date and place of death;

    iii.    age and cause of death for each parent.


A.2.   (a)   Mother: Mary Gitto       Father: Salvatore Gitto

      (b)   Mother: Deceased

           Father: Deceased

      (c)   Mother: deceased.

           Father: deceased.

        (i)    Mother: unknown    Father: Colon cancer.

        (ii)   Father: Date unknown; 1258 72nd Street, Brooklyn, NY

            Mother: Date unknown; 1258 72nd Street, Brooklyn, NY

        (iii)  Mother: Approximately 91yrs old; natural causes.

            Father: Approximately 80 years old; colon cancer.


3.    State the following with regard to each of your children:

    (a)   full name;

    (b)   the date of birth;

    (c)   sex;

    (d)   current address (if deceased, state the last known address);

    (e)   social security number;

    (f)   whether birth child or adopted child;

(g)     current state of each one's health.  If any of your children are deceased, state for each deceased child:

        i.      specific physical problems;

        ii.     date and place of death; and

        iii.    age and cause of death for each child.

A.3.I.     (a)     Stephen Gitto.

        (b)     October 2, 1955.

        (c)     Male.

        (d)     166 Celler Avenue, New Hyde Park, NY 11040

        (e)     To be provided.

        (f)     Birth child.

        (g)     Good health.

A.3.II.     (a)     Gregory Gitto.

        (b)     April 5, 1959.

        (c)     Male.

        (d)     12 Grant Way, Phillipsburg, NJ 08856.

        (e)     To be provided.

        (f)     Birth child.

        (g)     Good health.

A.3.II.    (a)    Rosemary Conroy.

(b)    April 21, 1963

(c)    Female.

(d)    170 Poor Farm Road, Weare, NH 03281.

(e)    To be provided.

(f)    Birth child.

(g)    Good health.

4.    State the complete address of all places you have resided since birth giving the inclusive dates of residence for each place named and as to each state:

(a)    fuel use for heating and cooking;

(b)    significant home improvements (e.g., additions, reinsulation, re-wiring, etc.);

(c)    number of family units co-occupying said structure.

A.4.I.    1230 73rd Street, Brooklyn NY.

Approximately 1932 - 1945.

(a)    Heating: Coal;    Cooking: gas.

(b)    None.

(c)    Two family home.

A.4.II.    1258 72nd Street, Brooklyn, NY.

Approximately 1945 - 1953.

        (a)      Heating: oil        Cooking: gas.

        (b)      Some minor remodeling.

        (c)      Two family home.

A.4.III    324 95th Street, Brooklyn, NY.

Approximately 1953 - 1962.

        (a)      Heating: oil        Cooking: gas.

        (b)      None.

        (c)      Single family home.

A.4.IV.    340 95th Street, Brooklyn, NY.

Approximately 1962 - 1988.

        (a)      Heating: oil        Cooking: gas.

        (b)      Remodeled kitchen, bathroom, walls and ceilings.

        (c)      Single family home.

A.4.V.    324 95th Street, Brooklyn, NY.

Approximately 1988 - present.

        (a)      Heating: oil        Cooking: gas

        (b)      Replaced kitchen and bathroom.

        (c)      Single family home.

5.   For every physician or other health care provider who ever tested, treated, consulted with or examined you up to and including the present date, for any reason whatsoever, please

state the following separately as to each:

    (a)    name and address of physician or health care provider and, if ongoing, the approximate frequency of said treatment and services;

    (b)    date(s) of test, examination and/or treatment;

    (c)    symptoms complained of at the time, if any;

    (d)    any diagnosis made;

    (e)    treatment or examination given and reason for treatment or examination; and

    (f)    any drugs or medications prescribed.

    A.5.    At the present time, although it is possible that plaintiff consulted other doctors, nurses and health care providers, plaintiff recalls the following names, dates and treatments:

    A.5.I.    (a)    Dr. Richard Lazzaro, Thoracic Surgeon.

        Maimonides Medical Center

        4802 Tenth Avenue, Brooklyn, NY 11219

    (b)    Approximately March 2007 to present.

    (c)    See medical records.

    (d)    Mesothelioma; see  medical records.

    (e)    See medical records.

    (f)    See medical records.

A.5.II.  (a)  Dr. Samuel Kopel, Oncologist.

Maimonides Cancer Center

6300 8th Avenue, Brooklyn NY 11220.

(b)  Approximately March 2007 - present.

(c)  Mesothelioma; see medical records.

(d)  See medical records.

(e)  Chemotherapy; see medical records;.

(f)  See medical records.


A.5.III.  (a)  Dr. James Butler, Radiologist.

Maimonides Cancer Center

6300 8th Avenue, Brooklyn NY 11220.

(b)  Approximately March 2007.

(c)  See medical records.

(d)  See medical records.

(e)  See medical records;

(f)  See medical records.


A.5.IV.  (a)  Dr. William Merritt, Physician.

Hamilton Medical Associates

369 93rd Street, Brooklyn, NY.

(b)  Approximately 1997 to present.

(c)  See medical records.

   (d) See medical records.

   (e) See medical records;.

   (f) See medical records.

A.5.IV. (a) Dr. Jacob Groopan, Pulmonary.

     953 49th Street, Suite 511, Brooklyn, NY 11219.

   (b) Approximately 2006 - present.

   (c) See medical records.

   (d) See medical records.

   (e) See medical records;.

   (f) See medical records.

A.5.V. (a) Dr. Daniel Zanger, Cardiologist.

     Cross County Medical, P.C.

     1262 Ocean Parkway, Brooklyn, NY 11230.

   (b) Approximately May 2006.

   (c) See medical records.

   (d) See medical records.

   (e) See medical records;.

   (f) See medical records.

A.5.VI. (a) Dr. Israel J. Jacobowitz, Cardiac Surgeon.

     Maimonides Medical Center

New York Cardiothorasic Surgeons, P.C.

984 50th Street, Brooklyn, NY 11219

(b)    Approximately May 2006.

(c)    Bypass surgery; see medical records.

(d)    See medical records.

(e)    See medical records;.

(f)    See medical records.


A.5.VI.   (a)    Dr. Harry Herr, Urologist.

Memorial Sloan-Kettering Hospital

633 Third Avenue, 11th Floor, New York, NY 10017.

(b)    Approximately 1998.

(c)    See medical records.

(d)    Prostate cancer; see medical records.

(e)    See medical records.

(f)    See medical records.


A.5.VI.   (a)    Dr. Lazlo Biro, Dermatologist.

Bay Ridge Skin and Cancer Center

9921 4th Avenue, Brooklyn, NY 11209

(b)    Approximately 2002.

(c)    See medical records.

(d)    Melanoma; see medical records.

(e) — See medical records;.

(f) See medical records.

6. For every hospital, clinic or health care institution in which you have ever been admitted, treated, tested, or examined, whether as an "in-patient" or as an "out- patient," please state the following for each such visit:

(a) name and address of the facility;

(b) dates and description of test, treatment, examination or hospitalization and, if ongoing, the approximate frequency of said treatment and services; and

(c) reason for visit to the facility.

A.6. At the present time, although it is possible that plaintiff may have been treated or examined in other hospitals and health institutions, plaintiff recalls the following:

A.6.I. (a) Maimonides Medical Center.

4802 Tenth Avenue, Brooklyn, NY 11219

(b) Approximately March 2006 to present

(c) Biopsy; see medical records.

A.6.II. (a) Memorial Sloan-Kettering Hospital

633 Third Avenue, 11th Floor, New York, NY 10017

(b) Approximately 1988

(c) Prostate cancer; see medical records.

A.6.III.     (a)     Victory Memorial Hospital

             699 92nd Street, Brooklyn, NY 11228.

             (b)     Approximately 1988

             (c)     Prostate cancer; see medical records.


7.     State each of your asbestos-related injuries and/or diseases, describe the nature of those symptoms that you contend are related to your asbestos-related condition(s), and state the date when you first experienced each such symptom and the date of diagnosis and the name of any diagnosing physician and, if different, indicate the date you first became aware of the diagnosis.


A.7.     Plaintiff has sustained a number of asbestos-related injuries, including, but not limited to mesothelioma, pain and suffering, mental and emotional distress, shortness of breath, coughing, weight loss, nausea, loss of appetite, difficulty breathing, chest pain, fatigue, respiratory discomfort and pain, sputum production and related sequelae.  As indicated in plaintiff's medical records, at various and numerous times, plaintiff has experienced a variety of different and differing symptoms related to his injuries, which are numerous and frequent. At this time, plaintiff is unable to state the precise date of the various symptoms might have first occurred. See medical records for date of diagnosis and name of diagnosing physician.

8.      Describe any pain, incapacity, inability to lead a normal life, inability to work, or disability (including retirement) alleged to have resulted from your medical conditions, including the date and basis therefore.

A.8.    Plaintiff has experienced shortness of breath, coughing, weight loss, loss of appetite, chest pain, respiratory discomfort and pain, difficulty breathing, and fatigue, among other things.  Plaintiff's asbestos-related condition has totally disrupted his life, totally limited him in his everyday activities, interfered with his living a normal life, caused him fear, emotional distress, pain, suffering, discomfort, and inconvenience.  His ability to do any tasks that require any physical exertion such as playing racquet ball, bowling, operating his consulting business, exercising, walking and everyday chores around the house has been extensively diminished.

9.      Have you ever had any biopsies or tissue samples taken?  If so, please state for each such procedure:

        (a)     the name of the physician performing such procedure;

        (b)     the address where such procedure was performed;

        (c)     the date when such procedure was performed; and

        (d)     the results, conclusions, and/or diagnosis arising from such procedure.

A.9.I.  (a)     Dr. Richard Lazzaro, Surgeon.

        (b)     Maimonides Medical Center.

4802 Tenth Avenue, Brooklyn, NY 11219.

    (c)    March 2007; see medical records.

    (d)    Mesothelioma.

10.    Have you ever had any chest x-rays, CT Scans and/or pulmonary function tests? If so, state:

    (a)    the dates and places;

    (b)    the reasons;

    (c)    the results and/or diagnosis resulting therefrom;

    (d)    the location of all chest X-ray films and CT Scans; and

    (e)    provide appropriate authorization to obtain all X-rays, CT Scans and pulmonary function tests.

A.10.I.    (a)    Plaintiff has had x-rays taken at Maimonides  Medical Center, but medical records may or may not reflect others.

    (b)    See medical records.

    (c)    See medical records.

    (d)    Chest x-ray films and CT Scans should be in the possession of the respective doctors and hospitals.

    (e)    Authorizations have been provided to RecordTrak.

11.    Have you ever been exposed to, used, inhaled or ingested any of the following substances on a regular basis or at work.  If so, state the date(s), place(s), and circumstances

thereof.

    (a)    acids

    (b)    aluminum

    (c)    arsenic

    (d)    barium

    (e)    beryllium

    (f)    butanol

    (g)    cadmium

    (h)    carborundum

    (i)    chloroethylene

    (j)    chlorine

    (k)    chromate

    (l)    chromite

    (m)    chromium

    (n)    coal dust (coal)

    (o)    coal tar

    (p)    cotton dust

    (q)    epoxy

    (r)    ethanol

    (s)    grinding dust

    (t)    iron

    (u)    isocyanates

(v)     isopropanol

(w)     lead

(x)     live chickens

(y)     manganese

(z)     nickel

(aa)    nitrogen dioxide

(ab)    nuclear radiation

(ac)    ozone

(ad)    petroleum distillates

(ae)    phosgene

(af)    radiation

(ag)    silica

(ah)    titanium

(ai)    toluene

(aj)    welding smoke or fumes

(ak)    zylene

(al)    zinc.

A.11.  Plaintiff was not exposed to the above substances on a regular basis.


