**MDL 875**

1   CATHERINE MORRIS KROW (California Bar No. 208412)
    Orrick, Herrington & Sutcliffe LLP
2   The Orrick Building
    405 Howard Street
3   San Francisco, CA  94105-2669
    Telephone:    (415) 773-5700
4   Facsimile:    (415) 773-5759

5   KEVIN M. JORDAN (Texas Bar No. 11014800)
    Baker Botts LLP
6   One Shell Plaza
    910 Louisiana Street
7   Houston, TX  77002
    San Francisco, CA  94105-2669
8   Telephone:    (713) 229-1322
    Facsimile:    (713) 229-7722

9

10  Attorneys for Defendant
    UNION CARBIDE CORPORATION

11

12              **BEFORE THE JUDICIAL PANEL ON**
                **MULTIDISTRICT LITIGATION**

13

14  IN RE:  ASBESTOS PRODUCTS          MDL DOCKET NO. 875
    LIABILITY LITIGATION               CTO-287
    (NO VI)

15                                     **UNION CARBIDE CORPORATION'S**
                                       **OPPOSITION TO PLAINTIFFS'**
16  This Document Relates To:          **MOTION TO VACATE CONDITIONAL**
    ROBERT F. LYMAN and                **TRANSFER ORDER 287**
    SAMANTHA LYMAN v.
17  ASBESTOS DEFENDANTS (B*P), et al.

18

19              UNITED STATES DISTRICT COURT

20              NORTHERN DISTRICT OF CALIFORNIA

21              OAKLAND DIVISION

22  ROBERT F. LYMAN and SAMANTHA       CASE NO.  C 07 4240 SBA
    LYMAN,
23
            Plaintiffs,
24
        v.
25
    ASBESTOS DEFENDANTS (B*P), et al.,
26
            Defendants.
27

28

PLEADING NO. 5226

**OFFICIAL FILE COPY**   UNION CARBIDE'S OPPOSITION TO PLAINTIFFS' MOTION TO
                         VACATE CONDITIONAL TRANSFER ORDER 287

**IMAGED** OCT 30 2007

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................1

II.   FACTUAL BACKGROUND...............................................................................1

    A.    MDL-875 ................................................................................................1

    B.    The Instant Action ...............................................................................1

        1.    The State Court Proceedings.................................................2

            a.    Expert discovery and challenges to expert testimony in the state court action ...................................................................2

            b.    Summary judgment in the state court action ...................2

            c.    Settlement discussions in the state court action................................3

        2.    The Federal Court Proceedings in the Northern District of California .............................................................................4

III.   ARGUMENT....................................................................................................4

    A.    As An Asbestos Case Not Currently In Trial, This Case Is Appropriate For Transfer to the MDL Court..........................................................................4

    B.    Because This Case Shares Common Questions of Fact and Law With Other Cases Before the MDL Court, Transfer Would Promote Judicial Efficiency And The Convenience Of The Parties ......................................................5

        1.    This Case Involves Questions of Fact Common to MDL-875 Cases..........5

        2.    Consolidation of this Case Will Not Inconvenience the Parties or Witnesses ...............................................................................6

    C.    Allowing The MDL Court to Resolve The Remaining Pretrial Proceedings Will Promote Judicial Efficiency..........................................................7

        1.    Union Carbide is Entitled to a Pretrial Hearing on the Admissibility of Expert Testimony Under Federal Rule of Evidence 702.......................7

        2.    Additional Expert Discovery in Advance of a Rule 702 Hearing Is Required Under the Federal Discovery Rules ...........................................10

        3.    Union Carbide Anticipates Renewing Its Motion for Summary Judgment...............................................................................12

            a.    Union Carbide may renew summary judgment based on failure to establish causation after Plaintiffs' causation evidence is tested under the federal standards ................................13

            b.    Union Carbide may renew summary judgment under federal standards based on Plaintiffs' failure to establish exposure to any Union Carbide product........................................................13

         4.    Individual Settlement Negotiations and Conferences are Coordinated Pretrial Proceedings Over Which the MDL Court Has Authority ...............................................................................15

IV.   CONCLUSION..................................................................................................17

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Aginsky v. Farmers Ins. Exchange,*
  409 F. Supp. 2d 1230 (D. Or. 2005) ....................................................................14

*Allstate Fin. Corp. v. Zimmerman,*
  296 F.2d 797 (5th Cir. 1961) ..............................................................................13

*In re Antibiotic Drugs,*
  299 F. Supp. 1403 (J.P.M.L. 1969) .......................................................................6

*In re Asbestos Products Liability Litig.,*
  MDL-875 (E.D. Pa. May 3, 2007) (Admin. Order 12) ...........................................16

*In re Asbestos Products Liability Litig.,*
  MDL-875 (E.D. Pa. Sept. 8, 1992) (Admin. Order 3) ...........................................16

*In re Asbestos Products Liability Litig.,*
  771 F. Supp. 415 (J.P.M.L. 1991)....................................................................1, 5, 7

*Buckner v. Sam's Club., Inc.,*
  75 F.3d 290 (7th Cir. 1996) ................................................................................15

*Castner v. First National Bank of Anchorage,*
  278 F.2d 376 (9th Cir. 1960) ..............................................................................14

*Daubert v. Merrell Dow Pharma., Inc.,*
  509 U.S. 579 (1993) ..............................................................................................8

*Edwards v. Sears, Roebuck and Co.,*
  512 F.2d 276 (5th Cir. 1975) ................................................................................8

*Fairbank v. Wunderman Cato Johnson,*
  212 F.3d 528 (9th Cir. 2000) ..........................................................................13, 14

*Foster v. Arcata Associates, Inc.,*
  772 F.2d 1453 (9th Cir. 1985) ............................................................................14

*Kennedy v. Allied Mutual Ins. Co.,*
  952 F.2d 262 (9th Cir. 1991) ..........................................................................14, 15

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,*
  523 U.S. 26 (1998)..............................................................................................1, 2

*Magistrini v. One Hour Martinizing Dry Cleaning,*
  180 F. Supp. 2d 584 (D.N.J. 2002) .......................................................................8

*McCray v. Casual Corner, Inc.,*
  812 F. Supp. 1046 (C.D. Cal. 1992) ....................................................................15

UNION CARBIDE'S OPPOSITION TO PLAINTIFFS' MOTION TO
VACATE CONDITIONAL TRANSFER ORDER 287

1

**TABLE OF AUTHORITIES**

2

(continued)

**Page**

3 *McDowell v. Brown,*
   392 F.3d 1283 (11th Cir. 2004) ........................................................................8

4

*McIntyre v. K-Mart Corp.,*
5   794 F.2d 1023 (5th Cir. 1986) ......................................................................10

6 *In re Patenaude,*
   210 F.3d 135 (3d Cir. 2000) ..........................................................................15

7
*Preaseau v. Prudential Ins. Co.,*
8   591 F.2d 74 (9th Cir. 1979) ....................................................................13, 14

9 *Radobenko v. Automated Equip. Corp.,*
   520 F.2d 540 (9th Cir. 1975) ........................................................................15

10
*Riley v. Walgreen Co.,*
11   233 F.R.D. 496 (S.D. Tex. 2005)..................................................................10

12 *Shearer v. Homestake Min. Co.,*
   727 F.2d 707 (8th Cir. 1984) ........................................................................13

13
*In re Stirling Homex Corp. Securities Litig.,*
14   442 F. Supp. 547 (J.P.M.L. 1977)...............................................................6, 7

15 *United States v. Roark,*
   753 F.2d 991 (11th Cir. 1985) ........................................................................8

16
*Willy v. Coastal Corp.,*
17   503 U.S. 131 (1991)......................................................................................10

18 *Yonkosky v. Hicks,*
   409 F. Supp. 2d 149 (W.D.N.Y. 2005)..........................................................10

19

20

**STATE CASES**

*People v. Leahy,*
21   8 Cal. 4th 587 (1994) ......................................................................................9

22 *People v. McDonald,*
   37 Cal. 3d 351 (1984) ......................................................................................9

23
*People v. Mendibles,*
24   199 Cal. App. 3d 1277 (1988) ........................................................................9

25 *People v. Mendoza,*
   23 Cal. 4th 896 (2000)......................................................................................9

26

27

28

**TABLE OF AUTHORITIES**
(continued)

Page

*People v. Stoll,*
   49 Cal. 3d 1136 (1989) ................................................................................................9

**STATUTES**

28 U.S.C. § 1407(a) ................................................................................................6

28 U.S.C. § 1450 ................................................................................................10

Cal. Civ. Proc. Code § 2034.210(c) ................................................................................2, 11

Cal. Civ. Proc. Code § 2034.260(c) ................................................................................11

Cal. Evid. Code § 801(b) ................................................................................................9

Cal. Evid. Code § 803 ................................................................................................9

**RULES**

Fed. R. Civ. P. 16(a)(5) ................................................................................................15

Fed. R. Civ. P. 26(a)(2)(B) ................................................................................................11

Fed. R. Civ. P. 26(a)(4) ................................................................................................11, 12

Fed. R. Civ. P. 26(d) ................................................................................................10

Fed. R. Civ. P. 81(c) ................................................................................................10

Fed. R. Evid. 702 ................................................................................................8

**MISCELLANEOUS**

19 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice
   & Procedure* § 4512 (2d ed. 1996) ................................................................................................8

Federal Judicial Center, *Manual for Complex Litigation - Fourth* § 20.132 (2004) ................15

1   　　　　Defendant Union Carbide Corporation ("Union Carbide") hereby files this

2   memorandum of points and authorities in opposition to Plaintiff's Motion Before the Judicial

3   Panel on Multi-District Litigation to Vacate Conditional Transfer Order 287.

4   **I.　　INTRODUCTION**

5   　　　　Union Carbide respectfully requests that the Panel deny Plaintiffs' motion to

6   vacate its order conditionally transferring this case to the United States District Court for the

7   Eastern District of Pennsylvania.  Transfer is appropriate because this asbestos case is not

8   presently in trial.  In fact, the District Court for the Northern District of California spoke

9   authoritatively on this issue in its recent order denying Plaintiffs' motion to expedite the trial

10  setting, and instead staying the case pending a transfer decision by this Panel.

11  　　　　Moreover, because this case involves common questions of fact with other MDL-

12  875 cases, and because transfer would not inconvenience the parties or witnesses, transfer of the

13  case is proper.  In addition, there are still pretrial questions to be answered regarding expert

14  testimony and discovery, causation, and summary judgment; therefore, transfer would promote

15  judicial efficiency because the MDL court can efficiently resolve the issues consistent with its

16  decisions in other asbestos cases.  Transfer would further promote judicial efficiency by requiring

17  the parties to participate in the comprehensive settlement mechanism developed by the MDL

18  court, thereby allowing the parties to engage in meaningful settlement discussions.

19  **II.　　FACTUAL BACKGROUND**

20  　　　　**A.　　MDL-875**

21  　　　　On July 29, 1991, this Panel entered a transfer order establishing MDL-875, and

22  directing that all pending and future asbestos cases in the federal courts be transferred to the

23  Eastern District of Pennsylvania for pretrial management.  *In re Asbestos Products Liability*

24  *Litig.*, 771 F. Supp. 415 (J.P.M.L. 1991).  Under this system of case management, cases are

25  typically not remanded back to the jurisdiction from which they were transferred until the

26  transferee court determines that they are ready for trial.  *Id.*; *see also Lexecon Inc. v. Milberg*

27  *Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998).

28

　　UNION CARBIDE'S OPPOSITION TO PLAINTIFFS' MOTION TO
　　　　VACATE CONDITIONAL TRANSFER ORDER 287

B.  **The Instant Action**

   1.   **The State Court Proceedings**

On December 26, 2006, Plaintiffs Robert and Samantha Lyman filed suit against Union Carbide and a number of other defendants in California state court. (Pls.' Mot. Before the Judicial Panel on Multi-District Litigation to Vacate Conditional Transfer Order 287 [hereafter "Pls.' Mot. to Vacate"] Ex. D.)  In their complaint, Plaintiffs alleged that exposure to defendants' asbestos and/or asbestos-containing products caused Mr. Lyman's lung cancer. (Pls.' Mot. to Vacate.)  Defendants claim that Mr. Lyman was not exposed to their products, and that Mr. Lyman's lung cancer was caused by his smoking approximately two packs of cigarettes per day for over 50 years.

   a.   **Expert discovery and challenges to expert testimony in the state court action**

In the state court action, experts were not required to provide written reports. *See* Cal. Civ. Proc. Code § 2034.210(c).  In this case, some experts elected to provide reports, but most experts did not. (Decl. of Catherine Morris Krow filed concurrently herewith ("Krow Decl.") ¶ 2.)  For those experts who did provide reports, their reports did not conform to federal procedural requirements. (Krow Decl. ¶ 2.)

In addition, expert depositions were taken in the state court action; however, these depositions were not complete by the time the case was assigned to trial on August 6, 2007. (Krow Decl. ¶ 3.)  To the extent Union Carbide could given the state of expert discovery, on August 7, 2007, it filed motions *in limine* with the trial court challenging the admissibility of certain expert testimony under California standards. (Krow Decl. ¶ 4.)  Those motions were not ruled upon before the case was removed to federal court on August 17, 2007. (Krow Decl. ¶ 4.)  Furthermore, because motions for summary judgment were due before expert discovery was complete, causation was not an issue that could be addressed in defendants' motions for summary judgment. (Krow Decl. ¶ 5, Ex. B.)

b.   **Summary judgment in the state court action**

Mr. Lyman, the Plaintiffs' key product identification witness, was deposed for seven days in April 2007. Although Mr. Lyman was the sole percipient product identification witness to his suit against Union Carbide, he *stated explicitly* at deposition that he could not recognize the names of any Union Carbide asbestos-containing products—including Super Visbestos and Univis—distributed by co-defendant Montello, Inc. ("Montello"), and had in fact been too far away to see the brand name, manufacturer, or supplier of the materials in the field. (Krow Decl. Ex. C at 527:4-8, 529:4-6, Ex. D at 471:2-13.) In interrogatory responses provided after Mr. Lyman's deposition, Plaintiffs again failed to identify exposure to any materials that contained Union Carbide asbestos. (Krow Decl. Ex. E at 3:19-20, Ex. F at 6:6-10.)

Because there was no evidence of any exposure to any product containing Union Carbide asbestos, Union Carbide moved for summary judgment on July 5, 2007. (Krow Decl. Exs. G, J.) In opposition to Union Carbide's motion, Mr. Lyman proffered a declaration attesting that, despite his express deposition testimony to the contrary, he could now recall working around two Union Carbide asbestos-containing products, Super Visbestos and Univis. (Krow Decl. Ex. H at ¶ 4.) Mr. Lyman attributed the contradiction to the fact that his attorneys refreshed his recollection with photographs shown after the deposition, as part of his "preparation of responses to Defendant Montello's written discovery." (Krow. Decl. Ex. H at ¶ 4.) Notably, however, Plaintiffs made no mention of these products in Mr. Lyman's responses to Montello's discovery, which were served *after* Mr. Lyman's recollection was allegedly refreshed. (Krow. Decl. Ex. F.) The court nevertheless denied Union Carbide's motion for summary judgment, based on Mr. Lyman's declaration. (Krow Decl. Ex. I.) Union Carbide subsequently filed a petition for writ of mandate, which was denied without substantive analysis by the California Court of Appeal on August 3, 2007. (Krow Decl. Exs. K, L.)

c.   **Settlement discussions in the state court action**

Pretrial settlement conferences with all parties were held on June 27 and July 18, 2007. (Krow Decl. ¶¶ 16-18, Ex. M, Ex. N at 207:20-26.) At the first conference, there were still at least 17 remaining defendants, and at the second conference, there were at least 10 remaining

-3-

1    defendants. (Krow Decl. ¶¶ 16-18, Exs. M, N.)  As is typically the case, no serious settlement

2    discussions took place at these conferences. (Krow Decl. ¶ 18.)

3              Two additional settlement conferences were ordered after the case was assigned

4    out for trial; however, these conferences were no more fruitful than the first two settlement

5    conferences. (Krow Decl. ¶ 19.)  In fact, at the final settlement conference, Plaintiffs' counsel

6    met with the settlement judge first but left after only a few minutes.  The settlement judge then

7    informed the remaining defendants that further settlement discussions would not be productive.

8    (Krow Decl. ¶ 20.)

9              **2.    The Federal Court Proceedings In the Northern District of California**

10             On August 17, 2007, Union Carbide timely removed this case to federal court in

11   the Northern District of California (hereinafter the "District Court").  On August 20, 2007, Union

12   Carbide filed a Notice of Tag-Along Action with this Panel.  On August 21, 2007, Plaintiffs filed

13   a motion to remand the case to California state court; however, that motion was subsequently

14   withdrawn, and Plaintiffs have now conceded that federal jurisdiction is proper.  On August 24,

15   2007, Union Carbide filed a Motion to Stay the Case Pending Transfer to MDL-875 with the

16   District Court.  Plaintiffs opposed Union Carbide's motion to stay the case and also moved for an

17   expedited trial setting.

18             On October 10, 2007, the District Court issued a written order denying Plaintiffs'

19   motion to expedite the trial and granting Union Carbide's motion to stay. (Krow Decl. Ex. O at

20   2:9-10, 4:2-3.)  In so doing, the District Court stated:

21             [P]laintiffs' motion to expedite the trial setting proceeds from the
             premise that because this matter was ready for trial in the state
22             court, it follows that it is also ready for trial in federal court.  Thus,
             there are no pretrial proceedings over which the MDL court will
23             exercise jurisdiction. *This is not a persuasive argument*.

24

25             (Krow Decl. Ex. O at 4:6-9 (emphasis added).)  The District Court then stated that

26   "it should be noted that given the likelihood of transfer, which even the plaintiffs acknowledge,

27   an expedited trial setting will likely be rendered moot." (Krow Decl. Ex. O at 5:3-4.)

28   Furthermore, the court found that "a stay will likely preserve judicial resources by preventing a

                                                    - 4 -

1   duplication of proceedings before this Court and the MDL court, and [] the plaintiffs have not

2   persuasively identified any hardship resulting from such a stay." (Krow Decl. Ex. O at 5:5-7.)

3   **III.    ARGUMENT**

4       **A.    As An Asbestos Case Not Currently In Trial, This Case Is Appropriate For**

5             **Transfer to the MDL Court**

6         This Panel's transfer order applies to all actions alleging personal injury from

7   asbestos exposure "that have not been resolved or are not presently in trial." *In re Asbestos*

8   *Products Liability Litig. (No. VI)*, 771 F. Supp. at 424 n.11. This case, presently unresolved as to

9   Union Carbide and two other defendants, undeniably involves allegations of personal injury from

10   asbestos exposure, (Pls.' Mot. to Vacate Ex. D, 3:3-5), and several pretrial proceedings remain for

11   resolution by the MDL court. Recognizing this, the District Court denied Plaintiffs' request to

12   expedite the trial setting, and instead issued a stay of the case pending a transfer decision by this

13   Panel. (Krow Decl. Ex. O at 5:10-15.) In so doing, the District Court explicitly rejected

14   Plaintiffs' assertion that there are no pretrial proceedings over which the MDL court will exercise

15   jurisdiction as "not a persuasive argument," and indicated that it believed transfer of the case was

16   likely. (Krow Decl. Ex. O at 4:6-9, 5:3-4.) Accordingly, this case is appropriate for transfer to

17   MDL-875.

18       **B.    Because This Case Shares Common Questions of Fact and Law With Other**

19             **Cases Before the MDL Court, Transfer Would Promote Judicial Efficiency**
               **And The Convenience Of The Parties**

20         **1.    This Case Involves Questions of Fact Common to MDL-875 Cases**

21         All actions involving allegations of personal injury caused by asbestos that are not

22   presently in trial are suitable for transfer to MDL-875 because they involve common questions of

23   fact. *In re Asbestos Products Liability Litig. (No VI)*, 771 F. Supp. 415, 417-18 (J.M.P.L. 1991).

24   Furthermore, in this Panel's decision creating the asbestos MDL, the Panel expressly held that

25   distinctions based on the "advanced stage of proceedings in many of the actions," "lack of

26   commonality among defendants and plaintiffs; circumstances of exposure predominately unique

27   to each action; individual questions of causation in each action;" and "predominately individual

28   questions of the liability of defendants in each action," were *not* adequate bases for denying

1    transfer. *Id.* The Panel has continued to adhere to this approach when dealing with the question

2    of consolidation of tag-along actions. *See, e.g., In re Asbestos Products Liability Litig. (No VI)*,

3    170 F. Supp. 2d 1348, 1349 (J.P.M.L. 2001).

4    Plaintiffs here argue that this case should not be transferred to the MDL because

5    the only "critical issues" remaining are "unique to Mr. Lyman's work history and identification of

6    the products with which he, in particular, worked." (Pls.' Mot. to Vacate 5:17-23.)  Not only are

7    these contentions wholly inaccurate in light of the other legal, scientific and medical issues

8    pending resolution (see Section IIC, *infra*), Plaintiffs' arguments are indistinguishable from those

9    this Panel has explicitly and consistently rejected.  Indeed, this Panel's prior consideration of such

10   arguments only highlights how truly similar this case is to the many other asbestos cases that have

11   been transferred to MDL-875.

12              **2.    Consolidation of this Case Will Not Inconvenience the Parties or**
                       **Witnesses**
13

14   Plaintiffs' position that "effective practice before the Eastern District of

15   Pennsylvania" will require the parties and witnesses to be inconvenienced is fallacious.  (Pls.'

16   Mot. to Vacate 6:6-9.)  In support of this position, Plaintiffs assert only that the parties and their

17   attorneys will have to pay for "expensive air fares and lodging" to Philadelphia.  (Pls.' Mot. to

18   Vacate 6:6-12.)  These contentions are entirely unavailing.

19   The Panel has consistently rejected the convenience arguments of individual

20   parties, since "[o]f course, it is to the interest of each plaintiff to have all of the proceedings in his

21   suit handled in his district." *In re Antibiotic Drugs*, 299 F. Supp. 1403, 1405 (J.P.M.L. 1969)

22   (citations omitted).  Instead, the Panel weighs "the interests of all the plaintiffs and all the

23   defendants, and must consider multiple litigation as a whole in light of the purposes of the law."

24   *Id.*

25   Moreover, the cost of counsel's travel to Philadelphia is not relevant, as

26   convenience considerations focus on inconvenience to parties and witnesses, not their lawyers.

27   28 U.S.C. § 1407(a) (requiring a "determination that transfers for such proceedings will be for the

28   convenience of parties and witnesses"); *In re Stirling Homex Corp. Securities Litig.*, 442 F. Supp.

UNION CARBIDE'S OPPOSITION TO PLAINTIFFS' MOTION TO
                                                                  VACATE CONDITIONAL TRANSFER ORDER 287

1   547, 549 (J.P.M.L. 1977) (rejecting plaintiff's arguments that "the Western District of New York

2   is a more convenient forum, since it is where the trustee and Stirling's corporate headquarters are

3   located"). Plaintiffs refute their own argument that transfer will inconvenience the parties when

4   they acknowledge that transfer is "primarily for pretrial, [thus] there is usually *no need for the*

5   *parties and witnesses to travel* to [Pennsylvania] for deposition or otherwise." (Pls.' Mot. to

6   Vacate 6:2-5 (quoting *In re Asbestos Products Liability Litig. (No. VI)*, 771 F. Supp. at 422)

7   (emphasis added); *see also In re Stirling Homex Corp. Securities Litig.*, 442 F. Supp. at 549 ("Of

8   course, transfer of an action under Section 1407 does not mean that all discovery must take place

9   in the transferee district."). Since Mr. Lyman will not be required to travel to Philadelphia, any

10   difficulties posed by such travel are irrelevant.[1]

11          Moreover, to the extent Plaintiffs are concerned about their counsel's travel costs

12   (which, as noted above, is not relevant), the Panel has previously stated that "judicious use of

13   liaison counsel, lead counsel and steering committees" would likely eliminate the need to travel to

14   Philadelphia. *In re Asbestos Products Liability Litig. (No. VI)*, 771 F. Supp. at 422.

15   Accordingly, Plaintiffs' claim that transfer will result in inconvenience is without merit.

16   C.   **Allowing The MDL Court to Resolve The Remaining Pretrial Proceedings**
         **Will Promote Judicial Efficiency**

17

18          As Plaintiffs concede, the most important factor in determining whether

19   consolidation of a tag-along case is appropriate is whether transfer will promote judicial

20   efficiency. (Pls.' Mot. to Vacate 6:18-24.) Here, there remain significant pretrial proceedings left

21   to resolve, including those related to scientific gatekeeping and expert discovery, motions for

22   summary judgment, and settlement discussions. Since many, if not all, of the discovery and legal

23   issues pending resolution are common to most asbestos actions, resolution of these issues by the

24   MDL court will promote judicial efficiency and ensure consistency with other asbestos cases.

25   Moreover, the MDL court can require the parties to engage in settlement procedures that have

26   been specifically tailored to asbestos cases.

27

28   [1] Notably, if travel considerations were indeed critically important for Plaintiffs, they could have
     filed suit in a Nevada court closer to Mr. Lyman's residence rather than in San Francisco.

-7-

1       **I.      Union Carbide is Entitled to a Pretrial Hearing on the Admissibility of
2                Expert Testimony Under Federal Rule of Evidence 702**

3       In diversity cases, the Federal Rules of Evidence, not state evidentiary laws, apply.

4   *See McDowell v. Brown*, 392 F.3d 1283, 1294 (11th Cir. 2004) (citing 19 Charles Alan Wright,

5   Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 4512 (2d ed. 1996)).

6   The admissibility of expert testimony is considered a matter of federal, not state, procedure. *Id.*

7   at 1294-95 (citing *United States v. Roark*, 753 F.2d 991, 994 (11th Cir. 1985); *Edwards v. Sears,*

8   *Roebuck and Co.*, 512 F.2d 276, 292 (5th Cir. 1975)).

9       Federal Rule of Evidence 702 provides that:

10          If scientific, technical or other specialized knowledge will assist
            the trier of fact to understand the evidence or to determine a fact in
11          issue, a witness qualified as an expert by knowledge, skill,
            experience, training, or education, may testify thereto in the form
12          of opinion or otherwise, if (1) the testimony is based upon
            sufficient facts or data, (2) the testimony is the product of reliable
13          principles and methods, and (3) the witness has applied the
            principles and methods reliably to the facts of the case.
14

15  Fed. R. Evid. 702. A Rule 702 determination is a question of law to be resolved by the court in a

16  preliminary hearing prior to trial. *See, e.g., Magistrini v. One Hour Martinizing Dry Cleaning,*

17  180 F. Supp. 2d 584, 593 (D.N.J. 2002). Thus, when a party seeks to admit *any* expert testimony,

18  the court must make an initial determination, typically in a preliminary hearing under Federal

19  Rule of Evidence 104(a), that the requirements of Rule 702 have been met. *Daubert v. Merrell*

20  *Dow Pharma., Inc.*, 509 U.S. 579, 592 (1993).

21      At the time of removal, the state court had yet to exercise any gatekeeping function

22  regarding the admissibility of expert testimony because, unlike federal court in which expert

23  discovery is completed before trial so that *Daubert* challenges can be adjudicated in time for

24  summary judgment, expert discovery in California "preference" cases continues up to and after

25  the start of trial. (Krow Decl. ¶ 4.) As a result, no motions relating to the admissibility of experts

26  had been decided at the time this case was removed to federal court. (Krow Decl. ¶ 4.)

27      Moreover, even if the state court had exercised a gatekeeping function in this case,

28  that court's decisions would not be of use now because the approach followed by the California

1    state courts with regard to the admissibility of expert testimony differs dramatically from the

2    federal approach.  In fact, California state courts have firmly rejected the Rule 702 and *Daubert*

3    standard as it applies to expert testimony.  *People v. Leahy*, 8 Cal. 4th 587, 612 (1994).[2]  Instead,

4    under the California Code of Evidence, expert medical causation testimony is excludable only if

5    the expert is not properly qualified, or the opinion is not based on matter that "is of a type that

6    reasonably may be relied upon by an expert in forming an opinion upon the subject to which [the]

7    testimony relates."  Cal. Evid. Code § 801(b); *see also* Cal. Evid. Code § 803 (providing that

8    opinion testimony without a proper basis may be excluded).  The additional requirements of

9    Federal Rule 702 (*e.g.*, a rigorous examination of the expert's methods and principles) are not

10   present in the California rules.  Consequently, even if the state court had considered the

11   admissibility of expert testimony, its decisions would have been of limited use in federal court

12   where the rules are far more stringent.

13          Accordingly, important pretrial decisions remain to be made by the federal court

14   with regard to the admissibility of expert testimony at trial.  Since the MDL court is already

15   familiar with the scientific, technical, and medical issues governing the Rule 702 proceedings in

16   asbestos cases, the interests of judicial economy would be served by having the MDL court

17   oversee *Daubert*-related pretrial issues.  Moreover, because many expert witnesses in asbestos

18   litigation are the same from case to case, the MDL court has likely encountered many of these

19   experts previously and would therefore be familiar with the particular challenges relating to these

20   witnesses.  The MDL court could thus efficiently and effectively resolve such challenges.

21

22

---

23   [2] Instead of using the Rule 702/*Daubert* standard, California state courts apply a "general

24   acceptance" standard "to that *limited class* of expert testimony which is based, in whole or part, on a technique, process, or theory which is *new* to science, and even more so, the law."  *People v.*

25   *Leahy*, 8 Cal. 4th 587, 605 (1994) (quoting *People v. Stoll*, 49 Cal. 3d 1136, 1156 (1989)).  *For all other expert testimony*, including medical causation testimony, the only gatekeeping analysis

26   undertaken by the state court is performed within the confines of California Evidence Code Sections 801 and 803.  *See, e.g., People v. McDonald*, 37 Cal. 3d 351, 373 (1984) (stating that

27   California courts "have never applied the *Kelly-Frye* rule to expert medical testimony"), *overruled on other grounds by People v. Mendoza*, 23 Cal. 4th 896, 913 (2000); *People v.*

28   *Mendibles*, 199 Cal. App. 3d 1277, 1293 (1988) ("[T]he expression of expert medical opinion as to the cause of a wound or injury falls, as *McDonald* notes, outside [*Kelly's*] realm.").

UNION CARBIDE'S OPPOSITION TO PLAINTIFFS' MOTION TO
                                         VACATE CONDITIONAL TRANSFER ORDER 287

1

2

## 2. Additional Expert Discovery in Advance of a Rule 702 Hearing Is Required Under the Federal Discovery Rules[3]

3

The Federal Rules of Civil Procedure govern upon removal of an action to federal

4 court. *See* Fed. R. Civ. P. 81(c) ("These rules apply to civil actions removed to the United States

5 district courts from the state courts and govern procedure after removal."); *Willy v. Coastal Corp.*,

6 503 U.S. 131, 134 (1992) ("This expansive language contains no express exceptions."). Thus, the

7 Rules of Civil Procedure pertaining to discovery, including Rule 26, now apply to this case. *See*

8 *McIntyre v. K-Mart Corp.*, 794 F.2d 1023, 1025 (5th Cir. 1986) (rejecting plaintiffs' position that

9 state procedural rules applied to interrogatories served before removal and observing that

10 plaintiffs' argument "appears to be wholly without support in the case law"); *Riley v. Walgreen*

11 *Co.*, 233 F.R.D. 496, 498 (S.D. Tex. 2005) ("[Plaintiff] attempts to circumvent [Fed. R. Civ. P.

12 26(d)] by citing general language from cases in other contexts, to the effect that a removed case

13 'comes into the federal system in the same condition in which it left the state system.' ... But

14 neither the plaintiff's cases nor [28 U.S.C. § 1450] deal specifically with discovery or procedure

15 after removal, unlike Rules 26(d) and 81(c)." ) (citations omitted); *Yonkosky v. Hicks*, 409 F.

16 Supp. 2d 149, 151 n.6 (W.D.N.Y. 2005).

17

18

---

19 [3] Plaintiffs try to bolster their otherwise unsupportable argument that transfer of this case is inappropriate by claiming that Union Carbide has conceded that all pretrial discovery is complete.

20 (Pls.' Mot. to Vacate 2:13-14.) Plaintiffs' citation to Union Carbide's *motion* to stay the case is disingenuous because Union Carbide's *reply* to Plaintiffs' opposition to the motion to stay the

21 case focused almost exclusively on why there remained pretrial issues, including discovery issues, left in the case. (Krow Decl. Ex. P.) Moreover, to prevent any confusion, Union Carbide

22 made its position on this issue explicit in a footnote in its reply brief, which stated:

23 At the time Union Carbide filed its motion to stay the case, the principal issue between the parties was whether removal to federal court was appropriate, not

24 whether other pretrial issues remained outstanding. Accordingly, in Union Carbide's moving papers, it focused almost exclusively upon the remand

25 question; however, it also indicated at one point that pretrial discovery in the case was complete. Plaintiffs' agreement to federal jurisdiction prompted additional

26 research into whether this would remain true if the case proceeded in federal court. *That research revealed that the outstanding pretrial matters in the case*

27 *would include expert discovery issues because the federal requirements have not been fulfilled.*

28 (Krow Decl. Ex. P at 7:24-28 (emphasis added).)

UNION CARBIDE'S OPPOSITION TO PLAINTIFFS' MOTION TO
VACATE CONDITIONAL TRANSFER ORDER 287

1    Federal Rule of Civil Procedure 26(a)(2) requires any expert who is retained to

2  testify in the case to provide a signed written report to the opposing party.  *See* Fed. R. Civ. P.

3  26(a)(2)(B).  This report is required to contain:

> [A] complete statement of all opinions to be expressed and the
> basis and reasons therefore; the data or other information
> considered by the witness in forming the opinions; any exhibits to
> be used as a summary of or support for the opinions; the
> qualifications of the witness, including a list of all publications
> authored by the witness within the preceding ten years; the
> compensation to be paid for the study and testimony; and a listing
> of any other cases in which the witness has testified as an expert at
> trial or by deposition within the preceding four years.

10  *Id.*

11  There is no similar requirement in California state court, *See, e.g.*, Cal. Civ. Proc. Code §§

12  2034.210(c) & 2034.260(c), and the few expert reports that were exchanged in the state court

13  action clearly did not conform to the comprehensive federal requirements.  (Krow Decl. ¶ 2, Ex.

14  A.)

15    Furthermore, because experts were deposed in the state court case without the

16  benefit of having exchanged expert reports that comply with these requirements, and without

17  regard to the potential for a *Daubert* challenge,  Union Carbide anticipates that there may be a

18  need to re-depose certain experts so as to allow both parties to benefit from the overall purpose

19  and effect of Rules 26(a) and 702.  In particular, Rule 26(a)(4) states that "[i]f a report from the

20  expert is required under subdivision (a)(2)(B), *the deposition shall not be conducted until after*

21  *the report is provided.*"  Fed. R. Civ. P. 26(a)(4) (emphasis added).

22    A review of the Advisory Committee Notes related to subdivision (a)(4) make

23  clear that this is not merely a technical requirement.  Rather, the requirement that expert reports

24  be exchanged prior to expert depositions reflects a determination that:

> Effective cross-examination of an expert witness requires advance
> preparation.  The lawyer even with the help of his own experts
> frequently cannot anticipate the particular approach his adversary's
> expert will take or the data on which he will base his judgment on
> the stand. ... Similarly, effective rebuttal requires advance

- 11 -

> knowledge of the line of testimony of the other side. If the latter is
> foreclosed by a rule against discovery, then the narrowing of the
> issues and elimination of surprise when discovery normally
> produces are frustrated.

Fed. R. Civ. P. 26 advisory committee's note regarding 1970 amendment to subdivision (b)(4).

The Advisory Committee's Notes also make plain that the trial problems that would flow from lack of discovery of expert witnesses would be "most acute and noteworthy when the case turns largely on experts." *Id.*

An asbestos case presents highly complex and contentious scientific, technical, and medical issues. The present case is no exception, and because the case involves a dispute over the cause of Mr. Lyman's disease, the testimony of the experts could be determinative. For this reason, it is especially crucial that the parties adhere to the strictures of Rule 26(a)(4), and that expert discovery be conducted with an eye towards a possible *Daubert* challenge. In so doing, the parties will be able to effectively narrow the issues for trial and eliminate surprises.

Finally, because the MDL court has likely encountered many of the scientific and medical experts retained in this case before, it is the most appropriate forum for overseeing any additional discovery required under the federal rules because it can efficiently resolve any disputes that may arise. The MDL court can also preserve judicial economy by avoiding duplication of any discovery that has already taken place in the MDL, and it can prevent inconsistent and repetitive rulings related to these and any other discovery issues that may arise in the case.

### 3.   Union Carbide Anticipates Renewing Its Motion for Summary Judgment

Also pending resolution before trial is Union Carbide's renewed motion for summary judgment, which it intends to file after transfer to the MDL court. Although Union Carbide filed a motion for summary judgment in state court, that court applied California state summary judgment standards and procedures to deny the motion. Under the federal procedural standards, however, Union Carbide is almost certainly entitled to summary judgment. *See, e.g.,* *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531-33 (9th Cir. 2000) (noting that federal

1    and state summary judgment standards differ and may warrant summary judgment after removal).

2    In addition, the issue of causation could not be raised in Union Carbide's prior summary

3    judgment motion because expert discovery had not even begun at the time its summary judgment

4    motion was due.  Union Carbide is therefore entitled to renew its motion for summary judgment

5    in the federal forum.  *See Preaseau v. Prudential Ins. Co.*, 591 F.2d 74, 79-80 (9th Cir. 1979); *see*

6    *also* Krow Decl. Ex. O at 4:14-22, *Lyman v. Asbestos Defenda*nts, Case No. C 07-4240 SBA

7    (N.D. Cal. Oct. 9, 2007) (order granting stay) ("Moreover, the pretrial decisions of the state court

8    are not definitively concluded because they may be revisited by the MDL court.").

9            **a.**   **Union Carbide may renew summary judgment based on failure**
                **to establish causation after Plaintiffs' causation evidence is**

10                   **tested under the federal standards**

11          Under state court procedures, Union Carbide could not address Plaintiffs' failure

12   to prove causation at the summary judgment stage, whereas under federal procedures, it can.

13   Accordingly, Union Carbide intends to first challenge Plaintiffs' causation evidence under

14   *Daubert* and Federal Rule of Evidence 702.  If the rulings on this evidence are favorable, Union

15   Carbide's renewed motion for summary judgment will include the previously-unavailable

16   argument that summary judgment should be granted based on Plaintiffs' inability to establish

17   causation.  *See Allstate Fin. Corp. v. Zimmerman*, 296 F.2d 797, 799 (5th Cir. 1961) (upholding

18   district judge's decision to reconsider summary judgment motion previously denied by another

19   district court judge where subsequent motion was based on additional facts); *Shearer v.*

20   *Homestake Mining Co.*, 727 F.2d 707, 709 (8th Cir. 1984) (upholding district court's

21   reconsideration of summary judgment motion where renewed motion was based upon substantial

22   discovery of facts not before the court at the time of the first motion).

23           **b.**   **Union Carbide may renew summary judgment under federal**
                **standards based on Plaintiffs' failure to establish exposure to**

24                   **any Union Carbide product**

25          Union Carbide's initial motion for summary judgment, filed before removal,

26   contended that after several days of deposition, Mr. Lyman was unable to specify exposure to

27   even one product containing Union Carbide asbestos that could have caused his alleged injury.  In

28   opposition to Union Carbide's motion, Plaintiffs proffered an eleventh-hour declaration signed by

UNION CARBIDE'S OPPOSITION TO PLAINTIFFS' MOTION TO
VACATE CONDITIONAL TRANSFER ORDER 287

1    Mr. Lyman, which contradicted both his sworn testimony and his interrogatory responses.

2    (Krow. Decl. Ex. H.)  Given federal courts' treatment of such declarations, the outcome of Union

3    Carbide's motion would almost certainly have been different in federal court.

4            Litigants may renew a motion for summary judgment after removal, even if a state

5    court previously heard and denied the motion. *Preaseau*, 591 F.2d at 79-80.  The district court

6    should, subject to its discretion, grant a previously-denied motion for summary judgment where

7    there is a cogent reason for doing so. *Id.* at 80 (upholding summary judgment granted by a

8    district court after removal, despite a state court order denying the selfsame motion); *Fairbank*,

9    212 F.3d at 532-33 (same).

10           In particular, "because ultimately the judge who enters the final judgment in the

11   case is responsible for the legal sufficiency of the ruling," a successor judge to a case should not

12   be made to adhere to an erroneous prior order. *Fairbank*, 212 F.3d at 530.  The district court is

13   therefore entitled to make an independent determination as to whether there is an issue of fact

14   remaining for resolution at trial. *Aginsky v. Farmers Ins. Exchange*, 409 F. Supp. 2d 1230, 1233

15   (D. Or. 2005) (concluding that no issue of fact remained, despite state court opinion to the

16   contrary).

17           Moreover, the differences between federal and state summary judgment standards

18   and procedure may entitle litigants to summary judgment in federal court where they would not

19   be so entitled in state court. *Fairbank*, 212 F.3d at 530-31.  District court review of the motion

20   under federal standards, despite prior denial by the state court, is therefore critical to ensuring the

21   expediency of litigation and conservation of judicial resources; such review enables the court to

22   "settle the questions presently without compelling the parties to proceed with what may be a futile

23   and expensive trial." *Preaseau*, 591 F.2d at 79 (quoting *Castner v. First National Bank of*

24   *Anchorage*, 278 F.2d 376, 380 (9th Cir. 1960)).

25           In this instance, district courts are able and encouraged to ascertain whether

26   eleventh-hour declarations such as Mr. Lyman's are a "sham." *Foster v. Arcata Assocs., Inc.*, 772

27   F.2d 1453, 1462 (9th Cir. 1985), *overruled on other grounds by Kennedy v. Allied Mutual Ins.*

28   *Co.*, 952 F.2d 262 (9th Cir. 1991).  As the Ninth Circuit has noted, "[i]f a party who has been

- 14 -       UNION CARBIDE'S OPPOSITION TO PLAINTIFFS' MOTION TO
                VACATE CONDITIONAL TRANSFER ORDER 287

1    examined at length on deposition could raise an issue of fact simply by submitting an affidavit

2    contradicting his own prior testimony, this would greatly diminish the utility of summary

3    judgment as a procedure for screening out sham issues of fact." *Id.* (citing *Radobenko v.*

4    *Automated Equip. Corp.*, 520 F.2d 540, 544 (9th Cir. 1975)).

5              In fact, federal courts often refuse to consider declarations submitted by plaintiffs

6    in response to a defendant's motion for summary judgment where, as here, the declaration

7    appears to be a "'clear attempt by plaintiffs to shore up obvious gaps in their prima facie case

8    with phantom evidence' that was contradictory to [] sworn deposition testimony." *Buckner v.*

9    *Sam's Club. Inc.*, 75 F.3d 290, 292-93 (7th Cir. 1996) (rejecting affidavit as "an effort to undo

10   (contradict) the effects of the deposition testimony"). Rather, "[w]here an issue of fact is created

11   by inconsistencies in a party's deposition testimony and his declaration in opposition to the

12   motion, that issue is not genuine but is a sham issue." *McCray v. Casual Corner, Inc.*, 812 F.

13   Supp. 1046, 1048 (C.D. Cal. 1992) (citing *Radobenko*, 520 F.2d at 543-44) (rejecting as sham

14   plaintiff's declaration prepared for purposes of the summary judgment motion).

15             Accordingly, because Union Carbide intends to renew its motion for summary

16   judgment, and because the federal court has a cogent basis for granting Union Carbide's motion,

17   summary judgment remains a pretrial issue for the federal court to consider. As the court most

18   familiar with the technical arguments raised in such motions for summary judgment, the MDL

19   court is the ideal forum for resolution of these issues and transfer will promote efficiency and

20   consistency.

21             **4.    Individual Settlement Negotiations and Conferences are Coordinated**
              **Pretrial Proceedings Over Which the MDL Court Has Authority**
22

23             The MDL court's authority includes the power to conduct settlement negotiations

24   and conferences. *In re Patenaude*, 210 F.3d 135, 144 (3d Cir. 2000) (citing Fed. R. Civ. P.

25   16(a)(5)). The MDL court is a choice forum for encouraging efficient settlement, and most

26   multidistrict litigation is settled before trial without need for remand. Federal Judicial Center,

27   *Manual for Complex Litigation - Fourth* § 20.132 (2004).[4]

28   ───────────────
     [4] (*See* Krow Decl. Ex. Q.) As of September 2006, the MDL-875 court had resolved over 72% of

UNION CARBIDE'S OPPOSITION TO PLAINTIFFS' MOTION TO
                                        VACATE CONDITIONAL TRANSFER ORDER 287

1    The MDL-875 court in particular has promulgated a comprehensive procedural
2    mechanism to ensure that the parties have ample opportunity for meaningful settlement
3    discussions. *See* Administrative Order No. 12, *In re Asbestos Products Liability Litig.*, MDL-
4    875, at 1 (E.D. Pa. May 3, 2007) [hereafter "Admin. Order 12"]; Administrative Order No. 3, *In*
5    *re Asbestos Products Liability Litig.*, MDL-875, at 1 (E.D. Pa. Sept. 8, 1992) [hereafter "Admin.
6    Order 3"].[5] At the outset of settlement negotiations, the MDL court requires all parties to submit
7    papers at the outset of settlement negotiations stating their position relative to disease, exposure,
8    and damages. Admin. Order 12. Counsel are required to negotiate in good faith and must report
9    their progress to the court at least once a week. Admin. Order 3. In the event that settlement
10   negotiations are unsuccessful, the MDL court may refer the case to mediation, Admin. Order 12,
11   and the court will hold a termination conference to assess the status of the parties and the
12   appropriateness of forwarding the case to the Mediation Committee. Admin. Order 3. Although
13   not always required, the MDL court will often make a determination that the parties have
14   negotiated in good faith before finding the litigation suitable for trial and thus for remand. *Id.*
15       Despite Plaintiffs' broad assertions to the contrary, nothing even remotely
16   comparable to the comprehensive settlement procedures available in the MDL has occurred in
17   this case so far: there have been four a total of four settlement conferences in the case, the last
18   one of which was terminated before the parties could even begin negotiations because ***Plaintiffs'***
19   ***counsel*** indicated to the settlement judge that further attempts at settlement would not be
20   productive. (Krow Decl. ¶ 20.) Accordingly, because the parties have yet to engage in
21   meaningful structured settlement negotiation, this case is particularly suitable for multidistrict
22   litigation. Moreover, the MDL court's established procedures will provide for and oversee the
23   parties' settlement discussions and will enhance the parties' efforts to resolve this litigation
24   expediently and without trial.
25   ///
26   ///

---

27   its cases before trial. *See Statistical Analysis of Multidistrict Litigation 2006*, Judicial Panel on
28   Multidistrict Litigation (2006), *available at* http://www.jpml.uscourts.gov/Statistics.
[5] (*See* Krow Decl. Exs. R, S.)

UNION CARBIDE'S OPPOSITION TO PLAINTIFFS' MOTION TO
VACATE CONDITIONAL TRANSFER ORDER 287

IV.   **CONCLUSION**

For the foregoing reasons, Union Carbide respectfully asks that the Panel deny

Plaintiffs' motion to vacate conditional transfer order 287.

Dated:

CATHERINE MORRIS KROW
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105
Telephone: (415) 773-5984
Facsimile: (415) 773-5759

Catherine Morris Krow
Attorneys for Defendant
UNION CARBIDE CORPORATION

UNION CARBIDE'S OPPOSITION TO PLAINTIFFS' MOTION TO
VACATE CONDITIONAL TRANSFER ORDER 287

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT 29 2007

FILED
CLERK'S OFFICE

1    CATHERINE MORRIS KROW (California Bar No. 208412)
Orrick, Herrington & Sutcliffe LLP

2    The Orrick Building
405 Howard Street

3    San Francisco, CA 94105-2669
Telephone:    (415) 773-5700

4    Facsimile:    (415) 773-5759

5    KEVIN M. JORDAN (Texas Bar No. 11014800)
Baker Botts LLP

6    One Shell Plaza
910 Louisiana Street

7    Houston, TX 77002
San Francisco, CA 94105-2669

8    Telephone:    (713) 229-1322
Facsimile:    (713) 229-7722

9

10    Attorneys for Defendant
UNION CARBIDE CORPORATION

11

12             **BEFORE THE JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

13

14    IN RE: ASBESTOS PRODUCTS      MDL DOCKET NO. 875
LIABILITY LITIGATION      CTO-287
(NO VI)

15                           **PROOF OF SERVICE BY HAND
DELIVERY**

16    This Document Relates To:
ROBERT F. LYMAN and

17    SAMANTHA LYMAN v.
ASBESTOS DEFENDANTS (B*P), et al.

18

19             UNITED STATES DISTRICT COURT

20           NORTHERN DISTRICT OF CALIFORNIA

21               OAKLAND DIVISION

22    ROBERT F. LYMAN and SAMANTHA      CASE NO. C 07 4240 SBA
LYMAN,

23           Plaintiffs,

24       v.

25    ASBESTOS DEFENDANTS (B*P), et al.,

26           Defendants.

27

28

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

2007 OCT 26 P 4: 19

FILED
CLERK'S OFFICE

PROOF OF SERVICE

MULTIDISTRICT LITIGATION

OCT 2 9 2007

FILED
CLERK'S OFFICE

## PROOF OF SERVICE BY HAND DELIVERY

I, _ERNEST B. FOXMAN_____, declare:

I am over the age of eighteen years and not a party to the above-entitled cause.

My business address is _1112 Bryant St., Suite 200, San Francisco_____,

_____, California.

On October 26, 2007, I served the following documents:

1.     DECLARATION OF CATHERINE MORRIS KROW IN
SUPPORT OF UNION CARBIDE CORPORATION'S
OPPOSITION TO PLAINTIFFS' MOTION TO VACATE
CONDITIONAL TRANSFER ORDER 287

2.     UNION CARBIDE CORPORATION'S OPPOSITION TO
PLAINTIFFS' MOTION TO VACATE CONDITIONAL
TRANSFER ORDER 287

by hand delivering true copies thereof, addressed as follows:

     David R. Donadio, Esq.
     Brayton Purcell, LLP
     222 Rush Landing Road
     Novato, CA  94948-6169

Executed on October 26, 2007 in the City and County of San Francisco, State of

California.  I declare under penalty of perjury that the foregoing is true and correct.

_____
SIGNATURE

_ERNEST B. FOXMAN_____
PRINT YOUR NAME

OHS West:260302414.1

- 1 -

PROOF OF SERVICE

IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)                                          MDL No. 875

## PANEL SERVICE LIST (Excerpted from CTO-287)

Robert F. Lyman, et al. v. Union Carbide Corp., et al., N.D. California, C.A. No. 4:07-4240

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114

Edward J. Cass
Gallagher, Sharp, Fulton & Norman
Bulkley Building, 7th Floor
1501 Euclid Avenue
Cleveland, OH 44115

Adam M. Chud
Goodwin Procter, LLP
901 New York Avenue, N.W.
Washington, DC 20001

David A. Damico
Burns, White & Hickton, LLC
Four Northshore Center
106 Isabella Street
Pittsburgh, PA 15212

David R. Donadio
Brayton Purcell, LLP
222 Rush Landing Road
Novato, CA 94948-6169

Raymond P. Forceno
Forceno & Hannon
111 S. Independence Mall East
The Bourse, Suite 1000
Philadelphia, PA 19106-2574

Ellen B. Furman
Goldfein & Hosmer
1600 Market Street
33rd Floor
Philadelphia, PA 19103

Susan M. Hansen
Brownson & Ballou
225 South Sixth Street
Suite 4800
Minneapolis, MN 55402

Christopher M. Jhang
Perkins Coie, LLP
Four Embarcadero Center
Suite 2400
San Francisco, CA 94111

Reginald S. Kramer
Oldham & Dowling
195 South Main Street
Suite 300
Akron, OH 44308-1314

David C. Landin
Hunton & Williams, LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Gene Locks
Locks Law Firm, LLC
1500 Walnut Street
Philadelphia, PA 19102

**MDL No. 875 - Panel Service List (Excerpted from CTO-287) (Continued)**

Catherine N. Morris
Orrick, Herrington & Sutcliffe, LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105

Ronald L. Motley
Motley Rice, LLC
P.O. Box 1792
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464

Molly Jeannette Mrowka
Dillingham & Murphy
225 Bush Street
6th Floor
San Francisco, CA 94104

John J. Repcheck
Marks, O'Neill, O'Brien & Courtney, PC
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219

John D. Roven
Roven-Kaplan, L.L.P.
2190 North Loop West
Suite 410
Houston, TX 77018

Richard D. Schuster
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216-1008

Neil Selman
Selman, Breitman & Burgess
11766 Wilshire Boulevard
Sixth Floor
Los Angeles, CA 90025

Robert N. Spinelli
Kelley, Jasons, McGuire & Spinelli, L.L.P.
Centre Square West
15th Floor
Philadelphia, PA 19102

Robert E. Swickle
Jaques Admiralty Law Firm, P.C.
1370 Penobscot Building, 645 Griswold St.
The Maritime Asbestosis Legal Clinic
Detroit, MI 48226-4192

Andrew J. Trevelise
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

James K. Weston, II
Tom Riley Law Firm
4040 First Avenue, N.E.
P.O. Box 998
Cedar Rapids, IA 52406

Hon. Saundra B. Armstrong
U.S.D.C. - Northern District, Oakland
C 07-4240-SBA
1301 Clay Street, Suite 400S
Oakland, CA 94612-5212

1   CATHERINE MORRIS KROW (California Bar No. 208412)
    Orrick, Herrington & Sutcliffe LLP
2   The Orrick Building
    405 Howard Street
3   San Francisco, CA  94105-2669
    Telephone:    (415) 773-5700
4   Facsimile:    (415) 773-5759

5   KEVIN M. JORDAN (Texas Bar No. 11014800)
    Baker Botts LLP
6   One Shell Plaza
    910 Louisiana Street
7   Houston, TX 77002
    San Francisco, CA  94105-2669
8   Telephone:    (713) 229-1322
    Facsimile:    (713) 229-7722

9

10  Attorneys for Defendant
    UNION CARBIDE CORPORATION

11

12              **BEFORE THE JUDICIAL PANEL ON**
                **MULTIDISTRICT LITIGATION**

13

14  IN RE:  ASBESTOS PRODUCTS              MDL DOCKET NO. 875
    LIABILITY LITIGATION                  CTO-287
    (NO VI)

15                                        **PROOF OF SERVICE BY MAIL**

16  This Document Relates To:
    ROBERT F. LYMAN and
    SAMANTHA LYMAN v.
17  ASBESTOS DEFENDANTS (B*P), *et al.*

18

19              UNITED STATES DISTRICT COURT

20            NORTHERN DISTRICT OF CALIFORNIA

21                  OAKLAND DIVISION

22  ROBERT F. LYMAN and SAMANTHA          CASE NO.  C 07 4240 SBA
    LYMAN,

23
              Plaintiffs,
24
         v.
25
    ASBESTOS DEFENDANTS (B*P), *et al.*,
26
              Defendants.
27

28

PROOF OF SERVICE

**PROOF OF SERVICE BY MAIL**

I am a citizen of the United States, over eighteen years old, and not a party to this action. My place of employment and business address is Orrick, Herrington & Sutcliffe LLP, The Orrick Building, 405 Howard Street, San Francisco, California 94105-2669.

On October 26, 2007, I served the following document(s):

1.  **DECLARATION OF CATHERINE MORRIS KROW IN SUPPORT OF UNION CARBIDE CORPORATION'S OPPOSITION TO PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER 287**

2.  **UNION CARBIDE CORPORATION'S OPPOSITION TO PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER 287**

on the interested parties in this action  via U.S. mail  by placing true and correct copies thereof in sealed envelope(s) addressed as follows:

*Please see attached Panel Service List.*

I am employed in the county from which the mailing occurred.  On the date indicated above, I placed the sealed envelope(s) for collection and mailing at this firm's office business address indicated above.  I am readily familiar with this firm's practice for the collection and processing of correspondence for mailing with the United States Postal Service.  Under that practice, the firm's correspondence would be deposited with the United States Postal Service on this same date with postage thereon fully prepaid in the ordinary course of business.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 26, 2007, at San Francisco, California.

_____
Youske Okano

- 1 -

IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)

MDL No. 875

## PANEL SERVICE LIST (Excerpted from CTO-287)

Robert F. Lyman, et al. v. Union Carbide Corp., et al., N.D. California, C.A. No. 4:07-4240

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114

Edward J. Cass
Gallagher, Sharp, Fulton & Norman
Bulkley Building, 7th Floor
1501 Euclid Avenue
Cleveland, OH 44115

Adam M. Chud
Goodwin Procter, LLP
901 New York Avenue, N.W.
Washington, DC 20001

David A. Damico
Burns, White & Hickton, LLC
Four Northshore Center
106 Isabella Street
Pittsburgh, PA 15212

David R. Donadio
Brayton Purcell, LLP
222 Rush Landing Road
Novato, CA 94948-6169

Raymond P. Forceno
Forceno & Hannon
111 S. Independence Mall East
The Bourse, Suite 1000
Philadelphia, PA 19106-2574

Ellen B. Furman
Goldfein & Hosmer
1600 Market Street
33rd Floor
Philadelphia, PA 19103

Susan M. Hansen
Brownson & Ballou
225 South Sixth Street
Suite 4800
Minneapolis, MN 55402

Christopher M. Jhang
Perkins Coie, LLP
Four Embarcadero Center
Suite 2400
San Francisco, CA 94111

Reginald S. Kramer
Oldham & Dowling
195 South Main Street
Suite 300
Akron, OH 44308-1314

David C. Landin
Hunton & Williams, LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Gene Locks
Locks Law Firm, LLC
1500 Walnut Street
Philadelphia, PA 19102

JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

2007 OCT 29  A 11: 48

RECEIVED CLERK'S OFFICE

## MDL No. 875 - Panel Service List (Excerpted from CTO-287) (Continued)

Catherine N. Morris
Orrick, Herrington & Sutcliffe, LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105

Ronald L. Motley
Motley Rice, LLC
P.O. Box 1792
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464

Molly Jeannette Mrowka
Dillingham & Murphy
225 Bush Street
6th Floor
San Francisco, CA 94104

John J. Repcheck
Marks, O'Neill, O'Brien & Courtney, PC
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219

John D. Roven
Roven-Kaplan, L.L.P.
2190 North Loop West
Suite 410
Houston, TX 77018

Richard D. Schuster
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216-1008

Neil Selman
Selman, Breitman & Burgess
11766 Wilshire Boulevard
Sixth Floor
Los Angeles, CA 90025

Robert N. Spinelli
Kelley, Jasons, McGuire & Spinelli, L.L.P.
Centre Square West
15th Floor
Philadelphia, PA 19102

Robert E. Swickle
Jaques Admiralty Law Firm, P.C.
1370 Penobscot Building, 645 Griswold St.
The Maritime Asbestosis Legal Clinic
Detroit, MI 48226-4192

Andrew J. Trevelise
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

James K. Weston, II
Tom Riley Law Firm
4040 First Avenue, N.E.
P.O. Box 998
Cedar Rapids, IA 52406

Hon. Saundra B. Armstrong
U.S.D.C. - Northern District, Oakland
C 07-4240-SBA
1301 Clay Street, Suite 400S
Oakland, CA 94612-5212

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT 2 9 2007

FILED
CLERK'S OFFICE

1    CATHERINE MORRIS KROW (California Bar No. 208412)
     Orrick, Herrington & Sutcliffe LLP
2    The Orrick Building
     405 Howard Street
3    San Francisco, CA  94105-2669
     Telephone:    (415) 773-5700
4    Facsimile:    (415) 773-5759

5    KEVIN M. JORDAN (Texas Bar No. 11014800)
     Baker Botts LLP
6    One Shell Plaza
     910 Louisiana Street
7    Houston, TX  77002
     San Francisco, CA  94105-2669
8    Telephone:    (713) 229-1322
     Facsimile:    (713) 229-7722

9

10   Attorneys for Defendant
     UNION CARBIDE CORPORATION

11

12              **BEFORE THE JUDICIAL PANEL ON**
                **MULTIDISTRICT LITIGATION**

13

14   IN RE:  ASBESTOS PRODUCTS          MDL DOCKET NO. 875
     LIABILITY LITIGATION               CTO-287
     (NO VI)

15                                      **DECLARATION OF CATHERINE**
                                        **MORRIS KROW IN SUPPORT OF**
16   This Document Relates To:          **UNION CARBIDE CORPORATION'S**
     ROBERT F. LYMAN and                **OPPOSITION TO PLAINTIFFS'**
     SAMANTHA LYMAN v.                  **MOTION TO VACATE CONDITIONAL**
17   ASBESTOS DEFENDANTS (B*P), et al.  **TRANSFER ORDER 287**

18

19              UNITED STATES DISTRICT COURT

20              NORTHERN DISTRICT OF CALIFORNIA

21              OAKLAND DIVISION

22   ROBERT F. LYMAN and SAMANTHA       CASE NO.  C 07 4240 SBA
     LYMAN,
23
                  Plaintiffs,
24
          v.
25
     ASBESTOS DEFENDANTS (B*P), et al.,
26
                  Defendants.
27

28

DECLARATION OF CATHERINE MORRIS KROW IN SUPPORT OF UNION CARBIDE'S OPPOSITION TO PLAINTIFFS' MOTION
TO VACATE  CONDITIONAL TRANSFER ORDER 287

1    I, Catherine Morris Krow, declare:

2    1.    I am an attorney at Orrick, Herrington & Sutcliffe LLP, counsel for Union

3    Carbide Corporation ("Union Carbide") in this action. Except where stated on information and

4    belief, I have personal knowledge of the facts set forth in this declaration, and I could and would

5    testify competently to them if called as a witness.

6    2.    Plaintiffs' witness list in the state court proceedings listed eleven experts,

7    five of which had provided reports. Attached hereto as Exhibit A is a true and correct copy of all

8    of the expert reports provided by Plaintiffs. One of Plaintiffs' experts who provided a report, Dr.

9    Donald Breyer, has not been deposed because he was not offered for deposition within the

10   deadline established by the asbestos general orders. The majority of the parties' experts did not

11   issue reports in the state court proceeding. Moreover, to the extent any experts did issue reports,

12   these reports did not conform to Federal Rule of Civil Procedure 26(a)(2)(B).

13   3.    Expert depositions were taken in the state court action. These depositions

14   were not complete by the time the case was assigned to a trial court on August 6, 2007. For

15   example, Dr. Samuel P. Hammar, Plaintiffs' pathologist, was not deposed until August 9, 2007.

16   4.    On August 7, 2007, Union Carbide filed motions *in limine* challenging the

17   admissibility of certain expert testimony under California standards. The state court did not rule

18   on any motions *in limine* relating to the admissibility of experts before the case was removed on

19   August 17, 2007.

20   5.    Attached hereto as Exhibit B are true and correct copies of asbestos

21   General Order Nos. 140 and 156. Pursuant to General Order No. 140, section 15.A., motions for

22   summary judgment must be heard 15 days before trial, whereas General Order No. 156, 5.B.,

23   provides that expert depositions may be conducted up until the swearing in of the jury.

24   6.    Attached hereto as Exhibit C is a true and correct copy of an excerpt from

25   the Discovery Deposition of Robert Lyman, Volume VI, dated April 26, 2007.

26   7.    Attached hereto as Exhibit D is a true and correct copy of an excerpt from

27   the Discovery Deposition of Robert Lyman, Volume V, dated April 25, 2007.

28   8.    Attached hereto as Exhibit E is a true and correct copy of Defendant

- 1 -

1    Montello, Inc.'s Special Interrogatories to Plaintiff, Set One, served April 30, 2007.

2              9.      Attached hereto as Exhibit F is a true and correct copy of Plaintiff's

3    Response to Defendant Montello, Inc.,'s Special Interrogatories to Plaintiff, Set One, verified by

4    Plaintiffs on June 9, 2007, and served June 12, 2007.

5              10.     Attached hereto as Exhibit G is a true and correct copy of Union Carbide's

6    Notice of Motion for Summary Judgment, Union Carbide's Memorandum of Points and

7    Authorities in Support of its Motion for Summary Judgment, and Union Carbide's Separate

8    Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment, filed

9    July 5, 2007.

10             11.     Attached hereto as Exhibit H is a true and correct copy of the Declaration

11   of Robert F. Lyman in Support of Plaintiff's Opposition to Defendant Union Carbide

12   Corporation's Motion for Summary Judgment.

13             12.     Attached hereto as Exhibit I is a true and correct copy of the Reporter's

14   Transcript of Proceedings before the Honorable Patrick J. Mahoney in *Robert Lyman and*

15   *Samantha Lyman v. Asbestos Defendants (B*P), et al.*, San Francisco Superior Court Case No.

16   CGC-06-459162, on July 27, 2007.

17             13.     Attached hereto as Exhibit J is a true and correct copy of Defendant Union

18   Carbide Corporation's Reply Brief in Support of its Motion for Summary Judgment, filed July 26,

19   2007.

20             14.     Attached hereto as Exhibit K is a true and correct copy of Union Carbide

21   Corporation's Memorandum of Points and Authorities in Support of its Petition for Writ of

22   Mandate, filed before the Court of Appeal of California, First Appellate Division, on August 3,

23   2007.

24             15.     Attached hereto as Exhibit L is a true and correct copy of the Order issued

25   August 3, 2007, by the Court of Appeal of the State of California, First Appellate District,

26   denying Union Carbide's petition for writ of mandate.

27             16.     Attached hereto as Exhibit M is a true and correct copy of the June 27,

28   2007 settlement conference chart provided by counsel for Plaintiffs.  This chart indicates that at

1   least 17 defendants remained in the case.

2   17.   Attached hereto as Exhibit N is a true and correct copy of an excerpt from

3   Trial Volume VI, in *Lyman v. Asbestos Defendants (B\*P), et al.*, San Francisco Superior Court

4   Case No. CGC-06-459162.  This transcript indicates that there were at least 10 remaining

5   defendants during the July 18, 2007 settlement conference.

6   18.   I am informed and believe that neither Plaintiffs nor their trial counsel

7   attended the pretrial settlement conferences that took place on June 27 and July 18, 2007, and that

8   no serious settlement discussions took place during the June 27 and July 18, 2007 pretrial

9   settlement conferences.

10   19.   The state court ordered the parties to attend two additional settlement

11   conferences after the case was assigned out for trial.  These conferences were no more fruitful

12   that the first two settlement conferences.

13   20.   At the final settlement conference, Plaintiffs' counsel met with the

14   settlement judge first but left after only a few minutes.  The settlement judge then informed the

15   remaining defendants that further settlement discussions would not be productive.

16   21.   Attached hereto as Exhibit O is a true and correct copy of the October 9,

17   2007 Order of Judge Sandra Brown Armstrong, United States District Court for the Northern

18   District of California, in *Lyman v. Asbestos Defendants*, Case No. C 07-4240 SBA.

19   22.   Attached hereto as Exhibit P is a true and correct copy of Union Carbide's

20   Reply Brief in Support of its Motion to Stay in *Lyman v. Asbestos Defendants*, Case No. C 07-

21   4240 SBA, filed in the United States District Court for the Northern District of California on

22   October 2, 2007.

23   23.   Attached hereto as Exhibit Q is a true and correct copy of sections 20.132

24   and 22.35 of the Federal Judicial Center's *Manual for Complex Litigation – Fourth* (2004).

25   24.   Attached hereto as Exhibit R is a true and correct copy of Administrative

26   Order No. 12, *In re Asbestos Products Liability Litig.*, MDL-875 (E.D. Pa. May 3, 2007).

27   25.   Attached hereto as Exhibit S is a true and correct copy of Administrative

28   Order No. 3, *In re Asbestos Products Liability Litig.*, MDL-875 (E.D. Pa. Sept. 8, 1992).

DECLARATION OF CATHERINE MORRIS KROW IN SUPPORT OF UNION CARBIDE'S OPPOSITION TO PLAINTIFFS' MOTION
TO VACATE CONDITIONAL TRANSFER ORDER 287

1       I declare under penalty of perjury under the laws of California that the foregoing is

2   true and correct.

3       Executed on October 26, 2007, in San Francisco, California.

4                   CATHERINE MORRIS KROW
                ORRICK, HERRINGTON & SUTCLIFFE LLP

5                   The Orrick Building
                405 Howard Street

6                   San Francisco, CA 94105
                Telephone: (415) 773-5984

7                   Facsimile: (415) 773-5759

8

9                   Catherine Morris Krow
                Attorneys for Defendant

10                  UNION CARBIDE CORPORATION

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 4 -

DECLARATION OF CATHERINE MORRIS KROW IN SUPPORT OF UNION CARBIDE'S OPPOSITION TO PLAINTIFFS' MOTION
TO VACATE CONDITIONAL TRANSFER ORDER 287

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT 2 9 2007

FILED
CLERK'S OFFICE

# EXHIBIT A

# EXHIBIT A – 1

## BEN-ZION REPORT

*Barry Ben-Zion, Ph.D.*
*3588 Kelsey Knolls*
*Santa Rosa, CA 95403*

RECEIVED

APR 0 2 2007

BY U.S. MAIL
BRYDON HUGO & PARKER

# ROBERT F. LYMAN

## ECONOMIC LOSS

## Personal Injury



# BARRY BEN-ZION, Ph.D.
## CONSULTING ECONOMIST

*3588 KELSEY KNOLLS • SANTA ROSA, CA 95403 • TELEPHONE (707) 526-2236*
*FAX (707) 526-2258*

March 19, 2007

Mr. Alan R. Brayton
Attorney at Law
Brayton & Purcell
P.O. Box 6169
Novato, CA 94948

Re: Robert F. Lyman — Personal Injury

Dear Mr. Brayton:

We arrived at $173,250 as the financial loss sustained by Mr. Robert F. Lyman as the result of his illness and anticipated premature death.

The total financial loss consists of two components: (1) the future loss of social security retirement income and (2) the future loss of Kroger retirement income. Each loss component is described separately.

Please do not hesitate to contact me if you have any questions concerning this report or any other aspect of this case.

Sincerely yours,

Barry Ben-Zion, Ph.D.

BBZ/ms
Enclosure

# SUMMARY OF FINANCIAL LOSS
## ROBERT F. LYMAN

| | |
|---|---|
| FUTURE LOSS OF SOCIAL SECURITY RETIREMENT INCOME (APV) | 160,575 |
| FUTURE LOSS OF KROGER RETIREMENT INCOME (APV) | 12,675 |
| **TOTAL FINANCIAL LOSS** | **$173,250** |

Page 1

# VITAL INFORMATION
## ROBERT F. LYMAN

| | |
|---|---|
| DATE OF BIRTH: | 08/13/1939 |
| DATE OF TRIAL (assumed): | 07/01/2007 |
| DATE OF ASSUMED DEATH: | 10/01/2007 |
| DATE END OF LIFE EXPECTANCY: | 05/18/2022 |
| | |
| AGE AT TRIAL: | 67.88 |
| AGE AT ASSUMED DEATH: | 68.13 |
| AGE END OF LIFE EXPECTANCY: | 82.76 |
| | |
| YEARS FROM TRIAL TO END LIFE EXPECTANCY: | 14.88 |

*Sources:*
*Life Expectancy:  National Center for Health Statistics, "United States Life Tables, 2003"*
*Male, White*

## FACTS, CONSIDERATIONS, AND ASSUMPTIONS

**Future Loss of Social Security Retirement Income – Actuarial Present Value**

1.  Mr. Lyman is currently receiving social security retirement income of $1,161 per month. Social Security has a cost-of-living increase provision that is tied to the changes in the Consumer Price Index. The future loss of this income begins on the assumed date of Mr. Lyman's premature death.

2.  The actuarial present value of the future loss of social security retirement income is based on the 2003 U.S. Life Expectancy Table mortality factors for white males at 5.5 percent interest, with an allowance for the system's cost-of-living increase provision, computed at 3 percent per year, compounded.

**Future Loss of Kroger Retirement Income – Actuarial Present Value**

3.  Mr. Lyman is currently receiving Kroger retirement income of $114 per month. The future loss of this income begins on the assumed date of Mr. Lyman's premature death.

4.  The actuarial present value of the future loss of Kroger retirement income is based on the 2003 U.S. Life Expectancy Table mortality factors for white males at 5.5 percent interest.

**Other Losses**

5.  This report does not consider the past or future medical care costs, loss of home services, or any other losses that may have been incurred.

## PROOF OF SERVICE

I, Jane Camingue, do hereby declare and state:

I am employed in the city of Petaluma, County of Sonoma, California. I am over the age of 18 and not a party to the within action. My business address is 1009 Clegg Court, Petaluma, CA 94954.

On _____ MAR 3 0 2007 _____, I served the within:

_report of economic loss, personal Injury_

_____

_____

_____

Re: _Robert P Lemon_ _____

on the parties in this action by placing a true copy thereof in a sealed envelope, and envelope addressed as follows:

By mail Service:

### SEE ATTACHED LIST
(Defendants that are crossed out are not being served).

I am readily familiar with the business practice at my place of business for collection and processing of correspondence for delivery by mail. Correspondence so collected and processed is deposited with the United States Postal Service on the same day in the ordinary course of business. On the above date the said envelope was collected for the United States Postal Service following ordinary business practices.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed _____ MAR 3 0 2007 _____, at Petaluma, California.

_____

Jane Camingue

Brayton-Purcell Service List

1

Date Created: 3/30/2007-3:26:43 PM

Created by: LitSupport - ServiceList - Live
Matter Number: T07053.001 - Robert Lyman

Run By : Eliasson, Kimberly
(KBE)

Adams Nye Sinunu Bruni Becht LLP
222 Kearny Street, Seventh Floor
San Francisco, CA 94108
415-982-8955   415-982-2042 (fax)
Defendants:
Weir Valve & Controls USA Inc.
(WEIVAL)

Bassi, Martini, Edlin & Blum
351 California Street, Suite 200
San Francisco, CA 94104
415-397-9006   415-397-1339 (fax)
Defendants:
Carlisle Corporation (CARLIS)

Berry & Berry
P.O. Box 16070
2930 Lakeshore Avenue
Oakland, CA 94610
510-835-8330 - 510-835-5117 (fax)
Defendants:
Berry & Berry (B&B)

Brydon Hugo & Parker
135 Main Street, 20th Floor
San Francisco, CA 94105
415-808-0300   415-808-0333 (fax)
Defendants:
Foster Wheeler LLC (FOSLLC)
Pneumo Abex LLC (ABEX)
Union Carbide Corporation (UNIONC)

Cooley Manion Jones, LLP
21 Custom House Street
Boston, MA 02110
617-737-3100   617-737-3113 (fax)
Defendants:
A.W. Chesterton Company (CHESTR)

Dillingham & Murphy
225 Bush Street
Sixth Floor
San Francisco, CA 94104
415-397-2700   415-397-3300 (fax)
Defendants:
Montello Inc. (MONTLL)

Filice, Brown, Eassa & McLeod LLP
1999 Harrison Street, 18th Floor
Oakland, CA 94612-0850
510-444-3131   510-839-7940 (fax)
Defendants:
Chevron U.S.A., Inc. (CHEUSA)
Ford Motor Company (FORD)
General Motors Corporation (GM)
Texaco, Inc. (TEXACO)
Unocal Corporation (UNOCAL)

Glaspy & Glaspy
One Walnut Creek Center
100 Pringle Avenue, Suite 750
Walnut Creek, CA 94596
925-947-1300   925-947-1594 (fax)
Defendants:
Garlock Sealing Technologies, LLC
(GARLCK)

Haight, Brown & Bonesteel
71 Stevenson Street, 20th Floor
San Francisco, CA 94105-2981
415-546-7500   415-546-7505 (fax)
Defendants:
International Truck & Engine Corporation
(INTTRK)

Hassard Bonnington
Two Embarcadero Center
Suite 1800
San Francisco, CA 94111
415-288-9800   415-288-9802 (fax)
Defendants:
John Crane, Inc. (CRANE)

Kirkpatrick & Lockhart Preston Gates
Ellis LLP
55 Second Street
Suite 1700
San Francisco, CA 94105
415-882-8200   415-882-8220 (fax)
Defendants:
Crane Co. (CRANCO)

Law Offices of Mark H. Rosenthal
44 Montgomery Street, Suite 4020
San Francisco, CA 94104-4602
415-986-1364   415-291-1984 (fax)
Defendants:
Crown Cork & Seal Company, Inc.
(CC&S)

Law Offices of Nancy E. Hudgins
565 Commercial, 4th Floor
San Francisco, CA 94111
415-979-0100   415-979-0747 (fax)
Defendants:
Uniroyal Holding, Inc. (UNIROY)

Lewis Brisbois Bisgaard & Smith LLP
One Sansome Street
Suite 1400
San Francisco, CA 94104
415-362-2580   415-434-0882 (fax)
Defendants:
Plant Insulation Company (PLANT)

Morgan, Lewis & Bockius
One Market, Spear Tower
San Francisco, CA 94105
415-442-1000   415-442-1001 (fax)
Defendants:
Tyco International (US) Inc. (TYCOUS)

Perkins Coie LLP
Four Embarcadero Center, Suite 2400
San Francisco, CA 94111
415-344-7000   415-344-7050 (fax)
Defendants:
Honeywell International, Inc. (HONEYW)

Prindle, Decker & Amaro
310 Golden Shore, Fourth Floor
Long Beach, CA 90802
562-436-3946   562-495-0564 (fax)
Defendants:
Chevron Phillips Chemical Company LP
(CHEPHI)
Drilling Specialties Company LLC
(DRISPE)
Henry Vogt Machine Co. (HENVOG)

Prindle, Decker & Amaro
369 Pine St., Suite 800
San Francisco, CA 94104
415-788-8354   415-788-3625 (fax)
Defendants:
A.W. Chesterton Company (CHESTR)

Clayton-Purcell Service List

2

Date Created: 3/30/2007-3:26:42 PM

Run By : Eliasson, Kimberly
(KRE)

Created by: LitSupport - ServiceList - Live
Matter Number: 107053.001 - Robert Lyman

Sainick & Whitney
190 Newport Center Dr. 2nd Flr
Newport Beach, CA 92660
949-644-9400
Defendants:
  San Joaquin Refining Co., Inc. (SJREF)

Schiff Harden LLP
One Market Plaza
Spear Street Tower, 32nd Floor
San Francisco, CA 94105
415-901-8700    415-901-8701 (fax)
Defendants:
  Owens-Illinois, Inc. (OI)

Sonnenschein Nath & Rosenthal, LLP
525 Market Street, 26th Floor
San Francisco, CA 94105-2708
415-882-5000    415-882-0300 (/fax)
Defendants:
  Rapid-American Corporation (RAPID)

Thelen Reid Brown Raysman & Steiner
LLP
101 Second St., Ste 1800
San Francisco, CA 94105
415-371-1200    415-644-6519 (fax)
Defendants:
  Mack Trucks, Inc. (MACKTR)
  Shell Oil Company (SHLOIL)

Wright Robinson Osthimer & Tatum
44 Montgomery Street
18th Floor
San Francisco, CA 94104
415-391-7111    415-391-8766 (fax)
Defendants:
  Freightliner LLC (FRECOR)

# EXHIBIT A – 2

## BREYER REPORTS

**BERRY & BERRY**
A PROFESSIONAL LAW CORPORATION
TELEPHONE (510) 250-0200
FAX (510) 835-5117
WWW.BERRYANDBERRY.COM

PHILLIP E. BERRY
PETER R. GILBERT
LEONARDO J. VACCHINA
LAURA E. PRZETAK
EVANTHIA M. SPANOS
BRENDA L. WOO
JILL J. HOFFMAN
KIMBERLY M. OUKETTE

SAMUEL N. BERRY          (1904-1990)

February 20, 2007

To:  All Defense Counsel

<u>Subject:</u> <u>LYMAN, ROBERT/SAMANTHA V. CLEAVER-BROOKS</u>
<u>SFSC 459162</u>

Dear Counsel:

Enclosed please find an expert report from **DR. DONALD BREYER (DOR: 1/23/07)** pertaining to the above referenced case, recently provided to Berry & Berry by the **BRAYTON & PURCELL** office.

Very truly yours,
BERRY & BERRY

Serena D. Fong
Evidence Paralegal

M1752.ABB

02/20/2007 11:24 FAX 93355117          3 BERRY & BERRY          → BRYDON HUGO          ☑002/003

JOE|DMJ          M1762

**DONALD BREYER, M.D., F.A.C.R.**
Certified ILO B Reader

Berry & Berry

6861 Gunn Drive
Oakland, CA 94611
(510) 339-9204
Fax (510) 338-0069

FEB 6 2007

Received

January 23, 2007

## LYMAN, ROBERT

**EXAMINATION:** A contrast CT scan of the chest. The study is performed at Carson Tahoe Hospital on 11/6/06 and is technically adequate. Lack of prone high resolution images limits evaluation for interstitial fibrosis.

**DATE OF EXAMINATION:** November 6, 2006

The patient is noted to have a pacemaker. There appears to be significant atherosclerotic disease of the aorta, especially the aortic arch and descending aorta. This includes irregular mural thickening and probable ulcerated atheromatous plaque. A large sliding type hiatus hernia is present, with most of the stomach in an intrathoracic location. There is a prominent right hilar lymph node.

Bilateral changes of chest wall and diaphragmatic pleural plaque are present. These include bilateral calcified chest wall and diaphragmatic pleural plaque, with plaque calcifications noted on both anterior and posterior chest walls.

**IMPRESSION:**

BILATERAL CHANGES OF CALCIFIED CHEST WALL AND DIAPHRAGMATIC PLEURAL PLAQUE. THESE FINDINGS RAE ESSENTIALLY PATHOGNOMONIC OF ASBESTOS RELATED PLEURAL DISEASE.

LACK OF PRONE HIGH RESOLUTION IMAGES LIMITS EVALUATION FOR INTERSTITIAL FIBROSIS.

ADVANCED ATHEROMATOUS DISEASE OF THE AORTIC ARCH AND DESCENDING AORTA. FURTHER EVALUATION RECOMMENDED.

HIATUS HERNIA WITH POSSIBLE INTRATHORACIC STOMACH.

PACEMAKER IN SITU.

## PROOF OF SERVICE

I, Joyce Diala, do hereby declare and state:

I am employed in the city of Petaluma, County of Sonoma, California. I am over the age of 18 and not a party to the within action. My business address is 1009 Clegg Court, Petaluma, CA 94954.

On _____ FEB 02 2007 _____, I served the within:

Reports;

Re: *Lyman , Robert*

on the parties in this action by placing a true copy thereof in a sealed envelope, and envelope addressed as follows:

By mail Service:

**BERRY & BERRY**
P.O. Box 16070
2930 Lakeshore Ave.
Oakland, CA 94610

I am readily familiar with the business practice at my place of business for collection and processing of correspondence for delivery by mail. Correspondence so collected and processed is deposited with the United States Postal Service on the same day in the ordinary course of business. On the above date the said envelope was collected for the United States Postal Service following ordinary business practices.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed _____ FEB 02 2007 _____, at Petaluma, California.

_____
Joyce Diala

**BERRY & BERRY**
A PROFESSIONAL LAW CORPORATION
TELEPHONE (510) 250-0200
FAX (510) 835-5117
WWW.BERRYANDBERRY.COM

PHILLIP E. BERRY
PETER R. GILBERT
LEONARDO J. VACCHINA
LAURA E. PRZETAK
EVANTHIA M. EVANOS
KRENDA L. WOO
JILL J. HOFFMAN

SAMUEL H. BERRY     (1904-1990)

May 1, 2007

To:  All Defense Counsel

Subject:  LYMAN, ROBERT/SAMANTHA V. CLEAVER-BROOKS
San Francisco Superior Court No: 459162

Dear Counsel:

Enclosed please find an expert report from Dr. Donald Breyer dated 4/6/07, pertaining to the above referenced case, provided to Berry & Berry by the Brayton office on 4/26/07.

Very truly yours,
BERRY & BERRY

Kristen Poppert
Case Status Coordinator
(510) 250-0468

M1752

05/01/2007 11:11 FAX 96356117          1 BERRY & BERRY          → BRYDON HUGO          @002/004

*M1752*

TO: 7/30/07
Aek: Yes
Soe

**DONALD BREYER, M.D., F.A.C.R.**
Certified ILO B Reader

6861 Gunn Drive
Oakland, CA 94611
(510) 339-9204
Fax  (510) 336-0069

Berry & Berry

APR 25 2007

Received

April 6, 2007

### LYMAN, ROBERT

**EXAMINATION:**  A contrast CT scan of the chest taken at 2.5 mm thin sections in the supine position. The study is performed at Carson Tahoe Regional Medical Center on 3/28/07.  Lack or prone high resolution images limits evaluation for interstitial fibrosis.

**DATE OF EXAMINATION:**  March 28, 2007

The patient has circumferential pleural thickening around the entire right chest wall and mediastinal pleural surfaces.  The pleura measures up to 2 cm in thickness.  There is significant volume loss of the right lung and changes of thickened, irregular interlobular septa and thickening of the interlobular interstitium are present throughout the right lung.

Bilateral changes of calcified pleural plaque are noted.  These are seen on both posterior chest walls.  There is also evidence of calcified pleural plaque on both anterior chest walls.

The heart size is enlarged.   The patient has a pacemaker. Atherosclerotic disease of the descending aorta is noted, and there appears to be a small intimal flap present.

Small left-sided pleural effusion appears to be present. Enlarged mediastinal and abdominal lymph nodes are noted.

**IMPRESSION:**

GENERALIZED DIFFUSE RIGHT CHEST WALL PLEURAL THICKENING WITH RIGHT LUNG VOLUME LOSS AND ENLARGED  LYMPH  NODES.  THESE  FINDINGS  ARE SUSPICIOUS FOR PLEURAL MALIGNANCY SUCH AS MESOTHELIOMA.

BILATERAL CHANGES OF CALCIFIED CHEST WALL PLEURAL PLAQUE.   THIS FINDING MOST LIKELY REPRESENT ASBESTOS RELATED PLEURAL DISEASE.

RE: LYMAN, ROBERT
Page 2 of 2
April 6, 2007

CARDIOMEGALY.

ARTERIOSCLEROSIS OF THE THORACIC AORTA.

LACK OF PRONE HIGH RESOLUTION IMAGES LIMITS
EVALUATION FOR INTERSTITIAL FIBROSIS.

LYMPHANGITIC SPREAD OF DISEASE APPEARS TO BE
PRESENT IN THE RIGHT LUNG.

DAB:gmp:
D: 4/6/07 T: 4/6/07 # 821263

# PROOF OF SERVICE

I, Joyce Diala, do hereby declare and state:

I am employed in the city of Petaluma, County of Sonoma, California. I am over the age of 18 and not a party to the within action. My business address is 1009 Clegg Court, Petaluma, CA 94954.

On _____ APR 2 4 2007 _____, I served the within:

Reports;

Re: Lyman, Robert

on the parties in this action by placing a true copy thereof in a sealed envelope, and envelope addressed as follows:

By mail Service:

**BERRY & BERRY**
P.O. Box 16070
2930 Lakeshore Ave.
Oakland, CA 94610

I am readily familiar with the business practice at my place of business for collection and processing of correspondence for delivery by mail. Correspondence so collected and processed is deposited with the United States Postal Service on the same day in the ordinary course of business. On the above date the said envelope was collected for the United States Postal Service following ordinary business practices.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed _____ APR 2 4 2007 _____, at Petaluma, California.

_____
Joyce Diala

**BERRY & BERRY**
A PROFESSIONAL LAW CORPORATION
TELEPHONE (510) 250-9200
FAX (510) 835-5117
www.berryandberry.com

PHILLIP E. BERRY
PETER E. GILBERT
LEONARDO J. VARGHINA
LAURA K. PRZETAK
IVANNA M. SPANOS
JOSHUA L. WOO
JILL L. HOFFMAN

SAMUEL N. BERRY    (1924-1990)

May 31, 2007

To: All Defense Counsel

Re:  **LYMAN, ROBERT/SAMANTHA V. CLEAVER-BROOKS**
San Francisco Superior Court No. 459162

Dear Counsel:

Enclosed please find a report by Donald Breyer M.D.(DOR:5/9/07) pertaining to the above referenced case, recently provided to Berry& Berry by the BRAYTON & PURCELL office .

Very truly yours,
BERRY & BERRY

Terri Hunt
Paralegal Assistant
Evidence Paralegal Department

M1752

05/31/2007 12:48 FAX 98355117          BERRY AND BERRY          → BRYDON HUGO          ☑002/007

**DONALD BREYER, M.D., F.A.C.R.**
Certified ILO B Reader

6861 Gunn Drive
Oakland, CA 94611
(510) 339-8204
Fax  (510) 338-0069

M752
Prof : Yes
See
Berry & Berry

MAY 2 5 2007
**Received**

---

May 9, 2007

**LYMAN, ROBERT**

**EXAMINATION:**  A high resolution CT scan of the chest including prone and supine high resolution images. The study is performed as a supplement to the CT scan of 3/28/07.  The study is performed at Great Basin Imaging on 4/27/07 and is technically adequate.

**DATE OF EXAMINATION:**  April 27, 2007

In the nondependent lung fields on the prone high resolution images there are bilateral changes of an increased profusion of ill defined centrilobular nodular opacities.   Some irregular interface and parenchymal band formation is also noted.

When compared with the prior study, it is now noted that the circumferential right chest wall pleural thickening is largely resolved as has the lymphangitic spread of disease. Right lung volume loss is present and is probably related to status post right lobectomy.   Left pleural effusion has also resolved.   Some significant pericardial pleural thickening is present.

The esophagogastric region appears abnormal with thickening of the distal esophagus and/or upper pars cardia of the stomach.   Other findings appear unchanged.

**IMPRESSION:**

PARENCHYMAL  FINDINGS  PRESENT  ARE COMPATIBLE  WITH  INTERSTITIAL  FIBROSIS.  THE DISTRIBUTION AND APPEARANCE ARE COMPATIBLE WITH ASBESTOS RELATED INTERSTITIAL FIBROSIS.

THERE HAS BEEN A SIGNIFICANT CHANGE IN THE APPEARANCE OF THE CT SCAN SINCE THE PREVIOUS STUDY OF 3/28/07.   THESE CHANGES PRIMARILY INVOLVE RESOLUTION OF FINDINGS OF GENERALIZED RIGHT  CHEST  WALL  PLEURAL  THICKENING, ENLARGED  LYMPH  NODES  AND  LYMPHANGITIC SPREAD OF DISEASE.

RE: LYMAN, ROBERT
Page 2 of 2
May 9, 2007

ADDITIONAL FINDINGS PRESENT AT THIS TIME THAT WERE NOT NOTED EARLIER INCLUDE PERICARDIAL EFFUSION AND ABNORMAL THICKENING OF THE ESOPHAGOGASTRIC REGION. FURTHER EVALUTION OF THE ESOPHAGOGASTRIC AREA RECOMMENDED.

LEFT PLEURAL EFFUSION HAS ALSO RESOLVED.

THE PATIENT IS ALSO NOTED TO HAVE A CALCIFIED GALLSTONE AND POSTOPERATIVE CHANGES IN THE ABDOMEN. THERE IS THORACOLUMBAR SCOLIOSIS AND POSTOPERATIVE CHANGES IN THE LUMBAR SPINE.

BILATERAL CALCIFIED CHEST WALL PLEURAL PLAQUES AGAIN NOTED, UNCHANGED FROM THE PREVIOUS SCAN AND MOST LIKELY REPRESENTING ASBESTOS RELATED PLEURAL DISEASE.

DAB:gmp:
D: 5/9/07 T: 5/9/07 # 832645

# PROOF OF SERVICE

I, Joyce Diala, do hereby declare and state:

I am employed in the city of Petaluma, County of Sonoma, California.  I am over the age of 18 and not a party to the within action.  My business address is 1009 Clegg Court, Petaluma, CA 94954.

On _____ MAY 2 3 2007 _____, I served the within:

Reports;

Re: _____ Robert Lyman _____

on the parties in this action by placing a true copy thereof in a sealed envelope, and envelope addressed as follows:

By mail Service:

### BERRY & BERRY
P.O. Box 16070
2930 Lakeshore Ave.
Oakland, CA 94610

I am readily familiar with the business practice at my place of business for collection and processing of correspondence for delivery by mail.  Correspondence so collected and processed is deposited with the United States Postal Service on the same day in the ordinary course of business.  On the above date the said envelope was collected for the United States Postal Service following ordinary business practices.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed _____ MAY 2 3 2007 _____, at Petaluma, California.

_____
Joyce Diala

| | | | |
|---|---|---|---|
| Page 1 of 3 | **BERRY AND BERRY SERVICE LIST** | As of: | 05/31/2007 |
| | **FAX NUMBER** | | |
| CASE NAME: | LYMAN, ROBERT/SAMANTHA V. CLEAVER-BROOKS   SFSC 459182 | BRAYTN | M1752.ASB |

| | | | |
|---|---|---|---|
| M1752.ASB | ADAMS NYE BINUNU BRUNI BECHT<br>222 KEARNY, 7TH FLOOR SAN FRANCISCO, CA 94108-4521<br>*WEIR VALVE & CONTROLS USA, INC.* | 000 | (415)982-2042 |
| M1752.ASB | BASSI, MARTINI, EDLIN & BLUM<br>351 CALIFORNIA STREET, SUITE 200 SAN FRANCISCO, CA 94104<br>*CARLISLE CORPORATION, INC.* | 041 | (415)397-1339 |
| M1752.ASB | BRYDON HUGO & PARKER<br>135 MAIN STREET, 20TH FLOOR SAN FRANCISCO, CA 94105<br>*FOSTER WHEELER CORPORATION* | 69 | (415) 808-0333 |
| M1752.ASB | BRYDON HUGO & PARKER<br>135 MAIN STREET, 20TH FLOOR SAN FRANCISCO, CA 94105<br>*UNION CARBIDE* | 69 | (415) 808-0333 |
| M1752.ASB<br>E | DILLINGHAM & MURPHY, LLP<br>225 BUSH STREET, SIXTH FLOOR SAN FRANCISCO, CA 94104-4207<br>*MONTELLO, INC.* | 116 | (415)397-3306 |
| M1752.ASB | FILICE, BROWN, EASSA & MCLEOD, LLP<br>1999 HARRISON STREET, 18 FLOOR OAKLAND, CA 94612<br>*CHEVRON, U.S.A., INC.* | 030 | (510)839-7940 |
| M1752.ASB | FILICE, BROWN, EASSA & MCLEOD, LLP<br>1999 HARRISON STREET, 18 FLOOR OAKLAND, CA 94612<br>*DETROIT DIESEL CORPORATION* | 030 | (510)839-7940 |
| M1752.ASB | FILICE, BROWN, EASSA & MCLEOD, LLP<br>1999 HARRISON STREET, 18 FLOOR OAKLAND, CA 94612<br>*FORD MOTOR COMPANY* | 030 | (510)839-7940 |
| M1752.ASB | FILICE, BROWN, EASSA & MCLEOD, LLP<br>1999 HARRISON STREET, 18 FLOOR OAKLAND, CA 94612<br>*GENERAL MOTORS CORPORATION* | 030 | (510)839-7940 |
| M1752.ASB | FILICE, BROWN, EASSA & MCLEOD, LLP<br>1999 HARRISON STREET, 18 FLOOR OAKLAND, CA 94612<br>*TEXACO, INC.* | 030 | (510)839-7940 |

05/31/2007 12:49 FAX 98355117          BERRY AND BERRY          → BRYDON HUGO          ☎008/007

Page 2 of 3                    **BERRY AND BERRY SERVICE LIST**          As of:   05/31/2007
                               **FAX NUMBER**

CASE NAME:   LYMAN, ROBERT/SAMANTHA V. CLEAVER-BROOKS   SFSC 459162        BRAYTN        M1752.ASB

---

| Case No. | Firm / Address / Client | Ref | Fax |
|---|---|---|---|
| M1752.ASB | FILICE, BROWN, EASSA & MCLEOD, LLP<br>1999 HARRISON STREET, 18 FLOOR OAKLAND, CA 94612<br>*UNOCAL CORPORATION* | 030 | (510)839-7940 |
| M1752.ASB | HAIGHT, BROWN & BONESTEEL<br>71 STEVENSON STREET, 20TH FLOOR SAN FRANCISCO, CA 94105<br>*INTERNATIONAL TRUCK AND ENGINE CORP.* | 028 | (415)546-7505 |
| M1752.ASB E | HASSARD BONNINGTON<br>TWO EMBARCADERO CENTER, SUITE 1800 SAN FRANCISCO, CA 94111-3993<br>*JOHN CRANE INC.* | 035 | (415)288-9602 |
| M1752.ASB | LEWIS, BRISBOIS, BISGAARD & SMITH LLP (SF Ofc)<br>ONE SANSOME STREET, SUITE 1400 SAN FRANCISCO, CA 94104<br>*LEAR VALVES & CONTROLS* | 52 | (415)434-0882 |
| M1752.ASB E | MCNAMARA, DODGE, NEY, BEATTY, SLATTERY<br>P.O. BOX 5288 WALNUT CREEK, CA 94596<br>*FMC CORPORATION* | 054 | (925)939-0292 |
| M1752.ASB | MCNAMARA, DODGE, NEY, BEATTY, SLATTERY<br>P.O. BOX 5288 WALNUT CREEK, CA 94596<br>*TYCO INTERNATIONAL (US), INC.* | 054 | (925)939-0292 |
| M1752.ASB | PERKINS COIE<br>FOUR EMBARCADERO CENTER, SUITE 2400 SAN FRANCISCO, CA 94111-3182<br>*HONEYWELL (AKA-ALLIED-SIGNAL, INC. (BENDIX)* | 58 | (415)344-7288 |
| M1752.ASB | PRINDLE, DECKER & AMARO<br>369 PINE STREET, SUITE 800 SAN FRANCISCO, CA 94104<br>*A.W. CHESTERTON CO.* | 062(or alt415-732-5959) | (415)788-3625 |
| **Associated Counsel**<br>2288.6965 | COOLEY MANION JONES          A.W. CHESTERTON CO.<br>21 CUSTOM HOUSE STREET BOSTON, MA 02110-3536 | | (617) 737-3113 |
| M1752.ASB | PRINDLE, DECKER & AMARO<br>310 GOLDEN SHORE 4TH FLOOR LONG BEACH, CA 90801-5511<br>*CHEVRON PHILLIPS CHEMICAL CO/DRILLING SPECIALTIE* | 12 | (562)495-0564 |

---

Page 3 of 3                    **BERRY AND BERRY SERVICE LIST**          As of:   05/31/2007
                                       FAX NUMBER

CASE NAME:   LYMAN, ROBERT/SAMANTHA V. CLEAVER-BROOKS   SFSC 459162        BRAYTN          M1752.ASB

| | | | |
|---|---|---|---|
| M1752.ASB | PRINDLE, DECKER & AMARO | 12 | (562)495-0564 |
| | 310 GOLDEN SHORE 4TH FLOOR LONG BEACH, CA 90801-5511 | | |
| | *DRILLING SPECIALTIES COMPANY* | | |
| M1752.ASB | PRINDLE, DECKER & AMARO | 12 | (562)495-0564 |
| | 310 GOLDEN SHORE 4TH FLOOR LONG BEACH, CA 90801-5511 | | |
| | *HENRY VOGT MACHINE COMPANY* | | |
| M1752.ASB | SCHIFF HARDIN, LLP | 057 | (415)901-8701 |
| | ONE MARKET PLAZA, 32ND FLOOR SAN FRANCISCO, CA 94105 | | |
| | *OWENS-ILLINOIS* | | |
| M1752.ASB E | THELEN, REID BROWN RAYSMAN & STEINER LLP | 075 | (415)644-8519 |
| | 101 SECOND STREET, SUITE 1800 SAN FRANCISCO, CA 94105-3601 | | |
| | *MACK TRUCKS, INC.* | | |
| M1752.ASB | THELEN, REID BROWN RAYSMAN & STEINER LLP | 075 | (415)644-8519 |
| | 101 SECOND STREET, SUITE 1800 SAN FRANCISCO, CA 94105-3601 | | |
| | *SHELL OIL COMPANY* | | |
| M1752.ASB | WRIGHT, ROBINSON, OSTHIMER & TATUM | 080 | (415)391-8766 |
| | 44 MONTGOMERY STREET, 18TH FLOOR SAN FRANCISCO, CA 94104 | | |
| | *FREIGHTLINER CORPORATION* | | |

# EXHIBIT A – 3

## HAMMAR REPORT

**DIAGNOSTIC SPECIALTIES LABORATORY, INC., P.S.**

Samuel P. Hammar, M.D., F.C.C.P., F.C.A.P., Director   Keith O. Hallman, M.D.   David M. Bray, M.D.   Richard A. Cox, M.D., Ph.D.
700 Lebo Boulevard
Bremerton, Washington 98310
e-mail: shammar@harrisonmedical.org

Voice: 360-479-7707  Facsimile: 360-479-7886  Washington State: 800-762-2344

| | | | | | |
|---|---|---|---|---|---|
| **Name:** | LYMAN, ROBERT F. | **Age:** | 67 | | |
| | | **DOB:** | 08/13/39 | **DOD:** | (Living) |

**Date Received:** 06/20/07
**Date Transcribed:** 07/31/07

**Requested:**   Shakena N. Hall, Administrative Assistant

**Specimens:**   Medical records/reports
Pathology materials (57 slides/26 blocks):
14 slides/3 blocks H06-9466
1 iron control slide
42 slides/23 blocks H07-111

**Court Caption:**
Superior Court of California; County of San
Francisco – No. 459162
Robert F. Lyman and Samantha Lyman vs.
Asbestos Defendants

**From:**   Brayton Purcell – Novato, CA          **Phone:** 415-898-1555; **Fax:** 415-898-1247

Received from Shakena N. Hall, Administrative Assistant, Brayton Purcell, Novato, California, are fourteen glass slides and three paraffin blocks for review designated H06-9466; one iron stain control slide; and forty-two glass slides and twenty-three paraffin blocks for review designated H07-111.  Also received are medical records and reports concerning Robert F. Lyman.

There is a medical records index as follows: 1) reports of Dr. Donald Breyer dated 1/23/07, 4/6/07 and 5/9/07; 2) reports of Dr. William Salyer dated 2/17/07 and 4/16/07; 3) records from Carson Tahoe Regional Healthcare; and 4) Answers to Standard Asbestos Case Interrogatories.

Response to Interrogatories were provided by Mr. Lyman, age 67.  Response to interrogatory #22 stated Mr. Lyman fell off a ladder into the back of a truck in the Baker oil yard in Ventura, California, in 1986 and broke his neck.  He had to stop working.  He was awarded approximately $35,000.00 compensation.  Response to interrogatory #23 stated Mr. Lyman smoked up to two packs of cigarettes per day between 1955 and 2007 (104-pack years).  He smoked Camel, Kools and USA brand cigarettes.  His wife, Samantha Lyman, smoked cigarettes for 36 years.  Response to interrogatory #25 stated Mr. Lyman first consumed alcoholic beverages in approximately 1953 and no longer consumed alcohol [my note: the medical records I reviewed stated Mr. Lyman considered himself an alcoholic].

Response to interrogatory #26 stated Mr. Lyman was exposed to asbestos as follows:

| Employer: | Location of Exposure: | Job Title: | Exposure Dates: |
|---|---|---|---|
| U.S. Marine Corps | Camp Leujuene in Jacksonville, NC; and Naval Air Station Cecil Field in Jacksonville, FL. | Trainee | 1956-1957 (8 weeks) and 9-10 months, respectively |
| Job Duties: Attended basic training and aviation mechanic school.  During his schooling, Mr. Lyman worked on jet engines and contends he was exposed to asbestos. | | | |

L07-272                    Lyman, Robert F.

| Associated Transport | Waltham, MA | Manager | 1958-1967 |
|---|---|---|---|
| Job Duties: Oversaw a fleet of over 200 vehicles. Was present when mechanics in the maintenance department changed brakes on vehicles, including but not limited to Mack; Ford; Freightliner; and Fruehauf (Hayes Lemmerz International – Howell, Inc.) semi trucks. Recalled mechanics using arcing machines in his presence. Recalled White Motor and Detroit Diesel (General Motors Corporation), who were manufacturers and suppliers of replacement parts, including but not limited to brakes and engine parts. Contends he was exposed to asbestos during this employment. | | | |
| United States Gypsum | Charlestown, MA | Factory Worker (Foreman) | 1967 (approximately 8 months) |
| Job Duties: Worked as a foreman on the production line. Recalled various products, including but not limited to sheetrock being produced on this production line. Recalled seeing other workers mixing materials in large vats that were then poured out in forms for wallboard. Recalled other workers cutting the wallboard. Recalled very dusty conditions. Contends he was exposed to asbestos during this employment. | | | |
| Alva Radio Industry | Santa Monica, CA | Assembler | 1971-1975 |
| Job Duties: Assembled aircraft radar systems. Refurbished cylinder shields. Recalled using sheets and rolls of asbestos when performing this work. Recalled disturbing asbestos-containing materials that were applied in the 1940s and 1950s. Recalled removing insulation from the wire used in the radar systems. Contends he was exposed to asbestos during this employment. | | | |
| Cudd Pressure Controls | Various locations throughout Southern California | Oil field worker | 1976-1982 |
| Job Duties: Treated oil wells in oil fields, including oil fields operated by Chevron, Shell, Union Oil and Texaco. Performed drilling and worked with drilling mud and packing. Worked with and/or around others working with Baroid; Halliburton; and Montello drilling mud. Worked in close proximity to other trades, including but not limited to pipefitters and insulators who worked on pipelines while Mr. Lyman was in the oil wells. Oversaw other workers who removed and replaced valve packing. Recalled subcontractors J.T. Thorpe, Inc., and Halliburton. Worked in close proximity to others working with packing manufactured by A.W. Chesterton Company, Anchor Packing, Garlock, and John Crane. Performed pressure tests on valves, including but not limited to Crane Company, Crosby, Vogt (Henry Vogt Machine Company), and Weir. Contends he was exposed to asbestos during this employment. | | | |
| Baker Hughes Oilfield Operations, Inc. | Various oil fields throughout Southern California | Oil field worker | 1982-1986 |
| Job Duties: Same/similar to those job duties described above. | | | |
| Secondary/bystander exposure | | | 1939-1959 |
| Mr. Lyman's father worked as a pipefitter aboard various ships at the Boston Naval Shipyard in Boston, Massachusetts. Mr. Lyman contends he was exposed to asbestos as a result of his father's employment. Investigation and discovery were continuing. | | | |

Bronchoscopy due to recurrent hemoptysis was performed at Carson-Tahoe Regional Healthcare on November 16, 2006. The pathology report (H06-9466) diagnosed Mr. Lyman to have a keratinizing squamous cell carcinoma with invasion.

A report by Dr. Bruce H. Baldecchi of the Carson Tahoe Regional Healthcare System dated January 2, 2007 stated Mr. Lyman was a 67-year-old man whose history was obtained via telephone the night prior to undergoing surgery. Mr. Lyman's primary care physician was stated to be Dr. Sundaram at Lahontan Medical Center. Mr. Lyman denied previous CNS disease. He had a pacemaker placed two years previous and his heart function was stated to now be stable. He was told he had mild emphysema. He had oxygen at home but did not use it. Five months previous, Mr. Lyman was stated to have developed severe hemoptysis and was diagnosed with a lung tumor. He had a history of asbestos exposure. He had severe debility and weight loss. Four years ago he was stated to have weighed 160 pounds and as of the date of this report he weighed 128 pounds. He measured 5'10" tall. Mr. Lyman

reported chronic neck pain and low back pain. He was in a wheelchair most of the time and occasionally used a cane and a walker. He had chronic hoarseness dating back 20 years previous when he was placed in a chokehold by a policeman in Los Angeles. Mr. Lyman was stated to have been a heavy alcohol abuser. Mr. Lyman stated he was an alcoholic. He quit drinking 3-4 years previous. He smoked cigarettes for 50 years and at the time of this report was smoking two packs of cigarettes per day. Past medical history included two neck surgeries with titanium hardware placement; low back surgery x 1; an appendectomy; ulcer surgery; and resection of an abdominal aortic aneurysm. Mr. Lyman was scheduled to undergo a right thoracotomy, right upper lobe resection and possible sleeve resection of the bronchus for a malignant neoplasm of the right upper lobe. Dr. Baldecchi's impressions were: 1) malignant neoplasm of the right upper lobe; 2) severe debility with weight loss and chronic back and neck pain; 3) essentially bedridden or in a wheelchair; 4) chronic obstructive pulmonary disease; 5) probable asbestosis; 6) hypertension; 7) history of a pacemaker; 8) possible history of old myocardial infarct; 9) abdominal aortic aneurysm repair; and 10) chronic hoarseness.

An operative report by Dr. Baldecchi stated Mr. Lyman underwent a right thoracotomy, right upper lobectomy, mediastinal node dissection, bronchial sleeve resection with primary anastomosis, intercostal muscle flap coverage of a bronchial anastomosis, parietal pleural peribronchial flap, and insertion of chest tubes on January 3, 2007. The postoperative diagnosis was: squamous cell carcinoma of the right upper lobe and right mainstem bronchus.

A pathology report from Carson-Tahoe Pathology (H07-111) listed the diagnoses as: Right upper lobectomy (part D) showed a keratinizing squamous cell carcinoma, moderately differentiated, arising in the right superior bronchus and measuring 2.2 cm. There was stated to be metastatic carcinoma involving two of ten peribronchial lymph nodes. There was invasive squamous cell carcinoma at the bronchial margin. Partial resection of the right mainstem bronchus (part H) was stated to show invasive squamous cell carcinoma. The margins appeared clear. The tumor was staged as: T2 N1, MX squamous cell carcinoma.

A discharge summary from Carson-Tahoe Regional Healthcare (admission date January 3, 2007; discharge date February 13, 2007) listed the discharge diagnoses as: 1) non-small cell carcinoma, stage I; 2) status-post sleeve resection; 3) pseudomonal pneumonia; 4) prolonged ventilatory failure requiring tracheostomy; 5) aspiration requiring gastric tube placement; 6) hypertension; 7) coronary artery disease; and 8) congestive heart failure. Mr. Lyman was stated to have had an extensive hospital stay due to complications from pneumonia, recurrent pleural effusions, respiratory failure requiring a ventilator, and urinary obstruction. He was discharged on a variety of medications.

A report by Dr. William R. Salyer dated February 17, 2007 stated he reviewed slides designated H06-9466. Dr. Salyer diagnosed Mr. Lyman to have an in situ and infiltrating squamous cell carcinoma. Dr. Salyer stated he identified zero asbestos bodies, however, the quantity and nature of the samples were inadequate.

A report by Dr. William R. Salyer dated April 16, 2007 stated he reviewed slides designated H07-111. Dr. Salyer stated the right upper lobe lobectomy specimen showed an in situ and infiltrating squamous cell carcinoma with lymph node involvement and focal bronchial margin

involvement; minimal emphysema; focal peribronchiolar fibrosis; and CAP-NIOSH grade 1 asbestosis. Dr. Salyer stated he identified 7 asbestos bodies in 5.2 $cm^2$ of lung tissue or 1.3 asbestos bodies per $cm^2$. Dr. Salyer stated there were two asbestos bodies found in 0.4 $cm^2$ of lymph node tissue. Dr. Salyer stated the right main bronchus showed an infiltrating squamous cell carcinoma.

There are three reports by Dr. Donald Breyer, Certified ILO B Reader. Dr. Breyer's report dated May 9, 2007 stated he reviewed a CT scan of the performed at Great Basin Imaging on April 27, 2007 that showed parenchymal findings compatible with interstitial fibrosis and bilateral calcified chest wall pleural plaques that were unchanged from the previous exam and most likely represented asbestos-related pleural disease. Dr. Breyer stated there was a significant change in the appearance of the CT scan performed on March 28, 2007 that primarily involved generalized right chest wall pleural thickening, enlarged lymph nodes and lymphangitic spread of disease. New findings included a pericardial effusion and abnormal thickening of the esophagogastric region. The left pleural effusion had resolved since the prior exam. Dr. Breyer stated there was a calcified gallstone and postoperative changes in the abdomen. There was thoracolumbar scoliosis and postoperative changes in the lumbar spine.

**Review of slides:**
There are fourteen glass slides and three paraffin blocks for review designated H06-9466 that correspond to a pathology report bearing that number from Carson-Tahoe Pathology, accession date November 16, 2006. There is one iron stain control slide. According to the pathology report bearing that number, the case consisted of four parts designated A through D.

Part A was labeled as "right upper lobe, endobronchial biopsy" and was stated to consist of multiple pieces of light tan to reddish-pink tissue aggregating 1.2 x 0.5 x 0.3 cm. There is one H&E stained section that shows multiple fragments of bronchial mucosal tissue involved by a malignant squamous cell carcinoma. The extent of invasion could not be determined. Iron stained section made from block A shows no ferruginous bodies.

Part B was labeled "right upper lobe lung washings" and was stated to consist of approximately 90 cc. of cloudy turbid reddish-brown fluid submitted for cytology. This slide shows fragments of tissue including fragments of necrotic material. There are also fragments of viable squamous cell carcinoma.

Part C was labeled as "right upper lobe brushings" and was stated to consist of three alcohol-fixed smears. These slides show respiratory columnar epithelial cells, blood and fragments of squamous cell carcinoma.

Part D was labeled as "right upper lobe BAL cytology" and was stated to consist of 40 cc. of cloudy red-brown fluid submitted for cytologic evaluation. The slide I have for review is a cell block and two smears. There is also an iron stained section. The BAL material contains small fragments of squamous cell carcinoma. The iron stained section shows no ferruginous bodies and the control iron stained section shows the expected staining result.

There are forty-two glass slides and twenty-three paraffin blocks for review designated H07-111 that correspond to a pathology report bearing that number from Carson-Tahoe Pathology, accession date January 4, 2007. According to the pathology report, the case consisted of nine parts designated A through I.

Part A was stated to consist of an ovoid piece of tissue consistent with lymph node measuring 1.9 x 0.7 x 0.3 cm. This was stated to be a level 9 N2 inferior pulmonary lymph node. This slide shows two step sections that are composed mostly of lung tissue and not lymph node. No metastatic tumor is noted.

Part B was stated to be a level 11 lymph node and consisted of an unspecified amount of tissue that was submitted in a single cassette. There are two slides of step sections of this tissue. This tissue shows lymph node with no evidence of primary or metastatic tumor.

Part C was labeled as "lymph node, level 10" and was stated to consist of an unspecified amount of tissue that was entirely submitted in a single cassette. The H&E stained sections show lymphoid tissue with no primary or metastatic tumor.

Part D was labeled as "right upper lobectomy specimen" and was stated to consist of a 15.2 x 10.8 x 4.6 cm. specimen. The proximal bronchus was stated to be abnormal in appearance, with a thickened and an irregular mucosal surface. These changes were stated to closely approach and grossly appeared to involve the bronchial margin. This area of abnormal bronchus appeared to extend for a length of approximately 2.2 cm., although the delineation of the abnormality was not well demarcated. No underlying parenchymal mass lesion was identified. There is a code of sections: D1-Bronchial margin; D2-perihilar lymph nodes; D3-vascular margins; D4 through D10-area of abnormal bronchus; D11-unremarkable lung tissue. Slide D1 shows bronchial margin of resection that is involved by a squamous cell carcinoma. Slide D2 was stated to represent the perihilar lymph nodes. The lymph nodes show no primary or metastatic tumor. Slide D3 was stated to be of the vascular margin. It shows lung tissue surrounding the vessels. The vessels are not involved by tumor. The lung tissue surrounding the vessel shows centrilobular emphysema. Slides D4 through D10 were stated to be the area of the abnormal bronchus. There is focal in-situ and focal invasive squamous cell carcinoma. There is an iron stained section made from the block and it shows an asbestos body in a lymph node. Iron stained section D8 shows three ferruginous bodies consistent with asbestos bodies. Iron stained section D9 shows two ferruginous bodies consistent with asbestos bodies. All sections show focal involvement by a squamous cell carcinoma, some of which is in-situ. The lymph nodes are not involved by tumor.

Slide D11 shows lung tissue that exhibits areas of mild centrilobular emphysema and also patchy interstitial fibrosis including peribronchiolar fibrosis. An iron stained section made from slide D11 shows three ferruginous bodies consistent with asbestos bodies.

Part E was stated to represent level 7 lymph node. It consisted of a single blackish hemorrhagic tissue fragment measuring 6 x 5 x 3 mm. This slide shows two step sections of lymph node that exhibit recognizable architecture with no primary or metastatic tumor.

Part F was labeled as "lymph node level 7 N1, subcarinal" and was stated to consist of a hemorrhagic-appearing tissue specimen measuring 1.2 x 1.1 x 0.4 cm. This slide has pieces of lymph node and fibrofatty tissue. No primary or metastatic tumor is identified.

Part G was labeled as "lymph node level 4 N2 paratracheal" and consisted of hemorrhagic tissue aggregating 2.3 x 1.9 x 0.4 cm. Slide G shows several fragments of lymphoid tissue and fibrofatty tissue. There is focal hemorrhage. No primary or metastatic tumor is noted.

Slide H was stated to represent mainstem bronchus of the right partial resection. This slide shows involvement by squamous cell carcinoma.

Part I was labeled as "7th right rib" and was stated to consist of bone and surrounding fibrofatty tissue and also skeletal muscle. The bone and bone marrow show no significant change.

**The following summary statements can be made in this case:**
1. My name is Samuel P. Hammar, M.D., and I am licensed to practice medicine in the State of Washington. My license is active. I have been Board certified in clinical and anatomic pathology since 1975.
2. Mr. Robert F. Lyman is a 67-year-old man with a 104 pack year history of cigarette smoking and a history of occupational exposure to asbestos as described in my report. He was stated to have possibly had bystander exposure to asbestos from his father who worked as a pipefitter aboard various ships at the Boston Naval Shipyard in Boston, Massachusetts between 1939 and 1959.
3. A report by Dr. Bruce H. Baldecchi of the Carson Tahoe Regional Healthcare System dated January 2, 2007 stated Mr. Lyman was a 67-year-old man who had a history of a pacemaker placed two years previous. He was told he had mild emphysema. Five months previous, Mr. Lyman was stated to have developed severe hemoptysis and was diagnosed with a lung cancer. He had a history of asbestos exposure. His weight had decreased from 160 to 128 pounds. Mr. Lyman was stated to have been an alcoholic but had quit drinking 3 to 4 years previous.
4. Dr. Baldecchi's impressions were: 1) malignant neoplasm of the right upper lobe; 2) severe debility with weight loss and chronic back and neck pain; 3) essentially bedridden or in a wheelchair; 4) COPD; 5) probable asbestosis; 6) hypertension; 7) history of a pacemaker; 8) possible history of old myocardial infarct; 9) abdominal aortic aneurysm repair; and 10) chronic hoarseness.
5. A discharge summary from the Carson-Tahoe Regional Healthcare (admission date January 3, 2007; discharge date February 13, 2007) listed the following discharge diagnoses: 1) non-small cell carcinoma, stage I; 2) status-post sleeve resection; 3) pseudomonal pneumonia; 4) prolonged ventilatory failure requiring tracheostomy; 5) aspiration requiring gastric tube placement; 6) hypertension; 7) coronary artery disease; and 8) congestive heart failure.
6. A report by Dr. Donald Breyer, Certified ILO B Reader, stated there were parenchymal findings in a CT scan performed on April 27, 2007 compatible with interstitial fibrosis and bilateral calcified chest wall pleural plaques that were unchanged from a previous exam. Dr. Breyer stated there was a significant change in the appearance of the CT scan performed on March 28, 2007 that primarily involved

generalized right chest wall pleural thickening, enlarged lymph nodes and lympangitic spread.

7. I reviewed fourteen glass slides and three paraffin blocks designated H06-9466 that represented a right upper lobe endobronchial biopsy, right upper lobe washings, a right upper lobe brushing, and a right upper lobe BAL cytology. All of these specimens showed squamous cell carcinoma.

8. I reviewed forty two glass slides designated H07-111 that represented a right upper lobectomy specimen and sections of lymph node and bronchus. The lobectomy specimen showed a squamous cell carcinoma that was predominantly in a bronchial distribution. There were two asbestos bodies in lymph nodes and seven asbestos bodies in lung parenchymal tissue. The lung parenchymal tissue showed areas of interstitial fibrosis and patchy interstitial fibrosis, the findings being consistent with CAP-NIOSH grade 2 asbestosis. There were areas of mild centrilobular emphysema.

9. Based on Mr. Lyman's history of occupational exposure to asbestos as described in my report and radiographic and pathologic asbestosis plus radiographic hyaline pleural plaques, I conclude his squamous cell carcinoma of the lung was caused by asbestos.

10. Based on Mr. Lyman's history of cigarette smoking and mild centrilobular emphysema, I conclude his lung cancer was caused by cigarette smoke carcinogens.

11. I conclude Mr. Lyman's lung cancer was caused by the combined effect of asbestos and cigarette smoke carcinogens.

12. Robert F. Lyman was diagnosed with a right upper lobe squamous cell carcinoma and, within a reasonable degree of medical probability, each and every breath of asbestos-containing air above background was a potential substantial contributing factor in causing his right upper lobe squamous cell carcinoma.

13. All opinions and conclusions in my report are to a reasonable degree of medical certainty/probability.

*Sam Hammar*

---

L07-272                    **Lyman, Robert F.**                    *Page 7 of 7*

Samuel P. Hammar, M.D., FCCP, FCAP, Director
Keith O. Hallman, M.D.
David M. Bray III, M.D.
Richard A. Cox, M.D., Ph.D.

700 Lebo Boulevard/PO 2171
Bremerton, Washington 98310

voice:      360-479-7707
FAX:      360-479-7886
Washington State:   800-762-2344
e-mail:  shammar@harrisonmedical.org

July 31, 2007

Shakena N. Hall, Administrative Assistant
Brayton Purcell
222 Rush Landing Road
Novato, CA 94945

Phone: 800-765-7778 or 415-898-1555
Fax: 415-898-1247

Re:     LYMAN, ROBERT F.
        L07-272

Dear Ms. Hall:

Please find enclosed my report on Mr. Robert F. Lyman. The statements at the end of my report summarize the most important findings and conclusions in this case.

If you have any questions concerning my report, please let me know.

Sincerely,

Samuel P. Hammar, M.D.

SPH:nb

Enclosure

# EXHIBIT A – 4

## RAYBIN REPORTS

# Brayton Purcell

## TRIAL LAWYERS

222 Rush Landing Road
P O Box 6169
Novato, California 94948-6169
Telephone: (415) 898-1555
Facsimile: (415) 898-1247

Portland: (503) 295-4931
Los Angeles: (310) 727-1900
Salt Lake City: (801) 366-9100

Email: mail@braytonlaw.com
www.braytonlaw.com

July 24, 2007

ALAN R. BRAYTON
GILBERT L. PURCELL

DAVID R. DONADIO
CHRISTOPHER E. ANDREAS

OF COUNSEL
ROBERT M. BROWN
JEFFREY D. EISENBERG*
PETER W. FISHER

* ADMITTED ONLY IN STATES
OTHER THAN CALIFORNIA

JAMES I. BASTA
DAVID R. BAGLIERETTO
BETT D. BENDEREK
HEATHER A. KEANN*
GARY L. BRAYTON
ELAINE L. BROWN*
ANGELO L. BUTLER
C. RYAN CHRISTENSEN*
KIMBERLY L. CHU
HUGH C. COOK
MICHAEL L. De ROUEN
JOHN K. DUEX
JOHN M. EXANI
LISA J. ESPADA
JOSHUA C. KEAN
BARBARA B. YOULS*
PETER R. FRIEDMAN
ROBERT DELCHRIST*
JOHN E. GOLDSTEIN
JULIE G. GRBBEL
STEPHEN I. HEALY
GARY V. JUDD
CLAYTON W. KENT

KERRY LAW
LLOYD F. LEROY
MAUREEN C. McGOWAN
KELLY A. McMAHON
E. BROCK MELAERD*
RAYMOND D. MUELLER
JAMES P. NEVIN
OREN F. MOAN
DONALD A. OGNR
SARA I. PAUL
DAVID L. POLIN
JAY RAFFORD
JOSH I. RANCHEZ
MICHAEL R. SANTIAGO
JOHN W. SCHILT
CHRISTINA C. SKUBIC
ERIC C. SOLOMON
ROBYN E. STEIN*
DAVID A. STEWART*
SALVATORE C. TINELAND
PAULA A. VASQUEZ-JOSEY
ANTHONY E. VIERA
NANCY T. WILLIAMS

TO ALL DEFENSE COUNSEL
VIA FACSIMILE

Re:   ROBERT LYMAN
DR. DANIEL RAYBIN

Enclosed please find the above-referenced reports.

Very truly yours,

Kim Eliasson
Administrative Assistant

K:\FORMS\MEDICAL\htpdev4.wpd

**DANIEL M. RAYBIN, M.D., F.A.C.P., F.C.C.P.**
2250 HAYES STREET, #505
SAN FRANCISCO, CA 94117
TELEPHONE 415-868-1835

July 23, 2007

Ms. Marion R. DeCarlo
Workers' Compensation Manager
Brayton-Purcell
222 Rush Landing Road
Novato, CA 94948-6169

RE: Robert F. Lyman vs. Fitzpatrick Chevrolet, et al.
WCAB Case No.: SFO unassigned

Dear Ms. DeCarlo:

Thank you for asking me to review the medical records on Mr. Robert F. Lyman for the purpose of a Workers' Compensation Medical-Legal Evaluation.

I have reviewed the Application for Adjudication of Claim. It is claimed that Mr. Lyman developed lung cancer due to exposure to asbestos and other toxic substances.

I have reviewed Social Security records. Employers listed are:

1955-56 Massachusetts General Hospital
1955 Walden Mop and Brush Co Corp
1956 Perry Packaging Inc
1956 Palpar Co. Inc.
1957 US Marines
1957 Boston American League Baseball Club
1957-58 WF Schrafft & Sons Corp
1958 Follett-United Bookstore, Inc.
1958 Shriner Bros Inc
1958-59, 1962 Atlantic & Gulf Stevedores, Inc.
1958-60 Bay State Stevedore Co., Inc
1958-59 Revere Sugar Refinery
1959 John T Clark & Son of Boston, Inc.
1959-60 Boston Marine Terminal Corp, Hoosac Pier No 1
1959-61 P & O Ports of New England, Inc
1959 HP Hood Inc
1959 Patterson Wylde & Co.
1959 Federated Department Stores Inc
1960 Wilbars Inc
1960 David Kay Shoe Co of Mass Inc
1961-62 Jasons Shoe Store

1961 Braintree A S Beck Corp
1962-1969 Associated Transport, Inc.
1966 United States Gypsum Co
1968-69 First National Supermarkets Inc c/o Tops Markets Inc
1968 Foreign Auto Import, Inc
1968 Foreign Auto Sales Inc.
1969-70 National Discount Corp.
1970 Merit Freight Consolidating, Inc
1970 Wooster Express Inc
1974-77 Alva Radio Industries Inc Beverly Hills CA
1978 Richards Maintenance & Repair Mar Vista CA
1980 Mary Help of the Sick Convalescent and Nursing Hospital Newbury Park CA
1981-82 Cudd Pressure Control Inc  Houma LA
1982-86 Baker Performance Chemicals, Inc. Sugar Land TX
1987-88 Guisto Enterprises Inc Daly City CA
1988 AAAAA Rent a Space Castro Valley CA
1988 Public Storage Management Clearing Co
1989-90 Serra Enterprises Inc Colma CA
1989 A to Z Self Storage Ltd RCH Palos Verde CA
1990-91 Elmer Haas Los Gatos CA
1991-1998 Smiths Food & Drug Centers Inc Cincinnati OH
1991-92 Dennis & Teresa Maloney 7-Eleven Reno NV

I have reviewed Answers to Interrogatories, verified by the patient's wife, Sandra Lyman, 1/30/07.

Mr. Lyman lived in Massachusetts 1939-1972. He lived in various cities in California 1972-88. He lived in Florida in 1988. He lived in Reno NV 1988-2000. He lived in Silver Springs NV 2000-2004 and 2005 to present. He had lived in Springdale AR in 2004-2005.

Since 1999 he has had shortness of breath, pain, weakness and fatigue.

He smoked cigarettes 1955-2007, 0-2 ppd.

Employment includes:

US Marine Corps. He was a trainee at Camp Lejeune in Jacksonville NC for 8 weeks 1956-7. He attended aviation mechanical school in Jacksonville FL at Naval Air Station Cecil Field. He worked on jet engines and was exposed to asbestos.

Associated Transport. 1958-67 he was the operation fleet manager of a fleet of over 200 vehicles. He was present while mechanics changed truck brakes. He recalls mechanics using arcing machines when necessary while in his presence.

United States Gypsum. 19 67, for 8 months he was the foreman on a production line. Products included sheet rock. Other workers mixed materials in vats that were poured out

in forms for wallboard. He recalls other workers cutting the wallboard. He recalls very dusty conditions.

Self Employment 1968-70 he worked as a laborer performing odd jobs. He does not recall asbestos exposure.

Alva Radio Industry Santa Monica 1971-75. He was an assembler of aircraft radar systems. He refurbished cylinder shields. He used sheets and rolls of asbestos. He recalls disturbing asbestos containing materials that were originally applied in the 1940s and 1950s. On occasion he would remove insulation from the wire used in these radar systems.

Cudd Pressure Controls, Port Hueneme CA. 1976-82. He was an oil field worker treating oil wells in oil fields throughout out southern CA. There were fields operated by Chevron, Shell, Union Oil and Texaco. He performed drilling and worked with drilling muds and packing. He worked near others who were also using Baroid, Halliburton and Montello drilling muds. He worked in proximity to pipefitters and insulators who were working on the pipelines while he was in the oil fields. He oversaw other workers who were removing and replacing valve packing. He performed pressure tests on valves.

Baker Hughes Oilfield Operations Houston TX. 1982-86.   He was an oil field worker at many different locations in southern California.  He worked on a three man crew that treated oil wells in oil fields. He performed drilling and worked with drilling muds and packing. He worked near others who were also using Baroid, Halliburton and Montello drilling muds.  He worked in proximity to pipefitters and insulators who were working on the pipelines while he was in the oil fields. He oversaw other workers who were removing and replacing valve packing. He performed pressures tests on various valves.

Self Employed 1987-91. He worked as a manager at motels throughout California and Florida. He and his wife were sent by Baker Hughes Oilfield Operations, Inc., to be trained in motel marketing and management. He and his wife then managed various motels in San Francisco and Long Beach CA as well as some in Florida.

Smith's Food & Drug Reno NV 1991-98 he worked as a clerk.

He stopped working in 1998 due to a non-asbestos related disability. He had stopped working for Baker Hughes Oilfield Operations Inc, Ventura because he broke his neck on the job.

His neck was broken in a car accident.

Secondary Asbestos exposure:

His father, Sylvester Lyman worked for the US Government as a pipefitter for about 50 years. Mr. Robert Lyman lived with his father from 1939 until about 1959f. His father came home with dusty dirty clothes every day. He would meet his father at the front gate of the shipyard and walk home with him. His father worked as a pipefitter at the Boston

Naval Shipyard on board various ships.

I have reviewed a radiology report by Donald Breyer, M.D., 1/23/07. Dr. Breyer reviewed a chest CT scan from Carson Tahoe Hospital 11/6/06. The films are technically adequate but they lack prone high resolution views, which limits evaluation for interstitial lung disease.

There are bilateral findings of chest wall and diaphragmatic pleural plaque, including calcified chest wall and diaphragmatic plaque. These findings are pathognomonic for asbestos pleural disease.

A pacemaker is present. There is significant atherosclerotic disease of the aorta, especially the aortic arch and descending aorta. There is irregular mural thickening and probable ulcerated atheromatous plaque. There is a large sliding type hiatus hernia with most of the stomach in the thorax. There is a prominent right hilar lymph node.

I have reviewed a radiology report by Donald Breyer, M.D., 4/6/07. Dr. Breyer reviewed a chest CT scan with 2.5 mm thin sections, taken in the supine position only, from Carson Tahoe Regional Medical Center 3/28/07. Again, the lack of prone high resolution images limits evaluation for interstitial lung disease.

There is circumferential pleural thickening around the entire right chest wall and mediastinal pleural surfaces, with the pleura measuring up to 2 cm in thickness. There is significant volume loss in the right lung and changes of thickened irregular interlobular septae and thickening of the interlobular interstitium throughout the right lung. There is a small left sided pleural effusion.

There are enlarged mediastinal and abdominal lymph nodes.

There are bilateral changes of calcified pleural plaque, seen on both anterior and posterior chest wall.

Heart size is enlarged. There is atherosclerotic disease of the descending aorta and there appears to be a small intimal flap present. A pacemaker is present.

The findings in the right chest are suspicious for pleural malignancy such as mesothelioma. Lymphangitic spread of disease appears to be present in the right lung.

I have reviewed hand written pathology notes from William Salyer, M.D., 2/17/07.
Dr. Salyer reviewed the pathology reports as follows:

11/16/06 Carson Tahoe Pathology, Carson City NV
    -hemoptysis, abnormal right upper lobe with multiple
    infectious vs. malignant

    Right upper lobe endobronchial biopsy, positive for malignancy, keratinizing

squamous cell carcinoma with invasion.

Right upper lobe washing, cytology, positive for malignancy, keratinizing squamous cell carcinoma.

Right upper lobe brushing, cytology, positive for malignancy, keratinizing squamous cell carcinoma.

Right upper lobe bronchoalveolar lavage, cytology, positive for malignancy, keratinizing squamous cell carcinoma.

Dr. Salyer reviewed the pathology slides and he also prepared iron stains.

Lung, right upper lobe bronchial biopsy showed *in situ* and infiltrating squamous cell carcinoma. There is no lung tissue. The bronchial tissue did not contain asbestos bodies.

Lung, right upper lobe bronchial wash showed squamous cell carcinoma, 0 asbestos bodies.

Lung, right upper lobe brushing - squamous cell carcinoma.

Lung, bronchoalveolar lavage, squamous cell carcinoma, no asbestos bodies.

Dr. Salyer stated that the quantity and nature of above samples are inadequate for documentation of asbestos body content of lung tissue.

<u>I have reviewed pathology notes from William Salyer, M.D., 4/16/07.</u>

Dr. Salyer reviewed pathology reports:

1/4/07 Carson-Tahoe Pathology, right upper lobe lung cancer.
Fragment of lung parenchyma, negative
Mediastinal lymph nodes- negative
Lung, right upper lobe lobectomy- moderately differentiated squamous cell carcinoma,
2.2 cm, metastatic cancer in 2/10 hilar nodes.
Clean vascular margin
-invasive squamous cell cancer at bronchial (*this word is difficult to read*) margin
Mediastinal lymph nodes, negative
Right main bronchus, partial resection-invasive squamous cell cancer, margins
Right 5th rib, negative.

Dr. Salyer reviewed pathology slides.
Mediastinal node- fragment of lung. No lymph node. Negative.
Mediastinal lymph nodes- negative
Lung, right upper lobe, lobectomy- *in situ* and infiltrating squamous cell carcinoma with
lymph node involvement.

Focal, peribronchiolar fibrosis.
7 asbestos bodies in 5.2 cm² of lung tissue or 1.3 asbestos bodies/cm².
2 asbestos bodies in 0.4 cm² of lymph node tissue.
Asbestosis, CAP-NIOSH Grade I.
Mediastinal Lymph nodes, negative.
Right main bronchus, partial resection, infiltrating squamous cell carcinoma, negative
margins clean (*this word is difficult to read*)..
Right 7th rib negative.

    I have reviewed records from Banner-Churchill Community Hospital Pathology
Department.

    3/25/04 pathology report of gastrointestinal polyp shows fragments of tubular
adenoma. Biopsy of small bowel mucosa shows normal histology.

    I have reviewed records of Carson Tahoe Pathology.

Pathology report 10/11/05 states: abdominal aortic aneurysm. There are fragments of
abdominal aortic plaque (aneurysm repair).

Pathology report 1/11/06 describes mature adipose tissue consistent with lipoma, from
excisional biopsy, soft tissue, back.

Pathology report 11/16/06 is exactly as described above by Dr. Salyer.

Pathology report 1/3/07, amended report, is mostly as described by Dr. Salyer. In
addition, the lung lobectomy specimen has proximal bronchus abnormal in appearance
with a thickened wall with an irregular mucosal surface. These changes closely approach
and grossly appear to involve the bronchial margin. This area of abnormal bronchus
appears to extend for a length of 2.2 cm. (This is the right upper lobe bronchus which was
resected initially). The specimen from the subsequent resection of the portion of the right
mainstem bronchus had margins which appear clear.

    The tumor stage is T2, since the tumor involves the main bronchus 2 cm distal to
the carina. The TNM stage is T2, N1, MX.

    Pathology report 1/17/07 describes right lower lobe lung brushing, cytology, with
mild inflammation and no evidence for malignancy. The right lower lobe washing has
increased acute inflammation, abundant mucoid material consistent with mucus plug,
negative for malignancy.

    Pathology report 1/26/07 left thoracentesis, cytology. 5 mL of turbid tan fluid was
submitted. There were scattered mesothelial cells in a background of acute inflammation,
negative for malignancy.

    Pathology report 2/5/07 of pleural effusion (side not specified) cytology. There is
50 mL of cloudy blue/gray fluid submitted for cytology. There is a macrophage dominant

mixed inflammatory cell population with no evidence of malignancy.

<u>I have reviewed records of Carson Surgical Group.</u>

4/7/04 CT abdomen report: History is weight loss, rectal bleeding. There is a moderate sized hiatal hernia. There is an abdominal aortic aneurysm with perianeurysmal soft tissue thickening suspicious for aortitis. The configuration of the soft tissue changes is somewhat unusual, but there appears to be subtle enhancement again raising the suspicion of aortitis in a retroperitoneal location and does partially encase the distal abdominal aorta. There are also small nodes in the retroperitoneum or superiorly.

4/7/04 CT pelvis report: Distal abdominal aortic aneurysm extends to the level of the aortic bifurcation where there are bilateral iliac stents. Soft tissue thickening with heterogeneous enhancement and nodular contour partially encases the distal aorta strongly suspicious for aortitis.

10/7/05 Report of CT scan chest and abdomen from Great Basin Imaging: The aorta is atherosclerotic with wall thickening present throughout. There is ulcerative plaque present along the course of the arch and descending thoracic aorta. There is a sliding hiatus hernia, moderate in size. There is multi-focal pleural plaquing, some of which is calcified, compatible with asbestos pleural disease and unchanged from 11/27/02. Otherwise the lung parenchyma is clear.

There is an infrarenal abdominal aortic aneurysm with a fairly extensive circumferential mural thrombus, 5.1 x 5 cm in transverse diameter, with a marked interval increase in size since the prior study. The morphology of the wall is worrisome, with interruption of mural calcifications and soft tissue or thrombus outside the calcified wall.

10/10/05 Consultation by William Thomas, M.D. The most recent CT scan showed the infrarenal abdominal aortic aneurysm had increased in size. He has severe back symptoms which are chronic. His partner, Dr. Tim King, evaluated Mr. Lyman in April 004 and determined that he was a poor risk for an open aneurysm repair. He may be appropriate for an endovascular stent. He will therefore be referred to Dr. Halow, who has expertise with endovascular stenting.

10/16/05 history and physical by Dr. Kevin Halow states that Mr. Lyman has had severe unrelenting back pain for two days, to the point where he cannot sleep. He had CT scan on 10/7. He has an abdominal aortic aneurysm which is thought to be inflammatory. He has severe atherosclerotic disease and has bilateral iliac artery stents. He has chronic back pain and neck pain from multiple surgeries. He has never had pain as severe as the current pain. He has a long history of COPD and he is significantly short of breath but he does not require oxygen. He has significant phlegm. He has chronic dysphagia, heartburn, constipation and diarrhea. He is a very thin man, very fragile. On reviewing the CT he has an obvious ruptured abdominal aortic aneurysm, ruptured posteriorly into the spine, consistent with his back pain.

10/11/05 operative report describes the surgery for the posteriorly ruptured aortic

aneurysm. It notes that there was significant thrombus in the aorta, requiring thrombectomy to the proximal aorta. The right common femoral artery was significantly diseased and had previously been operated upon, requiring an endarterectomy in order to sew a graft limb to that site. Both common iliac arteries were ligated.

10/11-10/16/05 discharge summary states that Mr. Lyman had emergency repair of the contained ruptured abdominal aortic aneurysm. Initially he had a stormy post-operative course in the ICU because of his cardiac and his pulmonary disease. He was able to be extubated immediately and once his fluid status adjusted he turned around quickly.

10/19/05 Dr. Halow notes patient is status post ruptured aneurysm repair. He has had significant lower extremity edema, probably related to his history of CHF cardiac disease. He also received a lot of fluids in the OR. His primary care physician recently increased his Lasix dose to 40 mg bid. He has some blistering around the ankle with significant edema.

10/21/05 he is status post aortobifemoral bypass for a ruptured abdominal aortic aneurysm. He now has lower extremity edema. After placing UNNA boots, his swelling is a lot less.

10/25/05 Dr. Halow notes he returns post aortobifemoral bypass. He has on Unna boots for lower extremity swelling which is doing very well. He now has minimal swelling. We have placed him in compression stockings.

11/11/05 he is doing well. He developed shingles. His lower extremity swelling is improved. His wounds are healing on his feet. He has shingles on his back.

1/3/06 Dr. Halow notes that he is seen for a lipoma on his back. There is an operative report of the excision of the lipoma on 1/11/06.

1/17/06 BUN is 31, creatinine 1.1.

1/31/06 operative note by Dr. Halow describes cryoplasty of left distal SFA and popliteal artery occlusion.

4/6/06 Dr. Halow notes he is doing well, with excellent flow in both feet. He has a little pain behind his left knee. He is walking much better.

7/18/06 BUN is 90, creatinine 1.4.

9/6/06 he is seen for follow up of incisional hernia.

11/6/06 PET whole body report: Normal examination, no suspicious hypermetabolism. The pleural plaques seen on the chest CT have normal metabolic activity.

11/14/06 bilateral lower extremity segmental pressure and PVR study report: There is probable restenosis of the previously performed cryoplasty left lower extremity with

occlusion of the femoral popliteal system on the left. The right lower extremity has mild femoral popliteal occlusive disease.

11/23/06 history and physical by Dr. Halow for the laparoscopic incisional hernia repair, mentions past history of chronic obstructive pulmonary disease and severe degenerative joint disease, from which he is disabled.

12/20/06 history and physical by Dr. Halow, for the right upper lobe squamous cell carcinoma, states that this 57 year old man has multiple medical problems, significant vascular disease and long history of smoking. He has a right upper lobe squamous cell carcinoma that was diagnosed after multiple episodes of hemoptysis. He has had some underlying shortness of breath. He had a bronchoscopy which revealed a right upper lobe lesion, which extends close to the right mainstem bronchus and possibly would require a sleeve resection. Past medical history includes cerebrovascular peripheral vascular disease, coronary artery disease and degenerative joint disease. He had abdominal aortic aneurysm repair about a year ago and lower extremity endovascular interventions for revascularization. He had multiple neck surgeries and abdominal incisional hernia repair.

He is currently disabled from his multiple neck surgeries. He still smokes. He used to drink, but doesn't drink any more. He is on chronic methadone use.

He had a chest CT scan which showed no significant adenopathy and no other abnormalities. His bronchoscopy was consistent with a superficial spreading squamous cell carcinoma of the right upper lobe extending close to the orifice of the right mainstem bronchus. He has had multiple pulmonary function tests. He would be a good candidate for a lobectomy but a marginal candidate for a pneumonectomy.

He also has chronic obstructive pulmonary disease.

1/3/07 operative report by Dr. Halow: The patient has a superficial spreading squamous cell carcinoma of the right upper lobe. He is extremely high risk for surgery but could tolerate a right upper lobectomy. Right upper lobectomy was attempted, but the bronchial margin was positive. They proceeded with sleeve resection with end to end anastomosis between the right main bronchus and the bronchus intermedius. There was intercostals muscle flap coverage with parietal peribronchial flap.

The right upper lobe was adherent to the chest wall. The adhesions were taken down. Mediastinal node dissection was performed. First right upper lobectomy was performed. Then, for the sleeve resection, the right main bronchus was transected 1 cm distal to the carina. The bronchus intermedius was transected. The frozen sections showed clean margins.

1/10/07 operative report by Dr. Halow states that tracheostomy was performed because of respiratory failure following the right upper lobe sleeve resection.

1/30/07 chest x-ray report: Improved aeration of right lung. There is prominent opacity in the left mid and lower lung field. Tracheostomy tube is noted. A PICC is noted. NG tube

is seen. Persistent opacity at the left mid and lower lung field likely represents overlying left pleural effusion, atelectasis or pneumonia. Increased markings projecting over the right upper lobe may represent infiltrate or atelectasis.

2/1/07 chest x-ray report: Airspace disease changes are noted in the left lower lobe. There is moderate volume loss in the left hemi-thorax.

2/13/07 chest x-ray report: Tracheostomy midline, right PICC line, left pacemaker, bilateral infiltrates and bibasilar atelectasis.

2/27/07 Dr. Halow notes post op visit, status post sleeve resection right upper lobe. Overall doing well despite some significant pulmonary issues. His right lower extremity has been swelling lately. He is in compression stockings. The tracheostomy is still in place.

2/28/07 report of right lower extremity venous ultrasound shows no evidence of deep vein thrombosis. The patient had some swelling in the right lower extremity.

<u>I have reviewed records of the Carson Tahoe Regional Medical Center.</u>

7/12/06 pulmonary consultation by Guy Foster, M.D. The patient has hemoptysis. CT 5/27/06 shows nodular density at right base and multiple pleural plaques. Prior chemical and asbestos exposure. Hemoptysis began 6 weeks previously and is more than streaks, red. He had prior laryngeal surgery due to crush injury. He's had intermittent darker stools for a couple of months. His dyspnea is stable. He seems to stop breathing at night, per wife, who wakes him up. He snores. He is not tired during the daytime. He lost 40 lbs. recently. He has smoked 1 ppd for 14 years. Occupation is disabled. He has COPD and heart problems. He was hospitalized twice in 2005 for blood loss. On exam his lungs have poor breath sounds throughout. Dr. Foster's assessment is hemoptysis, proceed with bronchoscopy given high risk for malignancy. Will obtain PET scan first. The right lower lobe findings are probably plaques as well. He has pleural plaque undoubtedly due to asbestos exposure. He has obstructive sleep apnea and COPD. Dr. Foster ordered Advair, and albuterol.

8/2/06 PET CT scan shows a mild degree of increased uptake in the superior right hilum.

8/8/06 Dr. Foster saw Mr. Lyman for surgical clearance. Hemoptysis has resolved. If it returns, bronchoscopy.

8/17/06 Dr. Foster reviewed the PET scan images. He does not clearly see a right hilar mass and he does not feel that the risks of bronchoscopy, biopsy of that region are justified.

9/25/06 Dr. Foster notes patient returns for follow up of obstructive sleep apnea, unable to use CPAP machine. No change in breathing, no further hemoptysis.

11/6/06 chest CT scan report describes clear lungs without obvious nodules. There are

numerous small partially calcified pleural plaques involving the diaphragmatic surfaces and chest wall bilaterally. The findings suggest asbestos pleural disease. They are unchanged vs. prior chest CT 10/14/05. There is a moderate sized retrocardiac hiatal hernia. There is stable fusiform aneurismal dilatation of the descending thoracic aorta. A pacemaker is present.

11/13/06 Dr. Foster notes right hilar activity on PBT scan, recent cough with white yellow phlegm for 2 weeks, now blood streaking as well. CT scan negative. Bronchoscopy is scheduled.

11/16/06 bronchoscopy report by Dr. Foster states the patient had recurrent hemoptysis. The vocal cords appeared normal. The right upper lobe bronchus was abnormal with multiple patches of possibly necrotic or viral vs. necrotic tissue from malignancy. Multiple biopsies, brushings and washings were taken.

The culture of the bronchial washings grew *Pseudomonas aeruginosa*.

11/20/06 Pulmonary Function Tests include for age 67, height 62 inches, FVC 3.05 L., 94% predicted, FEV1 1.76 L., 76% predicted, FEV1/FVC 58%, Total Lung Capacity 6.28 L., 135% predicted, Residual Volume 1.94 L., 168% predicted, DLCO 11.6, 76% predicted. Dr. Foster interpreted the study as showing a mild obstructive ventilatory dysfunction with no response to inhaled bronchodilator. Increased RV and TLC are consistent with air trapping/hyperinflation. DLCO is borderline reduced.
ii.
11/20/06 Dr. Foster notes follow up of non-small cell carcinoma, squamous cell ca, bronchoscopy positive, there was thickening and redness of RUL takeoff as well. Minimal streaks of blood intermittently.   He is to be referred to Dr. Halow.

11/22/06 cardiopulmonary exercise test report states VO2 max was 11.9, 51% predicted, based on weight. Absolute was 34% predicted. Anaerobic threshold was 0.576 which is 28% of predicted VO2 max. Heart rate was 100, which is 66% of predicted heart rate. Oxygen pulse was 6.9. Maximum minute ventilation was 49.2; 51%. Respiratory rate was 34. Dr. Foster believed the anaerobic threshold was correct. The patient did not achieve either a cardiac or a pulmonary limitation. His anaerobic threshold was severely decreased, compatible with deconditioning; severely peripheral vascular disease or mitochondrial disease or "mitochondrial myopathy." His preserved oxygen pulse argues for a relatively intact stroke volume. Dr. Foster's impression was severely reduced oxygen consumption, most likely due to deconditioning.
Comment: Elsewhere, Dr. Foster noted that the patient was taking a beta blocker at the time of the study.

The pre-exercise spirometry reports, for age 67, height 62 inches, FVC 2.99 L., 92% predicted, FEV1 1.39 L., 60% predicted and FEV1/FVC 46%.

The post-exercise spirometry shows FVC 2.97 L., 91% predicted, FEV1 1.52 L., 66% predicted. FEV1/FVC is 51%.

The report states that the test was performed with a bicycle ergometer. He stopped exercising due to leg fatigue. His medications were: Methadone, Xanax, Albuterol MDI, Advair, Lasix, Lisinopril, Plavix, Lipitor, Soma, atenolol, Spiriva and Niacin. History is dyspnea with exercise and at rest. HE has chronic congested productive cough. He has an 82 pack year smoking history. He has been diagnosed with lung cancer and COPD. He has had an occupational exposure to asbestos.

The exercise test results include peak responses of VO2 11.9 ml/kg/min, total 0.692 L./min, anaerobic threshold 0.576 L./min, heart rate 100, minute ventilation 49.3 L., 57% predicted, respiratory rate 34, tidal volume 1.3 L., SpO2 94%.

1/3/07-3/13/07 discharge summary of hospitalization, by Dr. Guy Foster. Diagnoses are Non-small cell carcinoma stage I, status post sleeve resection, pseudomonal pneumonia, prolonged ventilatory failure requiring tracheostomy, aspiration requiring gastric tube placement, hypertension, coronary artery disease, congestive heart failure.

He underwent prolonged intubation for his initial pseudomonas pneumonia. He did have pseudomonas recovered with new infiltrate prior to discharge, but he was completely stable with no further fevers or leukocytosis and will continue on ciprofloxacin as an outpatient.

He had left pleural effusion. He had thoracentesis twice on the left. Both fluids were transudates, undoubtedly due to low albumin/fluid overload.

The sleeve resection had excellent margins from the tumor and it held up well in the postop period. There were minimal problems with bleeding. He did have multiple mucus plugs, which required multiple bronchoscopies.

He had post-operative respiratory failure. After a tracheostomy was placed, he was gradually weaned off the ventilator over an extended period of time, likely complicated by coronary artery disease.

At discharge his hypertension was controlled. He was unable to tolerate a beta blocker or ACE inhibitor and would continue on Lasix due to very brittle congestive heart failure with repeated episodes of congestive heart failure.

His congestive heart failure will be followed by his cardiologist. He can only tolerate a minimal dose of diuretic. He is to follow his weight closely.

He had urologic obstruction while in the hospital. After a Foley catheter was placed, he was put back on Flomax and the obstruction resolved.

He continued on therapy for anxiety and on methadone for his chronic pain.

1/3/07 consultation by Dr. Guy Foster. He had referred the patient to Dr. Halow for possible resection of right upper lobe non-small cell lung cancer. The pre-op PET scan had shown minimal inflammation which was hilar only. Full pulmonary function testing

was actually fairly good. Cardiopulmonary exercise test showed quite poor status overall. It was cardiac limited, possibly falsely by his beta blocker. Currently he does not have any shortness of breath and he has not had cough lately. He has neck pain and pain at his incision.

Past medical history includes COPD, coronary artery disease status post MI, pacemaker placement and a broken neck. He had titanium rods placed in his head and shoulders. He is status post angioplasty. He was hospitalized twice in 2005 for loss of blood.

Family history is that his mother died of a massive heart attack.

He has smoked 1 ppd for 54 years.

His chest x-ray shows a right upper lung pneumothorax. His chest tube leak is currently minimal. He is continued on incentive spirometry treatments.

1/3/07 anesthesia consultation by Bruce Baldecchi, M.D. He has planned right thoracotomy, right upper lobe resection and possible sleeve resection of bronchus. He is on methadone 10 mg, 5 tablets daily and Vicodin about 2 tablets daily for breakthrough pain. His aspirin and Plavix were stopped 2 weeks ago. He had a pacemaker placed 2 years ago. He was told he probably had an old heart attack in the past. He does not remember it. He has been told he has slight emphysema. He has oxygen at home which he does not use. Five months ago he had severe hemoptysis. It has not recurred since then. That is how the diagnosis of lung cancer was made.

He also had a history of asbestos exposure. He has had hypertension. He has had severe debility and weight loss. Four years ago he weighed 160 lbs. Now he is down to 128 lbs. His height had been 5 foot 10 inches, now is 5 foot 3 inches. He has chronic neck pain and low back pain from what sounds like osteoarthrosis. He has had two prior neck surgeries. He has a lot of hardware in his neck and also some low back surgery.

He is essentially bedridden, pretty much in a wheelchair most of the time. He occasionally uses a cane, and Dr. Baldecchi thinks, a walker. He has had chronic hoarseness dating back to 20 years ago when he was placed in a choke hold by a policeman in Los Angeles. He was a heavy alcohol abuser. He had been an alcoholic. He quit drinking 3 or 4 years ago. He has smoked cigarettes for over 50 years, now 2 ppd.

The assessment is ASA status 4, with malignant neoplasm right upper lobe, severe debility with weight loss and chronic back and neck pain, essentially bedridden in a wheelchair, chronic obstructive pulmonary disease and probable asbestosis, hypertension, pacemaker, possible history of old myocardial infarction, abdominal aortic aneurysm repair and chronic hoarseness.

1/5/07 bronchoscopy report by Dr. Robert McDonald. The patient was orally intubated. Mucus plugs were removed.

1/7/07 bronchoscopy report by Dr. Robert McDonald. The patient was on a ventilator. Secretions were removed.

1/17/07 bronchoscopy report. Mucus plugs were removed.

1/17/07 chest CT scan report. There are new moderate bilateral pleural effusions and moderate pericardial effusion. There is volume loss in the right hemithorax. There is extensive consolidated lung bilaterally, right greater than left, as well as areas of atelectasis. There are probable mucus plugs occluding the right mainstem bronchus. A tracheostomy is in place.

1/19/07 bronchoscopy report. There was recurrent right lower lobe collapse. Mucus plugs were removed.

1/20/07 bronchoscopy report. Large amount of loose secretions was occluding the right mainstem bronchus.

1/21/07 bronchoscopy report by Dr. Foster. The patient had coughed up a large bloody colt. All the secretions had been removed by vigorous coughing.

1/23/07 bronchoscopy report by Dr. Foster. He had a large clot removed earlier. Now the secretions were quite clear. The distal airways had a plug in them which was removed, comprised of blood and clots. The left side was clear.

1/24/07 thoracentesis note. This was an urgent procedure performed for respiratory distress and hypoxia. 600 mL of transudative appearing fluid was removed.

1/24/07 09:20 bronchoscopy report by Guy Foster MD. The indication was right sided atelectasis. He did not find active bleeding, so hopefully there would be no more clots. He did not cross the suture line. The bronchoscope was inserted into the tracheostomy. There was a large clot blocking the distal tip of the tracheostomy which was removed. There was a large clot in the right mainstem bronchus which was removed. The suture site was not actively bleeding today.

1/24/07 14:17 bronchoscopy report by Dr. Foster. This was a stat procedure because of increasing airway resistance. Copious secretions in the airway were lavaged clear. There was minimal bleeding in the right lung distal to the anastomosis, possibly from the anastomosis itself. The left side had large amounts of secretions, possibly from his underlying pneumonia and certainly possibly from his possible congestive heart failure as well. After the procedure, the patient improved.

1/24/07 consultation by Dr. Frank Carrea, to evaluate recurring pulmonary congestion with pleural fluid and intermittent chest discomfort. The patient had resection of right upper lobe squamous cell carcinoma and subsequent tracheostomy and continued ventilator support since his surgery. He had chest tightness earlier today and had bronchoscopy to try and clear his airways. He developed more trouble with chest discomfort and worsened respiratory status and tachycardia. In radiology CT scan

demonstrated pleural fluid and some pulmonary congestion. He had left thoracentesis of straw colored fluid.

Office charts showed he had a myocardial perfusion scan, within the past year, which demonstrated ejection fraction of 39%.

It was noted he required fluid administration yesterday to treat hypotension. The fluids may have contributed to the pulmonary congestion in addition to his chronic left ventricular dysfunction. He is now more comfortable. Lasix should be continued. His hematocrit is only 27%. Dr. Carrea's diagnoses are: Pulmonary edema, History of coronary disease with significant left ventricular dysfunction, history of hypertension, chronic obstructive pulmonary disease and right upper lobe resection for squamous cell lung carcinoma.

1/24/07 chest CT with contrast showed no evidence of pulmonary embolism. There were bilateral pleural effusions and extensive consolidated and atelectatic lung. There was persistent volume loss in the right hemithorax.

1/25/07 CT scan of abdomen and pelvis. There were bilateral pleural effusions, left greater than right, with extensive consolidated and atelectatic lung bilaterally. There was focal consolidation of the left lower lobe. There were areas of pleural calcification and thickening in the left anterior thorax. There was a hiatus hernia and a moderate pericardial effusion.

2/9/07 bronchoscopy report by Dr. Gay Foster. This urgent procedure was performed for respiratory failure, new infiltrates, and rule out pneumonia. He obtained microbiological cultures. The patient was placed back on the ventilator prior to the procedure because of respiratory distress. The bronchoscope was inserted into the posterior pharynx. The trachea was patent and the tracheostomy was patent and normal. The right mainstem bronchus was completely occluded with purulent secretions, which were removed. The right lower lobe was lavaged.

2/9/07 report by Dr. Steven Taylor of esophagogastroduodenoscopy with PEG tube placement.

There are numerous radiology reports from the hospitalization for the lung cancer surgery.

3/5/07 emergency department note by Dr. Maurice Mayer states that patient has had abdominal pain for severe days, crampy, with associated constipation. His feeding tube is flushing easily. He has had moderate shortness of breath for 6 hours, which resolved after he was suctioned by his spouse. She said she suctioned a scant amount of phlegm that was not purulent. He has decreased appetite and weight loss.

He has right upper lobe cancer, treated surgically, chemotherapy is pending. He has peripheral vascular disease, coronary artery disease, elevated BNP level, congestive heart failure.

He continues to smoke 1 ppd.

He appears chronically ill. His lungs have mildly decreased breath sounds bilaterally.

WBC 8.8, Hgb 12, Na 128, UN 17, creatinine 0.8.

He received breathing treatments with albuterol and Atrovent, IV Solu-Medrol and respiratory status was back to baseline. Abdominal pain was improved but not gone.

3/5/07 chest x-ray report describes tracheostomy tube, previous right thoracotomy and lobectomy.

I have reviewed records of Mountain Pulmonary & Sleep Center. Some of these records contain reports reviewed above.

12/27/06 spirometry reports FVC 2.87 L., 85% predicted, FEV1 2.11 L., 78% predicted and FEV1/FVC 73%.

1/8/07 echocardiogram report notes technically difficult study. There is moderate concentric left ventricular hypertrophy. Left ventricular systolic function is normal. The ejection fraction is estimated at 60-65%. There is impaired left ventricular relaxation, associated with mild diastolic dysfunction. The left atrium and the right ventricle appear normal. There appears to be severe pulmonary hypertension, although the PA pressure is difficult to asses due to limited tricuspid regurgitation.

3/2/07 chest x-ray shows tracheostomy tube, pacemaker and nodular density projecting over the right second anterior interspace. CT is recommended.

I have reviewed records of Umasankari Sudaram, M.D.

5/17/06 chest CT scan report notes nodular atelectatic changes at the right lung base and atelectasis at the left lung base. There is bilateral pleural thickening. There are some calcifications along the pleural surface on the left and on the right. There is a stent in the left subclavian artery. There are prominent atherosclerotic plaques in the aorta.

7/10/06 handwritten note, on the report above, states will need to see pulmonologist for hemoptysis.

9/7/06 sleep study report. There is mild obstructive sleep apnea, with AHI (apnea hypopnea index) = 12.4 and moderate oxygen desaturation, the lowest being 78%.

8/9/06 Mr. Lymm returns for follow up of peripheral vascular disease. He is a smoker wand has hyperlipidemia. He has developed some anginal type chest discomfort, about once or twice a month, lasting 1-2 minutes. There is no increase in his usual shortness of breath, but he is occasionally diaphoretic with this. He has chronic orthopnea. He is

supposed to be using CPAP but he feels it makes too much noise. He continues to smoke. BP 110/70, weight 126 lbs. His lungs are clear. The impression is chest pain compatible with angina. A myocardial perfusion scan is planned. Continue smoking history and patient again advised to stop.

12/28/06 note by Dr. Foster. He is seeing the patient for pre-operative surgical evaluation. He attempted to exercise but had limited results. Minimal rare blood in sputum. Cough is at baseline and is chronic. Slight dyspepsia lately for several days. Depressed lately. Appetite is improving. Because of the poor results on the exercise test, his surgery is high risk for mortality and complications.

2/16/07 Dr. Foster notes follow up of pseudomonas pneumonia. He has slight pain at G tube site. Still producing sputum requiring suctioning 4 times per day, still feels weak but is improving every day.

I have reviewed Mr. Lyman's videotaped direct deposition, taken 4/17/07. Mr. Lyman lives in Silver Spring, NV. He had spent a year in Arkansas and previously lived in Silver Springs for 5 years before.

He has lung cancer and has been told that he has 9 months to live. He was told by Dr. Foster that he had lung cancer and that he had asbestosis throughout both lungs. He was told this last October. He feels terrible. He is in a lot of pain. He has shortness of breath any time that he exerts himself. This uses oxygen for exertion. This was prescribed 5 or 6 months ago. He uses oxygen when he sleeps and intermittently during the day when he is short of breath.

His shortness of breath only started recently and it is getting worse every day. Each day he is physically weaker and it is harder to walk. He walks to the bath room 3 or 4 times a day. His pain is in his low back, his spine, his neck, lungs, legs and all over.

He had seen Dr. Foster the day before because he was having pain on his right side. He found some spots in this other lung. There are a couple of nodules. There's other stuff going on in my lung, the so-called good lung. He has had problems with memory loss.

He served in the US Marine Corps for 1 ½ years, beginning at age 17. After rifleman training, he went to jet mechanic school in Jacksonville, FL. In the Marine Corps he smoked a couple of packs a day.

After the marines, he worked a few odd jobs and then got on with Associated Transport in Waltham, MA as a platform foreman. He was there 8 or 9 years. He supervised the loading and unloading of trucks and the dock workers, drivers, etc. There was a garage right next door. He spent a ½ day in there keeping after the mechanics to do whatever work had to be done on his trucks. He observed work on brakes, engines, mufflers, everything that has to do with a semi. He had 12 mechanics working there. There were Whites, Freuhaufs, Macks and Fords.. They used to build their own equipment, Brown equipment.

His first wife developed cancer and he left work to take care of her. She lived 4 years. He had 4 children with his first wife. His children had recently come to visit. He hadn't seen his oldest 2 daughters for 20 years.

He has been married to his present wife, Samantha, for 37 years. He has a son, Michael and a daughter, Kelly, from her first marriage.

Next, he worked for Freight Forwarding Co. on the railroad. He worked about a year as a dock supervisor.

In 1970 or 1971 he moved to California. He went to work for Alva Radio Industries in Santa Monica. He built tech and radar systems which are fiberglass tops had to be sanded and refinished and 55,000 volt transformers that he tore apart and rebuilt, rewired, cut all the old wiring out and put new wiring in. They rebuilt their own radar systems and sold them to the Saudis and Iraqis and eastern countries. There were electronic technicians who rebuilding different radar systems, TACAN, used on airliners. The technicians worked with different types of rubber, fiberglass sleeving, mostly copper wire. The large transformer was built out of a series of small transformers that stepped up to a total of 55,000 volts. One transformer powered a TACAN antenna. It was all covered with surplus. He built the transformers. It was a series of smaller transformers and a lot of wiring. They were filled with oil and welded shut. They weighed about 100 lbs. Technicians worked on cabinets and oscilloscopes.

He saw Bakelite used in the oil fields in plastic form. He did not see Bakelite at Alva.

He had a couple of odd jobs after Alva.

He had a business of his own doing building maintenance.

Next he worked for Cudd Pressure Control for about a year. He pumped number 2 diesel oil and nitrogen, other gases down hole to force the oil out. He worked at fields including Union, Conoco in Long beach. He did some work on Union's platform offshore, Chevron, Exxon, most big local oil companies. Usually he was pumping some sort of material like nitrogen or diesel fuel down hole. It was all pretty much the same. He sealed it, put what they called a Christmas tree o it, seal it in, While he was working at the oil fields, all the contractors that contracted with oil companies would be doing whatever they did. They did drilling, everything an oil worker does. They're all roustabouts doing general work in the field. For drilling they used sand, mud, his nitrogen and number 2 diesel fuel. The mud was mixed up and used at the well. They had a regular mixer, sometimes a big truck, sometimes a portable. A Christmas tree is a big piece of metal hardware that has 4 to 6 valves shooting off like a Christmas tree. It tops the well off. Sometimes he would open them up.

Next, he worked for Baker Oil for 7 years. He broke his neck on the job at Baker Oil in Ventura. At Baker he was a driver chemical technician. He drove a big oil tanker

up into the mountains in Santa Pula basically into Carpenteria and offshore occasionally. He treated oil wells with different anti-corrosive chemicals to treat the pipes for corrosion. He worked at oil fields including Union, Phillips, Shell, Conoco, Union, and La Conchita. These were located from Long Beach to Carpenteria to Santa Paula to Ojai, all over the Southern California region.

Most of the valve work was done with Baker in the oil fields. All the wells were shut in with valves. He would have to open them to apply the chemicals, occasionally repair them if they were broken. All the chemicals were in large steel tanks. To get at the chemicals he'd have to open the valve, hook up a hose from his truck, and pump the chemicals into the different tanks in his truck. If he had to put chemicals down and there was a leak, he would try to tighten it up so it wouldn't leak, or he would call the oil company and let them know. He would normally just check the valve out and try to tighten it up, put a new seal in. Usually the problem would be a worn out seal. There were oil company employees and contractors. Most of the work in the field is done by subcontractors. They would clean up, check the wells for leaks and repair leaks if they saw them. Occasionally they would be drilling. Conoco did it in Long Beach. There was always drilling on the platforms. A lot of times they would be using his nitrogen and diesel fuel to try to force oil up.

He left Baker. He broke his neck. When he recovered, they sent him to school because he couldn't go back to the oil fields. He and his wife went to TMCC in Fresno, which is motel and hotel management and marketing. They went to an accelerated course for a year. After the school, they went to the El Camino Motel just outside of San Francisco and managed it.

He retired in 1998. He was having a lot of problems with his neck and he had to have reconstructive surgery. It's all titanium.

He lived in the family home until age 17. When he left the Marine Corps he went to his mother's house until he was 19 or 20. He was working at Associated Transport when he got married to his first wife, Carol. He lived with his father almost 19 years. His father was a shipbuilder, pipefitter for the government. His father worked at the Boston Naval Shipyard. Almost everyday, he walked down to the shipyard where his father worked. He'd go to his shop and wait for him to finish and walk home with him. He'd go play on the USS Constitution while his father was working. His father came home in his work clothes. He was a pipefitter, so he was covered with grease and oil and whatever else he was working on.

He is seeing Dr. Foster about once a week and also he will be seeing the surgeon next month. They are going to take a look at the lungs again and see if he needs radiation and chemo. After the surgery he was in a coma for 7 days.

When he was working, he belonged to a health club and played racquetball, tennis and worked out. He used to run with his daughter. He was active in sports.

He doesn't do anything now, not for the last couple of years.

I have reviewed the Discovery Deposition of Mr. Robert Lyman, 4/18/07. He is having problems with short term memory but not with long term memory.

He quit high school to go into the Marine Corps.

His father's duties as a pipefitter included insulation and checking pipes aboard ship. He used to make training films for the government to train new employees. His father told him about his work and he used to go into the yard and watch his father. His father was a leading man pipefitter, equivalent to a foreman. He would give work assignments to his crew and find out what work had to be done, on which ship. Occasionally he did help. He was a hands-on supervisor. Mostly he did not do hands on work. His father advanced beyond leading man when Mr. Lyman was about 14 years old. He began to visit his father at work when he was 10 or 11. His father worked out of the pipe shop. It was about a mile from Gate Four. He would meet his father almost every day at Gate Four. He went into the yard every couple of weeks. His father's work was mainly aboard hip. His father used to have to go out on trial runs with the ship. Mr. Lyman went onto a ship, when his father was there, about a half dozen times.

He recalled the Lexington, the Guadalcanal, and the Exeter. He spent about an hour on the Lexington, an aircraft carrier. He went all over the ship. He went to the gun ports and the flight deck and down to the engine rooms. Sailors were cleaning and polishing guns and doing general cleanup. He did not himself observe any repair work there.

He was on the Guadalcanal, a destroyer, on two occasions. On the first occasion, he saw Navy Yard workers working on the pipelines. He went into the engine rooms for 15 minutes. There were sailors working on the equipment. He does not recall seeing work with pipe insulation. He did recall seeing valves on the top deck and one of the sailors was taking them apart. It was a pretty large valve. The sailor was disassembling the valve. They were removing old packing and putting in new. On the second visit, he did not observe any work going on.

On the Exeter, he did not go below deck or see anyone.

He recalls that his father worked on the Midway, more than once. In order to work on pipes, you had to remove insulation. He had seen his father take insulation off a pipe on the top deck of a destroyer. It was about 2 inches thick and 15 feet long. His father would not replace insulation because the yard had an insulation shop.

When Mr. Lyman was in the Marine Corps, he was a guard at the Boston Navy Yard gate.

He'd seen them tear valves apart on ships about 6 times, usually in the afternoon, in 1952-53. He saw them reassemble the valve after they had done work on it. He saw them tear back insulation on the pipe. About 3 feet of insulation was removed. He was within 4 or 5 feet. This was on a light cruiser or destroyer from World War II. He saw a

gasket being removed on one valve. He saw new packing being installed on the one valve.

He first visited his father in the pipe shop when he was 12. He lasted visited when he was in the Marine Corps. He saw his father supervising work on pipes. He saw work on valves in the pipe shop on about a dozen occasions. Most of them were steam valves. He saw packing material being removed once. He saw gaskets being removed a dozen or two dozen times. He saw new gasket material being installed once or twice. He saw a box labeled Anchor Hocking. There were individual preformed gaskets.

His father's clothes were always dirty from the inspection work that was done. His clothes would be greasy black. His father would change his clothes when he got home from work. His mother did most of the washing, but he washed the clothes about once a week. He did not wash his father's clothes. His mother would shake out his father's clothes.

Before he went into the Marine Corps, he worked for Palmer & Parker, a lumber yard that cut veneer sheets. It was an after school job. There was a huge press. All of the pipes were wrapped in asbestos. The pipes carried heat or water. The plant was built in the early 19002. The logs used to soak in boiling water. The pipes carried the water. The heat was hot water heat. The steam pipes were for the processing of the lumber. The pipe insulation had a fabric covering. He saw them repair steam pipes. The name Manville was on the asbestos covering., on the silver coating. He observed people break into or remove pipe insulation about half a dozen times. In total, about 20 feet of insulation was removed. He was within a couple of feet of the work. They cut the insulation with a knife and peeled it off. At this veneer shop, he saw them replacing valves and putting new gaskets in. He saw old flange gaskets being removed on 2 or 3 occasions, pried off with a knife. There was scraping involved. He saw new gaskets installed 3 or 4 times. He saw old valves being removed and replacement valves installed. The hot water valves were located on a wall 4 to 6 feet away from where he was.

Also, before the Marine Corps, he sold women's shoes in Boston at Wilbars for about a year.

Also, he worked as a longshoreman unloading ships. This was in the middle of 1956. The sips were in Charlestown at the piers, 12 and 14. His uncle was a union stevedore. He joined the longshoreman's union as an apprentice, then quit and joined the Marine Corps. He unloaded pig iron, liquor, food, rubber. He did not unload insulation material or asbestos. He worked mostly on weekends and after school. On a few occasions he observed work with valves and gaskets.

I reviewed Volume II of Mr. Lyman's deposition testimony, taken 4/19/07. He saw Dr. Foster on Tuesday. When they did his lungs, the x-rays showed that the other side had growth in it. They sent him to get a CAT scan.

In the Marine Corps, he did basic training, then combat training. They sent him to the basic electronics in jet mechanics school for 7 or 8 months. It was mostly classroom work. They only did a bit of hands on work.

Next he spent 7 months at the Boston Naval Shipyard as a guard. He was at Gate 4. He lived at the Marine barracks on the base. He visited his father at times, while he was on ships. He visited ships on about a dozen occasions, He saw his father removing valves on 3 or 4 occasions. He saw gaskets removed 2 or 3 times. His father was also a boilermaker. He visited his father in the pipe shop on a few occasions. He observed old insulation being removed from pipes from the ships. They came from the Essex. He observed pump repair. He saw gasket material on the ground, in pieces, that came from the pump. He saw old insulation being torn off pipes from the Exeter.

After the Marine Corps, he did more longshoreman work, on and off for a couple of years. He recalls working on the Cherry Maru and a Swedish ship carrying cherry herring, a liquor.  He unloaded ingots of pig iron. He was down in the hold of the Cherry Maru for about 8 hours loading pallets with ingots of pig iron. He saw new insulation being installed on pipes which were on horses outside the ship. They were wrapping the pipe with fiberglass insulation. He recalled unloading wood, hardware in cases, metal items, and loads of fiberglass wrap. It had been shipped from San Francisco. He did some loading of ships, He loaded building supplies, metal bracketing, and bags of cement.

I reviewed volume III of Mr. Lyman's deposition, taken 4/20/07. He worked at Cudd Pressure Control in the late 1980s or early 1990s for about a year. Afterwards, he worked for Baker Oil.

At Cudd he went and pumped nitrogen and diesel fuel. They were both heavier than oil and would go beneath it and force it up. Most of the work with Cudd was done on the platforms offshore, Shell, Mobil and Conoco, off Santa Barbara and Carpenteria. He also worked at fields on Mt. Sespe, in Santa Paula, where he did some work for Mobil and Chevron. He also did some work in El Centro. 70% of his time was on the offshore rigs. Most of the time he was pumping nitrogen. He would hook up his hoses and lines to the well. He had large machinery in the flat bed of the truck that would go to 500-600 lbs. of pressure and force the nitrogen down sometimes 300-400 feet. The truck carried liquid nitrogen. There was a diesel engine in the compressor. The hoses connected with a half twist that would lock the couplings. Sometimes the valves on the oil wells leaked. If possible, he would shut off the source of the crude oil. He would disconnect. Usually the problem was a gasket. On occasion the valve would be bent because someone hit it with something. In the oil field, everything is basically fixed with a sledgehammer. He had a supply of preformed gaskets in his truck. The gaskets were Bendix. He repaired the valve by popping out the old gasket and putting in a new one. He believes some of the gaskets were neoprene. He does not know if the gaskets contained asbestos.  Primarily he replaced gaskets when he worked for Baker, not for Cudd.

He worked at Associated Transport. When his wife became ill, he'd quit off and on to take care of her, then return to work. He was a foreman at the loading docks. He had begun working as a truck driver. He was promoted to city dispatcher, then to over the road dispatcher, then he became a platform foreman.

There were about 12 mechanics who worked at the garage for Associated.

When he was a driver, he would report for assignment, then be on the road al day. When he worked as a dispatcher, he sat in the office all day. When he was a platform foreman, he supervised the platform workers loading and unloading. After four months he became the platform supervisor. He worked in a heated office. There would be over 100 trucks on the facility at any one time. The mechanics did regular maintenance as well as repairs. On some occasions he observed brake and clutch work, muffler and exhaust system work. He observed engine work, including removing the head and working on the pistons, about a dozen times. He observed grinding and sanding of brake drums. He remembers walking through the dust and covering his eyes on two or three occasions. He believes an arcing machine is used by arc welders.

After he quit Associated, he worked at Consolidated for about 6 months. He did not observe any mechanical work there.

Discussion:

Diagnosis:

1. Squamous cell lung cancer, right upper lobe, with probable metastases, including lymphangitic tumor..

The diagnosis of lung cancer was confirmed by the pathology reports from Carson-Tahoe and by the independent pathology review by Dr. William Salyer.

Mr. Lyman stated in the deposition that he had been told that the cancer had spread. Dr. Donald Breyer reviewed the 3/28/07 chest CT scan which showed new circumferential pleural thickening in the right chest, up to 2 cm in thickness. There were enlarged mediastinal and abdominal lymph nodes and apparent lymphangitic spread of tumor in the right lung. The small left pleural effusion could be malignant.

2. Chronic obstructive pulmonary disease. This diagnosis was confirmed by the pulmonary function test results.

3. Asbestos pleural disease. The chest CT scans document bilateral pleural plaque, with areas of calcification, including both hemi-diaphragms.

4. Asbestosis. This diagnosis is based on the pathology notes from William Salyer, M.D., who diagnosed asbestosis, CAP-NIOSH grade I. He found peri-bronchiolar fibrosis and lung asbestos bodies. Dr. Salyer is a pathologist with recognized expertise in asbestos related diseases.

5. Mild obstructive sleep apnea. This was documented on a sleep study.

The following additional diagnoses are clearly documented in the records that I reviewed:

5. Coronary artery disease

6. Peripheral vascular disease.

7. Hypertensive heart disease, history of congestive heart failure.

8. History of neck injury and neck surgeries, with implantation of hardware and chronic pain.

**Permanent and Stationary / Maximal Medical Improvement:** Mr. Lyman has lung cancer with probable metastases. His condition is probably incurable. Therefore, he has reached maximal medical improvement. His condition is permanent and will probably continue to worsen.

**Factors of Disability:**

Subjective: Mr. Lyman stated in his deposition that he is able to walk to the bathroom about 4 times a day. He is otherwise bound to bed or wheel chair. He is limited by fatigue and dyspnea.

Objective: He has advancing lung cancer with evidence of lymphangitic spread of tumor in the entire right lung. The radiologic findings are consistent with his symptoms. It would be expected that he is totally impaired and unable to work.

**Impairment:** This is evaluated according to the *AMA Guides to the Evaluation of Permanent Impairment*, 5th Edition.

As stated in section 5.9 Lung Cancer: "All persons with lung cancer are severely impaired at diagnosis." Severe impairment is class 4 impairment, 51% to 100% impairment of the whole person.

Table 5-11 Scale for Judging Capabilities of Subjects with Cancer, "may be used to further describe the capabilities of a person with lung cancer and enable categorization within a particular class." The table describes grades 0 to 4. Grade 3 is capable of only limited self-care and confined to bed or chair at least half of waking hours. Grade 4 is almost totally impaired, cannot care for self, and totally confined to bed or chair.

The deposition testimony by Mr. Lyman indicates that in April 2007 his condition was somewhere between grade 3 and grade 4. His overall impairment would be about 90% impairment of the whole person as of the time of the April deposition.

It is probable that the lung cancer will prove fatal.

**Causation:**

1. Lung cancer

Asbestos exposure greatly increases the lung cancer risk for cigarette smokers. Mr. Lyman has a long cigarette smoking history. He also has had asbestos exposure.

He had exposure to asbestos when he visited his father, on occasion, at the Boston Naval Shipyard, where his father worked as a pipefitter. Also, for several years he met his father at the shipyard gates and walked home with him. His father was wearing his work clothes.

He had exposure to asbestos when he worked at Associated Transport. He was present, at times, while mechanics in the garage were repairing trucks. He observed brake work, clutch work, engine work, and exhaust system work.

He had asbestos exposure when he worked as a foreman at US Gypsum. He worked on a production line where sheet rock was produced. The conditions were very dusty.

He had asbestos exposure when he worked at Alva Radio Industry. He used sheets and rolls of asbestos insulation. He removed insulation from wire.

For several years, he worked in the oilfields in Southern California. At times he worked in proximity to the many other trades that work in oil fields. Asbestos containing materials including drilling muds and valve packing.

His asbestos exposure was sufficient to cause asbestosis (as documented in Dr. Salyer's pathology notes) and asbestos pleural disease (documented on the chest CT scans).

It is medically probable that all of Mr. Lyman's cigarette smoking and all of his asbestos exposure, together, caused his lung cancer. It is recognized that asbestos exposure, sufficient to cause asbestosis, is sufficient to cause lung cancer. When workers with asbestosis develop lung cancer, the cancer is generally partially attributed to the asbestos exposure.

Mr. Lyman was last exposed to asbestos when he worked in the southern California oil fields, through 1986. He first presented with symptoms related to his cancer, hemoptysis, in 2006, which is 20 years later. All of his asbestos exposure, cumulatively, was injurious.

2. Asbestosis and asbestos pleural disease were both caused by his cumulative asbestos exposure.

3. Chronic obstructive pulmonary disease, peripheral vascular disease, and heart disease were all unrelated to occupational exposures. The neck injury was due to a prior occupational injury

Future Medical Treatment/Medical Monitoring:  Mr. Lyman will require ongoing treatment for his cancer. He had been seeing his pulmonary physician every week. He should be referred to an oncologist for consideration of chemotherapy. He will probably require continuous oxygen as the cancer progresses. He will need increasing doses of pain

medication. He may require hospitalization in the future, as well as increasing assistance at home.

### Apportionment:

**apportionment to disease**

Before Mr. Lyman became symptomatic from lung cancer, he had impairment due to his chronic neck injury and pain, chronic obstructive pulmonary disease, peripheral vascular disease and heart disease.

Prior to his lung cancer surgery in January 2007, he had pulmonary function tests and cardiopulmonary exercise testing. His maximum oxygen consumption was 11.9 mL oxygen/kg/min.

According to Table 5-12 (from the *AMA Guides*) "Impairment Classification for Respiratory Disorders, Using Pulmonary Function and Exercise Test Results," VO2 maximum < 15 mL/kg/min is class 4, 51% to 100% impairment of the whole person.

Exercise testing is a good test of his maximum overall function, including his conditioning, cardiovascular disease and pulmonary disease.

Based on the exercise test results, Mr. Lyman had 60% impairment of the whole person at the time of the exercise test in November 2006.

His total impairment (as of April 2007) was about 90%. His impairment due to his pre-existing illnesses was 60%. Therefore, 30% impairment of the whole person is apportioned to lung cancer.

**apportionment to causation**

Mr. Lyman's lung cancer was caused by both cigarette smoking and asbestos exposure. The relative risk of cancer for cigarette smokers increases about 10 fold compared to non-smokers. The risk of lung cancer for cigarette smokers with asbestos exposure increases about 5 to 8 fold compared to cigarette smokers without asbestos exposure. In other words, these causes are synergistic, one enhancing the effect of the other. It is therefore reasonable to apportion causation equally between these risks.

Therefore, 50% of the causation of the lung cancer is due to asbestos exposure (occupational) and 50% to asbestos exposure.

**Overall apportionment**

Mr. Lyman's overall impairment (April 2007) was 90%. He had pre-existing 60% impairment due to his other diseases. His impairment due to lung cancer would thus be

30%.

Apportioning to causation, then, he has 15% impairment of the whole person attributable to his occupational asbestos exposure.

Please let me know if you have any questions.

Sincerely,

Daniel M. Raybin, M.D.

This report is being billed as ML 104, a complex comprehensive medical-legal evaluation under extraordinary circumstances. The following complexity factors apply:

(ii)  3 or more hours of record review by the physician
(iv)  Addressing the issue of medical causation
(v)  Addressing the issue of apportionment
(vi)  Addressing the issue of medical monitoring/treatment of a worker following a toxic exposure to a mineral substance (asbestos).

I verify under penalty of perjury that the following times were spent by me:

Reviewing the records                                    7 hours
Report preparation                                        2 hours

I declare under penalty of perjury that the information contained in this report and its attachments, if any, is true and correct to the best of my knowledge and belief, except as to information that I have indicated that I have received from others. As to that information, I declare under penalty of perjury that the information accurately describes the information provided to me, and except as noted herein, that I believe it to be true.

I further declare under penalty of perjury that I personally reviewed the records and that, except as otherwise stated herein, the evaluation was performed and the time spent performing the evaluation was in compliance with the guidelines, if any, established by the administrative director pursuant to paragraph (5) of subdivision (j) of Section 139.2 or Section 5307.6 of the California Labor Code.

I further declare under penalty of perjury that I have not violated the provisions of California Labor Code Section 139.3 with regard to the evaluation of this patient or the preparation of this report.

I further declare under penalty of perjury that the name and qualifications of each person who performed any services in connection with the report, including diagnostic

studies, other than clerical preparation are as follows:

NAME                          QUALIFICATIONS
None

Signed this 23rd day of July 2007
At San Francisco County, California

_____
Daniel M. Raybin, M.D.

Brayton-Purcell Service List

1

Date Created: 7/24/2007-2:58:42 PM

Run By : Eliasson, Kimberly (KRE)

Created by: LitSupport - ServiceList - Live
Matter Number: 107053.001 - Robert Lyman

**Berry & Berry**
P.O. Box 16070
2930 Lakeshore Avenue
Oakland, CA 94610
510-835-8330   510-835-5117 (fax)
Defendants:
Berry & Berry (B&B)

**Brydon Hugo & Parker**
135 Main Street, 20th Floor
San Francisco, CA 94105
415-808-0300   415-808-0333 (fax)
Defendants:
Union Carbide Corporation (UNIONC)

**Dillingham & Murphy**
225 Bush Street
Sixth Floor
San Francisco, CA 94104
415-397-2700   415-397-3300 (fax)
Defendants:
Montello Inc. (MONTLL)

**Glaspy & Glaspy**
One Walnut Creek Center
100 Pringle Avenue, Suite 750
Walnut Creek, CA 94596
925-947-1300   925-947-1594 (fax)
Defendants:
Garlock Sealing Technologies, LLC
(GARLCK)

**Haight, Brown & Bonesteel**
71 Stevenson Street, 20th Floor
San Francisco, CA 94105-2981
415-546-7500   415-546-7505 (fax)
Defendants:
International Truck & Engine Corporation
(INTRRK)

**Hassard Bonnington**
Two Embarcadero Center
Suite 1800
San Francisco, CA 94111
415-288-9800   415-288-9802 (fax)
Defendants:
John Crane, Inc. (CRANE)

**Law Offices of Mark H. Rosenthal**
44 Montgomery Street, Suite 4020
San Francisco, CA 94104-4602
415-986-1364   415-291-1984 (fax)
Defendants:
Crown Cork & Seal Company, Inc.
(CC&S)

**Law Offices of Nancy E. Hudgins**
565 Commercial, 4th Floor
San Francisco, CA 94111
415-979-0100   415-979-0747 (fax)
Defendants:
Uniroyal Holding, Inc. (UNIROY)

**Perkins Cole LLP**
Four Embarcadero Center, Suite 2400
San Francisco, CA 94111
415-344-7000   415-344-7288 (fax)
Defendants:
Honeywell International, Inc. (HONEYW)

**Prindle, Decker & Amaro**
310 Golden Shore, Fourth Floor
Long Beach, CA 90802
562-436-3946   562-495-0564 (fax)
Defendants:
Drilling Specialties Company LLC
(DRISPE)
Henry Vogt Machine Co. (HENVOG)

**Schiff Harden LLP**
One Market Plaza
Spear Street Tower, 32nd Floor
San Francisco, CA 94105
415-901-8700   415-901-8701 (fax)
Defendants:
Owens-Illinois, Inc. (OI)

**Sonnenschein Nath & Rosenthal, LLP**
525 Market Street, 26th Floor
San Francisco, CA 94105-2708
415-882-5000   415-882-0900 (fax)
Defendants:
Rapid-American Corporation (RAPID)

**Thelen Reid Brown Raysman & Steiner**
**LLP**
101 Second St., Ste 1800
San Francisco, CA 94105
415-371-1200   415-644-6519 (fax)
Defendants:
Shell Oil Company (SHLOIL)

**Wright Robinson Osthimer & Tatum**
44 Montgomery Street
18th Floor
San Francisco, CA 94104
415-391-7111   415-391-8766 (fax)
Defendants:
Freightliner LLC (FRECQR)

**BERRY & BERRY**
A PROFESSIONAL LAW CORPORATION
TELEPHONE (510) 250-0200
FAX (510) 835-5117
www.berryandberry.com

PHILLIP R. BERRY
PETER R. GILBERT
LEONARDO J. VACCHINA
LAURA K. PRZETAK
EVANTHIA M. EPANOS
RHONDA L. WOO
JILL J. HOFFMAN

SAMUEL R. BERRY   (1904-1990)

August 22, 2007

To:  All Defense Counsel

Re:   LYMAN, ROBERT/SAMANTHA V. CLEAVER-BROOKS
      San Francisco Superior Court No. 459162

Dear Counsel:

        Enclosed please find a report by Daniel M. Raybin M.D. (DOR:7/31/07) pertaining to the above referenced case, recently provided to Berry & Berry by the BRAYTON & PURCELL office .

                                        Very truly yours,
                                        BERRY & BERRY

                                        Terri Hunt
                                        Paralegal Assistant
                                        Evidence Paralegal Department

M1752

HT752
TO: 8/6/07
SOE

Berry & Berry

AUG 2 0 2007

Received

**DANIEL M. RAYBIN, M.D., F.A.C.P., F.C.C.P.**
2250 HAYES STREET, #505
SAN FRANCISCO, CA 94117
TELEPHONE 415-668-1835

July 31, 2007

Ms. Marion R. DeCarlo
Workers' Compensation Manager
Brayton-Purcell
222 Rush Landing Road
Novato, CA 94948-6169

RE: Robert F. Lyman vs. Fitzpatrick Chevrolet, *et al.*
WCAB Case No.: SFO unassigned

Dear Ms. DeCarlo:

This report is supplemental to my previous one dated July 23, 2007. I have received additional records for review.

I have reviewed a chest CT scan pulmonary angiogram from Carson Tahoe Regional Healthcare taken 3/28/07. On page 4 of my 7/23/07 report, I reviewed Dr. Donald Breyer's interpretation of these x-rays, I am in complete agreement with his findings.

I have reviewed a radiology report by Donald Breyer, M.D., 5/9/07. Dr. Breyer reviewed a high resolution chest CT scan, including prone and supine high resolution images, from Great Basin Imaging, 4/27/07.

Dr. Breyer found that in nondependent lung fields on the prone high resolution images there are bilateral changes of an increased profusion of ill defined centrilobular nodular opacities. Some irregular interface and parenchymal band formation is also noted. In comparison to the CT scan done 3/28/07, the circumferential right pleural thickening is largely resolved, as has the lymphangitic spread of disease. Right lung volume loss is present and is probably related to the prior right lobectomy. The left pleural effusion has resolved. Some significant pericardial pleural thickening is present.

The epigastric region appears abnormal with thickening of the distal esophagus and/or cardia of the stomach.

Dr. Breyer concluded that the parenchymal findings are compatible with interstitial fibrosis and the distribution and appearance are compatible with asbestos related interstitial fibrosis.

RE: Robert F. Lyman                                                                    2
July 31, 2007

There has been a significant change in the appearance of the CT scan since the previous study of 3/28/07. These changes primarily involve resolution of findings of generalized right chest wall pleural thickening, enlarged lymph nodes and lymphangitic spread of disease. Left pleural effusion has also resolved.

Additional findings, not noted earlier, include pericardial effusion and abnormal thickening of the esophageal region. Further evaluation of the esophagogastric area is recommended.

Bilateral calcified chest wall pleural plaque is again noted, unchanged from the previous scan and most likely representing asbestos pleural disease.

I have also reviewed the chest CT scan, including prone high resolution views, performed at Great Basin Imaging, 4/27/07. There continues to be substantial volume loss in the right hemi-thorax. There is bilateral pleural plaque, some of which is calcified. There is a moderate pericardial effusion, but smaller than on 3/28/07. Circumferential right pleural thickening is now no longer present.  The left pleural effusion has resolved. In comparison with the 3/28/07 CT scan, there is marked improvement in the lung parenchyma on the 5 mm conventional supine views. There are no longer findings suggestive of lymphangitic spread of tumor. Adenopathy is no longer present.

The high resolution views show focal areas of scarring at the medial left lung base. The image quality is limited by motion artifact.

I have reviewed a radiology report by Stephen Loos, M.D., interpreting the 4/27/07 chest CT scans above.  There are multifocal pleural plaques and thickening with calcification consistent with asbestos pleural disease. There is a new area of pleural thickening, in comparison with prior study 10/7/05, involving right anterior lung base. There are atherosclerotic changes of the aorta and a left subclavian artery stent, as before. There is a new pericardial effusion, moderate in extent, about 1.9 cm thick. There are changes from prior thoracotomy and partial upper lobectomy.  There is a hiatus hernia.

The high resolution images show extensive reticulonodular lung images diffusely with a wide differential diagnosis, including asbestosis.

Discussion:  There is marked improvement in the chest CT findings between March 28 and April 27, 2007. The circumferential right pleural effusion has resolved as has the left pleural effusion. There has been resolution of the extensive interstitial septal thickening in the right lung that had suggested possible lymphangitic spread of tumor.

Information about the therapy that Mr. Lyman received between the March 28, 2007 and April 27, 2007 CT scans might help explain the radiologic improvement.

RB: Robert F. Lyman                                                              3
July 31, 2007

Radiologists Dr. Breyer and Dr. Loos have each, separately, interpreted the
4/27/07 high resolution chest CT scan as showing interstitial lung disease. I find the
evidence insufficient to diagnose interstitial lung disease.

Lung pathology is more accurate that x-rays or CT scans for the diagnosis of
asbestosis. It remains my opinion that Mr. Lyman has CAP-NIOSH grade 1 asbestosis,
based on pathology interpretation by Dr. Salyer.

In my 7/23/07 report, relying on Dr. Breyer's interpretation of the 3/28/07 chest
CT scan (with which I concur), I concluded that Mr. Lyman has advancing lung cancer
with evidence of lymphangitic spread of tumor in the entire right lung. The 4/27/07 CT
scan no longer shows evidence of lymphangitic spread of tumor.

I have changed no other opinions in my previous report.

Please let me know if you have any questions.

Sincerely,

Daniel M. Raybin, M.D.

I declare under penalty of perjury that the information contained in this report and its
attachments, if any, is true and correct to the best of my knowledge and belief, except as
to information that I have indicated that I have received from others. As to that
information, I declare under penalty of perjury that the information accurately describes
the information provided to me, and except as noted herein, that I believe it to be true.

I, myself, reviewed the records and prepared this report.

I further declare under penalty of perjury that I have not violated the provisions of
California Labor Code Section 139.3 with regard to the evaluation of this patient or the
preparation of this report.

I further declare under penalty of perjury that the name and qualifications of each
person who performed any services in connection with the report, including diagnostic
studies, other than clerical preparation are as follows:

| NAME | QUALIFICATIONS |
|---|---|
| Donald Breyer, M.D. | Radiologist |

This report is being billed as ML 104-97, a Supplemental Medical-Legal
Evaluation.

RE: Robert F. Lyman                                                                                          4
July 31, 2007

I verify under penalty of perjury that the following times were spent by me:

Review of records:                                            1 hr
Report preparation                                           1 hr.


Signed this 31st day of July 2007
At San Francisco County, California


Daniel M. Raybin, M.D.

**DONALD BREYER, M.D., F.A.C.R.**
Certified ILO B Reader

6881 Gunn Drive
Oakland, CA 94611
(510) 339-9204
Fax: (510) 338-0069

May 9, 2007

## LYMAN, ROBERT

**EXAMINATION:** A high resolution CT scan of the chest including prone and supine high resolution images. The study is performed as a supplement to the CT scan of 3/28/07. The study is performed at Great Basin Imaging on 4/27/07 and is technically adequate.

**DATE OF EXAMINATION:** April 27, 2007

In the nondependent lung fields on the prone high resolution images there are bilateral changes of an increased profusion of ill defined centrilobular nodular opacities. Some irregular interface and parenchymal band formation is also noted.

When compared with the prior study, it is now noted that the circumferential right chest wall pleural thickening is largely resolved as has the lymphangitic spread of disease. Right lung volume loss is present and is probably related to status post right lobectomy. Left pleural effusion has also resolved. Some significant pericardial pleural thickening is present.

The esophagogastric region appears abnormal with thickening of the distal esophagus and/or upper pars cardia of the stomach. Other findings appear unchanged.

**IMPRESSION:**

PARENCHYMAL FINDINGS PRESENT ARE COMPATIBLE WITH INTERSTITIAL FIBROSIS. THE DISTRIBUTION AND APPEARANCE ARE COMPATIBLE WITH ASBESTOS RELATED INTERSTITIAL FIBROSIS.

THERE HAS BEEN A SIGNIFICANT CHANGE IN THE APPEARANCE OF THE CT SCAN SINCE THE PREVIOUS STUDY OF 3/28/07. THESE CHANGES PRIMARILY INVOLVE RESOLUTION OF FINDINGS OF GENERALIZED RIGHT CHEST WALL PLEURAL THICKENING, ENLARGED LYMPH NODES AND LYMPHANGITIC SPREAD OF DISEASE.

RE: LYMAN, ROBERT
Page 2 of 2
May 9, 2007

ADDITIONAL FINDINGS PRESENT AT THIS TIME THAT
WERE NOT NOTED EARLIER INCLUDE PERICARDIAL
EFFUSION AND ABNORMAL THICKENING OF THE
ESOPHAGOGASTRIC REGION.   FURTHER EVALUTION
OF THE ESOPHAGOGASTRIC AREA RECOMMENDED.

LEFT PLEURAL EFFUSION HAS ALSO RESOLVED.

THE PATIENT IS ALSO NOTED TO HAVE A CALCIFIED
GALLSTONE AND POSTOPERATIVE CHANGES IN THE
ABDOMEN. THERE IS THORACOLUMBAR SCOLIOSIS
AND POSTOPERATIVE CHANGES IN THE LUMBAR
SPINE.

BILATERAL   CALCIFIED   CHEST   WALL   PLEURAL
PLAQUES AGAIN NOTED, UNCHANGED FROM THE
PREVIOUS SCAN AND MOST LIKELY REPRESENTING
ASBESTOS RELATED PLEURAL DISEASE.

DAB:gmp:
D: 5/9/07 T: 5/9/07 # 832645

# PROOF OF SERVICE

I, Joyce Diala, do hereby declare and state:

I am employed in the city of Petaluma, County of Sonoma, California. I am over the age of 18 and not a party to the within action. My business address is 1324 Rand Street, Petaluma, CA 94954.

On _____AUG 1 7 2007_____, I served the within:

Reports;

Re: Robert Flyman

on the parties in this action by placing a true copy thereof in a sealed envelope, and envelope addressed as follows:

By mail Service:

**BERRY & BERRY**
P.O. Box 16070
2930 Lakeshore Ave.
Oakland, CA 94610

I am readily familiar with the business practice at my place of business for collection and processing of correspondence for delivery by mail. Correspondence so collected and processed is deposited with the United States Postal Service on the same day in the ordinary course of business. On the above date the said envelope was collected for the United States Postal Service following ordinary business practices.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed _____AUG 1 7 2007_____, at Petaluma, California.

Joyce Diala

# EXHIBIT A – 5

## SALYER REPORTS

05/11/2007 12:31 FAX 9835117          BERRY AND BERRY          → BRYDON HUGO          @001/005

**BERRY & BERRY**
A PROFESSIONAL LAW CORPORATION
TELEPHONE (510) 250-0200
FAX (510) 835-5117
WWW.BERRYANDBERRY.COM

PHILIP E. BERRY
PETER R. GILBERT
LEONARDO I. VACCENA
LAURA R. FREITAS
EVANTHIA M. EVANGS
RHONDA L. WOO
JILL J. HOFFMAN

SAMUEL H. BERRY    (1904-1994)

May 11, 2007

To:  All Defense Counsel

Re: LYMAN, ROBERT/SAMANTHA V. CLEAVER-BROOKS
San Francisco Superior Court No. 459162

Dear Counsel:

Enclosed please find an expert report from Dr. William Salyer dated 2/17/07, pertaining to the above referenced case, provided to Berry & Berry by the Brayton office on 3/5/07. We apologize for the delay in distributing this report, which was caused by our confusing this plaintiff with a different plaintiff with a similar name but separate case. Please accept our apologies for any inconvenience this may have caused. Thank your for you patience and understanding.

Very truly yours,
BERRY & BERRY

Kristen Poppert
Case Status Coordinator
(510) 250-0468

M1752

MAILING ADDRESS:
POST OFFICE BOX 16070 ■ OAKLAND, CA 94610

STREET ADDRESS:
2930 LAKESHORE AVENUE ■ OAKLAND, CA  94610-3614

05/11/2007 12:52 FAX 98355117          BERRY AND BERRY          → BRYDON HUGO          002/005

*Alta Bates*

M E D I C A L   C E N T E R
ANATOMIC PATHOLOGY

Berry & Berry

Received

Date 2/67/07

To Whom It May Concern

Attached is a true and correct copy of my notes, consisting of
__2__ page(s) in the case of *Robert F. Lyua*.

I have initialed the upper right corner(s) for identification.

Sincerely

William R. Salyer, M.D. / WRS

WRS/w

Alta Bates Medical Center
Ashby Campus, 2450 Ashby Avenue, Berkeley, CA 94705
Tel 510.204.1642 • Fax 510.549.2671

Lyman, Robert F.        CORS        L07-
DOB: 8-13-39                        Brayton

11-16-06 ⟹ Carson - Tahoe Pathology, Carson City, NV
                H-06-9466
        — hemoptysis, abnormal RUL c̄ multiple
        infectious vs. malignant

A. RUL, endobronchial bx:
        — Pos for malignancy — keratinizing
          squamous cell ca c̄ invasion

B. RUL, washing (cytology):
        — Pos for malig — keratinizing ca cell CA

C. RUL, brushing (cytology)
        — Pos for malig — keratinizing sq cell ca

D. RUL, bronchoalveolar lavage (cytology)
        — Pos for malig — keratinizing sq cell ca

09/11/2007 12:52 FAX 78555117    BERRI AND BERRI    → BRYDON HUGO    @004/005

Lyman ⌣        CRS ⌣        ②

Slide Review

Carson · Tahoe Pathology   H-06-9466   11 slides
(A-H+E; B- 2 smears [PAP]; B- cytospin [Giemsa]; B-cell block [H+E];
C- 3 smears [PAP]; D- 2 smears [PAP]; D-cell block [H+E]
+ 3 blocks (A, B, D)        prepared 3 fx (A,B,D)

A. Lung, RLL, bronch bx : — In-situ + infil sq cell ca
                            — No lung tissue (bronch wall + tumor)
                            — O ctb tumor in <0.1 cm² of bronch
                                                wall + tumor

B  Lung, RLL, bronch wash : — Squamous cell ca
                             — O ctb tumor

C. Lung, RLL, bronch : Sq cell ca

D.  Lung, B- A lavage : — Sq cell ca
                        — O ctb tumor

Note: Quantity + nature of above samples are
inadequate for documentation of asbestos - body
content of lung tissue.
                    WRL

05/11/2007 12:52 FAX 98389117        BERRY AND BERRY          → BRYDON BUGU         005/005

## PROOF OF SERVICE

I, Jane Cannigue, do hereby declare and state:

I am employed in the city of Petaluma, County of Sonoma, California. I am over the age of 18 and not a party to the within action. My business address is 1009 Clegg Court, Petaluma, CA 94954.

On _____ MAR 0 1 2007 _____, I served the within:

Reports;

Re: _Robert F. Lyman_

on the parties in this action by placing a true copy thereof in a sealed envelope, and envelope addressed as follows:

By mail Service:

**BERRY & BERRY**
P.O. Box 16070
2930 Lakeshore Ave.
Oakland, CA 94610

I am readily familiar with the business practice at my place of business for collection and processing of correspondence for delivery by mail. Correspondence so collected and processed is deposited with the United States Postal Service on the same day in the ordinary course of business. On the above date the said envelope was collected for the United States Postal Service following ordinary business practices.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed _____ MAR 0 1 2007 _____, at Petaluma, California.

_____
Jane Cannigue

**BERRY & BERRY**
A PROFESSIONAL LAW CORPORATION
TELEPHONE (510) 250-0200
FAX (510) 835-5117
www.berryandberry.com

PHILLIP R. BERRY
PETER R. GILBERT
LEONARDO J. VACCHINA
LAURA R. PRZETAK
EVANTHIA M. SPANOS
RHONDA L. WOO
JILL S. HOFFMAN

SAMUEL R. BERRY   · (1904-1990)

May 3, 2007

To:  All Defense Counsel

Re:   LYMAN, ROBERT/SAMANTHA V. CLEAVER-BROOKS
       San Francisco Superior Court No. 459162

Dear Counsel:

   Enclosed please find a report by William R. Salyer M.D.(DOR:4/16/07) pertaining to the above referenced case, recently provided to Berry& Berry by the BRAYTON & PURCELL office.

                              Very truly yours,
                              BERRY & BERRY

                              Terri Hunt
                              Paralegal Assistant
                              Evidence Paralegal Department

KH752

MAILING ADDRESS:                          STREET ADDRESS:
POST OFFICE BOX 16070 ▪ OAKLAND, CA 94610   2930 LAKESHORE AVENUE ▪ OAKLAND, CA 94610-3614

M1752
Prof: Yes
SoE.

*Alta Bates*

M E D I C A L   C E N T E R
ANATOMIC PATHOLOGY

Berry & Berry

MAY 0 3 2007

Received

Date   4-16-07

To Whom It May Concern

Attached is a true and correct copy of my notes, consisting of
_2_ page(s) in the case of ___ROBERT LYMAN_____ .

I have initialed the upper right corner(s) for identification.

Sincerely

William R. Salyer, M.D.   /WRS

WRS/w

Alta Bates Medical Center
Ashby Campus, 2450 Ashby Avenue, Berkeley, CA 94705
Tel 510.204.1642 • Fax 510.549.2671

Lyman. Robert                    WFS                    CO7.
DOB  8.13-39                                            Brayton

1-4-07 → Carson — Tahoe Pathology, H07-11, Carson City

RLL lung cancer

A) Fragment of lung parenchyma. No node
B-C) Mediastinal lymph node : Neg
D) Lung, RLL, lobectomy:

     — Mod diff squamous cell ca, 2.2 cm

     — Met CA in 2/3 hilar nodes

     — Clean vascular margin

     — Invasive sq ca at bronch margin

E-G) Mediastinal lymph nodes : Neg
H.) R main bronchus, partial resection:
     Invasive sq CA. Margins clear

I) R 7th rib : Neg

Lefgren.                                   W2S                              (2)

Slide Review

Carson - Tahoe Pathology, H-07-111, 36 slides
  (A, FSB-2, B, FSC-2, C, FSD-3, D1-D11, E, F, G,
  FSH1-2, H1, FSH2-2, H2, FSH3-2, H3-H5, I)
  + 23 blocks (A, B, C, D1-D11, E, F, G, H1-H5, I)
  prepared 6 Fe (D4, D6, D8, D9, D10, D11)

A) "Med node" — fragment of lung. No lymph. node. Negative

B, C) Mediastinal lymph nodes, Neg.

D) Lung, RUL, lobectomy —
   — In situ & infiltrating squamous cell CA —
   — Focal bronchial margin involvement. Neg vasc margin.
     with lymph node involvement
   — Minimal emphysema —
   — Focal peribronchial fibrosis.
   — 7 asbestos bodies in 5.2 cm² of lung tissue,
       or 1.3 asb bodies/cm²
   — 2 asb bodies in 0.4 cm² of lymph node tissue
   — Asbestosis, CAP-NIOSH Grade I

| Slide | Asb Bodies |
|-------|-----------|
| D4 | 1 - node |
| D6 | 0 |
| D8 | 3 - lung |
| D9 | 1 - node |
| D9 | 1 - lung |
| D10 | 0 |
| D11 | 3 |

E, F, G) Mediastinal lymph nodes, Neg.
H) R Main bronchus, partial resection: — Diffuse SQ. CA
                                        — Neg margins

I  R 7th rib. Neg.

## PROOF OF SERVICE

I, Joyce Diala, do hereby declare and state:

I am employed in the city of Petaluma, County of Sonoma, California.  I am over the age of 18 and not a party to the within action.  My business address is 1009 Clegg Court, Petaluma, CA 94954.

On _____ APR 3 0 2007 _____, I served the within:

Reports;

Re:  *Robert Lyman*

on the parties in this action by placing a true copy thereof in a sealed envelope, and envelope addressed as follows:

By mail Service:

### BERRY & BERRY
P.O. Box 16070
2930 Lakeshore Ave.
Oakland, CA 94610

I am readily familiar with the business practice at my place of business for collection and processing of correspondence for delivery by mail.  Correspondence so collected and processed is deposited with the United States Postal Service on the same day in the ordinary course of business.  On the above date the said envelope was collected for the United States Postal Service following ordinary business practices.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed _____ APR 3 0 2007 _____, at Petaluma, California.

_____
Joyce Diala

05/03/2007 12:28 FAX #8365117        3 BERRY & BERRY        → BRYDON HUGO        ☒006/008

| Page 1 of 3 | BERRY AND BERRY SERVICE LIST | As of: | 05/03/2007 |
|---|---|---|---|
| | FAX NUMBER | | |

CASE NAME:   LYMAN, ROBERT/SAMANTHA V. CLEAVER-BROOKS   SFSC 459162        BRAYTN        M1752.ASB

| | | | |
|---|---|---|---|
| M1752.ASB | ADAMS NYE SINUNU BRUNI BECHT<br>222 KEARNY, 7TH FLOOR SAN FRANCISCO, CA 94108-4521<br>*WEIR VALVE & CONTROLS USA, INC.* | 000 | (415)982-2042 |
| M1752.ASB<br>N | BASSI, MARTINI, EDLIN & BLUM<br>351 CALIFORNIA STREET, SUITE 200 SAN FRANCISCO, CA 94104<br>*CARLISLE CORPORATION, INC.* | 041 | (415)397-1339 |
| M1752.ASB | BASSI, MARTINI, EDLIN & BLUM<br>351 CALIFORNIA STREET, SUITE 200 SAN FRANCISCO, CA 94104<br>*PARKER-HANNIFIN* | 041 | (415)397-1339 |
| M1752.ASB | BRYDON HUGO & PARKER<br>135 MAIN STREET, 20TH FLOOR SAN FRANCISCO, CA 94105<br>*FOSTER WHEELER CORPORATION* | 69 | (415) 808-0333 |
| M1752.ASB | BRYDON HUGO & PARKER<br>135 MAIN STREET, 20TH FLOOR SAN FRANCISCO, CA 94105<br>*UNION CARBIDE* | 69 | (415) 808-0333 |
| M1752.ASB | DILLINGHAM & MURPHY, LLP<br>225 BUSH STREET, SIXTH FLOOR SAN FRANCISCO, CA 94104-4207<br>*MONTELLO, INC.* | 116 | (415)397-3300 |
| M1752.ASB | FILICE, BROWN,EASSA & MCLEOD, LLP<br>1999 HARRISON STREET, 18 FLOOR OAKLAND, CA 94612<br>*CHEVRON, U.S.A., INC.* | 030 | (510)839-7940 |
| M1752.ASB | FILICE, BROWN,EASSA & MCLEOD, LLP<br>1999 HARRISON STREET, 18 FLOOR OAKLAND, CA 94612<br>*DETROIT DIESEL CORPORATION* | 030 | (510)839-7940 |
| M1752.ASB | FILICE, BROWN,EASSA & MCLEOD, LLP<br>1999 HARRISON STREET, 18 FLOOR OAKLAND, CA 94612<br>*FORD MOTOR COMPANY* | 030 | (510)839-7940 |
| M1752.ASB | FILICE, BROWN,EASSA & MCLEOD, LLP<br>1999 HARRISON STREET, 18 FLOOR OAKLAND, CA 94612<br>*GENERAL MOTORS CORPORATION* | 030 | (510)839-7940 |

05/03/2007 12:28 FAX 98355117          3 BERRY & BERRY          → BRYDON HUGG          ☒007/008

## BERRY AND BERRY SERVICE LIST
### FAX NUMBER

CASE NAME:   LYMAN, ROBERT/SAMANTHA V. CLEAVER-BROOKS   SFSC 459182          BRAYTN          M1752.ASB

| Case | Firm / Party | Fax Code | Fax Number |
|------|--------------|----------|------------|
| M1752.ASB | FILICE, BROWN,EASSA & MCLEOD, LLP<br>1999 HARRISON STREET, 18 FLOOR OAKLAND, CA 94612<br>*TEXACO, INC.* | 030 | (510)839-7940 |
| M1752.ASB | FILICE, BROWN,EASSA & MCLEOD, LLP<br>1999 HARRISON STREET, 18 FLOOR OAKLAND, CA 94612<br>*UNOCAL CORPORATION* | 030 | (510)839-7940 |
| M1752.ASB | HAIGHT, BROWN & BONESTEEL<br>71 STEVENSON STREET, 20TH FLOOR SAN FRANCISCO, CA 94105<br>*INTERNATIONAL TRUCK AND ENGINE CORP.* | 026 | (415)546-7505 |
| M1752.ASB<br>E | HASSARD BONNINGTON<br>TWO EMBARCADERO CENTER, SUITE 1800 SAN FRANCISCO, CA 94111-3993<br>*JOHN CRANE INC.* | 085 | (415)288-9802 |
| M1752.ASB | KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP<br>55 SECOND STREET, SUITE 1700 SAN FRANCISCO, CA 94105-3493<br>*CRANE CO.* | 017 | (415) 882-8220 |
| M1752.ASB | LEWIS, BRISBOIS, BISGAARD & SMITH LLP (SF Ofc)<br>ONE SANSOME STREET, SUITE 1400 SAN FRANCISCO, CA 94104<br>*PLANT INSULATION COMPANY* | 52 | (415)434-0882 |
| M1752.ASB<br>E | MCNAMARA, DODGE, NEY, BEATTY, SLATTERY<br>P.O. BOX 5288 WALNUT CREEK, CA 94596<br>*FMC CORPORATION* | 054 | (925)939-0292 |
| M1752.ASB | PRINDLE, DECKER & AMARO<br>369 PINE STREET, SUITE 800 SAN FRANCISCO, CA 94104<br>*A.W. CHESTERTON CO.* | 082(or alt 415-732-5956) | (415)788-3625 |
| M1752.ASB | PRINDLE, DECKER & AMARO<br>310 GOLDEN SHORE 4TH FLOOR LONG BEACH, CA 90801-5511<br>*CHEVRON PHILLIPS CHEMICAL CO/DRILLING SPECIAL.TIE* | 12 | (562)495-0584 |
| M1752.ASB | PRINDLE, DECKER & AMARO<br>310 GOLDEN SHORE 4TH FLOOR LONG BEACH, CA 90801-5511<br>*DRILLING SPECIALTIES COMPANY* | 12 | (562)495-0584 |

05/03/2007 12:26 FAX 98355117          3 BERRY & BERRY          → BRYDON HUGO          ⊠008/008

Page 3 of 3                          BERRY AND BERRY SERVICE LIST          As of:   05/03/2007
                                            FAX NUMBER
CASE NAME:   LYMAN, ROBERT/SAMANTHA V. CLEAVER-BROOKS   SFSC 459162          BRAYTN          M1752.ASB

| M1752.ASB | PRINDLE, DECKER & AMARO | 12 | |
| | 310 GOLDEN SHORE 4TH FLOOR LONG BEACH, CA 90801-5511 | | (562)495-0584 |
| | *HENRY VOGT MACHINE COMPANY* | | |
| M1752.ASB | SCHIFF HARDIN, LLP | 057 | |
| N | ONE MARKET PLAZA, 32ND FLOOR SAN FRANCISCO, CA 94105 | | (415)901-8701 |
| | *OWENS-ILLINOIS* | | |
| M1752.ASB | THELEN, REID BROWN RAYSMAN & STEINER LLP | 075 | |
| E | 101 SECOND STREET, SUITE 1800 SAN FRANCISCO, CA 94105-3601 | | (415)644-8519 |
| | *MACK TRUCKS, INC.* | | |
| M1752.ASB | WRIGHT, ROBINSON, OSTHIMER & TATUM | 080 | |
| | 44 MONTGOMERY STREET, 18TH FLOOR SAN FRANCISCO, CA 94104 | | (415)391-8766 |
| | *FREIGHTLINER CORPORATION* | | |

# EXHIBIT B

# EXHIBIT B – 1

## GENERAL ORDER NO. 140



sfgov | residents | business | government | visitors | online services | search

Superior Court >> Court Divisions >> Civil Division >> Asbestos (General Orders)



## Superior Court of California
County of San Francisco

**General Order No. 140 Re: Case Advanced Pursuant t**
CALIFORNIA SUPERIOR COURT

CITY AND COUNTY OF SAN FRANCISCO

IN RE:

COMPLEX ASBESTOS LITIGATION      NO. 828684

GENERAL ORDER NO. 140
RE: CASE ADVANCED PURSUANT TO
CODE OF CIVIL PROCEDURE SECTION
36

This General Order supersedes General Order No. 40 and is applicable to asbestos cases in which, subsequent to May 1, 1997, a Motion for Preference pursuant to Code of Civil Procedure section 36 is filed in San Francisco Superior Court or in which the plaintiff has indicated on the Preliminary Fact Sheet an intention to file a Motion for Preference.

In recognition of the unique and serious problems posed for this court and the litigants by the large number of asbestos bodily injury actions advanced for preferential trial dates, and the unique problems posed by those cases in which a plaintiff is dying. The policy of this court in the administration of Complex Asbestos Litigation under Standard 19 of the Standards of Judicial Administration to:

A. Promote the expeditious exchange of necessary and relevant information in order to facilitate the prompt and intelligent evaluation of liability and damage aspects wherever possible;

B. Curtail and prevent unnecessary and repetitious discovery wherever possible;

C. Encourage delegations of work responsibility and sharing of costs on common problems in an effort to avoid unnecessary duplication and expense to the litigants; and

D. Ensure completion of discovery prior to the advanced trial date.

IT IS ORDERED:

1. REQUIREMENTS ATTENDANT TO PLAINTIFF'S MOTION TO ADVANCE OR MOTION FOR PREFERENCE.

A. Upon service by plaintiff of notice of plaintiff's deposition, plaintiff shall provide Designated Defense Counsel all nonprivileged medical, employment, economic and rehabilitation records including pathology materials and/or reports in their possession relating to plaintiff's claim;

B.  Upon filing a motion for preference pursuant to Code of Civil Procedure section 36, plaintiff shall provide Designated Defense Counsel the following:

    1.  Any additional nonprivileged medical, employment, economic and rehabilitation records and reports in their possession relating to plaintiff's claim not previously provided;

    2.  An inventory specifying, with respect to all medical or employment records, pathology and chest radiographs or CT scans within the plaintiff's possession or control and not previously provided to defendants, the following:

        a.  the facility from which each record or film was obtained;

        b.  the number of pages of records from each such location or the number of films;

        c.  the inclusive dates covered by each set of medical or employment records or the dates of each film or, alternatively, the identity of any Bates stamping on medical records; and

        d.  the date by which plaintiff will deliver to Designated Defense Counsel any such materials not already provided; and

    3.  If not previously provided, a privilege log (excluding nondiscoverable consultant writings or reports as to which an objection or claim of privilege is being raised) which describes specifically any medical or employment records withheld and the basis for each privilege claim.

C.  Pathology materials in cases subject to this order shall be provided and/or exchanged cooperatively, recognizing each side's needs to have reasonable access to the materials and not pursuant to unilateral and/or arbitrary demands precedent to release of the materials.

2.  **INTERROGATORIES DEFENDANTS' INTERROGATORIES TO PLAINTIFF.**

A.  The court has adopted and designated as exhibits to General Order No. 129 seven types of Standard Defense Interrogatories to Plaintiff (Exhibits B through H), to be answered by plaintiffs without objection except for the assertion of a claim of privilege.

B.  If not previously provided, within three days after the earlier of service by the plaintiff of the notice of the plaintiff's deposition or filing a Motion to Advance pursuant to Code of Civil Procedure section 36, plaintiff shall serve on each defendant then served in the case and upon Designated Defense Counsel answers to the appropriate set(s) of said Standard Defense Interrogatories to Plaintiff and, no later than the earlier of 30 days from the granting of the motion or 30 days before the trial, answers to the Standard Defense Interrogatories to Plaintiff, Set 2,. In the event plaintiff serves any defendant after filing the motion for preference pursuant to Code of Civil Procedure section 36, plaintiff shall simultaneously serve any such defendant with answers to the

appropriate set(s) of Standard Defense Interrogatories to Plaintiff upon local counsel, if known to plaintiff's attorney. Said answers to interrogatories may be served in the same manner as the summons and complaint.

C. Answers to Standard Defense Interrogatories to Plaintiff, within the time periods specified above, shall be served by the plaintiff without the necessity of defendant's service of said Standard Defense Interrogatories to Plaintiff upon plaintiff.

3. **INTERROGATORIES PLAINTIFF'S INTERROGATORIES TO DEFENDANTS.**

A. The court has adopted and designated as exhibits to General Order No. 129 Standard Plaintiff's Interrogatories to Defendants (Exhibits I and/or J ) which each defendant shall answer if that defendant has not previously answered. Such answers shall be provided under oath without objection except for the assertion of a claim of privilege within 20 days of the granting of the motion for preference or 75 days after service of the complaint, whichever is later. However, a defendant need not answer Interrogatory Nos. 33, 34 and 54 of Exhibit I at this time and may instead answer those interrogatories within the time frame specified in General Order No. 129.

B. The court has adopted and designated as exhibits to General Order No. 129 Plaintiffs' Standard CaseSpecific Interrogatories to Defendants and Plaintiffs' Standard CaseSpecific Interrogatories to Friction Defendants (Exhibits K and L to General Order No. 129) and a Notice of Service of Plaintiffs' Standard CaseSpecific Interrogatories to Defendants (Exhibit L1 to General Order No. 129). Plaintiffs' counsel may serve Exhibit L1 at any time after commencement of the action. Thereupon, the defendant (s) designated in the notice shall be required to answer such interrogatories within 30 days after service of the notice.

4. **REQUEST FOR IDENTIFICATION AND PRODUCTION OF DOCUMENTS AND THINGS.**

A. The court has adopted Defendants' Request for Production and Identification of Documents and Things to Plaintiff(s) (Exhibit "M" to General Order No. 129). These standard requests shall be deemed served upon plaintiff upon granting of the motion for preference, and shall be responded to under oath by plaintiff without objection except for the assertion of a claim of privilege. The responses shall be served on all defendants and Designated Defense Counsel no later than 30 days after the granting of the motion for preference or 15 days before trial, whichever is earlier. The documents required in response to the document request(s) shall be served simultaneously with said responses. Nothing in this Section shall preclude the use of subpoenas for obtaining records.

B. Any document(s) described or referenced in answers to standard interrogatories, and any index to documents shall, if not previously provided pursuant to General Order No. 129, be made available for inspection and copying upon request and at a mutually convenient time without a formal request for production of documents. Any party that answers any standard interrogatory pursuant to Code of Civil Procedure section 2030(f)(2) shall make available for inspection and copying all such documents, if not previously produced to the requesting party. If a

party makes documents available for inspection and copying pursuant to a notice under an In Re: Complex Asbestos Litigation caption with notice to all parties, that party need not produce those documents again absent a showing of good cause.

C.  Any party withholding documents on the ground of any privilege shall deliver to opposing counsel and any requesting party a list of such documents. For any documents dated January 1, 1974 or later, such list may refer to specific categories of documents, provided that any indices of documents withheld shall be individually identified.

5.  **REQUEST FOR ADMISSIONS.**

Any party may serve Request for Admissions on any other party no later than 30 days before the trial date. The responses to the Request for Admissions shall be mailed no later than as required by the Code of Civil Procedure or 10 days before trial, whichever is earlier.

6.  **OTHER DISCOVERY.**

Any party may serve other discovery requests nonduplicative of standard discovery on any other party.

7.  **RECORD PROCUREMENT.**

A.  Any stipulations and/or authorizations for production of records shall be executed and provided to Designated Defense Counsel as early as possible prior to the filing of a motion for preference pursuant to Code of Civil Procedure section 36 or within seven days of receipt of the authorizations and stipulations from Designated Defense Counsel, whichever is later. (Copies of authorizations and stipulations in the form to be used are attached as Exhibits N1 through N5 to General Order No. 129.)

B.  Any additional requests for authorizations and/or stipulations shall be executed and provided to Designated Defense Counsel within seven days after receipt of a written request for such authorizations and/or stipulations.

C.  The duration of all authorizations shall be 180 days.

D.  Upon receipt of records obtained by stipulation and/or authorization, the copy service will handdeliver copies of these records to plaintiff's counsel in the Bay Area, or overnight mail to plaintiff's counsel outside the Bay Area.

E.  Except for Social Security Earnings records, the copy service will provide copies of all records to Designated Defense Counsel no sooner than seven days after delivery of the records to plaintiff's counsel unless the copy service and Designated Defense Counsel are advised in writing that plaintiff's counsel asserts an objection to such production. The copy service shall not provide copies of the records to which an objection has been asserted unless ordered to do so by this Court or unless notified by plaintiff's counsel that the objection has been withdrawn. As to Social Security Earnings records, there shall be no "firstlook". Plaintiff's counsel shall return the records provided by the copy service within seven days

after delivery. Any records retained thereafter shall be at plaintiff's cost. The copy service shall retain a copy of all records copied for a period of six years or longer upon written request of any party. Under no circumstances may the copy service charge the plaintiff more than the copy service is charging any defendant for a copy of the records.

F.  Plaintiff's counsel must advise Designated Defense Counsel of any objection to production of records in writing, specifying the grounds upon which said objections are based. Any party may either make or oppose a motion to compel and/or a motion for a protective order or, without waiving objection, make a motion in limine for disclosure of records at trial.

G.  All records produced pursuant to this subsection are presumed to be authenticated and to satisfy the business records exception of the hearsay rule unless the party objecting to the admission establishes the contrary by preponderance of the evidence.

H.  If plaintiff alleges exposure to asbestos during the time he or she was the proprietor of a business, plaintiff's attorney shall arrange to produce any records pertaining to that business as soon as practicable and if the plaintiff has not been deposed, prior to plaintiff's deposition, at plaintiff's attorney's office or other convenient location within 75 miles of San Francisco. That request shall be in the form set forth as Exhibit M to General Order No. 129. Response to the request for business records shall be made within 10 days of the mailing of such request.

I.  Nothing in this Section shall preclude the use of subpoenas for obtaining records and service of such subpoenas shall not constitute a general appearance by or on behalf of any party. If subpoenas are used, notice to all parties of such subpoenas and/or depositions must be given.

J.  Except as otherwise ordered by the court, records obtained pursuant to this section shall be used only for purposes of the action in which they are so obtained unless the records are obtained in another case by subpoena or unless the plaintiff has consented to have his or her personnel records used in other cases.

8.  WAIVER OF TIME FOR SUBPOENA OF PLAINTIFF'S PERSONAL CONSUMER RECORDS.

Absent good cause communicated in writing by plaintiff to Designated Defense Counsel upon receipt of the notice of subpoena, plaintiff shall waive the provisions of Code of Civil Procedure section 1985.3(b) with respect to that plaintiff's own records and those records will be provided subject to the provisions of section 7.E., supra.

9.  PATHOLOGY MATERIALS AND REPORTS.

Following the granting of plaintiff's motion for preference, the parties and Designated Defense Counsel shall, upon request, provide promptly to defendants through Designated Defense Counsel or to plaintiff any subsequently acquired pathology materials and/or discoverable writings or reports by any pathology expert(s).

The parties and Designated Defense Counsel shall cooperate with each other to

obtain pathology materials and to exchange them so that each sides' experts
have a reasonable opportunity to review the pathology materials in preparation
for trial.

10. **DEPOSITION PLAINTIFF'S.**

    A. The plaintiff's deposition may be noticed only by Designated Defense
Counsel or by the plaintiff. The parties shall confer, through Designated
Defense Counsel, on scheduling of the plaintiff's deposition. The purpose
of the conference is to set the deposition at a mutually convenient date,
time and place considering the nature of the case. Nothing herein
contained shall prevent the plaintiff from obtaining an ex parte order to
take his or her own deposition before the defendants have appeared in
the case.

    B. If the plaintiff advises defendants and Designated Defense Counsel in
writing at least five days in advance of the deposition that plaintiff's
counsel intends to proceed first, the plaintiff may complete his or her
direct testimony before crossexamination is conducted by defendants. If
this procedure is used, absent agreement of the parties or court order,
the time for defendants' crossexamination shall be either 20 hours on the
record or three times the amount of time used by plaintiff to complete
the direct examination, whichever is longer. If, before the start of the
deposition, plaintiff has not served answers to the standard defense
interrogatories to plaintiff, Set 2, on each defendant then served in the
case and upon Designated Defense Counsel, the duration of the
deposition shall, absent agreement of the parties or court order, be the
longer of 30 hours on the record or three times the amount of time used
by plaintiff to complete the direct examination. The defendants will be
expected to allocate the available time among themselves and, in the
event of inability to agree, shall make a timely motion for protective
order before expiration of the time limit.

    C. In the event any defendant is served after completion of plaintiff's
deposition, such lateserved defendant(s) may request that Designated
Defense Counsel schedule and notice a further deposition of the
plaintiff. Said deposition shall be limited to those matters not
adequately covered in the initial deposition including liability issues
pertaining to the newly served defendant.

11. **PHYSICAL EXAMINATION OF PLAINTIFF.**

    A. The defendants or any of them at their option may request that plaintiff
be presented to a physician of defendants' selection for a complete
medical examination. The examination may at defendants' option
include chest xrays, pulmonary function test, and oral history taken by
the examining physician.

    B. Nothing in this provision shall limit the right of parties to apply to the
court to obtain additional medical examination and/or discovery.

12. **DISCOVERY CUTOFF.**

All discovery (with the exception of that governed by applicable sections of the
General Orders or by stipulation) shall be completed prior to the assignment to
a trial department.

13. **SETTLEMENT CONFERENCES.**

General Order No. 154 addresses settlement conference and related procedures.

14. **EXPERT DESIGNATION.**

General Order No. 156 shall govern expert designation, document exchange and discovery, except as provided in Section 1 of this order.

15. **MOTIONS FOR SUMMARY JUDGMENT.**

A. In asbestos cases which have been assigned trial dates pursuant to plaintiff's motion for preference pursuant to Code of Civil Procedure section 36, the parties shall be entitled to have motions for summary judgment, including motions for Expedited Summary Judgment pursuant to General Order No. 157, heard up to and including 15 days before the date set for trial.

B. Parties may bring such summary judgment motions pursuant to either Code of Civil Procedure Section 437c or General Order No. 157 on 15 days' notice if served in a manner which reasonably should result in receipt of the papers by the opposing party no later than 5:00 p.m. 15 days before the scheduled hearing.

C. In cases in which expedited summary judgment motions are brought pursuant to General Order No. 157, not later than 10 days before the hearing date, unless otherwise agreed, counsel shall meet and confer and make a good faith effort to resolve whether there is a triable issue of fact that the plaintiff or plaintiff's decedent was exposed to asbestos for which the defendant is responsible.

D. Any opposition to summary judgment motions brought pursuant to Code of Civil Procedure section 437c shall be filed with the court five court days before the hearing date and served in a manner which reasonably should result in receipt of the papers by the opposing party by 5:00 p.m. at least five court days prior to the hearing date. If the motion is brought pursuant to the expedited summary judgment procedure set forth in General Order No. 157, plaintiff shall either dismiss the defendant five court days before the hearing date or a response to such motion shall be filed with the court five court days before the hearing date and served in a manner which reasonably should result in receipt of the papers by the opposing party by 5:00 p.m. at least five court days prior to the hearing date. In the event that multiple motions are filed in the same case and are scheduled for response on the same day, the court will look favorably upon a request by the responding party for an extension of time to respond to the motion.

E. Any reply memorandum and/or evidentiary objections to motions for summary judgment pursuant to Code of Civil Procedure section 437c or expedited motions for summary judgment pursuant to General Order No. 157 must be filed two court days before the hearing date and served in a manner which reasonably should result in receipt of the papers by the opposing party by 5:00 p.m. two court days prior to the hearing date.

F. Absent a court order or agreement excusing the requirement to answer

standard interrogatories, or the expiration of the period within which a motion to compel answers may be filed, failure of a defendant to have responded to any standard interrogatory, which response would have been relevant to the subject matter of the motion for summary judgment, may be grounds for denial of the motion or for other relief as authorized by Code of Civil Procedure section 437c(h).

16. **MOTIONS.**

A party filing or opposing a motion need serve complete papers only on the plaintiff, Designated Defense Counsel and the party or parties directly affected by the motion. As to all other parties to that case, service may be accomplished by service of either the face page or a letter notifying the parties of the substance of the motion. However, the serving party shall provide the entire document(s) upon request from any party.

17. **JURISDICTION.**

Participation in the procedures established by this Order shall not constitute a general appearance or a waiver of objection to jurisdiction. Designated Defense Counsel's preparing, sending, filing or serving stipulations, authorizations for records and serving subpoenas for records shall not constitute a general appearance by or on behalf of any party.

DATED: _____

_____
STUART R. POLLAK
Judge of the Superior Court

_____
ALFRED G. CHIANTELLI
Judge of the Superior Court

# EXHIBIT B – 2

## GENERAL ORDER NO. 156



sfgov | residents | business | government | visitors | online services | search

Superior Court >> Court Divisions >> Civil Division >> Asbestos (General Orders)



## Superior Court of California
County of San Francisco

**General Order No. 156 Regarding Expert Witness Dis**
CALIFORNIA SUPERIOR COURT

CITY AND COUNTY OF SAN FRANCISCO

IN RE:

COMPLEX ASBESTOS LITIGATION          NO. 828684

                                     GENERAL ORDER NO. 156
                                     REGARDING EXPERT WITNESS
                                     DISCOVERY
_____ /   AND DEPOSITIONS

This General Order is applicable to all asbestos litigation cases filed in the San Francisco Superior Court subsequent to January 1, 1997.

It being the policy of this court in the administration of Complex Asbestos Litigation under Standard 19 of the Standards of Judicial Administration to:

A.  Promote the expeditious exchange of necessary and relevant information in order to facilitate the prompt and intelligent evaluation of liability and damage aspects wherever possible;

B.  Curtail and prevent unnecessary and repetitious discovery wherever possible; and

C.  Encourage delegations of work responsibility and sharing of costs on common problems in an effort to avoid unnecessary duplication and expense to the litigants;

D.  Acknowledge that special problems are posed in the mass tort context including those cases in which a plaintiff is gravely ill; and

E.  Promote judicial efficiency and economy.

IT IS ORDERED:

1.  MUTUAL EXPERT DEMAND DEEMED MADE

    A.  For all pending cases in which the deadline for demanding an exchange by all parties of expert witness lists has not passed as of the effective date of this order, all parties shall be deemed to have made a demand for the exchange of expert witness lists, information concerning expert witnesses for the mutual production of discoverable reports and writings, if any, made by an expert in the course of preparing that expert's opinion. Cases in which that deadline has passed as of the effective date of this order shall be governed by the then applicable

section of the Code of Civil Procedure and/or general order of this court.

## 2. MASTER EXPERT WITNESS DESIGNATION

A. Counsel may serve a master expert witness designation ("Master Designation"), which shall contain the information specified in Code of Civil Procedure Section 2034(f)(2)(a), (b), (d) and (e). This Master Designation should specify on its face page the date of service and each serving party (or parties). In addition, the Master Designation shall be served on all counsel on Designated Defense Counsel's current service list of plaintiff and defense counsel in this jurisdiction on the date the Master Designation is served. This Master Designation may be amended at any time by the serving party provided that party gives timely notification of any such amendments to all other parties in the litigation. If the amendment is limited to adding or deleting the names of defendants for which the Designated Defense Counsel serves a Master Designation, such notice may be provided no more frequently than bimonthly and may be served only on plaintiffs' counsel and the defendant(s) being added or deleted.

B. Upon the service of the Master Designation, that document will supersede any previously served expert designation in all cases in which an expert designation has been served.

## 3. EXCHANGE OF DISCOVERABLE WRITINGS

A. For discoverable writings/reports of medical expert witnesses, the dates of exchange of medical expert discoverable reports or writings in their possession shall, unless otherwise agreed by the parties or ordered by the court, be:

   1. For cases governed by General Order No. 129, 90 days before the initial trial date or 20 days after the Status and Setting Conference, whichever is closer to the initial trial date in those cases; and

   2. For cases governed by General Order No. 140, no later than 10 days after the granting of the motion to advance or the motion for preference or as provided in General Order No. 140, whichever is earlier.

   3. Subsequently received medical expert discoverable writings/reports shall be promptly produced as they are received and/or become discoverable.

B. All discoverable writings/reports addressing medical experts' opinions shall be produced by plaintiff by service on Designated Defense Counsel and by defendants or Designated Defense Counsel on plaintiff's counsel, except any such reports served within 30 days of the trial date shall be served by plaintiff directly on all defendants and on Designated Defense Counsel.

C. For all other discoverable expert writings/reports, the initial date of exchange shall be 30 days before the initial trial date, unless otherwise agreed to by the parties or ordered by the court. Other than medical expert's writings, any discoverable expert writings/reports generated

after the aboverreferenced deadlines shall be produced promptly to opposing counsel or as otherwise agreed by the parties.

D. Nothing in this General Order relieves a party of any obligation to exchange writings as set forth in Code of Civil Procedure Section 2032 (h), (i), and (j).

4. **CASESPECIFIC LISTING OF EXPERTS EXPECTED TO TESTIFY AT TRIAL.**

A. Each party shall serve a casespecific list of those experts actually contacted, retained and reasonably anticipated to testify at trial no later than 30 days before the initial trial date or, in cases granted preference under Code of Civil Procedure Section 36, 14 days before the initial trial date. This "pareddown" list can be supplemented thereafter for good cause shown.

B. No "pareddown" list need be served by any party if it would be identical to the original or Master Designation.

C. For any retained expert not on the Master Expert Witness Designation, the designating party shall serve no later than 30 days before the initial trial date a casespecific expert witness designation containing the information specified in Code of Civil Procedure Section 2034(f)(2)(ae) or, in cases granted preference under Code of Civil Procedure Section 36, 14 days before the initial trial date.

5. **SCHEDULING OF EXPERT DEPOSITIONS**

A. **Requesting and Scheduling Expert Depositions**

1. **Medical Experts**

Any party wishing to schedule the deposition of a plaintiff's medical or a defense joint medical expert witness may request a schedule of available dates and times for any or all experts who will testify on such issues at trial. Plaintiff's counsel shall request depositions of defendants' joint medical experts from Designated Defense Counsel. Any defendant seeking a deposition of a plaintiff medical expert must request Designated Defense Counsel to arrange said deposition. A schedule of available deposition dates will be provided no later than seven working days after receipt of the written request to schedule depositions, except in cases governed by General Order No. 140, in which best efforts shall be made to schedule depositions promptly.

2. **Other Experts**

Any party wishing to schedule the deposition of any other expert shall contact the party offering such witness in writing with a request for a schedule of available deposition dates. The parties offering the expert witnesses shall present such a schedule to the party requesting the deposition, unless the parties have an alternative.

3. **Time Estimates**

When scheduling plaintiff medical and defense joint medical expert witness depositions, the parties shall provide a reasonable estimate of the time anticipated for the deposition of each witness. Unless the parties otherwise agree, the time estimate shall be provided to opposing counsel (Designated Defense Counsel for defendants' joint medical expert depositions) as soon as possible and no less than 24 hours prior to the scheduled start of the deposition.

4.  Cancellation of Deposition

The parties shall cooperate in good faith to minimize late or untimely cancellations of depositions. Except as otherwise agreed or provided by General Order No.140, the parties shall provide a minimum of two working days' notification in the event of cancellation or change to a scheduled expert deposition. Where cancellation is not timely, the canceling party shall pay the expert witness his or her fee for onehalf hour of deposition time or the time estimated for the deposition, whichever is greater. This provision is intended to protect the schedules of experts and to adequately compensate them in the event of untimely cancellation.

B.  Completion of Expert Depositions

Unless otherwise agreed, or as described in Section C below, the parties shall complete all expert depositions prior to the initial trial date. In cases granted preference under Code of Civil Procedure Section 36, the parties shall use best efforts to complete all expert depositions before the case is assigned to a trial department. Any expert witness deposition scheduled prior to the assignment of a case to a trial department and completed prior to the swearing of the jury shall be considered timely, unless the parties have an alternative agreement with the party requesting the deposition.

C.  Subgrouping to Prioritize Expert Depositions Option

1.  Within five working days of the Status and Setting Conference consolidating a group of 15 cases or more, plaintiff's attorney may elect to proceed pursuant to Section C, in lieu of Section B above. Written notice of such election shall be served by plaintiff's counsel on all defendants and Designated Defense Counsel.

2.  In such cases, the parties shall confer approximately 75 days prior to the initial trial date to determine subgroups of approximately seven cases. Generally, the cases will be subgrouped by sequentially placing the lowest docket numbers into the earliest subgroups, unless other scheduling issues indicate a different subgrouping.

3.  Unless otherwise agreed, the parties shall complete all expert depositions in the first two subgroups prior to the initial trial date. Any expert witness deposition scheduled for those subgroups prior to the assignment of a case to a trial department and completed prior to the swearing of the jury shall be considered timely, unless the parties have an alternative agreement with the party requesting the deposition. Thereafter,

the parties will make a good faith effort to complete all expert witness discovery in the remaining cases from successive subgroups in time to complete the trial without delay. In the event that the cases in the first two subgroups settle in their entirety, the court may grant a short delay of the trial, if necessary, so that expert witness discovery may be completed for the next two subgroups.

4. The objective of completing discovery in the first two subgroups as set forth above does not prejudice the right of any party to request and to take depositions in a specific case or cases not in the first two subgroups.

6. **ALTERNATIVE AGREEMENTS.**

Nothing in this order shall preclude alternative agreement(s) between the party offering an expert and the party requesting the deposition. For example, those parties may agree to conduct expert depositions on a date other than provided by this order (such as 48 hours before anticipated trial testimony). Such agreements may further the objectives outlined in the preamble and should be given effect by the trial court whenever practicable, but such agreements will not restrict the authority or discretion of the trial court to control the conduct and scheduling of the trial.

DATED: _____

_____
STUART R. POLLAK
Judge of the Superior Court


_____
ALFRED G. CHIANTELLI
Judge of the Superior Court

# EXHIBIT C

1 IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2 IN AND FOR THE COUNTY OF SAN FRANCISCO

3 —OoO—

4 ROBERT LYMAN and SAMANTHA
  LYMAN,

5

  Plaintiffs,

6

 vs.    No. 459162

7

 ASBESTOS DEFENDANTS,

8

  Defendants.

9

10 _____/

11

12

13 DISCOVERY DEPOSITION OF ROBERT LYMAN

14 VOLUME VI

15 (Pages 514 to 569)

16

17

18

19 Taken before CATHLEEN M. MEUTER

20 CSR No. 12950

21 April 26, 2007

22

23

24

25

[1]  (Pages 514 to 517)

**[Page 516]**

| | |
|---|---|
| | (1)  DEPOSITION OF ROBERT LYMAN |
| (1)  IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA | (2) |
| (2)  IN AND FOR THE COUNTY OF SAN FRANCISCO | (3)  BE IT REMEMBERED, that pursuant to Notice, and on |

(1) IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
(2) IN AND FOR THE COUNTY OF SAN FRANCISCO
(3) ---oOo---
(4) ROBERT LYMAN and SAMANTHA
LYMAN,
(5)
     Plaintiffs,
(6)
vs.                    No. 459162
(7)
ASBESTOS DEFENDANTS,
(8)
     Defendants.
(9)
_____/
(10)
(11)
(12)
(13)     DISCOVERY DEPOSITION OF ROBERT LYMAN
(14)                VOLUME VI
(15)             (Pages 514 to 569)
(16)
(17)
(18)
(19)     Taken before CATHLEEN M. MEUTER
(20)            CSR No. 12950
(21)            April 26, 2007
(22)
(23)
(24)
(25)

**[Page 516]**

(1)        DEPOSITION OF ROBERT LYMAN
(2)
(3)     BE IT REMEMBERED, that pursuant to Notice, and on
(4) the 26th day of April 2007, commencing at the hour of
(5) 9:01 a.m., at the Lyon County Community Center, 1075
(6) Pyramid Avenue, Silver Springs, Nevada, before me,
(7) CATHLEEN M. MEUTER, a Certified Shorthand Reporter,
(8) personally appeared ROBERT LYMAN, produced as a witness
(9) in said action, and being by me previously sworn, was
(10) thereupon examined as a witness in said cause.
(11)
(12)          ---oOo---
(13)
(14)     PAUL VAILLANCOURT, Brayton Purcell, 222 Rush
(15) Landing Road, Novato, California 94948, appeared on
(16) behalf of the Plaintiffs.
(17)
(18)     ERIN MCGAHEY, Adams, Nye, Sinunu, Bruni &
(19) Becht, 222 Kearney Street, Seventh Floor, San
(20) Francisco, California 94111, was present telephonically
(21) on behalf of the Defendant Weir Valves.
(22)
(23)
(24)
(25)

**[Page 515]**

(1)              I N D E X
(2)                              PAGE
(3)  EXAMINATION BY MR. TWU              521, 556
(4)  EXAMINATION BY MR. JONES           526
(5)  EXAMINATION BY MS. MROWKA          527
(6)  EXAMINATION BY MS. DAVIS           530
(7)  EXAMINATION BY MR. SELERT          532
(8)  EXAMINATION BY MR. EGLER           533, 555
(9)  EXAMINATION BY MS. OGDIE           545, 556
(10) EXAMINATION BY MR. TUOHY           545
(11) EXAMINATION BY MS. DAVIDSON        546
(12) EXAMINATION BY MR. FELL            548
(13) EXAMINATION BY MR. BENGSON         554
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

**[Page 517]**

(1)     AFRICA DAVIDSON, Bassi, Martini, Edlin & Blum,
(2) 351 California Street, Suite 200, San Francisco,
(3) California 94104, was present telephonically on behalf
(4) of the Defendant Carlisle Corporation.
(5)
(6)     STEVE EGLER, Brydon, Hugo & Parker, 135 Main
(7) Street, 20th Floor, San Francisco, California 94105,
(8) appeared on behalf of the Defendants Foster Wheeler;
(9) Pneumo Abex Corporation; and Union Carbide.
(10)
(11)     MOLLY MROWKA, Dillingham & Murphy, 225 Bush
(12) Street, Sixth Floor, San Francisco, California
(13) 94104-4207, appeared on behalf of the Defendant
(14) Montello, Inc.
(15)
(16)     SUSAN OGDIE, Filice, Brown, Eassa & McLeod,
(17) 1999 Harrison Street, 18th Floor, Oakland, California
(18) 94612, appeared on behalf of the Defendants Chevron
(19) Products Company; Texaco, Inc.; and Unocal Corporation.
(20)
(21)     WHITNEY J. SELERT, Georgeson Angaran, 5450
(22) Longley Lane, Reno, Nevada 89511, appeared on behalf of
(23) the Defendants Honeywell; and Bendix.
(24)
(25)

**[Page 518]**

(1)     JAMES PRICHASON, Glaspy & Glaspy, 100 Pringle
(2)  Avenue, Suite 750, Walnut Creek, California 94596, was
(3)  present telephonically on behalf of the Defendant
(4)  Garlock Seal & Technologies.
(5)
(6)     LEANETTE FLENTROY, Haight, Brown & Bonesteel,
(7)  71 Stevenson Street, 20th Floor, San Francisco,
(8)  California 94105-2981, was present telephonically on
(9)  behalf of the Defendant International Truck & Engine
(10)  Corporation.
(11)
(12)     DANE JONES, Hassard, Bonnington LLP, Two
(13)  Embarcadero Center, Suite 1800, San Francisco,
(14)  California 94111, appeared on behalf of the Defendant
(15)  John Crane, Inc.
(16)
(17)     BRENDAN J. TUOHY, Kirkpatrick & Lockhart,
(18)  Preston, Gates, Ellis, LLP, 55 Second Street, Suite
(19)  1700, San Francisco, California 94105, appeared on
(20)  behalf of the Defendant Crane Co.
(21)
(22)     JIM TWU, Lewis, Brisbois, Bisgaard & Smith, One
(23)  Sansome Street, Suite 1400, San Francisco, California
(24)  94104, appeared on behalf of the Defendant Plant
(25)  Insulation.

**[Page 519]**

(1)     BRIAN BENGSON, McNamara, Dodge, Ney, Beatty,
(2)  Slattery, Pfalzer, Borges & Brothers, LLP, 1211 Newell
(3)  Avenue, Suite 202, Walnut Creek, California 94596, was
(4)  present telephonically on behalf of the Defendant Tyco
(5)  International (US).
(6)
(7)     KIM R. DAVIS, Prindle, Decker & Amaro, 310
(8)  Golden Shore, Long Beach, California 90802, appeared on
(9)  behalf of the Defendants Drilling Specialty Company,
(10)  LLC; Chevron Phillips Chemical Company, LP; A.W.
(11)  Chesterton Company; and Henry Vogt Machine Company.
(12)
(13)     NEIL LUDMAN, Schiff Hardin, LLP, One Market,
(14)  Spear Street Tower, 32nd Floor, San Francisco,
(15)  California 94105, was present telephonically on behalf
(16)  of the Defendant Owens-Illinois, Inc.
(17)
(18)     JAMES M. CONWAY, Thelen, Reid, Brown, Raysman &
(19)  Steiner, LLP, 101 Second Street, Suite 1800, San
(20)  Francisco, California 94105-3601, was present
(21)  telephonically on behalf of the Defendants Shell Oil
(22)  Company; and Mack Trucks, Inc.
(23)
(24)
(25)

**[Page 520]**

(1)     BRAD FELL, Wright, Robinson, Osthimer & Tatum,
(2)  44 Montgomery Street, 18th Floor, San Francisco,
(3)  California 94104, was present telephonically on behalf
(4)  of the Defendant Freightliner Corporation.
(5)
(6)
(7)
(8)
(9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

**[Page 521]**

(1)     ROBERT LYMAN,
(2)  previously sworn as a witness,
(3)  testified as follows:
(4)  EXAMINATION BY MR. TWU:
(5)  Q. Let's go back on record,
(6)     Good morning, Mr. Lyman. How are you doing?
(7)  A. Okay.
(8)  Q. My understanding is you had a visit to the
(9)  hospital last night?
(10)  A. Yeah.
(11)  Q. You can't go for too long today; is that
(12)  correct?
(13)  A. (Witness nods head.)
(14)  Q. Let me ask you two bookkeeping questions before
(15)  I try to close this out.
(16)     Other than your lawyer did you talk to anybody
(17)  about your case or your deposition since we last left
(18)  you yesterday?
(19)  A. No.
(20)  Q. Look at any documents since we last left you
(21)  yesterday?
(22)  A. No.
(23)  Q. We're entering the last couple phases of the
(24)  deposition. Let me just go straight into it.
(25)     First off, yesterday one of the attorneys was

**[Page 526]**

EXAMINATION BY MR. JONES:

(2) Q. Mr. Lyman, how are you, sir?

(3) A. Good.

(4) Q. Dane Jones. I represent a company called John

(5) Crane.

(6) Do you remember ever seeing any products

(7) made by a company called John Crane during your

(8) career?

(9) A. No.

(10) Q. You, during the course of your testimony,

(11) indicated a couple of times that over your long career

(12) you'd seen some other people open up some valves and

(13) they did something with packing, but you don't know

(14) what they were doing, you didn't know who made the

(15) packing, you didn't know what packing they replaced it

(16) with, correct?

(17) A. That's correct.

(18) Q. Do you know of any papers or documents that

(19) exist that you could look at that would refresh your

(20) memory about whether your John Crane product was on any

(21) job site you ever had?

(22) A. No. I wouldn't have anything like that.

(23) Q. Same thing true for people as well?

(24) A. No.

(25) MR. JONES: Thank you very much, sir.

**[Page 527]**

EXAMINATION BY MS. MROWKA:

(2) Q. Good morning, Mr. Lyman. Can you hear me okay?

(3) A. Yeah, I'm okay.

(4) Q. Have you ever worked with or around a product

(5) called Supervisbestos?

(6) A. What is it?

(7) Q. Supervisbestos, S-u-p-e-r-v-i-s-b-e-s-t-o-s?

(8) A. Not that I recall.

(9) Q. Did you ever work with or around a product

(10) called Visbestos?

(11) A. I don't recall it, no.

(12) Q. Did you ever work with or around a product

(13) called Telvis, T-e-l-v-i-s?

(14) A. Not that I recall.

(15) Q. Did you ever work with or around a product

(16) called Imcobest, I-m-c-o-b-e-s-t?

(17) A. Not that I recall.

(18) Q. Did you ever work with or around a product

(19) called Imcosuperbest?

(20) A. Not that I recall, no.

(21) Q. Did you ever work with or around product called

(22) Shurlift, S-h-u-r-l-i-f-t?

(23) A. I believe I did, but I'm not — I don't

(24) remember what it was, but I do recall seeing the name.

(25) Q. Do you recall where you saw the name?

**[Page 528]**

A. On Baker's property.

(2) Q. Which Baker's property?

(3) A. In Ventura.

(4) Q. Was that at the yard?

(5) A. Yes.

(6) Q. Can you tell me where you saw the name?

(7) A. I believe it was just on some cases.

(8) Q. Can you describe the cases?

(9) A. I just vaguely remember the name. No.

(10) Q. Do you know what material was in the cases?

(11) A. Not a clue.

(12) Q. Do you remember when you saw the cases?

(13) A. No.

(14) Q. Do you remember how many cases you saw?

(15) A. I recall there were maybe four or five.

(16) Q. Do you recall the size of the cases?

(17) A. I really don't.

(18) Q. Do you see anything being done with the cases?

(19) A. No. They were just being stored there.

(20) Q. Did you personally handle my material that was

in the cases?

(22) A. No.

(23) Q. Were you around anybody that personally handled

any material that was in the cases?

(25) A. Not that I know of.

**[Page 529]**

Q. Other than seeing possibly the cases at the

(2) Baker yard, that would be it; is that correct?

(3) A. Yes.

(4) Q. Did you ever work with or around a product

(5) called Univis, U-n-i-v-i-s?

(6) A. No.

(7) Q. Did you ever work with or around a product

(8) called Oilbestos, O-i-l-b-e-s-t-o-s?

(9) A. Not that I recall.

(10) Q. Have you ever worked or around any product that

(11) was distributed by a company called Montello, Inc.?

(12) A. Yeah, Montello. Again, I don't remember what

(13) it was. But I've seen the logo, and I believe it was

(14) in the oil fields.

(15) Q. Can you tell me what kind of container you saw

(16) the logo on?

(17) A. No. Again, this is 40 years ago.

(18) Q. Can you recall when you saw the logo?

(19) A. No.

(20) Q. Can you tell me what material was in any

(21) container that had that logo on it?

(22) A. No. I don't recall.

(23) Q. Did you ever personally handle any material

(24) that was in the container that you saw with that label

(25) on it?

[5]  (Pages 530 to 533)

**[Page 530]**

1)   A. Not that I know of.

2)   Q. Did you ever work around anybody that handled

3.) any material with that label on it?

4)   A. I don't recall.

5)   Q. Do you recall where or which oil field you were

6) in?

7)   A. I believe it was on Sespe.

8)   Q. I think I asked you this.

9)      But do you recall the type of material that was

10) in the container that had the label on it?

11)   A. No.

12)   Q. Can you recall what type of container had that

13) label on it?

14)   A. I just recall the name. I really don't

15) remember the -- I don't really remember the container

16) that well.

17)   Q. Okay. Other than just remembering the name,

18) you don't have any other specific recollection --

19)   A. No.

20)   Q. -- about Montello?

21)   A. No.

22)      MS. MROWKA: Thank you.

23)      MR. TWU: Next.

24)   EXAMINATION BY MS. DAVIS:

25)   Q. Good morning, Mr. Lyman.

**[Page 531]**

1)   A. Hi.

2)   Q. Sir, have you ever heard of a company called

3) A.W. Chesterton?

4)   A. Yes.

5)   Q. What do you associate with the name A.W.

6) Chesterton?

7)   A. Nothing. I just remember the company.

8)   Q. So is it fair to say you don't associate any

9) products or services with the name A.W. Chesterton?

10)   A. I don't recall, no.

11)   Q. Do you know if you ever worked with or around

12) an A.W. Chesterton product?

13)   A. I know I have, but I don't remember what it

14) was.

15)   Q. Then what is your basis for believing that you

16) worked with or around an A.W. Chesterton product?

17)   A. Because I recall the name.

18)   Q. Do you associate a product or service with the

19) name A.W. Chesterton?

20)   A. I believe it was a service.

21)   Q. Do you recall what type of service A.W.

22) Chesterton provided?

23)   A. No.

24)   Q. Do you recall where you would have seen A.W.

25) Chesterton provide a service?

**[Page 532]**

1)   A. Again, probably on Sespe, but I'm not sure.

2)   Q. Do you recall who you were employed with?

3)   A. It was Baker.

4)   Q. Other than a service, do you associate anything

5) else with the name A.W. Chesterton Company?

6)   A. No.

7)   Q. Have you ever heard of Diaseal M?

8)   A. No.

9)   Q. Do you know if you ever worked with or around a

10) Diaseal M product?

11)   A. No.

12)   Q. That's spelled D-i-a-s-e-a-l, capital M.

13)   A. No.

14)   Q. Have you ever heard of Flosal?

15)   A. No.

16)   Q. Do you know if you ever worked with or around a

17) Flosal product?

18)   A. No.

19)   Q. And that's spelled F-l-o-s-a-l.

20)   A. No.

21)      MS. DAVIS: Thank you, sir.

22)   EXAMINATION BY MR. SELERT:

23)   Q. Mr. Lyman, my name is Whitney Selert, and I

24) represent Honeywell International.

25)   A. Hi.

**[Page 533]**

1)   Q. Have you ever heard of the name Bendix?

2)   A. Yeah.

3)   Q. When you think of the name Bendix, what do you

4) associate that name with?

5)   A. Actually, it was automotive. I can't recall

6) what it was.

7)   Q. I'm sorry. It was on a what?

8)   A. Automotive.

9)   Q. Do you recall during the period when you were

10) working seeing Bendix products or automotive products

11) where you worked?

12)   A. No.

13)   Q. Do you remember when you might have, if ever,

14) been around a Bendix product?

15)   A. Back in the '70s. That's it.

16)   Q. Other than that recollection, do you have any

17) other recollection of being around a product --

18)   A. No.

19)   Q. -- with the brand name Bendix?

20)   A. (Witness shakes head.)

21)      MR. SELERT: Okay. That's all the questions I

22) have.

23)   EXAMINATION BY MR. EGLER:

24)   Q. Good morning, sir.

25)   A. Hi.

# EXHIBIT D

1        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2          IN AND FOR THE COUNTY OF SAN FRANCISCO

3              —O0O—

4    ROBERT LYMAN and SAMANTHA LYMAN,

5

6      Plaintiffs,

7    vs.          No. 459162

8    ASBESTOS DEFENDANTS,

9      Defendants.

10    _____/

11

12

13          DEPOSITION OF ROBERT LYMAN

14              VOLUME V

15           (Pages 435 to 513)

16

17

18

19      Taken before CATHLEEN M. MEUTER

20          CSR No. 12950

21         April 25, 2007

22

23

24

25

[1]  (Pages 435 to 438)

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SAN FRANCISCO
—oOo—

ROBERT LYMAN and SAMANTHA
LYMAN,

    Plaintiffs,

vs.      No. 459162

ASBESTOS DEFENDANTS,

    Defendants.

DEPOSITION OF ROBERT LYMAN
VOLUME V
(Pages 435 to 513)

Taken before CATHLEEN M. MEUTER
CSR No. 12950
April 25, 2007

---

**[Page 437]**

DEPOSITION OF ROBERT LYMAN

BE IT REMEMBERED, that pursuant to Notice, and on the 25th day of April 2007, commencing at the hour of 9:05 a.m., at the Lyon County Community Center, 1075 Pyramid Street, Silver Springs, Nevada, before me, CATHLEEN M. MEUTER, a Certified Shorthand Reporter, personally appeared ROBERT LYMAN, produced as a witness in said action, and being by me previously sworn, was thereupon examined as a witness in said cause.

—oOo—

PAUL VAILLANCOURT, Brayton Purcell, 222 Rush Landing Road, Novato, California 94948, appeared on behalf of the Plaintiffs.

ERIN MCGAHEY, Adams, Nye, Sinunu, Bruni & Becht, 222 Kearney Street, Seventh Floor, San Francisco, California 94111, was present telephonically on behalf of the Defendant Weir Valves.

---

**[Page 436]**

INDEX
           PAGE

EXAMINATION BY MR. TWU      441, 476
EXAMINATION BY MS. OGDIE     441, 484
EXAMINATION BY MR. EGLER     450
EXAMINATION BY MR. CONWAY  453, 457
                        496, 507

EXAMINATION BY MS. DAVIDSON  454

EXAMINATION BY MR. TUOHY   456, 506

EXAMINATION BY MR. WIEBMANN  458, 502

EXAMINATION BY MS. DAVIS    460, 502

EXAMINATION BY MS. MROWKA   482

---

**[Page 438]**

AFRICA DAVIDSON, Bassi, Martini & Blum, 351 California Street, Suite 200, San Francisco, California 94104, was present telephonically on behalf of the Defendant Carlisle Corporation.

STEVE EGLER, Brydon, Hugo & Parker, 135 Main Street, 20th Floor, San Francisco, California 94105, appeared on behalf of the Defendants Foster Wheeler; Pneumo Abex Corporation; and Union Carbide.

MOLLY MROWKA, Dillingham & Murphy, 225 Bush Street, Sixth Floor, San Francisco, California 94104-4207, appeared on behalf of the Defendant Montello, Inc.

SUSAN OGDIE, Filice, Brown, Eassa & McLeod, 1999 Harrison Street, 18th Floor, Oakland, California 94612, appeared on behalf of the Defendants Chevron Products Company; Texaco, Inc.; and Unocal Corporation.

WHITNEY J. SELERT, Georgeson Angaran, 5450 Longley Lane, Reno, Nevada 89511, appeared on behalf of the Defendants Honeywell; and Bendix.

---

**[Page 439]**

(1)      JAMES PRICHASON, Glaspy & Glaspy, 100 Pringle
(2)  Avenue, Suite 750, Walnut Creek, California 94596, was
(3)  present telephonically on behalf of the Defendant
(4)  Garlock Seal & Technologies.
(5)

(6)      DANE JONES, Hassard, Bonnington LLP, Two
(7)  Embarcadero Center, Suite 1800, San Francisco,
(8)  California 94111, appeared on behalf of the Defendant
(9)  John Crane, Inc.
(10)

(11)      BRENDAN J. TUOHY, Kirkpatrick & Lockhart,
(12)  Preston, Gates, Ellis, LLP, 55 Second Street, Suite
(13)  1700, San Francisco, California 94105, appeared on
(14)  behalf of the Defendant Crane Co.
(15)

(16)      JIM TWU, Lewis, Brisbois, Bisgaard & Smith, One
(17)  Sansome Street, Suite 1400, San Francisco, California
(18)  94104, appeared on behalf of the Defendant Plant
(19)  Insulation.
(20)

(21)      BRIAN BENGSON, McNamara, Dodge, Ney, Beatty,
(22)  Slattery, Pfalzer, Borges & Brothers, LLP, 1211 Newell
(23)  Avenue, Suite 202, Walnut Creek, California 94596, was
(24)  present telephonically on behalf of the Defendant Tyco
(25)  International (US).

**[Page 440]**

(1)      KIM R. DAVIS, Prindle, Decker & Amaro, 310
(2)  Golden Shore, Long Beach, California 90802, appeared on
(3)  behalf of the Defendants Drilling Specialty Company,
(4)  LLC; Chevron Phillips Chemical Company, LP; A.W.
(5)  Chesterton Company; and Henry Vogt Machine Company.
(6)

(7)      YAKOV WIEBMANN, Schiff Hardin, LLP, One Market,
(8)  Spear Street Tower, 32nd Floor, San Francisco,
(9)  California 94105, was present telephonically on behalf
(10)  of the Defendant Owens-Illinois, Inc.
(11)

(12)      JAMES M. CONWAY, Thelen, Reid, Brown, Raysman &
(13)  Steiner, LLP, 101 Second Street, Suite 1800, San
(14)  Francisco, California 94105-3601, appeared on behalf of
(15)  the Defendants Shell Oil Company; and Mack Trucks, Inc.
(16)

(17)      JILL RIZZO, Wright, Robinson, Osthimer & Tatum,
(18)  888 South Figueroa Street, Suite 1800, Los Angeles,
(19)  California 90017, was present telephonically on behalf
(20)  of the Defendant Freightliner Corporation.
(21)
(22)
(23)
(24)
(25)

**[Page 441]**

(1)                ROBERT LYMAN,
(2)        previously sworn as a witness,
(3)        testified as follows:
(4)  EXAMINATION BY MR. TWU:
(5)      Q. Back on record.
(6)        Good morning, Mr. Lyman. How are you doing
(7)  today?
(8)      A. I'm good.
(9)      Q. Let me just ask you a couple bookkeeping (sic)
(10)  questions before we resume with our questioning.
(11)        Since we last left yesterday, other than
(12)  your lawyer, have you talked to anybody about your
(13)  deposition or your case?
(14)      A. No.
(15)      Q. Since we last left yesterday, have you looked
(16)  at any documents to refresh your memory?
(17)      A. I meant to, but I forgot.
(18)      Q. All right. When we left yesterday, we're still
(19)  talking about your employment at Cudd Pressure
(20)  Controls. I believe there are still other attorneys
(21)  that have some questions regarding that employment.
(22)        Who is first?
(23)  EXAMINATION BY MS. OGDIE:
(24)      Q. I have a couple of additional questions for you
(25)  Mr. Lyman on Cudd Pressure Control. Again, if you

**[Page 442]**

(1)  can't hear me, let me know.
(2)      A. I hear you fine.
(3)      Q. All right. Very good.
(4)        These oil well heads that you were working on
(5)  for Cudd Pressure, they were wall out in open plains
(6)  and fields in the foothills of California; is that
(7)  correct?
(8)      A. Most of them, yes.
(9)      Q. Basically we're talking about dirt ground,
(10)  scrub on the ground, grass on the ground kinds of
(11)  conditions at these oil fields?
(12)      A. No grass; dirt.
(13)      Q. Lots of dirt. Some oil?
(14)      A. Lots of oil.
(15)      Q. Lots of oil spilled on the ground.
(16)        In terms of doing any cleanup work for Cudd
(17)  Pressure Controls if you spilled something or broke a
(18)  tool or a material that you had brought to the site,
(19)  did you personally clean that up?
(20)      A. I've drilled wells and had the spray 50 feet in
(21)  the air covering all over me.
(22)      Q. If you spilled stuff on the ground was, because
(23)  it was dirt, you didn't bother to clean it up?
(24)      A. I didn't clean it.
(25)      Q. Did you ever see anybody else coming around

**[Page 459]**

(1)  with — removing insulation while working at Cudd,
(2)  right?
(3)      A. Yes.
(4)      Q. All that insulation was — removing insulation
(5)  from pipes, was that insulation all fiberglass
(6)  insulation?
(7)      MR. VAILLANCOURT: Lacks foundation.
(8)      MS. OGDIE: Asked and answered.
(9)  BY MR. WIEBMANN:
(10)     Q. Mr. Lyman, can you describe what you saw people
(11) removing when you were at Cudd?
(12)     MR. CONWAY: Objection. Asked and answered.
(13) BY MR. WIEBMANN:
(14)     Q. Mr. Lyman, you also mentioned that — and I
(15) apologize in I go over something that's been asked
(16) already. I just want to make sure.
(17)     You also mentioned that you had to remove
(18) insulation from pipes yourself; is that true?
(19)     MR. CONWAY: Asked and answered.
(20)     THE WITNESS: I didn't have to, but I did.
(21) BY MR. WIEBMANN:
(22)     Q. You mentioned that you removed it in order to
(23) be able to have access to the valves that hooked onto
(24) the Christmas trees?
(25)     MR. VAILLANCOURT: Asked and answered.

**[Page 460]**

(1)  Harassing.
(2)      MS. DAVIS: Misstates testimony.
(3)      (Multiple counsel join.)
(4)      MS. OGDIE: Counsel that was all covered
(5)  yesterday.
(6)      MS. DAVIS: There's no insulation on a
(7)  Christmas tree.
(8)      MR. WIEBMANN: Right. But on the pipes leading
(9)  up to the Christmas trees, I just don't believe that
(10) there was a description of that insulation yesterday.
(11)     MR. JONES: There was.
(12)     MR. VAILLANCOURT: There was.
(13)     MS. OGDIE: Asked and answered.
(14)     MR. WIEBMANN: Withdrawn.
(15)     MR. VAILLANCOURT: Thank you.
(16)     MR. TWU: I'm going to call a break now.
(17)     (Break taken 9:26 a.m. to 9:37 a.m.)
(18) EXAMINATION BY MS. DAVIS:
(19)     Q. Back on the record.
(20)     Good morning, Mr. Lyman. My name is Kim Davis.
(21) I'm going to ask you probably the majority of the
(22) questions for the rest of the day. But I want to ask
(23) you about Cudd — your work at Cudd.
(24)     You delivered nitrogen and diesel number two
(25) only for Cudd; is that correct?

**[Page 461]**

(1)      A. No. I've used other products, but I don't
(2)  remember the names.
(3)      Q. Were all of these products used to get the oil
(4)  to come up out of the ground?
(5)      A. Increase flow.
(6)      Q. When you would arrive to a well site for Cudd,
(7)  a Christmas tree would be present, right?
(8)      A. Yeah.
(9)      Q. The well had already been drilled; is that
(10) correct?
(11)     A. Yeah.
(12)     Q. This is for Cudd?
(13)     A. (Witness nods head.)
(14)     Q. You said that you saw drilling mud delivered
(15) one time while working for Cudd, correct?
(16)     A. I said at least one time I saw it.
(17)     Q. Was that the Barroid?
(18)     A. I believe the truck was marked Barroid.
(19)     Q. Was this — did you see the drilling mud pull
(20) up to a nearby well, or was it the well that you were
(21) actually working on?
(22)     A. A well right next to me.
(23)     Q. Okay. You were usually pumping nitrogen and
(24) diesel number two in a well that had already been
(25) drilled; is that correct?

**[Page 462]**

(1)      A. Yeah.
(2)      Q. How near was the well that you saw drilling mud
(3)  delivered to on this at least one occasion for Cudd?
(4)      A. Probably 20 feet.
(5)      Q. I would like to ask you about your employment
(6)  with Baker Hughes.
(7)      Did you work for Baker Hughes right after you
(8)  stopped employment with Cudd Pressure Control?
(9)      A. Yeah. I believe I was working for Cudd when I
(10) left for Baker. And they weren't Baker Hughes then.
(11) They were just Baker.
(12)     Q. What year do you believe you began working for
(13) Baker? It would have been sometime after 1985,
(14) correct, because that's when you worked for Cudd?
(15)     A. I think it was '89 or '90. These dates are
(16) killing me.
(17)     Q. According to the research that I performed,
(18) Baker Hughes became a company as a result of a merger
(19) in 1987.
(20)     Does that help refresh your recollection?
(21)     A. That's probably something we didn't know about
(22) at that time.
(23)     Q. Okay. Do you recall what company appeared on
(24) your pay stub?
(25)     A. Baker Oil.

**[Page 463]**

(1)    Q. But you believe you worked for Baker Oil
(2) sometime in 1989 or 1990?
(3)    A. Yeah.
(4)    Q. What year did you break your neck while working
(5) for Baker Hughes if you recall?
(6)    A. I don't know. I think it was '88 or somewhere
(7) around there.
(8)    Q. So you were at least working for Baker in 1988;
(9) is that correct?
(10)    A. I believe that's the year, but, again, I'm not
(11) sure.
(12)    Q. Do you recall how long you had been working at
(13) Baker before you broke your neck?
(14)    A. About seven years, six years.
(15)    Q. How long did you work for Baker Oil Company?
(16)    A. When I broke my neck, that was pretty much it.
(17) It took two years recovery. And the doctor told me I
(18) couldn't work the oil fields anymore.
(19)    Q. After you broke your neck, you never returned
(20) to the oil fields to work; is that correct?
(21)    A. That's correct.
(22)    Q. How long did you actually work for Baker Oil
(23) total?
(24)    A. I think it was nine years, but I'm not sure.
(25) I'm not a clock watcher or a year watcher.

**[Page 464]**

(1)    Q. Well, you had previously said that you believe
(2) you began working for Baker right after Cudd; and you
(3) worked for Cudd in about 1985 and 1986; is that
(4) correct?
(5)    A. Yeah, somewhere around there.
(6)    Q. Most likely you would have started working at
(7) Baker Hughes sometime after 1986; is that correct?
(8)    A. Yes.
(9)    Q. Do you recall what year you stopped working at
(10) Baker Hughes? I know dates are hard for you. I'm just
(11) trying to narrow this down.
(12)    A. I think it was '89 I broke my neck. But I
(13) worked a month with a broken neck before I went to a
(14) hospital. And that's when they told me I had a broken
(15) neck.
(16)    Q. Okay. What was your job title at Baker Oil?
(17)    A. A chemical technician and a driver.
(18)    Q. Did you belong to a union?
(19)    A. At Baker, I was a teamster.
(20)    Q. Where was Baker Oil located?
(21)    A. On Ventura Avenue, 2000-something.
(22)    Q. What city was that?
(23)    A. Ventura.
(24)    Q. Did Baker Oil have locations all over the
(25) United States?

**[Page 465]**

(1)    A. All over the western United States, from Texas
(2) west.
(3)    Q. Baker Oil was a very large exploration and
(4) drilling company, correct?
(5)    A. Yes.
(6)    Q. They had their own drilling fluids and drilling
(7) additives, correct?
(8)    A. Correct.
(9)    Q. Have you ever heard of Performax?
(10)    A. I don't recall it.
(11)    Q. Baker Hughes also made their own tools like
(12) fishing tools and drilling heads, that kind of thing?
(13)    A. Like I said, when I worked for Baker, Hughes
(14) was not a part of it.
(15)    Q. Okay. Well, Baker, they made their own tools,
(16) correct?
(17)    A. No, not that I know of.
(18)    Q. What kind of a truck did you drive for Baker?
(19)    A. It was a ten-speed diesel, and it had a
(20) 500-gallon tank and two 200-gallon tanks, then an open
(21) space with wooden sides that I could load up to 50
(22) 55-gallon drums.
(23)    Q. Do you recall the manufacturer of this truck?
(24)    A. I think it was an International. I'm not sure
(25) though.

**[Page 466]**

(1)    Q. Did you ever drive any other trucks for Baker?
(2)    A. Not that I recall, no.
(3)    Q. So you were assigned to this one truck the
(4) entire time you worked for Baker; is that correct?
(5)    A. Yeah. I serviced the wells.
(6)    Q. Did you ever drive an oiler truck for Baker?
(7)    A. What do you mean an oiler truck?
(8)    Q. Like a hot oiler truck? When an oil well would
(9) get plugged, they would send an oiler truck out to get
(10) the -- they called it BS. It's kind of a wax that
(11) would build up in the lines.
(12)      Have you ever heard of that?
(13)    A. Yeah. I've never heard the expression oiler
(14) truck.
(15)    Q. Okay. So you were never present when anyone
(16) came out to unplug the lines, correct?
(17)    A. That's what I did.
(18)    Q. Well, okay --
(19)    A. Nitrogen and --
(20)    Q. That was to get the oil to come out, correct?
(21)    A. And unplug the lines.
(22)    Q. Okay. Would you fill up the tanks and obtain
(23) the 55-gallon drums from the Ventura site, the Baker
(24) Ventura site?
(25)    A. Yes.

**[Page 467]**

1)    Q. Did the truck have a tool box or supply box?
2)    A. I got tools that I carried with me.
3)    Q. Did you ever carry any other materials with
4) you?
5)    A. Like what?
6)    Q. Anything used to make repairs in the field.
7)    A. Like I said, I had my own tools.
8)    Q. Did you ever stock the tools or materials that
9) were in your truck?
10)    A. I didn't need a whole lot. Usually anything in
11) the oil field a hammer, screwdriver, wrench, that's it.
12) Basically a hammer, just beat it to death.
13)    Q. Okay. I believe you said a sledgehammer was
14) what was usually used to repair things in the oil
15) field; is that correct?
16)    A. That's the tool of choice.
17)    Q. Okay. For Baker, how many land-based oil wells
18) did you visit per day?
19)    A. Maybe 20.
20)    Q. How long would it take you to hook up your
21) tanker truck or drop off your chemicals at each of
22) these oil wells on average?
23)    A. On average, about 20 minutes.
24)    Q. Was there any reason that you would spend more
25) than 20 minutes at any particular well?

**[Page 468]**

1)    A. Yeah, depending on how low the company let it
2) get before calling us.
3)    Q. What is the longest amount of time that you
4) would spend at a well?
5)    A. I've spent a couple of days.
6)    Q. But this was rare, correct?
7)    A. Yeah, very rare.
8)    Q. Did you deliver nitrogen and diesel number two
9) when you were employed with Baker?
10)    A. No.
11)    Q. When you went out to the field would Baker
12) Hughes be the drilling company that was out there
13) drilling the well -- or Baker Oil? I'm sorry.
14)    A. Generally, no.
15)    Q. No? Okay.
16)    A. We have drilled wells, but as a rule, no.
17)    Q. Do you know the names of any of the contractors
18) that were drilling wells when you would go out to a
19) site?
20)    A. Not that I recall.
21)    Q. You would deliver corrosion inhibitors; is that
22) correct?
23)    A. Yeah.
24)    Q. Were there any other types of chemicals that
25) you delivered?

**[Page 469]**

1)    A. Yeah, there were. Like I said at the
2) beginning, I had over 50 different types of chemicals
3) that I, for the life of me, can't remember the names.
4)    Q. Just real quick to go back to Cudd.
5)        Did you ever pump CO2 down into a hole to get
6) the crude oil to come up?
7)    A. No.
8)    Q. I think that's a west Texas thing.
9)        Have you ever heard of Milchem or New Park
10) drilling fluids? Milchem is spelled M-i-l-c-h-e-m; and
11) New Park is N-e-w P-a-r-k.
12)    A. New Park, yes.
13)    Q. Have you ever heard of Baker Hughes Drilling
14) Fluids also known as BHDF?
15)    A. Yeah, after they merged with Baker. I was out
16) of the business then. I was recuperating.
17)    Q. Okay. Do you know if Baker had their own
18) drilling fluids?
19)    A. Not before the merger they didn't.
20)    Q. Do you believe that Hughes had their own
21) drilling fluids before the merger?
22)    A. Yeah, they did.
23)    Q. Did all of the drilling fluids that you saw
24) delivered to any of the wells that you were assigned to
25) come in either a drilling tanker truck or a 55-gallon

**[Page 470]**

1) drums?
2)    A. In a tanker truck usually.
3)    Q. The drilling muds were pumped into the mud
4) tank, is that correct, or they were hooked up from
5) the -- strike that.
6)        They were hooked up --
7)    A. From the truck.
8)    Q. To the tank?
9)    A. And some of it they'd mix in the field and did
10) whatever they did with it.
11)    Q. Okay. How did that mud come packaged that was
12) mixed in the field?
13)    MS. MROWKA: Objection. Lacks foundation.
14) Calls for speculation.
15)    THE WITNESS: I just know they mixed it. They
16) had dry ingredients and mixed it with some sort of
17) liquid.
18) BY MS. DAVIS:
19)    Q. Was this mixed in the mud tank?
20)    A. No. They mixed it in a truck, the rotating
21) mixers.
22)    Q. Okay.
23)    A. They'd put it all in there and mix it.
24)    Q. Were you actually present when any of the
25) materials were mixed in this mixing truck?

[10] (Pages 471 to 474)

[Page 471]

1) A. I was near it.
2) Q. How close were you?
3) A. Maybe 40, 50 feet.
4) Q. Okay. Do you know how any of the dry materials
5) came packaged?
6) A. Usually in bags; 50-pound bags, I guess, 55.
7) Q. Do you know the brand name, manufacturer, or
8) supplier of any of those dry materials that came in
9) 55-pound bags?
10) A. No. I was too far away to really see that.
11) Q. Do you recall seeing any colors, markings, or
12) logos on those bags?
13) A. Yeah. But I don't remember what they were.
14) Q. Now the mud tank was about 40 feet long and
15) about 8 feet wide; is that correct?
16) A. The truck?
17) Q. I'm talking about the mud tank.
18) A. It wasn't 40 feet long.
19) MS. MROWKA: Assumes facts.
20) BY MS. DAVIS:
21) Q. Can you tell me the dimensions of the mud tank?
22) A. Not really. But I know it wasn't 40 feet. It
23) was probably 20 feet, not even that.
24) Q. Were there — well, strike that.
25) Did you hook up your lines for these corrosion

[Page 472]

1) chemicals to the mud tank?
2) A. Directly into the head of the well.
3) Q. Okay. So you would have hooked your lines up
4) to the Christmas tree only; is that correct?
5) A. Or I'd go down the pipe. If the tree wasn't on
6) there, I'd go directly into the pipe.
7) Q. Have you ever heard of OCT valves?
8) A. Yeah. I've heard of them, but I didn't take
9) them apart.
10) Q. Right. Have you ever heard of Cameron valves?
11) A. No.
12) Q. Most of the valves on the Christmas trees had O
13) rings or a U cup seals made of rubber or neoprene; is
14) that correct?
15) A. The ones I saw, yeah.
16) Q. Have you ever heard of Aquaness (phonetic)?
17) A. I don't recall it, no.
18) Q. Have you ever heard of Chemlink (phonetic)?
19) A. Yes.
20) Q. Have you ever heard of Petrolite (phonetic)?
21) A. Yes.
22) Q. Do you believe that you ever delivered any of
23) these chemicals to oil wells for Baker Oil?
24) A. I can't really recall.
25) Q. Did you ever deliver any hydrochloric acid?

[Page 473]

1) A. Yes.
2) Q. Did you ever deliver any barites? That's
3) b-a-r-i-t-e-s?
4) A. I don't believe so.
5) Q. Did you ever deliver bitonites,
6) b-i-t-o-n-i-t-e-s?
7) A. No.
8) Q. Did you ever deliver any attapulgite,
9) a-t-t-a-p-u-l-g-i-t-e?
10) A. No.
11) Q. I'm just — you said you delivered 50 or so
12) chemicals. So I'm going through some of the chemicals
13) that were actually —
14) A. I just don't know the name.
15) Q. I'm asking you if any of these names ring a
16) bell as to the chemicals you delivered.
17) A. They probably had another commercial name.
18) Q. Did you ever deliver any sodium tetraphosphate?
19) A. Not under that name, no.
20) Q. Did you ever deliver any mica, m-i-c-a?
21) A. I've delivered product with mica in it.
22) Q. Did you ever deliver any potassium chloride?
23) A. That's a deadly poison. I don't believe so.
24) Q. Did you ever deliver any filming amine,
25) a-m-i-n-e?

[Page 474]

1) A. I don't recall.
2) Q. Did you ever deliver any sodium sulfate?
3) A. Yes.
4) Q. Did you ever deliver any Cronox, C-r-o-n-o-x?
5) This was a Baker brand name.
6) A. No.
7) Q. Have you ever heard of any drilling muds
8) referred to as KD40 or KD700?
9) A. Yes.
10) Q. In regards to the Christmas tree, have you ever
11) heard — or do you recall any of the Christmas trees
12) that you hooked up to being manufactured by Cameron?
13) A. I've seen parts manufactured by Cameron, but I
14) don't recall a Christmas tree.
15) Q. How about Drill-Quip, D-r-i-l, dash, Q-u-i-p?
16) A. No.
17) Q. FMC?
18) A. S what?
19) Q. As a Christmas tree.
20) (Reporter speaks.)
21) BY MR. DAVIS:
22) Q. F as in Frank, M as in Mary, and C as in cat.
23) A. FMC, not that I recall.
24) Q. How about National Oil Well?
25) A. National, yes.

# EXHIBIT E

iX.

diue: 5-30-07
cal: 7;7K

1  DILLINGHAM & MURPHY, LLP
   MOLLY J. MROWKA, ESQ. (SBN 190133)
2  RODRIGO E. SALAS, ESQ. (SBN 194462)
   225 Bush Street, 6th Floor
3  San Francisco, California 94104-4207
   Telephone:    (415) 397-2700
4  Facsimile:    (415) 397-3300

5  Attorneys for Defendant
   MONTELLO, INC.

6

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              IN AND FOR THE COUNTY OF SAN FRANCISCO

10 ROBERT F. LYMAN and            Case No.: CGC-06-459162
   SAMANTHA LYMAN
11                                 DEFENDANT MONTELLO, INC.'S
            Plaintiffs,            SPECIAL INTERROGATORIES TO
12                                 PLAINTIFF, SET ONE
            vs.
13                                 Date Action Filed:  December 29, 2006
   ASBESTOS DEFENDANTS (BⓄP)
14 As Reflected on Exhibits B, B-1, C, H, I; and
   DOES 1-K500;
15
            Defendants
16

17

18 PROPOUNDING PARTY:  Defendant MONTELLO, INC.

19 RESPONDING PARTY:   Plaintiff ROBERT F. LYMAN

20 SET NUMBER:         ONE

21              SPECIAL INTERROGATORIES

22 SPECIAL INTERROGATORY NO.1:

23      Do YOU contend that YOU were EXPOSED to an asbestos product manufactured by

24 MONTELLO, INC.? (For purposes of these interrogatories, YOU and YOUR includes

25 Plaintiff ROBERT F. LYMAN, Plaintiff's employees, representatives, attorneys, agents, and

26 investigators, and anyone else acting on his behalf; EXPOSED means and includes working

27 with, or in close proximity to others who were performing work with the product.)

28 ///



Page 1 - Case No.: CGC-06-459162
DEFENDANT MONTELLO, INC.'S REQUEST FOR SPECIAL INTERROGATORIES TO PLAINTIFF, SET
ONE



1  SPECIAL INTERROGATORY NO. 2:

2       Identify each asbestos product manufactured by MONTELLO, INC. which YOU

3  contend YOU were EXPOSED.

4  SPECIAL INTERROGATORY NO. 3:

5       If YOU contend that YOU were EXPOSED to an asbestos product manufactured by

6  MONTELLO, INC., state all facts which support YOUR contention.

7  SPECIAL INTERROGATORY NO. 4:

8       If YOU contend YOU were EXPOSED to an asbestos product manufactured by

9  MONTELLO, INC., IDENTIFY ALL DOCUMENTS which support YOUR contention.

10  (As used in these interrogatories, "IDENTIFY ALL DOCUMENTS" shall mean and include

11  the title, date and author of the document and the name, address, telephone number, both

12  residential and business, of the present custodian of said document; "DOCUMENT" means a

13  writing, as defined in Evidence Code section 250, and includes the original, or a copy of

14  handwriting, typewriting, printing, photostats, photographs, electronically stored information,

15  and every other means of recording upon any tangible thing and form of communicating or

16  representation, including letters, words, pictures, sounds, or symbols, or combinations of them.)

17  SPECIAL INTERROGATORY NO. 5:

18       If YOU contend YOU were EXPOSED to an asbestos product manufactured by

19  MONTELLO, INC., IDENTIFY ALL PERSONS who have knowledge of any fact or facts

20  which support YOUR contention. (As used in these interrogatories, the term "IDENTIFY,"

21  when used as reference to a natural person, means to set forth his, her or its (a) full name,

22  together with any and all known aliases or nicknames; (b) present residence address or, if

23  known, the last known residence address; and the date which such person is last or believed to

24  have resided at that address; (c) residence phone number, or if unknown, the last known

25  residence phone number; (d) present employer, employment position or title and business

26  address or, if unknown, the last known information in each of these respects and the date when

27  such person is last known or believed to have had that employer, position or title and business

28  address; and (e) business telephone number or, if unknown, his or her last known business

1   telephone number and the date when that person is last known or believed to have had this

2   business telephone number.)

3   <u>SPECIAL INTERROGATORY NO. 6:</u>

4        If YOU contend that YOU were EXPOSED to an asbestos product manufactured by

5   MONTELLO, INC., for each and every product identify by name and ADDRESS each

6   location where YOU allege YOU were EXPOSED.

7   <u>SPECIAL INTERROGATORY NO. 7:</u>

8        State with specificity the manner in which YOU were allegedly EXPOSED to each

9   asbestos product manufactured by MONTELLO, INC. at each of the locations at which YOU

10   claim such exposure occurred.

11   <u>SPECIAL INTERROGATORY NO. 8:</u>

12        For each location where YOU allege YOU were EXPOSED to an asbestos product

13   manufactured by MONTELLO, INC., state YOUR proximity to each product during YOUR

14   alleged injurious exposure.

15   <u>SPECIAL INTERROGATORY NO. 9:</u>

16        Do YOU contend that YOU were EXPOSED to an asbestos product supplied by

17   MONTELLO, INC.?

18   <u>SPECIAL INTERROGATORY NO. 10:</u>

19        Identify each asbestos product which YOU contend was supplied by MONTELLO,

20   INC., which YOU contend YOU were EXPOSED.

21   <u>SPECIAL INTERROGATORY NO. 11:</u>

22        If YOU contend that YOU were EXPOSED to an asbestos product supplied by

23   MONTELLO, INC., state all facts which support YOUR contention.

24   <u>SPECIAL INTERROGATORY NO. 12:</u>

25        If YOU contend YOU were EXPOSED to an asbestos product supplied by

26   MONTELLO, INC., IDENTIFY ALL PERSONS who have knowledge of any fact or facts

27   which support YOUR contention.

28   <u>SPECIAL INTERROGATORY NO. 13:</u>

Page 3 - Case No.: CGC-06-459102
DEFENDANT MONTELLO, INC.'S REQUEST FOR SPECIAL INTERROGATORIES TO PLAINTIFF, SET
ONE

1   If YOU contend that YOU were EXPOSED to an asbestos product supplied by

2   MONTELLO, INC., for each and every product identify by name and ADDRESS each

3   location where YOU allege YOU were EXPOSED.

4   SPECIAL INTERROGATORY NO. 14:

5   State with specificity the manner in which YOU were allegedly EXPOSED to each

6   asbestos product supplied by MONTELLO, INC. at each of the locations at which YOU claim

7   such exposure occurred.

8   SPECIAL INTERROGATORY NO. 15:

9   For each location where YOU allege YOU were EXPOSED to an asbestos product

10  supplied by MONTELLO, INC., state YOUR proximity to each product during YOUR

11  alleged injurious exposure.

12  SPECIAL INTERROGATORY NO. 16:

13  Identify the duration of each exposure to each asbestos product YOU contend was

14  supplied by MONTELLO, INC. at each of the locations at which YOU claim such exposure

15  occurred.

16  SPECIAL INTERROGATORY NO. 17:

17  For each location where YOU allege YOU were EXPOSED to a product which

18  contained asbestos supplied by MONTELLO, INC., identify the date(s) on which such

19  exposure took place.

20  SPECIAL INTERROGATORY NO. 18:

21  If YOU contend YOU were EXPOSED to an asbestos product supplied by

22  MONTELLO, INC., IDENTIFY ALL DOCUMENTS which support YOUR contention.

23  SPECIAL INTERROGATORY NO. 19:

24  Do YOU contend that YOU were EXPOSED to an asbestos product distributed by

25  MONTELLO, INC.?

26  SPECIAL INTERROGATORY NO. 20:

27  Identify each asbestos product which YOU contend was distributed by MONTELLO,

28  INC., which YOU contend YOU were EXPOSED.

Page 4 - Case No.: CGC-06-459162
DEFENDANT MONTELLO, INC.'S REQUEST FOR SPECIAL INTERROGATORIES TO PLAINTIFF, SET
ONE

1  SPECIAL INTERROGATORY NO. 21:

2      If YOU contend that YOU were EXPOSED to an asbestos product distributed by

3  MONTELLO, INC., state all facts which support YOUR contention.

4  SPECIAL INTERROGATORY NO. 22:

5      If YOU contend YOU were EXPOSED to an asbestos product distributed by

6  MONTELLO, INC., IDENTIFY ALL PERSONS who have knowledge of any fact or facts

7  which support YOUR contention.

8  SPECIAL INTERROGATORY NO. 23:

9      If YOU contend that YOU were EXPOSED to an asbestos product distributed by

10  MONTELLO, INC., for each and every product identify by name and ADDRESS each

11  location where YOU allege YOU were EXPOSED.

12  SPECIAL INTERROGATORY NO. 24:

13      State with specificity the manner in which YOU were allegedly EXPOSED to each

14  asbestos product distributed by MONTELLO, INC. at each of the locations at which YOU

15  claim such exposure occurred.

16  SPECIAL INTERROGATORY NO. 25:

17      For each location where YOU allege YOU were EXPOSED to an asbestos product

18  distributed by MONTELLO, INC., state YOUR proximity to each product during YOUR

19  alleged injurious exposure.

20  SPECIAL INTERROGATORY NO. 26:

21      Identify the duration of each exposure to each asbestos product YOU contend was

22  distributed by MONTELLO, INC. at each of the locations at which YOU claim such exposure

23  occurred.

24  SPECIAL INTERROGATORY NO. 27:

25      For each location where YOU allege YOU were EXPOSED to an asbestos product

26  distributed by MONTELLO, INC., identify the date(s) on which such exposure took place.

27  SPECIAL INTERROGATORY NO. 28:

28

Page 5 - Case No.: CGC-06-459162
DEFENDANT MONTELLO, INC.'S REQUEST FOR SPECIAL INTERROGATORIES TO PLAINTIFF, SET
ONE

1    If YOU contend YOU were EXPOSED to an asbestos product distributed by

2  MONTELLO, INC., IDENTIFY ALL DOCUMENTS which support YOUR contention.

3  SPECIAL INTERROGATORY NO. 29:

4    Do YOU contend that YOU were EXPOSED to drilling fluid additives sold by

5  MONTELLO, INC.?

6  SPECIAL INTERROGATORY NO. 30:

7    If YOU contend that YOU were EXPOSED to drilling fluid additives sold by

8  MONTELLO, INC., IDENTIFY each such drilling fluid additive.

9  SPECIAL INTERROGATORY NO. 31:

10    If YOU contend that YOU were EXPOSED to drilling fluid additives sold by

11  MONTELLO, INC., for each product state all facts which support YOUR contention.

12  SPECIAL INTERROGATORY NO. 32:

13    If YOU contend that YOU were EXPOSED to drilling fluid additives sold by

14  MONTELLO, INC., for each product IDENTIFY ALL PERSONS who have knowledge of

15  any fact or facts which support YOUR contention.

16  SPECIAL INTERROGATORY NO. 33:

17    If YOU contend that YOU were EXPOSED to drilling fluid additives sold by

18  MONTELLO, INC., for each product identify by name and ADDRESS each location where

19  YOU allege YOU were EXPOSED.

20  SPECIAL INTERROGATORY NO. 34:

21    If YOU contend that YOU were EXPOSED to drilling fluid additives sold by

22  MONTELLO, INC., for each product IDENTIFY ALL DOCUMENTS which support

23  YOUR contention.

24  SPECIAL INTERROGATORY NO. 35:

25    For each location where YOU contend YOU were EXPOSED to drilling fluid additives

26  sold by MONTELLO, INC., state YOUR proximity to each product during YOUR alleged

27  injurious exposure.

28

Page 6 - Case No.: CGC-06-459162
DEFENDANT MONTELLO, INC.'S REQUEST FOR SPECIAL INTERROGATORIES TO PLAINTIFF, SET
ONE

1  <u>SPECIAL INTERROGATORY NO. 36:</u>

2      State with specificity the manner in which YOU were allegedly EXPOSED to each

3  drilling fluid additive sold by MONTELLO, INC. at each of the locations at which YOU

4  claim such exposure occurred.

5  <u>SPECIAL INTERROGATORY NO. 37:</u>

6      For each location where YOU contend YOU were EXPOSED to drilling fluid additives

7  sold by MONTELLO, INC., please identify how the drilling fluid additives were used.

8  <u>SPECIAL INTERROGATORY NO. 38:</u>

9      For each location where YOU contend that YOU were EXPOSED to drilling fluid

10  additives sold by MONTELLO, INC. identify the date(s) on which such exposure took place.

11  <u>SPECIAL INTERROGATORY NO. 39:</u>

12      For each location where YOU contend YOU were EXPOSED to drilling fluid additives

13  sold by MONTELLO, INC., identify by name and ADDRESS, each supplier from whom each

14  of the drilling fluid additives sold by MONTELLO, INC. was obtained.

15  <u>SPECIAL INTERROGATORY NO. 40:</u>

16      Do YOU contend that YOU were EXPOSED to drilling mud additives sold by

17  MONTELLO, INC.?

18  <u>SPECIAL INTERROGATORY NO. 41:</u>

19      If YOU contend that YOU were EXPOSED to drilling mud additives sold by

20  MONTELLO, INC., IDENTIFY each such drilling mud additive.

21  <u>SPECIAL INTERROGATORY NO. 42:</u>

22      If YOU contend that YOU were EXPOSED to drilling mud additives sold by

23  MONTELLO, INC., for each product IDENTIFY ALL PERSONS who had knowledge of

24  any fact or facts which support YOUR contention.

25  <u>SPECIAL INTERROGATORY NO. 43:</u>

26      If YOU contend that YOU were EXPOSED to drilling mud additives sold by

27  MONTELLO, INC., for each product IDENTIFY ALL DOCUMENTS which support

28  YOUR contention.

1    **SPECIAL INTERROGATORY NO. 44:**

2        . If YOU contend that YOU were EXPOSED to drilling mud additives sold by

3    MONTELLO, INC., identify by name and ADDRESS each location where YOU allege YOU

4    were EXPOSED.

5    **SPECIAL INTERROGATORY NO. 45:**

6        State with specificity the manner in which YOU were allegedly EXPOSED to each

7    drilling mud additive sold by MONTELLO, INC. at each of the locations at which YOU

8    claim such exposure occurred.

9    **SPECIAL INTERROGATORY NO. 46:**

10       For each location where YOU contend YOU were EXPOSED to drilling mud additives

11   sold by MONTELLO, INC., state YOUR proximity to each product during YOUR alleged

12   injurious exposure.

13   **SPECIAL INTERROGATORY NO. 47:**

14       For each location where YOU contend YOU were EXPOSED to drilling mud additives

15   sold by MONTELLO, INC., identify how the drilling mud additives were used.

16   **SPECIAL INTERROGATORY NO. 48:**

17       For each location where YOU contend that YOU were EXPOSED to drilling mud

18   additives sold by MONTELLO, INC. identify the date(s) on which such exposure took place.

19   **SPECIAL INTERROGATORY NO. 49:**

20       If YOU have ever been deposed in any civil action, including but not limited to,

21   workers' compensation matters, for each such deposition, please state the date of the

22   deposition, the names of the court reporters, the court and action number of the involved

23   matter, and whether YOU were deposed as a witness or party.

24   **SPECIAL INTERROGATORY NO. 50:**

25       IDENTIFY the "TRANSCRIPT" (as used in these interrogatories, the term

26   TRANSCRIPT refers to any transcription of a deposition, trial, hearing or other proceeding) of

27   each PERSON with knowledge any fact or facts which support YOUR contention that YOU

28

Page 8 - Case No.: CGC-06-459162
DEFENDANT MONTELLO, INC.'S REQUEST FOR SPECIAL INTERROGATORIES TO PLAINTIFF, SET
ONE

1   were EXPOSED to asbestos products sold, distributed, supplied, or manufactured by

2   MONTELLO, INC. from 1966 to the present.

3   **SPECIAL INTERROGATORY NO. 51:**

4       IDENTIFY the DECLARATION (as used in these interrogatories, the term

5   DECLARATION refers to any affidavit and/or written or printed declaration or statement of

6   facts, confirmed by the oath or affirmation of the party making it) of each PERSON with

7   knowledge of the facts which support YOUR contention that YOU were EXPOSED to

8   asbestos products sold, distributed, supplied or manufactured by MONTELLO, INC. from

9   1966 to the present.

10   **SPECIAL INTERROGATORY NO. 52:**

11       State all facts which support YOUR cause of action for false representation against

12   MONTELLO, INC., as asserted in YOUR complaint for damages, in San Francisco Superior

13   Court civil action no. CGC-06-459162.

14   **SPECIAL INTERROGATORY NO. 53:**

15       IDENTIFY ALL DOCUMENTS which support YOUR cause of action for false

16   representation against MONTELLO, INC., as asserted in YOUR complaint for damages, in

17   San Francisco Superior Court civil action no. CGC-06-459162.

18   **SPECIAL INTERROGATORY NO. 54**

19       IDENTIFY ALL PERSONS which knowledge of any fact or facts which support

20   YOUR cause of action for false representation against MONTELLO, INC., as asserted in

21   YOUR complaint for damages, in San Francisco Superior Court civil action no. CGC-06-

22   459162.

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

Page 9 - Case No.: CGC-06-459162
DEFENDANT MONTELLO, INC.'S REQUEST FOR SPECIAL INTERROGATORIES TO PLAINTIFF, SET ONE

1   SPECIAL INTERROGATORY NO. 55

2        IDENTIFY the each and every fact known by each person YOU contend has

3   knowledge of any fact or facts which support YOUR cause of action for false representation

4   against MONTELLO, INC., as asserted in YOUR complaint for damages, in San Francisco

5   Superior Court civil action no. CGC-06-459162.

6   Dated:  April 30, 2007                          DILLINGHAM & MURPHY, LLP

7

8                                         By: _____
                                              MOLLY J. MROWKA, ESQ.
9                                             Attorney for Defendant
                                              MONTELLO, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Page 10 - Case No.: CGC-06-459162
DEFENDANT MONTELLO, INC.'S REQUEST FOR SPECIAL INTERROGATORIES TO PLAINTIFF, SET
ONE

## DECLARATION IN SUPPORT OF ADDITIONAL DISCOVERY

I, MOLLY J. MROWKA, declare:

1.      I am an attorney duly licensed to practice law before the courts of California, and am an attorney with the law firm of Dillingham & Murphy, LLP, attorneys of record for Defendant MONTELLO, INC. If called upon to do so, I could and would competently testify to the matters of fact set forth within this declaration, as I have personal knowledge thereof.

2.      MONTELLO, INC. is propounding to Plaintiff Robert Lyman the attached set of special interrogatories.

3.      This set of interrogatories will cause the total number of specially prepared interrogatories propounded to Plaintiff to exceed the number of specifically prepared interrogatories permitted by § 2030.030 of the Code of Civil Procedure.

4.      This set of interrogatories contains a total of fifty five (55) specially prepared interrogatories.

5.      I am familiar with the issues in this matter. I have previously propounded no specially prepared interrogatories to plaintiff Robert Lyman.

6.      I have personally examined each of the questions in this set of interrogatories.

7.      This number of questions is warranted under § 2030.040 of the Code of Civil Procedure because these specially prepared interrogatories are the most expedient way to obtain the information sought. Further, none of the questions in this set of interrogatories is being propounded for any improper purpose, such as to harass the party, or the attorney for the party, to whom it is directed, or to cause unnecessary delay or needless increase in the cost of litigation.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct, and that this declaration was executed in San Francisco, California on April 30, 2007.

Molly J. Mrowka

Page 11 - Case No.: CGC-06-459162
DEFENDANT MONTELLO, INC.'S REQUEST FOR SPECIAL INTERROGATORIES TO PLAINTIFF, SET ONE

**PROOF OF SERVICE**

Lyman v. Asbestos Defendants, San Francisco Superior Court CGC-06-459162

I am a citizen of the United States, and employed in the City and County of San Francisco. I am over the age of eighteen (18) years, and not a party to the within above-entitled action. My business address is 225 Bush Street, 6th Floor, San Francisco, California 94104-4207. On April 30, 2007, I served the following on each party listed below:

**DEFENDANT MONTELLO, INC.'S SPECIAL INTERROGATORIES TO PLAINTIFF, SET ONE**

☐   **(BY FAX)** By sending a true copy thereof by facsimile machine to the numbers listed below, and then depositing for collection and mailing, following ordinary business practices, a true copy thereof, enclosed in a sealed envelope with postage thereon fully prepaid.

X.   **(BY PERSONAL SERVICE)** By causing a true copy thereof enclosed in a sealed envelope to be personally delivered on the date indicated below.

Brayton Purcell
222 Rush Landing Rd
Novato, CA 94945
(415) 898-1555

☐   **(BY OVERNIGHT DELIVERY)** By causing a true copy thereof, enclosed in a sealed envelope, to be delivered via overnight courier service.

X   **(BY MAIL)** By depositing for collection and mailing, following ordinary business practices, a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid.

LETTER NOTICE OF THE ABOVE DOCUMENT WAS SERVED BY MAIL ON ALL DEFENDANTS LISTED IN THE ATTACHED SERVICE LIST.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on April 30, 2007, at San Francisco, California.

Mardoux Graff

Proof Of Service

# EXHIBIT F

ALAN R. BRAYTON, ESQ., S.B. #73685
DAVID R. DONADIO, ESQ., S.B. #154436
SARAH KRABMER ISAACS ESQ., S.B. # 227286
BRAYTON◆PURCELL LLP
Attorneys at Law
222 Rush Landing Road
P.O. Box 6169
Novato, California 94948-6169
(415) 898-1555

Attorneys for Plaintiffs

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

ROBERT F. LYMAN and
SAMANTHA LYMAN,

    Plaintiffs,

vs.

ASBESTOS DEFENDANTS (B◆P)

ASBESTOS
No. 459162

PLAINTIFF'S RESPONSE TO
DEFENDANT MONTELLO, INC'S
SPECIAL INTERROGATORIES TO
PLAINTIFF, SET ONE

PROPOUNDING PARTY:  Defendant MONTELLO, INC.

RESPONDING PARTY:  Plaintiff ROBERT F. LYMAN

SET NUMBER:  ONE

GENERAL OBJECTION

    Plaintiff generally objects to these Specially Prepared Interrogatories as unduly burdensome, oppressive and harassing in nature due to the redundancy and volume totaling 55 Interrogatories. Subject to and without waiving said objections, plaintiff responds as follows:

    RESPONSE TO INTERROGATORY NO. 1: Plaintiff objects to this Interrogatory on the grounds, and to the extent, that it seeks the premature disclosure of expert witnesses and opinions in violation of C.C.P. § 2034. Plaintiff objects to this Interrogatory to the extent it calls for a legal conclusion. Plaintiff objects to this Interrogatory on the grounds that it seeks information which is protected from disclosure by the attorney work-product doctrine in violation of C.C.P. § 2018 and by the attorney-client privilege. Plaintiff objects to this Interrogatory to the extent it seeks information equally or more available to the defendant, or already in the possession of defendant. Subject to the foregoing objections, and without waiver thereof, plaintiff responds as follows:  Yes.

    RESPONSE TO INTERROGATORY NO. 2: Plaintiff objects to this Interrogatory on the grounds that it is vague, ambiguous and overbroad. Plaintiff further objects to this Interrogatory to the extent it calls for information protected from disclosure by the attorney-client privilege

K:\Injured\107035\resp-sp-mont\int.wpd                        1

1   and/or the attorney work-product doctrine. Plaintiff further objects to this Interrogatory to the
2   extent it calls for expert witness information and writings, if any. Subject to and without waiving
    said objection, plaintiff responds as follows: Plaintiff was exposed to asbestos for which
3   MONTELLO, INC. is legally responsible, by way of asbestos drilling mud additive. Pursuant to
    C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith effort to obtain the
4   information by inquiry to other natural persons or organizations, believes that he has no further
    relevant and/or responsive information to disclose at this time other than what has been stated
5   herein Interrogatory Responses Nos. 1-55 inclusive, and in the course of his depositions, prior
    discovery responses, documents and pleadings already served on defendants in the instant action.
6   Plaintiff reserves the right to supplement this Response, as investigation and discovery are
    continuing.

7   RESPONSE TO INTERROGATORY NO. 3: Plaintiff objects to this Interrogatory on the
    grounds that it is vague, ambiguous and overbroad. Plaintiff further objects to this Interrogatory
8   on the grounds that it seeks information protected from disclosure by the attorney-client privilege
    and work-product doctrine. Plaintiff objects to this Interrogatory on the grounds that it calls for
9   legal conclusions. Plaintiff further objects to this Interrogatory on the grounds that it calls for
    expert opinions and therefore prematurely seeks disclosure of information which is properly the
10  subject of expert witness testimony and/or reports in violation of C.C.P. § 2034. Plaintiff further
    objects on this grounds, and to the extent that this Interrogatory seeks information equally
11  available to, and already provided to, defendant in Standard Asbestos Case Interrogatories and
    other employment documents served on Designated Defense Counsel pursuant to General Order
12  No. 41, and is therefore harassing, burdensome, oppressive and not reasonably calculated to lead
    to the discovery of admissible evidence. Subject to and without waiving said objections, as
13  plaintiff understands the question, plaintiff responds as follows:
         Plaintiff ROBERT LYMAN was exposed to asbestos-containing products that were
14  manufactured, supplied, distributed and/or sold by MONTELLO, INC. Plaintiff was exposed by
    working in close proximity to his/her handling and disturbing defendant's asbestos-containing
15  products and breathing the air and dust that had been generated by the handling and disturbance
    of these products as they mixed said products. Defendant knew that asbestos-containing
16  products such as those supplied to plaintiff's employers or contractors at plaintiff's jobsites,
    would be handled, disturbed and manipulated by workers, resulting in the release of airborne
17  asbestos fibers, and that through such foreseeable use and/or handling, plaintiff would be
    exposed to such asbestos fibers. As a manufacturer, supplier and/or distributor of asbestos-
18  containing products, defendant breached various duties for which it was obliged, including it's
    duty to warn consumers and those who would be exposed, of dangers inherent in said products.
19  As a proximate result of defendant's breaches of its duties, plaintiff sustained injury.
         Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith effort
20  to obtain the information by inquiry to other natural persons or organizations, believes that he has
    no further relevant and/or responsive information to disclose at this time other than what has
21  been stated herein Interrogatory Responses Nos. 1-55 inclusive, and in the course of his
    depositions, prior discovery responses, documents and pleadings already served on defendants in
22  the instant action. Plaintiff reserves the right to supplement this Response, as investigation and
    discovery are continuing.

23
24  RESPONSE TO INTERROGATORY NO. 4: Plaintiff objects to this Request on the grounds
    that it prematurely seeks information which it properly the subject of expert witness testimony -
25  and/or reports in violation of C.C.P. § 2034. Plaintiff further objects to this Request on the
    ground that it seeks documents protected from disclosure by the attorney work-product doctrine.
26  Plaintiff further objects to this Request on the grounds that it seeks documents equally of more
    available to defendants and that it seeks documents which are in the possession of defendants.
27  Without waiving the foregoing objections, plaintiff responds as follows: Plaintiff currently
    identifies the following documents: The transcripts of plaintiff's deposition, and exhibits
28  ///

K:\Lyman\DISC\Resp-rqs-Montello.wpd                    2

1  attached thereto, taken in the instant action; and plaintiff's responses to Standard Asbestos Case
2  Interrogatories, and all exhibits attached thereto. Plaintiff also identifies his Social Security
   records and medical records and billings, previously provided to coordinating defense counsel,
3  Berry & Berry and equally available to defendants.
4       Further, plaintiff identifies the following documents which evidence the sales of
   "Calidria" asbestos to various manufacturing companies, the state of Union Carbides' knowledge
   regarding the hazards of asbestos and the use of asbestos in the manufacturing of Bakelite
5  phenolic resin: The deposition transcripts of Union Carbide's person most knowledgeable, John
   Myers, taken on September 4, 1986, reported by Worldwide Court Reporters, 800-745-1101;
6  taken on July 23, 1999, reported by Aiken & Welch, One Kaiser Plaza, Suite 505, Oakland,
   California 94612 (510) 451-1580; taken on May 22, 2002, reported by Worldwide Court
7  Reporters, 800-745-1101, taken on February 6, 2003, reported by Harisell & Olivieri, 831-423-
   5911; taken on June 10 and 11, 2003, reported by Harisell & Olivieri, 831-423-5911. The trial
8  testimony of John Myers taken November 12, 2002 in Douglas Anderson v Adas Turner, et al,
   Los Angeles Superior Court, BC 257187. Plaintiff further identifies the documents produced
9  from Union Carbide's New York repository during various document productions attended by
   Brayton☆Purcell LLP and other law firms. Plaintiff also identifies the documents produced
10 under the In Rer Complex Asbestos Litigation notice dated September 21, 2001. Defendant is in
   possession of all identified deposition transcripts of John Myers and all documents copied from
11 the New York repository.
        Plaintiff also identifies the deposition transcripts and all exhibits attached thereto of the
12 following PMK for defendant UNION CARBIDE: Cido Marino taken on May 4, 2001, and all
   subsequent days, in Richard Yeager and Shirley Yeager v. Union Carbide Corporation, San
13 Francisco Superior Court Case No. 312060, reported by Cal North Reporting Service; Robert K.
   Beale taken on September 10, 1981, and all subsequent days; and John Myers taken on January
14 25, 1995, and all subsequent days, July 23, 1999, and all subsequent days, in Luiz Harris v. Plant
   Insulation Co., Alameda County Superior Court Case No. 791615-3, and on September 4, 1986,
15 and all subsequent days, in Bobby E. Sanford v. Johns-Manville Sales Corp., in United States
   District Court for the Southern District of Texas, Galveston Division, Civil Action No. G-82-
16 325, reported by Worldwide Court Reporters, Houston, Texas.
        Plaintiff further identifies UNION CARBIDE CHEMICALS AND PLASTICS
17 COMPANY, Inc.'s Response to General Order #129 Interrogatories in In Rer Complex Asbestos
   Litigation, San Francisco County Superior Court No. 828684, dated November 21, 1997; and
18 defendant's Response to General Order #129 Interrogatories.
        Plaintiff also identifies numerous articles and studies relating to the health hazards
19 associated with exposure to asbestos which have appeared in medical and scientific literature
   since the turn of the twentieth century and have also been summarized in various publications.
20 Plaintiff identifies two texts that contain summaries and/or bibliographies of asbestos-related
   disease. They are: Asbestos, Medical and Legal Aspects, Barry I. Castleman, Practice-Hall Law
21 & Business, 1990; and Sourcebook on Asbestos Disease, Medical, Legal & Engineering
   Aspects, George A. Peters and Barbara J. Peters, Garland STPM Press, Vol. 1, 1980, Vol. 2,
22 1980. Plaintiff is in possession of these texts and will make them available for defendants'
   review. Due to copyright laws, plaintiff cannot provide copies of those texts to defendants.
23 Plaintiff also identifies General Industry Safety Orders promulgated pursuant to California Labor
   Code § 6400, et seq. and California Administrative Code under the California Department of
24 Industrial Relations, Division of Industrial Safety, including, but not limited to, Title VIII, Group
   9 (Control of Hazardous Substances) Article 81, Section 4150, 4104-4108, and Threshold Limit
25 Values as incorporated for asbestos and other toxic substances under Appendix A, Table 1 of said
   Safety Orders. Plaintiff also identifies NESHAP Asbestos Regulations (National Emission
26 Standards for Hazardous Air Pollutants) which are found at Code of Federal Regulations, Title
   40, Chapter 1, Subchapter C, Part 61, Subpart M, published under the Federal Clean Air Act of
27 1970, 42 U.S.C.A. Section 7412(b)(1)(A) and 42 U.S.C.A. Section 7412(b)(1)(B). Plaintiff also
   identifies OSHA standards relating to asbestos, found at Code of Federal Regulations, Title 29,
28 Chapter 17, Section 1910, et seq.; and Title 8, Section 5208 of the California OSHA regulations
   pertaining to asbestos exposure. After a reasonable and good-faith inquiry, plaintiff has no

3

1    further documentation responsive to this Request. Plaintiff's investigation and discovery are
2    continuing, and as such, plaintiff expressly reserves the right to amend this Response pending the
     outcome of plaintiff's investigation.
3          Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith effort
     to obtain the information by inquiry to other natural persons or organizations, believes that he has
4    no further relevant and/or responsive information to disclose at this time other than what has
     been stated herein Interrogatory Responses Nos. 1-35 inclusive, and in the course of his
5    depositions, prior discovery responses, documents and pleadings already served on defendants in
     the instant action. Plaintiff reserves the right to supplement this Response, as investigation and
6    discovery are continuing.

7    RESPONSE TO INTERROGATORY NO. 5:  Plaintiff objects to this Interrogatory on the
     grounds that it is overbroad, vague, ambiguous, unduly burdensome, oppressive and harassing.
8    Plaintiff further objects to this Interrogatory to the extent it calls for information protected from
     disclosure by the attorney-client privilege and/or the attorney work-product doctrine. Plaintiff
9    further objects to this Interrogatory to the extent it calls for expert witness information and
     writings, if any. Without waiving said objections, plaintiff responds as follows: Plaintiff
10   identifies himself. Plaintiff further identifies present and former employees, agents and officers
     of MONTELLO, INC., Cudd Pressure Control, Inc. and Baker Hughes Oilfield Operations, Inc.
11   whose identities are currently unknown to plaintiff. Plaintiff further identifies Bob Priggy, co-
     worker at Baker Hughes Oilfield Operations, Inc., address currently unknown to plaintiff.
12         Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith effort
     to obtain the information by inquiry to other natural persons or organizations, believes that he has
13   no further relevant and/or responsive information to disclose at this time other than what has
     been stated herein Interrogatory Responses Nos. 1-35 inclusive, and in the course of his
14   depositions, prior discovery responses, documents and pleadings already served on defendants in
     the instant action. Plaintiff reserves the right to supplement this Response, as investigation and
15   discovery are continuing.

16   RESPONSE TO INTERROGATORY NO. 6:  Plaintiff objects to this Interrogatory on the
     grounds that it is compound, vague, overbroad. Plaintiff further objects on the grounds, and to
17   the extent that this Interrogatory seeks information equally available to, and already provided to,
     defendant in Standard Asbestos Case Interrogatories and other employment documents served on
18   Designated Defense Counsel pursuant to General Order No. 41 and is therefore harassing,
     burdensome, oppressive and not reasonably calculated to lead to the discovery of admissible
19   evidence. Plaintiff objects to this Interrogatory on the to the extent that it seeks information
     protected from disclosure by the attorney-client privilege and work-product doctrine, and seeks
20   premature disclosure of the writing or opinions of plaintiff's experts, in violation of C.C.P.
     § 2034. Without waiving said objections, plaintiff identifies the following locations, including
21   but not limited to:

22

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Cudd Pressure Control, Inc., 8022 Main Street Houma, LA | Cudd Pressure Control, Inc.r locations throughout Southern California | Oil Field Worker | 1981-1982 |
| Baker Hughes Oilfield Operations, Inc. Houston, TX | Baker Hughes Oilfield Operations, Inc., various oil fields throughout Southern California | Oil Field Worker | 1982-1986 |

27   ///
28   ///

4

1    Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith effort
2  to obtain the information by inquiry to other natural persons or organizations, believes that he has
   no further relevant and/or responsive information to disclose at this time other than what has
3  been stated herein Interrogatory Responses Nos. 1-55 inclusive, and in the course of his
   depositions, prior discovery responses, documents and pleadings already served on defendants in
   the instant action. Plaintiff reserves the right to supplement this Response, as investigation and
4  discovery are continuing.

5  **RESPONSE TO INTERROGATORY NO. 7:** Plaintiff objects to this Interrogatory on the
   grounds that it is overbroad, vague, ambiguous, unduly burdensome, oppressive and harassing.
6  Plaintiff further objects on the grounds, and to the extent that this interrogatory seeks information
   equally available to, and already provided to, defendant in Standard Asbestos Case
7  Interrogatories and other employment documents served on Designated Defense Counsel
   pursuant to General Order No. 41 and is therefore harassing, burdensome, oppressive and not
8  reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to
   this interrogatory to the extent it calls for information protected from disclosure by the attorney-
9  client privilege and/or the attorney work-product doctrine. Plaintiff further objects to this
   interrogatory to the extent it calls for expert witness information and writings, if any. Without
10 waiving said objections, plaintiff responds as follows: Plaintiff was in the immediate proximity
   of workers in the aforementioned oil field who mixing said MONTELLO, INC. asbestos product
11 into drilling mud and applying said road. Plaintiff breathed in respirable asbestos fibers from
   said products. Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith
12 effort to obtain the information by inquiry to other natural persons or organizations, believes that
   he has no further relevant and/or responsive information to disclose at this time other than what
13 has been stated herein Interrogatory Responses Nos. 1-55 inclusive, and in the course of his
   depositions, prior discovery responses, documents and pleadings already served on defendants in
14 the instant action. Plaintiff reserves the right to supplement this Response, as investigation and
   discovery are continuing.
15
   **RESPONSE TO INTERROGATORY NO. 8:** Plaintiff objects to this Interrogatory on the
16 grounds that it is overbroad, vague, ambiguous, unduly burdensome, oppressive and harassing.
   Plaintiff further objects on the grounds, and to the extent that this interrogatory seeks information
17 equally available to, and already provided to, defendants in Standard Asbestos Case
   Interrogatories and other employment documents served on Designated Defense Counsel
18 pursuant to General Order No. 41 and is therefore harassing, burdensome, oppressive and not
   reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to
19 this interrogatory to the extent it calls for information protected from disclosure by the attorney-
   client privilege and/or the attorney work-product doctrine. Plaintiff further objects to this
20 interrogatory to the extent it calls for expert witness information and writings, if any. Plaintiff
   was in the immediate proximity of the others working with said MONTELLO, INC. asbestos
21 product on numerous occasions. Pursuant to C.C.P. § 2030.220, plaintiff, after making a
   reasonable and good-faith effort to obtain the information by inquiry to other natural persons or
22 organizations, believes that he has no further relevant and/or responsive information to disclose
   at this time other than what has been stated herein Interrogatory Responses Nos. 1-55 inclusive,
23 and in the course of his depositions, prior discovery responses, documents and pleadings already
   served on defendants in the instant action. Plaintiff reserves the right to supplement this
24 Response, as investigation and discovery are continuing.

25 **RESPONSE TO INTERROGATORY NO. 9:** Plaintiff objects to this Interrogatory on the
   grounds, and to the extent, that it seeks the premature disclosure of expert witness and opinions
26 in violation of C.C.P. § 2034. Plaintiff objects to this Interrogatory to the extent it calls for a
   legal conclusion. Plaintiff objects to this Interrogatory on the grounds that it seeks information
27 which is protected from disclosure by the attorney work-product doctrine in violation of C.C.P.

28 ///

1  § 2018 and by the attorney-client privilege.  Plaintiff objects to this Interrogatory to the extent it
2  seeks information equally or more available to the defendant, or already in the possession of
   defendant.  Subject to the foregoing objections, and without waiver thereof, plaintiff responds as
3  follows:  Yes.

4  **RESPONSE TO INTERROGATORY NO. 10:**  Plaintiff objects to this Interrogatory on the
   grounds that it is vague, ambiguous and overbroad.  Plaintiff further objects to this Interrogatory
5  to the extent it calls for information protected from disclosure by the attorney-client privilege
   and/or the attorney work-product doctrine.  Plaintiff further objects to this Interrogatory to the
6  extent it calls for expert witness information and writings, if any.  Subject to and without waiving
   said objections, plaintiff responds as follows:  Plaintiff was exposed to asbestos for which
7  MONTELLO, INC. is legally responsible, by way of asbestos drilling mud additive.  Pursuant to
   C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith effort to obtain the
8  relevant and/or responsive information to disclose at this time other than what has been stated
   herein Interrogatory Responses Nos. 1-55 inclusive, and in the course of his depositions, prior
9  discovery responses, documents and pleadings already served on defendants in the instant action.
   Plaintiff reserves the right to supplement this Response, as investigation and discovery are
10 continuing.

11 **RESPONSE TO INTERROGATORY NO. 11:**  Plaintiff objects to this Interrogatory on the
   grounds that it is vague, ambiguous and overbroad.  Plaintiff further objects to this Interrogatory
12 on the grounds that it seeks information protected from disclosure by the attorney-client privilege
   and work-product doctrine.  Plaintiff objects to this Interrogatory on the grounds that it calls for
13 legal conclusions.  Plaintiff further objects to this Interrogatory on the grounds that it calls for
   expert opinions and therefore prematurely seeks disclosure of information which is properly the
14 subject of expert witness testimony and/or reports in violation of C.C.P. § 2034.  Plaintiff further
   objects on the grounds, and to the extent that this interrogatory seeks information equally
15 available to, and already provided to, defendant in Standard Asbestos Case Interrogatories and
   other employment documents served on Designated Defense Counsel pursuant to General Order
16 No. 43 and is therefore harassing, burdensome, oppressive and not reasonably calculated to lead
   to the discovery of admissible evidence.  Subject to and without waiving said objections, as
17 plaintiff understands the question, plaintiff responds as follows:

18     Plaintiff ROBERT LYMAN was exposed to asbestos-containing products that were
   manufactured, supplied, distributed and/or sold by MONTELLO, INC.  Plaintiff was exposed by
19 working in close proximity to trades handling and disturbing defendant's asbestos-containing
   products and breathing the air and dust that had been generated by the handling and disturbances
20 of these products as they mixed said products.  Defendant knew that asbestos-containing
   products such as those supplied to plaintiff's employers or contractors at plaintiff's jobsites,
21 would be handled, disturbed and manipulated by workers, resulting in the release of airborne
   asbestos fibers, and that through such foreseeable use and/or handling, plaintiff would be
22 exposed to such asbestos fibers.  As a manufacturer, supplier and/or distributor of asbestos-
   containing products, defendant breached various duties for which it was obliged, including it's
23 duty to warn consumers and those who would be exposed, of dangers inherent in said products.
   As a proximate result of defendant's breaches of its duties, plaintiff sustained injury.

24     Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith effort
   to obtain the information by inquiry to other natural persons or organizations, believes that he has
25 no further relevant and/or responsive information to disclose at this time other than what has
   been stated herein Interrogatory Responses Nos. 1-55 inclusive, and in the course of his
26 depositions, prior discovery responses, documents and pleadings already served on defendants in
   the instant action.  Plaintiff reserves the right to supplement this Response, as investigation and
27 discovery are continuing.

28 ///

1    RESPONSE TO INTERROGATORY NO. 12: Plaintiff objects to this Interrogatory on the
     grounds that it is overbroad, vague, ambiguous, unduly burdensome, oppressive and harassing.
2    Plaintiff further objects to this Interrogatory to the extent it calls for information protected from
     disclosure by the attorney-client privilege and/or the attorney work-product doctrine. Plaintiff
3    further objects to this Interrogatory to the extent it calls for expert witness information and
     writings, if any. Without waiving said objections, plaintiff responds as follows: Plaintiff
4    identifies himself. Plaintiff further identifies present and former employees, agents and officers
     of MONTELLO, INC., Cudd Pressure Control, Inc. and Baker Hughes Oilfield Operations, Inc.,
5    whose identities are currently unknown to plaintiff. Plaintiff further identifies Bob Priggy, co-
     worker at Baker Hughes Oilfield Operations, Inc., address currently unknown to plaintiff.
6           Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith effort
     to obtain the information by inquiry to other natural persons or organizations, believes that he has
7    no further relevant and/or responsive information to disclose at this time other than what has
     been stated herein Interrogatory Responses Nos. 1-55 inclusive, and in the course of his
8    depositions, prior discovery responses, documents and pleadings already served on defendants in
     the instant action. Plaintiff reserves the right to supplement this Response, as investigation and
9    discovery are continuing.

10   RESPONSE TO INTERROGATORY NO. 13: Plaintiff objects to this Interrogatory on the
     grounds that it is compound, vague, overbroad. Plaintiff further objects on the grounds, and to
11   the extent that this Interrogatory seeks information equally available to, and already provided to,
     defendant in Standard Asbestos Case Interrogatories and other employment documents served on
12   Designated Defense Counsel pursuant to General Order No. 41 and is therefore harassing,
     burdensome, oppressive and not reasonably calculated to lead to the discovery of admissible
13   evidence. Plaintiff objects to this Interrogatory on the to the extent that it seeks information
     protected from disclosure by the attorney-client privilege and work-product doctrine, and seeks
14.  premature disclosure of the writing or opinions of plaintiff's experts, in violation of C.C.P.
     § 2034. Without waiving said objections, plaintiff identifies the following locations, including
15   but not limited to:

16
17   | Employer | Location of Exposure | Job Title | Exposure Dates |
     | --- | --- | --- | --- |
18   | Cudd Pressure Control, Inc., 8052 Main Street Houma, LA | Cudd Pressure Control, Inc.: locations throughout Southern California | Oil Field Worker | 1981-1982 |
19
20   | Baker Hughes Oilfield Operations, Inc. Houston, TX | Baker Hughes Oilfield Operations, Inc., various oil fields throughout Southern California | Oil Field Worker | 1982-1986 |
21

22          Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith effort
     to obtain the information by inquiry to other natural persons or organizations, believes that he has
23   no further relevant and/or responsive information to disclose at this time other than what has
     been stated herein Interrogatory Responses Nos. 1-55 inclusive, and in the course of his
24   depositions, prior discovery responses, documents and pleadings already served on defendants in
     the instant action. Plaintiff reserves the right to supplement this Response, as investigation and
25   discovery are continuing.

26   RESPONSE TO INTERROGATORY NO. 14: Plaintiff objects to this Interrogatory on the
     grounds that it is overbroad, vague, ambiguous, unduly burdensome, oppressive and harassing.
27   Plaintiff further objects on the grounds, and to the extent that this Interrogatory seeks information
     equally available to, and already provided to, defendant in Standard Asbestos Case
28   Interrogatories and other employment documents served on Designated Defense Counsel

E:\Injured\DISCO\Discovery-nemials.wpd                    7                                       rlb

1  pursuant to General Order No. 41 and is therefore harassing, burdensome, oppressive and not
2  reasonably calculated to lead to the discovery of admissible evidence.  Plaintiff further objects to
   this Interrogatory to the extent it calls for information protected from disclosure by the attorney-
3  client privilege and/or the attorney work-product doctrine. Plaintiff further objects to this
   Interrogatory to the extent it calls for expert witness information and writings, if any. Without
4  waiving said objections, plaintiff responds as follows: Plaintiff was in the immediate proximity
   of workers in the aforementioned oil field who mixing said MONTELLO, INC. asbestos product
5  into drilling mud and applying said mud. Plaintiff breathed in respirable asbestos fibers from
   said products. Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith
6  effort to obtain the information by inquiry to other natural persons or organizations, believes that
   he has no further relevant and/or responsive information to disclose at this time other than what
7  has been stated herein Interrogatory Response Nos. 1-55 inclusive, and in the course of his
   depositions, prior discovery responses, documents and pleadings already served on defendants in
8  the instant action.  Plaintiff reserves the right to supplement this Response, as investigation and
   discovery are continuing.

9  RESPONSE TO INTERROGATORY NO. 15:  Plaintiff objects to this Interrogatory on the
10 grounds that it is overbroad, vague, ambiguous, unduly burdensome, oppressive and harassing.
   Plaintiff further objects on the grounds, and to the extent that this Interrogatory seeks information
11 equally available to, and already provided to, defendant in Standard Asbestos Case
   Interrogatories and other employment documents served on Designated Defense Counsel
12 pursuant to General Order No. 41 and is therefore harassing, burdensome, oppressive and not
   reasonably calculated to lead to the discovery of admissible evidence.  Plaintiff further objects to
13 this Interrogatory to the extent it calls for information protected from disclosure by the attorney-
   client privilege and/or the attorney work-product doctrine.  Plaintiff further objects to this
14 Interrogatory to the extent it calls for expert witness information and writings, if any. Plaintiff
   was in the immediate proximity of the others working with said MONTELLO, INC. asbestos
15 product on numerous occasions.  Pursuant to C.C.P. § 2030.220, plaintiff, after making a
   reasonable and good-faith effort to obtain the information by inquiry to other natural persons or
16 organizations, believes that he has no further relevant and/or responsive information to disclose
   at this time other than what has been stated herein Interrogatory Responses No. 1-55 inclusive,
17 and in the course of his depositions, prior discovery responses, documents and pleadings already
   served on defendants in the instant action.  Plaintiff reserves the right to supplement this
18 Response, as investigation and discovery are continuing.

19 RESPONSE TO INTERROGATORY NO. 16:  Plaintiff objects to this Interrogatory on the
   grounds that it is overbroad, vague, ambiguous, unduly burdensome, oppressive and harassing.
20 Plaintiff further objects on the grounds, and to the extent that this Interrogatory seeks information
   equally available to, and already provided to, defendant in Standard Asbestos Case
21 Interrogatories and other employment documents served on Designated Defense Counsel
   pursuant to General Order No. 41 and is therefore harassing, burdensome, oppressive and not
22 reasonably calculated to lead to the discovery of admissible evidence.  Plaintiff further objects to
   this Interrogatory to the extent it calls for information protected from disclosure by the attorney-
23 client privilege and/or the attorney work-product doctrine.  Plaintiff further objects to this
   Interrogatory to the extent it calls for expert witness information and writings, if any. Plaintiff
24 was in the immediate proximity of the others working with said MONTELLO, INC. asbestos
   product on numerous occasions.  Plaintiff cannot specifically recall the duration of each of said
25 exposures at this time.  Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and
   good-faith effort to obtain the information by inquiry to other natural persons or organizations,
26 believes that he has no further relevant and/or responsive information to disclose at this time
   other than what has been stated herein Interrogatory Responses Nos. 1-55 inclusive, and in the
27 course of his depositions, prior discovery responses, documents and pleadings already served on
   defendants in the instant action.  Plaintiff reserves the right to supplement this Response, as
28 investigation and discovery are continuing.
   ///

8

1  RESPONSE TO INTERROGATORY NO. 17:  Plaintiff objects to this interrogatory on the
2  grounds that it is overbroad, vague, ambiguous, unduly burdensome, oppressive and harassing.
   Plaintiff further objects on the grounds, and to the extent that this interrogatory seeks information
3  equally available to, and already provided to, defendant in Standard Asbestos Case
   Interrogatories and other employment documents served on Designated Defense Counsel
4  pursuant to General Order No. 41 and is literature harassing, burdensome, oppressive and not
   reasonably calculated to lead to the discovery of admissible evidence.  Plaintiff further objects to
5  this interrogatory to the extent it calls for information protected from disclosure by the attorney-
   client privilege and/or the attorney work-product doctrine.  Plaintiff further objects to this
6  interrogatory to the extent it calls for expert witness information and writings, if any.  Plaintiff
   refers to and incorporates by reference as though fully stated herein, his response to Interrogatory
7  13 above.  Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith
   effort to obtain the information by inquiry to other natural persons or organizations, believes that
8  he has no further relevant and/or responsive information to disclose at this time other than what
   has been stated herein Interrogatory Responses Nos. 1-35 inclusive, and in the course of his
9  depositions, prior discovery responses, documents and pleadings already served on defendants in
   the instant action.  Plaintiff reserves this right to supplement this Response, as investigation and
10  discovery are continuing.

11  RESPONSE TO INTERROGATORY NO. 18:  Plaintiff objects to this Request on the grounds
   that it prematurely seeks information which is properly the subject of expert witness testimony
12  and/or reports in violation of C.C.P. § 2034.  Plaintiff further objects to this Request on the
   ground that it seeks documents protected from disclosure by the attorney work-product doctrine.
13  Plaintiff further objects to this Request on the grounds that it seeks documents equally or more
   available to defendants and that it seeks documents which are in the possession of defendants.
14  Without waiving the foregoing objections, plaintiff responds as follows:  Plaintiff currently
   identifies the following documents:  The transcripts of plaintiff's deposition, and exhibits
15  attached thereto, taken in the instant action; and plaintiff's responses to Standard Asbestos Case
   Interrogatories, and all exhibits attached thereto.  Plaintiff also identifies his Social Security
16  records and medical records and billings, previously provided to coordinating defense counsel,
   Berry & Berry and equally available to defendants.
17      Further, plaintiff identifies the following documents which evidence the sales of
   "Calidria" asbestos to various manufacturing companies, the state of Union Carbide' knowledge
18  regarding the hazards of asbestos and the use of asbestos in the manufacturing of Bakelite
   phenolic resin:  The deposition transcripts of Union Carbide' person most knowledgeable, John
19  Myers, taken on September 4, 1986, reported by Worldwide Court Reporters, 800-745-1101;
   taken on July 23, 1999, reported by Aiken & Welch, One Kaiser Plaza, Suite 505, Oakland,
20  California 94612 (510) 451-1580; taken on May 22, 2002, reported by Worldwide Court
   Reporters, 800-745-1101; taken on February 6, 2003, reported by Hartsell & Olivieri, 831-423-
21  5911; taken on June 10 and 11, 2003, reported by Hartsell & Olivieri, 831-423-5911.  The trial
   testimony of John Myers taken November 12, 2002 in Douglas Anderson v Atlas Turner, et al.,
22  Los Angeles Superior Court, BC 237187.  Plaintiff further identifies the documents produced
   from Union Carbide's New York repository during various document productions attended by
23  Brayton®Purcell LLP and other law firms.  Plaintiff also identifies the documents produced
   under the In Re: Complex Asbestos Litigation notice dated September 21, 2001.  Defendant is in
24  possession of all identified deposition transcripts of John Myers and all documents copied from
   the New York repository.
25      Plaintiff also identifies the deposition transcripts and all exhibits attached thereto of the
   following PMK for defendant UNION CARBIDE:  Carlo Marino taken on May 4, 2001, and all
26  subsequent days, in Richard Yeager and Shirley Yeager v. Union Carbide Corporation, San
   Francisco Superior Court Case No. 312560, reported by Cal North Reporting Service; Robert E.
27  Poole taken on September 10, 1981, and all subsequent days; and John Myers taken on January
   25, 1998, and all subsequent days, July 23, 1999, and all subsequent days, in Lois Harris v. Fibreboard
28  Insulation Co., Alameda County Superior Court Case No. 791615-3, and on September 4, 1986,
   and all subsequent days, in Bobby R. Sanford v. Johns-Manville Sales Corp., in United States

1    District Court for the Southern District of Texas, Galveston Division, Civil Action No. G-82-
2    325, reported by Worldwide Court Reporters, Houston, Texas.
          Plaintiff further identifies UNION CARBIDE CHEMICALS AND PLASTICS
3    COMPANY, Inc.'s Response to General Order #129 Interrogatories in In Re: Complex Asbestos
     Litigation, San Francisco County Superior Court No. 828684, dated November 21, 1997; and
     defendant's Response to General Order #129 Interrogatories.
4
          Plaintiff also identifies numerous articles and studies relating to the health hazards
5    associated with exposure to asbestos which have appeared in medical and scientific literature
     since the turn of the twentieth century and have also been summarized in various publications.
6    Plaintiff identifies two texts that contain summaries and/or bibliographies of asbestos-related
     disease. They are: Asbestos: Medical and Legal Aspects, Barry I. Castleman, Prentice-Hall Law
7    & Business, 1990; and Sourcebook on Asbestos Disease: Medical, Legal & Engineering
     Aspects, George A. Peters and Barbara J. Peters, Garland 5 IPM Press, Vol. 1, 1980, Vol. 2,
8    1986. Plaintiff is in possession of these texts and will make them available for defendants'
     review. Due to copyright laws, plaintiff cannot provide copies of these texts to defendants.
9    Plaintiff also identifies General Industry Safety Orders promulgated pursuant to California Labor
     Code § 6400, et seq. and California Administrative Code under the California Department of
10   Industrial Relations, Division of Industrial Safety, including, but not limited in, Title VIII, Group
     2 (Control of Hazardous Substances) Article 81, Section 4150, 4104-4108, and Threshold Limit
11   Values as documented for asbestos and other toxic substances under Appendix A, Table I of said
     Safety Orders. Plaintiff also identifies NESHAP Asbestos Regulations (National Emission
12   Standards for Hazardous Air Pollutants) which are found at Code of Federal Regulations, Title
     40, Chapter 1, Subchapter C, Part 61, Subpart M, published under the Federal Clean Air Act of
13   1970, 42 U.S.C.A. Section 7412(b)(1)(A) and 42 U.S.C.A. Section 7412(b)(1)(B). Plaintiff also
     identifies OSHA standards relating to asbestos, found at Code of Federal Regulations, Title 29,
14   Chapter 17, Section 1910, et seq.; and Title 8, Section 5208 of the California OSHA regulations
     pertaining to asbestos exposure. After a reasonable and good-faith inquiry, plaintiff has no
15   further documentation responsive to this Request. Plaintiff's investigation and discovery are
     continuing, and as such, plaintiff expressly reserves the right to amend this Response pending the
16   outcome of plaintiff's investigation.
          Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith effort
17   to obtain the information by inquiry to other natural persons or organizations, believes that he has
     no further relevant and/or responsive information to disclose at this time other than what has
18   been stated herein Interrogatory Responses Nos. 1-55 inclusive, and in the course of his
     depositions, prior discovery responses, documents and pleadings already served on defendants in
19   the instant action. Plaintiff reserves the right to supplement this Response, as investigation and
     discovery are continuing.
20
     RESPONSE TO INTERROGATORY NO. 19:  Plaintiff objects to this Interrogatory on the
21   grounds, and to the extent, that it seeks the premature disclosure of expert witnesses and opinions
     in violation of C.C.P. § 2034. Plaintiff objects to this Interrogatory to the extent it calls for a
22   legal conclusion. Plaintiff objects to this Interrogatory on the grounds that it seeks information
     which is protected from disclosure by the attorney work-product doctrine in violation of C.C.P.
23   § 2018 and by the attorney-client privilege. Plaintiff objects to this Interrogatory to the extent it
     seeks information equally or more available to the defendant, or already in the possession of
24   defendant. Subject to the foregoing objections, and without waiver thereof, plaintiff responds as
     follows:  Yes.
25
     RESPONSE TO INTERROGATORY NO. 20:  Plaintiff objects to this Interrogatory on the
26   grounds that it is vague, ambiguous and overbroad. Plaintiff further objects to this Interrogatory
     to the extent it calls for information protected from disclosure by the attorney-client privilege
27   and/or the attorney work-product doctrine. Plaintiff further objects to this Interrogatory to the
     extent it calls for expert witness information and writings, if any. Subject to and without waiving
28   said objection, plaintiff responds as follows: Plaintiff was exposed to asbestos for which

1  MONTELLO, INC. is legally responsible, by way of asbestos drilling mud additive. Pursuant to
2  C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith effort to obtain the
   information by inquiry to other natural persons or organizations, believes that he has no further
3  relevant and/or responsive information to disclose at this time other than what has been stated
   herein Interrogatory Responses Nos. 1-55 inclusive, and in the course of his depositions, prior
4  discovery responses, documents and pleadings already served on defendants in the instant action.
   Plaintiff reserves the right to supplement this Response, as investigation and discovery are
   continuing.

5
6  RESPONSE TO INTERROGATORY NO. 21:  Plaintiff objects to this Interrogatory on the
   grounds that it is vague, ambiguous and overbroad. Plaintiff further objects to this Interrogatory
7  on the grounds that it seeks information protected from disclosure by the attorney-client privilege
   and work-product doctrine. Plaintiff objects to this Interrogatory on the grounds that it calls for
8  legal conclusions. Plaintiff further objects to this Interrogatory on the grounds that it calls for
   expert opinions and therefore prematurely seeks disclosure of information which is properly the
9  subject of expert witness testimony and/or reports in violation of C.C.P. § 2034. Plaintiff further
   objects on the grounds, and to the extent that this Interrogatory seeks information equally
10 available to, and already provided to, defendant in Standard Asbestos Case Interrogatories and
   other employment documents served on Designated Defense Counsel pursuant to General Order
11 No. 41 and is therefore harassing, burdensome, oppressive and not reasonably calculated to lead
   to the discovery of admissible evidence. Subject to and without waiving said objections, and
12 plaintiff understands this question, plaintiff responds as follows:
      Plaintiff ROBERT LYMAN was exposed to asbestos-containing products that were
13 manufactured, supplied, distributed and/or sold by MONTELLO, INC. Plaintiff was exposed by
   working in close proximity to trades handling and disturbing defendant's asbestos-containing
14 products and breathing the air and dust that had been generated by the handling and disturbance
   of these products as they mixed said products. Defendant knew that asbestos-containing
15 products such as those supplied to plaintiff's employers or contractors at plaintiff's jobsite,
   would be handled, disturbed and manipulated by workers, resulting in the release of airborne
16 asbestos fibers, and that through such foreseeable use and/or handling, plaintiff would be
   exposed to such asbestos fibers. As a manufacturer, supplier and/or distributor of asbestos-
17 containing products, defendant breached various duties for which it was obliged, including it's
   duty to warn customers and those who would be exposed, of dangers inherent in said products.
18 As a proximate result of defendant's breaches of its duties, plaintiff sustained injury.
      Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith effort
19 to obtain the information by inquiry to other natural persons or organizations, believes that he has
   no further relevant and/or responsive information to disclose at this time other than what has
20 been stated herein Interrogatory Responses Nos. 1-55 inclusive, and in the course of his
   depositions, prior discovery responses, documents and pleadings already served on defendants in
21 the instant action. Plaintiff reserves the right to supplement this Response, as investigation and
   discovery are continuing.

22 RESPONSE TO INTERROGATORY NO. 22:  Plaintiff objects to this Interrogatory on the
   grounds that it is overbroad, vague, ambiguous, unduly burdensome, oppressive and harassing.
23 Plaintiff further objects to this Interrogatory to the extent it calls for information protected from
   disclosure by the attorney-client privilege and/or the attorney work-product doctrine. Plaintiff
24 further objects to this Interrogatory to the extent it calls for expert witness information and
   witness, if any. Without waiving said objections, plaintiff responds as follows: Plaintiff
25 identifies himself. Plaintiff further identifies present and former employees, agents and officers
   of MONTELLO, INC., Cudd Pressure Control, Inc. and Baker Hughes Oilfield Operations, Inc.
26 whose identities are currently unknown to plaintiff. Plaintiff further identifies Bob Prisby, co-
   worker at Baker Hughes Oilfield Operations, Inc., address currently unknown to plaintiff.
27    Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith effort
   to obtain the information by inquiry to other natural persons or organizations, believes that he has
28 no further relevant and/or responsive information to disclose at this time other than what has

X:\logan\ROBERT\rog-resp-attach\lla.wpd                    11                                    sd4

1   been stated herein Interrogatory Responses Nos. 1-55 inclusive, and in the course of his
2   depositions, prior discovery responses, documents and pleadings already served on defendants in
    the instant action. Plaintiff reserves the right to supplement this Response, as investigation and
3   discovery are continuing.

4   **RESPONSE TO INTERROGATORY NO. 23:** Plaintiff objects to this Interrogatory on the
    grounds that it is compound, vague, overbroad. Plaintiff further objects on the grounds, and to
5   the extent that this Interrogatory seeks information equally available to, and already provided to,
    defendant in Standard Asbestos Case Interrogatories and other employment documents served on
6   Designated Defense Counsel pursuant to General Order No. 41 and is therefore harassing,
    burdensome, oppressive and not reasonably calculated to lead to the discovery of admissible
7   evidence. Plaintiff objects to this Interrogatory on the to the extent that it seeks information
    protected from disclosure by the attorney-client privilege and work-product doctrine, and seeks
8   premature disclosure of the writing or opinions of plaintiff's experts, in violation of C.C.P.
    § 2034. Without waiving said objections, plaintiff identifies the following locations, including
9   but not limited to:

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Cudd Pressure Control, Inc., 8092 Main Street Houma, LA | Cudd Pressure Control, Inc.; locations throughout Southern California | Oil Field Worker | 1981-1982 |
| Baker Hughes Oilfield Operations, Inc. Houston, TX | Baker Hughes Oilfield Operations, Inc.; various oil fields throughout Southern California | Oil Field Worker | 1982-1986 |

16   Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith effort
17   to obtain the information by inquiry to other natural persons or organizations, believes that he has
    no further relevant and/or responsive information to disclose at this time other than what has
18   been stated herein Interrogatory Responses Nos. 1-55 inclusive, and in the course of his
    depositions, prior discovery responses, documents and pleadings already served on defendants in
19   the instant action. Plaintiff reserves the right to supplement this Response, as investigation and
    discovery are continuing.

20   **RESPONSE TO INTERROGATORY NO. 24:** Plaintiff objects to this Interrogatory on the
    grounds that it is overbroad, vague, ambiguous, unduly burdensome, oppressive and harassing.
21   Plaintiff further objects on the grounds, and to the extent that this Interrogatory seeks information
    equally available to, and already provided to, defendant in Standard Asbestos Case
22   Interrogatories and other employment documents served on Designation Defense Counsel
    pursuant to General Order No. 41 and is therefore harassing, burdensome, oppressive and not
23   reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to
    this Interrogatory to the extent it calls for information protected from disclosure by the attorney-
24   client privilege and/or the attorney work-product doctrine. Plaintiff further objects to this
    Interrogatory to the extent it calls for expert witness information and writings, if any. Without
25   waiving said objections, plaintiff responds as follows: Plaintiff was in the immediate proximity
    of workers in the aforementioned oil field who mixing said MONTELLO, INC., asbestos product
26   into drilling mud and applying said mud. Plaintiff breathed in respirable asbestos fibers from
    said products. Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith
27   effort to obtain the information by inquiry to other natural persons or organizations, believes that
    he has no further relevant and/or responsive information to disclose at this time other than what

28   ///

1    has been stated herein Interrogatory Responses Nos. 1-55 inclusive, and in the course of his
2    depositions, prior discovery responses, documents and pleadings already served on defendants in
    the instant action. Plaintiff reserves the right to supplement this Response, as investigation and
3    discovery are continuing.

4    **RESPONSE TO INTERROGATORY NO. 25:** Plaintiff objects to this Interrogatory on the
    grounds that it is overbroad, vague, ambiguous, unduly burdensome, oppressive and harassing.
    Plaintiff further objects on the grounds, and to the extent that this Interrogatory seeks information
5    equally available to, and already provided to, defendant in Standard Asbestos Case
    Interrogatories and other employment documents served on Designated Defense Counsel
6    pursuant to General Order No. 41 and is therefore harassing, burdensome, oppressive and not
    reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to
7    this Interrogatory to the extent it calls for information protected from disclosure by the attorney-
    client privilege and/or the attorney work-product doctrine. Plaintiff further objects to this
8    Interrogatory to the extent it calls for expert witness information and writings, if any. Plaintiff
    was in the immediate proximity of the others working with said MONTELLO, INC. asbestos
9    product on numerous occasions. Pursuant to C.C.P. § 2030.220, plaintiff, after making a
    reasonable and good-faith effort to obtain the information by inquiry to other natural persons or
10   organizations, believes that he has no further relevant and/or responsive information to disclose
    at this time other than what has been stated herein Interrogatory Responses Nos. 1-55 inclusive,
11   and in the course of his depositions, prior discovery responses, documents and pleadings already
    served on defendants in the instant action. Plaintiff reserves the right to supplement this
12   Response, as investigation and discovery are continuing.

13   **RESPONSE TO INTERROGATORY NO. 26:** Plaintiff objects to this Interrogatory on the
    grounds that it is overbroad, vague, ambiguous, unduly burdensome, oppressive and harassing.
14   Plaintiff further objects on the grounds, and to the extent that this Interrogatory seeks information
    equally available to, and already provided to, defendant in Standard Asbestos Case
15   Interrogatories and other employment documents served on Designated Defense Counsel
    pursuant to General Order No. 41 and is therefore harassing, burdensome, oppressive and not
16   reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to
    this Interrogatory to the extent it calls for information protected from disclosure by the attorney-
17   client privilege and/or the attorney work-product doctrine. Plaintiff further objects to this
    Interrogatory to the extent it calls for expert witness information and writings, if any. Plaintiff
18   was in the immediate proximity of the others working with said MONTELLO, INC. asbestos
    product on numerous occasions. Plaintiff cannot specifically recall the duration of each of said
19   exposures at this time. Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and
    good-faith effort to obtain the information by inquiry to other natural persons or organizations,
20   believes that he has no further relevant and/or responsive information to disclose at this time
    other than what has been stated herein Interrogatory Response Nos. 1-55 inclusive, and in the
21   course of his depositions, prior discovery responses, documents and pleadings already served on
    defendants in the instant action. Plaintiff reserves the right to supplement this Response, as
22   investigation and discovery are continuing.

23   **RESPONSE TO INTERROGATORY NO. 27:** Plaintiff objects to this Interrogatory on the
    grounds that it is overbroad, vague, ambiguous, unduly burdensome, oppressive and harassing.
24   Plaintiff further objects on the grounds, and to the extent that this Interrogatory seeks information
    equally available to, and already provided to, defendant in Standard Asbestos Case
25   Interrogatories and other employment documents served on Designated Defense Counsel
    pursuant to General Order No. 41 and is therefore harassing, burdensome, oppressive and not
26   reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to
    this Interrogatory to the extent it calls for information protected from disclosure by the attorney-
27   client privilege and/or the attorney work-product doctrine. Plaintiff further objects to this
    Interrogatory to the extent it calls for expert witness information and writings, if any. Plaintiff
28   refers to and incorporates by reference as though fully stated herein, his response to interrogatory

N\Major\907\907\major-sixsaffa.wpd

13 above. Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith effort to obtain the information by inquiry to other natural persons or organizations, believes that he has no further relevant and/or responsive information to disclose at this time other than what has been stated herein Interrogatory Responses Nos. 1-33 inclusive, and in the course of his depositions, prior discovery responses, documents and pleadings already served on defendants in the instant action. Plaintiff reserves the right to supplement this Response, as investigation and discovery are continuing.

RESPONSE TO INTERROGATORY NO. 23: Plaintiff objects to this Request on the grounds that it prematurely seeks information which is properly the subject of expert witness testimony and/or reports in violation of C.C.P. § 2034. Plaintiff further objects to this Request on the ground that it seeks documents protected from disclosure by the attorney work-product doctrine. Plaintiff further objects to this Request on the grounds that it seeks documents equally or more available to defendants and that it seeks documents which are in the possession of defendants. Without waiving the foregoing objections, plaintiff responds as follows: Plaintiff currently identifies the following documents: The transcripts of plaintiff's deposition, and exhibits attached thereto, taken in the instant action; and Plaintiff's responses to Standard Asbestos Case Interrogatories, and all exhibits attached thereto. Plaintiff also identifies his Social Security records and medical records and billings, previously provided to coordinating defense counsel. Berry & Berry and equally available to defendants.

Further, plaintiff identifies the following documents which evidence the sales of "Calidria" asbestos to various manufacturing companies, the state of Union Carbide's knowledge regarding the hazards of asbestos and the use of asbestos in the manufacturing of Bakelite phenolic resin: The deposition transcripts of Union Carbide person most knowledgeable, John Myers, taken on September 4, 1986, reported by Worldwide Court Reporters, 800-745-1101; taken on July 23, 1999, reported by Allen & Welch, One Kaiser Plaza, Suite 505, Oakland, California 94612 (510) 451-1580; taken on May 22, 2002, reported by Worldwide Court Reporters, 800-745-1101; taken on February 6, 2003, reported by Hartnell & Olivieri, 831-423-5911; taken on June 10 and 11, 2003, reported by Hartnell & Olivieri, 831-423-5911. The trial testimony of John Myers taken November 12, 2002 in Douglas Anderson v. Atlas Turner, et al, Los Angeles Superior Court, BC 297187. Plaintiff further identifies the documents produced from Union Carbide's New York repository during various document productions attended by Brayton♦Purcell LLP and other law firms. Plaintiff also identifies the documents produced under the In Re: Complex Asbestos Litigation notice dated September 21, 2001. Defendant is in possession of all identified deposition transcripts of John Myers and all documents copied from the New York repository.

Plaintiff also identifies the deposition transcripts and all exhibits attached thereto of the following PMK for defendant UNION CARBIDE: Carlo Martino taken on May 4, 2005, and all subsequent days, in Richard Venner and Shirley Venner v. Union Carbide Corporation, San Francisco Superior Court Case No. 312666, reported by Cal North Reporting Services; Robert B. Peale taken on September 10, 1981, and all subsequent days; and John Myers taken on January 25, 1995, and all subsequent days, July 25, 1995, and all subsequent days, in Lois Harris v. Platt Insulation Co., Alameda County Superior Court Case No. 791615-3, and on September 4, 1986, and all subsequent days, in Robert R. Sanford v. Johns-Manville Sales Corp., in United States District Court for the Southern District of Texas, Galveston Division, Civil Action No. G-82-325, reported by Worldwide Court Reporters, Houston, Texas.

Plaintiff further identifies UNION CARBIDE CHEMICALS AND PLASTICS COMPANY, Inc.'s Response to General Order #129 Interrogatories in In Re: Complex Asbestos Litigation, San Francisco County Superior Court No. 828684, dated November 21, 1997; and defendant's Response to General Order #129 Interrogatories.

Plaintiff also identifies numerous articles and studies relating to the health hazards associated with exposure to asbestos which have appeared in medical and scientific literature since the turn of the twentieth century and have also been summarized in various publications. Plaintiff identifies two texts that contain summaries and/or bibliographies of asbestos-related disease. They are: Asbestos: Medical and Legal Aspects, Barry I. Castleman, Prentice-Hall Law

14

1  & Business, 1990; and Sourcebook on Asbestos Disease: Medical, Legal & Engineering
2  Aspects, George A. Peters and Barbara J. Peters, Garland STPM Press, Vol. 1, 1980, VOL. 2,
    1980. Plaintiff is in possession of these texts and will make them available for defendants'
3  review. Due to copyright laws, plaintiff cannot provide copies of these texts to defendants.
    Plaintiff also identifies General Industry Safety Orders promulgated pursuant to California Labor
4  Code § 6400, et seq. and California Administrative Code under the California Department of
    Industrial Relations, Division of Industrial Safety, including, but not limited to, Title VIII, Group
5  9 (Control of Hazardous Substances) Article 81, Section 4150, 4104-4108, and Threshold Limit
    Values as documented for asbestos and other toxic substances under Appendix A, Table I of said
6  Safety Orders. Plaintiff also identifies NESHAP Asbestos Regulations (National Emission
    Standards for Hazardous Air Pollutants) which are found at Code of Federal Regulations, Title
7  40, Chapter 1, Subchapter C, Part 61, Subpart M, published under the Federal Clean Air Act of
    1970, 42 U.S.C.A. Section 7412(b)(1)(A) and 42 U.S.C.A. Section 7412(b)(1)(B). Plaintiff also
8  identifies OSHA standards relating to asbestos, found at Code of Federal Regulations, Title 29,
    Chapter 17, Section 1910, et seq.; and Title 8, Section 5208 of the California CSHA regulations
9  pertaining to asbestos exposure. After a reasonable and good-faith inquiry, plaintiff has no
    further documentation responsive to this Request. Plaintiff's investigation and discovery are
10  continuing, and as such, plaintiff expressly reserves the right to amend this Response pending the
    outcome of plaintiff's investigation.
11        Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith effort
    to obtain the information by inquiry to other natural persons or organizations, believes that he has
12  no further relevant and/or responsive information to disclose at this time other than what has
    been stated herein Interrogatory Responses Nos. 1-58 inclusive, and in the course of his
13  depositions; prior discovery responses, documents and pleadings already served on defendants in
    the instant action. Plaintiff reserves the right to supplement this Response, as investigation and
14  discovery are continuing.

15  RESPONSE TO INTERROGATORY NO. 29: Plaintiff objects to this Interrogatory on the
    grounds, and to the extent, that it seeks the premature disclosure of expert witnesses and opinions
16  in violation of C.C.P. § 2034. Plaintiff objects to this Interrogatory to the extent it calls for a
    legal conclusion. Plaintiff objects to this Interrogatory on the grounds that it seeks information
17  which is protected from disclosure by the attorney work-product doctrine in violation of C.C.P.
    § 2018 and by the attorney-client privilege. Plaintiff objects to this Interrogatory to the extent it
18  seeks information equally or more available to the defendant, or already in the possession of
    defendant. Subject to the foregoing objections, and without waiver thereof, plaintiff responds as
19  follows: Yes.

20  RESPONSE TO INTERROGATORY NO. 30: Plaintiff objects to this Interrogatory on the
    grounds that it is vague, ambiguous and overbroad. Plaintiff further objects to this Interrogatory
21  to the extent it calls for information protected from disclosure by the attorney-client privilege
    and/or the attorney work-product doctrine. Plaintiff further objects to this Interrogatory to the
22  extent it calls for expert witness information and writings, if any. Subject to and without waiving
    said objection, plaintiff responds as follows: Plaintiff was exposed to asbestos for which
23  MONTELLO, INC. is legally responsible, by way of asbestos drilling mud additive. Pursuant to
    C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith effort to obtain the
24  information by inquiry to other natural persons or organizations, believes that he has no further
    relevant and/or responsive information to disclose at this time other than what has been stated
25  herein Interrogatory Responses Nos. 1-58 inclusive, and in the course of his depositions, prior
    discovery responses, documents and pleadings already served on defendants in the instant action.
26  Plaintiff reserves the right to supplement this Response, as investigation and discovery are
    continuing.

27  ///
28  ///

18

1   **RESPONSE TO INTERROGATORY NO. 31:** Plaintiff objects to this Interrogatory on the
2   grounds that it is vague, ambiguous and overbroad. Plaintiff further objects to this Interrogatory
    on the grounds that it seeks information protected from disclosure by the attorney-client privilege
3   and work-product doctrine. Plaintiff objects to this Interrogatory on the grounds that it calls for
    legal conclusions. Plaintiff further objects to this Interrogatory on the grounds that it calls for
4   expert opinions and therefore prematurely seeks disclosure of information which is properly the
    subject of expert witness testimony and/or reports in violation of C.C.P. § 2034. Plaintiff further
5   objects on the grounds, and to the extent that this Interrogatory seeks information equally
    available to, and already provided to, defendant in Standard Asbestos Case Interrogatories and
6   other employment documents served on Designated Defense Counsel pursuant to General Order
    No. 41 and is therefore harassing, burdensome, oppressive and not reasonably calculated to lead
7   to the discovery of admissible evidence. Subject to and without waiving said objections, as
    plaintiff understands the question, plaintiff responds as follows:
8        Plaintiff ROBERT LYMAN was exposed to asbestos-containing products that were
    manufactured, supplied, distributed and/or sold by MONTELLO, INC. Plaintiff was exposed by
9   working in close proximity to trades handling and disturbing defendant's asbestos-containing
    products and breathing the air and dust that had been generated by the handling and disturbance
10  of these products as they mixed said products. Defendant knew that asbestos-containing
    products such as those supplied to plaintiff's employers or contractors at plaintiff's jobsites,
11  would be handled, disturbed and manipulated by workers, resulting in the release of airborne
    asbestos fibers, and that through such foreseeable use and/or handling, plaintiff would be
12  exposed to such asbestos fibers. As a manufacturer, supplier and/or distributor of asbestos-
    containing products, defendant breached various duties for which it was obliged, including it's
13  duty to warn consumers and those who would be exposed, of dangers inherent in said products.
    As a proximate result of defendant's breaches of its duties, plaintiff sustained injury.
14       Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith effort
    to obtain the information by inquiry to other natural persons or organizations, believes that he has
15  no further relevant and/or responsive information to disclose at this time other than what has
    been stated herein Interrogatory Responses Nos. 1-55 inclusive, and in the course of his
16  depositions, prior discovery responses, documents and pleadings already served on defendants in
    the instant action. Plaintiff reserves the right to supplement this Response, as investigation and
17  discovery are continuing.

18  **RESPONSE TO INTERROGATORY NO. 32:** Plaintiff objects to this Interrogatory on the
    grounds that it is overbroad, vague, ambiguous, unduly burdensome, oppressive and harassing.
19  Plaintiff further objects to this Interrogatory to the extent it calls for information protected from
    disclosure by the attorney-client privilege and/or the attorney work-product doctrine. Plaintiff
20  further objects to this Interrogatory to the extent it calls for expert witness information and
    writings, if any. Without waiving said objections, plaintiff responds as follows: Plaintiff
21  identifies himself. Plaintiff further identifies present and former employees, agents and officers
    of MONTELLO, INC., Cudd Pressure Control, Inc. and Baker Hughes Oilfield Operations Inc.
22  whose identities are currently unknown to plaintiff. Plaintiff further identifies Bob Pliggy, co-
    worker at Baker Hughes Oilfield Operations, Inc., address currently unknown to plaintiff.
23       Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith effort
    to obtain the information by inquiry to other natural persons or organizations, believes that he has
24  no further relevant and/or responsive information to disclose at this time other than what has
    been stated herein Interrogatory Responses Nos. 1-55 inclusive, and in the course of his
25  depositions, prior discovery responses, documents and pleadings already served on defendants in
    the instant action. Plaintiff reserves the right to supplement this Response, as investigation and
26  discovery are continuing.

27  **RESPONSE TO INTERROGATORY NO. 33:** Plaintiff objects to this Interrogatory on the
    grounds that it is compound, vague, overbroad. Plaintiff further objects on the grounds, and to
28  the extent that this interrogatory seeks information equally available to, and already provided to,
    defendant in Standard Asbestos Case Interrogatories and other employment documents served on

16

1    Designated Defense Counsel pursuant to General Order No. 41 and is therefore harassing,
2    burdensome, oppressive and not reasonably calculated to lead to the discovery of admissible
     evidence. Plaintiff objects to this Interrogatory on the to the extent that it seeks information
3    protected from disclosure by the attorney-client privilege and work-product doctrine, and seeks
     premature disclosure of the writing or opinions of plaintiff's experts, in violation of C.C.P.
     § 2034. Without waiving said objections, plaintiff identifies the following locations, including
4    but not limited to:

5

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Cudd Pressure Control, Inc., 8032 Main Street Houma, LA | Cudd Pressure Control, Inc., locations throughout Southern California | Oil Field Worker | 1981-1982 |
| Baker Hughes Oilfield Operations, Inc. Houston, TX | Baker Hughes Oilfield Operations, Inc., various oil fields throughout Southern California | Oil Field Worker | 1982-1986 |

11        Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith effort
12   to obtain the information by inquiry to other natural persons or organizations, believes that he has
     no further relevant and/or responsive information to disclose at this time other than what has
13   been stated herein Interrogatory Responses Nos. 1-55 inclusive, and in the course of his
     depositions, prior discovery responses, documents and pleadings already served on defendants in
14   the instant action. Plaintiff reserves the right to supplement this Response, as investigation and
     discovery are continuing.

15   RESPONSE TO INTERROGATORY NO. 24:  Plaintiff objects to this Request on the grounds
16   that it prematurely seeks information which is properly the subject of expert witness testimony
     and/or experts in violation of C.C.P. § 2034. Plaintiff further objects to this Request on the
17   ground that it seeks documents protected from disclosure by the attorney work-product doctrine.
     Plaintiff further objects to this Request on the grounds that it seeks documents equally or more
18   available to defendants and that it seeks documents which are in the possession of defendants.
     Without waiving the foregoing objections, plaintiff responds as follows:  Plaintiff currently
19   identifies the following documents:  The transcript of plaintiff's deposition, and exhibits
     attached thereto, taken in the instant action; and plaintiff's responses to Standard Asbestos Case
20   Interrogatories, and all exhibits attached thereto. Plaintiff also identifies his Social Security
     records and medical records and billings, previously provided to coordinating defense counsel,
     Berry & Berry and equally available to defendants.
21
          Further, plaintiff identifies the following documents which evidence the sales of
22   "calidria" asbestos to various manufacturing companies, the state of Union Carbides' knowledge
     regarding the hazards of asbestos and the use of asbestos in the manufacturing of Bakelite
23   phenolic resin:  The deposition transcript of Union Carbides' person most knowledgeable, John
     Myers, taken on September 4, 1986, reported by Worldwide Court Reporters, 800-745-1101;
24   taken on July 23, 1999, reported by Allen & Welch, One Kaiser Plaza, Suite 505, Oakland,
     California 94612 (510) 451-1580; taken on May 12, 2003, reported by Worldwide Court
25   Reporters, 800-745-1101; taken on February 6, 2003, reported by Hartsell & Oliveri, 831-423-
     5911; taken on June 10 and 11, 2003, reported by Hartsell & Oliveri, 831-423-5911.  The oral
26   testimony of John Myers taken November 12, 2002 in Douglas Anderson v Atlas Turner, et al.,
     Los Angeles Superior Court, BC 257187. Plaintiff further identifies the documents produced
27   from Union Carbide's New York repository during various document productions attended by
     Brayton◆Purcell LLP and other law firms.  Plaintiff also identifies the documents produced
28   under the In Re:  Complex Asbestos Litigation notice dated September 21, 2001. Defendant is in
     possession of all identified deposition transcripts of John Myers and all documents copied from
     the New York repository.

                                              17

1       Plaintiff also identifies the deposition transcripts and all exhibits attached thereto of the
2 following PMK for defendant UNION CARBIDE: Cleto Martino taken on May 4, 2001, and all
subsequent days, in Richard Yeater and Shirley Yeater v. Union Carbide Corporation, San
3 Francisco Superior Court Case No. 312960, reported by Cal North Reporting Service; Robert H.
Poole taken on September 10, 1981, and all subsequent days; and John Myers taken on January
4 25, 1985, and all subsequent days, July 23, 1999, and all subsequent days, in Lois Harris v. Flexi
Insulation Co., Alameda County Superior Court Case No. 791615-3, and on September 4, 1985,
5 and all subsequent days, in Bobby R. Sanford v. Johns-Manville Sales Corp., in United States
District Court for the Southern District of Texas, Galveston Division, Civil Action No. G-82-
6 325, reported by Worldwide Court Reporters, Houston, Texas.
       Plaintiff further identifies UNION CARBIDE CHEMICALS AND PLASTICS
7 COMPANY, Inc.'s Response to General Order #129 Interrogatories in In Re: Complex Asbestos
Litigation, San Francisco County Superior Court No. 828684, dated November 21, 1977, and
8 defendant's Responses to General Order #129 Interrogatories.
       Plaintiff also identifies numerous articles and studies relating to the health hazards
9 associated with exposure to asbestos which have appeared in medical and scientific literature
since the turn of the twentieth century and have also been summarized in various publications.
10 Plaintiff identifies two texts that contain summaries and/or bibliographies of asbestos-related
disease. They are: Asbestos: Medical and Legal Aspects, Barry I. Castleman, Prentice-Hall Law
11 & Business, 1990; and Sourcebook on Asbestos Diseases: Medical, Legal & Engineering
Aspects, George A. Peters and Barbara A. Peters, Garland STPM Press, Vol. 1, 1980, Vol. 2,
12 1980. Plaintiff is in possession of these texts and will make them available for defendants'
review. Due to copyright laws, plaintiff cannot provide copies of these texts to defendants.
13 Plaintiff also identifies General Industry Safety Orders promulgated pursuant to California Labor
Code § 6400, et seq. and California Administrative Code under the California Department of
14 Industrial Relations, Division of Industrial Safety, including, but not limited to, Title VIII, Group
9 (Control of Hazardous Substances) Article 81, Section 4150, 4104-4108, and Threshold Limit
15 Values as documented for asbestos and other toxic substances under Appendix A, Table 1 of said
Safety Orders. Plaintiff also identifies NESHAP Asbestos Regulations (National Emission
16 Standards for Hazardous Air Pollutants) which are found at Code of Federal Regulations, Title
40, Chapter 1, Subchapter C, Part 61; Subpart M, published under the Federal Clean Air Act of
17 1970, 42 U.S.C.A. Section 7412(b)(1)(A) and 42 U.S.C.A. Section 74120(X)(B). Plaintiff also
identifies OSHA standards relating to asbestos, found at Code of Federal Regulations, Title 29,
18 Chapter 17, Section 1910, et seq.; and Title 8, Section 5208 of the California OSHA regulations
pertaining to asbestos exposure. After a reasonable and good-faith inquiry, plaintiff has no
19 further documentation responsive to this Request. Plaintiff's investigation and discovery are
continuing, and as such, plaintiff expressly reserves the right to amend this Response pending the
20 outcome of plaintiff's investigation.
       Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith effort
21 to obtain the information by inquiry to other natural persons or organizations, believes that he has
no further relevant and/or responsive information to disclose at this time other than what has
22 been stated herein Interrogatory Responses Nos. 1-55 inclusive, and in the course of his
depositions, prior discovery responses, documents and pleadings already served on defendants in
23 the instant action. Plaintiff reserves the right to supplement this Response, as investigation and
discovery are continuing.

24 RESPONSE TO INTERROGATORY NO. 35: Plaintiff objects to the Interrogatory on the
grounds that it is overbroad, vague, ambiguous, unduly burdensome, oppressive and harassing.
25 Plaintiff further objects on the grounds, and to the extent that this Interrogatory seeks information
equally available to, and already provided to, defendant in Standard Asbestos Case
26 Interrogatories and other employment documents served on Designated Defense Counsel
pursuant to General Order No. 41 and is therefore harassing, burdensome, oppressive and not
27 reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to
this Interrogatory to the extent it calls for information protected from disclosure by the attorney-
28 client privilege and/or the attorney work-product doctrine. Plaintiff further objects to this
Interrogatory to the extent it calls for expert witness information and writings, if any. Without

18

1  waiving said objections, plaintiff responds as follows:  Plaintiff was in the immediate proximity
2  of workers in this aforementioned oil field who mixing said MONTELLO, INC. asbestos product
3  into drilling mud and applying said mud. Plaintiff breathed in respirable asbestos fibers from
   said products. Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith
4  effort to obtain the information by inquiry to other natural persons or organizations, believes that
   he has no further relevant and/or responsive information to disclose at this time other than what
5  has been stated herein Interrogatory Responses Nos. 1-55 inclusive, and in the course of his
   depositions, prior discovery responses, documents and pleadings already served on defendants in
6  this instant action. Plaintiff reserves the right to supplement this Response, as investigation and
   discovery are continuing.
7  **RESPONSE TO INTERROGATORY NO. 36:** Plaintiff objects to this Interrogatory on the
   grounds that it is overbroad, vague, ambiguous, unduly burdensome, oppressive and harassing.
8  Plaintiff further objects on the grounds, and to the extent that this Interrogatory seeks information
   equally available to, and already provided to, defendant in Standard Asbestos Case
9  Interrogatories and other employment documents served on Designated Defense Counsel
   pursuant to General Order No. 41 and is therefore harassing, burdensome, oppressive and not
10 reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to
   this Interrogatory to the extent it calls for information protected from disclosure by the attorney-
11 client privilege and/or the attorney work-product doctrine. Plaintiff further objects to this
   Interrogatory to the extent it calls for expert witness information and writings, if any. Without
12 waiving said objections, plaintiff responds as follows: Plaintiff was in the immediate proximity
   of workers in the aforementioned oil field who mixing said MONTELLO, INC. asbestos product
13 into drilling mud and applying said mud. Plaintiff breathed in respirable asbestos fibers from
   said products. Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith
14 effort to obtain the information by inquiry to other natural persons or organizations, believes that
   he has no further relevant and/or responsive information to disclose at this time other than what
15 has been stated herein Interrogatory Responses Nos. 1-55 inclusive, and in the course of his
   depositions, prior discovery responses, documents and pleadings already served on defendants in
16 the instant action. Plaintiff reserves the right to supplement this Response, as investigation and
   discovery are continuing.
17 **RESPONSE TO INTERROGATORY NO. 37:** Plaintiff objects to this Interrogatory on the
   grounds that it is overbroad, vague, ambiguous, unduly burdensome, oppressive and harassing.
18 Plaintiff further objects on the grounds, and to the extent that this Interrogatory seeks information
   equally available to, and already provided to, defendant in Standard Asbestos Case
19 Interrogatories and other employment documents served on Designated Defense Counsel
   pursuant to General Order No. 41 and is therefore harassing, burdensome, oppressive and not
20 reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to
   this Interrogatory to the extent it calls for information protected from disclosure by the attorney-
21 client privilege and/or the attorney work-product doctrine. Plaintiff further objects to this
   Interrogatory to the extent it calls for expert witness information and writings, if any. Said
22 MONTELLO, INC. asbestos product was added to drilling mud. Pursuant to C.C.P. § 2030.220,
   plaintiff, after making a reasonable and good-faith effort to obtain the information by inquiry to
23 other natural persons or organizations, believes that he has no further relevant and/or responsive
   information to disclose at this time other than what has been stated herein Interrogatory
24 Responses Nos. 1-55 inclusive, and in the course of his depositions, prior discovery responses,
   documents and pleadings already served on defendants in the instant action. Plaintiff reserves
25 the right to supplement this Response, as investigation and discovery are continuing.
26 **RESPONSE TO INTERROGATORY NO. 38:** Plaintiff objects to this Interrogatory on the
   grounds that it is overbroad, vague, ambiguous, unduly burdensome, oppressive and harassing.
27 Plaintiff further objects on the grounds, and to the extent that this Interrogatory seeks information
   equally available to, and already provided to, defendant in Standard Asbestos Case
28 Interrogatories and other employment documents served on Designated Defense Counsel
   pursuant to General Order No. 41 and is therefore harassing, burdensome, oppressive and not

19

1    reasonably calculated to lead to the discovery of admissible evidence.  Plaintiff further objects to
2    this Interrogatory to the extent it calls for information protected from disclosure by the attorney-
     client privilege and/or the attorney work-product doctrine.  Plaintiff further objects to this
3    Interrogatory to the extent it calls for expert witness information and writings, if any.  Plaintiff
     refers to and incorporates by reference as though fully stated herein, his response to Interrogatory
4    13 above.  Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith
     effort to obtain the information by inquiry to other natural persons or organizations, believes that
5    he has no further relevant and/or responsive information to disclose at this time other than what
     has been stated herein Interrogatory Responses Nos. 1-55 inclusive, and in the course of his
6    depositions, prior discovery responses, documents and pleadings already served on defendants is
     the instant action.  Plaintiff reserves the right to supplement this Response, as investigation and
7    discovery are continuing.

8    **RESPONSE TO INTERROGATORY NO. 39:**  Plaintiff objects to this Interrogatory on the
     grounds that it is overbroad, vague, ambiguous, unduly burdensome, oppressive and harassing.
9    Plaintiff further objects on the grounds, and to the extent that this Interrogatory seeks information
     equally available to, and already provided to, defendant in Standard Asbestos Case
10   Interrogatories and other employment documents served on Designated Defense Counsel
     pursuant to General Order No. 41 and is therefore harassing, burdensome, oppressive and not
11   reasonably calculated to lead to the discovery of admissible evidence.  Plaintiff further objects to
     this Interrogatory to the extent it calls for information protected from disclosure by the attorney-
12   client privilege and/or the attorney work-product doctrine.  Plaintiff further objects to this
     Interrogatory to the extent it calls for expert witness information and writings, if any.  Plaintiff
13   does not presently recall or is unaware of the name and address of each supplier.  Pursuant to
     C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith effort to obtain the
14   information by inquiry to other natural persons or organizations, believes that he has no further
     relevant and/or responsive information to disclose at this time other than what has been stated
15   herein Interrogatory Responses Nos. 1-55 inclusive, and in the course of his depositions, prior
     discovery responses, documents and pleadings already served on defendants in the instant action.
16   Plaintiff reserves the right to supplement this Response, as investigation and discovery are
     continuing.

17   **RESPONSE TO INTERROGATORY NO. 40:**  Plaintiff objects to this question to the extent that
     is vague, ambiguous and overbroad in its use of undefined terms, by example, "sold".  Plaintiff
18   objects to this Interrogatory on the grounds, and to the extent, that it seeks the premature
     disclosure of expert witnesses and opinions in violation of C.C.P. § 2034.  Plaintiff objects to
19   this Interrogatory to the extent it calls for a legal conclusion.  Plaintiff objects to this
     Interrogatory on the grounds that it seeks information which is protected from disclosure by the
20   attorney work-product doctrine in violation of C.C.P. § 2018 and by the attorney-client privilege.
     Plaintiff objects to this Interrogatory to the extent it seeks information equally or more available
21   to the defendant, or already in the possession of defendant.  Subject to the foregoing objections,
     and without waiver thereof, as plaintiff understands the question, plaintiff responds as follows:
22   Yes.

23   **RESPONSE TO INTERROGATORY NO. 41:**  Plaintiff objects to this Interrogatory on the
     grounds that it is vague, ambiguous and overbroad.  Plaintiff further objects to this Interrogatory
24   to the extent it calls for information protected from disclosure by the attorney-client privilege
     and/or the attorney work-product doctrine.  Plaintiff further objects to this Interrogatory to the
25   extent it calls for expert witness information and writings, if any.  Subject to and without waiving
     said objection, plaintiff responds as follows:  Plaintiff was exposed to asbestos for which
26   MONTELLO, INC. is legally responsible, by way of asbestos drilling mud additive.  Pursuant to
     C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith effort to obtain the
27   information by inquiry to other natural persons or organizations, believes that he has no further
     relevant and/or responsive information to disclose at this time other than what has been stated
28   ///

1  herein Interrogatory Responses Nos. 1-55 inclusive, and in the course of his depositions, prior
2  discovery responses, documents and pleadings already served on defendants in the instant action.
   Plaintiff reserves the right to supplement this Response, as investigation and discovery are
3  continuing.

4  **RESPONSE TO INTERROGATORY NO. 42:**  Plaintiff objects to this Interrogatory on the
   grounds that it is vague, ambiguous and overbroad.  Plaintiff further objects to this Interrogatory
5  on the grounds that it seeks information protected from disclosure by the attorney-client privilege
   and work-product doctrine.  Plaintiff objects to this Interrogatory on the grounds that it calls for
6  legal conclusions.  Plaintiff further objects to this Interrogatory on the grounds that it calls for
   expert opinions and therefore prematurely seeks disclosure of information which is properly the
7  subject of expert witness testimony and/or reports in violation of C.C.P. § 2034.  Plaintiff further
   objects on the grounds, and to the extent that this Interrogatory seeks information equally
8  available to, and already provided to, defendant in Standard Asbestos Case Interrogatories and
   other employment documents served on Designated Defense Counsel pursuant to General Order
9  No. 41 and is therefore harassing, burdensome, oppressive and not reasonably calculated to lead
   to the discovery of admissible evidence.  Subject to and without waiving said objections, as
10 plaintiff understands the question, plaintiff responds as follows:
       Plaintiff ROBERT LYMAN was exposed to asbestos-containing products that were
11 manufactured, supplied, distributed and/or sold by MONTELLO, INC.  Plaintiff was exposed by
   working in close proximity to tradesmen handling and disturbing defendant's asbestos-containing
12 products and breathing the air and dust that had been generated by the handling and disturbance
   of these products as they mixed said products.  Defendant knew that asbestos-containing
13 products such as those supplied to plaintiff's employers or contractors at plaintiff's jobsites,
   would be handled, disturbed and manipulated by workers, resulting in the release of airborne
14 asbestos fibers, and that through such foreseeable use and/or handling, plaintiff would be
   exposed to such asbestos fibers.  As a manufacturer, supplier and/or distributor of asbestos-
15 containing products, defendant breached various duties for which it was obliged, including it's
   duty to warn consumers and those who would be exposed, of dangers inherent in said products.
16 As a proximate result of defendant's breaches of its duties, plaintiff sustained injury.
       Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith effort
17 to obtain the information by inquiry to other natural persons or organizations, believes that he has
   no further relevant and/or responsive information to disclose at this time other than what has
18 been stated herein Interrogatory Responses Nos. 1-55 inclusive, and in the course of his
   depositions, prior discovery responses, documents and pleadings already served on defendants in
19 the instant action.  Plaintiff reserves the right to supplement this Response, as investigation and
   discovery are continuing.

20 **RESPONSE TO INTERROGATORY NO. 43:**  Plaintiff objects to this Request on the grounds
   that it prematurely seeks information which is properly the subject of expert witness testimony
21 and/or reports in violation of C.C.P. § 2034.  Plaintiff further objects to this Request on the
   ground that it seeks documents protected from disclosure by the attorney work-product doctrine.
22 Plaintiff further objects to this Request on the grounds that it seeks documents equally or more
   available to defendants and that it seeks documents which are in the possession of defendants.
23 Without waiving the foregoing objections, plaintiff responds as follows:  Plaintiff currently
   identifies the following documents: The transcripts of plaintiff's deposition, and exhibits
24 attached thereto, taken in the instant action; and plaintiff's responses to Standard Asbestos Case
   Interrogatories, and all exhibits attached thereto.  Plaintiff also identifies his Social Security
25 records and medical records and billings, previously provided to coordinating defense counsel,
   Berry & Berry and equally available to defendants.
26     Further, plaintiff identifies the following documents which evidence the sales of
   "Calidria" asbestos to various manufacturing companies, the state of Union Carbide's knowledge
27 regarding the hazards of asbestos and the use of asbestos in the manufacturing of Bakelite
   phenolic resin:  The deposition transcript of Union Carbide's person most knowledgeable, John
28 Myers, taken on September 4, 1986, reported by Worldwide Court Reporters, 800-745-1101;

K:\lip...                    21

1  taken on July 23, 1999, reported by Aiken & Welch., One Kaiser Plaza, Suite 505, Oakland,
2  California 94612 (510) 451-1580; taken on May 22, 2002, reported by Worldwide Court
   Reporters, 800-745-1101; taken on February 6, 2003, reported by Hartsell & Olivieri, 831-423-
3  5911; taken on June 10 and 11, 2003, reported by Hartsell & Olivieri, 831-423-5911. The trial
   testimony of John Myers taken November 12, 2003 in Douglas Anderson v Adco Turner, et al.,
4  Los Angeles Superior Court, BC 237187. Plaintiff further identifies the documents produced
   from Union Carbide's New York repository during various document productions attended by
5  Brayton•Purcell LLP and other law firms. Plaintiff also identifies the documents produced
   under the In Re: Cumulex Asbestos Litigation notice dated September 21, 2001. Defendant is in
6  possession of all identified deposition transcripts of John Myers and all documents copied from
   the New York repository.
7       Plaintiff also identifies  the deposition transcripts and all exhibits attached thereto of the
   following PMK for defendant UNION CARBIDE: Carlo Martino taken on May 4, 2001, and all
8  subsequent days, in Richard Yeager and Shirley Yeager v. Union Carbide Corporation, San
   Francisco Superior Court Case No. 312965, reported by Cal North Reporting Service; Robert E.
9  Feele taken on September 10, 1981, and all subsequent days; and John Myers taken on January
   25, 1995, and all subsequent days, July 23, 1999, and all subsequent days, in Lois Harris v. Pfizt
10 Insulation Co., Alameda County Superior Court Case No. 791615-3, and on September 5, 1995,
   and all subsequent days, in Bobby R. Stanford v. Johns-Manville Sales Corp., in United States
11 District Court for the Southern District of Texas, Galveston Division, Civil Action No. G-82-
   325, reported by Worldwide Court Reporters, Houston, Texas.
12      Plaintiff further identifies UNION CARBIDE CHEMICALS AND PLASTICS
   COMPANY, Inc.'s Response to General Order #129 Interrogatories in In Re: Cumulex Asbestos
13 Litigation, San Francisco County Superior Court No. 828584, dated November 21, 1997; and
   defendant's Response to General Order #129 Interrogatories.
14      Plaintiff also identifies numerous articles and studies relating to the health hazards
   associated with exposure to asbestos which have appeared in medical and scientific literature
15 since the turn of the twentieth century and have also been summarized in various publications.
   Plaintiff identifies two texts that contain summaries and/or bibliographies of asbestos-related
16 disease.  They are:  Asbestos Medical and Legal Aspects, Barry I. Castleman, Prentice-Hall Law
   & Business, 1990; and Sourcebook on Asbestos Diseases: Medical, Legal & Engineering
17 Aspects, George A. Peters and Barbara J. Peters, Garland STPM Press, Vol. 1, 1970, Vol. 2,
   1986. Plaintiff is in possession of these texts and will make them available for defendants'
18 review.  Due to copyright laws, plaintiff cannot provide copies of these texts to defendants.
   Plaintiff also identifies General Industry Safety Orders promulgated pursuant to California Labor
19 Code § 6400, et seq. and California Administrative Code under the California Department of
   Industrial Relations, Division of Industrial Safety, including, but not limited to, Title VIII, Group
20 9 (Control of Hazardous Substances) Article 81, Section 4150, 4104-4108, and Threshold Limit
   Values as documented for asbestos and other toxic substances under
21 Appendix A, Table I of said Safety Orders. Plaintiff also identifies NESHAP Asbestos
   Regulations (National Emission Standards for Hazardous Air Pollutants) which are found at
22 Code of Federal Regulations, Title 40, Chapter 1, Subchapter C, Part 61, Subpart M, published
   under the Federal Clean Air Act of 1970, 42 U.S.C.A. Section 7412(b)(1)(A) and 42 U.S.C.A.
23 Section 7412(b)(1)(B). Plaintiff also identifies OSHA standards relating to asbestos, found at
   Code of Federal Regulations, Title 29, Chapter 17, Section 1910, et seq.; and Title 8, Section
24 5208 of the California OSHA regulations pertaining to asbestos exposure. After a reasonable and
   good-faith inquiry, plaintiff has no further documentation responsive to this Request. Plaintiff's
25 investigation and discovery are continuing, and as such, plaintiff expressly reserves the right to
   amend this Response pending the outcome of plaintiff's investigation.
26      Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith effort
   to obtain the information by inquiry to other natural persons or organizations, believes that he has
27 no further relevant and/or responsive information to disclose at this time other than what has
   been stated herein Interrogatory Responses Nos. 1-83 inclusive, and in the course of his
28 depositions, prior discovery responses, documents and pleadings already served on defendants in
   the instant action. Plaintiff reserves the right to supplement this Response, as investigation and
   discovery are continuing.

                                            23

1  **RESPONSE TO INTERROGATORY NO. 44:** Plaintiff objects to this interrogatory on the
2  grounds that it is vague, ambiguous and overbroad. Plaintiff further objects to this interrogatory
   to the extent it calls for information protected from disclosure by the attorney-client privilege
3  and/or the attorney work-product doctrine. Plaintiff further objects to this interrogatory to the
   extent it calls for expert witness information and writings, if any. Subject to and without waiving
4  said objection, plaintiff responds as follows: Plaintiff was refers to and incorporates by reference
   as though fully stated herein, his response to Interrogatory 13 above. Pursuant to C.C.P.
5  § 2030.220, plaintiff, after making a reasonable and good-faith effort to obtain the information by
   inquiry to other natural persons or organizations, believes that he has no further relevant and/or
6  responsive information to disclose at this time other than what has been stated herein
   Interrogatory Responses Nos. 1-55 inclusive, and in the course of his depositions, prior discovery
7  responses, documents and pleadings already served on defendants in the instant action. Plaintiff
   reserves the right to supplement this Response, as investigation and discovery are continuing.

8  **RESPONSE TO INTERROGATORY NO. 45:** Plaintiff objects to this interrogatory on the
   grounds that it is overbroad, vague, ambiguous, unduly burdensome, oppressive and harassing.
9  Plaintiff further objects on the grounds, and to the extent that this interrogatory seeks information
   equally available to, and already provided to, defendant in Standard Asbestos Case
10 Interrogatories and other employment documents served on Designated Defense Counsel
   pursuant to General Order No. 41 and is therefore harassing, burdensome, oppressive and not
11 reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to
   this Interrogatory to the extent it calls for information protected from disclosure by the attorney-
12 client privilege and/or the attorney work-product doctrine. Plaintiff further objects to this
   Interrogatory to the extent it calls for expert witness information and writings, if any. Without
13 waiving said objections, plaintiff responds as follows: Plaintiff was in the immediate proximity
   of workers in the aforementioned oil field who mixing said MONTELLO, INC. asbestos product
14 into drilling mud and applying said mud. Plaintiff breathed in respirable asbestos fibers from
   said products. Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith
15 effort to obtain the information by inquiry to other natural persons or organizations, believes that
   he has no further relevant and/or responsive information to disclose at this time other than what
16 has been stated herein Interrogatory Responses Nos. 1-55 inclusive, and in the course of his
   depositions, prior discovery responses, documents and pleadings already served on defendants in
17 the instant action. Plaintiff reserves the right to supplement this Response, as investigation and
   discovery are continuing.

18

19 **RESPONSE TO INTERROGATORY NO. 46:** Plaintiff objects to this interrogatory on the
   grounds that it is overbroad, vague, ambiguous, unduly burdensome, oppressive and harassing.
20 Plaintiff further objects on the grounds, and to the extent that this interrogatory seeks information
   equally available to, and already provided to, defendant in Standard Asbestos Case
21 Interrogatories and other employment documents served on Designated Defense Counsel
   pursuant to General Order No. 41 and is therefore harassing, burdensome, oppressive and not
22 reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to
   this Interrogatory to the extent it calls for information protected from disclosure by the attorney-
23 client privilege and/or the attorney work-product doctrine. Plaintiff further objects to this
   Interrogatory to the extent it calls for expert witness information and writings, if any. Without
24 waiving said objections, plaintiff responds as follows: Plaintiff was in the immediate proximity
   of workers in the aforementioned oil field who mixing said MONTELLO, INC. asbestos product
25 into drilling mud and applying said mud. Plaintiff breathed in respirable asbestos fibers from
   said products. Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith
26 effort to obtain the information by inquiry to other natural persons or organizations, believes that
   has been stated herein Interrogatory Responses Nos. 1-55 inclusive, and in the course of his
27 depositions, prior discovery responses, documents and pleadings already served on defendants in
   the instant action. Plaintiff reserves the right to supplement this Response, as investigation and
28 discovery are continuing.

23

1  **RESPONSE TO INTERROGATORY NO. 47:**  Plaintiff objects to this Interrogatory on the
2  grounds that it is overbroad, vague, ambiguous, unduly burdensome, oppressive and harassing.
   Plaintiff further objects on the grounds, and to the extent that this Interrogatory seeks information
3  equally available to, and already provided to, defendant in Standard Asbestos Case
   Interrogatories and other employment documents served on Designated Defense Counsel
4  pursuant to General Order No. 41 and is therefore harassing, burdensome, oppressive and not
   reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to
5  this Interrogatory to the extent it calls for information protected from disclosure by the attorney-
   client privilege and/or the attorney work-product doctrine. Plaintiff further objects to this
6  Interrogatory to the extent it calls for expert witness information and writings, if any. Said
   MONTELLO, INC. asbestos product was added to drilling mud. Pursuant to C.C.P. § 2030.220,
7  plaintiff, after making a reasonable and good-faith effort to obtain the information by inquiry to
   other natural persons or organizations, believes that he has no further relevant and/or responsive
8  information to disclose at this time other than what has been stated herein Interrogatory
   Responses Nos. 1-55 inclusive, and in the course of his depositions, prior discovery responses,
9  documents and pleadings already served on defendants in the instant action. Plaintiff reserved
   the right to supplement this Response, as investigation and discovery are continuing.

10  **RESPONSE TO INTERROGATORY NO. 48:**  Plaintiff objects to this Interrogatory on the
    grounds that it is overbroad, vague, ambiguous, unduly burdensome, oppressive and harassing.
11  Plaintiff further objects on the grounds, and to the extent that this Interrogatory seeks information
    equally available to, and already provided to, defendant in Standard Asbestos Case
12  Interrogatories and other employment documents served on Designated Defense Counsel
    pursuant to General Order No. 41 and is therefore harassing, burdensome, oppressive and not
13  reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to
    this Interrogatory to the extent it calls for information protected from disclosure by the attorney-
14  client privilege and/or the attorney work-product doctrine. Plaintiff further objects to this
    Interrogatory to the extent it calls for expert witness information and writings, if any. Plaintiff
15  refers to and incorporates by reference as though fully stated herein, his response to Interrogatory
    13 above. Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith
16  effort to obtain the information by inquiry to other natural persons or organizations, believes that
    he has no further relevant and/or responsive information to disclose at this time other than what
17  has been stated herein Interrogatory Responses Nos. 1-55 inclusive, and in the course of his
    depositions, prior discovery responses, documents and pleadings already served on defendants in
18  the instant action. Plaintiff reserves the right to supplement this Response, as investigation and
    discovery are continuing.
19
20  **RESPONSE TO INTERROGATORY NO. 49:**  Plaintiff objects to this Interrogatory on the
    grounds that it is overbroad, vague, ambiguous, unduly burdensome, oppressive and harassing.
21  Plaintiff further objects on the grounds, and to the extent that this Interrogatory seeks information
    equally available to, and already provided to, defendant in Standard Asbestos Case
22  Interrogatories and other employment documents served on Designated Defense Counsel
    pursuant to General Order No. 41 and is therefore harassing, burdensome, oppressive and not
23  reasonably calculated to lead to the discovery of admissible evidence.  Plaintiff further objects to
    this Interrogatory to the extent it calls for information protected from disclosure by the attorney-
24  client privilege and/or the attorney work-product doctrine.  Plaintiff further objects to this
    Interrogatory to the extent it calls for expert witness information and writings, if any. Aside from
25  the instant action for which defendant already has deposition information, plaintiff had his
    deposition taken in conjunction with a worker's compensation claim for a back injury,
26  approximately 15 years ago. Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable
    and good-faith effort to obtain the information by inquiry to other natural persons or
27  organizations, believes that he has no further relevant and/or responsive information to disclose
    at this time other than what has been stated herein Interrogatory Responses Nos. 1-55 inclusive,
28  and in the course of his depositions, prior discovery responses, documents and pleadings already
    served on defendants in the instant action.  Plaintiff reserves the right to supplement this
    Response, as investigation and discovery are continuing.

1  **RESPONSE TO INTERROGATORY NO. 50:** Plaintiff objects to this Interrogatory on the
2  grounds that it is overbroad, vague, ambiguous, unduly burdensome, oppressive and harassing.
   Plaintiff further objects on the grounds, and to the extent that this Interrogatory seeks information
3  equally available to, and already provided to, defendant in Standard Asbestos Case
   Interrogatories and other employment documents served on Designated Defense Counsel
4  pursuant to General Order No. 41 and is therefore harassing, burdensome, oppressive and not
   reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to
5  this Interrogatory to the extent it calls for information protected from disclosure by the attorney-
   client privilege and/or the attorney work-product doctrine. Plaintiff further objects to this
6  Interrogatory to the extent it calls for expert witness information and writings, if any. Plaintiff
   refers to and incorporates by reference as though fully stated herein, his response to Interrogatory
7  18 above. Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith
   effort to obtain the information by inquiry to other natural persons or organizations, believes that
8  he has no further relevant and/or responsive information to disclose at this time other than what
   has been stated herein Interrogatory Responses Nos. 1-33 inclusive, and in the course of his
9  depositions, prior discovery responses, documents and pleadings already served on defendants in
   the instant action. Plaintiff reserves the right to supplement this Response, as investigation and
10 discovery are continuing.

11 **RESPONSE TO INTERROGATORY NO. 51:** Plaintiff objects to this Interrogatory on the
   grounds that it is overbroad, vague, ambiguous, unduly burdensome, oppressive and harassing.
12 Plaintiff further objects on the grounds, and to the extent that this Interrogatory seeks information
   equally available to, and already provided to, defendant in Standard Asbestos Case
13 Interrogatories and other employment documents served on Designated Defense Counsel
   pursuant to General Order No. 41 and is therefore harassing, burdensome, oppressive and not
14 reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to
   this Interrogatory to the extent it calls for information protected from disclosure by the attorney-
15 client privilege and/or the attorney work-product doctrine. Plaintiff further objects to this
   Interrogatory to the extent it calls for expert witness information and writings, if any. Plaintiff
16 identifies the Declaration of Guy Fonzar, M.D. in Support of Plaintiff's Motion for Preference in
   the instant action, dated March 6, 2007. Plaintiff further refers to and incorporates by reference
17 as though fully stated herein, his response to Interrogatory 18 above. Pursuant to C.C.P.
   § 2030.220, plaintiff, after making a reasonable and good-faith effort to obtain the information by
18 inquiry to other natural persons or organizations, believes that he has no further relevant and/or
   responsive information to disclose at this time other than what has been stated herein
19 Interrogatory Responses Nos. 1-33 inclusive, and in the course of his depositions, prior discovery
   responses, documents and pleadings already served on defendants in the instant action. Plaintiff
20 reserves the right to supplement this Response, as investigation and discovery are continuing.

21 **RESPONSE TO INTERROGATORY NO. 52:** Plaintiff objects to this Interrogatory on the
   grounds that it is overbroad, vague, ambiguous, unduly burdensome, oppressive and harassing.
22 Plaintiff further objects to this Interrogatory to the extent it calls for information protected from
   disclosure by the attorney-client privilege and/or the attorney work-product doctrine. Plaintiff
23 further objects to this Interrogatory to the extent it calls for expert witness information and
   writings, if any. Without waiving said objections, plaintiff responds as follows: Defendant's
24 products in questions we designed in such a way as to expose consumers to a known carcinogen
   which caused/causes injury to plaintiff and other consumers. Therefore, defendant violated the
25 implied warranties of merchantability and fitness for a particular purpose, by falsely representing
   that said products and equipment were safe said intended uses. See Dorman v. International
26 Harvester Co. 46 Cal.App.3d 11, 130 Cal.Rptr.516 (Cal.App.1975). Pursuant to C.C.P.
   § 2030.220, plaintiff, after making a reasonable and good-faith effort to obtain the information by
27 inquiry to other natural persons or organizations, believes that he has no further relevant and/or
   responsive information to disclose at this time other than what has been stated herein
28 Interrogatory Responses Nos. 1-33 inclusive, and in the course of his depositions, prior discovery
   responses, documents and pleadings already served on defendants in the instant action. Plaintiff
   reserves the right to supplement this Response, as investigation and discovery are continuing.

25

1  **RESPONSE TO INTERROGATORY NO. 53:** Plaintiff objects to this Interrogatory on the
2  grounds that it is overbroad, vague, ambiguous, unduly burdensome, oppressive and harassing.
   Plaintiff further objects on the grounds, and to the extent that this interrogatory seeks information
   equally available to, and already provided to, defendant in Standard Asbestos Case
3  Interrogatories and other employment documents served on Designated Defense Counsel
   pursuant to General Order No. 41 and is therefore harassing, burdensome, oppressive and not
4  reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to
   this Interrogatory to the extent it calls for information protected from disclosure by the attorney-
5  client privilege and/or the attorney work-product doctrine. Plaintiff further objects to this
   Interrogatory to the extent it calls for expert witness information and writings, if any. Plaintiff
6  refers to and incorporates by reference as though fully stated herein, his response to Interrogatory
   18 above. Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable and good-faith
7  effort to obtain the information by inquiry to other natural persons or organizations, believes that
   he has no further relevant and/or responsive information to disclose at this time other than what
8  has been stated herein Interrogatory Responses Nos. 1-55 inclusive, and in the course of his
   depositions, prior discovery responses, documents and pleadings already served on defendants in
9  the instant action. Plaintiff reserves the right to supplement this Response, as investigation and
   discovery are continuing.
10
11 **RESPONSE TO INTERROGATORY NO. 54:** Plaintiff objects to this Interrogatory on the
   grounds that it is overbroad, vague, ambiguous, unduly burdensome, oppressive and harassing.
12 Plaintiff further objects to this Interrogatory to the extent it calls for information protected from
   disclosure by the attorney-client privilege and/or the attorney work-product doctrine. Plaintiff
13 further objects to this Interrogatory to the extent it calls for expert witness information and
   writings, if any. Without waiving said objections, plaintiff responds as follows: Plaintiff refers
14 to and incorporates by reference as though fully stated herein his Response to Interrogatory 18,
   above. Plaintiff further refers to employees, officers, and agents of MONTELLO, INC. whose
15 names and or identities are currently unknown to date. Pursuant to C.C.P. § 2030.220, plaintiff,
   after making a reasonable and good-faith effort to obtain the information by inquiry to other
16 natural persons or organizations, believes that he has no further relevant and/or responsive
   information to disclose at this time other than what has been stated herein Interrogatory
17 Responses Nos. 1-35 inclusive, and in the course of his depositions, prior discovery responses,
   documents and pleadings already served on defendants in the instant action. Plaintiff reserves
18 the right to supplement this Response, as investigation and discovery are continuing.

19 **RESPONSE TO INTERROGATORY NO. 55:** Plaintiff objects to this Interrogatory on the
   grounds that it is overbroad, vague, ambiguous, unduly burdensome, oppressive and harassing.
20 Plaintiff further objects on the grounds, and to the extent that this interrogatory seeks information
   equally available to, and already provided to, defendant in Standard Asbestos Case
21 Interrogatories and other employment documents served on Designated Defense Counsel
   pursuant to General Order No. 41 and is therefore harassing, burdensome, oppressive and not
22 reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to
   this Interrogatory to the extent it calls for information protected from disclosure by the attorney-
23 client privilege and/or the attorney work-product doctrine. Plaintiff further objects to this
   Interrogatory to the extent it calls for expert witness information and writings, if any. Plaintiff
24 refers to and incorporates by reference as though fully stated herein, his response to
   Interrogatories 1-54 above. Pursuant to C.C.P. § 2030.220, plaintiff, after making a reasonable
25 and good-faith effort to obtain the information by inquiry to other natural persons or
   organizations, believes that he has no further relevant and/or responsive information to disclose

26 ///

27 ///

28 ///

1   at this time other than what has been stated herein Interrogatory Responses Nos. 1-55 inclusive,
2   and in the course of his depositions, prior discovery responses, documents and pleadings already
    served on defendants in the instant action. Plaintiff reserves the right to supplement this
    Response, as investigation and discovery are continuing.

3   Dated:   6/1/07                      BRAYTON⬥PURCELL LLP

4

5                                        By:
6                                            Sarah Kramer Isaacs
7                                            Attorneys for Plaintiff

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

K:\Injured\107027\img-rtp-sanofib.wpd                    27                              ski

**VERIFICATION**

Robert F. Lyman and Samantha Lyman
San Francisco Superior Court Case No. 459162

I, Robert F. Lyman, declare:

I am the plaintiff in the above-entitled action. The foregoing Plaintiff's Response to Defendant Montello, Inc.'s Special Interrogatories to Plaintiff, Set One, propounded by Montello, Inc., are true of my knowledge, except as to those matters which are therein stated on my information and belief and, as to those matters, I believe them true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated:

Signed:

6/9/07

Please do not write below this line. If you have any changes, please submit them on a separate sheet of paper. Thank you.

## PROOF OF SERVICE BY MAIL

1

2     I am employed in the County of Sonoma, State of California.  I am over the age of 18
years and am not a party to the within action.  My business address is 1009 Clegg Court,
3     Suite G, Petaluma, California 94954.

4     On _____ JUN 1 2 2007 _____, I served the within:

5     VERIFICATION(S) for Plaintiff's Response to Defendant Montello, Inc.'s Special
Interrogatories to Plaintiff, Set One propounded by Montello, Inc. on the interested
6     parties in this action by transmitting a true copy thereof in the following manner.

7     I placed in a sealed envelope, postage thereon prepaid, addressed and served as follows:

8     Dillingham & Murphy
225 Bush Street, 6th Floor
9     San Francisco, CA 94104
Attorneys for Montello, Inc.

10

11     BY MAIL SERVICE:            I am readily familiar with the business practice at
my place of business for collection and processing
12                                 of correspondence for delivery by mail.
Correspondence so collected and processed is
13                                 deposited with the United States Postal Service on
the same day in the ordinary course of business.
14                                 On the above date the said envelope was collected
for the United States Postal Service following
15                                 ordinary business practices.

16     Executed on ____ JUN 1 2 2007 _____, at Petaluma, California.

17     I declare under penalty of perjury under the laws of the State of California that
18     the foregoing is true and correct.

19

20                                 _____
John Allen

21

22

23

24

25     Robert F. Lyman and Samantha Lyman
San Francisco Superior Court Case No. 459162
26

27

28     PROOF OF SERVICE BY MAIL

# EXHIBIT G

1    John R. Brydon [Bar No. 083365]
2    Thomas J. Moses [Bar No. 116002]
     Erin M. Carpenter [Bar No. 248337]
3    BRYDON HUGO & PARKER
     135 Main Street, 20th Floor
4    San Francisco, CA 94105
     Telephone: (415) 808-0300
5    Facsimile: (415) 808-0333

6    Attorney for Defendant
     UNION CARBIDE CORPORATION

7

8            SUPERIOR COURT - STATE OF CALIFORNIA

9       COUNTY OF SAN FRANCISCO – UNLIMITED JURISDICTION

| | |
|---|---|
| 10   ROBERT F. LYMAN and SAMANTHA LYMAN, | (ASBESTOS) <br> Case No. 459162 |
| 11 | |
| 12           Plaintiff(s), <br>     vs. | NOTICE OF DEFENDANT UNION CARBIDE CORPORATION'S MOTION AND MOTION FOR SUMMARY |
| 13   ASBESTOS DEFENDANTS (B✦P), et al. | JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION |
| 14 | |
| 15 | [Filed concurrently with Supporting Memorandum of Points and Authorities; Separate Statement of Undisputed Material |
| 16 | Facts; Declaration of Thomas J. Moses] |
| 17 | Date:     July 27, 2007 <br> Time:     9:30 A.M. |
| 18 | Dept.:     302 <br> Judge:    Hon. Patrick J. Mahoney |
| 19 | |
| 20 | Trial Date:   July 30, 2007 |

21

22   TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:

23       PLEASE TAKE NOTICE that on July 27, 2007[1], at 9:30 a.m., or as soon thereafter as

24   the matter may be heard in Department 302 or such other department as may be assigned

25   of the above-named Court, located at 400 McAllister St., San Francisco, California 94102,

26

27   _____
     [1] Per stipulation of the parties, Defendant Union Carbide Corporation is allowed to serve and file this motion

28   for summary judgment/adjudication on July 5, 2007, with this hearing date.

                         1

NOTICE OF DEFENDANT UNION CARBIDE CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1  Defendant UNION CARBIDE CORPORATION (hereinafter, "Defendant" or "Union

2  Carbide"), will and hereby does move the Court, pursuant to Code of Civil Procedure

3  section 437c(a), for an order granting summary judgment, including costs of suit, in favor

4  of Defendant and against ROBERT F. LYMAN and SAMANTHA LYMAN (hereinafter,

5  "Plaintiffs").

6      In the alternative, if for any reason summary judgment cannot be granted,

7  Defendant will and hereby does move the Court pursuant to Code of Civil Procedure

8  section 437c(f) for an order adjudicating that the following causes of action and claims for

9  damages contained in Plaintiffs' Complaint have no merit:

10     Adjudication Issue No. 1:  Plaintiffs' First Cause of Action for Negligence has no

11  merit, because there is no evidence that Union Carbide caused Mr. Lyman's asbestos-

12  related injuries, or that Mr. Lyman was exposed to any products manufactured, supplied,

13  or distributed by Union Carbide that contained asbestos.

14     Adjudication Issue No. 2:  Plaintiffs' Second Cause of Action for Strict Products

15  Liability has no merit, because there is no evidence that Union Carbide caused Mr.

16  Lyman's asbestos-related injuries, or that Mr. Lyman was exposed to any products

17  manufactured, supplied, or distributed by Union Carbide that contained asbestos.

18     Adjudication Issue No. 3:  Plaintiffs' Third Cause of Action for False Representation

19  has no merit, because there is no evidence that Union Carbide caused Mr. Lyman's

20  asbestos-related injuries, or that Mr. Lyman was exposed to any products manufactured,

21  supplied, or distributed by Union Carbide that contained asbestos, additionally, there is no

22  evidence that Union Carbide made any representations to Mr. Lyman, or owed Mr.

23  Lyman any duty to affirmatively disclose information, or that there is no proof that Mr.

24  Lyman was a consumer of a product for which Union Carbide is liable.

25     Adjudication Issue No. 4:  Plaintiffs' Fourth Cause of Action for Loss of Consortium

26  has no merit, because there is no evidence that Union Carbide caused Mr. Lyman's

27  asbestos-related injuries, or that Mr. Lyman was exposed to any products manufactured,

28                                    2

NOTICE OF DEFENDANT UNION CARBIDE CORPORATION'S MOTION FOR SUMMARY
JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1   supplied, or distributed by Union Carbide that contained asbestos, and because the

2   underlying causes of action from which it derives have no merit.

3       Adjudication Issue No. 5:  Plaintiffs' Claim for Punitive Damages has no merit,

4   because there is no evidence that Union Carbide caused Mr. Lyman's asbestos-related

5   injuries or that Mr. Lyman was exposed to any products manufactured, supplied, or

6   distributed by Union Carbide that contained asbestos or to any asbestos supplied by Union

7   Carbide placed into products manufactured by others, or that there is any "clear and

8   convincing evidence" that any of the conduct at issue concerning Union Carbide herein

9   constitutes "malice," "oppression," or "fraud," or "despicable conduct," which is necessary

10  to support such a claim.

11      This motion is made on the grounds that the material facts supporting entry of

12  judgment herein are without dispute and that, based upon the undisputed material facts,

13  Defendant is entitled to summary judgment or, in the alternative, summary adjudication,

14  as a matter of law.

15      This motion is based upon this Notice of Motion and Motion; the attached

16  Memorandum of Points and Authorities; the Separate Statement of Undisputed Facts, the

17  Declaration of Thomas J. Moses and the Declaration of John Edward Walsh filed

18  concurrently herewith; the pleadings and other records on file in this action; and upon such

19  other documentary and oral evidence or argument as may be presented at or before the

20  hearing of this matter.

21  DATED: July 5, 2007                    BRYDON HUGO & PARKER

22

23                                  By: _____
                                        John R. Brydon
24                                      Thomas J. Moses
                                        Erin M. Carpenter
25                                      Attorneys for Defendant
                                        UNION CARBIDE CORPORATION
26

27                                      1102-0231

28                                      3

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

*Lyman, Robert F. & Samantha vs. Asbestos Defendants (B°P), et al.*
San Francisco County Superior Court Case No. CGC-06-459162
LexisNexis Transaction No. 15465916

PROOF OF SERVICE

I am a resident of the State of California, over the age of 18 years, and not a party to the within action. My electronic notification address is service@bhiplaw.com and my business address is 135 Main Street, 20ᵗʰ Floor, San Francisco, California 94105. On the date below, I served the following:

NOTICE OF DEFENDANT UNION CARBIDE CORPORATION'S MOTION AND MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

on the following:

David R. Donadio                          AND SEE LEXIS NEXIS SERVICE LIST
Brayton Purcell
222 Rush Landing Road
Novato, CA 94945

X          By transmitting electronically the document(s) listed above as set forth on the electronic service list on this date before 5:00 p.m.

I declare under penalty of perjury that the above is true and correct. Executed on July 5, 2007, at San Francisco, California.

*Wanda D. Claudio*
Wanda D. Claudio

1

PROOF OF SERVICE

1  John R. Brydon [Bar No. 083365]
   Thomas J. Moses [Bar No. 116002]
2  Erin M. Carpenter [Bar No. 248337]
   BRYDON HUGO & PARKER
3  135 Main Street, 20th Floor
   San Francisco, CA 94105
4  Telephone: (415) 808-0300
   Facsimile: (415) 808-0333
5
   Attorney for Defendant
6  UNION CARBIDE CORPORATION

7

8              SUPERIOR COURT - STATE OF CALIFORNIA

9          COUNTY OF SAN FRANCISCO – UNLIMITED JURISDICTION

10 ROBERT F. LYMAN and SAMANTHA          (ASBESTOS)
   LYMAN,                                Case No. 459162
11
            Plaintiff(s),               MEMORANDUM OF POINTS AND
12                                       AUTHORITIES IN SUPPORT OF
         vs.                             DEFENDANT UNION CARBIDE
13                                       CORPORATION'S MOTION FOR
   ASBESTOS DEFENDANTS (B✦P), et al.     SUMMARY JUDGMENT, OR, IN THE
14                                       ALTERNATIVE, SUMMARY
                                         ADJUDICATION
15
                                        [Filed concurrently with Supporting Notice
16                                       and Motion for Summary Judgment;
                                         Separate Statement of Undisputed Material
17                                       Facts; Declaration of Thomas J. Moses]

18                                      Date:     July 27, 2007
                                        Time:     9:30 A.M.
19                                      Dept.:    302
                                        Judge:    Hon. Patrick J. Mahoney
20

21                                      Trial Date:   July 30, 2007

22

23

24

25

26

27

28

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

TABLE OF CONTENTS

I.    STATEMENT OF FACTS AND SUMMARY OF ARGUMENTS...........................1

II.   SUMMARY JUDGMENT AND ADJUDICATION STANDARDS ....................1

III.  PLAINTIFFS' CAUSES OF ACTION FOR NEGLIGENCE, STRICT LIABILITY
      AND LOSS OF CONSORTIUM FAIL AS A MATTER OF LAW ......................2

      A.    Plaintiffs' Complaint, Discovery Responses and Deposition Testimony
            Do Not Identify Any Union Carbide Product ...........................................2

      B.    Plaintiffs' Responses to Union Carbide's Written Discovery Fail to
            Establish Exposure To An Asbestos-Containing Product For Which
            Union Carbide Is Liable.............................................................................3

            1    *Plaintiffs Cannot Prove That Mr. Lyman Was Exposed to Asbestos-
                 Containing Drilling Mud For Which Union Carbide Would Be
                 Responsible*...................................................................................3

            2.   *Plaintiffs Cannot Prove That Mr. Lyman Was Exposed to Asbestos-
                 Containing Phenolic Resins or "Bakelite" For Which Union Carbide
                 Would Be Responsible*.....................................................................7

            3.   *Plaintiffs Cannot Prove That Mr. Lyman Was Exposed to Asbestos-
                 Containing Products From USG For Which Union Carbide Would Be
                 Responsible*...................................................................................10

                 a)   *Plaintiffs Cannot Prove That Mr. Lyman Was Exposed to Asbestos-
                      Containing Products From USG For Which Union Carbide Would Be
                      Responsible*............................................................................10

                 b)   Plaintiffs Cannot Establish Robert Lyman's Exposure to Asbestos
                      Supplied by Union Carbide in any Asbestos-Containing Product
                      Manufactured By United States
                      Gypsum.................................................................................11

                 c)   *As a Bulk Supplier of Raw Asbestos, Union Carbide Had to Rely on
                      Sophisticated Manufacturers Which Bought and Used "Calidria" Raw
                      Asbestos in Their Products to Warn End Users of Those Products*..12

      C.    Plaintiffs' Third Cause Of Action For False Representation Fails As A
            Matter Of Law...........................................................................................15

      D.    Plaintiffs Have No "Clear And Convincing" Evidence Of Conduct
            Sufficient To Support Their Claim For Punitive Damages. ......................17

IV.   CONCLUSION ...........................................................................................19

i

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT UNION CARBIDE
CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY
ADJUDICATION

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*Artiglio v. General Electric Co.*
4  (1998) 61 Cal.App.4th 830 .................................................................................12, 13

5  *Bell v. Sharp Cabrillo Hospital*
  (1989) 212 Cal.App.3d 1034.......................................................................................18

6  *Blackwell v. Phelps Dodge Corp.*
7  (1984) 157 Cal.App.3d 372.........................................................................................14

8  *Cadlo v. Owens-Corning, Inc.*
  (2004) 125 Cal.App.4th 513 .......................................................................................15

9  *Calatayud v. State of California*
10  (1998) 18 Cal.4th 1057 ...............................................................................................12

11  *Chaknova v. Wilbur-Ellis Co.*
  (1999) 69 Cal.App.4th 962..........................................................................................3

12  *College Hospital, Inc. v. Superior Court*
13  (1994) 8 Cal.4th 704 ...................................................................................................17

14  *Dumin v. Owens-Corning Fiberglas Corp*
  (1994) 28 Cal.App.4th 650 .........................................................................................6

15  *Flyer's Body Shop Profit Sharing Plan v. Ticor Title Insurance Co.*
16  (1986) 185 Cal.App.3d 1149.......................................................................................18

17  *Garcia v. Joseph Vince Co.*
  (1978) 84 Cal.App.3d 868 ...........................................................................................6

18  *Grieve v. Superior Court*
19  (1984) 157 Cal.App.3d 159.........................................................................................18

20  *Groll v. Shell Oil Co.*
  (1983) 148 Cal.App.3d 444 ...................................................................................12, 14

21  *Hauter v. Zogarts*
22  (1975) 14 Cal.3d 104, 111 ...........................................................................................15

23  *Hunter v. Pacific Mechanical Corp.*
  (1995) 37 Cal.App.4th 1282........................................................................................3

24  *In re Marriage of Weaver*
25  (1990) 224 Cal.App.3d 478..........................................................................................17

26  *La Jolla Village Homeowner's Assoc. Inc. v. Superior Court*
  (1989) 212 Cal.App.3d 1131.......................................................................................16

27

28                                                                ii

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

*Lineaweaver v. Plant Insulation Co.*
    (1995) 31 Cal.App.4th 1409 .................................................. 1

*Lovejoy v. AT&T Corp.*
    (2001) 92 Cal.App.4th 85 .................................................. 16

*Marketing West, Inc. v. Sanyo Fisher (USA) Corp.*
    (1992) 6 Cal.App.4th 603 .................................................. 16

McGonnell v. Kaiser Gypsum Co.
    (2002) 98 Cal.App.4th 1098 .................................................. 15

*Mock v. Michigan Millers Mutual Ins. Co.*
    (1992) 4 Cal.App.4th 306 .................................................. 17

*People v. Martin*
    (1970) 2 Cal.3d 822 .................................................. 17

*Persons v. Salomon North America, Inc.*
    (1990) 217 Cal.App.3d 168 .................................................. 12, 14

*Ramo v. Ford Motor Corporation*
    (1999) 99 Cal.App.4th 1115 .................................................. 18

*Scannell v. County of Riverside*
    (1984) 152 Cal.App.3d 596 .................................................. 18

*Shin v. Kong*
    (2000) 80 Cal.App.4th 498 .................................................. 16

*Union Bank v. Superior Court*
    (1995) 31 Cal.App.4th 573 .................................................. 3

*Walker v. Stauffer*
    (1971) 19 Cal.App.3d 669 .................................................. 13, 14

*Wilkins v. NBC, Inc.*
    (1999) 71 Cal.App.4th 1066 .................................................. 16

**Statutes**
Civ. Code § 3294(c)(1) .................................................. 16

Civ. Code § 3294(c)(2) .................................................. 17

Civ. Code, § 3294(c)(3) .................................................. 17

Code Civ. Proc., § 437c(c) .................................................. 1

Code Civ. Proc., § 437c(f)(1) .................................................. 1

**Other Authorities**
Restatement of Torts section 402-B .................................................. 15

iii

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT UNION CARBIDE CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

I.     <u>STATEMENT OF FACTS AND SUMMARY OF ARGUMENTS.</u>

In this asbestos personal injury case, Plaintiffs ROBERT F. LYMAN and SAMANTHA LYMAN, ("Plaintiffs") claim that ROBERT F. LYMAN was injured from exposure to asbestos from an asbestos-containing product manufactured by, or containing asbestos supplied by, Defendant Union Carbide Corporation ("Union Carbide"). Plaintiffs assert four causes of action against various Defendants, including Union Carbide, for negligence, strict liability, false representation, loss of consortium, and also assert a claim for compensatory and punitive damages.

Plaintiffs' claims herein have no merit, as they have not provided *any evidence* that Mr. Lyman was actually exposed to any asbestos-containing products manufactured by Union Carbide itself; neither do they identify any product containing asbestos supplied by Union Carbide which Mr. Lyman either worked with or was exposed to. Plaintiffs' claim for punitive damages in this matter is equally meritless, in that there is no "clear and convincing evidence" of conduct on the part of Union Carbide which would be sufficient to support or justify an award of exemplary damages.

II.     <u>SUMMARY JUDGMENT AND ADJUDICATION STANDARDS</u>

Summary judgment must be granted "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (Code Civ. Proc., § 437c(c).) Summary adjudication, alternatively, is granted if one or more causes of action has no merit. (Code Civ. Proc., § 437c(f)(1).) A cause of action has "no merit" if any element of the cause of action cannot be established, or there is a complete defense to the cause of action. (*Id.*)

In this case, Plaintiffs have the burden of proving causation, which requires a showing that (1) Mr. Lyman was exposed to an asbestos-containing Union Carbide product, or to a product manufactured by another that contained asbestos supplied by Union Carbide, and (2) that biological processes from this exposure resulted in his current

1

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

1   disease. (*Lineaweaver v. Plant Insulation Co.* (1995) 31 Cal.App.4th 1409, 1415-16.) This

2   proof is fundamental to each of Plaintiffs' causes of action set forth in their Complaint.

3       To prevail here, Union Carbide only has to put forth evidence to establish that

4   Plaintiffs do not possess, and cannot reasonably obtain, evidence necessary to raise a

5   genuine triable issue of fact concerning "*one or more*" of the elements of each cause of

6   action. (*Aguilar v. Atlantic Richfield Co.* (2001), 25 Cal.4th 826, at p. 849.) Alternatively, for

7   summary adjudication, all that must be shown is that *one or all* of Plaintiffs' causes of

8   action have "no merit," in that at least *one* of the elements of each cause of action cannot be

9   factually supported.

10   III.   **PLAINTIFFS' CAUSES OF ACTION FOR NEGLIGENCE, STRICT LIABILITY**

11         **AND LOSS OF CONSORTIUM FAIL AS A MATTER OF LAW**

12       In this case, Plaintiffs are claiming that Mr. Lyman, a foreman, worker and driver

13   for a variety of companies, was exposed to asbestos during the course of his career.

14   However, Plaintiffs have failed to provide any evidence that Mr. Lyman was ever exposed

15   to a Union Carbide product, asbestos-containing or otherwise, much less to any product

16   that contained Union Carbide's "Calidria" asbestos. Thus, summary judgment must be

17   entered as a matter of law.

18       A.   **Plaintiffs' Complaint, Discovery Responses and Deposition**

19           **Testimony Do Not Identify Any Union Carbide Product.**

20       Plaintiffs allege that various defendants, including Union Carbide, caused Mr.

21   Lyman to be exposed to asbestos-containing products and thereby develop an asbestos-

22   related disease. Though Plaintiffs named Union Carbide, the Complaint contains no case-

23   specific allegations showing that Mr. Lyman was exposed to asbestos products

24   manufactured by, or products containing asbestos supplied by, Union Carbide. [UMF No.

25   1.]

26       Plaintiffs' responses to Defendants' Standard Interrogatories do not make any

27

28

                                                2

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT UNION CARBIDE
CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY
ADJUDICATION

1   specific allegations relative to Union Carbide, or specify any particular asbestos-containing

2   products to which Mr. Lyman was allegedly exposed. [UMF No. 2.]

3       **B.**   **Plaintiffs' Responses to Union Carbide's Written Discovery Fail to**
            **Establish Exposure To An Asbestos-Containing Product For Which**
4               **Union Carbide Is Liable.**

5       In order to clarify Plaintiffs' claims against it, Union Carbide served special

6   interrogatories that required Plaintiffs to disclose all facts and sources of evidence in

7   support of their claims. [UMF No. 3.]  In response, Plaintiffs claim Union Carbide is liable

8   for Mr. Lyman's alleged exposure to "Montello drilling mud."  [UMF No. 4.]  As

9   demonstrated below, however, Plaintiffs' discovery responses fail to provide sufficient

10  evidence to establish that Union Carbide is liable to Plaintiffs for injuries resulting from

11  these exposures.[1]

12      Plaintiffs have no evidence to support these exposure claims against Union Carbide.

13  Plaintiffs cannot possibly establish that Mr. Lyman was exposed to any products that

14  actually contained asbestos supplied by Union Carbide including any asbestos-containing

15  drilling mud.  Thus, summary judgment should be entered as a matter of law.  (Code Civ.

16  Proc., § 437c(o)(2); *Chaknova v. Wilbur-Ellis Co.* (1999) 69 Cal.App.4th 962, 974, 977.)

17      Alternatively, summary adjudication should be entered on behalf of Union Carbide

18  as to Plaintiffs' First Cause of Action for Negligence, the Second Cause of Action for Strict

19  Products Liability and the Forth Cause of Action for Loss of Consortium.

20          **1.**   *Plaintiffs Cannot Prove That Mr. Lyman Was Exposed To Asbestos-*
              *Containing Drilling Mud For Which Union Carbide Would Be Responsible*

21

22      Plaintiffs in this action claim that Robert Lyman was exposed to asbestos through

23  the use of drilling mud.  Relevant to Union Carbide is the claim that Mr. Lyman worked

24  with or around "Montello drilling mud."

25

26  [1] A defendant may rely on factually devoid, inadequate, or vague discovery responses to meet its burden of
proof.  (*Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 590; *Hunter v. Pacific Mechanical Corp.* (1995) 37
27  Cal.App.4th 1282, 1287; *Chaknova v. Wilbur-Ellis Co.* (1999) 69 Cal.App.4th 962, 974-978.)

                                            3

28

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT UNION CARBIDE
CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY
ADJUDICATION

1    Drilling mud, which is a mixture of fluids and solids pumped down a well's

2 borehole, serves several functions, including lifting rock and soil, as well as cooling and

3 lubricating the drill bit. From 1968 until 1985, Union Carbide sold asbestos as a drilling

4 mud additive through its exclusive distributor, Montello, Inc. [UMF No. 5.] Montello, in

5 turn, sold Union Carbide's asbestos additive to mud service companies, who generally

6 then re-sold the product directly to drilling rig contractors. Throughout these years,

7 Union Carbide/Montello sold a variety of asbestos additives under the brand names

8 Visbestos, Super Visbestos, Oilbestos, Telvis, and Univis. Union Carbide's products came

9 in *dry* form, packaged in 50-pound bags with Montello's name on them.[2] [UMF No. 6.]

10    In this case, Plaintiffs have failed to identify a single Union Carbide product that

11 was used in the drilling industry, let alone a product to which Mr. Lyman was exposed. In

12 its special interrogatories to Plaintiffs, Union Carbide asked whether Mr. Lyman had been

13 exposed to any asbestos supplied by Union Carbide and, if so, to identify such products.

14 Plaintiffs responded in the affirmative and identified only "Montello drilling mud." [UMF

15 No. 7.] There is not enough information from these interrogatory responses, or from any

16 other discovery engaged in with regard to this case, to support any claim that Mr. Lyman

17 was exposed to any product which actually contained Union Carbide asbestos.

18    It is also clear from Plaintiffs' extensive deposition testimony that there is no factual

19 basis for any claims against Union Carbide, for the simple reason that there is no evidence

20 to show that Mr. Lyman actually worked with or near any drilling mud or additives at his

21 two jobs within the oil and gas industry. First, Mr. Lyman indicated in discovery

22 responses that he was employed by Cudd Pressure Control, Inc. ("Cudd") as an oil field

23 worker from 1981-1982. [UMF No. 8.] During his deposition, when asked about this

24 employment, Mr. Lyman testified that while he worked for Cudd, his work consisted

25

26

27 _____
[2] Oilbestos and Univis had an oil based coating, designed to prevent dust. These products were still "dry" in the sense that they were in solid, rather than liquid form.

4

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT UNION CARBIDE
CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY
ADJUDICATION

1  exclusively of transferring liquid nitrogen from a tanker truck into wells, forcing crude oil

2  up.  He noted this was all Cudd did.  [UMF No. 9.]

3  Mr. Lyman explained that the only time he ever witnessed any type of drilling fluid

4  or drilling mud in use while working for Cudd was on one occasion when he observed a

5  tanker marked "drilling fluid" deliver some form of *liquid* to an oil field he was working

6  at.  [UMF No. 10.]  Yet, Mr. Lyman did not even know whether drilling fluid in this

7  context was the same as drilling mud, or whether the contents of the fluid in the tanker

8  included asbestos, from Union Carbide or any other source.  [UMF No. 11.]  He also

9  testified that he never saw anyone mixing *dry* additives, fluids or muds near him while

10  working for Cudd.  [UMF No. 12.]

11  Mr. Lyman's only other job in the oil and gas industry was as a chemical technician

12  and tanker truck driver for Baker Hughes, from 1982-1986.  [UMF No. 13.]  Mr. Lyman

13  testified that while employed by Baker Hughes, he witnessed dry ingredients being mixed

14  with liquid drilling mud in a revolving tanker truck, which was then pumped into a mud

15  tank.  Mr. Lyman testified, however, that he was never closer then 40 to 50 feet when he

16  saw this.  [UMF No. 14.]  Because he was never close by when these ingredients were

17  being mixed, Mr. Lyman could not and did not identify the manufacturers, suppliers,

18  distributors or brand names of the alleged dry ingredients.  [UMF No. 15.]  Nor did Mr.

19  Lyman even know the composition of the materials which were being added to the mixing

20  truck and, therefore, could not and did not state that asbestos was one of those materials.

21  [UMF No. 16.]

22  Mr. Lyman also failed to identify a single Union Carbide or Montello asbestos

23  drilling mud additive.  During Mr. Lyman's deposition, Montello's attorney identified

24  asbestos products manufactured by Union Carbide and distributed by Montello, and

25  asked Mr. Lyman whether he had ever been exposed to any of them.  [UMF No. 17.]  With

26  one exception, Mr. Lyman testified that he did not recall being exposed to any of the

27

28

5

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

1   products; the only exception was Mr. Lyman's vague recollection of seeing the name

2   "Shurlift." [UMF No. 18.]  However, while he recalled seeing "Shurlift" at some point, Mr.

3   Lyman admitted that he was never exposed to it, as he neither handled "Shurlift," nor was

4   he around anyone who handled the product. [UMF No. 19.]

5        Furthermore, even if Mr. Lyman was exposed to asbestos by the "Shurlift" product

6   that he claims to have seen, there is no evidence that it contained asbestos for which Union

7   Carbide is liable. "Shurlift" was a product of IMCO Services, who supplied "Shurlift"

8   drilling muds to drilling mud contractors. [UMF No. 20.]  Union Carbide was *one* of the

9   manufacturers of the product that was repackaged and sold as "Shurlift." [UMF No. 21.]

10  Drilling Specialties, a major supplier and distributor of the asbestos-containing mud

11  additive "Flosal," was also responsible for "Shurlift" products, as they repackaged their

12  "Flosal" product under the "Shurlift" trade name for IMCO. [UMF No. 22.]  Therefore,

13  Plaintiffs cannot say with any certainty that the bag of "Shurlift" that Mr. Lyman vaguely

14  recalled seeing actually contained any Union Carbide asbestos, as opposed to an asbestos-

15  containing product from Drilling Specialties.

16       There is simply no evidence in this case to support any claim that Mr. Lyman was

17  exposed to a Union Carbide asbestos drilling mud additive products, or that he worked

18  with or near these products.  There was no identification by Mr. Lyman of any asbestos

19  additive Union Carbide manufactured, or that any asbestos-containing product, whether

20  associated or not with Union Carbide, was ever used at any of the oil fields he worked at.

21       Lastly, Union Carbide began placing warnings on its asbestos additive products as

22  early as 1968.  By 1972, these warnings mirrored the asbestos warnings mandated by the

23  newly formed Occupational Safety and Health Administration.  From 1972 until it stopped

24  manufacturing asbestos additive products, Union Carbide placed warnings on these

25  products that fully complied with all governmental standards. [UMF No. 23.]  Therefore,

26  even if Mr. Lyman was exposed to Union Carbide manufactured asbestos additives during

27

28

6

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT UNION CARBIDE
CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY
ADJUDICATION

1 his brief stint as an oil field worker from 1981-1986, he had legally sufficient warning of the

2 possible hazards of these products.

3          2.    *Plaintiffs Cannot Prove That Mr. Lyman Was Exposed to Asbestos-*

                 *Containing Phenolic Resins or "Bakelite" For Which Union Carbide Would*

4                  *Be Responsible*

5      Although not specifically alleged in Plaintiffs' responses to Union Carbide's special

6 interrogatories, Mr. Lyman testified in his deposition that he saw "bakelite" during his

7 work in the oil fields over the years. [UMF No. 24.] This potential "bakelite" claim,

8 however, is unsupported by any evidence to establish that the "bakelite" he claimed to

9 have seen was actually manufactured by Union Carbide, much less that it was "bakelite"

10 that actually contained asbestos.

11      Union Carbide was a manufacturer of epoxy resins and phenolic resins, which were

12 manufactured under the trade name "Bakelite." [UMF No. 25.] Union Carbide also made

13 phenolic molding compounds that were also sold under the trade name "Bakelite." [UMF

14 No. 26.] The epoxy resins and phenolic resins *never* contained asbestos. [UMF No. 27.]

15 Union Carbide's phenolic molding compounds were sold in a granular form to

16 manufacturers, who then used the molding compounds to make finished molded plastic

17 products. [UMF No. 28.] Until approximately 1974, some, but *not* all, of these phenolic

18 molding compounds contained asbestos fibers as filler. [UMF No. 29.] However, many of

19 Union Carbide's phenolic molding compounds did not contain asbestos, but instead used

20 other fillers such as wood flour, cotton flock, mica, coal, or talc. [UMF No. 30.]

21      While the phenolic resins were sold by Union Carbide to many different companies,

22 who used them to make finished plastic products that were then sold to end-users, Union

23 Carbide never itself manufactured finished products from its phenolic resins. [UMF No.

24 31.] Also, many other companies manufactured phenolic molding compounds similar to

25 those made by Union Carbide, including Durez, Plastic Engineering Co., GE,

26 Westinghouse, and Reichold amongst others. [UMF No. 32.]

27                                          7

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT UNION CARBIDE
CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY
ADJUDICATION

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

1      "Bakelite" is a generic term used to describe a type of plastic the identification of

2  which does not specifically relate to a Union Carbide product. [UMF No. 33.] While

3  "Bakelite" was at one time a registered trade name of Union Carbide, the term had, well

4  before Plaintiff's alleged exposure, become a generic name for a wide range of plastic

5  products, specifically including those made from phenolic resins and phenolic molding

6  compounds. [UMF No. 34.]

7      "Bakelite" is used as a generic to describe plastic products in the same way that

8  Kleenex® is used to refer to all facial tissue products. Even long after Union Carbide

9  stopped manufacturing phenolic resins and phenolic molding compounds, suppliers and

10  purchasers still refer to plastic materials generically as "bakelite." [UMF No. 35.] Clearly,

11  just because something was called "bakelite," there is no reason to assume such material

12  came from Union Carbide.

13      None of the facts alleged by Plaintiffs demonstrate that Union Carbide has any

14  liability for the "bakelite" to which Mr. Lyman might have been exposed, or that such

15  "bakelite" actually contained asbestos. In Mr. Lyman's videotaped direct deposition, he

16  stated that the only place he saw "bakelite" was in the oil fields in a plastic form. [UMF

17  No. 36.] Mr. Lyman testified in his discovery deposition that he did not recall what the

18  "bakelite" looked like, nor where it was that he saw it. [UMF No. 37.]

19      When asked when he saw "bakelite," Mr. Lyman testified that he believed he saw it

20  "maybe back in the '70s," and that it was "probably [at] Baker[3]." [UMF No. 38.] Moreover,

21  he did not recall any specific jobsite at which he may have seen "bakelite." [UMF No. 39.]

22  He did not state that this "bakelite" was manufactured by Union Carbide; instead, he

23  could only say that he believed the "bakelite" he used was "...manufactured by Bakelite."

24  [UMF No. 40.] He saw the name "bakelite" on the packaging, but could not recall what

25  the name looked like. [UMF No. 41.]

26

27  _____
    [3] "Baker" refers to "Baker Hughes," a company Mr. Lyman worked at between 1982-1986. [UMF No. 13.]

28
                                           8
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT UNION CARBIDE
CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY
ADJUDICATION

1   Most importantly, Mr. Lyman did not recall what he did with the product that he

2   believed was "bakelite," nor whether it contained asbestos:

3       Q: Do you recall what exactly you did when you worked with that product?
    A: No.

4       Q: Do you recall whether you had to mix, cut, sand, abrade, apply any of that?

5       A: I have no idea what I did with it.

6       Q: Okay. Do you know whether any of that product contained asbestos?
    A: No. [UMF No. 42.]

7

8   Plaintiffs' discovery responses or deposition testimony do not state any facts from

9   which the Court may infer that Union Carbide supplied any "bakelite" to which Mr.

10  Lyman was allegedly exposed, or that any such material actually contained asbestos.

11  [UMF No. 43.] As demonstrated above, Union Carbide was merely one of many suppliers

12  of phenolic resins and molding compounds used to make finished "bakelite" products.

13  Plaintiffs have proffered no evidence that Union Carbide supplied the "bakelite" to which

14  Mr. Lyman may have been exposed, or that any such materials did in fact contain asbestos.

15  Plaintiffs' generic product identification of "bakelite" is insufficient to avoid

16  summary judgment. (*Dumin v. Owens-Corning Fiberglas Corp.* (1994) 28 Cal.App.4th 650.)

17  In *Dumin* the plaintiff sued for personal injuries allegedly caused (in relevant part) by

18  exposure to asbestos in "kaylo." However, the *Dumin* plaintiff lacked evidence proving

19  that the "kaylo" to which he was exposed was the defendant's "kaylo," as opposed to

20  "kaylo" from other sources. (*Id.* at pp. 655-56.) Accordingly, the trial court granted the

21  defendant's motion for directed verdict, which decision was affirmed by the Court of

22  Appeal. (*Id.* at p. 655.)

23  And, where multiple suppliers of a product exist, a plaintiff cannot avoid summary

24  judgment simply by suing one of those suppliers unless he can prove that the particular

25  defendant sued actually supplied the injury-causing product. (*Garcia v. Joseph Vince Co.*

26  (1978) 84 Cal.App.3d 868.)

27

28

9

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT UNION CARBIDE
CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY
ADJUDICATION

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

1    As Union Carbide was merely one of many suppliers of phenolic resins and

2    molding compounds used to make finished "bakelite" products, and as Plaintiffs have no

3    evidence of Mr. Lyman's actual exposure to any product that can be associated with Union

4    Carbide specifically, either directly or indirectly, summary judgment must be entered for

5    Union Carbide.

6          3    *Plaintiffs Cannot Prove That Mr. Lyman Was Exposed to Asbestos-*

7                  *Containing Products From USG For Which Union Carbide Would Be Responsible*

8    Although not specifically alleged in their responses to Union Carbide's special

9    interrogatories, Plaintiffs may also claim that Union Carbide-supplied asbestos was

10   contained in "USG products" to which Mr. Lyman may have been exposed. [UMF No.

11   44.] Mr. Lyman stated in his deposition testimony that he worked with or around USG

12   products once in the U.S. Marine Corps, and then again when he was a foreman at the U.S.

13   Gypsum plant in Charlestown, Massachusetts. [UMF No. 45.] Despite being asked to do

14   so, Plaintiffs failed to specifically identify the brand name or manufacturer of any of these

15   allegedly asbestos-containing products, whether USG's or otherwise. [UMF No. 46.]

16   To prevail under this theory, however, Plaintiffs *must* show that Mr. Lyman was

17   exposed to asbestos-containing products manufactured by a third-party manufacturer

18   using asbestos supplied by Union Carbide. Plaintiffs cannot do so.

19         a)    Some of Mr. Lyman's Alleged Exposures Occurred Before

20                 Union Carbide's Entry Into The Asbestos Market

21   Union Carbide mined and milled short-fiber, chrysotile asbestos under the trade

22   name "Calidria" from approximately 1963 to 1985. [UMF No. 47.] The company's

23   asbestos mine was located near King City, California, and was the only asbestos mine ever

24   operated by Union Carbide. [UMF No. 48.] Union Carbide never sold "Calidria" to

25   individual consumers, but only to third party manufacturers who used it at certain times

26   in products that were utilized in various commercial applications. [UMF No. 49.]

27                     10

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT UNION CARBIDE CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1    Union Carbide did not begin to supply asbestos at all until 1963, and then only in a

2   limited fashion. [UMF No. 50.] Therefore, any allegations of exposure to U.S. Gypsum

3   drywall sheets or products from 1956 to 1958, the period that Mr. Lyman was in the

4   Marines, are irrelevant and cannot impose liability in any way on Union Carbide, as pre-

5   dating its entrance into the asbestos market.

6          b)    **Plaintiffs Cannot Establish Robert Lyman's Exposure to**
              **Asbestos Supplied by Union Carbide in any Asbestos-**
7              **Containing Product Manufactured By United States Gypsum**

8          Regarding Robert Lyman's alleged exposure while employed at a U.S. Gypsum

9   plant in Charlestown, Massachusetts for 8 months in 1967, Union Carbide never sold

10  asbestos fibers to U.S. Gypsum for the use in their tape joint compound before the year

11  1968. [UMF No. 51.] There is simply no evidence that any of these alleged exposures

12  involved products containing asbestos supplied by Union Carbide.

13         Plaintiffs' responses to interrogatories state that Mr. Lyman worked at the U.S.

14  Gypsum plant in Charlestown, Massachusetts, and fail to identify any specific USG

15  products or other materials for which Union Carbide might be liable. [UMF No. 52.] In

16  Mr. Lyman's deposition testimony, he states that he supervised the workers making

17  wallboard.  Mr. Lyman stated that he never mixed the mud for the drywall himself. [UMF

18  No. 53.] Moreover, he stated that he did not know what ingredients were used in this

19  wallboard mud. [UMF No. 54.] Furthermore, when asked if he knew what other products

20  were being manufactured at the plant he replied, "...I don't recall what they were." [UMF

21  No. 55.]

22         These statements do not establish exposure to an *asbestos-containing* USG product,

23  or any other manufacturer's product, let alone one containing asbestos supplied by *Union*

24  *Carbide*. Over the years, USG had at least ten different asbestos suppliers for its asbestos-

25

26

27                                          11

28

BRYDON
HUGO & PARKER
135 Main Street
20th Floor
San Francisco, CA 94105

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT UNION CARBIDE
CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY
ADJUDICATION

1  containing products.[4] [UMF No. 56.] Again, Plaintiffs have provided no facts that would

2  infer that any USG product allegedly handled or worked on by Mr. Lyman actually

3  contained asbestos, or that any asbestos therein was supplied by Union Carbide, as

4  opposed to one of USG's many other suppliers. No products potentially containing Union

5  Carbide's asbestos are identified as having been at this facility; therefore no Union Carbide

6  liability may be found.

7      Plaintiffs cannot possibly establish that Mr. Lyman was exposed to any products

8  that actually contained asbestos supplied by Union Carbide during the time periods

9  relevant to this case. Thus, summary judgment and/or summary adjudication should be

10  entered as a matter of law as to Plaintiffs' First Cause of Action for Negligence, and

11  Plaintiffs' Second Cause of Action for Strict Liability.

12      Finally, Plaintiffs' Fourth Cause of Action for loss of consortium is derivative of and

13  dependent upon the success of the other liability claims on behalf of Plaintiffs. (See

14  *Calatayud v. State of California* (1998) 18 Cal.4th 1057, 1060.) Since there is no merit to the

15  claims asserted herein against Union Carbide, Plaintiffs' loss of consortium claim must

16  also likewise fail as a matter of law.

17          c).   **As a Bulk Supplier of Raw Asbestos, Union Carbide Had to
               Rely on Sophisticated Manufacturers Which Bought and Used**

18               **"Calidria" Raw Asbestos in Their Products to Warn End Users
               of Those Products**

19

20      To the extent that Union Carbide is being sued in this case as a "bulk supplier" of

21  asbestos fiber to other manufacturers (otherwise-known-as the "fiber-supply" theory of

22  liability), no liability should be imposed on it for a perceived "failure to warn" consumers

23  about the alleged "dangers" of asbestos. Under the circumstances of this case, there was no

24  legal requirement that Union Carbide do so. "Modern life would be intolerable unless one

25

26  [4] U.S. Gypsum's General Order 129 discovery responses state that it obtained asbestos fiber from Canadian
    Johns-Manville, Lake Asbestos of Quebec, Nicolet Industries, Carey Canadian, Asbestos Corporation, Atlas
27  Asbestos, Pacific Asbestos, Keasby and Mattison, Johnson Mines and Union Carbide.

                                                12

28  ────────────────────────────────────────────────────────
    MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT UNION CARBIDE
    CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY
                            ADJUDICATION

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

1  were permitted to rely to a certain extent on others doing what they normally do,

2  particularly if it is their duty to do so." (*Persons v. Salomon North America, Inc.* (1990) 217

3  Cal.App.3d 168, 178 (citation omitted).)

4    It is settled California law that where a bulk supplier of a raw ingredient sells its

5  product to a sophisticated purchaser-manufacturer, who in turn incorporates the raw

6  ingredient into a finished product that is then sold to an end-user, the supplier has no duty

7  to warn the end-user and may rely upon the manufacturer to convey warnings associated

8  with the product. (See, *e.g., Artiglio v. General Electric Co.* (1998) 61 Cal.App.4th 830, 837;

9  *Groll v. Shell Oil Co.* (1983) 148 Cal.App.3d 444, 498-49.) As noted in that case, the duty of a

10 bulk supplier to warn end users is based on a consideration of the following questions: (1)

11 was the material supplied inherently dangerous, (2) was the material sold in bulk to a

12 sophisticated buyer; (3) was the material substantially altered during the manufacturing

13 process due to compounding, packaging, labeling or marketing; and (4) did the supplier

14 substantially participate in the design, development and integration of the raw material

15 into the finished product. (*Artiglio, supra,* at 839.)

16    The policy behind this principle is based on the notion that it may not be possible for

17 a component part suppliers' warning to actually reach the ultimate user of another

18 manufacturer's finished product. As a result, courts have reasoned that a "sophisticated

19 buyer" who would be reasonably expected to test and evaluate the potential risks of its

20 products and each of the components therein would be in the best position to evaluate any

21 product warnings, and decide whether the defendant's substance is appropriate for use in

22 the finished product. (*Artiglio, supra,* at 837.)

23    Courts generally recognize that bulk suppliers lack the ability to control packaging,

24 labeling, and marketing once an intermediary purchases their products. In *Groll,* for

25 example, a supplier of flammable lantern fuel, purchased in bulk and repackaged by an

26 intermediate supplier, was sued after someone was injured while using a product which

27

28

13

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT UNION CARBIDE
CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY
ADJUDICATION

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

1   incorporated the fuel.  (148 Cal.App.3d at 447.)  The Court found no liability on the part of
2   the fuel supplier, because it had provided adequate warning of the flammability of the
3   product to the intermediate supplier.  (*Id.* at 449-50.)  The court reasoned that the bulk
4   supplier was not liable because it was unable to communicate warnings to users of the
5   finished product because it had relinquished control over the packaging of its component
6   when it was sold to a distributor.  (*Id.*)  Instead, the court concluded, the duty of a bulk
7   supplier to provide warnings "must be absolved at such time as it provides adequate
8   warnings to the distributor who subsequently packages, labels and markets the product."
9   (*Id.* at 449.)

10      Similarly, in *Walker v. Stauffer* (1971) 19 Cal.App.3d 669, the defendant supplied
11  sulfuric acid in bulk to a purchaser who incorporated it into a drain cleaner, which it then
12  packaged, labeled, marketed and subsequently sold through distributors.  (19 Cal.App.3d
13  at 671.)  The *Walker* court held that liability for warnings defects claims should not extend
14  to a bulk product supplier if there is a change in the product or in the container in which
15  the product is distributed to consumers, and where the bulk supplier has no practical
16  ability to warn end users.  (*Id.*, at 673-74; see also *Persons, supra,* 217 Cal.App.3d at 178
17  ["When a manufacturer or distributor has no effective way to convey a product warning to
18  the ultimate consumer, the manufacturer should be permitted to rely on downstream
19  suppliers to provide the warning."]; *Blackwell v. Phelps Dodge Corp.* (1984) 157 Cal.App.3d
20  372, 378-379 [holding no liability for warnings defect where the supplier of bulk sulfuric
21  acid had no ability to place warnings on the ultimate product].)

22      The rationale behind these cases—that bulk suppliers cannot be expected to reach
23  end users with warnings—holds true for Union Carbide.  Here, Plaintiff Robert Lyman
24  does not claim that he ever handled, used, or manipulated any of Union Carbide's raw
25  "Calidria" asbestos.  He had no commercial dealings with Union Carbide, did not, nor
26  could not, review any documentation or packaging that came with Union Carbide's raw

27
28

14

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT UNION CARBIDE
CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY
ADJUDICATION

1  asbestos. Because in order to incorporate "Calidria" in their products pursuant to the

2  various formulas, manufacturers would have to remove the asbestos fibers from Union

3  Carbide's packaging (which contained warnings) and mix the fibers in with other

4  ingredients.

5       As shown in failure to warn cases such as *Groll*, *Walker* and *Persons*, courts have

6  declined to hold bulk suppliers liable for failure to warn beyond intermediaries because

7  bulk suppliers exercise no control over the packaging, labeling, and marketing of the

8  intermediaries' final products. The same policy should hold here, where Union Carbide

9  was a bulk supplier of raw asbestos fiber to intermediaries, and had no control over

10  warning ultimate consumers. Thus, Union Carbide cannot be held liable under any failure

11  to warn theory. Accordingly, any of Plaintiffs' causes of action which may be premised on

12  this duty should be dismissed.

13       C.    **Plaintiffs' Third Cause Of Action For False Representation Fails As
              A Matter Of Law.**

14       The same lack of evidence that defeats Plaintiffs' Negligence, Strict Liability and

15  Loss of Consortium claims described above is also fatal to Plaintiffs' Cause of Action for

16  False Representation based on the Third Restatement of Torts section 402-B. Section 402B

17  of the Restatement Second of Torts, which states, in relevant part:

18       One engaged in the business of selling chattels who, by advertising, labels, or
19       otherwise, makes to the public a misrepresentation of a material fact concerning
         the character or quality of a chattel sold by him is subject to liability for physical
20       harm to a consumer of the chattel caused by justifiable reliance upon the
         misrepresentation . . . .

21

22  (Rest.2d Torts, §402B.)

23       This cause of action requires proof of a misrepresentation of material fact upon

24  which the Plaintiffs detrimentally relied, causing damages. (*Hauter v. Zogaris* (1975) 14

25  Cal.3d 104, 111.) To prove that any reliance on a misrepresentation resulted in damages,

26  Plaintiffs must prove that Mr. Lyman was actually exposed to asbestos from a product for

27  which Union Carbide is liable.

28

15

BRYDON
HUGO & PARKER
135 MAIN STREET
20th FLOOR
San Francisco, CA 94105

1    But, Plaintiff cannot prove that *any* representation was made to Mr. Lyman by

2   Union Carbide, much less a *false* representation.  Plaintiffs have no evidence that Mr.

3   Lyman ever purchased, used, or was otherwise exposed to, a product containing asbestos

4   supplied by Union Carbide.  The inevitable conclusion is that Plaintiffs cannot establish

5   that Mr. Lyman was "a consumer of the chattel" as required by the Restatement.

6   Accordingly, "If there has been no exposure, there is no causation."  (*McGonnell v. Kaiser*

7   *Gypsum Co.* (2002) 98 Cal.App.4th 1098, 1103; *Cadlo v. Owens-Corning, Inc.* (2004) 125

8   Cal.App.4th 513, 523-24 [demurrer to fraud cause of action sustained when facts showed

9   asbestos plaintiff was not exposed to moving defendant's product].)

10    In their responses to Union Carbide's case-specific interrogatories regarding the

11   bases for Plaintiffs' false representation, Plaintiffs admit they do not have any specific

12   evidence to support a claim of false representation based upon such conduct.  [UMF No.

13   57.] Plaintiffs' discovery responses make clear that Plaintiffs have no facts showing that

14   Union Carbide ever verbally communicated with or made any oral representations to Mr.

15   Lyman at all.  [UMF No. 58.]

16    Nor can Plaintiffs proceed on the theory that Union Carbide failed to disclose

17   material information about the dangers of asbestos.  Among other things, Plaintiffs must

18   prove that Union Carbide was under a duty to disclose a material fact.  (*Lovejoy v. AT&T*

19   *Corp.* (2001) 92 Cal.App.4th 85, 95, quoting *Marketing West, Inc. v. Sanyo Fisher (USA) Corp.*

20   (1992) 6 Cal.App.4th 603, 612-613.)  But a duty to disclose generally exists only if there is a

21   "special relationship" between the parties.  (*Shin v. Kong* (2000) 80 Cal.App.4th 498, 509;

22   accord *Wilkins v. NBC, Inc.* (1999) 71 Cal.App.4th 1066.)

23    Put another way, a failure to disclose "is not actionable fraud unless there is a

24   fiduciary or confidential relationship giving rise to a duty to disclose."  (*La Jolla Village*

25   *Homeowner's Assoc. Inc. v. Superior Court* (1989) 212 Cal.App.3d 1131, 1151.)  Given the lack

26   of evidence that Mr. Lyman was ever exposed to an asbestos containing product for which

27

28

16.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT UNION CARBIDE
CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY
ADJUDICATION

1  Union Carbide is liable, or ever communicated with Union Carbide, there is no evidence of

2  any relationship at all between Union Carbide and the Plaintiffs, much less a *special* one.

3  Thus, Plaintiffs' Cause of Action for False Representation fails as a matter of law.

4      **D.     Plaintiffs Have No "Clear And Convincing" Evidence Of Conduct
       Sufficient To Support Their Claim For Punitive Damages.**
5

6      Plaintiffs' claim for punitive damages fails for at least two reasons: Plaintiffs'

7  discovery responses and deposition testimony fail to disclose any evidence of fraud, malice

8  or oppression by Union Carbide, much less by clear and convincing evidence, and fail to

9  disclose any evidence of corporate ratification or approval of any misconduct by Union

10 Carbide.

11     Under Civil Code section 3294(a), Plaintiffs can recover punitive damages only if

12 they prove by "clear and convincing evidence" that Union Carbide was guilty of

13 "oppression, fraud or malice."[5]  Proof by clear and convincing evidence has been defined in

14 other contexts as "clear, explicit, and unequivocal" proof, "so clear as to leave no substantial

15 doubt," and "sufficiently strong to demand the unhesitating assent of every reasonable

16 mind."  (*People v. Martin* (1970) 2 Cal.3d 822, 833, fn. 14; see *Mock v. Michigan Millers Mutual

17 Ins. Co.* (1992) 4 Cal.App.4th 306, 332, *In re Marriage of Weaver* (1990) 224 Cal.App.3d 478,

18 487, fn. 8.)[6]

19     While "despicable conduct"[7] is not defined by Section 3294(a), the Judicial Council

20
   [5]  "Malice" means either (1) conduct that is intended by the defendant to cause injury to the plaintiff, or (2) despicable
21 conduct that is carried on by the defendant with a willful and conscious disregard of the rights or safety of others.
   (Civ. Code § 3294(c)(1).)  "Oppression" means despicable conduct that subjects a person to cruel and unjust hardship in
22 conscious disregard of that person's rights.  (Civ. Code § 3294(c)(2).)  "Fraud" means an intentional misrepresentation,
   deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of
23 thereby depriving a person of property or legal rights or otherwise causing injury.  (Civ. Code, § 3294(c)(3))

24 [6] The addition of this requirement is part of a broader design to require a higher quantum of proof, and to limit punitive
   damage awards to those cases in which the defendant's conduct is clearly blameworthy
25 (*Mock, supra*, 4 Cal. App. 4th at pp. 332-333; emphasis added.)

26 [7] The California Supreme Court has noted that in choosing the phrase "despicable conduct," the Legislature intended to
   "impose a new substantive limitation on punitive damage awards."
27 (*College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 725.) In *College Hospital, Inc.*, the California Supreme
   Court noted that the adjective "despicable" is a powerful term that refers to circumstances that are "base, vile or
28

   17

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT UNION CARBIDE
CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY
ADJUDICATION**

1   of California, in its CACI instructions, has suggested the following definition:

2   > Despicable conduct which so vile, base, or contemptible that it
3   > would be looked down on and despised by reasonable people.
    > (CACI Nos. 3940, 3947.)

4   Here, Plaintiffs have proffered no relevant or admissible evidence that Union

5   Carbide acted with oppression, malice or fraud such as to warrant damages for the sake of

6   example, and by way of punishing Union Carbide. Plaintiffs' responses to Union

7   Carbide's case-specific interrogatories regarding the bases for Plaintiffs' punitive damages

8   claim rely upon various matters outside of the record of this case, refer to documents that

9   are not produced in this case, and otherwise show no direct conduct towards Plaintiffs

10  sufficient enough to support a claim for punitive damages based upon such conduct.

11  [UMF No. 59.]

12  In addition, the lack of any evidence of intentional conduct also establishes a

13  separate ground for summary adjudication of Plaintiffs' punitive damages claim herein.

14  All of the elements supporting a punitive claim—i.e., oppression, fraud and malice—

15  incorporate the requirement that the improper conduct of the defendant be "intentional,"

16  or "willful and conscious," or with "conscious disregard." Evidence of any of this kind of

17  conduct does not exist in this case. In any event, ordinary negligence (i.e., mere

18  carelessness or simple failure to exercise due care for a plaintiff's safety does not amount

19  to "malice" or "oppression" or "fraud," and thus does not support an award of punitive

20  damages. (*Bell v. Sharp Cabrillo Hospital* (1989) 212 Cal.App.3d 1034, 1044; *Flyer's Body Shop*

21  *Profit Sharing Plan v. Ticor Title Insurance Co.* (1986) 185 Cal.App.3d 1149, 1155.)

22  In addition, Plaintiffs have failed to satisfy the evidentiary requirements of Civil

23  Code section 3294(b). In 1980, this section was amended to require as an element of proof

24  for punitive damages that "the advance knowledge and conscious disregard, authorization,

25  ratification or act of oppression, fraud, or malice must be on the part of an officer, director

26  _____

27  contemptible." *(Ibid.)*

28                                    18

BRYDON
HUGO & PARKER
125 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT UNION CARBIDE
CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY
ADJUDICATION

1   or managing agent of the corporation." (*Id.*) Plaintiffs have not alleged, and do not have

2   any evidence to show, that managerial agents at Union Carbide had knowledge of the

3   hazards of asbestos, or were those who exercised "substantial discretionary authority over

4   decisions that ultimately determined corporate policy." (*Romo v. Ford Motor Corporation*

5   (1999) 99 Cal.App.4th 1115, 1140.)

6        For all of the above reasons, Plaintiffs' punitive damages claims against Union

7   Carbide must be summarily adjudicated. (*Grieve v. Superior Court* (1984) 157 Cal.App.3d

8   159, 167-168; *Scannell v. County of Riverside* (1984) 152 Cal.App.3d 596, 614.)

9   **IV.**   <u>**CONCLUSION**</u>

10       Based on the foregoing, Defendant Union Carbide Corporation requests that this

11  Court grant the motion for summary judgment or, alternatively, summary adjudication as

12  to all causes of action, as well as the claim for punitive damages.

13

14  Dated: July 5, 2007                 BRYDON HUGO & PARKER

15

16                       By:

17                         John R. Brydon

                       Thomas J. Moses

18                         Erin M. Carpenter

                       Attorneys for Defendant

19                         UNION CARBIDE CORPORATION

20                         1102-0231

21

22

23

24

25

26

27                         19

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT UNION CARBIDE
CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY
ADJUDICATION

1     *Lyman, Robert F. & Samantha vs. Asbestos Defendants (B*P), et al.*
San Francisco County Superior Court Case No. CGC-06-459162

2     LexisNexis Transaction No, 15465916

3     **PROOF OF SERVICE**

4     I am a resident of the State of California, over the age of 18 years, and not a party to the within action.  My electronic notification address is

5     service@bhplaw.com and my business address is 135 Main Street, 20th Floor, San Francisco, California 94105.  On the date below, I served the following:

6

7     MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT UNION CARBIDE CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

8

9     on the following:

10     David R. Donadio             AND SEE LEXIS NEXIS SERVICE LIST
Brayton Purcell

11     222 Rush Landing Road
Novato, CA 94945

12

13     X       By transmitting electronically the document(s) listed above as set forth on the electronic service list on this date before 5:00 p.m.

14

15     I declare under penalty of perjury that the above is true and correct.
Executed on July 5, 2007, at San Francisco, California.

16

17     *Wanda D. Cláudio*
              Wanda D. Cláudio

18

19

20

21

22

23

24

25

26

27

28

1

PROOF OF SERVICE

1   John R. Brydon [Bar No. 083365]
    Thomas J. Moses [Bar No. 116002]
2   Erin M. Carpenter [Bar No. 248337]
    BRYDON HUGO & PARKER
3   135 Main Street, 20th Floor
    San Francisco, CA 94105
4   Telephone: (415) 808-0300
    Facsimile: (415) 808-0333
5
    Attorney for Defendant
6   UNION CARBIDE CORPORATION

7

8              SUPERIOR COURT - STATE OF CALIFORNIA

9          COUNTY OF SAN FRANCISCO – UNLIMITED JURISDICTION

10  ROBERT F. LYMAN and SAMANTHA          (ASBESTOS)
    LYMAN,                                Case No. 459162
11
           Plaintiff(s),                  SEPARATE STATEMENT OF UNDISPUTED
12                                        MATERIAL FACTS IN SUPPORT OF
        vs.                               DEFENDANT UNION CARBIDE
13                                        CORPORATION'S MOTION FOR
    ASBESTOS DEFENDANTS (B◆P), et al.,    SUMMARY JUDGMENT, OR, IN THE
14                                        ALTERNATIVE, SUMMARY
                                          ADJUDICATION
15
                                          [Filed concurrently with Supporting Notice
16                                        of Motion and Motion for Summary
                                          Judgment; Memorandum of Points and
17                                        Authorities In Support of Motion;
                                          Declaration of Thomas J. Moses]
18
                                          Date:      July 27, 2007
19                                        Time:      9:30 A.M.
                                          Dept.:     302
20                                        Judge:     Hon. Patrick J. Mahoney
21
                                          Trial Date:   July 30, 2007
22

23

24         Defendant UNION CARBIDE CORPORATION ("Union Carbide") hereby submits

25  the following Separate Statement of Undisputed Material Facts and Supporting Evidence in

26  support of its Motion for Summary Judgment or in the alternative, Summary Adjudication,

27  against Plaintiffs ROBERT F. LYMAN and SAMANTHA LYMAN (hereinafter "Plaintiffs").

28                                        1

SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT
UNION CARBIDE CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE
ALTERNATIVE, SUMMARY ADJUDICATION

1

## SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

2

| UNDISPUTED MATERIAL FACTS | EVIDENTIARY SUPPORT |
|---|---|
| 1. Plaintiffs' Complaint contains no case-specific allegations showing that Mr. Lyman was exposed to asbestos products manufactured by, or products containing asbestos supplied by, Union Carbide. | 1. Plaintiffs' Complaint for Personal Injury and Loss of Consortium, attached as Exhibit A to the Declaration of Thomas Moses. ("Moses Decl."), *seriatim.* |
| 2. Plaintiffs' responses to Defendants' Standard Interrogatories do not make any specific allegations relative to Union Carbide, or specify any particular asbestos-containing products to which Mr. Lyman was allegedly exposed. | 2. Defendants' Standard Interrogatories to Plaintiffs' (Personal Injury and Loss of Consortium), Set Two, attached as Exhibit B to the Moses Decl.; Plaintiffs' Responses To Defendants' Standard Interrogatories, Set Two, attached as Exhibit C to the Moses Decl., at 1:21-8:2. |
| 3. Union Carbide served special interrogatories that required both Plaintiffs Robert F. Lyman and Samantha Lyman to disclose all facts and sources of evidence in support of their claims. | 3. Defendant Union Carbide Corporation's Special Interrogatories to Plaintiff Robert F. Lyman, Set One, attached to the Moses Decl. as Exhibit D, at 4:1-9:3, Special Interrogatories to Plaintiff Samantha Lyman, Set One, attached to the Moses Decl. as Exhibit E, at 4:1-9:3, Special Interrogatories to Plaintiff Robert F. Lyman, Set Two, attached to the Moses Decl. as Exhibit F, at 4:2-9:3, and Special Interrogatories to Plaintiff Samantha Lyman, Set Two, attached to the Moses Decl. as Exhibit G, at 4:2-9:3. |
| 4. In response, Plaintiffs claim Union Carbide is liable for Mr. Lyman's alleged exposure to "Montello drilling mud." | 4. Plaintiff Robert F. Lyman's Responses To Union Carbide's Special Interrogatories, Set Two, attached to the Moses Decl. as Exhibit |

2

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

H, at 2:1-10; Plaintiff Samantha Lyman's Responses To Union Carbide's Special Interrogatories, Set Two, attached to the Moses Decl. as Exhibit I, at 2:1-10

5. Montello, Inc. was Union Carbide's exclusive distributor of the company's asbestos drilling mud additive products from 1968 until 1985.

5. Declaration of John Edward Walsh, dated June 21, 2007 Exhibit J, at ¶ 5.

6. Through the years, Union Carbide/Montello sold a variety of asbestos additives under the brand names Visbestos, Super Visbestos, Oilbestos, Telvis and Univis. Union Carbide's products came in dry form, packaged in 50-pound bags with Montello's name on them.

6. Exhibit J, at ¶¶ 7,8

7. Plaintiffs' interrogatory responses only identified "Montello drilling mud" as a product for which Union Carbide might be responsible.

7. Exhibit H, at 2:1-10 and Exhibit I, at 2:1-10.

8. Mr. Lyman indicated in discovery responses that he was employed by Cudd Pressure Control, Inc. as an oil field worker from 1981-1982.

8. Exhibit H, 2:11-23.

9. During his deposition, Mr. Lyman testified that while he worked for Cudd, his work consisted exclusively of transferring liquid nitrogen from a tanker truck into wells, forcing crude oil up. This was all Cudd did.

9. Pertinent portions of the discovery deposition testimony of Robert F. Lyman attached as Exhibit K to the Moses Decl., at 406:4-15.

10. Mr. Lyman testified that the only time

10. Exhibit K, 428:1-429:19.

3

SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT UNION CARBIDE CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1 he ever witnessed any type of drilling fluid
2 or mud in use while working for Cudd was
3 on one occasion when he observed a tanker
4 marked "drilling fluid" deliver some form
   of liquid to an oil field he was working at.
5
6 11. Mr. Lyman testified that he did not          11. Exhibit K, 429:16-19
7 know whether drilling fluid in this context
  was the same as drilling mud, or whether
8 the contents of the fluid in the tanker
9 included asbestos, from Union Carbide or
  any other source.
10
11 12. Mr. Lyman testified that he never saw      12. Exhibit K, 432:9-11, 432:17-433:3.
12 anyone mixing dry additives, fluids or muds
   near him while working for Cudd.
13
14 13. Mr. Lyman's only other job in the oil      13. Exhibit C, 6:14-7:15; Exhibit K, 464:16-
15 and gas industry was as a chemical              17; 465:18-22.
   technician and tanker truck driver for Baker
16 Hughes, from 1982-1986.
17
18 14. Mr. Lyman testified that while             14. Exhibit K, 469:23-470:17, 471:2-3.
   employed by Baker Hughes, he witnessed
19 dry ingredients being mixed with liquid
20 drilling mud in a revolving tanker truck,
   which was then pumped into a mud tank,
21 but that he was never closer then 40 to 50
22 feet when he saw this.
23 15. Mr. Lyman did not know the                 15. Exhibit K, 471:7-10; 482:16-483:18.
24 manufacturers, suppliers, distributors or
   brand names of the dry ingredients.
25
26 16. Mr. Lyman did not know the                 16. Exhibit K, 493:11-14.
27 composition of the materials which were
28                                      4.

SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT
UNION CARBIDE CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE
ALTERNATIVE, SUMMARY ADJUDICATION

| | |
|---|---|
| 1 | being added to the mixing truck, and did |
| 2 | not state whether asbestos was one of those |
| 3 | materials. |
| 4 | 17. During Mr. Lyman's deposition, | 17. Exhibit K, 527:4-530:1. |
| 5 | Montello's attorney identified every |
| 6 | asbestos product manufactured by Union |
| 6 | Carbide and distributed by Montello and |
| 7 | asked Mr. Lyman whether he had ever been |
| 8 | exposed to any of them. |

1. being added to the mixing truck, and did
2. not state whether asbestos was one of those
3. materials.

4. 17. During Mr. Lyman's deposition, Montello's attorney identified every asbestos product manufactured by Union Carbide and distributed by Montello and asked Mr. Lyman whether he had ever been exposed to any of them.

17. Exhibit K, 527:4-530:1.

9. 18. With one exception, "Shurlift," Mr. Lyman stated that he did not recall being exposed to any of the products.

18. Exhibit K, 527:4-530:1.

12. 19. Mr. Lyman testified that he was never exposed to "Shurlift," as he neither handled any "Shurlift," nor was around anyone who handled it.

19. Exhibit K, 527:21-529:3.

16. 20. "Shurlift" was a product of IMCO Services, who supplied "Shurlift" drilling muds to drilling mud contractors.

20. Pertinent portions of the deposition testimony of James C. Floyd, attached as Exhibit L to the Moses Decl., at 53:16-54:8 and 153:8-25.

19. 21. Union Carbide was *one* of the manufacturers of the product that was repackaged and sold as "Shurlift."

21. Pertinent portions of the deposition testimony of John Edward Walsh, attached as Exhibit M to the Moses Decl., at 66:23-67:7.

22. 22. Drilling Specialties, a major supplier and distributor of the asbestos-containing mud additive "Flosal," was also responsible for "Shurlift" products, as they repackaged their "Flosal" product under the "Shurlift" trade name for IMCO.

22. Exhibit L, 153:2-25.

27. 23. From 1972, until it stopped

23. Exhibit J, at ¶ 10.

5

BRYDON
HUGO & PARKER
135 MAIN STREET
20th FLOOR
San Francisco, CA 94105

| | |
|---|---|
| 1 | manufacturing asbestos additive products, |
| 2 | Union Carbide placed warnings on their |
| 3 | drilling mud additives that fully complied |
| 4 | with all governmental standards. |
| 5 | 24. Although not specifically alleged in |
| 6 | Plaintiffs' responses to Union Carbide's |
| 7 | special interrogatories, Mr. Lyman testified |
| 8 | in his deposition that he saw "bakelite" |
| 9 | during his work in the oil fields over the |
|  | years. |

24. Although not specifically alleged in Plaintiffs' responses to Union Carbide's special interrogatories, Mr. Lyman testified in his deposition that he saw "bakelite" during his work in the oil fields over the years.

24. Pertinent portions of the videotaped deposition testimony of Plaintiff Robert F. Lyman, attached as Exhibit N to the Moses Decl., at 22:23-23:8.

25. Union Carbide was a manufacturer of epoxy resins and phenolic resins, which were manufactured under the trade name "Bakelite."

25. Declaration of Carlo Martino, dated November 17, 2006, attached as Exhibit O to the Moses Decl., at ¶5.

26. Union Carbide also made phenolic molding compounds that were sold under the trade name "Bakelite."

26. Exhibit O, at ¶6.

27. The epoxy resins and phenolic resins *never* contained asbestos.

27. Exhibit O, at ¶¶4 an 5.

28. Union Carbide's phenolic molding compounds were sold in a granular form to manufacturers, who then used the molding compounds to make finished molded plastic products.

28. Exhibit O, at ¶¶5, 6.

29. Until approximately 1974, some, but *not all*, of these phenolic molding compounds contained asbestos fibers as filler.

29. Exhibit O, at ¶6.

30. However, many of Union Carbide's phenolic molding compounds did not

30. Exhibit O, at ¶6.

6

BAYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT UNION CARBIDE CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1   contain asbestos, but instead used other
2   fillers such as wood flour, cotton flock, mica,
3   coal, or talc.

4   31. While the phenolic resins were sold by         31. Exhibit O, at ¶7.
5   Union Carbide to many different companies,
6   who used them to make finished plastic
7   products that were then sold to end-users,
8   Union Carbide never itself manufactured
    finished products from its phenolic resins.

9   32. Many other companies manufactured             32. Exhibit O, at ¶8.
10  phenolic molding compounds similar to
11  those made by Union Carbide, including, for
12  example, Durez, Plastic Engineering Co.
13  (hereinafter, "Plenco"), General Electric,
    Westinghouse, and Reichold.

14  33. "Bakelite" is a generic term used to          33. Affidavit of John Moalli, dated
15  describe a type of plastic the identification of   November 15, 2006, attached as Exhibit P to
16  which does not specifically relate to a Union      the Moses Decl., at ¶4-17.
    Carbide product.

17
18  34. While "Bakelite" was at one time a            34. Exhibit N, at ¶¶ 9, 10 and 11; Exhibit P,
19  registered trade name of Union Carbide, the        at ¶¶ 1-3, 5-10, 13 and 14.
20  term had, well before Plaintiffs' alleged
21  exposure, become a generic name for a wide
22  range of plastic products, specifically
    including those made from phenolic resins
    and phenolic molding compounds.

23  35. Even long after Union Carbide stopped         35. Exhibit P, at ¶ 10.
24  manufacturing phenolic resins and phenolic
25  molding compounds, suppliers and
26  purchasers still refer to plastic materials
27  generically as "bakelite."
28

7

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

| | |
|---|---|
| 1  36. In Mr. Lyman's videotaped direct | 36. Exhibit N, at 22:23-23:8. |
| 2  deposition, Mr. Lyman stated the only | |
| 3  place he saw "bakelite" was in the oil fields | |
| in a plastic form. | |
| 4  37. Mr. Lyman testified in his discovery | 37. Exhibit K, at 542:4-9. |
| 5  deposition that he did not recall what the | |
| 6  "bakelite" looked like, nor where it was that | |
| he saw it. | |
| 7  38. Mr. Lyman testified that he believed he | 38. Exhibit K, at 542:14-18, |
| 8  saw "bakelite" "maybe back in the '70s," | |
| 9  while he was "probably [at] Baker." | |
| 10  39. Mr. Lyman testified that he did not | 39. Exhibit K, at 542:22-25. |
| 11  recall any specific job site at which he may | |
| 12  have seen "bakelite." | |
| 13  40. Mr. Lyman did not state that any | 40. Exhibit K, at 543:1-8. |
| 14  "bakelite" he used was manufactured by | |
| 15  Union Carbide; he believed that the | |
| 16  "bakelite" he used was "manufactured by | |
| Bakelite." | |
| 17 | |
| 18  41. Mr. Lyman testified that he saw the | 41. Exhibit K, at 544:10-14. |
| 19  name "bakelite" on the packaging, but could | |
| not recall what the name looked like. | |
| 20  42. At his deposition, Mr. Lyman testified: | 42. Exhibit K, at 544:15-23. |
| 21  Q:  Do you recall what exactly you | |
| did when you worked with that product? | |
| 22  A:  No. | |
| 23  Q:  Do you recall whether you had to | |
| 24  mix, cut, sand, abrade, apply any of that? | |
| A:  I have no idea what I did with it. | |
| 25  Q:  Okay. Do you know whether | |
| 26  any of that product contained asbestos? | |
| 27  A:  No. | |
| 28 | |

8

BRYDON
HUGO & PARKER
135 MAIN STREET
20th FLOOR
San Francisco, CA 94105

SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT
UNION CARBIDE CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE
ALTERNATIVE, SUMMARY ADJUDICATION

| | |
|---|---|
| 1 | 43. Plaintiffs' discovery responses or | 43. Exhibit H, at 2:1-5:23; Exhibit I, at 2:1-5:23; Exhibit K, at 544:21-23. |

43. Plaintiffs' discovery responses or deposition testimony do not state any facts from which the Court may infer that Union Carbide supplied any "bakelite" to which Mr. Lyman was allegedly exposed, or that any such material actually contained asbestos.

43. Exhibit H, at 2:1-5:23; Exhibit I, at 2:1-5:23; Exhibit K, at 544:21-23.

44. Although not specifically alleged in their responses to Union Carbide's special interrogatories, Plaintiffs may also claim that Union Carbide-supplied asbestos was contained in "USG products" to which Mr. Lyman may have been exposed.

44. Exhibit A, at 4:10-12.

45. Mr. Lyman stated in his deposition testimony that he worked with or around U.S.G. products once in the U.S. Marine Corps, and then again when he was a foreman at the U.S. Gypsum plant in Charlestown, Massachusetts.

45. Exhibit K, at 160:22-161:6 and 343:13-344:7.

46. Plaintiffs failed to identify the brand name or manufacturers of any of these allegedly asbestos-containing products, whether USG's or otherwise.

46. Exhibit H, at 2:1-10 and Exhibit I, at 2:1-10.

47. Union Carbide mined and milled short-fiber, chrysotile asbestos under the trade name "Calidria" from approximately 1963 to 1985.

47. Declaration of John L. Myers, dated March 25, 2003, attached as Exhibit Q Declaration of Thomas J. Moses ("Moses Decl."), at ¶5.

48. Union Carbide's asbestos mine was located near King City, California, and was the only asbestos mine ever operated by Union Carbide.

48. Exhibit Q, at ¶5.

9

SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT UNION CARBIDE CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

| | | |
|---|---|---|
| 1 | 49. Union Carbide never sold "Calidria" to individual consumers, but only to third party manufacturers who used it at certain times in products that were utilized in various commercial applications. | 49. Exhibit Q, at ¶5. |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | 50. Union Carbide did not begin to supply asbestos at all until 1963, and then in a limited fashion. | 50. Exhibit Q, at ¶5. |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | 51. Union Carbide did not sell asbestos fibers to U.S. Gypsum for tape joint compound before the year 1968. | 51. Exhibit Q, at ¶7. |
| 10 | | |
| 11 | | |
| 12 | 52. In contrast to Plaintiffs' complaint, Plaintiffs' responses to interrogatories do not state that Mr. Lyman was exposed to asbestos at the U.S. Gypsum facility in Charlestown, Massachusetts, and in any event fail to identify any specific products or materials for which Union Carbide might be liable. | 52. Exhibit A, at 4:11-13, Exhibit H, at 2:1-10 and Exhibit I, at 2:1-10. |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | 53. Mr. Lyman testified that he never mixed the mud for the drywall himself. | 53. Exhibit K, at 345:14-15. |
| 19 | 54. Mr. Lyman testified that he did not know what ingredients were used in the wallboard mud. | 54. Exhibit K, at 345:18-25. |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | 55. Mr. Lyman testified that he did not recall what other products were being manufactured at the USG plant. | 55. Exhibit K, at 344:15-18. |
| 24 | | |
| 25 | | |
| 26 | 56. USG had at least ten different asbestos suppliers for its asbestos-containing | 56. Declaration of Howard J. Bowman, dated March 27, 2003 Exhibit R, at ¶¶10, 11; . |
| 27 | | |
| 28 | | |

10

SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT UNION CARBIDE CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

products.

57. In their responses to Union Carbide's case-specific interrogatories regarding the bases for Plaintiffs' false representation, Plaintiffs admit they do not have any specific evidence to support a claim of false representation.

58. Plaintiffs' discovery responses make clear that Plaintiffs have no facts showing that Union Carbide ever verbally communicated with or made any oral representations to Mr. Lyman at all.

59. Plaintiffs' responses to Union Carbide's case-specific interrogatories regarding the bases for Plaintiffs' punitive damages claim rely upon various matters outside of the record of this case, refer to documents that are not produced in this case, and show no direct conduct towards Plaintiffs sufficient enough to support a claim for punitive damages based upon such conduct.

relevant portions of U.S. Gypsum's General Order 129 Discovery Responses, attached as Exhibit S, to the Moses Decl. at 23:8-25:14.

57. Exhibit F, at 8:17-9:3; Exhibit G, at 8:17-9:3; Exhibit H, at 12:20-13:14, Exhibit I, at 12:20-13:14.

58. Exhibit F, at 8:17-9:3; Exhibit G, at 8:17-9:3; Exhibit H, at 12:20-13:14, Exhibit I, at 12:20-13:14.

59. Exhibit F, at 8:6-16; Exhibit G, at 8:6-16; Exhibit H, at 10:16-13:14, Exhibit I, at 10:16-13:14.

## SEPARATE STATEMENT IN SUPPORT OF UNION CARBIDE'S MOTION FOR SUMMARY ADJUDICATION

### Adjudication Issue No. 1:

Plaintiffs' First Cause of Action for Negligence has no merit, because there is no evidence that Union Carbide caused Mr. Lyman's asbestos-related injuries, or that Mr. Lyman was exposed to any products manufactured, supplied, or distributed by Union Carbide that contained asbestos.

11

SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT UNION CARBIDE CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

BRYDON
HUGO & PARKER
135 MAIN STREET
20th FLOOR
San Francisco, CA 94105

1

2    <u>UNDISPUTED MATERIAL FACTS</u>              <u>EVIDENTIARY SUPPORT</u>

3    Union Carbide incorporates herein the        Union Carbide incorporates herein the
     above-stated Undisputed Material Facts       evidence supporting the above-stated
4    Nos. 1 to 58, inclusive, as though restated  Undisputed Material Facts Nos. 1 to 58,
5    in full.                                      inclusive, as though restated in full.

6                          Adjudication Issue No. 2:

7         Plaintiffs' Second Cause of Action for Strict Products Liability has no merit, because

8    there is no evidence that Union Carbide caused Mr. Lyman's asbestos-related injuries, or

9    that Mr. Lyman was exposed to any products manufactured, supplied, or distributed by

10   Union Carbide that contained asbestos.

11   <u>UNDISPUTED MATERIAL FACTS</u>              <u>EVIDENTIARY SUPPORT</u>

12   Union Carbide incorporates herein the        Union Carbide incorporates herein the
     above-stated Undisputed Material Facts       evidence supporting the above-stated
13   Nos. 1 to 58, inclusive, as though restated. Undisputed Material Facts Nos. 1 to 58,
14   in full.                                      inclusive, as though restated in full.

15

16                         Adjudication Issue No. 3:

17        Plaintiffs' Third Cause of Action for False Representation has no merit, because

18   there is no evidence that Union Carbide caused Mr. Lyman's asbestos-related injuries, or

19   that Mr. Lyman was exposed to any products manufactured, supplied, or distributed by

20   Union Carbide that contained asbestos, additionally, there is no evidence that Union

21   Carbide made any representations to Mr. Lyman, or owed Mr. Lyman any duty to

22   affirmatively disclose information, or that there is no proof that Mr. Lyman was a

23   consumer of a product for which Union Carbide is liable.

24   <u>UNDISPUTED MATERIAL FACTS</u>              <u>EVIDENTIARY SUPPORT</u>

25   Union Carbide incorporates herein the        Union Carbide incorporates herein the
     above-stated Undisputed Material Facts       evidence supporting the above-stated
26   Nos. 1 to 58, inclusive, as though restated  Undisputed Material Facts Nos. 1 to 58,
27
                                      12
28

SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT
UNION CARBIDE CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE
ALTERNATIVE, SUMMARY ADJUDICATION

1 | in full.                                    inclusive, as though restated in full.

2

3 | ## Adjudication Issue No. 4:

4 | Plaintiffs' Forth Cause of Action for Loss of Consortium has no merit, because there

5 | is no evidence that Union Carbide caused Mr. Lyman's asbestos-related injuries, or that

6 | Mr. Lyman was exposed to any products manufactured, supplied, or distributed by Union

7 | Carbide that contained asbestos, and because the underlying causes of action from which

8 | it derives have no merit.

9 | **UNDISPUTED MATERIAL FACTS**              **EVIDENTIARY SUPPORT**

10 | Union Carbide incorporates herein the      Union Carbide incorporates herein the

11 | above-stated Undisputed Material Facts      evidence supporting the above-stated

   | Nos. 1 to 58, inclusive, as though restated  Undisputed Material Facts Nos. 1 to 58,

12 | in full.                                    inclusive, as though restated in full.

13 | ///

14 | ///

15 | ///

16 | ///

17 | ///

18 | ///

19 | ///

20

21

22

23

24

25

26

27 |                                    13

28 | **SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT
UNION CARBIDE CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE
ALTERNATIVE, SUMMARY ADJUDICATION**

BRYDON
HUGO & PARKER
135 MAIN STREET
20ᵗʰ FLOOR
San Francisco, CA 94105

1  Adjudication Issue No. 5:

2      Plaintiffs' Claim for Punitive Damages has no merit, because there is no evidence

3  that Union Carbide caused Mr. Lyman's asbestos-related injuries or that Mr. Lyman was

4  exposed to any products manufactured, supplied, or distributed by Union Carbide that

5  contained asbestos or to any asbestos supplied by Union Carbide placed into products

6  manufactured by others, or that there is any "clear and convincing evidence" that any of

7  the conduct at issue concerning Union Carbide herein constitutes "malice," "oppression,"

8  or "fraud," or "despicable conduct," which is necessary to support such a claim.

9

10  **UNDISPUTED MATERIAL FACTS**          **EVIDENTIARY SUPPORT**

11  Union Carbide incorporates herein the    Union Carbide incorporates herein the

12  above-stated Undisputed Material Facts    evidence supporting the above-stated

13  Nos. 1 to 58, inclusive, as though restated    Undisputed Material Facts Nos. 1 to 58,

    in full.                                   inclusive, as though restated in full.

14

15  DATED: July 5, 2007                        BRYDON HUGO & PARKER

16

17                                             By: _____

18                                                 John R. Brydon
                                                   Thomas J. Moses
19                                                 Erin M. Carpenter
                                                   Attorneys for Defendant
20                                                 UNION CARBIDE CORPORATION

21                                             1102-0231

22

23

24

25

26

27

28                                             14

BRYDON        SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT
HUGO & PARKER      UNION CARBIDE CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE
135 MAIN STREET                     ALTERNATIVE, SUMMARY ADJUDICATION
20TH FLOOR
San Francisco, CA 94105

_Lyman, Robert F. & Samantha vs. Asbestos Defendants (B*P), et al._
San Francisco County Superior Court Case No. CGC-06-459162
LexisNexis Transaction No. 15465916

PROOF OF SERVICE

I am a resident of the State of California, over the age of 18 years, and not a party to the within action. My electronic notification address is service@bhplaw.com and my business address is 135 Main Street, 20th Floor, San Francisco, California 94105. On the date below, I served the following:

SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT UNION CARBIDE CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

on the following:

David R. Donadio                          AND SEE LEXIS NEXIS SERVICE LIST
Brayton Purcell
222 Rush Landing Road
Novato, CA 94945

X        By transmitting electronically the document(s) listed above as set forth on the electronic service list on this date before 5:00 p.m.

I declare under penalty of perjury that the above is true and correct. Executed on July 5, 2007, at San Francisco, California.

_Wanda D. Claudio_
Wanda D. Claudio

1

PROOF OF SERVICE

# EXHIBIT H

1   ALAN R. BRAYTON, ESQ., S.B. #73685
    DAVID R. DONADIO, ESQ., S.B. #154436
2   GARY V. JUDD, ESQ., S.B. #127622
    BRAYTON◆PURCELL LLP
3   Attorneys at Law
    222 Rush Landing Road
4   P.O. Box 6169
    Novato, California  94948-6169
5   (415) 898-1555

6   Attorneys for Plaintiffs

7

8                 SUPERIOR COURT OF CALIFORNIA

9                    COUNTY OF SAN FRANCISCO

10

11  ROBERT F. LYMAN and              ASBESTOS
    SAMANTHA LYMAN,                  No. 459162
12
            Plaintiffs,              DECLARATION OF ROBERT F. LYMAN
13                                   IN SUPPORT OF PLAINTIFF'S
                                     OPPOSITION TO DEFENDANT UNION
    vs.                              CARBIDE CORPORATION'S MOTION
14                                   FOR SUMMARY JUDGMENT, OR IN
    ASBESTOS DEFENDANTS (B◆F)        THE ALTERNATIVE, SUMMARY
15                                   ADJUDICATION

16

17
                                     Date:  July 27, 2007
18                                   Time:  9:30 a.m.
                                     Dept:  302, Hon. Patrick J. Mahoney
19                                   Trial Date:  July 30, 2007
                                     Action Filed:  December 29, 2006
20       I, Robert F. Lyman, declare:

21       1.  I am the plaintiff in this action.  I have personal knowledge of the facts set forth in

22  this declaration, and if called as a witness, I could and would competently testify as to the truth

23  of the matters set forth herein.

24       2.  From approximately 1981 through 1986, I worked as an oil field worker treating oil

25  wells in oil fields throughout Southern California.  Along with others in a crew, I performed

26  drilling and worked with and around muds and packing.

27       3.  At my deposition I stated, and reaffirm here, that during this time period while

28  employed in the oil fields I worked around products bearing the Montello logo.

EXHIBIT ___A___

4. At the time of my deposition I could not recall which products I had seen the Montello logo on but did recall that it was on paper sacks. After my deposition my attorneys provided me 15 photos to review as part of the preparation of responses to Defendant Montello's written discovery. Upon reviewing the photos, my recollection was refreshed as to particular Montello brand products. The three photos which refreshed my memory, are attached to this declaration. The drilling mud products I most clearly recall, having had my memory refreshed by the photographs, is asbestos containing Super Visbestos and Univis throughout the years I worked in the oil fields.

5. The sacks were filled with a dry powdery substance, that they mixed with fluids. I worked in close proximity to workers who opened these sacks emptied the contents and threw the empty sacks aside. This process created large amounts of visible dust which I breathed and landed on my clothes.

6. I did not generally have breathing protection when I worked around these drill materials. On occasion I wore a paper dust mask, but I did not receive any instruction as when to wear it, and I generally only put it on if crude oil was spraying out of a hole. On other occasions I wore a heavy rubber mask with a filter. This was limited to work around volatile chemicals. I could not wear it on a regular basis because it obstructed my vision and put me in danger of falling into a well.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, as to my own personal knowledge.

Executed on _____, 2007, in _____.



Robert F. Lyman

DECLARATION OF ROBERT F. LYMAN IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT UNION CARBIDE CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION







# EXHIBIT I

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

BEFORE THE HONORABLE PATRICK J. MAHONEY, JUDGE PRESIDING

DEPARTMENT NUMBER 302

---oOo---

| | |
|---|---|
| ROBERT P. LYMAN, et al., ) | |
| ) | |
| Plaintiffs, ) | Case No. CGC-06-459162 |
| ) | Motion for Summary |
| vs. ) | Judgment |
| ) | |
| ) | Pages 1 - 22 |
| ASBESTOS DEFENDANTS, ) | |
| ) | |
| Defendants. ) | |

Reporter's Transcript of Proceedings

Friday, July 27, 2007

APPEARANCES OF COUNSEL:

For Plaintiffs:

    Brayton Purcell, LLP
    222 Rush Landing Road
    Novato, California  94945
    By:  Andrew Chew,
        ATTORNEY AT LAW


For Defendant Union Carbide Corporation:

    Brydon Hugo & Parker
    135 Main Street, 20th Floor
    San Francisco, California 94105
    By:  Brian H. Buddell,
        ATTORNEY AT LAW

      Erin M. Carpenter,
      ATTORNEY AT LAW


Reported by:  Kathy Kollehner, CSR No. 4102, RPR, CRR

2

```
 1   FRIDAY, JULY 27, 2007                    10:36 A.M.

 2                      ---oOo---

 3        THE COURT:  Okay.  So, let's do Lyman vs. Asbestos

 4   Defendants, which is 06-459162.  That's line 9.

 5        MR. CHEW:  Good morning, Your Honor, Andrew Chew for

 6   plaintiff.

 7        MR. BUDDELL:  Good morning again, Your Honor.  Brian Buddell

 8   for Union Carbide Corporation.

 9        MR. CARPENTER:  Good morning, Your Honor.  Erin Carpenter on

10   behalf of Union Carbide Corporation.

11        THE COURT:  Okay.  Whoever wants to go first.

12        MR. BUDDELL:  Well, Your Honor, to begin with, I wanted to

13   clarify the tentative ruling because the -- I think I know where

14   the Court was going, but I wanted to clarify a couple of things.

15        First of all, with respect to the second part of the Court's

16   tentative ruling with respect to the motion for summary

17   adjudication, we have not received any notice that that was

18   being contested.  I just confirmed that with my office

19   approximately an hour ago.  So, I'm assuming that that matter,

20   subject to any revisions changing your mind on the summary

21   judgment --

22        THE COURT:  Mr. Buddell, you're both here.  Let's get to the

23   merits of this, okay?

24        MR. BUDDELL:  Fair enough.
```

25      With respect to the motion for summary judgment, if I

26  understand the Court's ruling, did the Court find that we

27  shifted our burden, but then that burden was met by the

28  plaintiff through the submission of the declaration of

3

1  Mr. Lyman, the Walsh declaration, pages -- excuse me --

2  paragraphs seven and eight, and Ken Cohen's declaration and

3  deposition testimony?

4      THE COURT:  Yes.

5      MR. BUDDELL:  Okay.  Obviously, I have no problem with the

6  consideration of the Walsh declaration.  We submitted that

7  ourselves.  But we did raise some objections with respect to the

8  Lyman deposition that I'd like the Court to rule on so I can

9  focus my efforts here.

10      The first, Your Honor, was that the declaration that was

11  submitted was unsigned by Mr. Lyman.

12      MR. CHEW:  Your Honor, we have a signed declaration.  And I

13  believe we submitted it to the Court earlier.

14      THE COURT:  That was my recollection.

15      MR. BUDDELL:  It certainly wasn't submitted with the moving

16  papers -- or the opposition papers.

17      THE COURT:  Okay.  That objection is overruled, in light of

18  the fact that it's executed.

19      Next?

20      MR. BUDDELL:  Okay.  The next is with respect to Mr. Cohen's

21  declaration.  And that objection was made on the grounds that,

22  one, Mr. Cohen has not been properly designated as an expert in

23  this case.

24    THE COURT:  I'm not aware of the rule that somebody has to

25  be designated as an expert to file an opposition in a motion for

26  summary judgment or summary adjudication.  But if there is one,

27  you can point it out to me.

28    ·   MR. BUDDELL:  Well, I would simply rely on an issue of

4

1  fairness, Your Honor, that the Local Rules are quite clear --

2    THE COURT:  Look.  I don't write the rules on summary

3  judgment.  I'll just say if there's a rule on that that I'm

4  unaware of, you can point it out to me.  I'm not aware of that

5  rule.  It's not a bad idea.  But the objection on that ground is

6  overruled.

7    MR. BUDDELL:  All right.  The next is with respect to

8  Mr. Cohen's declaration lacking foundation, Your Honor.  And on

9  that grounds, Mr. Cohen does not have personal information based

10  on what he's testifying about.

11    In fact, if you look at the text of his declaration, he

12  makes several references to a Francis Lyman, who -- I don't know

13  who that is, but it's certainly not anybody in this case.

14  Specifically, his declaration, which goes to the crux of the

15  matter, states that Mr. Francis F. Lyman would have been exposed

16  to asbestos.

17    Obviously, the Court is constrained by the evidence

18  presented before it.  And if it's to read Mr. Cohen's

19  declaration as it's written, it provides no foundation to

20  support this ruling.

21    THE COURT:  Okay.  Let me find it.

22      MR. BUDDELL:  I might be able to help Your Honor.

23      MR. CHEW:  It's Exhibit D to plaintiff's motion -- or

24 opposition, Your Honor.

25      THE COURT:  I've got so many papers from the defendant, that

26 I can't get to the plaintiff's.

27      Okay.  Here we go.

28      MR. BUDDELL:  And if you go to paragraph nine of that

                                                                5

1 declaration, Your Honor, you can see what I'm talking about.

2      THE COURT:  Okay.  I see what you're saying.

3      MR. BUDDELL:  It says that the sacks -- about midway through

4 the paragraph -- the sacks was filled with a dry substance that

5 his coworkers mixed with fluids.  Francis F. Lyman worked in

6 close proximity to workers who opened these sacks, emptied these

7 contents and threw the empty sacks aside.

8      MR. CHEW:  If I may, Your Honor?

9      THE COURT:  Yes.

10      MR. CHEW:  It's Robert F. Lyman.  "F" stands for Francis.

11 And I certainly acknowledge that it says Francis F. Lyman, but I

12 believe that's what Mr. Cohen was alluding to.

13      And if I could refer the Court back to paragraph 12 of

14 Mr. Cohen's dec. on page 6, the final conclusion is with regards

15 to Robert F. Lyman, Your Honor.

16      MR. BUDDELL:  Well, that may be the case, Your Honor.  But

17 as the Court ruled in a case just previous this morning, without

18 the foundation, Mr. Cohen's conclusory opinions or worthless.

19      And Mr. Cohen, again in paragraph 11, states that this

20 Francis F. Lyman, mystery man, was the one in proximity to

21 workers who opened these sacks.  Now, certainly we can speculate

22 all day as to what Mr. Cohen meant or should have written or did

23 or didn't.  But what record is before this Court is that

24 Mr. Cohen has stated under penalty of perjury that he believes,

25 reading the materials presented to him, that a Francis F. Lyman

26 was the one exposed to the subject materials and suffered the

27 exposure therefrom.

28     They can't now come in and say, "Well, what he really meant

6

1 to say was this."

2     MR. CHEW:  Your Honor, if I may, I don't think it's -- that

3 Mr. Buddell is trying to represent as if we're trying to somehow

4 state that Mr. Cohen was alluding to two different individuals.

5     Francis Lyman is Robert Lyman, Your Honor.  It's the same

6 individual.

7     THE COURT:  Well, right.  How do I know that from the

8 record?  I mean, how do I know, for example, that Robert F., the

9 "F" really does stand for Francis?  I'm not saying I don't

10 believe you, but I don't really know what to do with this

11 problem.

12     MR. CHEW:  Well, Your Honor, as I alluded to earlier, I

13 believe the actual general -- the final conclusion in paragraph

14 12 refers to Robert Lyman, Your Honor, after reviewing all the

15 testimony, the deposition testimony, the declaration of

16 Mr. Lyman, dated, referred to, specified.

17     THE COURT:  Okay.  Mr. Buddell, what else?

18     MR. BUDDELL:  Okay.  On a more substantive matter,

19 Your Honor, I think the Court's primary focus was on Mr. Lyman's

20 declaration.

21     And in that regard; I think the Court improperly considered

22 this declaration in light of the holding in the D'Amico,

23 D-'A-m-i-c-o,' case, which specifically bars the consideration of

24 contradictory declarations -- or declarations which contradict

25 deposition testimony.

26     Now, in their brief, plaintiffs try to state, erroneously

27 so, that the subsequent cases, namely, the Scalf case and the

28 Benavidez case, have since come down and have undermined the

7

1 D'Amico holding, such that the declarations can be submitted.

2     That's simply not the case.  The Scalf case, which is the

3 most recent case -- it's a 2005 case -- at page 1521 and 1522,

4 specifically states that, "Properly applied, D'Amico is limited

5 to instances where credible discovery admissions are

6 contradicted only by self-serving declarations of a party."

7     It then goes on to summarize it and say, "In a nutshell, the

8 rule bars a party opposing summary judgment from filing a

9 declaration that purports to impeach his or her own prior sworn

10 testimony."  And that's exactly what has happened here.

11     Likewise, the Benavidez case dealt with the same issue.

12 What it did was state that, sure, there are some instances where

13 you have to look at the totality, but that doesn't change the

14 fact.  If somebody says X at deposition, and they later say Y in

15 a declaration, the Court can't consider that for purposes of

16 motion for summary judgment opposition.

17     In fact, the Benavidez court actually dealt with the two

18  other cases cited by plaintiff and threw them out --

19  distinguished them.  Those cases were the Price case, which the

20  Benavidez Court said, "Look, that doesn't apply because in that

21  situation, you've got an individual who made an admission at

22  declaration as to a legal term that they probably didn't know

23  what they were talking about."  Specifically, it related to the

24  term of assignment as it pertained to a real estate transaction,

25  and this was a layperson.  And there, the Price Court says,

26  "Look, you can't hold a layperson to a strict legal

27  interpretation of a strict legal term, absent some showing that

28  they know what they were talking about."

8

1       It also distinguished the Niederer case, which involves

2  another misunderstanding of a legal term.  But the bottom line

3  is both the Benavidez case, which is a 1999 case, and the Scalf

4  case absolutely support D'Amico to the point that it precludes

5  the declaration.

6       Now, in plaintiff's Ps and As, they absolutely misstate the

7  holding of Scalf at one point.

8       THE COURT:  Mr. Buddell, look.  I know what the holdings

9  are, right?  Let's look at the actual language, because that's

10  what's --

11      MR. BUDDELL:  When you say the "language," Your Honor, are

12  you talking about the testimony?

13      THE COURT:  Mr. Lyman, yes.

14      MR. BUDDELL:  Okay.  So, if we're going to do that, I guess

15  what we need to look at is:  Does it really contradict?  And it

16  absolutely does.  If you look at --

17      THE COURT:  Where is it?  That's what I'm trying to find.

18      MR. BUDDELL:  Okay.  If you look at plaintiff's

19  declaration --

20      THE COURT:  No.  I've got the declaration.

21      MR. BUDDELL:  Okay.  Go to Exhibit J -- no, I take that

22  back -- K of our declaration, specifically, on --

23      THE COURT:  Just wait a minute.  Okay.  Which page, 529?

24      MR. BUDDELL:  Yes.  Actually -- it's throughout that block

25  of pages, Your Honor.

26      THE COURT:  Okay.

27      MR. BUDDELL:  But if you look at paragraph 4 of his

28  declaration, Mr. Lyman states, "At the time of my deposition, I

                                                              9

1  could not recall which products I had seen the Montello logo on,

2  but did recall it was on paper sacks."  Okay?

3      THE COURT:  Uh-huh.

4      MR. BUDDELL:  The first part of that is dealt with beginning

5  at page 529, line 10.

6          "Q.  Have you ever worked or around any product that was

7      distributed by a company called Montello, Inc.?

8          "A.  Yeah.  Montello.  Again, I don't remember what it

9      was, but I've seen the logo, and I believe it was in the oil

10     fields."

11     THE COURT:  Okay.

12     MR. BUDDELL:  Here's the important part.

13         "Q.  Can you tell me what kind of container you saw the

14     logo on?

15        "A.  No.  Again, this is 40 years ago."

16        He denies -- this absolutely contradicts his assertion in

17   the declaration that he said at his deposition that it was on

18   paper sacks.  He didn't say that at all.  He denied knowing what

19   kind of container at all.  But it doesn't stop there.

20        Moving on.  Question -- and this is at line -- actually, let

21   me stop there.

22        If we go to paragraph five of the declaration, Mr. Lyman

23   states, "The sacks were filled with a dry powdery substance that

24   they mixed with fluids."  However, this directly contradicts his

25   deposition testimony at page 525, lines 20 and 22, where he's

26   asked,

27        "Q.  Can you tell me what material was in any container

28        that had that logo on it?

                                                              10


1        "A.  No.  I don't recall."

2        Then we go on further --

3        THE COURT:  Well, but you're ignoring the statement in

4   paragraph four about his recollection being refreshed as to the

5   subject.

6        MR. BUDDELL:  I understand that, Your Honor.  But that

7   doesn't change the fact that this is a direct contradiction.

8   And under the holding in --

9        THE COURT:  No, it's not.  It's not.

10       MR. BUDDELL:  It certainly is, Your Honor.

11       THE COURT:  You and I, I suppose we could argue about this

12   day and night.  But my ruling at this point is the only one that

13  counts.  And, you know, maybe some wiser folks will agree with

14  you.  But what I'm telling you is paragraph five does not

15  contradict the testimony, because based on paragraph four, the

16  witness has had his recollection refreshed.

17      Now, one can challenge the credibility of that, all right?

18  But that's not what this forum is about.  So, I don't find that

19  five is inconsistent with the testimony, based on the testimony,

20  the declaration in paragraph four, because there's absolutely

21  nothing wrong with a witness having their recollection

22  refreshed.

23      MR. BUDDELL:  Well, if that were the case, Your Honor, the

24  D'Amico rule would never stand because a witness could always

25  have it refreshed by something, and then it would fall.  And

26  that's certainly not what the Scalf --

27      THE COURT:  Look.  I wouldn't mind frankly if D'Amico was

28  interpreted as broadly as you'd like it to be interpreted, all

                                                                    11


1   right?  And I'm sure that a lot of my colleagues around here

2   would like that, as well, okay?  I just don't think that D'Amico

3   is as sweeping as you would like it to be, all right?  I just --

4   I just don't.  What else can I say?

5       MR. BUDDELL:  Well, Your Honor, there is one other issue.

6   And I've saved this for last because this is, I think, the

7   silver bullet for this case.

8       THE COURT:  I wish we'd start with the silver bullets first.

9   But go ahead.

10      MR. BUDDELL:  If you turn to the deposition testimonies also

11  submitted as part of Exhibit K, at page 543, you're going to see

12    that the submission of this declaration directly violates a

13    stipulation by Mr. Vaillancourt of the Brayton office,

14    specifically, beginning at line 12, Mr. Vaillancourt, dealing

15    with the problems that he's being faced with at deposition

16    because of all these I don't recall questions -- or excuse me --

17    answers being made by his client, stipulates that to the extent

18    his client has not heard the name or remembered the name of a

19    products or service company, he's not going to have any of the

20    information relating to it or associating that product with any

21    knowledge.

22         That's gone through clearly there to the bottom of the page,

23    and at the very bottom line, Mr. Vaillancourt says, "Stipulate."

24    Based on that stipulation, no further questions were asked, and

25    no further workup of these issues were made.

26         Now, the Brayton office --

27         THE COURT:  Just relax for a minute, all right?

28         Okay.  So, at the time his deposition is taken, which is on

                                                                    12


 1    April 26th of 2007, there's a stipulation on the record that if

 2    Mr. Lyman has not heard the name -- now, he has testified he's

 3    heard the name "Montello," or whatever it is; he has testified

 4    to that -- or remembered the name of a product or a service,

 5    he's not going to have any information related to that.  Okay?

 6         So, then on a date subsequent thereto, he is provided 15

 7    photographs to review, and his testimony is his recollection was

 8    refreshed as to particular Montello brand products.  Okay.  So,

 9    that's the state of the record.

10    MR. BUDDELL:  The only thing I would add, Your Honor, is

11  it's not just companies that he recalled to.  When

12  Mr. Vaillancourt adopts the statement by Mr. Twu, T-w-u, at

13  lines 19 through 21, he also incorporates those products that he

14  doesn't recall working with or around, not just those that he

15  recalls, which certainly --

16    THE COURT:  Wait a minute.

17    MR. BUDDELL:  -- encompasses Super Visbestos and Visbestos,

18  which are the products --

19                         (Reporter seeks clarification.)

20    THE COURT:  Okay.  You've got too many ifs, ands or buts in

21  the ...

22    Okay.  So, with respect to Super Visbestos, he testified --

23        "Q.  Have you ever worked with or around the product?"

24  He responds,

25        "A.  What is it?"

26    And the name of the product is given.  And he says, "Not

27  that I recall."  Okay?

28    As to the other product, did he ever work with or around the

                                                          13


1  product called Univis, U-n-i-v-i-s, his answer was no.  Okay.

2  So, we've got two different answers to two different questions.

3    And then he's asked, "Have you ever worked or around any

4  product that was distributed by a company called Montello, Inc.,

5  or a company that was -- any product that was distributed by a

6  company?"

7    His answer, "Yeah.  Montello.  And I don't remember what it

8  was, but I've seen the logo, and I believe it was in the oil

9    fields."   Okay.

10      So, then we turn to the attached photographs, okay?  And the

11   attached photographs that he reviewed all have the name of

12   Montello on them.  Of course, they also have the name Super

13   Visbestos as to one, and let's see what the other one is.

14      (Reviewing)

15      Okay.  All right.  So, I don't find that the silver bullet

16   necessarily kills the plaintiff because it seems to me that

17   the -- there's nothing wrong with a witness being shown

18   photographs and having his recollection refreshed.  It may well

19   go to his credibility, but that's not what we're talking about

20   here, okay?

21      And I don't find that he unequivocally -- in fact, he did

22   say he wasn't sure about Super Visbestos, but he definitely

23   recalled Montello.  So, if you looked at the photographs, it saw

24   a big Montello on it.  Okay?

25      MR. BUDDELL:  Well, and I agree with that, Your Honor, if we

26   were talking about any other Montello product, which

27   theoretically may or may not contain asbestos.

28      But the fact of the matter is that the two Montello products

                                                        14


1    at issue in this case are Super Visbestos and Univis, and he did

2    deny knowledge of those -- well, Univis, he absolutely denied

3    unequivocally working with them.

4      THE COURT:  All right.

5      MR. BUDDELL:  And with Super Visbestos, he denied even

6    knowing what it is, which falls directly within the stipulation

7   made by Mr. Vaillancourt at the deposition.  Either the

8   stipulation means something, or it doesn't.

9       THE COURT:  How do you get that?

10      MR. BUDDELL:  Well, Your Honor -- as -- granted, the

11  record -- it would have been nice if the record was a little bit

12  clear and counsel weren't talking over each other here.

13      But ultimately Mr. Vaillancourt adopted the statements by

14  Mr. Twu, when he states that the scope of the stipulation

15  includes --

16      THE COURT:  Look, look.  What you don't want to read -- you

17  could say it's not clear.  But at the very first words out of

18  counsel's mouth is, "If Mr. Lyman has not heard the name."  All

19  right?

20      He has heard the name Montello.  He has testified that he

21  remembers the name Montello.

22      MR. BUDDELL:  Agreed, Your Honor.  But then it goes on to

23  add, as to those products, that he doesn't recall if he's ever

24  worked with or around.  And that includes Super Visbestos and

25  Univis.

26      THE COURT:  As to Super Visbestos, his testimony was he

27  didn't recall, all right?

28      MR. BUDDELL:  He didn't recall what it was.

                                                        15


1       THE COURT:  He can look at the photographs and have his

2   recollection refreshed.  You know, as I said, you and I could

3   probably debate this all day.  But --

4       MR. BUDDELL:  My calendar is clear.

5       THE COURT:  I have lots of thing to do.

6      Anything further?

7      MR. BUDDELL:  Well, to the extent that that would be a

8   further objection to Mr. Lyman's declaration, I'd like to make

9   that at this point, Your Honor, and ask for a ruling on that.

10      THE COURT:  Overruled.

11      MR. BUDDELL:  Okay.  Finally, Your Honor, with respect to

12   the summary adjudication issue, I think the Court's ruling was

13   correct, in the sense that plaintiff didn't even oppose it nor

14   submit any evidence to support an allegation of punitive

15   damages.  And given the fact that I've not received notice of

16   that, I would submit to that.

17      MR. CHEW:  If I could, Your Honor.  It's been a while.  So,

18   Andrew Chew for plaintiff again.

19      THE COURT:  Sure.

20      MR. CHEW:  I don't mean to rehash any of the arguments that

21   Mr. Buddell --

22      THE COURT:  You don't need to.

23      MR. CHEW:  I certainly don't want to do that, Your Honor.  I

24   don't think D'Amico applies here, Your Honor.  The classic

25   example is he says "red light" in a deposition.  He says "green

26   light" in a declaration.

27      We have a clear contradiction.  I believe I counted

28   Mr. Buddell used the word "contradicts" 12 times.  There's no

                                                              16


1   contradiction here, Your Honor.

2      With regards to the Scalf case, if the Court will --

3      THE COURT:  No, no.  Do you want to say anything about the

4  other two?

5      MR. CHEW:  Yes, I do, Your Honor.

6      With regards to the motion for summary adjudication

7  Your Honor, I disagree with Mr. Buddell's representation that we

8  did not oppose it.  We did oppose it, Your Honor.  We

9  incorporated by reference everything that we used for our

10  separate statement, as they did for their motion for summary

11  adjudication.

12      I would like to bring to the Court's attention, however,

13  that I don't believe that Union Carbide has actually shifted the

14  burden on that, Your Honor, with regards to two points.  A, they

15  did not ask any questions with regards to false representation

16  or punitive damages to the plaintiff at the deposition; and,

17  two, they have not -- not -- propounded discovery with regards

18  to that particular issue.

19      Now, I see Mr. Buddell looking at his papers there right

20  now, Your Honor.  In their moving papers, they submit their set

21  one interrogatories, and they clearly propound that, Your Honor.

22      We responded to that.  They did not include our set one

23  responses in their moving papers.  Therefore, it's not properly

24  before this Court, Your Honor.  And if I could also add,

25  Your Honor --

26      THE COURT:  Well, but, Mr. Chew, the principal cause of

27  action -- the principle on which Union Carbide moved was really

28  causation; that is, that Mr. Lyman was incapable of linking his

                                                          17

1  condition to their product.  I mean, that was the thrust of the

2  motion, and as you said, both parties incorporated those

3    responses as to the other -- as to the other causes of action,

4    okay?

5        Well, if I find, as I did, that they shifted the burden of

6    proof on the issue of causation, I don't know how in the devil

7    one then could say there was some representation about some

8    product that they -- that Mr. Lyman had no contact with, all

9    right?

10       So, then you came back and appropriately responded, you

11   know, creating a triable issue of fact as to that contact.  But

12   I don't see anything on those bags or anything, for example,

13   that proffered any kind of a representation about that subject.

14       MR. CHEW:  Briefly, Your Honor?

15       THE COURT:  Yes.

16       MR. CHEW:  I believe -- and this might be -- I'm trying to

17   bifurcate the issue, Your Honor.

18       I do believe that -- certainly, they asked questions with

19   regards to causation, any possible exposure to their products.

20   So, if they've shifted the burden there, Your Honor, I would

21   probably stipulate to that -- with regards to that.  There is a

22   triable issue with regards to the causation.  However, they did

23   not shift the burden with regards to false representation and

24   punitive damages.  But they did not ask any questions about

25   those particular issues, Your Honor, at the deposition.

26       THE COURT:  But wait a minute.  I mean, at some point, you

27   know, this notion of -- I'm going to help Mr. Buddell.  I'm

28   going to go to his silver bullet and the stipulation, all right?

                                                              18

1    I mean, at some point, enough of this is enough.  I mean,

2  you don't want your client sitting there being harassed to death

3  by the question of:  Let's see.  You can't identify any of my

4  client's products, so is it true or not true that we never made

5  any representations?  You know, at some point it just gets to be

6  silly.

7    MR. CHEW:  I agree with that notion, Your Honor.

8    What I would like to add, or flesh out, if you will, even

9  putting that issue aside, Your Honor, there is no discovery,

10  written discovery, if you will, formal written discovery, with

11  regards to that issue.  And as the Court mentioned, there is

12  nothing on the bags with regard to that.  And that's exactly the

13  point, Your Honor.  There were no warnings with regards to lung

14  cancer, specifically, or mesothelioma, specifically.

15    We referenced the deposition testimony of several of their

16  persons most knowledgeable that stand for the notion that there

17  is despicable conduct here, Your Honor.  But they don't address

18  that in their moving papers.  So, therefore, they haven't

19  shifted the burden on that issue, Your Honor.

20    THE COURT:  Okay.  Mr. Buddell?

21    MR. BUDDELL:  Your Honor, we did shift the burden.  And we

22  brought it up in our moving papers.  And, notably, there is not

23  a single mention of the punitive damage issues in their Points

24  and Authorities, not one.

25    So, this is an issue that -- if we want to talk about what's

26  properly before the Court, this is clearly not -- this

27  opposition is clearly not before this Court because Mr. Chew is

28  raising both evidence and arguments that have never been raised

19

1   in their opposing papers whatsoever.

2       They can say that they've incorporated all of our papers

3   until the cows come home, but they've not made one single

4   argument, except for what Mr. Chew is saying today, orally, that

5   we've not shifted the burden, nor that -- that we have -- are

6   somehow liable for punitive damages under the elevated standard

7   that applies under California law.

8       THE COURT:  Okay.

9       MR. CHEW:  If I may, Your Honor?

10      THE COURT:  Mr. Chew.

11      MR. CHEW:  And I don't mean to beat a dead horse,

12  Your Honor.

13      But in our response to their separate statement with regards

14  to the fourth cause of action, the punitive cause of action, our

15  response is disputed.  "Objection.  The form of motion seeking

16  summary adjudication makes it impossible for plaintiff to

17  discern which facts defendant applies to this," capitalization,

18  "Cause of Action, without waiving such objection," and I won't

19  go any further, Your Honor.

20      If they don't bring up the point of how they shifted the

21  burden with respect to false representation and punitive

22  damages, how can we address that issue, Your Honor?  There's

23  nothing before us.  There's nothing for us to oppose.

24      MR. BUDDELL:  And there again, Your Honor called it exactly

25  right, going to the stipulation by Mr. Vaillancourt, who through

26  his stipulation tried to preclude the litany of questions that

27  would have been barraged upon his client with directly that

28  issue. Those questions weren't asked at deposition, under the

1  good faith assumption that the Brayton office would abide by its

2  stipulation.

3      THE COURT:  Now, now, now.

4      Okay.  Anything further, Mr. Chew?

5      MR. CHEW:  One question, Your Honor, or inquiry.

6      THE COURT:  Uh-huh.

7      MR. CHEW:  With regards to your tentative for punitive

8  damages, is that with regards to all punitive damages, or

9  punitive damages with regard to false representation only?  I'm

10  just -- I'm confused, Your Honor, and I need a little

11  clarification with regards to possible punitive damages with

12  regards to our claims for negligence.

13      THE COURT:  You can't have punitive damages for negligence.

14      MR. CHEW:  I believe you can, Your Honor.

15      THE COURT:  You mean a negligent misrepresentation?  Is that

16  what we're talking about?

17      MR. CHEW:  Well, you have -- you have pure negligence, if

18  you will, Your Honor.

19      MR. BUDDELL:  Which isn't alleged in the complaint,

20  Your Honor.

21      THE COURT:  I'll tell you what, gentlemen?  Anything

22  further?  I'm going to stay with the tentative ruling.  There's

23  only so much time and effort I can devote to these efforts.  So,

24  let the chips fall where they may.

25      MR. BUDDELL:  Thank you, Your Honor.

26      MR. CHEW:  Your Honor, may:  May I submit the proposed order

27  at a later date?

28      THE COURT:  Oh, sure.

                                                    21


1      MR. CHEW:  Thank you, Your Honor.

2      THE COURT:  Thank you.

3      MR. BUDDELL:  Thanks, Your Honor.

4                      (Proceedings concluded at 11:08 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

22

1    State of California                )
                                        )
2    County of San Francisco            )

3

4

5        I, Kathy Kollehner, Pro Tem Reporter for the Superior Court

6    of California, County of San Francisco, do hereby certify:

7        That I was present at the time of the above proceedings;

8        That I took down in machine shorthand notes all proceedings

9    had and testimony given;

10       That I thereafter transcribed said shorthand notes with the

11   aid of a computer;

12       That the above and foregoing is a full, true, and correct

13   transcription of said shorthand notes, and a full, true and

14   correct transcript of all proceedings had and testimony taken;

15       That I am not a party to the action or related to a party

16   or counsel;

17       That I have no financial or other interest in the outcome

18   of the action.

19

20

21   Dated:  August 1, 2007

22

23                        _____

24                    Kathy Kollehner, CSR No. 4102

25

26

27

28

# EXHIBIT J

1    John R. Brydon [Bar No. 0833365]
2    Thomas J. Moses [Bar No. 116002]
    Erin M. Carpenter [Bar No. 248337]
3    BRYDON HUGO & PARKER
    135 Main Street, 20th Floor
4    San Francisco, CA 94105
    Telephone: (415) 808-0300
5    Facsimile: (415) 808-0333

6    Attorneys for Defendant
    UNION CARBIDE CORPORATION

7

8

9            SUPERIOR COURT - STATE OF CALIFORNIA

10        COUNTY OF SAN FRANCISCO - UNLIMITED JURISDICTION

11

| | |
|---|---|
| 12   ROBERT F. LYMAN and SAMANTHA LYMAN, | (ASBESTOS)<br>Case No. 459162 |
| 13          Plaintiff(s), | |
| 14 | DEFENDANT UNION CARBIDE<br>CORPORATION'S REPLY BRIEF IN |
|       vs. | SUPPORT OF ITS MOTION FOR |
| 15 | SUMMARY JUDGMENT OR, IN THE<br>ALTERNATIVE, SUMMARY |
| 16   ASBESTOS DEFENDANTS (B♦P), | ADJUDICATION |
| 17         Defendants. | [Filed concurrently with Evidentiary<br>Objections To Plaintiffs' Evidence and |
| 18 | Declaration of Thomas J. Moses] |
| 19 | Date:     July 27, 2007<br>Time:    9:30 a.m. |
| 20 | Dept.:    302<br>Judge:    Hon. Patrick J. Mahoney |
| 21 | |
| 22 | Action Filed: December 29, 2006<br>Trial Date:   July 30, 2007 |

23   **I.**    **INTRODUCTION.**

24      Defendant Union Carbide Corporation's Motion for Summary Judgment or, in the

25   Alternative, Summary Adjudication must be granted, because Plaintiffs have failed to

26   meet their burden to show that any triable issue of material fact exists in this case.

27      Plaintiffs in this action claimed in their responses to Union Carbide's special

28   interrogatories that Robert Lyman was exposed to "Montello drilling mud" that

1

1  allegedly contained Union Carbide's asbestos. But, there is no evidence in this case to

2  support any claim that Mr. Lyman was exposed to any product which actually contained

3  Union Carbide asbestos. Indeed, Plaintiffs' deposition testimony itself establishes—

4  contrary to the unverified affidavit proffered in support of Plaintiffs' opposition to Union

5  Carbide's motion—that Mr. Lyman *never* actually worked with or near any asbestos

6  containing drilling mud or additives at his two jobs within the oil and gas industry.

7    Plaintiffs may not create a triable issue of material fact on the eve of trial simply by

8  filing self-serving evidence that directly contradicts deposition testimony previously

9  given by Plaintiff. This fatal flaw justifies granting Union Carbide's motion for summary

10  judgment or, in the alternative, summary adjudication.

11    Alternatively, Plaintiffs completely fail to controvert Union Carbide's motion for

12  summary adjudication with regards to Plaintiffs' Third Cause of Action for False

13  Representation and their claim for punitive damages. By their silence, Plaintiffs tacitly

14  admit that Union Carbide's motion as to those issues is well-taken, and accordingly

15  summary adjudication of those issues must be entered in favor of Union Carbide.

16  II.  **THE DECLARATION OF ROBERT F. LYMAN IS INADMISSIBLE**

17    Plaintiffs seek to rely on an *unsigned* declaration of Robert F. Lyman in their effort

18  to defeat Union Carbide's motion for summary judgment. The declaration, however, is

19  inadmissible on substantive as well as on procedural grounds set forth below, and cannot

20  be considered by this Court.

21    A.  **The Declaration Directly Contradicts The Prior Deposition Testimony of Robert Lyman.**

22    In support of their Opposition to Union Carbide's motion, Plaintiffs rely on a

23  declaration from Robert Lyman which directly conflicts with prior deposition testimony

24  given by him in this case. Plaintiff's attempt to create a triable issue of fact by

25

26  [1] Plaintiffs' counsel has now belatedly (i.e., only two days before the hearing) submitted a signed version of

27  this declaration. Union Carbide objects to this belated declaration, and believes that it should not be considered by the court for purposes of this hearing, as the signed declaration should have been submitted

28  along with the other opposition papers in a timely fashion, and pursuant to the stipulation of the parties and the guidelines provided by Code of Civil Procedure section 437c(b).)

BRYDON HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

2

1  contradicting his own testimony, however, will not be enough to derail Union Carbide's

2  well-taken motion.

3      The Supreme Court of California, in *D'Amico v. Board of Medical Examiners*, (1974)

4  11 Cal.3d 1, faced a situation quite similar to the present case.  There, the court ruled that

5  while affidavits filed in opposition to motions for summary judgment normally are

6  liberally construed, "when discovery has produced an admission or concession on the

7  part of the party opposing summary judgment which demonstrates that there is no

8  factual issue to be tried, certain of those stem requirements applicable in a normal case

9  are relaxed or altered in their operation." (*Id.* at 20-21.)

10     The *D'Amico* Court explained the logic behind this rule:

11     "The reasons for this attitude toward the legitimate products of discovery are
       clear.  As the law recognizes in other contexts (see Evid. Code, §§ 1220-1230)
12     admissions against interest have a very high credibility value.  This is
       especially true when, as in this case, the admission is obtained not in the
13     normal course of human activities and affairs but in the context of an
       established pretrial procedure whose purpose is to elicit facts.  Accordingly,
14     when such an admission becomes relevant to the determination, on motion for
       summary judgment, of whether or not there exist triable issues of fact (as
15     opposed to legal issues) between the parties, it is entitled to and should
       receive a kind of deference not normally accorded evidentiary allegations in
16     affidavits." (*Id.* at 22; see generally Bauman, California Summary Judgment: A
       Search For a Standard (1963) 10 U.C.L.A.L.Rev. 347, at pp. 350-351, 357-360.)

17     In the present case, Mr. Lyman's declaration directly contradicts admissions made

18  in his own sworn deposition testimony.  Examples of these contradictions are found

19  throughout the deposition of Robert F. Lyman.  Mr. Lyman only worked for two

20  companies during his time in the oil and gas industry.  His first employer was Cudd Oil.

21  During Mr. Lyman's deposition, he was asked about his work for this company.  He

22  stated that the only time he *ever* witnessed any type of drilling fluid or drilling mud in

23  use while working for Cudd was on one occasion when he observed a tanker marked

24  "drilling fluid" deliver some form of *liquid* to an oil field.  [UCC's UMF No. 10.]  He

25  never saw anyone mixing dry additives, fluids or muds near him while working for

26  Cudd.  [UCC's UMF No. 12.]

27

28

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

3

1    Mr. Lyman's only other job in the oil and gas industry was as a chemical

2  technician and tanker truck driver for Baker Hughes from 1982-1986. [UCC's UMF No.

3  13.] Although Mr. Lyman did testify that while employed by Baker Hughes, he

4  witnessed dry ingredients being mixed with liquid drilling mud in a revolving tanker

5  truck, which was then pumped into a mud tank, he also testified that he was never closer

6  then 40 to 50 feet away when he saw this. [UCC's UMF No. 14.] Moreover, Mr. Lyman

7  stated under oath that he could not identify the manufacturers, suppliers, distributors or

8  brand names of the alleged dry ingredients that he saw from a distance. [UCC's UMF

9  No. 16.]

10    Now, Mr. Lyman attempts an about-face in his affidavit.  In his newly submitted

11  declaration, Mr. Lyman states that he "worked in close proximity to workers who

12  opened these sacks emptied the contents and threw the empty sacks aside." [Decl. of

13  Robert F. Lyman, at ¶ 5.]  He further states "[t]he sacks were filled with a dry powdery

14  substance, that they mixed with fluids.  This process created large amounts of visible dust

15  which I breathed and landed on my clothes." [Decl. of Robert F. Lyman, at ¶ 5.]

16    The deposition testimony and declaration of Mr. Lyman are mutually exclusive.

17  At his deposition, Mr. Lyman states that while at Cudd he never saw dry ingredients

18  being mixed, and while at Baker Hughes he witnessed it at a distance greater then 40 or

19  50 feet.  This clearly is contradictory to his new statement that he was in "close

20  proximity" to workers who opened paper sacks.

21    The new declaration also states that at the time of his deposition, Robert Lyman

22  could not recall on which products he had seen a "Montello" logo, but did recall that it

23  was on paper sacks. [Decl. of Robert F. Lyman, at ¶ 4.]  The Plaintiffs cite to page 529,

24  lns. 10-14 of Mr. Lyman's deposition in support of this proposition.  This portion of his

25  deposition testimony, however, is merely a vague recollection of the name "Montello,"

26  with no such reference to a sack or any particular product type or description.  Reading a

27  mere one line beyond the Plaintiffs' cherry picked language sheds light on the new

28  declaration's contradiction:

BRYDON
HUGO & PARKER
135 MAIN STREET
20th FLOOR
San Francisco, CA 94105

4

1   Q: Can you tell me what kind of container you saw the (Montello) label on?

2   A: No. Again, this is 40 years ago. [Exhibit A to the Moses Decl. in support of

3   UCC's Reply to Plaintiffs' Opposition to Summary Judgment/Summary

4   Adjudication, at 529:15-17.]

5   Plaintiff, during his deposition, also did not know what type of material bore the

6   Montello logo:

7   Q: I think I asked you this. But do you recall the type of material that was in the

8   container that had the label on it?

9   A: No. [Exhibit A to the Moses Decl. in support of UCC's Reply to Plaintiffs'

10   Opposition to Summary Judgment/Summary Adjudication, at 530:8-11.]

11   The new assertions that the Plaintiff worked in close proximity to Montello sacks

12   which contained a dry powdery substance which he breathed and got on his clothes is in

13   direct contrast to his deposition testimony that he did not know what type of container

14   the Montello logo was on nor what was in the containers bearing the logo. Furthermore,

15   his declaration that he inhaled Montello brand, dry powdery substance which got on his

16   clothes is in direct contrast to his deposition testimony that he saw an unnamed product

17   from a distance of no closer then 40 to 50 feet away.

18   As stated above, these two variations of the story are at direct odds with one

19   another. They are mutually exclusive versions of the same event. As laid forth by the

20   California Supreme Court in *D'Amico*, credible testimony under oath at a formal

21   deposition must not be replaced with supplemental, self-serving affidavits in order to

22   conjure up a triable issue of material fact.

23   Furthermore, Mr. Lyman also failed to identify a single Union Carbide or Montello

24   asbestos drilling mud additive during his deposition. During Mr. Lyman's deposition,

25   Montello's attorney identified asbestos products manufactured by Union Carbide and

26   distributed by Montello which included Super Visbestos and Univis, and asked Mr.

27   Lyman whether he had ever been exposed to any of them. [UCC's UMF No. 17.] With

28   one exception, Mr. Lyman testified that he did not recall being exposed to any of the

BRYDON
HUGO & PARKER
135 Main Street
20th Floor
San Francisco, CA 94105

5

DEFENDANT UNION CARBIDE CORPORATION'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1  products; the only exception was Mr. Lyman's vague recollection of seeing the name

2  "Shurlift." [UCC's UMF No 18.] However, while he recalled seeing "Shurlift" at some

3  point, Mr. Lyman admitted that he was never exposed to it, as he neither handled

4  "Shurlift," nor was he around anyone who handled the product.  [UCC's UMF No. 19.]

5  　　　　Now, in direct contrast, Mr. Lyman asserts in his declaration that he recalls Super

6  Visbestos and Univis throughout the years he worked in the oil fields.  [Decl. of Robert

7  Lyman at ¶ 4.]  The statements made by the Plaintiff at his deposition that he did not

8  work with or around Super Visbestos or Univis are not "fragmentary concessions" as

9  suggested by the Plaintiffs.  They are unequivocal and credible admissions against

10  interest, made during a formal deposition setting.

11  　　　　Depositions are certainly not forums of the normal course of human activities, but

12  rather are established pretrial procedures whose purpose is exactly and fundamentally to

13  elicit facts.  Testimony and evidence elicited in those proceedings, particularly

14  admissions against the party's own interests, may properly be relied upon in motions for

15  summary judgment.  Mr. Lyman's admissions against interest are properly afforded a

16  very high credibility value.

17  　　　　The *D'Amico* court fleshed out this distinction by referencing a case with similar

18  facts to ours.  The Court states:

19  　　　　"Thus, in *King v. Andersen*...,the rule providing for liberal construction of
　　　　counteraffidavits was held not to require reversal of a summary judgment for

20  　　　　defendant where the plaintiff in an assault case, although having stated in his
　　　　counteraffidavit that unnecessary force was used, nevertheless had stated in a

21  　　　　previous deposition that no force was used; refusing to find that a triable issue
　　　　was thus presented, the court said: 'Where, as here, however, there is a clear

22  　　　　and unequivocal admission by the plaintiff, himself, in his deposition...we are
　　　　forced to conclude there is no substantial evidence of the existence of a triable

23  　　　　issue of fact.'" *King v. Andersen*, (1966) 242 Cal.App.2d 606, 608.

24  　　　　The Supreme Court has not retreated from its holding 25 years ago in *D'Amico*.

25  (See, e.g., *Scheiding v. Dinwiddie Const. Co.* (1999) 69 Cal.App.4th 64, 77.)  The Supreme

26  Court has consistently refused to allow a triable issue of fact to be conjured by the

27  submission of an affidavit contradicting the declarant's prior deposition testimony. (*Id.*)

28  Just like the plaintiff in *King*, the plaintiff in this action seeks to counteract a clear and

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

1  unequivocal admission stated under oath at his deposition.  Permitting this type of self-

2  serving evidence to create a triable issue of fact runs counter to well-established

3  California law, and undermines the discovery process as a whole.

4    Plaintiffs, knowing that Mr. Lyman's declaration is problematic, have anticipated

5  this very argument.  They seek to emasculate the ruling laid out by the California

6  Supreme Court in *D'Amico* by requesting that this Court follow the reasoning set forth in

7  several cases which are either factually distinguishable, or irrelevant, or both.

8    First, Plaintiffs rely on *Scalf v. D.B. Log Homes, Inc.*, (2005) 128 Cal.App.4th 1510, for

9  their assertion that the "appellate court dispelled the myth of *D'Amico*."  Plaintiffs claim

10  that the *Scalf* court held that *D'Amico* has been improperly applied, and was never meant

11  to raise a complete bar to a deponent *supplementing* a deposition with declaration

12  testimony.  While this statement may be true in a general sense, that does not mean that

13  *Scalf* is inconsistent with *D'Amico*.

14    As *Scalf* and *D'Amico* show, a declaration which *supplements* prior testimony—i.e.,

15  which provides additional information—may be acceptable, but a declaration which

16  flatly *contradicts* prior testimony—i.e., which attempts to replace one set of facts for

17  another—is not acceptable.  Accordingly, self-serving affidavits which directly contradict

18  a material fact given under oath, in a formal setting designed to elicit such facts, must be

19  stricken from the record or simply not admitted.

20    Plaintiffs also rely on *Price v. Wells Fargo Bank*, (1989) 213 Cal.App.3d 465, 482, to

21  assert that *D'Amico's* scope has been limited.  Plaintiffs misinterpret the meaning of the

22  opinion in *Price*, however, as *Price* actually stands for the proposition that *D'Amico* is

23  alive and well.  The *Price* court stated that "[t]he holding of *D'Amico* appears entirely

24  sound on its facts; and this court has recently applied the decision where credible

25  admissions on deposition were contradicted only by self-serving declarations of a party."

26  (*Id.*; see also *Advanced Micro Devices, Inc. v. Great American Surplus Lines Ins. Co.* (1988) 199

27  Cal.App.3d 791.

28

BRYDON
HUGO & PARKER
135 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

7

1    The facts in our case are precisely those that the *Price* court agreed were governed

2    by *D'Amico*. Here, Mr. Lyman's admissions against interest are certainly credible. They

3    were made in a formal setting, under oath. Moreover, the *only* evidence that the

4    Plaintiffs have set forth to oppose these credible admissions are exactly those *D'Amico*

5    stands to protect against—Plaintiff's own self-serving declaration.

6        Well-established California law does not allow the Plaintiffs to defeat summary

7    judgment with a self-serving and unequivocally contradictory declaration. This Court

8    must not consider Robert Lyman's declaration when ruling on Union Carbide's motion

9    for summary judgment/summary adjudication.

10       **B.      Plaintiffs' Declaration Is Inadmissible As If Is Not Signed Under Penalty of Perjury.**

11

12       The declaration of Robert F. Lyman is inadmissible on totally separate procedural

13   grounds as well. The declaration is unsigned by Mr. Lyman and therefore does not

14   present admissible evidence that this Court may consider. Code of Civil Procedure

15   section 2015.5 requires that affidavits and declarations be *signed* under penalty of perjury.

16   Mr. Lyman's declaration, however, is *unsigned*. Therefore, the declaration cannot

17   properly be considered evidence of a triable issue of material fact.

18   **III.   STATEMENTS OF FACT OR ARGUMENT REGARDING "FRANCIS F. LYMAN" SHOULD BE IGNORED.**

19       Several portions of the Plaintiffs' Memorandum of Points and Authorities present

20   statements of fact regarding a "FRANCIS F. LYMAN". Example of these references

21   include: "FRANCIS F. LYMAN worked in close proximity to workers who opened these

22   sacks emptied the contents and threw the empty sacks aside." This sentence is stated

23   twice in Plaintiffs' Memorandum of Points And Authorities[2] Furthermore, page 5, lines

24   17-22 states: "Mr. Cohen opines that, based on specific range of years, including 1981-

25   1986, and the identification of Super Visbestos and Univis consistent with that of John

26   Edward Walsh, when plaintiff, FRANCIS F. LYMAN, was in proximity to workers who

27   opened these sacks emptied the contents and threw the empty sacks aside, creating large

28   [2] At 2:15-16 and 4:22-24.

BAYDON
HODGO & PARKER
115 MAIN STREET
20TH FLOOR
San Francisco, CA 94105

8

DEFENDANT UNION CARBIDE CORPORATION'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1 amounts of visible dust, asbestos dust and fibers would have been released and become

2 airborne in plaintiff's presence in the course of these activities."

3      These errors undermine the credibility of Plaintiffs' entire Opposition, and at a

4 minimum must be disregarded.

5 **IV.   THE DECLARATION OF KENNETH COHEN IS INADMISSIBLE.**

6      The Declaration of Kenneth Cohen, filed in opposition to Union Carbide's motion

7 for summary judgment, or in the alternative summary adjudication, is inadmissible

8 because he has not been offered to Union Carbide for deposition. Code of Civil

9 Procedure section 2034.410 states, "If the expert is one who has been retained to testify, it

10 is the responsibility of the party designating such expert to make him or her available for

11 deposition...upon service of a proper deposition notice..."

12      Being that Mr. Cohen has neither been offered as an expert in this case, nor made

13 available for deposition in this matter, Defendant Union Carbide would be severely

14 prejudiced if his declaration is considered by this court without the opportunity for cross

15 examination before trial.

16      In addition, Mr. Cohen only relies on the unsigned declaration of Robert Lyman

17 submitted in opposition to Union Carbide's motion for the basis of his opinion that

18 Lyman would have been exposed to asbestos from Montello products such as Super

19 Visbestos and Univis. Cohen, of course, has no personal knowledge of these facts, and to

20 the extent that he is relying on Lyman's testimony that should be excluded, Cohen's

21 testimony is similarly defective and should also be excluded.

22 **V.   PLAINTIFFS DO NOT OPPOSE AND THEREFORE CONCEDE SUMMARY**
**ADJUDICATION REGARDING THEIR CAUSES OF ACTION FOR FALSE**
23 **REPRESENTATION AND THEIR CLAIM FOR PUNITIVE DAMAGES.**

24      Plaintiffs' opposition papers make no reference and include no arguments

25 attempting to oppose Union Carbide's request for summary adjudication of their third

26 cause of action for false representation and their claim for punitive damages. Plaintiffs'

27 lack of arguments effectively operates as concessions that Union Carbide's motion is

28

9

DEFENDANT UNION CARBIDE CORPORATION'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1   well-taken as to those claims.  Accordingly, this Court must grant summary adjudication

2   in favor of Union Carbide with regard to Plaintiffs' third cause of action for false

3   representation and their claim for punitive damages.

4   VI.   CONCLUSION.

5        Defendant Union Carbide contends that the burden was appropriately shifted by

6   the undisputed evidence submitted in support of it original Motion, and that Plaintiffs

7   have failed to satisfy their obligation to present admissible, relevant evidence sufficient

8   enough to create a triable issue of fact with regard to Plaintiff Robert Lyman's exposure

9   to any allegedly asbestos-containing products manufactured by Union Carbide or

10  distributed by Montello.  Thus, summary judgment as to Plaintiffs' entire complaint

11  should be entered in Union Carbide's favor as a matter of law.  Alternatively, because

12  Plaintiffs have failed to present any facts upon which to sustain any of the individual

13  causes of action set forth in their complaint, each cause of action must be summarily

14  adjudicated in favor of Union Carbide.

15  Dated: July 25, 2007                          BRYDON HUGO & PARKER

16

17

18                                     By:   _____
                                            John R. Brydon
19                                          Thomas J. Moses
                                            Erin M. Carpenter
20                                          Attorneys for Defendant
                                            UNION CARBIDE CORPORATION
21                                          1102-0231

22

23

24

25

26

27

28

DEFENDANT UNION CARBIDE CORPORATION'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1

_Lyman, Robert F. & Samantha vs. Asbestos Defendants (B*P), et al._
San Francisco County Superior Court Case No. CGC-06-459162
LexisNexis Transaction No. 15712960

2

3

PROOF OF SERVICE

4

I am a resident of the State of California, over the age of 18 years, and not a
party to the within action. My electronic notification address is
service@bhplaw.com and my business address is 135 Main Street, 20th Floor, San
Francisco, California 94105. On the date below, I served the following:

5

6

DEFENDANT UNION CARBIDE CORPORATION'S REPLY BRIEF IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE,
SUMMARY ADJUDICATION

7

8

on the following:

9

David R. Donadio                          AND SEE LEXIS NEXIS SERVICE LIST

10   Brayton Purcell
     222 Rush Landing Road
11   Novato, CA 94945
     Fax  (415) 898-1247

12

13   X       By transmitting electronically the document(s) listed above as set forth
             on the electronic service list on this date before 5:00 p.m.

14

15   o       By transmitting via facsimile the document(s) listed above to the fax
             number(s) set forth above on this date before 5:00 p.m.

16   o       By placing the document(s) listed above in a sealed envelope and placing
             the envelope for collection and mailing on the date below following the
17           firm's ordinary business practices. I am readily familiar with the firm's
             practice of collection and processing correspondence for mailing. Under
18           that practice it would be deposited with U.S. Postal service on the same
             day with postage thereon fully prepaid at San Francisco, California in
19           the ordinary course of business. I am aware that on motion of party
             served, service is presumed invalid if postal cancellation date or postage
20           meter date is more than one day after date of deposit for mailing in
             affidavit.

21

22   o       By placing the document(s) listed above in a sealed envelope designated
             for Federal Express overnight delivery and depositing same with fees
23           thereupon prepaid, in a facility regularly maintained by Federal Express,
             addressed as set forth above.

24

25   o       by causing personal delivery of the documents(s) listed above to the
             person(s) at the address(es) set forth above.

26   I declare under penalty of perjury that the above is true and correct.
     Executed on July 25, 2007, at San Francisco, California.

27

28

                                                    Lea Vaughn

1

PROOF OF SERVICE

# EXHIBIT K



Case No. _____

IN THE COURT OF APPEAL OF CALIFORNIA
FIRST APPELLATE DISTRICT
DIVISION _____

UNION CARBIDE CORPORATION,

Petitioner,

vs.

SUPERIOR COURT OF CALIFORNIA FOR
THE COUNTY OF SAN FRANCISCO,

Respondent,

ROBERT F. LYMAN and SAMANTHA LYMAN,
Real Parties-in-Interest.

_____

San Francisco County Superior Court, Case No. 459162
Patrick J. Mahoney, Judge of the Superior Court

_____

PETITION FOR WRIT OF MANDATE;
MEMORANDUM OF POINTS AND AUTHORITIES
(Exhibits Attached Hereto)

_____

John R. Brydon [SB 0833365]
James C. Parker [SB 106149]
Brian Buddell [SB 166103]
Erin M. Carpenter [SB 248337]
BRYDON HUGO & PARKER
135 Main Street, 20th Floor
San Francisco, CA 94105
(415) 808-0300
Attorneys for Petitioner
UNION CARBIDE CORPORATION

1

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................... 1

VERIFIED PETITION ........................................................................... 4

VERIFICATION ................................................................................... 7

STATEMENT OF FACTS....................................................................... 8

SUMMARY JUDGMENT STANDARDS................................................ 11

LEGAL DISCUSSION........................................................................... 12

CONCLUSION...................................................................................... 14

CERTIFICATION OF WORD COUNT................................................. 15

## TABLE OF AUTHORITIES

Cases                                                                                    Page

*Advanced Micro Devices, Inc. v. Great American Surplus Lines Ins. Co.*
    (1988) 199 Cal.App.3d 791 .................................................................... 12

*Aguilar v. Atlantic Richfield Co.*
    (2001) 25 Cal.4th 826 ......................................................................... 12

*Chaknova v. Wilbur-Ellis Co.*
    (1999) 69 Cal.App.4th 962 .................................................................. 12

*D'Amico v. Board of Medical Examiners*
    (1974) 11 Cal.3d 1 ............................................................... 3, 12, 13, 14

*Lineaweaver v. Plant Insulation Co.*
    (1995) 31 Cal.App.4th 1409 ................................................................ 11

*Price v. Wells Fargo Bank*
    (1989) 213 Cal.App.3d 465 ................................................................. 12

*Scalf v. D.B. Log Homes, Inc.*
    (2005) 128 Cal.App.4th 1510 ......................................................... 12, 13

*Scheiding v. Dinwiddie Const. Co.*
    (1999) 69 Cal.App.4th 64 .................................................................... 12


Statutes

Code of Civil Procedure
    Section 437c(c) .................................................................................. 11
    Section 437c(o)(2) .............................................................................. 12

IN THE COURT OF APPEAL OF CALIFORNIA
FIRST APPELLATE DISTRICT
DIVISION \_\_\_\_\_

UNION CARBIDE CORPORATION,

Petitioner,

vs.

SUPERIOR COURT OF CALIFORNIA FOR
THE COUNTY OF SAN FRANCISCO,

Respondent,

ROBERT F. LYMAN and SAMANTHA LYMAN,
Real Parties–in–Interest.

San Francisco County Superior Court, Case No. 459162
Patrick J. Mahoney, Judge of the Superior Court

**PETITION FOR WRIT OF MANDATE;
MEMORANDUM OF POINTS AND AUTHORITIES**

## INTRODUCTION

By this petition, Union Carbide Corporation ("UCC") asks this Court to rule on a novel issue: in opposing a motion for summary judgment, may a party submit a declaration contradicting his own prior deposition testimony to create a triable issue of material fact, by claiming a refreshed recollection even when (1) his recollection was refreshed before the filing of the summary judgment motion, and (2) he did not amend his deposition transcript nor reveal the new recollection in response to interrogatories?

1

In this case, the only percipient witness to the issue of product identification is Robert Lyman, the plaintiff. Lyman was deposed for seven days in April 2007. He was expressly asked during his deposition if he was ever around or could even recognize the names of any of several UCC asbestos-containing products, all distributed by co-defendant Montello, Inc. Lyman unequivocally testified that he did not recognize the product names, he had not worked with the Montello products, and had not worked around others who handled the Montello products. In interrogatory responses he provided before and after his deposition, Lyman likewise failed to identify by name any UCC-Montello products, even as to those interrogatories that clearly called for such information.

On July 5, 2007, UCC moved for summary judgment on the grounds that after seven days of deposition and multiple written discovery exchanges, there was no evidence that Lyman was exposed to any UCC products. In opposition, Lyman filed a two-page declaration stating that he now recalled two UCC-related names, and that he now recalled working in "close proximity" to others handling those products.

Over UCC's objection, the Court below accepted the Lyman declaration, reasoning that it did not contradict the deposition as plaintiff's recollection had been refreshed. Based on Lyman's declaration, the Court below denied UCC's motion.

UCC has time and again taken careful depositions, served specific interrogatories, and then filed a meritorious motion for summary judgment, only to have a plaintiff manufacture a triable issue of fact by filing a declaration supplementing, altering or even, as here, contradicting prior deposition testimony.

UCC understands that sometimes a plaintiff might have a legitimate late recollection. In those rare instances, he should promptly correct or amend his

2

deposition testimony. And when served with interrogatories calling for any further post-deposition information, he should fully respond, state that his recollection has been refreshed, and set forth his refreshed memories. Lyman did none of those things – even though he had those opportunities in this case.

Lyman claimed that his recollection was refreshed when, after his deposition, he was shown photographs of UCC-Montello products so that he could answer interrogatories served by Montello, some of which specifically asked him to identify all Montello products to which he claimed exposure. Lyman's eventual responses to Montello's interrogatories *did not identify the products at issue by name.* Instead, the very first time UCC, Montello or anyone outside plaintiff's attorneys learned that Lyman recalled the UCC-Montello products by name was when he filed his "I-just-now-remembered" declaration to defeat UCC's motion for summary judgment.

Over 30 years ago the Supreme Court in *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1 made clear that such tactics were intolerable. Clear, unequivocal deposition testimony cannot be ignored in ruling on a motion for summary judgment. In fact, *it is the declaration that contradicts the deposition that is to be ignored as "irrelevant, inadmissible or evasive."* Nonetheless, UCC and many other defendants in asbestos litigation find that the courts ignore explicit deposition testimony and accept contradictory declarations in contravention of *D'Amico* and its progeny.

This matter is urgent. *The case has been given a preferential trial setting and is currently trailing and awaiting assignment to a trial court.* UCC has moved promptly for writ relief.

UCC asks this Court to issue a peremptory writ to Respondent Court to vacate its order denying UCC's Motion, or issue an alternative writ directing Respondent Superior Court to show cause why it should not be so directed, and

3

upon return to the alternative writ, issue the peremptory writ.

## VERIFIED PETITION

By this verified petition, UCC alleges:

1.      Union Carbide Corporation ("UCC") is one of multiple defendants in a civil action entitled *Robert F. and Samantha Lyman v. Asbestos Defendants (B✦P)*, San Francisco Superior Court Case No. 459162.

2.      The real parties-in-interest are plaintiffs Robert F. and Samantha Lyman, ("plaintiffs"). Plaintiffs claim that Robert Lyman has developed lung cancer due to exposure to various asbestos-containing products.

3.      This action was commenced on December 29, 2006 as a personal injury action in San Francisco Superior Court.

4.      On February 13, 2007, UCC served its Answer to the Complaint.

5.      On April 12, 2007, Respondent court granted plaintiff's motion for a preferential trial, setting July 30 for the trial call.

6.      On April 17-26, 2007, Robert Lyman was deposed in this action. (A true and correct copy of relevant portions of Robert Lyman's deposition testimony is attached hereto as Exhibit A.)

7.      On July 5, 2007, UCC filed its motion for summary judgment or, in the alternative, summary adjudication (the "Motion"). (A true and correct copy of the Motion is attached hereto as Exhibit B.)

8.      On July 23, 2007, plaintiffs filed their opposition to the Motion. (A true and correct copy of the opposition is attached hereto as Exhibit C.)

9.      On July 25, 2007, UCC filed its reply to plaintiff's opposition to the Motion. (A true and correct copy of the reply is attached hereto as Exhibit D.)

10.      On July 27, 2007, UCC's Motion came on for hearing before the Hon. Patrick J. Mahoney, presiding in the Law & Motion department of the San

Francisco Superior Court.

11.   After reviewing all the moving and opposing papers, and considering the oral argument of counsel, Judge Mahoney denied UCC's Motion. (A true and correct copy of the transcript of the hearing is attached hereto as Exhibit E.)

12.   On July 30, 2007 this matter came on the trial calendar and was placed on "half day" standby, meaning it will be assigned to the first available trial judge.

13.   On June 25, 2007, Montello filed its amended motion for summary judgment. (A true and correct copy of this motion is attached hereto as Exhibit F.)

14.   On April 30, 2007, Montello served Robert Lyman with its first set of special interrogatories. (A true and correct copy of these interrogatories is attached as Exhibit G.)

15.   On June 12, 2007, Robert Lyman served Montello with his responses to Montello's first set of special interrogatories. (A true and correct copy of these responses is attached as Exhibit H.)

16.   On June 25, 2007, Robert Lyman signed a declaration to be submitted in opposition to Montello's motion for summary judgment. (A true and correct copy of his signed declaration is attached hereto I.)

17.   On July 25, 2007, Robert Lyman submitted a signed version of his declaration submitted in opposition to UCC's motion for summary judgment. (A true and correct copy of his signed declaration is attached hereto as Exhibit J)

18.   At no time has Lyman ever amended his deposition transcript to change any of his answers concerning the UCC-Montello products. Lyman also has not supplemented any prior interrogatory responses concerning the identification of UCC-Montello products.

WHEREFORE, petitioner UCC prays that this Court:

Issue its peremptory writ of mandate to Respondent Superior Court to set aside and vacate its order denying UCC's Motion and grant the Motion, or issue an alternative writ directing Respondent Superior Court to show cause why it should not be so directed, and upon return to the alternative writ, issue the peremptory writ requested above.

Respectfully submitted,
BRYDON HUGO & PARKER

Dated: August 3, 2007

James C. Parker
Attorneys for Petitioner Union Carbide Corporation

6

## VERIFICATION

I, James C. Parker, declare as follows:

I am a partner with Brydon Hugo & Parker, attorneys for petitioner Union Carbide Corporation. I have read the foregoing Petition for Writ of Mandate and know its contents. The facts alleged therein are true to my own knowledge or based upon my review of the pleadings and other documents contained within the Court's files.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 3d day of August 2007 at San Francisco, California.

_____
                        James C. Parker

## STATEMENT OF FACTS

This is an asbestos action arising out of plaintiff Robert F. Lyman's alleged exposure to various asbestos-containing products which have allegedly caused him to contract lung cancer.

As against UCC, plaintiffs claim that Lyman was exposed to raw asbestos added to drilling mud at oil field work sites. Drilling mud is a mixture of fluids and dry materials pumped down an oil well to lift earth and lubricate the drill bit. From 1968 until 1985, Union Carbide sold "Calidria" type asbestos fibers as an additive to drilling mud under various brand names, including "Super Visbestos" and "Univis." Each product came packaged in 50-pound bags labeled with an OSHA-type warning about asbestos, the name of the product, and UCC's distributor, Montello, all clearly displayed. [UMF Nos. 6; 23.]

Lyman worked in the oil field business from 1981-1986, which included the last five years that UCC sold Calidria asbestos as an additive to drilling mud. [UMF Nos. 12; 13.]  In his deposition, Lyman could not recall being around any products bearing the name Montello and was unable to identify by name a single Montello product to which he might have been exposed, even when specifically questioned about such products by name:

Q.   Have you ever worked with or around a product called Supervisbestos?

A.   What is it?

Q.   Supervisbestos, S-u-p-e-r-v-i-s-b-e-s-t-o-s?

A.   Not that I recall.

* * *

Q.   Have you ever worked with or around a product called Univis, U-n-i-v-i-s?

A.   No.

(Exhibit A, at 527:4-8; 529:4-6; UCC's UMF No. 17, 18 and 19.)

Lyman further testified that although he recalled the name "Montello," he could not recall when he had encountered it, but that in any event he had never handled any Montello product or worked around anybody who had:

Q.   Have you ever worked or around any product that was distributed by a company called Montello, Inc.?

A.   Yeah, Montello. Again, I don't remember what it was. But I've seen the logo, and I believe it was in the oil fields.

Q.   Can you tell me *what kind of container* you saw the logo on?

A.   No. Again, this is 40 years ago.

Q.   Can you recall *when* you saw the logo?

A.   No.

Q.   Can you tell me *what material* was in any container that had that logo on it?

A.   No. I don't recall.

Q.   Did you ever *personally handle* any material that was in the container that you saw with that label on it?

A.   Not that I know of.

Q.   Did you ever *work around* anybody that handled any material with that label on it?

A.   I don't recall.

(Exhibit A, at 529:10-530:4; emphasis added.)

Lyman's inability at his deposition to identify a Montello product or even being around any specific Montello product was understandable. He admitted that the only possible mixing of such products that he might have seen happened in the early 1980s, 40 to 50 feet from him; he did not know the composition of the materials being mixed, did not know the brand name, manufacturer or supplier of

those materials, and could not state that Calidria or any type of asbestos was among those materials. [Exhibit A, at 463:1-14; 470:11-471:13; UMF Nos. 14, 15 and 16.]

Relying on Lyman's lack of product identification after seven days of deposition testimony, UCC's Motion asked Respondent Court to grant summary judgment.  In opposition, Lyman submitted a two-page declaration in which he explained that he had recalled two Montello products when, after his deposition, to prepare him to answer interrogatories from Montello, his lawyers showed him some him some photographs:

> After my deposition my attorneys provided me 15 photos to review as part of the preparation of responses to Defendant Montello's written discovery.  Upon reviewing the photos, my recollection was refreshed as to particular Montello brand products. The three photos which refreshed my memory, are attached to this declaration.  The drilling mud products I most clearly recall, having had my memory refreshed by the photographs, is asbestos containing Super Visbestos and Univis throughout the years I worked in the oil fields.  (Exhibit C, at 16:1-8.)

The written discovery to which Lyman refers included a set of special interrogatories served by Montello after the deposition, which included this one:

> **SPECIAL INTERROGATORY NO. 10**: Identify each asbestos product YOU contend was supplied by MONTELLO, INC., which YOU contend YOU were exposed.

(Exhibit G, at 3:18-20.)

Lyman's answer to Montello's direct inquiry was no more detailed than his deposition, and declared that he had no further product identification information:

> **RESPONSE TO INTERROGATORY NO. 10**: Plaintiff objects to this Interrogatory …. Subject to and without waiving said objection, plaintiff responds as follows: Plaintiff was exposed to asbestos for which MONTELLO, INC: is legally responsible, by way of asbestos

10

drilling mud additive.... [P]laintiff, after making a reasonable and good-faith effort . . . has no further relevant and/or responsive information to disclose at this time other than what has been stated herein . . . and in the course of his depositions . . . .

(Exhibit H, at 6: 3-10.)

These responses were verified by Lyman on June 9, 2007, about six weeks after his deposition concluded and after he had been shown the photographs. (Exhibit H, at page 28.) Nowhere in the 27 pages of single-spaced responses to Montello's interrogatories did Lyman identify *any* Montello product by name or state that he had reviewed photographs of the products. (Exhibit H, *seriatim*.)[1]

At no time has Lyman ever amended his deposition transcript to change any of his answers concerning the UCC-Montello products. Lyman also has not supplemented any prior interrogatory responses concerning the identification of UCC-Montello products.

## SUMMARY JUDGMENT STANDARDS

Summary judgment must be granted "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (Code Civ. Proc., § 437c(c).) In an asbestos action, plaintiffs have the burden of proving causation, which here requires a showing that (1) Lyman was exposed to an asbestos-containing Union Carbide product, or to a product manufactured by another that contained asbestos supplied by Union Carbide, and (2) that biological processes from this exposure contributed to causing his current disease. (*Lineaweaver v. Plant*

---

1    Montello also filed a summary judgment motion, which was heard about two weeks prior to UCC's motion. In opposition, Lyman filed a declaration in which he asserted his memory had been refreshed not by photographs, but by a conversation with his attorney. (Exhibit I.)

11

*Insulation Co.* (1995) 31 Cal.App.4th 1409, 1415-16.)

To obtain summary judgment, Union Carbide only has to put forth evidence to establish that Plaintiffs do not possess, and cannot reasonably obtain, evidence necessary to raise a genuine triable issue of fact concerning *"one or more"* of the elements of each cause of action.  (Code Civ. Proc., § 437c(o)(2); *Chaknova v. Wilbur-Ellis Co.* (1999) 69 Cal.App.4th 962, 974, 977; *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, at p. 849.)

## LEGAL DISCUSSION

In *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, the Supreme Court ruled that a party's declaration or affidavit offered to controvert his or her prior, sworn and credible deposition testimony must be disregarded in ruling on a motion for summary judgment.  "In a nutshell, the [*D'Amico*] rule bars a party opposing summary judgment from filing a declaration that purports to impeach his or her own prior sworn testimony."  (*Scalf v. D.B. Log Homes, Inc.* (2005) 128 Cal.App.4th 1510, 1522; see also *Price v. Wells Fargo Bank* (1989) 213 Cal.App.3d 465, 482 [self-serving declarations filed in opposition to motions for summary judgment may not contradict credible discovery admissions]; *Advanced Micro Devices, Inc. v. Great American Surplus Lines Ins. Co.* (1988) 199 Cal.App.3d 791.)

The Supreme Court has never retreated from its holding in *D'Amico*. (See, e.g., *Scheiding v. Dinwiddie Const. Co.* (1999) 69 Cal.App.4th 64, 77.)  The appellate courts have consistently refused to allow a triable issue of fact to be conjured by the submission of an affidavit contradicting the declarant's prior deposition testimony.  (*Id.*)  To be sure, deposition testimony is simply evidence, and like other evidence can be overcome – *except* when the deposition testimony constitutes an admission, and the attempt to overcome that admission comes from

12

the party-declarant himself.

Thus, in *Scalf*, plaintiff's deposition testimony that he himself had no criticisms of the product at issue or of the defendant's conduct was not "the equivalent of a judicial admission that Lodge Log was free from fault or that Scalf had no evidence to support his claim of indemnity." (*Scalf, supra*, 128 Cal.App.4th at p. 1523.) By contrast, here the *only* evidence that places the UCC-Montello products anywhere near Lyman such that he could possibly be exposed to them is the declaration of Lyman filed in opposition to UCC's motion. That declaration contradicts Lyman's statements in his deposition that he was not around those products.

At no time did Lyman correct that testimony, even though he had that opportunity well before UCC filed its motion. He could have notified UCC of a change in his recollection. He was served with interrogatories which pointedly asked him and his attorneys to name such products, and to state all facts to support his response. His declaration states he was shown the photographs for the purpose of answering those very interrogatories, yet nowhere in the responses does he provide the names of the products or state that he or his attorneys have photographs of Montello products in their possession. (Exhibit H.)

Lyman could have successfully opposed UCC's motion by relying on other evidence beyond his own declaration. He could have obtained a declaration from a percipient witness, for example, even if that witness' statements contradicted his own, because while the *D'Amico* rule permits a trial court to disregard declarations by *a party* which contract his discovery responses, *other* credible contradictory evidence may still be admitted to create a triable issue of fact. (*Scalf, supra*, 128 Cal.App.4th at pp. 1524-1525.)

What Lyman could not do was to file a self-serving declaration that

contradicted his own deposition – that was a violation of *D'Amico's* self-impeachment rule. But, that is exactly what occurred in this case, and is what led to the denial of UCC's meritorious summary judgment motion. Respondent Court should not have considered Lyman's declaration when ruling on UCC's motion, under the clear guidance of *D'Amico.*

## CONCLUSION

UCC respectfully requests that this Court issue a peremptory writ to Respondent Superior Court to vacate its order denying the Motion, and to enter a new order granting the Motion, and/or issue an alternative writ directing Respondent to show cause why it should not be so directed, and upon return to the alternative writ, issue the peremptory writ requested above.

Respectfully submitted,
BRYDON HUGO & PARKER

Dated: August 3, 2007

_____
James C. Parker
Attorneys for Petitioner Union
Carbide Corporation

14

## CERTIFICATION OF WORD COUNT

I certify that this document contains 3,942 words.

_____
James C. Parker

15.

## PROOF OF SERVICE
### C.C.P. §§1013(a), 2015.5

I am over the age of eighteen years and not a party to this legal proceeding. My business address is 135 Main Street, 20th Floor, San Francisco, California 94105.

I am readily familiar with the business practice at my place of business for collection and processing of correspondence for mailing with the United States Postal Service. Correspondence so collected and processed is deposited with the United States Postal Service that same day in the ordinary course of business.

On the date below, I served the following documents:

### PETITION FOR WRIT OF MANDATE;
### MEMORANDUM OF POINTS AND AUTHORITIES

[X]   By placing the documents listed above in a sealed envelope, and depositing the same with fees thereupon pre-paid in a facility regularly maintained by U.S. Post Office addressed as set forth below:

### SEE ATTACHED SERVICE LIST

[X]   By arranging for hand-delivery on the following:

David R. Donadio
Gary V. Judd
Brayton ❖ Purcell
222 Rush Landing Road
Novato, CA 94948

Hon. Patrick J. Mahoney
San Francisco Superior Court
400 McAllister Street
Department 302
San Francisco, CA 94107

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct and that this declaration was executed at San Francisco, California.

Dated:  August 3, 2007

Melanie Getting

16

## SERVICE LIST

Filice Brown Eassa & McLeod
P.O. Box 70850
1999 Harrison Street, 18th Floor
Oakland, CA 94612-0850

Mark H. Rosenthal
425 California Street, Suite 2500
San Francisco, CA 94104

Berry & Berry
P.O. Box 16070
Oakland, CA 94610

Wright Robinson Osthimer & Tatum
44 Montgomery Street
San Francisco, CA 94104

Kirkpatrick & Lockhart Preston Gates
Ellis
55 Second Street, Suite 1700
San Francisco, California 94105-3493

Prindle Decker & Amaro
310 Golden Shore, Fourth Floor
P.O. Box 22711
Long Beach, CA 90801-5511

Perkins Coie
4 Embarcadero Center, Suite 2400
San Francisco, CA 94111

Haight Brown & Bonesteel
71 Stevenson Street, 20th Fl.
San Francisco, CA 94105

Lewis Brisbois Bisgaard & Smith
One Sansome Street, Suite 1400
San Francisco, CA 94104-4448

Andrew S. Hartman
6520 S Lewis Ave Suite 15
Tulsa, OK 74136-1041

Dillingham & Murphy
225 Bush Street, 6th Floor
San Francisco, CA 94104

Sonnenschein Nath & Rosenthal
525 Market Street, 26th Floor
San Francisco, CA 94105-2708

Sainick & Whitney
190 Newport Center Drive, Second
Floor
Newport Beach, CA 92660

Thelen Reid Brown Raysman & Steiner
101 Second Street, Suite 1800
San Francisco, CA 94105

Adams Nye Sinunu Bruni Becht
222 Kearny Street, Seventh Floor
San Francisco, CA 94108

Morgan Lewis & Bockius
One Market, Spear Street Tower
San Francisco, CA 94105

Law Offices of Nancy E. Hudgins
565 Commercial Street, Fourth Floor
San Francisco, CA 94111

17

**PROOF OF SERVICE**
C.C.P. §§1013(a), 2015.5

I am over the age of eighteen years and not a party to this legal proceeding. My business address is 135 Main Street, 20th Floor, San Francisco, California 94105.

I am readily familiar with the business practice at my place of business for collection and processing of correspondence for mailing with the United States Postal Service. Correspondence so collected and processed is deposited with the United States Postal Service that same day in the ordinary course of business.

On the date below, I served the following documents:

**EXHIBITS TO PETITION FOR WRIT OF MANDATE**

[X]   By arranging for hand-delivery on the following:

David R. Donadio
Gary V. Judd
Brayton ✤ Purcell
222 Rush Landing Road
Novato, CA 94948

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct and that this declaration was executed at San Francisco, California.

Dated:  August 3, 2007

Melanie Getting

18



# EXHIBIT L

COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

RECEIVED

AUG 0 6 2007

BY U.S. MAIL
BRYDON HUGO & PARKE

UNION CARBIDE CORP.,

Petitioner,

v.

SUPERIOR COURT SAN FRANCISCO,

Respondent;

ROBERT F. LYMAN,

Real Party in Interest.

FILED

AUG 0 3 2007

Court of Appeal - First App. Dist.
DIANA HERBERT
By_____
DEPUTY

A118643

San Francisco County No. 459162

BY THE COURT:*

The petition for writ of mandate is denied.

Dated: __AUG 03 2007__           GEMELLO, J.          _____ P.J.

* Before Gemello, Acting, P.J. and Needham, J.

A118643

James Carl Parker
Brydon Hugo & Parker
135 Main Street - 20th Floor
San Francisco, CA 94104

### NOTICE

*Please include both the appellate case number and the division number on any written communication or filing submitted to this court.*

**Our website address is**
**http://appellatecases.courtinfo.ca.gov**

pet

adda

# EXHIBIT M

Aug-17-07  12:25   From-DILLINGHAM & MURPHY L.L.P.        4193073300        T-320   P.02   F-725

THIS DOCUMENT HAS BEEN PREPARED FOR THE CONVENIENCE OF THE COURT AND PARTIES AND MAY CONTAIN INACCURACIES

**BRAYTON+PURCELL**

Trial Prem S4C

## 17 Defendants remain.

Client #107053
Trial Call Date 7/30/07

| Master No. | Name | Case No. | CROSSER | GARLOCK | THORPE | YUBA | OTHERS |
|---|---|---|---|---|---|---|---|
| 107053 | Lyman, Robert SPEC Case No. 459162 SOL: 3 yr. 12/01 | 459162 | X | X | X | X | FOSECO, FIBBOR, GARLOCK, GM, HENWOOD, INTEK, CRANE, MACKTEK, MONTIL, SHCOM, THORPE, TYCOUSE UNIONC |

# EXHIBIT N



1          SUPERIOR COURT OF CALIFORNIA

2            COUNTY OF SAN FRANCISCO

3        HONORABLE NANCY L. DAVIS, JUDGE PRESIDING

4              DEPARTMENT NO. 306

5                 ---oOo---

6

7   ROBERT LYMAN, ET AL.,              )
                                        )
8                  Plaintiffs,         )   CGC-06-459162
                                        )   Jury Trial
9        vs.                            )
                                        )   Pages 202 - 232
10  ASBESTOS DEFENDANTS, ET AL.         )
                                        )   Volume VI
11                 Defendants.          )

12

13

14

15                              **COPY**

16

17          REPORTER'S TRANSCRIPT OF PROCEEDINGS

18             Wednesday, August 15, 2007

19

20

21

22

23

24

25

26

27

28  Reported by:   Laura Martinez, CSR No. 11332, RPR

1  confirming service of the original petition, that Honeywell
2  never answered the complaint, that Honeywell has not complied in
3  virtually any respect with respect to the scheduling order in
4  this case.

5  Specifically on May 11th, 2007 was the time period for
6  Plaintiff's court-ordered disclosure regarding identification of
7  witnesses and documents regarding production, product
8  identification as to each defendant, and there's no reference to
9  Honeywell.

10  June 27 of 2007 was the mandatory settlement conference, and
11  Plaintiff's counsel indicated that the remaining Defendants
12  were:  Union Carbide; Foster Wheeler; and Drilling Specialties;
13  International Truck; Freightliner LLC; Garlock; GM; Henry Vogt
14  Machine Company; John Crane; MAC Trucks; Shell Oil Company;
15  Thorpe Insulation; Tyco U.S.; A.W. Chesterton; Carlysle Corp;
16  Ford; and Montello.  But there was no representation by
17  Plaintiff's counsel that Honeywell was in the case.

18  Then on July 16th of 2007 the pared down list of exposure --
19  expert disclosure was due, and there was no pared down list from
20  Honeywell.  Then on Wednesday July 18th, there was a mandatory
21  settlement conference, and at that mandatory settlement
22  conference Mr. Purcell indicated that ten Defendants remained in
23  the case:  Freightliner; Garlock; Henry Vogt; International
24  Truck; John Crane; Ford; Foster Wheeler; Drilling Specialties;
25  Union Carbide; and Montello.  And there was no indication from
26  Plaintiff's counsel that Honeywell was in the case.

27  Then on Monday August 6th there was a report for trial in
28  Division 306, and there was no appearance by Honeywell on

LAURA MARTINEZ, CSR NO. 11332

# EXHIBIT O

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

ROBERT F. LYMAN AND
SAMANTHA LYMAN,

         Plaintiffs,

  v.

ASBESTOS DEFENDANTS (B*P), *et al.*,

         Defendants.

No.  C 07-4240 SBA

**ORDER**

[Docket Nos. 36, 41, 43, 47]

Before the Court are defendants Union Carbide Corp. and Montello, Inc.'s motion to stay these proceedings pending transfer to MDL 875 [Docket Nos. 36, 41]; defendant Union Carbide's motion for leave to file an amended notice of removal [Docket No. 43]; and the plaintiffs' motions to withdraw their motion to remand and to expedite the trial setting [Docket No. 47]. After reading and considering the arguments presented by the parties, the Court finds this matter is appropriate for resolution without a hearing. *See* FED. R. CIV. P. 78. For the reasons that follow, the defendants' motion to stay is granted and their motion for leave to file an amended notice of removal is also granted. The plaintiffs' motion to withdraw their motion to remand is granted and their motion for an expedited trial setting is denied.

**BACKGROUND**

On December 29, 2006, plaintiffs Robert Lyman and his wife Samantha Lyman filed suit in the Superior Court of San Francisco for personal injury and loss of consortium against five defendants. The three remaining and current defendants are Union Carbide, Montello, Inc., and Honeywell International, Inc. The plaintiffs allege that Robert Lyman is dying from lung cancer caused by exposure to asbestos products manufactured by the defendants.

On August 17, 2007, defendants Union Carbide and Montello removed the action from state court. Defendant Honeywell did not join in or consent to the removal at that time. Accordingly, the plaintiffs filed a motion to remand because not all defendants consented to removal as required by 28 U.S.C. § 1446. On August 30, 2007, defendant Honeywell consented to removal. *See* Docket No. 42.

1   The plaintiffs then withdrew their motion to remand. *See* Docket No. 47.

2        On August 20, 2007, Union Carbide filed notice of a tag-along action with the Judicial Panel on

3   Multidistrict Litigation and with the MDL court in the Eastern District of Pennsylvania. The present

4   dispute between the parties is whether this action should be stayed pending a decision by the MDP

5   Judicial Panel to transfer this action or, conversely, whether this action should be expedited for trial.

6

7   **ANALYSIS**

8   **1.**     **Plaintiffs' Motion to Withdraw their Motion to Remand**

9        Following defendant Honeywell's consent to removal from state court, the plaintiffs' seek to

10  withdraw their motion to remand. This unopposed motion is granted.

11

12  **2.**     **Defendant Union Carbide's Motion for Leave to File an Amended Notice of Removal**

13       Defendant Union Carbide has submitted a motion for leave to file an amended notice of removal

14  to reflect Honeywell's consent to the removal and as a response to the motion to remand. No opposition

15  to this motion has been filed, and given the plaintiffs' withdrawal of their motion to remand and their

16  acknowledgment that there is no longer a basis for opposing removal to this Court, there is little dispute

17  over the amended notice of removal.

18       In addition, the motion is well-taken on the merits. The present action became removable on

19  August 7, 2007. The motion for leave to file an amended notice of removal was submitted on September

20  5, 2007, less than thirty days later. A notice of removal may be freely amended within the thirty day

21  period in which an action may be removed pursuant to 28 U.S.C. § 1446(b). *See, e.g., USX Corp. v.*

22  *Adriatic Ins. Co.*, 345 F.3d 190, 206 n.13 (3d Cir. 2003); *Shaw v. Dow Brands, Inc.*, 994 F.2d 364, 368

23  (7th Cir. 1993); *Smiley v. Citibank (South Dakota), N.A.*, 863 F. Supp. 1156, 1158-59 (C.D. Cal. 1993);

24  14C C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3733 (3d ed. 1998) ("The notice

25  of removal required by Section 1446(b) may be amended freely by the defendant prior to the expiration

26  of the thirty-day period for seeking removal . . . ."). Accordingly, defendant Union Carbide's motion

27

28  2

1   for leave to file an amended notice of removal is granted.

2

3   **3.    Defendants Union Carbide and Montello's Motion to Stay and Plaintiffs' Motion to Expedite the Trial Setting**

4

5        Defendants Union Carbide and Montello have filed a motion to stay this matter pending a

6   determination by the MDL Judicial Panel whether transfer of this action to Multidistrict Litigation

7   Proceeding 875, *In re Asbestos Product Liability Litigation (No. VI)* (MDL-875), is appropriate.  On

8   July 29, 1991, the Judicial Panel on Multidistrict Litigation issued a transfer order establishing MDL

9   Proceeding number 875. On August 20, 2007, Union Carbide filed notice of a tag-along action with the

10  MDL Judicial Panel.

11       The decision to grant or deny a temporary stay of proceedings pending a ruling on the transfer

12  of the matter to the MDL court lies within the Court's discretion.  *Landis v. North Am. Co.*, 299 U.S.

13  248, 254-55 (1936); *Conroy v. Fresh Del Monte Produce, Inc.*, 325 F. Supp. 2d 1049, 1053 (N.D. Cal.

14  2004); *Good v. Prudential Ins. Co. of Am.*, 5 F. Supp. 2d 804, 809 (N.D. Cal. 1998) ("Courts frequently

15  grant stay pending a decision by the MDL Panel"); *see also* Rules of the Judicial Panel on MDL, Rule

16  1.5, 199 F.R.D. 425, 427 (J.P.M.L. 2001) ("The pendency of a motion . . . before the Panel concerning

17  transfer . . . of an action pursuant to 28 U.S.C. § 1407 does not affect or suspend orders and pretrial

18  proceedings in the district court in which the action is pending and does not in any way limit the pretrial

19  jurisdiction of that court"). A stay "is appropriate when it serves the interests of judicial economy and

20  efficiency." *Rivers v. Walt Disney Co.*, 980 F. Supp. 1358, 1360 (C.D. Cal. 1997).

21       The plaintiffs oppose the motion to stay these proceedings pending transfer to the MDL court.

22  The plaintiffs maintain that the MDL court is authorized to coordinate and consolidate pretrial

23  proceedings.  The plaintiffs assert that all pretrial issues have been litigated and resolved, leaving only

24  the trial to be conducted. In addition to opposing the motion to stay, the plaintiffs have countered with

25  a motion to expedite the trial setting.  According to the plaintiffs, "Mr. Lyman's health is rapidly

26  deteriorating" due to his lung cancer, and this "matter is urgent because Plaintiff Robert Lyman is

27  unlikely to live either to testify at or to assist in the trial of his claim if the matter if further delayed."

28                                              3

1   Docket No. 47, at 3.

2        The plaintiffs' motion to expedite the trial setting must be denied on both procedural and

3   substantive grounds. Procedurally, the motion to expedite was not sufficiently noticed; it was filed on

4   September 18, 2007, and noticed for hearing on October 16, 2007, less than 35 days as required by the

5   local rules. The plaintiffs neither sought, nor received, a shortened time period for the hearing date.

6        Substantively, the plaintiffs' motion to expedite the trial setting proceeds from the premise that

7   because this matter was ready for trial in the state court, it follows that it is also ready for trial in federal

8   court. Thus, there are no pretrial proceedings over which the MDL court will exercise jurisdiction. This

9   is not a persuasive argument.   Under 28 U.S.C. 1407(b), "coordinated or consolidated pretrial

10  proceedings shall be conducted by a judge or judges to whom such actions are assigned by the judicial

11  panel on multidistrict litigation." The issue of whether pretrial proceedings are resolved and concluded

12  are for the court handling the asbestos litigation and the MDL Judicial Panel to decide, not for this

13  Court.

14       Moreover, the pretrial decisions of the state court are not definitely concluded because they may

15  be revisited by the MDL court. *See, e.g., Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th

16  Cir. 2000) (district court did not abuse its discretion in reaching merits of employer's motion for

17  summary judgment subsequent to removal to federal court when California court previously denied

18  employer's motion for summary judgment); *Crane v. Arizona Republic*, 972 F.2d 1511, 1516 n.3 (9th

19  Cir. 1992) (state court's denial of defendant's motion for summary judgment did not preclude federal

20  court from revisiting the issue after removal); *Preaseau v. Prudential Ins. Co. of Am.*, 591 F.2d 74, 79-

21  80 (1979) (state court decision denying insurer's motion for summary judgment did not bar federal court

22  from later granting the insurer's motion).

23       Additionally, the MDL court has instituted procedures addressing the plaintiffs' concern that the

24  very illness alleged to have been caused by the defendants will preclude the participation of the plaintiff

25  in the proceedings. Under the MDL court's Administrative Order number three, cases involving

26  mesothelioma and lung cancer are addressed on a priority basis. *See, e.g., In re Patenaude*, 210 F.3d

27

28                                          4

1   135, 140 (3d Cir. 2000); *In re Asbestos Prods. Liability Litig.*, 1994 WL 16140733, at *1 (Jan. 19,

2   1994).

3        Finally, it should be noted that given the likelihood of transfer, which even the plaintiffs

4   acknowledge, an expedited trial setting will likely be rendered moot.

5        Therefore, because a stay will likely preserve judicial resources by preventing a duplication of

6   proceedings before this Court and the MDL court, and because the plaintiffs have not persuasively

7   identified any hardship resulting from such a stay, the Court grants the motion to stay.

8

9                                **CONCLUSION**

10      Accordingly, Union Carbide Corp. and Montello, Inc.'s motion to stay these proceedings

11   pending transfer to MDL 875 [Docket Nos. 36, 41] is GRANTED and this action is STAYED.  It is

12   further ordered that Union Carbide's motion for leave to file an amended notice of removal [Docket No.

13   43] is GRANTED.  Finally, the plaintiffs' motions to withdraw their motion to remand is GRANTED

14   [Docket No. 47]; their motion to expedite the trial setting [Docket No. 47] is DENIED.

15      IT IS SO ORDERED.

16      October 9, 2007

17                               Saundra Brown Armstrong
                                 United States District Judge

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT P

CATHERINE MORRIS KROW (State Bar No. 208412)
NATASHA R. CUPP (State Bar No. 240939)
Orrick, Herrington & Sutcliffe LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:     (415) 773-5700
Facsimile:     (415) 773-5759
ckrow@orrick.com
ncupp@orrick.com

Attorneys for Defendant
UNION CARBIDE CORPORATION

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

|  |  |
|---|---|
| ROBERT F. LYMAN and SAMANTHA LYMAN, <br><br> Plaintiffs, <br><br> v. <br><br> ASBESTOS DEFENDANTS (B*P), *et al.,* <br><br> Defendants. | Case No. C 07-4240 SBA <br><br> **UNION CARBIDE CORPORATION'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR STAY** <br><br> Date:          October 16, 2007 <br> Time:          1:00 p.m. <br> Courtroom:  3, Third Floor, Oakland <br> Judge:        Hon. Saundra B. Armstrong |

OHS West:260311326.5

1    Defendant Union Carbide Corporation ("Union Carbide") hereby files this

2    memorandum of points and authorities in reply to Plaintiffs' opposition to Union Carbide's

3    motion to stay the case pending transfer to MDL-875.

4    **I.      INTRODUCTION / STATEMENT OF THE ISSUES TO BE DECIDED**

5    Union Carbide respectfully requests that the Court grant its motion to stay the case

6    pending a transfer decision by the MDL Panel. Plaintiffs' entire argument in opposition to this

7    stay boils down to one unsupportable assumption: that by belatedly acquiescing to removal, they

8    have somehow eliminated the only issue over which the MDL court could exercise oversight

9    responsibility. Notably, Plaintiffs do not cite any authority for this conclusion,[1] nor can they, as

10   this assumption is *directly contrary* to federal case law. In reality, there are significant pretrial

11   issues left to be addressed in this case, including issues related to expert discovery, the

12   admissibility of expert testimony, Union Carbide's motion for summary judgment, and

13   settlement.

14   Moreover, because all of the outstanding pretrial questions fall squarely within the

15   purview of the MDL court, the MDL Panel is likely to transfer the case when it rules on

16   Plaintiffs' objection to transfer in the near future. Thus, by temporarily staying the case pending

17   a transfer decision by the MDL Panel, this Court would preserve judicial resources and avoid the

18   risk of hardship to Union Carbide by requiring it to engage in motion practice and discovery that

19   will have to be duplicated before the MDL. Furthermore, while Plaintiffs' claim of prejudice

20   evokes great sympathy, ultimately proceeding forward with this case will accomplish nothing for

21   Plaintiffs if the MDL Panel rules against them soon, as it is likely to do. And if Plaintiffs truly

22   believe this case is "not suitable" for transfer to the MDL, then to ameliorate the claimed

23   prejudice, Plaintiffs could attempt to expedite the transfer decision by requesting a shortened

24   briefing schedule, or at least by notifying the Panel of any exigency. They have not done so.

---

25   [1] The only two cases cited in Plaintiffs' opposition both stand for the unremarkable proposition
     that the MDL oversees pretrial matters, but does not handle trials. *See In re Asbestos Products*
26   *Liability Litig. (No. VI)*, 771 F. Supp. 415 (J.P.M.L. 1991); *In re Drowning Incident at Quality*
     *Inn Northeast, Washington D.C., on May 3, 1974*, 405 F. Supp. 1304 (J.P.M.L. 1991). These
27   cases do not support Plaintiffs' much-broader conclusion that there are no outstanding pretrial
     issues in this matter, which presently is not in trial and, unlike the cases Plaintiffs cite, is a case
28   that has been removed from state court to federal.

## II.   FACTUAL BACKGROUND

On or about December 26, 2006, Plaintiffs Robert and Samantha Lyman filed suit against Union Carbide and a number of other defendants. In their complaint, Plaintiffs alleged that exposure to defendants' asbestos and/or asbestos-containing products caused Mr. Lyman's lung cancer.

### A.   Expert Discovery And Challenges To Expert Testimony In The State Court Action

In the state court action, experts were not required to provide written reports. *See* Cal. Civ. Proc. Code § 2034.210(c). In this case, some experts elected to provide reports, but most experts did not. (Decl. of Catherine Morris Krow filed concurrently herewith ("Krow Decl.") ¶ 1.) For those experts who did provide reports, their reports did not conform to federal procedural requirements. (Krow Decl. ¶ 1, Ex. A.)

In addition, expert depositions were taken in the state court action; however, these depositions were not complete by the time the case was assigned to a trial court on August 6, 2007. (Krow Decl. ¶ 3.) To the extent Union Carbide could given the state of expert discovery, on August 7, 2007 it filed motions *in limine* with the trial court challenging the admissibility of certain expert testimony under California standards. (Krow Decl. ¶ 4.) Those motions were not ruled upon before the case was removed to this Court on August 17, 2007. (*Id.*) Furthermore, because motions for summary judgment are due before expert discovery is complete, causation was not an issue that could be addressed in defendants' motions for summary judgment. (Krow Decl. ¶ 5, Ex. B.)

### B.   Summary Judgment In The State Court Action

Mr. Lyman, the Plaintiffs' key product identification witness, was deposed for seven days in April 2007. Although Mr. Lyman was the sole percipient product identification witness to his suit against Union Carbide, he *stated explicitly* at deposition that he could not recognize the names of any Union Carbide asbestos-containing products, including Super Visbestos and Univis, distributed by co-defendant Montello, Inc. ("Montello"), and had in fact been too far away to see the brand name, manufacturer, or supplier of the materials in the field.

1    (Krow Decl. Ex. C at 527:4-8, 529:4-6, Ex. D at 471:2-13.)

2            In interrogatory responses, provided both before and after Mr. Lyman's deposition,

3    Plaintiffs again failed to identify exposure to any materials that contained Union Carbide

4    asbestos.  (Krow Decl. Ex. E at 3:19-20, F at 6:6-10.)

5            Because there was no evidence of any exposure to any product containing Union

6    Carbide asbestos, Union Carbide moved for summary judgment on July 5, 2007.  (Krow Decl.

7    Exs. G, J.)  In opposition to Union Carbide's motion, Mr. Lyman proffered a declaration attesting

8    that, despite his express deposition testimony to the contrary, he could now recall working around

9    two Union Carbide asbestos-containing products—Super Visbestos and Univis.  (Krow Decl. Ex.

10   H at ¶ 4.)  Mr. Lyman attributed the contradiction to the fact that his attorneys refreshed his

11   recollection with photographs shown after the deposition, as part of his "preparation of responses

12   to Defendant Montello's written discovery."  (Krow. Decl. Ex. H at ¶ 4.)  Notably, however,

13   Plaintiffs made no mention of these products in Mr. Lyman's responses to Montello's discovery,

14   which were served *after* Mr. Lyman's recollection was allegedly refreshed.  (Krow. Decl. Ex. F.)

15   The court nevertheless denied Union Carbide's motion for summary judgment, based on Mr.

16   Lyman's declaration.  (Krow Decl. Ex. I.)  Union Carbide subsequently filed a petition for writ of

17   mandate, which was denied without substantive analysis by the California Court of Appeal on

18   August 3, 2007.  (Krow Decl. Exs. K, L.)

19       C.    **Settlement Discussions In The State Court Action**

20           Pretrial settlement conferences with all parties were held on June 27 and July 18,

21   2007.  (Krow Decl. ¶¶ 16-17, Ex. M, Ex. N at 207:20-26.)  At the first conference, there were still

22   at least 17 remaining defendants, and at the second conference, there were at least 10 remaining

23   defendants.  (*Id.*)  As is typically the case, no serious settlement discussions took place at these

24   conferences.  (Krow Decl. ¶ 18.)  Two additional settlement conferences were ordered after the

25   case was assigned out for trial; however, these conferences were no more fruitful than the first.

26   (Krow Decl. ¶ 19.)

27   ///

28   ///

1  **D.    The Current Dispute**

2    On August 24, 2007, Union Carbide filed a Motion to Stay the Case Pending

3  Transfer to MDL-875.  On September 17, 2007, Plaintiffs filed an opposition to Union Carbide's

4  request to stay the case.  In that opposition, Plaintiffs conceded that the case belongs in federal

5  court, but argued that the case should not be stayed pending transfer to MDL-875 because there

6  were no pretrial proceedings left for MDL-875 to oversee.  (Opp. to Mot. to Stay Case; Mot. to

7  Withdraw Mot. to Remand and to Expedite Trial Setting 4:2-17 [hereafter "Pls.' Opp."].)

8  **III.    ARGUMENT**

9  **A.    There Are Pretrial Proceedings Left In The Case For The MDL Court To**
**Oversee**

10

11    As discussed in Union Carbide's opposition to Plaintiffs' motion to expedite (*see*

12  Opp. to Mot. to Expedite Trial Setting 7:3-22), upon removal a federal court must revisit the state

13  court proceedings to the extent necessary to conform them to federal procedures.  *See Granny*

14  *Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 439-41 & n.15 (1974) (requiring the federal court

15  to accommodate a temporary restraining order issued by the state court to the federal time

16  limitation).  In addition, a federal court may revisit interlocutory orders issued in the state court.

17  *See Preseau v. Prudential Ins. Co.*, 591 F.2d 74, 79-80 (9th Cir. 1979).  Here, the state court

18  proceedings must be revisited because the state court's procedures relating to scientific

19  gatekeeping and expert discovery "requires the parties to act or refrain from acting in a manner

20  inconsistent with federal procedural requirements."  *Nisso-Iwai Am. Corp. v. Kline*, 845 F.2d

21  1300, 1303 (5th Cir. 1988) (citing *Granny Goose Foods*, 415 U.S. at 439-41 & n.15).  In addition,

22  the state court's prior interlocutory rulings, including its ruling on Union Carbide's summary

23  judgment motion, may be reevaluated by the federal court that retains jurisdiction.  Finally, the

24  settlement procedures available in the MDL remain an avenue of pretrial discussion that the MDL

25  court can and should oversee.

26  **1.    Union Carbide is Entitled to a Pretrial Hearing on the Admissibility of**
**Expert Testimony Under Federal Rule of Evidence 702**

27

28    In diversity cases, the Federal Rules of Evidence, not state evidentiary laws, apply.

1   *See McDowell v. Brown*, 392 F.3d 1283, 1294 (11th Cir. 2004) (citing 19 Charles Alan Wright,

2   Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 4512 (2d ed. 1996)).

3   Moreover, the admissibility of expert testimony is considered a matter of federal, not state,

4   procedure. *Id.* at 1294-95 (citing *United States v. Roark*, 753 F.2d 991, 994 (11th Cir. 1985);

5   *Edwards v. Sears, Roebuck and Co.*, 512 F.2d 276, 292 (5th Cir. 1975)).

6            Federal Rule of Evidence 702 provides that:

7            If scientific, technical or other specialized knowledge will assist
             the trier of fact to understand the evidence or to determine a fact in
8            issue, a witness qualified as an expert by knowledge, skill,
             experience, training, or education, may testify thereto in the form
9            of opinion or otherwise, if (1) the testimony is based upon
10           sufficient facts or data, (2) the testimony is the product of reliable
             principles and methods, and (3) the witness has applied the
11           principles and methods reliably to the facts of the case.

12   Fed. R. Evid. 702. A Rule 702 determination is a question of law to be resolved by the court in a

13   preliminary hearing prior to trial. *See, e.g., Magistrini v. One Hour Martinizing Dry Cleaning*,

14   180 F. Supp. 2d 584, 593 (D.N.J. 2002). Thus, when a party seeks to admit *any* expert testimony,

15   the court must make an initial determination, in a preliminary hearing under Federal Rule of

16   Evidence 104(a), that the requirements of Rule 702 have been met. *Daubert v. Merrell Dow*

17   *Pharma., Inc.*, 509 U.S. 579, 592 (1993).

18            In *Daubert*, the Supreme Court held that Rule 702 imposes a special obligation on

19   judges to "ensure that any and all scientific testimony or evidence admitted is not only relevant,

20   but reliable." *Id.* at 589. A court is therefore required to act as a gatekeeper "to make certain that

21   an expert, whether basing testimony upon professional studies or personal experience, employs in

22   the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the

23   relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

24            At the time of removal, the state court had yet to exercise any gatekeeping function

25   regarding the admissibility of expert testimony because, unlike federal court in which expert

26   discovery is completed before trial so that *Daubert* challenges can be adjudicated in time for

27   summary judgment, expert discovery in California "preference" cases continues up to and after

28   the start of trial. (Krow Decl. ¶ 3.) Thus, in asbestos cases pending before a California state

1    court, the admissibility of expert testimony typically is resolved through motions *in limine*

2    submitted at the beginning of trial. These motions had not been ruled on by the state court at the

3    time the case was removed to federal court. (Krow Decl. ¶ 4.)

4              Moreover, even if the state court had exercised a gatekeeping function in this case,

5    that court's decisions would not be of use now because the approach followed by the California

6    state courts with regard to the admissibility of expert testimony differs dramatically from the

7    federal approach. In fact, California state courts have firmly rejected the Rule 702 and *Daubert*

8    standard as it applies to expert testimony. *People v. Leahy*, 8 Cal. 4th 587, 612 (1994)

9    (concluding that the *Kelly* doctrine survived the Supreme Court's decision in *Daubert*). Instead,

10   California state courts apply a "general acceptance" standard "to that **limited class** of expert

11   testimony which is based, in whole or part, on a technique, process, or theory which is *new* to

12   science, and even more so, the law." *See id.* at 605 (quoting *People v. Stoll*, 49 Cal. 3d 1136,

13   1156 (1989)); *see also People v. Kelly*, 17 Cal. 3d 24, 30 (1976). *For all other expert testimony*,

14   including medical causation testimony, the only gatekeeping analysis undertaken by the state

15   court is performed within the confines of California Evidence Code Sections 801 and 803. *See,*

16   *e.g., People v. McDonald*, 37 Cal. 3d 351, 373 (1984) (stating that California courts "have never

17   applied the *Kelly-Frye* rule to expert medical testimony"), *overruled on other grounds by People*

18   *v. Mendoza*, 23 Cal. 4th 896, 913 (2000); *People v. Mendibles*, 199 Cal. App. 3d 1277, 1293

19   (1988) ("[T]he expression of expert medical opinion as to the cause of a wound or injury falls, as

20   *McDonald* notes, outside [*Kelly's*] realm."). Under these rules, expert testimony is excludable if

21   the expert is not properly qualified, or the opinion is not based on matter that "is of a type that

22   reasonably may be relied upon by an expert in forming an opinion upon the subject to which [the]

23   testimony relates." Cal. Evid. Code § 801(b); *see also* Cal. Evid. Code § 803 (providing that

24   opinion testimony without a proper basis may be excluded). There addition requirements of

25   Federal Rule 702 (*e.g.*, a rigorous examination of the expert's methods and principles) are not

26   present in the California rules.

27             Thus, because California state courts engage in only a limited foundational

28   analysis for most expert testimony, even had the state court considered the admissibility of expert

1   testimony prior to removal, that analysis would be of no use in federal court, where the rules are

2   far more stringent.  Accordingly, it is plain that there remain important pretrial decisions to be

3   made by the court with regard to the admissibility of expert testimony at trial.  The MDL court

4   would be best suited to resolve any challenges to the parties' experts because it has likely

5   encountered many of these experts before and, therefore, would be familiar with the challenges

6   that would be raised.  In addition, the interests of judicial economy are served if the MDL court

7   oversees *Daubert*-related pretrial issues because the MDL court is already familiar with the

8   scientific, technical, and medical issues that affect the Rule 702 rulings.

9          **2.**       **Additional Expert Discovery in Advance of a Rule 702 Hearing Is**
                    **Required Under the Federal Discovery Rules**[2]

10

11          The Federal Rules of Civil Procedure govern upon removal of an action to federal

12   court.  *See* Fed. R. Civ. P. 81(c) ("These rules apply to civil actions removed to the United States

13   district courts from the state courts and govern procedure after removal."); *Willy v. Coastal Corp.*,

14   503 U.S. 131, 134 (1992) ("This expansive language contains no express exceptions.").  Thus, the

15   Rules of Civil Procedure pertaining to discovery, including Rule 26, now apply to this case.  *See*

16   *McIntyre v. K-Mart Corp.*, 794 F.2d 1023, 1025 (5th Cir. 1986) (rejecting plaintiffs' position that

17   state procedural rules applied to interrogatories served before removal and observing that

18   plaintiffs' argument "appears to be wholly without support in the case law"); *Riley v. Walgreen*

19   *Co.*, 233 F.R.D. 496, 498 (S.D. Tex. 2005) ("[Plaintiff] attempts to circumvent [Fed. R. Civ. P.

20   26(d)] by citing general language from cases in other contexts, to the effect that a removed case

21   'comes into the federal system in the same condition in which it left the state system.' ... But

22   neither the plaintiff's cases nor [28 U.S.C. § 1450] deal specifically with discovery or procedure

23   after removal, unlike Rules 26(d) and 81(c).") (citations omitted); *Yonkosky v. Hicks*, 409 F.

24

25     [2] At the time Union Carbide filed its motion to stay the case, the principal issue between the
    parties was whether removal to federal court was appropriate, not whether other pretrial issues

26   remained outstanding.  Accordingly, in Union Carbide's moving papers, it focused almost
    exclusively upon the remand question; however, it also indicated at one point that pretrial

27   discovery in the case was complete.  Plaintiffs' agreement to federal jurisdiction prompted
    additional research into whether this would remain true if the case proceeded in federal court.

28   That research revealed that the outstanding pretrial matters in the case would include expert
    discovery issues because the federal requirements have not been fulfilled.

             - 7 -           UNION CARBIDE'S REPLY MEMORANDUM IN SUPPORT
                                              OF ITS MOTION FOR STAY; CASE NO. C 07-4240 SBA

1    Supp. 2d 149, 151 n.6 (W.D.N.Y. 2005).

2           Federal Rule of Civil Procedure 26(a)(2) requires any expert who is retained to

3    testify in the case to provide a signed written report to the opposing party.  *See* Fed. R. Civ. P.

4    26(a)(2)(B).  This report is required to contain:

> [A] complete statement of all opinions to be expressed and the
> basis and reasons therefore; the data or other information
> considered by the witness in forming the opinions; any exhibits to
> be used as a summary of or support for the opinions; the
> qualifications of the witness, including a list of all publications
> authored by the witness within the preceding ten years; the
> compensation to be paid for the study and testimony; and a listing
> of any other cases in which the witness has testified as an expert at
> trial or by deposition within the preceding four years.

11   *Id.*  There is no similar requirement in California state court.  *See, e.g.,* Cal. Civ. Proc. Code §§

12   2034.210(c) & 2034.260(c).  Thus, to the extent any expert reports were exchanged in the state

13   court action (and this was the exception, not the rule), they did not conform to the federal

14   requirements.  (Krow Decl. ¶ 2, Ex. A.)

15          Furthermore, because experts were deposed in the state court case without the

16   benefit of having exchanged expert reports that comply with these requirements, and without

17   regard to the potential for a *Daubert* challenge that is only available in federal proceedings,

18   Union Carbide anticipates that there may be a need to re-depose certain experts so as to allow

19   both parties to benefit from the overall purpose and effect of Rules 26(a) and 702.  In particular,

20   Rule 26(a)(4) states that "[i]f a report from the expert is required under subdivision (a)(2)(B), *the*

21   *deposition shall not be conducted until after the report is provided.*"  Fed. R. Civ. P. 26(a)(4)

22   (emphasis added).

23          A review of the Advisory Committee Notes related to subdivision (a)(4) make

24   clear that this is not merely a technical requirement.  Rather, the requirement that expert reports

25   be exchanged prior to expert depositions reflects a determination that:

> Effective cross-examination of an expert witness requires advance
> preparation.  The lawyer even with the help of his own experts
> frequently cannot anticipate the particular approach his adversary's
> expert will take or the data on which he will base his judgment on
> the stand. ... Similarly, effective rebuttal requires advance

1  knowledge of the line of testimony of the other side. If the latter is
2  foreclosed by a rule against discovery, then the narrowing of the
   issues and elimination of surprise when discovery normally
3  produces are frustrated.

4  Fed. R. Civ. P. 26 advisory committee's note regarding 1970 amendment to subdivision (b)(4).

5  The Advisory Committee's Notes also make plain that the trial problems that would flow from

6  lack of discovery of expert witnesses would be "most acute and noteworthy when the case turns

7  largely on experts." Id.

8        An asbestos case presents highly complex and contentious scientific, technical,

9  and medical issues. The present case is no exception, and because the case involves a dispute

10  over the cause of Mr. Lyman's disease (specifically, Union Carbide believes that Mr. Lyman

11  suffers from lung cancer because he smoked heavily for over 50 years), the testimony of the

12  experts could be outcome determinative. For this reason, it is especially crucial that the parties

13  adhere to the strictures of Rule 26(a)(4), and that expert discovery be conducted with an eye

14  towards a possible *Daubert* challenge. In so doing, the parties will be able to effectively narrow

15  the issues for trial and eliminate surprises, something that was not previously possible under

16  California's procedural rules.

17        Finally, Union Carbide believes the MDL court is the most appropriate forum for

18  overseeing the additional discovery required under the federal rules because it has likely

19  encountered many of these experts before. Thus, the MDL court could preserve judicial economy

20  by avoiding duplication of any discovery that has already taken place in the MDL and it can

21  prevent inconsistent and repetitive rulings related to these and any other discovery issues that may

22  arise in the case.

23        **3.    Union Carbide Anticipates Renewing Its Motion for Summary**
24                **Judgment in Federal Court**

25        Also pending resolution before trial is Union Carbide's renewed motion for

26  summary judgment, which it intends to file after transfer to the MDL Panel. Although Union

27  Carbide filed a motion for summary judgment in state court, that court applied California state

28

OHS West 260311326.5

UNION CARBIDE'S REPLY MEMORANDUM IN SUPPORT
OF ITS MOTION FOR STAY; CASE NO. C 07-4240 SBA

1   summary judgment standards and procedures to deny the motion, and the issue of causation could

2   not be raised therein because expert discovery had not even begun.  Under the federal procedural

3   standards, however, Union Carbide is almost certainly entitled to summary judgment. *See, e.g.,*

4   *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531-33 (9th Cir. 2000) (noting that federal

5   and state summary judgment standards differ and may warrant summary judgment after removal).

6   Union Carbide is therefore entitled to renew its motion for summary judgment in the federal

7   forum. *See Preaseau*, 591 F.2d at 79-80.

8                     **a.**      **Union Carbide may renew summary judgment based on failure
9                            to establish causation after Plaintiffs' causation evidence is
                            tested under the federal standards**

10   Under state court procedures, Union Carbide could not address Plaintiffs' failure

11   to prove causation at the summary judgment stage, whereas under federal procedures, it can.

12   Accordingly, Union Carbide intends to first challenge Plaintiffs' causation evidence under

13   *Daubert* and Rule 702 of the Federal Rules of Evidence.  If the rulings on this evidence are

14   favorable, Union Carbide's renewed motion for summary judgment will include the previously-

15   unavailable argument that summary judgment should be granted based on Plaintiffs' inability to

16   establish causation. *See Allstate Fin. Corp. v. Zimmerman*, 296 F.2d 797, 799 (5th Cir. 1961)

17   (upholding district judge's decision to reconsider summary judgment motion previously denied

18   by another district court judge where subsequent motion was based on additional facts); *Shearer*

19   *v. Homestake Mining Co.*, 727 F.2d 707, 709 (8th Cir. 1984) (upholding district court's

20   reconsideration of summary judgment motion where renewed motion was based upon substantial

21   discovery of facts not before the court at the time of the first motion).

22                     **b.**      **Union Carbide may renew summary judgment under federal
23                            standards based on Plaintiffs' failure to establish exposure to
                            any Union Carbide product**

24   Union Carbide's initial motion for summary judgment, filed before removal,

25   contended that after several days of deposition, Mr. Lyman was unable to specify exposure to

26   even one product containing Union Carbide asbestos that could have caused his alleged injury.  In

27   opposition to Union Carbide's motion, Plaintiffs proffered an eleventh-hour declaration signed by

28   Mr. Lyman, which contradicted both his sworn testimony and his interrogatory responses.

- 10 -

1   (Krow. Decl. Ex. F.)  Given federal courts' treatment of such declarations, the outcome of Union

2   Carbide's motion would almost certainly have been different in federal court.

3         Litigants may renew a motion for summary judgment after removal, even if a state

4   court previously heard and denied the motion. *Preseau*, 591 F.2d at 79-80.  The district court

5   should, subject to its discretion, grant a previously-denied motion for summary judgment where

6   there is a cogent reason for doing so. *Id.* at 80 (upholding summary judgment granted by a

7   district court after removal, despite a state court order denying the selfsame motion); *Fairbank*,

8   212 F.3d at 532-33 (same).

9         In particular, "because ultimately the judge who enters the final judgment in the

10   case is responsible for the legal sufficiency of the ruling," a successor judge to a case should not

11   be made to adhere to an erroneous prior order. *Fairbank*, 212 F.3d at 530.  The district court is

12   therefore entitled to make an independent determination as to whether there is an issue of fact

13   remaining for resolution at trial. *Aginsky v. Farmers Ins. Exchange*, 409 F. Supp. 2d 1230, 1233

14   (D. Or. 2005) (concluding that no issue of fact remained, despite state court opinion to the

15   contrary).

16         Moreover, the differences between federal and state summary judgment standards

17   and procedure may entitle litigants to summary judgment in federal court where they would not

18   be so entitled in state court. *Fairbank*, 212 F.3d at 530-31.  District court review of the motion

19   under federal standards, despite prior denial by the state court, is therefore critical to ensuring the

20   expediency of litigation and conservation of judicial resources; such review enables the court to

21   "settle the questions presently without compelling the parties to proceed with what may be a futile

22   and expensive trial." *Preseau*, 591 F.2d at 79 (quoting *Castner v. First National Bank of*

23   *Anchorage*, 278 F.2d 376, 380 (9th Cir. 1960)).

24         In this instance, district courts are able and encouraged to ascertain whether

25   eleventh-hour declarations such as Mr. Lyman's are a "sham." *Foster v. Arcata Assocs., Inc.*, 772

26   F.2d 1453, 1462 (9th Cir. 1985), *overruled on other grounds by Kennedy v. Allied Mutual Ins.*

27   *Co.*, 952 F.2d 262 (9th Cir. 1991). As the Ninth Circuit has noted, "[i]f a party who has been

28   examined at length on deposition could raise an issue of fact simply by submitting an affidavit

1    contradicting his own prior testimony, this would greatly diminish the utility of summary

2    judgment as a procedure for screening out sham issues of fact." *Id.* (citing *Radobenko v.*

3    *Automated Equip. Corp.*, 520 F.2d 540, 544 (9th Cir. 1975)).

4           In fact, federal courts often refuse to consider declarations submitted by plaintiffs

5    in response to a defendant's motion for summary judgment where, as here, the declaration

6    appears to be a "'clear attempt by plaintiffs to shore up obvious gaps in their prima facie case

7    with phantom evidence' that was contradictory to [] sworn deposition testimony." *Buckner v.*

8    *Sam's Club, Inc.*, 75 F.3d 290, 292-93 (7th Cir. 1996) (rejecting affidavit as "an effort to undo

9    (contradict) the effects of the deposition testimony"). Rather, "[w]here an issue of fact is created

10   by inconsistencies in a party's deposition testimony and his declaration in opposition to the

11   motion, that issue is not genuine but is a sham issue." *McCray v. Casual Corner, Inc.*, 812 F.

12   Supp. 1046, 1048 (C.D. Cal. 1992) (citing *Radobenko*, 520 F.2d at 543-44) (rejecting as sham

13   plaintiff's declaration prepared for purposes of the summary judgment motion).

14          Accordingly, because Union Carbide intends to renew its motion for summary

15   judgment, and because the federal court has a cogent basis for granting Union Carbide's motion,

16   summary judgment remains a pretrial issue for the federal court to consider. Furthermore, Union

17   Carbide believes that this issue is best resolved by the MDL court because it has likely

18   encountered similar declarations in other asbestos cases. Accordingly, the MDL court could

19   efficiently resolve the issue while also ensuring that the decision is consistent with the decisions

20   reached in other asbestos cases.

21          **4.    Individual Settlement Negotiations and Conferences are Coordinated
              Pretrial Proceedings Over Which the MDL Court Has Authority**

22

23          The MDL court's authority includes the power to conduct settlement negotiations

24   and conferences. *In re Patenaude*, 210 F.3d 135, 144 (3d Cir. 2000) (citing Fed. R. Civ. P.

25   16(a)(5)). The MDL court is a choice forum for encouraging efficient settlement, and most

26   multidistrict litigation is settled before trial without need for remand. Federal Judicial Center,

27   *Manual for Complex Litigation - Fourth* § 20.132 (2004).[3]

28   ――――――――――――――――
     [3] (*See* Krow Decl. Ex. Q.)

1         The MDL-875 court in particular has promulgated a comprehensive procedural

2    mechanism to ensure that the parties have ample opportunity for meaningful settlement

3    discussions.  *See* Administrative Order No. 12, *In re Asbestos Products Liability Litig.*, MDL-

4    875, at 1 (E.D. Pa. May 3, 2007) [hereafter "Admin. Order 12"]; Administrative Order No. 3, *In*

5    *re Asbestos Products Liability Litig.*, MDL-875, at 1 (E.D. Pa. Sept. 8, 1992) [hereafter "Admin.

6    Order 3"].[4]  At the outset of settlement negotiations, the court requires all parties to submit papers

7    stating their position relative to disease, exposure, and damages.  Admin. Order 12.  Counsel are

8    required to negotiate in good faith and must report their progress to the court at least once a week.

9    Admin. Order 3.

10        In the event that settlement negotiations are unsuccessful, the MDL court may

11   refer the case to mediation, Admin. Order 12, and the court will hold a termination conference to

12   assess the status of the parties and the appropriateness of forwarding the case to the Mediation

13   Committee.  Admin. Order 3.  Although not always required, the MDL court will often make a

14   determination that the parties have negotiated in good faith before finding the litigation suitable

15   for trial and thus for remand.  *Id.*

16        Nothing even remotely comparable to the comprehensive settlement procedures

17   available in the MDL has occurred in this case so far.  Because the parties have yet to engage in

18   meaningful structured settlement negotiation, this case is particularly suitable for multidistrict

19   litigation.  The MDL court's established procedures will provide for and oversee the parties'

20   settlement discussions and will enhance the parties' efforts to resolve this litigation expediently

21   and without trial.

22   **B.**    **The Pretrial Issues Presented By This Case Counsel In Favor Of Granting A**
     **Stay Pending A Transfer Decision By The MDL Panel**

23

    **1.**    **A Stay Would Conserve Judicial Resources**

24

25        Courts commonly stay actions pending the MDL Panel's decision when a transfer

26   order is likely and when the pending motions raise issues likely to be raised in other cases as well.

27

28   [4] (*See* Krow Decl. Exs. O, P.)

- 13 -

1   *See* Federal Judicial Center, *Manual for Complex Litigation – Fourth* § 22.35.[5]  Such decisions

2   increase efficiency and consistency by ensuring that the Court does not needlessly expend its

3   energies familiarizing itself with a case that more likely than not will ultimately be heard by

4   another judge anyway.  *See Rivers v. Walt Disney Co.*, 980 F. Supp. 1358, 1360 (C.D. Cal. 1997).

5              As the foregoing discussion makes plain, there remain several important pretrial

6   matters in this case for the MDL court to oversee.  Moreover, because the outstanding issues raise

7   questions likely to be raised in other asbestos cases as well, transfer is likely.  *See, e.g.,* Federal

8   Judicial Center, *Manual for Complex Litigation – Fourth* § 22.35.[6]  Thus, this Court can promote

9   judicial efficiency and economy by staying the case pending a transfer decision by the MDL

10   Panel.

11              **2.      A Stay Would Not Unduly Prejudice Plaintiffs**

12              Plaintiffs argue that a stay is inappropriate in this case because Mr. Lyman's health

13   is deteriorating.[7]  (Pls.' Opp. 3:12-14.)  However, the MDL Panel has already set a briefing

14   schedule (all briefing to be completed by November 5), and a hearing on the transfer should take

15   place within the next couple of months; thus, a stay is likely to result in only a brief delay of the

16   case.

17              In addition, if this case truly is "not suitable" for transfer as Plaintiffs contend

18   (Pls.' Opp. 4:15), then it stands to reason that a quick decision by the MDL Panel would be in

19   Plaintiffs' best interest.  Yet Plaintiffs have not even notified the MDL Panel of any exigency, let

20   alone requested that the briefing or decision regarding transfer be expedited.  (Krow Decl. ¶ 20.)

21   Further, to the extent Mr. Lyman is unable to travel to trial, Plaintiffs' counsel can use the video-

22   taped direct testimony that was preserved for just such a purpose.  Finally, pressing forward with

23   

---

24   [5] (*See* Krow Decl. Ex. Q.)
     [6] (*See* Krow Decl. Ex. Q.)
25   [7] Plaintiffs also attempt to convince the Court that a stay is improper by claiming that Union
     Carbide has already somehow unduly delayed the start of trial. (Pls.' Opp. 2:15-3:20.) Yet it is
26   Plaintiffs, not defendants, who control when the time for removal begins to run. *See Preaseau v.
     Prudential Ins. Co.*, 591 F.2d 74, 79 (9th Cir. 1979).  Here, removal was not possible until late in
27   the proceedings because Plaintiffs did not dismiss the peripheral forum and non-diverse
     defendants until the start of the state court trial, and it took several days to confirm that diversity
28   jurisdiction existed and to ascertain the position of the remaining defendants regarding consent to
     removal.  (Krow Decl. ¶ 24.)

1    this case now ultimately will not advance Plaintiffs' interests, as the case is likely to be

2    transferred to the MDL before the outstanding pretrial issues are resolved by this Court.

3             **3.    Union Carbide Will Be Prejudiced if Proceedings Are Not Stayed and
                       the Action Is Later Transferred to the MDL Court**

4

5             If a stay is not entered by the Court and the MDL Panel concludes that this case

6    should be transferred to the MDL court, the parties will be forced to engage in duplicative motion

7    practice and discovery proceedings.  This, when combined with the fact that a stay will conserve

8    judicial resources – one of the fundamental goals of multidistrict litigation practice – weighs in

9    favor of granting a temporary stay pending a transfer decision by the MDL Panel.

10   **IV.    CONCLUSION**

11            For the foregoing reasons, Union Carbide respectfully asks that the Court grant its

12   request to stay the case pending a transfer decision by the MDL Panel.

13   Dated: October 2, 2007                CATHERINE MORRIS KROW
                                           ORRICK, HERRINGTON & SUTCLIFFE LLP

14

15                                         /s/ Catherine Morris Krow
                                           _____
16                                         Catherine Morris Krow
                                           Attorneys for Defendant
                                           UNION CARBIDE CORPORATION

17

18

19

20

21

22

23

24

25

26

27

28

OHS West 260311326.5

UNION CARBIDE'S REPLY MEMORANDUM IN SUPPORT
OF ITS MOTION FOR STAY; CASE NO. C 07-4240 SBA

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION / STATEMENT OF THE ISSUES TO BE DECIDED ......................1

II.  FACTUAL BACKGROUND ...............................................................................2

    A.   Expert Discovery And Challenges To Expert Testimony In The State Court Action.............................................................................................................2

    B.   Summary Judgment In The State Court Action.....................................................2

    C.   Settlement Discussions In The State Court Action................................................3

    D.   The Current Dispute.............................................................................................3

III. ARGUMENT ....................................................................................................4

    A.   There Are Pretrial Proceedings Left In The Case For The MDL Court To Oversee.................................................................................................................4

        1.   Union Carbide is Entitled to a Pretrial Hearing on the Admissibility of Expert Testimony Under Federal Rule of Evidence 702.......................4

        2.   Additional Expert Discovery in Advance of a Rule 702 Hearing Is Required Under the Federal Discovery Rules.............................................7

        3.   Union Carbide Anticipates Renewing Its Motion for Summary Judgment in Federal Court..................................................................................9

            a.   Union Carbide may renew summary judgment based on failure to establish causation after Plaintiffs' causation evidence is tested under the federal standards...............................10

            b.   Union Carbide may renew summary judgment under federal standards based on Plaintiffs' failure to establish exposure to any Union Carbide product ......................................................10

        4.   Individual Settlement Negotiations and Conferences are Coordinated Pretrial Proceedings Over Which the MDL Court Has Authority.........................................................................................12

    B.   The Pretrial Issues Presented By This Case Counsel In Favor Of Granting A Stay Pending A Transfer Decision By The MDL Panel ...................................13

        1.   A Stay Would Conserve Judicial Resources..............................................13

        2.   A Stay Would Not Unduly Prejudice Plaintiffs .........................................14

        3.   Union Carbide Will Be Prejudiced if Proceedings Are Not Stayed and the Action Is Later Transferred to the MDL Court...........................15

IV.  CONCLUSION .............................................................................................15

# TABLE OF AUTHORITIES

**Page**

## CASES

*Aginsky v. Farmers Ins. Exchange*
409 F. Supp. 2d 1230 (D. Or. 2005)...............................................................11

*Allstate Fin. Corp. v. Zimmerman*
296 F.2d 797 (5th Cir. 1961) .......................................................................10

*Buckner v. Sam's Club, Inc.*
75 F.3d 290 (7th Cir. 1996) .........................................................................12

*Castner v. First National Bank of Anchorage*
278 F.2d 376 (9th Cir. 1960) .......................................................................11

*Daubert v. Merrell Dow Pharma., Inc.*
509 U.S. 579 (1993) .......................................................................................5

*Edwards v. Sears, Roebuck and Co.*
512 F.2d 276 (5th Cir. 1975) ........................................................................5

*Fairbank v. Wunderman Cato Johnson*
212 F.3d 528 (9th Cir. 2000) ............................................................10, 11, 12

*Foster v. Arcata Assocs., Inc.*
772 F.2d 1453 (9th Cir. 1985) ....................................................................11

*Granny Goose Foods, Inc. v. Teamsters*
415 U.S. 423 (1974) .......................................................................................4

*In re Asbestos Products Liability Litig. (No. VI)*
771 F. Supp. 415 (J.P.M.L. 1991)................................................................1

*In re Drowning Incident at Quality Inn Northeast, Washington D.C., on May 3, 1974*
405 F. Supp. 1304 ...........................................................................................1

*In re Patenaude*
210 F.3d 135 (3d Cir. 2000) ........................................................................12

*Kennedy v. Allied Mutual Ins. Co.*
952 F.2d 262 (9th Cir. 1991) .......................................................................11

*Kumho Tire Co. v. Carmichael*
526 U.S. 137 (1999) .......................................................................................5

*Magistrini v. One Hour Martinizing Dry Cleaning*
180 F. Supp. 2d 584 (D.N.J. 2002) ..............................................................5

*McCray v. Casual Corner, Inc.*
812 F. Supp. 1046 (C.D. Cal. 1992)...........................................................12

*McDowell v. Brown*
392 F.3d 1283 (11th Cir. 2004)....................................................................5

*McIntyre v. K-Mart Corp.*
794 F.2d 1023 (5th Cir. 1986) ......................................................................7

*Nisso-Iwai Am. Corp. v. Kline*
845 F.2d 1300 (5th Cir. 1988) ......................................................................4

///

**TABLE OF AUTHORITIES**
(continued)

Page

*People v. Kelly*
  17 Cal. 3d 24 (1976)............................................................6

*People v. Leahy*
  8 Cal. 4th 587 (1994)..........................................................6

*People v. McDonald*
  37 Cal. 3d 351 (1984).........................................................6

*People v. Mendibles*
  199 Cal. App. 3d 1277 (1988) ..............................................6

*People v. Mendoza*
  23 Cal. 4th 896 (2000).........................................................6

*People v. Stoll*
  49 Cal. 3d 1136 (1989)........................................................6

*Preseau v. Prudential Ins. Co.*
  591 F.2d 74 (9th Cir. 1979) ................................... 4, 10, 11, 14

*Radobenko v. Automated Equip. Corp.*
  520 F.2d 540 (9th Cir. 1975) ...............................................12

*Riley v. Walgreen Co.*
  233 F.R.D. 496 (S.D. Tex. 2005) ..........................................7

*Rivers v. Walt Disney Co.*
  980 F. Supp. 1358 (C.D. Cal. 1997)......................................13

*Shearer v. Homestake Mining Co.*
  727 F.2d 707 (8th Cir. 1984) ...............................................10

*United States v. Roark*
  753 F.2d 991 (11th Cir. 1985) ...............................................5

*Willy v. Coastal Corp.*
  503 U.S. 131 (1991) ............................................................7

*Yonkosky v. Hicks*
  409 F. Supp. 2d 149 (W.D.N.Y. 2005)................................7, 8

**RULES**

Cal. Civ. Proc. Code § 2034.210(c) ......................................2, 8

Cal. Civ. Proc. Code § 2034.260(c) .........................................8

Cal. Evid. Code § 801(b) .........................................................6

Cal. Evid. Code § 803 .............................................................6

Fed. R. Civ. P. 16(a)(5) ..........................................................12

Fed. R. Civ. P. 26(a)(2)(B).......................................................8

Fed. R. Civ. P. 26(a)(4) ...........................................................8

Fed. R. Civ. P. 81(c).................................................................7

Fed. R. Evid. 702 .....................................................................5

1

**TABLE OF AUTHORITIES**
(continued)

2                                                                                    Page

3                          **MISCELLANEOUS**

4   19 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper
          *Federal Practice & Procedure* (2d ed. 1996) .......................................................................5
5
    Administrative Order No. 3, *In re Asbestos Products Liability Litig.*
6         MDL-875 (E.D. Pa. Sept. 8, 1992)...................................................................................13

    Administrative Order No. 12, *In re Asbestos Products Liability Litig.*
7         MDL-875 (E.D. Pa. Sept. 8, 1992)...................................................................................13

8   Fed. R. Civ. P. 26 advisory committee's notes regarding 1970 amendment to
          subdivision (b)(4) ........................................................................................................9
9
    Federal Judicial Center, *Manual for Complex Litigation – Fourth* (2004)...........................12, 14

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNION CARBIDE'S REPLY MEMORANDUM IN SUPPORT
OF ITS MOTION FOR STAY; CASE NO. C 07-4240 SBA

# EXHIBIT Q

# Manual for Complex Litigation,
# Fourth

Federal Judicial Center 2004

the filing of a motion for transfer,[652] therefore, matters such as motions to dismiss or to remand, raising issues unique to the particular case, may be particularly appropriate for resolution before the Panel acts on the motion to transfer. The Panel has sometimes delayed ruling on transfer to permit the court in which the case is pending to decide critical, fully briefed and argued motions. At the same time, it may be advisable to defer certain matters until the Panel has the opportunity to rule on transfer. For example, there would be little purpose in entering a scheduling order while a conditional order of transfer is pending. The court should, however, modify any previously scheduled dates for pretrial proceedings or trial as may be necessary to avoid giving the Panel a misleading picture of the status of the case.

More often, however, the Panel has held that the pendency of potentially dispositive motions is not an impediment to transfer of actions, because such motions can be addressed to the transferee judge for resolution after transfer. Furthermore, the pendency of motions raising questions common to related actions can itself be an additional justification for transfer.[653]

The Panel uses no single factor to select the transferee district,[654] but the Panel does consider where the largest number of cases is pending, where discovery has occurred, where cases have progressed furthest, the site of the occurrence of the common facts, where the cost and inconvenience will be minimized, and the experience, skill, and caseloads of available judges. Based on these factors, the Panel will designate a judge (on rare occasions, two judges) to whom the cases are then transferred for pretrial proceedings. The judge is usually a member of the transferee court, but occasionally the Panel selects a judge designated to sit specially in the transferee district on an intracircuit or intercircuit assignment.

### 20.132 During Period of Transfer

After the transfer, the transferee judge[655] exercises not only the judicial powers in the transferee district but also "the powers of a district judge in any district for the purpose of conducting pretrial depositions in such coordinated or consolidated proceedings."[656] The Panel has no authority to direct transferee judges in the exercise of their powers and discretion in supervising multidis-

---

652. A copy of the motion is to be filed with the court where the action is pending. *See* J.P.M.L. R.P. 5.12(c).

653. *See, e.g., In re Ivy,* 901 F.2d 7, 9 (2d Cir. 1990).

654. *See* Robert A. Cahn, *A Look at the Judicial Panel on Multidistrict Litigation,* 72 F.R.D. 211, 214–215 (1977).

655. *In re Plumbing Fixture,* 298 F. Supp. at 489.

656. 28 U.S.C. § 1407(b) (West 2003).

trict proceedings.[657] This supervisory power over depositions in other districts may be exercised in person or by telephone.[658] The transferee judge may vacate or modify any order of a transferor court, including protective orders;[659] unless altered, however, the transferor court's orders remain in effect.[660]

Although the transferee judge has no jurisdiction to conduct a trial in cases transferred solely for pretrial proceedings, the judge may terminate actions by ruling on motions to dismiss, for summary judgment, or pursuant to settlement, and may enter consent decrees.[661] Complexities may arise where the rulings turn on questions of substantive law. In diversity cases, the law of the transferor district follows the case to the transferee district.[662] Where the claim or defense arises under federal law, however, the transferee judge should consider whether to apply the law of the transferee circuit or that of the transferor court's circuit;[663] keeping in mind that statutes of limitations may present unique problems.[664] An action is closed by appropriate orders entered in the transferee court, without further involvement by the Panel or the original transferor court.

The transferee judge's management plan for the litigation should include provisions for handling tag-along actions transferred by the Panel after the initial transfer. Panel Rules 7.2(l) and 7.5(e) impose an affirmative obligation on parties in cases in which a motion to transfer is pending, or that previously have been transferred by the Panel, to promptly notify the Panel of any potential tag-along action in which the party is also named. This obligation also is imposed on counsel with respect to any action in which the counsel appears. Ordinarily, it is advisable to order that (1) tag-along actions shall be automatically made part of the centralized proceedings upon transfer to, or filing in, the transferee court; (2) rulings on common issues—for example, on the statute of limitations—shall be deemed to have been made in the tag-along

action without t
already been sh
other means of
trials by measur
bellwether trials,
the transferor co

One of the
single judge all
litigation. They
global settlemen
tion is settled ir
make the most
and any related s

Until 1998,
otherwise dismi:
remained in the
effecting transf
previously transi

In 1998, the
to invoke sectio
section 1407(a)
end of pretrial
been terminate
the pre-1998 p
section 1407 as
the case, and it
greatest underst
trying the cons
adjudicating re
transferee judg
greater ability to

657. *Id.*

658. *See In re* Corrugated Container Antitrust Litig., 662 F.2d 875 (D.C. Cir. 1981); *In re* Corrugated Container Antitrust Litig., 644 F.2d 70 (2d Cir. 1981); *In re* Corrugated Container Antitrust Litig., 620 F.2d 1086 (5th Cir. 1980).

659. *See, e.g., In re* Upjohn Co. Antibiotic Cleocin Prods. Liab. Litig., 664 F.2d 114 (6th Cir. 1981).

660. *See In re* Master Key Antitrust Litig., 320 F. Supp. 1404 (J.P.M.L. 1971).

661. *See, e.g., In re* Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 367–68 (3d Cir. 1993).

662. Van Dusen v. Barrack, 376 U.S. 612 (1964); *In re* Dow Co. "Sarabond" Prods. Liab. Litig., 666 F. Supp. 1466, 1468 (D. Colo. 1987).

663. *Compare In re* Korean Air Lines Disaster, 829 F.2d 1171 (D.C. Cir. 1987), *aff'd on other grounds sub nom.* Chan v. Korean Air Lines Ltd., 490 U.S. 122 (1989), *with* Dow "Sarabond," 666 F. Supp. 1468 (D. Colo. 1987), and cases cited therein.

664. *See, e.g.,* Berry Petroleum Co. v. Adams & Peck, 518 F.2d 402, 406 (2d Cir. 1975).

665. For a disc
*also infra* sample o

666. *In re* Lexe
Court infers that M
all, neither to a th
analogy and furth
section 1406. *See i*

action without the need for separate motions and orders; and (3) discovery already taken shall be available and usable in the tag-along cases.[665] Consider other means of reducing duplicative discovery activity and expediting later trials by measures such as videotaping key depositions or testimony given in bellwether trials, particularly of expert witnesses, for use at subsequent trials in the transferor courts after remand.

One of the values of multidistrict proceedings is that they bring before a single judge all of the federal cases, parties, and counsel comprising the litigation. They therefore afford a unique opportunity for the negotiation of a global settlement. Few cases are remanded for trial; most multidistrict litigation is settled in the transferee court. As a transferee judge, it is advisable to make the most of this opportunity and facilitate the settlement of the federal and any related state cases. See section 20.31.

Until 1998, actions based on section 1407 proceedings and not settled or otherwise dismissed in the transferee districts during their pretrial stages often remained in the transferee districts for trial. Transferee judges entered orders effecting transfer for trial, pursuant to 28 U.S.C. § 1404 or 1406, of cases previously transferred to them for pretrial under section 1407.

In 1998, the U.S. Supreme Court held that a district court has no authority to invoke section 1404(a) to assign a transferred case to itself for trial, because section 1407(a) "uncondition[ally]" commands the Panel to remand, at the end of pretrial proceedings, each action transferred by the Panel that has not been terminated in the transferee district.[666] However, the policy reasons for the pre-1998 practice remain: (1) during the often protracted time of the section 1407 assignment, the transferee judge gains a solid understanding of the case, and it makes sense for trial to be conducted by the judge with the greatest understanding of the litigation; (2) the transferee judge may already be trying the constituent centralized action(s), and there may be efficiencies in adjudicating related actions or portions thereof in one trial; and (3) the transferee judge, if empowered to try the centralized actions, may have a greater ability to facilitate a global settlement.

---

665. For a discussion of the use of supplemental depositions, see *supra* section 11.453. See *also infra* sample order at section 40.29.

666. *In re* Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26 (1998). The Court infers that MDL transferee judges may not use section 1404(a) to transfer to any district at all, neither to a third district or back to the section 1407 transferor district. *Id.* at 41 n.4. By analogy and further inference, an MDL transferee judge likewise now may not transfer under section 1406. *See id.*

Accordingly, evolving alternatives, such as those below, permit the transferee court to resolve multidistrict litigation through trial while remaining faithful to the *Lexecon* limitations:

- Prior to recommending remand, the transferee court could conduct a bellwether trial of a centralized action or actions originally filed in the transferee district, the results of which (1) may, upon the consent of parties to constituent actions not filed in the transferee district, be binding on those parties and actions,[667] or (2) may otherwise promote settlement in the remaining actions.

- Soon after transfer, the plaintiffs in an action transferred for pretrial from another district may seek or be encouraged (1) to dismiss their action and refile the action in the transferee district, provided venue lies there, and the defendant(s) agree, if the ruling can only be accomplished in conjunction with a tolling of the statute of limitations or a waiver of venue objections, or (2) to file an amended complaint asserting venue in the transferee district,[668] or (3) to otherwise consent to remain in the transferee district for trial.[669]

- After an
  at the
  could n
  to the t

- The tra
  ment p
  tion, pr

20.133 Remar

Section 14
proceedings, a
respective trans
be done will d
remands have
remained to be
the cases were
Some of the co
further centrali
The Panel
remand, but th
remand.[672] The
the expeditious
on its own ini
"separate any
remand any of
the Panel has r

---

667. *See, e.g., In re* Air Crash Near Cali, Colombia on Dec. 20, 1995, MDL No. 1125, Order No. 1522 (S.D. Fla. Jan. 12, 2000) (noting that parties in some of the actions transferred under section 1407 had agreed to be bound by the results of a consolidated liability trial and had been instructed to file appropriate motions after the completion of the trial, seeking a ruling that effectuated such agreements).

668. Often in multidistrict litigation the transferee court will consider establishing a master file with standard pleadings, motions, and orders. This file may include a single amended consolidated complaint, alleging that venue is proper in the transferee district. If such a document is used, the court and parties should take care to ensure a common understanding of the document's intent and significance—that is, whether it is being used as a device simply to facilitate ease of the docket's administration, or whether the filing in the transferee district constitutes the inception of a new "case or controversy" in that district, thereby superseding and rendering moot the pending separate actions that had been transferred to that district for pretrial proceedings by the Panel under section 1407.

669. *See, e.g.,* State v. Liquid Air Corp. (*In re* Carbon Dioxide Indus. Antitrust Litig.), 229 F.3d 1321 (11th Cir. 2000) (ruling that *Lexecon* does not prohibit parties from waiving venue objections in centralized actions where transferee court otherwise had subject-matter jurisdiction); *In re* Dippin' Dots Patent Litig., MDL No. 1377, Docket No. 1:00-CV-907 (N.D. Ga. July 23, 2001) (transferee court ordered all parties to file a pleading stating whether they consented to trial in the transferee district); *In re* Research Corp. Techs., Inc. Patent Litig., Docket No. 97-2836 (D.N.I. Dec. 3, 1999) (order entering final judgment and staying further pretrial proceedings; transferee court found it reasonable to conclude that final judgment may be entered following trial proceedings consented to by the parties that resulted in termination of the actions).

670. *Lexecon,*
671. *See, e.g.,*
(S.D.N.Y. May 11
recommending it
*e.g., In re* Air Cra
V. Covello, Chief
Judicial Panel on
back to the court
Multidistrict Litig
672. *See In re*
673. J.P.M.L.
*e.g. In re* IBM Pe
Efforts by parties
remand, have bee

224.

- After an action has been remanded to the originating transferor court at the end of section 1407 pretrial proceedings, the transferor court could transfer the action,[670] pursuant to 28 U.S.C. § 1404 or 1406, back to the transferee court for trial by the transferee judge.[671]
- The transferee judge could seek an intercircuit or intracircuit assignment pursuant to 28 U.S.C. § 292 or 294 and follow a remanded action, presiding over the trial of that action in that originating district.

### 20.133 Remand

Section 1407 directs the Panel to remand, after appropriate pretrial proceedings, actions not filed or terminated in the transferee court to the respective transferor court for further proceedings and trial. When this should be done will depend on the circumstances of the litigation. In some cases, remands have been ordered relatively early, while substantial discovery remained to be done; in others, virtually all discovery had been completed and the cases were ready for trial at the time of remand to the transferor districts. Some of the constituent cases may be remanded, while others are retained for further centralized pretrial proceedings.

The Panel looks to the transferee court to suggest when it should order remand, but that court has no independent authority to order section 1407 remand.[672] The transferee court should consider when remand will best serve the expeditious disposition of the litigation. The Panel may also order remand on its own initiative or on the motion of a party.[673] Although authorized to "separate any claim, cross claim, counter-claim, or third-party claim and remand any of such claims before the remainder of the action is remanded," the Panel has rejected most requests to exclude portions of a case from transfer

---

670. *Lexecon,* 523 U.S. at 19.

671. *See, e.g.,* Kenwin Shops, Inc. v. Bank of La., 97 Civ. 907, 1999 WL 294800, at *11 (S.D.N.Y. May 11, 1999). The transferee court might also facilitate such a transfer by expressly recommending it either in its suggestion of remand to the Panel or in its final pretrial order. *See, e.g., In re* Air Crash at Dubrovnik, Croatia on Apr. 3, 1996, MDL No. 1180 (Letter from Alfred V. Covello, Chief Judge, U.S. District Court, D. Conn., to Michael J. Beck, Clerk of the Panel, Judicial Panel on Multidistrict Litigation, suggesting that four remanded cases be transferred back to the court and consolidated for trial (Jan. 4, 2002) (on file with the Judicial Panel on Multidistrict Litigation)].

672. *See In re* Roberts, 178 F.3d 181 (3d Cir. 1999).

673. J.P.M.L. R.P. 7.6(c). Great deference is given to the views of the transferee judge. *See, e.g., In re* IBM Peripheral EDP Devices Antitrust Litig., 407 F. Supp. 254, 256 (J.P.M.L. 1976). Efforts by parties to use the Panel as a substitute for appellate review, by seeking premature remand, have been uniformly rejected.

## 22.35 Authority of a Judge Pending Decision by the MDL Panel

In many cases, a court with one or more cases that are part of a mass tort may anticipate transfer by the MDL Panel. That court may, however, have motions to remand, motions to dismiss, or motions relating to discovery filed before the MDL Panel rules. A court in that position has the authority to grant or deny a motion or to stay the cases before it, pending the Panel's decision on transfer. If the case is transferred, the transferee court then decides unresolved motions after transfer.[1129]

A stay pending the Panel's decision can increase efficiency and consistency, particularly when the transferor court believes that a transfer order is likely and when the pending motions raise issues likely to be raised in other cases as well.[1130] The reasons for a stay diminish, however, if the pending motions raise issues relating to the law of a single state that are unlikely to arise in other related cases, if MDL transfer appears unlikely, or if the absence of federal jurisdiction is clear.[1131] Judicial economy may then be served by resolving specific issues and declining to stay the proceedings.[1132] Similarly, if the case is far along in discovery or motions practice, and there is an urgent need to have that case resolved, the court may decide not to stay the proceedings.[1133] For example, if the case involves a critically ill plaintiff who cannot wait an ex-

1129. The rules of the Judicial Panel on Multidistrict Litigation expressly provide that the pendency of a proceeding before the Panel to transfer a case "does not affect or suspend orders or pretrial proceedings in the district court in which the action is pending." J.P.M.L. R. P. 1.5 (West 2003); *see also In re* Asbestos Prods. Liab. Litig., 170 F. Supp. 2d 1348, 1349 n.1 (J.P.M.L. 2001) (citing Rule 1.5 and noting that proceedings for transferring tag-along actions experience "a lag time of at least three or four months from the filing of an action . . . and the issuance of the Panel's subsequent order").

1130. Moore v. Wyeth-Ayerst Labs., 236 F. Supp. 2d 509, 510–11 (D. Md. 2002) (observing that the MDL transferee judge had faced multiple motions to remand cases removed from state courts).

1131. *See, e.g.,* Caldwell v. Am. Home Prods. Corp., 210 F. Supp. 2d 809, 811 (S.D. Miss. 2002) (stating "the law in this circuit is clear that the *All Writs Act* does not provide an independent basis for federal jurisdiction").

1132. McGrew v. Schering-Plough Corp., No. CIV.A.01-2311, 2001 WL 950790, at *3 (D. Kan. Aug. 6, 2001) ("For purposes of judicial economy, the jurisdictional issue should be resolved immediately," before action by the MDL panel.).

1133. *See, e.g.,* Carden v. Bridgestone/Firestone, Inc., No. CIV.00-3017, 2000 WL 33520302, at *4 (S.D. Fla. Oct. 18, 2000) (denying stay and remanding case seeking injunctive relief to state court); *see also* Naquin v. Nokia Mobile Phones, Inc., No. CIV.A.00-2023, 2001 WL 1242253, at *1 (E.D. La. June 20, 2001) (denying motions to stay because "the prior substantial rulings in this case and continuing efforts by counsel may in fact aid the multidistrict litigation").

tended period for trial, the court may decide to proceed rather than wait for MDL action.

## 22.36 The Tasks of an MDL Transferee Judge

Aside from deciding any threshold motion to remand, the initial tasks of the MDL transferee judge include coordinating or consolidating the cases previously pending in a number of different districts; identifying differences in applicable law; and seeking information from the parties as to the status of the cases in order to determine how to proceed with pretrial discovery and motions. See sections 22.2 and 22.61. As to remand motions, the Panel's policy is not to delay a transfer decision because a remand motion is pending. The transferor court may rule on such a motion—or any other motion—while the Panel considers transfer. If the transferor courts have not decided remand motions before the MDL Panel order is issued, the transferee court should try to resolve the remand motions promptly because they invariably affect federal subject-matter jurisdiction, and the failure to rule on them until a case is returned to the transferor court may result in unnecessary and prejudicial delay.

An MDL transferee judge has authority to dispose of cases on the merits—for example, by ruling on motions for summary judgment[1134] or trying test cases that had been originally filed in the transferee district or refiled in or transferred to that district. If summary judgment motions are pending, the transferee court must consider whether to decide the motions or to transfer the cases back to the transferor districts. If the summary judgment motion pertains to one or few cases, or rests on application of the transferor court's conflicts-of-law and substantive law rules, the transferee judge may be able to decide the motions most efficiently.[1135] If the summary judgment motions involve issues common to all the cases centralized before the MDL court, however, the transferee judge may be in the best position to rule.[1136]

1134. *See, e.g., In re* Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig., 113 F.3d 1484, 1488 (8th Cir. 1997) (affirming grant of summary judgment for defendant Dow Chemical in relation to liability for the use of silicone gel in TMJ implants).

1135. *See In re* Orthopedic Bone Screw Prods. Liab. Litig., MDL No. 1014, 1997 WL 109595, at *2 (E.D. Pa. Mar. 7, 1997) (ruling on motions for partial summary judgment would not advance the litigation and would serve no useful purpose (citing Manual for Complex Litigation, Third, § 21.34 (1995))); *see also* Francis E. McGovern, *Judicial Centralization and Devolution in Mass Torts,* 95 Mich. L. Rev. 2077 (1997) (citing *In re* Silicone Gel Breast Implants Prods. Liab. Litig., 887 F. Supp. 1455 (N.D. Ala. 1995)) [hereinafter McGovern, *Judicial Centralization*].

1136. *See, e.g., In re* Norplant Contraceptive Prods. Liab. Litig., 215 F. Supp. 2d 795, 810, 835 (E.D. Tex. 2002) (granting summary judgment terminating "nearly all remaining non-settling

# EXHIBIT R

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

IN RE: ASBESTOS PRODUCTS
LIABILITY LITIGATION (NO. VI)        :

Civil Action No. MDL 875

This Document Relates To:
ALL ACTIONS
_____x

ADMINISTRATIVE ORDER NO 12

THE COURT, after examination of current procedures in place in this matter, and with a desire to facilitate the expeditious movement of pending cases on the MDL docket, and having had the benefit of input from the court-appointed plaintiff and defendant steering committees, hereby imposes the following filing requirements and procedures:

1.    SUBMISSION OF IDENTIFICATION INFORMATION

All plaintiffs shall submit to the Court a report identifying each plaintiff by full name, date of birth, last four digits of plaintiff's SSN, and a statement indicating the status of the plaintiff in the case before this Court; ie., asbestos-related injury victim, spouse of injured party, administrator of injured party of deceased injured party, executor(trix), child of injured party, etc.

2.    SUBMISSION OF RELATED COURT ACTIONS

Each plaintiff shall identify each and every prior or pending court or administrative action brought with the intent of satisfying in whole or in part the damages sustained by the plaintiffs alleged asbestos-related personal injury. In each such instance the plaintiff shall identify the claim, the parties involved and the results of any action thereon.

3.    SUBMISSION OF STATEMENT OF CASE STATUS

The plaintiff in each case shall identify all of the named defendants in the following manner:

a) Each defendant with whom the plaintiff has achieved resolution of his/her claim, whether by settlement or agreement to dismiss without payment or by payment of a claim through the bankruptcy court, shall be identified and, where a dismissal has not yet been entered of record, a proposed order shall be submitted.

b) Each defendant that the plaintiff now desires to dismiss from the action, with or without prejudice, the reason for the dismissal, and a proposed order.

c) Each remaining defendant that is currently in bankruptcy with a claim pending, together with an order for the transfer of the claim to an inactive docket which the court has created for the holding of such claims.

d) Each non-bankrupt unsettled defendant.

## 4.   SUBMISSION OF MEDICAL REPORTS

Each plaintiff asserting a claim based upon an alleged asbestos-related malignancy shall submit to the court a copy of the medical diagnosing report or opinion upon which the plaintiff now relies for the prosecution of the claim as if to withstand a dispositive motion.

Each plaintiff asserting a claim based upon an alleged non-malignant injury or condition shall submit to the court a copy of the medical diagnosing report or opinion upon which the plaintiff now relies for the prosecution of the claim as if to withstand a dispositive motion.

Each report or opinion submitted hereunder shall be based upon objective and subjective data which shall be identified and descriptively set out within the report or opinion.

## 5.   ALTERNATIVE PLAINTIFF SUBMISSION

Alternative submissions to the court are acceptable under the following circumstances:

a) If the plaintiff has remaining claims only against bankrupt parties and is desirous of seeking payment on those claims through the bankruptcy action, then, as an alternative to the required submissions under sections 2. and 4. above, the plaintiff may submit a proposed order for the transfer of this case to the "Bankrupts Only" docket in the form attached.

b) If the plaintiff has viable claims remaining against both bankrupt and non-bankrupt parties and wishes to pursue through the bankruptcy action only those claims remaining against the bankrupt parties, then, as an alternative to the required submissions under sections 2. and 4. above, the plaintiff may submit a proposed order for the dismissal of the non-bankrupt parties with prejudice and the transfer of the remaining claims against the bankrupt parties to the "Bankrupts Only" docket in the form attached.

c) The plaintiff may at any time submit to the court a proposed order to dismiss his/her case against all parties with prejudice. Plaintiff may also request a dismissal against any or all parties without prejudice; however, notice must be given to all parties, any of whom may file an objection within thirty (30) days thereafter. The court will hold a hearing if deemed necessary.

**6.     TIMING REQUIREMENTS**

Plaintiffs shall submit required documentation and proposed orders to the court in accordance with the schedule set forth:

a) Plaintiffs whose cases were filed during the years 2007, 2006, and before July 29, 1991 shall file with the court their required papers on or before August 1, 2007.

b) Plaintiffs whose cases were filed between July 29, 1991 and December 31, 1995 shall file with the court their required papers on or before September 1, 2007.

c) Plaintiffs whose cases were filed in 1996, 1997 and 1998, shall file with the court their required papers on or before October 1, 2007.

d) Plaintiffs whose cases were filed in 1999, 2000, 2001 and 2002, shall file with the court their required papers on or before November 1, 2007.

e) Plaintiffs whose cases were filed in 2003, 2004, and 2005 shall file with the court their required papers on or before December 1, 2007.

The court may dismiss pursuant to F.R.C.P. 41(b) the cases of any plaintiffs who fail to comply with the requirements set forth.

**7.     SCREENED CASES**

Current litigation efforts in this court and in the silica litigation have revealed that many mass screenings lack reliability and accountability and have been conducted in a manner which failed to adhere to certain necessary medical standards and regulations. The result is that mass screenings create an inherent suspicion as to their reliability. Where screenings have been conducted by the Sheet Metal Occupational Health Institute Trust and other organizations utilizing standards and protocols established by the American Thoracic Society (ATS), the Association of Occupational and Environmental Clinics (AOEC), and other accredited health organizations, there is a larger probability of adequacy for the reliablity foundation necessary for admissibility. This court will therefore entertain motions and conduct such hearings as may be necessary to resolve questions of evidentiary sufficiency in non-malignant cases supported only by the results of mass screenings which allegedly fail to comport with acceptable screening standards.

**8.     EXCLUSIONS**

The cases designated as 2MDL 875 (MARDOC) shall be excluded from the requirements set forth and those actions shall continue to be governed by the requirements of previous orders of this court concerning the management of the MARDOC cases.

**9.     SETTLEMENT CONFERENCES/SUGGESTIONS OF REMAND**

The court intends upon stepping up the pace of settlement conferences and will accordingly issue orders to that effect. Counsel are expected to comply with all requirements of the notice and to be prepared at the conference. All parties shall submit to the court at the time of the first settlement conference in any case a <u>short</u> position paper stating their position relative to disease, exposure and damages. Mitigating factors for the purposes of settlement shall also be set forth.

If the parties have failed to achieve settlement following one or more settlement conferences and working with the court, the case may be referred to mediation or, if the court finds that the parties have negotiated in good faith without success, the court may suggest the case for remand. A determination of good faith may not be necessary with regard to all defendants. The court will continue to prioritize malignant and exigent cases.

10.   **MANNER OF SUBMISSIONS**

All submissions to be made to the court pursuant to this order shall be paper filings with copies provided to all remaining viable parties in accordance with Rule 5, F.R.C.P.


IT IS SO ORDERED

Date: 5/30/07


BY THE COURT


James T. Giles,                J.

[Administrative Order No. 12 - Exhibit to Section 5 a)]

## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: ASBESTOS PRODUCTS     :
LIABILITY LITIGATION (NO. VI)     :      Civil Action No.  MDL - 875

---

### This Document Relates To:

---

### UNITED STATES DISTRICT COURT
### FOR THE (name of Transferor District)

DOE, John and Mary     :
     :
     v.     :      Civil Action No. (Transferor Ct. No.)
     :
ABC Corp., et al.     :

---

## MOTION AND ORDER TO TRANSFER TO "BANKRUPT's ONLY" DOCKET

Plaintiff hereby submits to the Court, in accordance with this Court's Administrative Order No. 12, that the only remaining claims in this action are against defendants in bankruptcy and that the defendant wishes at this time to pursue those claims through the bankruptcy claim process.

Plaintiff therefore moves that this action be transferred to the Court's administrative "Bankrupt's Only" docket. The Plaintiff understands that should there be a change of circumstances, the Plaintiff may, upon compliance with Administrative Order No. 12, petition the Court to have this action reinstated against certain defendants.

Plaintiff further understands that it is Plaintiff's responsibility to submit a final dismissal order to this Court when all claims have been resolved.

SUBMITTED BY:                SO ORDERED

_____ (  / /  )      _____J.
(Counsel for Plaintiff)                 James T. GILES
address                             (  / /  )
tel. No.

[Administrative Order No. 12 - Exhibit to Section 5 b)]

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

IN RE: ASBESTOS PRODUCTS :
LIABILITY LITIGATION (NO. VI) :          Civil Action No.  MDL - 875

**This Document Relates To:**

**UNITED STATES DISTRICT COURT**
**FOR THE (name of Transferor District)**

DOE, John and Mary                      :
                                        :
           v.                           :          Civil Action No. (Transferor Ct. No.)
                                        :
ABC Corp., et al.                       :

**MOTION FOR PARTIAL DISMISSAL AND ORDER TO TRANSFER TO**
**"BANKRUPT's ONLY" DOCKET**

Plaintiff hereby submits to the Court, in accordance with this Court's Administrative Order No. 12, that the remaining claims in this action are against bankrupt and non-bankrupt defendants. Plaintiff desires to dismiss with prejudice all claims against the remaining non-bankrupt defendants and pursue those claims remaining against the bankrupt defendants through the bankruptcy claim process.

The remaining non-bankrupt defendants to be dismissed with prejudice are:
(list non-bankrupt defendants to be dismissed with prejudice)

Plaintiff therefore moves that, following the dismissal of the non-bankrupt defendants, this action be transferred to the Court's administrative "Bankrupt's Only" docket. The Plaintiff understands that should there be a change of circumstances, the Plaintiff may, upon compliance with Administrative Order No. 12, petition the Court to have this action reinstated against certain bankrupt defendants.

Plaintiff further understands that it is Plaintiff's responsibility to submit a final dismissal order to this Court when all claims have been resolved.

SUBMITTED BY:                            SO ORDERED

_____ ( / / )         _____ J.

(Counsel for Plaintiff)                  James T. GILES
address                                  ( / / )
tel. No.

# EXHIBIT S

CRW



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)

FILED

SEP 8 1992

This Document Relates MICHAEL E. KUNZ, Clerk
ALL ACTIONS        By ____ Dep. Clerk

CIVIL ACTION NO. MDL 875
(Including MARDOC, FELA,
and TIREWORKER cases)

## ADMINISTRATIVE ORDER NO. 3

It is the intention of the Court that the cases be resolved through negotiation wherever possible. The Court and all parties agree that, as that process proceeds, it is often necessary to give special attention to certain cases. Although all settlements represent steps toward the Court's ultimate goal, special efforts to resolve these cases are not a substitute for broad-based negotiations designed to reduce the docket backlog.

In accordance with ADMINISTRATIVE ORDER NO. 2 Plaintiffs' counsel has previously submitted information to the Court relating to their malignancy and asbestosis cases. The Court has determined to give a priority to malignancy, death and total disability cases where the substantial contributing cause is an asbestos-related disease or injury. The following procedures are hereby established for review, settlement and/or further action in these cases:

### I    SELECTED CASES

Selected cases are identified by disease category. In each case, plaintiff's counsel must have a written medical opinion by a board certified specialist setting forth that exposure to asbestos or asbestos-containing products is a substantial contributing cause to the condition or death of plaintiff (plaintiff's decedent). The disease categories are:

A. Mesothelioma, living and deceased.
B. Lung Cancer, living and deceased.
C. Other malignancies, living and deceased.
D. Asbestosis, total disability deceased or total disability living.

### II   PROCEDURES FOR PLAINTIFFS' COUNSEL

The Court will process all cases previously identified by Plaintiffs' counsel pursuant to ADMINISTRATIVE ORDER NO. 2 as mesothelioma and lung cancer in accordance herewith UNLESS the

Court is advised that such cases do not meet the above criteria. Plaintiffs' counsel must affirmatively identify all other malignancy and asbestosis cases which meet the requirements hereof.  In all instances hereunder, the cases shall be identified by plaintiff's name, the transferor jurisdiction, and the individual case number assigned by the transferor district. The Court will advise plaintiffs' counsel (with a copy to defense, plaintiff's and peripheral liaison counsel) when his/her cases are ready for processing.  Plaintiffs' counsel shall then take the following steps:

    A.    Identify to the Court all remaining viable defendants from whom plaintiff expects to recover damages.

    B.    Provide the necessary fact information for defense counsel to process the cases for settlement. (work history, exposure information, date of birth/death, medical history, smoking history, Social Security Number, and printout or release etc.)

    C.    Provide defense counsel with X-rays and pathology in plaintiff's possession, together with necessary releases for medical and employment records.

    D.    Provide a reasonable settlement demand to each remaining defendant.

    E.    Notify the Court when each of the above requirements is completed.

III    PROCEDURES FOR DEFENSE COUNSEL

    Each defendant shall be prepared to identify the counsel who will be available and able to conduct all settlement negotiations with any particular plaintiffs' counsel.  Defense counsel shall take the following steps in these proceedings:

    A.    Within fifteen (15) days of receipt of notice that plaintiffs' counsel has complied with the requirements set forth in Section II above, notify the Court and Plaintiff's counsel by telephone and in writing as to any discrepancies in such notice, and set forth in detail all necessary additional information.

    B.    Within forty-five (45) days of receipt of the information from the plaintiff necessary to engage in settlement negotiations and the demand from plaintiffs' counsel, defense counsel shall review the same and accept such terms or make a reasonable offer for settlement.

## IV    SETTLEMENT NEGOTIATIONS

Following the initial procedures, all counsel shall make themselves readily available for personal and telephone settlement conferences. AT THIS TIME, NEGOTIATION IS TO BE ONGOING AND IN GOOD FAITH. All counsel are to report no less than once a week by telephone to the Court as to their progress. The Court will be available on a regular basis for participation in a settlement conference, either by telephone or in person. If, after thirty (30) days, any party feels that his/her opponent is not negotiating in good faith, they may request the Court to forward the matter to the Mediation Committee for a recommendation. If a request is made to refer the matter to the Mediation Committee, such request shall be honored by the Court. When the Court determines that further settlement discussions are unlikely to be productive, the Court will hold a termination conference to discover the status of all remaining parties to the action(s) in negotiation and to determine whether the case is to be forwarded to the Mediation Committee. A referral may be of one or a number of cases. If no request for referral is made, and the parties have been unable to resolve their differences, the Court shall determine whether the matter is appropriate for immediate remand.

## V    MEDIATOR

The Court shall appoint a neutral mediator for each case who is familiar with the jurisdiction. Once the Mediator is selected, he/she shall hear all referrals for that jurisdiction subject to resignation or Court reassignment. Upon receipt of a referral from the Court, the Mediator shall take the following action:

A.   Provide notice to each party of the time and place of a mediation hearing, which hearing shall take place no sooner than ten (10) days after such notice, but as soon thereafter as possible.

B.   Each party may provide a short position statement to his/her opponent and to the Mediator no less than five (5) days prior to the hearing.

C.   The Mediator shall set forth his/her own rules for proceeding on the referral and shall advise the participants.

D.   At the hearing the Mediator shall attempt to mediate settlement as to all parties. As to any case in the group that is not so resolved, the Mediator shall determine whether the participants have negotiated in good faith. This determination shall be made on a case by-case-basis.

E.  The Mediator shall make a report to the Court
setting forth his/her determination regarding
the good or bad faith of all parties to the
negotiations.  Upon receipt of the report
from the Mediator, the Court shall allow
those parties who have been negotiating in
good faith a reasonable time to complete a
settlement.  There shall be a presumption
that where the plaintiff has acted in good
faith and one or more defendants have been
found to be acting in bad faith, the case
will be immediately remanded for trial as to
such defendants.  If all parties are acting
in good faith the Court will make additional
efforts to settle the case.  If no settlement
is achieved the matter will be remanded.  The
Court will act promptly in all respects upon
receipt of a report from the Mediator.

F.  All information provided to the Mediator by
the parties shall be kept in confidence
except as set forth to the Court in the
Mediator's report.

VI.  **GOOD FAITH NEGOTIATIONS**

In order for the participants to the settlement
negotiations to be in good faith, there must be a reasonable
relationship between their demand/offer and the following
criteria:

A.  Historical settlement averages between the
same defendants with the same plaintiff's
counsel in the same jurisdiction in similar
cases.  Variances from such historical
criteria can be justified by the following
factors:
1.  Severity/mildness of disease.
2.  Lack of exposure to product.
3.  Personal factors, i.e.; smoking, age,
occupation, etc.
4.  Other persuasive evidence.

B.  Historical averages by disease category for
cases that have been previously settled in
that jurisdiction with that plaintiff's
counsel and with that defendant.

C.  If there is no historical settlement average
by disease category between plaintiff's
counsel and the defendant in the jurisdiction
from which the case arises, then comparable
settlement averages for similar cases in that
same jurisdiction with that defendant shall
be confidentially provided to the Mediator.

Because different viewpoints of the same case are equally understandable, a finding of bad faith is not necessary in all instances where the parties are unable to reconcile their differences and settle.


BY THE COURT:


Date: _9/2/92_        _____
                      CHARLES R. WEINER, J.

Xc 9/10/92: attached liaison counsel list
all USDC's
attached plff's counsel list (498)

1  CATHERINE MORRIS KROW (California Bar No. 208412)
   Orrick, Herrington & Sutcliffe LLP
2  The Orrick Building
   405 Howard Street
3  San Francisco, CA 94105-2669
   Telephone:    (415) 773-5700
4  Facsimile:    (415) 773-5759

5  KEVIN M. JORDAN (Texas Bar No. 11014800)
   Baker Botts LLP
6  One Shell Plaza
   910 Louisiana Street
7  Houston, TX 77002
   San Francisco, CA 94105-2669
8  Telephone:    (713) 229-1322
   Facsimile:    (713) 229-7722
9
10 Attorneys for Defendant
   UNION CARBIDE CORPORATION
11

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT 29 2007

FILED
CLERK'S OFFICE

Request of deft. Union Carbide Corp. in
*Lyman*, CAN 4:07-4240 - for Extension
of Time to File Response -- GRANTED
(cdm - 10/29/07)

12              BEFORE THE JUDICIAL PANEL ON
                  MULTIDISTRICT LITIGATION
13

14 IN RE: ASBESTOS PRODUCTS         MDL DOCKET NO. 875
   LIABILITY LITIGATION             CTO-287
   (NO VI)
15
                                    **UNION CARBIDE CORPORATION'S**
16 This Document Relates To:        **APPLICATION BEFORE THE**
   ROBERT F. LYMAN and              **JUDICIAL PANEL ON MULTI-**
   SAMANTHA LYMAN v.                **DISTRICT LITIGATION FOR A ONE-**
17 ASBESTOS DEFENDANTS (B*P), et al. **DAY EXTENSION OF TIME TO FILE**
                                    **ITS OPPOSITION TO PLAINTIFFS'**
18                                  **MOTION TO VACATION**
                                    **CONDITIONAL TRANSFER ORDER 287**
19

20              UNITED STATES DISTRICT COURT

21             NORTHERN DISTRICT OF CALIFORNIA

22                     OAKLAND DIVISION

23 ROBERT F. LYMAN and SAMANTHA       CASE NO. C 07 4240 SBA
   LYMAN,
24
          Plaintiffs,
25
       v.
26
   ASBESTOS DEFENDANTS (B*P), et al.,
27
          Defendants.
28

OHS West:260321428

1    Pursuant to Rule 6.2 of the Rules of Procedure of the Judicial Panel on

2    Multidistrict Litigation, Defendant Union Carbide Corporation ("Union Carbide") hereby

3    requests a one-day extension of time to file its Opposition to Plaintiffs' Motion Before the Judicial

4    Panel on Multi-District Litigation to Vacate Conditional Transfer Order 287, submitted

5    concurrently herewith.

6    **I.    INTRODUCTION**

7    Union Carbide respectfully requests a single day extension of time – from October

8    25 to October 26 – in order to file its Opposition to Plaintiffs' Motion Before the Judicial Panel on

9    Multidistrict Litigation to Vacate Conditional Transfer Order 287, which is submitted herewith.

10   Union Carbide requests this relief because it did not learn until the date of this Application that

11   Plaintiffs had actually filed their Motion to Vacate Conditional Transfer Order 287 ("Plaintiffs'

12   Motion") on October 5, 2007, one business day earlier than their October 9 deadline, which meant

13   the twenty-day deadline to file a response may have been October 25.  Union Carbide was

14   previously unaware of Plaintiffs' early filing because Plaintiffs' proof of service by mail did not

15   indicate the method or date of filing, and the MDL Panel's docket is not available electronically.

16   A one-day extension of time is appropriate in this case because the extension will

17   have no impact the Panel's calendar, and no prejudice to Plaintiffs will result.  Indeed, Union

18   Carbide submitted this application for relief the same day it learned of the issue, and has hand-

19   served Plaintiffs with all papers to ensure they receive them _earlier_ than they would if service had

20   been effected by mail on October 25.  Accordingly, Union Carbide respectfully requests that its

21   Opposition to Plaintiffs' Motion to Vacate Conditional Transfer Order 287 be accepted for filing

22   on October 26, 2007.

23   **II.    FACTUAL BACKGROUND**

24   Pursuant to the September 21, 2007 letter from the Clerk for the MDL Panel,

25   Plaintiffs' Motion to Vacate was due on October 9, 2007.  (Declaration of Catherine Krow in

26   Support of Union Carbide's Application for One-Day Extension of Time To File Opposition to

27   Plaintiffs Motion to Vacate ("Krow Decl."), Exhibit A.)   In accordance with Rule 7.2 of the

28   Rules of Procedure of the Judicial Panel on Multidistrict Litigation, Union Carbide's counsel

1  calendared twenty days after Plaintiffs' deadline to file the motion – October 29 – as its response

2  date.[1] (Krow Decl., ¶ 3.)

3            Union Carbide's designated counsel for service in this case was traveling from

4  October 5 through October 9, but was notified via email on Monday October 8 (Columbus Day)

5  that Plaintiffs' motion had arrived that day. (Krow Decl., ¶ 4.)  According to the proof of service,

6  on October 5 the motion was served by mail on all parties and on the District Court for the

7  Northern District of California. (Krow Decl., Exhibit B.)  This being the case, and October 8

8  being a holiday, it seemed that the papers had been submitted to the MDL Panel by mail too, and,

9  therefore, the actual filing had not occurred until the deadline of October 9.

10            On the morning of October 26, the date of this Application, a member of Orrick

11  Herrington and Sutcliffe LLP's calendar department contacted the Office of the Clerk for the

12  MDL Panel to confirm that appropriate procedures were being followed with respect to Union

13  Carbide's Opposition to Plaintiffs' Motion to Vacate, including timing of the filing.  During that

14  conversation, it was discovered that Plaintiffs' motion had been filed on October 5, not on the

15  October 9 deadline as Union Carbide's counsel had believed. (Krow Decl., ¶ 6.)

16            Upon learning of the timing issue, Union Carbide promptly finalized its opposition

17  and served Plaintiffs' counsel by hand to ensure that it received the papers earlier than they would

18  have if the papers had been served by mail on the date they were due. (Krow Decl., ¶ 7.)

19  **III.    ARGUMENT**

20            Rule 6.2 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation

21  states:

22            Any application for an extension of time to file a pleading or
          perform an act required by these Rules must be in writing, must
23            request a specific number of additional days and may be acted upon
          by the Clerk of the Panel.  Such an application will be evaluated in
24            relation to the impact on the Panel's calendar as well as on the basis
          of the reasons set forth in support of the application.

25

26

27  [1] It is not clear whether Federal Rule of Civil Procedure 6(e) could extend Union Carbide's time
   to respond by three days due to Plaintiffs' service by mail.  In an abundance of caution, however,
28  Union Carbide has calculated its deadline and filed this Application for an Extension of Time
   without reliance on Rule 6(e).

1    Here, there will be no impact on the Panel's calendar at all because the requested

2  one-day extension of time is so minimal (only a single day), and because this matter is not set for

3  hearing until November 29.  Moreover, calendaring an October 29 deadline is understandable

4  given the method of service (by mail) and the Columbus day holiday, the fact that the actual filing

5  date is not available on any website and was not included in the proof of service, and because

6  October 9 was the deadline set by the Panel.

7    Furthermore, a single-day extension would result in no prejudice to the Plaintiffs

8  because they have actually received Union Carbide's opposition papers earlier than they would

9  have if Union Carbide had served them by mail on October 25.

10    Accordingly, Union Carbide respectfully requests that it be permitted to file its

11  Opposition to Plaintiffs' Motion to Vacate, submitted herewith, on October 26, 2007.

12  **IV.    CONCLUSION**

13    For the foregoing reasons, Union Carbide respectfully asks that the Panel grant

14  Union Carbide's application for a one-day extension of time to file its Opposition to Plaintiffs'

15  Motion Before the Judicial Panel on Multi-District Litigation to Vacate Conditional Transfer

16  Order 287, which is submitted herewith.

17  Dated: October 26, 2007                    ORRICK, HERRINGTON & SUTCLIFFE LLP
                                              The Orrick Building
18                                            405 Howard Street
                                              San Francisco, CA 94105-2669
19                                            Telephone:    (415) 773-5700
                                              Facsimile:    (415) 773-5759
20

21                                            _____
                                                      Catherine Morris Krow
22                                                   Attorneys for Defendant
                                              UNION CARBIDE CORPORATION
23

24

25

26

27

28

UNION CARBIDE'S APPLICATION FOR A ONE-DAY
EXTENSION OF TIME TO FILE ITS OPP. TO PLAINTIFFS'
MOTION TO VACATE CONDITIONAL TRANSFER ORDER

1  CATHERINE MORRIS KROW (California Bar No. 208412)
   Orrick, Herrington & Sutcliffe LLP
2  The Orrick Building
   405 Howard Street
3  San Francisco, CA  94105-2669
   Telephone:    (415) 773-5700
4  Facsimile:    (415) 773-5759

5  KEVIN M. JORDAN (Texas Bar No. 11014800)
   Baker Botts LLP
6  One Shell Plaza
   910 Louisiana Street
7  Houston, TX  77002
   San Francisco, CA  94105-2669
8  Telephone:    (713) 229-1322
   Facsimile:    (713) 229-7722
9
   Attorneys for Defendant
10 UNION CARBIDE CORPORATION

11

                    **BEFORE THE JUDICIAL PANEL ON**
12                  **MULTIDISTRICT LITIGATION**

13 IN RE:  ASBESTOS PRODUCTS          |  MDL DOCKET NO. 875
   LIABILITY LITIGATION              |  CTO-287
14 (NO VI)                           |
                                     |  **DECLARATION OF CATHERINE**
15 This Document Relates To:         |  **MORRIS KROW IN SUPPORT OF**
   ROBERT F. LYMAN and              |  **UNION CARBIDE CORPORATION'S**
16 SAMANTHA LYMAN v.                 |  **APPLICATION BEFORE THE**
   ASBESTOS DEFENDANTS (B*P), et al. |  **JUDICIAL PANEL ON MULTI-**
17                                   |  **DISTRICT LITIGATION FOR A ONE-**
                                     |  **DAY EXTENSION OF TIME TO FILE**
18                                   |  **ITS OPPOSITION TO PLAINTIFFS'**
                                     |  **MOTION TO VACATE**
19                                   |  **CONDITIONAL TRANSFER ORDER 287**

20              UNITED STATES DISTRICT COURT

21              NORTHERN DISTRICT OF CALIFORNIA

22                    OAKLAND DIVISION

23 ROBERT F. LYMAN and SAMANTHA       |  CASE NO. C 07 4240 SBA
24 LYMAN,                            |
              Plaintiffs,            |
25                                   |
         v.                          |
26                                   |
   ASBESTOS DEFENDANTS (B*P), et al.,|
27                                   |
              Defendants.            |
28

OHS West:260321428                    KROW DECLARATION IN SUPPORT OF UNION CARBIDE'S
                                      APPLICATION FOR A ONE-DAY EXTENSION OF TIME

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT 2 9 2007

FILED
CLERK'S OFFICE

1       I, Catherine Morris Krow, declare:

2       1.      I am an attorney at Orrick, Herrington & Sutcliffe LLP, counsel for Union

3    Carbide Corporation ("Union Carbide") in this action. Except where stated on information and

4    belief, I have personal knowledge of the facts set forth in this declaration, and I could and would

5    testify competently to them if called as a witness.

6       2.      Attached hereto as Exhibit A is a true and correct copy of a letter dated

7    September 21, 2007 form the Clerk of the Panel on Multidistrict Litigation to Mr. David Donadio,

8    counsel for Plaintiffs.

9       3.      Upon receiving the letter attached as Exhibit A, my firm calendared

10   October 29, 2007 – 20 days from October 9 – as the date to respond to Plaintiffs' Motion

11   opposing the conditional transfer order for the Lyman case.

12      4.      I was traveling from October 5 through October 9 and therefore was not in

13   the office when Plaintiffs' Motion Before the Judicial Panel on Multidistrict Litigation to Vacate

14   the Conditional Transfer Order ("Plaintiffs' Motion") arrived. However, on Monday October 8, I

15   received an email from an associate at my firm indicating that Plaintiffs' Motion had arrived that

16   day.

17      5.      A true and correct copy of the proof of service for Plaintiffs' Motion is

18   attached hereto as Exhibit B. This proof of service indicates that the motion was served by mail

19   on the parties and on the District Court for the Northern District of California. It does not state

20   when Plaintiffs' Motion was filed.

21      6.      I am informed and believe that on October 26, 2007, a member of Orrick's

22   calendaring department contacted the Office of the Clerk of the MDL Panel. During that

23   conversation, the Clerk informed him that Plaintiffs' Motion had been filed on October 5, 2007,

24   not on October 9.

25      7.      Upon information and belief, Union Carbide's Opposition to Plaintiffs'

26   Motion was served on Plaintiffs' counsel by hand on October 26. A proof of service to Plaintiffs'

27   counsel by hand will be submitted to the Panel with this filing.

28

1     I declare under penalty of perjury under the laws of California that the foregoing is

2   true and correct.

3     Executed on October 26, 2007, in San Francisco, California.

4
      ORRICK, HERRINGTON & SUTCLIFFE LLP
5     The Orrick Building
      405 Howard Street
6     San Francisco, CA  94105-2669
      Telephone:   (415) 773-5700
7     Facsimile:   (415) 773-5759

8

9                     Catherine Morris Krow
                      Attorneys for Defendant
10                 UNION CARBIDE CORPORATION

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KROW DECLARATION IN SUPPORT OF UNION CARBIDE'S
APPLICATION FOR A ONE-DAY EXTENSION OF TIME R

1  CATHERINE MORRIS KROW (California Bar No. 208412)
   Orrick, Herrington & Sutcliffe LLP
2  The Orrick Building
   405 Howard Street
3  San Francisco, CA  94105-2669
   Telephone:    (415) 773-5700
4  Facsimile:     (415) 773-5759

5  KEVIN M. JORDAN (Texas Bar No. 11014800)
   Baker Botts LLP
6  One Shell Plaza
   910 Louisiana Street
7  Houston, TX  77002
   San Francisco, CA  94105-2669
8  Telephone:    (713) 229-1322
   Facsimile:     (713) 229-7722

9

10  Attorneys for Defendant
    UNION CARBIDE CORPORATION
11

12          **BEFORE THE JUDICIAL PANEL ON**
               **MULTIDISTRICT LITIGATION**
13

14  IN RE:  ASBESTOS PRODUCTS            MDL DOCKET NO. 875
    LIABILITY LITIGATION                CTO-287
    (NO VI)
15
                                        **PROOF OF SERVICE BY MAIL**
16  This Document Relates To:
    ROBERT F. LYMAN and
    SAMANTHA LYMAN v.
17  ASBESTOS DEFENDANTS (B*P), et al.

18

19          UNITED STATES DISTRICT COURT

20          NORTHERN DISTRICT OF CALIFORNIA

21                  OAKLAND DIVISION

22  ROBERT F. LYMAN and SAMANTHA        CASE NO.  C 07 4240 SBA
    LYMAN,
23
              Plaintiffs,
24
        v.
25
    ASBESTOS DEFENDANTS (B*P), et al.,
26
              Defendants.
27

28

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT 2 9 2007

FILED
CLERK'S OFFICE

**PROOF OF SERVICE BY MAIL**

I am a citizen of the United States, over eighteen years old, and not a party to this action. My place of employment and business address is Orrick, Herrington & Sutcliffe LLP, The Orrick Building, 405 Howard Street, San Francisco, California 94105-2669.

On October 26, 2007, I served the following document(s):

1.   **DECLARATION OF CATHERINE MORRIS KROW IN SUPPORT OF UNION CARBIDE CORPORATION'S OPPOSITION TO PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER 287**

2.   **UNION CARBIDE CORPORATION'S OPPOSITION TO PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER 287**

on the interested parties in this action  via U.S. mail  by placing true and correct copies thereof in sealed envelope(s) addressed as follows:

*Please see attached Panel Service List.*

I am employed in the county from which the mailing occurred.  On the date indicated above, I placed the sealed envelope(s) for collection and mailing at this firm's office business address indicated above.  I am readily familiar with this firm's practice for the collection and processing of correspondence for mailing with the United States Postal Service.  Under that practice, the firm's correspondence would be deposited with the United States Postal Service on this same date with postage thereon fully prepaid in the ordinary course of business.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 26, 2007, at San Francisco, California.

_____
Youske Okano

- 1 -

PROOF OF SERVICE

IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)

MDL No. 875

## PANEL SERVICE LIST (Excerpted from CTO-287)

Robert F. Lyman, et al. v. Union Carbide Corp., et al., N.D. California, C.A. No. 4:07-4240

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114

Edward J. Cass
Gallagher, Sharp, Fulton & Norman
Bulkley Building, 7th Floor
1501 Euclid Avenue
Cleveland, OH 44115

Adam M. Chud
Goodwin Procter, LLP
901 New York Avenue, N.W.
Washington, DC 20001

David A. Damico
Burns, White & Hickton, LLC
Four Northshore Center
106 Isabella Street
Pittsburgh, PA 15212

David R. Donadio
Brayton Purcell, LLP
222 Rush Landing Road
Novato, CA 94948-6169

Raymond P. Forceno
Forceno & Hannon
111 S. Independence Mall East
The Bourse, Suite 1000
Philadelphia, PA 19106-2574

Ellen B. Furman
Goldfein & Hosmer
1600 Market Street
33rd Floor
Philadelphia, PA 19103

Susan M. Hansen
Brownson & Ballou
225 South Sixth Street
Suite 4800
Minneapolis, MN 55402

Christopher M. Jhang
Perkins Coie, LLP
Four Embarcadero Center
Suite 2400
San Francisco, CA 94111

Reginald S. Kramer
Oldham & Dowling
195 South Main Street
Suite 300
Akron, OH 44308-1314

David C. Landin
Hunton & Williams, LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Gene Locks
Locks Law Firm, LLC
1500 Walnut Street
Philadelphia, PA 19102

## MDL No. 875 - Panel Service List (Excerpted from CTO-287) (Continued)

Catherine N. Morris
Orrick, Herrington & Sutcliffe, LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105

Ronald L. Motley
Motley Rice, LLC
P.O. Box 1792
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464

Molly Jeannette Mrowka
Dillingham & Murphy
225 Bush Street
6th Floor
San Francisco, CA 94104

John J. Repcheck
Marks, O'Neill, O'Brien & Courtney, PC
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219

John D. Roven
Roven-Kaplan, L.L.P.
2190 North Loop West
Suite 410
Houston, TX 77018

Richard D. Schuster
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216-1008

Neil Selman
Selman, Breitman & Burgess
11766 Wilshire Boulevard
Sixth Floor
Los Angeles, CA 90025

Robert N. Spinelli
Kelley, Jasons, McGuire & Spinelli, L.L.P.
Centre Square West
15th Floor
Philadelphia, PA 19102

Robert E. Swickle
Jaques Admiralty Law Firm, P.C.
1370 Penobscot Building, 645 Griswold St.
The Maritime Asbestosis Legal Clinic
Detroit, MI 48226-4192

Andrew J. Trevelise
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

James K. Weston, II
Tom Riley Law Firm
4040 First Avenue, N.E.
P.O. Box 998
Cedar Rapids, IA 52406

Hon. Saundra B. Armstrong
U.S.D.C. - Northern District, Oakland
C 07-4240-SBA
1301 Clay Street, Suite 400S
Oakland, CA 94612-5212

1    CATHERINE MORRIS KROW (California Bar No. 208412)
     Orrick, Herrington & Sutcliffe LLP
2    The Orrick Building
     405 Howard Street
3    San Francisco, CA  94105-2669
     Telephone:    (415) 773-5700
4    Facsimile:    (415) 773-5759

5    KEVIN M. JORDAN (Texas Bar No. 11014800)
     Baker Botts LLP
6    One Shell Plaza
     910 Louisiana Street
7    Houston, TX  77002
     San Francisco, CA  94105-2669
8    Telephone:    (713) 229-1322
     Facsimile:    (713) 229-7722
9

10   Attorneys for Defendant
     UNION CARBIDE CORPORATION
11

12   **BEFORE THE JUDICIAL PANEL ON**
     **MULTIDISTRICT LITIGATION**
13

| | |
|---|---|
| IN RE:  ASBESTOS PRODUCTS LIABILITY LITIGATION (NO VI) | MDL DOCKET NO. 875 CTO-287 |
| | **PROOF OF SERVICE BY HAND DELIVERY** |
| This Document Relates To: ROBERT F. LYMAN and SAMANTHA LYMAN v. ASBESTOS DEFENDANTS (B*P), et al. | |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ROBERT F. LYMAN and SAMANTHA LYMAN, | CASE NO.  C 07 4240 SBA |
|        Plaintiffs, | |
|    v. | |
| ASBESTOS DEFENDANTS (B*P), et al., | |
|        Defendants. | |

PROOF OF SERVICE

## PROOF OF SERVICE BY HAND DELIVERY

I, _ERNEST B. FOXMAN_ , declare:

I am over the age of eighteen years and not a party to the above-entitled cause.

My business address is _1112 Bryant St. Suite 200, San Francisco_ ,

_____ , California.

On October 26, 2007, I served the following documents:

1.  UNION CARBIDE CORPORATION'S APPLICATION
    BEFORE THE JUDICIAL PANEL OF MULTI-DISTRICT
    LITIGATION FOR A ONE-DAY EXTENSION OF TIME TO
    FILE ITS OPPOSITION TO PLAINTIFFS' MOTION TO
    VACATION CONDITIONAL TRANSFER ORDER 287

2.  DECLARATION OF CATHERINE MORRIS KROW IN
    SUPPORT OF UNION CARBIDE CORPORATION'S
    APPLICATION BEFORE THE JUDICIAL PANEL OF MULTI-
    DISTRICT LITIGATION FOR A ONE-DAY EXTENSION OF
    TIME TO FILE ITS OPPOSITION TO PLAINTIFFS' MOTION
    TO VACATION CONDITIONAL TRANSFER ORDER 287

by hand delivering true copies thereof, addressed as follows:

David R. Donadio, Esq.
Brayton Purcell, LLP
222 Rush Landing Road
Novato, CA  94948-6169

Executed on October 26, 2007 in the City and County of San Francisco, State of California.  I declare under penalty of perjury that the foregoing is true and correct.

_____
SIGNATURE

_ERNEST B. FOXMAN_
PRINT YOUR NAME

OHS West:260302414.1

- 1 -

PROOF OF SERVICE

**IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)**                     MDL No. 875

## PANEL SERVICE LIST (Excerpted from CTO-287)

Robert F. Lyman, et al. v. Union Carbide Corp., et al., N.D. California, C.A. No. 4:07-4240

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114

Edward J. Cass
Gallagher, Sharp, Fulton & Norman
Bulkley Building, 7th Floor
1501 Euclid Avenue
Cleveland, OH 44115

Adam M. Chud
Goodwin Procter, LLP
901 New York Avenue, N.W.
Washington, DC 20001

David A. Damico
Burns, White & Hickton, LLC
Four Northshore Center
106 Isabella Street
Pittsburgh, PA 15212

David R. Donadio
Brayton Purcell, LLP
222 Rush Landing Road
Novato, CA 94948-6169

Raymond P. Forceno
Forceno & Hannon
111 S. Independence Mall East
The Bourse, Suite 1000
Philadelphia, PA 19106-2574

Ellen B. Furman
Goldfein & Hosmer
1600 Market Street
33rd Floor
Philadelphia, PA 19103

Susan M. Hansen
Brownson & Ballou
225 South Sixth Street
Suite 4800
Minneapolis, MN 55402

Christopher M. Jhang
Perkins Coie, LLP
Four Embarcadero Center
Suite 2400
San Francisco, CA 94111

Reginald S. Kramer
Oldham & Dowling
195 South Main Street
Suite 300
Akron, OH 44308-1314

David C. Landin
Hunton & Williams, LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Gene Locks
Locks Law Firm, LLC
1500 Walnut Street
Philadelphia, PA 19102

**MDL No. 875 - Panel Service List (Excerpted from CTO-287) (Continued)**

Catherine N. Morris
Orrick, Herrington & Sutcliffe, LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105

Ronald L. Motley
Motley Rice, LLC
P.O. Box 1792
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464

Molly Jeannette Mrowka
Dillingham & Murphy
225 Bush Street
6th Floor
San Francisco, CA 94104

John J. Repcheck
Marks, O'Neill, O'Brien & Courtney, PC
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219

John D. Roven
Roven-Kaplan, L.L.P.
2190 North Loop West
Suite 410
Houston, TX 77018

Richard D. Schuster
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216-1008

Neil Selman
Selman, Breitman & Burgess
11766 Wilshire Boulevard
Sixth Floor
Los Angeles, CA 90025

Robert N. Spinelli
Kelley, Jasons, McGuire & Spinelli, L.L.P.
Centre Square West
15th Floor
Philadelphia, PA 19102

Robert E. Swickle
Jaques Admiralty Law Firm, P.C.
1370 Penobscot Building, 645 Griswold St.
The Maritime Asbestosis Legal Clinic
Detroit, MI 48226-4192

Andrew J. Trevelise
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

James K. Weston, II
Tom Riley Law Firm
4040 First Avenue, N.E.
P.O. Box 998
Cedar Rapids, IA 52406

Hon. Saundra B. Armstrong
U.S.D.C. - Northern District, Oakland
C 07-4240-SBA
1301 Clay Street, Suite 400S
Oakland, CA 94612-5212

# EXHIBIT  A

RECEIVED
CLERK'S OFFICE
2007 OCT 25  P 4: 18
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

**UNITED STATES JUDICIAL PANEL**
**on**
**MULTIDISTRICT LITIGATION**

CHAIRMAN:
Judge John G. Heyburn II
United States District Court
Western District of Kentucky

MEMBERS:
Judge D. Lowell Jensen
United States District Court
Northern District of California

Judge J. Frederick Motz
United States District Court
District of Maryland

Judge Robert L. Miller, Jr.
United States District Court
Northern District of Indiana

Judge Kathryn H. Vratil
United States District Court
District of Kansas

Judge David R. Hansen
United States Court of Appeals
Eighth Circuit

Judge Anthony J. Scirica
United States Court of Appeals
Third Circuit

DIRECT REPLY TO:

Jeffery N. Lüthi
Clerk of the Panel
One Columbus Circle, NE
Thurgood Marshall Federal
Judiciary Building
Room G-255, North Lobby
Washington, D.C. 20002

Telephone: [202] 502-2800
Fax:        [202] 502-2888
http://www.jpml.uscourts.gov

September 21, 2007

David R. Donadio, Esq.
Brayton Purcell, LLP
222 Rush Landing Road
Novato, CA 94948-6169

Re:  MDL No. 875 -- IN RE: Asbestos Products Liability Litigation (No. VI)

　　　Robert F. Lyman, et al. v. Union Carbide Corp., et al., N.D. California, C.A. No. 4:07-4240
　　　(Judge Saundra Brown Armstrong)

Motion and Brief Due on or before:  October 9, 2007

Dear Mr. Damico:

　　　We have received and filed your Notice of Opposition to the proposed transfer of the referenced matter for coordinated or consolidated pretrial proceedings. In accordance with Rule 7.4(c) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, 199 F.R.D. 425, 435 (2001), the conditional transfer order is stayed until further order of the Panel.  You must adhere to the following filing requirements:

1)　　Your Motion and Brief to Vacate the Conditional Transfer Order must be received in the Panel office by the due date listed above. An ORIGINAL and FOUR copies of all pleadings, as well as a COMPUTER GENERATED DISK of the pleading in Adobe Acrobat (PDF) format, are currently required for filing. Fax transmission of your motion and brief will not be accepted.  See Panel Rule 5.12(d).  Counsel filing oppositions in more than one action are encouraged to consider filing a single motion and brief with an attached schedule of actions.

2)　　Papers must be served on the enclosed Panel Service List. Please attach a copy of this list to your certificate of service.  (Counsel who have subsequently made appearances in your action should be added to your certificate of service).

3)　　Rule 5.3 corporate disclosure statements are due within 11 days of the filing of the motion to vacate.

4)　　Failure to file and serve the required motion and brief within the allotted 15 days will be considered a withdrawal of the opposition and the stay of the conditional transfer order will be lifted.

- 2 -

Any recent official change in the status of a referenced matter should be brought to the attention of the clerk's office as soon as possible by facsimile at (202) 502-2888.  Your cooperation would be appreciated.

Very truly,

Jeffery N. Lüthi
Clerk of the Panel

By

Deputy Clerk

Enclosure

cc:    Panel Service List
       Transferee Judge:  Judge James T. Giles
       Transferor Judge:  Judge Saundra Brown Armstrong

JPML Form 37

IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)                                    MDL No. 875

## PANEL SERVICE LIST (Excerpted from CTO-287)

Robert F. Lyman, et al. v. Union Carbide Corp., et al., N.D. California, C.A. No. 4:07-4240

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114

Edward J. Cass
Gallagher, Sharp, Fulton & Norman
Bulkley Building, 7th Floor
1501 Euclid Avenue
Cleveland, OH 44115

Adam M. Chud
Goodwin Procter, LLP
901 New York Avenue, N.W.
Washington, DC 20001

David A. Damico
Burns, White & Hickton, LLC
Four Northshore Center
106 Isabella Street
Pittsburgh, PA 15212

David R. Donadio
Brayton Purcell, LLP
222 Rush Landing Road
Novato, CA 94948-6169

Raymond P. Forceno
Forceno & Hannon
111 S. Independence Mall East
The Bourse, Suite 1000
Philadelphia, PA 19106-2574

Ellen B. Furman
Goldfein & Hosmer
1600 Market Street
33rd Floor
Philadelphia, PA 19103

Susan M. Hansen
Brownson & Ballou
225 South Sixth Street
Suite 4800
Minneapolis, MN 55402

Christopher M. Jhang
Perkins Coie, LLP
Four Embarcadero Center
Suite 2400
San Francisco, CA 94111

Reginald S. Kramer
Oldham & Dowling
195 South Main Street
Suite 300
Akron, OH 44308-1314

David C. Landin
Hunton & Williams, LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Gene Locks
Locks Law Firm, LLC
1500 Walnut Street
Philadelphia, PA 19102

**MDL No. 875 - Panel Service List (Excerpted from CTO-287) (Continued)**

Catherine N. Morris
Orrick, Herrington & Sutcliffe, LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105

Robert N. Spinelli
Kelley, Jasons, McGuire & Spinelli, L.L.P.
Centre Square West
15th Floor
Philadelphia, PA 19102

Ronald L. Motley
Motley Rice, LLC
P.O. Box 1792
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464

Robert E. Swickle
Jaques Admiralty Law Firm, P.C.
1370 Penobscot Building, 645 Griswold St.
The Maritime Asbestosis Legal Clinic
Detroit, MI 48226-4192

Molly Jeannette Mrowka
Dillingham & Murphy
225 Bush Street
6th Floor
San Francisco, CA 94104

Andrew J. Trevelise
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

John J. Repcheck
Marks, O'Neill, O'Brien & Courtney, PC
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219

James K. Weston, II
Tom-Riley Law Firm
4040 First Avenue, N.E.
P.O. Box 998
Cedar Rapids, IA 52406

John D. Roven
Roven-Kaplan, L.L.P.
2190 North Loop West
Suite 410
Houston, TX 77018

Richard D. Schuster
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216-1008

Neil Selman
Selman, Breitman & Burgess
11766 Wilshire Boulevard
Sixth Floor
Los Angeles, CA 90025

# EXHIBIT  B

1  ALAN R. BRAYTON, ESQ., S.B. #73685
   DAVID R. DONADIO, ESQ., S.B. #154436
2  BRAYTON❖PURCELL LLP
   Attorneys at Law
3  222 Rush Landing Road
   P.O. Box 6169
4  Novato, California  94948-6169
   (415) 898-1555
5  (415) 898-1247 (Fax No.)

6  Attorneys for Plaintiff

7

8            BEFORE THE JUDICIAL PANEL ON MULTI-DISTRICT LITIGATION

9  IN RE: ASBESTOS PRODUCTS LIABILITY          )    MDL DOCKET NO. 875
   LITIGATION (NO. VI),                         )    CTO-287
10                                              )
   This Document Relates to:                    )
11                                              )
   ROBERT and SAMANTHA LYMAN                     )
12 v. UNION CARBIDE CORP., et al.               )

13               THE UNITED STATES DISTRICT COURT
14            FOR THE NORTHERN DISTRICT OF CALIFORNIA
                         OAKLAND DIVISION
15
   ROBERT and SAMANTHA LYMAN,        )    No. C07-4240 SBA
16                                    )
              Plaintiff,             )
17                                    )
   vs.                               )
18                                    )    CERTIFICATE OF SERVICE
   UNION CARBIDE CORP., et al.,       )
19                                    )
              Defendants.            )
20 ─────────────────────────────────── )

21          I am over 18 years of age and not a party to the within action. I am employed in

22  the County of Marin, California; my business address is 222 Rush Landing Road, P.O. Box 6169,

23  Novato, California, 94948-6169.

24          On the 5th day of October, 2007, I served the within:

25  PLAINTIFF'S MOTION BEFORE THE JUDICIAL PANEL ON MULTI-
    DISTRICT LITIGATION TO VACATE CONDITIONAL TRANSFER ORDER
26  287 AND BRIEF IN SUPPORT OF MOTION (with Exhibits A-D)

27  RULE 7.2(A)(ii) SCHEDULE

28  ///

K:\FORMS\POSTTRIAL\FED-CertServ.wpd
Certificate of Service - MDL DOCKET NO. 875, CTO-276 (Northern District of California)
Case No. C07-4240 SBA)

ENTERED
OCT 1 7 2007
CALENDARED

**DECLARATION OF GILBERT L. PURCELL IN SUPPORT OF PLAINTIFF'S MOTION BEFORE THE JUDICIAL PANEL ON MULTI-DISTRICT LITIGATION TO VACATE CONDITIONAL TRANSFER ORDER 287**

**DECLARATION OF ROBERT F. LYMAN IN SUPPORT OF PLAINTIFF'S MOTION BEFORE THE JUDICIAL PANEL ON MULTI-DISTRICT LITIGATION TO VACATE CONDITIONAL TRANSFER ORDER 287**

on the interested party(ies) in this action as LISTED ON THE **ATTACHED** "PANEL SERVICE LIST".

   **X**    BY OFFICE MAILING: I am readily familiar with this office's practice of collection and processing correspondence, pleadings and other matters for mailing with the United States Postal Service on that same day with postage thereon fully prepaid at Novato, California in the ordinary course of business. I placed in the outgoing office mail, the above-described document(s), in a sealed envelope, addressed to the party(ies) as stated above, for collection and processing for mailing the same day in accordance with ordinary office practices.

Executed this 5th day of October, 2007, at Novato, California.

I declare under penalty of perjury that the foregoing is true and correct.

Signature: _Jane Ehni_
Jane Ehni

K:\FORMS\POSTRIAL\FED-CertServ.wpd
Certificate of Service - MDL DOCKET NO. 875, CTO-276 (Northern District of California
Case No. C07-4240 SBA)

2

**IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)**

MDL No. 875

## PANEL SERVICE LIST (Excerpted from CTO-287)

Robert F. Lyman, et al. v. Union Carbide Corp., et al., N.D. California, C.A. No. 4:07-4240

Richard C. Binzley
Thompson Hine, LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114

Edward J. Cass
Gallagher, Sharp, Fulton & Norman
Bulkley Building, 7th Floor
1501 Euclid Avenue
Cleveland, OH 44115

Adam M. Chud
Goodwin Procter, LLP
901 New York Avenue, N.W.
Washington, DC 20001

David A. Damico
Burns, White & Hickton, LLC
Four Northshore Center
106 Isabella Street
Pittsburgh, PA 15212

David R. Donadio
Brayton Purcell, LLP
222 Rush Landing Road
Novato, CA 94948-6169

Raymond P. Forceno
Forceno & Hannon
111 S. Independence Mall East
The Bourse, Suite 1000
Philadelphia, PA 19106-2574

Ellen B. Furman
Goldfein & Hosmer
1600 Market Street
33rd Floor
Philadelphia, PA 19103

Susan M. Hansen
Brownson & Ballou
225 South Sixth Street
Suite 4800
Minneapolis, MN 55402

Christopher M. Jhang
Perkins Coie, LLP
Four Embarcadero Center
Suite 2400
San Francisco, CA 94111

Reginald S. Kramer
Oldham & Dowling
195 South Main Street
Suite 300
Akron, OH 44308-1314

David C. Landin
Hunton & Williams, LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Gene Locks
Locks Law Firm, LLC
1500 Walnut Street
Philadelphia, PA 19102

**MDL No. 875 - Panel Service List (Excerpted from CTO-287) (Continued)**

Catherine N. Morris
Orrick, Herrington & Sutcliffe, LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105

Robert N. Spinelli
Kelley, Jasons, McGuire & Spinelli, L.L.P.
Centre Square West
15th Floor
Philadelphia, PA 19102

Ronald L. Motley
Motley Rice, LLC
P.O. Box 1792
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464

Robert E. Swickle
Jaques Admiralty Law Firm, P.C.
1370 Penobscot Building, 645 Griswold St.
The Maritime Asbestosis Legal Clinic
Detroit, MI 48226-4192

Molly Jeannette Mrowka
Dillingham & Murphy
225 Bush Street
6th Floor
San Francisco, CA 94104

Andrew J. Trevelise
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

John J. Repcheck
Marks, O'Neill, O'Brien & Courtney, PC
3200 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219

James K. Weston, II
Tom Riley Law Firm
4040 First Avenue, N.E.
P.O. Box 998
Cedar Rapids, IA 52406

John D. Roven
Roven-Kaplan, L.L.P.
2190 North Loop West
Suite 410
Houston, TX 77018

U.S.D.C - NORTHERN DIST. OAKLAND.
C07-4240 SBA
1301 Clay St. 400S
Oakland, CA 94612-5212

Richard D. Schuster
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216-1008

Neil Selman
Selman, Breitman & Burgess
11766 Wilshire Boulevard
Sixth Floor
Los Angeles, CA 90025