MDL 875

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

DEC 1 8 2007

FILED
CLERK'S OFFICE

## UNITED STATES OF AMERICA
## JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | | |
|---|---|---|
| MICHAEL McCURDY, *et ux.* | * | |
| Plaintiffs | * | DIST. DIV. C.A. #MD 1 07-2681 |
| v. | * | |
| JOHN CRANE HOUDAILLE, INC., *et al.* | * | |
| Defendants | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MOTION TO VACATE
## CONDITIONAL TRANSFER ORDER

NOW COME Plaintiffs, by their undersigned attorneys, and pursuant to Rules 7.4 and

12c of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, hereby files its

Motion to Vacate the Conditional Transfer Order in the above captioned matter and requests a

hearing.   Plaintiffs adopt and incorporate by reference herein their Brief in Support of Motion to

Vacate the Conditional Transfer Order.

Respectfully Submitted,

/s/ *Steven W. Smith*
Steven W. Smith (#05766)

/s/ *Sean D. Burns*
Sean D. Burns (# 27489)

THE LAW OFFICES OF PETER G. ANGELOS
100 N. Charles Street, 22nd Floor
One Charles Center
Baltimore, Maryland 21201
(410) 649-2000

Attorneys for the Plaintiffs

PLEADING NO. 5290

OFFICIAL FILE COPY
IMAGED DEC 1 8 2007

RECEIVED
CLERK'S OFFICE
2007 DEC 18 A 11: 04

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

DEC 18 2007

FILED
CLERK'S OFFICE

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of December, 2007, a copy of Plaintiff's Motion to Vacate Conditional Transfer Order was mailed first class, postage prepaid, to the below listed counsel.

David Foxwell Albright, Sr.
LAW OFFICES OF DAVID F. ALBRIGHT
1122 Kenilworth Drive
Suite 500
Baltimore, MD 21202

David W. Allen
GOODELL DEVRIES LEECH & DANN, LLP
One South Street
Suite 2000
Baltimore, MD 21202

Thomas P. Bernier
SEGAL MCCAMBRIDGE SINGER & MAHONEY, LTD
One North Charles Street
Suite 2500
Baltimore, MD 21201

Richard C. Binzley
THOMPSON HINE, LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114

John J. Boyd, Jr.
LORD & WHIP, P.A.
Charles Center South
36 S. Charles Street, 10th Floor
Baltimore, MD 21201

Malcolm S. Brisker
GOODELL DEVRIES LEECH & DANN, LLP
One South Street
Alex Brown Building, 20th Floor
Baltimore, MD 21202

Edward J. Cass
GALLAGHER SHARP FULTON & NORMAN
Bulkley Building, 7th Floor
1501 Euclid Avenue
Cleveland, OH 44115

Laura C. Cellucci
MILES & STOCKBRIDGE
10 Light Street
Baltimore, MD 21202

Adam M. Chud
GOODWIN PROCTER, LLP
901 New York Avenue, N.W.
Washington, DC 20001

David A. Damico
BURNS WHITE & HICKTON
Four Northshore Center
106 Isabella Street
Pittsburgh, PA 15212

Thomas L. Doran
DECARO DORAN SICILIANO GALLAGHER
4601 Forbes Boulevard, Suite 200
P.O. Box 40
Lanham, MD 20703

Katherine S. Duyer
GAVETT & DATT, P.C.
15850 Crabbs Branch Way
Suite 180
Rockville, MD 20855

Stephen A. Fennell
STEPTOE & JOHNSON, LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036

2007 DEC 18 A 11: 04

RECEIVED
CLERK'S OFFICE

Raymond P. Forceno
FORCENO GOGGIN & KELLER
1528 Walnut Street
Suite 900
Philadelphia, PA 19102

Ellen B. Furman
GOLDFEIN & HOSMER
1600 Market Street
33rd Floor
Philadelphia, PA 19103

Susan M. Hansen
BROWNSON & BALLOU
225 South Sixth Street
Suite 4800
Minneapolis, MN 55402

M. King Hill, III
VENABLE, LLP
210 Allegheny Avenue
Towson, MD 21204

Jeannie P. Kauffman
BACON THORNTON & PALMER, LLP
Capital Office Park
6411 Ivy Lane, Suite 706
Greenbelt, MD 20770-1411

Reginald S. Kramer
OLDHAM & DOWLING
195 South Main Street
Suite 300
Akron, OH 44308-1314

Philip A. Kulinski
EVERT WEATHERSBY HOUFF
120 E. Baltimore Street
Suite 1300
Baltimore, MD 21201

David C. Landin
HUNTON & WILLIAMS, LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Gene Locks
Locks Law Firm LLC
1500 Walnut Street
Philadelphia, PA 19102

Neil J. MacDonald
HARTEL KANE DESANTIS MACDONALD &
HOWIE
Calverton Office Park
11720 Beltsville Drive, Suite 500
Beltsville, MD 20705-3166

Alexander J. May
BRASSEL & BALDWIN
112 West Street
Annapolis, MD 21401

Donald S. Meringer
MERINGER ZOIS & QUIGG
300 East Lombard Street
Suite 1400
Baltimore, MD 21202

Ronald L. Motley
MOTLEY RICE LLC
P.O. Box 1792
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464

John J. Nagle, III
BODIE NAGLE DOLINA SMITH & HOBBS PA
21 W. Susquehanna Avenue
Towson, MD 21204

Joel D. Newport
MOORE & JACKSON LLC
305 Washington Avenue
Suite 401
Baltimore, MD 21204

Steven J. Parrott
DEHAY & ELLISTON, LLP
36 S. Charles Street
13th Floor
Baltimore, MD 21201

R. Thomas Radcliffe, Jr.
DeHay & Elliston, LLP
36 S. Charles Street
13th Floor
Baltimore, MD 21201

John J. Repcheck
Marks O'Neill O'Brien & Courtney PC
Gulf Tower, Suite 2600
707 Grant Street
Pittsburgh, PA 15219

John D. Roven
Roven-Kaplan LLP
2190 North Loop West
Suite 410
Houston, TX 77018

Richard D. Schuster
Vorys Sater Seymour & Pease LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216-1008

Neil Selman
Selman Breitman & Burgess
11766 Wilshire Boulevard
Sixth Floor
Los Angeles, CA 90025

David A. Seltzer
Wilson Elser Moskowitz Edelman &
Dicker
1341 G Street, N.W.
Suite 500
Washington, DC 20005-3105

Robert N. Spinelli
Kelley Jasons McGuire & Spinelli LLP
Centre Square West
15th Floor
Philadelphia, PA 19102

Robert E. Swickle
Jaques Admiralty Law Firm PC
1370 Penobscot Building, 645 Griswold
Street
The Maritime Asbestosis Legal Clinic
Detroit, MI 48226-4192

Andrew J. Trevelise
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

Keith R. Truffer
Royston Mueller McLean & Reid
102 W. Pennsylvania Avenue
Suite 600
Towson, MD 21204

James K. Weston, II
Tom Riley Law Firm
4040 First Avenue, N.E.
P.O. Box 998
Cedar Rapids, IA 52406

Gordon S. Woodward
Schnader Harrison Segal & Lewis
2001 Pennsylvania Avenue, N.W.
Suite 300
Washington, DC 20006-1825

Peter Allan Woolson
Robinson Woolson PA
217 E. Redwood Street
Suite 1500
Baltimore, MD 21202

**BEFORE THE JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

MICHAEL McCURDY, et ux.                    :

       Plaintiffs,                         :

v.                                          :

                                 Dist. Div. C.A. # MD 1 07-2681

JOHN CRANE HOUDAILLE, et al.                :

       Defendants.                          :

**BRIEF IN SUPPORT OF MOTION TO
<u>VACATE CONDITIONAL TRANSFER ORDER</u>**

**<u>INTRODUCTION</u>**

This brief is filed pursuant to Rule 12c of the Rules of Procedure of the Judicial Panel on Multi-District Litigation, in support of plaintiffs' Motion to Vacate the Conditional Transfer Order of the Panel ordering the transfer of this case to the Eastern District of Pennsylvania in accordance with 28 U.S.C.A. § 1407.  This case was originally filed in the Circuit Court for Baltimore City and sought damages from the defendants who are manufacturers, distributors, sellers and/or installers of asbestos containing products. On October 2, 2007, Defendants Garlock Sealings Technologies, LLC (Garlock) and Greene Tweed & Co. (Greene Tweed) improperly removed this matter from the Circuit Court for Baltimore City to the United States District Court for the Northern District of Maryland (hereinafter "District Court of Maryland").  On October 25, 2007, Mr. McCurdy filed a Motion for Remand for Lack of Federal Jurisdiction. (Exhibit 1).  Defendants filed their response to Plaintiff's remand motion on November 13, 2007.  On November 16, 2007, this Panel issued a conditional transfer order in the case at bar. Subsequently, on November 19, 2007, the District Court of Maryland ordered that this matter be administratively closed, noting the option to reopen the matter for good cause shown, in light of the conditional transfer order issued by this Panel. On November 29, 2007 Plaintiff filed his reply to Defendants' opposition to the remand motion making absolutely clear that no federal jurisdiction exists

in this case. (Exhibit 2). Finally, on December 3, 2007 Plaintiff filed a Motion to Reopen this matter and for the District Court of Maryland to review the remand and removal filings given that this matter was improperly removed and to ensure Plaintiff will not unfairly lose his upcoming state court trial date. (Exhibit 3).

## ARGUMENT

### THE TRANSFER OF THIS CASE TO MDL IS UNJUSTIFIED.

An action may be transferred for coordinated or consolidated pretrial proceedings only when there are common issues of fact and when the transfer will "serve the convenience of the parties and witnesses" and "promote the just and efficient conduct" of the action. 28 U.S.C. § 1407. It is the position of the plaintiff that transfer by this panel is not appropriate because there is no federal jurisdiction and there are no issues to be resolved in this proceeding which have commonality with the asbestos personal injury cases currently pending in the Eastern District of Pennsylvania. Neither the convenience of the parties and witnesses nor the just and efficient conduct of the case will be served by transfer to the Eastern District of Pennsylvania.

Plaintiff Michael McCurdy was diagnosed with mesothelioma, "an invariably fatal form of cancer... for which asbestos exposure is the only known cause." In Re Patenaude, 210 F.3d 135, 138 (3d Cir. 2000). Sadly, Mr. McCurdy passed away on November 10, 2007 due to contracting malignant mesothelioma as a result of his exposure to asbestos fibers used within products manufactured or sold by several companies, including Removing Defendants, Garlock and Greene Tweed, while he worked as a boiler technician in the Baltimore area. Mesothelioma is a terminal disease, which as in the case at bar, almost always results in death within twelve to eighteen months from the date of diagnosis. Its only known cause in the U.S.A. is exposure to asbestos. Because the Plaintiffs have demonstrated herein that removal was improper, the Plaintiffs seek prompt remand so as not to lose their upcoming trial date in the Circuit Court for Baltimore City.

2

This is a mesothelioma case based on Defendants' failure to warn under state law during his time working in the private sector. Plaintiffs are seeking to recover damages based on Mr. McCurdy's exposure during his work as a boiler technician in the Baltimore area from approximately 1967 to the early 1980's - not during his exposure aboard the U.S.S. Intrepid, a Navy aircraft carrier. Plaintiff's Interrogatory Answer No. 91. (Exhibit 4). Specifically, after graduating high school, the Plaintiff began working as a oil burner technician in 1967 for Yeaton Co. until 1969 when he became a Navy seaman. Following his brief naval service from 1969 to 1971 when he served onboard the U.S.S. Intrepid, the Plaintiff returned to the oil burner service business in 1971 working through 1989 in residential and commercial job sites throughout the Baltimore area. As an oil burner technician in the private sector, Mr. McCurdy frequently installed and removed asbestos-containing Garlock[1] and Palmetto gaskets using a wire brush to scrape the asbestos off the flanges. (Exhibit 5, pp. 49-50). He testified that the process created visible dust. (Exhibit 5, pp. 49-50). He also recalled regularly removing asbestos cement manufactured by Hercules from the boilers he worked on. He testified that he would have to break the cement loose and wire brush it down; the process created very dusty conditions. (Exhibit 5, pp. 67-68).

Mesothelioma cases have received an expedited trial track in the Circuit Court for Baltimore City with an expedited discovery schedule. The Circuit Court for Baltimore City set an expedited trial date for Mr. McCurdy to begin on March 11, 2008. Mr. McCurdy was diagnosed with mesothelioma in April of 2007. If Mr. McCurdy's case is not remanded promptly, discovery deadlines in the state court action will pass and Mr. McCurdy will lose his March, 2008 trial date. According to the Pre-Trial Schedule agreed upon by the parties in the state court action, January 8, 2008 shall be the last day for Plaintiffs to conduct fact witness depositions who plaintiffs are able to voluntarily produce for deposition without a subpoena from a defendant. (Exhibit 6). In addition, on January 24, 2008 Defendants are to identify their fact witnesses for trial and on February 11, 2008 defendants are to submit defense export reports based on

---

[1] Mistakenly spelled "Gurlock" in deposition.

3

their experts' review of Plaintiff's diagnosing materials. (Exhibit 6).  Mr. McCurdy's pathology materials and chest films are currently in the possession of the defendants. Mr. McCurdy's discovery deposition was taken on September 19, 2007 (Exhibit 7), and his videotaped deposition for trial testimony was taken on September 21, 2007. (Exhibit 5).

Contrary to the impression given by the Notice of Removal, this case is based purely on exposures stemming from Mr. McCurdy's extensive employment history in the private sector.  The Plaintiffs are not pursuing, and Mr. McCurdy did not identify, any defendants for his alleged exposure onboard the U.S.S. Intrepid aircraft carrier from 1969 to 1971, the vessel at issue in this matter.  Mr. McCurdy did not state in his Complaint, interrogatory answers or in his two depositions that he breathed any asbestos or was claiming exposure to any defendant's asbestos products during his service in the Navy.  The reason for this omission is because Mr. McCurdy simply has no actionable asbestos claim related to the U.S.S. Intrepid since there is no evidence that he was exposed to respirable asbestos fibers at any time while aboard the Intrepid.

Specifically, Mr. McCurdy testified that, while he saw insulation in place on the U.S.S. Intrepid which he speculated contained asbestos, he was not present while the insulation was applied or torn out nor was he able to identify the manufacturer of any insulation he saw.  In his deposition, Mr. McCurdy testified:

> Q:    What type of asbestos did you see in the boiler room of the Navy?
>
> A:    Well, it was on the pipes and everything and turbines.  You know, anything that was really hot was covered with asbestos.
>
> Q:    Were you around when people worked around any of the asbestos covering you saw?
>
> A:    No.
>
> **Q:    Do you know who made any of the asbestos materials you saw while you were in the Navy?**

> **A:      In the Navy, no.**

(Exhibit 7, pp. 23-24)(Emphasis added).  Mr. McCurdy confirmed this testimony in his video deposition.

> Q:      Do you believe you were exposed to any asbestos in the Navy?
>
> A:      I was around it, yes.
>
> Q:      Okay. ... what was it on?
>
> A:      Anything that was hot, pipes, turbines.
>
> **Q:      Were you ever around any of that equipment when it was worked on?**
>
> **A:      No.**
>
> **Q:      ... was there anything on top of the pipecovering or the turbines other than insulation?**
>
> **A:      Coats of paint.**

(Exhibit 5, pp. 10-11.) (Emphasis added).  There is no evidence in the record confirming Mr. McCurdy's speculation that the insulation on board the ship contained asbestos or that he breathed in respirable asbestos fibers.

Moreover, Mr. McCurdy never identified working with any Garlock or Greene Tweed products or any "asbestos-containing" gaskets and packing on the ship as falsely alleged by these Defendants.  In paragraph 20 of their Notice of Removal, they erroneously state, "He himself used **asbestos** containing gaskets and packing when he performed repairs himself." *See* Removal Notice at 9. (Exhibit 8)(Emphasis supplied).  Nowhere in his two days of testimony does Mr. McCurdy identify using "asbestos" gaskets and packing on the ship.  Mr. McCurdy's testimony about gaskets and packing is as follows:

> Q:      What kind of equipment did you repair?
>
> A:      We had to replace gaskets in the lines and pumps, whatever.
>
> <center>*   *   *</center>
>
> Q:      Do you remember the manufacturer of any of the gaskets you had to replace?

<center>5</center>

A:     I'm not sure, you know I could tell you what they looked like.

Q:     Were they precut or did you have to make them yourself?

A:     Oh, no, they were all precut.

(Exhibit 7 at 25-26).     Garlock and Greene Tweed manufactured both asbestos-containing and non-asbestos containing gasket and packing.  (Exhibit 6, pp. 6-8) (Exhibit 7, p. 4).  The above-cited testimony by Mr. McCurdy is the full record relating to the types of products manufactured by Garlock and Greene Tweed.  Not only did Mr. McCurdy not recall being exposed to Garlock or Greene Tweed products onboard the U.S.S. Intrepid, he never testified that the gaskets and packing he used on the ship contained asbestos.

It is also clear in Mr. McCurdy's testimony that all his potential asbestos exposure during the Navy occurred onboard the U.S.S. Intrepid and never on any federal lands:

Q:     And how long were you on the Intrepid?

A:     **The entire time I was on active duty.**

(Exhibit 7 at 22) (Emphasis supplied).  Mr. McCurdy also discussed this topic in his video deposition:

Q:     When you **boarded that ship** as an active-duty sailor, that was in Philadelphia?

A:     Yes, sir.

Q:     At the Naval base there?

A:     Yes, sir.

Q:     Did the ship sail right away or did you stay with it for awhile in dock there?

A:     It was in drydock.

Q:     And did you - - you were actually a machinist mate at that point in time?

A:     No, sir.

Q:     What were you, a **seaman**, or how did you start?  You were a member of

the Navy though at that point, correct?

A:     Yes, sir.

Q:     So you actually enlisted as a **sailor** on that ship at that time?

A:     Yes, sir.

Q:     And what were your general duties at that point?

A:     As soon as I went **onboard** as a new crewman they gave you the grunt work.  They gave you the kitchen patrol...which I did for about two or three months.

Q:     When did you become a machinist mate?

A:     About three months after I boarded.

Q:     And did you - - at any time before you became, I guess, an official machinist's mate, were you working in maintenance and other things besides the kitchen?

A:     No, sir.

Q:     When did the ships(sic) leave Philadelphia?

A:     Right around the time I went down in the engine room.

(Exhibit 5 at 122-24)  (Emphasis supplied).

After his testimony confirmed that he did not work off the ship at the Philadelphia Naval

Shipyard, Mr. McCurdy was asked about his work at other potential naval shipyards.  Again, Mr.

McCurdy never stated that he worked on any federal land:

Q:     Was there damage caused to [the USS Intrepid around 1970?]

A:     We had to go into drydock in Boston.  ...I remember - - again, I didn't get involved with that much maintenance on it.  I know that they had to break open the turbines to get to the coils where it took the steam back to condensate, and I knew that there was problems with that.

Q:     Right.  And that was back in the dock, right?

A:     In Boston.

7

Q:     Now, do you recall it ever being in Quonset Point, Rhode Island?

A:     That's where we were home based out of.  ...That's we were going into Quonset Point, Rhode Island as the brand new home port for the USS Intrepid when the captain ran us aground.

Q:     And what part of - - I mean, what were you doing in Boston?  Where were you actually docked?

A:     It was a drydock up there.

Q:     You don't remember the name?

A:     No.  **I assume** it was a Navy yard.

                              *     *     *

Q:     And were there times when this vessel was being repaired down in Boston, especially when they were working on the turbines, that you would have had occasion as a machinist's mate to be at least in the engine room area?

A:     Yes.

(Exhibit 5 at 128-30) (Emphasis supplied).

I.      <u>**The Removing Defendants Have Not Shown That Mr. McCurdy Was Exposed to Respirable Asbestos Fibers While Aboard the U.S.S. Intrepid.**</u>

In order for the Removing Defendants to establish federal jurisdiction, they must be able to at the very least establish a federal exposure to asbestos.  Despite the Defendants' assertions, evidence does not exist of the Plaintiff's exposure to airborne asbestos while aboard the U.S.S. Intrepid, the only site at issue in this removal.  The Defendants are quick to point to the various portions of Mr. McCurdy's deposition which acknowledge that asbestos insulation appeared to have been applied at some point of time on the U.S.S. Intrepid.  However, in order for a viable asbestos claim to be pursued against a manufacturer of an asbestos product, there must be proof of <u>respirable</u> asbestos fibers that the Plaintiff inhaled.  This is true under both Federal and Maryland case law.  <u>Eagle-Picher Ind., Inc. v. Balbos</u>, 326 Md. 179, 604 A.2d 445 (1992); <u>In re Armstrong World Ind. Inc.</u>, 285 B.R. 8 64 (2002).

In other words, the fact that asbestos insulation may have been affixed to the Intrepid does not

8

mean that Mr. McCurdy was exposed to respirable asbestos fibers capable of giving rise to a compensable injury. Without airborne asbestos fibers, there is no legally recognized exposure. In this case, each of the instances where Mr. McCurdy thought he may have been exposed to asbestos related to insulation that was already in place and that he did not recall being manipulated in any way during his time on the U.S.S. Intrepid. Specifically, Mr. McCurdy testified that he never saw any of the insulation on the pipes or turbines worked on or manipulated while he was aboard the U.S.S. Intrepid, and he recalled that the pipe insulation was covered with coats of paint. Importantly, he further could not recall the manufacturers of any asbestos-containing products, including the Removing Defendants' gasket and packing products, used on the Intrepid, and there was absolutely no evidence submitted by the removing Defendants as to the composition of any of the products he identified on the ship. This evidence clearly is insufficient to establish that a "federal" exposure occurred on the U.S.S. Intrepid.

To bolster their argument that Mr. McCurdy suffered a legally cognizable exposure on the Intrepid, the Removing Defendants point to a report by Plaintiff's expert Dr. Gabrielson which the Defendants claim shows a causal connection between Mr. McCurdy's time on board the Intrepid and his injury. In doing so, the Removing Defendants misrepresent Dr. Gabrielson's conclusions. Specifically, Dr. Gabrielson stated:

> Mr. McCurdy <u>may</u> have also been exposed to asbestos while on the U.S.S. Intrepid aircraft carrier from approximately 1969 to 1971. <u>Based on an assumption that Mr. McCurdy inhaled significant amounts of asbestos as a result of these exposures</u>, it is my opinion to a reasonable degree of medical certainty that asbestos exposure was the cause of his mesothelioma. (Emphasis added)

Dr. Gabrielson's qualified opinion was based on information provided to him by Mr. McCurdy's counsel before Mr. McCurdy was deposed. At deposition, of course, it became clear that Mr. McCurdy was not exposed to respirable airborne asbestos fibers while on the Intrepid because the insulation he recalled seeing on the ship was never applied or torn out while he was on the ship.

Despite the complete lack of evidence that Mr. McCurdy was actually exposed to asbestos while on the Intrepid, the Removing Defendants argue that they have somehow satisfied their burden. In doing so, the Removing Defendants cite to <u>Mesa v. California</u>, 489 U.S. 121 (1989), and imply that they only need make a "colorable" showing of asbestos exposure. This is simply not true. <u>Mesa</u>'s relaxed "colorable" requirement is strictly limited to a federal officer removal and further limited solely to the officer's assertion of a federal defense. <u>Mesa</u> in no way, shape or form changes the general burden that a removing party must meet in order to establish federal jurisdiction. Since the Removing Defendant's have failed to establish that Mr. McCurdy was exposed to respirable airborne asbestos while on the Intrepid, remand is warranted.

**II.      <u>Federal Enclave Jurisdiction is Inappropriate.</u>**

      A.      <u>Navy ships are not federal enclaves even while at port.</u>

While the Removing Defendants agree that Navy ships are not federal enclaves under applicable federal law, they nevertheless argue that the U.S.S. Intrepid was at port for unspecified periods of time between its time at sea at alleged federal enclaves allows for federal jurisdiction in this case. Specifically, the Removing Defendants argue that Mr. McCurdy testified the U.S.S. Intrepid was in dry-dock at some of the ports at issue places the naval vessel squarely within enclave status. The Removing Defendants cite to no authority for this proposition.

The Removing Defendants' argument flies directly in the face of <u>Anderson v. Crown Cork and Seal</u>, 93 F. Supp. 2d 697 (E.D. Va. 2000), where it was held that the fact that a naval vessel at port in a federal enclave did not lose its identity as a ship. The Removing Defendants try to distinguish the cases cited in Mr. McCurdy's Motion for Remand by arguing that the U.S.S. Intrepid was dry-docked for undetermined periods of time, places the naval vessel on federal land. This argument ignores that in <u>Anderson</u>, the vessel at issue, the U.S.S. Laffey, was in dry-dock while at Norfolk Naval Shipyard. <u>Id</u>. at 699. That the U.S.S. Laffey was dry-docked did not change the conclusion of the U.S. District Court that

10

the Navy ship was not a federal enclave and removal was improper.

The rationale of the Anderson court was based on the fact that the plaintiff was stationed exclusively on the U.S.S. Laffey and no where else. He was not stationed on any other ship nor did he work out of a shipyard. Rather, his duties were based solely on a naval vessel that occasionally went to port. The court stated that the U.S.S. Laffey "never was a federal enclave, but simply moved in and out of federal enclaves." Id. at 702. Accordingly, the court concluded that the plaintiff's exposure occurred on the naval vessel and "not as a result of the Laffey's location 'in' the Shipyard." Id. at 701.

The facts in the case at bar are identical to the facts of Anderson. For instance, Mr. McCurdy was stationed exclusively on the U.S.S. Intrepid. Mr. McCurdy worked on no other naval ships and he was never stationed at any shipyards. These facts are not disputed. The fact that the U.S.S. Intrepid may have been dry-docked at some time during its journeys is irrelevant under Anderson. First, the U.S.S. Laffey was itself dry-docked at Norfolk Naval Shipyard. Second, it is the relationship of the plaintiff to the federal property that is dispositive in these cases. Mr. McCurdy was not in any way associated with any Navy shipyard. He worked as a Navy seaman on one ship that simply passed through ports when necessary. Under Anderson, Mr. McCurdy's alleged federal exposures occurred on the U.S.S. Intrepid, no matter where the ship may have been located at any given time.

B.    Removing Defendants still have not established the existence of a federal enclave.

The burden of establishing the facts necessary to show the propriety of this removal lies squarely with the Removing Defendants. Since the Removing Defendants claim that federal jurisdiction here is derived by virtue of the fact that Mr. McCurdy was exposed on certain federal enclaves, they must establish that the ports in question are, in fact, enclaves. They have not done so.

In their response, the Removing Defendants rely solely upon the testimony of Mr. McCurdy to establish what ports the U.S.S. Intrepid visited during its time at sea. They argue that Mr. McCurdy testified that the U.S.S. Intrepid docked at a Navy base in Philadelphia and at what he "assumed" was a

11

Navy base in Boston.  The Removing Defendants conclude that this testimony is sufficient to positively identify which precise ports the U.S.S. Intrepid entered in those two cities.  The fact that Mr. McCurdy identified a city and testified that he thought the ports were naval yards does not establish the identities of the ports with any specificity.  See Anderson, 93 F. Supp. 2d at 700, fn. 2 (where there was confusion regarding the identity of one of two naval ports in Norfolk, Virginia).  Regardless, even assuming that the testimony of Mr. McCurdy does establish that the U.S.S. Intrepid docked at both the Philadelphia Navy Yard and the Boston Navy Yard, the Removing Defendants have not established that the ports identified by Mr. McCurdy were federal enclaves as defined under federal law where he was present.

As discussed in Pratt v. Kelly, 585 F.2d 692 (4th Cir. 1978), a property, even if under federal control, is not a federal enclave unless it can be established that the state holding the property ceded jurisdiction to the federal government and that the federal government accepted the cession.  Until both acts happen, a property cannot be considered a federal enclave as described under Article I, Section 8, clause 17 of the U.S. Constitution.  In support of their contention that the three ports are federal enclaves, the Removing Defendants cite to Non-Resident Taxpayers Association v. Philadelphia, 478 F.2d 456 (3rd Cir. 1973), which makes a passing reference that the Philadelphia Naval Yard is a federal enclave.  The Removing Defendants then make a conclusory statement that "[l]ikewise, the U.S. Naval base in Boston and at Quonset Point, Rhode Island are federal enclaves." (Defs' Resp. at p. 10).  There was no citation or evidential support for the conclusion.

It is not clear in the text of the court's opinion in Non-Resident Taxpayers what factual basis was relied upon by the Third Circuit regarding its description of the Philadelphia Naval Yard as a federal enclave.  Indeed, the status of the shipyard does not seem to even be at issue in the case.  This is not to question the Third Circuit Court of Appeals' statement.  But if the Removing Defendants intend to use reported case law to fulfill its burden and substantiate its claim of federal jurisdiction, the case relied upon should reflect the basis for the conclusion that jurisdiction over a particular piece of property was

12

voluntarily ceded by a state to the federal government and accepted by the federal government.
Regardless, the Philadelphia port does not appear at issue in this case since it does not appear from any of
the Defendants' filings that there is any genuine claim that Mr. McCurdy was exposed to asbestos while
the U.S.S. Intrepid was docked in Philadelphia. Mr. McCurdy testified that he worked kitchen patrol
during that time period and did not move to the engine room until after the Intrepid left Philadelphia.
Since the only exposures to asbestos that the Removing Defendants claim that Mr. McCurdy incurred on
the Intrepid occurred in the engine room, the Philadelphia location cannot be at issue here.

