MDL 875
JUDICIAL PANEL ON MULTIDISTRICT LITIGATION
DEC 26 2007
FILED CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE: ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI) | MDL No. 875 |
| | December 21, 2007 |

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| LAURA CONTOIS, executrix of the estate of Hugo Mortenson, et al. Plaintiffs, | Civil Action No. 3:07-cv-01328-AWT |
| v. | |
| ABLE INDUSTRIES, INC., et al. Defendants. | December 21, 2007 |

PLEADING NO. 5300

**PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER TO MDL**

The plaintiffs in the above-captioned action hereby move this Court to vacate the conditional transfer order that will transfer this case to the Asbestos MDL (MDL-875) in Philadelphia (CTO-297). Transfer of this case should not be allowed for two main reasons: 1) this case does not satisfy the preconditions for transfer; and 2) transferring this case to the MDL would violate the plaintiffs' constitutional rights.

A memorandum of law is attached.

OFFICIAL FILE COPY

RECEIVED CLERK'S OFFICE
2007 DEC 26 A 9:51
JUDICIAL PANEL ON MULTIDISTRICT LITIGATION



EARLY, LUDWICK, SWEENEY & STRAUSS
An Association of Professional L.L.C.s
EARLY, LUDWICK & SWEENEY, L.L.C.
ONE CENTURY TOWER • 11th FLOOR • 265 CHURCH STREET • P.O. BOX 1866
NEW HAVEN, CONNECTICUT 06508-1866 • (203) 777-7799 • JURIS. NO. 409080

IMAGED DEC 27 2007



Respectfully submitted,
THE PLAINTIFFS


By /s/Christopher Meisenkothen, Esq.
Christopher Meisenkothen, Esq.
cmeisenkothen@elslaw.com
Federal Bar No.: CT 20906
Early, Ludwick & Sweeney, LLC
One Century Tower, 11th Floor
265 Church St., PO Box 1866
New Haven, CT 06508
203-777-7799 phone
203-785-1671 fax


## Certificate of Service

I hereby certify that on December 21, 2007 a copy of foregoing PLAINTIFFS'
MOTION TO VACATE CONDITIONAL TRANSFER ORDER TO MDL was
filed and served, postage prepaid, via United States Postal Service to all parties
listed on the attached certification page.


/s/Christopher Meisenkothen, Esq.
Christopher Meisenkothen, Esq.
Federal Bar No.: CT 20906
Early, Ludwick & Sweeney, LLC
265 Church Street, 11th Floor
New Haven, CT 06510
203-777-7799 phone
203-785-1671 fax
cmeisenkothen@elslaw.com
Counsel for the Plaintiffs

RECEIVED CLERK'S OFFICE
2007 DEC 26 A 9: 51
JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

EARLY, LUDWICK, SWEENEY & STRAUSS
An Association of Professional L.L.C.s
**EARLY, LUDWICK & SWEENEY, L.L.C.**
ONE CENTURY TOWER • 11th FLOOR • 265 CHURCH STREET • P.O. BOX 1866
NEW HAVEN, CONNECTICUT 06508-1866 • (203) 777-7799 • JURIS. NO. 409080

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

DEC 2 6 2007

FILED
CLERK'S OFFICE

|  |  |  |
|---|---|---|
| IN RE:  ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI) | : | MDL No. 875 |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : | December 21, 2007 |

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

|  |  |  |
|---|---|---|
| LAURA CONTOIS, executrix of the estate of Hugo Mortenson, et al. Plaintiffs, | : : : | Civil Action No. 3:07-cv-01328-AWT |
| v. | : : | |
| ABLE INDUSTRIES, INC., et al. Defendants. | : : | December 21, 2007 |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER TO MDL

The plaintiffs in the above-captioned action hereby move this Court to vacate the conditional transfer order that will transfer this case to the Asbestos MDL (MDL-875) in Philadelphia (CTO-297).  Transfer of this case should not be allowed for two main reasons:  1) this case does not satisfy the preconditions for transfer; and 2) transferring this case to the MDL would violate the plaintiffs' constitutional rights.

## I.    Introduction and facts:

In accordance with Rules 7.4(c) and 7.4(d) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, the plaintiffs oppose the transfer of the above-captioned action to the United States District Court for the Eastern District of Pennsylvania under 28 U.S.C. § 1407. The plaintiffs respectfully ask that this Court enter an Order vacating CTO-297, and allowing

EARLY, LUDWICK, SWEENEY & STRAUSS
An Association of Professional L.L.C.s
**EARLY, LUDWICK & SWEENEY, L.L.C.**
ONE CENTURY TOWER • 11th FLOOR • 265 CHURCH STREET • P.O. BOX 1866
NEW HAVEN, CONNECTICUT 06508-1866 • (203) 777-7799 • JURIS. NO. 409080

RECEIVED CLERK'S OFFICE
2007 DEC 26 A 9: 52
JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

this case to be litigated and proceed to trial in the United States District Court for the District of Connecticut.

This case was originally filed in the Superior Court for the Judicial District of Fairfield at Bridgeport in Bridgeport, CT in November of 2004.  Hugo Mortenson was diagnosed with terminal malignant mesothelioma – an asbestos-related cancer – on or around August 19, 2002, and that cancer inevitably took his life on December 27, 2002.  After waiting three full years on the Connecticut asbestos docket,[1] this case was originally due to commence trial in October or November of this year.[2]  Now, at the eleventh hour, the defendants have frustrated the plaintiffs' hopes for their long-awaited day in court by removing this case to federal court (District of Connecticut) claiming federal officer jurisdiction arising from Mr. Mortenson's allegations of asbestos exposure while serving in the United States Navy.  The plaintiffs filed a motion to remand the case to state court, which was denied by the court (Thompson, J.).  The plaintiffs now move to prevent the transfer of this case to the MDL and the concomitant, irreparable damage that would be done to their lawsuit and to their constitutional rights.

**II.**      **Argument:**

Pursuant to 28 U.S.C. § 1407(a), a case may be transferred to the MDL if the court makes an affirmative finding that the transfer 1) "will be for the convenience of parties and witnesses," and 2) "will promote the just and efficient conduct of such actions."  28 U.S.C. § 1407(a).  Neither of these preconditions to a transfer has been met in this case and, therefore, transfer to the MDL is inappropriate.  Even if these preconditions are deemed satisfied, transfer to the MDL

---

[1] The standing pre-trial orders governing the Connecticut Asbestos Litigation provide for the "acceleration" of cases involving living plaintiffs who have been diagnosed with a malignant condition.  Although Mr. Mortenson died from malignant mesothelioma, he was not living at the time his lawsuit was filed so instead of being accelerated for trial, Mr. Mortenson's case was placed on the inventory docket to come up for trial in normal due course.
[2] This case's current trial setting, if it had remained in the Superior Court, would now be January or February.

EARLY, LUDWICK, SWEENEY & STRAUSS
An Association of Professional L.L.C.s
**EARLY, LUDWICK & SWEENEY, L.L.C.**
ONE CENTURY TOWER • 11th FLOOR • 265 CHURCH STREET • P.O. BOX 1866
NEW HAVEN, CONNECTICUT 06508-1866 • (203) 777-7799 • JURIS. NO. 409080

should not be permitted as any transfer would irreparably violate the plaintiffs' constitutional rights.

### 1.     *Transfer of this case to the MDL in Philadelphia will* <u>*not*</u> *be convenient for the parties or witnesses.*

Any transfer of this case out of the State of Connecticut will **not** "be for the convenience of parties and witnesses" and, therefore, the first precondition for transfer to the MDL is not met and transfer should not be allowed. 28 U.S.C. § 1407(a). Mr. and Mrs. Mortenson filed their lawsuit in the Superior Court of Connecticut, their home state and their preferred choice of jurisdiction and venue.

The Mortensons have lived virtually their entire lives in Connecticut. Mr. Mortenson died in Connecticut and Mr. Mortenson is buried in Connecticut. After completing his Navy service during the Korean War, Mr. Mortenson returned to Connecticut and worked in Connecticut and raised his family in Connecticut for the next forty years. After retiring, the Mortensons remained in Connecticut. Some of the defendants – Union Carbide Corporation, General Electric Company, American Optical Company, Carrier Corporation (subsidiary of Connecticut-based United Technologies Company) and Crane Company, – are Connecticut-based companies. The parties have all retained Connecticut counsel to represent them in this action, discovery had already commenced in the Connecticut Superior Court and trial was imminent.

The plaintiffs' witnesses include the Mortenson's adult children, all of whom still reside in Connecticut. Although some expert and some lay witnesses may be traveling in from various parts of the country for trial, there is no reason why traveling to Philadelphia is any easier or more convenient than traveling to Connecticut. Since several defendants are based in

3

Connecticut, one or more of the various corporate witnesses (whether called by the defendants or by the plaintiffs) are also likely to be Connecticut-based.

It is hard to imagine why the jurisdiction of Connecticut is not an appropriate venue for this case. It is even harder to imagine why the jurisdiction of Philadelphia *would be* appropriate. Considering these simple facts, transfer to the MDL will not be for the convenience of the parties or witnesses and transfer should not be allowed.

### 2. *Transfer of this case to the MDL will <u>not</u> promote the just and efficient conduct of this action.*

Transfer to the MDL will also ***not*** "promote the just and efficient conduct of [this] action[]." 28 U.S.C. § 1407(a). Since the second precondition for transfer has also not been satisfied, transfer should not be allowed.

The attempted removal of asbestos cases is a common tactic for defendants seeking to delay or deny plaintiffs' rights to a trial on the merits of their state claims. Defendants seek to avail themselves of the "black hole" that is the federal Asbestos MDL. Once removed and assigned to the MDL, asbestos cases that would have proceeded to a timely trial in state court are forever mired in inactivity. Defendants benefit from the passage of time, while plaintiffs (most of whom die first) suffer from never having the opportunity to put their claims to a jury. As Judge Michael Mills of the United States District Court for the Northern District of Mississippi stated:

> [A]sbestos removal litigation … generally has less to do with effecting valid removals than with attempting to obtain a transfer of the case to a multi-district litigation (MDL) court, where the case generally languishes for a protracted period of time. While the desire of defendants to reach the comparative safety of an MDL court is understandable, their repeated efforts to do so, regardless of the jurisdictional merits, has resulted in an air of skepticism among the federal courts regarding the validity of most asbestos removals.

4

Rosamond v. Garlock Sealing Technologies, Inc., No. 3:03CV235, 2004 WL 943924 at *4 (N.D. Miss, Apr. 5, 2004).

Asbestos cases removed to federal court are transferred to MDL-875. The cases languishing in MDL-875 are not only never tried, but indeed virtually nothing happens to them at all. In fact, Chief Judge Hornsby of the United States District Court in Maine has recognized this very problem:

> If these claims return to state court, they will proceed to resolution. If they remain in federal court they will encounter significant delay upon their transfer through the panel on multidistrict litigation to the Eastern District of Pennsylvania where no asbestos trials or discovery takes place in deference to global settlement efforts. This delay is of economic benefit to the defendants and imposes costs on the plaintiffs.

In re Maine Asbestos Cases, 44 F.Supp.2d 368, 374 (D.Me 1999). Although approximately 103,000 asbestos cases have been transferred to MDL-875 from other federal courts during the life of MDL-875, no common or global discovery has been sought or obtained by either the plaintiffs or the defendants. Nor has the asbestos Plaintiffs' Steering Committee met since 1993. The defendants may argue that this case can be tried if it is remanded from MDL-875. As the defendant is well aware, however, while remand may be a theoretical possibility, it is not a real possibility. According to orders issued by the former MDL Judge, remands are only for the "sick and dying," and only then *after* a conclusion that all settlement avenues have been decided. See Carlough et al v. Amchem Products, Inc. et al., C.A. No. 93-215, U.S.D.C. for the E.D. of Penn., at 8 (April 1993) (Weiner, J.) (attached as Exhibit A). The MDL Court has made its intentions clear. All other motions for remand are "routinely denied." Id. at 8.

As further ordered by the former MDL Judge, it is the Court's stated intention to resolve MDL-875 cases through *negotiation*, not trial. Indeed, MDL-875 Administrative Order No. 3,

EARLY, LUDWICK, SWEENEY & STRAUSS
An Association of Professional L.L.C.s
**EARLY, LUDWICK & SWEENEY, L.L.C.**
ONE CENTURY TOWER • 11th FLOOR • 265 CHURCH STREET • P.O. BOX 1866
NEW HAVEN, CONNECTICUT 06508-1866 • (203) 777-7799 • JURIS. NO. 409080

which establishes a priority system for resolving asbestos cases, discusses resolution by settlement **only**. See Administrative Order No. 3, *In re Asbestos Products Liability Litigation (No. VI)*, in the U.S. District Court for the Eastern District of Pennsylvania (attached as Exhibit B). If there was any doubt that trial is not a realistic option for victims whose cases are transferred to MDL-875, those doubts were resolved when John F. Nangle, the then-Chair of the Multidistrict Litigation Panel, stated in reference to MDL-875, "**that anything but trial is the answer**." See Excerpt from Transcript of Hearing, Judicial Panel on Multidistrict Litigation, *In re Asbestos Products Liability Litigation(No. VI)*, Middle District of Florida, January 29, 1999, at 69 (attached as Exhibit C).

The data collected by the Judicial Panel on Multidistrict Litigation clearly illustrates what an empty promise MDL-875 is, even for the sick and dying. By August 10, 2000, more than 85,000 cases had been transferred to MDL-875. Yet, during Fiscal Year 1998 (October 1, 1997-September 30, 1998) **only four cases were remanded back for trial. In Fiscal Year 1999, only six cases were remanded back for trial.** See Letter from Ariana Estariel, Judicial Panel on Multidistrict Litigation, to Kay Gunderson Reeves, August 10, 2000, at 2 (results of data request) (attached as Exhibit D). Though the data for FY2000 show an increase in remand activity, the number remanded as of the date of Ms. Estariel's letter was only 0.2294% of the total number of cases transferred to MDL-875. Id.