12.     Do you use or have you ever used cigarettes, cigars, pipes, smokeless tobacco, or any other tobacco substance, from birth to the present time?  If so, state the following:

(a)    the brand and type of tobacco product(s) used (e.g., filter, non-filter, chewing tobacco);

(b)    the dates during which you used each such product;

(c)    the amount of the product used per day, during each period of time (e.g., 2 packs of cigarettes per day);

(d)    whether you have ever been told by a physician that you are or were suffering from any disease or illness caused by or contributed to by tobacco; and

(e)    whether you were ever advised by any physician or any other person that use of tobacco products could adversely affect your health and whether you were ever advised to stop using tobacco products, and if so, identify each physician or person who gave you any such advice, the dates on which the advice was given, and state exactly what, if anything, you did in response to that advice.

A.12.I.    Yes.

(a)    Chesterfield unfiltered.

(b)    1954 - 1955.

(c)    Less than 1 pack per day.

(d)    No.

(e)    No.

A.12.II.    Yes.

(a)    Kent filtered.

(b)    1954 - 1955.

(c)    Less than one pack per day.

(d)    No.

(e)    No.

13.    For each spouse and member of your household, from your birth to the present time, state whether they use or have ever used cigarettes, cigars, pipes, smokeless tobacco, or any other tobacco substance, and if so, state the following:

(a)    the brand and type of tobacco product(s) used (e.g., filter, non-filter, chewing tobacco); and

(b)    the dates during which they used each such product.

A.13.I.   Yes, father.

(a)    cigars.

(b)    Approximately birth to 1952.

14.    Do you presently consume or have you in the past consumed alcoholic beverages.  If so, state the following:

(a)    the type of alcoholic beverages consumed;

(b)    the dates during which you consumed each such alcoholic beverage;

(c)    the amount of such beverage you consumed each day; and

(d)    whether you have ever been treated for any illness or disease related to

your consumption of alcoholic beverages.

A.14.   Plaintiff may have had a beer or wine socially on occasion but not on a regular basis.

15.   Have you ever been a member of the Armed Forces of the United States?  If so, state the following:

      (a)   the branch of the service, serial number, and highest rank held;

      (b)   the beginning and ending dates of your military service;

      (c)   the type of discharge that you received; and

      (d)   whether you sustained any injuries or incurred any illness during military service.

      (e)   if you received a medical discharge, attach a copy hereto and set forth the medical reasons.

A1. 15.   Yes

      (a)   Army, Corporal; US51210816

      (b)   December 1952 - December 1954.

      (c)   Honorable.

      (d)   No.

      (e)   No.

16.   As to each and every employer (including military service) you have had from the time you were first employed to the present, set forth the following:

(Use attached Chart A)

Include on the Chart all employers where you have worked, and all job sites, regardless of whether or not you believe you were exposed to asbestos during the employment. Also, include the source of any product identification information provided on Chart A.

A. 16.  See Chart A.

17.    Please state the following with respect to each asbestos-containing product identified on Chart A:

(a)    the color, dimensions, shape, form, texture, weight, appearance and flexibility of each product;

(b)    the appearance of the package or container indicating the manner of packaging, size, dimensions, color and weight; and

(c)    the name, logo, label, numerical and alphabetical markings and other markings or words including warnings on the product and package or container.

A. 17.  (a)    The asbestos-containing products identified in Chart A were varied in color, dimension, shape, form, texture, weight, appearance and/or flexibility. Further information may be provided in response to questioning at deposition.

(b)    To the extent that the asbestos-containing products identified in Chart A came packaged, such packaging varied in appearance, size, dimension, color and/or weight. Further information may be provided in response to questioning at deposition.

(c)    To the extent that the asbestos-containing products identified in Chart A

came packaged, such packaging may have contained various markings including the manufacturer or trade name of the product. In addition, the product itself may have also contained various markings. Plaintiff never personally observed any warnings about asbestos on product packaging or on the asbestos-containing products themselves.  Further information may be provided in response to questioning at deposition.

18.     If you have retired from your employment, set forth the following:

    (a)     whether said retirement was voluntary or involuntary;

    (b)     the effective date of said retirement;

    (c)     the name of your employer at the time of retirement;

    (d)     the reason for your retirement;

    (e)     whether your retirement was related to any claimed asbestos-related injury; and

    (f)     the amount of pension and/or retirement benefits you are receiving or entitled to receive.

A.18.I (a)     Voluntary.

    (b)     1998.

    (c)     MTA, New York City Transit.

    (d)     Retirement eligibility.

    (e)     No.

    (f)     Approximately $11,000.00 per year.

19.     State whether you were exposed (either directly, through a co-worker or otherwise), to any Bankrupt Entity's asbestos-containing materials, or products either mined or manufactured, sold, or distributed by a Bankrupt Entity. If so, state the following:

    (a)     As to each and every employer (including military service) you have had from the time you were first employed to the present, set forth the following, concerning Bankrupt Entities' products only:

        i.      Name of Employer;

        ii.     Dates of employment;

        iii.    Asbestos-related job site and address where Bankrupt Entity's products were being used;

        iv.     Dates you were at the job site;

        v.      Job duties at the particular job site;

        vi.     Bankrupt Entity's asbestos-containing materials or products to which you were exposed.

        vii.    Other companies using Bankrupt Entity's asbestos-containing materials or products at the jobsite; and

        viii.   Whether you received any warnings with respect to the use of said product and the nature of those warnings.

    (b)     If you were exposed to, used, ingested or inhaled any Bankrupt Entity's Asbestos-Containing Products at any time other than in the scope of your employment, state for each such exposure:

        i.      the date, location and circumstances; and

      ii.     the type of product and the name of the manufacturer, distributor, and miner.

A.19.  Subject to the foregoing general objection, plaintiff responds as follows:

      See plaintiff's attached "Chart A"

20.   If you were exposed to, used, ingested or inhaled asbestos or asbestos-containing products at any time other than in the scope of your employment, state for each such exposure:

      (a)    the date, location and circumstances; and

      (b)    the type of product and the name of the manufacturer, distributor, and miner.

A.20.  Plaintiff does not recall being exposed to asbestos or asbestos containing products outside the scope of his employment.

21.   Have you ever been a member of any labor union? If so, state:

      (a)    the name and address of each local, national and international labor union;

      (b)    the inclusive dates of your membership; and

      (c)    any positions you have held with each such labor union, and the dates during which you held such  positions.

A.21.  No.

22.    State whether you have ever seen or received any information, instruction, direction, warning, or directive, from any source whatsoever, concerning alleged dangers of exposure to asbestos or asbestos-containing products, and if so, identify:

      (a)    each such warning, directive, notification, direction, instruction, or information;

      (b)    the means by which such was given to you;

      (c)    the source and the date on which it was received by you; and

      (d)    your response or reaction, including any complaints made or changes in work habits.

A.22.  No.

      (a)    Warned of dangers of exposure to asbestos and paper masks were made available.

      (b)    Safety meeting.

      (c)    Approximately 1989; Supervisor.

      (d)    Wore paper masks.

23.    State whether you had available for use during any period of your employment, respirators or masks or other dust inhalation inhibitor, or protective gear and, if so, state the following:

(a)     the period of time during which said items were available;

(b)     what instructions were given with regard to the use of each of said items;

(c)     whether you used said items and the dates of your use;

(d)     whether you ever requested said items, and, if so, when, where and to whom

the request was made, and the response to the request.

A.23.   No masks were available.


24..    If you are making a claim for loss of earnings or impairment of earning power

because of your medical conditions, state the following:

(a)     date of commencement of any loss or impairment;

(b)     the name and address of your employer, your job title and your monthly

or weekly rate of pay at the time of the alleged commencement of any loss or impairment;

(c)     if you had more than one employer during the three year period prior to

the date of the commencement of any loss or impairment, as indicated on Chart A, provide

your monthly or weekly rate of pay and inclusive dates of such employment during the three

year period;

(d)     your total earnings for the period of three years prior to the

commencement of any loss or impairment;

(e)     the inclusive dates during which you allege that you were unable to work

as a result of any loss or impairment and the total amount of pay you claim you lost because of

this absence;

(f)    the date on which any loss or impairment ended; and

(g)    your monthly or weekly rate of pay which you have received, from the date of any loss or impairment ended through the present time.

A.24.  Plaintiff does not assert a claim for loss earnings at this time.

25.    Do you claim damages for loss of consortium, society, affection, services, or sexual enjoyment?  If so, please set forth in complete detail all facts on which this claim is based, including a complete description of the loss suffered.

A.25.  Plaintiff's spouse, Phyllis Gitto, does assert a claim for loss of consortium, society, affection, services, and sexual enjoyment. This claim is based upon the deleterious effect of asbestos exposure on the health and well being of Salvatore Gitto and its effect on his ability to provide companionship, love, affection, and services to his wife.

26.    For each person who is or was partially or totally dependent upon you for financial support and assistance during the last ten years, state:

(a) the name, address, sex, age  and  relationship; and

(b)  the amounts you contributed during the last ten years for support and assistance.

A.26I

(a).    Phyllis Gitto, 324 95th Street, Brooklyn NY 11209; female, 73yrs. old;

LEVY PHILLIPS &
ONIGSBERG, L.L.P.
800 THIRD AVENUE
EW YORK, N.Y. 10022

wife;

(b)     Total Support.


27.     State, in the form of an itemized list, all special damages alleged in this lawsuit including, but not limited to, hospital charges, medical charges, medicines, lost wages, etc., naming the person or organization to whom each item of expense was paid or is due, and, if paid, by whom each item of expense was paid.


A.27.   To be provided.


28.     Identify and give the substance of all written statements, recordings, or videotapes which relate to the facts of this lawsuit and the damages you claim given by plaintiff or any witness (provided such information is in plaintiff's possession, custody or control and/or such statements, recordings or videotapes are not protected by the attorney-client privilege) in the above-captioned matter.


A. 28.   None.


29.     Have you ever made any claim for, or received any, health or accident insurance benefits, social security benefits, state or federal benefits for disabilities, workers' compensation benefits, veterans' benefits, tort claims or suits, Federal Employers Liability Act claims or suits, Longshoremen and Harbor Workers Act claims or suits, unemployment compensation insurance benefits, or early payment from any public or private pensions due to

disability or your medical condition?  If so, state the following:

      (a)    the date and place where each such claim was made;

      (b)    the name and nature of the entity with which the claim was made;

      (c)    any identifying number, such as a docket or petition number, for each claim;

      (d)    the defendant, agency, insurer, employer or other entity to or against whom the claim was made and its file number;

      (e)    the nature of the claim;

      (f)    whether you were examined by a physician and if so, the name and address of that physician;

      (g)    the result of such claim, including the amount realized by way of settlement, judgment or award upon the claim;

      (h)    the name and address of any attorney who represented you with regard to such claims; and

      (i)    whether you are presently receiving such benefits.


A.29.I. (a)    1997; Brooklyn, NY.

      (b)    Social Security Benefit Office.

      (c)    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.

      (d)    Social Security Administration.

      (e)    Social Security.

      (f)    No.

    (g)    $569.00 monthly.

    (h)    Not applicable.

    (i)    Yes.


30.    State the following with regard to your asbestos-related legal action:

    (a)    Did you file an asbestos-related claim in more than one (1) jurisdiction;

    (b)    Identify all of the jurisdiction(s) where an asbestos-related claim has been filed (whether or not these claims have been dismissed or discontinued or otherwise resolved) on your behalf;

    (c)    Did you file your asbestos-related claim(s) under more than one (1) Index Number; and

    (d)    Provide all of the Index Numbers for all of your asbestos-related claim(s), including all multiple Index Numbers for Claims filed in New York County.


A.30.    Subject to the foregoing general objection, plaintiff responds as follows:

    (a)    No.

    (b)    New York County.

    (c)    No.

    (d)    Index # 07/105033 .