There is no basis, by citation, factual basis or otherwise, provided by the Removing Defendants
for their claim that the states of Massachusetts or Rhode Island ceded jurisdiction to the federal
government and that such jurisdiction was accepted. No statute or act of any legislative body nor any
deed has been presented by the Removing Defendants to establish the legal enclave status of Quonset
Point or the Boston Naval Yard. Nor have they provided any citation to a court opinion where such
materials were discussed and ruled upon. Instead, the Removing Defendants ask this court to assume that
a military base is an enclave when Mr. McCurdy was present over 30 years ago and take judicial notice of
its status as a federal enclave.[2] In order for a court to take judicial notice of a fact, Rule 201 of the Federal
Rules of Evidence requires that the fact be "(1) generally known within the territorial jurisdiction of the
trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot
reasonable be questioned." The technical requirements relating to the creation of an enclave, i.e., the
voluntary cession of a particular property by a state and the acceptance of the property by the federal
government, is certainly not something that would be generally known in Maryland, especially in light of
the fact that the properties in question are located out of state. Furthermore, the enclave status of a
property requires research into the terms of its purported transfer from both sides of the transaction. Such

---

[2] The Removing Defendants quote Celli v. Shoell, 995 F. Supp. 1337, 1341 (D. Utah 1998), as stating that
it is a matter of common sense "to assume that a United States military base is a federal enclave...." (Defs' Resp. at
9 (emphasis added)). That quote does not appear in Celli anywhere.

13

information is not normally found in a dictionary, on a common map, or in any other resource "whose accuracy cannot be reasonably questioned." The Removing Defendants have been unable or unwilling to produce whatever deeds or other documents establishing the enclave status of the three properties in question and simply seek to eschew their burden on removal by shifting the onus to this Court to declare judicial notice without any direction to whatever reliable resource one is to rely upon in identifying the properties as federal enclaves nor any explanation as to how the enclave status of the properties is commonly known. There is, therefore, no basis for the Removing Defendants' request, and removal of this case based upon federal enclave jurisdiction is inappropriate.

III.   **The Removing Defendants Have Made No Showing That They Are Entitled to Federal Officer Jurisdiction.**

     A.   The Removing Defendants have not shown that their products were actually aboard the U.S.S. Intrepid.

In their Response to Mr. McCurdy's Motion for Remand, the Removing Defendants make no showing that any of their products were actually present or applied on the U.S.S. Intrepid. In fact, the Removing Defendants tellingly make no allegation that any of their products were ever used aboard the U.S.S. Intrepid. Instead, the Removing Defendants rely wholly upon two Qualified Product Lists ("QPLs") dated January 30, 1956 and June 28, 1951, which reflect gasket products qualified for military use. First, it must be noted that these lists were promulgated fifteen and twenty years prior to Mr. McCurdy's tour on the U.S.S. Intrepid, which is too removed a time period for them to be relevant to Mr. McCurdy's exposure. Regardless, the QPLs submitted by the Removing Defendants in no way places any particular product in any particular place at any particular time.

The fact that the federal government may have qualified the Removing Defendants' products for use does not actually place those products on the U.S.S. Intrepid. Many manufacturers of gaskets were on the very same QPLs submitted by the Removing Defendants. There is no way of telling from the lists which of those products were actually being used by the military nor the specific site those products were

14

located. See generally, Marshall v. Celotex Corp., 651 F. Supp. 389 (E.D. Mich. 1987)(discussing QPLs and their failure to place a particular product at a particular site). Indeed, the Removing Defendants acknowledge this shortcoming by noting that the whole basis for their claim to federal officer jurisdiction was only "[t]o the extent that Garlock and Greene Tweed did supply asbestos-containing gasket or packing products to the U.S. Navy, that were used by the Plaintiff...." (Emphasis added) (Defs' Resp., p. 17). Yet no allegation nor any probative evidence was submitted by the Removing Defendants to show to what extent, if any, that their products were on the U.S.S. Intrepid. This omission is fatal to the Removing Defendants' claims that federal officer jurisdiction exists in this case. Without a showing that their products were actually used on the U.S.S. Intrepid during the time period that Mr. McCurdy served there, they cannot claim to be under the directive of the federal government in any way that is at all relevant to this case.

        B.     <u>The Removing Defendants have not made a showing that they were under direct or detailed control of the federal government nor that there was any type of causal nexus between the alleged control and Mr. McCurdy's injury.</u>

The Removing Defendants argue that they satisfied the second prong of Mesa by producing two Military Qualified Products Lists dated 1951 and 1956. The Removing Defendants argue that these QPLs establish that they were under direct federal control when supplying their products to the U.S.S. Intrepid. It should be noted once again there is absolutely no evidence that the Removing Defendants' products were present on the Intrepid, and the QPLs are, likewise, irrelevant to the question of whether Mr. McCurdy's injuries were proximately caused by the Removing Defendants' actions performed under "federal directive" since those QPLs in no way place those products on the U.S.S. Intrepid. It should further be reiterated that the QPLs in question are seriously out dated in terms of the time period that Mr. McCurdy served on the Intrepid. Regardless, the QPLs prove facially defective in establishing federal jurisdiction for the very fact that they do not show any type of specification requiring the use of asbestos.

Federal law is clear that the type of control necessary to establish jurisdiction under 28 U.S.C.

§1442(a)(1) is the kind that leaves the governmental contractor absolutely no option but to breach its duties under state law. Specifically, the Removing Defendants must show that they were "required to take actions that subjected [them] to liability...." Alsup v. 3-Day Blinds, Inc., 435 F. Supp. 2d 838, 846 (2006). As noted in Good v. Armstrong World Industries, Inc., 914 F. Supp. 1125 (E.D. Penn. 1996), in asbestos cases, federal specifications must specifically show that asbestos was required to be used by the military, and failure to bring forth the particular specification regarding the necessity of asbestos-containing products constitutes a failure to establish federal jurisdiction.

In this case, the QPLs in question simply lay out a list of products qualified for use by the United States Military from which, one presumes, materials could be ordered for use on various military projects. Nowhere in the proffered QPLs are any specifications laid out for any of the products listed. Nowhere on the QPLs is there any indication that the inclusion of asbestos in any of the products listed was required by the federal government. There is no indication in the QPLs and no evidence submitted by the Removing Defendants relating to how the products became "qualified" or if asbestos was mandated by the federal government before the inclusion of the Removing Defendants' products in the QPLs could occur.

In short, the Removing Defendants have proffered a menu of qualified products, but no directive or specification. There is no indication or statement contained in the QPLs that would suggest that either Garlock or Greene Tweed was required by the federal government to use asbestos in its products, thereby forcing them to expose themselves to civil liability. Accordingly, the Removing Defendants have failed to prove the existence of federal jurisdiction in this case.

More importantly, the Removing Defendants have utterly ignored the fact that this case is a pure failure to warn case. There is not one mention nor one argument in the Removing Defendants' response disputing that federal law requires that a defendant prove that the federal government in some way prohibited or hindered its ability to fulfill its obligation under state law and warn end-users of the dangers of using its products. See Freiberg v. Swinerton & Walberg Property Services, Inc., 245 F. Supp. 2d 1144

16

(D. Colo. 2002); <u>Faulk v. Owens-Corning Fiberglas Corp.</u>, 48 F. Supp. 2d 653 (E.D. Tex 1999). The QPLs make no mention regarding the packaging and warning requirements for any of the products listed, and the Removing Defendants' response is completely silent on the issue. This silence is understandable in light of the Uniform Labeling Program for the U.S. Navy discussed in Mr. McCurdy's opening motion, which makes clear that the U.S. Navy expected that manufacturers of products supplied to it affix warnings in accordance with federal law. Accordingly, the Removing Defendants' removal is baseless, and remand is appropriate.

Finally, the Removing Defendants again seem to imply that the fact that Mr. McCurdy was a serviceman and under the directives of his superior officers while aboard the Intrepid means that they can somehow commandeer any orders that may have been given to Mr. McCurdy for themselves and transform themselves into federal officers. As pointed out in Mr. McCurdy's Motion for Remand, it is not Mr. McCurdy who is seeking federal officer status. The only party entitled to removal under 28 U.S.C. 1442(a)(1), is the federal officer. 28 USC. §1442(a) ("A civil action . . . commenced in a State court against [a federal officer] may be removed <u>by them</u>. . . .") (Emphasis added). Therefore, it is the Removing Defendants' obligation to show that they specifically were under federal direction. Mr. McCurdy's status is irrelevant. Regardless, the Removing Defendants cannot possibly argue that Mr. McCurdy was ordered or directed by the federal government to put asbestos in Garlock and Greene Tweed's products and then forbid him to warn himself of the dangers of those products.

C.  <u>The Removing Defendants have not properly asserted a federal defense.</u>

In order to establish that they are entitled to removal under 28 U.S.C. §1442, the Removing Defendants have to make a showing that they qualify for some federal defense. In this case, the Removing Defendants claim that they are entitled to the government contractor defense as described in <u>Boyle v. United Technologies, Inc</u>, 487 U.S. 500 (1998), and are quick to point out that they need not show that their defense is meritorious, but merely colorable. Yet, the Removing Defendants have not even alleged

17

the basic requirements of the <u>Boyle</u> defense, let alone "colored" the allegations with any factual proffer. In particular, <u>Boyle</u> requires that the removing party show that it warned the federal government of any dangers attributable to the federal contract.  The Removing Defendants have completely ignored this prong of <u>Boyle</u> both in their Notice of Removal and in their response to Mr. McCurdy's Motion for Remand.  In the absence of even a mere allegation in any document filed in this Court relating to the third prong of <u>Boyle</u>, there can be no argument that the Removing defendants have raised a "colorable" defense.

Additionally, the Removing Defendants have failed to show any sort of "reasonably precise specifications for contract performance" which is required under <u>Boyle</u>.  They have proffered a list of products that were considered acceptable for purchase by the Navy.  Those QPLs were dated June 28, 1951 and January 30, 1956, respectively.  Mr.  McCurdy served on the U.S.S. Intrepid well over a decade later.  The QPLs consist of a list of products and their manufacturers.  Noticeably absent in the QPLs provided by the Defendants, are any type of contractual specification.  Accordingly, there is no colorable government contractor defense.

## **CONCLUSION**

For the reasons stated herein, movants respectfully request that the Panel vacate the conditional transfer order.

Respectfully submitted,

/s/ ***Steven W. Smith***
Steven W. Smith
Federal Bar #05766

18

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

DEC 18 2007

FILED
CLERK'S OFFICE

/s/ *Sean D. Burns*
Sean D. Burns
Federal Bar #27489

LAW OFFICES OF PETER G. ANGELOS, P.C.
One Charles Center, 22nd Floor
100 North Charles Street
Baltimore, Maryland 21201
(410) 649-2000

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of December, 2007, a copy of Brief in Support of
Motion to Vacate Conditional Transfer Order was mailed first class, postage prepaid, to the below listed
counsel.

David Foxwell Albright, Sr.
LAW OFFICES OF DAVID F. ALBRIGHT
1122 Kenilworth Drive
Suite 500
Baltimore, MD 21202

David W. Allen
GOODELL DEVRIES LEECH & DANN, LLP
One South Street
Suite 2000
Baltimore, MD 21202

Thomas P. Bernier
SEGAL MCCAMBRIDGE SINGER & MAHONEY,
LTD
One North Charles Street
Suite 2500
Baltimore, MD 21201

Richard C. Binzley
THOMPSON HINE, LLP
127 Public Square
3900 Key Center
Cleveland, OH 44114

John J. Boyd, Jr.
LORD & WHIP, P.A.
Charles Center South
36 S. Charles Street, 10th Floor
Baltimore, MD 21201

Malcolm S. Brisker
GOODELL DEVRIES LEECH & DANN, LLP
One South Street
Alex Brown Building, 20th Floor
Baltimore, MD 21202

Edward J. Cass
GALLAGHER SHARP FULTON & NORMAN
Bulkley Building, 7th Floor
1501 Euclid Avenue
Cleveland, OH 44115

19

Laura C. Cellucci
MILES & STOCKBRIDGE
10 Light Street
Baltimore, MD 21202

Adam M. Chud
GOODWIN PROCTER, LLP
901 New York Avenue, N.W.
Washington, DC 20001

David A. Damico
BURNS WHITE & HICKTON
Four Northshore Center
106 Isabella Street
Pittsburgh, PA 15212

Thomas L. Doran
DECARO DORAN SICILIANO GALLAGHER
4601 Forbes Boulevard, Suite 200
P.O. Box 40
Lanham, MD 20703

Katherine S. Duyer
GAVETT & DATT, P.C.
15850 Crabbs Branch Way
Suite 180
Rockville, MD 20855

Stephen A. Fennell
STEPTOE & JOHNSON, LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036

Raymond P. Forceno
FORCENO GOGGIN & KELLER
1528 Walnut Street
Suite 900
Philadelphia, PA 19102

Ellen B. Furman
GOLDFEIN & HOSMER
1600 Market Street
33rd Floor
Philadelphia, PA 19103

Susan M. Hansen
BROWNSON & BALLOU
225 South Sixth Street
Suite 4800
Minneapolis, MN 55402

M. King Hill, III
VENABLE, LLP
210 Allegheny Avenue
Towson, MD 21204

Jeannie P. Kauffman
BACON THORNTON & PALMER, LLP
Capital Office Park
6411 Ivy Lane, Suite 706
Greenbelt, MD 20770-1411

Reginald S. Kramer
OLDHAM & DOWLING
195 South Main Street
Suite 300
Akron, OH 44308-1314

Philip A. Kulinski
EVERT WEATHERSBY HOUFF
120 E. Baltimore Street
Suite 1300
Baltimore, MD 21201

David C. Landin
HUNTON & WILLIAMS, LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219

Gene Locks
Locks Law Firm LLC
1500 Walnut Street
Philadelphia, PA 19102

Neil J. MacDonald
HARTEL KANE DESANTIS MACDONALD &
HOWIE
Calverton Office Park
11720 Beltsville Drive, Suite 500
Beltsville, MD 20705-3166

Alexander J. May
BRASSEL & BALDWIN
112 West Street
Annapolis, MD 21401

Donald S. Meringer
MERINGER ZOIS & QUIGG
300 East Lombard Street
Suite 1400
Baltimore, MD 21202

Ronald L. Motley
MOTLEY RICE LLC
P.O. Box 1792
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464

John J. Nagle, III
BODIE NAGLE DOLINA SMITH & HOBBS PA
21 W. Susquehanna Avenue
Towson, MD 21204

Joel D. Newport
MOORE & JACKSON LLC
305 Washington Avenue
Suite 401
Baltimore, MD 21204

Steven J. Parrott
DEHAY & ELLISTON, LLP
36 S. Charles Street
13th Floor
Baltimore, MD 21201

R. Thomas Radcliffe, Jr.
DEHAY & ELLISTON, LLP
36 S. Charles Street
13th Floor
Baltimore, MD 21201

John J. Repcheck
MARKS O'NEILL O'BRIEN & COURTNEY PC
Gulf Tower, Suite 2600
707 Grant Street
Pittsburgh, PA 15219

John D. Roven
ROVEN-KAPLAN LLP
2190 North Loop West
Suite 410
Houston, TX 77018

Richard D. Schuster
VORYS SATER SEYMOUR & PEASE LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216-1008

Neil Selman
SELMAN BREITMAN & BURGESS
11766 Wilshire Boulevard
Sixth Floor
Los Angeles, CA 90025

David A. Seltzer
WILSON ELSER MOSKOWITZ EDELMAN &
DICKER
1341 G Street, N.W.
Suite 500
Washington, DC 20005-3105

Robert N. Spinelli
KELLEY JASONS MCGUIRE & SPINELLI LLP
Centre Square West
15th Floor
Philadelphia, PA 19102

Robert E. Swickle
JAQUES ADMIRALTY LAW FIRM PC
1370 Penobscot Building, 645 Griswold
Street
The Maritime Asbestosis Legal Clinic
Detroit, MI 48226-4192

Andrew J. Trevelise
REED SMITH LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

Keith R. Truffer
ROYSTON MUELLER MCLEAN & REID
102 W. Pennsylvania Avenue
Suite 600
Towson, MD 21204

James K. Weston, II
TOM RILEY LAW FIRM
4040 First Avenue, N.E.
P.O. Box 998
Cedar Rapids, IA 52406

Gordon S. Woodward
SCHNADER HARRISON SEGAL & LEWIS
2001 Pennsylvania Avenue, N.W.
Suite 300
Washington, DC 20006-1825

Peter Allan Woolson
ROBINSON WOOLSON PA
217 E. Redwood Street
Suite 1500
Baltimore, MD 21202

# EXHIBIT 1

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **MICHAEL McCURDY,** *et ux.* | * | |
| **Plaintiffs** | * | **Case No. 1:07-CV-02681-AMD** |
| **v.** | * | **JUDGE ANDRE M. DAVIS** |
| **JOHN CRANE HOUDAILLE, INC.,** *et al.* | * | |
| **Defendants** | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**MOTION FOR REMAND FOR LACK OF
FEDERAL JURISDICTION**

Plaintiffs, by their undersigned attorneys, pursuant to 28 U.S.C.A., Section 1447 ( c )

hereby files this Motion for Remand and moves this Court to remand the above-captioned case to

the Circuit Court for Baltimore City. There grounds therefore, which are more fully set forth in

the accompanying Memorandum in Support For Remand, are as follows:

1.    On October 2, 2007, Garlock Sealing Technologies, Inc. And Greene Tweed &

Co. removed this action from the Circuit Court for Baltimore City to the U.S.

District Court for the Northern District of Maryland.

2.    The stated grounds for removal as laid out in the filed Notice of Removal was

Federal Question Jurisdiction under 28 U.S.C. §1331 stemming from alleged

exposures to asbestos in alleged federal enclaves, as well as Federal Officer

Jurisdiction as laid out under 28 U.S.C. §1442.

3.    Plaintiffs Michael J. McCurdy, *et. al.* file this Motion for Remand on the grounds

that there is no federal jurisdiction in this case since there is no evidence of

exposure to asbestos on a federal enclave or under the supervision of a federal officer.

4. The only alleged asbestos exposures that the Notice of Removal claims to be federal in nature occurred on the U.S.S. Intrepid, and federal law does not recognize naval vessels as federal enclave.

5. Finally, the Defendants have not satisfied any of the three prongs of <u>Mesa v. California</u>, 489 U.S. 121, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989), which lays out the standard for federal officer jurisdiction.

6. Since federal jurisdiction is lacking in this case, remand is proper.

**WHEREFORE**, Plaintiff Michael J. McCurdy, *et. al.*, request that this Court GRANT their Motion for Remand, and remand this case back to the Circuit Court for Baltimore City.

Respectfully submitted,

/s/ ***Sean D. Burns***
Sean D. Burns
Federal Bar #27489

/s/ ***Steven W. Smith***
Steven W. Smith
Federal Bar #05766

LAW OFFICES OF PETER G. ANGELOS, P.C.
One Charles Center, 22nd Floor
100 North Charles Street
Baltimore, Maryland 21201
(410) 649-2000

Attorneys for Plaintiffs

2

UNITED STATES DISTRICT COURT FOR THE
FOR THE DISTRICT OF MARYLAND


MICHAEL McCURDY, *et ux.*          *     (Circuit Court for Baltimore City

             Plaintiffs          *     Case No. 1:07-CV-02681-AMD)

v.          *     JUDGE ANDRE M. DAVIS

JOHN CRANE HOUDAILLE, INC., *et al.*          *

             Defendants          *
*     *     *     *     *     *     *     *     *     *     *     *     *     *


PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR REMAND

3

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

FACTUAL AND PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II.   There can be no federal jurisdiction under any theory since the record is
      devoid of any evidence that the Plaintiff was actually exposed to asbestos
      while serving on the U.S.S. Intrepid. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III.  Federal enclave jurisdiction is inappropriate . . . . . . . . . . . . . . . . . . . . . . . 11

      A. Federal enclave jurisdiction is completely absent since Mr. McCurdy
      was only allegedly exposed on the U.S.S. Intrepid, and Federal law makes
      clear that navy vessels are not enclaves . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

      B. The Removing Defendants have not carried their burden in establishing
      that federal enclave jurisdiction exists. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

IV.   There is no basis for federal officer jurisdiction in this case since there is no
      showing of a causal nexus between the Plaintiff's injuries and any alleged
      mandate from a federal officer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      A. Neither Garlock nor Greene Tweed have shown that they were persons
      acting under a federal officer at the time that the Plaintiff was aboard the
      U.S.S. Intrepid. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      B. There is no evidence that the Defendants acted at the direction of an
      officer nor any evidence of a causal nexus between the Plaintiff's injuries
      and any direction given by a federal officer. . . . . . . . . . . . . . . . . . . . . . . . . 20

      C. The Removing Defendants have not asserted a colorable defense. . . . . . . . . 28

## TABLE OF AUTHORITIES

**U.S. SUPREME COURT CASES**                                    **Page(s)**

Boyle v. United Technologies Corp., 487 U.S. 500 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 29-31

Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235 (1970) . . . . . . . . . . . . . . 8

City of Greenwood v. Peacock, 384 U.S. 808 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

McNutt v General Motors Acceptance Corp. of Indiana, 298 U.S. 178 (1936) . . . . . . . . . . . . 8

Mesa v. California, 489 U.S. 121, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989) . . . . . . . . . . . . . 19, 30

Owen Equipment & Erection Co. v. Kroger, 437 U.S. 365 (1978) . . . . . . . . . . . . . . . . . . . . . . 8

Paul v. United States, 371 U.S. 245 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Turner v. Bank of North-America, 4 U.S. (4 Dall.) 8, . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**FEDERAL CASES**

Adams v. Bain, 697 F.2d 1213 (4th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Alsup v. 3-Day Blinds, Inc., 435 F. Supp. 2d 838 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 29-31

Anderson v. Crown Cork & Seal, 93 F. Supp.2d 697 (E.D. Va. 2000) . . . . . . . . . . . . . . . . . . . 8

Arness v. Boeing North American, Inc., 997 F. Supp. 1268 (C.D.Cal. 1998) . . . . . . . . . . . . . 27

Bahrs v. Hughes Aircraft Co., 795 F.Supp. 965 (D.Ariz. 1992) . . . . . . . . . . . . . . . . . . . . . . . 27

Bell Atlantic Md. Inc. v. MCI Worldcom,Inc, 240 F.3d 279 (4th Cir. 2001) . . . . . . . . . . . . . . . 8

Blahnik v. BASF Corp., 2006 WL 2850113 (S.D.Tex. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Celli v. Shoell, 40 F.3d 324 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 30

Faulk v. Owens-Corning Fiberglass Corp., 48 F. Supp. 2d 653 (E.D.Tex. 1999) . . . . . . . . . . . 8

Fortier v. AMPCO Pittsburgh Corp., 3:07-cv-00005 (WWE) (D.Conn March 5, 2007) . . . . . . 27

_Freiberg v. Swinerton & Walberg Property Services, Inc._, 245 F. Supp. 2d 1144
(D. Colo. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

_Gauthe v. Asbestos Corp._, 1997 WL 3255 (E.D.La. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

_Good v. Armstrong World Industries, Inc._, 914 F. Supp. 1125 (E.D. Pa. 1996) . . . . . . . . . . . . . 8

_Gross v. Hougland_, 712 F.2d 1034 (6th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

_In Re Patenaude_, 210 F.3d 135 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

_Mater v. Holley_, 200 F.2d 123 (5th Cir. 1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

_McCormick  v. C.E. Thurston & Sons, Inc._, 977 F. Supp. 400 (E.D. Va. 1997) . . . . . . . . . . 13-15

_Michigan v. Banning_, 88 F.Supp. 449 (E.D. Mich. 1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

_Pratt v. Kelly_, 585 F.2d 692 (4th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

_Ryan v. Dow Chemical Co._, 781 F.Supp. 934 (E.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . 19, 21

_Stokes v. Adair_, 265 F.2d 662 (4th Cir. 1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

_Swan v. Community Relations-Social Development Commission_, 374 F.Supp. 9, 11
(E.D. Wis. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

_United States v. Johnson_, 994 F.2d 980 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16

_Van Pelt v. AcandS, Inc_, C.A. 01-949 (D.C.Md. May 15, 2001) . . . . . . . . . . . . . . . . . . . . . . . . 14

_Verizon Maryland, Inc. v. Public Service Com'n of Maryland_, 335 U.S. 635 (2002) . . . . . . . . 8

_Virden v. Altria Group, Inc._, 304 F. Supp. 2d 832 (N.D.W.V. 2004) . . . . . . . . . . . . . . . . . . . . . 22

_Williams v. General Electric Co._, C.A. No. 1:04-CV-2762 (M.D. Pa. Aug. 22, 2005) . . . . . . . 25

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF MARYLAND
Northern Division

| | | |
|---|---|---|
| MICHAEL McCURDY, *et ux.* | * | |
| | | |
| Plaintiffs | * | Case No. 1:07-CV-02681-AMD |
| | | |
| v. | * | JUDGE ANDRE M. DAVIS |
| | | |
| JOHN CRANE HOUDAILLE, INC., *et al.* | * | |
| | | |
| Defendants | * | |

**************

MEMORANDUM IN SUPPORT OF
MOTION FOR REMAND FOR LACK OF FEDERAL JURISDICTION

Plaintiffs, by their undersigned attorneys, pursuant to 28 U.S.C.A., Section 1447 ( c )

hereby moves this Court to remand the above-captioned case to the Circuit Court for Baltimore

City. and in support thereof states as follows:

**FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff Michael McCurdy has been diagnosed with mesothelioma, "an invariably fatal

form of cancer... for which asbestos exposure is the only known cause." In Re Patenaude, 210

F.3d 135, 138 (3d Cir. 2000). Mr. McCurdy's prognosis is very poor (Exhibit 1), and he will

soon die from his injuries.  Because the Plaintiffs have demonstrated herein that removal was

improper, the Plaintiffs seek prompt remand so as not to lose their upcoming trial date in the

Circuit Court for Baltimore City.

This is a mesothelioma case based on Defendants' failure to warn under state law during

his time working in the private sector.  Plaintiffs are seeking to recover damages based on Mr.

McCurdy's exposure during his work as a boiler technician in the Baltimore area from

1

approximately 1967 to the early 1980's - not during his exposure aboard the U.S.S. Intrepid.

Plaintiff's Interrogatory Answer No. 91. (Exhibit 2).  Specifically, after graduating high school,

the Plaintiff began working as a oil burner technician in 1967 for Yeaton Co. until 1969 when he

became a Navy seaman.  Following his brief naval service, the Plaintiff returned to the oil burner

service business in 1971 working through 1989  in residential and commercial job sites

throughout the Baltimore area. As an oil burner technician in the private sector, Mr. McCurdy

frequently installed and removed asbestos-containing Garlock[1] and Palmetto gaskets using a wire

brush to scrape the asbestos off the flanges.  (Exhibit 5, pp. 49-50).  He testified that the process

created visible dust.  (Exhibit 5, pp. 49-50).  He also recalled regularly removing asbestos cement

manufactured by Hercules from the boilers he worked on.  He testified that he would have to

break the cement loose and wire brush it down; the process created very dusty conditions.

(Exhibit 5, pp. 67-68).

Mesothelioma cases have received an expedited trial track in the Circuit Court for

Baltimore City with an expedited discovery schedule.  Mr. McCurdy's trial is scheduled to begin

in the Circuit Court for Baltimore City on March 11, 2008 and was subject to the attached

Consolidation Order and Pre-Trial Schedule dated January 27, 2007. (Exhibit 3).  Mr.

McCurdy's discovery deposition was taken on September 19, 2007 (Exhibit 4), and his

videotaped deposition for trial testimony was taken on September 21, 2007. (Exhibit 5).  On

October 2, 2007, Defendants Garlock Sealing Technologies, Inc. and Greene Tweed & Co.,

(hereinafter "Garlock" and "Greene Tweed" respectively or "Removing Defendants"

collectively) filed a Notice of Removal in this Court on the basis that Mr. McCurdy was exposed

---

[1]Mistakenly spelled "Gurlock" in depostition.

on one or more federal enclaves and under the direction of a federal officer.

Contrary to the impression given by the Notice of Removal, this case is based purely on exposures stemming from Mr. McCurdy's extensive employment history in the private sector. The Plaintiffs are not pursuing, and Mr. McCurdy did not identify, any defendants for his alleged exposure onboard the U.S.S. Intrepid aircraft carrier from 1969 to 1971, the vessel at issue in this matter.  Mr. McCurdy did not state in his Complaint, interrogatory answers or in his two depositions that he was claiming exposure to any defendant's asbestos products during his service in the Navy.  The reason for this omission is because Mr. McCurdy simply has no actionable asbestos claim related to the U.S.S. Intrepid since there is no evidence that he was exposed to respirable asbestos fibers at any time while aboard the Intrepid.

Specifically, Mr. McCurdy testified that, while he saw insulation in place on the U.S.S. Intrepid which he speculated contained asbestos, he was not present while the insulation was applied or torn out nor was he able to identify the manufacturer of any insulation he saw.  In his deposition, Mr. McCurdy testified:

> Q:   What type of asbestos did you see in the boiler room of the Navy?
>
> A:   Well, it was on the pipes and everything and turbines.  You know, anything that was really hot was covered with asbestos.
>
> Q:   Were you around when people worked around any of the asbestos covering you saw?
>
> A:   No.
>
> **Q:   Do you know who made any of the asbestos materials you saw while you were in the Navy?**
>
> **A:   In the Navy, no.**

3

(Exhibit 4, pp. 23-24)(Emphasis added).  Mr. McCurdy confirmed this testimony in his video deposition.

> Q:   Do you believe you were exposed to any asbestos in the Navy?
>
> A:   I was around it, yes.
>
> Q:   Okay. ... what was it on?
>
> A:   Anything that was hot, pipes, turbines.
>
> **Q:   Were you ever around any of that equipment when it was worked on?**
>
> **A:   No.**
>
> **Q:   ... was there anything on top of the pipecovering or the turbines other than insulation?**
>
> **A:   Coats of paint.**

(Exhibit 5, pp. 10-11.) (Emphasis added).  There is no evidence in the record confirming Mr. McCurdy's speculation that the insulation on board the ship contained asbestos or that he breathed in respirable asbestos fibers.