A recent summary of additional docket information from the MDL Court is instructive. See Summary (attached here as Exhibit E). Between September 30, 2003 and September 30, 2004, only 20 of the 32,542 pending cases were remanded (<0.1% of pending MDL cases, or fewer than one-in-a-thousand). Between the same dates in 2004 and 2005, only an additional 61 cases were remanded (<0.2% of pending cases, or fewer than two-in-a-thousand). Between 2005

EARLY, LUDWICK, SWEENEY & STRAUSS
An Association of Professional L.L.C.s
**EARLY, LUDWICK & SWEENEY, L.L.C.**
ONE CENTURY TOWER • 11th FLOOR • 265 CHURCH STREET • P.O. BOX 1866
NEW HAVEN, CONNECTICUT 06508-1866 • (203) 777-7799 • JURIS. NO. 409080

and 2006, a scant 6 cases were remanded (<0.02% of pending cases, or **fewer than two-in-ten thousand**). The total numbers of transferred cases and pending cases have risen each year. And if one looks at the totals, it is plain to see that over 99% of all the pending cases remain dormant for years, if not forever. These are not encouraging statistics.[3]

Remand is an empty dream for victims unlucky enough to have their cases transferred to MDL-875. Indeed, it is to achieve this very result (referral to the black hole that is MDL-875) that this removal was pursued in the first place. The defendants should not be rewarded for taking unfair advantage of procedural tools that will permit this malignant mesothelioma case to disappear into the Asbestos MDL. The defendant has already thwarted the plaintiffs' hopes for a speedy trial on the accelerated docket in the Connecticut Superior Court by removing this case to federal court. After successfully challenging the plaintiffs' motion to remand this case to state court, the defendant (revealing its true motives) is not content simply to litigate this case in the federal forum. Instead, the defendant continues to thwart any remaining hopes that the plaintiffs had for a trial by pursuing transfer of this case to the Asbestos MDL, a transfer, it should be noted, that has been seriously and legitimately criticized not only by the plaintiffs, but by the federal courts themselves. See Rosamond v. Garlock Sealing Technologies, Inc., No. 3:03CV235, 2004 WL 943924 at *4 (N.D. Miss, Apr. 5, 2004); In re Maine Asbestos Cases, 44 F.Supp.2d 368, 374 (D.Me 1999); Madden v. Able Supply Company, 205 F.Supp.2d 695, 702 (May 27, 2002).

Although invited to do so by the plaintiffs, the defendant has not agreed to litigate this case in the Connecticut federal court. If the defendant's real motive was simply to avail itself of

---

[3] The numbers are similarly abysmal if one compares the total number of remanded cases (433) to the total number of transferred cases (103,364) as of September 30, 2006. Using those numbers, the rate of remand for all cases is less than 0.45%, or fewer than five-in-a-thousand.

EARLY, LUDWICK, SWEENEY & STRAUSS
An Association of Professional L.L.C.s
**EARLY, LUDWICK & SWEENEY, L.L.C.**
ONE CENTURY TOWER • 11th FLOOR • 265 CHURCH STREET • P.O. BOX 1866
NEW HAVEN, CONNECTICUT 06508-1866 • (203) 777-7799 • JURIS. NO. 409080

a federal forum within which to litigate its federal defenses, then those motives would be fulfilled by litigating this case in the District of Connecticut. But the defendant is not content even to litigate in Connecticut. The defendant apparently believes that letting this case stagnate in the MDL is the only option that is "fair" to all parties. It should be crystal clear by now what the defendant's true motive is – transfer to the MDL and eternal stagnation of this mesothelioma death case.

There is little serious question that the plaintiffs are about to suffer substantial harm if their case is transferred to the MDL where it will become one of 30,000+ pending cases, never to see the light of day again.[4] The defendant may claim that the plaintiffs have relied on outdated data and have essentially ignored the 75,000 cases that have been "terminated" by the MDL. This is simply untrue. The plaintiffs have provided all current data from the Asbestos MDL's own docket, which clearly show an abysmal remand rate even up through September of 2006. The number of cases "terminated" or "dismissed" is misleading since that number takes into consideration cases that were dismissed voluntarily by plaintiffs as well as cases that were dismissed (not remanded for trial) by the MDL for a variety of reasons, including recent attempts by various defendants to dismiss large numbers of nonmalignant cases that rely on certain

---

[4] At last count, plaintiffs' counsel had over 600 plaintiffs sitting in the Asbestos MDL (some in individual cases and some in multi-plaintiff cases) for several years (some dating back to the inception of the MDL) and literally no action of any kind has been taken in those cases. As one specific example, since October of 2006 plaintiffs' counsel has been actively trying to get one of their Rhode Island mesothelioma cases transferred back to Rhode Island for trial. After numerous trips to Philadelphia for settlement conferences, a small number of defendants have settled the case, but one or more defendants remain obstinate that they will not take any action due to the fact that the case is in limbo in the MDL. As of the date of this Motion (more than one year later) that case is still pending in the MDL with no indication of when, or if, it will be transferred back to Rhode Island for trial. The plaintiffs encourage the defendants to submit any and all data they have on the numbers of cases that they have settled or tried (as opposed to simply "resolved" or "terminated" or "dismissed") in the MDL for comparison. It would be helpful and instructive for the plaintiffs and the Court to know what the defendant's own experience has been in the MDL. The plaintiffs have provided real data and real information on their own experience in the MDL, but, to date, the defendant has provided no information about its experience "resolving" cases in the MDL.

8

EARLY, LUDWICK, SWEENEY & STRAUSS
An Association of Professional L.L.C.s
**EARLY, LUDWICK & SWEENEY, L.L.C.**
ONE CENTURY TOWER • 11th FLOOR • 265 CHURCH STREET • P.O. BOX 1866
NEW HAVEN, CONNECTICUT 06508-1866 • (203) 777-7799 • JURIS. NO. 409080

doctors for their diagnoses. In any event, the number of cases "terminated" or "dismissed" by the MDL is **not** an indication of the number of cases settled, tried or remanded.

Again, the plaintiffs encourage the defendants to share their own experiences in the MDL. The plaintiffs have provided current data from the MDL itself, and plaintiffs' counsel has provided details about its own experience in the MDL, but, to date, the defendants have provided no information about their own experience in the MDL. Perhaps the defendants can prove the plaintiffs wrong and show that the defendants have a successful history or settling or trying a number of cases in the MDL. That information would be insightful, instructive and welcome, but the plaintiffs venture to guess that the defendants will not, because they cannot, provide any such information to this Court.

The plaintiffs' fate is best summed up by a concise statement from the United States District Court for the Southern District of Texas, which found that if the cases before that court were not remanded,

> they will surely be transferred to the MDL Court in the Eastern District of
> Pennsylvania. There are thousands of asbestos cases pending in that forum, and,
> if history be any indicator, Plaintiff's claims against the Remaining Defendants
> will not be heard for many years. Keeping these claims in federal court will not
> increase efficiency and expediency. Rather the opposite is true.

Madden v. Able Supply Company, 205 F.Supp.2d 695, 702 (May 27, 2002). The conditions for transfer to the MDL have not been met, and indeed, cannot be met. Transfer is inappropriate and should not be allowed.[5]

---

[5] The plaintiffs also take personal and professional umbrage at the particularly offensive claim that they are engaging in an "elaborate game of forum shopping," which the defendants accused the plaintiffs of doing in the District Court. If anyone is forum shopping, it is the defendants. For all intents and purposes, the plaintiffs are lifelong residents of the State of Connecticut. Several of the defendants are Connecticut-based companies. The plaintiffs retained Connecticut counsel and filed their case in the court of their **home state**. It was the defendants that removed this case to the USDC for the District of Connecticut and it is the defendants who are now attempting to transfer this case to the distant foreign forum of Philadelphia. It is baffling to understand how the defendants could claim that the **plaintiffs** are the ones who are forum shopping.

9

EARLY, LUDWICK, SWEENEY & STRAUSS
An Association of Professional L.L.C.s
**EARLY, LUDWICK & SWEENEY, L.L.C.**
ONE CENTURY TOWER • 11th FLOOR • 265 CHURCH STREET • P.O. BOX 1866
NEW HAVEN, CONNECTICUT 06508-1866 • (203) 777-7799 • JURIS. NO. 409080

### 3.    *Transfer to the MDL would violate the plaintiffs' constitutional rights.*

Transferring this case to the Asbestos MDL would violate the plaintiffs' constitutional rights under Article 1, §§ 1, 10 and 20 of the Connecticut Constitution and the Seventh and Fourteenth Amendments to the United States Constitution.

  a.    *Transfer to the MDL would violate the plaintiffs' State right of redress or "right of open access to the courts."*

Article 1, § 10 of the Connecticut Constitution creates a "right of redress" or "right to open access to the courts" and provides that "[a]ll courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay." The state right of redress holds a slightly different meaning than the various equal protection provisions by providing an explicit constitutional guarantee of open access to the state courts to pursue any cause of action that existed at the time of the constitution's adoption. See Daily v. New Britain Machine Co., 200 Conn. 562, 512 A.2d 893 (1986).

Although the state constitutional right of redress does not "automatically translate[] each and every claim that a litigant may raise into one invoking fundamental rights;" Zapata v. Burns, 207 Conn. 496, 507, 542 A.2d 700 (1988); it did "recognize[] all existing rights and removed from the power of the legislature the authority to abolish those rights in their entirety . . . ." Daily, 200 Conn. at 585. However, "the legislature retains the power to provide reasonable alternatives to the enforcement of such rights. Where such reasonable alternatives are created, the legislature may then restrict or abolish the incorporated common-law or statutory rights." Id. The Workers' Compensation Act represents one such example of the legislature's power. Conn. Gen. Stat. § 31-275, *et seq*.

EARLY, LUDWICK, SWEENEY & STRAUSS
An Association of Professional L.L.C.s
**EARLY, LUDWICK & SWEENEY, L.L.C.**
ONE CENTURY TOWER • 11th FLOOR • 265 CHURCH STREET • P.O. BOX 1866
NEW HAVEN, CONNECTICUT 06508-1866 • (203) 777-7799 • JURIS. NO. 409080

In passing the Workers' Compensation Act, the legislature abolished employees' common law right to sue their employers in tort. As a "reasonable alternative" to the common law right it abolished, the legislature created a workers' compensation system wherein an injured worker received the "new" right to seek compensation for an injury sustained in the course of his employment without regard to fault. This is the fundamental public policy trade-off underlying the Workers' Compensation Act. Employers have a responsibility to compensate employees for workplace injuries and employees surrender their common law right to sue their employers in tort. Employers get predictable, finite compensation scales and "fixed" liability, while employees get quick compensation for their injuries at a fixed percentage of their usual wage. This type of "substitution" scheme is normally permissible, provided that the alternative remedy is reasonable and adequate. However, in the case of the Asbestos MDL, no such reasonable alternative exists for plaintiffs that are transferred to Philadelphia.

The statistics cited above show that there is virtually no movement of cases in the MDL. This systemic inertia violates the plaintiffs' State constitutional rights to redress and open access to the courts. Upon transfer to the MDL, the plaintiffs' case will be mired in the MDL quicksand and all remedies against these particular defendants will be effectively extinguished, leaving no "reasonable alternative" for the plaintiffs' to pursue their lawful claims against these defendants. The plaintiffs' State constitutional right to seek redress against these defendants for their injuries would be foreclosed, and their right to open access to the courts would become a nullity. Such an obvious injustice should not be allowed to stand.

> b.   *Transfer to the MDL would violate the plaintiffs' right of trial by jury as guaranteed by the Seventh Amendment to the U.S. Constitution and Article 1, § 19 of the Connecticut Constitution.*

11

The Seventh Amendment to the United States Constitution guarantees that "[i]n Suits at common law . . . the right of trial by jury shall be preserved . . ." U.S.C.A. Const. Amend. VII. The Connecticut Constitution also protects this fundamental right: "The right of trial by jury shall remain inviolate . . ." Conn. Const. Article 1, § 19.  Transfer of the plaintiffs' case to the MDL would violate the plaintiffs' fundamental right to trial by jury, as guaranteed by the Seventh Amendment to the United States Constitution and Article 1, § 19 of the Connecticut Constitution.  The Seventh Amendment enshrines and protects one of our most cherished and fundamental rights – the right of trial by jury – that was deemed so crucial to our new republic that the Founding Fathers included it among the first ten amendments – the Bill of Rights – that were added to the Constitution shortly after its ratification.  With the current state of the MDL (indeed, the state that has persisted for many years now), there is no realistic hope of any trial, let alone a jury trial, for the vast majority of plaintiffs banished to Philadelphia.

In 1787, no less an authority than Thomas Jefferson explained the fundamental importance of the right to trial by jury: "A bill of rights [should provide] clearly and without the aid of sophisms for... the eternal and unremitting force of the habeas corpus laws, and trials by jury in all matters of fact triable by the laws of the land and not by the law of nations." Thomas Jefferson to James Madison, 1787, ME 6:387 (http://etext.virginia.edu/jefferson/quotations/jeff1520.htm).  Two years later, Jefferson again intoned his unflinching faith in the bedrock principle of the jury system: "I consider trial by jury as the only anchor ever yet imagined by man, by which a government can be held to the principles of its constitution." Thomas Jefferson to Thomas Paine, 1789, ME 7:408, Papers 15:269 (http://etext.virginia.edu/jefferson/quotations/jeff1520.htm).  The case before this Court represents more than simple ideological or historical platitudes about the jury system; it reveals

12

EARLY, LUDWICK, SWEENEY & STRAUSS
An Association of Professional L.L.C.s
EARLY, LUDWICK & SWEENEY, L.L.C.
ONE CENTURY TOWER • 11th FLOOR • 265 CHURCH STREET • P.O. BOX 1866
NEW HAVEN, CONNECTICUT 06508-1866 • (203) 777-7799 • JURIS. NO. 409080

the actual application of these fundamental, first principles: that all people should have equal access to the courts to seek redress for their legitimate grievances and that the government shall deny no person the right to trial by jury.