31.    State whether or not you have made, filed, or submitted a Claim Against Bankrupt

00091612.WPD

30

Entity or received funds in settled from a Bankrupt Entity. If so, for each claim state the following:

(a) the date and place where each such claim was made;

(b) the name and nature of the entity with which the claim was made;

(c) any identifying number, such as a docket or petition number, for each claim;

(d) the defendant, agency, insurer, employer or other entity to or against whom the claim was made and its file number;

(e) the nature of the claim;

(f) whether you were examined by a physician and if so, the name and address of that physician; and

(g) whether you received any compensation as a result of such claim, but not the amount.

A.31.    Subject to the foregoing general objection, plaintiff responds as follows: No.

32.    State whether you have applied to any Bankrupt Entity or Bankruptcy Court to lift the stay as to your claim or otherwise have attempted to join a Bankrupt Entity to this action.

A.32    Subject to the foregoing general objection, plaintiff responds as follows:

31

As of the present time, plaintiff has neither applied to any Bankrupt Entity or Bankruptcy Court to lift the stay nor otherwise attempted to join a Bankrupt Entity to this action because any such action would be contrary to federal law which provides that plaintiff is barred from proceeding against any Bankrupt Entities in this action. Further, any such action would force the Bankrupt Estate or Settlement Trust to unnecessarily incur litigation costs, thereby causing an unnecessary drain on trust assets that are designed to benefit asbestos victims.

33.　Have you or your spouse ever been a party to or a witness in any lawsuit, court or administrative proceeding?  If so, please state:

　　　(a)　whether you or your spouse were a party or witness and if party, whether plaintiff or defendant;

　　　(b)　the precise name of the lawsuit or proceeding, the court agency in which it was brought and the docket number;

　　　(c)　the nature of the charges or claims and, if you or your spouse were a witness, the subject matter of the testimony; and

　　　(d)　the disposition of the case.

A.33.　Yes.

　　　(a)　Wife plaintiff, husband witness.

　　　(b)　Gitto v. The Town of East Hampton; Supreme Court of Suffolk County, Index No.: 28044/99.

(c)    Slip and fall; witness to incident.

(d)    Settled.

34.    Have you or your spouse filed a claim seeking compensation for any alleged asbestos-related condition from any entity, including settlement trusts?  Specify "Yes" or "No" only.

A.34.  Other than the present lawsuit, no.

35.    Identify all entities, whether or not parties to this lawsuit, with whom you have settled or agreed to settle this lawsuit.

A. 35.  Settlements are ongoing. A list will be provided of all defendants not dismissed by Summary Judgement or otherwise immediately prior to trial.

36    Identify all persons, other than your attorneys, who provided you with any information used in answering these interrogatories, and state the particular information each person supplied.

A.36.  Myself.

00091612.WPD

## REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to paragraph 19 of the CMO, the defendants request that plaintiffs produce for inspection and copying, the documents and things identified below.  The documents and things identified herein shall be produced for inspection and copying at such time as the answers to the interrogatories herein are filed.

You are hereby requested to produce the following documents and things:

1.      All documents identified in your answers to these interrogatories.

R.1.    Such documents will be produced, to the extent required by the relevant rules.

2.      All documents relating to the plaintiff's job qualifications and professional licenses held.

R.2.    If any such documents are located in plaintiff's possession, they will be produced.

3.      All documents relating to the plaintiff's membership in any labor trade association or professional organization.

R.3.    Not applicable.

4.      All documents relating to the plaintiff's military or foreign service, including and not limited to, personnel records, discharge papers, military occupational specialty qualifications, promotions, reductions or disciplinary actions.

R.4.    Authorizations have been provided to Recordtrak, 651 Allendale Road, King of Prussia, PA 19406.

5.      All documents relating to any claim or demand ever made by the plaintiff for damages, compensation or other benefits allegedly resulting from any illness or injury,

including but not limited to, Industrial Accident Board records, social security disability claim records, federal or state employment compensation claim records, social disability records, pension claim record or any other health or accident insurance claim records.

R.5.    To be provided if located.

6.    All documents in plaintiff's possession, custody or control relating in any way to the plaintiff's exposure or possible exposure to asbestos, asbestos-containing products and/or asbestos-containing materials.

R.6.    At this time, plaintiff has no such documents in his personal possession.

7.    All documents in plaintiff's possession, custody or control relating in any way to the plaintiff's exposure or possible exposure to silica, acids, beryllium, nuclear radiation, ammonia, cadmium, chlorine, chromate, phosgene, grinding dust, coal dust, cotton dust, nickel, welding smoke or fumes.

R.7.    At this time, plaintiff has no such documents in his personal possession.

8.    All documents, of which you have ever become aware, relating in any way to warnings, potential health hazards, instructions or precautions regarding the use or handling of, or exposure to, asbestos, asbestos-containing products,  and/or asbestos-containing materials.

R.8.    At this time, plaintiff has no such documents in his personal possession.

9.    All applications prepared or submitted by or on behalf of the plaintiff for life insurance, medical insurance, health and accident insurance, and/or disability insurance.

R.9.    At this time, plaintiff has no such documents in his personal possession.

10.    All statements, recorded interviews, films, videotapes, reports, questionnaires, forms or other documents made, submitted, compiled, prepared or filled out by, on behalf of,

or under the direction of, plaintiff relating in any way to exposure or alleged exposure to asbestos, asbestos-containing products and/or asbestos-containing materials or any other issues relating to this lawsuit except that information prepared by, for, or at the request of plaintiff's counsel must be identified (including the date made), but need not be produced without an order by the Court, provided that written or recorded communication between plaintiff and counsel, made after an attorney-client relationship has been established, and attorney work product, need not be produced or identified.

R.10.   Objection.  Attorney/client privilege; work product privilege.

11.    All records in plaintiff's possession, custody or control relating to comments, complaints, suggestions, or proposals made to your employer or your union, by yourself or by other employees or union members regarding asbestos exposure.

R.11.   At this time, plaintiff has no such documents in his personal possession.

12.    All written, recorded, filmed, transcribed or videotaped statements of all parties and non-party declarants pertaining to the subject of this lawsuit, except that information prepared by, for, or at the request of plaintiff's counsel must be identified (including the date made), but need not be produced without an order by the Court, provided that written or recorded communication between plaintiff and counsel made after an attorney-client relationship has been established and attorney work product need not be produced or identified.

R.12.   Objection.  Attorney/client privilege; work product privilege.

13.    All photographs of the plaintiff at work or in work clothes and all photographs of all products or conditions complained of in the plaintiff's place of employment.

R.13.   At this time, plaintiff has no such photographs in his personal possession.

14.     Copies of all itemized bills covering all the special damages and losses and expenses claimed in this matter.

R.14.   See A.27.  Bills to be provided if located.

15.     Copies of all reports, correspondence and records from any doctor who has examined the plaintiff, any hospital where the plaintiff has been treated either as an inpatient or as an outpatient, except for any reports, records, correspondence, or communications issued by any consulting physicians who have been retained or specially employed in anticipation of litigation or preparation for trial and who are not expected to be called as a witness at trial.

R.15.   Medical authorizations have been provided to RecordTrak, 651 Allendale Road, King of Prussia, PA 19406.

16.     All tissue specimens, tissue slides, and x-ray films and CT scans pertaining to the plaintiff.

R.16.   See Answer R.15.

17.     Copies of plaintiff's income tax returns for the last ten years of plaintiff's employment and up to the current year as well as any other documents, including economic loss reports, upon which plaintiff relies in support of his claims.  If loss of earnings or earning capacity is alleged or claimed to have occurred before the current year, include copies of the income tax returns of the plaintiff from ten years prior to the claimed loss and up to the current tax year.

R.17.   Authorizations have been provided to RecordTrak, 651 Allendale Road, King of Prussia, PA 19406.

18.     Any asbestos and/or asbestos-containing products or product packaging of the

type to which the plaintiff alleges exposure and which the plaintiff has in his possession, custody or control.

R.18.   At this time, plaintiff has no such products in his personal possession.

19.     All photographs, charts, drawing, diagrams or other graphic representations depicting work conditions at work sites where the plaintiff claims the plaintiff was exposed to asbestos or asbestos-containing products.

R.19.   To be produced if located.

20.     All invoices, bills, statements and any other writings or records which the plaintiff contends evidence the sale of any products containing asbestos to the place of the plaintiff's employment at which plaintiff claims that plaintiff was exposed to asbestos.  This does not include documents in the possession, custody or control of plaintiff's attorney unless such documents were provided by plaintiff to his/her attorney and are not privileged.

R.20.   At this time, plaintiff has no such documents in his personal possession.

21.  Any written advice, publication, warning, order, directive, requirement, or recommendation, which advised or warned of the possible harmful effects of exposure to or inhalation of asbestos or asbestos-containing products in the products in the possession, custody or control of the plaintiff.

R.21.   Objection.  Work product, over-broad, unduly burdensome and irrelevant. Subject to this objection, appropriate exhibit and witness lists will be provided at the appropriate time.

22.     Any accident or incident reports which relate to the facts, circumstances or incidents which form the basis of plaintiff's complaint.

00091612.WPD                                    38

R.22.   At this time, plaintiff has no such documents in his personal possession.


Dated:          New York, New York
                May 4, 2007

                                LEVY PHILLIPS & KONIGSBERG, L.L.P.

                                Carmen Victoria St. George, Esq.
                                *Attorneys for Plaintiffs*
                                800 Third Avenue, 13th Floor
                                New York, NY  10022
                                (212) 605-6200

CHART A
JOBSITE-SPECIFIC EXPOSURE HISTORY

re: Salvatore Gitto

| Name of Employer | Dates of Employment | Asbestos Related Jobsite & Address | Dates You Were at Jobsite | Job Duties | ACM[1] Used Personally | Other ACM to Which You Were Exposed[2] | Other Workers on Jobsite including supervisor | ACM identified by Such other workers | Other companies Using ACM at Jobsite |
|---|---|---|---|---|---|---|---|---|---|
| Textile High School, New York, NY | 6/1950 - 4/1951 | Factory | 6/1950 - 4/1951 | Assembly-man | No known asbestos exposure at this time | No known asbestos exposure at this time | | | |

00091790.WPD

CHART A
JOBSITE-SPECIFIC EXPOSURE HISTORY

re: Salvatore Gitto

| Name of Employer | Dates of Employment | Asbestos Related Jobsite & Address | Dates You Were at Jobsite | Job Duties | ACM[1] Used Personally | Other ACM to Which You Were Exposed[2] | Other Workers on Jobsite including supervisor | ACM identified by Such other workers | Other companies Using ACM at Jobsite |
|---|---|---|---|---|---|---|---|---|---|
| United States Navy | 1951 - 1952 | Brooklyn Navy Yard<br><br>ships:<br><br>USS Hornet<br><br>USS Constellation<br><br>USS Wasp<br><br>USS Bennington<br><br>USS Independence<br><br>NJ Battleship<br><br>USS Saratoga<br><br>USS Vancouver<br><br>USS Ticonderoga | 1951 - 1952 | Apprentice | At this time plaintiff believes he handled and/or worked with various types of asbestos-containing materials.<br><br>At this time plaintiff believes that he handled and/or worked with asbestos contained in and/or covering boilers, pumps, valves, motors, compressors, condensers, turbines, engines, generators, welding rods wand other like equipment.<br><br>Plaintiff cannot presently identify all of the manufacturers of such products but states that he would have handled and/or worked with all such materials manufactured during the periods he was employed and used at his job sites.<br><br>Plaintiff will further rely upon the testimony of co-workers and other evidence demonstrating the presence of various manufacturers of such material. | At this time plaintiff believes he was exposed to various types of asbestos-containing materials<br><br>At this time plaintiff believes that he handled and/or worked with asbestos contained in and/or covering boilers, pumps, valves, motors, compressors, condensers, turbines, engines, generators, welding rods wand other like equipment.<br><br>Plaintiff cannot presently identify all of the manufacturers of such products but states that he would have been exposed to all such materials manufactured during the periods he was employed and used at his job sites.<br><br>Plaintiff will further rely upon the testimony of co-workers and other evidence demonstrating the presence of various manufacturers' products at various sites. and other like products. | | | |