Moreover, Mr. McCurdy never identified working with any Garlock or Greene Tweed products or any "asbestos-containing" gaskets and packing on the ship as falsely alleged by these Defendants.  In paragraph 20 of their Notice of Removal, they erroneously state, "He himself used **asbestos** containing gaskets and packing when he performed repairs himself." *See* Removal Notice at 9.  (Emphasis supplied).  Nowhere in his two days of testimony does Mr. McCurdy identify using "asbestos" gaskets and packing on the ship.  Mr. McCurdy's testimony about gaskets and packing is as follows:

> Q:   What kind of equipment did you repair?

4

> A:    We had to replace gaskets in the lines and pumps, whatever.
>
> *    *    *
>
> Q:    Do you remember the manufacturer of any of the gaskets you had
>       to replace?
>
> A:    I'm not sure, you know I could tell you what they looked like.
>
> Q:    Were they precut or did you have to make them yourself?
>
> A:    Oh, no, they were all precut.

(Exhibit 4 at 25-26).   Garlock and Greene Tweed manufactured both asbestos-containing and

non-asbestos containing gasket and packing.  (Exhibit 6, pp. 6-8) (Exhibit 7, p. 4).  The above-

cited testimony by Mr. McCurdy is the full record relating to the types of products manufactured

by Garlock and Greene Tweed.  Not only did Mr. McCurdy not recall being exposed to Garlock

or Greene Tweed products onboard the U.S.S. Intrepid, he never testified that the gaskets and

packing he used on the ship contained asbestos.

It is also clear in Mr. McCurdy's testimony that all his potential asbestos exposure during

the Navy occurred onboard the U.S.S. Intrepid and never on any federal lands:

> Q:    And how long were you on the Intrepid?
>
> **A:    The entire time I was on active duty.**

(Exhibit 4 at 22)  (Emphasis supplied).  Mr. McCurdy also discussed this topic in his video

deposition:

> Q:    When you **boarded that ship** as an active-duty sailor, that was in
>       Philadelphia?
>
> A:    Yes, sir.
>
> Q:    At the Naval base there?

5

A:      Yes, sir.

Q:      Did the ship sail right away or did you stay with it for awhile in dock there?

A:      It was in drydock.

Q:      And did you - - you were actually a machinist mate at that point in time?

A:      No, sir.

Q:      What were you, a **seaman**, or how did you start?  You were a member of the Navy though at that point, correct?

A:      Yes, sir.

Q:      So you actually enlisted as a **sailor** on that ship at that time?

A:      Yes, sir.

Q:      And what were your general duties at that point?

A:      As soon as I went **onboard** as a new crewman they gave you the grunt work.  They gave you the kitchen patrol...which I did for about two or three months.

Q:      When did you become a machinist mate?

A:      About three months after I boarded.

Q:      And did you - - at any time before you became, I guess, an official machinist's mate, were you working in maintenance and other things besides the kitchen?

A:      No, sir.

Q:      When did the ships(sic) leave Philadelphia?

A:      Right around the time I went down in the engine room.

(Exhibit 5 at 122-24)  (Emphasis supplied).

After his testimony confirmed that he did not work off the ship at the Philadelphia Naval

6

Shipyard, Mr. McCurdy was asked about his work at other potential naval shipyards.  Again, Mr.

McCurdy never stated that he worked on any federal land:

> Q:  Was there damage caused to [the USS Intrepid around 1970?]
>
> A:  We had to go into drydock in Boston.  ...I remember - - again, I didn't get involved with that much maintenance on it.  I know that they had to break open the turbines to get to the coils where it took the steam back to condensate, and I knew that there was problems with that.
>
> Q:  Right.  And that was back in the dock, right?
>
> A:  In Boston.
>
> Q:  Now, do you recall it ever being in Quonset Point, Rhode Island?
>
> A:  That's where we were home based out of.  ...That's we were going into Quonset Point, Rhode Island as the brand new home port for the USS Intrepid when the captain ran us aground.
>
> Q:  And what part of - - I mean, what were you doing in Boston?  Where were you actually docked?
>
> A:  It was a drydock up there.
>
> Q:  You don't remember the name?
>
> A:  No.  **I assume** it was a Navy yard.
>
> \*   \*   \*
>
> Q:  And were there times when this vessel was being repaired down in Boston, especially when they were working on the turbines, that you would have had occasion as a machinist's mate to be at least in the engine room area?
>
> A:  Yes.

(Exhibit 5 at 128-30) (Emphasis supplied).

## ARGUMENT

**I.**    **Standard of Review**

    As a federal court, this Court is a court of limited jurisdiction. Gross v. Hougland, 712

F.2d 1034 (6th Cir. 1983). See also, Owen Equipment & Erection Co. v. Kroger, 437 U.S. 365,

372 (1978) (stating federal court jurisdiction is limited both by Article III of the Constitution,

and by Acts of Congress); Bell Atlantic Md. Inc. v. MCI Worldcom,Inc, 240 F.3d 279, 301 (4th

Cir. 2001), vacated on other grounds sub. nom. Verizon Maryland, Inc. v. Public Service Com'n

of Maryland, 335 U.S. 635 (2002), citing Turner v. Bank of North-America, 4 U.S. (4 Dall.) 8,

11 (1799) (observing that because federal courts are courts of limited jurisdiction, "the fair

presumption . . . that a cause is without its jurisdiction till the contrary appears."). Federal law

has long held that federal removal statutes are not to be used as a mechanism to preclude state

courts from reviewing purely state causes of action. Boys Markets, Inc. v. Retail Clerks Union,

Local 770, 398 U.S. 235, 247 (1970). Congress did not intend the removal statute to effectuate a

wholesale dislocation in the allocation of judicial business between the state and federal courts.

Id (citing City of Greenwood v. Peacock, 384 U.S. 808 (1966)). This Court should respect the

principle of limited jurisdiction in matters of removal to preserve traditional notions of

federalism and judicial comity.

    Generally, removal statutes are strictly construed with all doubts construed against

removal, and the federal courts should confine their jurisdiction to the precise limits defined by

the statute under consideration. Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100, 108-109

(1941). Garlock and Greene Tweed, as the parties invoking federal jurisdiction, bear the burden

of affirmatively and clearly establishing the existence of federal subject matter jurisdiction. See

McNutt v General Motors Acceptance Corp. of Indiana, 298 U.S. 178 (1936); Adams v. Bain,

697 F.2d 1213 (4th Cir. 1982); <u>Anderson v. Crown Cork & Seal</u>, 93 F. Supp.2d 697 (E.D. Va. 2000).

**II.      There can be no federal jurisdiction under any theory since the record is devoid of any evidence that the Plaintiff was actually exposed to asbestos while serving on the U.S.S. Intrepid.**

In order for the Removing Defendants to establish that there is any federal connection in this case, they must at least show that Mr. McCurdy was actually exposed to asbestos while serving on the U.S.S. Intrepid. The mere fact that Mr. McCurdy was on the Navy vessel at some point in his career does not create federal jurisdiction. Rather, the cause of action must be linked to the U.S.S. Intrepid through Mr. McCurdy's exposure to asbestos while on the vessel. There is not sufficient facts on the record to show that Mr. McCurdy was exposed on the Intrepid, so the Removing Defendants are not entitled to removal on any grounds.

In <u>Blahnik v. BASF Corp.</u>, 2006 WL 2850113 (S.D.Tex. 2006), defendants removed a cause of action for injuries stemming from the exposure to benzene based on the fact an answer to an interrogatory reflected that the plaintiff had at one time worked at Fort Hood in Texas for a period of two years. (Exhibit 8). No other evidence was promulgated tending to show that the plaintiff in that case was actually exposed to benzene while at Fort Hood or what the nature of his duties were while serving on the installation. The district court accordingly remanded the case back to state court. In doing so, the court noted that proof that an injury was caused while on a federal property was necessary for federal jurisdiction to be imposed.

> [T]he Court cannot assume that federal enclave jurisdiction exists from a single, ambiguous response to an interrogatory. The fact that Plaintiff...may have worked on an military base at some point in time is insufficient, the Defendants must show that the Plaintiffs' causes of action can fairly be said to arise on a federal enclave.

9

Id. at *4.

A fair reading of both of Mr. McCurdy's depositions reveals that there was no testimony elicited establishing that Mr. McCurdy was actually exposed to respirable airbourne asbestos fibers while aboard the U.S.S. Intrepid.  Mr. McCurdy worked on kitchen patrol for the first three months of his stint and then transferred to the engine room where the bulk of his duties involved controlling the speed of the engine.  (Exhibit 5, pp. 123-124, 127).  Mr. McCurdy recalled seeing insulation on pipes and turbines located within the Intrepid, but testified that the insulation was covered with coats of paint.  (Exhibit 5, pp. 10-11).  Mr. McCurdy testified that he was never around when any work was being done on the insulation.  (Exhibit 5, p. 11, Exhibit 4, pp. 23-24). He did not know the name of any of the manufacturers of the insulation products he saw on board the Intrepid.  (Exhibit 4, p. 24).

While Mr. McCurdy worked in the engine room of the U.S.S. Intrepid, he recalled seeing turbines that he believed were manufactured by GE or Westinghouse and that he believed were insulated.  (Exhibit 5, p. 125). When the Intrepid ran aground in 1970, Mr. McCurdy recalled seeing others breaking open the turbines to repair damaged coils.  (Exhibit 5, pp. 128-129).  Mr. McCurdy stated that he was never present when thermal insulation materials were removed or applied to the turbines during repairs.  (Exhibit 5, pp. 139-140, Exhibit 4, pp. 34-35).

Mr. McCurdy did remember occasionally replacing gaskets and packing during the course of his job duties while aboard the Intrepid.  (Exhibit 5, p. 127).  But he could not recall the manufacturer of the gaskets.  (Exhibit 4, pp. 25-26).  He could only remember what the gaskets looked like and the fact that they were pre-cut.  (Exhibit 4, p. 26).  No Defendant asked Mr. McCurdy to give a description of the gasket or asked if he recalled the gaskets' packaging.

10

Likewise, no question was posed to Mr. McCurdy regarding whether he believed those gaskets actually contained asbestos.

This testimony simply does not establish that Mr. McCurdy was exposed to asbestos on the Intrepid. The crux of the alleged exposures being relied upon to support this removal lies in two distinct areas: 1) asbestos insulation that was already applied when Mr. McCurdy boarded the U.S.S. Intrepid and was not manipulated during Mr. McCurdy's service and 2) the use of gaskets where there is no evidence of the manufacturer or composition of the products Mr. McCurdy used. The allegations contained in the Notice of Removal of actual asbestos exposure on the Intrepid is purely speculative and would not survive a motion for summary judgment. It should, likewise, be insufficient to form a basis for federal jurisdiction.

**III.    Federal enclave jurisdiction is inappropriate**.

A. <u>Federal enclave jurisdiction is completely absent since Mr. McCurdy was only allegedly exposed on the U.S.S. Intrepid, and Federal law makes clear that Navy vessels are not enclaves.</u>

The Removing Defendants primary basis for removal is premised on the notion that certain job sites at issue in this matter are federal enclaves (notably the U.S. Naval Shipyards in Philadelphia, PA; Boston, MA and Quonset Point, RI.) which purportedly justifies removal under 28 U.S.C. § 1331. The Removing Defendants completely ignore the fact that Mr. McCurdy enlisted in the Navy and served as military personnel during the Vietnam War, stationed exclusively on the U.S.S. Intrepid throughout the entire duration of his service. Mr. McCurdy was not brought in as a contractor to build the U.S.S. Intrepid. Nor was Mr. McCurdy charged with the responsibility of making repairs to random navy ships that happened into a naval shipyard he worked at. Mr. McCurdy was a naval serviceman, and his job was to report to

11

the U.S.S. Intrepid and sail with her wherever she went.  Under prevailing law, a ship is simply

not a federal enclave.  Accordingly, the Removing Defendants have no basis for removal under

28 U.S.C. §1331.

The Removing Defendants claim that this case falls within this Court's federal-enclave

jurisdiction.  Federal-enclave jurisdiction grows out of article I, section 8, clause 17 of the United

States Constitution:

> To exercise exclusive Legislation in all Cases whatsoever,
> over such District (not exceeding ten Miles square) as may,
> by Cession of particular States, and the Acceptance of
> Congress, become the Seat of the Government of the
> United States, and to exercise like Authority over all Places
> Purchased by the Consent of the Legislature of the State in
> which the Same shall be, for the Erection of Forts,
> Magazines, Arsenals, dock-Yards, and other needful
> Buildings.

Under this clause, the federal government gains exclusive jurisdiction over federally-

owned land when the state within which that land sits cedes its own jurisdiction and the federal

government assumes complete sovereignty over it.  United States v. Johnson, 994 F.2d 980 (2d

Cir. 1993); see 40 U.S.C.A. § 255 (West 1986).  Without this withdrawal of state authority and

concomitant assertion of exclusive federal authority, however, the land is federal property over

which a state exercises concurrent jurisdiction, not a federal enclave over which the federal

government exercises sole jurisdiction.  Paul v. United States, 371 U.S. 245, 263 (1963) ("But

without the State's 'consent' the United States does not obtain the benefits of Art 1 § 8 cl 17, its

possession being simply that of an ordinary proprietor."); Johnson, 994 F.2d at 984 (stating that

without state jurisdictional retreat, "the United States does not take jurisdiction over the property,

and can only be a proprietor of the property").  Since a state voluntarily cedes its own jurisdiction

12

over federal enclaves, if a tort occurs there, then state law is inapplicable, the tort arises

exclusively under federal law, and the case can be removed under federal-question jurisdiction.

Mater v. Holley, 200 F.2d 123, 125 (5th Cir. 1952).

The status of naval vessels in the federal enclave context has been discussed by several

courts in the Fourth Circuit. In McCormick v. C.E. Thurston & Sons, Inc., 977 F. Supp. 400,

402 (E.D. Va. 1997), the plaintiff, a naval officer stationed on the U.S.S. Nimitz, an aircraft

carrier like the U.S.S. Intrepid, was exposed to asbestos during his tenure on the ship and

contracted mesothelioma. The defendants removed the case based upon federal enclave

jurisdiction, and the district court remanded the case back to state court. In doing so, the court

noted that "a federal enclave is created only when the federal government acquires exclusive

jurisdiction over land with the consent of the state ... containing the land." Id. at 402 (emphasis

added). The court emphasized that the prevailing law focused on land voluntarily ceded by a

state and concluded that "this Court rejects any suggestion that the USS NIMITZ is or ever was a

'federal enclave' sufficient to establish jurisdiction in this case." Id.

The McCormick defendants also argued, as the Removing Defendants in this case seem

to argue, that the U.S.S. Nimitz passed through and were docked at several naval facilities during

the course of the plaintiff's service. The court acknowledged that at least one of those facilities

was established to be a federal enclave. However, the court rejected the notion that a ship that

docked at a federal enclave could be considered an enclave where the injured serviceman's

orders and accompanying exposure only occurred on the ship. Specifically, the court stated that

"all the evidence before the Court, and the Defendant has proffered nothing to the contrary,

suggests that decedent's exposure has no connection with governmental lands." Id.

13

The rule laid out in <u>McCormick</u> was fleshed out further in <u>Anderson v. Crown Cork & Seal</u>, 93 F. Supp. 2d 697 (E.D. Va. 2000).  In that asbestos mesothelioma case, the decedent plaintiff claimed that exposure to asbestos occurred aboard the U.S.S. Laffey, which was docked at the Norfolk Naval Yard at some time during its tour.  After confirming that naval ships, in and of themselves, are not enclaves, the court went on to examine the enclave status of ships that dock at proven enclaves.  The court ruled that

> [a]ll of the evidence before the Court indicates that the decedent was a seaman, not a shipyard worker.  The most persuasive evidence before the Court is the affidavit of Douglas Adams, one of the decedent's fellow seaman aboard the Laffey. In his affidavit, Adams states unequivocally that he and the decedent worked together in the "After Fireroom" of the Laffey; that the majority of their time aboard the Laffey it  was at sea; that it was occasionally docked at its home port, the Norfolk Naval Shipyard; and most importantly, that at no point did they work "aboard any other ship or in the shipyard." The defendants failed to submit any evidence contradicting the Adams affidavit.  Based on the evidence before the Court, the Court FINDS that the decedent's exposure occurred on the U.S.S. Laffey, and not as a result of the Laffey's location "in" the Shipyard.

<u>Id</u>. at 701 (citations omitted).

These principles were accepted by this court in <u>Van Pelt v. AcandS, Inc</u>, C.A. 01-949 (D.C.Md. May 15, 2001).  (Exhibit 9).  There, the plaintiff was exposed, in part, on a variety of Navy vessels. Judge Smalkin noted that

> the better rule in the case of exposure aboard naval vessels was that adopted by a district court within this Circuit, holding that there is no "federal enclave" original jurisdiction over such cases. *McCormick v. C.E. Thurston & Sons, Inc.*, 977 F. Supp. 400 (E.D. Va. 1997).  This Court will follow *McCormick*, which emanates from a respected admiralty court.

<u>Id</u>. at 2.

14

Mr. McCurdy was a Navy seaman, who reported to and served exclusively on the U.S.S. Intrepid during his two-year stint in the Navy beginning in 1969.  (Exhibit 5, p. 10, Exhibit 4, pp. 21-22.)  Mr. McCurdy served on the Intrepid for the entirety of his service with the U.S. Navy.  (Exhibit 4, p. 22.)  While on the Intrepid, Mr. McCurdy worked in the engine room, and his job was to control the speed of the vessel.  (Exhibit 4, p. 25). Although docked for periods of time at a few shipyards, the Intrepid spent the interim time between ports at sea.  (Exhibit 5, pp. 122-124, 128-130).  When docked, Mr. McCurdy's orders did not change.  He was assigned to the Intrepid, and that is where he stayed even when docked.  (Exhibit 6, p. 130).  The record is completely devoid of any evidence that Mr. McCurdy's assignment encompassed federal land.  He was not a shipyard worker.  He was a naval serviceman charged with the responsibility of sailing the Intrepid.  Accordingly, this case is indistinguishable from McCormick and Anderson.  Any alleged exposure the Plaintiff may have had to asbestos-containing products occurred solely on the naval vessel that Mr. McCurdy was assigned to and not on any land under the exclusive jurisdiction of the Federal government.  Removal to this Court was, therefore, wholly improper and remand is warranted.

      B.      **The Removing Defendants have not carried their burden in establishing that federal enclave jurisdiction exists.**

In the Notice of Removal, Removing Defendants rely on facts provided on various websites that allegedly assert that the federal government was the property owner of three alleged federal enclaves.  Removing Defendants casually ignore the well-defined, detailed inquiry necessary to determine enclave status.  See e.g., Stokes v. Adair, 265 F.2d 662 (4th Cir. 1959); Pratt v. Kelly, 585 F.2d 692 (4th Cir. 1978); Celli v. Shoell, 40 F.3d 324 (10th Cir. 1994).  Enclave status depends on far more than simply federal ownership of land.

15

> Whether federal enclave jurisdiction, a form of federal question jurisdiction, exists is a complex question, resting on such factors as whether the federal government exercises exclusive, concurrent or proprietarial jurisdiction over the property, when the property became a federal enclave and what the state law was at that time, whether that law is consistent with federal policy, and whether it has been altered by national legislation.

Celli v. Shoell, 40 F.3d 324, 328 (10th Cir. 1994).  A party who wishes to establish federal enclave jurisdiction must show that the State has relinquished jurisdiction over the piece of property *and* that the federal government has accepted the transfer of sovereignty.  See e.g., United States v. Johnson, 994 F.2d 980, 985 (2nd Cir. 1994).  For property acquired by the federal government after January 31, 1940, Congress has enacted specific statutory limitations on acceptance of jurisdiction.  40 U.S.C. § 255.

The standard discussed in Celli is followed by the Fourth Circuit in determining the existence of a federal enclave.  Pratt v. Kelly, 585 F.2d 692 (4th Cir. 1978).  The plaintiff in Pratt asserted that 28 U.S.C. 1331(a) and 16 U.S.C. 457 provided the basis for federal jurisdiction because the United States owned the Blue Ridge Parkway.  Id. at 694.  Defendants moved to dismiss the case on the ground that the federal court lacked jurisdiction over torts committed on the Blue Ridge Parkway.  The Fourth Circuit held that

> [i]t is now clear that ownership of land by the United States does not imply a transfer or either total or partial jurisdiction except so far as necessary for the United States to accomplish the purposes for which the land was transferred.

Id. at 695.  In finding federal jurisdiction lacking, the Fourth Circuit carefully considered the specific language of the deed conveyed by the State of Virginia to the Unite States and found that the terms of the deed specifically reserved jurisdiction over civil matters to the State of Virginia.  Id. at 696.  The court then examined the language of 16 U.S.C. § 457 and found the statute

facially inapplicable because it is limited to properties that are "Subject to the exclusive jurisdiction of the United States. . . ." Id. at 697.

The face of the Notice of Removal filed by the Removing Defendants does not establish the existence of federal enclaves in this case in accordance with federal law.  Of the three ports that Mr McCurdy testified to, he provided the name for only one: Quonsot Point, Rhode Island. This port was the home port of the Intrepid. (Exhibit 5, p. 129).  In the Defendants' Notice of Removal, the enclave status of Quonsot Point is merely alleged without citations to supporting facts that jurisdiction over Quonsot Point was forfeited by the State of Rhode Island, the terms of the forfeiture, or whether the federal government accepted jurisdiction over Quonsot Point in accordance with federal law.

Likewise, the Notice of Removal is deficient in establishing federal enclave jurisdiction for the other two ports cited.  First, Mr. McCurdy never testified with any specificity as to the names of the two ports in question.  He simply testified that he recalled boarding the Intrepid in Philadelphia[2] at what he thought was a Navy base and that repairs to the ship were made in Boston at what he assumed was a Navy yard.  (Exhibit 5, pp. 122-129).  In the Removing Defendants' Notice of Removal, these nameless ports in "Boston" and "Philadelphia" are identified with particularity with no explanation or evidentiary support to establish that those were the ports that the Intrepid was, in fact, situated in.  Regardless, even assuming that the Intrepid was docked in the Philadelphia Navy Yard and the Boston Navy Yard, the Defendants

---

[2]It should be noted that Mr. McCurdy testified that he initially worked on kitchen patrol while serving on the Intrepid and did not move to the engine room until the time that the Intrepid left the Philadelphia port. (Exhibit 5, pp. 123-124).  Accordingly, it does not appear that there is any alleged exposure to asbestos in Philadelphia since the Defendants argue that Mr. McCurdy was exposed while he worked in the engine room.

17

included no facts upon which one could determine that both ports were federal enclaves as defined under federal law.  Rather, the Removing Defendants merely cite to encyclopedic web-sites, i.e., Wikipedia, to show the status of the two ports at issue.  In each case, the web pages simply note that the federal government had purchased the sites.  Under Pratt, mere federal ownership is insufficient to prove federal enclave status.  Rather, one must show that the state conferred exclusive jurisdiction to the federal government and that the federal government accepted jurisdiction in accordance with federal law.  The Notice of Removal is devoid of any facts supporting the legal status of the ports at issue and is, therefore, defective.

**IV.     There is no basis for federal officer jurisdiction in this case since there is no showing of a causal nexus between the Plaintiff's injuries and any alleged mandate from a federal officer.**

The Removing Defendants also seek removal pursuant to 28 U.S.C. § 1442(a)(1) claiming that it acted under the direction of a federal officer.  Under 28 U.S.C. 1442(a)(1), the movant must establish factually that they were acting at the direction of a federal officer.  "In order to remove an action to federal court under §144Z ... the movant's petition must show that he was an 'officer of the United States or any agency thereof, or person acting under him' and that he was acting 'under color of such office' when he did the act for which he is being sued." Swan v. Community Relations-Social Development Commission, 374 F.Supp. 9, 11 (E.D. Wis. 1974).  The fact that one is acting under color of such office "must affirmatively appear, not alone by a broad statement in the petition to that effect, but by direct averments which must exclude [the] possibility that any of their alleged acts was not justified by their federal duty." Michigan v. Banning, 88 F.Supp. 449, 450 (E.D. Mich. 1950) (citations omitted) (emphasis supplied).

18

These principles are derived from <u>Mesa v. California</u>, 489 U.S. 121, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989).  There, the United States Supreme Court made clear that the propriety of jurisdiction under §1442(a) required that the injuries at issue be causally related to acts performed at the direction of a federal officer and that a federal defense be available to the removing defendant.  <u>Id</u>. at 124-131.  Courts applying the principles in <u>Mesa</u> use a three prong test when examining the propriety of federal officer jurisdiction:

> 1) the removing party must be an officer or a "person" acting under a federal officer;
>
> 2) the removing defendant was acting at the direction of an officer of the United States and that a causal nexus exists between the defendant's actions under color of federal office and the plaintiff's claims; and
>
> 3) the removing defendant asserts a colorable federal defense.

<u>Faulk v. Owens-Corning Fiberglass Corp.</u>, 48 F. Supp. 2d 653 (E.D.Tex. 1999).  <u>See also</u>, <u>Ryan v. Dow Chemical Co.</u>, 781 F.Supp. 934 (E.D.N.Y. 1992); <u>Alsup v. 3-Day Blinds, Inc.</u>, 435 F. Supp. 2d 838 (2006).  The Removing Defendants have failed to satisfy all three requirements in their Notice of Removal.

> A.  Neither Garlock nor Greene Tweed have shown that they were persons acting under a federal officer at the time that the Plaintiff was aboard the U.S.S. Intrepid.

Normally, Plaintiffs challenging the first prong of <u>Mesa</u> will argue that a particular entity claiming to be a federal officer is not in fact a "person" and, therefore, not entitled to removal.  The Plaintiff here makes no such assertion and concedes that both Garlock and Greene Tweed are considered "persons" under prevailing federal case law.  However, there is absolutely no indication that any products manufactured by either Garlock or Greene Tweed were present on the U.S.S. Intrepid during the time that the Plaintiff was aboard.  Although the Plaintiff did recall

19

using pre-cut gaskets on occasion while aboard the Intrepid, he could not remember the manufacturer of the products.  (Exhibit 4, p. 25-26).  No Defendant pressed the Plaintiff for a description of either the gaskets or the packaging that they came in at the time of either of Mr. McCurdy's depositions.

The only other piece of evidence relating to the actual presence of the Removing Defendants's products on the Intrepid is an uncorroborated reference to U.S. Navy QPL# 16472-23-29, which purportedly designates both Garlock and Greene Tween products as "qualified products" for use on Navy vessels.  This document was not attached to the Notice of Removal, and therefore cannot currently be used as an evidentiary basis for the Removing Defendants' claims of federal jurisdiction.  Regardless, the fact that the Navy may have qualified the Removing Defendants' products for use on Navy ships does not mean they were actually present on any given ship at any given time or that they even contained asbestos.  In the absence of any proof that Garlock or Greene Tweed gaskets were actually on the Intrepid at the time of Mr. McCurdy's service, Garlock and Greene Tweed cannot argue that they were persons acting under a federal officer during the course of events at issue in this case.

> B.  There is no evidence that the Defendants acted at the direction of an officer nor any evidence of a causal nexus between the Plaintiff's injuries and any direction given by a federal officer.

In order for a private party to qualify for federal officer jurisdiction, he must establish that he was acting upon the orders of a federal officer.  That is, the removing party "must show that it effectively stands in the shoes of a federal employee and, as such, was required by the government to take actions that subjected it to liability under state law." Alsup, 435 F. Supp. 2d at 846.

> Put another way, a removing defendant must show that "at all
> times" it was "acting under express orders, control and directions
> of federal officers," and that its "involvement [in conduct giving
> rise to state-court liability] was 'strictly and solely at the behest of
> the federal government." *Ryan*, 781 F. Supp. at 947 (quoting
> *Comacho*, 868 F.2d at 486).

Id. Control of the federal government at the expense of a contractor is the determining factor.

The removing defendant has to show that the federal directive leaves it no option but to expose

itself to liability under applicable state law before it can avail itself of federal officer jurisdiction.

The defendants here must show that some federal entity's "direction and control of their

activities directly interfered with their ability to fulfill their state law obligation...." Freiberg v.

Swinerton & Walberg Property Services, Inc., 245 F. Supp. 2d 1144, 1155 (D. Colo. 2002).

In Good v. Armstrong World Industries, Inc., 914 F. Supp. 1125 (E.D. Pa. 1996), a

boilermaker suffering from asbestos-related injuries and who worked on naval ships was

removed to federal court by Westinghouse, the manufacturer of generators alleged to have caused

the Plaintiff's injuries.  Westinghouse argued, substantiated by an affidavit of a Westinghouse

employee, that the generators it supplied were designed and manufactured "pursuant to strict

direction and control of the United States Navy/Department of Navy." Id. at 1128.  After noting

that Westinghouse was unable to prove with any evidence where the exact source of the federal

directive came from, the court noted that

> Westinghouse's poor showing of the causal connection between
> the allegations of plaintiffs and its conduct taken under direction of
> a federal officer is also evidenced by its failure to set forth the
> substance of the regulations and specifications.  The complaint
> alleges personal injury based upon exposure to asbestos.  Neither
> the notice or the affidavit establishes that the Secretary of the Navy
> specified the use of asbestos in the design and manufacture of the
> turbine generators. ...  Neither the notice nor the affidavit
> establishes that a federal officer required the use of asbestos in the

21

> design or manufacture of the turbine generators.  In fact, neither of
> those documents ... even mention asbestos.

Id. at 1130.  The court subsequently ordered remand.