The data cited above from the MDL's own docket reveal the plaintiffs' words to be true. The MDL is not a proper forum for this case. The MDL does not move cases. The MDL is a "black hole" for asbestos cases. And the MDL denies plaintiffs their fundamental rights to redress, open access to the courts and trial by jury.

Some reasonable delay or alternative process in jury trials has sometimes been accepted as constitutional. See Woods v. Holy Cross Hospital, 591 F.2d 1164, 1178-81 (5th Cir. 1979) (mediation requirement for medical malpractice case prior to jury trial held constitutional); Crateo, Inc. v. Intermark, Inc., 536 F.2d 862, 867-68 (9th Cir. 1976), cert. denied, 429 U.S. 896, 97 S.Ct. 259, 50 L.Ed.2d 180 (1976) (referral of complex matter to special master prior to jury trial held constitutional); In re Peterson, 253 U.S. 300, 304, 40 S.Ct. 543, 64 L.Ed. 919 (1920) (court-appointed auditor to conduct initial investigation and file report held constitutional). However, the interminable delay wrought by transfer to the MDL is not reasonable nor constitutional, and it effectively denies the plaintiffs their rights to trial by jury.

The plaintiffs' assertions are not made in a vacuum or invented out of whole cloth. As we saw in Section 2 of this brief, even the federal courts themselves have acknowledged that the asbestos MDL is broken. See Rosamond v. Garlock Sealing Technologies, Inc., No. 3:03CV235, 2004 WL 943924 at *4 (N.D. Miss, Apr. 5, 2004); In re Maine Asbestos Cases, 44 F.Supp.2d 368, 374 (D.Me 1999); Madden v. Able Supply Company, 205 F.Supp.2d 695, 702 (May 27, 2002). The MDL does not simply *delay* the trial and resolution of asbestos cases, it effectively *eliminates* trials and halts resolution.

EARLY, LUDWICK, SWEENEY & STRAUSS
An Association of Professional L.L.C.s
**EARLY, LUDWICK & SWEENEY, L.L.C.**
ONE CENTURY TOWER • 11th FLOOR • 265 CHURCH STREET • P.O. BOX 1866
NEW HAVEN, CONNECTICUT 06508-1866 • (203) 777-7799 • JURIS. NO. 409080

This type of substantial delay was ruled unconstitutional by the Ninth Circuit Court of Appeals. See Armster v. U.S. Dist. Court for the Central Dist. of Florida, 792 F.2d 1423 (9th Cir. 1986). See also Ex parte Milligan, 71 U.S. 2, 18 L.Ed. 281 (1866) (holding that criminal jury trials may not be suspended even during wartime). In Armster, the plaintiffs sought writs of mandamus prohibiting the local district courts from suspending all civil jury trials for a period of *three-and-a-half-months* due to budgetary concerns. See Armster, 792 F.2d at 1424 ("alleged insufficiency of funds appropriated for the payment of juror fees"). The Court of Appeals noted that the United States Supreme Court has "emphasized, in no uncertain terms, the importance of the right to a civil jury trial and the need for the courts to be vigilant in guarding against the erosion of that right." Id. at 1428. "The right of jury trial in civil cases . . . is a basic and fundamental feature of our system of federal jurisprudence which is protected by the Seventh Amendment. A right so fundamental and sacred to the citizen . . . should be jealously guarded by the courts." Id. (quoting Jacob v. New York City, 315 U.S. 752, 752-53, 62 S.Ct. 854, 86 L.Ed. 1166 (1942)).

> ***The Supreme Court has adopted a most rigorous standard for reviewing any potential infringement of the right to a civil trial.*** The Court has said more than once that "'[m]aintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care.'" Beacon Theatres v. Westover, 359 U.S. 500, 501, 79 S.Ct. 948, 951, 3 L.Ed.2d 988 (1959) (quoting Dimick v. Schiedt, 293 U.S. 474, 486, 55 S.Ct. 296, 301 (1935)).
> Thus, our duty is clear. ***We must vigilantly protect the right to civil jury trials, and we must scrutinize in the most rigorous manner possible any action that appears to limit in any way the availability of that right***.

Id. at 1428-29 (emphasis added).

The Ninth Circuit emphatically rejected any cessation of civil jury trials for even a relatively short three-and-a-half-month period. The court explained:

14

EARLY, LUDWICK, SWEENEY & STRAUSS
An Association of Professional L.L.C.s
**EARLY, LUDWICK & SWEENEY, L.L.C.**
ONE CENTURY TOWER • 11th FLOOR • 265 CHURCH STREET • P.O. BOX 1866
NEW HAVEN, CONNECTICUT 06508-1866 • (203) 777-7799 • JURIS. NO. 409080

> *[C]onstitutional rights do not turn on the political mood of the moment, the outcome of cost/benefit analyses or the results of economic or fiscal calculations.* Rather, our constitutional rights are fixed and immutable, subject to change only in the manner our forefathers established for the making of constitutional amendments. The constitutional mandate that federal courts provide civil litigants with a system of civil jury trials is clear. There is no price tag on the continued existence of that system, or on any other constitutionally-provided right.

Id. at 1429 (emphasis added). The court concluded that "the civil jury trial system may not be suspended for lack of funds" and "*the seventh amendment right to a civil jury trial is violated when, because of such a suspension, an individual is not afforded, for any significant period of time, a jury trial he would otherwise receive*." Id. at 1430 (emphasis added). We should recall that the plaintiffs' case was originally filed in November of 2004 and was scheduled for trial by late 2007 or early 2008. Now with the delay occasioned by the defendants' removal of this case to federal court and the impending transfer of the case to the MDL, the plaintiffs have lost all hope of having their trial by early 2008. As the Ninth Circuit forbade, the plaintiffs are "not [being] afforded, for any significant period of time, a jury trial [they] would otherwise receive." Id. The Ninth Circuit went so far as to determine that the three-and-a-half-month delay in Armster was "far more than a significant period, given the mandate of the seventh amendment." Id.

Is anyone prepared to argue that a system that denies over 99% of plaintiffs their right to trial by jury is adequate, appropriate, fair or constitutional? Is anyone prepared to argue that years of stagnation in the MDL passes constitutional muster? The very notion insults the fundamental vision of the Framers.

The defendant cannot argue that the plaintiffs would be able to have any trial, let alone a timely trial, if this case is transferred to the MDL 875. Indeed, the defendants' silence on this

EARLY, LUDWICK, SWEENEY & STRAUSS
An Association of Professional L.L.C.s
**EARLY, LUDWICK & SWEENEY, L.L.C.**
ONE CENTURY TOWER • 11th FLOOR • 265 CHURCH STREET • P.O. BOX 1866
NEW HAVEN, CONNECTICUT 06508-1866 • (203) 777-7799 • JURIS. NO. 409080

"MDL-as-black-hole" issue is deafening.  The defendants barely even addressed the plaintiffs' legitimate arguments, or the federal district courts that have criticized the Asbestos MDL, during the original removal/remand debate.  The defendants did not address these issues because they know they cannot credibly defend the transfer of this case to the MDL as fair, just, convenient or efficient.  This case does not belong in the Asbestos MDL and transfer should not be allowed.

> c.   *Transfer to the MDL would violate the plaintiffs' rights to equal protection as guaranteed by Article 1, §§ 1 and 20 of the Connecticut Constitution and the Fourteenth Amendment to the U.S. Constitution.*

Transferring this case to the MDL would violate the plaintiffs' rights of equal protection under Article 1, §§ 1 and 20 of the Connecticut Constitution and the Fourteenth Amendment to the United States Constitution.

> When a statute is challenged on equal protection grounds . . . the reviewing court must first determine the standard by which the challenged statute's constitutional validity will be determined.  When a statutory classification impinges upon an inherently suspect class or affects a fundamental personal right, the statute is subject to strict scrutiny and is justified only by a compelling state interest.  Otherwise, a statute will stand if the classification bears a reasonable relation to a legitimate state interest. . . . A right is fundamental for purposes of equal protection analysis if it is explicitly or implicitly guaranteed by the constitution.

Id. at 505 (citations omitted; internal quotation marks omitted).  Transfer to the MDL affects the plaintiffs' rights to trial by jury, which are explicitly guaranteed under both the Connecticut and the U.S. constitutions.  Because transfer to the MDL affects the plaintiffs' fundamental rights to trial by jury, courts must utilize a strict scrutiny standard when reviewing the constitutionality of the MDL for equal protection purposes.  See id.

Article 1, § 1, of the Connecticut Constitution creates a "right of equality" that states: "All men when they form a social compact, are equal in rights, and no man or set of men are entitled to exclusive public emoluments or privileges from the community."  Article 1, § 20, the

16

state equal protection provision, states that "[n]o person shall be denied equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment or his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability." Section 1 of the Fourteenth Amendment to the United States Constitution provides that "[no] State [shall] deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

"The equality of rights provision contained in article first, § 1, of the Connecticut constitution has a meaning equivalent to the equal protection clause contained in the fourteenth amendment to the United States Constitution." Zapata v. Burns, 207 Conn. 496, 504, 542 A.2d 700 (1988). "Similarly, the equal protection provisions of the federal and state constitutions have the same meaning and limitations." Id. (internal quotation marks omitted). See also Barnes v. City of New Haven, 140 Conn. 8, 98 A.2d 523 (1953); Lyman v. Adorno, 133 Conn. 511, 52 A.2d 702 (1947).

As is, unfortunately, clearly shown by the Asbestos MDL's own policies and statistics, cases stagnate in the MDL and become forgotten. A miniscule fraction of one percent of the pending cases in any given year are remanded for trial. While courts have sometimes permitted reasonable delays and alternative procedures in jury trials, this unique MDL brand of litigation limbo was never intended nor anticipated, and it should not be permitted. There is simply no compelling state interest in allowing legitimate lawsuits to disappear into a "black hole" and in denying plaintiffs their fundamental right to trial by jury.[6]

---

[6] The plaintiffs' arguments are not an indictment of the entire system of multidistrict litigation, which itself has been upheld as constitutional. Multidistrict litigation may be appropriate, efficient and functional in another context, but in this particular context – asbestos cases – the Asbestos MDL has been a proven failure. This Court can strike down and dismantle the Asbestos MDL as unconstitutional while leaving intact the existing law upholding the propriety of multidistrict litigation in other contexts.

EARLY, LUDWICK, SWEENEY & STRAUSS
An Association of Professional L.L.C.s
**EARLY, LUDWICK & SWEENEY, L.L.C.**
ONE CENTURY TOWER • 11th FLOOR • 265 CHURCH STREET • P.O. BOX 1866
NEW HAVEN, CONNECTICUT 06508-1866 • (203) 777-7799 • JURIS. NO. 409080

**III.**   **Conclusion:**

This case does not belong in the Asbestos MDL in Philadelphia.  By any objective measure, this case belongs in the State of Connecticut and it should be allowed to proceed to trial.  The preconditions for transfer to the MDL have not been satisfied and, therefore, transfer is not appropriate and should not be allowed.  Transferring this case to the MDL will not "be for the convenience of parties and witnesses" and it will not promote the just and efficient conduct of such actions."  28 U.S.C. § 1407(a).  Transferring this case to the MDL will also violate the plaintiffs' constitutional rights to redress, open access to the courts, equal protection and trial by jury.  The plaintiffs respectfully request that this Court enter an Order vacating Conditional Transfer Order 297 and prohibiting transfer of this case to MDL-875 in Philadelphia.

EARLY, LUDWICK, SWEENEY & STRAUSS
An Association of Professional L.L.C.s
**EARLY, LUDWICK & SWEENEY, L.L.C.**
ONE CENTURY TOWER • 11th FLOOR • 265 CHURCH STREET • P.O. BOX 1866
NEW HAVEN, CONNECTICUT 06508-1866 • (203) 777-7799 • JURIS. NO. 409080

Respectfully submitted,
THE PLAINTIFFS

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

DEC 2 6 2007

FILED
CLERK'S OFFICE

By _/s/Christopher Meisenkothen, Esq._____
Christopher Meisenkothen, Esq.
cmeisenkothen@elslaw.com
Federal Bar No.: CT 20906
Early, Ludwick & Sweeney, LLC
One Century Tower, 11th Floor
265 Church St., PO Box 1866
New Haven, CT  06508
203-777-7799 phone
203-785-1671 fax

### Certificate of Service

I hereby certify that on December 21, 2007a copy of foregoing MEMORANDUM OF
LAW IN SUPPORT OF PLAINTIFFS' MOTION TO VACATE CONDITIONAL
TRANSFER ORDER TO MDL was filed and served by mail, postage prepaid, via
United States Postal Service to all parties listed on the attached certification page.