00091790.WPD

CHART A
JOBSITE-SPECIFIC EXPOSURE HISTORY

re: Salvatore Gitto

| Name of Employer | Dates of Employment | Asbestos Related Jobsite & Address | Dates You Were at Jobsite | Job Duties | ACM[1] Used Personally | Other ACM to Which You Were Exposed[2] | Other Workers on Jobsite including supervisor | ACM identified by Such other workers | Other companies Using ACM at Jobsite |
|---|---|---|---|---|---|---|---|---|---|
| United States Navy Cont'd | | USS Franklin D. Roosevelt<br><br>USS Iowa<br><br>USS Lexington<br><br>USS Oriskany<br><br>USS Missouri<br><br>USS Raleigh | | | Plaintiff recalls the following:<br><br>Boilers:<br>Babcock & Wilcox<br><br>Turbines:<br>General Electric, Westinghouse<br><br>Equipment (motors, valves, cylinders):<br>Vickers (Eaton Hydraulics)<br><br>Compressors:<br>Carrier<br>Ingersoll-Rand<br><br>Pumps:<br>Vickers (Eaton Hydraulics), Ingersoll-Rand, Peerless, Worthington<br><br>Reduction Gears:<br>General Electric, Westinghouse | Plaintiff recalls the following:<br><br>Boilers:<br>Babcock & Wilcox<br><br>Turbines:<br>General Electric, Westinghouse<br><br>Equipment (motors, valves, cylinders):<br>Vickers (Eaton Hydraulics)<br><br>Compressors:<br>Carrier<br>Ingersoll-Rand<br><br>Pumps:<br>Vickers (Eaton Hydraulics), Ingersoll-Rand, Peerless, Worthington<br><br>Reduction Gears:<br>General Electric, Westinghouse | | | |
| U.S. Army | 1952 - 1954 | Ft. Sammorson, TX | 1952 - 1954 | Apprentice X-Ray Technician | No known asbestos exposure at this time | No known asbestos exposure at this time | | | |

00091790.WPD

CHART A
JOBSITE-SPECIFIC EXPOSURE HISTORY

re: Salvatore Gitto

| Name of Employer | Dates of Employment | Asbestos Related Jobsite & Address | Dates You Were at Jobsite | Job Duties | ACM[1] Used Personally | Other ACM to Which You Were Exposed[2] | Other Workers on Jobsite including supervisor | ACM identified by Such other workers | Other companies Using ACM at Jobsite |
|---|---|---|---|---|---|---|---|---|---|
| United States Navy | 1954 - 1965 | Brooklyn Navy Yard | 1954 - 1965 | Mechanic/ Shipbuilding Inspector | See above U.S. Navy | See above U.S. Navy | Marty Cohen  Bill Wubbe  Joe Bonjiorno  Rocky Anacono | | |
| United States Navy, Grumman, Long Island, NY | 1966 - 1988 | Grumman | 1966 - 1988 | Inspector/ Manager/ Quality Assurance | No known asbestos exposure at this time | No known asbestos exposure at this time | | | |
| MTA New York City Transit | 1988 - 1998 | Various field construction sites  Various Subways  Powerhouses  Jamaica Yard | 1988 - 1998 | Manager/ Quality Assurance | No known asbestos exposure at this time | No known asbestos exposure at this time | | | |
| Self Employed SJG Enterprise | 1998 - 2007 | | 1998 - 2007 | Business Consultant | No known asbestos exposure at this time | No known asbestos exposure at this time | | | |

1.   ACM - Asbestos Containing Materials of Products.

2.   Identify brand and manufacturer names, if known.



# MAIMONIDES MEDICAL CENTER
Department of Pathology
4802 Tenth Avenue
Brooklyn, NY 11219
Tel: 718-283-8257 Fax: 718-283-6655

## SURGICAL PATHOLOGY REPORT

| | | | |
|---|---|---|---|
| **Patient Name:** | GITTO, SALVATORE | **Accession #:** | S07-3341 |
| **Med. Rec. #:** | 30131098 | **Account #:** | 100400310433 |
| **DOB/Age:** | 11/5/1932 (Age: 74) | **Location:** | GBW |
| **Sex** | M | **Ordering Dr:** | LAZZARO,RICHARD |
| **Collection Date/Time:** | 3/12/2007 08:55 | **Attending Dr:** | LAZZARO,RICHARD |
| **Received Date/Time:** | 3/12/2007 08:55 | **Copy To:** | KOPEL,SAMUEL |

**Clinical History**
Pleural effusion, exposure to asbestos

**Specimen(s) Received**
1. Soft Tissue Mass, Biopsy
2. Soft Tissue Mass, Biopsy
3. Soft Tissue Tumor, Extensive Resection

## Pathologic Diagnosis
1. SOFT TISSUE, "INTRAMUSCULAR", LEFT CHEST, BIOPSY:
   Malignant epithelioid mesothelioma, see note.
   The tumor measures 2.5 cm in largest dimension, involving fibromuscular tissue.

2. SOFT TISSUE, DESIGNATED "ADHERING TO THE 8TH RIB", BIOPSY:
   Malignant epithelioid mesothelioma.

3. SOFT TISSUE, CHEST WALL, DESIGNATED "INTRAMUSCULAR", EXCISIONAL BIOPSY:
   Malignant epithelioid mesothelioma, 3.5 cm in largest dimension,
   Inked soft tissue resection margin are negative, tumor is 0.1 cm away from the margin.

Note:
Immunohistochemical analysis revealed that the tumor cells are positive for calretinin, AE 1/AE 3, thrombomodulin, and negative for TTF-1. This immuno-profile supports the diagnosis of mesothelioma.

Intradepartmental review.
Discussed with Drs. Kopel and Lazzaro.

dyy/3/15/2007

Pathologist: Yin, Diana Yongmei MD.
This is to certify that the pathologist whose name appears above reviewed the gross findings, read the slides, if any, and rendered the final diagnosis.
***Electronically Signed By***
Yin, Diana Yongmei MD
3/29/2007 12:09

## Intraoperative Consult Diagnosis
1. soft tissue tumor (intramuscular) , excision:spindle cell tumor with focal squamous differentiation, favor squamous carcinoma
2. soft tissue tumor adherent to 8th rib excision:spindle cell tumor with focal squamous differentiation, favors squamous carcinoma
frozen section diagnosis rendered by Dr. Huang . on March 12, 2007

**CPT Code(s):**   1: 88307
   1,2: 88331(2)
   2: 88307
   3: 88309

GITTO, SALVATORE          SURGICAL PATHOLOGY REPORT          S07-3341

## Gross Description

1. Received fresh designated "Soft Tissue Tumor (Intramuscular)" is a portion of soft tissue measuring 2.5 x 1.5 x 1.0 cm. The margins are inked. On section is grey tan and firm. Representative sections are submitted in three cassettes as follows; FA-frozen section, B-C-remaining tissue.

2. Received fresh designated "Soft Tissue Tumor, Adherent to 8th Rib" is a fragment of tan soft tissue measuring 1 x 0.4 x 0.2 cm entire. Entire specimen is submitted in one cassette as frozen section.

3. Received fresh designated "Chest Wall Tumor (intramuscular)" is a fragment of soft tissue with fascia and muscle s, measuring 5.5 x 2.0 x 1.0cm. The margins are inked. On sectioning, it shows a tan white, nodular and firm tumor mass measuring 4.5 cm in greatest dimension. It is very close to one of the inked margins. Representative sections are submitted in five cassettes.

pa/3/12/2007                                          Khanum, Zubaida

**Previous Case Number(s):**
S06-6558
C06-450

**Procedures/Addenda**
Immunohistochemistry

Completed by: Harris Suellen

**Results-Comments**

### IMMUNOHISTOCHEMISTRY ANALYSIS

| Antibody/Tests | Marker For | Results |
|---|---|---|
| AE-1/AE-3 | Keratins: 40, 48, 50, 52, 54, 56.5, 58, 59, 64, 65, 67 | Positive |
| Ber-EP4 | Epithelial Antigen, Adenocarcinomas | Negative |
| CALRETININ | Ca-Binding Protein, Mesothelial Cells, Sex Cord Stromal Tumor | Positive |
| MOC-31 | Epithelial Cells, Adenocarcinoma | Focally Positive (Weak) |
| WT-1 | Mesothelial & Mullerian Tumors, DSRCT | Negative |
| CEA(P) | Carcinoembryonic Antigen (Polyclonal), Adenocarcinomas | negative |
| TTF-1 | Thyroid Transcription Factor-1, Lung & Thyroid Carcinomas | Negative |
| DESMIN | Muscle, Desmoplastic Small Round Cell Tumor | Negative |
| P53 | Prostatic basal cells, breast, myoepithelial cells, squamous Carcinoma | Rare cell positive |
| CAM5.2 | Keratin: 39, 43, 48, 50, 50.5 kD | Positive |
| THROMBOMODULIN | Mesothelioma, Mesothelial Cells | Positive |
| CK7 | Keratins: 54 kD, Subst of Carcinomas (OV-TL 12/30) | Positive |
| CK20 | Keratin: 39, 43, 48, 50, 50.5 kD | Negative |
| B72.3 | Simple Epithelial Adenocarcinoma | Negative |

## Immunohistochemistry analysis performed by Genzyme Laboratories

Pathologist: Yin, Diana Yongmei MD
*** Electronically Signed By ***
Yin, Diana Yongmei MD
3/29/2007 12:12

GITTO, SALVATORE          SURGICAL PATHOLOGY REPORT          S07-3341

## AFFIDAVIT OF SERVICE BY MAIL

STATE OF NEW YORK   )
                            )ss.:

COUNTY OF NEW YORK  )

      CORRINNE DONALDSON, being duly sworn deposes and says she is an employee of Levy Phillips & Konigsberg, L.L.P., the attorneys for the plaintiffs herein, that she is over the age of eighteen and is not a party to the within action.  That on the 4th day of May, 2007 a copy of Plaintiff's **Answers To Defendant's Fourth Amended Standard Set Of Interrogatories And Request for Production Of Documents** on behalf of **Salvatore Gitto** was caused to be mailed postage prepaid to:

Julie Evans, Esq.
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER, LLP
150 East 42nd Street
New York, New York 10017
*Attorneys for Defendants A.W. Chesterton, Co., Inc.*

Genevieve MacSteel, Esq.
MCGUIREWOODS
1345 Avenue of the Americas, 7thFloor
New York, New York 10105
*Attorneys for American Standard Inc.*

David M. Katzenstein, Esq.
MCGIVNEY & KLUGER, P.C.
80 Broad Street, 23rd Floor
New York, NY 10024
*Attorneys for Aurora Pump Company*

Edward J. Wilbraham Esq./
John S. Howarth, Esq.
WILBRAHAM, LAWLER & BUBA
1818 Market Street
Philadelphia, PA 19103
*Attorneys for Buffalo Pumps, Inc.*

Frank A. Cecere, Esq.
AHMUTY DEMERS & McMANUS
200 I.U. Willets Road
Albertson, New York 11507
*Attorneys for Carrier Corp.*

Michael Waller, Esq
KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP
One Newark Center, Tenth Floor
Newark, NJ 07102
*Attorneys for Crane Co.  and Crane Pumps & Systems, Inc.*

Peter Lagenus, Esq.
SCHNADER, HARRISON, SEGAL & LEWIS
140 Broadway, Suite 3100
New York, New York 10005
*Attorneys for Dunham-Bush, Inc. n/k/a Fort Kent Holdings, Inc.*

William Mueller, Esq.
CLEMENTE MUELLER & TOBIA, P.A.
P.O. Box 1296
Morristown, New Jersey 07962
*Attorneys for Durabla Manufacturing Co.*