This result was echoed in McGillick v. World Trade Center Properties, LLC, 2004 WL

2049260 (S.D.N.Y. 2004), where plaintiffs involved in the clean-up effort at the World Trade

Center sued for respiratory injuries.  (Exhibit 10).  The case was removed on a variety of

grounds, including federal officer jurisdiction.  The basis for the federal officer argument, which

was supported by affidavit, was that the Occupational Safety and Health Administration (OSHA)

oversaw the work.  The affidavit stated that OSHA provided assistance and monitored the

condition of the air during the operation and provided safety gear as needed.  The court rejected

jurisdiction on those averments and noted that "[t]he statement does not evince the substantial

degree of direct and detailed federal control over the working conditions that courts have

required to assert section 1442 jurisdiction."  Id. at 3.  See Also, Virden v. Altria Group, Inc., 304

F. Supp. 2d 832 (N.D.W.V. 2004)(using a federally sanctioned testing procedures were not

federal directives sufficient to base federal jurisdiction).

In this case, the Defendants have provided no affidavits or described with any

particularity what precise directive or control exerted by the federal government prohibited them

from complying with state law.  The Removing Defendants have made no allegation that they

entered into any contract with the federal government to supply the Navy with gaskets and/or

packing nor has there been any attempt to verbalize with any particularity the naval

"specifications" that they believe they needed to comply with.  There is likewise no allegation

that the Navy required that Garlock or Greene Tweed asbestos gaskets or packing  be used on the

Intrepid at the time that Mr. McCurdy served.

The closest that the Removing Defendants come to showing that the Navy made any type of "specification" for the Removing Defendants is a mere reference to U.S. Navy QPL #17472-23-29, which, if one were to take the Removing Defendants at their word, purports to designate both Garlock and Greene Tweed gaskets as "qualified" products for use in the Navy. This document has yet to be produced, so one can only but speculate as to the "degree of direct and detailed federal control" that such document would have exerted over the Removing Defendants.[3] Regardless, the fact that the Navy may have approved certain products for their ships does not mean that they exerted necessary control over the manufacturers and suppliers of the products to allow Garlock and Greene Tweed, both private corporations, to actually step into the shoes of a federal officer. There is simply no indication that either Garlock or Greene Tweed acted strictly at the behest of the federal government.

Additionally, the Removing Defendants attempt to commute Mr. McCurdy's activities on the U.S.S. Intrepid onto themselves by pointing to testimony of Mr. McCurdy reflecting that his service with the Navy required that he follow orders of superior officers throughout his tenure on the U.S.S. Intrepid. The Defendants seem to indicate that orders given to Mr. McCurdy somehow makes the Removing Defendants themselves federal officers  This argument is simply obtuse. What the Removing Defendants ignore is that Mr. McCurdy is not the party seeking federal officer status in this case. There is absolutely no case law to support the notion that a private party who injures a person who is under the control of the federal government can turn

---

[3]The omission is hardly surprising because based on information and belief, QPLs generally reflect a long list of product manufacturers whose products have been approved for use by the US Navy.  QPLs are not military specifications which require how approved products are to be manufactured and packaged.

23

around and claim to be a federal officer themselves.  The Defendants must point to some

authority through specifications or contract or statute that <u>bestows</u> the status on <u>them</u>.  The

Removing Defendants have not done so.

Not only must the Removing Defendants show that they were subject to detailed and

specific directives of a federal officer, they must also show that there is a direct causal

relationship between the federal instruction and the injury sustained.  It is not enough that the

federal government exert control over the private party; the control or directive must directly

cause the party to be exposed to civil liability.  For example in <u>Arness v. Boeing North</u>

<u>American, Inc.</u>, 997 F. Supp. 1268 (C.D.Cal. 1998), plaintiffs filed suit when improperly stored

trichloroethylene (TCE) used to flush rocket engines during testing for the federal government

seeped into the neighbors' ground water and caused personal injuries and property damage.  The

case was removed on federal officer jurisdiction since the use of TCE was specifically required

by the federal government.  The case was remanded for lack of causal nexus.  In doing so, the

court noted that although the federal government did, in fact, require the use of TCE during

testing of the engines, it did not specify how the TCE was to be stored and used so as to force the

TCE to be released onto neighboring properties.

> BNA admits that the government did not specify that BNA take
> safeguards to prevent the release of TCE.  Plaintiffs are suing BNA
> based on its conduct resulting in the alleged release of TCE,
> including BNA's storage and disposal of TCE.  Thus, because the
> government did not specify safeguards that BNA must use, or
> restrict BNA's ability to implement safeguards, BNA was not
> acting under federal direction when it allegedly released the TCE.
> Rather, the acts relevant to Plaintiffs' suit occurred only "'under
> the general auspices of a federal officer."

<u>Id</u>. at 1275 (citations omitted).  <u>See Also</u> <u>Bahrs v. Hughes Aircraft Co.</u>, 795 F.Supp. 965 (D.Ariz.

24

1992)(in water pollution case, federal jurisdiction not present where federal contract did not specify how pollutant was to be disposed of); Williams v. General Electric Co., C.A. No. 1:04-CV-2762 (M.D. Pa. Aug. 22, 2005).  (Exhibit 11).

This rule of law is commonly seen in asbestos failure to warn cases.  In Freiberg v. Swinerton & Walberg Property Services, Inc., 245 F. Supp. 2d 1144 (D. Colo. 2002), five asbestos cases arising out of construction of buildings located at a nuclear weapons production facility were removed on the basis of federal officer jurisdiction.  In support of the motion, the defendants filed an affidavit averring that the work was conducted pursuant to a contract with the Department of Energy and that the defendants completed the work and "used materials that were specified in detail by the engineering and operating contractors." Id. at 1153-54.  After expressing doubt that the affidavit illustrated sufficient facts to show the degree of control necessary to establish that Swinerton was a federal officer, the court turned to the failure to warn aspect of the case.

> Unless an officer of the United States (or one acting under him) can justify what he did by reason of some official connection between the acts complained of and his official duties, the purpose of the statute to protect federal interests and immunities is not implicated and the proceeding is not removable.
>
> ***
>
> Defendants fail to apprehend the essence of the "under color" causal connection requirement.  They are being sued for unnecessarily and negligently causing their employees and other workers to be exposed to asbestos dust on the job and for failing to warn these employees and workers of the associated dangers. What they must establish for purpose of the §1442(a)(1) is that the government authority under which they worked required them to act as they did.  For purposes of Plaintiffs' failure to warn claims, for example, they must establish the DOE's direction and control of their activities directly interfered with their ability to fulfill their state law obligation to warn employees of safety hazards
>
> ***

25

> Nothing in Prout's affidavit or the government contracts ...
> establishes the requisite nexus between their construction and
> safety practices ... and government direction and control.

Id. at 1155-56.

Likewise in Faulk v. Owens-Corning Fiberglas Corp., 48 F. Supp. 2d 653 (E.D. Tex

1999), plaintiffs sued property owners for their asbestos related injuries based upon theories of

failure to warn.  The case was removed by the Defendants on the basis that federal officer

jurisdiction existed because the federal government directed the owners to produce Avgas,

butadiene, and steel according to federal specification on the premises where the Plaintiffs were

exposed to asbestos.  The court found no causal nexus between the federal control exerted over

the defendants and the plaintiffs' injuries and ordered remand.  Specifically, the court noted

> In this case, the Plaintiffs' complaint alleges injury from the
> Defendants' failure to warn about asbestos.  For the sake of
> argument, this Court concedes federal officer control as to
> Defendants' production Avgas, butadiene, and steel under federal
> regulations. But, according to the Defendants, there is a necessary
> causal nexus between *Defendants' federally-controlled production
> of Avgas, butadiene and steel under federal specifications* and
> Plaintiffs' complaint about the *Defendants' non-federally
> controlled failure to warn about asbestos.*  Causal nexus? Of
> course not.  Why not? Because the federal government provided no
> direction or control on warnings when using asbestos; moreover,
> the federal government did not prevent Defendants from taking
> their own safety precautions heeding state-law standards above the
> minimum standards incorporated in their federal contracts.

Id. at 663.  The court concluded that

> there are detailed, government specifications relating to the
> production of Avgas, butadiene and steel-nothing about warning
> about asbestos.  The federal officer remained completely silent as
> to whether to *warn* about the use of asbestos; this silence is fatal to
> the "causal nexus" necessary for the second prong [of *Mesa*].

Id. at 664.

In <u>Gauthe v. Asbestos Corp.</u>, 1997 WL 3255 (E.D.La. 1997), the plaintiff sued defendants for injuries sustained from exposure to asbestos sustained while building naval ships. (Exhibit 12). The case was removed on the basis of federal officer jurisdiction. Again, the court ordered remand based upon the lack of causal nexus. In doing so, the court turned to the failure to warn aspect of the plaintiff's claims.

> There is no evidence that the Government restricted or prohibited Avondale's ability to notify individuals of the presence of asbestos in the work environment. Assuming Avondale built ships under the direct supervision of the federal government, nothing about that supervision prevented Avondale from warning Mr. Gauthe about the dangers.

<u>Id</u>. at *3. <u>See Also</u> <u>Fortier v. AMPCO Pittsburgh Corp.</u>, 3:07-cv-00005 (WWE) (D.Conn March 5, 2007)(asbestos suppliers and/ manufacturers were unable to prove that the Navy "had the sole authority to dictate the warnings affixed to or provided with the equipment..." and were not entitled to federal officer status) (Exhibit 13).

This case is also a failure to warn case. Even assuming that the Removing Defendants were subject to clear and direct specifications of the federal government in regard to suppling asbestos-containing supplies to the U.S.S. Intrepid during the two years that Mr. McCurdy was aboard, the Defendants must also show that those very same specifications and directives prohibited the Removing Defendants from applying appropriate warnings to their products in compliance with state law. There has been no allegation nor any proffer of evidence in the Removing Defendants' Notice of Removal that they were in any way prevented from providing those warnings.

In fact, the Removing Defendants will be hard pressed to prove that they were prevented from making appropriate warnings by the U.S Navy. As far back as 1956, the United States

27

Navy promulgated criteria for the manner in which warnings were to be disseminated.  Attached

as Exhibit 14 is the Uniform Labeling Program for the U.S. Navy, which lays out the Navy's

specifications for the labeling of hazardous materials used on naval sites.  This document clearly

states that the scope of the specifications "applies to the labeling of all hazardous materials

throughout the Naval Establishment wherever distribution of hazardous chemicals or materials is

made to the actual consumer."  State law is not preempted, however.  The document states that

the specifications "are not intended to govern... the type of labels to be affixed by the

manufacturer.  (These are governed by State and Federal laws and regulations...)."   Accordingly,

it is clear that the Navy expected that manufacturers of hazardous materials would label their

products in accordance with state law.  Since the crux of Mr. McCurdy's claims relates to

Garlock and Greene Tweed's failure to warn of the dangerous propensities of their products and

there is no indication that the Navy inhibited the Removing Defendant's ability to label their

products in accordance with state law, remand is appropriate in this case.

### C.  The Removing Defendants have not asserted a colorable defense.

Finally, the Removing Defendants Notice of Removal is defective because they have

failed to properly allege and establish with evidentiary support that they have a colorable federal

defense.  The closest the Defendants come to asserting a defense is a citation to Boyle v. United

Technologies Corp., 487 U.S. 500 (1998), which lays out the federal contractor defense.  Notably

absent from the Notice of Removal is the actual requirements under federal law for asserting the

defense and any explanation by the Removing Defendants regarding why they are entitled to

assert it.

In Boyle v. United Technologies Corp., 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442

(1988), the United States Supreme Court laid out the elements for the common law federal

contractor defense.  First, the defendants must show that the federal government laid out

reasonable precise specifications.  Second, the defendants must show that they complied with the

federal specifications.  Finally, and most importantly, the defendants must show that they warned

the federal government of any dangers attributable to the nature of the federal contract where the

contractor appreciates the hazards and the federal government does not.  Id. at 512.  Good, 914 F.

Supp. at 1131.

     In Faulk v. Owens-Corning Fiberglas Corp., supra, the sufficiency of the defendants'

proffer relating to the availability of the federal contractor defense to the removing defendants is

examined.  After noting that the defendants had not provided any evidence that actual federal

specifications relating to the use of asbestos existed and that such omission was fatal to the

defendants' argument, the court turned to the third prong of the Boyle test.

> [T]here is no evidence that the Defendants provided the federal
> government with any warnings about asbestos; nor was there any
> evidence that the federal government prohibited Defendants from
> warning about the dangers of asbestos.  Furthermore, there is no
> evidence that the government independently knew of the danger of
> exposure to asbestos.  Finally, the federal government did not
> dictate any specifications regarding the *warning* about asbestos-
> containing products-let alone demand the Defendants insulate with
> asbestos-containing products.
>
> Although the Defendants have indeed "plead" a federal defense
> under the federal officer statute, it is not a "*colorable*" federal
> defense.  Defendants have provided this Court with no evidence
> supporting their *Boyle* defense under the federal officer statute; that
> is, Defendants have failed to significantly "color" their federal
> defense with any supporting evidence.  This Court notes, once
> again, that if there are significant doubts about the propriety of
> removal, those doubts should be resolved *against* removal.

Id. at 665-66.

The Removing Defendants in this case have likewise made no evidentiary showing to support the notion that they are entitled to the <u>Boyle</u> defense. Indeed, the Removing Defendants have not even alleged facts, substantiated or not, to support the third prong of <u>Mesa</u>. The Defendants have made no showing of any "reasonably precise specifications for <u>contract</u> performance." <u>Id</u>. at 665 (emphasis added). The Removing Defendants in this case are in essence claiming that they are federal <u>contractors</u> entitled to the federal <u>contractor</u> defense without producing any actual contract. They have produced no set of federal specifications, detailed or not, for any asbestos products that they supplied the Navy generally or the Intrepid specifically. They have not even shown that their product was on the Intrepid at the same time that Mr. McCurdy was stationed there.

Additionally, there is no allegation in the Notice of Removal that the Removing Defendants warned the government of the dangers of asbestos as required by <u>Boyle</u>. There is nothing stated in the Notice of Removal to even acknowledge that a federal contractor has a duty to warn the federal government under <u>Boyle</u>. Accordingly, the Defendants have failed to show that they have a colorable federal defense.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court remand this action to the Circuit Court for Baltimore City.

Respectfully submitted,

**/s/ *Sean D. Burns*** _____
Sean D. Burns
Federal Bar #27489

**/s/ *Steven W. Smith*** _____
Steven W. Smith
Federal Bar #05766

30

LAW OFFICES OF PETER G. ANGELOS, P.C.
One Charles Center, 22nd Floor
100 North Charles Street
Baltimore, Maryland 21201
(410) 649-2000

Attorneys for Plaintiffs

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 25th day of October, 2007, a copy of the MOTION FOR REMAND was served via e-filing upon all counsel.

/s/ **Sean D. Burns**
Sean D. Burns #27489
Law Offices of Peter G. Angelos
One Charles Center, 22nd Floor
100 N. Charles Street
Baltimore, MD 21201

31

# EXHIBIT 2

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF MARYLAND

MICHAEL McCURDY, *et ux.*                    *

               Plaintiffs          *      Case No. 1:07-CV-02681-AMD

v.                                           *      JUDGE ANDRE M. DAVIS

JOHN CRANE HOUDAILLE, INC., *et al.*         *

               Defendants         *

**************

PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION
TO MOTION FOR REMAND FOR LACK OF
FEDERAL JURISDICTION

Plaintiffs, by their undersigned attorneys, pursuant to 28 U.S.C.A., Section 1447 ( c )

hereby files this Reply to Defendants' Opposition to Motion for Remand and moves this Court to remand

the above-captioned case to the Circuit Court for Baltimore City. The grounds in support are more fully

set forth below.

I.      **The Removing Defendants Have Not Shown That Mr. Mccurdy Was Exposed to Respirable
        Asbestos Fibers While Aboard the U.S.S. Intrepid.**

In order for the Removing Defendants to establish federal jurisdiction, they must be able to at the

very least establish a federal exposure to asbestos. Despite the Defendant's assertions, evidence does not

exist of the Plaintiff's exposure to airborne asbestos while aboard the U.S.S. Intrepid, the only site at

issue in this removal. The Defendants are quick to point to the various portions of Mr. McCurdy's

deposition which acknowledge that asbestos insulation appeared to have been applied at some point of

time on the U.S.S. Intrepid. However, in order for a viable asbestos claim to be pursued against a

manufacturer of an asbestos product, there must be proof of <u>respirable</u> asbestos fibers. This is true under

both Federal and Maryland case law. <u>Eagle-Picher Ind., Inc. v. Balbos</u>, 326 Md. 179, 604 A.2d 445

(1992); <u>In re Armstrong World Ind. Inc.</u>, 285 B.R. 8 64 (2002).

In other words, the fact that asbestos insulation may have been affixed to the Intrepid does not mean that Mr. McCurdy was exposed to respirable asbestos fibers capable of giving rise to a compensable injury. Without airborne asbestos fibers, there is no legally recognized exposure. In this case, each of the instances where Mr. McCurdy thought he may have been exposed to asbestos related to insulation that was already in place and that he did not recall being manipulated in any way during his time on the U.S.S. Intrepid. Specifically, Mr. McCurdy testified that he never saw any of the insulation on the pipes or turbines worked on or manipulated while he was aboard the U.S.S. Intrepid, and he recalled that the pipe insulation was covered with coats of paint. He further could not recall the manufacturers of any asbestos-containing products, including gaskets, used on the Intrepid, and there was absolutely no evidence submitted by the removing Defendants as to the composition of any of the products he identified on the ship. This evidence clearly is insufficient to establish that a "federal" exposure occurred on the U.S.S. Intrepid.

To bolster their argument that Mr. McCurdy suffered a legally cognizable exposure on the Intrepid, the Removing Defendants point to Dr. Gabrielson's report which the Defendants claim shows a causal connection between Mr. McCurdy's time a board the Intrepid and his injury. In doing so, the Removing Defendants misrepresent Dr, Gabrielson's conclusions. Specifically, Dr. Gabrielson stated that

> Mr. McCurdy <u>may</u> have also been exposed to asbestos while on the U.S.S. Intrepid aircraft carrier from approximately 1969 to 1971. <u>Based on an assumption that Mr. McCurdy inhaled significant amounts of asbestos as a result of these exposures</u>, it is my opinion to a reasonable degree of medical certainty that asbestos exposure was the cause of his mesothelioma. (Exhibit 1)(Emphasis added)

Dr. Gabrielson's qualified opinion was based on information provided to him by Mr. McCurdy's counsel before Mr. McCurdy was deposed. At deposition, of course, it became clear that Mr. McCurdy was not exposed to respirable airborne asbestos fibers while on the Intrepid because the insulation he

recalled seeing on the ship was never applied or torn out while he was on the ship.

Despite the complete lack of evidence that Mr. McCurdy was actually exposed to asbestos while on the Intrepid, the Removing Defendants argue that they have somehow satisfied their burden.  In doing so, the Removing Defendants cite to <u>Mesa v. California</u>, 489 U.S. 121 (1989), and imply that they only need make a "colorable" showing of asbestos exposure.  This is simply not true.  <u>Mesa</u>'s relaxed "colorable" requirement is strictly limited to a federal officer removal and further limited solely to the officer's assertion of a federal defense.  <u>Mesa</u> in no way, shape or form changes the general burden that a removing party must meet in order to establish federal jurisdiction.  Since the Removing Defendant's have failed to establish that Mr. McCurdy was exposed to respirable airborne asbestos while on the Intrepid, remand is warranted.

**II.**     **Federal Enclave Jurisdiction is Inappropriate.**

      A.     Navy ships are not federal enclaves even while at port.

While the Removing Defendants agree that Navy ships are not federal enclaves under applicable federal law, they nevertheless argue that the fact that the U.S.S. Intrepid was at port for unspecified periods of time between its time at sea at alleged federal enclaves allows for federal jurisdiction in this case.  Specifically, the Removing Defendants argue that the fact that Mr. McCurdy testified that the U.S.S. Intrepid was in dry-dock at some of the ports at issue places the naval vessel squarely within enclave status.  The Removing Defendants cite to no authority for this proposition.

The Removing Defendants' argument flies directly in the face of <u>Anderson v. Crown Cork and Seal</u>, 93 F. Supp. 2d 697 (E.D. Va. 2000), where it was held that the fact that a naval vessel at port in a federal enclave did not lose its identity as a ship.  The Removing Defendants try to distinguish the cases cited in Mr. McCurdy's Motion for Remand by arguing that the fact that the U.S.S. Intrepid was dry-docked for undetermined periods of time places the naval vessels on federal land.  This argument ignores that in <u>Anderson</u>, the U.S.S. Laffey was in dry-dock while at Norfolk Naval Shipyard.  <u>Id</u>. at 699.  The fact

3

that the U.S.S. Laffey was dry-docked did not change the conclusion of the U.S. District Court that the Navy ship was not a federal enclave and that removal was improper.

The rationale of the <u>Anderson</u> court was based on the fact that the plaintiff was stationed exclusively on the U.S.S. Laffey and no where else.  He was not stationed on any other ship nor did he work out of a shipyard.  Rather, his duties were based solely on a naval vessel that occasionally went to port.  The court stated that the U.S.S. Laffey "never was a federal enclave, but simply moved in and out of federal enclaves."  <u>Id</u>. at 702.  Accordingly, the court concluded that the plaintiff's exposure occurred on the naval vessel and "not as a result of the Laffey's location 'in' the Shipyard."  <u>Id</u>. at 701.

The facts in this case are identical to the facts of <u>Anderson</u>.  Mr. McCurdy was stationed exclusively on the U.S.S. Intrepid.  Mr. McCurdy worked on no other naval ships and he was never stationed at any shipyards.  These facts are not disputed.  The fact that the U.S.S. Intrepid may have been dry-docked at some time during its journeys is irrelevant under <u>Anderson</u>.  First, the U.S.S. Laffey was itself dry-docked at Norfolk Naval Shipyard.  Second, it is the relationship of the plaintiff to the federal property that is dispositive in these cases.  Mr. McCurdy was not in any way associated with any Navy shipyard.  He worked as a Navy seaman on one ship that simply passed through ports when necessary.  Under <u>Anderson</u>, Mr. McCurdy's alleged federal exposures occurred on the U.S.S. Intrepid, no matter where the ship may have been located at any given time.

B.    <u>Removing Defendants still have not established the existence of a federal enclave.</u>

The burden of establishing the facts necessary to show the propriety of this removal lies squarely with the Removing Defendants.  Since the Removing Defendants claim that federal jurisdiction here is derived by virtue of the fact that Mr. McCurdy was exposed on certain federal enclaves, they must establish that the ports in question are, in fact, enclaves.  They have not done so.

In their response, the Removing Defendants rely solely upon the testimony of Mr. McCurdy to establish what ports the U.S.S. Intrepid visited during its time at sea.  They argue that the fact that Mr.

4

McCurdy testified that the U.S.S. Intrepid docked at a Navy base in Philadelphia and at what he "assumed" was a Navy base in Boston. The Removing Defendants conclude that this testimony is sufficient to positively identify which precise ports the U.S.S. Intrepid entered in those two cities. The Plaintiff disagrees for the reasons stated in his opening motion. The fact that Mr. McCurdy identified a city and testified that he thought the ports were naval yards does not establish the identities of the ports with any specificity. See Anderson, 93 F. Supp. 2d at 700, fn. 2 (where there was confusion regarding the identity of one of two naval ports in Norfolk, Virginia). Regardless, even assuming that the testimony of Mr. McCurdy does establish that the U.S.S. Intrepid docked at both the Philadelphia Navy Yard and the Boston Navy Yard, the Removing Defendants have not established that the three ports identified by Mr. McCurdy were federal enclaves as defined under federal law where he was present.

As discussed in Pratt v. Kelly, 585 F.2d 692 (4th Cir. 1978), a property, even if under federal control, is not a federal enclave unless it can be established that the state holding the property ceded jurisdiction to the federal government and that the federal government accepted the cession. Until both acts happen, a property cannot be considered a federal enclave as described under Article I, Section 8, clause 17 of the U.S. Constitution. In support of their contention that the three ports are federal enclaves, the Removing Defendants cite to Non-Resident Taxpayers Association v. Philadelphia, 478 F.2d 456 (3rd Cir. 1973), which makes a passing reference to the fact that the Philadelphia Naval Yard is a federal enclave. The Removing Defendants then make a conclusory statement that "[l]ikewise, the U.S. Naval base in Boston and at Quonset Point, Rhode Island are federal enclaves." (Defs' Resp. at p. 10) There was no citation or evidential support for the conclusion.

It is not clear in the text of the court's opinion in Non-Resident Taxpayers what factual basis was relied upon by the Third Circuit regarding its description of the Philadelphia Naval Yard as a federal enclave. Indeed, the status of the shipyard does not seem to even be at issue in the case. This is not to question the Third Circuit Court of Appeals' statement. But if the Removing Defendants intend to use

5

reported case law to fulfill its burden and substantiate its claim of federal jurisdiction, the case relied upon

should reflect the basis for the conclusion that jurisdiction over a particular piece of property was

voluntarily ceded by a state to the federal government and accepted by the federal government.

Regardless, the Philadelphia port does not appear at issue in this case since it does not appear from any of

the Defendants' filings that there is any genuine claim that Mr. McCurdy was exposed to asbestos while

the U.S.S. Intrepid was docked in Philadelphia.  Mr. McCurdy testified that he worked kitchen patrol

during that time period and did not move to the engine room until after the Intrepid left Philadelphia.

Since the only exposures to asbestos that the Removing Defendants claim that Mr. McCurdy incurred on

the Intrepid occurred in the engine room, the Philadelphia location cannot be at issue here.

There is no basis, by citation, factual basis or otherwise,  provided by the Removing Defendants

for their claim that the states of Massachusetts or Rhode Island ceded jurisdiction to the federal

government and that such jurisdiction was accepted.  No statute or act of any legislative body nor any

deed has been presented by the Removing Defendants to establish the legal enclave status of Quonset

Point or the Boston Naval Yard.  Nor have they provided any citation to a court opinion where such

materials were discussed and ruled upon.  Instead, the Removing Defendants ask this court to assume that

a military base is an enclave when Mr. McCurdy was present over 30 years ago and take judicial notice of

its status as a federal enclave.[1]  In order for a court to take judicial notice of a fact, Rule 201 of the Federal

Rules of Evidence requires that the fact be "(1) generally known within the territorial jurisdiction of the

trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot

reasonable be questioned."  The technical requirements relating to the creation of an enclave, i.e., the

voluntary cession of a particular property by a state and the acceptance of the property by the federal

---

[1]  The Removing Defendants quote <u>Celli v. Shoell</u>, 995 F. Supp. 1337, 1341 (D. Utah 1998), as stating that it is a matter of common sense "to assume that a United States military base is a federal enclave...."  (Defs' Resp. at 9 (emphasis added)).  That quote does not appear in <u>Celli</u> anywhere.

6

government, is certainly not something that would be generally known in Maryland, especially in light of the fact that the properties in question are located out of state. Furthermore, the enclave status of a property requires research into the terms of its purported transfer from both sides of the transaction. Such information is not normally found in a dictionary, on a common map, or in any other resource "whose accuracy cannot be reasonably questioned." The Removing Defendants have been unable or unwilling to produce whatever deeds or other documents establishing the enclave status of the three properties in question and simply seek to eschew their burden on removal by shifting the onus to this Court to declare judicial notice without any direction to whatever reliable resource one is to rely upon in identifying the properties as federal enclaves nor any explanation as to how the enclave status of the properties is commonly known. There is, therefore, no basis for the Removing Defendants' request, and removal of this case based upon federal enclave jurisdiction is inappropriate.

III. __The Removing Defendants Have Made No Showing That They Are Entitled to Federal Officer Jurisdiction.__

   A.   The Removing Defendants have not shown that their products were actually aboard the U.S.S. Intrepid.

In their Response to Mr. McCurdy's Motion for Remand, the Removing Defendants make no showing that any of their products were actually present or applied on the U.S.S. Intrepid. In fact, the Removing Defendants tellingly make no allegation that any of their products were ever used aboard the U.S.S. Intrepid. Instead, the Removing Defendants rely wholly upon two Qualified Product Lists ("QPLs") dated January 30, 1956 and June 28, 1951, which reflect gasket products qualified for military use. First, it must be noted that these lists were promulgated fifteen and twenty years prior to Mr. McCurdy's tour on the U.S.S. Intrepid, which is too removed a time period for them to be relevant to Mr. McCurdy's exposure. Regardless, the QPLs submitted by the Removing Defendants in no way places any particular product in any particular place at any particular time.

The fact that the federal government may have qualified the Removing Defendants' products for

7

use does not actually place those products on the U.S.S. Intrepid.  Many manufacturers of gaskets were on the very same QPLs submitted by the Removing Defendants.  There is no way of telling from the lists which of those products were actually being used by the military nor the specific site those products were located.  See generally, Marshall v. Celotex Corp., 651 F. Supp. 389 (E.D. Mich. 1987)(discussing QPLs and their failure to place a particular product at a particular site).  Indeed, the Removing Defendants acknowledge this shortcoming by noting that the whole basis for their claim to federal officer jurisdiction was only "[t]o the extent that Garlock and Greene Tweed did supply asbestos-containing gasket or packing products to the U.S. Navy, that were used by the Plaintiff...." (Emphasis added) (Defs' Resp., p. 17.)  Yet no allegation nor any probative evidence was submitted by the Removing Defendants to show to what extent, if any, that their products were on the U.S.S. Intrepid.  This omission is fatal to the Removing Defendants' claims that federal officer jurisdiction exists in this case.  Without a showing that their products were actually used on the U.S.S. Intrepid during the time period that Mr. McCurdy served there, they cannot claim to be under the directive of the federal government in any way that is at all relevant to this case.