/s/Christopher Meisenkothen, Esq.
Christopher Meisenkothen, Esq.
Federal Bar No.: CT 20906
Early, Ludwick & Sweeney, LLC
265 Church Street, 11th Floor
New Haven, CT  06510
203-777-7799 phone
203-785-1671 fax
cmeisenkothen@elslaw.com
Counsel for the Plaintiffs

2007 DEC 26   A 9: 58
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION
RECEIVED
CLERK'S OFFICE

EARLY, LUDWICK, SWEENEY & STRAUSS
An Association of Professional L.L.C.s
**EARLY, LUDWICK & SWEENEY, L.L.C.**
ONE CENTURY TOWER • 11th FLOOR • 265 CHURCH STREET • P.O. BOX 1866
NEW HAVEN, CONNECTICUT 06508-1866 • (203) 777-7799 • JURIS. NO. 409080

John Robinson
McCarter and English
CityPlace I
185 Asylum Street
Hartford, CT  06103

Richard C. Binzley
Thompson Hine LLP
127 Public Square
3900 Key Center
Cleveland, OH  44114

Ellen B. Furman
Goldfein & Hosmer
1600 Market Street
33rd Floor
Philadelphia, PA  19103

Reed Slatas
McGivney & Kluger
406 Farmington Avenue
Suite 1002
Farmington, CT  06032

Edward J. Cass
Gallagher Sharp Fulton Norman
Bulkley Building; 7th Floor
1501 Euclid Avenue
Cleveland, OH  44115

Susan M. Hansen
Brownson & Ballou
225 South Sixth Street
Suite 4800
Minneapolis, MN  55402

Dan E. LaBelle
Halloran & Sage
315 Post Rd. West
Westport, CT 06880

Adam M., Chud
Goodwin Procter, LLP
901 New York Avenue, N.W.
Washington, DC  20001

Reginald S. Kramer
Oldham & Dowling
195 South Main Street
Suite 300
Akron, OH  44308-1314

Geoffrey Lane Squitiero
Edward Walsh
Maher & Murtha
528 Clinton Ave.,
PO Box 901
Bridgeport, CT 06601

David A. Damico
Burns White & Hickton
Four Northshore Center
106 Isabella Street
Pittsburgh, PA  15212

David C. Landin
Hunton & Williams, LLP
Riverfront Tower
East Tower
951 East Byrd Street
Richmond, VA 23219

James R. Oswald
Adler, Pollock & Sheehan
One Citizens Plaza, 8th Floor
Providence, RI   02903

Raymond P. Forceno
Forceno Goggin & Keller
1528 Walnut Street
Suite 900
Philadelphia, PA  19102

Gene Locks
Locks Law Firm LLC
1500 Walnut Street
Philadelphia, PA  19102

Ronald L. Motley
Motley & Rice LLC
PO Box 1792
28 Bridgeside Blvd
Mt Pleasant, SC  29464

John J. Repcheck
Marks O'Neill O'Brien & Courtney PC
Gulf Tower; Suite 2600
707 Grant Street
Philadelphia, PA  15219

John D. Roven
Roven-Kaplan LLP
2190 North Loop West
Suite 410
Houston, TX  77018

Richard D. Schuster
Vorys Sater Seymour& Pease, LLP
52 East Gay Street
PO Box 1008
Columbus, OH  43216-1008

Robert N. Spinelli
Kelley Jasons McGuire & Spinelli LLP
Centre Square West
15th Floor
Philadelphia, PA  19102

Marc S. Edrich
Litchfield Cavo
40 Tower Lane
Suite 200
Avon, CT  06001

Neil Selman
Selman Breitman & Burgess
11766 Wilshire Blvd
Sixth Floor
Los Angeles, CA  90025

Jonathan Tabasky
Cooley Manion Jones
21 Custom House Street
Boston, MA  02110

Robert Stuart Ludlum
Pierce Davis & Perritano
10 Winthrop Square
Boston, MA  02110

Robert E. Swickle
Jaques Admiralty Law Firm PC
1370 Penobscot Building
645 Griswold Street
Maritime Asb. Legal Clinic
Detroit, MI  48226-4192

George W. Clark
Cetrulo & Capone
Two Seaport Lane
10th Floor
Boston, MA  02210

William Murray
Edwards Angell Palmer & Dodge
90 State House Square
9th Floor
Hartford, CT  06103

Andrew Trevelise
Reed Smith LLP
2500 Liberty Place
1650 Market Street
Philadelphia, PA  19103

James K. Weston, II
Tom Riley Law Firm
4040 First Avenue, NE
PO Box 998
Cedar Rapids, IA  52406

Mena J. Bonazzoli
Cummings & Lockwood, LLC
Six Landmark Square
Stamford, CT  06901

Richard Dighello
Updike Kelly & Spellacy
One State Street
PO Box 231277
Hartford, CT  06123-1277

Frank Usseglio
Kenny O'Keefe & Usseglio
21 Oak Street, Suite 208
Hartford, CT   06106

Anthony Iaconis
Diserio Martin O'Connor Castiglioni,
LLP
One Atlantic Street
Stamford, CT  06901

Thomas F. Maxwell, Jr.
Pullman & Comley, LLC
850 Main Street
P.O. Box 7006
Bridgeport, CT  06601-7006

Robert Dombrowski
Morrison & Mahoney, LLP
One Constitution Plaza, 10th Floor
Hartford, CT  06103

Bryna Rosen Misiura
Governo Law Firm
260 Franklin Street
15th Floor
Boston, MA  02110

# EXHIBIT A

JAN.18.2002  1:32PM
JAN.14.2002  4:15PM

NO.646   P.8
NO.928   P.2

*CRW*

(292)

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EDWARD J. CARLOUGH; PAVLOS
KEKRIDES and NAFSSICA KEKRIDES,
his wife; LAVERNE WINBUN,
Executrix of the Estate of
JOSEPH E. WINBUN, deceased;
AMBROS VOGT, JR. and JOANNE
VOGT, his wife; CARLOS RAVER
and DOROTHY M. RAVER, his wife;
JOHN A. BAUMGARTNER and ANNA
MARIE BAUMGARTNER, his wife;
TIMOTHY MURPHY and GAY
MURPHY, his wife; TY T. ANNAS; and
FRED ANGUS SYLVESTER,

ON BEHALF OF THEMSELVES AND
ALL OTHERS SIMILARLY SITUATED

V.

AMCHEM PRODUCTS, INC, ET AL.

WEINER, J.

**FILED**

**APR 1 6 1993**

MICHAEL E. KUNZ, Clerk
By _____ Dep. Clerk

C.A. NO. 93-215

April 15 1993

## MEMORANDUM OPINION AND ORDER

### Introduction

Plaintiffs in this class action are individuals who have alleged asbestos related personal injury claims against defendants represented by the Center for Claims Resolution (hereafter CCR). Following the initiation of this action, Carl D. Roland, Gloria J. Roland,



PLAINTIFF'S EXHIBIT
A

Shelva D. Wiese, Carl D. Payne, Sr., Helen E. Payne, Walter L. Mays, Sr., and Shirley G. Mays (hereafter "the Wiese parties") filed a joint motion to intervene in this matter as parties plaintiff. On February 19, 1993, the court entered an order granting the intervention. Subsequently, an objection to the motion to intervene was filed by CCR,[1] alleging that the intervention would deprive the court of diversity jurisdiction.[2] CCR also averred that the Wiese parties did not satisfy the requirements of Fed. R. Civ. P. 24 and that denying their intervention would not deprive the movants of their rights to participate fully in the consideration of the issues involved in the class action. On February 24, 1993, the court issued an Order directing the Wiese parties to file a response to the CCR objections and set the issue down for oral argument.

Subsequently, the Wiese parties filed motions (1) to decertify the class; (2) to dismiss the action for lack of subject matter jurisdiction or in the alternative for partial decertification of the class; (3) to dismiss this matter on the grounds it is collusive; (4) to create sub-classes; (5) to disqualify class counsel; and (6) for recusal of the court. To place the motions in their proper context, it is necessary to review the long history of asbestos personal injury litigation in the courts, and the history of the multidistrict litigation consolidated in this court.

---

1. The court ruled on the motion prior to the expiration of the time to file responsive pleadings, believing that the motion was unopposed. Accordingly, we shall treat the CCR Memorandum in Opposition to Motion to Intervene as a motion for reconsideration of the court's February 19, 1993 order.

2. The allegedly non-diverse intervenors, Carl D. Roland, Gloria J. Roland, Walter L. Mays, Sr, and Shirley G. Mays have been voluntarily dismissed. Accordingly, this portion of the CCR's objections are moot.

2

## Factual Background of Asbestos Litigation and the MDL Panel Order

In 1985, the Rand Report[3] estimated that the total number of asbestos cases, federal and state, was approximately 30,000. It predicted that tens of thousands more could be expected over the following decade. On July 29, 1991, the Judicial Panel on Multidistrict Litigation entered an order transferring all pending federal district court actions not then in trial involving allegations of personal injury or wrongful death caused by asbestos to the United States District Court for Eastern District of Pennsylvania. Since the Multidistrict Panel entered its transfer order, this court has received in excess of 38,000 cases; the estimates of state court dockets range from 70,000 to 100,000 cases. In its order, the Panel determined that those cases involved common questions of fact relating to injuries or wrongful death allegedly caused by exposure to asbestos and that centralization would best promote the just and efficient conduct of that litigation.

The Multidistrict Panel's decision to consolidate these cases was made only after consideration of the burden that asbestos litigation has placed on the federal courts and the interests of all plaintiffs and defendants involved in the cases. Noting that the consolidation might prove burdensome or inconvenient to some parties involved, the Panel concluded that centralization in the Eastern District of Pennsylvania, while offering no panacea, would provide "a great opportunity to all participants who sincerely wish to resolve asbestos claims fairly and with as little unnecessary expense as possible". The Panel, in its order, also stated:

---

3.  D. Hensler, W. Felstiner, M. Selvin and P. Ebener, Asbestos in the Courts - The Challenge of Mass Toxic Torts, The Rand Corporation - Institute for Civil Justice, 1985.

information convinced the court that the state and federal courts had to work together in a coordinated effort to resolve these cases. The court met and continues to meet with the State Court Toxic Tort Committee on a regular basis. The focus of the court in its own cases prior to multidistrict consolidation was on the victims who were ill and dying and their families. The court has applied this same approach to the MDL.

Plaintiffs, defendants and peripheral parties organized themselves into working committees. The court established separate dockets for maritime and FELA cases because of their involvement with the Jones Act and railroads. Tireworker cases were also separated because of the number of talc defendants in these actions. The court then undertook to work with these committees, jointly and separately, with the knowledge and agreement of all involved in an attempt to arrive at a global resolution. Unfortunately, this effort, though coming very close to fruition, failed in achieving its stated goal, although all felt this was probably the best means of arriving at an equitable solution.

The negotiation process, however, did provide a vehicle for the parties to begin to talk to each other through the committees and explore alternate methods for a solution to the massive problems involved in these cases. It also had the benefit of establishing better credibility between the plaintiffs and defendants and caused each side to begin analyzing historical data in these cases. The long and arduous adversarial stance, even among those on the same side of an issue, which had developed over the years, caused them to be wary, resentful and distrustful of each other. The court's ability to provide a neutral meeting ground and the committee structure facilitated the process of removing the barriers and getting the various parties to be more cooperative.

Various factors, including statistics and regional differentiation in the asbestos bar's outlook on the litigation of asbestos cases, led the court to conclude that narrowing the focus of settlement activity might prove more successful. Consequently, the court next undertook to bring about a regional settlement, hopeful that the example of one region would provide a national model. Focusing first on the New England area, where there appeared requisite case numbers, historical information and counsel interested in settlement, extensive negotiations were begun involving those plaintiffs' attorneys with the greatest number of cases on file, and the attorneys for the core asbestos defendants and peripheral defendants in an effort to resolve blocks of cases[5].

The court's involvement in this process at the behest of the parties was to provide a neutral forum for meetings and to arbitrate those issues the parties were unable to resolve. The defendants agreed to settle the complete inventory of each plaintiff's attorney's case load on the condition that they agree to a "futures agreement", whereby future claims would be entered on pleural registries established by the courts or placed into alternative dispute resolution systems.[6] Many courts in the nation, in order to manage their crowded dockets, have set up pleural registries, or "dormant dockets"[7], into which they can, with the agreement of the parties, place cases involving plaintiffs who are currently

---

5.   These blocks included cases that had grown quite old and those in which there was concern about the viability of the litigants and the availability of necessary evidence.

6.   The Eastern District of Pennsylvania never set up any pleural registries.   Prior to and since the initiation of the MDL, this court had never been presented with a futures agreement for review and approval.

7.   The term is one used by defendants and later adopted by the plaintiffs.

asymptomatic. This procedure's purpose is to guarantee that funds are available to those who were seriously ill or dying or to their surviving family members. The parties never submitted these futures agreements to the court and each defense counsel separately negotiated with each plaintiff's counsel a futures agreement that met their particular requirements. Court approval was not needed nor requested and the court has never reviewed or seen a futures agreement.

While the negotiations in New England were progressing, the court focused its attention in other areas of the country and, with the cooperation of the aforesaid committees and local counsel, began the resolution of other cases. Many serious cases that seemed impossible to settle were remanded; local judges then either set them down for trial or subjected them to alternative dispute resolution. Certain key cases were also remanded to serve as test cases. The results achieved in those test cases were used to help resolve substantial blocks of cases in certain areas in the nation.

To date, the court has closed approximately 14,000 cases. These include cases not originally assigned to the MDL. Also, through its involvement with the State Court Committee on Toxic Torts, this court has played a role in resolving state cases in a number of jurisdictions. These efforts have helped to bring the parties together to have a meaningful dialogue and engender an atmosphere of trust.

In so doing, the court constantly focused on the claims of the sick and dying plaintiffs and maintained a constant concern that the transaction costs not exhaust the assets to be used for the compensation of the seriously ill victims. The court's purpose was to reduce discovery to its essentials and to end overbroad, duplicative and expensive activity

7

by all counsel. Posturing by counsel, the necessity of trial when either or both parties refused to negotiate in good faith and lengthy post trial practice served only to deplete the funds otherwise available to compensate the victims. Very rarely have final judgments ever been subject to execution; instead they are used for bargaining leverage in the resolution of larger numbers or blocks of cases.