Donald Fay, Esq.
WATERS McPHERSON McNEIL
233 Broadway, Suite 970
New York, NY 10279
*Attorneys for Elliot Turbomachinery Co.*

John A. Turlik, Esq.
SEGAL McCAMBRIDGE SINGER &
MAHONEY, LTD.
830 Third Avenue, Suite 400
New York, New York 10022
*Attorneys for Fairbanks Morse Pumps*

00092691.WPD

Christopher Hannan, Esq.
KELLEY JASONS MCGOWAN
SPINELLI & HANNA, LLP
120 Wall Street, 30th Floor
New York, NY 10005
*Attorneys for FMC Corporation*

Erich Gleber, Esq.
SEGAL McCAMBRIDGE
SINGER & MAHONEY
830 Third Avenue, Suite 400
New York, NY 10022
*Attorneys for Flowerserve Corporation*

Michael A. Tanenbaum, Esq.
SEDGWICK, DETERT,
MORAN & ARNOLD LLP
Three Gateway Center, 12th Floor
Newark, NJ 07102
*Attorneys for Foster Wheeler Energy Corp.*

Robert J. Kenney, Esq.
SEGAL McCAMBRIDGE
SINGER&MAHONEY, LTD.
830 Third Avenue, Suite 400
New York, New York 10022
*Attorneys for Gardner Denver*

John A. Turlik, Esq.
SEGAL McCAMBRIDGE
SINGER&MAHONEY, LTD.
830 Third Avenue, Suite 400
New York, New York 10022
*Attorneys for Garlock Sealing Technologies*

Diane Pompei, Esq.
SEDGWICK, DETERT,
MORAN & ARNOLD LLP
Three Gateway Center, 12th Floor
Newark, NJ 07102
*Attorneys for General Electric Company*

Suzanne Halbardier, Esq.
BARRY McTIERNAN & MOORE
2 Rector Street, 14th Floor
New York, New York 10006
*Attorneys for General Refractories*

John Fanning, Esq.
CULLEN & DYKMAN LLP
177 Montague Street
Brooklyn, New York 11201
*Attorneys for Goulds Pumps Inc.*

Jeff Kluger, Esq./ Joan Gaisor, Esq.
McGIVNEY & KLUGER , P.C.
80 Broad Street, 23rd Floor
New York, New York 10004
*Attorneys for Hercules Chemical Co., Inc.*

Jennifer Darger, Esq.
DARGER & ERRANTE, LLP
116 E.27th Street, 12th Floor
New York, NY 10016
*Attorneys for Hopeman*

John Fanning, Esq.
CULLEN & DYKMAN LLP
177 Montague Street
Brooklyn, New York 11201
*Attorneys for Howden Buffalo, Inc.*

Lawrence G. Cetrulo, Esq./
Christopher A. D. Hunt, Esq.
CETRULO & CAPONE LLP
20 Excchange Place
New York, NY 10005
*Attorneys for Howden Buffalo, Inc.*

Joseph Colao, Esq.
LEADER & BERKON
630 Third Avenue, 17th Floor
New York, New York 10017
*Attorneys for IMO*

Lisa M. Pascarella, Esq.
PEHLIVAN, BRAATEN
& PASCARELLA, L.L.C.
Paytner's Ridge Office Park
2430 Route 34
Manasquan, NJ 08736
*Attorneys for Ingersoll-Rand Company*

Robert C. Malaby, Esq.
MALABY, CARLISLE & BRADLEY, LLC
150 Broadway, Suite 600
New York, New York 10038
*Attorneys for JH France Refractories Co.*

Mark S. Gaffrey, Esq.
HOAGLAND LONGO MORAN
DUNST & DOUKAS
40 Patterson Street
P.O. Box 480
New Brunswick, New Jersey 08903
*Attorneys for Johnston Boilers Co.*

John J. Fanning, Esq.
CULLEN & DYKMAN, LLP
177 Montague Street
Brooklyn, NY 11201
*Attorneys for Leslie Controls, Inc.*

Julie Evans, Esq.
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER, LLP
150 East 42nd Street
New York, New York 10017
*Attorneys for Murphy Brothers Works*

Timothy J. McHugh, Esq.
LAVIN, O'NEIL, RICCI,
CEDRONE & DISIPIO
420 Lexington Ave, Suite 2900
Graybar Building
New York, NY 10170
*Attorneys for Otis Elevator Co,*

Arthur D. Bromberg, Esq.
WEINER LESNIAK, LLP
629 Parsippany Road
PO Box 0438
Parsippany, NJ 70754-0438
*Attorneys for Peerles Industrie, Inc.*

Stephen A. Manuele, Esq.
FELDMAN KIEFFER & HERMAN, LLP
The Dun Building
110 Pearl Street, Suite 400
Buffalo, New York 14202
*Attorneys for Quaker Chemical Corporation*

Linda Yassky, Esq.
SONNENSCHEIN NATH
& ROSENTHAL LLP
1221 Avenue of the Americas
23rd Floor
New York, New York 10020
*Attorneys for Rapid-American Corp.*

Stephen A. Manuele, Esq.
FELDMAN KIEFFER & HERMAN, LLP
The Dun Building
110 Pearl Street, Suite 400
Buffalo, New York 14202
*Attorneys for Selby Battersby & Company*

Christopher Hannan, Esq.
KELLEY JASONS MCGOWAN
SPINELLI & HANNA, LLP
120 Wall Street, 30th Floor
New York, NY 10005
*Attorneys for Sterling Fluid Systems*

Joan Gaisor, Esq.
McGIVNEY & KLUGER, P.C.
80 Broad Street, 23rd Floor
New York, New York 10004
*Attorneys for TACO, Inc.*

Philip J. O'Rourke, Esq.
McGIVNEY & KLUGER, P.C.
80 Broad Street, Suite 2300
New York, New York 10004
*Attorneys for Tate Andale, Inc.*

Dave Weinberg, Esq.
SEGAL McCAMBRIDGE SINGER &
MAHONEY, LTD.
830 Third Avenue, Suite 400
New York, New York 10022
*Attorneys for The Anchor Packing Co.*

Chuck McGivney, Esq.
McGIVNEY & KLUGER, P.C.
80 Broad Street, 23rd Floor
New York, New York 10004
*Attorneys for The Nash Engineering Co.*

Genevieve MacSteel, Esq./
Robert Brooks-Rigolosi, Esq.
MCGUIREWOODS
1345 Avenue of the Americas, 7thFloor
New York, New York 10022
*Attorneys for The Trane CO.*

Rob Tonogbanua, Esq.
DICKIE, MCCAMBY & CHILCOTE, P.C.
Public Ledger Building, Suite 901
150 South Independence Mall West
Philadelphia, PA 19106-3409
*Attorneys for Tyco Flow Control Inc.*

Stephen S. Davie, Esq.
MACKENZIE HUGHES, LLP
101 South Salina Street
P.O. Box 4967
Syracuse, NY 13221-4967
*Attorneys for Tyco Flow Control Inc.*

Judith Yavitz, Esq.
ANDERSON KILL & OLICK, P.C.
1251 Avenue of the Americas
New York, New York 10020
*Attorneys for Union Carbide*

William J. Bradley, III, Esq.
MALABY, CARLISLE & BRADLEY, LLC
150 Broadway, Suite 600
New York, New York 10038
*Attorneys for Viacom, Inc.*

Andrew Sapon, Esq.
BIVONA & COHEN, P.C.
Wall Street Plaza
88 Pine Street
New York, NY 10005-1886
*Attorneys for Vickers Inc.*

Joseph Colao, Esq.
LEADER & BERKON LLP
630 Third Avenue, 17th Floor
New York, New York 10017
*Attorneys for Warren Pumps, Inc.*

Rob Tonogbanua, Esq.
DICKIE, MCCAMEY & CHILCOTE, P.C.
Public Ledger Building, Suite 901
150 South Independence Mall West
Philadelphia, PA 19106-3409
*Attorneys for Yarway Corp.*

Stephen S. Davie, Esq.
MACKENZIE HUGHES, LLP
101 South Salina Street
P.O. Box 4967
Syracuse, NY 13221-4967
*Attorneys for Yarway Corp.*

**Counsel Unknown for the following
Defendants:**

BLACKMER PUMP
GRISHAM RUSSELL
WALTER H. EAGAN CO., INC.
WEIL PUMP CO.

by depositing a true copy of the same securely enclosed in a post-paid wrapper in the Post Office regularly maintained by the United States Government in said County of New York directed to said attorneys, unless otherwise indicated.

**CORRINNE DONALDSON**

Sworn to before me this
4th day of May 2007

**NOTARY PUBLIC**

ELLEN T. PINE
Commissioner of Deeds, City of N.Y.
No. 4-1544
Certificate Filed in New York County
Commission Expires November 1, 2007

LEVY PHILLIPS00092691.WPD
ONIGSBERG, L.L.P.
800 THIRD AVENUE
IEW YORK, N.Y. 10022

# EXHIBIT 4

Page 153

1   SUPREME COURT:

2   ALL COUNTIES WITHIN THE STATE OF NEW YORK

3   IN RE:  NEW YORK CITY ASBESTOS LITIGATION

4

5

6

7           DEPOSITION UNDER ORAL          VOLUME II

8              EXAMINATION OF

9              SALVATORE GITTO

10

11

12

13

14   This Document Applies To:

15   SALVATORE GITTO

16   INDEX NO:  07/105033

17

18

19

20

21

22        PRIORITY-ONE COURT REPORTING SERVICES, INC.

23              899 Manor Road

24        Staten Island, New York  10314

25              (718) 983-1234

Gitto v. Asbestos
May 16, 2007

Salvatore Gitto
Vol. 2

Page 170

1  on the Hornet?
2  A.    Yes.
3       Q.  How so?
4  A.    The spaces that I worked in had various types
5  of equipment that were covered in asbestos.  Asbestos
6  was being added, removed, shifted around.  I was
7  present when that was being done.
8       Q.  What types of equipment on the Hornet?
9  A.    Similar to the other ships.  There were
10 boilers, compressors, pumps, valves.
11      Q.  Can you tell me the brand name, trade
12 name or manufacturer of the boilers on the U.S.S.
13 Hornet?
14 A.    I can't identify a boiler with a particular
15 ship, but I know there were Babcock & Wilcox boilers.
16      Q.  Can you tell me the brand name, trade
17 name or manufacturer of the compressors on the
18 Hornet?
19 A.    I can't on the Hornet.  I can't, but I do
20 recall Ingersoll-Rand as a manufacturer of some of
21 the compressors that were being installed on various
22 ships.
23      MS. MITTLEMAN:  Objection. Move to
24      strike.
25      Q.  Can you tell me the brand name, trade

Page 171

1  name or manufacturer of any of the valves on the
2  Hornet?
3  A.    I recall the name of Vickers, Vickers valves.
4       My hearing seems to be a little bit less
5  this morning than yesterday.  So, I apologize.
6       Q.  If you can't hear me, let me know.
7  A.    I can hear you, but it's not as easy as
8  yesterday.
9       Q.  No problem.
10      Can you tell me any specific jobs you did
11 on the Hornet?
12      MR. BLOCK:  Objection. Asked and
13      answered.
14      MR. NOVAKIDIS:  Withdrawn.
15      Q.  Do you recall what your very first job on
16 the Hornet was?
17 A.    No.
18      Q.  Do you recall what your very last job on
19 the Hornet was?
20 A.    No.
21      Q.  Can you tell me how long you were on the
22 Hornet?
23 A.    Probably a month or two.
24      Q.  What type of ship was the Hornet?
25 A.    Carrier, aircraft carrier.