        B.      <u>The Removing Defendants have not made a showing that they were under direct or detailed control of the federal government nor that there was any type of causal nexus between the  alleged control and Mr. McCurdy's injury.</u>

In their response, the Removing Defendants argue that they satisfied the second prong of <u>Mesa</u> by producing the two Military Qualified Products Lists dated 1951 and 1956.  The Removing Defendants argue that these QPLs establish that they were under direct federal control when supplying their products to the U.S.S. Intrepid.  It should be noted once again that there is absolutely no evidence that the Removing Defendants' products were present on the Intrepid, and the QPLs are, likewise, irrelevant to the question of whether Mr. McCurdy's injuries were proximately caused by the Removing Defendants' actions performed under "federal directive" since those QPLs in no way place those products on the U.S.S. Intrepid.  It should further be reiterated that the QPLs in question are seriously out dated in terms

of the time period that Mr. McCurdy served on the Intrepid.  Regardless, the QPLs prove facially

defective in establishing federal jurisdiction for the very fact that they do not show any type of

specification requiring the use of asbestos.

Federal law is clear that the type of control necessary to establish jurisdiction under 28 U.S.C.

§1442(a)(1) is the kind that leaves the governmental contractor absolutely no option but to breach its

duties under state law.  Specifically, the Removing Defendants must show that they were "required to take

actions that subjected [them] to liability...."  Alsup v. 3-Day Blinds, Inc., 435 F. Supp. 2d 838, 846 (2006).

As noted in Good v. Armstrong World Industries, Inc., 914 F. Supp. 1125 (E.D. Penn. 1996), in asbestos

cases, federal specifications must specifically show that asbestos was required to be used by the military,

and failure to bring forth the particular specification regarding the necessity of asbestos-containing

products constitutes a failure to establish federal jurisdiction.

In this case, the QPLs in question simply lay out a list of products qualified for use by the United

States Military from which, one presumes, materials could be ordered for use on various military projects.

Nowhere in the proffered QPLs are any specifications laid out for any of the products listed.  Nowhere on

the QPLs is there any indication that the inclusion of asbestos in any of the products listed was required

by the federal government.  There is no indication in the QPLs and no evidence submitted by the

Removing Defendants relating to how the products became "qualified" or if asbestos was mandated by the

federal government before the inclusion of the Removing Defendants' products in the QPLs could occur.

In short, the Removing Defendants have proffered a menu of qualified products, but no directive

or specification.  There is no indication or statement contained in the QPLs that would suggest that either

Garlock or Greene Tweed was required by the federal government to use asbestos in its products, thereby

forcing them to expose themselves to civil liability.  Accordingly, the Removing Defendants have failed to

prove the existence of federal jurisdiction in this case.

More importantly, the Removing Defendants have utterly ignored the fact that this case is a pure

failure to warn case. There is not one mention nor one argument in the Removing Defendants' response disputing that federal law requires that a defendant prove that the federal government in some way prohibited or hindered its ability to fulfill its obligation under state law and warn end-users of the dangers of using its products. See Freiberg v. Swinerton & Walberg Property Services, Inc., 245 F. Supp. 2d 1144 (D. Colo. 2002); Faulk v. Owens-Corning Fiberglas Corp., 48 F. Supp. 2d 653 (E.D. Tex 1999). The QPLs make no mention regarding the packaging and warning requirements for any of the products listed, and the Removing Defendants' response is completely silent on the issue. This silence is understandable in light of the Uniform Labeling Program for the U.S. Navy discussed in Mr. McCurdy's opening motion, which makes clear that the U.S. Navy expected that manufacturers of products supplied to it affix warnings in accordance with federal law. Accordingly, the Removing Defendants' removal is baseless, and remand is appropriate.

Finally, the Removing Defendants again seem to imply that the fact that Mr. McCurdy was a serviceman and under the directives of his superior officers while aboard the Intrepid means that they can somehow commandeer any orders that may have been given to Mr. McCurdy for themselves and transform themselves into federal officers. As pointed out in Mr. McCurdy's Motion for Remand, it is not Mr. McCurdy who is seeking federal officer status. The only party entitled to removal under 28 U.S.C. 1442(a)(1), is the federal officer. 28 USC. §1442(a) ("A civil action . . . commenced in a State court against [a federal officer] may be removed by them. . . .") (Emphasis added). Therefore, it is the Removing Defendants' obligation to show that they specifically were under federal direction. Mr. McCurdy's status is irrelevant. Regardless, the Removing Defendants cannot possibly argue that Mr. McCurdy was ordered or directed by the federal government to put asbestos in Garlock and Greene Tweed's products and then forbid him to warn himself of the dangers of those products.

C.    The Removing Defendants have not properly asserted a federal defense.

In order to establish that they are entitled to removal under 28 U.S.C. §1442, the Removing

10

Defendants have to make a showing that they qualify for some federal defense. In this case, the Removing Defendants claim that they are entitled to the government contractor defense as described in <u>Boyle v. United Technologies, Inc</u>, 487 U.S. 500 (1998), and are quick to point out that they need not show that their defense is meritorious, but merely colorable. Yet, the Removing Defendants have not even alleged the basic requirements of the <u>Boyle</u> defense, let alone "colored" the allegations with any factual proffer. In particular, <u>Boyle</u> requires that the removing party show that it warned the federal government of any dangers attributable to the federal contract. The Removing Defendants have completely ignored this prong of <u>Boyle</u> both in their Notice of Removal and in their response to Mr. McCurdy's Motion for Remand. In the absence of even a mere allegation in any document filed in this Court relating to the third prong of <u>Boyle</u>, there can be no argument that the Removing defendants have raised a "colorable" defense.

Additionally, there is nothing in the Removing Defendants' response to show any sort of "reasonably precise specifications for contract performance" which is required under <u>Boyle</u>. They have proffered a list of products that were considered acceptable for purchase by the Navy. Those QPLs were dated June 28, 1951 and January 30, 1956, respectively. Mr. McCurdy served on the U.S.S. Intrepid well over a decade later. The QPLs consist of a list of products and their manufacturers. Noticeably absent in the attachment is any type of contractual specification. Accordingly, there is no colorable government contractor defense.

WHEREFORE, Plaintiffs respectfully requests that this Honorable Court remand this action to the Circuit Court for Baltimore City.

<div style="margin-left:40%">

Respectfully submitted,

<u>/s/ *Sean D. Burns*</u>
Sean D. Burns
Federal Bar #27489

</div>

11

/s/ *Steven W. Smith*
Steven W. Smith
Federal Bar #05766

LAW OFFICES OF PETER G. ANGELOS, P.C.
One Charles Center, 22nd Floor
100 North Charles Street
Baltimore, Maryland 21201
(410) 649-2000

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th day of November, 2007, a copy of the Plaintiffs' Reply to

Defendants' Opposition to Motion for Remand for Lack of Federal Jurisdiction was served via e-filing

upon all counsel.

/s/ **Sean D. Burns**
Sean D. Burns #27489

LAW OFFICES OF PETER G. ANGELOS
one Charles Center, 22nd Floor
100 N. Charles Street
Baltimore, MD 21201
(410) 649-2000

Attorneys for Plaintiffs

12

# EXHIBIT 3

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND
Northern Division

MICHAEL McCURDY, *et ux.*        *

        Plaintiffs        *    Civil Action No. 1:07-CV-02681 AMD

v.        *    JUDGE ANDRE M. DAVIS

JOHN CRANE HOUDAILLE, INC., *et al.*   *

        Defendants        *

**************

## MOTION TO REOPEN
## ADMINISTRATIVELY CLOSED MATTER

Plaintiff, Michael McCurdy, by his undersigned attorneys, and pursuant to FRCP 7(b) and this Court's November 19, 2007 Order, files the following Motion to Reopen Administratively Closed Matter for good cause shown regarding his Motion to Remand filed in this matter. As grounds therefore, the Plaintiff states as follows:

1.    Plaintiff is seeking to reopen this recently administratively closed asbestos-related malignant mesothelioma case on the grounds that Defendants' removal to federal court was wholly improper without basis in law or fact. As such, Plaintiff contends removal was not filed in good faith and Defendants' dilatory tactics should not be condoned by this Court.

2.    On October 2, 2007, Defendants Garlock Sealings Technologies, LLC (Garlock) and Greene Tweed & Co. (Greene Tweed) improperly removed this matter from the Circuit Court for Baltimore City. On October 25, 2007, Mr. McCurdy filed a Motion for Remand for Lack of Federal Jurisdiction. Defendants filed their response to Plaintiff's remand

1

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND
Northern Division

| | | |
|---|---|---|
| **MICHAEL McCURDY,** *et ux.* | * | |
| **Plaintiffs** | * | **Civil Action No. 1:07-CV-02681 AMD** |
| **v.** | * | **JUDGE ANDRE M. DAVIS** |
| **JOHN CRANE HOUDAILLE, INC.,** *et al.* | * | |
| **Defendants** | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## MOTION TO REOPEN
## ADMINISTRATIVELY CLOSED MATTER

Plaintiff, Michael McCurdy, by his undersigned attorneys, and pursuant to FRCP 7(b) and this Court's November 19, 2007 Order, files the following Motion to Reopen Administratively Closed Matter for good cause shown regarding his Motion to Remand filed in this matter. As grounds therefore, the Plaintiff states as follows:

1.      Plaintiff is seeking to reopen this recently administratively closed asbestos-related malignant mesothelioma case on the grounds that Defendants' removal to federal court was wholly improper without basis in law or fact. As such, Plaintiff contends removal was not filed in good faith and Defendants' dilatory tactics should not be condoned by this Court.

2.      On October 2, 2007, Defendants Garlock Sealings Technologies, LLC (Garlock) and Greene Tweed & Co. (Greene Tweed) improperly removed this matter from the Circuit Court for Baltimore City. On October 25, 2007, Mr. McCurdy filed a Motion for Remand for Lack of Federal Jurisdiction. Defendants filed their response to Plaintiff's remand

1

motion on November 13, 2007.  On November 16, 2007, the Judicial Panel on Multidistrict

Litigation (MDL) issued a conditional transfer order in the case at bar.  Subsequently, on

November 19, 2007, your Honor ordered that this matter be administratively closed, noting the

option to reopen the matter for good cause shown, in light of the conditional transfer order issued

by the MDL.  Thus,  Plaintiff files the instant motion to reopen this matter and for the Court to

review the remand and removal filings given that this matter was improperly removed and to

ensure Plaintiff will not unfairly lose his upcoming state court trial date.

    3.      On November 29, 2007 Plaintiff filed his reply to Defendants' opposition to the

remand motion making absolutely clear that no federal jurisdiction exists in this case.

    4.      Sadly, Mr. McCurdy passed away this month due to contracting malignant

mesothelioma as a result of his exposure to asbestos fibers used within products manufactured or

sold by several companies, including Removing Defendants, Garlock and Greene Tweed.

Mesothelioma is a terminal disease, which as in the case at bar, almost always results in death

within twelve to eighteen months from the date of diagnosis.  Its only known cause in the U.S.A.

is exposure to asbestos.

    5.      The Circuit Court for Baltimore City set an expedited trial date for Mr. McCurdy

to begin on March 11, 2008.  Mr. McCurdy was diagnosed with mesothelioma in April of 2007.

    6.      If Mr. McCurdy's case is not remanded promptly, discovery deadlines in the state

court action will pass and Mr. McCurdy will lose his March, 2008 trial date.[1]  According to the

Pre-Trial Schedule agreed upon by the parties in the state court action, <u>January 8, 2008 shall be</u>

---

[1] Mr. McCurdy's case in the Circuit Court for Baltimore City was not originally included within the March 11, 2008 trial cluster: <u>See</u> Exhibit 1.  By Order of the Circuit Court for Baltimore City dated July 19, 2007, however, Mr. McCurdy's case was added to this March, 2008 trial group without objection by defendants.  <u>See</u> Exhibit 2.

2

<u>the last day</u> for Plaintiffs to conduct fact witness depositions who plaintiffs are able to voluntarily produce for deposition without a subpoena from a defendant. (Exhibit 1). In addition, on January 24, 2008 Defendants are to identify their fact witnesses for trial and on February 11, 2008 defendants are to submit defense export reports based on their experts' review of Plaintiff's diagnosing materials. Exhibit 1. Mr. McCurdy's pathology materials and chest films are currently in the possession of the defendants.

  7.  As Plaintiff argued in his Motion to Remand and his reply to Defendants' opposition, removal of Mr. McCurdy's state court action has no basis and was improper:

    a.  Plaintiff had no federal exposure to asbestos and is making <u>no claim against any defendant</u>, including Removing Defendants, that he was exposed to asbestos while serving aboard the U.S. Navy aircraft carrier, U.S.S. Intrepid. In Plaintiff's state court complaint, interrogatory answers and deposition testimony, he makes no allegations of asbestos exposure during his time in the U.S. Navy.

    b.  Removing Defendants have cited no authority to support their argument that Navy ships are not federal enclaves when docked at port. These Defendants, moreover, failed to inform this Court in their Notice of Removal of cases within the Fourth Circuit which hold <u>directly contrary</u> to their position advocated in this case that service work aboard a U.S. Navy ship is a federal enclave.

    c.  Removing Defendants provided <u>no evidence</u> to establish a causal nexus between the cause of Plaintiff's injury and their actions which were allegedly based on a federal officer's direction. <u>No</u> affidavit, testimony or documentary evidence was produced in Defendants' filings to support their claim that their asbestos-containing products were even used

3

on the U.S.S. Intrepid at any time or that they acted under the control of a federal officer.

        d.     Plaintiffs are proceeding <u>only</u> on their state failure to warn theories of liability for Plaintiff's asbestos exposure to Defendants' products while he worked as a boiler and furnace technician in the Baltimore Metropolitan area for many years.

    8.     Defendants' apparent goal is to have this case transferred to the MDL-857 proceedings where over 100,000 asbestos claims have sat dormant for years.  Based on experience, Plaintiffs' counsel will <u>never</u> be heard on their remand motion in MDL.

    9.     The case at bar possesses striking similarities to the facts that were at issue before this Honorable Court in *Sledz v. Flintkote*, Co. 209 F.Supp. 2d 559 (D.Md. 2002) in which your Honor granted a similar Plaintiff's Motion to Remand.  As the Court may recall, in *Sledz*, the Plaintiff also suffered from mesothelioma contracted as a result of his occupational exposure to asbestos.  As here, the Plaintiff filed suit in the Circuit Court for Baltimore City against several defendants. Defendant Flintkote removed the case to federal district court on the grounds of diversity of citizenship. Ultimately, your Honor granted Plaintiff's Motion to Remand holding that the one-year period for removing cases on the basis of diversity jurisdiction began to run when the Plaintiff filed his initial complaint in state court.

    10.    Although in the case at bar the Defendants do not seek removal on diversity of citizenship grounds, several factors exist in this cause of action that were also present in *Sledz*. For instance, in both cases, defendants wrongfully removed Plaintiffs who suffered from mesothelioma and were terminally ill.  Also, as in *Sledz*, the case at bar has made substantial progress in state court prior to its removal to federal court. *See Sledz,* 209 F. Supp. 2d at 563.  As noted above, there is a January 8, 2008 fact witness deadline as well as a February 11, 2008

<div align="center">4</div>

defense expert report deadline pending. In addition, there is an imminent trial date of March 11, 2008, another factor your Honor took into consideration in *Sledz*. Id. at 564. Furthermore, like in *Sledz*, a Conditional Transfer Order to the Judicial Panel on Multi-district litigation has been issued, which (as your Honor pointed out in *Sledz*) would further *cause a substantial "slowing down" in the progress of this case to conclusion. Id.* (Emphasis supplied).

11.     Given that the Defendants Garlock and Greene Tweed's Removal of this matter was improper and the upcoming state court pre-trial deadlines, expedited consideration is warranted to ensure Plaintiff's trial will go forward according to the current trial schedule in state court. Any delay in considering Plaintiff's Motion to Remand would jeopardize the Plaintiff's state court case from moving forward timely.

WHEREFORE, Plaintiff respectfully requests this Honorable Court grant Plaintiff's Motion to Reopen Administratively Closed Matter.

Respectfully submitted,

*/s/ Sean D. Burns*
Sean D. Burns
Federal Bar #27489

*/s/ Steven W. Smith*
Steven W. Smith
Federal Bar #05766

LAW OFFICES OF PETER G. ANGELOS, P.C.
One Charles Center, 22nd Floor
100 North Charles Street
Baltimore, Maryland 21201
(410) 649-2000

Attorneys for Plaintiffs

5

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of December, 2007, a copy of the Plaintiffs' Motion to

Reopen Administratively Closed Matter was served via e-filing upon all counsel.

/s/ **Sean D. Burns**
Sean D. Burns #27489

LAW OFFICES OF PETER G. ANGELOS
one Charles Center, 22nd Floor
100 N. Charles Street
Baltimore, MD 21201
(410) 649-2000

Attorneys for Plaintiffs

# EXHIBIT 4

| | |
|---|---|
| IN RE:  **BALTIMORE CITY**<br>**ASBESTOS CASES** | \*   **MARCH 11, 2008 MESOTHELIOMA**<br>**TRIAL CLUSTER (M-90)**<br>\*<br>**CONSOLIDATED CASE NO.**<br>\*   **24X07000065** |

<div align="center">*************</div>

| | |
|---|---|
| **CHARLES WEBB, et al.** | \*   **IN THE** |
| **Plaintiffs** | \*   **CIRCUIT COURT** |
| **v.** | \*   **FOR** |
| **ACandS, INC., et al.** | \*   **BALTIMORE CITY** |
| **Defendants** | \*   **(LAW OFFICES OF PETER G. ANGELOS)** |
| | \* |
| **CASE AFFECTED:** | \* |
| **MICHAEL MCCURDY** | \*   **CASE NO.  24X07000235**<br>\* |

<div align="center">*************</div>

### PLAINTIFF'S SECOND SUPPLEMENTAL AND/OR AMENDED
### ANSWERS TO DEFENDANTS' JOINT INTERROGATORIES

Comes now the above captioned Plaintiff by the undersigned attorneys, and for

Answers to Interrogatories and Request for Production of Documents propounded by the

Defendants, states as follows:

### PRELIMINARY STATEMENT/GENERAL OBJECTION

Plaintiff generally objects to the subject discovery requests on the grounds that they are

unduly burdensome, harassing, overly broad and vague.  Plaintiff objects on the grounds that

these requests assume the truth of facts not proven or facts not in evidence.  Plaintiff objects

on the grounds that the subject discovery requests seek information which is immaterial, not

relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff objects on the grounds that all or some of these discovery requests seek information or

materials which have been gathered or prepared in the course of litigation or which are otherwise protected by the attorney/client privilege, the attorney work product doctrine or by other applicable privileges.

Nearly every interrogatory of Defendants designates extensive and overly broad periods of time or requests information without any limitation or specification of a particular period of time rendering such interrogatory as overly broad, unduly burdensome, oppressive, harassing and annoying.  Defendants' interrogatories are repetitive, redundant or overlapping as to subject matter and are therefore burdensome, oppressive, annoying and harassing. Defendants' interrogatories are vague, ambiguous, compound, complex and at times may be unintelligible.

Plaintiff objects to all or some of Defendants' interrogatories to the extent that they seek discovery of information which, pursuant to the Scheduling Orders issued in these consolidated cases has previously been provided by Plaintiff to Defendants, is in the process of being provided or is to be provided on some future specified date.

Plaintiff objects to the instructions and definitions as supplied by Defendants with regard to these interrogatories since the definitions supplied by Defendants are overly broad, vague and often inconsistent with the normal usage of such words and the instructions are overly broad, burdensome and constitute an unreasonable expansion of the interrogatories themselves.  As a result, Plaintiff is not bound by the instructions and/or definitions supplied by Defendants and shall respond to the requests in a manner consistent with a normal understanding of the language and terms used and to the extent necessary to fairly and fully answer the interrogatories.  In filing these Answers to Interrogatories, Plaintiff withdraws any and all previously provided answers which are in any manner inconsistent with the information provided herein.

The information supplied in these Answers may not be based solely on the knowledge of the Plaintiff, but may include the knowledge of the Plaintiff, Plaintiff's agents, representatives and attorneys, unless privileged.  The word usage and sentence structure may be that of the attorney assisting in the preparation of these Answers and does not necessarily purport to be the precise language of the Plaintiff.

Each answer is derived from a review of documents and other evidence generated through discovery in this and other litigation.  The Plaintiff may not have direct first-hand knowledge of all the facts set forth in these Answers, but is informed that the numerous sources, persons and documents relied upon and/or referred to herein do support the information provided as of the date of signature.  Plaintiff continues to investigate issues relevant to this lawsuit and specifically reserve the right to amend and/or supplement these Answers pursuant to continued discovery and to introduce additional evidence at trial which is obtained during the course of Plaintiff's further investigation.

Plaintiff adopts and incorporates this Preliminary Statement/General Objection into each response, as if the same were fully reprinted.  Without waiving these objections but in reliance thereon, Plaintiff states the following:

## INTERROGATORIES AND SUPPLEMENTAL AND/OR AMENDED ANSWERS

91.     For each job at which you allege you have been exposed, or are being exposed to asbestos-containing products manufactured, distributed or sold by this Defendant, state:
(a)     The employer's name and address;
(b)     Your job title and work description, including an exact description of job duties and responsibilities.
(c)     The duration of the job (month/day/year through month/day/year);
(d)     The duration of your exposure to asbestos on that job month/day/year through month/day/year);
(e)     The location of the job;
(f)     The identity of your foreman or supervisor;
(g)     The identity of your co-workers;
(h)     A description of the types of asbestos-containing products to which you claim exposure (i.e., pipe covering, block, cement, cloth, etc.);
(i)     The identity of the supplier or distributor of each type of asbestos-containing

product;
(j)     The identity of the manufacturer(s) of each type of asbestos-containing product;
        The trade or brand names of each type of asbestos-containing products.

## SUPPLEMENTAL AND/OR AMENDED ANSWER:

Plaintiff objects to this interrogatory to the extent that it seeks information beyond that

relating to Plaintiff's exposure to the asbestos products of the direct defendants.  Without

waiving this objection and in relation to the direct defendants only, Plaintiff states that prior to

and after the filing of Plaintiff's lawsuit, Plaintiff and his attorneys, have conducted a continuing

investigation in an attempt to gather all available information concerning Plaintiff's exposure to

the asbestos products of the direct defendants.  As a result of this investigation, it is now

believed that Plaintiff was exposed to the asbestos products manufactured, sold, distributed

and/or installed as follows:

1.     (a)     Yeaton Co.
       (b)     Boiler/furnace technician.
       (c-d)   1967 - 1969
       (e)     Plaintiff worked mostly residential work, but also some commercial.
               Plaintiff will supplement this answer.  Also, see the deposition of Mr.
               McCurdy.

2.     (a)     American Oil Co./BP
       (b)     Boiler/furnace technician.
       (c-d)   1971- 1977
       (e)     Plaintiff worked mostly residential work, but also some commercial.
               Plaintiff will supplement this answer.  Also, see the deposition of Mr.
               McCurdy.

3.     (a)     Southern Fule Oil
               Bel Air, Md.
       (b)     Boiler/furnace technician.
       (c-d)   1977 - 1978
       (e)     Plaintiff worked mostly residential work, but also some commercial.
               Plaintiff will supplement this answer.  Also, see the deposition of Mr.
               McCurdy.

4.     (a)     Fred Gross
               Baltimore, Md.
       (b)     Boiler/furnace technician.
       (c-d)   1978 - 1982

      (e)     Plaintiff worked mostly residential work, but also some commercial. Plaintiff will supplement this answer.  Also, see the deposition of Mr. McCurdy.

5.     (a)     Marex
                  Baltimore, Md.
     (b)     Boiler/furnace technician.
     (c-d)  1983
     (e)     Plaintiff worked mostly residential work, but also some commercial. Plaintiff will supplement this answer.  Also, see the deposition of Mr. McCurdy.

     (f)-(g) Plaintiff's investigation is continuing.
     (h)     Tape, gaskets, rope/packing, cements, refractories, boiler equipment and furnaces.
     (i)      E.L. Stebbing, John Hampshire, MCIC, Eddco supply, R.E. Michael.
     (j-k)  Garlock tape, gasket, rope/packing and blankets; Durabla gaskets; Goodyear gaskets;  A.W. Chesterton gaskets, rope/packing; Certainteed; Bondex; Kaiser Gypsum; Union Carbide; International Paper; Hercules; B.F. Foster; Palmetto/Green Tweed tape, gaskets, rope/packing; Conwed; Cleaver Brooks; Kewanee; Keeler; Erie City; Weil-McLain; A.O. Smith; Burnham; Riley Stoker; Superior; Dunham Bush; H.B. Smith; Columbia Boiler; Columbia Heating; Georgia Pacific; National Boilers.

I DO SOLEMNLY DECLARE AND AFFIRM, under the penalties of perjury, that the contents of the foregoing Answers to Interrogatories are true and correct to the best of my knowledge, information and belief.

_____

MICHAEL McCURDY

Respectfully submitted,

/s/ *Charles A. Candon*
Charles A. Candon

LAW OFFICES OF PETER G. ANGELOS, P.C.
One Charles Center, 22nd Floor
100 North Charles Street
Baltimore, Maryland 21201
(410) 649-2000

Attorneys for Plaintiffs

## LexisNexis File & Serve Transaction Receipt

| | |
|---|---|
| **Transaction ID:** | 16419776 |
| **Submitted by:** | Karen Tutin, Angelos, Peter G PC-Baltimore |
| **Authorized by:** | Charles A Candon, Angelos, Peter G PC-Baltimore |
| **Authorize and file on:** | Sep 24 2007 3:24PM EDT |

| | |
|---|---|
| **Court:** | Baltimore City Circuit Court |
| **Division/Courtroom:** | Not applicable |
| **Case Class:** | Civil |
| **Case Type:** | Personal Injury-Asbestos |
| **Case Number:** | 24x07000065 |
| **Case Name:** | Webb, Charles vs A C and S Inc |

| | |
|---|---|
| **Transaction Option:** | File and Serve |
| **Billing Reference:** | TMST62989 |

### Documents List

**1 Document(s)**

| Attached Document, 6 Pages   Document ID: 11406353 | | PDF Format  \|  Original Format | |
|---|---|---|---|
| **Document Type:** Answer to Interrogatories | **Access:** Public | **Statutory Fee:** $0.00 | **Linked:** |
| **Document title:** Plaintiff's Second Supplemental and or Amended Answers to Defendants' Joint Interrogatories (McCurdy) | | | |

Expand All

⊟ **Sending Parties (1)**

| Party | Party Type | Attorney | Firm | Attorney Type |
|---|---|---|---|---|
| McCurdy, Michael J | Plaintiff | Candon, Charles A | Angelos, Peter G PC-Baltimore | Attorney in Charge |

⊞ **Recipients (105)**

  ⊞ Service List (105)

  ⊟ Additional Recipients (0)

⊞ **Case Parties**



 LexisNexis®  |  About LexisNexis | Terms & Conditions | Privacy | Customer Support - 1-888-529-7587
Copyright © 2007 LexisNexis®. All rights reserved.

# EXHIBIT 5

Page 1

IN THE CIRCUIT COURT FOR BALTIMORE CITY

| | |
|---|---|
| IN RE: PERSONAL INJURY ASBESTOS LITIGATION | * |
| * * * * * * | * * * * * |
| CHARLES WEBB, et al., | * March 11, 2008 |
| | * Meso Trial Group |
| Plaintiffs | * Consolidated No. |
| v. | * 24-X-07-000065 |
| | * |
| ACandS, INC., et al., | * |
| | * |
| Defendants | * |
| * * * * * * | * * * * * |
| CASE AFFECTED: | * |
| MICHAEL MCCURDY | * 24-X-07-000235 |
| * * * * * * | * * * * * |

VIDEOTAPED DEPOSITION OF MICHAEL JAMES MCCURDY


          The Videotaped Deposition of Michael James

McCurdy was taken on Friday, September 21, 2007,

commencing at 10:15 a.m. at the Law Offices of

Peter G. Angelos, One Charles Center, 100 North

Charles Street, 22nd Floor, Baltimore, Maryland and

was reported by Denise M. Thomas, Notary Public.