## Judicial objectives

Throughout the course of the multidistrict litigation, the court has maintained several overriding objectives. Foremost, it is this court's considered judicial opinion that the sick and the dying, their widows and survivors should have their claims addressed first. Accordingly, the court steadfastly resisted motions to remand cases back to transferor courts unless the claimant was seriously ill or dying and all avenues of settlement were exhausted. In hardship circumstances, the court requested that the remand result in an early trial setting. The court advised counsel that motions to remand involving other circumstances would only serve to deplete resources otherwise available for settlements and thus would be routinely denied. This philosophy has also guided the court in conducting settlement negotiations.

The court sought to follow through on the Panel's observation that consolidation would preserve judicial resources. Consolidation removed from the other eighty-eight (88) federal judicial districts which previously had asbestos cases on their dockets the onus of dealing with the asbestos case load and, perhaps as importantly, relieved those

8

districts of the administrative burdens of these complicated cases. This court also made it a primary objective to coordinate its efforts with those of the state court judges who are managing large asbestos case loads in order to eliminate duplicative efforts, conserve their judicial resources, and better coordinate comprehensive solutions to the national asbestos litigation problem.

Finally, the consolidation of asbestos cases has enabled the court to perceive asbestos litigation from a unique perspective. The major concern of the defendants in asbestos cases is to bring the case load in asbestos litigation to manageable proportions so that the necessary funds can be obtained and allocated for their resolution; the primary concern of the plaintiffs is to move their cases forward and obtain recoveries. In the context of the MDL, the objective of this court is to find a means, through the device of coordinated pre-trial proceedings, to satisfy the interests of justice. In ordering the consolidation of asbestos cases, the Panel sought to promote a just and efficient resolution to the litigation. It is this court's opinion that a continuation of the consolidated MDL proceedings and the cooperation by all those concerned will satisfy the stated goals of all involved to develop a comprehensive plan or plans for the future of asbestos claims procedure in the United States.

## The initiation of this action

On January 15, 1993, counsel for the plaintiff's class, Gene Locks of Greitzer and Locks of Philadelphia and Ron Motley of Ness, Motley, Loadholt, Richardson and Poole

9

JAN. 11. 2002   5:34PM                                              NO. 454   P. 12-8

of Charleston, South Carolina, filed the complaint in this action, along with motions for class

certification and for approval of a settlement agreement.  Although the grapevine which

winds its way among all those involved in asbestos litigation had given the court an inkling

that such a lawsuit was being prepared, until the complaint was actually filed with the Clerk

of Court, this court had no knowledge of the contents of the complaint, the claims to be

included, the defendants to be named, the definition of the putative class, nor of the terms

of the proposed settlement agreement, and the process of negotiations which led thereto.


Discussion


        The motion of the Wiese parties for recusal is premised upon 28 U.S.C.

§455(a), which provides:

        Any justice, judge or magistrate of the United States shall
        disqualify himself in any proceeding in which his impartiality
        might reasonably be questioned.

This section, amended in 1974, has been interpreted as providing an objective, "reasonable

person" standard, which a judge must use in determining whether recusal is appropriate

under the circumstances.  The 1974 amendment is also seen as eliminating the so-called

"duty to sit" - the presumption that a judge must not recuse himself unless a clear

demonstration of extrajudicial bias or prejudice is made. Blizard v. Frechette, 601 F.2d 1217,

1220 (1st Cir. 1979).  Congress has, however, cautioned that:

        While the proposed legislation would remove the "duty to sit"
        concept of present law, a cautionary note is in order.  No judge
        of course, has a duty to sit where his impartiality might be

10

> reasonably questioned. However, the new test should not be
> used by judges to avoid sitting on difficult or controversial cases.
> At the same time, in assessing the reasonableness of a
> challenge to his impartiality, each judge must be alert to avoid
> the possibility that those who would question his impartiality are
> in fact seeking to avoid the consequences of his expected
> adverse decision. Disqualification for lack of impartiality must
> have a reasonable basis. Nothing in this proposed legislation
> should be read to warrant the transformation of a litigant's fear
> that a judge may decide a question against him into a "reason-
> able fear" that the judge will not be impartial. Litigants ought
> not to face a judge where there is a reasonable question of
> impartiality, but they are not entitled to judges of their own
> choice.

H.R. Rep. No. 93-1453, House Judiciary Committee, 93d Cong, 2d Sess., 1974 U.S. Code

Cong. & Ad. News 6351, 6355 (emphasis in original). The ultimate issue, committed to the

sound discretion of the district judge,[8] is whether a reasonable man would infer that the

judge's impartiality is, under all the circumstances, subject to question. This decision is to

be made from the prospective of an uninvolved observer in light of the full record, and not

simply in the light of an isolated incident. In re Federal Skywalk Cases, 680 F.2d 1175, 1183-

84 (8th Cir. 1982); In re Wirebound Boxes Antitrust Litigation, 724 F.Supp. 648, 651

(D.Minn. 1989).

The policy served by §455(a) is crucial to the institutional dignity of the

Judicial Branch. The appearance of impartiality in a judicial officer has correctly been

termed by our Court of Appeals the "sine qua non of the American legal system", Lewis v.

Curtis, 671 F.2d 779, 789 (3d Cir 1982), and a "basic requirement of due process". Haines

v. Liggett Group, Inc., 975 F.2d 81, 98 (3d Cir. 1992). As that court has stated, "Congress

---

8.   In this circuit, review by the Court of Appeals of a district
court's action on recusal is by an abuse of discretion standard.
Johnson v. Trueblood, 629 F.2d 287, 290 (3d Cir. 1980).

enacted section 455(a) precisely because 'people who have not served on the bench are often all too willing to indulge suspicions and doubts concerning the integrity of judges'. . . . In high profile cases such as this one, the outcome of which will in some way affect millions of people, such suspicions are especially likely and untoward". In re School Asbestos Litigation, 977 F.2d 764, 782 (3d Cir. 1992). How these lofty goals are translated into workable decision making criteria is perhaps, an even more difficult task. A recusal motion, even one raising frivolous grounds, tends to shift the focus of inquiry from those matters rightly in issue to the manner in which they are resolved. While the courts must take great care to insure the proponents of such a motion are not permitted to unjustly gain the result they seek, merely by propounding the allegation, it remains that the court is thereby placed in the untenable position of examining its own actions to address the averments.

The decisions of other district judges both before and after the 1974 amendment to §455, provide enlightenment on how the objective standard is to be applied. In United States v. Mitchell, 377 F.Supp. 1312 (D.D.C. 1974), former Attorney General John Mitchell requested the recusal of Chief Judge John Sirica on the grounds that he had had prior contact with the proceedings at the grand jury stage, that he had met with the special prosecutor and the prosecution personnel in the absence of defense counsel, and that he had met with columnist Jack Anderson, following Anderson's publication of grand jury minutes. Judge Sirica explained that his prior contact with the case occurred through his duty as chief judge to supervise grand jury proceedings, that the meetings with the special prosecutor were also necessitated by his grand jury duties, and that the alleged meeting with Anderson was

actually a meeting with his attorneys resulting in the cessation of publication of the secret minutes. Judge Sirica concluded that each of the activities cited was the result of his judicial activities, rather than evidence of personal prejudice. Accordingly, he denied the motion for recusal, which was affirmed through the denial of a writ of mandamus. Mitchell v. Sirica, 502 F.2d 375 (D.C. Cir. 1974), cert. denied 431 U.S. 933, rehearing denied 433 U.S. 916 (1974).

In Bradley v. School Board (Richmond Virginia), 324 F.Supp. 439, (E.D.Va. 1971), defendants sought the recusal of the district judge because he wrote a letter to plaintiff's counsel, suggesting a means of proceeding in the matter. The judge held that, even assuming that the allegations were true, they did not indicate prejudgment of any factual issues in the case. In deciding that neither 28 U.S.C §144 nor §455 necessitated his disqualification, the judge indicated that in writing the letter he was fulfilling his obligation "to assist the litigants in the case in any appropriate manner to the end that the law is conformed to." 324 F.Supp. at 448.

In Bradley v. Milliken, 426 F.Supp. 929 (E.D. Mich. 1977), plaintiffs sought recusal of the district judge, alleging the court engaged in various ex parte discussions and negotiations and met secretly with numerous individuals and community groups. Applying the reasonable person standard of §455(a), the court denied the motion for recusal on the basis that its actions were not directly related to contested issues, but resulted solely from judicial activities designed to insure a community climate receptive to the court's orders and were well within the court's discretion.

13

Indeed, these cases stand amid a long line of cases distinguishing judicial actions resulting from information learned by the judge in his judicial capacity, from knowledge gained from extra judicial sources. See, e.g., Berger v. United States, 255 U.S. 22, 31 (1920); United States v. Grinnell Corp, 384 U.S. 563, 583 (an alleged bias, to be disqualifying, must stem from an extrajudicial source); United States v. Gordon, 634 F.2d 639 (1st Cir. 1980); United States v. Patrick, 542 F.2d 381 (7th Cir. 1976); United States v. Bernstein, 533 F.2d 775, 785 (2d Cir. 1976) (the rule of law is that what a judge learns in his judicial capacity . . . is a proper basis for judicial observations, and the use of such information is not the kind of matter that results in disqualification); In re Foster Iron Works, Inc., 3 B.R. 715 (E.D. Tx. 1980) (disqualification of judge under §455(a) will result only from extra judicial conduct and not from conduct within judicial context).

The two recent cases from our Court of Appeals also help define when a reasonable observer would find that a judge's partiality might reasonably be questioned. In Haines, the court found it necessary to order a case reassigned on remand where the district judge had included in his decision his personal opinion regarding a defendant's corporate culpability. In In re School Asbestos Litigation, the court granted a mandamus against a district judge who attended a conference sponsored by the plaintiffs' bar wherein he was exposed to the expert scientific evidence which would later be presented at trial. In both these cases, the court, apparently focusing upon the extra-judicial nature of the allegation, found that the district judges should have recused themselves.

From these examples, it may be extrapolated that courts have properly denied motions seeking recusal when the basis for the motion is an allegation of the appearance of

14

impropriety arising out the court's legitimate judicial actions in trying cases, managing its caseload, and applying the expertise it has garnered in handling similar cases. In those situations, it has been concluded that the reasonable person examining the judge's actions would not find his partiality might be reasonably questioned. Where, however, the allegations involve extra judicial activity, i.e. something not integral to the judicial function, such as the attendance of a conference wherein the judge is exposed to one party's evidence, or stating an opinion regarding the merits of a pending case that is based upon personally held beliefs rather than evidence, the motion for recusal should be granted.

Turning then to the issues presented sub judice, the basis of the Wiese parties' motion is this court's prior involvement with asbestos personal injury litigation, both within the context of the pending multidistrict litigation and the ongoing asbestos litigation track within the Eastern District of Pennsylvania. It is asserted that the court's prior involvement in asbestos cases,

> approving and widely promoting the proposed extrajudicial future claims settlement as the most efficient means for resolving future asbestos claims

Brief in Support of Motion for Recusal at 4, has brought this court's impartiality into question. While acknowledging that some judicial role in the settlement process is entirely appropriate, Id., citing Johnson v. Trueblood, supra, 629 F.2d 287, the Wiese parties allege that the court has engaged in ex parte contacts with counsel for asbestos victims and others

15

wherein this type of an "extrajudicial" settlement of future claims has been touted as a preferred method to obtain maximum settlement value for present claims.[9]

It is noted initially, that no affidavit, affirmation of counsel or other evidence to substantiate this claim is appended to the instant motion. While the Wiese parties request discovery in aid of their motion, it is incumbent upon them to come forward with some substantiation of their allegations at the time those allegations are made to merit further inquiry. The court would hope that counsel had some basis for filing this motion, which contains such serious allegations and cannot understand why some preliminary effort to substantiate these allegations was not attempted prior to the time the motion was filed. This failure weighs heavily upon the question of whether their allegations of impartiality are objectively reasonable.

Addressing the merits of the allegation, the court finds that application of the objective standards of §455(a) does not require that the court recuse itself from this litigation. This court's preference for a negotiated resolution of asbestos claims, rather than litigation, is well known. From its handling of asbestos claims from their genesis, this court has developed a unique perspective and insight into the vagaries of these cases. This has

---

9.  We do not understand the movant's use of term "extra judicial" to describe the proposed future claims vehicle as invoking the line of cases cited above distinguishing information garnered by a judge through his involvement in a case with an extra judicial bias derived from something other than the judge's participation in judicial proceedings.   If this was the movants' intention, we reject this characterization.   There is no explanation why this settlement, if approved by the court and executed under its auspices, constitutes an extra judicial remedy.
   As stated above, it was the defendants who insisted on a futures agreement or pleural registry as a condition for settling the plaintiffs' cases, to which the plaintiffs agreed.

shaped the court's judicial philosophy in managing these cases along two interrelated lines: making sure that those who are seriously ill and their families receive a priority, and reducing transactional costs to make more money available for those who truly deserve it.

      This court's experience over the past decade led the Judicial Panel on Multidistrict Litigation to select this court as the transferee of all asbestos personal injury litigation suits pending in the federal courts.[10]  Since being designated as the asbestos coordinating judge for this district, and later as transferee judge under the Panel's transfer order, this court has carefully reserved for itself the role of management of these cases, while designating other judges to hear trials and dispositive motions.[11]  Specifically, in the matter

---

10.  In its order the Panel stated:
    The Panel has decided to centralize this litigation in the Eastern District of Pennsylvania before Judge Charles R. Weiner. We note that;   1) more asbestos personal injury or wrongful death actions are pending in that district than any other; 2) the court there has extensive experience in complex litigation in general and asbestos litigation in particular; and 3) the court has graciously expressed its willingness to assume the responsibility for this massive undertaking.
J.P.M.L. Docket No. 875, Order of July 29, 1991, slip op at 13.  At the time the Panel transferred the cases, this district's asbestos docket was among the most current in the country, even though it had one of the highest concentrations of asbestos filings. Were it not for the institution of the MDL, this district would have no asbestos backlog.