Page 172

1       Q.  Can you tell me any specific jobs you
2  performed on the Constellation?
3  A.    Constellation was the CV-64, I believe.  I
4  think I was assigned for a period of time to the
5  gallery tech where the crew's living quarters were
6  located.  Installing bunks, living equipment, tables,
7  chairs, that kind of stuff.  I remember that
8  particularly, because there was a fire on the
9  Constellation where 50-some-odd yard workers were
10 killed.  I was on board when the fire occurred.
11      Q.  You were on board when the fire actually
12 took place?
13 A.    Yes.
14      Q.  Thinking back to the work that you
15 performed on the gallery deck of the Constellation,
16 do you have any reason to believe you would have been
17 exposed to asbestos from that work?
18 A.    I don't recall any specific asbestos, but
19 asbestos was widely used in various stages of
20 construction. I'm sure asbestos was being used as
21 protection, fire protection and that type of stuff.
22 That's about all I recall as far as asbestos goes in
23 that particular area.  Excuse me.  That space was
24 covered with ventilation and piping, and all of that
25 piping had asbestos coverings on it.

Page 173

1       Q.  Was the venting, the ventilation ducts
2  covered as well?
3  A.    Yes, most of them.
4       Q.  Other than the work you performed on the
5  gallery deck, can you think of any other specific
6  jobs you performed on the Constellation?
7  A.    Not offhand.
8       Q.  Do you recall what your very first job on
9  the Constellation was?
10 A.    It might have been in that galley area.
11      Q.  Do you recall how long you worked on the
12 Constellation?
13 A.    Several months.
14      Q.  After the fire took place, did
15 construction stop?
16 A.    For a period of time, yes.
17      Q.  Do you recall how long it stopped?
18 A.    No. It might have been a month or so before
19 they started production again.
20      Q.  You said that you were aboard ship when
21 the fire actually took place.  After the period where
22 construction had ended, once it started, did you go
23 back on the Constellation?
24 A.    Yes.
25      Q.  Can you tell me any specific jobs you

Gitto v. Asbestos
May 16, 2007

Salvatore Gitto
Vol. 2

Page 186

1    the ships on different ships.  I can't just
2    say the same thing, because the ships weren't
3    the same.  It's very clear.
4         MR. BLOCK:  This is the last day for
5    discovery.
6         MR. NOVAKIDIS:  Read back my question,
7    please.
8         (Whereupon, the referred-to question,
9    page 185, line 12, was read back by the court
10   reporter.)
11   A.   No.
12        Q.   Do you know the hull number of the
13   Ticonderoga?
14   A.   What?
15        Q.   The hull number.
16   A.   No.  I don't recall.
17        Q.   Are you able to tell me how long a time
18   period you worked on the Ticonderoga?
19   A.   No, I don't recall.
20        Q.   Are you able to tell me a specific year
21   you worked on the Ticonderoga?
22   A.   I don't recall.
23        Q.   Can you tell me any specific jobs you
24   performed on the U.S.S. Franklin D. Roosevelt?
25   A.   Again, it would have been work similar to the

Page 187

1    work that I described in detail yesterday in the
2    engine spaces, boiler rooms, access removal of
3    equipment, foundation work, access work.
4         Q.   You believe that the FDR was being
5    de-mothballed at this point?
6         MR. BLOCK:  Objection to form.
7    A.   I don't recall.
8         Q.   Can you tell me a specific year that you
9    worked on the FDR?
10   A.   No.
11        Q.   Can you tell me how long you worked on
12   the FDR?
13   A.   No.
14        Q.   You just told me that you have a
15   recollection of working in the engine spaces on the
16   FDR; is that correct?
17   A.   Yes.
18        Q.   How specifically do you think you would
19   have been exposed to asbestos in the engine spaces on
20   the FDR?
21   A.   How?
22        Q.   How specifically do you think you would
23   have been exposed to asbestos?
24   A.   In a similar manner that I've described
25   previously.

Page 188

1         Q.   How specifically on the FDR?
2         MR. BLOCK:  Objection.  Asked and
3    answered, but he wants you to go through it
4    again.  I know it's frustrating, but you have
5    to answer his question.
6    A.   Again, the equipment would have been covered,
7    and I would have been involved with assisting in the
8    removal of the old equipment.  Would have been
9    involved in obtaining access for the new equipment.
10   Would have been involved with new foundations.  Would
11   have been involved with repair of any holes or damage
12   that was done in order to get the equipment in or
13   out.
14        Q.   A number of times you talked about
15   building new foundations.  I don't believe I ever
16   asked you exactly what that entailed.  Can you
17   describe it for me?
18   A.   Most of the equipment has some sort of base on
19   it with angle bars or something with holes that
20   attach to a permanent structure.  That could be part
21   of the equipment.  The part that gets attached to the
22   ship would be the foundation, and that would be
23   welded to the deck, and the holes would be drilled
24   through equipment into the foundation, and then
25   probably bolted.  So, those foundations are located

Page 189

1    and aligned.  The holes would have had to have been
2    aligned, drilled through the holes in the equipment,
3    through the foundation and then bolted and secured.
4         MR. BLOCK:  Let's take a quick break.
5         (Whereupon, a brief recess was taken from
6    11:05 a.m. to 11:13 a.m.)
7         Q.   Sir, you talked about equipment being
8    covered in the engine spaces of the FDR.  Can you
9    tell me any specific pieces of equipment that were
10   covered?
11        MR. BLOCK:  You mean types of equipment?
12        MR. NOVAKIDIS:  Yes.
13   A.   Pumps, compressors, valves, general pieces of
14   equipment found in those spaces.
15        Q.   Can you tell me the brand name, trade
16   name or manufacturer of any of the pumps in those
17   engine spaces on the FDR?
18   A.   Vickers.
19        Q.   Can you tell me the brand name, trade
20   name or manufacturer of the compressors in the engine
21   spaces on the FDR?
22   A.   God.  The compressors, Ingersoll-Rand stands
23   out in my mind.
24        Q.   Can you tell me the brand name, trade
25   name or manufacturer of any of the valves in the

Page 190

1  engine spaces on the FDR?
2  A.   I associate valves with Vickers.
3       Q.   Are you able to tell me how many engine
4  spaces there were on the FDR?
5  A.   I believe two.
6       Q.   What type of ship was the FDR?
7  A.   Carrier.
8       Q.   Do you know what class?
9  A.   No.
10      Q.   Do you know the hull number?
11 A.   The FDR?
12      Q.   Yes.
13 A.   I'm guessing 42.
14      Q.   You also mentioned boiler rooms on the
15 FDR.  How many boiler rooms were there on the FDR?
16 A.   Two or four.
17      Q.   Do you have any reason to believe you
18 would have been exposed to asbestos in the boiler
19 rooms on the FDR?
20 A.   Yes.
21      Q.   How so?
22 A.   Similar to what I've said 100 times before.
23      Q.   Can you tell me any specific ways?  I
24 know we've already discussed on different ships
25 boiler rooms; but this is now another ship, the FDR.

Page 191

1  So, can you tell me any specific ways you were
2  exposed to asbestos in the boiler rooms on the FDR?
3       MR. BLOCK:  I'm going to object as asked
4       and answered.  He does want you to describe it
5       again.  I know it's frustrating, but you have
6       to describe it again.
7  A.   Can you repeat the question?
8       MR. NOVAKIDIS:  Read it back, please.
9       (Whereupon, the referred-to question,
10      page 190 line 23, was read back by the court
11      reporter.)
12 A.   Just by virtue of me being in the area while I
13 was doing my work on building up foundations, gaining
14 access, repairing any holes, damage that was done,
15 being in the general vicinity where work was being
16 done by other tradesmen.
17      Q.   The work you personally performed, do you
18 think any of that work exposed you to asbestos?
19 A.   Just by being in the proximity, yes.
20      Q.   There were other tradesmen working around
21 you, correct?
22 A.   Sure.
23      Q.   Are you able to tell me what trades were
24 working around you on the boiler rooms in the FDR?
25 A.   In general.  Outside machinists, pipe fitters,

Page 192

1  pipe coverers, shipwrights, riggers, welders,
2  burners, tin knockers, shipfitters.
3       Q.   Can you tell me what work any of those
4  trades were doing that you believe would have exposed
5  you to asbestos?
6  A.   The ones responsible for the equipment for the
7  outside machinists, Shop 38, probably were the ones
8  that were mostly involved with the work.  Them
9  together with pipe coverers, pipe fitters that
10 connected all the ancillary piping.
11      Q.   Can you tell me specifically what the
12 outside machinists were doing in the boiler rooms on
13 the FDR that you believe exposed you to asbestos?
14 A.   Removing and installing equipment.
15      Q.   Can you tell me any specific pieces of
16 equipment in the boiler rooms on the FDR?
17      MR. BLOCK:  Objection to form, and asked
18      and answered.
19      Do you understand the question?
20      THE WITNESS:  Yes.
21 A.   Compressors, pumps, valves.
22      Q.   Can you tell me the brand name, trade
23 name or manufacturer of the compressors on the FDR?
24 A.   I associate compressors with Ingersoll-Rand.
25      Q.   Can you tell me the brand name, trade

Page 193

1  name or manufacturer of any of the pumps in the
2  boiler rooms on the FDR?
3  A.   Vickers.
4       Q.   Can you tell me the brand name, trade
5  name or manufacturer of any of the valves in the
6  boiler rooms on the FDR?
7  A.   Probably Vickers.
8       Q.   Can you tell me the brand name, trade
9  name or manufacturer of any of the covering being
10 used by the pipe coverers?
11 A.   Pipe covering.
12      Q.   Can you tell me the brand name, trade
13 name or manufacturer of any of that covering?
14 A.   No.
15      Q.   Other than the engine rooms and the
16 boiler rooms, were there any other specific parts of
17 the FDR, specific compartments of the FDR where you
18 believe you would have been exposed to asbestos?
19 A.   I don't recall.
20      Q.   Can you tell me any specific jobs you
21 performed on the U.S.S. Lexington?
22 A.   I don't recall.
23      Q.   Do you know what the hull number for the
24 Lexington was?
25 A.   I believe it was CV-20.

Page 270

1  that time?
2  A.   I can't identify compressors, I guess, but
3  Ingersoll-Rand. That's about it. At this time, I do
4  not recall too much more.
5       Q.   I understand you said more than once
6  today that you identify compressors with
7  Ingersoll-Rand. Do you have a specific recollection
8  of the brand that was aboard the Lexington in the
9  engine room?
10 A.   No.
11      Q.   How about the pumps that you believe were
12 installed and removed on the Lexington only? Are you
13 able to identify the manufacturer?
14 A.   Again, I believe Vickers was the manufacturer.
15      Q.   The piping insulation that was removed
16 and replaced in the engine room, are you able to
17 identify the brand of that insulation?
18 A.   No.
19      Q.   The welding that you just described that
20 you believe caused you to be exposed to asbestos,
21 what welding are you referring to?
22 A.   Welding of the foundation; welding of the
23 hangers, brackets, supporting structure; welding of
24 any patches or holes that were cut out.
25      Q.   Why were holes made on that particular

Page 271

1  ship in the engine room?
2  A.   To get access. In order to get access for the
3  equipment, they didn't fit through a normal size
4  hatch, hole, so they had to cut a hole in the
5  bulkhead or something, allow the equipment to be
6  passed through.
7       Q.   Do you have a specific recollection of
8  equipment being passed through the hole of the
9  Lexington?
10 A.   I think on all the ships, similar type of
11 operation. The equipment was quite large, and the
12 normal access ladders, hatches were made for human
13 transportation, for humans to pass through, not large
14 pieces of equipment.
15      Q.   Do you recall if you worked with anybody
16 in the engine room aboard the Lexington performing
17 the work that you just described?
18 A.   I'm sure I did.
19      Q.   Do you recall the names of anybody in
20 particular?
21 A.   No.
22      Q.   Do you recall who your supervisor was
23 when did you that work?
24 A.   No.
25      Q.   With respect to the boiler rooms aboard

Page 272

1  the Lexington, do you believe that you were exposed
2  in the same fashion as you've already described with
3  respect to the engine rooms on this ship?
4  A.   Yes.
5       Q.   Again, are you able to specifically
6  identify the manufacturer of any equipment located
7  within those engine rooms?
8  A.   And on the boilers I remember Babcock &
9  Wilcox.
10      Q.   Was there any other type of equipment in
11 that room that you believe you were exposed to
12 asbestos from?
13 A.   Again, there was a lot of other equipment in
14 there, compressors, pumps, valves.
15      Q.   Again, are you able to testify with
16 certainty the manufacturers of those pieces of
17 equipment aboard the Lexington in the boiler room?
18 A.   No.
19      Q.   Let's move on to the Oriskany. I have
20 the same questions for you. How is it that you
21 believe you were exposed to asbestos aboard that
22 ship?
23 A.   Similarly.
24      Q.   Was there anything different about how
25 you're claiming exposure on the Oriskany as opposed

Page 273

1  to the Lexington?
2  A.   Basically not.
3       Q.   Again, did you work in both the engine
4  room and the boiler rooms in that ship?
5  A.   Yes.
6       MR. NOVAKIDIS: I'm just going to object
7  to the last question as foundation.
8       Q.   Are you able to testify with certainty as
9  to the names of the manufacturers of any of the
10 equipment on those spaces on the Oriskany?
11      MS. WAYNE: Form. Foundation.
12 A.   No.
13      Q.   You were never a licensed machinist or
14 millwright, correct?
15 A.   No.
16      Q.   You had no training with respect to the
17 maintenance of compressors or pumps?
18 A.   No.
19      Q.   True?
20 A.   True.
21      Q.   In your interrogatories, there's
22 reference made to both Worthington pumps and
23 compressors aboard various vessels. Do you recall
24 that?
25 A.   I believe so, yes.