EVANS REPORTING SERVICE
Munsey Building
7 North Calvert Street
Suite 705
Baltimore, Maryland 21202
(410) 727-7100

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service
092ded7d-7d7e-4017-9fb1-d9f6e2df6b63

Michael James McCurdy 9/21/07

Page 2

1   APPEARANCES:
2   CHARLES CANDON, ESQUIRE
        Law Offices of Peter G. Angelos
3       On behalf of the Plaintiffs
4   SCOTT RICHMOND, ESQUIRE
        Venable LLP
5       On behalf of the Defendants, American Standard
        and International Paper
6
    DONALD MERINGER, ESQUIRE
7       Meringer, Zois & Quigg
        On behalf of the Defendant, General Electric
8
    DAVID W. ALLEN, ESQUIRE
9       Goodell, DeVries, Leech & Dann
        On behalf of the Defendants, Hopeman Brothers,
10      Inc., Hampshire Industries, Zurn Industries,
        Wayne Manufacturing and Lofton Corporation
11
    PETER WOOLSON, ESQUIRE
12      Robinson Woolson
        On behalf of the Defendant, John Crane
13
    THOMAS P. BERNIER, ESQUIRE
14      Segal, McCambridge, Singer & Mahoney
        On behalf of the Defendants, Greene Tweed,
15      Garlock Sealing Technologies, LLC, Anchor
        Packing Company and Cooper Industries
16
    LAURA D. ABENES, ESQUIRE
17      Gavett and Datt
        On behalf of the Defendants, Selby Battersby,
18      J.H. France and Keeler Dorr-Oliver
19  VINCENT J. PALMIOTTO, ESQUIRE
        Miles & Stockbridge, P.C.
20      On behalf of the Defendants, Cleaver-Brooks,
        CertainTeed Corporation, Georgia Pacific,
21      Superior Boiler Works and R.E. Michel

Page 3

1   APPEARANCES, (cont'd.)
2   STEVEN PARROTT, ESQUIRE
        DeHay & Elliston, L.L.P.
3       On behalf of the Defendants, Bayer Cropscience,
        Foster Wheeler, Union Carbide Corporation,
4       Burnham and Riley Stoker Corp.
5   JOHN BOYD, ESQUIRE
        Lord & Whip, P.A.
6       On behalf of the Defendant, Hercules Chemical
        Company
7
    NEIL J. MACDONALD, ESQUIRE
8       Hartel, Kane, DeSantis, MacDonald & Howie, LLP
        On behalf of the Defendants, Crane Co. and
9       Square D Company
10  MICHAEL OSBORN, ESQUIRE
        Brassel, Baldwin, Kagan & May, P.A.
11      On behalf of the Defendant, Conwed
12  JEREMY NORTH, ESQUIRE
        North & Cobb
13      On behalf of the Defendant, Uniroyal, Inc.
14  JAMES T. SMITH, ESQUIRE
        Bodie, Nagle, Dolina, Smith & Hobbs
15      On behalf of the Defendants, E.L. Stebbing and
        MCIC
16
    JOEL M. NEWPORT, ESQUIRE
17      Moore & Jackson, LLC
        On behalf of the Defendants, Wallace & Gale,
18      Kaiser-Gypsum and Columbia Boiler
19  JEANNIE PITTILLO KAUFFMAN, ESQUIRE
        Bacon, Thornton & Palmer, LLP
20      On behalf of the Defendants, Bondex
        International, Inc. and RPM
21

Page 4

1   APPEARANCES, (cont'd.)
2   JOSEPH C. WICH, JR., ESQUIRE
        Venable LLP
3       On behalf of the Defendants, The Goodyear
        Tire & Rubber Company
4
    PHILIP KULINSKI, ESQUIRE
5   W. THOMAS LAWRIE, ESQUIRE
        Evert Weathersby Houff
6       On behalf of the Defendant, Viacom, Inc.,
        Successor by merger to CBS Corporation, f/k/a
7       Westinghouse Electric Corporation
8   DAVID A. SELTZER, ESQUIRE
        Wilson, Elser, Moskowitz, Edelman & Dicker, LLP
9       On behalf of the Defendant, Oakfabco
10  ROBERT RICHARDS, ESQUIRE
        DeCaro, Doran, Siciliano, Gallagher &
11      DeBlasis, LLP
        On behalf of the Defendant, A.O. Smith
12      Corporation
13
14
15
16
17
18
19
20
21

Page 5

1              PROCEEDINGS
2              * * * * * * *
3       MR. CANDON:  We have all agreed that
4   the appearance page will stand instead of all of us
5   introducing ourselves.
6       Is there anything anybody wants to say,
7   any objections?
8       MR. BERNIER:  Yeah.  Can we have an
9   understanding that an objection by a single counsel
10  will count for objections by all counsel?
11      MR. CANDON:  That's okay with me.
12      MR. BERNIER:  Okay.  And that
13  objections are as to form and all substantive
14  objections are preserved?
15      MR. CANDON:  Correct.  I have no
16  problem with that.  Okay.
17      THE VIDEO OPERATOR:  Here begins the
18  deposition of Michael McCurdy.  The time is now
19  10:19:59 on September 21st, 2007.  This deposition
20  is being conducted at the Offices of Peter Angelos
21  located at 100 North Charles Street, 22nd floor,

2  (Pages 2 to 5)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

092ded7d-7d7e-4017-9fb1-d9f6e2df6b63

Michael James McCurdy 9/21/07

Page 10

1   Mergenthaler?
2      A   I was trained to be a boiler, furnace,
3   burner heating technician.
4      Q   And you joined the Navy in the reserves
5   upon getting out of high school?
6      A   Yes, sir.
7      Q   And I believe you did your two week
8   basic training up in the Great Lakes?
9      A   Correct.
10     Q   And then you came home?
11     A   Um-hmm.  Yes.
12     Q   And went into active duty in '69 until
13  '71?
14     A   Correct.
15     Q   And you were stationed upon what ship
16  during --
17     A   The USS Intrepid.
18     Q   And what was your job?
19     A   I was a machinist's mate.
20     Q   Do you believe you were exposed to any
21  asbestos in the Navy?

Page 11

1      A   I was around it, yes.
2      Q   Okay.  Were you ever around -- well,
3   what was it on?
4      A   Anything that was hot, pipes, turbines.
5      Q   Were you ever around any of that
6   equipment when it was worked on?
7      A   No.
8      Q   Did -- was there anything on top of the
9   pipe covering or the turbines other than insulation?
10     A   Coats of paint.
11     Q   Okay.  What was your job -- what did
12  you actually do while you were in the Navy?
13     A   I'm trying to remember what the actual
14  title was, but I controlled the speed of one of the
15  engines.
16     Q   Okay.  So you would stand at a control
17  panel?
18     A   Correct.
19     Q   Okay.  If you had down time in the
20  Navy, what were you told to do?
21     A   Clean it and paint it.

Page 12

1      Q   Okay.  Now, you are married?
2      A   Yes, sir.
3      Q   To who?
4      A   Anna Theresa.
5      Q   And when did you get married?
6      A   May 27th, 1973.
7      Q   So you have been married --
8      A   Thirty-four years.
9      Q   And your wife is a registered nurse?
10     A   Yes, sir.
11     Q   Works at Johns Hopkins?
12     A   Yes, sir.
13     Q   For how long?
14     A   Fifteen years.
15     Q   And you have -- what types of things do
16  you enjoy doing with your wife in the past?
17     A   Travel, socialize with -- we have a lot
18  of friends, being in the business that I'm in.  We
19  like going out to eat, the grandchildren, enjoy the
20  family.
21     Q   Okay.  And your business is a 7-Eleven.

Page 13

1   And we will get into that later today.
2      A   Yes, sir.
3      Q   Okay.  You have two children.  Angela
4   Lang is how old?
5      A   Thirty-two, 33.
6      Q   And she's married?
7      A   Yes, sir.
8      Q   And what is her -- she is a certified
9   dietitian, I believe?
10     A   Yes, sir.
11     Q   And the baby of the family, who is 29,
12  is Melissa McCurdy, correct?
13     A   Correct.
14     Q   And what is her job?
15     A   She is an attorney.
16     Q   Okay.  Does your wife or any of your
17  children have any lung or cancer problems?
18     A   No.
19     Q   And I believe Angela has two children?
20     A   Two grandchildren.  Yes.  Right.
21     Q   You have two grandchildren?

4  (Pages 10 to 13)

Court Reporting in                    Evans Reporting Service          Over 20 years of
Baltimore/Washington                    800-256-8410               award-winning service
                                                                092ded7d-7d7e-4017-9fb1-d9f6e2df6b63

Michael James McCurdy 9/21/07

Page 30

1    A    Yeah. There was some premixed and then
2  there was the powder.
3    Q    Okay. Gaskets, rope, premixed cement
4  and powdered cement?
5    A    Yes, sir.
6    Q    Was there anything else that you recall
7  using if you had to wrap something around a stove
8  pipe, let's say?
9         MR. BERNIER: Objection.
10   A    We used the --
11   Q    You can answer, sir.
12   A    We used the tape, the asbestos tape.
13   Q    All right. Let me go through each
14  type. Okay?
15        What would you use the asbestos tape
16  for in the maintenance of a boiler?
17   A    Asbestos tape we would wrap the smoke
18  pipe with at the seams. Sometimes I would make some
19  small gaskets out of it.
20   Q    Okay. What was the consistency of the
21  tape?

Page 31

1    A    It was thicker than normal paper, about
2  two and a half inches wide, came in a roll of about
3  200, 250 feet.
4    Q    Okay. The gaskets, what would you use
5  the gaskets for in the maintenance of boilers from
6  '67 to '81, '82?
7    A    If the flue passages or the clean-outs
8  had gaskets, I would have to replace them, the rear
9  flue and sometimes the front panels.
10   Q    Okay. And what would you use the
11  rope -- well, let me back up a second. I apologize.
12        Describe the gaskets to us. What did
13  they look like?
14   A    They were white, they were preformed
15  and cut to whatever specifications the boiler
16  manufacturers required.
17   Q    Okay. Now, the rope, what would the
18  rope be used for on the maintenance to the boilers
19  from '67 to '82?
20   A    Again, it was on clean-out doors and
21  panels.

Page 32

1    Q    And what did the rope look like?
2    A    It was about a half of an inch diameter
3  and was like weaved. It came in a roll.
4    Q    What color?
5    A    White.
6    Q    Okay. The premixed cement, what did
7  that come in?
8    A    A can.
9    Q    Okay. And what was that used for?
10   A    Again, to seal clean-outs and access
11  panels.
12   Q    Okay. And the asbestos powder, what
13  did -- what was that used for?
14   A    The same thing, but I also used it to
15  cap off fireboxes inside the boilers and repair
16  maybe the fronts of the boilers.
17   Q    Okay. Do you know the name or
18  manufacturer of the asbestos tape you used during
19  your career?
20   A    Gurlock (phonetic) and Palmetto.
21   Q    And how do you know the names Garlock

Page 33

1  and Palmetto in association with the asbestos tape?
2         MR. BERNIER: Objection.
3    A    It was written on the boxes.
4         MR. CANDON: Let me interrupt. There
5  was an objection to the form of that question?
6         MR. BERNIER: Can we go off the record?
7         MR. CANDON: Sure.
8         THE VIDEO OPERATOR: Going off record
9  at 10:43:22.
10        (Whereupon, discussion held off the
11  record.)
12        THE VIDEO OPERATOR: Back on record at
13  10:43:33.
14        BY MR. CANDON:
15   Q    Sir, spell the word -- not Palmetto.
16  Spell the other word you just told us that made the
17  tape.
18   A    G-U-R-L-O-C-K.
19   Q    Okay. Gurlock.
20        Okay. And how do you know the name --
21  I'm going to say Garlock.

9 (Pages 30 to 33)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service
092ded7d-7d7e-4017-9fb1-d9f6e2df6b63

Michael James McCurdy 9/21/07

Page 46

1    Q    During this time period when you were
2    using these gaskets, when you would install a new
3    gasket on an old boiler that you were maintaining,
4    what, if anything, did you have to replace?
5             MR. BERNIER: Objection.
6    A    You would have to remove the old
7    gasket.
8    Q    And how would you remove the old
9    gaskets?
10    A    Putty knife, hammer, chisel. It
11    depends.
12    Q    Okay. When, if ever, did you have to
13    use -- well, describe using a chisel to take out an
14    old gasket.
15             MR. BERNIER: Objection. Charlie, can
16    I have a continuing objection on any gasket
17    questions, then I won't have to interrupt you?
18             MR. CANDON: If you will tell me why
19    you have an objection to them.
20             MR. BERNIER: I mean, if we can go off
21    the record.

Page 47

1             MR. CANDON: That's fine. We can go
2    off the record.
3             MR. BERNIER: I don't want to do it in
4    front of your client.
5             MR. CANDON: That's fine.
6             THE VIDEO OPERATOR: Off record at
7    10:54:42.
8             (Whereupon, witness not present.)
9             MR. BERNIER: He was specifically asked
10    at the discovery deposition if tape and the rope
11    were the only Garlock and Palmetto products that he
12    worked with at each site, and each time, he
13    specifically said yes. He never mentioned gaskets,
14    never said he worked with gaskets, never identified
15    Garlock gaskets, never identified Palmetto gaskets
16    at any time. In fact, he specifically said he
17    didn't.
18             And for that reason, anything to do
19    with gaskets, I'm reserving all my objections as to
20    it as a courtesy to you. I would rather not be
21    sitting here and object to every question relating

Page 48

1    to gaskets.
2             MR. CANDON: That's fine. If that's
3    the objection, it's fine with me.
4             MR. BERNIER: Okay.
5             (Whereupon, witness present.)
6             THE VIDEO OPERATOR: Going back on
7    record at 10:56:55.
8             BY MR. CANDON:
9    Q    Okay. Sir, counsel and I had a
10    discussion off the record or off the video but on
11    the stenograph record.
12             Before we did that, we were talking
13    about removal of old gaskets, the Garlock and
14    Palmetto gaskets you had discussed.
15             MR. BERNIER: Objection. Different
16    grounds.
17             MR. CANDON: Oh, okay. You are right.
18    I forgot where I was. I apologize.
19             BY MR. CANDON:
20    Q    Okay. We were talking about removal of
21    gaskets. And you were describing using a putty

Page 49

1    knife. Did you ever use any other tool to remove
2    gaskets?
3    A    A putty knife pretty much got it off of
4    it, chisel, and then I would have to clean the
5    surface with a wire brush.
6    Q    Okay. When you would chisel the old
7    gaskets off, what, if anything, did you see in the
8    air?
9    A    Oh, it made some dust. It made dust.
10    Q    And when you took the wire brush to
11    scrape --
12    A    Lots of dust.
13    Q    Okay. And what did that dust come from
14    when you wire brushed it and scraped?
15             MR. BERNIER: Objection.
16    A    I was removing the product.
17    Q    Okay. And were you able to -- are you
18    able to tell us the name or manufacturer of the old
19    gaskets you were removing?
20    A    Gurlock and Palmetto.
21    Q    And how could you tell the old gaskets

13 (Pages 46 to 49)

Court Reporting in
Baltimore/Washington                 Evans Reporting Service
                                          800-256-8410                 Over 20 years of
                                                                    award-winning service
                                                          092ded7d-7d7e-4017-9fb1-d9f6e2df6b63

Michael James McCurdy 9/21/07

Page 50

1  you were removing?
2      A    They were stamped.
3      Q    Okay. And how often during your career
4  would you engage in the removal of the Palmetto or
5  Gurlock gasket?
6      A    All the time.
7      Q    Okay. Okay. Thank you.
8          Okay. During the maintenance of the
9  boilers from '67 to '82, other than using new rope,
10 did you ever encounter any other rope?
11     A    Yes, sir.
12     Q    And what would you have to do to the
13 old rope?
14     A    If it was deteriorated enough, I would
15 have to replace it.
16     Q    And how would you go about removing the
17 old?
18     A    Putty knife, sometimes hammer and
19 chisel on rope.
20     Q    And when you were removing the old rope
21 on a maintenance job, what, if anything, did you see

Page 51

1  in the air?
2      A    Dust.
3      Q    And were you ever able to tell whose
4  rope you were removing?
5      A    On the rope, no, sir.
6      Q    Okay. Then on the -- okay. Let's talk
7  about the installation of new boilers.
8          Okay. Let me ask you this. You gave
9  us a list of boilers that you maintained. Do you
10 believe there were more boilers than that?
11     A    Yes, sir.
12     Q    Sir, you recall being in here two days
13 ago and being asked a lot of questions by counsel?
14     A    Yes, sir.
15     Q    And they asked you questions fairly
16 similar to the questions I'm asking you, correct?
17     A    Yes, sir.
18     Q    And you were asked then to name the
19 names of boilers -- well, let me do it this way, see
20 if I can do it this way, and then if I have to go
21 back, I will do it that way.

Page 52

1          We were talking about the installation
2  of new boilers. Okay? Do you know the name or
3  manufacturer of the new boilers you would install?
4      A    New boilers?
5      Q    Yes, sir.
6      A    Columbia, Burnham, Weil-McLain. I
7  believe I got involved with Nationals.
8      Q    Okay.
9      A    I can't --
10     Q    The National boiler -- you've mentioned
11 the other boilers. Was the National boiler any
12 different from the other boilers in --
13     A    No, sir.
14     Q    -- how your work was affected?
15     A    No, sir.
16     Q    When, if ever, would you -- okay.
17 That's fine.
18         On the boilers you would maintain --
19 I'm flip-flopping, and I apologize, but I want to --
20 there is one specific thing I'm interested in, if I
21 can find it. So I apologize, I'm going to have to

Page 53

1  take a second.
2          Okay. You gave a deposition two days
3  ago, Wednesday, in this same room, a lot of the same
4  attorneys here. And the defense counsel was asking
5  you -- and on page 54, lines 12 through 18 is what
6  I'm going to show him. Page 54, lines 12 through
7  18. Okay? And I'm going to show these lines to
8  you, sir, and ask for you to read them.
9          MR. PARROTT: I object to your doing
10 that.
11     Q    You were asked -- I'm going to read you
12 the question. While you worked at Yeaton, do you
13 remember the names or manufacturers of the boilers
14 you worked on? And then this is your answer. Okay?
15     A    You want me to read the answer?
16     Q    No, I don't. I want to know if that
17 refreshes your recollection as to --
18     A    Yes, sir.
19         MR. PARROTT: I object.
20     Q    Are there any other boilers you now
21 recall that you maintained during your time with

14  (Pages 50 to 53)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service
092ded7d-7d7e-4017-9fb1-d9f6e2df6b63

Michael James McCurdy 9/21/07

Page 66

1 maintain the boilers you installed, the ones we have
2 talked about?
3     A    As long as they remained our customer,
4 I was pretty much the one to go in.
5     Q    And how often would you maintain a
6 boiler?
7     A    Every year. Once a year.
8     Q    And let's say -- what, if any, original
9 asbestos that was on the boiler would remain after
10 about five services?
11         MR. BERNIER: Objection.
12         MR. RICHMOND: Objection.
13     Q    You can answer.
14     A    It would probably all be replaced by
15 then.
16     Q    So even on a Columbia boiler where it
17 came with the gasket and rope in place and
18 assembled, during your maintenance, what, if
19 anything, would you do to the gasket and rope?
20         MR. NEWPORT: Objection.
21     A    It would have to be replaced.

Page 67

1     Q    And what, if anything, did you see in
2 the air when you were doing that?
3         MR. NEWPORT: Objection.
4     A    Dust.
5     Q    Okay. I told you I would come back to
6 the Hercules cement, and here I am.
7         You said it did not produce dust during
8 application?
9     A    Yes, sir.
10     Q    Are you okay?
11     A    Um-hmm.
12     Q    After it was installed, when, if ever,
13 did you come in contact with the Hercules cement?
14         MR. BOYD: Objection.
15     A    Probably the next year when I did the
16 maintenance.
17     Q    And how did you know it was Hercules
18 cement?
19     A    I put it on.
20     Q    Okay. And how would you -- what, if
21 anything, would you do to the Hercules cement that

Page 68

1 was already on the boilers?
2     A    I would have to break it loose, chisel
3 it off, wire brush it down, clean it up, clean up
4 the surface so I could reseal it back up.
5     Q    And what, if anything, did you see in
6 the air when you did that?
7     A    It was dusty then.
8     Q    Okay. And where would that dust go?
9     A    All over the place.
10     Q    And how often during your career did
11 you know you were removing Hercules cement that you
12 had applied?
13     A    All the time.
14     Q    Okay. We are leaving boilers. We are
15 going to talk about furnaces. Okay?
16         And what was the split of your time
17 between boilers and furnaces, you know, if you can
18 give us --
19     A    About 50/50.
20     Q    Okay. So when you installed -- you
21 installed furnaces, correct?

Page 69

1     A    No.
2     Q    Oh, you just maintained them?
3     A    Right.
4     Q    Okay. In -- well, do you know who made
5 the furnaces?
6     A    Bryant, Carrier.
7     Q    I think you told us Holland?
8     A    Holland. Oh, yeah, the old Hollands,
9 yeah.
10     Q    Okay. What, if any, asbestos products
11 were on furnaces?
12     A    All of them. All of the products.
13     Q    Okay. Which manufacturers were on the
14 furnaces?
15     A    Which manufacturers were on the
16 furnaces?
17     Q    Well, no, no. I apologize.
18         You said you used all the asbestos
19 products?
20     A    Yes, sir.
21     Q    Which manufacturers of the asbestos

18 (Pages 66 to 69)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service
092ded7d-7d7e-4017-9fb1-d9f6e2df6b63

Michael James McCurdy 9/21/07

Page 114

1   true today?

2     A   On the packaging?

3     Q   Right.

4     A   Well, I must have misunderstood or

5   whatever because, you know, when a package came with

6   a boiler, it had so many things in it, so many

7   parts, especially on a sectional boiler. I mean,

8   yeah, you know, the boiler's manufacturer's name

9   could have been on there because their manual was in

10   it.

11     Q   You don't know who put all those parts

12   in with the materials, do you?

13     A   No, sir.

14     Q   And you talked about a manual being in

15   with some of them. Is it correct that early on in

16   your -- when you started installing boilers, you

17   would look at the manual to see what it says, and at

18   some point, you took a manual, kept it in your

19   truck, and that's the manual you would refer to?

20     A   Yes, sir.

21     Q   Okay. And do you remember what year it

Page 115

1   was when you put that first manual in your truck and

2   referred to it?

3     A   As soon as I started out.

4     Q   Okay. And you would use that as sort

5   of your Bible throughout your career?

6     A   Sure.

7     Q   Okay. Now I want to ask you about a

8   product that you said you used during the

9   maintenance of boilers and furnaces, and that was

10   the loose material in a bag.

11     A   Yes, sir.

12     Q   Remember that?

13     And, as I understand it, that material

14   came in a 50 to 60-pound bag?

15     A   Yes, sir.

16     Q   And it was an Armstrong or a

17   Johns-Manville product, one of the two?

18     A   Yes, sir.

19     Q   Okay. And it was sort of a loose

20   material, correct?

21     A   Yes, sir.

Page 116

1     Q   All right. And you would have to take

2   it out of the bag, mix it with water and put it on

3   whatever installation you were putting on, correct?

4     A   And we also mixed in a refractory with

5   it, too.

6     Q   Right.

7     And the refractory you told us you

8   didn't think had asbestos in it?

9     A   No, sir.

10     Q   That was used to, I think you said, to

11   make it a good consistency, that sort of --

12     A   It was like a cement.

13     Q   And I asked you if you had read

14   anything else that was on this bag of asbestos, and

15   you mentioned you couldn't remember what else was

16   written on there?

17     A   No, sir.

18     Q   Okay. You don't remember what

19   instructions or warnings may have been on that bag,

20   do you?

21     A   No, sir.

Page 117

1     Q   All right. Well, thank you,

2   Mr. McCurdy. For now, those are my questions. Oh,

3   I want to back up one other time.

4     When you were in the Navy, as I

5   understand it, you went to the reserves in '67?

6     A   Yes, sir.

7     Q   You went active duty '69 through '71,

8   correct? ·

9     A   Yes, sir.

10     Q   At any time during your time in the

11   Navy, did the Navy ever warn you about the hazards

12   of asbestos?

13     A   No, sir.

14     Q   Did they ever give you a respirator on

15   board ship that was approved by the United States

16   Bureau of Mines?

17     A   No, sir.

18     Q   Did they share with you what is called

19   a Navy minimum specifications manual that they had

20   published in 1946?

21     A   No, sir.

30 (Pages 114 to 117)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

092ded7d-7d7e-4017-9fb1-d9f6e2df6b63

Michael James McCurdy 9/21/07

## Page 118

1    MR. PARROTT: Okay. All right.
2  Mr. McCurdy, I appreciate you answering my
3  questions. Some other attorneys have a few
4  questions for you.
5    CROSS EXAMINATION
6    BY MR. PALMIOTTO:
7    Q   Sir, how are you doing? My name is
8  Vince Palmiotto. We met the other day. And I
9  represent R.E. Michel. And I just have a couple
10  questions for you. It's going to be very brief.
11    I understand when you were --
12  throughout your career as a boiler tech or heating
13  technician, you pretty much worked throughout the
14  Baltimore City, Baltimore County area, correct?
15    A   Yes, sir.
16    Q   And depending on where you were in the
17  city, if you had to go pick up a supply or whatever
18  kind of material that would be for your job, you
19  would stop at the closest supply house, correct?
20    A   Yes, sir.
21    Q   For instance, on the west house, I

## Page 119

1  think you -- west part of the city area, I think you
2  said -- you told us you stopped at Sid Harvey?
3    A   Yes, sir.
4    Q   And Allied Service?
5    A   Yes, sir.
6    Q   And I think you also told us Sid Harvey
7  was a pretty big company back then, correct?
8    A   Yes, sir.
9    Q   I mean, they carried pretty much the
10  gamut of everything you needed?
11    A   Yes, sir.
12    Q   Now, when you were at Amoco -- well,
13  strike that.
14    When you were at Yeaton, Yeaton was
15  kind of a small shop, correct?
16    A   Yes, sir.
17    Q   In fact, I think you were one of --
18  pretty much the only technician?
19    A   I was it, yes.
20    Q   So Yeaton didn't buy in bulk, you would
21  just have to go and purchase your materials, right?

## Page 120

1    A   Right.
2    Q   And then, again, depending on where you
3  were in the city is where you would stop by and get
4  your material, correct?
5    A   Yes, sir.
6    Q   Now, Amoco, or it would be American
7  Oil, that was a little bigger shop, correct?
8    A   (Witness nods head in the affirmative.)
9    Q   I think there was -- correct?
10    A   Oh, yes, sir.
11    Q   And the reason why I say correct is
12  because you were just nodding your head yes.
13    A   Yeah. I'm sorry.
14    Q   I know we are on video, but you still
15  have to say yes or no.
16    So supply houses would deliver to
17  American Oil?
18    A   Yes, sir.
19    Q   And I think you told us the other day
20  that the same supply houses that you told
21  Mr. Candon, which would be -- I think you did tell

## Page 121

1  us R.E. Michel, but you also told us Sid Harvey,
2  Eddco and Allied Services, they would all deliver
3  materials to American Oil, correct?
4    A   Yes, sir.
5    Q   You know what, sir, those are all the
6  questions I have. Oh, one last question.
7    Other than the four that you told us,
8  were there other supply houses that you would stop
9  in, you just don't recall the names of those today?
10    A   I would go to the plumbing supply
11  houses. We went to a sheet metal company down on
12  Central Avenue, and we bought smoke pipe there that
13  we hooked up to the furnaces and boilers.
14    Q   Okay.
15    A   You know, but --
16    MR. PALMIOTTO: Fair enough, sir.
17  Thank you. I appreciate it. Those are all the
18  questions I have.
19    CROSS EXAMINATION
20    BY MR. BERNIER:
21    Q   Mr. McCurdy, good afternoon. I'm Tom

31 (Pages 118 to 121)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service
092ded7d-7d7e-4017-9fb1-d9f6e2df6b63

Michael James McCurdy 9/21/07

Page 122

1    Bernier.  We met about a day ago, correct?
2        A    Yes, sir.
3        Q    At your earlier deposition.
4             And you can hear me okay from where I'm
5    sitting?
6        A    Yes, sir.
7        Q    Okay.  Sir, you were active duty in the
8    U.S. Navy beginning in '69, correct?
9        A    Yes, sir.
10       Q    And that lasted until '71?
11       A    Yes, sir.
12       Q    That was wartime, correct?
13       A    Yes, sir.
14       Q    Vietnam was pretty much at its peak
15   then, correct?
16       A    Yes, sir.
17       Q    Now, when you were assigned to the
18   Intrepid, did that go into the Vietnam or southeast
19   Asia corridor at all?
20       A    No, sir.
21       Q    Okay.  When you boarded that ship as an

Page 123

1    active-duty sailor, that was in Philadelphia?
2        A    Yes, sir.
3        Q    Okay.  At the Naval base there?
4        A    Yes, sir.
5        Q    Did the ship sail right away or did you
6    stay with it for a while in dock there?
7        A    It was in drydock.
8        Q    Okay.  And did you -- you were actually
9    a machinist mate at that point in time?
10       A    No, sir.
11       Q    Okay.  What were you, a seaman, or how
12   did you start?  You were a member of the Navy though
13   at that point, correct?
14       A    Yes, sir.
15       Q    Okay.  So you were actually enlisted as
16   a sailor on that ship at that time?
17       A    Yes, sir.
18       Q    Okay.  And what were your general
19   duties at that point?
20       A    As soon as I went on board as a new
21   crewman, they give you the grunt work.  They give

Page 124

1    you the kitchen patrol.
2        Q    Okay.
3        A    Which I did for about two or three
4    months.
5        Q    Okay.  When did you become a machinist
6    mate?
7        A    About three months after I boarded.
8        Q    Okay.  And did you -- at any time
9    before you became, I guess, an official machinist's
10   mate, were you working in maintenance and other
11   things besides the kitchen?
12       A    No, sir.
13       Q    Okay.  When did the ships leave
14   Philadelphia?
15       A    Right around the time I went down in
16   the engine room.
17       Q    Okay.  Now, the USS Intrepid, sir, that
18   was, in fact, an aircraft carrier?
19       A    That is correct.
20       Q    And that was built back around the
21   second world war, right?  It was not one of the

Page 125

1    newer ones?
2        A    F-44.
3        Q    Okay.  What powered that vessel?  Do
4    you know?
5        A    Steam turbines.
6        Q    Steam turbines.
7             Do you know who manufactured the
8    turbines?
9        A    I couldn't swear to it.
10       Q    Okay.
11       A    I believe I recognized seeing GE,
12   Westinghouse, one of them.
13       Q    Okay.
14       A    I was quite surprised.
15       Q    The turbines, would they -- when they
16   were in operation and powering the ship, would they
17   get hot?
18       A    Oh, yeah.
19       Q    Very hot?
20       A    Yes, sir.
21       Q    And as a result, they were insulated,

32 (Pages 122 to 125)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service
092ded7d-7d7e-4017-9fb1-d9f6e2df6b63

Michael James McCurdy 9/21/07

| Page 126 | Page 128 |
|---|---|

**Page 126**

1  correct?

2  A    Yes, sir.

3  Q    Okay.  And do you know what they were

4  insulated with?

5  A    I believe asbestos.

6  Q    And you mentioned going down as a

7  machinist mate into the engine room.  Can you

8  describe what you are talking about when you say you

9  were in the engine room part of the ship?