11.  In addition to the one instance cited by the movants, the court has also called upon Judge Robert Parker of the District of Texas and Circuit Judge Patrick Higginbotham of the Court of Appeals for the Fifth Circuit to help with MDL cases involving defendant Fiberboard because of their familiarity with issues presented in those cases.
    It has as of this date involved in various capacities more than sixteen federal and state court judges in order to expedite these cases.

sub judice, the court has designated another judge to pass upon the fairness to the class of the proposed settlement reached between the parties.[12] While the Wiese parties cite this order as indicating that this court itself perceives an appearance problem, it must be remembered that the Judicial Panel approved this procedure for the management of the MDL, recognizing that the shear breadth of asbestos litigation would cause problems in administration and tax the finite resources of any district judge.[13]

---

12.  It should also be noted, that while this court granted the plaintiffs' motion for class certification, it was granted conditionally, subject to decertification, should any issue of the adequacy of class representation arise. Accordingly, this court's order was merely ministerial, entered so that the proceedings in this matter could move along expeditiously. Several of the motions filed by the Wiese parties involve the conditional class certification order.   It has always been the court's intention to assign class certification issues to another judge, to be determined in conjunction with the issue of fairness of the settlement.   The order which follows effectively makes this assignment, since the pending motions are dismissed without prejudice to the Wiese parties filing objections on these same grounds in the course of the fairness hearings.

13.  It should also be noted that another of the Wiese parties' specific charges, that the court organized and met with a group of bankruptcy judges who are hearing asbestos defendants' reorganization cases, also arose out of a Panel proceeding. The movant's allege that the court "touted the virtues of this settlement device" and that a memorandum prepared for that conference sets out the means and merits to accomplish it.  Again, significantly, no court prepared no such memorandum.   The substantiation of this allegation is included with the brief.   The convened, at the suggestion of the Panel, the conference was prepare quarterly reports ordained by the Panel, the conference was in order to obtain additional funding for the asbestos victims and to provide a coordinated approach for the processing of the asbestos claims, to address the concerns of those and other judges involved to keep transaction costs and fees at a minimum and to expedite the distribution of those funds. Congress in considering a bill to attempt to eliminate "soaring costs and inefficiencies" that exist in the Bankruptcy Act.

18

It should be noted that despite all these allegations, the office of the counsel for the Wiese parties has asked for the court's intercession in negotiating a settlement of the entire inventory for a counsel for the plaintiff from another state in which the defendants insisted as they have in all such matters to a futures agreement. The court merely got the parties together, communicating and negotiating, and the court was subsequently advised that the cases had been settled and that futures agreements had been negotiated. The court never saw nor was privy to these agreements the same as in the previous futures agreements entered into by other counsel.

In order to effectuate the goals of reducing transaction costs and ensuring the sick are compensated, it has often become necessary for the court to involve itself in the negotiations, at the invitation of the participants, to amicably resolve suits and ensure the process continues apace. In so doing, the court studiously avoids ex parte contacts unless, during the give and take of negotiation, it appears that speaking with the parties in confidence will assist the process. This is usually requested by the parties. In those circumstances, the court always seeks the permission of all parties to speak with them separately. There has never been an objection to this process as it is done at their behest.

In managing this MDL, the court, in accordance with the Manual for Complex Litigation, has appointed and met with, on a continuous basis, plaintiff and defendant steering committees. The court has also met with individual plaintiffs' attorneys, defendants' national counsel and local counsel in a continuous effort to develop methods for the

19

resolution of common issues which arise in these cases[14].   The court also receives numerous requests from all counsel to hold conferences to expedite outstanding matters, so as to avoid paper wars and additional expense.  The court denies, unequivocally, that it has in any way "created this lawsuit" as the Wiese parties allege, or engaged in conduct which would reasonably lead one to conclude that it had any role therein.  There is a great leap in the movant's logic in concluding from the court's willingness to foster and aid the parties to communicate and negotiate settlements, that the court in some manner engineered the filing of this action, or involved itself in the pre-complaint negotiations.

Indeed, nothing is further from the truth.  As stated, this action was filed by the parties with no prior notice to the court of the contents of the complaint or the settlement agreement.  The volume of the complaint and proposed settlement agreements are witness to the fact that many hours must have been spent by all counsel prior to the initiation of the suit.  This is agreed to by the Wiese parties.  See, Brief in Support of Motion to Intervene at 4 (. . . present class representatives have invested months of negotiation into the settlement. . .)  Had the court been involved with these parties prior to the filing of the complaint, as alleged by the movants, the court could scarcely have spent any time on its other dockets.  In short, this court has not permitted its role as a facilitator of negotiations in current MDL cases to obscure its paramount duty to administer the law in a manner that is both fair in fact and has the appearance of fairness,

---

14.   The court averages over two hundred pieces of mail per day, which includes among other things motions, complaints, answers, briefs, orders, stipulations, correspondence and other sundry matters.

20

We find it patent from the Wiess parties' brief that their objection to the court's actions derive from the court's judicial philosophy, prior experience and understanding of the dynamics of asbestos personal injury litigation, rather than from some extra-judicial source or bias.  The activities of the court which form the basis of the motion are not directly related to contested issues of liability, proximate cause and damages which arise in individual constituent lawsuits within the MDL.  Rather they are judicial actions taken in the context of managing the MDL, along the lines of the court's experiences gained from handling these cases, and working with the parties to bring about a universal resolution of the issues.  The court's objectives, as previously set out, have not precluded the court from retaining an open mind and forum to receive input from diverse sources[15].  The court has received communications from many sources who feel that they have an "answer" to this massive tort litigation all of which have been either published or sent to plaintiffs and defendants as well as the court.

We find that an objective reasonable person, placed in the position of an uninvolved observer familiar with the full record of asbestos litigation in this country, would determine that the instant motion is motivated not by a perceived appearance of impropriety in the actions of the court, by rather by the fear that, if recusal does not occur, the

---

15.   The court has previously granted amicus curiae status to Fibreboard Corporation, Owens Corning Fiberglas, Inc., Owens-Illinois, Inc., the State of Texas, W.R. Grace & Co. - Conn, and Pittsburgh Corning Corporation and has also permitted participation by the White Lung Association, a national asbestos victims' association, which is appearing pro se.

21

JR JAN.11.2002 4 6:02PM                                    NO.456   P.12
                                                          NO.928   P.23

controlling point of law will be resolved against the Wiese parties' interests.[16]  As quoted
above from the legislative history of §455, in assessing the reasonableness of a challenge to
his impartiality, each judge must be alert to avoid the possibility that those who would
question his impartiality are in fact seeking to avoid the consequences of his expected
adverse decision.

       For these reasons, the motion pursuant to 28 U.S.C. §455(a) will be denied.
Thus, we shall address the other motions filed by the Wiese parties.


## The motion to intervene


       In their original motion, the Wiese parties averred that intervention under
Rule 24(a) should be granted as of right because they have substantial interests in the
subject matter of this action, they need the ability to protect those interests, and their
interests may not be adequately represented by existing representative parties. Alternatively,
they contended that permissive intervention should be granted because their intervening
complaint raised common issues of law and fact, and because they are members of the class
on whose benefit the original action was brought.  After CCR's response was received, the
court directed the intervening plaintiffs to file a reply to CCR's averments that the interven-

---

16.   It should be stressed that the solution to having the case sub
judice resolved against the movants' interest is for them to opt
out of this Fed. R. Civ. P. 23(b)(3) class action.

tion would deprive this court of diversity jurisdiction and that they did not meet the requirements of Fed. R. Civ. P. 24.[17]      Rule 24(a)(2) provides:

> Upon timely application anyone shall be permitted to intervene in an action . . . (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Thus, whether applicants are entitled to intervene under 24(a)(2) depends upon their meeting three criteria:

> First, that they had sufficient interest in the matter, and that their interest would be affected by the disposition; second, that their interest was not adequately represented by the existing parties; and third, that their application was timely.

Commonwealth of Pennsylvania v. Rizzo, 530 F.2d 501, 504 (3d Cir. 1976). We find the Wiese parties have failed to demonstrate that whatever interests they have will not be adequately represented by the existing class representatives, so as to qualify to intervene in this action as a matter of right.

The burden, however minimal after Trbovich v. United Mine Workers, 404 U.S. 528, 538, n.10 (1972), is on the applicant for intervention as of right to show that his interests are not adequately represented by the existing parties. Hoots v. Pennsylvania, 672 F.2d 1133, 1135 (3d Cir. 1982). A determination of the adequacy of representation issue must focus upon "a comparison of the interests asserted by the applicant for intervention and the existing party". United States v. I.B.M., 62 F.R.D. 530, 535 (S.D.N.Y. 1974). If the

---

17. At Oral Argument, class counsel joined in the CCR opposition to the Wiese parties' intervention. Transcript of Hearing on Motion to Intervene of March 31, 1993 at 33.

existing parties' interests are adverse to the proposed intervenors, intervention will ordinarily be granted assuming compliance with the other requirement of Rule 24(a)(2). 7A Wright & Miller, Federal Practice and Procedure § 1909. If the applicants' interests are considered similar to those of the existing parties, intervention will be granted unless it is clear that the existing parties will provide adequate representation. Id. Finally, if the interests of the applicants and existing parties are deemed identical, the applicants must make a compelling showing why representation by the existing parties will not be adequate. Id. Representation of an absent party is generally considered adequate if no collusion is shown between the representative and an opposing party, if the representative does not represent an interest adverse to the proposed intervenor, and if the representative has been diligent in prosecuting the litigation. Delaware Valley Citizens' Council v. Commonwealth of Pennsylvania, 674 F.2d 970, 972 (3d Cir. 1982).

In their brief, the only argument proffered by the Wiese parties to show their interests are adverse to the representative parties, is their suspicions about the manner and circumstances in which the settlement of this action was negotiated. They state:

> Since the present class representatives have invested months of negotiation into the settlement, they may not perceive a need to conduct discovery into these issues; thus, intervention is necessary to ensure that all aspects of the settlement are explored, including the manner in which it was negotiated.

Brief in Support of Motion to Intervene at 4.[18] This argument misses the mark. While it may be cause to object, at an appropriate time, to the fairness of the settlement reached

---

18.   In their Reply to CCR Defendants' Memorandum in Opposition to Motion to Intervene, the Wiese parties also apparently incorporate by reference their more extensive discussion of this issue in their separate Motion to Disqualify Class Counsel and Supporting Brief.

24

between the representative parties and CCR, it does not establish the type of adverseness of interest required by Rule 24(a)(2) for intervention as of right.

Indeed, the arguments presented by the Wiese parties demonstrate that their status should more appropriately be that of objectors, rather than intervenors. Accordingly, invoking the discretion accorded this court by Rule 24(b)(2)[19], we also find that permissive intervention should not be granted at this time. We note that the Wiese parties' Complaint in Intervention raises the same issues as the class complaint. While the settlement they would prefer might diverge from those of the class representative, a putative intervenor's interest is not inadequately represented merely because its motives in the litigation are different from that of a party to the action. Washington Electric Cooperative, Inc. v. Massachusetts Municipal Wholesale Electric Co., 922 F.2d 92, 98, (2d Cir. 1990). As objectors to the class representatives' settlement, they would have the right to appear through counsel, participate in the fairness hearing and conduct discovery. Further, as counsel for CCR point out, they would have standing to appeal the court's approval or disapproval of the class action settlement. Clearly, this is the option favored by the authors of the Manual for Complex Litigation 2nd, when they stated:

19.   Rule 24(b)(2) provides:
      Upon timely application anyone may be permit-
      ted to intervene in an action: . . . (2) when
      an applicant's claim or defense and the main
      action have a question of law or fact in
      common. . . .   In exercising its discretion
      the court shall consider whether the interven-
      tion will unduly delay or prejudice the adju-
      dication of the rights of the original par-
      ties.

> Formal intervention by class members is usually unnecessary and inadvisable. Class members in (b)(3) actions may, however, appear by their own attorneys, subject to the court's power to adopt appropriate controls regarding the organization of counsel.

Id. at §30.15 n. 31 (1986).

Accordingly, the court's order of February 19, 1993, granting the Wiese parties' motion to intervene will be vacated, without prejudice to their continued rights to file objections to the class settlement as putative members of the class. Additionally, the Wiese parties shall be granted the status of amicus curia, so that they may comment on issues brought to the court's attention by other parties.

## The Wiese Parties' Other Motions

Also before the court are motions filed by the Wiese parties after the court's February 19, 1993 order was entered, seeking (1) to decertify the class; (2) to dismiss the action for lack of subject matter jurisdiction or in the alternative for partial decertification of the class; (3) to dismiss this matter on the grounds it is collusive; (4) to create sub-classes; and (5) to disqualify class counsel. We do not believe that these motions should be dismissed as moot now that the February 19, 1993 order has been vacated. Several of them will presumably be reasserted as objections to the fairness of the settlement at the appropriate time, and we do not wish to place an imprimatur upon their merit. Instead, the motions filed by the Wiese parties shall be dismissed without prejudice to their being reasserted as objections to the class settlement. The Wiese parties and all other interested

26

JR JAN.11.2002 4 6:03PM

NO.456   P.17
NO.929   P.28

parties will be granted leave to renew all their objections before the judge assigned to hear this matter.

An appropriate order follows.

27

CRW

JAN. 11. 2002 41 6:03PM                                    NO. 456   P. 18

(292)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EDWARD J. CARLOUGH; PAVLOS
KEKRIDES and NAFSSICA KEKRIDES,
his wife; LAVERNE WINBUN,
Executrix of the Estate of
JOSEPH E. WINBUN, deceased;
AMBROS VOGT, JR. and JOANNE
VOGT, his wife; CARLOS RAVER
and DOROTHY M. RAVER, his wife;
JOHN A. BAUMGARTNER and ANNA
MARIE BAUMGARTNER, his wife;
TIMOTHY MURPHY and GAY
MURPHY, his wife; TY T. ANNAS; and
FRED ANGUS SYLVESTER,

ON BEHALF OF THEMSELVES AND
ALL OTHERS SIMILARLY SITUATED

v.