Page 295

1    SUPREME COURT:

2    ALL COUNTIES WITHIN THE STATE OF NEW YORK

3    IN RE:   NEW YORK CITY ASBESTOS LITIGATION

4

5

6

7              DEPOSITION UNDER ORAL              VOLUME III

8                   EXAMINATION OF

9                  SALVATORE GITTO

10

11

12

13

14    This Document Applies To:

15    SALVATORE GITTO

16    INDEX NO:   07/105033

17

18

19

20

21

22              PRIORITY-ONE COURT REPORTING SERVICES, INC.

23                        899 Manor Road

24              Staten Island, New York   10314

25                      (718) 983-1234

Gitto v. Asbestos
June 7, 2007

Salvatore Gitto
Vol. 3)

Page 356

1 talking about?
2     Q.   On the FDR.
3 A.    I would see where the pump was supposed to be
4 located by drawing or spec, check it out that it was
5 there.  If it wasn't there, remove it and put it in
6 the proper location.
7     Q.   Would you personally remove it?
8 A.    The foundation itself, not the pump.  The pump
9 itself was handled by machinists.  The foundation was
10 my responsibility.
11     Q.   Do you believe you were exposed to
12 asbestos from the Vicker pumps on the FDR?
13 A.    Yes.
14     Q.   How do you believe were exposed to
15 asbestos from these pumps?
16 A.    Lot of these pumps had asbestos pipe covering
17 that needed to be removed and replaced and disturbed.
18 They were ripped.  They were burnt.  They gave off
19 fumes.
20     Q.   Any other ways?
21 A.    That's it.
22     Q.   Where is this asbestos pipe covering
23 located?
24 A.    I'm sorry?  Where?
25     Q.   The pipe covering you're referring to,

Page 357

1 where is it located?
2 A.    Where?
3     Q.   On the pipes or the pump itself?
4 A.    On both.
5     Q.   On both?
6 A.    Yes.
7     Q.   What was the purpose of the covering that
8 was located on the Vicker pump?
9 A.    Asbestos covering?
10     Q.   Yes.
11 A.    For protection.
12     Q.   Protection from what?
13 A.    Outside environment, sparks.  There's
14 construction activity going on all around.  Sparks go
15 flying, hot molten metal.  People were bumping into
16 these things.  Just generally protection.
17     Q.   So, you said people were bumping into
18 these things.  Was it like a cushion?
19 A.    No.
20     Q.   Can you describe the covering, the
21 asbestos covering that was on the pump, the Vickers
22 pump?
23 A.    Blanket form, I guess, brownish in color.
24     Q.   Do you recall the texture of the blanket?
25 A.    Not really, no.

Page 358

1     Q.   Do you know who installed the covering,
2 that blanket covering on the Vicker pump?
3 A.    I'm really not hearing you.  I'm sorry.
4     Q.   Do you know who installed the asbestos
5 blanket over the Vicker pump?
6 A.    Did I ever?
7     Q.   Do you know who installed it?
8 A.    Oh, the blankets.  They were the
9 responsibility of the pipe coverers and the laggers, I
10 guess they call them.  A specific trade.
11     Q.   Do you associate the blanket covering on
12 the Vicker pumps to old pumps on the FDR or newly
13 installed pumps?
14 A.    Old.
15     Q.   Did the old pumps and the newly installed
16 pumps have the same type of blanket over them?
17 A.    Similar.
18     Q.   Was there a certain type of Vicker pump
19 that was covered as opposed to another type of Vicker
20 pump that was covered with another asbestos blanket?
21 A.    I have no idea.
22     Q.   You also identified Vicker pumps as being
23 located on the U.S.S. Lexington in the boiler rooms
24 and equipment room.  Do you have a specific
25 recollection of seeing a Vicker pump on the U.S.S.

Page 359

1 Lexington?
2 A.    There were pumps all over.  Specifically, it
3 would be difficult for me to say I saw one of their
4 pumps right there, but there were pumps on board.
5     Q.   I'm just asking as you sit here today, do
6 you have a specific recollection of seeing a Vicker
7 pump on the U.S.S. Lexington?
8 A.    No.
9     Q.   Do you recall whether or not Vicker pumps
10 were in any other compartment on the U.S.S. Lexington
11 besides the boiler room and the equipment room?
12 A.    I don't have a recollection.
13     Q.   When you worked on the U.S.S. Lexington,
14 what was your title?
15 A.    Can you give me a time frame?
16     Q.   Whenever you worked on the U.S.S.
17 Lexington.
18         MR. BLOCK:  Why don't you ask the full
19     question again so it's clear.  Maybe a little
20     louder.
21     Q.   Do you recall what year or years you
22 worked on the U.S.S. Lexington?
23         MR. BLOCK:  Objection to the extent that
24     it's been asked and answered, but you can go
25     ahead.

17 (Pages 356 to 359)

Gitto v. Asbestos
June 7, 2007

Salvatore Gitto
Vol. 3)

**Page 364**

1 pumps had hoses connected to them?
2 A.   Hoses?
3 Q.   Hoses.
4 A.   Yes.
5 Q.   Were there any markings on those hoses?
6 A.   Not that I recall.
7 Q.   Do you associate a particular color to
8 these hoses?
9 A.   Most of the hoses were black.
10 Q.   With regard to the Vicker pumps on the
11 U.S.S. Lexington, how do you believe you were exposed
12 to asbestos from these pumps?
13 A.   In a similar manner described before.
14 Involved with the inspection, location and
15 relocation, if necessary, foundation.
16 Q.   Are you finished --
17 MR. BLOCK: He's not finished if you
18 interrupt him in the middle of a word.
19 Read back the answer up to the point
20 where Mr. Gitto was interrupted, please.
21 (Whereupon, the referred to question and
22 answer were read back by the court reporter.)
23 A.   That's about the answer.
24 Q.   In regard to all these different
25 activities, inspection, location, relocation and

**Page 365**

1 foundation, what was the source of your exposure to
2 asbestos?
3 A.   What was my?
4 Q.   What was the source of your exposure to
5 asbestos?
6 A.   In order to relocate it, foundation or a pump,
7 they had to remove the pipe covering. It was often
8 not -- it was often burnt off, creating residue,
9 smoke, fibers in the air, in the compartment.
10 Q.   And this covering was on pipe and the
11 pump?
12 A.   Yes.
13 Q.   Can you describe this covering that was
14 on the pump?
15 A.   It was pipe covering. It was two halves
16 usually strapped together with a metal band.
17 Q.   Do you associate a color to that
18 covering?
19 A.   Generally a brown.
20 Q.   And you believe this covering consisted
21 of asbestos?
22 A.   Yes.
23 Q.   If it consisted of asbestos, how did they
24 burn it off?
25 A.   An acetylene torch.

**Page 366**

1 Q.   And that would burn the asbestos?
2 A.   Yes.
3 Q.   That was in the covering?
4 A.   Yes.
5 Q.   Besides the covering that was on the
6 pulling pump, do you recall any other ways that you
7 were exposed to asbestos from Vicker pumps on the
8 U.S.S. Lexington?
9 A.   Just general handling of the covering and the
10 insulation that was on there. They took it on and
11 off.
12 Q.   Is the covering you referred to and
13 insulation the same thing, or are they different
14 materials that were on the pump or the pipes?
15 A.   Pretty much the same thing.
16 Q.   Do you know what the difference is?
17 A.   No.
18 Q.   Do you have a difference in mind between
19 the insulation and the covering that was on the pump?
20 A.   Generally, I think, again, covering wraps
21 around the pipe itself (indicating). On the pump, it
22 would be laid on top of the pump or attached in some
23 manner to the pump.
24 Q.   You're making a distinction regarding the
25 pipes leading to the pump, that they were covered as

**Page 367**

1 opposed to how the pump itself was covered, correct?
2 A.   Right.
3 Q.   Can you describe how the pump itself was
4 covered?
5 A.   Again, with this blanket. It might have some
6 sort of attaching screws, something to hold it in
7 place.
8 Q.   And this is the type of covering that was
9 on a Vickers pump on the U.S.S. Lexington, correct?
10 A.   Yes.
11 Q.   Was this covering on both the old pumps
12 and the newly installed pumps?
13 A.   Yes.
14 Q.   Was there any difference between the
15 covering that was used on the older pumps that were
16 removed and the new pumps that were installed?
17 A.   I don't recall. I don't recall.
18 Q.   I'm just going to switch gears a second
19 and ask you about Vicker valves. You previously
20 testified that you assorted Vicker valves to the
21 U.S.S. Hornet, the U.S.S. Franklin D. Roosevelt and
22 the U.S.S. Lexington. Do you recall that testimony?
23 A.   Those were ships that I worked on, yes.
24 Q.   Do you associate the Vicker valves to any
25 other ships or locations?

Gitto v. Asbestos
June 7, 2007

Salvatore Gitto
Vol. 3)

---

Page 372

1   A.    Control the flow of fluid.
2         Q.   Is there a difference in your mind
3   between the Vickers valves and the Vickers pumps?
4   A.    Valves control the flow of fluid. The pumps
5   raise or lower the pressure.
6         Q.   Do you recall what type of fluid flowed
7   through these Vickers valves on the U.S.S. Hornet?
8   A.    There is a variety of anything from fuel oil
9   to drinking water.
10        Q.   Do you believe you were exposed to
11  asbestos from the Vicker valves on the U.S.S. Hornet?
12  A.    Yes.
13        Q.   How do you believe that occurred?
14  A.    By my, again, similar as to what I testified
15  to before, that I was involved with the inspection,
16  relocation, if necessary, of foundations for these
17  valves, which encompassed and removing and
18  reinstalling valve covering, pipe coverings.
19        Q.   What were the valves covered with?
20  A.    I'm sorry?
21        Q.   What were the Vicker valves covered with?
22  A.    What were the Vicker valves covered with?
23        Q.   Yes.
24  A.    Protective covering, you're talking about?
25  We're talking about protective covering.