10  A    The engine rooms is the lowest part, so

11  when you say you go down, you go down several

12  ladders.  Do you want me to describe the engine

13  room?

14  Q    You didn't have nice windows to look

15  out, I guess?

16  A    No.

17  Q    Okay.

18  A    You were below water level.

19  Q    All right.  And what comprised the

20  engine room?  What equipment would be in an engine

21  room?

**Page 127**

1  A    The turbines, reduction gear, pipes,

2  pumps.

3  Q    Were the boilers in there?

4  A    No, sir.

5  Q    What heated up steam to run turbines?

6  A    It was the boilers.

7  Q    Okay.

8  A    They were in separate rooms.

9  Q    Okay.  Is that part of the engine room

10  or is that a second room?

11  A    No.  That's a second room.

12  Q    Did you ever have to work in there?

13  A    No, sir.

14  Q    As a machinist mate, what types of

15  maintenance would you have to complete?

16  A    Maintenance.  Sometimes we had to

17  replace some gaskets on valves, replace the packing

18  in the valves.

19  Q    Okay.

20  A    Most of my job was controlling the

21  speed of the engine.  You know, I had to watch.

**Page 128**

1  Q    Do you recall who the captain of that

2  vessel was when you served there?

3  A    No, sir.

4  Q    Okay.  Do you recall if at any time

5  while you were on that vessel it was grounded or ran

6  aground?

7  A    Yes, it did.  Yes, it did.

8  Q    And that was kind of an infamous badge

9  of honor for an aircraft carrier?

10  A    Very disgraceful.

11  Q    Yes.

12     And do you remember when that happened?

13  A    1970 or '71.

14  Q    Okay.  Was there damage --

15  A    Oh, it was 1970.  It had to be '70.

16  Q    Was there damage caused to it?

17  A    We had to go into drydock in Boston.

18  Q    Okay.

19  A    I remember -- again, I didn't get

20  involved with that much maintenance on it.  I know

21  that they had to break open the turbines to get to

**Page 129**

1  the coils where it took the steam back to

2  condensate, and I knew that there was problems with

3  that.

4  Q    Right.

5     And that was back in the dock, right?

6  A    In Boston.

7  Q    Now, do you recall it ever being in

8  Quonset Point, Rhode Island?

9  A    That's where we were home based out of.

10  Q    Okay.

11  A    That's -- we were going into Quonset

12  Point, Rhode Island as the brand new home port for

13  the USS Intrepid when that captain ran us aground.

14  Q    Okay.  And what part of -- I mean, what

15  were you doing in Boston?  Where were you actually

16  docked?

17  A    It was a drydock up there.

18  Q    You don't remember the name?

19  A    No.  I assume it was a Navy yard.

20  Q    Okay.

21  A    And it wasn't huge like Philadelphia.

33 (Pages 126 to 129)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service
092ded7d-7d7e-4017-9fb1-d9f6e2df6b63

Michael James McCurdy 9/21/07

Page 130

1    Q    And then you later then got on to --
2    did you make it to Quonset Point at some point after
3    that?
4    A    Sure.
5    Q    Okay.  And that's where the ship was
6    docked again?
7    A    Yes, sir.
8    Q    And am I correct that as a sailor,
9    machinist mate, when these vessel are docked, that's
10   where you are pretty much staying?
11   A    Yes, sir.
12   Q    Okay.  And were there times when this
13   vessel was being repaired down in Boston, especially
14   when they were working on the turbines, that you
15   would have had occasion as a machinist's mate to be
16   at least in the engine room area?
17       MR. KULINSKI:  Objection.
18       MR. CANDON:  You can go ahead and
19   answer.
20   A    Yes.
21   Q    Okay.  And as an enlisted sailor,

Page 131

1    machinist mate in the Navy, you had superiors,
2    correct?
3    A    Oh, yes.  Many.
4    Q    I'm sorry?
5    A    Many.
6    Q    And those superiors, depending on how
7    high up you went, were the officers and petty
8    officers who gave you your orders?
9    A    Yes, sir.
10   Q    And those orders would be just about
11   everything that covered your day?
12   A    Yes, sir.
13   Q    Where you stood watch, you know, what
14   you did with respect to the controls you operated?
15   A    (Witness nods head in the affirmative.)
16   Q    With respect to the repairs you
17   performed, those would have been as a result of
18   orders from somebody?
19   A    Yes, sir.
20   Q    They would have told you, you know, I
21   guess, what they wanted done, how fast it had to be

Page 132

1    done and probably checked up on you to make sure it
2    was done?
3    A    Um-hmm.
4    Q    And as a sailor in the Navy, you didn't
5    have a choice as to whether you obeyed an order or
6    not, correct?
7    A    I did, but I wouldn't want to suffer
8    the consequences.
9    Q    Right.
10       The consequences of disobeying a direct
11   order at a time of war on a Navy ship is pretty
12   severe?
13   A    Yes, sir.
14   Q    Okay.  If you were working on a repair
15   and you needed a part like a gasket or a piece of
16   packing or some other mechanical piece of machinery
17   to work on, those were Navy products that came on
18   board, correct?
19   A    To the best of my knowledge.
20   Q    All right.  I mean, everything that you
21   worked on in the Navy had a manual that told you

Page 133

1    what to do and how to do it?  Is that a fair
2    statement?
3    A    Yes, it is.
4    Q    Okay.  And the products that they used
5    were, essentially, Navy spec'd for that purpose,
6    correct?
7    A    I assume so.
8    Q    Other than Boston and Phili and Quonset
9    Point, Rhode Island, do you recall being docked
10   while on the Intrepid in any other ports of call?
11   A    For how long?
12   Q    Well, for any significant maintenance
13   on the vessel.
14   A    Maintenance, no.
15   Q    Okay.
16       MR. CANDON:  Object to the form of the
17   question.
18   Q    By the way, thank you for your service.
19   A    Thanks for calling it a war.
20   Q    I'm going to completely shift gears.
21       You talked briefly about -- well, not

34  (Pages 130 to 133)

Court Reporting in                    Evans Reporting Service                Over 20 years of
Baltimore/Washington                   800-256-8410                    award-winning service
                                                          092ded7d-7d7e-4017-9fb1-d9f6e2df6b63

Michael James McCurdy 9/21/07

**Page 138**

1    I asked you if you believed it was fair
2  to say that the use of gaskets in your boiler work
3  was not an everyday occasion. And you said no.
4    Were you trying to say -- can you
5  explain to me whether or not it was an everyday
6  occasion for you to use gaskets while you were doing
7  boiler work?
8    A    I used gaskets and rope all the time.
9    Q    Okay.
10   A    When I was doing the installation work,
11 gaskets were every day.
12   Q    And I understand that's about
13 installation work. But I was referring to
14 maintenance. On your day-to-day maintenance on
15 those days when you were doing, you know, you said
16 as many as 20 service calls a day, those were not
17 days on which you were working with gaskets; fair to
18 say?
19         MR. CANDON:  Objection to form.
20         You can answer, sir.
21   A    Possibly one of the jobs would have

**Page 139**

1  involved it during the day, yes.
2    Q    Okay. So maybe one job a day?
3    A    It could have been, yeah, two.
4    Q    All right. Thanks.
5    A    It's a long time ago.
6         MR. BERNIER:  Fair enough.
7         CROSS EXAMINATION
8    BY MR. KULINSKI:
9    Q    Mr. McCurdy, my name is Phil Kulinski.
10 I asked you one or two brief questions on Wednesday,
11 I'm going to try and do the same today.
12   You told us about your history aboard
13 the USS Intrepid, and you told us about a time up in
14 Massachusetts when she ran aground and you were
15 present in the engine room when some work was being
16 done on the turbine. Do you remember that?
17   A    Yes, sir.
18   Q    That was interior work on the turbine,
19 correct?
20   A    Correct.
21   Q    Were you ever present around the

**Page 140**

1  turbine when thermal insulation materials were
2  removed?
3    A    No, sir.
4         MR. KULINSKI:  Thank you. That's all I
5  have.
6         MR. BOYD:  Good afternoon, Mr. McCurdy.
7  No. He's got another one.
8         MR. KULINSKI:  One quick follow-up.
9         MR. CANDON:  This is consistent,
10 everyone so far.
11        BY MR. KULINSKI:
12   Q    Were you ever present in the engine
13 room when thermal insulation materials were applied
14 to the turbines?
15   A    No, sir.
16        MR. KULINSKI:  Thank you. Now I'm
17 finished.
18        MR. BOYD:  I'm going to wait for him to
19 leave.
20        CROSS EXAMINATION
21    BY MR. BOYD:

**Page 141**

1    Q    Good afternoon, Mr. McCurdy. My name
2  is John Boyd. I represent Hercules Chemical
3  Company. We spoke two days ago.
4    A    Yes, sir.
5    Q    Good to see you again.
6    I ask you this question, Mr. McCurdy,
7  because I'm not sure whether you misspoke today. I
8  don't want to go back to the transcript from two
9  days ago. But until today, I hadn't heard that you
10 used the Hercules cement product when you were
11 installing new boilers. I thought you had told us
12 that this cement came in a can and it came with a
13 package, everything was there from whoever delivered
14 the boilers.
15   A    Yes, sir.
16   Q    And that you couldn't identify who had
17 made that cement. Which was it?
18   A    I thought it was Hercules cement that,
19 you know, was in the same package with the asbestos,
20 the bolts, the manual.
21   Q    Okay. Well, the reason I asked that

36 (Pages 138 to 141)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service
092ded7d-7d7e-4017-9fb1-d9f6e2df6b63

# EXHIBIT 6

| | | |
|---|---|---|
| **IN RE:** | **BALTIMORE CITY** **ASBESTOS CASES** | * **MARCH 11, 2008 MESOTHELIOMA** **TRIAL CLUSTER (M-90)** |
| | | * |
| | | * **CONSOLIDATED CASE NO.** **24X07000065** |

**\*\*\*\*\*\*\*\*\*\*\*\*\***

| | | |
|---|---|---|
| **CHARLES WEBB, et al.** | | * **IN THE** |
| | **Plaintiffs** | * **CIRCUIT COURT** |
| **v.** | | * **FOR** |
| **ACandS, INC., et al.** | | * **BALTIMORE CITY** |
| | **Defendants** | * **(LAW OFFICES OF PETER G. ANGELOS)** |
| | | * |
| **CASES AFFECTED:** | | * |
| **CHARLES WEBB** | | **CASE NO. 24X06000615** |
| **ROY CARLTON** | | * **CASE NO. 24X06000348** |
| **STEFAN E. MARTIN** | | **CASE NO. 24X07000076** |
| **MICHAEL MCCURDY** | | * **CASE NO. 24X07000235** |
| **LENORA WILLIAMS-WALKER** | | **CASE NO. 24X06000271** |
| | | * |

**\*\*\*\*\*\*\*\*\*\*\*\*\***

## CONSENT MOTION TO AMEND PRE-TRIAL SCHEDULE

Plaintiffs and Defendants request the Court amend the pretrial scheduling order as follows:

| **New Date** | **Old Date** | |
|---|---|---|
| 1/8/08 | 12/7/07 | Last day for deposition of plaintiffs' fact witnesses who plaintiffs are able to voluntarily produce for deposition without subpoena by defendants. (Product Identification Witnesses) |
| 1/14/08 | 12/24/07 | Plaintiffs name their "most likely to use" general product identification fact witnesses from the original fact witness list who have been previously deposed. Plaintiffs may supplement this list with names of any additional witnesses (1) who are specified as being made in substitution for an earlier-named witness who has |

1

|         |         | become unavailable to testify at trial. The substituted witness must come from the original fact witness list or (2) whose testimony concerns job sites newly disclosed in documents or deposition testimony during the remaining time for depositions of fact witnesses. |
|---------|---------|---|
| 1/24/08 | 1/7/08  | Defendants and third-party defendants name all fact witnesses who may testify at trial.  Defendants provide addresses of fact witnesses they cannot voluntarily produce for deposition. Defendants provide executed answer to interrogatories which identify each worksite where plaintiff or plaintiff's decedent worked, dates at each site, co-workers at each site, and contractors installing asbestos products at each site. Defendants respond to requests for production of documents and tangible things (including medical records defendants have had possession of). |
|         |         | *Plaintiffs must file any motions contesting the adequacy of discovery. Defendants shall respond within five (5) days. Any requests(s) for conference with the Court shall be filed with the motion(s) or response(s).* |
| 2/11/08 | 1/7/08  | Defendants name experts, provide 2-402(e)(1) statements and state available dates for depositions of expert witnesses.  Defendants produce/return imaging and pathology which defendants have possession of and provide plaintiff-specific reports. |
| 2/11/08 | 1/8/08  | Last day for deposition of defense fact witnesses other than witnesses not subject to deposition under Judge Levin's Order dated April 16, 1990. |
| 1/24/08 | 1/15/08 | Defendants name their "most likely to use," general production identification fact witnesses from the original fact witness list who have been previously deposed. Defendants may supplement this list with names of any additional witnesses (1) who are specified as being made in substitution for an earlier-named witness who has become unavailable to testify at trial. The substituted witness must come from the original fact witness list or (2) whose testimony concerns job sites newly disclosed in documents or deposition testimony during the remaining time for depositions of fact witnesses. |

2

# EXHIBIT 7

Michael James McCurdy 9/19/07

IN THE CIRCUIT COURT FOR BALTIMORE CITY

```
IN RE:   PERSONAL INJURY          *
         ASBESTOS LITIGATION       *
*     *     *     *     *     *     *     *     *     *     *
CHARLES WEBB, et al.,              *   March 11, 2008
                                   *   Meso Trial Group
              Plaintiffs           *   Consolidated No.
v.                                 *   24-X-07-000065
                                   *
ACandS, INC., et al.,              *
                                   *
              Defendants           *
*     *     *     *     *     *     *     *     *     *     *
CASE AFFECTED:                     *
MICHAEL MCCURDY                    *   24-X-07-000235
*     *     *     *     *     *     *     *     *     *     *
```

DEPOSITION OF MICHAEL JAMES MCCURDY


        The Deposition of Michael James McCurdy

was taken on Wednesday, September 19, 2007,

commencing at 10:12 a.m. at the Law Offices of

Peter G. Angelos, One Charles Center, 100 North

Charles Street, 22nd Floor, Baltimore, Maryland and

was reported by Denise M. Thomas, Notary Public.


                EVANS REPORTING SERVICE
                    Munsey Building
                7 North Calvert Street
                      Suite 705
                Baltimore, Maryland 21202
                    (410) 727-7100

Court Reporting in                Evans Reporting Service              Over 20 years of
Baltimore/Washington                  800-256-8410                    award-winning service
                                                              f981a016-c1f8-4c11-9bc1-8c1e1a65becb

Michael James McCurdy 9/19/07

| Page 2 | Page 4 |
|---|---|

**Page 2**

1  APPEARANCES:
2  CHARLES CANDON, ESQUIRE
   Law Offices of Peter G. Angelos
3  On behalf of the Plaintiffs
4  SCOTT RICHMOND, ESQUIRE
   Venable LLP
5  On behalf of the Defendants, American Standard
   and International Paper
6
   DONALD MERINGER, ESQUIRE
7  Meringer, Zois & Quigg
   On behalf of the Defendant, General Electric
8
   DAVID W. ALLEN, ESQUIRE
9  Goodell, DeVries, Leech & Dann
   On behalf of the Defendants, Hopeman Brothers,
10  Inc., Hampshire Industries, Zurn Industries,
   Wayne Manufacturing and Lofton Corporation
11
   PETER WOOLSON, ESQUIRE
12  Robinson Woolson
   On behalf of the Defendant, John Crane
13
   THOMAS P. BERNIER, ESQUIRE
14  Segal, McCambridge, Singer & Mahoney
   On behalf of the Defendants, Greene Tweed,
15  Garlock Sealing Technologies, LLC, Anchor
   Packing Company and Cooper Industries
16
   LAURA D. ABENES, ESQUIRE
17  Gavett and Datt
   On behalf of the Defendants, Selby Battersby,
18  J. H. France and Keeler Dorr-Oliver
19  VINCENT J. PALMIOTTO, ESQUIRE
   Miles & Stockbridge, P.C.
20  On behalf of the Defendants, Cleaver-Brooks,
   CertainTeed Corporation, Georgia Pacific,
21  Superior Boiler Works and R.E. Michel

**Page 4**

1  APPEARANCES, (cont'd.)
2  THOMAS HANNA, ESQUIRE
   Kelley, Jasons, McGowan, Spinelli & Hanna
3  On behalf of the Defendant, MCIC
4  JOSEPH C. WICH, JR., ESQUIRE
   Venable LLP
5  On behalf of the Defendants, The Goodyear
   Tire & Rubber Company
6
   PHILIP KULINSKI, ESQUIRE
7  Evert Weathersby Houff
   On behalf of the Defendant, Viacom, Inc.,
8  Successor by merger to CBS Corporation, f/k/a
   Westinghouse Electric Corporation
9
   DAVID A. SELTZER, ESQUIRE
10  Wilson, Elser, Moskowitz, Edelman & Dicker, LLP
   On behalf of the Defendant, Oakfabco
11
   ROBERT RICHARDS, ESQUIRE
12  DeCaro, Doran, Siciliano, Gallagher &
   DeBlasis, LLP
13  On behalf of the Defendant, A.O. Smith
   Corporation
14
15
16
17
18
19
20
21

| Page 3 | Page 5 |
|---|---|

**Page 3**

1  APPEARANCES, (cont'd.)
2  STEVEN PARROTT, ESQUIRE
   BRIAN PALMER, ESQUIRE
3  DeHay & Elliston, L.L.P.
   On behalf of the Defendants, Bayer Cropscience,
4  Foster Wheeler, Union Carbide Corporation,
   Burnham and Riley Stoker Corp.
5
   JOHN BOYD, ESQUIRE
6  Lord & Whip, P.A.
   On behalf of the Defendant, Hercules Chemical
7  Company
8  RACHELLE A. SCHOFIELD, ESQUIRE
   Hartel, Kane, DeSantis, MacDonald & Howie, LLP
9  On behalf of the Defendants, Crane Co. and
   Square D Company
10
   MICHAEL OSBORN, ESQUIRE
11  Brassel, Baldwin, Kagan & May, P.A.
   On behalf of the Defendant, Conwed
12
   JEREMY NORTH, ESQUIRE
13  North & Cobb
   On behalf of the Defendant, Uniroyal, Inc.
14
   JAMES T. SMITH, ESQUIRE
15  Bodie, Nagle, Dolina, Smith & Hobbs
   On behalf of the Defendant, E.L. Stebbing
16
   JOEL M. NEWPORT, ESQUIRE
17  Moore & Jackson, LLC
   On behalf of the Defendants, Wallace & Gale,
18  Kaiser-Gypsum and Columbia Boiler
19  JEANNIE PITTILLO KAUFFMAN, ESQUIRE
   Bacon, Thornton & Palmer, LLP
20  On behalf of the Defendants, Bondex
   International, Inc. and RPM
21

**Page 5**

1        PROCEEDINGS
2        * * * * * * *
3        (Whereupon, McCurdy Deposition Exhibit
4  Number 1 was marked for identification.)
5  Whereupon,
6        MICHAEL JAMES MCCURDY
7        A witness herein, called for oral
8  examination in the matter pending, being first duly
9  sworn to tell the truth, the whole truth and nothing
10  but the truth, testified as follows on
11        EXAMINATION
12  BY MR. PARROTT:
13        Q   Sir, would you give us your full name
14  and your address for the record, please?
15        A   Michael James McCurdy, number 7 Vista
16  View Court, Kingsville, Maryland  21087.
17        Q   Good morning, sir.  My name is Steve
18  Parrott.  I'm going to be asking you some questions
19  to start off.
20        Sir, have you ever had your deposition
21  taken before?

2  (Pages 2 to 5)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service
f981a016-c1f8-4c11-9bc1-8c1e1a65becb

| Page 18 |
|---|

1   A   No.
2   Q   Do you have any grandchildren?
3   A   Yes.
4   Q   How many grandchildren?
5   A   Two.
6   Q   All right.  How often do you see your
7   grandchildren?
8   A   Gosh.  Five, six, seven times a week.
9   Q   All right.  Your parents are still
10  alive?
11  A   My mother is.
12  Q   When did your father die?
13  A   Three years ago.
14  Q   What is his name?
15  A   Earl G. McCurdy.
16  Q   And what was his cause of death?
17  A   Heart disease.
18  Q   What kind of work did he do?
19  A   He was a Baltimore City police officer.
20  Q   Did he ever have any problems with his
21  lungs or with cancer?

| Page 19 |
|---|

1   A   No.
2   Q   As far as you know, was he ever exposed
3   to asbestos?
4   A   No.
5   Q   And your mother is how old?
6   A   Ninety.
7   Q   Ninety.
8       Has she ever been exposed to asbestos?
9   A   No.
10  Q   Has she ever had any problems with her
11  lungs or with cancer?
12  A   No.
13  Q   Do you have brothers and sisters?
14  A   Yes.
15  Q   I want you to run down the list and
16  give me their names and ages.
17  A   Mary Joan McCurdy.
18  Q   Okay.  How old is she?
19  A   Around 54.
20  Q   Do you know what kind of work she does?
21  A   She works for Social Security.

| Page 20 |
|---|

1   Q   Has she ever been exposed to asbestos?
2   A   Not to my knowledge.
3   Q   Any problems with her lungs or with
4   cancer?
5   A   No.
6   Q   Okay.  Next sibling?
7   A   William McCurdy.
8   Q   Okay.  How old is he?
9   A   Sixty-two.
10  Q   What kind of work does he do?
11  A   Construction business.
12  Q   Do you know if he's ever been exposed
13  to asbestos?
14  A   Not to my knowledge.
15  Q   Okay.  Has he had any problems with his
16  lungs or with cancer?
17  A   No.
18  Q   Any other siblings?
19  A   No.
20  Q   As I understand it, sir, you were in
21  the military service?

| Page 21 |
|---|

1   A   Yes, sir.
2   Q   You were in the Navy from 1969 through
3   1971, correct?
4   A   Active duty, yes.
5   Q   When you say active duty, did you then
6   go into the reserves?
7   A   I was in the reserves.  I signed up for
8   the reserves in '67.
9   Q   Where did you do your basic training?
10  A   Great Lakes, Chicago, Illinois.
11  Q   Great Lakes.
12      And after that, where did you go to?
13  A   I was -- well, the way the reserves
14  works is I was there for only a few weeks, and then
15  I came back home until I was activated.
16  Q   All right.  And during the reserve
17  period, was it a weekend a month or something like
18  that --
19  A   That is correct.
20  Q   -- that you would have to report?
21  A   Right.

6 (Pages 18 to 21)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service
f981a016-c1f8-4c11-9bc1-8c1e1a65becb

Michael James McCurdy 9/19/07

| Page 22 | Page 24 |
|---|---|

**Page 22**

1    Q    And you reported locally?

2    A    Yes.

3    Q    Where did you --

4    A    Fort McHenry.

5    Q    When you went on active duty, where did

6    you report?

7    A    I reported to my ship in Philadelphia.

8    Q    And what ship was that?

9    A    The USS Intrepid.

10    Q    What kind of ship was it?

11    A    Aircraft carrier.

12    Q    And how long were you on the Intrepid?

13    A    The entire time I was on active duty.

14    Q    I saw in the information we got that

15    you were an E-3.

16    A    Yes.

17    Q    What does that mean?  Is that a rank?

18    A    Yes.

19    Q    All right.  Did you have a specialty or

20    a job title while you were on active duty?

21    A    Machinist mate.

**Page 23**

1    Q    Were you honorably discharged?

2    A    Yes.

3    Q    During your stay in the Navy, were you

4    exposed to asbestos?

5    A    It was there in the -- I worked in the

6    engine room, yeah.

7    Q    Okay.  The reason I asked, I have a

8    medical record from Johns Hopkins dated May 8th,

9    2007.  Do you remember seeing a Dr. Julie Brahmer,

10    B-R-A-H-M-E-R?

11    A    Yes.

12    Q    And under social history, it says he is

13    married, he was exposed to asbestos in the Navy, he

14    worked in an engine room, as well as in the heating

15    and cooling business.  Do you remember telling her

16    that?

17    A    Yes, sir.

18    Q    What type of asbestos did you see in

19    the boiler room when you were in the Navy?

20    A    Well, it was all on the pipes and

21    everything and the turbines.  You know, anything

**Page 24**

1    that was really hot was covered with asbestos.

2    Q    Were you around when people worked on

3    any of the asbestos covering that you saw?

4    A    No.

5    Q    Do you know who made any of the

6    asbestos materials you saw while you were in the

7    Navy?

8    A    In the Navy, no.

9    Q    You mentioned a turbine.  Do you know

10    who made the turbine that you saw?

11    A    It was either GE or Westinghouse, one

12    of them.  I'm not sure.

13    Q    While you were on the Intrepid, the

14    pipes that you saw in the boiler room, did they go

15    throughout the ship?

16    A    Sure.  Well, just from the boiler room

17    to the engine room.  We were the power plant.

18    Q    Did you see any that went down the

19    hallways, that sort of thing, while you were in the

20    Army, any pipes that were covered?

21    A    Probably.  I can't swear one way or the

**Page 25**

1    other.

2    Q    As a machinist mate, what did you do on

3    board the Intrepid?

4    A    My primary duty was controlling the

5    speed of the -- one of the engines.

6    Q    And tell me specifically what you did

7    to control the speed on the engine.

8    A    I stood in front of a board with two

9    wheels in front of me, which one made it go forward,

10    and one made it go backwards.

11    Q    Okay.  Did you ever have to repair any

12    equipment, that sort of thing, while you were in the

13    Navy?

14    A    Sure.

15    Q    What kind of equipment did you repair?

16    A    We had to replace gaskets in the lines

17    and pumps, whatever.

18    Q    Do you remember any of the pumps you

19    might have had to work on?

20    A    No.

21    Q    Do you remember the manufacturer of any

7.  (Pages 22 to 25)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service
f981a016-c1f8-4c11-9bc1-8c1e1a65becb

Michael James McCurdy 9/19/07

## Page 26

1    of the gaskets you had to replace?

2        A    I'm not sure, you know.  I could tell

3    you what they looked like.

4        Q    Were they precut or did you have to

5    make them yourself?

6        A    Oh, no, they were all precut.

7        Q    Have you, other than this lawsuit,

8    filed any other lawsuits in your lifetime?

9        A    No, sir.

10       Q    Have you ever filed a workers'

11   compensation claim before?

12       A    No, sir.

13       Q    During your lifetime, have you ever

14   been hospitalized?  And let me exclude for a moment

15   whatever hospitalizations you've had relating to

16   your current condition because I'm going to come

17   back to that.  But I'm talking about prior to your

18   current condition, have you ever been hospitalized

19   during your lifetime?

20       A    I had a tonsillectomy when I was about

21   four.

## Page 27

1        Q    Okay.

2        A    Other than that, no.

3        Q    As I understand it, a Timothy Krohe,

4    that's C-R-O-H-E --

5        A    K-R-O-H-E.

6        Q    It's K?

7        A    Yep.

8        Q    Is your primary care physician?

9        A    Yes, sir.

10       Q    And he's been your primary care

11   physician from '98 to the present?

12       A    Yes.

13       Q    Do you remember who your primary care

14   physician was prior to '98?

15       A    Dr. Plott, P-L-O-T-T.

16       Q    Do you know where he or she was

17   located?

18       A    Was is right.  East Baltimore.

19       Q    All right.  Do you know if Dr. Plott is

20   still practicing?

21       A    No.  He is retired and living in

## Page 28

1    Virginia somewhere is last I heard.

2        Q    I saw a record that indicated that in

3    approximately February of 1998, you went to Johns

4    Hopkins with a problem with your neck and

5    right-sided arm pain?

6        A    Correct.

7        Q    That, apparently, was a result of your

8    playing golf or you thought it might have been a

9    result of playing golf?

10       A    Yeah.

11       Q    Were you ever given a diagnosis as to

12   the result of that?

13       A    Yes.

14       Q    What was the diagnosis?

15       A    Deteriorated disk between number 3 and

16   4 vertebrae.

17       Q    Have you undergone treatment over the

18   years for that?

19       A    No.

20       Q    I want to talk to you about certain

21   conditions I saw in your medical record.  Are you

## Page 29

1    being treated for depression?

2        A    Yes, sir.

3        Q    When did you start being treated for

4    that?

5        A    About 18 years ago.

6        Q    And are you taking Prozac?

7        A    Correct.

8        Q    And I saw a reference to an anxiety

9    disorder.  Are you being treated for that?

10       A    Not to my knowledge.

11       Q    And there is a reference to high

12   cholesterol and your being treated with Lipitor and

13   Baycol.

14       A    Baycol, yes.

15       Q    Are you still taking Baycol?

16       A    No.  I had reactions from that.  I

17   think -- what am I on now?  I'm on Vytorin right

18   now.

19       Q    Other than the Prozac and the Vytorin,

20   are there any other prescription medications that

21   you are taking on a regular basis?