AMCHEM PRODUCTS, INC., ET AL

FILED

APR 1 6 1993

MICHAEL E. KUNZ, Clerk
By _____ Dep. Clerk

C.A. NO. 93-215

## ORDER

The motion of Carl D. Roland, Gloria J. Roland, Shelva D. Wiese, Carl D.
Payne, Sr., Helen E. Payne, Walter L. Mays, Sr., and Shirley G. Mays, pursuant to 28 U.S.C.
§455(a) is DENIED.

28

The court's Order of February 19, 1995, granting the motion of Carl D. Roland, Gloria J. Roland, Shelva D. Wiese, Carl D. Payne, Sr., Helen E. Payne, Walter L. Mays, Sr., and Shirley G. Mays to intervene as parties plaintiff in this matter is VACATED.

In its stead, the motion of Carl D. Roland, Gloria J. Roland, Shelva D. Wiese, Carl D. Payne, Sr., Helen E. Payne, Walter L. Mays, Sr., and Shirley G. Mays to intervene as parties plaintiff in this matter is DENIED.

Shelva D. Wiese, Carl D. Payne, Sr., and Helen E. Payne are sua sponte granted the status of amicus curia, as well as the status as objectors to the class settlement, should they wish to so proceed, or such other status as the court may grant them.

The motions of Shelva D. Wiese, Carl D. Payne, Sr., and Helen E. Payne (1) to decertify the class; (2) to dismiss the action for lack of subject matter jurisdiction or in the alternative for partial decertification of the class; (3) to dismiss this matter on the grounds it is collusive; (4) to create sub-classes; and (5) to disqualify class counsel are DISMISSED WITHOUT PREJUDICE to their being reasserted as objections to the class settlement.

IT IS SO ORDERED.

CHARLES R. WEINER

29

# EXHIBIT B

JAN.18.2002 1:30PM

CRW

NO.646   P.2

NO.894   P.2/7

658

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: ASBESTOS PRODUCTS LIABILITY
LITIGATION (NO. VI)

FILED
SEP 1992
MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

CIVIL ACTION NO. MDL 875
(Including MARDOC, FELA,
and TIREWORKER cases)

This Document Relates to:
ALL ACTIONS

### ADMINISTRATIVE ORDER NO. 3

It is the intention of the Court that the cases be resolved through negotiation wherever possible. The Court and all parties agree that, as that process proceeds, it is often necessary to give special attention to certain cases. Although all settlements represent steps toward the Court's ultimate goal, special efforts to resolve these cases are not a substitute for broad-based negotiations designed to reduce the docket backlog.

In accordance with ADMINISTRATIVE ORDER NO. 2 Plaintiffs' counsel has previously submitted information to the Court relating to their malignancy and asbestosis cases. The Court has determined to give a priority to malignancy, death and total disability cases where the substantial contributing cause is an asbestos-related disease or injury. The following procedures are hereby established for review, settlement and/or further action in these cases:

I    SELECTED CASES

Selected cases are identified by disease category. In each case, plaintiff's counsel must have a written medical opinion by a board certified specialist setting forth that exposure to asbestos or asbestos-containing products is a substantial contributing cause to the condition or death of plaintiff (plaintiff's decedent). The disease categories are:
A. Mesothelioma, living and deceased.
B. Lung Cancer, living and deceased.
C. Other malignancies, living and deceased.
D. Asbestosis, total disability deceased or total disability living.

II    PROCEDURES FOR PLAINTIFFS' COUNSEL

The Court will process all cases previously identified by Plaintiffs' counsel pursuant to ADMINISTRATIVE ORDER NO. 2 as mesothelioma and lung cancer in accordance herewith UNLESS the


PLAINTIFF'S
EXHIBIT
B

Court is advised that such cases do not meet the above criteria. Plaintiffs' counsel must affirmatively identify all other malignancy and asbestosis cases which meet the requirements hereof. In all instances hereunder, the cases shall be identified by plaintiff's name, the transferor jurisdiction, and the individual case number assigned by the transferor district. The Court will advise plaintiffs' counsel (with a copy to defense, plaintiff's and peripheral liaison counsel) when his/her cases are ready for processing. Plaintiffs' counsel shall then take the following steps:

A. Identify to the Court all remaining viable defendants from whom plaintiff expects to recover damages.

B. Provide the necessary fact information for defense counsel to process the cases for settlement. (Work history, exposure information, date of birth/death, medical history, smoking history, Social Security Number, and printout or release etc.)

C. Provide defense counsel with X-rays and pathology in plaintiff's possession, together with necessary releases for medical and employment records.

D. Provide a reasonable settlement demand to each remaining defendant.

E. Notify the Court when each of the above requirements is completed.

III  **PROCEDURES FOR DEFENSE COUNSEL**

Each defendant shall be prepared to identify the counsel who will be available and able to conduct all settlement negotiations with any particular plaintiffs' counsel. Defense counsel shall take the following steps in these proceedings:

A. Within fifteen (15) days of receipt of notice that plaintiffs' counsel has complied with the requirements set forth in Section II above, notify the Court and Plaintiff's counsel by telephone and in writing as to any discrepancies in such notice, and set forth in detail all necessary additional information.

B. Within forty-five (45) days of receipt of the information from the plaintiff necessary to engage in settlement negotiations and the demand from plaintiffs' counsel, defense counsel shall review the same and accept such terms or make a reasonable offer for settlement.

JAN. 18. 2002 1:31PM

NO. 646   P. 4
NO. 894   P. 4/7

## IV   SETTLEMENT NEGOTIATIONS

Following the initial procedures, all counsel shall make themselves readily available for personal and telephone settlement conferences. AT THIS TIME, NEGOTIATION IS TO BE ONGOING AND IN GOOD FAITH. All counsel are to report no less than once a week by telephone to the Court as to their progress. The Court will be available on a regular basis for participation in a settlement conference, either by telephone or in person. If, after thirty (30) days, any party feels that his/her opponent is not negotiating in good faith, they may request the Court to forward the matter to the Mediation Committee for a recommendation. If a request is made to refer the matter to the Mediation Committee, such request shall be honored by the Court. When the Court determines that further settlement discussions are unlikely to be productive, the Court will hold a termination conference to discover the status or all remaining parties to the action(s) in negotiation and to determine whether the case is to be forwarded to the Mediation Committee. A referral may be of one or a number of cases. If no request for referral is made, and the parties have been unable to resolve their differences, the Court shall determine whether the matter is appropriate for immediate remand.

## V   MEDIATOR

The Court shall appoint a neutral mediator for each case who is familiar with the jurisdiction. Once the Mediator is selected, he/she shall hear all referrals for that jurisdiction subject to resignation or Court reassignment. Upon receipt of a referral from the Court, the Mediator shall take the following action:

A. Provide notice to each party of the time and place of a mediation hearing , which hearing shall take place no sooner than ten (10) days after such notice, but as soon thereafter as possible.

B. Each party may provide a short position statement to his/her opponent and to the Mediator no less than five (5) days prior to the hearing.

C. The Mediator shall set forth his/her own rules for proceeding on the referral and shall advise the participants.

D. At the hearing the Mediator shall attempt to mediate settlement as to all parties. As to any case in the group that is not so resolved, the Mediator shall determine whether the participants have negotiated in good faith. This determination shall be made on a case by-case-basis.

E.   The Mediator shall make a report to the Court
setting forth his/her determination regarding
the good or bad faith of all parties to the
negotiations.  Upon receipt of the report
from the Mediator, the Court shall allow
those parties who have been negotiating in
good faith a reasonable time to complete a
settlement.  There shall be a presumption
that where the plaintiff has acted in good
faith and one or more defendants have been
found to be acting in bad faith, the case
will be immediately remanded for trial as to
such defendants.  If all parties are acting
in good faith the Court will make additional
efforts to settle the case.  If no settlement
is achieved the matter will be remanded.  The
Court will act promptly in all respects upon
receipt of a report from the Mediator.

F.   All information provided to the Mediator by
the parties shall be kept in confidence
except as set forth to the Court in the
Mediator's report.

VI   GOOD FAITH NEGOTIATIONS

In order for the participants to the settlement
negotiations to be in good faith, there must be a reasonable
relationship between their demand/offer and the following
criteria:

A.   Historical settlement averages between the
same defendants with the same plaintiff's
counsel in the same jurisdiction in similar
cases.  Variances from such historical
criteria can be justified by the following
factors:
1.   Severity/mildness of disease.
2.   Lack of exposure to product.
3.   Personal factors, i.e.; smoking, age,
     occupation, etc.
4.   Other persuasive evidence.

B.   Historical averages by disease category for
cases that have been previously settled in
that jurisdiction with that plaintiff's
counsel and with that defendant.

C.   If there is no historical settlement average
by disease category between plaintiff's
counsel and the defendant in the jurisdiction
from which the case arises, then comparable
settlement averages for similar cases in that
same jurisdiction with that defendant shall
be confidentially provided to the Mediator.

JAN.18.2002 1:32PM

NO.646   P.6
NO.694   P.6/7

Because different viewpoints of the same case are
equally understandable, a finding of bad faith is not necessary
in all instances where the parties are unable to reconcile their
differences and settle.

BY THE COURT:

Date: _9/8/92_

CHARLES R. WEINER, J.

XC 9/10/92:  attached liaison counsel list
all USDC's
attached plff's counsel list (498)

# EXHIBIT C

27

JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

MIDDLE DISTRICT OF FLORIDA

FORT MYERS, FLORIDA

DOCKET NUMBER 875

In Re:  Asbestos Products Liability Litigation (No. VI)

DATE OF HEARING:       January 29, 1999

LOCATION OF HEARING:   United States Courthouse
                       2110 First Street
                       Fort Myers, Florida  33901

CHAIRMAN:

JUDGE JOHN F. NANGLE
United States District Court
Southern District of Georgia

COPY

MEMBERS:

JUDGE WILLIAM B. ENRIGHT
United States District Court
Southern District of California

JUDGE CLARENCE A. BRIMMER
United States District Court
District of Wyoming

JUDGE JOHN F. GRADY
United States District Court
Northern District of Illinois

JUDGE BAREFOOT SANDERS
United States District Court
Norther District of Texas

JUDGE LOUIS C. BECHTLE
United States District Court
Eastern District of Pennsylvania


PLAINTIFF'S
EXHIBIT

JUDGE JOHN F. KEENAN
United States District Court

69

1      I just tried, what, three, four asbestos

2  cases within the last two months.. All these judges up

3  here have been through it.  We know.  But the problem

4  is a big problem to try to keep these companies from

5  going under and to try to keep it in some kind of an

6  organized fashion.  That's our game.

7      MR. BAUGHMAN:  Your Honor, there are public

8  policy problems that you have just identified and

9  others have been identified as well.

10      JUDGE NANGLE:  We all know Congress should

11  have taken care of it, but it didn't.

12      MR. BAUGHMAN:  Those are substantive

13  problems that it's up to the State legislatures, the

14  State courts or Congress to deal with.  It is not the

15  role of 28 U.S.C. 14.07(a) and the transferee court

16  that has been transferred to multidistrict litigation

17  under that statute.

18      JUDGE NANGLE:  I tell you, if you had cases

19  in my district, you wouldn't survive because we -- I'd

20  challenge the lawyer who handles them in the Southern

21  District of Georgia.  He'll tell you, try em, try em

22  and get done with them and they all -- anything but

23  trial is the answer.

24      MR. BAUGHMAN:  The vast majority of asbestos

25  litigation in this country now is in State courts, as I

# EXHIBIT D

AUG. 10. 2000 11:54AM    JPML                                    NO. 2752   P. 1



**FAX TRANSMITTAL SHEET**

## JUDICIAL PANEL ON MULTIDISTRICT LITIGATION
One Columbus Circle, NE
Thurgood Marshall Federal Judiciary Building
Room G-255
Washington, DC 20002-8004

Telephone: (202) 502-2800        FAX N°: (202) 502-2888

Date:  August 10, 2000                 Time: 11:46 AM

To:    Ms. Kay Gunderson Reeves

From:  Ariana Estariel

Re:    REQUEST OF AUGUST 9, 2000

Notes: Dear Ms. Reevas:

    Here is your request. I have provided the information based on fiscal year data as opposed
to calendar year data. When the word "remand" is used it is a reference to a 28 U.S.C. §1407
remand. The word "dismissed" as used encompasses several methods for termination within the
transferee court which the Panel does not break out in their statistics. If there is any jargon that
may not be immediately clear to you or I may be of additional service, please call me at (202)
502-2811. An invoice is also enclosed.

    Sincerely,

    *Ariana Estariel*

Number of pages transmitted (including this page)  3

Original document is being ____ mailed __X__ retained in our file.



PLAINTIFF'S
EXHIBIT
D

Please call the Panel office regarding any difficulties involved in this transmission.

NO. 2752    2

UG. 10. 2000  11:54AM

Judicial Panel on Multidistrict Litigation
MDL-875 — Request of August 9, 2000

As of August 10, 2000:
 Total Transferred to PAE Under §1407: 86,746
 Total Filed in the Transferee Court: 7,376

   Combined Totals: 94,122
   Total Pending: 32,892

Terminated Actions:
 *From October 1, 1997 to September 30, 1998*
  Total Cases Remanded: 4
  Returned/Claims Remaining: 162
  Total Dismissed or Terminated
   Via §1404* Transfer: 12,998

 *From October 1, 1998 to September 30, 1999*
  Total Cases Remanded: 6
  Returned/Claims Remaining: 0
  Total Dismissed or Terminated
   Via §1404 Transfer: 1,084

 *From September 30, 1999 to August 10, 2000*
  Total Cases Remanded: 199
  Returned/Claims Remaining: 0
  Total Dismissed or Terminated
   Via §1404 Transfer: 2,276

* 28 U.S.C. 1404

*[handwritten annotations:]*

100 Terminated 1404 = 100
Dismiss or Termin total

Via 1404 Transfer
: J. Weiner decides not to
: 1404 Transfer (to dismissal
effectuate dismissal)
pre-dates 1407.