---

Page 373

1         Q.   Let me ask that again. Were the Vicker
2   valves covered with anything?
3   A.    For protection, they were covered with
4   asbestos blankets.
5         Q.   Is it your testimony that you were
6   exposed to asbestos when these asbestos blankets that
7   were over the Vicker valves were removed or replaced?
8   A.    Them and the pipe covering.
9         Q.   The pipe covering that you're referring
10  to, was that only on the pipes or also on the valves?
11  A.    Certainly was on the pipes. I don't recall
12  specifically on the valves themselves, but probably
13  were.
14        Q.   You earlier testified, I believe, in
15  regard to the Vicker pumps, that one of the ways to
16  get the covering off the pumps was a burning process.
17  Was that burning process used to remove the asbestos
18  blankets if these asbestos blankets were on a pump or
19  a valve?
20  A.    I don't specifically remember seeing them used
21  to burn off blankets, but it wouldn't have surprised
22  me if they had. They just went in there, and it was
23  kind of a destructive process, get rid of the old
24  ones and start building from the ground up.
25        Q.   Besides the asbestos blanket and the pipe

---

Page 374

1   covering that was on the pipes, was there any other
2   way you believe you were exposed to asbestos from a
3   Vickers valve on the U.S.S. Hornet?
4   A.    No.
5         Q.   If I go to the U.S.S. FDR and the U.S.S.
6   Lexington and ask you about the Vicker valves on each
7   of those ships, would your description of these
8   valves be different than your description of the
9   Vicker valves on the U.S.S. Hornet?
10  A.    It would be very similar.
11        Q.   How would they be different?
12        MR. BLOCK:  If at all.
13  A.    Maybe the way the piping configurations hooked
14  up, the runs of the pipe or something might be
15  different.
16        Q.   On the U.S.S. Hornet, do you recall a
17  specific piping configuration that you associate to
18  the Vicker valves?
19  A.    No.
20        Q.   Do you recall a specific piping
21  configuration that you associate to the Vicker valves
22  on the FDR?
23  A.    No.
24        Q.   And the same question for the U.S.S.
25  Lexington?

---

Page 375

1   A.    No.
2         Q.   Do you recall whether the sizes that you
3   described for the Vicker valves on the U.S.S. Hornet
4   were the same range of sizes that you would see on
5   the FDR and the U.S.S. Lexington?
6   A.    Yes, pretty much so.
7         Q.   Is your testimony the same or similar as
8   to how you were exposed to asbestos from the Vicker
9   valves on the FDR and the Lexington in comparison to
10  your testimony with the U.S.S. Hornet?
11  A.    Similar-type work was done, yes, similar
12  exposure.
13        Q.   By that, you would be exposed to asbestos
14  from the asbestos blankets on the Vicker valves and
15  the pipe covering on the pipes assorted to the Vicker
16  valves?
17  A.    Yes.
18        Q.   Are all the Vicker valves covered with an
19  asbestos blanket?
20  A.    Some were, some weren't.
21        Q.   Do you know what the reason would be that
22  some Vicker valves would not be covered with an
23  asbestos blanket?
24  A.    They may have been removed for some reason
25  that I have no idea what it would be.

Page 1

```
 1   SUPREME COURT:

 2   ALL COUNTIES WITHIN THE STATE OF NEW YORK

 3   IN RE:  NEW YORK CITY ASBESTOS LITIGATION

 4

 5

 6

 7        DEPOSITION UNDER ORAL          VIDEO

 8             EXAMINATION OF

 9            SALVATORE GITTO

10

11

12

13

14   This Document Applies To:

15   SALVATORE GITTO

16   INDEX NO:  07/105033

17

18

19

20

21

22        PRIORITY-ONE COURT REPORTING SERVICES, INC.

23                 899 Manor Road

24          Staten Island, New York  10314

25                 (718) 983-1234
```

Gitto v. Asbestos
June 7, 2007

Salvatore Gitto
Video

Page 14

1   A.      And there was new construction going on also.
2        Q.   And how did you feel about that?
3   A.      I wanted to become part of it.
4        Q.   You said that working at the Brooklyn
5   Navy Yard also was a decent employment opportunity
6   back then?
7   A.      Yes.
8        Q.   And do you recall what your pay was per
9   day?
10  A.      Exactly $9.44 a day.
11       Q.   When you began at the Brooklyn Navy Yard,
12  what position or job title did you start in?
13  A.      I had competed for a job as an apprentice
14  shipfitter, and I was successful and was employed.
15       Q.   And how long is the apprentice program
16  for a shipfitter?
17  A.      It's a four-year formal program, which
18  includes one week of formal schooling every month.
19       Q.   And can you describe just generally, as
20  best you can, what a shipfitter does with regard to
21  shipbuilding or ship repair?
22  A.      I like to compare it to the equivalent of a
23  carpenter in the construction industry.  Build the --
24  put the flooring in, put the walls in, put the
25  ceiling in, put the doors on, put the lath, put the

Page 15

1   staircases in, and generally it's work that's done
2   with structural steel.
3        Q.   How, if at all -- strike that. How, if at
4   all, is the building of foundations on a ship part of
5   the trade of shipfitter?
6   A.      All the equipment on a ship is mounted on some
7   sort of foundation. The responsibility for the
8   installation of those foundations, the location of
9   those foundations, are a shipfitter's responsibility.
10       Q.   Now, did there come a point in time when
11  you were drafted into the Army?
12  A.      December 1952.
13       Q.   Okay. And at that time, was your
14  apprenticeship program at the Brooklyn Navy Yard
15  interrupted?
16  A.      Yes.
17       Q.   And did you serve in the United States
18  Army?
19  A.      For two years.
20       Q.   When were you -- do you recall exactly
21  when you were discharged from the Army?
22  A.      December 1954, from active duty. I still had
23  reserve time to serve.
24       Q.   And what type of discharge was it?
25  A.      Honorable.

Page 16

1        Q.   Can you tell the jury what you did in the
2   Army and where you did your service?
3   A.      I wound up in the medical service.  I was
4   trained as an X-ray technician.  Served two years in
5   Fort Belvoir, Virginia as an X-ray tech working in
6   the Army hospital down there.
7        Q.   After you were honorably discharged from
8   the Army, did you return to the Brooklyn Navy Yard?
9   A.      Yes.
10       Q.   And, at that point in time, did you
11  continue your apprenticeship in the trade of
12  shipfitter?
13  A.      Yes.
14       Q.   Do you recall when you completed your
15  shipfitter apprenticeship?
16  A.      It would have been an additional two more
17  years for a total of six years.
18       Q.   Okay. Let me show you what has been
19  previously marked and discussed as Exhibit D-1 to
20  your deposition.
21  A.      Um-hum.
22       Q.   Do you recognize Exhibit D-1?
23  A.      Yes. This is my certificate of completion as
24  an -- my apprenticeship program in April of 1957.
25       Q.   And is that a true and accurate copy of

Page 17

1   the original certificate that you've kept in your
2   possession to this day?
3   A.      Yes.
4        Q.   Can you just show that to the camera so
5   it can be seen?
6            (Witness complying with request)
7        Q.   And the certificate reflects that you
8   completed your apprenticeship as a shipfitter on or
9   about April 29th, 1957.  Is that consistent with your
10  recollection?
11  A.      Yes.
12       Q.   After you became a shipfitter or --
13  strike that.
14           When did you leave the Brooklyn Navy
15  Yard?
16  A.      When it closed in nineteen -- May of 1966.
17       Q.   Okay. And were you a shipfitter up until
18  the time that you left the Brooklyn Navy Yard in
19  about May 1966?
20  A.      No. I had received the promotion to
21  shipbuilding inspector, shipbuilding and hull
22  machinery inspector.
23       Q.   And was that several years -- did that
24  promotion occur several years before you left the
25  Brooklyn Navy Yard?

Gitto v. Asbestos
June 7, 2007

Salvatore Gitto
Video

Page 18

1  A.   Yes.
2       Q.   And your title of ship inspector, was
3  that a title that included certain parts of the ship
4  or certain subjects?
5  A.   Generally, it included the -- it didn't really
6  get involved with -- other than -- there were
7  specific areas that shipfitters focused on.  One
8  instance would be the anchor would be the
9  responsibility of a shipfitter.  The steering gear
10 would be the responsibility or shipfitter work.  The
11 transfer of fuel to personnel would be the
12 responsibility of a shipfitter.
13      Q.   In your work as a shipfitter, what, if
14 any, responsibility did you have with regard to
15 machinery?
16 A.   In the machinery spaces, all of the equipment
17 was mounted on foundations.  It was shipfitter
18 responsibility to see that these foundations were in
19 the accurate location, that they were in good shape
20 and that they served the function that they were
21 meant to serve, that they were in according to the
22 blueprints and specifications.
23      Q.   Mr. Gitto, I now want to ask you some
24 questions about your work at the Brooklyn Navy Yard
25 during your entire career there during the years 1951

Page 19

1  and 1952 and also during the years 1954 through 1966,
2  okay?  Now, during your years at the Brooklyn Navy
3  Yard, did you do work on new construction of ships?
4  A.   Yes, sir.
5       Q.   And, as you sit here today, do you recall
6  some of these ships that you did new construction on
7  at the Brooklyn Navy Yard?
8  A.   Yes, sir.
9       Q.   And can you identify those for the jury?
10 A.   There are two that I recall, the U.S.S.
11 Constellation and the U.S.S. Saratoga.  For the
12 first -- CV-60 was the Saratoga, and it was the first
13 new construction ship.  There might have been --
14 there was a new type of ship also, landing personnel
15 built for the Marine Corps, the OPDs.  I think U.S.S.
16 Raleigh was one of them.
17      Q.   And were there other ships other than the
18 Constellation, the Saratoga and the Raleigh in which
19 you did work on new construction at the Brooklyn Navy
20 yard?
21 A.   There may have been.  I don't recall the names
22 offhand.
23      Q.   Okay.
24 A.   Oh, I'm sorry.  There was one more.  Excuse
25 me.  The Independence.  CV-62 was a new -- new ship.

Page 20

1       Q.   Now, can you describe for us, Mr. Gitto,
2  what type of work, if any, you did during the new
3  constructions of ships at the Brooklyn Navy Yard
4  relating to equipment?
5  A.   Well, relating to equipment, a ship is built
6  up, as you know, from the keel up, and then they
7  start putting structural members, steel beams.  They
8  start building engine spaces and different spaces
9  where equipment goes into, and I would have been
10 involved with that build-up of the ship's structure
11 and then any foundations that might have -- that the
12 equipment might have had to be mounted on on the
13 inside of the ship.
14      Q.   Why did equipment have to be put on
15 foundations on a Navy ship?
16 A.   It was the way they secured it to the ship,
17 otherwise it would move around, roll around, become a
18 danger to a person's health or damage of the
19 equipment.  Had to be secured.
20      Q.   Throughout your career at the Brooklyn
21 Navy Yard, did you build foundations for valves?
22 A.   Yes.
23      Q.   And throughout your career at the
24 Brooklyn Navy Yard, did you build foundations for
25 turbines?

Page 21

1  A.   Yes.
2       Q.   Throughout your career at the Brooklyn
3  Navy Yard, did you build foundations for compressors?
4  A.   Yes.
5       Q.   Throughout your career at the Brooklyn
6  Navy Yard, did you build foundation is for pumps?
7  A.   Yes.
8       Q.   What would happen, Mr. Gitto, after you
9  built the foundations for this type of equipment on a
10 ship?  What would happen next in the process?
11 A.   The next trade that would come along would
12 probably be machinists, outside machinists that were
13 responsible for the installation and the operation of
14 their particular equipment, and they would start
15 doing their things, like shimming and lining up
16 various piping and electrical wiring.  Again,
17 electricians would be part of the operation,
18 machinists.  Pipe fitters would fit all the piping
19 to -- pipe coverers that would protect the piping,
20 insulate it.
21      Q.   What, if anything, would the pipe
22 coverers or lagers do with regard to the surface of
23 the equipment, of the types of equipment that you've
24 referred to?
25 A.   To my knowledge, they were covered with