8  (Pages 26 to 29)

Court Reporting in                    Evans Reporting Service                    Over 20 years of
Baltimore/Washington                      800-256-8410                    award-winning service
                                                                          f981a016-c1f8-4c11-9bc1-8c1e1a65becb

Page 34

1  Q    How long has it been since you felt
2  comfortable traveling?
3  A    Since March of last year.  I mean March
4  of this year.
5  Q    All right.  And the information we have
6  says you don't have any criminal convictions.  Is
7  that correct?
8  A    No, sir.
9  MR. PARROTT:  Sir, those are my
10  questions for now relating to your personal history
11  and background.  I'm going to come back and ask you
12  questions about your work history and your current
13  condition, but right now, some of the other
14  attorneys might have questions about your personal
15  background.
16  EXAMINATION
17  BY MR. KULINSKI:
18  Q    Sir, my name is Phil Kulinski.  I'm
19  sitting down at the end of the table, so I couldn't
20  hear you too well.
21  You talked about your time in the Navy

Page 35

1  on board the Intrepid.
2  A    Yes, sir.
3  Q    Mr. Parrott asked you about the
4  turbines.  Do you remember that?
5  A    Yes, sir.
6  Q    And you said you don't recall any work
7  being performed on those; is that correct?
8  A    Not while I was there.
9  MR. KULINSKI:  Okay.  That's all I
10  have.  Thank you, sir.
11  MR. PARROTT:  Anyone else?
12  (Whereupon, no response.)
13  MR. PARROTT:  I'm not hearing anyone.
14  Are you all right to continue into your work
15  history?
16  THE WITNESS:  Yes.
17  RE-EXAMINATION
18  BY MR. PARROTT:
19  Q    In response to Interrogatory Number 8
20  that your attorney provided to us, there is an
21  indication that you feel you have had exposure to

Page 36

1  asbestos beginning in 1967 and continuing into the
2  1980s.  Is that --
3  A    Correct.
4  Q    That's your belief?
5  A    Um-hmm.
6  Q    Before I get into the specifics of it,
7  sir, is it correct that you were a member of the
8  Teamsters Local 311?
9  A    Yes, sir.
10  Q    From '71 through '77?
11  A    Correct.
12  Q    All right.  This Local 311, was that
13  for -- we think of Teamsters as truck drivers and so
14  forth.
15  A    Truckers, um-hmm.
16  Q    Were you in the truck driving local or
17  was there one for boiler mechanics?
18  A    You know, I'm really not sure because
19  when you are in the oil business, you have got truck
20  drivers who deliver the oil and you have got
21  technicians who repair the furnaces.  And I'm not

Page 37

1  sure exactly how it fell or how it was classified.
2  I know it was 311, it was a truckers union.
3  Q    Did you hold any offices in that union?
4  A    Pardon?
5  Q    Did you hold any offices in that union?
6  A    No, I did not.
7  Q    Did they send you a publication, like a
8  newsletter, that sort of --
9  A    No.
10  Q    Did you attend any meetings?
11  A    Sure.
12  Q    How often would you attend meetings
13  during that period?
14  A    In the seven years, maybe only two or
15  three times.
16  Q    Do you remember receiving anything from
17  the union, either a mailing or something you saw at
18  a meeting relating to potential hazards associated
19  with asbestos?
20  A    No.
21  Q    Do you remember seeing any -- receiving

10  (Pages 34 to 37)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service
f981a016-c1f8-4c11-9bc1-8c1e1a65becb

# EXHIBIT 8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

MICHAEL J. MCCURDY, *et ux.*          \*          Civil Action:

    Plaintiffs          \*          (Circuit Court for Baltimore City
                          Case No.:  24X07000235)

    vs.          \*

JOHN CRANE-HOUDAILLE, INC., *et al.*   \*

    Defendants          \*

\*   _   \*     \*     \*     \*     \*     \*          \*     \*     \*     \*     \*

CHARLES WEBB, *et al* .          \*
    Plaintiffs          \*          (Circuit Court for Baltimore City
                          Consol. Case No.:  24X07000065)

    vs.          \*

ACandS, INC. *et al.*          \*

    Defendants          \*

\*     \*     \*     \*     \*     \*     \*          \*     \*     \*     \*     \*

Case Affected:          \*

MICHAEL J. MCCURDY          \*          Case No.:  24X07000235
\*     \*     \*     \*     \*     \*     \*          \*     \*     \*     \*     \*

## NOTICE OF REMOVAL OF CIVIL ACTION

**TO PLAINTIFFS AND THEIR ATTORNEY OF RECORD:**

    PLEASE TAKE NOTICE that Defendants, Garlock Sealing Technologies, LLC

(improperly named as Garlock, Inc.)( hereinafter, "Garlock"), and Greene Tweed & Co.

(individually and as successor to Palmetto Inc. and improperly named as Green, Tweed &

Co.) (hereinafter "Greene Tweed") joined in and consented to by all Defendants named

and served in the civil action filed in the Circuit Court for Baltimore City, Maryland, Civil

Action No. 24X07000235 ["the State Case"],[1] hereby note the removal of this action to the United States District Court for the District of Maryland, Northern Division.  The United States District Court's basis for jurisdiction is that of a Federal Question under 28 U.S.C. § 1331, namely that of federal enclave jurisdiction, as well as jurisdiction conferred pursuant to 16 U.S.C. § 457, as the job sites at issue in this matter include exclusive federal enclaves, notably the United States Naval Shipyards at Philadelphia, Pennsylvania; Boston, Massachusetts; and Quonset Point, Rhode Island.

Concurrent grounds for removal exist under 28 U.S.C. §1442(a)(1) which permits the removal to a federal district court of a civil action commenced in a State court against the United States or any agency thereof or any officer (or person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office.

In support thereof, Garlock and Greene Tweed state the following:

1.      On or about June 4, 2007, Garlock was served via certified mail with Plaintiffs' Complaint and Prayer for Jury Trial [hereinafter "Complaint" or "Plaintiffs' Complaint"]. See, **Exhibit 1**.  This service constituted Garlock's first notice of this matter.

2.      On or about May 30, 2007 Greene Tweed was served via certified mail with Plaintiffs' Complaint. (See, **Exhibit 1**). This service constituted Greene Tweed's first notice of this matter.

3.      Plaintiffs' Complaint is based upon the alleged exposure of Michael J. McCurdy to asbestos.  The documents attached to, and served with, Plaintiffs' Complaint did not specifically mention any location as to where this exposure took place. On July 20,

---

[1] Plaintiff, McCurdy's case was filed separately under case #: 24x07000065. It was later moved to a consolidated group of cases under the caption of lead Plaintiff, Charles Webb and assigned a new consolidated case #24X07000065 where it is now listed under "case affected". Mr. McCurdy's case is the only case subject to this Notice of Removal.

2007 Plaintiffs electronically filed Plaintiff's Answers to Defendants' joint interrogatories. In answer to interrogatory number 6 Plaintiff states that he was a member of the U. S. Navy from 1969 through 1971 and was honorably discharged. (Plaintiff's Answer to Interrogatory # 6 at **Exhibit 2**). Interrogatory Number 8 specifically asked Plaintiff, McCurdy to: "State the periods during which you were exposed to asbestos fibers". In answer to this Interrogatory Plaintiffs responded: "It is believed that Mr. Pushwal was exposed to asbestos products of the defendants from approximately 1967 into the 1980's. Plaintiffs investigation is continuing." (Plaintiff's Ans. To Interrog. # 8 at **Exhibit 2**).[2]

4.      On or about September 4, 2007, Counsel for Plaintiffs announced for the first time that Mr. McCurdy's medical records were available for defense counsel to review (See, letter from counsel of Sept. 4, 2007 at **Exhibit 3**).  In a May 8, 2007, medical report prepared by Dr. Julie R. Brahmer of Johns Hopkins Hospital, it is stated under the "Social History" section she prepared that *"[Mr. McCurdy ] is married. He was exposed to **asbestos in the navy. He worked in an engine room** as well as in the heating and cooling business."* (emphasis added). (See, **Exhibit 3A**).

5.      On September 21, 2007, Plaintiffs produced to all defendants the expert medical report of pathologist and Plaintiff's expert witness, Dr. Edward Gabrielson. (See, **Exhibit 4**).  Dr. Gabrielson references Mr. McCurdy's exposure to asbestos on the USS Intrepid and causally relates that exposure and others to his mesothelioma.

6.      On September 19, 2007, Mr. McCurdy was deposed for discovery purposes in this matter and he was asked about his military service. Specifically he testified that he entered the Naval Reserves in 1967 and reported for active duty in Philadelphia in 1969

---

[2] Defendants do not know who Mr. Pushwal is or what significance he has to this case. It appears that his name might appear as the result of a "cut and paste" miscue in answering the Interrogatories. Regardless, Mr. McCurdy swore to truth of these interrogatory answers.

where he was assigned to serve on the USS Intrepid. He advised that the Intrepid was an aircraft carrier and was the only vessel on which he ever served. He was discharged in 1971. (See, **Exhibit 5** at page 20, line 20 through page 26, line 6). He further testified that he served as a machinist mate and that when asked if he was exposed to asbestos he answered: "It was there—I worked in the engine room, yeah." (See, **Exhibit 5** at pages 23-24). When asked what types of asbestos he saw he answered: "Well it was all on the pipes and everything and the turbines. You know, anything that was really hot was covered with asbestos." (See, **Exhibit 5** at page 25). Mr. McCurdy was also questioned as to whether he ever repaired equipment while in the Navy. His response was: "Sure." (See, **Exhibit 5** at page 25, line 14).  When asked to explain he stated: "We had to replace gaskets in the lines and pumps, whatever." (See, **Exhibit 5** at page 25, lines 15-17).

7.    On September 21, 2007, Mr. McCurdy again appeared for deposition. On this occasion it was for the purpose of perpetuating his testimony for trial in a video-taped *de bene esse* deposition. During cross examination Mr. McCurdy was again asked to discuss the details of his asbestos exposure while a machinist mate aboard the USS Intrepid between 1969 and 1971. (See, **Exhibit 6**). In this deposition, Mr. McCurdy testified that he boarded the USS Intrepid in Philadelphia at the Navy base there. He stated that when he boarded the ship it was initially in drydock. (See, **Exhibit 6** at page 122 line 21 through page 123 line 7). Mr. McCurdy also advised that the vessel was powered by steam turbines manufactured either by GE or Westinghouse. (See, **Exhibit 6** at page 125 lines 3-12). Historical documents on the Intrepid confirm that in fact Westinghouse, an original defendant in this case, manufactured the turbines.[3] (See, **Exhibit 7**). Mr.

---

[3] On or about September 26, 2007 Plaintiffs stipulated to the dismissal of Westinghouse as a direct defendant.

McCurdy advised that these turbines were insulated with what he believed was asbestos. (See, **Exhibit 6** at page 125, line 15 through page 126, line 5).  Mr. McCurdy also reaffirmed that as a machinist mate that sometimes he had to replace some gaskets on valves and the packing in the valves. (See, **Exhibit 6** at page 127, lines 14-18). Mr. McCurdy also recalled an occasion on which The Intrepid ran aground in 1970 requiring that it make an emergency stop in drydock at the Boston Navy Yard. (See, **Exhibit 6** at page 128, line 4-17). It was during that drydocking that the Westinghouse turbine were actually broken open and repaired. (See, **Exhibit 6** at page 128, line 19 through page 129, line 6). Ultimately The Intrepid returned to its home port at the Naval Base at Quonset Point, Rhode Island. (See, **Exhibit 6** at page 129, line 7 through page 130, line 7). At each point where the USS Intrepid was drydocked, Mr. McCurdy lived on board ship and was exposed to repairs on equipment like the turbines in the engine room. (See, **Exhibit 6** at page 130, lines 12-20).

8.      Mr. McCurdy confirmed also that as an enlisted man in the U.S. Navy every chore he did on board ship was as result of an order he received from a superior Naval officer. He further advised that the equipment he worked on and any material or part he used for repair work, including gaskets and packing were specified for use by the U.S. Navy.  (See, **Exhibit 6** at page 130, line 21 through page 133, line 7).

9.      Among the qualified products specified for use on Navy vessels during this time period were, gaskets and packing, manufactured and distributed by both Garlock and Green Tweed. The gasket and packing of both defendants are specifically identified under U.S. Navy QPL# 17472-23-29.

10.     It is generally safe to assume that a United States military base is a federal enclave subject to the exclusive jurisdiction of the United States. *See, Celli v. Shoell*, 995 F. Supp. 1337, 1341 (D. Utah 1998). Such is the case here.

11.     There is no dispute that the longstanding Naval Base located in Philadelphia to which Plaintiff reported to board the Intrepid is a "federal enclave" and has been such for over 200 years. http://www.workshopoftheworld.com/south_phila/shipyard.html. Federal Appellate Courts such as the United States Court of Appeals for the Third Circuit have recognized and accepted this as a "given" when dealing with cases arising out of that site. *See, Non-Resident Taxpayers Association v. The Municipality of Philadelphia et al.* 478 F.2d 456, 457 (3d Cir. 1973).

12.     The Boston Navy Yard, originally called the Charlestown Navy Yard and after 1945 called Boston Naval Shipyard was one of the oldest shipbuilding facilities of the United States Navy. Established in 1801, it was officially closed on July 1, 1974. http://en.wikipedia.org/wiki/Boston_Navy_Yard#History.

13.     Likewise, the U.S. Naval base at Quonset Point Rhode Island is a federal enclave. As stated by Plaintiff, this Navy base was the Intrepid's home port. During the 1960's and early 1970's, four aircraft carriers used Quonset Point as their home port. They included the USS Lake Champlain, The USS Essex, the USS Wasp and the USS Intrepid.

14.     Quonset Point Naval Air Station was established as part of the Lend-Lease Act of 1941, shortly before the US entered World War II. It served as the major northeastern naval base during the war and subsequent years. During its heyday Quonset's workforce, combined with that of the adjacent Davisville Construction Battalion Center, was the largest in the state of Rhode Island. Like other WWII-era military installations

6

across the country. The base was decommissioned on June 28, 1974.
http://quonsetpoint.artinruins.com/quonset_main.htm.

15.     The defendants' right of removal in a civil action is provided in 28 U.S.C.
§ 1441(a), which states:

> (a) Except as otherwise expressly provided by Act of Congress, any
> civil action brought in a State court of which the district courts of the
> United States have original jurisdiction, may be removed by the
> defendant or the defendants, to the district court of the United States
> for the district and division embracing the place where such action is
> pending.

Thus pursuant to 28 U.S.C. § 1441(a), defendant(s) may remove an action to federal court

if the case is one over which the U.S. district courts have original jurisdiction.  Further,

federal courts have "original jurisdiction" over cases involving diversity of citizenship

between parties, because of claims arising under federal law, or by virtue of some other

explicit grant of jurisdiction. *Powers v. South Central United Food & Commercial*

*Workers Unions and Employers Health & Welfare Trust*, 719 F.2d 760, 763 (5th Cir.

1983).  Claims "arising under" federal law are those based on federal question jurisdiction

under 28 U.S.C. §1331, which provides that, "[t]he district courts shall have original

jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the

United States."

16.     In the instant matter, the U.S. District Court has original jurisdiction

pursuant to federal enclave jurisdiction, which is a specific type of federal question

jurisdiction arising under 28 U.S.C. § 1331.  The Constitution grants Congress the power

"[t]o exercise exclusive Legislation in all Cases whatsoever . . . over all Places purchased

by the Consent of the Legislature of the State in which the Same shall be, for the Erection

of Forts, Magazines, Arsenals, Dockyards, and other needful Buildings." U.S. Const. art.

I., § 8, cl. 17.  The federal courts have held that "[s]uch places are 'federal enclaves' within which the United States has exclusive jurisdiction." *Akin v. Ashland Chemical*, 156 F.3d 1030, 1034 (10th Cir. 1998), (*citing Mater v. Holley*, 200 F.2d 123, 124-25 (5th Cir. 1952)).  As such, "[p]ersonal injury actions which arise from incidents occurring in federal enclaves may be removed to federal district court as a part of federal question jurisdiction." *Akin*, 156 F.3d at 1034; *Mater*, 200 F.2d at 124-25.

17.    The U.S. District Court also has original jurisdiction over this matter on the basis of 16 U.S.C. § 457, which provides the following:

> *Action for death or personal injury within national park or other place under jurisdiction of United States; application of State laws.*
> In the case of the death of any person by the neglect or wrongful act of another within a national part or other place subject to the exclusive jurisdiction of the United States, within the exterior boundaries of any State, such right of action shall exist as though the place were under the jurisdiction of the State within whose exterior boundaries such place may be; and in any action brought to recover on account of injuries sustained in any such place the rights of the parties shall be governed by the laws of the State within the exterior boundaries of which it may be. (Feb. 1, 1928, c. 15, 45 Stat. 54).

Pursuant to 16 U.S.C. § 457, federal courts are explicitly granted jurisdictional authority over death and personal injury claims arising in federal enclaves. *Stokes v. Adair*, 265 F.2d 662, 665-66 (4th Cir. 1959).  The laws of the state that are assimilated under § 457 "lose their character as laws of the state and become laws of the Union," thereby providing an independent basis for federal jurisdiction independent of the "arising under federal law" provision of 28 U.S.C. § 1331. *Id.*

18.    In the present matter, Mr. McCurdy has alleged that his exposure to asbestos fibers has caused him to contract cancer of the pleural lining of his lung, known as mesothelioma. He has stated to his treating physician and during two separate depositions that at least part of his exposure to asbestos occurred while he was on active

duty in the U.S. Navy. The only ship on which he served during his three years of active duty was the USS Intrepid. Mr. McCurdy has testified that while on the Intrepid it was **drydocked** at the Philadelphia and Boston Naval bases and that he lived onboard ship during repairs there and while the ship was docked at its home port of Quonset Point, Rhode Island.

19.    Mr. McCurdy further testified that as a machinist mate he would remain in the engine room while repairs were being performed and specifically recalls being present when the asbestos insulated Westinghouse turbine was opened up for repair.

20.    He himself used asbestos containing gaskets and packing when he performed repairs himself.

21.    Experts for Plaintiffs, in mesothelioma cases, including Dr. Gabrielson, have long maintained, and will surely do so in this case, that "each and every" exposure to asbestos substantially contributes to the risk of contracting mesothelioma. Plaintiffs routinely argue that it is the cumulative dose of asbestos that counts.

22.    Given that Plaintiff's own testimony has now established that he has sustained an injurious exposure to asbestos while living on three separate exclusive federal enclaves, the United States District Courts now have two independent bases for original jurisdiction:  **federal enclave jurisdiction** – a specific type of federal question jurisdiction arising under 28 U.S.C. § 1331; and **16 U.S.C. § 457 jurisdiction**, by virtue of the explicit grant of authority provided by statute.  Therefore, as these cases involve the federal courts' original jurisdiction, and as the Plaintiffs originally brought suit in Baltimore City, Maryland, the Defendants may properly remove this case to the United States District Court for the District of Maryland, Northern Division pursuant to 28 U.S.C. §1441(a). *See Akin v. Big Three Industries*, 851 F. Supp. 819, 821-22 (E.D. Tex. 1994)

(stating that "enclave jurisdiction is properly invoked" where "plaintiffs' claims arise out of exposure to chemicals on base in furtherance of their employment duties"); *Fung v. Abex Corp., et al.*, 816 F. Supp. 569, 571 (N.D. Cal. 1992) (indicating that as plaintiff's causes of action arose on an exclusive federal enclave, they were properly the subject of federal jurisdiction).

23.     All other Defendants named and served in the State Case have joined in, and consented to, this Notice of Removal, and each has expressly stated their joinder and consent in written correspondence.  These correspondences have been filed separately with the Clerk, United States District Court for the District of Maryland under the docket entry, "Consent of Removal."  These correspondences do not constitute a waiver of any defenses to which these Defendants are otherwise entitled, including without limitation, the defenses of lack of personal jurisdiction, insufficient process or service of process, and improper venue.

24.     In addition to Removal based on federal enclave jurisdiction, 28 U.S.C. §1442(a)(1) provides that:

> (a) A civil action...commenced in a State court against any of the following may be removed by them to the district court of the United States for the district and division embracing the place where it is pending:
> (1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office....

25.     Removal to federal court is appropriate where the moving party demonstrates that it acted under the direction of a federal officer, raises a federal defense to Plaintiff's claim, and shows a causal nexus between Plaintiff's claim and the acts which Defendants allegedly performed under color of federal office. *See, Madden v. Able Supply Co.*, 205 F. Supp. 2d 695 (S.D. Tex. 2002). This basis for removal has been recognized in

an asbestos setting by this and other federal district courts. *See, Pack v. ACandS, Inc.*, 838 F. Supp. 1099 (D. Md. 1993); *Crocker v. Borden,* 852 F. Supp. 1322, 1326-27 (D.D. La. 1994); *but see, Good v. Armstrong World Industries,* 914 F. Supp. 1125 (E.D.Pa. 1996) (remanded for lack of sufficient supporting information); *Feidt v. OCF*, No. 96-4349 (D.N.J. 1997) (failure to warn allegations against removing defendant not sufficiently under government control).

26.    To the extent that Garlock and Greene Tweed did supply asbestos-containing gasket or packing products to the U.S. Navy, that were used by the Plaintiff, Garlock and Greene Tweed undertook those actions at the direction of a federal officer. Thus to the extent that Plaintiff came into contact with such asbestos-containing products, that occurred because officers of the U.S. Navy and/or federal government directed that they be used on board the USS Intrepid by machinist mates.  Mr. McCurdy, himself, admitted that his use of asbestos containing gaskets and packing on pumps was always at the direction of his superior officers and with the specified materials they directed him to use. By demonstrating these facts, Defendants, Garlock and Greene Tweed have raised a federal defense. *See, Boyle v. United Technologies Corp.*, 487 U.S. 500, (1998).

27.    The consent of other defendants in this action is not required, where removal is sought pursuant to 28 U.S.C.§1442 (a)(1). *Ely Valley Mines, Inc. v. Hartford Accident Indemnity Co.*, 644 F.2d 1310, 1315 (9th Cir., 1981); *National Audobon Society v. Development of Water & Power of the City of Los Angeles*, 496 F. Supp. 509 (E.D. Cal. 1980).

28.    Garlock and Greene Tweed reserve the right to amend this Notice of Removal as may be necessary.

29.     Garlock and Greene Tweed reserve all defenses, including without limitation, the defenses of lack of personal jurisdiction, insufficient process or service of process, and improper venue.

30.     In accordance with 28 U.S.C. §1446(a) and Local Rule 103(5)(a), Garlock and Greene Tweed have filed with this Notice of Removal true and correct copies of all process, pleadings, and orders that have been served upon Garlock and Greene Tweed in the State Case as of this date.  Additionally, within 30 days, Garlock and Greene Tweed will file true and correct copies of all other documents on file in the State Case, together with a certification from counsel that all filings in the State Case have been filed in the United States District court.

WHEREFORE, Defendants Garlock and Greene Tweed, joined in and consented to by all other Defendants named and served in the State Case, whrere necessary, remove this action to the United States District Court for the District of Maryland, Northern Division.

Thomas P. Bernier
Federal Bar # 2141

SEGAL, MCCAMBRIDGE, SINGER
& MAHONEY, LTD.
One North Charles Street
Suite 2500
Baltimore, MD  21201
Phone:    410-779-3960
Fax:       410-779-3967

Attorneys for:
**Defendants, Garlock
and Greene Tweed**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this ___ day of October, 2007, a copy of the

foregoing was electronically filed and served via first-class mail, postage prepaid and via

Lexis/Nexis File and Serve upon the following individuals:

Charles Candon, Esquire
Law Offices of Peter G. Angelos
One Charles Center
100 N. Charles Street, Suite 2200
Baltimore, MD  21201
- **Attorneys for Plaintiffs**

---

Stephen A. Fennell, Esquire
Steptoe & Johnson, LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036-1795

Attorneys for the following Defendant:
- **Metropolitan Life Insurance Company**

---

David F. Albright, Esquire
Albright & Goertemiller
1122 Kenilworth Drive, Suite 500
Baltimore, Maryland 21204

Attorneys for the following Defendant:
- **H.B. Smith Co., Inc.**

---

Malcolm S. Brisker, Esquire
Goodell, DeVries, Leech & Dann, LLP
One South Street, 20th Floor
Baltimore, Maryland 21202

Attorneys for the following Defendants:
- **Hopeman Brother, Inc.**
- **Selby Battersby & Co.**
- **Zurn Industries**
- **Hampshire Industries, Inc. f/k/a John H. Hampshire Co.**

---

13

Thomas L. Doran, Esquire
DeCaro, Doran, Siciliano, Gallagher & DeBlasis, LLP
4601 Forbes Boulevard, Suite 200
Post Office Box 40
Lanham, Maryland 20703

Attorneys for the following Defendant:

- **A.O. Smith Corporation**

---

Katherine S. Duyer, Esquire
Laura Abenes, Esquire
Gavett and Datt, P.C.
15850 Crabbs Branch Way, Suite 180
Rockville, Maryland 20855

Attorneys for the following Defendant:

- **Keeler/Dorr-Oliver Boiler Company**
- **GL & V Dorr-Oliver Incorp.**
- **Premier Refractories Inc., f/k/a J. H. France Refractories Co.**
- **S.B. Decking Inc.**

---

Thomas Hanna, Esquire
Kelley, Jasons McGowan Spinelli & Hanna
Two Liberty Place
50 South 16th Street, Suite 1900
Philadelphia, Pennsylvania 19102

Attorneys for the following Defendant:

- **MCIC, Inc.**

---

Jeannie Pittillo Kauffman, Esquire
Bacon, Thorton & Palmer, LLP
6411 Ivy Lane, Suite 706
Greenbelt, Maryland 20770

Attorneys for the following Defendants:

- **Bondex International, Inc.**
- **RPM, Inc.**

---

Steven A. Luxton, Esquire
Morgan, Lewis & Bockius, LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004

Attorneys for the following Defendant:

- **Owen-Illinois, Inc.**

---

Neil J. MacDonald, Esquire
Hartel, Kane, DeSantis, MacDonald & Howie, LLP
Calverton Office park
11720 Beltsville Drive, Suite 500
Beltsville, Maryland 20705

Attorneys for the following Defendant:

- **Crane Co.**
- **Square D Company**

---

Joel D. Newport, Esquire
Moore & Jackson, LLC
305 Washington Avenue, Suite 401
Towson, Maryland 21204

Attorneys for the following Defendant:

- **Kaiser Gypsum, Co.**
- **Columbia Boiler Co.**
- **Columbia Heating Products Co.**
- **The Wallace & Gale Asbestos Settlement Trust**

---

Jeremy W. North, Esquire
North & Cobb, P.A.
7313 York Road
Towson, Maryland 21204

Attorneys for the following Defendant:

- **Uniroyal, Inc.**

---

Laura Cellucci, Esquire
Douglas B. Pfeiffer, Esquire
Robin Silver, Esquire
Miles & Stockbridge, P.C.
10 Light Street
Baltimore, Maryland 21202-1487

Attorneys for the following Defendants:

- **CertainTeed Corporation**
- **Cleaver-Brooks, Inc.**
- **Georgia-Pacific, LLC**

- **Superior Boiler Works**
- **R. E. Michel Company Inc.**

---

Steven J. Parrott, Esquire
Laura Higgs, Esquire
DeHay & Elliston, LLP
36 South Charles Street, Suite 1300
Baltimore, Maryland 21201

Attorneys for the following Defendants:
- **Union Carbide Corporation**
- **Riley Power, Inc.**
- **Babcock Borsig Power, Inc.**
- **Foster Wheeler Corporation**
- **Bayer Cropscience, Inc.**
- **Burnham Corporation**

---

M. King Hill, Esquire
Brian A. Zemil, Esquire
Venable, LLP
210 Allegheny Avenue
Post Office Box 5517
Towson, Maryland 21285-5517

Attorneys for the following Defendants:
- **American Standard Companies, Inc.**
- **International Paper Company**
- **The Goodyear Tire & Rubber Company, f/k/a Kelly Springfield Tire Company**
- **Rapid American Corporation**

---

David A. Seltzer, Esquire
Wilson, Elser, Moskowitz, Edelman & Dicker, LLP
The Colorado Building
1341 G Street, NW, Suite 500
Washington, D.C. 20005

Attorneys for the following Defendant:
- **Oakfabco, Inc.**

---

Keith R. Truffer, Esquire
Royston, Mueller, McLean & Reid, LLP
The Royston Building

102 West Pennsylvania Avenue, Suite 600
Towson, Maryland 21204

Attorneys for the following Defendant:

- **A.W. Chesterton Company**
- **The William Powell Company**
- **Durable Manufacturing Company**

---

Donald S. Meringer, Esquire
Meringer, Zois & Quigg, LLC
300 East Lombard Street, Suite 1440
Baltimore, Maryland 21202

Attorneys for the following Defendant:

- **General Electric Company**

---

Philip Kulinski, Esquire
Weathersby & Houff
120 E. Baltimore Street, Suite 1300
Baltimore, Maryland 21202

Attorneys for the following Defendant:
- **CBS Corporation f/k/a Westinghouse Electric Corporation**

---

Gordon Samuel Woodward, Esquire
The James Monroe Building
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC   20006-1825

Attorneys for the following Defendant:

- **Fort Kent Holdings f/k/s Dunham Bush, Inc.**

---

Mike Osbourne, Esquire
Brassel Baldwin Kagan & May
Executive Plaza
11350 McCormick Road, Suite 701
Baltimore, Maryland 21031

Attorneys for the following Defendant:

- **Conwed Corp.**

---

John J. Nagle, III, Esquire

Law Office of Bodie, Nagle, Dolina, Smith & Hobbs, P.A.
21 W. Susquehanna Avenue
Towson, Maryland 21204-5279

Attorneys for the following Defendant:

- **E.L. Stebbing & Co., Inc.**

---

John Boyd, Esquire
Lord & Whip, P.A.
Charles Center South
36 South Charles Street, 10th Floor
Baltimore, Maryland 21201-3020

Attorneys for the following Defendant:

- **Hercules Chemical Company, Inc.**
- **RHI Refratories America f/k/a RHI AG**

---

Peter Woolson, Esquire
Redwood Tower
217 East Redwood Street, Suite 1500
Baltimore, Maryland 21202

Attorneys for the following Defendant:

- **John Crane-Houdaille, Inc.**

---

David Allen, Esquire
Goodell, DeVries, Leech & Dann, LLP
One South Street, 20th Floor
Baltimore, Maryland 21202

Attorneys for the following Defendant:

- **Lofton Corporation**
- **Wayne Manufacturing Corporation**

---

Thomas P. Bernier