Lexecon: 1404 dismiss/
transfer a no-no.

AUG. 10. 2000 11:54AM   JPM|                          NO. 2752   P. 3

FED ID#. 53-0197081 | INVOICE DATE: August 10, 2000

...able Upon Receipt | FUND: J22388 MXXXXXC

## JUDICIAL PANEL ON MULTIDISTRICT LITIGATION
*One Columbus Circle, NE, Room G-255*
*Washington, DC 20002-8004*

Phone: (202) 502-2800

BILL TO:   Kay Gunderson Reeves
           Kaeske Reeves LLP
           6301 Gaston Avenue
           Suite 735
           Dallas, TX 75214

Telephone N°: (214) 877-1221

Please remit check to this office in the amount of $ 15.00 payable to:

## Judicial Panel on Multidistrict Litigation
(Please reference the above Invoice Date and Fund information on check and return a copy
of this invoice with your remittance)

MDL Docket N°: 875 — In re Asbestos Products Liability Litigation (VI)

Pleading N°(s) or description of document(s) copied/certified and/or retrieved from Federal Records Center or
Automated Diskette Information:

1)   Information on terminated cases for 1998 & 1999

N° of pages @ $0.50 per page ____        N° of documents certified @ $5.00 each ____
N° of diskettes @ $25.00 each ____       N° of dockets retrieved from Federal Records Center @ $25.00 per docket ____
N° of names/items researched @ $15.00 per name/item __1__ (See numbered list above)

### THANK YOU

Office of the Clerk, Judicial Panel on Multidistrict Litigation

By: _____
    Statistical/Automation Analyst

# EXHIBIT E

SUMMARY BY DOCKET OF MULTIDISTRICT LITIGATION PENDING AS OF SEPTEMBER 30, 2003, OR CLOSED SINCE OCTOBER 1, 2002

## THIRD CIRCUIT (continued)

| Index to Tr'e Dist | MDL No. | MDL Caption | Transferee Judge | Transferee Districts and Number of Cases Transferred | Total Tr'd | Total Filed in Tr'e Court | Cases Terminated Dist'd | Rem'd | Cases Pending |
|---|---|---|---|---|---|---|---|---|---|
| | 1514 | Electrical Carbon Products AT | Simandle, J.B. | 1-CAN; 1-ILN; 10-PAE; ........ | 12 | 4 | 0 | 0 | 16 |
| | 1540 | MOSAID Technologies, Inc., PAT | Martini, W.J. | 1-CAN; ........ | 1 | 1 | 0 | 0 | 2 |
| | 1550 | IDT Corp. Calling Card Terms | Walls, W.H | 1-NYS; ........ | 1 | 1 | 0 | 0 | 2 |
| 313 | 875 | PENNSYLVANIA, EASTERN 18 Litigations | | | | | | | |
| | | Asbestos PL (No VI) | Weiner, C.R. | 154-AK; 3-ALM; 119-ALN; 97-ALS 70-ARE; 15-ARW; 338-AZ; 50-CAC; 10-CAE; 285-CAN; 57-CAS; 252-CO; 125-CT; 42-DC; 24-DE; 332-FLM; 16-FLN; 218-FLS; 52-GAM; 365-GAN; 1295-GAS; 197-HI; 32-IAN; 958-IAS; 87-ID; 1069-ILC; 1106-ILN; 447-ILS; 113B-INN; 1576-INS; 179-KS; 202-KYE; 262-KYW; 288-LAE; 129-LAM; 260-LAW; 3051-MA; 129-MD; 546-ME; 313-MIE; 35-MIW; 167-MN; 202-MOE; 95-MOW; 165-MSN; 1101-MSS; 187-MT; 484-NCE; 264-NCM; 365-NCW; 165-ND; 146-NE; 125-NH; 363-NJ; 298-NM; 157-NV; 1493-NYE; 620-NYN; 4810-NYS; 466-NYW; 6692-OHN; 159-OHS; 28-OKE; 625-OKN; 138-OKW; 183-OR; 243-PAM; 320-PAW; 6-PR; 253-RI; 1376-SC; 6-SD; 294-TNE; 78-TNM; 79-TNW; 532-TXE; 1314-TXN; 809-TXS; 53-TXW; 340-UT; 8276-VAE; 387-VAW; 88-VI; 2-VT; 140-WAE; 297-WAW; 512-WIE; 281-WIW; 22-WVN; 654-WVS; 70-WY ........ | 99268 | 7428 | 73748 | 346 | 31782 |
| | | | | Returned/Claims Remain ........ | 0 | 0 | 820 | 0 | 0 |
| | 969 | Unisys Corp Retiree Medical Benefit "ERISA" | Kauffman, B.W. | 1-MIE; 1-MN; 1-NYE; ........ | 3 | 8 | 6 | 0 | 5 |



SUMMARY BY DOCKET OF MULTIDISTRICT LITIGATION PENDING AS OF SEPTEMBER 30, 2004, OR CLOSED SINCE OCTOBER 1, 2003

## THIRD CIRCUIT
### (continued)

| Index to Tre-Dist | MDL No. | MDL Caption | Transferee Judge | Transferee Districts and Number of Cases Transferred | Total Trf'd | Total Filed in Trf Court | Cases Terminated Dis'd | Rem'd | Cases Pending |
|---|---|---|---|---|---|---|---|---|---|
| | 1514 | Electrical Carbon Products AT | Simandle, J.B. | 1-CAN, 1-ILN, 1D-PAE............... | 12 | 12 | 20 | 0 | 4 |
| | 1540 | MOSAID Technologies, Inc., PAT | Martini, W.J. | 1-CAN................................. | 1 | 1 | 0 | 0 | 2 |
| | 1550 | IDT Corp. Calling Card Terms | Walls, W.H. | 2-NYS................................. | 2 | 2 | 1 | 0 | 3 |
| 313 | 875 | **PENNSYLVANIA, EASTERN** | | | | | | | |
| | | *12 Litigations* | | | | | | | |
| | | Asbestos PL (No. VI) | Weiner, C.R. | 153-AK, 3-ALM, 1D0-ALN, 97-ALS 70-ARE, 15-ARW, 358-AZ, 50-CAC, 12-CAE, 285-CAN, 58-CAS, 252-CO, 1326-CT, 43-DC, 24-DE, 332-FLM, 16-FLN, 223-FLS, 52-GAM, 365-GAN, 1299-GAS, 197-HI, 32-IAN, 959-IAS, 87-ID, 1069-ILC, 1122-ILN, 450-ILS, 1166-INN, 1580-INS, 180-KS, 209-KYE, 264-KYW, 292-LAE, 131-LAM, 260-LAW, 3052-MA, 1309-MD, 547-ME, 315-MIE, 35-MIW, 216-MN, 202-MOE, 117-MOW, 20-MSN, 1125-MSS, 189-MT, 523-NCE, 270-NCM, 372-NCW, 166-ND, 169-NE, 125-NH, 365-NE, 299-NM, 4-NME, 158-NV, 1356-NYE, 620-NYN, 4817-NYS, 466-NYW, 47066-OHN, 161-OHS, 28-OKE, 626-OKN, 158-OKW, 184-OR, 243-PAM, 320-PAW, 6-PR, 255-RI, 1603-SC, 5-SD, 239-TNE, 78-TNM, 78-TNW, 3330-TXE, 1368-TXN, 819-TXS, 54-TXW, 341-UT, 8844-VAE, 382-VAW, 88-VT, 2-VT, 142-WAE, 298-WAW, 521-WIE, 261-WIW, 22-WVN, 654-WVS, 70-WY. | | | | | |
| | | | | Retured/Claims Remain......... | 100412 | 7468 | 74152 | 365 | 32542 |
| | 969 | Unisys Corp Retiree Medical Benefit "ERISA" | Kaufman, B.W. | 1-MIE, 1-MN, 1-NYE............... | 3 | 11 | 6 | 0 | 8 |

SUMMARY BY DOCKET OF MULTIDISTRICT LITIGATION PENDING AS OF SEPTEMBER 30, 2005, OR CLOSED SINCE OCTOBER 1, 2004

### THIRD CIRCUIT
### (continued)

| Index to Trf Dist. | MDL No. | MDL Caption | Transferee Judge | Transferee Districts and Number of Cases Transferred | Total Tr'd | Total Filed in Trf Court | Cases Terminated Dis'd | Cases Terminated Rem'd | Cases Pending |
|---|---|---|---|---|---|---|---|---|---|
| | 1653 | Insurance Brokerage AT | Hochberg, F.S. | 1-CAN; 7-ILN; 1-NYE; 2-NYS; 2-PAE; 1-SC; 1-TNW; 1-TXS............... | 17 | 9 | 1 | 0 | 25 |
| | 1687 | Ford Motor Co. E-350 Van PL (No. II) | Ackerman, H.A. | 1-ALN; 1-ARW; 1-CAC; 1-ILN........ | 4 | 1 | 0 | 0 | 5 |
| 313 | 875 | **PENNSYLVANIA, EASTERN** | Weiner, C.R. | 153-AK; 1-ALM; 123-ALN; 88-ALS; 70-ARE; 15-ARW; 159-AZ; 51-CAC; 12-CAE; 294-CAN; 58-CAS; 252-CO; 1326-CT; 43-DC; 24-DE; 338-FLM; 18-FLN; 237-FLS; 52-GAM; 367-GAN; 1301-GAS; 198-HI; 32-IAN; 959-IAS; 87-ID; 1069-ILC; 1124-ILN; 463-ILS; 1167-INN; 1592-INS; 180-KS; 203-KYE; 266-KYW; 294-LAE; 134-LAM; 261-LAW; 3063-MA; 1324-MD; 551-ME; 315-MIE; 35-MIW; 292-MN; 228-MOE; 121-MOW; 22-MSN; 1195-MSS; 190-MT; 561-NCE; 281-NCM; 394-NCW; 166-ND; 159-NE; 125-NH; 388-NJ; 304-NM; 4-NMI; 158-NV; 1618-NYE; 620-NYN; 4838-NYS; 467-NYW; 47094-OHN; 161-OHS; 29-OKE; 627-OKN; 160-OKW; 186-OR; 243-PAM; 322-PAW; 7-PR; 257-RI; 1624-SC; 6-SD; 239-TNE; 78-TNM; 78-TNW; 5333-TXE; 1394-TXN; 828-TXS; 57-TXW; 341-UT; 9814-VAE; 387-VAW; 88-VI; 2-VT; 140-WAE; 300-WAW; 522-WIE; 262-WIW; 22-WVN; 655-WVS; 71-WY ....... | 101962 | 7481 | 74297 | 427 | 33899 |
| | | *14 Litigations* | | Returned/Claims Remain............... | 0 | 0 | 820 | 0 | 0 |
| | 969 | Unisys Corp. Retiree Medical Benefit "ERISA" | Kauffman, B.W. | 1-MIE; 1-MN; 1-NYE............... | 3 | 11 | 6 | 0 | 8 |

SUMMARY BY DOCKET OF MULTIDISTRICT LITIGATION PENDING AS OF SEPTEMBER 30, 2006, OR CLOSED SINCE OCTOBER 1, 2005

Page 11

| Index to Trfe Dist. | MDL No. | MDL Caption | Transferee Judge | Transferee Districts and Number of Cases Transferred | Total Trf'd | Total Filed in Trfe Court | Cases Terminated Dis'd | Rem'd | Cases Pending |
|---|---|---|---|---|---|---|---|---|---|

THIRD CIRCUIT
(continued)

| 313 | 875 | PENNSYLVANIA, EASTERN | Giles, J.T. | 152-AK; 3-ALM; 132-ALN; 98-ALS; 70-ARE; 15-ARW; 359-AZ; 51-CAC; 14-CAE; 320-CAN; 58-CAS; 252-CO; 1326-CT; 43-DC; 24-DE; 339-FLM; 19-FLN; 293-FLS; 52-GAM; 357-GAN; 1301-GAS; 1-GU; 198-HI; 32-IAN; 959-IAS; 88-ID; 1070-ILC; 1130-ILN; 472-ILS; 1167-INN; 1594-INS; 180-KS; 203-KYE; 268-KYW; 300-LAE; 138-LAM; 262-LAW; 3054-MA; 1346-MD; 553-ME; 315-MIE; 35-MIW; 320-MN; 229-MOE; 122-MOW; 109-MSN; 1583-MSS; 190-MT; 576-NCE; 123-NCM; 493-NCW; 166-ND; 159-NE; 125-NH; 391-NJ; 312-NM; 4-NME; 158-NV; 1650-NYE; 628-NYN; 4859-NYS; 457-NYW; 47112-OHN; 161-OHS; 29-OKE; 62?-OKN; 160-OKW; 186-OR; 245-PAM; 324-PAW; 74PR; 257-RI; 1739-SC; 6-SD; 239-TNE; 78-TNM; 78-TNW; 5337-TXE; 1394-TXN; 839-TXS; 57-TXW; 343-UT; 10196-VAE; 3EF-VAW; 88-VI; 2-VT; 140-WAE; 309-WAW; 522-WIE; 262-WIW; 22-WVN; 656-WVS; 71-WY... | 103364 | 7485 | 74563 | 433 | 35033 |
| | | | | Returned/Claims Remain....................... | 0 | 0 | 820 | 0 | 0 |
| | 969 | Unisys Corp. Retiree Medical Benefit "ERISA" | Kauffman, B.W. | 1-MIE, 1-MN, 1-NYE............................ | 3 | 11 | 6 | 0 | 8 |

*17 Litigations*